Patrick J. Stueve, Mo. Bar #37682
Todd E. Hilton, Mo. Bar #51388
STUEVE SIEGEL HANSON LLP
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7100
stueve@stuevesiegel.com
hilton@stuevesiegel.com

Don M. Downing, Mo. Bar #30405
Gretchen Garrison, Mo. Bar #33963
Cort A. VanOstran, Mo. Bar #67276
GRAY, RITTER & GRAHAM, P.C.
701 Market Street, Suite 800
St. Louis, Missouri 63101
ddowning@grgpc.com
ggarrison@grgpc.com
cvanostran@grgpc.com

*Attorneys for*

*Ryan Tomlinson and Carol Richardson*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741<br><br>Case No. 16-md-02741-VC |
| This document relates to:<br><br>*Gilmore v. Monsanto*, Case No. 21-cv-08159 | **DECLARATION OF GRETCHEN GARRISON IN SUPPORT OF RYAN TOMLINSON AND CAROL RICHARDSON'S OPPOSITION TO PLAINTIFFS MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Date: April 14, 2022<br>Time: 2:00 p.m.<br>Place: Via Zoom Webinar<br>Judge: Hon. Vince G. Chhabria |

1

## DECLARATION OF GRETCHEN GARRISON

I, Gretchen Garrison, declare as follows:

1.      I am a licensed attorney, practicing with the law firm Gray, Ritter & Graham ("GRG"), 701 Market Street, Suite 800, St. Louis, MO 63101 and one of the plaintiffs' counsel in *Tomlinson, et al. v. Monsanto Company*, Case No. 1916-CV22788, pending in the circuit court of Jackson County, Missouri. I have been extensively involved in the *Tomlinson* action, including briefing on class certification, Monsanto's efforts to obtain reconsideration and appellate review, efforts to stay *Tomlinson*, and written discovery, including a motion to compel, drafting discovery requests, analyzing objections, answers and responses thereto, and drafting golden rule letters. I have personal knowledge of the facts set forth in this declaration, and, if called as a witness, could and would competently testify thereto under oath.

2.      Attached hereto as Exhibit 1 is a true and correct copy of the First Amended Petition filed in *Tomlinson, et al. v. Monsanto Company*, Case No. 1916-CV22788.

3.      Plaintiffs in *Tomlinson* brought suit under Missouri's Merchandising Practices Act ("MMPA") on behalf of themselves and a proposed class of "all Missouri residents who purchased Roundup for personal, family, or household use." Ex. 1, Am. Pet., at ¶¶ 1, 73, 75.

4.      On July 14, 2020, plaintiffs in *Tomlinson* filed a motion for class certification, seeking certification of the class of Missouri purchasers alleged and appointment as class counsel. Attached hereto as Exhibit 2 is a true and correct copy of Plaintiffs' Suggestions in Support of Motion for Class Certification filed in Case No. 1916-CV22788 on July 14, 2020.

5.      Monsanto opposed plaintiffs' motion. In connection therewith, Monsanto submitted various affidavits, including one from James Guard, Monsanto's Global Lawn & Garden

Lead. A true and correct copy of that affidavit, dated October 5, 2020 and filed October 6, 2020, is attached hereto as Exhibit 3.

6.      Full briefing on class certification concluded with *Tomlinson* plaintiffs' reply filed on November 6, 2020. A true and correct copy of that reply is attached hereto as Exhibit 4. The court on March 22, 2021 granted the motion and certified a Missouri class, which includes purchasers of Monsanto's lawn and garden (L&G), agricultural (AG) and professional (I&P) products. A true and correct copy of the court's order granting class certification is attached as Exhibit 5.

7.      On April 1, 2021, Monsanto moved for reconsideration of that order with the trial court and for interlocutory appeal to the Missouri Western District Court of Appeals, seeking also to stay the *Tomlinson* action.

8.      *Tomlinson* plaintiffs opposed these motions, which were denied. Attached hereto as Exhibit 6 is a true and correct copy of the *Tomlinson* Court's Order denying Monsanto's Motion to Reconsider the March 22, 2021 Class Certification Order, dated May 14, 2021. Attached hereto as Exhibit 7 is a true and correct copy of the Missouri Court of Appeals' denial of Monsanto's petition for permission to appeal, dated April 19, 2021. Although it sought a stay, Monsanto did not disclose in court filings or to *Tomlinson* plaintiffs that settlement was mediated, had been reached in principle, or was even being discussed in connection with the *Gilmore* action or any other action.

9.      On May 14, 2021, Monsanto filed a petition for writ of prohibition with the Missouri Supreme Court. *Tomlinson* plaintiffs filed suggestions in opposition thereto, Monsanto file a reply, and *Tomlinson* plaintiffs filed a sur-reply. Monsanto's petition was denied on June 29, 2021.

10.    On the same day *Gilmore* plaintiffs moved for preliminary settlement approval in Delaware (June 14, 2021, Dkt. No. 24), Monsanto moved again to stay the *Tomlinson* action, citing settlement as grounds therefore. The trial court entered a stay on July 20, 2021.

11.    Monsanto has not filed a motion to dismiss or any other dispositive motion in the *Tomlinson* action.

12.    *Tomlinson* plaintiffs have engaged in discovery since December 2019, including two sets of interrogatories and three sets of document requests.

13.    *Tomlinson* plaintiffs have filed one motion to compel on July 7, 2020 (granted by the trial court), and also have exchanged several golden rule letters with Monsanto in pursuit of discovery. The first (over 30 pages in length) is dated April 29, 2020, the second (also over 30 pages in length) is dated April 30, 2021, and the third (38 pages in length) is dated June 18, 2021.

14.    Among other information, *Tomlinson* plaintiffs have requested sales and price data for Roundup products sold to Missouri purchasers.

15.    Monsanto has objected to providing such information on grounds including that it does not track prices paid by end purchasers and should not be required to obtain information from third parties. Attached hereto as Exhibit 8 is a true and correct copy of Monsanto's Answers and Objections to Plaintiffs' Second Set of Interrogatories, objecting to Interrogatory No. 16.

16.    *Tomlinson* plaintiffs disputed the propriety of such objections, requesting information in Monsanto's possession, available to it or within its ability to obtain. They also disputed sufficiency of interrogatory answers and sales data Monsanto has provided in Missouri on grounds including that it is incomplete and not self-interpreting. These and other disputes have been memorialized in golden rule letters to Monsanto's counsel.

17.     *Tomlinson* Plaintiffs have engaged in multiple meet-and-confer sessions with Monsanto and reached agreement on protocol for disclosure and maintenance of electronically stored information and procedures for designating materials confidential.

18.     According to document storage system data, Monsanto has, as of present, produced approximately 635,200 pages of documents to *Tomlinson* plaintiffs, with additional documents still to be produced.  Until the stay on July 20, 2021, discovery was ongoing. As of January 5, 2021, trial had been scheduled for October 2022, and as of June 9, 2021, for March 6, 2023.

19.     On or about June 24, 2020, *Tomlinson* counsel became aware that Monsanto and certain plaintiffs' counsel in this MDL had proposed a global settlement and preliminary approval of a class of Roundup users. I and other *Tomlinson* counsel immediately obtained and reviewed relevant filings, which included a first amended complaint filed in an associated case, *Ramirez, et al. v. Monsanto Co*., Case No. 3:19-cv-02224 ("*Ramirez*"), Dkt. No. 15, and proposed settlement agreement, MDL Dkt. No.11042-2. In July 2020, this Court indicated skepticism and intent to deny preliminary approval. MDL Dkt. No. 11182.

20.     On or about February 3, 2021, *Tomlinson* counsel became aware of a second settlement proposal in the MDL. I and other *Tomlinson* counsel immediately obtained and reviewed relevant filings, which included motion for preliminary approval, proposed settlement agreement, *Ramirez* Dkt. No. ("SA"), and second amended complaint. *Id*., Dkt. No. 19.

21.     The first amended complaint proposed a settlement class of all persons (residing in or exposed to Roundup in the United States) who "(1) have been exposed to Roundup Products through the application of Roundup Products prior to June 24, 2020 and (2) have not commenced a lawsuit or otherwise retained counsel with respect to any individual personal injury claims relating to such exposure prior to June 24, 2020 …." *Ramirez* Dkt. No. 15, at ¶ 99.

22.     The second proposed settlement revised the class definition to include persons who had not "commenced an individual, non-class lawsuit or retained counsel for … individual, nonclass personal injury or false advertising claims arising from, resulting from, in any way relating to or in connection with [Roundup] exposure." *Ramirez* Dkt. No. 21-2 (SA § 1.1(a)).

23.     Roundup Claims were defined to include any claim "in any way relating to or in connection with the allegations, transactions, facts, matters, occurrences, representations or omissions involved, set forth, alleged, or referred to in the Class Action Complaint … including … tort claims (including claims for fraud, misrepresentation, fraudulent concealment, negligent misrepresentation, and failure to warn), warranty claims, false advertising claims, and claims for violations of any consumer protection or unfair and deceptive acts or practices statute." *Id*. at § 2.1 (70).  The word "exposure" was defined as any steps associated with application, "whether or not the individual performed the application, mixing, or other steps associated with application himself or herself." *Id*. at § 2.2.

24.     The second proposed Settlement Agreement was a complex 114-page document, containing, among other things, a covenant not to sue (SA § 17.4), a four-year stay of litigation (SA §§ 2.1(41), 17.4(b)) and a wavier of punitive damages. SA §17.1(1).

25.     Based on the proposed class definition and associated provisions and definitions in the Settlement Agreement and the *Ramirez* second amended complaint, *Tomlinson* counsel were concerned that *Tomlinson* was being swept into the California settlement.

26.     The second settlement agreement contained a provision to the effect that certain actions were excluded from the four-year stay provisions.  It stated at SA § 30.11 that:

Section 30.11 Certain Actions Not Subject to Particular Provisions.
Notwithstanding anything else to the contrary in the Settlement Agreement, the stay under Section 18.2(b)(i) and the associated provisions of Section 17.4(b), Section 21.6, Section 21.7 and Section 21.10 regarding compliance with that stay shall not

apply to the continued prosecution of the following actions (and only such specific actions), but only so long as there is no expansion of the type of relief currently sought: *Gilmore v. Monsanto Company*, No. 1:20-cv-01085-UNA (D. Del.); *Ezcurra v. Monsanto Company*, No. 20-13341 (11th Cir.); *Tomlinson v. Monsanto* Co., No. 1916-CV22788 (Jackson County, MO Sup. Ct.); *Weeks v. Home Depot USA, Inc*., No. 21-55027 (9th Cir.); *Taylor v. Costco Wholesale Corp*., No. 2:20-cv-00655-KJM-DMC (E.D. Cal.); *Williams v. Lowe's Home Centers, LLC*, No. 5:20-cv-01356-JGB-KK (C.D. Cal.); *Lamerson v. Walmart Stores, Inc*., No. 50-2019-CC-009139-XXXX-MB (Palm Beach Cty. Fla. Cir. Ct.); *Shelly v. Target Corp*., 50-2019-CC-010718-XXXX-MB (Palm Beach Cty. Fla. Cir. Ct.); *Biddle v. Lowe's Home Centers LLC*, No. 50-2019-CC-011405-XXXX-MB (Palm Beach Cty. Fla. Cir. Ct.); *Morley v. Ace Hardware Corp*., No. CONO19010648 (Broward Cty. Fla. Cir. Ct); and *Jones v. Monsanto Company*, No. 4:19-cv-00102-BP (W.D. Mo.), including any amendments to these actions to which Monsanto consents.

27.     No one had contacted *Tomlinson* counsel about a second proposed settlement or carve-out. *Tomlinson* counsel were concerned that although excepted from the stay, members of the *Tomlinson* putative class fell within the proposed class definition and settlement itself, which would have resulted in, at minimum, waiver of punitive damages.

28.     Presuming that counsel in other identified cases would also be concerned, I attempted to contact them. By February 5, 2021, I had left voice mail messages with both Gillian Wade and Sara Avila with Milstein Jackson Fairchild & Wade, LLP about the second proposed settlement in the MDL. I left another voice mail message for either Ms. Wade or Ms. Avila a few days later. No one from the Milstein law firm returned my calls.

29.     *Tomlinson* counsel also reached out to counsel for plaintiffs in the MDL proposing settlement to determine intent of the provision as to *Tomlinson*.  I also began work on an opposition to the proposed settlement. MDL plaintiffs' counsel and counsel for Monsanto ultimately agreed to revise the settlement agreement to clarify that *Tomlinson* was excluded from the settlement (and release of punitive damages), not just the stay provisions.

30.     Amendment to the second proposed settlement in the MDL was filed on April 7, 2021 revising Section 30.11 to provide:

(a) Notwithstanding anything to the contrary in the Settlement Agreement, all provisions of the Settlement Agreement and the Final Order and Judgment shall not apply to the continued prosecution of the following actions (and only such specific actions), but only so long as there is no expansion of the type of relief currently sought: *Tomlinson v. Monsanto Co*., No. 1916-CV22788 (Jackson County, MO Cir. Ct.), including any amendments to these actions to which Monsanto consents.

*Ramirez* Dkt. No. 50-1. *Tomlinson* plaintiffs did not know and were not then advised that Monsanto had at that point mediated and reached agreement in principle with *Gilmore* counsel to settle (on nationwide basis) or intended to formalize an agreement, executed in June 2021, that releases the claims of *Tomlinson* class members.

31.    A true and correct copy of the docket from *Shelly v. Target Corp*., No. 50-2019-CC-010718 (Cty. Ct. 15th Cir. Palm Beach Cty., Fl.) is attached hereto as Exhibit 9.

32.    A true and correct copy of the docket from *Biddle v. Lowe's Home Ctrs., LLC*, No. 2019-cc-011405 (Cty. Ct. 15th Cir. Palm Beach Cty., Fl.) is attached hereto as Exhibit 10.

33.    A true and correct copy of the docket from *Morley v. Ace Hardware Corp*., No. CONO-19-010648 (Cty. Ct. 17th Cir. Broward Cty., Fla.) is attached hereto as Exhibit 11.

34.    A true and correct copy of the docket from *Lamerson v. Walmart Stores, Inc*., 50-2019-CC-009139 (Cty. Ct. 15th Cir. Palm Beach Cty., Fl.) is attached hereto as Exhibit 12.

35.    Counsel representing the *Tomlinson* class have extensive experience with the MMPA, including but not limited to securing certification in a case that to this day stands as significant precedent for substantive requirements, and class certification, in cases under that statute. *Plubell v. Merch & Co., Inc*., 289 S.W.3d 707 (Mo. App. W.D. 2009). We also have a track record of successful litigation against Monsanto and its parent, Bayer, in high-stakes cases, securing bellwether plaintiffs' verdicts, and settlement of $750 million in *In re Genetically Modified Rice Litigation*, No. 4:06-md-1811-CDP (E.D. Mo.), as well as a $300 million settlement in *In re: Dicamba Herbicides Litigation*, MDL No. 2820 (E.D. Mo.). Another case against

agricultural giant Syngenta culminated in a settlement of $1.51 billion in *In re: Syngenta AG MIR 162 Corn Litigation*, MDL No. 2591 (D. Kan.).

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on this 3rd day of March 2022 in St. Louis Missouri.


Gretchen Garrison

# EXHIBIT 1

Electronically Filed - Jackson - Kansas City - October 17, 2019 - 04:01 PM

**IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
AT KANSAS CITY**

| | |
|---|---|
| RYAN TOMLINSON, SARAH JORDAN, KEITH MADDEN, CAROL GREEN RICHARDSON, and CHRISTI GRAY on their behalf and on behalf of the class of others similarly situated, | |
| | Case No. 1916-CV22788 |
| Plaintiffs, | Division: 9 |
| vs. | |
| MONSANTO COMPANY | **JURY TRIAL DEMANDED** |
| On the registered agent: CSC of St. Louis County, Inc. 130 South Bemiston Ave., Suite 700, Clayton, MO 63105 | |
| Defendant. | |

**FIRST AMENDED CLASS ACTION PETITION FOR DAMAGES**

COME NOW Plaintiffs RYAN TOMLINSON, SARAH JORDAN, KEITH MADDEN, CAROL GREEN RICHARDSON, and CHRISTI GRAY (hereinafter referred to as "Plaintiffs"), on behalf of themselves and all others similarly situated in the State of Missouri, through their attorneys, and bring this action against Defendant Monsanto Company (herein referred to as "Defendant" or "Monsanto") for violations of the Missouri Merchandising Practices Act in connection with the sale and/or advertisement of Roundup herbicide (hereinafter referred to as "Roundup," and as further defined herein) in the State of Missouri, and for damages, as well as attorneys' fees and costs.

Electronically Filed - Jackson - Kansas City - October 17, 2019 - 04:01 PM

Plaintiffs, by and through their undersigned attorneys, based upon their personal knowledge of their Roundup purchases, their attorneys' investigation, and information and belief, allege as follows:

## NATURE OF THE ACTION

1.   Plaintiffs bring this action on their own behalf and as representatives of a class of persons consisting of all Missouri citizens who purchased Roundup for personal, family, or household purposes, as more specifically defined below.

2.   Plaintiffs bring this action individually and as class representatives to recover damages for violations of the Missouri Merchandising Practices Act, Mo. Rev. Stat. §§ 407.010 *et seq.*, for economic relief against Monsanto, which tested, marketed, distributed, promoted, and sold Roundup.

3.   Although Roundup was advertised and sold as safe and without risk to humans, Roundup is a known carcinogen, and does in fact carry significant health risks, as detailed further herein.

4.   Monsanto misrepresented, and/or concealed, suppressed, or omitted material facts in connection with the sale, distribution, and/or advertisement of Roundup.  Therefore Plaintiffs, on behalf of themselves and the putative class, seek a refund for monies paid as a result of their purchases of Roundup.

## PARTIES

5.   Plaintiff Ryan Tomlinson is a citizen of the State of Missouri residing in Jackson County, Missouri, with his principal place of residence at 2116 NW 10th Street, Blue Springs, Missouri 64015. Plaintiff Tomlinson purchased Roundup for personal, family, or household use in Jackson

Electronically Filed - Jackson - Kansas City - October 17, 2019 - 04:01 PM

County, Missouri. Accordingly, Plaintiff Tomlinson has been injured as a result of Defendant's unlawful conduct alleged herein.

6.   Plaintiff Sarah Jordan is a citizen of the State of Missouri residing in Jackson County, Missouri, with her principal place of residence at 508 NE 3rd Street, Blue Springs, Missouri 64014. Plaintiff Jordan purchased Roundup for personal, family, or household use in Jackson County, Missouri. Accordingly, Plaintiff Jordan has been injured as a result of Defendant's unlawful conduct alleged herein.

7.   Plaintiff Keith Madden is a citizen of the State of Missouri residing in Jackson County, Missouri, with his principal place of residence at 2334 Walrond Avenue, Kansas City, Missouri 64127. Plaintiff Madden purchased Roundup for personal, family, or household in Jackson County, Missouri. Accordingly, Plaintiff Madden has been injured by the result of Defendant's unlawful conduct alleged herein.

8.   Plaintiff Carol Green Richardson is a citizen of the State of Missouri residing in Jackson County, Missouri, with her principal place of residence at 139001 Arrington Road, Grandview, Missouri 64030. Plaintiff Richardson purchased Roundup for personal, family, or household use in Jackson County, Missouri. Accordingly, Plaintiff Richardson has been injured as a result of Defendant's unlawful conduct alleged herein.

9.   Plaintiff Christi Gray is a citizen of the State of Missouri residing in Jackson County, Missouri, with her principal place of residence at 1809 NW 4th Street Place, Blue Springs, Missouri 64014. Plaintiff Gray purchased Roundup for personal, family, or household use in Jackson County, Missouri. Accordingly, Plaintiff Gray has been injured as a result of Defendant's unlawful conduct alleged herein.

Electronically Filed - Jackson - Kansas City - October 17, 2019 - 04:01 PM

10. Defendant Monsanto is a foreign (Delaware) general for-profit business corporation in good standing in the State of Missouri, with its principal place of business and corporate headquarters located at 800 N. Lindbergh Boulevard, St. Louis, Missouri 63167. Defendant Monsanto's registered agent is CSC of St. Louis County, Inc., 130 South Bemiston Avenue, Suite 700, Clayton, Missouri 63105. Defendant conducts business, including advertising and selling Roundup, throughout the nation, including Jackson County, Missouri. Monsanto is a citizen of the State of Missouri.

11. "Roundup" as used throughout this First Amended Petition, refers to any and all herbicide products sold under the brand name Roundup, or any variation thereof; including, but not limited to: Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Pro Dry Herbicide, Roundup Pro Max, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass Killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide; or, any other formulation sold by Monsanto containing the active ingredient glyphosate.

Electronically Filed - Jackson - Kansas City - October 17, 2019 - 04:01 PM

## JURISDICTION AND VENUE

12. This Court has personal jurisdiction over this matter pursuant to Mo. Rev. Stat. §§ 478.070 and 506.500 because Monsanto is registered to conduct business in Missouri, has its principal place of business and headquarters in Missouri at 800 N Lindbergh Blvd., Saint Louis, Missouri, is present, has transacted and conducted, and continues to transact and conduct substantial business in Missouri, has a registered agent in Missouri, consistently and purposefully avails itself of the privileges of conducting business in Missouri and in this judicial district, and can fairly be regarded as at home in Missouri. As such, consistent with the holding of the United States Supreme Court in *Hertz Corp. v. Friend*, 559 U.S. 77, 92-93 (2010), the "nerve center" for Defendant is in the State of Missouri, and thus corporate citizenship for purposes of jurisdiction for Defendant Monsanto is the State of Missouri. Furthermore, Monsanto committed a tortious act within this state by marketing, distributing, promoting, and selling Roundup in Missouri in a manner which violates the Missouri Merchandising Practices Act, Mo. Rev. Stat. §§ 407.010 *et seq.*, as detailed further herein.

13. The principal injuries resulting from the alleged conduct or any related conduct of Defendant were incurred in Jackson County, Missouri, where Plaintiffs reside. Defendant knew or should have known that its actions would adversely affect Plaintiffs, and that its actions were in violation of Missouri law. Defendant should have reasonably anticipated being brought before Missouri courts as a result of the actions set forth in this First Amended Petition.

14. As a result of the marketing, distribution, sale, and delivery of Roundup, which would be sold to Plaintiffs in the State of Missouri, Defendant, directly and through its subsidiaries, affiliates, or agents, obtained the benefits of the laws of the State of Missouri.

Electronically Filed - Jackson - Kansas City - October 17, 2019 - 04:01 PM

15. Neither Plaintiffs nor any member of Plaintiffs' Class assert any federal question. Plaintiffs assert only violations of the Missouri Merchandising Practices Act. Plaintiffs specifically deny any intent to state a cause of action arising under the laws of the United States of America, including any claim for injunctive relief available under federal law.

16. Venue is proper in this Court pursuant to Mo. Rev. Stat. § 508.010.4 in that Plaintiffs were first injured in Jackson County, Missouri, and pursuant to Mo. Rev. Stat. § 407.025 because the transactions complained of took place in Jackson County, Missouri.

AGENCY

17. The actions or inactions alleged against Defendant in this First Amended Petition were authorized, ordered, or done by Defendant's respective officers, agents, employees, or representatives while actively engaged in the management and operation of Defendant's businesses or affairs.

FACTUAL ALLEGATIONS

The Defendant

18. Defendant Monsanto claims to be a "sustainable agriculture company." It produces agricultural products that it claims support farmers all around the world.

19. Defendant Monsanto produces chemicals and agricultural products that make it one of the most profitable agribusiness companies in the world.

20. Defendant Monsanto produces and sells seed containing genetically-modified traits that allows Roundup to be sprayed over the top of crops grown from those seeds, killing weeds but not harming the crops.   A large percentage of the crops grown in the United States and in Missouri are "Roundup Ready," thus resulting in massive spraying of Roundup over the top of those crops.

Electronically Filed - Jackson - Kansas City - October 17, 2019 - 04:01 PM

21. Defendant Monsanto also sells Roundup for use in the home-and-garden market, where it is widely and commonly used.

**Glyphosate and Formulated Roundup**

22. Defendant Monsanto was the first company to recognize potential in the chemical Glyphosate (N-(phosphonomethyl)glycine).

23. Glyphosate is a broad-spectrum systemic herbicide used to kill weeds, especially annual broadleaf weeds and grasses known to compete with commercial crops grown around the globe.

24. Glyphosate was discovered to be an herbicide by Defendant Monsanto's chemist John E. Franz in 1970. Defendant Monsanto brought it to market in the 1970s under the trade name Roundup, and Defendant Monsanto's last commercially relevant United States patent expired in 2000.

25. Glyphosate is a non-selective herbicide, meaning it will indiscriminately kill plants and simple organisms.

26. Roundup is marketed for home and personal use to kill weeds, including weeds in home lawns and gardens.

27. Glyphosate was quickly adopted by farmers. Acceptance by farmers increased when Defendant Monsanto introduced glyphosate-resistant crops.  These glyphosate-resistant crops enable farmers to kill weeds without killing their crops.

28. In 2007, glyphosate was the most-used herbicide in the United States agricultural sector, with 180 to 185 million pounds applied that year, and the second-most used in the home-and-garden market, where users applied 5 to 8 million pounds.

29. Glyphosate's mode of action is to inhibit the enzyme 5-enolpyruvylshikimate-3-phosphate synthase, which synthesizes the aromatic amino acids: tyrosine, tryptophan, and phenylalanine.

Electronically Filed - Jackson - Kansas City - October 17, 2019 - 04:01 PM

30. Glyphosate is absorbed by plants through their leaves, stems, and roots. Defendant Monsanto's line of "Roundup Ready" crops has been genetically engineered to be resistant to glyphosate.

31. Glyphosate is the active ingredient in Roundup but, in addition to glyphosate salts, Roundup also contains additives that vary in nature and concentration. One such additive, a surfactant known as polyethyloxylated tallow amine (commonly referred to, and referred to hereinafter, as "POEA") helps glyphosate penetrate plant cells. Defendant Monsanto considers added surfactants to be inert because they do not directly kill plants, they merely enhance glyphosate's ability to do so.

32. The full spectrum of surfactants in Roundup are considered to be trade secrets. They have traditionally been protected as confidential business information and have not been publicly disclosed.

**Roundup Poses Risks to Human Health**

33. For several decades, Monsanto has been presented with mounting, consistent evidence that glyphosate and/or Roundup poses significant risks to human health, and, is carcinogenic.

34. As early as 1985, a U.S. Environmental Protection Agency ("EPA") study concluded glyphosate was oncogenic, meaning it causes the development of tumors.[1]

35. Glyphosate appears to be absorbed by humans, as glyphosate has been detected in the blood and urine of agricultural workers as well as non-farm workers.[2]

---

[1] EPA Consensus Review of Glyphosate, *available at* https://archive.epa.gov/pesticides/chemicalsearch/chemical/foia/web/pdf/103601/103601-171.pdf.

[2] P.J. Mills, et al., *Excretion of the Herbicide Glyphosate in Older Adults Between 1993 and 2016*, 318 JAMA No. 16 at 1610-11 (October 24/31, 2017); B.D. Curwin, *et al.*, *Urinary pesticide concentrations among children, mothers and fathers living in farm and non-farm households in Iowa*, ANNALS OF OCCUPATIONAL HYGIENE 51, 53–65 (2007).

Electronically Filed - Jackson - Kansas City - October 17, 2019 - 04:01 PM

36. Numerous studies and scientific research have confirmed that glyphosate poses severe and significant risks, as further detailed below.

*Glyphosate Is a Carcinogen*

37. Multiple studies from the late 1990s and early 2000s provided strong evidence that the chemical combination in Roundup posed increased risk of developing cancer. Specifically, these studies show elevated risk of all non-Hodgkin's lymphoma cancers ("NHL") with glyphosate exposure, including a heightened risk of small lymphocytic lymphoma, follicular lymphoma, diffuse large B-cell lymphoma, and other subtypes.[3] Studies and meta-analysis suggest increased cancer risk can occur with even minimal Roundup use.

38. These studies have also indicated that lymphomas caused by Roundup can have long "latent" periods, meaning the disease is often present for months or years before it is discovered and diagnosed, and may have no symptoms at diagnosis but can progress over a number of years.

39. Some of these studies have suggested that Roundup poses even greater risks than glyphosate alone, with at least one study suggesting that the harmful effects of Roundup could be the result of Roundup's specific combination of chemicals, and the interaction of glyphosate and the surfactant POEA.[4]

*Glyphosate Is Genotoxic*

40. Toxicologists have studied glyphosate alone, additives alone, and formulations. In 2009, for example, scientists published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells. The study used low levels of Roundup and glyphosate. The study concluded that ingredients like the surfactant POEA, in tandem with

---

[3] Numerous studies are compiled in the cumulative review by IARC and discussed in Paragraph 52, *infra*.

[4] *See, e.g.*, Peixoto 2005 study, *available at* https://www.ncbi.nlm.nih.gov/pubmed/16263381.

Electronically Filed - Jackson - Kansas City - October 17, 2019 - 04:01 PM

glyphosate as found in Roundup, can change human cell permeability and amplify the toxicity of glyphosate alone. ("Glyphosate formulations induce apoptosis and necrosis in human umbilical, embryonic, and placental cells").[5]

41. This study and others have concluded that in addition to increased cancer risk, Roundup likely poses a significant risk of cell-cycle dysfunction and DNA damage, known as genotoxicity.

*Glyphosate Causes Endocrine System Disruption*

42. Glyphosate is also an endocrine disrupting chemical (EDC). EDCs can block the binding of hormone to receptor and prevent activation of genes. They can also bind in place of hormones[6] and mimic their effects. EDCs exert their effects at very low doses, and with exposure over long periods of time can lead to severe health problems, including cancer, birth defects, and other reproductive and developmental problems.

43. For example, a 2007 study showed that glyphosate herbicide altered hormone levels in female catfish and decreased egg viability, concluding that the herbicide was harmful to catfish reproduction.[7]

44. Another earlier study found that Roundup disrupted production of the steroid hormone progesterone in mouse cells.[8]

---

[5] C. Gasnier, *et al.. Glyphosate-based herbicides are toxic and endocrine disruptors in human cell lines*, 262 TOXICOLOGY, 184-191 (2009).

[6] Glyphosate has been confirmed through multiple research studies to disrupt the sex hormones balance by mimicking estrogen when administered in very low doses. *See* S. Thongprakaisang, et al., *Glyphosate induces human breast cancer cells growth via estrogen receptors*, 59 FOOD AND CHEMICAL TOXICOLOGY, 129-136 (2013).

[7] A.B. Soso, et al., Chronic exposure to sub-lethal concentration of a glyphosate-based herbicide alters hormone profiles and affects reproduction of female Jundiá (Rhamdia quelen), 23 ENVTL. TOXICOLOGY AND PHARMACOLOGY, Issue 3, 308-313 (2007).

[8] L.P. Walsh, et al., *Roundup inhibits steroidogenesis by disrupting steroidogenic acute regulatory (StAR) protein expression*, 108 ENVTL. HEALTH PERSPECTIVES, Issue 8, 769-776.

Electronically Filed - Jackson - Kansas City - October 17, 2019 - 04:01 PM

45. A study published in 2010 reported that glyphosate herbicide was a potent EDC in rats and caused disturbances in reproductive development after exposure during puberty.[9]

46. An in vitro experiment on human cells revealed that glyphosate herbicides prevented the action of androgens, masculinizing hormones, at levels up to 800 times lower than the levels of glyphosate residue allowed in some genetically modified crops used for animal feed in the U.S. The same study found that the herbicides disrupted the action and formation of estrogens, the feminizing hormones.[10]

47. A study of Roundup administered to rats in drinking water at half the level permitted in drinking water in the EU and 14,000 times lower than that permitted in drinking water in the U.S. resulted in severe organ damage and a trend of increased incidence of mammary tumors in female animals over a 2-year period of exposure.[11]

48. This impact on the endocrine system is dose dependent. Production of hormones is also inhibited by the chemicals in Roundup.

### Scientific Consensus

49. Literature reviews analyzing the entire body of studies undertaken on the effects of glyphosate and/or Roundup show a statistically significant increase in the risk of developing NHL and other diseases as a result of Roundup use.

50. These studies have been peer-reviewed, and they are and were available and/or known to Monsanto.

---

[9] R.M. Romano, et al., *Prepubertal exposure to commercial formulation of the herbicide Glyphosate alters testosterone levels and testicular morphology*, 84 ARCHIVES OF TOXICOLOGY, 309-317 (2010).
[10] Note 5, *supra*.
[11] G. Séralini, et al., *Republished study: long-term toxicity of a Roundup herbicide and a Roundup-tolerant genetically modified maize*, ENVTL. SCIS. EUROPE 26 (June 24, 2014).

Electronically Filed - Jackson - Kansas City - October 17, 2019 - 04:01 PM

51. A critical inflection point in public and scientific understanding of the risks posed by Roundup came in 2015, when the International Agency for Research on Cancer ("IARC") undertook a systematic review of scientific research gathered to date.  The IARC is an intergovernmental cancer agency tasked by the World Health Organization of the United Nations with conducting and coordinating research into the causes of cancer.

52. In March 2015, after a cumulative review of available studies, the IARC reached the conclusion that Roundup is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.[12]

53. The IARC found "sufficient evidence in experimental animals" that glyphosate is a carcinogen.  The IARC's conclusion followed review of epidemiologic studies and results from the EPA regarding the risk and effects of glyphosate.  The 2A designation suggests strong evidence of probable causality.

54. Foreign governments have also concluded that Roundup is unsafe. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup.[13]

### Monsanto Rejects and Manipulates Scientific Proof

55. Defendant Monsanto has performed and commissioned studies to support its claim that Roundup is safe, but these studies only observed the effects of massive doses of glyphosate (not formulated Roundup) over a short period of time.

56. Defendant Monsanto's ability to claim the details of Roundup's formulation as trade secrets allows it the opportunity to change the formula at will without subjecting the product to additional testing. Thus, Defendant Monsanto can adapt to competition and reformulate Roundup

---

[12] *Available at* https://monographs.iarc.fr/wp-content/uploads/2018/06/mono112-10.pdf.
[13] *See* BBC news report, October 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

to make it a more effective weed killer without regard for any potential increased toxicity levels or impact on human health.

57. On information and belief, Monsanto, directly and through third parties, has acted to suppress research that found Roundup to be toxic. It has used third parties and go-betweens to challenge science performed by researchers who reach findings inconsistent with Roundup's marketing message.

### Monsanto Held Liable for Roundup's Health Effects

58. In the past several years, numerous lawsuits have been filed against Monsanto for selling an unsafe product that has caused NHL and other diseases in Roundup users.

59. The United States District Court for the Northern District of California, as well as multiple state trial courts, have accepted as reliable scientific testimony that Roundup is unsafe and has caused NHL or other diseases, further notifying Monsanto that its product is dangerous and poses health risks.  *See, e.g., In re Roundup Prod. Liab. Litig.*, 358 F. Supp. 3d 956, 959 (N.D. Cal. 2019).

60. State and federal juries have concluded that Roundup causes cancer.[14]

### Monsanto's False and Misleading Representations

61. Despite the growing body of evidence that Roundup is carcinogenic and poses health risks to animals and humans, including the IARC's classification of glyphosate as a class 2A probable carcinogen, Monsanto has continued to misrepresent that glyphosate and/or Roundup is safe, non-carcinogenic, and falsely warrants to users and the general public that experts and regulatory agencies agree that there is no evidence of carcinogenicity in glyphosate and Roundup.

---

[14] *See* Patricia Cohen, $2 Billion Verdict Against Monsanto Is Third to Find Roundup Caused Cancer, N.Y. TIMES, May 13, 2019, https://www.nytimes.com/2019/05/13/business/monsanto-roundup-cancer-verdict.html.

Electronically Filed - Jackson - Kansas City - October 17, 2019 - 04:01 PM

62. For example, Monsanto has caused to be posted online that "Glyphosate-based herbicides, as a tool in an Integrated Weed Management system, have provided efficient, safe and cost-effective weed control for more than 40 years."

63. Monsanto also posted to its website that "Glyphosate is widely considered by regulatory authorities, scientific bodies and independent scientists to have low acute toxicity, no potential to cause cancer, reproductive problems or birth defects[.]" Monsanto continued to maintain this statement on its website through 2016, even after the IARC classified glyphosate as a probable carcinogen.

64. Additionally, Monsanto has caused to be posted to the website operated by Bayer, Monsanto's parent company, the following statement:

> There is an extensive body of research on glyphosate and glyphosate-based herbicides, including more than 800 scientific studies and reviews submitted to U.S., European and other regulators in connection with the registration process, that confirm that glyphosate and our glyphosate-based formulated products can be used safely and are not carcinogenic. The EFSA, the U.S. EPA and other regulatory authorities around the world have comprehensively and routinely reviewed glyphosate and glyphosate-based herbicides for more than 40 years and their conclusions consistently support the safety of glyphosate and glyphosate-based herbicides when used as directed.

(*Available at* https://www.bayer.com/en/is-glyphosate-safe.aspx; retrieved on June 7, 2019.)

65. As recently as May 19, 2019, Monsanto issued (through its parent company Bayer's website) a statement targeted at consumers wherein it stated:

> Glyphosate-based Roundup™ products have been used safely and successfully for over four decades worldwide and are a valuable tool to help farmers deliver crops to markets and practice sustainable farming by reducing soil tillage, soil erosion and carbon emissions.

The statement continues that glyphosate-based weed killers are "safe when used as directed."

(*Available at* https://www.bayer.us/en/newsroom/press-releases/article/?id=123306.)

Electronically Filed - Jackson - Kansas City - October 17, 2019 - 04:01 PM

66. In October 2013, Monsanto instructed employees to answer inquiries about the dangerous nature of Roundup with the following misleading statement:

> Roundup® brand agricultural herbicides have a long history of **safe use** in more than 100 countries around the world. **When used according to label directions, these products present no unreasonable risk of adverse effects to human health or the environment. Comprehensive toxicological studies have demonstrated that glyphosate, the active ingredient in Roundup® branded agricultural herbicides, does not cause cancer, mutagenic effects, nervous system effects, birth defects or reproductive problems . . .** Glyphosate has favorable environmental characteristics, including tight binding to most soils, making it unlikely to move to groundwater or reach non-target plants, and degrades over time in soil and natural waters . . .

(emphasis added).

67. In November 2014, Monsanto issued a press release in which it affirmatively misrepresented Roundup's safety and stated: "Glyphosate is not a carcinogen . . . Roundup herbicide, like glyphosate, has very low acute toxicity[.]" Monsanto's press release affirmatively misrepresented the actual dangers posed by Roundup.

68. On information and belief, Monsanto has also attempted to influence media reports about the growing scientific consensus that Roundup poses risks to human health.

69. On information and belief, Monsanto has introduced falsified and manipulated scientific information to the public overstating the safety of glyphosate and/or Roundup.

70. Monsanto has misrepresented the safety risks of Roundup and concealed and suppressed information about the harmful effects of Roundup.

71. Monsanto failed to adequately inform or warn Plaintiffs of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup.

72. To this day, Monsanto continues to misrepresent, conceal, and suppress information about the safety risks posed by Roundup in its advertising and communications with purchasers.

Electronically Filed - Jackson - Kansas City - October 17, 2019 - 04:01 PM

**The Class**

73. Plaintiffs and the Class purchased Roundup, a product that was falsely represented as set forth above, primarily for personal, family and/or household purposes and thereby suffered an ascertainable loss of money or property as a result of Monsanto's practices declared to be unlawful by Missouri's Merchandising Practices Act, because the product Plaintiffs and other Class Members purchased was worth less than the product they thought they had purchased had Monsanto's representations been true.

**CLASS ACTION ALLEGATIONS**

74. Plaintiffs and Class Members hereby incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this First Amended Petition.

75. Plaintiffs bring this action under Rule 52.08 of the Missouri Rules of Civil Procedure, on behalf of themselves and others similarly situated in the State of Missouri and defined as follows:

> **All Missouri residents who purchased Roundup primarily for personal, family or household use.**

76. Excluded from the Class are Monsanto, including any parent, subsidiary, affiliate or controlled person of Monsanto; Monsanto's officers, directors, agents or employees; the judicial officers assigned to this litigation; and members of their staffs and immediate families. Also excluded from the Class are those claiming they have suffered a personal injury as a result of using Roundup.

77. The proposed Class meets all requirements for class certification. The Plaintiffs' Class satisfies the numerosity standards. Plaintiffs have a good faith belief that there are thousands of Class Members in the State of Missouri. As a result, joinder of all Class Members in a single action

Electronically Filed - Jackson - Kansas City - October 17, 2019 - 04:01 PM

is impracticable. Class Members may be informed of the pendency of this Class Action by published and broadcast notice.

78. Plaintiffs' claims are typical of the other Class Members. Plaintiffs and Class Members purchased Roundup in the State of Missouri in connection with Defendant's violations of the Missouri Merchandising Practices Act. Plaintiffs and Class Members have all sustained damages in that each paid the purchase price for Roundup.

79. Plaintiffs are adequate representatives of the Class because they are members of the Class and their interests do not conflict with the interests of the members of the Class they seek to represent. The interests of Class Members will be fairly and adequately protected by Plaintiffs and their undersigned counsel, who have extensive experience prosecuting complex class action litigation.

80. Common questions of law and/or fact exist as to all Class Members, which predominate over any questions affecting solely individual Class Members. The questions of law and fact common to the Class arising from Monsanto's actions include, without limitation, the following:

    a. whether, in marketing and selling Roundup, Monsanto misrepresented, concealed and/or suppressed the dangers and risks to the health of persons using the herbicide;

    b. whether Monsanto misrepresented in its advertisements, promotional materials and public statements, among other things, the safety and potential side effects of Roundup;

    c. whether Monsanto failed to warn adequately of the risks of adverse effects of Roundup;

    d. whether Monsanto knew or should have known of the risks that the use of Roundup could lead to serious adverse health effects;

    e. whether Monsanto adequately tested Roundup;

Electronically Filed - Jackson - Kansas City - October 17, 2019 - 04:01 PM

f.  whether Monsanto continued to manufacture, market, distribute, and sell Roundup notwithstanding its knowledge of the herbicide's dangerous nature;

g.  whether Monsanto knowingly omitted, suppressed or concealed material facts about the unsafe and defective nature of Roundup from government regulators, the medical community and/or the consuming public;

h.  whether Monsanto's conduct violated Missouri's Merchandising Practices Act.

81. These and other questions of law and/or fact are common to Class Members and predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

82. A class action is superior, with respect to considerations of consistency, economy, efficiency, fairness and equity, to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual Class Members would impose heavy burdens upon the courts and Defendant, and would create a risk of inconsistent or varying adjudications of the questions of law and/or fact common to the Class. In addition, the prosecution of separate actions by individual Class Members would establish incompatible standards of conduct for any party opposing the Class. Also, the prosecution of separate actions by individual Class Members, if fully adjudicated, as a practical matter, would be dispositive of the interests of the other Class Members not parties to that particular adjudication and, as such, would substantially impair or impede upon those Class Members abilities to protect their interests. A class action, on the other hand, would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

Electronically Filed - Jackson - Kansas City - October 17, 2019 - 04:01 PM

83. The interest of Class Members in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through a representative would be unobjectionable. The amounts at stake for Class Members, while substantial in the aggregate, may not be great enough individually to enable them to maintain separate suits against Defendant. Plaintiffs do not anticipate any difficulty in the management of this action as a class action.

84. Plaintiffs seek a refund of monies paid for Roundup.

85. Plaintiffs specifically exclude from this Class Action any damages, losses, or other relief of any kind arising from the personal injuries suffered by those Class Members diagnosed with the various diseases caused by Roundup. This Class Action seeks only the economic relief requested herein to which Class Members are entitled under the Missouri Merchandising Practices Act.

86. Notice can be provided to Class Members by using techniques and forms of notice similar to those customarily used in other drug-related cases and complex class actions.

**ALLEGATIONS RELATED TO PUNITIVE DAMAGES**

87. Plaintiffs and Class Members hereby incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this First Amended Petition.

88. Defendant Monsanto's unlawful practices including deception, false promises, misrepresentation, and/or the concealment, suppression, or omission of material facts in connection with the sale, distribution or advertisement of Roundup were outrageous because of Monsanto's evil motive and/or conscious disregard and/or reckless indifference to the rights and/or safety of Plaintiffs and Class Members alike.

Electronically Filed - Jackson - Kansas City - October 17, 2019 - 04:01 PM

89. As a result of Monsanto's conduct alleged herein, the jury should be permitted to return a verdict of punitive damages under of this First Amended Petition that will serve to punish Monsanto and deter others from like conduct. The Missouri Merchandising Practices Act expressly provides for punitive damages. *See* Mo. Rev. Stat. § 407.025.

**CLAIM FOR RELIEF**
**VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT**
**Mo. Rev. Stat. §§ 407.010, *et seq.***

90. Plaintiffs and Class Members hereby incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this First Amended Petition.

91. The acts and practices engaged in by Monsanto, and described herein, constitute unlawful, unfair and/or fraudulent business practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. §§ 407.010, *et seq*.

92. Monsanto engaged in unlawful practices including deception, false promises, misrepresentation, and/or the concealment, suppression, or omission of material facts in connection with the sale, distribution or advertisement of Roundup in violation of Mo. Rev. Stat. § 407.020, which states in relevant part as follows:

> 407.020. 1. The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce ... is declared to be an unlawful practice. ... Any act, use or employment declared unlawful by this subsection violates this subsection whether committed before, during or after the sale, advertisement or solicitation.

93. Plaintiffs and Class Members purchased Roundup, a product that was falsely represented, as stated above, in violation of the Missouri Merchandising Practices Act and as a result Plaintiffs suffered economic damages, in that the product they and other Class Members purchased was

Electronically Filed - Jackson - Kansas City - October 17, 2019 - 04:01 PM

worth less than the product they thought they had purchased had Monsanto's representations been true.

94. At all times relevant herein Plaintiffs were unaware that Roundup had significant carcinogenic, and otherwise toxic, properties.

95. At all times relevant herein Plaintiffs were unaware that using Roundup created a risk that endocrine pathways would be disrupted.

96. Defendant's product brochures for Roundup do not disclose that Roundup has any carcinogenic effects.

97. Defendant's product brochures for Roundup do not disclose that Roundup has been found to be a carcinogen by the International Agency for Research on Cancer.

98. Defendant's product brochures for Roundup do not disclose it as an endocrine disrupting chemical.

99. Defendant's website does not disclose that Roundup has carcinogenic effects.

100.    Defendant's website does not disclose that Roundup has been found to be a carcinogen by the International Agency for Research on Cancer.

101.    Defendant's website does not disclose Roundup as an endocrine disrupting chemical.

102.    Defendant's televised commercials make no mention that Roundup has carcinogenic effects.

103.    Defendant's televised commercials make no mention Roundup has been found to be a carcinogen by the International Agency for Research on Cancer.

104.    Defendant's televised commercials make no mention that Roundup is an endocrine disrupting chemical.

Electronically Filed - Jackson - Kansas City - October 17, 2019 - 04:01 PM

105.     Defendant's failure to disclose the fact that the active ingredients in Roundup, including glyphosate and other unnamed adjuvants and surfactants have the potential to cause cancer, was a violation of the Missouri Merchandising Practices Act, as further stated herein, and was a material omission.

106.     Defendant's failure to disclose the fact that the active ingredients in Roundup, including glyphosate and other unnamed adjuvants and surfactants have the potential to be an endocrine disruptor, was a violation of the Missouri Merchandising Practices Act, as further stated herein, and was a material omission.

107.     The foregoing acts and practices of Defendant constituted unfair and unlawful practices, and deceptive conduct, in violation of the Missouri Merchandising Practices Act.

108.     As alleged above, Defendant conducted such activities in secret and concealed the nature of their unlawful conduct and acts through various means and methods designed to avoid detection. Accordingly, such acts and practices were done with the intent to deceive, conceal and avoid detection.

109.     As a direct and proximate result of the above-described unlawful practices, Plaintiffs and Class Members suffered ascertainable loss of money due to the purchasing of Roundup.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendant Monsanto and in favor of Plaintiffs and award the following relief:

a.  Certification of the proposed Class;

b.  Return of all purchase costs Plaintiffs paid for Roundup;

c.  Attorneys' fees and those costs available under the law;

Electronically Filed - Jackson - Kansas City - October 17, 2019 - 04:01 PM

d.  Punitive damages in an amount that is fair and reasonable, but will serve to deter Monsanto and others from like conduct in the future; and

e.  Such other and further relief, at law or in equity, as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial as to all issues so triable.

Dated: October 17, 2019

Respectfully submitted,

**STUEVE SIEGEL HANSON LLP**

Todd E. Hilton, Mo. Bar #51388
Patrick J. Stueve, Mo. Bar #37682
Emily M. Smith, Mo. Bar #67265
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7100
Facsimile: (816) 714-7101
hilton@stuevesiegel.com
stueve@stuevesiegel.com
emily@stuevesiegel.com

and

**GRAY, RITTER & GRAHAM, P.C.**
Don M. Downing, Mo. Bar #30405
Cort A. VanOstran, Mo. Bar #67276
701 Market Street, Suite 800
St. Louis, Missouri 63101
Telephone: (314) 241-5620
Facsimile: (314) 241-4140
ddowning@grgpc.com
cvanostran@grgpc.com

and

23

Electronically Filed - Jackson - Kansas City - October 17, 2019 - 04:01 PM

**SPEER LAW FIRM, P.A.**
Charles F. Speer, Mo. Bar #40713
104 W. 9th Street, Suite 400
Kansas City, Missouri 64105
Tel: (816) 472-3560
Fax: (816) 421-2150
cspeer@speerlawfirm.com

# EXHIBIT 2

Electronically Filed - Jackson - Kansas City - July 14, 2020 - 04:24 PM

**IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI**
**AT KANSAS CITY**

RYAN TOMLINSON, *et al.*,
on their behalf and on behalf of the class )
of others similarly situated, ) Case No. 1916-CV22788
)
Plaintiffs ) Division: 9
)
v. )
)
MONSANTO COMPANY )
)
Defendant. )

**PLAINTIFFS' SUGGESTIONS IN SUPPORT OF**
**MOTION FOR CLASS CERTIFICATION**

**INTRODUCTION**

In the 1970s, Monsanto patented the glyphosate molecule, which became the active

ingredient in Monsanto's Roundup herbicides ("Roundup"). Glyphosate is a non-selective

systemic herbicide used to kill weeds, especially annual broadleaf weeds and grasses. Monsanto

then genetically engineered seed to withstand glyphosate, sold under the brand name "Roundup

Ready" seed. That seed allowed Roundup to be sprayed over the top of glyphosate-tolerant crops,

killing weeds but not the crops. This combination — seed and herbicide — became a blockbuster

for Monsanto. Large percentages of crops grown in the United States and in Missouri are Roundup

Ready, resulting in massive spraying of Roundup over the top of those crops.[1] Roundup became

one of the world's most widely used herbicides.[2] In the United States, farmers across the Midwest

---

[1] For example, Missouri is the sixth largest soybean producing state, with more than 6 million acres in 2017. *See* Ex.
1, 2017 USDA National Agricultural Statistics Service Agricultural Chemical Use Survey Chart (available at
https://www.nass.usda.gov/Surveys/Guide_to_NASS_Surveys/Chemical_Use/2017_Cotton_Soybeans_Wheat_High
light/ChemUseHighlights_Soybeans_2017.pdf (last visited May 20, 2020)). Glyphosate was the herbicide most used
by far. *See id*. (Table 2: glyphosate isopropylamine salt used with 46% of all planted acres or 44.2 million lbs.;
glyphosate potassium salt used with 30% of all planted acres or 40.3 million lbs.).

[2] *See* Ex. 2, Monsanto Company 2016 Form 10-K (for the fiscal year ended Aug. 31, 2016) at 20 (available at
http://www.annualreports.com/HostedData/AnnualReportArchive/m/NYSE_MON_2016.pdf (last visited May 20,

1

Electronically Filed - Jackson - Kansas City - July 14, 2020 - 04:24 PM

used an estimated 188.7 million pounds of glyphosate in 2016.[3]  Monsanto also sells Roundup for use in the home-and-garden market, where it is widely and commonly used.  In 2017, Monsanto reported net sales of $3.7 billion in its agricultural productivity division, which includes glyphosate, up $213 million from 2016, according to its year-end report.[4]

For decades, Monsanto has had evidence that glyphosate poses significant risks to human health.  Numerous studies and scientific research confirmed those risks, including: elevated risk of non-Hodgkin's lymphoma cancers with glyphosate exposure, including a heightened risk of small lymphocytic lymphoma, follicular lymphoma, diffuse large B-cell lymphoma, and other subtypes; significant risk of cell-cycle dysfunction and DNA damage, known as genotoxicity; and endocrine system disruption.  *See* First Amended Class Action Petition ("Am. Pet.") ¶¶ 33–54 (citing various scientific studies).[5]  Nevertheless, Monsanto did and does advertise Roundup as safe.  *See id.* at ¶¶ 61–68.  Not only has Monsanto affirmatively misrepresented the safety risks of Roundup, but it has consistently omitted, concealed, and suppressed information about its harmful effects.  *Id.* at ¶¶ 70–72.  It also suppressed and manipulated research in order to conceal the dangers of Roundup.  *Id.* at ¶¶ 55–57, 69.

---

2020)) ("Roundup herbicides remain the largest crop protection brand globally.  Monsanto's crop protection business focus is to support strategically Monsanto's *Roundup Ready* crops ….")*; see also id.* at 6 ("Through our Agricultural Productivity segment, we manufacture Roundup brand herbicides and other herbicides and provide lawn-and-garden herbicide products for the residential market.").

[3] Ex. 3, C. Walljasper and R. Ferrando, Midwest Center for Investigative Reporting, *Controversial pesticide use sees dramatic increase across the Midwest* (May 26, 2019), https://investigatemidwest.org/2019/05/26/controversial-pesticide-use-sees-dramatic-increase-across-the-midwest/ (last visited May 20, 2020).

[4] *Id.*; *see also* Ex. 4, Monsanto Company Form 10-K (for the fiscal year ended Aug. 31, 2017) at 26 (available at https://www.sec.gov/Archives/edgar/data/1110783/000111078317000187/mon-20170831x10k.htm (last visited May 20, 2020)).

[5] In March, 2015, the International Agency for Research on Cancer ("IARC") published analysis of several studies, finding that "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong,"  that "case-control studies in the USA, Canada, and Sweden reported increased risks for [non-Hodgkin's lymphoma] associated with exposure to glyphosate," and that glyphosate "is probably carcinogenic to humans."  Ex. 5, IARC Report at 75, 77-78 (available at https://monographs.iarc.fr/wp-content/uploads/2018/06/mono112-10.pdf (last visited May 20, 2020)).

Electronically Filed - Jackson - Kansas City - July 14, 2020 - 04:24 PM

Named Plaintiffs Ryan Tomlinson, Carol Richardson, and Christi Gray are citizens and residents of Jackson County, Missouri, who purchased Roundup products at Missouri retailers. *See* Ex. 6, Affidavit of Ryan Tomlinson; Ex. 7, Affidavit of Carol Richardson; Ex. 8, Affidavit of Christi Gray.  Plaintiff Tomlinson purchased Roundup, including the branded product Roundup Concentrate Plus, from approximately 1999 until 2018 (including within the five years preceding Plaintiffs' lawsuit) at Home Depot and Westlake Ace Hardware stores in Kansas City and Blue Springs, Missouri.  Ex. 6 at ¶ 3.  Mr. Tomlinson paid approximately $20–$30 per bottle of Roundup, using it to kill weeds around his driveway and yard approximately 1–2 times per month during spring and summer months.  *Id.* at ¶¶ 4, 6.  Plaintiff Gray purchased Roundup, including the branded product Roundup Power Max Ready-to-Use, in 2015 at a Home Depot store in Blue Springs, Missouri, in order to kill weeds around her driveway and yard.  Ex. 8 at ¶¶ 3, 5.  Plaintiff Richardson purchased Roundup, including the branded products Roundup Extended Control Weed & Grass Killer Plus Weed Preventer, Roundup Weed & Grass Killer Concentrate Plus, and Roundup 365, on numerous occasions over the five years preceding Plaintiffs' lawsuit at Lowe's Home Improvement stores in Kansas City and Raymore, Missouri (among other locations in the greater Kansas City areas).  Ex. 7 at ¶ 3.  She paid approximately $23 per bottle of Roundup Extended Control Weed & Grass Killer Plus Weed Preventer, between $20 and $109 (based on size) per bottle of Roundup Weed & Grass Killer Concentrate Plus, and approximately $43 per bottle of Roundup 365.  She used all these products to kill weeds and thistles around her driveway, yard, and property approximately every two to three months.  *Id.* at ¶¶ 4, 6.

All three Plaintiffs purchased Roundup for personal, family, and household use in Jackson County, Missouri.  *See* Ex. 6 at ¶ 6; Ex. 7 at ¶ 6; Ex. 8 at ¶ 5.  All three saw advertisements for Roundup, including television advertisements.  *See* Ex. 6 at ¶ 5; Ex. 7 at ¶ 5; Ex. 8 at ¶ 4.  None

Electronically Filed - Jackson - Kansas City - July 14, 2020 - 04:24 PM

of the Plaintiffs were informed of the risks associated with Roundup and/or glyphosate, and none would have purchased Roundup had they known about the associated risks.  *Id.*; *see also* Ex. 6 at ¶ 7; Ex. 7 at ¶ 7; Ex. 8 at ¶ 6.

This case seeks redress for economic harm suffered by Missouri citizens as a result of Monsanto's violations of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010 *et seq.*  ("MMPA").  Plaintiffs bring this action on behalf of themselves and all Missouri residents who purchased Roundup for personal, family, or household purposes.  *See* Am. Pet. ¶¶ 1, 73, 75. Plaintiffs assert economic loss resulting from such purchases.  *Id.* at ¶¶ 2, 73.  They do not seek damages related to, or claim, personal injury and exclude from the class those claiming personal injury as a result of using Roundup.  *Id.* at ¶ 76.

The MMPA expressly provides for class actions and directs that "[a]s soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained."  Mo. Rev. Stat. § 407.025.4(1).  This case meets all requirements for class certification; accordingly, Plaintiffs' motion should be granted.

## APPLICABLE STANDARDS

As observed by the Missouri Supreme Court, "[a] class action is designed to promote judicial economy by permitting the litigation of the common questions of law and fact of numerous individuals in a single proceeding."  *State ex rel. Union Planters Bank v. Kendrick*, 142 S.W.3d 729, 735 (Mo. 2004).  Class certification does not test the merits of the case.  *Craft v. Philip Morris Cos., Inc.*, 190 S.W.3d 368, 384 (Mo. App. E.D. 2005); *accord Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 177–78 (1974). The only question is whether the requisites of certification are satisfied.  *See Plubell v. Merck & Co., Inc.*, 289 S.W.3d 707, 712 (Mo. App. W.D. 2009) ("At the class certification stage, our concern is whether the plaintiffs have met the class action

Electronically Filed - Jackson - Kansas City - July 14, 2020 - 04:24 PM

requirements . . . we do not inquire whether the plaintiffs will prevail on the merits or even whether the plaintiffs have stated a cause of action . . . In fact, '[t]he trial court has no authority to conduct even a preliminary inquiry' into these issues.") (quoting *Wright v. Country Club of St. Albans*, 269 S.W.3d 461, 465 (Mo. App. E.D. 2008)). "In class certification determination[s], the named plaintiffs' allegations are accepted as true." *Elsea v. U.S. Eng'g Co.*, 463 S.W.3d 409, 413–14 (Mo. App. W.D. 2015) (quoting *Hope v. Nissan N. Am., Inc.*, 353 S.W.3d 68, 74 (Mo. App. W.D. 2011) (quoting *Hale v. Wal-Mart Stores, Inc.*, 231 S.W.3d 215, 227 (Mo. App. W.D. 2007)). "Therefore, the determination of class certification is based primarily upon the allegations in the petition." *Id.* at 414 (quoting *Hope*, 353 S.W.3d at 74). An evidentiary hearing is not required. *Dale v. DaimlerChrysler Corp.*, 204 S.W.3d 151, 167 (Mo. App. W.D. 2006); *Byrd v. Chadwick*, 956 S.W.2d 369, 380 (Mo. App. W.D. 1997). "While some evidence relating to the merits may be considered in determining whether the class certification prerequisites have been met, the court must look only so far as to determine whether, given the factual setting of the case, if the plaintiff's general allegations are true, common evidence could suffice to make out a prima facie case for the class." *Elsea,* 463 S.W.3d at 414 (quoting *Hale,* 231 S.W.3d at 222).

Whether an action should proceed as a class ultimately rests within the sound discretion of the trial court. *State ex rel. Am. Family Mut. Ins. Co. v. Clark*, 106 S.W.3d 483, 486 (Mo. 2003). "A court abuses its discretion only if its ruling is so arbitrary and unreasonable as to shock one's sense of justice and indicate a lack of careful consideration." *Koger v. Hartford Life Ins. Co.*, 28 S.W.3d 405, 409 (Mo. App. W.D. 2000). Inasmuch as Rule 52.08(c)(1) provides for de-certification as well as alteration or amendment of a certification order "before [a] decision on the merits," courts give the benefit of the doubt to approving the class. *See State ex rel. McKeage v. Cordonnier*, 357 S.W.3d 597, 600 (Mo. 2012) ("courts should err in close cases in favor of

Electronically Filed - Jackson - Kansas City - July 14, 2020 - 04:24 PM

certification because the class can be modified as the case progresses") (quoting *Meyer ex rel. Coplin v. Fluor Corp.*, 220 S.W.3d 712, 715 (Mo. 2007)); *see also id.* at 601 ("courts favor certification as the class may be refined as the case progresses"); *Frank v. Enviro-Tech Servs.*, 577 S.W.3d 163, 167 (Mo. App. E.D. 2019) ("In determining whether to certify a proposed class, 'a court should err in favor of, and not against, allowing maintenance of the class action' because 'class certification is subject to later modification.'") (quoting *Hale*, 231 S.W.3d at 222; *Plubell*, 289 S.W.3d at 712) ("because class certification may be modified or even terminated before a decision on the merits, we err on the side of allowing the action") (citing *Dale,* 204 S.W.3d at 164). The decision here is not a close call.

## I.     THE REQUIREMENTS OF RULE 52.08(a) ARE SATISFIED.

Rule 52.08(a) sets out four requisites for class certification commonly referred to as numerosity, commonality, typicality, and adequacy. The action must also satisfy one of three requirements under Rule 52.08(b). *Plubell*, 289 S.W.3d at 712. Here, Plaintiffs seek certification under Rule 52.08(b)(3), where "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Mo. S. Ct. Rule 52.08(b)(3); *see also* Mo. Rev. Stat. § 407.025.3(7) (same). These elements are commonly referred to as "predominance" and "superiority." The first four elements are satisfied as discussed in this section; the latter are satisfied as discussed *infra*, Section II.

### A.     Joinder of All Class Members Is Impracticable.

"Rule 52.08(a) does not require that joinder of all the members of a class be impossible, only that it be impracticable," meaning "inefficient, costly, time-consuming and probably confusing." *Elsea*, 463 S.W.3d at 418 (quoting *Dale*, 204 S.W.3d at 167). There is no "magic

Electronically Filed - Jackson - Kansas City - July 14, 2020 - 04:24 PM

number" of class members needed to satisfy the numerosity requirement.  *See Paxton v. Union Nat. Bank*, 688 F.2d 552, 559 (8th Cir. 1982) ("No arbitrary rules regarding the necessary size of classes have been established.").  Even a class size of twenty has been found sufficient.  *Ark. Ed. Ass'n v. Bd. of Ed. of Portland, Ark. Sch. Dist.*, 446 F.2d 763, 765 (8th Cir. 1971); *see also Weigand v. Maxim Healthcare Servs., Inc.*, 2:15-CV-04215-NKL, 2016 WL 127595, at *4 (W.D. Mo. Jan. 11, 2016) (class size of 25 met requirement); *Wakefield v. Monsanto Co.* 120 F.R.D. 112, 115 (E.D. Mo. 1988) (same).  In addition, "[a] plaintiff does not have to specify an exact number of class members to satisfy the numerosity prerequisite . . . but must show only that joinder is impracticable through some evidence or reasonable, good faith estimate of the number of purported class members." *Elsea*, 463 S.W.3d at 418 (internal citation omitted); *see also Wakefield*, 120 F.R.D. at 115 (same); *Halbach v. Great-West Life & Annuity Ins. Co.*, 2007 WL 1018658 at *3 (E.D. Mo. April 2, 2007) ("plaintiffs must only show a reasonable estimate of the number of class members").  To support numerosity, the trial court can accept "common sense assumptions." *Elsea*, 463 S.W.3d at 418.

Here, the proposed class — all Missouri residents who purchased Roundup primarily for personal, family or household use — undoubtedly encompasses at least thousands of purchasers. Am. Pet. ¶ 77.  Without doubt, Missouri farmers make extensive use of glyphosate herbicide.  As noted, Missouri ranked sixth in national soybean production in 2017 and glyphosate was by far the most used herbicide for soybeans.  *See supra*, n. 1.  Missouri also is a significant producer of cotton, wheat, and corn, again with high levels of glyphosate use.[6]  Residential use of glyphosate

---

[6] Missouri farmers planted 300,000 acres of cotton in 2017, with glyphosate isopropylamine salt used on 59% of all cotton acres and glyphosate potassium salt used on 18% of all cotton acres (or a total of 14.1 million lbs. applied). *See* Ex. 9, 2017 USDA Agricultural Chemical Use Survey - Cotton (May 2018) (Chart & Table 2) (available at https://www.nass.usda.gov/Surveys/Guide_to_NASS_Surveys/Chemical_Use/2017_Cotton_Soybeans_Wheat_High light/ChemUseHighlights_Cotton_2017.pdf (last visited May 20, 2020)).  In the same year, Missouri farmers planted 1.9 million acres of winter wheat, with glyphosate used on 22% of all winter wheat acres (or 8.2 million lbs. applied). *See* Ex. 10, 2017 USDA Agricultural Chemical Use Survey – Wheat (May 2018) (Chart & Table 2) (available at

Electronically Filed - Jackson - Kansas City - July 14, 2020 - 04:24 PM

also is significant.[7]  In *Jones v. Monsanto Company*, Case No. 4:19-cv-00102-BP, plaintiffs served

Monsanto with requests for production seeking documents confirming sales of the Roundup

Products, in response to which Monsanto produced responsive documents on December 20, 2019

and February 10, 2020.  *See* Ex. 13, Declaration of Kim E. Richman, *Jones v. Monsanto Company*,

(ECF No. 50-1) (filed 3/23/20) at ¶ 14.  According to counsel's sworn declaration in that case, the

proposed nationwide settlement there covers approximately 88,925,680 units, representing about

$1.49 billion in retail sales, of Roundup weed and lawn products.  *Id.* at ¶ 15; *see also* Ex. 14,

Memorandum in Support of Plaintiffs' Motion for Preliminary Approval of Class Certification,

(ECF No. 50) (filed 3/23/20) at 11–13 (describing Roundup products). Reasonably assuming that

Missouri purchasers are average users of Roundup weed and lawn products, this amounts to almost

$30 million of such sales and 1,778,514 units sold in Missouri.

Impracticability of joinder may be presumed where a class numbers as few as forty

members.  *See* Newberg on Class Actions, § 3.05 at 247 ("[I]n light of the prevailing precedent,

the difficulty inherent in joining as few as [forty] class members should raise a presumption that

joinder is impracticable, and the plaintiff whose class is that large or larger should meet the tests

of Rule 23(a)(1) on that fact alone.").  Here, the reasonable probability is that the class numbers at

least well into the tens of thousands, common sense dictates that joinder is impracticable, satisfying

---

https://www.nass.usda.gov/Surveys/Guide_to_NASS_Surveys/Chemical_Use/2017_Cotton_Soybeans_Wheat_Highlight/ChemUseHighlights_Wheat_2017.pdf (last visited May 20, 2020)).  In 2016, Missouri was the ninth largest corn producer.  Missouri farmers planted 3.7 million acres of corn, with glyphosate potassium salt used on 33% of all corn acres and glyphosate isopropylamine salt used on 32% of all corn acres (or a total of 66.1 million lbs. applied).  *See* Ex. 11, 2016 USDA Agricultural Chemical Use Survey – Corn (May 2017) (Chart and Table 2) (available at https://www.nass.usda.gov/Surveys/Guide_to_NASS_Surveys/Chemical_Use/2016_Corn_Potatoes/ChemUseHighlights_Corn_2016.pdf (last visited May 20, 2020)).

[7] Non-agricultural use of glyphosate in the United States increased over 40-fold between 1974 and 2014, and an estimated 26.5 million pounds of glyphosate was sprayed in 2014 alone.  *See* Ex. 12, C.M. Benbrook, Environmental Sciences Europe, *Trends in glyphosate herbicide use in the United States and globally* (February 2, 2016) (available at https://enveurope.springeropen.com/articles/10.1186/s12302-016-0070-0 (last visited May 20, 2020)), Supplemental Table S18, digitally available through the provided link).

Electronically Filed - Jackson - Kansas City - July 14, 2020 - 04:24 PM

the numerosity requirement.  *See id.* at 240 ("Certainly, when the class is very large, for example, numbering in the hundreds, joinder will be impracticable.").

**B.      There Are Questions of Fact or Law Common to the Class.**

This action also easily satisfies the commonality requirement.  Rule 52.08(a)(2) "is written in the disjunctive, and hence, the common question may be one of fact *or* law and need not be one of each."  *Elsea*, 463 S.W.3d at 418.  In addition, the rule "does not require that all issues in the litigation be common, only that common questions exist."  *Id.* at 419.  Indeed, a single issue common to class members is sufficient.  *Id.*; *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) ("[E]ven a single common question will do.") (internal quotation omitted).  Here, there are many such questions, including but not limited to:

a.      whether, in marketing and selling Roundup, Monsanto misrepresented, concealed and/or suppressed the dangers and risks to the health of persons using the herbicide;

b.      whether Monsanto misrepresented in its advertisements, promotional materials and public statements, among other things, the safety and potential side effects of Roundup;

c.      whether Monsanto failed to warn adequately of the risks of adverse effects of Roundup;

d.      whether Monsanto knew or should have known of the risks that the use of Roundup could lead to serious adverse health effects;

e.      whether Monsanto adequately tested Roundup;

f.      whether Monsanto continued to manufacture, market, distribute, and sell Roundup notwithstanding its knowledge of the herbicide's dangerous nature;

g.      whether Monsanto knowingly omitted, suppressed or concealed material facts about the unsafe and defective nature of Roundup from government regulators, the medical community and/or the consuming public;

h.      whether Monsanto's conduct violated Missouri's Merchandising Practices Act.

Electronically Filed - Jackson - Kansas City - July 14, 2020 - 04:24 PM

Am. Pet. ¶ 80. These common questions are more than sufficient to satisfy the commonality requirement of Rule 52.08.  They also can be answered by common proof as more fully addressed *infra*, Section II.A.

### C.    Claims of the Representative Parties Are Typical of the Class.

 "[Typicality is fairly easily met so long as other class members have claims similar to the named plaintiff." *Hale*, 231 S.W.3d at 223 (quoting *DeBoer v. Mellon Mortg. Co*., 64 F.3d 1171, 1174 (8th Cir. 1995)*; Bradford v. AGCO Corp*., 187 F.R.D. 600, 603 (W.D. Mo. 1999) (same).  A plaintiff's claim is typical "if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory."  Newberg on Class Actions § 3.13 at 328-329; *see also In re Zurn Pex Plumbing Prods. Liab. Litig*., 08-MDL-1958 ADM/AJB, 2013 WL 716088, at *3 (D. Minn. Feb. 27, 2013) (typicality exists when there are "other members of the class who have the same or similar grievances as the plaintiff");  *Doran v. Mo. Dep't of Soc. Servs*., 251 F.R.D. 401, 405 (W.D. Mo. 2008) (typicality exists when plaintiff's claims "emanate from the same legal theory or offense as the claims of the class").  The typicality requirement is satisfied "even when there is a variance in the underlying facts of the representative's claim and the putative class members' claims, as long as the claim arises from the same event or course of conduct of the defendant as the class claims, the underlying facts are not markedly different, and the conduct and facts give rise to the same legal or remedial theory." *Dale*, 204 S.W.3d at 170–71; *see also Hale,* 231 S.W.3d at 223 ("If the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory, factual variations in the individual claims will not normally preclude class certification.") (citing cases). The existence of affirmative defenses also does not make his claim atypical.  *See Dale,* 204 S.W.3d at 172 ("Defenses may affect the individual's ultimate right

Electronically Filed - Jackson - Kansas City - July 14, 2020 - 04:24 PM

to recover, but they do not affect the presentation of the case as to liability for the named class representative's case.").

Plaintiffs and class members are asserting the same claims based on the same course of conduct by Monsanto.  Typicality is satisfied.

### D.    Class Representatives Will Adequately Protect the Interests of the Class.

Finally, the adequacy requirement "seeks to determine whether the representative party will fairly and adequately protect the interests of the class." *Lucas Subway MidMo, Inc. v. Mandatory Poster Agency, Inc*., 524 S.W.3d 116, 130 (Mo. App. W.D. 2017).  Adequacy focuses on whether plaintiffs' attorneys are "qualified, experienced, and generally able to conduct the proposed litigation," and whether plaintiffs have "interests antagonistic to those of the class." *Claxton v. Kum & Go, L.C.*, No. 6:14–CV–03385–MDH, 2015 WL 3648776, at *4 (W.D. Mo. June 11, 2015); *see also Lucas Subway*, 524 S.W.3d 116 at 130 (adequacy satisfied where "class counsel is qualified and competent to conduct the litigation and that the plaintiff has no interests that are antagonistic to the other proposed class members") (citing *Dale*, 204 S.W.3d at 172–73).

Class representatives here have no conflicts or interests antagonistic to those of the class. Plaintiffs and class members all were victims of Monsanto's deceptive conduct and all were damaged in the same way.  *See* Am. Pet. ¶ 93.  There likewise is no question that class counsel are capable of, and will, vigorously prosecute the claims.  Class counsel have significant experience in complex commercial litigation, class actions, MMPA cases, cases involving herbicides, and those involving large agro-business companies like Monsanto.  All three firms can and are willing to devote the resources necessary to prosecute these claims and zealously represent the plaintiff class.  *See* Ex. 15, Affidavit of Patrick J. Stueve; Ex. 16, Affidavit of Don M. Downing; Ex. 17, Affidavit of Charles Speer. Respectfully, Plaintiffs and counsel are able advocates who will more

Electronically Filed - Jackson - Kansas City - July 14, 2020 - 04:24 PM

than adequately represent class members. *See White v. Martin*, No. 02–4154–CV–C–NKL, 2002 WL 32596017, at \*10 (W.D. Mo. Oct. 3, 2002) ("In the absence of proof to the contrary, courts presume that class counsel is competent and sufficiently experienced to vigorously prosecute the class action.") (citation omitted).

As demonstrated above, the requirements of Rule 52.08(a) are easily satisfied.

## II.      THE REQUIREMENTS OF RULE 52.08(b) ARE SATISFIED.

### A.      Common Questions of Law or Fact Predominate.

"The fundamental question in determining predominance under 52.08(b)(3) is "whether the group aspiring to class status is seeking to remedy a common legal grievance." *Lucas Subway*, 524 S.W.3d at 127–28 (quoting *Dale*, 204 S.W.3d at 175); *Karen S. Little, L.L.C. v. Drury Inns, Inc.*, 306 S.W.3d 577, 580 (Mo. App. E.D. 2010) (same).

"The 'predominance' requirement . . .  does not demand that every single issue in the case be common to all the class members, but only that there are substantial common issues which 'predominate' over the individual issues." *McKeage*, 357 S.W.3d at 600 (quoting *Am. Family*, 106 S.W.3d at 488); *Hale*, 231 S.W.3d 215, 224–25 (same); *Craft v. Philip Morris Cos.*, 190 S.W.3d 368, 381 (Mo. App. E.D. 2005) (same).  The predominance requirement is not a numerical test that compares the sheer number of common issues with the number of individual issues.  Even a single common issue "may be the overriding one in the litigation, despite the fact that the suit also involves numerous individual issues." *McKeage*, 357 S.W.3d at 600 (quoting Newberg on Class Actions § 4:25, at 172 (4th ed. 2002)).  Moreover, "Missouri does not require that the common issues advance resolution of the litigation in order for them to predominate over the individual ones." *Hale*, 231 S.W.3d at 226–27.  This is because "the predominate issue need not be dispositive of the controversy or even be determinative of the liability issue involved."

*McKeage*, 357 S.W.3d at 600; *Am. Family*, 106 S.W.3d at 488; *Hale*, 231 S.W.3d at 227; *see also Wright v. Country Club of St. Albans*, 269 S.W.3d 461, 466 (Mo. App. E.D. 2008) (same).  As the United States Supreme Court distilled it, "[w]hen one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members."  *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016).  The Missouri Supreme Court has similarly held that "[t]he predominance of the common issue is not defeated simply because individual questions may remain . . . [such as] questions of damages or possible defenses to individual claims."  *McKeage*, 357 S.W.3d at 488–89 (citation and internal quotations omitted).  In sum, "predominance does not require that a single body of evidence satisfy the prima facie elements of an MMPA claim on behalf of every putative class member. Rather, it requires at least one significant fact question or issue, dispositive or not, that is common within the class's claim." *Plubell*, 289 S.W.3d at 713 (internal quotation and citations omitted)

"To classify an issue as common or individual, a court looks to the nature of the evidence required to show the allegations of the petition." *Karen S. Little*, 306 S.W.3d at 382.  "If the same evidence on a given question will suffice for each class member, then it is common; if the evidence on the question varies from member to member, then it is an individual issue."  *Id*.; *see also Hale*, 231 S.W.3d at 224 (a question is common when the "same evidence will suffice for each member to make a prima facie showing") (quoting *Craft*, 190 S.W.3d at 382).

In this case, common questions abound.  One obvious overriding common issue is whether Monsanto's misrepresentations and omissions about Roundup constitute unfair and deceptive trade practices under the MMPA.  *See Plubell*, 289 S.W.3d at 713 (central issue was whether defendant

13

Electronically Filed - Jackson - Kansas City - July 14, 2020 - 04:24 PM

Electronically Filed - Jackson - Kansas City - July 14, 2020 - 04:24 PM

violated the MMPA by failing to disclose and concealing product's safety risks; "Because that issue — the legality of [defendant's] conduct — is common to all the Missouri class members, and because that issue is at the core of the case, the court did not abuse its discretion in finding the predominance requirement satisfied.").  This and constituent issues are subject to common proof focused on Monsanto and its products; for example, the dangerous nature of Roundup, Monsanto's representations and omissions, and the false and misleading nature thereof.  Reliance is not required for an MMPA claim.  *See Plubell*, 289 S.W.3d at 714 ("Both our case law and the governing regulations make clear that the consumer's reliance on an unlawful practice is not required under the MMPA."); *see also* 15 C.S.R. § 60-9.070(2) ("Reliance, knowledge that the assertion is false or misleading, intent to defraud, intent that the consumer rely upon the assertion, or any other capable mental state such as recklessness or negligence, are not elements of misrepresentation as used in section 407.020.1"). Also, "[b]ecause an unlawful practice under the MMPA may be demonstrated by the defendant's conduct — irrespective of mental state — [Monsanto's] knowledge of [Roundup's] risks at the time of each class member's purchase is not an issue on which Plaintiffs will have to present individualized proof."  *Id.* at 713–14.

Quite clearly, there are one or more common questions amenable to common proof and Plaintiffs meet the predominance requirement.

**B.      A Class Action Is Superior to Other Available Methods for Fair and Efficient Adjudication of the Controversy.**

The final element is whether a class action is "superior" to other available methods for fair and efficient adjudication of the controversy.  This involves a balancing of the fairness and efficiency of a class action as the means of resolving the controversy against those of "alternative available methods" of adjudication.  *Wright*, 269 S.W.3d at 182 (citing *Dale*, 204 S.W.3d at 181); *see also Karen S. Little,* 306 S.W.3d at 583 ("The underlying question in any class action

Electronically Filed - Jackson - Kansas City - July 14, 2020 - 04:24 PM

certification is whether the class action device provides the most efficient and just method to resolve the controversy at hand.").

This requirement is satisfied. Class actions "provide for the expeditious handling of disputes and to allow a remedy for those for whom it would be unrealistic to expect to resort to individual litigation." *Hale*, 231 S.W.3d at 222 (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1754 (3d ed. 2005)). It is unrealistic to think that class members would alone pursue individual claims against Monsanto, or could even do so given the complexity of the issues and expense of litigation, including experts. *See* Ex. 6, Affidavit of Ryan Tomlinson, at ¶ 8; Ex. 7, Affidavit of Carol Richardson, at ¶ 8; Ex. 8, Affidavit of Christi Gray, at ¶ 7. "Class actions which aggregate small claims that could not otherwise be brought are exactly the type of claims that satisfy the superiority requirement." *Elsea*, 463 S.W.3d at 423 (quoting *Hale*, 231 S.W.3d at 229); *see also Wright*, 269 S.W.3d at 467–68 (class action "would be superior to other methods of adjudication in that, in the absence of class action, the potential expense of the litigation in relation to the relatively small recovery amount for each plaintiff would prevent most, if not all, injured parties from initiating a lawsuit . . . Judicial economy and efficiency dictate that all such possible claims against Defendants be tried in one class action lawsuit, rather than numerous lawsuits."). Joinder of or intervention by thousands of class members as actual parties also would be entirely impractical and unmanageable. The case is far more manageable as a class action, and manageability concerns generally are insufficient to defeat certification because "refusing to certify a class action on the basis of vaguely perceived manageability obstacles is acting counter to the policy behind [the class certification rule]" and because trial courts have sufficient power and creativity "to devise a process to manage" class proceedings. *Elsea*, 463

Electronically Filed - Jackson - Kansas City - July 14, 2020 - 04:24 PM

S.W.3d at 423, 424.  As articulated by the Missouri Supreme Court in language equally applicable here:

> The benefits of proceeding with a class action in this case are as obvious to this Court as they were to the trial judge.  This class action amounted to a fair, efficient, and time-saving means of adjudicating the many common questions of law and fact.  The individual members of the classes had no interest in controlling the litigation as long as their interests were fairly and adequately protected, as they were, nor would it have been at all beneficial for them to proceed individually against defendant.  This trial court properly permitted this cause to proceed as a class action.

*Senn v. Manchester Bank of St. Louis*, 583 S.W.2d 119, 132 (Mo. 1979), disavowed on other grounds by *Haarmann v. Davis*, 651 S.W.2d 134, 136 (Mo. 1983).  The superiority requirement is satisfied.

## **CONCLUSION**

For the reasons expressed above, Plaintiffs' motion for class certification should be granted and the law firms of Stueve Siegel Hanson LLP, Gray, Ritter & Graham, P.C., and Speer Law Firm should be designated as class counsel.

Electronically Filed - Jackson - Kansas City - July 14, 2020 - 04:24 PM

Date:   July 14, 2020

Respectfully submitted,

**STUEVE SIEGEL HANSON LLP**

Patrick J. Stueve, Mo. Bar #37682
Todd E. Hilton, Mo. Bar #51388
Tanner J. Edwards, Mo. Bar # 68039
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7100
Facsimile: (816) 714-7101
hilton@stuevesiegel.com
stueve@stuevesiegel.com
tanner@stuevesiegel.com

and

**GRAY, RITTER & GRAHAM, P.C.**
Don M. Downing, Mo. Bar #30405
Gretchen Garrison, Mo. Bar ##33963
Cort A. VanOstran, Mo. Bar #67276
701 Market Street, Suite 800
St. Louis, Missouri 63101
Telephone: (314) 241-5620
Facsimile: (314) 241-4140
ddowning@grgpc.com
cvanostran@grgpc.com

and

**SPEER LAW FIRM, P.A.**
Charles F. Speer, Mo. Bar #40713
104 W. 9th Street, Suite 400
Kansas City, Missouri 64105
Tel: (816) 472-3560
Fax: (816) 421-2150
cspeer@speerlawfirm.com

17

Electronically Filed - Jackson - Kansas City - July 14, 2020 - 04:24 PM

## CERTIFICATE OF SERVICE

I hereby certify that on July 14, 2020, the foregoing document was served via the Court's Case.Net system, which automatically provided electronic service to all counsel of record, including counsel listed below, who are deemed to have consented to electronic service.

SHOOK, HARDY & BACON L.L.P.
Amy M. Crouch
Brent Dwerlkotte
2555 Grand Blvd.
Kansas City, Missouri 64108-2613
Ph: 816.474.6550
Fax: 816.421.5547
amcrouch@shb.com
dbdwerlkotte@shb.com
*Attorneys for Defendant Monsanto Company*

Patrick J. Stueve

# EXHIBIT 3

Electronically Filed - Jackson - Kansas City - October 06, 2020 - 07:02 PM

**IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
AT KANSAS CITY**

RYAN TOMLINSON, *et al.*,⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀Plaintiffs,⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀Case No. 1916-CV22788
⠀⠀⠀⠀v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀Division: 9
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
MONSANTO COMPANY,⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀Defendant.⠀⠀⠀⠀⠀)

**AFFIDAVIT OF JAMES GUARD IN SUPPORT OF DEFENDANT MONSANTO
COMPANY'S SUGGESTIONS IN OPPOSITION TO PLAINTIFFS' MOTION FOR
<u>CLASS CERTIFICATION</u>**

STATE OF MISSOURI⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀) ss.
COUNTY OF ST. LOUIS⠀⠀⠀)

⠀⠀⠀⠀⠀⠀⠀⠀COMES NOW Affiant James Guard, who, being of lawful age and first duly

sworn on oath, alleges and states as follows:

⠀⠀⠀⠀⠀⠀⠀⠀1.⠀⠀⠀⠀I am the Global Lawn & Garden Lead for Monsanto Company ("Monsanto"), a

wholly-owned subsidiary of Bayer U.S. Prior to being promoted to Global Lawn & Garden Lead,

I served as North American Lawn & Garden Lead. I have worked for Monsanto since October

2009.

⠀⠀⠀⠀⠀⠀⠀⠀2.⠀⠀⠀⠀In my current position, I am responsible for overseeing the global Lawn & Garden

business. I oversee Monsanto's relationship with the Scotts Company LLC, which, as described

more fully below, serves as Monsanto's exclusive agent and distributor in the manufacturing,

packaging, sales, marketing, and advertising of Roundup® Lawn & Garden products in certain

markets including the United States.

⠀⠀⠀⠀⠀⠀⠀⠀3.⠀⠀⠀⠀Roundup® Lawn & Garden products are marketed for residential use. The Lawn

& Garden family of products includes a wide range of herbicides, including those designed to

kill most weeds and grasses, those designed to kill weeds but not grasses, and those designed to

Electronically Filed - Jackson - Kansas City - October 06, 2020 - 07:02 PM

kill most weeds and grasses plus prevent growth for an extended period of time. Herbicides that kill most weeds and grasses are referred to as non-selective herbicides; those that kill only certain plants are referred to as selective herbicides.

**A.      Glyphosate**

4.      The active ingredient in many Roundup® Lawn & Garden products is a chemical called glyphosate. Glyphosate is a non-selective herbicide derived from the amino acid glycine. The chemical molecule was invented in 1950 by a Swiss chemist, but was first synthesized in 1970 by a Monsanto scientist named Dr. John Franz. Dr. Franz was the first to discover glyphosate's effectiveness as an herbicide and worked with Monsanto to introduce it commercially in 1974. Glyphosate was first registered with the U.S. Environmental Protection Agency ("EPA") pursuant to the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") that same year. Monsanto was granted a patent on glyphosate's use as an herbicide, which expired in 2000.

5.      Since its commercialization in 1974, glyphosate has become one of the most widely used herbicide products in history. Its success is due in large part to its mode of action, which allows glyphosate to control over one hundred annual broad-leaf weed and grass species and over sixty perennial weed species, but pose little risk of harm to humans and animals. Glyphosate works by disrupting a biochemical process in plants called the Shikimate Pathway. This prevents the plant from synthesizing the essential amino acids that it needs to grow and leads to its death.

6.      After over four decades of testing, the overwhelming conclusion of experts worldwide, including the EPA, has been that glyphosate can be used safely according to label instructions. The EPA has repeatedly concluded that glyphosate-based herbicides do "not pose

Electronically Filed - Jackson - Kansas City - October 06, 2020 - 07:02 PM

unreasonable risks of adverse effects to humans or the environment" when used according to label directions.

**B.      The Monsanto-Scotts Relationship**

7.      Since 1998, The Scotts Company LLC has served as Monsanto's exclusive agent for the sales, marketing, and distribution of non-selective Roundup® Lawn & Garden products in the United States and Canada. Scotts's specific responsibilities relate to Roundup® Lawn & Garden manufacturing, sales, merchandising and in-facility services, warehousing and distribution, order and general administration, product returns, product information and consumer inquiries, product promotion, advertising and promotional programs, brand image and stewardship, retail relationships, merchandising and display techniques, and business planning.

8.      In general, Monsanto does not sell Lawn & Garden products directly to consumers. Lawn & Garden products are sold to wholesalers and retailers who in turn sell directly to consumers. The majority of the volume of the Lawn & Garden products is sold through retail outlets such as Home Depot, Lowe's, Walmart, and Ace Hardware. Retailers also sell the products online. Scotts is responsible for maintaining relationships with retail customers, for managing returns, and for providing customers and potential customers with information concerning the characteristics, uses, and availability of Lawn & Garden products. Scotts is also responsible for performing, on behalf of Monsanto, all order taking, order processing, and invoicing for Roundup® Lawn & Garden products.

9.      Although Scotts is also responsible for advertising, Monsanto has always had final approval authority over advertising for the Roundup® Lawn & Garden products.

**C.      The Roundup® Lawn & Garden Family of Products**

10.      The Lawn & Garden family of herbicide products currently includes Roundup® Weed & Grass Killer III, Roundup® Max Control 365, Roundup® Extended Control Weed &

Grass Killer Plus Weed Preventer II, Roundup® Poison Ivy Tough Brush Killer, Roundup® Landscape Weed Preventer, Roundup® Weed & Grass Killer Super Concentrate, Roundup® Weed & Grass Killer Concentrate Plus, Roundup® Concentrate Poison Ivy Plus Tough Brush Killer, and Roundup® for Lawns. Although many Lawn & Garden products contain glyphosate, the products are not exclusively glyphosate-based products. Roundup® for Lawns, for example, is a selective herbicide product that kills weeds but not grasses. Other products, such as Max Control 365 and Extended Control Weed & Grass Killer Plus Weed Preventer II, contain both glyphosate and an additional active ingredient that prevents growth for an extended period of time.

11.     The Roundup® Weed & Grass Killer products, a subset of the Lawn & Garden products, constitute Monsanto's line of traditional, non-selective herbicides. The primary active ingredient in each Roundup® Weed & Grass Killer product is glyphosate.

12.     Within the Weed & Grass Killer line, individual products vary in a number of ways. For example, Weed & Grass Killer products are sold in both "ready-to-use" formulations and concentrated formulations. Ready-to-use products can be applied immediately, whereas concentrated formulations must be mixed with water prior to application.

13.     Specific product formulations also vary in the relative amounts of glyphosate, water, and other ingredients mixed together to create the product. Some ready-to-use products, for example, contain pelargonic acid in addition to glyphosate. Pelargonic acid is another herbicide used to kill weeds.

14.     Weed & Grass Killer products are also sold in a variety of sizes and packaging. Concentrated products are sold in bottles ranging from sixteen ounces to one gallon. Ready-to-use product sizes range from twenty-four ounce sprayer bottles to 1.33 gallon containers

Electronically Filed - Jackson - Kansas City - October 06, 2020 - 07:02 PM

Electronically Filed - Jackson - Kansas City - October 06, 2020 - 07:02 PM

complete with product applicators such as battery-operated sprayers and wands. For example, Monsanto's base ready-to-use weed and grass killer, Roundup® Ready-To-Use Weed & Grass Killer III, is currently available with four different applicators to meet the diverse array of consumer preferences: spray bottles, the Sure Shot® Wand, the Comfort Wand®, and the Pump 'N Go® Sprayer. Examples of just a handful of product configurations are shown below:



15.    The following chart summarizes some of the differences among various Roundup® Lawn & Garden herbicide products:

| Product Name | Active Ingredient(s) | RTU or Concentrate | Sizes Available | Applicator |
|---|---|---|---|---|
| Roundup Ready- | Glyphosate | RTU | 24 oz | Trigger Sprayer |

Electronically Filed - Jackson - Kansas City - October 06, 2020 - 07:02 PM

| Product Name | Active Ingredient(s) | RTU or Concentrate | Sizes Available | Applicator |
|---|---|---|---|---|
| to-Use Weed and Grass Killer III | Pelargonic Acid | | 1 gal<br>1.25 gal<br>1.33 gal | Comfort Wand<br>Sure Shot Wand<br>Pump 'N Go 2<br>Refills |
| Roundup Weed & Grass Killer Concentrate Plus | Glyphosate<br>Diquat Dibromide | Concentrate | 16 oz<br>32 oz<br>35.2 oz<br>36.8 oz<br>64 oz | Not Included |
| Roundup Weed & Grass Killer Super Concentrate | Glyphosate | Concentrate | 35.2 oz<br>64 oz<br>1 gal | Not Included |
| Roundup Ready-to-Use Max Control 365 | Glyphosate<br>Imazapic<br>Diquat dibromide | RTU | 1.25 gal<br>1.33 gal | Comfort Wand<br>Refills |
| Roundup Concentrate Max Control 365 | Glyphosate<br>Imazapic<br>Diquat dibromide | Concentrate | 32 oz<br>35.2 oz | Not included |
| Roundup Ready-to-Use Extended Control Weed & Grass Killer Plus Weed Preventer II | Glyphosate<br>Diquat Dibromide<br>Imazapic | RTU | 24 oz<br>64 oz<br>1.1 gal<br>1.25 gal<br>1.33 gal | Trigger Sprayer<br>Comfort Wand<br>Pump 'N Go 2<br>Refills |
| Roundup Concentrate Extended Control Weed & Grass Killer Plus Weed Preventer II | Glyphosate<br>Pelargonic Acid<br>Imazapic | Concentrate | 16 oz<br>32 oz | Not included |
| Roundup Ready-to-Use Poison Ivy Plus Tough Brush Killer | Glyphosate<br>Triclopyr | RTU | 24 oz<br>1 gal<br>1.33 gal | Spray Bottle<br>Trigger Sprayer<br>Comfort Wand |
| Roundup Concentrate Poison Ivy Plus Tough Brush Killer | Glyphosate<br>Triclopyr | Concentrate | 32 oz | Not Included |
| Roundup for Lawns Ready-to-Use (North) | MCPA<br>Dicamba<br>Sulfentrazone | RTU | 32 oz<br>1.33 gal | Comfort Wand<br>Refills |
| Roundup for Lawns Ready-to-Use (South) | 2,4-D<br>Penoxsulam<br>Dicamba<br>Sulfentrazone | RTU | 32 oz<br>1.33 gal | Comfort Wand<br>Refills |
| Roundup for Lawns Ready-to-Spray (North) | MCPA<br>Quinclorac<br>Dicamba<br>Sulfentrazone | Concentrate | 32 oz | Hose-end sprayer |

Electronically Filed - Jackson - Kansas City - October 06, 2020 - 07:02 PM

| Product Name | Active Ingredient(s) | RTU or Concentrate | Sizes Available | Applicator |
|---|---|---|---|---|
| Roundup for Lawns Ready-to-Spray (South) | 2,4-D Penoxsulam Dicamba Sulfentrazone | Concentrate | 32 oz | Hose-end sprayer |
| Roundup for Lawns Crabgrass Destroyer | Topramezone | RTU | 1.33 gal | Comfort Wand |
| Roundup Landscape Weed Preventer | Pendamethalin | RTU (granules) | 5.4 lbs 13 lbs | Shaker Bag |

**D.    Product Labeling**

16.    With the exception of certain herbicides exempted by regulation, all herbicides sold in the United States are regulated by the EPA. In order to sell a non-exempt herbicide in the United States, the herbicide must first be registered with the EPA. After the herbicide has been registered, manufacturers must register specific herbicide products with the EPA, which must approve the contents of specific product labels. Manufacturers submit draft label language that addresses topics such as product ingredients, directions for use, and any claims to be made on the labeling. "Labeling" includes everything on the bottle, including the front and back of the bottle and any attachments thereto. Generally, all information on labeling must be approved by the EPA in what is collectively referred to as the "master" label. Once approved, each registration receives an individual EPA registration number.

17.    Prior to registering an herbicide, the EPA must find that the herbicide's master label complies with federal law, including that the label is not "misbranded." Once the master label is approved, products may be sold or distributed with a subset of the master labeling, provided no changes would be necessary to the precautionary statements, use classifications, or packaging. Monsanto submits its final product labels to the EPA in what is referred to as a "notification."

7

Electronically Filed - Jackson - Kansas City - October 06, 2020 - 07:02 PM

18.     As mentioned above, glyphosate has been registered with the EPA since 1974. Since glyphosate's first registration, EPA has reviewed and reassessed its safety and uses, including undergoing registration review, a program that reevaluates each registered pesticide. The registration was renewed in 1993 and, in January 2020, the EPA released an Interim Registration Review Decision for glyphosate which concluded that "there are no risks to human health from the current registered uses of glyphosate and that glyphosate is not likely to be carcinogenic to humans."

19.     States—including the State of Missouri—have similar regulatory schemes under which herbicides must be registered prior to sale and the final product label must be approved by the state regulatory agency. Various glyphosate-based Lawn & Garden products have been registered with the State of Missouri during the years that I understand to be relevant to this lawsuit.

**E.      Retail Sale of Lawn & Garden Products**

20.     In retail outlets, the Roundup® Lawn & Garden products are typically displayed on shelves next to one another and competitive products, including selective and non-selective products. Both ready-to-use and concentrated products are generally displayed in the same section. Retailers typically display the products with the front label facing the customer. As a result, a customer who wants to see the rear label of our Lawn & Garden products typically must pull the product off the shelf and turn it around. In addition, a customer who wants to read the information on the rear pamphlet under the rear label must turn the product around and open the pamphlet. Some retailers also make online sales. Each retailer's website differs, but typically such websites include a picture of the front of the bottle as the primary image, with descriptive information printed in plain text below, along with competing products pictured elsewhere on the

Electronically Filed - Jackson - Kansas City - October 06, 2020 - 07:02 PM

page. Images of the full product label may be available, but will typically need to be separately clicked on and reviewed by the customer.

21.     Monsanto does not set the prices for Roundup® Lawn & Garden products sold by retail stores like Lowe's or Home Depot. In general, these retailers themselves make the pricing decisions for Lawn & Garden products, including deciding when and whether to offer discounted pricing.

22.     Based on information Monsanto has been provided, consumers who purchase Roundup® Lawn & Garden products tend to purchase, on average, between one and two bottles of the product each year.

23.     Monsanto does not track or identify individual consumers who purchase Roundup® Lawn & Garden products from retail stores nor the prices that individual consumers pay.

**F.    Marketing and Advertising of Lawn & Garden Products**

24.     Monsanto markets and advertises Roundup® Lawn & Garden products though several different channels that target home users. These include the internet, television, and in-store signage. The marketing and advertising for Roundup® Lawn & Garden products is developed by Scotts and approved by Monsanto separately from any advertising that may be done for other Roundup®-brand products labeled for agricultural ("AG") or industrial, turf, and ornamental ("Industrial & Professional") uses, which are sold under differing trade names and are not marketed toward home users.

25.     Roundup® Lawn & Garden products are advertised and sold on a separate website—www.Roundup.com—from Monsanto's AG and Industrial & Professional products. Indeed, that website is managed by Scotts, and not Monsanto.

Electronically Filed - Jackson - Kansas City - October 06, 2020 - 07:02 PM

26.     Roundup® Lawn & Garden products are also marketed through signage and displays that appear in retail stores such as Lowe's and Home Depot.

27.     Marketing and advertising of Roundup® Lawn & Garden products is restricted by the EPA-approved master label.   Monsanto is prohibited by federal and state law from distributing or selling the products with claims that substantially differ from its approved labeling.

**G.    Money Back Guarantee**

28.     All of Monsanto's Roundup® Lawn & Garden products are sold with a money-back guarantee. Customers who are dissatisfied "for any reason" with a Roundup® Lawn & Garden product are entitled to a full refund.

Further affiant saith not.

James Guard

Subscribed and sworn to before me, a notary public, this _5_ day of _October_. 2020.

NOTARY PUBLIC

My Commission Expires: _Oct. 24, 2020_

LINDA HALEY
Notary Public - Notary Seal
STATE OF MISSOURI
Comm. Number 12409270
St. Louis County
My Commission Expires: Oct. 24, 2020

# EXHIBIT 4

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

**IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
AT KANSAS CITY**

| | | |
|---|---|---|
| **RYAN TOMLINSON and** | ) | |
| **CAROL RICHARDSON,** *et al.* | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No. 1916-CV22788** |
| | ) | **Division: 9** |
| **vs.** | ) | |
| | ) | |
| **MONSANTO COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFFS' REPLY IN FURTHER SUPPORT
<u>OF MOTION FOR CLASS CERTIFICATION</u>**

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................1

ARGUMENT......................................................................................................3

I.       MONSANTO'S RELIANCE-BASED ARGUMENTS IGNORE
         MISSOURI LAW.......................................................................................3

II.      THE CLASS IS NOT OVERBROAD.............................................................6

         A.       Monsanto's Argument Concerning Supposed "Awareness"
                  of Roundup's Safety Risk Is Contrary to Missouri Law
                  and Irrelevant to Certification...............................................6

                  1.       Monsanto's argument has been expressly
                           and soundly rejected ................................................6

                  2.       Dr. Rossi's opinions are legally irrelevant
                           and patently flawed .................................................9

         B.       Monsanto's Argument That a Misrepresentation Must
                  Affect Purchasing Decisions Is Contrary to Missouri Law.................13

         C.       Monsanto's Argument That Consumers Who Used
                  Roundup Are Uninjured Is Contrary to Missouri Law .....................16

III.     COMMON ISSUES PREDOMINATE.............................................................20

         A.       There Are Numerous Common Questions to Meet
                  Predominance......................................................................20

         B.       Monsanto's Argument That Roundup Use Defeats
                  Predominance Is Meritless ...................................................22

         C.       Benefit-of-the-Bargain Injury Is an Objective Standard ...................25

         D.       Although Not Required, Classwide Damages Can Be
                  Demonstrated by Objective Benefit-of-the-Bargain Measure
                  or "Model" of Damages .......................................................25

IV.      PLAINTIFFS ARE TYPICAL AND ADEQUATE REPRESENTATIVES.....30

         A.       Plaintiffs' Claims Are Typical of the Class..............................30

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

| | | | |
|---|---|---|---|
| | 1. | Plaintiffs' claims are not atypical of other class members | 31 |
| | 2. | Monsanto's "standing" argument is misplaced, premature, and rejected by a majority of courts | 32 |
| | 3. | Plaintiffs are not "atypical" for lack of knowledge regarding AG and I&P product features and uses | 34 |
| B. | | Ms. Richardson Is an Adequate Representative | 35 |
| | 1. | Ms. Richardson has adequate knowledge and will fulfill her obligations as class representative | 35 |
| | 2. | Ms. Richardson is not disqualified because of "family relationship" | 36 |
| V. | | A CLASS ACTION IS A SUPERIOR FORM OF ADJUDICATION | 37 |
| VI. | | THE CLASS IS ASCERTAINABLE | 38 |
| A. | | Identification of Purchasers Is Administratively Feasible | 39 |
| B. | | The Class Definition Is Not "Indefinite" | 42 |
| C. | | The Class Definition Can Be Modified as Appropriate | 43 |
| CONCLUSION | | | 44 |

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

## TABLE OF AUTHORITIES

**State Cases**                                                                                    **Page**

*Collora v. R.J. Reynolds Tobacco Co*,
    2003 WL 23139377 (Mo. Cir. Ct. Dec. 31, 2003) ................................................30

*Comm. on Legisl. Research of Mo. Gen. Assembly v. Mitchell*,
    886 S.W.2d 662 (Mo. App. W.D. 1994)................................................................23

*Conway v. CitiMortgage, Inc*.,
    438 S.W.3d 410 (Mo. 2014) ........................................................................3, 14, 24

*Craft v. Philip Morris Cos., Inc*.,
    2003 WL 23139381 (Mo. Cir. Ct. Dec. 31, 2003)................................................17

*Craft v. Philip Morris Cos., Inc.,*
    190 S.W.3d 368 (Mo. App. E.D. 2005) ........................................................ *passim*

*Dale v. DaimlerChrysler Corp*.,
    204 S.W.3d 151 (Mo.App. W.D. 2006) ......................................20, 22, 31, 32, 36

*Dep't of Social Srvs. v. Villa Capri Homes, Inc*.,
    684 S.W.2d 327 (Mo. 1985) ..........................................................................4

*Doyle v. Fluor Corp*.,
    199 S.W.3d 784 (Mo. App. E.D. 2006) ........................................................20, 27

*Edmonds v. Hough*,
    344 S.W.3d 219 (Mo. App. E.D. 2011)..........................................................4, 14

*Elsea v. U.S. Eng'g Co*.,
    463 S.W.3d 409 (Mo. App. W.D. 2015)........................................................ *passim*

*Gerken v. Sherman*,
    351 S.W.3d 1 (Mo. App. W.D. 2011)..................................................................29

*Gibbons v. J. Nuckolls, Inc*.,
    216 S.W.3d 667 (Mo. 2007) ............................................................................24

*Hale v. Wal-Mart Stores, Inc*.,
    231 S.W.3d 215 (Mo. App. W.D. 2007)........................................................ *passim*

*Hess v. Chase Manhattan Bank, USA, N.A.*,
　　220 S.W.3d 758 (Mo. 2007) ................................................................................3

*Hope v. Nissan N. Am., Inc.*,
　　353 S.W.3d 68 (Mo. App. W.D. 2011)........................................................ *passim*

*Huch v. Charter Comm'ns, Inc.*,
　　290 S.W.3d 721 (Mo. 2009) ......................................................................3, 4, 24

*Lucas Subway MidMo, Inc. v. Mandatory Poster Agency, Inc.*,
　　524 S.W.3d 116 (Mo. App. W.D. 2017)........................................................33, 38

*McGuire v. Kenoma, LLC*,
　　375 S.W.3d 157 (Mo. App. W.D. 2012)................................................................6

*Meyer ex rel. Coplin v. Fluor Corp.*,
　　220 S.W.3d 712 (Mo. 2007) ................................................................................1

*Mitchell v. Resid. Funding Corp.*,
　　334 S.W.3d 477 (Mo. App. W.D. 2010)..............................................................33

*Murphy v. Stonewall Kitchen, LLC*,
　　503 S.W.3d 308 (Mo. App. E.D. 2016) ........................................................16, 17

*Plubell v. Merck & Co., Inc.*,
　　289 S.W.3d 707 (Mo. App. W.D.  2009)...................................................... *passim*

*Schoenlein v. Routt Homes, Inc.*,
　　260 S.W.3d 852 (Mo. App. E.D. 2008) ..............................................................17

*Schuchmann v. Air Srvs. Heating & Air Cond., Inc.*,
　　199 S.W.3d 228 (Mo. App. S.D. 2006) ..........................................................4, 14

*State v. Mack*,
　　66 S.W.3d 706 (Mo. 2002) ................................................................................6

*State ex rel. Am. Fam. Mut. Ins. Co. v. Clark*,
　　106 S.W.3d 483 (Mo. 2003) ....................................................................1, 22, 27

*State ex rel. Coca-Cola Co. v Nixon*,
　　249 S.W.3d 855 (Mo. 2008) ..............................................................7, 8, 25, 39

*State ex rel. McKeage v. Cordonnier*,
　　357 S.W.3d 597 (Mo. 2012) ..........................................................................1, 22

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

*State ex rel. Union Planters Bank v. Kendrick*,
    142 S.W.3d 729 (Mo. 2004) ....................................................1

*Sunset Pools of St. Louis, Inc. v. Schaefer*,
    869 S.W.2d 883 (Mo. App. E.D. 1994) .......................17, 18

*Wright v. Country Club of St. Albans*,
    269 S.W.3d 461 (Mo. App. E.D. 2008) ..............................20

**Federal Cases**

*Ahmad v. City of St. Louis, Missouri*,
    2019 WL 2009589 (E.D. Mo. May 7, 2019) ......................42

*Aldapa v. Fowler Pkg.Co., Inc.*,
    323 F.R.D. 316 (E.D. Cal. 2018) ......................................39

*Amchem Products, Inc. v. Windsor*,
    521 U.S. 591 (1997).............................................................20

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013)...............................................16, 20

*Bellinder v. Microsoft Corp.*,
    2001 WL 1397995 (D. Kan. Sept. 7, 2001) ......................32

*Berger v. Compaq Computer Corp.*,
    257 F.3d 475 (5th Cir. 2001) .............................................36

*Brown v. SCI Funeral Services of Florida, Inc.*,
    212 F.R.D. 602 (S.D. Fla. 2003)........................................41

*Briseno v. ConAgra Foods, Inc.*,
    844 F.3d 1121 (9th Cir. 2017) ...........................................39

*Bratton v. Hershey Co.*,
    2018 WL 934899 (W.D. Mo. Feb. 16, 2018) ......................8

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)..............................................................26

*Competitive Edge, Inc. v. Staples, Inc.*,
    763 F. Supp. 2d 997 (N.D. Ill. 2010) ................................10

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)............................................................12

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

*Ebin v. Kangadis Food Inc.*,
    297 F.R.D. 561 (S.D.N.Y. 2014) ........................................................41

*Faltermeir v. FCA US LLC*,
    899 F.3d 617 (8th Cir. 2018) ..........................................................13

*Fish v. Kobach*,
    309 F. Supp. 3d 1048 (D. Kan. 2018)................................................11

*Fischer v. Int'l Tel. & Tel. Corp.*,
    72 F.R.D. 170 (E.D.N.Y. 1976) ......................................................36

*Forcellati v. Hyland's, Inc.*,
    2014 WL 1410264 (C.D. Cal. Apr. 9, 2014) ....................................37

*George v. Omega Flex, Inc.*,
    2020 WL 4718386 (W.D. Mo. Aug. 13, 2020)....................................9

*Grabinski v. Blue Springs Ford Sales, Inc.*,
    136 F.3d 565 (8th Cir. 1998) ..........................................................19

*Gratz v. Bollinger*,
    539 U.S. 244 (2003).......................................................................33

*Grovatt v. St. Jude Med., Inc.*,
    522 F.3d 836 (8th Cir. 2008) ..........................................................13

*Guido v. L'Oreal, USA, Inc.*,
    2014 WL 6603730 (C.D. Cal. July 24, 2014)..............................27, 40

*Halvorson v. Auto-Owners Ins. Co.*,
    718 F.3d 773 (8th Cir. 2013) ..........................................................26

*Hill v. LLR, Inc.*,
    2019 WL 2404900 (D. Mont. Mar. 8, 2019) ....................................38

*In re Barrick Gold Sec. Litig.*,
    314 F.R.D. 91 (S.D.N.Y. 2016) ......................................................26

*In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig.*,
    687 F. Supp. 2d 897 (W.D. Mo. 2009) ............................................16

*In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig.*,
    2011 WL 6740338 (W.D. Mo. Dec. 22, 2011)..........................8, 18, 42

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

*In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.*,
  2014 WL 108197 (D. Mass. Jan. 10, 2014) ........................................................14

*In re Deepwater Horizon*,
  739 F.3d 790 (5th Cir. 2014) ...........................................................................26

*In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Pracs. Litig.*,
  2019 WL 1418292 (W.D. Mo. Mar. 21, 2019)............................................. *passim*

*In re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Prac. Litig.*,
  2014 WL 1669930 (S.D. Fla. Apr. 28, 2014) .....................................................10

*In re Linerboard Antitrust Litig.*,
  305 F.3d 145 (3d Cir. 2002)...........................................................................42

*In re McCormick & Co., Inc., Pepper Prods. Mkg. & Sales Pracs. Litig.*,
  422 F. Supp. 3d 194 (D.D.C. 2019) ..................................................................8

*In re McNeil Consumer Healthcare, Mkg. and Sales Pracs. Litig.*,
  2011 WL 2802854 (E.D. Pa. July 15, 2011)......................................................18

*In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*,
  2009 WL 331426 (D.N.J. Feb. 10, 2009) ..........................................................36

*In re Milk Prods. Antitrust Litig.*,
  195 F.3d 430 (8th Cir. 1999) .....................................................................31, 34

*In re Monster Worldwide, Inc. Sec. Litig.*,
  251 F.R.D. 132 (S.D.N.Y. 2008) .....................................................................36

*In re Novo Nordisk Sec. Litig.*,
  2020 WL 502176 (D.N.J. Jan. 31, 2020)...........................................................34

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  725 F.3d 244 (D.C. Cir. 2013) ........................................................................27

*In re: Syngenta AG MIR 162 Corn Litig.*,
  2016 WL 5371856 (D. Kan. Sept. 26, 2016)......................................................41

*In re Teflon Prod. Liab. Litig.*,
  254 F.R.D. 354 (S.D. Iowa 2008) .....................................................................40

*Irvin E. Schermer Tr. by Kline v. Sun Equities Corp.*,
  116 F.R.D. 332 (D. Minn. 1987) .....................................................................37

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

*Johnson v. Atkins Nutritionals, Inc.*,
    2017 WL 6420199 (W.D. Mo. Mar. 29, 2017)............................................4, 15, 16

*K.A. by & Through B.W. v. Children's Mercy Hosp.*,
    2019 WL 2144815 (W.D. Mo. May 16, 2019) ................................................13, 16

*Kelly v. Cape Cod Potato Chip Co.*,
    81 F. Supp. 3d 754 (W.D. Mo. 2015) ....................................................................33

*Lafollette v. Liberty Mut. Fire Ins.*,
    2016 WL 4083478 (W.D. Mo. Aug. 1, 2016)........................................................38

*Lewis v. Goldsmith*,
    95 F.R.D. 15 (D.N.J. 1982) ...................................................................................36

*Martin v. Monsanto Co.*,
    2017 WL 1115167 (C.D. Cal. March 24, 2017) ...................................................37

*Malchman v. Davis*,
    588 F. Supp. 1047 (S.D.N.Y. 1984)......................................................................37

*McAllister v. St. Louis Rams, LLC*,
    2018 WL 1299553 (E.D. Mo. Mar. 13, 2018) ......................................................42

*McCall v. Monro Muffler Brake, Inc.*,
    2013 WL 1282306 (E.D. Mo. Mar. 27, 2013) ........................................................8

*McLeod v. Bank of Am., N.A.*,
    2017 WL 6373020 (N.D. Cal. Dec. 13, 2017).......................................................27

*Menocal v. GEO Group, Inc.*,
    882 F.3d 905 (10th Cir. 2018) ...............................................................................27

*Mikhlin v. Johnson & Johnson*,
    2014 WL 6084004 (E.D. Mo. Nov. 13, 2014).......................................................17

*Morgan v. United Parcel Serv. of Am., Inc.*,
    169 F.R.D. 349 (E.D. Mo. 1996) ..........................................................................20

*Mullins v. Direct Digital, LLC*,
    795 F.3d 654 (7th Cir. 2015) .................................................................................42

*Murphy v. Gospel for Asia, Inc.*,
    327 F.R.D. 227 (W.D. Ark. 2018) .........................................................................39

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

*Myers-Armstrong v. Actavis Totowa, LLC*,
  2009 WL 1082026 (N.D. Cal. April 22, 2009)......................................................18

*Neale v. Volvo Cars of N. Am., LLC*,
  794 F.3d 353 (3d Cir. 2015).....................................................................26, 27

*New Directions Treatment Srvs. v. City of Reading*,
  490 F.3d 293 (3d Cir. 2007)...........................................................................34

*New England Carpenters Health Benefits Fund v. First DataBank, Inc*.,
  248 F.R.D. 363 (D. Mass. 2008)......................................................................29

*O'Shaughnessy v. Cypress Media, L.L.C*.,
  2015 WL 4197789 (W.D. Mo. July 13, 2015) ....................................................37

*Owen v. Gen. Motors Corp*.,
  2007 WL 1655760 (W.D. Mo. June 5, 2007) .......................................................8

*Quiroz v. Rev. Prod. Mgmt., Inc*.,
  252 F.R.D. 438 (N.D. Ill. 2008) .....................................................................35

*Paxton v. Union Nat. Bank*,
  688 F.2d 552 (8th Cir. 1982) .........................................................................35

*Phillips v. Joint Legisl. Comm. on Perf. & Expenditure Review of State of Miss*.,
  637 F.2d 1014 (5th Cir. 1981) ........................................................................36

*Rawa v. Monsanto Co*.,
  2017 WL 3392090 (E.D. Mo. Aug. 7, 2017)........................................................32

*Ries v. Arizona Bevs. USA LLC*,
  287 F.R.D. 523 (N.D. Cal. 2012)......................................................................41

*Rivera v. Wyeth-Ayerst Labs*.,
  283 F.3d 315 (5th Cir. 2002) .........................................................................18

*Roach v. T.L. Cannon Corp*.,
  778 F.3d 401 (2d Cir. 2015)...........................................................................26

*SI03, Inc. v. Musclegen Research, Inc*.,
  2020 WL 2468412 (E.D. Mo. May 13, 2020) .......................................................8

*Sabal Trail Transm., LLC v. 13.386 Acres of Land in Lake County Florida*,
  2018 WL 8583439 (M.D. Fla. Aug. 13, 2018) .....................................................11

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

*Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*,
    821 F.3d 992 (8th Cir. 2016) ..................................................39

*Scanio v. Zale Delaware, Inc.*,
    2012 WL 368741 (E.D. Mo. Feb. 3, 2012)...........................14

*Sitzer v. Nat'l Ass'n of Realtors*,
    420 F. Supp. 3d 903 (W.D. Mo. 2019) ..................................18

*Stephens v. Arctic Cat Inc.*,
    2012 WL 628867 (E.D. Mo. Feb. 27, 2012).........................14

*Suchanek v. Sturm Foods, Inc.*,
    2019 WL 1978342 (S.D. Ill. May 3, 2019)...........................33

*Texas Grain Storage, Inc. v. Monsanto Co.*,
    2019 WL 4087430 (W.D. Tex. June 24, 2019) ......................34

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016)...........................................................26

*Waste Mgmt. Holdings, Inc. v. Mowbray*,
    208 F.3d 288 (1st Cir. 2000)..................................................42

*White v. Just Born, Inc.*,
    2018 WL 3748405 (W.D. Mo. Aug. 7, 2018)...........................8

*Yokoyama v. Midland Nat. Life Ins. Co.*,
    594 F.3d 1087 (9th Cir. 2010) ...............................................27

**Statutes, Regulations and Rules**

Mo. Rev. Stat. § 407.010 ...............................................................23

Mo. Rev. Stat. § 407.020 ..........................................................13, 14

Mo. Rev. Stat. § 407.025 ..........................................14, 19, 23, 38

15 CSR § 60-8.020........................................................................21

15 CSR § 60-9.020.....................................................................4, 7

15 CSR § 60-9.050..........................................................................4

15 CSF § 60-9.060..........................................................................4

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

15 CSR § 60-9.070 ................................................................4, 7

15 C.S.R. § 60-9.010 ................................................................15

15 CSR § 60-9.110 ............................................................4, 15

Missouri Supreme Court Rule 52.08 ................................................39

Federal Rule 23 ................................................................39

**Miscellaneous**

MAI 39.01 ................................................................4

1 Newberg on Class Actions § 2:3 (5th ed.) ................................................33

1 Newberg on Class Actions § 3:67 (5th ed.) ................................................34

2 Newberg on Class Actions § 4:54 (5th ed.) ................................................27

Diamond, Reference Guide on Survey Research, Fed. Jud. Ctr. (3d ed) ....................10, 12

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

## INTRODUCTION

The standards for class certification could not be more clear.  **First,** despite Monsanto's call for "caution," Sugg. in Opp. to Mot. for Class Cert. ("Opp.") at 15, Missouri courts have never disfavored class treatment, which "promote[s] judicial economy[.]" *State ex rel. Union Planters Bank v. Kendrick*, 142 S.W.3d 729, 735 (Mo. 2004).  The Missouri Supreme Court expressly directs courts to "err in close cases in favor of certification" because it "can be modified as the case progresses." *Meyer ex rel. Coplin v. Fluor Corp*., 220 S.W.3d 712, 715 (Mo. 2007); *accord State ex rel. McKeage v. Cordonnier*, 357 S.W.3d 597, 600 (Mo. 2012) (same).

**Second**, despite (otherwise unavailing) efforts to overcome predominance, Monsanto forgets that not all issues need be common. Even one common question satisfies predominance where it is an overriding one in the litigation,  *State ex rel. Am. Fam. Mut. Ins. Co. v. Clark*, 106 S.W.3d 483, 488 (Mo. 2003), and Monsanto does not contest the several core overriding common issues identified in Plaintiffs' opening brief.  *Infra*, Section III.A.

**Third**, despite Monsanto's quest to litigate the merits, a court "has no authority" to determine "whether the plaintiff has stated a cause of action or will prevail on the merits."  *Meyer*, 220 S.W.3d at 715; *see also Craft v. Philip Morris Cos., Inc.,* 190 S.W.3d 368, 377 (Mo. App. E.D. 2005) ("whether a proper class exists does not depend on the merits of the cause of action"); *Hale v. Wal-Mart Stores, Inc*., 231 S.W.3d 215, 222 (Mo. App. W.D. 2007) ("courts do not conduct an inquiry into the merits . . . when class certification is at issue."). In addition, "plaintiffs' allegations are accepted as true." *Hale,* 231 S.W.3d at 227; *accord Craft*, 190 S.W.3d at 377. While "some" evidence may be considered, this goes "only so far as to determine whether, given the factual setting of the case, if the plaintiff's general allegations are true, common evidence could suffice to make out a prima facie case for the class." *Elsea v. U.S. Eng'g Co*., 463 S.W.3d 409,

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

416 (Mo. App. W.D. 2015) (quoting *Hale*, 231 S.W.3d at 222).  It is error to "find" common questions negated by defendant's evidence.  *Elsea*, 463 S.W.3d at 419; *see also id*, at 416 n.6 (defendants "presented improper expert witness 'merits' testimony" and the trial court "improperly relied upon such testimony in reaching its certification ruling"); *Hale*, 231 S.W.3d at 227 (arguments tending to negate allegations should be ignored because they are taken as true).[1]

Contrary to these basic rules, Monsanto even attempts to litigate whether Roundup is dangerous (*see* Opp. at 5–7) as well as a host of legal issues.  Among other things, Monsanto:

- constantly attempts to inject reliance into the MMPA when reliance is not required (*infra* Sections I, II.A–C, III.C);

- contends that a person must see or hear a misrepresentation "before his purchase" for "effect on his purchase decisions" (Opp. at 25) when the MMPA and Missouri law are clear that neither is required (*infra*, Sections I, II.B);

- ignores that under the MMPA, injury can be established under Missouri's objective benefit-of-the-bargain rule (*infra*, Sections I, III.C–D);

- claims that persons who use a product cannot be injured (Opp. at 22–24) when Missouri law is to the contrary in multiple respects (*infra* Section II.C);

- contends that purchase for "personal, family or household" use is "subjective" individual inquiry (Opp. at 33–35) when use is not subjective, and predominance is not defeated by such questions under Missouri law (*infra*, Section III.B);

- contends that business use does not qualify as "personal" use (Opp. at 33–35) when (aside from incorrectness) legal conclusions on whether the petition states a claim are inappropriate at the certification stage (*infra*, Section III.B);

- engages in debate on whether Plaintiffs can demonstrate classwide damages (Opp. at 36–39), not even required at this juncture, and mischaracterizes Plaintiffs' damages model, which is expressly approved in this state (*infra*, Section III.D);

---

[1] Fond of soundbites, Monsanto cites *Craft* for the proposition that Plaintiffs "bear[] the burden of proof." Opp. at 17.  That case, however, holds that a plaintiff *is not* required to prove, among other things, post-purchase behavior (irrelevant) or her damage theory at class certification.  *Craft,* 190 S.W.3d at 382–83, 386.  Oddly, Monsanto also cites *Hope v. Nissan N. Am., Inc.*, 353 S.W.3d 68 (Mo. App. W.D. 2011), which held that as certification often is addressed before discovery, plaintiffs' allegations are taken as true, and "the determination of class certification is based primarily upon the allegations in the petition."  *Id.* at 74.

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

- fails to adhere to standards on typicality (Opp. at 27–28; *infra* Section IV.A);

- challenges standing (Opp. at 29), premature under Missouri law and based on federal decisions contradicted by majority position (*infra*, Section IV.A.2);

- challenges superiority by suggesting that L&G customers can obtain a refund (Opp. at 39–40), an argument Missouri and other courts reject (*infra*, Section V);

- attempts to defeat ascertainability with demand for customer "list" (Opp. at 17–18) before discovery and based on one federal decision contradicted by others in and outside Missouri (*infra*, Section VI.A); and

- claims that the "use" component of a MMPA-based class definition is subjective (Opp. at 19, 33–34) when courts have rejected that argument, and Monsanto itself urges product segments divided by use categories (*infra*, Sections III.B, VI.B).

Not once in its 40-page opposition does Monsanto address the MMPA's language, cite governing regulations, or case law in this state, including *Plubell*, rejecting virtually every argument it advances. Unable to sustain its positions under Missouri law, Monsanto cites federal decisions that, like Monsanto itself, misperceive or disregard that law. These decisions, however, have no binding effect and moreover, have been rejected by other federal courts in Missouri and elsewhere.

## ARGUMENT

## I.   MONSANTO'S RELIANCE-BASED ARGUMENTS IGNORE MISSOURI LAW.

The MMPA does not require reliance. Sugg. in Supp. at 14. Monsanto's continuous attempts to inject reliance into the MMPA, directly and indirectly, must be rejected.

The MMPA "expand[s] the common law definition of fraud 'to preserve fundamental honesty, fair play and right dealings in public transactions.'" *Conway v. CitiMortgage, Inc*., 438 S.W.3d 410, 414 (Mo. 2014) (quoting *State ex rel. Danforth v. Indep. Dodge, Inc*., 494 S.W.2d 362, 368 (Mo. App. 1973)); *Huch v. Charter Comm'ns, Inc*., 290 S.W.3d 721, 724 (Mo. 2009) (same). While a fraud claim requires reliance, a MMPA claim "expressly does not." *Hess v. Chase Manhattan Bank, USA, N.A*., 220 S.W.3d 758, 774 (Mo. 2007). Regulations interpreting

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

the MMPA, which have the force of law (*Dep't of Social Servs. v. Villa Capri Homes, Inc*., 684 S.W.2d 327, 332 (Mo. 1985); *Huch*, 290 S.W.3d at 725), also make clear that reliance is not required. *E.g.,* 15 CSR § 60-9.020(2) ("Reliance, actual deception, . . . or . . . culpable mental state . . . ***are not elements*** of deception"); (emphasis added).[2] *See also* MAI 39.01, cmt. D ("A consumer's reliance on an unlawful practice is not required under the MMPA."); *Edmonds v. Hough*, 344 S.W.3d 219, 223 (Mo. App. E.D. 2011) (plaintiff "need not establish reliance" on unlawful practice); *Schuchmann v. Air Srvs. Heating & Air Cond., Inc*., 199 S.W.3d 228, 232 (Mo. App. S.D. 2006) (referring to "plethora of case law holding that the MMPA . . . eliminates the need to prove . . . reliance"); *Johnson v. Atkins Nutritionals, Inc*., 2017 WL 6420199, at *10 (W.D. Mo. Mar. 29, 2017) ("Missouri case law is clear" that reliance on an unlawful practice is not required).

It is crystal clear that the MMPA does not require that plaintiff rely on defendant's unlawful practice.  Neither does reliance reappear through the back door of causation.  Just as reliance is not required, neither must the unlawful practice cause a purchase.

In *Plubell v. Merck & Co., Inc*., Merck sought to convince trial and appellate courts that a class of persons who took Vioxx could not be certified because, among other things, Vioxx was an effective pain reliever that many doctors would still prescribe, and patients would still take, notwithstanding more information on risks.[3]  The trial court rejected such arguments as based on the idea that reliance is required, which it is not.  *See* Order Granting Mot. for Class Cert., Case

---

[2] *See also* 15 CSR § 60-9.050(2) ("Reliance and injury are not elements of false pretense"); 15 CSF § 60-9.060 (2) ("Reliance and injury are not elements of false promise"); 15 CSR § 60-9.070(2) ("Reliance, knowledge that the assertion is false or misleading, intent to defraud, . . . or any other capable mental state , , , are not elements of misrepresentation"); 15 CSR 60-9.110(4) ("Reliance and intent that others rely . . . are not elements of concealment, suppression or omission").

[3] Merck's Sugg. Opp. Mot. for Class Cert., Case No.  04CV235817-01 (Cir. Ct. Jackson Cty. Mo.), attached as Ex. A, at 16–17; *see also id.* at 21 ("for many patients, Vioxx was the only anti-inflammatory pain medication that worked"); Merck's Mot. for Decert., attached as Ex. B, at 2–4; *see also* Sugg. in Supp. of Decert., attached as Ex. C, at 1–2, 5–12 (asserting no injury as to persons who would still take Vioxx).

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

No. 04CV235817-01 (June 12, 2008), attached as Ex. D, at 13–14. It also recognized that injury under the MMPA is not based on reaction to information on safety risks. Rather, injury occurs based on ascertainable loss under a benefit-of-the bargain rule. *Id.* at 19–21. Merck continued on appeal to insist that many physicians "have testified that they would still prescribe [Vioxx] today" and "many consumers have readily admitted that they would still take Vioxx," urging among other things that such persons "did not 'lose' anything as a result of Merck's alleged deception." Merck & Co. App. Br. No. WD 698088 (W.D.), attached as Ex. E, at 39, 46.

The Western District squarely rejected the notion that to prove loss, each person must show "that they would not have used Vioxx had the risks been known" because the MMPA "does not require these subjective, individualized inquiries." *Plubell v. Merck & Co., Inc*., 289 S.W.3d 707, 714 (Mo. App. W.D. 2009). First, "[b]oth our case law and the governing regulations make clear that the consumer's reliance on an unlawful practice is not required under the MMPA." *Id.* (citing cases and regulations). Correspondingly, causation "does not require that an unlawful practice cause a 'purchase.'" *Id.* Rather, the MMPA authorizes suit by persons who purchase merchandise "and *thereby suffers an ascertainable loss* of money . . . *as a result of* [an unlawful practice]." *Id.* (quoting Mo. Rev. Stat. § 407.025.1) (emphasis original). The words "as a result of" modifies "ascertainable loss," not "purchases or leases." Thus, "a plaintiff's *loss* should be a result of the defendant's unlawful practice, but the statute does not require that the *purchase* be caused by the unlawful practice." *Id*. (emphasis original). Hence, class members were not "required to show what they would or would not have done had the product not been misrepresented and the risks known." *Id.* Finally, Missouri's "benefit-of-the-bargain" rule applies "to meet the element of ascertainable loss." *Id*. at 715 (citing *Schoenlein v. Routt Homes, Inc*., 260 S.W.3d 852, 854 (Mo. App. 2008)). Class certification was affirmed. Merck thereafter sought decertification, citing

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

testimony from three more physicians, again asserting that many would still prescribe and patients would still take Vioxx knowing its risks and hence, there was no injury. *See* Ex. C, Merck Sugg. Supp. Mot. for Decert., at 8–10.  These arguments were again rejected.  Order, attached as Ex. F.

Federal cases on which Monsanto relies are not binding. *State v. Mack*, 66 S.W.3d 706, 710 (Mo. 2002); *McGuire v. Kenoma, LLC*, 375 S.W.3d 157, 167 n.9 (Mo. App. W.D. 2012).  The MMPA and its regulations, however, *are* binding.  They, *Plubell*, and other salient Missouri cases are the law in this state and they are fatal to Monsanto's arguments.

## II.     THE CLASS IS NOT OVERBROAD.

Monsanto's position that the proposed class includes "many people" aware of the Roundup controversy (Opp. at 19) relies on an expert whose (untested) opinions are reliance-based and irrelevant.  Its position that misrepresentations must affect purchase decisions (Opp. at 24–26) also is wrong.  The MMPA makes clear in every possible way that neither reliance nor transaction causation are required. Monsanto's argument that class members who used the Roundup got the benefit of their bargain (Opp. at 22) also is contrary to Missouri law on multiple levels.

### A.     Monsanto's Argument Concerning Supposed "Awareness" of Roundup's Safety Risk Is Contrary to Missouri Law and Irrelevant to Certification.

#### 1.     Monsanto's argument has been expressly and soundly rejected.

Similar to the physician testimony Merck advanced in *Plubell*, Monsanto cites the affidavit of Peter E. Rossi, a purported survey expert, to the effect that "many" purchasers are aware of Roundup's health risks and would purchase Roundup anyway. Opp. at 21. Such purchasers, Monsanto says, are uninjured.  Opp. at 2, 19.  There are patent flaws in Rossi's hastily executed surveys, *infra*, Section II.A.2, and all this is an improper attempt to litigate the merits.  Even more fundamentally, however, Monsanto's argument is contrary to Missouri law and its supposed evidence irrelevant to class certification.

6

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

In *Craft*, defendants argued that "the need to determine which individuals were deceived by the term 'light' [cigarettes] must be determined on a case-by-case basis." 190 S.W.3d at 383. Plaintiff, however, alleged a "fail[ure] to receive the qualities and economic value of a low tar, low nicotine cigarette," going not to individualized deception but rather, "condition of the product." *Id.* at 382.[4]   That is the kind of injury Plaintiffs assert here.   Am. Pet. ¶ 73.   And Monsanto's position is mere variant of the argument rejected in *Plubell*.   Simply put, loss does not require showing that the named plaintiff or class members "would not have used [the product] had the risks been known" and as recognized in *Craft*, injury occurs where the product "as is" is worth less than the product as represented.   289 S.W.3d at 714–15.   Just as in *Craft* and *Plubell*, Plaintiffs assert ascertainable loss under the benefit-of-the-bargain rule.   *See infra*, Sections III.C–D.

Monsanto cites one and only one Missouri case for its position that class members who "don't care" about safety risks are uninjured: *State ex rel. Coca-Cola Co. v Nixon*, 249 S.W.3d 855 (Mo. 2008).   Opp. at 19–20.   It lifts out those words without analysis.   In *Coca-Cola*, plaintiff asserted that she and others would not have purchased Diet Coke had they known it contained saccharin.   *Id.* at 859, 862. The court distinguished *Craft* where plaintiffs "alleged that they . . . suffered ascertainable losses because they failed to receive the qualities and economic value of a low tar, low nicotine cigarette." *Id.* at 863 (quoting *Craft*, 190 S.W.3d at 387).   Thus, the court said, "all consumers [in *Craft*] suffered an economic injury that was based on an objective characteristic."   *Id*.   By contrast, injury in *Coca-Cola* was based on "subjective preference against saccharin."   *Id*.   As against ***that kind*** of injury, evidence that class members did "not care" if Diet

---

[4] Neither reliance nor "actual deception" are elements of a MMPA claim of deception. 15 CSR 60-9.020(2). *See also* 15 CSR 60-9.070(1) & (2) (misrepresentation focused only on whether an assertion "is not in accord with the facts"; reliance not required); *supra*, note 2.

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

Coke contained saccharin might be meaningful.  *Id*. at 862.[5]  The court, however, expressly pointed to *Craft* as the kind of classwide injury appropriately based on failure to receive "economic value" of the product as represented.[6]  Again, that is what Plaintiffs assert here.

Monsanto otherwise cites federal cases, primarily *In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig*., 2011 WL 6740338 (W.D. Mo. Dec. 22, 2011) ("*BPA II*"), which, like Monsanto, misread *Coca-Cola*.  *Id*. at *1.[7]  Other courts recognize this misreading.  In *SI03, Inc. v. Musclegen Research, Inc*., 2020 WL 2468412 (E.D. Mo. May 13, 2020), the court explained:

> The Missouri Supreme Court emphasized that in *Coca-Cola* the "alleged injury was based on a subjective preference against saccharin," so a purchaser who did not have that preference could not have been injured, but that the result could be different in a case alleging an "economic injury . . . ***based on an objective characteristic,*" *such that individual preferences were irrelevant*.

*Id*. at *4 (citing *Coca-Cola*, 249 S.W.3d at 863) (emphasis added).  In *In re McCormick & Co., Inc., Pepper Prods. Mkg. & Sales Pracs. Litig*., 422 F. Supp. 3d 194 (D.D.C. 2019), the court likewise criticized *White*, also relying on *Coca-Cola*, which "does not, upon closer examination, support [that] court's conclusion."  *Id*. at 263.  Consistent with *Craft*, the Missouri Supreme

---

[5] Note also that in *Coca-Cola*, it was plaintiff's own expert who indicated that only twenty percent of those who consumed Diet Coke would not continue to do so if they knew it contained saccharin.  *Id*. at 862.  Here, Plaintiffs do not concede admissibility much less truth of Dr. Rossi's deficient surveys and opinions.

[6] *See also Hope*, 353 S.W.3d at 80 (distinguishing *Coca-Cola*, "where the basis of the injury was a subjective consumer preference," from case where alleged injury was diminished economic value, even if the purchaser was unaware of it).

[7] *Bratton v. Hershey Co*. and *White v. Just Born, Inc*. also cited by Monsanto, hold similarly to the *BPA* decision.  They also rely on *Coca-Cola*, and otherwise cite federal decisions including *BPA* and others Monsanto does not address. *Bratton*, 2018 WL 934899, at *2; *White*, 2018 WL 3748405, at *3.  These include *Owen v. Gen. Motors Corp*., 2007 WL 1655760 (W.D. Mo. June 5, 2007), in which plaintiff failed on summary judgment to prove that the undisclosed defect caused his vehicle wiper malfunction (*id*. at *4), sought repair cost (*id*. at *5) and was decided prior to *Plubell*.  The other, *McCall v. Monro Muffler Brake, Inc*., 2013 WL 1282306 (E.D. Mo. Mar. 27, 2013), did not involve benefit-of-the-bargain, the court granted summary judgment because it found adequate disclosure of charges in a Shop Supply Fee (*id*. at *3–4), and in dicta discussing what plaintiff saw or heard, relied on fraud cases, not MMPA cases.  *Id*. at *5.

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

Court's discussion of *Craft*, and other cases (including *Hope* and *Plubell*), the Court rejected defendant's "they don't care" argument because the alleged injury was "difference in value" of pepper as represented versus as received. Thus, they alleged economic injury "based on an objective characteristic, not an injury that is dependent on class members' subjective preferences" subject to individual inquiry. *Id*. at 264. Here, the class is not overbroad for the same reason.

Aside from *BPA* and compatriot cases *White* and *Bratton*, Monsanto relies on *George v. Omega Flex, Inc*., 2020 WL 4718386 (W.D. Mo. Aug. 13, 2020), which does not hold what Monsanto suggests. Opp. at 19. There, homeowners alleged that defective piping resulted in "diminution of the value to their homes." *Id*. at *1. Home values, however, increased after purchase. *Id*. at *1–3. Monsanto cites *George* for its "did not care" language (Opp. at 19), a mere stray quote from *Bratton* and pure dicta. *Id*. at *8. The Court acknowledged that reliance is not required; its holding was based on plaintiffs' failure to prove home devaluation, that they even purchased the pipe, or that it was worth less than as represented. *Id*. at *7–8.[8] Not only are the facts different, *George* was decided on summary judgment. Here, the merits are not at issue.

### 2. Dr. Rossi's opinions are legally irrelevant and patently flawed.

In response to Plaintiffs' motion, Monsanto engaged Dr. Rossi who, in short order, purportedly conducted two surveys[9] and produced a 56-page affidavit to support its positions. Dr. Rossi obtained his "understanding" of MMPA elements from Monsanto's lawyers. Rossi Aff. ¶¶ 57, 61, 64–65, 67. He was misinformed. Missouri law is clear: the MMPA does not require

---

[8] Save one (who acquired pipe in exchange for labor (*id*. at *7 n.8), all plaintiffs purchased homes with the pipe in them, not the pipe itself, and hence, there was no evidence that any overpaid for it. *Id*. at *7.

[9] Dr. Rossi represents that he not only conducted pretesting and focus groups but "fielded" residential and farm user surveys in September. Rossi Aff. ¶¶ 70, 85–86. The affidavit is dated October 6.

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

reliance or transaction causation. As in *Plubell*, whether "many" people would still purchase Roundup knowing its risk is immaterial to Plaintiffs' claims and cannot defeat certification.[10]

While his surveys are irrelevant as a legal matter and the survey instruments are not provided, preventing full analysis, Plaintiffs feel compelled to point out some of the more glaring defects in Dr. Rossi's presentation.  Taking the residential-use survey as example:

(1)    Dr. Rossi does not address sampling frame or method by which the sample was selected (*e.g.*, random sample).[11] He did not obtain the sample himself, but from a third party. Rossi Aff. ¶ 71; *see also id.* at ¶ 87 (same as to farmers). How the sample was obtained and by what method are thus in question. There is little indication of population save that Rossi "surveyed U.S. adults generally." *Id.* ¶ 72.  Why exactly the survey was not targeted to relevant population (Missouri purchasers) is unexplained. Insofar as ensuring that the sample is representative of the population,[12] Rossi says he compared "demographic characteristics" to "market research" by Monsanto (Rossi Aff. ¶ 73 & Ex. 3A).  He did not compare use patterns, which obviously vary by

---

[10] In addition to irrelevant opinions on "awareness" of Roundup's risks, Dr. Rossi includes lengthy discussion about the EPA's registration and what that supposedly means in terms of safety.  Rossi Aff. ¶¶ 16–18.  He professes no expertise in regulatory matters or medical science, and moreover, all of this is a pure merits dispute. Rossi also purports to opine on education, certification, and practices of herbicide applicators (Rossi Aff. ¶¶ 49–52), also outside his area of expertise, irrelevant, and merits-based.  He also recounts hearsay about pricing (Rossi Aff. ¶ 42 & n.84), which also goes, at most, to Monsanto's arguments about damages, a subject not even properly addressed at this juncture.  *Infra*, Section III.D.

[11] The target population "consists of all the individuals or units that the researcher would like to study. The sampling frame is the source (or sources) from which the sample actually is drawn." Diamond, Ref. Guide on Survey Research, Fed. Jud. Ctr. (3d ed.) at 377. In order to even be possible to scrutinize a survey, its proponent "should describe in detail" its design including "population from which the sample was selected" and "why [the] sample design was appropriate." *Id.* at 362.  Failure to draw from the population at issue or explain extrapolation from sample to population is alone reason to reject a survey.  *In re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Prac. Litig.*, 2014 WL 1669930, at *14 (S.D. Fla. Apr. 28, 2014); *see also, e.g., Competitive Edge, Inc. v. Staples, Inc.*, 763 F. Supp. 2d 997, 1008 (N.D. Ill. 2010) (survey relevance "greatly harmed" by "failure to focus . . . on the consumers in the market at issue in this case").

[12] "Identification of a survey population must be followed by selection of a sample that accurately represents that population." *Competitive Edge,* 763 F. Supp. 2d at 380.  Rossi admits that a sample "must be representative of the target population." Rossi Aff. ¶ 72; *see also id.* ¶ 90 (same).

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

region, and admits that Monsanto's study was "not of Midwest consumers" (Rossi Aff. ¶ 74) and "may not accurately reflect the true population of Monsanto customers." Rossi Ex. 3A (n.5).

(2)        Survey results on which Dr. Rossi relied were from 275 people who purchased Roundup in the last year and/or intend to do so within a year. Rossi Aff. ¶ 71.[13] Plaintiffs have estimated that 88.9 million Roundup units were sold nationally and 1,778,514 in Missouri. Sugg. in Supp. at 8. Monsanto says approximately 25% of purchasers are in the L&G segment. Opp. at 33. Assuming Rossi's sample covered the entire United States, the fraction represented by 275 people is astronomically small and without assurance of representativeness or statistical import. Rossi acknowledges "many thousands" of residential purchasers in Missouri alone. Rossi Aff. ¶ 73.[14] Survey results too small to be statistically meaningful are rejected. *E.g. Fish v. Kobach*, 309 F. Supp. 3d 1048, 1059 (D. Kan. 2018); *Sabal Trail Transm., LLC v. 13.386 Acres of Land in Lake County Florida*, 2018 WL 8583439, at *8 (M.D. Fla. Aug. 13, 2018).[15]

(3)        The questions Rossi asked are grossly uninformative on even the irrelevant conclusions he offers. His conclusions about percentage of residential purchasers supposedly aware of Roundup safety issues (Rossi Aff. ¶¶ 75–79) are drawn from responses to two questions. *Id.* at ¶¶ 75–76. QF3 asked respondents aware of "at least one" lawsuit "related to Roundup" to

---

[13] Rossi indicates that questions on which he relies for his opinion were asked only of those who so responded. Rossi Aff. ¶ 71 and Ex. 4 (n. 3), Ex. 5 (n.1), Ex. 6, Ex. 7 (n.2).

[14] The Monsanto document cited for this statement (*id.* & n. 127) actually indicates hundreds of thousands of L&G Roundup units sold in Missouri during a five-year period.

[15] As to farmers, 403 completed a questionnaire. Rossi Aff. ¶ 87. It appears that 221 persons were screened out, leaving 182 respondents (from a 10-state "Midwest" population) on which to base opinion. Rossi Aff. ¶ 86 & n. 135; Rossi Ex. 10. Unquestionably, the number of Midwestern farmers who purchase Roundup number well into the hundreds of thousands, if not millions. As of 2016, Midwest farmers accounted for 65 percent of the nation's glyphosate use on crops. Midwest Center For Investigative Reporting, *By The Numbers: Glyphosate Use In The Midwest For Corn, Soybeans* (May 27, 2019) (https://www.harvestpublicmedia.org/post/numbers-glyphosate-use-midwest-corn-soybeans). Missouri alone accounts for enormous use of glyphosate. *See* Sugg. in Supp. at 7, n.6.
.

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

describe it.[16]   QM4 asks about "drawbacks" of using weed killers.  Aff. ¶ 75 & Ex. 4.  Dr. Rossi makes the quantum presumptive leap that awareness of "at least one" Roundup lawsuit (as of 2020) involving health and safety equates to actual knowledge of Roundup's actual risks (and for an entire 5-year period). Persons obviously can be aware of lawsuits but discount or disbelieve their allegations. That is particularly true given Monsanto's constant representations that Roundup is safe.   Rossi *did not* ask respondents about perceptions of Roundup based on Monsanto's representations or to assume that Roundup is in fact dangerous, which Plaintiffs allege and must be taken as true.  Am. Pet. ¶ 3.  This dearth also infects conclusions about persons intending to use Roundup in the future.  Rossi Aff. ¶ 81; *see also id*. ¶ 96 (regarding farmers). Dr. Rossi did ask residential users about importance of product characteristics (QM7) and states that "three product attributes ranked as more important than either of the two health attributes."  Rossi Aff. ¶ 83.  But this was by degrees of *one-hundreds* of a percentage. Rossi Ex. 8.  The responses are so close as to actually indicate that safety is on par with other factors such as effectiveness and ease of use.

As overtly deficient as they are, Rossi's surveys fundamentally seek to support propositions irrelevant to class certification.  Rossi did not ask whether persons would choose to purchase, much less pay the same for, Roundup *with* health risks as Roundup *without* health risks.  His effort was not directed to injury (ascertainable loss) under a benefit-of-the-bargain analysis as here alleged. Surveys must be "designed to provide relevant data on the issue before the court."  Diamond, *supra*, at 373.  Opinions that do not address the actual issue are inadmissible.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993) (internal quotations and citation omitted).  Effort to

---

[16]   *See also* Muckerman Aff. ¶ 26 (opining generally that farmers are aware of "the allegation and litigation regarding supposed health risks of Roundup"); Rossi Ex. 15 (question asking farmers about awareness of lawsuits relating to Roundup).

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

demonstrate that some persons would still purchase Roundup aware of its risks is the same tactic specifically rejected by trial and appellate courts in *Plubell*.   It fails as a matter of law.

### B.   Monsanto's Argument That a Misrepresentation Must Affect Purchasing Decisions Is Contrary to Missouri Law.

Monsanto also argues that a person must see a misrepresentation "before his purchase" and that the misrepresentation must affect his purchase decisions.  Opp. at 25.  But again, reliance is not required.  In language directly responsive to Monsanto's position, the Western District ruled in *Plubell* that plaintiffs were "not required to prove they or their physicians relied on Merck's alleged misrepresentations . . . and consequently, they are not required to offer individualized proof that the misrepresentation colored the decision to take Vioxx."  289 S.W.3d at 714.

Monsanto does not attempt to take on *Plubell* directly because it cannot.  Instead, it relies on *Faltermeir v. FCA US LLC*, 899 F.3d 617, 622 (8th Cir. 2018), and its proposition that the "alleged misrepresentation must have some connection with the sale."  Opp. at 24.[17]  In *K.A. by & Through B.W. v. Children's Mercy Hosp.*, 2019 WL 2144815 (W.D. Mo. May 16, 2019), the defendant also cited federal cases to argue that plaintiff did not connect loss to actionable practice. *Id.* at *5.  The court found that argument "not persuasively support[ed]" because defendant did not "discuss how **Missouri courts** have construed the MMPA's requirement that "an unlawful act [be] committed 'in connection with' the sale."  *Id.* (emphasis added).  Neither does Monsanto.

In the first place, the MMPA manifestly does not require that unlawful practice occur before sale. It expressly provides that an unlawful practice "violates this subsection whether committed before, during ***or after*** the sale . . . ."  Mo. Rev. Stat. § 407.020.1 (emphasis added). This clearly condemns unlawful practices ***even if they occur after the sales transaction has***

---

[17] Monsanto also cites *White* (Opp. at 25), to which it attributes a quote from *Grovatt v. St. Jude Medical Inc.*, 522 F.3d 836, 840 (8th Cir. 2008), addressing Minnesota, not Missouri, law.

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

***already taken place***. As plainly, that is why reliance is not required and Section 407.025.1 does not require that the unlawful practice cause a purchase.  It would be incongruous indeed to at once declare a practice occurring after sale unlawful while also requiring that it induce the sale.

Missouri courts recognize that "connection" between unlawful practice and sale need not be before sale. *E.g., Schuchmann*, 199 S.W.3d at 232 (fact that refusal to honor warranty came after sale "is of no consequence").  They recognize that the unlawful practice need not induce a decision to purchase.  *Plubell*, 289 S.W.3d at 714; *see also Edmonds*, 344 S.W.3d at 222–23 (rejecting argument that purchaser did not rely on appraisal in decision to close on loan). The Missouri Supreme Court holds that the MMPA does not require privity.  *Conway v. CitiMortgage, Inc.*, 438 S.W.3d 410, 416 (Mo. 2014).  As made clear by Section 407.020.1, neither does it require unlawful practice before sale.  In *Conway*, plaintiffs alleged that a loan servicer wrongfully foreclosed after "sale of the mortgage loan." The Court interpreted "in connection with" to mean "relationship" and ruled that how a sale is enforced meets the criteria "because the MMPA covers alleged wrongdoing 'before, during ***or after*** the sale." *Id*. at 414, 415 (emphasis added).

If Monsanto can cite federal cases to support its position, Plaintiffs can cite as many or more that disagree.  *See, e.g., Stephens v. Arctic Cat Inc.,* 2012 WL 628867, at *4 (E.D. Mo. Feb. 27, 2012) (rejecting as "without merit" argument that unlawful acts were not in connection with sale because they occurred after purchase; recognizing that an act is unlawful whether before, during, or after sale, and that "[u]nder the MMPA a plaintiff need not prove that he relied on the acts or omissions complained of or that they induced the sale or purchase"); *Scanio v. Zale Delaware, Inc.*, 2012 WL 368741, at *2 (E.D. Mo. Feb. 3, 2012) (representations after sale can be an unlawful practice); *In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.*, 2014 WL 108197, at *7 (D. Mass. Jan. 10, 2014) ("the MMPA does not require an individualized showing that . . .

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

alleged misrepresentations caused consumers to purchase Celexa or Lexapro"); *Johnson,* 2017 WL 6420199, at *10 (plaintiff need not demonstrate that unlawful practice caused purchase: "Missouri case law is clear" that reliance is not required).

Missouri law is abundantly clear that a purchaser need not rely on the unlawful practice, which need not induce decision to purchase. The MMPA itself compels that conclusion or it would not deem practices unlawful although occurring after a sale already has transpired. Further, unlawful practices have "connection with" a sale where they occasion loss under Missouri's benefit-of-the-bargain rule, concerned with product value, not individual decisions to purchase.

To the extent Monsanto suggests that all class members must have been exposed to the same misrepresentation from the same source (*see* Opp. at 26), it cites nothing for such a proposition. Moreover, Plaintiffs allege that Monsanto consistently misrepresented Roundup as safe, regardless of media. Am. Pet. ¶¶ 61–69. In addition, even Monsanto recognizes that all class members are "uniformly" exposed to Roundup's label at point of purchase. Opp. at 26. Plaintiffs allege not only misrepresentations but omissions. Am Pet. ¶¶ 70–71. Monsanto's argument that Plaintiffs cannot show that each class member read the label (*id.*) is at the outset illusory, as one cannot read a warning not there. Monsanto does not suggest that labels warn of the health risks alleged. The label statements it provides do not. *See* Rossi Aff. at 18; Muckerman Aff. ¶ 9 & Exs. 1–3.[18] But again, Monsanto commits a MMPA violation if it concealed, suppressed, or omitted a material fact, and reliance ***is not required***. 15 C.S.R. § 60-9.110(4).[19]

---

[18] The labels Rossi reproduces for Roundup Power Max and Roundup Pro Max are unreadable. *See id.* at 22, 30. They have been located on the internet, however, and neither contains a warning of the health hazards alleged. *See* Roundup Power Max label (https://s3-us-west-1.amazonaws.com/agrian-cg-fs1 production/pdfs/Roundup_PowerMAX1e_Herbicide_Label.pdf); Roundup Pro Max label (https://assets.greenbook.net/L90263.pdf).

[19] In addition, "material" fact is defined in terms of what "a reasonable consumer" would likely consider important or would likely induce a "reasonable consumer" to act. 15 C.S.R. § 60-9.010 (C). This states an

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

### C.    Monsanto's Argument That Consumers Who Used Roundup Are Uninjured Is Contrary to Missouri Law.

"A plaintiff adequately pleads [the ascertainable loss] element . . . if he alleges an ascertainable loss under the benefit-of-the-bargain rule, which compares the actual value of the item to the value of the item if it had been as represented at the time of the transaction." *Murphy v. Stonewall Kitchen, LLC*, 503 S.W.3d 308, 313 (Mo. App. E.D. 2016).[20] Mirroring what was alleged in *Plubell*, Plaintiffs allege that they and class members

> purchased Roundup, a product that was falsely represented . . . and thereby suffered an ascertainable loss . . . as a result of Monsanto's practices . . . because the product [they] . . . purchased was worth less than the product they thought they had purchased had Monsanto's representations been true.

Am Pet. ¶ 73; *see Plubell*, 289 S.W.3d. at 711 (quoting allegations). This states "an objectively ascertainable loss under the MMPA using the benefit-of-the-bargain rule." *Id.* at 715.

According to Monsanto, however, those who used or disposed of the Roundup product purchased "are uninjured because they received the full benefit of their bargains." Opp. at 22. Again, Monsanto relies primarily on the *BPA* decisions. Again, not only is this a merits-based argument, but contrary to Missouri law as consistently set out by the courts of this state.

In *In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig.*, 687 F. Supp. 2d 897, 900 (W.D. Mo. 2009) ("*BPA I*"), the Court found on a motion to dismiss that persons using BPA-

---

objective reasonable-man standard amenable to common proof.  *See*, *e.g. Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 467 (2013) ("because '[t]he question of materiality . . . is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor,' materiality can be proved through evidence common to the class.")  (citation omitted).

[20] *See also Children's Mercy Hosp.*, 2019 WL 2144815, at *4 ("to determine whether a plaintiff has suffered an ascertainable loss, Missouri courts apply the benefit-of-the-bargain rule . . . [under which] . . . a plaintiff can recover damages for 'the difference between the actual value of the property and what its value would have been if it had been as represented'") (citing *Plubell*, 289 S.W.3d at 715); *Johnson* , 2017 WL 6420199, at *10 ("In order to demonstrate an ascertainable loss under this rule, a plaintiff need only allege that the product "was worth less than the product as represented.") (citing *Plubell*, 289 S.W.3d at 715).

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

containing products obtained "full value" from their purchase.  *Id*. at 912–13.  It did so based on hypothesized analysis, untethered to Missouri law, to the effect that while a purchaser "may not have paid the asking price" for a product with safety risks, there is an "offset" if the product was functional.   *Id*. at 912.[21]   In  *BPA  II*, the Court cited this dismissal ruling in denying class certification. 2011 WL 6740338, at *2.  When confronted with Missouri law that loss does not consider post-purchase conduct, it equated plaintiffs' position to one "claiming that their purchases, *ipso facto*, caused an economic loss." *Id.* at *3. The Court considered their claim akin to purchasers who ingested the drug Duract who were found uninjured because "Duract worked." *Id.* (quoting *Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 317 (5th Cir. 2002)).

Monsanto has not moved for dismissal and such decisions disregard Missouri law in multiple respects.  **First**, benefit-of-the-bargain loss is indeed determined at time of sale. *Murphy,* 503 S.W.3d at 313; *see also Schoenlein,* 260 S.W.3d at 854 (rule measures damages "at the time of the transaction"); *Sunset Pools of St. Louis, Inc. v. Schaefer*, 869 S.W.2d 883, 886 (Mo. App. E.D. 1994) (same).[22] In *Schoenlein*, for example, plaintiffs alleged failure to provide home warranties in a timely manner.  260 S.W.3d at 853.  Defendant eventually provided the warranty and hence, argued that plaintiffs received the benefit of their bargain.  However, under the "correct" benefit-of-the-bargain measure, loss is determined "at the time of the transaction."  *Id*. at 854 (citing cases and remanding on damages only). In *Craft*, plaintiff "retained and consumed" the cigarettes.  *Craft v. Philip Morris Cos., Inc.*, 2003 WL 23139381, at *4 (Mo. Cir. Ct. Dec. 31,

---

[21] *Mikhlin v. Johnson & Johnson*, 2014 WL 6084004 (E.D. Mo. Nov. 13, 2014), also cited by Monsanto, followed this analysis on a motion to dismiss.  *See id.* at *3.

[22] This is not to say that date(s) of purchase have bearing on certification. *See Plubell*, 289 S.W.3d at 714 ("Because Plaintiffs alleged Merck misrepresented Vioxx throughout the entire class period, individualized evidence as to the company's representation at the time of each class member's purchase will not be required.").

2003.  Nevertheless, injury could be based on failure to receive the value of a low tar, low nicotine cigarette.  *Id.* at *5.  The Eastern District recognized that this "goes to the condition of the product at the time of the purchase transaction" and did "not consider the consumer's manner of use . . . after purchase" such to raise individual issues.  *Craft*, 190 S.W.3d at 382.

A measure of damages that does not look to post-purchase activity in no way translates to "*ipso facto*" injury.  *BPA II*, 2011 WL 6740338, at *3.  There still must be some difference between the value of the product as is and the value of the product as represented.

**Second**, use or consumption cannot destroy the benefit-of-the-bargain rule, which indeed is the appropriate measure when a plaintiff **_has retained_** the product rather than rescinding the transaction and returning it.  *See Sunset Pools*, 869 S.W.2d at 886 ("Courts of this state apply the benefit of the bargain rule to determine the damages in cases of fraud or deceit where the parties have not elected to rescind the contract and seek restitution.").

**Third**, loss under the MMPA does not require that a product be devoid of function.  In *Schoenlein*, plaintiffs lived in their home; in *Craft*, class members smoked the cigarettes. In *Hope*, class members drove their vehicles.  In *Plubell*, Merck argued at length that Vioxx was an effective pain reliever many class members still wanted and would use.  Just because a product can be said "to work" does not mean there is no injury.  *See also Sitzer v. Nat'l Ass'n of Realtors*, 420 F. Supp. 3d 903, 918 (W.D. Mo. 2019) (that plaintiffs received the services they contracted for does "not mean Plaintiffs fail to plead an ascertainable loss" under the MMPA).

*Rivera*, on which *BPA II* relied, addressed neither the MMPA nor Missouri law on benefit of the bargain.  *See Rivera*, 283 F.3d at 317 ("plaintiffs state their complaint under Texas law").[23]

---

[23] Other cases cited in *BPA I* also do not address the MMPA.  *Myers-Armstrong v. Actavis Totowa, LLC*, 2009 WL 1082026 (N.D. Cal. April 22, 2009) involved California purchasers with claims under California law. *In re McNeil Consumer Healthcare, Mkg. and Sales Pracs. Litig.*, 2011 WL 2802854 (E.D. Pa. July 15, 2011) involved alleged violations of several consumer fraud laws but nowhere addresses the MMPA.

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

Moreover, the court was analyzing whether plaintiffs were denied their bargain under contract principles designed to "place the injured party . . . in the position that he would have occupied had the defaulting party performed the contract." *Id.* at 320 (citation omitted). Under that conception, the court found that had Wyeth "provided additional warnings or made Duract safer," plaintiffs taking the drug "would be in the same position they occupy now." *Id.* Missouri, however, ***does not follow*** that formulation of a benefit-of-the-bargain analysis. As explained in *Craft*, some states follow an "out-of-pocket" rule designed "to restore a defrauded plaintiff to . . . the same position he would have been in before the fraudulent transaction occurred." 2003 WL 23139381, at *6. Missouri, however, follows a value-comparison rule allowing compensation "for what [plaintiff] . . . might have gained if the representation had been true." *Id.* at *6–7 (citing cases). *E.g., Grabinski v. Blue Springs Ford Sales, Inc.*, 136 F.3d 565, 570 (8th Cir. 1998) (testimony that vehicle was worth $2,500–$3,000 "but would have been worth $8,000 as represented" supported damages).

**Fourth**, injury under the MMPA does not require manifestation of defect. In *Hope*, the Western District rejected argument that the class definition was too broad because it included vehicle owners who did not experience the alleged dashboard bubbling. Plaintiffs' injury, however, was based on negative stigma effect on marketability and resale value; hence, whether owners experienced bubbling was immaterial. 353 S.W.3d at 78, 80. The Court also rejected Nissan's argument that a "diminished value" theory was not viable because "the merits of this theory are not properly our concern" at the class certification stage. *Id.* at 80.

Here, all Roundup products contain glyphosate, a carcinogen. That Plaintiffs do not assert personal injury (Opp. at 23) is immaterial. Injury can be economic. Mo. Rev. Stat. § 407.025.1 (ascertainable loss "of money or property"). A plaintiff ***does not*** receive the benefit of the bargain

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

if he receives something other, and of lesser value, than the product as represented.  This is so whether he uses it or not.  All of Monsanto's arguments are contrary to Missouri law.

## III.   COMMON ISSUES PREMOMINATE.

Monsanto adopts blindness to the many core common questions presented.  The arguments it does make are meritless.  Opp. at 32–39.  The first is infirm in multiple respects. The second is wrong for the same reasons as Monsanto's "overbreadth" arguments.  The third presumes that damages must be addressed at class certification, which they do not, focuses on the wrong "model" of damages, and impermissibly delves into merits of what Plaintiffs must prove.

### A.   There Are Numerous Common Questions to Meet Predominance.

Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). All issues need not be common.  A "***single common issue may be the overriding one*** in the litigation" regardless of whether it "entails numerous remaining individual questions."  *Plubell*, 289 S.W.3d at 713 (emphasis added).  Common proof need not be winning proof.  *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459–60 (2013).  Certification is not to "adjudicate the case" but to select the "metho[d] best suited" to fair and efficient adjudication.  *Id* at 460.  In sum, "predominance does not require that a single body of evidence satisfy the prima facie elements of an MMPA claim on behalf of every putative class member. Rather, it requires 'at least one significant fact question or issue, dispositive or not,' that is common within the class's claim." *Plubell*, 289 S.W.3d at 713.  Common questions may be "of fact *or* law and need not be one of each." *Elsea*, 463 S.W.3d at 418.  These standards are well recognized.[24]

---

[24] *Hope*, 353 S.W.3d at 81; *Doyle v. Fluor Corp.*, 199 S.W.3d 784, 789 (Mo. App. E.D. 2006); *Dale v. DaimlerChrysler Corp,* 204 S.W.3d 151, 175 (Mo. App. W.D. 2006); *Wright v. Country Club of St. Albans*, 269 S.W.3d 461, 466 (Mo. App. E.D. 2008); *Hale*, 231 S.W.3d at 244–25; *Craft*, 190 S.W.3d at 381–82);

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

Here, there are several core common questions. Monsanto simply ignores them. As Plaintiffs already have indicated, "[o]ne obvious overriding common issue is whether Monsanto's misrepresentations and omissions about Roundup constitute unfair and deceptive trade practices under the MMPA." Sugg. in Supp. at 13. "This and constituent issues are subject to common proof focused on Monsanto and its products; for example, the dangerous nature of Roundup, Monsanto's representations and omissions, and the false and misleading nature thereof." *Id.* at 14. The first of these—whether Roundup is dangerous—is central and drives several others, including the misrepresentative nature of Monsanto's statements and the "product-as-is" comparator for a benefit-of-the-bargain analysis. Proof will be the same as to all class members, entailing (undisputed) fact that all Roundup contains glyphosate and evidence of glyphosate's health risks. Monsanto's own (improperly merits-based) arguments illustrate the point. Its arguments and "evidence" pertaining to EPA registration, and attempts to discredit the IARC publication (Opp. at 5–7), if ultimately allowed, do not vary according to class member.

Also, and because "the legality of [Monsanto's] conduct" is central and common to all class members, predominance is satisfied by that question alone. *Plubell*, 289 S.W.3d at 713. Plaintiffs allege misrepresentations, concealment, suppression, and omissions. All look to Monsanto's own conduct and as such, proof is common to the class. *See id.* ("[i]t is the defendant's conduct . . . which determines whether a violation has occurred.") (citation omitted).[25] Roundup's risks and Monsanto's conduct are common and overriding. Predominance is satisfied.

---

*see also Morgan v. United Parcel Serv. of Am., Inc*., 169 F.R.D. 349, 357 (E.D. Mo. 1996) ("every question of law or fact does not have to be common to every member of the class.").

[25] Plaintiff also assert that Monsanto committed an "unfair" practice (Am. Pet. ¶ 91), which is "any practice which (A) Either (1) Offends any public policy . . . established by . . . statutes or common law of this state . . . ; or (2) Is unethical, oppressive or unscrupulous; and (B) Presents a risk of, or causes, substantial injury to consumers." 15 CSR § 60-8.020(1). As with other claims, reliance is not required. 15 CSR § 60-8.020(2). This violation focuses on Monsanto itself, health risks, and injury to consumers generally.

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

**B.**     **Monsanto's Argument That Roundup Use Defeats Predominance Is Meritless.**

Monsanto contends that whether class members purchased Roundup for "personal, family or household" use requires "subjective" individualized inquiries.  Opp. at 33.  **First**, purchase for one of the identified uses does not involve a "state of mind" such as subjective "dislike of saccharin" in *Coca-Cola* (Opp. at 34), which, moreover, was not decided on predominance. A class definition is not subjective because it includes the MMPA's "use" language.  Even if it were, and according to Monsanto's own presentation, the definition could be revised to describe class members according to products purchased.  *Infra*, Section VI.B–C.

**Second**, the question here is predominance.  The quote Monsanto lifts from *Dale* also does not address predominance but ascertainability.  *Dale*, 204 S.W.3d at 178.  And there, the Western District ***affirmed*** class certification, specifically ***rejecting*** argument "that any individualized fact-finding necessary to determine class membership renders the particular class definition in question infirm."  *Id.* at 181.  In doing so, it cited *Clark*, which holds in no uncertain terms that predominance is "not defeated simply because individual questions may remain" after common questions are determined. 106 S.W.3d at 488 (internal quotations and citation omitted). *Clark* recognized that whether defendant breached its contracts was the predominant issue, and that if established "for some or all" class members, "the trial court can proceed in the most expeditious and efficient way possible relative to any individual circumstances or issues that may exist."  *Id.* The predominant issue also "need not be dispositive of the controversy or even be determinative of the liability issues involved."  *Id.* (citation omitted); *accord McKeage*, 357 S.W.3d at 600 (same); *see also Craft,* 190 S.W.3d at 383 (if defendants' conduct violates the MMPA and caused ascertainable loss to "some or all" class members, trial court can "thereafter consider" remaining

---

Whether Monsanto's behavior was unethical, oppressive or unscrupulous focuses on standards of conduct, as does offense to public policy as reflected in statutes or common law.

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

individual issues); *Hale*, 231 S.W.3d at 226 ("Missouri does not require that the common issues advance resolution of the litigation in order for them to predominate").

**Third**, Monsanto's position that "personal" use does not include business use (Opp. at 33; Rossi Aff. ¶ 57) does not defeat certification.  As an initial matter, Plaintiffs strongly disagree with that position for all reasons set out in their Motion and Suggestions in Support of Motion to Compel (filed 7/20/2020) and Reply (filed 7/22/2020), which they reassert and incorporate herein.  The MMPA allows an action for "***any*** person," expressly defined to include business entities.  Mo. Rev. Stat. §§ 407.010(5), 407.025.1.  Had the Missouri legislature intended to exclude businesses as a category of "persons" with protection under the MMPA, it could have done so.  It did not.  In addition, if "personal" use were synonymous with "household' or "family" use, it would be mere surplusage, an interpretation contrary to canons of statutory construction. *See Comm. on Legisl. Research of Mo. Gen. Assembly v. Mitchell*, 886 S.W.2d 662, 664 (Mo. App. W.D. 1994) ("We must presume that every word of a statute was included for a purpose and has meaning.").   It indeed is difficult to image how a business entity would make "household" or "family" use of a product. The word "personal" is included for a reason and must be given effect.  Its plain meaning is easily broad enough to encompass a company's own use, as opposed to resale.[26]   Plaintiffs continue to assert that persons who purchase a product for his, her, or its own use is afforded a claim based on the plain language and purposes of the MMPA.  The Missouri Supreme Court has

---

[26] The plain meaning of "personal" includes activities relating to or affecting a person and done in person. Sugg. Supp. Mot. Compel at 3 (citing dictionary). Farmers use Roundup to grow their own crops and "produce and harvest as much as possible." Muckerman Aff. ¶ 3; Rossi Aff. ¶ 36. Golf courses use Roundup to manage their turf. Rossi Aff. ¶50. Landscapers and contractors use Roundup to fulfill their own customer service engagements.  Owen Aff. ¶¶ 8, 9. These and other purchasers make their own use of Roundup. They are no less consumers or "persons" than "household" users. Dr. Rossi's opinions on the subject are inadmissible legal conclusions he is not qualified to make.  *See* Rossi Aff. ¶ 59.

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

consistently rejected attempts to narrow the MMPA and consistently indicated that it should be construed broadly consistent with its broad language and protective purposes.[27]

In any case, Monsanto urges that business use does not qualify as "personal" use for AG and I&P purchasers (Opp. at 33–34) and in passing for L&G purchasers (Opp. at 35 n.24). Whether that is so is a legal question inappropriate at certification.  In *Craft*, for example, whether the MMPA requires "transaction causation" had not yet been addressed (as later in *Edmonds* and *Plubell*).  The Court held that whether plaintiffs stated a claim "is not properly part" of certification but "should be resolved in the context of a motion to dismiss, a motion for summary judgment, or at trial." *Craft*, 190 S.W.3d at 384.  Such conclusions go "to the merits," not properly considered. *Id.*  Questions of standing also are premature.  *Infra*, Section IV.A.2.

If this Court, however, disagrees on all points, Monsanto's own presentation indicates that the class definition can be amended to limit membership to L&G purchasers.  *Infra*, Section VI.C.  Such an amendment removes Monsanto's arguments as to other purchasers.  Monsanto's footnote suggestion that "some [L&G] buyers surely intend to use the products for a business (Opp. at 35 n. 24) is untenable.  Just as Monsanto suggests that "it is basic common sense that virtually all [AG and I&P] purchases fall outside" household use (Opp. at 33), it is basic common sense that virtually all L&G products fall within it.  Evidence similar to what Monsanto itself presents (as tested and developed in discovery), respecting separate treatment of L&G products for home use,

---

[27] In *Huch*, the court rejected application of the voluntary payment doctrine, which prohibits recovery for a person who voluntarily pays money with full knowledge of the facts[.]" 290 S.W.3d at 726.  Describing the MMPA as "paternalistic" with "broad scope" (*id*. at 725, 727), it held that allowing a defendant to avoid liability "would nullify the protections of the act and be contrary to the intent of the legislature."  *Id.* at 727.  In *Gibbons v. J. Nuckolls, Inc*., 216 S.W.3d 667 (Mo. 2007), it held that privity is not required, *id*. at 669, recognizing that "[r]elevant precedent consistently reinforces" the plain language, spirit and protective purposes of the MMPA.  In *Conway*, it construed "in connection with" to include collection practices, consistent with case law interpreting the MMPA "to provide protection . . . in a gradually increasing variety of circumstances" and the broad scope of what the MMPA prohibits. 438 S.W.3d at 416.

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

is itself common proof of that use.  Monsanto's call upon this Court's observation that use is a fact question (Opp. at 33) again forgets that the merits are not at issue.  Even Monsanto concedes that "most" L&G purchasers are home-use purchasers.  Opp. at 35 n.24.  Bare possibility that some may make another use of Roundup is no reason to deny certification.

### C.  Benefit-of-the-Bargain Injury Is an Objective Standard.

Monsanto makes the same reliance-based arguments on predominance as it did for its over-breadth arguments, and they are just as wrong as before.  Opp. at 35.  Missouri's benefit-of-the-bargain rule is "applicable in MMPA cases to meet the element of ascertainable loss" and recognized as an ***objective*** standard not requiring individualized inquiry.  *Plubell*, 289 S.W.3d. at 714-15; *Craft*, 190 S.W.3d at 382; *Coca-Cola*, 249 S.W.3d at 863 (distinguishing *Craft*); *see also In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Pracs. Litig.*, 2019 WL 1418292, at *20 (W.D. Mo. Mar. 21, 2019) ("this proposed model can be used to measure damages on a classwide basis").

Any suggestion that Plaintiffs are required to present their evidence at this stage is also wrong.  *See Hope*, 353 S.W.3d at 80 (rejecting argument against "stigma-loss" theory as "the merits of this theory are not properly our concern" at class certification); *id.* at 84 ("we do not know how Plaintiffs will go about attempting to show . . . that there is an 'ascertainable loss' in this case. Nevertheless, we must proceed on the assumption (yet to be determined in the trial court) that Plaintiffs can show that there is an ascertainable loss, an economic injury, from the alleged stigma."); *Plubell*, 289 S.W.3d at 715 (whether a plaintiff "is able to prove a theory is irrelevant at the class certification stage").

### D.  Although Not Required, Classwide Damages Can Be Demonstrated by Objective Benefit-of-the-Bargain Measure or "Model" of Damages.

Plaintiffs also are not required to present their evidence on quantum of damages.  Indeed, they are not required to demonstrate a classwide model of damages at all.  Monsanto's citation to

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

*Comcast* does not aid it. In *Comcast*, expert testimony on a damages model ***was*** presented and the decision neither requires such testimony nor that a classwide model be presented (there an unchallenged proposition); it simply requires that damages sought be consistent with injury claimed. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (model supporting plaintiff's damages case "must be consistent with its liability case").[28]  *See also Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015) (*Comcast* "did not hold that proponents of class certification must rely upon a classwide damages model to demonstrate predominance");  *In re Deepwater Horizon*, 739 F.3d 790, 815 (5th Cir. 2014) (rejecting argument that class cannot be certified "where the class members' damages are not susceptible to a formula for classwide measurement . . . [as] a misreading of *Comcast* . . . which has already been rejected by three other circuits") (collecting cases); *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 375 (3d Cir. 2015) (it is a misreading of *Comcast* to interpret it as "preclud[ing] certification under Rule 23(b)(3) in any case where the class members' damages are not susceptible to a formula for classwide measurement") (citation omitted); *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 105 (S.D.N.Y. 2016) (finding "nothing improper about plaintiffs' decision not to proffer expert damages analysis at this stage, given that plaintiffs are not required to . . . proffer a damages model . . . on class certification").

Since *Comcast* was decided, the Supreme Court has made clear that certification ***does not*** require evidence of classwide damages. *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036,

---

[28] In *Comcast*, plaintiffs did not challenge whether class certification required method to prove classwide damages and thus the ruling was "good for this day and case only" as there is "well nigh universal" recognition "that individual damages calculations do not preclude class certification." 569 U.S. at 42 (Ginsburg & Breyer, JJ., dissenting).  Monsanto's reliance on *Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773 (8th Cir. 2013) also is misplaced.  That case did not deny certification based on need for damage model but perceived individual questions "necessary to determine breach of contract and bad faith" in an insurer's claims processing. *Id.* at 779; *see also id.* at 80 (concluding that the "reasonableness of any claim payment" would need to be individually analyzed).

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

1045 (2016) (certification proper although "other important" matters would need to be tried separately "such as damages"); *see also* 2 Newberg on Class Actions § 4:54 (5th ed.) ("courts in every circuit have uniformly held that the 23(b)(3) predominance requirement is satisfied despite the need to make individualized damage determinations"). The Missouri Supreme Court holds that "need for inquiry as to individual damages does not preclude a finding of predominance." *Clark*, 106 S.W.3d at 488; *see also Hale*, 231 S.W.3d at 224–25 (same); *Doyle*, 199 S.W.3d at 789–90 (same).[29]  Simply put, proof of damages is not prerequisite to class certification.[30]

Even if considered, Monsanto is incorrect to say that Plaintiffs have proposed no "damage model."  Opp. at 36, 39.  Both injury *and* damages can be determined by comparing the "as is" value of Roundup (with health risk) to its "as represented" value (without health risk) under Missouri's benefit-of-the-bargain rule.[31]  Such a model is fully consistent with Plaintiffs' liability theory and expressly approved for MMPA claims alleging a misrepresented product.

---

[29] *See also Menocal v. GEO Group, Inc*., 882 F.3d 905, 922–23 (10th Cir. 2018) ("the fact that damages may have to be ascertained on an individual basis" is insufficient to defeat certification) (citation omitted); *Yokoyama v. Midland Nat. Life Ins. Co*., 594 F.3d 1087, 1094 (9th Cir. 2010) ("damage calculations alone cannot defeat certification"); *McLeod v. Bank of Am., N.A*., 2017 WL 6373020, at *17, n.24 (N.D. Cal. Dec. 13, 2017) (leaving to later determination whether aggregate damages calculation would be appropriate and recognizing discretion to shape proceedings at later stages).

[30] Monsanto also relies on *In re Rail Freight Fuel Surcharge Antitrust Litig*., 725 F.3d 244, 253 (D.C. Cir. 2013), in which, like *Comcast*, an expert did present a damages model found to be infirm.  Even before *Tyson* made the Supreme Court's view plain, courts read that case more narrowly than Monsanto or outright disagreed with it.  *See, e.g., Neale*, 794 F.3d at 375 n.10 ("One could read [*Rail Freight*] out of context as saying that all classes require a damages model; however, like *Comcast*, the analysis as to classwide damages was specific to that antitrust claim."); *Guido v. L'Oreal, USA, Inc*., 2014 WL 6603730, at *13, 14 (C.D. Cal. July 24, 2014) (*Rail Freight* "read properly, does not require plaintiffs to actually prove classwide injury as a predicate to class certification" and even if so, is inconsistent with decisions . . . "that the strength of a plaintiff's claim is not at issue when deciding whether to certify a class").

[31] Monsanto points to "refund" language in the petition (Opp. at 36) but Plaintiffs allege benefit-of-the-bargain injury and this is the damages theory on which they rely. Monsanto also points to "refund" language used by Plaintiffs at deposition, but they are neither lawyers nor damages experts. *See Craft*, 2003 WL 23139181, at *6 ("Plaintiff is only a lay person, and should not be expected answer the question at deposition of what relief she seeks by explicating a legal theory of damages."). Monsanto indicates its understanding that a benefit-of-the-bargain theory is pled by its own attempt at improper merits-based challenge thereto.  *See* Opp. at 39; Rossi Aff. ¶¶ 99, 105, 106.

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

Monsanto attempts to construe the petition as conceding that Roundup "is not worthless" (Opp. at 37), when it makes no such concession, and points again to Dr. Rossi's irrelevant, reliance-based opinions.   *Id.*  Monsanto also misapplies what it calls a "*Craft* line of cases" to the effect that a "full refund" measure or "model" is available only if a plaintiff receives "nothing of value."  Opp. at 36–37.  Plaintiffs, however, are relying on a benefit-of-the-bargain "model" of damages, which of course, the *Craft* case acknowledged as appropriate.[32]  And again, what the evidence will show in terms of "as is" or "as represented" Roundup value is not now at issue or required for certification.  *Hope*, 353 S.W.3d at 80, 84;  *Plubell*, 289 S.W.3d at 715; *see also In re Dollar Gen.,* 2019 WL 1418292, at *20 (rejecting argument "regarding varying capability of recovering full-refund damages because at the class certification stage, Plaintiffs are only required to show that 'common questions to the class predominate, not that those questions will be answered in favor of the class.'") (quoting *Amgen*, 568 U.S. at 459).[33]

Monsanto also contends that a "refund model" cannot be applied because it "presupposes the ability to determine how much each class member *paid* for the products they bought," which Monsanto says cannot be done because it "has no master list of . . . prices paid" for L&G products

---

[32] The trial court in *Craft* was not in the position of addressing evidence on value—either "as is" or "as represented"—and that was no impediment to certification. *Craft*, 190 S.W.3d at 385–86.

[33] For all these reasons, Dr. Rossi's ruminations about a "refund measure" of damages (*see* Rossi Aff. ¶¶ 101–104) are off base.  His example interestingly admits that a "fraudulent Chiefs ticket sold on CraigsList has no value as received and therefore refund "is a valid economic measure of damages." *Id.* at ¶ 101.  He then opines that if the seat is inferior to the one promised, full refund is not justified, presumably because the purchaser still has a seat at the game.  As discussed, however, Missouri law on benefit-of-the-bargain assesses value ***at purchase***.  And of course, a Chiefs ticket is not a product with serious health risk.  His opinion that the value of Roundup is "not equal to zero" (*id.* at ¶ 102) is only his opinion and well into a merits debate.  As an aside, however, Plaintiffs note that it possible and permissible that an "as is" value be zero within a benefit-of-the bargain analysis. In addressing defendant's argument that a "diminished value" theory for correctable vehicle flaws is different than the situation in *Plubell*, the Western District itself recognized that "defective drugs, which cannot be fixed or repaired, have no value." *Hope*, 353 S.W.3d at 83–84.  That indeed was the evidence ultimately presented in *Plubell*.

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

and Plaintiffs "offer no way to obtain that information with classwide evidence."  Opp. at 37–38.

The latter part of this statement is nonsensical.  Plaintiffs have no burden to "obtain" price

information with classwide evidence.  They can present such evidence via expert opinion.  Pricing

information can be obtained through discovery. That Monsanto itself has no "master list" of L&G

pricing, even if true, is hardly an insurmountable obstacle.  For example, Monsanto identifies the

Scotts Company as its "exclusive agent" for L&G products.  Opp. at 7–9.  It does not say that

Scotts lacks a price list or that pricing information cannot be had through other means.  The same

is true of Monsanto's other products.[34]  Discovery has only begun and again, what Plaintiffs will

be able to prove after full discovery in this case is not at issue.

Moreover, Monsanto's representations about pricing generally, as well as rebates and the

like on net expenditure (*see* Opp. at 38) appear based on the misconception that Plaintiffs rely on

an "out-of-pocket" damages model entailing expenditure by each class member for each Roundup

product.  A benefit-of-the-bargain analysis, however, relies on *value* assessment based on product

condition ("safe" Roundup versus carcinogenic Roundup).  The idea that each class member would

need to be examined on the cost of Roundup he bought is misplaced and again, was rejected in

*Plubell*.  *See* Ex. E at 38–44 (asserting individual inquiry regarding cost of alternative therapies);

*Plubell*, 289 S.W.3d at 714–15 (rejecting argument).

What each class member ultimately would recover also is not at issue.  In class actions, it

appropriate to calculate aggregate damages leaving method of distribution to claims process.  *See*

*Gerken v. Sherman*, 351 S.W.3d 1, 11 (Mo. App. W.D. 2011) ("aggregate proof of damages is

proper" and claims process can determine distribution); *New England Carpenters Health Benefits*

*Fund v. First DataBank, Inc.*, 248 F.R.D. 363, 371 (D. Mass. 2008) (damages need not be

---

[34] For example, Monsanto does set pricing for AG and I&P products at distributor level and has information on average pricing for AG products at retail level.  Muckerman Aff. ¶¶ 18, 20; Owen Aff. ¶ 24.

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

calculated with "absolute precision" and may be proven by reference to the class "rather than by reference to each individual class member") (quoting Newberg on Class Actions § 10.5 (4th ed. 2002)).   One of Monsanto's own cases holds that even assuming that "distribution of damages among class members" would require some form of individualized determination (*e.g.*, number of cigarette packages purchased), this is "not a sufficient reason to deny class certification." *Collora v. R.J. Reynolds Tobacco Co*, 2003 WL 23139377, at *4 (Mo. Cir. Ct. Dec. 31, 2003) (citing *Clark*, 106 S.W.3d at 488).  It also acknowledged that proof can be handled through administrative claims process, "without the need for individual trials on damages." *Id.*

Monsanto's efforts to undermine a benefit-of-the-bargain analysis (Opp. at 39) also is contradicted by *Collora*, which approves that model, says nothing about how a plaintiff must go about his proof, and makes clear (contrary to Rossi's opinions about use of Roundup), that persons are injured ***at point of sale*** when they receive a lesser-value, misrepresented product ***regardless*** of "their different reasons for buying [the product] and the many different ways they intended to use it." 2003 WL 23139377 at *3.  Monsanto's claim that a benefit-of-the-bargain measure "would not be viable" (Opp. at 39) is an inappropriate merits issue.  *Hope*, 353 S.W.3d at 80, 84.

Monsanto will have full opportunity to test the methodologies and opinions of Plaintiffs' expert at the merits stage and can seek decertification if it chooses (as in *Plubell*).  The subject of damages is not a required part of the inquiry and even if it were, benefit-of-the-bargain is a model approved for this kind of case.  Monsanto's arguments are misfocused, premature, and immaterial.

## IV.   PLAINTIFFS ARE TYPICAL AND ADEQUATE REPRESENTATIVES.

### A.   Plaintiffs' Claims Are Typical of the Class.

Typicality is fairly easily met "so long as other class members have claims similar to the named plaintiff." *Hale*, 231 S.W.3d at 223 (quoting *DeBoer v. Mellon Mort. Co*., 64 F.3d 1171,

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

1174 (8th Cir.1995)).  "If the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory, factual variations in the individual claims will not normally preclude class certification."  *Id*.  The claims of every class member need not be identical.  *See, e.g., Elsea*, 463 S.W.3d at 420 (trial court erred in finding that individual variances in asbestos exposure defeated typicality).

### 1.    Plaintiffs' claims are not atypical of other class members.

Monsanto's suggestion that Plaintiffs' claims are not typical because they bought Roundup "for home use" while other class members include "farmers, landscapers, and other professional users" (Opp. at 27) is meritless.  *All* claims in this case arise from Monsanto's course of conduct misrepresenting and concealing Roundup's health risks.  While Monsanto makes much of its own distinctions between product lines, the admitted fact remains that *all* Roundup products contain glyphosate (Opp. at 5), alleged to be carcinogenic. Monsanto misrepresented, concealed, and omitted the truth not just as to some products but all of them. And the remedial theory is the same for all purchasers—Monsanto committed practices declared unlawful by Section 407.020, and the Roundup they purchased was worth less than the Roundup Monsanto held out.

Monsanto's citation to *Dale* (Opp. at 27) hurts rather than helps it.  There, plaintiff's vehicle "was one of a relatively small subset" with a design flaw and there were "ten distinct iterations of the power window regulators" during the relevant time period.  204 S.W.3d at 170. The Court, however, *affirmed* certification, finding that plaintiff's MMPA claim was "based on the same conduct . . . giving rise to the same legal theory as the putative class members, regardless of which design of the power window regulator motor is involved."  *Id*. at 171.  The same is true here.

Monsanto cites *In re Milk Prods. Antitrust Litig.*, 195 F.3d 430 (8th Cir. 1999) for a "unique defense" soundbite (Opp. at 27) but the only supposed "unique defense" it raises is that Mr.

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

Tomlinson "fully used each Roundup® product he bought."  Opp. at 29.  Monsanto also puts this into categories of standing and failure to state a claim.  *Id.* at 29–30.  Monsanto's standing argument is misplaced generally and its substantive position both merits-based and meritless. As discussed, MMPA claims are often brought by persons who use or consume a product, Missouri's benefit-of-the-bargain rule does not consider post-purchase conduct, and ***is precisely*** the theory appropriate for purchasers who, for whatever reason, do not return a product and sue for rescission. *Supra*, Section II.B.   Moreover, the class is not limited to persons who forwent use of the product, and Monsanto itself claims that many purchasers used or consumed the Roundup they bought.  *See* Opp. at 23.  Monsanto's non-defense is not unique to Mr. Tomlinson.

Finally, whether the petition states a claim is not part of Missouri's certification analysis, *Craft*, 190 S.W.3d at 384, and whether Mr. Tomlinson ultimately may recover, "depending on the various defenses that may be asserted, is irrelevant to whether his claim is typical of the claims of the class members."  *Dale,* 204 S.W.3d at 172; *see also Plubell* 289 S.W.3d at 716 (contention that plaintiff did not 'purchase' Vioxx, and legal effect thereof, are "defenses that go to the merits . . . and are not properly considered in class certification;" moreover, such issues did not make plaintiff's claims atypical as "common logic would indicate that many of the class members' insurers paid for their Vioxx prescriptions").  Put succinctly, typicality and adequacy "focus[] on the plaintiff's claims, not on the defendant's defenses." *Bellinder v. Microsoft Corp*., 2001 WL 1397995 at *3 (D. Kan. Sept. 7, 2001).

## 2. Monsanto's "standing" argument is misplaced, premature, and rejected by a majority of courts.

Monsanto also urges that Plaintiffs lack standing to pursue claims on behalf AG and I&P purchasers because Plaintiffs purchased L&G products.  Monsanto cites two federal cases—*Rawa*

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

*v. Monsanto Co.*, 2017 WL 3392090 (E.D. Mo. Aug. 7, 2017) and *Kelly v. Cape Cod Potato Chip Co.*, 81 F. Supp. 3d 754 (W.D. Mo. 2015)—for that proposition.   Opp. at 29.

**First**, Monsanto conflates standing with typicality, the latter of which is the question at hand.  Missouri courts treat class certification as antecedent to standing.  *Mitchell v. Resid. Funding Corp.*, 334 S.W.3d 477, 490 (Mo. App. W.D. 2010); *accord Lucas Subway MidMo, Inc. v. Mandatory Poster Agency, Inc.*, 524 S.W.3d 116, 131 (Mo. App. W.D. 2017) ("Only once a class has been certified are standing requirements assessed . . . We find the circuit court erred in finding that standing should be a bar to class certification at this stage.").  Neither of Monsanto's cases are to the contrary as both were decided on a motion to dismiss.

Admitting that federal standing requirements "obviously do not apply in Missouri courts," Monsanto nonetheless says this Court should apply them.  Opp. at 29, n.20.  Monsanto, however, does not actually take up federal standing requirements in class actions (which are not uniform).  Indeed, majority rule is that "the standing inquiry focuses on the class representatives" rather than unnamed class members.  1 Newberg on Class Actions § 2:3 (5th ed.).

**Second**, and aside from when it should be addressed, federal courts regularly hold that a representative plaintiff has "standing" to assert claims on behalf of others similar to his own.  *E.g.*, *Gratz v. Bollinger*, 539 U.S. 244, 265 (2003) (plaintiff had standing to challenge race-based admissions criteria for both freshmen and transfer applicants although plaintiff only applied as a freshman, where similar criteria used in both contexts).  This includes cases involving products similar to the one plaintiff purchased.  In *In re Dollar Gen.*, the Court rejected argument that a class could not be certified "because the representative Plaintiffs lack standing to assert claims on motor oil they did not purchase" as characteristics of the different motor oils and alleged misrepresentations were similar,  2019 WL 1418292, at *12*; see also Suchanek v. Sturm Foods,*

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

*Inc.*, 2019 WL 1978342, at *2 (S.D. Ill. May 3, 2019) ("The majority of courts hold "that a plaintiff may have standing to assert claims for unnamed class members based on products he or she did not purchase so long as the products and alleged misrepresentations are substantially similar.") (quoting *Brown v. Hain Celestial Grp., Inc.*, 913 F. Supp. 2d 881, 890 (N.D. Cal. 2012)).[35]   Such an analysis is satisfied here. Plaintiffs and all other class members purchased glyphosate-containing products, all of which were marketed and sold as safe and without disclosure of carcinogenic qualities. Plaintiffs and all class members complain of the same misconduct based on the same legal theory. Standing is no bar to certification.

### 3.    Plaintiffs are not "atypical" for lack of knowledge regarding AG and I&P product features and uses.

Monsanto also claims that Plaintiffs are not "typical" of AG or I&P purchasers because they "lack understanding" of details like product formulations, tank-mixing, pricing, rebates, and the like.  Opp. at 28.  *Milk Products*, on which Monsanto relies, says nothing about how much a named plaintiff must know about other class members. 195 F.3d at 437.  And Monsanto's position is meritless.  **First**, its argument does not even speak to typicality, which asks whether plaintiffs and class members have similar grievances, not similar levels of knowledge. **Second**, even had Monsanto put its argument in proper context, "[a] class representative need only possess "a minimal degree of knowledge necessary to meet the adequacy standard." *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007) (citation omitted); *see also In re Novo Nordisk Sec. Litig.*, 2020 WL 502176, at *6 (D.N.J. Jan. 31, 2020) (same); 1 Newberg

---

[35] *Texas Grain Storage, Inc. v. Monsanto Co.*, 2019 WL 4087430 (W.D. Tex. June 24, 2019), also cited by Monsanto (Opp. at 28) was a Sherman Act anti-trust case.  There, the court already had entered dismissal on "tying" claims (*i.e.*, that plaintiff was forced into buying Roundup in order to purchase Monsanto's genetically modified seed) because plaintiff never bought Monsanto's seed. *Id*, at *2. For the same reason, he could not assert a "bundling" claim.  *Id*.  Here, Plaintiffs themselves purchased Roundup, do have MMPA claims, and are asserting the same theories as all other class members.

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

on Class Actions § 3:67 (5th ed.) ("A proposed representative's knowledge of the case need not be robust . . . while a plaintiff must have some knowledge of the litigation and facts of the case, he need only possess a minimal degree of knowledge necessary to meet the adequacy standard") (internal citation and quote marks omitted).

Both Plaintiffs clearly understand what this litigation is about. *See* Richardson Dep. excerpts, attached as Ex. G, at 209:15–19 (explaining that Monsanto "has misrepresented the fact . . . that Roundup causes cancer"); Tomlinson Dep. excerpts, attached as Ex. H, at 34:20–22, 125:15–20 (explaining that glyphosate is the active ingredient in Roundup and Monsanto failed to warn him and the class about the risks).  Their claims arise from the same course of conduct and present the same legal or remedial theory as all other class members.  More is not required.

**B.      Ms. Richardson Is an Adequate Representative.**

        **1.      Ms. Richardson has adequate knowledge and will fulfill her obligations as class representative.**

Monsanto's challenge to Ms. Richardson's adequacy on a "knowledge-of-the litigation" basis is similarly meritless.  Opp. at 31–32.  Adequacy primarily tests whether "the interest of the [class] representative and that of the absent [class] members [are] compatible, not antagonistic." *Elsea*, 463 S.W.3d at 421.  There is no antagonism here.  Beyond that, the basic question is whether a named representative will "vigorously prosecute the interests of the class through qualified counsel." *Paxton v. Union Nat. Bank*, 688 F.2d 552, 563 (8th Cir. 1982). Monsanto does not dispute that counsel are qualified.  And adequacy demands "only an understanding of the basic facts underlying the claims, some general knowledge, and a willingness and ability to participate in discovery." *Quiroz v. Rev. Prod. Mgmt., Inc.*, 252 F.R.D. 438, 442 (N.D. Ill. 2008) (internal

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

quotations and citation omitted).[36]  Ms. Richardson understands not only the fundamentals of the litigation, but her obligation to "stay informed" (Richardson Dep. 167:8–9) and her role as representative of "anyone in the State of Missouri who purchased Roundup" except those with personal injury claims.  *Id.*, at 167:9–12; 170:20–24.  She is committed to making herself available to fulfill all duties of a class representative, *id.* at 174:17–20, reviewed relevant pleadings, *id.* at 176:7–9, and has demonstrated willingness to participate in discovery by sitting for deposition.

### 2.  Ms. Richardson is not disqualified because of "family relationship".

Monsanto also attempts to disqualify Ms. Richardson because of supposed "close family tie" to a lawyer at Stueve Siegel Hanson.  In fact, George Hanson (a partner with SSH not active in this case), is merely Ms. Richardson's ***former*** son-in-law. Richardson Dep. at 22:2.  Monsanto's argument again is meritless.  Preference against familial relationships "is directed at a particular ethical problem," *i.e.*, conflict that might arise when class representative stands "to gain financially from an award of attorney's fees made out of a class fund."  *Phillips v. Joint Legisl. Comm. on Perf. & Exp. Review of State of Miss.*, 637 F.2d 1014, 1023–24 (5th Cir. 1981).  Courts have little trouble finding class representatives adequate absent showing that he or she "is likely to have any interest in any fee which may be recovered by [the related lawyer] if plaintiff is successful in his case."  *Fischer v. Int'l Tel. & Tel. Corp.*, 72 F.R.D. 170, 174 (E.D.N.Y. 1976); *see also Lewis v. Goldsmith*, 95 F.R.D. 15, 20 (D.N.J. 1982) (nephew of counsel adequate representative); *Dale*, 204 S.W.3d 151, 173–74 ("class actions have built-in safeguards . . . to insure fair and adequate

---

[36] Monsanto cites *Berger v. Compaq Computer Corp.*, 257 F.3d 475 (5th Cir. 2001), but that case stated only that adequacy had been improperly presumed. *Id.* at 480.  In Monsanto's other cases—*In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, 2009 WL 331426 (D.N.J. Feb. 10, 2009) and *In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132 (S.D.N.Y. 2008)—classes ***were certified***, and the courts simply removed proposed representatives who, by contrast with Ms. Richardson, were ***woefully*** ignorant about their cases. *See, e.g., Monster Worldwide* 251 F.R.D. at 135 (among other things, representative did not know if an amended complaint had been filed or whether he had ever seen any complaint in the action).

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

representation" and detect actual conflict; as such, there no need "for a per se rule, disqualifying any class representative who is related to an employee/non-lawyer of class counsel").[37]

Monsanto attempts no such a showing, and there is no reason to presume a conflict.  Ms. Richardson's family tie not only is attenuated but extinguished.  Moreover, there is another named plaintiff—Mr. Tomlinson—with "no relationship with any of plaintiffs' attorneys."  *Malchman v. Davis*, 588 F. Supp. 1047, 1057 (S.D.N.Y. 1984), *aff'd as modified*, 761 F.2d 893 (2d Cir. 1985).  Monsanto's argument is meritless.

## V.   A CLASS ACTION IS A SUPERIOR FORM OF ADJUDICATION.

Class treatment in this case is superior for all the reasons set out in Plaintiffs' opening brief. Sugg. in Supp. at 14–16.  Monsanto does not challenge those reasons, but rather, suggests that customers (L&G only) can obtain "a full refund" if "unsatisfied for any reason."  Opp. at 39–40. This argument has been explicitly rejected in cases including those in which Monsanto has asserted it.  *Martin v. Monsanto Co*., 2017 WL 1115167, at *9 (C.D. Cal. March 24, 2017).  Some courts refuse even to entertain offer of a refund because "it does not comport with the plain language of Rule 23," which, like Missouri Rule 52.08(b)(3), "directs courts to consider other available methods *of adjudication*."  *Forcellati v. Hyland's, Inc*., 2014 WL 1410264, at *12 (C.D. Cal. Apr. 9, 2014) (emphasis added); *see also Martin*, 2017 WL 1115167, at *9 ("the analysis is whether the class action format is superior to other methods of adjudication, not whether a class action is superior to an out-of-court, private settlement program") (internal citation, quote mark, and

---

[37] In *Irvin E. Schermer Tr. by Kline v. Sun Equities Corp.*, 116 F.R.D. 332 (D. Minn. 1987), cited by Monsanto, the court rejected disqualification based on family tie as "defendants have not presented any evidence that the close family relationship between the class representatives is likely to create a conflict of interest.  Further, any potential conflicts that may arise during settlement can be controlled by the court's power to review settlement agreements for fairness."  *Id.* at 338.  *O'Shaughnessy v. Cypress Media, L.L.C.*, 2015 WL 4197789 (W.D. Mo. July 13, 2015) addressed an *immediate* family tie (sibling) between counsel and class representative.  *Id.* at *5.  That is not the case here.

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

emended capital omitted).  Other courts willing to consider it hold that superiority is not defeated where the putative class seeks damages beyond refund amount.  *See Hill v. LLR, Inc.*, 2019 WL 2404900, at *13 (D. Mont. Mar. 8, 2019) (superiority not defeated where plaintiffs sought damages "in excess of those provided as part of a defendant-administered refund program"). Here, Plaintiffs seek punitive damages and attorney fees under Section 407.025 making refund insufficient.

Missouri courts have also rejected Monsanto's argument.  In *Lucas Subway,* the defendant, like Monsanto, argued that because refund was available, a class action suit was unnecessary and hence, not a superior form of adjudication.  524 S.W.3d at 128.  Reversing the trial court, the Western District explained that a plaintiff "should not be prevented from full recovery of the damages to which it is entitled simply because it was offered a refund of the product purchase price."  *Id*.  Because customers "cannot be forced to accept the remedy of a refund . . . and forgo their rights to an independent cause of action . . . the circuit court erred in finding that a class action was not a superior method of recovery[.]" *Id*. at 129.

## VI.     THE CLASS IS ASCERTAINABLE.

Monsanto opens its brief with ascertainability arguments (Opp. at 17–19) that are both exceedingly weak and easily answered through revision to class definition, which may be done at any time. "Missouri courts consistently recognize a certified class may subsequently be modified or decertified . . . Therefore, it would make no sense to require that the initial definition be the final definition."  *Hope*, 353 S.W.3d at 79 (citing cases). A court is "not bound by the class definition proposed in the complaint," *Lafollette v. Liberty Mut. Fire Ins*. 2016 WL 4083478, at *13 (W.D. Mo. Aug. 1, 2016) (citation omitted),  but may "redefine a proposed class in such a way as to allow the class action to be maintained."  *Id*. (citation omitted). Such authority, for example, permits subclassing, even *sua sponte*, and at such point as "the nature of the proof to be developed

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

at trial becomes clear." *Id*. (citations omitted). Certification "may be altered or amended' at any time before decision on the merits. Mo. S. Ct. Rule 52.08(c)(1); Fed. Rule 23(c)(1).

Moreover, "ascertainability" is not generally considered a strenuous test. *See Murphy v. Gospel for Asia, Inc*., 327 F.R.D. 227, 234, 235 (W.D. Ark. 2018) ("The requirement that a class be clearly defined . . . is not designed to be a particularly stringent test," but looks to whether "general outlines of the membership of the class are determinable") (citation omitted); *Aldapa v. Fowler Pkg.Co., Inc*., 323 F.R.D. 316, 343 (E.D. Cal. 2018) (definition need only "set forth common characteristics sufficient to allow a member of that group to identify himself or herself as having a [potential] right to recover based on the description").[38]  In this state, the Missouri Supreme Court's "primary concern" is that the definition not be too "amorphous, vague, or indeterminate." *Coca-Cola*, 249 S.W.3d at 861–62 (quoting *Craft*, 190 S.W.3d at 387).  While noting that it should be "sufficiently definite so that it is administratively feasible to identify members of the class[,]" *id*. at 862, the Court did not elaborate on what administrative mechanism may accomplish that task, and otherwise made clear that not "every potential member" of a class need be identified at commencement of the action.  *Id*.

### A.    Identification of Purchasers Is Administratively Feasible.

Monsanto does not suggest that "purchase" is subjective and clearly it is not.  *E.g., Craft*, 190 S.W.3d at 388 (purchasers of "Lights [cigarettes]" not claiming personal injury was "an ascertainable defined class" that did "not depend on the consumer's subjective state of mind"). Monsanto's argument is that: (1) it has no records of, and retailers have no "comprehensive list"

---

[38] Federally, many circuits reject a test requiring administrative feasibility. *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc*., 821 F.3d 992, 996 (8th Cir. 2016); *see also Briseno v. ConAgra Foods, Inc*., 844 F.3d 1121, 1123 (9th Cir. 2017) ("We have never interpreted Rule 23 to require [a showing of administrative feasibility], and, like the Sixth, Seventh, and Eighth Circuits, we decline to do so now.").

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

of, L&G purchasers (Opp. at 18; Rosenthal Aff. ¶ 18); and (2) AG and I&P products generally "are not sold directly" to end users.  *Id.* (citing Muckerman Aff. ¶ 15; Owen Aff. ¶¶ 9, 13).

Factually, Monsanto's criticisms, based on untested say-so, are unconvincing. Monsanto says retailers do not have a "comprehensive" list of L&G purchasers, not that they have no purchaser information at all.[39]  Monsanto says farmers purchase Roundup from retailers "within the AG sector" (Muckerman Aff. ¶ 16) and that it sells I&P products to distributors (*e.g.*, Helena Chemical, Nutrien, and SiteOne) and "specialty retailers" (*e.g.*, Tractor Supply Company, Rural King, Atwoods, and Bomgaars Supply).  Owen Aff. ¶¶ 9, 12.  Monsanto does not suggest that distributors or specialty retailers do not have customer lists, which they very likely do.

As much or more to the point, Monsanto produces one federal decision—*White*—to support the notion that there must be a "list" of purchasers before a class can be certified.  Opp. at 18.[40]  Such a requirement would deny certification for wide swaths of persons the MMPA was designed to protect and defeat legislative intent that class actions be allowed.  Other federal courts reject such arguments, recognizing that classes are "routinely" certified "where there are unlikely to be records of who purchased the product," *Guido v. L'Oreal, USA, Inc.*, 2014 WL 6603730, at

---

[39] Representation that retailers have no "comprehensive list" of purchasers comes from Monsanto's own lawyer in this case, who bases it on experience with "certain retailers." Rosenthal Aff. ¶ 18.  It is questionable whether Mr. Rosenthal can ethically serve as both witness and lawyer but that aside, he neither professes knowledge as to all retailers nor even identifies the retailers on which is opinion is based.

[40] In *In re Teflon Prod. Liab. Litig.*, cited by Monsanto, the court recognized that "[d]ocumentary evidence is not necessarily crucial to granting class certification." 254 F.R.D. 354, 363 n.14 (S.D. Iowa 2008).  The problem there was specific to the case. Plaintiffs sued DuPont, manufacturer of non-stick coating. Importantly, "DuPont does not manufacturer cookware—only the coating used on other manufacturers' cookware." *Id.* at 357 n.3.  Some cookware was branded with, *e.g.*, a "Teflon" label, and some was not. *Id.*  Many pans had no visible labels, and those that did "could not be identified as containing a Teflon® coating" due to uncertainties regarding year of manufacture and/or purchase. *Id.* at 361 n.13.  Also, "many class representatives mistakenly believe[d] their product contained Teflon® coating" when it did not, or that "all non-stick coating is from DuPont," when it was not. *Id.* at 362.  In addition, there already had been "a lengthy discovery period" without opportunity for better evidence.  In marked contrast, "Roundup" products are Monsanto products, all of them contain glyphosate, and discovery here has just begun.

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

*17 (C.D. Cal. July 24, 2014), and decline requirements defeating of class actions. *See Ries v. Arizona Bevs. USA LLC*, 287 F.R.D. 523, 535 (N.D. Cal. 2012) (rejecting argument that without receipts, administration would require "mini-trials" to establish whether each member had made a purchase: "This is simply not the case. If it were, there would be no such thing as a consumer class action."); *Ebin v. Kangadis Food Inc*., 297 F.R.D. 561, 567 (S.D.N.Y. 2014) (declining certification when consumers likely lack proof of purchase "would render class actions against producers almost impossible to bring.") (internal quotations and citation omitted). Federal courts in Missouri likewise reject such demands, holding that "class members are ascertainable through the use of self-identification affidavits." *In re Dollar Gen*., 2019 WL 1418292, at *16.

Missouri's Western District has held that fact-finding on class criteria (in a case involving more individualized questions than purchase) "does not necessarily render a class definition infirm" and further, that "class members are required to affirm their membership in a class by verifying satisfaction of class criteria." *Elsea*, 463 S.W.3d at 426. It is common and acceptable to do so at claims administration through means including declaration or affidavit. *In re Dollar Gen.*, 2019 WL 1418292, at *16; *see also In re: Syngenta AG MIR 162 Corn Litig*., 2016 WL 5371856, at *3 (D. Kan. Sept. 26, 2016) (if needed, producers "may be able to establish membership in the class properly by affidavit"); *Brown v. SCI Funeral Srvs. of Florida, Inc*., 212 F.R.D. 602, 606 (S.D. Fla. 2003) ("The mere fact that class members will have to file a claim form or affidavit stating whether and when they were provided with the pertinent disclosures does not preclude the application of class treatment.").

Monsanto's focus on perceived problem with consumer "memories" (Opp. at 17) is conceptionally unsound and plainly over-exaggerated. **First**, affidavits are used in litigation all

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

the time.  *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 669 (7th Cir. 2015).[41]  **Second**, there is no reason to suspect persons' memories.  While Monsanto suggests that Plaintiffs could not identify *every* Roundup product they purchased (Opp. at 18), class membership requires only *a single* purchase.  That is hardly a memory challenge.[42]

### B.    The Class Definition Is Not "Indefinite".

Monsanto also suggests that whether a class member purchased Roundup primarily for one of the MMPA uses renders the definition indefinite as to AG and I&P products.  Opp. at 19. Monsanto again relies on *Coca-Cola*, involving "subjective preference" against saccharine. Here, use is not some amorphous state of mind.  Indeed, courts have certified classes involving far more qualitative criteria.[43] They have little hesitation finding definitions incorporating a MMPA "use" component ascertainable. *See McAllister v. St. Louis Rams, LLC*, 2018 WL 1299553, at *6 (E.D. Mo. Mar. 13, 2018) (finding class definition in MMPA case that included being a Personal Seat

---

[41]  *BPA II*, cited by Monsanto (Opp. at 17), treated class membership as a "manageability" issue, was decided before *Sandusky*, which rejected heightened standard for ascertainability (*supra*, note 38) and is contrary to more recent federal decisions in Missouri.  *In re Dollar Gen.*, 2019 WL 1418292, at *16.  It should also be noted that by the time the court entered its ruling, the parties were two years into discovery. *See* Docket, *In Re: Bisphenol-A (BPA) Polycarbonate Plastic Products Liability Litigation*, 4:08MD01967 (containing entries indicating discovery responses as early as 2009). Here, discovery has just begun.

[42] Insofar as when purchase occurred, Monsanto raises the specter of a statute of limitations defense (Opp. at 18 n.15), but that is routinely rejected as impediment to certification.  *See, e.g., Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000) ("As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of statutes of limitations will not automatically foreclose class certification . . . Predominance . . . cannot be reduced to a mechanical, single-issue test."); *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 163 (3d Cir. 2002) ("Challenges based on the statute of limitations. . .  will not bar predominance satisfaction because those issues go to the right of a class member to recover, in contrast to underlying common issues of the defendant's liability.").

[43] For example, in *Ahmad v. City of St. Louis, Missouri*, 2019 WL 2009589 (E.D. Mo. May 7, 2019), the court itself redefined a class to include "persons who will in the future participate in or observe non-violent public demonstrations and/or who record such public demonstrations and/or police activities at the public demonstrations for the exercise of constitutional rights of free speech and assembly in the City of St. Louis." *Id*. at *3.  This was not subjective because the terms "demonstration" and "non-violent" are "objectively determinable descriptors" that did not "depend upon the state of mind of class members." *Id.*

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

License holder who used it for "household purposes" ascertainable); *In re Dollar Gen.,* 2019 WL 1418292, at *16 (rejecting argument that purchase of motor oil "for use" in vehicles made after 1988 and/or 1930 is subjective).  Courts frequently certify MMPA classes notwithstanding the "use" aspect of Section 407.025.  Were that considered prohibitively subjective, both the purposes of the MMPA and its express authorization of class actions would again be severely undermined.

In addition, Monsanto's own presentation counteracts its argument.  Monsanto says that Roundup products are sold within three segments, each with its own marketing, distribution, and container types, all according to ***use*** categories.  It describes these uses within each segment:

- L&G products, which Monsanto concedes "most" purchasers buy for "home use" on grass and gardens.  Opp. at 35 n.24.

- AG products, which farmers use in clearing fields and to spray over the top of growing crops to control weeds.  Muckerman Aff. ¶¶ 3, 7, 8, 12.

- I&P products, sold for use on "turf athletic fields, golf courses, and other manicured landscapes" and to manage weeds risking infrastructures.   Owen Aff. ¶¶ 7, 8.

How consumers intend to use Roundup is not then some amorphous state of mind but well understood.  Even by Monsanto's own account, such uses are objective and observable not only according to function but product type.

## C.    The Class Definition Can Be Modified as Appropriate.

As noted, class definitions are fluid and can be revised as the case progresses.  The court is not confined to what was originally pled.

In terms of "personal" use, the class definition can be presently and easily revised to describe such use consistent with the MMPA as follows:

All Missouri residents who from August 19, 2014 to the present[44] purchased Roundup primarily for family use, household use, or for their own personal use and not for resale.

[44] Monsanto concedes understanding that Plaintiffs are proposing a class of persons who purchased Roundup within the five-year statute of limitations period.   Opp. at 26 n.19.

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

If more elucidating description is needed, the definition could, after discovery, be re-defined according to product purchased, undeniably objective criteria, for example:

> All Missouri residents who from August 19, 2014 to the present purchased one or more of the following Roundup products primarily for family use, household use, or for their own personal use and not for resale: *[insert all products for sale in Missouri within last five years]*.

To the extent the Court rules that "personal" use does not include business use (and it should not for all reasons discussed), Plaintiffs (expressly without waiving and subject to all arguments herein and in connection with their motion to compel), the class could, after discovery, be re-defined as:

> All Missouri residents who, from August 19, 2014 to the present, purchased one or more of the following products primarily for personal, family or household use: [*insert L&G products sold in Missouri during last five years*].

In sum, class definitions are flexible. Monsanto's argument about relying on memories is a non-starter, and its other positions have not only been rejected by courts within and outside Missouri, but are counter to purposes of the MMPA and legislative intent that class actions be allowed.

## CONCLUSION

Most if not all Monsanto's arguments are contrary to Missouri law, which is well-articulated and clear. As set out in Plaintiffs' motion, supporting memorandum, and herein, all class certification requirements are met. Monsanto's arguments are without merit.

Date: November 6, 2020              Respectfully Submitted,

By: /s/ Patrick J. Stueve
STUEVE SIEGEL HANSON LLP
Patrick J. Stueve, Mo. Bar #37682
Todd E. Hilton, Mo. Bar #51388
Tanner Edwards, Mo. Bar #66208
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7100
Facsimile: (816) 714-7101
hilton@stuevesiegel.com

Electronically Filed - Jackson - Kansas City - November 06, 2020 - 04:05 PM

stueve@stuevesiegel.com
tanner@stuevesiegel.com

GRAY, RITTER & GRAHAM, P.C.
Don M. Downing, Mo. Bar #30405
Gretchen Garrison, Mo. Bar #33963
Cort A. VanOstran, Mo. Bar #67276
701 Market Street, Suite 800
St. Louis, Missouri 63101
Telephone: (314) 241-5620
Facsimile: (314) 241-4140
ddowning@grgpc.com
cvanostran@grgpc.com
ggarrison@grgpc.com

SPEER LAW FIRM, P.A.
Charles F. Speer, Mo. Bar #40713
104 W. 9th Street, Suite 400
Kansas City, Missouri 64105
Tel: (816) 472-3560
Fax: (816) 421-2150
cspeer@speerlawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2020, the foregoing document was filed via the

Court's Case.Net system, which automatically provided electronic service to all counsel of record

who are deemed to have consented to electronic service, including the following:

SHOOK, HARDY & BACON L.L.P.
Amy M. Crouch
Brent Dwerlkotte
2555 Grand Blvd.
Kansas City, Missouri 64108-2613
Ph: 816.474.6550
Fax: 816.421.5547
amcrouch@shb.com
dbdwerlkotte@shb.com
Attorneys for Defendant Monsanto Company

By: /s/ Patrick J. Stueve
An Attorney for Plaintiffs

# EXHIBIT 5

**IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
AT KANSAS CITY**

| | | |
|---|---|---|
| **RYAN TOMLINSON, *et al,*** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| | ) | **Case No. 1916-CV22788** |
| **v.** | ) | **Division  9** |
| | ) | |
| **MONSANTO COMPANY** | ) | |
| **Defendant.** | ) | |

## <u>ORDER</u>

Pending before the Court is Plaintiffs' Motion for Class Certification.  For the following reasons, Plaintiffs' motion is granted.

### <u>Background</u>

On October 17, 2019, Plaintiffs Ryan Tomlinson ("Tomlinson"), Carol Richardson ("Richardson"), and Christi Gray ("Gray") filed an Amended Class Action Petition for Damages under the Missouri Merchandising Practices Act ("MMPA") on behalf of themselves and a putative class of Missouri residents who purchased Roundup-brand herbicide products for personal, family, or household purposes.  They allege economic loss resulting from those purchases, but do not seek damages related to personal injury.  They have moved for class certification and Defendant Monsanto Company ("Monsanto") opposes the request.

### <u>Analysis</u>

Class actions brought under the MMPA are governed by Section 407.025.3 and Rule 52.08. To obtain class certification, Plaintiffs must satisfy the requirements of Missouri Rules of Civil Procedure 52.08(a) and 52.08(b).  As applicable here, those prerequisites are as follows:

      a.      The class is so numerous that joinder of all members is impracticable;

      b.      There are questions of law or fact that are common to the class;

      c.        The claims of the representative parties are typical of the class claims; and

      d.        The representative parties will fairly and adequately protect the interests of

            the class.

Mo. Sup. Ct. R. 52.08(a).   The questions of law or fact common to the members of the class must predominate over any questions affecting only individual members, and the class action must be superior to other available methods for the fair and efficient adjudication of the controversy.   Mo Sup. Ct. R. 52.08(b)(3).   Finally, a class must be capable of legal definition, and the representative party must be a member of the proposed class.   *Elsea v. U.S. Eng'g Co.*, 463 S.W.3d 409, 425 (Mo. Ct. App. 2015) (citation omitted).

Class certification is a procedural matter where the sole issue is whether plaintiffs met the requirements for class action under Rule 52.08.   *Elsea*, 463 S.W.3d at 416.   The party seeking class certification has the burden of proof.   *Dale v. DaimlerChrysler Corp.*, 204 S.W.3d 151, 164 (Mo. Ct. App. 2006).   The party seeking class certification satisfies its burden "if there is evidence in the record, which if taken as true, would satisfy" each requirement of Rule 52.08.   *Elsea*, 463 S.W.3d at 417 (quoting *Hope v. Nissan N. Am., Inc.*, 353 S.W.3d 68, 74 (Mo. Ct. App. 2011)).

In class certification determinations, "the named plaintiffs' allegations are accepted as true."   *Hale v. Wal-Mart Stores, Inc.*, 231 S.W.3d 215, 227 (Mo. Ct. App. 2007) (citation omitted). The issue is not whether a plaintiff will prevail on the merits, but rather whether a plaintiff has met the requirements for a class action.   *Id.* at 222.   Arguments that tend to negate allegations in the Petition should be ignored.   *Id.* at 227.   While some evidence relating to the merits may be considered in determining whether the class certification prerequisites have been met, "the court must look only so far as to determine whether, given the factual setting of the case, if the plaintiff's general allegations are true, common evidence could suffice to make out a prima facie case for the class."   *Craft v. Philip Morris Companies, Inc.*, 190 S.W.3d 368, 377 (Mo. Ct. App. 2005).

Further, there is a presumption in favor of certifying the class in class certification hearings "because class certification may be modified or even terminated before a decision on the merits." *Plubell v. Merck & Co.*, 289 S.W.3d 707, 712 (Mo. Ct. App. 2009). Rule 52.08(c)(1) provides the mechanism for the modification or outright decertification of the putative class. *Elsea*, 463 S.W.3d at 416. Because class certification is subject to later modification, a court should err in favor of, and not against, allowing maintenance of the class action. *Hale*, 231 S.W.3d at 221. The rule's requirements are construed in light of its objectives—to provide for the expeditious handling of disputes. *Id.*

As noted by Monsanto, in addition to the class certification factors, the Court must consider the propriety of the class definition. "[A] properly defined class is necessary to realize both the protections and benefits for which the class action device was created." *State ex rel. Coca-Cola Co. v. Nixon*, 249 S.W.3d 855, 861 (Mo. 2008) (citations omitted). It is here that the Court's analysis must begin. *Id.* (before considering class action factors, courts must first determine whether the class exists and is capable of legal definition). "If a class is not properly defined, the circuit court must deny certification." *Id.* Plaintiffs have proposed the class definition as: All Missouri residents who purchased Roundup primarily for personal, family, or household use with the exception of those claiming they have suffered a personal injury as a result of using Roundup. "Roundup" is defined to include "any and all herbicide products sold under the brand name Roundup … containing the active ingredient glyphosate."

Monsanto first argues it is not "administratively feasible" to identify the members of the proposed class focusing on Plaintiffs' failure to propose a method, other than individual purchasers' "say-so." However, courts have recognized the use of self-identified affidavits in consumer protection claims as not violative of the "administratively feasible" requirement. *See,*

*e.g.*, *In re Dollar Gen. Corp.*, No. 2709, 2019 U.S. Dist. LEXIS 58082, at *66–67 (W.D. Mo. Mar. 21, 2019); *Craft v. Philip Morris Cos.*, 190 S.W.3d 368, 387–88 (Mo. Ct. App. 2005).

     Monsanto next argues Plaintiffs' class definition is overbroad and improper because it includes many uninjured persons—persons who were aware but purchased anyway, purchasers who used up the product, and persons who cannot show Monsanto's alleged omission was connected with the purchase of the product—primarily relying on *State ex rel. Coca-Cola Co.*, *George v. Omega Flex*, Civil Action No. 2:17-cv-3114-MDH, 2020 U.S. Dist. LEXIS 145605 (W.D. Mo. Aug. 13, 2020) and *In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig.*, 687 F. Supp. 2d 897 (W.D. Mo. 2009) ("BPA I"). However, these cases are distinguishable in this instance. In *George v. Omega Flex,* the Court analyzed the issue of injury in the context of a summary judgment motion rather than class certification. 2020 U.S. Dist. LEXIS 145605 at *18–19. While the Court in *In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig.*, No. MDL No. 1967, 2011 U.S. Dist. LEXIS 150015 (W.D. Mo. Dec. 22, 2011) ("BPA II") declined to certify a class, it did so after finding plaintiffs had no injury in a previous order ruling a motion to dismiss. Finally, unlike the Coke plaintiffs who alleged they would not have purchased Diet Coke had they known it contained saccharin, the Plaintiffs here allege Monsanto's actions resulted in economic loss to all purchasers. This allegation takes this case out of the realm of economic injury based on subjective personal preference. *See State ex rel. Coca-Cola Co.*, 249 S.W.3d at 859 & 862–63; *Craft*, 289 S.W.3d at 714–15; *In re McCormick & Co., Inc., Pepper Prods. Mkg. & Sales Pracs. Litig.*, 422 F. Supp. 3d 194, 263–64 (D.D.C. 2019).

     Monsanto raises various concerns about whether Plaintiffs will ultimately be able to prove the injury they allege, but the Court is constrained from engaging in that analysis at the class certification stage. *See e.g., Plubell,* 289 S.W.3d at 712 (holding the allegation of loss under the benefit-of-the-bargain rule was sufficient to satisfy class definition requirements); *Hope v. Nissan*

*N. Am., Inc.*, 353 S.W.3d at 74 ("While we agree with Nissan that the definition is subject to difficulties, we do not believe we can say at this point that the class definition was *clearly* overbroad or too indefinite."); *Polk v. KV Pharm. Co.*, No. 4:09-CV-00588 SNLJ, 2011 U.S. Dist. LEXIS 144313, at *12–18 (E.D. Mo. Dec. 15, 2011) (ascertainable loss analyzed for motion to dismiss); *Povich v. Combe Inc.*, No. 4:16 CV 97 CDP, 2017 U.S. Dist. LEXIS 40016, at *5–6 (E.D. Mo. Mar. 21, 2017) (noting class certification uses a different standard than a motion to dismiss).

Monsanto next turns to proposed class representatives Tomlinson and Richardson arguing neither are typical or adequate class representatives.  Monsanto first notes they purchased the product for home use but the proposed class includes farmers, landscapers, and other professionals. Monsanto also asserts they lack standing because they have not purchased some of the products at issue.  Typicality is easily met "so long as other class members have claims similar to the named plaintiff."  *Hale*, 231 S.W.3d at 223.  "If the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory, factual variations in the individual claims will not normally preclude class certification." *Id.* (citations omitted).  The claims of every class member need not be identical. *See, e.g., Elsea*, 463 S.W.3d at 420 (trial court erred in finding that individual variances in asbestos exposure defeated typicality).  Here all claims arise from the same course of conduct, all claims concern products containing glyphosate, and all allege the same injury—purchasers did not get the benefit of the bargain.  Typicality and adequacy are satisfied.[1]

Monsanto next argues Richardson is not an adequate representative because of her close family ties to class counsel.  The concern of the courts finding a proposed class representative was

---

[1] As noted above, the Court may not delve into the substantive issues of standing and failure to state a claim, but rather must rely on Plaintiffs' allegations at this stage of the litigation.

inadequate due to family ties "has been the threat that the plaintiff may have an interest in the attorneys fees that the class counsel may ultimately seek" which might "provide the class representative with an incentive to accept a settlement that is not in the interest of the class as a whole thus creating a conflict of interest between the class representative  and the remainder of the class." *Irvin E. Schermer Tr. v. Sun Equities Corp.*, 116 F.R.D. 332, 337–38 (D. Minn. 1987). But, courts allowing certification despite this threat "have noted the absence of any concrete evidence to support the existence of such collusion between closely related class counsel and class representatives." *Id. See also In re Dollar Gen. Corp.*, 2019 U.S. Dist. LEXIS 58082 at *60-63. Monsanto has presented no such "concrete evidence" here.

Monsanto also asserts Richardson is not an adequate class representative because she lacks understanding of the case. Adequacy primarily tests whether "the interest of the [class] representative and that of the absent [class] members [are] compatible, not antagonistic." *Elsea*, 463 S.W.3d at 421 (citation omitted). There is no evidence of antagonism presented here.  The basic question is whether a named representative will "vigorously prosecute the interests of the class through qualified counsel." *Paxton v. Union Nat. Bank*, 688 F.2d 552, 563 (8th Cir. 1982) (citation omitted).  Richardson has demonstrated the required "understanding of the basic facts underlying the claims, some general knowledge, and a willingness and ability to participate in discovery." *See Quiroz v. Rev. Prod. Mgmt., Inc.*, 252 F.R.D. 438, 443 (N.D. Ill. 2008) (internal quotations and citation omitted).

Monsanto next argues class certification is not proper because individualized issues predominate over common issues, contending Plaintiffs cannot show with common evidence which purchases were primarily for personal, family, or household purposes, which members suffered injury, or the extent of damages suffered.  The predominance requirement "does not demand that every single issue in the case be common to all the class members, but only that there

are substantial common issues which 'predominate' over the individual issues." *Hale*, 231 S.W.3d at 224–25 (citation omitted).[2] In the present matter, common questions predominate individual issues, and self-identification affidavits may be used to identify class members who purchased Roundup for personal, family, or household purposes. *See In re Dollar Gen. Corp*, 2019 U.S. Dist. LEXIS 58082 at *65–66 (finding defendant failed "to show how the use of [self-identification] affidavits would render class members unascertainable, thus showing individual issues would predominate over common issues.").  One of the substantial common issues, subject to common proof, is whether Monsanto's misrepresentations and omissions about Roundup constitute unfair and deceptive trade practices under the MMPA. Furthermore, given Plaintiffs' theory of liability, both causation and ascertainable loss are common questions. *See In re McCormick & Co.*, 422 F. Supp. 3d 194, 263–64 (D.D.C. 2019).[3]  Here, "while it may well be a challenge to figure out how to identify class members and to allocate damages among them," the Court finds Plaintiffs have met their burden at the class certification stage to prove that damages are calculable on a class-

---

[2] "To classify an issue as common or individual, a court looks to the nature of the evidence required to show the allegations of the petition." *Karen S. Little, L.L.C. v. Drury Inns, Inc.*, 306 S.W.3d 577, 581 (Mo. Ct. App. 2010). "If the same evidence on a given question will suffice for each class member, then it is common; if the evidence on the question varies from member to member, then it is an individual issue." *Id.*; *see also Hale*, 231 S.W.3d at 224 (a question is common when the "same evidence will suffice for each member to make a prima facie showing").

[3] The alleged injury in this case is not framed based on subjective preference and does not require the subjective individualized inquires at issue in *State ex rel. Coca-Cola Co.*, 249 S.W.3d 855.  In the case *In re McCormick & Co.,* the district court found the predominance factor was met where plaintiffs' MMPA claim was that "defendants' unlawful act (deceptively underfilling the Slack-Filled Pepper Products) caused an ascertainable loss because the value of the pepper received by all purchasers was less than the value of the pepper as represented by the container size." 422 F. Supp. 3d at 263. The district court emphasized "under plaintiffs' theory of causation and ascertainable loss, every purchaser would have suffered the same loss irrespective of their motivations for purchasing the Slack-Filled Pepper Product" and that "this is a case where 'class members are not individually required to show what they would or would not have done had the product not been misrepresented and the risks known." *Id.* at 264. (citing *Plubell*, 289 S.W.3d at 714). The district court held "[u]nder such circumstances, the elements of causation and ascertainable loss are subject to common proof and are thus 'common questions' for purposes of analyzing predominance." *Id.*

wide basis. *See id*. at 248; *see also State ex rel. Am. Family Mut. Ins. Co. v. Clark*, 106 S.W.3d 483, 488 (Mo. 2003) (citations omitted) ("The need for inquiry as to individual damages does not preclude a finding of predominance.").  Finally, Monsanto maintains a class action is not superior because purchasers can obtain refunds without litigation.  As noted by Plaintiffs, however, courts have rejected this argument. *Lucas Subway MidMo, Inc. v. Mandatory Poster Agency, Inc.,* 524 S.W.3d 116, 128 (Mo. Ct. App. 2017) (reversing trial court and holding plaintiff "should not be prevented from full recovery of the damages to which it is entitled simply because it was offered a refund of the product purchase price").

For the foregoing reasons, Plaintiffs' Motion for Class Certification is granted.

**IT IS SO ORDERED.**

_____
March 22, 2021
Date

_____
**HONORABLE JOEL P FAHNESTOCK**

**CERTIFICATE OF SERVICE**

I hereby certify that copies of the above and foregoing were
automatically forwarded through the Court's e-filing system
on this 22nd day of March, 2021 to all attorneys of record.

Law Clerk, Division 9

# EXHIBIT 6

**IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI**
**AT KANSAS CITY**

| | | |
|---|---|---|
| RYAN TOMLINSON, *et al,* | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| | ) | **Case No. 1916-CV22788** |
| **v.** | ) | **Division  9** |
| | ) | |
| MONSANTO COMPANY | ) | |
| **Defendant.** | ) | |

## <u>ORDER</u>

Pending before the Court is Defendant Monsanto Company's Motion to Reconsider the March 22, 2021 Class Certification Order. After review of the pleadings, the Court hereby denies the Motion.

**IT IS SO ORDERED.**

_____        _____
        May 14, 2021                              **HONORABLE JOEL P FAHNESTOCK**
            Date

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that copies of the above and foregoing were automatically forwarded through the Court's e-filing system on this 14th day of May, 2021 to all attorneys of record.

_Lindsey Windwhurst_
_____
Law Clerk, Division 9

# EXHIBIT 7



# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| **RYAN TOMLINSON** and **CAROL RICHARDSON,** | ) ) ) | |
| **Respondents,** | ) ) | |
| **v.** | ) ) ) | **WD84429** |
| **MONSANTO COMPANY,** | ) ) | |
| **Appellant.** | ) ) | |

## <u>ORDER</u>

The Court takes up for consideration the petition of Monsanto Company, filed with this Court on April 2, 2021, for permission to appeal from the March 22, 2021 order of the Circuit Court of Jackson County, Missouri, certifying class action claims; the Court additionally takes up for consideration the suggestions in opposition thereto filed with this Court by Ryan Tomlinson and Carol Richardson on April 12, 2021.  Being fully advised in the premises, the petition for permission to appeal is denied.

Dated this 19th day of April, 2021.

/s/ *Mark D. Pfeiffer*
_____
Mark D. Pfeiffer
Presiding Judge, Writ Division

Edward R. Ardini, Jr., Judge, concurs.

cc:    Booker T. Shaw, Esq.
*Attorney for Appellant*

Patrick J. Stueve, Esq.
Todd E. Hilton, Esq.
Tanner Edwards, Esq.
Charles F. Speer, Esq.
Don M. Downing, Esq.
Gretchen Garrison, Esq.
Cort A. VanOstran, Esq.
*Attorneys for Respondents*

# EXHIBIT 8

**IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI**
**AT KANSAS CITY**

| | |
|---|---|
| RYAN TOMLINSON *et al*., on their behalf and on behalf of the class of others similarly situated, | Cause No. 1916-CV-22788 |
| Plaintiffs, | Division: 9 |
| v. | |
| MONSANTO COMPANY, | **CLASS ACTION** |
| Defendant. | |

**MONSANTO COMPANY'S OBJECTIONS AND RESPONSES**
**TO PLAINTIFFS' SECOND SET OF INTERROGATORIES TO**
**DEFENDANT MONSANTO COMPANY**

Monsanto Company ("Monsanto") hereby responds pursuant to Missouri Rule of Civil

Procedure 57.01 to Plaintiffs' Second Set of Interrogatories to Defendant Monsanto Company.

**GENERAL OBJECTIONS**

1.      Monsanto objects to the definitions of "Monsanto" and "Defendant" in

paragraph 9 of "Definitions," which defines the terms as "Monsanto Company and includes its

affiliated corporations, parents, subsidiaries, divisions, subdivisions, managers, directors,

officers, employees, agents, and representatives, as well as its predecessors in interest or name."

This definition is overbroad and unduly burdensome because a number of affiliated companies

have nothing whatsoever to do with the manufacture or sale of the products at issue in Plaintiffs'

complaint.  The definition is also overbroad and unduly burdensome because Monsanto is a

corporation that has employed many thousands of people, and glyphosate-containing products

have been manufactured and sold for more than 40 years.  Thousands of such people potentially

could have some information responsive to Plaintiffs' Interrogatories.  Instead, Monsanto will

respond to the Interrogatories based on the knowledge and the documents within the possession,

1

custody, or control of a group of key custodians of Defendant Monsanto Company with responsibility in the areas covered by relevant and otherwise unobjectionable Interrogatories and/or through particular non-custodian-based records collections in the possession of Defendant Monsanto Company.

2.       Monsanto objects to the overbroad term "all."  All Interrogatories using this term not directed to particular custodians or sources are overbroad, unduly burdensome, unduly cumulative, and not reasonably calculated to lead to the discovery of admissible evidence.  It is impossible for all such people (many of whom are long ago deceased and/or left their employment with Monsanto) to be interviewed to respond to these Interrogatories, and it is an overly burdensome and frivolous suggestion that this should be done or that records should be collected and reviewed for all such people.

3.       Monsanto objects to these Interrogatories to the extent they seek information not relevant to any claims or defenses asserted in this case.

4.       Monsanto objects to these Interrogatories to the extent they seek to impose a burden or requirements beyond what the Missouri Rules of Civil Procedure require.

5.       Monsanto objects to the definition of "Roundup" in paragraph 8 of "Definitions" as overbroad and unduly burdensome because Plaintiffs only allege purchasing Lawn & Garden ("L&G") products for residential use and therefore any information that does not concern L&G products is irrelevant.  Nonetheless, and consistent with prior communications and the Court's August 31, 2020 order, Monsanto will not withhold information or documents on this basis.

6.       Monsanto objects to the definition of "Roundup" in paragraph 8 of "Definitions" as overbroad and unduly burdensome to the extent it seeks information of purchases made other than primarily for personal, family, or household purposes as required for a viable claim under

the Missouri Merchandising Practice Act.

7.     Monsanto has based these Responses and Objections on the assumption that Plaintiffs, in propounding these Interrogatories, do not intend to seek information protected from discovery by the attorney-client privilege, or the attorney work product rule, or information regarding or reflecting the impressions, conclusions, opinions, legal research, or theories of Monsanto's attorneys.  Monsanto objects to each Interrogatory to the extent it seeks documents or information protected by the attorney-client privilege, the work product doctrine, or any other applicable statutory or common law privilege.

8.     Monsanto objects to these Interrogatories to the extent they seek information that is publicly available and therefore readily available to Plaintiffs, as the burden of obtaining such information is the same for Plaintiffs as it would be for Monsanto.

9.     Monsanto's Responses to the Interrogatories are made without waiving the right, at any time and for any reason, to revise, supplement, correct, add to, or clarify these Responses. These Responses also are provided without limiting or waiving Monsanto's right to object to additional discovery that may be sought from Monsanto or from any of the custodians or production sources identified in these responses.

10.     These General Objections apply to all of the following Responses to specific Interrogatories and are incorporated by reference therein.

### MONSANTO'S RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 15:**  As to each Roundup Product Line (L&G, AG, and I&P), state the name, address, and if known, manager, of each retailer and each distributor that sold Roundup products to end users in Missouri each year from 2014 to present, identifying as to each which line(s) of Roundup Products were sold by that retailer and/or distributor during each year.

**OBJECTIONS AND RESPONSE TO INTERROGATORY NO. 15:**  Monsanto incorporates by reference the foregoing General Objections here as if restated in full.  Monsanto

3

objects to Interrogatory No. 15 because in combination with all of the Interrogatories and their subparts, this Interrogatory exceeds the limit of 25 interrogatories, including all discrete subparts, imposed by Missouri Rule of Civil Procedure 57.01(a).  Monsanto objects that Interrogatory No. 15 is compound, including because it asks for "the name, address, and if known, manager, of each retailer and each distributor that sold Roundup products to end users in Missouri each year from 2014 to present, identifying as to each which line(s) of Roundup Products were sold by that retailer and/or distributor during each year" and is therefore the equivalent of a separate interrogatory for each such retailer.  Monsanto objects that the term "manager" is vague and ambiguous and invites Plaintiffs to meet and confer regarding the meaning of that term. Monsanto objects to Interrogatory No. 15 because it is not limited by subject matter to the claims or defenses in Plaintiffs' case, and therefore the burden and expense of the discovery outweigh its likely benefit to Plaintiffs.  Monsanto objects to Interrogatory No. 15 to the extent the information is publicly available and therefore readily available to Plaintiffs, as the burden of obtaining such information is the same for Plaintiffs as it would be for Monsanto.  Monsanto objects to Interrogatory No. 15 to the extent it would require collecting information from third parties, including because Monsanto's Lawn & Garden ("L&G") glyphosate-based products in the U.S. market are sold by Monsanto's exclusive marketing agent for U.S. Lawn & Garden products, the Scotts Company, which sells such products to retailers and distributors, and because Monsanto does not directly sell Agricultural ("AG") and Industrial & Professional ("I&P" (collectively made up of Vegetation Management and Turf & Ornamental products)) Roundup® products to all entities that eventually sell the products to end users.  Monsanto objects to the extent Interrogatory No. 15 seeks documents and information outside of Monsanto's possession, custody, and/or control as Monsanto does not have information

4

identifying every retailer or distributor that sells Roundup® products to end users.  Searching for information outside of Monsanto's possession would be unduly burdensome, particularly given the sweeping scope of the Interrogatory.  Monsanto objects to Interrogatory No. 15 to the extent it requests information from before August 2014, as the Missouri Merchandising Practices Act has a five-year statute of limitations and therefore data from before August 2014 is irrelevant.

Subject to the foregoing specific and general objections, and pursuant to Missouri Rule of Civil Procedure 57.01(c)(4), Monsanto points Plaintiffs to documents it has produced (at MON-B00011829-835), which identify the entities to whom Monsanto shipped L&G and I&P Roundup® products from August 2014 to August 2019.  Monsanto further states that it will produce updated data providing similar information as to AG Roundup® products from August 2014 to present and as to L&G and I&P Roundup® products through the present, to the extent such information is in Monsanto's possession, custody, or control.  Monsanto further states that, because such data identifies the location to which such products were shipped, it is likely that (1) retailers, distributors, or other purchasers of products shipped to Missouri may have subsequently transported them to other states before any further sale; and (2) some such products were ultimately sold to end users outside of Missouri.

Monsanto further points Plaintiffs to documents it has produced at MON-B0001823-827, which identify sales of L&G Roundup® products to end users in Missouri from certain retailers, and states that it will produce similar data as to L&G Roundup® products through the present. Monsanto further states that it does not have similar data as to other retailers of L&G Roundup® products.  Monsanto further points Plaintiffs to such data as is in Monsanto's possession, custody, or control identifying entities that sold AG and I&P Roundup® products to end users in Missouri from August 2014 to present, which Monsanto will produce.  Monsanto further states

that the data it has produced and will produce does not and will not identify which sales were primarily for personal, family, or household purposes.

**INTERROGATORY NO. 16:** State, as to each Roundup Product sold in Missouri, and in total, the amount (by unit of packaged product or by gallon if not in pre-packaged form):

a) sold by Monsanto to retailers and distributors each year from 2014 to the present;

b) sold by Monsanto to distributors each year from 2014 to the present; and

c) sold to end users each year from 2014 to the present.

**OBJECTIONS AND RESPONSE TO INTERROGATORY NO. 16:** Monsanto incorporates by reference the foregoing General Objections here as if restated in full. Monsanto objects to Interrogatory No. 16 because in combination with all of the Interrogatories and their subparts, this Interrogatory and its subpart exceed the limit of 25 interrogatories, including all discrete subparts, imposed by Missouri Rule of Civil Procedure 57.01(a). Monsanto objects that the term "amount" is vague, ambiguous, and subject to various interpretations, including because it does not indicate any sales figures tracked by Monsanto. Monsanto objects that subpart (a) and subpart (b) of Interrogatory No. 16 are duplicative in that subpart (a) encompasses subpart (b). Monsanto objects that the terms "retailers" and "distributors" are vague and ambiguous. Monsanto objects that Interrogatory No. 16 is overbroad, irrelevant, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence, including because the "amount" of Roundup® products sold in Missouri over the last seven years is not limited by subject matter to the claims or defenses in Plaintiffs' case, and therefore the burden and expense of the discovery outweigh its likely benefit to Plaintiffs. Monsanto objects to Interrogatory No. 16 to the extent it would require collecting information from third parties, including because Monsanto's L&G glyphosate-based products in the U.S. market are sold by Monsanto's exclusive marketing agent for U.S. Lawn & Garden products, the Scotts

Company, which sells such products to retailers and distributors, and because Monsanto does not directly sell AG and I&P Roundup® products to all entities that eventually sell the products to end users.  Monsanto objects to the extent Interrogatory No. 16 seeks documents and information outside of Monsanto's possession, custody, and/or control as Monsanto does not have information identifying every retailer or distributor that sells Roundup® products to end users. Searching for information outside of Monsanto's possession would be unduly burdensome, particularly given the sweeping scope of the Interrogatory.  Monsanto objects to Interrogatory No. 16 to the extent it requests information from before August 2014, as the Missouri Merchandising Practices Act has a five-year statute of limitations and therefore sales data from before August 2014 is irrelevant.  Monsanto objects to Interrogatory No. 16 to the extent it calls for compiling or performing arithmetic as to data that Monsanto has produced or will produce, as the burden of doing so is equal for Plaintiffs and Monsanto.

Subject to, and without waiving the foregoing objections, and pursuant to Missouri Rule of Civil Procedure 57.01(c)(4), Monsanto states:

- As to L&G Roundup® products, Monsanto points Plaintiffs to the documents it has produced at Mon-B0001829-33, which identify, by unit, quantity, and invoiced amount, the L&G Roundup® products shipped to Missouri from August 2014 to August 2019, and states that it will produce similar data as to L&G Roundup® products through the present.  Monsanto further states that it will produce updated data providing similar information as to AG Roundup® products from August 2014 to present and as to L&G and I&P Roundup® products through the present, to the extent such information is in Monsanto's possession, custody, or control.  Monsanto further states that, because such data identifies the

7

location to which such products were shipped, it is likely that (1) retailers, distributors, or other purchasers of products shipped to Missouri may have subsequently transported them to other states before any further sale; and (2) some such products were ultimately sold to end users outside of Missouri. Monsanto further states that the data it has produced and will produce does not and will not identify which sales were primarily for personal, family, or household purposes. Monsanto further points Plaintiffs to documents it has produced at MON-B0001823-827, which identify sales of L&G Roundup® products to end users in Missouri from certain retailers, and states that it will produce similar data as to L&G Roundup® products through the present. Monsanto further states that it does not have similar data as to other retailers of L&G Roundup® products.

- As to I&P Roundup® products, Monsanto points Plaintiffs to the document it produced at MON-B00011835, which identifies the I&P Roundup® products shipped to Missouri from 2014 to 2019, and states that it will produce similar data as to I&P Roundup® products through the present. Monsanto further states that, to the extent it is in its possession, custody, or control, it will produce additional data on such shipments to provide more details on the quantity of such products shipped. Monsanto further states that, because such data identifies the location to which such products were shipped, it is likely that (1) retailers, distributors, or other purchasers of products shipped to Missouri may have subsequently transported them to other states before any further sale; and (2) some such products were ultimately sold to end users outside of Missouri. Monsanto further

states that the data it has produced and will produce does not and will not identify which sales were primarily for personal, family, or household purposes. Monsanto further states that it will produce data on any sales in Missouri to end users of I&P Roundup® products from August 2014 to present to the extent such data is in its possession, custody, and control.

- As to AG Roundup® products, Monsanto points Plaintiffs to the document it produced at MON-B00011836, which identifies the quantity (in gallons) and invoiced amount for AG Roundup® products shipped to Missouri from 2014 to 2019, and states that it will produce similar data as to AG Roundup® products through the present.  Monsanto further states that, to the extent it is in its possession, custody, or control, it will produce additional data on such shipments to provide more details on the quantity of such products shipped and the entities to whom the products were shipped.  Monsanto further states that, because such data identifies the location to which such products were shipped, it is likely that (1) retailers, distributors, or other purchasers of products shipped to Missouri may have subsequently transported them to other states before any further sale; and (2) some such products were ultimately sold to end users outside of Missouri. Monsanto further states that the data it has produced and will produce does not and will not identify which sales were primarily for personal, family, or household purposes.  Monsanto further states that it will produce data on any sales in Missouri to end users of AG Roundup® products from August 2014 to present to the extent such data is in its possession, custody, and control.

**INTERROGATORY NO. 17:**  State, as to each Roundup Product Line (L&G, AG, and I&P), and in total, the amount of revenue, and profit, received by Monsanto from sales of Roundup Products in the state of Missouri each year from 2014 to the present.

**OBJECTIONS AND RESPONSE TO INTERROGATORY NO. 17:**  Monsanto

incorporates by reference the foregoing General Objections here as if restated in full.  Monsanto

objects to Interrogatory No. 17 because in combination with all of the Interrogatories and their

subparts, this Interrogatory exceeds the limit of 25 interrogatories, including all discrete subparts,

imposed by Missouri Rule of Civil Procedure 57.01(a).  Monsanto objects that Interrogatory

No. 17 is overbroad, irrelevant, unduly burdensome, and not reasonably calculated to lead to the

discovery of admissible evidence, including because "the amount of revenue . . . received by

Monsanto from sales of Roundup Products" in Missouri over the last seven years is not limited

temporally or by subject matter to the claims or defenses in Plaintiffs' case, and therefore the

burden and expense of the discovery outweigh its likely benefit to Plaintiffs.  Monsanto objects

that the phrase "sales of Roundup Products in the state of Missouri" is vague and ambiguous

because it is not clear whether Plaintiffs are referring to sales by Monsanto to distributors or

retailers of products shipped to Missouri locations or to sales by distributors or retailers to end

users in Missouri.  Monsanto will interpret "sales of Roundup Products in the state of Missouri"

to refer to the former but notes that Plaintiffs have no possible, viable claim as to products not

ultimately sold to end users in Missouri or sold to end users who did not purchase the products

primarily for personal, family, or household purposes.  Monsanto objects that Plaintiffs do not

seek, and could never recover, disgorgement of Monsanto's profits, and so this request is not

calculated to lead to the discovery of admissible evidence to the extent it seeks information on

profits.  To the extent Interrogatory No. 17 is relevant to punitive damages, which Monsanto

denies, it seeks information in unreasonable excess of what would be needed to establish

Monsanto's financial status.  Monsanto objects to Interrogatory No. 17 to the extent the

10

information requested is publicly available and therefore readily available to Plaintiffs, as the

burden of obtaining such information is the same for Plaintiffs as it would be for Monsanto.

Monsanto objects to Interrogatory No. 17 to the extent it would require collecting information

from third parties, including because Monsanto's L&G glyphosate-based products in the U.S.

market are sold by Monsanto's exclusive marketing agent for U.S. Lawn & Garden products, the

Scotts Company, which sells such products to retailers and distributors, and because Monsanto

does not directly sell AG and I&P Roundup® products to all entities that eventually sell the

products to end users.  Monsanto objects to the extent Interrogatory No. 17 seeks documents and

information outside of Monsanto's possession, custody, and/or control, as Monsanto does not

have information identifying every retailer or distributor that sells Roundup® products to end

users.  Searching for information outside of Monsanto's possession would be unduly

burdensome, particularly given the sweeping scope of the Interrogatory.  Monsanto objects to

Interrogatory No. 17 to the extent it requests information from before August 2014, as the

Missouri Merchandising Practices Act has a five-year statute of limitations and therefore sales

data from before August 2014 is irrelevant.  Monsanto objects to Interrogatory No. 17 to the

extent it calls for compiling or performing arithmetic as to data that Monsanto has produced or

will produce, as the burden of doing so is equal for Plaintiffs and Monsanto.

Subject to, and without waiving the foregoing objections, Monsanto points Plaintiffs to

its responses to Interrogatories Nos. 15-16.

**INTERROGATORY NO. 18:**  As to the representation on page 8, n. 8 of Monsanto's
Opposition to Plaintiffs' Motion for Class Certification filed on October 6, 2020 that "in fiscal
year 2018, approximately 73% of Monsanto's U.S. sales of glyphosate-containing herbicides
were of AG products, followed by 24% of L&G and 3% of I&P":

a) State the percentage of such sales in Missouri for each Product Line during each year
   from 2014 to present;
b) Identify each person with knowledge of facts and data on which such figures are
   calculated;

11

    c)  Identify all documents sufficient to show the data on which such figures are calculated.

**<u>OBJECTIONS AND RESPONSE TO INTERROGATORY NO. 18:</u>**  Monsanto

incorporates by reference the foregoing General Objections here as if restated in full.  Monsanto

objects to Interrogatory No. 18 because in combination with all of the Interrogatories and their

subparts, this Interrogatory and its subparts exceed the limit of 25 interrogatories, including all

discrete subparts, imposed by Missouri Rule of Civil Procedure 57.01(a).  Monsanto objects that

the phrase "sales in Missouri" is vague and ambiguous because it is not clear whether Plaintiffs

are referring to sales by Monsanto of products shipped to Missouri locations or to sales by

distributors or retailers to end users in Missouri.  Monsanto will interpret "sales in Missouri" to

refer to the former but notes that Plaintiffs have no possible, viable claim as to products not

ultimately sold to end users in Missouri or sold to end users who did not purchase the products

primarily for personal, family, or household purposes.  Monsanto further states that, because the

data on which the below answers are based identifies the location to which Roundup® products

were shipped, it is likely that (1) retailers, distributors, or other purchasers of products shipped to

Missouri may have subsequently transported them to other states before any further sale; and

(2) some such products were ultimately sold to end users outside of Missouri.  Monsanto further

states that the data on which its answer below is based does not and will not identify which sales

were primarily for personal, family, or household purposes.  Monsanto objects that the request

for "each person with knowledge of facts and data" on Monsanto's sales is overbroad, unduly

burdensome, and not proportional to the needs of this case.  The "facts" underlying such figures

include every sale of Roundup® products shipped into Missouri for more than six years, and it is

not possible or reasonable to expect Monsanto to identify ever person with knowledge of such

sales.  Instead, Monsanto will provide below the names of current Monsanto employees with

knowledge of the relevant data.  Monsanto objects to the request for "all documents sufficient to show" as duplicative and will instead identify documents sufficient to show the relevant data. Monsanto objects that Interrogatory No. 18 is overbroad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence, including because it seeks information that is not limited temporally or by subject matter to the claims or defenses in Plaintiffs' case, and therefore the burden and expense of the discovery outweigh its likely benefit to Plaintiffs. Monsanto objects to Interrogatory No. 18 to the extent it would require Monsanto to produce or search for information not within its possession, custody, or control, including information in the possession of other corporations or individuals not employed by the company.  Monsanto objects to Interrogatory No. 18 to the extent it calls for compiling or performing arithmetic as to data that Monsanto has produced or will produce, as the burden of doing so is equal for Plaintiffs and Monsanto.  Monsanto objects to Interrogatory No. 18 to the extent it requests information from before August 2014, as the Missouri Merchandising Practices Act has a five-year statute of limitations and therefore sales data from before August 2014 is irrelevant.  Subject to the foregoing objection, Monsanto will provide the requested information for the years 2015, 2016, 2017, and 2018, which are the only full years within the relevant time period for which Monsanto has produced full-year data.  Monsanto will supplement this response to provide the same information for the years 2019 and 2020 once full-year data for those years is produced.

Subject to and without waiving the foregoing objections, Monsanto responds as follows:

- For 2015, the percentage of sales of L&G, AG, and I&P Roundup® products shipped to Missouri is as follows (rounded to the nearest hundredth of a percentage point):

  o L&G: 21.83 percent

13

- o   AG: 77.77 percent

- o   I&P: 0.39 percent

- For 2016, the percentage of sales of L&G, AG, and I&P Roundup® products shipped to Missouri is as follows (rounded to the nearest hundredth of a percentage point):

  - o   L&G: 20.28 percent

  - o   AG: 78.75 percent

  - o   I&P: 0.96 percent

- For 2017, the percentage of sales of L&G, AG, and I&P Roundup® products shipped to Missouri is as follows (rounded to the nearest hundredth of a percentage point):

  - o   L&G: 14.18 percent

  - o   AG: 85.11 percent

  - o   I&P: 0.71 percent

- For 2018, the percentage of sales of L&G, AG, and I&P Roundup® products shipped to Missouri is as follows (rounded to the nearest hundredth of a percentage point):

  - o   L&G: 10.35 percent

  - o   AG: 89.02 percent

  - o   I&P: 0.63 percent

- James Guard is responsible for Monsanto's Lawn & Garden business, including the sale of L&G Roundup® products, and has knowledge of the sales data on which the L&G figures above are calculated.  Matthew Muckerman is responsible

for Monsanto's sale of AG Roundup® products and has knowledge of the sales

data on which the AG figures above are calculated.  Michael Owen is responsible

for Monsanto's sale of I&P Roundup® products and has knowledge of the sales

data on which the I&P figures above are calculated.

- The figures above are based on the data produced by Monsanto at MON-

  B0011829-836.

**INTERROGATORY NO. 19:**  As to each Roundup Product sold in Missouri, state the retail price (both unadjusted, and if applicable, adjusted by discounts, incentive programs and the like) to end users each year from 2014 to present.

**OBJECTIONS AND RESPONSE TO INTERROGATORY NO. 19:**  Monsanto

incorporates by reference the foregoing General Objections here as if restated in full.  Monsanto

objects to Interrogatory No. 19 because in combination with all of the Interrogatories and their

subparts, this Interrogatory exceeds the limit of 25 interrogatories, including all discrete subparts,

imposed by Missouri Rule of Civil Procedure 57.01(a).  Monsanto objects that the phrase "retail

price (both unadjusted, and if applicable, adjusted by discounts, incentive programs and the

like)" is vague and ambiguous in that it assumes that for any given year (or other time period),

there is a single "retail price" for a given Roundup® product.  In fact, Roundup® products are

sold at retail at differing prices by different retailers, and the adjustments for "discounts,

incentive programs and the like" can also differ by purchaser.  There thus is not a single "retail

price" for "each Roundup Product."  Monsanto objects to the extent that Interrogatory No. 19

seeks information on sales not primarily for personal, family, or household purposes.  Monsanto

objects that Interrogatory No. 19 is overbroad, irrelevant, and not reasonably calculated to lead to

the discovery of admissible evidence, including because it seeks information that is not limited

temporally or by subject matter to the claims or defenses in Plaintiffs' case, and therefore the

burden and expense of the discovery outweigh its likely benefit to Plaintiffs.  Monsanto objects

15

to Interrogatory No. 19 to the extent it would require collecting information from third parties, including because Monsanto's L&G glyphosate-based products in the U.S. market are sold by Monsanto's exclusive marketing agent for U.S. Lawn & Garden products, the Scotts Company, which sells such products to retailers and distributors, and because Monsanto does not directly sell AG and I&P Roundup® products to all entities that eventually sell the products to end users. Monsanto objects to the extent Interrogatory No. 19 seeks documents and information outside of Monsanto's possession, custody, and/or control, as Monsanto does not have information identifying every retailer or distributor that sells Roundup® products to end users.  Searching for information outside of Monsanto's possession would be unduly burdensome, particularly given the sweeping scope of the Interrogatory.  Monsanto objects to Interrogatory No. 19 to the extent it requests information from before August 2014, as the Missouri Merchandising Practices Act has a five-year statute of limitations and therefore sales data from before August 2014 is irrelevant.  Monsanto objects to Interrogatory No. 19 to the extent it calls for compiling or performing arithmetic as to data that Monsanto has produced or will produce, as the burden of doing so is equal for Plaintiffs and Monsanto.

Subject to, and without waiving the foregoing objections, and pursuant to Missouri Rule of Civil Procedure 57.01(c)(4), Monsanto points Plaintiffs to documents it has produced at MON-B0001823-827, which identify sales of L&G Roundup® products to end users in Missouri from certain retailers, and states that it will produce similar data as to L&G Roundup® products through the present.  Monsanto further states that it does not have similar data as to other retailers of L&G Roundup® products.  Monsanto further states that it will produce data on any sales in Missouri to end users of I&P Roundup® products from August 2014 to present to the extent such data is in its possession, custody, and control.  Monsanto further states that it will

produce data on any sales in Missouri to end users of AG Roundup® products from August 2014 to present to the extent such data is in its possession, custody, and control.

**INTERROGATORY NO. 20:**  As to each Roundup Product sold in Missouri, state the average retail price to end users each year from 2014 to present.

**OBJECTIONS AND RESPONSE TO INTERROGATORY NO. 20:**  Monsanto incorporates by reference the foregoing General Objections here as if restated in full.  Monsanto objects to Interrogatory No. 20 because in combination with all of the Interrogatories and their subparts, this Interrogatory exceeds the limit of 25 interrogatories, including all discrete subparts, imposed by Missouri Rule of Civil Procedure 57.01(a).  Monsanto objects that the phrase "average retail price" is vague and ambiguous in that it is unclear whether it includes rebates or incentive payments.  Monsanto objects to the extent that Interrogatory No. 20 seeks information on sales not primarily for personal, family, or household purposes.  Monsanto objects that Interrogatory No. 20 is overbroad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence, including because it seeks information that is not limited temporally or by subject matter to the claims or defenses in Plaintiffs' case, and therefore the burden and expense of the discovery outweigh its likely benefit to Plaintiffs.  Monsanto objects that that the average retail price for any given Roundup® brand product is not relevant as to any fact of consequence in this litigation.  Monsanto objects to Interrogatory No. 20 to the extent it would require collecting information from third parties, including because Monsanto's L&G glyphosate-based products in the U.S. market are sold by Monsanto's exclusive marketing agent for U.S. Lawn & Garden products, the Scotts Company, which sells such products to retailers and distributors, and because Monsanto does not directly sell AG and I&P Roundup® products to all entities that eventually sell the products to end users.  Monsanto objects to the extent Interrogatory No. 20 seeks documents and information outside of Monsanto's possession,

custody, and/or control, as Monsanto does not have information identifying every retailer or distributor that sells Roundup® products to end users.  Searching for information outside of Monsanto's possession would be unduly burdensome, particularly given the sweeping scope of the Interrogatory.  Monsanto objects to Interrogatory No. 20 to the extent it requests information from before August 2014, as the Missouri Merchandising Practices Act has a five-year statute of limitations and therefore sales data from before August 2014 is irrelevant.  Monsanto objects to Interrogatory No. 20 to the extent it calls for compiling or performing arithmetic as to data that Monsanto has produced or will produce, as the burden of doing so is equal for Plaintiffs and Monsanto.

Subject to, and without waiving the foregoing objections, and pursuant to Missouri Rule of Civil Procedure 57.01(c)(4), Monsanto points Plaintiffs to documents it has produced at MON-B0001823-827, which identify sales of L&G Roundup® products to end users in Missouri from certain retailers, and states that it will produce similar data as to L&G Roundup® products through the present.  Monsanto further states that it does not have similar data as to other retailers of L&G Roundup® products.  Monsanto further points Plaintiffs to documents that it will produce, to the extent they are in its possession, custody, or control, on sales in Missouri to end users of I&P Roundup® products from August 2014 to present.  Monsanto further states that it will produce data on any sales in Missouri to end users of AG Roundup® products from August 2014 to present to the extent such data is in its possession, custody, and control.

**INTERROGATORY NO. 21:**  As to each Roundup Product sold in Missouri, state the list price and/or suggested retail price (if applicable) to end users each year from 2014 to present.

**OBJECTIONS AND RESPONSE TO INTERROGATORY NO. 21:**  Monsanto incorporates by reference the foregoing General Objections here as if restated in full.  Monsanto objects to Interrogatory No. 21 because in combination with all of the Interrogatories and their

subparts, this Interrogatory exceeds the limit of 25 interrogatories, including all discrete subparts, imposed by Missouri Rule of Civil Procedure 57.01(a).  Monsanto objects to the extent that Interrogatory No. 21 seeks information on sales not primarily for personal, family, or household purposes.  Monsanto objects that Interrogatory No. 21 is overbroad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence, including because it seeks information that is not limited temporally or by subject matter to the claims or defenses in Plaintiffs' case, and therefore the burden and expense of the discovery outweigh its likely benefit to Plaintiffs.  Monsanto objects that the term "list price" is vague and ambiguous.  Monsanto will interpret the term "list price" and the phrase "suggested retail price" to be synonymous and to refer to the price at which Monsanto suggests that Roundup® products may be offered to end users for purchase, before any applicable rebates, incentives, or similar payments that would decrease the net price paid by end users.  Monsanto objects that the list or suggested retail price for any given Roundup® brand product is not relevant as to any fact of consequence in this litigation.  Monsanto objects to Interrogatory No. 21 to the extent it requests information from before August 2014, as the Missouri Merchandising Practices Act has a five-year statute of limitations and therefore sales data from before August 2014 is irrelevant.

Subject to, and without waiving the foregoing objections, and pursuant to Missouri Rule of Civil Procedure 57.01(c)(4), Monsanto points Plaintiffs to documents that it will produce showing the list of, or suggested retail prices, if any, for, Roundup® products sold in Missouri from August 2014 to present.

**INTERROGATORY NO. 22:**  Identify (by title, author(s) or analyst(s), and date) all studies, trials, testing, investigations or other analyses pertaining in any way to whether glyphosate or glyphosate-based herbicides can cause cancer, be genotoxic, can cause endocrine system disruption or can cause other adverse health effects performed, sponsored or conducted by or on behalf of Monsanto from 1985 to present, including those carried to completion and those ending prior to completion, and as to each:

> a. Identify the person(s) at Monsanto primarily responsible for conducting or engaging others to conduct such study, trial, test, investigation or other analysis;

> b. Identify each person or entity outside Monsanto to whom or which such study, trial, testing, investigation or other analysis was provided and the date it was provided; and

> c. Identify all emails, letters, facsimiles, meetings and other communications (written or oral) within Monsanto and any other person or entity, that discuss or refer to such study, trial, testing, investigation or analysis.

**OBJECTIONS AND RESPONSE TO INTERROGATORY NO. 22:**  Monsanto

incorporates by reference the foregoing General Objections here as if restated in full.  Monsanto

objects to Interrogatory No. 22 because in combination with all of the Interrogatories and their

subparts, this Interrogatory and its subparts exceed the limit of 25 interrogatories, including all

discrete subparts, imposed by Missouri Rule of Civil Procedure 57.01(a).  Monsanto objects to

Interrogatory No. 22 to the extent it seeks documents or information protected by the attorney-

client privilege, the work product doctrine, or any other applicable statutory or common law

privilege.  Monsanto objects to Interrogatory No. 22 because the terms "testing,"

"investigations," "analyses," and "other communications" are vague, ambiguous, and subject to

various interpretations.  Monsanto objects that Interrogatory No. 22 is overbroad, irrelevant, and

not reasonably calculated to lead to the discovery of admissible evidence, including because it

seeks information that is not limited temporally or by subject matter to the claims or defenses in

Plaintiffs' case, and therefore the burden and expense of the discovery outweigh its likely benefit

to Plaintiffs.  Monsanto objects to providing, and will not provide, information in response to this Interrogatory that does not concern whether glyphosate or glyphosate-based herbicides can cause cancer, can be genotoxic, or can cause endocrine system disruption.  Interrogatory No. 22's reference to "other adverse health effects" is overbroad and would include information not relevant or reasonably related to Plaintiffs' allegations in this matter.

Subject to, and without waiving the foregoing objections, and pursuant to Missouri Rule of Civil Procedure 57.01(c)(4), Monsanto points Plaintiffs to documents it has produced or will produce from its collection of scientific literature and studies regarding the safety of glyphosate and glyphosate-containing products to humans and to other mammals; from its EPA Registration and EPA Correspondence files; and from the files of six toxicologists (Donna Farmer, Daniel Goldstein, William Heydens, Michael Koch, Joel Kronenberg, and David Saltmiras) who have worked with glyphosate and glyphosate-containing products.

**INTERROGATORY NO. 23:**  Identify (by title, author(s) or analyst(s), and date) all studies, trials, testing, investigations or other analyses pertaining in any way to whether glyphosate or glyphosate-based herbicides can cause cancer, be genotoxic, can cause endocrine system disruption or can cause other adverse health effects performed, sponsored or conducted by any outside entity or scientist(s) from 1985 to present, and as to each:

a. Identify the person(s) at Monsanto who received such study, trial, test, investigation or other analysis and the date it was received;

b. Identify each person or entity outside Monsanto to whom or which such study, trial, testing, investigation or other analysis was provided and the date it was provided; and

c.  Identify all emails, letters, facsimiles, meetings and other communications (written or oral) within Monsanto and any other person or entity, that discuss or refer to such study, trial, testing, investigation or analysis.

**OBJECTIONS AND RESPONSE TO INTERROGATORY NO. 23:**  Monsanto

incorporates by reference the foregoing General Objections here as if restated in full.  Monsanto

objects to Interrogatory No. 22 because in combination with all of the Interrogatories and their subparts, this Interrogatory and its subparts exceed the limit of 25 interrogatories, including all discrete subparts, imposed by Missouri Rule of Civil Procedure 57.01(a).  Monsanto objects to Interrogatory No. 23 to the extent it seeks documents or information protected by the attorney-client privilege, the work product doctrine, or any other applicable statutory or common law privilege.  Monsanto objects to Interrogatory No. 23 because the terms "testing," "investigations," "analyses," and "other communications" are vague, ambiguous, and subject to various interpretations.  Monsanto objects that Interrogatory No. 23 is overbroad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence, including because it seeks information that is not limited temporally or by subject matter to the claims or defenses in Plaintiffs' case, and therefore the burden and expense of the discovery outweigh its likely benefit to Plaintiffs.  Monsanto objects to providing, and will not provide, information in response to this Interrogatory that does not concern whether glyphosate or glyphosate-based herbicides can cause cancer, can be genotoxic, or can cause endocrine system disruption.  Interrogatory No. 23's reference to "other adverse health effects" is overbroad and would include information not relevant or reasonably related to Plaintiffs' allegations in this matter.

Subject to, and without waiving the foregoing objections, and pursuant to Missouri Rule of Civil Procedure 57.01(c)(4), Monsanto points Plaintiffs to documents it has produced or will produce from its collection of scientific literature and studies regarding the safety of glyphosate and glyphosate-containing products to humans and to other mammals; from its EPA Registration and EPA Correspondence files; and from the files of six toxicologists (Donna Farmer, Daniel Goldstein, William Heydens, Michael Koch, Joel Kronenberg, and David Saltmiras) who have worked with glyphosate and glyphosate-containing products.

DATED:  June 1, 2021          Respectfully submitted,

By: /s/ John J. Rosenthal
John J. Rosenthal

*Attorneys for Defendant*
*MONSANTO COMPANY*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and accurate copy of **Monsanto Company's**

**Objections and Responses to Plaintiffs' Second Set of Interrogatories to Defendant**

**Monsanto Company** was served upon the parties below via electronic mail and U.S. Mail,

postage prepaid, this 1st day of June 2021:

**STUEVE SIEGEL HANSON LLP**
Patrick J. Stueve, Mo. Bar #37682
Todd F. Hilton, Mo. Bar #51388
Emily M. Smith, Mo. Bar #67265
460 Nichols Road, Suite 200
Kansas City, MO 64112
Telephone: (816) 714-7100
Facsimile: (816) 714-7101
stueve@stuevesiegel.com
hilton@stuevesiegel.com
emily@stuevesiegel.com

**GRAY, RITTER & GRAHAM, P.C.**
Don M. Downing, Mo. Bar #30405
Cort A. VanOstran, Mo. Bar #67276
701 Market Street, Suite 800
St. Louis, MO 63101
Telephone: (314) 241-5620
Facsimile: (314) 241-4140
ddowning@grgpc.com
evanostran@grgpc.com

*Attorneys for Plaintiffs*

<u>*/s/ Jeff Wilkerson*</u>
Jeff Wilkerson

# EXHIBIT 9

# JOSEPH ABRUZZO
### CLERK OF THE CIRCUIT COURT & COMPTROLLER
### PALM BEACH COUNTY

**CASE NUMBER: 50-2019-CC-010718-XXXX-MB**
**CASE STYLE: SHELLY, SUSAN V TARGET CORPORATION**

Search Criteria | Search Results | Case Info | Party Names | **Dockets & Documents** | Case Fees | Court Events

To view a document, click on the document icon 📄 in the left column.

Documents with a lock icon 🔒 are viewable on request (VOR) to protect confidential information. Click on the lock icon 🔒 to request the document. VOR documents are reviewed and then generally become available online within three business days of request.

A clock icon 🕐 means a VOR document is 'In Process' and being reviewed. Click on the clock icon 🕐 to request email notification when the document becomes available online.

Public = 📄          VOR = 🔒          In Process = 🕐          Page Size: 25 ▾

| | Docket Number | Effective Date | Description | Notes |
|---|---|---|---|---|
| 📄 | 1 | 08/14/2019 | COMPLAINT | FOR INJUNCTIVE AND DECLARATORY RELIEF. F/B PLT. |
| | 2 | 08/15/2019 | DIVISION ASSIGNMENT | RB: County Civil Central - RB (Civil) |
| 📄 | 3 | 08/15/2019 | PAID $310.00 ON RECEIPT 3291372 | $310.00 3291372 Fully Paid |
| 📄 | 5 | 08/15/2019 | SUMMONS ISSUED | HOWARDR@PDQ.NET AS TO DFT. EISSUED TO PLT. |
| 📄 | 6 | 08/22/2019 | SERVICE RETURNED (NUMBERED) | VERIFIED RETURN OF SERVICE SERVED TARGET CORPORATION - 08/15/2019 |
| 📄 | 7 | 09/04/2019 | COMPLAINT | FOR INJUNCTIVE AND DECLARATORY RELIEF F/B PLT |
| 📄 | 8 | 09/05/2019 | NOTICE TO STATE COURT AND ADVERSE PART OF REMOVAL OF ACTION F/B DFT | TO STATE COURT AND ADVERSE PART OF REMOVAL OF ACTION F/B DFT |
| | 9 | 09/05/2019 | DISPOSED - OTHER | DO - DISPOSED OTHER |
| 📄 | 10 | 10/02/2019 | TRUE COPY | ORDER GRANTING PLAINTIFF'S MOTION TO REMAND FROM THE UNITED STATES DISTRICK COURT SOUTHERN DISTRICK OF FLORIDA. SIGN BY JUDGE ROBIN L ROSENBERG 9/24/2019 |
| 📄 | 11 | 10/02/2019 | RECEIPT OF CERTIFIED COPY OF THE DISTRICT COURT'S ORDER OF REMAND | CERTIFIED COPY OF THE DISTRICT COURT'S ORDER OF REMAND |

# EXHIBIT 10

# JOSEPH ABRUZZO
### CLERK OF THE CIRCUIT COURT & COMPTROLLER
PALM BEACH COUNTY

**CASE NUMBER: 50-2019-CC-011405-XXXX-MB**
**CASE STYLE: BIDDLE, YVETTE HELEN V LOWE'S HOME CENTERS LLC**

Search Criteria   Search Results   Case Info   Party Names   Dockets & Documents   Case Fees   Court Events

To view a document, click on the document icon 🗎 in the left column.

Documents with a lock icon 🔒 are viewable on request (VOR) to protect confidential information. Click on the lock icon 🔒 to request the document. VOR documents are reviewed and then generally become available online within three business days of request.

A clock icon 🕐 means a VOR document is 'In Process' and being reviewed. Click on the clock icon 🕐 to request email notification when the document becomes available online.

Public = 🗎          VOR = 🔒          In Process = 🕐          Page Size:  25 ⌄

| | Docket Number | Effective Date | Description | Notes |
|---|---|---|---|---|
| 🗎 | 1 | 08/27/2019 | COMPLAINT | FOR INJUNCTIVE AND DECLARATORY RELIEF F/B PLT |
| | 2 | 08/27/2019 | DIVISION ASSIGNMENT | RF: County Civil Central - RF (Civil) |
| 🗎 | 3 | 08/27/2019 | PAID $310.00 ON RECEIPT 3308158 | $310.00 3308158 Fully Paid |
| 🗎 | 4 | 08/27/2019 | SUMMONS ISSUED | HOWARDR@PDQ.NET |
| 🗎 | 5 | 09/09/2019 | NOTICE FB DFT/ OF STATE COURT AND ADVERSE PARTY OF REMOVAL OF ACTION | FB DFT/ OF STATE COURT AND ADVERSE PARTY OF REMOVAL OF ACTION |
| | 6 | 09/09/2019 | DISPOSED - OTHER | DO - DISPOSED OTHER |
| 🗎 | 7 | 11/07/2019 | COPY | OF ORDER FROM UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA #9:19-CV-81251-RKA |

1/1

# EXHIBIT 11

## Simon Morley Plaintiff vs. Ace Hardware Corporation Defendant

**Broward County Case Number:** CONO19010648
**State Reporting Number:** 062019SC010648AXXXNO
**Court Type:** Civil
**Case Type:** * Small Claims + - Damages >$2,500 - $5,000
**Incident Date:** N/A
**Filing Date:** 09/06/2019
**Court Location:** North Courthouse
**Case Status:** Disposed
**Magistrate Id / Name:** N/A
**Judge ID / Name:** 71 Schiff, Louis H.

### – Party(ies)

Total: 2

| Party Type | Party Name | ❓ Address | ❓ Attorneys / Address ★ Denotes Lead Attorney |
|---|---|---|---|
| Plaintiff | **Morley, Simon** | | ★ Rubinstein, Howard W Retained Bar ID: 104108 The Law Office of Howard W. Rubinstein 1281 N. Ocean Dr. Apt. 198 Singer Island, FL 33404 **Status: Active** |
| Defendant | **Ace Hardware Corporation** | | ★ Alvarez, Melissa Raspall Retained Bar ID: 820091 333 Avenue of the Americas, Suite 4500 Miami, FL 33131 **Status: Active** |

### – Disposition(s)

Total: 1

| Date | Statistical Closure(s) |
|---|---|
| 10/18/2019 | Disposed by Other |

| Date | Disposition(s) | View | Page(s) |
|---|---|---|---|

| Date | Disposition(s) | View | Page(s) |
|------|----------------|------|---------|
| 10/18/2019 | **Notice of Filing/Notice of Removal to Federal Court**<br>　　Comment (df ) | 📄 | 920 |

## Event(s) & Document(s)

Total: 9

| Date | Description | Additional Text | View | Pages |
|------|-------------|-----------------|------|-------|
| 11/18/2019 | **Certified Copy** | of order sent to the Broward clerks office | 📄 | 4 |
| 10/21/2019 | **Notice of Resetting Pretrial** | 12/9/2019 at 3:00 PM rm: 3 | 📄 | 1 |
| 10/14/2019 | **Disposition Order on Pretrial Conference** | reset and notice | 📄 | 1 |
| 10/07/2019 | **Motion for Continuance** | OF THE PRETRIAL CONFERENCE<br>Party: *Defendant* Ace Hardware Corporation | 📄 | 3 |
| 09/16/2019 | **Return of Service Served** | 9/13/2019 | 📄 | 1 |
| 09/09/2019 | **Filing Fee Paid** | Payor: HOWARD RUBINSTEIN ; Userid: CTS-fg/t ; Receipt: 20191FA1A167941;<br>;<br><br>Amount: $300.00 | | |
| 09/09/2019 | **Summons Issued Fee** | Payor: HOWARD RUBINSTEIN ; Userid: CTS-fg/t ; Receipt: 20191FA1A167941;<br>;<br><br>Amount: $10.00 | | |
| 09/06/2019 | **Statement of Claim (eFiled)** | | 📄 | 25 |
| 09/06/2019 | **eSummons Issuance - Pretrial** | | 📄 | 3 |

## ➖  Hearing(s)

Total: 2

| Date | Description | Additional Text |
|------|-------------|-----------------|
| 12/09/2019 | **Pretrial Hearing** | *CANCELED  Disposed*<br>Hearing Time: 3:00 PM<br>Judicial Officer(s):71 Schiff, Louis H.<br>Location: North Courtroom 3 |
| 10/14/2019 | **Pretrial Hearing** | Hearing Time: 1:30 PM<br>Judicial Officer(s):71 Schiff, Louis H.<br>Location: North Courtroom 3 |

## ➖  Related Case(s)

Total: 0

**There is no related case information available for this case.**

# EXHIBIT 12

# JOSEPH ABRUZZO
### CLERK OF THE CIRCUIT COURT & COMPTROLLER
### PALM BEACH COUNTY

**CASE NUMBER: 50-2019-CC-009139-XXXX-MB**
**CASE STYLE: LAMERSON, TAYLOR ANN V WALMART STORES INC**

Search Criteria    Search Results    Case Info    Party Names    **Dockets & Documents**    Case Fees    Court Events

View documents and order certified copies. See our eCaseView FAQ for step-by-step guidance and information about what documents are available online.

**Document Icons**

Document available. Click icon to view.

Add a certified copy of the document to your shopping cart.

Document is Viewable on Request (VOR). Click to request.

VOR document is being reviewed. Click to be notified when available.

**0**

Public =     VOR =     In Process =     Page Size: 25

| | | Docket Number | Effective Date | Description | Notes |
|---|---|---|---|---|---|
| | | 1 | 07/15/2019 | COMPLAINT | FOR INJUNCTIVE AND DECLARATORY RELIEF F/B PLT |
| | | 2 | 07/16/2019 | DIVISION ASSIGNMENT | RE: County Civil Central - RE (Civil) |
| | | 3 | 07/16/2019 | PAID $310.00 ON RECEIPT 3250556 | $310.00 3250556 Fully Paid |
| | | 5 | 07/16/2019 | SUMMONS ISSUED | HOWARDR@PDQ.NET |
| | | 6 | 07/18/2019 | SERVICE RETURNED (NUMBERED) | VERIFIED RETURN OF SERVICE SERVED WALMART STORES INC - 07/17/2019 |
| | | 7 | 08/02/2019 | MOTION FOR EXTENSION OF TIME | UNOPPOSED; TO RESPOND TO THE COMPLAINT F/B DFT |
| | | 8 | 08/05/2019 | MOTION FOR EXTENSION OF TIME | UNOPPOSED. FB DFT |
| | | 9 | 08/05/2019 | ORDER EXTENDING TIME | UNOPPOSED- FOR DFT -JUDGE ZUCKERMAN DTD 8/5/19 |
| | | 10 | 08/16/2019 | NOTICE TO STATE COURT AND ADVERSE PARTY OF REMOVAL OF ACTION F/B DFT | TO STATE COURT AND ADVERSE PARTY OF REMOVAL OF ACTION F/B DFT |
| | | 11 | 08/16/2019 | DISPOSED - OTHER | DO - DISPOSED OTHER |
| | | 12 | 08/29/2019 | MOTION FOR REHEARING CIVIL | OF ORDER REMANDING CASE F/B DFT |
| | | 13 | 08/30/2019 | STIPULATION | F/B PARTIES |
| | | 14 | 10/18/2019 | STIPULATION | SECOND F/B PLT/DFT |
| | | 15 | 03/16/2020 | STIPULATION | FB BOTH PARTIES- ( THIRD) - OF EXTENSION |

| | | 16 | 05/13/2020 | STIPULATION | FOURTH STRIP OF EXTENSION AND SCHEDULING F/B BOTH PARTIES DFT/PLT |
| | | 17 | 03/01/2021 | ORDER CLOSING REOPENED CASE-JUDGE SHULLMAN DTD 3/1/21 | CLOSING REOPENED CASE-JUDGE SHULLMAN DTD 3/1/21 |

517-c498fe36-98e8-4b64-b68c-72030c1eda11