GILLIAN L. WADE (State Bar No. 229124)
SARA D. AVILA (State Bar No. 263213)
MARC A. CASTANEDA (State Bar No. 299001)
Milstein Jackson Fairchild & Wade, LLP
gwade@mjfwlaw.com
mcastaneda@mjfwlaw.com
10990 Wilshire Blvd., 8th Floor
Los Angeles, CA 90024
Tel: (310) 396-9600
Fax: (310) 396-9635

JOEL OSTER
Law Offices of Howard Rubinstein
joel@osterlaw.com
22052 W. 66th St. #192
Shawnee, Kansas 66226

*Attorneys for Plaintiffs and the Proposed Settlement Class*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT GILMORE, et al., | MDL No. 2741 |
| Plaintiffs, | Case No. 3:21-cv-08159 |
| vs. | **PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND CERTIFICATION OF CLASS FOR PURPOSES OF SETTLEMENT** |
| MONSANTO COMPANY, | |
| Defendant. | |
| | Date:  April 14, 2022 |
| | Time:  10:00 a.m. |
| | Place:  Via Zoom Webinar |
| | Judge:  Hon. Vince G. Chhabria |

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ...................................................................................................... 1

OBJECTORS MISCHARACTERIZE THE FACTS AND SETTLEMENT AGREEMENT ........ 2

    A.   The Novel Retailer Actions Exerted Substantial Pressure on Monsanto ...................... 3

    B.   The Work in *Ezcurra* Contributed to Settlement Negotiations ........................... 4

    C.   Gilmore's Meritorious Delaware Suit ........................................................... 5

    D.   Mediation and Settlement Negotiations Were Well-Informed and Successful ............ 6

    E.   The Objectors Mischaracterize the Settlement Agreement ........................... 7

ARGUMENT ........................................................................................................... 8

I.    PLAINTIFFS APPLY THE CORRECT LEGAL STANDARD ........................................ 8

II.   RULE 23(e)(2) AND RELATED CHURCHILL FACTORS WEIGH IN FAVOR OF
PRELIMINARY APPROVAL ................................................................................. 9

    A.   Class Counsel has Adequately Represented the Class .................................... 9

        1.   Class Counsel undertook discovery sufficient to engage in settlement
discussions and has provided support for its calculation of potential recovery ... 10

        2.   Missouri class members have been adequately represented ................................. 12

    B.   The Proposal was Negotiated at Arm's Length .......................................... 13

        1.   The presence of a highly experienced mediator underscores the fairness of
the settlement negotiations ................................................................... 13

        2.   Objectors' claims of a reverse auction are completely meritless ........................ 14

    C.   The Relief Provided for the Class is Fair and Reasonable by Any Standard ............... 16

        1.   The relief is hardly *de minimis* .......................................................... 16

        2.   The risks were significant ..................................................................... 19

        3.   The scope of the release is clear and justified .......................................... 21

D.    The Proposal Treats Class Members Equitably Relative to Each Other......................22

III.   *BLUETOOTH* ANALYSIS DOES NOT SUGGEST COLLUSION........................................24

A.    Counsel will Not Receive a 'Disproportionate Distribution of the Settlement' ..........24

1.   Legal framework for the percentage-of-the-fund method ....................................25

2.   Plaintiffs' calculation of the Class 'potential recovery' common fund uses a reasonable claims rate range.................................................................................25

3.   Twenty-five percent of the common fund is the benchmark percentage in the Ninth Circuit..........................................................................................................28

4.   The lodestar cross-check is irrelevant for *Bluetooth* analysis, but nevertheless confirms the reasonableness of the proposed fee award .....................................29

B.    There is no Clear Sailing Provision as Attorneys' fees are not Paid 'Separate and Apart from Class Funds'..............................................................................................30

C.    There is no Reverter of Unawarded Attorneys' fees to Monsanto ..............................32

IV.   CERTIFICATION OF THE SETTLEMENT CLASS IS PROPER ....................................33

CONCLUSION...............................................................................................................................34

## TABLE OF AUTHORITIES

**Cases**                                                                         ***Page***

*Acosta v. Trans Union, LLC* (C.D. Cal. 2007)
    243 F.R.D. 377 ................................................................................................11, 12

*Allen v. Bedolla* (9th Cir. 2015)
    787 F.3d 1218 ...............................................................................................24, 26

*Allen v. ConAgra Foods, Inc.* (N.D. Cal. 2019)
    331 F.R.D. 641 ....................................................................................................18

*Alves v. Main* (D.N.J. Dec. 4, 2012)
    2012 U.S. Dist. LEXIS 1717733 .......................................................................13

*Biddle v. Lowe's Home Centers LLC* (Fla. Cty. Ct. 15th Cir.)
    No. 50-2019-CC-011405 .....................................................................................30

*Blue Cross Blue Shield Ass'n v. GlaxoSmithKline LLC* (E.D. Pa. Nov. 9, 2016)
    2016 U.S. Dist. LEXIS 155347 ..........................................................................18

*Boyette v. Lowe's Companies, Inc.*, (W.D. Ark.)
    No.19-4119 .............................................................................................................4

*Brazil v. Dole Packaged Foods, LLC* (N.D. Cal. Nov. 6, 2014)
    2014 U.S. Dist. LEXIS 157575 ..........................................................................17

*Briseño v. Henderson* (9th Cir. 2021)
    998 F.3d 1014 ...................................................................24, 27, 28, 29, 31

*Bristol-Myers Squibb Co. v. Superior Court* (2017)
    137 S. Ct. 1773......................................................................................................5

*Bumpers v. Cmty. Bank* (N.C. 2013)
    747 S.E.2d 220.....................................................................................................21

*Campbell v. Facebook, Inc.* (9th Cir. 2020)
    951 F.3d 1106 ........................................................................................................9

*Carriuolo v. GM Co.* (11th Cir. 2016)
    823 F.3d 977 ........................................................................................................17

*Carson v. Monsanto Co.* (S.D. Ga. 2020)
    508 F. Supp. 3d 1369 ..........................................................................................19

*Cherry v. Dometic Corp.* (11th Cir. 2021)
  986 F.3d 1296 ..................................................................................................4

*Chowning v. Kohl's Department Stores, Inc.* (9th Cir. 2018)
  735 F. App'x 924 ..............................................................................................17

*Class Plaintiffs v. City of Seattle* (9th Cir.1992)
  955 F.2d 1268 ..................................................................................................21

*Collins v. Cargill Meat Solutions Corp.* (E.D. Cal. 2011)
  274 F.R.D. 294 .................................................................................................20

*Craft v. County of San Bernardino* (C.D. Cal. 2008)
  624 F. Supp. 2d 1113 .......................................................................................29

*Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993)
  509 U.S. 579 .....................................................................................................16

*Dei Rossi v. Whirlpool Corp.* (E.D. Cal. Apr. 28, 2015)
  2015 U.S. Dist. LEXIS 55574 .........................................................................20

*Ezcurra v. Monsanto Co.* (S.D. Fla.)
  No. 20-80524 .......................................................................................4, 5, 30, 33

*Ferrell v. Buckingham Prop. Mgmt.* (E.D. Cal. Jan. 21, 2020)
  2020 U.S. Dist. LEXIS 9919 .....................................................................16, 25

*Fraser v. ASUS Computer Int'l* (N.D. Cal. Dec. 21, 2012)
  2012 U.S. Dist. LEXIS 181315 .............................................................11, 12, 17

*Gallucci v. Gonzalez* (9th Cir. 2015)
  604 F. App'x 533 .........................................................................................13, 14

*Galope v. Deutsche Bank Nat'l Trust Co.* (9th Cir. 2014)
  566 Fed. Appx. 552............................................................................................33

*Garibay v. Archstone Cmtys. LLC* (9th Cir. 2013)
  539 F. App'x. 763 .............................................................................................28

*Gregorio et al v. Home Depot U.S.A., Inc.* (Fla. Cty. Ct. 17th Cir.)
  No. CACE-21-002428 .......................................................................................30

*Hadley v. Kellogg Sales Co.* (N.D. Cal. Feb. 20, 2020)
  2020 U.S. Dist. LEXIS 30193 .....................................................................20, 32

*Hanlon v. Chrysler Corp.*, (9th Cir.1998)
150 F.3d 1011 ......................................................................................................33

*Hanna v. Walmart Inc.* (C.D. Cal.)
No. 20-1075 ......................................................................................................4, 30

*Harnish v. Widener Univ. Sch. of L.* (3d Cir. 2016)
833 F.3d 298 ......................................................................................................6, 16, 17

*Harris v. Vector Mktg. Corp.* (N.D. Cal. Oct. 12, 2011)
2011 U.S. Dist. LEXIS 117927 ......................................................................26, 27, 28, 31

*Hesse v. Sprint Corp.* (9th Cir. 2010)
598 F.3d 581 ......................................................................................................21

*In re American Medical Systems, Inc.* (6th Cir. 1996)
75 F.3d 1069 ......................................................................................................20

*In re Apple Inc. Device Performance Litig.* (N.D. Cal. Mar. 17, 2021) \
2021 U.S. Dist. LEXIS 50550 ......................................................................................7

*In re Apple iPhone 4 Prods. Liab. Litig.* (N.D. Cal. Aug. 10, 2012)
2012 U.S. Dist. LEXIS 113876 ......................................................................................12

*In re Bluetooth Headset Prods. Liab. Litig.* (9th Cir. 2011)
654 F.3d 935 ......................................................................................................*passim*

*In re Cmty. Bank of N. Virginia* (3d Cir. 2005)
418 F.3d 277 ......................................................................................................34

*In re Literary Works in Elec. Databases Copyright Litig.* (2d Cir. 2011)
654 F.3d 242 ......................................................................................................34

*In re Mercury Interactive Corp.*
618 F.3d 992 ......................................................................................................26

*In re Morning Song Bird Food Litig.* (S.D. Cal. 2017)
320 F.R.D. 540......................................................................................................18

*In re Myford Touch Consumer Litig.* (N.D. Cal. June 14, 2018)
2018 U.S. Dist. LEXIS 100222 ......................................................................................7, 26, 31

*In re Packaged Seafood Prod. Antitrust Litig.* (S.D. Cal. Jan. 17, 2020)
2020 U.S. Dist. LEXIS 28586 ......................................................................................27

*In re POM Wonderful LLC* (C.D. Cal. Mar. 25, 2014)
    2014 U.S. Dist. LEXIS 40415 ...................................................................18

*In re Tobacco Cases II*
    240 Cal. App. 4th 779 ...........................................................................18

*Jewell v. Walmart, Inc*., (W.D. Ark.)
    No. 19-4088 ..............................................................................................4

*Johannessohn v. Polaris Indus.* (D. Minn. 2020)
    450 F. Supp. 3d 931 ...............................................................................17

*Jones v. Monsanto Co.* (W.D. Mo. May 13, 2021)
    2021 U.S. Dist. LEXIS 91260 ...........................................................16, 27

*Kerr v. Vatterott Educ. Ctrs. Inc*. (Mo. Ct. App. 2014)
    439 S.W.3d 802........................................................................................12, 24

*Kim v. Allison* (9th Cir. 2021)
    8 F.4th 1170 .....................................................................................24, 27, 28

*Lamerson v. Walmart Stores, Inc*. (Fla. Cty. Ct. 15th Cir.)
    No. 50-2019-CC-009139 .......................................................................30

*Lane v. Facebook, Inc*. (9th Cir. 2012)
    696 F.3d 811 ............................................................................................20

*Lobatz v. U.S. W. Cellular of California, Inc*. (9th Cir. 2000)
    222 F.3d 1142 .........................................................................................30

*Macdougall v. Am. Honda Motor Co.* (9th Cir. Dec. 21, 2021)
    2021 U.S. App. LEXIS 37780 ...............................................................16

*Marshall v. Priceline.com Inc*. (Del. Super. Ct. Oct. 31, 2006)
    2006 Del. Super. LEXIS 447 ...........................................................16, 33

*McKinney-Drobnis v. Oreshack* (9th Cir. 2021)
    16 F.4th 594 ......................................................................................24, 32

*Moreno v. Capital Bldg. Maint. & Cleaning Servs*. (N.D. Cal. May 5, 2021)
    2021 U.S. Dist. LEXIS 87268 ...............................................................16

*Moore v. Verizon Comms. Inc.* (N.D. Cal. Aug. 28, 2013)
    2013 U.S. Dist. LEXIS 122901 ...............................................................6

*Morley v. Ace Hardware Corp.*, (Fla. Cty. Ct. 17th Cir.)
    No. CONO-19-010648 ................................................................................30

*Nat'l Ass'n of Wheat Growers v. Becerra* (E.D. Cal. 2020)
    F. Supp. 3d 1247 .....................................................................................19

*Negrete v. Allianz Life Ins. Co.* (9th Cir. 2008)
    523 F.3d 1091 ..........................................................................................14

*O'Connor v. Uber Techs., Inc.* (N.D. Cal. Mar. 29, 2019)
    2019 U.S. Dist. LEXIS 54608 ................................................................23

*Ortiz v. Fibreboard Corp.* (1999)
    527 U.S. 815 ............................................................................................34

*Pulaski & Middleman, LLC v. Google, Inc.* (9th Cir. 2015)
    802 F.3d 979 ............................................................................................18

*Radcliffe v. Experian Info. Solutions Inc.* (9th Cir. 2013)
    715 F.3d 1157 ..........................................................................................23

*Ramirez v. Monsanto Co.* (May 26, 2021)
    541 F. Supp. 3d 1004 ................................................................................7

*Rawa v. Monsanto Co.* (E.D. Mo. May 25, 2018)
    2018 U.S. Dist. LEXIS 88401 ...........................................................16, 27

*Razo v. AT&T Mobility Servs.* (E.D. Cal. Oct. 15, 2021)
    2021 U.S. Dist. LEXIS 199583 ..............................................................14

*Roes, 1-2 v. SFBSC Mgmt., LLC* (9th Cir. 2019)
    944 F.3d 1035 ..........................................................................................23

*Scoy v. Kasal* (Del. Super. Ct. Apr. 9, 1999)
    1999 Del. Super. LEXIS 240 ....................................................................6

*Shelly v. Target Corp.*, (Fla. Cty. Ct. 15th Cir.)
    No. 50-2019-CC-010718 ..........................................................................30

*Sonner v. Premier Nutrition Corp.* (9th Cir. 2020)
    971 F.3d 834 ..............................................................................................4

*Soto v. O.C. Communications, Inc.* (N.D. Cal Apr. 1, 2019)
    2019 U.S. Dist. LEXIS 61782 ................................................................23

*Staton v. Boeing Co.* (9th Cir. 2003)
    327 F. 3d 938 ...............................................................................................23, 32

*Steiner v. Am. Broad. Co., Inc.* (9th Cir. 2007)
    248 F. App'x 780 ...................................................................................................29

*Stemple v. QC Holdings, Inc.* (S.D. Cal. Apr. 25, 2016)
    2016 U.S. Dist. LEXIS 55011 ..............................................................................17

*Swinton v. SquareTrade, Inc.* 6 (8th Cir. 2020)
    960 F.3d 1001 .......................................................................................................13

*Taylor v. Costco Wholesale Corporation* (E.D. Cal.)
    No. 20-655 ........................................................................................................4, 30

*Theodore Broomfield v. Craft Brew All., Inc.* (N.D. Cal. Feb. 5, 2020)
    2020 U.S. Dist. LEXIS 74801 ..............................................................................25

*Vandervort v. Balboa Capital Corp.* (C.D. Cal. 2014)
    8 F. Supp. 3d 1200 .................................................................................................7

*Vizcaino v. Microsoft Corp.* (9th Cir. 2002)
    290 F.3d 1043 ................................................................................................25, 29

*Weeks v. Home Depot* (C.D. Cal. Sept. 18, 2020) ("*Weeks I*")
    2020 U.S. Dist. LEXIS 188369 ..........................................................................3, 30

*Weeks v. Home Depot* (C.D. Cal.) ("*Weeks II*")
    No. 19-6780 ..........................................................................................3, 4, 19, 30

*Williams v. MGM-Pathe Communications Co.* (9th Cir. 1997)
    129 F.3d 1026 ................................................................................................25, 26

*Williams v. Lowe's Home Centers, LLC* (C.D. Cal.)
    No. 20-1356 ......................................................................................................4, 30

*Wilson v. J.B. Hunt Logistics, Inc.* (C.D. Cal. Nov. 13, 2020)
    2020 U.S. Dist. LEXIS 259007 ............................................................................27

## Statutes

Colorado's Consumer Protection Act, Colo. Rev. Stat. § 6-1-106 ...............................20

Fed. R. Civ. P. 23 ................................................................................................8, 9, 13

Illinois' Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/10b .................20

Ohio's Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.12 ......................................20

Tex. Bus. & Com. Code § 17.50(a)(1)(B) ...................................................................................20

**<u>Rules</u>**

Advisory Committee Notes to Rule 23(e)(2) .................................................................................9

**<u>Other Sources</u>**

4 NEWBERG ON CLASS ACTIONS  (5th ed. 2018)
       § 13:7 ...............................................................................................................7
       § 14.7...............................................................................................................29
       § 15:68 ...........................................................................................................25

Black's Law Dictionary (11th ed. 2019) .....................................................................................14

## INTRODUCTION

The Settlement represents an excellent achievement for Class Members, who stand to recover nearly two-thirds of Plaintiffs' *best-case* damages estimate, and reflects Class Counsel's vigorous and concerted efforts in pursuing more than a dozen actions in federal and state courts across the country, against both Monsanto and large retailers of Roundup®. Class Counsel was and continues to be well-equipped to adequately represent the interests of the Settlement Class and ultimately reached a settlement that is fair, reasonable, and adequate. Plaintiffs' motion for preliminary approval ("Motion") should be granted.

Objectors Ryan Tomlinson and Carol Richardson's ("Tomlinson Objectors") Opposition, which is riddled with contradictions that ignore critical facts and the standard for settlement approval, is based on the inflated premise that their Missouri case is superior, and they could have achieved a better result. *See generally* ECF No. 106 ("Tomlinson Opp."). Tomlinson Objectors ignore and grossly misunderstand the coordinated litigation strategy deployed by Class Counsel to hold not only Monsanto liable for the lack of health risk disclosures, but also the retailers who are responsible for selling the products they know are dangerous to consumers. Class Counsel certainly faced challenges in their relentless pursuit of these actions, but flouting their efforts as useless is misguided at best. It is *because* of these efforts that a settlement was reached. That Class Counsel pursued a different strategy than Tomlinson Objectors does not mean the Settlement is not fair, reasonable, and adequate.

Tomlinson Objectors' "collusion" accusations are baseless and indeed false. They argue Monsanto "agreed" to pay Class Counsel excessive fees in exchange for a paltry recovery for the Settlement Class. This is wrong on several fronts. First, the fee award is within the Court's sole discretion, and does not affect the validity of the Settlement. Second, Class Counsel does not intend to seek more than 25% of the total benefit available to the Settlement Class, the benchmark level for reasonable attorney's fees in a class action settlement. Third, the settlement fund is far from *de mimimis*. Tomlinson Objectors scoff at the amount of the settlement fund—asserting claims are not likely to reach the $23 million Floor Amount and at the same time the $45 million Ceiling

Amount is far too low—but ultimately, the individual relief accounts for over two-thirds of Class Members' potential recovery. Far from collusive, the Settlement was the result of a fully informed arm's length mediation between highly experienced counsel before a well-respected former magistrate judge.

Objectors George Leonard, Valentin Cervantes, and Patricia Godsey's ("Leonard Objectors") arguments fair no better. *See generally* ECF No. 105 ("Leonard Opp."). Their contention that that the Settlement seeks to release "more meritorious" claims not based on the same factual predicate as the underlying lawsuit is erroneous and belied by the express language of the agreement. The Settlement would release only economic-loss claims related to the alleged misrepresentations and omissions alleged in the complaint. Additionally, the specific carve-out for Personal Injury and Medical Monitoring Claims is clear and unambiguous.

While Tomlinson Objectors and Leonard Objectors thoroughly pick apart every aspect of the Settlement and assert baseless theories of collusion, they ignore critical facts and realities. At the end of the day, none of the issues raised or specific criticisms warrant denial of preliminary approval. The Settlement is fair, reasonable, and adequate and should be preliminarily approved.

## OBJECTORS MISCHARACTERIZE THE FACTS AND SETTLEMENT AGREEMENT

This Settlement is the culmination of a hard-fought coordinated litigation strategy pursued on multiple fronts which ultimately brought Monsanto to the negotiating table. Plaintiffs exerted pressure on Monsanto with ongoing actions against Monsanto and the retailer-defendants—whom Monsanto was obligated to indemnify—in multiple jurisdictions at the same time. *Ezcurra* was dismissed on Florida-specific safe-harbor grounds one business day before depositions were set to commence, one week before the deadline to move for class certification, two months before the mediation deadline, and four months before trial. Monsanto had produced thousands of pages of documents in discovery, including sales data and final product labeling, and Plaintiff had completed his expert analysis regarding damages. Undeterred, Plaintiffs continued their fight in the instant matter filed in Delaware—Monsanto's state of incorporation where no safe-harbor defense exists—and in the retailer cases that were pending or on appeal at the time of settlement.

Armed with the knowledge and discovery from *Ezcurra*, and publicly available discovery from personal injury cases, Class Counsel was more than capable of negotiating vigorously on their clients' behalf at mediation and ultimately reached a fair, reasonable, and adequate settlement.

### A.     The Novel Retailer Actions Exerted Substantial Pressure on Monsanto.

*Gilmore* Plaintiffs' collective efforts against the retailers were instrumental in bringing about the proposed settlement. The Tomlinson Objectors—characterizing the retailer actions as useless failures that were either dismissed or "abandoned"—fail to recognize or understand the serious impact these novel cases had on Settlement. Tomlinson Opp. at 2. Plaintiffs sought to hold the retailers accountable under state consumer protection statutes for actively promoting and knowingly placing a dangerous product in the stream of commerce without providing any warnings to consumers. While not named directly, these cases created substantial risk for Monsanto, both reputational and financial. Rosenthal Decl. at ¶ 4. In addition to responsibility for the retailers' defense costs, Monsanto faced significant legal exposure from the retailers, which could assert contractual and/or common-law indemnity claims against Monsanto should they be found liable. *Id.* Although the cases did not get this far—and Monsanto was smart to end this litigation when it did—in *Weeks v. Home Depot*, No. 19-6780 (C.D. Cal. filed Aug. 8, 2019) ("*Weeks II*"), Judge Olguin made clear plaintiff's theory of liability against Home Depot for Monsanto's lack of disclosure was viable. [1] By targeting Monsanto's largest customers, the retailer cases also strained Monsanto's business relationships and threatened its reputation.

---

[1] Indeed, after engaging in discovery (including Home Depot's production of tens of thousands of pages of documents, Weeks's responses to Home Depot's lengthy written discovery, and many Rule 37 conferences), Weeks prevailed on certain issues on Home Depot's second motion to dismiss. The court found the case was not expressly or impliedly preempted and that a retailer could be liable under California's Unfair Competition Law for knowingly selling a dangerous product without informing consumers of the dangers. *Weeks,* 2020 U.S. Dist. LEXIS 188369, at *5-21 (C.D. Cal. Sept. 18, 2020) (allowing Weeks to "conduct discovery with respect to the scope and extent of defendant's knowledge regarding the health risks to consumers posed by Roundup"). Although the case was later dismissed with prejudice on narrow Proposition 65 grounds, Weeks has filed his opening brief on appeal and the matter remains pending before the Ninth Circuit.

Despite Objectors' misstatements to the contrary, *Weeks II* is the *only* retailer case that was dismissed with prejudice, and all others were voluntarily dismissed only *after* a settlement was reached (or well before for strategic reasons). Tomlinson Objectors criticize the work done in *Taylor v. Costco Wholesale Corporation*, No. 20-655 (E.D. Cal. filed Mar. 27, 2020) and *Hanna v. Walmart Inc.*, No. 20-1075 (C.D. Cal. filed May 22, 2020) because both were dismissed. ECF No. 106 at 8. Yet in both cases, plaintiffs were given leave to amend after substantial briefing. Taylor thereafter strengthened his allegations and continued litigating until Plaintiffs and Monsanto reached an agreement at mediation. In *Hanna,* Walmart argued the District Court lacked jurisdiction because Hanna possessed an adequate legal remedy. *Hanna*, ECF No. 43 at 9-10 (*citing Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020)). As such, Hanna voluntarily dismissed her federal court case and re-filed in state court. Like the others, Hanna's state court action was voluntarily dismissed only after the parties' successful mediation.

Similarly, the motion to dismiss in *Williams v. Lowe's Home Centers, LLC*, No. 20-1356 (C.D. Cal. filed July 6, 2020) was fully briefed and voluntarily dismissed only after the Parties had reached an agreement in principle. *Jewell v. Walmart, Inc.*, No. 19-4088 (W.D. Ark. filed Aug. 12, 2019) and *Boyette v. Lowe's Companies, Inc.*, No.19-4119 (W.D. Ark. filed Sept. 13, 2019) were not "abandoned," but rather, a strategic decision to pursue similar claims against Walmart and Lowes in California was made to carry on the litigation with *Hanna* and *Williams*.

**B.    The Work in *Ezcurra* Contributed to Settlement Negotiations.**

Objectors downplay the significant role of *Ezcurra v. Monsanto Co.*, No. 20-80524 (S.D. Fla. filed Feb. 19, 2020) ("*Ezcurra*") in facilitating Settlement.[2] But the work done in *Ezcurra*—discovery, the Dr. Sharp expert report, and briefing on complex issues, including class certification—contributed significantly to the Settlement and informed the parties at mediation.

---

[2] Ezcurra did *not* limit the class to persons who purchased Roundup® from Home Depot. And the class was limited to debit and credit card purchasers because of the specific ascertainability standard in the Eleventh Circuit. *See Cherry v. Dometic Corp.*, 986 F.3d 1296, 1304 (11th Cir. 2021) ("a proposed class is ascertainable if it is adequately defined such that its membership is capable of determination").

Following the Rule 26(f) conference, a Joint Discovery Plan was promptly filed and the parties engaged in discovery, with Monsanto producing thousands of pages of documents (including sales data and product labeling), responding to interrogatories and requests for production, and Ezcurra producing his Rule 26(a)(2) expert report measuring class-wide damages under a price premium model. Depositions were noticed and set to commence just one business day after the case was dismissed, and although the depositions never went forward, the parties were prepared for them (and obviously could not have known the timing of the order on Monsanto's motion to dismiss). Plaintiffs had also prepared a Motion for Class Certification that was due one week after the case was dismissed. Trial was set for December 7, 2020, and while Objectors question the total length of time the matter was pending (6 months), they ignore the fact that Judge Middlebrooks' scheduling order allotted only 10-months total for *Ezcurra* from the date of filing until trial. *Ezcurra*, ECF No. 16.

Tomlinson Objectors also mischaracterize the months of briefing in *Ezcurra* as simply "amending" the complaint. When Class Counsel appeared in the case, they did indeed amend the complaint, but also briefed the motion to dismiss, prepared for and appeared for oral argument, and prepared supplemental briefing at the Court's request.  The issues in the supplemental briefing were novel and complex, and as noted, the matter is fully briefed before the Eleventh Circuit. If the proposed Settlement is not approved, Ezcurra will move forward with his appeal.

### C.      Gilmore's Meritorious Delaware Suit

The Tomlinson Objectors' scrutiny of Gilmore's pursuit of claims against Monsanto in Delaware misses the point. While Gilmore did originally file in Oregon, his ultimate objective was to pursue nationwide class certification. Indeed, Delaware is a more suitable forum for purposes of certifying a nationwide class because Monsanto is incorporated there, and the Court has jurisdiction over non-resident class members' claims. *See Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1783 (2017) ("out-of-state plaintiffs [not prevented] from joining together in a consolidated action in the States that have general jurisdiction over [defendant]"). If anything, the pursuit of claims in Delaware shows Gilmore's dedication to the case and willingness to pursue

5

claims he genuinely believes in, in a jurisdiction where nationwide certification is viable.

Objectors' suggestion the DCFA does not apply to Plaintiffs' claims because Plaintiffs purchased Roundup® in states other than Delaware is wrong. The DCFA applies to conduct in Delaware, and Plaintiffs clearly allege Monsanto is incorporated and transacts business in Delaware, and that the material omissions giving rise to Plaintiffs' claims arose, at least in part, in Delaware. ECF No. 22 at ¶¶ 11, 12, 22, 24, 25, 27. But even if the Delaware District Court were to have held that Gilmore could not proceed under the DCFA, he could and would have easily amended the complaint to assert claims under Oregon law.

Objectors' criticism of Gilmore's decision not to seek a full refund or punitive damages in the Delaware action also falls flat. Counsel's litigation strategy, in the course of pursuing this action and the Related Actions, understandably evolved and adjusted over time, and there is nothing suspicious about amending pleadings. Nor is it unusual for an original complaint to be broad and assert theories that may later not be pursued or successful. Full-refund damages were not pursued in Delaware because they are not recoverable. *See Harnish v. Widener Univ. Sch. of L.*, 833 F.3d 298, 307 (3d Cir. 2016) (damages are the difference between price paid and actual value of product); *Scoy v. Kasal*, 1999 Del. Super. LEXIS 240, at *12-13 (Del. Super. Ct. Apr. 9, 1999) (similar for breach of warranty). That Gilmore did not plead punitive damages is irrelevant, considering a nationwide settlement need not account for the speculative possibility that a fraction of class members could potentially recover punitive damages under certain states' laws. *See Moore v. Verizon Comms. Inc.*, 2013 U.S. Dist. LEXIS 122901, at *36 (N.D. Cal. Aug. 28, 2013).

### D.    Mediation and Settlement Negotiations Were Well-Informed and Successful.

The Tomlinson Objectors attack the efficiency and success of the parties' mediation before Judge Welsh. But the fact that a settlement was reached in one mediation session is not indicia of collusion. If anything, the productive mediation underscores the hard work put in by the parties— including lengthy mediation statements informed by the discovery gathered in the Related Actions, and the nationwide sales data produced by Monsanto and analyzed by Dr. Sharp for purposes of mediation—and the effectiveness of the mediator. In any event, at the time of mediation, the matter

had been on file for several months, Gilmore had amended and briefed the motion to dismiss, the parties had already agreed to Judge Welsh in *Ezcurra*, and there was incentive for Monsanto to avoid motion to dismiss rulings in the retailer actions. The efficiency at which the parties were capable of settlement inures to the benefit of the litigants, the putative class, and the Court.[3]

### E.    The Objectors Mischaracterize the Settlement Agreement.

Contrary to Tomlinson Objectors' characterizations, the settlement agreement is not simply "claims-made." A typical claims-made settlement "is a settlement that does not have a fixed settlement fund, but rather provides that the defendant will pay claims of class members who file them." *In re Myford Touch Consumer Litig.*, No. 13-3072-EMC, 2018 U.S. Dist. LEXIS 100222, at *5 n.1 (N.D. Cal. June 14, 2018) (*citing* 4 NEWBERG ON CLASS ACTIONS § 13:7 (5th ed. 2018)). In other words, there is no set amount of money available to the class and class members make claims with no minimum or maximum amount paid. Here, the 'floor-ceiling' settlement structure is neither a classic claims-made or common fund, but instead has aspects of both to strike a balance of what is a fair settlement given typical claims rates in a consumer fraud class action. The structure guarantees $23 million will be paid, but allows for up to $45 million if needed to satisfy claims.[4] This "floor-ceiling" structure has been approved many times by Courts across the Country. *See, e.g., In re Apple Inc. Device Performance Litig.*, No. 18-2827-EJD, 2021 U.S. Dist. LEXIS 50550, at *51, 76 (N.D. Cal. Mar. 17, 2021) (approving settlement with floor-ceiling structure); *Vandervort v. Balboa Capital Corp.*, 8 F. Supp. 3d 1200, 1210 (C.D. Cal. 2014) (same).

---

[3] Tomlinson Objectors suggest the proposed settlement was some sort of backup to the failed settlement proposed in the *Ramirez* action, Case No. 3:19-cv-02224-VC ("*Ramirez*"), given the timing of the mediation. ECF No. 106 at 14. But the *Ramirez* settlement was rejected *after* the parties' mediation on February 16, 2021, where the parties reached an agreement in principle. *Ramirez v. Monsanto Co.*, 541 F. Supp. 3d 1004 (May 26, 2021).

[4] Contrary to Tomlinson Objectors' references to an "agreed-upon fee," there is no such fee. The Settlement provides that Monsanto will not *oppose* a fee request of *up to* 25% of the ceiling.

## ARGUMENT

### I.    PLAINTIFFS APPLY THE CORRECT LEGAL STANDARD.

Plaintiffs did not, as Leonard Objectors claim, "rely on the incorrect legal standard for addressing the reasonableness of their proposed settlement" by "relying exclusively on the *Churchill* factors[.]" Leonard Opp. at 5. The "goal of the [Rule 23] amendment [was] to focus the court and the lawyers on the core concerns of procedure and substance," and each 'core concern' was specifically addressed by Plaintiffs. Advisory Committee Notes to Rule 23(e)(2). This includes the concerns presented by Rule 23(e)(2), including Subsections (A) (adequate representation),[5] (B) (arm's length negotiation),[6] (C)(i) (trial costs and risks),[7] (C)(ii) (claims processing),[8] (C)(iii) (attorneys' fees),[9] (C)(iv) (Rule 23(e)(3) agreements),[10] and (D) (equitable treatment of class members).[11] Plaintiffs also analyzed various *Churchill* factors that are not explicitly provided by Rule 23. *See* MPA at Argument: Sections III(A)(4)-(6). Plaintiffs also addressed this District's Guidance for Class Action Settlements. *Id.* at Argument Section IV.

The Leonard Objectors are also wrong to claim Plaintiffs failed to analyze the *Bluetooth* warning factors applying to pre-certification settlements. Leonard Opp. at 6. Rather, all three *Bluetooth* factors were presented and directly addressed in Plaintiffs' Motion. *See* MPA at 33-35 (analyzing 'disproportionate distribution of the settlement' factor) and 35 (analyzing 'clear-sailing arrangement' and 'reverter clause' factors).

Finally, after arguing the Court should focus on Rule 23(e)'s statutory language, the Leonard Objectors claim that Rule 23 demands analysis of the scope of the release. Leonard Opp.

---

[5] *See* MPA at Facts §§ I(B) and I(E), Argument §§ I(D) and III(A)(3)-(4); Declaration of Gillian Wade, ECF. No. 14486-1 ("Wade Decl.") at ¶¶ 6-7, 12-14, 16-17, 22-23, 25-36.

[6] *See* MPA at Facts § I(E), Argument § III(B); Wade Decl. at ¶¶ 13-16, 35.

[7] *See* MPA at Argument §§ III(A)(1), III(A)(2), and IV; Wade Decl. at ¶ 24.

[8] *See* MPA at Facts §§ II(C) and II(D), Argument § IV.

[9] *See* MPA at Facts § II(G), Argument § IV; Wade Decl. at ¶¶ 37-41.

[10] *See* MPA at p. 36 fn. 33; Wade Decl. at ¶ 44.

[11] *See* MPA at Facts §§ II(B), II(D), Argument § IV; Wade Decl. at ¶ 21.

at 6-7. However, the scope of the release is not included in Rule 23(e)'s list of factors, and the Leonard Objectors' focus thereon merely confirms Plaintiffs' point that the Rule 23(e) amendments "were not intended to displace the factors traditionally used by circuit courts." MPA at 18 fn. 22 (citing *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1121 & n.10 (9th Cir. 2020)); *see also* Advisory Committee Notes to Rule 23(e)(2) ("[t]he goal of this amendment is not to displace any factor, but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal"). In any event, Plaintiffs *did* analyze the scope of the release in their opening brief, and further explained how the Settlement's release was amended for additional clarity. MPA at 7 fn. 11, 11, 28.

## II.     RULE 23(e)(2) AND RELATED CHURCHILL FACTORS WEIGH IN FAVOR OF PRELIMINARY APPROVAL.

Contrary to Objectors' misleading and erroneous assertions, the proposed Settlement is fair, reasonable, and adequate under Rule 23(e)(2) and the related *Churchill* factors. Despite the risks of continued litigation, Class Counsel was able to reach a settlement under which Class Members stand to receive *two-thirds* of Plaintiffs' estimate of best-case damages at trial. Throughout the litigation of this matter and the Related Actions, Class Counsel undertook substantial factual and expert discovery before engaging a contentious, arm's-length mediation before an experienced, former magistrate judge, who facilitated the outstanding result achieved here. These factors, as discussed more fully herein, weigh in favor of preliminary approval.

### A.     Class Counsel has Adequately Represented the Class.

Class Counsel has adequately represented the interests of absent Class Members for purposes of Rule 23(e)(2)(A). Class Counsel thoroughly investigated the allegations in *Gilmore* and the Related Actions through targeted discovery and an extensive review of publicly available information from the personal-injury litigation. Class Counsel also retained Dr. Sharp to perform a hedonic-regression analysis measuring the price premium associated with Monsanto's failure to disclose Roundup®'s potential cancer risk—an analysis that did indeed consider Monsanto's nationwide sales data and glyphosate-based weed and grass killer brands aside from Roundup®

Weed & Grass Killer III. In short, Class Counsel entered mediation with substantial information on liability and damages, which enabled them to make an informed decision regarding settlement. Objectors' contention that their interests were not adequately represented is based on their subjective belief they will achieve a better result at trial. That is not the standard, nor is it enough to find that Class Counsel's representation was inadequate.

1. **Class Counsel undertook discovery sufficient to engage in settlement discussions and provided support for its calculation of potential recovery.**

Class Counsel obtained exhaustive discovery on both liability and damages. Because Plaintiffs' claims are premised largely on Monsanto's deception and injury at the point of purchase, Class Counsel's investigation centered on the marketing, labeling, and sales data for the Products. The discovery confirmed Monsanto's failure to disclose Roundup®'s potential carcinogenicity was uniform and undisputed, and Class Counsel obtained the critical information needed to establish class-wide damages, i.e., product sales data. With the assistance of Dr. Sharp's report and ongoing analysis, Class Counsel was able to interpret this data and determine the price premium on all Roundup® Products on a class-wide basis. Although Plaintiffs were never required to prove they developed cancer, Class Counsel also reviewed publicly available information and documentation concerning causation from the personal-injury litigation and the regulatory record. Wade Decl. ¶ 13. Class Counsel was well-prepared to engage in settlement discussions with the information gathered.

Objectors' specious criticism of the discovery completed in *Ezcurra* should be rejected. As an initial matter, the comparison of number of documents produced in *Ezcurra* versus *Tomlinson* is meaningless without considering the value of what was produced, which Tomlinson Objectors concede. *See* ECF No. 25 at n. 32 ("Number of written discovery requests served or responded to does not indicate what substantive information was actually provided"). Class Counsel made efficient use of the discovery process, focusing on the key issues of the case. Moreover, Objectors' assumption the discovery in *Ezcurra* was limited to Monsanto's conduct and sales in Florida is perplexing and wrong. Monsanto's omissions as to the Product's potential carcinogenicity, its

knowledge thereof, and the science related to the Product's potential carcinogenicity is the same regardless of the state in which discovery is conducted. And although Dr. Sharp's analysis in *Ezcurra* was based on sales data in Florida, he was able to calculate the price effect of the nondisclosure of a potentially carcinogenic active ingredient on the price of weed and grass killers, controlling for other product attributes, which is a *percentage-based figure* easily applied to the nationwide sales data he later analyzed. Wade Decl., Ex. 2 ("Sharp Report") at ¶¶ 26-27. Dr. Sharp's analysis is also not limited to Roundup® Weed & Grass Killer III as Objectors claim. The Sharp report considered other weed and grass killer products containing glyphosate. *Id.* at ¶¶ 26-27 and App'x C.[12]

Nevertheless, Objectors suggest the sales data provided by Monsanto was incomplete (if not false), "untested," and uninterpreted. Yet Objectors provide no factual basis for these assumptions and appear to ignore the contents of his report. To the contrary, Dr. Sharp considered a great deal of information, *see* Sharp Report at App'x B, and Objectors cite to no authority requiring Class Counsel to reveal their work product and privileged communications regarding their interpretation of sales data to justify the fairness of the settlement. Nor is there any authority requiring Dr. Sharp—a Ph.D. Economist—to sit down with a Monsanto representative to ensure he adequately comprehends the data. Objectors' suggested inability to understand the sales data provided in *Tomlinson* has no relevance to Class Counsel's well-founded interpretations.

The discovery conducted in *Weeks* also provided value to Class Counsel as it shed light on the relationship between Home Depot and Monsanto, the sales value of the Products, and the known risks associated therewith. Moreover, Plaintiffs have never asserted that the substantive information learned about Home Depot in discovery was directly relevant for settlement negotiations in *Gilmore.* Rather, it was the very fact discovery was ongoing in *Weeks II* and that the case was being litigated that contributed significantly to settlement (as explained above).

Lastly, *Acosta v. Trans Union, LLC*, 243 F.R.D. 377 (C.D. Cal. 2007) and *Fraser v. ASUS*

---

[12] These include BioAdvanced, Bonide, Compare-N-Save, and Knockout, among others. *Id.* at App'x C.

*Computer Int'l*, 2012 U.S. Dist. LEXIS 181315 (N.D. Cal. Dec. 21, 2012) are plainly distinguishable. In *Acosta*, where plaintiffs alleged defendant engaged in inaccurate credit reporting of discharged debts, the discovery (which consisted of 79 pages of documents gathered in discovery and a "discovery bank of information" collected in other cases) was incomplete such that plaintiffs had no basis to "quantify the frequency of the erroneous reporting," to "discern approximately how costly it would be for [defendants] to correct their reporting procedures," or to "objectively estimate how much [defendants] would be required to pay class members under the Settlement's economic relief provisions." *Acosta*, 243 F.R.D. at 380, 397. Here, Class Counsel's investigation revealed the extent of Monsanto's deception and was sufficient to quantify damages on a class-wide basis. *Fraser* is also distinguishable because plaintiff obtained discovery on only *half of the legal issues in the case*. 2012 U.S. Dist. LEXIS 181315, at * 15 ("expert's report only analyzes the value of the GPS feature and does not consider the value of Wifi functionality").

### 2.      Missouri class members have been adequately represented.

Objectors' argument that *Gilmore* plaintiffs and Class Counsel did not adequately represent the certified Missouri class in *Tomlinson* is premised entirely on their baseless aspiration that they will do better at trial someday. But Objectors' speculative belief they will achieve their best-case scenario at trial does not render Gilmore plaintiffs or counsel inadequate (nor does it mean the settlement is unfair, unreasonable or inadequate).[13] *See In re Apple iPhone 4 Prods. Liab. Litig.*, No. 10-2188-RMW, 2012 U.S. Dist. LEXIS 113876, at *10 (N.D. Cal. Aug. 10, 2012) ("objections seeking a 'better' result are not sufficient to overturn a settlement agreement"). In any event, Plaintiffs achieved the same kind of relief Tomlinson Objectors sought to achieve should they ultimately prevail—a partial refund. Indeed, Missouri law requires an offset for the value of the product. *See Kerr v. Vatterott Educ. Ctrs. Inc.*, 439 S.W.3d 802, 814 (Mo. Ct. App. 2014) (holding

---

[13] Tomlinson Objectors repeated references to a voicemail they supposedly left "by February 5, 2021" for Ms. Wade and/or Ms. Avila is disputed. But in any event, it also bears no relevance to the question of fairness before the Court.  Even if Objectors did leave unreturned messages (during the height of the pandemic when Los Angeles County residents were not even permitted to go into their offices), it begs the question as to why an email was not also sent.

"refund" damages are available only when plaintiff "rescinds and returns the property received or whe[n] he received nothing of value"). If Tomlinson Objectors have an expert analysis showing the Products are worthless, they certainly have not shared it and, in fact, they offered no expert analysis at the class certification stage in *Tomlinson* or in support of their Opposition.

### B.   The Proposal was Negotiated at Arm's Length.

The Settlement resulted from legitimate, arm's length negotiations facilitated by a skilled and experienced mediator. Tomlinson Objectors' reverse auction accusations are meritless absent concrete evidence of collusion, of which there is none (because there was no collusion). Objectors' bare assertion they were in a superior negotiating position assumes *Tomlinson* was a slam dunk, and ignores the strength of counsel's overarching litigation strategy. Of course, the speculative belief *Tomlinson* was better positioned for settlement is not evidence of a reverse auction. *See, e.g., Swinton v. SquareTrade, Inc.*, 960 F.3d 1001, 1005-06 (8th Cir. 2020) (that proposed intervenor's case was more procedurally advanced than the settling case, in which no discovery had occurred, was insufficient to find the proposed settlement was the result of a reverse auction). Far from collusive, the outcome of the Parties' negotiations is the result of a fully informed arm's length mediation between highly experienced counsel. Rule 23(e)(2)(B) is readily satisfied.

### 1.   The presence of a highly experienced mediator underscores the fairness of the settlement negotiations.

As detailed in the moving papers, the proposed Settlement was reached in the course of contentious and arm's length negotiations during the Parties' 14-hour mediation before Judge Welsh. Judge Welsh was extensively involved in brokering this Settlement and her presence supports the conclusion that the mediation process was not collusive. *Gallucci v. Gonzalez*, 604 F. App'x 533, 534 (9th Cir. 2015) (claims of collusion rebutted by fact that the settlement was reached "with aid of a retired magistrate judge and experienced mediator"); *Alves v. Main*, No. 01-789, 2012 U.S. Dist. LEXIS 1717733, at *73-74 (D.N.J. Dec. 4, 2012) *aff'd*, 559 F. App'x 151 (3d Cir. 2014) (negotiation before third-party mediator "virtually ensures that the negotiations were conducted at arm's length and without collusion between the parties"); Wade Decl. Ex. 3 (Welsh

13

Decl. (ECF No. 27)) ¶¶ 9-10 (Judge Welsh "observed nothing that suggested any collusion or untoward behavior by counsel for either party"). Although the presence of a mediator "is not on its own dispositive of whether the end product is a fair, adequate, and reasonable settlement agreement," it is a "factor weighing in favor of a finding of non-collusiveness." *In re Bluetooth Headset Prods. Liab. Litig*., 654 F.3d 935, 948 (9th Cir. 2011).

### 2. Objectors' claims of a reverse auction are completely meritless.

Tomlinson Objectors' reverse auction claims do not withstand scrutiny. To credit such claims based on the *mere existence* of their Missouri case would mean "no settlement could ever occur in the circumstances of parallel or multiple class actions — none of the competing cases could settle without being accused by another of participating in a collusive reverse auction." *Negrete v. Allianz Life Ins. Co*., 523 F.3d 1091, 1099-1100 (9th Cir. 2008). Contrary to their interpretation of *Gallucci*, the Ninth Circuit not only found there was no evidence of a bidding war, but also opined that the absence of a bidding war precluded a reverse auction. *Gallucci*, 603 F. App'x at 535. An auction, by definition, requires offers by multiple bidders, *see* Black's Law Dictionary (11th ed. 2019) (defining an auction as "a sale by consecutive bidding, intended to reach the highest price of the article through competition for it"), and Tomlinson Objectors have never asserted they were invited to or did make an offer.

The prospect of a reverse auction is even more implausible considering most of *Tomlinson* will proceed whether or not the Settlement is approved. The *Tomlinson* plaintiffs are pursuing claims based not only on the consumer products at issue in this case, but also for agricultural ("AG") and industrial and professional ("I&P") Roundup® products, which are unaffected by the Settlement. Notably, the AG and I&P claims, which Tomlinson Objectors contend are quite strong, represent at least 78.16% of the total sales at issue in their Missouri case. *See* ECF No. 41-1 at 133-134. Had a reverse auction occurred, it would have precluded the entirety of the *Tomlinson* action, which is evidently not the case here. *See Razo v. AT&T Mobility Servs*., No. 20-172, 2021 U.S. Dist. LEXIS 199583 (E.D. Cal. Oct. 15, 2021) (A reverse auction occurs when "the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement with

14

the hope that the district court will approve a weak settlement *that will preclude other claims against the defendant*") (emphasis added). Additionally, Tomlinson Objectors could not be bidders in a reverse auction for a nationwide settlement given the consumer products at issue in *Tomlinson* represent less than 2% of nationwide sales. Tomlinson Opp. at 39.

Objectors' counsel certainly seem to believe in their own greatness. But that subjective belief does not support their allegation of collusion or unsupported assertion of a better case. At the time the Parties reached a settlement in principle, *Tomlinson's* motion for class certification had not yet been granted. The fact that *Tomlinson* was later certified by a state court based upon a bare bones motion not supported by any deposition testimony or expert work does not negate the risks it faces on the merits. Monsanto's decision not to file a motion to dismiss in *Tomlinson* only confirms the pleadings have not been challenged and that the *Tomlinson* plaintiffs have yet to grapple with preemption arguments and address other dispositive issues. It certainly does not mean Objectors are sure to prevail on the merits as they suggest. The number of pages of documents the *Tomlinson* plaintiffs obtained through discovery says nothing about the substantive value of those documents nor translate into a superior bargaining advantage. And while *Tomlinson* counsel's success in other litigation is noted, it does not lessen the fairness of this Settlement or what has been accomplished here.

Tomlinson Objectors also disregard the substantial pressure Class Counsel's ongoing and coordinated litigation strategy imposed on Monsanto at the time of mediation. As discussed extensively herein, Monsanto faced substantial risks in *Gilmore*, financial and reputational pressure from the pending retailer actions, and exposure from the *Weeks* and *Ezcurra* appeals. That Class Counsel pursued a different approach from the Tomlinson Objectors does not mean they were in a weaker position to settle.

As explained herein, Tomlinson Objectors' portrayal of Class Counsel's supposed weakness is grossly misleading. Class Counsel never "abandoned" its litigation efforts—rather, the voluntary dismissals resulted from the Settlement or strategic decisions by Class Counsel for the Class's benefit. There is also no support for the assertion Gilmore's DCFA claim is unviable.

Although Gilmore did not purchase Roundup® in Delaware, the DCFA requires only that "*some* conduct took place in Delaware," *Marshall v. Priceline.com Inc*., No. 05-195, 2006 Del. Super. LEXIS 447, at *5 (Del. Super. Ct. Oct. 31, 2006), which Plaintiffs allege in the complaint. ECF No. 22 at ¶¶ 11, 12, 22, 24, 25, 27. As previously stated, full-refund damages are not available under the DCFA, *Harnish,* 833 F.3d at 307, and that punitive damages were not initially pled does not mean Plaintiffs could not amend the complaint to add them or that it was not part of the calculus in settlement negotiations. Nor did Plaintiffs ever relinquish seeking punitive damages at trial.

### C. The Relief Provided for the Class is Fair and Reasonable by Any Standard.

#### 1. The relief is hardly *de minimis.*

The Settlement is an excellent result for Class Members, who will receive roughly two-thirds of Plaintiffs' estimated best-case recovery at trial. *See Moreno v. Capital Bldg. Maint. & Cleaning Servs*., No. 19-cv-07087-DMR, 2021 U.S. Dist. LEXIS 87268, at *24 (N.D. Cal. May 5, 2021) ("a settlement that accounts for over a third of the total possible recovery is reasonable"). Tomlinson Objectors do not dispute the 20% per-unit payment is consistent with other consumer-product settlements that have been approved nationwide. *See* Tomlinson Opp. at 39 n. 48 (*citing* MPA at 40 n. 29). Nor do they dispute that the settlement fund as a percentage of the potential aggregate damages, ranging from 2.8% at the Floor Amount to 5.5% at the Ceiling Amount (using Plaintiffs' 31% price-premium model[14]), is within the range of other approved class action settlements. *See Ferrell v. Buckingham Prop. Mgmt*., No. 19-332, 2020 U.S. Dist. LEXIS 9919, at *59 n. 20 (E.D. Cal. Jan. 21, 2020) (collecting cases approving settlements in which payments comprised between 0.75 and 16% of total estimated liability).[15] Although the fund as a percentage

---

[14] Tomlinson Objectors criticize the use of Monsanto's conjoint analysis in evaluating potential liability, but had this matter proceeded to trial, there would certainly be a risk of it being accepted over Plaintiffs' hedonic-regression analysis. The Ninth Circuit recently held that conjoint analysis is admissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993)*. Macdougall v. Am. Honda Motor Co.*, No. 20-56060, 2021 U.S. App. LEXIS 37780, at *3 (9th Cir. Dec. 21, 2021) ("Honda's argument that conjoint analysis categorically fails as a measure of economic damages is unavailing").

[15] Objectors criticize Plaintiffs' comparison of the settlement's value to that in *Rawa v. Monsanto Co.*, No. 17-1252, 2018 U.S. Dist. LEXIS 88401 (E.D. Mo. May 25, 2018) and *Jones*

16

of potential aggregate liability may appear seemingly modest, it should be evaluated "in light of the claims rate anticipated by the parties," *Stemple v. QC Holdings, Inc.*, No. 12-1997, 2016 U.S. Dist. LEXIS 55011, at *22 (S.D. Cal. Apr. 25, 2016), which P&N estimates to fall within the single digits. Dkt. No. 94-4 ("Schwartz Decl.") ¶ 11.

Plaintiffs' price premium model is the only appropriate measure for damages in this case. *Brazil v. Dole Packaged Foods, LLC*, No. 12-1831-LHK, 2014 U.S. Dist. LEXIS 157575, at *14 (N.D. Cal. Nov. 6, 2014) ("The proper measure of restitution in a mislabeling case is the amount necessary to compensate the purchaser for the difference between a product as labeled and the product as received"). Measuring damages as the price paid versus value received is the standard under virtually every state's consumer protection statute, including DCFA, FDUTPA, and the UCL. *Harnish*, 833 F.3d at 307 (damages under DCFA are the difference between price paid and actual value of the product); *Carriuolo v. GM Co.*, 823 F.3d 977, 986 (11th Cir. 2016) (same for FDUTPA); *Chowning v. Kohl's Department Stores, Inc.*, 735 F. App'x 924, 925 (9th Cir. 2018) (same for the UCL).[16] Tomlinson Objectors' claim that Dr. Sharp did not analyze damages under alternative models presupposes such models exist and are appropriate for this case.[17]

Contrary to Tomlinson Objectors' assertions, Plaintiffs are precluded from obtaining a full refund as they do not dispute Roundup® performs its intended function, namely, killing weeds. Under the price premium model, a full refund is inappropriate unless the product is actually

---

*v. Monsanto Co.*, No. 19-102, 2021 U.S. Dist. LEXIS 91260 (W.D. Mo. May 13, 2021). Although Plaintiffs acknowledge certain differences in the claims, procedural history, and settlement terms, both matters were essentially consumer fraud cases concerning Roundup® that resulted in a smaller net recovery than the $45 million Ceiling Amount available here.

[16] *See also Johannessohn v. Polaris Indus.*, 450 F. Supp. 3d 931, 968 (D. Minn. 2020) ("Each state statute at issue [including that of Missouri, California, Florida, New York, North Carolina, and Minnesota] . . . recognize[s] that a consumer who overpays for an item because the actual value of the item he purchased was less than the value of the item as represented can establish that he has been injured").

[17] Tomlinson Objectors' reliance on *Fraser*, 2012 U.S. Dist. LEXIS 181315, is misplaced. The court did not fault the expert for analyzing one measure of damages to the exclusion of the others, but rather for analyzing the value of only one product defect (the product's GPS feature) and not the other alleged (the product's Wi-Fi functionality). *Id.* at *14.

worthless. *In re Tobacco Cases II*, 240 Cal. App. 4th 779, 795 (2015) (full refund only available "when the plaintiffs prove the product had no value to them"); *Kerr*, 439 S.W.3d at 814 (same under Missouri law). Indeed, consumers may not "retain some unexpected boon, yet obtain the windfall of a full refund." *In re POM Wonderful LLC*, No. 10-2199, 2014 U.S. Dist. LEXIS 40415, at *3 (C.D. Cal. Mar. 25, 2014). Moreover, that Roundup® is potentially carcinogenic does not mean it is valueless. *See In re Tobacco Cases II*, 240 Cal. App. 4th at 802 (full refund inappropriate for cigarette products deceptively advertised as less dangerous, considering it is "inherently implausible to show a class of smokers received *no* value from a particular type of cigarette").

Tomlinson Objectors devote two pages of their brief questioning the entire validity of the price premium theory, arguing that a full refund is not appropriate in *any* consumer case where the plaintiff alleges she would not have purchased a product absent the false advertising. Objectors cite no case that supports this proposition and this Court has specifically rejected it in the past. *See, e.g., Allen v. ConAgra Foods, Inc*., 331 F.R.D. 641, 673 (N.D. Cal. 2019) (Chhabria, J.) (Despite plaintiffs alleging "they would not have purchased [the product] had they known that the statements were false," full refund model is inappropriate because the "product provides the benefit of a buttery taste"). Plaintiffs agree that the injury in a consumer case occurs at the point of purchase and that post-purchase use does not alter the value of the product. But Plaintiffs are not suggesting that a product's value depends on post-purchase use. The price premium model considers the value of the product at the point of purchase and here, consumers who purchase Roundup® are receiving a product that works as intended.[18] Plaintiffs' theory is not a "steep discount" of potential recovery—rather, it is fully consistent with what is legally recoverable.

---

[18] Tomlinson Objectors' reliance on *Pulaski & Middleman, LLC v. Google, Inc*., 802 F.3d 979 (9th Cir. 2015) is unavailing. The court actually *accepted* the plaintiffs' price premium model, and "express[ed] no opinion on the merits" of their full refund approach. *Id.* at 989 n. 9. Furthermore, *In re Morning Song Bird Food Litig*., 320 F.R.D. 540 (S.D. Cal. 2017) is distinguishable because the product was indeed worthless (instead of receiving "nourishing bird food," plaintiffs got "bird poison"). *Id.* at 554. *Blue Cross Blue Shield Ass'n v. GlaxoSmithKline LLC*, No. 13-4663, 2016 U.S. Dist. LEXIS 155347 (E.D. Pa. Nov. 9, 2016) did not involve the measure of damages (let alone endorse a full refund model), but rather the question of whether plaintiffs suffered an economic injury.

### 2.  The risks were significant.

Tomlinson Objectors discount the risks posed by continued litigation. Although Plaintiffs believe the merits of this case are strong, no case is without risks and Monsanto has formidable defenses that could ultimately leave Class Members with little to no recovery should this matter proceed to trial. These uncertainties, in addition to the inevitable expense of litigating a large, complex case through trial, weigh in favor of approval.

First, the issue of causation poses real challenges and Tomlinson Objectors do not dispute that juries have reached divergent conclusions. Tomlinson Opp. at 40. Although the purchase-based injury alleged by Plaintiffs does not require a showing that Plaintiffs or Class Members developed cancer, Plaintiffs may be required to prove that Roundup® is capable of causing cancer generally. In *Weeks*, the court dismissed the case on grounds Weeks's allegations that the Roundup® formulation causes cancer lacked "scientific support,"[19] despite the fact he was asserting only an economic injury. *Weeks* ECF No. 77 at 7, 8. In *Nat'l Ass'n of Wheat Growers v. Becerra*, the court enjoined a state-imposed cancer warning on Roundup® products because it was not "factual and uncontroversial." F. Supp. 3d 1247, 1252-53 (E.D. Cal. 2020). That this matter, like *Weeks* and *Wheat Growers*, is not a personal injury case does not mean Plaintiffs will not be required to prove general causation.

Second, the issue of preemption poses not just a risk to Plaintiffs' claims, but an existential threat to *Gilmore*, the *Tomlinson* matter, and all cases in the MDL, as the Supreme Court may take up *Hardeman* on appeal. Although Monsanto has lost on preemption in several courts, the issue remains unsettled and the authority is split. *See, e.g.*, *Carson v. Monsanto Co.*, 508 F. Supp. 3d 1369, 1377 (S.D. Ga. 2020) (Roundup® failure to warn claims "are preempted if they would impose a labeling requirement that is new or different from the requirements of FIFRA"). With the

---

[19] Contrary to Tomlinson Objectors' characterization, the court was not referring to POEA alone, but the Roundup® formulation as a whole. *Weeks* ECF No. 77 at 8.

issue of preemption now before the Supreme Court with the possibility of reversal, preemption and EPA's approval[20] of the Roundup label poses a real threat to continued litigation.

Third, the issue of damages is yet another risk. Although Dr. Sharp's hedonic-regression analysis concluded consumers paid a 31% price premium, Monsanto's expert found no statistically significant price premium using a conjoint analysis. The possibility that Monsanto's damages model would prevail further justifies the settlement.[21]

Lastly, Plaintiffs' risks in *Gilmore* are not of counsel's own making. Their DCFA claim is not weak, as explained earlier herein, because the statute applies to conduct in Delaware, which Plaintiffs clearly allege. Moreover, the choice-of-law risks would not likely be any different had Plaintiffs had filed elsewhere. Tomlinson Objectors argue Plaintiffs could have alleged subclasses for groups of states, but some courts have held that if even "*more than a few* of the laws of the fifty states differ, the district judge would face an impossible task of instructing a jury on the relevant law." *In re Am. Med. Sys. Inc.*, 75 F.3d 1069, 1085 (6th Cir. 1996) (emphasis added); *see also Dei Rossi v. Whirlpool Corp.*, No. 2:12-cv-00125-TLN-CKD, 2015 U.S. Dist. LEXIS 55574, at *37 (E.D. Cal. Apr. 28, 2015) (court "is not convinced that the complexities involved in this matter can be overcome by the creation of numerous subclasses"). Tomlinson Objectors claim, that if that's the case, a settlement that treats all class members alike cannot be adequate and fair to all of them. Tomlinson Opp. at 45. However, "a class-action settlement necessarily reflects the parties' pre-trial assessment as to the potential recovery of the entire class, with all of its class members' varying claims." *Lane v. Facebook, Inc.*, 696 F.3d 811, 824 (9th Cir. 2012). Additionally, reliance indeed poses additional issues given many consumer protection statutes

---

[20] The safe harbor defense, which resulted in the dismissal of *Ezcurra*, is available under many states' consumer protection statutes. *See, e.g.*, Illinois' Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/10b (safe harbor for actions authorized by state or federal agency); Ohio's Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.12 (same), Colorado's Consumer Protection Act, Colo. Rev. Stat. § 6-1-106 (same).

[21] Plaintiffs address Tomlinson Objectors' criticism of Dr. Sharp's methodology in Section II(C)(1).

require such a showing.[22]

### 3.    The scope of the release is clear and justified.

The release language in the Settlement is clearly defined and appropriate. The Settlement would release only economic-loss claims based on the alleged misrepresentations and omissions at issue, expressly excluding economic losses resulting from personal injury. Settlement at 21-22. Leonard Objectors argue the Settlement is overbroad, as it would release claims for breach of contract, false misrepresentation, and any economic claims "distinct from the *Gilmore* Plaintiffs' benefit-of-the-bargain claim." Leonard Opp. at 10. However, each of these claims would still stem from the same factual predicate: Monsanto's representations and omissions concerning Roundup®'s health risks.[23] Courts "may release not only those claims alleged in the complaint, but also a claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action." *Class Plaintiffs v. City of Seattle,* 955 F.2d 1268, 1287 (9th Cir. 1992).

Tomlinson Objectors also contend the phrase, "related in any way to the same factual predicates as the Action," is overbroad. Tomlinson Opp. at 47 (citing *Hadley v. Kellogg Sales Co*., No. 16-CV-04955-LHK, 2020 U.S. Dist. LEXIS 30193, at *5-6 (N.D. Cal. Feb. 20, 2020). Although the settlement in *Hadley* had similar language, it was not tied to the "identical factual predicate" underlying the claims in the action. Here, the Settlement expressly provides that the released claims *must* relate to the "same factual predicates" underlying *Gilmore*. Courts have approved settlement agreements with similar language. *See, e.g.*, *Collins v. Cargill Meat Solutions*

---

[22] *See, e.g.*, Ind. Code § 24-5-0.5-4 (Indiana's Deceptive Consumer Sales Act requires a showing of reliance, in that it provides a private right of action for "a person relying upon an uncured or incurable deceptive act"); *Bumpers v. Cmty. Bank*, 747 S.E.2d 220, 227 (N.C. 2013) (when a claim under N.C. Gen. Stat. § 75-1.1stems from an alleged misrepresentation, the plaintiff must show reasonable reliance); Tex. Bus. & Com. Code § 17.50(a)(1)(B) (Texas's Deceptive Trade Practices—Consumer Protection Act expressly requires a consumer to prove reliance).

[23] *Hesse v. Sprint Corp*., 598 F.3d 581, 590 (9th Cir. 2010) is distinguishable for this reason alone. There, claims that Sprint passed government fees along to customers did not stem from the same factual predicate, where one action involved federal regulatory fees and the other involved state taxes.

*Corp.*, 274 F.R.D. 294, 303 (E.D. Cal. 2011) (releasing "any and all claims . . . arising out of the facts alleged in the Complaint," and not "unrelated claims").

Tomlinson Objectors further argue the Settlement is overbroad because the release encompasses representations and omissions concerning Roundup®'s overall health effects (as opposed to its alleged carcinogenicity alone). Tomlinson Opp. at 47. However, the release language is consistent with the complaint, which broadly alleges Roundup® is "dangerous to human health" and that Monsanto "made and continues to make representations regarding Roundup's potential health risks." ECF No. 22 at ¶¶ 4, 25. Additionally, that the Settlement may release claims by Class Members as to a reformulated Roundup® produced by Monsanto in the future is not unreasonable. Class Members are releasing claims based on *the same allegations* regarding Roundup®'s undisclosed health risks, regardless of whether the product has been reformulated with a different concentration of glyphosate or other ingredient.

Leonard Objectors' concerns regarding the release of personal injury claims are baseless. Leonard Opp. at 8-9. They take issue with the definitional provision for "Personal Injury Claims," which provides "[i]t is expressly contemplated that a cause of action could include both Claims that are Personal Injury Claims and Claims that are not Personal Injury Claims," arguing it somehow creates ambiguity as to whether such claims are released. *Id.* However, the Settlement defines "Personal Injury Claims" with respect to the *type of relief sought*, not the cause of action brought. In other words, to the extent a cause of action seeks relief for both personal injury and economic damages (that do not stem from a personal injury), only the latter would be released.

Lastly, Tomlinson Objectors argue the Settlement is collusive because it releases the retailers. Tomlinson Opp. at 33-34. But the reason for this is clear—Monsanto has an obligation to indemnify them should they be sued on the same factual predicate. Rosenthal Decl. ¶ 4.

### D.     The Proposal Treats Class Members Equitably Relative to Each Other.

The Settlement does not treat Class Members unfairly relative to the Class Representatives. The incentive awards of $5,000 are "considered presumptively reasonable in this District,"

*O'Connor v. Uber Techs., Inc.*, No. 13-CV-03826-EMC, 2019 U.S. Dist. LEXIS 54608, at *44 (N.D. Cal. Mar. 29, 2019), which Tomlinson Objectors do not dispute, and reflect Plaintiffs' efforts in this matter and the Related Actions. Plaintiffs were actively involved in the prosecution of their respective actions, regularly communicated with counsel and reviewed court filings, and remained willing to do the work necessary to bring this case to a resolution, either through settlement or continued litigation, up to and through trial. *See* Gilmore Decl. ¶ 6; Weeks Decl. ¶ 7; Taylor Decl. ¶ 6; Hanna Decl. ¶ 6; Boyette Decl. ¶ 6; Ezcurra Decl. ¶ 6; Jewell Decl. ¶ 6; Williams Decl. ¶ 6. Additionally, Plaintiff Ezcurra and Plaintiff Weeks both responded to written discovery and Plaintiff Ezcurra also prepared for a deposition. Weeks Decl. ¶ 7; Ezcurra Decl. ¶ 6. As explained at length herein, their work in the Related Actions contributed significantly to the Settlement.

Tomlinson Objectors' criticism of the service awards is based on case law that is readily distinguishable. In *Staton v. Boeing Co.*, the service awards were "up to $50,000, with an average of more than $30,000"—six times the amount requested here. 327 F. 3d 938, 977 (9th Cir. 2003). In *Roes, 1-2 v. SFBSC Mgmt., LLC*, the service awards were "$20,000." 944 F.3d 1035, 1058 (9th Cir. 2019). In *Radcliffe v. Experian Info. Solutions Inc*., the service awards were conditioned on the class representatives' support for the settlement—which is not the case here. 715 F.3d 1157, 1163 (9th Cir. 2013). Plaintiffs here were not promised a service award and acknowledge it is fully within the Court's discretion. Gilmore Decl. ¶ 8; Weeks Decl. ¶ 10; Taylor Decl. ¶ 8; Hanna Decl. ¶ 8; Boyette Decl. ¶ 8; Ezcurra Decl. ¶ 9; Jewell Decl. ¶ 8; Williams Decl. ¶ 8.

Tomlinson Objectors' argument Class Counsel did not consider other claims again presupposes that the recovery for mislabeling claims varies from state to state. As set forth in Section II(C)(1), virtually every consumer fraud or warranty theory involving Roundup®'s labeling is subject to a damages model that accounts for the value received. Thus, this matter is distinguishable from *Soto v. O.C. Communications, Inc*., No. 17-cv-00251-VC, 2019 U.S. Dist. LEXIS 61782 (N.D. Cal Apr. 1, 2019), where the court observed "California law entitles workers to a greater recovery for [wage and hour] violations than Washington law does." *Id.* at *3. Although Tomlinson Objectors intend to seek a full refund for their Missouri claims, that does not mean it is

available—indeed, it is not. *Kerr*, 439 S.W.3d at 814.

## III.    *BLUETOOTH* ANALYSIS DOES NOT SUGGEST COLLUSION.

Applying "the requisite heightened scrutiny for pre-certification settlements…[the Court should] adequately investigate and address the three warning signs of implicit collusion that [the Ninth Circuit] articulated in *In re Bluetooth*[.]" *McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 597–98 (9th Cir. 2021) (citing *In re Bluetooth*, 654 F.3d at 947).[24] The three "subtle signs" of collusion include: "(1) 'when counsel receive[s] a disproportionate distribution of the settlement; (2) when the parties negotiate a clear-sailing arrangement, under which the defendant agrees not to challenge a request for an agreed-upon attorneys' fee; and (3) when the agreement contains a kicker or reverter clause that returns unawarded fees to the defendant, rather than the class.'" *Id.* at 607-608 (quoting *Briseño*, 998 F.3d at 1023) (edits in original). "The presence of these three signs is not a death knell—but when they exist, 'they require[ ] the district court to examine them, ... develop the record to support its final approval decision,' and thereby 'assure itself that the fees awarded in the agreement were not unreasonably high.'" *Kim v. Allison*, 8 F.4th 1170, 1180 (9th Cir. 2021) (quoting *Allen v. Bedolla*, 787 F.3d 1218, 1224 (9th Cir. 2015)).

As Plaintiffs previously explained, not one of these three 'subtle signs' exist here (MPA at 33-35). Alternatively, even if the Court were to find *Bluetooth* imposed on the Court a duty to closely examine this settlement, such an examination would find no collusion or unreasonable fee.

### A.    Counsel will Not Receive a 'Disproportionate Distribution of the Settlement'.

Objectors are wrong to claim the Settlement Agreement's provisions regarding attorneys' fees reflect a "disproportionate distribution of the settlement" suggesting collusion. Leonard Opp. at 11-12; Tomlinson Opp. at 28-30. As explained below, the provision pertaining to fees simply does not run afoul of well-established Ninth Circuit guidelines for common fund cases, and the cases cited by Objectors are highly distinguishable.

---

[24] The Ninth Circuit has also held that "[*Bluetooth's*] heightened inquiry applies to *post-class certification* settlements" as well. *Briseño v. Henderson*, 998 F.3d 1014, 1023 (9th Cir. 2021) (emphasis in original) (citations omitted).

### 1.     Legal framework for the percentage-of-the-fund method

Here, Class Counsel has not yet filed its fee application, but does not intend to seek more than 25% of the total benefit available to the Settlement Class under the percentage-of-the-fund method.[25] There is a three-step process to apply the percentage-of-the-fund method:

> First, the court will ascertain the size of the fund against which the percentage will be taxed.
>
> Second, the court will review the percentage counsel seek, ensuring that the fee resulting from application of that percentage is reasonable.
>
> Third, the court will sometimes undertake a lodestar cross-check, comparing the percentage award to the time counsel expended on the case at the prevailing hourly rates, to further ensure the fee's reasonableness.

*Ferrell*, 2022 U.S. Dist. LEXIS 13728, at *4-5 (E.D. Cal. Jan. 25, 2022) (quoting NEWBERG, § 15:68). As explained below, Plaintiffs' potential $11.25 million fee request was based on reasonable assumptions conforming with Ninth Circuit standards.

### 2.     Plaintiffs' calculation of the Class 'potential recovery' common fund uses a reasonable claims rate range.

When ascertaining the size of the fund, courts include "settlement administration costs, litigation expenses, and the allotment for attorneys' fees[.]" *In re Bluetooth*, 654 F.3d at 945. When assessing value of the class claims, "'Ninth Circuit precedent requires courts to [use] the total benefits being made available to class members rather than the actual amount that is ultimately claimed.'" *Theodore Broomfield v. Craft Brew All., Inc.*, No. 17-1027-BLF, 2020 U.S. Dist. LEXIS 74801, at *48-49 (N.D. Cal. Feb. 5, 2020) (citations and quotations omitted). In *Williams v. MGM-Pathe Communications Co.*, the Ninth Circuit held "the district court abused its discretion by basing the fee on the class members' claims against the fund rather than on a percentage of the entire fund or on the lodestar." 129 F.3d 1026, 1027 (9th Cir. 1997). Thus, even where the settlement is reversionary, "the Court must use the maximum settlement amount in step one."

---

[25] The Ninth Circuit has approved two methods for determining attorney's fees in such cases where the attorney's fee award is taken from the common fund set aside for the entire settlement: the "percentage of the fund" method and the "lodestar" method. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002) (citation omitted).

*Ferrell*, 2022 U.S. Dist. LEXIS 13728, at *5 (citing *Williams*, 129 F.3d at 1027).

However, this does not mean courts should apply the *Williams* standard as "'a mechanical or formulaic approach that results in an unreasonable reward.'" *In re Bluetooth*, 654 F.3d at 944 (quoting *In re Mercury Interactive Corp.*, 618 F.3d at 992). As Objectors correctly point out, in 'claims-made' settlements, using the potential total recovery of the class to calculate fees creates "'an inherent risk of conflict…between counsel and the class[.]" Tomlinson Opp. at 29 (quoting *Harris v. Vector Mktg. Corp.*, No. 08-5198-EMC, 2011 U.S. Dist. LEXIS 117927, at *18-19 (N.D. Cal. Oct. 12, 2011)). That is because the suggested class recovery might be "'largely illusory'" when it assumes unprecedented claims rates. *Id.* (quoting *Harris* at *14-15).

Thus, when assessing *Bluetooth* disproportionality, the calculation of the fund size should not ignore the "economic reality" regarding claims rates in similar cases. *Allen v. Bedolla*, 787 F.3d 1218, 1224 (9th Cir. 2015) (citing *In re Bluetooth*, 654 F.3d at 943). Disproportionality likely exists where class counsel's estimation of the fund size "assum[es] a 100% claims rate…[which is] wholly illusory." *In re Myford Touch Consumer Litig.*, 2018 U.S. Dist. LEXIS 100222, at *9. Where, for example, "claims rates are often in the range of 1 to 10%, trending towards the lower end", a court should utilize the higher end of that range. *Id.* at *1-2 (calculating fund size based on higher end of claims rate range instead of class counsel's proposed 100% claims rate).

Here, this is not a typical claims-made settlement, where Plaintiffs are seeking 25% of an uncapped common fund amount that is 'theoretically possible' with a 100% claims rate. If that were the case, Plaintiffs' fees would be $133,000,000.[26] Rather, Plaintiffs' estimation of the *potential* recovery—reflected by the $45 million payment ceiling—utilizes the upper end of a reasonable estimated claims rate range: six percent.[27] As Plaintiffs previously explained, "the Ceiling Amount will cover a claims rate on the high end of likely claims." MPA at 30.

A 'reasonable best-case scenario' 6% claims rate estimate is hardly a 'largely illusory'

---

[26] This represents 25% of $532,000,000 ( 20% of the total retail sales figure of $2.66 billion).

[27] With a claims rate of 6.06%, $32,262,382 would be paid to the Class. When proposed fees, expenses, notice, and incentive awards are added, the result is the $45 million cap.

assumption. Even the Tomlinson Objectors appear to accept a 5 percent "top end," but complain the total fund would only amount to $40,219,618. Tomlinson Opp. at 29. But that would result in an attorney fee award of 27.9% of the common fund, hardly an "urgent red flag." *Id.* at 28 As the notice administrator noted, "[t]here is no formula to project response rates with certainty[.]" Schwartz Decl. ¶ 10. And while typical low-value retail item claims rates average between 1% and 5%, "[i]t is also instructive to look to comparable settlements with Monsanto related to Roundup® products, such as the *Rawa* and *Jones* settlements." *Id.* ¶ 12. The claims rates in those two cases were 13% and 2-3%, respectively. *See Rawa v. Monsanto Co.*, 2018 U.S. Dist. LEXIS 88401, at *9; *Jones*, 2021 U.S. Dist. LEXIS 91260, at *6. "Given that this case shares similar class products and likely purchasers as Rawa and Jones, it is reasonable to expect that claims volumes in this case may fall within this range, though it is possible that there could be an increased claims volume in light of factors such as the level of press coverage of this matter and the nature of Plaintiffs' allegations." Schwartz Decl. ¶ 12.[28]

Objectors' attempts to analogize this case to *Briseño*, *Harris*, and *Kim*—the only 'claims-made' 'potential recovery' cases they cite—are absurd.[29] *See* Leonard Opp. at 12; Tomlinson Opp. at 28-30. In those cases, the plaintiffs' common fund valuations assumed claims rates of 100%.[30] More importantly, for the proposed fees in those cases to amount to 25% of the common fund

---

[28] This is precisely the approach mandated by this District's Guidance directing parties seeking preliminary approval to provide "an estimate of the number and/or percentage of class members who are expected to submit a claim in light of the experience of the selected claims administrator and/or counsel from other recent settlements of similar cases, the identity of the examples used for the estimate, and the reason for the selection of those examples." Guidance § (1)(g).

[29] Tomlinson Objectors also cite two non-claims made (i.e., fixed fund) cases which are also distinguishable on additional grounds. Tomlinson Opp. at 30 (citing *In re Packaged Seafood Prod. Antitrust Litig.*, No. 15-2670, 2020 U.S. Dist. LEXIS 28586 (S.D. Cal. Jan. 17, 2020); *Wilson v. J.B. Hunt Logistics, Inc.*, No. 18-3487, 2020 U.S. Dist. LEXIS 259007 (C.D. Cal. Nov. 13, 2020)). In *Packaged Seafood*, the settlement was structured such that 46 percent of the fund would be allocated to fees, and class counsel's fee and cost awarded was more than three times what was paid in claims). *In re Packaged Seafood* at *50-51, 53. *Wilson* was similarly unreasonable, seeking one-third of the fund in fees (more than would be paid to class members). *Wilson* at *3.

[30] *See Briseño*, 998 F.3d at 1021; *Harris*, 2011 U.S. Dist. LEXIS 117927, at *14-15; *Kim*, 8 F.4th at 1179.

eventually paid by defendants, claims rates of 99% (*Harris*),[31] 51% (*Kim*),[32] and 31% (*Briseño*),[33] would be required – a far cry from the 6% contemplated here. Unlike in this case, the plaintiffs in Objectors' cited cases used patently unreasonable claims rate assumptions, raising the specter of bad faith or collusion. Further, the fact that Plaintiffs here negotiated for and received a $23 million payment floor—guaranteed *regardless* of the claims rate—is further evidence that they were not bargaining away Class value for higher fees.[34]

### 3. Twenty-five percent of the common fund is the benchmark percentage in the Ninth Circuit.

After calculating a good faith estimate of the maximum potential recovery, Plaintiffs intend to seek *no more than* 25% of the total benefit available to the Settlement Class in fees. Twenty-five percent is "the 'benchmark' level for reasonable attorneys' fees in class action cases." *Garibay v. Archstone Cmtys. LLC*, 539 F. App'x. 763, 764 (9th Cir. 2013); *see also In re Bluetooth*, 654 F.3d at 942 ("courts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award, providing adequate explanation in the record of any 'special circumstances' justifying a

---

[31] *Harris* was even more problematic as the plaintiffs sought 32% of a $13,000,000 capped fund. But even to reach the cap, after subtracting the proposed fee ($4,190,000), expenses ($400,000), administration costs ($250,000), service awards ($25,000), and PAGA penalties ($25,000), approximately $8 million would be required in claim payments. *Harris*, 2011 U.S. Dist. LEXIS 48878, at *4-8. Thus, to reach each subclass' $3.8 million cap, 68,070 of the 68,345 (99.6%) 'training time' sub-class members would have to claim $57, and 51,735 out of 52,232 (99%) 'sample fit' sub-class members would have to claim $75. *Id.*

[32] A common cash fund of $4,800,000 (not accounting for the coupon and injunctive relief components flagged as problematic by the court) is four times the plaintiffs' proposed fee of $1,200,000. *Kim*, 8 F.4th at 1174, 1177. After subtracting the proposed fee, service awards ($5,000), and (estimated) administration costs ($500,000), the amount remaining as class payments would be $3,095,000. Thus, 123,800 out of 240,000 class members (51%) would have to claim the $25 award. *Id.* at 1176.

[33] A common fund of $23,400,000 is four times the plaintiffs' proposed fee of $5,850,000. *Briseño*, 998 F.3d at 1020. After subtracting the proposed fee, expenses ($978,671), and service awards ($25,000), the amount remaining as class payments would be $21,396,329 – 31.6 percent of the $67,500,000 payable with a 100% claims rate. *Id.* at 1023.

[34] The Leonard Objectors also claim that the "settlement is unlikely to reach the floor amount by the Gilmore Plaintiffs own concession[.]" Leonard Opp. at 11-12. This is not accurate, as the floor is reached with class payments totaling $11.5 million, reflecting a low-end 1.9% claims rate.

departure."). Since Plaintiffs are seeking the benchmark percentage of a reasonable and justified common fund valuation (discussed *supra*), counsel is not seeking a 'disproportionate distribution of the settlement' raising the possibility of collusion.

**4.    The lodestar cross-check is irrelevant for *Bluetooth* analysis, but nevertheless confirms the reasonableness of the proposed fee award.**

The Tomlinson Objectors argue that the "proposed fee is unsupported by [the] offered lodestar." Tomlinson Opp. at 30-31. But the lodestar calculation does not bear on whether there is a "gross disparity in distribution of funds between class members and their class counsel [which] raises an urgent red flag demanding more attention and scrutiny." *Briseño*, 998 F.3d at 1026. This was evident in *Briseño*, where "the district court did not adequately scrutinize the fee arrangement for collusion [by] not[ing] that the fee request amounted to less than half of the lodestar amount." *Id.* Regardless of the lodestar, courts must assess whether "plaintiffs' counsel 'receive[d] a disproportionate distribution of the settlement.'" *Id.* (quoting *In re Bluetooth*, 654 F.3d at 947). Objectors' arguments are irrelevant to the task before this Court.

In any event, Plaintiffs' near $7.7 million lodestar, representing a 1.46 multiplier (should Plaintiffs seek $11.25 million in fees), confirms the reasonableness of the proposed fee award. Wade Decl. ¶¶ 40-41. This multiplier falls well within the accepted range in the Ninth Circuit, where positive multipliers are routinely awarded, and is reasonable. *See, e.g., Vizcaino*, 290 F.3d at 1051 (noting district court cases in the Ninth Circuit approving multipliers as high as 19.6); *Craft v. County of San Bernardino*, 624 F. Supp. 2d 1113, 1125 (C.D. Cal. 2008) (approving fee award resulting in a multiplier of 5.2, and collecting similar cases); *Steiner v. Am. Broad. Co., Inc*., 248 F. App'x 780, 783 (9th Cir. 2007) (approving multiplier of 6.85); 4 NEWBERG, § 14.7 (courts typically approve percentage awards based on lodestar cross-checks of 1.9 to 5.1 or even higher).

Tomlinson Objectors claim that because the majority of hours were not incurred in the *Gilmore* litigation, that they must not have benefited the proposed Class. Tomlinson Opp. at 30-31. This argument fails for multiple reasons.

First, the Settlement Agreement did not just resolve the *Gilmore* litigation, but the eighteen

29

Related Actions which contributed to the lodestar amount. Settlement at 6-7. In its discussion on fees, the Settlement understands "Class Counsel's Fees" to means "the amount awarded as attorneys' fees to Class Counsel by the Court for Class Counsel's and Plaintiffs' Counsel's prosecution of the Action *and Related Actions*." *Id.* at 4 (emphasis added). Objectors are seemingly making the argument that multiple cases cannot be resolved in one settlement, but there is no precedent whatsoever for this position. Notably, at the time of the mediation, when the agreement was struck, six cases accounting for approximately 95% of the lodestar were still pending.[35]

Second, despite Objectors' assertions to the contrary, the Related Actions (which again, were *part of the Settlement*) contributed to the overall prosecution of the case. As explained above, the retailer cases were essentially actions against Monsanto, since Monsanto "had obligations to indemnify each of the retailers named in these actions for defense costs and for any liability that the retailers may have incurred." Declaration of John Rosenthal, ECF No. 14486-3 ("Rosenthal Decl."), at ¶ 4. Thus, "Monsanto could not achieve global resolution of the claims at issue in this action" without resolving the Related Actions. *Id.*

**B.   There is no Clear Sailing Provision as Attorneys' fees are not Paid 'Separate and Apart from Class Funds'.**

Objectors claim there exists a 'clear sailing' provision suggesting collusion. Leonard Opp. at 11-12; Tomlinson Opp. at 27-28. As explained below, there is no *Bluetooth* clear sailing arrangement, and even if there were, a closer examination does not suggest an unreasonable fee.

First, there is no "'clear sailing' arrangement providing for the payment of attorneys' fees *separate and apart from class funds*[.]" *In re Bluetooth*, 654 F.3d at 947 (emphasis added) (quoting *Lobatz v. U.S. W. Cellular of California, Inc.*, 222 F.3d 1142, 1148 (9th Cir. 2000)). As Plaintiffs previously explained, "Class Counsel's fee request is directly tied to the amount available to the Settlement Class and will be paid from the overall settlement fund." MPA at 35.

Second, even if the Settlement was construed as containing a clear sailing provision, this

---

[35] These include *Biddle*, *Ezcurra*, *Gilmore*, *Gregorio*, *Hanna* (wherein the first case was re-filed and dismissed after mediation), *Lamerson*, *Morley*, *Shelly*, *Taylor*, *Weeks*, and *Williams*. Compare Related Actions Chart (MPA App'x A) with Wade Decl. ¶ 40.

merely triggers a duty for the Court to "determine[ whether] the clear sailing provision authorizes unreasonably high attorneys' fees." *In re Bluetooth*, 654 F.3d at 949; *see also Briseño*, 998 F.3d at 1027 ("When faced with a clear sailing provision, courts thus have a heightened duty to peer into the provision and scrutinize closely the relationship between attorneys' fees and benefit to the class, being careful to avoid awarding 'unreasonably high' fees") (quotations omitted); *see also In re Myford Touch*, 2018 U.S. Dist. LEXIS 100222, at *5 (problematic nature of clear sailing provision typically turns on whether the uncontested fee amount is "an amount which dwarfs the actual value of the likely relief to the class") (quotations omitted).

Objectors note the same, premising their 'clear sailing' analysis on their misguided assertion of a reasonable range of claims rates. *See* Tomlinson Opp. at 27 (describing provision as a "self-serving, clear-sailing provision that triggers scrutiny…particularly because it is highly unlikely the claims rate will cause Monsanto pay [sic] more than $23 million"); Leonard Opp. at 11-12 (Monsanto's agreement "to not oppose attorneys [sic] fees totaling 25% of the ceiling" problematic "[b]ecause the settlement is unlikely to reach the floor amount").

In this case, even if a clear sailing provision exists (it does not), it does not authorize unreasonably high attorneys' fees. As explained above, Plaintiffs' potential fees are based on a fund valuation using a reasonable 6% claims rate (upper range). This is in stark contrast to the 'clear sailing' cases cited by Objectors. *See* Leonard Opp. at 12; Tomlinson Opp. at 27-28. In those cases, for the proposed fees to amount to 25% of the common fund eventually paid by Monsanto, claims rates of 100% (*Roes*),[36] 99% (*Harris*, *see supra* fn. 31), 51% (*Kim*, *see supra* fn. 32), and 31% (*Briseño*, *see supra* fn. 33) would be required.

---

[36] A common fund of $3,800,000 is four times the plaintiffs' proposed fee of $950,000. *Roes,* 944 F.3d at 1043 (9th Cir. 2019). After subtracting the fee, administration costs ($35,000), service awards ($71,000), PAGA penalties ($100,000), and expenses ($4884), the amount remaining as class payments would be $2,639,116. *Id.* Actual payments to class members were increased to meet the $2 million payment floor by a factor such that actual claims were 53% of what was eventually paid. *See* Myette Decl., *Roes* ECF Docket No. 166 at ¶ 14. After considering the amount to reach the floor, it appears the average claim of the 865 claimants was $563. *Id.* Thus, to reach $2,639,116 in claims, every member of the 4,681-person would have needed to make a claim.

The parties negotiated a floor-ceiling representing a reasonable range of Monsanto's claim payments, and there is no indication that Plaintiffs bargained away something of value to the Class.

### C.     There is no Reverter of Unawarded Attorneys' fees to Monsanto.

Tomlinson Objectors claim the settlement contains a reversion of unawarded fees to Monsanto. Tomlinson Opp. at 31. But there is no settlement provision "arrang[ing] for fees not awarded to revert to defendants rather than be added to the class fund." *In re Bluetooth*, 654 F.3d at 947. Further, even if the ceiling-floor settlement structure was construed as a reverter (it should not be), it does not result in an unreasonably high fee suggesting possible collusion.

First, there is "no [Settlement] provision automatically reverting unawarded fees to Monsanto[.]" *See* MPA at 35. Leonard Objectors agree, stating that "[h]ere, two of the three *Bluetooth* factors [(disproportionality and clear sailing)] are present." Leonard Opp. at 11.

Alternatively, even if the floor-ceiling structure was construed as reverting unawarded fees to Defendant, this again only triggers the Court's "special 'obligat[ion] to assure itself that the fees awarded in the agreement were not unreasonably high[.]'" *In re Bluetooth*, 654 F.3d at 947 (quoting *Staton*, 327 F.3d at 965). As explained above, Plaintiff's potential fees are based on a fund valuation using a reasonable 6% claims rate upper range. This is in stark contrast to the two reverter cases cited by Tomlinson. Tomlinson Opp. at 31. In those cases, for the proposed fees to amount to 25% of the common fund eventually paid by Monsanto, claims rates of 182% (*Hadley*)[37] and 94% (*McKinney-Drobnis*)[38] would be required.

---

[37] *See Hadley*, 2020 U.S. Dist. LEXIS 30193. The ECF Docket on this case provides concrete numbers. A common fund of $27,000,000 is four times the plaintiffs' proposed fee of $6,750,000. *Hadley* ECF No. 325-1 at 87. After subtracting the proposed fee, administration costs ($854,389), expenses ($1,141,499), and incentive awards ($17,500), the amount remaining as class payments would be $18,236,612. *Id.* Even assuming all claimants chose a $10 voucher over $5 cash, 1,823,661 (out of 1,000,000) claims would be needed, a claims rate of 182%.

[38] A common fund of $13,200,000 is four times the plaintiffs' proposed fee of $3,300,000. After subtracting the proposed fee, administration costs ($450,000), and incentive awards ($30,000), the amount remaining as class payments would be $9,420,000. *McKinney-Drobnis*, 16 F.4th at 600. This represents 94% of the total value of the vouchers ($10,000,000).

## IV.      CERTIFICATION OF THE SETTLEMENT CLASS IS PROPER.

Tomlinson Objectors do not dispute that the Settlement satisfies the numerosity, commonality, and typicality requirements of Rule 12(a). Rather, Tomlinson Objectors contend class certification is improper because Plaintiffs and Class Counsel are inadequate under Rule 23(a)(4). Tomlinson Opp. at 47-50. Each of their arguments is without merit.

First, that Plaintiffs neither live nor purchased Roundup® in Delaware is inapposite. As discussed repeatedly herein, the DCFA applies to conduct in Delaware, *Marshall*, 2006 Del. Super. LEXIS 447, at *5, and Plaintiffs allege Monsanto transacts business in Delaware, Monsanto sells Roundup in Delaware, Monsanto's material representations and omissions originated, in part, in Delaware, and Monsanto consistently selects Delaware law in its contracts bearing on Roundup (including with its parent company and distributor. ECF No. 22 at ¶¶ 11, 12, 22, 24, 25, 27. But even if the Delaware District Court were to have found Gilmore lacked statutory standing[39] under the DCFA, he could have easily amended the complaint to assert claims under Oregon law.

Second, Plaintiffs have vigorously represented Class Members in pursuing this matter and the Related Actions. Again, Tomlinson Objectors fail to understand the substantial pressure the Related Actions (most of which were still pending at the time of mediation) had on Monsanto in reaching the Settlement. Tomlinson Objectors' accusation Class Counsel was not prepared to try a case is undermined by the significant performed work in *Ezcurra* (including extensive factual and expert discovery, briefing on complex issues, including class certification) and the Related Actions. When faced with negative rulings, Class Counsel continued to press on with litigation on other fronts including the instant matter. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir.1998) actually confirms Class Counsel's adequacy. Like in *Hanlon*, Class Counsel "conferred regularly to coordinate their litigation strategy" and undertook a thorough investigation on the merits and damages sufficient to engage in a well-informed, arms' length mediation. *Id.* at 1022.

---

[39] There is no question Plaintiffs' have Article III standing. *Galope v. Deutsche Bank Nat'l Trust Co.*, 566 Fed. Appx. 552, 552 (9th Cir. 2014) ("Article III standing exists when a plaintiff purchases a product she would not have otherwise purchased but for the alleged misconduct of the defendant").

Third, Class Counsel explored other claims (and indeed asserted claims under various state statutes in the Related Actions). It is worth repeating, Tomlinson Objectors have not identified any other claims that would have provided Class Members with a different value, given the measure of damages is essentially the same in every state's consumer fraud statute. *See* Section II(C)(1).[40]

Fourth, the Settlement does not release claims of any individual who has never purchased Roundup®, because such persons are not in the Settlement Class. Settlement at 8. Additionally, Class Members who purchase Roundup in the future will be given notice of the Settlement and have the opportunity to opt out, eliminating the concerns in *Ortiz*. 527 U.S. at 856 (releasing future-injury class, which included individuals who were not yet born, without opt-out mechanism).

## <u>CONCLUSION</u>

Despite their tired accusations, it is Objectors—not Plaintiffs—who are consumed by self-serving motivations. For all of the aforementioned reasons, this Court should grant preliminary approval, which would allow Class Members an opportunity to weigh in on the settlement's value.

---

[40] *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) is distinguishable as it was a non-opt out limited fund asbestos class action with conflicts between those suffering current disabilities and possible future disabilities. *Id.* at 821. *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242 (2d Cir. 2011) is also distinguishable. There, the settlement, which was made up of three categories of claims, was rejected because each category commanded a different settlement value and plaintiffs had no incentive to maximize the recovery for plaintiffs in the category that had the lowest value. *Id.* at 254. In *Kim*, plaintiff's case had been compelled to arbitration whereas objector's case was not subject to an arbitration clause. *Id.* at 1175-76, 1177. Moreover, the settlement was rejected on additional grounds, including the fact that the $1.2 million fee award dwarfed the class recovery of $45,000. *Id.* at 1026. In *In re Cmty. Bank of N. Virginia*, 418 F.3d 277 (3d Cir. 2005), the plaintiffs failed to assert Truth in Lending Act claims and Home Ownership and Equity Protection Act claims, the former of which provides statutory damages up to $500,000 or one percent of the creditor's net worth (whichever is less). *Id.* at 304, 307-08.

Dated: March 31, 2022                    */s/ Gillian L. Wade*

GILLIAN L. WADE
SARA D. AVILA
MARC A. CASTANEDA
Milstein, Jackson Fairchild & Wade, LLP
gwade@mjfwlaw.com
savila@mjfwlaw.com
mcastaneda@mjfwlaw.com
10990 Wilshire Blvd., 8th Floor
Los Angeles, CA 90024
Tel: (310) 396-9600
Fax: (310) 396-9635

JOEL OSTER
The Law Offices of Howard Rubinstein
joel@osterlaw.com
22052 W. 66th St. #192
Shawnee, Kansas 66226

*Counsel for Plaintiffs and the Proposed Class*