JOHN J. ROSENTHAL
Winston & Strawn LLP
jrosenthal@winston.com
1901 L Street NW
Washington, DC 20036
Tel:  (202) 282-5000
Fax:  (202) 282-5100

BRIAN STEKLOFF
Wilkinson Stekloff LLP
bstekloff@wilkinsonstekloff.com
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4030
Fax: (202) 847-4005
*Attorneys for Defendant* (*other counsel listed on signature page*)

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT GILMORE et al., | MDL No. 2741 |
| Plaintiffs, | Case No. 3:21-cv-08159 |
| vs. | **MONSANTO COMPANY'S REPLY TO TOMLINSON AND RICHARDSON'S OPPOSITION TO PRELIMINARY APPROVAL** |
| MONSANTO COMPANY, | |
| Defendant. | Date:   April 14, 2022<br>Time:  10:00 a.m.<br>Place: Via Zoom Webinar<br>Judge: Hon. Vince G. Chhabria |

## TABLE OF CONTENTS

Page(s)

[TABLE OF AUTHORITIES] ...........................................................................................................ii

INTRODUCTION ........................................................................................................................... 1

I.    OBJECTORS' ACCUSATIONS OF COLLUSION AND REVERSE AUCTION ARE BASELESS ............................................................................................................... 9

II.    OBJECTORS' ARGUMENTS THAT THE SETTLEMENT RELIEF IS INADEQUATE CANNOT WITHSTAND SCRUTINY .................................................. 18

III.   OBJECTORS' OTHER COMPLAINTS ABOUT THE SETTLEMENT'S TERMS ARE UNFOUNDED ......................................................................................... 25

      A.    Class Members Are Treated Equitably Relative to One Another......................... 25

      B.    Objectors Have Not Shown That the Release Is Improper ................................... 25

IV.   OBJECTORS' RECYCLED ADEQUACY ARGUMENTS ARE NOT PERSUASIVE ................................................................................................................ 27

CONCLUSION.............................................................................................................................. 28

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

*In re Anthem, Inc. Data Breach Litig.*,
327 F.R.D. 299 (N.D. Cal. 2018) ........................................................................26

*In re Apple Inc. Device Performance Litig.*,
2021 WL 1022867 (N.D. Cal. Mar. 17, 2021) .....................................................17

*Blue Cross Blue Shield Ass'n v. Glaxosmithkline LLC*,
2016 WL 6612804 (E.D. Pa. Nov. 9, 2016) .........................................................21

*In re Bluetooth Headset Prods. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011) ...............................................................................16

*Borup v. CJS Sols.*,
2019 WL 2137360 (D. Minn. May 16, 2019) .......................................................12

*Briseño v. Henderson*,
998 F.3d 1014 (9th Cir. 2021) ..............................................................................15

*Carson v. Monsanto Co.*,
508 F. Supp. 3d 1369 (S.D. Ga. 2020) .................................................................23

*Cohorst v. BRE Props., Inc.*,
2011 WL 3489781 (S.D. Cal. Jul. 19, 2011) ..................................................11, 13

*Cottle v. Plaid Inc.*,
2021 WL 415252 (N.D. Cal. 2021) ................................................................22, 26

*In re Countrywide Fin. Corp. Mortg. Backed Sec. Litig.*,
860 F. Supp. 2d 1062 (C.D. Cal. 2012) ...............................................................27

*Craft v. Cnty. of San Bernardino*,
624 F. Supp. 2d 1113 (C.D. Cal. 2008) ...............................................................15

*Craft v. Phillip Morris Co.*,
2003 WL 23139381 (Mo. Cir. Ct. 2003) ...............................................................8

*Eddings v. DS Servs. of Am., Inc.*,
2016 WL 3390477 (N.D. Cal. May 20, 2016) ......................................................21

*Eddings v. DS Waters of Am., Inc.*,
No. 3:15-cv-02576-VC (N.D. Cal.) .......................................................................21

*Ezcurra v. Monsanto Co.*,
   No. 20-13341 (11th Cir.) ................................................................3

*Ezcurra v. Monsanto Co.*,
   No. 9:20-cv-80524-DMM (S.D. Fla.) ........................................ *passim*

*Fraley v. Facebook, Inc.*,
   966 F. Supp. 2d 939 (N.D. Cal. 2013) ............................................22

*Gallucci v. Gonzalez*,
   603 F. App'x 533 (9th Cir. 2015) ....................................................11

*Hadley v. Kellogg Sales Co.*,
   324 F. Supp. 3d 1084 (N.D. Cal. 2018) ..........................................20

*Haralson v. U.S. Aviation Services Corp.*,
   383 F. Supp. 3d 959 (N.D. Cal. 2019) ............................................18

*Harvey v. Morgan Stanley*,
   2019 WL 4462653 (N.D. Cal. Sept. 5, 2019) ..................................11

*Hibler v. Santander Consumer USA, Inc.*,
   2013 WL 12137716 (C.D. Cal. Nov. 21, 2013) ...............................13

*In re Hyundai & Kia Fuel Econ. Litig.*,
   926 F.3d 539 (9th Cir. 2019) ..........................................................24

*Jabarri v. Farmer*,
   965 F.3d 1001 (9th Cir. 2020) ........................................................24

*Kim v. Allison*,
   8 F.4th 1170 (9th Cir. 2021) ...........................................................15

*Lane v. Wells Fargo Bank, N.A.*,
   2013 WL 3187410 (N.D. Cal. June 21, 2013) ................................25

*Lierboe v. State Farm Mut. Auto. Ins. Co.*,
   350 F.3d 1018 (9th Cir. 2003) ........................................................27

*Linney v. Cell. Alaska P'ship*,
   151 F.3d 1234 (9th Cir. 1998) ........................................................14

*In re Lithium Ion Batteries Antitrust Litig.*,
   2020 WL 7264559 (N.D. Cal. Dec. 10, 2020) ................................24

*Lobatz v. U.S. W. Cellular of Cal., Inc.*,
   22 F.3d 1142 (9th Cir. 2000) ............................................................9

*Marsh v. First Bank of Del.*,
    2014 WL 2085199 (N.D. Cal. May 19, 2014) ....................................................13, 25, 26, 27

*In re Mego Fin. Corp. Sec. Litig.*,
    213 F.3d 454 (9th Cir. 2000) ................................................................................13, 14

*Moore v. Verizon Commc'ns*,
    2013 WL 4610764 (Aug. 28, 2013)........................................................................24

*In re Morning Song Bird Food Litigation*,
    320 F.R.D. 540 (S.D. Cal. 2017) ...........................................................................21

*Mullins v. Premier Nutrition Corp.*,
    2016 WL 3440600 (N.D. Cal. June 20, 2016)........................................................25

*Nat'l Ass'n of Wheat Growers v. Becerra*,
    468 F. Supp. 3d 1247 (E.D. Cal. 2020)...............................................................22, 23

*Negrete v. Allianz Life Ins. Co.*,
    523 F.3d 1091 (9th Cir. 2008) ...............................................................................11

*Noll v. eBay, Inc.*,
    309 F.R.D. 593 (N.D. Cal. 2015)...........................................................................17

*Officers for Justice v. Civil Serv. Comm'n*,
    688 F.2d 615 (9th Cir. 1982) .................................................................................21

*Patel v. Axesstel, Inc.*,
    2015 WL 6458073 (S.D. Cal. Oct. 23, 2015) ........................................................14

*Pulaski & Middleman, LLC v. Google, Inc.*,
    802 F.3d 979 (9th Cir. 2015) .................................................................................21

*Ramirez v. Benihana Nat'l Corp.*,
    2019 WL 131843 (N.D. Cal. Jan. 8, 2019) ............................................................15

*Ramirez v. Monsanto Co.*,
    No. 3:19-cv-02224 (N.D. Cal.) ..............................................................................12

*In re Roundup Prods. Liab. Litig.*,
    16-md-02741-VC (N.D. Cal. May 26, 2021)..........................................................12

*In re Roundup Prods. Liab. Litig.*
    (J.P.M.L. July 19, 2021) ........................................................................................12

*Salmonson v. Bed Bath & Beyond, Inc.*,
    2012 WL 12919187 (C.D. Cal. Apr. 27, 2012) ......................................................11

*Smith v. CRST Van Expedited, Inc.*,
2012 Wl 5873701 (S.D. Cal. Nov. 20, 2012) ........................................................................11

*Taafua v. Quantum Global Techs., LLC*,
2021 WL 579862 (N.D. Cal. Feb. 16, 2021) ........................................................................14

*Tomlinson v. Monsanto Co.*,
No. 1916-cv22788 (Mo. Cir. Ct. Jackson Cnty. Nov. 6, 2020)...................................... *passim*

*In re TracFone Unlimited Serv. Plan Litig.*,
112 F. Supp. 3d 993 (N.D. Cal. July 2, 2015) ........................................................................24

*Trauth v. Spearmint Rhino Cos. Worldwide, Inc.*,
2010 WL 11468628 (C.D. Cal. July 26, 2010)........................................................................18

*Uschold v. NSMG Shared Servs. LLC*,
2020 WL 3035776 (N.D. Cal. Jun. 5, 2020)........................................................................16

*In re Wal-Mart Stores, Inc. Wage & Hour Litig.*,
2011 WL 31266 (N.D. Cal. Jan. 5, 2011) ........................................................................17

*Weeks v. Home Depot U.S.A., Inc.*,
No. 2:19-cv-06780-JWH-AS (C.D. Cal. Jan. 12, 2021) ...........................................................4

*Yamagata v. Reckkitt Benckiser*,
2021 WL 5909206 (N.D. Cal. Oct. 28, 2021)...........................................................24, 27, 28

*Zepeda v. PayPal, Inc.*,
2017 WL 1113293 (N.D. Cal. Mar. 24, 2017) ........................................................................23

*Zinser v. Accufix Rsch. Inst.*,
253 F.3d 1180 (9th Cir. 2001) ........................................................................25

**Statutes**

28 U.S.C. § 1332(d) ........................................................................10

Ark. Code § 4-88-101 ........................................................................23

Class Action Fairness Act of 2005........................................................................10

Conn. Gen. Stat. § 42-110c(a) ........................................................................23

Fair Labor Standards Act of 1938........................................................................18

Ind. Code § 24-5-0.5-6........................................................................23

Me. Rev. Stat. tit. 5, § 208(1)........................................................................23

Mo. Rev. Stat. § 407.025.1(1)...................................................................................................9

**Other Authorities**

4 Newberg on Class Actions § 13:50........................................................................................13

4 Newberg on Class Actions § 13:60........................................................................................12

Fed. R. Civ. P. 23(a)(4)...........................................................................................................27

## <u>INTRODUCTION</u>

The nationwide class Settlement is fair, reasonable, and adequate, and this Court should grant Plaintiffs' motion for preliminary approval ("Motion").  Objectors Ryan Tomlinson and Carol Richardson ("Objectors") seek to derail the Settlement to save their own state-court action and their own ultimate request for fees.  But Objectors' rhetoric and hyperbole do not substitute for facts.  Their suggestions of "collusion" hinge on speculation—not only unsupported but refuted by the evidence.  And their assertion that the Settlement is "discounted" is contradicted by both the evidence (Class Members stand to receive nearly two-thirds of Plaintiffs' *best-case* damages estimate, and many times Monsanto's expert's estimate) and comparisons to similar nationwide settlements.  The Motion should be granted.

Like any good Monday-morning quarterback, Objectors argue that *they* could have done better for Class Members.  But Objectors overstate the strengths of their case, the extent of their efforts, and their supposed bargaining power.  Their efforts to denigrate Plaintiffs' litigation strategy and Plaintiffs' counsel is unsupported.  Objectors were never serious candidates to negotiate a nationwide settlement.  They represented a tiny fraction of purchasers of the Products, and their action was focused largely on agricultural and professional sales—not at issue in this Settlement.  Plaintiffs were best situated to resolve this action on a nationwide basis given the breadth of the *Gilmore* action and the Related Actions against both Monsanto and retailers.

Objectors continue to make allegations of "collusion" and "reverse auction."  But this Court has already found that Objectors have not made even a "preliminary showing" of collusion (Dkt. No. 104), and Objectors offer no new arguments—nor any evidence—to support these baseless accusations.  The Parties have proffered evidence that contradicts Objectors' claims, showing that the Parties negotiated the Settlement at arm's length before a highly respected former judicial officer of the United States, who is also an experienced mediator of class actions and complex litigation.  The result—despite Objectors' protestations to the contrary—is a fair and reasonable settlement that compares favorably to similar settlements approved by this Court and

others, and that will provide Class Members with meaningful payments now while avoiding the cost, delay, and significant risks of further litigation.

Objectors' other issues with the terms of the Settlement are also ill-founded. Payments to Class Members are more than adequate—in fact, they are generous considering Monsanto's expert's conclusion that, even when applying a methodology favored by plaintiffs in similar cases, there was no statistically significant price premium. The fees and incentive awards Plaintiffs may seek—which will be awarded only in the Court's discretion—adhere to the benchmarks in this circuit. And the Settlement's release is appropriately cabined to the factual predicates of this case—in fact, many claims based on the same factual predicate are *excluded* from the release.

## RESPONSE TO PLAINTIFFS' "FACTUAL" ASSERTIONS[1]

Objectors spend nearly a dozen pages at the front of their opposition brief outlining the "factual background" of this case. But their "facts" are largely a series of distortions and speculation.

### A. Plaintiffs' Litigation Strategy

In an effort to undercut the Settlement, Objectors understate Plaintiffs' efforts in the litigation preceding mediation and settlement. Plaintiffs' strategy, as the record plainly shows, was to file a series of actions in various jurisdictions against both Monsanto and key retailers in order to exert leverage over Monsanto in terms of either liability or settlement. While Objectors criticize this strategy, it has been pursued successfully in other similar litigation. Here, it is true, as Objectors point out, that Monsanto and retailers (often represented by the same counsel[2])

---

[1] The Motion describes in detail the Parties' prior litigation, the terms of the Settlement, and the proposed Notice Plan. *See generally* Mot. Monsanto's opposition to Objectors' prior motions to intervene and for discovery sets forth additional factual background on the *Tomlinson* litigation. Dkt. No. 98, at 3–6. Both are incorporated by reference.

[2] Objectors argue in a footnote that Monsanto's counsel's declaration included only a "vague assertion" of indemnities to retailers and did not say that those indemnities were "enforceable or actually asserted." Opp. 31 n.39. That is wrong. The declaration stated that Monsanto "*had obligations* to indemnify each of the retailers named in the actions for defense costs and for any liability that the retailers may have incurred." Dkt. No. 94-3 ¶ 2. That is not vague or ambiguous.

succeeded with dispositive-motion practice in some of the Related Actions.[3]  But that does not mean Plaintiffs' strategy was unsuccessful in moving the case toward settlement, nor that Objectors' strategy of pursuing a single state-court case representing a tiny fraction of nationwide sales was somehow superior.

Contrary to Objectors' suggestion, Plaintiffs did not fold their tents after these defense victories.  They appealed *Ezcurra* to the Eleventh Circuit, and both Parties had filed their main briefs (at considerable expense) when the mediation occurred.  *See* Appellant's Initial Brief*, Ezcurra v. Monsanto Co.*, No. 20-13341 (11th Cir. Dec. 14, 2020); Appellee's Brief, *Ezcurra* (Jan. 28, 2021).  Plaintiffs were also actively pursuing cases against retailers.  Objectors suggest that Plaintiffs "abandoned" the *Hanna* case against Wal-Mart and the *Taylor* case against Costco.  Opp. 8.  But Plaintiffs did not dismiss *Taylor* until *after* the Parties had reached an agreement in principle at mediation.  *See* Dkt. No. 94-1 ¶ 15; Dkt. No. 94 App. A (voluntary dismissal on Mar. 1, 2021).  They dismissed *Hanna* before that, but they almost immediately refiled in state court, presumably to try to avoid the defendant's standing arguments—and like *Taylor*, they did not dismiss the refiled case until after mediation.  *See* Dkt. No. 94-1 ¶ 15; Dkt. No. 94 App. A (voluntary dismissal of refiled state case on Apr. 14, 2021).  Likewise, Objectors note Plaintiffs voluntarily dismissed the *Williams* case against Lowe's "three days before the hearing [on Lowe's motion to dismiss]."  Opp. 8.  But that was *after* the Parties mediated and reached an agreement in principle.  Dkt. No. 94-1 ¶ 15; Dkt. No. 94 App. A (voluntary dismissal on Feb. 19, 2021).

---

But even if it were, Monsanto confirms here that it was indemnifying each of the retailers sued in a Related Action for defense costs—as Objectors surely know, since the same counsel was defending many of the Related Actions.  In any event, even if indemnities had not been asserted (and they had), the *possibility* of indemnity obligations would provide a simple and reasonable explanation why, as Monsanto's counsel has already declared, Monsanto views the release of retailers as an essential part of the consideration for the Settlement.  *Id.*

[3] Objectors would have faced similar risks had their case progressed.  Objectors point to the class certification order in their case as if it were an assurance of future victory.  But the state court distinguished several of the key authorities cited by Monsanto *only* because they were decided on summary judgment or other dispositive motions—motions that Objectors would have later faced and likely lost.  *See* Class Cert. Order, *Tomlinson v. Monsanto Co.*, No. 1916-cv22788 (Mo. Cir. Ct., Jackson Cnty., Mar. 22, 2021), Dkt. No. 98-8 at 4-5 & n.1.

Plaintiffs also filed an appeal in *Weeks* that was pending at the time of mediation. *See* Notice of Appeal (Dkt. No. 78), *Weeks v. Home Depot U.S.A., Inc.*, No. 2:19-cv-06780-JWH-AS (C.D. Cal. Jan. 12, 2021). In short, far from abandoning their cases, Plaintiffs continued to litigate until the Parties reached a Settlement.[4]

### B. Mediation

Objectors state that the Parties engaged the mediator "used in *Ezcurra*" within a month of when this action was filed. Opp. 13. There is no basis, however, for Objectors' suggestion that there is anything suspect or inappropriate about that. Judge Middlebrooks required the Parties to designate a mediator quickly—consistent with that court's general practice of setting very quick schedules for civil matters. *Ezcurra v. Monsanto Co.*, No. 9:20-cv-80524-DMM (S.D. Fla.), Dkt. No. 17 ¶ 11.c. By May 11, 2020, the Parties had conferred and, after exchanging several different possible names, agreed that Judge Welsh was an acceptable mediator for both sides given her reputation of mediating similar cases. *Id.* Dkt. No. 27. Contrary to Objectors' suggestion that there was an attempt to secret this process, that mediator designation was publicly filed, noted that similar actions had been filed against retailers, and declared that the Parties hoped to conduct a mediation that would "include an attempt at resolution of all these matters." *Id.*

The planned mediation in *Ezcurra* never moved forward because that case was dismissed by Judge Middlebrooks in August 2020. But just two weeks after that dismissal, Plaintiffs sued in the District of Delaware in the instant action. Dkt. No. 1. The Parties—having already agreed that Judge Welsh was an acceptable mediator for both sides, and consistent with their obligations to

---

[4] It is true that Plaintiffs' counsel dismissed some of the Related Actions (such as the *Boyette* and *Thomas* matters) before a ruling on a dispositive motion (and before the Parties had mediated). Monsanto cannot know why those cases were dismissed. It has long suspected, however, that the cases were dismissed to avoid bad precedent when Plaintiffs' counsel believed that there was a reasonable chance of losing a dispositive motion, as it has been clear to Monsanto for years that Plaintiffs were pursuing a global strategy. Most important from Monsanto's perspective was that such dismissals were always followed by filing a new case with refined allegations and theories. In short, contrary to Objectors' suggestion, it was Monsanto's view that Plaintiffs' counsel was in this litigation for the long haul and would not be put off by maneuvering, or even outright victories, in individual cases.

consider the possibility of settlement—thus retained Judge Welsh as a mediator relatively quickly, on September 24, 2020.  Dkt. No. 27 ¶ 4.  The mediation itself, however, did not move forward until February 16, 2021.  *Id.* ¶ 5.  In the interim, Monsanto moved to dismiss two iterations of Plaintiffs' complaint.  *See* Dkt. Nos. 10, 15.  The Parties each submitted detailed and extensive pre-mediation briefing to, and conducted separate pre-mediation calls with, Judge Welsh.  *Id.* ¶¶ 5–6.  At the mediation, the Parties engaged in "extensive adversarial negotiations on virtually every issue in the case," including both face-to-face negotiations (with Judge Welsh present)  and shuttle diplomacy by Judge Welsh.  *Id.* ¶¶ 7, 9.  The Parties exchanged proposals and counterproposals for settlement and reached an agreement in principle after more than fourteen hours of mediation, early in the morning of February 17.  *Id.* ¶ 9.  Judge Welsh has declared that she "observed nothing that suggested any untoward behavior by counsel for either party."  *Id.*

Objectors, apparently loath to suggest that a former federal judge is misrepresenting the facts, seek to undermine Judge Welsh's observations by suggesting that "mediators are privy only to what they are told or provided."  Opp. 24–25.  But the suggestion that there was some secret collusion and the negotiations before Judge Welsh were a sham is unsupported by the record.  As Monsanto's counsel has declared under penalty of perjury, the Parties' "negotiations and disagreements at the mediation … were all sincere."  Dkt. No. 94-3 ¶ 7.  Likewise, and contrary to accusations of a "reverse auction," Monsanto never stated, suggested, or signaled to Plaintiffs or their counsel that they could or should underbid any competing settlement offer.  *Id.* ¶ 8.  In short, the negotiations between the Parties were uniformly carried out at arms' length.  *Id.* ¶ 5.

### C.  Settlement Terms

Objectors' suggestion that the Settlement is a typical "claims-made" settlement (Opp. 15) is not accurate.  Although Monsanto believed that a claims-made structure would have been appropriate, the Parties ultimately negotiated a "Floor/Ceiling" structure.  Dkt. No. 94-1 Ex. 1 ("Settlement") §§ D–E.  Under this structure, even if claims made on the settlement do not exhaust the Floor Amount, when considering other fees and expenses, Monsanto is still obligated to pay

the Floor Amount of $23 million, with Authorized Claimants receiving upward pro rata adjustments as necessary to exhaust that amount. *Id.* § E.2.

Objectors' suggestion that there is an "agreed fee" to Plaintiffs' counsel is also misleading. Monsanto agreed not to oppose an award up to 25% of the available fund—an easy term to agree to, because it is the "benchmark" under this circuit's law and a presumptively reasonable fee under the law of the Third Circuit, where this case was venued when these terms were negotiated. Settlement § F.1. But the amount Plaintiffs' counsel seek in fees is left to them. *Id.* Moreover, the Settlement specifically provides that the amount awarded is "within the Court's discretion" and "shall have no impact on the validity" of the Settlement. *Id.*

Nor did Monsanto agree, as Objectors suggest, that it would "support" any effort by Plaintiffs to have this Court include its work in the Related Actions in calculating a fee. It agreed only that those cases contributed to bringing about the mediation—which is true—and that the Court could appropriately "consider" that work in assessing the fee award. *Id.* Monsanto takes no position on whether the Court should grant whatever fees Plaintiffs ultimately seek—that is in the Court's discretion. Nor will it make any argument about how this Court should perform any lodestar calculation.[5]

Lastly, Objectors' contention that the Settlement Class includes individuals who purchased the relevant Products only *after* approval of the Settlement (Opp. 16) is wrong.[6] The Class Period does not include "end dates" because it is plain that it cannot include individuals who made purchases after approval and were not subject to class notice. If the Court believes there is any

---

[5] Monsanto, of course, reserves its right to oppose any fee award above 25% of the Settlement fund, though Plaintiffs have stated in filings with this Court that they do not intend to seek such an amount.

[6] To be clear, an individual who bought Products during the Class Period would be a Class Member subject to the release. But an individual who bought Products only after certification and approval would not be a Class Member and thus would not be subject to the Settlement or its release provisions.

ambiguity in that regard (and Monsanto does not believe there is), Monsanto is more than willing to amend the Settlement to make that clearer.

### D.      The Tomlinson Litigation Revealed

Objectors repeatedly suggest that the *Tomlinson* action had substantially progressed, that it was being "readied for trial," that they were pursuing "aggressive discovery," and that their "relative bargaining strength cannot be debated" because they achieved certification of a class "which includes L&G, AG, and I&P purchasers."  Opp. 4.  But Objectors overstate both the status of that litigation and the relative strength of their position.

As to the suggestion that trial was approaching in *Tomlinson*, the earliest trial date Objectors reference is October 3, 2022—which was more than *19 months* after the Parties to this action entered mediation.[7]  Objectors, despite suggesting that Plaintiffs were laggards, never took any depositions—they never even *noticed* any depositions.  Likewise, though they criticize Plaintiffs' expert report, the motion for class certification was little more than a bare-bones pleading that was unsupported by an expert report and failed to even describe the method they would use to prove injury and damages.  *See* Suggs. in Supp. of Mot. for Class Cert., *Tomlinson v. Monsanto Co.*, No. 1916-CV22788 (Mo. Cir. Ct. Jackson Cnty. Jul. 14, 2020), Dkt. No. 107, Ex. 2 at 12-14.[8]  While they repeatedly criticize Plaintiffs for not pursuing a full-refund measure of damages, Objectors themselves insisted repeatedly in their reply in support of class certification in *Tomlinson* that they were pursuing a "benefit of the bargain" measure of damages (though with no explanation of how they intended to prove that) based on the "as is" value of the products versus their "as represented" value.[9]  Reply in Further Supp. of Mot. for Class Cert., *Tomlinson v.*

---

[7] That state court later moved the trial date to March 2023 at Objectors' request.  *See* Dkt. No. 107 ¶ 18.  And as Objectors well know, it is extraordinarily unlikely that the March 2023 trial date would have held, even if Objectors had been prepared for trial at that time.

[8] Similarly, Objectors proffer no evidence here, expert or otherwise, to support their repeated contention that Plaintiffs are relying on a "substantially discounted" damages estimate.

[9] It is no surprise that they made this shift, because Missouri law is clear that full refund is *not* a valid measure of damages in MMPA cases.  *See, e.g.*, *Craft v. Phillip Morris Co.*, 2003 WL

*Monsanto Co.*, No. 1916-cv22788 (Mo. Cir. Ct. Jackson Cnty. Nov. 6, 2020), Dkt. No. 107, Ex. 4 at 2, 5-9, 12, 15-19.

As to Objectors' assertion of "aggressive discovery" they had undertaken, Objectors served exactly one set of requests for production and one set of interrogatories in the nearly 18 months after they filed *Tomlinson* and before this case entered mediation.[10] Decl. of John J. Rosenthal ("Rosenthal Decl.") filed concurrently herewith, ¶ 2.  Objectors point to the volume of pages produced in their case as if it were evidence of their diligence.  But they do not mention that the vast majority of what was produced was product labels (also produced to Plaintiffs), sales data (also provided to Plaintiffs, but on a nationwide basis), scientific studies (the results of which are described in detail in publicly available documents), and custodial files from six toxicologists (also produced to lead counsel in the MDL, who mined them and posted what they viewed as "hot documents" publicly, along with depositions).  *Id.* ¶ 3.  In short, there is no reason to believe that Objectors were any more well informed about the underlying factual issues than Plaintiffs.

Objectors' suggestion that Monsanto engaged in a reverse auction to avoid the "bargaining strength" they gained via class certification also conflicts with the facts.  Class certification was not granted in *Tomlinson* until March 22, 2021—more than a month after the Parties had mediated and reached an agreement in principle in this case.  Although *Tomlinson* protests that they were in Missouri and thus had general personal jurisdiction (Opp. 20–21), their class was limited to Missouri purchasers and thus was not an appropriate vehicle for a nationwide settlement—they could have never been "bidders" in any supposed reverse auction.  *See* Dkt. 94-3 ¶ 9.  Objectors also had a highly unrealistic view of the amount of sales at issue, pursuing an overbroad class that

---

23139381, at *3–4 (Mo. Cir. Ct. 2003).  A "benefit of the bargain" measure is precisely what Plaintiffs' expert tried to quantify (the difference in value attributable to including a carcinogenic warning) and what Monsanto's expert tested as well (the effect on price of including a warning that Plaintiffs and Objectors claim was required).

[10] The "five sets of written discovery requests" Objectors reference (Opp. 5) include two sets of RFPs and a set of interrogatories served in late April and mid-May 2021—months after the Parties had mediated.  Rosenthal Decl. ¶ 2.

included agricultural and professional purchasers even though the MMPA limits recovery to purchases "primarily for personal, family, or household purposes" (Mo. Rev. Stat. § 407.025.1(1)), which made any meaningful settlement discussions with them impossible.[11]  *See* Dkt. 94-3 ¶ 9.  As declarations from both counsel and the mediator show, the course of negotiations does not support any suggestion of a reverse auction.  Dkt. No. 27 ¶¶ 4–10; Dkt. No. 94-1 ¶¶ 15–18; Dkt. No. 94-3 ¶¶ 5, 8.

## ARGUMENT

## I.   OBJECTORS' ACCUSATIONS OF COLLUSION AND REVERSE AUCTION ARE BASELESS

Objectors spend the first 17 pages of their argument restating and recycling the accusations of "collusion" and "reverse auction" they have previously made in this case.  Opp. 18–34.  Monsanto has already shown that these accusations are baseless and contrary to the record.  Dkt. No. 98, at 10–13.  And this Court has already held, in denying Objectors' motion for discovery, that Objectors have not put forth evidence to make even a "preliminary showing" of collusion.  Dkt. No. 104, at 2; *see also Lobatz v. U.S. W. Cellular of Cal., Inc.*, 22 F.3d 1142, 1148 (9th Cir. 2000).  But given the length of Objectors' argument on this front, Monsanto will briefly respond in substance.

### A.  There Is No Evidence of a Reverse Auction

Objectors' lead argument is that there *must* have been a reverse auction because, they assert, they were "experienced, proven counsel" and Plaintiffs were in a "weak position."  Opp. 18–23.  As discussed above, Objectors overstate their strengths and exaggerate Plaintiffs' weaknesses.

---

[11] Ironically, Objectors cite the Missouri state court's order on their motion to compel as evidence of the strength of their position and claim that there are "strong arguments" for including AG and I&P purchases.  Opp. 2.  That order roundly *rejected* their position. Order, *Tomlinson et al. v. Monsanto Co.* No. 1916-CV22788(Mo. Cir. Ct., Jackson Cnty., Aug. 31, 2020),  Rosenthal Decl. Ex. A at 3 ("Courts have consistently interpreted 407.025.1's phrase 'primarily for personal, family, or household purposes' as *not* including products purchased for business uses, even if it is the purchaser himself using the product." (emphasis added) (citing a half dozen cases)).

And in any event, Objectors point to no law that a defendant can settle only with the plaintiffs in the strongest position—putting aside due-process concerns, such a rule would be an administrative nightmare, requiring courts to evaluate the relative strength of every competing class action anytime a settlement was reached.

Objectors also gloss over the reasons why they would have never been serious "bidders" in any supposed reverse auction. They were pursuing a Missouri-only class action in Missouri state court and insisting that their case include *business* purchases of Monsanto's nonconsumer products, despite plain language in the MMPA to the contrary.[12] Even though the state court certified a class, the chances of Objectors establishing agricultural and professional sales as qualified purchases under the MMPA never presented a serious risk to Monsanto. Objectors' insistence on pursuing such sales as a means to raise the value of the case necessarily resulted in Monsanto's *never* viewing Objectors' case as appropriate for a nationwide settlement. Dkt. No. 94-3 ¶ 9.

Objectors next argue that there must have been a reverse auction because they were not included in the "secreted" settlement negotiations. Opp. 19. But putting aside that Monsanto and Plaintiffs' counsel had noted in public filings their intent to engage in global mediation,[13] it is not evidence of a reverse auction that a defendant negotiated with counsel in one case when a

---

[12] Objectors' suggestion that they would have amended in Missouri state court to assert a nationwide class cannot survive scrutiny. First, it is Objectors who chose to file in state court and assert a state-only class, presumably *precisely* because they wanted to avoid minimal diversity under CAFA and removal to federal court. *See* 28 U.S.C. § 1332(d)(2)(A), (d)(4)(B). Second, such an amendment would not resolve Objectors' insistence that their case includes sales that are *not* covered by the MMPA.

[13] Objectors' suggestion that there is evidence of collusion because Monsanto did not disclose the fact that it had reached a preliminary agreement with Plaintiffs *after* the mediation (Opp. 23–24) makes little sense. The Parties had reached an agreement in principle at that time. If it were collusive (and it was not), then the collusion had already occurred. Disclosing the agreement to Objectors, besides violating Monsanto's confidentiality obligations, would have led to *more* arguments that the Settlement was a reverse auction, as it would have led to discussions between Monsanto and competing groups of plaintiffs before a settlement agreement was signed. Monsanto appropriately and promptly advised both Objectors and the Missouri court once the Parties executed the Settlement.

competing class action was pending. *Negrete v. Allianz Life Ins. Co.*, 523 F.3d 1091, 1100 (9th Cir. 2008). If that were the rule, "no settlement could ever occur in the circumstances of parallel or multiple class actions." *Gallucci v. Gonzalez*, 603 F. App'x 533, 535 (9th Cir. 2015). Instead, a reverse auction will be established only upon a "showing of impropriety" or an "air of mendacity" about the settlement. *Harvey v. Morgan Stanley*, 2019 WL 4462653, at *1 (N.D. Cal. Sept. 5, 2019); *Salmonson v. Bed Bath & Beyond, Inc.*, 2012 WL 12919187, at *3 (C.D. Cal. Apr. 27, 2012). It is not enough that Objectors are "unhappy that [theirs] was not the class [defendant] chose to settlement." *Smith v. CRST Van Expedited, Inc.*, 2012 WL 5873701, at *4 (S.D. Cal. Nov. 20, 2012).

None of the factors courts consider to determine whether there is evidence of a reverse auction supports Objector's position. For example, the Ninth Circuit held in *Negrete* that there was no basis to find a reverse auction because "[n]o settlement was directly in prospect in this [competing] case, and it could not, therefore, be said that a settlement was being circumvented or co-opted." 523 F.3d at 1100; *see also Cohorst v. BRE Props., Inc.*, 2011 WL 3489781, at *8 (S.D. Cal. Jul. 19, 2011) (no evidence of reverse auction where competing plaintiff provided no evidence that "she ever engaged in settlement discussions with [defendant's] attorney prior to the mediation sessions [in the settled cases]" and thus defendant "had no opportunity to determine which class [of] lawyers would negotiate the weaker settlement"). The same is true here. Objectors do not and cannot put forth any evidence that there were any substantive settlement discussions between them and Monsanto that could be used to drive a "reverse auction."

Even if there were such competing discussions (and there were not), they would not suggest a reverse auction if there is "no evidence suggesting a bidding war," *Gallucci*, 603 F. App'x at 535, or the defendant "never disclosed one group's settlement proposals with the other group," *Salmonson*, 2012 WL 12919187, at *3 (C.D. Cal. Apr. 27, 2012).[14] Here, Objectors put forth no

---

[14] Objectors argue that an "open bidding war" is not *required* to prove a reverse auction. Opp. 19. Perhaps not. But courts have found the lack of such a bidding war to be important in finding that there was no reverse auction, and with good reason—it is unclear what an "auction" means if there

evidence that, either before or after the mediation, Monsanto attempted to leverage its discussions with Plaintiffs to force competing bids from Objectors.

Objectors' suggestion that Monsanto tried to "cabin off" this litigation to allow a reverse auction (Opp. at 23–24) also makes little sense. Objectors' authorities involve competing class actions that the defendant could have consolidated and reflect a concern that the failure to consolidate might be an effort to allow competing negotiations with the counsel in the various class actions. *E.g.*, *Borup v. CJS Sols.*, 2019 WL 2137360, at *1 (D. Minn. May 16, 2019), *cited by* Objectors at Opp. 23 (citing "the fact that CJS took steps to cabin off these [competing class actions] *from each other*") (emphasis added); 4 Newberg on Class Actions § 13:60, *cited by* Objectors at Opp. 23 (noting that failure to consolidate parallel class actions could suggest that "defendant sought to create the conditions" for a reverse auction). But by Objectors' own design, Monsanto could not have consolidated this case with *Tomlinson*, because Objectors filed in *state court* and represented a class that included *different* members who purchased different products. The suggestion that Monsanto tried to keep this case out of the MDL to further a reverse auction is thus illogical—Objectors' case would have remained separate from this case regardless.[15]

---

are no bidders. 4 Newberg on Class Actions § 13:60 ("In a reverse auction, the seller looks for the lowest bid … . [T]he defendant can play the plaintiffs' attorneys off against one another, bargaining down the price of the settlement in exchange for ensuring the lowest selling attorneys that they will be the ones to get a fee out the case.").

[15] Objectors also vaguely allude several times in their briefing to a theory that this Settlement relates to this Court's denial of approval to the settlement in *Ramirez v. Monsanto Co.*, No. 3:19-cv-02224 (N.D. Cal.). *See* Opp. 4–5, at 23 n.31. Objectors have their timing mixed up. The Parties mediated this case *before* this Court ruled on the motion for preliminary approval of the revised *Ramirez* settlement, so it could not have been an effort to respond to that denial. *Compare* Dkt. No. 94-1 ¶ 15, *with* Pretrial Order No. 235: Denying the Motion for Preliminary Approval, *In re Roundup Prods. Liab. Litig.*, 16-md-02741-VC (N.D. Cal. May 26, 2021) (relating to *Ramirez v. Monsanto Co.*, No. 3:19-cv-02224). Objectors suggest that it was "inexplicable" why the *Ramirez* settlement would exclude their case and Plaintiffs' cases from the stay. Opp. 23 n.31. But *Ramirez*, while it would have imposed a litigation stay, would ultimately *not* have released false-advertising claims except on behalf of individual class members who opted in and signed a waiver. The exclusion of pending false-advertising class actions from the stay was thus reasonable, both substantively and to avoid objections from the plaintiffs in those cases, like Objectors and Plaintiffs, who would have argued that it was unfair to stay their cases when the benefits provided by the settlement applied primarily to those who suffered personal injury.

Mediation before a former federal judge and Plaintiffs' counsel's extensive experience with consumer class actions also weigh against a finding of reverse auction. *Hibler v. Santander Consumer USA, Inc.*, 2013 WL 12137716, at *5 n.11 (C.D. Cal. Nov. 21, 2013) (rejecting reverse auction argument where "the settlement was reached by counsel experienced in TCPA litigation in front of a neutral former federal judge"); *Cohorst*, 2011 WL 3489781, at *8 (rejecting reverse auction argument given "class counsel's prior experience in prosecuting class actions"). Objectors' argument that the use of a mediator is not "dispositive" (Opp. 24–25) is beside the point. As their own authority recognizes, it weighs strongly against the suggestion that there was collusion or a reverse auction. 4 Newberg on Class Actions § 13:50 ("Evidence of a truly adversarial bargaining process helps assuage this [collusion] concern, and there is *no better evidence* of such a process than the presence of a neutral third party mediator."). That is significant when the only thing on the other side of the scale is Objectors' speculation.[16]

**B.  Objectors' Other "Badges" of Collusion Are Illusory**

Objectors' other supposed "badges" of collusion indicate nothing of the sort.

*First*, Objectors suggest that the Settlement must have been collusive because it was "quick and without discovery in this case" and that the discovery in the Related Actions was "cursory" compared to the number of documents produced in *Tomlinson*. Opp. 25–27. But the question is not the quantum of formal discovery completed here—indeed, courts approve settlements even where *no* formal discovery has occurred. *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) ("[F]ormal discovery is not a necessary ticket to the bargaining table." (quoting *Linney v. Cell. Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998))). Instead, courts ask whether the parties "have sufficient information to make an informed decision about settlement." *Linney*, 151 F.3d at 1239. This considers informal discovery, plaintiffs' counsel's investigation into their

---

[16] There are good reasons to doubt even the sincerity of Objectors' belief there was collusion. As Monsanto has previously explained, Objectors' counsel repeatedly offered to withdraw any objection if Monsanto would carve out Missouri and preserve their ability to claim fees. Dkt. No. 98, at 5–6.

claims, information developed in prior or related proceedings, work with experts, governmental reports on the subject matter, and publicly available information related to the claims. *See, e.g.*, *Mego*, 213 F.3d at 459 (considering work with experts).[17]

Plaintiffs here had (1) formal discovery from their own prior cases (Dkt. No. 94, at 2–4; Dkt. No. 94-1 ¶ 6); (2) informal discovery (including nationwide shipment and point-of-sale data) from Monsanto (Dkt. No. 94-1 ¶ 13); (3) extensive discovery—including documents and depositions—published online by the plaintiffs in the personal-injury litigation (*id.*); (4) a massive, publicly available regulatory record (*id.*); (5) thousands of pages of publicly available dossiers on the science around glyphosate and the Products (*id.*); (6) publicly available records from personal-injury cases and the Proposition 65 litigation in *Wheat Growers* case (*id.*); (7) consultations with and a study from their damages expert (*id.* ¶ 14); and (8) years of experience with these types of claims in the Related Actions (*id.* ¶ 16). In short, Plaintiffs did not start with a blank slate, but had a wealth of relevant information. In that context, it is inappropriate simply to compare the volume of formal discovery here with that in *Tomlinson*.[18]

**Second**, Objectors suggest that the Settlement's terms regarding attorney's fees are a "clear-sailing agreement" suggesting collusion and that Monsanto "agreed to pay class counsel

---

[17] *See also Linney*, 151 F.3d at 1240 ("[P]laintiffs may rely on discovery developed in prior or related proceedings" and "the results of government investigations."); *Taafua v. Quantum Global Techs., LLC*, 2021 WL 579862, at *6 (N.D. Cal. Feb. 16, 2021) (plaintiffs appropriately relied on defendant's informal estimate of class size and other "informal discovery, as well as discussions between the parties and their investigation of the claims"); *Patel v. Axesstel, Inc.*, 2015 WL 6458073, at *6 (S.D. Cal. Oct. 23, 2015) (relying on "array of relevant publicly available information related to the claims").

[18] Plaintiffs also nitpick the value of the discovery in *Ezcurra*, asserting that it produced only a "Florida damages calculation" and that there is no evidence that the plaintiffs' expert "himself sat down with a Monsanto representative to interpret the Florida data." Opp. 26. But Monsanto informally produced *nationwide* data on shipments of the Products (as well as all data on retail sales in its possession) to Plaintiffs' counsel ahead of the mediation. Dkt. No. 94-1 ¶¶ 6, 13. Objectors' suggestion that the data is not "self-interpreting" is a red herring—Plaintiffs retained an expert (a Ph.D. economist) who produced an expert report based on the Florida data and then analyzed the nationwide sales data. Dkt. No. 94-1 ¶¶ 7, 14; *id.* Ex. 2. There is no authority or logical basis for Objectors' suggestion that the Settlement requires a "sit down" between Plaintiffs' expert and representatives of the defendant.

excessive fees in exchange for counsel accepting a lower amount for class members." Opp. 27–28 (quoting *Briseño v. Henderson*, 998 F.3d 1014, 1027 (9th Cir. 2021)). But Monsanto has not "agreed to pay class counsel" anything except the fee awarded in the Court's discretion—the exercise of which does not affect the validity of the Settlement.[19] Settlement § F(1). Contrary to Objectors' suggestion that this suggests a collusive agreement to an "excessive fee," 25% of the Settlement fund is the *benchmark* for attorney's fees in this circuit. *Ramirez v. Benihana Nat'l Corp.*, 2019 WL 131843, at *2 (N.D. Cal. Jan. 8, 2019). And far from suggesting an intent to sell out the Class, a fee award tied to the size of the Settlement *aligns* counsel's interests with the Class. *Craft v. Cnty. of San Bernardino*, 624 F. Supp. 2d 1113, 1123–24 (C.D. Cal. 2008) (collecting cases).

This case is materially distinct from *Briseño*, where the defendant agreed to an award of millions of dollars "separate from the class settlement fund"—an award more than six times the amount paid to Class Members.[20] Likewise, it differs dramatically from *Kim v. Allison*, Objectors' other primary authority, where the awarded fee (again, separately designated from the settlement fund) amounted to nearly *27 times* the amount paid to class members. 8 F.4th 1170, 1176, 1179 (9th Cir. 2021).

Objectors' assertion that if claims rates are sufficiently low, 25% of the available Settlement fund could represent a higher percentage of the total cash value of the Settlement, while technically correct, does not support their position. The Settlement's Floor/Ceiling structure ensures that it will never result in a fee award disproportionate to class benefit. Even under the lowest-possible claims rate scenario, 25% of the fee award would represent less than half the cash value of the

---

[19] Objectors' own counsel has called such provisions "routine and unproblematic" and consistent with an "arms' length negotiation process." Dkt. No. 98-7 Ex. F at 16. Apparently, such settlement terms suggest collusion only when they are in settlements negotiated by other counsel.

[20] Objectors argue that if the claims rate is sufficiently low, 25% of the Ceiling could become a higher percentage of the final amount paid. That is true, but it will never approach the disproportionate fees at issue in *Briseño* and *Kim*. Moreover, if the claims rate is indeed low, then the Court has discretion to take that into account.

fund. This is not the type of clear-sailing arrangement "providing for fees separate and apart from class funds" that could enable the payment of "excessive fees." *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011).[21]

Objectors' suggestion that the Settlement's Ceiling Amount is "illusory" and intended only to justify Plaintiffs' fee request is also baseless. Under Objectors' own math, the Ceiling would be nearly exhausted at the high end of likely claims rates predicted by the Claims Administrator. Opp. 29 n.36. More importantly, settlements are not negotiated only to account for the most likely outcomes. Claims rates in consumer class actions are notoriously variable, as Objectors' counsel has argued in this very district. Dkt. No. 48-1 Ex. E at 8–9 (asserting that claims rate in a consumer case could range from 2.5 to 7.5%). Monsanto's counsel's experience is similar. Thus, far from being illusory, the Ceiling is an important and hard-fought protection for Monsanto in the event of less likely, but not unreasonable, claims rates—particularly given the robust notice program.[22]

*Third*, Objectors' suggestion that the Settlement is "reversionary" (Opp. 31) is unsupported. The Settlement contains no reversionary provision. Any amount by which attorney's fees are reduced is available for Class Members to receive. Settlement §§ D(1), E(1)–(3).

Objectors' real argument appears to be that under certain claims-rate scenarios, a reduced attorney's-fee award could result in a lower total payment by Monsanto. That is true, but that is not a reversion to Monsanto—it is an inherent feature of the Floor/Ceiling structure, which

---

[21] Even if the Court concludes that the Settlement includes a "clear-sailing provision" of the kind addressed in *Bluetooth*, that will not render the Settlement problematic. Courts regularly approve settlements containing such terms. *See, e.g., Uschold v. NSMG Shared Servs. LLC*, 2020 WL 3035776, at *12 (N.D. Cal. Jun. 5, 2020) ("[T]he existence of a clear sailing provision on its own does not evince collusion, because the fees awarded are not 'unreasonably high,' but instead fa[ll] within the 25% benchmark established by the Ninth Circuit. Further, the fees are not disproportionate to the class payout.").

[22] Objectors also argue that a fee calculated as 25% of the Settlement fund would not be supported by Plaintiffs' lodestar. Opp. 30–31. Monsanto takes no position on that issue, which it leaves to the Court's sound discretion. But the suggestion that a high lodestar multiplier would indicate collusion is hogwash. Plaintiffs did not—and Monsanto would have never expected them to—provide Monsanto with their billing records before negotiating settlement. Accordingly, Monsanto could not have colluded to avoid any supposed problem with the lodestar.

16

promotes the best interest of the class by ensuring significant monetary benefits to the Settlement Class even in a low-claims-rate scenario and which courts have repeatedly concluded is appropriate.  *See, e.g.*, *In re Apple Inc. Device Performance Litig.*, 2021 WL 1022867, at \*3, \*12–13 (N.D. Cal. Mar. 17, 2021); *In re Wal-Mart Stores, Inc. Wage & Hour Litig.*, 2011 WL 31266, at \*2 (N.D. Cal. Jan. 5, 2011).   Correspondingly, in many claims-rate scenarios, that structure *increases* amounts paid to individual Class Members if fees are reduced.  For example, Objectors argue that the most likely claims rate scenario would result in only $5.32 million in claims and a total of $18.06 million in payments (before adjustment up to the Floor Amount).  Opp. 29 n.37. But in that situation, any reduction in fees would directly result in a pro rata increase of the payments made to Class Members.  *See* Settlement § E(3).  Similarly, if the claims rate is such that the total amount of payments and other expenses would exceed the Ceiling Amount (and thus a downward pro rata adjustment of payments to Class Members would be required), a reduction in fees would reduce or eliminate that downward pro rata adjustment.  *See* Settlement § E(2).

**Fourth**, Objectors argue that there are indications of collusion because the Settlement provides that the Class Representatives can seek $5,000 incentive-fee awards.  Opp. 32.  This district, however, has described a $5,000 incentive award as the "established incentive award" that is "presumptively reasonable."  *Noll v. eBay, Inc.*, 309 F.R.D. 593, 611 (N.D. Cal. 2015).  Monsanto thus has little legal basis to oppose such awards.  And practically speaking, the cost of such an opposition could exceed the amount at issue.  Monsanto secured Plaintiffs' agreement that the Settlement's validity does not turn on whether the Court grants its requested fee award.  Settlement § F(1).  That is not collusion.

**Finally**, Objectors argue that the Settlement must be collusive because it releases claims against retailers based on the same facts.  Opp. 33–34.  This, they argue, "must be explained."[23]

---

[23] Objectors' reliance on *Haralson v. U.S. Aviation Services Corp.*, 383 F. Supp. 3d 959 (N.D. Cal. 2019), and *Trauth v. Spearmint Rhino Cos. Worldwide, Inc.*, 2010 WL 11468628 (C.D. Cal. July 26, 2010), is misplaced.  Neither case was materially similar to this one.  In *Haralson*, the question was whether FLSA claims were properly included in the settlement at all, and the release of a third

*Id.*  But it *has* been explained, and that explanation is reasonable—Monsanto is not willing to pay tens of millions of dollars to settle this case only to be dragged back into litigation based on the same claims against its retail business partners.  *See supra* at 3 n.2; Dkt. No. 94-3 ¶ 2.

## II.   OBJECTORS' ARGUMENTS THAT THE SETTLEMENT RELIEF IS INADEQUATE CANNOT WITHSTAND SCRUTINY

Objectors claim inadequacy by arguing that Plaintiffs did not "show their work" or otherwise sufficiently explain assessment of their claims and their value.  Opp. 34, 39.  But the Motion spends more than a dozen pages describing the legal and factual risks of Plaintiffs' claims, the Parties' competing damages estimates, and the basis for and adequacy of the Settlement amount.  Mot. 18–30, 39–41.  Objectors' other attacks on this front fare no better.

### A.  Objectors' Attacks on Plaintiffs' Damages Estimate Are Backward

Objectors argue that it is "not disclosed" what kind of sales data Plaintiffs received and reviewed, and whether that included data on retailer sales.  Opp. 35 & n.23.  That is incorrect.  *See* Dkt. No. 94-3 ¶ 12 (explaining that data on the number of units shipped and all available data on retail sales were provided to Plaintiffs); Dkt. No. 94-1 ¶ 14 (declaring that Plaintiffs' expert analyzed nationwide sales data to help Plaintiffs confirm and interpret that data).  It is also disingenuous coming from Objectors, who have received the same dataset for Missouri sales of the Products and know full well that it includes substantial, but not complete, information on sales from retailers to consumers.  Dkt. No. 94-3 ¶ 12 n.5.  Objectors suggest in a footnote, for example, that their research into *Ezcurra* "revealed" that Monsanto has access to data on products sold by Home Depot.  Opp. 35 n.42.  But that is no "revelation," as Objectors know that the data includes

---

party was unexplained.  383 F. Supp. 3d at 969.  *Trauth* was about certain strip clubs' treatment of their employees, but settlement included a release of *separate* clubs, with no indication that any claims against those clubs would be based on the same underlying facts.  2010 WL 11468628, at *7.  Here, claims against retailers would be (and have been) based on the same sales asserted against Monsanto, based on the same theory that consumers were misled about the Products' alleged health risk.  The release of such claims is reasonable, and is no indication of collusion.

all shipments to Home Depot, and they also know the extent of point-of-sale data available from Home Depot, because they have it for Missouri.[24]

Objectors next repeat a theme raised repeatedly in their brief, suggesting that the Settlement's $23 to $45 million price tag is too low because it relieves Monsanto of an $825 million liability. Opp. 36; *see also id.* at 30 ("Monsanto is relieved of an estimated liability exceeding $825 million"), 35 (referencing Plaintiffs' "estimated price premium recovery of $825 million"). But that is not how any reasonable defendant—or plaintiff—would value this case. For one thing, Monsanto's view, informed by expert opinion, is that Plaintiffs' damages estimate is far too high. *See* Dkt. No. 30 ¶¶ 11–12. Thus, even assuming Plaintiffs could succeed all the way through trial, they would face a significant risk that a jury either agrees with Monsanto's expert that there is *no* price premium or finds that the price premium is much lower than Plaintiffs' estimate. And of course, for all the reasons discussed in the Motion (and many more), the chances that Plaintiffs would even get that far are low. The Settlement value of this case—like any case—thus must be substantially discounted from Plaintiffs' pie-in-the-sky predictions of best-case scenario.

Surely recognizing this, Objectors argue that even Plaintiffs' estimate is too low and that Plaintiffs should have pursued a "full refund" theory of damages. Opp. 37–38. But Objectors' own analysis of the law shows that such a measure would have been inappropriate. They say that the measure of damages in Delaware is the "difference between the actual and represented values of the object of the transaction" or the difference between "what [was] paid and the actual value of the item." Opp. 37 n.44 (quoting *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1059, 1076 (Del. 1983)). And they acknowledge that the same measure applies under other states' laws. Opp. 5 (damages under the MMPA are the difference between the "actual value of the item [and] the value of the item if it had been as represented at the time of the transaction" (quoting *Plubell v. Merck &*

---

[24] Objectors also suggest that they lack sufficient information on how retail prices were calculated. That was explained in Monsanto's counsel's declaration. Dkt. No. 94-3 ¶ 12. If the Court feels that more-detailed information is needed, Monsanto is happy to provide it.

*Co.*, 289 S.W.3d 707, 714 (Mo. App. W.D. 2009))), Opp. at 27 n.44 (FDUPTA measure is "difference in market value of the product in condition delivered versus the condition in which it should have been delivered"). That is *precisely* what Plaintiffs' and Monsanto's experts assessed—what the difference in price would have been, if any, had the product contained the warnings that Plaintiffs claim were required.[25]  Dkt. No. 94-1 Ex. 2 ¶¶ 12–14; Dkt. No. 94-3 Ex. A ¶¶ 4–11.

Objectors protest that a full refund could be appropriate if the product were "valueless" and that it is theoretically possible for the "as is value of a product" to be zero. Opp. 37–39. But they offer no evidence suggesting that is the case here, and Plaintiffs' expert's analysis would prove the contrary—if buyers would pay 69% of the current price for the Products even if they contained the allegedly required warnings, then they are not worthless. The best Objectors can cobble together is speculation that "[a] consumer faced with two bottles of Roundup—identical except that one discloses a cancer risk and the other does not—would not choose the former." Opp. 37–38. But even if that is true, it is not the relevant question. A product is not "worthless" just because consumers would pick another product when priced the same, and Objectors cite nothing suggesting otherwise.[26]

---

[25] Objectors' suggestion that this Court should ignore Monsanto's expert's opinions altogether because Monsanto's expert did not endorse the use of conjoint as a measure of classwide damages(Opp. 36) lacks support in case law or and logic. Monsanto's expert noted, accurately, that Plaintiffs in similar cases often rely on conjoint analyses, and that this methodology has been recognized by many courts. *See Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1107 (N.D. Cal. 2018). And Objectors do not contest that Monsanto's expert is well qualified to conduct such a conjoint survey, or that the survey conducted was well designed. That survey is thus highly informative on what a likely damages estimate would show were such a methodology approved by a court.

[26] In a footnote, Objectors cite *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979 (9th Cir. 2015); *In re Morning Song Bird Food Litigation*, 320 F.R.D. 540 (S.D. Cal. 2017); and *Blue Cross Blue Shield Ass'n v. Glaxosmithkline LLC*, 2016 WL 6612804 (E.D. Pa. Nov. 9, 2016). These cases do not assist them. *Pulaski* confirms that the proper measure of damages is "the difference between what was paid and what a reasonable consumer would have paid at the time of purchase without the fraudulent or omitted information," 802 F.3d at 989, which is precisely what Plaintiffs' expert purports to quantify. *Morning Song* dealt with a full-refund theory, but there was a viable argument that the product was in fact worthless for its intended purpose—the plaintiffs alleged that the "bird food" they bought was actually "bird poison." 320 F.R.D. 556. Here, it is

**B. Objectors' Arguments on the Merits of Monsanto's Defenses Are Misplaced and Wrong**

As noted above, Objectors' argument that the Motion fails to "analyze" the risks posed by continued litigation of this case is wrong. The Motion details potential risks posed by continued litigation of this case, the facts and law weighing for and against those risks, and Plaintiffs' counsel's evaluation of each. Objectors' authority does not require more. *Eddings v. DS Servs. of Am., Inc.*, 2016 WL 3390477, at *1 (N.D. Cal. May 20, 2016).[27] As the Ninth Circuit has long recognized, the Court's role in approving a settlement is to "reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982). Courts are not to "reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Cottle v. Plaid Inc.*, --- F.R.D. ----, 2021 WL 415252, at *11 (N.D. Cal. 2021) (quoting *Officers for Justice*, 688 F.2d at 625); *see also Fraley v. Facebook, Inc.*, 966 F. Supp. 2d 939, 948 (N.D. Cal. 2013) ("[T]he settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on the merits.").

Objectors substantially understate the risks to Plaintiffs posed by further litigation. They argue that there is little "causation" risk because, while two juries in personal-injury cases have found that Roundup® products did not cause the plaintiffs' cancer, three juries have found liability.

---

uncontested by Objectors that the Products are effective, and they proffer no evidence rebutting Plaintiffs' and Defendant's experts' findings. *Blue Cross Blue Shield* did not even address the appropriate measure of damages, but only whether the plaintiffs had adequately alleged *injury*. 2016 WL 6612804, at *7.

[27] Comparison of the Motion here with the motion at issue in *Eddings* is instructive. There, the plaintiff spent less than two pages discussing the risks of further litigation, with no citation to relevant case law and little more than a brief summary of the defendant's positions. *Eddings v. DS Waters of Am., Inc.*, No. 3:15-cv-02576-VC (N.D. Cal.), ECF No. 33, at 8–9. Here, in contrast, the Motion included a detailed, lengthy discussion of risks of further litigation, with discussion of case law, competing rulings in other cases about Roundup®, and the factual record. Mot. 18–30.

Opp. 40–41.  But this is *not* a personal-injury case.  If Plaintiffs were to proceed to trial, the jury would not be faced with a sympathetic plaintiff suffering from a horrible illness and seeking compensation for her medical expenses and suffering but a healthy plaintiff forced to admit that she had suffered none of the health effects she alleges the product causes, seeking only money back for a product she admits did what it was advertised to do.[28]  Outside the three personal-injury verdicts, the evidence on causation *overwhelmingly* favors Monsanto's position.  EPA, for example, has repeatedly reviewed the scientific record, concluding that the products do *not* pose any health risks when used as directed.  *See* Dkt. No. 12-1 Exs. A–G.  Likewise, and contrary to Objectors' suggestion that it addressed only the IARC findings, *Wheat Growers* concluded that a cancer warning on the Products would be "misleading" and that the "weight of authority" shows that "glyphosate was not known to cause cancer and did not cause cancer."  *Nat'l Ass'n of Wheat Growers v. Becerra*, 468 F. Supp. 3d 1247, 1259 (E.D. Cal. 2020).  And even if personal-injury cases were the most relevant comparator—and they are not—a 3–2 record for the plaintiffs suggests considerable risk.

Objectors' suggestion that prior dismissals in the Related Actions are irrelevant (Opp. 41–42) is also wrong.  For one thing, it seems that Objectors cannot keep their story straight.  They repeatedly argue that Plaintiffs' counsel was motivated to enter a cheap and quick settlement because their case was marred by defeats in the retailer cases (Opp. 1–4, 6–12), but they then suggest that those defeats "do not inform" on the risks Plaintiffs face (Opp. 41).  Which is it?  Regardless, the suggestion that dismissals in prior cases are irrelevant is wrong.  *Ezcurra* posed significant risk for claims under any of the many state laws that include safe-harbor provisions (besides raising broader preemption issues before the Eleventh Circuit, discussed below).  *See, e.g.*, Ark. Code § 4-88-101; Conn. Gen. Stat. § 42-110c(a); Ind. Code § 24-5-0.5-6; Me. Rev. Stat.

---

[28]  Indeed, Objectors have expressly *excluded* from their case any purchaser who has suffered personal injury as a result of using Roundup® products.  First Amended Class Action Petition for Damages, *Tomlinson v. Monsanto Co.*, No. 1916-cv22788 (Mo. Cir. Ct. Jackson Cnty. Oct. 17, 2019), Dkt. No. 107, Ex. 1 ¶ 76.

tit. 5, § 208(1). Dismissals against retailers based on the notice requirements of Proposition 65 would have effect in claims asserted against Monsanto in California as well. And the First Amendment issues that led to the *Wheat Growers* injunction are at play for *any* state law purporting to require a warning that the Products were carcinogenic.

Objectors' argument that preemption does not pose a significant risk (Opp. 43–44) ignores both contrary case law and the current state of appeals. When the Parties mediated, that issue was before the Eleventh Circuit in *Ezcurra* (stayed only after settlement) and had just been decided favorably to Monsanto in *Carson v. Monsanto Co.*, 508 F. Supp. 3d 1369, 1375–78 (S.D. Ga. 2020). The Supreme Court is now considering whether to grant certiorari in *Hardeman*. Objectors' speculation that the Supreme Court will not take the case does not obviate the risk. Finally, Objectors' assertion that the Supreme Court would have to overrule *Bates* is simply wrong— Monsanto has never *argued* that *Bates* should be overturned but rather that *Bates* compels a finding of preemption. *See* Petition for Writ of Certiorari, *Monsanto v. Hardeman*, No. 21-241, at 13-18.

Objectors' repeated argument that the Parties' disagreement on damages poses no risk (Opp. 44) is addressed above and is not more persuasive in this context. And their assertion that any damages risk must be discounted because Plaintiffs did not plead punitive damages has been repeatedly rejected. *E.g.*, *Zepeda v. PayPal, Inc.*, 2017 WL 1113293, at *12 (N.D. Cal. Mar. 24, 2017) ("[Objector's] ancillary contention that Plaintiffs should have taken into account Defendants' potential exposure to punitive damages has [] been rejected by this Circuit."); *Moore v. Verizon Commc'ns*, 2013 WL 4610764, at *9 n.16 (Aug. 28, 2013) ("[C]ourts generally determine fairness of an antitrust class action settlement based on how it compensates the class for past injuries, without giving much, if any, consideration to treble damages."). At any rate, the amount of the payments to Class Members is fair and adequate under any calculus—Class Members stand to recover nearly two-thirds of Plaintiffs' *best-case* compensatory-damages measure.

Finally, Objectors' suggestion that litigation risk is not substantial and of Plaintiffs' own making is unrealistic. Objectors suggest that Plaintiffs should not have pleaded under Delaware

law.[29]  But as the Motion aptly noted, the risks of losing class certification would not have been

obviated by pleading under any other state's law.[30]  To the contrary, courts have repeatedly rejected

attempts at certification of litigation class based on the need to apply the laws of multiple states.

*E.g.*, *In re TracFone Unlimited Serv. Plan Litig.*, 112 F. Supp. 3d 993, 1000–01 (N.D. Cal. July 2,

2015) (collecting cases from multiple circuits).   Case law belies Objectors' suggestion that

Plaintiffs could have negated this risk by seeking geographic subclasses—courts often reject such

attempts.  *E.g.*, *Zinser v. Accufix Rsch. Inst.*, 253 F.3d 1180, 1190 (9th Cir. 2001) (affirming district

court's denial of proposal for subclass treatment based on similar state laws); *Mullins v. Premier*

*Nutrition Corp.*, 2016 WL 3440600, at *5–8 (N.D. Cal. June 20, 2016) (rejecting attempted

subclass to include multiple states' laws); *Marsh v. First Bank of Del.*, 2014 WL 2085199, at *7–

8 (N.D. Cal. May 19, 2014) (noting that "[c]ourts routinely deny class certification where the laws

of multiple states must be applied" and declining "to certify a nationwide class that will have 50

subclasses applying the laws of 50 different jurisdictions"); *Lane v. Wells Fargo Bank, N.A.*, 2013

---

[29] While Monsanto argued for dismissal under the DCFA, Plaintiffs could—and if Plaintiffs' prior track record is any indication, probably would—have addressed that issue if they lost on the merits by amending the pleadings to assert another state's or other states' law.

[30] Objectors' follow-on argument that the concerns with certifying a nationwide class for litigation would also render inappropriate certification of a nationwide *settlement* class (Opp. 45) conflicts with Ninth Circuit law.  *E.g.*, *Jabarri v. Farmer*, 965 F.3d 1001, 1005–06 (9th Cir. 2020) ("Settlement may obviate the need to litigate individualized issues that would make a trial unmanageable, making common questions more important in the relative analysis." (internal quotation marks omitted) (quoting *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 558 (9th Cir. 2019))).  The Ninth Circuit has *expressly* rejected this argument in the context of similar nationwide settlements.  *Hyundai & Kia*, 926 F.3d 539, 563 ("In settlement cases, such as the one at hand, the district court need not consider trial manageability issues.").  Courts thus regularly certify such nationwide classes for settlement.  *See, e.g.*, *Yamagata v. Reckkitt Benckiser*, 2021 WL 5909206, at *1 (N.D. Cal. Oct. 28, 2021) (Chhabria, J.) (approving nationwide class action settlement based on alleged consumer-protection claims related to consumer products); *In re Lithium Ion Batteries Antitrust Litig.*, 2020 WL 7264559, at *4 (N.D. Cal. Dec. 10, 2020) ("[F]or purposes of *settlement*, common issues predominated despite variations in state law [that] might have affected some settlement class members' right to recover had the case proceeded to trial." (emphasis added)).

24

WL 3187410, at *4 (N.D. Cal. June 21, 2013) (rejecting attempted subclass that would require scrutinizing a "multitude of different state law standards.").

## III.   OBJECTORS' OTHER COMPLAINTS ABOUT THE SETTLEMENT'S TERMS ARE UNFOUNDED

### A.   Class Members Are Treated Equitably Relative to One Another

Objectors argue that Class Members are treated inequitably relative to one another for two reasons.  Neither withstands scrutiny.

**First**, Objectors argue that the named Plaintiffs receive "more than other proposed class members" because they can seek incentive awards.  Opp. 46.  But Objectors cite nothing suggesting that the availability of incentive awards is inequitable to other class members, and this Court has held that Class Members are treated equitably relative to one another despite the presence of incentive awards.  *See Lembeck*, 2021 WL 5494940, at *3 (awarding incentive fees to named plaintiffs and concluding that "Class Members are treated fairly as to one another because they are compensated according to the amount of Pay-to-Pay Fees they were charged").

**Second**, Objectors argue that Missouri residents are treated unfairly because their claims are "more valuable" and their case was closer to trial.  Opp. 46.  But Objectors' own analysis shows that MMPA claims are subject to the same measure of damages as Plaintiffs' claims.  *See supra* Section II.A.  And as explained at length above, Objectors overstate the strengths of their case relative to Plaintiffs' cases, its readiness for trial, and their supposed comparative diligence.

### B.   Objectors Have Not Shown That the Release Is Improper

Objectors briefly raise three supposed problems with the Settlement's release.  Opp. 47.  None has merit.

**First**, Objectors claim that, despite its explicit limitation to claims arising from the same factual predicates, and express exclusion of Medical Monitoring and Personal Injury Claims, the release is overbroad because it uses the phrase "related in any way."  Opp. 47.  But courts in this district have *repeatedly* approved similar language in class-action settlement releases.  *See Cottle*, --- F.R.D. ----, 2021 WL 5415252, at *18 ("[c]ourts in this district have approved releases with

similar language," including releases of claims "arising out of or relating in any way to any of the legal, factual, or other allegations made in the Action"); *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 327 (N.D. Cal. 2018) (same) (collecting cases).   Particularly given the release's exclusion of Medical Monitoring and Personal Injury Claims, this release is not overbroad.

  **Second**, Objectors claim that the release's reference to "health effects" is overbroad and beyond the factual predicate.   But the complaint *includes* suggestions that the Products, including both glyphosate and the inert ingredients in the formulated Products, pose risks other than just carcinogenicity, genotoxicity, and endocrine disruption.   It cites literature asserting, for example, that Roundup® (including both glyphosate and inert ingredients) affects cell cycle regulation, causes Parkinson's, impairs metabolism, causes disappearance of the internal membrane of mitochondria, and promotes necrosis.  *See* Dkt. No. 22 ¶¶ 49, 51, 52, 54.   Moreover, if the concern is that the release would encompass health effects not within the factual predicate of this case, that is expressly prevented by the release's limitation to claims based on "the same factual predicates as the Action."   Settlement § L.1.

  **Finally**, Objectors argue that the release is improper because it could release claims by Class Members as to reformulated products that might be offered in the future.   Opp. 47.   But that is appropriate.   Plaintiffs assert that they paid more for the Products because Monsanto misled them about the supposed health risks of glyphosate, inert ingredients, and the formulated Products. *See, e.g.*, Dkt. No. 22 ¶¶ 1–9, 30–33, 100–135.   It is not unreasonable—after they receive notice of this Settlement and payment for their claims—for Class Members to release future claims based on the same allegations that an ingredient in the Products has undisclosed health risks, even if the product they purchase has a different percentage of glyphosate or also includes a different inert or active ingredient.

## IV.   OBJECTORS' RECYCLED ADEQUACY ARGUMENTS ARE NOT PERSUASIVE

Objectors close their brief by recycling several of their earlier arguments under the guise of a Rule 23(a)(4) adequacy argument.   Those arguments are no more persuasive under that heading.

*First*, Objectors argue that the named Plaintiffs cannot pursue DCFA claims, and thus they cannot serve as class representatives.   But Objectors' authority does not support that argument. The cases they cite hold that a plaintiff who has not "personally been injured" lacks standing and thus cannot be a class representative.   *Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003); *In re Countrywide Fin. Corp. Mortg. Backed Sec. Litig.*, 860 F. Supp. 2d 1062, 1069 (C.D. Cal. 2012) (named plaintiffs lacked standing because they *did not purchase* the securities at issue).   Objectors do not even *argue* that Plaintiffs lack injury, and they could not— their own theory of injury is the same as Plaintiffs.   Their argument that Plaintiffs would lose their DCFA claims on the merits is a non sequitur.[31]

*Second*, Objectors argue that Plaintiffs and their counsel "did not vigorously represent putative class members."   As already discussed above, Objectors are factually wrong in this regard.

*Third*, Objectors argue that Plaintiffs had to engage in subclassing to account for "claims more valuable than the one asserted, which certainly includes *Tomlinson* class members."   Opp. 49. This is wrong on two fronts.   As explained above, Objectors' characterization of their claim as "more valuable" is unsupported even by their own analysis.   Courts also regularly approve nationwide settlements of consumer-protection claims without subclassing.   *E.g.*, *Yamagata*, 2021 WL 5909206.

*Finally*, Objectors argue that the Settlement is improper because it "extracts" releases from individuals who have not purchased the Products and thus should be "divided between holders of

---

[31] Objectors' argument would also mean that no plaintiff could ever serve as a representative of nationwide consumer-protection class—presumably no plaintiff would have viable claims under the law of every state.   That is not the law.   *See Yamagata*, 2021 WL 5909206, at *2 (ten named plaintiffs were adequate representatives of a nationwide settlement class because they were members of that class and their claims were typical).

present and future claims."  Opp. 50 (citing *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999)). Putting aside that this argument does not go to adequacy, it misdescribes the Settlement Class, which includes only individuals who purchase the Products during the Class Period.  Settlement § A(52).

## <u>CONCLUSION</u>

Objectors' attempts to attack the Settlement lack merit.  Their manufactured allegations of collusion and reverse auction are contradicted by the record.  And their attacks on the Settlement's terms conflict with authority.  The Motion should be granted.

Dated: March 31, 2022

By:   /s/ John J. Rosenthal

JOHN J. ROSENTHAL
Winston & Strawn LLP
jrosenthal@winston.com
1901 L Street NW
Washington, DC 20036

JEFF WILKERSON
Winston & Strawn LLP
jwilkerson@winston.com
300 S. Tryon Street, 16th Floor
Charlotte, NC 28202

SHAWN R. OBI
Winston & Strawn LLP
sobi@winston.com
333 S. Grand Ave., 38th Floor
Los Angeles, CA 90071

BRIAN STEKLOFF
Wilkinson Stekloff LLP
bstekloff@wilkinsonstekloff.com
2001 M Street NW, 10th Floor
Washington, DC 20036

RAKESH KILARU
Wilkinson Stekloff LLP
rkilaru@wilkinsonstekloff.com
2001 M Street NW, 10th Floor
Washington, DC 20036

*Counsel for Monsanto Company*