**Pages 1 - 53**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

|  |  |  |
|---|---|---|
| | ) | |
| In re Roundup Products | ) | |
| Liability Litigation | ) | **NO. 16-md-02741-VC** |
| | ) | |
| _____ | ) | |

San Francisco, California
Wednesday, September 7, 2022

<u>**TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ZOOM SOUND RECORDING**</u>

<u>**APPEARANCES**</u>:

For Plaintiffs:

> BAUM HEDLUND ARISTEI GOLDMAN, PC
> 10940 Wilshire Boulevard, 17th Floor
> Los Angeles, CA  90024
> BY:  **ROBERT BRENT WISNER, ESQUIRE**

> ANDRUS WAGSTAFF, PC
> 7171 West Alaska Drive
> Lakewood, CO  80226
> BY:  **AIMEE H. WAGSTAFF, ESQUIRE**

> WEITZ AND LUXENBERG, P.C.
> 700 Broadway
> New York, NY  10003
> BY:  **ROBIN GREENWALD, ESQUIRE**

> LOCKRIDGE GRINDAL NAUEN PLLP
> 100 Washington Avenue South, Suite 2200
> Minneapolis, MN  55401
> BY:  **YVONNE M. FLAHERTY, ESQUIRE**

> THE MILLER FIRM, LLC
> The Sherman Building
> 108 Railroad Avenue
> Orange, VA 22960
> BY:  **DAVID DICKENS, ESQUIRE**

Transcriber:            Pamela Batalo Hebel

**APPEARANCES CONTINUED:**

For Plaintiffs:
                         DALIMONTE RUEB STOLLER, LLP
                         515 S Figueroa Street
                         Los Angeles, CA  90071
           BY:  **BEHRAM PAREKH, ESQUIRE**

For Defendant Monsanto Company:
                         WILKINSON STEKLOFF
                         2001 M Street, NW
                         Washington, DC 20036
           BY:  **BRIAN STEKLOFF, ESQUIRE**
                         **RAKESH KILARU, ESQUIRE**

                         SHOOK, HARDY & BACON, LLP
                         2555 Grand Boulevard
                         Kansas City, MO  64108
           BY:  **ANTHONY MARTINEZ, ESQUIRE**


Special Master:            **KEN FEINBERG**

Also Present:              **CAMILLE BIROS**

<u>Wednesday, September 7, 2022</u>                    <u>12:34 p.m.</u>

**ELECTRONICALLY RECORDED ZOOM PROCEEDINGS**

**---000---**

    **THE CLERK:**  Now calling civil case 16-md-2741, In Re Roundup Products Liability Litigation.

    Will counsel please state your appearances for the record round, starting with the plaintiff.

    **MS. GREENWALD:**  Robin Greenwald for the plaintiff. Good afternoon, Your Honor.

    **THE COURT:**  Hello.

    **MS. WAGSTAFF:**  Good afternoon, Your Honor.  Aimee Wagstaff for the plaintiffs.

    **THE COURT:**  Hi.

    **MR. DICKENS:**  Good afternoon, Your Honor.  David Dickens on behalf of plaintiffs.

    **THE COURT:**  Hello.

    **MR. WISNER:**  Your Honor, long time no see.  Brent Wisner for the plaintiffs.

    **THE COURT:**  Hello, Mr. Wisner.

    **MS. FLAHERTY:**  Good afternoon, Your Honor.  Yvonne Flaherty for plaintiffs.

    **THE COURT:**  Hi.

    **MR. PAREKH:**  Good afternoon, Your Honor.  Behram Parekh for plaintiffs.

    **THE COURT:**  Hello.

1      **MR. STEKLOFF:**  Good afternoon, Your Honor.  Brian

2  Stekloff, Rakesh Kilaru, and Anthony Martinez on behalf of

3  Monsanto.

4      **THE COURT:**  Hello.  And then we have a special guest.

5      **MR. FEINBERG:**  Thank you, Your Honor.  It's Ken

6  Feinberg with another special guest, my colleague that you all

7  know, Camille Biros, and we are the Special Masters -- or I'm

8  the Special Master in the Roundup MDL.

9      **THE COURT:**  Hello.  Okay.  Welcome, everybody.

10      I thought we would start with an update from our special

11  master about the mediation program and where it's been and

12  where it's going and all of that.

13      **MR. FEINBERG:**  Thank you, Your Honor.  Anticipating

14  this, we -- Camille and I have put together some, I think,

15  valuable statistics that help point out the success of the

16  court-mandated under Court Order 240 -- the requirement that

17  all MDL-filed claimants participate in the program.  Whether or

18  not they accept the amounts offered, that's entirely up to them

19  and their counsel, but everybody has been required pursuant to

20  Court Order 240 to participate.

21      And here are the statistics that I think are rather

22  striking.

23      Claim packets sent out to MDL filed claimants, 1,321.

24      Claim packets received 978.

25      Claims already determined, 840.

1    Accepted -- you'll hear -- don't be fooled by these

2   numbers.  Accepted, 350.

3    Claims settled and released -- (inaudible) released,

4   rejected of the 840, 132.

5    Denied by the Special Master as ineligible, 60.

6    Offers currently outstanding waiting to hear back from the

7   claimant, 290.

8    Now, there are unfiled with us 343 cases.  Now, how can

9   that be if they're required to participate in the program?

10  Well, as many of you know, people like Robin and David

11  Dickens -- as many of you know -- and Monsanto knows this --

12  there are 343 claimants who never filed with the Special

13  Master's program, but 295 of them were settled outside of the

14  program; in other words, as part of inventory or separate

15  settlements with Monsanto, we send out a packet only to find

16  out from the claimant or Monsanto, that case has already been

17  settled and should be removed from the MDL docket.

18   Forty-eight additional claimants are in the process right

19  now of filing.  Many of them missed the judge's deadline in

20  Court Order 240.  Came back to us and said, "Oh, my goodness,

21  can we now file with the program," and we have permitted that.

22  And the Court has not deleted the case or dismissed the case.

23  We're giving them now a chance, and they are in the process of

24  filing.  And we are currently reviewing right now as we speak

25  about 48 claims that are in the process of being determined.

1      We also note that for whatever the reason, 90 claimants

2  withdrew their -- their packet.  They didn't complete it, they

3  didn't participate.  They just withdrew it.  And we're

4  assuming -- we'll get the confirmation -- that the reasons that

5  they withdrew -- we're not sure whether they dismissed their

6  own case in the MDL, whether they hired another lawyer.  We're

7  not sure.  We'll try and get an answer to that.  But there are

8  relatively few claimants left in this rather creative program

9  that have not yet either been processed or awaiting process by

10  us in the next, you know, weeks ahead.

11      So those are the stats.  We're pretty comfortable with the

12  overall success of the program.  And you look at the relatively

13  few numbers that are rejected, still litigating, don't want to

14  settle, it's a rather interesting statistical, I think,

15  corroboration about the success of the program, particularly

16  after Judge Chhabria ordered everybody in 240, you either have

17  to participate or you run the risk of a dismissed claim.  The

18  judge only ended up, out of the 1,321 or more cases -- the

19  judge only had to dismiss 21.  And of the 21 he dismissed, I

20  think we let back in a half a dozen or so and are still willing

21  to do that if somebody comes running to us and asks.

22      So that's the statistical summary.

23      And thank you, Judge Chhabria and the MDL court.

24      **THE COURT:**  Thank you.  And let me just say, it sounds

25  like a success to me as well, but I may define "success" a

1    little differently than you do; right?

2        I mean, you, as a mediator -- you -- you want to get as

3    many cases settled as possible.  For me it's just about giving

4    as many people as possible the opportunity to settle if they

5    wish.  And if they don't want to settle, that's perfectly fine,

6    and we've made clear in our order that if somebody doesn't want

7    to settle, they don't have to.  There's no requirement to take

8    a settlement offer.  And that the participation in your program

9    would not delay the litigation in any way --

10        **MR. FEINBERG:**  That's (inaudible). on a parallel

11    track, that's absolutely clear.

12        **THE COURT:**  And I think we've succeeded in keeping

13    that promise so far, and I intend to continue to keep that

14    promise.

15        Now, it seems like, you know -- I mean, this -- we have

16    far fewer active cases than we -- you know, we did when this

17    MDL was in its heyday, and it does raise a question about, you

18    know, how long does it make sense to keep using your valuable

19    time on settlement administration.

20        So what's your view on that?

21        **MR. FEINBERG:**  I have two views on that.  One, I am

22    prepared, with Camille, to work valuable time -- there's a lot

23    of valuable time involved in satisfying this Court that the

24    process has gone to its completion.  We want to continue to do

25    that, Your Honor.

1    I'll also say this, however -- and Your Honor knows, quite

2    apart from this program, I am working with the company and with

3    the plaintiff lawyers, David Zahn, Robin Zahn -- there are

4    other cases that have either, you know -- have not yet been --

5    are not part of the pilot program.  There are cases in the MDL

6    where a claimant has either rejected the program voluntarily,

7    entitled to, as you say, or there are a fair number of cases,

8    Judge, where counsel, as part of a bigger deal, an inventory

9    settlement, are urging me as the mediator, court-appointed

10   mediator, to stay on and try and resolve as many -- voluntarily

11   as many cases as still remain in the MDL, especially if they're

12   accompanied by cases in the inventory outside of the MDL like

13   in the state courts in St. Louis.

14       So I'm pretty busy.  Camille is pretty busy on the pilot

15   program.  And I'm not prepared to say today that, you know,

16   we'll be done by X date or Y date.  As long as there's effort,

17   as long as it's helpful -- as long as it's helpful for me to

18   stick around, I will continue to do so, subject to the Court's

19   pleasure.

20       **MS. BIROS:**  If I could just add just a couple of

21   points?

22       **THE COURT:**  Go ahead.

23       **MR. FEINBERG:**  Sure.

24       **MS. BIROS:**  We are very claimant-friendly in terms of

25   allowing additional time beyond the 30-day response time that

1    we request when an offer is made, so in many, many cases, which

2    explains why there are almost 300 that are outstanding -- in

3    many, many cases, the claimant needs additional time before he

4    or she makes a decision.  That's point number one.

5         And point number two is the 48 that Ken mentioned that are

6    in process of filing, those -- once those are completed, they

7    have to go then through our process of review.  So it's really

8    96 cases that we have outstanding that are in some -- some

9    state of review or expected to be filed.

10        So those are just two clarifying points which help

11   understand better the timing.

12        **THE COURT:**  Well, so, I mean, in light of that, I know

13   that new cases will continue to trickle in; right?  There will

14   be new filings, there will be new claims made by lawyers on

15   behalf of clients who haven't yet filed lawsuits and all that.

16   And, you know, that -- that will go on for a while, but given

17   how few pending claims you have left, I mean, it seems like

18   we're kind of getting close to the tail end of your program; is

19   that -- is that fair?

20        **MR. FEINBERG:**  I think that's fair.  I would

21   supplement that -- and it is a trickle, I agree.

22        The program subject to Order 240 is nearing completion, I

23   think successfully.  As long as we can stick around, with the

24   Court's imprimatur -- it helps that it's the Court -- I'm a

25   Court-sponsored mediator, Special Master.  There are still

other cases tangential to the MDL filing that are still, I think, important that we try and complete those with settlement, thanks to Your Honor, and the MDL and that designation.

So we can report back later in the fall, Judge, as to exactly where we are and what -- and what that leads to in terms of timing.  We can get back with a better understanding in a few months.

**THE COURT:**  Okay.  That sounds great.

But meanwhile, it's sort of a signal to the parties to think about, you know, for the cases that are going to keep trickling in, you know, in the coming years, you know -- presumably in the coming years this program won't be there anymore --

**MR. FEINBERG:**  That's correct.

**THE COURT:**  -- and the parties should start thinking about whether they want kind of an alternative mechanism to be put into place to facilitate settlement discussions in the cases that are coming.  For example -- I mean, Judge Tse has been appointed to handle discovery matters in the MDL.

It's remarkable -- I mean, we've had -- other than maybe in connection with general causation early on in the litigation, we've had very little in the way of discovery disputes.  I think that speaks, you know, highly of both sides.

But some disputes have been cropping up, and so I decided

1    to appoint Judge Tse to be the discovery judge in the case.

2    I'm sure he would be perfectly happy to be the -- handle

3    settlement matters as well if the parties think that would be a

4    good idea going forward in the MDL.

5        So that's something you all can think about.  No need to

6    make any decisions any time in the immediate future, I don't

7    think.

8            MR. FEINBERG:  Thank you, Your Honor.

9            THE COURT:  Okay.

10       Let me ask, I -- I understand that, you know, in the case

11   management statement both sides made kind of competing

12   proposals for how to -- how to move forward with the MDL.  And

13   we can talk about that more in a little bit.  But I guess

14   before I cut Ken and Camille loose -- and of course you're

15   always welcome to stay for the rest of the party, if you want

16   to, but I doubt you want to -- does anybody want to raise

17   anything specific to, you know, the program that they are

18   running?  Does anybody have any questions or statements they

19   want to make to me while Ken and Camille are still here?

20           MR. STEKLOFF:  Your Honor, on behalf of Monsanto, I'll

21   just say that we echo the success of the program.  I think

22   you'll see and I know we're going to talk in a moment about the

23   docket control order that Monsanto proposed, but we think it's

24   important to not only keep the program in place through the

25   closure of the remaining cases that Special Master Feinberg is

working on now but to have a mechanism in place even if he

decides and you decide to -- to sort of let him go, as I think

has been hinted at here.

I think -- I think that -- I agree with Your Honor that we

don't need to decide that today, but I think it would be very

helpful for us to actually work with Special Master Feinberg.

I'm thinking of proposals for Your Honor along those lines.  I

think we're all prepared to go in front of Judge Tse.

I know there are some discovery disputes that are popping

up, but you can also tell that I think a lot of work goes into

dealing with these claims from Special Master Feinberg and his

colleagues, and I just -- I don't think we, at least on behalf

of Monsanto, want to overburden Judge Tse with sort of a

similar process, but we do think that a similar process is very

important and very valuable to the litigation, given the

success we've seen through what's already occurred and what we

think will be continuing success in a similar or -- or

continued program, maybe even with a different Special Master.

So I just want -- I wanted to thank Special Master

Feinberg and Camille and the rest -- they have others on their

team that are working on this, but I also think I just wanted

to say that, that I think we should work with Special Master

Feinberg to think about if the transition is going to occur,

how that might occur as we also work through these remaining

claims.

1       **THE COURT:**  Okay.

2       Any other comments or questions from anybody on this

3  topic?

4       **MR. WISNER:**  Your Honor, Brent Wisner.

5       I think from the plaintiffs' side, there is -- we're at a

6  bit of a disadvantage, right?  The negotiations and settlements

7  and interactions with the Special Master are between Monsanto,

8  who has insight into everything, and we don't have insight into

9  what's happening.  And I think the only thing that I would ask

10  is we're going to look to the Court for oversight and whether

11  or not it's working or not.  We really don't know.  I don't

12  know what these settlement offers actually look like.  I don't

13  know why they're being rejected.  And it would be nice if there

14  was maybe an in camera review by the Court just to make sure

15  that it is making financial sense to continue, you know, to

16  have the -- the famous Mr. Feinberg handling these settlements

17  or not.  I don't know.  It might be something that the Court

18  would take a look at because we really don't have insight into

19  that.  We just write checks.  You know what I mean?

20       **THE COURT:**  I understand what you're saying.  And as

21  leadership counsel, it would be helpful for you to have, you

22  know, insight and input into the process.

23       On the other hand, it's not a class action, and I don't --

24  you know, I mean, if somebody comes to me and says -- both

25  sides come to me, you know, an individual plaintiff and

1    Monsanto and say, "We really want to settle for X amount of

2    money," I can't say no.  So I'm not -- I'm not sure, you know,

3    how much value I would add by kind of sort of looking behind

4    the curtain, so to speak, on Mr. Feinberg's program, but maybe

5    that's -- that is an argument for, you know -- involving

6    somebody who wears a robe.  I mean, maybe you would support,

7    you know, for future cases, you know, involving Judge Tse in

8    some way, but I'm mindful of what -- of Mr. Stekloff's comment,

9    that we can't burden anybody on our court with, you know, the

10   kind of heavy lifting on a claim-by-claim basis that Ken and

11   Camille and their staff have done.  So we'll just have to have

12   that conversation on an ongoing basis, I think.

13        Okay.  Like I said, we thank you both and everybody who

14   you've worked with, and you're free to hang out, if you want,

15   but you're also free to go, if you like.

16            **MR. FEINBERG:**  Thank you very much.

17            **MS. BIROS:**  Thanks very much.

18            **MR. FEINBERG:**  Thank you.

19            **THE COURT:**  Thank you.

20        Okay.  I'm not sure what the next thing to discuss is.

21   Maybe we should have a discussion of the competing proposals

22   that you have in your -- in your statement.

23        I guess maybe let me start with Monsanto's proposal.  I

24   mean, everybody has to do a plaintiffs' fact sheet, right,

25   already.  We have the fact sheet requirement.  I don't know --

1    I don't know exactly what a Lone Pine order is in comparison to

2    the requirement that somebody provide a fact sheet, and, you

3    know -- you know, I don't know the precise definition of a

4    "Lone Pine order," but it seems -- it seems to me that we're

5    already requiring plaintiffs to provide, you know, sort of

6    towards the front end basic information about their cases.

7        I think you said you want to require quite a bit more,

8    including the identification of a specific causation expert.

9    Did I -- did I read that right?

10           **MR. STEKLOFF:**  Yeah.  I think not only the

11   identification, but a report from a specific causation expert

12   opining that Roundup was the -- I mean, I realize the standard

13   is different everywhere, but, you know, was a substantial

14   contributing factor in the plaintiffs' development of NHL.

15           **THE COURT:**  I mean, I guess I had -- I had a fairly

16   negative reaction to that proposal because it strikes me as a

17   little too heavy-handed, particularly -- I mean, my sense --

18   and maybe the plaintiffs can speak to this -- but my sense is

19   that given the number of cases out there and the relatively

20   limited number of specific causation experts, it's probably

21   hard to -- hard to get a specific causation expert,

22   particularly if we're going to be asking plaintiffs to do it

23   at -- all plaintiffs to do it at the front end.

24       I mean, it's a lot of work to be a specific causation

25   expert, at least if you're going to be a good one, and, you

know, I mean, they need to prioritize their cases and, you
know, lead counsel needs to presumably help them in
prioritizing their cases.  And to just say all of a sudden that
everybody needs to have a specific causation expert and needs
to submit a report -- I mean, it seems burdensome.  It also
seems like the kind of thing where you would be sort of -- it's
really kind of a trap for plaintiffs because inevitably the
reports, if they're demanded at an early stage like that,
they're not going to be nearly as good.  There are going to be
mistakes.  Then there are going to be all these fights about
who -- whether the expert needs to be held to what was
disclosed in that very early, you know, report that they --
they submitted.  I mean, I -- I'm somewhat reluctant to make
plaintiffs do more than what they do now.

     What I can't remember is when -- under -- under our
current system, when are plaintiffs required to file their fact
sheets?  Is that only when they get put in a wave and then
there is a deadline for submitting a fact sheet in a particular
wave, or does everybody have to do it at the beginning of the
case?

          **MR. STEKLOFF:**  I believe they have to do it at the
beginning of the case under the -- under the orders you've set
forth.

          **THE COURT:**  So -- so -- I mean, given what I just
said -- and I don't know.  Maybe the plaintiffs will disagree

1    with me and say the world is crawling with specific causation

2    experts for these plaintiffs, but, I mean, why do I -- why

3    should we require more of individual plaintiffs up front than

4    what we're already requiring?

5            MR. STEKLOFF:  I think the reason is -- well, I think

6    using Wave 4 is the best example, Your Honor.

7        So Wave 4 right now -- and you broke it into subwaves --

8    A, B, C and D -- given the original number of -- large number

9    of cases at our request.  So we're in sort of the expert phase

10   right now of Wave 4 and the fact discovery phase of Wave 5.

11           THE COURT:  Okay.

12           MR. STEKLOFF:  And in Wave 4 alone, we have had 14 --

13   and I'm just looking at -- and this is on page 2 of the case

14   management statement -- 14 dismissals.  Nine were voluntary.

15   One was for a failure to provide the plaintiff fact sheet.  And

16   four were for the failure to comply with another pretrial

17   order.  We've had three that we are moving to dismiss for

18   failure to provide expert reports.

19       And then I would also say Your Honor has seen that there

20   have been 63 cases that have moved to Wave 5 or Wave 6 -- you

21   sign the orders, I think, weekly -- at the request of the

22   plaintiffs.  And we have not opposed those movements.  But I

23   think what we are seeing is that there are a number of cases

24   that -- that -- some where fact discovery occurs and -- and

25   there's burden on both sides to take the depositions of

1    plaintiffs and treaters and family members, and then we can

2    reach a point where we realize either through settlement,

3    through Special Master Feinberg, or otherwise, but also through

4    failures to come forward with the right type of expert, or I

5    think in some of the cases where the waves -- where they

6    requested movement to another wave, in part it's because they

7    may have a hard time, you know, finding their client.  Their

8    client may not, in fact, have Non-Hodgkin's lymphoma.  They may

9    have alternative causes --

10           THE COURT:  But why doesn't -- I mean, these are the

11   things, kind of, that you -- you said to me many years ago in

12   support of -- of a requirement that the plaintiffs submit a

13   fact sheet at the beginning of the case, and I would think that

14   that would, you know -- that would help root out a lot of the

15   issues that you're talking about right now.

16           MR. STEKLOFF:  Well, I will just say -- and we have

17   seen this, even in some of the recent trials in which Monsanto

18   has prevailed.  I mean, we get fact sheets, and then they

19   change four or five or six times.  And also, I think, we find

20   fact sheets where the facts that are -- that are attested to in

21   the fact sheets are then not backed up by what happens in --

22   when we get medical records, when the fact depositions of the

23   treaters go forward.  And so the fact sheets are -- and I

24   understand that there is an affirmation by the plaintiffs and

25   the lawyers involved, but they don't always match up what ends

1    up happening with the case.

2         And so I think the reason -- and I understand that there

3    is a burden to put it on the plaintiffs up front, is because it

4    will then allow the parties to focus on the cases where there

5    are valid claims, where the plaintiffs' exposure is sufficient

6    for, you know -- whether it's Dr. Riesenberger or -- there are

7    a lot of other specific causation experts who have now been

8    identified across the country in state court cases, let alone

9    in the MDL waves -- for them to come forward and say having

10   looked at the alternative risk factors and otherwise, that they

11   think NHL is related.

12        And for us to go through the fact discovery phase only for

13   that not to occur seems like a poor use of the parties'

14   resources.  And so I think it is an efficiency mechanism to

15   actually narrow the number of cases and allow -- it's almost

16   like a prima facie showing that goes necessarily beyond the

17   plaintiff fact sheet, that this is a valid case that the

18   parties should be working up through fact discovery and expert

19   discovery.

20             **THE COURT:**  Well, but, I mean, you know, to -- to the

21   extent your goal is to eliminate, you know, doing discovery and

22   litigation on cases that are totally lacking in merit, I mean,

23   that's just an unrealistic goal.  Like, that's the nature of

24   litigation.  We have cases that are totally lacking in merit,

25   and, you know, you end up having to, you know -- to litigate

1   and have discovery battles in them and all that.  I just -- I

2   think -- your proposal strikes me as, like, perfect being the

3   enemy of good.

4       **MR. STEKLOFF:**  Yeah.  And I understand that we all --

5   I mean, we filed motions to dismiss, right, that are granted,

6   and maybe it makes the (inaudible) motion to dismiss and a

7   party prevails on summary judgment, but in an MDL context --

8   and I think we cited a number of other litigations where an

9   order has been entered in an MDL in products liability or mass

10  tort situations at a sort of similar stage of the litigation.

11      I think in this litigation specifically, particularly

12  given the history of the litigation, there were a lot of

13  invalid cases that were filed that are being warehoused in the

14  MDL, and this is a mechanism to try to eliminate those cases

15  and also avoid those cases being filed in the future.

16      **THE COURT:**  But it seems like those cases -- I mean,

17  it seems like those cases are being weeded out, maybe you're

18  saying they could be weeded out earlier and, you know -- and

19  more efficiently, but at what expense?  You know, I think

20  the -- the cost is that you're imposing a significant and

21  potentially, you know, insurmountable burden on some plaintiffs

22  to, you know, make a stronger and more detailed and more

23  expensive showing at the outset of the litigation.

24      So I'm -- I think I'm -- I think -- I think, you know, we

25  could think about whether -- I mean, I think you should look at

1    sort of the history of the -- of the -- of the MDL and the

2    cases that were totally lacking in merit and how they were

3    discovered and when they were discovered and see if, you know,

4    there's a proposal you can make for tweaking the fact sheet

5    that would help you weed out, you know, frivolous cases earlier

6    without imposing much more of a burden on plaintiffs at the

7    front end.  I think that's what you want to be looking at.

8             MR. STEKLOFF:  Okay.  I hear you, Your Honor.  I mean,

9    we did -- we'll go back to the sort of drawing board.  We

10   have -- we had an affidavit that we submitted as part of the

11   docket control order at the end of Exhibit C to the case

12   management statement.  So something along those lines we may

13   come back to the Court -- I defer to you on timing -- to

14   propose that something along those lines, even if you're not

15   going to require a rule -- you know, an expert -- a specific

16   causation expert report could supplement the plaintiff fact

17   sheet.

18        We also, I think, could propose that a stronger proof --

19   you know, some medical records -- maybe not -- I understand we

20   requested more -- but some medical records establishing

21   actually a diagnosis of Non-Hodgkin's lymphoma and maybe

22   stronger proof of Roundup use.

23        So there might be things that we could do that I think

24   would be less burdensome and maybe less costly.  I hear what

25   Your Honor is saying.

1    **THE COURT:**  That stuff currently is part of the

2    Feinberg program; right?  So, again, people are being asked to

3    provide that kind of information on the early side right now

4    through the Feinberg program.

5        But, you know, maybe it makes sense to, you know -- we're

6    going to have some new program, you know, in the not-to-distant

7    future, and maybe it makes sense to tweak the plaintiff fact

8    sheet in conjunction with that.

9        **MR. STEKLOFF:**  Okay.

10    **THE COURT:**  More maybe like to -- you know, for the

11   next wave, we can say that the -- we can change the fact sheet

12   for the next wave, for example, and we can talk about the next

13   wave in a minute.

14       But that's -- I think that's the kind of thing really that

15   we're looking at.

16    **MR. STEKLOFF:**  Okay.  I understand, Your Honor.

17       We'll -- should we set a deadline for us to propose

18   something, or do you want to wait until the next case

19   management conference?  I defer.  Or just should we continue

20   the discussion --

21    **THE COURT:**  Yeah.  Kind of -- can we bookmark it, and

22   maybe when we get to the next wave, we can -- we can see if it

23   makes sense to change the fact sheet for the next wave of

24   plaintiffs?

25        **MR. STEKLOFF:**  That's fine.

1      **THE COURT:**  Okay.

2      And then for the plaintiffs' -- the plaintiffs propose,

3   you know, basically wrapping up the MDL and sending all the

4   cases back.

5      And Monsanto's response to that seems to be, well, if you

6   send that many cases back to their home districts, that's kind

7   of a failure of the MDL, and that's not supposed to be how it

8   works.

9      I don't have a lot of sympathy for Monsanto's response.  I

10  think that -- you cited the statistic, which I found very

11  interesting, about the number of cases in MDLs that have been

12  remanded in the Ninth Circuit overall since, like, 1968 or

13  something like that.  What was the statistic?

14     **MR. STEKLOFF:**  The number was in the 700s, Your Honor.

15  I can find the exact statistics.  And I think you would be

16  remanding more than that number or -- or very close to that

17  number if you followed the plaintiffs' proposal.

18     **THE COURT:**  Yeah.  Yeah.  Right.  So -- so here.  I

19  found it.

20     So you said, by way of example, as of September 21 --

21  2021, the total cases remanded in the Ninth Circuit for all

22  Ninth Circuit MDLs from 1968 to the present was 797 cases.

23     I was amazed to see that statistic, but I think that

24  statistic probably suggests that the MDL system isn't working

25  very well.  I think -- I think that suggests that cases are

being sent to these MDL judges, and the judges are holding on to the cases for too long.

And plaintiffs' counsel and plaintiffs get the message that your case is just going to sit around forever, and it's never -- you're never going to get a trial, so you might as well just settle.  And the cases settle, and that's why such a minute number of cases have been remanded to their home districts in the Ninth Circuit since 1968.

I think that is a suggestion -- that statistic suggests that there may be something really wrong with the MDL process from the standpoint of making sure that plaintiffs have an opportunity to get their claims litigated and adjudicated as opposed to just being kind of forced to settle them.

But -- so I have -- I do have sympathy for the plaintiffs' sentiment, for the sentiment behind the proposal to just kind of suggest that all the cases get sent back now, but I do think it's too -- I think it's too early for that.

I think that, you know, there is -- we've seen, just in recent -- you know, just in like the last year or so, right, there are individual specific causation issues that are difficult to -- to adjudicate that come up in these cases.  There are individual questions of law that come up at summary judgment like the Texas -- that Texas statute, you know, conferring immunity on a defendant if the product goes through the federal regulatory process.  I don't remember the details.

It was a while ago.  But that was a dispositive -- potentially
dispositive legal issue that could affect a lot of these cases
in Texas, and those are the kinds of things -- I mean, I
strongly believe that it is not the job -- it's not -- it's not
the job of the MDL judge to make sure these cases settle and to
do anything possible to -- to sort of force everybody to
settle, and I do not believe that it -- a lack of settlement
means a failure.  And, like I said, I think there are -- you
know, I think there are some problems with the MDL system on
that issue.

       But -- but it is the job of the MDL judge to get these
cases ready for trial, and these are things that I can do --
you know, adjudicate questions relating to specific causation,
adjudicate questions of immunity, you know, under that Texas
statute, or I'm sure there are a number of other similar
questions or issues that come up in cases from other states.
And I think that is, you know, the job of the MDL judge.

       So I think -- I guess I think that Monsanto's proposal for
how to tweak the system goes too far in one direction, and your
proposal for how to change things goes too far in the other
direction.  I assume -- I guess this is a question for
plaintiffs.  I presume that between Monsanto's proposal and the
current system, you would prefer the current system, the
current wave system.  And I assume that for Monsanto, between
the plaintiffs' proposal for sending all the cases back to

1   their home district and wrapping up the MDL and the current

2   system, you would prefer the current system.  Does anybody

3   disagree with what I just said?

4           **MR. WISNER:**  Sounds right, Your Honor.

5           **THE COURT:**  Okay.  So -- and the current system is, I

6   think, by MDL stands -- I mean, you can correct me if I'm

7   wrong -- but I think by MDL standards, we are moving these

8   cases along pretty quickly and getting these cases ready for

9   trial pretty quickly and sort of getting them ready to send

10  them back to their home districts for trial pretty quickly,

11  and, you know, I think that we should keep doing that.

12      I'm always -- I'm always open to suggestions for how to

13  make the process more efficient, make it move the cases along

14  even faster.  And I've got one suggestion that I'll give you in

15  a minute, but I -- you know, I think we should more or less

16  stay the course.

17      So what -- does anybody have any strong pushback to that?

18          **MR. WISNER:**  Your Honor, not pushback, but I just want

19  to put out there sort of a conceptual issue; right?

20          **THE COURT:**  You can pushback.  You can call it

21  pushback.

22          **MR. WISNER:**  All right, Your Honor.  I'm pushing back.

23      And the issue is this.  The -- the issues that you're

24  dealing with now are regional and specific by their nature;

25  right?  The big issues, the -- the -- how we assess general

1    causation evidence, preemption, they have -- they've come to

2    rest, and these ones that have had monumental fights in this

3    Court and courts above us and what have you have come to a

4    place where we're done.  The general work, the common discovery

5    is largely complete.  We're wrapping up some stuff right now in

6    discovery, but -- but for the most part, it's -- it's -- it's

7    done.

8         And so by its general nature, what is the sort of legal

9    rubric by which you're going to say okay, now it's getting to

10   minutia and it really is -- where is that line?  Because I -- I

11   don't know --

12             **THE COURT:**  That's a fair -- that's a fair question.

13             **MR. WISNER:**  When we see it, I don't know, but I would

14   submit that, you know, even when it comes to, for example,

15   expert reports or what or getting a case resolved or, frankly,

16   getting it to trial, the single greatest motivator is always

17   setting a trial date for that case.  Deadlines crystalize,

18   actions -- people -- frivolous cases disappear very quickly.

19   And the only way to do that in the MDL is to remand them.

20   That's why -- that's our instinct.  Send them all home and set

21   them to trial.  And --

22             **THE COURT:**  But the question -- but you said "send

23   them all home and set them for trial."  I mean, the -- if you

24   send them home without having done the pretrial work, it's

25   going to take a lot longer for them to get to trial when they

1   go back home; right?

2       And so given the expertise that I've developed on the

3   issue of causation, for example, like is it going to take a

4   shorter -- if we send all the cases home and we have several

5   hundred judges in the federal judiciary needing to learn the

6   ins and outs of, you know, specific causation as it relates to

7   Roundup, you know, are the trials going to happen sooner, or is

8   it going to take longer for the trials to happen?  It's not --

9   it's not clear to me.

10          **MR. WISNER:**  Well, I would submit for those --

11          **THE COURT:**  Assuming we -- we work up -- in the MDL we

12   work the cases up quickly.  We don't let, you know, the

13   mediation program interfere with getting them worked up

14   quickly, and then send them -- you know, and then send them

15   back in waves quickly.  I mean, why -- why should we assume

16   that they would get to trial sooner if we just sent them all

17   back right now?

18          **MR. WISNER:**  Well, I think the plaintiffs in Wave 50,

19   right, probably would go to trial sooner; right?  I mean,

20   that's just the function of logistics and time and resources --

21          **THE COURT:**  Well, that -- that -- that -- that is a

22   good point, but, you know, to the extent that you're suggesting

23   that there are some plaintiffs currently in the MDL who are

24   going to be in Wave 50, they're not because how many -- how

25   many cases do we have left that are not part of Wave 5 or

1   Wave 6?  How many cases do we have in this MDL that are not

2   part of Wave 5 or Wave 6?

3          **MR. WISNER:**  Well, that's -- that was one of the

4   points that we made, and it's just a function of new cases keep

5   coming in.  They'll --

6          **THE COURT:**  Right, but that's not -- I mean, they

7   haven't been filed yet.  There's nothing I can do.  There's

8   nothing anybody can do.

9          **MR. WISNER:**  I agree with that.

10         **THE COURT:**  So the cases in Wave 50, you know, will

11  they -- you know, will they be tried sooner -- so you're saying

12  the case in Wave 50 might be filed five years from now, and

13  will it be tried sooner if it comes to the -- if it becomes

14  part of the MDL and worked up and then sent out, or will it be

15  tried sooner if it just gets filed in the home district and

16  then worked up by a judge who doesn't know anything about

17  Roundup causation?  I don't know the answer to that.  I'm not

18  sure that it will get tried sooner --

19         **MR. WISNER:**  Well, we have some insight; right?  So

20  there have been cases that have been remanded.  Okay?  They get

21  assigned to a judge.  It takes -- it has taken up to a year to

22  get before a judge after they had been remanded, and then the

23  first thing we have to do is redo a lot of the workup already

24  because new studies came out or the client's health took a

25  turn --

1    **THE COURT:**  Let me ask you that.  The cases that are

2    being remanded, you know -- I can imagine if some, you know,

3    solo practitioner, plaintiff's lawyer who is not really engaged

4    in their client's case, has their case remanded, say, to

5    Eastern District of California -- you could imagine it's

6    sitting there for a long time; right?  But -- but it's sort of

7    on plaintiffs' leadership counsel, I think, to help make sure

8    that that case gets teed up for trial, probably; right?

9        So have you been helping these lawyers get their cases

10   teed up for trial in these districts?

11   **MR. WISNER:**  I personally have not, but I know

12   leadership has.  I know Ms. Greenwald, for example, has been

13   intimately involved in helping them get their cases teed up for

14   trial, and it's been difficult; right?  Which is fine.  But

15   there is just a logistical -- the machinery of the courts is

16   what it is, and so by the time --

17   **THE COURT:**  Mr. Wisner, could I interrupt you for a

18   second just to say one thing?

19       We had a bunch of other case management conferences

20   scheduled for 1:00 p.m., so just for those -- for the lawyers

21   who came on at 1:00 p.m. expecting to start their case

22   management conferences, we will start those when we wrap up

23   this mega case management conference.  Hopefully not too much

24   longer, but we have a couple other things we need to talk

25   about.

1        Sorry.  Go ahead, Mr. Wisner.

2             **MR. WISNER:**  Not a problem, Your Honor, and I'll just

3    be quick about it.

4        Because of the machinery and because of the logistics of

5    discovery and the fact that people's lives change and new

6    damages arise and prognoses change and all these things, it

7    requires new experts' disclosures or amended or supplemented

8    expert disclosures which then leads to another *Daubert*

9    challenge invariably.

10       And so while I don't say that the wave system is not going

11   to work, it does have its limitations.  And I don't know --

12            **THE COURT:**  And it should have -- it should have a

13   shelf life; right?

14            **MR. WISNER:**  Exactly.

15            **THE COURT:**  Right.  It shouldn't go on in perpetuity.

16   I agree with that.  And I -- and I share your concern that it

17   might be hard to figure out exactly when we've crossed that

18   line into the minutia and we should wrap up the MDL, but I do

19   feel like for now, it's not -- you know, it doesn't seem -- it

20   doesn't seem like the right time.

21       And I do feel fairly confident that we, in this MDL, can

22   continue to get the cases worked up fairly quickly and sent

23   back to their home districts fairly quickly.

24       And on that note -- I can't remember how many -- let me

25   see.  What are there, like, maybe two or three hundred cases,

1    individual cases in this MDL that are not already part of

2    Wave 5 and 6?

3            **MR. STEKLOFF:**  I think it's 315, Your Honor.  It's on

4    the top of page 2 of the case management --

5            **THE COURT:**  So let's -- let's put all of those cases

6    in the next wave.  Then every -- every case in the MDL has a

7    litigation schedule of its own and there will be some

8    plaintiffs who -- or their lawyers who don't want to move it

9    along that fast and they want to get out of the wave or

10   whatever, and if they do, I suppose that's fine, but for

11   anybody who is anxious to get their case worked up and anxious

12   to go to trial in relatively short order, they'll have a

13   schedule.

14           **MR. WISNER:**  Your Honor, I think that sounds pretty

15   reasonable.  I mean, I think the only concern -- and I will

16   just flag this -- is the amount of work that will be on your

17   end because it's not going to be all from the same state.  It's

18   going to be every -- every -- every immunity, every statute --

19           **THE COURT:**  Yeah.  But the more work that I've done on

20   it, the easier it gets to do the work going forward.  So it

21   will be a lot of work for you all and it will be a lot of work

22   for me.  I made the mistake of signing up for it, and so did

23   you, although this turned out not to be much of a mistake for

24   you, I suppose.

25           So I -- I think what I would propose is that you all get

1    together and confer on a -- on a schedule for the 7th wave of

2    cases.  Every case in the MDL that has not been placed into a

3    wave already, does not have its own litigation schedule

4    already, will be placed into Wave 7.

5        I think it sounds like it might be a good idea to take the

6    opportunity to figure out if there are any changes that can be

7    made to the fact sheet requirement that don't impose too much

8    more of a burden on individual plaintiffs but maybe improves

9    the ability of the fact sheet to weed out -- fact sheet

10   requirement to weed out frivolous cases at the beginning.  And

11   we -- we can -- we can plow ahead.

12       So when do you want to give me a schedule for the Wave 7?

13       **MR. WISNER:**  Does the next status conference in

14   anticipation of that make sense, or do you want us to do it

15   sooner, Your Honor?

16       **THE COURT:**  It sort of depends on when the next status

17   conference is.

18       **MR. WISNER:**  Fair enough.

19       **THE COURT:**  Do you want to have another status

20   conference in a few weeks and do it then?

21       **MR. STEKLOFF:**  I defer to Your Honor whether you want

22   a status conference.  I think if you gave us two weeks or so,

23   we could propose something.

24       I suspect -- I mean, we have a template now, so I suspect

25   we can take the distance between Wave 5 and Wave 6 and then

1    apply it to Wave 6 and Wave 7 and come out -- (Whereupon, Mr.

2    Stekloff's Zoom feed froze.)

3         **THE COURT:**  You were cutting off there, at least for

4    me.  Did he get cut off for everybody else?

5         **MR. WISNER:**  Yes, Your Honor.

6         **THE COURT:**  Now he's frozen.

7         **MR. STEKLOFF:**  As to Wave 7.  I don't think there will

8    actually be many disputes to be made to improve the plaintiff

9    fact sheet, so I was going -- I apologize.  My bad.  My

10   Internet is unstable.

11      I was going to say that I just think there won't be many

12   disputes about the schedule.  There may be --

13        **THE COURT:**  Okay.  Well, why don't you --

14        **MR. STEKLOFF:**  -- disputes about the plaintiff --

15   plaintiff fact sheet, but I don't think there will be disputes

16   about the schedule.

17        **THE COURT:**  Okay.  So why don't you -- why don't you

18   submit a proposed schedule for Wave 7 that will include all

19   remaining cases in the MDL.

20      And, by the way, you know, I -- I assume you don't want

21   the schedule for Wave 7 to step too much on the toes of the

22   schedule for the earlier wave, so it may be -- you know, Wave 7

23   may be for every case that's currently in the MDL and every

24   case that comes in in the next, what, three months or something

25   like that.

1          So -- so why don't you -- and -- so why don't you talk

2     about how much time makes sense.  Like every case that comes

3     in -- every case that comes in over the next six months or

4     three months or one month or whatever will be in Wave 7 and

5     submit a schedule, proposed schedule, 14 days from today for a

6     revised fact sheet.

7          Do you want to submit either a proposed revised fact sheet

8     or competing revised fact sheets also within 14 days?

9               **MR. WISNER:**  That sounds good, Your Honor.

10              **MR. STEKLOFF:**  That's fine, Your Honor.

11              **THE COURT:**  Okay.  And then should we get a -- why

12    don't we get another status conference on calendar.  There may

13    be other things to talk about.  I'm happy to talk about

14    something else if you need to, but why don't we get another

15    status conference on calendar for like -- I don't know.  Maybe

16    November something.  Does that sound about right?  Okay.

17              **MR. WISNER:**  Or maybe a little earlier, Your Honor, if

18    we're going to be discussing this issue.  Mid October makes

19    sense if we are going to be submitting everything in 14 days.

20              **THE COURT:**  Well, I don't know if we'll be discussing

21    it.  I mean, I think if I need to discuss it with you, I

22    will -- I'll -- I'll schedule something with you much earlier.

23    That's what I was -- that's what I was thinking.

24              **MR. WISNER:**  Gotcha.

25              **THE COURT:**  So that's why I was proposing November,

and we could do like -- I'm looking at my trial schedule here.
What about like the 9th?  The 9th at, say, noon California
time.

            **MR. WISNER:**  Your Honor, that shouldn't be a problem,
I'm actually starting a Roundup trial on the 7th.

            **THE COURT:**  Oh, yeah?

            **MR. WISNER:**  State court.

            **THE COURT:**  Which one?

            **MR. WISNER:**  It's the Langford case.  It's in state
court in San Francisco so I'll be down the street.

            **THE COURT:**  Okay.  Good.  All right.

    Let's see.  Is there anything else -- let me look at my
notes.  I think I had a couple other things.

    Oh, yeah.  The issue -- you're -- not so small.  It does
seem to me that at some point, you know -- and I'm not talking
about this MDL.  I'm talking about MDLs generally.  That at
some point, you know, leadership counsel might lose the
incentive or energy or whatever to continue to make sure
everything's going well in the MDL.  And -- well, for
plaintiffs in the MDL; right?

            So, for example, we had, you know, those bellwethers, and
Mr. Gabayu (phonetically) was one of the bellwether cases;
right?  And it struck me, just from my observations, that
leadership counsel was doing a good job of helping Mr. Gabayu's
lawyer get his case ready for trial and deal with summary

1   judgment and stuff like that; right?

2        And I guess maybe -- I've come to view that as sort of

3   part of leadership counsel's job.  I mean, maybe it's -- maybe

4   it shouldn't be.  I don't know.  I'm not sure.  But, like, you

5   know, then I was thinking to fast forward several years, and,

6   you know, you have those Texas motions that I was talking

7   about, the immunity issue and the summary judgment papers from

8   the plaintiffs on -- and I don't think it was any of your

9   clients; right?  It was just, I think, random lawyers from

10  Texas who were handling that, and they did a terrible job;

11  right?  And they missed a number of, you know, important

12  arguments that could have ended up being, you know, the death

13  of their clients' cases.

14       And so, you know, that and a couple other things have

15  gotten me thinking, like, is it, you know -- do -- do the --

16  you know, you all have done a good job up to now.  Do you still

17  have the incentive, the inclination to serve as leadership

18  counsel?

19            **MS. GREENWALD:**  I --

20            **MS. WAGSTAFF:**  So, Your Honor --

21            **MS. GREENWALD:**  Go ahead, Aimee.

22            **MS. WAGSTAFF:**  I was going to say this is Aimee

23  Wagstaff.

24       I think that we all do.  After your last order, you know,

25  requesting that question in particular, we got together, and I

1    think our CMC statement shows that we are actively still

2    litigating this case.

3         Mr. Wisner is going to trial in November.  I'm going to

4    trial in January.  Mr. Dickens is going to trial in also

5    November.

6         I think at -- at most, which we may want to entertain, as

7    you may recall that back in 2016 or '17 when this was formed,

8    we never added a PSC.  At most, we could add people, but I

9    think that, you know, as shown through the trials throughout

10   the state courts, which you haven't really been a part of, you

11   know, the success at trial has come from the group on this

12   Zoom, right, for the plaintiffs' side.  And I think it's easier

13   to know the case when you built the case.  So I think that

14   removing us as leads or having us not play an active role would

15   not benefit the plaintiffs in this litigation.

16        **THE COURT:**  That -- I think that's probably right.

17   And I -- I want to -- I want to make clear that my -- my

18   question did not stem from any, you know, particular concern I

19   had.  It's more just a general -- I mean, I think some of the

20   MDL reformer types in academia propose that that's -- you know,

21   that's something that judges should do, is replace leadership

22   counsel after they've made enough money to buy their own

23   island, as I've said in other contexts.

24        But I -- I guess I just want to get a commitment from you

25   all that you are going to continue to be sort of responsive and

1    responsible about docket management, that you are going to

2    continue to kind of look over people's shoulders who might not

3    have the resources that you have to make sure that, you know,

4    some solo practitioner lawyer isn't shooting their client's

5    case in the foot, things like that.

6          MS. GREENWALD:  Your Honor, I have -- yes.  We are

7    more than willing to do that, but I do have one thought of

8    something that could help, is if Monsanto would serve us with

9    some of these motions when they make them.  I mean, the problem

10   is there are so many cases in the MDL when these waves come,

11   and it's hard for us to -- to go to the docket.  They're

12   oftentimes filed in individual dockets, and we, of course, have

13   our own cases as well.  And if we got served with them as sort

14   of courtesy copies, it would really help us to know when one of

15   these heady issues is coming up, like the one in Texas, which,

16   by the way, was also heard by a Texas judge, and we did help

17   that lawyer when it got there.

18        So I'm sorry we weren't there to help you.  I really am.

19   I didn't know about it.  I openly confess, I was not aware of

20   that motion when it was before you, and probably we should have

21   been.  But we didn't get served with it.  We're not on any kind

22   of --

23          THE COURT:  But --

24          MS. GREENWALD:  We're not -- I'm sorry.

25          THE COURT:  I was just going to say, it seems like,

1    you know, to use that as an example, you know, I should be able

2    to look -- in a situation like that, I think I should be able

3    to look to leadership counsel as -- to play sort of an amicus

4    role or something like that; right?

5            MS. GREENWALD:  Right.  Agreed.

6            MS. WAGSTAFF:  And, Your Honor -- oh, I thought I was

7    on mute.  Sorry.

8        A couple of case management conferences ago we submitted

9    to you something called, I think it was, a contact information

10   sheet or something like that, where when people filed the case,

11   they would let us know what cases they had, who to contact,

12   and, you know, we're trying to distribute information to

13   people --

14           THE COURT:  You asked me to -- you asked me to order

15   people to provide you?

16           MS. WAGSTAFF:  Yes.  Right.

17           THE COURT:  I will do that.  I have that pending.  I

18   will sign that.

19           MS. WAGSTAFF:  If you would like us to resubmit the

20   actual sheet, we will, but that would help a lot, if you would

21   do that.

22           THE COURT:  We'll let you know if we need it.  I think

23   we have it, and I was just letting it sit until this

24   conference.

25           MR. WISNER:  I would also say, Your Honor, I think

1   your concerns are well met.  I mean, you're right.  When you no

2   longer represent any clients from the individual level, your

3   incentives for others may decrease.  I don't think we've hit

4   that point yet.

5        And I do think it's a good idea -- and I've advised other

6   judges in other MDLs to the same effect -- to reassess

7   leadership whenever you have any concerns.  You know what I

8   mean?  Because that's something that's a big part of making the

9   case move forward.

10        I think right now we're all working really good.  We have

11   a really good team still.  We're still playing well in the

12   sandbox, but I think that's something that, you know, is a

13   well-met concern.  I just don't think we're there yet,

14   Your Honor.

15        **THE COURT:**  At what point, by the way, should people

16   be able to make claims from the common benefit fund?

17        You know, we -- you know, there's this idea of this case,

18   like, kind of going -- continuing in perpetuity; right?  But at

19   some point the lawyers who have done common benefit work should

20   be able to make a claim for -- for, you know, funds, even if

21   it's not a claim for all of it.  You know, even if we're -- if

22   we're not resolving -- if we're not disbursing everything from

23   the common benefit fund, I mean, it seems to me that people

24   should be able to get ongoing compensation.

25        And similarly, you know, maybe we can -- you know, some of

1   that eight percent holdback, you know, can go to the

2   plaintiffs -- the individual plaintiffs who -- for whom it was

3   held back or the individual plaintiff lawyers or whatever from

4   whom it was held back.

5       Should we -- this is something I haven't given a ton of

6   thought to, so, you know -- and we don't need to decide

7   anything now, but should we be waiting until we're ready to

8   wrap up the MDL before we deal with the common benefit fund at

9   all, or should there be, you know, kind of interim, you know,

10  withdrawals from the common benefit fund?

11      **MS. WAGSTAFF:**  So, Your Honor, I think that most of

12  the common benefit work, the bulk of the hours, are done;

13  right?  I mean, people, I think, are still doing common benefit

14  work, and especially for those of us staying on to help the

15  lawyers sort of in an amicus role, as you said, is definitely

16  common benefit work.

17      I think the first step is back when you ordered a common

18  benefit order, you know, five, six, seven years ago, you know,

19  you ordered -- you probably don't remember this, but on the

20  15th of every month, we are to submit a spreadsheet of our time

21  to a particular place.

22      I think the first step is sort of auditing those so that

23  you can figure out who can make a claim and for what, right,

24  and using your new orders of no state court time and that sort

25  of thing, because I don't --

1      **THE COURT:**  Should we wait -- by the way, you all

2   appealed or somebody appealed my common benefit ruling; right?

3   The holdback ruling?

4      **MS. WAGSTAFF:**  I don't -- some people did, yes.  I

5   don't think we need to wait to audit that, to audit the hours.

6   I think that is sort of separate and apart from the appeal.

7   Because the auditing could take, you know, months to do.  And

8   so that would be something -- it actually comes to an email

9   account at my law firm.  And so, you know, gathering --

10      **THE COURT:**  Maybe you should do it.

11      **MS. WAGSTAFF:**  I'll do it.  I'll -- I'll make my

12   recommendation in 14 days.

13      **THE COURT:**  I assume I should appoint somebody for

14   that.  I'm kind of thinking that Ken -- it's probably, like,

15   not something we should use Ken -- Ken's time -- I mean, Ken's

16   time is better -- probably better spent on other things, but I

17   probably should appoint somebody to do that; right?

18      **MS. WAGSTAFF:**  Yes.  So, Your Honor, I would request

19   that you let the -- the plaintiffs' leadership maybe submit a

20   proposal to you, and we could do that within 14 days as well.

21      **THE COURT:**  Yeah.  I mean, I don't know how soon this

22   needs to happen, but you're welcome to submit a proposal

23   whenever you like.

24      **MS. WAGSTAFF:**  Okay.  Great.  Thanks.

25      **THE COURT:**  And, like I said, that's just sort of

1    thinking out loud.  I haven't given much thought to that, but

2    as we started talking about, you know, leadership counsel doing

3    work on an ongoing basis, I mean, it does seem fair at some

4    point to let, you know -- let people make an interim claim or

5    something like that.  I don't know.  I don't know exactly how

6    it would work.

7        But --

8            **MS. WAGSTAFF:**  And -- and just another just -- because

9    we'll probably put this in the report, and it might be easier

10   if I just explain it to you, but another thing is we will

11   probably be requesting to take some of that money and use it to

12   pay common benefit expenses related to general experts or

13   something like that to help further litigation.  That's

14   probably going to be a piece of our request, because I know

15   that we've talked about that internally, how we fund that going

16   forward.  So that -- you might see that in our request as well.

17           **THE COURT:**  Okay.

18       Let's see.  Should there be -- with -- with Judge Tse and,

19   you know, the discovery stuff, should there be, you know, a

20   point person in the leadership group for that -- for -- you

21   know, like a primary contact for him and a lead person for

22   discussing discovery issues?

23           **MS. WAGSTAFF:**  I would propose that the three co-leads

24   be the point person -- point people, and then we can farm it

25   out to whoever on the leadership team is sort of of the

1    expertise related to the particular dispute.

2         **THE COURT:**  Okay.  I mean, I would sort of defer to

3    him on that, but it may be much easier for him if he has one

4    kind of primary point person who he can count on to be

5    responsive.  I know it's hard because somebody might be in

6    trial, and I get that, but I think you should, you know,

7    consider -- you should consider, you know, having a point --

8    you know, primary point person, maybe with a cc to the other --

9    you know, somebody who he can count on getting ahold of

10   promptly if he needs to.

11        The spreadsheet.  This is a comment from Judge Tse also.

12   You know, you have this monthly spreadsheet that you -- you're

13   submitting.  Could you -- could you add a column for the wave

14   number that the case is assigned to?

15        **MR. STEKLOFF:**  That's on our end, Your Honor.  We can

16   add that.

17        **THE COURT:**  Okay.

18        And then I -- provide, I think, clarity on which of the

19   cases are active and which are on the inactive.  I think that

20   is, I think, very helpful.  That's probably helpful to all of

21   us.

22        And -- let me see.  I think that covers everything that I

23   wanted to make sure to talk about.  Do you all have anything

24   else that you -- that you need to raise now?

25        **MS. WAGSTAFF:**  Your Honor, I have one question that

1   you just reminded me of.

2       For the past four or five years, the Andrus Anderson firm

3   has been submitting to your chambers every single month a

4   spreadsheet of cases that they believe are subject to the

5   common benefit order.  Is that helpful to you?  Do you want

6   that to keep going?  It seems like it's --

7           **THE COURT:**  I don't know.  I didn't -- I mean, I

8   haven't seen -- I probably saw, like, the first one that came

9   in.  Where did that come from?  Was that part of the common

10  benefit order that you all put in front of me back in the

11  beginning of the case?

12          **MS. WAGSTAFF:**  I'm not really sure where it came from,

13  but it seems like it's -- I just wanted to check in with you if

14  it was still helpful, because they have to gather a round --

15  and now that you have made an order that it's just MDL cases,

16  it would seem like --

17          **THE COURT:**  It seems like it's pretty easy to figure

18  out which case --

19          **MS. WAGSTAFF:**  Right.

20          **THE COURT:**  -- is part of the common benefit order.

21          **MS. WAGSTAFF:**  So, you know, unless Your Honor wants

22  it to keep going, I think it would be helpful to release that

23  task from that law firm.

24          **THE COURT:**  Does anybody think that there would be a

25  problem with that?  No?

1      What if -- what if the circuit disagrees and says that I

2  should have imposed the holdback on all cases -- any case filed

3  around the country?

4          MS. WAGSTAFF:  Well, Monsanto has that list of cases.

5          THE COURT:  That's true.

6          MS. WAGSTAFF:  I would assume.

7          THE COURT:  One would think.  Yeah.

8      Okay.  That's fine.  You're relieved of that obligation.

9      And then -- this sort of reminds me of when I was in the

10 San Francisco City Attorney's office, I did some -- the school

11 district was one of my clients, and there was a consent decree

12 from, like, 1972 or something.  And every year the school

13 district would submit a report to the Northern District of

14 California explaining how it was in compliance with this

15 consent decree.  And none of the lawyers knew about it.  None

16 of the judges in the Northern District of California knew about

17 it.  It just, like, found its way into the Clerk's office and

18 just sat there for, you know -- and there was this big stack of

19 them going back to like 1984 or something.

20     And it -- that's a good reminder that, you know, you all

21 should revisit all of the -- I mean, this case has been going

22 on forever.  There are all sorts of requirements that have been

23 imposed.  Some of them may be, you know -- may be obsolete.

24 Some of them may be duplicative of requirements that have been

25 imposed later.  I mean, you guys should go back and take a look

at all of that stuff and make sure that people aren't being required to do things that are unnecessary and look for ways to streamline the procedures.

All right.  Anything else?

**MR. PAREKH:**  Your Honor, just --

**THE COURT:**  Oh, sorry.  Mr. Parekh.

**MR. PAREKH:**  Just from the perspective of somebody who's not in leadership, to go back to your question about is leadership doing a good job and still has an interest, I mean, we certainly felt like they are doing a good job and have interest.  There is just a few things that would make it easier from the perspective of a non-leadership lawyer who has wave cases to go forward with this.

One is if we understood what general discovery was continuing to be done.  It's been very difficult for us to determine, for example, if there's been any 26(e) updates to the production that Monsanto made way back, you know, several years ago, and whether -- as individual plaintiffs, we're required to submit requests with Monsanto for general discovery in addition to case-specific discovery.  So things like that would be really helpful for us to know.  And if they haven't been done, obviously they should be done because it's been several years, and there needs to be an update to those kind of discovery requests.

The other is --

1          **THE COURT:**  Before we get -- before we get to the

2    other, I mean, I think the answer to that -- I mean, there

3    would be two ways to deal with that.  One is to put together

4    some sort of process for keeping that information updated.  The

5    other would be for you to contact leadership counsel and get

6    that information.  And I would think that that would be the

7    kind of information that they should be able to provide to you,

8    and it would be their responsibility to provide to you.

9          So which do you think is, you know, sort of the better

10   route?  Putting in another process -- another layer of process

11   or just kind of reminding leadership counsel that it's on them

12   to -- to keep track of that stuff and inform lawyers of it who

13   are not in the leadership group?

14          **MR. PAREKH:**  I mean, we certainly have contacted

15   leadership counsel and gotten some information.  I think, just

16   given the number of individual solo practitioners and other

17   lawyers who have cases -- and we've taken on some cases from

18   other smaller firms where, you know, the lawyers are confused

19   as to what's going on -- it would be helpful to have some sort

20   of ongoing sort of monthly email or update or something to

21   everyone in the MDL, preferably through the CM/ECF system or

22   some other system, where it's easy for lawyers who have cases

23   in the MDL to get it without having to ask to be put on a list

24   or things like that.

25          It's just not clear from the Court's orders what is, you

know, part of fact discovery on an individual case.  In terms
of when we'd approach Monsanto, you know, they said, "Well,
fact discovery is done from us.  We don't owe you guys
anything.  This is all just individual fact discovery."  And
that's, you know -- we don't have any ability to say, "Well,
no, that's not right," because we haven't been involved in
those discussions.  We haven't seen and the leadership hasn't
told us that there has been any updates, you know, for example,
26(e) updates to the documents in the system.

        And that was my other point, is currently there's only
currently one way for plaintiffs in the MDL to access documents
and depositions and things like that, and that is to pay
Crivella West a significant amount of money to access the
documents in their system.  When we ask Monsanto, "Hey, can you
just give us all the documents," the answer is, "No, they're in
the system.  You guys can go get them from the system."

        And we believe that there should be an alternative
mechanism without us having to pay Crivella West for us simply
to get a copy of everything that was produced in the litigation
and a copy of all the depositions and, you know, other items
that were produced in the litigation --

        **THE COURT:**  Well, but I mean somebody has to --
somebody has to be paid to store and organize that stuff;
right?  I mean, we're talking about voluminous, voluminous
discovery; right?

1          **MR. PAREKH:**  That's correct, Your Honor.  And someone

2    has to be paid, but we shouldn't be obligated to select the

3    same vendor that was selected by leadership approximately six

4    years or seven years ago now --

5          **THE COURT:**  I mean, I -- look, I don't -- I don't know

6    if I agree with that.  I mean, part of being leadership is

7    selecting, you know, a document repository, I think.

8          But I will say that I am very open to, you know,

9    suggestions for how to make it easier for non-leadership

10   lawyers to access information.  The idea that they don't have

11   to, you know, pay, I mean, that gets back to the free-rider

12   stuff that we were discussing, you know, in the -- in

13   connection with the holdback ruling, and I, you know -- I think

14   there is a free-rider -- you've implicated a free-rider concern

15   there, but -- but, you know, I'm -- you know, the idea of a

16   monthly update or maybe a quarterly update or something like

17   that that goes on the docket may, you know -- ensures that, you

18   know, individual lawyers can have a document that they can go

19   to to kind of see what the status is of various discovery

20   matters and other matters, I mean, that sounds like a really

21   good idea, and I guess I would, you know, urge the leadership

22   counsel to work with you on -- on, you know, the contents of

23   such an update, and, you know, maybe submit a proposed order in

24   14 days since everything else is based on 14 days.

25          **MR. PAREKH:**  And, Your Honor, let me just explain in

1    terms of the document repository.  It's not a question of

2    whether or not we're required to pay.  I mean, we would have to

3    pay someone; right?  The -- the problem that we're having is

4    that it's an old system that's become unwieldy and very

5    difficult to navigate, and when we've asked people, you know,

6    "Hey, can we do -- can you do this search, can you do this, can

7    you do that," it's very difficult to have that happen in that

8    particular repository.

9         And so the question is, is there a way where we can pay a

10   certain amount of money, a reasonable amount of money, that

11   says just give us everything that you currently have from the

12   repository in a manner that we can then use a different, you

13   know, system to navigate with.  And that doesn't seem possible

14   at this point.  It's something that obviously, you know, we'll

15   talk to leadership about as well, but it is something that we

16   think would be very advantageous, especially when we're talking

17   about, you know, Wave 7 and a lot more people having to have

18   these cases worked up, to have the ability to navigate these

19   systems in a more -- in a more modern system.

20        **THE COURT:**  I hear what you're saying.

21        **MR. WISNER:**  Your Honor, if I could just quickly,

22   there is a lot of complexity to this issue, as you can

23   imagine --

24        **THE COURT:**  Yeah.

25        **MR. WISNER:**  -- from security issues to

1   confidentiality issues to if we were to hand over all of our

2   work product, where would it go.  Having a system that requires

3   a logon and tells you who's looking at it and when is very

4   helpful.

5        Mr. Parekh and I are close friends.  He's on my leadership

6   committee in Zantac litigation across the street in Oakland, so

7   I can talk to him and work through a proposal in the next 14

8   days that makes sense, because I know what he's trying to get

9   at.  I know the issue.  To make it more accessible for people

10  who maybe aren't familiar with the cumbersome Crivella West

11  system.  I understand.  So...

12          **THE COURT:**  Okay.  All right.

13          **MR. PAREKH:**  That's all, Your Honor.  Thank you.

14          **THE COURT:**  Thank you.

15       Anything else?  All right.  Very good.  So we'll see you

16  at the next status conference.  If I need to talk to you about

17  any of the stuff that's filed in the next 14 days, I'll

18  schedule something sooner.  All right.  Thank you.

19              (Proceedings adjourned at 1:49 p.m.)

20

21

22

23

24

25

## CERTIFICATE OF TRANSCRIBER

I, Pamela Batalo Hebel, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

DATE:  Monday, September, 12, 2022

*Pamela Batalo Hebel*
Pamela Batalo Hebel