**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Anthony J. Patek (State Bar No. 228964)
  anthony@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

Kali R. Backer (State Bar No. 342492)
  kali@gutridesafier.com
4450 Arapahoe Avenue, Suite 100
Boulder, CO 80303
Telephone: (415) 336-6545
Facsimile:  (415) 449-6469

**WOOL TRIAL LAW LLC**
David J. Wool (State Bar No. 324124)
  david@wooltriallaw.com
1001 Bannock Street, Suite 410
Denver, CO 80204
Telephone: (720) 509-9101

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT FOR THE

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 |
| | Case No. 3:16-md-02741-VC |
| This document relates to: | **PLAINTIFFS' OPPOSITION TO MONSANTO COMPANY AND BAYER CROPSCIENCE LP'S MOTION TO DISMISS** |
| *Scott Koller, et al., v. Monsanto Company, et al.*, Case No. 3:22-cv-04260-VC | Honorable Vince Chhabria |
| | Hearing Date:  December 15, 2022<br>Hearing Time:  10:00 a.m.<br>Hearing Location:  Via Zoom Webinar |

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   BACKGROUND .................................................................................................. 2

    A.   Regulatory Framework. ............................................................................. 2

    B.   EPA Policy on Nitrosamines. .................................................................... 4

    C.   The Products. ............................................................................................. 4

    D.   NNG Formation in the Products. ............................................................... 6

    E.   Defendants' Knowledge of the Problems with NNG Formation. ............... 6

III.  ARGUMENT ....................................................................................................... 7

    A.   Plaintiffs' UCL Unlawful Claims Withstand Dismissal. ............................ 7

        1.   Plaintiffs adequately pleaded that Defendants sold and
           distributed unregistered pesticides. ............................................... 8

        2.   Plaintiffs allege that Defendants' pesticides are misbranded. ................ 10

    B.   Plaintiffs' UCL Unfair Prong Claims Withstand Dismissal................................ 11

    C.   Plaintiffs' CLRA and Fraud Claims are Adequately Alleged. ........................... 11

        1.   Plaintiffs allege affirmative misrepresentations. ...................................... 11

        2.   Plaintiffs allege actionable omissions. ..................................................... 12

        3.   Plaintiffs allege fraudulent concealment. ................................................. 16

            i.   Buckman does not impliedly preempt Plaintiffs'
               fraudulent concealment claim based on the sale of
               unregistered pesticides.................................................. 16

            ii.  Equitable tolling is warranted. ................................................... 18

    D.   Plaintiffs Plausibly Allege Warranty Claims. .................................................... 20

        1.   Plaintiffs allege a defect for purposes of the warranty claims................. 20

        2.   Plaintiffs allege breach of express warranties. ....................................... 21

         3.   Plaintiffs allege breach of implied warranties. ......................................... 21

        4.   Plaintiffs plausibly allege their MMWA and SBWA claims. ................. 22

        5.   The court has subject matter jurisdiction over the MMWA claim. ......... 23

    E.   Plaintiffs have pled inadequate remedies at law for their equitable claims......... 23

    F.   Plaintiffs have standing for their injunctive relief claims. ................................ 24

    G.   Plaintiffs Request Leave to Amend If Necessary............................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Acedo v. DMAX, Ltd.*,
No. CV 15-02443 MMM (ASx), 2015 U.S. Dist. LEXIS 192128
(C.D. Cal. Nov. 13, 2015) ................................................................................................ 21

*Adkins v. Comcast Corp.*,
No. 16-cv-05969-VC, 2017 U.S. Dist. LEXIS 137881 (N.D. Cal. Aug. 1, 2017) .............. 24

*Arnold v. Dow Chemical Co.*,
91 Cal. App. 4th 698 (Cal. Ct. App. 2001) ....................................................................... 22

*Ashcroft v. Iqbal*,
556 U.S. 662, 129 S. Ct. 1937 (2009) .............................................................................. 14

*Bates v. Dow Agrosciences L.L.C.*,
544 U.S. 431, 125 S. Ct. 1788 (2005) ........................................................................ 17, 18

*Brown v. Natures Path Foods, Inc.*,
No. 21-cv-05132-HSG, 2022 U.S. Dist. LEXIS 42760 (N.D. Cal. Mar. 10, 2022)............ 24

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001) ........................................................................................... 16, 17, 18

*Cepelak v. Hp Inc.*,
No. 20-cv-02450-VC, 2021 U.S. Dist. LEXIS 221360 (N.D. Cal. Nov. 15, 2021) ............ 24

*Collins v. eMachines, Inc.*,
202 Cal. App. 4th 249 (2011), *as modified* (Dec. 28, 2011) ............................................. 13

*Conmar Corp. v. Mitsui & Co. (USA), Inc.*,
858 F. 2d 499 (9th Cir. 1988) .......................................................................................... 19

*Daniel v. Ford Motor Co.*,
806 F.3d 1217 (9th Cir. 2015) .......................................................................................... 11

*Davidson v. Kimberly-Clark Corp.*,
889 F.3d 956 (9th Cir. 2018) ...................................................................................... 24, 25

*Drum v. San Fernando Valley Bar Ass'n*,
182 Cal. App. 4th 247 (2010) ........................................................................................... 11

*Edmonson v. LCW Auto. Corp.*,
No. CV-07-3303 CAS (VBKx), 2008 U.S. Dist. LEXIS 126768
(C.D. Cal. March 10, 2008) .............................................................................................. 23

*Floyd v. Am. Honda Motor Co.*,
966 F.3d 1027 (9th Cir. 2020) .......................................................................................... 23

*Hardeman v. Monsanto Co.*,
216 F. Supp. 3d 1037 (N.D. Cal. 2016) ............................................................................ 18

*Hardeman v. Monsanto Co.*,
997 F. 3d 941 (9th Cir. 2021) .................................................................................. 2, 17, 25

*Hindsman v. GM LLC*,
No. 17-cv-05337-JSC, 2018 U.S. Dist. LEXIS 92319 (N.D. Cal. June 1, 2018)................ 15

*Hinojos v. Kohl's Corp.*,
718 F.3d 1098 (9th Cir. 2013) .......................................................................................... 16

*Hodsdon v. Mars, Inc.*,
891 F.3d 857 (9th Cir. 2018) ............................................................................................ 13

*Holley v. Gilead Scis., Inc.*,
  379 F. Supp. 3d 809 (N.D. Cal. 2019)..................................................................... 17

*Huu Nguyen v. Nissan N. Am., Inc.*,
  932 F.3d 811 (9th Cir. 2019) ................................................................................... 20

*In re Animation Workers Antitrust Litig.*,
  123 F. Supp. 3d 1175 (N.D. Cal. 2015).................................................................... 18

*In re Bextra & Celebrex Mktg., Sales Practices & Prod. Liab. Litig.*,
  No. MDL 05-01699 CRB, 2007 U.S. Dist. LEXIS 102340 (N.D. Cal. July 10, 2007) ....... 21

*In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Practices & Prods. Liab. Litig.*
  ("*In re EcoDiesel*"), 295 F. Supp. 3d 927 (N.D. Cal. 2018) ................................. 16

*In re Juul Labs, Inc., Mktg., Sales Practices, & Prods. Liab. Litig.*,
  No. 19-md-02913-WHO, 2020 U.S. Dist. LEXIS 197766 (N.D. Cal. Oct. 23, 2020)......... 24

*In re Korean Ramen Antitrust Litig.*,
  281 F. Supp. 3d 892 (N.D. Cal. 2017)....................................................................... 20

*In re Lithium Ion Batteries Antitrust Litig.*,
  No. 13-MD-2420 YGR, 2014 U.S. Dist. LEXIS 7516 (N.D. Cal. Jan. 21, 2014) .............. 18

*In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*,
  No. 2875 (RBK/KW), 2021 U.S. Dist. LEXIS 17728 (D.N.J. Jan. 29, 2021) ..................... 12

*In re Zantac Ranitidine Prods. Liab. Litig.*,
  546 F. Supp. 3d 1284 (S.D. Fla. 2021) ..................................................................... 17

*Johnson v. Glock, Inc.*,
  No. 3:20-cv-08807-WHO, 2021 U.S. Dist. LEXIS 23798 (N.D. Cal. Feb. 8, 2021)........... 15

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ................................................................................... 22

*Klein v. Chevron U.S.A., Inc.*,
  137 Cal. Rptr. 3d 293 (Cal. Ct. App. 2012).............................................................. 8

*Mizraie v. Monsanto Co.*,
  No. CV 15-04361 DDP (FFMx), 2016 U.S. Dist. LEXIS 3816 (C.D. Cal. Jan. 12, 2016) . 25

*Nacarino v. Chobani, LLC*,
  No. 20-cv-07437-EMC, 2022 U.S. Dist. LEXIS 20671 (N.D. Cal. Feb. 4, 2022)............... 11

*Nathan Kimmel, Inc. v. DowElanco*,
  275 F. 3d 1199 (9th Cir. 2002) ................................................................................. 17

*Nat'l Family Farm Coal. v. United States EPA*,
  966 F.3d 893 (9th Cir. 2020) ..................................................................................... 8

*NRDC v. United States EPA*,
  735 F.3d 873 (9th Cir. 2013) ..................................................................................... 2

*Patterson v. RW Direct, Inc.*,
  382 F. Supp. 3d 938 (N.D. Cal. 2019)....................................................................... 12

*Precht v. Kia Motors Am., Inc.*,
  No. SA CV 14-1148-DOC (MANx), 2014 U.S. Dist. LEXIS 185202
  (C.D. Cal. Dec. 29, 2014) ......................................................................................... 21

*Reynolds v. S & D Foods*,
  No. 91-1442-PFK, 1993 U.S. Dist. LEXIS 3040 (D. Kan. 1993)...................................... 23

*Rose v. HP Inc.*,
  No. 20-cv-02450-VC, 2020 U.S. Dist. LEXIS 243918 (N.D. Cal. Dec. 29, 2020) ............. 13

*Rutledge v. Boston Woven Hose & Rubber Co.*,
  576 F. 2d 248 (9th Cir. 1978) ........................................................................... 19

*Sanchez v. Kia Mot. Am.*,
  No. 8:20-cv-01604-JLS-KES, 2021 U.S. Dist. LEXIS 200707 (C.D. Cal. Aug. 9, 2021) .. 23

*Schreiber Distrib. Co. v. Serv-Well Furniture Co.*,
  806 F.2d 1393 (9th Cir. 1986) .......................................................................... 25

*Shoner v. Carrier Corp.*,
  30 F.4th 1144 (9th Cir. 2022) ........................................................................... 23

*Siqueiros v. GM LLC*,
  No. 16-cv-07244-EMC, 2021 U.S. Dist. LEXIS 169326 (N.D. Cal. Sep. 7, 2021)............ 20

*Sloan v. General Motors LLC*,
  287 F. Supp. 3d 840 (N.D. Cal. 2018)......................................................... 14, 15

*Spectrum Scis., LLC v. Celestron Acquisition, LLC*,
  No. 5:20-cv-03642-EJD, 2021 U.S. Dist. LEXIS 103832 (N.D. Cal. June 2, 2021) ........... 19

*Starr v. Baca*,
  652 F.3d 1202 (9th Cir. 2011) .......................................................................... 16

*Stockinger v. Toyota Motor Sales USA, Inc.*,
  No. LACV 17-00035-VAP (KLSx), 2017 U.S. Dist. LEXIS 224071
  (C.D. Cal. July 7, 2017)..................................................................................... 15

*Taragan v. Nissan N. Am., Inc.*,
  No. C 09-3660 SBA, 2013 U.S. Dist. LEXIS 87148 (N.D. Cal. June 20, 2013) ................. 21

*United State Gypsum Co. v. Nat'l Gypsum Co.*,
  352 U.S. 457, 77 S. Ct. 490 (1957) ................................................................... 24

**Statutes**

7 U.S.C. § 136 .................................................................................................. 1

7 U.S.C. § 136(bb) ........................................................................................... 9

7 U.S.C. § 136(q)(1)(A) .................................................................................... 3

7 U.S.C. § 136(q)(1)(C) ............................................................................... 3, 11

7 U.S.C. § 136(q)(1)(E) .................................................................................... 3

7 U.S.C. § 136a(a) .................................................................................... 1, 2, 3

7 U.S.C. § 136a(c)(1)(D) ............................................................................... 8, 9

7 U.S.C. § 136a(c)(5)(C) .............................................................................. 9, 10

7 U.S.C. § 136a(c)(5)(D) .............................................................................. 9, 10

7 U.S.C. § 136j(a)(1)(E) ............................................................................... 3, 10

7 U.S.C. § 136v(a) ........................................................................................ 1, 2

Cal. Bus. & Prof. Code § 17082 ...................................................................... 23

Cal. Civ. Code § 1780(e) ................................................................................. 23

Cal. Civ. Code § 1792.3 .................................................................................. 22

Cal. Civ. Code § 1792.4(a)(1) ......................................................................... 22

Cal. Civ. Code § 1794(d) ................................................................................. 23

Cal. Food & Agric. Code § 12811 ..................................................................... 2

Cal. Food & Agric. Code § 12854 ................................................................... 22

Cal. Food & Agric. Code § 12881(c) ................................................................... 3, 11

Cal. Food & Agric. Code § 12881(d) ................................................................... 3, 10

Cal. Food & Agric. Code § 12882(b) ......................................................................... 11

Cal. Food & Agric. Code § 12991 ................................................................................ 3

Cal. Food & Agric. Code § 12992 ....................................................................... 3, 10

Cal. Food & Agric. Code § 12993 ......................................................................... 1, 2

**Regulations**

16 C.F.R. § 700.1(a) .................................................................................................. 23

40 C.F.R. § 156.10(g)(6) ........................................................................................ 2, 3

40 C.F.R. § 158.130(b)(2) ........................................................................................... 3

40 C.F.R. § 158.350 ........................................................................................ 1, 3, 8, 9

41 C.F.R. § 158.300 ...................................................................................................... 3

41 C.F.R. §158.350 ....................................................................................................... 3

**Other Authorities**

45 Fed. Reg. 42855 ........................................................................................................ 4

45 Fed. Reg. 42856 ........................................................................................................ 4

EPA, *Reregistration Eligibility Decision: Glyphosate*, (Sept. 1993), available at
      https://www3.epa.gov/pesticides/chem_search/reg_actions/reregistration/red_PC-
      417300_1-Sep-93.pdf ............................................................................................ 5

## I.      INTRODUCTION

At the heart of this case is a chemical known as N-nitrosoglyphosate ("NNG"), a type of nitrosamine. The overwhelming majority of nitrosamines are carcinogenic, so EPA restricts them to no more than 1 ppm within *any* herbicide absent acceptable proof that the nitrosamine does not cause cancer. EPA knows that NNG exists in the glyphosate herbicides that Defendants Monsanto Company, Bayer CropScience LLP, The Scotts Company, LLC and Seamless Control LLC ("Defendants") manufacture, sell and distribute. It conditions these products' registrations, and thus, sale, on the requirement that they cannot and never will develop over 1 ppm NNG through the lifetime of the herbicide.

What Defendants conceal from consumers and EPA, however, is that the most highly concentrated forms of Roundup (the "Products") are all but ensured to surpass EPA's limit on NNG when they fall into consumers' hands. The reasons are twofold. First, the Products have inherently elevated levels of NNG at manufacture due to their high concentrations of glyphosate. Second, NNG levels increase over time through a simple chemical reaction: glyphosate, when exposed to nitrites, turns into NNG. Because nitrites are pervasive, simply opening a Product or mixing it with water can cause NNG to form. Monsanto witnessed first-hand how much NNG develops when it conducted a study that revealed NNG could reach *levels over 80 times the legal limit.* What prompted the study? Monsanto realized *entire lots* of one of the Products (QuikPRO) had levels of NNG above 1 ppm *prior to sale.* What caused the QuikPRO to reach unlawful levels? *The same conditions present in everyday consumers' garages.*

Both the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § 136, *et seq.* ("FIFRA") and California state law ban the sale and distribution of unregistered and misbranded pesticides. *See* 7 U.S.C. §§ 136a(a) & 136v(a); Cal. Food & Agric. Code § 12993. The Products are both. EPA only registers products that can *never* exceed 1 ppm NNG. That limit applies through "the date of use," unless the product carries an expiration date. 40 C.F.R. § 158.350. None of the Products ever had an expiration date. Because the Products can easily surpass the 1 ppm limit before they are fully used, they were unregistered and illegal to sell.

The Products are also misbranded. A conspicuous expiration date on the label was required

since the formation of NNG causes the Products to "change[] chemical composition significantly." 40 C.F.R. § 156.10(g)(6). But, to date, none have one. Further, by selling and distributing the Products under the guise that they were registered herbicides, Defendants deceived consumers about what they were actually purchasing. The herbicide, branded as "QuikPRO," that consumers buy, for instance, is not the same as the QuikPRO EPA registered. It is different since there is no guarantee NNG stays below 1 ppm through full use.

Fully aware of the damning science, Defendants ask the Court to impose an evidentiary standard at the pleading stage. But proof of unlawful levels of NNG in any specific consumer's Product is not necessary to state a plausible claim that *every* product is unlawful and misbranded because they are fully *capable* of exceeding the legal limit for NNG. *Monsanto's own testing* more than suffices to show that. Defendants further claim that such proof is necessary to plead manifestation of a defect. Not so. The defect existed from the time Plaintiffs bought the Products since the defect lies in the *design*. Indeed, Plaintiffs do not seek damages for personal injuries sustained from the high levels of NNG; rather, they lost money because, at a minimum, they paid more than they would have because the Products (i) never should have been on the market in the first place and/or (ii) should have come with an expiration date.

Finally, the Ninth Circuit essentially addressed, and rejected, Defendants' arguments about Plaintiffs' entitlement to injunctive relief in *Hardeman v. Monsanto Co.*, 997 F. 3d 941, 959 (9th Cir. 2021). Plaintiffs simply request that Monsanto and Bayer CropScience add an expiration date to the labels of their Products via the notification process. If *Hardeman* says that they can use this mechanism to put a cancer warning on the label, they can also do so to add an expiration date, as other manufacturers have done. The Motion should be denied in its entirety.

## II.    BACKGROUND

### A.    Regulatory Framework.

FIFRA prohibits the sale or distribution of any pesticide that is not registered with EPA and the state in which it is sold. 7 U.S.C. §§ 136a(a) & 136v(a). California, too, bars the sale of unregistered, non-EPA approved pesticides. *See id.*; Cal. Food & Agric. Code §§ 12811 & 12993. "Through the registration requirement, EPA ensures that no pesticides that will cause 'unreasonable

adverse effects' on human health or the environment are sold in the United States." *NRDC v. United States EPA*, 735 F.3d 873, 875 (9th Cir. 2013). To register a product, the applicant must certify its chemical composition, including limits on ingredients and impurities of toxicological significance like NNG.[1] *See* 41 C.F.R. §158.350; *see also* ECF 1 ("Compl.") ¶¶ 79, 95, 188. EPA uses the certified limits "to enforce the composition of the product and to ensure the accuracy of hazard assessments." 40 C.F.R. § 158.130(b)(2).

The certified limits set the bounds of what a manufacturer may legally sell or distribute under the registration. 40 C.F.R. § 158.350. They are "legally binding limits upon approval of the application" and apply "from the date of production to the date of use" unless "the product label bears a statement prohibiting use after a certain date," in which case, "the certified limits will apply only until that date." *Id*. When a product does not have "a statement prohibiting use after a certain date" on the product, then a manufacturer may legally sell a product only if it ***never*** exceeds its certified limits for the product's ***entire life cycle***. *Id*.; *see also* 7 U.S.C. § 136a(a).

FIFRA and California also prohibit the sale or distribution of all "misbranded" pesticides, whether they are registered or not. 7 U.S.C. § 136j(a)(1)(E); Cal. Food & Agric. Code §§ 12991 & 12992. A pesticide is misbranded if: (1) its label "is false or misleading in any particular," 7 U.S.C. § 136(q)(1)(A), Cal. Food & Agric. Code § 12881(d); or (2) "it is an imitation of, or offered for sale under the name of, another article," 7 U.S.C. § 136(q)(1)(C), Cal. Food & Agric. Code § 12881(c).

A pesticide is misbranded if it fails to include an expiration date when "a pesticide formulation changes chemical composition significantly." 40 C.F.R. § 156.10(g)(6). In such case, the product "must bear the following statement in a prominent position on the label: 'Not for sale or use after [date].'" *Id*. Omitting a required expiration date misleads consumers about the length of time in which they can use the product and violates Cal. Food & Agric. Code § 12881(d); *see also* 7 U.S.C. § 136(q)(1)(E) (a pesticide is misbranded if "any word, statement, or other information required … to appear on the label or labeling is not prominently placed thereon with such conspicuousness…and in such terms as to render it likely to be read and understood by the ordinary individual under customary

---

[1] An "impurity" is "any substance… in a pesticide product other than" active or ingredients including "contaminants" and "side reaction" and "degradation products." 41 C.F.R. § 158.300.

conditions of purchase and use").

**B.      EPA Policy on Nitrosamines.**

EPA has long been concerned about nitrosamine contamination in pesticides. In 1980, it explained that a study testing 80 nitrosamines found that 80% were carcinogenic. 45 Fed. Reg. 42855; Compl. ¶ 73. The study also tested 47 nitrosamines for mutagenicity and found that 39 were mutagenic (82.9%). *Id*. As a result, EPA determined that "[s]uch compounds therefore present a potential risk to the public health." *Id*.

To address the risk, EPA requires the following steps to process "applications for registration involving products potentially contaminated with N-nitroso compounds." 45 Fed. Reg. 42856. If a product has less than 1 ppm of any nitrosamine, the registration application goes through the usual registration procedures, but "[t]he registrant must certify the upper limit of the N-nitroso compound in his Confidential Statement of Formula" for all relevant products. *Id*. If it has more than 1 ppm, "the registrant must submit data to the Agency on the potential oncogenic risk of the contaminant." *Id*. "In the absence of acceptable oncogenic testing with the specific N-nitroso compound," EPA "***assume[s] that the contaminant is as potent a carcinogen as N-nitrosodiethylamine (NDEA)***." *Id*. Without acceptable testing, EPA *presumes* the nitrosamine is a carcinogen when it can occur at levels above 1 ppm. It also does not allow products with over 1 ppm nitrosamine to be sold or distributed in the absence of acceptable oncogenic testing and makes clear that "[i]f individual products contain contaminants that exceed EPA's level of concern, these must be reported to EPA and are assessed on a case-by-case basis." Compl. ¶ 92.

**C.      The Products.**

Roundup is a glyphosate-based herbicide that contains a nitrosamine impurity known as N-nitrosoglyphosate ("NNG") and is subject to EPA's policy on nitrosamines. *Id*. ¶¶ 2–3, 72. Monsanto initially set out to prove that NNG is not carcinogenic by doing a few toxicity studies conducted by IBT, a lab ensnarled in a massive scientific fraud scandal. *Id*. ¶¶ 81–6. EPA determined that the IBT studies on NNG were inadequate. *Id*. After doing another, non-IBT study in which most mice died and, when repeated, showed a statistically significant increase in malignant lymphomas in male mice, Monsanto abandoned its efforts. *Id*. ¶¶ 81, 87–8.

Without any acceptable testing, Monsanto, and later Seamless Control and Bayer CropScience, chose to sell Roundup, and EPA, in turn, registered it, with the understanding that Roundup could *never* exceed more than 1 ppm NNG and set the certified limit as such. *Id.* ¶¶ 78–80, 95, 97. EPA has been of the understanding that the Products comply with the limit since it has not received any new data since 1993 indicating that levels could be higher.[2] *Id.* ¶¶ 89–92.

Since Roundup's launch, Monsanto, Seamless Control, and Bayer CropScience brought to market versions with higher concentrations of glyphosate. *Id.* ¶ 106. Glyphosate and NNG are directly correlated, which means higher glyphosate levels produce more NNG. *Id.* ¶¶ 7, 100–3; 107. Monsanto's own registration manager (who oversees all registrations for glyphosate-based products), Dr. Stephen Wratten, testified *under oath* how this works. *Id.* He explained that Monsanto and EPA agreed to set the limit for NNG in glyphosate acid at 2.5 ppm[3] because other ingredients would dilute the amount of NNG. *Id.* The most concentrated product on the market at the time, Rodeo, had 40% glyphosate acid which meant end products would still have an upper certified limit of 1 ppm NNG. *Id.* As Dr. Wratten explained, "It's just math. .4 times 2.5 is 1. So if Rodeo is 40 percent glyphosate acid at a level of 2.5, that becomes 1 part per million in Rodeo." *Id.* Dr. Wratten confirmed that Monsanto uses this simple formula (percent of glyphosate acid x 2.5) to determine the expected upper limit for NNG for all of its glyphosate products. *Id.*

This means that ***any product*** with more than 40% glyphosate acid has a presumptive upper limit that exceeds 1 ppm. *Id.* ¶ 110. QuikPRO, for instance, has 73.3% glyphosate and 66.6% glyphosate acid. *Id.* ¶ 109. Applying Monsanto's own formula, (i.e., 2.5 x .666) shows a presumptive upper limit of 1.665 ppm NNG. *Id.* Although Monsanto knew it was selling products with certified

---

[2] Defendants cite to the *Reregistration Eligibility Decision: Glyphosate* (Sept. 1993) for the proposition that "NNG levels even in glyphosate technical are typically well below 1 ppm." ECF 18 ("MTD") at 7. The argument, however, ignores that NNG can and likely will continue to form post-manufacture, something EPA still does not know. Compl. ¶¶ 91, 93, 146. Further, to date, EPA is not aware of the of the "discrepancy" in the upper certified limit referenced by Dr. Wratten or of the incidents of NNG above 1 ppm in glyphosate-based products. *Id.* ¶¶ 16, 111–2, 123, 129, 133.

[3] The Products each have a form of glyphosate as the active ingredient, which consists of glyphosate acid, salt, and other chemicals. Compl. ¶ 98. Only a portion of it is glyphosate acid. *Id.*

limits above what EPA allowed for NNG, "EPA never noticed this discrepancy"; according to Dr. Wratten this is because no one from Monsanto ever told EPA. *Id*. ¶ 111.

### D.    NNG Formation in the Products.

NNG can continue to form post-manufacture at levels well-past EPA limits. *Id*. ¶¶ 7, 10. Glyphosate, by its nature, is highly reactive in the presence of nitrites. *Id*. Every time a Product is exposed to nitrites, NNG is likely to form. *Id*. As Dr. Wratten put it, the degradation reaction is "complete and instantaneous." *Id*. ¶ 114, 139. Degradation occurs regardless of whether the glyphosate is pure or mixed into an end product. *Id*. ¶ 7. And, "for every unit of nitrite [], *there is a roughly 4-times higher concentration of NNG produced*." *Id*. ¶ 139.

Nitrites are pervasive in the air due to emissions from vehicles, lawn mowers, and industrial sources such as power plants. *Id*. ¶ 116. They are also prevalent in water. *Id*. ¶¶ 7, 138. Garages are nitrite-rich environments from vehicle and lawnmower exhaust. *Id*. ¶¶ 10, 117. Simply opening a Product in a garage, near a vehicle, or where nitrites are otherwise present can cause NNG to form. *Id*. Mixing the Products with water, another act required to use the Products, can create more NNG. *Id*. ¶ 118. Other factors, like heat, long storage periods, and humidity, accelerate NNG. *Id*. ¶¶ 120, 131. The Products are, thus, defective, because they can and inevitably will develop unlawful levels of NNG when following the label. *Id*. ¶ 121.

### E.    Defendants' Knowledge of the Problems with NNG Formation.

Monsanto has seen numerous instances of glyphosate products exceeding regulatory limits, but it continued to sell the Products nonetheless. As early as 1997, it found levels as high as 8 ppm after just 18 months in warehouse conditions and 4 ppm *at room temperature*. *Id*. ¶ 123. Again, in 2001, it found unlawful levels in samples of glyphosate, which it speculated was due to the water added at formulation, and decided to "monitor" the situation. *Id*. ¶¶ 124–6.

Monsanto soon learned, however, how readily glyphosate can convert into NNG when it found NNG levels above 1 ppm in ***nearly all the production lots of QuikPRO***. *Id*. ¶ 130. The source of the contamination was believed to be combustion gases in the warehouse where the active ingredient was stored. *Id*. When Monsanto sampled the active ingredient, "***[n]early all the material was out of specification for NNG,***" meaning it was all above 1 ppm. *Id*.

The incident forced Monsanto to finally do a study on NNG formation. *Id*. The internal study, completed in October 2004, revealed that the problem was worse than anyone could imagine and essentially proved that Monsanto, and any other registrant, could never "certify" that the Products would stay below 1 ppm for their entire life cycle. *Id*. ¶¶ 129–32. The study found that NNG forms readily in glyphosate upon contact with nitrites even when mixed with other ingredients like surfactants and sodium sulfite. *Id*. It forms so easily that it could "penetrate deep within a supersack of MON8750 given enough exposure time." *Id*. In fact, samples taken in connection with the study reached levels as high as ***over 80 times the legal limit***. *Id*. It further revealed that humidity exacerbates NNG since it erodes sodium sulfite (the inert ingredient Monsanto believed could control NNG) and samples tested with sodium sulfite were found to be over 1 ppm. *Id*. It also showed that surfactants, which are in the Products, can increase NNG. *Id*.

After learning that NNG forms at unlawful levels in formulated product, it would seem obvious that Monsanto should test real world products. Monsanto assiduously avoided doing so. *Id*. ¶¶ 148–55. Indeed, Dr. Wratten said so repeatedly, and unequivocally, in testimony and contemporaneous emails. *Id*. When directly asked why this was the case, he testified that doing so "***might result in you having to recall a bunch of product***" due to NNG. *Id*. ¶ 152.

Bayer AG acquired Monsanto in 2018, and, after that time, Bayer CropScience took over the registrations for some of the Products and manufactures them as well. *Id*. ¶¶ 27, 41–3. Monsanto also entered into a joint venture with Defendant Scotts Company LLC to form Seamless Control,[4] which registered and sold some of the Products as well. *Id*. ¶¶ 46–8. Despite this, Monsanto, Bayer CropScience, and Seamless Control have, nonetheless, continued to roll out highly concentrated Products, even though none have an expiration date, and all falsely represent to consumers that they contain EPA-registered herbicides. *Id*. ¶¶ 20–1, 41–8, 104–6.

## III.   ARGUMENT

### A.   Plaintiffs' UCL Unlawful Claims Withstand Dismissal.

Section 17200's "unlawful" prong "borrows violations of other laws and makes those

---

[4] Defendants state that, shortly before Plaintiffs filed suit, but after they sent their demand letter, Seamless Control merged into Monsanto and is no longer a separate entity. *See* ECF 14, n. 1.

unlawful practices actionable under the UCL." *Klein v. Chevron U.S.A., Inc.*, 137 Cal. Rptr. 3d 293, 326–27 (Cal. Ct. App. 2012) (internal quotation marks and ellipsis omitted). "Virtually any law or regulation—federal or state, statutory or common law—can serve as a predicate for a section 17200 'unlawful' violation." *Id.* (internal quotation marks and ellipsis omitted).

### 1. Plaintiffs adequately pleaded that Defendants sold and distributed unregistered pesticides.

Plaintiffs' UCL unlawful prong claim alleges, *inter alia*, that Defendants violated the California Food & Agriculture Code by selling and distributing pesticides with chemical compositions that were never registered with EPA. "Before any pesticide can be sold or used in the United States, EPA must register the pesticide—that is, provide a license that establishes the terms and conditions under which a pesticide may be lawfully sold, distributed, and used within the United States." *See Nat'l Family Farm Coal. v. United States EPA*, 966 F.3d 893, 912 (9th Cir. 2020). "The terms and conditions on the license include exactly what product can be sold". *Id.*

"A product proposed for registration must have a single, defined composition" that is set by the upper and lower certified limits for the active ingredient, inert ingredients, and impurities of toxicological significance, like NNG. 40 C.F.R. §§ 152.43(a), 158.320, and 158.350; *see also* 7 U.S.C. § 136a(c)(1)(D). The "[c]ertified limits become legally binding limits upon approval of the application." 40 C.F.R. § 158.350. EPA ensures that the products consumers actually use remain within the confines of the certified limits (and their registrations) by mandating compliance with the certified limits "from the date of production to the date of use" unless "the product label bears a statement prohibiting use after a certain date", in which case, "the certified limits will apply only until that date." *Id*. In the absence of "a statement prohibiting use after a certain date" on the product, the product can never exceed the certified limits for its ***entire life cycle*** (i.e., the final "date of use"). *Id.* But, as Monsanto observed itself, it was impossible to ever guarantee that the Products would remain below 1 ppm NNG through full consumer use since they are fully capable of exceeding the certified limit of 1 ppm for NNG over their life cycle, even though none had an expiration date. Compl. ¶¶ 123–32. Because EPA never registered Products that can exceed 1 ppm NNG, they are unregistered pesticides that were unlawful to sell and distribute.

Defendants' only counter to this interpretation is to argue that the idea "that the Products

would be universally 'unregistered' if some unidentified portion of the Products were out of spec…lacks support in law or logic." MTD at 8–9. But this fundamentally misunderstands Plaintiffs' theory. Plaintiffs do not allege that the Products are unregistered because *some* were "out of spec"; rather, they allege that *all of* the Products were unregistered because *every* product *can, and invariably will,* exceed 1 ppm NNG as Monsanto's own testing proved repeatedly, and EPA and California never approved of products that can exceed 1 ppm NNG. Compl. ¶¶ 123–32.

Moreover, characterizing the issue as simply "some" Products being "out of spec" downplays the critical role of EPA's certified limits. EPA deems NNG to be an impurity of toxicological significance and a probable carcinogen. *Id*. ¶¶ 79, 188. By setting an across-the-board 1ppm limit on nitrosamines, EPA determined that exceeding that amount poses too great of a risk to consumers. The point of the policy is to ensure that no consumer uses any product that can surpass 1 ppm nitrosamine unless it has undergone a comprehensive risk evaluation far beyond what is typically required for standard registrations. *Id*. ¶ 45; 45 Fed. Reg. 42855-6.

EPA conditions the registration of any pesticide on a determination that it will not cause "unreasonable adverse effects" on humans and the environment even if it has the maximum amount of impurity provided for in the upper certified limit. 7 U.S.C. §§ 136a(c)(5)(C), (D); § 136(bb). EPA limits the evaluation to the chemical for which registration is sought as defined by the certified limits. *Id*.; *see also* § 136a(c)(1)(D); 40 C.F.R. § 158.350. Registration is a license to sell or distribute solely the chemical EPA evaluated. When a product can exceed the certified limits, it is an entirely different formulation for which EPA has made no determination as to unreasonable adverse effects. Such products, accordingly, cannot be registered as a matter of law.

If a registration allowed products to deviate from the certified limits at any point in time the requirement that the certified limits remain "binding" through the "date of use" absent an expiration date would serve no purpose. It would also create a moving target for purposes of EPA's "unreasonable adverse effects" analysis. It is hard to imagine *how* EPA could make such a determination if it has absolutely no assurance as to the specific parameters of the chemical. The problem is particularly apparent where, as here, EPA refuses to register products with over 1 ppm nitrosamine, absent additional data, because nitrosamines "present a potential risk to the public health."

45 Fed. Reg. 42855-6; Compl. ¶ 73. Implicit in this policy is that the registration of products with over 1 ppm NNG that lack the requisite testing is simply not possible. Nor is it possible for the agency to determine the pesticide does not cause "unreasonable adverse effects." 7 U.S.C. §§ 136a(c)(5)(C), (D). Because Defendants never submitted acceptable studies and the Products' true chemical compositions can exceed 1 ppm NNG, registration was not possible. The Products were, thus, unregistered pesticides illegal to sell or distribute from the outset.

### 2.    Plaintiffs allege that Defendants' pesticides are misbranded.

Plaintiffs also allege that Defendants violated the California Food & Agriculture Code by selling and distributing misbranded pesticides. *See* 7 U.S.C. § 136j(a)(1)(E); Cal. Food & Agric. Code § 12992. Pesticides are misbranded when they are labeled "so as to deceive or mislead the purchaser." Cal. Food & Agric. Code § 12881(d). The Products were misleading in two ways.

First, they failed to include the legally required expiration date. Section 156.10(g)(6) provides that when "a pesticide formulation changes chemical composition significantly," the product "***must bear** the following statement in a prominent position on the label: 'Not for sale or use after [date]*.'" EPA regulations make clear that exceeding the certified limits is a significant change in chemical composition. Section 158.350 mandates compliance with the certified limits until "the date of use"— whether that is months or decades after purchase—*unless* "the product label bears a statement prohibiting use after a certain date." The upshot is that if the Product *can* surpass certified limits over the course of its life cycle, it must have an expiration date. Again, the point is to ensure that products that consumers are using have the same chemical compositions, throughout, as what EPA approved. Without an expiration date, consumers unknowingly take a gamble every time they use a Product; it could very well have unsafe levels of NNG or not; it could be the chemical EPA approved or not. But consumers should not be unknowingly duped into bearing that risk. The expiration date tells consumers, at a minimum, when they should stop using the Product and prevents them from being misled as to the duration in which they can be assured that the Product complies with baseline safety standards.

Second, the Products were sold under the labels of registered pesticides. This leads consumers to believe that they are buying products that conform to EPA's minimum safety standards, which is

false because a presumptive carcinogen grows over time to levels EPA deems unsafe. California law and FIFRA, explicitly bar products that are merely an "imitation" of a registered pesticide or "of a quality below that of the guarantee on the label [or] on the application for registration." Cal. Food & Agric. Code §§ 12881(c) & 12882(b); 7 U.S.C. § 136(q)(1)(C).

Defendants do not challenge Plaintiffs' interpretations of the misbranding provisions. Plaintiffs allege that they relied on the Products' labels that represented them to be EPA-approved herbicides and paid more money than they would have had they known that the Products can develop unsafe levels of a presumptive carcinogen. Compl. ¶¶ 204–5, 209–10, 214–5, 219–20. Plaintiffs further allege that they relied on the absence of an expiration date and paid more money than they would have had they known the Products expire. *Id*. Plaintiffs' unlawful prong claims must proceed. *See Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015) (setting forth the criteria for alleging a claim under the unlawful prong of the UCL); *Nacarino v. Chobani, LLC*, 2022 U.S. Dist. LEXIS 20671, at *19 (N.D. Cal. Feb. 4, 2022) (same).

### B.    Plaintiffs' UCL Unfair Prong Claims Withstand Dismissal.

Plaintiffs allege UCL claims under the unfair prong that Defendants do not challenge. Compl. ¶¶ 361, 363. As explained in the Opposition to Defendant The Scotts Company LLC's Motion to Dismiss, Plaintiffs' claims are directly "tethered to specific constitutional, statutory, or regulatory provisions" since Defendants' sale and distribution of pesticides that can/will exceed 1 ppm NNG in the absence of acceptable oncological testing violates the public policy underlying the specific statutory and regulatory provisions discussed above. *See Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 256–57 (2010); *see also* Compl. ¶¶ 71–75, 83–88, 121, 361, 363

### C.    Plaintiffs' CLRA and Fraud Claims are Adequately Alleged.

#### 1.    Plaintiffs allege affirmative misrepresentations.

Plaintiffs' deception claims under the CLRA, UCL and for common law fraud allege that Defendants made affirmative misrepresentations by selling the Products under the guise that they contained registered herbicides when they do not, as explained above. Put bluntly, manufacturers cannot, for example, put a QuikPRO label on a product that does not contain the exact chemical composition that EPA registered as QuikPRO.

The theory is akin to the fraud claims that survived dismissal in *In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*, 2021 U.S. Dist. LEXIS 17728, at *61 (D.N.J. Jan. 29, 2021). That case involved a generic drug contaminated with nitrosamines. *Id.* at *34. The plaintiffs alleged that the defendants misrepresented that their drug was "therapeutically equivalent to the reference listed drug" by "affixing an FDA approved label to their products" that is the same as the reference listed drug. *Id.* at *61. "[B]y presenting consumers with an FDA approved label," the manufacturers represented their drugs "were consistent with safety, quality, purity, identity, and strength characteristics reflected in that label." *Id.* The act misrepresented the products because the presence of nitrosamines rendered the generic "non-bioequivalent" to the reference drug. *Id.* Similarly, here, the very act of placing EPA-approved labels on the Products represented to consumers that the Products conform to the safety standards and are chemically identical to the herbicides approved and registered with EPA. They are not, however, because, in all likelihood, they will vastly exceed EPA's 1 ppm NNG threshold during their life cycle.

Defendants contend that the fraud-based claims fail because they do not adequately allege a duty to disclose. *See* MTD at 6–8. The argument, however, is "premised on the mistaken assumption that [Plaintiffs have] to show that the defendants had a duty to disclose in the first place." *Patterson v. RW Direct, Inc.*, 382 F. Supp. 3d 938, 942 (N.D. Cal. 2019). "A duty to disclose only arises in cases involving fraudulent omissions."[5] *Id.* It does not apply to the affirmative misrepresentations at issue here. Even if it did, Plaintiffs adequately pled such a duty.

### 2.    Plaintiffs allege actionable omissions.

Plaintiffs also allege omissions based on the failure to inform consumers about the defect, the Products' expiration date, and the fact that they are unregistered pesticides. Compl. ¶¶ 18, 20–1, 201, 315, 337, 351. "[T]o be actionable [an] omission must be contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obliged to disclose." *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 861 (9th Cir. 2018). A duty to disclose arises in two scenarios relevant to this case.

---

[5] This also makes Plaintiffs' omissions claims actionable because they are "contrary to a representation actually made by the defendant" and do not hinge on a duty to disclose. *Id.*

One is when the defect goes to the central function of the Product, is material, and the defendant "knew of th[e] defect while plaintiffs did not, and, given the nature of the defect, it was difficult to discover." *Collins v. eMachines, Inc.*, 202 Cal. App. 4th 249, 256 (2011), *as modified* (Dec. 28, 2011); *see also Rose v. HP Inc.*, 2020 U.S. Dist. LEXIS 243918, at *1–2 (N.D. Cal. Dec. 29, 2020). The other is when the defect "cause[s] an unreasonable safety hazard."[6] *Hodsdon*, 891 F.3d at 861–62.

The Complaint alleges that Defendants, as registrants and manufacturers of the Products, knew that NNG could continue to rise post-manufacture to levels surpassing regulatory limits, while Plaintiffs did not.[7] Compl. ¶¶ 18, 53, 146, 154–6, 204–6, 209–11, 214–6, 219–21. Plaintiffs could not discover this defect because they did not know that NNG is even in the Products, let alone have access to scientific laboratories to test for it, nor was there an expiration date. *See, e.g.*, *id.*; *see also* ¶ 340. The defect goes to the Products' central function because, without disclosure, consumers have no idea when or if the Product has developed unlawful levels of a presumptive carcinogen. This makes it ***never*** safe for a consumer to use a Product, which is precisely why EPA bans such products absent safety testing not done here.[8] Defendants ignore this independent duty to disclose, and instead focuses solely on the duty arising from safety hazards.

The Complaint similarly alleges an unreasonable safety hazard. Defendants dispute the amount of proof of the hazard, but Plaintiffs need not prove *anything* at this stage. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009). They need only provide notice of the defect

---

[6] Plaintiffs discuss the standard in more detail in their Opposition to Defendant The Scotts Company LLC's Motion to Dismiss. *See* § IV(B). Defendants' active concealment of the defect, discussed further below, is another basis for finding a duty to disclose. *See Hodsdon*, 891 F.3d at 862.

[7] Some courts limit this duty to the warranty period, *see Sloan v. General Motors LLC*, 287 F. Supp. 3d 840, 868–70 (N.D. Cal. 2018), but here, the warranty period is unlimited. *See* Exs. 2–22.

[8] A non-disclosed fact is material "if the omitted information would cause a reasonable consumer to behave differently if he or she were aware of it." *See, e.g.*, *Rose*, 2020 U.S. Dist. LEXIS 243918, at *3. Plaintiffs allege that had they known that the Products expire or are "defective because [they are] substantially likely to develop uncontrollable and unlaw levels of a presumptive carcinogen", they "would not have purchased" or "paid less for each Product." Compl. ¶¶ 204–6, 209–11, 214–6, 219–21. Plaintiffs further allege that the Products are "worth less to consumers since the Products…can be used only for a limited period of time, if at all"and the undisclosed facts "pose[] a safety hazard to consumers." *Id.*; *see also id.* ¶183.

and how it creates a safety hazard, which they have done. Judge Chen explained the "two-step inquiry" on "whether the defect poses an unreasonable safety hazard" in *Sloan v. General Motors LLC*, 287 F. Supp. 3d 840, 870-1 (N.D. Cal. 2018):

> "Where a plaintiff alleges a sufficiently close nexus between the claimed defect and the alleged safety issue, the injury risk need not have come to fruition." However, if the nexus is not "sufficiently close," then a plaintiff must allege examples of the safety risk coming to fruition to plausibly plead an unreasonable safety hazard. A "sufficiently close nexus" exists when the causal chain between the alleged defect and the ultimate safety hazard is adequately explained. The nexus is not sufficiently close, however, where the connection is not explained or appears illogical.

The Products' defect (i.e., their propensity to develop over 1 ppm NNG) creates a safety issue because it exposes consumers to a carcinogen at levels EPA deems unsafe. Plaintiffs allege a causal chain of how this works. The Products have inherently elevated levels of NNG at the time of manufacture. Compl. ¶¶ 8, 102–3, 106–12. NNG grows over time because glyphosate is highly reactive in the presence of nitrites. *Id*. ¶¶ 113–4. NNG will form (quickly) any time nitrites come in contact with glyphosate. *Id*. Because nitrites are commonly found in the places where consumers use and store the Products, actions *inherent to their use* can easily tip NNG over 1 ppm. *Id*. ¶¶ 115–20. Exhaust and water are sources of nitrites, so opening a Product near any sort of exhaust whether it is from vehicle, lawnmower, or smog in the air, can create NNG. *Id*. Adding water, too, which is required to use the Products, can create NNG. *Id*. The more exposures to nitrites over time, the more NNG will build up. *Id*. ¶ 114. Other elements cause NNG to form, such as heat, humidity, and long storage periods. *Id*. ¶ 120. The Products' supposed fail-safe, sodium sulfite, doesn't work to keep NNG below 1 ppm either since humidity erodes it. *Id*. ¶¶ 132. Other design features, like surfactants, can *increase* NNG. *Id*. ¶ 131.

The build-up of NNG is a serious safety hazard. The vast majority of nitrosamines are carcinogenic and mutagenic, as EPA and the studies referenced in the Complaint acknowledge. *Id*. ¶¶ 60, 61–2, 73; *see also* 45 Fed. Reg. 42855-6. EPA presumes nitrosamines like NNG to be potent carcinogens, given what it knows about nitrosamines in general and completely bans the sale of herbicides that can develop levels above 1 ppm unless there is acceptable testing or the Products are certified to stay below 1 ppm either through the time of use or as of an expiration date on the label. *Id*. At a minimum, an expiration date would inform consumers when the Products become unsafe.

Without it, consumers unknowingly use Products that are likely accumulate a presumptive carcinogen over time and become more dangerous with each use.

This is not a case "where the connection is not explained or appears illogical;" Plaintiffs allege a safety hazard because they allege a "sufficiently close nexus," between the defect and the safety issue, as other courts have found even when the plaintiffs there did not experience issues associated with the defect. *Sloan*, 287 F. Supp. 3d at 870-1; *see also Johnson v. Glock, Inc.*, 2021 U.S. Dist. LEXIS 23798, at *14 (N.D. Cal. Feb. 8, 2021); *Hindsman v. GM LLC*, 2018 U.S. Dist. LEXIS 92319, at *35 (N.D. Cal. June 1, 2018); *Stockinger v. Toyota Motor Sales USA, Inc.*, 2017 U.S. Dist. LEXIS 224071, at *60–61 (C.D. Cal. July 7, 2017).

Defendants dispute the safety hazard by arguing that "Plaintiffs point only to instances where Monsanto's quality-control efforts identified glyphosate technical exceeding the 1 ppm NNG threshold." MTD at 6. But that is dead wrong. The reason Monsanto chose to do a study on NNG formation was because it discovered unlawful levels in *entire lots* of QuikPRO, the exact same Product that many Plaintiffs purchased. *See* Compl. ¶¶ 130, 208, 213, 218. Glyphosate-based herbicides were also known to reach high levels of NNG even when stored in warehouse conditions, which, at this stage, is fair to assume had better ventilation and lower concentrations of nitrites than the garages where real world consumers store their Products. *Id*. ¶¶ 128, 130

The study also proves that the Products are more than capable of reaching levels far over regulatory limits. *Id*. at ¶ 131. Defendants argue that the study is somehow irrelevant because it did not test "final Products," something Monsanto has intentionally avoided for decades, and instead looked at "combinations of ingredients similar to a dry formulated product" under "extreme" conditions.[9] MTD at 7. In essence, Defendants ask the Court to accept blatant facts outside the pleadings, draw inferences *against* Plaintiffs and find that it is *implausible as a matter of law* that real world products will react in the same manner as the samples tested in the study. The Court should not do so. *See Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are

---

[9] Monsanto fought in state court to keep portions of the study confidential. It now cherry picks those sections to dispute Plaintiffs' allegations. Plaintiffs can address this in an amendment if need be.

plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6).").

Moreover, Defendants' own actions do not align with that theory. If real world products were not expected to perform as the samples tested, why consciously avoid testing real world product? Compl. ¶¶ 149–55. Why also would the person in charge of Monsanto's glyphosate registrations testify *under oath* that the company avoided such testing because doing so might cause a recall? *Id*. Even accepting that the conditions of the study were "extreme"—which Plaintiffs can allege were not if need be— Defendants do not, and cannot, dispute that the study shows that NNG forms upon nitrite exposure, sodium sulfite is ineffective at keeping NNG below 1 ppm and degrades with humidity, and surfactants make NNG worse—all conditions that are either present in or common to the use of the Products.[10]

### 3.    Plaintiffs allege fraudulent concealment.

Defendants similarly contest the fraudulent concealment claim, and equitable tolling on that basis, for many of the same reasons described above; namely, that they did not have a duty to disclose anything to consumers about defect or the expiration date. But, as explained above, they did. Defendants' other arguments are addressed below.

### i.    *Buckman does not impliedly preempt Plaintiffs' fraudulent concealment claim based on the sale of unregistered pesticides.*

In a strained reading of the Complaint, Defendants argue that Plaintiffs' unregistered pesticide theory is impliedly preempted under *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001) because it purportedly alleges that Defendants fraudulently concealed "information from EPA." MTD at 12. *Buckman* involved a fraud-on-the-FDA claim brought against a consulting company for misrepresentations made to the FDA as to a medical device that allegedly injured the plaintiff. *See* 531 U.S. at 343–44. Critically, none of the claims rested on state law duties owed to the plaintiff; rather, they hinged purely on the FDCA's disclosure requirements. The Court found in favor of

---

[10] Defendants incorrectly claim that a plaintiff cannot allege a price premium injury absent manifestation of the defect. MTD at 8. The case Defendants rely upon was reversed and involved a defect that was purely hypothetical, unlike here. Cases involving *plausible* defects reject the notion that payment of a price premium is an insufficient injury for standing. *See In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Practices & Prods. Liab. Litig.* ("*In re EcoDiesel*"), 295 F. Supp. 3d 927, 949–50 (N.D. Cal. 2018) (distinguishing *Contreras* on this basis); *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1104 (9th Cir. 2013) (payment of a price premium confers standing).

implied preemption because preventing "fraud-on-the-FDA" was not "a field which the States have traditionally occupied" and allowing such claims would interfere with "FDA's responsibility to police fraud consistently with the Agency's judgment and objectives" 531 U.S. at 347, 350 (internal quotation marks and citation omitted). While there is no question that Defendants hid information from regulatory authorities, this is not a fraud-on-the-EPA case. Plaintiffs' fraudulent concealment claim arises from the traditional common law duty that manufacturers owe *to consumers* not to misrepresent their goods, not on duties owed to the EPA. *See Holley v. Gilead Scis., Inc.*, 379 F. Supp. 3d 809, 825 (N.D. Cal. 2019) (finding that *Buckman* did not apply to claims based on the "failure to warn consumers").[11]

Implied preemption under *Buckman* stems, in part, from FDA's full occupation of medical device regulation and the concern that "complying with the FDA's detailed regulatory regime in the shadow of 50 States' tort regimes will dramatically increase the burdens facing potential applicants—burdens not contemplated by Congress in enacting the FDCA and the MDA." *Id.* at 350. The Supreme Court in *Bates*, however, rejected the notion that state misbranding actions impede EPA or otherwise impose burdens not envisioned under FIFRA. *See Bates v. Dow Agrosciences L.L.C.*, 544 U.S. 448 (2005); *see also* 544 U.S. at 459 ("Today's decision thus comports with this Court's increasing reluctance to expand federal statutes beyond their terms through doctrines of implied pre-emption. This reluctance reflects that pre-emption analysis is not '[a] freewheeling judicial inquiry into whether a state statute is in tension with federal objectives,' but an inquiry into whether the ordinary meanings of state and federal law conflict.") And, as this Court has previously explained, "the EPA's authority to enforce FIFRA does not prohibit private litigants from also enforcing that statute: the Supreme Court, rejecting an argument against 'giv[ing] juries in 50 States the authority to give content to

---

[11] Defendants' cases are distinguishable. *Nathan Kimmel, Inc.*, for instance, was not a misbranding action but involved claims from one competitor against another for making misrepresentations to EPA to obtain an unfair business advantage, a clear attempt to police fraud on the EPA. *See Nathan Kimmel, Inc. v. DowElanco*, 275 F. 3d 1199 (9th Cir. 2002). The other case found that claims against generic drug manufacturers based on the failure to file adverse event reports with FDA were impliedly preempted, a position the opinion acknowledges splits with 9th Circuit law. *See In re Zantac Ranitidine Prods. Liab. Litig.*, 546 F. Supp. 3d 1284, 1315–6 (S.D. Fla. 2021). The claims here do not require any warning "through EPA" because it can be achieved via notification or simply not selling the Product. *See Hardeman*, 997 F. 3d at 959.

FIFRA's misbranding prohibition,' has instead allowed '[p]rivate remedies that enforce [FIFRA's] misbranding requirements.'" *Hardeman v. Monsanto Co.*, 216 F. Supp. 3d 1037, 1038 (N.D. Cal. 2016). In other words, FIFRA and state law misbranding actions comfortably coexist. *Buckman* has no application here.

### ii. Equitable tolling is warranted.

To toll the statute of limitations on fraudulent concealment grounds, a plaintiff must allege that: "(1) the defendant took affirmative acts to mislead the plaintiff; (2) the plaintiff did not have actual or constructive knowledge of the facts giving rise to its claim; and (3) the plaintiff acted diligently in trying to uncover the facts giving rise to its claim. *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1194 (N.D. Cal. 2015). It is "generally inappropriate to resolve the fact-intensive allegations of fraudulent concealment at the motion to dismiss stage." *Id*.[12]

The Complaint alleges that Monsanto became aware of the NNG problem at least as of 2004 when it confirmed entire lots of QuikPRO had been contaminated and did a study that showed none of the methods they believed could control NNG worked. Compl. ¶ 130. In the wake of that study, Monsanto, Seamless Control and Bayer CropScience nonetheless continued to file applications for the registration of Products falsely certifying that the NNG would stay below 1 ppm.[13] *See* Ex. 1 to Compl. (PROMAX registered in 2007; Roundup EasyMix Dry Concentrate registered in 2019); *id*. ¶¶ 42, 47 (Bayer CropScience and Seamless Control registered Products beginning in 2018); *see also Conmar Corp. v. Mitsui & Co. (USA), Inc*., 858 F. 2d 499, 505 (9th Cir. 1988) (filing false customs forms is an affirmative act); *Spectrum Scis., LLC v. Celestron Acquisition, LLC*, 2021 U.S. Dist.

---

[12] Defendants do not dispute the second and elements. Plaintiffs allege that they were not aware of the defect nor could they discover it since nothing indicated the Products can form unlawful levels of NNG. Compl. ¶¶ 204–6, 209–211, 214–6, 219–21. Plaintiffs also acted diligently. The serious problems with NNG came to light with the Fall 2021 deposition of Dr. Wratten. *Id*. ¶¶ 7, 14, 16, 100–1, 111, 128, 134–6. Tolling is, thus, appropriate to "embrace the full class period claimed by Plaintiffs" which, here, extends back to 2004. *See In re Lithium Ion Batteries Antitrust Litig*., 2014 U.S. Dist. LEXIS 7516, at *35 (N.D. Cal. Jan. 21, 2014).

[13] Bayer CropScience cannot feign ignorance of the study or knowledge of the problem with NNG. After the merger, it took over the registrations for some of the Products. Compl. ¶ 42. Registrants have a continuing duty to comply with labelling requirements, including to ensure the labelling is "adequate to protect health." *Bates*, 544 U.S. at 438; § 136(q)(1)(G). It is plausible to infer that Bayer CropScience had scientific data to support the Products' registrations.

LEXIS 103832, at *19 (N.D. Cal. June 2, 2021) (misrepresentations to regulatory agencies suffice).

Defendants dismiss the incidents of high levels of NNG cited in the Complaint as mere pre-release "quality assurance" efforts. *See* MTD at 4, 6. But Dr. Wratten knew that simply testing products at manufacture was insufficient. Compl. ¶ 7. In 2010, he wrote "it is a real concern that even our own material that was okay at the production plant could have higher [NNG] levels later when sampled in the field." *Id*. ¶ 154. To avoid scrutiny from regulators, Defendants affirmatively chose *not* to test real world products. *Id*. ¶¶ 14, 155; *see also* §158.350. As early as 2003, Dr. Wratten wrote: the "[f]ormation of NNG on aging of the formulation is one topic we have avoided carefully" and "[t]here is a lingering concern about aged samples of dry products... *I would avoid sampling long-aged dry product from retail*." *Id*. ¶¶ 149, 151. This was because "you might find more [NNG] than you started with" and it "*might result in you having to recall a bunch of product*." *Id*. ¶ 152. In other words, Monsanto wanted to conceal the problem from consumers. Defendants write off Dr. Wratten's admissions as mere passive conduct but, in truth, these were conscious decisions made by the company's top decisionmaker on glyphosate registrations, and to date, Monsanto, along with the other Defendants, have heeded Dr. Wratten's advice and not tested real world product in spite of their duty to warn consumers about the Products' expiration and ensure compliance with the certified limits through the "time of use." *See Rutledge v. Boston Woven Hose & Rubber Co*., 576 F. 2d 248 (9th Cir. 1978) (passive conduct can be fraudulent when "the relationship of the parties imposes a duty upon the defendant to make disclosure.")

Monsanto and Bayer CropScience, through their parent Bayer AG, continue to represent to the public that "there are no safety concerns in connection with these products" and that they are "safe when used as directed," even though they know neither of things are true for NNG. Compl. ¶¶ 159,163; *see also Conmar Corp.*, 858 F. 2d at 505 (a direct public denial is an affirmative act). Monsanto and Bayer CropScience preserved the false narrative by *removing* all references to expiration dates in Material Safety Data Sheets, a form designed for distributors, but not consumers, and even representing in court filings that discovery into impurities was unwarranted because they "are well within EPA safety standards." *Id*. ¶¶ 16, 195–200; *In re Korean Ramen Antitrust Litig.*, 281 F. Supp. 3d 892, 905 (N.D. Cal. 2017) (misleading "public pretextual statements" qualify as

affirmative acts). These acts, in combination with Defendants' marketing and sales of Products they knew were likely to surpass legal limits for NNG over their life cycle, evidence a clear intent to defraud consumers since they knew that telling the truth would expose them to government scrutiny, reduced profits, and significant liability. [14]

      **D.**    **Plaintiffs Plausibly Allege Warranty Claims.**

      **1.**    **Plaintiffs allege a defect for purposes of the warranty claims.**

Defendants attack the warranty claims on similar grounds, contending that the claims fail because Plaintiffs "must plead manifestation of the alleged defect in the Products during a relevant warranty period." MTD at 8. But, again, Defendants mischaracterize the law.

"Courts in this circuit, including the Ninth Circuit, have repeatedly held that putative class members have Article III standing when plaintiffs allege that they overpaid for a defective product, even if the defect at issue does not manifest itself in every putative class member's product." *See Siqueiros v. GM LLC*, 2021 U.S. Dist. LEXIS 169326, at *17–18 (N.D. Cal. Sep. 7, 2021), citing *Huu Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 819 (9th Cir. 2019). This is because Plaintiffs have a "right to take a product free from defect." *Huu Nguyen*, 932 F.3d at 822. When Defendants sold Plaintiffs defective Products, "the defect did not cause the plaintiffs' injury; the defect *was* the injury." *Id*. To that end, Plaintiffs allege that the Products were defective when first sold because they can and likely will exceed over 1 ppm NNG during the life of the product, which can be years, even decades. Compl. ¶¶ 113–21, 177; *see also In re EcoDiesel*, 295 F. Supp. 3d at 949–50. Moreover, Plaintiffs do not "seek to recover for physical injury or property damage *caused* by the defect", *id*.; rather, they seek refunds or costs of replacement, as did the plaintiffs in *Siqueiros* and *Nguyen*. *Id*. ¶ 264.

The cases Defendants cite involved defects that could be avoided. *See Acedo v. DMAX, Ltd.*, 2015 U.S. Dist. LEXIS 192128, at *74–75 (C.D. Cal. Nov. 13, 2015). Or, failed to allege concrete injuries, such as payment of a price premium. *Taragan v. Nissan N. Am., Inc.*, 2013 U.S. Dist. LEXIS 87148, at *15 (N.D. Cal. June 20, 2013). Or, involved products that "worked as warranted." *See In re Bextra & Celebrex Mktg., Sales Practices & Prod. Liab. Litig.*, 2007 U.S. Dist. LEXIS 102340, at

---

[14] Defendants assert that tolling is not available because Plaintiffs do not allege an inadequate remedy at law. MTD at 13. As discussed below, the assertion is incorrect.

*210 (N.D. Cal. July 10, 2007). Or, found that a defect that was likely to manifest post-warranty. *See Precht v. Kia Motors Am., Inc.*, 2014 U.S. Dist. LEXIS 185202, at *24–25 (C.D. Cal. Dec. 29, 2014). None of that is at issue here.

### 2.      Plaintiffs allege breach of express warranties.

All of the Products but one include express warranties on the label. Of these Products, all warrant that they "conform[] to the chemical description on the label." Defendants argue that they never "expressly warranted anything to Plaintiffs about the Products' registrations;" however, the chemical description on the label is the representation that they contain "QuikPRO," for instance. *See* MTD at 9; Compl. ¶¶ 20, 255, 272, 306. Because the Products can develop over 1 ppm NNG, their chemical compositions do not conform to the "QuikPRO" that EPA allows to be sold and distributed. *Id*. Defendants accordingly breached the warranty.

Many of the Products also expressly warrant that they are "reasonably fit for the purposes set forth" on the label. Compl. ¶ 256. The Products were not because, in all likelihood, they would develop over 1 ppm NNG during use, which made them unreasonably unsafe. *Id*. Defendants' only response to this is an unsupported assertion that NNG does not pose a safety risk. MTD at 9. Unfortunately for Defendants, EPA strongly disagrees. *See* 45 Fed. Reg. 42855-6.

Defendants also assert that no breach occurred because the Products remain "suitable for their specified use as herbicides." MTD at 10. But because EPA generally bans herbicides that can form nitrosamines over 1 ppm, it necessarily determined that such products are simply too dangerous to be used *at all* by consumers absent adequate safety testing or an expiration date, neither of which exist here. Suppose Defendants had installed an invisible grenade in the Products that could explode at an unknown time. Simply because the grenade does not explode when the consumer first opens the Product does not mean it is "suitable for use" as an herbicide until it does go off. The same principle applies here.

### 3.      Plaintiffs allege breach of implied warranties.

Plaintiffs also state a claim for implied warranties. California law imposes an implied warranty that a "pesticide is reasonably fit for use for any purposes for which it is intended according to any printed statement of the registrant" that cannot be disclaimed. Compl. ¶ 263 (citing Cal. Food & Agric.

Code § 12854). Defendants breached this warranty for the same reasons described above, namely that the Products were too unsafe to be used *at all* because they can and likely will exceed the limit for NNG, and consumers have no idea when that occurs. The Products should not be on the market in accordance with EPA's policy on nitrosamines. Defendants contend that they disclaimed all other implied warranties. But the implied warranty of merchantability under the Song-Berkeley Warranty Act ("SBWA") cannot be waived except in sales of goods on an "as is" or "with faults" basis. Cal. Civ. Code § 1792.3. The Products, here, were not sold on that basis.[15] Compl. ¶ 292. Finally, Defendants contend that the claims fail because Plaintiffs are not in vertical privity with Defendants. The argument is without merit since California recognizes an exception for pesticides. *See Arnold v. Dow Chemical Co.*, 91 Cal. App. 4th 698, 720 (Cal. Ct. App. 2001).

### 4.     Plaintiffs plausibly allege their MMWA and SBWA claims.

Defendants argue that the Products do not qualify as "consumer goods" under the Magnusson-Moss Warranty Act ("MMWA") and SBWA. MTD at 14. But they improperly rely on matters outside the pleadings to contend they are "marketed to professionals for commercial uses." *Id.*; *see also Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). The Complaint makes clear that the Products at issue here are those sold in quantities that regular consumers would use, ranging from 1.5 ounces to 6.8 pound sizes. *See* Compl., Ex. 1. Moreover, the fact that Defendants dispute that only three of the *eight* referenced retailers are purportedly "professional" outlets, even though they clearly sold Products to ordinary consumers like Plaintiffs, concedes that the other five outlets are for regular consumers. At its best, the argument is that the Products are used for both consumer and professional purposes. FTC regulations, however, provide that "*any ambiguity will be resolved in favor of coverage*…". 16 C.F.R. § 700.1(a). Moreover, Defendants' cases all involve situations in which the Court could determine the product was not a "consumer good" as a matter of law. *Edmonson v. LCW Auto. Corp.*, 2008 U.S. Dist. LEXIS 126768 (C.D. Cal. March 10, 2008) (plaintiff acknowledged limousines were a "business use vehicle"); *Reynolds v. S & D Foods*, 1993 U.S. Dist. LEXIS 3040, *9–10 (D. Kan. 1993) (dog food specifically for racing greyhounds that not marketed to private

---

[15] To do so the Products must "clearly inform[] the buyer" in a "conspicuous writing" that "[t]he goods are being sold on an 'as is' or 'with all faults' basis." Cal. Civ. Code § 1792.4(a)(1).

consumers). Nothing here makes the Products' sale for personal, family, or household purposes implausible.

### 5. The Court has subject matter jurisdiction over the MMWA claim.

Defendants argue that the Court lacks subject matter jurisdiction over Plaintiffs' MMWA class claim because there are not 100 named plaintiffs. *See* MTD at 15. Under *Floyd v. Am. Honda Motor Co.*, 966 F.3d 1027, 1035 (9th Cir. 2020), the Court does appear to lack subject matter jurisdiction over the nationwide *class* claim.[16] However, "[n]othing in the MMWA prohibits Plaintiffs from maintaining individual actions." *Sanchez v. Kia Mot. Am.*, 2021 U.S. Dist. LEXIS 200707, at *26 (C.D. Cal. Aug. 9, 2021). The Court can strike the MMWA class allegations and allow the *individual* claims to go forward because attorneys' fees, to be "computed on the basis of all claims to be determined in [the] suit," count toward the MMWA's $50,000 jurisdictional threshold and Plaintiffs' individual claims meet or exceed $25. *Shoner v. Carrier Corp.*, 30 F.4th 1144, 1149–50 (9th Cir. 2022); *see also* Compl. ¶ 253. Plaintiffs meet both requirements since attorneys' fees are available under the SBWA, UCL or CLRA. *See id.*; *see also* Cal. Civ. Code § 1794(d); Cal. Bus. & Prof. Code § 17082; Cal. Civ. Code § 1780(e).

### E. Plaintiffs have pled inadequate remedies at law for their equitable claims.

Defendants further argue that Plaintiffs are not entitled to equitable relief because they do not allege inadequate remedies at law. MTD at 15–17. The Complaint, however, alleges that Plaintiffs Koller and Cornejo have been purchasing the Products for at least a "decade." Compl. ¶¶ 203, 213. Equitable tolling is necessary for time-barred purchases (i.e., before 2018). Damages are also unavailable for future harm. *Cepelak v. Hp Inc.*, 2021 U.S. Dist. LEXIS 221360, at *6–8 (N.D. Cal. Nov. 15, 2021). Plaintiffs "continue[] to want to purchase products that control weeds" including the Products and "regularly visit[] online and brick and mortar stores where the Products are sold." Compl. ¶¶ 207, 212, 217, 222. But, absent an injunction requiring Defendants "to add a 'Not for sale or use after [date]' to the Products," they cannot "rely on the Products' labels when shopping for herbicide products in the future". *Id.* In the 9th Circuit, a "threat of future harm may be the consumer's plausible

---

[16] While this Court is bound by *Floyd*, Plaintiffs dismiss without prejudice and reserve the right to request leave to amend to reassert the MMWA class claims should they add 96 more named plaintiffs.

allegations that she will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although she would like to." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969–70 (9th Cir. 2018).

Plaintiffs also do not have an adequate remedy at law for their unlawfulness or unfair prong claims. *See Cepelak*, 2021 U.S. Dist. LEXIS 221360, at *6 (noting that a "plaintiff may be able to state a claim for equitable relief under the unfair prong of the UCL alongside a claim for damages based on a theory of fraud under the CLRA"); *In re Juul Labs, Inc., Mktg., Sales Practices, & Prods. Liab. Litig.*, 2020 U.S. Dist. LEXIS 197766, at *225–27 (N.D. Cal. Oct. 23, 2020) (noting that "the allegations regarding unfair conduct are not otherwise coextensive with plaintiffs' legal claims"). Moreover, nothing "disturb[s] the well-established rule that equitable and damages claims may coexist when they are based on different theories."[17] *Brown v. Natures Path Foods, Inc.*, 2022 U.S. Dist. LEXIS 42760, at *14, n.5 (N.D. Cal. Mar. 10, 2022).

### F.   Plaintiffs have standing for their injunctive relief claims.

Plaintiffs have standing to pursue their injunctive relief claims for the reasons described above, including the fact that they will sustain future harm absent injunctive relief. *See Davidson*, 889 F.3d at 970–971; *see also* Compl. ¶¶ 207, 212, 217, 222. *Davidson* also refutes Defendants' argument that Plaintiffs lack standing because they now know "the Products 'degrade into uncontrollable and unlawful levels of NNG.'" MTD at 16. *Davidson* specifically holds that a "previously deceived consumer may have standing to seek an injunction . . . even though the consumer now knows or suspects that the advertising was false." 889 F.3d at 969. This is because "[k]nowledge that the advertisement or label was false in the past does not equate to knowledge that it will remain false in the future." *Id*. Plaintiffs' allegations are consistent with this holding.

Defendants further argue that adding an expiration date will not redress any harm since "[a]n expiration date would tell Plaintiffs nothing about NNG levels" among other things. MTD at 17. But,

---

[17] The Court recognized this in *Adkins v. Comcast Corp.*, 2017 U.S. Dist. LEXIS 137881, at *6–7 (N.D. Cal. Aug. 1, 2017), which explicitly rejected the reasoning underlying the opinions Defendants cite. *See also United State Gypsum Co. v. Nat'l Gypsum Co.*, 352 U.S. 457, 467, 77 S. Ct. 490, 495 (1957) (F.R.C.P. 8 "expressly sanction[s]" alternative pleading of legal and equitable claims). This applies equally here. Compl. ¶ 372.

as explained above, an expiration date would tell consumers when it is unsafe to use the Product, which is the kind of repeated harm contemplated by *Davidson*.

Finally, the Ninth Circuit's decision in *Hardeman* forecloses the argument that injunctive relief is preempted due to EPA's "exclusive authority to approve pesticide labelling." MTD at 16. *Hardeman* made clear that "EPA permits pesticide manufacturers to make certain changes to labels without prior approval…if EPA is notified of the change." 997 F. 3d at 959. And, "EPA has repeatedly permitted pesticide manufacturers to use the notification procedure to add notices related to cancer to their products' labels." *Id*. The same rationale applies here. Under *Hardeman*, no EPA approval is necessary because the addition of an expiration date can be accomplished via the notification process, as other manufacturers have done.[18] *See* Compl. ¶193.

### G.    Plaintiffs Request Leave to Amend If Necessary.

Plaintiffs request leave to amend should this Court find the Complaint insufficient. Leave "should be granted unless the Court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co*., 806 F.2d 1393, 1401 (9th Cir. 1986).

---

[18] *Mizraie v. Monsanto Co*., 2016 U.S. Dist. LEXIS 3816, at *6 (C.D. Cal. Jan. 12, 2016) is distinguishable since the opinion found that the claims challenging a label that "was approved by" EPA necessarily impose requirements "different from or in addition to" those under FIFRA, a notion *Hardeman* rejected. 997 F. 3d at 956.

Dated: November 9, 2022

**GUTRIDE SAFIER LLP**

*s/ Seth A. Safier*
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Anthony J. Patek (State Bar No. 228964)
  anthony@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

Kali R. Backer (State Bar No. 342492)
  kali@gutridesafier.com
4450 Arapahoe Avenue, Suite 100
Boulder, CO 80303
Telephone: (415) 336-6545
Facsimile:  (415) 449-6469

**WOOL TRIAL LAW LLC**

David J. Wool (State Bar No. 324124)
  david@wooltriallaw.com
1001 Bannock Street, Suite 410
Denver, CO 80204
Telephone: (720) 509-9101

*Attorneys for Plaintiffs*