**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Anthony J. Patek (State Bar No. 228964)
  anthony@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone:  (415) 639-9090
Facsimile:  (415) 449-6469

Kali R. Backer (State Bar No. 342492)
  kali@gutridesafier.com
4450 Arapahoe Avenue, Suite 100
Boulder, CO 80303
Telephone:  (415) 336-6545
Facsimile:  (415) 449-6469

**WOOL TRIAL LAW LLC**
David J. Wool (State Bar No. 324124)
  david@wooltriallaw.com
1001 Bannock Street, Suite 410
Denver, CO 80204
Telephone:  (720) 509-9101

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT FOR THE

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION<br><br>This document relates to:<br>*Scott Koller, et al. v. Monsanto Company, et al.,*<br>Case No. 3:22-cv-04260-VC | MDL No. 2741<br><br>Case No. 3:16-md-02741-VC<br><br>**PLAINTIFFS' OPPOSITION TO THE SCOTTS COMPANY LLC'S MOTION TO DISMISS**<br><br>Honorable Vince Chhabria<br><br>Hearing Date:  December 15, 2022<br>Hearing Time:  10:00 a.m.<br>Hearing Location:  Via Zoom Webinar |

# TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................1

II.     BACKGROUND ...................................................................................................3

        A.      Plaintiffs' Allegations................................................................................3

        B.      Specific Allegations Concerning The Scotts Company LLC.....................4

        C.      Plaintiff Koller's Roundup Purchase..........................................................5

III.    LEGAL STANDARD ...........................................................................................6

IV.     ARGUMENT ........................................................................................................6

        A.      Plaintiffs' UCL Claims Withstand Dismissal............................................6

                1.      Plaintiffs allege a claim under the UCL's unlawful prong.........6

                2.      Plaintiffs allege Defendants violated the unfair prong of the UCL.............9

        B.      Plaintiffs Adequately Allege Fraud-Based Claims Against Scotts. ..........11

                1.      Plaintiffs satisfy Rule 9(b).........................................................11

                2.      Scotts' plausibility challenge is meritless..................................14

        C.      Plaintiffs Adequately Plead a Claim for Unjust Enrichment...................16

        D.      Plaintiffs Request Leave to Amend If Necessary.....................................18

V.      CONCLUSION ..................................................................................................18

## TABLE OF AUTHORITIES

**Cases**

*Allergan United States, Inc. v. Prescribers Choice, Inc.*,
364 F. Supp. 3d 1089 (C.D. Cal. 2019)...................................................................... 8, 14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................................................ 6

*Astiana v. Hain Celestial Grp., Inc.*,
783 F. 3d 753 (9th Cir. 2015) ...................................................................................... 17

*Beaver v. Tarsadia Hotels*,
816 F.3d 1170 (9th Cir. 2016) ........................................................................................ 6

*Bell Atlantic. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................................ 6

*Beyer v. Symantec Corp.*,
333 F. Supp. 3d 966 (N.D. Cal. 2018) .......................................................................... 16

*Brown v. Madison Reed, Inc.*,
No. 21-cv-01233-WHO, 2022 U.S. Dist. LEXIS 149105 (N.D. Cal. Aug. 19, 2022) ......... 15

*Bruton v. Gerber Prods. Co.*,
No. 15-15174, 2017 U.S. App. LEXIS 12833 (9th Cir. July 17, 2017) ................................ 1

*Bruton v. Gerber Products Co.*,
703 F. App'x 468 (9th Cir. 2017) ................................................................................. 17

*Clorox Co. v. Reckitt Benckiser Grp. PLC*,
398 F. Supp. 3d 623 (N.D. Cal. 2019) .......................................................................... 10

*Daugherty v. Am. Honda Motor Co.*,
144 Cal. App. 4th 824 (2006) ...................................................................................... 14

*DeSoto v. Yellow Freight Sys.*,
957 F.2d 655 (9th Cir. 1992) ........................................................................................ 18

*Drum v. San Fernando Valley Bar Ass'n*,
182 Cal. App. 4th 247 (2010) ........................................................................................ 9

*Friedman v. AARP, Inc.*,
855 F.3d 1047 (9th Cir. 2017) ........................................................................................ 7

*Guido v. L'Oreal*,
No. CV 11-1067 CAS (JCx), 2011 U.S. Dist. LEXIS 164080 (C.D. Cal. June 27, 2011) .. 10

*Herremans v. BMW of N. Am., LLC*,
No. CV 14-02363 MMM PJWX, 2014 U.S. Dist. LEXIS 145957
(C.D. Cal. Oct. 3, 2014)............................................................................................... 15

*Hodsdon v. Mars, Inc.*,
891 F.3d 857 (9th Cir. 2018) ........................................................................................ 15

*Hydroxycut Mktg. & Sales Practices Litig. v. Iovate Health Scis. Grp., Inc.*,
801 F. Supp. 2d 993 (S.D. Cal. 2011) ............................................................................ 9

*In re Facebook, Inc.*,
402 F. Supp. 3d 767 (N.D. Cal. 2019) .......................................................................... 17

*In re S.C. Johnson & Son, Inc.*,
No. 20-cv-03184-HSG, 2021 U.S. Dist. LEXIS 141101 (N.D. Cal. July 28, 2021)............ 17

*In re Toyota Corp.*, 754 F. Supp. 2d 1145 (C.D. Cal. 2010) .................................................. 10

*In re Toyota RAV4 Hybrid Fuel Tank Litig.*,
  534 F. Supp. 3d 1067 (N.D. Cal. 2021) ................................................................. 15

*Johnson v. Glock, Inc.*,
  No. 3:20-cv-08807-WHO, 2021 U.S. Dist. LEXIS 253042 (N.D. Cal. Sept. 22, 2021) ...... 14

*Kearns v. Ford Motor Co.*,
  567 F.3d 1120 (9th Cir. 2009) ............................................................................ 11

*Keegan v. Am. Honda Motor Co.*,
  838 F.Supp.2d 929 (C.D. Cal. 2009) ................................................................... 15

*Klein v. Chevron U.S.A., Inc.*,
  137 Cal. Rptr. 3d 293 (Cal. Ct. App. 2012) ............................................................ 6

*Locklin v. StriVectin Operating Co.*,
  No. 21-cv-07967-VC, 2022 U.S. Dist. LEXIS 52461 (N.D. Cal. Mar. 23, 2022) ........... 2, 17

*Loop AI Labs, Inc. v. Gatti*,
  No. 15-cv-00798-HSG, 2015 U.S. Dist. LEXIS 117268 (N.D. Cal. Sep. 2, 2015) ............ 17

*MacDonald v. Ford Motor Co.*,
  37 F. Supp. 3d 1087 (N.D. Cal. 2014) .................................................................. 10

*McKinney v. Corsair Gaming, Inc.*,
  No. 22-cv-00312-CRB, 2022 U.S. Dist. LEXIS 127906 (N.D. Cal. July 19, 2022) ........... 15

*Park v. Thompson*,
  851 F.3d 910 (9th Cir. 2017) .............................................................................. 14

*Patterson v. RW Direct, Inc.*,
  382 F. Supp. 938 (N.D. Cal. 2019) ...................................................................... 14

*Penikila v. Sergeant's Pet Care Prods., LLC*,
  442 F. Supp. 3d 1212 (N.D. Cal. 2020) ................................................................. 17

*People ex rel. Harris v. Sarpas*,
  225 Cal. App. 4th 1539 (2014) ............................................................................. 8

*People v. First Fed. Credit Corp.*,
  104 Cal. App. 4th 721 (2002) .............................................................................. 8

*Prudencio v. Midway Importing, Inc.*,
  831 F. App'x 808 (9th Cir. 2020) .......................................................................... 9

*Robinson v. Wells Fargo Home Mortg.*,
  No. 16-cv-01619-YGR, 2016 U.S. Dist. LEXIS 152925 (N.D. Cal. 2016) ..................... 17

*Rojas v. Bosch Solar Energy Corp.*,
  443 F. Supp. 3d 1060 (N.D. Cal. 2020) ................................................................. 17

*Rutherford Holdings, LLC v. Plaza Del Rey*,
  223 Cal.App.4th 221 (2014) ............................................................................... 17

*Schreiber Distrib. Co. v. Serv-Well Furniture Co.*,
  806 F.2d 1393 (9th Cir. 1986) ............................................................................ 18

*Swartz v. KPMG LLP*,
  476 F.3d 756 (9th Cir. 2007) .............................................................................. 13

*Theranos, Inc. v. Fuisz Pharma LLC*,
  876 F. Supp. 2d 1123 (N.D. Cal. 2012) .................................................................. 6

*Tortilla Factory, LLC v. Better Booch, LLC*,
  No. 2:18-cv-02980-CAS(SKx), 2018 U.S. Dist. LEXIS 156617
  (C.D. Cal. Sep. 13, 2018) .................................................................................... 9

*United States ex rel. Lee v. Corinthian Colls.*,
   655 F.3d 984 (9th Cir. 2011) ............................................................................ 16

*United States v. Corinthian Colleges*,
   655 F.3d 984 (9th Cir. 2011) ............................................................................ 13

*United States v. United Healthcare Ins. Co.*,
   848 F.3d 1161 (9th Cir. 2016) .......................................................................... 13

*Unruh-Haxton v. Regents of Univ. of Cal.*,
   162 Cal. App. 4th 343 (2008) ............................................................................. 8

*Vess v. Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003) .......................................................................... 11

*Wallace v. SharkNinja Operating, LLC*,
   No. 18-cv-05221-BLF, 2020 U.S. Dist. LEXIS 40594 (N.D. Cal. Mar. 9, 2020) .............. 15

*Wang v. Massey Chevrolet*,
   97 Cal. App. 4th 856 (2002) ................................................................................ 1

*Zeiger v. Wellpet LLC*,
   304 F. Supp. 3d 837 (N.D. Cal. 2018) ....................................................... 11, 13

**Statutes**

7 U.S.C. § 136a(a) ........................................................................................... 7

7 U.S.C. § 136j(a)(1)(A) .................................................................................. 7

7 U.S.C. § 136j(a)(1)(C) .................................................................................. 7

7 U.S.C. § 136j(a)(1)(E) .................................................................................. 7

Cal. Bus. & Prof. Code § 17200 ...................................................................... 6

Cal. Food & Agric. Code § 12811 .................................................................. 7

Cal. Food & Agric. Code § 12991(a) .............................................................. 7

Cal. Food & Agric. Code § 12991(b) .............................................................. 7

Cal. Food & Agric. Code § 12991(c) .............................................................. 7

Cal. Food & Agric. Code § 12992 .................................................................. 7

Cal. Food & Agric. Code § 12993 .................................................................. 7

**Rules**

Fed. R. Civ. P. 9(b) ........................................................................................ 16

**Regulations**

40 C.F.R. § 156.10(g)(6) ................................................................................. 4

40 C.F.R. § 158.350 ........................................................................................ 4

**Other Authorities**

45 Fed. Reg. 42855-6 .................................................................................. 3, 9

## I.    INTRODUCTION

Plaintiffs allege that Defendant The Scotts Company LLC ("Scotts" or "Defendant") (i) exclusively markets and distributes, in California, a concentrated Roundup herbicide product—Roundup Weed & Grass Killer Super Concentrate and (ii) in conjunction with a joint venture with Defendants Monsanto Company and Seamless Control, LLC, formulates, markets and distributes other concentrated Roundup products in California, including Roundup Custom for Aquatic & Terrestrial Use, Roundup QuikPRO Herbicide, Roundup PROMAX Herbicide, Roundup PRO Herbicide, Roundup PRO Concentrate Herbicide and Ranger Pro. Plaintiffs further allege that Scotts knew or should have known that the concentrated glyphosate in these Roundup products, even when used in accordance with their labels, degrades into N-Nitrosoglyphosate ("NNG"), an impurity inherent to glyphosate, at levels that can surpass the Environmental Protection Agency's ("EPA") limit.

Scotts moves to dismiss. It argues that the company cannot be held liable, in this case, for its allegedly unlawful conduct, under California's Unfair Competition Law ("UCL"), because Plaintiffs do not plead that it "*personally participated in*" and "*exercised unbridled authority*" over the allegedly unlawful Roundup sales. ECF 23 ("Scotts MTD") at 1. This is factually and legally incorrect.

Plaintiffs' UCL theory of liability against Scotts is straightforward. Both California and federal law agree that it is illegal to sell ***or distribute*** herbicides that are 1) unregistered, 2) misbranded, and/or 3) non-compliant with what is allowed under their respective Confidential Statements of Formula. *See, e.g.*, ECF 1 ("Compl."), ¶¶ 177–184. That is exactly what Plaintiffs allege Scotts has done by exclusively marketing and distributing, at a minimum, the Roundup Weed & Grass Killer Super Concentrate (and other products pursuant to its joint venture agreement with Monsanto). Even if Scotts is ultimately correct that it marketed and distributed *only* one product in California on behalf of Monsanto, it still may be held liable under the unlawful prong of the UCL. *See, e.g.*, *Bruton v. Gerber Prods. Co*., 2017 U.S. App. LEXIS 12833, at *6 (9th Cir. July 17, 2017) (The UCL's unlawful prong "borrows" predicate legal violations and treats them

as independently actionable under the UCL) *citing Wang v. Massey Chevrolet*, 97 Cal. App. 4th 856, 871 (2002). Plaintiffs' UCL claim is adequately pled and may not be dismissed.

Scotts further argues that Plaintiffs' fraud based allegations against it are implausible and lack particularity. *See* Scotts MTD at 7–10. Both arguments are easily refuted. First, as to particularity, Plaintiffs adequately plead the "who, what, when, where, and how' of the misconduct charged." They plead: (a) Defendants; (b) misrepresented that the Products contained EPA-approved herbicides, such as "Roundup Weed & Grass Killer Super Concentrate," and omitted that the Products expire and are substantially likely to develop unlawfully high levels of a presumptive carcinogen, even with use and storage consistent with the label; (c) to Koller (and other consumers) when they purchased the Products; (d) on the Products' labels at the point of purchase; and (e) the Products do not contain EPA-approved herbicides because they can easily develop over 1 ppm NNG and expire because they will surpass the certified limit for NNG over the course of the Product's life cycle. *See* Compl. ¶¶ 203–206. Nothing more is required.

Second, as to plausibility, Plaintiffs allege that Scotts made affirmative misrepresentations and had a duty to disclose the safety hazard associated with the Products it distributed and sold. As explained in detail, the Products were defective because they could (and almost invariably would) degrade into higher and higher levels of NNG that would ultimately exceed regulatory limits. *Id*. ¶ 121. That a California consumer would want to know of a shelf life and material health danger—even just potential danger—associated with a pesticide purchase is not only plausible, it is obvious.

Scotts finally challenges Plaintiffs' unjust enrichment claim with the often repeated, but almost invariably rejected, argument that "there is no standalone" unjust enrichment cause of action in California. *See* Scotts MTD at 11. This too is mistaken. But, even if unjust enrichment is not a "standalone claim" in California, it is still treated as "a quasi-contract claim seeking restitution" that may be pled in the alternative. *See Locklin v. StriVectin Operating Co*., 2022 U.S. Dist. LEXIS 52461, at *7–8 (N.D. Cal. Mar. 23, 2022). As Plaintiffs adequately allege that Scotts made money by unlawfully selling, marketing and distributing Roundup in California, they may recover for Scotts' unjust enrichment.

Scotts' motion to dismiss should be denied.

## II.   BACKGROUND

### A.   Plaintiffs' Allegations.[1]

Plaintiffs generally allege that Monsanto Company, Bayer CropScience LP, Seamless Control LLC, and Scotts (collectively, "Defendants") formulate, manufacture, market and/or distribute glyphosate-based herbicides, which are designed to kill weeds. Compl. ¶¶ 2, 138. These products are primarily sold under the brand name "Roundup," including increasingly concentrated formulations with significantly higher amounts of glyphosate ranging from 41% to as much as 73.3% glyphosate. *Id*.; *see also* Ex. 1 to Compl.

N-Nitrosoglyphosate ("NNG") is an impurity inherent to glyphosate. *Id*. ¶ 3. NNG belongs to a class of chemicals called nitrosamines. *Id*. ¶ 4.  Nitrosamines are so dangerous that the EPA ***presumes*** them to be potent carcinogens in absence of proof otherwise. *Id*. ¶¶ 4, 73–5; *see also* 45 Fed. Reg. 42855-6. EPA's review of nitrosamines determined that 80% of the nitrosamines tested are carcinogenic. *Id*. EPA accordingly sets a hard limit of 1 part per million ("ppm") of NNG in *all* pesticides, including glyphosate products, absent sufficient oncogenic testing.  *Id*.; *see also id*. ¶¶ 74–6.

The amount of NNG in a glyphosate product, however, does not remain static. It grows over time. *Id*. ¶¶ 6–7. By its nature, glyphosate is a highly reactive and unstable chemical in the presence of nitrites. *Id*. Glyphosate, when exposed to nitrites (which are prevalent in everyday environments including, for example, heat, city air, exhaust from cars, and, even in water) degrades into NNG. *Id*. Degradation occurs regardless of whether the glyphosate is pure or mixed into a formulated end product. *Id*. *Because NNG is an impurity inherent to glyphosate, increasing the concentration of glyphosate within a product necessarily increases the amount of NNG in the product too*. *Id*. ¶¶ 8, 98–109. Thus, when a Roundup product has 73.3% glyphosate, as opposed to 2% glyphosate, the concentrated product will have far more NNG.

---

[1] Plaintiffs include, and incorporate by reference, a more detailed description of their allegations and the arguments made in their Opposition to the Motion to Dismiss from Monsanto Company, Bayer CropScience LP, and Seamless Control LLC ("Opposition to the Monsanto Defendants' MTD").

This case relates solely to the most highly concentrated forms of Roundup (i.e., those that have over 41% glyphosate) (the "Products"). The Products' high concentration of glyphosate means that they have inherently high levels of NNG. *Id.* ¶¶ 3, 8. This in combination with glyphosate's known reactivity with nitrites—which come in contact with the Products through ordinary consumer use—means NNG levels in real world Products can easily exceed the 1 ppm limit and become more dangerous with each use. *Id.* ¶¶ 10, 19, 113–121. In doing so, the Products do not comply with a fundamental condition of their registration—the requirement that the Products can *never* exceed 1 ppm NNG *at any point in time* before the consumer uses all of the Product. *See* 40 C.F.R. § 158.350. *Id.*; *see also id.* ¶¶ 175–77.

By marketing, distributing, and selling the Products under the names of registered pesticides like "Roundup Weed & Grass Killer Super Concentrate," Defendants misled consumers into believing that they are buying products chemically identical to those registered with EPA (i.e., a product that can never develop illegal levels of a probable carcinogen). *Id.* ¶¶ 20, 179–83. But they are not. *Id.* EPA registered (and, therefore, provided a license to sell) only Products that can never have more than 1 ppm NNG over the entire life cycle of the Product. *Id.* Because the Products can (and invariably do) degrade, pushing NNG levels above regulatory limits, they were illegal to sell or distribute. *Id.*

Defendants also unlawfully, unfairly and or deceptively manufactured, marketed and sold, or caused to be manufactured, marketed and sold, the Products by knowingly selling, marketing and distributing the Products without including an expiration date—i.e., "Not for sale or use after [date]." *Id.* ¶¶ 21–2; 185–90. EPA requires an expiration date when a product "changes chemical composition significantly." 40 C.F.R. § 156.10(g)(6). Further, if a manufacturer cannot certify that impurities like NNG will remain within its 1 ppm limit until a consumer uses all the product, then the product must bear an expiration date. 40 C.F.R. § 158.350.

### B.   Specific Allegations Concerning The Scotts Company LLC.

During the class period, Scotts exclusively marketed and distributed in California a concentrated Roundup herbicide product—Roundup Weed & Grass Killer Super Concentrate. Compl. ¶ 45. In 2018, Monsanto (and later Bayer CropScience) entered into a joint venture with

Scotts for Scotts to sell, distribute and market some additional glyphosate-based products. *Id.* ¶ 46. Monsanto and Scotts also formed Seamless Control, which they jointly owned either directly or indirectly through holding companies. *Id.* For at least a year, Seamless Control distributed and marketed certain Products to retailers for sales to consumers nationwide pursuant to the joint venture, including in California. *Id.* ¶ 47. Though Monsanto had initially registered the Products with EPA, EPA later approved registrations with Seamless Control as the registrant, including for Roundup Custom for Aquatic & Terrestrial Use, Roundup QuikPRO Herbicide, Roundup PROMAX Herbicide, Roundup PRO Herbicide, Roundup PRO Concentrate Herbicide and Ranger Pro. *Id.*

### C. Plaintiff Koller's Roundup Purchase.

Plaintiff Scott Koller purchased Roundup Weed & Grass Killer Super Concentrate on several occasions from Lowe's, Ace Hardware, and Home Depot stores in the Brentwood, California and Antioch, California areas in the last decade, including at least two times over the last four years. *Id.* ¶ 203. He made each of his purchases after reading and relying on the truthfulness of the Roundup Weed & Grass Killer Super Concentrate label, which among other things, promised it contained "Roundup Weed & Grass Killer Super Concentrate" as approved by EPA. *Id.* ¶ 204.

Further, Mr. Koller made each of his purchases after reading and relying on the truthfulness of the Product's label, which did not include "Not for sale or use after [date]." *Id.* ¶ 205. Because there was not a "Not for sale or use after [date]" disclaimer on the Product, he believed that it could be used for an indefinite duration when used and stored in accordance with the label. *Id.* Finally, at the time of each of Mr. Koller's purchases, he was not aware that the Product was defective because it was substantially likely to develop uncontrollable and unlawful levels of a presumptive carcinogen, even with use and storage consistent with the label. *Id.* ¶ 206. Mr. Koller would not have purchased the Products, or would not have paid as much for them, if he had known of the truth of the matter. *Id.* ¶¶ 204–6.

## III.    LEGAL STANDARD

To survive a motion to dismiss, a plaintiff's complaint need only contain "enough facts to state a claim [for] relief that is plausible on its face." *Bell Atlantic. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In evaluating plausibility, "the court must presume all factual allegations are true and draw all reasonable inferences in favor of Plaintiff." *Theranos, Inc. v. Fuisz Pharma LLC*, 876 F. Supp. 2d 1123, 1136 (N.D. Cal. 2012) (citing *Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 678).

## IV.    ARGUMENT

### A.    Plaintiffs' UCL Claims Withstand Dismissal.

The UCL broadly proscribes the use of any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code. § 17200; *Beaver v. Tarsadia Hotels*, 816 F.3d 1170, 1177 (9th Cir. 2016). "The UCL operates as a three-pronged statute: 'Each of these three adjectives [unlawful, unfair, or fraudulent] captures a 'separate and distinct theory of liability.'" *Id.* (citation omitted.) Plaintiffs allege violations under each prong of the UCL.

### 1.    Plaintiffs allege a claim under the UCL's unlawful prong.

Though Plaintiffs allege violations of each UCL prong against Defendants, Scotts attacks only Plaintiffs' unlawful claim. It specifically argues that it cannot be held "vicariously" liable under the UCL here because Plaintiffs have not (and cannot) allege "*personal participation and unbridled control*" over the "*unlawful conduct*."[2] (emphasis supplied). Scotts MTD at 4. It further suggests that a retailer or distributer may not be held liable, as a matter of law, just because it knew about the deceptive marketing. Scotts misapprehends Plaintiffs' theory of liability.

The UCL's "unlawful" prong "borrows violations of other laws and makes those unlawful practices actionable under the UCL." *Klein v. Chevron U.S.A., Inc.*, 137 Cal. Rptr. 3d 293, 326–27 (2012). "Virtually any law or regulation—federal or state, statutory or common law—can serve as a predicate for a section 17200 'unlawful' violation." *Id.* (internal quotation marks omitted); *see*

---

[2] Scotts does not attack Plaintiffs' unfair or fraudulent prong claims under the UCL. For that matter, it never even mentions those claims. *See* Scotts MTD at 4–7.

*also Friedman v. AARP, Inc.*, 855 F.3d 1047, 1052 (9th Cir. 2017) (same). Here, Plaintiffs allege

predicate violations, including the California Food & Agriculture Code which expressly regulates

the *distribution* of pesticides, as follows:

    a. Cal. Food & Agric. Code § 12811 ("[e]very manufacturer of, importer of, *or dealer in any pesticide*…shall obtain a certificate of registration from the department before the pesticide is offered for sale");

    b. Cal. Food & Agric. Code § 12991(a) (it is unlawful for *any person* in connection with a pesticide to "[m]ake any material or substantial misrepresentation");

    c. Cal. Food & Agric. Code § 12991(b) (it is unlawful for *any person* in connection with a pesticide to "[m]ake any false promises of a character likely to influence, induce, or deceive");

    d. Cal. Food & Agric. Code § 12991(c) (it is unlawful for *any person* in connection with a pesticide to "[e]ngage in illegitimate business or dishonest dealing");

    e. Cal. Food & Agric. Code § 12992 ("[i]t is unlawful for *any person* to sell any adulterated or misbranded pesticide"); and

    f. Cal. Food & Agric. Code § 12993 ("[i]t is unlawful for *any person* to manufacture, *deliver*, or sell any pesticide or any substance or mixture of substances that is represented to be a pesticide…which is not registered pursuant to this chapter…")

Compl. ¶¶ 177–184 (emphasis supplied). The acts further violated parallel FIFRA requirements,

including:

    a. 7 U.S.C. § 136a(a) ("*no person* in any State may *distribute* or sell to any person any pesticide that is not registered under this subchapter");

    b. 7 U.S.C. § 136j(a)(1)(A) ("it shall be unlawful for *any person* in any State to *distribute* or sell to any person— (A) any pesticide that is not registered under section 136a of this title…");

    c. 7 U.S.C. § 136j(a)(1)(C) ("it shall be unlawful for *any person* in any State to *distribute* or sell to any person— (C) any registered pesticide the composition of which at the time of *its distribution or sale* from its composition as described in the statement required in connection with registration under section 136a of this title");

    d. 7 U.S.C. § 136j(a)(1)(E) ("it shall be unlawful for any person in any State to *distribute or sell* to any person—(E) any pesticide which is adulterated or misbranded");

      The clear implication of these statutes is that even if Scotts marketed and distributed only

the Roundup Weed & Grass Killer Super Concentrate, and only did so in conjunction with others,

Plaintiffs still adequately allege violations of statutory predicates, and, therefore, liability under

the UCL unlawful prong. Otherwise stated, there is no requirement, under each statute, or the UCL,

for that matter, that Scotts have had anything to do with the formula, manufacture, or registration, as it contends. That Scotts *distributed, delivered* and/or *dealt* the Roundup Weed & Grass Killer Super Concentrate in California, in violation of any law or regulation, is sufficient. *See Allergan United States, Inc. v. Prescribers Choice, Inc.*, 364 F. Supp. 3d 1089, 1107 (C.D. Cal. 2019) (finding a drug distributor violated "violated the Sherman Law and the UCL's unlawful prong by making and selling unapproved drugs without complying with Section 503B or the FDA's Interim Policy up until July 2018").

Scotts' focus on vicarious liability is a red herring. The Complaint does not allege that Scotts committed the unlawful acts via a vicarious liability theory; rather, it alleges that, at a minimum, Scotts personally participated in and had control over the acts that violated the aforementioned statutes because it was the *exclusive* distributor of the Roundup Weed & Grass Killer Super Concentrate. *Sew People ex rel. Harris v. Sarpas*, 225 Cal. App. 4th 1539, 1563 (2014).

Further, "liability under the UCL may be imposed against those who aid and abet the violation." *Id*. California courts have found that such liability exists for joint owners of a company. *Id*. For instance, in *People v. First Fed. Credit Corp*., 104 Cal. App. 4th 721, 735 (2002), the court found that "one of two principals" could be liable because she "was in a position of control, yet permitted the unlawful practices to continue despite her knowledge thereof." *See Harris*, 225 Cal. App. 4th at 1563. Similarly, here, Scotts was in a position of control as one of two principals of Seamless Control, which registered and distributed additional Products. Members of joint ventures generally "have joint control over the venture" and "share the profits of the undertaking." *Unruh-Haxton v. Regents of Univ. of Cal.*, 162 Cal. App. 4th 343, 370–71 (2008). As a joint venturer with Monsanto, Scotts knowingly permitted the unlawful practice (i.e., the distribution and sale of the Seamless Control Products). These allegations suffice for aiding and abetting liability under the UCL.

Scotts' argument that it cannot be found liable under the UCL's unlawful prong for violations of the CLRA similarly misses the mark. Plaintiffs do not allege a CLRA claim against Scotts, either as a standalone claim or as a predicate act under the UCL unlawful prong. The cases

that Scotts relies upon, thus, do not apply here, which relate solely to UCL claims arising from violations of the CLRA or FAL, which do not give rise to distributor liability absent participation in or control over the deceptive advertising. By contrast, Plaintiffs' claim here is predicated on statutes that *specifically* prohibit the distribution and sale of the Products in this context, not generic prohibitions on false advertising. Each of Scott's cases is therefore inapposite. *See Prudencio v. Midway Importing, Inc*., 831 F. App'x 808, 811 (9th Cir. 2020) (based on a CLRA claim); *Hydroxycut Mktg. & Sales Practices Litig. v. Iovate Health Scis. Grp., Inc*., 801 F. Supp. 2d 993, 1012–3 (S.D. Cal. 2011) (based on false advertising violations); *Tortilla Factory, LLC v. Better Booch, LLC*, 2018 U.S. Dist. LEXIS 156617, at *31 (C.D. Cal. Sep. 13, 2018) (based on violations of the FAL).

### 2.   Plaintiffs allege Defendants violated the unfair prong of the UCL.

Plaintiffs further allege Defendants engaged in unfair conduct in violation of the UCL by marketing, selling and distributing herbicides that could (and likely would) exceed 1 ppm, without sufficient oncogenic testing. *See* Compl. ¶¶ 182, 363. At a minimum, such conduct directly contravenes EPA's policy on nitrosamines. *Id*. ¶¶ 72–6; *see also* 45 Fed. Reg. 42855-6. Scotts does not challenge this claim.

There are at least two tests to evaluate whether a practice is "unfair" under the UCL. *See Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 256–57 (2010) (articulating the possible tests defining "unfair"). The "balancing test" asks whether the alleged business practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers and requires the court to weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim. *Id*. The "tethering test" asks whether the unfairness and public policy at issue are "tethered to specific constitutional, statutory, or regulatory provisions." *Id*.

Plaintiffs have adequately alleged a claim under the unfair prong of the UCL under either test. The misconduct alleged is unscrupulous and substantially injurious to millions of consumers who are being duped into buying and using herbicides that can become more and more dangerous with each use, thereby exposing them to a presumptive carcinogen at levels of which regulatory authorities do not approve. Any utility of Defendants' conduct (if any) is far outweighed by the

harm they are causing to vulnerable consumers. Indeed, the Products never should have been on the market to begin with. *Cf. Guido v. L'Oreal*, 2011 U.S. Dist. LEXIS 164080, at *22 (C.D. Cal. June 27, 2011) (finding that "the allegation that L'Oreal knew the Serum posed an unreasonable danger to consumers, but failed to warn consumers is sufficient to state a claim for unfair business practices under the UCL"); *In re Toyota Corp.*, 754 F. Supp. 2d 1145, 1175–76 (C.D. Cal. 2010) (allegations sufficed to state a claim under the unfair prong of the UCL since Toyota sold vehicles with sudden unintended acceleration defect and failed to adequately investigate, disclose, and remedy defect).

Under the "tethering test," Defendants' conduct also offends EPA's policy against the sale and distribution of herbicides with over 1 ppm nitrosamines absent proof that the nitrosamine is not carcinogenic. *See MacDonald v. Ford Motor Co.*, 37 F. Supp. 3d 1087, 1097–99 (N.D. Cal. 2014) (holding that allegations of a failure to disclose an alleged safety problem with certain parts satisfied both tests for unfair conduct under the UCL). EPA enacted the policy to ensure that any exposure to nitrosamines remains at a low level or is to a nitrosamine that is conclusively not carcinogenic. The policy is tethered to federal and state statues prohibiting the sale and distribution of products that do not conform to the limits set forth in their registrations and the requirement that only pesticides that do not pose "unreasonable adverse effects" may be registered and legally sold in the United States. *See* Opp. to Monsanto Defendants' MTD at § III(A).

Finally, Plaintiffs note that reliance is not a necessary element of a claim under the UCL's "unfair" prong. *See Clorox Co. v. Reckitt Benckiser Grp. PLC*, 398 F. Supp. 3d 623, 646 (N.D. Cal. 2019) (noting that some cases have held to the contrary, but denying a motion to dismiss a claim under the UCL unfair prong despite dismissing claims under the FAL and the UCL unlawful prong based on a failure to allege reliance).[3] Under the applicable case law, Plaintiffs have sufficiently alleged unfair acts by *all* Defendants under the UCL.

---

[3] In any event, Plaintiffs adequately allege reliance on the Products' labels. *See* Opp. to Monsanto Defendants' MTD at § III(A).

### B.      Plaintiffs Adequately Allege Fraud-Based Claims Against Scotts.

#### 1.      Plaintiffs satisfy Rule 9(b).

Scotts further argues that Plaintiffs' fraud-based claims fail to meet Rule 9(b). To satisfy the particularity requirements of Rule 9(b), a plaintiff must plead "'the who, what, when, where, and how' of the misconduct charged." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003))**Error! Bookmark not defined.**. Plaintiffs easily meet this requirement. They plead:

> **Who:** Defendants;
>
> **What:** Misrepresented that the Products contained EPA-approved herbicides, such as "Roundup Weed & Grass Killer Super Concentrate", and omitted that the Products expire and are substantially likely to develop unlawfully high levels of a presumptive carcinogen, even with use and storage consistent with the label;
>
> **When:** To Koller (and other consumers) when they purchased the Products;
>
> **Where:** On the Products' labels at the point of purchase; and
>
> **How:** The Products do not contain EPA-approved herbicides because they can easily develop over 1 ppm NNG and expire because they will inevitably surpass the certified limit for NNG over the course of the Product's life cycle.

Compl. ¶¶ 203–206. *See Zeiger v. Wellpet LLC*, 304 F. Supp. 3d 837, 849–50 (N.D. Cal. 2018) (applying the "the who, what, when, where, and how" analysis).

Scotts nevertheless insists that Plaintiffs have not satisfied Rule 9(b) because the allegations are made against "Defendants," with nothing specific to Scotts. *See* Scotts MTD at 10. To the contrary, Plaintiffs adequately lay out each Defendant's involvement, including Scotts. Among other things, the Complaint alleges that Monsanto initially registered, sold through third parties, and manufactured all of the Products, and Bayer CropScience took over the manufacture and registration for some of the Products when Bayer AG, acquired Monsanto in 2018. Compl. ¶¶ 38–43. The Complaint further alleges that Scotts has served as Monsanto's, and later Bayer CropScience's exclusive distributor and marketing agent for the Roundup Weed & Grass Killer Super Concentrate since 1998, and, in the course of that role, falsely represented to consumers that the "Roundup Weed & Grass Killer Super Concentrate" on store shelves was the same as the "Roundup Weed & Grass Killer Super Concentrate" that was legally permitted to be sold. *Id.* ¶¶

45, 183. The Complaint further alleges that the Material Safety Data Sheet for the Roundup Weed & Grass Killer Super Concentrate – a document that Scotts certainly would have seen as the exclusive distributor of the Product – recommended a 2-year shelf life in 2003. *Id*. ¶ 200. At a minimum, the 2003 Material Safety Data Sheet should have alerted Scotts that the Roundup Weed & Grass Killer Super Concentrate could expire. *Id*.

Scotts' involvement ran even deeper. The Complaint further discusses how Scotts and Monsanto had first-hand experience with the problems that arise from nitrites in the water used to formulate the glyphosate products in 2005–2007. *Id*. ¶¶ 124–7, 138–9, 141–2. Scotts itself formulated, or mixed, certain glyphosate products for Monsanto. *Id*. In the course of those duties, Scotts knew it had to monitor nitrite levels since it "tended to see high levels of nitrites in the water it used to formulate the glyphosate products [*sic*]." *Id*. But because Scotts was "faced with increasing nitrite levels in their city water supply," Monsanto agreed, for at least two summers in 2005 and 2006, to wholesale *waive* all limits set on nitrites in the formulation water, something Scotts undoubtedly knew. *Id*. By securing the nitrite waiver, Scotts was directly involved with increasing NNG levels in the Products. *Id*.

Given that Scotts was formulating glyphosate products, it knew—or, at worst, should have known—the basic chemistry underlying the Products, namely that nitrites plus glyphosate creates NNG, and the measures it could take to reduce NNG at formulation (i.e., monitoring the water or reducing ambient exhaust). *Id*. If it did not know by 2007, it certainly should have known after Dr. Wratten explained how this works and why "spec waivers" posed a serious danger as it relates to NNG. *Id*. At a minimum, the exchange shows that Scotts knew that nitrites are in water and, considering that, in order to use the Products, consumers must mix them with water, it should have known that NNG can continue to form post-manufacture. *Id.* ¶ 118.

Against this backdrop, Scotts nevertheless chose to enter into an agreement with Monsanto in 2018 to form a joint venture "to have Scotts sell, distribute, and market…many of the Products." *Id*. ¶ 46. As part of that joint venture, Scotts and Monsanto formed a new entity called Seamless Control for the purpose of using the entity as a vehicle to file applications for registrations with EPA for many of the Products that certified that the Products would stay below 1 ppm NNG, even

though, at the time, both Scotts and Monsanto knew (or should have known) that was not true. *Id*. ¶¶ 46-7. Indeed, a Monsanto internal study demonstrated that the Products were fully capable of exceeding the regulatory limit for NNG. *Id*. ¶¶ 129–30. Scotts, too, was aware that NNG forms in glyphosate-based herbicides and that nitrosamines are known carcinogens. *Id*. ¶ 62. Moreover, the person who Scotts and Monsanto tasked with filing those applications for registration was Monsanto's own regulatory affairs manager, who knew at the time that "formulations containing the ethanolamine salt form of Glyphosate...can be converted into N-nitroso-glyphosate (NNG), an impurity of toxicological significance with an upper concentration limit of 1 ppm in Glyphosate products" and should have some awareness as to how NNG forms given the company's knowledge of the topic.  *Id*. ¶¶ 50, 79. With the registrations secured, Scotts proceeded to distribute, market and sell those Products, through Seamless Control, to consumers nationwide who had no idea about their propensity to form a presumptive carcinogen or that they expire. *Id*. ¶ 47. In doing so, it misrepresented the Products as identical to those approved by EPA even though they were not. *See Zeiger*, 304 F. Supp. 3d at 851–2 (finding that allegations that the defendant made false claims, marketed the product, and was involved with manufacturing "provide[d] the basis for plaintiffs' theory of WellPet's knowledge that they should have known of the presence of contaminants in their Products").

Any complaints about "lumping" Defendants are simply inapplicable here. Plaintiffs have done exactly what Scotts claims the law requires them to do: "identif[y] the role of [each] defendant[ ] in the alleged fraudulent scheme." Scotts MTD at 10, *citing Swartz v. KPMG LLP*, 476 F.3d 756 (9th Cir. 2007). Indeed, the Ninth Circuit recognizes that plaintiffs need only "differentiate their allegations when suing more than one defendant and inform each defendant separately of the allegations surrounding his alleged participation in the fraud." *United States v. Corinthian Colleges*, 655 F.3d 984, 997–98 (9th Cir. 2011) (quoting *Swartz*, 476 F.3d at 764–65.) "There is no flaw in a pleading, however, where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct." *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1184 (9th Cir. 2016). Rule 9(b) is not a basis to dismiss the claims against Scotts.

### 2.      Scotts' plausibility challenge is meritless.

Scotts further challenges the fraud claims on plausibility grounds. *See* Scotts MTD at 8–9. Whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). Generally, a court must accept the factual allegations in the pleadings as true and view them in the light most favorable to the plaintiff. *Park v. Thompson*, 851 F.3d 910, 918 (9th Cir. 2017).

To begin with, Scotts contends that the fraud claims are implausible because it did not make any misrepresentations. *See* Scotts MTD at 8. However, the Complaint plainly alleges that Scotts misrepresented the "Roundup Weed & Grass Killer Super Concentrate" as containing the herbicide that was legally permitted to be sold and distributed under that label. Compl. ¶¶ 36, 183. Because Scotts made these misrepresentations to both consumers and retailers through its distribution, these affirmative misrepresentations are independently actionable and do not require a duty to disclose. *See Patterson v. RW Direct, Inc*., 382 F. Supp. 938, 942 (N.D. Cal. 2019); *see also Allergan United States, Inc. v. Prescribers Choice, Inc.*, 364 F. Supp. 3d 1089, 1110–3 (C.D. Cal. 2019) (finding that a distributor's statements that the drugs it distributed were "FDA-approved" were literally false and could serve as a basis for a FAL claim).

Omissions, too, are actionable when they are "contrary to a representation actually made by the defendant." *Id*., *citing Daugherty v. Am. Honda Motor Co*., 144 Cal. App. 4th 824, 835 (2006). A duty to disclose is not required in such an instance. *Id*. Because the omissions here— i.e., the failure to disclose the Products do not contain EPA-approved herbicides—are contrary to statements made about the herbicides that Scotts sold and distributed, Plaintiffs' "claims again do not hinge on the defendants' duty to disclose" and "there was no need for [Plaintiffs] to show that knowledge of the defect was in the defendants' exclusive possession." *Id*.

Further, the Complaint adequately alleges that Scotts had a duty to disclose because the duty "arises… when the undisclosed information 'cause[s] an unreasonable safety hazard.'" *Johnson v. Glock, Inc.*, 2021 U.S. Dist. LEXIS 253042, at *5 (N.D. Cal. Sept. 22, 2021); *see also In re Toyota RAV4 Hybrid Fuel Tank Litig.*, 534 F. Supp. 3d 1067, 1102–04 (N.D. Cal.

2021). "Under this theory, a plaintiff must adequately plead (1) a defect, (2) a safety hazard, (3) a causal connection between the defect and the hazard, and (4) the defendant's knowledge of the defect at the time of sale." *Id.* As explained in detail in Plaintiffs' Opposition to the Monsanto Defendants' MTD, Plaintiffs' allegations suffice for this as well. *See* § III(C)(2). Scotts' marketing and distribution of Products that did not include a "Not for sale or use after [date]" or disclose that they were not registered, EPA-approved, or chemically consistent with the Products they purported to be meets the requirement for a "safety hazard" since, without that information, consumers are unknowingly exposed to a presumptive carcinogen at levels EPA deems unsafe.[4] *See, e.g., Keegan v. Am. Honda Motor Co.*, 838 F.Supp.2d 929 (C.D. Cal. 2009) (duty to disclose plausible safety concerns proximately resulting from the alleged defect—i.e., defective tires); *Herremans v. BMW of N. Am., LLC*, 2014 U.S. Dist. LEXIS 145957, at *14 (C.D. Cal. Oct. 3, 2014) (defining an "unreasonable risk to safety" as any "risk of physical injury"); *Wallace v. SharkNinja Operating, LLC*, 2020 U.S. Dist. LEXIS 40594, at *20 (N.D. Cal. Mar. 9, 2020) (risk of a laceration is an unreasonable safety hazard).

Scotts ignores this basis for a duty to disclose. It further argues that a duty to disclose does not exist because none of the four *LiMandri* factors giving rise to a duty to disclose are present: "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts." Scotts MTD at 8. But courts recognize that a plaintiff may establish a duty to disclose *either* by alleging the undisclosed information causes a safety hazard *or* (1) the omission is material, (2) goes to the product's central functionality, and (3) one of the *LiMandri* factors is met. *See Brown v. Madison Reed, Inc.*, 2022 U.S. Dist. LEXIS 149105, at *30 (N.D. Cal. Aug. 19, 2022) (stating the standard); *McKinney v. Corsair Gaming, Inc.*, 2022 U.S. Dist. LEXIS 127906, at *23–24 (N.D. Cal. July 19, 2022) (same); *In re Toyota RAV4 Hybrid Fuel Tank Litig.*, 534 F. Supp. 3d at 1102–04 (detailed discussion of this

---

[4] This also goes to the central function of the Products. *See Hodsdon v. Mars, Inc.*, 891 F.3d 857, 863 (9th Cir. 2018); *see also* Opp. to Monsanto Defendants' MTD at § III(C)(2).

issue and applying a slightly different standard, but finding that a safety hazard may serve as an independent basis for a duty to disclose).

Plaintiffs meet both tests since, in addition to alleging a safety hazard, they allege materiality, defects that pertain to the central function, and *LiMandri* factors, as explained in detail in Plaintiffs' Opp. to Monsanto Defendants' MTD. *See* § III(C)(2). The Complaint alleges that Defendants, including Scotts, knew or should have known of the true nature of the Products, which was not known to Plaintiffs and that Scotts and the other Defendants actively concealed defect, as discussed above. *See* Opp. to Monsanto Defendants' MTD at § III(C); *see also* Compl. ¶¶ 36, 45-7, 62, 138-9. Those allegations demonstrate that Scotts engaged in affirmative acts in furtherance of the fraud by, among other things, (i) elevating the levels of NNG in the products it formulated on behalf of Monsanto by obtaining waivers on the nitrite levels in the water, (ii)  working to register Products that it should have known could never be certified to stay below 1 ppm NNG, and (iii) selling, distributing and marketing certain Products under the guise they contain herbicides that conform to EPA's minimum safety standards. Compl. ¶¶ 45, 47, 59, 62, 138–9, 182–3, 200.

Given that knowledge may be alleged generally, these allegations suffice. *See* Fed. R. Civ. P. 9(b); *Beyer v. Symantec Corp.*, 333 F. Supp. 3d 966, 981 (N.D. Cal. 2018) (finding that the fact a defendant "designed and produced" the software, among other actions, were sufficient to allege knowledge of the defect, which can be pled generally); *United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 996 (9th Cir. 2011) (holding "malice, intent, knowledge, and other conditions of a persons mind," including scienter, can be alleged generally); *see also* Compl. ¶ 18 ("Monsanto, Bayer CropScience, Scotts, and Seamless Control sold, or caused the Products to be sold, to consumers even though they knew, or should have known, at the time of those sales, that the Products were defective because they could (and almost invariably would) degrade into higher and higher levels of NNG that would ultimately exceed regulatory limits.")

### C.    Plaintiffs Adequately Plead a Claim for Unjust Enrichment.

Scotts argues that Plaintiffs' unjust enrichment claim fails for three reasons:  First, there is no "standalone claim' for unjust enrichment in California. Second, Plaintiffs' claim must be

dismissed as duplicative. Third, Plaintiffs fail to plead any "actionable benefit" was conferred upon Scotts. *See* Scotts MTD at 11–12. Each is easily refuted.

It is well-established that "standalone" unjust enrichment claims are permissible in California under certain circumstances. *See Penikila v. Sergeant's Pet Care Prods., LLC*, 442 F. Supp. 3d 1212, 1215 (N.D. Cal. 2020) (denying motion to dismiss plaintiff's claim for unjust enrichment when presented with the same argument); *see also Bruton v. Gerber Products Co.*, 703 F. App'x 468, 470 (9th Cir. 2017) (noting that the California Supreme Court has allowed independent claims for unjust enrichment to proceed); *Robinson v. Wells Fargo Home Mortg*., 2016 U.S. Dist. LEXIS 152925, at *17 (N.D. Cal. 2016). Even where courts have found no standalone claim for "unjust enrichment" in California, they still "construe the cause of action as a quasi-contract claim seeking restitution." *Locklin*, 2022 U.S. Dist. LEXIS 52461, at *7–8, *citing Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal.App.4th 221, 231 (2014); *Astiana v. Hain Celestial Grp., Inc*., 783 F. 3d 753, 762 (9th Cir. 2015) (stating that courts can construct "unjust enrichment" claims as a quasi-contract claim seeking restitution).

Next, a plaintiff is "permitted to plead an unjust enrichment claim in the alternative." *Loop AI Labs, Inc. v. Gatti*, 2015 U.S. Dist. LEXIS 117268, at *23 (N.D. Cal. Sep. 2, 2015); *see also In re Facebook, Inc*., 402 F. Supp. 3d 767, 803 (N.D. Cal. 2019) (holding "plaintiffs are permitted to plead claims for breach of contract and unjust enrichment in the alternative."); *In re S.C. Johnson & Son, Inc*., 2021 U.S. Dist. LEXIS 141101, at *26–27 (N.D. Cal. July 28, 2021) ("Therefore, at this stage, the Court will construe the cause of action as a quasi-contract claim seeking restitution, as it has done in prior cases"); *Rojas v. Bosch Solar Energy Corp.*, 443 F. Supp. 3d 1060, 1080 (N.D. Cal. 2020) (noting that "this Court has held that a claim for unjust enrichment may be asserted under California law, and that such a claim is not subject to dismissal at the pleading stage even if duplicative of other claims"). Otherwise stated, a claim for unjust enrichment that is, as here, pleaded in the alternative, may be duplicative. The Ninth Circuit has, in fact, specifically held that a district court errs when it dismisses an "unjust enrichment" claim as "duplicative of or superfluous of" other claims. *Astiana*, 783 F.3d at 762–63.

Finally, Plaintiffs allege that Defendant has been unjustly enriched in retaining the revenues from purchases of the Products, which retention is unjust and inequitable, because the Products were illegal to sell and Defendants falsely represented that the Products contained registered, EPA-approved herbicides even though they did not. Compl. ¶¶ 182–3, 379. Plaintiffs further allege that Defendants also hid the defect from Plaintiffs and members of the California Subclass. *Id*. These actions harmed Plaintiffs and members of the California Subclass, and benefitted Defendants, because Defendants retain the funds of Products that are worthless to Plaintiffs. *Id*. ¶¶ 158, 204–206, 379. Just as Plaintiffs have adequately stated unlawful and fraudulent acts attributable to Scotts, they too state a claim for unjust enrichment against Scotts.

### D.     Plaintiffs Request Leave to Amend If Necessary.

Should this Court find the complaint insufficient, Plaintiffs request leave to amend to add additional allegations and/or increased specificity. Leave "should be granted unless the Court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co*., 806 F.2d 1393, 1401 (9th Cir. 1986). Only "where the amendment would be futile" should leave be denied. *DeSoto v. Yellow Freight Sys*., 957 F.2d 655, 658 (9th Cir. 1992).

## V.     CONCLUSION

For the reasons set forth above, the Court should deny The Scotts Company LLC's motion to dismiss in full.

Dated: November 9, 2022

        **GUTRIDE SAFIER LLP**

        */s/Seth A. Safier/s/*
        Seth A. Safier (State Bar No. 197427)
         seth@gutridesafier.com
        Marie A. McCrary (State Bar No. 262670)
         marie@gutridesafier.com
        Anthony J. Patek (State Bar No. 228964)
         anthony@gutridesafier.com
        100 Pine Street, Suite 1250
        San Francisco, CA 94111
        Telephone: (415) 639-9090
        Facsimile:  (415) 449-6469

        Kali R. Backer (State Bar No. 342492)
         kali@gutridesafier.com
        4450 Arapahoe Avenue, Suite 100
        Boulder, CO 80303
        Telephone: (415) 336-6545
        Facsimile:  (415) 449-6469

        **WOOL TRIAL LAW LLC**

        David J. Wool (State Bar No. 324124)
         david@wooltriallaw.com
        1001 Bannock Street, Suite 410
        Denver, CO 80204
        Telephone: (720) 509-9101

        *Attorneys for Plaintiffs*