1

**WILKINSON STEKLOFF LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonstekloff.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonstekloff.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel:    202-847-4030
Fax:    202-847-4005

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843
Fax: 202-682-1639

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

**BRYAN CAVE LEIGHTON PAISNER LLP**
K. Lee Marshall (CA Bar No. 277092)
(klmarshall@bclplaw.com)
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Tel: 415-675-3400
Fax: 415-675-3434

Jed P. White (CA Bar No. 232339)
(jed.white@bclplaw.com)
120 Broadway, Suite 300
Santa Monica, CA 90401
Tel:  310-576-2100
Fax: 310 -576-2200

*Attorneys for Defendant Monsanto Company*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION, | MDL No. 2741 |
|---|---|
| | Case No.: 3:16-md-02741-VC |
| *Engilis v. Monsanto Company*, 3:19-cv-07859-VC | **DEFENDANT MONSANTO COMPANY'S NOTICE OF MOTION AND MOTION TO EXCLUDE TESTIMONY OF JOEL J. GAGNIER** |
| | Hearing date: January 12, 2023 Time: 10:00 a.m. |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on January 12, 2023, at 10:00 a.m. in Courtroom 4 of the United States District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, or as ordered by the Court, Defendant Monsanto Company ("Monsanto") will present its Motion to Exclude Testimony of Joel J. Gagnier. Monsanto seeks an order excluding opinions of this witness under Federal Rule of Evidence 702.

Dated:  November 30, 2022                    Respectfully submitted,


                                             /s/ *Jed P. White*_____
                                             Jed P. White
                                             Attorneys for Defendant Monsanto Company

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................2

   **A.** DR. GAGNIER'S EXPERIENCE ...........................................................................2

   **B.** PRINCIPLES OF EPIDEMIOLOGY ......................................................................2

   **C.** DR. GAGNIER'S OPINIONS .................................................................................5

LEGAL STANDARD .............................................................................................................6

ARGUMENT ..........................................................................................................................6

   A. DR. GAGNIER'S OPINIONS ARE INCONSISTENT AND NOT RELIABLE. ..................6

   B. Dr. Gagnier's Opinions Are Not BASED ON a Scientifically Reliable
     Methodology. ........................................................................................................7

      **1.** Dr. Gagnier Failed to Abide by Analytical Principles That He Admits Are
        Appropriate and That Would Result in a Different Opinion.........................8

      **2.** Dr. Gagnier Did Not Analyze Causation, But Instead Analyzed Only
        Association.          10

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Accutane Prod. Liab.*,
    *No.* 804-MD-2523-T-30TBM, 2009 WL 2496444 (M.D. Fla. Aug. 11, 2009),
    *aff'd*, 378 F. App'x 929 (11th Cir. 2010) ................................................................... 10

*Bailey v. Allgas, Inc.*,
    148 F. Supp. 2d 1222 (N.D. Ala. 2000), *aff'd*, 284 F.3d 1237 (11th Cir. 2002) ..................... 7

*Cooper v. Brown*,
    510 F.3d 870 (9th Cir. 2007) ..................................................................................... 6

*Crane Co. v. DeLisle*,
    206 So. 3d 94 (Fla. Dist. Ct. 2016) ...................................................................... 4, 12

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) ................................................................................................. 6

*Ed Peters Jewelry Co. v. C & J Jewelry Co.*,
    124 F. 3d 252 (1st Cir. 1997) ................................................................................... 6

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) ................................................................................................. 4

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
    341 F. Supp. 3d 213 (S.D.N.Y. 2018) .................................................................. 4, 12

*Nelson v. Am. Home Prod. Corp.*,
    92 F. Supp. 2d 954 (W.D. Mo. 2000) ..................................................................... 10

*In re Roundup*,
    390 F. Supp. 3d at 1116 ........................................................................................... 4

*Sorensen v. Shaklee Corp.*,
    31 F.3d 638 (8th Cir. 1994) ..................................................................................... 4

*Tucker v. SmithKline Beecham Corp.*,
    701 F. Supp. 2d 1040 (S.D. Ind. 2010) .................................................................... 4

*In re Viagra (Sildenafil Citrate) & Cialis (Tadalafil) Prod. Liab. Litig.*,
    424 F. Supp. 3d 781 (N.D. Cal. 2020) .................................................................... 10

*White v. Ford Motor Co.*,
    312 F.3d 998 (9th Cir. 2002) ................................................................................... 6

### INTRODUCTION

Plaintiffs designated Dr. Joel Gagnier, a clinical epidemiologist and former naturopathic doctor, to opine that Roundup causes NHL.  If permitted, Dr. Gagnier will testify that the scientific evidence available from human epidemiologic research points to an increased risk of non-Hodgkin lymphoma (NHL) in (1) those ever exposed to glyphosate and (2) those exposed to glyphosate exposure thresholds reported in various epidemiological studies.  He bases his opinions on his review of the epidemiological literature and the updated meta-analyses he performed.  *See generally* Ex. A, Report of Joel J. Gagnier in *Engilis v. Monsanto Company* ("Report").[1]  Dr. Gagnier's testimony should be excluded because of fundamental flaws in his methodology.

Dr. Gagnier's methodology is unreliable for several reasons. First, he failed to abide by basic methodological principles that he himself admits are proper. For example, although he admits it is appropriate to adjust epidemiological data for pesticides other than glyphosate, he chose to use *unadjusted* data in his assessment – a choice he could not explain at his deposition.  He testified that he teaches his students that it is important to have at least two people oversee a scientific review in order to reduce bias, but he did not have anyone else review his meta-analyses.

Further, Dr. Gagnier did not use the widely accepted Bradford Hill criteria[2]—or any other identified criteria—to determine whether the association he purports to find between Roundup and NHL is causal, as opposed to coincidental.  As Dr. Gagnier testified, finding an association is the only the first step of an analysis to determine causation, not the only step. *See infra* page 11. In short, Dr. Gagnier manipulated data in a manner contrary to what he teaches his epidemiology students to practice in order to manufacture a statistical association, and then he failed to evaluate whether the resulting association was causal or simply coincidental.  This methodology fails to meet established standards for reliable expert testimony, and Dr. Gagnier's opinions should therefore be excluded in their entirety.[3]

---

[1]      All exhibits are attached to the concurrently filed declaration of Jed White.

[2]      The Bradford Hill criteria are widely accepted epidemiological guidelines for investigating causality in epidemiological studies. *See infra*, pp. 4-5.

[3]      As a general causation expert offering opinions regarding the same literature review amongst multiple cases, Dr. Gagnier's testimony regarding his opinions in prior cases against Monsanto Company are authoritative in this case.

**BACKGROUND**

**A.  Dr. Gagnier's Experience**

Dr. Gagnier practiced as a naturopathic doctor (ND) in Canada for approximately ten years. Naturopathic medicine, per Dr. Gagnier, is primary care including things like clinical nutrition, botanical medicine, and acupuncture. *See* Ex. C, 03/28/2022 Deposition of Joel Gagnier in *Alesi* ("*Alesi* Dep.") at 15:1-18. In 2018, Dr. Gagnier stopped practicing naturopathy, discontinued paying his dues, and his Canadian naturopathy license was revoked. *Id.* at 213:7-24. Since 2010, Dr. Gagnier has served as an Associate Professor at the University of Michigan in the Department of Orthopedic Surgery and in the Department of Epidemiology. Ex. D, CV of Gagnier, J. ("Gagnier CV").  Within his capacity as an epidemiologist, almost all of his publications have involved orthopedics. Ex. C, *Alesi* Dep., at 18:3-6; 19:1-10.

Prior to being retained as an expert in Roundup litigation, Dr. Gagnier had no experience or expertise in the relationship between glyphosate and NHL. *Id.* at 71:8-14.  He has never designed, conducted, or published a case-control study on NHL or on any type of cancer. *Id.* at 19:11-20:4.  He also has never designed, conducted, or published a cohort study in which the primary health outcome was any type of cancer. *Id.* at 20:20-24.  He has never published a meta-analysis or systematic review of literature looking at the association between any exposure and NHL or any type of cancer. *Id.* at 21:1-9; 21:20-22:1. Dr. Gagnier admits that everything he knows about the scientific literature and clinical research in the area of glyphosate's relationship with NHL he learned as part of his work as an expert in litigation. *Id.* at 71:15-22.

**B.  Principles of Epidemiology**

Epidemiology is the study of disease occurrence in populations. Case-control epidemiology studies, upon which Dr. Gagnier relies in part for his opinions, state risk in terms of an odds ratio, which measures the association between the variables at issue in the study (here, Glyphosate-Based Herbicides and NHL).  Ex. C, *Alesi* Dep., at 46:12-15; *see also* Ex. E, Michael D. Green et al., *Reference Guide on Epidemiology*, *in* Reference Guide on Scientific Evidence 549, 568 (3d ed. 2011).[4] An odds

---

[4]      The term "odds ratio . . . is similar to a relative risk in that it expresses in quantitative terms the association between exposure to an agent and a disease."  Ex. E, Green et al. at 568.

ratio greater than 1.0, *if statistically significant*,[5] indicates a positive association—*i.e.,* it indicates that exposure to an agent is associated with an increased prevalence of an outcome. Ex. E, Green et al. at 567.  If the odds ratio is equal to or less than one, there is no positive association.  *Id.*

When assessing the reliability of statistically significant odds ratios, however, scientists must consider the effect of so-called "confounding" variables.  These are factors that are not the primary subject of the study, but which may explain an apparent association between the studied agent and the outcome.  *Id.* at 591.  Here, exposure to pesticides[6] other than glyphosate is a confounder in many of the studies Dr. Gagnier relies on, as those studies investigated the association of a variety of pesticides with NHL and asked participants to report all of the pesticides to which they were exposed.  *See, e.g.*, Ex. F, McDuffie, *et al.*, *Non-Hodgkin's Lymphoma and Specific Pesticide Exposures in Men: Cross-Canada Study of Pesticides and Health*, 10 Cancer Epidemiology, Biomarkers & Prevention 1155, 1156 (2001).  Without adjusting for confounders, like other pesticides to which participants were exposed, any association found in these studies cannot reliably be attributed to glyphosate as opposed to the other pesticides in the study. Moreover, many of the other pesticides included in glyphosate studies have been classified by IARC or the EPA's Integrated Risk Information System as possible human carcinogens, and some have been classified as "known" human carcinogens.  *See, e.g.*, Ex. G, A.J. De Roos, *et al.*, *Integrative Assessment of Multiple Pesticides as Risk Factors for Non-Hodgkin's Lymphoma Among Men*, 60 Occup. Environ. Med. E11 3, tbl. 1 (2003) (table listing pesticides used and noting "Carcinogenic probability value [was] created by combining the classifications from the IARC Monographs Programme on the Evaluation of Carcinogenic Risks to Humans and the US EPA Integrated Risk Information System.").[7]

---

[5]    If not statistically significant, an odds ratio above or below 1.0 indicates that there is no difference between the two groups being compared, in this case, those who have been exposed to glyphosate (the active ingredient in Roundup) and those who have not. Ex. E, Green et al. at 573.

[6]    Pesticides include, among other things, herbicides, insecticides, rodenticides, and fungicides.

[7]    Since these papers were published, in 2001 and 2003 respectively, IARC and other organizations have classified multiple other pesticides included in these studies as human carcinogens or probable human carcinogens, several with direct links to NHL.  For example, IARC classified Lindane as a human carcinogen in 2015 in its Monograph 113, specifically linking it to NHL.  *See* Ex. H, IARC Monograph 113 at 356.  That same Monograph found DDT was probably carcinogenic and linked to NHL.  *See id.* at 233.  Moreover, in Monograph 112 addressing glyphosate, IARC determined that, like glyphosate, there was limited evidence that malathion and diazinon—two other pesticides included in both studies—were carcinogenic and linked to NHL.  *See* Ex. I, IARC Monograph 112.

As Dr. Gagnier agrees, although epidemiology studies may suggest an "association" between an agent and outcome, the results of epidemiology studies, standing alone, cannot establish that an agent caused a particular outcome. *See* Ex. E, Green et al. at 589-99. Any association may be "real or a result of sampling error, confounding, or bias." *Id*. at 567. Hence, "[w]hether that agent causes the outcome . . . cannot be proven by epidemiological studies alone; an evaluation of causation requires epidemiologists to exercise judgment about the import of those studies and to consider them in context." *See In re Roundup*, 390 F. Supp. 3d at 1116.

One such generally accepted methodology to analyze causation is to consider and reliably weigh the Bradford Hill criteria.[8] *See* Ex. J, Surgeon General 2004 Report on Smoking ("2004 Surgeon General Report") at 21 (calling the Bradford Hill criteria "the most widely cited criteria in epidemiology and public health" for determination of a cause). Under this methodology, "the first step is to determine whether there is an 'association' between the substance at issue and the studied outcome by evaluating epidemiology studies, which "examine the pattern of disease in human populations[.]" *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 144 n.2 (1997). These studies "compare the incidence of a particular disease in the [human] population at large with the incidence of the disease in a population that has been exposed to a particular chemical." *Sorensen v. Shaklee Corp.*, 31 F.3d 638, 643 n.8 (8th Cir. 1994) (internal quotation marks omitted). This comparison helps "determine whether the exposure to the substance is associated with an increased rate of disease." *Tucker v. SmithKline Beecham Corp.*, 701 F. Supp. 2d 1040, 1060 (S.D. Ind. 2010). An "association" means that there is a study (or studies) showing a statistically significant increased risk and that the increased risk does not appear to be the result of bias or confounding.

Once an "association is shown, an expert must then evaluate causation using the nine 'Bradford

---

[8] Even when experts *do* consider the Bradford Hill criteria, which Dr. Gagnier did not, that still does not automatically render their opinions reliable and admissible. Purported application of this "flexible" method is not admissible by default; rather, "where experts have claimed to apply Bradford Hill, courts have insisted on a clear explication of the weighting assigned to the different criteria." *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 248 (S.D.N.Y. 2018); *see also Crane Co. v. DeLisle*, 206 So. 3d 94, 104-05 (Fla. Dist. Ct. 2016) (reversing trial court that admitted expert who "fail[ed] to explain the Bradford Hill criteria or how they applied"). Without such rigorous standards, methodologies like this "are virtually standardless and their applications to a particular problem can prove unacceptably manipulable. Rather than advancing the search for truth, these flexible methodologies may serve as vehicle to support a desired conclusion." *In re Mirena*, 341 F. Supp. 3d at 247.

- 4 -

Hill' factors: (1) the strength of the association, (2) consistency across studies, (3) specificity, (4) temporality, (5) biological gradient or dose response, (6) biological plausibility, (7) coherence with other scientific knowledge, (8) experimental evidence, and (9) analogy." Ex. E, Green et al. at 599-600.  It is not necessary to satisfy each and every one of the Bradford Hill criteria, but it is generally accepted that all of these criteria need to be considered before one can conclude that an association is causal. *See, e.g.* Ex. J, Surgeon General Report at 23 ("Which of these criteria may be more important, and whether some can be unfulfilled and still justify the causal claim, is a judgmental issue. Temporality, however, cannot be violated.").

### C.  Dr. Gagnier's Opinions

Dr. Gagnier's report explains that he undertook to "collect, review, assess and provide a scientific opinion on the human clinical epidemiologic research evidence regarding the relationship between exposure to glyphosate-based herbicides and the risk of non-Hodgkin lymphoma (NHL)." Ex. A, Report at 4. He describes his "methodology" as (a) evaluating the literature, (b) selecting the studies he deemed appropriate, and (c) including only the studies he deemed appropriate in his meta-analyses. *See generally* Ex. A, Report. He then reports the results of various meta-analyses that he conducted. Dr. Gagnier did not conduct any further analysis under Bradford Hill, or any other generally accepted causation analysis, to determine whether the association between glyphosate exposure and NHL that he generated through his meta-analyses was *causal* as opposed to coincidental.

Ultimately, Dr. Gagnier concluded that the results of his meta-analyses suggest: (a) an increased risk—that is, an *association*—for NHL in anyone ever exposed to glyphosate at any point in their life; and (b) an increased risk for NHL generically in those exposed to glyphosate at various exposure thresholds reported in various individual studies. *Id.* at 49-50. Dr. Gagnier has been inconsistent about the percentage by which he claims these risks increase through exposure to glyphosate, though his reported odds ratios generally fall between 1.1 and approximately 1.5. *Id.*

## LEGAL STANDARD

A proposed expert witness must possess "knowledge, skill, experience, training, or education" sufficient to qualify him as an expert on the subject to which his testimony relates. Fed. R. Evid. 702. When an expert's field of expertise is not related to the subject on which he seeks to offer testimony, such testimony is inadmissible. *See White v. Ford Motor Co.*, 312 F.3d 998, 1008-09 (9th Cir. 2002). Apart from qualifications, expert testimony must be (1) based upon sufficient facts or data, (2) the product of reliable principles and methods, and (3) the result of applying those principles and methods reliably to the facts of the case. Fed. R. Evid. 702. The trial judge is charged with the responsibility of acting as a gatekeeper to "ensure that any and all scientific testimony … is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). The proponent of the expert bears the burden of proving that the expert's proffered testimony is admissible. *See, e.g.*, *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007).

## ARGUMENT

### A.  DR. GAGNIER'S OPINIONS ARE INCONSISTENT AND NOT RELIABLE.

At the outset, there are inconsistencies both within Dr. Gagnier's report in this case and between his reports in this case and other reports—*based on the same meta-analysis*—that he has submitted in other Roundup cases. In his report in this case, Dr. Gagnier is inconsistent with his risk calculations. Dr. Gagnier initially concluded that "these results from our main analyses suggest an increased risk of **15% to 25%** for NHL in those exposed to Glyphosate at any point in their life." Ex. A, Report at 35. However, when summarizing his findings later on in his report, he inexplicably revised these figures, stating that "[t]he results from our main analyses suggest an increased risk of **20% to 26%** for NHL in those ever exposed to Glyphosate at any point in their life." *Id.* at 49 (emphasis added). He was similarly inconsistent with his results regarding the "Highest Reported Level of Exposure" assessment, first concluding that there is an "increased risk of **38% to 42%**" (*id.* at 43), but later on reporting that the risk was "**10% to 52%.**" *Id.* at 49. This inconsistency alone is grounds for exclusion. *See Ed Peters Jewelry Co. v. C & J Jewelry Co.,* 124 F. 3d 252, 260 (1st Cir. 1997) (district court did not abuse its discretion in excluding expert testimony based on methodology that was "internally inconsistent and unreliable", specifically noting that a "moving target" opinion provides "ample reason" for skepticism);

*Bailey v. Allgas, Inc.*, 148 F. Supp. 2d 1222, 1239 (N.D. Ala. 2000), *aff'd*, 284 F.3d 1237 (11th Cir. 2002) (expert opinion excluded in part due to inconsistencies between his testimony and report).

This inconsistency is further troubling as it marks a change from prior reports offered by Dr. Gagnier on the same subject matter in the Roundup litigation, even though he has not substantively updated his meta-analyses in these cases. *See* Ex. B, 06/02/2022 Deposition of Joel Gagnier in *Ferro* ("*Ferro* Dep.") at 17:5-18:18.[9] *See generally* Ex. A, Report; Ex. K, Report of Dr. Joel Gagnier in *Alesi*; Ex. L, Report of Dr. Joel Gagnier in *Ferro*.  In his report in *Alesi,* Dr. Gagnier consistently reported an increased risk of 15%-20% for those exposed at any point in life and an increased risk of 38%-42% for those exposed at various "highest levels." Ex. K, Report of Dr. Joel Gagnier in *Alesi*, at pgs. 35, 42 and 49. Despite not having conducted a new, separate analysis, it appears Dr. Gagnier updated the percentile risk calculations in his reports in *Ferro* and *Engilis*. *See* Ex. A, Report, at pgs. 35, 43 and 49; Ex. L, Report of Dr. Joel Gagnier in *Ferro,* at pgs. 35, 43 and 49.   Dr. Gagnier testified in his prior deposition in *Ferro* that there were *no other substantive changes* in his report in the present case from his report in *Alesi*, aside from the inclusion of several additional sensitivity analyses.  Ex. B, *Ferro* Dep. at 17:5-18:18.   However, significantly altered risk calculations seem to be a substantive change. This inexplicable change is further indication of the unreliable and haphazard nature of Dr. Gagnier's opinions.  On this basis alone, his opinions should be excluded.

## B. DR. GAGNIER'S OPINIONS ARE NOT BASED ON A SCIENTIFICALLY RELIABLE METHODOLOGY.

Dr. Gagnier's opinions should be excluded because he uses an unreliable methodology to reach his conclusion that glyphosate causes NHL. *First*, Dr. Gagnier failed to abide by basic analytical principles he admits are appropriate. Most significantly, even though he admits it is appropriate to adjust epidemiological data for pesticides other than glyphosate, he uses unadjusted data in his assessment. *Second*, after completing that analysis and reporting his results, Dr. Gagnier did not analyze

---

[9]      Note that Dr. Gagnier's deposition in *Alesi* was continued on June 9, 2022, <u>*after*</u> he submitted his report in *Ferro* on May 24, 2022, with the inexplicably revised risk calculations, and testified that he still stood by the estimations from his report in *Alesi* (15 to 25 percent for those ever exposed and 38 to 42 percent for those exposed at various high levels), which were inconsistent with his calculations in *Ferro*. *See* Ex. M, 06/09/2022 Deposition of Dr. Joel Gagnier in *Alesi*, at 273:11-274:24; Ex. L, Report of Dr. Joel Gagnier in *Ferro*, at pgs. 35, 43, 49 and 58. This is yet another example of Dr. Gagnier's confusing, inconsistent, and unreliable opinions in this case.

whether there is a causal relationship—as opposed to a mere association—between glyphosate exposure and NHL.

**1. Dr. Gagnier Failed to Abide by Analytical Principles That He Admits Are Appropriate and That Would Result in a Different Opinion.**

An expert's failure to follow his own methodological tenets renders any opinions reached unreliable. At his deposition, Dr. Gagnier conceded numerous limitations and biases of his purported methodology, all of which result from his failure to abide by proper analytical principles. These choices—including Dr. Gagnier's choice to use data unadjusted for other pesticides—affected his conclusion. The cumulative effect of these multiple *admitted* flaws renders Dr. Gagnier's purported methodology unreliable.

*First*, Dr. Gagnier failed to use data adjusted for other pesticides, despite acknowledging that such adjustment is necessary and appropriate in this case. Dr. Gagnier testified that "the reason you adjust for important confounders is so that you don't confuse a relationship between the outcome you're actually interested in and the exposure you're actually interested in with some other variable." Ex. B, *Ferro* Dep., at 81:14-20; 86:20-87:13. When analyzing whether glyphosate can cause NHL, Dr. Gagnier testified that there is good reason to adjust for exposure to other pesticides:

> Q.   Controlling for other pesticides tries to tease out the risk for one product as opposed to whether multiple products combined could be influencing the result, true?
>
> A.   Yeah.
>
> Q.   Controlling for other pesticides when you can is a good thing to do, right?
>
> A.   Yes, if you have reason to suspect that it is a confounder.
>
> Q.   Controlling helps you tease out if the observed effect is due to glyphosate or to something else, correct?
>
> A.   Yes.

*Id.* at 134:7-18.

Despite these admissions about the importance of adjusting for confounding variables, Dr. Gagnier used unadjusted data in his meta-analyses. For instance, Dr. Gagnier conceded that every meta-analysis he conducted used odds ratios from Pahwa (2019) and Eriksson (2008) that were not adjusted for other pesticides, although adjusted data was available. *Id.* at 192:17-23, 232:2-5.

- 8 -

Dr. Gagnier has testified that he could not recall why he decided to use unadjusted data. Ex. B, *Ferro* Dep. at 232:19-233:15. That reason is clear: if Dr. Gagnier had adjusted for other pesticides, the underlying data would not support Dr. Gagnier's preordained conclusions. Dr. Gagnier admits as much. He acknowledges that his meta-analysis odds ratio would have been lower if he had used the most adjusted odds ratios from Pahwa (2019) or Eriksson (2008) instead of the unadjusted data. *Id.* at 193:5-17.  And he agreed that had he used the adjusted data, his meta-analysis odds ratio "quite possibly" would not have been statistically significant. *Id.* at 265:2-9. Indeed, Dr. Gagnier could not confirm that *any* analysis he conducted would have been statistically significant had he used *any* odds ratio from Pahwa (2019) that was adjusted for other pesticides. *Id.* at 265:10-20.

*Second*, Dr. Gagnier testified that certain other procedures are important for a study to be meaningful and effective, yet he admitted he did not follow these procedures in his own meta-analyses. For example, Dr. Gagnier emphasized that it is important to have a written protocol laying out the planned analyses before conducting them so "you don't manipulate your analyses in the process by view of the data." *Id.* at 57:10-58:6. But Dr. Gagnier's report does precisely what he testified it should not do: Dr. Gagnier did not specify ahead of time whether he would use days/years, number of years, or lifetime days for his highest exposure meta-analysis. *Id.* at 35:25-36:3.

Dr. Gagnier even ignored basic epidemiology principles that he teaches to his students.  He testified that he teaches his students that it is important to have at least two people oversee a scientific review in order to reduce bias, but he did not have anyone else review his meta-analyses.  *See id.* at 52:18-53:4; 54:4-55:21.

*Third,* Dr. Gagnier cherry-picked unpublished data points in order to reach his desired outcome. Dr. Gagnier testified that before constructing a meta-analysis, a researcher should justify the choice of data so that "estimates aren't cherry-picked." *Id.* at 58:13-20; 111:14-112:10. But Dr. Gagnier failed to justify the data he chose to input into his meta-analyses—choices that no author of any *published* meta-analysis has endorsed.  For instance, Dr. Gagnier admitted that he was not aware of a single published meta-analysis of Roundup and NHL that used the odds ratio he selected from Pahwa (2019):

> Q.    Your ever/never meta-analysis uses numbers from Pahwa (2019) that nobody who has published meta-analyses of Roundup and NHL used, true?
>
> A.    None of these that we're looking at.

> Q.      Are you aware of any other published meta-analyses that you did not include in your report in your review?
>
> A.      I'm not aware of any additional ones.

*Id.* at 323:3-10.  In other words, Dr. Gagnier cherry-picked convenient data that would support his pre-ordained conclusions, making analytical choices along the way that no published meta-analysis supports. These flaws render Dr. Gagnier's opinions unreliable.

**2.  Dr. Gagnier Did Not Analyze Causation, But Instead Analyzed Only Association.**

Dr. Gagnier's methodology also misses a crucial step required to assess causation: after purporting to find an association (based on confounded and cherry-picked data), he did not perform any assessment of whether his reported association was causal.  For instance, Bradford Hill, a method in the field of epidemiology that is widely used to determine whether an association is causal, involves a two-step analysis. Step one determines whether there is an association. Once an association has been found at step one, step two considers nine criteria to determine whether the association is causal. *See* pp. 4-5, *supra*; *see also* Ex. E, Green et al. at 600. This step is essential because causation opinions cannot properly be put before a jury if the underlying data shows only an association. *See In re Accutane Prod. Liab., No.* 804-MD-2523-T-30TBM, 2009 WL 2496444, at *2 (M.D. Fla. Aug. 11, 2009), *aff'd*, 378 F. App'x 929 (11th Cir. 2010) (excluding expert testimony when "their review of the existing literature, case reports and scientific data, only formed hypotheses, not opinions of causation"). *See also In re Viagra (Sildenafil Citrate) & Cialis (Tadalafil) Prod. Liab. Litig.*, 424 F. Supp. 3d 781, 798 (N.D. Cal. 2020) (excluding expert causation testimony when the "studies […] may be subject to differing interpretations as to biological plausibility, or as to how strong the evidence is for an actual association, [but] there simply is no interpretation by anyone other than plaintiffs experts that supports general causation"); *Nelson v. Am. Home Prod. Corp.*, 92 F. Supp. 2d 954, 972 (W.D. Mo. 2000) (excluding expert causation testimony when "an association […] has been reported in published case studies for over ten years, [but] these individual case reports have not evolved analytically or been subjected to peer review and controlled experimentation" and, as such, "are no more than untested hypothesis").

Interestingly, Dr. Gagnier agrees that a causation assessment is more than finding an association.

> Q.   When evaluating data as a clinical epidemiologist, you assess, one, is there an association, right?
>
> A.   Yes.
>
> Q.   Two, is that association causal or likely to be causal, true?
>
> A.   Yes.
>
> Q.   Three, are there clinical implications of an association found, correct?
>
> A.   Yes.

Ex. B, *Ferro* Dep at 39:19-40:2. He further testified that applying the Bradford Hill criteria is one method of performing the second step in the analysis:

> Q.   The Bradford Hill criteria are one way of assessing whether an exposure that is associated with an outcome is more likely to be causal of that outcome, true?
>
> A.   That's correct.
>
> Q.   You were not asked to perform a Bradford Hill analysis, right?
>
> A.   No, I was not.
>
> Q.   You did not perform a Bradford Hill analysis, correct?
>
> A.   No, I did not.

*Id.* at 21:5-13. Instead, Dr. Gagnier performed an analysis called a "GRADE" assessment. *Id.* at 305:24-25; 306:2; *see also* Ex. C, *Alesi* Dep. at 231:24-232:16; 235:9-24. Dr. Gagnier conducted a GRADE assessment in lieu of Bradford Hill, arguing that this is a sufficient replacement for Bradford Hill because "there is overlap" between the GRADE and Bradford Hill criteria.[10] Ex. C, *Alesi* Dep., at 235:9-24. This is not so. A GRADE assessment—the approach proposed by the Grading of Recommendations, Assessment, Development and Evaluation (GRADE) Working Group—is a

---

[10]   The purported "overlap" between the GRADE assessment criteria and the Bradford Hill criteria, is minimal. For one example, the GRADE criteria does not assess the important Bradford Hill "temporality" factor, or, more specifically, the concept of latency. Latency is particularly important for diseases like cancer, where one does not simply become exposed to something and immediately develop cancer; there is a certain period of time (a latency period) between any such exposure and diagnosis. Ex. C, *Alesi* Dep. at 40:15-41:3. However, Dr. Gagnier testified, unequivocally, that he that he is not an expert on, and cannot testify regarding, the average latency for NHL after any exposure. Ex. B, *Ferro* Dep. at 99:11-100:16. Dr. Gagnier has testified that latency "wasn't something that [he] focused on with respect to [his] analysis" and that he did not form an opinion in the course of his review about what he believes to be the latency period between first exposure to glyphosate and development of NHL. Ex. C, *Alesi* Dep. at 41:1-9.

process used to rate the overall *quality* of studies.  *See* Ex. N, Schünemann, Holger; Brożek, Jan; Guyatt, Gordon; Oxman, Andrew, *GRADE Handbook*, available at training.cochrane.org; *see also* Ex. C, *Alesi* Dep. at 235:9-24 (Dr. Gagnier testifying that he used GRADE to "assess[ ] the credibility of the evidence.").[11]  A methodologically sound analysis cannot replace a causation analysis with a tool to grade the credibility of individual studies; they are different analyses with different aims.

Nor does Dr. Gagnier otherwise explain why his findings indicate a causal relationship, as opposed to a coincidental one.  In short, Dr. Gagnier analyzed only whether select studies showed an *association* between glyphosate and NHL. He did not evaluate *causation*. As other courts have concluded, methodologies like Dr. Gagnier's "are virtually standardless and their applications to a particular problem can prove unacceptably manipulable." *In re Mirena IUS Levonorgestrel-Related Prod. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 247 (S.D.N.Y. 2018), *aff'd sub nom. In re Mirena IUS Levonorgestrel-Related Prod. Liab. Litig. (No. II)*, 982 F.3d 113 (2d Cir. 2020). *See also Crane Co. v. DeLisle*, 206 So. 3d 94, 104-05 (Fla. Dist. Ct. 2016) (reversing trial court that admitted expert who "fail[ed] to explain the Bradford Hill criteria or how they applied").  "Rather than advancing the search for truth, these flexible methodologies may serve as vehicles to support a desired conclusion." *In re Mirena*, 341 F. Supp. 3d at 247.

It would be highly prejudicial to allow an epidemiologist like Dr. Gagnier to opine that the association he found is causal when he has not undertaken the scientific work required to make such a determination. For this fundamental reason, Dr. Gagnier's causation opinion should be excluded.

---

[11]     In his report, he included Table 4, which set out the GRADE criteria as Outcome Measure, Study Design, Risk of Bias, Inconsistency, Indirectness, Imprecision, and Publication Bias. *See* Ex. A, Report at 49, Table 4.

## **CONCLUSION**

For the reasons set forth above, the Court should grant Monsanto's Motion to Exclude Testimony of Joel J. Gagnier, ND, MSc, PhD.


Dated:  November 30, 2022                     Respectfully submitted,


                                             /s/ *Jed P. White*
                                             Jed P. White
                                             Attorneys for Defendant Monsanto Company

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 30th day of November, 2022, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

/s/ *Jed P. White*
Jed P. White