# EXHIBIT C

```
 1          IN THE CIRCUIT COURT FOR THE COUNTY OF ST. LOUIS

 2                     STATE OF MISSOURI

 3

 4   CARL ALESI, et al.,

 5                 Plaintiffs,

 6      -vs-                   Case No. 19SL-CC03617

 7   MONSANTO COMPANY,

 8                 Defendant.

 9   _____/

10

11   Pages 1 - 244

12

13   THE VIDEOTAPED DEPOSITION OF JOEL J. GAGNIER, ND, MSc, PhD

14        Taken via Zoom

15        Commencing at 9:07 a.m.

16        Monday, March 28, 2022

17        Before Trisha Cameron, RDR, RMR, CRR, RPR, CSR

18

19

20

21

22

23

24
```

```
 1    APPEARANCES:

 2    MR. GIBBS HENDERSON

 3    Fears Nachawati

 4    5489 Blair Road

 5    Dallas, Texas  75231

 6    (214) 890-0711

 7    ghenderson@fnlawfirm.com

 8         Appearing on behalf of the plaintiffs.

 9

10    MR. JOSEPH D. PIORKOWSKI, JR.

11    The Piorkowski Law Firm, P.C.

12    1800 K Street, NW, Suite 1000

13    Washington, DC  20006

14    (202) 223-5535

15    jpiorkowski@lawdoc1.com

16         Appearing on behalf of the defendant.

17

18    ALSO PRESENT:  Anne Hovis - Piorkowski Law Firm

19                   Nathan Arndt - videographer

20

21

22

23

24
```

Joel J. Gagnier, MD, MSc, PhD



```
 1                    INDEX TO EXAMINATIONS

 2

 3   WITNESS                                        PAGE

 4   JOEL J. GAGNIER, Ph.D.,

 5    EXAMINATION BY MR. PIORKOWSKI                   7

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Joel U. Gagnier, ND, MSc, PhD

```
  1                       EXHIBITS

  2   DEPOSITION EXHIBIT                              PAGE

  3   Exhibit No. 1    Defendant Monsanto Company's    11

  4                    Second Amended Notice of

  5                    Taking Videotaped Deposition

  6                    of Joel Gagnier, N.D., Ph.D.

  7   Exhibit No. 2    Dr. Gagnier's Report            11

  8   Exhibit No. 3    Reliance List                   12

  9   Exhibit No. 4    Plaintiff's Designation of      12

 10                    Experts

 11   Exhibit No. 5    Dr. Gagnier's CV                12

 12   Exhibit No. 6    Invoice                         12

 13   Exhibit No. 7    Billing Correspondence          12

 14   Exhibit No. 8    Dr. Gagnier's Trial             12

 15                    Testimony History

 16   Exhibit No. 9    Documents Sent by Counsel to    12

 17                    Dr. Gagnier

 18   Exhibit No. 10   Plaintiffs' Objections and      13

 19                    Responses to Defendant

 20                    Monsanto Company's Notice of

 21                    Deposition of Joel Gagnier,

 22                    N.D., Ph.D. and Request For

 23                    Production

 24
```

```
 1                    EXHIBITS

 2   DEPOSITION EXHIBIT                              PAGE

 3   Exhibit No. 11    Notes Made by Dr. Gagnier      13

 4   Exhibit No. 12    IARC Monograph - Some         124

 5                     Organophosphate Insecticides

 6                     and Herbicides, Volume 112

 7   Exhibit No. 13    Case-Control Studies Summary  183

 8   Exhibit No. 14    Case-Control Studies - An     188

 9                     Efficient Observational

10                     Study Design, by Karlijn J.

11                     Van Stralen, Friedo W.

12                     Dekker, Carmine Zoccali, and

13                     Kitty J. Jager

14   Exhibit No. 15    Case Control Studies, by      188

15                     Steven Tenny; Connor C.

16                     Kerndt; Mary R. Hoffman

17   Exhibit No. 16    The Potential Effects of      188

18                     Recall Bias and Selection

19                     Bias on the Epidemiological

20                     Evidence for the

21                     Carcinogenicity of

22                     Glyphosate, by Kenny Crump

23   Exhibit No. 17    Dr. Gagnier's EndNote file    211

24   (Exhibits attached.)
```

Joel J. Gagnier, ND, MSc, PhD

1   Monday, March 28, 2022

2   About 9:07 a.m.

3                          *   *   *

4           VIDEOGRAPHER:  We are now on the

5   record.  My name is Nathan Arndt.  I'm a

6   videographer for Golkow Litigation

7   Services.  Today's date is March 28th,

8   2022, and the time is 9:07 Eastern

9   Standard Time.  This remote video

10  deposition is being held in the matter of

11  Carl Alesi, et al, versus Monsanto

12  Company, et al, for the Circuit Court of

13  St. Louis County, State of Missouri.  The

14  deponent is Dr. Joel Gagnier.  Sorry.

15  Gagnier.

16          MR. HENDERSON:  Gagnier.

17          VIDEOGRAPHER:  Gagnier.  Okay.

18  Sorry.  There we go.

19          All parties to this deposition are

20  appearing remotely and have agreed to the

21  witness being sworn in remotely.  Due to

22  the nature of remote reporting, please

23  pause briefly before speaking to ensure

24  all parties are heard completely.

Joel J. Gagnier, ND, MSc, PhD

```
 1                    Will counsel please identify

 2            themselves.

 3                    MR. HENDERSON:  Gibbs Henderson here

 4            on behalf of Plaintiffs.

 5                    MR. PIORKOWSKI:  Joseph Piorkowski on

 6            behalf of Defendants, and Anne Hovis is

 7            also with me from my office.

 8                    VIDEOGRAPHER:  Our court reporter is

 9            Trisha Cameron, and she will now swear in

10            the witness.

11                              *   *   *

12                    JOEL J. GAGNIER, ND, MSc, PhD,

13                    having been first duly sworn,

14                was examined and testified as follows:

15                              *   *   *

16                         EXAMINATION

17    BY MR. PIORKOWSKI:

18    Q.   Good morning, Dr. Gagnier.  How are you today?

19    A.   Good morning.  I'm just fine.  Yourself?

20    Q.   Good.  So have you had your deposition taken before?

21    A.   I have not.

22    Q.   Okay.  Well, even under normal circumstances it can

23            be difficult, but it's particularly difficult when

24            you're doing it by Zoom.  So let me -- let me just
```

```
 1        ask you first, let's just go over some basics.  Could

 2        you state your full name for the record, please.

 3   A.   Sure.  It's Joel Joseph Gagnier.

 4   Q.   Okay.  And what's your home address?

 5   A.   My home address is 427 East Ruscom River Road, Saint

 6        Joachim, Ontario, Canada.

 7   Q.   And what's your -- do you have a business address, a

 8        primary business address?

 9   A.   Yes.  It's University of Michigan MedSport, Domino's

10        Farms, 24 Frank Lloyd Wright Drive, Ann Arbor,

11        Michigan, 48105.

12   Q.   So you live in Canada and work in Michigan; is that

13        right?

14   A.   That's correct.  Yeah.  Yep.

15   Q.   All right.  You understand that your role in this

16        litigation is that you've been identified as an

17        expert witness on behalf of the plaintiffs?

18   A.   Yes.

19   Q.   Okay.  And you're being compensated by the plaintiffs

20        for your work on their behalf; is that right?

21   A.   I am.

22   Q.   And at what rate are you being compensated?

23   A.   400 an hour.

24   Q.   Okay.  You realize that even though we're all in
```

Joel S. Wagmeister, ND, MSc, PhD

```
 1        different places, that you're testifying under oath

 2        today just as you would if you were testifying live

 3        in court in front of a judge?

 4   A.   Yes, I'm aware of that.

 5   Q.   Okay.  You know, whenever we're talking about

 6        scientific matters, there are times where things can

 7        get confusing.  So if at any point you don't

 8        understand my question, please just ask me to

 9        rephrase it, or if there's something that seems to be

10        unclear, just ask me to clarify it.  All right?

11   A.   Okay.  Sounds good.

12   Q.   It's important to give verbal answers like yes or no,

13        as opposed to uh-huhs and huh-uhs, things like that,

14        because there's a written transcript being prepared.

15        Do you understand?

16   A.   I do, yes.

17   Q.   Okay.  I know from watching some of your videos

18        online that you have a tendency to talk very quickly.

19   A.   Oh, yeah.  The -- were you looking at training videos

20        from SAGE Publishing?

21   Q.   A couple different things.  But in any event, Trisha,

22        who's our court reporter, is taking down everything

23        you say, and so it's just important for her to be

24        able to keep up.  So just bear that in mind as you're
```

Joel S. Wagner, ND, MSc, PhD

```
 1        answering the questions in terms of your speed.  All

 2        right?

 3   A.   Yeah.  Absolutely.  I'll be deliberate in my answers.

 4        Certainly.

 5   Q.   Okay.  We'll try to not talk over each other.  Even

 6        if you think you know where my question is going,

 7        please wait until I'm done with the question, and

 8        I'll try to let you complete your answer before I ask

 9        my next question.  Okay?

10   A.   Okay.

11   Q.   There's an off chance here that at some point

12        Mr. Henderson may object to one of my questions.  If

13        that happens, go ahead and answer the question

14        anyway, unless there's an instruction not to answer

15        it.  Okay?

16   A.   Okay.

17   Q.   And similarly, if I think an answer that you give is

18        not responsive, I may object.  That's not intended as

19        disrespect.  It's just preserving the record.  Okay?

20   A.   Okay.

21   Q.   Is there any reason that you can't proceed today?

22   A.   Myself?  No.  I'm fine.  Yes, I can proceed.

23   Q.   If at any point during the day, you know, you need to

24        take a break for whatever reason, just let me know.
```

```
 1        There's no -- this isn't an endurance contest.

 2        Separately, you know, if you need to take a look at a

 3        document, this is also not a memory test, so if you

 4        need to take a look at a document to answer a

 5        question accurately, whether the document is your CV,

 6        your report, or an underlying study, you know, just

 7        let me know, and, you know, that's fine to do that.

 8        I'm more interested in accuracy than anything else.

 9        Okay?

10   A.   Okay.

11             MR. PIORKOWSKI:  For the record, I'm

12        just going to go over -- we've premarked

13        some exhibits.  I'm not going to go over

14        all of these right now.  But for the

15        record, the Notice of Deposition has been

16        marked as Exhibit 1.

17             (Exhibit No. 1 marked.)

18             MR. PIORKOWSKI:  A report that has

19        been provided, which is about 58 pages in

20        length by Dr. Gagnier, is marked as

21        Exhibit 2.

22             (Exhibit No. 2 marked.)

23             MR. PIORKOWSKI:  A reliance list is

24        marked as Exhibit 3.
```

Joel U. Gagnier, MD, MSc, PhD

```
 1                    (Exhibit No. 3 marked.)

 2               MR. PIORKOWSKI:  The plaintiffs'

 3          designation of experts is marked as

 4          Exhibit 4.

 5                    (Exhibit No. 4 marked.)

 6               MR. PIORKOWSKI:  A CV that we

 7          received yesterday from Dr. Gagnier is

 8          marked as Exhibit 5.

 9                    (Exhibit No. 5 marked.)

10               MR. PIORKOWSKI:  Exhibit 6 is an

11          invoice.

12                    (Exhibit No. 6 marked.)

13               MR. PIORKOWSKI:  Exhibit 7 is billing

14          correspondence.

15                    (Exhibit No. 7 marked.)

16               MR. PIORKOWSKI:  Exhibit 8 is a trial

17          testimony history.

18                    (Exhibit No. 8 marked.)

19               MR. PIORKOWSKI:  Exhibit 9 is

20          documents sent.

21                    (Exhibit No. 9 marked.)

22               MR. PIORKOWSKI:  My understanding of

23          that is it's documents sent by counsel to

24          Dr. Gagnier.  We can clarify that as we go
```

```
 1              forward.

 2                   Exhibit 10 is the plaintiffs'

 3              objection to the notice of deposition.

 4                   (Exhibit No. 10 marked.)

 5                   MR. PIORKOWSKI:  And Exhibit 11 is a

 6              document that was just provided to us this

 7              morning, which is a set of notes.

 8                   (Exhibit No. 11 marked.)

 9    BY MR. PIORKOWSKI:

10    Q.   And, Doctor, can you just tell me what the notes are

11         that are provided in Exhibit 11.  Did you -- this is

12         five pages of handwritten -- or I'm sorry.

13         Type-written notes.

14    A.   Yeah.  It's basically a summary of my review of the

15         US EPA memorandum is the first section on page 1 and

16         part of page 2.  And then the table, table 1 is a

17         summary of the studies that I reviewed, their

18         strengths and their weaknesses, just in summary form.

19         And then a synopsis of my findings under that

20         starting on page -- I'm sorry.  I didn't number those

21         pages.  But on the third -- on the fourth page you'll

22         see the summary table of the meta-analytic findings,

23         my overall findings for ever exposure or highest

24         exposure levels and the actual data that was produced
```

Joel C. Gagnier, ND, MSc, PhD

```
1          in the meta-analytic estimates.  And that's it.

2   Q.     Okay.  And when did you prepare Exhibit 11?

3   A.     I prepared that last week on Wednesday and Thursday.

4   Q.     Okay.  And was this done in anticipation of the

5          deposition?

6   A.     Yeah.  It was just a preparatory action on my behalf

7          in addition to rereading, you know, some of the

8          exhibits.

9   Q.     Okay.  All right.  Now, you're not a medical doctor,

10         correct?

11  A.     That's correct.

12  Q.     And you're not licensed to practice medicine in any

13         state in the United States, correct?

14  A.     That's correct.

15  Q.     And you're not licensed to practice medicine in any

16         province in Canada, correct?

17  A.     That's correct.  I was up until about three or four

18         years ago.

19  Q.     Okay.  Now, you attended a naturopathic school.  Is

20         that right?

21  A.     Yeah.  The Canadian College of Naturopathic Medicine

22         in Canada.  It's an accredited school for

23         naturopathic medicine.  Trained in primary care and

24         some complimentary medicine.
```

Joel C. Gagnier, ND, MSc, PhD

```
 1    Q.    And can you briefly explain what naturopathic

 2          medicine is?

 3    A.    Yeah.  Absolutely.  Naturopathic doctors are trained

 4          as primary care physicians.  So all of the standard

 5          diagnostic physical exam procedures, laboratory

 6          procedures, pharmacology that is covered in your

 7          standard contemporary M.D. undergraduate program.  So

 8          a four-year M.D. program.  The naturopathic

 9          accredited schools are based off of those programs.

10          In addition to getting all the standard conventional

11          training in pharmaceuticals, lifestyle, counseling,

12          etcetera, naturopathic doctors are also trained in

13          things like clinical nutrition, botanical medicine,

14          acupuncture.  And primarily it is -- they're

15          four-year programs with optional two to four-year

16          residencies.  And most go out and enter into private

17          practice, and some work for companies.  But primarily

18          it's private practice, which I did for ten years.

19    Q.    Are there -- are licensed naturopathic doctors

20          permitted to prescribe prescription medications in

21          Canada?

22    A.    In Ontario they are.  It depends on the jurisdiction.

23          But yes, in Ontario they are, as well as in British

24          Columbia, several states in the US as well.
```

```
 1   Q.   And is it an unlimited prescription privilege, or is

 2        it limited to certain medications?

 3   A.   It's limited, yep.  It's limited in Ontario.

 4   Q.   Are there special -- specialties in naturopathic

 5        medicine like rheumatology, nephrology, those kinds

 6        of things, or not?

 7   A.   No.  No recognized or accredited subspecialties.

 8        It's primary care medicine.

 9   Q.   Okay.  Now, you are not an oncologist, correct?

10   A.   That's correct.

11   Q.   And an oncologist is a doctor who specializes in

12        treatment of cancer patients; is that right?

13   A.   If they're -- yep, if they're an M.D., the treatment

14        of cancer patients.  That's correct.

15   Q.   And you do not diagnose patients with any type of

16        non-Hodgkin lymphoma and have not ever, right?

17   A.   Have not ever, no.  I've seen patients with it in my

18        practice who have already been diagnosed.

19   Q.   Okay.  And you do not now and have never treated

20        patients with non-Hodgkin lymphoma as -- let me

21        rephrase that.

22              Have you been the primary physician

23        treating a patient with non-Hodgkin's lymphoma for

24        their cancer?
```

Joel C. Gagnier, ND, MSc, PhD

```
 1    A.    No.  It would be supplemental care in addition to

 2          their -- whether it be chemotherapy or whatever.

 3    Q.    Okay.  You've never prescribed chemotherapy; is that

 4          right?

 5    A.    No.  I've referred patients to oncologists who then

 6          prescribed it, though.

 7    Q.    Okay.  You counsel -- have you ever counseled

 8          patients with non-Hodgkin lymphoma about what the

 9          cause is of their underlying disease?

10    A.    No.

11    Q.    Okay.  I assume that you've never told a patient with

12          non-Hodgkin's lymphoma that Roundup or glyphosate

13          caused their disease; is that correct?

14    A.    That's correct.

15    Q.    And you're also not a pathologist; is that right?

16    A.    That's correct.

17    Q.    Pathologists are the doctors who look under the

18          microscope to determine, let's say, what type of

19          lymphoma a patient has based on their tissue; is that

20          right?

21    A.    Yep.  Generally it's tissue or cellular analyses,

22          yep.

23    Q.    Okay.  And is that outside your area of expertise?

24    A.    Yeah.  I'm not trained as a pathologist, though we
```

```
 1          did take pathology, as all people who practice in

 2          primary care do.

 3    Q.    Okay.  Now, in looking at your CV, in your capacity

 4          as an epidemiologist, you've published quite a bit on

 5          orthopedic subjects; is that right?

 6    A.    Yes, that's correct.

 7    Q.    Okay.  And I see you're an associate professor of

 8          both orthopedics and epidemiology; is that correct?

 9    A.    Yes, it is.

10    Q.    Okay.  Now, when you are an associate professor of

11          orthopedics, are you credentialed to perform any

12          therapeutic orthopedic procedures on patients?

13    A.    No.  No.  It's a -- the appointment is with the

14          department of orthopedic surgery.  So there are --

15          there are many people who do basic science research

16          who are PhDs in basic science.  I happen to do

17          clinical research.

18    Q.    So your work with the department of orthopedics is

19          basically doing research; is that correct?

20    A.    Yeah.  I have a 90 percent research appointment.

21          Yes.

22    Q.    Okay.  And what is the remaining 10 percent of your

23          time?

24    A.    Administrative and supervision.
```

```
 1    Q.    Okay.  And you've published probably ten or twenty
 2          peer-reviewed papers on different aspects of
 3          evaluating different types of care in orthopedic
 4          patients, correct?
 5    A.    Interventions, is that what the question is?
 6          Associated with interventions, treatments?
 7    Q.    Sure.  Yeah.  That's a better --
 8    A.    More than that.  I don't recall the exact number.  I
 9          could look it over, but it's getting probably closer
10          to about 75 papers.  Yes.
11    Q.    Okay.  All right.  Have you -- have you ever designed
12          or conducted a case-control study looking at patients
13          with non-Hodgkin's lymphoma?
14    A.    No, not for non-Hodgkin's lymphoma.  For other
15          interventions.
16    Q.    Have you ever published a case-control study looking
17          at patients with non-Hodgkin's lymphoma?
18    A.    No.
19    Q.    Have you ever designed or conducted a cohort study in
20          which the health outcome was non-Hodgkin's lymphoma?
21    A.    No.
22    Q.    Have you ever published a cohort study in which the
23          outcome was non-Hodgkin's lymphoma?
24    A.    No.
```

Joel D. Wagmzer, MD, MSc, PhD

```
 1   Q.   To broaden it a little bit, have you ever designed,

 2        conducted, or published a case-control study looking

 3        at patients with any type of cancer?

 4   A.   No.

 5   Q.   Okay.  And have you ever designed, conducted or

 6        published a cohort study looking at any type of

 7        cancer?

 8   A.   We did subgroup analyses within observational studies

 9        to look at various types of osteosarcomas.  So bone

10        cancers.  Yes.

11   Q.   Those were prospective studies?

12   A.   Well, they're -- it's a little bit of a nuanced

13        answer, but it's a cohort study for which data has

14        already been collected.  So like a registry, for

15        example.  So the data is already collected.  You look

16        back in time and do a secondary analysis of registry

17        data.  It's called a retrospective cohort study.  It

18        seems like an oxymoron, but that's usually what

19        they're called.

20   Q.   Yep.  I understand.  Have you ever -- let me ask it

21        this way.  Have you ever designed, conducted, or

22        published a cohort study in which the primary health

23        outcome was any type of cancer?

24   A.   No.
```

1   Q.   Okay.  Have you ever published a meta-analysis or

2        systematic review of literature looking at the

3        association between any type of exposure and

4        non-Hodgkin's lymphoma?

5   A.   No.

6   Q.   Have you ever published a meta-analysis or systematic

7        review of the literature looking at the association

8        between any type of exposure and any type of cancer?

9   A.   No.

10  Q.   Outside of the context of being hired as an expert in

11       litigation, do you have any experience designing or

12       conducting a meta-analysis or systematic review of

13       literature regarding exposure to a chemical, any

14       chemical and non-Hodgkin lymphoma?

15  A.   I'm going to have to ask for a clarification on that

16       question.

17  Q.   Sure.

18  A.   Because you're asking about a methodologic approach

19       versus an exposure outcome relationship.

20  Q.   Okay.  Well, let's -- let's -- let me ask -- let me

21       try to rephrase it to make it more clear.  Have you

22       ever designed or conducted a meta-analysis evaluating

23       the relationship between an exposure to any chemical

24       and non-Hodgkin's lymphoma?

```
 1   A.   No.

 2   Q.   Okay.  Have you authored any article in the

 3        peer-reviewed medical literature on the subject of

 4        the diagnosis or treatment of non-Hodgkin lymphoma?

 5   A.   No.

 6   Q.   Have you authored any article in the peer-reviewed

 7        medical literature about risk factors or causes of

 8        non-Hodgkin lymphoma?

 9   A.   No.

10   Q.   All right.  Not having given a deposition before, let

11        me just explain a couple things.  One of the things

12        that we're -- that I need to try to find out today,

13        I'm going to be asking you some things about your

14        opinions, but I'm also trying to identify some areas

15        in which you're not going to be giving opinions, just

16        so I'm clear on what areas you are and what areas you

17        aren't.  Do you understand that?

18   A.   I do, yes.

19   Q.   Okay.  So let me -- let me first of all clarify some

20        areas in which I think you're not giving opinions

21        based on your designation and your report.  You're

22        not here to discuss any particular Plaintiff's

23        non-Hodgkin lymphoma; is that correct?

24   A.   I'm sorry.  Did you say any particular --
```

Joel S. Gagnier, ND, MSc, PhD

```
 1    Q.    You're not here to discuss any particular plaintiff's

 2          non-Hodgkin lymphoma, correct?

 3    A.    That's correct.

 4    Q.    Okay.  And are you aware that in the case in which

 5          you've been designated that there are four plaintiffs

 6          whose names are Gary Gentile, Cheryl Davis, Roberta

 7          Fox, and Marty Cox?

 8    A.    Yes.

 9    Q.    Okay.  Have you been involved in any way in the

10          diagnosis, care, or treatment of any of those

11          plaintiffs?

12    A.    No.

13    Q.    Have you reviewed any of their medical records?

14    A.    No.

15    Q.    Have you reviewed any of their depositions?

16    A.    No.

17    Q.    Have you spoken to any of the plaintiffs?

18    A.    No.

19    Q.    Have you reviewed any of the depositions of any of

20          their treating physicians?

21    A.    No.

22    Q.    Do you know anything about the specific diagnoses

23          that any of those plaintiffs have?

24    A.    No.
```

Joel G. Wagner, ND, MSc, PhD

```
 1   Q.   Do you know specifically the subtype of lymphoma that
 2        any of the plaintiffs have?
 3   A.   No.
 4   Q.   You're aware that non-Hodgkin lymphoma is an umbrella
 5        term that includes several discreet types of
 6        lymphoma, correct?
 7   A.   Yes.
 8   Q.   Okay.  So, for example, one type is referred to as
 9        DLBCL, which I think you allude to in your report in
10        a couple of places, correct?
11   A.   Yes.
12   Q.   Okay.  And you've also I'm assuming not reviewed the
13        pathology slides for any individual plaintiff,
14        correct?
15   A.   That's correct.
16   Q.   You're not testifying about the type of lymphoma that
17        any individual plaintiff has, correct?
18   A.   Correct.
19   Q.   You're not offering any opinions about what caused
20        any specific plaintiff's lymphoma, correct?
21   A.   Correct.
22   Q.   You're not offering any opinions about any individual
23        plaintiff's treatment, correct?
24   A.   Correct.
```

Joel C. Slagmer, ND, MSc, PhD

```
 1    Q.    You're not offering any opinions about any individual

 2          plaintiff's prognosis, correct?

 3    A.    Correct.

 4    Q.    Do you have any information about any individual

 5          plaintiff's exposure to glyphosate or Roundup?

 6    A.    No.

 7    Q.    And you're not, I'm assuming then you're not offering

 8          any opinions about the amount of glyphosate to which

 9          any individual plaintiff was exposed; is that right?

10    A.    Correct.

11    Q.    All right.  Now, in the course of your review -- next

12          subject.  In the course of your review, you've

13          undoubtedly seen some information about pesticides

14          other than glyphosate, correct?

15    A.    Correct.

16    Q.    So, for example, a lot of the studies, they look at

17          malathion, dicamba, 2,4-D.  You've seen that,

18          correct?

19    A.    Yes.

20    Q.    And to make sure we're on the same page here, you

21          understand the word pesticide is an umbrella term

22          that includes a wide variety of chemical compounds

23          ranging from herbicides to insecticides to

24          fungicides, correct?
```

```
 1   A.   Correct.

 2   Q.   In other words, pesticide doesn't just refer to

 3        compounds that eliminate pests.  It's a broad

 4        regulatory term.  You understand that?

 5   A.   I do, yes.

 6   Q.   And so when I use the term pesticide today, you'll

 7        understand what I mean.  Okay?

 8   A.   Yes.

 9   Q.   Okay.  Now, I assume that with respect to glyphosate

10        or Roundup, you attempted to conduct as comprehensive

11        a review of the epidemiological literature as

12        possible in preparing your report; is that true?

13   A.   Yes, that's correct.

14   Q.   Okay.  Now, as a part of your review, have you

15        conducted a comprehensive review of the

16        epidemiological literature on any other pesticide

17        other than glyphosate?

18   A.   No.

19   Q.   Okay.  And having not conducted a review, is it

20        correct that you're not offering any expert opinions

21        with respect to whether any other pest -- any

22        pesticide other than glyphosate can or cannot cause

23        non-Hodgkin lymphoma; is that correct?

24   A.   Correct.
```

```
 1   Q.   As a part of your review, and we're going to come

 2        back and talk about the methodology that you used to

 3        arrive at your opinions, but as a part of your review

 4        in this case, did you conduct a separate literature

 5        search to look into risk factors for non-Hodgkin

 6        lymphoma other than glyphosate and Roundup?

 7   A.   No.

 8   Q.   Okay.  Let me actually pause for a second and make --

 9        get one thing clear.  When I talk about glyphosate

10        and Roundup, you understand that glyphosate is the

11        active ingredient in the product Roundup, correct?

12   A.   Yes.

13   Q.   And Roundup refers to the formulated version of the

14        product, several of which are manufactured by

15        Monsanto, correct?

16   A.   Yes.

17   Q.   Okay.  Now, when we talk -- I know there's -- in

18        other contexts, there may be distinctions between

19        Roundup and glyphosate.  For example, if people talk

20        about whether they're doing animal bio -- animal

21        carcinogenicity testing, there may be a difference

22        between evaluating technical glyphosate and

23        evaluating the formulated product.  You understand

24        that, right?
```

Joel T. Gagnier, ND, MSc, PhD

```
 1   A.   Yes.

 2   Q.   Okay.  But with respect to the epi across the board,

 3        all epi studies by definition evaluated the

 4        formulated product, correct?

 5   A.   They state glyphosate-based herbicides.  Yes.

 6   Q.   Right.  In other words, none of the epi studies deal

 7        with just strictly technical glyphosate in the

 8        absence of the formulated product, correct?

 9   A.   No.  As far as I can tell from those reports, there

10        is no just glyphosate exposure.  It's

11        glyphosate-based herbicides.

12   Q.   Okay.  We're on the same page.  Now, as a part of

13        your review in this case, did you conduct a separate

14        literature search to look into risk factors for

15        non-Hodgkin lymphoma other than glyphosate?

16   A.   No.

17   Q.   Okay.  So, for example, there are several studies in

18        the medical literature finding an association between

19        obesity and non-Hodgkin lymphoma.  Are you aware of

20        that?

21   A.   I'm not aware of the details of that literature.

22   Q.   Okay.  And I guess your report doesn't mention

23        anything about any opinions about obesity as a risk

24        factor for non-Hodgkin lymphoma, correct?
```

Joel C. Gagnier, ND, MSc, PhD

```
 1   A.   That's correct.

 2   Q.   Okay.  And I assume, therefore, that you're not

 3        offering any opinions in this case about whether

 4        obesity is or is not a risk factor for non-Hodgkin

 5        lymphoma, correct?

 6   A.   That's correct.

 7   Q.   Okay.  And similarly, are you aware that there are

 8        studies showing an association between smoking,

 9        cigarette smoking and certain types of lymphoma?

10   A.   Certainly I'm aware of some of that literature.  I'm

11        a trained epidemiologist.  Yes.

12   Q.   Okay.  But your report doesn't include any opinions

13        about smoking as a risk factor for any type of

14        non-Hodgkin lymphoma, correct?

15   A.   No.  That's correct.

16   Q.   And you're not planning at trial to offer any

17        opinions in this case about whether smoking is or is

18        not a risk factor for any type of non-Hodgkin

19        lymphoma, correct?

20   A.   Correct.

21   Q.   Okay.  One of the studies referenced in your report

22        is the McDuffie study from 2001.  Do you recall that?

23   A.   I do.

24   Q.   And that's a study that you had a chance to look at
```

1        closely when you were formulating your opinions in

2        this case; is that true?

3  A.   Well, the McDuffie study, interesting enough, is an

4        initial analysis of a longitudinal study.  So it was

5        incorporated into several other pooled analyses,

6        which updated the data from the original McDuffie

7        study.  So that study was not -- that initial

8        publication from 2001 was not included in the

9        meta-analysis because the data -- because it was

10       included in another study that was included in the

11       meta-analysis.

12  Q.   Right.  I understand that you're talking about the

13       Pahwa paper.

14  A.   Yes.

15  Q.   Okay.  But my question is actually just -- and I

16       understand if we're going to look at the most

17       currently available information about the study

18       subjects in McDuffie, looking at Pahwa is sort of the

19       best available data we have at this point, correct?

20  A.   Yeah.  It's the most updated.  Yeah.

21  Q.   Okay.  But my question is a little different, and I'm

22       not -- I'm not disputing what you're saying about

23       Pahwa.  I'm just asking that as a part of your

24       review, you did have an opportunity to look carefully

```
 1        at the McDuffie 2001 paper, correct?

 2   A.   Yeah.  Yeah.  Yeah.  I read it carefully.  Yeah.

 3   Q.   Okay.  And do you remember that in looking at the

 4        demographic factors, McDuffie authors found that

 5        family history of any type of cancer in a

 6        first-degree relative was associated with a

 7        statistically significant increased risk of

 8        non-Hodgkin lymphoma?

 9   A.   Can you give me a moment just to look at that?

10   Q.   Yeah.  Do you have it handy?  I can put it in as an

11        exhibit.

12   A.   Yeah.  I'm looking at it.  I have hardcopies of all

13        of them.

14   Q.   Okay.

15   A.   I sort of old school prefer the hardcopies whenever

16        I'm doing this detailed work.

17   Q.   Let me direct you to --

18   A.   I've got it here.  Yeah.  It's in table 1.

19   Q.   Table 1.

20   A.   Yeah.  The odds ratio is 2.43 for any previous cancer

21        with a confidence interval of 1.71 and 3.44.

22   Q.   I'm sorry.  Say that again one more time.

23   A.   Table 1, the --

24   Q.   Right.
```

Joel C. Wagner, ND, MSc, PhD

```
 1    A.    It says under medical history, it's the difference

 2          between the NHL patients and the controls, yeah, the

 3          odds ratio is 2.43 for any previous cancer.

 4    Q.    Okay.  Yeah.  My question was a little bit different.

 5          My question was family history of cancer in a

 6          first-degree relative.

 7    A.    Uh-huh.  I'm sorry.  Yes.  So that's there too.  It's

 8          the very last line in table 1.

 9    Q.    And that's 1.31 odds ratio, correct?

10    A.    It is, yes.

11    Q.    But it is statistically significant, right?

12    A.    Yes.  Yes, it is statistically significant.

13    Q.    Okay.  Right.  And so my question is not really

14          whether you agree or disagree with that.  But did you

15          conduct a literature search on family history of

16          cancer as a risk factor for non-Hodgkin lymphoma?

17    A.    No, I did not.

18    Q.    Okay.  And you don't mention family history of cancer

19          anywhere in your report, correct?

20    A.    I do not, no.

21    Q.    Okay.  And you're not planning to offer any opinions

22          at trial about whether family history of cancer in a

23          first-degree relative is or is not a risk factor for

24          non-Hodgkin's lymphoma, correct?
```

```
 1   A.   That's correct.

 2   Q.   Okay.  Did you do any literature searches on any --

 3        I'm sorry.  Can you excuse me for just one second?

 4   A.   Sure.

 5             MR. PIORKOWSKI:  Can we just go off

 6          the record.  Thanks.

 7             VIDEOGRAPHER:  We are going off the

 8          record at 8:37 a.m.

 9             (Recess taken.)

10             VIDEOGRAPHER:  We are back on the

11          record at 9:39 a.m.

12   BY MR. PIORKOWSKI:

13   Q.   Okay.  So next subject was did you do any literature

14        searches on medications that have been associated

15        with non-Hodgkin lymphoma?

16   A.   No.

17   Q.   Okay.  Are you familiar that there are -- and I'm

18        wondering especially as a naturopathic physician

19        whether you're familiar that there are a number of

20        medications that have been associated with

21        non-Hodgkin lymphoma.

22   A.   I'm superficially aware of that literature.  Yeah.

23   Q.   Okay.  You don't discuss any medications in your

24        report with respect to being at risk of non-Hodgkin
```

Joel G. Wagner, ND, MSc, PhD

```
 1        lymphoma, correct?

 2   A.   That's correct.

 3   Q.   And you don't intend at the time of trial to offer

 4        any opinions about whether any particular medication

 5        is or is not a risk factor for NHL, correct?

 6   A.   That's correct.

 7   Q.   Did you do research into any other -- and I'm not

 8        going to just go through -- there's a long laundry

 9        list of risk factors.  Is there any risk factors into

10        which you did research, auto immune disease,

11        hepatitis C, H. Pylori, or anything else, that you

12        plan to offer opinions on at the time of trial as to

13        whether they are or are not a risk factor for

14        non-Hodgkin lymphoma?

15   A.   No.  But I'll just qualify that, in that the human

16        studies associated with glyphosate exposure do their

17        own adjustments.  All of the studies do adjustments

18        for a variety of risk factors.  So whatever is

19        included in those are inherently included in my

20        assessment.  But beyond that, I did not do a

21        comprehensive assessment of each individual risk

22        factor.

23   Q.   Okay.  So, for example, age is a risk factor --

24   A.   Yeah.
```

Joel C. Gagnier, ND, MSc, PhD

```
 1   Q.   -- that's adjusted for in almost every study, right?

 2   A.   That's right.

 3   Q.   Okay.  All right.  Okay.  Your designation says that

 4        you're offering opinions about glyphosate exposure

 5        and the risk of non-Hodgkin lymphoma as an outcome,

 6        correct?  And that's consistent with your report as

 7        well, right?

 8   A.   Yes.

 9   Q.   Okay.  You are not offering any opinions about

10        glyphosate exposure and any other type of cancer

11        outcome; is that correct?

12   A.   That's correct.

13   Q.   And specifically, you're not offering any opinions

14        about glyphosate and Hodgkin lymphoma, correct?

15   A.   That's correct.  Though some of the papers do cover

16        it, but it wasn't what I focused on for this

17        searching and literature acquisition.  Yes.

18   Q.   Okay.  And you're not offering any opinions about the

19        overall risk of cancer for glyphosate compared --

20        compared to non use of glyphosate, correct?

21   A.   Did you say any cancer?  I'm sorry.

22   Q.   Overall cancer risk.  Yes.

23   A.   That's right.  I'm not providing an opinion on that.

24   Q.   All right.  Have you spoken with as a part of your
```

Joel S. Wagoner, ND, MSc, PhD

```
 1          review of this case any current or former employees
 2          of Monsanto or Bayer about any issues related to the
 3          case?
 4    A.    No.
 5    Q.    Have you been provided with any internal Monsanto
 6          documents that have been produced in connection with
 7          the litigation?
 8    A.    No.
 9    Q.    Have you read the deposition testimony or trial
10          testimony of any Monsanto scientists about any aspect
11          of glyphosate or Roundup?
12    A.    No.
13    Q.    Have you read the deposition testimony or trial
14          testimony of any Monsanto employee?
15    A.    No.
16    Q.    Do you have any education or experience in the
17          marketing of pesticides or any other chemical?
18    A.    No.
19    Q.    Are you offering any opinions in this case
20          criticizing the manner in which Monsanto marketed
21          Roundup for residential use?
22    A.    No.
23    Q.    Do you have any experience drafting warning labels
24          for pesticide products in the United States or
```

```
 1          Canada?

 2    A.    No.

 3    Q.    And you do not intend to express any opinions about

 4          the warnings or the labeling for Roundup; is that

 5          correct?

 6    A.    Correct.

 7    Q.    And you're not offering any opinions in this case

 8          criticizing any aspect of Monsanto's conduct

 9          specifically, correct?

10    A.    Correct.

11    Q.    Okay.  New topic.  Have you ever designed or

12          conducted animal carcinogenicity studies on any

13          chemical compound?

14    A.    No.

15    Q.    Do you consider yourself to be an expert in the

16          design and conduct of animal carcinogenicity studies?

17    A.    No.

18    Q.    Do you consider yourself to be an expert in the

19          interpretation of animal carcinogenicity studies?

20    A.    No.

21    Q.    Your report does not include any opinions related to

22          your interpretation of the animal -- any animal

23          carcinogenicity studies related to glyphosate,

24          correct?
```

```
 1    A.    Correct.

 2    Q.    And am I correct that you don't intend to offer any

 3          opinions about animal carcinogenicity studies

 4          concerning glyphosate or Roundup at the time of

 5          trial?

 6    A.    Correct.

 7    Q.    Similarly, have you ever designed or conducted

 8          genotoxicity studies on Roundup or glyphosate or any

 9          other chemical?

10    A.    No.

11    Q.    Do you consider yourself to be an expert in the

12          design and conducts of genotoxicity studies?

13    A.    No.

14    Q.    Do you consider yourself to be an expert in the

15          interpretation of genotoxicity studies?

16    A.    No.

17    Q.    You have no opinions about genotoxicity studies in

18          your report; is that correct?

19    A.    That's correct.

20    Q.    And do you intend to offer any opinions about

21          genotoxicity studies at the time of trial?

22    A.    No.

23    Q.    Your report also doesn't contain any opinions about

24          oxidative stress, correct?
```

Joel O. Gaginer, ND, MSc, PhD

```
 1   A.   Correct.

 2   Q.   And you're not planning to offer any opinions about

 3        oxidative stress at the time of trial; is that right?

 4   A.   Correct.

 5   Q.   Are you -- I don't see any discussion in your report

 6        of any -- well, let me back up a minute.

 7             You understand that the formulated product

 8        Roundup contains certain inert ingredients, correct?

 9   A.   Correct.

10   Q.   I mean, it's primarily made up of glyphosate and

11        water, but there are additional ingredients.  You

12        understand that?

13   A.   Uh-huh.  Yes.

14   Q.   Yes.  I don't see anything in your report where you

15        set forth opinions about any other chemicals or inert

16        ingredients other than glyphosate.  Is that correct?

17   A.   Glyphosate-based herbicides.

18   Q.   Right, glyphosate-based herbicides.  Right.

19   A.   Right.  Which is the whole -- which is the whole

20        herbicide which is studied in these.  So the opinions

21        associated with the evidence for glyphosate-based

22        herbicides are what was included.

23   Q.   Are you -- but you're not intending to offer any

24        opinion about any specific ingredient or specific
```

```
 1        chemical or specific contaminate in glyphosate-based

 2        herbicides, correct?

 3   A.   That's correct.

 4   Q.   Do you -- did you form an opinion about the internal

 5        dose that is necessary to -- is necessary in order

 6        for a person exposed to glyphosate to develop

 7        non-Hodgkin lymphoma?

 8   A.   No.

 9   Q.   Did you form an opinion -- you have a discussion in

10        your report about lag times.  Do you recall that?

11   A.   Uh-huh.  Yes, sir.

12   Q.   And about -- latency also is mentioned in there in

13        passing, correct?

14   A.   That's correct.

15   Q.   Okay.  And just to put it in simple terms, the idea

16        of latency is that if hypothetically a substance can

17        cause cancer, you don't get exposed to the substance

18        today and develop cancer tomorrow, right?

19   A.   That's correct.  Yeah.

20   Q.   There's generally some period of time that it takes

21        for that process to develop, and that period between

22        the exposure and the diagnosis of disease is often

23        referred to as the latency period, correct?

24   A.   It is referred to as the latency period.  Several of
```

```
 1        these studies looked at -- looked at latency.  It

 2        wasn't something that I focused on with respect to my

 3        analysis.

 4   Q.   Yeah.  That's fine.  I just wanted to know, is

 5        there -- did you form an opinion in the course of

 6        your review about what you believe to be the latency

 7        period between first exposure to glyphosate and

 8        development of non-Hodgkin lymphoma?

 9   A.   No.

10   Q.   I see in your report that you have some mention of --

11        there's a couple places where you mention the

12        findings about diffuse large B-cell lymphoma or

13        DLBCL, correct?

14   A.   That's correct.

15   Q.   But I don't see any discussion -- other than some

16        reference to DLBCL, I don't see any other references

17        to any of the other types of lymphoma that come under

18        the umbrella of non-Hodgkin lymphoma.  Is that

19        correct?

20   A.   That's correct.  Most papers lump them together.

21        Yes.

22   Q.   And are you -- are you offering any opinions about

23        any particular type of lymphoma other than

24        non-Hodgkin lymphoma generally and DLBCL?
```

```
 1   A.   No.

 2   Q.   Okay.  Based on your review, do you have a, for lack

 3        of a better term, a bottom line on what your

 4        understanding is of the relative risk of developing

 5        NHL in people who are exposed to glyphosate compared

 6        to people who are not exposed to glyphosate?

 7   A.   What does the human subjects literature say?

 8   Q.   Yeah.  Or do you have an opinion?

 9   A.   I can tell you that.

10   Q.   Do you have an opinion based on your review of the

11        human subjects literatures is my question.

12   A.   It -- sorry.  I can hear some beeping going off.  I'm

13        not sure who that was.

14             The -- well, at the end of my report, you

15        can see that I do have a summary statement regarding

16        the -- what is essentially the range of odds ratios

17        for those who have ever been exposed and for the

18        highest exposure categories.  And it -- I'll just --

19        for ever exposure, the increased risk for --

20   Q.   I'm sorry.  What page are you referring to?

21   A.   Yeah.  I'm actually using the summary document.

22   Q.   The five-page thing we talked about earlier,

23        Exhibit 11?

24   A.   Yeah.  That's correct.  Yeah.  Under table 2 it says
```

```
1        ever exposure, and then it says highest exposure

2        level synopsis.  So for ever exposure, it's between

3        20 and 26 percent increased risk.  And then for

4        highest level of exposure, which we should probably

5        flesh out a little bit, is between 38 and 52-ish

6        percent increased risk.  But it depends upon how that

7        highest exposure was defined because it was defined a

8        little bit variably across the studies and there was

9        multiple analyses.  So it looks like it -- with more

10       exposure, highest amount of days per year per

11       lifetime the risk goes up.

12   Q.  So the answer to my question -- my question dealt

13       with ever exposure.

14   A.  Okay.

15   Q.  And you're reading from the line under the heading of

16       table 2, is that right, in your notes?

17   A.  That's correct.  Yes.

18   Q.  Okay.  And your conclusion is that for ever exposure,

19       there's an increased risk of 20 to 26 percent for

20       ever exposure to glyphosate at any point in your

21       life; is that right?

22   A.  Yes, that's what the literature shows.

23   Q.  And then we'll come back and talk about the higher

24       exposure in a bit here.
```

Joel C. Gagnier, ND, MSc, PhD

```
 1   A.   Okay.

 2   Q.   Now, for -- let's -- I just want to flesh out as an

 3        epidemiologist kind of what that means.  So if for

 4        the sake of discussion -- let's even assume that for

 5        the sake of discussion it's the upper end of that 26

 6        percent.  Okay?

 7   A.   Uh-huh.

 8   Q.   This would translate to a relative risk of 1.26,

 9        correct, if we're doing it in -- in those terms?

10   A.   No.  No, it wouldn't.  This is -- these are odds

11        ratios.  So it's a ratio of odds of an event in an

12        exposed group versus the event in a non-exposed

13        group.  A relative risk is the risk of the event over

14        everybody exposed.  So it's a different calculation.

15        So no, it wouldn't be 1.26.  Though, when odds ratios

16        are relatively -- when odds ratios are between 1 and

17        2, it's approximately the same for a relative risk.

18        It changes when you have really rare events or really

19        common events where an odds ratio and a relative risk

20        are no longer equivalent.

21   Q.   All right.  Let me back up and make sure you didn't

22        misspeak.  Did you say that the relative risk is the

23        risk over everybody that's ever been exposed?

24   A.   The -- it's the rate or -- when I say risk, it's how
```

1     many people have the event of interest, say, over

2     everybody who's exposed compared to the other group

3     how many have the event of interest over everybody

4     exposed.

5              Now, when I say exposed, I mean those

6     who -- so we're talking about cases and controls here

7     obviously.  So there's going to be those who

8     obviously aren't exposed in both of the groups.  So

9     I'd have to do the -- I'd have to show you with the

10    PowerPoint exactly what it is that I'm describing.

11    But yeah, it's a relative measure -- relative risk is

12    a relative measure and odds ratio is a ratio of odds.

13 Q.  Let me back up, though, because I want to make sure

14    our terminology is the same.  You said that relative

15    risk is -- is how many have the event over everybody

16    who's exposed, right?  That was what you just said?

17 A.  How many have the event over everybody who was

18    measured.

19 Q.  Okay.  But that's actually not relative risk.  That's

20    incidence.

21 A.  Yes.  But it's the ratio of that to those who don't

22    have the disease who were measured.  So that's where

23    the ratio comes in.  So yes, you're correct that the

24    initial number is incidence.

Joel T. Gagnier, ND, MSc, PhD

```
 1   Q.   All right.  So --

 2   A.   Yeah.

 3   Q.   What relative risk is -- let's just back up and make

 4        sure we're on the same page with our terminology.  So

 5        relative risk involves the -- relative risk is the

 6        term, first of all, that people use in cohort studies

 7        or prospective studies, right?

 8   A.   It kind of depends.  But relative risk is -- you

 9        know, I'm not exactly sure if it's more often, more

10        frequently used.  I believe it is more frequently

11        used from my experience of the literature.  Yes.

12   Q.   Okay.  Well, case-control studies don't measure

13        relative risk, right?

14   A.   No, they don't.  They almost uniformly will use odds

15        ratios.

16   Q.   And that's because, as you said, it's a ratio of

17        odds.  It's not a -- it's not a comparison of exposed

18        to unexposed patients, right?

19   A.   That's right.  Yeah.

20   Q.   So when you do -- when you do a comparison of the

21        rate of disease in people who are exposed to the rate

22        of disease in people who are unexposed, that is the

23        relative risk, correct?

24   A.   Can you say that again?
```

```
 1    Q.    Yeah.  Relative risk is the rate of disease in people

 2          who are exposed compared to people who are not

 3          exposed.

 4    A.    Yes.

 5    Q.    Okay.  And odds ratios -- well, let me back up a

 6          little bit.  So in a case-control study, the basic

 7          construct is that -- the basic comparison is you're

 8          starting with people who have disease, and then

 9          you're finding a control population of people who do

10          not have disease, correct?

11    A.    Yes.  There's the people that have the disease are

12          the cases, and those that do not have the disease are

13          the controls.  Yes.

14    Q.    And then what you do when you -- to figure out the

15          odds ratio is you look at the level of exposure in

16          the cases compared to the level of exposure in

17          controls and then you make that comparison and that's

18          what the odds ratio is, correct?

19    A.    Yes.  Not necessarily level of exposure, but number

20          exposed.

21    Q.    Rate of expose -- let's say rate of exposure.  Is

22          that fair?

23    A.    Well, it's not rate.  Rate is a -- rate is a -- rate

24          would be a measure over time.  It would just be --
```

```
 1          it's just a raw number.

 2    Q.    Let me rephrase it then.  If you compare the

 3          percentage of people in the case -- among the cases

 4          who had an exposure and you divide that by the

 5          percentage of people in the control group who had the

 6          disease, that's going to give you the odds ratio,

 7          correct?

 8    A.    It will, yeah.  You have to treat it as a proportion,

 9          though, as a decimal place.  Yeah.

10    Q.    Okay.  All right.  So going back to understanding

11          what you're saying here, are you saying that this 20

12          to 26 percent is based on entirely on case-control

13          studies?

14    A.    No.  That's a mix of studies.

15    Q.    Okay.  So is -- do you have an opinion about -- well,

16          let me back up.  I think you said that at risks

17          between 1 and 2, that odds ratios and relative risks

18          tend to be close, close to equivalent.  Is that what

19          you said?

20    A.    Yeah.  Fairly similar.  And that's a -- that's a

21          broad generalization because it all depends upon the

22          rarity of the outcome for the amount of people who

23          have -- were studied or the commonality of the

24          outcome for how many people who were studied.  But
```

Joel C. Wagner, ND, MSc, PhD

```
 1         generally speaking, that is the case.  Yes.
 2    Q.   Okay.  And so if we're going to understand -- let me
 3         just -- whether we're talking about a relative risk
 4         or whether we're talking about an odds ratio, let's
 5         start with relative risk.  A relative risk of 1 means
 6         that there is no difference really between the
 7         exposed cases and the unexposed cases, correct?
 8    A.   Correct.
 9    Q.   Okay.  And an odds ratio of 1 similarly means that
10         there's no increased risk, correct?
11    A.   Same thing.  Yeah.  Equal -- there's equal odds of
12         the outcome in each group.
13    Q.   Okay.  And if we sort of use another number, a
14         relative risk of 2, for example, means that
15         there's -- that the risk in the exposed group is
16         twice as high as in the unexposed group, correct?
17    A.   Yes.
18    Q.   And the same is true whether we're talking about odds
19         ratios or relative risks, correct?
20    A.   Yeah.  It's the same.  It's a little bit more nuanced
21         when you talk about odds ratio because it's a ratio
22         of odds, but it's similar.
23    Q.   Right.  And so when you say an increased risk of 20
24         to 26 percent, that would translate roughly to either
```

Joel C. Gagnier, MD, MSc, PhD

```
 1        an odds ratio or a relative risk of 1.2 to 1.26,

 2        correct?

 3   A.   Yes.

 4   Q.   Okay.  All right.  So we'll come back to that.  So I

 5        marked your report as Exhibit 2.  Do you have that

 6        handy?

 7   A.   I do, yeah.  I'll just pull it up, the version that

 8        was sent to me, just to make sure.  Exhibit 6?

 9   Q.   6?

10   A.   Is that what you said?

11   Q.   I think it's 2.

12   A.   Oh, I'm sorry.  Yep.  Okay.  I got it.

13   Q.   Now, is this your final report?

14   A.   Yes, sir.

15   Q.   And is the -- are the notes that we added as

16        Exhibit 11, are they essentially like a supplement to

17        your report?

18   A.   Yeah, they're a supplement to the report.  Yes.

19   Q.   Okay.  So if we take Exhibit 2 and Exhibit 11, do

20        those together include all of the opinions that you

21        intend to offer at the time of trial?

22   A.   Yes.

23   Q.   And are you prepared to offer all those opinions

24        under oath at the time of trial?
```

```
 1   A.   Yes.

 2   Q.   And in Exhibit 2 and Exhibit 11, did you attempt to

 3        include an explanation of the bases of the opinion

 4        you intend to offer?

 5   A.   Could you ask that question again, please.

 6   Q.   Yeah.  I guess let me make it more simple.  Did you

 7        attempt in your report to explain not just your

 8        conclusion but your reasoning for your conclusion,

 9        the basis scientifically for your conclusion?

10   A.   Yes.

11   Q.   Okay.  As we sit here today, if we take Exhibit 2 and

12        11, is your report complete?

13   A.   Yes, it's up to date.  Yes, to the point of the final

14        date listed in my literature search.

15   Q.   Okay.  Are you awaiting any additional information at

16        this point?

17   A.   I have contacted one author, but I haven't heard back

18        from them for additional data.  I wasn't intending on

19        using it -- I don't -- I haven't got a response about

20        it.  It was for the Leon paper because they didn't

21        have the exposure numbers allowing me to calculate

22        odds ratios because they report hazard ratios.  So I

23        was waiting for some numbers.  Often when you do

24        meta-analysis, you can contact the authors and they
```

```
 1        will fill in some gaps that are not in the report, in

 2        their published papers --

 3   Q.   Did you --

 4   A.   -- but I haven't gotten any of that.

 5   Q.   I'm sorry.  I interrupted you.  Were you finished?

 6   A.   That's okay.  I just haven't gotten any of that yet.

 7        Sometimes you just don't get any responses.

 8   Q.   Who did you attempt to contact about the Leon paper?

 9   A.   Well, the corresponding author is Maria Leon.

10   Q.   Okay.  And what's the question you put to her?

11   A.   I needed the number of people that were measured in

12        both groups and the number of cases because it's not

13        fully listed because they use Cox

14        proportional-hazards regression.

15             (Reporter clarification.)

16             THE WITNESS:  They use a type of

17             regression model, but they don't -- they

18             don't state the numbers that would have

19             allowed me to calculate odds ratios to be

20             able to include that in the meta-analysis.

21             So what ended up happening was that I had

22             to include the hazard ratios in the

23             meta-analysis under the assumption that,

24             again, it's kind of similar to the
```

```
 1              relationship between an odds ratio and a

 2              relative risk, that when it's close --

 3              when it's between 1 and 1.5-ish, that

 4              they're sort of similar, but that's a big

 5              assumption to make, which is why I did the

 6              sensitivity analysis as well.  So long

 7              story short, I asked for the numbers, but

 8              I haven't gotten any response.

 9   BY MR. PIORKOWSKI:

10   Q.   How long ago did you ask for those?

11   A.   About three weeks ago.  I have to check my

12        correspondence, but I can --

13   Q.   And did you -- was it by e-mail?  Is that what, you

14        e-mailed her?

15   A.   E-mail, yeah.

16   Q.   So let me be clear.  Let's stop a minute and -- so

17        the Leon study was an analysis that included a look

18        at three different databases, right?

19   A.   Yes.  That's correct.

20   Q.   One of the databases was the Agricultural Health

21        Study, Andreotti version of the Agricultural Health

22        Study from 2018, correct?

23   A.   Yeah, that's correct.

24   Q.   And the other two studies that they looked at were --
```

Joel C. Gagnier, ND, MSc, PhD

```
 1          one was called the AGRICO study and one was called

 2          the CNAP study, correct?

 3   A.     Yeah.  That is correct.

 4                  MR. PIORKOWSKI:  And, Trisha, I'll

 5          catch you on the break for those.

 6   BY MR. PIORKOWSKI:

 7   Q.     Now, with respect to the AGRICO and the CNAP study,

 8          both of those were done using something called crop

 9          exposure matrices, correct?

10   A.     Yes.  That's the way it's described.  Yeah.

11   Q.     And so methodologically, they looked at -- let me

12          just see if we can agree on what that means.  So what

13          they did was they made some assumptions about who

14          used which pesticides based on what kind of crops

15          people grew, correct?

16   A.     Yeah.  Yes.  Crops and animal species.

17   Q.     Right.  And so, for example, if you grew corn, then

18          they had certain assumptions about what percentage of

19          farmers who grew corn used glyphosate versus other

20          pesticides, right?

21   A.     Yeah.  That's correct.  Can I make a quick, quick

22          clarification?

23   Q.     Sure.

24   A.     It's not the AGRICO study.  They're the AGRICO
```

Joel G. Wagenaar, ND, MSc, PhD

```
 1          collaborative, that author group.  It's the AGRICAN

 2          study.

 3    Q.    Okay.

 4    A.    So it's AGRICAN, CNAP, and AHS that they combined.

 5    Q.    Okay.  I appreciate that.  Now, with the AGRICAN and

 6          the CNAP study, we don't actually know -- the people

 7          who got counted as being exposed to glyphosate, we

 8          have no assurance that even one of them actually was

 9          exposed to glyphosate, do we?

10    A.    Yes.  It certainly is an assumption that's made based

11          on these matrices.

12    Q.    In other words, there was no -- apart from the

13          assumptions based on the matrices, there was no

14          ascertainment of exposure in individual people in

15          either of those studies, correct?

16    A.    Yes.  That's correct.  For those two studies, that is

17          correct.  Yep.

18    Q.    Okay.  All right.  Go back to my question.  I was

19          asking whether you're awaiting any other information.

20          In response to that you mentioned your correspondence

21          with Maria Leon.  Is there any other information

22          you're waiting for other than a response from

23          Dr. Leon?

24    A.    No.
```

Joel C. Gagnier, ND, MSc, PhD

```
 1   Q.   As we sit here today, is your report accurate?  When
 2        is the last time -- let me start over.  When is the
 3        last time you reviewed your report?
 4   A.   Yesterday.
 5   Q.   Okay.  And when you last reviewed it, did you see
 6        anything that needed to be changed or corrected to
 7        make it accurate?
 8   A.   No.  The supplemental -- supplemental table is --
 9        together -- that together with the report, it's
10        complete.  Yes.
11   Q.   Okay.  And as we sit here today, it's your belief
12        that your report is accurate, correct?
13   A.   Yes.
14   Q.   Have you submitted any of the opinions contained in
15        your report for publication?
16   A.   No.
17   Q.   Have any of the opinions in your report been
18        peer-reviewed?
19   A.   No.
20   Q.   Do you have any plans to submit the opinions in your
21        report for publication?
22   A.   No.  Not at this moment, no.
23   Q.   Okay.  Did you write this report?
24   A.   I did, yes.
```

```
 1   Q.   And who assisted you with the preparation of your

 2        report?

 3   A.   No one.  It was just me.

 4   Q.   Now, on page 12 of your report, you have the

 5        statement -- I'll just read from it.  It says

 6        furthermore, their weighting of the Leon 2019 was

 7        very high, much higher than it should have been,

 8        according to our calculation.

 9   A.   Oh, yeah.

10   Q.   When you use the word our, who's that for?

11   A.   Yeah.  I'm sorry about that.  That's just the nature

12        of sort of scientific writing.  Sometimes I would

13        catch myself writing we or our, but there is no we or

14        our.  It's I.

15   Q.   So it just should be my calculation, not our

16        calculation?

17   A.   Yeah.  That's right.  It's commonplace for --

18        obviously, I publish a lot of papers, and we have

19        group authorship so I always say we or our.  It's

20        just -- it's a habit.

21   Q.   Okay.  So how are you doing?

22             MR. PIORKOWSKI:  Everybody good or

23          you want to take a break or what's --

24          Gibbs?
```

```
 1                  MR. GIBBS:  Can we grab -- can we do
 2             a quick coffee break, like five minutes?
 3                  MR. PIORKOWSKI:  Sure.
 4                  THE WITNESS:  Okay.
 5                  VIDEOGRAPHER:  We are going off the
 6             record --
 7                  MR. PIORKOWSKI:  Off the record.
 8                  VIDEOGRAPHER:  We are going off the
 9             record at 10:12 a.m.
10                  (Recess taken.)
11                  VIDEOGRAPHER:  We are back on the
12             record at 10:21 a.m.
13    BY MR. PIORKOWSKI:
14    Q.   So, Dr. Gagnier, could you -- let me change topics a
15         minute and go a little bit to your practice.  So you
16         teach in addition to doing research, right?
17    A.   Yes, I do.  Yeah.  In fact, I'm teaching a graduate
18         course right now.
19    Q.   Okay.  So when you had said -- I can't remember what
20         you said -- 90 percent research, is that -- are you
21         wrapping teaching into that?
22    A.   Yeah.  Except I'm -- the graduate course I'm teaching
23         right now, so -- well, I'll give a little bit of an
24         explanation.  I'm in the transition from University
```

Joel G. Gagnier, ND, MSc, PhD

```
 1          of Michigan to Western University in London, Ontario,

 2          Canada.  So I'm teaching a graduate course for

 3          Western University right now, and I -- in their

 4          clinical epidemiology and biostatistics department

 5          where I'm cross appointed in surgery, and I'll be

 6          going there full time as a full-time associate

 7          professor at the beginning of May.

 8                    So then at Michigan, I taught a course this

 9          fall, last fall, for example, 2021 in the fall, on

10          systematic reviews and meta-analyses, and I teach

11          summer -- there's something called the graduate

12          summer session.  It's called the epidemiology summer

13          session now at University of Michigan where I've

14          taught for I think since 2009 also systematic

15          reasoning meta-analysis but also measurement course.

16          And then I do a little bit of teaching for residents

17          in like introduction to biostatistics and

18          evidence-based medicine.

19   Q.     So when you say you're in transition, can you explain

20          what you mean there?

21   A.     Yeah.

22   Q.     Changing jobs or?

23   A.     Yeah.  I'm changing universities.  That's correct.

24          Yeah.  I accepted a position at Western University in
```

```
 1        the fall.  It was formerly called University of

 2        Western Ontario.  In the last two years they changed

 3        their name to Western University.  Nevertheless,

 4        yeah, I accepted a position there.  They wanted me to

 5        teach the course, so I'm teaching the course.  I'm

 6        not doing anything else there.  But I'm still

 7        full-time faculty at University of Michigan where I

 8        have several grants that I'm just overseeing the

 9        finishing on a couple of these grants.  So yeah.  So

10        then May 1st I'll be done at University of Michigan

11        as a full-time employee and moving full time to

12        western.

13   Q.   Okay.  So let's just take, let's say, the last year

14        of your -- or we can do it by academic year since

15        that may make more sense.

16   A.   Okay.

17   Q.   What courses did you teach in the last academic year,

18        like 2021-'22?

19   A.   I taught -- in the summer of 2021, I taught

20        introduction to systematic reviews and meta-analyses

21        in the epidemiology summer session.

22             In the fall, in the formal graduate

23        program, which is the MPH and PhD program which is

24        separate from the summer session, though there's a
```

```
 1          lot of crossover in teaching, nonetheless, I taught a
 2          full graduate course to PhD students and master's
 3          students called systematic reviews and meta-analyses.
 4          So a three-credit course.
 5                  And right now I'm teaching epidemiology --
 6          or excuse me.  Clinical epidemiology at Western
 7          University.
 8                  In addition to those three courses, I also
 9          gave a handful of lectures for residents, that is
10          orthopedic surgery residents, where -- we call it the
11          basic science program.  But it's a mix of basic
12          science education, things like bone biology to things
13          like that I have expertise in which is clinical
14          research methods, biostatistics, and evidence-based
15          medicine.  I'm not a biostatistician, but, you know,
16          I can give introductory lectures to them because it's
17          fairly straightforward.  Those lectures are mostly
18          meant to prepare them for their residency
19          qualification exams.
20     Q.   Okay.  Are those lectures to residents listed in your
21          CV which we've marked --
22     A.   Yeah.
23     Q.   -- as Exhibit 5?
24     A.   Yeah, they're listed in there.  It's under basic
```

```
 1          science lectures, and it has years starting to

 2          present.  It should say 2010 to present.

 3   Q.     So in terms of epi methods, systematic reviews and

 4          meta-analysis have been your primary focus.  Is that

 5          fair?

 6   A.     Those are -- yeah.  Those are the primary -- that's

 7          the primary course that I've taught the most of.

 8          Yes.  But I've also taught a lot on measurement.  So

 9          outcome measurements, for example, in epidemiology.

10          And like I said, evidence-based medicine and clinical

11          epidemiology are areas that I've taught a lot in as

12          well.  But certainly systematic reviews and

13          meta-analysis as far as formal courses go is the most

14          frequent one that I've taught.

15   Q.     Now, the course in clinical epidemiology that you

16          alluded to, that's -- what's included in that course

17          subject matter wise?

18   A.     Yeah.  Well, clinical epidemiology, which is the

19          subbranch of epidemiology that I have expertise in,

20          clinical epidemiology, is taking epidemiologic

21          principles, like cohort study methods, clinical trial

22          methods, and applying that to healthcare-related

23          questions.  So the students are learning how to --

24          how to read and critically appraise the medical
```

```
 1          literature, how to interpret the evidence that's
 2          included, find and interpret the evidence that's
 3          included in articles.  So doing a comprehensive
 4          critical appraisal of them.  It's an introductory
 5          clinical epidemiological course.  So it's mostly
 6          master's students.  There's some PhD students in it
 7          as well.
 8   Q.     All right.  What are the main ongoing research
 9          projects that you have -- I know you said you're
10          transitioning.  So I assume you're trying to finish
11          some of the research before you move.
12   A.     Yeah.
13   Q.     What are the big projects you have working on right
14          now?
15   A.     The ones that I'm -- I'll go by sort of the ones
16          where I'm the PI, the main investigator one, and then
17          down to where I'm a co-investigator.
18                 So I'm a PI, primary investigator, on
19          what's called an R-34 grant from the National
20          Institutes of Health, specifically the NIAMS,
21          N-I-A-M-S, which is one of the many institutes at
22          NIH.  And that study -- an R-34 is a -- the mechanism
23          is it's called a clinical trial planning grant.  So
24          we've taken the last year and we have about
```

```
 1        another -- I think we have another eight or nine

 2        months to go on it where we're preparing our sites

 3        for a multi-site clinical trial for using CBD, or

 4        cannabidiol, perioperatively to treat pain and to

 5        improve recovery from total knee arthroplasties.  So

 6        I'm a co-primary investigator on that grant and will

 7        be submitting the follow-up to that grant, which is

 8        called a U01, in July to actually implement the

 9        clinical trial.  So we've, you know, created our

10        scientific advisory team, our safety monitoring

11        board, and did our preliminary statistical

12        calculations for sample size and all that as the

13        preparatory work, added our sites, got the surgeon

14        involved, all that sort of stuff.  So that's one.

15              The other grant that I'm the PI on, it's

16        a -- I'm the site PI.  So I'm the University of

17        Michigan primary investigator.  And it's a long COVID

18        associated grant.  As many of you probably know,

19        there's been a large reallocation of funding

20        resources towards COVID, SARS COVID 2, and now long

21        COVID.  So that grant is specifically to -- I'll try

22        to say it briefly.  But there's -- there's an

23        organization that's called NCCC, which stands for the

24        National COVID Cohort Collaborative, which is
```

1       across -- I don't know what the exact number is now,

2       but I believe it's 102 institutions in the United

3       States who basically contribute health data to a

4       centralized database on those who have -- have tested

5       positive for COVID.  So it's like a very large

6       registry, long story short.  So we're adding long

7       COVID, the long COVID diagnosis and various other

8       patient demographic characteristics from our site to

9       that collaborative effort.  And I'm specifically

10      interested in the musculoskeletal and the

11      health-related quality of life outcomes in that group

12      as well.  So I'm the PI, site PI for that.

13              I'm a co-investigator --

14  Q.  Actually, let me -- before you go to the next one --

15  A.  Yes.

16  Q.  -- let me ask you a follow-up on that one.

17              So with respect to the -- what are the

18      outcomes that you're primarily involved with looking

19      at as the PI?  You said they're musculoskeletal.

20      What specifically?

21  A.  Yeah.  That's what I'm personally interested in is

22      musculoskeletal outcomes.  The main objective is to

23      actually -- to get a really good sense of what those

24      musculoskeletal outcomes are.  So it could be that --

```
1          for example, the literature is quite messy in the

2          field so far.  So there hasn't been a very strong

3          concerted effort at collecting, comprehensively

4          collecting symptoms that folks get after having acute

5          COVID.  And then the relationship with either prior

6          conditions, the severity of the COVID, whether

7          they're hospitalized, whether they are intubated or

8          had supplemental oxygen.

9                    So we're trying to figure out what all the

10         predictors are and the circumstances of their acute

11         COVID and then what happens to them

12         musculoskeletally.  So whether they have general

13         myalgias, which is just muscle pain or specific joint

14         pain, where at, how long, how often, how frequent.

15         What makes it worse, what makes it better, who's at

16         risk for those.  And then what are the health-related

17         quality of life associated outcomes.  So things like

18         quality of sleep, ability to just do physical

19         function, maybe to play sports, maybe just to walk,

20         maybe just to do activities of daily living.

21                    So it's a whole variety of outcomes.  But

22         it's mainly trying to conceptualize what's actually

23         going on, rather than it being kind -- because, like

24         I say, it's very disorganized in the literature right
```

Joel C. Gagnier, ND, MSc, PhD

```
 1        now.  So we want to do this comprehensively across a

 2        very large sample.

 3   Q.   Okay.  And then I interrupted you.  You were going on

 4        to talk about the one that you were a co-investigator

 5        in.

 6   A.   Oh, yeah.  I'm a co-investigator on something called

 7        the bioscience initiative grant, which is a -- which

 8        is an internal grant to the University of Michigan

 9        but a substantial one where we're looking at the

10        concept of -- it's in the undergraduate population at

11        University of Michigan.  We just had a paper

12        accepted.  Basically looking at resilience factors in

13        the COVID era amongst that group.

14              So a variety of outcome measures, pain

15        measures, musculoskeletal measures, but also things

16        like sleep or like mood or, you know, anxiety,

17        depression, etcetera, psychological variables.  Also

18        doing some activity monitoring with actographs, risk

19        actographs, some heart rate variability monitoring as

20        well.  And that's one -- that's another one that I'm

21        co-investigator.  I'm going to have to give that up

22        when I go to Western because it is an internal grant

23        to University of Michigan.

24   Q.   Uh-huh.
```

```
 1   A.      The -- the other one -- well, I may not even have to

 2           mention the other one.  But there's the Michigan

 3           Institute For Clinical and Health Research at

 4           University of Michigan, which is a -- which is funded

 5           by a CTSA grant, which is a very large training grant

 6           from the NIH.  Well, partially funded by it.  So it

 7           wasn't -- so MICHR is a very -- so it's a large

 8           research institute at University of Michigan where

 9           I'm one of the faculty members on it as a

10           co-investigator.  And the renewal was submitted last

11           fall, but the -- the renewal was rejected.  So

12           that -- that grant is coming to an end.  It will be

13           sustained internally now.

14                   And I think -- I don't think I'm missing

15           anything else right at the moment.  I have a few

16           other pending grants, like I have no effort on a

17           grant from the Canadian Institute's of Health

18           Research, which is looking at reporting guidelines

19           for outcomes that are combined in systematic reviews,

20           any type of outcome.  And that's -- the primary

21           investigator is Martin Offringa from the University

22           of Toronto.

23                   And yeah.  That pretty much sums it up.  We

24           have a couple others that look like we're going to
```

```
 1        get them, but I don't want to say we're going to get

 2        them.  I don't know for certain.

 3   Q.   All right.  Okay.  Changing topics here.  When were

 4        you first contacted about getting involved in this

 5        case?

 6   A.   I'd have to look back to be absolutely certain.  I'm

 7        not absolutely certain.  It was in the fall sometime,

 8        I believe.

 9   Q.   When you say I'd have to look back, what would you

10        look back at?

11   A.   Just e-mail correspondence.  Yeah.

12   Q.   And do you remember when in the fall exactly?

13   A.   No, I don't.

14   Q.   Does your -- would your invoice or the

15        correspondence, which are Exhibit 6 or 7, be helpful

16        in answering that question?

17   A.   Yes.  Very likely.  I can take a look.  6 or 7.

18        Yeah.  It must have been sometime in November then of

19        2021.  Yeah.

20   Q.   Okay.  And who contacted you?

21   A.   Mr. Gibbs Henderson.

22   Q.   And had you ever worked with Mr. Henderson before?

23   A.   No.

24   Q.   Had you ever worked with anyone from Mr. Henderson's
```

```
 1        firm before?

 2   A.   No.

 3   Q.   Okay.  At the time you were first contacted, did you

 4        already have an opinion about whether glyphosate

 5        caused non-Hodgkin lymphoma?

 6   A.   No.

 7   Q.   Before you were contacted, did you have any

 8        experience, education, or expertise in the

 9        carcinogenicity of glyphosate or Roundup?

10   A.   I had been in the process of reviewing the papers for

11        the eight months prior to that.  So since

12        approximately January or February I had been started

13        to review that literature of 2021.

14   Q.   And for what reason were you reviewing that

15        literature?

16   A.   For a separate litigation.

17   Q.   So you mean another Roundup case?

18   A.   Yes.

19   Q.   Okay.

20   A.   Yes.

21   Q.   So let me rephrase that a little bit.  Before -- and

22        I'm not -- I'm not necessarily referring to your

23        involvement in this case.  But before you -- before

24        you were contacted about becoming an expert in any
```

Joel D. Wagoner, ND, MSC, PhD

```
1          Roundup case, did you have any experience, education,

2          or expertise in the carcinogenicity of glyphosate or

3          Roundup?

4    A.    Education, yes.  In epidemiology we have a -- the

5          epidemiology of cancer or epidemiology oncology where

6          we cover carcinogenicity of various types of

7          substances, though not specifically glyphosate.

8    Q.    Okay.  Yeah.  That's my -- my question is before you

9          were first contacted about being an expert, not

10         necessarily by Mr. Gibbs but by anybody in relation

11         to the case, did you have any expertise in the

12         relationship between glyphosate and non-Hodgkin's

13         lymphoma risk?

14   A.    No.

15   Q.    Okay.  And so everything that you know about the

16         relationship between glyphosate-based herbicides and

17         non-Hodgkin lymphoma you learned as a part of your

18         work as an expert in litigation; is that fair?

19   A.    Everything I know about the -- everything I know

20         about the scientific literature, the clinical

21         research in the area, yes, during the litigation.

22         Yes.  Or whatever -- after I was asked to.  Yep.

23   Q.    Okay.  Before you were first asked to look at the

24         literature as an expert, had you ever read any
```

Joel U. Wagner, ND, MSc, PhD

```
 1        articles in the medical literature concerning

 2        glyphosate and non-Hodgkin lymphoma?

 3   A.   That's a good question.  I don't think so.  But I've

 4        probably read 500,000 articles in the last ten years.

 5   Q.   Fair enough.  When is the first time that you can

 6        remember hearing about an association between

 7        glyphosate-based herbicides and non-Hodgkin lymphoma?

 8   A.   That I -- did you say heard about?

 9   Q.   Yeah.

10   A.   The first time I would have been exposed to the

11        scientific literature that tested that question would

12        have been like about January or February of 2021.

13        You know, we hear a lot of things in epidemiology and

14        in medicine and, but, I mean, I'm a scientist.  I

15        have to look at the literature before I can form any

16        opinion on it.

17   Q.   Okay.  Fair enough.  So coming back to this case,

18        meaning the Alesi case, when did you first agree to

19        serve as an expert in this case?

20   A.   I believe it was in November.

21   Q.   Okay.

22   A.   I was just looking at my e-mail.  But, you know, much

23        like you with your -- with new computer, or computer

24        issues, I changed computers.  So it seems I don't
```

Joel D. Wagner, ND, MSc, PhD

```
 1        have all the history of my e-mail on this application
 2        on my computer.  So I'd have to dig a little bit.
 3   Q.   Okay.  All right.  Are you working on additional
 4        Roundup cases?  And I'm not asking you to identify
 5        the case or who you're working with.  I'm just asking
 6        generally are you working on additional cases besides
 7        the Alesi case?
 8   A.   Yes.
 9   Q.   Okay.  Have you ever personally used Roundup?
10   A.   I grew up on a farm not far from here.  I'd have to
11        ask my father specifically.  I suspect so when I was
12        younger.  I'm 49 years old.  My father sold the farm
13        when I was about 15.  So, you know, we were spraying
14        thistles and hoeing weeds and pulling weeds.  So it's
15        possible.  I'd have to ask.  I suspect probably.
16   Q.   It's possible, but you just don't know one way or the
17        other --
18   A.   Yeah.
19   Q.   -- as you sit here today?
20   A.   Yeah.
21   Q.   So going back to some epi-related stuff.  I know I
22        asked you a lot about your research on non-Hodgkin
23        lymphoma and cancer.
24   A.   Yeah.
```

Joel C. Gagnier, ND, MSc, PhD

```
 1    Q.    Have you ever designed an epidemiological study on

 2          Roundup or any other pesticide?

 3    A.    Designed one, no.

 4    Q.    How about conducted one?

 5    A.    No.

 6    Q.    How about published an epidemiological study on

 7          Roundup or any other pesticide?

 8    A.    No.

 9    Q.    Have you ever been -- you're familiar with a group

10          called the IARC or the International Agency For

11          Research on Cancer?

12    A.    Yes.

13    Q.    Okay.  Have you ever been a member of an IARC working

14          group?

15    A.    No.

16    Q.    Have you ever been asked to be a member of an IARC

17          working group?

18    A.    No.

19    Q.    Have you ever been a consultant to IARC in any

20          capacity?

21    A.    No.

22    Q.    Do you personally know anyone who's been a member of

23          an IARC working group?

24    A.    I don't think so, though I haven't seen all of the
```

Joel C. Gagnier, ND, MSc, PhD

```
 1        names over the years because they do transition on

 2        and off.  It's possible.

 3   Q.   Okay.  You haven't spoken with anyone who was on an

 4        IARC working group about any aspect of IARC in

 5        connection with your opinions; is that right?

 6   A.   That's correct.  I have not.

 7   Q.   Had you heard of IARC before you first became

 8        involved in this litigation?

 9   A.   Yes.

10   Q.   In what context?

11   A.   Just from -- just from reading the literature in

12        other areas.  You know, it's a large organization, as

13        there are many international, if you want to call

14        them, think tanks or research organizations,

15        consortia.  So yeah, usually we're aware of the large

16        ones like that.  Yeah.

17   Q.   Okay.  And did you read the IARC 112 working group

18        monograph?

19   A.   Some time ago I did, yes.

20   Q.   When you say some time ago, what do you mean?

21   A.   Probably last spring I read it.  Yeah.

22   Q.   Are you offering any opinions about IARC?  Your

23        designation indicates that you might be offering some

24        opinions about IARC.  I didn't see anything in your
```

```
 1       report, but I wanted to --

 2   A.  No, I'm not.

 3   Q.  Are you relying on the IARC monograph for any

 4       purpose?

 5   A.  No.

 6   Q.  Are you familiar with an organization called Health

 7       Canada?

 8   A.  Yes.  I have had funding and several fellowships from

 9       Health Canada.

10   Q.  And Health Canada is a regulatory authority for

11       Canada; is that right?

12   A.  Yeah.  It's essentially the equivalent to the FDA.

13   Q.  Well, they actually have a broader mandate than even

14       the FDA, right, in the sense that Health Canada

15       regulates pesticides in Canada as well as

16       pharmaceutical products, right?

17   A.  Yes.  As well as natural health products.

18   Q.  Right.

19   A.  Uh-huh.

20   Q.  And that, in the United States, you know, that's

21       under the purview of the EPA, I think you probably

22       understood, right?

23   A.  Yeah.  Yeah, I did.  And in the US, dietary

24       supplements are separate as well.
```

```
 1   Q.   So the mission of Health Canada is that they're

 2        generally tasked with protecting the public health of

 3        Canadian citizens.  Is that fair?

 4   A.   Yeah.  That's fair to say, I suppose.  I don't have

 5        great expertise on what their mandates are.

 6   Q.   Okay.  Do you know whether one of Health Canada's

 7        responsibilities is to evaluate the scientific

 8        evidence on pesticide products to determine whether

 9        they're safe for use in Canadian citizens?

10   A.   I believe so, but that's as far as I can say.

11   Q.   Okay.  Have you ever been an employee of Health

12        Canada?

13   A.   No.

14   Q.   Okay.  Have you ever been -- well, let me -- you said

15        you've done some research that has been funded by

16        Health Canada; is that right?

17   A.   The Canadian Institutes of Health Research is the

18        equivalent to the NIH in the US, and there is a --

19        there's some regulatory relationship between the two

20        organizations.  So CIHR has a bunch research

21        institutes under it just like the NIH does.  So as a

22        graduate student, for my master's and my PhD and my

23        post-doc, I got fellowships from the Canadian

24        Institutes of Health Research to pursue that graduate
```

Joel C. Gagnier, ND, MSc, PhD

```
 1        level education and also have gotten three grants

 2        from the Canadian Institutes of Health to help

 3        research -- for my research too as a primary

 4        investigator and one as a co-investigator.

 5   Q.   So is the Canadian Institute of Health Research a

 6        division of Health Canada?

 7   A.   Not exactly a division.  How would you describe it?

 8        To be honest, it's been so long since I've been in

 9        the Canadian system, for me to comment on the

10        structure and relationship between Health Canada and

11        CHR would be -- I wouldn't be well informed at this

12        moment to do that.

13   Q.   What's your best understanding of the relationship

14        between Health Canada and Canadian Institute of

15        Health Research?

16   A.   That they have a similar funding source, I think.

17   Q.   Do you know one way or the other whether they're

18        distinct entities?

19   A.   No, I'd have to say that I don't.

20   Q.   Okay.  That's fine.  Have you ever been a consultant

21        to Health Canada?

22   A.   No.

23   Q.   Okay.  Have you, to the best of your knowledge,

24        discussed any issues related to glyphosate or Roundup
```

Joel G. Wagoner, ND, MSc, PhD

```
1        with any officials from Health Canada?

2   A.   No.

3   Q.   As a part of your review of the scientific evidence

4        in this case, did you review Health Canada's

5        assessment of the scientific evidence with respect to

6        the carcinogenicity of glyphosate?

7   A.   I'm aware of it, but I haven't reviewed it.  No.

8   Q.   What do you mean by you're aware of it?

9   A.   Well, I knew it existed, but I haven't got a copy of

10       it.  But yeah.  I mean, I've seen -- I saw the

11       evidence of it, that it exists, but I haven't looked

12       at it.

13  Q.   So you didn't consider Health Canada's evaluation of

14       the scientific evidence in reaching your own

15       opinions; is that correct?

16  A.   That's correct.  I relied on the peer-reviewed

17       published literature.

18  Q.   Okay.  Do you know what conclusion the scientists at

19       Health Canada reached concerning the carcinogenicity

20       of glyphosate?

21  A.   No, I don't.

22  Q.   And I'm assuming you're not relying on any aspect of

23       Health Canada's assessment for purposes of your

24       opinions in this case, correct?
```

```
 1    A.   That's correct.

 2    Q.   Similarly, you're familiar with the Environmental

 3         Protection Agency, right?

 4    A.   Yes.

 5    Q.   EPA is a regulatory agency for the United States,

 6         correct?

 7    A.   Correct.  Yes.

 8    Q.   They're tasked generally with protecting the public

 9         health of US citizens?

10    A.   Yes.  That sounds accurate.

11    Q.   One of EPA's responsibilities is to evaluate

12         scientific evidence on pesticide products to

13         determine whether they're safe for use, correct?

14    A.   Yes.

15    Q.   Have you ever been an employee of the EPA?

16    A.   No.

17    Q.   Have you ever been a consultant to the EPA?

18    A.   No.

19    Q.   Have you discussed any issues related to glyphosate

20         or Roundup with any EPA officials?

21    A.   No.

22    Q.   As part of your review of the scientific evidence in

23         this case, did you review any of EPA's assessments of

24         the scientific evidence with respect to the
```

Joel C. Gagnier, ND, MSc, PhD

```
 1        carcinogenicity of glyphosate?

 2   A.   No.

 3   Q.   Did you consider EPA's evaluation of the scientific

 4        evidence in reaching your own opinions in this case?

 5   A.   No.

 6   Q.   Are you relying on any aspect of EPA's assessment for

 7        purposes of your opinions in this case?

 8   A.   No.

 9   Q.   Do you know the conclusion that EPA reached after

10        evaluating the scientific evidence?

11   A.   No.

12   Q.   Do you have any familiarity procedurally with the

13        process that's used by Health Canada when they

14        conduct a scientific evaluation of any kind of

15        chemical product to determine its health effects?

16   A.   No.

17   Q.   Do you have an understanding of whether when Health

18        Canada reaches -- conducts an evaluation, whether it

19        publishes preliminary opinions that are then open to

20        public comment by members of the public including the

21        scientific community before it issues its final

22        conclusions?

23   A.   Yeah, I believe so.  Yeah.  Superficially I believe

24        that I'm aware of that.  Yeah.
```

Joel U. Gagnier, ND, MSc, PhD

```
 1    Q.    Okay.  Have you ever, not just with respect to

 2          glyphosate but with respect to any chemical compound,

 3          have you ever filed public comments to provide Health

 4          Canada with your views about any product that was

 5          under evaluation by them?

 6    A.    No.

 7    Q.    And same questions with respect to the EPA.  Do you

 8          have an understanding that when EPA issues -- I'm

 9          sorry.  Let me start over.  When EPA conducts an

10          evaluation of scientific evidence, it issues

11          preliminary conclusions that are then -- that then

12          give the public an opportunity on which you comment.

13          Is that your understanding?

14    A.    Yes.  Again, rather superficially, yes, I understand

15          that that's the case.

16    Q.    And have you ever submitted any comments to EPA in

17          connection with any compound, chemical that was under

18          evaluation by them?

19    A.    No.

20    Q.    Are you familiar with a group called the National

21          Toxicology Program?

22    A.    No, I'm not.

23    Q.    Okay.  Are you aware that in the United States, the

24          national toxicology -- well, are you aware that
```

```
 1           there's a group that issues a statement identifying

 2           carcinogenic or probably carcinogenic substances for

 3           the public?

 4    A.     No.

 5    Q.     Okay.  Are you familiar with the difference between

 6           hazard identification and risk assessments?

 7    A.     From what perspective?

 8    Q.     From the perspective of what they represent.  Let

 9           me -- let me come back to that.  We'll come back to

10           that in a little bit.  Change topics here for a

11           minute.

12                   With respect to -- you understand that

13           you're not the only expert who's been designated by

14           the plaintiffs in this case, right?

15    A.     Yes.

16    Q.     Have you reviewed the reports of any experts who have

17           been designated by plaintiffs in the Roundup

18           litigation, not just in this case but in any case?

19    A.     Yes.

20    Q.     What experts' reports have you reviewed?

21    A.     None associated with this case.  But with the -- with

22           the other case that I'm involved in, yes, several of

23           them.

24    Q.     Can you tell me what -- whose reports you've looked
```

```
1       at?

2    A. The names of the people?

3    Q. Yes.

4    A. I'm not sure that I'm supposed to do that or not.

5    Q. Well --

6    A. I'm not sure -- if I could have some guidance on what

7       I can and cannot say regarding a separate case of

8       experts.

9    Q. Well, yeah.  I'm not asking you your opinion in the

10      other case.  I'm not asking who you worked with.  But

11      I assume if you've read a report by an expert on the

12      very subject that we're talking about here, that's

13      not something that you can put out of your mind

14      entirely.  Is that fair?

15   A. Oh, I see.  Yes.  Yes, I understand.  The -- the

16      other reports that I had looked at were reports

17      outside of my area of expertise.

18   Q. Okay.

19   A. For example, pathology.  Another example would be

20      animal studies that you asked me questions about,

21      which I do not have expertise in.  My intent of

22      seeing the reports was making sure that I wasn't

23      being redundant with something that was already being

24      presented.  And I'm the expert in clinical subjects
```

Joel C. Gagnier, ND, MSc, PhD

```
 1        research.  So that's what I looked at and nobody else

 2        did.

 3   Q.   Are you relying for any purpose on your evaluation of

 4        any expert reports that you've looked at from other

 5        plaintiffs' experts?

 6   A.   No.

 7   Q.   Have you reviewed the deposition testimony or trial

 8        testimony of anyone who was designated as an expert

 9        by the plaintiffs in any Roundup case?

10   A.   No.

11   Q.   Have you spoken to anyone who has served as an expert

12        for plaintiffs in the Roundup litigation?

13   A.   No.

14   Q.   Have you reviewed the reports of any experts -- and

15        I'll represent to you that in this case, the Alesi

16        case, we have not served reports yet.  We're

17        designating our experts today.  But have you reviewed

18        the reports of any experts who have been designated

19        by Monsanto in the Roundup litigation generally?

20   A.   No.

21   Q.   Have you reviewed the deposition or trial testimony

22        of any expert who was designated as an expert by

23        Monsanto in the Roundup litigation?

24   A.   No.
```

Joel U. Gagnier, ND, MSc, PhD

```
 1   Q.   Have you spoken with anyone who has testified as an
 2        expert on behalf of Monsanto in the Roundup
 3        litigation?
 4   A.   No.
 5   Q.   Do you know who the epidemiologists are who have
 6        testified or been designated by Monsanto in the
 7        Roundup litigation?
 8   A.   No.
 9   Q.   Have you discussed this case with any of your
10        colleagues?
11   A.   No.
12   Q.   Have you -- is there any other person other than
13        counsel with whom you've discussed any aspect of this
14        case?
15   A.   No.
16   Q.   So let's turn to a new subject.  I want to talk to
17        you a little bit about your methodology --
18   A.   Okay.
19   Q.   -- and how you approached this.  What question or
20        questions were you asked to address at the outset of
21        your review?  What was your understanding of your
22        task?
23   A.   I was asked as a clinical epidemiologist to review
24        the epidemiologic literature to determine whether or
```

Joel C. Gagnier, ND, MSc, PhD

```
 1        not there was a cause and effect association or not

 2        between exposure to glyphosate and the risk of

 3        non-Hodgkin's lymphoma.

 4   Q.   Okay.  Is that it?  Is that the main question?

 5   A.   Yes.

 6   Q.   Okay.

 7   A.   Yes.

 8   Q.   And what was your methodology that you used in

 9        evaluating the question that you were asked to

10        address?

11   A.   Well, first, I did a search for systematic reviews

12        and meta-analysis that have already been done on the

13        topic because systematic reviews and meta-analysis

14        are the peak of the literature.  They're the top of

15        the pyramid of scientific evidence for making

16        inferential statements.  And so I looked at the

17        systematic reviews and meta-analysis and reviewed

18        them, realized fairly quickly that the most recent

19        meta-analyses did not include or had a relatively

20        dated search period.

21             So I wanted to redo a search and create my

22        own search in relevant databases to make sure that

23        that meta-analysis was up to date or not, and it

24        turns out it was not because there's been new studies
```

Joel C. Gagnier, ND, MSc, PhD

```
 1        that have been published since the time that it had

 2        did its analyses.

 3              So I still collected the meta-analyses,

 4        though, and did kind of a brief critical appraisal

 5        and overview of them.  But realizing that they were

 6        out of date, decided to gather all of the literature

 7        on this question because I knew there was new studies

 8        that had been published since that time, and I

 9        gathered -- did a comprehensive literature search of

10        relevant databases, such as PubMed, which is also

11        Medline; the European medical database, which is

12        Embase; also the Cochrane library.

13              In addition to doing the literature

14        searches in those electronic databases, I reviewed

15        reference lists of articles that I had found,

16        including the meta-analysis and systematic reviews

17        that I had already found, in a way that's kind of

18        broadly called a snowballing technique until I gather

19        all of the relevant literature that met my inclusion

20        criteria.

21              So I collected the PDFs for all of those

22        papers, reviewed them carefully to see what was --

23        the challenge with the literature is that there's a

24        lot of overlapping from one study to another study
```

Joel D. Wagner, MD, MSc, PhD

```
 1         and reanalyses of the existing data, like the AHS

 2         data, for example, to make sure that I was, you know,

 3         not using overlapping studies, which we can get to at

 4         some point, I'm sure, and then proceeded to extract

 5         data from each of those individual studies,

 6         calculated odds ratios with a statistical program

 7         called Stata, and --

 8    Q.   Called what?

 9    A.   Stata.

10    Q.   Stata?

11    A.   Yeah.  S-t-a-t-a.  It's one of the big statistical

12         programs.  That one, SAS, and R are a couple of the

13         big ones, SPSS as well.

14              Yeah.  I extracted the data and combined

15         the data with well-accepted meta-analytic methods,

16         fixed effects and random effects models, as you can

17         see, using an inverse variance approach.  Also did a

18         variety of sensitivity analysis for studies like

19         Leon, for example, that only presented hazard ratios.

20         Or for the overlap of the Andreotti study, the Pahwa

21         study, and also looking at the cumulative, various

22         cumulative data that was presented in the studies, as

23         you can see in the report.

24              After doing that, I wanted to be sure that
```

Joel C. Gagnier, ND, MSc, PhD

```
 1        there was -- to investigate whether there was the

 2        possibility of publication bias.  Publication bias is

 3        strictly speaking is the -- you would expect when you

 4        have small studies with wide conference intervals

 5        that they would -- they would gather on either side

 6        of the pooled effect estimate that you get from a

 7        meta-analysis.

 8               So long story short, you want to make sure

 9        that somehow small negative studies aren't missing in

10        the literature cause historically that has been found

11        in other areas, not specifically in this area, but in

12        other areas there's been evidence of publication

13        bias.  So I explored that.

14               I also did a meta-regression, which is a

15        special type of regression in meta-analysis where I

16        looked at the influence of study quality or the risk

17        of bias of the individual studies on the effect

18        estimates and presented all of that data.  That's the

19        methods in a nutshell.

20   Q.   So let me back up and follow up on a couple things.

21        So I think you covered the databases that you looked

22        at.  What search terms did you look at when you did

23        these searches?

24   A.   I have them listed in the report.
```

Joel C. Gagnier, ND, MSc, PhD

```
 1   Q.   Feel free to refer to your report or refer me to your
 2        report.
 3   A.   It's very long.  You want me to go through all the
 4        search terms?
 5   Q.   Where -- well, direct me to where you --
 6   A.   Oh, just tell you where they're at?  Yeah.  Okay.
 7        Let's see here.  Page -- I give two examples of the
 8        search terms that I used here.
 9                  MR. HENDERSON:  It's on page 16.
10                  THE WITNESS:  Yeah.  That's correct.
11             Yeah.  They start on page 16.  Search
12             methods.  So I say I performed a
13             literature search in Medline, etcetera,
14             etcetera.  The search terms used were as
15             follows.  Then I have all the search terms
16             there.  And then also performed a
17             literature search in Embase, and the
18             search terms are listed there.  So those
19             are the, yeah, the examples of the search
20             terms.
21   BY MR. PIORKOWSKI:
22   Q.   So your search terms included glyphosate, pesticide,
23        herbicide, and lymphoma, non-Hodgkin lymphoma, NHL,
24        cancer generally, and also included occupational
```

Joel C. Gagnier, ND, MSc, PhD

```
 1        exposure, farmer's exposure, applicator's exposure,

 2        agricultural worker's exposure, worker exposure, and

 3        cohort or case control, right?

 4   A.   Yes.

 5   Q.   Okay.  Did you do any searches for -- that included

 6        the term statistical bias?

 7   A.   No.

 8   Q.   Okay.  So let me back up a second.  You talked

 9        about -- you talked -- you said that when you looked

10        at the meta-analyses, it became clear that some of

11        them were out of date.  Did I understand you

12        correctly?

13   A.   All of them were out of date.  Yes.

14   Q.   Okay.  And so everything published up to and

15        including 2021 was out of date?

16   A.   Yes.  The most recent meta-analysis was a Boffetta

17        analysis, which was a reanalysis of the data included

18        in Zhang.

19   Q.   Right.  And what was omitted from the Boffetta

20        analysis?

21   A.   Two recent studies, the study by Andreotti and the

22        study by Meloni.

23   Q.   Andreotti 2018?

24   A.   Excuse me.  Yes.  Andreo -- I need to check back.
```

Joel C. Gagnier, ND, MSc, PhD

```
 1        But I'm pretty sure it's Andreotti, Pahwa, and Meloni

 2        that were not -- most recent -- oh, he did include

 3        the most recent data on Pahwa.  Pardon me.  So it

 4        was the Meloni article that he didn't -- or they

 5        didn't -- I don't know if it was he or she -- include

 6        in the -- in their meta-analysis.  Yes.

 7   Q.   The Meloni article is one that did not show an

 8        increased risk of non-Hodgkin lymphoma overall,

 9        right?

10   A.   That's correct.  On its own.  Yes.

11   Q.   Okay.  So I want to just back up and flesh this out a

12        little bit more.  So you identified a number of

13        meta-analyses and then you went back and looked at

14        let's call it the original data that the

15        meta-analyses considered; is that fair

16        characterization?

17   A.   Yeah, that's right.

18   Q.   Yeah.  And I think what you're saying is if you go

19        back to the concept of kind of a Venn diagram, that

20        almost all of these meta-analyses included something

21        along the lines of 80 to 90 percent of the same

22        studies, correct?

23   A.   Yeah.  Yeah.  Approximately I would say.  Yeah.  I'd

24        have to look more closely to say if that was exactly
```

Joel C. Gagnier, ND, MSc, PhD

```
 1        right.  But yeah.

 2   Q.   Yeah.  And so then once you identify the underlying

 3        studies, we're going to talk about those in a second,

 4        but studies like McDuffie, Hardell, Eriksson,

 5        De Roos, Orsi, Cocco, you went back and individually

 6        analyzed each of those studies; is that right?

 7   A.   That's right.

 8   Q.   Okay.  And then -- and did you review each and every

 9        one of those articles?

10   A.   Yes.

11   Q.   And in selecting -- in choosing the articles, did you

12        just choose articles that supported the plaintiffs'

13        position, or did you look at articles that supported

14        Monsanto's position as well?

15   A.   I looked -- I wasn't terribly concerned about

16        supporting either position.  I looked at the question

17        whether or not -- the question was being asked and

18        investigated in the study if there was a relationship

19        between non-Hodgkin's lymphoma and exposure to

20        glyphosate-based herbicides.

21   Q.   Okay.  And how did you weigh each of the articles?

22   A.   In a meta-analysis, articles are weighted by some

23        measure of precision or exposure.  So, for example,

24        the largest -- the Leon study, for example, included
```

Joel G. Gagnier, ND, MSc, PhD

```
 1        a lot of, you know, a very large sample of

 2        participants, and so that study was weighted very

 3        high.  So it gets a percentage.  That's done by a

 4        method called the inverse-variance method, and it's

 5        basically a calculation of 1 over the square of a

 6        standard error for the odds ratio that was calculated

 7        or has -- in that case, has a ratio that was

 8        calculated in that study.  So larger studies get more

 9        weight generally speaking.  That's not the full --

10        that's not the most correct answer.  The most correct

11        answer is the more precise studies get weighted more

12        overall.

13   Q.   Okay.  So Leon had large numbers, but in terms of

14        exposure assessment, it was probably at the bottom of

15        the pack, right?

16   A.   It had a drawback associated with exposure

17        assessment.  Yes.

18   Q.   Okay.  Now, one of the papers that you looked at is

19        the Zhang 2019 meta-analysis, correct?

20   A.   Yes.

21   Q.   And that's the meta-analysis that I think you said in

22        your report you thought was the best of the ones that

23        you reviewed.

24   A.   I thought methodologically it was the strongest.
```

```
 1        Yep.

 2   Q.   Okay.  Do you have a copy of the Zhang study handy?

 3   A.   Yes, I do.  I have it right here.

 4   Q.   One of the things that the Zhang authors did on the

 5        front end was they systematically evaluated the

 6        quality of each of the studies that they used in the

 7        meta-analysis, correct?

 8   A.   Yes.  They did a -- they did a quality -- they call

 9        it a study quality evaluation.  It's really a risk

10        and bias assessment.  Yes.

11   Q.   Right.  And that's on page 194 under section 2.5.2

12        study quality evaluation, right?

13   A.   Yes.

14   Q.   And they say the methodological quality of the

15        cohort, table 2, and the case-control studies, table

16        3, included in the meta-analysis was assessed

17        independently by two co-authors using the Newcastle

18        Ottawa Scale, NOS.

19   A.   Yes.  That's correct.

20   Q.   Studies were evaluated based on selection,

21        comparability, and outcome or exposure (in nine

22        categories), correct?

23   A.   Correct.

24   Q.   Okay.  So what they did was they used a tool that
```

```
 1        provided a method of objectively assessing the

 2        quality of each one of the studies; is that right?

 3   A.   Well, it's not objective.  It's -- it's a subjective

 4        process on the basis of what's reported in the

 5        studies.

 6   Q.   Well, it's an attempt to be objective in the sense of

 7        the criteria that are used in, for example, table 2

 8        and table 3?

 9   A.   Well, we're using the terms objective and subjective

10        differently here.  This is -- it's not -- it's never

11        an objective assessment unless you're looking at

12        something, like, that has a -- like a definitive

13        measurement.  For example, like red blood cell level

14        count in a laboratory test.  That's objective.  These

15        are subjective assessments on the basis of the

16        readers.

17   Q.   Okay.  But they're attempting to do this in a

18        methodologically sound way; is that fair?

19   A.   It's the best way that we can do it for

20        meta-analysis.  Yes.

21   Q.   Okay.  All right.  And is the Newcastle Ottawa Scale

22        a tool that is accepted for conducting evaluations of

23        the quality of studies?

24   A.   Yes.  Yeah.  One of several.  Yes.
```

```
1   Q.   Is it -- to your knowledge, is it a validated method?

2   A.   It has some validity and reliability, studies that

3        have been done on it.  Yes.

4   Q.   Okay.  And one of the things that I read was she said

5        it was assessed independently by two co-authors,

6        correct?

7   A.   That's correct.

8   Q.   And what do you understand that to mean?

9   A.   Well, that's one of the -- that's one of the methods

10       that are generally used in meta-analyses when

11       conducting a meta-analyses to make sure that you have

12       reliable procedures as a part of your meta-analytic

13       methods.  So doing a risk of bias assessment across

14       several criteria, what happens is that -- basically

15       people take the papers, say it's five or six papers,

16       and go off on their own, do a risk of bias

17       assessment, and come back together to see if they

18       agree on all of the assessments for each of the

19       criteria.  And if they disagree on something, then

20       they discuss it and usually resolve it through

21       consensus.  If they can't resolve it through

22       consensus, then they refer to a third party.

23  Q.   All right.  So following their assessments, if you

24       see at the bottom of that section, it says according
```

```
 1          to our quality assessments, tables 2 and 3, the

 2          highest quality study in either design category was

 3          the AHS 2018 cohort, correct?

 4     A.   That's correct.

 5     Q.   And they gave out of a possible score of 9, they gave

 6          the AHS study an 8, correct?

 7     A.   And 8 out of 9.  Yeah.

 8     Q.   Yeah.

 9     A.   Yeah.

10     Q.   And you've reviewed each of the individual underlying

11          studies that went into the Zhang meta-analysis,

12          correct?

13     A.   I have, yes.

14     Q.   Okay.  And do you -- first of all, do you agree with

15          the authors' assessment that the AHS 2018 cohort is

16          the highest quality study in either design category?

17     A.   It is.  I believe I rated it the same.  Just let me

18          check to be certain.  I'm pretty sure I rated it an 8

19          out of 9 as well.  But yes, it was a -- yeah.  It was

20          a fairly well done -- as far as any single study goes

21          across all of these studies, it was fairly well done.

22          Yes.

23     Q.   Okay.  And with respect to the -- their assessment of

24          the individual case-control studies, which are set
```

```
 1        forth in table 3, do you agree with their assessment

 2        in terms of how the quality of those studies were

 3        ranked?

 4   A.   I'm just going to pull up table 3.  Yeah.  I did look

 5        at -- I did look at their assessments, and I believe

 6        I mostly agreed with what their -- how they assessed

 7        those studies.  Yes.

 8   Q.   Okay.

 9   A.   Yeah.  I'm looking at it.

10   Q.   Yeah.  Take a second and -- I don't want to -- as I

11        said, it's not a rush.  So I want to make sure you

12        have a chance to look at it and --

13   A.   Yeah.  You know, as I said, they're -- I believe that

14        their methods are sound and their rating of the

15        quality scores on those five case-control studies

16        is -- yeah.  It looks like it's -- it's well done.

17        Uh-huh.

18   Q.   Okay.

19             MR. PIORKOWSKI:  How we doing?  Just

20          off the record for a minute.

21             (Off stenographic record.)

22             (Recess taken.)

23             MR. PIORKOWSKI:  All right.  Let's

24          move on.
```

Joel J. Gagnier, ND, MSc, PhD

```
 1   BY MR. PIORKOWSKI:

 2   Q.   All right.  So I want to talk about some basic

 3        concepts.  It's been 30 years since I studied

 4        epidemiology at Johns Hopkins.  I want to make sure

 5        it hasn't changed.  All right?

 6   A.   Yep.  Well, you went to a good institution.

 7   Q.   Thank you.  So I want to start off just talking a

 8        little bit about recall bias.

 9   A.   Sure.

10   Q.   Recall bias is -- would you agree that it's something

11        that occurs in case-control studies potentially?

12   A.   It's something that we certainly need to be aware of

13        in case-control studies.  Now, it depends on what

14        exposure outcome relationship we're talking about.

15   Q.   Uh-huh.

16   A.   But yes, of course in some cases we're -- when we do

17        case-control studies, we have to ask about historical

18        events and sometimes long ago.

19   Q.   All right.  And just conceptually, recall bias is a

20        bias where there can be an increased likelihood that

21        those with the outcome will recall and report

22        exposures compared to those without the outcome.  Is

23        that fair?

24   A.   Well, that's not exactly the case.  It could be in
```

Joel J. Gagnier, ND, MSc, PhD

```
 1         either direction.  And so it's not -- it's not always

 2         that the -- that the recall bias favors the

 3         association.  It could not favor the association as

 4         well.  So it depends on a whole lot of circumstances.

 5   Q.    Can you give me any example of a study in which

 6         recall bias favors the absence of an association?

 7   A.    Well, there's lots of methodologic work on this

 8         question.  I don't have any right offhand, but I can

 9         give you a theoretical example.

10             If I'm doing a study about nutritional

11         intake and somebody hasn't done a, say, prospective

12         diet diary across time and I ask them, you know, how

13         much salmon did you eat 15 years ago because I want

14         to see what your food intake was around a time over

15         some period of time and your risk of, say,

16         cardiovascular disease, it depends on the

17         characteristics of the individual.  So if the

18         individual was knowledgeable about the relationship

19         between omega fatty acids and a risk of heart

20         disease, then maybe they would recall or had been

21         more cognizant of eating those foods and, therefore,

22         recalled it more often.  But if somebody wasn't

23         educated on that potential relationship, then they

24         might not at all recall what they had eaten.  So
```

1          instead, it would be in all relationships that would

2          be found instead of a positive relationship.

3     Q.   When we're talking about a disease like cancer and

4          we're talking about exposure to some substance that's

5          alleged to have caused cancer, in epidemiology,

6          recall bias, it is the -- it's not just a problem

7          with memory.  It's an established concept where

8          people who have the disease have a greater likelihood

9          to remember exposure to the potentially carcinogenic

10         substance than people that do not have the disease.

11    A.   Only if they know -- only if they have been exposed

12         to the possibility of that relationship and that

13         they're aware, meaning that if they're -- if they saw

14         a study like the studies that we're looking at.  Only

15         under those circumstances, or somebody has told them

16         about the potential relationship, only under those

17         circumstances will recall bias increase the

18         likelihood of that association.

19    Q.   So your testimony is unless the study subjects

20         actually had knowledge of the relationship, that

21         recall bias cannot affect the -- cannot affect the

22         odds ratio of a case-control study?

23    A.   No.  I'm saying it can work in either direction

24         depending on the characteristics of the individual.

Joel J. Gagnier, ND, MSc, PhD

```
 1    Q.    Well, in the case where there's a cancer and an

 2          exposure, it can only work in one direction, right?

 3    A.    Well, no.  No.  It can be in any direction or have no

 4          effect at all.  It completely depends upon the

 5          characteristics of the individual and how long ago

 6          are you asking.  And it's a complex relationship.

 7          It's not as simple as recall bias always exaggerating

 8          an effect.  It doesn't do that all the time.  There's

 9          evidence to show that that's not the case.

10    Q.    And what studies do you have supporting that

11          proposition?

12    A.    Well, I don't have them on -- I don't have them on

13          hand, but I could certainly produce them if you would

14          like to see some.

15    Q.    Is one way to evaluate recall bias to go back and try

16          to validate the exposure histories of the cases and

17          controls?

18    A.    Yes.  Absolutely.  That's an important safety measure

19          in case-control studies.

20    Q.    But that wasn't done in any of the case-control

21          studies that are at issue here, right?

22    A.    As far as -- no.  Not -- there was some attempt to

23          look at purchasing of products historically, which is

24          a measure of -- a potential -- there's a little bit
```

Joel J. Gagnier, ND, MSc, PhD

```
1        of inference involved in doing that, but that's a

2        measure of exposure.  Yes.  There is also independent

3        evaluation of the possibilities of exposures in

4        multiple studies from those who had expertise in

5        toxicology.  But, you know, the -- so yeah, there was

6        some attempt in some of the studies.  Yes.

7   Q.   Which studies attempted to look at purchasing as a

8        validation method?

9   A.   I'd have to look back and see which one.  I'm sorry.

10       I don't have that right off the top of my head.

11       Yeah.  I'm not sure.  It would take me -- probably

12       take me a while to find that for you, but I can look

13       into it as we're kind of going along.

14  Q.   No.  We're going to look at each of the studies as we

15       move forward.  So is there any way to go back after

16       the fact after a study has been done and ascertain

17       objectively whether recall bias did or did not affect

18       the study results?

19  A.   The best way to do it would be, as you say,

20       confirmation of exposure.  And there's a few

21       different ways that you could potentially -- you

22       could potentially do that.  So, like, I would say the

23       purchase history is more of a proxy measure.  It

24       wouldn't be exact because is the product being used
```

1        or not, even if it was purchased.  There's -- you

2        know, could be a possibility of some blood markers,

3        but I didn't look at that data.  Whether if somebody

4        went in for some routine blood work, is there a blood

5        bank available?  Maybe it could be objectively

6        measured then.  That wasn't done in any of these

7        studies.  There are some ways to do it.  And a couple

8        studies, as I said, did try to do something.

9    Q.   So here's my question, though, for you is you're

10       looking at studies, case-control studies that are

11       dated between, published between 2001 and, you know,

12       in some cases 2013 when we look at that original

13       batch.  And take Meloni out of the mix, for example.

14       With respect to those studies, is there any way now

15       that you in 2022 can go back and determine

16       objectively whether recall bias did or didn't play a

17       role in those studies?

18   A.   Could it be done?  It could be done for the

19       prospective cohort studies.

20   Q.   But I'm talking about the case-control studies now.

21   A.   It would be very difficult.  You might be able to do

22       it for a proportion of them, but it would be pretty

23       difficult to do.  Yeah.

24   Q.   You recognize that -- you're familiar with the term

```
 1        exploratory study?

 2   A.   Yes.

 3   Q.   Okay.  If we look at the case-control studies that

 4        include McDuffie, De Roos 2002, Hardell -- I'm sorry.

 5        De Roos 2003, Hardell 2002, Eriksson, all of those

 6        studies were exploratory studies, correct?

 7   A.   Well, maybe you should tell me what you mean by

 8        exploratory study before I am able to elaborate on

 9        that.

10   Q.   So first of all, if we look at the case-control

11        studies that include McDuffie, Hardell, De Roos 2003,

12        Eriksson 2008, Orsi, and Cocco, none of those studies

13        set out specifically to evaluate glyphosate and ask

14        the question whether glyphosate is associated with an

15        increased risk of NHL specifically, correct?

16   A.   Yes.

17   Q.   Okay.  Most of those, and we can look at this as we

18        go through them, looked at literally dozens of

19        chemical compounds to see whether there was any

20        increased risk observed of non-Hodgkin's lymphoma

21        with these various chemical compounds that were being

22        considered, correct?

23   A.   Yeah.  Yes.  Some of them looked at multiple

24        compounds.  Yes.
```

Joel J. Gagnier, ND, MSc, PhD

```
 1   Q.   Right.  Now, if recall bias was present in a study,
 2        one indication you might have that recall bias
 3        affected the results of the study is if there was a
 4        general trend across all of the chemicals studied
 5        towards an increased risk, correct?
 6   A.   That's very difficult to say.  I don't think I could
 7        agree with that type of statement, that recall bias
 8        would inflate the effects across all.
 9   Q.   Well, if you saw a general increase across all
10        chemicals of an odds ratio that was greater than 1,
11        there's only a couple of possible explanations that
12        are logical, right?  One explanation is that there
13        could be recall bias.  Another explanation could be
14        that every chemical has an association with
15        non-Hodgkin lymphoma.  Those are pretty much the two
16        possible explanations, right?
17   A.   No.  There are several other possible explanations.
18   Q.   What are they?
19   A.   Other possible explanations might be associated
20        with -- might be associated with geographic region.
21        Confounding variables, for example.  Could be
22        associated with genetic variance within particular
23        areas that were sampled.  Those are two.  I mean, you
24        know, these are possible confounders associated with
```

1        the -- what you're describing as -- and I'd have to

2        look back to see if that indeed is the case, that

3        there's increased odds ratios across all chemicals

4        for non-Hodgkin's lymphoma, which I don't believe

5        that is the case across these studies.

6              So yes, there are other possible

7        explanations.  Recall -- recall bias and a true

8        association aren't the only two reasons.  They're not

9        the only two possible reasons, which is why, you

10       know, the authors try to do a good job, and they're

11       supposed to try to do a good job to adjust for

12       various other risk factors, like age, like, you know,

13       like gender, and some do smoking history, etcetera.

14       So yeah, there's other reasons, other possible

15       reasons.

16  Q.   Okay.  Go back to Zhang for a second.  Are you aware,

17       by the way, that Dr. Zhang is a retained expert for

18       the plaintiffs in the Roundup litigation?

19  A.   No, I wasn't aware of that.

20  Q.   Are you aware that she's been deposed on several

21       occasions?

22  A.   No, I was not aware of that.

23  Q.   Are you aware that she testified at a trial on behalf

24       of Plaintiffs last year?

```
 1   A.   No, I was not.

 2   Q.   If we go to --

 3   A.   I'm sorry.  Did you say last year?

 4   Q.   Yes.

 5   A.   Oh, so much after the meta-analysis was published.

 6        Yeah.

 7   Q.   Her testimony at trial was after the meta-analysis

 8        was published.  Yes.  Okay.  If we go to page 196.

 9        Do you have Zhang handy?

10   A.   Of Zhang?  Yep.

11             MR. HENDERSON:  We're back on Zhang?

12             MR. PIORKOWSKI:  I'm sorry.  Yes.

13             THE WITNESS:  196.  You know what, I

14        have a PMC version of it.  It didn't print

15        out the right numbers.  So which section?

16        I'm sorry.

17   BY MR. PIORKOWSKI:

18   Q.   You see -- you see the page where table 4 is?

19   A.   Yeah.  Like I say, I have it slightly different --

20        oh, you know what, I have a different PDF of it.

21        Pardon me for just one moment.  I'll pull up the

22        other version of it that I have.

23   Q.   Sure.

24   A.   There's two -- when you download a PDF, you can --
```

Joel J. Gagnier, ND, MSc, PhD

```
 1          from PubMed, you can get two different versions of

 2          it.  Let's see here.  Okay.  There we go.  So I'm

 3          sorry.  You said page 196?

 4   Q.     196, yes.

 5   A.     Okay.  Yes.  I'm there.

 6   Q.     All right.  So do you see in the first full

 7          paragraph, it's under table 4, it says, quote,

 8          although there are different perspectives on the best

 9          way to account for other pesticide exposures, we

10          selected relative risk estimates that adjusted for

11          other pesticide use over their unadjusted

12          counterparts to mitigate the potentially substantial

13          confounding.  Did I read that correctly?

14   A.     Yes.

15   Q.     Okay.

16   A.     Yes.

17   Q.     Okay.  So first of all, when we talk about adjusting

18          in case-control studies, that's a statistical method

19          of ensuring that the groups being studied are

20          comparable, correct?

21   A.     Sort of.  It's not -- maybe what you're referring to

22          is more something that we would call matching.

23          Matching helps with comparability.  What adjustment

24          does is it statistically takes out variation due to
```

Joel J. Gagnier, ND, MSc, PhD

```
 1        certain variables.

 2   Q.   But the objective of it is to make sure that the

 3        groups are comparable in terms of risk, correct?

 4   A.   Yeah.  It's -- as I said, it statistically tries to

 5        eliminate the role of other variables in risk.  Yes.

 6   Q.   Right.  So if you have a group of 60-year-olds and

 7        you're comparing them to a group of 30-year-olds with

 8        respect to NHL, the group of 60-year-olds are going

 9        to be inherently at greater risk just by virtue of

10        their age, right?

11   A.   Yeah.

12   Q.   And so you might conduct an adjustment to account for

13        that so that the groups are more comparable.  That's

14        what an adjustment does, right?

15   A.   Yeah.

16   Q.   Okay.  Now, and so another example is in the McDuffie

17        paper, we talked earlier about the fact that the

18        authors found that a family history of cancer in a

19        first-degree relative would increase the risk.  One

20        of the things that the authors did in one of their

21        analyses is adjusted the data for a family history of

22        cancer in first-degree relatives.

23   A.   Uh-huh.  Yes.

24   Q.   Is that right?
```

```
 1   A.   Yeah.  I'm just looking back at their analyses.  I

 2        believe they did adjust for it.  Yes.

 3   Q.   I mean, I want to be sure.  Take your time.  I

 4        don't want --

 5   A.   So yeah.  Oh, no.  That's okay.  Yeah.  It looks like

 6        they do here.  Yes.  And they have it in their

 7        footnotes in their tables.

 8   Q.   So, for example, the McDuffie table 2, they have --

 9        they have an OR a and OR b, correct?

10   A.   Yes.

11   Q.   And OR b -- both of them were adjusted for certain

12        things.  But OR b -- OR b includes an adjustment for

13        positive family history of cancer in first-degree

14        relative, right?

15   A.   Yes, it does.  Yeah.  Amongst a bunch of other things

16        too.  Yeah.

17   Q.   So that's what we're talking about when we talk about

18        making adjustments, right?

19   A.   Yeah.  Yeah.  It's -- yeah.  Those variables are put

20        into a regression model, and you statistically try to

21        factor out their role.

22   Q.   Okay.

23   A.   Try to.

24   Q.   Right.  Now, in her -- if you go back to Dr. Zhang's
```

```
 1        statement --

 2   A.   Okay.

 3   Q.   -- what her statement is referring to is the fact

 4        that most individuals who use a pesticide such as

 5        glyphosate did not use just one pesticide.  A large

 6        number of study participants used multiple

 7        pesticides, correct?

 8   A.   Correct.

 9   Q.   And if we go to the -- we've got the McDuffie paper

10        still handy.  There's a table in McDuffie that is

11        table 9.

12   A.   Uh-huh.

13   Q.   And table 9 shows, for example, with herbicides that

14        for study participants who used between 2 and 4

15        different herbicides, they had an increased odds

16        ratio simply by virtue of using multiple herbicides,

17        correct?

18   A.   Yes.  It looks like it.

19   Q.   So there was 1.75, which represents a 75 percent

20        increase based on multiple herbicide use, right?

21   A.   Yes.

22   Q.   So let's go back to Dr. Zhang's statement for a

23        minute and see if you agree with what she's saying.

24        Okay?  First, when she's saying -- when she says when
```

```
 1          looking at the risk of a particular pesticide,

 2          there's different ways about the best way to adjust

 3          for the use of other pesticides -- that's her

 4          statement, right?

 5   A.    I'm sorry.  Could you say that again?

 6   Q.    Right.  She says there are different perspectives on

 7          the best way to account for other pesticide

 8          exposures, right?

 9                (Reporter clarification.)

10                THE WITNESS:  I'm sorry.  I'm just

11            sort of reading that section.

12   BY MR. PIORKOWSKI:

13   Q.    I'm reading from the same sentence I read to you

14          before that starts with although.

15   A.    So yes.  She states that they wanted to try to

16          mitigate potential for confounding due to other

17          pesticides.  Yes.

18   Q.    Right.  I understand that, but I'm actually asking

19          earlier than that.  She says there are different

20          perspectives on the best way to account for other

21          pesticide exposures, right?

22   A.    Where are you reading that from?  I'm sorry.

23   Q.    The sentence that starts although.

24   A.    Oh, different -- yeah.  I'm sorry.  Beginning of that
```

```
 1         sentence.  Of course, yeah.  I was looking up

 2         further.  Okay.  Yes, I agree.  Yep.

 3    Q.   So do you agree that, you know, reasonable scientific

 4         minds differ about the best methodologic approach for

 5         adjusting for other pesticides?

 6    A.   I think that's a reasonable statement, yes.

 7    Q.   Okay.  In other words, even in the studies you looked

 8         at, not all of the studies had the same methodology

 9         for adjusting for other pesticide use, right?

10    A.   Yeah.  They didn't appear to.  That's correct.

11    Q.   Right.  Okay.  The second thing Dr. Zhang is saying

12         in her statement there, that risk estimates that are

13         adjusted for the use of other pesticides are

14         preferred over risk adjust -- risk estimates that are

15         not adjusted.  That's what she's saying, correct?

16    A.   Yes.  They said that they prefer to use risk ratios

17         that were adjusted for other pesticide use.

18    Q.   Right.  And I know that's what she's saying.  But my

19         question is, do you agree with that?

20    A.   If there is a -- if there's a good reason to think

21         that some other variable, whether it be pesticide or

22         any demographic variable or family history of cancer,

23         like you pointed out, if there's a good reason to

24         think that those variables either are independently
```

1        related to the outcome of interest, in this case

2        non-Hodgkin's lymphoma, or they somehow act as an

3        effect modifier for the relationship of glyphosate to

4        the risk of non-Hodgkin's lymphoma, meaning there's

5        some type of interaction effect, then if you wanted

6        to isolate the role of glyphosate, only then you have

7        to try to adjust for them.  Yes.

8    Q.   So you agree that using -- well, first of all, you

9        agree, just looking at the McDuffie data point we

10       just looked at, that supports the fact that

11       pesticides, exposure to other pesticides can be a

12       substantial -- can have a substantial influence on

13       the risk, right?

14   A.   Well, it appears so.  But that table 9, those are

15       unadjusted estimates.

16   Q.   Okay.  But every study that has looked at exposure to

17       other pesticides and adjustment for exposure to other

18       pesticides has found that not adjusting for exposure

19       to other pesticides increases the risk, right,

20       comparatively to adjusting for other pesticides?  We

21       could go through study after study that have shown

22       that.

23   A.   Yeah.  I mean, I don't have expertise across the

24       whole field of pesticides and their interactions and

Joel J. Gagnier , ND, MSc, PhD

```
 1            whether adjusting for them or not has some

 2            relationship with non-Hodgkin's lymphoma or other

 3            cancers.  What I can say is that some of these

 4            studies did do it and some didn't.  And for the most

 5            part, and I'd have to look back very carefully at

 6            this again to make sure that this statement is

 7            correct, but it does look like the odds ratios are

 8            muted slightly after adjusting for other pesticides.

 9            Yes.

10    Q.      And if there's data to support that other pesticides

11            are potential confounding agents, do you agree with

12            Dr. Zhang that using data that are adjusted for use

13            of other pesticides are preferred over risk estimates

14            that are not adjusted?

15    A.      Yes.  If you have a really good reason to think that

16            that variable, which is back to my original

17            statement, that some pesticide, herbicide, whatever

18            it may be, has either an independent relationship to

19            the outcome or is an effect modifier for the

20            relationship between glyphosate and non-Hodgkin's

21            lymphoma.  Only under those circumstances.  Uniformly

22            doing it just because you think it's important to do

23            or there could be a relationship is not okay.  I have

24            to have a really good -- a really good scientific
```

Joel J. Gagnier, ND, MSc, PhD

```
 1          rationale for why you should do that.  So that's a

 2          bit of a broad statement from Dr. Zhang here.  So,

 3          you know --

 4   Q.     Go ahead.  I'm sorry.

 5   A.     That was it.

 6   Q.     Well, you've looked at the studies.  Is there a good

 7          reason for adjusting for use of other pesticides or

 8          not, in your opinion?

 9   A.     I don't have expertise on the other -- enough on the

10          other pesticides to know if there's a potential

11          relationship from other human subjects data to make

12          that suggestion whether you should or should not

13          adjust for them.  It does look like -- put it this

14          way.  The more variables that you put into a

15          regression model, you're always going to get subtler

16          risk ratios, almost always is going to be the case.

17          It doesn't mean that there's a true relationship.  It

18          doesn't mean it's necessarily an important variable.

19                  If, you know, if we want to go through a

20          list of, you know, 15 or 18 other herbicides or

21          pesticides to look at the independent relationships

22          and then the toxicological data, the pathological

23          data, all that, if there's good reason to do it, then

24          it should be adjusted for.  I can't say yes or no
```

Joel J. Gagnier, ND, MSc, PhD

```
 1        that we should uniformly do that because it's a

 2        mistake that's often done is to try to over adjust in

 3        regression models.

 4               The beauty is that here they have really

 5        large sample sizes, so maybe they can kind of get

 6        away with it a little bit.  But, you know, it's

 7        not -- it's not simply just saying adjusting is

 8        better.  It's not.  You have to have a good -- a very

 9        good rationale for why to do that.

10               MR. PIORKOWSKI:  Objection.

11          Nonresponsive.

12   BY MR. PIORKOWSKI:

13   Q.   My question is, is there a good rationale for doing

14        that based on what you've reviewed in the literature?

15   A.   From the studies that I've seen that are looking at

16        this question that we're referring to, the

17        relationship between glyphosate and non-Hodgkin's

18        lymphoma, it does look like that's an appropriate

19        action in the studies that I've seen.  Yes.

20   Q.   All right.  Do you have the Pahwa paper handy?

21   A.   I do, yes.

22   Q.   Can we take a look at that.

23   A.   Sure.  Yeah.  I got it.  Thank you.

24   Q.   Do you see the discussion in Pahwa that concerns the
```

```
 1          approach that they used for determining -- well, let

 2          me back up a second.

 3                   One of the points that you just made was

 4          that you can over adjust data, correct?

 5   A.     Yes.  Absolutely.

 6   Q.     In other words, if you adjust data for something that

 7          doesn't have a potential effect, then that can blunt

 8          the effect -- that can blunt the exposition of the

 9          effect that you're looking for, correct?

10   A.     It could.  More often than not, it just doesn't do

11          anything.  It's just kind of a waste of your

12          statistical power.

13   Q.     Fair enough.  Now, in the Pahwa study, they did not

14          adjust for every single other pesticide, correct?

15          Why don't you take a second to --

16   A.     Yeah.  No, they did not.  2,4-D, dicamba, malathion.

17   Q.     Right.  And they had a very thoughtful approach about

18          how they determined which pesticides to adjust for,

19          would you agree?

20   A.     Yeah.  Yeah, I do agree.  Yep.

21   Q.     Okay.  And their approach was kind of a two-step

22          process, correct?

23   A.     Yep.  The way they describe it in their methods, it

24          was.
```

Joel J. Gagnier, ND, MSc, PhD

```
 1   Q.   Okay.  And these are authors, by the way, who have

 2        published not just on glyphosate but have published

 3        on multiple other pesticides as well, correct?

 4   A.   Yes.

 5   Q.   Okay.  And you would not criticize the approach that

 6        the Pahwa authors took, for example, to approaching

 7        for -- or to adjusting for use of other pesticides,

 8        correct?

 9   A.   No, I wouldn't criticize their methods in that

10        regard.  Yeah.

11   Q.   Okay.  Are you familiar with a statistical tool

12        called a Bonferroni correction?

13   A.   Yes, I am.

14   Q.   What is a Bonferroni correction?

15   A.   Bonferroni correction is a safeguard against multiple

16        testing.  So say, for example, if you do -- if you do

17        four separate significance tests, let's just say

18        they're t-tests, and your original p-value cutoff

19        point is .05, if you do four -- if you do four

20        significance tests, you have the opportunity to have

21        false positive findings or what's also called a

22        type 1 error.

23   Q.   Uh-huh.

24   A.   And what you do is you divide the p-value by 4 to
```

Joel J. Gagnier , ND, MSc, PhD

```
 1        come up with this new cutoff p-value.  So it's a more

 2        conservative way of determining if there's

 3        statistical significance in your results across

 4        multiple tests.

 5   Q.   And so the time when the Bonferroni correction comes

 6        into play is when you're undertaking multiple

 7        comparisons; is that right?

 8   A.   When -- yeah, when you're doing multiple separate

 9        significance tests and you -- yes.  Yes.

10   Q.   Okay.  And Bonferroni correction is actually -- well,

11        let me back up.  The type 1 error that you

12        described -- let me start over.  The Bonferroni

13        correction is just one statistical method of

14        addressing the potential for type 1 error related to

15        multiple comparisons, correct?

16   A.   Yes, it is.

17   Q.   There are other statistical methods similarly

18        available to ensure --

19   A.   Yeah.

20   Q.   -- to ensure that you avoid false positive results,

21        correct?

22   A.   Yeah.  There's several other techniques.  Yes.

23             MR. PIORKOWSKI:  Off the record for a

24        minute.
```

```
 1                    VIDEOGRAPHER:  We are going off the

 2             record at 11:53 a.m.

 3                    (Recess taken.)

 4                    VIDEOGRAPHER:  We are back on the

 5             record at 12:37 p.m.

 6                    (Exhibit No. 12 marked.)

 7   BY MR. PIORKOWSKI:

 8   Q.   Doctor, are you able to access Exhibit 12?

 9   A.   Yes.  Sorry about that.  Hold on one second here.

10   Q.   Take your time.

11   A.   Okay.  Just opening now.

12   Q.   Okay.  I'll represent you had said earlier, I

13        believe, that you had reviewed the IARC monograph

14        from working group 112 with respect to glyphosate at

15        some point, right?

16   A.   Yeah.  I read it some time ago.  Yeah.

17   Q.   Yeah.  You're not relying on it, but you did review

18        it at some point, right?

19   A.   Uh-huh.

20   Q.   Okay.  Yes, right?

21   A.   Yes.  I'm sorry.  Yeah.

22   Q.   All right.  I just want to -- I'd asked you earlier

23        about the difference between a hazard identification

24        and a risk assessment.  Do you recall that?
```

```
 1   A.   I do.

 2   Q.   And you asked me to kind of provide you some context.

 3        Do you remember that?

 4   A.   Yes.

 5   Q.   Okay.  So I wanted to take a look -- this -- what

 6        I've marked as Exhibit 12 is -- the monograph itself

 7        dealt with five different pesticides.  Do you recall

 8        that?

 9   A.   Uh-huh.

10   Q.   Yes, right?

11   A.   Yes.

12   Q.   One of which was glyphosate?

13   A.   Yes.

14   Q.   Okay.  And at the beginning of the monograph, there

15        is a section that's referred to as the preamble.  Are

16        you familiar with that?

17   A.   Yes.

18   Q.   Okay.  And the preamble kind of lays out some of the

19        definitions and, you know, so there's an

20        understanding of what the findings are and what they

21        mean.  Do you understand that?

22   A.   Yes.

23   Q.   Okay.  And so what I've marked as Exhibit 12 is the

24        preamble to the working group 112 monograph.  Okay?
```

```
 1   A.   Okay.

 2   Q.   Okay.  Can you turn to page 10.

 3   A.   Yes.  I'm there.

 4   Q.   Okay.  And you see there's a section called objective

 5        and scope?

 6   A.   Uh-huh.  Yes.

 7   Q.   And it kind of -- it tries to define some words and

 8        give some context for what IARC is trying to do.

 9   A.   Yes.

10   Q.   Do you see on the right-hand side of page 10 it says,

11        quote, a cancer "hazard" is an agent that is capable

12        of causing cancer under some circumstances, while a

13        cancer "risk" is an estimate of the carcinogenic

14        effects expected from exposure to a cancer hazard.

15        Do you see that?

16   A.   Yeah.  Yes, I do.

17   Q.   Okay.  And is that consistent with your understanding

18        of those terms?

19   A.   Yes.  It's used in other areas as well.

20   Q.   Okay.  And it goes on to say, quote, the monographs

21        are an exercise in evaluating cancer hazards despite

22        the historical presence of the word risks in the

23        title, correct?

24   A.   Correct.
```

```
 1   Q.   Okay.  Then it goes on to say, the distinction

 2        between hazard and risk is important and the

 3        monographs identify cancer hazards even when risks

 4        are very low in current exposure levels, because new

 5        uses or unforeseen exposures could engender risks

 6        that are significantly higher, correct?

 7   A.   Yes.

 8   Q.   Okay.  So in essence, what they're -- they're making

 9        a determination that when they say something is a

10        cancer -- if you go on, it says, next paragraph says,

11        in the monographs, an agent is termed "carcinogenic"

12        if it is capable of increasing the incidence of

13        malignant neoplasms, reducing their latency, or

14        increasing their severity or multiplicity, right?

15   A.   Correct.

16   Q.   And so the key of hazard identification is whether an

17        agent is capable of causing cancer at any dose,

18        right?

19   A.   Yes.

20   Q.   And a risk assessment is an evaluation of what the

21        risk is for any exposure at a particular dose,

22        correct?

23   A.   Well, more specifically, risk is an estimate of

24        carcinogenicity relative to a hazard or an exposure.
```

1    Q.   Right.  But the difference between a risk and a

2         hazard identification is a risk involves a

3         quantitative measure or some assumption about an

4         amount of exposure, whereas a hazard does not,

5         correct?

6    A.   Yes.

7    Q.   Okay.  All right.  I also want to ask you to turn to

8         page -- well, let me ask you some preliminary

9         questions first, and then I'll turn to page 27.

10                  You understand when IARC does its

11        evaluation, it evaluates three general categories of

12        scientific evidence.  One, it evaluates epidemiology;

13        two, it evaluates animal carcinogenicity; and three,

14        it evaluates mechanistic studies, as well as some

15        exposure assessment.  Is that consistent with your

16        understanding?

17   A.   Yes.

18   Q.   Okay.  And you understand when they make their

19        conclusions, they actually reach separate conclusions

20        about what the epidemiology shows and what the animal

21        carcinogenicity studies show, correct?

22   A.   Yes.

23   Q.   Okay.  And if you turn to page 27, and, again, this

24        is the general preamble language, this isn't specific

Joel J. Gagnier , MD, MSc, PhD

```
 1          to any one pesticide, but they're providing an

 2          explanation of their terminology that they use for

 3          their categorization, correct?

 4   A.     Is that 27 of the PDF, or 27 as numbered in the

 5          monograph?

 6   Q.     27.  Page number of the monograph 27.

 7   A.     Okay.  I'm going to go look down there.  Okay.  Yes.

 8          I see that.

 9   Q.     Okay.  And you see that there are definitions for

10          different levels of epidemiological evidence, which

11          is section a, carcinogenicity in humans, right?

12   A.     Yes.

13   Q.     Okay.  Now, sufficient evidence of carcinogenicity is

14          when, quote, the working group considers that a

15          causal relationship has been established between

16          exposure to the agent and human cancer.  That is, a

17          positive relationship has been observed between the

18          exposure and cancer in studies in which chance, bias,

19          and confounding could be ruled out with reasonable

20          confidence.  Did I read that correctly?

21   A.     Yes.

22   Q.     Okay.  And by contrast, limited evidence of

23          carcinogenicity is defined as, quote, a positive

24          association has been observed between exposure to the
```

```
 1          agent and cancer for which a causal interpretation is

 2          considered by the working group to be credible, but

 3          chance, bias, or confounding could not be ruled out

 4          with reasonable confidence, correct?

 5   A.     Yes.  That's what it says.

 6   Q.     Okay.  And so the difference between sufficient

 7          evidence and limited evidence is that in sufficient

 8          evidence, they made a determination that chance,

 9          bias, and confounding could be ruled out with

10          reasonable confidence, whereas with limited evidence,

11          their conclusion is that chance, bias, or confounding

12          could not be ruled out with reasonable confidence.

13          Is that fair?

14   A.     Yes.

15   Q.     Okay.  Now, you're aware that the ultimate conclusion

16          of IARC was that it was a 2A probable human

17          carcinogen, correct?

18   A.     Yes.  Yes.

19   Q.     And if you turn to page 30 and you look at 2A, it

20          says this category is used when there is limited

21          evidence of carcinogenicity in humans and sufficient

22          evidence of carcinogenicity in experimental animals,

23          correct?

24   A.     Yes.
```

Joel J. Gagnier , ND, MSc, PhD

```
 1   Q.   Okay.  And you're aware that the IARC's conclusion

 2        with respect to the epidemiological evidence was that

 3        there was limited evidence of carcinogenicity,

 4        correct?

 5   A.   That's what it says.  Yes.

 6   Q.   I mean, is that consistent with your understanding

 7        from having read it?

 8   A.   I'd have to re-review IARC to make sure that that

 9        statement is correct.  But it appears to be so.  Yes.

10   Q.   Okay.  Now, is it your opinion in this case that

11        chance, bias, and confounding can be ruled out with

12        reasonable confidence?

13   A.   Could you clarify?  You mean -- do you mean with

14        respect to the evidence that I reviewed, the human

15        subjects literature?

16   Q.   Yeah.  I'm talking about with respect to the

17        epidemiological evidence.  IARC has reached the

18        conclusion that they see an association, but chance,

19        bias, and confounding could not be ruled out with

20        reasonable confidence.  I'm trying to determine

21        whether you're prepared to go beyond what IARC said

22        in terms of, you know, you have a stronger conclusion

23        than they reached.

24   A.   Yeah.  I understand that's what you -- that's what
```

1          you're trying to determine.

2                    Well, first of all, IARC didn't include the

3          updated data.  So it's out of date.  Number two,

4          the -- so I had more evidence to -- more human

5          subjects literature, clinical research evidence to my

6          disposal than IARC did when they did this report.  So

7          it's reasonable that my -- that the results of my

8          analysis would be -- could be different.  Didn't have

9          to be, but it could be because there's new evidence

10         in the literature, which they will probably

11         re-review.

12                   And because we're dealing with

13         observational studies, we can't do a randomized

14         trial.  Because we're dealing with observational

15         studies, which I state in the report that when I do a

16         grade assessment across these studies is that you

17         can -- you can try really hard in observational

18         studies, cohort studies or case-control studies, to

19         control for all possible confounding or effect

20         modifiers.  I mean, chance is chance.  There's not a

21         whole lot we can do about chance except for to

22         collect large sample sizes.

23                   So that's -- it's interesting that they

24         would even state it because chance is potentially at

Joel J. Gagnier, ND, MSc, PhD

1        play for any associations that we're looking at,

2        whether it be a randomized trial or observational

3        studies.  So it's inconsequential to making causal

4        arguments.

5              With the cohort studies and case-control

6        studies, again, the authors try to do their best to

7        be able to adjust for important confounders and

8        effect modifiers, but because of the nature of the

9        types of study, there's always a potential for them

10       to be at risk of confounding, always, even the very,

11       very best of these that are done.  But.

12             When we started seeing the evidence point

13       in the same direction across multiple studies, the

14       risk of confounding is variable across these studies,

15       meaning possibly high in some and possibly low in

16       others.  What that means is that the evidence as a

17       whole points to an association.

18             This is not just one observational study

19       that we're talking about.  It's multiple, done by

20       multiple different groups in multiple different parts

21       of the world.

22             So the inference from the evidence is

23       fairly clear.  And I believe that IARC will come to

24       the same conclusion when they review the updated

1         evidence.

2   Q.    All right.  Now, when you're talking about updated

3         evidence, I want to sort of divide the world into two

4         categories here.  One is meta-analyses, all of which

5         do not provide original data, and the other is cohort

6         studies or case-control studies that do provide

7         original data.

8   A.    Right.

9   Q.    So with respect to the latter category, cohort

10        studies and case-control studies that provide new

11        data, what -- new original data, what cohort studies

12        and case-control studies have been published since

13        2015 when IARC reached its conclusion that you had

14        available that they didn't have available?

15  A.    I need to check to see exactly what their inclusion

16        date was.

17  Q.    We can work off of March 2015.

18  A.    Okay.  Yeah.  Well, from the ones that I included,

19        there's Leon, Andreotti, and Meloni.

20  Q.    Okay.

21  A.    Could I say that -- regarding your statement

22        regarding meta-analysis not being original data,

23        that's not -- that's not exactly accurate.  While

24        meta-analyses use data that's already been published

```
1          and been collected in other original studies, they

2          are themselves original investigations that use new

3          statistical techniques to combine -- to combine

4          existing data together.  Sometimes they're different

5          techniques from meta-analysis to meta-analysis with

6          slightly different investigations of things like

7          publication bias or using meta-regression analyses or

8          doing grade assessments.  So they're original

9          scientific investigations of existing published data.

10         They're observational nature, make no mistake,

11         because the -- the data already exists that they're

12         combining together.  But they are original

13         investigations and they're new analyses and they

14         present new data in the literature.

15    Q.   All right.  But I think my question was original --

16         original -- they represent a reanalysis of existing

17         data, correct?

18    A.   Yes.

19    Q.   Okay.  They are not themselves original data that

20         report on the relationship between glyphosate use and

21         non-Hodgkin's lymphoma, correct?

22    A.   Yes.  They aren't primary new data collection studies

23         from human subjects.

24    Q.   Okay.  So you mentioned Leon.  You mentioned
```

1         Andreotti.  You mentioned Meloni.

2              In Leon, as we I think already said, Leon

3         is a collection -- Leon is a meta-analysis itself,

4         right?

5    A.   Well, it's sort of.  It's a pooled analysis.

6    Q.   Okay.

7    A.   It's a pooled analysis of three separate studies.

8    Q.   Okay.

9    A.   It's really not a comprehensive meta-analysis.  No.

10   Q.   Fair enough.  So it's a pooled analysis of three

11        studies, one of which is the Andreotti study and two

12        of which are the other studies that we talked about

13        before, the CNAP and the AGRICAN study, correct?

14   A.   Well, while it does include the AHS -- so I'm talking

15        about Leon.  While it does include the AHS data,

16        Andreotti uses more recent AHS data.

17   Q.   Andreotti uses more recent AHS data than what?

18   A.   Than Leon does.

19   Q.   I'm not sure what you mean by that.

20   A.   Well, if you look at the description of the AHS data

21        that's used in Leon, they use the data from linkages

22        up to 2011 for Iowa and up to 2010 for North

23        Carolina, whereas in the Andreotti study, they looked

24        at data up to 2012 and 2013.  So they have a year

Joel J. Gagnier, ND, MSc, PhD

```
 1           more of outcome data in the Andreotti study for AHS

 2           linkages.

 3    Q.     And the Leon study doesn't report comprehensively on

 4           the AHS data either, correct?

 5    A.     No.  No, it does not.  That's correct.

 6    Q.     Right.  And the CNAP study and the AGRICAN study that

 7           we were just alluding to, there are no separate

 8           independent published papers reporting on the results

 9           of those studies, correct?

10    A.     Not associated with non-Hodgkin's lymphoma.

11    Q.     Okay.  Now, were there any other papers that have

12           original data other than those three that -- let me

13           back up.  Another study that came out that is not

14           really a meta-analysis, it's a pooled analysis, is

15           the Pahwa paper, correct?

16    A.     Yes.  Yes.  And I'm sorry.  I have that out of order.

17           The Pahwa paper is another one.  Yes.

18    Q.     Okay.  And while the Pahwa paper doesn't have

19           original data because -- well, let me back up.  The

20           Pahwa paper integrates the study populations of

21           De Roos 2003 and McDuffie 2001, correct?

22    A.     Yes.

23    Q.     And it does have additional analysis that was not

24           contained in those original McDuffie and De Roos 2003
```

```
 1        articles, correct?

 2   A.   Yes.

 3   Q.   So the new data we're talking about collectively

 4        consists of Andreotti 2018, Meloni, what was it, '21?

 5   A.   '21, yeah.  Yes.

 6   Q.   Pahwa 2019 and the CNAP and AGRICAN data that's

 7        contained in Leon, correct?

 8   A.   Correct.

 9   Q.   So the Andreotti study 2018 did not show an increased

10        risk of non-Hodgkin's lymphoma in glyphosate users,

11        correct?

12   A.   That's correct.  It was a cohort study, and the

13        follow-up period is questionable.

14   Q.   And the Meloni study, I think we already covered, did

15        not show a statistically significant increased risk

16        of non-Hodgkin's lymphoma in glyphosate users for NHL

17        either, correct?

18   A.   That's correct.  That individual study did not.

19   Q.   Right.

20   A.   But together as a group they certainly do.

21   Q.   So as a group, the four studies that were published,

22        none of which show an increased risk, collectively

23        show an increased risk.  Is that your testimony?

24   A.   No.  Across all of the studies that I included in my
```

Joel J. Gagnier, ND, MSc, PhD

```
 1        meta-analysis do.

 2   Q.   Right.  But when you said that you have stuff

 3        available to you that IARC didn't have available to

 4        you -- didn't have available to them, all of the

 5        studies that you've cited that present original data

 6        all do not show an increased risk of non-Hodgkin

 7        lymphoma, correct?

 8   A.   No, that is not correct.

 9   Q.   Why is it not correct?

10   A.   Some of the subgroup analysis on number of years of

11        glyphosate use and cumulative exposures do show an

12        increased risk in those individual studies.

13   Q.   In which studies?

14   A.   I can refer you to the tables if you want to look at

15        it together, or do you want me just to tell you which

16        studies?

17   Q.   Let me understand.  So are you disregarding the

18        overall conclusion and relying instead on the

19        subgroups analysis?  Is that what you're saying?

20   A.   I'm sorry.  What overall conclusions?

21   Q.   Well, the overall conclusion of the Andreotti 2018

22        paper was there was no increased risk of NHL or any

23        subtype of NHL, correct?

24   A.   Are you referring to the abstract of the conclusions
```

```
 1          section in the abstract?

 2    Q.    I'm referring to the whole entire paper.

 3    A.    Well, that's an overgeneralization of what they did.

 4          There is certainly that statement in the one sentence

 5          in their conclusions in the abstract, but that

 6          doesn't at all represent the analyses that were

 7          separately used across the nice analyses that were

 8          done in this paper.  For example, in table 3, also in

 9          table 5, those analyses do show relationships.

10    Q.    And what did table -- let's start with table 3.  Tell

11          me what relationships table 3 shows.

12    A.    So non-Hodgkin's lymphoma overall.

13    Q.    Uh-huh.

14    A.    There's two -- well, there's two separate things I

15          can point to here.  The first is that the p-value for

16          the trend in odds ratio for risk of non-Hodgkin's

17          lymphoma from 0 to greater than 3.5 years, that trend

18          is statistically significant.

19    Q.    I'm sorry.  Where are you -- you're in table 3?

20    A.    I'm in table 3, yes.  Table 3, if you go down -- so

21          there's the first subheading that says controls.  And

22          if you go down, it says NHL overall.

23    Q.    Wait a second.

24    A.    It says, yeah, NHL overall.
```

Joel J. Gagnier, ND, MSc, PhD

```
 1    Q.    All right.  I don't see where you are.  I see

 2          non-Hodgkin's lymphoma.  In table 3 in Andreotti

 3          2018?

 4    A.    No.  I'm sorry.  I'm looking at Pahwa.  Apologize.

 5    Q.    Okay.  Well, I was asking about Andreotti 2018.

 6    A.    Okay.  Well, let's go back to Andreotti then.  Okay.

 7    Q.    And I'll just -- I'll just read the conclusion.  It

 8          says in this large prospective cohort study, no

 9          association was apparent between glyphosate and any

10          solid tumors or lymphoid malignancies overall,

11          including NHL and its subtypes.  Now, do you disagree

12          with that?

13    A.    No, I don't disagree with that.  I agree with that

14          with respect to the Andreotti paper.  Apologize.  I

15          was referring to the Pahwa paper.

16    Q.    Okay.  So with respect to the Pahwa paper, why don't

17          you tell me what you were looking at.

18    A.    Yeah.  Sure.  In table 3 -- well, actually, we could

19          actually go even back another table to table 2.  So

20          it has non-Hodgkin's lymphoma.  So this is table 2.

21          Ever/never glyphosate use and associations with

22          non-Hodgkin's lymphoma.  It has in the first column

23          controls, non-Hodgkin's lymphoma overall, and then

24          some subtypes.
```

1    Q.    Okay.

2    A.    For non-Hodgkin's lymphoma overall, they have the

3          referent category, which is never used glyphosate.

4          And they have the ever exposed category, ever --

5          excuse me.  Ever used glyphosate category.  The odds

6          ratio is 1.43 with a confidence interval of 1.11 to

7          1.83, which is a statistically significant odds

8          ratio.  And that's in the initially adjusted model.

9          And in the further adjusted model, the odds ratio

10         goes down slightly and the confidence interval after

11         controlling for dicamba, malathion, and 2,4-D does go

12         down.

13   Q.    It goes down 30 percent.  It doesn't go down

14         slightly, right?

15   A.    Oh, yeah.  I didn't say slightly.  It goes down 30

16         percent.  Exactly.

17   Q.    Yeah.  And it's not a statistically significant

18         finding.

19   A.    That's correct.

20   Q.    And the difference between the first odds ratio that

21         you read and the second is adjustment for uses -- use

22         of other pesticides, which you already agreed you

23         thought was done appropriately in the Pahwa study,

24         correct?

1    A.    Yeah.  I thought it was a reasonable approach to

2          decide which pesticides to adjust on.  Yes.

3    Q.    Okay.  So when we look at the adjusted data from

4          Pahwa, the Pahwa study does not show an increased

5          risk for NHL in glyphosate users, in ever glyphosate

6          users overall, correct?

7    A.    Yeah.  That's correct.

8    Q.    Okay.

9    A.    Yeah.

10   Q.    You mentioned Meloni as another paper.

11   A.    Oh, well, we could still look at table 3 for the

12         increased exposures and table 4 if you'd like.

13   Q.    Sure.

14   A.    The fully adjusted models are still a little bit

15         different.

16   Q.    Please tell me what you're looking at.

17   A.    So, again, in the first adjusted model for

18         non-Hodgkin's lymphoma overall in table 3, the

19         p-value for the trend in overall days is

20         statistically significant in the first model and it

21         becomes non-statistically significant in the second

22         model, which includes the adjustment for the

23         additional pesticides.

24   Q.    So at that point, though, we're not talking about

```
 1        ever and never use of glyphosate, right?

 2  A.    Yeah.  That's right.  This is more cumulative type

 3        exposures.

 4  Q.    And you'd agree with me that there's only a fraction

 5        of the data in the Pahwa paper for which we have

 6        number of days of use actually available, correct?

 7  A.    Yeah.  Not for the entire sample.

 8  Q.    Okay.  All right.  What else were you looking at in

 9        Pahwa?

10  A.    Then they have another -- they have this -- I mean, I

11        know you're familiar with the papers.  But where they

12        did their calculation of number of years used times

13        days per year handled to come up with this cumulative

14        exposure rating, which is listed in table 5, showing

15        similar associations, though a little bit stronger in

16        the initially adjusted model and, again, less so in

17        the other pesticide adjusted model.  So in the -- I

18        mean, it's obvious when looking at the tables, when

19        after adjusting for the pesticide, the relationship

20        or the association goes down in the Pahwa study.  But

21        when you add it to all of the other existing data

22        that's available, the association is maintained.  The

23        confidence interval goes down because you have more

24        subjects that are included in the meta-analysis
```

Joel J. Gagnier, ND, MSc, PhD

```
 1        across all of the studies.  Looking at an individual

 2        study will never give you the answer if you have

 3        multiple studies.  You're looking at a fraction of

 4        the evidence that's available.  You have to look

 5        across all of it.

 6   Q.   So let me ask you in the Pahwa paper, while we're on

 7        the subject.  Do you have page 606?

 8   A.   I do, yes.

 9   Q.   Do you see in the discussion section --

10   A.   I do.

11   Q.   So you see where it says although there was a

12        statistically significant association between ever

13        glyphosate use and NHL overall --

14   A.   Yes.

15   Q.   -- this association was attenuated and became no

16        longer statistically significant when adjusted for

17        reported use of 2,4-D, dicamba, and malathion?

18   A.   Yes, I do see that.

19   Q.   And that's what we talked about earlier when we were

20        talking about table 2, right?

21   A.   Yes.  In fact, it shows that general trend across all

22        of those tables.

23   Q.   Right.  And then it goes on to say, however, the

24        significant excess risk among those who reported use
```

Joel J. Gagnier, ND, MSc, PhD

```
 1        of glyphosate for greater than or equal to two days
 2        per year was not eliminated by adjustment for other
 3        pesticides, although the trend test was not
 4        statistically significant after adjustment for other
 5        pesticides.  What does that mean?
 6   A.   That means when they're looking at increasing number
 7        of days of exposure from -- I can use the -- go from
 8        two to three to five or more days, it means that
 9        greater than two days or more, there was an
10        association.  But when you looked across one versus
11        two versus three versus greater than five, there was
12        not a trend in increased risk across those increased
13        exposure categories.
14   Q.   Okay.  And would you expect there to be a trend if
15        there was a cause and effect relationship?
16   A.   Yes, I would.  And we do see that when we look across
17        all of the studies.
18   Q.   Okay.  The next sentence says there was no pattern of
19        increasing risk of NHL overall with increasing years
20        of use of glyphosate, correct?
21   A.   Yes.  That's what this individual study shows.  But
22        the meta-analysis across all of the studies does show
23        that there's an increasing risk.
24   Q.   And when you say the meta-analysis, you're talking
```

Joel J. Gagnier, ND, MSc, PhD

1         about your meta-analysis?

2    A.   The analysis that I did.  That's correct.  Yeah.

3    Q.   Okay.

4    A.   And I mean this -- that -- I guess we can talk about

5         other meta-analysis at some other point.

6    Q.   Yeah.  We're going to get into the meta-analysis in

7         just a second here.

8              So we're coming back to my question that

9         started this whole discussion, which is I asked you

10        whether you're prepared to offer an opinion that

11        based on your analysis, chance, bias, and confounding

12        can be ruled out with reasonable certainty.  And I

13        think you told me about data that you had that IARC

14        didn't have, and you told me that chance can never be

15        completely ruled out, which I understand.  But there

16        are yardsticks for evaluating whether chance played a

17        role in a given -- in a given analysis, correct?

18   A.   There is, yep.  Usually it's associated with

19        precision of the effect estimate, confidence

20        intervals primarily.

21   Q.   And that's what you referred to earlier as a p-value,

22        right?

23   A.   No.  The confidence interval is a measure of the --

24        well, technically the confidence interval is -- if

Joel J. Gagnier, MD, MSc, PhD

```
 1        you were to take 100 samples of a population and you

 2        calculated the mean of some cause and effect

 3        relationship and constructed a confidence interval

 4        around that mean, 95 of them would contain the true

 5        value.  A p-value, what a p-value refers to is

 6        whether or not you would see an observation as

 7        extreme or more extreme than you're seeing.

 8   Q.   The confidence interval, though, is related to the

 9        p-value, correct?

10   A.   The width of the confidence interval is not.  But

11        yeah, the position of it relative to the line of no

12        effect is.  Yes.

13   Q.   Well, if you use a p-value of .1, the confidence

14        interval is going to be different than if you use a

15        p-value of .5 versus the p-value of, you know -- I

16        mean, in other words, as you allow for a greater

17        probability, that affects the confidence interval,

18        correct?  Confidence interval would be different --

19        the confidence interval would be different if you

20        used a p-value of .05 versus a p-value of .01, right?

21   A.   You mean the -- I'm not quite understanding you.  I'm

22        sorry.  But the -- you're talking about the p-value

23        associated with the significance of the effect

24        estimate?
```

```
 1   Q.   Yes.

 2   A.   Indicating the statistical significance or not of the

 3        effect estimate?

 4   Q.   Yes.

 5   A.   Okay.  So no.  That's not the case because it's all

 6        in relationship to where the line of no effect is.

 7        So for an odds ratio, which we already did discuss,

 8        the 1 is the line of no effect.  So theoretically, if

 9        a confidence interval crosses the line of no effect,

10        say it goes from .98, even though it barely crosses

11        it, to 1.36, then the p-value will be -- will be

12        non-statistically significant.  It will be .06 or

13        .07, something like that, if you used your -- like

14        the conventional .05 cutoff in biomedical sciences.

15        So that's the -- that's the only time -- that's

16        really the only relationship between the two.

17             With respect to doing -- well, I'm sorry.

18        That was just the answer to your question.  I think

19        you were going to ask something else.

20   Q.   Yeah.  I'm going to move on.  So -- let's see here.

21        So did you say you have hardcopies of the individual

22        studies available to you?

23   A.   I do of the ones that I included.  Yes.

24   Q.   Okay.  So let me just ask you a couple things
```

```
 1        collectively.  McDuffie 2001, Hardell 2002,

 2        De Roos 2003, Eriksson 2008, Orsi 2009, and

 3        Cocco 2013.

 4   A.   Okay.

 5   Q.   Those are six -- those are the six case-control

 6        studies that were looked at by IARC in its

 7        evaluation, correct?

 8   A.   I believe so, yes.

 9   Q.   And five of those six you already talked about are

10        included in the Zhang meta-analysis, right?

11   A.   Yes.

12   Q.   I believe Cocco was not included because it's not all

13        NHL.

14             (Reporter clarification.)

15   BY MR. PIORKOWSKI:

16   Q.   Cocco did not include -- was not included because

17        it's not all NHL.  It's just B-cell lymphomas.

18   A.   Yes.  It was just a subgroup.  Yes.  Or a subtype.

19        I'm sorry.

20   Q.   Okay.  I think we already talked about -- but in each

21        of the studies, glyphosate was just one of dozens of

22        pesticides and pesticide classes that were evaluated,

23        right?

24   A.   In most of them.  Most of the studies, yes.
```

Joel J. Gagnier, ND, MSc, PhD

```
 1    Q.   All right.  None of the studies, by the way, used a

 2         Bonferroni correction or adjustment to account for

 3         multiple comparisons, to your knowledge, right?

 4    A.   Not to my knowledge.  But Bonferroni corrections are

 5         often done in error.  It's a common problem in the

 6         biomedical literature just uniformly applying a

 7         Bonferroni correction.  If you don't have a

 8         predetermined hypothesis for a particular cause and

 9         effect association, then you want to be careful not

10         to, you know, falsely reject a hypothesis when you

11         make a more conservative p-value by doing something

12         like a Bonferroni or one of these other methods.  But

13         usually it's inappropriate to do.  It has no bearing

14         on the importance of your hypothesis or the cause

15         of -- the underlying scientific rationale for a

16         particular association that you're testing.

17    Q.   Was there a hypothesis in the McDuffie study?

18    A.   I can take a look just to be certain.  Well, they

19         state an objective, which has an inferred hypothesis.

20    Q.   What's the objective?

21    A.   Our objective in this study was to investigate the

22         putative associations of specific pesticides with

23         non-Hodgkin's lymphoma.

24    Q.   And in McDuffie, if we take a look at table 2, 3, 4,
```

Joel J. Gagnier, ND, MSc, PhD

```
 1        and 5, what we see is that there were a total of 38

 2        chemicals or chemical classes that the McDuffie paper

 3        looked at, correct?

 4   A.   Yes.

 5   Q.   And there was no specific hypothesis related to any

 6        of those individual chemicals, correct?

 7   A.   Yeah.  It was more of a general hypothesis or

 8        objective.  Yeah.

 9   Q.   And is it your testimony that in a situation like

10        that, when there's no specific hypothesis, that it

11        would not be appropriate to do a Bonferroni

12        correction or some similar correction?

13   A.   I'm sorry.  Can you ask that again, please.

14   Q.   Well, when I asked you about the Bonferroni

15        correction earlier, you said -- you said that they

16        are done mistakenly in many instances, right?

17   A.   Yeah.  Inappropriately used.  Yes.

18   Q.   Okay.  And when you explained why they were

19        inappropriately used, you said if you have -- if you

20        don't have a specific hypothesis, then there's not an

21        appropriate place for a Bonferroni correction,

22        correct?

23   A.   When you don't have a specific hypotheses.

24   Q.   Yeah.
```

```
 1   A.   When you don't have a specific hypotheses, it is okay
 2        to use a Bonferroni correction.
 3   Q.   Right.  And in this case, there was not a specific
 4        hypothesis in the McDuffie paper.
 5   A.   Well, they -- I mean, they have a broad hypothesis, I
 6        guess.  But there wasn't specific hypotheses for each
 7        of the -- for each of the chemical classes.  That is
 8        correct.  Yes.
 9   Q.   Okay.  All right.  Now, look at table 2 in McDuffie.
10        McDuffie included two different odds ratios, correct?
11   A.   Table 2, the adjusted and the unadjusted.  Yes.
12   Q.   Well, there's not an adjusted and an unadjusted.
13        There is an adjusted and a more adjusted, right?
14   A.   Yeah.  Yeah.  Yes, there is.  Yep.  That's correct.
15   Q.   Okay.
16   A.   A fully adjusted versus a partially adjusted model.
17        Yes.
18   Q.   Well, actually, there isn't a fully adjusted model
19        because none of them adjust for use of other
20        pesticides, correct?
21   A.   Fully only means with respect to the variables that
22        they were interested in.
23   Q.   All right.  So first of all, both of these odds
24        ratios, while they adjusted for different things,
```

```
 1          none of them adjusted for use of other pesticides,

 2          correct?

 3     A.   They did not.  That's correct.

 4     Q.   Okay.  And if we look at the results, glyphosate is

 5          listed as an odds ratio of 1.26 in the lower

 6          adjusted --

 7     A.   Yes.

 8     Q.   -- and 1.20 in the higher adjusted, with confidence

 9          intervals as to which neither are statistically

10          significant, correct?

11     A.   Yes.  Both confidence intervals crossed the line of

12          no effect, though they are relatively wide and they

13          are mostly to the line -- to the right of the line of

14          no effect.

15     Q.   Okay.  But they're not statistically significant

16          results, correct?

17     A.   If you want to make a categorical judgement on

18          statistical significance, then yes, that's correct.

19          They are not.

20     Q.   Okay.  Well, this paper, out of the 38 categories --

21          out of the 38 compounds that they -- that they looked

22          at, 13 of the 38 or more than a third were

23          statistically significantly elevated in both odds

24          ratios, correct?
```

Joel J. Gagnier, ND, MSc, PhD

```
 1    A.    I mean, I didn't count the number, but --

 2    Q.    Well, take a minute and do it.

 3    A.    Across both?  Okay.

 4    Q.    Yeah.

 5    A.    I see 28 across those tables.

 6    Q.    28 that have increases in both?

 7    A.    That are -- not in both.  Either/or.  Yeah.  If

 8          it's -- if it's both, then it's just two less than

 9          that.  So 26.  Does that make sense?  Those are the

10          individual odds ratios.  Yeah.

11    Q.    Let me just go through this with you real quick.

12    A.    Sure.

13    Q.    Phenoxy herbicide exposed --

14                (Reporter clarification.)

15    BY MR. PIORKOWSKI:

16    Q.    Phenoxy herbicide is elevated in both, correct?

17    A.    Correct.

18    Q.    Mecoprop is elevated in both, correct?

19    A.    Correct.

20    Q.    That's two.  Dicamba is elevated in both, correct?

21    A.    Correct.

22    Q.    That's three.  Carbamates are elevated in both,

23          correct?

24    A.    Correct.
```

Joel D. Gagnier, ND, MSc, PhD

```
 1   Q.   That's four.  Carbaryl is elevated in both, correct?

 2   A.   Correct.

 3   Q.   That's five.  Lindane is elevated in both, correct?

 4   A.   Yes.

 5   Q.   That's six.  Aldrin is elevated in both, correct?

 6   A.   Yes.

 7   Q.   That's seven.  DDT is elevated in both, correct?

 8   A.   Yes.

 9   Q.   That's eight.  Organophosphorus is elevated in both,

10        correct?

11   A.   Yes.

12   Q.   That's nine.  Malathion is elevated in both, correct?

13   A.   Yes.

14   Q.   That's ten.  Amide is elevated in both, correct?

15   A.   Yes.

16   Q.   That's eleven.  Captan is elevated in both, correct?

17   A.   Yes.

18   Q.   That's twelve.  Sulphur compounds are elevated in

19        both, correct?

20   A.   Yes.

21   Q.   That's twelve.  And then carbon tetrachloride is

22        elevated in both, right?

23   A.   Yes.

24   Q.   Okay.  So that represents 13 of the 38 or 34 percent
```

Joel J. Gagnier, ND, MSc, PhD

```
 1         of the compounds they looked at had statistically

 2         significant increased risks, right?

 3    A.   I mean, again, I have to count all of them, but I'll

 4         take your word for it.  Sure.

 5    Q.   Okay.  And actually, putting aside statistically

 6         significant increased risks, if you look at the

 7         trends in terms of odds ratio, 34 of the 38 actually

 8         have odds ratios that are greater than one, correct?

 9    A.   Yes.

10    Q.   Okay.  Does that suggest to you that recall bias may

11         have played a role in this study?

12    A.   It's hard to know.  It's difficult to assess for

13         certain.  This is one of the -- it's one of the

14         earlier studies.  You know, these types of

15         associations need to be borne out in follow-up

16         studies, which they have been for glyphosate anyways.

17         So it was -- I mean, I see your point.  I know where

18         you're going with it.  There was a lot of testing

19         that was done in this study.  It had a decent sample

20         size, but not, you know, not a monstrous study.  The

21         probability of a false positive is certainly there at

22         some point.  Though, when combined across all of the

23         other studies that show a similar association, it's

24         simply undeniable.
```

```
 1                    MR. PIORKOWSKI:  Objection to the

 2          nonresponsive portion.

 3   BY MR. PIORKOWSKI:

 4   Q.   Take a look, please, at table 8.

 5   A.   Again, in the McDuffie paper?

 6   Q.   Yes, sir.

 7   A.   Okay.  Got it.

 8   Q.   Table 8 takes a look at different levels of exposure.

 9        With respect to glyphosate, they divide it into

10        unexposed, greater than 0 and less than or equal to

11        2, and greater than 2, correct?

12   A.   Yes.

13   Q.   Okay.  Now, and their conclusion is they have a

14        statistically significant increase for greater than

15        two days, correct?

16   A.   Yes, they do.

17   Q.   Okay.  Now, as we said before, these data are not

18        adjusted for use of other pesticides, correct?

19   A.   That's correct.  In fact, that analysis is just

20        adjusted for age and province of residence.

21   Q.   Right.  And was this greater than zero to two days

22        and greater than two days analysis, was this part of

23        a pre-specified analysis based on methodology

24        section?
```

Joel J. Gagnier, ND, MSc, PhD

```
 1   A.   Pre-specified analysis from -- as described in their

 2        statistical analysis section?

 3   Q.   Yes, sir.

 4   A.   It says on page 1157 in the bottom right-hand corner,

 5        the last paragraph, we created dose-response levels

 6        based on days per year of personally mixing or

 7        applying selected herbicides, insecticides,

 8        fungicides, and fumigants.

 9             Sometimes it's hard to know if it was

10        actually preplanned or if they did it and then wrote

11        it in the statistical methods section.  It's not

12        entirely clear.

13   Q.   All right.  Well, is there any rationale offered

14        about greater than two days, like what's -- you know,

15        why --

16             (Reporter clarification.)

17   BY MR. PIORKOWSKI:

18   Q.   What makes sense as a biological explanation?

19   A.   They did not give a rationale for those cutoff

20        levels.

21   Q.   Okay.  Do you know why they used different cutoff

22        levels for different chemicals that they studied?

23   A.   No, I do not.

24   Q.   There was no increased risk whatsoever in the lower
```

```
 1         dose, correct?

 2    A.   In the greater than 0 and less than 2?

 3    Q.   Yes, sir.

 4    A.   That's correct.

 5    Q.   Did you review as part of your review the Hohenadel

 6         2011 study?

 7    A.   I'm sorry.  I didn't hear the name.

 8    Q.   Hohenadel.  It's H-o-h-e-n --

 9    A.   Oh, yeah.  I saw the study, but I excluded it.

10    Q.   Based on what?

11    A.   Let me pull it up.  Oh, there it is there.  I'm

12         sorry.  I have to look for it here.

13    Q.   Take your time.

14    A.   Apologize.  I'm just looking for it here.  I'll find

15         it.  We can start talking about it, if you want, so

16         I'm not wasting y'all's time.

17    Q.   My only question is, you said you didn't count it or

18         you disregarded it, and I'm just trying to understand

19         why.

20    A.   Yeah.  I'm just trying to pull up my notes on it

21         here.

22    Q.   I don't want to ask you questions before you're ready

23         to answer.

24    A.   Okay.  Can you spell that author's first name again
```

1        for me?  I'm sorry.

2   Q.   I don't know his first name.  His last name is --

3   A.   Or his last name, I mean.

4   Q.   H-o-h-e-n-d-a-l, I believe.

5   A.   H-o-e?

6   Q.   I think it's H-o-h.  Let me see.

7               MR. HENDERSON:  H-o-h-e-n-a-d-e-l.

8               MR. PIORKOWSKI:  Thank you, Gibbs.

9               MR. HENDERSON:  I've got it in front

10        of me.

11              THE WITNESS:  Yeah.  Thanks.  Yeah.

12          I'm sorry.  I just can't find it.

13   BY MR. PIORKOWSKI:

14   Q.   Okay.  We can come back to that.

15   A.   Okay.

16   Q.   What about Hardell 2002, do you have that available?

17   A.   I do.

18   Q.   Again, this is one of the -- this is one of the

19        studies that went into the Zhang meta-analysis and

20        this went into your meta-analysis as well, right?

21   A.   Yes, sir.

22   Q.   This pooled two small --

23              (Reporter clarification.

24

1    BY MR. PIORKOWSKI:

2    Q.    This pooled two smaller Swedish studies, correct?

3    A.    Yes, it did.

4    Q.    And, again, this is a study that looked at 18

5          different chemicals and chemical categories, not just

6          glyphosate?

7    A.    Yes.  That's correct.

8    Q.    And if you look at table 1, out of 18 compounds they

9          looked at, 44 percent total statistically increase --

10                  (Reporter clarification.)

11   BY MR. PIORKOWSKI:

12   Q.    Out of the 18 chemicals and chemical classes that

13         they looked at in the Hardell study, 44 percent

14         showed a statistically significant increased risk of

15         non-Hodgkin lymphoma, correct?

16   A.    Well, I don't know the exact percent.  But there

17         appears to be a variety of relationships.  I'll take

18         your word for it that it's 40 percent.

19   Q.    The univariate analysis in table 1, this is not

20         adjusted for other pesticides but this is --

21                  THE REPORTER:  I'm sorry.  I'm

22             missing some of the words.  Can we maybe

23             take a break?  I think we need to make

24             some adjustments here.

Joel J. Gagnier, ND, MSc, PhD

```
 1              MR. PIORKOWSKI:  Sure.  That would be

 2         fine.

 3              VIDEOGRAPHER:  We are going off the

 4         record at 1:35 p.m.

 5              (Recess taken.)

 6              VIDEOGRAPHER:  We are back on the

 7         record at 1:47 p.m.

 8    BY MR. PIORKOWSKI:

 9    Q.   Okay.  Doctor, we were talking about the Hardell

10         article from 2002.  Do you recall that?

11    A.   Yes, sir.

12    Q.   And we were talking about in table 1 they looked at

13         18 different compounds and chemicals and chemical

14         classes, correct?

15    A.   Correct.  Yes.

16    Q.   And with respect to the chemicals that they analyzed,

17         8 out of the 18 showed a statistically significant

18         increased risk for non-Hodgkin's lymphoma in this

19         analysis, correct?

20    A.   Yes.

21    Q.   And all 18 of them showed odds ratios that were

22         greater than 1, correct?

23    A.   Yes.

24    Q.   Okay.
```

1    A.    But as you stated, there's only a subset of those

2          that are statistically significant.  Most across the

3          line have no effect.

4    Q.    Right.  But 44 percent were statistically

5          significant, right?

6    A.    Yes.

7    Q.    8 out of 18.  And this is not -- I understand this is

8          not the adjusted data.  This is a univariate

9          analysis.  But when 44 percent of the compounds

10         you're studying show a statistically significant

11         increased risk and the odds ratio for every single

12         compound is greater than 1, does that suggest to you

13         that recall bias was an issue in the study?

14   A.    No.  For the very reason that you said, because first

15         of all, this is not the adjusted analysis.  That

16         would be the primary reason, I would say, that the

17         answer would be no.

18   Q.    Okay.  In the Hardell 2002 study, when they did a

19         multivariate analysis that included an adjustment for

20         the use of other pesticides, the glyphosate did not

21         show a statistically significant increased risk,

22         correct?

23   A.    Let me just find that to make sure.  If memory serves

24         me, that is correct.

```
 1   Q.   Table 7 is what I'm looking at, if it helps.

 2   A.   Yeah.  Yes.  In the multivariate analysis, the --

 3        while the odds ratio is still large, the confidence

 4        interval significantly crosses the line of no effect.

 5   Q.   Okay.  So it's not a statistically significantly

 6        increased risk based on the confidence intervals,

 7        correct?

 8   A.   That's correct.  But it has a very wide confidence

 9        interval which makes me very cautious in interpreting

10        that result.  It means there's probably some sort of

11        subgroup effect within glyphosate.  That's what we

12        see commonly.

13   Q.   The Hardell study, by the way, unlike McDuffie did

14        not -- well, let me ask you.  Does the Hardell

15        study -- the Hardell study dealt exclusively with

16        ever/never use of glyphosate, correct?

17   A.   Yes.

18   Q.   There's no information in Hardell differentiating

19        individuals who had high exposure from individuals

20        who had low exposure, correct?

21   A.   That's right.  There didn't appear to be a dose

22        response analysis.

23   Q.   Right.  There didn't appear to be a dose response

24        analysis.  But there's no data in that study at all
```

```
 1          telling you about higher exposure users versus lower

 2          exposure users, correct?

 3    A.    In terms of exposure amount, no.

 4    Q.    Okay.  Let's turn to De Roos 2003, please.

 5    A.    Okay.  Okay.  I've got it.

 6    Q.    Okay.  And De Roos 2003 is a paper that pooled data

 7          from three smaller case-control studies, correct?

 8    A.    Yes.

 9    Q.    Okay.  And the authors adjusted for the use of other

10          pesticides using two different analyses, correct?

11    A.    Yes, they'd did.

12    Q.    Okay.  And one analysis that they used was a logistic

13          regression analysis, correct?

14    A.    Yes.

15    Q.    And that analysis showed a statistically significant

16          increased risk, right?

17    A.    It did.

18    Q.    With an odds ratio of 2.1.

19    A.    Yes.

20    Q.    And they also did a hierarchical regression analysis

21          which did not show a statistically significant

22          increased risk, correct?

23    A.    That is correct.  Yes.

24    Q.    And the authors say on page 1 that, quote,
```

```
 1          hierarchical regression models, also known as

 2          multilevel or multistage models, allow the researcher

 3          to specify prior distributions for multiple

 4          parameters of interest (for example, pesticide

 5          effects), and to adjust the observed likelihood

 6          estimates towards these prior distributions with the

 7          objective of obtaining increased precision and

 8          accuracy for the ensemble of estimates, correct?

 9    A.    That is correct.  Except that their prior

10          distributions that they used were from old data.

11    Q.    Well, their purpose in using these analyses were to

12          increase precision and accuracy, correct?

13    A.    Well, that's always the case when you use -- this is

14          the type of Bayesian analysis where you use a prior

15          distribution.  So it compresses the confidence

16          interval.  So yeah.  That's typically the case

17          because you have more data at your hands to be able

18          to qualify the end odds ratio, except that this is

19          old date they were using with respect to their

20          priors.  So it wouldn't be relevant for across all of

21          these studies.

22    Q.    How old was the data they were using?

23    A.    Let me see.  Sorry.  I'm going to make a little noise

24          here.  They say on -- oh, jeez.  What page is that?
```

Joel J. Gagnier, ND, MSc, PhD

```
 1            Well, it's in the statistical analysis section, their
 2            description of hierarchical regression of multiple
 3            pesticide exposures.  On the right side of that page
 4            about halfway down they state that they used prior
 5            covariates incorporating prior evidence for
 6            carcinogenicity based on data from the US EPA
 7            integrated risk information and IARC for carcinogenic
 8            probability.  But I don't know exactly what -- they
 9            don't actually -- they don't actually state how old
10            that data is.  Certainly it was prior to 2003.
11    Q.   Well, when you do a logistic regression, the logistic
12            regression also makes assumptions about risk of other
13            pesticides, correct?
14    A.   Yeah.  If they incorporated it as a variable.  Yeah.
15    Q.   Well, if they say it was adjusted for use of other
16            pesticides and they did a logistic regression
17            analysis, logically one would assume that they
18            incorporated whatever data they had about risk of
19            other pesticides into their logistic regression
20            analysis, correct?
21    A.   Well, yeah, that's what a hierarchical model will
22            allow you to do.
23    Q.   But I'm not asking about the hierarchical model.
24    A.   Okay.
```

Joel J. Gagnier, ND, MSc, PhD

```
 1   Q.   I'm asking about the logistic regression model.

 2   A.   Well, maybe we're not using the same language then

 3        because you can use a hierarchical regression model

 4        with logistic regression.  All logistic regression

 5        means is that you have a categorical outcome, say

 6        non-Hodgkin's lymphoma or not.  So the hierarchical

 7        model will be used to generate covariates that are

 8        then added to the logistic regression model.

 9   Q.   Well, the logistic regression model in table 3

10        purports to have accounted for other pesticides

11        separate and apart from the hierarchical regression

12        model, correct?

13   A.   It does say in the footnotes, yes, each estimate is

14        adjusted for use of all other pesticides listed in

15        table 3, age, and study site.

16   Q.   So when you say that the hierarchical regression

17        analysis was based on certain assumptions that may

18        have been outdated, the same is true for logistic

19        regression analysis, correct?

20   A.   Well, they used -- the hierarchical used historical

21        data.  The logistic regression used data that they

22        had at hand.

23   Q.   Do you know how exactly they did the logistic

24        regression?  Did they -- methodologically?
```

```
 1   A.   Well, they would have took the associations with the

 2        other insecticides and added them into the model.

 3   Q.   And did they break down anywhere how that -- how they

 4        approached that --

 5   A.   That's a good question.

 6   Q.   For example, they explain their reasoning for how

 7        they decided whether to adjust for other pesticides.

 8        Do you recall that?

 9   A.   If they listed the reasons why they did that and the

10        methods for doing it?  I'm sorry.  You broke up a

11        little bit.

12   Q.   The methods.  When we talked about the Pahwa paper,

13        you -- we talked about the specific methodology that

14        they used to do adjustments for other pesticides.  Do

15        you recall that?

16   A.   Yes.

17   Q.   Okay.  Is there anywhere in this paper where they

18        talk about the specific methods they used to adjust

19        for other pesticides using the logistic regression

20        analysis?

21   A.   Let me have a look.  It doesn't -- no, it doesn't

22        appear they do state, just except that it was

23        adjusted for every other pesticide in the model.  It

24        doesn't state it in the statistical analysis section.
```

Joel J. Gagnier, ND, MSc, PhD

```
 1    Q.   The De Roos 2003 paper also provides no scientific

 2         evidence of how lower glyphosate exposure users

 3         compared to higher glyphosate exposure users,

 4         correct?

 5    A.   The dose response?  I believe that they do not.  I

 6         just want to make sure.  No, they do not.

 7    Q.   Do you have Eriksson 2008 available?

 8    A.   Yes, sir.  Let me find it.  Yes, I have it here.

 9    Q.   Okay.  Eriksson 2008, the Swedish study done by the

10         same research group as Hardell 2002, correct?

11    A.   Uh-huh.  Yes.

12    Q.   And they did both a univariate analysis as well as a

13         multivariate analysis that adjusted for use of other

14         pesticides, correct?

15    A.   Yes.  I'm just going to clarify something.  When

16         we're talking about multivariate and univariate, in

17         the context of regression modeling, the terms even in

18         the literature are not used uniformly.

19              A multivariate model technically means

20         multiple dependent variables, and what we're talking

21         about is independent variables here.  So it's really

22         a multivariable model.  I just want to make sure

23         that's clear.

24    Q.   Well, I'm using their terminology.
```

```
 1   A.   Yeah.  I know.  But I want to make it certain that I

 2        understand and that you understand that really it's a

 3        multivariable model, not a multivariate model.

 4   Q.   Okay.  So they have what they call a univariate

 5        analysis that shows the statistically significant

 6        increased odds ratio for glyphosate use, correct?

 7   A.   Yes, they do.

 8   Q.   And they show a multivariate -- they show what they

 9        call a multivariate analysis, which you understand to

10        be a multivariable analysis, which does not show a

11        statistically significant increased risk, correct?

12   A.   That's correct.  The confidence interval crosses the

13        line of no effect, though most of it is to the right

14        of the line of effect.

15   Q.   But it's not a statistically significant result,

16        correct?

17   A.   It doesn't cross -- that's correct.  It does not

18        cross the standard biomedical threshold of .05, but

19        when combined across all the other studies, it does

20        suggest an association.

21            MR. PIORKOWSKI:  Okay.  Object to the

22            nonresponsive portion.

23   BY MR. PIORKOWSKI:

24   Q.   Separately, Eriksson looks at less than or equal to
```

1          ten days use and greater than ten days use, correct?

2    A.    I'm sorry.  I'm just looking for it.  But yeah, I do

3          recall that.  Yes.

4    Q.    And the greater than ten days use has an odds ratio

5          of 2.36, which is statistically significant, correct?

6    A.    Yes, it is.

7    Q.    But that data point is not adjusted for the use of

8          other pesticides, correct?

9    A.    That's correct.  It just says it was adjusted for

10         age, sex, and year of diagnosis or enrollment.

11   Q.    Okay.  If you look at table 2, you see that there's a

12         variety of -- well, let me back up actually.

13         Eriksson also, like the other studies we looked at,

14         is not just a study of glyphosate.  It looked at

15         several different chemical compounds, correct?

16   A.    Correct.

17   Q.    And if we look at table 2, much like Hardell and

18         these other studies, the odds ratios, while not

19         always statistically significant, are almost entirely

20         above 1, correct?  There's only one category of other

21         herbicides greater than 32 days that's less than 1,

22         right?

23   A.    That's correct.  While most aren't statistically

24         significant.

```
 1    Q.    Okay.  Now, you see under glyphosate, we already

 2          talked about the fact they break it down to greater

 3          than or equal to ten days, greater than ten days,

 4          right?

 5    A.    Yes.

 6    Q.    For each of the different compounds and classes,

 7          though, they have a different breakdown of the number

 8          of days of use, correct?

 9    A.    Yeah.  That's correct.

10    Q.    Do you know why they used ten days with respect to

11          glyphosate but they used 24 days for other herbicides

12          and 29 days for 2,4-D and 45 days for phenoxyacetic

13          acid?

14    A.    I don't know why.  It's not stated in their paper.

15    Q.    Does it make sense to you that the number of days

16          would differ for each of these classes of compounds?

17    A.    I mean, certainly there's precedent in other areas.

18          I don't have expertise on these other compounds.

19          Certain -- you know, it's possible -- I'm

20          speculating.  It's possible that the latency periods

21          are different, the exposure amounts are different

22          from the animal studies or the preclinical

23          toxicologic studies that require different levels of

24          exposure.
```

Joel T. Gagnier, ND, MSc, PhD

```
 1   Q.   Okay.

 2   A.   That's an inference on my part.  But they could have

 3        just taken the median and took those under the median

 4        and those over the median.  We don't really know.

 5   Q.   That would have actually made sense, wouldn't it,

 6        from a statistic vantage point?

 7   A.   Yeah.

 8   Q.   And that's clearly not what they did, right?

 9   A.   I don't know because they don't say.

10   Q.   Well, you can just tell from the number of cases and

11        controls that they're not equally divided.  If they

12        took the median, then it should be equal on the top

13        and the bottom, right?

14   A.   Well, it would be -- well, no.  No.  It wouldn't be

15        because it would be median number of days.  So you'd

16        have to get the number of days for each person, find

17        the median for that.  And you could have less of them

18        under that day than more of them over it.

19   Q.   You're saying median number of days as opposed to the

20        median --

21   A.   Subjects.  Yeah.

22   Q.   The median studies that we see.

23   A.   Yep.

24   Q.   But the bottom line is we don't know how they got to
```

```
 1        this number, and we don't know whether that number

 2        has any biological significance, correct?

 3   A.   Yeah.  That's correct.  I mean, without having read

 4        all of the citations, I don't -- yeah.  I can't say

 5        for certain because they don't say it.

 6   Q.   Okay.  I've got a question on the methodology in the

 7        control group here.

 8   A.   Yeah.

 9   Q.   You see page 1658?

10   A.   Yes, sir.

11   Q.   You see it says in the univariate analysis, different

12        pesticides were analyzed separately and the unexposed

13        category consisted of subjects that were unexposed to

14        all included pesticides?

15   A.   Did you say that was under the subheading of

16        controls?

17   Q.   I didn't say where it was.  It's on page --

18   A.   Okay.

19   Q.   -- 15 -- 1658.  Let me see if I can find it.  It's

20        under statistical methods.  It's the third sentence.

21   A.   In the univariate analysis, different pesticides were

22        analyzed separately and the unexposed category

23        consisted of subjects that were unexposed to all

24        included pesticides.  Yep.
```

Joel J. Gagnier, ND, MSc, PhD

```
 1   Q.   What does that mean?

 2   A.   It just means that the control group were -- they

 3        were all unexposed.

 4   Q.   Right.  It means the control group was unexposed to

 5        any pesticide, right?

 6   A.   In the univariate analysis, yep.

 7   Q.   And the study group or the group of patients who were

 8        diseased were exposed to many other pesticides,

 9        right?

10   A.   I'm not sure, actually.  I don't know.

11   Q.   Let me back up for a second.  We talked earlier about

12        the design of a case-control study, right?

13   A.   Yes.

14   Q.   Okay.  And we talked about the fact that you're

15        looking in a population of people who have a disease

16        and a control group of people who do not have a

17        disease, right?

18   A.   Yes.

19   Q.   And the idea is you're trying to look at the exposure

20        in these two different groups to see how they

21        compare, correct?

22   A.   Yes.

23   Q.   And assuming the control group is representative of

24        the group of cases, then you're making some
```

Joel J. Gagnier, ND, MSc, PhD

```
 1         inferences about whether there's an increased risk in

 2         the cases compared to the controls, right?

 3   A.    Yes.

 4   Q.    Now, if the -- if the control group is a group that

 5         is exposed to no other pesticides and the cases

 6         include people who are exposed to other pesticides,

 7         does that call into question the validity of the

 8         control group?

 9   A.    Well, it's a confusing statement, certainly, in their

10         statistical analysis section.  I mean, it doesn't --

11         I mean, it doesn't call into question the statistical

12         analysis necessarily.  It raises some -- a lack of

13         clarity certainly because there was -- you know,

14         there's obviously controls that were measured as

15         being exposed because of, I mean, the resultant odds

16         ratios because it would make no sense to do an

17         analysis, a case-control analysis if, in fact, none

18         of your controls were exposed because then you have

19         no association to compare.  So lack of clarity.

20              And this, you know, sort of harkens to a

21         lot of -- a lot of research that exists out there.

22         And this study is -- well, it's not all that old.

23         That they appear not to have followed what we say --

24         call reporting guidelines.  So there's somewhat of a
```

Joel J. Gagnier, ND, MSc, PhD

```
 1         lack of clarity there.  I would agree.

 2    Q.   Okay.  Orsi 2009.

 3    A.   Okay.

 4    Q.   This is a French case-control study, correct?

 5    A.   Yes.

 6    Q.   Odds ratio.  Well, this is, again, another study that

 7         shows -- this only looks at ever and never use,

 8         correct?

 9    A.   Yes.

10    Q.   And like De Roos 2003 and Hardell 2002, it doesn't

11         give you any information about the risk in people

12         with high exposure to glyphosate versus no exposure

13         to glyphosate, correct?

14    A.   That's correct.

15    Q.   The odds ratio of NHL for glyphosate users was 1,

16         correct?

17    A.   That is correct.  Yep.

18    Q.   Not statistically significant obviously, right?

19    A.   Yes.

20    Q.   And the data were not adjusted for the use of other

21         pesticides, correct?

22    A.   That's correct.

23    Q.   All right.  The last study is the Cocco 2003 study.

24    A.   Okay.
```

Joel J. Gagnier, ND, MSc, PhD

```
 1   Q.   Are you familiar with this one?

 2   A.   I am.

 3   Q.   And what's the title of this study?

 4   A.   Lymphoma risk and occupational exposures to

 5        pesticides:  Results of the Epilymph study.

 6   Q.   This was a case-control study in six European

 7        countries, correct?

 8   A.   Yes.

 9   Q.   It looked at B-cell lymphoma, not non-Hodgkin's

10        lymphoma overall, correct?

11   A.   That's correct.

12   Q.   Okay.  Are you -- do you know from your research that

13        the vast majority of non-Hodgkin's lymphoma tends to

14        be B-cell lymphoma as opposed to T-cell lymphoma?

15   A.   Yes.

16   Q.   Okay.  Something on the order of 80 to 90 percent.

17        Is that your understanding?

18   A.   Yeah.

19   Q.   Okay.  So even though this isn't a study of NHL

20        overall, it's a fairly close population.  You agree?

21   A.   Yes.  It's more specific certainly.

22   Q.   Okay.  And Cocco --

23             (Reporter clarification.)

24
```

```
 1   BY MR. PIORKOWSKI:

 2   Q.   Cocco was based on a very small number of cases, four

 3        exposed cases and two controls, correct?

 4   A.   Yes.  I believe that is the major methodologic

 5        drawback is the lack of events.

 6   Q.   Okay.  And it also had a result that was not

 7        statistically significant.  Had very wide confidence

 8        intervals, correct?

 9   A.   Yeah.  That's correct.  Not surprising for a small

10        number of events.

11   Q.   Okay.  So let's go back to Pahwa.  We talked a little

12        bit about the Pahwa paper.  Do you still have that in

13        front of you?

14   A.   I'm sorry.  The Pahwa paper?

15   Q.   Yes, sir.

16   A.   Yes, sir.  I have it.

17   Q.   And Pahwa was referred to as the North American

18        pooling project, correct?

19   A.   Yes.

20   Q.   North American because McDuffie was Canadian,

21        De Roos was American, right?

22   A.   Yeah.  The studies were from, yeah, US and Canada.

23   Q.   And it included 1,690 non-Hodgkin's lymphoma cases

24        and 5,131 controls, correct?
```

Joel J. Gagnier, ND, MSc, PhD

```
 1   A.   Yes.

 2   Q.   And I think we already went over this earlier when we

 3        were looking at table 2.  But the adjusted odds ratio

 4        when it was adjusted for use of other pesticides was

 5        1.13 with a result that was not statistically

 6        significant, correct?

 7   A.   Yes.

 8   Q.   All right.  And would you agree that if we're going

 9        to look at data, that Pahwa adds some additional

10        granularity to the McDuffie and the De Roos 2003 data

11        that those study did not originally have available,

12        correct?

13   A.   Yes.

14   Q.   In other words, for example, McDuffie, as we talked

15        about, was not originally adjusted for the use of

16        pesticides, but as part of the pooled analysis, Pahwa

17        did adjust for use of other pesticides, correct?

18   A.   Yes.  Three other pesticides.

19   Q.   Okay.  So --

20             MR. PIORKOWSKI:  Anne, could you add

21          to the next exhibit the PowerPoint

22          case-control studies summary.

23             MS. HOVIS:  Yes, I'll do that.

24
```

Joel J. Gagnier, ND, MSc, PhD

```
 1                    MR. PIORKOWSKI:  What's our next

 2           exhibit, Trisha?  Is it 13?

 3                    THE REPORTER:  Yes.

 4                    (Exhibit No. 13 marked.)

 5    BY MR. PIORKOWSKI:

 6    Q.   Is that -- are you able to call that up, Dr. Gagnier?

 7    A.   Exhibit 12?

 8    Q.   13.

 9    A.   I don't see it there yet.  Oh, there it is.  Yep.

10    Q.   So these are -- I'll represent these are a couple of

11         PowerPoint slides that I put together, but I just

12         want to go over these with you.  So we talked about

13         each of these studies.  I want to make sure that this

14         data on this slide accurately represents the data

15         that we talked about.  Okay?

16    A.   The data we've already talked about.  Yes.  Okay.

17    Q.   And if you need to go back and refer to it to be

18         sure, that's fine.  Hardell we talked about had a --

19         had an increased risk when it was not adjusted for

20         other pesticides, but then when it was adjusted for

21         other pesticides, the risk was not statistically

22         significant, right?

23    A.   Yes.

24    Q.   Okay.  Oris was not adjusted for other pesticides and
```

Joel J. Gagnier , ND , MSc , PhD

```
 1          it was an odds ratio of 1.  So obviously it was not

 2          statistically significant, correct?

 3   A.     Yes.

 4   Q.     Okay.  Eriksson we talked about had a statistically

 5          significant increased risk, but it was not adjusted.

 6          But when it was adjusted for use of other pesticides,

 7          this is what you call a multivariable analysis, the

 8          result was not a statistically significant elevation

 9          for ever and never use, correct?

10   A.     Yes.  Yes.

11   Q.     Okay.  Cocco we talked about was small numbers and

12          not -- not adjusted for other pesticides and not

13          statistically significant, correct?

14   A.     Yes.

15   Q.     Okay.  And Pahwa, again, we talked about earlier.

16          This was from table 2.  It had an increased risk when

17          it was not adjusted for use of other pesticides but

18          no statistically significant increased risk when it

19          was adjusted for use of other pesticides, correct?

20   A.     Yes.

21   Q.     Okay.  So does this table that I've marked as the

22          first page of Exhibit 13 accurately represent the

23          results of the studies that we talked about?

24   A.     With respect to adjustment for pesticides or not?
```

Joel J. Gagnier, ND, MSc, PhD

```
 1    Q.   With respect to the odds ratios, with respect to

 2         adjustment for pesticides, and with respect to

 3         statistical significance.

 4    A.   I can check it line for line, but it appears to be.

 5         Yes.

 6    Q.   Okay.  The second page that I have here is -- the

 7         difference between the first page and the second page

 8         is I took out results that were statistically

 9         significant -- well, I took -- if you remember the

10         Zhang comment about preferring to use data that are

11         adjusted for use of other pesticides, for the three

12         studies that presented numbers that were adjusted and

13         unadjusted, I used the adjusted numbers.  Okay?

14    A.   Okay.

15    Q.   And does the -- so does the second slide here

16         accurately represent the results of the case-control

17         studies for ever and never use of glyphosate when the

18         data points that are not adjusted for use of other

19         pesticides are taken out of the mix?

20    A.   Yes, it appears so.

21    Q.   Okay.  I want to ask you about Meloni.  That's

22         another study that you looked at, correct?

23    A.   It is, yes.

24    Q.   And what was the -- the Meloni study -- the Meloni
```

Joel J. Gagnier, ND, MSc, PhD

```
 1        study was published in 2021; is that right?

 2   A.   Yes.

 3   Q.   Okay.  And with respect to non-Hodgkin lymphoma

 4        overall, the Meloni study did not find a

 5        statistically significant increased risk, correct?

 6   A.   Correct.

 7   Q.   And separately, the Meloni study did not adjust for

 8        use of other pesticides, correct?

 9   A.   Correct.

10   Q.   And then separately, Meloni is another study that was

11        based on this whole crop exposure matrix idea,

12        correct?

13   A.   Yes.

14   Q.   So there actually was not an individual assessment of

15        study subjects in terms of exposure.  It was an

16        assessment that was based inferentially on a crop

17        exposure matrix analysis, right?

18   A.   Let me make sure.  Well, to be more specific, they

19        asked about -- they had a questionnaire that asked

20        about their job and about their exposure to various

21        pesticides in terms of days and years, types of

22        tools, personal protective equipment, etcetera,

23        together with a crop exposure matrix.

24   Q.   Okay.  So you're saying it was a hybrid analysis?
```

```
 1   A.   Yes.

 2   Q.   Hold on a second.  Okay.  How do you assess -- we

 3        talked earlier about the quality of the studies.  You

 4        remember when we were going through Zhang's paper?

 5   A.   Yes.

 6   Q.   And I think you said you roughly agreed with Zhang's

 7        assessment of the various case-control studies.

 8   A.   Yes.

 9   Q.   Yeah.  And obviously Meloni was not available when

10        Zhang came out, right?

11   A.   That's right.

12   Q.   So that's not one of the studies that she assessed.

13        If you were going to rank the Meloni study according

14        to the criteria that Zhang used in her paper, what

15        score would you give it?

16   A.   I did score it.  I scored it a 2 out of 9.

17   Q.   2 out of 9.  Okay.  And why did you give it that

18        score?

19   A.   Because it had a lack of clarity on several -- across

20        several aspects of the paper.  It was the weakest

21        methodologic paper of the group.

22   Q.   Okay.  All right.

23            MR. PIORKOWSKI:  Anne, did we load

24        the -- those other next studies?
```

```
 1                    MS. HOVIS:  Yeah.  All three are

 2            loaded.

 3                    MR. PIORKOWSKI:  And which one is 14?

 4                    MS. HOVIS:  Hold on one second.  It's

 5            Ten -- I'm sorry.  It's van Stralen, then

 6            Tenny, then Crump.

 7                    MR. PIORKOWSKI:  Okay.

 8                    (Exhibit No. 14 marked.)

 9                    (Exhibit No. 15 marked.)

10                    (Exhibit No. 16 marked.)

11    BY MR. PIORKOWSKI:

12    Q.   So do you see the studies that have been marked as

13         14, 15, and 16, Doctor?

14    A.   Yes.

15    Q.   So let's look at 14 first.

16    A.   Okay.

17    Q.   This is a paper by -- I'm sorry.  This is a paper by

18         Karlijn J. van Stralen and co-authors.  Do you see

19         that?

20    A.   I do.

21    Q.   And it's a -- it's an epidemiological methodological

22         paper on case-control studies and study design,

23         correct?

24    A.   Yes.
```

```
 1   Q.   Okay.  And I really just want to ask you about

 2        something that she says on page c3.

 3   A.   Okay.

 4   Q.   Do you see on the -- under bias, there's a

 5        discussion?

 6   A.   Yes.

 7   Q.   Do you see under the third sentence starts and it

 8        says, quote, another important source of bias, which

 9        is unique for case-control studies, is recall bias,

10        correct?

11   A.   Correct.

12   Q.   And you agree with that, right?

13   A.   Well, it's not unique to case-control studies, but

14        it's an important risk of bias for them.

15   Q.   It's not -- in your opinion, it's not unique to

16        case-control studies?

17   A.   That's correct.

18   Q.   How can recall bias not be unique to case-control

19        studies?

20   A.   Well, if you do a secondary analysis of a cohort

21        study of data that exists in a registry, you can

22        still ask the patients about some historical

23        exposure.

24   Q.   Okay.  There's a difference between inaccurate memory
```

```
 1        and recall bias, correct?

 2   A.   Yes.

 3   Q.   Recall bias is a specific bias that has been defined

 4        historically as the propensity of cases to have an

 5        increased risk of remembering exposure compared to

 6        controls, right?

 7   A.   Right.  Bias can operate in both directions.

 8   Q.   You said that, but I want to actually take a look at

 9        a couple other commentators.

10             So the next sentence says, quote, this

11        occurs when a subject is interviewed to obtain

12        exposure information after the disease has occurred.

13        As the case is suffering from the disease, they may

14        search their memory for any history of exposure.

15        Controls do not have such a stimulus, which possibly

16        results in less accurate or more socially acceptable

17        answers.

18             Do you agree with that?

19   A.   I do agree with that.  But that's a special type of

20        recall bias.  That is not -- that is not

21        methodologically what is accepted as the more general

22        class of bias, recall bias, or there's other terms

23        that sometimes are used in the literature.  That's a

24        special type of recall bias, and it can be associated
```

Joel J. Gagnier, MD, MSc, PhD

```
 1          with faulty memory also.

 2    Q.    All right.  But faulty memory, memory issues in terms

 3          of having difficulty accurately remembering, that can

 4          affect -- that can be present in any kind of study.

 5          But that's not the same thing as recall bias,

 6          correct?

 7    A.    It is a part of recall bias.  And yes, it can be in

 8          multiple types of studies when you're asking about

 9          distant events or complicated events or something.

10    Q.    All right.  Can you turn to Exhibit 15, please.

11    A.    Sure.  I see it.

12    Q.    Okay.  And if you look under -- this is a paper by

13          Tenny on case-control studies.  Do you see on page --

14          the second page is disadvantages and limitations?

15    A.    I do.

16    Q.    And it says the most commonly cited disadvantage in

17          case-control studies is the potential for recall

18          bias.  Recall bias in a case-control study is the

19          increased likelihood that those with the outcome will

20          recall and report exposures compared to those without

21          the outcome.  In other words, even if both groups had

22          exactly the same exposures, the participants in the

23          cases group may report the exposure more often than

24          the controls do.  Recall bias may lead to concluding
```

Joel J. Gagnier, ND, MSc, PhD

1          that there are associations between the exposure and

2          the disease that do not, in fact, exist.

3                    That's what he says, correct?

4     A.   It is what this paper says.  Yes.

5     Q.   And you disagree with that?

6     A.   Well, no.  That's a part of recall bias.  But that's

7          not the strict -- how should I say this?  Recall bias

8          is a broader phenomenon than simply someone with some

9          disease recalling some exposure more.  It is a

10         broader phenomena.  They're specifically saying that

11         this is away from the null hypothesis, which is not

12         the common understanding.  But, you know, there is

13         different terminology that's used across epidemiology

14         sometimes.  So we have to be really specific to what

15         we're speaking about.  Recall bias is certainly a

16         drawback in case-control studies.  But recall bias

17         away from the null is not the only type of recall

18         bias.  It can be towards the null as well.

19    Q.   Yeah.  And I'm not -- I don't want to get into a

20         debate about this area of recall bias, and maybe our

21         terminology is not the same.

22                   But if we're talking about the studies that

23         we're looking at here, there is -- when patients have

24         a disease like non-Hodgkin's lymphoma, there is a

Joel J. Gagnier , ND, MSc, PhD

```
 1        tendency to remember exposure more in patients who

 2        have a disease than in patients who don't have a

 3        disease.  Isn't that correct?

 4   A.   To recall -- it depends on the individual.  It

 5        depends on the disease.  It depends on the exposure.

 6        We can't generalize across all possible phenomena.

 7        In this case, we're talking about non-Hodgkin's

 8        lymphoma and the risk of exposure to glyphosate.  And

 9        if the subjects had some bias towards thinking that

10        insecticides have an increased risk for non-Hodgkin's

11        lymphoma or their doctor told them about that or they

12        read it somewhere, then sure, maybe there is a

13        likelihood.  But maybe they know nothing at all about

14        it, so it would have no effect.  This is speculation

15        on both of our parts saying these sorts of things

16        about the subjects.

17   Q.   So the two options you're saying is there could be

18        recall bias that would inflate the risk or there may

19        be no recall bias.  But there's no scenario in which

20        the risk is lower because of recall bias with respect

21        to this situation that we're talking about, right?

22   A.   Only if there is differences in the characteristics

23        of the subjects in the cases and controls that could

24        change their ability to -- change their ability to
```

```
 1        either recall or ask questions of their family or of

 2        people in their environment who use these chemicals.

 3        If there are differences in those factors, those are

 4        independently predictive of their ability to make,

 5        whether right or wrong, that connection between

 6        non-Hodgkin's lymphoma and some pesticide exposure.

 7        So it's dependent upon the groups and the

 8        characteristics of the groups.  It's a big deal.

 9   Q.   Is there any scenario which you can outline in

10        which -- or in which the cases would have a less

11        likelihood of remembering exposure compared to the

12        controls?

13   A.   Well, yeah.  I just gave you an example.

14   Q.   Which is?

15   A.   Which would be differences in, let's say, educational

16        level as a -- or socioeconomic status.  There's

17        methodologic literature that shows that there's

18        differences in recall and, therefore, the effect of

19        recall bias on comparisons in case-control studies

20        where there's difference in socioeconomic status.

21        This is not unknown.

22   Q.   Do you have a reason to believe that in any of these

23        studies there's a difference in socioeconomic status

24        between the cases and controls?
```

Joel J. Gagnier , ND, MSc, PhD

```
 1   A.   I don't.  But I could take a look at it, if you would

 2        like me to.  And that was just an example to

 3        illustrate and to answer -- to help to answer your

 4        question, which would be a no.  I mean, sorry.  Which

 5        would be a yes, there would be a scenario.

 6   Q.   Let me ask you to look at Exhibit 16.

 7   A.   Exhibit 16?

 8   Q.   Yes, sir.

 9   A.   Okay.

10   Q.   Exhibit 16 is an article entitled The Potential

11        Effects of Recall Bias and Selection Bias on the

12        Epidemiological Evidence for the Carcinogenicity of

13        Glyphosate, correct?

14   A.   Yes.

15   Q.   So this is a paper that deals specifically with bias

16        in the context of evaluating the epidemiological

17        evidence for the carcinogenicity of glyphosate,

18        correct?

19   A.   I haven't read this paper, but I've seen the title.

20        So I'll take your word for it.

21   Q.   And that's actually -- so when you said you did a

22        literature search, did this paper not come up on the

23        literature search?

24   A.   This paper is in my EndNote file, which I'd be happy
```

Joel J. Gagnier, ND, MSc, PhD

```
 1        to share.

 2   Q.   It's not in your materials -- it's not in your

 3        reliance list, correct?

 4   A.   No, I didn't cite it.  I reviewed -- I reviewed

 5        hundreds of papers for inclusion into -- in the

 6        meta-analysis.

 7   Q.   So do you have a list of the hundreds of papers that

 8        you looked at?

 9   A.   The -- yes.  I have an EndNote file with all of the

10        citations from Embase and from Medline that were

11        uploaded to the EndNote file, which I then went

12        through with my inclusion/exclusion criteria to rule

13        in or rule out papers.  And those which I couldn't

14        make a decision on on the basis of reading the title

15        and the abstract, I went to the full text to read the

16        full text of the paper.  So if there wasn't

17        sufficient data to perform a meta-analysis on the

18        questions I was interested in, I excluded it.

19   Q.   Based on the title and the abstract, this is a paper

20        that would have got your interest, right?

21   A.   It's a reanalysis of -- yeah, it a reanalysis of some

22        data.  Yeah.

23   Q.   Just like your meta-analysis is a reanalysis of data,

24        correct?
```

1    A.    Yes.  Yeah.

2    Q.    Okay.  And do you know who Kenny Crump is, the author

3          of this?

4    A.    I don't know Kenny Crump like personally or

5          professionally.  No.

6    Q.    Do you know whether Kenny Crump was somebody who was

7          on the EPA's scientific advisory panel to look at

8          issues of glyphosate and carcinogenicity?

9    A.    The name appears sort of vaguely familiar.  If you

10         say that's the case, then I would believe you.

11   Q.    Okay.  So let me just ask you.  In the abstract, it

12         says, quote, the principal human data on glyphosate

13         and NHL come from five case-control studies and two

14         cohort studies.  The case-control studies are at risk

15         of recall bias resulting from information on exposure

16         to pesticides being collected from cases and controls

17         based on their memories.  In addition, two of the

18         case-control studies are additionally at risk of a

19         form of selection bias that can exacerbate the effect

20         of recall bias.  Both biases are in the direction of

21         making glyphosate appear carcinogenic.

22                I know you haven't had a chance to look at

23         this.  But based on that excerpt from the abstract,

24         is that something you would be interested in looking

Joel J. Gagnier, ND, MSc, PhD

```
 1        at further?

 2   A.   Well, I mean, I have the same criticisms of those

 3        papers.  I know what the flaws of them are.  I

 4        would -- this is -- still wouldn't be included in my

 5        meta-analysis because I have the data from all the

 6        original studies myself.  Though, you know, I'm

 7        always interested in sort of perspectives and

 8        reanalysis of data.  So certainly I could take a look

 9        at it.

10   Q.   It says -- do you see at the bottom of 696 on the

11        right-hand side it says, in each of the case-control

12        studies, the evidence on the extent of pesticide

13        exposure comes from self-reporting by both cases and

14        controls.  This raises the potential for recall bias

15        because cases may carefully search their memories

16        trying to recall an exposure that may be the cause of

17        their disease, whereas controls have no such

18        motivation and may not attempt to recall previous

19        exposures as fastidiously as those with diagnosed

20        disease.  Do you agree with that?

21   A.   I do agree that recall bias -- I mean, I think I've

22        made that clear a couple times that recall bias is a

23        potential drawback for case-control studies or any

24        time we're asking about distant events or complicated
```

```
 1        events in the past, and that there are variations

 2        between groups of -- with different characteristics.

 3        I completely agree.  The challenge is whether or not

 4        that's a flaw enough -- to determine whether that

 5        flaw is enough to bias the estimates of the treatment

 6        effect in the studies.  That's the key question, not

 7        whether it exists or not, whether that bias is of a

 8        magnitude that can influence the estimates of effect.

 9   Q.   Well, there's a difference between influencing the

10        effects and accounting for the effects, correct?

11   A.   Well, accounting for it would diminish it entirely.

12   Q.   Exactly.

13   A.   Whereas influencing would decrease it or increase it.

14        Yeah.

15   Q.   So do you have an opinion as to -- I mean, I thought

16        I understood you earlier to say that you were not

17        able to do an evaluation of whether recall bias

18        quantitatively affected these case-control studies or

19        not.  Is that true?

20   A.   Yeah.  It would be really difficult to do for the

21        case-control studies.  Yes.  Not impossible for the

22        more recent ones, but it would be very difficult.

23   Q.   Okay.  It goes on to say in the next sentence, quote,

24        in their IARC-sponsored book on the statistical
```

```
 1        analysis of case-control studies, Breslow and Day

 2        (1982) [sic] state -- do you know who Breslow and Day

 3        are?

 4   A.   Yes.

 5   Q.   Is that a recognized authority in epidemiological

 6        methods?

 7   A.   Well, there's a study that's a Breslow -- or a

 8        statistical analysis called the Breslow Day analysis.

 9        Yes.

10   Q.   Okay.

11   A.   That's where it's familiar.

12   Q.   Is that highly respected in the epidemiological

13        community?

14   A.   Yeah.  I mean, it's one of many tools that we have

15        biostatistically.  Yeah.

16   Q.   So the quote from Breslow and Day is bias resulting

17        from non-comparable information from cases and

18        controls is potentially serious.  The most common of

19        these is recall ... bias which may result because

20        cases tend to consider more carefully than do

21        controls the questions they are asked or because the

22        cases have been considering what may have caused

23        their cancer.  The weakness then of case-control

24        studies is that in the end, the investigator must
```

```
1           appeal to subjective or only semi-quantitative

2           arguments to the effect that the information that he

3           has from cases and controls is equivalent in source

4           and quality.

5               Do you agree with that?

6    A.     I do agree with that, except that it's not just

7           for -- it's not just, you know, that he's talking

8           about cancer in this -- specifically cancer in this

9           little paragraph.  You have to know that it's any

10          condition possibly.  So that means that if the --

11          let's just say the control groups, some of these

12          case-control groups had more heart disease, and,

13          again, I'm speculating here, I don't know if that's

14          the case or not, then they could have recall bias in

15          the control groups, meaning they recall exposures

16          more.  Does that -- does that make sense?  So it's

17          not just associated with cancers and the association

18          with non-Hodgkin's lymphoma and glyphosate exposure.

19          It could be any disease and any herbicide exposure

20          for any condition.

21   Q.     Yeah.  And I wasn't suggesting that it was limited to

22          glyphosate.

23   A.     Yeah.  I didn't think that you were, but I didn't

24          want -- I didn't want my agreement with this
```

Joel J. Gagnier, ND, MSc, PhD

```
 1        paragraph to mean that it's just associated with

 2        cancer.  This could -- recall bias can operate with

 3        any condition.

 4   Q.   They go on to say, quote, similarly, Grimes and

 5        Schulz (2002) in a review of potential problems and

 6        epidemiological research state -- who are Grimes and

 7        Schulz?

 8   A.   Ken Schulz is a physician and clinical

 9        epidemiologist.  I don't know if he's still active or

10        not.  He was the founder of the CONSORT Group.  And

11        is it David Grimes?  Is it David?  I can't remember

12        if that's his first name or not.  Nonetheless, both

13        pretty well-known clinical epidemiologists.

14   Q.   It goes on to say from the Grimes and Schulz paper,

15        quote, in case-control studies that rely on memory of

16        remote exposures, recall bias is pervasive.  Cases

17        tend to search their memories to identify what might

18        have caused their disease; healthy controls have no

19        such motivation.  Thus, better recall among cases is

20        common.

21             Did I read that correctly?

22   A.   Yes, I would say so.

23   Q.   All right.  Are you doing all right or do you need a

24        break or where are we?
```

```
 1   A.   I mean, I'm okay.  Yeah.  I'm happy with -- unless

 2        y'all need a break.

 3             THE REPORTER:  If I could have five

 4        minutes, that would be good, please.

 5             MR. PIORKOWSKI:  Yeah.  Why don't we

 6        take ten and get organized, and then we'll

 7        come back.

 8   BY MR. PIORKOWSKI:

 9   Q.   Just for logistics, Doctor, you're limited to 4:00.

10        Is that right?

11   A.   Yes, I am.

12   Q.   Okay.  All right.

13   A.   Sorry.  Kids coming home.

14   Q.   All right.

15             VIDEOGRAPHER:  We are going off the

16        record at 2:50 p.m.

17             (Recess taken.)

18             VIDEOGRAPHER:  We are back on the

19        record at 2:59 p.m.

20   BY MR. PIORKOWSKI:

21   Q.   Dr. Gagnier, what is Bartimus, Frickleton, Robertson,

22        Radar, PC?

23   A.   What is it?  It's a law firm.

24   Q.   Okay.  And are you a paid consultant to or an
```

Joel J. Gagnier, ND, MSc, PhD

```
 1        employee of that law firm?

 2   A.   Was a consultant to.  Yes.

 3   Q.   Was?  How long ago?

 4   A.   How long ago?  Let me see.  I'd have to check to be

 5        certain.  I can check.  I'm just trying to do that

 6        right now.

 7   Q.   I'll represent to you that in both a 2019 article and

 8        a 2021 book chapter, you stated that you were either

 9        a paid consultant or employee of the firm.

10   A.   Yes.  Yes, I was -- I did consult on a case for them.

11        Yes.

12   Q.   Okay.

13   A.   Not currently.  But I was, yeah.

14   Q.   Okay.  What is Rubin Anders Scientific?

15   A.   What is Rubin Anders?

16   Q.   Yes.

17   A.   It is a -- how would you describe Rubin Anders?  I

18        guess it's a consultant firm that connects experts

19        with -- with cases, with law groups or with companies

20        or whatever to help them out with some scientific

21        questions on cases.  Yeah.

22   Q.   Okay.  And do you -- are you an employee of Rubin

23        Anders Scientific?

24   A.   No.  I'm just one of the -- I'm just one of the
```

Joel J. Gagnier, MD, MSc, PhD

```
 1        experts that they contact when lawyers contact them

 2        or when companies contact them for the need for a

 3        certain type of expertise.  And I have a -- I haven't

 4        done -- they're kind of -- what would you call them?

 5        I guess more like a management company, I guess.  But

 6        I haven't did anything through them or with them for

 7        quite a number of years.

 8   Q.   Okay.  You're not an owner of the company or --

 9   A.   Oh, no.  No.

10   Q.   And that wasn't -- they're not involved in your

11        retention in this case; is that right?

12   A.   That's correct.  They are not involved.

13   Q.   What is the Orthopedic Research Society?

14   A.   The ORS is a US research scientific society of those

15        that do research in orthopedic surgery, whether it be

16        basic science research, translational research, or

17        clinical research.  So I'm a member of that

18        scientific society as a clinical researcher and

19        epidemiologist and sit on several committees.

20   Q.   Do you receive any compensation?

21   A.   No.

22   Q.   For how long have you been -- are you a board member

23        or committee member or what?

24   A.   I am -- the structure has changed around a little
```

```
 1          bit.  I sit on several committees.  One is the

 2          educational committee, another is the learning

 3          committee.  I was on the program committee for the

 4          last annual conference.  So that's primarily --

 5          that's the primary thing that they do is have an

 6          annual scientific conference.  But there's also a

 7          learning platform, and I'm the chair elect of the

 8          clinical research section it's called.  It's a

 9          special section of the ORS, and I've been a member of

10          the ORS since 2010, I believe.

11   Q.     All right.  So your invoice, which is Exhibit 6, can

12          you take a look at that for me?

13   A.     Sure.

14   Q.     Let me know when you have it up.

15   A.     Oops, I'm in the wrong spot.  Sorry.  Okay.

16   Q.     So your invoice reflects how many total hours you've

17          done on the case?

18   A.     64.

19   Q.     Okay.  And when was this invoice issued?

20   A.     March 10th.

21   Q.     And was that through February or through March 10th

22          or what?

23   A.     For those hours?

24   Q.     Yes.
```

```
 1    A.    From December to March.  Yeah.

 2    Q.    Up through March 10th?

 3    A.    Up through March 10th.  That's correct.  Yeah.

 4    Q.    And does that reflect all the hours you've spent on

 5          this case up through March 10th?

 6    A.    Yes.

 7    Q.    Okay.  And how many hours have you spent on the case

 8          since March 10th, not counting the deposition today?

 9    A.    Not -- just not a whole lot.  In preparation for the

10          case, I think about eight hours.

11    Q.    So like a total of maybe 72 hours, not counting the

12          deposition today?

13    A.    That's correct.

14    Q.    Okay.  And I'd just like to get some sense of how you

15          spent those 72 hours.  So starting out, how much time

16          did you spend preparing for the deposition today?

17    A.    I spent most of last Thursday, basically the entire

18          working day.  I spent a little bit of, well, this

19          morning between -- our kids are up pretty early.  I

20          usually get up before them.  But a couple hours this

21          morning preparing for the deposition.  That's

22          basically it.

23    Q.    So about ten of the 72 hours would have been

24          preparing for the deposition?
```

```
 1   A.   Yeah.  About.  Yeah.

 2   Q.   Okay.  What about separately from that meetings with

 3        attorneys and phone calls with attorneys?

 4   A.   I'm not sure.  I didn't keep track of the phone

 5        calls.  So I wasn't aware I should.

 6   Q.   No.  I'm not asking you to -- you know, this is based

 7        on your best estimate.  So of that ten hours you just

 8        talked about for preparing, was part of that meetings

 9        or not?

10   A.   No, it didn't include meetings.

11   Q.   What's your best estimate of, you know, out of the 72

12        hours how much time you spent either meeting with

13        lawyers or on phone calls with lawyers?

14   A.   Well, it would be in addition to that.  Probably,

15        maybe Gibbs can answer it better than I could, but I

16        think two hours would be the maximum.

17   Q.   All together for the whole case?

18   A.   Maybe a little bit more than that.  Maybe closer to

19        three.  Yeah.

20   Q.   Okay.  Now, you issued a -- you know, we already

21        marked as Exhibit 2, which is a 58 page report.  How

22        much time did you spend drafting your report?

23   A.   All of those 64 hours.

24   Q.   Okay.  So I guess what I'm trying to sort out --
```

```
 1      there's -- let me back up and give you an

 2      explanation.  You know, you talked about doing a

 3      literature search, then you talked about carving out

 4      certain articles that you looked at more intensively,

 5      then you talked about doing your own analysis, and

 6      then separate from that you have writing your report.

 7      So I'm trying to get a sense among those different

 8      tasks of how that time was divvied up.

 9  A.  Well, you know, the writing and those aspects of the

10      report were happening continuously and in unison.  So

11      that's not really separable.  The search -- the

12      inclusion -- well, I'm just going to give you

13      estimates on the search because I didn't break down

14      the exact --

15  Q.  That's fine.

16  A.  -- number of hours for each component.  But the

17      search -- the search, the actual electronic search

18      after the -- after the keywords are developed, you're

19      talking just like maybe just like a couple of hours

20      for just running an electronic search.  You know,

21      uploading the data or organizing it in EndNote is a

22      couple of more hours.  Really the reading of the

23      papers, the inclusion and the analysis is where the

24      vast majority of the hours are spent.  And then a
```

```
 1        re-review, which I didn't put on there, a re-review

 2        of the report for, you know, grammar and conciseness

 3        and completeness.  So, you know, probably 75 percent

 4        was spent doing the reading of the papers, the

 5        inclusion, and the meta-analysis, and the rest of the

 6        time with the search and a re-review of the report

 7        sort of refining it.

 8   Q.   Okay.  So when you mentioned these -- did you call

 9        them EndNotes?  Is that what you refer to them as?

10   A.   Yeah.  EndNotes is just a reference manager tool that

11        you -- it's kind of like a fancy Excel.

12   Q.   Okay.  Is that a -- is that a document that you can

13        provide to Mr. Henderson?

14   A.   It is.  It's an EndNote file, and I can -- I can save

15        it in any format that you'd like.

16             MR. PIORKOWSKI:  Okay.  Gibbs, can

17        we -- can we have an agreement to have him

18        produce that?

19             MR. HENDERSON:  Yes.

20             MR. PIORKOWSKI:  And what's the next

21        exhibit number, Trish?

22             MR. HENDERSON:  Should be 17.

23             THE REPORTER:  17, I believe.

24
```

Joel J. Gagnier, ND, MSc, PhD

```
 1               MR. PIORKOWSKI:  17.  So if we can

 2               just, Trisha, hold that open and we'll

 3               have the doctor provide it to

 4               Mr. Henderson and then he'll in turn

 5               provide it to you and we'll just keep that

 6               as Exhibit 17 for the deposition.

 7               (Exhibit No. 17 marked.)

 8   BY MR. PIORKOWSKI:

 9   Q.   And just so I understand, this is -- this is your

10        evaluation of articles that you looked at but didn't

11        necessarily include in your reference list; is that

12        right?

13   A.   It's the entire list of all articles that I reviewed

14        for inclusion.  Yep.

15   Q.   And so if it's not on your -- if it's not on what

16        we're marking as Exhibit 17, then you didn't look at

17        it.  Fair?

18   A.   Correct.

19   Q.   Okay.  All right.  So what's your -- you mentioned

20        earlier your billing rate for your work and preparing

21        a report.  What's your billing rate for your

22        deposition?

23   A.   I have to check to be certain.  This is, you may or

24        may not know, the first deposition I've given.  I
```

```
 1        have to check.

 2   Q.   All right.  Well, there was something I saw that said

 3        $800 an hour, but then it says $500 an hour for

 4        trial.  And I was trying to understand why

 5        deposition -- why your rate for deposition testimony

 6        is greater than your rate for trial testimony.

 7   A.   Yeah.  I don't know.  Maybe that was a typo.  I'm not

 8        sure.  I don't have any specific reasoning for that.

 9        In fact, I don't even recall that.  But I believe 800

10        was the right number for deposition, and I thought it

11        was the same for the trial item.  Sorry if that's

12        confusing.

13   Q.   Okay.  We've already talked about Exhibit 2.

14        Exhibit 3 is called your reliance list.

15   A.   Yes.

16   Q.   That represents documents that you reviewed that

17        you're actually relying on for purposes of the

18        opinions in your report; is that right?

19   A.   Yes.  Or for referencing methodology.  Yes.

20   Q.   Okay.  And did you prepare Exhibit 3, or did somebody

21        else prepare that?

22   A.   I prepared it.

23   Q.   Okay.  Your CV was marked as Exhibit 5.  Is that

24        current and up to date as of today?
```

Joel J. Gagnier, ND, MSc, PhD

```
 1   A.   They're never always up to date.  There was a couple

 2        other publications that I had accepted last week.  So

 3        I could -- no.  I don't have an assistant.  So it's

 4        up to me to keep this thing up to date, and it's a

 5        giant document.  So it's at least as good as the

 6        beginning of March.

 7   Q.   On your CV you indicate that you had a -- you have a

 8        license, a naturopathic license; is that right?

 9   A.   Yes.  Had.  Yeah.

10   Q.   I think your CV still has it listed as a license,

11        right?

12   A.   No.  I got it in -- well, I guess I could clarify

13        that.  I got it -- yeah.  I achieved that license in

14        2001, in October of 2001, and I didn't list the end

15        date.  But there is an end date.  Yeah.

16   Q.   On the website for the licensing, for the licensing

17        authority, it indicates that your license was revoked

18        in 2018.  Is that correct?

19   A.   Yes.

20   Q.   And for what reason was your license revoked?

21   A.   Because I didn't want to keep paying the fees.

22   Q.   So was that the sole reason, it was just nonpayment

23        of fees?

24   A.   Yeah.  It was just -- it was purposeful.  I knew it
```

```
 1        had already been ten years since I practiced.  You

 2        know, I have no intention to go back to private

 3        practice.  I have a full-time academic career, which

 4        I very much like doing.  And if I was going to go

 5        back to practice, I'd -- it would be -- it would be

 6        necessary for me to rewrite my boards.  But I have no

 7        intention of having a clinical practice again.  So I

 8        just stopped paying the fees, and that's just how

 9        they write it.

10   Q.   Okay.  Exhibit 8, do you have that handy?

11   A.   I can take a look here.  Yes.

12   Q.   And Exhibit 8, can you explain what that is.

13   A.   Yeah.  I was in -- I don't know how much detail do

14        you need or require?

15   Q.   Well, what is the context in which you testified

16        previously?

17   A.   I testified for the -- for the plaintiff in that

18        case, Hodkinson.  And that was a -- do you want the

19        details of the topic of the trial or --

20   Q.   So first of all, when was it again?

21   A.   In August of 2021.

22   Q.   And you testified at trial for how many days?

23   A.   For one day.  The trial was across three days.  Yeah.

24   Q.   Okay.  And what was just generally the subject of
```

```
 1       your testimony?

 2   A.  The subject was associated with the evidence for a

 3       single study for the risk of an adverse event from a

 4       vaccination.

 5   Q.  And what type of vaccination?

 6   A.  In that case, the vaccination was influenza.

 7   Q.  Okay.  And you were testifying on behalf of the

 8       plaintiff you said?

 9   A.  Yes.

10   Q.  Okay.  And how did that case result?

11   A.  As far as I know, I haven't talked to the lawyer for

12       about three weeks, four weeks, as far as I know, it's

13       ongoing.

14   Q.  Oh, the trial is still ongoing?

15   A.  No.  It hasn't been resolved yet.  I don't know if

16       there's been -- a decision hasn't been rendered as

17       far as I know.  At least he hasn't said anything to

18       me about it.

19   Q.  All right.  And that's the only time you've testified

20       either at deposition or trial ever in your life?

21   A.  That's correct.

22   Q.  There's a document -- Exhibit 9 says documents sent.

23   A.  Uh-huh.

24   Q.  What is -- is that a document that you were sent by
```

Joel J. Gagnier, ND, MSc, PhD

```
 1        counsel?

 2   A.   It is, yes.

 3   Q.   Were there any other documents that were sent to you

 4        by counsel?

 5   A.   I don't think so.

 6   Q.   And did you review Exhibit 9?

 7   A.   I did.

 8   Q.   When did you review it the first time?

 9   A.   The first time that I reviewed it, I'm not exactly

10        sure if it was in December or if it was in January.

11        I'd have to look back to be certain.

12   Q.   You don't discuss that document in your report,

13        correct?

14   A.   That's right.

15   Q.   Back to -- talk about the Zhang study for a minute.

16        This is the meta -- 2019 meta-analysis.  This is the

17        one you said you thought it was the best of the

18        meta-analyses that have been done, even though you

19        said that's still not up to date, correct?

20   A.   That's correct.

21   Q.   Do you have any criticisms of the Zhang

22        meta-analysis?

23   A.   You know, I believe that meta-analysis could have

24        been a little bit more careful about doing additional
```

```
1        sensitivity analyses.  I think editorially it was

2        just -- I mean, it was too long.  It could have been

3        more straightforward.  That's -- let me just check.

4        There's something else with that paper too.  Sorry

5        about that.  I'm just checking on something here.

6        Yeah.  They only searched a single electronic

7        database, but they did supplement their search with

8        looking at reference lists from the WHO report and

9        the IARC report and the EPA report.  So I didn't feel

10       like it was a major drawback, but I like to see

11       multiple databases searched typically in a

12       meta-analysis.  That's a -- I would say that's the

13       many -- that's the main thing.  Not nothing dramatic.

14   Q.  Let me ask you this.  When you do a meta-analysis,

15       you sort of hold yourself out as an expert in

16       systematic meta-analysis, right?

17   A.  I have some expertise in it.  Yes.

18   Q.  I mean, within epidemiological methods.  That's one

19       of the areas that you hold yourself out as being an

20       expert in, right?

21   A.  Well, yes.  Yeah.  I've done -- I've done many

22       meta-analysis.  I teach graduate courses on it.  I'm

23       involved with large research organizations that do

24       meta-analysis, etcetera.  I have done methodological
```

```
 1          work on it.  So yeah.

 2    Q.    So one thing about a meta-analysis is that sort of

 3          unlike some other kinds of studies, when you are the

 4          author of a meta-analysis, you know in advance how

 5          all of the studies that are the component parts come

 6          out in advance of doing the analysis, right?

 7    A.    Sometimes.  Yeah.

 8    Q.    Well, most times, right?

 9    A.    Not necessarily.  Well, actually, that's not true.  I

10          would agree with you.  Yes.  I would say that most

11          times you are aware of the -- I'm sorry.  I've got to

12          shut my phone off -- aware of the studies.  And

13          usually -- yeah.  Usually you're aware of the

14          studies.  Not necessarily of the details of the

15          results, but aware that some exist and generally

16          maybe what they say.

17    Q.    So take Zhang's paper, for example.

18    A.    Uh-huh.

19    Q.    There are six studies that were included, right?

20          There was the one cohort study and five case-control

21          studies, right?

22    A.    That's correct.  Yeah.

23    Q.    And she was aware of all of the results of those six

24          studies before she ever sat down to design this
```

```
 1        meta-analysis, correct?
 2   A.   I mean, I can't speak for her in that regard.  I'm
 3        not sure.  Probably was aware of some of them for
 4        sure.
 5   Q.   Well, Andreotti is the latest of the publications,
 6        correct?
 7   A.   Yeah, it is.  Yeah.
 8   Q.   And that was a year before her meta-analysis came
 9        out, right?
10   A.   Uh-huh.
11   Q.   And do you know that Dr. Zhang was a member of the
12        scientific advisory panel for the FDA also?
13   A.   I thought maybe I saw a disclosure somewhere about
14        that.  Yep.
15   Q.   Yeah.  So she was familiar with the studies dating
16        back to 2016, obviously not Andreotti 2018, but the
17        other studies, all of which had been done, correct?
18   A.   Probably.
19   Q.   And if I'm going to do a meta-analysis, I can to some
20        extent dictate how the results come out by playing
21        with the weightings for different studies and how
22        much weight I give them or what data I include or
23        don't include, correct?
24   A.   If you're -- if you're asking me if you can
```

```
 1            intentionally bias the results in a meta-analysis by

 2            either cherry picking results or manually changing

 3            weightings, sure, it's possible.

 4    Q.     Yeah.  That is what I'm asking.  I mean, that's

 5            possible to do, right?

 6    A.     Sure.  It's possible.  Yeah.  But it's easily seen

 7            through by reviewers and -- or people like me.

 8    Q.     Okay.  And one of the ways that -- when you look at

 9            the criteria for doing a meta-analysis, one of the

10            things that a lot of the guidelines recommend is

11            something called protocol, right?

12    A.     Yeah.  Yes.  There's been -- there's been a move

13            towards even in meta-analysis to write and to publish

14            a protocol and there's the database for that or,

15            like, publish in a database, much like

16            clinicaltrials.gov or in an actual journal.

17    Q.     What a protocol does is it says before I start the

18            analysis, it commits you to the methods you're going

19            to use for doing an analysis, right?

20    A.     That's right.

21    Q.     Okay.  And it's no different than in a -- clinical

22            trials also require the same thing.  You have to have

23            generally a study protocol that's in place and often

24            published in advance, right?
```

```
1    A.    It's ideal that you have it in advance for the same

2          reasons as a clinical trial, so that you can't

3          manipulate your methods by virtue of knowing the data

4          and, therefore, biasing the results.

5    Q.    Okay.  Fair enough.  Now, Dr. Zhang's meta-analysis

6          did not have a protocol, correct?

7    A.    They have no reference to publishing a protocol or

8          submitting it to the systematic review protocol

9          database.

10   Q.    Okay.  To the best of your knowledge, I think this is

11         based on your last answer, but to the best of your

12         knowledge, she did not have a protocol in advance of

13         conducting the meta-analysis, right?

14   A.    That's correct.

15   Q.    Okay.  Now, Dr. Zhang had a pre-specified hypothesis,

16         correct?

17   A.    Yes.

18   Q.    What was her hypothesis?

19   A.    It's stated in section 2.2.  Our a priori hypothesis

20         is that the highest biologically relevant exposure to

21         GBHs, i.e., higher levels, longer durations and/or

22         with sufficient lag and latency, will lead to

23         increased risk of NHL in humans.

24   Q.    Okay.  Now, in the documents that counsel sent you,
```

1       Exhibit 9, that was an EPA critique of the Zhang and

2       the Leon studies, correct?

3   A.   Yes, it was.

4   Q.   Okay.  One of the points that EPA scientists raised

5       was that there was not sufficient support of her

6       a priori hypothesis in advance of undertaking the

7       meta-analysis.  Do you recall that?

8   A.   Not sufficient support of the a priori hypothesis?

9   Q.   Correct.

10  A.   I believe that was a criticism.  Yep.

11  Q.   Yeah.  And, in fact, that's -- that's a fair

12      criticism, right, because the AHS study, the

13      Andreotti 2018 study did not show a dose response

14      relationship, correct?

15  A.   That's right.

16  Q.   And the only other two studies that looked at dose

17      response were the McDuffie paper and the Eriksson

18      paper, correct?

19  A.   The Meloni looked at cumulative exposure as well.

20  Q.   But Meloni wasn't available at that time.

21  A.   Oh, wasn't available at the time.  Yes.  Correct.

22      Yep.

23  Q.   So you agree with me that at the time that Dr. Zhang

24      did her study, the only other data points besides the

```
 1          AHS for differentiating low exposure from high

 2          exposure were the Eriksson study and the McDuffie

 3          study, right?

 4   A.     I believe so, yep.

 5   Q.     Okay.  Now, if you're undertaking to evaluate the

 6          scientific question of whether higher exposure is

 7          associated with greater risk than lower exposure, you

 8          need to have studies, data that differentiate higher

 9          exposure from lower exposure, correct?

10   A.     Yes.

11   Q.     And studies that failed to differentiate higher

12          exposure from lower exposure really don't help you

13          scientifically to determine whether higher exposure

14          is or is not associated with a greater risk than

15          lower exposure, correct?

16   A.     Yes.  Yes.  But -- can I -- can I elaborate on that

17          for a moment?

18   Q.     Sure.

19   A.     They -- Zhang was interested in the highest

20          biologically relevant exposure, which means whatever

21          the highest exposure was reported in any paper,

22          whether it was -- if it was ever exposure, then

23          that's the highest exposure.  If it was greater than

24          two days, then that's the highest exposure.  If it
```

1    was greater than seven days, then that's the highest

2    exposure.  That's really what they were after.

3    Though, they did do a separate analysis for ever

4    exposure where it was available.  But I agree, most

5    of the papers don't have anything beyond just ever,

6    ever, or never, and then a couple just have the

7    longer or higher amounts of exposure.

8  Q.  Well, three of the six studies she used in her

9    meta-analysis provide no data about whether higher

10   exposure is associated with a greater risk than lower

11   exposure, correct?

12 A.  That's right.  They only have ever or never.

13 Q.  Right.  And of the other three studies, two of

14   them -- let me start over here.

15          Remember, we looked at on page 196 of

16   Zhang's study, she said we selected relative risk

17   estimates that adjusted for other pesticide use over

18   their unadjusted counterparts to mitigate potentially

19   substantial confounding, correct?

20 A.  Yes.

21 Q.  Okay.  So in the two studies that she used that

22   actually did differentiate high exposure from low

23   exposure, she used data points from those studies

24   that were unadjusted despite what she says in her

```
 1        paper, correct?

 2   A.   I believe so.  Yes.  I need to check to be certain

 3        about that.  But I believe so.  Yes.

 4   Q.   And the AHS study that she used, she chose to use

 5        only about one tenth of the AHS cohort data, correct?

 6   A.   About one tenth of the data.  Can you clarify what

 7        you mean by that?

 8   Q.   Why don't we talk about the AHS for a second, and

 9        then I'll come back to that question.

10   A.   Okay.

11   Q.   Then we'll finish that line of questions up.

12             You obviously looked at the Agricultural

13        Health Study as a part of your review, right?

14   A.   Yes.

15   Q.   And you looked at both the De Roos 2005 and the

16        Andreotti 2018 version of the study, right?

17   A.   Yes.

18   Q.   And I think we already talked about your assessment

19        of the quality of the study.  Do you understand that

20        the AHS was a collaborative effort that started in

21        the mid 1990s between the National Cancer Institute,

22        the National Institute of Environmental Health

23        Sciences, the EPA, and the National Institute For

24        Occupational Safety and Health?
```

```
 1   A.   Yes.

 2   Q.   So it was an entirely government-funded study,

 3        correct?

 4   A.   I believe so, yep.

 5   Q.   No indication that Monsanto or any other manufacturer

 6        of glyphosate had any input into the study, right?

 7   A.   I don't think so, no.

 8   Q.   And the study followed 54,251 pesticide users,

 9        correct?

10   A.   Yes.

11   Q.   Which included 44,932 Roundup users, right?

12   A.   Yes.

13   Q.   And followed them for 20 plus years, right?

14   A.   Well, not -- not everybody, but some of them.

15   Q.   Now, the 2018 version of the AHS had 17 and a half

16        years of follow-up -- 6.7 from the original De Roos

17        2005, right?

18             (Reporter clarification.)

19   BY MR. PIORKOWSKI:

20   Q.   The Andreotti 2018 paper had 17 and a half years of

21        follow-up versus 6.7 years back in De Roos 2005?

22   A.   I've got to check on the De Roos paper, but I believe

23        that's the average follow-up across the entire

24        cohort.
```

```
 1   Q.   Right.  Now, so when I -- when I said that in the

 2        Zhang meta-analysis that she used only one-tenth of

 3        the data --

 4   A.   Yes.

 5   Q.   -- the data in -- we just talked about the fact that

 6        there were 55,000 pesticide users and 44,000 Roundup

 7        users in the AHS study, right?

 8   A.   Yes.

 9   Q.   And so she used 55 exposed patients and 575 controls,

10        right?  Out of the total, rather.  If you look at

11        Zhang table 4.

12   A.   Yeah.  I'm looking at it.  We're getting to it here.

13        Oh, that's because of the higher -- yeah.  The higher

14        exposure category.  Yes.

15   Q.   Okay.  So I don't know what that comes out to

16        numerically, but something like on the order of maybe

17        a tenth or 10 percent to 12 percent of the data from

18        AHS?

19   A.   Yeah.  Yeah.  Something like that.  Yeah.  It's the

20        highest -- yeah, it's the highest exposure category

21        they could find, they could come up with for their

22        analysis.

23   Q.   Did you have -- what criticisms did you have of the

24        Agricultural Health Study?
```

```
 1   A.   What criticisms?

 2   Q.   Yes, sir.

 3   A.   Well, there's variable follow-up, first of all,

 4        across the -- across the cohort.  So there's a bit of

 5        a time lag issue for a proportion of the patients.

 6        There was -- I guess there was a slight possibility

 7        for exposure misclassification due to the

 8        implementation method that they used.  But overall,

 9        it was quite a good study.

10   Q.   It is true that with respect to -- outcomes were

11        determined by using cancer registries, right?

12   A.   Linkage to cancer registries.  Yep, I believe so.

13   Q.   That doesn't change when somebody doesn't send in a

14        follow-up questionnaire, right?

15   A.   It doesn't -- the -- yeah.  The determination of the

16        non-Hodgkin's lymphoma doesn't change.

17   Q.   Right.  Let me ask it better.  It doesn't -- when a

18        patient doesn't follow -- doesn't submit a follow-up

19        questionnaire, that doesn't obviate the ability of

20        the investigators to follow up on whether they did or

21        didn't have non-Hodgkin's lymphoma, correct?

22   A.   Yeah, that's correct.  They just wouldn't have the

23        information about the exposure status.

24   Q.   And with respect to the exposure status, certainly if
```

Joel J. Gagnier , ND, MSc, PhD

```
 1        we think of this as -- if you look at the people who

 2        were exposed to glyphosate, although their level of

 3        exposure may have changed, patients who were exposed

 4        to glyphosate certainly wouldn't have changed to an

 5        unexposed group, right?

 6   A.   Yeah.  Right.  If they were ever exposed and you had

 7        data about that, then that's still true.

 8   Q.   All right.  One thing that -- one thing that a cohort

 9        study allows you to do is to calculate the incidence

10        rate, right?

11   A.   Yeah.  Yes.  The rates across time.  Yes.

12   Q.   Which you can't really do with a -- you can't really

13        do with a case-control study, right?

14   A.   You can, but it's -- it would be difficult and it's

15        not done very often where you ask about different

16        periods, historical periods.  Yes.

17   Q.   If you look at -- do you have Andreotti handy?

18   A.   I do.

19   Q.   Look at table 2 for a second.

20   A.   Okay.  Got it.

21   Q.   In table 2, do you see they divide them into

22        quartiles in terms of -- well, okay.  Look under

23        non-Hodgkin's lymphoma for me, right?

24   A.   Yes.
```

Joel J. Gagnier, ND, MSc, PhD

```
 1    Q.    And you see they divide the patient into quartiles,

 2          correct?

 3    A.    Yes.

 4    Q.    And so if we wanted to know the total number of

 5          patients who had non-Hodgkin's lymphoma, we would add

 6          up the quartiles from Q1 down to Q4, right?

 7    A.    Yes.

 8    Q.    Okay.  And if you do that math, it comes out to

 9          approximately 440 patients who used glyphosate who

10          developed non-Hodgkin's lymphoma during the course of

11          the study; is that right?

12    A.    Yeah.  Exactly 440.

13    Q.    Yeah.  And if you divide that by the 44,932 users of

14          glyphosate, that comes out to an incidence of less

15          than 1 percent, correct?

16    A.    Yes.

17    Q.    Do you have any basis for suggesting that the

18          incidence of non-Hodgkin's lymphoma in glyphosate

19          users is any greater than 1 percent?

20    A.    Do I have any reason to believe it's greater than .1

21          percent?

22    Q.    No, not .1 percent.  1 percent.  400 out of 44,000 is

23          1 percent.

24    A.    Oh, sorry.  Well, I don't have any reason to.  I
```

Joel J. Gagnier, ND, MSc, PhD

```
 1        mean, that's what this particular study shows.

 2   Q.   Well, there are no other -- there are no other data

 3        points with a contrary result, let me put it that

 4        way, that you're aware of, right?

 5   A.   That I'm aware of.  That's correct.  Yeah.

 6   Q.   Yeah.  Do you know from -- do you know from your

 7        research whether it's the case the vast majority of

 8        non-Hodgkin's lymphoma -- that in the vast majority

 9        of cases of non-Hodgkin's lymphoma, a specific cause

10        cannot be identified?

11   A.   I haven't had the chance to comprehensively look at

12        risks for non-Hodgkin's lymphoma and whether or not

13        there's a proportion of those who have confirmed

14        non-Hodgkin's lymphoma that don't have an

15        identifiable cause.  I don't know.

16   Q.   You have no basis to say one way or the other?

17   A.   That's right.

18   Q.   What are the Bradford Hill criteria?

19   A.   Bradford Hill criteria are a set of questions that

20        you ask when you're looking at case-control or cohort

21        studies to increase your conviction of cause-effect

22        associations or to test your conviction of a

23        cause-effect association.  Yeah.

24   Q.   So do you -- do you subscribe to the view that
```

```
1          establishing causation is a two-step process that

2          first you have to establish that you have an

3          association, then you have to evaluate whether that

4          association is causal?

5     A.   A two-step, yes.

6     Q.   Okay.  And what is an association as you understand

7          that term?

8     A.   What is just an association?

9     Q.   Yes, sir.

10    A.   Association is two variables that change together.

11    Q.   So if -- if the incidence of non-Hodgkin's lymphoma

12         increases with use of glyphosate, is that two

13         variables that are changing together?

14    A.   Yes.

15    Q.   Okay.  And that would be an association, right?

16    A.   Yes.

17    Q.   Okay.  And is it generally considered that an

18         association requires some determination of

19         statistical significance to be valid?

20    A.   This is where it gets dicey because statistical

21         significance is -- I would refer you to the American

22         Statistical Association guidance on the

23         misinterpretation of p-values, the use of confidence

24         intervals that came about I believe it was four or
```

```
 1        five years ago where there is -- and I wrote a paper

 2        on it too for The Journal of Bone and Joint Surgery

 3        summarizing it for the clinician scientists and

 4        scientists out there that a p-value doesn't give you

 5        any indication of a strength of a relationship or a

 6        strength of an association.  A p-value is only

 7        indicative of whether you're going to find an

 8        association at that level or greater than that level

 9        or more extreme than that level, and it has caveats.

10        The p-value is only as good as the underlying model

11        that's being used to test that.  So the statistical

12        model, for example, the distribution of effects in

13        the sample, and a variety of other factors.

14             So I realize that's complicated, maybe a

15        more wordy answer than I could have given, but I

16        believe that is the accurate way to interpret a

17        p-value.  So you don't have to -- statistically

18        significant p-value has no bearing on how important a

19        result is.

20   Q.   Yeah.  I'm not sure that was my question.  My

21        question is, in your view, to establish an

22        association, does the value need to be statistically

23        significant?

24   A.   It's better if it is certainly.  But if the
```

```
 1        association is strong and it's not statistically

 2        significant, it's still indicative of a possible

 3        association.

 4   Q.   In your 2017 paper you kind of caution -- which I

 5        think is the one you're referring to, right?

 6   A.   Yeah.  Yeah.

 7   Q.   You caution people about even using the term

 8        statistical significance in discussing results,

 9        right?

10   A.   Yes.  Dr. Morgenstern and I do do that.

11   Q.   Although, if you look at any of the last five papers

12        you've published, every one of them uses the term

13        statistical significance to describe the results,

14        right?

15   A.   But also uses confidence intervals and measures of

16        precision, which is what the longer point in my paper

17        said.  Don't use them in isolation.

18   Q.   But every study uses confidence intervals.  I mean,

19        no study just defines a p-value with no point of

20        reference, right?

21   A.   Not necessarily.  In conclusions quite often or in

22        abstracts just estimates of effect are presented

23        often without confidence intervals or measures of

24        precision.  That's the point.
```

Joel J. Gagnier, ND, MSc, PhD

```
 1    Q.    Right.  You make some reference in your report to

 2          other -- to a couple of other studies that discuss

 3          the Bradford Hill criteria.  Do you recall that?

 4    A.    Reference to studies that discuss the Bradford Hill

 5          criteria, or like use them in their -- in their

 6          publications?

 7    Q.    Yeah.

 8    A.    Yeah.  Yep.  Yep.

 9    Q.    I didn't see a section of your report where you

10          conducted a Bradford Hill analysis yourself.  Is

11          that --

12    A.    I did -- that's correct.  I did not.

13    Q.    So you didn't -- you didn't do an evaluation

14          according to the Bradford Hill criteria?

15    A.    No.  No.  Establishing -- the grade assessment is an

16          assessment of the credibility of the evidence, which

17          is -- it's not completely the same.  There is overlap

18          with the Bradford Hill criteria.  But the grade

19          assessment is the modern technique that's used in

20          meta-analysis or for making recommendations on the

21          basis of scientific evidence.  Bradford Hill

22          criteria, I could have discussed it certainly.  But,

23          you know, I wasn't tasked to do that as a part of the

24          assessment.
```

```
 1   Q.   Okay.  You make a reference in your report to

 2        children and adults.  Do you recall that?

 3   A.   As far as inclusion of papers you mean?

 4   Q.   Well, I think when you outline your research

 5        question --

 6   A.   Let's see here.  Yeah.

 7   Q.   -- you use the term whether there is an increased

 8        risk in children and adults.

 9   A.   At any level in children and adults.  Yep, I do say

10        that.

11   Q.   Yeah.  Do you have any data regarding the risk of

12        non-Hodgkin lymphoma in children?

13   A.   No.

14   Q.   Okay.  And are you prepared to extrapolate your

15        results to children?

16   A.   No.

17   Q.   Okay.  What is -- can you explain briefly the

18        difference between -- well, let me ask you, do you

19        believe there's a difference between something that's

20        a risk factor and a cause for a disease such as NHL?

21   A.   Yes.

22   Q.   What's the difference?

23   A.   A risk factor could be working together with other --

24        we generally use the term exposures, I guess.  A risk
```

Joel J. Gagnier, ND, MSc, PhD

```
 1        factor could be -- an exposure doesn't necessarily

 2        mean like a herbicide.  It could be an exposure to a

 3        food or a genetic influence or whatever.  So a risk

 4        factor could be a lifestyle choice, being a risk

 5        factor for some disease or outcome.  Whereas -- and

 6        it could be operating together with other risk

 7        factors or interacting with other exposures.  And you

 8        wanted me to differentiate that from a cause?

 9   Q.   I'm not -- I'm just asking if you regard them as

10        different things.

11   A.   Well, a risk factor can cause -- be a causal agent in

12        a disease process, certainly, together with

13        other -- together with other risk factors or even on

14        its -- even on its own, though the term is kind of

15        vague.

16   Q.   Is a cause always a risk factor?

17   A.   Yes.

18   Q.   And a risk factor is not always a cause?

19   A.   Yes.

20   Q.   Okay.  And how do you distinguish one from the other?

21   A.   By finding out which of those risk factors has a

22        logical and predictable relationship with some

23        outcome.

24   Q.   Well, it would have to have a predictable
```

Joel J. Gagnier, ND, MSc, PhD

```
 1          relationship with an outcome to be a risk factor,

 2          right?

 3   A.     If it's a cause.  Yeah.

 4   Q.     Well, for example, do you think age is a cause of

 5          non-Hodgkin lymphoma?

 6   A.     No, it's a risk factor.

 7   Q.     Right.  But there's a predictable and logical

 8          correlation between age and NHL development, right?

 9   A.     Yeah.  Maybe I should have explained that further.  I

10          mean, a mechanistic -- a mechanistic -- well, maybe

11          I'm not so clear about what you're asking me now.

12   Q.     Well, you recognize that age -- you consider age a

13          risk factor but not a cause of non-Hodgkin's

14          lymphoma, right?

15   A.     Right.

16   Q.     So I guess what I'm asking you is if there's a

17          statistical relationship between a variable and the

18          outcome, how do you determine whether that

19          statistical relationship is, you know, is a risk

20          factor like age or something that rises to the level

21          of being a cause?

22   A.     Well, we just talked about the Bradford Hill criteria

23          as one.

24   Q.     I mean, if that's not something you've thought about
```

Joel J. Gagnier, ND, MSc, PhD

```
 1          in this context, that's fine.  I mean, I'm not going

 2          to press you to form an opinion on the fly.

 3     A.   Yeah.  You know, it has been an interest of mine over

 4          the years, the whole area of causation, Judea Pearl's

 5          work, etcetera.  But, you know, when we're talking

 6          about and thinking about it in the context obviously

 7          that we're talking about it today, I mean, a cause is

 8          an identifiable factor that has a known or proven or

 9          repetitively proven relationship with some outcome.

10          So, you know, while age is more commonly termed a

11          risk factor, the process of aging causes physiologic

12          changes across time that are themselves causes of

13          certain types of cancers.  So it's -- it depends on

14          the context that we're talking about.

15     Q.   Can you turn to your report on page 26.

16     A.   Sure.

17     Q.   Do you see about seven lines from the bottom it talks

18          about they also evaluated potential confounding

19          factors?

20     A.   Yes.

21     Q.   Do you see the next sentence, it says the number of

22          and then it goes no where?

23     A.   Oh, yeah.  Typos.  Yep.

24     Q.   What is that -- what was that supposed to be or is
```

```
 1        there an incomplete sentence there or --

 2   A.   Yeah.  It appears to be an incomplete sentence.

 3   Q.   Do you know what --

 4   A.   I don't know why -- I don't know what happened to it.

 5        I can check and fill it in for you, if you like.

 6   Q.   Again, I'm happy to, you know, have you pass it along

 7        to Mr. Henderson, and we can take a look.

 8   A.   Okay.

 9   Q.   Last subject is in your -- in your analysis, can you

10        explain how you decided whether a random effects

11        model was necessary for each part of your analysis?

12   A.   Yeah.  Almost uniformly meta-analysis can proceed

13        with a fixed effects model and then to a random

14        effects model, if necessary.  So typically if you,

15        you know, have a good reason to think that the

16        studies are somehow fundamentally different, like had

17        different samples or maybe even in different eras,

18        decades or something, then it's easy to immediately

19        move to a random effects model.

20             So the way that I -- the way that I chose

21        to do it for this -- for these analyses is to run the

22        fixed effects model approach and then also to produce

23        statistical heterogeneity statistics.  So the

24        Cochran's Q test and the I-squared value.  The
```

```
 1        Cochran's Q test is a measure of the presence or not

 2        of statistical heterogeneity, which technically is

 3        whether or not there's differences between the

 4        studies that are greater than expected due to chance,

 5        and then the I-squared is a measure of the magnitude

 6        of the heterogeneity.  So the Cochran's Q test is

 7        compared to a chi-squared distribution that produces

 8        a p-value.  I-squared takes it one step further and

 9        gives you the magnitude in a percentage of

10        statistical heterogeneity.

11              So if that magnitude was high, over about

12        50-ish percent, and if the Cochran's Q test was

13        statistically significant, then together those two

14        things would indicate that there's unexplained

15        heterogeneity beyond chance and, therefore, a random

16        effects model should be used to incorporate that

17        heterogeneity into the meta-analytic estimate and

18        also the confidence interval.  Almost always the

19        confidence interval gets wider.  So it becomes less

20        precise of a result.  And sometimes the effect

21        estimate can move a little bit as well.  So that was

22        the rationale for the choice.

23              MR. PIORKOWSKI:  Okay.  Can we go off

24           record for just a second, and I just need
```

```
 1              to confer here.  We should be done.

 2              VIDEOGRAPHER:  We are going off the

 3         record at 3:57 p.m.

 4              (Recess taken.)

 5              VIDEOGRAPHER:  We are back on the

 6         record at 3:58 p.m.

 7  BY MR. PIORKOWSKI:

 8  Q.   So, Doctor, did you understand my questions

 9       today?

10  A.   Yeah, I did understand your questions.  And I should

11       have said is that, you know, I apologize for having

12       to go at 4:00.  If you -- if you did happen to need

13       me later in the week, I know it's not set up or

14       anything, just let me know.  Maybe we can figure

15       something out.

16  Q.   Let me confer with Mr. Henderson about that, but

17       I'm hoping we don't need to do that.  But thank

18       you.

19  A.   Okay.

20              MR. PIORKOWSKI:  We'll go ahead and

21         go off the record.  Gibbs, can you stick

22         on for a second?

23              MR. HENDERSON:  Yeah.  Sure.

24              VIDEOGRAPHER:  We are going off the
```

Joel J. Gagnier, ND, MSc, PhD

```
1            record at 3:59 p.m.

2                (Deposition concluded at 3:59 p.m.)

3                            *   *   *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Joel J. Gagnier, ND, MSc, PhD

```
 1                   CERTIFICATE OF NOTARY PUBLIC

 2       STATE OF MICHIGAN )

 3       COUNTY OF LENAWEE )

 4            I, Trisha Cameron, Certified Shorthand Reporter

 5       and Notary Public in and for the State of Michigan, do

 6       hereby certify that the witness whose attached

 7       deposition was taken before me in the above cause was

 8       first duly sworn or affirmed to testify to the truth,

 9       the whole truth, and nothing but the truth; that the

10       testimony contained herein was by me reduced to writing

11       in the presence of the witness by means of Stenography;

12       afterwards transcribed by means of computer-aided

13       transcription; and that the deposition is a true and

14       complete transcript of the testimony given by the

15       witness to the best of my ability.  I further certify I

16       am not connected by blood or marriage with any of the

17       parties, their attorneys or agents; that I am not an

18       employee of either of them; and that I am not

19       interested directly, indirectly, or financially in the

20       matter of controversy.

21       _____

22            Trisha Cameron, RDR, RMR, CRR, RPR, CSR

23            Notary Public, Lenawee County, Michigan

24            My Commission Expires 5-24-24
```

```
 1                - - - - - -

                  E R R A T A

 2                - - - - - -

 3

 4    PAGE  LINE  CHANGE

 5    ____  ____  _____

 6       REASON:  _____

 7    ____  ____  _____

 8       REASON:  _____

 9    ____  ____  _____

10       REASON:  _____

11    ____  ____  _____

12       REASON:  _____

13    ____  ____  _____

14       REASON:  _____

15    ____  ____  _____

16       REASON:  _____

17    ____  ____  _____

18       REASON:  _____

19    ____  ____  _____

20       REASON:  _____

21    ____  ____  _____

22       REASON:  _____

23    ____  ____  _____

24       REASON:  _____
```

Joel J. Gagnier, ND, MSc, PhD

```
1

2          ACKNOWLEDGMENT OF DEPONENT

3

4              I,_____, do

5    hereby certify that I have read the

6    foregoing pages, and that the same is

7    a correct transcription of the answers

8    given by me to the questions therein

9    propounded, except for the corrections or

10   changes in form or substance, if any,

11   noted in the attached Errata Sheet.

12

13

14   _____

15   Joel J. Gagnier, ND, MSc, PhD      DATE

16

17

18   Subscribed and sworn

     to before me this

19   _____ day of _____, 20____.

20   My commission expires:_____

21

     _____

22   Notary Public

23

24
```