# EXHIBIT E

# Reference Manual on Scientific Evidence

*Third Edition*

Committee on the Development of the Third Edition of the
Reference Manual on Scientific Evidence

Committee on Science, Technology, and Law
Policy and Global Affairs

FEDERAL JUDICIAL CENTER

NATIONAL RESEARCH COUNCIL
*OF THE NATIONAL ACADEMIES*

THE NATIONAL ACADEMIES PRESS
Washington, D.C.
**www.nap.edu**

**THE NATIONAL ACADEMIES PRESS**  500 Fifth Street, N.W.  Washington, DC 20001

The Federal Judicial Center contributed to this publication in furtherance of the Center's statutory mission to develop and conduct educational programs for judicial branch employees. The views expressed are those of the authors and not necessarily those of the Federal Judicial Center.

NOTICE: The project that is the subject of this report was approved by the Governing Board of the National Research Council, whose members are drawn from the councils of the National Academy of Sciences, the National Academy of Engineering, and the Institute of Medicine. The members of the committee responsible for the report were chosen for their special competences and with regard for appropriate balance.

The development of the third edition of the *Reference Manual on Scientific Evidence* was supported by Contract No. B5727.R02 between the National Academy of Sciences and the Carnegie Corporation of New York and a grant from the Starr Foundation. The views expressed in this publication are those of the authors and do not necessarily reflect those of the National Academies or the organizations that provided support for the project.

International Standard Book Number-13: 978-0-309-21421-6
International Standard Book Number-10: 0-309-21421-1

Library of Congress Cataloging-in-Publication Data

Reference manual on scientific evidence. — 3rd ed.
    p. cm.
  Includes bibliographical references and index.
  ISBN-13: 978-0-309-21421-6 (pbk.)
  ISBN-10: 0-309-21421-1 (pbk.)
  1.  Evidence, Expert—United States.  I. Federal Judicial Center.
  KF8961.R44 2011
  347.73´67—dc23

                              2011031458

Additional copies of this report are available from the National Academies Press, 500 Fifth Street, N.W., Lockbox 285, Washington, DC 20055; (800) 624-6242 or (202) 334-3313 (in the Washington metropolitan area); Internet, http://www.nap.edu.

Copyright 2011 by the National Academy of Sciences. All rights reserved.

Printed in the United States of America

# THE FEDERAL JUDICIAL CENTER

The Federal Judicial Center is the research and education agency of the federal judicial system. It was established by Congress in 1967 (28 U.S.C. §§ 620–629), on the recommendation of the Judicial Conference of the United States, with the mission to "further the development and adoption of improved judicial administration in the courts of the United States." By statute, the Chief Justice of the United States chairs the Federal Judicial Center's Board, which also includes the director of the Administrative Office of the U.S. Courts and seven judges elected by the Judicial Conference.

The Center undertakes empirical and exploratory research on federal judicial processes, court management, and sentencing and its consequences, often at the request of the Judicial Conference and its committees, the courts themselves, or other groups in the federal system. In addition to orientation and continuing education programs for judges and court staff on law and case management, the Center produces publications, videos, and online resources. The Center provides leadership and management education for judges and court employees, and other training as needed. Center research informs many of its educational efforts. The Center also produces resources and materials on the history of the federal courts, and it develops resources to assist in fostering effective judicial administration in other countries.

Since its founding, the Center has had nine directors. Judge Barbara J. Rothstein became director of the Federal Judicial Center in 2003

**www.fjc.gov**

# THE NATIONAL ACADEMIES
*Advisers to the Nation on Science, Engineering, and Medicine*

The **National Academy of Sciences** is a private, nonprofit, self-perpetuating society of distinguished scholars engaged in scientific and engineering research, dedicated to the furtherance of science and technology and to their use for the general welfare. Upon the authority of the charter granted to it by the Congress in 1863, the Academy has a mandate that requires it to advise the federal government on scientific and technical matters. Dr. Ralph J. Cicerone is president of the National Academy of Sciences.

The **National Academy of Engineering** was established in 1964, under the charter of the National Academy of Sciences, as a parallel organization of outstanding engineers. It is autonomous in its administration and in the selection of its members, sharing with the National Academy of Sciences the responsibility for advising the federal government. The National Academy of Engineering also sponsors engineering programs aimed at meeting national needs, encourages education and research, and recognizes the superior achievements of engineers. Dr. Charles M. Vest is president of the National Academy of Engineering.

The **Institute of Medicine** was established in 1970 by the National Academy of Sciences to secure the services of eminent members of appropriate professions in the examination of policy matters pertaining to the health of the public. The Institute acts under the responsibility given to the National Academy of Sciences by its congressional charter to be an adviser to the federal government and, upon its own initiative, to identify issues of medical care, research, and education. Dr. Harvey V. Fineberg is president of the Institute of Medicine.

The **National Research Council** was organized by the National Academy of Sciences in 1916 to associate the broad community of science and technology with the Academy's purposes of furthering knowledge and advising the federal government. Functioning in accordance with general policies determined by the Academy, the Council has become the principal operating agency of both the National Academy of Sciences and the National Academy of Engineering in providing services to the government, the public, and the scientific and engineering communities. The Council is administered jointly by both Academies and the Institute of Medicine. Dr. Ralph J. Cicerone and Dr. Charles M. Vest are chair and vice chair, respectively, of the National Research Council.

**www.national-academies.org**

# Reference Guide on Epidemiology

MICHAEL D. GREEN, D. MICHAL FREEDMAN, AND
LEON GORDIS

*Michael D. Green, J.D., is Bess & Walter Williams Chair in Law, Wake Forest University School of Law, Winston-Salem, North Carolina.*

*D. Michal Freedman, J.D., Ph.D., M.P.H., is Epidemiologist, Division of Cancer Epidemiology and Genetics, National Cancer Institute, Bethesda, Maryland.*

*Leon Gordis, M.D., M.P.H., Dr.P.H., is Professor Emeritus of Epidemiology, Johns Hopkins Bloomberg School of Public Health, and Professor Emeritus of Pediatrics, Johns Hopkins School of Medicine, Baltimore, Maryland.*

CONTENTS

  I. Introduction, 551
 II. What Different Kinds of Epidemiologic Studies Exist? 555
      A. Experimental and Observational Studies of Suspected Toxic Agents, 555
      B. Types of Observational Study Design, 556
          1. Cohort studies, 557
          2. Case-control studies, 559
          3. Cross-sectional studies, 560
          4. Ecological studies, 561
      C. Epidemiologic and Toxicologic Studies, 563
III. How Should Results of an Epidemiologic Study Be Interpreted? 566
      A. Relative Risk, 566
      B. Odds Ratio, 568
      C. Attributable Risk, 570
      D. Adjustment for Study Groups That Are Not Comparable, 571
 IV. What Sources of Error Might Have Produced a False Result? 572
      A. What Statistical Methods Exist to Evaluate the Possibility of Sampling Error? 574
          1. False positives and statistical significance, 575
          2. False negatives, 581
          3. Power, 582

*Reference Manual on Scientific Evidence*

    B. What Biases May Have Contributed to an Erroneous Association? 583
       1. Selection bias, 583
       2. Information bias, 585
       3. Other conceptual problems, 590
    C. Could a Confounding Factor Be Responsible for the Study Result? 591
       1. What techniques can be used to prevent or limit confounding? 595
       2. What techniques can be used to identify confounding factors? 595
       3. What techniques can be used to control for confounding factors? 596
  V. General Causation: Is an Exposure a Cause of the Disease? 597
    A. Is There a Temporal Relationship? 601
    B. How Strong Is the Association Between the Exposure and Disease? 602
    C. Is There a Dose–Response Relationship? 603
    D. Have the Results Been Replicated? 604
    E. Is the Association Biologically Plausible (Consistent with Existing Knowledge)? 604
    F. Have Alternative Explanations Been Considered? 605
    G. What Is the Effect of Ceasing Exposure? 605
    H. Does the Association Exhibit Specificity? 605
    I. Are the Findings Consistent with Other Relevant Knowledge? 606
  VI. What Methods Exist for Combining the Results of Multiple Studies? 606
  VII. What Role Does Epidemiology Play in Proving Specific Causation? 608
  VIII. Acknowledgments, 618
Glossary of Terms, 619
References on Epidemiology, 630
References on Law and Epidemiology, 630

# I. Introduction

Epidemiology is the field of public health and medicine that studies the incidence, distribution, and etiology of disease in human populations. The purpose of epidemiology is to better understand disease causation and to prevent disease in groups of individuals. Epidemiology assumes that disease is not distributed randomly in a group of individuals and that identifiable subgroups, including those exposed to certain agents, are at increased risk of contracting particular diseases.[1]

Judges and juries are regularly presented with epidemiologic evidence as the basis of an expert's opinion on causation.[2] In the courtroom, epidemiologic research findings are offered to establish or dispute whether exposure to an agent[3]

---

1. Although epidemiologists may conduct studies of beneficial agents that prevent or cure disease or other medical conditions, this reference guide refers exclusively to outcomes as diseases, because they are the relevant outcomes in most judicial proceedings in which epidemiology is involved.

2. Epidemiologic studies have been well received by courts deciding cases involving toxic substances. *See, e.g.,* Siharath v. Sandoz Pharms. Corp., 131 F. Supp. 2d 1347, 1356 (N.D. Ga. 2001) ("The existence of relevant epidemiologic studies can be a significant factor in proving general causation in toxic tort cases. Indeed, epidemiologic studies provide 'the primary generally accepted methodology for demonstrating a causal relation between a chemical compound and a set of symptoms or disease.'" (quoting Conde v. Velsicol Chem. Corp., 804 F. Supp. 972, 1025–26 (S.D. Ohio 1992))), *aff'd,* 295 F.3d 1194 (11th Cir. 2002); Berry v. CSX Transp., Inc., 709 So. 2d 552, 569 (Fla. Dist. Ct. App. 1998). Well-conducted studies are uniformly admitted. 3 Modern Scientific Evidence: The Law and Science of Expert Testimony § 23.1, at 187 (David L. Faigman et al. eds., 2007–08) [hereinafter Modern Scientific Evidence]. Since *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993), the predominant use of epidemiologic studies is in connection with motions to exclude the testimony of expert witnesses. Cases deciding such motions routinely address epidemiology and its implications for the admissibility of expert testimony on causation. Often it is not the investigator who conducted the study who is serving as an expert witness in a case in which the study bears on causation. *See, e.g.,* Kennedy v. Collagen Corp., 161 F.3d 1226 (9th Cir. 1998) (physician is permitted to testify about causation); DeLuca v. Merrell Dow Pharms., Inc., 911 F.2d 941, 953 (3d Cir. 1990) (a pediatric pharmacologist expert's credentials are sufficient pursuant to Fed. R. Evid. 702 to interpret epidemiologic studies and render an opinion based thereon); Medalen v. Tiger Drylac U.S.A., Inc., 269 F. Supp. 2d 1118, 1129 (D. Minn. 2003) (holding toxicologist could testify to general causation but not specific causation); Burton v. R.J. Reynolds Tobacco Co., 181 F. Supp. 2d 1256, 1267 (D. Kan. 2002) (a vascular surgeon was permitted to testify to general causation); Landrigan v. Celotex Corp., 605 A.2d 1079, 1088 (N.J. 1992) (an epidemiologist was permitted to testify to both general causation and specific causation); Trach v. Fellin, 817 A.2d 1102, 1117–18 (Pa. Super. Ct. 2003) (an expert who was a toxicologist and pathologist was permitted to testify to general and specific causation).

3. We use the term "agent" to refer to any substance external to the human body that potentially causes disease or other health effects. Thus, drugs, devices, chemicals, radiation, and minerals (e.g., asbestos) are all agents whose toxicity an epidemiologist might explore. A single agent or a number of independent agents may cause disease, or the combined presence of two or more agents may be necessary for the development of the disease. Epidemiologists also conduct studies of individual characteristics, such as blood pressure and diet, which might pose risks, but those studies are rarely of interest in judicial proceedings. Epidemiologists also may conduct studies of drugs and other pharmaceutical products to assess their efficacy and safety.

# III. How Should Results of an Epidemiologic Study Be Interpreted?

Epidemiologists are ultimately interested in whether a causal relationship exists between an agent and a disease. However, the first question an epidemiologist addresses is whether an association exists between exposure to the agent and disease. An association between exposure to an agent and disease exists when they occur together more frequently than one would expect by chance.[51] Although a causal relationship is one possible explanation for an observed association between an exposure and a disease, an association does not necessarily mean that there is a cause–effect relationship. Interpreting the meaning of an observed association is discussed below.

This section begins by describing the ways of expressing the existence and strength of an association between exposure and disease. It reviews ways in which an incorrect result can be produced because of the sampling methods used in all observational epidemiologic studies and then examines statistical methods for evaluating whether an association is real or the result of a sampling error.

The strength of an association between exposure and disease can be stated in various ways,[52] including as a relative risk, an odds ratio, or an attributable risk.[53] Each of these measurements of association examines the degree to which the risk of disease increases when individuals are exposed to an agent.

## A. Relative Risk

A commonly used approach for expressing the association between an agent and disease is relative risk ("RR"). It is defined as the ratio of the incidence rate (often referred to as incidence) of disease in exposed individuals to the incidence rate in unexposed individuals:

$$\text{RR} = \frac{\text{(Incidence rate in the exposed)}}{\text{(Incidence rate in the unexposed)}}$$

51. A negative association implies that the agent has a protective or curative effect. Because the concern in toxic substances litigation is whether an agent caused disease, this reference guide focuses on positive associations.

52. Another outcome measure is a risk difference. A risk difference is the difference between the proportion of disease in those exposed to the agent and the proportion of disease in those who were unexposed. Thus, in the example of relative risk in the text below discussing relative risk, the proportion of disease in those exposed is 40/100 and the proportion of disease in the unexposed is 20/100. The risk difference is 20/100.

53. Numerous courts have employed these measures of the strength of an association. *See, e.g., In re* Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig., 524 F. Supp. 2d 1166, 1172–74 (N.D. Cal. 2007); Cook v. Rockwell Int'l Corp., 580 F. Supp. 2d 1071, 1095 (D. Colo. 2006) (citing the second edition of this reference guide); *In re* W.R. Grace & Co., 355 B.R. 462, 482–83 (Bankr. D. Del. 2006).

The incidence rate of disease is defined as the number of cases of disease that develop during a specified period of time divided by the number of persons in the cohort under study.[54] Thus, the incidence rate expresses the risk that a member of the population will develop the disease within a specified period of time.

For example, a researcher studies 100 individuals who are exposed to an agent and 200 who are not exposed. After 1 year, 40 of the exposed individuals are diagnosed as having a disease, and 20 of the unexposed individuals also are diagnosed as having the disease. The relative risk of contracting the disease is calculated as follows:

- The incidence rate of disease in the exposed individuals is 40 cases per year per 100 persons (40/100), or 0.4.
- The incidence rate of disease in the unexposed individuals is 20 cases per year per 200 persons (20/200), or 0.1.
- The relative risk is calculated as the incidence rate in the exposed group (0.4) divided by the incidence rate in the unexposed group (0.1), or 4.0.

A relative risk of 4.0 indicates that the risk of disease in the exposed group is four times as high as the risk of disease in the unexposed group.[55]

In general, the relative risk can be interpreted as follows:

- If the relative risk equals 1.0, the risk in exposed individuals is the same as the risk in unexposed individuals.[56] There is no association between exposure to the agent and disease.
- If the relative risk is greater than 1.0, the risk in exposed individuals is greater than the risk in unexposed individuals. There is a positive association between exposure to the agent and the disease, which could be causal.
- If the relative risk is less than 1.0, the risk in exposed individuals is less than the risk in unexposed individuals. There is a negative association, which could reflect a protective or curative effect of the agent on risk of disease. For example, immunizations lower the risk of disease. The results suggest that immunization is associated with a decrease in disease and may have a protective effect on the risk of disease.

Although relative risk is a straightforward concept, care must be taken in interpreting it. Whenever an association is uncovered, further analysis should be

---

54. Epidemiologists also use the concept of prevalence, which measures the existence of disease in a population at a given point in time, regardless of when the disease developed. Prevalence is expressed as the proportion of the population with the disease at the chosen time. *See* Gordis, *supra* note 32, at 43–47.

55. *See* DeLuca v. Merrell Dow Pharms., Inc., 911 F.2d 941, 947 (3d Cir. 1990); Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp. 2d 584, 591 (D.N.J. 2002).

56. *See Magistrini*, 180 F. Supp. 2d at 591.

conducted to assess whether the association is real or a result of sampling error, confounding, or bias.[57] These same sources of error may mask a true association, resulting in a study that erroneously finds no association.

## B. Odds Ratio

The odds ratio ("OR") is similar to a relative risk in that it expresses in quantitative terms the association between exposure to an agent and a disease.[58] It is a convenient way to estimate the relative risk in a case–control study when the disease under investigation is rare.[59] The odds ratio approximates the relative risk when the disease is rare.[60]

In a case–control study, the odds ratio is the ratio of the odds that a case (one with the disease) was exposed to the odds that a control (one without the disease) was exposed. In a cohort study, the odds ratio is the ratio of the odds of developing a disease when exposed to a suspected agent to the odds of developing the disease when not exposed.

Consider a case–control study, with results as shown schematically in a 2 × 2 table (Table 2):

Table 2. Cross-tabulation of cases and controls by exposure status

|  | Cases (with disease) | Controls (no disease) |
|---|---|---|
| Exposed | *a* | *b* |
| Not exposed | *c* | *d* |

In a case–control study,

$$\text{OR} = \frac{\text{(Odds that a case was exposed)}}{\text{(Odds that a control was exposed)}}.$$

57. *See infra* Sections IV.B–C.

58. A relative risk cannot be calculated for a case–control study, because a case–control study begins by examining a group of persons who already have the disease. That aspect of the study design prevents a researcher from determining the rate at which individuals develop the disease. Without a rate or incidence of disease, a researcher cannot calculate a relative risk.

59. If the disease is not rare, the odds ratio is still valid to determine whether an association exists, but interpretation of its magnitude is less intuitive.

60. *See* Marcello Pagano & Kimberlee Gauvreau, Principles of Biostatistics 354 (2d ed. 2000). For further detail about the odds ratio and its calculation, see Kahn & Sempos, *supra* note 31, at 47–56.

the number in the reference population that would be expected if the reference population had the age distribution of the population of interest.

This ratio is called the standardized mortality ratio (SMR). When the outcome of interest is disease rather than death, it is called the standardized morbidity ratio.[65] If the ratio equals 1.0, the observed number of deaths equals the expected number of deaths, and the mortality rate of the population of interest is no different from that of the reference population. If the SMR is greater than 1.0, the population of interest has a higher mortality risk than that of the reference population, and if the SMR is less than 1.0, the population of interest has a lower mortality rate than that of the reference population.

Thus, age adjustment provides a way to compare populations while in effect holding age constant. Adjustment is used not only for comparing mortality rates in different populations but also for comparing rates in different groups of subjects selected for study in epidemiologic investigations. Although this discussion has focused on adjusting for age, it is also possible to adjust for any number of other variables, such as gender, race, occupation, and socioeconomic status. It is also possible to adjust for several factors simultaneously.[66]

# IV. What Sources of Error Might Have Produced a False Result?

Incorrect study results occur in a variety of ways. A study may find a positive association (relative risk greater than 1.0) when there is no true association. Or a study may erroneously result in finding that that there is no association when in reality there is. A study may also find an association when one truly exists, but the association found may be greater or less than the real association.

Three general categories of phenomena can result in an association found in a study to be erroneous: chance, bias, and confounding. Before any inferences about causation are drawn from a study, the possibility of these phenomena must be examined.[67]

---

65. *See* Taylor v. Airco, Inc., 494 F. Supp. 2d 21, 25 n.4 (D. Mass. 2007) (explaining SMR and its relationship with relative risk). For an example of adjustment used to calculate an SMR for workers exposed to benzene, see Robert A. Rinsky et al., *Benzene and Leukemia: An Epidemiologic Risk Assessment,* 316 New Eng. J. Med. 1044 (1987).

66. For further elaboration on adjustment, see Gordis, *supra* note 32, at 73–78; Philip Cole, *Causality in Epidemiology, Health Policy, and Law,* 27 Envtl. L. Rep. 10,279, 10,281 (1997).

67. *See* Cole, *supra* note 65, at 10,285. In *DeLuca v. Merrell Dow Pharmaceuticals, Inc.,* 911 F.2d 941, 955 (3d Cir. 1990), the court recognized and discussed random sampling error. It then went on to refer to other errors (e.g., systematic bias) that create as much or more error in the outcome of a study. For a similar description of error in study procedure and random sampling, see David H. Kaye & David A. Freedman, Reference Guide on Statistics, Section IV, in this manual.

The findings of a study may be the result of chance (or random error). In designing a study, the size of the sample can be increased to reduce (but not eliminate) the likelihood of random error. Once a study has been completed, statistical methods (discussed in Section IV.A) permit an assessment of the extent to which the results of a study may be due to random error.

The two main techniques for assessing random error are statistical significance and confidence intervals. A study that is statistically significant has results that are unlikely to be the result of random error, although any criterion for "significance" is somewhat arbitrary. A confidence interval provides both the relative risk (or other risk measure) found in the study and a range (interval) within which the risk likely would fall if the study were repeated numerous times. These two techniques (which are closely related) are explained in Section IV.A.

We should emphasize a matter that those unfamiliar with statistical methodology frequently find confusing: That a study's results are statistically significant says nothing about the importance of the magnitude of any association (i.e., the relative risk or odds ratio) found in a study or about the biological or clinical importance of the finding.[68] "Significant," as used with the adjective "statistically," does not mean important. A study may find a statistically significant relationship that is quite modest—perhaps it increases the risk only by 5%, which is equivalent to a relative risk of 1.05.[69] An association may be quite large—the exposed cohort might be 10 times more likely to develop disease than the control group—but the association is not statistically significant because of the potential for random error given a small sample size. In short, *statistical significance is not about the size of the risk found in a study*.

Bias (or systematic error) also can produce error in the outcome of a study. Epidemiologists attempt to minimize bias through their study design, including data collection protocols. Study designs are developed before they begin gathering data. However, even the best designed and conducted studies have biases, which may be subtle. Consequently, after data collection is completed, analytical tools are often used to evaluate potential sources of bias. Sometimes, after bias is identified, the epidemiologist can determine whether the bias would tend to inflate or dilute any association that may exist. Identification of the bias may permit the

---

68. *See* Modern Scientific Evidence, *supra* note 2, § 6.36 at 358 ("Statisticians distinguish between 'statistical' and 'practical' significance. . . ."); Cole, *supra* note 65, at 10,282. Understandably, some courts have been confused about the relationship between statistical significance and the magnitude of the association. *See* Hyman & Armstrong, P.S.C. v. Gunderson, 279 S.W.3d 93, 102 (Ky. 2008) (describing a small increased risk as being considered statistically insignificant and a somewhat larger risk as being considered statistically significant.); *In re* Pfizer Inc. Sec. Litig., 584 F. Supp. 2d 621, 634–35 (S.D.N.Y. 2008) (confusing the magnitude of the effect with whether the effect was statistically significant); *In re* Joint E. & S. Dist. Asbestos Litig., 827 F. Supp. 1014, 1041 (S.D.N.Y. 1993) (concluding that any relative risk less than 1.50 is statistically insignificant), *rev'd on other grounds,* 52 F.3d 1124 (2d Cir. 1995).

69. In general, small effects that are statistically significant require larger sample sizes. When effects are larger, generally fewer subjects are required to produce statistically significant findings.

epidemiologist to make an assessment of whether the study's conclusions are valid. Epidemiologists may reanalyze a study's data to correct for a bias identified in a completed study or to validate the analytical methods used.[70] Common biases and how they may produce invalid results are described in Section IV.B.

Finally, a study may reach incorrect conclusions about causation because, although the agent and disease are associated, the agent is not a true causal factor. Rather, the agent may be associated with another agent that is the true causal factor, and this latter factor confounds the relationship being examined in the study. Confounding is explained in Section IV.C.

## A. What Statistical Methods Exist to Evaluate the Possibility of Sampling Error?[71]

Before detailing the statistical methods used to assess random error (which we use as synonymous with sampling error), two concepts are explained that are central to epidemiology and statistical analysis. Understanding these concepts should facilitate comprehension of the statistical methods.

Epidemiologists often refer to the true association (also called "real association"), which is the association that really exists between an agent and a disease and that might be found by a perfect (but nonexistent) study. The true association is a concept that is used in evaluating the results of a given study even though its value is unknown. By contrast, a study's outcome will produce an observed association, which is known.

Formal procedures for statistical testing begin with the null hypothesis, which posits that there is no true association (i.e., a relative risk of 1.0) between the agent and disease under study. Data are gathered and analyzed to see whether they disprove[72] the null hypothesis. The data are subjected to statistical testing to assess the plausibility that any association found is a result of random error or whether it supports rejection of the null hypothesis. The use of the null hypothesis for this testing should not be understood as the a priori belief of the investigator. When epidemiologists investigate an agent, it is usually because they hypothesize that the agent is a cause of some outcome. Nevertheless, epidemiologists prepare their

70. *E.g.,* Richard A. Kronmal et al., *The Intrauterine Device and Pelvic Inflammatory Disease: The Women's Health Study Reanalyzed,* 44 J. Clin. Epidemiol. 109 (1991) (a reanalysis of a study that found an association between the use of IUDs and pelvic inflammatory disease concluded that IUDs do not increase the risk of pelvic inflammatory disease).

71. For a bibliography on the role of statistical significance in legal proceedings, see Sanders, *supra* note 13, at 329 n.138.

72. *See, e.g.,* Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 593 (1993) (scientific methodology involves generating and testing hypotheses).

The scientific validity of the research findings is influenced by the reliability of the diagnosis of disease or health status under study.[116] The disease must be one that is recognized and defined to enable accurate diagnoses.[117] Subjects' health status may be essential to the hypothesis under investigation. For example, a researcher interested in studying spontaneous abortion in the first trimester must determine that study subjects are pregnant. Diagnostic criteria that are accepted by the medical community should be used to make the diagnosis. If a diagnosis had been made at a time when home pregnancy kits were known to have a high rate of false-positive results (indicating pregnancy when the woman is not pregnant), the study will overestimate the number of spontaneous abortions.

Misclassification bias is a consequence of information bias in which, because of problems with the information available, individuals in the study may be misclassified with regard to exposure status or disease status. Bias due to exposure misclassification can be differential or nondifferential. In nondifferential misclassification, the inaccuracies in determining exposure are independent of disease status, or the inaccuracies in diagnoses are independent of exposure status—in other words, the data are crude, with a great deal of random error. This is a common problem. Generally, nondifferential misclassification bias leads to a shift in the odds ratio toward one, or, in other words, toward a finding of no effect. Thus, if the errors are nondifferential, it is generally misguided to criticize an apparent association between an exposure and disease on the ground that data were inaccurately classified. Instead, nondifferential misclassification generally underestimates the true size of the association.

Differential misclassification is systematic error in determining exposure in cases as compared with controls, or disease status in unexposed cohorts relative to exposed cohorts. In a case–control study this would occur, for example, if, in the

---

116. In *In re Swine Flu Immunization Products Liability Litigation,* 508 F. Supp. 897, 903 (D. Colo. 1981), *aff'd sub nom. Lima v. United States,* 708 F.2d 502 (10th Cir. 1983), the court critically evaluated a study relied on by an expert whose testimony was stricken. In that study, determination of whether a patient had Guillain-Barré syndrome was made by medical clerks, not physicians who were familiar with diagnostic criteria.

117. The difficulty of ill-defined diseases arose in some of the silicone gel breast implant cases. Thus, in *Grant v. Bristol-Myers Squibb,* 97 F. Supp. 2d 986 (D. Ariz. 2000), in the face of a substantial body of exonerative epidemiologic evidence, the female plaintiff alleged she suffered from an atypical systemic joint disease. The court concluded:

> As a whole, the Court finds that the evidence regarding systemic disease as proposed by Plaintiffs' experts is not scientifically valid and therefore will not assist the trier of fact. As for the atypical syndrome that is suggested, where experts propose that breast implants cause a disease but cannot specify the criteria for diagnosing the disease, it is incapable of epidemiologic testing. This renders the experts' methods insufficiently reliable to help the jury.

*Id*. at 992; *see also* Burton v. Wyeth-Ayerst Labs., 513 F. Supp. 2d 719, 722–24 (N.D. Tex. 2007) (parties disputed whether cardiology problem involved two separate diseases or only one; court concluded that all experts in the case reflected a view that there was but a single disease); *In re* Breast Implant Cases, 942 F. Supp. 958, 961 (E.D.N.Y. & S.D.N.Y. 1996).

process of anguishing over the possible causes of the disease, parents of ill children recalled more exposures to a particular agent than actually occurred, or if parents of the controls, for whom the issue was less emotionally charged, recalled fewer. This can also occur in a cohort study in which, for example, birth control users (the exposed cohort) are monitored more closely for potential side effects, leading to a higher rate of disease identification in that cohort than in the unexposed cohort. Depending on how the misclassification occurs, a differential bias can produce an error in either direction—the exaggeration or understatement of a true association.

### 3. Other conceptual problems

There are dozens of other potential biases that can occur in observational studies, which is an important reason why clinical studies (when ethical) are often preferable. Sometimes studies are limited by flawed definitions or premises. For example, if the researcher defines the disease of interest as all birth defects, rather than a specific birth defect, there should be a scientific basis to hypothesize that the effects of the agent being investigated could be so broad. If the effect is in fact more limited, the result of this conceptualization error could be to dilute or mask any real effect that the agent might have on a specific type of birth defect.[118]

Some biases go beyond errors in individual studies and affect the overall body of available evidence in a way that skews what appears to be the universe of evidence. Publication bias is the tendency for medical journals to prefer studies that find an effect.[119] If negative studies are never published, the published literature will be biased. Financial conflicts of interest by researchers and the source of funding of studies have been shown to have an effect on the outcomes of such studies.[120]

---

118. In *Brock v. Merrell Dow Pharmaceuticals, Inc.,* 874 F.2d 307, 312 (5th Cir. 1989), the court discussed a reanalysis of a study in which the effect was narrowed from all congenital malformations to limb reduction defects. The magnitude of the association changed by 50% when the effect was defined in this narrower fashion. *See* Rothman et al. *supra* note 61, at 144 ("Unwarranted assurances of a lack of any effect can easily emerge from studies in which a wide range of etiologically unrelated outcomes are grouped.").

119. Investigators may contribute to this effect by neglecting to submit negative studies for publication.

120. *See* Jerome P. Kassirer, On the Take: How Medicine's Complicity with Big Business Can Endanger Your Health 79–84 (2005); J.E. Bekelman et al., *Scope and Impact of Financial Conflicts of Interest in Biomedical Research: A Systematic Review,* 289 JAMA 454 (2003). Richard Smith, the editor in chief of the British Medical Journal, wrote on this subject:

> The major determinant of whether reviews of passive smoking concluded it was harmful was whether the authors had financial ties with tobacco manufacturers. In the disputed topic of whether third-generation contraceptive pills cause an increase in thromboembolic disease, studies funded by the pharmaceutical industry find that they don't and studies funded by public money find that they do.

Richard Smith, *Making Progress with Competing Interests,* 325 Brit. Med. J. 1375, 1376 (2002).

Examining a study for potential sources of bias is an important task that helps determine the accuracy of a study's conclusions. In addition, when a source of bias is identified, it may be possible to determine whether the error tended to exaggerate or understate the true association. Thus, bias may exist in a study that nevertheless has probative value.

Even if one concludes that the findings of a study are statistically stable and that biases have not created significant error, additional considerations remain. As repeatedly noted, an association does not necessarily mean a causal relationship exists. To make a judgment about causation, a knowledgeable expert[121] must consider the possibility of confounding factors. The expert must also evaluate several criteria to determine whether an inference of causation is appropriate.[122] These matters are discussed below.

## C. Could a Confounding Factor Be Responsible for the Study Result?[123]

The third major reason for error in epidemiologic studies is confounding. Confounding occurs when another causal factor (the confounder) confuses the relationship between the agent of interest and outcome of interest.[124] (Confounding and selection bias (Section IV.B.1, *supra*) can, depending on terminology, overlap.) Thus, one instance of confounding is when a confounder is both a risk factor for the disease and a factor associated with the exposure of interest. For example, researchers may conduct a study that finds individuals with gray hair have a higher rate of death than those with hair of another color. Instead of hair color having an impact on death, the results might be explained by the confounding factor of age. If old age is associated differentially with the gray-haired group (those with gray hair tend to be older), old age may be responsible for the association found between hair color and death.[125] Researchers must separate the relationship between gray hair and risk of death from that of old age and risk of death. When researchers find an association between an agent and a disease, it is critical to determine whether the association is causal or the result of confounding.[126] Some

---

121. In a lawsuit, this would be done by an expert. In science, the effort is usually conducted by a panel of experts.

122. For an excellent example of the authors of a study analyzing whether an inference of causation is appropriate in a case-control study examining whether bromocriptine (Parlodel)—a lactation suppressant—causes seizures in postpartum women, see Kenneth J. Rothman et al., *Bromocriptine and Puerpal Seizures,* 1 Epidemiology 232, 236–38 (1990).

123. *See* Grassis v. Johns-Manville Corp., 591 A.2d 671, 675 (N.J. Super. Ct. App. Div. 1991) (discussing the possibility that confounders may lead to an erroneous inference of a causal relationship).

124. *See* Rothman et al., *supra* note 61, at 129.

125. This example is drawn from Kahn & Sempos, *supra* note 31, at 63.

126. Confounding can bias a study result by either exaggerating or diluting any true association. One example of a confounding factor that may result in a study's outcome understating an

epidemiologists classify confounding as a form of bias. However, confounding is a reality—that is, the observed association of a factor and a disease is actually the result of an association with a third, confounding factor.[127]

Confounding can be illustrated by a hypothetical prospective cohort study of the role of alcohol consumption and emphysema. The study is designed to investigate whether drinking alcohol is associated with emphysema. Participants are followed for a period of 20 years and the incidence of emphysema in the "exposed" (participants who consume more than 15 drinks per week) and the unexposed is compared. At the conclusion of the study, the relative risk of emphysema in the drinking group is found to be 2.0, an association that suggests a possible effect). But does this association reflect a true causal relationship or might it be the product of confounding?

One possibility for a confounding factor is smoking, a known causal risk factor for emphysema. If those who drink alcohol are more likely to be smokers than those who do not drink, then smoking may be responsible for some or all of the higher level of emphysema among those who do not drink.

A serious problem in observational studies such as this hypothetical study is that the individuals are not assigned randomly to the groups being compared.[128] As discussed above, randomization maximizes the possibility that exposures other than the one under study are evenly distributed between the exposed and the control cohorts.[129] In observational studies, by contrast, other forces, including self-selection, determine who is exposed to other (possibly causal) factors. The lack of randomization leads to the potential problem of confounding. Thus, for example, the exposed cohort might consist of those who are exposed at work to an agent suspected of being an industrial toxin. The members of this cohort may, however, differ from unexposed controls by residence, socioeconomic or health status, age, or other extraneous factors.[130] These other factors may be causing (or

---

association is vaccination. Thus, if a group exposed to an agent has a higher rate of vaccination for the disease under study than the unexposed group, the vaccination may reduce the rate of disease in the exposed group, thereby producing an association that is less than the true association without the confounding of vaccination.

127. *Schwab v. Philip Morris USA, Inc.,* 449 F. Supp. 2d 992, 1199–1200 (E.D.N.Y. 2006), *rev'd on other grounds,* 522 F.3d 215 (2d Cir. 2008), describes confounding that led to premature conclusions that low-tar cigarettes were safer than regular cigarettes. Smokers who chose to switch to low-tar cigarettes were different from other smokers in that they were more health conscious in other aspects of their lifestyles. Failure to account for that confounding—and measuring a healthy lifestyle is difficult even if it is identified as a potential confounder—biased the results of those studies.

128. Randomization attempts to ensure that the presence of a characteristic, such as coffee drinking, is governed by chance, as opposed to being determined by the presence of an underlying medical condition.

129. *See* Rothman et al., *supra* note 61, at 129; *see also supra* Section II.A.

130. *See, e.g., In re* "Agent Orange" Prod. Liab. Litig., 597 F. Supp. 740, 783 (E.D.N.Y. 1984) (discussing the problem of confounding that might result in a study of the effect of exposure to Agent Orange on Vietnam servicemen), *aff'd,* 818 F.2d 145 (2d Cir. 1987).

protecting against) the disease, but because of potential confounding, an apparent (yet false) association of the disease with exposure to the agent may appear. Confounders, like smoking in the alcohol drinking study, do not reflect an error made by the investigators; rather, they reflect the inherently "uncontrolled" nature of exposure designations in observational studies. When they can be identified, confounders should be taken into account. Unanticipated confounding factors that are suspected after data collection can sometimes be controlled during data analysis, if data have been gathered about them.

To evaluate whether smoking is a confounding factor, the researcher would stratify each of the exposed and control groups into smoking and nonsmoking subgroups to examine whether subjects' smoking status affects the study results. If the relationship between alcohol drinking and emphysema in the smoking subgroups is the same as that in the all-subjects group, smoking is not a confounding factor. If the subjects' smoking status affects the relationship between drinking and emphysema, then smoking is a confounder, for which adjustment is required. If the association between drinking and emphysema completely disappears when the subjects' smoking status is considered, then smoking is a confounder that fully accounts for the association with drinking observed. Table 4 reveals our hypothetical study's results, with smoking being a confounding factor, which, when accounted for, eliminates the association. Thus, in the full cohort, drinkers have twice the risk of emphysema compared with nondrinkers. When the relationship between drinking and emphysema is examined separately in smokers and in nonsmokers, the risk of emphysema in drinkers compared with nondrinkers is not elevated in smokers or in nonsmokers. This is because smokers are disproportionately drinkers and have a higher rate of emphysema than nonsmokers. Thus, the relationship between drinking and emphysema in the full cohort is distorted by failing to take into account the relationship between being a drinker and a smoker.

Even after accounting for the effect of smoking, there is always a risk that an undiscovered or unrecognized confounding factor may contribute to a study's findings, by either magnifying or reducing the observed association.[131] It is, however, necessary to keep that risk in perspective. Often the mere possibility of uncontrolled confounding is used to call into question the results of a study. This was certainly the strategy of some seeking, or unwittingly helping, to undermine the implications of the studies persuasively linking cigarette smoking to lung cancer. The critical question is whether it is plausible that the findings of a given study could indeed be due to unrecognized confounders.

In designing a study, researchers sometimes make assumptions that cannot be validated or evaluated empirically. Thus, researchers may assume that a missing potential confounder is not needed for the analysis or that a variable used was adequately classified. Researchers employ a sensitivity analysis to assess the effect of those assumptions should they be incorrect. Conducting a sensitivity analysis

131. Rothman et al., *supra* note 61, at 129; *see also supra* Section II.A.

593

Table 4. Hypothetical Emphysema Study Data[a]

| Drinking Status | Total Cohort | | | | Smokers | | | | Nonsmokers | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | Cases | Incidence | RR | Total | Cases | Incidence | RR | Total | Cases | Incidence | RR |
| Nondrinkers | 471 | 16 | 0.034 | 1.0[b] | 111 | 9 | 0.081 | 1.0[b] | 360 | 7 | 0.019 | 1.0[b] |
| Drinkers | 739 | 41 | 0.069 | 2.0 | 592 | 48 | 0.081 | 1.0 | 147 | 3 | 0.020 | 1.0 |

[a] The incidence of disease is not normally presented in an epidemiologic study, but we include it here to aid in comprehension of the ideas discussed in the text.
[b] RR = relative risk. The relative risk for each of the cohorts is determined based on reference to the risk among nondrinkers; that is, the incidence of disease among drinkers is compared with nondrinkers for each of the three cohorts separately.

594

entails repeating the analysis using different assumptions (e.g., alternative corrections for missing data or for classifying data) to see if the results are sensitive to the varying assumptions. Such analyses can show that the assumptions are not likely to affect the findings or that alternative explanations cannot be ruled out.[132]

### 1. What techniques can be used to prevent or limit confounding?

Choices in the design of a research project (e.g., methods for selecting the subjects) can prevent or limit confounding. In designing a study, the researcher must determine other risk factors for the disease under study. When a factor or factors, such as age, sex, or even smoking status, are risk factors and potential confounders in a study, investigators can limit the differential distribution of these factors in the study groups by selecting controls to "match" (or the exposed group) in terms of these variables. If the two groups are matched, for example, by age, then any association observed in the study cannot be due to age, the matched variable.[133]

Restricting the persons who are permitted as subjects in a study is another method to control for confounders. If age or sex is suspected as a confounder, then the subjects enrolled in a study can be limited to those of one sex and those who are within a specified age range. When there is no variance among subjects in a study with regard to a potential confounder, confounding as a result of that variable is eliminated.

### 2. What techniques can be used to identify confounding factors?

Once the study data are ready to be analyzed, the researcher must assess a range of factors that could influence risk. In the hypothetical study, the researcher would evaluate whether smoking is a confounding factor by comparing the incidence of emphysema in smoking alcohol drinkers with the incidence in nonsmoking alcohol drinkers. If the incidence is substantially the same, smoking is not a confounding factor (e.g., smoking does not distort the relationship between alcohol drinking and the development of emphysema). If the incidence is substantially different, but still exists in the nonsmoking group, then smoking is a confounder, but does not wholly account for the association with alcohol drinking. If the association disappears, then smoking is a confounder that fully accounts for the association observed.

---

132. Kenneth Rothman & Sander Greenland, Modern Epidemiology (2d ed. 1998).

133. Selecting a control population based on matched variables necessarily affects the representativeness of the selected controls and may affect how generalizable the study results are to the population at large. However, for a study to have merit, it must first be internally valid; that is, it must not be subject to unreasonable sources of bias or confounding. Only after a study has been shown to meet this standard does its universal applicability or generalizability to the population at large become an issue. When a study population is not representative of the general or target population, existing scientific knowledge may permit reasonable inferences about the study's broader applicability, or additional confirmatory studies of other populations may be necessary.

*Reference Manual on Scientific Evidence*

### 3. What techniques can be used to control for confounding factors?

A good study design will consider potential confounders and obtain data about them if possible. If researchers have good data on potential confounders, they can control for those confounders in the data analysis. There are several analytic approaches to account for the distorting effects of a confounder, including stratification or multivariate analysis. Stratification permits an investigator to evaluate the effect of a suspected confounder by subdividing the study groups based on a confounding factor. Thus, in Table 4, drinkers have been stratified based on whether they smoke (the suspected confounder). To take another example that entails a continuous rather than dichotomous potential confounder, let us say we are interested in the relationship between smoking and lung cancer but suspect that air pollution or urbanization may confound the relationship. Thus, an observed relationship between smoking and lung cancer could theoretically be due in part to pollution, if smoking were more common in polluted areas. We could address this issue by stratifying our data by degree of urbanization and look at the relationship between smoking and lung cancer in each urbanization stratum. Figure 5 shows actual age-adjusted lung cancer mortality rates per 100,000 person-years by urban or rural classification and smoking category.[134]

Figure 5: Age-adjusted lung cancer mortality rates per 100,000 person-years by urban or rural classification and smoking category.



*Source:* Adapted from E. Cuyler Hammond & Daniel Horn, *Smoking and Death Rates—Report on Forty-Four Months of Follow-Up of 187,783 Men: II, Death Rates by Cause*, 166 JAMA 1294 (1958).

134. This example and Figure 4 are from Leon Gordis, Epidemiology 254 (4th ed. 2009).

For each degree of urbanization, lung cancer mortality rates in smokers are shown by the dark gray bars, and nonsmoker mortality rates are indicated by light gray bars. From these data we see that in every level (or stratum) of urbanization, lung cancer mortality is higher in smokers than in nonsmokers. Therefore, the observed association of smoking and lung cancer cannot be attributed to level of urbanization. By examining each stratum separately, we, in effect, hold urbanization constant, and still find much higher lung cancer mortality in smokers than in nonsmokers.

For each degree of urbanization, lung cancer mortality rates and smokers are shown by the dark-colored bars, and nonsmoker mortality rates are indicated by light-colored bars. For these data we see that in every level (or stratum) of urbanization, lung cancer mortality is higher in smokers than in nonsmokers. Therefore, the observed association of lung cancer cannot be attributed to level of urbanization. By examining each stratum separately, we are, in effect, holding urbanization constant, and we still find much higher lung cancer mortality in smokers than in nonsmokers.

Multivariate analysis controls for the confounding factor through mathematical modeling. Models are developed to describe the simultaneous effect of exposure and confounding factors on the increase in risk.[135]

Both of these methods allow for adjustment of the effect of confounders. They both modify an observed association to take into account the effect of risk factors that are not the subject of the study and that may distort the association between the exposure being studied and the disease outcomes. If the association between exposure and disease remains after the researcher completes the assessment and adjustment for confounding factors, the researcher must then assess whether an inference of causation is justified. This entails consideration of the Hill factors explained in Section V, *infra*.

# V. General Causation: Is an Exposure a Cause of the Disease?

Once an association has been found between exposure to an agent and development of a disease, researchers consider whether the association reflects a true cause–effect relationship. When epidemiologists evaluate whether a cause–effect relationship exists between an agent and disease, they are using the term causation in a way similar to, but not identical to, the way that the familiar "but for," or sine qua non, test is used in law for cause in fact. "Conduct is a factual cause of

---

135. For a more complete discussion of multivariate analysis, see Daniel L. Rubinfeld, Reference Guide on Multiple Regression, in this manual.

[harm] when the harm would not have occurred absent the conduct."[136] This is equivalent to describing the conduct as a necessary link in a chain of events that results in the particular event.[137] Epidemiologists use causation to mean that an increase in the incidence of disease among the exposed subjects would not have occurred had they not been exposed to the agent.[138] Thus, exposure is a necessary condition for the increase in the incidence of disease among those exposed.[139] The relationship between the epidemiologic concept of cause and the legal question of whether exposure to an agent caused an individual's disease is addressed in Section VII.

As mentioned in Section I, epidemiology cannot prove causation; rather, causation is a judgment for epidemiologists and others interpreting the epidemiologic data.[140] Moreover, scientific determinations of causation are inherently tentative. The scientific enterprise must always remain open to reassessing the validity of past judgments as new evidence develops.

In assessing causation, researchers first look for alternative explanations for the association, such as bias or confounding factors, which are discussed in Section IV, *supra*. Once this process is completed, researchers consider how guidelines for inferring causation from an association apply to the available evidence. We emphasize that these guidelines are employed only *after* a study finds an association

---

136. Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 26 (2010); *see also* Dan B. Dobbs, The Law of Torts § 168, at 409–11 (2000). When multiple causes are each operating and capable of causing an event, the but-for, or necessary-condition, concept for causation is problematic. This is the familiar "two-fires" scenario in which two independent fires simultaneously burn down a house and is sometimes referred to as overdetermined outcomes. Neither fire is a but-for, or necessary condition, for the destruction of the house, because either fire would have destroyed the house. *See* Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 28 (2010). This two-fires situation is analogous to an individual being exposed to two agents, each of which is capable of causing the disease contracted by the individual. *See* Basko v. Sterling Drug, Inc., 416 F.2d 417 (2d Cir. 1969). A difference between the disease scenario and the fire scenario is that, in the former, one will have no more than a probabilistic assessment of whether each of the exposures would have caused the disease in the individual.

137. *See supra* note 7; *see also* Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 26 cmt. c (2010) (employing a "causal set" model to explain multiple elements, each of which is required for an outcome).

138. "The imputed causal association is at the group level, and does not indicate the cause of disease in individual subjects." Bruce G. Charlton, *Attribution of Causation in Epidemiology: Chain or Mosaic?* 49 J. Clin. Epidemiology 105, 105 (1999).

139. *See* Rothman et al., *supra* note 61, at 8 ("We can define a cause of a specific disease event as an antecedent event, condition, or characteristic that was necessary for the occurrence of the disease at the moment it occurred, given that other conditions are fixed."); Allen v. United States, 588 F. Supp. 247, 405 (D. Utah 1984) (quoting a physician on the meaning of the statement that radiation causes cancer), *rev'd on other grounds,* 816 F.2d 1417 (10th Cir. 1987).

140. Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 28 cmt. c (2010) ("[A]n evaluation of data and scientific evidence to determine whether an inference of causation is appropriate requires judgment and interpretation.").

*Reference Guide on Epidemiology*

to determine whether that association reflects a true causal relationship.[141] These guidelines consist of several key inquiries that assist researchers in making a judgment about causation.[142] Generally, researchers are conservative when it comes to assessing causal relationships, often calling for stronger evidence and more research before a conclusion of causation is drawn.[143]

The factors that guide epidemiologists in making judgments about causation (and there is no threshold number that must exist) are[144]

141.  In a number of cases, experts attempted to use these guidelines to support the existence of causation in the absence of any epidemiologic studies finding an association. *See, e.g.,* Rains v. PPG Indus., Inc., 361 F. Supp. 2d 829, 836–37 (S.D. Ill. 2004) (explaining Hill criteria and proceeding to apply them even though there was no epidemiologic study that found an association); Soldo v. Sandoz Pharms. Corp., 244 F. Supp. 2d 434, 460–61 (W.D. Pa. 2003). There may be some logic to that effort, but it does not reflect accepted epidemiologic methodology. *See In re* Fosamax Prods. Liab. Litig., 645 F. Supp. 2d 164, 187–88 (S.D.N.Y. 2009); Dunn v. Sandoz Pharms. Corp., 275 F. Supp. 2d 672, 678–79 (M.D.N.C. 2003) ("The greater weight of authority supports Sandoz' assertion that [use of] the Bradford Hill criteria is a method for determining whether the results of an epidemiologic study can be said to demonstrate causation and not a method for testing an unproven hypothesis."); *Soldo,* 244 F. Supp. 2d at 514 (the Hill criteria "were developed as a mean[s] of interpreting an established association based on a body of epidemiologic research for the purpose of trying to judge whether the observed association reflects a causal relation between an exposure and disease." (quoting report of court-appointed expert)).

142.  *See* Mervyn Susser, Causal Thinking in the Health Sciences: Concepts and Strategies in Epidemiology (1973); Gannon v. United States, 571 F. Supp. 2d 615, 624 (E.D. Pa. 2007) (quoting expert who testified that the Hill criteria are "'well-recognized' and widely used in the science community to assess general causation"); Chapin v. A & L Parts, Inc., 732 N.W.2d 578, 584 (Mich. Ct. App. 2007) (expert testified that Hill criteria are the most well-utilized method for determining if an association is causal).

143.  Berry v. CSX Transp., Inc., 709 So. 2d 552, 568 n.12 (Fla. Dist. Ct. App. 1998) ("Almost all genres of research articles in the medical and behavioral sciences conclude their discussion with qualifying statements such as 'there is still much to be learned.' This is not, as might be assumed, an expression of ignorance, but rather an expression that all scientific fields are open-ended and can progress from their present state. . . ."); Hall v. Baxter Healthcare Corp., 947 F. Supp. 1387 app. B. at 1446–51 (D. Or. 1996) (report of Merwyn R. Greenlick, court-appointed epidemiologist). In *Cadarian v. Merrell Dow Pharmaceuticals, Inc.,* 745 F. Supp. 409 (E.D. Mich. 1989), the court refused to permit an expert to rely on a study that the authors had concluded should not be used to support an inference of causation in the absence of independent confirmatory studies. The court did not address the question whether the degree of certainty used by epidemiologists before making a conclusion of cause was consistent with the legal standard. *See* DeLuca v. Merrell Dow Pharms., Inc., 911 F.2d 941, 957 (3d Cir. 1990) (standard of proof for scientific community is not necessarily appropriate standard for expert opinion in civil litigation); Wells v. Ortho Pharm. Corp., 788 F.2d 741, 745 (11th Cir. 1986).

144.  *See* Cook v. Rockwell Int'l Corp., 580 F. Supp. 2d 1071, 1098 (D. Colo. 2006) ("Defendants cite no authority, scientific or legal, that compliance with all, or even one, of these factors is required. . . . The scientific consensus is, in fact, to the contrary. It identifies Defendants' list of factors as some of the nine factors or lenses that guide epidemiologists in making judgments about causation. . . . These factors are not tests for determining the reliability of any study or the causal inferences drawn from it.").

1. Temporal relationship,
2. Strength of the association,
3. Dose–response relationship,
4. Replication of the findings,
5. Biological plausibility (coherence with existing knowledge),
6. Consideration of alternative explanations,
7. Cessation of exposure,
8. Specificity of the association, and
9. Consistency with other knowledge.

There is no formula or algorithm that can be used to assess whether a causal inference is appropriate based on these guidelines.[145] One or more factors may be absent even when a true causal relationship exists.[146] Similarly, the existence of some factors does not ensure that a causal relationship exists. Drawing causal inferences after finding an association and considering these factors requires judgment and searching analysis, based on biology, of why a factor or factors may be absent despite a causal relationship, and vice versa. Although the drawing of causal inferences is informed by scientific expertise, it is not a determination that is made by using an objective or algorithmic methodology.

These guidelines reflect criteria proposed by the U.S. Surgeon General in 1964[147] in assessing the relationship between smoking and lung cancer and expanded upon by Sir Austin Bradford Hill in 1965[148] and are often referred to as the Hill criteria or Hill factors.

145. *See* Douglas L. Weed, *Epidemiologic Evidence and Causal Inference,* 14 Hematology/Oncology Clinics N. Am. 797 (2000).

146. *See* Cook v. Rockwell Int'l Corp., 580 F. Supp. 2d 1071, 1098 (D. Colo. 2006) (rejecting argument that plaintiff failed to provide sufficient evidence of causation based on failing to meet four of the Hill factors).

147. Public Health Serv., U.S. Dep't of Health, Educ., & Welfare, Smoking and Health: Report of the Advisory Committee to the Surgeon General (1964); *see also* Centers for Disease Control and Prevention, U.S. Dep't of Health & Human Servs., The Health Consequences of Smoking: A Report of the Surgeon General (2004).

148. *See* Austin Bradford Hill, *The Environment and Disease: Association or Causation?* 58 Proc. Royal Soc'y Med. 295 (1965) (Hill acknowledged that his factors could only serve to assist in the inferential process: "None of my nine viewpoints can bring indisputable evidence for or against the cause-and-effect hypothesis and none can be required as a *sine qua non*."). For discussion of these criteria and their respective strengths in informing a causal inference, see Gordis, *supra* note 32, at 236–39; David E. Lilienfeld & Paul D. Stolley, Foundations of Epidemiology 263–66 (3d ed. 1994); Weed, *supra* note 144.