# EXHIBIT M

```
1              IN THE CIRCUIT COURT OF ST. LOUIS COUNTY

2                       STATE OF MISSOURI

3

4    CARL ALESI, et al,

5                  Plaintiffs,

6        vs.                  Case No. 19SL-CC03617

7

8    MONSANTO COMPANY,

9                  Defendant.

10   _____/

11                   (Volume II)

12

13        Videotaped Deposition of JOEL GAGNIER, ND, MSc, PhD,

14        Taken Via Golkow Virtual,

15        Commencing at 1:01 p.m.,

16        Thursday, June 9, 2022,

17        Before Laurel A. Frogner, RMR, CRR, CSR-2495.

18

19   (Court reporter, attorneys & witness appearing remotely)

20

21

22

23

24

25
```

```
 1   APPEARANCES:

 2

 3   MR. GIBBS HENDERSON

 4   Fears Nachawati, PLLC

 5   5489 Blair Road

 6   Dallas, Texas  75231

 7   214-890-0711

 8   ghenderson@fnlawfirm.com

 9       Appearing on behalf of the Plaintiffs

10

11   MR. JOSEPH D. PIORKOWSKI and

12   MS. ANNE HOVIS

13   The Piorkowski Law Firm PC

14   1800 K Street, NW

15   Suite 1000

16   Washington, DC  20006

17   202-257-7662

18   jpiorkowski@lawdoc1.com

19       Appearing on behalf of the Defendant

20

21   ALSO PRESENT:  Julie Robinson, Videographer

22

23                   *  *  *  *  *  *  *

24

25
```

```
1                    TABLE OF CONTENTS

2    Witness                                    Page

3    EXAMINATION BY MR. PIORKOWSKI              251

4

5

6                    INDEX TO EXHIBITS

7           (Exhibits attached to transcript)

8

9    Exhibit                                    Page

10   GAGNIER DEPOSITION EXHIBIT NUMBER 17,      255

11   MEDICAL LITERATURE SEARCH

12

13   GAGNIER DEPOSITION EXHIBIT NUMBER 18,      263

14   SUMMARY CHART

15

16

17

18

19

20

21

22

23

24

25
```

Joel J. Gagnier, ND, MSc, PhD

1           Remote Deposition

2           Thursday, June 9, 2022

3           About 1:01 p.m.

4           THE VIDEOGRAPHER:  We are now on the

5      record.  My name is Julie Robinson.  I'm a

6      videographer for Golkow Litigation Services.  Today's

7      date is June 9th, 2022, and the time is 1:01 p.m.

8      Eastern Time.  This remote video deposition is being

9      held in the matter of Carl Alesi, et al., versus

10     Monsanto Company, et al., for the Circuit Court of

11     St. Louis County, State of Missouri.  The witness is

12     Joel J. Gagnier, ND, MSc, PhD.  All parties to this

13     deposition are appearing remotely and have agreed to

14     the witness being sworn in remotely.  Due to the

15     nature of remote reporting, please pause briefly

16     before speaking to ensure all parties are

17     heard completely.

18           Will counsel please identify themselves,

19     after which the court reporter will swear in the

20     witness.

21           MR. HENDERSON:  Gibbs Henderson, here on

22     behalf of Plaintiffs.

23           MR. PIORKOWSKI:  Joseph Piorkowski and Anne

24     Hovis from the Piorkowski Law Firm, on behalf of

25     Monsanto.

```
 1                      JOEL GAGNIER, ND, MSc, PhD,

 2          having first been duly sworn, was examined and

 3          testified on his oath as follows:

 4     EXAMINATION BY MR. PIORKOWSKI:

 5     Q.   Good afternoon, Dr. Gagnier.  How are you?

 6     A.   Good afternoon, I'm pretty good.  Don't mind me.  I

 7          might cough here and there.  I have the lingering

 8          remnants of a cold.

 9     Q.   Okay.  Long as it's not COVID, right?

10     A.   Ha, ha.  I tested negative last week, so I just, I'm

11          assuming it's still negative.

12     Q.   We actually have a trial going on where we have a

13          number of attorneys and one juror who got excused for

14          --

15                      MR. HENDERSON:  Oh, no, Kansas City?

16                      MR. PIORKOWSKI:  No, not in Kansas City, in

17          Oregon.

18                      MR. HENDERSON:  Oh, the Oregon one.

19                      MR. PIORKOWSKI:  Yeah, but they're still

20          pressing on so --

21                      MR. HENDERSON:  Wow.

22                      MR. PIORKOWSKI:  Yeah.

23     BY MR. PIORKOWSKI:

24     Q.   Anyway, so Dr. Gagnier, you understand this is a

25          continuation of your deposition that we started back
```

Joel D. Gagnier, ND, MSc, PhD

```
 1        in March?

 2   A.   Yes, sir.

 3   Q.   Yeah, and we're just going to be an hour today.  I

 4        just have some things to finish up that we didn't

 5        have a chance to finish last time.

 6   A.   Okay.

 7   Q.   Since the deposition in March, have you had a chance

 8        to look at the transcript or review it?

 9   A.   Yeah, I've had a chance to look through the

10        transcript, yeah, briefly, but I did look through it,

11        yeah.

12   Q.   Okay.  Did you identify any corrections or changes to

13        the transcript?

14   A.   From our discussion, from the original deposition?  I

15        don't recall any errors, yeah, I don't recall any

16        errors.

17   Q.   Okay.  And have any of your opinions changed since

18        March?

19   A.   No.

20   Q.   And I also assume the scope of the opinions that you

21        plan to offer, which we spent a lot of time talking

22        about last time, is also not changed; is that right?

23   A.   That's correct.

24   Q.   Okay.  Have you billed additional time on this matter

25        since your deposition?
```

Joel O. Gaghler, ND, MSc, PhD

```
 1    A.    No.

 2    Q.    So you haven't spent any time working on the Alesi

 3          case?

 4    A.    No additional, no additional hours.

 5    Q.    Okay.  Do you have a retention letter in this case?

 6                THE WITNESS:  Gibbs, we have a retention

 7          letter I think, right?

 8                MR. HENDERSON:  Let me see.

 9                THE WITNESS:  I'm going to have to look.  I

10          believe so.

11                MR. PIORKOWSKI:  I can short-circuit this.

12          Gibbs, if you will agree to produce it, we can just

13          agree to mark it.

14                THE WITNESS:  Yeah, I'm sorry, if we had

15          it, we would have produced it, but I will double

16          check.

17    BY MR. PIORKOWSKI:

18    Q.    Okay.  All right.  I appreciate that.  And I assume,

19          then, that if you haven't spent any additional time,

20          you don't have any additional invoices since the last

21          time we talked, you know, March; is that right?

22    A.    Yeah, that's correct.

23    Q.    Okay.  And other than the opinions that were in your

24          report originally and you also produced a

25          supplemental report, I think, which we marked as
```

```
 1        Exhibit 11 at your original deposition, there's no
 2        new --
 3   A.   Yes.
 4   Q.   -- opinions you intend to offer, is that correct?
 5   A.   That's correct, yeah.
 6   Q.   That's correct, okay.  I understand you also gave a
 7        deposition in another Roundup case called Farrell
 8        about a week ago; is that right?
 9   A.   That's correct, yes.
10   Q.   Okay.  Now, I want to go to your meta-analysis for a
11        minute.  Is it correct that you did your
12        meta-analysis by yourself?
13   A.   Yes.
14   Q.   In other words, you didn't have any assistance
15        whatsoever from any other person; is that right?
16   A.   That's correct.
17   Q.   And you didn't consult with anybody about the
18        meta-analysis; is that right?
19   A.   That's correct, I did not.
20   Q.   Okay.  Did you have a written protocol for your
21        meta-analysis that you did or I should say
22        meta-analyses?
23   A.   I had a -- not a published or submitted protocol, but
24        I had a plan, like a sketched-out plan.  I don't know
25        if it was in my notebook or if it was in a Word file,
```

1        but, yeah, like sort of the basics of the types of

2        search strategies, inclusion/exclusion criteria, and

3        the planned meta-analysis which I then summarized in

4        the report.

5    Q.   Okay.  So to the -- so the strategy for your

6        meta-analysis is fully summarized in your report?

7    A.   Yes.

8    Q.   Okay.  Since March, if you remember, at your

9        deposition we had asked about what documents you

10       searched, and we had agreed to mark as Exhibit 17 a

11       document that was subsequently provided to the court

12       reporter and to us, which I think represents the

13       results of your medical literature search; do you

14       recall that?

15   A.   Yeah, that's correct.

16           GAGNIER DEPOSITION EXHIBIT NUMBER 17,

17           MEDICAL LITERATURE SEARCH,

18           WAS MARKED BY THE REPORTER

19           FOR IDENTIFICATION

20   BY MR. PIORKOWSKI:

21   Q.   Okay.  And are you able to access Exhibit 17 to the

22       deposition?

23   A.   Yes, I just opened it.

24   Q.   Okay.  And so could you briefly just explain what

25       Exhibit 17 is?

```
 1    A.    Yeah.  This is an EndNote file that I exported

 2          from -- EndNote is a piece of -- it's a program, it's

 3          a citation manager software that I basically exported

 4          into a PDF file.  So this is a list of citations, and

 5          I'm just going to check to see what order, doesn't

 6          appear they're in any particular order.  Sometimes it

 7          can choose the order.  Nonetheless, it looks like

 8          it's by title at first when there wasn't an author

 9          list, and then starting at Citation 35 it's by the

10          first author's last name and then alphabetical.  So

11          these would be all of the citations that I read the

12          title and abstract for all of them, and for a good

13          proportion had to refer to the full text to decide

14          whether to include it or not.

15    Q.    So there's 1,015 total publications here; is that

16          right?

17    A.    Yes, yep, that's after excluding the duplicates,

18          yeah.

19    Q.    Okay.  And you have reviewed the abstracts for each

20          one of these 1,015?

21    A.    Abstract and title, yeah, where available, yeah.

22    Q.    And how long did that take you?

23    A.    I don't know exactly.  I'd have to look back to be

24          certain because I didn't split up the hours that I

25          spent on it so specifically as to -- with respect to
```

Joel V. Gagnier, ND, MSc, PhD

```
 1          inclusion/exclusion process, just sort of lumped the
 2          developing of the search strategy doing the search,
 3          downloading the citations in EndNote, removing
 4          duplicates, and then reviewing, usually that's all
 5          together, but it takes a fair bit of time, especially
 6          if I have to go through the full text.  So, I'm
 7          sorry, I can't give you a number, even ballparking it
 8          wouldn't be fair.
 9     Q.   Let me ask you this.  You had told us that you had
10          been retained in other Roundup litigation not by
11          Mr. Henderson's firm previously, right?
12     A.   Yeah, yeah, that's right.
13     Q.   So was the search and the review of Exhibit 17
14          something that you did as a part of your work for the
15          Alesi case or is that something you had done
16          previously?
17     A.   The review of those abstracts, that EndNote file that
18          I shared with you, were -- well, they were -- the
19          process was overlapping between the two cases.  So,
20          yeah, some specifically for one and some for both.
21     Q.   Okay.  And how did this document get generated?
22          What -- I mean when I look in here I see, you know,
23          things about lung cancer and, you know, pesticides,
24          other chemicals --
25     A.   Yeah.
```

```
 1   Q.    -- that are not relied to glyphosate, so I'm just

 2         trying to understand how this list got generated in

 3         the first instance.

 4   A.    Yeah, that's the challenge when you do systematic

 5         reviews and meta-analysis, as you probably know, is

 6         that I mean you have to -- you're dealing with the

 7         indexing methods of whatever database you're

 8         searching.  So, you know, PubMed has different

 9         indexing terms.  Some are similar, but there often

10         are different and not a lot of overlap with other

11         databases like Embase, which is the European medical

12         database.  So you can't be ultra specific with your

13         searches or you could rule out articles that might be

14         relevant.  So it creates kind of a wide net which

15         takes a little bit more time reviewing the citations

16         that you find, but that way you can be more confident

17         that you're not missing something because it's like

18         embedded in a strange spot of the manuscript or

19         something and/or it's not indexed.

20                I had a library and information scientist

21         once tell me that indexing is very -- you know, it's

22         done by individuals mostly, there's some computerized

23         indexing now, but individuals will make mistakes with

24         respect to indexing articles, so that's why you're

25         seeing articles that are not specific to my -- what
```

```
 1            would need be included in this meta-analysis.
 2    Q.    Okay.  And if I could, I realize you can't give us an
 3            exact time estimate, but can you give me your best
 4            time estimate of the amount of time it took to review
 5            the abstracts for 1,015 articles and to do -- (audio
 6            distortion) --
 7    A.    That's very difficult.  Let me think -- I would say
 8            between -- it goes quicker -- if you've ever done
 9            these before, it goes sort of quicker with time.
10            It's about -- you're looking at like about I'd say
11            five minutes average for each citation.
12    Q.    Okay.
13    A.    So you're looking at, you know, 5,000 minutes.
14    Q.    Okay.
15    A.    That's an average, yeah.  Some may be way quicker
16            because it's immediately obvious and some may take
17            longer.
18    Q.    Sure.  Okay.  All right.  Next thing I want to ask
19            you about is at your deposition last time you
20            produced a document that we marked as Exhibit 11
21            which was a supplemental report.  Do you remember
22            that?
23    A.    Yes.
24    Q.    Do you have access to that?
25    A.    I do.
```

1    Q.   And let me just ask you, do you have a hard copy of

2         either that document or your report available?  The

3         reason I ask is because I want to do a little

4         -- (audio distortion) -- and it's going to be hard

5         for you to be probably doing it with both of them

6         online.

7    A.   Yeah, I understand.  Let me see.  Yeah, I have the

8         copy of the report right here.  Let me just make sure

9         I've got that.  Sorry, I'm shuffling papers.  I know

10        I was making a lot of noise last time.  Yep, I do

11        have it, yep.

12   Q.   Okay.  All right.  So I want to ask you if you look

13        at Exhibit 11, there's -- they're not -- pages aren't

14        numbered, but there's a page that has on it Table 2:

15        Summary Table of All Meta-Analytic Findings.  Do you

16        see that?

17   A.   Yes.  I do, yeah.

18   Q.   Okay.  Now, I wanted to ask you, if you can keep that

19        opened or keep that accessible, I want to sort of

20        refer back to your report.

21   A.   Okay.

22   Q.   And I have a few questions.  So when I tried to do a

23        side-by-side comparison here, for example, when I

24        look at Page 32 and 33 of your report, on Page -- at

25        the top of Page 33 there is a Fixed Effects

```
 1          Meta-Analysis Results Table for Ever Exposure there.

 2          Do you see that?

 3     A.   Yes.

 4     Q.   And it shows an odds ratio of 1.146, correct?

 5     A.   Yes.

 6     Q.   Okay.  Now, when we look at your table on Table 2,

 7          that --

 8     A.   Uh-huh.

 9     Q.   -- data point isn't there, correct?

10     A.   Yeah, that's correct, because that fixed effects

11          analysis wasn't the final analysis for those sets of

12          studies.  So that's a fixed effects analysis, and the

13          heterogeneity was statistically significant;

14          therefore, random effects analysis was required.  So

15          that's why I present only the random effects analysis

16          in that table, though for sake of completeness, I

17          could have just added -- put them all in there and

18          said which one was the final model.

19     Q.   Well, and I'm actually going to -- I actually did

20          that and I prepared an exhibit that has all of them

21          together, and I want to make sure that you agree that

22          I've done that correctly, but I just had a couple

23          that I wanted to ask about specifically.

24     A.   Okay.

25     Q.   Okay.  So -- and then separately, if we look at
```

```
1           Page 36, for example, of your report.

2      A.   Uh-huh.

3      Q.   And we look at Figure 5.

4      A.   Yes.

5      Q.   On Figure 5 there's an odds ratio of 1.152, correct?

6      A.   Yes.

7      Q.   And, again, that's not on the meta-analysis summary

8           that you prepared, correct?

9      A.   Yeah, that's correct, and for the same reason as the

10          other one.

11     Q.   Okay.  And your reasoning again for why a random

12          effects analysis is appropriate as opposed to a fixed

13          effects analysis is what?

14     A.   If you look -- so if you refer back to Figure 5.

15     Q.   Right.

16     A.   On the top of Page 36, you can see underneath the --

17          near the bottom of that figure it says heterogeneity

18          chi-squared.

19     Q.   Yes.

20     A.   And then it has a p value of .018.  So that's a

21          highly statistically significant test for the

22          presence of statistical heterogeneity.

23     Q.   Okay.

24     A.   And then, also, the I-squared, which is right

25          underneath that, shows as 58.6 percent.  It might not
```

Joel O. Gagnier, ND, MSc, PhD

```
 1          sound like a large percentage, but in meta-analytic

 2          terms it is significant -- a significant magnitude of

 3          statistical heterogeneity that is not appropriately

 4          explained for by, say, subgroup analysis or variants.

 5          Therefore, a random effects analysis incorporates

 6          that between-study heterogeneity into the effect

 7          estimate into the confidence interval.  So it's a way

 8          to incorporate unknown heterogeneity into the effect

 9          estimate.

10     Q.   All right.  And have we marked the summary chart we

11          prepared as an exhibit yet?  You're on mute.

12               MS. HOVIS:  We have not, but I will do it

13          right now, because you want that Exhibit 18, the next

14          exhibit?

15               MR. PIORKOWSKI:  Yeah, let's make it

16          Exhibit 18.

17               GAGNIER DEPOSITION EXHIBIT NUMBER 18,

18               SUMMARY CHART,

19               WAS MARKED BY THE REPORTER

20               FOR IDENTIFICATION

21     BY MR. PIORKOWSKI:

22     Q.   Dr. Gagnier, let me know when you are able to access

23          Exhibit 18, okay?

24     A.   Okay.  I don't see it yet.

25               MS. HOVIS:  Okay.  That's marked.  You may
```

```
 1        have --

 2                  THE WITNESS:  I've got it.

 3                  MS. HOVIS:  Good.

 4                  THE WITNESS:  Yeah, I have it.

 5   BY MR. PIORKOWSKI:

 6   Q.   Okay.  So what I've done here, let me explain this,

 7        the way this is coded, this is a summary of findings

 8        that you made either in your report or in your

 9        supplemental report.

10   A.   Yes.

11   Q.   So all of these come from you, at least is my best

12        understanding here.  The ones that are highlighted in

13        yellow are findings that were in your original report

14        but not included in Exhibit 11, okay?

15   A.   Okay.

16   Q.   And can you look at those highlighted entries to make

17        sure that I've captured them correctly?  I can give

18        you the page numbers that correspond to your report

19        if that's helpful.

20   A.   Yes, sure.  I've already looked at the first two.

21   Q.   Right, the first two, so the next one is 7 Studies,

22        Andreotti removed, and that's Page 42 at the top.

23   A.   Okay.

24   Q.   Is that --

25   A.   Yeah, oh, yeah, that's right, I don't report a figure
```

Joel T. Gagnier, ND, MSc, PhD

```
 1          for it, but, yeah, it's there in the text, okay.

 2    Q.    Yeah.

 3    A.    Correct.

 4    Q.    And then go down to All 8 Studies with Cumulative

 5          Data from Meloni, Fixed Effects.

 6    A.    Yes.

 7    Q.    And that's, if you look at Page 40, I think Figure 9

 8          on your report.

 9    A.    Yeah, those numbers are correct, yeah.

10    Q.    Okay.  All right.  And then the blue numbers, the

11          blue entries, I separately have a question about

12          those.  The blue entries represent findings that were

13          included in Table 2 in Exhibit 11 but did not appear

14          to have been included in your original report; is

15          that also correct?

16    A.    Yeah, that's correct, that's right, yeah, and I

17          realized after reviewing it, oh, I think we had

18          covered this in the first deposition, yeah, I

19          realized there was a couple sensitivity analyses that

20          I left out inadvertently, and I wanted to make sure I

21          covered them.

22    Q.    Now, for all these meta-analyses you give confidence

23          intervals, right?

24    A.    Yes.

25    Q.    And am I correct that for the ever exposure
```

Joel C. Gagnier, ND, MSc, PhD

```
1        meta-analyses for two of the -- for two of the four

2        meta-analyses, the confidence interval includes 1,

3        correct?

4    A.  Well, for -- those aren't the -- we have to -- I

5        would ignore the ones that you've added in yellow

6        because they aren't the final models.  I would only

7        consider the final models to be something that we

8        consider for looking at statistical significance,

9        because they have no bearing on -- meaning that

10       there's redundancy between the first two analyses

11       that are listed there, so we certainly can't consider

12       them both, so two out of the three do not contain an

13       odds ratio of 1 in the confidence interval, correct.

14   Q.  Okay.  But both of the analyses, whether you looked

15       at the fixed effect or the random effect for --

16       whether they're the final analysis or not, the ones

17       that include all eight studies, neither of those was

18       statistically significant, correct?

19   A.  Yeah, that's correct.

20   Q.  Okay.  Now, if we go down to -- which of the -- which

21       of the studies below do you consider to be,

22       quote-unquote, "final studies," if you will?

23   A.  Well, only the ones that I had originally included,

24       so the non-highlighted ones, yeah.

25   Q.  The non-highlighted ones in blue or the
```

```
 1          non-highlighted ones in yellow?
 2   A.     The ones in -- we'll start off with the ones in
 3          yellow.
 4   Q.     Okay.  So you're saying the ones in yellow you're not
 5          including because they were fixed effects?
 6   A.     Because they were not the final, they were not the
 7          final model.  You know what I mean when I'm saying
 8          that, though?
 9   Q.     Yeah, I understand what you're saying.  When you
10          started out the meta-analysis, did you intend for the
11          fixed effect analysis to be the primary analysis?
12   A.     Well, when the studies are -- when there's no
13          between-study heterogeneity, a fixed effects model
14          and a random effects model are identical, because all
15          a random effects model does is add a
16          between-studies -- between-studies variants estimate,
17          which a fixed effects model does not.  Some people in
18          the meta-analytic community argue for only using
19          random effects models for that reason, but others, I
20          would say most others and most textbooks recommend
21          starting with the fixed effects approach and going to
22          a random effects approach if you can explain that
23          between-study heterogeneity and it's statistically
24          significant.
25                  So it's very rare, but it does happen that
```

```
 1          fixed effects models end up being your final model.

 2          There are some examples in the literature where

 3          there's really similar populations, you know, no

 4          between-subject heterogeneity.  The studies are very

 5          similar even done by the same research groups, but in

 6          slightly different populations even though they have

 7          the same characteristics, and under kind of -- under

 8          really similar circumstances like that a fixed

 9          effects model will often generate the same effect

10          estimate, not always, but that's kind of a

11          hypothetical example.

12     Q.   All right.  Now, so when you did your meta-analysis

13          that resulted -- go back, well, actually, before I

14          get to that, putting aside what analysis you

15          considered to be the final analysis, am I correct

16          that Exhibit 18 summarizes the results of all of the

17          meta-analyses that you conducted as a part of your

18          research in this case?

19     A.   Yes, it appears so, yes.

20     Q.   Okay.  Now, when you're talking about the ever

21          exposure analysis, one of the things -- one of the

22          studies that you included was the Pahwa 2019 study,

23          correct?

24     A.   Correct.

25     Q.   And the Pahwa 2019 study in terms of weight comprised
```

```
 1          slightly more than a third of the weight for that

 2          total analysis, right?

 3     A.   Yes.

 4     Q.   Okay.  And the number you used was a number that was

 5          not adjusted for use of other pesticides, correct?

 6     A.   Yes, yes, that is correct.

 7     Q.   Okay.  And so if we had a number that is adjusted for

 8          use of other pesticides for Pahwa, that would have

 9          been 30 percent lower for that particular odds ratio,

10          correct?

11     A.   From the Pahwa study itself.

12     Q.   Yes.

13     A.   Approximately, yeah.  Well, not -- well, 29 percent.

14     Q.   Well, 1.43 versus 1.13, right?

15     A.   You're looking at the -- oh, I'm looking at the wrong

16          table in Pahwa.  Yes, correct, you're correct, yes.

17     Q.   Okay.  All right.  And have you for any -- (audio

18          distortion) -- because you did actually consistently

19          -- (audio distortion) --

20               MS. HOVIS:  I think when you move your head

21          away from the speaker that it's getting wavy.

22     BY MR. PIORKOWSKI:

23     Q.   Okay.  Can you hear me now?

24     A.   Yes.

25     Q.   Okay.  So it's correct, Dr. Gagnier, that it's not
```

Joel V. Gaghiler, ND, MSc, PhD

```
 1           just this particular analysis for which you used data

 2           from Pahwa that were unadjusted for use of other

 3           pesticides, that's true for all of the meta-analyses

 4           that you did, correct?

 5    A.     Using an unadjusted estimate?

 6    Q.     Yes, no, yeah, well, no, let me back up.  As you

 7           pointed out before, some of these estimates are

 8           adjusted for certain things, right?

 9    A.     Yes.

10    Q.     But in terms of using estimates that are adjusted for

11           use of other pesticides, all of the numbers you used

12           throughout all of your meta-analyses where you

13           included the Pahwa study include numbers that were

14           not adjusted for use of other pesticides; that's

15           true, correct?

16    A.     That is true.  I wasn't at all concerned whether or

17           not they were adjusted for pesticides.  I was

18           concerned with the number of variables that were

19           included in that regression model.  And that

20           regression model is getting a lot of variables in it

21           for the number of events, which makes it a possible

22           spurious association that you're going to see with

23           respect to that odds ratio.  So I have to be very

24           cautious with interpreting that.  That's why I chose

25           the effect estimate that I did.
```

Joel V. Gagnier, ND, MSc, PhD

```
 1    Q.    Wait, I'm sorry, we had a long discussion last time

 2          about using numbers that were adjusted for use of

 3          other pesticides versus numbers that weren't,

 4          correct?

 5    A.    Yes, we did.

 6    Q.    And your testimony was that the most appropriate

 7          choice was to use data that were adjusted for use of

 8          other pesticides, correct?

 9                MR. HENDERSON:  Yeah, I'm going to object

10          here because we had an agreement that this deposition

11          was going to be limited to his additional reliance

12          list.  I have that in writing from Mr. Martinez.  So

13          I gave you some latitude, Counsel, but we're way

14          beyond that at this point.

15                MR. PIORKOWSKI:  Well, Gibbs, I mean the

16          truth is we didn't get seven hours so, and I'm even

17          giving up another 20 minutes, frankly.  And this

18          document that I'm going over was produced at the

19          beginning of the deposition, and so I didn't have

20          time to process it.  So I'm not going into any --

21          (audio distortion) -- meaningful opportunity to cover

22          before what --

23                MR. HENDERSON:  Irrespective of that, Mr.

24          Martinez specifically represented that this was going

25          to be limited to "another list of material he
```

```
 1          reviewed," and we reserved another hour to review
 2          that with him, and so that is an agreement.  We
 3          agreed to put him back up for that purpose.
 4                    MR. PIORKOWSKI:  Well --
 5                    MR. HENDERSON:  And Mr. Martinez is
 6          counsel -- is a counsel for Monsanto as well.
 7                    MR. PIORKOWSKI:  Well, what I'm saying,
 8          Gibbs, is this is not unreasonable.  We haven't had a
 9          chance, we didn't have a full seven hours, we didn't
10          have a chance to examine him on Exhibit 11.  If you
11          want to stand on that agreement with Mr. Martinez and
12          say that that's where you're going to draw the line,
13          then I'll go along with that, but I don't think
14          that's reasonable, and I think maybe Mr. Martinez
15          didn't fully understand what had happened at the
16          previous deposition and the reason we continued it.
17                    MR. HENDERSON:  And in fairness, Joe, I
18          gave you a lot of latitude and let you go well beyond
19          that, but when we get into, you know, crossing him
20          about what he said at the previous deposition, I am
21          going to draw the line and I'm going to instruct Dr.
22          Gagnier not to answer the question based on the
23          agreement with Mr. Martinez.
24     BY MR. PIORKOWSKI:
25     Q.   All right.  My other question, then, I guess, is have
```

Joel D. Gagnier, ND, MSc, PhD

```
 1          you redone any analyses to calculate the odds ratios

 2          using data from Pahwa that have been adjusted for use

 3          of other pesticides?

 4    A.    No.  I'm sorry, you're breaking up, but I'm pretty

 5          sure I heard that correct.

 6    Q.    Yes, no, I didn't say anything else.

 7    A.    Okay.

 8    Q.    All right.  Well, then the last thing I have is on

 9          Page 49 of your original report --

10    A.    Uh-huh, yes, sir.

11    Q.    -- you have in there estimates of the increase in

12          risk 15 to 25 percent for NHL overall, 38 to 42

13          percent for exposure at the highest levels of

14          exposure.  Are those numbers that you still stand

15          behind?

16    A.    I'm sorry, could you say that again?

17    Q.    Yeah.  Do you stand behind the estimates that are on

18          Page 49 of your report, 15 to 25 percent for NHL and

19          those ever exposed and 48 -- or 38 to 42 percent for

20          those exposed at various higher levels of exposure?

21               MR. HENDERSON:  Objection, asked and

22          answered.

23               THE WITNESS:  Pardon me?

24               MR. HENDERSON:  Oh, I just said objection,

25          asked and answered.
```

```
 1                    THE WITNESS:  You want me to answer that?

 2      BY MR. PIORKOWSKI:

 3      Q.   Yes.

 4                    MR. HENDERSON:  So what's the pending

 5           question?

 6                    MR. PIORKOWSKI:  You want to read it back,

 7           Laurel.

 8                    (Record repeated as requested.)

 9                    MR. HENDERSON:  I don't see that on

10           Page 49.  Are we on Page 49 on the original report?

11                    MR. PIORKOWSKI:  I think so.  Under

12           Interpretation and then Conclusions; first sentence.

13                    MR. HENDERSON:  Okay.  That's Page 51.

14                    MR. PIORKOWSKI:  It's 49 on my copy.

15                    MR. HENDERSON:  Okay.

16                    So, okay, Dr. Gagnier, do you understand

17           the question?

18                    THE WITNESS:  Yeah, I understand the

19           question.  I'm just getting to it.  Oh, yeah, yeah,

20           that's the -- yeah.  So those summaries didn't

21           necessarily include the additional sensitivity

22           analyses that were done, but the sensitivity analyses

23           didn't show any differences, anyway, so generally,

24           yes, I would stand by those.

25
```

Joel V. Gagnier, ND, MSc, PhD

```
 1    BY MR. PIORKOWSKI:

 2    Q.   Okay.  I'm -- just for purposes of, you know, this is

 3         our chance to find out what you're going to say, so

 4         that's consistent with what you plan to say at trial;

 5         is that right?

 6                   MR. HENDERSON:  Objection, asked and

 7         answered.

 8                   THE WITNESS:  Yes.

 9    BY MR. PIORKOWSKI:

10    Q.   Okay.  All right.

11                   Gibbs, based on your representation of Mr.

12         Martinez's agreements, I'm going to go ahead and

13         close it down here.

14                   MR. HENDERSON:  Okay.

15                   MR. PIORKOWSKI:  Do you have any questions?

16                   MR. HENDERSON:  Counsel, I'm sorry, yes,

17         Plaintiffs have no questions today.

18                   MR. PIORKOWSKI:  All right.

19                   THE VIDEOGRAPHER:  All right.  That

20         concludes the deposition.  The time is 1:37 p.m.

21                   MR. PIORKOWSKI:  All right.  Thank you.

22                   Thank you, Dr. Gagnier.

23                   MR. HENDERSON:  Thanks, guys.

24                   (The deposition was concluded at 1:37 p.m.)

25
```

```
1                      CERTIFICATE

2

3            I, LAUREL FROGNER, Certified Realtime Reporter

4       and Certified Shorthand Reporter, do hereby certify

5       that prior to the commencement of the examination,

6       JOEL GAGNIER, ND, MSc, PhD, was duly remotely sworn

7       by me to testify to the truth, the whole truth and

8       nothing but the truth.

9            I DO FURTHER CERTIFY that the foregoing is a

10      verbatim transcript of the testimony as taken

11      stenographically by me at the time, place and on the

12      date hereinbefore set forth, to the best of my

13      ability.

14           I DO FURTHER CERTIFY that I am neither a

15      relative nor employee nor attorney nor counsel of any

16      of the parties to this action, and that I am neither

17      a relative nor employee of such attorney or counsel,

18      and that I am not financially interested in the

19      action.

20

21

22      _____

23      LAUREL A. FROGNER, CSR-2495

24      Notary Public, State of Michigan

25      Dated:  6-16-2022
```