# EXHIBIT D

```
 1           IN THE CIRCUIT COURT OF ST. LOUIS COUNTY

 2                     STATE OF MISSOURI

 3

 4    -------------------------------|
                                     |
 5    PAUL FERRO, et al.,            |
                                     |
 6        Plaintiffs,                |
                                     |
 7    vs.                            | Case No. 20SL-CC03678
                                     |
 8    MONSANTO COMPANY,              |
                                     |
 9        Defendant.                 |
                                     |
10    -------------------------------|

11                          - - -

12                 Monday, June 13, 2022

13                          - - -

14

15         This is the Videotaped Deposition of ANDREW

16    M. SCHNEIDER, M.D., Volume 1, commencing at

17    11:13 a.m. EDT, on the above date, at 3030 Holiday

18    Drive, Ft. Lauderdale, Florida, before Susan D.

19    Wasilewski, Registered Professional Reporter,

20    Certified Realtime Reporter, Certified Manager of

21    Reporting Services, Certified Realtime Captioner,

22    and Florida Professional Reporter.

23                          - - -

24              GOLKOW LITIGATION SERVICES

           877.370.3377 ph | 917.591.5672 fax

25                  deps@golkow.com
```

```
 1                       APPEARANCES

 2

 3     Counsel for Plaintiffs:

 4        SCHLESINGER LAW OFFICES, P.A.

          BY:  JEFFREY L. HABERMAN, ESQUIRE

 5             jhaberman@schlesingerlaw.com

          1212 SE Third Avenue

 6        Fort Lauderdale, Florida 33316

          Phone:  (954) 467-8800

 7

 8

 9         THE SIMON LAW FIRM P.C.

          BY:  PAUL J. TAHAN, ESQUIRE  (via Zoom)

10             ptahan@simonlawpc.com

          800 Market Street, Suite 1700

11        St. Louis, Missouri 63101

          Phone:  (314) 241-2929

12

13

14     Counsel for Defendant:

15        GOLDMAN ISMAIL TOMASELLI BRENNAN & BAUM LLP

          BY:  EMMA C. ROSS, M.D., J.D.

16             eross@goldmanismail.com

          200 South Wacker Drive, 22nd Floor

17        Chicago, Illinois 60606

          Phone:  (312) 681-6000

18

19

20     Also Present:

21        DUKE STEPHENSON, Videographer

22

23

24

25
```

```
 1                        - - -
 2                    I N D E X
 3                        - - -
 4   Testimony of:  ANDREW M. SCHNEIDER, M.D.        PAGE
 5        DIRECT EXAMINATION BY MS. ROSS.............   7
 6
 7
 8                   E X H I B I T S
 9              (Attached to transcript)
10   ANDREW M. SCHNEIDER, M.D. DEPOSITION EXHIBITS    PAGE
11   Exhibit 1     Handwritten Invoices                8
12   Exhibit 2     Reliance List of Andrew Schneider,  8
                   MD  Ferro et al., v. Monsanto Company
13
     Exhibit 3     Reliance List of Andrew Schneider,  8
14                 MD  Ferro et al., v. Monsanto Company
                   Amended
15
     Exhibit 4     Plaintiffs' Designation and        23
16                 Disclosure of Retained and
                   Nonretained Expert Witnesses
17
     Exhibit 5     SEAK, Inc.                          28
18                 Contact Information
19   Exhibit 6     Article - A Review and Update with  43
                   Perspective of Evidence that the
20                 Herbicide Glyphosate (Roundup)) is a
                   Cause of Non-Hodgkin Lymphoma
21                 Weisenberger
22   Exhibit 7     Curriculum Vitae                    72
                   Andrew Schneider, MD
23
     Exhibit 8     Article - Chronic lymphocytic       80
24                 leukaemia/small lymphocytic
                   lymphomas
25
```

```
 1                    E X H I B I T S
 2              (Attached to transcript)
 3    ANDREW M. SCHNEIDER, M.D. DEPOSITION EXHIBITS     PAGE
 4    Exhibit 9     Article - Cancer Stat Facts:        113
                    Non-Hodgkin Lymphoma
 5
      Exhibit 10    Article - Carcinogenicity of        146
 6                  tetrachlorvinphos, parathion,
                    malathion, diazinon, and glyphosate
 7                  IARC
 8    Exhibit 11    Notes about Roundup                 177
 9    Exhibit 12    E-mail - Subject:  CLL 2016         178
10    Exhibit 13    E-mail - Subject:  Reserve 209-2013 178
                    1 gallon jugs used backpack sprayer
11                  Feb-Nov
12    Exhibit 14    Medical Record                      181
                    Confidential-Ferro-WPleuJr-NHCI-
13                  000083 through 85
14    Exhibit 15    Medical Record                      183
                    Confidential-Ferro-WPleuJr-NHCI-
15                  000081 and 82
16    Exhibit 16    Medical Record                      185
                    Confidential-Ferro-WPleuJr-NHCI-
17                  000016 through 18
18    Exhibit 17    Medical Record                      210
                    Confidential-Ferro-WPleuJr-NHCI-
19                  000063 through 65
20    Exhibit 18    Article - Occupation and malignant  247
                    lymphoma: A population based case
21                  control study in Germany
                    Mester, et al.
22
      Exhibit 19    Medical Record                      279
23                  Confidential-Ferro-SMoore-DOffice-
                    000002 through 4
24
25
```

```
 1                    E X H I B I T S
 2               (Attached to transcript)
 3    ANDREW M. SCHNEIDER, M.D. DEPOSITION EXHIBITS    PAGE
 4   Exhibit 20   Article - Autoimmunity and          291
                  lymphomagenesis
 5                Goldin, et al.
 6   Exhibit 21   Article - Autoimmune Disease in      298
                  Individuals and Close Family Members
 7                and Susceptibility to Non-Hodgkin's
                  Lymphoma
 8                Mellemkjaer, et al.
 9   Exhibit 22   Article - Etiologic Heterogeneity    301
                  Among Non-Hodgkin Lymphoma Subtypes:
10                The InterLymph Non-Hodgkin Lymphoma
                  Subtypes Project
11
     Exhibit 23   Article - Occupational exposure to   321
12                glyphosate and risk of lymphoma:
                  Results of an Italian multicenter
13                case-control study
                  Meloni
14
     Exhibit 24   Article - Pesticide use and risk of  330
15                non-Hodgkin lymphoid malignancies in
                  agricultural cohorts from France,
16                Norway and the USA: A pooled
                  analysis from the AGRICOH consortium
17                Leon, et al.
18   Exhibit 25   Article - Glyphosate use and         342
                  associations with non-Hodgkin
19                lymphoma major histological
                  sub-types: Findings from the North
20                American Pooled Project
                  Pahwa
21
     Exhibit 26   Article - Exposure to Multiple       352
22                Pesticides and Risk of Non-Hodgkin
                  Lymphoma in Men from Six Canadian
23                Provinces
                  Hohenadel
24
     Exhibit 27   Summary Table - Pahwa 2019: Results  389
25                Reported for DLBCL & SLL
```

```
 1                        - - -

 2              THE VIDEOGRAPHER:  Good morning.  We're now

 3      on the record.  My name is Duke Stephenson, I'm

 4      the videographer, and our court reporter today is

 5      Susan Wasilewski.

 6              Today's date is Monday, June 13, 2022, and

 7      our time now is 11:13 a.m. Eastern Standard Time.

 8              This deposition is being taken at the

 9      Marriott Harbor Beach Resort in Fort Lauderdale,

10      Florida.

11              This begins Media Unit Number 1 of the video

12      recorded deposition of Dr. Andrew M. Schneider,

13      taken in the matter of Roundup, Paul Ferro,

14      et al., vs. Monsanto Company, et al.

15              Will counsel please introduce themselves,

16      after which will the court reporter swear in the

17      witness.

18              MS. ROSS:  Emma Ross for the defendant.

19              MR. HABERMAN:  Jeff Haberman from

20      Schlesinger Law Offices on behalf of plaintiffs.

21              MR. TAHAN:  Paul Tahan from the Simon Law

22      Firm on behalf of plaintiffs.

23              THE COURT REPORTER:  Would you raise your

24      right hand?

25              Do you solemnly swear or affirm the
```

```
 1        testimony you're about to give will be the truth,

 2        the whole truth, and nothing but the truth?

 3             THE WITNESS:  I do.

 4             THE COURT REPORTER:  Thank you.

 5             ANDREW M. SCHNEIDER, M.D., called as a

 6   witness by the Defendant, having been first duly

 7   sworn, testified as follows:

 8                  DIRECT EXAMINATION

 9   BY MS. ROSS:

10        Q.   Good morning, Dr. Schneider.

11        A.   Good morning.

12             MS. ROSS:  Before we begin, at the outset of

13        this deposition, about 10 minutes ago, I was

14        handed a new reliance list for Dr. Schneider

15        that, for the first time, lists a number of

16        internal Monsanto documents, additional

17        literature, and a category entitled Other

18        Documents.

19             We will continue this deposition and leave

20        it open for the purposes of exploring those

21        documents at a later date.

22             THE WITNESS:  Okay.

23        Q.   How are you this morning?

24        A.   I'm good.  Thank you.

25        Q.   Dr. Schneider, I'm handing you Exhibits 1,
```

Andrew M. Schneider, M.D.

```
1    2, and 3 to your deposition.
2            (Schneider Exhibit 1 was marked for
3    identification.)
4            (Schneider Exhibit 2 was marked for
5    identification.)
6            (Schneider Exhibit 3 was marked for
7    identification.)
8    BY MS. ROSS:
9        Q.   Exhibit 1 to your deposition is several
10   pages of invoices that we received this morning.
11           Do you see that?
12       A.   I do.
13       Q.   Exhibit 2 is the original materials list
14   that we were provided in this case.
15           Can you confirm that that's correct?
16       A.   It is.
17       Q.   Exhibit 3 is an amended materials list that
18   we were provided about 10 minutes ago.
19           Does that look right to you?
20       A.   It does.
21       Q.   You can hold onto those for the moment -- or
22   hand them back to me, and we can go through them in
23   a minute.  Thanks.
24           Would you give us your full name, please?
25       A.   Sure.  Andrew Schneider.
```

1    Q.   Dr. Schneider, my name is Emma Ross, and I

2    represent Monsanto in this case.  Okay?

3    A.   Okay.

4    Q.   At some point today I'm sure that I will ask

5    a question that is unclear, uses a term

6    inappropriately, or mispronounces something.  So if

7    you'd ask me to stop and repeat or rephrase my

8    question, I would be happy to do that.  Okay?

9    A.   Okay.

10   Q.   If you answer my question, I'll assume that

11   you understood it.  Is that fair?

12   A.   Sure.

13   Q.   Is there any reason you cannot give complete

14   and accurate testimony today?

15   A.   No.

16   Q.   Do you understand that this is my

17   opportunity to ask you questions about you, your

18   opinions, and the bases for those opinions?

19   A.   I do.

20   Q.   You've served as an expert in litigation

21   before, correct?

22   A.   Correct.

23   Q.   You've been doing expert work for over 10

24   years; is that right?

25   A.   It is.

```
 1        Q.   What is your best estimation of the number
 2   of times you have served as an expert in litigation?
 3        A.   So to be clear, an expert means just
 4   reviewing a case with paper, an e-mail?  I -- you've
 5   got to define what you mean by "review" so I can
 6   answer that question better.
 7        Q.   Sure.  In 2019 your best guess was that you
 8   reviewed 20 to 25 cases per year in which you issued
 9   an invoice.
10             Does that --
11        A.   So you --
12        Q.   -- ring a bell?
13        A.   So you threw in "issue an invoice," because
14   I also review cases that I don't issue an invoice if
15   I don't take the case.  I may get an e-mail from a
16   law firm saying "What do you think" or a phone call,
17   "What do you think."
18             So in terms of an invoice, I would say that
19   number is correct.  It could be even higher than
20   that.
21        Q.   Let me break that down a little because it
22   was a long answer.  Okay?  Fair?
23        A.   Sure.
24        Q.   You review some cases in which you never
25   issue an invoice, right?
```

```
 1        A.   Well, how do you define "review"?  Sometimes

 2   I get an e-mail from a law firm saying, you know, "I

 3   have this case, what do you think," and I'll say "I

 4   don't think so," and that will be it.

 5        Q.   You review some number of cases every year

 6   where you do issue an invoice, true?

 7        A.   True.

 8        Q.   In 2019 your estimate was that was about 20

 9   to 25 cases per year, right?

10        A.   So I don't have an independent recollection

11   of what I -- of 2019, but if I said it, I assume

12   it's true.

13        Q.   And today what is your best estimate of the

14   number of cases that you review per year in which

15   you issue an invoice?

16        A.   As a guess for the record, I -- you know,

17   because I could be way off because I don't have that

18   memorized or keep those numbers anywhere, so I'm

19   guessing for the record.

20             With that being said, I'd say maybe 25 to

21   30, yes.

22        Q.   You review about 25 to 30 cases a year in

23   which you issue an invoice, but you don't keep

24   specific records of how many cases; is that fair?

25        A.   There's no reason to.  Once I do a case, I'm
```

 1    done with it, and I don't have records about it,

 2    so...

 3        Q.   Has that number gone up, gone down, or

 4    remained relatively stable for the last 10 years?

 5        A.   Well, again, you have a pandemic in there,

 6    so, you know, it probably went down during the

 7    pandemic, but I think overall, it's stable to

 8    increased.

 9        Q.   How many of those 25 to 30 cases you review

10    a year in which you issue an invoice are for

11    plaintiffs?

12        A.   Probably around 90 percent.

13        Q.   That would mean that you review somewhere

14    around two to three cases per year in which you

15    issue an invoice for defendants; is that right?

16        A.   It's a guess, yes.

17        Q.   What is your best estimate of how many times

18    you have testified ever, either in deposition or at

19    trial?

20        A.   Well, it's a big difference.  Can we do them

21    separately?

22        Q.   Absolutely.  So let me ask the question

23    again so the record's clear.  Okay?  New question.

24             What is your best estimate of how many times

25    you have testified ever in court?

Andrew M. Schneider, M.D.

```
 1       A.   I'm going to guess at 30.  I think that -- I
 2   think that's close.
 3       Q.   What is your best estimate of the number of
 4   times you have testified ever in a deposition?
 5       A.   That's hard.  And I -- I've been asked that
 6   question many times, and I've guessed many times.
 7   So I don't know if I'm always consistent because I'm
 8   always guessing.
 9            Over 20 years, I'm sure I can do, let's say,
10   an average of seven, maybe eight.  So I'd say, if I
11   had to guess, maybe 200, but could be off.
12       Q.   Let's take the last year.  How many times
13   have you been deposed in the last year?
14       A.   Again, I'm doing this from memory and -- so
15   I could be way off because I don't have it
16   memorized.
17            In the last year, I'd say five.  That could
18   be off.  I don't -- I'm guessing.
19       Q.   And was that more or less than average?
20       A.   Probably average.
21       Q.   About what percentage of your income comes
22   from serving as an expert witness?
23       A.   About eight percent, e-i-g-h-t.
24       Q.   In 2019 you estimated your average annual
25   income from medicolegal work was maybe $150,000 per
```

1    year.  Is that still accurate?

2         A.    That would be my guess, yes.

3         Q.    Has that number gone up, gone down, or

4    remained the same --

5         A.    Again, during the pandemic --

6         Q.    -- in the last year?

7         A.    -- it probably went down, but other than the

8    pandemic, probably the same or stable.

9         Q.    It is true that you have been an expert

10   witness in litigation over 200 times, correct?

11        A.    So, again, you mean by touching paper or --

12   define what you mean so I know what you're saying.

13        Q.    When you were asked what -- your best

14   estimate of the number of times you've testified

15   ever in a deposition, you stated maybe 200, but you

16   could be way off.  Do you recall that?

17        A.    Just now, yes.

18        Q.    Just now, yes.  It is true that you have

19   been an expert in litigation, either testifying in a

20   deposition or touching paper, over 200 times,

21   correct?

22        A.    In my 20 years?

23        Q.    Yes.

24        A.    Yes.

25        Q.    It is true that nearly every single time you

1    testify, it is as an expert for the plaintiffs,

2    right?

3         MR. HABERMAN:  Objection.

4    A.   Well, I can actually answer that question

5    for you, because I do know.  So out of the 30 times,

6    I think two or three were as either a treating

7    physician, and then either one or two were for the

8    defense.  There's a firm called Reminger in Akron,

9    Ohio.  I did a rectal cancer case for them.  That

10   was a trial case.  That's how I'd answer that

11   question.

12   Q.   When was the last time you testified in a

13   deposition as an expert for the defense?

14   A.   For the defense?

15   Q.   Yes.

16   A.   I can't recall off the top of my head.

17   Q.   The cases where you serve as an expert in

18   litigation are predominantly medical malpractice

19   cases, correct?

20   A.   True.

21   Q.   How many of the 200 cases where you've

22   served as a disclosed expert involved a pesticide?

23   A.   I don't think any.

24   Q.   You have testified as to whether there was a

25   delay in the diagnosis of lymphoma.  Do you recall

Andrew M. Schneider, M.D.

```
 1    that?

 2        A.    I'm sure I have.

 3        Q.    Before this case, have you ever testified as

 4    to the cause of someone's non-Hodgkin's lymphoma?

 5        A.    No.

 6        Q.    When were you retained in this case?

 7        A.    Again, I'm guessing, but probably eight

 8    weeks ago, and I could be off by a few weeks here

 9    and there.

10        Q.    Today is --

11        A.    I think -- I think the invoice will tell us

12    because that's when I --

13        Q.    That would be helpful --

14        A.    That would be --

15        Q.    -- to look at your invoices?

16        A.    Yeah, yeah, look at the --

17        Q.    Sure.

18        A.    The first one will give me an idea.

19        Q.    And, again, Exhibit 1 are the invoices that

20    you've issued in this case, right?

21        A.    Correct.  So it looks like I issued an

22    invoice on April 12th, so probably shortly before

23    April 12th was the first time I was contacted.

24        Q.    You were contacted for the first time about

25    this case shortly before April 12th of 2022,
```

Andrew M. Schneider, M.D.

```
1    correct?
2       A.   Correct.
3       Q.   Who contacted you?
4       A.   I don't remember if it was Jeff or one of
5    his assistants, in all honesty.
6       Q.   It was someone at the Schlesinger law firm
7    who contacted you, correct?
8       A.   Yes.
9       Q.   Had you ever worked with the Schlesinger law
10   firm before?
11      A.   As a -- I testified for them in court as a
12   treating physician, and I also testified in
13   deposition as a treating physician, and that's a
14   tobacco case.
15      Q.   Did you issue any expert opinion in that
16   case as to what caused the plaintiff's lung cancer
17   or other cancer?
18      A.   So my understanding was, I was hired in that
19   case as a treating physician.  I may have given an
20   opinion, but I don't know if it fits the expert
21   opinion because I was not an expert witness.  I was
22   a treating physician.
23      Q.   What was the name of that case?
24      A.   I don't remember.
25      Q.   How many years ago was that?
```

Andrew M. Schneider, M.D.

```
1        A.   I'm guessing again, I'll say, several years

2   ago.  There -- I remember -- I think I did -- I'm

3   guessing.  I think I did two depositions and one

4   trial, I'm guessing.

5        Q.   Are there any other occasions on which

6   you've worked with the Schlesinger firm before?

7        A.   Only as a treating physician where it was my

8   patient who they had gotten as a client, and they

9   wanted me to either give a deposition or a trial

10  testimony that -- me, the treating physician.

11       Q.   And how many other times have you worked

12  with the Schlesinger firm as a treating physician?

13       A.   I think I told you.  I think I said -- my

14  guess is around three.  That could be off.

15       Q.   Okay.  Do you have a retention letter in

16  this case?

17       A.   No.

18       Q.   Have you heard of the Simon Law Firm?

19       A.   If you jog my memory a little bit, I can --

20  maybe.  I don't know who they are off the top of my

21  head.

22       Q.   The Simon Law Firm is another law firm

23  representing the plaintiffs in this case.  They are

24  based out of Seattle -- or, I'm sorry, they are not

25  based out of Seattle.  New question.
```

Andrew M. Schneider, M.D.

```
 1            The Simon Law Firm is another law firm
 2    representing the plaintiffs in this case.  They're
 3    based out of St. Louis.
 4            Have you heard of them before?
 5       A.   I don't think so.
 6       Q.   I take it that, to the best of your
 7    recollection, you've never worked with the Simon Law
 8    Firm before; is that right?
 9       A.   To the best of my recollection, yes.
10       Q.   You agreed to be an expert when the lawyers
11    contacted you around April of 2022, correct?
12       A.   After I reviewed the cases and the
13    literature.
14       Q.   And we have several invoices that we'll walk
15    through, and this might be a good time to do it.
16    I'm handing you back Exhibit 1.  Okay?
17       A.   Sure.
18       Q.   The first page of Exhibit 1 is an invoice.
19    And what is the date on that invoice?
20       A.   April 12, 2022.
21       Q.   In that invoice, you list several plaintiffs
22    for whom you reviewed depositions and medical
23    records.  Is that correct?
24       A.   Correct.
25       Q.   You reviewed medical records and a
```

```
 1     deposition for a Mr. William Pleu.  Do you see that?
 2        A.   I do.
 3        Q.   How many hours did you spend reviewing
 4     medical records for Mr. Pleu?
 5        A.   It looks about an hour.
 6        Q.   And how much time did you spend reviewing
 7     Mr. Pleu's deposition?
 8        A.   Two hours.
 9        Q.   You also reviewed medical records in a
10     deposition for Stacey Moore, correct?
11        A.   Correct.
12        Q.   And how much time did you spend reviewing
13     Mr. Moore's medical records?
14        A.   It looks like half an hour for records and
15     two hours for deposition.
16        Q.   The total amount you billed for this invoice
17     was what?
18        A.   13 hours.
19        Q.   And the total dollar amount was $3,900; is
20     that correct?
21        A.   Correct.
22        Q.   I'm doing this math, so I could be off.  But
23     it appears to me that your hourly rate for medical
24     record review is $300 an hour; is that right?
25        A.   It's correct.
```

```
 1        Q.   Can you turn to the next page in that

 2   exhibit?  Are you there?

 3        A.   I'm -- yes.

 4        Q.   Okay.  What's the date on Page 2 of your

 5   exhibit?

 6        A.   May 31st.

 7        Q.   And on May 31st you issued an exhibit for

 8   additional record review of three hours, correct?

 9        A.   Yes.

10        Q.   You also spent 20 hours reviewing

11   literature, right?

12        A.   Yes.

13        Q.   The total amount for that invoice is $6,900;

14   is that right?

15        A.   True.

16        Q.   That was also billed at your rate of $300

17   per hour, correct?

18        A.   Correct.

19        Q.   On May 31st you also issued one additional

20   invoice.  Can you walk us through that?

21        A.   That's for the time for today.  It's a full

22   day of deposition.

23        Q.   And the full day of deposition is billed for

24   a total of $6,000, correct?

25        A.   Correct.
```

Andrew M. Schneider, M.D.

```
 1        Q.   What was your assignment in this case?
 2        A.   I was asked to review the records and offer
 3   an opinion whether Roundup was an etiological factor
 4   in causing either diffuse large B-cell lymphoma or
 5   CLL.
 6        Q.   The opinions you were asked to offer in this
 7   case that we're here to talk about today are
 8   specific to two plaintiffs, correct?
 9        A.   Correct.
10        Q.   Those plaintiffs are William Pleu and Stacey
11   Moore, right?
12        A.   Correct.
13        Q.   Were you asked to express any opinions that
14   you were unable to provide?
15        A.   I wasn't told what opinions to express as an
16   expert.  No.  I can only express my opinions.
17        Q.   Were you asked to comment on anything that
18   you felt was outside of your expertise or you were
19   not able to comment on?
20        A.   Again, I don't think I was asked to comment
21   on anything.  I think I was asked to review the
22   records and give an opinion about whether Roundup
23   caused the CLL or the diffuse large B-cell lymphoma,
24   and, again, to answer any questions that you were
25   going to ask me today.
```

```
 1              (Schneider Exhibit 4 was marked for

 2       identification.)

 3       BY MS. ROSS:

 4           Q.   Exhibit 4 to your deposition is the

 5       Plaintiffs' Disclosure of Retained and Nonretained

 6       Expert Witnesses in this case.

 7              Do you see that?

 8           A.   I do.

 9           Q.   Have you seen this document before?

10           A.   No.

11           Q.   If you'll go to the very last -- or Page 5

12       with me, do you see that the date on plaintiff's

13       disclosure is April 18th of 2022?

14           A.   The last page, please?

15           Q.   Page 5.

16           A.   I see that, yes.

17           Q.   Your opinions are described on the previous

18       page, Page 4.  Would you go with me there, please?

19       Are you there?

20           A.   Yes.  I'm reading it.  Okay.

21           Q.   You were disclosed in this case to testify

22       on issues of specific causation, right?

23           A.   Yes.

24           Q.   Specific causation is what you told me about

25       just a moment ago, correct?  Did Roundup cause
```

1    Mr. Pleu's condition, or did Roundup cause

2    Mr. Moore's DLBCL, true?

3        A.    True.

4        Q.    You intend to talk about that at trial,

5    right?

6        A.   I can't talk.  I have to answer questions.

7    So any question I'm asked, I'll answer.  I can't

8    just talk.

9        Q.    You were also disclosed to testify about the

10   causes of non-Hodgkin's lymphoma, right?

11       A.    True.

12       Q.    What other causes of non-Hodgkin's lymphoma

13   are you offering opinions on in this case?

14       A.    Sure.   Immunosuppression, EBV, HIV, other

15   diseases that cause immunosuppression like SLE or

16   rheumatoid arthritis.   Certain drugs cause

17   immunosuppression and may increase the risk of

18   lymphoma.

19       Q.    Are there any other causes of non-Hodgkin's

20   lymphoma that you are offering opinions on in this

21   case?

22       A.    Those are the ones that come to mind.

23       Q.    You are also offering an opinion on whether

24   exposure to glyphosate and/or glyphosate-based

25   formulated products can cause cancer, right?

1      A.    Specifically lymphoma, correct.

2      Q.    Thank you for that clarification.  So you

3    are opining on whether exposure to glyphosate and/or

4    glyphosate-based formulations can cause lymphoma,

5    true?

6      A.    NHL, correct.  I'm not giving any opinions

7    on other diseases.  I wasn't asked to.

8      Q.    You are not offering any expert opinion in

9    this case on whether exposure to glyphosate or

10   glyphosate-based formulations causes any cancer

11   other than non-Hodgkin's lymphoma, correct?

12     A.    I was not prepared to give that opinion

13   today, correct.

14     Q.    And you're not going to come to trial and

15   offer that opinion, correct?

16     A.    Correct.

17     Q.    You were disclosed on the cellular changes

18   with the development of non-Hodgkin's lymphoma,

19   correct?

20     A.    Yes.

21     Q.    What cellular changes do you intend to tell

22   the jury about?

23     A.    Well, there's evidence that glyphosate can

24   cause genotoxic changes and oxidative stress,

25   meaning chromosomal changes and the development of

1    oxygen free radicals causing damage or lymphoma.

2        Q.   Exhibit 3 to your expert deposition was your

3    original materials list, right?

4        A.   Yes.

5        Q.   I'm sorry, no.  I'm wrong.

6        A.   Okay.

7        Q.   Exhibit 2 -- new question.

8             Exhibit 2 to your expert deposition is your

9    original materials list, correct?

10       A.   If you say so, I'm sure it's true.

11       Q.   You'll see that it's somewhat shorter than

12   the materials list in Exhibit 3.

13       A.   Okay.

14       Q.   Do you see that?

15       A.   I do.  I do.

16       Q.   Can you identify for me the articles on

17   Exhibit 2 to your deposition, your original

18   materials list, that discuss the genotoxicity of

19   glyphosate?

20       A.   Sure.  I wouldn't be able to do that from

21   memory because I reviewed, as you can see, many,

22   many articles, and I have a general opinion based

23   upon what I read.  If you want me to look through

24   some of the things I have here, I probably could

25   find something if you want me to take that time.

Andrew M. Schneider, M.D.

```
 1      Q.   I'd like to start just by understanding when

 2   you reviewed what.  Okay?

 3      A.   What's your specific question?

 4      Q.   There are 30 articles listed on your

 5   original materials list.  I counted them up, but

 6   you're welcome to do the same.  All right?

 7      A.   Okay.

 8      Q.   Of the 30 articles that you originally

 9   reviewed on Roundup and for this case, how many of

10   those articles discussed genotoxicity?

11      A.   I wouldn't be able to tell you from memory

12   without looking at each individual article.

13      Q.   When did you first review any literature

14   related to the genotoxicity of Roundup?

15      A.   Probably after I was told that there would

16   be a deposition coming.

17      Q.   And when was that?

18      A.   I don't remember.

19      Q.   That would have been sometime presumably in

20   May of 2022, correct?

21      A.   I can't tell you whether it was April or

22   May.

23      Q.   Are there any other cellular changes you

24   intend to tell the jury about?

25      A.   Those are the two that I have to talk about.
```

Andrew M. Schneider, M.D.

1      Q.   Are there any other opinions that we have

2   not discussed that you intend to offer at trial?

3      A.   I mean, I'm not sure.  We just started, but

4   I'm sure there's a lot of opinions I'll be giving

5   you.  So I'm not sure what I've said so far, so I

6   don't want to answer that question.  I can't answer

7   that question with that understanding.

8      Q.   If you'll take a look at Page 4 of your

9   disclosure again.

10          THE VIDEOGRAPHER:  I'm sorry to interrupt.

11          (Discussion off the record.)

12   BY MS. ROSS:

13      Q.   Are you ready for my question,

14   Dr. Schneider?

15      A.   I am.  I am.

16      Q.   Are there any other opinions that were not

17   disclosed to us in Exhibit 4 that, sitting here

18   today, you intend to offer at trial in this case?

19      A.   No.  But these -- this is very general.  I'm

20   going to be, I'm sure, going into great specifics

21   about each part.

22      Q.   You can hold onto that.

23      A.   Okay.

24          (Schneider Exhibit 5 was marked for

25   identification.)

```
 1    BY MS. ROSS:
 2        Q.   Exhibit 5 to your deposition is from the
 3    SEAK expert website, and it states Andrew Schneider,
 4    MD, expert witness, SEAK, Incorporated.
 5             Do you see that?
 6        A.   I do.
 7        Q.   What is SEAK?
 8        A.   SEAK is a directory of medical experts.
 9    It's published online and in book form that lawyers
10    can obtain and call me if they choose to.
11        Q.   Why do you list a profile with SEAK?
12        A.   To advertise my expertise.
13        Q.   SEAK trains experts through seminars.  Have
14    you taken any of their seminars?
15        A.   Just one when I first started in the year
16    2000, probably.
17        Q.   SEAK also has written training materials for
18    experts.  Have you reviewed any of those?
19        A.   No.
20        Q.   Tell me about the seminar you took with SEAK
21    back in 2000 or so.
22        A.   Again, I was, at that time, entertaining
23    becoming an expert witness.  I don't think I had
24    done any work yet.  And I went to Cape Cod and went
25    to a seminar where they, I guess, discussed expert
```

```
 1    witness work.  22 years ago, I don't have a very

 2    good memory of what they discussed.  But I went to

 3    Cape Cod, and I learned about being -- being an

 4    expert witness, and I had a nice time.

 5        Q.   What did you learn about being an expert

 6    witness?

 7        A.   Honestly, I can't tell you what I learned 22

 8    years ago.

 9        Q.   Do you have any materials related to that

10    seminar you took around the year 2000?

11        A.   No.

12        Q.   You pay SEAK to have your name listed,

13    correct?

14        A.   Yes.

15        Q.   The standard listing is $595 annually?

16        A.   I though it was $550, but if you tell me

17    it's 595, I'm sure it is.

18        Q.   Do you pay for any of SEAK's premium

19    listings?

20        A.   No.

21        Q.   You pay just for the basic, standard listing

22    with SEAK, correct?

23        A.   Sure, correct.

24        Q.   Are you relying on any other expert in this

25    case if any of the opinions you're offering?
```

```
 1      A.   No.

 2      Q.   Have you ever communicated in any way with

 3   Dr. Benbrook?

 4      A.   I don't know who he is.

 5      Q.   How about Dr. Ambrose Charles?

 6      A.   I'll make it easy.  I have communicated with

 7   nobody about this case and don't know any of these

 8   people.

 9      Q.   Let me walk through since they're in --

10      A.   Sure.

11      Q.   -- plaintiffs' disclosure.  All right?

12      A.   Sure.  Sure.

13      Q.   And, sure, we can cut this short.

14      A.   Sure.

15      Q.   So you don't know who Dr. Ambrose Charles

16   is, correct?

17      A.   Correct.

18      Q.   You are not relying on Dr. Charles for any

19   of the opinions that you are offering in this case,

20   true?

21      A.   True.

22      Q.   You have never communicated, I take it, with

23   Dr. Sawyer, right?

24      A.   I don't know any of these people.

25      Q.   Dr. Gagnier?
```

```
 1      A.    Correct.

 2      Q.    Have you ever heard of Dr. Neugut?

 3      A.    No.

 4      Q.    Have you ever heard of Dr. Zeiss?

 5      A.    No.

 6      Q.    Have you ever heard of Dr. Zhang?

 7      A.    What -- unless he's the author of the

 8  article, which -- I read his article if that's him.

 9      Q.    She.

10      A.    She.  Okay.

11      Q.    But, yes.

12      A.    Shows I don't know who they are.

13      Q.    So -- and we can, without going into any

14  further detail, just confirm that you are not

15  relying on any of those experts for any of your

16  opinions in this --

17      A.    Well --

18      Q.    -- case, right?

19      A.    -- I'm relying on the Zhang article to give

20  some opinions, so if that's Dr. Zhang, then, yes.

21      Q.    Sure.  And so let me ask a clearer question.

22  Okay?

23      A.    Sure.

24      Q.    You are not relying on any communications,

25  expert reports, or depositions of any other expert
```

Andrew M. Schneider, M.D.

1    for the plaintiffs in this case for the opinions you

2    are offering, correct?

3        A.   Correct.

4        Q.   Have you spoken with anyone other than

5    counsel about William Pleu or Stacey Moore?

6        A.   No.

7        Q.   You have not spoken with any of their family

8    members, correct?

9        A.   I've spoken to no one.

10       Q.   Okay.  Have you discussed this litigation

11   with anyone else?

12       A.   I've spoken to no one, so the answer could

13   be no.

14       Q.   You've not discussed this litigation with

15   any of your colleagues, for example?

16       A.   Correct.

17       Q.   Earlier we discussed that you charge $300

18   per hour for record review, right?

19       A.   True.

20       Q.   You charge the same $300 per hour for

21   literature review, correct?

22       A.   True.

23       Q.   Do you charge $300 per hour to talk to the

24   lawyers for the plaintiffs?

25       A.   So I'm pretty -- not very picky or finessey,

1     so I don't -- usually I talk for a short time, so I

2     don't usually charge them.

3          Q.   You don't usually charge when you talk with

4     the lawyers for the plaintiffs?

5          A.   I usually don't charge for discussions with

6     the attorneys, correct.

7          Q.   Are those typically phone conversations or

8     videoconference conversations?

9          A.   Phone conversations.

10         Q.   As we discussed, you first reviewed anything

11    related to the Roundup litigation around April of

12    2022, right?

13         A.   Correct.

14         Q.   You've spent, according to your invoice, 20

15    hours to date reviewing literature, right?

16         A.   Yes.

17              MR. HABERMAN:  As a -- of that date, 20

18         hours as of that date.

19              THE WITNESS:  Correct.

20         Q.   How many hours have you spent since May

21    31st, 2022 reviewing medical literature?

22         A.   All right.  So I'll be honest with you and

23    tell you that I don't sit with a stopwatch and look

24    at every hour.  I can tell you I did at least 20

25    hours, but I review every day continually.  And then

```
 1    there was a change in the date of the deposition, so
 2    I had to keep reviewing and memorizing, and so I
 3    can't tell you.
 4         Q.   So do you intend to bill for the additional
 5    literature review that you've done between May 31st
 6    and June 13th?
 7         A.   I was not going to bill anything for it.
 8         Q.   You're not going to bill anything for any
 9    additional literature review you've done in the last
10    two weeks?
11         A.   I was not -- I was not going to bill
12    anything further, correct.
13         Q.   Do you -- what is your best estimate of the
14    additional time that you've spent reviewing
15    literature beyond the 20 hours in Exhibit 1?
16         A.   So like I said, I really can't tell you
17    since I don't sit with a stopwatch.  You know, I
18    thought 20 hours was the appropriate time to go
19    through this copious literature.
20              There were delays, as you know, in this
21    deposition, and then there were other literature.  I
22    think it's a learning curve, so I get faster and
23    faster as I know more information.
24              So I wasn't planning on billing another few
25    hours.  I'm not going to -- I don't like to nickel
```

```
 1    and dime people, so I'm happy that -- I think I got
 2    paid fairly.  I'm not going to worry whether I'm two
 3    or three hours short.
 4       Q.   20 hours plus or minus two or three hours is
 5    a fair estimate of the total amount of time that
 6    you've spent reviewing literature on Roundup, true?
 7       A.   It's a guess.
 8       Q.   When did you first review any medical record
 9    for any plaintiff in this case?  And it's -- if it's
10    helpful, you can look at your invoices.
11       A.   Well, we discussed it.  I mean, the date of
12    the invoice is April 12th, so probably one or two
13    weeks or -- before that.  Sometime in April would be
14    my guess.
15       Q.   Now, we went through the numbers of your
16    original review of medical -- I'm -- medical records
17    in April of 2022, right?
18       A.   Correct.
19       Q.   And since then, you've spent an additional
20    three hours reviewing medical records, correct?
21       A.   I mean, I don't have it memorized, but I
22    think we discussed it already.
23       Q.   It's in your invoices.  You're happy -- I'm
24    happy for you to take a look at it if you like.
25       A.   I -- sure.  I think we did that already, but
```

Andrew M. Schneider, M.D.

1    sure.  What was your question?

2      Q.   My question is:  How many hours to date have

3    you spent reviewing the medical records of

4    Mr. Moore?

5      A.   Well, again, the initial was just a cursory

6    review, because I had six cases and didn't know

7    which cases I would need to, you know, have

8    memorized for trial or deposition.  So initially it

9    says what it says.  You want me to say what it says?

10     Q.   Since you have the only copy in front of

11   you, I'm happy to just summarize what I think it

12   says, and you can tell me if I'm wrong.  Okay?

13     A.   Sure.

14     Q.   Initially you spent an hour reviewing

15   Mr. Pleu's medical records, right?

16     A.   Correct.

17     Q.   And half an hour reviewing Stacey Moore's

18   medical records, correct?

19     A.   Correct.

20     Q.   In your subsequent invoice, you spent

21   another three hours reviewing medical records, and

22   that is not broken down by each plaintiff, correct?

23     A.   Right.

24     Q.   Was that about an hour and a half for

25   Mr. Moore and hour and a half for Mr. Pleu?

```
 1       A.   I don't know.

 2       Q.   But total for the two of them, presumably,

 3  since they were now the trial plaintiffs, you spent

 4  an additional three hours reviewing medical records,

 5  right?

 6       A.   Right.  I reviewed the medical records, and

 7  I probably spent a lot more time on the depositions.

 8       Q.   I think you said that you've spent little

 9  time actually talking to the lawyers; is that right?

10       A.   I didn't say that.  You didn't ask --

11       Q.   Okay.

12       A.   -- that question.

13       Q.   So let me, then, just ask a new question.

14  Okay?

15       A.   Sure.

16       Q.   How much time have you spent to date talking

17  to the plaintiff lawyers?

18       A.   Again, I'd be totally guessing since I

19  already told you I'm not billing for that time, and

20  I don't have a stopwatch every time I have a

21  conversation.  So you want me to just give my best

22  guess?

23       Q.   Yes.

24       A.   Sure.  I've only talked to Mr. Haberman, and

25  we probably had, I'm guessing, two to four
```

1    conversations.  And I'm a pretty fast New Yorker, so
2    I don't have a lot of patience to sit on the phone
3    for hours.  So I'm sure our total time on the phone
4    is around an hour over four times.  That's a guess.
5        Q.   Got it.  Best estimate, an hour, but that
6    was split over four different conversations or so,
7    is your best guess sitting here --
8        A.   That's --
9        Q.   -- correct?
10       A.   For the record, this is a guess.  So if I --
11   if I'm wrong, I'm wrong.  I don't know the answer to
12   that question.
13       Q.   And as you said, you're not billing for the
14   time that you spent talking to the lawyers, right?
15       A.   Correct.
16       Q.   The fee we received for your deposition in
17   advance of today was 1,500 an hour for a two-hour
18   minimum and then 625 for each additional hour.  Is
19   that still your rate?
20       A.   So it is, but when you take a whole day of
21   my time, then I charge a $6,000 flat fee.
22       Q.   And today we started the deposition at 11:00
23   a.m.  You had patients in the morning, correct?
24       A.   I'm prepared to spend eight hours with you
25   today if need be.

```
1      Q.   What do you charge for trial?

2      A.   The same, $6,000 plus prep time, so it

3   usually runs around $9,000.

4      Q.   That's $6,000 per day for trial, correct?

5      A.   I've never had a -- well, once I had a trial

6   that they kept me overnight.  But in my 30 trials,

7   only once did they keep my overnight.

8      Q.   And it -- if you had to testify for more

9   than one day, it would be $6,000 per day, correct?

10     A.   Correct.

11     Q.   Do you charge for travel time?

12     A.   No.

13     Q.   Do you charge for -- you said you charge for

14   prep time and -- new question.

15          You charge for prep time for trial, correct?

16     A.   Yes.

17     Q.   At what rate?

18     A.   $300 an hour.

19     Q.   If I add up your invoices, not counting

20   today's deposition -- well, actually, since you have

21   the copy in front of you, I'm going to ask you to do

22   it instead.  Is that --

23     A.   Sure.

24     Q.   -- all right?

25     A.   Sure.
```

```
 1        Q.   How much time have you spent total
 2   consulting on the Roundup litigation?
 3        A.   It looks like 23 and 13, so that would be 36
 4   hours.
 5        Q.   And you've invoiced thus far for all of the
 6   time that you've spent consulting, correct?
 7        A.   Yes.
 8        Q.   Did you take any notes of the medical
 9   records that you reviewed?
10        A.   I did.  I did, yes.  I have them on my
11   phone.
12        Q.   Okay.
13        A.   I can send them to you.
14        Q.   Please do.
15        A.   Sure.
16             MR. HABERMAN:  Why don't you send them to
17        me.
18             MS. ROSS:  Yeah.
19             THE WITNESS:  Sure.
20             MR. HABERMAN:  And I'll send them over.
21        Q.   Since you have Jeff's e-mail, that's the
22   best way to do that.
23        A.   Okay.  Give me one second.  Basically, I
24   took notes of the depositions.
25        Q.   Okay.  So you took notes from the
```

1    depositions that you reviewed in this case, right?

2        A.   Yes.

3        Q.   And have you ever spoken with Mr. Pleu?

4        A.   No.

5        Q.   Have you ever met Mr. Pleu?

6        A.   No.  No.

7        Q.   You were not Mr. Pleu's doctor, correct?

8        A.   I don't know Mr. Pleu.

9             I sent -- I sent you notes on the two

10   plaintiffs in this case from my notes of my -- my

11   review of the deposition.  And then I do have on my

12   computer, which I can get whenever you want me to,

13   some notes that I took from the literature.

14       Q.   Yes, we'll want those at well.

15       A.   You want it now or want to do it at a break?

16       Q.   Let's do it at a break.

17       A.   Okay.

18       Q.   Do you have any other notes that you've

19   prepared in the Roundup litigation apart from the

20   notes on the individual plaintiffs that you just

21   sent to your counsel and the notes on the Roundup

22   literature that you will send to us?

23       A.   No.

24       Q.   When you were reviewing literature, did you

25   review it in hard copy or electronically?

Andrew M. Schneider, M.D.

```
 1      A.   Both.

 2      Q.   And did you take notes on articles as you

 3   reviewed them?

 4      A.   So I did take some notes, which you'll see

 5   when I send it to you, and then I've also

 6   highlighted certain things, which you can see.

 7      Q.   I can see that, yes.

 8           So we will mark as Exhibit 6 the stack of

 9   literature in hard copy --

10      A.   Want me to put that on?

11      Q.   -- that -- yes -- that you brought with you

12   today.

13      A.   And this is not all the literature I

14   reviewed, just whatever I was able to print.

15           (Schneider Exhibit 6 was marked for

16   identification.)

17   BY MS. ROSS:

18      Q.   Sure.  So why don't we make sure the record

19   is clear on that.

20           Dr. Schneider, what is Exhibit 6?

21      A.   It is the records that I printed out that I

22   have some notes or highlights on, on the issue of

23   Roundup causation.

24      Q.   Before we were talking about that, we were

25   talking about Mr. Pleu and Mr. Moore, correct?
```

```
 1       A.   Yes.

 2       Q.   Have you ever met Mr. Moore?

 3       A.   I haven't met anybody.

 4       Q.   So the answer to my question is, no, you've

 5  never met Mr. Moore, correct?

 6       A.   Correct.

 7       Q.   I take it you've not interviewed, performed

 8  a physical examination, or spoken to Mr. Moore in

 9  any capacity.  Am I correct?

10       A.   You're correct.

11       Q.   You are not Mr. Moore's treating doctor,

12  right?

13       A.   Correct.

14       Q.   You have two materials considered lists

15  sitting in front of you.  Let's go to the earlier

16  one first.  Okay?

17       A.   I didn't understand what -- the reliance

18  list we're talking about?

19       Q.   The reliance list.

20       A.   Yes.

21       Q.   Yes.

22       A.   You want -- Exhibit 2, then, that would be?

23       Q.   Yes.  Let's go to Exhibit 2.  Have you seen

24  Exhibit 2 before?

25       A.   No.
```

Andrew M. Schneider, M.D.

```
1        Q.   You --
2        A.   I mean -- I mean, let me say that
3   differently.  I've seen the reliance list, but not
4   Exhibit 2.  Does that make sense?
5        Q.   It didn't, so tell me what you mean.
6        A.   I mean, I -- I helped prepare the reliance
7   list, and I -- before today I knew what was on the
8   reliance list, but I've never seen it in this form,
9   this piece of paper.  I've seen it only
10  electronically.
11       Q.   I see.  So the lawyers -- did you type up
12  the reliance list or did the lawyers?
13       A.   The lawyers.
14       Q.   Okay.  You did have an opportunity to review
15  what was on your reliance list prior to today; is
16  that right?
17       A.   That's correct.
18       Q.   Okay.  You reviewed the deposition of Stacey
19  Moore, right?
20       A.   Correct.
21       Q.   You reviewed Mr. Moore's Plaintiff Fact
22  Sheet, correct?
23       A.   Correct.
24       Q.   You reviewed Mr. Moore's medical records,
25  right?
```

```
 1        A.   Yes.
 2        Q.   Do you recall what the most recent medical
 3   record for Mr. Moore was that you reviewed?
 4        A.   I don't.
 5        Q.   You also reviewed the deposition of William
 6   Pleu, correct?
 7        A.   Correct.
 8        Q.   You reviewed Mr. Pleu's Plaintiff Fact
 9   Sheet, right?
10        A.   Yes.
11        Q.   You reviewed Mr. Pleu's medical records,
12   correct?
13        A.   Yes.
14        Q.   Do you recall what the most recent medical
15   record for Mr. Pleu was that you reviewed?
16        A.   I don't.
17        Q.   There is medical literature listed on
18   Exhibit 2, right?
19        A.   Yes.
20        Q.   There's additional medical literature listed
21   on your amended materials list, Exhibit 3, right?
22        A.   Correct.
23        Q.   Did you take anything off your reliance list
24   between Exhibits 2 and 3, or did you just add?
25        A.   I didn't prepare the reliance list, so I
```

1    can't tell you.

2        Q.    Okay.  All the medical literature you

3    reviewed in forming your opinions is listed in

4    Exhibit 3, correct?

5        A.    Yes.

6        Q.    If something is not on your reliance list,

7    we can assume that you did not review it in forming

8    your opinions, true?

9            MR. HABERMAN:   Objection.

10       A.    Yeah.  I'm -- I don't know, unless it's

11   something in my fund of knowledge that you've asked

12   me a question, and I just happen to know something

13   from somewhere else, but, yes.

14       Q.    What other materials are you relying on for

15   your opinions in this case?

16       A.    Just what's on the reliance list.

17       Q.    One thing you reviewed in forming your

18   opinions was a chapter in Goldman-Cecil Medicine on

19   non-Hodgkin's lymphoma, correct?

20       A.    Yes.

21       Q.    Did you find that chapter supported the

22   opinions you are offering today?

23       A.    So honestly speaking, I did not get access

24   to that chapter, so I did not -- I did not review

25   it.

1      Q.   You did not review the chapter with the

2    first author of Bierman, B-i-e-r-m-a-n, in

3    Goldman-Cecil Medicine --

4      A.   That's --

5      Q.   -- correct?

6      A.   That's correct.

7      Q.   Is there anything else on your reliance list

8    that you did not review?

9      A.   I'll have to go through it.

10     Q.   Let's do that at a break, then.

11     A.   Okay.

12     Q.   And we'll come back to that question.  Okay?

13     A.   Sure.

14     Q.   You reviewed the WHO criteria, which are

15   Swerdlow 2017, for the classification of tumors of

16   the hematopoietic and lymphoid tissues, right?

17     A.   Yes.

18     Q.   What is that?

19     A.   Basically, the WHO is an organization which

20   classifies the different types of lymphoma, and

21   there are as you know, many, many different types.

22     Q.   We've heard Swerdlow 2017 referred to as the

23   Bible of non-Hodgkin's lymphoma diagnosis.  Do you

24   agree with that classification?

25     A.   So I'm not a pathologist.  In my practice, I

Andrew M. Schneider, M.D.

```
1    get a pathologic diagnosis.  So I couldn't comment
2    on who is the expert or the Bible from the WHO.
3           As a trained medical oncologist, I'm aware
4    of all the different types of lymphoma.  So when I
5    get a pathology report, I know what it means and
6    don't actually go to the WHO.
7    Q.   You rely on a pathologist for the actual
8    diagnosis of non-Hodgkin's lymphoma --
9    A.   Correct.
10   Q.   -- correct?
11   A.   Correct.
12   Q.   I want to go back to when you first reviewed
13   anything related for Roundup and cancer.  Okay?
14   A.   Sure.
15   Q.   Before you were retained in April of 2022,
16   had you reviewed the published literature on Roundup
17   and non-Hodgkin's lymphoma?
18   A.   No.
19   Q.   What did you initially review?
20   A.   I can't tell you the sequence of what I
21   reviewed first, unfortunately.
22   Q.   It is fair for us to take a look at your
23   materials list in this case to get a sense of what
24   you reviewed in forming your opinions, right?
25   A.   Yes.
```

1     Q.   It's true that prior to April of 2022, you

2   had no opinion on whether or not Roundup caused

3   non-Hodgkin's lymphoma, right?

4     A.   Correct.

5     Q.   Your references on your materials list

6   initially included 30 references to medical

7   literature.  Did you -- withdrawn.  New question.

8          How did you identify the articles on your

9   reliance list?

10    A.   So some I found myself, and some plaintiffs'

11  counsel suggested or gave to me.

12    Q.   Is there any way that you can identify which

13  articles you found yourself and which plaintiffs'

14  counsel identified for you?

15    A.   No.

16    Q.   Did you, for the articles that you

17  identified yourself, perform a search of the

18  published medical literature?

19    A.   Yes.

20    Q.   How did you conduct that search?

21    A.   Through a Google search.

22    Q.   Google Scholar?

23    A.   No, just regular Google.

24    Q.   So you did a regular Google search for

25  Roundup and non-Hodgkin's lymphoma?

Andrew M. Schneider, M.D.

```
1        A.    Correct.

2        Q.    Are you familiar with PubMed?

3        A.    I am.

4        Q.    Have you ever used PubMed?

5        A.    So I don't use PubMed specifically, but

6    often I'm led there by my Google search.

7        Q.    Did you, in searching for literature on

8    Roundup and non-Hodgkin's lymphoma, conduct a PubMed

9    search?

10       A.    No.

11       Q.    Did you, in searching for literature on

12   Roundup and non-Hodgkin's lymphoma, conduct a

13   specific Google Scholar search as opposed to a

14   general Google search?

15       A.    No.

16       Q.    Did you include all the relevant articles

17   that you found in your Google search on your

18   reliance list?

19       A.    Yes.

20       Q.    You included relevant articles in your

21   review whether or not they supported your opinions,

22   correct?

23       A.    Correct.

24       Q.    Did you attempt to be balanced in what you

25   reviewed and included in your references?
```

Andrew M. Schneider, M.D.

1      A.   I reviewed everything I could find that I

2   thought was applicable, and good or bad, I think

3   it's on the reliance list.

4      Q.   Three of the articles on your reliance list

5   are about PCBs.  Do you see that?

6      A.   I'm sure, but, yes, go ahead.

7      Q.   Freeman 2012 is one of them, right?

8      A.   Yes.

9      Q.   The IARC monograph of 2016 is another about

10   PCBs, right?

11      A.   Yes.

12      Q.   Lauby-Secretan is another article about

13   PCBs.  Do you see that?

14      A.   I do.

15      Q.   Did PCBs cause or contribute to Mr. Pleu's

16   condition?

17      A.   No.

18      Q.   Did PCBs cause or contribute to Mr. Moore's

19   cancer?

20      A.   No.

21      Q.   Is there any plaintiff in this case alleging

22   they were exposed to PCBs in any way?

23      A.   No.

24      Q.   Are you offering an opinion on PCBs and

25   cancer?

```
 1       A.   No.

 2       Q.   Another one of the papers on your MCL is

 3  Linet 2014.  Do you see that?

 4       A.   If you're going to -- is it alphabetized?

 5  Let me see.

 6       Q.   It is.

 7       A.   Okay.  Linet, is that what -- I see it.

 8  Yes, yes, yes.  I'm ready.

 9       Q.   That is a paper about risk factors for

10  follicular lymphoma, true?

11       A.   True.

12       Q.   Mr. Moore has DLBCL, right?

13       A.   Correct.

14       Q.   Mr. Pleu does not have follicular lymphoma,

15  right?

16       A.   True.

17       Q.   No plaintiff we're here to talk about today

18  has follicular lymphoma, right?

19       A.   True.

20       Q.   You told us earlier that you intend to give

21  the opinion at trial, if asked, that you believe

22  glyphosate-based herbicides cause non-Hodgkin's

23  lymphoma?

24       A.   Yes.

25       Q.   And you formed that opinion sometime after
```

1    April 2022, after reviewing the literature cited on

2    your materials list, right?

3        A.   True.

4        Q.   You did not, at the time of your initial

5    materials list, review in vitro or in vivo studies

6    about the genotoxicity of glyphosate or Roundup,

7    right?

8             MR. HABERMAN:  Objection.

9        A.   Like I said, I don't have an independent

10   recollection of when I did.  I believe, actually,

11   some of these articles talk about that.

12       Q.   And the stack of articles sitting in front

13   of you, perhaps we'll, at a break, ask you to take a

14   look at them and see if those articles are on this

15   initial materials list.  Okay?

16       A.   Sure.

17       Q.   Are you offering any opinions about the cell

18   studies of glyphosate?

19       A.   So since I don't really know what you mean

20   by cell studies, I'd have to ask you to define what

21   that means.  Then I'll be able to answer that

22   question better.

23       Q.   Sure.  Let me see if this helps.  Okay?

24       A.   Sure.

25       Q.   Earlier you mentioned that you were going to

Andrew M. Schneider, M.D.

```
1    talk about glyphosate and genotoxicity.  Do you
2    recall that?
3       A.   I do.
4       Q.   At some point you reviewed some in vitro or
5    in vivo studies of glyphosate, correct?
6       A.   I can't tell you whether I did that or
7    whether I reviewed other people's review of it.
8       Q.   Okay.  What opinions do you intend to offer
9    about the genotoxicity of glyphosate or Roundup?
10      A.   Well, I think I said that I'm aware that it
11   can cause chromosomal changes, chromatin changes,
12   and that there's been in vitro studies showing that.
13      Q.   Are there any other opinions about
14   glyphosate's genotoxicity you intend to offer?
15      A.   Since I'm not a trained toxicologist or
16   pathologist, that's about the extent of my
17   understanding.
18      Q.   Did you review any of the mouse or rat
19   cancer studies about glyphosate --
20      A.   I did.
21      Q.   -- directly, or did you just review other
22   people's summaries of them?
23      A.   I actually reviewed the mouse studies
24   directly.
25      Q.   And how many mouse studies did you review
```

1    directly?

2        A.   How many articles?

3        Q.   How many mouse -- you said you reviewed the

4    mouse studies directly.

5        A.   Yes.  But some of the articles had more than

6    one, I think, mouse studies.  So can I just say how

7    many articles I reviewed?

8        Q.   Sure.

9        A.   Sure.  I think somewhere between two and

10   four.

11       Q.   And which were those?

12       A.   I can tell you if you'd let me go to my

13   phone.

14       Q.   Sure.  And just for the record, can you tell

15   us what you're looking at on your phone?

16       A.   Sure.  I'm going to look at the animal

17   studies that were sent to me by plaintiffs'

18   attorney.

19       Q.   Okay.

20       A.   I didn't find them myself.  They were sent

21   to me by the attorney.

22            THE WITNESS:  Would it be fair if you just

23       tell her, or do you want me to look it up?

24       Q.   You're testifying today, Doctor --

25       A.   No --

1    Q.   -- if you don't mind looking it up.

2    A.   No problem.  If you don't mind waiting, no

3    problem.

4    Q.   No, no problem.

5    A.   Okay.  There's an article called A

6    comprehensive analysis of the animal carcinogenicity

7    data from glyphosate from chronic exposure rodent

8    carcinogenicity studies.  The author is Portier,

9    P-o-r-t-i-e-r.  Do you want the name of the article,

10   or is that okay?

11   Q.   No.  I know the article.

12   A.   Okay.  So I --

13   Q.   Can you confirm that that article is not on

14   Exhibit 2, your initial reliance list in this case?

15   A.   I can confirm that.

16   Q.   Go ahead and list the next one, and just the

17   first author last name --

18   A.   Sure.

19   Q.   -- in here is fine.

20   A.   Sure, sure.  I think that was the only

21   article, I think, but I'll just look one more time.

22        I think that was the only article that

23   looked at lymphoma.  I have some EPA archive

24   documents showing the association of glycophate

25   [sic] -- I'm saying it wrong, I apologize -- with

1    renal adenomas, tumors.

2        Q.   What opinions are you offering about the

3    mouse or rat studies that you reviewed?

4        A.   Sure.   In the CD1 mice studies, there was a

5    statistical significant development of NHL in both

6    male and female CD1 mice exposed to gly -- I'll get

7    it right eventually -- glyphosate.

8        Q.   Anything else?

9        A.   I think in that same article there was a

10   nonstatistical association -- can I just tell -- go

11   back one second -- give me one second?

12       Q.   No.

13       A.   Okay.

14       Q.   I need you to just --

15       A.   Okay.   No problem.

16       Q.   -- testify as to what your opinions are and

17   not --

18       A.   No problem.   No problem.

19       Q.   -- do that.

20       A.   There was a nonsignificant risk of NHL in --

21   it was the albino rat, the -- I think it was the

22   Swedish albino rat.

23       Q.   If you'll set your phone aside for a moment,

24   Dr. Schneider, I'm just --

25       A.   That's what I was looking at.

1    Q.   Oh, you're -- so what you're looking at are
2    your notes --
3    A.   No.  I'm looking at --
4    Q.   -- is that correct?
5    A.   You asked me to tell you what I got from the
6    plaintiffs' attorney, and I was reading you the
7    articles.  That's why I'm looking at my phone.
8    Q.   I see.  No, sorry.  I was just trying to
9    understand -- is there something on your phone that
10   you need in order to answer my question about what
11   opinions you are offering based on the mouse
12   studies?
13   A.   No.  I think I already answered it.
14   Q.   Okay.  So just so the record's clear, you
15   said you're offering an opinion on the CD1 mouse
16   studies that there was statistically significant
17   trend for lymphoma in males and females, right?
18   A.   Yes.
19   Q.   You're also offering an opinion about
20   Swedish albino rats, and that opinion is what?
21   A.   That there was a trend, but it wasn't
22   statistically significant.
23   Q.   For?
24   A.   The development of NHL.
25   Q.   In your view, there was a trend that was not

```
 1    statistically significant for the development of

 2    lymphoma in rats?

 3        A.   It wasn't my view.  It was what the authors

 4    said.

 5        Q.   And the author that you're speaking of is

 6    Portier?

 7        A.   Correct.

 8        Q.   Are you relying on anything other than

 9    Dr. Portier's analysis for the opinions you're

10    offering about the mouse and rat studies?

11        A.   Other than what may be -- others have

12    commented on in these articles here.

13        Q.   Are you an expert on the conduct of

14    long-term carcinogenicity studies in mice and rats?

15             MR. HABERMAN:  Objection.

16        A.   Absolutely not.

17        Q.   Do you have any independent opinions about

18    what the mouse and rat studies show, other than what

19    authors have commented on in the materials that

20    you've reviewed?

21        A.   I rely on the statistics and the authors'

22    opinions to give you my opinions based upon what

23    I've learned.

24        Q.   Okay.  And what you've learned is what you

25    just said to me, right?
```

```
 1      A.   Correct.

 2      Q.   There are no other opinions about mouse and

 3   rats that you intend to offer at trial, right?

 4      A.   Correct.

 5           MR. HABERMAN:  Objection.

 6      Q.   You reviewed internal Monsanto documents at

 7   the request of counsel, right?

 8      A.   Yes.

 9      Q.   Did you ask to see those documents?

10      A.   No.

11      Q.   They were provided to you by counsel?

12      A.   I didn't know they existed, so they were

13   provided to me by counsel.

14      Q.   Are you intending to offer any expert

15   opinions in this case about Monsanto's conduct?

16      A.   No.

17      Q.   Are you intending to offer any --

18           MR. HABERMAN:  Objection.

19      Q.   -- expert opinions in this case about

20   Roundup labeling?

21      A.   Don't know, even, what you mean by Roundup

22   labeling, so, no.

23      Q.   Are you intending to offer any expert

24   opinions in this case about Roundup marketing?

25      A.   No.
```

1    Q.   You reviewed a study by Meloni and

2  colleagues published in 2021, correct?

3    A.   Is this -- let me look at it because I don't

4  remember.  Okay.  Yes.

5    Q.   Was that study well-conducted, in your

6  assessment?

7    A.   I'd have to review the study again, because

8  I reviewed 30 articles, to answer that question.  I

9  can't do it.

10   Q.   We'll look at it in more detail; is that

11  fair?

12   A.   Sure.

13   Q.   Can you confirm that you also reviewed a

14  cohort study by Leon and colleagues published in

15  2019?

16   A.   I absolutely did.

17   Q.   You reviewed a study by Pahwa and colleagues

18  published in 2019, correct?

19   A.   Correct.

20   Q.   You also reviewed studies by McDuffie in

21  2001 and De Roos in 2003, correct?

22   A.   Correct.

23   Q.   Those are earlier publications from the

24  North American case-control studies, right?

25   A.   Yes.

1      Q.   Pahwa is the more recent publication,

2   correct?

3      A.   Correct.

4      Q.   The data in McDuffie and De Roos are

5   contained in Pahwa 2019, right?

6      A.   Correct.

7      Q.   Today those studies are subsets of Pahwa,

8   right?

9           MR. HABERMAN:   Objection.

10      A.   So Pahwa is a pooled analysis, so yes.

11      Q.   You reviewed IARC's 2015 assessment of

12   Roundup and glyphosate, right?

13      A.   I did.

14      Q.   IARC conducted meta-analysis in 2015, right?

15      A.   Yes.

16      Q.   What is a meta-analysis?

17      A.   Look at the available individual studies

18   that were done and whittle them together, if you

19   will, and come up with an opinion about whether

20   these individual studies, taken together, contribute

21   to the belief that Roundup causes NHL.

22      Q.   A meta-analysis combines data from

23   individual studies, right?

24      A.   That's what I had said.

25      Q.   It uses the relative risks and odds ratios

1    from those different studies to give a summary of

2    what they show overall, correct?

3        A.   Yes.

4             MR. HABERMAN:  Objection.

5        Q.   Did you find that IARC'S methodology was a

6    reliable one?

7        A.   I had no problem with their methodology.

8        Q.   Is it a good thing to combine data from

9    different studies and see whether, if you look at

10   all the studies together, use of glyphosate is

11   associated with non-Hodgkin's lymphoma?

12       A.   I think you have to in studies where there

13   are low numbers.  So, yes, I think that's a --

14   meta-analysis is a scientifically approved way to

15   look at this -- the causation issue of Roundup and

16   lymphoma.

17       Q.   More data on Roundup and non-Hodgkin's

18   lymphoma have come out since 2015, correct?

19       A.   Correct.

20       Q.   IARC's 2015 meta-analysis did not include

21   Leon 2019, right?

22       A.   Correct.

23       Q.   IARC's 2015 meta-analysis didn't include

24   Pahwa 2019, right?

25       A.   Yes.

1      Q.    IARC's meta-analysis did not include Meloni

2   2021, correct?

3      A.    Right.

4      Q.    Are you familiar with a paper by

5   Andreotti and colleagues --

6      A.    I am.

7      Q.    -- published in 2018?

8      A.    I am.

9      Q.    IARC's 2015 meta-analysis did not include

10  Andreotti 2018, correct?

11     A.    Correct.

12     Q.    That's not necessarily a criticism of IARC.

13  That's just what was available at the time, right?

14     A.    Well, as you're -- as you're -- you're

15  saying that, right.  There's no way you can have

16  something looked at in '15 that didn't come out

17  until '18, so --

18     Q.    You reviewed a 2021 updated meta-analysis by

19  Boffetta and colleagues, right?

20     A.    I'm sorry, say the name.  Boffetta?

21     Q.    Boffetta.

22     A.    Yes.

23     Q.    You also reviewed a 2019 meta-analysis by

24  Zhang and colleagues, correct?

25     A.    Correct.

```
 1        Q.   Do you recall what studies Zhang included in

 2    their --

 3        A.   I do not.

 4        Q.   -- analysis?

 5        A.   I mean, I can -- okay to go in my article,

 6    yes?

 7        Q.   Sure.  And I'll ask you a question.  Okay?

 8        A.   Sure.

 9        Q.   Can you confirm that Zhang 2019 did not

10    include Pahwa?

11        A.   I think I can if you just give me a second.

12        Q.   Sure.  And I'll reask the question so we

13    have a clean record.

14        A.   No problem.  Okay.  So --

15        Q.   Let me reask the question.

16        A.   Sure.

17        Q.   And Table 4 might help you with it as well.

18        A.   Table 4 in the Zhang article?

19        Q.   In the Zhang article, yes.

20        A.   Oh, I was looking at Table 7, but okay.

21        Q.   New question.

22        A.   Go ahead.

23        Q.   Can you confirm that Zhang 2019 did not

24    include Pahwa 2019?

25        A.   Correct.
```

```
1        Q.    Zhang 2019 did not include Leon 2019, right?

2        A.    So Zhang included Schinasi and Leon, but

3    maybe that's a different article than Leon by

4    himself.

5        Q.    That is a different article.  If you look at

6    the date on that article, it's 2015.

7        A.    Okay.

8        Q.    So I'll reask my question.

9        A.    Sure.

10       Q.    Zhang 2019 did not include a cohort analysis

11   published by Leon and colleagues published in 2019,

12   correct?

13       A.    Correct.

14       Q.    Zhang did not include the Meloni publication

15   from 2021?

16       A.    Correct.

17       Q.    Andreotti 2018 is not on your materials

18   list, correct?

19       A.    I don't know.  I mean, it should be.  I

20   reviewed Andreotti 2018.

21       Q.    You did review Andreotti 2018?

22       A.    Yes.

23       Q.    And so if that article is not on your

24   reliance list, that was simply an oversight; is that

25   correct?
```

1      A.   I didn't create the reliance list, but I'm

2   very familiar with Andreotti 2018.

3      Q.   Do you know any reason why the lawyers might

4   have left Andreotti 2018 off of your reliance list

5   in this case?

6      A.   No.

7      Q.   You did, you're telling me today, review the

8   Andreotti publication from the Agricultural Health

9   Study, right?

10     A.   Yes.  I can't say specifically whether I

11   reviewed it independently or through others, but I

12   think I reviewed it.

13     Q.   And did you review the abstract only or the

14   full paper?

15     A.   To be honest and fair, I can't tell you.  I

16   think I reviewed everything, but I can't tell you

17   specifically that I did.  I'm familiar with

18   Andreotti 2018, both what it says and the flaws of

19   it and all that kind of stuff.

20     Q.   So since that was not on either materials

21   list, we're going to leave that issue open for a

22   future date and discussion.  Okay?

23     A.   Okay.  Sure.

24     Q.   You do know what the Agricultural Health

25   Study is, right?

Andrew M. Schneider, M.D.

1      A.    I do.

2      Q.    It's a prospective cohort study of over

3    5,400 pesticide applicators, correct?

4      A.    I know what it is, yes.

5      Q.    AHS looked at whether pesticide use was

6    associated with non-Hodgkin's lymphoma, correct?

7      A.    Correct.

8      Q.    AHS looked specifically at whether

9    glyphosate was associated with non-Hodgkin's

10   lymphoma, right?

11     A.    Yes.

12     Q.    Would you want to consider the Agricultural

13   Health Study in forming your opinions in this case?

14     A.    Yes.

15     Q.    And your testimony today is that you did

16   consider the Agricultural Health Study in forming

17   your opinions, right?

18     A.    Correct.

19     Q.    You don't know why there isn't a single

20   publication from the Agricultural Health Study

21   listed on your reliance list, true?

22     A.    So I didn't prepare the reliance list.  I

23   looked at, as I told you before, everything I can

24   find favorable or not favorable, and as I'm sure you

25   know, the -- when you see my little stack here, the

1    AHS is all over the place talked about and

2    criticized.

3        Q.   And sitting here, you don't know why, since

4    you considered the AHS, it did not make it onto your

5    reliance list, true?

6        A.   So just so we're not saying the same thing

7    over and over again, I already told you since I

8    didn't prepare the reliance list, I can't answer why

9    it's not on there, but I can tell you that I'm

10   familiar with Andreotti 2018 and the previous one

11   from 2005, the AHS, and I'm prepared to discuss it

12   today with you.

13       Q.   Since those weren't on your reliance list,

14   we're going to do that at a future date.  All right,

15   Dr. Schneider?

16       A.   I'm here for you, so that's a legal issue

17   between the two lawyers.

18       Q.   You're telling me that you never saw your

19   reliance list before today?

20       A.   That's not what I said, no.

21       Q.   Okay.  So then I think I need some

22   clarification here.

23            Did you, in fact, review your reliance list

24   to make sure that the articles that you reviewed in

25   preparing your opinions were on there?

```
 1        A.   So I'm not a lawyer, and I don't know the

 2   legality of what has to be there and what doesn't.

 3   My job is to give a causation opinion, and that's

 4   what I'm prepared to do today.  I'm going to tell

 5   you what I reviewed, and the lawyers can argue

 6   whether it should have been there or not should have

 7   been there.

 8        I didn't make it, I didn't prepare it, and I

 9   can't tell you why it's there or not there, but I

10   can tell you my opinions about it, about the AHS, if

11   you ask me, and I will give you my opinions when you

12   ask them.

13        Q.   Dr. Schneider, my question at this point was

14   trying to figure out whether this was simply an

15   oversight or whether you just didn't actually ever

16   look at the reliance list and say, "Hey, there are

17   other things that I reviewed that aren't on here."

18   Okay?

19        A.   I think I answered that question, but --

20        Q.   I'm not sure that you did.

21        A.   Okay.

22        Q.   So I'm going to ask the question again.  All

23   right?

24        A.   No.  I'll just answer it again.

25        Q.   Did you ever look at the actual lists
```

```
1    prepared in Exhibit 2 and Exhibit 3 to see if they

2    included the materials that you reviewed in forming

3    your opinions?

4         A.   So we have to break that down.  I never saw

5    Exhibit 3 till today, so we have to take those

6    questions separately.

7         Q.   You've never seen Exhibit 3 until today; is

8    that right?

9         A.   That's correct.

10        Q.   I'll ask a new question.

11             (Schneider Exhibit 7 was marked for

12   identification.)

13   BY MS. ROSS:

14        Q.   Exhibit 7 to your deposition is the CV that

15   we were provided.

16        A.   Thanks.

17        Q.   Is this a current and accurate CV?

18        A.   Yes.  Yes.

19        Q.   You are an oncologist at South Florida

20   Oncology & Hematology Consultants, correct?

21        A.   Correct.

22        Q.   You see patients with cancer every day?

23        A.   I do.

24        Q.   Now, telling a patient they have cancer is

25   an important medical diagnosis, true?
```

```
 1          A.   I don't understand that question, sorry.
 2          Q.   Telling a patient that they have cancer is
 3     an important medical diagnosis for that patient,
 4     correct?
 5          A.   I don't understand, the way you're phrasing
 6     that question, what that means.
 7          Q.   Okay.  Tell me what you're having trouble
 8     with.
 9          THE WITNESS:  Can you read back what she
10     said?  It doesn't seem to me to be proper
11     English, so...
12          (The question was read by the reporter.)
13          A.   What do you mean by "an important medical
14     diagnosis of a patient"?  I don't know what that
15     means.
16          Q.   When you see patients with cancer and you
17     tell them that they have cancer, that is typically a
18     significant event for the patient who's sitting in
19     front of you, right?
20          A.   That's correct.  But usually, to be fair,
21     I'm not the one that tells them.  They've already
22     been diagnosed when they come to me.
23          Q.   You're affiliated with HCA Florida
24     Healthcare, right?
25          A.   So I'm on staff at some of their hospitals.
```

1      Q.   What is that?

2      A.   HCA is a -- an entity that owns certain

3   hospitals.

4      Q.   And do you work at any non-HCA-affiliated

5   hospitals?

6      A.   Yes.

7      Q.   Which?

8      A.   Well, let me first preface that by saying

9   since the pandemic, I don't really go to the

10   hospitals anymore.  I'm trying not to get COVID.  So

11   I'm -- but prior to March 2020, I made rounds in the

12   hospitals.  And I'm on staff at four hospitals.  Two

13   are HCA hospital, that being University Hospital,

14   now called Woodmont, and Northwest Regional.  Those

15   are the two HCA hospitals.  And I'm on staff at

16   Florida Medical Center, which is not an HCA

17   hospital, and Coral Springs Medical Center, which is

18   a Broward County hospital.

19      Q.   Do you see any patients in the hospital

20   currently?

21      A.   No.

22      Q.   You just see patients in your clinic; is

23   that right?

24      A.   Yes.

25      Q.   If patients need in-hospital treatment, for

Andrew M. Schneider, M.D.

```
 1    example, chemotherapy, you might see that patient in

 2    clinic, but you would not take care of them in the

 3    hospital --

 4        A.   So we don't --

 5        Q.   -- is that right?

 6        A.   -- we don't give chemotherapy in the

 7    hospital.  That's a rare event.  And if a patient is

 8    hospitalized, then my partner will see the patient.

 9        Q.   You haven't gone to work in a hospital since

10    March of 2020, right?

11        A.   Correct.

12        Q.   Are there -- withdrawn.

13             What types of cancer do you personally treat

14    patients for?

15        A.   All types.

16        Q.   There are oncologists who specialize in

17    lymphoma specifically, correct?

18        A.   Correct.

19        Q.   You are not one of them?

20        A.   True.

21        Q.   Does any of your time today go to research

22    of any kind?

23             MR. HABERMAN:  Objection.

24        A.   No.

25        Q.   Do you have any administrative
```

Andrew M. Schneider, M.D.

```
1    responsibilities at any of the hospitals where you

2    have admitting privileges?

3        A.   No.

4        Q.   You're in private practice, correct?

5        A.   Correct.

6        Q.   And you said that you have a partner who'll

7    see patients if they need to go into the hospital;

8    is that right?

9        A.   Correct.

10       Q.   How many partners are in your practice?

11       A.   Legally, I have four partners.

12       Q.   Okay.  Practically, how many partners do you

13   have?

14       A.   One.

15       Q.   You said you see all types of cancer, true?

16       A.   True.

17       Q.   Do you see any particular type of patient

18   population?  Do you see pediatrics, for example --

19       A.   No.

20       Q.   -- in addition?

21       A.   No, we don't see pediatrics.  We're adult

22   doctors.

23       Q.   So you treat any patient with any cancer who

24   is over the age of 18, fair?

25       A.   Yes, yes.
```

```
 1        Q.   You treat patients with DLBCL, correct?

 2        A.   Yes.

 3        Q.   Best estimate of the number of DLBCL

 4   patients you've treated?

 5        A.   In my lifetime?

 6        Q.   Sure.

 7        A.   Including my training and my fellowship?

 8        Q.   Do you have a best estimate, or would you

 9   just be wildly guessing?

10        A.   I'll be wildly guessing, but I -- you know,

11   it's your question.

12        Q.   Okay.  So let me ask a better question.

13             Since you've been out of fellowship

14   training, in the last -- what would that be, 32

15   years or so?

16        A.   33 years.

17        Q.   Okay.  In the last 33 years or so,

18   approximately how many patients with DLBCL have you

19   treated?

20        A.   I'm going to be wildly guessing at the

21   number of 100.

22        Q.   Do you consider yourself to be an expert in

23   DLBCL?

24        A.   I do.

25        Q.   What percentage of your practice is DLBCL?
```

Andrew M. Schneider, M.D.

```
1        A.   I'm totally guessing here because I can't
2   even do the math, but I'm going to guess three
3   percent maybe.
4        Q.   How about for NHL generally, what percentage
5   of your practice is non-Hodgkin's lymphoma?
6        A.   I'm going to say 10 percent.
7        Q.   Do you treat patients with chronic
8   lymphocytic leukemia, or CLL?
9        A.   All the time.
10       Q.   And to go back a step, I said DLBCL a moment
11  ago.  That is diffuse large B-cell lymphoma,
12  correct?
13       A.   Correct.
14       Q.   How many patients have you treated with CLL
15  in your 33 years of practice, approximately?
16       A.   I'll be wildly guessing again, but it's more
17  common.  I'd say 400.
18       Q.   Do you consider yourself to be an expert in
19  CLL?
20       A.   Yes.
21       Q.   CLL is a relatively common form of
22  non-Hodgkin's lymphoma, true?
23       A.   Yes.
24       Q.   What is needed to diagnose a patient with
25  CLL?
```

1      A.   So we can diagnose a patient with CLL by

2   flow cytometry.  We can -- if they have circulating

3   lymphocytes that are abnormal, we'll pick that up on

4   flow, so we can make that diagnosis by flow.

5      Q.   There must be a monoclonal B-cell count

6   greater than or equal to five in order to diagnose a

7   patient with CLL, correct?

8      A.   So I don't have memorized, but, yes, there

9   has to be what -- to distinguish a benign monoclonal

10  lymphocytosis versus a CLL, there is a number,

11  correct.

12     Q.   I'm going to break that down a little bit.

13  All right?

14     A.   Sure.

15     Q.   There is a condition that's different from

16  CLL called monoclonal B-cell lymphocytosis, correct?

17     A.   Yes.

18     Q.   Monoclonal B-cell lymphocytosis is a benign

19  condition, correct?

20     A.   It has a tendency to become CLL, but it is

21  not CLL yet, correct.

22     Q.   There is a number of cells that you must

23  have in a monoclonal B-cell count in order to

24  diagnose CLL, correct?

25     A.   Correct.

```
 1              (Schneider Exhibit 8 was marked for

 2      identification.)

 3      BY MS. ROSS:

 4      Q.   Exhibit 8 to your deposition is the chapter

 5      on CLL from Swerdlow 2017.  Do you see that?

 6      A.   I do.

 7      Q.   This is the WHO classification of tumors of

 8      the hematopoietic and lymphoid tissues, right?

 9      A.   Yes.

10      Q.   Do you see on the first page it provides a

11      definition of CLL?

12      A.   Yes.

13      Q.   For CLL there must be a monoclonal B-cell

14      count of greater than or equal to 5 times 10 to the

15      9th per liter, correct?

16      A.   Yes.

17      Q.   Those B-cells must also have the

18      characteristic morphology and phenotype of CLL in

19      the peripheral blood, correct?

20      A.   Correct.

21      Q.   What is the average latency for CLL

22      following an environmental exposure?

23      A.   I think it could be as long as 20 to 30

24      years and perhaps as short as probably 10 years or

25      less.
```

1    Q.   Do you have an opinion on what the average

2    is between 10 years or less and 20 to 30 years?

3    A.   Again, I think more commonly for CLL, it's a

4    longer latency.  So if I had to pick an average, I

5    would say the average is probably around 15, 20

6    years.

7    Q.   We were talking about environmental

8    exposures generally.  For Roundup in particular, is

9    the average latency for CLL approximately 15 to 20

10   years following exposure?

11   A.   Yes.

12   Q.   For NHL generally, is that the same?

13   A.   Yes.

14   Q.   So the average latency for NHL following

15   Roundup is somewhere between 15 and 20, but it's

16   difficult to be more specific than that, correct?

17   A.   Correct.

18   Q.   We were talking just a minute ago about

19   monoclonal lymphocytosis, right?

20   A.   Yes.

21   Q.   What is that?

22   A.   So when -- as we discussed, when you don't

23   have the high enough number to meet the diagnosis of

24   CLL, you have a precursor, if you will, called a

25   monoclonal lymphocytosis of unknown significance.

1     Q.   Do you consider yourself to be an expert in

2   monoclonal B-cell lymphocytosis?

3     A.   Yes.

4     Q.   You mentioned that monoclonal

5   B-cell lymphocytosis, or MBL, has unknown

6   significance.  What does that mean?

7     A.   Well, it means it's not a -- something that

8   needs to be treated now, and it means that the

9   future, it can become CLL but it may not.

10    Q.   What experience do you have with MBL?

11    A.   I have patients who don't meet the criteria

12   for CLL who I follow, so I have experience.

13    Q.   How many patients have you treated with MBL

14   approximately over the years?

15    A.   I'm going to be wildly guessing again, for

16   the record, but these things aren't committed to

17   memory, of course.  Maybe 100.

18    Q.   MBL is much more common than CLL, correct?

19    A.   Well, it may be, but not in my patient

20   population because the patients that I see pretty

21   much have CLL and rarely have a benign

22   lymphocytosis.

23    Q.   If you'll take a look at Exhibit 8.

24    A.   That's this one?

25    Q.   That is -- yes.  That's the WHO --

```
 1       A.   Yeah.  Got it.

 2       Q.   -- chapter on CLL.  There's the discussion

 3   at the end about monoclonal B-cell lymphocytosis.

 4   Do you see that?

 5       A.   I mean, I'll take your word for it, but,

 6   yes, I see it.  Yes, I see it.

 7       Q.   Okay.  MBL is defined by monoclonal B-cell

 8   count of less than 5 times 10 to the 9th per liter

 9   in the peripheral blood, correct?

10       A.   Yes.

11       Q.   MBL is when a patient has, one, a monoclonal

12   B-cell count of less than five plus, two, no fevers,

13   chills, rigors, night sweats, or weight loss, no

14   thrombocytopenia or anemia, and no evidence of

15   splenomegaly, correct?

16       A.   Yes.

17       Q.   Turn to the next page.  Oh, I see you're

18   already there.

19       A.   I'm reading it, yeah.

20       Q.   Great.  The reported frequency of CLL-type

21   MBL in the general population depends on the

22   sensitivity of the method used for detection and

23   ranges from 3.5 percent to 12 percent among healthy

24   individuals, correct?

25       A.   That's what it says, correct?
```

```
 1        Q.   Just taking the whole population generally,

 2   anywhere from 3.5 percent to 12 percent of healthy

 3   individuals will have MBL, right?

 4        A.   That's what it says, correct.

 5        Q.   And you have no reason to dispute that,

 6   true?

 7        A.   Correct.

 8        Q.   The incidence of MBL increases with age,

 9   right?

10        A.   Yes.

11        Q.   For example, while folks younger than 40

12   very rarely have MBL, 50 to 57 percent of

13   90-year-olds will have MBL, right?

14        A.   Yes.

15        Q.   20 percent or so of people over 60 will have

16   MBL, correct?

17        A.   I mean, it's hard to believe it says that,

18   but I'm -- it's hard to believe.

19        Q.   MBL is not cancer, right?

20        A.   Correct.

21        Q.   One to two percent of patients with MBL will

22   progress to CLL every year, true?

23        A.   I don't know that number, but if it says

24   that, that's okay.

25        Q.   Okay.  So the WHO, in their listing of the
```

Andrew M. Schneider, M.D.

```
 1    criteria, state that high count MBL progresses to

 2    frank leukemia requiring therapy at an annual rate

 3    of one to two percent.

 4         Do you see that?

 5    A.   Yes, I do.

 6    Q.   You have no reason to disagree with that

 7    number, correct?

 8    A.   Correct.

 9    Q.   MBL itself does not require treatment,

10    right?

11    A.   Correct.

12    Q.   You've published six articles in your career

13    based on your CV.  Does that sound right to you?

14    A.   Yes.  Yes.

15    Q.   The last article you published was roughly

16    30 years ago, fair?

17    A.   Fair.

18    Q.   You've published on colorectal cancer,

19    hepatocellular carcinoma, and salivary gland

20    neoplasms, right?

21    A.   Yes.

22    Q.   You have not ever published on NHL, true?

23    A.   Can I look again?

24    Q.   Of course.

25    A.   So when I trained at Sloan Kettering, I
```

```
 1    actually specialized in lymphoma.  I worked with

 2    Dave Strauss.  We had to pick two diseases to work

 3    with, so I was the -- specializing in lymphoma and

 4    colon cancer.  Let's see if I ever published on

 5    lymphoma with Dr. Strauss.

 6         I guess I didn't.  If it says I didn't, I

 7    didn't, but I did specialize in lymphoma with

 8    Dr. Strauss.

 9    Q.   You should have -- and just so that you do

10    have it, you should have your CV in front of you --

11    A.   I had it, but I --

12    Q.   -- somewhere.

13    A.   -- don't know where it went.

14    Q.   Okay.  There we are.

15    A.   There it is.  Okay.

16    Q.   So take a look, and then I'll ask you the

17    question again.  All right?

18    A.   Sure.

19    Q.   You have not ever published on non-Hodgkin's

20    lymphoma, true?

21    A.   Correct.

22    Q.   You trained at Memorial Sloan Kettering,

23    correct?

24    A.   I did.

25    Q.   Memorial Sloan Kettering is a good
```

Andrew M. Schneider, M.D.

1    institution, correct?

2        A.    Yes.

3        Q.    Have you endeavored to stay on top of the

4    oncology literature since you finished training in

5    1989?

6        A.    Of course.

7        Q.    Have you endeavored to follow cutting edge

8    research into cancer etiology since you finished

9    your training in 1989?

10       A.    So I read everything that I can to stay

11   current with the oncologic field.

12       Q.    Do you read articles in the journal Science?

13       A.    Not usually.

14       Q.    Are you familiar with that journal?

15       A.    Heard of it.

16       Q.    What is its reputation?

17       A.    I don't know.

18       Q.    Are you familiar with Dr. Burt Vogelstein at

19   Johns Hopkins?

20       A.    I've heard the name.

21       Q.    Who is he?

22       A.    The Vogelstein that I -- that I know of is

23   a -- I think a GU oncologist.  Maybe I -- is that

24   the right one?

25       Q.    He's a researcher in colorectal cancer,

```
 1    among other things, correct?

 2        A.   So the Vogelstein I'm thinking about and --

 3    was more GU, not colon, but I could be wrong.

 4        Q.   Okay.  So sitting here today, you don't have

 5    any particular opinions about Burt Vogelstein at

 6    Hopkins, right?

 7        A.   Correct.

 8        Q.   Have you heard of Dr. Cristian Tomasetti?

 9        A.   No.

10        Q.   You have no opinions about Cristian

11    Tomasetti or his research, correct?

12        A.   I'm not familiar with it.

13        Q.   Have you ever researched Roundup in any

14    context?

15        A.   Only --

16             MR. HABERMAN:  Objection.

17        A.   -- for this deposition today.

18        Q.   I'll ask the question outside of this

19    litigation.  All right?

20        A.   Sure.

21        Q.   Outside of this litigation, have you ever

22    researched Roundup in any context?

23        A.   No.

24        Q.   Have you ever published about Roundup in any

25    context?
```

1    A.    No.

2    Q.    Have you ever given a presentation

3    mentioning Roundup in any context?

4    A.    No.

5    Q.    In clinical practice have you ever concluded

6    that a patient's cancer was caused by exposure to

7    Roundup?

8    A.    I don't remember that.

9    Q.    To the best of your recollection, you have

10   never told a patient that Roundup caused their

11   cancer, right?

12   A.    Correct.

13   Q.    Have you ever heard any other healthcare

14   provider determine that exposure to Roundup caused a

15   patient's cancer?

16   A.    That would be hearsay.  I can't tell you

17   specifically what I've heard from other oncologists.

18   Q.    Sitting here today, do you recall any time

19   where you heard another healthcare provider

20   determine that exposure to Roundup caused someone's

21   cancer?

22   A.    I don't recall that.

23   Q.    You've never told any colleague of yours

24   that Roundup causes cancer, true?

25   A.    True.

1    Q.   You're not -- withdrawn.

2         MR. HABERMAN:  Let's take a five-minute

3    break, if we can.

4    Q.   Is that all right with you, Dr. Schneider?

5    A.   Sure.

6         MS. ROSS:  All right.  Let's go off the

7    record.

8         THE VIDEOGRAPHER:  Off the record at

9    12:34 p.m.

10        (Recess from 12:34 p.m. until 12:44 p.m.)

11        THE VIDEOGRAPHER:  Back on the record at

12    12:44 p.m.

13   BY MS. ROSS:

14   Q.   Dr. Schneider, MBL and CLL are distinct

15   clinical entities, correct?

16   A.   Correct.

17   Q.   MBL and CLL have difference diagnostic

18   criteria, right?

19   A.   Yes.

20   Q.   Do you tell patients with MBL that they have

21   cancer?

22   A.   No.

23   Q.   Are you an expert in epidemiology?

24   A.   No.

25   Q.   Are you an expert in pathology?

```
 1    A.   No.

 2    Q.   Are you an expert in toxicology?

 3    A.   No.

 4    Q.   Are you an expert in chemistry?

 5    A.   No.

 6    Q.   Are you an expert in the regulation of

 7  pesticides?

 8    A.   No.

 9    Q.   Are you an expert in weed science?

10    A.   No.

11    Q.   Do you know what that is?

12    A.   I can guess, but --

13    Q.   Do you know that there are scientists who

14  have spent their careers evaluating herbicides?

15    A.   I'm sure.

16    Q.   There are scientists who evaluate strategies

17  for controlling weeds and improving agricultural

18  output, for example?

19    A.   I'm sure.

20    Q.   You are not one of those scientists,

21  correct?

22    A.   Correct.

23    Q.   You would defer to a weed scientist on the

24  actual use of a pesticide like glyphosate, true?

25    A.   True.
```

```
 1        Q.   You are not an expert in chemical exposures,

 2   right?

 3        A.   Right.

 4             MR. HABERMAN:  Objection.

 5        Q.   Outside of litigation, have you ever

 6   evaluated the number of days someone was exposed to

 7   a chemical?

 8        A.   No.

 9        Q.   Did you rely on a number of days of exposure

10   here?

11        A.   I looked at that, yes.

12        Q.   Did you count up a specific number of days

13   that Mr. Pleu or Mr. Moore were exposed to Roundup?

14        A.   I didn't count it up yet, but if you asked

15   me, I would count it up from my notes.

16        Q.   And you have that information in your notes;

17   is that right?

18        A.   Yes.

19        Q.   Those weren't provided to us in advance of

20   today's deposition, so we may need to come back to

21   that.  Okay?

22        A.   That's a legal issue.

23        Q.   All right.  Outside of litigation, have you

24   ever determined whether, on the basis of a number of

25   days of exposure, a particular chemical caused a
```

```
 1    person's cancer?

 2       A.   No.

 3       Q.   Comparing the number of days of exposure to

 4    a chemical in published literature is not a strategy

 5    doctors employ in clinical practice, true?

 6            MR. HABERMAN:  Objection.

 7       A.   True.

 8       Q.   That is not how doctors determine the cause

 9    of a patient's cancer, right?

10            MR. HABERMAN:  Objection.

11       A.   Well, to be fair, as a -- I have different

12    hats.  So as a treating oncologist, if you have

13    cancer, it doesn't really matter how you got it.

14    I've got to get you better.

15            In my legal work, it's a different issue.

16       Q.   Have you ever, before this case, in your

17    legal work compared the number of days of exposure

18    to a chemical to the published literature on that

19    chemical?

20       A.   Just cigarette smoking, pack years, if

21    that's an analogous idea.

22       Q.   Have you -- withdrawn.

23            Can you name an herbicide with a better

24    safety profile than Roundup?

25       A.   Right.  So since I'm not an expert in weeds
```

Andrew M. Schneider, M.D.

1    and herbicides, no.

2        Q.   What alternatives to glyphosate are

3    available?

4        A.   Right.  So I'm not here today to talk about

5    weeds or alternatives.  I'm here to talk about

6    causation for lymphoma.

7        Q.   You have no opinions on what alternatives to

8    glyphosate are available, correct?

9        A.   Since we already discussed that I'm not an

10   expert on herbicides, weeds and -- so I have no

11   opinion, correct.

12       Q.   You have no opinions on how the toxicity of

13   glyphosate compares to available alternatives, I

14   take it, right?

15       A.   Correct.  My job today was to talk about

16   whether -- that word -- glyphosate is an etiological

17   cause of NHL.

18       Q.   Are you an expert in pesticides?

19       A.   No.

20       Q.   Are you an expert in glyphosate-based

21   herbicides?

22       A.   No.

23            MR. HABERMAN:  Objection.

24       Q.   What is glyphosate?  Is it an herbicide or a

25   pesticide?

```
1       A.   It is an herbicide.

2       Q.   What's the difference between those two

3   things?

4       A.   I don't know.

5       Q.   Is glyphosate a selective or nonselective

6   herbicide?

7       A.   Right, I don't know.

8       Q.   Do you know what that means?

9       A.   No.

10      Q.   You don't know whether Roundup kills all

11  weeds or just the bad ones, right?

12      A.   Well --

13           MR. HABERMAN:  Objection.

14      A.   -- so we can save time, we already discussed

15  I'm not an expert on weeds and pesticides and

16  herbicides.  I'm only an expert on whether

17  glyphosate causes NHL.

18      Q.   Have you ever used Roundup yourself?

19      A.   No.  I don't do any yard work at all.

20      Q.   Yard work is not one of your passions, I

21  take it?

22      A.   I don't do any housework.  Sorry.

23      Q.   I want to make sure that you and I have the

24  same basic understanding of cancer genetics, so I'm

25  going to go over basic concepts.
```

```
1        A.    Sure.

2        Q.    Cells contain our DNA, right?

3        A.    Yeah.

4        Q.    That DNA contains thousands of genes,

5     correct?

6        A.    Yes.

7        Q.    The DNA that houses our genes is called the

8     exome?

9        A.    Okay.

10       Q.    Do you know approximately what percentage of

11    our DNA is made up of the exome as opposed to what's

12    sometimes called junk DNA?

13       A.    So since I'm not an expert in genetics, I

14    don't know.

15       Q.    You are not an expert in genetics; is that

16    right?

17       A.    That's correct.

18       Q.    Cells in our body divide and replicate,

19    right?

20       A.    True.

21       Q.    The process of cell division is called

22    mitosis, right?

23       A.    Yes.

24       Q.    When cells copy their DNA, they copy

25    billions of base pairs, correct?
```

```
 1      A.    Yes.

 2      Q.    Do you know how many base pairs there are in

 3   the human genome?

 4      A.    No.

 5      Q.    The different tissues in our body are made

 6   up of different cells, right?

 7      A.    Yes.

 8      Q.    For example, the blood cells in our body

 9   come from hematopoietic stem cells, correct?

10      A.    True.

11      Q.    Those cells are in the bone marrow, right?

12      A.    Yes.

13      Q.    Lymphocytes are a type of blood cell, right?

14      A.    Right, uh-huh.

15      Q.    Lymphocytes originate from stem cells in the

16   bone marrow, correct?

17      A.    Yes.

18      Q.    Lymphocytes mature in different tissues

19   depending on the specific type of cell, correct?

20      A.    Yes.

21      Q.    Cell division happens billions of times in

22   our lifetime, right?

23      A.    I assume.

24      Q.    Depending on the issue, some cells divide a

25   lot and others not as much, correct?
```

Andrew M. Schneider, M.D.

```
 1       A.   Yes.
 2       Q.   For instance, you take care of patients with
 3   colon cancer, right?
 4       A.   I do.
 5       Q.   Do you know how often cells in the colon
 6   divide?
 7       A.   No.
 8       Q.   How about cells in the femur, in the long
 9   bone in your thigh, do you know how often those
10   divide?
11       A.   No.
12       Q.   Just like other tissues, hematopoietic stem
13   cells divide throughout our lives, correct?
14       A.   Yes.
15       Q.   While the body is almost perfect in the
16   copying process, some errors are made, correct?
17       A.   True.
18       Q.   Sometimes DNA does not get copied correctly,
19   right?
20       A.   Yes.
21       Q.   When DNA does not get copied correctly, that
22   results in a cell that has a mutation, correct?
23       A.   Yes.
24       Q.   A mutation is a mistake in DNA, so to speak,
25   fair?
```

```
 1      A.   An abnormality.

 2      Q.   I'm sorry, I --

 3      A.   I said an abnormality.

 4      Q.   Okay.  A mutation is an abnormality in the

 5  DNA, right?

 6      A.   Yes.

 7      Q.   The abnormality can be a point mutation,

 8  correct?

 9      A.   I'm going to say yes, but, again, I'm not an

10  expert in genetics.  So these questions are probably

11  better asked to someone who does genetics.  I'm a

12  clinical oncologist, but, yes.

13      Q.   And when we get outside of the realm of your

14  expertise in oncology, just tell me.

15      A.   I mean, these are things I know from my med

16  school days, but --

17      Q.   Right.

18      A.   -- not things that I look at every day as a

19  clinical oncologist.

20      Q.   So an abnormality in DNA can be a

21  translocation.  You're familiar with those from

22  taking care of lymphoma patients, right?

23      A.   Of course.

24      Q.   A translocation is where an arm of a

25  chromosome gets transposed next to something else,
```

Andrew M. Schneider, M.D.

1    right?

2       A.   Yes.

3       Q.   Mutations can occur in any type of cell in

4    our body, including lymphocytes, right?

5       A.   Correct.

6       Q.   And everything we just talked about happens

7    all day every day in cells throughout our body,

8    right?

9       A.   Yes.

10      Q.   Every time a cell divides, it accumulates

11   mutations, correct?

12      A.   I'm not sure.  I don't know.

13      Q.   You're not familiar with research on how

14   many abnormalities accumulate in DNA every time a

15   cell divides, right?

16      A.   Correct.

17      Q.   Cells do not have to be exposed to anything

18   external to the cell to have a mutation happen,

19   right?

20      A.   True.

21      Q.   Are there -- well, withdrawn.  New question.

22           There are experiments in cell lines

23   unexposed to anything else that have shown that

24   cells in a Petri dish accumulate mutations.  Are you

25   familiar with that research?

Andrew M. Schneider, M.D.

```
 1      A.   No.

 2      Q.   There are also genome sequencing studies

 3   that show that cells in healthy tissues accumulate

 4   mutations over the course of someone's life.  Are

 5   you familiar with that research?

 6      A.   No.

 7      Q.   You have no opinion on that, correct?

 8      A.   Correct.

 9           MR. HABERMAN:  Objection.

10      Q.   The body is incredible and can often repair

11   mistakes or abnormalities in DNA, right?

12      A.   Hopefully.

13      Q.   If a mutation is not repaired, a cell can

14   die on its own.  That's called apoptosis, correct?

15      A.   Again, I'm going say yes to these things,

16   but these are things that I don't look at the

17   last -- since I was in med school, so...

18      Q.   The answer to my question is, yes, a cell

19   can die through apoptosis?

20           MR. HABERMAN:  Objection.

21      A.   To the best of my knowledge, but in all

22   honesty, I'm not an expert on apoptosis, so I could

23   be wrong.

24      Q.   Do you know, sitting here today, whether the

25   mutations that make it through a body's repair
```

Andrew M. Schneider, M.D.

1    mechanism often end up in places that are not

2    involved in cancer at all?

3         A.   I don't know.

4         Q.   Are you familiar with the term "driver

5    mutation"?

6         A.   I've heard of it, yes.

7         Q.   Are you familiar with the term "passenger

8    mutation"?

9         A.   No.

10        Q.   Do you agree that certain mutations, when

11   they occur and are not repaired, can cause a cell to

12   divide and never stop or not die when it's supposed

13   to?

14        A.   Meaning cause cancer, yes.

15        Q.   Right.  Mutations like that confer growth

16   advantage on cells, right?

17        A.   I believe so.

18        Q.   Driver mutations can happen in any cell,

19   including lymphocytes, correct?

20        A.    In all honesty, this is really outside of my

21   field of expertise.

22        Q.   Do you -- well, withdrawn.

23             Are you aware of some of the driver

24   mutations involved in non-Hodgkin's lymphoma?

25        A.   Yes.

1     Q.   Different types of non-Hodgkin's lymphoma

2   have different driver mutations, correct?

3     A.   There are different chromosomal changes

4   associated with different types of lymphoma.

5     Q.   Different types of NHL are different

6   diseases, right?

7     A.   Correct.

8          MR. HABERMAN:   Objection.

9     Q.   Different types of NHL have different

10   mutational signatures, correct?

11         MR. HABERMAN:   Objection.

12     A.   Some may have some; some may have none.   You

13   don't have to have a mutation to have lymphoma.

14     Q.   MYC is an example of a driver mutation found

15   in some cases of DLBCL, right?

16     A.   Correct.

17     Q.   And that's M-Y-C, right?

18     A.   Correct.

19     Q.   ECL2 is an example of a driver mutation

20   found in some cases of DLBCL, right?

21     A.   Correct.

22     Q.   ECL6 is an example of a driver mutation in

23   some cases of DLBCL, right?

24     A.   True.

25     Q.   Can you name any other driver mutations in

Andrew M. Schneider, M.D.

1    DLBCL?

2        A.    I think those are the three, because then

3    you have your double hit and triple hit diffuse

4    large cell lymphomas, so --

5        Q.    Can you name any driver mutations in CLL?

6        A.    So there are chromosomal changes.  I think

7    there is Chromosome 13, and I think there could be

8    Chromosome 11.  There are chromosomal abnormalities

9    that can be seen in CLL.

10       Q.    Are those the same in CLL-like MBL?

11       A.    I don't know.

12       Q.    Do you have an opinion on how many driver

13   mutations are needed for a patient to develop DLBCL?

14       A.    So since I'm not an expert on genetics or

15   chromosomal -- I don't know.

16       Q.    I take it you do not have an opinion on how

17   many mutations are needed for a patient to develop

18   CLL, correct?

19       A.    I believe patients can develop CLL and

20   diffuse large B-cell lymphoma with no mutations.

21       Q.    What would be the mechanism by which a

22   patient would develop CLL or DLBCL with no

23   mutations?

24       A.    I don't -- it may not be known.  I mean, I

25   think that certainly patients can develop large cell

1     lymphomas and be chromosomally normal.

2        Q.   In your understanding, if a patient is

3     chromosomally normal, does that mean they don't have

4     any mutations in their lymphocytes or just that you

5     didn't identify them?

6        A.   This is really out of my field of expertise.

7        Q.   You would defer to someone else on the

8     number of mutations that you might observe in DLBCL,

9     correct?

10       A.   Correct.

11       Q.   The same would be true for CLL, right?

12       A.   Correct.

13       Q.   If mutated lymphocytes are not identified

14    and destroyed by the immune system, they can grow

15    into a clinical cancer, right?

16       A.   I believe.

17       Q.   You talked earlier about immunosuppression

18    as being one risk factor for non-Hodgkin's lymphoma,

19    right?

20       A.   Yes.

21       Q.   Depending on -- withdrawn.

22            The immune system has a role in finding and

23    killing cancer cells, correct?

24       A.   Yes.

25       Q.   If the immune system isn't functioning

1    properly, abnormally growing cells have a better

2    chance of getting through, right?

3        A.   Yes.

4        Q.   The immune system might not function

5    properly because the patient has an immune

6    deficiency syndrome, correct?

7        A.   True.

8        Q.   The immune system might not function

9    properly because of something we, as physicians, did

10   to a patient, like giving them drugs that

11   chronically suppressed their immune system, right?

12       A.   True.

13       Q.   As we age, our immune systems don't work as

14   well as they used to, correct?

15       A.   I hate to believe that, but I guess it's

16   true.

17       Q.   Have you heard that referred to as immune

18   senescence?

19       A.   It makes sense, but I'm not sure I really

20   know that term.

21       Q.   Advances in tumor sequencing over the past

22   15 years have given rise to a new field of cancer

23   genomics.  I take it that is not your area of

24   expertise, correct?

25       A.   Correct.

Andrew M. Schneider, M.D.

1    Q.   As on oncologist, are you familiar with

2    cancer genomics?

3    A.   Yes.

4    Q.   You agree that whole genome sequencing has

5    given rise to a new era in cancer etiology?

6    A.   I think so.

7    Q.   DNA sequencing of cancer genomes has been

8    likened to explorers mapping a new world.  Do you

9    think that's a good analogy?

10   A.   I don't know.

11   Q.   Are you familiar with molecular

12   epidemiology?

13   A.   Be more specific.

14   Q.   So molecular epidemiology refers to a field

15   that incorporates genetic information to trace the

16   development of diseases.  Are you familiar with that

17   field?

18   A.   I'm not an expert on it, no.

19   Q.   Genome sequencing makes it possible to

20   identify how many mutations occur in a tissue as a

21   result of normal cell division.  Are you aware of

22   that?

23   A.   No.

24   Q.   Mutation load refers to how many mutations

25   there are in a cancer.  Did you know that?

1      A.    No.

2      Q.    Okay.  So in terms of mutation load or

3    mutation burden, you would not be the correct expert

4    to ask about that.  Is that fair?

5      A.    Fair.

6      Q.    Do you have -- I think we can cut some of

7    this short, so give me a second.  All right?

8      A.    Sure.  Sure.

9      Q.    Dr. Schneider, let's take DLBCL.  Research

10   has shown that on average, a DLBCL will have about

11   150 to 200 mutations in the exome.  I take it you're

12   not familiar with that research.  Is that fair?

13     A.    Fair.

14     Q.    You have no basis to agree or disagree with

15   that number, right?

16     A.    Correct.

17     Q.    Research has shown that on average, CLL will

18   have somewhere between five and 20 mutations in the

19   exome.  You're not familiar with that research,

20   correct?

21     A.    Correct.

22     Q.    You have no basis to agree or disagree with

23   that, right?

24     A.    Right.

25     Q.    Are you aware that genome sequencing makes

```
 1    it possible to determine how many mutations are

 2    added to a background rate by environmental or

 3    hereditary factors?

 4        A.   I have no idea what you're talking about.

 5        Q.   Research has shown that smoking

 6    increases the mutation load in lung cancer by about

 7    threefold.  Are you familiar with that research?

 8        A.   So I'm familiar with that smoking is an

 9    etiologic risk factor for lung cancer, but I'm not

10    familiar with data about mutational changes.

11        Q.   Research has shown that inherited errors in

12    DNA replication such as Lynch syndrome increase

13    mutational load in colorectal cancer by about

14    tenfold.  Are you familiar with that research?

15        A.   So I'm --

16             MR. HABERMAN:  Objection; foundation.

17        A.   I'm familiar with Lynch syndrome.  I'm

18    familiar with how it increases your risk for colon

19    cancer.  I'm not familiar with specific numbers of

20    mutational changes.

21        Q.   What is Lynch syndrome?

22        A.   Lynch syndrome is an inherited

23    predisposition to colon cancer.  They're usually

24    microsatellite instable.  They may have a polyp

25    syndrome.  And they're at high risk for colon
```

1    cancer, usually seen in younger people with colon

2    cancer.  They're --

3       Q.   Is --

4       A.   -- microsatellite instable.  There's a --

5    there are these DNA repair proteins, and they're

6    deficient in one of five DNA proteins?  They -- the

7    proteins are MLH1, MSH2, MSH6, PMS2, and EPCAM,

8    E-P-C-A-M.  How's that?

9       Q.   That was a long answer, so I'm going to

10   break it down a little bit.  Okay?

11      A.   Okay.

12      Q.   Lynch syndrome is an inherited

13   predisposition to cancer, correct?

14      A.   Yes.

15      Q.   Lynch syndrome predisposes patients to colon

16   cancer and also to other types of cancer, correct?

17      A.   That's correct.

18      Q.   Patients with Lynch syndrome have

19   microsatellite instability, right?

20      A.   That's true.

21      Q.   In order to test for Lynch syndrome, you

22   need genetic testing, right?

23      A.   Yes.

24      Q.   Sitting here today, can you identify any

25   studies or data of any kind showing that Roundup

1    increases the mutational load in patients with

2    non-Hodgkin's lymphoma?

3        A.   I don't know that.

4        Q.   Genome sequencing also makes it possible to

5    identify patterns of mutations or signatures caused

6    by different processes that act on DNA.  Are you

7    familiar with that research?

8        A.   No.

9        Q.   Are you familiar with the Sanger Institute

10   at -- in the UK?

11       A.   I think I've heard the name, but I don't

12   know anything else about it.

13       Q.   You've not read any of the Sanger Institute

14   papers on mutation signatures, I take it?

15       A.   Correct.

16       Q.   You do not have an opinion on whether

17   different cancers have different predominant

18   signatures, right?

19       A.   Be more specific in that question.

20       Q.   Sure.  The predominant signatures in CLL

21   have been shown to be related to aging.  Are you

22   familiar with that research?

23       A.   I guess maybe I'm not understanding.  What

24   do you mean by signatures?

25       Q.   When mutations happen in a tissue, they can

Andrew M. Schneider, M.D.

1    happen with different patterns, right?

2         A.    Again, to be fair, I'm not an expert on

3    genetics and mutations.  I'm a clinical oncologist.

4    So I'm hearing your questions, but I think I already

5    told you I'm not an expert on these topics.

6         Q.    So you don't know if smoking, for example,

7    causes C to A point mutations in DNA?

8         A.    CD what?

9         Q.    C to A.

10        A.    I don't even know what that means.

11        Q.    Okay.  I take it, then, you don't know

12   whether aging has been associated with C to T point

13   mutations, right?

14        A.    That's correct.

15        Q.    The four letters involved in DNA are C, A,

16   G, and T, right?

17        A.    Sounds familiar.

18        Q.    One of the forms of mutations that you can

19   get is a point mutation, meaning that one letter in

20   the DNA turns to a different letter in the DNA,

21   right?

22        A.    Sure.

23        Q.    There are different patterns of mutations

24   that can be observed, for example, in lung

25   adenocarcinoma or in colorectal cancer, but you've

1    not looked at those patterns of changes that happen

2    in DNA with cancer, right?

3        A.   Since I'm a clinical oncologist, the answer

4    would be no.

5        Q.   Are you aware of any literature showing that

6    Roundup has a mutation signature in patients with

7    non-Hodgkin's lymphoma?

8        A.   I'm not aware of that literature.

9             (Schneider Exhibit 9 was marked for

10   identification.)

11   BY MS. ROSS:

12       Q.   I'm going to hand you Exhibit 9 to your

13   deposition.  Exhibit 9 comes from SEER, S-E-E-R.  Do

14   you see that?

15       A.   I do.

16       Q.   Are you familiar with the SEER program?

17       A.   I am.

18       Q.   What is it?

19       A.   They look at incidence and survivability of

20   different cancers.

21       Q.   Specifically, so SEER is the Surveillance

22   Epidemiology and End Results program from the

23   National Cancer Institute, right?

24       A.   That's what SEER stands for, correct?

25       Q.   SEER is part of the NIH, right?

```
 1        A.    I don't know.

 2        Q.    Do you see that it says NIH in the upper

 3   left corner?

 4        A.    Where?

 5        Q.    Right next to National Cancer Institute

 6   there's --

 7        A.    Oh, yeah.

 8        Q.    -- a little NIH.

 9        A.    Yes, of course.

10        Q.    SEER collects statistics on various cancers

11   in the United States, correct?

12        A.    Yes.

13        Q.    Do you rely on SEER statistics in your

14   clinical practice?

15        A.    So the way I use SEER data is that I use the

16   AJCC cancer staging manuals, and in those staging

17   manuals they usually present survival data which

18   often, but not always, is relevant to SEER data.

19        Q.    SEER collects information not just on how

20   often cancers occur, but also how survivable those

21   cancers are, right?

22        A.    Correct.

23        Q.    Exhibit 9 is the SEER Cancer Facts for

24   non-Hodgkin's lymphoma as of 2022, correct?

25        A.    Yes.
```

Andrew M. Schneider, M.D.

```
1        Q.    In 2022 it's estimated that 80,470 people

2   will be diagnosed with NHL, right?

3        A.    That's what it says.

4        Q.    If you'll turn with me to Page 2, do you see

5   there's a section titled Lifetime Risk of Developing

6   Cancer?

7        A.    Yes.

8        Q.    Approximately 2.1 percent of men and women

9   will be diagnosed with non-Hodgkin's lymphoma at

10  some point during their lifetime based on 2017 to

11  2019 data, right?

12       A.    Yes.

13       Q.    That's about two people out of every 100,

14  two percent, right?

15       A.    Yes.

16       Q.    About one out of every 50 people will be

17  diagnosed with non-Hodgkin's lymphoma, true?

18       A.    True.

19             MR. HABERMAN:  Objection.

20       Q.    Do you see there's a section that starts at

21  the bottom of Page 3 titled How Common is This

22  Cancer?

23       A.    Yes.

24       Q.    Compared to other cancers, non-Hodgkin's

25  lymphoma is fairly common, correct?
```

```
 1            MR. HABERMAN:   Objection; the document

 2      speaks for itself.

 3      A.    That's what it says.

 4      Q.    Do you have any reason to disagree with

 5      that?

 6      A.    Well, it depends.  I mean, non-Hodgkin's, as

 7      we discussed, is a broad category of diseases,

 8      right?  So we talked about CLL, so, I mean, if you

 9      include probably CLL, it's probably very common.

10      Q.    I'm going to break that down just a little

11      bit.  All right?

12      A.    Sure.

13      Q.    Non-Hodgkin's lymphoma is a broad category

14      of different diseases, correct?

15      A.    Yes.

16      Q.    CLL is one of those diseases, right?

17      A.    Yes.

18      Q.    DLBCL is another of those diseases, correct?

19      A.    Yes.

20      Q.    If you include all types of NHL together, it

21      is relatively common, right?

22      A.    Yes.

23      Q.    But to be fair, in looking at a specific

24      cancer, it would be a good idea to look at the data

25      for that individual cancer; is that right?
```

```
 1      A.   True.

 2      Q.   Do you see a section that says -- that

 3   begins:  Changes over time?

 4      A.   What page?

 5      Q.   Page 6.

 6      A.   Where?

 7      Q.   Page 6 of 9.

 8      A.   Sorry, I'm on Page 6.  Okay.

 9      Q.   Okay.  Age-adjusted rates for new

10   non-Hodgkin's lymphoma cases have been falling,

11   according to SEER, on average one percent each year

12   over 2010 to 2019, correct?

13      A.   That's what it says.

14      Q.   You have no reason to disagree with those

15   statistics, right?

16      A.   True.

17      Q.   There's a figure on the following page that

18   gives new cases and then also deaths and five-year

19   relative survival.  Do you see that?

20      A.   Yes.

21      Q.   This figure in the SEER data for

22   non-Hodgkin's lymphoma gives the rate of new cases

23   in light green, correct?

24      A.   Yes.

25      Q.   There's a rate per 100,000 persons that's
```

1    given, right?

2        A.   Yes.

3        Q.   The year starts at 1975 and goes up through

4    2019.  Do you see that?

5        A.   I do.

6        Q.   Rates of NHL increased from about 1975 to

7    the early 1990s, right?

8        A.   Yes.

9        Q.   New NHL cases remained flat from about 1995

10   to 2010, correct?

11       A.   Relatively.

12       Q.   New NHL cases began to decline around 2010,

13   right?

14       A.   Looks almost flat, but it's a little

15   down-sloping, so, yes.

16       Q.   And you have no reason to disagree with the

17   figures from the National Cancer Institute on this,

18   right?

19       A.   Only in the interpretation of whether it's

20   really different.

21       Q.   So when NCI says age-adjusted rates for NHL

22   have been falling, on average, one percent each year

23   from 2010 to 2019, I take it you're not quibbling

24   with those numbers.  You're just stating it may be

25   close to flat --

```
 1      A.    Well, I guess --

 2      Q.    -- as opposed to a decline?

 3      A.    -- I could quibble whether one percent is

 4    meaningful or not.

 5      Q.    Okay.  Are you aware that glyphosate use in

 6    the United States increased dramatically at the same

 7    time NHL rates were plateauing?

 8            MR. HABERMAN:  Objection.

 9      A.    So glycophate [sic] use did increase in the

10    years -- I think 2000, yes.

11      Q.    Glyphosate use increased starting in the mid

12    1990s, right?

13      A.    Yes.

14      Q.    Glyphosate use has continued to increase

15    since the mid 1990s, correct?

16      A.    Yes.

17      Q.    What is your explanation for why, at the

18    same time glyphosate use in the US increased

19    dramatically, NHL rates were plateauing and have

20    continued to fall?

21      A.    There may be a latency period.  It may take

22    time to develop the lymphoma.

23      Q.    Any other explanation you have as to why, at

24    the same time glyphosate use in the US increased

25    dramatically, NHL rates were falling?
```

Andrew M. Schneider, M.D.

1    A.   Well, as we talked before, as you said, you

2    know, if the latency is 20 to 30 years, and if we're

3    saying that it starts increasing in 1995, it's going

4    to take till about 2025 to see that increase in

5    lymphoma.  So we may see that spike as time goes on.

6    Q.   And you haven't seen anything to date that

7    shows an increase in NHL concomitant with the

8    increase in glyphosate use, correct?

9    A.   So this curves stops at 2019.  I don't have

10   the last three years of data.

11   Q.   And I'm correct that you have not seen those

12   data, sitting here, right?

13   A.   Correct.  Maybe the data doesn't exist.  I

14   don't know.

15   Q.   Right.  Since this is the SEER database from

16   2022, is there anywhere else that you would look to

17   see data since 2019 for NHL rates?

18   A.   No.  But, again, I think I've answered your

19   question.  This may be a fact of evidence not long

20   enough to see the increase in lymphoma.

21   Q.   Is it your opinion, then, that the average

22   latency is 20 to 30 years?

23   A.   I --

24        MR. HABERMAN:  Objection.

25   A.   -- think we talked about this before, and I

Andrew M. Schneider, M.D.

```
1    gave you the number of --

2       Q.   15 to 20 is what you said.

3       A.   -- 15 to 20, right.  But I think -- I think

4    the answer is -- and we can't be so dogmatic in the

5    actual number.  The qualitative answer is that

6    there's a latency, and we just may not have seen the

7    increase yet.

8       Q.   Okay.  So your explanation for why there's

9    not an increase in NHL cases at the same time

10   there's an increase in glyphosate use is that the

11   latency may not be long enough, right?

12      A.   Yes.

13      Q.   You've referenced IARC for your opinions in

14   this case, right?

15      A.   Yes.

16      Q.   Besides glyphosate, what other IARC have you

17   reviewed?

18      A.   None.

19      Q.   Does IARC have any relevance to your

20   clinical practice?

21      A.   No.

22           MR. HABERMAN:  Objection.

23      Q.   Do you make a point of following the various

24   substances IARC has evaluated for carcinogenic

25   potential?
```

Andrew M. Schneider, M.D.

1      A.   No.  As a clinician, as opposed to my legal

2   work, I'm here to treat the patient, get them

3   better.  It doesn't matter how they got to where

4   they are.  Only when I'm doing medicolegal work and

5   asked a specific question do I do research on that

6   topic.

7      Q.   Have you, before your opinions in this case,

8   offered an opinion in litigation based on an IARC

9   assessment?

10     A.   No.

11     Q.   For example, IARC has assessed working the

12  night shift as a probable human carcinogen.  Are you

13  aware of that?

14     A.   No.

15     Q.   Do you agree that working the night shift is

16  a probable human carcinogen?

17     A.   I have no independent opinion.

18     Q.   Have you ever diagnosed someone's cancer as

19  being caused by working the night shift?

20     A.   So I don't diagnose cancer.  They come to me

21  with a pathology report saying they have cancer, and

22  I treat them.

23     Q.   Let me ask a better question then.  Okay?

24     A.   Sure.

25     Q.   In your clinical practice, have you ever

Andrew M. Schneider, M.D.

1    come to a conclusion that someone's cancer was

2    caused by working the night shift?

3        A.   No.

4        Q.   Have you ever evaluated whether, in this

5    case, working the night shift contributed to any

6    plaintiff's non-Hodgkin's lymphoma?

7        A.   Right.  From the literature that I've seen,

8    there's no strong association between working the

9    night shift and getting lymphoma.  In addition, I

10   believe Mr. Pleu -- I have to look at my notes, but

11   one of the plaintiffs got -- allegation is that he

12   got -- used Roundup in his personal life, nothing to

13   do with his job.  I'd have to review that but, no, I

14   don't think working the night shift is an

15   etiological factor for either plaintiff in

16   getting lymphoma.

17       Q.   What -- what -- we're going to -- withdrawn.

18            So at a break, Dr. Schneider, I'm going to

19   ask you to identify what materials on your reliance

20   list you reviewed that relate to whether or not

21   working the night shift is a risk factor --

22       A.   So --

23       Q.   -- for lymphoma.

24       A.   -- without going through each one, I won't

25   be able to tell you that.  I don't have it

1    memorized.

2        Q.    Is there any paper that you can point me to

3    that's actually listed on your reliance list that

4    discusses working the night shift as a risk factor

5    for lymphoma?

6        A.    I don't recall seeing that, so maybe you can

7    show me where you've seen that.  That's not

8    something I'm aware of.

9        Q.    I'm sorry.  I thought you said that you

10   reviewed the literature to see whether working the

11   night shift was associated with lymphoma.

12       A.    So I think you misinterpreted.  What I said

13   is I reviewed the -- sorry.  I reviewed the

14   literature and didn't see that as a risk factor, so

15   it was absent.  So if you want to show me something

16   where it is a risk factor, I can look at that.  But

17   I don't remember reading -- we looked at working the

18   night shift as a risk factor for NHL, and we decided

19   it is or it isn't a risk factor.

20       Q.    So I think we're clear, but I want to just

21   make sure that we have the same understanding.  Is

22   that all right?

23       A.    Sure.

24       Q.    Okay.  In your review of the literature, you

25   did not see articles finding an association between

1    working the night shift and the development of

2    non-Hodgkin's lymphoma, right?

3        A.   I don't recall that.  So, you know, again, I

4    reviewed a lot of literature, and I could have

5    missed it.  So if you want to show that to me, I can

6    look at it, see if I've seen it before, and comment.

7    But I don't have independent recollection of seeing

8    that before.

9        Q.   I think we both have a tendency to speak a

10   little bit quickly, so probably it would make

11   Susan's life easier if we try to slow down a bit.

12   Is that fair?

13       A.   Sure.

14       Q.   IARC's assessment of Roundup did not

15   identify a threshold dose for Roundup for the

16   substance to be carcinogenic, correct?

17       A.   True.

18       Q.   That's just a function of how IARC works,

19   right?

20       A.   I don't know how IARC works.

21       Q.   You don't know whether IARC performs a

22   hazard assessment or a risk assessment?

23       A.   I'm not an epidemiologist or a statistician,

24   so I can't tell you the statistical methods they use

25   without looking at the article again and reading the

Andrew M. Schneider, M.D.

1    methods.

2        Q.   Do you know what the difference is between a

3    hazard assessment and a risk assessment?

4        A.   I know both, I think, look at the increased

5    risk -- take one as the -- as the baseline, and then

6    if there's an increased number above one, is the

7    risk -- is the agent an etiological factoring in

8    getting the disease.  I don't know the specific

9    difference between a relative risk and a -- and a

10   hazards ratio.

11       Q.   I think I might be able to help clarify

12   something.  Okay?

13       A.   Sure.

14       Q.   So I'll ask you a specific question.

15       A.   Sure.

16       Q.   A risk assessment, as conducted by a

17   regulatory or scientific agency, looks at whether an

18   exposure poses a risk to human health at levels to

19   which people are actually exposed, correct?

20       A.   Yes.

21       Q.   A hazard assessment looks at a different

22   question, which is, is it theoretically possible

23   that a substance could cause cancer, correct?

24       A.   So I don't have enough information.

25       Q.   IARC's evaluations are whether a compound

1    has the potential to be carcinogenic at some dose,

2    correct?

3         MR. HABERMAN:  Objection.

4    A.   Yes.

5    Q.   IARC does not examine real world human

6    exposures, right?

7         MR. HABERMAN:  Objection.

8    A.   Without looking at the articles, I don't

9    know the specifics of what IARC does.  And I've only

10   read that one IARC monograph talking about

11   glyphosate.  So if you want to show me it, I can

12   answer your questions, but I don't have independent

13   knowledge of this topic.

14   Q.   Sitting here today, the specifics of IARC's

15   process for reaching an evaluation are outside of

16   your expertise, fair?

17        MR. HABERMAN:  Objection.

18   A.   Correct.  I'm -- I'm not a statistician or

19   an epidemiologist, so I can't comment on whether

20   their methodology was flawed or not.

21   Q.   You're offering opinions in this case about

22   what causes non-Hodgkin's lymphoma, right?

23   A.   Yes.

24   Q.   How do you define a cause of lymphoma?

25   A.   Etiologic agent.

```
1       Q.   What does etiologic agent mean?

2       A.   That means the agent is a known risk factor

3   or there's data to support that this agent or --

4   agent can cause lymphoma.

5       Q.   You gave me some examples earlier of

6   immunosuppression, certain autoimmune diseases as

7   examples of etiologic agents in lymphoma, correct?

8       A.   Correct.

9       Q.   Are cause and risk factor the same to you?

10           MR. HABERMAN:   Objection.

11      A.   I mean, I'm sure there may be some nuance to

12  it, but a risk factor is something that predisposes

13  you to getting the cancer, and cause may be

14  multifactorial, so there may be more than one cause,

15  so...

16      Q.   And I just wanted to be clear on how you're

17  using the term, since everybody uses these a little

18  bit differently.  Okay?

19      A.   Sure.  Sure.

20      Q.   A risk factor, in your view, is something

21  that predisposes you to getting a cancer, correct?

22      A.   Yes.

23      Q.   A cause may be a little bit different in

24  that there may be more than one cause for an

25  individual cancer, right?
```

Andrew M. Schneider, M.D.

```
 1      A.   Yes.

 2      Q.   Do you agree that for most cases of

 3   non-Hodgkin's lymphoma the cause is unknown?

 4           MR. HABERMAN:  Objection.

 5      A.   I don't know.

 6      Q.   In your clinical practice, because you're a

 7   treating oncologist, you do not typically evaluate

 8   the cause of an individual person's lymphoma, right?

 9      A.   Correct.

10      Q.   I take it you have no opinions, sitting here

11   today, whether, in your clinical practice, the cause

12   of most patients' lymphoma is unknown; is that

13   right?

14      A.   It's probably unknown to me, but doesn't

15   mean it's unknown.

16      Q.   Do you have an opinion one way or the other

17   as to whether the cause of lymphoma is unknown for

18   most of the patients you see in your clinical

19   practice?

20      A.   Well, again, it depends on the individual

21   patient.  So if the individual patient has a history

22   of rheumatoid arthritis, is on one of those

23   medications that suppressed the immune system, or if

24   they've been on steroids for a long, long time, or

25   they're a post-transplant, lymphoproliferative
```

```
 1    disorder, they've been on chronic immunosuppression,

 2    or they've been exposed to Roundup, those patients,

 3    I have a good idea what the etiologic agent is.

 4    Others, I don't.

 5        Q.   What percentage of your patient population

 6    fall into the category where you can identify a

 7    known cause for their lymphoma?

 8        A.   You want me to wildly speculate again?

 9        Q.   Give me your best estimate, sitting here

10    today.

11        A.   Which would be wildly speculating for the

12    record.

13        Q.   Sure.

14        A.   Sure.  I'd say 15 percent I might know the

15    etiology.

16        Q.   That's different than, for example, lung

17    cancer or mesothelioma, correct?

18        A.   Depends.  I mean, we know that some patients

19    who are nonsmokers get lung cancer.  Mesothelioma is

20    a different issue.  But, you know, lung cancer, as

21    you, I'm sure, well know, I mean, smoking is a

22    strong etiologic risk factor, but not everybody who

23    gets lung cancer is a smoker.

24        Q.   Not everybody who gets lung cancer is a

25    smoker, but a large portion of lung cancers are due
```

1    to smoking; is that fair?

2        A.    Yes.

3        Q.    Unknown, in terms of cause of cancer, means

4    that there's not environmental or hereditary factor

5    that we can point to as causing that cancer, true?

6        A.    No.  It just means we don't know.

7        Q.    How is that different from what I said?

8        A.    There may be an environmental or hereditary

9    factor that we just haven't identified yet, or

10   studies are ongoing.  Doesn't mean that -- it means

11   we don't know yet, but we don't know that it's not.

12       Q.    Okay.  Unknown means there's not an

13   environmental or hereditary factor that we can point

14   to today as causing that cancer, correct?

15           MR. HABERMAN:  Objection.

16       A.    It means that the evidence is still out, and

17   we don't know the ultimate answer till all the

18   evidence that's in.

19       Q.    Are there any risk factors for lymphoma that

20   you're aware of that you haven't told us about so

21   far today?

22       A.    There might be, but I've -- from memory,

23   I've done my best to tell you what I remember.

24       Q.    And you mentioned that autoimmune disease is

25   a risk factor for lymphoma, correct?

Andrew M. Schneider, M.D.

```
 1      A.   Yes.

 2      Q.   Autoimmune diseases includes rheumatoid

 3   arthritis, right?

 4      A.   Yes.

 5      Q.   Systemic lupus is an autoimmune disease,

 6   right?

 7      A.   Yes.

 8      Q.   Hashimoto's thyroiditis is an autoimmune

 9   disease, right?

10      A.   Yes.

11      Q.   Hashimoto's is the most common cause of

12   hypothyroidism in the United States, correct?

13      A.   So I'm not a board certified

14   endocrinologist, but if you tell me that's true,

15   I'll believe you.

16      Q.   Do you have an example of something that is

17   a risk factor for lymphoma, but you don't consider

18   it to be a cause?

19      A.   Nothing comes to mind.  I'm not sure what

20   you mean.

21      Q.   The reason glyphosate is a risk factor for

22   Mr. Moore, in your opinion, is because he fits into

23   a group in epidemiologic studies that found an

24   association between Roundup and non-Hodgkin's

25   lymphoma, true?
```

1      A.   True.

2      Q.   The same is true for Mr. Pleu, right?

3      A.   True.

4      Q.   The reason that glyphosate is a risk factor

5   is because he fits into a group in an epidemiologic

6   study that found an association between Roundup and

7   NHL, correct?

8      A.   The answer is that there's a huge body of

9   literature that states that exposure to Roundup

10  causes NHL.

11     Q.   Certainly it is true for glyphosate that

12  there are some data showing no increased risk,

13  right?

14     A.   Correct.

15     Q.   In your view, a risk factor is something

16  that has been associated with an increased risk

17  based on some epidemiologic data even if there are

18  other epidemiologic data going the other way,

19  correct?

20     A.   The question was too long.  I'm sorry.

21  You're going to have to do it slower and break it

22  up.

23     Q.   Sure.  In your view, a risk factor is

24  something that has been associated in some

25  literature with non-Hodgkin's lymphoma?

1      A.    Yes.

2      Q.    Even if there is other epidemiologic data

3    showing no increased risk, correct?

4      A.    I think the way I'd answer that question is,

5    it's my job, as someone who's been trained to read

6    articles like this for 33 years, to go through the

7    studies, talk about what studies are positive, what

8    are negative, and then talk about the flaws of each

9    study, look at the meta-analysis, and then reach an

10   opinion.

11     Q.    As someone who has been trained to read

12   articles like this for 33 years, how do you

13   determine whether or not a risk factor is causal?

14     A.    By looking at the individual articles, by

15   looking at the meta-analysis, looking at the

16   relative risks, looking at whether they're

17   statistically significant, and then coming up with

18   an opinion.

19          THE VIDEOGRAPHER:  Can I change tapes very

20      quickly?

21          MS. ROSS:  Going off the record.

22          THE VIDEOGRAPHER:  Okay.  Off the record at

23      1:25 p.m.

24          (Recess from 1:25 p.m. until 1:27 p.m.)

25          THE VIDEOGRAPHER:  This begins Media Unit

 1        Number 2.  We're back on the record at 1:27 p.m.

 2   BY MS. ROSS:

 3        Q.   Dr. Schneider, I think I understood your

 4   last answer as to how you determine whether an

 5   association in the literature is causal or not, and

 6   I just want to make sure that I'm clear on this.

 7   Okay?

 8        A.   Sure.

 9        Q.   We can agree not all associations are

10   causal, right?

11             MR. HABERMAN:  Objection.

12        A.   So I don't know what you mean by that.

13   Like, if they're -- if someone doesn't show an

14   increased relative risk that is significant, we can

15   decide whether that's due to an error or low numbers

16   of patients or no good power to find that.  If there

17   is an association, we can look at the article or the

18   data and decide whether it's a fair association or

19   not.

20        Q.   What do you mean by "a fair association or

21   not"?

22        A.   Maybe they did some statistical mistakes or

23   they only had two patients, you know.  We can look

24   at the data together and try to reach an opinion

25   about whether the data is meaningful or not, and is

1    this -- you know, is it published in peer-reviewed

2    literature?  Has it been looked at by someone else

3    besides me?  Those kind of things.

4        Q.   Sometimes there may be an association

5    reported in the literature that's just based on too

6    few patients to be able to say anything, correct?

7        A.   Well, they'll make that opinion, but it's up

8    to the reader to decide whether it's a valid

9    association or not.  I mean --

10       Q.   Sometimes there are association reported in

11   the literature that may not be meaningful, I think

12   you said, for some reason, right?

13       A.   I think the answer is that you have to look

14   at the individual study, look at the meta-analysis,

15   and critique it.

16       Q.   Are you familiar with the Bradford Hill

17   criteria?

18       A.   So I've heard that term.  I can't tell you

19   off the top of my head what it is, but if you

20   refresh my memory, I do know I've heard of it.

21       Q.   You can't list the Bradford Hill criteria,

22   sitting here today, correct?

23       A.   I'm not a -- I'm a clinical oncologist, so I

24   don't memorize the Bradford Hill criteria.

25       Q.   You did not perform a Bradford Hill analysis

Andrew M. Schneider, M.D.

```
 1    in this case?

 2       A.    Can you tell me what a Bradford Hill is?

 3    Then I can tell you if I did it.

 4       Q.    No.

 5       A.    Okay.

 6       Q.    I'm asking you here -- so we'll start by --

 7    you just told me you can't list the Bradford Hill

 8    criteria, right?

 9       A.    Correct.

10       Q.    If the Bradford Hill criteria include a

11    variety of factors one might look at, you don't know

12    what those factors are, sitting here today, right?

13       A.    Correct.  I don't know --

14       Q.    So --

15       A.    I don't know what the Bradford Hill criteria

16    are.  It doesn't mean I didn't use the Bradford Hill

17    criteria in assessing my opinions because I don't

18    know what the Bradford Hill criteria are.

19       Q.    You did not perform a Bradford Hill analysis

20    in this case using those criteria because you don't

21    know what they are, correct?

22       A.    I can't answer that question because I might

23    have done it, but -- and just not know that they're

24    the Bradford Hill criteria.  So if you want to tell

25    me or show me or give me a chance to see if I did
```

Andrew M. Schneider, M.D.

```
 1    it, I'll be happy to look at that, but I can't

 2    answer the question because I don't know what the

 3    Bradford Hill criteria are.

 4       Q.   There's a document on your reliance list

 5    entitled Hill, A.B., 1965, The Environment and

 6    Disease Association or Causation.  Did you review

 7    that document?

 8       A.   I don't think I did.

 9       Q.   You're aware that an association means two

10    things tend to occur together, right?

11       A.   Yes.

12       Q.   A statistical association can be confounded

13    by other factors, right?

14       A.   Correct.

15       Q.   A confounder is some other variable that may

16    or may not also cause a particular problem, right?

17       A.   True.

18       Q.   You must consider and analyze whether any

19    statistical association is confounded before

20    considering a causal relationship, right?

21            MR. HABERMAN:  Objection.

22       A.   Yes.

23       Q.   For example, it is true that ice cream

24    consumption and drowning are correlated.  Did you

25    know that?
```

1      A.   I didn't know that.  Why?

2      Q.   Hot weather might confound the relationship

3   between ice cream and drowning, right?

4      A.   Well, just to be fair, I have no idea what

5   you're talking about.  I don't know anything about

6   ice cream and drowning, so --

7      Q.   Do you have any example of confounding that

8   you like to use when you're explaining it to peers

9   or to a jury?

10      A.   So as I've already discussed, this is my

11   first Roundup case.  I've never explained it to a

12   jury.  I'll give you -- an example that I can come

13   up with here is, you know, a patient was exposed to

14   Roundup, but maybe he was exposed to other

15   pesticides or herbicides.  And, you know, how do we

16   distinguish whether his lymphoma is from the

17   glyphosate or another pesticide or maybe both?  So

18   that maybe is an example.

19      Q.   Thank you.  So I'm going to break that down

20   a little bit.  All right?

21      A.   Sure.

22      Q.   A confounder is something that muddies the

23   relationship between what you're interested in

24   studying and the outcome, right?

25      A.   Yes.

1         MR. HABERMAN:  Objection.

2    Q.   In the case of Roundup, exposure to other

3    pesticides might muddy or cloud the relationship

4    between Roundup exposure and the outcome of

5    interest, such as non-Hodgkin's lymphoma, true?

6    A.   True.

7    Q.   The way to address that would be to control

8    for confounding by other pesticides in analyses of

9    Roundup and non-Hodgkin's lymphoma, right?

10   A.   So you see in the articles that

11   statisticians are able to do that.  Again, it's not

12   something that I'm an expert on.  But you'll see the

13   relative risks for glyphosate, and then you will see

14   it just alone, and they'll take out other things and

15   see whether they're still significant.

16   Q.   You're not an expert in conducting those

17   controlled analyses, correct?

18   A.   Nor am I expert in the statistical method

19   for doing it.

20   Q.   You are not an expert in biostatistics,

21   true?

22   A.   No.

23   Q.   You rely on published data to look at

24   whether a relationship of interest between Roundup

25   and non-Hodgkin's lymphoma was actually controlled

1    for other pesticides, right?

2        A.   Correct.

3        Q.   You do have expertise in reviewing the

4    published literature, correct?

5        A.   Yes.

6        Q.   You are aware that risk estimates that are

7    adjusted for other pesticides are more reliable,

8    true?

9        A.   I think so.

10       Q.   Do you recall ever hearing -- well,

11   withdrawn.

12            Have you ever heard anyone refer to

13   different pillars of scientific evidence?

14       A.   What do you mean by "pillars"?  I mean, I

15   might have.  I just don't know what you mean by

16   "pillars."  Can you explain it?

17       Q.   So it's not my term.

18       A.   Okay.

19       Q.   I'll start there.  Okay?

20       A.   It's not your term.  What does that mean?

21   Oh, it's not your term.

22       Q.   It's not my term?

23       A.   Can you define the term for me so I

24   understand --

25       Q.   Sure.

1        A.    -- what you're talking about?

2        Q.    New question, so we're not talking over each

3    other.

4              Some folks in this litigation have referred

5    to epidemiology, animal studies, and cell studies as

6    different pillars of evidence.  I take it you do not

7    think about things in terms of those pillars of

8    evidence.  Is that right?

9        A.    No.  I mean, I've been asked to look at

10   those things, so I do what I did in this particular

11   litigation.

12       Q.    Do you consider Roundup to be a known cause

13   of non-Hodgkin's lymphoma?

14       A.    Yes.

15       Q.    What, to your mind, is the best data

16   establishing that Roundup is a known cause of NHL?

17       A.    That's going to be a long --

18             MR. HABERMAN:  Objection.

19       A.    -- a long answer.  I mean, that's going to

20   be going through the articles and looking at the

21   relative risks and critiquing the studies.

22       Q.    Okay.  So to your mind, the body of

23   epidemiologic literature you reviewed establishes

24   that Roundup is a known cause of non-Hodgkin's

25   lymphoma; is that right?

1      A.   Yes.

2      Q.   What other chemicals are known to cause NHL,

3    to your knowledge?

4      A.   Right.  So since my only task in this case

5    was to look at glyphosate, I didn't look.  I know we

6    talked about the other pesticide that you mentioned

7    starting with a P in the IARC manual.  But I didn't

8    go there for this deposition because that wasn't my

9    task.

10     Q.   You -- am I correct that you cannot name a

11   single other chemical that is known to cause

12   lymphoma?

13     A.   I could if you give me time to look.

14     Q.   Okay.  And, Dr. Schneider, what are you

15   looking at on your phone, for the record?

16     A.   I was going to go back to those articles

17   that he sent me, and I think it's there.

18     Q.   The articles that counsel sent you?

19     A.   The stuff that's on, I think, either 2 or 3

20   or both, yes.

21     Q.   Okay.  So you are looking for articles that

22   counsel sent you for your reliance list --

23     A.   Yes.

24     Q.   -- on what other chemical exposures are --

25     A.   Well, again --

1      Q.   -- associated with NHL?

2      A.   -- I remember seeing them, but I didn't pay

3   attention to them because that wasn't my task today,

4   nor with any of these -- both plaintiffs only were

5   exposed to Roundup glyphosate and nothing else.

6      Q.   You are not an expert on chemical causes of

7   non-Hodgkin's lymphoma, right?

8           MR. HABERMAN:  Objection.

9      A.   I can tell you what -- I can look it up and

10   tell you what other chemicals are -- you know, I've

11   done it.  But I wasn't prepared today to discuss

12   whether a certain chemical is an etiologic risk

13   factor for lymphoma because there's no allegation in

14   this case that anything other than glyphosate was

15   what they were exposed to.

16     Q.   As an oncologist, have you encountered other

17   chemicals as risk factors for non-Hodgkin's

18   lymphoma, or no?

19     A.   I think there are.  I just would have to

20   look it up.  If you want to -- me to do that, I'm

21   happy to do it.  Just give me a few minutes.

22     Q.   So let's come back to this.

23     A.   Okay.  Sure.

24     Q.   I take it if I asked you what pesticides

25   other than glyphosate are associated with an

1    increased risk of non-Hodgkin's lymphoma, you would

2    need to look that information up, right?

3        A.   Right.

4        Q.   Sitting here today, you don't have an

5    independent recollection of what pesticides other

6    than glyphosate increase the risk of NHL, right?

7        A.   Since both patients only had exposure to

8    glyphosate, correct.

9        Q.   And you are not saying that Roundup is the

10   only pesticide that causes NHL, right?

11       A.   Correct.

12       Q.   For other pesticides that cause NHL, I take

13   it you don't know what the mechanism is by which

14   they cause cancer, right?

15       A.   So I specifically asked what my function was

16   today, and I was told that I would not be commenting

17   on any other herbicide, pesticide, other than

18   glyphosate.

19       Q.   You were not asked, nor did you prepare, to

20   evaluate the literature on whether other pesticide

21   exposures increase the risk of NHL, right?

22       A.   Correct, because both the plaintiffs in this

23   case were not exposed to anything other than

24   glyphosate, so there was no need to.

25       Q.   Now, you mentioned the best way to identify

1    other pesticides that increase the risk of NHL would

2    be to look at the literature that you reviewed,

3    right?

4         A.   Just as I did for glycosate -- glyphosate.

5              (Schneider Exhibit 10 was marked for

6    identification.)

7    BY MS. ROSS:

8         Q.   Exhibit 10 to your deposition is an article

9    that you reviewed entitled Carcinogenicity of

10   tetrachlorvinphos, parathion, malathion, diazinon,

11   and glyphosate.

12        A.   Right.  So --

13        Q.   Do you see that?

14        A.   I do, and if you would have given me time, I

15   would have found it and have been able to read all

16   those names.

17        Q.   I'm helping in this regard.

18        A.   Appreciate it.  Thank you.

19        Q.   New question.

20        A.   Yes.

21        Q.   Do you see on the first page of this, there

22   are several different pesticides listed?

23        A.   I do.

24        Q.   One of those pesticides is malathion, right?

25        A.   Yes.

```
 1        Q.   IARC, in their assessment, states:  The
 2   insecticides malathion and diazinon were classified
 3   as probably carcinogenic to humans.
 4             Do you see that?
 5             MR. HABERMAN:  Where are you reading?
 6        A.   Where are you reading?
 7        Q.   Right column on the first page, very first
 8   sentence.
 9        A.   Right column?
10        Q.   Yes.
11        A.   All the way to the right?  Okay.  I see,
12   yes.
13        Q.   Do you agree with IARC's assessment of
14   malathion?
15        A.   So since we already discussed I wasn't asked
16   to have any opinion about anything other than
17   whether -- wish it was easy to say -- glyphosate
18   was -- is an etiologic risk factor for NHL, I didn't
19   look at this issue because I wasn't asked to look at
20   this issue.
21        Q.   This is one of the articles that you relied
22   on, right?
23        A.   I've seen this article and said, okay, I
24   don't really need to know much about this because it
25   doesn't answer the question about glyphosate.
```

Andrew M. Schneider, M.D.

1    Glyphosate here, it does, but I didn't look at the

2    other ones besides glyphosate.

3       Q.   You took this two-page article, and you

4    looked specifically at the information about

5    glyphosate and not at the information for any of the

6    other pesticides listed there, correct?

7            MR. HABERMAN:

8       Objection; mischaracterizes --

9       A.   That's correct.

10           MR. HABERMAN:   -- testimony.

11      A.   I mean, to a degree, that's correct.   I

12   mean, the other stuff wasn't relevant to my task

13   today.

14      Q.   You do not have an opinion on whether

15   malathion is probably carcinogenic to humans, right?

16      A.   Not an expert opinion.

17      Q.   Do you have any opinion?

18      A.   I mean, I've heard it is, but I haven't

19   reviewed the literature to have an expert opinion.

20      Q.   Malathion has been associated with

21   non-Hodgkin's lymphoma, correct?

22      A.   I believe so.

23      Q.   In mice, malathion increased hepatocellular

24   adenoma or carcinoma, correct?

25      A.   Again, I don't know this information.   I

1    can -- we could read it together and...

2    Q.   Sure.  Let's do it this way.  New question.

3        IARC states that in mice, malathion

4    increased hepatocellular adenoma or carcinoma

5    combined, correct?

6    A.   If that's what it says.  I don't know where

7    you're reading.

8    Q.   Right column.

9    A.   Okay.

10   Q.   About halfway down.

11   A.   I see it.  In mice, malathion increased

12   hepatocellular adenoma or carcinoma combined.

13   That's what it says, yes.

14   Q.   That's true, right?

15   A.   I don't know.

16   Q.   What does the next sentence say?

17   A.   In rats, it increased thyroid carcinoma in

18   males, hepatocellular adenoma or carcinoma combined

19   in females, and mammary gland adenocarcinoma after

20   subcutaneous injection in females.

21   Q.   You have no opinion on whether that is

22   correct or incorrect, sitting here today, right?

23   A.   Right.

24   Q.   A little further down, this states:

25   Malathion induced DNA and chromosomal damage in

Andrew M. Schneider, M.D.

```
 1    humans corroborated by studies in animals and

 2    in vitro.

 3            Do you see that?

 4       A.   I do.

 5       Q.   You have no opinion as to whether or not

 6    that's correct, right?

 7       A.   I haven't researched malathion, so, no.

 8       Q.   There's a section on Page 2 of this article

 9    that discusses diazinon.  It's the left column.  Do

10    you see the sentence beginning:  In rodents,

11    diazinon increased?

12       A.   I've got to look for it.  How far down the

13    page?

14       Q.   Correct.

15       A.   How far down the page?

16       Q.   I'm sorry.  I thought you said halfway down

17    the page.

18       A.   Oh, halfway.  I see it, yes.

19       Q.   Can you read that sentence, please?

20       A.   Sure.  In rodents, diazinon increased

21    hepatocellular carcinoma in mice and leukemia or

22    lymphoma combined in rats, but only in males

23    receiving a low dose in each study.

24       Q.   The next sentence states:  Diazinon induced

25    DNA or chromosomal damage in rodents and in human
```

Andrew M. Schneider, M.D.

1    and mammalian cells in vitro, right?

2       A.   That's what it says, yes.

3       Q.   You did not evaluate diazinon as that was

4    not part of your task here, correct?

5       A.   Correct.

6       Q.   You do not have an opinion on whether

7    diazinon causes non-Hodgkin's lymphoma, right?

8       A.   I have not researched that, correct.

9       Q.   You did not investigate that question, true?

10      A.   True.

11      Q.   IARC did classify diazinon as probably

12   carcinogenic to humans in the same monograph you

13   reviewed on glyphosate, right?

14      A.   I don't remember that.

15      Q.   Okay.  Did you review the entirety of the

16   IARC monograph on glyphosate?

17      A.   So it was very long, and my recollection was

18   I went to the studies, the meta-analysis they did,

19   and the clinical studies and looked at that.

20      Q.   About how long did you spend reading the

21   IARC monograph, do you think?

22      A.   I'm guessing -- as I -- as I told you, I

23   don't stopwatch these things -- 30 minutes.

24      Q.   Does 2,4-D cause non-Hodgkin's lymphoma?

25      A.   So, again, to be fair, that wasn't a task I

1    was asked to look at, so I don't really know.

2        Q.   You did not investigate whether 2,4-D causes

3    NHL, right?

4        A.   Since neither of the patients here were

5    exposed to 2,4-D, I did not look at it, correct.

6        Q.   And you're not offering an opinion on that,

7    right?

8        A.   I wasn't asked to, correct.

9        Q.   Your answer would be the same for dicamba,

10   right?

11       A.   Right.

12       Q.   You're not offering as opinion on

13   whether dicamba causes non-Hodgkin's lymphoma?

14       A.   Correct.

15       Q.   You did not look at the literature on

16   dicamba and NHL, true?

17       A.   True.

18       Q.   You did not look at the literature on

19   MCPA --

20       A.   True.

21       Q.   -- and lymphoma?

22       A.   True.

23       Q.   You're not offering an opinion on whether

24   that causes lymphoma, correct?

25       A.   Correct.

Andrew M. Schneider, M.D.

1       Q.   I take it you did not look at the literature

2   on paraquat and non-Hodgkin's lymphoma; is that

3   right?

4       A.   Well, to be fair, as I said before, I only

5   looked at glyphosate because that's what I was asked

6   to do.

7       Q.   Is paraquat toxic?

8       A.   I don't know independently without reviewing

9   the data on paraquat.

10      Q.   And you haven't reviewed any of the data on

11  paraquat to date, correct?

12      A.   No.  There was no reason to.

13      Q.   Do you agree that general toxicity is not

14  the same as causing non-Hodgkin's lymphoma?

15      A.   I don't know what you mean by general

16  toxicity.

17      Q.   So that might be a better question for a

18  toxicologist; is that fair?

19      A.   I can't answer the question the way you

20  asked it, so maybe.

21      Q.   You're aware that -- withdrawn.  New

22  question.

23           For chemicals that are marketed in the

24  United States, one has to consider how much eye

25  damage they'll cause or skin damage they'll cause if

1    they touch the skin.  But that's outside of your

2    expertise, right?

3        A.   Correct.

4             MR. HABERMAN:  Objection.

5        Q.   You don't have an opinion on whether general

6    toxicity such as irritation to eyes or skin is a

7    marker of whether something causes you to develop

8    non-Hodgkin's lymphoma, right?

9        A.   I know in the -- I've seen data that

10   suggests that skin exposure causes NHL.

11       Q.   Skin exposure to any chemical causes NHL?

12       A.   I'm only talking about glyphosate.

13       Q.   Okay.  And when you say you've seen data

14   that suggests that skin exposure causes NHL, what do

15   you mean?

16       A.   I'd have to go back and try to find it if

17   you want me to.

18       Q.   Are you talking about the epidemiologic

19   studies of glyphosate in non-Hodgkin's lymphoma, or

20   are you talking about something else when you say

21   that skin exposure to glyphosate causes NHL?

22       A.   My recollection was, I've been sent some --

23   either some internal memos or some literature to

24   suggest that.  But, again, I'd have to find it for

25   you.

1      Q.   And in order to find it, you'd go back to an

2   e-mail from counsel that you have on your phone; is

3   that right?

4      A.   Right.

5           MR. HABERMAN:  Objection.

6           MS. ROSS:  So, Counsel, I'm going to need

7      whatever the list is of documents that

8      Dr. Schneider is reviewing on his phone in this

9      deposition.

10          THE WITNESS:  I think it's on reliance

11     number 3, isn't it?

12          MR. HABERMAN:  Yeah.  I don't have -- well,

13     we can deal with that after.  You have what he's

14     reviewed and relied on.

15          MS. ROSS:  Okay.

16     Q.   So, Dr. Schneider, then go to Exhibit 3 and

17   identify for me what the articles are that you say

18   show --

19     A.   Right.  So I have to spend some time doing

20   that.

21     Q.   Okay.  So we'll do that at a break, then.

22     A.   Okay.

23     Q.   You've mentioned that your task in this case

24   was to evaluate glyphosate and non-Hodgkin's

25   lymphoma risk, right?

Andrew M. Schneider, M.D.

```
 1        A.    Yes.

 2        Q.    You agree that when studying the effects of

 3    pesticides, it's important to try and isolate the

 4    effects of one pesticide --

 5        A.    Yes.

 6        Q.    -- over another, correct?

 7              MR. HABERMAN:  Objection.

 8        Q.    Adjusting for other pesticides is a good

 9    thing to do, right?

10        A.    Yes.

11              MR. HABERMAN:  Objection.

12        Q.    Do you know -- well, I take it since you did

13    not look at individual pesticides, you don't have an

14    independent opinion on which pesticides should be

15    adjusted for.  Is that fair?

16        A.    That's fair.

17        Q.    You would rely on the authors of various

18    epidemiologic studies to decide what pesticides to

19    adjust for in their analyses, correct?

20        A.    I would hope they'd adjust for every

21    pesticide they could.  So if you ask me a specific

22    question about glyphosate, then you look for the

23    relative risk excluding everything else.

24        Q.    Do you follow evidence-based medicine?

25        A.    Yes.
```

1     Q.   Do you agree that there is a hierarchy of

2   reliability when it comes to scientific evidence?

3     A.   Can you be more specific in that question?

4     Q.   Sure.  Sometimes there's a visual depiction

5   of a pyramid of evidence in evidence-based medicine.

6   Are you familiar with that?

7     A.   I think I have some ideas of what you're

8   talking about, but I'd like to -- you to define it

9   for me so I can answer the question better.

10     Q.   Do you have a working definition of

11   evidence-based medicine?

12     A.   I do.

13     Q.   What is it?

14     A.   So as a clinical oncologist, I base my

15   treatment decisions based upon evidence-based

16   medicine.  So for me, that's peer-reviewed

17   literature, high quality journals, NCCN guidelines.

18     Q.   As a practicing oncologist, you look at the

19   peer-reviewed literature to determine what it means

20   to practice evidence-based medicine, right?

21     A.   I think I answered that question.  For me,

22   evidence-based medicine is what I told you.

23     Q.   And I think what you said is peer-reviewed

24   literature, high quality journals, and NCCN

25   guidelines; is that correct?

1     A.   Yes.

2     Q.   Not everything that's published in the

3   peer-reviewed literature is considered equal in

4   terms of the level of evidence it provides, right?

5     A.   That's subject to interpretation.  That's

6   subject to the reader's opinion.

7     Q.   We heard from another expert for the

8   plaintiff in this case who's an epidemiologist who

9   teaches doctors and graduate studies to practice

10  evidence-based medicine.  Would you defer to him on

11  the hierarchy?

12          MR. HABERMAN:  Objection.

13    A.   I don't think so.  I mean, I've given you

14  what I -- what I think evidence-based medicine

15  means, and that's my opinion.  So for me,

16  evidence-based medicine would be that, you know, you

17  want -- there are certain studies, right?  So there

18  are -- there are prospective studies.  There are

19  randomized studies.  There are retrospective

20  studies.  There's inherit flaws in all these things,

21  you know.  But if something is published in the

22  literature, is it peer-reviewed, I have my opinions.

23    Q.   All right.  That was a long answer.  So I'm

24  going to break it up a little bit.  Okay?

25    A.   Sure.

Andrew M. Schneider, M.D.

```
 1        Q.   There are randomized, controlled trials

 2   which, if they can be done, are considered the best

 3   form of evidence available, correct?

 4        A.   Yes.

 5        Q.   Prospective studies are next in terms of

 6   levels of evidence if they are well-conducted,

 7   correct?

 8        A.   Yes.

 9        Q.   Below that are case-control studies,

10   correct?

11        A.   So, again, I'm not an expert.  But there are

12   cohort and case-control studies.  And my

13   understanding was the cohort studies, which may be

14   the prospective studies, I guess, are higher level.

15        Q.   Right.  So cohort studies are typically

16   higher level evidence than case-control studies,

17   correct?

18        A.   Yes.  But it's more difficult to do a cohort

19   study.

20        Q.   Case series are below all of the controlled

21   studies that we've been talking about in terms of

22   the level of evidence they provide.  They are

23   typically anecdotes of what happened to particular

24   patients, correct?

25        A.   Correct.
```

1    Q.   And in vitro studies are the least reliable

2    category of scientific evidence when trying to

3    assess human response, correct?

4    A.   I agree with that.

5    Q.   In vitro means a study in a Petri dish,

6    right?

7    A.   Yes.

8    Q.   In vitro means not in an actual living

9    organism, right?

10   A.   Yes.

11   Q.   In vivo is the other category of studies,

12   right?

13   A.   Yes.

14   Q.   Would you ever conclude that a drug works to

15   treat a disease in humans based solely on the result

16   of in vitro studies?

17   A.   No.

18   Q.   Would you ever conclude a drug works to

19   treat a disease in humans based solely on the

20   results of animal studies?

21   A.   No.

22        MR. HABERMAN:   Objection.

23   Q.   Would you -- withdrawn.

24        You agree that there are limitations in

25   terms of human health risks to what you can learn

1    from animal studies, right?

2        A.   Yes.

3        Q.   Animals are different biological systems,

4    correct?

5        A.   Yes.

6        Q.   Animals have different dosing typically,

7    right?

8        A.   Yes.

9        Q.   There are also limitations in terms of human

10   health risks to what you can learn from in vitro

11   studies, right?

12       A.   Yes.

13       Q.   You cannot conclude from in vitro studies

14   whether a particular substance can cause cancer in

15   humans, right?

16            MR. HABERMAN:   Objection.

17       A.   Well, I'm not sure that's true.   I mean,

18   again, it depends who you're asking.   I think IARC

19   looked at data and said that, you know, based upon

20   animal studies, they gave it a -- glyphosate a 2A

21   with limited data about humans.   So it -- I think it

22   depends who you're asking.

23       Q.   If I'm asking you, Dr. Schneider, would you

24   conclude from in vitro studies that a particular

25   substance causes cancer in humans?

1    A.   So I'm not the expert on the topic, so I

2    would -- I would defer to the experts.

3    Q.   And, Dr. Schneider, would you conclude from

4    animal studies whether a particular substance can

5    cause cancer in humans?

6    A.   Dr. Schneider, the community clinical

7    oncologist, is not the one you're going to ask to

8    answer those questions.

9    Q.   You are not the correct person to ask as to

10   whether in vitro studies or animal studies show that

11   an exposure causes cancer in humans, correct?

12   A.   Again, I think the IARC in 2015 clearly

13   stated that glyphosate is a -- is a 2A and mostly

14   based upon animal data.  So they, in their wisdom,

15   said it was carcinogenic.

16   Q.   And are you relying on IARC for that

17   opinion, or did you perform an independent

18   assessment of genotoxicity in animal studies?

19   A.   I think you know the answer to that

20   question, but I have to rely on the data.  I am a

21   clinical oncologist.  I don't do this kind of stuff.

22   Q.   Do you agree that animal and in vitro

23   studies are hypothesis-generating?

24        MR. HABERMAN:  Objection.

25   A.   I don't know what you mean by that.

```
 1        Q.    Do you know that there is a difference

 2   between hypothesis-generating studies and

 3   hypothesis-proving studies?

 4        A.    I don't know.

 5        Q.    Are you familiar with the concept of

 6   statistical significance?

 7        A.    Yes.

 8        Q.    Can you please define that?

 9        A.    Sure.  I've been taught that a p-value of

10   less than 0.5 is statistically significant.

11        Q.    Statistical significance is a traditional

12   measure by which researchers define whether

13   differences in an outcome are possibly due to

14   chance, correct?

15        A.    Yes.

16              MR. HABERMAN:  Objection.

17        Q.    A p-value of less than .05, in your

18   training, is statistically significant, correct?

19        A.    Right.

20        Q.    You're familiar with a confidence interval,

21   right?

22        A.    Yes.

23        Q.    What is a confidence interval?

24        A.    So in these studies, for example, they

25   looked at relative risks, and instead of giving a
```

Andrew M. Schneider, M.D.

1    p-value, they looked at the 95 percent confidence

2    interval.  And if the number 1 falls in that

3    confidence interval, then it's not significant.

4        Q.    A confidence interval that includes 1.0 is

5    not statistically significant, correct?

6        A.    Correct.

7             MR. HABERMAN:  Objection.

8        Q.    What is an odds ratio?

9        A.    Again, I'm not a statistician, but my

10   understanding it's the chance of something

11   happening.  I guess you have an odds ratio greater

12   than 1, there's a chance of it happening.  And then

13   if it's -- look at the confidence interval, and if 1

14   is not included, then it's a statistically

15   significant chance of happening.

16       Q.    What is a relative risk?

17       A.    Again, I'm not -- I'm not a statistician, so

18   I can't tell you the real difference between

19   relative risk and overall, but a relative risk is,

20   again, looking to see the ratio of controls and an

21   event happening, and if the relative risk is greater

22   than 1, it's more likely to happen or the

23   etiological agent we're looking at is more likely to

24   have been the cause.  But, again, then we look at

25   the confidence interval to see if 1 is included, and

Andrew M. Schneider, M.D.

```
1    if it is, although it may be increased, it may not

2    be statistically meaningful.

3        Q.   A -- okay.  That was a slightly long answer.

4    So I'm going to break that down a little bit.

5        A.   That's fine.

6        Q.   A relative risk or odds ratio gives an

7    estimate and then a confidence interval around it as

8    to whether something is associated with an outcome

9    or not, fair?

10       A.   Yes.

11       Q.   We look at the relative risk and also the

12   confidence interval around it to see whether the

13   reported relative reaction or odds ratio is

14   statistically meaningful, right?

15       A.   Yes.

16       Q.   You do not have an understanding, I take

17   it -- well, let me just ask the question.  Okay?

18       A.   Sure.

19       Q.   New question.  Are relative risks and odds

20   ratios different?

21       A.   I think they are, but I don't know the

22   nuances of slight differences.

23       Q.   Any epidemiologic study is subject to forms

24   of bias, correct?

25       A.   Yes.
```

Andrew M. Schneider, M.D.

1      Q.   In any retrospective study in which exposure

2   assessment is based on a patient's memory, there's a

3   potential bias that a patient misremembers

4   something, right?

5      A.   Of course.

6      Q.   That is called recall bias, correct?

7      A.   Yes.

8      Q.   People sometimes have trouble remembering

9   exposures that occurred 20 or 30 years ago, correct?

10      A.   Yes.

11      Q.   Sometimes people with cancer remember their

12   exposures different than healthy people?

13      A.   Yes.

14      Q.   Recall bias works by creating an association

15   between exposure and an outcome even if the exposure

16   didn't actually cause that outcome, right?

17      A.   Yes.

18      Q.   We talked already about what confounding is,

19   correct?

20      A.   Yes.

21      Q.   Confounding is when some other

22   variable clouds the relationship we're interested

23   in, right?

24      A.   Well, it's -- another variable could be a

25   factor that doesn't allow us to adequately assess

Andrew M. Schneider, M.D.

1    whether the agent we're looking at is the -- is a

2    cause.

3        Q.   If not adequately controlled for,

4    confounding can create a false association between

5    an exposure and an outcome, correct?

6        A.   Yes.

7        Q.   Do you have a definition of exposure

8    misclassification?

9        A.   I mean, it's defined in here, so it's not my

10   own, but I can find it for you.  Give me a second.

11       Q.   And if you could, Dr. Schneider, just let us

12   know what paper you're looking at.

13       A.   Sure.  I'll -- just give me a little time

14   to -- here we go.  I'm -- I can read you from the

15   Zhang article.

16       Q.   From Zhang 2019?

17       A.   Yes.

18       Q.   Okay.

19       A.   So he has -- he has a Section 5.2.2, 522.

20       Q.   Okay.

21       A.   And he's talking about exposure

22   misclassification.

23       Q.   And you would rely on Zhang 12409 for a

24   definition of exposure miscalculation?

25       A.   Well, I -- or others, I mean, there -- I

1    have others.  But this is not -- again, I'm a

2    clinical oncologist.  It's not something that I know

3    off of the top of my head.  I had to learn about,

4    so --

5        Q.   So exposure misclassification is when you

6    misclassify people in an epidemiologic study based

7    on whether or not they had an exposure, correct?

8        A.   When you incorrectly misclassify or classify

9    whether the agent caused the lymphoma.

10       Q.   That -- an exposure misclassification would

11   create bias in either direction, in other words,

12   either towards or away from an association, correct?

13       A.   Yes.

14       Q.   The Roundup epidemiologic studies are

15   potentially subject to the biases we just discussed,

16   correct?

17       A.   Correct.

18       Q.   Have you independently assessed to what

19   extent particular Roundup studies are potentially

20   impacted by these biases?

21            MR. HABERMAN:  Objection.

22       A.   I've looked at the opinion of others.  I'm

23   not qualified to do that kind of assessment, but

24   I'm -- I've looked at the opinions of others who

25   say, for example, that in -- if you're asking

Andrew M. Schneider, M.D.

```
1    someone, like you suggested, about their exposure to

2    Roundup 30 years ago, they may not remember.  And,

3    therefore, the relative risk may be lower than

4    really should be.  Maybe that's one reason why some

5    of the studies, like AHS, don't show a significant

6    relative risk.

7        Q.   That was a long answer again, so I'm going

8    to break it up.

9        A.   Sure.

10       Q.   Okay?  You have looked at the published

11   literature, including the comments from various

12   authors on whether particular Roundup studies were

13   subject to recall bias or exposure misclassification

14   or confounding, correct?

15       A.   Yes.

16       Q.   You are not independently qualified to do

17   that kind of assessment, true?

18       A.   True.

19       Q.   You considered the impact, for example, of

20   recall bias in the studies that you're relying on,

21   right?

22       A.   Yes.

23       Q.   Which studies did you review that suffer

24   from recall bias?  Do you have a sense, sitting here

25   today?
```

1    A.   Yeah.  Well, I think the big one is AHS

2    2018, the Andreotti study, which -- where, again,

3    you're going back 30 years and asking a people on

4    questionnaires.  And, again, I think 37 percent of

5    the people didn't even respond.  But there's clearly

6    a misclassification or recall bias when you have to

7    remember something from 20 or 30 years ago.

8    Q.   Did McDuffie 2001 suffer from recall bias?

9    A.   Give me a second to find it.  I mean, there

10   could be some recall bias in that the -- you had to

11   tell, you know, how many days of exposure you had.

12   But, again, you would think that these things would

13   all work in that they would remember less, not more.

14        And McDuffie was a positive study for

15   greater than two days per year with a relative risk

16   of 2.12 and a 95 percent confidence interval of 1.2

17   to 3.73.  So although there may be some recall bias

18   in McDuffie, I don't think that would have lowered.

19   I think it would only have helped to increase the

20   relative risk.

21   Q.   You're looking at the actual relative risks

22   and odds ratios in the studies to tell you whether a

23   study suffered from recall bias; is that right?

24   A.   No, that's not what I said.

25   Q.   Okay.  So can I take a look at what you're

Andrew M. Schneider, M.D.

```
 1    looking at --

 2        A.   Yes.  Just --

 3        Q.   -- just quickly?

 4        A.   -- just the table from -- to refresh my

 5    memory.

 6             THE WITNESS:  I need a tissue.  Do we have a

 7        tissue?  Need a tissue.

 8             MR. HABERMAN:  Napkins here.

 9             THE WITNESS:  Give me a napkin.  That's

10        fine.  Thanks a lot.  Appreciate it.

11        Q.   To answer the study of what different --

12    well, withdrawn.

13             Thank you.  Dr. Schneider, I just wanted to

14    be clear what article you were looking at to answer

15    my --

16        A.   I mean --

17        Q.   -- question.  And let me finish my --

18        A.   Okay.

19        Q.   -- my question, and then we can go --

20        A.   Sure.

21        Q.   Okay.  New question.

22             You were just looking at an article by

23    Dennis Weisenburger published in 2021 on glyphosate

24    and NHL, correct?

25        A.   Yes.
```

1    Q.   Do you know if Dr. Weisenburger is an expert

2    for plaintiffs in litigation claiming Roundup causes

3    cancer?

4    A.   I believe I've seen him name, so I believe

5    he either is or has been.

6    Q.   You would agree that all epidemiologic

7    studies, including the case-control studies you

8    reviewed, are potentially subject to recall bias,

9    right?

10   A.   It can --

11        MR. HABERMAN:   Objection.

12   A.   I mean, it can be, yes.

13   Q.   You are not saying that the Agricultural

14   Health Study is the only study that is potentially

15   subject to misclassification bias, are you?

16   A.   No, I don't -- I didn't say that.  We

17   already discussed that -- I talked about McDuffie

18   and said, however, the recall -- recall bias, in my

19   opinion, would increase the relative risk, not

20   decrease.

21   Q.   Recall bias in McDuffie would make the

22   relative risk further away from 1.0?

23   A.   More significant, correct.

24   Q.   The same is true for the other case-control

25   studies that you reviewed that, recall bias would

1    make the odds ratios reported higher than 1.0,

2    correct?

3       A.   Yes.

4       Q.   You did consider confounding for each of the

5    studies that you're relying of Roundup and NHL,

6    correct?

7       A.   Correct.

8       Q.   You're aware that some studies addressed

9    confounding by controlling for other pesticides,

10   right?

11      A.   Correct.

12      Q.   Not all studies controlled for other

13   pesticides, true?

14      A.   True.

15      Q.   We would need to look at an individual study

16   to determine whether that study controlled for other

17   pesticides, right?

18      A.   Right.

19      Q.   Not all analyses within studies controlled

20   for other pesticides, correct?

21      A.   True.

22      Q.   Again, we would need to look at the specific

23   odds ratio or relative risk to determine whether

24   that odds ratio or relative risk controlled for

25   other pesticides, right?

Andrew M. Schneider, M.D.

```
 1       A.   Correct.

 2       Q.   Do you agree with the general proposition

 3  that different types of cancer have different

 4  causes?

 5       A.   Yes.

 6       Q.   Even if it is established that a particular

 7  exposure can cause one type of cancer, we cannot

 8  conclude, just from that, that the exposure causes

 9  some other type of cancer, right?

10            MR. HABERMAN:   Objection.

11       A.    If I'm understanding your question

12  correctly, just because cigarette smoking causes

13  lung cancer, we can't say that it causes ovarian

14  cancer.   Is that what you're saying?

15       Q.   That's a good question -- that's a good

16  clarification, so let me ask a clearer question.

17       A.   Okay.

18       Q.   Okay?   Smoking causes some cancers, correct?

19       A.   Yes.

20       Q.   Smoking does not cause every cancer,

21  correct?

22       A.   Correct.

23       Q.   Asbestos exposure is known to cause some

24  cancers, correct?

25       A.   Yes.
```

```
1        Q.    Asbestos exposure does not cause every

2   cancer, true?

3        A.    Correct.

4        Q.    Even if it's established that an exposure

5   causes one type of cancer, you cannot conclude from

6   that information that that exposure causes every

7   type of cancer, correct?

8        A.    Of course.

9        Q.    That is true for Roundup also, right?

10       A.    So ask the -- ask the specific question.

11       Q.    That is true for Roundup --

12       A.    So ask --

13       Q.    -- also?

14       A.    Could you just ask that question so I'm --

15   so I make sure I --

16       Q.    Sure.

17       A.    -- answer it correctly?

18       Q.    Oh, the -- repeat the whole question?

19       A.    No, no.  I just want your question about

20   Roundup.  I don't want to have to guess that I'm --

21   that you -- that I'm answering the question

22   correctly.  I want to hear your question so I can

23   answer it.  Does Roundup blah, blah, blah?  What's

24   your question?

25       Q.    New question.
```

```
 1        A.   Sure.

 2        Q.   Even if it is established that Roundup

 3   causes one type of cancer, you cannot conclude from

 4   that information that Roundup causes every type of

 5   cancer, correct?

 6        A.   Correct.

 7        Q.   Even if there are data that exposure to

 8   Roundup is associated with a particular cancer, you

 9   would need to see corroborating data before

10   concluding Roundup causes another kind of cancer,

11   right?

12        A.   Yes.

13        Q.   Did you -- okay.  Withdrawn, because I think

14   you answered this earlier, so I just want to be sure

15   that I'm clear.  Okay?

16        A.   Sure.

17        Q.   You examined the scientific literature to

18   form an opinion as to whether NHL is associated with

19   Roundup?

20        A.   Yes.

21        Q.   You did not examine the scientific

22   literature as to any other cancer and Roundup

23   exposure, correct?

24        A.   I specifically asked the plaintiffs'

25   attorney whether I need to do that, and I was told
```

1    my only task is to talk about NHL and Roundup.

2        Q.   You're offering the opinion on whether

3    Roundup causes NHL and not offering an opinion on

4    whether Roundup causes any other cancer, correct?

5        A.   Correct.

6        Q.   We are at a little after 2:00 p.m., and I'm

7    going to switch topics.  Do you want to take a short

8    break now --

9        A.   Well --

10       Q.   -- or keep going?

11       A.   -- it's up to you.  We -- are you going to

12   give me a 20 or 30-minute break at 2:15?  If you

13   want to go to 2:15, we can.  If you want to do it

14   now, do what's better for you.

15       Q.   Let's take a 30-minute break.

16       A.   Okay.

17       Q.   Okay.

18       A.   So we'll meet back at 2:38.

19            MS. ROSS:  Off the record.

20            THE VIDEOGRAPHER:  Off the record at

21       2:08 p.m.

22            (Recess from 2:08 p.m. until 2:50 p.m.)

23            THE VIDEOGRAPHER:  Back on the record at

24       2:50 p.m.

25            (Schneider Exhibit 11 was marked for

1    identification.)

2         (Schneider Exhibit 12 was marked for

3    identification.)

4         (Schneider Exhibit 13 was marked for

5    identification.)

6    BY MS. ROSS:

7    Q.   Dr. Schneider, I'm handing you three

8    exhibits to your deposition that I'd like to

9    identify for the record.  All right?

10   A.   Yes.

11   Q.   Exhibit 11 is your notes about the Roundup

12   literature generally; is that correct?

13   A.   Yes.

14   Q.   Exhibit 12 is an e-mail from you to

15   Mr. Haberman entitled CLL 2016.  Do you see that?

16   A.   Yeah, but that's not exactly what it really

17   is.

18   Q.   Right.  So the plaintiff in this case who

19   had CLL is Mr. William Pleu, correct?

20   A.   Yes.

21   Q.   And these are your notes about William Pleu,

22   right?

23   A.   Correct.  Correct.

24   Q.   The next --

25   A.   Is it okay if I -- if I write his name there

1    on it?

2        Q.   Sure.  That's fine.

3        A.   Okay.

4        Q.   Okay.  Exhibit 13 contains your notes about

5    Mr. Stacey Moore, correct?

6        A.   I'm going to write his name also there, if I

7    could.

8        Q.   Sure.  And I'm correct that the notes that

9    you sent to Mr. Haberman in Exhibit 13 are about

10   Stacey Moore, correct?

11       A.   Correct.

12       Q.   Have you reviewed any other plaintiffs in

13   this litigation besides the plaintiffs in this case?

14       A.   Well, you saw what I reviewed.  I reviewed

15   -- I don't -- I'm not a lawyer, so I don't know who

16   the plaintiffs are.  This is what I reviewed

17   initially, those names.

18       Q.   You initially reviewed six different

19   plaintiffs for the Schlesinger law firm, right?

20       A.   If that's what it says.  It looks like five,

21   right?  The last one is review literature, I think.

22       Q.   Oh, you're right.  Okay.

23       A.   So I think it's --

24       Q.   So let me --

25       A.   -- five.

1      Q.   -- reask the question.

2           You reviewed five plaintiffs initially for

3      this case for the Schlesinger law firm, correct?

4      A.   Correct.

5      Q.   Have you reviewed any other plaintiffs in

6      the Roundup litigation besides these five?

7      A.   I started -- I was asked to report on

8      another plaintiff, and I started reviewing those

9      records and writing a report.

10     Q.   You started reading the records and writing

11     a report for the other plaintiff who we're not here

12     to talk about today?

13     A.   Correct.

14     Q.   Okay.  Any other cases that you reviewed?

15     A.   No.

16     Q.   I want to see if we can agree on some basics

17     about Mr. Pleu.  Okay?

18     A.   Can I get a copy?  Do you -- do you have a

19     copy?

20     Q.   Yes.  These are all yours.

21     A.   Okay.

22     Q.   Everything in this pile.

23     A.   Okay.

24     Q.   Mr. Pleu presented in June of 2016 with

25     lymphocytosis, correct?

Andrew M. Schneider, M.D.

1      A.   Correct.

2      Q.   William Pleu was 63 years old at the time he

3    presented, correct?

4      A.   Yes.

5      Q.   His date of birth is December 1st, 1952?

6      A.   Okay.

7      Q.   He was --

8      A.   Yes.

9      Q.   He was referred to Dr. Reddy in June 2016

10    for hemologic abnormalities on blood work, right?

11      A.   Again, I don't memorize names, so I can't

12    tell you who he was referred to.

13           (Schneider Exhibit 14 was marked for

14    identification.)

15    BY MS. ROSS:

16      Q.   I will hand you Exhibit 14 to your

17    deposition, which is a June 29th, 2016 progress note

18    indicating the first time Dr. Reddy saw Mr. Pleu.

19    Do you see that?

20      A.   Yeah, I'm seeing that.  Thank you.

21      Q.   Do you see where it states -- there's a

22    history of present illness in this note, correct?

23      A.   Yes.

24      Q.   And it states:  The patient is a 63-year-old

25    male with the above history here for recent

1    abnormalities on recent blood work.

2         Do you see that?

3    A.   Yes.

4    Q.   Mr. Pleu was referred for abnormalities on

5    his blood work, right?

6    A.   Yes.

7    Q.   When he presented in June of 2016, William

8    Pleu had no fevers, chills, night sweats, or weight

9    loss, correct?

10   A.   Correct.

11   Q.   When he presented in June of 2016, Mr. Pleu

12   had no lymphadenopathy and no organomegaly on

13   examination, right?

14   A.   Yes.

15   Q.   William Pleu's total white blood cell at

16   presentation was 11.1, correct?

17   A.   On this day, correct.

18   Q.   William Pleu's lymphocyte count on June

19   29th, 2016 was 4.5, correct?

20   A.   Yes.

21   Q.   Flow cytometry was performed on this same

22   date.  Have you reviewed William Pleu's flow

23   cytometry?

24   A.   I have.

25   Q.   I take it you don't have it memorized?

Andrew M. Schneider, M.D.

```
 1     A.   No.

 2     Q.   New question.

 3     A.   I'm going to need to see everything.  I

 4  don't have everything memorized.

 5     Q.   Neither do I.

 6          MR. HABERMAN:  I don't know if that's true.

 7          (Schneider Exhibit 15 was marked for

 8  identification.)

 9  BY MS. ROSS:

10     Q.   Exhibit 15 is Mr. Pleu's flow cytometry

11  collected on June 29th, 2016.  Do you see that?

12     A.   I do.

13     Q.   Flow cytometry for Mr. Pleu showed a

14  monoclonal lambda B-cell population representing 14

15  percent of total cells, correct?

16     A.   Correct.

17     Q.   Again, his total white count was 11.1 in

18  June of '16, right?

19     A.   Yes.

20     Q.   Do you know if total cells in his flow

21  cytometry is total leukocytes or total lymphocytes?

22     A.   I don't think it's leukocytes.  It says

23  total cells, so it has to be all cells.

24     Q.   Right.  That would be all white blood cells,

25  right?
```

Andrew M. Schneider, M.D.

```
1        A.    Right.

2        Q.    So a white blood cell count of 11.1 times 14

3    percent is about 1.5, correct?

4        A.    Which is in disagreement with the 44 percent

5    seen on the peripheral smear.

6        Q.    Show me where there's 44 percent seen on the

7    peripheral smear.

8        A.    Okay.  Can I circle it?

9        Q.    No.  Just for now show me what you're

10   talking about and we'll go from there.

11       A.    We already discussed that the white count

12   was 11.1 with 40.7 percent lymphocytes.

13       Q.    40.7 is the total lymphocyte count, not the

14   monoclonal B-cell population, correct?

15       A.    That's correct.  That's the total

16   lymphocyte, right.

17       Q.    So if we go back to what we were talking

18   about on the flow cytometry, the monoclonal B-cell

19   population was 14 percent of the total cells,

20   correct?

21       A.    That's what it says, correct.

22       Q.    Could you -- you have your phone in front of

23   you.  Do you mind pulling up your calculator

24   quickly, unless you can do this math in your head?

25       A.    I probably can.  Go ahead.
```

Andrew M. Schneider, M.D.

```
1        Q.    Okay.   What's 11.1 times 14 percent?

2        A.    1.55.

3        Q.    All right.   Mr. Pleu's monoclonal B-cell

4    population at the time of his diagnosis was 1.55,

5    correct?

6        A.    His monoclonal, correct.

7        Q.    1.55 is less than 5, correct?

8        A.    Correct.   But that's only one day, one draw.

9    There are other records, I'm sure.

10       Q.    Did you review William Pleu's lymphocyte

11   counts over time?

12       A.    I think I relied on the opinions of his

13   treating oncologist who said he had CLL stage zero.

14   But, again, I --

15       Q.    In the medical records that you reviewed,

16   did you review Mr. Pleu's lymphocyte counts over

17   time?

18       A.    I mean, I looked at everything, so if it's

19   there, I did.   But, again, I don't have it

20   memorized, but you'll -- you can show me.   I mean,

21   we're going to have to look at all the CBCs.

22             (Schneider Exhibit 16 was marked for

23   identification.)

24   BY MS. ROSS:

25       Q.    Exhibit 16 to your deposition is Mr. Pleu's
```

1    February 7th, 2022 follow-up with his oncologist.

2    Do you see that?

3        A.   I do.

4        Q.   And there's a CBC with differential

5    performed, correct?

6        A.   Yes.

7        Q.   On February 7th of 2022 Mr. Pleu's white

8    blood cell count was 9.7, right?

9        A.   Yes.

10       Q.   His lymphocyte count was 3.26, correct?

11       A.   Correct.

12       Q.   As we just discussed, Mr. Pleu's lymphocyte

13   count at the time of diagnosis was 4 something,

14   under 5, correct?

15       A.   4.5, just -- close to 5.

16       Q.   William Pleu's absolute lymphocyte count has

17   been monitored over time, right?

18       A.   His entire case has been monitored over

19   time.

20       Q.   At no point has Mr. Pleu's lymphocyte count

21   shown a monoclonal B-cell population of greater than

22   5, true?

23       A.   I'd have to go through each individual CBC

24   and look at it.  Could you also show me the WHO

25   criteria again that you pointed -- it was one of the

1    exhibits.  Can I see that again, please?

2    Q.   That should be in front of you.

3         MR. HABERMAN:  Should be in that stack.

4         THE WITNESS:  I don't think so.  Here it is.

5    Okay.

6    A.   Okay.  I'm ready.  We're going to have to go

7    through each CBC.

8    Q.   Okay.  So I'm going to ask a general

9    question first and then note that we're going

10   through every CBC at your request.  Okay?

11   A.   Sure.

12   Q.   Sitting here today, can you point me toward

13   any test result or other data of any kind showing

14   that at any point in time William Pleu has had a

15   monoclonal B-cell population of greater than or

16   equal to 5?

17   A.   I'd have to go through each one to look.  I

18   don't have them memorized.  But what I can tell you

19   is the flow read by the pathologist calls it CLL,

20   not anything else, chronic lymphocytic leukemia.

21   And the treating oncologist calls it CLL.  So we

22   have two independent physicians that call it CLL.

23   And I'd have to go through each CBC to look and see

24   what the abnormal leucocyte count is.

25   Q.   We'll do that.

1       A.    Sure.

2       Q.    Are you aware of any other flow cytometry

3    that was performed besides the initial flow

4    cytometry --

5       A.    So I --

6       Q.    -- on June 29th?

7       A.    As we discussed, since it's not a memory

8    test, I'd have to look at it again.

9       Q.    I will represent to you that I did not see

10   any other instances of flow cytometry performed in

11   the medical records since Mr. Pleu's initial

12   diagnosis in June of 2016.  And right now I just

13   want to make sure that there's nothing that you

14   recall in the medical records that's different from

15   that.  Okay?

16      A.    I don't, but you wouldn't need a repeat flow

17   because we have the monoclonal lymphocytes here.

18   And it's just really now, per the WHO, to decide

19   whether it's MBL or CLL.  Again, the treating

20   physicians and the, you know, pathologist who read

21   the flow are calling it CLL.  But, again, we can go

22   through and find the CBCs.

23      Q.    And I didn't bring every CBC that Mr. Pleu

24   has had.

25      A.    Okay.

1      Q.   I will -- so we can't mark all of those as

2    exhibits to this deposition.

3      A.   Okay.

4      Q.   I'll start by asking you, as the expert in

5    this case sitting here, are you aware of any

6    occasion on which Mr. Pleu has had a monoclonal

7    B-cell population of greater than 5 in his medical

8    records?

9      A.   The answer is that's not something I would

10   memorize.  We have to go through the records, and

11   you show me.

12     Q.   Okay.  So I'm going to march through the

13   records that I have --

14     A.   Sure.

15     Q.   -- if that's all right with you.

16     A.   Sure.

17     Q.   And you can tell me if these sound

18   consistent with what you saw.

19     A.   You're going --

20     Q.   Okay?

21     A.   -- to show them to me, right?

22     Q.   I am.  We began with Mr. Pleu's visit on

23   June 29th, 2016; is that right?

24     A.   Correct.

25     Q.   On August 24th, 2016, can you confirm

Andrew M. Schneider, M.D.

1    that -- Mr. Pleu's white cell count was what?

2        A.   10.6 with 45.5 percent lymphocytes.

3        Q.   Thank you.

4        A.   Can we just do the math then?

5        Q.   I'm sorry?

6        A.   Can I do the math for that for a second?

7        Q.   10.6 --

8        A.   Times --

9        Q.   -- times .14?  Sure.

10       A.   No, .55.

11       Q.   No.  That's the total lymphocyte count.  You

12   need the total monoclonal B-cell population.

13       A.   Does it say it there?

14       Q.   That would come from flow cytometry,

15   correct?

16       A.   Right.  But clinical oncologists don't do

17   that.  So we don't do flow every time we have a

18   patient.  This patient has a circulating population

19   of abnormal lymphocytes.

20       Q.   Right.

21       A.   And we're trying to decide whether it's --

22   meets the WHO criteria of CLL or not --

23       Q.   And you're saying --

24       A.   -- but -- you're interrupting me.

25       Q.   Sorry.  Go ahead.

1    A.   So I'm saying as a clinical oncologist,

2    we're not going to repeat the flow every time.  The

3    treating oncologist called it CLL stage zero.  Maybe

4    he has information that I don't have about how many

5    percent abnormal lymphocytes he had, but the record

6    carries a diagnosis of CLL stage zero.

7         I'm not here to dispute the treating

8    oncologist is wrong.  And regardless, a stage zero

9    CLL requires no treatment.  In fact, Mr. -- Peu?

10   Pleu?  Peu?

11        MR. HABERMAN:  Pleu.

12   A.   -- Pleu has never had treatment.  So I

13   understand where you're coming from, but we're going

14   to have to find every CBC.  And if you want to show

15   me what the percent abnormal lymphocytes is, that's

16   fine, but I -- we both know an oncologist wouldn't

17   do that.  That's not -- that's a waste of money.

18   It's a waste of resources.

19        The treating oncologist believed it was CLL

20   stage zero.  The pathologist who read the report

21   didn't call it MBL.  He called it CLL.  You know, I

22   don't know if they ever checked and maybe the number

23   was wrong.  Maybe it wasn't 14 percent.  I don't

24   know.

25   Q.   Dr. Schneider, do you remember --

```
1      A.    You're --

2      Q.    -- what my question is?

3      A.    I do, but you're interrupting me.

4      Q.    What was my question?

5      A.    You asked if any more flow cytometry was

6    done.

7      Q.    That is correct.

8      A.    Okay.

9      Q.    So yes or no, was any more flow cytometry

10   done, to your knowledge?

11     A.    Again, it's not a memory test.  You'd have

12   to show me the entire record.  Then we'd look

13   through it together.

14     Q.    And you've not -- sitting here today, you

15   don't have any recollection of any flow cytometry

16   that was done that was different from the initial,

17   correct?

18     A.    I haven't memorized the records.

19     Q.    Okay.

20     A.    So...

21     Q.    So I've -- we're going to be clear on

22   something here.  In a CBC with a differential, you

23   can get a white blood cell count, correct?

24     A.    Yes.

25     Q.    That includes both lymphocytes and other
```

Andrew M. Schneider, M.D.

1    types of white blood cells, right?

2        A.    Yes.

3        Q.    So flow cytometry would tell you what

4    percentage of the total cell count is an abnormal

5    B-cell population, correct?

6        A.    So it does, but I believe there's error in

7    flow cytometry measurements.  I don't think you can

8    necessarily use that to give an accurate count of

9    lymphocytes.  What it's really used for is to see if

10   there is any monoclonality, which there is.

11       Q.    In addition to looking at monoclonality with

12   flow cytometry, you can get a -- what's called a CBC

13   with differential that gives you the total

14   lymphocyte count at any given point in time,

15   correct?

16       A.    Correct.

17       Q.    We looked at Mr. Pleu's initial lymphocyte

18   count.  That was 4.5, correct?

19       A.    Yes.

20       Q.    His most recent lymphocyte count in February

21   of 2022 was 3.26, right?

22       A.    Yes.

23       Q.    His total lymphocyte count on August 24th,

24   2016 was what?

25       A.    Total lymphocyte count?

1    Q.   Correct.

2    A.   It's 45.5 percent or 10.6 -- do they tell

3    us?

4    Q.   They do.

5    A.   Sorry.  Take a look.  4.8.

6    Q.   Mr. Pleu's total lymphocyte count on October

7    12th of 2016 was what?

8    A.   4.9.

9    Q.   And on April 19th of 2017, Mr. Pleu's

10   lymphocyte count was what?

11   A.   4.7.

12   Q.   On October 11th of 2017 -- and you'll get

13   the date from the bottom of that page.  And I'll ask

14   my question when you are ready.

15   A.   Okay.  I'm ready.

16   Q.   On October 11th of 2017, what was Mr. Pleu's

17   lymphocyte count?

18   A.   4.6.

19   Q.   On April 9th of 2018, what was Mr. Pleu's

20   total lymphocyte count?

21   A.   4.49.

22   Q.   On October 3rd of 2018, what was Mr. Pleu's

23   total lymphocyte count?

24   A.   I'm sorry, what -- this is October 18th?

25   Okay.

Andrew M. Schneider, M.D.

```
 1       Q.   October 3rd of 2018.

 2       A.   Thanks.  4.91.

 3       Q.   On April 22nd of 2019, what was Mr. Pleu's

 4    total lymphocyte count?

 5       A.   4.29.

 6       Q.   Now, in 2019, Mr. Pleu was diagnosed with

 7    another cancer, correct?

 8       A.   Uh-huh.

 9       Q.   On July 13th of 2020, what was Mr. Pleu's

10    total lymphocyte count?

11       A.   3.31.

12       Q.   On January 11th of 2021, what was Mr. Pleu's

13    total lymphocyte count?

14       A.   2.83.

15       Q.   On June 28th of 2021, what was Mr. Pleu's

16    total lymphocyte count?

17       A.   2.87.

18       Q.   And we've already discussed his next

19    six-month follow-up, which was February of 2022,

20    correct?

21       A.   I don't remember.

22       Q.   In February of 2022, what was Mr. Pleu's

23    total lymphocyte count?

24       A.   3.26.

25       Q.   Can you point me toward any test result or
```

Andrew M. Schneider, M.D.

1    other data of any kind showing that at any point in

2    time William Pleu has had a monoclonal B-cell

3    population of greater than or equal to 5?

4        A.   So my answer to that would be the following:

5    So we saw at one point he was up to 4.91, and we

6    don't know how many monoclonal lymphocytes there

7    were.  The treating oncologist believed he had CLL

8    stage zero.  And as you understand, you know, if

9    it's 5.1 or 4.9, that's not a whole lot of

10   difference.  It's a semantic argument.

11        So in my opinion, I would have to agree with

12   the treating physician that he had CLL stage zero.

13   And again, there's error in every measurement.  So

14   4.9 and 5, there's an error in that measurement.  So

15   I would defer to the opinion of both the pathologist

16   and the treating physician, and I believe he had CLL

17   stage zero.

18        Q.   There's a -- there was a lot in that answer,

19   so I'm going to --

20        A.   Sure.

21        Q.   -- unpack it a little bit.  Okay?

22        A.   Sure.

23        Q.   In Mr. Pleu's records, his treating

24   oncologist refers to CLL stage zero, correct?

25        A.   Correct.

Andrew M. Schneider, M.D.

```
 1        Q.   You cannot point me toward any test result
 2   or data of any kind showing that at any point in
 3   time William Pleu has had a monoclonal B-cell
 4   population of greater than or equal to 5, true?
 5        A.   Because no one didn't look.
 6        Q.   Folks did look over time at his CBCs, and
 7   we've walked through them today.  And sitting here
 8   today, you cannot point me toward any finding of a
 9   lymphocyte count greater than or equal to 5,
10   correct?
11        A.   Well, we had a 4.91, and I would argue with
12   you that a 4.91 could be a 5.
13        Q.   Can you point me toward any test result that
14   actually shows a lymphocyte count of greater than 5?
15        A.   You have a 4.91, and it's my opinion that
16   there's statistical error in each measurement.  So I
17   believe a 4.91 could be a 5.
18        Q.   A 4.91 could also be a 4.7, right?
19        A.   Yes.
20        Q.   You have no evidence from any objective
21   tests, sitting here today, that William Pleu has
22   ever had an absolute lymphocyte count, much less
23   than a monoclonal B-cell population, of greater than
24   or equal to 5, true?
25        A.   So the answer is that we don't know what the
```

1    monoclonal count was, since no one looked again.

2    And indeed, I can't fault the treating oncologist

3    for doing that, because there is no point for

4    repeating flows each time you do a CBC to give you

5    that magic 5.0 number.

6        The fact is, a treating provider thought he

7    had CLL stage zero.  He wrote that all over the

8    record.  And that does not require treatment.  So

9    the treating oncologist correctly did not order flow

10   each time.  He monitored his CBC, and when there's a

11   change in his CBC, that would be a reason to

12   institute therapy.  But at this point, there's no

13   reason to treat CLL stage zero.

14       Q.   And, again, I'm going to unpack that a

15   little bit.  Okay?

16       A.   Sure.

17       Q.   Silpa Reddy is Mr. Pleu's treating

18   oncologist, correct?

19       A.   I don't know names, but okay.

20       Q.   She has monitored his CBCs over time,

21   correct?

22       A.   Correct.

23       Q.   There has been no indication to repeat flow

24   cytometry?

25       A.   Correct.

```
 1        Q.   She has, instead, monitored Mr. Pleu with

 2   CBCs giving total lymphocyte counts, correct?

 3        A.   Correct.

 4        Q.   The highest total lymphocyte count of which

 5   you are aware in Mr. Pleu's records is a 4.91,

 6   correct?

 7        A.   That's what you showed me, correct.

 8        Q.   You do not, sitting here today, have a

 9   lymphocyte count that you're relying on that's

10   greater than 5, demonstrating CLL by WHO criteria.

11   You are relying on what Philippa Ready wrote in

12   Mr. Pleu's medical records.  Is that right?

13        A.   Not entirely correct.  In addition, I argue

14   to you that 4.91 could be a 5; that, you know, the 5

15   is not a black-and-white number where, if it is

16   4.99, you don't have CLL, and when it's 5.0001, you

17   do.  So I think that he demonstrated a

18   lymphocyte count of 5, and we don't know that those

19   lymphocytes weren't all monoclonal because no one

20   was going to look.

21        Q.   Can you pull up Exhibit 8 to your

22   deposition, please?

23        A.   I'm sorry?

24        Q.   8.

25        A.   Help me out.  What does it look like so I
```

1    know?

2         Q.   It's the chapter from the WHO on classifying

3    CLL.

4         A.   Okay.

5              THE WITNESS:   Someone help me.   Thanks.

6         A.   Yes.

7         Q.   Would you read the first three sentences

8    under Definition, please, for the record?

9         A.   CLL/small lymphocytic lymphoma is a neoplasm

10   composed of monomorphic small mature B-cells that

11   express CD5 and CD23.   There must be a monoclonal

12   B-cell count greater than 5 times 10 to the 9th with

13   a characteristic morphology and phenotype.

14        Q.   What does the next sentence say?

15        A.   Individuals with a clonal CLL-like cell

16   count of less than 5 times 10 to the 9th and without

17   lymphadenopathy, organomegaly, or other

18   extramedullary disease, are considered to have

19   monoclonal B-cell lymphocytosis.

20        Q.   Can you point me toward any test, physical

21   exam finding, or other result in Mr. Pleu's medical

22   record demonstrating that he has any other evidence

23   of CLL, such as splenomegaly or lymphadenopathy?

24        A.   So I already told you that he had stage zero

25   CLL.   Do you want me to define what that means for

Andrew M. Schneider, M.D.

1    you?

2        Q.   I would like for you to answer my question,

3    please.

4        A.   I've answered it by telling you he has stage

5    zero CLL.   That answered the question.

6        Q.   Do you recall what my question was?

7        A.   I do.

8        Q.   Can you point me toward any test --

9        A.   He does --

10       Q.   -- physical exam finding, or medical record

11   demonstrating that he has evidence of CLL, such as

12   lymphadenopathy or splenomegaly?

13       A.   You don't need --

14            MR. HABERMAN:   Asked and answered.

15       A.   Yeah.   You don't need lymphadenopathy or

16   splenomegaly to have CLL.

17       Q.   Okay.   What objective physical exam finding

18   or test can you point me to --

19       A.   You don't need --

20       Q.   -- showing he has CLL.

21       A.   You don't need any physician exam.   All you

22   need is flow cytometry showing a monoclonal

23   population of lymphocytes, and again, I would argue

24   to you that a 4.91 certainly could be a 5 if you did

25   it the next day, and I -- we don't know the actual

Andrew M. Schneider, M.D.

1    number of how many of those lymphocytes were

2    monoclonal.

3         I would argue to you that the treating

4    physician called him CLL stage zero, and I don't

5    have a problem with that.

6    Q.   You are an expert in this case, right?

7    A.   Yes.

8    Q.   Dr. Reddy is not, correct?

9    A.   Correct.

10   Q.   You hold yourself out as an expert in CLL

11   and MBL, true?

12   A.   Correct.

13   Q.   You are aware of the diagnostic criteria,

14   right?

15   A.   I think they're -- I'm aware of the

16   diagnostic criteria, but, again, I've said it three

17   or four times now that numbers have error, right.

18   Q.   You've never spoken with Dr. Reddy, correct?

19   A.   Correct.

20   Q.   Do you know anything about Dr. Reddy's

21   credentials or specialization?

22   A.   No.

23   Q.   You are, nevertheless, relying on a written

24   statement in the medical records that you know fails

25   to meet diagnostic criteria you cite from WHO,

1    correct?

2      A.   So -- may I finish?

3      Q.   Please.

4      A.   Thank you.  This is the WHO.  I didn't have

5    the time -- maybe on a break I'll look and see if

6    there are other diagnostic criteria apart from the

7    WHO.  That's number one.

8          Number two, I believe, to a reasonable

9    degree of medical certainty, that a 4.91 is no

10   different than a 5.  I think there are errors in

11   every measurement.  And no oncologist is going to

12   bother to do flow each time to prove that magical 5

13   number.

14         So I respect and agree with the treating

15   physician that this is CLL stage zero, and the

16   treating oncologist made the correct call to do

17   nothing.  Observations are what's indicated.  So

18   that's my opinion.

19     Q.   You would defer to what the treating

20   oncologist wrote in the medical records as to

21   William Pleu's medical condition; is that right?

22     A.   I don't understand that question.  I'm

23   sorry.

24     Q.   Sure.  Did you form an independent opinion

25   as to whether Mr. Pleu has CLL, or did you rely on

1    what Dr. Reddy wrote in the medical records?

2         A.   So I don't diagnose CLL.   I'm not a

3    pathologist, but what I saw in the medical record

4    was a flow cytometry report saying CLL, not saying

5    monoclonal B-cell lymphocytosis.

6              And I understand that that number doesn't

7    meet the 5 category, but in my experience,

8    pathologists will write, you know, less than

9    whatever number they want to choose and say that

10   consider monoclonal lymphocytosis in a -- or in the

11   proper clinical setting, CLL.   That wasn't done in

12   this case.

13             Number two, the treating oncologist called

14   it CLL.

15             Number three, we do have a lymphocyte count

16   of 4.91, which I -- in my opinion, is -- could be a

17   5.   And I think if you repeat it on different times,

18   you'd get -- you'd get a 5.1.   You'd get a 4.8.   You

19   know, 5 isn't a magic number.   It's just a number to

20   use as a starting point.   So I don't have a problem

21   with calling it CLL stage zero.

22        Q.   Would you call it CLL stage zero?

23        A.   I would investigate further.   It wouldn't

24   make a difference as a -- as a clinician because I'm

25   not going to do anything differently.   I'm going to

Andrew M. Schneider, M.D.

1    follow the stage regardless.  They have CLL stage

2    zero, or they have monoclonal lymphocytosis of

3    unknown significance.  The outcome is going to be

4    the same.  They're going to be followed.

5         You know, if the patient really wanted me --

6    pressed me and say, "Doctor, do I have CLL," then I

7    probably would repeat the numbers.  I'd talk to the

8    pathologist.

9         There is error in looking at percentages on

10   flow.  It's -- the purpose of flow really is to look

11   at the markers on the lymphocyte, CD5 positive.  So

12   I don't have a problem calling it CLL stage zero,

13   nor did two other treating physicians in this case.

14   Q.   If a patient came to you with the laboratory

15   results that we've walked through, with lymphocyte

16   counts consistently under 5, close to, but under 5,

17   based on the available information, would you

18   diagnose that patient with CLL, or would you

19   diagnose them with a monoclonal B-cell

20   lymphocytosis?

21   A.   Well, if they ask me that question -- again,

22   it doesn't really make a difference clinically, but

23   if they ask me that question, then I would do

24   further tests.  I might do a bone marrow.

25   Q.   Based on the available information, would

Andrew M. Schneider, M.D.

1    you tell that patient they have cancer?

2         A.   I would say I'm not sure at this point.  I

3    would -- if you need to know -- I would explain it

4    just the way I explained to you, that, really, at

5    this point, whether we call it CLL or a monoclonal

6    lymphocytosis, nothing needs to be done at this

7    point.  If you need to know for your mental

8    well-being if this is a cancer, I would do a bone

9    marrow.

10        Q.   Based on --

11        A.   You're interrupting me.

12        Q.   Oh, I just thought you were done.

13        A.   I would -- I'd -- I would --

14        Q.   You said you would do a bone marrow.

15        A.   And I was going to finish.

16        Q.   Okay.  Go ahead.

17        A.   So the gold standard of diagnosing CLL is

18   the bone marrow, right?  This is the WHO

19   classification for CLL based upon peripheral blood.

20   But I would look at the bone marrow if we really

21   needed to know, and see what that looked like,

22   because that's really going to tell me whether they

23   have CLL or not.

24        Q.   Do you know if CLL is always seen in the

25   bone marrow?

Andrew M. Schneider, M.D.

1      A.   Well, by definition, as opposed to SLL, CLL

2   is in the bone marrow.

3      Q.   Do you know if CLL is typically diagnosed

4   based on a bone marrow biopsy or a peripheral blood?

5      A.   So we just discussed that.  So what we

6   normally do is we do flow.  We don't want to subject

7   patients to needless bone marrow procedures.  But if

8   I have a patient who's not happy with -- I can't

9   really distinguish whether they have a B-cell

10   lymphoproliferative disorder, a monoclonal of

11   unknown significance, or a CLL, and they need to

12   know today -- and, again, I don't believe that

13   flow -- the percent lymphocytes is a very accurate

14   test.  It's much better to distinguish markers on

15   the lymphocyte.  The gold standard would be a bone

16   marrow.

17      Q.   Did you see anything in Dr. Reddy's records

18   that you disagreed with?

19      A.   Nothing that comes to mind.  You'll have to

20   show me.

21      Q.   If you'll go with me to Exhibit 16 --

22      A.   Do I have that?

23      Q.   You do.

24      A.   What does it say?

25      Q.   This is the March 7th, 2022 note.

```
 1      A.   I have that?

 2      Q.   Okay.

 3      A.   Okay.  Yeah.  I do have it, yes.

 4      Q.   Dr. Reddy noted her diagnosis, which is

 5   stage zero CLL, correct?

 6      A.   Correct.

 7      Q.   Dr. Reddy documented a performance status of

 8   zero, fully active, able to carry on all predisease

 9   activities without restrictions, correct?

10      A.   Yes.

11      Q.   That's the ECOG diagnostic criteria that

12   you're familiar with for how one is doing; is that

13   fair?

14      A.   Yes.

15      Q.   An ECOG of zero is the best score that you

16   can get, correct?

17      A.   Yes.

18      Q.   Do you agree with Dr. Reddy's assessment of

19   performance status in Mr. Pleu?

20      A.   I would have no way of independently

21   evaluating that.  I never met the patient.

22      Q.   Dr. Reddy has prescribed Mr. Pleu's

23   prognosis as excellent.  Do you agree with that?

24      A.   Yes.

25      Q.   Mr. Pleu has never received chemotherapy for
```

```
1    his condition, correct?

2       A.   Correct.

3       Q.   Mr. Pleu has never been hospitalized for his

4    monoclonal B-cell population or CLL, correct?

5       A.   Correct.

6       Q.   Mr. Pleu has received no treatment

7    whatsoever for his condition, right?

8       A.   Correct.

9       Q.   That is consistent with treatment guidance

10   for stage zero CLL, right?

11      A.   Correct.

12      Q.   That is consistent with treatment guidance

13   for monoclonal B-cell lymphocytosis, true?

14      A.   Correct.

15      Q.   Thankfully today Mr. Pleu is doing very well

16   from an MBL/CLL standpoint, correct?

17           MR. HABERMAN:  Objection.

18      A.   The only problem that I see is the recurrent

19   sinus infections.  So patients with CLL are

20   predisposed to infections with encapsulated

21   organisms, and they often have

22   hypogammaglobulinemia.  And if this patient had a

23   low IGG level with the history of recurrent sinus

24   infections, they would meet criteria for IVIG

25   immunoglobulin.
```

1    Q.   Do you know if that was tested in Mr. Pleu's

2    case?

3    A.   She says she's going to check.

4    Q.   Right.  Do you know what that testing found?

5    A.   I never saw that, or I don't remember seeing

6    it.  I don't remember the number.

7         (Schneider Exhibit 17 was marked for

8    identification.)

9    BY MS. ROSS:

10   Q.   Exhibit 17 to your deposition is a visit

11   with Dr. Reddy on October 12 of 2016.  Do you see

12   that?

13   A.   I do.

14   Q.   Can you read Number 2 --

15   A.   Can I just make a comment?

16   Q.   -- of her diagnosis, please?

17   A.   Can I make a comment, if I can?  Just -- you

18   know, I think the chromosomal changes go along with

19   CLL and not of benign monoclonal lymphocytosis,

20   also, just to tell you that.  Okay.

21   Q.   Let me come back to that since you're on

22   that point.  Okay.  And then we'll -- first of all,

23   do you want to -- so --

24   A.   I would look at the IgG level, sure.

25   Q.   Okay.  I'm going to ask a new question so

Andrew M. Schneider, M.D.

```
 1    that the record is clear.  Okay?

 2        A.   Yes.

 3        Q.   Do you see, under Diagnosis/Problems, Number

 4    2 is:  History of recurrent sinus infections.  IgG

 5    subclasses unremarkable.

 6             Do you see that?

 7        A.   Just give me a second to review it.  Okay.

 8    Thanks.  It's on Page 1?

 9        Q.   Correct.

10        A.   Is the IgG level actually reported here?

11        Q.   What Dr. Reddy says about the IgG level is

12    that it was unremarkable, correct?

13        A.   I'm just looking for the actual number.

14        Q.   Right.  And this is the information that I

15    have --

16        A.   Okay.

17        Q.   -- which is that Dr. Reddy said that the IgG

18    level was unremarkable --

19        A.   So --

20        Q.   -- true?

21        A.   -- may I respond to that?

22        Q.   First --

23        A.   What -- what was --

24        Q.   -- answer my question, and then I'll give

25    you an opportunity to --
```

Andrew M. Schneider, M.D.

```
1        A.   So what's your question?

2        Q.   Okay.  So Dr. Reddy's description of

3   Mr. Pleu's IgG level is that it was unremarkable,

4   correct?  Yes or no?

5        A.   She writes:  IgG subclass is unremarkable.

6        Q.   Right.  Now, what is the explanation that

7   you wish to give?

8             MR. HABERMAN:  Objection.

9        A.   Yes.  So you don't need a low IgG level with

10  CLL to institute immunoglobulin.  As I told you

11  before, patients with CLL are predisposed to

12  infections with encapsulated organisms.  And if you

13  remember before, we discussed evidence-based

14  medicine.  And every state has what's called an LCD,

15  local determinant, that gives the rules for allowing

16  IVIG.  Now, some states require a low IgG level, and

17  some states don't.

18            Medicare has compendia.  Some compendia

19  don't require an IgG level.  So just because -- a

20  patient who has a low -- who has CLL and recurrent

21  infections may qualify for IVIG without IgG levels.

22            In addition, I don't know what the IgG level

23  is here because she didn't tell me.  But that

24  doesn't change the fact that this patient may

25  benefit from immunoglobulin.
```

1      Q.   Do you know how long Mr. Pleu had recurrent

2   sinus infections prior to his diagnosis with CLL?

3      A.   Again, I don't have any of this stuff

4   memorized, so you can show me.

5      Q.   I'm asking you, do you have any opinion on

6   whether he'd had chronic sinusitis for years --

7      A.   I believe he --

8      Q.   -- prior to his diagnosis.

9      A.   -- did, but I don't remember the exact

10   dates, if you want to show me.

11      Q.   Mr. Pleu, again -- withdrawn.

12           Thankfully today Mr. Pleu is doing well from

13   an MBL/CLL standpoint, correct?

14           MR. HABERMAN:  Objection.

15      A.   Yes.

16      Q.   His last white blood cell count was normal,

17   correct?

18      A.   Correct -- I'm sorry, incorrect.  11.1, it's

19   high.

20      Q.   His last white count was from the February

21   7th, 2022 note.

22      A.   Oh, I have a -- this is printed?  Let me see

23   what the date is.  Oh, I'm sorry.

24      Q.   You're looking for Exhibit 16.

25      A.   Help me.

1      Q.   It might be the very top page you have in

2   front of you.

3      A.   This one?

4      Q.   I'm not sure because I --

5      A.   This says Exhibit 14.

6      Q.   Okay.  So you want Exhibit 16.

7      A.   Where is that one?  I have 14 and 17, 8.  Do

8   I have 16?

9      Q.   You have all of them.

10     A.   I've got it.  16.  Thank you.

11     Q.   Mr. Pleu's last white blood cell count was

12   normal, correct?

13     A.   Okay.  On February 7th, correct.

14     Q.   Dr. Reddy stated on February 7th of 2022

15   that the patient had no clinical evidence of disease

16   on exam or laboratory finding, true?

17     A.   He had stage zero CLL.

18     Q.   If you'll go with me to Dr. Reddy's note.

19     A.   Yes.

20     Q.   Do you see where Dr. Reddy states:

21   Assessment.  This patient -- this is a patient with

22   stage zero CLL.

23          Did I read that correctly?

24     A.   You did.

25     Q.   Dr. Reddy stated the patient had no clinical

Andrew M. Schneider, M.D.

```
 1    evidence of disease on exam or laboratory finding,

 2    correct?

 3        A.   Give me a second.  That's what he wrote.

 4    You want me to look at it, though?  Yes.

 5        Q.   Now, you mentioned that Mr. Pleu's FISH

 6    results were consistent with CLL, right?

 7        A.   I think what I said was that I think when

 8    you have chromosomal changes, that's more indicative

 9    of CLL than a benign monoclonal lymphocytosis.

10        Q.   Do you know, sitting here, one way or the

11    other whether it is typical for CLL-type MBL to have

12    the same chromosomal markers that CLL does?

13        A.   My understanding, to the best that I -- to

14    my knowledge, is they would not have that, but

15    that's what -- that's my understanding.

16        Q.   FISH was positive for a deletion of

17    chromosome 13 at q14, right?

18        A.   Yes.

19        Q.   In general, that portends a positive

20    prognosis in CLL, right?

21        A.   Yes.  And now you're acknowledging CLL, so,

22    yes.

23        Q.   You don't know whether a 13q deletion is

24    also observed in monoclonal B lymphocytosis CLL-like

25    type, correct?
```

1      A.   My --

2           MR. HABERMAN:  Objection.

3      A.   My understanding is it's not.  If you have

4   evidence to the contrary, you can show me.

5      Q.   No other mutations were identified in

6   Mr. Pleu's FISH testing other than a 13q14 deletion,

7   correct?

8      A.   So that's a lot.  I mean, usually most

9   people don't have any deletions.

10     Q.   I'm sorry.  So my question was:  There were

11  other tests performed in his FISH analysis, right?

12     A.   Yes.  He had FISH analysis showing the

13  abnormality in the chromosomes, which, in my

14  opinion, is more indicative of CLL.

15     Q.   Did you need to review any other results of

16  sequencing to arrive at your opinion that Roundup

17  caused Mr. Pleu's condition?

18          MR. HABERMAN:  Objection.

19     A.   Yeah.  I'm sorry.  Say that question again.

20     Q.   Sure.  So you looked at the FISH results

21  here, right?

22     A.   Yes.

23     Q.   You saw a 13q deletion which, in your

24  opinion, is more indicative of CLL than MBL; is that

25  right?

```
 1       A.   Yes.

 2       Q.   You did not see any other abnormalities on

 3   FISH, right?

 4       A.   I'm trying to think if he's the one that had

 5   the ZAP, but let me see a second.

 6            Not that I recall, but give me the option on

 7   a break to look again.

 8       Q.   Sure.

 9       A.   Thanks.

10       Q.   I think ZAP was checked, and it was

11   negative.

12       A.   Which I think is a good prognosis, but --

13   okay.  I thought he had a ZAP that was checked,

14   right?

15       Q.   Correct.

16       A.   And it -- and it was negative.

17       Q.   Right.

18       A.   So that's --

19       Q.   And that would -- so if it helps you,

20   Exhibit 17 tells you that.

21       A.   Do I have that?

22       Q.   You do.

23       A.   Too many exhibits.  13, 11, maybe in here,

24   14.  17, yes.  Here we go.

25       Q.   ZAP is Z-A-P?
```

Andrew M. Schneider, M.D.

1        A.    Correct.

2        Q.    And ZAP was negative in --

3        A.    Right.

4        Q.    -- Mr. Pleu's case, correct?

5        A.    Yes.

6        Q.    That is a positive prognostic finding,

7    correct?

8        A.    In CLL, correct.

9        Q.    Do you know whether it's also a positive

10   prognostic finding in monoclonal B-cell

11   lymphocytosis?

12       A.    I don't think they prognosticated, because,

13   you know, it's not -- it's not CLL yet.  By

14   definition, a monoclonal lymphocytosis of unknown

15   significance is a -- has a good prognosis.

16       Q.    Do you -- withdrawn.

17             Did you see any genome or exome sequencing

18   performed for Mr. Pleu?

19       A.    No.

20       Q.    You did not need to review the results of

21   any genome sequencing for Mr. Pleu to arrive at your

22   opinion that Roundup caused his condition?

23       A.    Correct.

24       Q.    Those results would not inform your opinion

25   in any way, right?

Andrew M. Schneider, M.D.

1      A.   We've already discussed that I'm not an

2  expert in genome sequencing.

3      Q.   Did you see that Mr. Pleu's oncologist

4  referred him to a genetics counselor because he had

5  multiple different forms of cancer over the course

6  of his lifetime?

7      A.   Again, I'll take -- I don't remember, but

8  I'll take your word for it.

9      Q.   We can go back to Exhibit 16, which is the

10 February 2022 note.  Are you there?

11     A.   I'm there.

12     Q.   Mr. Pleu's oncologist referred him to a

13 genetics counselor because he had multiple forms of

14 cancer over the course of his lifetime, correct?

15     A.   Yes.

16     Q.   Do you have any criticism of Dr. Reddy's

17 assessment that referral to genetics was appropriate

18 for this patient?

19     A.   I mean, there's never harm in getting an

20 opinion.  It's not like she ordered any invasive

21 procedure, so I don't think I would have done it,

22 but I don't think there is a harm in it.

23     Q.   Do you agree that genetic counseling is

24 indicated for someone who has multiple different

25 cancers over their lifetime beginning with a cancer

1    at age 30?

2        A.   So colon cancer, as we discussed, at age 30,

3    you have to think about the Lynch syndrome.  So

4    absolutely he needs genetic testing to rule out

5    Lynch syndrome because he had colon cancer at age

6    30.

7        Q.   Did Mr. Pleu ever get genetic testing to

8    rule out Lynch syndrome that you're aware of?

9        A.   I don't know, because that wasn't really

10   applicable to my task here of looking at Roundup and

11   CLL.

12       Q.   You didn't review his records to see if he

13   had ever undergone genetic testing for Lynch

14   syndrome?

15       A.   So I reviewed all his records, but if I saw

16   it, it's not something I would have remembered,

17   because it has no applicability -- help me get that

18   right -- it's not applicable to my task of looking

19   at Roundup and NHL.

20       Q.   If you saw a patient with multiple different

21   cancers beginning at age 30, including colon cancer,

22   would you recommend genetic counseling?

23       A.   I would have ordered Lynch syndrome testing

24   myself.  I wouldn't need to send him out.

25       Q.   Did Mr. Pleu actually go for that genetics

Andrew M. Schneider, M.D.

1    counseling?

2        A.   I don't know.

3        Q.   You've not seen any records related to that,

4    correct?

5        A.   I don't know.

6        Q.   Did you ask --

7        A.   Wait, it's my office.  I'm sorry.  I need

8    one second.

9            MS. ROSS:  We'll go off the record.

10           THE VIDEOGRAPHER:  Yeah.  Off the record at

11       3:37 p.m.

12           (Recess from 3:37 p.m. until 3:37 p.m.)

13           THE VIDEOGRAPHER:  Back on the record at

14       3:37 p.m.

15   BY MS. ROSS:

16       Q.   Dr. Schneider, are you good to continue?

17       A.   Yeah, of course.

18       Q.   You reviewed all of Mr. Pleu's medical

19   records that were available, right?

20       A.   Yes.

21       Q.   You reviewed Mr. Pleu's medical records from

22   his primary care provider, right?

23       A.   I reviewed everything that was given to me

24   that we discussed.

25       Q.   Mr. Pleu has high blood pressure, right?

```
1      A.   Again, I don't have these things memorized,
2   but I will take your word for it if you say he does.
3      Q.   Okay.  High blood pressure is a common
4   disease of aging, right?
5      A.   Yeah.
6      Q.   Roundup did not cause Mr. Pleu's high blood
7   pressure, correct?
8      A.   Correct.
9      Q.   Mr. Pleu has high cholesterol or
10  hyperlipidemia.  Is that a common disease as folks
11  get older?
12     A.   Yes.
13     Q.   Roundup didn't cause his high cholesterol,
14  right?
15     A.   Correct.
16     Q.   Mr. Pleu has anxiety that predates his
17  MBL/CLL.  Did you see that?
18     A.   I remember vaguely, but okay.
19     Q.   Mr. Pleu's anxiety got much worse after his
20  prostate cancer diagnosis, correct?
21     A.   I can't blame him.  Yes.
22     Q.   Do you recall from his testimony that he
23  started having panic attacks and worse depression
24  after his prostate cancer treatment in 2020?
25     A.   Yes.
```

1    Q.   Mr. Pleu has severe obstructive sleep apnea,

2    correct?

3    A.   Yes.

4    Q.   He was diagnosed with severe obstructive

5    sleep apnea in mid 2017, right?

6    A.   I don't remember the date.

7    Q.   Mr. Pleu failed CPAP and was prescribed

8    BiPAP.  What is that?

9    A.   So those are devices that help patients

10   breathe.  They're forced air.  They can wear them at

11   home.  If it's sleep apnea, they put on a BiPAP in

12   the evening.

13   Q.   I know you're a hematologist/oncologist --

14   A.   Right.

15   Q.   -- and not a generalist.  But do you have a

16   sense as a medical doctor that fatigue is one of the

17   common daytime symptoms of obstructive sleep apnea?

18   A.   I imagine it could be.

19   Q.   Do you have any sense, sitting here today,

20   of what the other daytime symptoms of obstructive

21   sleep apnea are?

22   A.   I'm not a pulmonologist.  I don't -- I don't

23   see sleep apnea.  I'm sorry.

24   Q.   And I take it you don't know one way or the

25   other whether obstructive sleep apnea is associated

Andrew M. Schneider, M.D.

1    with any particular negative health outcomes, right?

2        A.   I think it is.  I think they have problems

3    with cognition, restlessness.  I mean, they're

4    not -- they're not sleeping well.  I think they may

5    have other heart risks.

6        Q.   What other risks of obstructive sleep apnea

7    are you aware of?

8        A.   So I'm talking now not as an expert because

9    this is not really what I do or see.  But those are

10   the ones I know about.  I think it may be a

11   higher -- and I'm not saying this as an expert.  I'm

12   just talking as a -- as a doctor.  I'm not a -- I'm

13   not an expert in sleep apnea.  But I think they

14   might have a higher risk of heart problems,

15   arrhythmias, cognition.

16       Q.   We've sort of discussed tangentially, but

17   I'd like to discuss more specifically some of

18   Mr. Pleu's other cancer diagnoses.

19       A.   Okay.

20       Q.   Okay?

21       A.   Sure.

22       Q.   Mr. Pleu was diagnosed with colon cancer in

23   1983, correct?

24       A.   Yes.

25       Q.   Mr. Pleu was 30 when he was diagnosed with

Andrew M. Schneider, M.D.

```
 1    colon cancer?

 2        A.   Yes.

 3        Q.   He underwent surgery to remove part of his

 4    colon, right?

 5        A.   Yes.

 6        Q.   He was hospitalized for about a month, he

 7    said in his deposition, for that surgery?

 8        A.   Yes.

 9        Q.   Mr. Pleu required a second surgery to

10    address complications from his colectomy?

11        A.   Yes.

12        Q.   He was hospitalized for about a week for

13    that?

14        A.   Yes.

15        Q.   You are not opining that Roundup caused

16    Mr. Pleu's colon cancer, true?

17        A.   True.

18        Q.   Mr. Pleu has a history of prostate cancer,

19    right?

20        A.   Yes.

21        Q.   You are not opining that Roundup caused

22    Mr. Pleu's prostate cancer, true?

23        A.   True.

24        Q.   Mr. Pleu was diagnosed with prostate cancer

25    in 2019, right?
```

Andrew M. Schneider, M.D.

```
 1      A.   Yes.

 2      Q.   He was treated with radical prostatectomy in

 3   2020, right?

 4      A.   Yes.

 5      Q.   He had a complicated course for his prostate

 6   cancer; is that fair?

 7      A.   Yes.

 8      Q.   After his surgery, he was readmitted to the

 9   hospital for infection?

10      A.   Yes.

11      Q.   Eventually he required a second surgery to

12   address a nonhealing surgical wound from his

13   prostate cancer surgery, right?

14      A.   Yes.

15      Q.   He has struggled with incontinence since

16   treatment for prostate cancer, right?

17      A.   Yes.

18      Q.   He has struggled with erectile dysfunction

19   since treatment for his prostate cancer, correct?

20      A.   Yes.

21      Q.   Medical treatments for his erectile

22   dysfunction have worked, correct?

23      A.   Correct.

24      Q.   They have caused painful side effects,

25   right?
```

```
 1      A.   Yes.

 2      Q.   Mr. Pleu had a tongue mass biopsied on May

 3   11th of 2012.  Did you see that --

 4      A.   I did.  It was --

 5      Q.   -- in his medical records?

 6      A.   -- it was benign.  It wasn't cancer.

 7      Q.   Mr. Pleu also had a left breast mass

 8   removed --

 9      A.   It --

10      Q.   -- on January 31st of 2013, correct?

11      A.   But not -- yeah.  It was benign.

12      Q.   That was also benign, right?

13      A.   Yeah.

14      Q.   Are you familiar with Li-Fraumeni syndrome?

15      A.   A little bit.

16      Q.   What is that?

17      A.   Yeah.  I'd have to look it up.  I do know

18   it.  I can't tell -- I mean, I'd have to look it up.

19      Q.   Mr. Pleu has never been tested

20   for Li-Fraumeni syndrome, correct?

21      A.   Can you tell me what it is?  Then I'll tell

22   you whether he should be tested for it.

23      Q.   So right now my question is:  Did you see

24   anything in Mr. Pleu's medical records indicating he

25   underwent testing for Li-Fraumeni syndrome?
```

1    A.   You can show me.  I don't recall.

2    Q.   You don't recall any tests of testing for

3    Li-Fraumeni, right?

4    A.   So like I said, there's tons of records I

5    reviewed, and it's not a memory test.  So I don't

6    recall that.  If you want to show me, please do.

7    Q.   I will represent to you that in my review of

8    the medical records, I did not see any testing for

9    Li-Fraumeni syndrome.

10    A.   Can we get -- cut to the chase and tell me

11    what it is, so I can at least know whether he should

12    have been tested for it?

13    Q.   Sure.  Li-Fraumeni is an inheritable defect

14    in mismatch repair mechanisms that predisposes

15    patients to multiple cancers.  Are you aware of

16    that?

17    A.   We already discussed the MSI and the Lynch

18    syndrome.  So how is this different from the Lynch

19    syndrome?  I'd have to look it up.

20    Q.   There are different mismatch repair

21    inherited defects that are --

22    A.   Well --

23    Q.   -- different syndromes, right?

24    A.   -- I'd have to look it up.  No, because when

25    we're talking about mismatch repair, I think we're

1    talking about microsatellite instability, and there

2    are only those five proteins I discussed before.

3        Q.   Do you know if there -- so we can look it up

4    at a break and come --

5        A.   Yes.

6        Q.   -- back to it --

7        A.   Great.

8        Q.   -- so that --

9        A.   Okay.

10       Q.   -- that will refresh where your memory.

11   Okay?

12       A.   Sure.

13       Q.   All right.  We did establish that neither

14   you nor I have seen testing in Mr. Pleu's medical

15   records for Lynch syndrome, correct?

16       A.   I have not, correct.  But, again, I wouldn't

17   be really looking for it that hard because it

18   doesn't have any bearing on my causation opinions

19   today.

20       Q.   Mr. Pleu has a sister who's been diagnosed

21   with multiple cancers, including bone, liver, lungs,

22   and ovaries, right?

23       A.   Well, she probably doesn't have primary bone

24   or liver cancer.  She probably has metastatic

25   disease.  So it's bone liver, what else?

1    Q.   Lung and ovaries.

2    A.   So she may have metastatic lung cancer, for

3    example.

4    Q.   She may also have metastatic ovarian cancer,

5    right?

6    A.   I don't -- I haven't seen those records, so

7    I don't know.

8    Q.   Is it unusual in your work as an oncologist

9    to see a patient diagnosed with multiple different

10   cancers like that?

11   A.   Talking about his sister or him now?

12   Q.   My question was about his sister.  So let me

13   clarify that in my question, and then we can go from

14   there.

15        You didn't review any of William Pleu's

16   sister's medical records, right?

17   A.   I don't think they were given to me.

18   Q.   So you don't know, sitting here, what

19   primary tumors she had versus secondary, correct?

20   A.   Correct.

21   Q.   Is it unusual in your work as an oncologist

22   to see a patient diagnosed with lung and ovarian

23   cancer?

24   A.   How do you define "unusual"?

25   Q.   I'm asking you, as a practicing oncologist,

1    if you have -- let me ask it differently.  Okay?

2    New question.

3        A.    Sure.

4        Q.    Have you, in your work as a clinical

5    oncologist, seen patients with both ovarian and lung

6    cancer?

7        A.    Yes.

8        Q.    How often?

9        A.    I mean, not that often, but, you know, you

10   have a cigarette smoker who has lung cancer and then

11   they get ovarian cancer, which happens, I mean, it's

12   not something that I go, "Oh, my God, it's so

13   strange."  It happens.

14       Q.    Do you agree that it is possible that

15   Mr. Pleu has a hereditary defect of some kind that

16   predisposes him to cancer?

17       A.    Well, let's take -- the answer would be, it

18   depends on the cancer.  So colon cancer, yes.

19   Prostate cancer, could be if he's BRCA positive.  I

20   don't have any evidence he's BRCA positive or -- but

21   lymphoma, no.

22       Q.    Do you know whether Li-Fraumeni -- well,

23   we'll look it up --

24       A.    Let's look --

25       Q.    -- at a break.

Andrew M. Schneider, M.D.

```
1        A.   Can we take a break and look it up so we

2   don't have to play this game?

3        Q.   Sure.  Let's take a quick break.

4        A.   Let's see what it is and we'll -- we don't

5   have to guess anymore.

6        Q.   All right.

7             THE VIDEOGRAPHER:  All right.  Off the

8   record at 3:46 p.m.

9             (Recess from 3:46 p.m. until 3:49 p.m.)

10            THE VIDEOGRAPHER:  All right.  This begins

11   Media Unit Number 3, and we're back on the record

12   at 3:49 p.m.

13  BY MS. ROSS:

14       Q.   We took a short break to look at Li-Fraumeni

15   syndrome online; is that right, Dr. Schneider?

16       A.   Yes.

17       Q.   Li-Fraumeni syndrome is a rare disorder that

18   increases the risk of developing several types of

19   cancer, correct?

20       A.   Yes.

21       Q.   The cancers most often associated with

22   Li-Fraumeni syndrome include breast cancer,

23   osteosarcoma, and soft tissue cancers, correct?

24       A.   Yes.

25       Q.   Other cancers commonly seen in this syndrome
```

1    include brain tumors and cancers of blood-forming

2    tissues such as leukemias, right?

3        A.   Correct.

4        Q.   Did you see any genetic testing for

5    Li-Fraumeni syndrome in Mr. Pleu's medical records?

6        A.   I didn't see it, but I don't think, based

7    upon this, that I would have -- think he needs it.

8    I mean, he doesn't have any of the five common

9    cancers that you see.  He doesn't have

10   adrenocortical carcinoma, breast cancer, CNS cancer,

11   osteosarcoma, soft tissue sarcoma.

12           I think more telling is his colon cancer at

13   page 30, which is not part of the Li-Fraumeni

14   syndrome, and that speaks to MSI testing to rule out

15   Lynch syndrome.

16       Q.   You cannot rule out Lynch syndrome in

17   Mr. Pleu's case, true?

18       A.   Not --

19           MR. HABERMAN:  Objection.

20       A.   -- not without seeing the MSI test.

21       Q.   And you have not seen an MSI test in this

22   case, correct?

23       A.   Correct.  But it wouldn't have any bearing

24   on my opinions about glyphosate and lymphoma.

25       Q.   Even if -- let me make sure I understand

1    that.  All right, Dr. Schneider?

2        A.   Sure.  Sure.

3        Q.   So even if Mr. Pleu had Lynch syndrome, that

4    would have no bearing on your opinion on whether

5    glyphosate causes his non-Hodgkin's lymphoma; is

6    that right?

7        A.   Correct.

8        Q.   Mr. Pleu could have any heritable cancer

9    disorder, and that would not change your opinion

10   that Roundup caused his cancer, right?

11       A.   No, not if he had one of the -- you just --

12   you brought up Li-Fraumeni, not me.  But, you know,

13   if he was a guy who had adrenal cancer and then he

14   had a breast cancer and now a sarcoma, and all of a

15   sudden he has lymphoma, that would be a different

16   situation than this guy who hasn't had any of the

17   five types of cancer, nor does his family.

18       Q.   His sister has breast cancer, correct?

19       A.   So does one in eight women.

20       Q.   Breast cancer is one of the cancers

21   associated with Li-Fraumeni, right?

22            MR. HABERMAN:  Objection.

23       A.   Correct, but he doesn't have a breast

24   cancer.

25       Q.   In your view, Mr. Pleu has a leukemia,

Andrew M. Schneider, M.D.

```
1    correct?

2       A.   He has CLL/SLL, correct.

3       Q.   That is one of the cancers associated with

4    Li-Fraumeni syndrome, right?

5       A.   No.  It's not one of the five major ones.

6    It's a sideline cancer.  But the main ones are the

7    five cancer types that account for the majority.  So

8    it's not one of the majority cancers, no.

9       Q.   You've seen 63-year-old men with MBL/CLL who

10   never used Roundup, true?

11      A.   Of course.

12      Q.   Can you point me to anything in Mr. Pleu's

13   presenting symptoms workup treatment --

14           MR. HABERMAN:  I'm going to object to the

15      question.

16           MS. ROSS:  Or -- okay.  Are you going to let

17      me finish the question?

18           MR. HABERMAN:  No.  I'm sorry.  I didn't

19      object early enough to the:  You've seen

20      63-year-old men with CLL/SLL who've never used

21      Roundup.  I object to that question.

22           MS. ROSS:  And I think it was CLL/MBL.

23           THE COURT REPORTER:  Okay.

24           (Discussion off the record.)

25      Q.   New question.
```

1          MR. HABERMAN:  He was never diagnosed with

2      MBL, so I object to that.

3      Q.   So new question.  All right, Dr. Schneider?

4      A.   Sure.  Sure.

5      Q.   Can you point me toward anything in

6      Mr. Pleu's presenting symptoms workup, treatment, or

7      response that tells you that Roundup caused William

8      Pleu's monoclonal B-cell population?

9      A.   Yes.  So Mr. Pleu has circulating abnormal

10     lymphocytes in his blood.  We'll leave it at that.

11     We can argue more whether it's CLL or MBL.  He has

12     heavy exposure to Roundup.

13          It's my opinion, to a reasonable degree of

14     medical certainty, that Roundup is an etiological

15     factor that causes NHL.  Just like a smoker who has

16     lung cancer, and you want to argue he didn't get it

17     from smoking, but this is the only etiological agent

18     that I see in the record which would account for him

19     getting CLL.  So it's my opinion, to a reasonable

20     degree of medical certainty, that his CLL was caused

21     by Roundup.

22     Q.   I think we're speaking at sort of parallels

23     a little bit, so let me --

24     A.   Okay.

25     Q.   -- try my question again.  Okay?

```
1       A.   Sure.

2       Q.   Mr. Pleu testified about his use of Roundup,

3    right?

4       A.   Yes.

5       Q.   And separate from that, you reviewed

6    Mr. Pleu's medical records including his diagnostic

7    workup and his follow-up since with Dr. Reddy,

8    correct?

9       A.   Correct.

10      Q.   What in Mr. Pleu's presenting symptoms tells

11   you Roundup caused his cancer?

12      A.   So I thought I answered that, but I'll try

13   again.  Maybe I didn't.

14      Q.   No.  I'm not asking about Mr. Pleu's use of

15   Roundup that he reported in his deposition right

16   now.  I'm asking about Mr. Pleu's presenting -- his

17   presentation to his oncologist.  Do you understand

18   that?

19      A.   I think so.

20      Q.   Okay.

21      A.   The way I'd answer that --

22           MR. HABERMAN:   Objection.

23      A.   -- question is, he presented with CLL.  So,

24   okay, we can argue whether he has it, but I think he

25   did.  His treating oncologist thinks he did, and the
```

Andrew M. Schneider, M.D.

1    pathologist thinks he did.  So he presented with

2    CLL.  Now you're asking me:  Well, what's the

3    etiologic reason for having the CLL?

4        Q.   I'm not.  I'm asking a different question.

5        A.   What's your next question -- after does he

6    have CLL, what's your next question?

7        Q.   So my question is:  If you were taking

8    Mr. Pleu's symptoms and his presentation to his

9    oncologist --

10       A.   Okay.

11       Q.   -- which was with an abnormal white blood

12   cell count --

13       A.   Okay.

14       Q.   -- that got him referred, right?

15       A.   Uh-huh.

16       Q.   What in that presentation tells you Roundup

17   caused his cancer as opposed to him having

18   run-of-the-mill CLL?

19       A.   Because he was exposed to Roundup, and

20   Roundup is a known, in my opinion -- and we'll get

21   there eventually when you ask the questions --

22   etiologic risk factor for NHL.

23            So you have a guy who's 63, who has a

24   diagnosis of CLL, and has a significant Roundup

25   exposure.  Based upon my review of the literature,

Andrew M. Schneider, M.D.

1    it's my medical opinion, based upon those facts and

2    findings, that the Roundup is the etiologic reason

3    he developed CLL.

4        Q.   I think I understand you now, so let's see

5    if we can get this clear.  Okay?

6        A.   Sure.

7        Q.   Apart from Mr. Pleu's reported exposure to

8    Roundup, there is nothing in his presentation,

9    workup, or recommended therapeutic course that tells

10   you Roundup contributed to his cancer, true?

11       A.   That's an unfair question because that can't

12   be.  There's no test I can do to see if Roundup

13   causes CLL.  I'm here as your expert witness to give

14   an opinion.  It's my opinion.  That's all it is, is

15   my expert opinion, whether Roundup caused the CLL.

16   You may have experts who disagree with me.  That's

17   okay.

18            But there's nothing I can point to saying I

19   did a blood test, and it shows Roundup caused CLL.

20   That test doesn't exist.  You know that.

21       Q.   Apart from Mr. Pleu's reported Roundup

22   exposure, there is no test, imaging study, pathology

23   report, physical exam finding that tells you Roundup

24   caused his condition, correct?

25            MR. HABERMAN:  Objection.

Andrew M. Schneider, M.D.

```
1        A.   If there was, we wouldn't be here.  There

2    wouldn't be a legal battle about this, right?  You

3    guys say it doesn't cause it.  This guy says it

4    does.  You have experts on both sides.  The jury

5    will decide.  But there's no test that could be

6    done.  Therefore, experts like me will give their

7    best opinions based upon the clinical situation and

8    the review of literature.

9        Q.   Right.  So the answer to my question is,

10   there is no test, imaging study, pathology report,

11   or physical exam finding that tells you Roundup

12   caused Mr. Pleu's CLL?

13       A.   There isn't, but that shouldn't be a reason

14   not to allow me to support my belief that it did,

15   based upon the available literature and his clinical

16   scenario.

17       Q.   Have you ever seen a patient whose only risk

18   factor for an abnormal monoclonal B population was

19   being male?

20            MR. HABERMAN:  Objection.

21       A.   That's a -- I don't really understand that

22   question.  Try it again.

23       Q.   Sure.  So there's a higher risk of CLL in

24   men, correct?

25       A.   Yes.
```

1      Q.   There's also a higher risk of CLL in

2   patients as they age, right?

3      A.   Yes.

4      Q.   Have you ever seen a patient whose only risk

5   factor for CLL was being male?

6      A.   Well, I think as we discussed earlier, I

7   don't usually -- maybe I should, but spend time

8   asking the risk factor for CLL because it doesn't

9   matter to my clinical practice.

10      Q.   In your clinical practice, you don't ask

11   patients what risk factors they have for CLL?

12      A.   I don't.

13      Q.   And the same would be true for DLBCL?

14      A.   I don't.  I do for lung cancer, for

15   mesothelioma.  And I think going forward, after

16   working in this Roundup case, I will, but I have

17   not, no.

18      Q.   Today, sitting here today, you've not asked

19   your patients about their exposure history when they

20   come to you with non-Hodgkin's lymphoma, correct?

21      A.   Yes, because it's not going to change

22   anything I've got to do.

23      Q.   Have you ever seen a patient whose only risk

24   factor for abnormal monoclonal B-cell population was

25   being older?

1    A.   Again, I've seen all different types of

2    patients.  I don't routinely go into a detailed

3    account of occupational exposure.  Maybe I should.

4    My job is to stage the CLL and recommend treatment,

5    if any.

6    Q.   Have you ever seen a patient with CLL who

7    had a personal history of cancer going back to age

8    30?

9    A.   Probably.  I'm sure I have in my 33 years.

10   I can't give you a specific.  But I think the most

11   troubling part of that is the colon cancer at age 30

12   cries Lynch syndrome.

13   Q.   Have you ever seen a patient with CLL or MBL

14   diagnosed with two other types of cancer?

15   A.   Of course.

16   Q.   Is it unusual in your practice to see a

17   patient like that?

18   A.   We already discussed what unusual means.

19   Q.   How many patients like that have you seen?

20   A.   I mean, it happens.  I mean, CLL is a common

21   disease, as we discussed.  Prostate cancer is a

22   common disease, I mean, so -- the most troubling to

23   me about this gentleman is the age 30 colon cancer.

24   The other thing is people get CLL, and people get

25   CLL who use Roundup, and people get prostate cancer.

1    Q.   We've discussed at some length CLL versus

2    MBL, and I understand that your opinion in this case

3    is based on the diagnosis given by his treating

4    oncologist you -- and the pathology results at the

5    time that Mr. Pleu has CLL, right?

6    A.   Plus the lymphocyte count of 4.91, which I

7    argue is really not different than 5, and we don't

8    actually know what percent of those cells were

9    monoclonal lymphocytes.

10    Q.   Can you point me toward any data anywhere in

11    the world, published or unpublished, establishing an

12    association between Roundup and monoclonal B-cell

13    lymphocytosis?

14    A.   I can't sitting here right now.  I didn't

15    look at that topic.

16    Q.   Mr. Pleu was overweight or obese in the

17    years leading up to his diagnosis, correct?

18    A.   Yes.

19    Q.   Do you consider obesity to be a risk factor

20    for Mr. Pleu?

21         MR. HABERMAN:  Objection.

22    A.   Not a strong risk factor, no.

23    Q.   Do you consider it to be a weak risk factor

24    for Mr. Pleu?

25    A.   I consider Roundup to be the risk factor.

Andrew M. Schneider, M.D.

```
 1        Q.   Did you consider whether obesity was a risk
 2   factor for Mr. Pleu?
 3        A.   I considered that so many people in our
 4   population are obese, I don't think that I can say
 5   that obesity is a real risk factor.
 6        Q.   Did you review the literature one way or the
 7   other whether obesity is associated with NHL?
 8        A.   I did.
 9        Q.   Did you see in the literature that you
10   reviewed that obesity is, in fact, associated with
11   NHL?
12        A.   I believe it is.
13        Q.   You considered obesity has a potential risk
14   factor for Mr. Pleu, correct?
15        A.   I considered it.
16        Q.   Mr. Pleu falls into the categories in
17   various epidemiologic studies of folks who had an
18   increased risk of NHL because they were overweight
19   or obese, right?
20        A.   I think the more important risk factor is
21   glyphosate.
22        Q.   My question was:  Mr. Pleu falls into
23   categories in various epidemiologic studies of folks
24   who had an increased risk of NHL because they were
25   overweight or obese, correct?
```

1       A.   Yes.

2       Q.   Mr. Pleu told his oncologist that two of his

3   friends from a small town in Massachusetts were

4   diagnosed with CLL, and they all worked at a local

5   paper mill.  Did you see that?

6       A.   I do remember that vaguely.

7       Q.   Did you find it significant that Mr. Pleu

8   and two of his friends all worked at the same paper

9   mill and were all diagnosed with CLL?

10       A.   I didn't have enough information to go on.

11   I mean, I don't really understand anything about his

12   two friends, where they worked, what they were

13   exposed to.  So I really can't comment on it.

14       Q.   Did you do anything to investigate whether

15   working at a paper mill was associated with

16   non-Hodgkin's lymphoma?

17       A.   I'd have to know what chemicals they were

18   exposed to in the paper mill.

19       Q.   Let me back up just a little bit and see if

20   I understand your methodology in this case.  Okay?

21       A.   Sure.

22       Q.   Your methodology was to look at the

23   literature on whether Roundup is associated with

24   non-Hodgkin's lymphoma so that you could rule

25   Roundup in as a potential cause of non-Hodgkin's

Andrew M. Schneider, M.D.

1    lymphoma for individual plaintiffs, right?

2        A.   Right.

3        Q.   Then you looked at the plaintiff and their

4    deposition testimony and Plaintiff Fact Sheet and

5    whether they reported exposure to Roundup, correct?

6        A.   Yes.

7        Q.   Did you also go through a process of ruling

8    out other contributing factors to each patient's

9    non-Hodgkin's lymphoma?

10       A.   Yes.  I don't believe he said he had

11   occupational exposure to any other problems, so...

12       Q.   Did you look to see if there was literature

13   on whether working in a paper mill was associated

14   with an increased risk of non-Hodgkin's lymphoma?

15       A.   So just so we're clear, did he work in a

16   paper mill?

17       Q.   He did.

18       A.   Okay.  I've looked at all the data given to

19   me, and none of the data mentions anything about

20   working in a paper mill.

21       Q.   You did not review any literature on whether

22   working in a paper mill is associated with

23   non-Hodgkin's lymphoma, true?

24       A.   I reviewed the etiologic risk factors for

25   NHL, and I don't remember seeing working in a paper

Andrew M. Schneider, M.D.

1    mill.

2         (Schneider Exhibit 18 was marked for

3    identification.)

4    BY MS. ROSS:

5         Q.   Exhibit 18 to your deposition is an article

6    by Mester and colleagues.  Do you see that?

7         A.   Yes.

8         Q.   This is a 2006 publication, right?

9         A.   Yes.

10        Q.   On the first page there's a statement

11   that -- in the third paragraph down:  Several

12   studies point to a potential etiologic role of

13   occupational factors to malignant lymphoma.

14        Do you see that?

15        A.   I do.

16        Q.   Then it states:  Hodgkin lymphomas have been

17   found in excess among farmers or carpenters, welding

18   workers, woodworkers, workers in the paper industry.

19        And it goes on.  Do you see that?

20        A.   The problem with this is it lists everything

21   under the sun, from real estate agents, maids,

22   farmers, shoemaking, leather goods.  So, I mean,

23   everything causes lymphoma in this article.

24        Q.   Were you aware of an association between

25   lymphoma and working in the paper industry?

Andrew M. Schneider, M.D.

```
1        A.   Again, I mean, this article says it, but it
2   says other things.  I don't see the relative risk
3   numbers.  I'd have to review that.  I'm not aware
4   that working in a paper mill is a high etiologic
5   risk factor for NHL.
6        Q.   Will you turn with me to Table 1, please?
7   Are you there?
8        A.   Yes.
9        Q.   Table 1 gives odds ratios and 95 percent
10  confidence limits for various sectors in relation to
11  lymphomas.
12            Do you see that?
13       A.   I do.
14       Q.   One of them is pulp, paper, paper products,
15  publishing, and printing.
16            Do you see that?
17       A.   I do.
18       Q.   If you go all the way to the right in this
19  table, it gives you adjusted odds ratios and 95
20  percent confidence intervals for the sample overall.
21            Do you see that?
22       A.   I do.
23       Q.   The odds ratio was 1.7 with a 95 percent
24  confidence interval of 1.0 to 2.8; is that correct?
25       A.   So that would not be statistically
```

1    significant.

2        Q.   If a 95 percent confidence interval touches

3    1.0 on the lower bound, you do not consider that

4    statistically significant, right?

5        A.   I'm not a --

6             MR. HABERMAN:  Objection.

7        A.   -- I'm not a statistician, but my

8    understanding is if 1 is included, then it's not

9    statistic -- may be almost, but it's not

10   statistically significant.  So this speaks against

11   it being statistically significant.  Just give me

12   one more second, if you could, so I can look at it a

13   second.

14             The other -- the other thing to say about

15   this article is there are only 24 cases.  The

16   numbers are so small.  It's hard to make meaningful

17   opinions about 24 people.

18       Q.   24 cases is not a sufficient number of cases

19   in a case-control study to lead you to meaningful

20   conclusions, correct?

21       A.   I mean, the problems I have with this study

22   are the following:  One, 24 patients is a low

23   number; two, it's not statistically significant;

24   and, three -- just give me one second -- so we have

25   food products, beverages, tobacco, paper products,

Andrew M. Schneider, M.D.

```
 1    publishing, printing, metals, chemicals, real

 2    estate, renting, business activities, architects,

 3    maids, farmers, farmers, construction workers,

 4    shoemaking, leather.  I mean, the list goes on and

 5    on.  One more second.

 6          In fact, the only statistically significant

 7    etiologic agent was food products, beverages, and

 8    tobacco, and I don't know what that means when you

 9    include food with tobacco.  I don't know -- I don't

10    understand what this means.

11    Q.   So this might help in just -- for later

12    discussions, so I'm going to try to get some clarity

13    on something now.  Okay?

14    A.   Sure.

15    Q.   If an odds ratio or a relative risk is 1.7,

16    the 95 percent confidence interval goes down to 1.0

17    and up to 2 point something, we cannot say that is

18    evidence for an increased risk, right?

19    A.   Correct.

20    Q.   The reason for that is that the result is

21    not statistically significant because the lower

22    confidence bound includes 1.0, right?

23    A.   Yeah, especially when you only have 24

24    patients.  To make a meaningful judgment that this

25    is a statistically significant finding in 24
```

Andrew M. Schneider, M.D.

1    patients when 1 is included in the confidence

2    interval, I don't think is fair.

3        Q.   You wouldn't interpret an odds ratio like

4    this as showing a 70 percent increased risk

5    associated with some activity, correct?

6        A.   So I think the more important question is --

7    and, again, I'm not a statistician.  But the more

8    important question is, is working in the paper mill,

9    is that -- is that statistically significant for

10   increasing your risk of NHL?  This article says no.

11       Q.   And regardless, you did not investigate the

12   literature on whether working in a paper mill is

13   associated with NHL, correct?

14       A.   I mean, no.  For fairness, I looked at

15   everything, and I didn't see it.  And this is the

16   reason why, because it's not statistically

17   significant.

18       Q.   You reviewed William Pleu's sworn deposition

19   testimony.  We talked about that, right?

20       A.   Yes.

21       Q.   You relied on his deposition, correct?

22       A.   Yes.

23       Q.   You also reviewed Mr. Pleu's sworn Plaintiff

24   Fact Sheet, right?

25       A.   Yes.

Andrew M. Schneider, M.D.

1      Q.   You relied on that, correct?

2      A.   Correct.

3      Q.   Your sources of information for Mr. Pleu's

4   Roundup exposure were his deposition and his

5   Plaintiff Fact Sheet, right?

6      A.   Correct.

7      Q.   At the time William Pleu was deposed, he was

8   a plaintiff in a lawsuit claiming Roundup caused his

9   lymphoma, right?

10     A.   Yes.

11     Q.   At the time of his PFS, Mr. Pleu --

12     A.   I'm sorry, his what?  P --

13     Q.   I'm sorry.  I'll repeat the question.

14     A.   Thanks.

15     Q.   At the time Mr. Pleu completed his Plaintiff

16   Fact Sheet --

17     A.   Thank you.

18     Q.   -- he was a plaintiff in this lawsuit,

19   correct?

20     A.   Yes.

21     Q.   You didn't interview William Pleu, right?

22     A.   You already know that, yes.

23     Q.   There's nothing in an interview that would

24   tell you the cause of a patient's non-Hodgkin's

25   lymphoma, true?

```
 1              MR. HABERMAN:  Objection.
 2       A.   Well, I thought it was my job as your expert
 3   witness to give my opinion, based upon all the
 4   facts, what did it.
 5       Q.   And you did not find it necessary to
 6   interview William Pleu to determine the cause of his
 7   non-Hodgkin's lymphoma, right?
 8       A.   I don't think I was given that option.  I
 9   think I was given the information.  And in my 33
10   years as an expert -- 20, whatever, 25 years as an
11   expert, or 20 years, I've never interviewed a
12   plaintiff.
13       Q.   Okay.  I'm going to break that down a little
14   bit.  Okay?
15       A.   Sure.
16       Q.   In your 20 to 25 years as an expert witness,
17   you've never interviewed a plaintiff, correct?
18       A.   Correct.
19       Q.   You get the information that you need on a
20   plaintiff's medical history and exposure from their
21   medical records and their deposition testimony,
22   correct?
23       A.   Correct.
24       Q.   There's nothing additional that you would
25   get from an interview with a plaintiff that would
```

Andrew M. Schneider, M.D.

1    tell you about the cause of their non-Hodgkin's

2    lymphoma, right?

3        A.    I can't think of something I could have

4    asked him that would have helped me.

5        Q.    There's nothing in a physical exam that

6    would tell you the cause of someone's lymphoma,

7    correct?

8        A.    Correct.

9        Q.    Besides what Mr. Pleu said in his sworn

10   deposition and sworn PFS, was there any

11   documentation of any kind that you looked at to

12   determine how much Roundup Mr. Pleu used?

13       A.    I don't think there can be.  All -- again,

14   this is his recall of what he thinks.

15       Q.    You did not see any receipts from Mr. Pleu's

16   purchases of Roundup, right?

17       A.    So I'm not a private investigator or a

18   lawyer.  I wouldn't be looking at receipts.

19       Q.    Would it be good to look at receipts to

20   verify someone -- someone's Roundup use if you

21   could?

22       A.    I mean, in my humble opinion, that's your

23   job to show the jury that.  I'm not going to sit

24   there and look at receipts.  I'm not -- I'm a

25   doctor.

Andrew M. Schneider, M.D.

1      Q.   You do not have any firsthand knowledge of

2  how Mr. Pleu sprayed Roundup, right?

3      A.   Just what he said.

4      Q.   You did not see any photos or videos taken

5  of the -- at the time of Mr. Pleu spraying Roundup,

6  right?

7      A.   No.  No photos, no.

8      Q.   You did not see any contemporaneous

9  documentation of any kind for Mr. Pleu's claimed use

10  of Roundup, right?

11      A.   No.  Can we take a five-minute break so I

12  can see what's going on here?

13      Q.   We can.

14      A.   Thank you.

15           THE VIDEOGRAPHER:  All right.  Off the

16      record at 4:12 p.m.

17           (Recess from 4:12 p.m. until 4:22 p.m.)

18           THE VIDEOGRAPHER:  Back on the record at

19      4:22 p.m.

20  BY MS. ROSS:

21      Q.   Dr. Schneider, you did not see

22  any contemporaneous documentation of any kind where

23  Mr. Pleu's claimed use of Roundup was documented,

24  right?

25      A.   Yeah, I don't understand what I would be

1    looking for.

2        Q.   Did you see any records of any kind from

3    before Mr. Pleu filed his lawsuit that bear on the

4    question of whether he used Roundup?

5        A.   I mean, he clearly says it in his deposition

6    under oath.

7        Q.   And that deposition was taken while he was a

8    plaintiff in this lawsuit, correct?

9        A.   Yes, but so what?

10       Q.   What your numbers come from is Mr. Pleu's

11   trying to remember in 2022 what weed control

12   products he used going back to 1994, correct?

13       A.   Correct.

14       Q.   Even with the best of intentions and

15   assuming complete good faith, you would acknowledge

16   that the exercise of trying to remember how much of

17   a lawn care product you used in any given month 20

18   or 30 years ago carries with it some uncertainty,

19   true?

20       A.   True.

21            MR. HABERMAN:   Objection.

22       Q.   Would it change your opinion if Mr. Pleu

23   actually never used Roundup?

24       A.   If he never used Roundup, I couldn't blame

25   the Roundup as causing his CLL.

1    Q.   If there was actual evidence that Mr. Pleu

2    never used Roundup, you agree it could not cause his

3    cancer, right?

4    A.   I wouldn't be able to testify under oath

5    that Roundup was an etiological agent for his NHL if

6    in fact he never was exposed to any Roundup.

7    Q.   If someone did not use Roundup, Roundup did

8    not cause their non-Hodgkin's lymphoma, right?

9    A.   Right.

10        MR. HABERMAN:  Objection.

11   Q.   If Mr. Pleu was not exposed to Roundup in

12   any significant way, Roundup did not cause his

13   condition, correct?

14   A.   So you have to define significant.

15   Q.   What is your standard for what constitutes

16   enough Roundup exposure to increase risk?

17   A.   Well, I've looked at all the data and

18   everybody has their own definition.  Some studies

19   I've seen greater than two exposures in a year, some

20   -- some more, maybe 10 exposures in a year, and then

21   the number of years.

22   Q.   Let me break that down.  Okay?

23   A.   Sure.

24   Q.   In forming your expert opinion that Roundup

25   exposure is sufficient to cause non-Hodgkin's

Andrew M. Schneider, M.D.

```
1     lymphoma, you looked at the different studies in the

2     literature and how much Roundup exposure they

3     reported, correct?

4          A.   I did, and not all studies did report that.

5          Q.   And let me break that down.  Okay?

6          A.   Okay.

7          Q.   Not all studies looked at different

8     categories of exposure, true?

9          A.   True.

10         Q.   Some studies just looked at is anyone ever

11    exposed to Roundup at an increased risk of cancer,

12    right?

13         A.   Yes.

14         Q.   IARC's meta-analysis is one of those, where

15    they looked at ever use of glyphosate-based

16    herbicides and NHL risk, true?

17         A.   True.

18         Q.   There are some studies that looked at

19    whether increasing frequency, intensity, or duration

20    of use were associated with non-Hodgkin's lymphoma,

21    right?

22         A.   Yes.

23         Q.   You looked at those studies, correct?

24         A.   Yes.  Uh-huh.

25         Q.   All of the epidemiologic studies you looked
```

```
 1    at assessed whether people who actually sprayed

 2    Roundup were at an increased risk, whether that was

 3    ever exposure or some intensity measure, right?

 4         A.   True.

 5         Q.   In order to be at increased risk of NHL from

 6    Roundup, do you need to get Roundup on your skin?

 7         A.   I think it's clear that getting Roundup on

 8    your skin --

 9              MR. HABERMAN:  Objection.

10              THE WITNESS:  Sure.

11         A.   -- getting Roundup on your skin can increase

12    your risk of NHL, but I don't think that you have to

13    have it necessarily on your skin.

14         Q.   How else would you get it into your body?

15         A.   Once again, aerosol.

16         Q.   So the two routes of exposure you're aware

17    of are inhaling and skin exposure, right?

18         A.   Yes.

19         Q.   How much systemic exposure do you need to

20    Roundup in order to increase your risk of NHL?

21         A.   Depends on the study.

22         Q.   And when you say depends on the study,

23    you're talking about studies that looked at lifetime

24    days of exposure, number of days per year, or number

25    of years exposure, right?
```

1        A.    Correct.

2        Q.    Did you look at any studies that actually

3    measured systemic exposure to Roundup in parts per

4    billion, for example?

5        A.    So since I'm not a trained toxicologist, I

6    wouldn't know how to interpret that.  I don't

7    remember seeing that, and if I did, I wouldn't know

8    what it meant.

9        Q.    I want to talk about Mr. Pleu's use of

10   Roundup with you.  Okay?

11       A.    Sure.

12       Q.    You have in front of you some notes that you

13   took about your review of Mr. Pleu's deposition;

14   isn't that right?

15       A.    Yes.

16       Q.    Can you remind me what exhibit number that

17   is?

18       A.    I'll find it.  Yes, 12.

19       Q.    Mr. Pleu -- new question.

20             Mr. Pleu started using Roundup in 1994,

21   correct?

22       A.    Yes.

23       Q.    He stopped using Roundup in 2020; is that

24   right?

25       A.    Correct.

Andrew M. Schneider, M.D.

```
 1      Q.   How many total lifetime days of exposure to

 2   Roundup did Mr. Pleu have?

 3      A.   So I have when he lived at 2275 Lansdowne,

 4   he used it two to three times every two weeks for 30

 5   minutes to an hour, except for maybe the months of

 6   February through December.  I also have a couple of

 7   times per year, so -- does anybody got a pen or --

 8      Q.   Before you do that, Dr. Schneider, I'm just

 9   going to clarify something for the record.

10      A.   Sure.

11      Q.   You formed your opinion about Roundup

12   causing Mr. Pleu's condition before your deposition

13   today, right?

14      A.   Yes.

15      Q.   Before your deposition today you did not

16   calculate a total number of days of Roundup exposure

17   for Mr. Pleu, true?

18      A.   So it's --

19           MR. HABERMAN:  Objection.

20      A.   It's going to be greater than two, so -- I

21   mean, some didn't have any, some had greater than

22   two, so he's clearly going to meet definitions of --

23   by some authors.  He's probably going to meet

24   definitions of anybody.  Some are greater than 10

25   days, some are greater than two days.  Obviously,
```

1    it's hundreds of days over 20 years, so I didn't

2    bother getting the exact number.

3         Q.   I'm correct that you did not calculate a

4    total number of exposure days for Mr. Pleu prior to

5    today, right?

6         A.   I was going to do it here if you asked me.

7         Q.   And you are able to do that by take the

8    number of times every two weeks that Mr. Pleu said

9    he sprayed Roundup and multiplying that by 26,

10   correct?

11        A.   So I have in my notes he did it a couple

12   times per year, so just taking that, we have 26

13   years times twice a year, that's 52, but again, he

14   did it more often when he was at Landowne, two to

15   three times every two weeks.  So, you know, he's

16   going to have a large exposure.

17        Q.   Does anyone who uses Roundup for more than

18   two days per year, in your expert opinion, have an

19   increased risk of non-Hodgkin's lymphoma?

20        A.   I'm sorry.  Say that question again.

21        Q.   Does anyone who uses Roundup for more than

22   two days per year have an increased risk of

23   non-Hodgkin's lymphoma, in your expert opinion?

24        A.   Yes.  You look at the data.  Some data

25   doesn't even mention any risk or no risk.  Some

1    breaks it down by number of days per year and some

2    breaks it down by lifetime exposure.

3        Q.   Does anyone who uses Roundup for more than

4    10 lifetime days have an increased risk of

5    non-Hodgkin's lymphoma, in your expert opinion?

6        A.   Yes.

7        Q.   Did you calculate a number of hours that

8    Mr. Pleu was exposed to Roundup?

9        A.   I did not because it wouldn't change my

10   opinion that his Roundup exposure caused his

11   lymphoma.

12       Q.   The particular number of hours that Mr. Pleu

13   was exposed to Roundup wouldn't change your opinion

14   that Roundup exposure caused his lymphoma; is that

15   right?

16           MR. HABERMAN:   Objection.

17       A.   Sure.   So as I said, there are some studies

18   where it's an any -- it's an all-or-none phenomena,

19   you know, you've been exposed to Roundup.   Some

20   studies, like McDuffie, greater than two days per

21   year, Eriksson, greater than 10 days per year.

22           So depending upon what study you're looking

23   at, he meets those criteria.

24       Q.   You were just looking at a summary table

25   from Dr. Weisenberger's publication on the McDuffie

Andrew M. Schneider, M.D.

```
 1   and Eriksson studies, right?

 2       A.   So I -- so I do that to refresh my memory,

 3   because --

 4       Q.   No, and that's fine, I just want the record

 5   to be clear.

 6       A.   Yes.

 7       Q.   So this is not -- you're not required to

 8   have all of these data memorized, right?

 9       A.   There's no way I can memorize that data.

10       Q.   And we will look individually at the

11   McDuffie and Eriksson studies.  Okay?

12       A.   Sure.  Sure.

13       Q.   The McDuffie study reported greater than 10

14   days, right?

15       A.   No, greater --

16       Q.   I'm sorry.

17       A.   You got it wrong.

18       Q.   The McDuffie study reported greater than two

19   days, right?

20       A.   Yes.

21       Q.   The Eriksson study reported greater than 10

22   days, correct?

23       A.   Do you want to borrow my table?  Yes.

24   Excuse me.

25       Q.   You do not have any facts or data to suggest
```

Andrew M. Schneider, M.D.

```
 1    that Mr. Pleu was exposed to Roundup in any way

 2    that's different from what he testified to in his

 3    deposition, correct?

 4        A.    Correct.

 5        Q.    Mr. Pleu started using Roundup in 1994,

 6    right?

 7        A.    Yes.

 8        Q.    He used it at his house, correct?

 9        A.    Yes.

10        Q.    You would classify Mr. Pleu as a residential

11    user, right?

12        A.    Yes.

13        Q.    When he applied Roundup, Mr. Pleu would hold

14    the bottle or the sprayer one to three inches away

15    from the weeds, correct?

16        A.    Yes.

17        Q.    He never sprayed indiscriminately because

18    that would kill something he didn't intend to kill,

19    right?

20        A.    Yes.

21        Q.    He did not spray when it was windy, true?

22        A.    True.

23        Q.    Mr. Pleu wore work boots, shorts, a T-shirt,

24    glasses, and work gloves when he applied Roundup,

25    right?
```

```
 1        A.   I have gloves, no mask, and glasses, leather

 2   boots.

 3        Q.   Do you want me to reask my question?

 4        A.   I just want to -- it was compound.  You have

 5   to take them one at a time.

 6        Q.   Mr. Pleu wore work boots when he applied

 7   Roundup, right?

 8        A.   Crrect.

 9        Q.   Mr. Pleu wore glasses, correct?

10        A.   Yes.

11        Q.   He also wore work gloves, correct?

12        A.   Correct.

13        Q.   Mr. Pleu got Roundup on his hand a few times

14   when taking off a glove to get to the bottom of a

15   bottle of Roundup, right?

16        A.   Yes.

17        Q.   That was on his right hand and no other body

18   part, correct?

19             MR. HABERMAN:  Objection.

20        A.   I didn't memorize which hand it was.  I'm

21   sorry.

22        Q.   On those few occasions that Mr. Pleu got

23   Roundup on his hand, he would then spray his hand

24   down with a hose, correct?

25        A.   Yes.
```

Andrew M. Schneider, M.D.

```
 1        Q.    After spraying and doing whatever other yard

 2     work he was going to do that day, he would strip in

 3     the garage and shower immediately, correct?

 4        A.    Correct.

 5        Q.    Does everyone who uses Roundup have

 6     measurable glyphosate in their blood or their urine?

 7        A.    So I'm not a toxicologist, I wouldn't be

 8     able to answer that question.

 9        Q.    You don't know the answer to that question,

10     fair?

11        A.    As a clinical medical oncologist, I don't

12     know the answer to that question.  I can give you an

13     answer but it doesn't mean it's right, nor is it

14     evidence-based.

15        Q.    As an expert opining that Roundup caused

16     particular patients' non-Hodgkin's lymphoma, you do

17     not have an opinion on whether everyone who uses

18     Roundup has measurable glyphosate in their blood or

19     their urine, true?

20        A.    True.

21        Q.    As an expert opining that Roundup caused

22     particular plaintiffs' non-Hodgkin's lymphoma, you

23     have not investigated the question of whether

24     everyone who uses Roundup has measurable glyphosate

25     in their blood or their urine, right?
```

```
 1        A.    I'm not trained to do that.
 2        Q.    You've never read any studies on the levels
 3   of glyphosate in the body of Roundup users?
 4        A.    I have not.
 5        Q.    Did Mr. Pleu, in the medical records you
 6   saw, ever have measurements taken that showed the
 7   presence of glyphosate in his blood or urine?
 8        A.    I don't think he ever had measurements
 9   taken.
10        Q.    Can you point me toward any test at any time
11   that would confirm that William Pleu had measurable
12   glyphosate in his body?
13        A.    That wouldn't be possible because when he
14   was using it, he didn't know it causes lymphoma.  If
15   he did, he wouldn't be doing it.  So when he was
16   using Roundup, he didn't go, "Oh, let me go to the
17   doctor and get tested today because 20 years from
18   now I will be suing somebody."  So...
19        Q.    I think we can probably cut some of this
20   questioning off, so I'm going to try.  Okay?
21        A.    Well, some of the questions are, with all
22   due respect, ridiculous.
23        Q.    Next question:  You have done nothing to
24   investigate how much glyphosate Mr. Pleu actually
25   absorbed, true?
```

```
 1            MR. HABERMAN:  Objection.
 2       A.   Yeah, I think you asked that question and I
 3  said there is no documentation of that because it
 4  wasn't done.  He didn't go get tested.
 5       Q.   You are not relying on any measurement of
 6  glyphosate in William Pleu's body, true?
 7       A.   Correct.
 8       Q.   You're not measuring -- you're not relying
 9  on any estimation or calculation from a toxicologist
10  or anyone else for the amount of glyphosate in
11  Mr. Pleu's body, correct?
12       A.   So to be fair, you already asked me three
13  hours ago if I was going to rely on anybody else's
14  expert testimony and I said no.
15       Q.   So let me ask the question without the
16  toxicologist in it.  Okay?
17       A.   Okay.
18       Q.   You are not relying on any estimation or
19  calculation of glyphosate in Mr. Pleu's body for any
20  of your opinions in this case, true?
21       A.   Correct.
22       Q.   Were there any other ingredients in the
23  Roundup Mr. Pleu used besides glyphosate that you
24  considered significant to your analysis?
25       A.   So there are other things that glyphosate --
```

Andrew M. Schneider, M.D.

1    sorry, in Roundup, I believe, like surfactant, but

2    I'm not a toxicologist.  My role here was to look at

3    the data on the etiologic agent of Roundup being

4    glyphosate and to see what the data shows about the

5    etiology risk of NHL.

6        Q.   Okay.  So right now I'm trying to determine

7    how far into detail we need to go on other

8    ingredients.  Okay?

9        A.   Sure.

10       Q.   New question:  Were there any other

11   ingredients in the Roundup Mr. Pleu used besides

12   glyphosate that you considered significant to your

13   analysis?

14       A.   No.

15       Q.   You are not offering an opinion that any

16   ingredient in Roundup other than glyphosate caused

17   or contributed to Mr. Pleu's non-Hodgkin's lymphoma,

18   true?

19       A.   True.

20       Q.   That's true for Mr. Moore as well?

21       A.   True.

22       Q.   That you are not offering an opinion that

23   any ingredient in Roundup other than glyphosate

24   caused or contributed to his NHL, right?

25       A.   True.

```
 1              MR. HABERMAN:  Objection.

 2       Q.   Let's talk about Mr. Moore.  Okay.

 3       A.   Sure.

 4       Q.   Mr. Moore was diagnosed with testicular

 5  DLBCL in January of 2020, right?

 6       A.   Yes.

 7       Q.   Mr. Moore was 50 years old at the time of

 8  his diagnosis, right?

 9       A.   Yes.

10       Q.   His date of birth is August 15th, 1969.

11  Okay?

12       A.   Sure.

13       Q.   Are you looking for your notes on Mr. Moore?

14       A.   I am.

15       Q.   I think that they are Exhibit 13, if that

16  helps you.  You should have it in front of you.

17       A.   I've got them.  Okay.  Okay.

18       Q.   You good?

19       A.   I'm good.

20       Q.   There are different types of DLBCL, true?

21       A.   Yes.

22       Q.   Germinal center is one type of DLBCL, right?

23       A.   Yes.

24       Q.   Nongerminal center is another type of DLBCL,

25  right?
```

```
1        A.    Yes.

2        Q.    What was Mr. Moore's?

3        A.    I don't remember, because to me, unless they

4    are a double-hit or triple-hit, they are all treated

5    the same way.

6        Q.    Okay.  I will represent to you, based on his

7    medical records, that Mr. Moore's DLBCL was

8    nongerminal center type.

9        A.    Okay.

10        Q.    Do you have any reason to dispute that?

11        A.    No, and it means nothing to me.

12        Q.    And the reason it means nothing to you is

13    that, if I'm understanding correctly, what matters

14    from a treating oncologist's perspective is a DLBCL

15    double or triple hit, right?

16        A.    Correct.

17        Q.    Mr. Moore's DLBCL was not double-hit,

18    correct?

19        A.    Correct.

20        Q.    It was not triple-hit, correct?

21        A.    Yes.

22        Q.    Mr. Moore's cancer was tested for a mec

23    rearrangement and was negative, right?

24        A.    Yes.

25        Q.    Was that a good thing?
```

```
 1        A.    Yes.

 2        Q.    Did you see anything anywhere in Mr. Moore's

 3   medical records that identified the driver mutations

 4   responsible for his DLBCL?

 5        A.    No.

 6        Q.    You did not need to review the results of

 7   any other genetic testing for Mr. Moore to arrive at

 8   your opinion that Roundup caused his cancer, right?

 9        A.    Correct.

10        Q.    Genome or exome sequencing would not inform

11   your opinion in any way, true?

12        A.    True.

13        Q.    Mr. Moore had a bone marrow biopsy on

14   January 31st of 2020, right?

15        A.    Yes.

16        Q.    Thankfully, that was negative for cancer,

17   correct?

18        A.    Correct.

19        Q.    Mr. Moore had DLBCL in his right testicle,

20   right?

21        A.    Yes.

22        Q.    Pet CT before he started treatment showed no

23   other areas of cancer, correct?

24        A.    Correct.

25        Q.    In other words, Mr. Moore's DLBCL was caught
```

1    earlier, right?

2       A.   Well, I would say at stage 1(E), but I don't

3    -- I don't know what caught early means.

4       Q.   Okay.  I'll ask a new question.  Okay?

5       A.   Sure.

6       Q.   Mr. Moore's DLBCL was stage 1, right?

7       A.   1(E).

8       Q.   Okay.  And 1(E) means extranodal, correct?

9       A.   Correct.

10      Q.   Mr. Moore's DLBCL was 1(E), correct?

11      A.   We just said that, yes.

12      Q.   Okay.  Is that a good thing in terms of

13   staging of DLBCL?

14      A.   Yes.  It's better to be stage 1 than stage

15   4, so...

16      Q.   Mr. Moore was treated with R-CHOP for his

17   DLBCL, right?

18      A.   Yes.

19      Q.   Mr. Moore completed six rounds of R-CHOP

20   between February and July of 2020, right?

21      A.   Yes.

22      Q.   Mr. Moore had imaging completed after he

23   finished treatment, right?

24      A.   Yes.

25      Q.   Mr. Moore's post-treatment imaging after he

Andrew M. Schneider, M.D.

1    completed R-CHOP showed no cancer, right?

2        A.    Yes.

3        Q.    That is a good thing, correct?

4        A.    Yes.

5        Q.    Have you seen any cancer records for

6    Mr. Moore since July of 2020?

7        A.    The last records I saw showed he was without

8    disease.  I don't memorize the date.

9        Q.    As you understand it, Mr. Moore has not

10   received any further treatment for his DLBCL since

11   finishing chemotherapy, correct?

12       A.    You omitted the radiation he had, and the

13   intrathecal medicine.

14       Q.    Those were recommended.  Did you see

15   anything in the records actually indicating that he

16   got radiation?

17       A.    So what I did see was I think he got one

18   dose of high-dose methotrexate and then he had some

19   bad side effects, so I believe he got some

20   intrathecal methotrexate.

21       Q.    I saw that recommended.  Did you see any

22   actual medical records of intrathecal --

23       A.    My recollection is that he got it.  If I'm

24   wrong, I'm wrong.  I mean, that's what I remember

25   reading.

Andrew M. Schneider, M.D.

```
1       Q.   Okay.  Let's break that down into pieces so
2    that we're clear on what we have.  Is that fair?
3       A.   Sure.
4       Q.   All right.  Mr. Moore received one dose of
5    methotrexate for CNS prophylaxis in June of 2020,
6    right?
7       A.   Yes.
8       Q.   He developed an acute kidney injury that
9    fully resolved after discontinuation of
10   methotrexate, right?
11      A.   Yes.
12      Q.   It does not appear from his medical records
13   that he -- at least those that have been produced to
14   us -- that he underwent radiation, though that was,
15   at one point, recommended.  Is that consistent with
16   what you saw in his records?
17      A.   Right.  So I never saw radiation records but
18   I saw he was going -- I assumed he got it.  Maybe I
19   assumed wrong.  So I think if we're going to do
20   it -- you're right, I don't know if I saw the actual
21   radiation records.
22      Q.   I believe Mr. Moore testified about the
23   treatment that he received for his DLBCL and you
24   reviewed his deposition, correct?
25      A.   Yes.
```

Andrew M. Schneider, M.D.

1      Q.   Did you see anything in his deposition

2   saying that he had radiation?

3      A.   I don't remember.

4      Q.   Did you see anything in his deposition

5   saying that he had methotrexate beyond that one

6   dose?

7      A.   I think he did, I just can't -- you

8   understand I can't point to where it is but my

9   recollection was, from reading the records, that he

10  did.

11     Q.   And the best way to verify that would be to

12  go to Mr. Moore's medical records?

13     A.   Yeah, pull out the records.  I don't know if

14  it really matters in terms of my opinions today.

15     Q.   Thankfully, today Mr. Moore is doing very

16  well from a lymphoma standpoint, right?

17     A.   Yes.

18     Q.   He has been in remission since completing

19  treatment in July of 2020, correct?

20     A.   Yes.

21     Q.   That's nearly two years now, right?

22     A.   Yes.

23     Q.   It is true that if DLBCL remains in

24  remission two years after completing treatment,

25  long-term prognosis is good, right?

```
 1              MR. HABERMAN:  Objection.
 2        A.   Right.  Well, we've got to break that --
 3    I'll be like you, we have to break it down a little
 4    bit.  Why are you picking two years and what do you
 5    mean by good?
 6        Q.   NCCN guidance and SEER have data on
 7    prognosis and likelihood of relapse for DLBCL after
 8    two years post-therapy.  Are you familiar with that?
 9        A.   Well, yeah, but usually it's after five
10    years.  I mean, there are survival charts, we can
11    pull them, but usually it's -- you know, we don't
12    look at two-year survivals, we more usually look at
13    five-year survival.
14        Q.   When you are looking at long-term outcomes
15    for DLBCL, you'd look at five years post-treatment
16    as opposed to two years; am I right on that?
17        A.   We don't look at two years.  In oncology, we
18    don't look at two years, we look at five years.
19        Q.   What is the likelihood today that
20    Mr. Moore's cancer will recur?
21        A.   More likely than not it will not recur.
22        Q.   Mr. Moore's treating oncologist has
23    described his ECOG status as zero, right?
24        A.   Yes.
25        Q.   That is a good thing, right?
```

1     A.   Yes.

2     Q.   As we discussed earlier, ECOG of zero means

3   fully active, able to carry on all predisease

4   performance without restriction, correct?

5     A.   Correct.

6     Q.   Do you agree with Mr. Moore's treating

7   oncologist as to his performance status?

8     A.   Like you asked me before, there is no way I

9   can independently verify a performance status

10  without seeing him.

11    Q.   You don't have an opinion that there is

12  anything Mr. Moore cannot do today because of his

13  DLBCL, true?

14    A.   True.

15    Q.   You reviewed Mr. Moore's medical records in

16  addition to his cancer records, right?

17    A.   Yes.

18    Q.   Mr. Moore has a history of anxiety, true?

19    A.   I believe so.  I don't remember.

20    Q.   Mr. Moore's anxiety predates his DLBCL,

21  right?

22    A.   Okay.

23         (Schneider Exhibit 19 was marked for

24  identification.)

25  BY MS. ROSS:

Andrew M. Schneider, M.D.

```
1        Q.   Exhibit 19 to your deposition is a primary
2   care note from August of 2017 for Stacey Moore.  Do
3   you see that?
4        A.   I do.
5        Q.   At the time of this evaluation in August
6   2017 -- well, let me back up.  New question.  Okay,
7   Dr. Schneider?
8        A.   Sure.
9        Q.   August of 2017 was before Mr. Moore was
10  diagnosed with DLBCL, right?
11       A.   Okay.
12       Q.   At the -- in August of 2017 Mr. Moore's BMI
13  on his vitals was 25.9.  Do you see that?
14       A.   No, but I'm sure you'll show me where -- I
15  see it.  I've got it, 25.9, yeah.
16       Q.   A BMI of 25.9 is an overweight BMI, right?
17       A.   I don't actually really know.  His weight is
18  175.  Does it say how tall he is?  I don't know how
19  tall he is.  How tall is he, do we know?
20       Q.   It says 69 inches.
21       A.   So 5' 9", 175?  That's a little bit -- I
22  don't know.  It's not horrendous, I don't think, but
23  it's -- it could be a little bit.
24       Q.   Do you see under -- just above the vital
25  signs there is a comment that -- other
```

Andrew M. Schneider, M.D.

1    comment/concerns, "anxiety attacks that are

2    happening nightly."  Do you see that?

3        A.   Where is that?

4        Q.   Just above the vital signs.

5        A.   I see the vital signs.  Show me where.  I

6    don't see it.

7        Q.   Two rows up.

8        A.   Okay.  Yes, yes, yes, yes.

9        Q.   In August of 2017 Mr. Moore was having

10   anxiety attacks that were happening nightly

11   according to his medical records, correct?

12       A.   Okay.

13       Q.   And if you look at the assessments on the

14   following page, do you see that Mr. Moore was

15   diagnosed with generalized anxiety disorder?

16       A.   Yes.

17       Q.   You have no reason to dispute that

18   diagnosis, right?

19       A.   Correct.

20       Q.   Mr. Moore has hypothyroidism, right?

21       A.   Hypo, right?

22       Q.   Hypo.

23       A.   Yes.

24       Q.   Correct.

25       A.   Yes.

```
 1        Q.   Mr. Moore was diagnosed with hypothyroidism

 2   in 2017, right?

 3        A.   Okay.

 4        Q.   He was treated with Synthroid, correct?

 5        A.   Yes.

 6        Q.   Synthroid is a form of hormone replacement

 7   for thyroid, correct?

 8        A.   Correct.

 9        Q.   Mr. Moore has an autoimmune thyroid

10   condition, right?

11        A.   I don't know if it's autoimmune.  He has

12   hypothyroidism.

13        Q.   Hypothyroidism is most commonly caused by

14   Hashimoto's disease, right?

15        A.   I don't know that.

16        Q.   You don't know one way or another whether --

17   what the most common cause of hypothyroidism is in

18   the United States?

19        A.   Correct.

20        Q.   That's not your area of expertise, fair?

21        A.   I'm not an endocrinologist.

22        Q.   Did you look into the literature of

23   whether autoimmune thyroid disorders are associated

24   with non-Hodgkin's lymphoma?

25        A.   So autoimmune diseases that cause
```

Andrew M. Schneider, M.D.

1    immunosuppression are.  One, I don't know he had an

2    autoimmune disease; and two, I don't think

3    autoimmune thyroiditis would cause

4    immunosuppression.

5        Q.   Does Mr. Moore have any other health issues

6    of which you are aware?

7        A.   I mean, do you want to show me?  Is there

8    something I should look at besides this piece of

9    paper here?  He's only on Synthroid, so I don't know

10   what else.

11       Q.   I didn't see anything in your notes --

12       A.   Okay.

13       Q.   -- indicating any other health conditions,

14   correct?

15       A.   He's only Synthroid, so -- here, past

16   medical history, I don't see anything else on this

17   page.

18       Q.   Right.  And so I just am --

19       A.   Okay.

20       Q.   -- checking with you that there is nothing

21   else that you're aware of --

22       A.   Not -- no, not that I'm aware of.

23       Q.   Okay.  We were talking over each other a

24   little there, so let me just clarify.

25            New question:  Mr. Moore has no other

1    medical conditions of which you are aware, correct?

2        A.   Correct.

3        Q.   Mr. Moore smokes every day, right?

4        A.   Yes.

5        Q.   You saw it documented in Mr. Moore's medical

6    records that he smokes a pack a day, right?

7        A.   Yes.

8        Q.   A pack-a-day smoker since age 20, right?

9        A.   Yes.

10       Q.   He's now 53, correct?

11       A.   Correct.

12       Q.   That's a 33-pack-year history?

13       A.   Yes.

14       Q.   Did you consider Mr. Moore's 33-pack-year

15   history to be significant?

16       A.   Significant towards what?

17       Q.   In general?

18       A.   How do you -- are we talking about his risk

19   of lung cancer?  What do -- what are you actually

20   asking me?  Significant is a very general term.

21   What do you mean by significant?

22       Q.   I'm going to break that down.  Okay?

23       A.   Sure.

24       Q.   Mr. Moore was at an increased risk of lung

25   cancer because of his smoking, right?

1    A.   Yes.

2    Q.   And he has not been diagnosed with lung

3  cancer, thankfully, correct?

4    A.   Correct.

5    Q.   Cigarette smoke contains benzene, right?

6    A.   Yes.

7    Q.   Benzene is a solvent, correct?

8    A.   Yes.

9    Q.   Benzene has been associated with

10 non-Hodgkin's lymphoma, true?

11   A.   Usually follicular lymphoma.

12   Q.   Have you looked at the literature on whether

13 benzene generally is associated with non-Hodgkin's

14 lymphoma?

15   A.   I don't think it's statistically

16 significantly associated with it.

17   Q.   Now, when you say follicular lymphoma, you

18 are aware that there is an association between

19 cigarette smoking and follicular lymphoma, right?

20   A.   I've seen literature to that effect, yes.

21   Q.   For DLBCL specifically, you are not aware of

22 literature finding an association between DLBCL and

23 smoking; is that correct?

24   A.   Correct.

25   Q.   Did Mr. Moore's smoking history contribute

Andrew M. Schneider, M.D.

1    to his DLBCL?

2        A.   I don't believe it did.

3        Q.   Why not?

4        A.   As we just discussed, that it's follicular

5    lymphoma.

6        Q.   Smoking causes cancer, correct, generally?

7        A.   Off the record.  So?  Yes.

8        Q.   Exposures that cause one cancer, as we've

9    discussed, do not necessarily cause another cancer,

10   right?

11       A.   Correct.

12       Q.   We need to look at data for an exposure in a

13   particular type of cancer to form an opinion, right?

14       A.   Right.

15       Q.   For DLBCL, we need to look at data for DLBCL

16   to form an opinion on whether an exposure caused

17   that cancer, true?

18       A.   To the best of our ability, yes.

19       Q.   For follicular lymphoma, the same would be

20   true, right?

21       A.   The answer is to the best of our ability.

22   We always can't do that, as we'll talk about, but we

23   try.

24       Q.   You've seen 50-year-old men with DLBCL who

25   did not ever use Roundup, true?

```
 1        A.    Of course.
 2        Q.    Can you point me toward anything other than
 3   Stacey Moore's Plaintiff Fact Sheet and his
 4   deposition testimony that shows that Roundup caused
 5   Mr. Moore's cancer?
 6        A.    That's the same question you asked for
 7   Mr. Pleu and I will answer it the same way, that
 8   this is a gentleman who has a significant both
 9   occupational and residential exposure to Roundup,
10   who developed diffuse large cell lymphoma.
11   Therefore, it's my opinion, to a reasonable degree
12   of medical certainty, based upon the literature
13   which I'm sure we'll discuss at some point, that
14   that was the reason why he developed diffuse large
15   B-cell lymphoma.
16        Q.    You're aware that there is a difference
17   between what Mr. Moore testified to and what his
18   presenting symptoms were, for example, right?
19              MR. HABERMAN:  Objection.
20        A.    Yeah, I don't understand that question.  It
21   doesn't make sense.
22        Q.    What in Mr. Moore's presenting symptoms
23   tells you that Roundup caused his cancer?
24        A.    And with all due respect, these are the same
25   questions I objected to about Mr. Pleu.  You can't
```

Andrew M. Schneider, M.D.

```
1    tell by physical exam, there's no test I can do to
2    determine why he got the lymphoma.  All I can tell
3    is he has a testicular mass and he has a lymphoma,
4    diffuse large B-cell lymphoma.  That's a given fact,
5    no dispute.  He's a 1(E) diffuse large B-cell
6    lymphoma.
7           The job here today is I'm giving expert
8    testimony about whether I believe his significant
9    Roundup exposure was the reason he developed the
10   lymphoma, and I will say yes, to a reasonable degree
11   of medical certainty.
12       Q.   Did you understand my question,
13   Dr. Schneider?
14       A.   With all due respect, probably not.
15       Q.   Let me try again.  Okay?
16       A.   Sure.
17       Q.   What in Mr. Moore's presenting symptoms, his
18   workup for DLBCL, his treatment or response to
19   therapy, tells you Roundup caused his cancer?
20       A.   So that's an unfair question because you --
21   we both know that there is nothing I can point to on
22   pathology that's going to say that this is from
23   Roundup.  So the answer is, as I told you when you
24   asked that question before, the reason we're going
25   to spend seven hours today, is we have to have
```

1    someone to make the connection from Roundup to large

2    cell lymphoma, and that can only be done by

3    reviewing literature, data, and knowing the clinical

4    situation.

5           There is no test that we can do on Mr. --

6    help me -- Mr. Moore to prove that the Roundup

7    caused the lymphoma.  We both know that can't be

8    done.

9    Q.   So the answer to my question is there is no

10   test result, imaging study, pathology report, or

11   physical exam finding that tells you Roundup caused

12   Mr. Moore's cancer, true?

13   A.   The answer is true, but that's why you have

14   me here today, to give expert testimony over seven

15   hours to tell you that I believe, I'll tell the jury

16   to a reasonable degree of medical certainty, is that

17   the Roundup caused the diffuse large B-cell

18   lymphoma.

19   Q.   Have you ever seen a patient whose only risk

20   factor for DLBCL was being male?

21   A.   Again, we've gone these --

22          MR. HABERMAN:  Objection.

23   A.   Yeah, we've -- these questions before.

24   Q.   Have we gone through these questions with

25   regard to DLBCL in Stacey Moore?

1    A.    No, but it's going to be the same thing,

2    so...

3    Q.    So let me reask my question so that it's

4    clear.

5    A.    Sure.  You can ask your question.

6    Q.    Okay.

7    A.    I'm just going to comment on it, though.

8    Q.    Have you ever seen a patient in clinical

9    practice as a treating oncologist whose only risk

10   factor for DLBCL was being male?

11   A.    So I don't really consider being a male a

12   risk factor.  I mean, it very well might be but half

13   the population is male, so -- so what?  I mean, I

14   see diffuse large B-cell lymphoma, as we discussed

15   my numbers before, and I've already discussed that I

16   don't usually take a strong occupational history

17   because my job is "Here's your lymphoma, let's get

18   rid of it."

19        Why it happened doesn't really matter to me

20   at the given point in time when I'm trying to cure

21   this patient of his lymphoma.

22   Q.    As an expert in this case, when you

23   concluded that Roundup was a substantial factor

24   contributing to someone's non-Hodgkin's lymphoma, I

25   think you told me earlier you did consider other

1    risk factors, right?

2        A.   Yes.

3        Q.   What other risk factors did you consider in

4    determining that Roundup was a substantial

5    contributing factor for someone's non-Hodgkin's

6    lymphoma?

7        A.   We talked about history of EB -- EBV

8    infection, history of post lymphoproliferative

9    disorder, post-transplant.  We talked about chronic

10   immunosuppression with steroids, history of RA on

11   medications, history of lupus.

12       Q.   We mentioned autoimmune conditions and you

13   just mentioned two specifically, right?

14       A.   Correct.

15       Q.   Autoimmune thyroiditis increases the risk of

16   non-Hodgkin's lymphoma, right?

17       A.   So I think you'd need to see some

18   immunosuppression, I think, just if you have -- if

19   you can show me the data.  I'm unaware of

20   Hashimoto's increasing your risk of diffuse large

21   B-cell lymphoma.

22           (Schneider Exhibit 20 was marked for

23   identification.)

24   BY MS. ROSS:

25       Q.   I'm handing you Exhibit 20.  This is an

1    article, the first author is Goldin, G-o-l-d-i-n,

2    2009.  Do you see that?

3        A.   Yes.

4        Q.   You did not cite this article on your

5    reliance list, right?

6        A.   No, I don't think I was aware of this

7    article.

8        Q.   Did you perform any literature searches to

9    determine whether autoimmune thyroiditis was

10   associated with an increased risk of NHL?

11       A.   I did literature searches to look for any

12   possible association and I don't think I saw

13   autoimmune thyroiditis pop up on my search.

14       Q.   Do you perform any literature searches to

15   determine how big a risk autoimmune thyroiditis

16   might have for NHL?

17       A.   Okay.  First of all, if you -- there's just

18   one -- NHL is a broad category.  We're talking only

19   about diffuse large cell lymphoma.  That's number

20   one.

21           Number two, in my search I didn't find that.

22       Q.   If you will go with me to -- well, let's

23   start with the first page of this.  Do you see the

24   corresponding author is listed as Lynn Goldin,

25   right?

```
1        A.   Yes.

2        Q.   And correspondence is directed to the

3   Genetic Epidemiology Branch of the National Cancer

4   Institute, right?

5        A.   Yes.

6        Q.   The National Cancer Institute has good

7   researchers, right?

8        A.   I don't know.

9        Q.   Do you know whether the researchers at the

10  National Cancer Institute know what they're doing

11  when it comes to cancer risks?

12       A.   So people -- I always laugh when people ask

13  me these questions because you want me to say yes

14  but I -- I'm sure the answer is yes but I don't know

15  who these people are, I don't know their names,

16  their background.  So it's not really fair.

17       Q.   If you will go with me to Table 2 and tell

18  me when you are there.

19       A.   I'm there.

20       Q.   Table 2 gives associations between various

21  autoimmune diseases and lymphomas, right?

22       A.   Yes.

23       Q.   One of the associations reported is for

24  Hashimoto's thyroiditis.  Do you see that?

25       A.   I do.
```

Andrew M. Schneider, M.D.

```
1        Q.   For NHL, the risk of NHL in folks with

2    Hashimoto's thyroiditis was 3.0, right?

3        A.   That's what it says, correct.

4        Q.   And that's statistically significant, right?

5        A.   Correct.

6        Q.   In Goldin 2009, folks who had a history of

7    Hashimoto's thyroiditis were at a threefold

8    increased risk of non-Hodgkin's lymphoma, true?

9        A.   Right, but this is not applicable to our

10   patient for the following reasons.  May I tell you?

11       Q.   You're saying that Mr. Moore did not have

12   non-Hodgkin's lymphoma?

13       A.   I'm saying he had diffuse large B-cell

14   lymphoma, and we discussed -- we went back to

15   cigarettes, that cigarettes increase your risk of

16   follicular lymphoma but not diffuse large cell

17   lymphoma.  This doesn't go into that detail, so we

18   don't know.  Maybe these are patients who had

19   Waldenstrom's or a mantle cell or a marginal zone.

20   I don't know what type of lymphoma.  I'd have known

21   if I read this article.  Do you want to give me time

22   to read the article?

23       Q.   So I want to just make sure that I'm

24   understanding --

25       A.   Let me -- the other thing to say is I don't
```

1    even know that he had Hashimoto's thyroiditis.  I

2    just know he has hypothyroid.  You're the one who

3    says you think he had it but you haven't shown me a

4    record that says that.

5         Q.   Do you know whether someone with DLBCL in

6    this study would have been included in the NHL

7    category?

8         A.   To be fair, I haven't read the study.  Do

9    you want me to read it?

10        Q.   I'd like you to answer my question, if you

11   can.

12        A.   I can't -- unless you have the study.  I

13   haven't read it yet, so you have to give me time to

14   read it.

15        Q.   And I want to make sure I understand your

16   position on different subtypes of non-Hodgkin's

17   lymphoma, just so we're very clear on this going

18   forward.  Okay?

19        A.   Sure.

20        Q.   So different subtypes of non-Hodgkin's

21   lymphoma are distinct diseases, right?

22        A.   Yes.

23             MR. HABERMAN:  Objection.

24        Q.   Different subtypes of non-Hodgkin's lymphoma

25   have different etiologies, meaning different causes,

1    right?

2             MR. HABERMAN:  Objection.

3        A.    Some do, some don't.

4        Q.    Different subtypes of non-Hodgkin's

5    lymphoma, when you say some do and some don't have

6    different causes, DLBCL and CLL have different

7    causes, correct?

8        A.    Yes.

9        Q.    DLBCL and follicular lymphoma have different

10   causes, right?

11       A.    Yes.

12       Q.    In order to understand the causes of a

13   particular type of non-Hodgkin's lymphoma, you would

14   prefer to look at data specific to that subtype if

15   those data are available, true?

16       A.    Correct.  So we do the best we can do.  If

17   the data is available, then we look at it.  If we

18   don't have that data, then we'll talk about the data

19   that we have and we can criticize it back and forth.

20       Q.    And one criticism of data that looks at NHL

21   overall as opposed to subtype data is that it's not

22   really answering the question of whether an exposure

23   is associated with that particular subtype of

24   non-Hodgkin's lymphoma?

25       A.    And that's why --

```
 1              MR. HABERMAN:  Objection.
 2      A.   And that's why they made the meta-analysis,
 3   so they can get that data.
 4      Q.   I'm not sure that that answered my question,
 5   so I'll try again.
 6              One criticism of studies that look at NHL
 7   overall is that they do not answer the question of
 8   whether a particular exposure is associated with a
 9   particular type of non-Hodgkin's lymphoma, right?
10      A.   That can be a criticism, and we'd have to
11   look at the individual study and see if that's
12   merited to that study.
13      Q.   Did IARC look at any subtype of
14   non-Hodgkin's lymphoma in their analysis?
15      A.   I don't remember they did.
16              Are you not going to ask me questions on
17   this article?  Do you want me to read it or --
18      Q.   You can set it aside.
19      A.   You don't want me to read it?
20      Q.   We'll come back to it if we have time.
21      A.   Sure.
22      Q.   You can hold onto it.
23      A.   I don't want it.
24      Q.   The exhibits are yours.
25      A.   I'm not going to read it.
```

1          (Schneider Exhibit 21 was marked for

2     identification.)

3     BY MS. ROSS:

4     Q.   Exhibit 21 to your deposition is an article

5     by Mellemkjaer and others published in 2008.  Do you

6     see that?

7     A.   Yes.

8     Q.   I take it you searched for articles on

9     autoimmune disease and non-Hodgkin's lymphoma in

10    Google, right?

11    A.   Right.

12    Q.   The title of this article is "Autoimmune

13    disease in individuals and close family members and

14    susceptibility to non-Hodgkin's lymphoma."  Do you

15    see that?

16    A.   I do.

17    Q.   Mellemkjaer and colleagues report a variety

18    of results for a personal history of autoimmune

19    diseases.  Do you see that?

20    A.   Yes.

21    Q.   They also -- they report information for

22    systemic autoimmune diseases and then also

23    nonsystemic autoimmune conditions, including

24    Hashimoto's thyroiditis, right?

25    A.   Just for the record, we don't know he has

Andrew M. Schneider, M.D.

```
1    Hashimoto's thyroiditis, just that we're clear on

2    that.  It's hypothyroid, but you haven't shown me

3    any data that he has Hashimoto's.

4        Q.    Correct.  And right now I'm asking you about

5    data on Hashimoto's thyroiditis.  I think the record

6    is clear that you did not determine whether or not

7    Mr. Moore has Hashimoto's thyroiditis.

8        A.    Since it's not a memory test and I don't

9    remember seeing that, would you show me it if it's

10   true?

11       Q.    I'm not saying that --

12       A.    Okay.  It is true.

13       Q.    -- one way or another --

14       A.    Fair enough.

15       Q.    -- whether Mr. Moore has Hashimoto's

16   thyroiditis.  Right now I'm asking you about --

17       A.    You don't want to tell me.  That's fair.

18   Okay.  Sure.

19       Q.    -- data and non-Hodgkin's and Hashimoto's.

20   Do you see that?

21       A.    I do.

22       Q.    Okay.

23       A.    So what's your question.  I'm sorry?

24       Q.    Are you looking at Table 3?

25       A.    You didn't say that before, did you?
```

1    Q.   No.  I thought I saw you looking at it.

2    A.   I was just looking at the article.

3    Q.   Okay.  If you will turn with me to Table 3

4    on page 661, are you there?

5    A.   Yes.

6    Q.   Do you see that Table 3 gives the risk of

7    non-Hodgkin's lymphoma in relation to a personal

8    history of autoimmune disease stratified by time

9    interval between the development of an autoimmune

10   condition and NHL diagnosis?

11   A.   I see you have six patients with Hashimoto's

12   thyroiditis, which isn't very many, yes.

13   Q.   And in an autoimmune condition one to four

14   years prior to non-Hodgkin's lymphoma, the odds of

15   developing NHL for those with Hashimoto thyroiditis

16   were 4.9 and statistically significant, correct?

17   A.   Yes, but you have six patients.  I don't

18   think that's a fair assessment, in all honesty.

19   Q.   Did this article come up in your searches

20   when you did Google searchs for NHL and autoimmune

21   disease?

22   A.   Just to be fair, for me it's not a memory

23   test.  This is not on my reliance thing, correct?

24   Q.   It is not on your reliance list.

25   A.   So I don't know this article, nor did it

Andrew M. Schneider, M.D.

1    come up, so again, my one comment to you is I don't

2    know what you can say about six cases.  I don't

3    think that data is meaningful.

4         Q.   If we wanted to look at DLBCL specifically,

5    are there any articles that you recall reviewing

6    that did have data for Hashimoto's thyroiditis and

7    DLBCL?

8         A.   I already told you I didn't find that

9    association when I did my search, so I wouldn't be

10   able to tell you.

11             (Schneider Exhibit 22 was marked for

12   identification.)

13   BY MS. ROSS:

14        Q.   Exhibit 22 is an article, the first author

15   is Morton.

16        A.   Just give me -- give me one second, please.

17   Give me one second.  Since you gave me the article,

18   could I just look at it for a second?

19        Q.   You can.

20             MS. ROSS:  Let's go off the record.

21             THE VIDEOGRAPHER:  Off the record at

22   5:03 p.m.

23             (Recess from 5:03 p.m. until 5:03 p.m.)

24             THE VIDEOGRAPHER:  Back on the record at

25   5:03 p.m.

```
 1    BY MS. ROSS:

 2         Q.   Dr. Schneider, Exhibit 22 to your deposition

 3    is an article by Morton and colleagues entitled

 4    "Etiological heterogeneity among non-Hodgkin

 5    lymphoma subtypes."  Do you see that?

 6         A.   I'm sorry.  Where am I looking now?

 7         Q.   Exhibit 22.

 8         A.   Okay.

 9         Q.   This article is on your reliance list,

10    correct?

11         A.   Yes.

12         Q.   And Exhibit 22 includes information on a

13    variety of B-cell activating autoimmune diseases,

14    right?

15         A.   Yes.

16         Q.   If you go to Supplementary Table 2 -- and

17    tell me when you are there.

18         A.   What page is it on?

19         Q.   They are not numbered at that point since

20    you're in the supplement --

21         A.   Oh.

22         Q.   -- but it's Supplementary Table 2.

23         A.   Okay.  I'm there.

24         Q.   History of any B-cell activating autoimmune

25    disease was associated with a 2. --
```

 1       A.    Show me where you're looking.

 2       Q.    Sure.  Sorry.  Let's back up so the record

 3   is clear.  Okay?  Supplementary -- new question.

 4             Supplementary Table 2 gives the risk of NHL

 5   overall and specific NHL subtypes associated with a

 6   variety of factors.

 7             Do you see that?

 8       A.    Yes.

 9       Q.    One of those factors is history of B-cell

10   activating autoimmune disease, right?

11       A.    Yes.

12       Q.    There is a category of any B-cell activating

13   autoimmune disease, and then directly under that is

14   Hashimoto thyroiditis, right?

15       A.    Yes.

16       Q.    For Hashimoto thyroiditis, the odds ratio

17   for DLBCL and Hashimoto's was 3 --

18       A.    Sorry.  Okay.

19       Q.    -- with a 95 percent confidence interval of

20   .99 to 9.1, right?

21       A.    So it's not significant, correct.

22       Q.    That is a nonsignificant finding and you

23   would say it does not show an increased risk, true?

24             MR. HABERMAN:  Objection.

25       A.    Well, the other problem is you only have

Andrew M. Schneider, M.D.

1    seven patient -- I'm sorry.  You have 13 cases and

2    you're reporting a nonsignificant statistical

3    correlation, so, obviously, this data is not

4    helpful.

5         Q.   The overall data for a history of any B-cell

6    activating autoimmune disease is an odds ratio of

7    2.45 for DLBCL that is statistically significant,

8    right?

9         A.   Right, but that doesn't help us.

10        Q.   Mr. Moore -- well, withdrawn.

11             Why does the data on any autoimmune disease

12   not help you answer the question here?

13             MR. HABERMAN:  Objection.

14        A.   Sure.  For the reason that for any there

15   were 172 cases; for Hashimoto's there are only seven

16   -- sorry, there were 289 cases for any; only 13 for

17   Hashimoto's.  The majority of these patients had 100

18   -- or had RA, and I've discussed how RA is an

19   etiologic risk factor for diffuse large B-cell

20   lymphoma, so the any data is skewed by the -- out of

21   the 289 patients, 120 had RA, so we can say that --

22   we can say that RA is a risk factor for diffuse

23   large B-cell lymphoma but not Hashimoto's

24   thyroiditis.

25        Q.   Would you turn with me to the next page of

1    this table?

2       A.   That's -- yeah.

3       Q.   About two-thirds of the way down there is a

4    section on anthropometric factors.  Do you see that?

5       A.   I wish I knew what that meant, but okay,

6    yes.

7       Q.   We talked earlier about Mr. Moore's BMI,

8    right?

9       A.   Yes.

10      Q.   A usual adult BMI of greater than or equal

11   to 25 --

12      A.   Yes.

13      Q.   -- is associated with an increased risk of

14   DLBCL, right?

15      A.   Give me a second to look at it, so I --

16   thanks.

17           So it says young adults.  How do you -- I

18   don't know how they're defining young.

19      Q.   I'm not looking at young adult.

20      A.   Okay.

21      Q.   I'm looking at usual adult BMI --

22      A.   Okay.  Thanks.

23      Q.   -- greater than 25 is associated with --

24      A.   Okay.

25      Q.   -- a risk that's 1.32 --

1      A.   Yes.

2      Q.   -- and statistically significant, correct?

3      A.   Correct, but I do need to look at that

4   little notation to see what that means.  Where can I

5   find that -- what that means?  See that next to BMI

6   there is a little symbol?  See the symbol next to

7   BMI?

8      Q.   What are you asking me?

9      A.   I want -- I've got to find out what that --

10  the symbol means.

11     Q.   I think the best place to do that is the end

12  of this table.

13     A.   Yes.  Thank you.

14     Q.   And the symbol you're talking about is

15  accompanied by a comment -- and I think we can

16  probably agree on this, Dr. Schneider, but let me

17  just ask it for the record.  Okay?

18     A.   Sure.

19     Q.   The odds ratios in this category represent

20  risk per increasing category of an ordinal variable

21  for age of first transfusion, number of

22  transfusions, usual adult body mass index.

23          Did I read that correctly?

24     A.   Where are you reading?  I'm sorry.

25     Q.   The symbol for the -- that you were

1    referencing at the bottom of Supplementary Table 2.

2        A.    Thank you.  My eyes aren't that good.  I'm

3    sorry.  It's -- I got it.  Let me read it.  Thanks.

4              Okay.  What's your question?

5        Q.    A biostatistician might be better suited to

6    answer the specifics of the footnote for

7    Supplementary Table 2; is that fair?

8        A.    Yeah, I mean, that's fair.  It's fair.  I

9    mean --

10       Q.    My question was in Morton 2014, which you

11   relied on in forming your opinions, an BMI of

12   greater than 25 was associated with DLBCL

13   specifically, correct?

14       A.    But again, as we discussed, back to the CLL

15   issue, so he was 25.6.  Now, is that really greater

16   than 25?  I don't know.

17       Q.    Mr. Moore falls into the group in Morton

18   2014 with an adult BMI of greater than or equal to

19   25, correct?

20       A.    I didn't calculate his BMI, so I would have

21   to calculate it to see if that's really true.

22       Q.    In his medical records Mr. Moore's BMI was

23   described as being greater than or equal to 25,

24   correct?

25       A.    Just as in the medical records Mr. Pleu was

Andrew M. Schneider, M.D.

1    described as having stage zero CLL, correct.

2        Q.   You would rely on Mr. Moore's documentation

3    in his medical records as to what his BMI is, true?

4        A.   It depends.  I mean, I could or I could

5    calculate it myself, whichever you wanted me to do.

6        Q.   And in this case, in forming your expert

7    opinions about what risk factors Mr. Moore had for

8    NHL, which of those did you do?  Did you rely on his

9    medical records or calculate it yourself?

10       A.   I would rely on the medical records but I

11   would also state that, you know, there is just --

12   there's error in measurements, as we discussed

13   before, and I don't think 25.9 -- was it 25 point --

14   what was the actual number, 25 point -- do you

15   remember the number?

16       Q.   I do.

17       A.   Could you tell me?

18       Q.   25.9.

19       A.   Was it .9?

20       Q.   It was.

21       A.   All right.  So could that be 24.9?  I don't

22   know, so -- I think it's just on the borderline.

23       Q.   25.9 could also be 26.9, correct?

24       A.   Or 24.9, right.

25       Q.   You reviewed Stacey Moore's Plaintiff Fact

1    Sheet, right?

2       A.   Yes.

3       Q.   You reviewed his deposition testimony,

4    right?

5       A.   Yes.

6       Q.   At the time Mr. Moore was deposed, he was a

7    plaintiff in a lawsuit claiming Roundup caused his

8    DLBCL, right?

9       A.   True.

10      Q.   Same is true for his Plaintiff Fact Sheet,

11   right?

12      A.   Yes.

13      Q.   Your sources of information for Mr. Moore's

14   Roundup exposure were, one, his deposition; and two,

15   his Plaintiff Fact Sheet, correct?

16      A.   Yes.

17      Q.   Besides what Mr. Moore said in his sworn

18   deposition and sworn Plaintiff Fact Sheet, was there

19   any other document of any kind that you looked at to

20   determine how much Roundup Mr. Moore used?

21      A.   No.

22      Q.   Again, you did not see any receipts from

23   Mr. Moore's purchases of Roundup, true?

24      A.   True.

25      Q.   You do not have firsthand knowledge of how

1    Mr. Moore sprayed Roundup, right?

2       A.   True.

3       Q.   You did not see any photos or videos showing

4    how Mr. Moore sprayed Roundup, right?

5       A.   Correct.

6       Q.   You did not see any records of any kind from

7    before Mr. Moore filed his lawsuit that bear on the

8    question of whether he used Roundup or how much

9    Roundup he used, right?

10      A.   I didn't because there would be no reason

11   that those records would exist.

12      Q.   Again, what your numbers come from is

13   Mr. Moore trying to remember in 2022 what weed

14   control products he used going back at least three

15   decades, right?

16           MR. HABERMAN:   Objection.

17      A.   Correct.

18      Q.   If there was actual evidence that Mr. Moore

19   did not use Roundup, you would agree it could not

20   cause his lymphoma, right?

21      A.   If you're telling me he never used Roundup,

22   he lied under oath, he perjured himself, then yes, I

23   would agree.

24      Q.   If Mr. Moore was not exposed to Roundup in

25   any significant way, Roundup did not cause his

Andrew M. Schneider, M.D.

```
 1    DLBCL, correct?

 2        A.   Well, same --

 3             MR. HABERMAN:  Objection.

 4        A.   Same issue as before, that word

 5    "significant."  What do you mean by that?

 6        Q.   In order to increase the risk of DLBCL, one

 7    must actually get Roundup into their body in some

 8    way, right?

 9        A.   Right, but that's -- it doesn't mean

10    significant.  That's a different term.

11        Q.   The details of how someone gets Roundup or

12    glyphosate into their body, that's a better question

13    for some expert other than you as a clinical

14    oncologist, correct?

15             MR. HABERMAN:  Objection.

16        A.   I'm not sure I understand your question.

17    What is your question?

18        Q.   The details of how someone gets Roundup or

19    glyphosate into their body is a better question for

20    someone other than you as a treating oncologist,

21    fair?

22        A.   I didn't look at that in formulating my

23    opinions about the etiologic risk factor of Roundup

24    and lymphoma.

25        Q.   When did Mr. Moore start using Roundup?
```

1    A.   In '84, he was spraying at his mom's house.

2    Q.   Did you see in Mr. Moore's deposition that

3  at times he said that he began spraying Roundup at

4  his mom's house and at times he said he began

5  spraying Roundup for the first time when he worked

6  for Coleman Landscaping?

7    A.   I don't remember.

8    Q.   You didn't do anything to try and reconcile

9  those two statements, right?

10    A.   These are my notes.  I mean, I read the

11  depo.  I don't remember him changing his opinion

12  or --

13    Q.   Now, you state that Mr. Moore, in your

14  notes, sprayed Roundup at his mom's house from 1984

15  to 2014; is that right?

16    A.   Yes.

17    Q.   Mr. Moore also used Roundup in various

18  landscaping jobs, right?

19    A.   Correct.

20    Q.   Mr. Moore used Roundup, according to his

21  deposition, at Coleman Landscaping from 1992 to

22  1995, right?

23    A.   Right.

24    Q.   Mr. Moore went through a gallon of Roundup

25  concentrate a day personally at Coleman Landscaping,

Andrew M. Schneider, M.D.

1    correct?

2        A.   Right.

3        Q.   That was Roundup concentrate, right?

4        A.   Yes.

5        Q.   How many gallons of Roundup does one gallon

6    of concentrate make?

7             MR. HABERMAN:   Objection.

8        A.   I'm sorry.  Say it again.

9        Q.   How many gallons of Roundup does one gallon

10   of concentrate make?

11       A.   I don't think I know the answer to that

12   question.

13       Q.   What type of apparatus did Mr. Moore use to

14   spray Roundup?

15       A.   I'd have to go back and look at his

16   deposition.  I didn't write that down.

17       Q.   Does it -- withdrawn.

18            Do you remember Mr. Moore testifying that he

19   used a backpack sprayer for Roundup?

20       A.   Yeah.  So the honest truth is I don't really

21   know what these things mean nor is it important to

22   my expert testimony, and in the articles I reviewed,

23   no one talked about the different types of sprayers

24   so I didn't pay much attention to that.

25       Q.   Mr. Moore testified that his backpack

```
1    sprayer held about two gallons of Roundup.  You have

2    no reason to dispute that if that's in his

3    testimony; is that fair?

4         A.   Correct.

5         Q.   Do you have any idea how many times

6    Mr. Moore would have had to refill his backpack

7    sprayer every day to go through a gallon of Roundup

8    concentrate?

9         A.   No.

10             MR. HABERMAN:  Objection.

11        Q.   Mr. Moore also said he used Roundup at

12   various other employers, right?

13        A.   Yes.

14        Q.   None of his employers had any sort of safety

15   postings displayed, correct?

16        A.   I don't know.

17        Q.   Did you see that in his deposition

18   testimony?

19        A.   I don't remember.

20        Q.   If you will, turn with me to Page 131 of

21   Stacey Moore's deposition.

22        A.   Page 131?

23        Q.   Yes, beginning at about line 4.  Are you

24   there?

25        A.   Yep.
```

Andrew M. Schneider, M.D.

1      Q.   I'll ask my question again.  Okay?

2      A.   Uh-huh.

3      Q.   None of Mr. Moore's employers had any sort

4  of safety postings displayed, correct?

5      A.   Correct.

6      Q.   None gave warnings or instructions about

7  Roundup use, right?

8      A.   Right.

9      Q.   Mr. Moore wore no PP -- withdrawn.  I'll ask

10  that question differently.  New question.

11      A.   Sure.

12      Q.   Mr. Moore wore no personal protective

13  equipment when spraying Roundup, right?

14      A.   True.

15      Q.   Mr. Moore wore no gloves, correct?

16      A.   Correct.

17      Q.   Mr. Moore wore tennis shoes, a tank top, and

18  a pair of shorts when applying Roundup, right?

19      A.   Correct.

20      Q.   That was true when he applied Roundup at

21  home, correct?

22      A.   Yes.

23      Q.   It was also true when he applied Roundup

24  with all of his employers, right?

25      A.   Yes.

Andrew M. Schneider, M.D.

```
 1        Q.   Mr. Moore testified he got Roundup on his

 2   skin all day long when he worked as a landscaper,

 3   correct?

 4        A.   Yes.

 5        Q.   The Roundup felt wet and sticky, according

 6   to Mr. Moore, right?

 7        A.   Yes.

 8        Q.   If Mr. Moore got Roundup on him, why not

 9   wash it off with water?

10        A.   You're asking me?

11        Q.   I am.

12        A.   How could I answer for Mr. Moore?

13        Q.   Is that a question that you considered in

14   reviewing his deposition testimony on how Mr. Moore

15   used Roundup?

16        A.   My job, as I said multiple times today, as

17   the causation expert is to say does any use -- and

18   then we can talk about the categories of use -- of

19   Roundup cause lymphoma, and the answer is yes.

20        Q.   If you will turn with me to Page 139 of

21   Mr. Moore's deposition, at about Line 18, can you

22   tell me when you are there?

23        A.   Okay.  I'm there.

24        Q.   Mr. Moore testified that he was careful to

25   keep Roundup close and not hit flowers or things
```

1    other than the weeds he intended to kill, right?

2        A.    Right.

3        Q.    Can you explain the physics to me of how it

4    is that someone would get their skin covered in

5    Roundup while spraying weeds that are down on the

6    ground and not hit the flower beds next to them?

7        A.    Yeah, so that --

8            MR. HABERMAN:  Objection; improper

9        hypothetical.

10       A.    Yeah, that wouldn't be my field of

11   expertise, the physics of Roundup spraying.

12       Q.    Did you do anything to investigate

13   Mr. Moore's claimed usage of Roundup at Coleman's

14   Landscaping?

15       A.    I took his deposition at face value.

16       Q.    Did you do anything to investigate Mr.

17   Moore's claimed usage of Roundup at Hawthorne

18   Apartments?

19       A.    I took his deposition at face value.

20       Q.    Did you do anything to investigate Mr.

21   Moore's claimed usage of Roundup at The Reserve?

22       A.    I took his deposition at face value.

23       Q.    Mr. Moore did not ever have any measurements

24   taken that showed the presence of glyphosate in his

25   blood, urine, or any body tissue, right?

1    A.   I don't think anybody did in those days.

2    Q.   Do you know whether such tests exist?

3    A.   Today?

4    Q.   At any point.

5    A.   I don't know.

6    Q.   Mr. Moore continued to use Roundup through

7    2020 when he saw lawyer advertisements, right?

8    A.   Yes.

9    Q.   Can you point me toward any test at any time

10   that would confirm that Stacey Moore had measurable

11   glyphosate in his body?

12   A.   None was done, so I can't.

13   Q.   You have not done anything to investigates

14   how much glyphosate Mr. Moore actually absorbed,

15   true?

16   A.   Those questions are better asked to a

17   toxicologist.  I wouldn't know what to do with the

18   information.

19   Q.   You don't know whether it's possible that

20   Stacey Moore never had measurable glyphosate in his

21   body, right?

22   A.   Nor would I know if it matters.

23   Q.   You cannot point me toward any actual

24   medical data that would answer the question of

25   whether Stacey Moore had measurable glyphosate in

1    his body, right?

2        A.    So with all due respect, you're asking

3    toxicology questions and I'm a clinical oncologist.

4        Q.    You might speculate that -- okay.  So let me

5    see if we can cut some of this off.  Okay?  New

6    question.  All right?

7        A.    Sure.

8        Q.    You could speculate as to whether Stacey

9    Moore had systemic exposure to glyphosate but

10   because you are not a toxicologist, that is outside

11   of your field of expertise; is that fair?

12            MR. HABERMAN:  Objection.

13       A.    I can tell you he was exposed to Roundup

14   based upon his deposition.  I can't tell you the

15   concentrations he absorbed.

16       Q.    And when you say you can't tell me the

17   concentrations he absorbed, you are not relying on

18   any measurement of glyphosate in Mr. Moore's body,

19   correct?

20       A.    I don't need to to give my opinion because

21   none of the articles that I looked at talked about

22   that.

23       Q.    Are you relying on any measurement of

24   glyphosate in Stacey Moore's body?

25       A.    No.

```
 1              MR. HABERMAN:  Objection.

 2      Q.   Are you relying on any estimation or

 3   calculation of glyphosate in Stacey Moore's body for

 4   any of your opinions?

 5      A.   No.

 6      Q.   Let's talk about some of the particular

 7   studies that you relied on to conclude Roundup is a

 8   cause of non-Hodgkin's lymphoma.  Okay?

 9              THE WITNESS:  What's that?

10              MR. HABERMAN:  That's okay.  I object to

11      that question.  I have to take a five-minute

12      break.

13              MS. ROSS:  Let's go off the record.

14              THE VIDEOGRAPHER:  Okay.  Off the record at

15      5:21 p.m.

16         (Recess from 5:21 p.m. until 5:29 p.m.)

17              THE VIDEOGRAPHER:  Back on the record at

18      5:29 p.m.

19   BY MS. ROSS:

20      Q.   Dr. Schneider, I want to start with the most

21   recent article on Roundup and non-Hodgkin's lymphoma

22   you've reviewed.

23      A.   Okay.

24      Q.   That is the Meloni 2021, correct?

25      A.   Okay.
```

```
 1              (Schneider Exhibit 23 was marked for

 2     identification.)

 3     BY MS. ROSS:

 4         Q.   Meloni 2021 is Exhibit 23 to your

 5     deposition, right?

 6         A.   Yes.

 7              MS. ROSS:  I almost gave you my copy, Jeff.

 8         Q.   Meloni 2021 is a case-control study of

 9     occupational exposure to glyphosate and risk of

10     lymphoma, right?

11         A.   Yes.

12         Q.   The study was conducted in Italy, correct?

13         A.   Yes.

14         Q.   This study was not in the United States,

15     right?

16         A.   Yes.

17         Q.   If you will go with me to Table 3 of Meloni,

18     are you there?

19         A.   Yes.

20         Q.   The odds ratio for non-Hodgkin's lymphoma

21     and being ever exposed to glyphosate was 1.4, right?

22         A.   Just give me a second.  We're at Table 3?

23         Q.   We're at Table 3, yes.

24         A.   Okay.  Yes, got it, 1.4.

25         Q.   And that was for NHL overall, right?
```

1      A.    Correct.

2      Q.    Meloni also looked at subtypes of

3   non-Hodgkin's lymphoma, right?

4      A.    Yes.

5      Q.    The odds ratio of CLL in those ever exposed

6   to glyphosate was .6.  Do you see that?

7      A.    Diffuse large B-cell lymphoma, ever

8   exposed --

9      Q.    My question was CLL, but we can go in that

10   order.

11      A.    Oh, I'm sorry.

12      Q.    No, you're fine.

13      A.    Okay.  CLL.

14      Q.    New question.

15      A.    Okay.

16      Q.    We can start with DLBCL.  All right?

17      A.    Okay.  Yes.

18      Q.    The odds ratio for being ever exposed to

19   glyphosate and having DLBCL was .8 in Meloni, right?

20      A.    Yes.  Yes.

21      Q.    The 95 percent confidence interval is .1 to

22   6.62, right?

23      A.    Yes.

24      Q.    That -- this odds ratio does not mean that

25   glyphosate decreased the risk of DLBCL by 80 -- or

1    I'm sorry.  New question.  Let me just ask it this

2    way.

3            Does an odds ratio of .8 mean that

4    glyphosate exposure decreased the risk of DLBCL by

5    20 percent?

6            MR. HABERMAN:  Objection.

7        A.  I don't honestly know.  I'm not a

8    statistician but it's not a significant number, so

9    it's -- it's not a -- it's not a number greater than

10   one and, indeed, it's not significant.

11       Q.  If a confidence interval includes 1.0, we

12   cannot say there is a difference between the exposed

13   and unexposed groups, right?

14       A.  Correct.

15       Q.  Confidence intervals are important because

16   while two numbers can be different, statistics are

17   used to say if they are truly different, right?

18           MR. HABERMAN:  Objection.

19       Q.  Dr. Schneider?

20       A.  Yeah, I'm -- I'm sorry.

21       Q.  Do you remember my question?

22       A.  You know what would be fair, though, since

23   -- you know, I've reviewed a lot of articles.  I'd

24   like to spend, like, three minutes reviewing the

25   article again so I can answer questions more

Andrew M. Schneider, M.D.

```
 1      effectively.

 2           Q.   Sure.  Let's go off the record and you can

 3      take all the time you need.

 4           A.   Okay.  There's so many articles --

 5                MR. HABERMAN:  No, it's got to be done on

 6           the record.  We're not going off the record.

 7                MS. ROSS:  No, it doesn't.

 8                MR. HABERMAN:  Yes, it does.

 9                MS. ROSS:  This is something that is on your

10           expert's reliance list.

11                MR. HABERMAN:  Okay.  And he's asked -- this

12           is done all the time.  This is, like, routine.

13           If you want to show him an article, he's entitled

14           to look at it.  It doesn't mean we have to go off

15           the record for him to look at it.

16                MS. ROSS:  He can take as much time as he

17           wants to review the article if we go off the

18           record.

19                MR. HABERMAN:  We're not going off the

20           record.

21                MS. ROSS:  So I will note that Dr. Schneider

22           right now is reviewing one of the articles on his

23           reliance list, which is fine.  If we need to do

24           this for every article that he has reviewed that

25           is on his reliance list, we may need to come back
```

```
 1      to some of these articles when we come back for

 2      other issues.

 3  BY MS. ROSS:

 4      A.   I'm ready here.

 5      Q.   You're ready to answer my questions about

 6  Meloni 2021?

 7      A.   I am.

 8      Q.   I'm going to repeat my last question so the

 9  record is clear.  All right, Dr. Schneider?

10      A.   Yes.

11      Q.   Confidence intervals are important because

12  while two numbers can appear different, statistics

13  are used to say if they are truly different, right?

14      A.   Correct.

15      Q.   Meloni 2021 does not show an increased risk

16  of CLL in glyphosate users, right?

17      A.   Correct.

18      Q.   Meloni 2021 does not show an increased risk

19  of DLBCL in glyphosate users, right?

20      A.   Yes.

21      Q.   There are no data in Meloni 2021 for

22  monoclonal B-cell lymphocytosis, right?

23      A.   Correct.

24      Q.   For your opinions are you relying on data

25  for non-Hodgkin's lymphoma overall, or for subtypes?
```

1      A.   For my opinion about the Meloni article or

2   in general?

3      Q.   For your opinions on whether Roundup causes

4   cancer and whether Roundup caused Mr. Moore or

5   Mr. Pleu to develop cancer, are you relying on data

6   for NHL overall or are you relying on data for

7   subtypes?

8           MR. HABERMAN:  Objection; compound.

9      A.   Sure.  So both.  I'm going to -- the best

10   data is when we break it down, so I'm going to look

11   at the diffuse large B-cell lymphoma data and the

12   CLL data when I can, and then when I can't, we'll go

13   to all NHL.

14      Q.   For what you think is a risk factor for

15   NHL -- well, withdrawn.

16           So just so I understand when we go forward,

17   there are a number of articles that we're going to

18   talk about that looked at glyphosate-based

19   formulations and subtypes of non-Hodgkin's lymphoma

20   and then also non-Hodgkin's lymphoma overall, right?

21      A.   Yes.

22      Q.   You looked at both the data for

23   non-Hodgkin's lymphoma overall and for subtypes,

24   correct?

25      A.   Correct.

```
 1        Q.   Are you relying more on the data for

 2   non-Hodgkin's lymphoma overall, more on the data for

 3   subtypes, or are you relying on both of those pieces

 4   of information?

 5        A.   I rely on all the data and try to put it

 6   together.

 7        Q.   Okay.  So for a study like Meloni 2021, that

 8   looked at both NHL overall and subtypes, you looked

 9   at both the numbers for NHL overall and for the

10   subtypes that particular plaintiffs had, correct?

11        A.   Yes.

12        Q.   Mr. Moore would fall into the group in

13   Meloni 2021 with DLBCL with a risk of .8 that was

14   not statistically significant, right?

15        A.   Correct.

16        Q.   Mr. Pleu, in your view, would fall into the

17   group in Meloni 2021 with CLL with a risk of .6 that

18   was not statistically significant, right?

19        A.   Correct.

20        Q.   If you will turn with me to Page 2 of Meloni

21   2021, there is a paragraph near the bottom of the

22   right column and one of the last sentences begins:

23   Based on the above described information --

24        A.   I'm sorry.  Where are you reading from?

25        Q.   Right column.
```

Andrew M. Schneider, M.D.

```
 1        A.   Right column, yes.

 2        Q.   Just below or just above the A and B.   Do

 3   you see --

 4        A.   I've got it.   Yes.

 5        Q.   Okay.   This article states:   Based on the

 6   above-described information, and with the support of

 7   a crop exposure matrix, occupational physicians and

 8   industrial hygienists with expertise in the

 9   retrospective assessment of agricultural exposures

10   assessed exposure to glyphosate using

11   semiquantitative indicators.

12             Do you see that?

13        A.   I do.

14        Q.   Meloni used a crop exposure matrix to

15   determine glyphosate exposure.   Do you know what

16   that is?

17        A.   I do not.

18        Q.   Meloni did not ask people directly "Did you

19   use glyphosate?"   They calculated glyphosate

20   exposure in a different way.   Do you know whether

21   it's more accurate to ask people if they used a

22   pesticide or to try and guess which pesticide they

23   used based on what crops they farmed?

24             MR. HABERMAN:   Objection.

25        A.   That would better be asked to an
```

1    epidemiologist.  I can give you an opinion but it's

2    not evidence-based or based upon anything that I do

3    for a living every day.

4        Q.   You'd defer that question to an

5    epidemiologist; is that fair?

6        A.   Yes.

7        Q.   Meloni did not adjust for other pesticides,

8    right?

9        A.   Correct.

10       Q.   Another recent study you reviewed on

11   Roundup --

12       A.   Wait.  Can we just -- may I criticize this

13   study, or I don't get a chance to do that?

14       Q.   If your counsel wants to ask you questions,

15   you are absolutely welcome to, but right now you're

16   here to answer my questions, so I'm going to ask my

17   next one.  All right?

18       A.   But I just want to make a comment then.

19   It's fine but -- so I don't get a chance to say why

20   I think the results aren't legitimate?

21       Q.   You can do that on direct examination with

22   your counsel --

23       A.   Okay.

24       Q.   -- but I need to get through my questions

25   today and we have limited time.

```
1      A.   Okay.  Is this mine to keep?

2           MR. HABERMAN:  It's the court reporter's.

3      Q.   For the purposes of the deposition --

4      A.   I can write on it, though, right?

5      Q.   I would not write on it, no.

6      A.   Okay.

7           (Schneider Exhibit 24 was marked for

8   identification.)

9   BY MS. ROSS:

10     Q.   Exhibit 24 is a study by Leon and colleagues

11  published in 2019.  Do you see that?

12     A.   This study I know very well, so I won't have

13  to read it again.

14     Q.   You've reviewed the study and it is on your --

15     A.   I reviewed them all but some I reviewed 20

16  times and some one time, so the ones I don't

17  remember that well I'll review again.  This one I

18  know very well.

19     Q.   Why did you review this study 20 times?

20     A.   I thought it was important and I wanted to

21  make sure I knew it well to talk about it.

22     Q.   Leon 2019 is a pooled consortium of

23  agricultural cohort studies, correct?

24     A.   Correct.

25     Q.   If you will turn with me to Page 3, do you
```

1    see there is a section on the different cohorts that

2    were included?

3        A.    I do.

4        Q.    One of the cohorts that was included in this

5    study is the Agricultural Health Study, right?

6        A.    Correct.

7        Q.    And it's sometimes abbreviated AHS, right?

8        A.    Correct.

9        Q.    AHS enrolled over 50,000 participants,

10   correct?

11       A.    Correct.

12       Q.    AHS included farmers and commercial

13   pesticide applicators, right?

14       A.    Yes.

15       Q.    Cohort members were enrolled in 1993 to

16   1997, right?

17       A.    Yes.

18       Q.    They have been followed since that time,

19   correct?

20       A.    Yes.

21       Q.    It's now 2022 as we're sitting here in your

22   deposition today, correct?

23       A.    Yes.

24       Q.    AHS has 25-plus years of follow-up, correct?

25       A.    Yes.

Andrew M. Schneider, M.D.

```
 1        Q.   Are you aware of any other prospective

 2   cohort study that directly looked at glyphosate

 3   exposure and cancer?

 4        A.   So the only one that I know of that was

 5   prospective was the Andreotti study, which is the

 6   2018 AHS study.

 7        Q.   There was also an earlier publication of

 8   Agricultural Health Study data in --

 9        A.   2005, yes.

10        Q.   -- 2005, correct?

11        A.   Correct.

12        Q.   If you will turn with me to Page 8 of Leon

13   2019, and tell me when you are there.

14        A.   I'm there.

15        Q.   Table 2 of Leon gives data for ever use of

16   different pesticide chemical groups and

17   non-Hodgkin's lymphoma overall and subtypes, right?

18        A.   Yes.

19        Q.   For glyphosate, the meta relative risk in

20   Leon for NHL with glyphosate exposure is .95 with a

21   95 percent confidence interval of .77 to 1.18,

22   right?

23        A.   Right.

24        Q.   If he had NHL, Mr. Pleu would fall into the

25   ever users in Table 2 of Leon with a risk of .95,
```

1    correct?

2        A.   Right, but there are breakdowns of the

3    studies and actually one of the studies shows a

4    significant finding of diffuse large B-cell lymphoma

5    with glyphosate, that being the -- I believe the

6    Norwegian study.

7        Q.   We were talking about Mr. Pleu who has CLL.

8        A.   I'm sorry.

9        Q.   That's all right.

10       A.   We're going to do both at the same time,

11   aren't we?  I apologize.

12       Q.   That's fine.

13       A.   Go ahead.

14       Q.   Okay.  I'll reask my question.

15       A.   Yeah.

16       Q.   If he had NHL, Mr. Pleu would fall into the

17   ever users in Table 2 of Leon 2019 with a risk of

18   .95, correct?

19       A.   Correct.  Correct.

20       Q.   Mr. Pleu, if he had CLL, would also fall

21   into the category of ever users with a risk of .92

22   for CLL and a 95 percent confidence interval of .69

23   to 1.24, correct?

24       A.   Correct.

25       Q.   Does that mean that Leon 2019 shows an eight

1    percent decrease in the risk of CLL for folks

2    exposed to Roundup?

3        A.   Again, I'm not a statistician but that seems

4    to be what it's saying.

5        Q.   The meta relative risk for CLL with

6    glyphosate exposure in Leon we just covered, right?

7    That's .92 with a nonsignificant confidence

8    interval, true?

9        A.   Correct.  Correct.

10       Q.   Mr. Moore had DLBCL, right?

11       A.   Correct.

12       Q.   We'll start with the overall NHL results and

13   then move to the subgroup.  Okay?

14       A.   Okay.

15       Q.   Mr. Moore would fall into the group in Leon

16   2019 for NHL overall with a hazard ratio of .95

17   that's nonsignificant, right?

18       A.   Just give me a second to read across.

19            Sorry.  So what did you say the number was?

20       Q.   So for NHL overall -- are you there with me?

21       A.   Okay.  Yes.

22       Q.   Okay.  So for NHL overall --

23       A.   Yeah.

24       Q.   -- Mr. Moore would fall into the category of

25   glyphosate-exposed folks with a hazard ratio of .95

Andrew M. Schneider, M.D.

```
 1    that's nonsignificant, right?
 2        A.   Correct.
 3        Q.   For DLBCL, Mr. Moore falls into the group in
 4    Leon 2019 with a hazard ratio of 1.36 and a 95
 5    percent confidence interval of 1.0 to 1.85, correct?
 6        A.   Correct.
 7        Q.   If the 95 percent confidence
 8    interval includes -- well, let's break that up.
 9             In Leon 2019 -- new question:  In Leon 2019,
10    the 95 percent confidence interval for DLBCL
11    includes 1.00, correct?
12        A.   Correct.
13        Q.   If a 95 percent confidence interval includes
14    1.0, we cannot say that that study showed a
15    statistically significant increased risk, correct?
16        A.   Just as you said before, it's borderline but
17    it's not there, correct.
18        Q.   You mentioned that there were different
19    agricultural cohorts that looked at DLBCL in Leon
20    2019, right?
21        A.   Correct.
22        Q.   Now, one of those was AGRICAN?
23        A.   Yes.
24        Q.   Right?
25        A.   Uh-huh.
```

Andrew M. Schneider, M.D.

1    Q.   And that showed a hazard ratio of 1.67 with

2    a 95 percent confidence interval of 1.05 to 2.65,

3    correct?

4    A.   Just to orient me, where are we looking?

5    Q.   Sure.  Page 7.

6    A.   Okay.  Under diffuse large B-cell lymphoma?

7    Q.   Yes.

8    A.   Okay.

9    Q.   Do you want me to repeat the question?

10   A.   Just let me read it and then you can ask it.

11   Q.   Sure.

12   A.   You can go ahead.

13   Q.   In AGRICAN --

14   A.   Yes.

15   Q.   -- the hazard ratio for DLBCL was 1.67 with

16   a 95 percent confidence interval of 1.05 to 2.65,

17   correct?

18   A.   Correct.

19   Q.   In CNAP the hazard ratio for DLBCL was 1.2,

20   with a 95 percent confidence interval of .72 to

21   1.98, correct?

22   A.   Correct.  Uh-huh.

23   Q.   In -- I'm sorry.  Actually, I think we're

24   going to revise those because I don't think I was

25   right, so let me ask those questions again.  Okay?

Andrew M. Schneider, M.D.

```
1        A.   You were -- you were reading from here,

2   right?

3        Q.   I was but I -- new question:  So there is a

4   sentence on Page 7 of Leon 2019 that states:  The

5   cohort specific hazard ratios for ever use of

6   glyphosate in DLBCL were --

7        A.   Right.

8        Q.   -- and then gives three hazard ratios.  Do

9   you see that?

10       A.   I do.

11       Q.   For AGRICAN, the first of the cohort

12   studies, the hazard ratio was 1.06 with a 95 percent

13   confidence interval of .51 to 2.19, right?

14       A.   Yes.

15       Q.   For CNAP --

16       A.   That's the one, right.  Correct.

17       Q.   -- the hazard ratio was 1.67 with a

18   confidence interval of 1.05 to 2.65, correct?

19       A.   So that one is statistically significant.

20       Q.   For AHS the hazard ratio was 1.20 with a 95

21   percent confidence interval of .72 to 1.98, correct?

22       A.   Correct.

23       Q.   That hazard ratio for DLBCL in AHS that we

24   just read, that was the data included in Leon 2019,

25   right?
```

```
 1        A.    Yes.

 2        Q.    If you will go to Page 3 of Leon with me and

 3   tell me when you're there.

 4        A.    Page 3?

 5        Q.    Yes.

 6        A.    Okay.

 7        Q.    When we're talking about these three

 8   different cohorts, data on those different cohorts

 9   is given on Page 3 in their specifics.  Do you see

10   that?

11        A.    I do.

12        Q.    AGRICAN used crop-exposure matrices to

13   determine who was exposed to what pesticide,

14   correct?

15        A.    Yes.

16        Q.    CNAP used crop-exposure matrices to

17   determine who was exposed to what pesticide, right?

18        A.    Yes.

19        Q.    AHS asked people "Did you use glyphosate?"

20   correct?

21        A.    Correct.

22        Q.    On Page 3 you will see that the linkage for

23   AHS for the Leon study included data until December

24   2001 in Iowa and December 2010 in North Carolina.

25   Do you see that?
```

```
 1      A.   Show me where.

 2      Q.   Top left -- I'm sorry, top right column.

 3      A.   Page 3, top right?

 4      Q.   Yes.

 5      A.   Yes.

 6      Q.   Do you see where it says:  This study

 7   includes linkages until 31 December 2011 in Iowa and

 8   31 December 2010 in North Carolina?

 9      A.   Which paragraph?

10      Q.   The very first one at the top.

11      A.   I'm not sure where you're reading.

12      Q.   The last sentence of the top paragraph

13   begins  "this study."

14      A.   What's -- how does it begin?

15      Q.   "This study includes linkages."

16      A.   Got it.  Yes.

17      Q.   Leon 2019 included data from AHS through

18   December 2011 in Iowa and December of 2010 in North

19   Carolina, correct?

20      A.   Yes.

21      Q.   Do you recall sitting here whether Andreotti

22   included more data from the Agricultural Health

23   Study than is present in Leon 2019?

24      A.   I thought it was the same number.  I thought

25   it was 50,000 patients.
```

1      Q.   In terms of follow-up and diagnoses of

2   cancer, do you know if Andreotti included the same

3   data as Leon 2019 or more data?

4      A.   No.  It was an additional 11 years from the

5   2005 study, so -- what year did this guy go up to?

6   I don't know.

7      Q.   We can come back to that and look at the

8   Andreotti paper.

9      A.   Okay.

10      Q.   Okay.

11      A.   So just so I -- so I understand the format

12   here, so I don't get a chance to -- I'm just going

13   to read the numbers and not have any say and no

14   questions about what I think or what it means,

15   nothing?

16      Q.   That's correct.  If your counsel wants you

17   to answer question, you can do whatever you want

18   when --

19      A.   I'm just going to acknowledge everything --

20         MR. HABERMAN:  You can respond to the

21      question the way you want to respond to the

22      question.  If you feel there is information that

23      would be relevant to your response, you can add

24      that in your response.

25      A.   I mean, you don't want my critique of

1    anything, right?

2        Q.   Right now I would --

3        A.   You just want me to acknowledge what the

4    paper says.

5        Q.   -- really appreciate it if you would answer

6    my questions?

7        A.   Okay.

8        Q.   Is that all right, Dr. Schneider?

9        A.   I'm just --

10           MR. HABERMAN:  You are allowed to answer the

11       question the way you feel would appropriately

12       respond to her question.

13       A.   All right.  I'm ready for your next

14   question.  So -- well, in conclusion, we have

15   evidence that you presented that the --

16       Q.   There is no question pending but let me ask

17   you one and then you can -- well --

18       A.   Okay.

19       Q.   If there is something that is not addressed

20   in my questions today that you wish to speak about,

21   you understand that your counsel has an opportunity

22   to ask you questions, right?

23       A.   Can we go off the record?  Or I'll stay on

24   the record.

25       Q.   No, just on the record.

```
 1      A.   On the record, my usual experience is I --
 2   when someone says, you know, this counter doesn't
 3   agree with your interpretation, I get a chance to
 4   explain, well, why it does or does not, but you
 5   don't seem to want to -- you don't -- you're not
 6   interested in my opinions, you don't want to hear
 7   why I disagree or agree with the article and
 8   criticize the articles, right?
 9      Q.   Right now I would like for you to answer my
10   questions because we have limited time here today
11   and if you have additional points you want to make,
12   we can do that.
13      A.   I mean, with all due respect, we're just
14   regurgitating what the article says.  I'm just
15   saying -- I'm just saying "Yes, this is what it
16   says."  You don't -- you really don't need me to do
17   that.  That's -- it says what it says.
18          (Schneider Exhibit 25 was marked for
19   identification.)
20   BY MS. ROSS:
21      Q.   Exhibit 25 to your deposition is another
22   article that you reviewed and relied on by Pahwa and
23   colleagues.  Do you see that?
24      A.   This is the 2020 -- '19?
25      Q.   This is Pahwa 2019, correct.
```

1       A.   Yes.  I know this article well, yes.

2       Q.   Did you consider Pahwa 2019 to be a

3    well-conducted study?

4       A.   It was a pooled analysis and I thought it

5    had some merits, yes.

6       Q.   Pahwa 2019 includes more data than any of

7    the earlier published case-control studies in the

8    United States or Canada, correct?

9       A.   Yes.

10      Q.   If you will turn with me to Page 2, there's

11   a paragraph that starts "In the 1980s and 1990s."

12   It's the first full paragraph on that page.  Do you

13   see where that is?

14      A.   Okay.  I do.  Uh-huh.

15      Q.   In that paragraph Pahwa and colleagues

16   explain the studies that they included and there are

17   references to Numbers 9 and 10.  Do you see that?

18      A.   I do.

19      Q.   Number 9 is McDuffie 2001, correct?

20      A.   Correct.

21      Q.   Number 10 is De Roos 2003, right?

22      A.   Yes.

23      Q.   Pahwa 2019 includes all of the Canadian

24   glyphosate cases in McDuffie 2001, right?

25      A.   Yes.

Andrew M. Schneider, M.D.

1       Q.   Pahwa 2019 also includes all of the

2   glyphosate cases in De Roos 2003, correct?

3       A.   Yes.

4       Q.   Pahwa 2019 also includes additional data not

5   captured in either of those studies, right?

6       A.   Yes.

7       Q.   Right now McDuffie 2001 and De Roos 2003 are

8   subsets of Pahwa, true?

9       A.   True.

10       Q.   You looked at McDuffie 2001 and De Roos

11   2003, but you also looked at Pahwa 2019, right?

12       A.   Correct.

13       Q.   Pahwa looked at NHL overall and at various

14   subtypes of non-Hodgkin's lymphoma, right?

15       A.   Yes.

16       Q.   Pahwa included SLL but specifically excluded

17   CLL.  Did you see that?

18       A.   Show me where it says that.  I'm sure it

19   should say it but I just don't remember.

20       Q.   If you will turn to Page 8 with me.

21       A.   Yes.

22       Q.   All right.  Go to the paragraph that begins

23   "NHL is a constellation of heterogeneous cancers" on

24   the right column.  Are you there?

25       A.   Uh-huh.

1    Q.   Do you agree that NHL is a constellation of

2    heterogeneous cancers with different biological

3    properties --

4    A.   Yes.

5    Q.   -- and they have distinct etiologies?

6    A.   Yes.

7         MR. HABERMAN:   Objection.

8    Q.   In the most recent classification scheme,

9    SLL and CLL are classified together, right?

10   A.   Correct.

11   Q.   The analysis by Pahwa only includes SLL,

12   correct?

13   A.   I'm sure you -- it says that down below?

14   Q.   It does.

15   A.   Where does it say that?

16   Q.   Do you see the sentence that begins "For

17   example, in the most recent classification scheme,"

18   in the same paragraph you were just reading from?

19   A.   Yes.  Yes.  Yeah.

20   Q.   Okay.  So I'll repeat my question just so

21   our record is clear.

22   A.   I see it.  I got it.  Yeah.

23   Q.   Pahwa 2019 included SLL but specifically

24   excluded CLL, right?

25   A.   Right.  It only included SLL, correct.

Andrew M. Schneider, M.D.

1      Q.   So for Mr. Pleu, for example, we should look

2   at the data for NHL overall, correct?

3      A.   No, I would disagree.   So SLL and CLL are

4   the same diseases.   They behave the same way.   They

5   are the same, so we now know that based upon the WHO

6   criteria.   So we should look at CLL or SLL.

7      Q.   For the data that as they apply to Mr. Pleu

8   and Mr. Moore --

9      A.   Yes.

10      Q.   -- and your opinion that Roundup caused each

11   of their cancers, you looked at the data for both

12   NHL overall and for specific subtypes in Pahwa 2019,

13   right?

14      A.   So as I've told you, what I like to do is,

15   when I have data about these distinct type of NHL,

16   I'll go to that, and the SLL data, although it

17   doesn't include CLL, is the pertinent data to use

18   here.

19      Q.   If --

20      A.   Wait.   I'm not done.

21      Q.   Oh, go ahead.

22      A.   So we have to use the SLL data, and my

23   opinion is if they included CLL, it would only

24   bolster and make the numbers even better.

25      Q.   If a patient had CLL and did not have SLL --

1      A.    They're the same disease.

2      Q.    Let me -- can I finish my question?

3      A.    Sure.

4      Q.    Okay.  So you did not see anything in

5  Mr. Pleu's medical records diagnosing him with

6  lymphadenopathy or involvement of any lymph node,

7  right?

8      A.    Correct, but it's my opinion that CLL and

9  SLL are the same disease.

10      Q.    And in a study like Pahwa 2019, that looks

11  at all cases of non-Hodgkin's lymphoma and then

12  looks at specific subtypes, Mr. Pleu would fall in a

13  particular category in terms of the analysis that

14  these authors did, correct?

15      A.    I don't know because I don't know where they

16  included CLL but -- I mean, did they put CLL into

17  NHL?  Were there any CLL patients?  I don't know.

18      Q.    You don't know sitting here today where a

19  CLL patient would have actually fallen in Pahwa

20  2019, right?

21      A.    Without, again, going through the details of

22  the article, unless you want to tell me, I don't

23  know it off the top of my head.  It may say it in

24  the article, I just don't have that memorized, but

25  I'm absolutely positive that we need to look at the

1    SLL data for Mr. Pleu.

2        Q.   Would you also look at the NHL overall data

3    in a study like Pahwa 2019?

4        A.   I would say that the SLL data trumps the NHL

5    data because, as we discussed, the NHL data is all

6    types of lymphomas.  I think we have great evidence

7    here for the association of CLL/SLL and glyphosate.

8        Q.   There are no data in Pahwa 2019 for

9    monoclonal B-cell lymphocytosis, correct?

10       A.   Correct, although I don't even know where

11   those patients would fit because we don't even know

12   where the CLL patients would fit or even if they

13   were included, and again, we can go back and look at

14   the patient population, or you can just tell me, if

15   you know, because I don't know off the top of my

16   head.

17       Q.   I will represent to you that nothing in the

18   methods section of this paper makes it clear where

19   CLL patients would be included, other than that they

20   are not included in the SLL analysis.

21       A.   Right.  So, therefore, it's my opinion as a

22   trained board certified medical oncologist that to

23   interpret data we have to look at the SLL data and

24   not the overall NHL data.

25       Q.   And that is your opinion despite knowing

Andrew M. Schneider, M.D.

1    that for Pahwa 2019, patients with CLL were

2    specifically excluded from the SLL analyses?

3         MR. HABERMAN:  Objection.

4    A.    It doesn't matter because we know -- we now

5    know they're the same disease.  CLL and SLL are the

6    same disease, so if they would have included the CLL

7    patients, the numbers would have been higher and

8    even better.  So to me, this article is excellent

9    validation that glyphosate is an etiologic cause of

10   CLL/SLL, the same disease.

11   Q.    If you will turn with me to Page 3 of Pahwa

12   2019, the authors of Pahwa discuss here how they

13   evaluated whether the use of other pesticides might

14   have confounded the association between specific

15   pesticides, such as glyphosate and NHL, correct?

16   A.    Correct.

17   Q.    Pahwa and her coauthors chose to adjust for

18   2,4-D, dicamba, and malathion in their analyses.  Do

19   you see that?

20   A.    Yes.

21   Q.    You do not have any criticism of the Pahwa

22   authors' choice to adjust for 2,4-D, dicamba, and

23   malathion, correct?

24   A.    That's not my field of expertise.  I

25   wouldn't be able to --

1    Q.   Is it a good thing that they adjusted?

2         MR. HABERMAN:  Objection.

3    A.   I would think so but that's probably better

4    asked to an epidemiologist.

5    Q.   You told us earlier you're not an expert on

6    2,4-D, dicamba, or malathion, right?

7    A.   Correct.

8    Q.   You have not evaluated the scientific

9    literature to determine whether 2,4-D, dicamba, or

10   malathion, increased the risk of non-Hodgkin's

11   lymphoma, right?

12   A.   Correct.

13   Q.   Nevertheless, you can confirm from your

14   review of the IARC Monograph that 2,4-D, dicamba,

15   and malathion are associated with NHL in at least

16   some studies, right?

17   A.   Correct.

18   Q.   Let's take malathion as one example of that.

19   I think you told me earlier that because Mr. Pleu

20   and Mr. Moore did not use malathion, you would want

21   to look at data specific to glyphosate in folks who

22   did not also use malathion, right?

23        MR. HABERMAN:  Objection.

24   A.   So, I'm sorry, as it gets later and later,

25   I'm going to have to ask you to repeat things again,

1    so I -- I didn't catch it.  I'm sorry.

2        Q.    Sure.  I think you told me earlier that

3    because Mr. Pleu and Mr. Moore did not use

4    malathion, you would want to look at data specific

5    to glyphosate in folks who did not also use

6    malathion, right?

7        A.    I'm not sure I understand what you're

8    saying, I'm sorry.

9        Q.    If you have data for people who use just

10   glyphosate --

11       A.    Uh-huh.

12       Q.    -- glyphosate and malathion --

13       A.    Uh-huh.

14       Q.    -- and just malathion --

15       A.    Uh-huh.

16       Q.    -- which of those data apply to Mr. Pleu and

17   Mr. Moore?

18       A.    Just the glyphosate data.

19       Q.    One of the articles cited in Pahwa 2019 is

20   an article by Hohenadel published in 2011.

21       A.    Yes.

22       Q.    Did you review that study?

23       A.    Yes.  Wait.  Make sure I get it right.

24   What's the name?

25       Q.    Hohenadel 2011.

1      A.   Is this on my reliance list?  I don't

2   remember, no.

3      Q.   It's not, which is why I'm asking.

4      A.   I don't -- I don't remember.

5      Q.   Okay.

6      A.   I don't think I did.

7      Q.   Okay.  If Hohenadel looked at people who

8   just used glyphosate, people who used glyphosate and

9   malathion, and people who used malathion, is that a

10  study that you would want to consider in arriving at

11  your opinion as to whether glyphosate is associated

12  with non-Hodgkin's lymphoma?

13     A.   I mean, I want to look at all studies, so if

14  you want to show me the study, I'd be happy to look

15  at it.  Are we done with this study?  This study

16  supports my opinions.  Are we going to go through

17  it?

18     Q.   I'll ask you the questions that I'm going to

19  ask you about it.  In the meantime, I'm handing you

20  Exhibit --

21     A.   This study shows significant for CLL and

22  diffuse large B-cell lymphoma.  This is a very

23  supportive study for Plaintiff's opinion.

24          (Schneider Exhibit 26 was marked for

25  identification.)

1    BY MS. ROSS:

2        Q.   Exhibit 26 --

3        A.   So we're done with this article?

4        Q.   No, but I get to ask my questions in the

5    order I'd like to ask them.

6        A.   So we're going back and forth?

7        Q.   Correct.  Right now I'm asking you a

8    question about Hohenadel 2011.

9        A.   So since it's not on my reliance list and

10   it's the first time I'm seeing it, I'll have to read

11   it.

12            THE VIDEOGRAPHER:  I need to change tapes.

13            MS. ROSS:  We're going off the record.

14            THE WITNESS:  So I'll start reading it.

15            MS. ROSS:  Go for it.

16            THE VIDEOGRAPHER:  Okay.  Off the record at

17       6:04 p.m.

18            (Recess from 6:04 p.m. until 6:12 p.m.)

19            THE VIDEOGRAPHER:  This begins Media Unit

20       Number 4, and we're back on the record at

21       6:12 p.m.

22   BY MS. ROSS:

23       Q.   Dr. Schneider, Exhibit 26 to your deposition

24   is Hohenadel 2011.  Do you see that?

25       A.   Just for the record, an article that's not

Andrew M. Schneider, M.D.

1    on my reliance list and I've never seen before

2    today.

3        Q.   And you had an opportunity at a break to

4    review this article, correct?

5        A.   About two or three minutes to analyze an

6    important article, but, yeah, not a whole lot of

7    time, yes.

8        Q.   The -- this was not an article that you

9    identified in your Google search or that counsel for

10   the plaintiffs provided to you on Roundup and

11   non-Hodgkin's lymphoma, right?

12       A.   Correct.

13       Q.   The bottom of Page 2321 of this article

14   identifies the data source for this study --

15       A.   Uh-huh.

16       Q.   -- and states:  The data used in these

17   analyses were part of the Cross-Canada Study of

18   Pesticides and Health.

19            Do you see that?

20       A.   I do.

21       Q.   That's the same study that McDuffie 2001

22   comes from, correct?

23       A.   Okay.

24       Q.   If you'll go with me to Table 4 on Page

25   2326, the title of that table is:  Individual and

```
 1    joint effects of commonly used pesticide

 2    combinations on NHL.

 3            Do you see that?

 4    A.    Yes.

 5    Q.    For malathion only, the odds ratio was about

 6    2 and was statistically significant, correct?

 7    A.    Uh-huh.

 8    Q.    For malathion and glyphosate, the odds ratio

 9    was about 2 and was statistically significant,

10    right?

11    A.    I'm sorry.  I'm -- which box are you on?

12    Q.    Fourth box down.

13    A.    Yes.

14    Q.    Malathion and glyphosate, the odds ratio was

15    2.1 and statistically significant, right?

16    A.    Yes.

17    Q.    For glyphosate only, what was the odds ratio

18    in Hohenadel 2011?

19    A.    Just for the record, I'm reading this, but

20    you're not going to give me an opportunity to

21    discuss the limitations of the study.  It was .92,

22    just reading.

23    Q.    And the 95 percent confidence interval is

24    .54 to 1.55, right?

25    A.    That's what it says, correct.
```

Andrew M. Schneider, M.D.

```
1          Q.   I want to make sure I understand how this
2     works.  For people who use malathion only, the odds
3     ratio is 2 and statistically significant.  Those
4     people are at an increased risk of non-Hodgkin's
5     lymphoma, right?
6          A.   That's per this one article that I had about
7     three minutes to read and never saw before, correct.
8          Q.   Then they used malathion and glyphosate and
9     have a similar increased risk, right?
10              MR. HABERMAN:  Objection.
11         A.   Correct.
12         Q.   For people who only used glyphosate-based
13    herbicides in the Cross-Canada Study of Pesticides
14    and Health and didn't also use malathion, the odds
15    ratio was .92, and the 95 percent confidence
16    interval was .54 to 1.55, right?
17         A.   That's because a major limitation of the
18    analysis is that their proxy measures for pesticide
19    exposure were based on self-reported, lifetime use.
20    It is not clear whether use of combinations of
21    pesticides were from actual tank mixtures,
22    combinations used during the same growing season, or
23    use in different years over a lifetime.
24              These are quite different exposures
25    scenarios, and you might get difference biological
```

```
 1    effects from different exposure patterns.  Moreover,

 2    we have no information on pesticide exposure or

 3    absorbed dose because analyses were based on

 4    self-reported pesticide use.  This may relate in

 5    exposure measurement errors, and the presence of

 6    other cofounding factors can result in risk

 7    estimates biased in unpredictable ways.

 8        Q.   I'm going to break that down a little bit.

 9    Okay?

10        A.   Sure.

11        Q.   The Cross-Canada Study of Pesticides and

12    Health had a major limitation in their analysis,

13    which is that pesticide exposure came from

14    self-reported use, correct?

15        A.   Correct.

16        Q.   It's not clear in the Cross-Canada Study of

17    Pesticides and Health whether use was from actual

18    tank mixtures, combinations used during the same

19    growing season, or use in years over a lifetime,

20    correct?

21        A.   Yes.

22        Q.   Those are quite different exposure

23    scenarios, and you might get different biological

24    effects from different exposure patterns, true?

25        A.   True.
```

```
 1        Q.    For Mr. Pleu, you read his deposition,

 2    right?

 3        A.    Yes.

 4        Q.    You saw that he said the only pesticide he

 5    ever used was Roundup, right?

 6        A.    Correct.

 7        Q.    William Pleu did not use malathion, correct?

 8        A.    Correct.  But that doesn't change the

 9    limitations of the study.

10        Q.    Mr. Moore also said he only used Roundup,

11    correct?

12        A.    Correct.

13        Q.    Stacey Moore did not report use of

14    malathion, correct?

15        A.    Correct.  But that has no bearing on the

16    weaknesses of the study.

17        Q.    Malathion use in the North American Pooled

18    Project, as we saw in Pahwa 2019, was associated

19    with non-Hodgkin's lymphoma and glyphosate exposure,

20    right?

21        A.    Sorry, say that again.

22        Q.    Malathion used in the North American Pooled

23    Project, as we saw in Pahwa 2019, was associated

24    with both non-Hodgkin's lymphoma, the outcome, and

25    glyphosate, which is the exposure of interest,
```

 1    right?

 2         A.   You have to show me.  I don't remember.

 3         Q.   Sure.  Page 3.

 4         A.   Yes.

 5         Q.   Pesticides that were most strongly

 6    correlated --

 7         A.   Where -- where are you reading from?

 8         Q.   The -- I think you're there.

 9         A.   Show me where.

10         Q.   So first paragraph in the right column.

11         A.   Okay.  Go ahead.

12         Q.   Okay.  Pesticides that were most strongly

13    correlated with glyphosate use included the

14    herbicides 2,4-D and dicamba, correct?

15         A.   Yes.

16         Q.   The insecticide malathion was correlated

17    with glyphosate use in the North American Pooled

18    Project, correct?

19         A.   I'm not sure it says that, but I think

20    you're right.  I mean, why don't you read what it

21    says?

22         Q.   I was trying to shorten, but, sure, I'll

23    read the whole thing.

24              Pesticides that were most strongly

25    correlated with glyphosate use, defined in this

1     study as Spearman coefficients greater than or equal

2     to .35 and Cohen's Kappa value of greater than or

3     equal to .30 -- stop there for a moment.

4          Are you an expert on Spearman coefficients

5     and Cohen's Kappa values?

6     A.   Of course I am.  No, I'm not.  I'm joking.

7     Of course I am.  No, I'm not.

8     Q.   Pesticides that were most strongly

9     correlated with glyphosate use in the North American

10    Pooled Project were the herbicides 2,4-D and

11    dicamba --

12    A.   Let me stop you.  With all due respect, I

13    want you to read it or I'll read it.  You're --

14    Q.   Sure.

15    A.   -- editing and saying things --

16    Q.   Go ahead and read the --

17    A.   Let me read --

18    Q.   -- sentences --

19    A.   -- from pesticides down --

20    Q.   -- (garbled audio) --

21    A.   -- so we understand what it says.

22    Q.   Absolutely.

23    A.   Pesticides that were most strongly

24    correlated with glyphosate use, defined in this

25    study as Spearman coefficients and Cohen's Kappa --

Andrew M. Schneider, M.D.

```
 1    I'm not going to say the numbers -- and that were

 2    statistically significant or strongly

 3    associated with NHL in the previous study were

 4    evaluated as cofounders [sic].  The herbicides

 5    2,4-dichlorophenoxyacetic acid and dicamba, as well

 6    as the insecticide malathion met both criteria and

 7    were therefore included in the more fully adjusted

 8    secondary logistic regression models.

 9        Q.   Okay.

10        A.   Okay.

11        Q.   I'll ask my question again.  All right?

12        A.   Sure.

13        Q.   In the North American Pooled Project, three

14    pesticides were associated with both glyphosate use

15    and non-Hodgkin's lymphoma, based on what you just

16    read out loud, correct?

17        A.   Okay.

18        Q.   Malathion, 2.4-D, and dicamba were

19    associated with glyphosate use, true?

20        A.   Were associated?  I don't know what that

21    means.

22        Q.   Correct.  But I'm just -- so we can use the

23    words here.

24             Most strongly correlated with glyphosate

25    use, do you see that?
```

Andrew M. Schneider, M.D.

```
 1       A.    Are you saying they were used together?

 2       Q.    Correct.

 3       A.    Okay.

 4       Q.    Those same three pesticides were also

 5   significantly or strongly associated with NHL in

 6   previous studies, correct?

 7       A.    Okay.

 8       Q.    What that means in layman's terms is that

 9   malathion is a potential confounder in the

10   relationship between non-Hodgkin's lymphoma and

11   glyphosate, right?

12       A.    No.  But it's accounted --

13             MR. HABERMAN:  Objection.

14       A.    -- it's accounted for on Table 4 and 5, but

15   you're not -- you don't want to go to the meat of

16   the matter, where, in Table 5, when they take out

17   the confounding pesticides that you mentioned,

18   there's still a significant association of SLL with

19   ordinal 10 lifetime days at a 1.08 and the

20   confidence interval of 1.01 to 1.16.

21             So by doing just what you said, by

22   accounting for the confounding other pesticides,

23   this article supports that CLL/SLL is associated

24   with malathion use to a statistical significant

25   number.
```

```
 1              Similarly, in Table 4, for diffuse large

 2    B-cell lymphoma, we see that for exposures greater

 3    than two days, when accounting for the other

 4    pesticides, the relative risk is 2.14 with a

 5    confidence interval of 1.07 to 4.28.

 6              Thus, I can say based upon the Pahwa

 7    articles, that to a reasonable degree of medical

 8    probability, the CLL of Mr. Pleu and the diffuse

 9    large B-cell lymphoma of Mr. M --

10              MR. HABERMAN:  Moore.

11              THE WITNESS:  What's the name?

12              MR. HABERMAN:  Moore.

13              THE WITNESS:  Moore?  Moore.  Thank you.

14       A.    -- were caused by glyphosate.  This article

15    supports just my feeling, my belief.

16       Q.    Dr. Schneider, did -- I will ask you about

17    Tables 3, 4, and 5 of the Pahwa 2019 article.  Okay?

18       A.    Okay.  I didn't think you wanted to, but

19    okay.

20       Q.    At this moment, I am asking you a different

21    question, and we will get to the various tables

22    reported in Pahwa 2019.  Okay?

23       A.    Okay.

24       Q.    My question right now is:  Is malathion --

25              MR. HABERMAN:  I object to the predicate.
```

Andrew M. Schneider, M.D.

1      Q.   -- a potential --

2           MR. HABERMAN:  He answered the question.

3           MS. ROSS:  I'm sorry.  Are you done with

4      your objection?

5           MR. HABERMAN:  My -- he answered your

6      question, just now asked and answered.

7      Q.   Malathion is a potential confounder that was

8      controlled for in the analyses in Pahwa 2019,

9      correct?

10     A.   Correct.

11     Q.   What that means is that malathion could

12     cloud the relationship between non-Hodgkin's

13     lymphoma and glyphosate, but here there are adjusted

14     analyses that we can look at for non-Hodgkin's

15     lymphoma and various subtypes of non-Hodgkin's

16     lymphoma, correct?

17     A.   That's what I said.

18     Q.   Do you agree that if you can adjust for

19     malathion, you should?

20     A.   Yes.

21          MR. HABERMAN:  Objection.

22     Q.   If you'll go with me to Table 2 to begin

23     with, are you there?

24     A.   Give me a second.  I'm there now.

25     Q.   Now, Pahwa 2019 reports various analyses

1    that they did, including in Tables 2, 3, 4, 5, and

2    Supplementary Table 1, correct?

3        A.   Correct.

4        Q.   In Table 2 of Pahwa 2019, the authors give

5    their results for ever use of glyphosate.  Do you

6    see that?

7        A.   I do.

8        Q.   For NHL overall, there were 113 exposed

9    cases, correct?

10       A.   Yes.

11       Q.   The odds ratios in Pahwa that are adjusted

12   for other pesticides are the odds ratios with a

13   superscript B, right?

14       A.   Right.

15       Q.   For NHL overall, for ever use of glyphosate,

16   the odds ratio in Pahwa was 1.13 and not

17   statistically significant, right?

18       A.   Correct.

19       Q.   For DLBCL, the odds ratio was 1.23 and not

20   statistically significant, right?

21       A.   I mean, are you asking me just to read what

22   you already -- to save time, it says what it says.

23   I'm not going to say -- it's reading comprehension.

24   It just says what it says.

25       Q.   I'm entitled to ask you these questions,

Andrew M. Schneider, M.D.

```
1    so --

2        A.   It's your time.

3        Q.   -- that's what I'll do today.

4        A.   That's fine.

5        Q.   All right.  Do you want me to repeat my

6    question?

7        A.   I do.

8        Q.   Okay.  For DLBCL, in Pahwa 2019, the odds

9    ratio was 1.23 and nonsignificant, correct?

10       A.   That's what the article says.  It doesn't

11   say nonsignificant.  Are you asking my opinion, if

12   that -- if it's nonsignificant?

13       Q.   Do you want me to read the whole confidence

14   interval?

15       A.   No.  I just want you to know -- since you

16   don't really want to hear my opinion, do you want me

17   to say what the -- say what the table says, or do

18   you want me to interpret the table?

19       Q.   Okay.  Right now I'm asking you for the

20   numbers in the table.

21       A.   Okay.  So ask your question.  I'll --

22       Q.   Sure.

23       A.   Ask me the questions.

24       Q.   For DLBCL --

25       A.   Uh-huh.
```

Andrew M. Schneider, M.D.

1      Q.    -- in Pahwa 2019 --

2      A.    Uh-huh.

3      Q.    -- with ever use of glyphosate --

4      A.    Uh-huh.

5      Q.    -- the adjusted odds ratio was 1.23 with a

6   95 percent confidence interval .81 to 1.88, correct?

7      A.    That's what it says.  You read it correctly.

8      Q.    And for SLL, what was the adjusted odds

9   ratio for ever use of glyphosate?

10     A.    Adjusted with -- for other pesticides?

11     Q.    Correct.

12     A.    1.79.

13     Q.    With a nonsignificant 95 percent confidence

14   interval, correct?

15     A.    Are you asking my interpretation, or are you

16   asking me to say what it says?

17     Q.    Based on what you've told me earlier today,

18   I would assume that a 95 percent confidence interval

19   of .87 to 3.69 is nonsignificant, in your view.  Is

20   that correct?

21           MR. HABERMAN:  Objection.

22     A.    That's correct.  But before, you didn't want

23   to hear my opinions.  You just wanted me to read.

24   So that's why I wanted to know whether you want my

25   opinion or you want me to read.  Yes, it's not

1     significant.

2         Q.    In your view --

3         A.    Thank you.

4         Q.    -- Mr. Moore falls into the group in Table 2

5     of Pahwa with DLBCL that has an odds ratio of 1.23

6     that is nonsignificant?

7               MR. HABERMAN:  Objection.

8         A.    Right.  But we should look at Table 4 where

9     it hones it down and shows it is significant.

10        Q.    And in your view, Mr. Pleu falls into the

11    SLL category in Table 2 of Pahwa 2019, right?

12        A.    Right.  But then we should look at the Table

13    4 and 5.  That's where the --

14        Q.    Did you rely any differently on Table 3?

15              MR. HABERMAN:  Objection.

16        A.    I looked at -- I looked at all the tables.

17        Q.    Okay.  So let's break this up a little bit.

18    Pahwa 2019 looks at data for ever use of glyphosate

19    and whether that's associated with NHL.  That's in

20    Table 2, right?

21        A.    Correct.

22        Q.    Pahwa 2019 also looked at different

23    frequencies, durations, and lifetime days of

24    glyphosate use, right?

25        A.    Sorry, which table?

1      Q.   I'm saying the article overall looked at

2   different frequencies, durations, and lifetime days

3   of glyphosate use, correct?

4      A.   Correct.

5      Q.   Just as they -- and I understand from your

6   previous answers that you relied on the data for

7   frequency, duration, and lifetime days; is that

8   right?

9      A.   Well, I think they're important and that we

10   should discuss.

11      Q.   When you look at Pahwa 2019, you looked at

12   the data overall and then all of the different ways

13   that the authors analyzed their data, correct?

14      A.   Correct.

15      Q.   Just as they did for the overall analysis

16   for their duration, frequency, and lifetime days

17   analyses, Pahwa reported odds ratios that adjusted

18   and those that were not adjusted, right?

19      A.   Yes.

20      Q.   You relied on the odds ratios in Pahwa 2019

21   that were adjusted for other pesticides, correct?

22      A.   I relied on the whole article.

23      Q.   Pahwa 2019 -- I'm not sure -- well,

24   withdrawn.

25           When you say you relied on the whole

1    article, did you have a preference, as an expert

2    giving an opinion on Roundup and non-Hodgkin's

3    lymphoma, as to whether adjusted analyses for other

4    pesticides or unadjusted analyses are more reliable?

5        A.   I think if you have adjusted, you have to

6    look at those numbers.  I think it would be wrong to

7    look at the nonadjusted numbers.  So I think

8    whenever we have adjusted numbers, I'm obligated to

9    use those numbers.

10       Q.   And in Pahwa 2019 we have adjusted numbers,

11   correct?

12       A.   Correct.

13       Q.   In Pahwa 2019 you relied on the adjusted

14   odds ratios for other pesticides --

15           MR. HABERMAN:  Objection.

16       Q.   -- correct?

17       A.   Correct.

18       Q.   With Tables 3, 4, and 5, the Pahwa authors

19   report three different measures of frequency,

20   duration, and lifetime days, right?

21       A.   Yes.

22       Q.   What is the best measure of high exposure to

23   Roundup, in your expert opinion, the number of years

24   someone used Roundup, the number of days per year

25   they used Roundup, or the total number of lifetime

Andrew M. Schneider, M.D.

1   days?

2           MR. HABERMAN:  Objection.

3       A.   So I would look at anything I can look at.

4   Since I'm not a statistician, that's a question

5   better asked of a statistician.  My job is to look

6   at different categories from these tables and then

7   apply them to the plaintiffs in this case.

8       Q.   Table 3 in Pahwa 2019 gives years of use of

9   glyphosate, correct?

10      A.   Correct.

11      Q.   Table 4 gives frequency of use of

12  glyphosate, right?

13      A.   Yes.

14      Q.   Table 5 gives lifetime days, which is the

15  number of years times the days per year, correct?

16      A.   Correct.

17      Q.   In Table 2 we saw that Pahwa included 113

18  glyphosate exposed cases in their ever/never

19  analysis, correct?

20      A.   Correct.

21      Q.   Okay.  In Table 3 do you see that for NHL

22  overall, there is an N, and then it gives exposure

23  greater than zero and less than 3.5 and then

24  exposure greater than 3.5 days?

25      A.   Yes.

Andrew M. Schneider, M.D.

1      Q.   Okay.  For NHL overall, Pahwa included 102

2   glyphosate exposed cases in their duration of use

3   analysis, correct?

4      A.   Show me where it says that.

5      Q.   59 plus 43.

6      A.   I'm sorry, Table 3?

7      Q.   Table 3.

8      A.   59 plus 43 is, right, 102, right.

9      Q.   Right.  Pahwa included 102 glyphosate

10   exposed cases in their duration of use analysis for

11   NHL overall, right?

12      A.   Yes.

13      Q.   For DLBCL, how many patients did Pahwa

14   include in their duration of use analysis?

15      A.   Is that 41?

16      Q.   Right, 24 plus 16, correct?

17      A.   Uh-huh.

18      Q.   For SLL, in their duration of use analysis,

19   Pahwa included 14 patients, correct?

20      A.   Correct.

21      Q.   In Table 4, for -- this is the frequency of

22   use table in Pahwa 2019, right?

23      A.   Uh-huh.

24      Q.   For NHL overall, Pahwa included 61 patients

25   in their frequency of use analysis.  Do you see

1    that?

2        A.    I do.

3        Q.    For DLBCL, for frequency of use, Pahwa

4    included 26 patients, correct?

5        A.    Yes.

6        Q.    For SLL, for frequency of glyphosate use,

7    Pahwa included seven patients, correct?

8        A.    Yes.

9        Q.    In Table 5 this is lifetime days of

10   glyphosate use, correct?

11       A.    Yes.

12       Q.    In Table 5 Pahwa included 57 cases for NHL

13   overall, correct?

14       A.    Yes.

15       Q.    For lifetime days, Pahwa included 23 cases

16   of DLBCL, right?

17       A.    Yes.

18       Q.    For lifetime days, Pahwa included seven

19   cases of SLL, correct?

20       A.    Yes.

21       Q.    There are various P-values for trends

22   reported in Tables 3, 4, and 5 of Pahwa 2019.  Do

23   you see those numbers?

24       A.    I do.

25       Q.    P for trend is a statistical measure of

1    whether increasing exposure is associated with

2    increasing risk, right?

3        A.   Say that again.

4        Q.   P for trend is a --

5        A.   P for trend?

6        Q.   P for trend, yes.

7        A.   Is it -- where does it say that?

8        Q.   When it says P-trend.

9        A.   I'm sorry, it's late.  Where does it

10   say P-trend?  Oh, I see it.  Got it.  P-trend C.

11   Okay.  What's your question?

12       Q.   P for trend is a statistical measure of

13   whether increasing exposure is associated with

14   increasing risk, right?

15       A.   Yes.

16       Q.   Are the P for trend values in Table 3

17   statistically significant adjusted for other

18   pesticides?

19       A.   Table 3 now?  No.

20       Q.   Are the P for trend values in Table 4

21   statistically significant and adjusted for other

22   pesticides?

23       A.   So where am I looking for -- am I looking

24   only at other -- where does it say P for trend under

25   diffuse large B-cell lymphoma?  I see it there.

1        So what Table 4 says to me is that for five

2   days per year of exposure, the relative risk is

3   1. -- sorry, let me find that again.

4        Sorry.  Under diffuse large B-cell lymphoma

5   for greater two days of exposure, taken out

6   confounding pesticides, the relative risk is 2.14

7   with and odds ratio of 1.07 to 4.28.  That's

8   statistically significant.

9        Q.   That's the value for DLBCL in Table 4 of

10  Pahwa 2019 for greater than two days per year,

11  correct?

12       A.   Correct.

13       Q.   For the ordinal analysis, which is five days

14  per year or more, the odds ratio was 1.14 with a 95

15  percent confidence interval of .96 to 1.35, correct?

16       A.   Right.  But I don't understand that, because

17  they say there are 368.  They're adding people that

18  were unexposed.  I don't understand why they're

19  doing that.

20       Q.   The analysis by Pahwa didn't just look at

21  exposure based on number of days per year, right?

22       A.   My not understanding is they add up the 342,

23  the 12, and the 14 to get 368.  But you have only 26

24  patients who were exposed and 342 that were not, and

25  then they want to say that it's not significant.

1          I think the more important data is the one I

2     suggested to you of greater than two days, which

3     showed a statistical significant effect of the

4     association of glyphosate with diffuse large B-cell

5     lymphoma.

6     Q.    In Table 2 you're relying on the greater

7     than two days per year analysis --

8     A.    Table 4.

9     Q.    Thank you.  New question.

10          Table 4 in Pahwa 2019, you're relying on the

11    greater than two days per year analysis and not the

12    five days per year analysis, right?

13    A.    So I don't understand what that means,

14    because they have an N of 368, but 342 weren't

15    exposed.  So I don't understand that.

16    Q.    Would you defer to a biostatistician

17    or epidemiologist --

18          MR. HABERMAN:  Objection.

19    Q.    -- on how to interpret this --

20    A.    No.  I'm going to give my opinion, to a

21    reasonable medical degree of certainty, that Table 4

22    in this study suggests that greater than two days

23    exposure of glyphosate increases someone's relative

24    risk to 2.14 of getting diffuse large B-cell

25    lymphoma and is statistically significant.

1          So I would suggest that this data from Table

2     4 is evidence that glyphosate is associated with

3     diffuse large B-cell lymphoma for people who have

4     more than two days exposure, which Mr. Moore did.

5          Q.   What's the difference between an ordinal

6     analysis at five days per year and a greater than

7     two days per year analysis?  Can you explain that?

8          A.   I wish I could.

9          Q.   What's a P for trend in this study for DLBCL

10    with increasing frequency of glyphosate handling?

11    Do you see that number?

12         A.   C?

13         Q.   P for trend was .2 in the adjusted analysis,

14    correct?

15         A.   That's what it says, but let's see what C

16    says.  So what's your question?  I'm sorry.

17         Q.   The P for trend in the adjusted analysis was

18    .2, which is not statistically significant, in Table

19    4 of Pahwa 2019, correct?

20         A.   Right, but I don't know what that represents

21    because just above it, for greater than two days, it

22    is significant.  So maybe that includes the zero,

23    which is 342 patients, and zero to two, which is 12

24    patients.  So if you're going to use the zero,

25    you're going to confound the interpretation.

1    Q.   Do you have any biological explanation for

2    why more than two days per year of glyphosate use

3    would be associated with an increased risk, but five

4    days per year of glyphosate use would not?

5    A.   So it says ordinal five days per year.  I'd

6    have to research what they mean by ordinal, you

7    know, why they put that in.  I'd have to go back and

8    see if the article says it.  And we'd have to

9    research what P for trend means.  I mean, I would

10   help -- I would need help with a -- from a

11   statistician to fully understand this.

12        But as a clinical medical oncologist, it's

13   clear to me that greater than two days is meaningful

14   and statistically significant.

15   Q.   And that's for DLBCL, correct?

16   A.   Correct.

17   Q.   For SLL, the result for greater than two

18   days per year of glyphosate use was 2.31 with a 95

19   percent confidence interval of .61 to 8.75, correct?

20   A.   I think that's only because there are three

21   patients.  So, you know, you have a very wide

22   confidence interval, so I think it's hard to

23   interpret.

24        You do see a 2.31, which is, you know, more

25   than twice the effect, 100 times increased.  But I

Andrew M. Schneider, M.D.

1    think it's -- you know, you have three patients.

2    It's difficult.

3         Q.   And the ordinal analysis showed an odds

4    ratio of 1.18 that was nonsignificant, but I take it

5    you don't understand the details of that ordinal

6    analysis, sitting here today, correct?

7         A.   After six-and-a-half hours of sitting here,

8    I don't, without trying to -- maybe the article will

9    tell me if I read it again.  I don't know.

10        Q.   You would defer to a biostatistician on the

11   interpretation of those relates?

12             MR. HABERMAN:  Objection.  The doctor gave

13        his answers.

14        A.   Yeah.  I would -- I would like to first

15   reread the article and spend some time trying to

16   understand what it meant.

17        Q.   Table 4 is the table that we've just been

18   talking about that gives frequency of glyphosate

19   handling in items of days per year, right?

20        A.   Correct.

21        Q.   Table 3 gives information on the risk of

22   glyphosate use with increasing duration of

23   glyphosate use, correct?

24        A.   Correct.

25        Q.   Table 3 breaks the numbers into more than

Andrew M. Schneider, M.D.

```
1    zero, but less than or equal to three-and-a-half

2    years, and greater than three-and-a-half years,

3    right?

4        A.   Right.

5        Q.   For DLBCL, what was the adjusted odds ratio

6    for greater than three-and-a-half years of

7    glyphosate use?

8        A.   Now it's back to Table 3?

9        Q.   Correct.

10       A.   And you're asking me greater than five years

11   for diffuse large B-cell lymphoma, and the relative

12   risk was .93 with a confidence interval of .5 to

13   1.74.

14       Q.   Mr. Moore used glyphosate for more than

15   three-and-a-half years, right?

16       A.   Yes.

17       Q.   He would fall into the group in Table 3 that

18   has an odds ratio of .93 with a 95 percent

19   confidence interval of .5 to 1.74, correct?

20       A.   Correct.  But on Table 5 you have the

21   ordinal 10 lifetime days, where it is significant.

22       Q.   You're not relying on the ordinal data

23   because you don't know how to interpret those data,

24   correct?

25       A.   I never said that.
```

1          MR. HABERMAN:  Objection.

2      A.   I never said that.  I'm saying that I'd have

3  to look and see what it means.  But clearly the

4  table is telling me that there is a significant

5  association of ordinal 10 lifetime days glyphosate

6  use and diffuse large cell lymphoma.

7          Sitting here without rereading this article,

8  after six-and-a-half hours, I don't really know what

9  ordinal means.  But clearly looking at Table 4 and

10  Table 5, there is etiologic evidence that glyphosate

11  causes both CLL and diffuse large B-cell lymphoma.

12      Q.   You would agree that if you're going to rely

13  on the ordinal data in Pahwa 2019, you would need to

14  rely equally on the ordinal data for Tables 3, 4,

15  and 5, correct?

16          MR. HABERMAN:  Objection.

17      A.   Yeah.  I think that I would have to reread

18  the article, understand better what the ordinal

19  number means.  I'm not a statistician.  I'm a

20  clinical oncologist.  And then I would try to

21  decipher it.

22      Q.   Are you going to tell the jury that the

23  ordinal values in Table 4 or 5 are meaningful for

24  glyphosate, but not in Table 3?

25      A.   No.

```
 1              MR. HABERMAN:  Objection.
 2       A.   I'm going to -- since we're coming back
 3   again, I'm going to take the opportunity to reread
 4   the article and figure out what it means more fully,
 5   so I understand it, and then explain it to you and
 6   the jury.
 7       Q.   We were talking about the findings for DLBCL
 8   greater than three-and-a-half years.  Do you recall
 9   that?
10       A.   Yes.
11       Q.   There are also data in Table 3 for SLL and
12   greater than three-and-a-half years of glyphosate
13   use, right?
14       A.   Yes.
15       Q.   Those data show an odds ratio of 1.94 and a
16   95 percent confidence interval of .79 to 4.8,
17   correct?
18       A.   Correct.
19       Q.   The ordinal data in Table 3 for SLL show an
20   odds ratio of 1.3, then 95 percent confidence
21   interval of .91 to 1.91?
22       A.   Right.  So I wonder why they chose five
23   years in Table 3 and 10 years in Table 5.
24       Q.   Table 5 is lifetime days of glyphosate use,
25   not years of glyphosate use, correct?
```

```
1       A.    I'm sorry, give me one second.

2             So Table 5 has ordinal 10 lifetime days.

3       Q.    Right.

4       A.    Right.

5       Q.    Table 3 that we were just talking about is

6   the number of years someone used glyphosate, right?

7       A.    Well, it says ordinal five years.

8       Q.    Right.  Table 5 is the number of lifetime

9   days someone used glyphosate, correct?

10      A.    That's what it says, correct.

11      Q.    Between now and your next deposition in this

12  case, will you do your best to identify why it is

13  that these ordinal values would show lower risks

14  with higher years of exposure, days of exposure, or

15  lifetime days, as compared to the other values

16  reported?

17      A.    I'm not sure that's true, right?  The --

18  Table 5 says ordinal 10 lifetime days is

19  significant.  Table 3 used ordinal five years.

20      Q.    When you say that Table 5 shows ordinal

21  lifetime days is significant, look at the data for

22  DLBCL, if you will.

23      A.    I'm talking about SLL.

24      Q.    Right.  So for SLL in Table 5, the odds

25  ratio was, in the ordinal analysis, 1.08 with a 95
```

1   percent confidence interval of 1.01 to 1.16,

2   correct?

3       A.   Correct.

4       Q.   The P-value given is .03, right?

5       A.   Right.

6       Q.   Do you see any other P-value in this table

7   that is statistically significant?

8       A.   Only looking at the adjusted, not glyphosate

9   by itself, correct?

10      Q.   Correct.  The adjusted values.

11      A.   No.

12      Q.   For DLBCL, the ordinal analysis in Table 5

13  of Pahwa reports an odds ratio of 1.03 and 95

14  percent confidence interval of .98 to 1.07, right?

15      A.   Right.

16      Q.   You are not saying that we should rely on

17  the ordinal analysis for SLL, but not the ordinal

18  analysis for DLBCL, are you?

19      A.   No.  I'm saying that we should look at all

20  data.

21      Q.   You are not saying --

22           MR. HABERMAN:  (Garbled audio.)

23      A.   You're interrupting -- you're interrupting

24  me again.

25      Q.   Okay.  Go ahead.

Andrew M. Schneider, M.D.

```
1       A.   We should look at all data, look at all
2   tables --
3       Q.   Right.
4       A.   -- put it all together, explain it to the
5   jury, and let them decide what it means.
6       Q.   It would be inappropriate to cherry-pick one
7   value from Pahwa 2019 as opposed to looking at all
8   the data in totality, correct?
9            MR. HABERMAN:  Objection.
10      A.   What you've got to do is you have to look at
11  all the data and then criticize the data.  Maybe
12  some data is too small a number of patients, or
13  maybe there are other reasons why the data has
14  inaccuracies.  So we look at all the tables, look at
15  all the data, and then decide what data is reliable
16  and what data has error.
17      Q.   What you have to do is look at all of the
18  data and criticize the data in the various studies
19  on Roundup and non-Hodgkin's lymphoma, is that what
20  you said?
21      A.   Are we talking about the -- this article or
22  all articles now?
23      Q.   That was your answer, Dr. Schneider, so I'm
24  trying to --
25      A.   That was my answer --
```

1      Q.   -- understand.

2      A.   -- about this article.

3      Q.   Okay.  So for Pahwa 2019, what you have to

4  do is look at all the data and criticize the data;

5  maybe some data is too small a number of patients,

6  correct?

7           MR. HABERMAN:  Objection.

8      A.   I think you have to analyze the data and

9  then decide, based upon my best clinical -- clinical

10 expertise, what the data means.

11     Q.   You would not pick and choose the ordinal

12 analyses in one of Tables 3, 4, and 5, but not look

13 at the ordinal analyses in the other tables, right?

14     A.   If I did, I'd have to explain why I did

15 that.

16     Q.   You would not pick and choose the numbers

17 between NHL overall and DLBCL and SLL; you would

18 want to look at all of those numbers, correct?

19     A.   I didn't say that.  I thought I said that if

20 I had data on a specific entity, I'd rather look at

21 that data when I can.  You know, I don't think it's

22 fair to look at NHL overall when I have data on

23 diffuse large cell and CLL/SLL.  I think it's a good

24 study when I have that, and so I take advantage of

25 that and do the best I can to explain it.

1      Q.   Would your approach be the same if the

2   plaintiff in this case had follicular lymphoma?

3      A.   Of course.

4      Q.   For Pahwa 2019 there was no increased risk

5   of Roundup exposure -- withdrawn.  New question.

6           For Pahwa 2019 there was no increased risk

7   of follicular lymphoma with Roundup exposure,

8   correct?

9      A.   I mean, I'll take your word for it.  I

10   didn't look at that because it wasn't the case.

11      Q.   The odds ratio for follicular lymphoma and

12   any glyphosate exposure ever use was .69 --

13      A.   What table are you at?

14      Q.   Table 2.

15      A.   Well, Table 2, nothing was significant.

16      Q.   Okay.

17      A.   No lymphoma was significant.

18      Q.   And for follicular lymphoma for greater than

19   3.5 years, the odds ratio was .61, right?

20      A.   Table 3 now?

21      Q.   Yes.

22      A.   What did you say?

23      Q.   For greater than 3.5 years, the odds ratio

24   for follicular lymphoma was .61, right?

25      A.   Yes.

Andrew M. Schneider, M.D.

```
1       Q.   And for greater than two days per year for

2    follicular, the odds ratio was 1.3, right?

3       A.   Is that Table 4?

4       Q.   That's in Table 4.

5       A.   Sure.  What did you say?

6       Q.   For greater than two days per year, the odds

7    ratio for follicular lymphoma was 1.3, correct?

8       A.   1.33?

9       Q.   Yes.

10      A.   You said 1.3.

11      Q.   Sure.

12      A.   1.33.

13      Q.   Okay.  Does the difference between 1.3 to

14   1.33 matter for your analysis?

15      A.   I thought you'd want me to answer the

16   question honestly.  It doesn't say 1.3.  It says

17   1.33.

18      Q.   Okay.  For follicular lymphoma for greater

19   than two days per year, the odds ratio was 1.33 with

20   a 95 percent confidence interval of .55 to 3.25,

21   correct?

22      A.   Correct.

23      Q.   In Table 5, for lifetime days of use for

24   follicular lymphoma, the odds ratio was .75 and

25   nonsignificant.  Do you see that?
```

Andrew M. Schneider, M.D.

```
 1        A.    I do.

 2        Q.    Did Pahwa 2019 show an increased risk of

 3    follicular lymphoma following Roundup use?

 4        A.    No.

 5        Q.    For Boffetta 2021, that's another analysis

 6    that you looked at and relied up, right?

 7        A.    Correct.  So you have to give me the article

 8    to look at again, and then we have 10 minutes.

 9              MR. HABERMAN:  Yeah.  I think the doctor is

10        getting tired.  I know I am.

11              THE WITNESS:  If we're going to start

12        another article --

13              MR. HABERMAN:  If we're going to start

14        another article --

15              THE WITNESS:  -- I think we should stop now.

16              MR. HABERMAN:  Yeah.

17        Q.    How about instead of doing that, then we

18    finish up some questions on Pahwa 2019.  Okay?

19        A.    Sure.

20              (Schneider Exhibit 27 was marked for

21    identification.)

22    BY MS. ROSS:

23        Q.    Exhibit 27 to your deposition is entitled

24    Pahwa 2019, and the top said Results Reported for

25    DLBCL and CLL, but as we've been over, Pahwa 2019
```

1    actually reports results for DLBCL and SLL, correct?

2        A.   Correct.

3        Q.   For the ever/never exposure -- you still

4    have Pahwa 2019 in front of you, correct?

5        A.   Yes.  This is a summary table that you made?

6        Q.   It is.

7        A.   Okay.

8        Q.   And I want you to just make sure my numbers

9    are correct and I'm not trying to mislead you here.

10   Okay?

11       A.   I mean, it -- I'm sure it is what the tables

12   say, right?

13       Q.   Right.  So I want to talk to you about where

14   Mr. Moore and Mr. Pleu fall in these various

15   analyses.

16            Do you see that Exhibit 27 is a chart that

17   lists various results reported in Pahwa 2019 for

18   ever exposure to glyphosate and for duration,

19   frequency, and cumulative exposure, right?

20       A.   Just to make my life easier, what tables are

21   you getting this from so I can -- I can look -- I

22   can check your numbers?

23       Q.   Table 2 is ever/never exposure.

24       A.   And where is that in your analysis?

25       Q.   Where it says Ever/Never Exposure at the

1    top.

2        A.   Right.  So you're copying the tables that

3    you just went over, right?

4        Q.   Yes.  And I'm going to ask you some

5    questions about this, but I want to make sure that

6    we can agree these are the numbers and then not mess

7    with presenting the numbers to you.

8        A.   Okay.

9        Q.   Okay.  So for ever/never exposure, the

10   numbers in Exhibit 27 are correct for DLBCL and SLL,

11   correct?

12       A.   The first box is correct.

13       Q.   Is the second box also correct?

14       A.   I haven't looked at it yet.

15       Q.   Okay.

16       A.   Do you want to help me, just tell me what

17   tables to look at?

18       Q.   For greater than three-and-a-half years or

19   greater than five years, that's going to be Table 3.

20       A.   Where do you see greater than five years?

21       Q.   Ordinal five years.

22       A.   Well, that's not what you wrote.  It's

23   ordinal five years, not greater than five years.

24       Q.   Do you know whether ordinal five years means

25   greater than five years?

1      A.   I don't know.

2      Q.   Okay.  Do you want to cross out "greater

3    than" five years and write "ordinal" five years?

4      A.   Well, I want it to say what the table says

5    if you want me to verify it's true.

6      Q.   So why don't we cross out "greater than" and

7    write "ordinal"?  You can write on this exhibit.

8      A.   You're writing -- you're crossing off

9    "greater than"?

10      Q.   And writing "ordinal" five years, yes.  And

11    while we're doing that, why don't you cross out

12    "greater than" five days per year and write

13    "ordinal."

14      A.   Should I write -- what should I write?

15      Q.   Ordinal.

16      A.   Ordinal what?

17      Q.   Five days per year.

18      A.   Okay.

19      Q.   And, again, if we're talking about the

20    ordinal, in your understanding, that should be

21    ordinal 10 lifetime days, not greater than 10

22    lifetime days, based on Table 5 of Pahwa, right?

23          MR. HABERMAN:  How many boxes are we

24      changing to ordinal, which boxes?

25          THE WITNESS:  Second box, the fourth box,

Andrew M. Schneider, M.D.

1      and the sixth box.

2      Q.   Sounds right to me.

3      A.   So now we're --

4      Q.   You made that change?

5      A.   Yes.

6      Q.   And did you make that change for both DLBCL

7    and SLL?

8      A.   I didn't have a chance because I have to now

9    verify the numbers.

10     Q.   Okay.

11     A.   And --

12     Q.   Go ahead.

13     A.   -- we have seven minutes.

14          Okay.  So what table should I look at for

15   the second box?

16     Q.   For greater than 3.5 years --

17     A.   No, no.  We did that one already.

18     Q.   -- ordinal --

19     A.   Ordinal five years.

20     Q.   Okay.  So that's Table 3.

21     A.   This is for diffuse large B-cell, and that's

22   correct.

23     Q.   And while you're on Table 3, take a look at

24   SLL so that we don't have to come back to it later.

25     A.   Well, then I've got to change --

```
 1      Q.   Sure.

 2      A.   I've got to change everything.

 3      Q.   Go ahead.

 4      A.   So tell me what I'm changing again.

 5      Q.   You're crossing out "greater than" five

 6   years and putting "ordinal."

 7      A.   What else?

 8      Q.   You're crossing out "greater than" five days

 9   per year and putting "ordinal."  You're crossing out

10   "greater than" --

11      A.   You're going too fast.  What else?

12      Q.   You're crossing out "greater than" 10

13   lifetime days and writing "ordinal."

14      A.   Okay.  So now it's back to greater than two

15   days per year.  Is that Table 4?

16      Q.   That is, as is ordinal five days per year.

17      A.   You've got to give me a chance to find it.

18      Q.   Go ahead.

19      A.   Ordinal five days per year is back to Table

20   3?

21      Q.   No.  It's the same table, Table 4.

22      A.   I see.  Greater than 3.5 lifetime, that's

23   point...

24      Q.   That's Table 5 for greater than 3.5 lifetime

25   days or ordinal 10 lifetime days.  Table 5 was just
```

Andrew M. Schneider, M.D.

1    on the next page, Page 7.

2        A.    Okay.  Where does it say greater -- greater

3    than -- I'm sorry -- greater than 3.5 lifetime days,

4    where does it say that?

5        Q.    In Table 5.

6        A.    Yes.

7        Q.    Do you see the categories are greater than

8    zero to less than or equal to 3.5 and then greater

9    than 3.5?

10       A.    But you included lifetime.  Let's see.

11       Q.    Right.  The title of Table 5 says lifetime

12   days of glyphosate use.

13       A.    Okay, because you didn't have that in the

14   other one.  Okay.

15             All right.  So I verified the second box.

16   Now I have to go to the third box, and we have four

17   minutes.

18             Do you want to walk me through it real fast

19   to save time?

20       Q.    Sure.  So greater than 3.5 years and ordinal

21   five years comes from Table 3.

22       A.    Give me a second.

23       Q.    And let's actually do it this way,

24   Dr. Schneider.  Am I to understand that you're going

25   to walk away from this deposition at exactly 7:00

```
 1    p.m. --

 2        A.   Yes.

 3        Q.   -- and not a minute later?

 4        A.   Correct.

 5        Q.   Okay.  Then I'm going to ask you my

 6    remaining questions about this exhibit, and we can

 7    come back to it.

 8        A.   Do you want --

 9        Q.   Mr. Pleu falls --

10        A.   Do you want me to verify the numbers?  You

11    don't want me to verify the numbers?

12        Q.   I don't --

13        A.   Okay.

14        Q.   -- because this is taking more time than --

15        A.   Okay.

16        Q.   -- we have today.

17        A.   We've been here for -- we've been here for

18    seven hours.

19        Q.   Okay.  Mr. Pleu falls into the results for

20    DLBCL.

21        A.   Mr. Pleu had -- no, that's not true.

22        Q.   I'm sorry.  You're right.

23        A.   Getting late.

24        Q.   It's been a long day.

25        A.   Yeah, so we should stop.
```

Andrew M. Schneider, M.D.

```
 1      Q.   Okay.

 2      A.   Errors.

 3      Q.   Mr. Moore falls into the various categories

 4   in Exhibit 27 for DLBCL, correct?

 5      A.   I don't know.  You have to ask me a specific

 6   question.

 7      Q.   Mr. Moore used glyphosate for more than

 8   three-and-a-half years, right?

 9      A.   Correct.

10      Q.   Mr. Moore also used glyphosate for more than

11   five years, right?

12      A.   Yes.

13      Q.   Mr. Moore used glyphosate for more than two

14   days per year, right?

15      A.   Yes.

16      Q.   Mr. Moore also used glyphosate for more than

17   five days per year, right?

18      A.   Yeah.

19      Q.   Mr. Moore used glyphosate for more than

20   three-and-a-half lifetime days, right?

21      A.   Yes.

22      Q.   Mr. Moore also used glyphosate for more than

23   10 lifetime days, right?

24      A.   Yes.

25      Q.   Mr. Pleu used glyphosate for more than
```

```
 1    three-and-a-half years, right?

 2        A.   Yes.

 3        Q.   Mr. Pleu used glyphosate for more than five

 4    years, right?

 5        A.   Yes.

 6        Q.   Mr. Pleu used glyphosate for more than two

 7    days per year, right?

 8        A.   Yes.

 9        Q.   Mr. Pleu used glyphosate for more than 3.5

10    lifetime days, right?

11        A.   Yes.

12        Q.   Mr. Pleu used glyphosate for more than 10

13    lifetime days, right?

14        A.   Yes.

15        Q.   Now, since we have a minute --

16        A.   We have --

17        Q.   -- why don't you go to --

18        A.   -- two minutes.

19        Q.   -- Tables 3, 4, and 5 and verify that the

20    numbers for SLL is not CLL in the Pahwa study, but I

21    understand you are of the view that they are the

22    same, and make sure those numbers are correct.

23        A.   Do you want to save time and orient me?

24        Q.   Yes.  Greater than 3.5 years and five years

25    in the ordinal analysis are Table 3.
```

1    A.   Okay.  Okay.  Next.

2    Q.   Two days per year and five days per year are

3    Table 4.

4    A.   Okay.

5    Q.   3.5 lifetime days and 10 lifetime days,

6    those are Table 5.

7    A.   Okay.

8    Q.   You can confirm that Mr. Moore falls into a

9    number of different analyses performed in Tables 2,

10   3, 4, and 5 of Pahwa 2019, correct?

11   A.   Yes.

12   Q.   Mr. Pleu falls into a number of analyses

13   performed in Tables 2, 3, 4, and 5 of Pahwa 2019,

14   right?

15   A.   Yes.

16   Q.   You had an opportunity to verify that the

17   numbers in Exhibit 27 are correct, right?

18   A.   Correct.

19        MS. ROSS:  Why don't we stop here for the

20    day, Dr. Schneider.

21        And counsel for both sides have an agreement

22    that we will come back and finish Dr. Schneider's

23    deposition on another day, correct?

24        MR. HABERMAN:  That's right.  Okay.

25        MS. ROSS:  We'll leave the deposition open.

1          THE WITNESS:  You'll let me know how many

2     hours you'll be ordering so I --

3          MS. ROSS:  Absolutely.

4          THE WITNESS:  Okay.

5          THE VIDEOGRAPHER:  All right.  Off the

6     record at 6:59 p.m.

7          (Whereupon, the deposition recessed at

8     6:59 p.m. EDT.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Andrew M. Schneider, M.D.

```
 1              C E R T I F I C A T E

 2         I, Susan D. Wasilewski, Registered

 3    Professional Reporter, Certified Realtime Reporter,

 4    Certified Manager of Reporting Services, Certified

 5    Realtime Captioner, and Florida Professional

 6    Reporter, hereby certify that the witness named

 7    herein appeared before me on Monday, June 13, 2022,

 8    and was duly sworn.

 9         I FURTHER CERTIFY that I was authorized to

10    and did stenographically report the examination of

11    the witness named herein; that a review of the

12    transcript was requested; and that the foregoing

13    transcript is a true record of my stenographic

14    notes.

15         I FURTHER CERTIFY that I am not related to

16    or an employee of any of the parties, nor am I

17    related to or an employee of any of the parties'

18    attorneys or counsel connected with this action, nor

19    am I financially interested in the outcome of this

20    action.

21         WITNESS my hand this 20th of June, 2022.

22

23    _____

24    Susan D. Wasilewski, RPR, CRR, CMRS, CRC, FPR

25
```

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4         Please read your deposition over carefully

 5    and make any necessary corrections.  You should

 6    state the reason in the appropriate space on the

 7    errata sheet for any corrections that are made.

 8

 9         After doing so, please sign the errata sheet

10    and date it.  It will be attached to your

11    deposition.

12

13         It is imperative that you return the

14    original errata sheet to the deposing attorney

15    within thirty (30) days of receipt of the deposition

16    transcript by you.  If you fail to do so, the

17    deposition transcript may be deemed to be accurate

18    and may be used in court.

19

20

21

22

23

24

25
```

```
 1                        - - - - - -

 2                       E R R A T A

 3                        - - - - - -

 4   PAGE    LINE    CHANGE

 5   _____   _____   _____

 6      REASON: _____

 7   _____   _____   _____

 8      REASON: _____

 9   _____   _____   _____

10      REASON: _____

11   _____   _____   _____

12      REASON: _____

13   _____   _____   _____

14      REASON: _____

15   _____   _____   _____

16      REASON: _____

17   _____   _____   _____

18      REASON: _____

19   _____   _____   _____

20      REASON: _____

21   _____   _____   _____

22      REASON: _____

23   _____   _____   _____

24      REASON: _____

25
```

```
 1                   ACKNOWLEDGMENT OF DEPONENT

 2

 3          I, _____, do hereby

 4     acknowledge that I have read the foregoing pages, 1

 5     through 403, and that the same is a correct

 6     transcription of the answers given by me to the

 7     questions therein propounded, except for the

 8     corrections or changes in form or substance, if any,

 9     noted in the attached Errata Sheet.

10

11

12     _____        _____

13     ANDREW M. SCHNEIDER, M.D.                     DATE

14

15

16

17

18     Subscribed and sworn to before me this

19     ____ day of _____, 20____.

20     My Commission expires: _____

21

22     _____

       Notary Public

23

24

25
```