# EXHIBIT E

```
 1                IN THE UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3                      MDL NO: 2741

 4   ********************************

 5   IN RE: ROUNDUP PRODUCTS
     LIABILITY LITIGATION
 6

 7   This document relates to:

 8   Peter Engilis v. Monsanto Co.
     Case No. 3:19-cv07859-vc
 9

10   ********************************

11

12

13

14

15

16            The remote video deposition of ANDREW

17            SCHNEIDER, M.D., held via Zoom webconference

18            on August 9, 2022, commencing at

19            approximately 2:02 p.m. ET.

20

21

22

23

24

25   REPORTER: Alan Peacock, RDR, CRR, CCR
```

```
 1                  A P P E A R A N C E S

 2   ON BEHALF OF THE PLAINTIFF:

 3        SCHLESINGER LAW OFFICES, PA
          1212 Southeast Third Avenue
 4        Ft. Lauderdale, Florida 33316
          954-467-8800
 5
          BY: JEFFREY LOUIS HABERMAN, ESQ
 6            jhaberman@schlesingerlaw.com

 7   ON BEHALF OF THE DEFENDANT:

 8        HOLLINGSWORTH LLP
          1350 I Street, N.W.
 9        Washington, D.C. 20005
          202-898-5800
10
          BY: JOHN M. KALAS, ESQ
11            jkalas@hollingsworthllp.com

12        BY: LOUIS M. RUSSO, ESQ.
              lrusso@hollingsworthllp.com
13

14   COURT REPORTER:

15        L. ALAN PEACOCK, FAPR, CRC, CCR, RDR
          Realtime Systems Administrator
16        Golkow Litigation Services

17   VIDEOGRAPHER:

18        JOHN FISLER

19

20

21                         - - -

22

23

24

25
```

1            E X A M I N A T I O N

2   DEPOSITION OF ANDREW SCHNEIDER, M.D., 8-9-22

3     By Mr. Kalas  ............................... Page 6

4     By Mr. Haberman  ......................... Page 132

5     By Mr. Kalas  ............................. Page 136

6

7   Reporter's Certificate ...................... Page 138

8

                    DEPOSITION EXHIBITS
9
    Exhibit Number
10

11   1          Notice of Deposition ............... Page 5

12   2          Expert Disclosure .................. Page 5

13   3          Case-Specific Report of ............ Page 5
                Andrew M. Schneider, M.D.
14
     4          Curriculum Vitae ................... Page 5
15
     5          Amended Reliance List of .......... Page 5
16              Andrew Schneider, M.D.

17   6          IARC Monograph 112 Glyphosate ..... Page 68

18   7          Acquavella Article ................ Page 84

19   8          Deposition of Mr. Engilis ........ Page 95

20   9          Handwritten Invoices from Dr. .... Page 102
                Schneider
21
     10         Pahwa Article .................... Page 104
22
     11         McDuffie Study: Non-Hodgkin's .... Page 108
23              Lymphoma and Specific
                Pesticide Exposures in Men

24   /

25   /

```
 1                    EXHIBITS CONTINUED

 2    12          Riou Study: The Association ...... Page 112
                  Between Melanoma, Lymphoma,
 3                and Other Primary Neoplasms

 4    13          2010 Verwer Article: ............ Page 115
                  "Lymphoma Occurring in
 5                Patients with Cutaneous
                  Melanoma"
 6
      14          Medical Record from FH Fish ...... Page 121
 7                Memorial Hospital

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Andrew Schneider, M.D.

```
 1              (DEPOSITION EXHIBITS 1 THROUGH 5 WERE

 2               PREMARKED FOR IDENTIFICATION.)

 3              THE VIDEOGRAPHER:  We are now on the record.

 4        My name so John Fisler.  I'm a videographer

 5        representing Golkow Litigation Services.  Today's

 6        date is August 9, 2022, and the time is 2:02 p.m.

 7              This video deposition is being held virtually

 8        in the matter of Roundup, Peter and Cathy Engilis

 9        versus Monsanto Company, et al., for the U.S.

10        District Court, Northern District of California.

11              The deponent is Dr. Andrew Schneider.

12              Will counsel and all parties present state

13        their appearances and who they represent.

14              MR. HABERMAN:  Jeffrey Haberman from

15        Schlesinger Law Offices on behalf of plaintiffs.

16              MR. KALAS:  John Kalas and Louis Rosseau of

17        Hollingsworth.

18              THE VIDEOGRAPHER:  The court reporter is Alan

19        Peacock and will now swear in the witness.

20              THE COURT REPORTER:  If you would raise your

21        right hand, please.

22                  ANDREW SCHNEIDER, M.D.,

23              the witness, having been first duly sworn to

24        speak the truth, the whole truth, and nothing but the

25        truth, testified as follows:
```

```
 1                     EXAMINATION
 2  BY MR. KALAS:
 3      Q.    Good afternoon, Dr. Schneider.  How are you?
 4      A.    I'm good thanks.  How are you?
 5      Q.    Good.  Thanks.  It's a pleasure to meet you,
 6  virtually at least.
 7            You've been deposed many times before; right?
 8      A.    Right.
 9      Q.    Okay.  And so I assume you're familiar with
10  how these go.  But if you need a break at any time,
11  these let me know, and I'd be happy to accommodate.
12      A.    Thank you.
13      Q.    We're doing this deposition virtually via
14  Zoom; right?
15      A.    Yes.
16      Q.    Okay.  Where are you right now?
17      A.    I'm in my office, 7301 North University
18  Drive, Tamarac, Florida, 33321.
19      Q.    And is anyone in your office with you?
20      A.    I'm in my office, yes, but I'm in my little
21  office.
22      Q.    So you have a little office within the larger
23  office?
24      A.    Yeah.  I have my little office, which is my
25  office.  But then we have a big office where we see
```

Andrew Schneider, M.D

```
 1    patients.  So I have a full staff outside of my doors.

 2         Q.   Got it.  Okay.  And my question is about who

 3    is in your little office with you.  And the answer is

 4    no one?

 5         A.   Just me.

 6         Q.   Okay.  Are you on your own personal computer

 7    right now?

 8         A.   This computer is a computer I use for New

 9    Century Health.

10         Q.   Okay.  And New Century Health is the company

11    that you work for?

12         A.   Well, no.  So New Century Health -- so I have

13    my practice and I have a full-time practice.  And

14    that's the address I gave you.  And then I also do work

15    for a company called New Century Health, which is a

16    third-party intermediary where I review chemotherapy

17    requests from around the country.

18              I can't hear you.

19         Q.   I heard "third-party intermediary" and then I

20    lost you.

21         A.   Sorry.  I may change mics.  Sometimes I have

22    to change it.  The third-party intermediaries are I

23    review chemotherapy requests from around the country to

24    see if they're evidence based.

25         Q.   Got it.  And do you have any programs open on
```

```
 1   your New Century Health computer besides the Zoom that

 2   the we're on?

 3        A.   I mean, I can't tell you.  The only thing I

 4   can see is Zoom.

 5        Q.   Do you have any files open on the computer?

 6        A.   No.

 7        Q.   Do you have any paper documents in front of

 8   you right now?

 9        A.   Yes, I do.

10        Q.   Okay.  What paper documents do you have in

11   front of you right now?

12        A.   I have my expert report.

13        Q.   Okay.

14        A.   Then I have assorted literature that is on my

15   reliance list that I printed for a previous deposition

16   on this topic that I still have.

17        Q.   Okay.  And so the literature that you have in

18   front of you is literature that you printed for the

19   Ferro deposition?

20        A.   I'm really bad with names.  The only other

21   Roundup depo I did was -- I thought the names were

22   Plugh (assumed spelling) and the name with an M.  I

23   forgot.

24        Q.   Those are the names of the plaintiffs, so I

25   suspect that's why those are the names you know.  But
```

1    that was a deposition taken by Emma Ross of you,

2    correct?

3        A.    Correct.

4        Q.    And beyond the materials that you had printed

5    out for that deposition, have you printed any other

6    materials for this deposition?

7        A.    The only thing I have printed -- of course, I

8    have a lot of records on my phone which I didn't bother

9    to print and other literature that I didn't bother to

10   print, but, yes, that's all I have printed right now.

11       Q.    Okay.  And is there anything else in the room

12   with you right now that you will be relying on for your

13   deposition today that we haven't talked about?

14       A.    No.  Depending on your questions and how it

15   goes, you know, if you can't show me the document, I

16   will have to find it, if I don't have it printed, if I

17   need to see it.  I don't think so.

18       Q.    Okay.  To the extent you refer to anything

19   else today that we haven't covered, so not your expert

20   report or that literature that you had printed out in

21   front of you, will you let me know so we can mark it as

22   an exhibit?

23       A.    Sure.

24       Q.    Okay.  Have you used this Golkow Litigation

25   platform before for a deposition?

```
 1        A.    I'm not sure what you mean by that.

 2        Q.    Okay.  Well, the way this works, with their

 3   platform, is I will be marking exhibits on an exhibit

 4   share file site.  And as I mark them, they will become

 5   live for you.  So I'm going to put in the chat below

 6   the link to that.  And when you click on the link,

 7   there should be five exhibits in there.  And those five

 8   exhibits should also be accessible to Mr. Haberman.  So

 9   let me put that in the chat.

10        A.    So let me answer your question.  The answer

11   is no.  And I hope I can do this.  It sounds very

12   complicated.

13        Q.    It shouldn't be.  But we will see.

14        A.    I click this link now?

15        Q.    Yes, sir.  And you should see five exhibits

16   marked.

17        A.    Yes.  I see five exhibits.  I thought there

18   was another one.

19        Q.    Okay.  So I'm going to go through them one by

20   one.

21        A.    You're going to pull them up?

22        Q.    You can click on them yourself.  I can also

23   share my screen so we're all singing from the same song

24   book.  But yeah, you can look at them yourself too and

25   manipulate them however you need to within there.
```

Andrew Schneider, M.D

```
1         A.   I will just let you do it, and if I have a

2    question I will go back.  How is that?

3         Q.   Sure.

4              So the first document I have marked -- and I

5    will put it on the screen as Exhibit 1 -- is your

6    notice of deposition.

7              Have you seen this document before, sir?

8         A.   Again this is my first problem.  I don't see

9    it.  All I see is what I clicked on.  Should I minimize

10   that?

11        Q.   Yeah.  So you should get back in the Zoom

12   screen.

13        A.   I got it.  Okay.

14        Q.   Can you see that I put it up on the screen?

15        A.   Yes.

16        Q.   Okay.  And this is your notice of deposition

17   in the Ingilis case.  And it sets the deposition time

18   as the time you have come.

19             Have you seen this document before, sir?

20        A.   Yes.

21        Q.   Okay.  When did you first see this document?

22        A.   I can't tell you.  I don't know dates.

23        Q.   Okay.  Did you see that we requested some

24   documents in this notice of deposition?

25        A.   Yes.
```

Andrew Schneider, M.D.

1        Q.   Okay.  And Request 2 requested "Invoices or

2    bills that you rendered in connection with your work as

3    an expert in litigation involving Roundup, including

4    but not limited to his work regarding plaintiff in this

5    case."

6             Do you see that?

7        A.   I do.

8        Q.   And I know you provided some invoices to

9    Ms. Ross prior to your last deposition.  Since your

10   last deposition, have you submitted any invoices for

11   Roundup cases to Mr. Haberman?

12       A.   Just for this deposition today, which I

13   actually asked him to give you a bill too, which  --

14       Q.   Yeah.  I haven't received that invoice.

15            MR. KALAS:  And I don't know -- Mr. Haberman,

16       can you forward that invoice to me, sir?

17            MR. HABERMAN:  Yeah.  I will forward you

18       invoices.

19   BY MR. KALAS:

20       Q.   While Mr. Haberman is doing that,

21   Dr. Schneider will move on to another issue, which is

22   this Request for Production, also asked for it, Number

23   3, "All documents that Dr. Schneider will consider in

24   support of his deposition testimony in this case."

25            Do you see that?

```
 1        A.    I do.

 2        Q.    Okay.  And we received from Mr. Haberman an

 3   amended materials considered list or reliance list.  I

 4   guess he sent it either yesterday evening or this

 5   morning.  And I premarked that as Exhibit 5, so we're

 6   jumping ahead a little here.

 7              Is this list here in Exhibit 5 the full list

 8   of materials you intend to rely upon in this case for

 9   your expert opinions?

10        A.    Assuming this is the updated list, yes.

11              MR. KALAS:  Mr. Haberman, can you stipulate

12        this is the updated the list?

13              MR. HABERMAN:  Yeah.

14   BY MR. KALAS:

15        Q.    Okay.  Now, backtracking a little bit,

16   Exhibit 2 is the expert disclosure in this matter.  And

17   in you look here at page 2, carrying over to page 3, it

18   says "Plaintiffs may call Dr. Andrew Schneider of South

19   Florida Oncology and Hematology Consultants" -- and

20   then it lists your address on North University Drive.

21   It says "Dr. Schneider may testify on issues of general

22   and specific causation including whether exposure to

23   glyphosate and/or glyphosate-based formulated products

24   can cause cancer, specifically non-Hodgkin's lymphoma

25   and cancer development."
```

Andrew Schneider, M.D.

```
 1              "Dr. Schneider may also testify on issues of

 2    specific causation, i.e., proximate and but-for

 3    causation, regarding whether exposure to glyphosate

 4    and/or glyphosate-based formulated products was a cause

 5    or substantial contributing factor to causing the

 6    plaintiff's development of non-Hodgkin's lymphoma and

 7    other cancers.  Dr. Schneider may also testify as to

 8    plaintiff's damages," and then it lists your fee for

 9    deposition there.

10              Did I read that correctly, sir?

11        A.   You read it correctly.

12        Q.   And is that the scope of the opinions that

13    you intend to offer in this case?

14        A.   Well, I mean very, very -- what's the

15    word? -- not "embellished;" so I'm sure you're going to

16    ask me a lot of questions to get my opinions, but this

17    is just a general format, if you will.

18        Q.   Okay.  And so, for instance, do you not

19    intend to offer any opinions on the corporate conduct

20    of Monsanto in this case?

21        A.   On the what?  I'm sorry.  I didn't hear you.

22        Q.   Corporate conduct of Monsanto.

23        A.   No.

24        Q.   And do you not intend to offer any opinions

25    on the safer alternative design of Roundup; correct?
```

```
 1        A.   Correct.  I'm a medical oncologist.  That's

 2   what I will be talking about, things that are in my

 3   expertise.

 4        Q.   Okay.  Perfect.  And getting to the nitty

 5   gritty of your opinions, you served an expert report in

 6   this matter; correct?

 7        A.   Correct.

 8        Q.   And that expert report I have marked as

 9   Exhibit 3.  And it's dated June 22, 2022.  Do you see

10   that?

11        A.   I do.

12        Q.   And is this a true and correct copy of your

13   expert report?

14        A.   To be fair, you haven't shown me more than

15   five lines.  I'm sure it is, but --

16        Q.   So remember I said you could manipulate the

17   document whenever you wanted?

18        A.   I'm not as good as you guys.  How do I get

19   back to that --

20        Q.   Go back to the other link, which is the -- it

21   should be the Golkow remote link.  You should have an

22   address like this at the top.

23        A.   I don't see that anymore.  Do I have to "X"

24   you out and minimize the screen?

25        Q.   Minimize the Zoom, and you should be able to
```

1    go back to the other one.

2           And just to sort of ground us, we're looking

3    at Exhibit 3 here.

4       A.   Okay.  This is the 12 pages.  This is

5    correct.

6       Q.   Okay.  Is this the most current version of

7    your expert report in this matter?

8       A.   Yes.

9       Q.   Okay.  Are all of the opinions you intend to

10   offer in the Engilis v. Monsanto case outlined in this

11   expert report?

12      A.   I believe so.

13      Q.   Okay.  Perfect.  Now, lastly, we asked for an

14   updated copy of your CV in anticipation of this

15   deposition, and we didn't get one.  This is the CV that

16   was marked at the previous deposition.  Do you have any

17   updates to this CV?

18      A.   This is the one I did with Aetna; right?

19      Q.   Yes, sir.

20      A.   It's only been a few weeks, so no.

21      Q.   Perfect.  Moving right along, I want to go to

22   Exhibit 5 real quick here.  So in Exhibit 5, you

23   have -- well, I want to go to the title first of

24   Exhibit 5.  The title of this is Amended Reliance List

25   of Andrew Schneider; correct?

```
 1       A.   Yes.

 2       Q.   Okay.  Now, there is a reliance list as

 3  opposed to a materials-considered list, at least in the

 4  title.  Have you considered --

 5       A.   Can I stop you for a second?

 6       Q.   Sure.

 7       A.   I'm not a lawyer.  I don't know the

 8  difference; so -- I'm a doctor.

 9       Q.   Well, I'm going to get to it.  I understand

10  you're not a lawyer.

11            Have you considered additional materials, in

12  other words, read and thought about them in formulating

13  your opinions, that are not listed on Exhibit 5?  And

14  take a minute to look through it if you need to.

15       A.   Well, the answer is I have a fund of

16  knowledge.  I read all the time.  I come across

17  literature all the time.  You know, this is what I'm

18  relying on; so I guess it's why I'm calling it my

19  reliance list.  But if you ask me a question about

20  something else, I might have some knowledge about it

21  and I will talk about it if you want.  So I don't know

22  if that helps you in that, but that's how I answer the

23  question.

24       Q.   Well, I need to ask a few more follow-up

25  questions.
```

1      A.   Sure.  Sure.

2      Q.   So, for instance, are there articles in the

3  medical or scientific literature on glyphosate that you

4  read when forming your expert opinion in this case but

5  chose not to list on your reliance list?

6      A.   No.  The example I was going to give was, in

7  my last deposition, Emma showed me 10 documents that I

8  had never seen before.  Now I've seen them.  So, for

9  example, maybe you're talking about those documents.

10  "Oh, yeah, I remember Emma showed to it me two weeks

11  ago," that kind of thing.

12      Q.   Okay.  Let me ask the question excluding

13  those.  Excluding documents shown to you by -- well,

14  strike that.

15           Excluding scientific articles and medical

16  articles shown to you by opposing counsel on your

17  previous Roundup deposition, have you considered any

18  other scientific or medical articles on glyphosate or

19  Roundup in reaching your conclusions in this matter

20  other than those listed in Exhibit 5?

21      A.   No.

22      Q.   Okay.  And the same would be true of

23  regulatory documents, sir?

24      A.   Correct.

25      Q.   Okay.  Now going down here to internal

1   documents, now this -- where it's called internal

2   documents here, what do you mean by calling these

3   internal documents?  What's that mean?

4        A.   I didn't label them internal documents.  But

5   basically, these are, I think, requests for production

6   to Monsanto or other makers of glyphosate where there

7   was some emails and discussions.

8        Q.   Okay.  You said you didn't label them

9   internal documents.  Did you not create this list?

10       A.   I endorsed this list but I did not type this

11   list, no.

12       Q.   Okay.  Did counsel type this list?

13       A.   I don't know who typed the list, but I didn't

14   type it.

15       Q.   How did you receive the list?

16       A.   This list?  By email.

17       Q.   Okay.  From whom did you receive the list?

18       A.   Either Mr. Haberman or his paralegal.

19       Q.   Okay.  Do you intend to offer opinions

20   regarding any of the documents listed as internal

21   documents in the Engilis case?

22            MR. HABERMAN:  I object to the form of the

23       question.

24   BY MR. KALAS:

25       Q.   Dr. Schneider, you can answer the question

Andrew Schneider, M.D.

```
 1   unless counsel instructs you not to answer.

 2        A.   It depends on what question you ask me; so --

 3        Q.   Well, today is my opportunity to find out

 4   what opinions you're going to offer in this case.

 5        A.   Right.

 6        Q.   And let me just put my cards on the table.

 7   Here is what I'm concerned about; okay?  And this is --

 8   this isn't a question.  I'll just tell you where I'm

 9   coming from, and then we can ask questions.

10             My concern is that you have a bunch of

11   documents that are mostly company emails listed on

12   here.  You don't talk about them in your expert report,

13   but you may offer opinions on them later on at trial

14   and say they were on my reliance list.  That's my

15   concern.  So what I'm trying to understand is what your

16   opinions today are regarding these documents.

17        A.   Sure.

18        Q.   So let me ask the question now, because that

19   wasn't my question.

20        A.   Okay.

21        Q.   Sitting here today, you have opinions you

22   intend to offer regarding the documents listed under

23   internal documents?

24             MR. HABERMAN:  Object to the form.

25             THE WITNESS:  You're asking if I have
```

1      opinions about the documents?

2    BY MR. KALAS:

3      Q.   Yes, sir.  Expert opinions.

4      A.   Only to the extent that you asked me a

5    question where I need to bring them up.  As a matter of

6    my report, I don't intend to use them unless there's a

7    question that arises where I say, oh, yeah, I haven't

8    seen that in these internal documents.  But if it's not

9    in my report, it's not the basis for my opinion about

10   whether the glyphosate caused the CLL.

11     Q.   Okay.  Let's go back into Exhibit 3 so I can

12   make sure to understand that part.

13          Looking at Exhibit 3, which is your expert

14   report, are there any opinions you offer in here for

15   which you rely on those documents entitled internal

16   documents on Exhibit 5?

17     A.   No.

18     Q.   And all of the opinions you intend to offer

19   at trial are contained in Exhibit 3; correct?

20     A.   Unless, of course, you ask me something -- it

21   depends on what you ask me.  My answer is yes unless

22   something comes up and you ask me that.  I don't know

23   what you're going to ask me.

24     Q.   Perfect.  Now, at your last deposition with

25   Ms. Ross, you discussed invoicing approximately

1   $150,000 on medicolegal work each year; is that right?

2        A.   Yes.

3        Q.   And this year is the first year you've worked

4   on Roundup cases; right?

5        A.   Correct.

6        Q.   Up to this point, August 9, 2022, how much

7   have you invoiced or do you plan to invoice on Roundup

8   cases?

9        A.   I have only -- I have completed my invoices

10  for the first deposition and those cases, so that's

11  done.  So you have those records or you can get them

12  from Mr. Haberman.  You also should be getting the

13  invoices on this case.  So those are the only invoices

14  that I have.  Add up the two cases, and that's what the

15  number is.

16       Q.   Okay.  And we will mark those at a break once

17  I'm able to get back in my email.

18            Just jumping back to Exhibit 5 real quick,

19  given I just got this -- and I'm not casting any

20  aspersions with that, but I did just get it -- I

21  haven't gone back and compared Exhibit 5 to your

22  previous reliance list that was served in late June.

23  Do you have any recollection of what you added to this?

24       A.   Yes.  I think the only thing I have added is

25  cites for the literature that I have in my expert

Andrew Schneider, M.D.

```
 1    report about the association of CLL and melanoma; so I
 2    think there was no reference to what I was saying, so I
 3    think I just gave you two references.
 4         Q.   Got it.  Okay.  Perfect.  Thank you.
 5         A.   Sure.
 6         Q.   Okay.  Going to Exhibit 3 -- well, actually
 7    going back to Exhibit 2, Exhibit 2 says you're going to
 8    offer opinions on both general causation and specific
 9    causation; right?
10         A.   Yes.
11         Q.   So going to Exhibit 3 -- and feel free to
12    refer to Exhibit 3 as much or as little as you need
13    to -- can you walk me through your methodology, first,
14    in reaching your general causation opinion in the
15    Engilis matter that Roundup is capable of causing CLL?
16         A.   Sure.  So I reviewed all of the available
17    pertinent literature including animal data,
18    epidemiologic data; I reviewed meta-analysis, case
19    control studies, cohort studies; and I formed an
20    opinion based upon the epidemiologic and animal data
21    whether Roundup causes NHL and specifically CLL.
22         Q.   Okay.  And you said NHL and specifically CLL.
23    Do you hold the opinion that Roundup causes NHL
24    generally?
25         A.   I believe to a reasonable degree of medical
```

1    certainty that, yes, Roundup is an etiologic agent that

2    causes NHL.

3         Q.   Okay.  And likewise, do you hold the opinion

4    that Roundup causes the specific NHL subtype CLL?

5         A.   I do.

6         Q.   And the methodology that you employ to

7    determine whether Roundup causes NHL generally, can you

8    just explain that to me and then we will go to the CLL

9    after.

10        A.   Sure.  Well, as I'm sure you're aware --

11             MR. HABERMAN:  Asked and answered.  Go ahead.

12             THE WITNESS:  I did answer, but I will do it

13        again.

14             MR. HABERMAN:  That's fine.

15             THE WITNESS:  So I'm sure you're aware that

16        the studies -- some look at NHL in general, some

17        break it down by subtype, some by exposure.

18             So I have reviewed, first, animal data and

19        then epidemiologic data.  You can see from my

20        report I reviewed -- I think it's six or seven

21        main studies, and then I reviewed multiple

22        meta-analysis or pool studies to reach my opinion

23        to a reasonable degree of medical certainty that

24        Roundup is an etiologic agent that causes NHL and

25        then, based upon reviewing some of these studies,

Andrew Schneider, M.D.

```
 1        CLL.

 2        Q.   Got it.  Okay.  And so going to the animal

 3   data quickly here, when you talk about animal data, are

 4   you specifically talking about rat and mouse cancer

 5   bioassays?

 6        A.   Specifically, yes, I know there are other

 7   data about causing other kinds of cancers, which I take

 8   into consideration.  But, you asked for the association

 9   and the animal data.  It was mouse, rat studies,

10   correct.

11        Q.   Okay.  And those mouse and rats that were

12   looked at in those studies -- well, let me back up and

13   ask a foundational question so strike that.

14             Can mice get CLL?

15        A.   So I don't know if they did that detailed

16   analysis.  I know they get NHL, and CLL is a type of

17   NHL, so the answer would be, yes, mice get NHL and they

18   can get CLL, but I'm not sure that was looked at.

19        Q.   I'm not sure -- I wasn't asking whether it

20   was looked at.  I was asking whether they were

21   physically capable of getting the specific disease that

22   Mr. Engilis, has which is CLL?

23        A.   Let me answer that question then:  Since I'm

24   not a veterinarian, I can't answer that question.

25        Q.   And same question for rats.  Are rats capable
```

1    of getting the specific disease Mr. Engilis has, CLL?

2        A.   I don't treat rats for a living, so I'm

3    unable to say whether rats can get CLL, although they

4    can get NHL.  I just don't know what subtypes they can

5    get or how they subtype rat lymphomas.

6        Q.   And you can see that there are physiological

7    differences between rodents and humans; correct?

8        A.   Sure.

9        Q.   And pathologically, do you have an opinion,

10   one way or the other, whether a lymphatic tumor in a

11   rodent even looks the same as a lymphatic tumor in a

12   human?

13       A.   Do you mean under the microscope?

14       Q.   Yes, sir.

15       A.   Since I'm not pathologist, I don't look at

16   lymphoma under the microscope.  I couldn't answer that

17   question either.

18       Q.   And actually let me ask you a more broad

19   question.  Are mice capable of getting non-Hodgkin's

20   lymphoma?

21       A.   Yes.  I believe the studies show that these

22   CB1 mice do get NHL.

23       Q.   You don't recall if they were listed as

24   having a malignant lymphoma?

25       A.   I'm confused on your question.  Are you

```
 1   saying NHL is not malignant?  What are you trying to

 2   tell me?

 3       Q.   My question is:  Is NHL physiologically the

 4   same disease as malignant lymphoma in mice?

 5       A.   I'm not a veterinarian, but I believe that

 6   NHL and malignant lymphoma -- I believe -- I believe

 7   they're the same, yes.

 8       Q.   And what are you basing that opinion on?

 9       A.   My understanding, as a medical oncologist, if

10   you ask in humans is malignant lymphoma the same as

11   NHL, I would say yes.

12            When I talk about malignant lymphoma, I'm

13   ruling out Hodgkin's, for example.  I'm ruling out -- I

14   don't consider those malignant lymphomas.  So for me,

15   hairy cell leukemia, myeloma, and Hodkin's are not

16   malignant lymphomas.  They're just what I said they

17   were.

18            So for me, malignant lymphomas are B-cell

19   lymphomas, T-cell lymphomas, and the various B-cell

20   lymphomas including CLL and diffuse large B-cell

21   lymphoma.

22       Q.   Right.  And I completely understand that, and

23   I appreciate that you are an expert on what NHL is in a

24   human.  My question is whether you're an expert on what

25   malignant lymphoma is to a veterinary pathologist.
```

Andrew Schneider, M.D.

```
 1              So let my ask my question, and you can
 2   object.  So my question is:  Do veterinary pathologists
 3   classify malignant lymphoma the same way human
 4   oncologists classify non-Hodgkin's lymphoma?
 5              MR. HABERMAN:  Objection to the scope.
 6              THE WITNESS:  There's no way I can tell what
 7         a veterinary pathologist does.  I'm not a
 8         veterinary pathologist nor do I deal with them.  I
 9         am, however, able to read the literature, which
10         clearly states that the CB1 mouse exposed to
11         glyphosate develops NHL.
12   BY MR. KALAS:
13       Q.  We will look at some of that literature in a
14   bit.  But thank you.  Let's keep going.
15              Let's go to your methodology for your
16   specific causation opinions.  Can you walk me through
17   your methodology in reaching your conclusions on
18   specific causation in the case of Mr. Engilis?
19       A.   Sure.  I looked at all of the etiologic
20   factors that cause CLL.  And I think they're in my
21   report.  There are autoimmune diseases.  There are
22   viral exposures.  There are occupational exposures.
23   There are immunosuppressive drugs.  So I look through
24   all of the possible causes of CLL.
25              Let me go through my report one second.
```

```
 1              So I say that having acquired

 2    immunodeficiency syndrome, autoimmune diseases,

 3    infection, previous lymphoma, certain drugs,

 4    occupational/environmental exposures, family history of

 5    malignancies -- so I went through all of the possible

 6    etiologic agents for CLL and ruled them out to a large

 7    degree.  And then, in my mind, a reasonable degree of

 8    medical certainty is left, Roundup, the 24-year

 9    exposure, as the most probable etiologic agent for the

10    development of CLL to a reasonable degree of medical

11    probability and certainty.

12         Q.   So we will get into that a little more detail

13    in a bit.  Are all of those things you just outlined

14    listed here on page 10 that I have up on the screen?

15         A.   I believe so, yes.

16         Q.   And so you conducted what is known as a

17    differential etiology in reaching your opinion that

18    Mr. Engilis's Roundup use caused or contributed to his

19    CLL; correct?

20         A.   Correct.

21         Q.   Okay.  Now, in the text of the report, and

22    again on the amended reliance list, which is Exhibit 5,

23    you talk about the fact that you have relied upon --

24    I'm going up here to page 1 -- and incorporated by

25    reference the expert report for Christopher Portier,
```

Andrew Schneider, M.D.

1    Dennis Weisenburger and Ron Schiff.  Do you see that?

2         A.   I do.

3         Q.   Before we get into that and who they are and

4    what have you, what do you mean by "incorporate by

5    reference"?

6         A.   Just that I reviewed those reports, looked up

7    what they said, and then reached my own conclusions.

8         Q.   So when you say "incorporate by reference,"

9    you don't mean that you have adopted every single

10   opinion they have, and you're going to tell the jury

11   those objections.

12             MR. HABERMAN:  Objection.

13             THE WITNESS:  Yes.  That is correct.

14   BY MR. KALAS:

15        Q.   Are there any portions of Dr. Portier --

16   well, we will take them in turn so that we have clean

17   questions here.  Are there any portions of

18   Dr. Portier's report that you are not relying on here?

19             MR. HABERMAN:  Objection.

20             THE WITNESS:  Again, I don't have them

21        memorized.  We would have to pull them up and look

22        at them to answer that question.

23   BY MR. KALAS:

24        Q.   Same question for Dr. Weisenburger and Dr.

25   Schiff?

Andrew Schneider, M.D.

```
 1        A.   Yes.  They're lengthy reports.  I don't have

 2   them memorized.  If you have a specific question, I can

 3   call up the report.

 4        Q.   Are you aware that portions of Dr. Portier's

 5   opinions on the animal data were excluded by the same

 6   court that you're offering opinions in here?

 7        A.   I don't know which opinion you're talking

 8   about; and, no, I don't know anything about illegal

 9   maneuvers.  But, again, you haven't even asked me what

10   I'm relying on from Portier's report, because you

11   haven't shown it to me yet.  What I am relying on is

12   data from the CB1 mouse that shows glyphosate causes

13   NHL.

14        Q.   So you're relying on -- that's one thing

15   you're relying on, Dr. Portier's report, data from CB1

16   mice that shows, in your opinion, glyphosate causes

17   NHL.  What -- are you relying on his entire animal

18   section?  Only portions of that?

19        A.   Again, to be fair, if you're going to talk

20   about the report, you have to show it to me.

21        Q.   Well, let me ask you this -- well, strike

22   that.  I'll come back to that.

23             Now, Dr. Shiff, Dr. Weisberger, and

24   Dr. Portier, they're all experts for plaintiffs in

25   Roundup litigation; right?
```

Andrew Schneider, M.D.

```
1        A.   I believe so, yes.

2        Q.   How did you select those three to rely on?

3        A.   I was given their reports by plaintiff's

4   counsel and reviewed them.

5        Q.   Okay.  Did you review any of Monsanto's

6   expert reports in forming your opinions?

7        A.   Just the internal documents that we discussed

8   before.

9        Q.   Okay.  I mean, were there retained experts

10  for Monsanto Company in litigation like Dr. Portier is

11  or Dr. Weisenburger or Dr. Shiff is for plaintiffs?

12       A.   I mean, I'm sure there are.  I don't know who

13  they are, and they were not given to me.  And again, I

14  read these reports, but these reports are not the basis

15  for my opinions.  You know, they're additive things.

16  But my opinions are based upon my understanding of the

17  literature and the epidemiologic studies that I have

18  discussed before.

19       Q.   Okay.  So just to be clear, though,

20  Dr. Portier is a biostatistician; right?

21       A.   So I don't remember exactly what his title

22  is.  He was a Ph.D., and I don't have memorized what

23  he is an expert in other than knowing that he did or

24  reported the animal data.

25       Q.   You didn't review the report of Christopher
```

1    Portier from Utah State University who is a

2    biostatistician, did you?

3        A.   I wasn't given that so I wouldn't know to ask

4    for that, correct.

5        Q.   And Dennis Weisenburger, he is a pathologist;

6    right?

7        A.   Yeah.  And I don't have these factors

8    memorized.  I know Dennis Weisenburger.  I have his

9    expert report, and I have an article from him.  But I

10   don't memorize whether he is a pathologist or

11   oncologist or what he does for a living.

12       Q.   And you didn't review the report of Eric

13   Duncavage from University of St. Louis on pathology,

14   did you?

15       A.   I wasn't give that; so no.

16       Q.   And Ron Schiff, he is an oncologist; right?

17       A.   Again, I don't memorize what these people do;

18   so --

19       Q.   Do you need to take a break?

20       A.   No.  I don't need to take a break.  So, you

21   know, I read all three reports.  Again, I don't have

22   them memorized.  We'll talk about them if you want to

23   pull them up one by one, but these are the reports I

24   was given to review.  And I wouldn't be able to ask for

25   other reports because I don't have the names or know

1    who to ask for.

2         Q.   And you did not review the report, for

3    instance, of Celeste Feldman at USF Moffitt Cancer

4    Center on glyphosate; correct?

5         A.   That is correct.

6         Q.   Now, why did you care, when reaching your

7    opinions, what other experts for plaintiffs had to say

8    but not what experts for Monsanto had to say?

9              MR. HABERMAN:  Objection.  Argumentative.

10             But you can answer.

11             THE WITNESS:  So the answer is I read the

12        reports just to read the reports.  It pointed me

13        to the literature.  I went to the epidemiologic

14        literature and read extensively to give my own

15        opinions.  I'm not adopting the opinions of any of

16        these three doctors.

17             So my opinions are based upon my

18        understanding of CLL, its epidemiology, and

19        reading in detail the literature, which I'm sure

20        we're going to talk about in detail.  So plaintiff

21        and defense opinions really don't influence my

22        decisions and my opinions.

23             I come here today to give you my opinions as

24        Dr. Andrew Schneider, medical oncologist, what I

25        believe to a reasonable degree of medical

Andrew Schneider, M.D

1          certainty, and it's not in any way predicated on

2          an opinion of Dr. Portier, Dr. Weisenburger, or

3          Dr. Schiff.

4    BY MR. KALAS:

5          Q.   Well, you said Dr. Portier, Dr. Weisberger

6    and Dr. Schiff pointed you to the literature.  You

7    mentioned that in your last answer.  Do you recall that

8    when you were deposed by Ms. Ross last time she pointed

9    you to some literature that you had not considered?

10          MR. HABERMAN:  Objection to the form of the

11          question.

12          THE WITNESS:  What she pointed to, my

13          recollection, was other countries' regulatory

14          agencies' reports on the association of glyphosate

15          and NHL.  I don't recall these being epidemiologic

16          studies, or if they were, they probably referenced

17          the same epidemiologic studies that I referenced

18          because there are only a certain number of studies

19          out there.  So that's my answer.

20    BY MR. KALAS:

21          Q.   You cite the meta-analysis by Dr. Zhang from

22    2019 on your reliance list; right?

23          A.   Correct.

24          Q.   You do not cite the meta-analysis from

25    Dr. Kabat from 2020 on your reliance list, do you?

Andrew Schneider, M.D.

```
1        A.    No.

2        Q.    You do not cite the meta-analysis from

3   Dr. Donato from 2020 on your materials from your

4   reliance list, do you?

5        A.    Well, that's not fair.  I'm familiar with

6   Donato and his meta-analysis.  And I thought he was

7   also part of -- I think 2020 there was another author

8   there.  Who is the other author?

9        Q.    So Boffetta 2020?

10       A.    Right.  Boffetta.

11       Q.    Well, he is not listed actually as an author,

12   Befetta.  We're looking at that right now.  But just to

13   go back to my original question, you don't cite on your

14   reliance list Donato 2020; correct?

15       A.    I don't.  But again, I think he may be

16   associated with Boffetta.

17       Q.    The reason I ask you this question is -- are

18   you aware that Dr. Portier and Dr. Schiff and

19   Dr. Weisenburger also don't cite to those studies?

20       A.    Like I said, I'm not relying on everything

21   they say.  I do my own research.  You know, I got a way

22   to start, I think, by looking at the six or seven main

23   epidemiologic studies.  And then from there, I went to

24   the meta-analysis and the pooled studies.

25       Q.    But you didn't go to the Kabat meta-analysis;
```

Andrew Schneider, M.D.

```
 1    correct?

 2         A.   I may have seen that one.  I actually have

 3    seen that one.  Is that the January 6, 2021?

 4         Q.   I don't believe it would have an actual date

 5    like that on it.  It's a published article in

 6    peer-reviewed literature, sir.

 7         A.   Okay.  I think I have seen it.  But I agree,

 8    if it's not on my list, it's not on my list.

 9         Q.   Right.  Have you ever spoken to any of the

10    experts for plaintiffs in Roundup litigation regarding

11    Roundup?

12         A.   No.

13         Q.   Have you ever spoken to Mr. Engilis?

14         A.   No.

15         Q.   Okay.  Turning to Mr. Engilis here for a

16    minute -- and we will take a break soon --

17         A.   I don't need to break, by the way, unless you

18    do.

19         Q.   No.  I know.  I just usually do them one an

20    hour.  If you want to keep going and --

21         A.   We've only been going 45 minutes.  It's up to

22    you.

23         Q.   I don't need it yet.  But anyway, we will

24    keep going until you tell me you need a break.  How

25    does that work?
```

1      A.    Yeah.  I think we should go another 45

2    minutes at least.

3      Q.    Okay.  Cool.

4            MR. HABERMAN:  We will break on the hour.  I

5        have to use the restroom.

6            THE WITNESS:  I mean, you guys only have

7        three hours; so --

8    BY MR. KALAS:

9      Q.    All right.  So Mr. Engilis's cancer -- and I

10   say cancer collectively here.  Mr. Engilis actually had

11   three cancers manifest in 2014; correct?

12     A.    Correct.

13     Q.    Okay.  First, he was diagnosed with bladder

14   cancer in the middle part of that year; correct?

15     A.    Correct.

16     Q.    And then near the end of the year, he was

17   diagnosed with melanoma.  And then during the course of

18   his melanoma treatment was diagnosed with CLL; correct?

19     A.    Correct.

20     Q.    Okay.  Are you offering an expert opinion

21   regarding the cause of Mr. Engilis's bladder cancer?

22     A.    I'm going to make the opinion that patients

23   with CLL have immunodysfunction and are at risk for

24   second malignancies.

25     Q.    That wasn't my question, though.  I

1  understand that's an opinion you offer.  But I asked

2  about the cause of his bladder cancer.

3       Are you going to offer an opinion -- let me

4  ask a more specific question.  Are you going to opine

5  that Mr. Engilis's CLL caused his bladder cancer?

6       A.   I think I said that in my report.  I think I

7  say decreased immunity and B-cell dysfunction of CLL

8  probably, more likely than not, accounts for this

9  emergence of second malignancy such as TCC of the

10  bladder.

11       Q.   Where do you say that in your report, sir?

12       A.   Look at the last page.  It's under Line

13  Association.  Right there.

14       Q.   Probably more likely than not.  Okay.

15       So let me ask you -- let's get our timelines

16  right here.  When did the genetic damage that caused

17  Mr. Engilis's bladder cancer first occur?

18       A.   I can't give you a date.  But basically he

19  had 24 years of Roundup exposure which, in my opinion,

20  was the etiologic agent which eventually caused his

21  CLL.  And because he had CLL, he had immune B-cell

22  dysfunction and was at risk for secondary malignancies

23  including TCC of the bladder and melanoma.

24       Q.   When did the genetic damage that led to

25  Mr. Engilis's malignant melanoma first occur?

1      A.    I can't give you an exact date.  I think it

2   was probably years before he was diagnosed.  Again, he

3   had 24 years of Roundup exposure, but I can't tell you

4   an exact date when the immune dysfunction occurred.

5      Q.    When did the genetic damage that led to

6   Mr. Engilis's CLL first occur?

7      A.    Again, I think sometime years before

8   diagnosis, but I can't be any more precise than that.

9      Q.    Explain to me -- well, let me ask you this:

10  Do you have an opinion to a reasonable degree of

11  scientific certainty that the genetic damage that led

12  to Mr. Engilis's CLL preceded the genetic damage that

13  led to his bladder cancer?  We will start with that.

14     A.    Well, I'm not sure I understand your

15  question, but let me try to answer it; and if I don't

16  answer it correctly, it's because I don't understand

17  it.

18           So as you said to me before, they all kind of

19  occurred in a similar time frame, right, within 12

20  months of each other, 14, 15 -- so it's my opinion, to

21  a reasonable degree of medical certainty, that the 24

22  years of glyphosate exposure caused him to have CLL and

23  subsequently immune dysfunction which led to his other

24  problems of TCC of the bladder and melanoma.

25           Now, as you may or may not know, bladder

1    cancer, one of the strongest etiological factors is

2    cigarette smoking.  He was not a cigarette smoker.  So

3    again, doing a differential type of diagnosis, I think,

4    to a reasonable degree of medical certainty, that the

5    glyphosate exposure over 24 years caused the CLL; and

6    that B-cell dysfunction and immunosuppression allowed

7    him to develop the secondary malignancies which are

8    well reported in the literature, including TCC of the

9    bladder and melanoma.

10        Q.   Well, let me ask some hypotheticals here,

11   then, to get our timeline right.  If the genetic damage

12   that caused his malignant -- excuse me -- strike that.

13            If the genetic damage that caused

14   Mr. Engilis's bladder cancer occurred prior to the

15   alleged damage from Roundup that caused his CLL, then

16   the Roundup and CLL could not have caused the bladder

17   cancer; true?

18        A.   Well, that's a confusing statement, but I

19   will try.  Maybe say it slowly and then piece it.

20        Q.   Let me make it simpler.  If the genetic

21   damage that caused the bladder cancer occurred prior to

22   the manifestation of CLL, then the CLL could not have

23   caused the bladder cancer, true?

24        A.   No.  I don't think so.  As I said before, you

25   know, the manifestations of all three diseases kind of

 1    occurred simultaneously.  We can argue a month here,

 2    month there, six months, but all in the same time frame

 3    of 2014, 2015.  And we have a 24-year exposure of

 4    glyphosate causing damage over these 24 years.  And at

 5    some point, the development of CLL amassed and it

 6    probably amassed because, when they were found, it was

 7    probably there perhaps years or months before it was

 8    found.

 9              And I believe, based on my understanding as a

10    trained medical oncologist, that the glyphosate, the

11    long 24-year exposure, caused B-cell dysfunction and

12    increased immunity and allowed the development of two

13    other malignancies, that being melanoma and TCC of the

14    bladder.

15    Q.    So I really don't think I understand, but I

16    think we're talking past each other a little bit.  I'm

17    not asking specifically about Mr. Engilis in this

18    question.  I'm asking a hypothetical question.

19              My hypothetical question is:  If the damage

20    that caused the bladder cancer, whatever it is -- the

21    random application error, environmental exposure, what

22    have you, whatever it is -- if the damage that caused

23    the bladder cancer, occurred prior to the damage that

24    caused his CLL, then the CLL could not have contributed

25    to the initiation of the bladder cancer.  True?

Andrew Schneider, M.D.

```
 1        A.   I don't understand the question.  For

 2   example, are we talking about glyphosate or cigarette

 3   smoking or -- I don't understand the parameters.

 4        Q.   Well --

 5        A.   Wait.  You're interrupting me.  Let me

 6   finish.  I don't understand the parameters of your

 7   question.  So if you could -- if it's a hypothetical,

 8   nothing to do with this case --

 9        Q.   Sure.

10        A.   Give me the hypothetical so I can understand

11   it.

12        Q.   Yep.  I tried to.  But the cause of the

13   injury is not important to the hypothetical.  Okay?

14        A.   Well, okay.  Maybe it is, but okay.

15        Q.   Well, you said it could be cigarette smoking.

16   It could be whatever.  You can make it be whatever you

17   want it to be.  My question is focused on timing

18   instead, which is:  If the cause of the bladder cancer,

19   or whatever it is, occurred prior to the initiation

20   from another cause, the same cause of the CLL, then the

21   CLL could not have caused the bladder cancer.  True?

22        A.   Not to be difficult.  I don't understand your

23   question.  I can't follow your question.

24        Q.   It's just a question of timing.  Let me make

25   it a little more concrete, but still, it doesn't matter
```

1    what the cause is.

2          Let's say the bladder cancer is initiated in

3    1996.  Okay?

4     A.   I'm going to take notes on your question, if

5    that's okay.  In 1997 --

6     Q.   I said '6 but '7 is fine too.

7     A.   1996 what happens?

8     Q.   The bladder cancer is initiated.

9     A.   What do you mean by -- how do you know?  What

10   does that mean?

11    Q.   The first genetic damage that causes the

12   bladder cancer occurs.

13    A.   How do you actually know that?

14    Q.   Well, that is actually kind of the point I'm

15   getting at.  But let's say you have all knowledge.

16   Okay?

17    A.   So something that causes -- some etiologic

18   agent that -- do they have the bladder cancer in '96 or

19   is it just starting?

20    Q.   All of these diseases have latency; right?

21   Let's make this very basic.  Bladder cancer, malignant

22   melanoma, CLL, they have latency; right?

23    A.    I mean, there's timing before diagnosis but

24   there may be different time frames.  But okay.

25    Q.   Right.  So the genetic damage, if it's an

1    external etiologic source, could occur years before the

2    manifestation of the disease.  You agree with that;

3    right?

4        A.   Right.  That's what I said before about the

5    glyphosate.  Right.

6        Q.   And glyphosate is the concrete example you

7    have in Mr. Engilis's case, but it could be lots of

8    things in the real world that contribute to a cancer

9    right?

10            MR. HABERMAN:  Object to the form.

11   BY MR. KALAS:

12       Q.   So the damage from the etiologic agent that

13   initiates the bladder cancer occurs in 1997.

14            Are you with me so far?

15       A.   But they don't have cancer?  They just have

16   some sort of exposure?  Is that what you're saying?

17       Q.   Yes.  They have an exposure to cigarette

18   smoke, and then they finally get the hit that initiates

19   the mutation that is going to replicate and eventually

20   manifest into bladder cancer.

21       A.   But they don't have bladder cancer in '96;

22   correct?

23       Q.   No.  Just the initiation of the process.

24       A.   All right.

25       Q.   All right.  In 1999, a different etiologic

1    agent contributes to their malignant melanoma, and that

2    initiates that process.  Okay?

3         A.   Okay.

4         Q.   In 2003, a different etiologic agent

5    initiates the process of CLL.  Are you with me?

6         A.   I think so.

7         Q.   In that hypothetical, the etiologic agent

8    that initiated the CLL could not have initiated the

9    bladder cancer -- correct? -- because it occurred later

10   in time?

11        A.   Assuming that -- let me think it through.

12   That's very -- not so concrete.  In '96 some agent

13   starts the bladder cancer process, but they don't have

14   it yet?

15        Q.   Right.

16        A.   In 1999, some different agent starts the

17   melanoma process, but they don't have it yet?

18        Q.   Right.

19        A.   And 2003, a third agent causes the CLL

20   process, so they don't have that either?

21        Q.   Correct.

22        A.   So the 2003, they don't have any cancer?  Or

23   do they have cancer?  I don't even know.

24        Q.   No cancer has manifested yet.  None of the

25   cancer manifests until 2014.  All three manifest in

1    2014.

2        A.    Right.  What's the question now?

3        Q.    The question is given that the etiological

4    cause of the CLL occurred later in time from the

5    initiation of the bladder cancer, you agree with me in

6    that situation, the etiologic agent did not cause the

7    bladder cancer, true?

8        A.    I really don't know if that's true.  I can't

9    say that.  I'm not sure.

10       Q.    Okay.  So if you're not sure -- well, let me

11   ask you this.  You told me earlier you weren't sure if

12   the genetic damage that led to the bladder cancer --

13   you weren't sure when it occurred, and you said the

14   same for CLL and malignant melanoma?

15       A.    Wait.  That's not what I said though.

16       Q.    Well, you said you couldn't give me a date.

17       A.    I gave you a timeline.

18       Q.    Okay.  Are you sure that the genetic damage

19   that caused CLL occurred --

20       A.    Can I stop you?  You're in the hypothetical

21   now?

22       Q.    No.  I'm getting back to Mr. Engilis now.

23   Are you sure -- do you have an opinion to a reasonable

24   degree of scientific certainty that the genetic damage

25   that caused his CLL occurred prior to the genetic

Andrew Schneider, M.D

```
 1   damage that caused his bladder cancer or malignant

 2   melanoma?

 3        A.   What I think happened, he had 24 years of

 4   glyphosate exposure and that is the etiologic agent --

 5   why he has CLL.  Then by having CLL, he has immune

 6   dysfunction and B-cell dysfunction.  And it's a

 7   well-known description in the medical literature that

 8   patients with CLL have secondary malignancies.  So it's

 9   my opinion that the CLL caused by the glyphosate is the

10   reason to develop two other malignancies, that being

11   melanoma and TCC to the bladder, to a reasonable degree

12   of medical certainty.

13        Q.   Here is what I don't understand about your

14   opinion.  How do you know the bladder cancer is

15   secondary to the CLL and that the CLL is not secondary

16   to the bladder cancer?  That's what I'm getting at.

17        A.   Sure.  Because bladder cancer doesn't

18   predispose you to CLL.  Melanoma can predispose you to

19   CLL but probably not to a statistically significant

20   effect.

21             So the way things happened here, and it's

22   known in the literature, is that glyphosate is known,

23   in my opinion, to be an etiologic agent for CLL; and

24   patients with CLL absolutely have immune dysfunction

25   and get secondary malignancies.
```

Andrew Schneider, M.D.

```
1              Patients with TCC of the bladder, for

2    example, don't get secondary malignancies other than

3    cigarette smoking malignancies.  If they have -- if

4    they're cigarette smokers and they have TCC, well,

5    maybe they get lung cancer.

6              But this is a clear case to me, in my

7    opinion, as a medical oncologist, board certified,

8    practicing 33 years, that the glyphosate exposure for

9    24 years caused the CLL and associated immune

10   dysfunction which led to the other secondary

11   malignancies which is well described in the literature.

12        Q.   What study are you relying on, on your

13   reliance list, that shows a statistically significant

14   increased incidence of bladder cancer in individuals

15   who have proceeding CLL?

16        A.   So the answer is there are secondary

17   malignancies.  I agree with you about -- I can't say

18   that I could find a study that says bladder cancer

19   specifically.  But clearly, it does -- the development

20   of secondary malignancies -- and in this patient, who

21   is not a cigarette smoker, there's really no other

22   reasonable explanation that I can come up with for the

23   development of TCC of the bladder.

24        Q.   Do individuals with malignant melanoma -- do

25   they have an increased risk of secondary malignancies?
```

```
 1      A.    They do, but I'm not -- I have seen CLL both

 2   ways again, but not statistically significant going

 3   from melanoma to CLL.  I don't think it's well

 4   described.  I don't think bladder cancer is described.

 5           Usually, you know, melanoma is either some

 6   inheritance problem, dysplastic nevi syndrome, or

 7   people who are fair skinned and exposed to the sun,

 8   those are the risk factors for melanoma.

 9      Q.    Okay.  So let me ask you about that because

10   we have talked about bladder cancer and cigarette

11   smoking.  You said people with fair skin or people who

12   were exposed to the sun.  Are there any other risk

13   factors for melanoma besides sun exposure and fair

14   skin?

15      A.    As I said, I think there are dysplastic nevi

16   families.  There are inherited predispositions to

17   melanoma.

18      Q.    And the exposure to the sun, is that

19   sunburns?  Is that just working in the sun?  What is

20   it?

21      A.    Well, it could be both.  I think there some

22   data to suggest that people who have had severe sunburn

23   may be more at risk for melanoma.  And I think vast

24   individuals who have a genetic predisposition or are

25   out in the sun without using protection are at
```

1    increased risk for melanoma.

2        Q.   And did you do any investigation as to

3    whether or not Mr. Engilis had any of those risk

4    factors for malignant melanoma?

5        A.   I don't know if he was fair skinned.  I don't

6    know whether he was exposed to the sun.  But what I do

7    know is that in the literature, the association of

8    patients with CLL getting melanoma is well described.

9        Q.   And in the literature, the association of

10   patients with melanoma getting CLL is also well

11   described; correct?

12       A.   Well, it's yes and no.  And I can look at my

13   reliance list.  I actually have an article which says

14   that that relationship may just be chance.  So I don't

15   think it's that well described, no.

16       Q.   We will talk about that some more.  Are you

17   aware of any treating physician of Mr. Engilis who

18   attributed his CLL to his Roundup exposure?

19       A.   From the records I saw, I don't think anybody

20   made that statement either way.  I think the records

21   are silent on that topic.

22       Q.   Are you aware of any treating physician who

23   attributed Mr. Engilis's melanoma to his Roundup

24   exposure?

25       A.   The answer, again, is -- I'm an oncologist.

1    It's what I do all the time.  And when I see patients

2    who have either CLL or melanoma or both, my job is to

3    treat the patients.  You know, how they got there isn't

4    all that important, unless it's something I can do

5    about it in the future.

6         Q.   Are you aware of any treating physician who

7    attributed Mr. Engilis's bladder cancer to his Roundup

8    exposure?

9         A.   I don't think so.  No one mentioned it in the

10   record.

11        Q.   Are you aware of any -- any article -- I

12   asked you about CLL.  I don't think I asked you about

13   NHL.  Are you aware of any article in the literature

14   which supports an association between a primary NHL and

15   a secondary bladder cancer, specifically that cancer?

16        A.   So, again, CLL is a type of NHL.  And as

17   opposed to other types of NHL, patients with CLL do

18   have immune dysfunction probably more than other types

19   of lymphoma.  And there's a clear association of

20   secondary malignancies including TCC of the bladder in

21   patients with CLL.

22        Q.   Again, I was asking a little different

23   question than the one you answered there.  I was

24   focused on NHL generally, because I thought I already

25   asked you about CLL.  So it was just a literature-based

1    question, which is:  Is there an article you can point

2    me to that associates secondary bladder cancer with

3    primary NHL?

4         A.   So the answer is -- I can look at that issue,

5    because this is an issue of a gentleman who had CLL,

6    which is a type of NHL -- and, again, I think patients

7    with CLL have more immune dysfunction than generally

8    NHL.  CLL is a type of NHL.  So, you know, why go

9    backwards?  Why would I look to see if NHL does it when

10   I know that CLL does it?

11        Q.   And you say you know CLL does it.  You said

12   that patients with CLL have more immune dysfunction

13   than NHL generally.  What are you relying on for that

14   opinion?

15        A.   My knowledge of CLL and all of the different

16   types of NHL, including the diffuse large B-cell

17   lymphoma, follicular lymphoma, mantle cell lymphoma --

18        Q.   Is there an article you can cite for me that

19   shows that point that you're relying on?

20        A.   I wasn't asked that question before the

21   deposition.  If you wanted to research it, I certainly

22   could.  But my fund of knowledge, as a board-certified

23   oncologist, knows that patients with CLL are more

24   predisposed to immune type problems, and they have

25   hypergammaglobulinemia, which is seen in other types of

1    lymphoma, the more susceptible to encapsulated organism

2    infections.  So these patients are known to have B-cell

3    dysfunction, decreased immunogenicity, and predisposed

4    to secondary malignancies.

5         Q.   Just to be clear, because there was a lot in

6    those last few answers.  Is there an article on your

7    reliance list that shows a statistically significant

8    increased risk for bladder cancer following a CLL

9    diagnosis?

10        A.   Only to the effect that we're talking about

11   secondary malignancies; otherwise, no.

12        Q.   Jeff, this is about an hour, if you need your

13   break?

14             MR. HABERMAN:  Yeah, let's do that.

15             THE WITNESS:  How long do we take?  Five

16        minutes?

17             THE VIDEOGRAPHER:  Going off the record at

18        8:53 p.m.  Sorry about that.

19             Let me go back on.  Sorry about that.  That's

20        off the record at 3:09 p.m.

21             MR. KALAS:  Okay.

22             (A BRIEF RECESS WAS HELD.)

23             THE VIDEOGRAPHER:  Back on the record at 3:20

24        p.m.

25   BY MR. KALAS:

Andrew Schneider, M.D.

1        Q.   Dr. Schneider, going back to the three

2    cancers that all manifested in 2014, have you done any

3    research in reaching your opinions on genetic

4    predispositions to those three cancers?

5        A.   Well, my fund of knowledge as a medical

6    oncologist, I know what the risk factors are for each

7    disease, which I think we have already discussed.

8        Q.   Okay.  Are you aware that literature -- well,

9    strike that.

10            Have you heard of a mutation called ataxia

11   telangiectasia?

12            And I will spell that for you, Alan,

13   A-T-A-X-I-A  T-E-L-A-N-G-I-E-C-T-A-S-I-A.

14       A.   So if you're asking me if I know what the ATM

15   mutation is, the answer is yes.  So I will leave it at

16   that.

17            And ATM mutations are not big causes of

18   bladder cancer, melanoma, and CLL.  I have seen ATM

19   mutations of prostrate cancer, for example, breast

20   cancer, I believe.  I don't think they're big ones for

21   those two diseases.

22       Q.   Well, are you aware that approximately 1

23   percent of Americans have the ATM mutation?

24       A.   I wouldn't that have the number memorized.

25       Q.   Are you aware that over 10 percent of bladder

```
 1   cancer, CLL, and melanoma cases all have the ATM

 2   mutation?

 3        A.   You can show me the literature.  I'm unaware

 4   of that literature.

 5        Q.   Okay.  Did you do anything to research

 6   whether or not Mr. Engilis had the ATM mutation?

 7        A.   Like I said, it's my opinion -- and, again,

 8   if you have evidence you want to show me, please do --

 9   but I don't think ATM mutation is a big risk factor for

10   these diseases.

11             You said it occurs in maybe 1 percent of the

12   population.  And I'm sure most of those patients,

13   people don't get malignancies.  So my opinion is, as an

14   oncologist, is that the ATM mutation is not a major

15   cause of CLL melanoma.  But ATT of the bladder is more

16   indicative of diseases like prostate cancer or breast

17   cancer.

18        Q.   Did Mr. Engilis undergo any genetic testing

19   at all?

20        A.   I didn't see any in the record, no.

21        Q.   Okay.  His treating physicians actually

22   recommended that he undergo genetic testing, didn't

23   they?

24        A.   That's my recollection.  But I don't have

25   that memorized.
```

1      Q.    If Mr. Engilis were your patient, appearing

2    in your office with three cancers manifesting almost

3    simultaneously, would you suggest he go for genetic

4    testing?

5      A.    Not in this particular situation, because

6    it's my opinion that I have an explanation that the

7    glyphosate 23-year exposure causes CLL, which

8    subsequently causes immune dysfunction and lead to two

9    other malignancies, that being melanoma and TDC of the

10   bladder.  I don't need to go and find some esoteric

11   rare mutation.  I think we have the answer by the

12   glyphosate exposure.

13     Q.   Can you rule out that Mr. Engilis had a

14   genetic mutation that caused or contributed to all

15   three of his cancers without doing that testing?

16     A.    I'm sorry.  You froze.  Say that again.

17     Q.    I'm sorry.  Can you rule out that Mr. Engilis

18   had a genetic mutation that caused or contributed to

19   any or all of his cancers without doing genetic

20   testing?

21     A.    Well, you can ask me my opinion.  And my

22   opinion to a reasonable degree of medical certainty is

23   that he does not have a genetic mutation that caused

24   these three cancers.  I believe glyphosate was the

25   etiologic agent.

1      Q.   Okay.  But my question wasn't -- well, maybe

2  you answered my question.  Let me ask a different

3  question.

4           Can you opine to a reasonable degree of

5  medical certainty that Mr. Engilis does not have a

6  germline mutation that predisposes him to cancer?

7      A.   Yes.  That's my opinion to a reasonable

8  degree of medical certainty.

9      Q.   And what is the methodology that you employed

10  to reach the conclusion that Mr. Engilis does not have

11  a germline mutation that led to his cancer?

12      A.   So I have knowledge of mutations.  I get

13  requests all the time as part of my work at Century

14  Health, and I also do reviews for Maximus where they

15  ask me to approve just what you're asking.  They're

16  asking me to approve requests for mutational analysis

17  such as foundation 1 or other mutational studies.  And

18  I know what diseases warrant that and what don't, okay,

19  because that's my job.

20           And patients with melanoma, for example, we

21  don't do routine mutational analysis.  Patients with

22  CLL, we look at things like heavy chain mutations.  We

23  look for TP53 mutations.  We don't look at ATM

24  mutations.

25           If somebody asked me to approve an ATM

Andrew Schneider, M.D.

```
 1    mutation request, I would deny it because it's not
 2    indicated.  So I do have specific training in this
 3    topic because I get these requests on a daily basis
 4    from Maximus and from the Century Health, and I would
 5    not approve mutational testing for these three
 6    diseases.
 7         Q.   Let me ask you this:  You said with patients
 8    with CLL you look for TP53 mutations.  Did anyone look
 9    for that in Mr. Engilis?
10         A.   That's only, again, for prognosis and for
11    therapeutic intervention.  It doesn't need to be done
12    to recommend treatment.
13              And the fact -- there's no point to do it in
14    a Stage 1 CLL because he doesn't need treatment.
15    There's no point in the test.  It would be a waste of
16    money, not medically relevantly indicated, and would be
17    denied by me if that was a request coming to me.
18         Q.   So let me follow up on something you said
19    there.  Mr. Engilis has a Stage 1 CLL; right?
20         A.   That's what the records say, correct.
21         Q.   And you said he doesn't need treatment.  What
22    do you mean by that?
23         A.   Just that.  Stage I CLL does not need to be
24    treated.
25         Q.   Okay.  Why?
```

```
1         A.    Because they have a long life expectancy, and
2    treatment will not change survivability.
3         Q.    Okay.  And the heavy chain mutations, you
4    also mentioned those.  Did Mr. Engilis have any testing
5    for those?
6         A.    Again, he didn't need to have those tests
7    done because he had a Stage 1 disease.  Now, when the
8    disease becomes more aggressive or if he gets symptoms
9    and they wanted a treatment, you know -- if they ask
10   for it, I would approve it.  But it's not going to
11   change therapeutic intervention.  There's a certain way
12   you treat CLL when you need to be treated, and it's not
13   dependent really on TP53 or heavy chain mutations.
14        Q.    Is it -- well, let me ask you this.
15   Mr. Engilis is 73 years old; right?
16        A.    I guess -- if you tell me he is, yeah, that's
17   about right.
18        Q.    To this day, his CLL remains a Stage I CLL;
19   right?
20        A.    I haven't seen records since 2019.  But in
21   his deposition, he is doing okay.  So I assume it's
22   Stage I, but I can't tell you that because I haven't
23   seen records since 2019.
24        Q.    Do you have patients who had CLL who have
25   died -- with Stage I CLL -- who have died of natural
```

Andrew Schneider, M.D.

```
 1    causes before their CLL ever became more aggressive?
 2         A.    I have.
 3         Q.    And is it possible that Mr. Engilis may die
 4    of natural causes before his CLL becomes more
 5    aggressive?
 6              MR. HABERMAN:  Object to the form.
 7              THE WITNESS:  Like I say here in -- I see
 8         here in my status to prognosis says, if he can
 9         survive 105 months -- he was diagnosed in 2015,
10         let's say, I want to say.  105 months is, what,
11         about nine years.  So 64 -- so statistically
12         speaking, he will die in his 70s of CLL but --
13         you know.  But maybe he will die of something else
14         first.  I don't know.
15    BY MR. KALAS:
16         Q.    If the case of Mr. Engilis, do you see any
17    manifestations either in the deposition or in his
18    medical records to suggest that he is at an imminent
19    risk of dying from CLL?
20         A.    Well, by "imminent risk," you mean months?
21    What do you mean by imminent risk?
22         Q.    Is he going to die in months from CLL based
23    on what you're seeing in your expert opinion?
24         A.    No.
25         Q.    Okay.  Have you seen any indication that
```

1    Mr. Engilis has a higher mutational burden of cancer as

2    a result of his external etiologic exposures to

3    glyphosate?

4        A.    I'm not sure I understand your question, but

5    I will try to answer it.  You know, I think glyphosate

6    causes CLL.  I think CLL caused the melanoma and TCC of

7    the bladder.  As far as I can tell, all diseases are

8    quiescent now, best I can tell you.

9        Q.    Well, okay.  I know you went around and

10   around with Ms. Ross on this in the last depo, and I

11   don't intend to rehash things you've already been asked

12   about.  But you will agree with me, just as a baseline

13   question, that we have random replication errors every

14   day in our DNA; correct?

15       A.    I remember this line of questioning, and I

16   think it got us nowhere because I'm a medical

17   oncologist, clinical oncologist.  I'm not a geneticist.

18   So I will say yes, but I don't really know what that

19   means other than yes.

20       Q.    Sure.  And etiologic cause of a cancer would

21   be additive to whatever those endogenous replication

22   errors are; right?  In other words, if I smoke

23   cigarettes and I get lung cancer, that cigarette smoke

24   is going to add to my genetic damage burden; right?

25            MR. HABERMAN:  Objection.

```
1              THE WITNESS:  Again, to be fair, I think you

2         saw that with her.  You know, this isn't really my

3         field of expertise.

4    BY MR. KALAS:

5         Q.   So that's where my mutational burden question

6    was coming from.  You haven't seen any evidence that

7    Mr. Engilis has more mutations than somebody who has

8    not had an exogenous cause of their NHL; right?

9         A.   It wasn't looked at.  And why would it be

10   looked at?  There's no clinical utility to looking for

11   that information.

12        Q.   Would there be utility in trying to determine

13   whether or not he has an exogenous cause of his cancer?

14        A.   He does.  Glyphosate.

15        Q.   Would there be utility to doing that

16   analysis, looking at whether or not he has an excess

17   mutational burden, in trying to determine whether or

18   not he has an exogenous cause of his cancer?

19        A.   In my mind, I have enough information.  The

20   24 years of glyphosate caused the CLL, which causes

21   secondary malignancy.  It's that simple.

22        Q.   Can I ask you a question?  This isn't to be

23   rude.  You keep saying glycosate (phonetic).  It's

24   glyphosate.

25        A.   Maybe I have a speech impediment.  Are you
```

1    making fun of me?

2        Q.    No.   I said I wasn't saying it to be rude.

3        A.    But you said it on the record, so it's kind

4    of embarrassing.

5        Q.    I don't want it transcribed that you said it

6    wrong.

7        A.    Well, why don't we delete that, then, from

8    the record?

9        Q.    I already said it on the record.  I'm not

10   doing it to be rude.

11       A.    Obviously you are.  Because why else say it?

12       Q.    Because I was trying to help.  But anyway --

13       A.    So you say, "Dr. Schneider, I just want to

14   make sure you know that your pronunciation is a little

15   off."  That would be polite.  The way you said it

16   wasn't polite.  It was rude.

17       Q.    Well, I apologize.

18       A.    On the record -- so we have it on the record

19   you were rude to me on the record.

20       Q.    If that's the way you took it, I apologize,

21   sir.

22             Turning to the general causation analysis

23   here, NHL, as I think we alluded to a few times today,

24   is an umbrella term for what are dozens of separate

25   diseases; correct?

1        A.    Well, we can count how many there are, but,

2   yes, there are many diseases that fall under NHL.  I

3   don't know if there are dozens, but there are many.

4        Q.    And some of the diseases under that umbrella

5   of NHL have their own distinct risk factors particular

6   to those specific diseases; right?

7        A.    More specific, let's talk about a disease and

8   you can talk about the risk factor.  I can't journalize

9   like that.

10       Q.    For instance, there's a type of NHL called

11  MALT; right?

12       A.    Yes.

13       Q.    And bacteria called H. pylori is associated

14  with that type of lymphoma; right?

15       A.    Correct.

16       Q.    And H. pylori, on the other hand, is not

17  associated with other types of lymphoma; right?

18       A.    Right.  But we said infection-wise, so it's

19  just another example of an infection causing lymphoma.

20  That's all.

21       Q.    But, for instance, if somebody with CLL came

22  into your office, you wouldn't put on your differential

23  etiology H. pylori; right?

24       A.    Not from a CLL, of course.

25       Q.    Okay.  But if somebody with MALT came into

1    your office, you would put on your differential

2    etiology H. pylori; right?

3         A.   It depends on where it was.  If it was in the

4    stomach, yes.  But if it was in the neck, probably not.

5         Q.   Sure.  And the reason H. pylori causes MALT

6    in the stomach --

7         A.   May I correct you for a second?

8         Q.   Sure.

9         A.   It's H. pylori.

10        Q.   Thank you.

11        A.   We can correct each other as we go along and

12   do it that way.  That's fine.

13        Q.   I appreciate that.  Thank you.

14             The reason H. pylori can cause MALT in the

15   stomach but not in the neck has to do with the

16   mechanism of action of H. pylori; correct?

17        A.   Again, I'm a clinical oncologist.  I assume

18   that's right, but that's not really my field of

19   expertise, knowing the -- the mechanism of how H.

20   pylori induces more lymphoma.  It's a known risk factor

21   for lymphoma of the stomach.

22             You're frozen by the way.

23        Q.   I lost you.

24        A.   You froze.

25        Q.   Can you hear me now?

Andrew Schneider, M.D.

```
 1        A.   Yeah.  Was I answering the question or you

 2   asking the question?

 3        Q.   No.  If Mr. Peacock can just read back that

 4   last answer to me, please.

 5             (THE REPORTER READ BACK THE REQUESTED

 6              TESTIMONY.)

 7   BY MR. KALAS:

 8        Q.   What is the mechanism by which glyphosate

 9   causes every single type of NHL?

10        A.   So there are different mechanisms of action.

11   It's genotoxic, meaning it affects DNA.  It's -- it

12   causes oxidative stress, free radicals.  Those are the

13   two main ways.

14        Q.   And via genotoxicity and oxidative stress, it

15   causes every single type of NHL; right?  That's your

16   opinion?

17             MR. HABERMAN:  Object to the form.

18             THE WITNESS:  My opinion is that genotoxicity

19        and oxidative stress allows glyphosate to cause

20        NHL.  That is my opinion, correct.

21   BY MR. KALAS:

22        Q.   Okay.  And genotoxicity and oxidative stress

23   is a mechanism by which it causes CLL in your opinion

24   as well; right?

25        A.   Correct.
```

1      Q.   Okay.  Does glyphosate cause any other types

2  of cancer besides NHL?

3           MR. HABERMAN:  Objection.  Scope.

4           THE WITNESS:  Right.  That's exactly right.

5           So I haven't researched that topic.  I was

6      never asked to.  I think -- my understanding, and

7      I could be wrong, is that, at least in humans, I

8      believe it's NHL, people that work through

9      myeloma, hairy cell leukemia -- I'm not aware of

10     the data for solid tumors, but I haven't looked at

11     the data.

12  BY MR. KALAS:

13     Q.   Well, you read the IARC monograph; right?

14     A.   I did.  All 134 pages, yes.

15     Q.   And we can look at it if you need to.  But

16  you recall they looked at all types of cancer in

17  people; right?

18     A.   They did.  But I didn't memorize that for

19  this depo because that wasn't really what I was going

20  to talk about.  But, again, if you have a specific

21  question, we can certainly pull it out and take a look

22  at it.

23           MR. KALAS:  Well, let's mark it as Exhibit 6

24      and let's look at it together.

25           (DEPOSITION EXHIBIT 6 WAS MARKED FOR

```
 1           IDENTIFICATION.)

 2   BY MR. KALAS:

 3        Q.   Now, just to give you a little primer on how

 4   this system works, unfortunately, it is -- once I mark

 5   it -- and I will let you know when I mark it -- you

 6   have to refresh the page.

 7        A.   Are you going to share the screen, or should

 8   I look at it?

 9        Q.   Just go if you need to access it, because

10   it's a long document.

11        A.   I'm sure you're going to show me a particular

12   part you want me to look at; right?

13        Q.   I absolutely am.  But if you need to access

14   it --

15        A.   Let's start by doing it that way.

16        Q.   Okay.  So Exhibit 6 is the IARC on

17   glyphosate; correct?

18        A.   Yes.

19        Q.   And this is a document you reviewed in

20   reaching your opinions; right?

21        A.   134 pages, yes.

22        Q.   And if you look at the Section 2 that's

23   entitled cancer in humans; right?

24        A.   Yes.

25        Q.   And do you see that you look here, they look
```

```
 1   at cancer at many different sites and they talk

 2   about -- for instance, here, prostate cancer.  They

 3   look at oral cavity, colon, rectum, pancreas, kidney,

 4   bladder, prostate, leukemia, et cetera, et cetera.

 5           And if you read through -- and you can take a

 6   moment to read through Pages 11 through -- a lot of

 7   tables in here, but -- pages 11 through 30, they talk

 8   about all sorts of cancer.  They have cancer of the

 9   brain and soft tissue sarcoma and esophagus, stomach,

10   et cetera.  Do you see that?

11       A.    Yeah.  I'm aware of that, yes.

12       Q.    So IARC reviewed all types of human cancer,

13   not just lymphoma; right?

14       A.    Correct.

15       Q.    And IARC found that there was limited

16   evidence for an association between glyphosate exposure

17   and non-Hodgkin's lymphoma; right?

18       A.    I'm sorry.  You said IARC said that?

19       Q.    Yes, sir.

20       A.    They called it 2A, I thought.

21       Q.    Right.  Go down here.  They did call it a 2A.

22           Right here, they say there's limited evidence

23   for the carcinogenicity of glyphosate.  Positive

24   association has been observed for NHL.  Do you see

25   that?
```

1       A.   There you go.  This is a positive association

2   with NHL.  There's your answer:  IARC believes

3   glyphosate causes NHL.

4       Q.   Right.  I know that.  I was getting at the

5   solid tumors portion.

6       A.   I think I said that.  I don't think it causes

7   solid tumors.  I think that's what I said.

8       Q.   And my question was a little broader than

9   that, which got us here, which is:  Are there any other

10  types of cancer that you believe glyphosate causes

11  besides NHL?

12      A.   Again, I already told you what the cause is.

13  There's evidence -- I mean, again, it wasn't really my

14  task in these depositions to look at that topic.  So

15  I'm not prepared.

16           But my understanding from what I read, for

17  example, is people talk about myeloma and Hodgkin's

18  disease, hairy cell leukemia -- those are not NHL.  But

19  I don't believe there's good evidence they produce

20  solid tumors, but I haven't researched that topic

21  significant to date.

22      Q.   And is there any agency besides IARC that

23  you're aware that associated glyphosate with any of

24  those hematopoietic beyond NHL?

25      A.   Are you talking about a regulatory agency

1    versus --

2         Q.   Or --

3         A.   -- meta-analysis study?

4         Q.   Let me start with agency, and then get to the

5    studies.  Is there any agency that has associated

6    hematopoietic tumors beyond NHL that you're aware of?

7         A.   I've got to stretch my mind to see what

8    agencies there are out there.  My understanding is that

9    the literature are the main six or seven epidemiologic

10   studies, and then the multiple meta-analysis.

11          I can't tell you, for example, without

12   looking at it, who sponsors the meta-analysis, and I

13   don't know whether there's an agency or just an author

14   or university.  I don't know what you mean by agency, I

15   guess.

16        Q.   Well, let me ask you this.  You said the

17   evidence wasn't there for solid tumors, at least

18   according to IARC.  Genotoxicity is a mechanism by

19   which a carcinogen can cause cancer of a solid tumor;

20   correct?

21        A.   I mean, it can be.

22        Q.   Oxidative stress is a mechanism by which a

23   carcinogen can cause cancer that manifests as a solid

24   tumor; correct?

25        A.   It can be.

Andrew Schneider, M.D.

1          Q.    Okay.  Tell me how glyphosate can be

2     genotoxic yet only cause a particular cancer, NHL, and

3     not solid tumors?

4               MR. HABERMAN:  Object to the form.  Scope.

5               THE WITNESS:  Yeah.  Well, I mean, my

6          understanding is that -- it depends on what it's

7          affecting; right?

8               So, you know, an adenocarcinoma -- a gland in

9          the lung is different from a hematopoietic stem

10          cell or blood cell.  So an individual stress to a

11          different type of cell will have a different

12          outcome; so it's not unexpected at all to think

13          that a glyphosate may not cause cancer to a lung

14          gland but may be hardly carcinogenic to a B-cell

15          lymphocyte.  So to me, that's very easy to

16          understand.

17          Q.    I understand that's an easy-to-understand

18     hypothesis.  Explain to me how that's been proven.

19          A.    It's been proven that -- they've done studies

20     to look at genotoxicity and oxidative stress in these

21     lymphoid cells.  And we've just discussed that there's

22     no good data that it causes solid tumors.

23               So, you know, I think -- I'm not the one

24     saying these things, but I think you will agree with me

25     that there is literature to suggest that glyphosate is

1   genotoxic and causes oxidative stress, and there is

2   literature to suggest that glyphosate causes NHL

3   because of these mechanisms.

4        Q.   Will you answer my question, Dr. Schneider?

5             My question is:  What study has been done to

6   show that glyphosate can cause genotoxicity in

7   lymphocytes but not in these other cytes?

8             MR. HABERMAN:  Asked and answered.

9             THE WITNESS:  I can pull up some stuff if you

10      want to.

11            MR. HABERMAN:  No.  Sorry.  Go ahead, Doctor.

12            THE WITNESS:  Do you want me to look for some

13      data?

14  BY MR. KALAS:

15       Q.   Well, I'm asking for the name of a study.  So

16  if you're referring to your report, go for it.

17       A.   It's not in my report, if you're moving on

18  the scope of my report.  But I think there's data that

19  I have read --

20       Q.   What papers are you looking at right there?

21       A.   The papers I brought with me today, which --

22       Q.   Which were marked at the previous deposition?

23       A.   Yes.

24       Q.   Okay.  What study -- if you may, please find

25  me a study in there that shows that glyphosate causes

Andrew Schneider, M.D.

```
1    genotoxic damage to lymphocytes but not to solid cancer
2    cytes?
3        A.   I don't want to waste my time looking to find
4    something to say it causes genotoxicity to
5    lymphocytes -- do you agree with me, so I don't waste
6    my time, or no?
7        Q.   Yeah.  We can go up and down all day long to
8    find the studies.  But my question is -- my question is
9    different than the one you're answering.  It has
10   nothing to do with whether or not there's a study that
11   shows reportedly that glyphosate causes genotoxic
12   damage to lymphocytes.  Whether or not there's a study
13   that shows that glyphosate does genotoxic damage to
14   lymphocytes but not to other cells?
15       A.   So again, I wasn't asked to look into that.
16   I was asked to look at solid tumors.  So I didn't
17   research that topic.  My topic today was:  Does
18   glyphosate cause NHL?  Why would you go and see whether
19   it causes solid tumors?  That wasn't my task.
20       Q.   You're opining that glyphosate use led to
21   Mr. Engilis's solid tumor bladder cancer, aren't you?
22       A.   Because of the CLL.  He didn't have the CLL,
23   he wouldn't have it.  Don't get confused.  I think you
24   know what my point was, and it was well said.  My point
25   is the B-cell dysfunction and the immune dysfunction,
```

Andrew Schneider, M.D.

```
 1   by virtue of having CLL caused by glyphosate --

 2           Did I say that right?  You're frozen.

 3      Q.   You did.

 4      A.   Okay.

 5           -- caused the bladder cancer.

 6           So I'm not saying that genotoxicity caused

 7   bladder cancer.  It's the genotoxicity from the

 8   glyphosate that caused the CLL.  And then by having

 9   CLL, he gets a whole host of other immune dysfunction

10   problems that causes secondary malignancies which is

11   well reported in the literature.

12      Q.   So one study that reports that glyphosate is

13   immunotoxic -- one study.

14      A.   I'm sorry.  Immunotoxic or genotoxic?

15      Q.   Immunotoxic, sir.

16      A.   What do you mean by immunotoxic?

17      Q.   Immunotoxicity is one of the ten hallmarks of

18   cancer or 10 key characteristics of cancer that has

19   been used by IARC in the monograph.

20           Is there a study that shows glyphosate is

21   immunotoxic?

22      A.   I would have to go back and look at the 134

23   pages.

24      Q.   Go for it.  I marked it.

25      A.   Okay.  Well, I will need about 30 minutes to
```

```
 1   read it.
 2        Q.   Go ahead and look at it.  If that's a threat,
 3   that's fine.  Go ahead --
 4        A.   It's not a threat.
 5        Q.   Go ahead and tell me where they show it's
 6   immunotoxic.
 7        A.   We will reconvene in 30 to 40 minutes.
 8        Q.   No.  We're going to stay on the record.  And
 9   I'm going to mark the time:  3:49
10        A.   That's fine.  Can you pull up the monograph?
11   How can I find it so I can look at it?
12        Q.   It will be in your exhibits.
13        A.   Help me out.  Where are they?
14        Q.   So the exhibit link that's the Golkow remote
15   link --
16        A.   Okay.  Where do I go next?
17             I got it.  I got it.
18             Ask me one more time so I know what I'm
19   looking for.
20        Q.   Is there a study in humans or human cells
21   that shows glyphosate is immunotoxic?
22        A.   Do I only have to look at the IARC, or can I
23   look anywhere I want?
24        Q.   Let me ask you this.  Let me withdraw the
25   question.  I withdraw the question.
```

1      A.    Sure.

2      Q.    Do you discuss as a mechanism of action

3   anywhere in your report that glyphosate is immunotoxic?

4      A.    I use the word genotox -- well, not in my

5   report.  Maybe it is.  Let me read my report again.

6            But I think that it's genotoxic and oxidative

7   stress.  Those are the two main mechanisms of action of

8   glyphosate.

9      Q.    Have you reviewed the studies that have been

10  done on the potential immunotoxicity of glyphosate by

11  Monsanto and by other researchers?

12     A.    If it's on my reliance list, yes.  Otherwise,

13  no, I have to go back and look at that.  I don't have

14  this memorized.

15     Q.    Okay.  Is there a test one can do to

16  determine that somebody's solid tumor is related to

17  immunotoxicity caused by a previous cancer?

18     A.    So I'm a clinical oncologist.  That would be

19  out of my scope of expertise.

20     Q.    Okay.  Is there a test someone could do to

21  determine whether or not someone's malignant melanoma

22  is related to immunotoxicity from a previous cancer?

23     A.    You're asking me as a clinical oncologist?

24     Q.    I heard -- I know you're a clinical

25  oncologist.  I'm asking you if you know of a test.

Andrew Schneider, M.D.

```
1        A.    I think that the literature is clear that the
2   B-cell dysfunction and immune dysfunction by virtue of
3   having CLL can cause melanoma.  That is undisputed.
4        Q.    My question is different, though.  It wasn't
5   about CLL.  My question was about immunodeficiency and
6   your opinion that the bladder cancer and the melanoma
7   resulted from the immunodeficiency caused by the CLL.
8   Is that your opinion?
9        A.    Yes.
10        Q.    Okay.  Is there a test that somebody can do
11   on the melanoma to determine whether or not it was
12   induced by an immunodeficient state caused by a primary
13   cancer?
14        A.    So since I'm not a pathologist or a
15   geneticist, I don't know of one.  I don't think there's
16   one.  I think it goes by reasoning.  And I have given
17   you the reason, and I know you understand the
18   reasoning.  I don't know of a test sitting here today.
19        Q.    Okay.  Is there a difference, Dr. Schneider,
20   between exposure to an etiologic agent and internal
21   dose of that etiologic agent?
22        A.    I don't think I understand your question.
23   You need to try being more specific or explain to me
24   what you mean.  If you're asking pharmacology
25   questions, I would defer to a pharmacologist or
```

```
1   epidemiologist about thresholds for exposure, if that's

2   what you're getting at.

3        Q.   Well, I'm asking something a little more

4   basic.  I'll ask this:  Do you drive a car?

5        A.   I do.

6        Q.   Does the car take gasoline?

7        A.   It does.

8        Q.   When you go to the gas station, do you fill

9   it up yourself?

10       A.   Not always.

11       Q.   Do you fill it up sometimes?

12       A.   Sometimes.

13       Q.   When you fill up the car at the gas station,

14   are you exposed to benzene?

15       A.   So you're asking me now as a layperson or as

16   a medical oncologist?

17       Q.   I'm just asking you if you have an opinion

18   one way or another.  I'll ask you as a medical

19   oncologist first.  Do you have opinion, one way or

20   another, whether someone is exposed to benzene when

21   they go to the gas station?

22       A.   I'm going to be fair.  Let's be fair about

23   this.  I'm a medical oncologist.  And you can ask me as

24   a layperson what I think, and I can give you an answer.

25   But this is not something in my field of expertise.
```

1    I'm a medical oncologist.  I'm not an expert upon the

2    threshold of benzene exposure while pumping gas.

3        Q.   I'm not asking about thresholds.  I'm not

4    going there.  This is not an AML case.  I don't care

5    about thresholds.  Are you exposed to benzene when you

6    go to the gas station?

7        A.   So that's not in my field of expertise as a

8    medical oncologist.  If you're asking as a person --

9        Q.   Let me ask you something that doctors use.

10   When you're in medical school, did you work in a lab at

11   all?

12       A.   No.

13       Q.   Did you have any -- do you have any exposure

14   as a medical oncologist to something called

15   formaldehyde?

16       A.   No.

17       Q.   Do doctors have exposure to something called

18   formaldehyde?

19       A.   I'm an oncologist, sir.  I don't know what

20   other doctors are exposed to.

21       Q.   How do you sterilize medical equipment in the

22   office?

23       A.   What kind of medical equipment are you

24   talking about?

25       Q.   Well, how do you sterilize -- let me ask you

```
 1   more basic question.  Do you use stethoscopes?
 2        A.   Yes.
 3        Q.   Do you use -- I don't know what they're
 4   called -- the thing that goes in the ear to look inside
 5   somebody?
 6        A.   No.
 7        Q.   Do you use other equipment when examining
 8   patients beyond stethoscopes?
 9        A.   No.
10        Q.   Do you sterilize your stethoscopes?
11        A.   No.
12        Q.   Have you heard of a material called ethylene
13   oxide used in sterilization?
14        A.   No.
15        Q.   Have you heard of formaldehyde used in
16   sterilization?
17        A.   I know what formaldehyde is.  I'm not
18   familiar with its use in sterilization.
19        Q.   Okay.  Are you familiar with its use in
20   setting slides and conducting experiments in scientific
21   labs?
22        A.   Again, I'm a medical oncologist.  I don't
23   want to waste your time or my time.  I don't do that
24   stuff.
25        Q.   What is the dose of glyphosate that somebody
```

1   needs to enter their body to put them at an increased

2   risk of NHL?

3        A.   So now we're getting into dose again, and I

4   told you that would be a question better asked to an

5   epidemiologist, statistician, or pathologist, not a

6   medical oncologist.

7        Q.   Did Mr. Engilis have a dose of glyphosate

8   that entered this body that put him at an increased

9   risk of NHL?

10       A.   So he was exposed to glyphosate for 24 years,

11  and that put him at risk to developing NHL which he

12  did.

13       Q.   Can you opine to a reasonable degree of

14  scientific certainty that one molecule of glyphosate

15  entered Mr. Engilis's body?

16            MR. HABERMAN:  Objection.

17            THE WITNESS:  Yes.

18  BY MR. KALAS:

19       Q.   How?

20       A.   Because I read his deposition.  He had dermal

21  exposure and probably airborne exposure and was clearly

22  exposed.  He used it, so how could he not have any -- I

23  have an answer.  He walked barefoot, he said.  So

24  clearly his skin was exposed to the glyphosate.

25       Q.   Right.  And my question was different, which

Andrew Schneider, M.D

1    is:  How did you reach an opinion that the glyphosate

2    his skin was exposed to entered his body?

3              MR. HABERMAN:  Asked and answered.

4              THE WITNESS:  I think that's intuitive.  I

5         think if it's durable absorption, that's a known

6         entity.

7    BY MR. KALAS:

8         Q.   How do you know even one drop of glyphosate

9    was absorbed by Mr. Engilis?  How did you reach that

10   opinion?

11        A.   I read his deposition, and I'm aware of the

12   literature which talks about glyphosate.  And, you

13   know, I think you're being very disingenuous to believe

14   he didn't have dermal exposure.  And if you want to

15   tell the jury he wasn't exposed to it, then you can,

16   but I don't think they will believe you.

17             MR. KALAS:  I'm going to mark as Exhibit 7 an

18        article in the scientific literature that does not

19        appear on your reliance list.

20             (DEPOSITION EXHIBIT 7 WAS MARKED FOR

21              IDENTIFICATION.)

22   BY MR. KALAS:

23        Q.   I need, like, two minutes; okay?  I have to

24   do something real quick.  You can stay on.  I just need

25   two minutes.

```
 1      A.    Okay.

 2            (Pause.)

 3      Q.    Okay.  I'm done.  Thank you for that.

 4            So marked as Exhibit 7 is an article that

 5   appeared in the Journal of Environmental Health

 6   Perspectives in 2004.

 7      A.    I have to get it bigger.  Hold on.

 8      Q.    I can put it up on the screen too if that

 9   helps.

10      A.    Somehow I made it smaller, and I need to make

11   it bigger.

12            Do you want to help me make the screen big

13   again?  It's small now.

14            I got it.  I got it.  I got it.

15      Q.    Okay.  So this is an article entitled

16   "Glyphosate Biomonitoring for Farmers and Their

17   Families:  Results from the Family Exposure Study."

18            Have you seen this article before, sir?

19      A.    I don't think so.

20      Q.    And this article appears in a peer-reviewed

21   journal; correct?

22      A.    I haven't even read it.  Do you want to give

23   me a chance to read the article?

24      Q.    That's fine.  I was just asking --

25      A.    Well, how would I know this is a
```

1    peer-reviewed when I don't know which journal.

2        Q.   Environmental Health Perspectives right

3    there.  But go ahead.

4        A.   Can I read it myself somehow?

5        Q.   Sure.  So if you go to the Golkow remote

6    site, you can read it yourself.

7        A.   I got it.  Let me read it.  Okay?

8        Q.   Sure.

9        A.   I'm skimming it to save time.

10       Q.   Sure.  Just tell me when you're ready.

11       A.   I'm do my best.

12       Q.   Just tell me when you're ready.

13       A.   All right.  We can try.  I just read it --

14   skimmed it, but I will try and answer your questions

15   the best I can after seeing this the first time.

16       Q.   Sure.  Going to the first page, does this

17   appear in a peer-reviewed journal, sir?

18       A.   You can show me where it says that.  I don't

19   know.

20       Q.   It said here Environmental Health

21   Perspectives, Volume 112, Number three, March 2004.

22       A.   How would I know if that was peer-reviewed?

23   I never read that journal before.

24       Q.   Is that a fact?

25       A.   Excuse me.

```
 1        Q.   I said is that true; you can't recall ever
 2   seeing this journal before?
 3        A.   If I have, it's on my reliance list.  But I
 4   don't have the journal memorized with the article.  And
 5   I don't know, sitting here today, whether it's a
 6   peer-reviewed journal or not.  I will believe you, but
 7   I don't know.
 8        Q.   Do you see it's a biomonitoring study of
 9   farmers in Minnesota and South Carolina?
10        A.   Yes.
11        Q.   And just going to Table 1 of the study, it
12   discusses some of the demographic characteristics of
13   the farmers; right?
14        A.   Yes.
15        Q.   So, for instance, about 20 percent of the
16   farmers in the study didn't wear gloves; right?
17        A.   Yes.
18        Q.   And Mr. Engilis, he did wear gloves; right?
19   He talked about that?
20        A.   But he was barefoot.
21        Q.   Did Mr. Engilis wear gloves?  I didn't ask
22   about his feet.  I asked about his hands.
23             Did he wear gloves?
24        A.   I believe he -- I have to look it up.  I
25   believe me wore gloves, but he was barefoot so it
```

Andrew Schneider, M.D.

```
 1   doesn't make a difference.  He got dermal exposure.

 2        Q.   Did he wear gloves?

 3        A.   Let me look.

 4        Q.   It says he wore plastic gloves.

 5        A.   Okay.

 6        Q.   The farmers -- going to Table 2, they applied

 7   Roundup to between 10 and 439 acres; right?

 8        A.   Okay.  If you say so.

 9        Q.   Well, it's right here in Table 2.  I'm not

10   just saying it.  It's says --

11        A.   I don't have it memorized.  I've got to go to

12   Table 2.

13        Q.   All right.  I put it up on the screen.

14        A.   Between 10 and 439?

15        Q.   Right.  Do you see that?

16        A.   I do.

17        Q.   And Mr. Engilis applied through a property

18   that was far smaller than that; correct?

19        A.   Correct.

20        Q.   These farmers, they applied tractor loads

21   that numbered between one load and 12 loads in a given

22   day; right?

23        A.   If you say so.  Where does it say that?

24        Q.   Right beneath the acres, sir.

25        A.   Okay.  One to 12.  I see that.
```

Andrew Schneider, M.D.

```
1        Q.   And 14.6 percent of the farmers reported

2   spills while mixing the product; right?

3        A.   Show me where it says it, and I will say

4   right.

5        Q.   "Pesticide spills during mixing."

6        A.   Yes.  14.6 percent.  Correct.

7        Q.   Likewise, a similar number reported spills

8   during applying; right?

9        A.   Yes.

10        Q.   31 percent reported skin contact with

11   pesticides; right?

12        A.   Yes.

13        Q.   And Mr. Engilis, in his deposition, actually

14   said he could not recall glyphosate or Roundup getting

15   on his skin.  Do you remember that?

16        A.   I don't.  But if you want to show me, you

17   can.  My recollection was he was barefoot when he was

18   spraying.

19        Q.   Well, we will go to that in his depo in a bit

20   here.

21             Despite the fact -- well, let me ask a

22   foundational question.  After these farmers applied the

23   Roundup, they looked to see how much glyphosate was in

24   their bodies; right?

25             A.   In their urine; right?
```

Andrew Schneider, M.D.

1      Q.   Right.

2      A.   Yes.

3      Q.   Okay.  And dermal absorbed glyphosate goes to

4  the urine; correct?

5      A.   Not my field of expertise, but I believe

6  that's what the article says.  Correct.

7      Q.   And even among these farmers applying to 10

8  to 439 acres, 40 percent -- right here -- did not have

9  detectable levels of glyphosate in their urine; right?

10     A.   My reading of the article was that those

11  patients who didn't wear gloves had higher secretions

12  of glyphosate indicating to me, from this brief cursory

13  review of this article, that those patients who had

14  dermal exposure did have higher concentrations of

15  glyphosate secretion.

16          MR. KALAS:  Let's just strike that as

17      nonresponsive.

18  BY MR. KALAS:

19     Q.   That wasn't my question, Dr. Schneider.  My

20  question was:  In these 10 to 439 acres --

21     A.   I'm sorry.  You broke up again.  So you have

22  to start --

23     Q.   Well, my question was:  In these farmers that

24  applied glyphosate to 10 to 439 acres, 40 percent did

25  not have detectable levels of glyphosate in their

1   urine; correct?

2       A.   Show me where it says that.

3       Q.   Right here.  I have highlighted it on the

4   screen.  It's in the discussion.  It's the third

5   sentence.

6       A.   I'm sorry.  I don't see your screen.

7       Q.   Okay.  You probably don't have the Zoom open.

8   You're probably looking the article.  If you open the

9   Zoom --

10      A.   Hold on.  Okay.  Yes.

11      Q.   Do you need me to ask the question again?

12      A.   Can I just read it again?

13      Q.   Yes.

14      A.   Right below it, it says "The highest values

15  for farmers were most clearly associated with not

16  wearing rubber gloves when handling pesticide

17  formulation."  So to me it's saying those with dermal

18  exposure to have a higher excretion of glyphosate.

19          MR. KALAS:  Motion to strike as

20      nonresponsive.

21  BY MR. KALAS:

22      Q.   Dr. Schneider, my question was whether the

23  article reported that 40 percent of the farmers who

24  apply did not have detectable levels of glyphosate in

25  their urine.

Andrew Schneider, M.D.

```
 1              MR. HABERMAN:  Objection.  The article speaks
 2         for itself.  Asked and answered.
 3              THE WITNESS:  That's what it says, but I
 4         don't know what that means in terms of -- were
 5         those the ones who were not wearing gloves,
 6         wearing gloves?  I think you need to read the
 7         whole discussion to have the opinion -- instead of
 8         taking three lines and showing me -- because
 9         that's what it says.  But are you asking me to
10         interpret it or are you testing my reading
11         abilities?
12    BY MR. KALAS:
13         Q.   Given the fact that this study involved
14    farmers that applied to upwards of 400 acres, and yet
15    40 percent did not have detectable levels of glyphosate
16    in their body, how can you reach the conclusion that
17    Mr. Engilis had detectable levels of glyphosate in his
18    body?
19         A.   You're missing something important to the
20    article.  Maybe you need to go back and look at it.
21              To me, looking at that article, it's telling
22    me that those patients who -- sorry -- those
23    applicators who didn't wear gloves, they had a much
24    higher secretion of glyphosate, telling me that dermal
25    exposure was an etiologic reason to have glyphosate
```

Andrew Schneider, M.D.

```
1    exposure.  To me it implies that, yes, those people who

2    have dermal exposure had a much higher incidence of

3    glyphosate in their body.

4        Q.   The highest dose in this study, even among

5    those farmers where they did find detectable levels of

6    glyphosate, was .004 mg/kg.  Do you see that?

7        A.   It is.  But I don't know about doses.  As I

8    told you before, that's better asked for a

9    pharmacologist or statistician or epidemiologist.

10       Q.   As a clinical oncologist, is that much

11   glyphosate enough to cause cancer in somebody?

12       A.   I could be.

13       Q.   Well, how would you test that?

14       A.   So I --

15            MR. HABERMAN:  Objection.

16            THE WITNESS:  I wouldn't test it as a

17       clinical oncologist.  That's not something I do.

18   BY MR. KALAS:

19       Q.   Do you know if Mr. Engilis had a dose that

20   ever exceeded this?

21            MR. HABERMAN:  Objection.

22            THE WITNESS:  I'd be ready to discuss with

23       you so we don't have to waste my time and your

24       time -- dosing questions are not my field of

25       expertise as a clinical oncologist.  What I did
```

Andrew Schneider, M.D.

```
 1        indicate today is that he did have dermal exposure

 2        to glyphosate, and it's my opinion the glyphosate

 3        caused his CLL and subsequent melanoma and TCC of

 4        the bladder.

 5   BY MR. KALAS:

 6        Q.   Okay.  He had dermal exposure to glyphosate,

 7   and it's your opinion it caused his CLL.  The thing

 8   that is missing from me and what I'm trying to

 9   understand is what you did to determine how the

10   glyphosate got in his body other than just common

11   sense; it got on his skin, it must have gotten in his

12   body?

13        A.   I told you before, if you want to argue to

14   the jury this his 24 years of exposure, he had no

15   glyphosate absorption, go do that.  I don't think they

16   will believe you.

17        Q.   I don't care about what you think a jury will

18   believe, Dr. Schneider.  My question is about your

19   methodology, respectfully, sir.

20        A.   So I believe to a reasonable --

21             MR. HABERMAN:  I'm sorry.  This is getting

22        out of hand and argumentative, which is improper.

23        He's asked the question.  He's asked what other

24        oncologists do in this litigation.  He laid out

25        his methodology for you in the first few questions
```

1       of his deposition.

2            MR. KALAS:  Mr. Haberman, that's an improper

3       objection.

4    BY MR. KALAS:

5       Q.   Dr. Schneider, what did you do to determine

6    glyphosate got in his body?

7       A.   Sure.  I reviewed his deposition.  I reviewed

8    his medical records.  I think the IARC supports my

9    belief, so I will use that to bolster my opinion.

10           I believe that walking barefoot and spraying

11   glyphosate caused dermal absorption.  And I believe --

12   to a reasonable degree of medical certainty, it's my

13   belief -- Dr. Anthony Schneider, clinical oncologist --

14   that glyphosate was the etiologic reason he got CLL,

15   and the CLL was an immune dysfunction for the melanoma

16   and the TCC of the bladder.  That's my opinion.

17           MR. KALAS:  I will mark as Exhibit 8

18      Mr. Engilis's deposition testimony.

19           (DEPOSITION EXHIBIT 8 WAS MARKED FOR

20            IDENTIFICATION.)

21           THE WITNESS:  Are you showing me something?

22   BY MR. KALAS:

23      Q.   Not yet.

24           Okay.  Dr. Schneider, I'm looking at page 123

25   of Mr. Engilis' deposition marked as Exhibit 8.  This

1   is a deposition you read; right?

2        A.    Correct.

3        Q.    It informed your opinions; right?

4        A.    Correct.

5        Q.    Mr. Engilis was asked:

6              "Mr. Engilis, when you were spraying Roundup,

7   do you remember ever feeling it on your skin?"

8              Answer: "Not that I recall, no".

9              Moving down:  "Sitting here today, you don't

10  ever remember ever feeling Roundup on your skin?"

11             Answer:  "No."

12             Did I read that correctly?

13       A.    Your vocabulary and reading abilities are

14  exquisite.

15       Q.    Given the fact, Dr. Schneider, that

16  Mr. Engilis could not even recall feeling Roundup on

17  his skin, explain to me the methodology by which you

18  took that testimony and determined he got Roundup on

19  his skin and then into his body?

20             MR. HABERMAN:  Objection.  It's an improper

21        question.

22             THE WITNESS:  Because there's evidence that

23        he sprayed barefoot.  And maybe he didn't

24        understand that it got in his skin that way.  I

25        can't speak to what he thought.  But I think -- my

```
1          read of the record is that he was spraying it

2          barefoot, and it's not a hard stretch to imagine

3          then that the glyphosate entered his skin through

4          his skin.

5     Q.   Are you an expert on skin physiology?

6          MR. HABERMAN:  Argumentative.  Objection.

7          THE WITNESS:  What do you mean by skin

8          physiology?  Be more specific on that question.

9  BY MR. KALAS:

10    Q.   Are you an expert on physiology of the skin?

11         Let me ask it this way.  Can you name for me

12 the layers that make up human skin?

13    A.   Sure.  The epidermis, the dermis, and I think

14 there's a subdermis also.

15    Q.   Can you name for me the layers of the

16 epidermis?

17    A.   I'm not sure.

18         MR. HABERMAN:  Objection.  Scope.

19    Q.   What is a stratum corneum?

20    A.   (Video frozen.)

21         MR. KALAS:  Did he freeze for you, Joe?

22         MR. HABERMAN:  Yes.

23         MR. KALAS:  Let's go off the record.

24         THE VIDEOGRAPHER:  Going off the record at

25         4:21 p.m.
```

Andrew Schneider, M.D.

```
 1              (A BRIEF RECESS WAS HELD.)

 2              THE VIDEOGRAPHER:  Back on the record at 4:35

 3       p.m.

 4  BY MR. KALAS:

 5       Q.   Dr. Schneider, we were talking about skin

 6  physiology before we went off the record.  Are you an

 7  expert on the dermal absorption of chemicals?

 8              MR. HABERMAN:  Objection.

 9              THE WITNESS:  No.

10  BY MR. KALAS:

11       Q.   Now, Mr. Engilis was 62 when he was diagnosed

12  with CLL; right?

13       A.   Yes.

14       Q.   And, unfortunately, there are people

15  diagnosed with CLL every day in this country; right?

16       A.   Of course.

17       Q.   There are people who are diagnosed with CLL

18  who never used Roundup; right?

19       A.   Of course.

20       Q.   The disease CLL existed before Roundup

21  existed; correct?

22       A.   I assume it always existed.  It's a matter of

23  when we discovered it, but I'm not a historian.

24       Q.   Just because Mr. Engilis used Roundup and was

25  diagnosed with CLL does not mean, in and of itself,
```

1    Roundup caused his CLL; right?

2        A.    That's not my opinion.  My opinion is to a

3    reasonable degree of medical certainty that indeed

4    Roundup did cause his CLL.

5        Q.    Right.  And that wasn't really what my

6    question was directed at.  You made quite clear what

7    you opinion is.  My question is:  Is it enough to reach

8    the opinion that Roundup caused Mr. Engilis' CLL just

9    based on the fact that he used Roundup and has CLL?

10            MR. HABERMAN:  Objection.

11            THE WITNESS:  As we discussed two and a half

12        hours ago, I went through differential and the

13        risk factors for CLL, thought what could or could

14        not have contributed to a CLL; and my number one

15        hypothesis, to a reasonable degree of medical

16        certainty, is that indeed the glyphosate -- I hope

17        I'm saying that right -- did cause his CLL.

18    BY MR. KALAS:

19        Q.    Right.  I think we're in agreement here.

20    It's not enough for you conducting a differential

21    etiology to say this gentleman used a pesticide, which

22    I believe is associated with CLL, and he has CLL;

23    therefore, the CLL was caused by the pesticide.  That's

24    not enough?

25        A.    Well, I think it is enough.  I do a

1    differential.  I go through all of the possibilities of

2    why you could have CLL.  And lo and behold, he has a

3    24-year exposure to a medicine which we haven't even

4    talked about in the literature yet.  Maybe we're not

5    going to.  But I believe the literature is supportive

6    of my belief that his exposure caused the CLL.

7              So despite what you're saying, I disagree

8    with you, and my opinion, as your medical oncology

9    expert here, is that, indeed, using a differential

10   diagnosis approach, the glyphosate did cause his CLL.

11        Q.   Okay.

12        A.   I think you knew that already.

13        Q.   Now, talking about that literature -- and I

14   know you went over the CLL literature quite a bit with

15   Ms. Ross in the last deposition.  And I guess -- let me

16   ask you a question about that last deposition.  Did you

17   get an opportunity to review your transcript from that

18   last deposition?

19        A.   No.  I wasn't going to read 10 hours of

20   deposition.

21        Q.   Okay.  Thinking back on that deposition, are

22   there any opinions after that deposition that you

23   walked away and said, you know, I would really like to

24   change that to CLL?

25              MR. HABERMAN:  Objection.

```
 1              THE WITNESS:  No.
 2   BY MR. KALAS:
 3        Q.   When you were doing your differential
 4   etiology for an association between glyphosate and CLL,
 5   based on my reading of that deposition, you relied upon
 6   multiple epidemiology studies; right?
 7        A.   Yes.
 8        Q.   And of the epidemiology studies that were out
 9   there that you looked at, by my count, four of them
10   looked at CLL specifically:  Those are Maloney,
11   Eriksson, Andrioti and Lyonne.  Are there any other
12   studies that you can think of, looking at your reliance
13   list or looking at your report, that look at CLL
14   specifically?
15        A.   Just let me comment, if I could.  So
16   Eriksson, yes.  I would have to go back and pull the
17   others to see.  The other one that comes to my mind is
18   Pahwa.
19        Q.   And Pahwa is an asset -- do you remember
20   that?  We can look at it.
21        A.   If you remember -- if you read the
22   deposition, you would see that they're the same
23   disease, and we had the argument the last time.  But
24   they're the same disease.
25        Q.   So there's five then?  There's five studies?
```

1    It would be Maloney, Eriksson, Andrioti, Lyonne, and

2    Pahwa for CLL, SLL?

3         A.   If you say so.  I don't have it memorized

4    like that.  But we can look at individual studies and

5    see, I'm sure.

6         Q.   Is there a statistically significant

7    increased risk for glyphosate use and CLL SLL in any

8    study but Eriksson?

9         A.   Yes.  Pahwa.

10        Q.   That's stat sig?

11        A.   What is stat sig?

12        Q.   Statistically significant, sir.

13        A.   Yes.

14             Do you want to look at it with me or you

15   don't?

16             MR. HABERMAN:  Just let him ask the

17        questions.

18             THE WITNESS:  Sure.

19             MR. KALAS:  Let me do a little housekeeping

20        before we do that.

21             (DEPOSITION EXHIBIT 9 WAS MARKED FOR

22              IDENTIFICATION.)

23   BY MR. KALAS:

24        Q.   If you look at the exhibits I marked as

25   Exhibit 9 your invoice that Mr. Haberman gave to us.

1        Are those the invoices that you submitted in

2   this matter, sir?

3        A.   I don't see them.

4        Q.   You have to refresh the exhibit --

5        A.   Why don't you show them to me?  You don't

6   want to show them?

7        Q.   I can show you.

8        A.   It makes it easier for me.

9        Q.   There you go.  Are these the invoices that

10   you submitted in this case?  This is the first page.

11   This is the second.

12        A.   That's from July.  That's not for this depo.

13        Q.   These are the two that Mr. Haberman gave me.

14        A.   That's for July 6.  That's not this depo.

15            MR. KALAS:  So I guess, Mr. Haberman, do you

16        have any more?

17            MR. HABERMAN:  I don't think I do.  I think

18        that -- you know, I think in response to your

19        Request for Production, you asked for all

20        invoices; so I was bringing you up to date on the

21        invoices that had not been given to Emma or to

22        Ms. Ross.  And I don't know if I have invoices --

23            THE WITNESS:  Off the record, I sent you

24        invoices that have not been paid by anybody for

25        this deposition.  I sent you, Mr. Haberman, and --

```
 1          I'm sorry, what's your name, sir?

 2              MR. KALAS:  Mr. Kalas.

 3              THE WITNESS:  I sent invoices for both

 4       defense and plaintiff to pay me, and no one has

 5       paid me.  And Jeff Haberman has the invoices I

 6       sent them.

 7              MR. HABERMAN:  So I will look for those

 8       again.

 9              MR. KALAS:  All right.  We will leave it at

10       that and keep moving.  And maybe I will ask you

11       some questions whenever I get those other ones.

12              Let me mark as Exhibit 10 Pahwa.

13              (DEPOSITION EXHIBIT 10 WAS MARKED FOR

14                IDENTIFICATION.)

15   BY MR. KALAS:

16       Q.   You stated that there's a statistically

17   significant increased risk for SLL on this study, and I

18   will need your help finding that.

19       A.   Sure.

20       Q.   I have got it open.

21       A.   Let me start with Table 4 and Table 5.

22       Q.   Sure.  We're at Table 4.  This is frequency

23   of handling.

24       A.   Let me see Table 5, please.

25       Q.   Sure.  Then it is small.
```

```
 1        A.    There it is right there.

 2        Q.    The ordinal figure.  What does ordinal mean?

 3        A.    We had this discussion with Emma, and I

 4   learned.  So it's a statistical method -- and I'm not a

 5   statistician.  But basically, it's a way to look at

 6   things that don't have uniform numbers between

 7   different parameters.

 8              For example, let's say you are rating someone

 9   as 1.5 and there's a 3 for one category, a 2 for

10   another category.  It's a statistical way to look at

11   the data for -- that doesn't have uniform measurement

12   between the numbers.

13        Q.    Now, the authors state about their SLL

14   figure -- they state in the most recent classification

15   scheme, SLL and chronic lymphocytic leukemia, or CLL,

16   are classified together as they have similar

17   etiologies, while our analysis only includes SLL."

18              Do you see that?

19        A.    I do.

20        Q.    The authors of this study said that their

21   analysis does not include CLL; right?

22        A.    So as your clinical oncology expert, I'm

23   telling you that they're the same disease.  So although

24   maybe in that time they didn't know it, you can use

25   that data to support the small lymphocytic lymphoma.
```

1   They're the same disease.  I'm absolutely 100 percent

2   certain I think it was applicable.

3        Q.   Okay.  The authors of this study work at

4   places like the United States National Cancer

5   Institute, the British Columbia Cancer Agency, the

6   Dalla Lana School of Public Health at the University of

7   Toronto, and so on and so forth.  And it's your opinion

8   that they don't understand the difference between SLL

9   and CLL?-

10       A.   I hope you're not -- you're being

11   disingenuous.

12       Q.   Well, we already read it into the record.

13       A.   Let's go back.  I want you to go back.  You

14   misrepresented what they said.

15       Q.   Okay.  I'm asking if you disagree with these

16   authors.  If you don't -- if it's your belief you don't

17   disagree with them, we will move on.

18       A.   Well, don't you want to go back and see what

19   it said?

20       Q.   No.  I have something I need to get to.

21       A.   So you just want to lie and don't want to --

22       Q.   You know, I know you took offense to

23   something I said earlier.  I take offense to that.

24       A.   So I guess we're even.  The answer is that

25   the authors didn't say that at all.

```
 1        Q.    Okay.

 2        A.    I guess you don't want me to show that to

 3   you?

 4        Q.    Let me ask you this.  You ruled out --

 5   because you opined that Mr. Engilis' CLL preceded his

 6   development of bladder cancer and malignant melanoma,

 7   you were able to rule out a history of a primary cancer

 8   as a risk factor for his CLL; correct?

 9        A.    Correct.  They came at the same time.  I

10   didn't say preceded.  I said they came at the same

11   time, if you remember three hours ago.

12        Q.    Well, the bladder cancer was diagnosed six

13   months before his CLL; correct?

14        A.    That doesn't mean they weren't there at the

15   same time, sir.

16        Q.    Well, I understand that it's your opinion

17   they may have been there at the same time, but it was

18   diagnosed six months ahead of the CLL; right?

19        A.    We talked about lead time before.  So what?

20        Q.    But my question is:  When you were conducting

21   your differential etiology, did you consider as a

22   potential risk factor a history of primary cancer that

23   preceded the CLL?

24        A.    So we already went through this, but I will

25   be happy to do it with you again.  So we know patients
```

1    with bladder cancer, for example, don't get CLL.

2    That's not a factor of CLL.

3              We already discussed that CLL causes

4    secondary malignancies.  And it's well described in the

5    literature that melanoma and we discussed the TCC of

6    the bladder.  So I reviewed the records.  I'm the

7    expert in medical oncology here.

8              My opinion is that they occurred at the same

9    time.  And it's my opinion, as you well know, that the

10   risk factor for CLL wasn't having previous malignancy;

11   it was indeed glyphosate causing CLL and the immune

12   dysfunction of CLL causing the melanoma and the TCC of

13   the bladder, and I'm sure you know that already.

14             MR. KALAS:  I'll mark as Exhibit 11 the

15        McDuffie study.

16             (DEPOSITION EXHIBIT 11 WAS MARKED FOR

17              IDENTIFICATION.)

18   BY MR. KALAS:

19        Q.   The McDuffie study in Table 1 has a section

20   on medical history; correct?

21        A.   You have to show me.

22        Q.   I'm looking at it.

23        A.   Okay.  Yes.

24        Q.   Do you see "previous cancer"?

25        A.   Yes.

1      Q.    Do you see that on medical history?

2      A.    Yes.

3      Q.    "Individuals with a previous cancer in the

4   McDuffie study had an odds ratio of 2.43 with a

5   confidence interval of 171 to 3.44 for NHL; right?

6      A.    That's what it says, but I don't believe he

7   had a previous malignancy.

8      Q.    That's what I was getting at.  You would

9   agree with me that having a previous malignancy is a

10  risk factor for NHL?

11     A.    That's a general statement.  It depends on

12  what kind of malignancy.  Again, I don't believe having

13  a previous bladder cancer is a risk factor of NHL.

14     Q.    In the McDuffie study, having a previous

15  malignancy was a risk factor for NHL; correct?

16     A.    Right.  But it doesn't tell you what kind of

17  malignancy.  We have to look at the 75 patients and see

18  what kind of malignancy they have.  Maybe they had

19  melanoma, and that's why they got the CLL.  Maybe they

20  had Hodgkin's disease, and that's why they got NHL.

21  I'm here to tell you that, one, he didn't have a

22  previous malignancy; and, two, this data doesn't

23  explain what the previous malignancies were.

24     Q.    Let me take out of -- let me take Mr. Engilis

25  out of the situation for just a moment and get to the

1    step where we're putting together our ruling in stage

2    of our differential etiology.  It is a risk factor for

3    NHL, according to the McDuffie study, if someone has a

4    previous malignancy; correct?

5         A.    It depends on what type.  They don't tell

6    you, so you have to go into the details of that to see.

7         Q.    Do the authors here differentiate between

8    what type of malignancy is a risk factor for NHL?

9         A.    So they didn't.  That might be a weakness of

10   the study.  We always criticize studies, looking at the

11   good and the bad of the study.  That's a weakness in

12   this study where we need to know what type of previous

13   cancers they had.  What if they had all Hodgkin's

14   disease?  That wouldn't make sense.  Or maybe they all

15   had MALT lymphoma, that would make sense.  Or what if

16   they have lung cancer?  Lung cancer doesn't cause CLL.

17        Q.    Is there any odds ratio for your glyphosate

18   in here that is as high as 2.43 in this whole study?

19   And I will go to all of them if you want to look at

20   them.

21        A.    It doesn't matter.  The number doesn't

22   matter.  The confidence interval matters, yes.

23        Q.    Is there any confidence interval that has a

24   lower bound of 1.71 and an upper bound as high as 2.44

25   for glyphosate in this study?

1      A.   You can look at it as well as I can.  But if

2   you're correct -- and I will assume you are -- so what?

3   Maybe they all had Hodgkin's disease.  That would make

4   perfect sense.  It should be even higher.  Maybe they

5   all had history of MALT lymphomas.  That would make

6   perfect sense.  It depends on what the cancers were.

7      Q.   Okay.  But you haven't done any inquiry, like

8   write any of the authors of the study or look at the

9   underlying questionnaire --

10     A.   No.

11     Q.   Let me finish my question.

12          -- to determine what the type of cancer was;

13   right?

14     A.   Let's go to -- what year is this study

15   published, sir?

16     Q.   It's 2001.  And you actually rely, I believe,

17   on some of the studies written by these authors

18   elsewhere in your report?

19     A.   Pahwa, yes.  The answer is, no, I wouldn't

20   write that because I don't need to know that.  I

21   reached my opinion that they occurred at the same time.

22   So why would I write him and ask him that question when

23   I don't believe that he had a previous malignancy.

24     Q.   Now, you mentioned the fact that you didn't

25   believe the evidence was as strong for melanoma

1    proceeding CLL as CLL preceding melanoma.  Am I right?

2         A.   Yes.

3              MR. KALAS:  I'm going to mark as Exhibit -- I

4         think I'm at 12 -- a study entitled "The

5         Association Between Melanoma, Lymphoma and Other

6         Primary Neoplasms."

7              (DEPOSITION EXHIBIT 12 WAS MARKED FOR

8               IDENTIFICATION.)

9    BY MR. KALAS:

10        Q.   I'll get it up on the screen for you.

11             This is a study I did not see on your

12   materials considered list.  Is this the study you have

13   seen?

14        A.   I have to read it.  I've never seen it.

15        Q.   How did you search for studies -- before you

16   read it, how did you search for studies on melanoma and

17   CLL?  Tell me about the process you went through.

18        A.   I did a Google search, and I said look for

19   the association of CLL and melanoma.

20        Q.   And did you refer to the association between

21   lymphoma and melanoma?

22        A.   No.  I was -- our patient has CLL, so that's

23   much more specific and, really, if I can get that data,

24   that's the better data so --

25        Q.   This is an article -- and again I'm not going

1    to ask any specific questions yet about it.  But this

2    is an article --

3          A.    You have questions, I have to read it.  So

4    you decide.

5          Q.    This is an article that is written by people

6    with MDs after their name; right?  Do you see that one?

7          A.    Yes.  They all have MDs.  I don't know who

8    they are or where this is published.  I never read this

9    article before.

10         Q.    MD means medical doctor; right?

11         A.    Like me, correct.

12         Q.    And down here it says "From the Department of

13   Surgery, Yale University School of Medicine, New Haven

14   Connecticut;" right?  Is that what it says?

15         A.    That's what it says, right.

16         Q.    And this article says "The incidence of a

17   second malignant neoplasm in our patients with melanoma

18   was 8.1 percent.  Lymphoma was a particularly common

19   type of second malignancy showing an incidence of more

20   than 16 fold higher than the expected in the normal

21   population."

22               Did I read that correctly?

23         A.    If you're asking me about -- your reading

24   comprehension is correct.  But I never read the

25   article.

1      Q.   I'm just asking if I read it correctly.

2      A.   Your third grade teacher would be proud of

3   you.  Your reading was perfect.

4           MR. HABERMAN:  Okay, okay.  All right.

5   BY MR. KALAS:

6      Q.   Dr. Schneider, this article, which purports

7   to show a 16-fold higher-than-expected level of

8   lymphoma in melanoma patients is not an article you

9   considered in reaching your opinions; correct?

10     A.   Because, again, the better issue is look at

11  CLL, not all lymphoma.  We already discussed that I

12  believe that CLL patients have much more immune

13  dysfunction, B-cell function; so I wouldn't want to go

14  to an article looking at general NHL and melanoma when

15  I can go to articles and looking at CLL and melanoma.

16  That's the better way to do this to answer the

17  question.

18          Just for the record, you never let me read

19  that article.

20     Q.   And it's an article you never found on

21  Google; right?

22     A.   Well, I wouldn't because that is an

23  inadequate search.  The better search is CLL and

24  melanoma.  That's what Mr. Engilis has.  We discussed

25  NHL comprises many disease, some not the same in

1    dysfunction and maybe not the same associations.

2        Q.   Well, then, because NHL and CLL are so

3    different, were you relying on any NHL epidemiology

4    figures at trial?

5            MR. HABERMAN:  No.  Objection.

6            MR. KALAS:  I'm just asking him.

7            THE WITNESS:  Go ahead.  Ask the questions.

8        You look at all the data.  You critique the data.

9        You look at the strengths and weaknesses and go

10       from there.

11           So each article will have strengths and

12       weaknesses, and we will talk about the strengths

13       and weaknesses of the article.  And you haven't

14       even asked me yet my opinion of the articles.  And

15       we have only a few minutes left, but that's okay.

16       I will give the jury my opinion, you know, of what

17       the epidemiologic data shows.

18           MR. KALAS:  I'm marking as Exhibit 13 an

19       article that also does not appear on your reliance

20       list by Verwer from 2010.

21           (DEPOSITION EXHIBIT 13 WAS MARKED FOR

22            IDENTIFICATION.)

23   BY MR. KALAS:

24       Q.   Is this an article you have seen before, sir?

25       A.   No.

1      Q.   And this is an article that appears in a

2   journal called Journal of Clinical Pathology.  Do you

3   see that?

4      A.   Yes, I see that.

5      Q.   All right.  If we go down to Table 1, it

6   looks at CLL.  Do you see that, CLL/SLL?

7      A.   I'm not going to answer any questions unless

8   you let me read the article.

9      Q.   I'm just asking if I'm reading it right.  I'm

10   not going to even ask you what you opinion is, because

11   I know you didn't read it.  Do you see it says CLL/SLL?

12      A.   I see that.

13      Q.   Do you see they have something called an SIR

14   that they say is statistically significant here.  Do

15   you see that?

16      A.   You have to give me time.  I can't answer a

17   question -- if you ask what something means, I have to

18   be able to read the article.

19      Q.   Okay.  That's fine.

20           The author stated here -- I'm just going to

21   ask you if I read it correctly.  I know you think I'm a

22   good reader.

23           It says "In our study of over 18,000 patients

24   with melanoma diagnosed over a 15-year period, we also

25   found an increased incidence of lymphoma compared with

1    the general population, with SIRs of 3.5 and 7.5 for

2    NHL and CLL/SLL respectively."

3              Did I read that correctly?

4        A.   Your reading is correct, but I have never

5    seen the article, don't know what it says, and can't

6    critique it because you don't want me to read it.

7        Q.   Okay.  So let me ask you this.  I've now

8    shown you two articles that show an increased risk of

9    lymphoma including one that says it has been an

10   increased risk of CLL/SLL after a melanoma diagnosis.

11   And my question is, why didn't you find those articles?

12       A.   Well, I'm not sure it actually says that, to

13   be fair.  So you have to let me read the article to see

14   if it says that's.  So let's be fair; okay?

15       Q.   Why didn't you find them?  That's my

16   question?

17             MR. HABERMAN:  Objection.

18             THE WITNESS:  I'll answer it.

19             MR. HABERMAN:  You can answer it, but I

20        object to the form of the question.  It's

21        argumentative and it calls for speculation.

22             THE WITNESS:  The answer is the better way of

23        doing it is to look at the association of CLL and

24        melanoma, not NHL.  And you have not let me read

25        either of the two articles.  Maybe you don't want

1      me to.

2      Q.   Is there any study you're aware of that shows

3   a statistically significant increased risk of bladder

4   cancer following exposure to glyphosate?

5      A.   You asked that about three hours ago, and I

6   told you that there's clear evidence in the literature

7   of second malignancies.

8           We discussed that one of the main risk

9   factors of bladder cancer is smoking.  He was not a

10  smoker.  That's my opinion based upon my knowledge as a

11  clinical oncologist, and his glyphosate causes CLL, and

12  the immune dysfunction caused the TCC of the bladder.

13  There are no other reasonable explanations.

14          MR. KALAS:  Dr. Schneider, motion to strike

15      as nonresponsive.

16          MR. HABERMAN:  I oppose that.  It's

17      responsive.  You just don't like his answer.

18  BY MR. KALAS:

19      Q.   This is a question that I'm specifically

20  asking because we're going to write a brief and tell

21  the Court that you have no study to rely upon to state

22  that bladder cancer is associated with glyphosate use.

23  I'm going to tell you.  That's why I'm asking this

24  question.  Okay?

25          So with that preface, do you have a study

1    that you can point me to that shows a statistically

2    significant increased risk for bladder cancer following

3    glyphosate use?  Yes or no.

4        A.   Yes.  I have multiple studies that show an

5    increased risk of secondary malignancies but don't

6    specify the type of malignancy, but clearly bladder

7    cancer is a secondary malignancy.  So, yes, I think we

8    can show you the data of secondary malignancies in

9    patients with CLL.

10            MR. KALAS:  Again motion to strike as

11        nonresponsive.

12   BY MR. KALAS:

13       Q.   Is there a study that shows a statistically

14   significant --

15            MR. HABERMAN:  I oppose that.

16   BY MR. KALAS:

17       Q.   Is there a study that shows statistically

18   significant increased risk for melanoma following

19   glyphosate exposure?

20       A.   Yes.  Because the -- you just have to go and

21   connect the dots.  The glyphosate causes CLL, and the

22   CLL causes the melanoma; so yes.

23       Q.   Is there a study that shows a statistically

24   significant increased incidence of secondary

25   malignancies following the glyphosate-induced primary

1    malignancy?

2         A.   Again, I think I have already answered that

3    question.  The answer is, yes, by virtue of the B-cell

4    dysfunction and the deficiencies in the CLL patient.

5         Q.   What's the name of the study that shows the

6    statistically significant increase in secondary

7    malignancies following a glyphosate-induced primary

8    malignancy?  What's the name of that study?

9         A.   Right.  So the answer is that I'm here, your

10   expert, to connect the dots.  That study has to have

11   been done.  But we know that glyphosate causes CLL.  We

12   know that CLL causes immune dysfunction and B-cell

13   dysfunction; therefore, I'm going to come to the jury

14   and say it's to a reasonable degree of medical

15   certainty that glyphosate causes CLL; the associated

16   immune dysfunction caused the melanoma; and here are

17   the studies.

18              MR. KALAS:  Mark that as Exhibit 14.

19              THE WITNESS:  By the way --

20              MR. KALAS:  Let's get a time check.

21              THE WITNESS:  That was my question.

22              MR. KALAS:  Mr. Videographer or Mr. Court

23        Reporter, can you tell me how long we have been on

24        the record?

25              THE VIDEOGRAPHER:  One moment.  We're been on

```
 1          the record for 3 hours and 40 minutes.

 2               THE WITNESS:  No.  Two hours.  We started at

 3          2:00.

 4               THE VIDEOGRAPHER:  One moment.  Two hours, 41

 5          minutes.

 6               (DEPOSITION EXHIBIT 14 WAS MARKED FOR

 7                IDENTIFICATION.)

 8  BY MR. KALAS:

 9       Q.   I marked as Exhibit 14, Dr. Schneider, a

10  medical record of Mr. Engilis.  Can you see this from

11  Fish Hospital?

12       A.   I don't see the record yet.  Open it up.

13       Q.   I opened it up in Zoom.

14       A.   Let's see.  Hold on.  Hold on.  I'm having

15  trouble here.  How do I find it?

16       Q.   Exhibit 14.  But if you can get it out of the

17  exhibit site and just get back to the Zoom, you can see

18  it.

19       A.   I can't get out of it.  Unfortunately, I'm

20  having trouble.  I'm sorry.

21               I see you now.  Can you share your screen?

22       Q.   Yes.  I will share my screen.

23               Do you see the record now?

24       A.   Yes, I see the record.

25       Q.   This is a set of records you reviewed from FH
```

```
 1    Fish Memorial?

 2         A.   Yes.

 3         Q.   You see this is a medical record of

 4    Mr. Engilis, has his date of birth, and then it has a

 5    date of 11-3-2014.  Do you see that?

 6         A.   I do.

 7         Q.   Okay.  This is after his bladder cancer

 8    diagnosis and during the period when his melanoma and

 9    CLL were being diagnosed; right?

10         A.   Right.

11         Q.   Okay.  If you go down here, it talks about

12    the fact that he presents for skin cancer --

13         A.   Are you moving?  I can't see it.

14         Q.   No.  I'm just going down the record here a

15    bit.  Okay.  And it talks about the date of diagnosis

16    being 10-17-2014.  Do you see that?

17         A.   Yes.

18         Q.   Okay.  Then they have additional information.

19    Do you see this?

20         A.   I do.

21         Q.   It talks about "Biopsy proven invasive

22    malignant melanoma of his left forearm.  Patient noted

23    nevus on arm for five years."  What does it mean to

24    note the nevus on the arm for five years?

25         A.   He had a mole on his arm for five years.
```

1      Q.   Is that the mole that was removed?

2      A.   I believe so.

3      Q.   Okay.  So that means that his malignant

4  melanoma was present five years prior to 2014; right?

5           MR. HABERMAN:  Objection.

6           THE WITNESS:  That's absolutely wrong.  It

7      probably wasn't benign either.

8  BY MR. KALAS:

9      Q.   Okay.  It says the patient states it became

10  darker, and Dr. Mari ordered a biopsy showing 1.2

11  millimeter malignant melanoma; right?

12     A.   It doesn't prove your adenopathy moved up

13  years ago.

14     Q.   How would you disprove that wasn't malignant

15  melanoma dating back to 2009?

16     A.   I would prove that because I know the natural

17  history of untreated melanoma.  And if you leave a

18  melanoma five years, it's going to cause havoc in your

19  body.

20     Q.   Like causing secondary cancers perhaps?

21     A.   No.  Like causing death.  Not secondary

22  cancers.  Like death.

23     Q.   How long would it take an untreated melanoma

24  to cause a secondary cancer?

25     A.   I don't believe that melanoma causes

Andrew Schneider, M.D.

```
 1    secondary cancers.  The data which I showed you says --

 2    and the study I showed you it was probably by chance.

 3    So I don't think having melanoma is a big risk factor

 4    to develop CLL.

 5         Q.   Okay.  It says "Patient admits history of

 6    sunburns."  Do you see that?

 7         A.   I do.

 8         Q.   You told me that you hadn't seen any

 9    information that Mr. Engilis had a history of sunburn.

10              Do you remember telling me that?

11         A.   Everyone has had a sunburn.  I don't know

12    what that means.  Having a sunburn is a bad sunburn.

13    How do I know what that means?

14         Q.   How many sunburns did Mr. Engilis have?

15         A.   I don't know.

16         Q.   Sunburns are a risk factor for malignant

17    melanoma.  You told me that.  Remember?

18              MR. HABERMAN:  Objection.

19              THE WITNESS:  I think a severe sunburn is a

20         risk factor for melanoma.  A more important risk

21         factor is the presence of glyphosate.

22    BY MR. KALAS:

23         Q.   Can you rule out, given Mr. Engilis's

24    self-reported history of sunburns and his malignant

25    melanoma that it would not have occurred absent
```

1    glyphosate exposure?

2        A.   It's my opinion that there's no record here

3    that says he has had severe sunburns.  I don't know

4    whether the sunburn was even on his arm.  And so, yes,

5    I think there's no foundation to state that his

6    melanoma was from a sunburn when I don't know, one, how

7    many he had; two, how severe they were; three, where

8    they were.  But the more important issue to me is that

9    this is a clear 24-year exposure of glyphosate.

10       Q.   What inquiry have you done into Mr. Engilis'

11   history of sunburn?

12       A.   Just reading the records like you have, sir.

13       Q.   Okay.  And when you read the records, looking

14   for his history of sunburns, you didn't see this;

15   right?

16       A.   A lot of records.  I could have missed it.

17   But again, it just says history of sunburns.  It's very

18   vague.  It doesn't tell me much.

19       Q.   What methodology have you employed to -- let

20   me back up.  Because you did not consider or rule in

21   Mr. Engilis' history of sunburns in your differential

22   etiology for his malignant melanoma, you could not rule

23   out a history of sunburn as a potential cause.  Is that

24   fair?

25            MR. HABERMAN:  Objection.  Mischaracterizes

1       the record.

2           THE WITNESS:  Stop here.  Let me say a few

3       things.  Number one, I see tons of mistakes in

4       this record anyway.  The problem is in situ

5       malignant melanoma.  That's not your item.  So

6       cast that on the validity of certain things.  So

7       that's wrong.

8           "Admits history of sunburns."  Well, I don't

9       know that that means, in all fairness.  I think if

10      you ask most people if they've had a sunburn they

11      would say yes, but most people don't get melanoma

12      from it.  We don't even know where the sunburn

13      was, how many times he had a sunburn, but we do

14      know is that he had a 24-years exposure to

15      glyphosate.

16  BY MR. KALAS:

17      Q.   And we don't know how much glyphosate he

18  absorbed; right?

19          MR. HABERMAN:  Objection.

20          THE WITNESS:  His wife says he walked around

21      barefoot, so you can use your imagination.

22  BY MR. KALAS:

23      Q.   Did he say that in his deposition?

24      A.   He only showed me a small part, but his wife

25  stated in her deposition.

```
 1        Q.    That's not my question.

 2        A.    Let me finish.

 3              He walked around barefoot.

 4        Q.    That's not my question.  Did he say it in his

 5   deposition, the plaintiff, Mr. Engilis?

 6              MR. HABERMAN:  Objection.  The document

 7        speaks for itself.

 8              MR. KALAS:  You froze, Dr. Schneider.

 9              Dr. Schneider?

10              MR. HABERMAN:  Maybe he lost Internet again.

11              MR. KALAS:  Let's go off the record again.

12              THE VIDEOGRAPHER:  Going off record at

13        5:10 p.m.

14              (A BRIEF RECESS WAS HELD.)

15              THE VIDEOGRAPHER:  Back on the record at 5:12

16        p.m.

17   BY MR. KALAS:

18        Q.    Dr. Schneider you also attribute

19   psychological stresses to Mr. Engilis' CLL in your

20   report; right?

21        A.    I went to the point that anybody that has

22   given a cancer diagnosis will obviously have some

23   stress.

24        Q.    And is that the opinion that you went through

25   an expert methodology to reach -- well, let me back up.
```

1    That's a bad question.  Strike the question.

2            Tell me the methodology with which you

3    went -- that you went through to reach the opinion that

4    his psychological stress was due to his cancer

5    diagnosis?

6        A.    I think it says in my disclosure here, "A

7    matter of common sense as well as personal professional

8    experience that the diagnosis and treatment of cancer

9    and the complications can result in stressful

10   experiences that a person can undergo during his

11   lifetime."

12           "Mr. Engilis acknowledged in his depo that

13   the developments, ongoing experiencing anxiety, severe

14   stress resulted from his prognosis of NHL,

15   psychological symptoms also affected his wife and

16   family, along with associated effects on the marital

17   relationship."

18       Q.    That reminds me of the question that was

19   pending when you went offline.  Did Mr. Engilis say in

20   his deposition he walked barefoot through the grass?

21       A.    Again, I said I don't recall that.  But we

22   can look at it together.  You only showed me a few

23   lines, but I'm sure you read it and maybe you memorized

24   it better than I have.  It says what it says.

25       Q.    Okay.  Going back to the psychological stress

1   point, is it your opinion that Mr. Engilis never

2   complained of psychological stress prior to his cancer

3   diagnosis?

4        A.   No.  That's not my opinion.  I believe he

5   did.

6        Q.   In fact, he had medical records that talked

7   about having psychological stress due to his doctor's

8   MS and due to his pending lawsuits; right?

9        A.   Correct.

10       Q.   And is there any way you can separate the

11  psychological stress he suffered from his CLL diagnosis

12  from the psychological stress he suffered prior to his

13  cancer diagnosis?

14       A.   Just from what he said.  Again, you are

15  asking my opinion, and this is just an opinion, that,

16  you know, seeing patients for 33 years, it's stressful

17  to be told you have a cancer.  And even if you have a

18  baseline anxiety, one could easily believe that this

19  diagnosis would exacerbate any underlying anxiety.  And

20  also he said he had some marital issues.  So again, I'm

21  not saying he never had anxiety.  He did.  But clearly

22  given a diagnosis of three cancers it will make the

23  anxiety much worse.

24       Q.   I think that was responsive, but I'm not sure

25  if it answered the specific question I was asking, so I

1    just want to make sure that I understand your specific

2    answer to my question.

3              Can you separate that anxiety and the stress

4    from his cancer diagnosis from his previous stresses as

5    far as quantifying how much of his stress was due to

6    one versus the other?

7         A.   Well, just qualitatively I can.  Not

8    quantitatively.  As I read into the record before, he

9    says that the ongoing experience in anxiety of the

10   uncertainty about NHL gave him anxiety, and he has

11   marital issues.  So it's clear that -- I'm not sure --

12   it's hard to imagine if you're given a cancer

13   diagnosis, in fact three cancers in a short period of

14   time, that would cause stress; right.

15        Q.   A few final questions.  Is Mr. Engilis's

16   bladder cancer active today?

17        A.   Not that I'm aware of, but these low-grade

18   bladder cancers have a tendency to reoccur locally.

19   And it wouldn't be unexpected if indeed it were in the

20   future at some point.

21        Q.   Have you seen any indication in the medical

22   records that were available to you that the bladder

23   cancers is in the process of rearing its head?

24        A.   No.

25        Q.   Is Mr. Engilis' malignant melanoma active

1    today?

2         A.   No.

3         Q.   Have you seen any indication in the medical

4    records his malignant melanoma is beginning to rear its

5    head?

6         A.   No.

7         Q.   And I think you answered this for CLL, but

8    just to make sure, is the CLL active today?

9         A.   So I haven't seen records past 2019, but from

10   his deposition I would say no.

11        Q.   Okay.  And have you seen any indication from

12   his deposition or his records that that is rearing its

13   head?

14        A.   I already answered that question.

15        Q.   I thought you did too, but is the answer no?

16        A.   I think the record will speak for itself, but

17   you can read it back, but I already answered that

18   question.

19        Q.   I think you said no.

20             Okay.  Are there any other medical conditions

21   that you would attribute to Mr. Engilis' glyphosate use

22   beyond the ones we have discussed today?

23        A.   No.

24             MR. KALAS:  I will reserve my last couple of

25        minutes for any follow-up questions Mr. Haberman

```
 1      asks.

 2                      EXAMINATION

 3  BY MR. HABERMAN:

 4      Q.   Dr. Schneiderman, I do have some questions

 5  for you.  Okay.

 6      A.   All right.

 7      Q.   So you were asked questions earlier about any

 8  internal documents that you reviewed that are on your

 9  reliance list.  Do you recall questions about that?

10      A.   I do.

11      Q.   Did those internal documents support your

12  opinions in this case?

13      A.   Yes, they did.  Yes.  Do you want me to say

14  why or no?

15      Q.   Yes.  You can answer why.

16      A.   I think there was mentions in those internal

17  documents that Monsanto knew that glyphosate was

18  carcinogenic, number one.  That's the main one.

19      Q.   And were there also mentions in those

20  documents about be Monsanto's coordination and efforts

21  to discredit IR?

22           MR. KALAS:  Objection to form.

23           THE WITNESS:  Yes.  There were mentions of

24      those in those internal documents.

25  BY MR. HABERMAN:
```

Andrew Schneider, M.D.

1      Q.   And were there mentions in those internal

2   documents about Monsanto ghost writing peer-reviewed

3   literature?

4           MR. KALAS:  Objection to form.

5           THE WITNESS:  Yes.  I read those.  Correct.

6   BY MR. HABERMAN:

7      Q.   Were there mentions in those documents about

8   Monsanto's concern of the surfactants in Roundup?

9           MR. KALAS:  Object to the form.

10          THE WITNESS:  They believed that the

11          surfactants might potentiate the absorption,

12          correct.

13   BY MR. HABERMAN:

14     Q.   Were there documents that you read and

15   reviewed that support your opinions in this case where

16   you saw communications between Monsanto and EPA

17   employees?

18          MR. KALAS:  Object to the form.

19          THE WITNESS:  Correct.  Yes.

20          MR. KALAS:  Dr. Schneider, I'm going to

21          object every time.  I don't want to talk over you,

22          so just give me a pause.

23          THE WITNESS:  Sure.

24          MR. KALAS:  Thanks.

25   BY MR. HABERMAN:

1     Q.   You were asked questions about certain

2   experts whose reports you read, reviewed, and relied

3   on, Dr. Schiff, Dr. Portier, and Dr. Weisenburger.  Do

4   you recall those types of questions?

5     A.   I do.

6     Q.   And did you find those reports helpful in the

7   sense that those reports summarized the certain

8   epidemiological studies, animal studies, and

9   mechanistic studies in this case?

10          MR. KALAS:  Object to the form.

11          THE WITNESS:  They did, but they didn't

12      influence my opinions which I reached and depend

13      on.

14   BY MR. HABERMAN:

15     Q.   Understood.  You reached your opinions

16   independent of any expert report; right?

17          MR. KALAS:  Object to the form.

18          THE WITNESS:  Right.

19   BY MR. HABERMAN:

20     Q.   Did those expert reports also help just

21   summarize the types of literature and materials that

22   you reviewed?

23          MR. KALAS:  Object to the form.

24          THE WITNESS:  Yes.

25   BY MR. HABERMAN:

```
 1          Q.    Okay.  So can you run us through -- you were

 2    asked questions about this at length.  But can you run

 3    us through the methodology you employed to conclude

 4    that CLL that Mr. Engilis had caused or contributed to

 5    causing the secondary cancers of bladder cancer and

 6    melanoma?

 7               MR. KALAS:  Object to the form.  Asked and

 8          answered.

 9               THE WITNESS:  Well, yes, it is asked and

10          answered, in all fairness.  But I discussed many

11          times throughout the three hours that patients

12          with CLL have B-cell dysfunction and immune

13          dysfunction.  And the literature is clear that

14          there are risks for secondary malignancies,

15          including melanoma, which is well documented in

16          the literature.

17               In addition, they get secondary malignancies.

18          And I did again in my differential like I did to

19          decide whether glyphosate causes CLL; and again,

20          the most common etiologic risk factor for bladder

21          cancer is smoking, and he was a nonsmoker.  So I

22          do believe that the immune dysfunction from the

23          CLL caused the secondary bladder cancer and

24          absolutely the melanoma.

25    BY MR. HABERMAN:
```

1      Q.   You expressed opinions in your report and

2   express opinions today in the deposition.  Are all of

3   those opinions held to a reasonable degree of medical

4   certainty?

5      A.   Yes.

6           MR. HABERMAN:  Thank you, Doctor.  That's all

7      I have for you.

8                        EXAMINATION

9   BY MR. KALAS:

10     Q.   Just a couple of follow-ups on the questions

11  from Mr. Haberman.

12          Dr. Schneider, most of those documents,

13  internal documents, you were asked about are emails;

14  right?

15     A.   Yes.  Emails, yes.

16     Q.   Okay.  Is it your typical practice as a

17  practicing clinical oncologist to rely on emails for

18  scientific information?

19     A.   No.

20     Q.   Is it your practice outside of litigation to

21  review emails when reaching scientific conclusions?

22          MR. HABERMAN:  Objection.

23          THE WITNESS:  No.

24          MR. KALAS:  I have no further questions.

25          THE VIDEOGRAPHER:  That concludes today's

```
 1      deposition.  The time is 5:23.

 2            (A DISCUSSION WAS HELD OFF THE RECORD.)

 3            THE COURT REPORTER:  Would you like a rough

 4      and a copy?

 5            MR. KALAS:  Yeah.  Our typical is two-day

 6      order.  We don't need a rough.

 7            THE COURT REPORTER:  Do you need a copy?

 8            MR. HABERMAN:  Yeah.  But not a rough.  I

 9      just need an eTrans and scanned exhibits.

10            THE COURT REPORTER:  Thank you.

11            (THE DEPOSITION OF ANDREW SCHNEIDER, M.D.,

12             WAS CONCLUDED AT 5:44 P.M.)

13

14                         - - -

15

16

17

18

19

20

21

22

23

24

25
```

Andrew Schneider, M.D.

```
 1               C E R T I F I C A T E

 2   STATE OF ALABAMA  )

 3   MOBILE COUNTY     )

 4

 5           I do hereby certify that the foregoing

 6   proceedings were taken down by me and transcribed using

 7   computer-aided transcription and that the foregoing is

 8   a true and correct transcript of said proceedings.

 9           I further certify that I am neither of

10   counsel nor of kin to any of the parties, nor am I in

11   anywise interested in the result of said cause.

12           I further certify that I am duly licensed by

13   the Alabama Board of Court Reporting as a Certified

14   Court Reporter.

15

16

17   _____

     L. ALAN PEACOCK, FAPR, CCR, RDR, CRC
18   NCRA REALTIME SYSTEMS ADMINISTRATOR
     ALABAMA ACCR No. 13, Expires 9/30/22
19   LOUISIANA -  CCR #2015013, Expires 12/31/22
     COURT REPORTER, NOTARY PUBLIC
20   STATE OF ALABAMA AT LARGE

21   My Notary Commission Expires: 10/28/2023

22

23

24

25
```