# EXHIBIT G

```
 1            IN THE CIRCUIT COURT OF ST. LOUIS COUNTY

 2                      STATE OF MISSOURI

 3

 4   -------------------------------|
                                    |
 5   PAUL FERRO, et al.,            |
                                    |
 6        Plaintiffs,               |
                                    |
 7   vs.                            | Case No. 20SL-CC03678
                                    |
 8   MONSANTO COMPANY,              |
                                    |
 9        Defendant.                |
                                    |
10   -------------------------------|

11                       - - -

12               Wednesday, July 6, 2022

13                       - - -

14

15        This is the Videotaped Deposition of ANDREW

16   M. SCHNEIDER, M.D., Volume 2, commencing at

17   12:11 p.m. EDT, on the above date, at 3030 Holiday

18   Drive, Ft. Lauderdale, Florida, before Susan D.

19   Wasilewski, Registered Professional Reporter,

20   Certified Realtime Reporter, Certified Manager of

21   Reporting Services, Certified Realtime Captioner,

22   and Florida Professional Reporter.

23                       - - -

24               GOLKOW LITIGATION SERVICES
             877.370.3377 ph | 917.591.5672 fax
25                    deps@golkow.com
```

```
 1                    APPEARANCES
 2
 3     Counsel for Plaintiffs:
 4
           SCHLESINGER LAW OFFICES, P.A.
 5         BY:   JEFFREY L. HABERMAN, ESQUIRE  (Via Zoom)
                 jhaberman@schlesingerlaw.com
 6               SARAH J. SCHULTZ, ESQUIRE
                 sarah@schlesingerlaw.com
 7         1212 SE Third Avenue
           Fort Lauderdale, Florida 33316
 8         Phone:  (954) 467-8800
 9
10
       Counsel for Defendant:
11
12         GOLDMAN ISMAIL TOMASELLI BRENNAN & BAUM LLP
           BY:   EMMA C. ROSS, M.D., J.D.
13               eross@goldmanismail.com
                 CALEB A. KENNEDY, ESQUIRE
14               ckennedy@goldmanismail.com
           200 South Wacker Drive, 22nd Floor
15         Chicago, Illinois 60606
           Phone:  (312) 681-6000
16
17
18     Also Present:
19
           BRIAN ROSENTHAL, Videographer
20
21
22
23
24
25
```

```
 1                        - - -
 2                   I N D E X
 3             Wednesday, July 6, 2022
 4                   Volume 2
 5                      - - -
 6  Testimony of:  ANDREW M. SCHNEIDER, M.D.       PAGE
 7       DIRECT EXAMINATION BY MS. ROSS.............. 412
 8       CROSS-EXAMINATION BY MR. HABERMAN.......... 610
 9
10
11                   E X H I B I T S
12              (Attached to transcript)
13   ANDREW M. SCHNEIDER, M.D. DEPOSITION EXHIBITS    PAGE
14  Exhibits 2  Reliance Lists of Andrew Schneider, MD   413
    and 3       Ferro, et al., v. Monsanto Company
15
    Exhibit 25  Article - Glyphosate use and          511
16              associations with non-Hodgkin
                lymphoma major histological
17              sub-types: Findings from the North
                American Pooled Project
18              Manisha Pahwa, MPH, et al.
19  Exhibit 28  Article - A Review and Update with     420
                Perspective of Evidence that the
20              Herbicide Glyphosate (Roundup) is a
                Cause of Non-Hodgkin Lymphoma
21              Dennis D. Weisenburger
22  Exhibit 29  Article - A comprehensive analysis of  439
                the animal carcinogenicity data for
23              glyphosate from chronic exposure
                rodent carcinogenicity studies
24              Christopher J. Portier
25
```

```
 1                    E X H I B I T S
 2              (Attached to transcript)
 3    ANDREW M. SCHNEIDER, M.D. DEPOSITION EXHIBITS      PAGE
 4    Exhibit 30  Article - Conclusion on the peer      448
                  review of the pesticide risk
 5                assessment of the active substance
                  glyphosate
 6                European Food Safety Authority
 7    Exhibit 31  Article - Re-evaluation Decision      455
                  RVD2017-01, Glyphosate
 8                April 28, 2017
 9    Exhibit 32  Dr. Schneider's Handwritten Notes on  461
                  Canada 2017
10
      Exhibit 33  Article - Glyphosate: No change       476
11                proposed to hazard classification
                  European Chemicals Agency, Risk
12                Assessment Committee
13    Exhibit 34  Web Page - National Toxicology        484
                  Program - US Department of Health and
14                Human Services
15    Exhibit 35  Article - Evaluation of Glyphosate,   486
                  (Aminomethyl)phosphonic Acid, and
16                Glyphosate-Based Formulations for
                  Genotoxicity and Oxidative Stress
17                Using In Vitro Approaches
                  Stephanie L. Smith-Roe, Ph.D.
18
      Exhibit 36  US EPA Archive Document - Subject:    487
19                Glyphosate; oncogenicity study in the
                  mouse; PP#3E2845; Caswell No.: 661A.
20
      Exhibit 37  US EPA Archive Document - Subject:    487
21                Use of historical data in determining
                  the weight of evidence from kidney
22                tumor incidence in the Glyphosate
                  two-year feeding study; and some
23                remarks on false positives
24    Exhibit 38  US EPA Archive Document - Subject:    487
                  Consensus Review of Glyphosate
25                Caswell No. 661A
```

```
 1                    E X H I B I T S
 2               (Attached to transcript)
 3    ANDREW M. SCHNEIDER, M.D. DEPOSITION EXHIBITS      PAGE
 4    Exhibit 39  US EPA Archive Document - Subject:      487
                  Glyphosate;  2-year Combined Chronic
 5                Toxicity/Carcinogenicity Study in
                  Sprague-Dawley Rats - List a
 6                Pesticide for Reregistration
 7    Exhibit 40  US EPA Memorandum:  Glyphosate:         497
                  Epidemiology Review of Zhang et al.
 8                (2019) and Leon et al. (2019)
                  Publications for Response to Comments
 9                on the Proposed Interim Decision
10    Exhibit 41  Article - Exposure to glyphosate and    514
                  risk of non-Hodgkin lymphoma: An
11                updated meta-analysis
                  Paolo Boffetta, et al.
12
      Exhibit 42  Article - Pesticide exposure as risk    529
13                factor for non-Hodgkin lymphoma
                  including histopathological subgroup
14                analysis
                  Mikael Eriksson, et al.
15
      Exhibit 43  Article - Integrative assessment of     537
16                multiple pesticides as risk factors
                  for non-Hodgkin's lymphoma among men
17                A J De Roos, et al.
18    Exhibit 44  Article - Non-Hodgkin's Lymphoma and    542
                  Specific Pesticide Exposures in Men:
19                Cross-Canada Study of Pesticides and
                  Health
20                Helen H. McDuffie, et al.
21    Exhibit 45  Article - Exposure to                   555
                  glyphosate-based herbicides and risk
22                for non-Hodgkin lymphoma:  A
                  meta-analysis and supporting evidence
23                Luoping Zhang, et al.
24
25
```

```
 1                  E X H I B I T S

 2              (Attached to transcript)

 3    ANDREW M. SCHNEIDER, M.D. DEPOSITION EXHIBITS      PAGE

 4    Exhibit 46   Article - Glyphosate Use and Cancer    555

                   Incidence in the Agricultural Health

 5                 Study

                   Gabriella Andreotti, et al.

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Andrew M. Schneider, M.D.

```
 1                    - - -

 2              THE VIDEOGRAPHER:  Good morning.  We are now

 3       on the record.  My name is Brian Rosenthal, and I

 4       am the videographer.  The court reporter is Susan

 5       Wasilewski, both representing Golkow Litigation

 6       Services.  Today's date is July 6, 2022, and the

 7       approximate time is 12:11 p.m.

 8              This deposition is being conducted at 3030

 9       Holiday Drive, Fort Lauderdale, Florida, 33316,

10       taken in the matter of Ferro, et al. vs. Monsanto

11       Company, et al.

12              The deponent is Andrew Schneider, MD.

13              Would counsel and all parties please

14       identify themselves for the record, after which

15       would the court reporter please swear in the

16       witness.

17              MS. SCHULTZ:  Sarah Schultz and Jeff

18       Haberman from Schlesinger Law Offices on behalf

19       of the Plaintiffs.

20              MS. ROSS:  Emma Ross on behalf of the

21       Defendant.  With me is Caleb --

22              MR. KENNEDY:  It's Caleb Kennedy.

23              MS. ROSS:  And nobody else on the line.

24              THE COURT REPORTER:  Would you raise your

25       right hand?
```

```
 1           Do you solemnly swear or affirm the

 2      testimony you're about to give will be the truth,

 3      the whole truth, and nothing but the truth?

 4           THE WITNESS:  I do.

 5           THE COURT REPORTER:  Thank you.

 6           THE VIDEOGRAPHER:  Did we get Mr. Haberman's

 7      an appearance?

 8           MR. HABERMAN:  Sarah did it for me, but Jeff

 9      Haberman on behalf of the Plaintiffs.

10           ANDREW M. SCHNEIDER, M.D., called as a

11      witness by the Defendant, having been first duly

12      sworn, testified as follows:

13                    DIRECT EXAMINATION

14      BY MS. ROSS:

15      Q.   Good afternoon, Dr. Schneider.

16      A.   Hi.

17      Q.   At your last deposition you told us you were

18      offering certain opinions about the animal studies

19      and genotoxicity studies of glyphosate.

20           Do you remember that generally?

21      A.   I do.

22      Q.   Did you review the underlying genotoxicity

23      studies supporting glyphosate's registration in the

24      United States and around the world?

25      A.   So you ask me a particular one, I'll tell
```

1    you if I reviewed it.  How's that?

2         (Schneider Exhibits 2 and 3 were marked for

3    identification.)

4    BY MS. ROSS:

5         Q.   Sure.  You have in front of you your

6    reliance lists.  Those are Exhibits 2 and Exhibits 3

7    to your deposition, correct?

8         A.   Correct.

9         Q.   Do you know that there are hundreds of

10   genotoxicity studies, published and unpublished,

11   that were involved in the registration of glyphosate

12   in the United States and around the world?

13        A.   I'm sure.

14        Q.   Okay.  Did you review, for example, a study

15   called Wozniak 2019?

16        A.   So the answer is, I can't memorize what I

17   reviewed.  I reviewed everything on the reliance

18   list, but I don't have an independent recollection.

19   So if you show me it, I'll tell you whether I saw it

20   before.

21        Q.   If you look at your reliance list, do you

22   see Wozniak 2019 listed?

23        A.   I'll have to go look for it.  Is it under W?

24        Q.   It would be, yes.

25        A.   So I don't see -- don't see that.  Where is

1    that?

2        Q.   It's not on your reliance -- --

3        A.   Okay.

4        Q.   -- list, so I take it you did not review

5    that study?

6        A.   Correct.

7             MR. HABERMAN:   Objection.

8        Q.   There's another study called Kwiatkowska.

9    That author is K-w-i-a-t-k-o-w-s-k-a.

10            Do you see that on your reliance list?

11       A.   No.

12       Q.   There's another study, for example, Suarez

13   Marios.  That is S-u-a-r-e-z.  That, too, is not on

14   your materials list.  I take it you did not review

15   that study?

16       A.   So I can't tell you whether I reviewed it.

17   I can tell you if it's on the list.  If you show me

18   it, I can tell you whether I've seen it before.  I

19   don't memorize all those?  But it's not -- I agree

20   with you it's not on the reliance list.  I can't

21   tell you whether I've ever reviewed it or not

22   without seeing it.

23       Q.   Do you know how many genotoxicity studies of

24   glyphosate have been performed, ballpark?

25       A.   I don't.

1        Q.   Do you know how many long-term, two-year

2   rodent carcinogenicity bioassays with glyphosate

3   have been performed?

4        A.   I don't.

5        Q.   Do you know if it's more or less than a

6   dozen?

7        A.   Since I don't know, I wouldn't be able to

8   tell you that.

9        Q.   You -- I take it -- withdrawn.

10            Are you qualified to review and interpret

11   the long-term rodent carcinogenicity bioassays of

12   glyphosate?

13        A.   So I'm competent and qualified to do it on a

14   qualitative basis, meaning, since I'm a scientist,

15   if you will, I'm a medical doctor, I know how to

16   read peer-reviewed articles.

17            I know a little bit about statistics, not as

18   much as statisticians, but I'm qualified to see

19   if -- for example, in the CD1 mouse study, whether

20   there was a significant effect of glyphosate causing

21   lymphoma.

22            So I'm qualified to read the studies.  I'm

23   qualified to try to understand the statistics.

24            Does that answer your question?

25        Q.   It does.  Since you are qualified to review

1    the actual underlying study, why didn't you do that

2    and, instead, rely on summaries of them?

3        A.   So --

4             MR. HABERMAN:  Objection.

5        A.   Sure.  So we've said that I reviewed

6    everything on the reliance list.  And I did

7    review -- I don't remember whether it was a summary

8    or not -- the CD1 mouse study.  Could you show me

9    that article again so I can see what it was?

10       Q.   What article are you asking for?

11       A.   Well, you won't let me look at it on my

12   phone, so I can't tell you without you finding it

13   for me.

14       Q.   Okay.  So let's see if we can get at it this

15   way.  All right?

16       A.   Okay.  It's on the documents we talked about

17   last time.  We talked about the CD1 mouse study last

18   time.  Do you remember that?

19       Q.   I do.

20       A.   So it's from that article.

21       Q.   The article by Dr. Portier, I think, is --

22       A.   Again, since I don't memorize names and --

23   I'd have to see the article again to talk about it,

24   but I remember we discussed the article last time.

25       Q.   You told us last time you intend to offer

```
 1    the opinion that glyphosate is genotoxic and causes

 2    oxidative stress, correct?

 3        A.   Correct.

 4        Q.   Are you an expert on the genotoxicity or

 5    mutagenicity of glyphosate?

 6             MR. HABERMAN:  Objection.

 7        A.   So I don't have an independent opinion, but

 8    I've gotten that opinion from preparing for this

 9    deposition and reading copious articles.  So I can't

10    give you my independent opinion, but I can summarize

11    the respected opinions of others.

12        Q.   All right.  That was a long answer, so I'm

13    going to break that down.  Okay?

14        A.   Sure.

15        Q.   You do not have an independent opinion on

16    the genotoxicity or mutagenicity of glyphosate,

17    correct?

18        A.   Since I don't do those studies, and I'm a

19    clinical oncologist, I relied on my read of the

20    literature.

21        Q.   And when you say you relied on your read of

22    the literature, you aren't giving an independent

23    opinion about the genotoxicity or mutagenicity of

24    glyphosate.  You can summarize the opinions that

25    others have provided.  Correct?
```

Andrew M. Schneider, M.D.

```
 1        A.    Correct.  I can -- I can critically analyze
 2   their opinions and contrary opinions, if there are,
 3   and tell you my opinion based upon their opinion.
 4        Q.    What is the definition, from a scientific
 5   perspective, of the term "genotoxicity"?
 6        A.    I believe we discussed last time that it's,
 7   like, breaks in chromatin, changes in the
 8   chromosomal nature.
 9        Q.    How is that different from cytotoxicity?
10        A.    I believe cytotoxicity doesn't have to deal
11   with chromosomal changes.  I think it could be cell
12   death, for example.
13        Q.    What is the difference between mutagenicity
14   and genotoxicity?
15        A.    So a mutation is a change in the gene, and
16   genotoxicity involves changes in the -- in the
17   chromosome.  I can't tell you anything more than
18   that.
19        Q.    You told us -- withdrawn.
20              When we discussed this last time -- and I
21   think you've mentioned it today.  You said that
22   you're relying on articles that you reviewed in the
23   literature for your opinion that glyphosate is
24   genotoxic and causes oxidative stress, correct?
25        A.    Correct.
```

Andrew M. Schneider, M.D.

```
 1        Q.   And before we go further, Dr. Schneider, you
 2   understand that this is a continuation of your
 3   deposition several weeks ago, right?
 4        A.   I'm confused by that question.
 5        Q.   Okay.  Do you stand by the testimony that
 6   you gave when we met several weeks ago in this case?
 7        A.   That's a different question than you asked
 8   me before, right?
 9        Q.   It is.  So let me ask it again --
10        A.   Sure.
11        Q.   -- so the record is clear.
12        A.   Sure.
13        Q.   I want to be sure that we don't need to go
14   back over all of the areas that you testified to the
15   last time we were here.  Okay?
16        A.   Okay.
17        Q.   Do you understand that today we are
18   continuing the deposition that we began several
19   weeks earlier?
20        A.   Of course.
21        Q.   Do you stand by the testimony that you gave
22   when we met several weeks ago in this case?
23        A.   I gave you my honest answers at the time.
24   If you have a statement you want to show me, if I
25   still agree with, you can ask me, but I don't have
```

1    an independent recollection of something I want to

2    change.

3        Q.   Sitting here today, are there any areas of

4    your testimony that you need to go back and change

5    or amend?

6        A.   No.

7             (Schneider Exhibit 28 was marked for

8    identification.)

9    BY MS. ROSS:

10       Q.   Exhibit 28 to your deposition is a review

11   article by Dr. Dennis Weisenburger titled "A Review

12   and Update with Perspective of the Evidence That the

13   Herbicide Glyphosate is a Cause of Non-Hodgkin

14   Lymphoma."

15            Do you see that?

16       A.   I do.

17       Q.   Is this the article that you're relying on

18   for your opinion that glyphosate is genotoxic and

19   causes oxidative stress?

20       A.   This may be one of them.  Again, you'd have

21   to show me other ones, but I believe this article

22   does mention that, yes.

23       Q.   I'd like you -- because there's no way for

24   me to know what, in your mind, you're relying on, if

25   you could please go through your materials list in

1    Exhibit 3, which is the more complete one, and tell

2    me what else, besides Dr. Weisenburger's article,

3    you're relying on for your opinion about

4    genotoxicity.

5        A.   So what I told you before was, this is not a

6    memory test.  I'd have to look at each article and

7    go through it and see what it said.  I don't

8    memorize what each article said by author's name.

9            So, yes, I remember this article distinctly.

10   I remember it talks about genotoxicity.  I can't

11   tell you, sitting here, which other ones do.  There

12   may be other ones.

13           The only way to do that would be to review

14   the article fast.  You show me the article, and

15   we'll look and see what it says.

16       Q.   Sitting here, because this is my opportunity

17   to ask you questions, can you please take a look at

18   your materials list and tell me if there are any

19   other articles that stand out to you that you're

20   relying on for your opinion that glyphosate is

21   genotoxic and causes oxidative stress?

22       A.   So the answer is that it's now in my fund of

23   knowledge.  I read tons of articles, including

24   articles on the reliance list, and I have a fund of

25   knowledge, like I do for oncology.  And I can't

1    distinguish where that fund of knowledge comes from

2    every single time.

3          But in this case, you were kind enough to

4    show me an article that I do remember vividly.  It

5    talks about the genotoxicity.  So, yes, this is one

6    of the points of reference.  The other ones, you

7    have to show me the article so we can look at it

8    together.

9    Q.   Dr. Schneider, are you able to look at the

10   materials list that's in front of you?

11   A.   I already said since it's not a memory test,

12   just by the author's name and the title of the

13   article, I won't be able to do that.  That wouldn't

14   be fair.

15         What's fair, as we discussed before we

16   started, that you show me the article.  Let me look

17   at it, and then we talk about it.  It's not a memory

18   test.

19   Q.   What else on your reference list are you

20   relying on for your opinion that glyphosate is

21   genotoxic and causes oxidative stress?

22   A.   Everything on the reliance list.

23   Q.   There are no specific articles that you can

24   point me to that support your opinion that

25   glyphosate is genotoxic and causes oxidative stress,

```
1    other than Dr. Weisenburger's article?

2        A.    That's because it's not a memory --

3              MR. HABERMAN:   Objection.

4        A.    That's because it's not a memory test.  And

5    you told me before this depo started that you would

6    be kind enough to show me any article I asked for.

7              So I would ask you to show me each article

8    so I can look and see if it talks about that,

9    because I don't remember exactly where each one

10   comes from, but it's now in my fund of knowledge and

11   it's very difficult to decipher which of these 30 or

12   50 articles talks about it because it's not a memory

13   test.

14       Q.    And to be clear, what you're asking me for

15   is every single article on your reliance list,

16   correct?

17       A.    Well, you told me I can't go to my phone, so

18   I can't go myself.  You've told me that.  Do you

19   remember that?  I'll take that as a yes.

20             So since it's not a memory test, I'd have to

21   look at the individual article and see what it says

22   because it's not a memory test.  Okay?  And there

23   are how many articles, for the record?

24             One, two, three, four, five, six, seven,

25   eight, nine, ten, eleven, twelve -- there's at least
```

1    30 articles, and I don't think it would be fair for

2    me to have memorized which of -- which articles says

3    what of these 30 articles.  That would be unfair.

4        Q.   What is it that you're looking for if you

5    were to go for -- to your phone, Dr. Schneider, so

6    that we understand --

7        A.   Well -- sure.

8        Q.   -- for the record what it is that you --

9        A.   I can -- well, I can pull up some of the

10   articles and read -- and read them, but you don't --

11   if you could give them to me, I can read them that

12   way, but --

13       Q.   Ah, okay.  Understood.

14            So new question:  You have Exhibit 28 in

15   front of you, correct?

16       A.   I think you know that.  You just gave it to

17   me.

18       Q.   This is a review article by

19   Dr. Weisenburger, right?

20       A.   Correct.

21       Q.   Did the plaintiff lawyer send you this

22   article from Dr. Weisenburger?

23       A.   So the answer is, again, I don't have an

24   independent recollection of which was given to me

25   and which I found myself.  I think this probably was

Andrew M. Schneider, M.D.

```
 1    given to me, but I'm not a hundred percent positive.

 2    I know he was an expert for the plaintiff in another

 3    case, and I read his report.  So I would assume that

 4    it was given to me, although I can't say that with a

 5    hundred percent certainty that I didn't find it

 6    myself.

 7        Q.   When you first picked up the name

 8    Dr. Weisenburger, did you have any idea who he was?

 9        A.   No.

10        Q.   When you first saw the paper by Dr. Portier,

11    did you have any idea who he was?

12        A.   No, no.

13        Q.   Do you know who Dr. Weisenburger works for

14    in this litigation, plaintiffs or defendants?

15        A.   I just told you, I thought, before -- and I

16    hope -- I hope you're listening to me -- that I'm --

17    he was a -- he wrote a report for the plaintiff.

18        Q.   Did the plaintiff lawyer tell you that

19    Drs. Weisenburger and Portier were hired by

20    plaintiff lawyers and have been paid hundreds of

21    thousands of dollars in this litigation?

22             MR. HABERMAN:  Objection.

23        A.   Sure.  Number one, I don't discuss money.  I

24    don't care how much he was paid.  And number two,

25    no, we didn't discuss what he was paid.  And it has
```

```
1    no relevance to my opinions of what he was paid.

2    This is a review article.  I reviewed the review

3    article, and I'm happy to talk about with you.

4        Q.   Did you ask the plaintiff lawyers, is this

5    all there is on the genotoxicity of Roundup or

6    glyphosate?

7             MR. HABERMAN:  Objection.

8        A.   As we said before, we don't know that's all

9    there is because you won't show me the 30 articles.

10   So I -- and so the answer is, no, I didn't ask them

11   because why would I?

12       Q.   When -- withdrawn.

13            In the 30 or so articles that you reviewed

14   to form your opinions in this case, it never

15   occurred to you to ask whether this is all there is?

16       A.   I think you're not hearing what I'm saying,

17   so I think you're being disrespectful.  I've already

18   told you that we've already established that you

19   won't show me the 30 articles.  So I can't say

20   whether that's all there is.  You're saying that's

21   all there is, but I'm not.  Okay?  So I think your

22   question is disrespectful.

23       Q.   When you reviewed the genotoxicity of

24   Roundup, did you consider studies that tended to

25   disprove your hypothesis as well as those that
```

1    supported it?

2        A.   Yes.

3        Q.   Did you try to be fair and balanced in your

4    evaluation?

5        A.   Yes.

6        Q.   Did you acknowledge when there were studies

7    that came out the opposite way if the studies you

8    cited?

9        A.   Absolutely.

10            MR. HABERMAN:  Objection.

11       Q.   Did you do your best to acknowledge when

12   there were other scientists or scientific

13   organizations who came to different conclusions from

14   you?

15       A.   Yes.

16       Q.   For example, on -- let's go to Page 625 of

17   Dr. Weisenburger's article.

18       A.   I'm sorry.  Where are the pages?

19       Q.   They're at the bottom right corner.  Oh,

20   yours are different than mine.

21       A.   Right.  Right.

22       Q.   I'm sorry.

23       A.   Are you trying to trick me?

24       Q.   I -- that, I promise I'm not.

25            Let me count out.  Okay?

```
 1      A.    Sure.

 2      Q.    If you will go to Page 5 and tell me when

 3   you are there.

 4      A.    I'm there.

 5      Q.    There's a section here where

 6   Dr. Weisenburger describes Mechanisms of

 7   Carcinogenesis.

 8            Do you see that?

 9      A.    I do.

10      Q.    The second full paragraph begins:  Two

11   studies of individuals living or working in areas

12   sprayed with GBS, glyphosate-based formulations.

13   And then there are two references.

14            Do you see that?

15      A.    Yeah.  Just as an aside, since you now show

16   me that the IARC Working Group, and I review their

17   articles -- you remember we discussed -- you

18   actually -- you asked me last time how many hours I

19   spent reviewing it.  It was, like, 40 pages.  Do you

20   remember that?

21            Well, that says that they also concluded

22   that glyphosate was genotoxic, so that would be a

23   second article that I reviewed that says that,

24   just -- this is --

25      Q.    And that would --
```

```
1        A.    Wait.   You're interrupting me.   That
2   refreshes my memory since you wouldn't show it to
3   me.
4        Q.    That would be IARC's 2015 monograph that you
5   reviewed?
6        A.    Correct.   So that also is a -- is a second
7   article now which supports the genotoxicity of
8   glyphosate.
9        Q.    So, Dr. Schneider, just so we're clear on
10  the record, I'm going to repeat back my
11  understanding, and I think we're on the same page.
12  Okay?
13       A.    Okay.
14       Q.    You reviewed Dr. Weisenburger's 2021 article
15  and IARC's 2015 monograph in forming your opinion
16  that glyphosate is genotoxic and causes oxidative
17  stress, correct?
18       A.    Those are just two.   There may be more, but,
19  again, since it's not a memory test, I can't tell
20  you, but this refreshed my memory that I did review
21  the IARC monograph, which I told you last time.   You
22  actually asked me how long I spent reviewing it.   We
23  discussed it was, like, 40 pages or more, and this
24  refreshes my memory that it did discuss the
25  genotoxicity of glyphosate, so, yes.
```

```
 1      Q.   If you turn to Page 9 -- well, before we go
 2   there, we were discussing --
 3      A.   The two studies.
 4      Q.   -- Dr. Weisenburger's two studies that he
 5   references, and those are 61 and 62.
 6           Do you see that?
 7      A.   I do.
 8      Q.   Cites 61 and 62 in this article are two
 9   different literature references, if you will go to
10   Page 6 -- or Page 9.
11      A.   You want me to look at the references?
12      Q.   Yes.
13      A.   Okay.  Okay.
14      Q.   One of the studies he discusses is a -- is a
15   study of individuals living or working in areas
16   sprayed with glyphosate-based formulations.  And the
17   citations for that are Paz-y-Miño 2007.
18           Do you see that?
19      A.   I do.
20      Q.   And Bolognesi 2009, correct?
21      A.   Correct.
22      Q.   Can you confirm that neither of those
23   studies is in your reference list?
24      A.   Correct.  Neither of them are on the
25   reference list, correct -- reliance list, I'm sorry.
```

1      Q.   On Page 6 of his article, Dr. Weisenburger

2    talks about some in vitro studies, including ones

3    that he says show oxidative stress.  In a paragraph

4    that begins:  New in vitro studies further

5    demonstrating the --

6      A.   I'm sorry.  It's on Page 5 or 6?

7      Q.   Page 6.  Do you see there is a paragraph in

8    the left column that begins:  New in vitro studies?

9      A.   Yes.

10     Q.   For example, Dr. Weisenburger says:  An

11   important study -- and then references 73 -- showed

12   a significant increase in DNA double strand breaks.

13          Do you see that?

14     A.   I do.

15     Q.   Reference 73 is an article by Suarez-Larios,

16   correct?

17     A.   Yes.

18     Q.   That is not on your reference list, is it?

19     A.   Correct.

20     Q.   Then Dr. Weisenburger references another

21   study, Number 74, that's Santovito.

22     A.   Okay.

23     Q.   That is not on your reference list, is it?

24     A.   Correct.

25     Q.   Then Dr. Weisenburger references another

Andrew M. Schneider, M.D.

```
 1    study called Kwiatkowski and Wozniak, and I think I

 2    actually have those backwards.  Let's start with

 3    Wozniak.

 4          New question:  Reference 75 in

 5    Dr. Weisenburger's paper, what study is that?

 6    A.    The mechanism of DNA damage induced by

 7    Roundup 360 Plus, glyphosate and AMPA in human

 8    peripheral blood mononuclear cells - genotoxic risk

 9    assessment.

10    Q.    The first author of that paper is Wozniak,

11    correct?

12    A.    Correct.

13    Q.    Can you confirm that is not on your

14    reference list?

15    A.    Correct.

16    Q.    The next reference is a paper by

17    Kwiatkowski, et al.

18          Do you see that?

19    A.    No, but I'll take your word for it.

20    Q.    Reference 76.

21    A.    Okay.  Yeah.

22    Q.    Can you confirm that is not on your

23    reference list?

24    A.    Who is the author?

25    Q.    Kwiatkowski.
```

Andrew M. Schneider, M.D.

1    A.   Is that with a Q?

2    Q.   It's with a K.

3    A.   Correct.

4    Q.   Did you check any of Dr. Weisenburger's

5    citations?

6    A.   The answer is, I think I did, but without

7    you showing them to me, I can't tell you exactly

8    which ones I reviewed.  As I said before, I did my

9    own independent research.  I did a general

10   literature search.  So I can't tell you whether I

11   did or did not review these articles since you have

12   not showed them to me.

13   Q.   I hear you saying that you independently

14   reviewed some of the articles, although you can't

15   identify them without walking through every article

16   on your exhibit list, correct?

17   A.   I can't tell you with hundred percent

18   certainty whether a given article I reviewed because

19   I don't memorize authors' names and things like

20   that.

21        I do know I reviewed -- I Googled the

22   genotoxicity of glyphosate, and articles came up,

23   and I reviewed those articles that were not on the

24   reliance list.

25   Q.   Did you independently interpret the results

```
 1    of any genotoxicity study of Roundup?

 2         A.   So I don't understand that question.

 3         Q.   I'll repeat it.

 4         A.   You --

 5         Q.   Did you --

 6         A.   -- have to clarify it.  I don't understand

 7    what you mean by -- did I do a study in a test tube,

 8    are you asking, or did I analyze the study and say

 9    whether I agree with it?  Is that the question.

10         Q.   Sure.  I'll clarify.

11              Did you analyze any study of the

12    genotoxicity of Roundup to determine whether or not

13    you agreed with the author's findings?

14         A.   So I would review the article and then,

15    based upon my training as a board certified medical

16    oncologist, as a physician, see if I agreed with it

17    or not.

18         Q.   Did you find any studies where you disagreed

19    with the author's conclusions?

20         A.   Again, I don't have an independent

21    recollection of that, but if you showed me an

22    article, I can tell you whether I agree or disagree.

23         Q.   How did you go making the determination that

24    Dr. Weisenburger and his article are authoritative?

25              MR. HABERMAN:  Objection.
```

Andrew M. Schneider, M.D.

```
1         A.    Yeah.  I don't remember saying they're
2    authoritative.  Did you ask that question?
3         Q.    You told me that you were relying on
4    Dr. Weisenburger's review of the literature of
5    genotoxicity.  So I'm trying to --
6         A.    Well, I think that --
7         Q.    -- understand what you're saying.
8         A.    I think that's not a fair comment.
9    That's -- to be fair on the record, that's one,
10   among many things, I'm relying on.  Right?  We
11   already talked about the IARC monograph.  And I've
12   told you I've reviewed literature on the
13   genotoxicity through a Google search.
14         So that's just one thing I'm reviewing --
15   I'm relying on.  So it would be unfair to say that's
16   the only thing I'm relying on.  That's number one.
17         Number two, I read the article.  I reviewed
18   the literature to the best of my ability and find
19   that his comments are credible.
20         Q.    What about them is credible?
21         A.    Well, I believe that glyphosate is
22   genotoxic.  I believe it causes oxidative stress.  I
23   reviewed his summaries of the epidemiologic
24   case-control and cohort studies in Table 1.
25         Q.    Do you perform any due diligence on
```

Andrew M. Schneider, M.D.

```
1    Dr. Weisenburger?

2        A.   How do you define due diligence?

3        Q.   Did you look at how much Dr. Weisenburger

4    has been paid in this litigation?

5        A.   As I said before, I have no interest, nor

6    does anybody's payments influence my opinion about

7    credibility.  I hope you're not insinuating that

8    people are bought, because I hope it's not true.

9    Maybe I'm too naive, but I'm -- I don't care what

10   they're paid.  I don't know what they're paid.

11            I look at his review.  He mentions IARC, and

12   we all -- I hope you think IARC is credible.  IARC

13   does show that glyphosate is genotoxic.

14       Q.   Did you review any of Dr. Weisenburger's

15   testimony, either at trial or deposition, in the

16   Roundup litigation?

17       A.   The only thing I reviewed is a report he

18   issued for the plaintiff.

19       Q.   Are there any other opinions about the cell

20   studies of glyphosate that you intend to offer?

21       A.   No.

22       Q.   You also told us you intend to offer the

23   opinion that glyphosate causes lymphoma and renal

24   tubule adenomas in mice, correct?

25       A.   Yes.
```

Andrew M. Schneider, M.D.

```
1        Q.   Are there any other opinions about
2    glyphosate and cancer in animals that you intend to
3    offer?
4        A.   No.
5        Q.   How many of the mouse studies, in your view,
6    showed positive findings for lymphoma in mice?
7        A.   Again, it's not a memory test.  You'd have
8    to give me the article again to review how many
9    there were.
10       Q.   Take a look at your reliance list, if you
11   would, please, and tell me which of those were
12   positive studies for lymphoma in mice.
13       A.   All right.  So we know we're not going to
14   play this game.  So I told you it's not a memory
15   test.  So you're going to have to -- if you won't
16   let me go to my phone, you're going to have to show
17   me the article, and we can count together how many
18   articles there were, how many studies there were.
19   It's something that I obviously can't memorize.  You
20   know that.
21       Q.   Do you know how long the study reports are
22   for two-year animal carcinogenicity bioassays?
23       A.   What do you mean by "long"?
24       Q.   I'll represent that each study report is
25   typically over 1,000 pages.  Do you recall reviewing
```

1    any actual study reports for any long-term animal

2    carcinogenicity bioassays?

3        A.   Right.  So the answer is, again, unless you

4    show me what I reviewed, I'm not going to be able to

5    answer that question with certainty.

6        Q.   And you can't even estimate that, looking at

7    your reliance list; is that right?

8        A.   Just for the record, you will not let me go

9    to my phone and find the article, and you will not

10   give me the article.  And since it's not a memory

11   test, it's very difficult to answer your questions.

12   Before we started in the depo, we had an agreement

13   that you would show me the articles.

14       Q.   So, again, to be clear, you need to pull up

15   an article on your phone.  What article do you need

16   to pull up on your phone and I'll show it to you?

17       A.   One of them about the CD1 mouse studies.

18       Q.   Okay.  So give me some more context and I'll

19   see if I can pull up that article for you.

20       A.   That's the best I can do.

21       Q.   So if you were looking for that article on

22   your phone, would you be looking for the article

23   itself, or would you be looking for some e-mail that

24   summarizes some information about the article?

25       A.   It wasn't an e-mail.  I believe it was an

1    article, but it certainly was not an e-mail.

2    Q.   Okay.  So if you can tell me which article

3    you'd like to see about the CD1 mouse studies, I'd

4    be happy to show it to you.

5    A.   Can I go to my phone?

6    Q.   Again, it doesn't sound like you're pulling

7    up the article on your phone.  It sounds like you'd

8    be pulling up something else.

9    A.   We don't know unless I do it, but you can

10   watch me do it if you'd like.

11        MR. HABERMAN:  I don't -- I don't think that

12   would be an appropriate use of time in the

13   deposition just to start researching -- or to

14   pull up anything on the phone unless -- well,

15   unless you have it readily for you.

16        THE WITNESS:  Well, if she's going to ask me

17   questions, I have to be able to see the article.

18   It's not a memory test.

19        MR. HABERMAN:  Right.

20   Q.   I think this might help, and I'd like to

21   just see if this is what we're talking about.  Okay?

22   A.   Okay.

23        (Schneider Exhibit 29 was marked for

24   identification.)

25   BY MS. ROSS:

1    Q.   Exhibit 29 to your deposition is a review

2    article by Christopher Portier entitled "A

3    comprehensive analysis of the animal carcinogenicity

4    data for glyphosate from chronic exposure rodent

5    carcinogenicity studies."

6         Do you see that?

7    A.   I do.

8    Q.   I see you're taking a minute to look at it,

9    which is fine.  Tell me when you're ready for my

10   question.

11   A.   Well, I mean, ask the question.  Then I'll

12   see if I can answer it or whether I have to look

13   further.

14   Q.   How many of the mouse studies, in your view,

15   showed positive findings for lymphoma in mice?

16   A.   So I'd have to read the article again to

17   answer that question.  Would you like me to do that?

18   Q.   Do you know, sitting here today, how many

19   animal -- well, withdrawn.

20        Do you know if all of the mouse studies were

21   positive for lymphoma?

22   A.   I do know that they were not; that it was

23   only in the CD1 mouse and maybe the nonstatistical

24   and the Swedish albino, is my recollection.

25   Q.   Are you relying on Dr. Portier's analysis in

1    Exhibit 29 for your opinion that glyphosate caused

2    tumors in animals?

3         A.   Probably in part, but in all fairness and

4    honesty, without rereading the article, I can't

5    answer that question with all honesty.  I can't tell

6    you -- I'd have to look and see what the study

7    showed, and then based upon the studies, I'd give

8    you my own opinion.

9         Q.   In the abstract there is a sentence that

10   begins:  In this review.

11              Would you go with me there, please?

12        A.   Show me where that is.

13        Q.   Sure.  About four sentences deep, it says:

14   In this review.

15        A.   Yeah, I see it.  Yes.

16        Q.   Dr. Portier states:  There were 21 chronic

17   exposure animal carcinogenicity studies of

18   glyphosate and 13 studies that were of sufficient

19   quality and detail to be reanalyzed.

20              Do you see that?

21        A.   I do.

22        Q.   Sitting here today, do you have any idea

23   whether you reviewed all of those primary studies or

24   none of them?

25        A.   I can't tell you without you showing me the

1    articles, with any certainty.

2    Q.   Each one of those studies are done by

3    authors who are veterinary pathologists.  Are you

4    one of those?

5    A.   No.

6    Q.   Did you look at the thousand-plus page

7    write-ups of those studies by the actual study

8    authors?

9    A.   No.

10   Q.   Do you have any idea what those authors

11   concluded about whether their own studies actually

12   showed treatment-related tumors?

13   A.   Well, you'd have to show me the individual

14   study, and we can talk about it one on one.  I don't

15   think we can group them all together.

16   Q.   Did you go to see if there are any other

17   articles by people just as qualified as Dr. Portier

18   talking about the animal studies?

19   A.   I did do a literature search, yes.

20   Q.   For example, you mentioned a Google search,

21   right?

22   A.   Correct.

23   Q.   Did you do a Google search for glyphosate in

24   animal bioassay to see what popped up?

25   A.   Not in bioassay.  I probably did a Google

1    search about glyphosate and rodents or mice.

2       Q.   How about glyphosate and rodent

3    carcinogenicity studies, did you do that search?

4       A.   I don't think it was exactly the way you

5    worded it, but, yes.

6       Q.   You understand that, again, Dr. Portier is a

7    retained expert for the plaintiffs in the Roundup

8    litigation, right?

9       A.   Actually, I didn't know that.

10      Q.   If you'll turn with me to the disclosures on

11   Page 15 of this article, do you see there's a

12   section on competing interests?

13      A.   Yes.

14      Q.   You hadn't heard prior to today that

15   Dr. Portier was a retained expert for the plaintiffs

16   in this litigation at the time he wrote this

17   article?

18      A.   All right.  So this is not something I would

19   memorize or, you know, care about.  I analyze each

20   article for what it says.  I don't care, you know,

21   who is getting paid.  And I think the evidence will

22   speak for itself.

23      Q.   Did you check any of Dr. Portier's citations

24   when you relied on this article?

25      A.   Again, I told you that I did a literature

```
 1   search.  So I -- without you showing me the article,

 2   I can't tell you whether I saw it before or not.

 3       Q.   And right now I'm not asking you -- I'm

 4   asking, when you read Dr. Portier's article, which

 5   you have in front of you, do you recall at any point

 6   going at any time to any of the articles that

 7   Dr. Portier cites and checking them as you were

 8   reading Exhibit 29?

 9       A.   I don't recall, but it doesn't mean I didn't

10   see them.

11       Q.   I take it you did not perform any due

12   diligence on Dr. Portier?

13           MR. HABERMAN:  Objection.

14       A.   What do you mean by due diligence?

15       Q.   Have you read any of Dr. Portier's trial or

16   deposition transcripts in this litigation?

17       A.   No, but it wouldn't be the scope of what I'm

18   here for today.  I'm not here to critique

19   Dr. Portier.  I'm here to give you an opinion about

20   the causation of glyphosate with NHL.

21       Q.   Did you ask anyone how many hundreds of

22   thousands of dollars Dr. Portier has been paid in

23   this litigation?

24       A.   I have not asked anybody about any money,

25   and I've not asked you how much you're getting paid
```

Andrew M. Schneider, M.D.

1    either.

2        Q.   You reviewed, based on your reliance list, I

3    think, four documents from the EPA in the 1980s and

4    early 1990s on glyphosate rodent carcinogenicity

5    studies.  How did you find those four documents?

6        A.   Fist, you have to show me which the four

7    documents are.

8        Q.   You have your only copy of the reliance

9    list.

10       A.   Like I said, I don't --

11       Q.   We need to go to the EPA section.

12       A.   I don't have it memorized.  Where do you

13   want me to go?  Where do you want me to turn to?

14       Q.   The EPA section.

15       A.   On the reliance list?

16       Q.   If you'll hand me your reliance list, I am

17   sure I can help you find it.

18       A.   Thank you very much.  Exhibit 3, you said?

19       Q.   Yes.

20       A.   Okay.

21       Q.   You reviewed four documents from the EPA in

22   the 1980s and early 1990s on glyphosate rodent

23   carcinogenicity studies, correct?

24       A.   Correct.

25       Q.   How did you find those four documents?

Andrew M. Schneider, M.D.

1      A.    I believe they were given to me.

2      Q.    Are you relying on those documents for your

3   opinions?

4      A.    Which opinion?

5      Q.    Are you relying on those documents for any

6   opinion you're offering in this case?

7      A.    I've already told you that I believe the

8   animal studies are consistent with the notion that

9   glyphosate causes NHL, specifically in the CD1 mouse

10  and perhaps the Swedish albino mouse, so, yes.

11     Q.    Sitting here today, apart from Dr. Portier's

12  review article and the EPA documents that we've

13  discussed, can you identify on your reliance list

14  anything else that you're relying upon for your

15  opinion that glyphosate causes cancer in animals?

16     A.    As we said before, it's not a memory test.

17  So you'd have to show me the individual article, and

18  we can pull -- go through them one by one and find

19  the data, but it's not a -- it's not a memory test,

20  so I can't do things from memory.

21     Q.    Okay.  You'd need to see each of the 30

22  articles on your reliance list and read them again

23  to determine --

24     A.    Well --

25     Q.    -- whether or not they support your opinion

1    on glyphosate and tumors in animals?

2        A.   I'd have to skim through them to see if an

3    individual article even mentions the topic.  So,

4    again, it's become my fund of knowledge, and it's

5    unfair to ask me to say where did that fund of

6    knowledge come from and which of these 30 articles,

7    without showing them to me, says that.  It's not a

8    memory test, and you refuse to show me the articles.

9        Q.   Are you aware that other people besides

10   experts paid by the plaintiffs in this litigation

11   have looked into the question of whether glyphosate

12   is genotoxic or causes cancer in animals?

13       A.   I'm sorry, say that question again.

14       Q.   Are you aware that other people, besides

15   experts paid by the plaintiffs in this litigation,

16   have looked into the question of glyphosate is

17   genotoxic or causes cancer in animals?

18       A.   Which people?

19       Q.   Anyone other than Drs. Portier and

20   Weisenburger, for example.

21       A.   I'm not sure I understand the question.  I'm

22   sorry.

23       Q.   Okay.  I'll repeat it one more time.

24            Are you aware that other people, besides

25   experts paid by the plaintiffs in this litigation,

1   have looked into the question of whether glyphosate

2   is genotoxic or causes cancer in animals?

3       A.   So I don't know what you're referring to by

4   other people besides experts.

5       Q.   Okay.

6       A.   Are you talking about the janitor or are

7   you -- I don't know what you're talking about.

8       Q.   Then we'll walk through some documents.

9       A.   Great, thanks.

10          (Schneider Exhibit 30 was marked for

11   identification.)

12   BY MS. ROSS:

13      Q.   Dr. Schneider, Exhibit 30 to your deposition

14   is the "Conclusion on Pesticide Peer Review by the

15   European Food Safety Authority."

16          Do you see that?

17      A.   I do.

18      Q.   There's an abstract on Page 1.  Do you see

19   it?

20      A.   I do.

21      Q.   The last sentence of that states that:  EFSA

22   concluded that glyphosate is unlikely to pose a

23   carcinogenic hazard to humans, and the evidence does

24   not support classification with regard to its

25   carcinogenic potential according to the regulation.

```
 1              Do you see that?

 2      A.   I see that.

 3      Q.   Do you agree or disagree that glyphosate is

 4   unlikely to pose a carcinogenic hazard to humans?

 5      A.   I disagree.

 6              MR. HABERMAN:  Objection.

 7      Q.   If you'll go with me to Page 10, and tell me

 8   when you're there.

 9      A.   I'm there.  Should I remove the clip?

10      Q.   I'm sorry?

11      A.   Can I remove this clip so I can look at it

12   better?

13      Q.   You can.

14      A.   Okay.

15      Q.   There's a long paragraph at the end of that

16   page that begins:  The glyphosate dossier consists

17   of an exceptionally large database.

18              Do you see that paragraph?

19      A.   I do.

20      Q.   Okay.  About halfway through that paragraph,

21   there's a parenthesis that says:  Around 100

22   milligrams per kilogram body weight per day.  And

23   then there's a sentence that --

24      A.   Wait.  I'm going to have to find that.

25   Okay.  I see that, yes.
```

Andrew M. Schneider, M.D.

```
 1        Q.    Okay.  The sentence after that states:
 2   Glyphosate did not present genotoxic potential, and
 3   no evidence of carcinogenicity was observed in rats
 4   or mice.
 5             Do you see that?
 6        A.    I do.
 7        Q.    EFSA concluded glyphosate did not --
 8        A.    Where are you reading?
 9        Q.    I'm asking you a question --
10        A.    Okay.
11        Q.    -- about this document now.
12        A.    Before we do that, is this on my reliance
13   list?
14        Q.    No.  That's the point.
15        A.    So then I should be able to review the
16   document before you ask your questions.
17        Q.    Sure.
18        A.    So let me review it.
19        Q.    Go ahead.
20        A.    You want me to read the whole thing?
21        Q.    No.  I'd like you to review the part that
22   I'm going to be asking you about.
23        A.    Well, okay.  To be fair, you have to give me
24   10, 15 minutes to review this document on the
25   record.
```

```
 1        Q.   You would need 15 or 20 minutes to review

 2   this document before you can answer any question

 3   about it?

 4        A.   So I've never -- I've never seen it before,

 5   correct?

 6        Q.   I don't know if you've ever seen it.

 7        A.   I'll tell you, it's not on the reliance

 8   list, and I've never seen it before, and it's 105

 9   pages.  So I think I'm going to need at least 15, 20

10   minutes to review it, to be fair to me.

11        Q.   So let's break this down.

12        A.   Sure.

13        Q.   Okay.  I'll represent to you that EFSA

14   concluded that glyphosate did not present genotoxic

15   potential.  You have not reviewed this document.  So

16   you have no basis to agree or disagree with that; is

17   that right?

18        A.   Correct.

19        Q.   EFSA also concluded that glyphosate did not

20   show carcinogenicity in mice or rats, and since you

21   have not reviewed this document, you have no basis

22   to agree or disagree, correct?

23        A.   Well, actually, that's not true.  My --

24             MR. HABERMAN:  Objection.  He has a basis --

25        objection --
```

Andrew M. Schneider, M.D.

```
 1              THE WITNESS:  May I talk?  Thank you.
 2      A.    Actually, that's not true, and even before,
 3   we've already discussed the IARC showing it is
 4   genotoxic, so that would disagree with IARC, so
 5   there is a disagreement.
 6              And we already discussed that the data in
 7   CD1 mouse, for example, shows that glyphosate is
 8   carcinogenic and causes NHL.
 9              So I would disagree with those two
10   statements based on that alone, but, again, I
11   haven't had the opportunity to read this 105-page
12   document yet.
13      Q.    Do you know what Dr. Portier's expertise is
14   in animal carcinogenicity studies?
15      A.    No.
16      Q.    Do you have any reason to take Dr. Portier's
17   word, as a paid litigation testifying expert, over
18   the experts at the European Food Safety Authority?
19      A.    I'm not taking anybody's word.  As I said, I
20   think I looked at some independent studies myself.
21   I think that there's good support that glyphosate
22   causes NHL in some rodents.  I think the IARC
23   monograph clearly states that it's genotoxic.  I
24   think there are other data that it's genotoxic.
25              So, you know, I don't -- just because I
```

1    don't really know the expertise of Dr. Portier, I

2    don't know who the European Food Safety Authority is

3    and who they're paid by.

4            So you've shown me something for the first

5    time, and it's 105 pages.  And I think it is unfair

6    to ask me questions about it without me -- giving me

7    time to review it.

8    Q.    Have you ever heard of the European Food

9    Safety Authority before your deposition today?

10   A.    I can't say with a hundred percent

11   certainty.

12   Q.    Do you recall ever hearing of the European

13   Food Safety Authority before your deposition today?

14   A.    I already answered that question.

15   Q.    I don't believe you did.

16   A.    I said I can't say with a hundred percent

17   certainty.

18   Q.    Right.  Is it more likely or not that you'd

19   ever heard of the European Food Safety Authority

20   before your deposition?

21   A.    Honestly, I don't know, because the -- I

22   read a lot of things with abbreviations.  There's

23   IARC.  Then there's the -- something -- something

24   with an abbreviation, but I can't tell you with

25   certainty, in all fairness.

Andrew M. Schneider, M.D.

1    Q.   And can you even hazard a guess as to

2    whether you've heard --

3    A.   I wouldn't want to guess.

4    Q.   Regardless, the plaintiff lawyers did not

5    provide you with this document before, right?

6    A.   I have not seen this document before,

7    correct.  Do you want me to hold it and read it?

8    Q.   No.  Hold on to it.  Don't get the

9    deposition exhibits until the end of the deposition.

10   A.   So you don't want me to -- don't want me to

11   read this?

12   Q.   You can read it at a break if you're

13   curious.

14   A.   No more questions you want to ask me about

15   this?

16   Q.   You can read it at a break if you're

17   curious.

18   A.   Do you have any questions that you want to

19   ask me about this?

20   Q.   I guess I'm not understanding what --

21   A.   I have to read it if you have questions.

22   Are we done with this for right now?

23   Q.   We're done with this --

24   A.   Okay.  Very good.

25   Q.   -- for right now.

```
 1        A.   We're done.  You don't want to ask me any

 2    questions.  Okay.

 3             (Schneider Exhibit 31 was marked for

 4    identification.)

 5    BY MS. ROSS:

 6        Q.   Dr. Schneider, Exhibit 31 to your deposition

 7    has been marked.

 8             Do you see that?

 9        A.   I do.

10        Q.   Okay.  The second page of this exhibit

11    identifies the document overall as Health Canada's

12    Re-evaluation Decision on glyphosate, and the date

13    is April 28th, 2017.

14             Do you see that?

15        A.   I do.

16        Q.   There's an executive summary to this

17    document on Page 1.  It comes after the whole page

18    of acronyms.

19        A.   Okay.

20        Q.   Can you read the first sentence of that

21    section, please?

22        A.   Sure.  You don't want -- it's not on my

23    reliance list for the record, correct?

24        Q.   You can take a look at your reliance list to

25    confirm.
```

```
 1      A.   I'm sure it's not, but I'll look.  What
 2   would it be under, by juror or what should I look
 3   under to see if it's on my list?
 4      Q.   You're familiar with your reliance list,
 5   correct, Dr. Schneider?
 6      A.   I am.  So let me go through it, then, and
 7   see if I can find it.  Okay?
 8      Q.   Go ahead.
 9      A.   If you don't want to tell me, that's fine.
10      Q.   I'll represent to you that I did not see any
11   documents from Health Canada on your reliance list.
12      A.   That's what I thought.  Okay.  But thank you
13   for helping and saving us time.
14      Q.   Can you confirm that you did not review or
15   rely on Health Canada's assessment of glyphosate?
16      A.   That's correct.
17      Q.   And plaintiff lawyers did not provide this
18   to you, right?
19      A.   Correct.
20      Q.   Health Canada's primary objective --
21      A.   I'm not going to be able -- if I don't read
22   it, I can't answer any questions about it.
23      Q.   Sure.  So why don't you read the executive
24   summary, which is a single page, Page 1.
25      A.   But I don't think that's fair.  I think I
```

Andrew M. Schneider, M.D.

```
1    should be ale to read the whole thing because maybe

2    there's something contradictory in it later on.  I

3    think if you want me to answer questions, I should

4    be given the opportunity to review it in its

5    entirety.

6        Q.   This document is 103 pages long, correct?

7        A.   You gave it to me, ma'am.

8        Q.   I'm sorry.  Was that an answer to my

9    question, Dr. Schneider?

10       A.   Yes.  Yes, it was.  I don't think it's fair

11   to answer questions about a document I've never seen

12   before without you letting me read it.

13       Q.   And you can't answer my questions about the

14   executive summary by reading the executive summary;

15   is that right?

16       A.   I don't know.  I mean, I haven't even read

17   the executive summary yet.  I don't know what your

18   questions are, and I don't know what else is in the

19   body of these 105 pages.

20       Q.   So why don't you take a moment and read Page

21   1, the executive summary, and I'll ask you my

22   questions about that.  Okay?

23       A.   Okay.  Sure.  Okay.

24       Q.   Dr. Schneider, the very first sentence on

25   this page states:  Health Canada's primary objective
```

1   in regulating pesticides is to protect Canadians'

2   health and their environment.

3       Do you see that?

4   A.   I do.

5   Q.   Do you have any reason to dispute that?

6       MR. HABERMAN:   Objection; the document

7   speaks for itself.

8   A.   I don't know who Health Canada is, so I

9   can't confirm or deny.  I don't know who Health

10  Canada is.

11  Q.   Do you know one way or the other whether all

12  regulatory authorities have a similar mandate, which

13  is to protect humans' health and their environment?

14  A.   I would assume they do, but, again, I don't

15  know anything about Health Canada.

16  Q.   Health Canada concluded that glyphosate is

17  not genotoxic, correct?

18  A.   That's what -- that's what it says, correct.

19  Q.   Do you agree or disagree with that opinion?

20  A.   I disagree.

21  Q.   Health Canada also concluded that glyphosate

22  is unlikely to pose a human cancer risk, correct?

23  A.   Correct, but they don't even tell me what

24  studies they looked at.  So, you know, it's a --

25  it's a one-page summary, and I don't -- maybe in the

1    next 105 pages I'd find actually what they're

2    relying on to say that.

3          Did they look at the epidemiologic studies?

4    What animal studies did they look at?  I can't say

5    by reading this one page, so I don't know, you

6    know -- I don't -- I don't know the basis for their

7    opinion.  They give their opinion but really don't

8    tell me the basis for it.  And I disagree with their

9    opinion.

10   Q.   Okay.  I want you to have the opportunity to

11   review what you need to.  So I need to break that

12   down into two pieces.  Okay?

13         You state that in order to understand the

14   basis for Health Canada's opinion, you'd actually

15   need to read the sections on their -- in their

16   document that are related to carcinogenicity, right?

17   A.   Perhaps.  I don't even know if they're

18   there.  I don't -- you know, I don't know the basis

19   for their opinion.  And maybe the basis is in the

20   105 pages, and maybe it's not.  I haven't read it.

21   Q.   Do you agree or disagree with Health

22   Canada's ultimate conclusion that glyphosate is

23   unlikely to pose a human cancer risk?

24   A.   I strongly disagree.

25   Q.   If you'll turn with me to Page 20, I think

1    this may help, Dr. Schneider.

2        A.   Okay.

3        Q.   There's a section entitled

4    "Carcinogenicity."

5            Do you see that?

6        A.   I do.

7        Q.   It begins with a description of studies in

8    animals.  That's 1, right?

9        A.   Yes.

10       Q.   And it goes on to epidemiologic studies.

11   That's 2?

12       A.   Uh-huh.  Uh-huh.

13       Q.   And then if you go on to Page 23, there's a

14   conclusion to this carcinogenicity section.

15           Do you see that?

16       A.   Yes.

17       Q.   Would you like to take a few moments to read

18   that second?

19       A.   Only if you have questions, and it may be

20   more than a few moments I'm going to review it.

21       Q.   Okay.

22       A.   Thank you.  Would it be okay if I take a pen

23   to -- so I could highlight my comments, or give me a

24   piece of paper so I can write my comments down?

25       Q.   I have a piece of paper for you.  Since it's

```
 1    the exhibit --

 2       A.   Okay.

 3       Q.   -- I don't know that we want writing on it.

 4       A.   Okay.  I mean --

 5       Q.   Let's --

 6       A.   I think I need to take some notes.

 7       Q.   Which is your preferred method?  It's --

 8    actually, I'm fine if you'd like to write on the

 9    exhibit.

10       A.   Whatever you want, but I just -- you know, I

11    want to highlight --

12            MR. HABERMAN:  I'd rather not write on the

13       exhibit.

14       A.   Okay.  Just give me a piece of paper.

15       Q.   Sure.  Tell you what, Dr. Schneider, we will

16    mark this as Exhibit 32.

17            MS. ROSS:  And it is Dr. Schneider's notes

18       on Health Canada 2017.

19       A.   Thanks.  A pen, please.

20            (Schneider Exhibit 32 was marked for

21    identification.)

22    BY MS. ROSS:

23       Q.   There you go.

24       A.   Thank you very much.  I'll probably need

25    about 15 or 20 minutes.
```

Andrew M. Schneider, M.D.

```
1      Q.   You need 15 or 20 minutes to read four

2   pages?

3      A.   We'll see.  You can put a clock watch --

4   stop clock, and we'll see how long it takes.

5           That's it, just through Page 21, just --

6      Q.   Through the conclusion --

7      A.   Okay.

8      Q.   -- on Page 23.

9      A.   I'm going to skip myeloma for the record.

10  Okay?

11     Q.   Sure.

12     A.   I'll just go to NHL.

13          Okay.  I'm ready for your questions.

14     Q.   Dr. Schneider, Health Canada conducted a

15  weight of evidence analysis that utilized all

16  carcinogenicity studies in animals, together with

17  other contextual information, correct?

18     A.   Sorry.

19          MR. HABERMAN:  Objection; the document

20      speaks for itself.

21     A.   Yeah.  I'm not sure that's true.  I'm

22  looking -- going to go back and find that.

23     Q.   There is a sentence beginning:  Based on a

24  weight of evidence analysis.

25     A.   Well, let --
```

1      Q.   Do you see that?

2      A.   Let me answer your question the way I want

3   to.

4      Q.   I thought you just did.

5      A.   I didn't answer your question.  Can you

6   repeat the question, please?

7      Q.   Sure.

8      A.   Repeat your question.

9      Q.   I'm trying to look at the -- withdrawn.

10          So you would like me to repeat the last

11   question; is that right?

12     A.   If you want me to answer it, yes.

13     Q.   Based on a weight of evidence analysis that

14   utilized all available carcinogenicity studies in

15   animals, together with other contextual information,

16   Health Canada did not consider any of the observed

17   tumors in animals to be treatment-related.  Correct?

18     A.   So I don't think they reviewed all.  That's

19   the problem I have.  There was two mouse studies,

20   four rat studies.  Not all available carcinogenicity

21   studies on glyphosate were submitted to the PMRA.

22   So they relied on reviews, evaluations, and

23   committee meetings.  So I'm not sure that's true

24   that they relied -- they reviewed all animal

25   studies.

1       Q.   Do you dispute that Health Canada conducted

2    a weight of evidence analysis?

3       A.   Can you --

4            MR. HABERMAN:  Objection.

5       A.   Sure.  Since I'm not a statistician, can you

6    define what weight of evidence means?

7       Q.   Do you have any definition as an expert

8    providing opinions in this case?

9       A.   I'm not giving statistical opinions, since

10   I'm not a statistician.  I'm giving oncologic

11   opinions.  I can guess what weight of the evidence

12   means, but if you want to define it for me, we'll be

13   on the same page.

14      Q.   Did Health Canada conclude that the tumors

15   in animals were treatment-related or not

16   treatment-related?

17      A.   I'm sorry.  Treatment from glyphosate?

18      Q.   Correct.

19      A.   They concluded it was not, but I disagree

20   with that opinion.

21      Q.   You disagree with Health Canada's conclusion

22   that the tumors observed in animals were not

23   treatment-related, correct?

24      A.   Correct.  Well, first of all, they clearly

25   state not all studies were submitted.  So first of

1    all, maybe they're cherry-picking what studies they

2    wanted to look at.

3          Clearly we've discussed before that that

4    contradicts the CD1 mouse studies.  So clearly there

5    is data to support that glyphosate causes NHL.

6          And so I think to come to the conclusion

7    that there is no evidence of the carcinogenicity in

8    rats is unfair.

9    Q.   You would not want to cherry-pick the animal

10   studies in coming to a conclusion on whether or not

11   they showed tumors in animals, right?

12   A.   I think you should look at all --

13          MR. HABERMAN:  Objection.

14   A.   -- all studies, critique them, and then --

15   just as I'm doing here today, when I'm going to do

16   the epidemiologic studies, if we ever get to it.

17   We'll look at all the studies.  We'll critique them,

18   and then I'll give my opinion for what it's worth.

19          So here, they're giving their opinion, but

20   they clearly state not all available carcinogenicity

21   studies on glyphosate were submitted.  So they're

22   admitting that not all available studies were

23   submitted.  They relied on reviews, evaluation

24   reports, committee meeting documents.

25          So, you know, we've already discussed that

1    there are other rat studies which show that

2    glyphosate causes NHL.

3        Q.   Do you know how many studies IARC reviewed,

4    for example, of long-term rodents?

5        A.   All right.  So, again, it's not a memory

6    test.  So you'd have to show me the article.  I

7    don't have these things memorized.

8        Q.   If IARC reviewed less than the total number

9    that are available, is that something you'd want to

10   consider in your own reliance on IARC?

11       A.   So just to be clear, the answer is I should

12   know what everybody reviews.  Did they review 100,

13   seven, why they didn't review some, which they

14   reviewed, and then I'm here to give an opinion about

15   what I think based upon the data that's been

16   provided to me.

17            I see Canada Health [sic].  You know, they

18   have their opinion, but I don't agree with their

19   opinion, and the fact is, let me go further, they

20   don't even mention which epidemiologic studies they

21   reviewed, you know.  We're all well aware of the six

22   or seven prime studies.  They don't even mention

23   them.

24            So, you know, I think I'm disheartened to

25   see they make opinions without really telling me how

```
 1    they got there.
 2        Q.   Do you see on Page 24 of this document, the
 3    statement at the very end that says:  The PMRA's
 4    determination --
 5        A.   I'm not sure -- where are you reading?
 6    Okay.
 7        Q.   Page 24.
 8        A.   Got it.
 9        Q.   The PMRA's determination on the carcinogenic
10    potential of glyphosate is consistent with the most
11    recent conclusions of other international regulatory
12    authorities and intergovernmental organizations,
13    USEPA CARC Report, EFSA, JMPR, ECHA, and NZEPA --
14    and then there are citations to each of those.
15            Do you see that?
16        A.   I do.  Actually EFSA is one you just gave me
17    before.
18        Q.   Right.
19        A.   Right.
20        Q.   And then they go on to say:  -- which
21    concluded that glyphosate is unlikely to be
22    genotoxic or carcinogenic.
23            Do you see that?
24        A.   I see it, but I disagree with it.
25        Q.   Can you name any scientific or regulatory
```

1    authority anywhere in the world that has concluded

2    that glyphosate causes cancer?

3       A.   So is IARC not a regulatory agency?

4       Q.   IARC is not.

5       A.   Okay.  Again, you'd have to tell me the name

6    of the regulatory agency and we can discuss it, but,

7    you know, a lot of these regulatory agencies -- for

8    example, what you showed me here today, you know,

9    I'm disheartened by Canada Health who doesn't even

10   discuss any of the epidemiologic studies, not one.

11   Okay?  And they clearly state that not all studies

12   of the animals were submitted.

13           So I think there's, you know, problems with

14   their conclusion.  And I don't know who pays them

15   and what -- I don't know anything about them.  Maybe

16   they're, you know -- I don't know who they are,

17   so...

18      Q.   Dr. Schneider, do you remember what my

19   question was?

20      A.   I do.

21      Q.   Can you name any scientific or regulatory

22   authority anywhere in the world that has concluded

23   that glyphosate causes cancer?

24      A.   So you'd have to show me -- then you have to

25   name the agency.  I'll tell you what I know about

Andrew M. Schneider, M.D.

1    it.

2        Q.   All right.  Let's start with the USEPA.  The

3    USEPA has concluded that glyphosate is not

4    carcinogenic.  Do you agree or disagree?

5        A.   I believe --

6             MR. HABERMAN:  Objection.

7        A.   I believe they said it, but I very much

8    disagree with their opinion.

9        Q.   The European Food Safety Authority we've

10   already talked about, right?

11       A.   That's this one here?

12       Q.   Yes.

13       A.   Yes.

14       Q.   And referenced in the document we were just

15   looking at, do you see that?

16       A.   I do.

17       Q.   The European Food Safety Authority has

18   concluded that glyphosate is unlikely to be

19   genotoxic or carcinogenic.  Do you agree or

20   disagree?

21       A.   Well, I disagree.  And just for the record,

22   you didn't give me the opportunity to review the 105

23   pages to see what they said.  Maybe they're very

24   much similar to Canada Health, where they don't even

25   talk about the epidemiologic studies and critique

Andrew M. Schneider, M.D.

```
 1    them.  They just say, you know, there's no evidence.
 2           But clearly there is -- there is evidence,
 3    and you know there's evidence.  And when you ask me,
 4    I'm going to give you the evidence, but -- so --
 5    disappointed to see that there is no evidence in
 6    this article.
 7        Q.   The next reference here is Reference 20 to
 8    JMPR.
 9           Do you see that?
10        A.   I'm sorry.  Where are we now?
11        Q.   Page 24, Reference Number 20.
12        A.   Okay.
13        Q.   That's the Pesticide Residues in Food, 2016,
14    Special Session of the Joint FAO/WHO Meeting on
15    Pesticide Residues.
16           Do you see that?
17        A.   I mean, I see what it says, but I don't know
18    anything about this.
19        Q.   Do you -- have you ever heard of JMPR before
20    this moment?
21        A.   No.
22        Q.   Do you agree or disagree with JMPR's
23    conclusion that glyphosate is unlikely to be
24    carcinogenic?
25        A.   So I strongly disagree, and you know that's
```

1    my opinion.  And I can't critique why they reached

2    that conclusion without seeing it, as I did critique

3    Health South's [sic] opinions, as I've told you.

4        Q.    The same would be true for the European

5    Chemicals Agency, or ECHA, correct?

6        A.    So I've never seen it.

7        Q.    You've never seen the European -- okay.

8            New question:  Dr. Schneider, have you ever

9    seen the evaluation by the European Chemicals

10   Agency, or ECHA, of whether glyphosate causes

11   cancer?

12       A.    I don't recall unless -- make sure it's not

13   on my reliance list, but I don't remember it.

14       Q.    If it's not on your reliance list, we can

15   assume that you've not seen ECHA's conclusions about

16   glyphosate, correct?

17       A.    Correct.

18       Q.    If it's not on your reliance list, we can

19   assume that you've not seen the New Zealand EPA's

20   conclusions about glyphosate, correct?

21       A.    Correct.

22       Q.    The same would be true for any other

23   regulatory agencies that have reviewed glyphosate,

24   such as, for example, Japan or Australia, right?

25       A.    Correct.

Andrew M. Schneider, M.D.

```
1        Q.   To the extent you know, do you agree that
2   those agencies' conclusion that glyphosate is not
3   likely to --
4        A.   Which agency?  Which agency?
5        Q.   I'll repeat the question.
6        A.   Sure.
7        Q.   To the extent you know, do you agree that
8   Health Canada's conclusion that glyphosate is not
9   likely to be carcinogenic is consistent with
10   regulatory bodies around the world?
11        A.   So all I can tell you is that I believe
12   Health Canada's opinions are not founded by any good
13   data.  They admit that they did not look at all
14   animal studies.  They don't mention one
15   epidemiologic study.
16             And I haven't had a chance to review any
17   other countries' opinion.  So you've given me this
18   one opinion from Health -- one dossier from Health
19   Canada and I've critiqued it for you and tell you
20   why I think their opinions don't hold any water, and
21   I strongly disagree with their opinions.
22        Q.   In your view, Health Canada has made a
23   mistake when it comes to glyphosate; is that right?
24        A.   In my --
25             MR. HABERMAN:  Objection.
```

1      A.   Sure.  In my view, they don't adequately

2   show me their thinking.  They don't -- by reading

3   the two pages you gave me -- it may be buried here

4   in the other 105 pages, but just -- you've only

5   allowed me to look at two pages, and on those two or

6   three pages they don't really, for me, come to a

7   conclusion that they justify.  They don't critique

8   any of the epidemiologic studies.  You know, there's

9   been, as you know, meta-analysis and cohort studies

10  and case-control studies.  They don't mention any of

11  these.

12     Q.   Is it your view that all of the regulatory

13  agencies, including Health Canada and the EPA, have

14  made a mistake when it comes to glyphosate?

15     A.   So you've only shown me Health South, so I

16  can't talk about anything else.  And Health South --

17  you only allowed me to read three pages, so maybe if

18  I read the other 104 pages, I might have a different

19  opinion.

20          But my opinion, based upon the totality of

21  the scientific evidence, the animal studies, and the

22  epidemiologic studies, is that glyphosate does cause

23  NHL.  And I believe I've told you why I think Health

24  South may have reached a different conclusion.

25     Q.   Let's unpack that a little.  Okay?

1     A.   Sure.

2     Q.   You know that scientists at regulatory

3   bodies around the world have evaluated the science

4   since IARC came out with their assessment on whether

5   glyphosate causes cancer in humans, right?

6     A.   Yes.

7     Q.   Regulators include experts in animal

8   carcinogenicity studies, right?

9         MR. HABERMAN:  Objection.

10    A.   So I -- to be fair, I don't know without you

11  showing me an individual paper and let me see who

12  the people are.  I don't know.  And you're being

13  general, because maybe in one country it's one way,

14  in another country it's another way.  So let's --

15  for your question, let's just talk about one

16  particular study.

17    Q.   Do you know one way or the other who the

18  scientists are at various regulatory bodies who look

19  at glyphosate?

20    A.   Which -- which regulatory body are you

21  talking about?

22    Q.   I take it, no, you don't know one way or the

23  other?

24    A.   You haven't showed me.  You need to ask me a

25  specific question about a regulatory agency and an

1    author and say, who was this author?  Then I'll

2    review it.  I'm sure they'll tell me who he is, and

3    we can talk about it.

4        Q.   Sure.  So for example, the New Zealand

5    EPA --

6        A.   Do you have a copy I can look at.

7        Q.   I'm asking you a question, and then I'll --

8        A.   Okay.

9        Q.   -- see if you can -- if you -- I think that

10   we can do this and move forward, but we'll try.  All

11   right, Dr. Schneider?

12       A.   Well, I mean, I'll do my best, but I've

13   never seen the New Zealand --

14       Q.   I appreciate that.

15       A.   Okay.

16       Q.   I will represent to you that the New Zealand

17   EPA also concluded that the overall weight of the

18   evidence does not indicate that glyphosate is

19   carcinogenic.  I take it you have not reviewed that

20   conclusion, correct?

21       A.   Correct.

22       Q.   You disagree with the New Zealand EPA if

23   they concluded that glyphosate is not carcinogenic,

24   right?

25       A.   True.

1    Q.   Your answers would be the same for the

2    Australian Pesticides and Veterinary Medicines

3    Agency, correct?

4    A.   Correct.

5    Q.   Your answers would be the same for the Japan

6    National Institute of Technology and Evaluation,

7    correct?

8    A.   I've never heard of the Japan National

9    Institute of whoever.

10   Q.   Your answers would be the same for the WHO

11   Joint Meeting on Pesticide Residues, correct?

12   A.   I'd like to see that, yes.

13   Q.   Your answers would be the same for the

14   European Chemicals Agency, or ECHA, correct?

15   A.   Correct.

16   Q.   You've mentioned you would like to see these

17   documents.  Did plaintiff's counsel ever provide you

18   with any of them?

19   A.   No.  I've looked at the epidemiologic

20   studies and the meta-analysis and the IARC, which

21   are on my reliance list.  I did not look at other

22   countries' opinions until today when you showed me

23   Health South for the first time.

24        (Schneider Exhibit 33 was marked for

25   identification.)

1    BY MS. ROSS:

2        Q.   As you said you'd like to see these, I want

3    to give you what I understand to be the latest, and

4    you can take a look at it.  All right?

5        A.   Uh-huh.

6        Q.   Exhibit 33 to your deposition is a statement

7    from the website of the ECHA, which, if you see at

8    the top left coroner, is an agency of the European

9    Union.

10            Do you see that?

11       A.   Yes.

12       Q.   Would you like to take a moment to read

13   this?

14       A.   I think if you have questions for me, that

15   would be only fair, don't you?

16       Q.   Go ahead.

17       A.   Thank you.

18            Okay.  I'm ready for your questions.

19       Q.   On this first page, do you see where it

20   states -- there's Helsinki and then a date, 30 May

21   2022.  Are you there with me?

22       A.   Show me where.  Yes, I see it.

23       Q.   Now, this committee for the European Union

24   concluded:  The existing classifications for

25   glyphosate as a substance that causes serious eye

1    damage and is toxic to aquatic life with

2    long-lasting effects should be retained.  Right?

3        A.   You're asking me if that's what it says?

4        Q.   That's what it says?

5        A.   That's what it says.

6        Q.   Do you see the next sentence that states:

7    The committee found that the available scientific

8    evidence did not meet the criteria to classify

9    glyphosate for specific target organ toxicity or as

10   a carcinogenic, mutagenic, or reprotoxic substance?

11       A.   That's what it says, correct.  Do you want

12   my opinion about this, or no?

13       Q.   Again --

14       A.   Do you have a question for me?

15       Q.   -- in 2022 --

16       A.   Do you have a question for me about my

17   opinion or just want me to read it?

18       Q.   So I'll ask my question.

19       A.   Okay.  Right now you just asked me to see

20   how my reading skills were, and they're good, right?

21   Okay.  I'm ready for the next question.

22       Q.   In 2022 ECHA does not find evidence that

23   glyphosate causes cancer, true?

24       A.   I'm sorry.  Where does it say that?

25       Q.   Did not meet the criteria to classify

1    glyphosate as a carcinogenic, mutagenic, or

2    reprotoxic substance.

3           Do you know what that means?

4    A.   Yes.  So let me -- can I -- would you like

5    me to interpret that for you?

6    Q.   I'm asking if you -- sure.  What's your

7    interpretation?

8    A.   First of all --

9           MR. HABERMAN:  Objection; the document

10    speaks for itself.

11           MS. ROSS:  Dr. Schneider just asked to --

12           THE WITNESS:  Okay.

13           MS. ROSS:  -- interpret the document.

14    A.   First of all, I see this as talking about

15    eye damage and aquatic life.  It's not talking about

16    NHL or people or even rodents.  I don't know which

17    aquatic life they're talking about.

18           Number two, it says:  The available evidence

19    did not meet the criteria to classify glyphosate for

20    specific target organ toxicity -- I guess that's

21    just an aquatic life.  I don't know how it relates

22    to rats or people -- or as a carcinogenic,

23    mutagenic, or reprotoxic substance.

24           Again, I believe they're only talking about

25    aquatic life, and, you know, I don't know how I

1    interpret that.  I don't even know what aquatic life

2    they're talking about, so I don't see how this is

3    relevant to mammals.  I don't think aquatic life are

4    mammals, but I could be wrong, and I don't see how

5    it's relevant to people.  So maybe I'm missing

6    something.

7        Q.   So when ECHA says they found the available

8    scientific evidence did not meet the criteria to

9    classify glyphosate for a specific target organ

10   toxicity or as a carcinogenic, mutagenetic, or

11   reprotoxic substance, your interpretation of this

12   document is that they're talking only about aquatic

13   life?

14       A.   Well, let me read it again because --

15            MR. HABERMAN:  Objection.

16       A.   -- I've only seen it once.  Let me -- maybe

17   I missed it.  Let me read it again.  Maybe you can

18   show me otherwise.  Maybe my interpretation is

19   wrong, but that's how I interpret it.

20       Q.   Got it.  Are you aware of any regulatory

21   decision more recent than May 2022 on the

22   carcinogenicity of glyphosate?

23       A.   So, again, since it's not a memory test, you

24   have to show me something and I'll tell you whether

25   I'm aware of it or not.

1    Q.   When the plaintiff's lawyer sent you IARC

2    and the articles by Drs. Portier and Weisenburger,

3    did they ever tell you, "Hey, you ought to know

4    there are a bunch of organizations that disagree"?

5         MR. HABERMAN:  Objection; misstates the

6         evidence.  There is no foundation for that

7         question.

8    A.   You can always find people who are going to

9    disagree, but perhaps they didn't give me, for

10   example, Health Canada because it's -- it doesn't

11   have any epidemiologic studies.  How can I critique

12   something when the studies aren't there?  I'm --

13   quick look, it talks about birds, amphibians.  Let's

14   see.

15        So, you know, again, one, you haven't given

16   me the opportunity to read these 105 pages but still

17   you want me to answer questions; two, I've already

18   critiqued it to the best I can with the four pages

19   that you did allow me to read.

20   Q.   There are scientists on both sides of the

21   glyphosate carcinogenicity issue, true?

22   A.   Can you define what you mean "on both

23   sides"?

24   Q.   There are scientists like you who believe

25   that glyphosate causes cancer, and there are other

1    scientists that believe that glyphosate does not,

2    correct?

3        A.   I believe that's true.

4        Q.   In fact, there are a number of scientists

5    who do not agree that Roundup causes non-Hodgkin's

6    lymphoma, true?

7        A.   You'd have to show me who they are.

8        Q.   You don't know one way or the other whether

9    there are many scientists who do not agree with that

10   conclusion?

11       A.   How do you define "many"?

12            MR. HABERMAN:  Objection.

13       Q.   Is there consensus in the medical community

14   that Roundup causes lymphoma?

15       A.   So how can I speak for the medical

16   community?

17       Q.   You are not offering an opinion that there's

18   any consensus in the medical community that Roundup

19   causes lymphoma?

20       A.   I'm offering on opinion --

21            MR. HABERMAN:  Objection.

22       A.   Sure.  I'm offering an opinion that the

23   epidemiologic studies and the meta-analysis support

24   my belief, to a reasonable degree of medical

25   certainty, that the Roundup causes NHL.

Andrew M. Schneider, M.D.

```
1      Q.   Other than plaintiff's other retained
2   experts, are you aware of any scientists who agree
3   with you that Roundup causes lymphoma?
4      A.   Sure.  We can go through the -- if you want,
5   this would be a great opportunity to go through all
6   the studies, and I'll tell you the author, and we'll
7   discuss what they said.
8      Q.   When you came to your conclusion on
9   genotoxicity and the animal studies of glyphosate,
10  did you take into consideration what the National
11  Toxicology Program has to say about that?
12     A.   I'm not sure I read it.  Do you want to show
13  it to me?
14     Q.   Have you ever heard of the National
15  Toxicology Program before?
16     A.   Not off the top of my hear.
17     Q.   If there's an agency in the US that's tasked
18  whether environmental substances are genotoxic,
19  would you want to review its conclusions?
20     A.   Sure.  I'd like to review anything you want
21  to show me so I can critique it and decide.
22     Q.   NPT puts out a report called the "Report on
23  Carcinogens."  Have you ever heard of that?
24     A.   No.
25     Q.   I take it you did not look at it?
```

```
 1        A.   If I did, I don't remember the name.

 2             (Schneider Exhibit 34 was marked for

 3   identification.)

 4   BY MS. ROSS:

 5        Q.   Exhibit 34 to your deposition is a website

 6   from the National Toxicology Program.

 7             Do you see that?

 8        A.   I do.

 9        Q.   At the very bottom there's a section on

10   About NPT, and it states under that:  Science you

11   can depend on for decisions that matter.

12             Do you see where I am?

13        A.   I do.

14        Q.   The font is small.  Can you see it with your

15   glasses?

16        A.   I'll try.  It's very small.

17        Q.   Okay.

18        A.   Want me to read it?

19        Q.   Sure.

20        A.   In the record or myself?

21        Q.   You can read it into the record.

22        A.   The National Toxicology Program provides a

23   scientific basis for programs, activities, and

24   policies that promote health or lead to the

25   prevention of disease.  Founded in 1978, NTP plays a
```

```
1    critical role in generating, interpreting, and

2    sharing toxicologic information about potentiality

3    hazardous substances in our environment.

4           NTP strives to remain at the cutting edge of

5    scientific research and the development and

6    application of new technologies from modern

7    toxicology and molecular biology.  A world leader in

8    toxicology research, NTP has evaluated more than

9    2,800 environmental substances for potential human

10   health effects.

11   Q.   Do you have any basis to disagree that since

12   its inception in 1978, the National Toxicology

13   Program has evaluated more than 2,800 substances?

14   A.   I don't know who they are, so I don't have

15   an opinion.

16   Q.   At no point between their inception and your

17   deposition today had you heard of the NPT, correct?

18   A.   That's correct.

19   Q.   And you're aware that the NPT has come to

20   the conclusion that certain substances are

21   carcinogenic, right?

22   A.   Again, I haven't -- you're showing me a

23   one-page picture.  If you want to show me what they

24   say in their treatise, I'd like to look at it, but

25   this is just a -- one page from their website, I
```

1    guess.

2         Q.   Sure.

3              (Schneider Exhibit 35 was marked for

4    identification.)

5    BY MS. ROSS:

6         Q.   Exhibit 35 to your deposition is a

7    presentation entitled "Evaluation of Glyphosate,

8    (Aminomethyl)phosphonic Acid in Glyphosate-Based

9    Formulations for Genotoxicity and Oxidative Stress

10   Using in Vitro Approaches" authored by the National

11   Toxicology Program.

12             Do you see that?

13        A.   It's authored by Stephanie L. Smith-Roe,

14   Ph.D.

15        Q.   And where is Dr. Smith-Roe?

16        A.   Right, but I don't even know what her --

17   what she's a Ph.D. in.

18        Q.   I'm sorry.  Where is Dr. Smith-Roe, Doctor?

19        A.   Where is she?

20        Q.   Yeah.  Where does she work?

21        A.   I assume for NPT.

22             MS. ROSS:  Let's take a short break and go

23        off the record.

24             THE VIDEOGRAPHER:  Off the record --

25             THE WITNESS:  How much time do you want to

Andrew M. Schneider, M.D.

```
1      take?

2             THE VIDEOGRAPHER:  Off the record, 1:32 p.m.

3          (Recess from 1:32 p.m. until 1:41 p.m.)

4             THE VIDEOGRAPHER:  The time is 1:41 p.m. and

5       this begins Media Unit Number 2.  We are back on

6       the record.

7             (Schneider Exhibit 36 was marked for

8    identification.)

9             (Schneider Exhibit 37 was marked for

10   identification.)

11            (Schneider Exhibit 38 was marked for

12   identification.)

13            (Schneider Exhibit 39 was marked for

14   identification.)

15   BY MS. ROSS:

16      Q.   Dr. Schneider, you can set Exhibit 35 to the

17   side.  I have no questions about it for you right

18   now.

19            Exhibits 36, 37, 38, 39 have been marked and

20   handed to you.  And so the record is clear, I'm

21   going to name what they are and then we can go

22   through them.  All right, Dr. Schneider?

23      A.   Yes.

24      Q.   Exhibit 36 to your deposition is a February

25   10th, 1984 EPA memorandum on "Glyphosate;
```

Andrew M. Schneider, M.D.

1    oncogenicity study in the mouse," correct?

2        A.   Yes.

3        Q.   Exhibit 37 to your deposition is a February

4    26th, 1985 EPA memorandum on the "Use of historical

5    data in determining weight of evidence from kidney

6    tumor incidence in the Glyphosate two-year feeding

7    study," correct?

8        A.   Yes.

9        Q.   Exhibit 38 to your deposition is a March

10   4th, 1985 EPA memorandum on "Consensus Review of

11   Glyphosate," right?

12       A.   Yes.

13       Q.   And Exhibit 39 to your deposition is a June

14   3rd, 1991 EPA memorandum on glyphosate in a "2-year

15   Combined Chronic Toxicity/Carcinogenicity Study in

16   Sprague-Dawley Rats," correct?

17       A.   Yes.

18       Q.   Exhibit -- well, backing up a second.  Okay?

19           New question:  Dr. Schneider, you were given

20   these four EPA documents from the 1980s and early

21   1990s on the animal studies of glyphosate, correct?

22       A.   Correct.

23       Q.   Exhibit 36, which is the earliest, February

24   1984, references a two-year mouse study, right?

25       A.   I'm sure it does.  Where does it say two

```
 1   years?

 2       Q.   It might just say oncogenic study in mice.

 3       A.   So it doesn't --

 4       Q.   Is that what it says?

 5       A.   But -- right.  I couldn't verify what you

 6   said.  I'm sorry.

 7       Q.   Okay.  Exhibit 39, the most recent of those,

 8   is the June 1991 EPA memorandum.

 9           Do you see that?

10       A.   Yes.

11       Q.   Now, you have my only copy, so I'm going to

12   just ask you to verify.  I believe that there are

13   page numbers on the bottom that are 001 and 002 and

14   so forth.

15       A.   Correct.

16       Q.   Is that right?

17       A.   Yes.

18       Q.   On Page 003 there is a discussion of a study

19   in rats, and they reference the authors of that

20   study as Stout, S-t-o-u-t, and Rucker, R-u-c-k-e-r.

21           Do you see that?

22       A.   I do.

23       Q.   If you go to Page 2, 002 of that document,

24   what does the first bullet state?

25       A.   Number one you want me to read?
```

1    Q.   Yes.

2    A.   Due to the high incidence of pancreatic

3   islet cell tumors in each of the treated male groups

4   (2000, 8000, and 20,000 ppms) in comparison to

5   current controls, Toxicology Branch I has

6   recommended that the carcinogenic potential of

7   glyphosate be addressed by the Peer Review

8   Committee.  The approximate date of this will be

9   mid-June 1991.

10    Q.   Now, the Peer Review Committee that's

11   mentioned there, are you familiar with that at all?

12    A.   I know what a peer review committee is.

13    Q.   Do you know what an EPA Peer Review

14   Committee is?

15    A.   I assume it's a peer review committee for

16   the EPA.

17    Q.   There is a plan noted to send the glyphosate

18   information to the Peer Review Committee in mid-June

19   of 1991.  I didn't see any EPA documents on your

20   list that were reflecting the results of that Peer

21   Review Committee.  Do you recall reviewing those?

22    A.   No.

23    Q.   Why did you review the EPA documents that

24   were added to your materials list?

25    A.   They were things given to me by plaintiff's

1    attorney to look at.

2        Q.   Did you ask to see them?

3        A.   No.

4        Q.   What conclusions did you draw from these EPA

5    memoranda?

6        A.   Let me go through them one at a time.

7             The first one, Exhibit 36, the conclusion

8    is:  Review of the mouse oncogenicity study

9    indicates that glyphosate is oncogenic, producing

10   renal tubule adenomas, a rare tumor, in a

11   dose-related manner.

12            That's one.

13       Q.   So you reviewed these EPA documents to

14   support your opinion that glyphosate causes renal

15   tubule adenomas in mice; is that right?

16       A.   So I don't -- that wasn't my task.  I really

17   wasn't looking to address the effects of glyphosate

18   on the renal tubule.  My task was to talk about NHL.

19   This was given to me.  I looked at it, but I don't

20   use this as support for causing NHL because it

21   doesn't speak to NHL.

22       Q.   Do you know if you were provided with

23   complete sets of documents from the EPA?

24       A.   How would I know?  I only know what I was

25   given.

1      Q.   If you were not, would you want to see the

2   complete set of EPA documents before drawing any

3   conclusions from them?

4      A.   So my opinions are the following:  One, that

5   animal data, including CD1 mouse and perhaps Swedish

6   albino mice, shows that glyphosate causes NHL.  So

7   the EPA information we can look at and it may

8   further support that or not.  We can talk about it.

9      Q.   Do you know whether the studies that

10  Dr. Portier says show that glyphosate causes

11  lymphoma in mice are the same studies that were

12  reviewed by EPA in the '90s?

13     A.   So we'd have to match them up one to one

14  because I don't have an independent knowledge of

15  that.

16     Q.   You don't know one way or the other whether

17  EPA considered all of the same studies Dr. Portier

18  relied on in --

19     A.   You wouldn't really expect me to have that

20  memorized, would you?  I don't have that memorized,

21  so I wouldn't know.

22     Q.   Do you have a general understanding of how

23  EPA registration works?

24     A.   Could you be more specific in your question?

25     Q.   Sure.  At your last deposition, we learned

```
 1    that you reviewed a number of regulatory documents

 2    from the USEPA, right?

 3        A.    Yes.

 4        Q.    Have you ever been employed by the USEPA?

 5        A.    No.

 6        Q.    Have you ever been employed by an industrial

 7    pesticide, chemical, or agricultural company subject

 8    to EPA regulations?

 9        A.    No.

10        Q.    Have you ever been part of a corporation's

11    preparation and submission to the EPA of a

12    registration for a pesticide or an herbicide?

13        A.    No.

14        Q.    Have you ever participated or otherwise been

15    involved with a decision made by a company about

16    what statements to include on a warning label for a

17    product?

18        A.    No.  I'm a clinical oncologist.

19        Q.    Have you ever written or been involved in

20    writing a pesticide or herbicide label?

21        A.    No.

22        Q.    Have you ever been asked by the EPA to

23    participate in a Peer Review Committee or reviewing

24    any publication, potential regulation, or other

25    material?
```

Andrew M. Schneider, M.D.

1      A.   No.

2      Q.   Have you ever worked as a pesticide

3   applicator?

4      A.   Is that a serious question?  No.

5      Q.   Within the US, you are aware that the

6   regulatory body that approves pesticides is the EPA?

7      A.   Yes.

8      Q.   Are you an expert in EPA regulations or EPA

9   process?

10     A.   No.

11     Q.   Are you offering expert opinions about any

12  bans of glyphosate or alleged bans anywhere in the

13  world?

14     A.   Bans, meaning they can't be used?

15     Q.   Yes.

16     A.   The only opinion I have is that a recent

17  court decision came up, and they've asked the EPA to

18  go back and look again at whether glyphosate causes

19  cancer, because this -- I don't know if it was an

20  appellate court, but this court was concerned and

21  asked the EPA to go back and do the due diligence

22  again.

23     Q.   And that's the only opinion that you have on

24  any places in the world where glyphosate can or

25  cannot be used, right?

1      A.   I think that's a pretty strong opinion, but,

2   yes.

3      Q.   Do you know whether reregistration, in

4   general, includes a restatement of an agency's basis

5   for determining that a pesticide doesn't pose

6   unreasonable threats?

7      A.   Since I'm not an expert in the process, I

8   wouldn't have an opinion about reregistration.

9      Q.   And you have not reviewed any of the EPA's

10  reregistration decisions on glyphosate; is that

11  right?

12     A.   My role here is to be a causation expert, as

13  a clinical oncologist, about glyphosate and NHL and

14  not about the workings of the EPA.

15     Q.   So the EPA documents that counsel provided

16  you from the 1980s and the 1990s, are you relying on

17  them for any opinions you're offering?

18          MR. HABERMAN:   Objection.

19     A.   I'd have to look at each one individually.

20  The first one -- sorry.

21          So Exhibit 36 talks about renal tubule

22  adenoma, so there is no opinion about my -- about

23  NHL for that one, no.

24          So Exhibit Number 37 is also about renal

25  adenoma, so it wouldn't be relevant to my opinion on

1    NHL.

2           Exhibit 38 also really looked at renal

3    tubule adenoma, so, no.

4    Q.   So that -- Exhibit 38 is also not relevant

5    to any opinions you're offering about glyphosate and

6    NHL, correct?

7    A.   Correct.

8           MR. HABERMAN:  Objection.

9    A.   Looks like Exhibit 39 also is talking about

10   carcinomas and adenomas and not lymphomas.

11   Q.   Exhibit 38 is also not relevant to any

12   opinions you're offering about glyphosate and NHL,

13   correct?

14   A.   I didn't do that one yet.

15   Q.   I'm sorry.  You did Exhibit 39?

16   A.   Right, correct.

17   Q.   Exhibit 39 is not relevant to any opinions

18   you're offering about glyphosate and non-Hodgkin's

19   lymphoma, correct?

20   A.   Correct.

21   Q.   You mentioned, I think, you're aware of

22   EPA's most recent decisions about glyphosate; is

23   that right?

24   A.   Talking about the court decision?

25   Q.   Talking about EPA's most recent evaluations

Andrew M. Schneider, M.D.

1    of glyphosate.  Are you aware of those?

2        A.   Which ones are you referring to, what year?

3        Q.   You reviewed an EPA document from 2020.  Do

4    you recall that?

5        A.   You'd have to show it to me to refresh my

6    memory.

7        Q.   Would you have to read the entirety of that

8    EPA document?

9        A.   I'd have to see it first and then tell you.

10       Q.   Sure.

11            MS. ROSS:  This is, for the record, a

12       document that is on Dr. Schneider's materials

13       list as one of the documents that he reviewed in

14       reaching his opinions in this case.

15            (Schneider Exhibit 40 was marked for

16    identification.)

17   BY MS. ROSS:

18       Q.   Exhibit 40 is an EPA memorandum dated

19    January 6 of 2020.

20            Do you see that?

21       A.   Yes.  And I -- luckily, I have a good

22    recollection of this one.  It may just take me a

23    minute or two, but I know this one pretty well.

24       Q.   Great.

25       A.   Okay.  So I'm waiting for your first

Andrew M. Schneider, M.D.

```
1    question.
2        Q.   On Page 13 there's a final summary.
3        A.   So we're going to skip everything else and
4    go to Page 13?
5        Q.   Yes.
6        A.   Okay.  Fair enough.  Where do you want me to
7    read?
8        Q.   I'll read.
9        A.   Okay.
10       Q.   That's fine.
11       A.   Okay.
12       Q.   The last sentence in this section talks
13   about --
14       A.   Are you going to give me the opportunity to
15   critique or just want me to say whether it says what
16   you say?
17       Q.   I'll ask my question --
18       A.   Okay.  Great.
19       Q.   -- and then we'll see.
20            It says that the --
21       A.   Show me -- show me -- show me where you're
22   reading.
23       Q.   Sure.  Last sentence in this --
24       A.   Page 13?
25       Q.   -- in this paragraph that states:  In
```

1    summary --

2        A.   Yes.  Yeah.

3        Q.   It states:  The revised estimate

4    incorporates most recent -- the most recent AHS data

5    from Andreotti 2018 and does not impact the

6    conclusions presented in the EPA revised glyphosate

7    issue paper, which concludes that the strongest

8    support, based on the weight of evidence, is for

9    glyphosate being categorized as not likely

10   carcinogenic to humans.

11            Did I read that correctly?

12       A.   You're asking me if your reading

13   comprehension is correct?

14       Q.   I think that's what my question was.

15       A.   I would hope, as a lawyer, you know how to

16   read.

17       Q.   Did I read that correctly?

18       A.   Say that again.  We'll check it word for

19   word.  Can you read it back?

20       Q.   That's okay.  We'll move on.

21            The EPA has repeatedly found that glyphosate

22   is unlikely to be carcinogenic.  You're aware of

23   that, Dr. Schneider?

24       A.   Strongly disagree, but yes.

25       Q.   That was true in 1983, for example?

```
 1       A.   Okay.  Yes.

 2       Q.   That was true in 2020?

 3       A.   Where are you getting the 2020 from?

 4       Q.   The memo that we're reading that says that

 5   EPA's position remains unchanged that glyphosate is

 6   not likely to be carcinogenic to humans is dated

 7   January 6th of 2020, correct?

 8       A.   Do I have that here?

 9       Q.   That is on the front page of the document.

10       A.   Oh, okay.  Yes.

11       Q.   You strongly disagree with EPA's conclusion,

12   right?

13       A.   Correct.

14       Q.   Did you actually review and consider EPA's

15   most recent conclusions regarding glyphosate in

16   forming your opinions in this case?

17       A.   Is that in -- from this memorandum here?

18       Q.   So when they talk, for example, about the

19   EPA revised glyphosate issue paper, do you recall

20   ever seeing that before?

21       A.   Can you show me it so I can remember if I

22   saw it?

23       Q.   Yeah.  So it's right here --

24       A.   I need to see the paper.  This I remember

25   seeing.  If you didn't show me, I wouldn't remember.
```

1    Show me and I'll tell you if I saw it.

2        Q.   So I'll represent I didn't see anything on

3    your materials list --

4        A.   Okay.

5        Q.   -- that would indicate you've seen the EPA's

6    revised glyphosate issue paper.  I take it you don't

7    have an independent recollection that you've seen

8    that document; is that right.

9        A.   Well, since it's not a memory test, and I've

10   said this in the last two hours, please show it to

11   me and I'll tell you if I saw it.

12       Q.   Sure.  Exhibit 3 is your revised --

13       A.   No, no, no, no.

14       Q.   -- materials list.

15       A.   You just were kind enough to show me this

16   article.  Without you showing me this, I wouldn't

17   have remembered I saw this, and I read this eight

18   times.

19       Q.   I think you told us --

20       A.   Let me -- may I -- may I finish?  May I

21   finish?

22       Q.   -- that --

23       A.   May I finish?

24       Q.   -- the materials you reviewed are on your

25   reliance list.  Is that correct or incorrect?

1      A.    And those are -- the reliance list has

2   materials I reviewed.  It doesn't mean I didn't

3   review other materials from Google searches,

4   et cetera.

5      Q.    So if I, as the lawyer who has an

6   opportunity to take your deposition in the case,

7   wanted to know the entire world of materials you

8   reviewed and relied on, Dr. Schneider, is it your

9   testimony that your reliance list in this case

10  doesn't provide those materials?

11     A.    No.  The reliance list --

12           MR. HABERMAN:  Objection.

13     A.    Sure.  The reliance list provides that but,

14  like, just for example, you showed me other articles

15  that weren't on my reliance list and questioned me

16  about them.  I may have seen something five years

17  ago reading a journal.  You know, I can't tell you

18  with certainty what I know and don't know, but I'm

19  not relying on anything other than the reliance list

20  for my opinions today.

21           But you now want to talk to me about

22  something from 2020, so you want me to talk about

23  it, so show it to me.

24     Q.    Okay.  So what I was talking to you about

25  from 2020 is this EPA memorandum dated January 6th

Andrew M. Schneider, M.D.

1    of 2020.

2         A.   You led me to believe there's something

3    else.

4         Q.   Okay.

5         A.   Is there something else?  This I know very

6    well.  I'm ready to talk about it.  It's on my

7    reliance list.  I'm ready to talk about it.

8         Q.   Great.  At your -- new question.  Okay?

9         A.   Sure.

10        Q.   At your last deposition we talked about

11   various measures of exposure used in different

12   studies of glyphosate-based herbicides.

13             Do you remember that?

14        A.   No.

15        Q.   Okay.  Do you recall our discussion about

16   the Roundup epidemiology from your previous

17   deposition?

18        A.   Be more specific, please.

19        Q.   I'll ask a new question.  Okay?

20        A.   Thank you.

21        Q.   There are, in different studies of Roundup

22   and non-Hodgkin's lymphoma, various measures of

23   exposure, true?

24        A.   True.

25        Q.   Some studies measured high exposure by the

1    number of days sprayed per year, right?

2         A.    Yes.

3         Q.    Number of days per year is a frequency of

4    exposure measurement, correct?

5         A.    Correct.

6         Q.    Some studies reported frequency of exposure

7    as greater than two days per year?

8         A.    Correct.

9         Q.    Greater than two days per year could be

10   three days per year for a year or 15 days per year

11   for 20 years, right?

12        A.    Yes.

13             MR. HABERMAN:   Objection.

14        Q.    There's no way to tell from greater than two

15   days per year where the -- whether the total number

16   of days of exposure is three or 300, true?

17        A.    True.

18        Q.    To measure highest exposure by number of

19   days per year, you'd want to use the highest number

20   of years available, right?

21        A.    Yes.

22        Q.    Five days per year is more exposure than

23   greater than two days per year, true?

24        A.    True.

25        Q.    If a study has --

```
 1              MR. HABERMAN:  Objection.
 2      Q.   -- greater than two days per year and an
 3  ordinal five days per year -- I think we started
 4  talking about this at your last deposition; is that
 5  right?
 6      A.   We did.
 7      Q.   Would you want to use the ordinal five days
 8  or greater than two days?
 9      A.   So I've had the opportunity to look at this
10  issue a little bit.  And I'm not a statistician, but
11  I kind of understand ordinal a little better than I
12  did before, and I don't know if you understand any
13  better than I do, but -- so it's a way of doing
14  statistics on things that may not have exact
15  numerical number, and the difference between
16  categories might not be uniform.  So it's an
17  accepted way in statistics to analyze data for data,
18  just as I said.
19              So I think both are good.  I think that one
20  is not better than the other.  My opinion, based
21  upon my review of the glyphosate data, is that I
22  think you have to look at some intensity, but I'm
23  not sure that it has to be five days is better than
24  two days.  It may be a limit and then it doesn't
25  matter.  You know, people have done a lot of
```

```
 1    statistics, which we can talk about.  So my answer
 2    to your question, I think, is that both are
 3    reasonable to use.
 4        Q.   I think I'm understanding but I want to just
 5    be clear as we go into this.  Okay?
 6        A.   Sure.  Are we done with this, by the way?
 7        Q.   Yes.
 8        A.   So you have no questions for me on this?
 9        Q.   Right.  You can set it aside.
10        A.   Wow.  Okay.
11        Q.   If I understand what you've just said
12    correctly, you're looking at both greater than two
13    days per year and ordinal measures and are not
14    necessarily saying that one is better than the
15    other; is that right?
16        A.   That's my understanding, yes.
17        Q.   Some studies measured high exposure by the
18    total number of years someone was exposed to
19    glyphosate, right?
20        A.   Yes.
21        Q.   Total number of years is a duration of
22    exposure measure, correct?
23        A.   Well, but it doesn't tell you a guess how
24    many days per year.
25        Q.   Exactly.
```

1      A.   Right.

2      Q.   The total number of years provided doesn't

3   tell us whether someone sprayed Roundup one time per

4   year or 50 times per year, correct?

5      A.   Correct.

6           MR. HABERMAN:   Objection.

7      Q.   Some studies measured high exposure by a

8   cumulative number of days in a lifetime, right?

9      A.   Yes.

10     Q.   Cumulative lifetime days tells you how many

11   times over the course of somebody's life they were

12   exposed to Roundup, right?

13     A.   Yes.

14     Q.   Cumulative days of exposure combines

15   frequency and duration of use, correct?

16     A.   I believe so, yes.

17     Q.   What is the most reliable measure of high

18   exposure to glyphosate-based herbicides, number of

19   days per year, number of years, or lifetime days?

20     A.   So I think the answer, as I told you before,

21   is I don't think we know that.  I think they all

22   have merit.  You know, we don't know -- maybe

23   there's a threshold, and then it doesn't matter, or

24   we have to consider latency, how long -- you know,

25   did they spray yesterday or 10 years ago or 20 years

1    ago?  We didn't -- we didn't include latency at all

2    in that discussion.

3         So I -- you know, back to the Pahwa article,

4    which is, I think, where we're going, you know, I

5    think they're all reasonable to look at, and then we

6    can discuss why one might be positive, one might be

7    negative.  We can critique it and then reach a

8    conclusion together.  Maybe we'll agree about

9    whether glyphosate causes NHL.

10   Q.   So I think I understand you on this, and

11   then we can talk about it in the specific context of

12   Pahwa.

13   A.   Okay.

14   Q.   Okay?  You aren't relying specifically on

15   either the ordinal days analyses or the threshold

16   days analyses; you're taking both into

17   consideration.

18   A.   I'm looking --

19   Q.   Right?

20   A.   -- at everything, and then we'll -- you

21   know, the data will speak for itself.  And then you

22   and I can interpret it together, and you may

23   disagree with my interpretation, but that's okay.

24   Q.   For example, when Pahwa reports an ordinal

25   analysis looking at five days per year of glyphosate

Andrew M. Schneider, M.D.

```
 1    use and a greater than two days analysis, you're

 2    considering both of those, right?

 3         A.   I'm considering everything but, you know, if

 4    one is statistically significant and one isn't, that

 5    might be good enough.

 6         Q.   When you say if one is statistically

 7    significant and one isn't, what do you mean by that?

 8         A.   Whether 1 is included in the 95 percent

 9    confidence interval.

10         Q.   When you say that might be good enough, are

11    you saying if you have one statistically significant

12    result from either the threshold or the ordinal

13    analyses, that is good enough to conclude that there

14    is an increased risk with glyphosate and NHL?

15         A.   At least in that individual study, but

16    obviously we're not going to base an opinion just on

17    one.  And this is a pooled analysis, is my

18    recollection of Pahwa, so, you know, we're not going

19    to just -- my opinion is based upon Pahwa's pooled

20    analysis.  I'm only going to cherry-pick this one

21    number, that's not what I intend to do.

22              You know, we can look and see what's

23    positive, what's negative, and then compare that to

24    the other meta-analysis, the other pooled data, the

25    other six or seven case-controlled or cohort
```

Andrew M. Schneider, M.D.

1    studies, and we should take all the data together

2    and we should reach an opinion, which I'm going to

3    give you when you ask.

4       Q.   When Pahwa reports an ordinal analysis

5    looking at 10 lifetime days in a greater than five

6    lifetime days analysis, you're considering both the

7    ordinal and the threshold analyses, right?

8       A.   So I'm going to consider everything and then

9    use something, in addition to other things, to reach

10   an opinion and perhaps discuss why something isn't

11   statistically significant, which you really haven't

12   had me -- given me the opportunity to critique

13   anything.  You just show me the article and move on.

14   Let's sit and critique it, and then maybe we'll --

15   maybe you'll agree with me.

16      Q.   And if one of those findings is

17   statistically significant and the other is not,

18   that's good enough for you, correct?

19      A.   I didn't -- I think you're --

20           MR. HABERMAN:  Objection.

21      A.   I think you're misinterpreting what I'm

22   saying.  What I'm saying is, well, let's figure out

23   why that is.  Let's look at the data.  Let's compare

24   it to other people's data.  Let's compare to it the

25   four meta-analysis.  Let's compare it to the six

```
 1    studies, five case-controlled and one cohort.  Let's
 2    look at Andreotti.  Let's go back to the exhibit and
 3    critique it and see why EPA says what they say and
 4    why I disagree.  I think there are a lot of things
 5    to say.
 6           No, I'm not going to cherry-pick and say
 7    this is positive and that's negative, so that
 8    supports my opinion.  That's not what I'm trying to
 9    do.
10      Q.   That's not what you're trying to do, to
11    cherry-pick and say this is positive, and that's
12    negative, so the positive is the basis for my
13    opinion, correct?
14      A.   Correct.
15      Q.   When you looked at Pahwa, were you provided
16    the supplemental tables?  Do you remember?
17      A.   You'd have to show me so I can tell you
18    whether I remember seeing them.
19      Q.   Sure.
20      A.   I think I saw all the tables from Pahwa, I
21    think.  Again, if you want, I can look at my phone,
22    if that's where it actually is, and see if I have
23    the tables or not, so...
24           (Schneider Exhibit 25 was previously marked
25    for identification.)
```

Andrew M. Schneider, M.D.

```
 1    BY MS. ROSS:

 2        Q.   So Exhibit 25 to your deposition was Pahwa,

 3    and I'm handing you another copy of that.

 4        A.   That's a terrible copy.

 5        Q.   You see it says -- it is, and so I printed a

 6    different one --

 7        A.   Thank you.

 8        Q.   -- just to see.  Is that better?

 9        A.   Yeah.  I can read that one.

10             To answer your question honestly, I'm going

11    to have to go to my phone and see if it's on my

12    phone.  I think I saw it but I don't want to swear

13    under oath because I could be wrong, but I think

14    it's there.

15        Q.   Okay.  I'm going to break that down.  Okay?

16        A.   Sure.

17        Q.   You think that you probably saw the

18    supplemental tables in Pahwa, correct?

19        A.   I think I did, yes.

20        Q.   Table S1 talks about different measures from

21    Pahwa when proxy respondents are excluded.

22             Do you see that?

23        A.   I'm sorry.  Table S1?

24        Q.   Yes.  Do you see the very end of the title

25    of the table says:  Proxy respondents excluded?
```

Andrew M. Schneider, M.D.

1       A.   I see it, yes.

2       Q.   So Pahwa reported information when proxy

3   respondents were excluded from the analysis, right?

4       A.   Yes.

5       Q.   Proxy means that they got information from

6   someone other than the person who actually applied

7   the pesticide, correct?

8       A.   Yes.

9       Q.   Those results are reported in Table S1?

10      A.   Yes.

11      Q.   You believe that you've seen Table S1 before

12   in the version of Pahwa that you had.  More likely

13   than not, but in order to verify that, you'd need to

14   look at your --

15      A.   It would take two seconds.  You can watch me

16   do it.  I'll pull up the article, and we'll see if

17   my -- the table is there.  That's the fair way, but

18   it's up to you.

19      Q.   Okay.

20      A.   Do you want -- do you want me to do that?

21      Q.   Sure.

22      A.   Okay.  Do you want to watch me do it?

23      Q.   No.  You're fine.

24      A.   This is my Pahwa article here.

25      Q.   Okay.

Andrew M. Schneider, M.D.

```
 1      A.   So I'm going to scroll down and see if it's

 2   there.

 3           So I don't think I have that, no.

 4      Q.   You didn't have the supplemental tables from

 5   Pahwa in the version of the article that was

 6   provided to you?

 7      A.   No, unfortunately not.

 8           MR. HABERMAN:  Objection.

 9      Q.   You can put your phone --

10           MR. HABERMAN:  Misleads --

11      Q.   -- away, Dr. Schneider.

12           MR. HABERMAN:  -- the evidence.

13           (Schneider Exhibit 41 was marked for

14   identification.)

15   BY MS. ROSS:

16      Q.   Exhibit 41 to your deposition --

17      A.   Are we done with this now?

18      Q.   For the moment.

19      A.   No questions?

20      Q.   Correct.

21      A.   Okay.

22      Q.   Exhibit 41 to your deposition --

23      A.   Uh-huh.

24      Q.   -- is an article by Boffetta and colleagues.

25      A.   Correct.
```

```
 1        Q.   You're familiar with this article; is
 2   that --
 3        A.   I am.
 4        Q.   -- right, Dr. Schneider?
 5             Is this the most recent meta-analysis that
 6   you recall reviewing on glyphosate and non-Hodgkin's
 7   lymphoma?
 8        A.   Well, I'll tell you the ones I remember, but
 9   I don't remember the dates, as you can understand.
10   There's Donato, there's Rana, and there's this one.
11   I don't know which one is --
12        Q.   Okay.  Was Boffetta well conducted, in your
13   assessment?
14        A.   Just give me, like, three minutes to review
15   it again, because I've read it, but I don't have it
16   committed to memory.
17        Q.   Absolutely.
18        A.   There were problems with Boffetta.  I
19   remember that.  Let me go to the problems.
20             I wish I could see this a little better, but
21   I'm just about ready to answer your question.  So I
22   have a few problems with the study.
23        Q.   What are your criticisms of the Boffetta
24   study?
25        A.   So he's -- on Figure 1 he's summarizing the
```

Andrew M. Schneider, M.D.

```
 1    other studies.  Like, for example, he uses Eriksson
 2    with showing no statistical significant difference
 3    but he doesn't take when they used the -- I think it
 4    was Eriksson was greater than 10 days, and I could
 5    be wrong, but we'll find it.  That confidence
 6    interval was significant with a relative risk of
 7    two, and one was not included.
 8         So he chooses to take the one which didn't
 9    look at exposure, so I have a problem with that.
10         Is that -- I think it's a little small.  Is
11    that Cocco, is that what it says?  Cocco only had, I
12    think -- didn't have -- didn't reach -- didn't have
13    the power to reach a significant opinion.  I think
14    there were only, like, four studies, so I don't
15    think Cocco should be included.
16         And then the other point that this article
17    makes, in Leon and Pahwa, he says that that
18    contributed 56.8 to 30.1 percent that overweighted
19    Leon and Pahwa.  So I don't agree with his
20    statistics.  In addition, I believe he also works
21    for someone involved with the EPA or another
22    organization.  So I'm not sure he's unbiased but I'm
23    not going to go there.
24         I don't agree with the way he did things for
25    the reasons I told you.  I think his meta-analysis
```

1    fails to include the data where exposure was looked

2    at, i.e. Eriksson, Hardell.  Those and other tables

3    are significant with 1 not included in the

4    confidence interval.  I don't think Cocco should be

5    included and I think Leon and Pahwa or overrated.

6         Let me just finish one last comment.

7         I do agree with his last opinion, though, an

8    association with risk of DLBCL cannot be ruled out,

9    and in fact, I think the data supports that DLBCL is

10   associated with glyphosate.  So I think -- I agree

11   with that comment.

12   Q.   Are there any other criticisms you have of

13   the Boffetta study?

14   A.   Those are the ones that come to mind.

15   Q.   So that was a long answer, Dr. Schneider.

16   I'm going to break it down a little bit.  Okay?

17   A.   Sure.

18   Q.   When -- new question:  In a Roundup

19   epidemiology study, if the numbers are small, you

20   cannot draw definitive conclusions, correct?

21   A.   Well, first, how do --

22        MR. HABERMAN:  Objection.

23   A.   Yeah, sure.  How do you define small?  And I

24   think you -- again, the goal here is we critique

25   each study, we look at the study, and then we can

Andrew M. Schneider, M.D.

1    say, well, you know, that's a good study, it's a bad

2    study.  I mean, it's a study.  So, you know, four

3    patients is a study.  Should it be given equal

4    weight to another study?  Maybe not, you know.  We

5    need to look at the totality of the circumstances.

6         So, you know, I think in a lot of the

7    studies there were small numbers, and maybe that's

8    the best we can do and that's why maybe

9    meta-analysis are more helpful, but, you know,

10   that's my answer.

11   Q.   If you only have four exposed cases, is that

12   enough people from which to draw conclusions on

13   glyphosate and NHL?

14        MR. HABERMAN:  Objection.

15   A.   Sure.  So I'm not a statistician, so I

16   really can't answer that, but what I would say as

17   your clinical oncologist expert who is trained to

18   read scientific literature, is let's look at all the

19   data and then make a decision, you know.

20        Yes, Cocco had four patients, you know,

21   someone else had 90 patients, and someone else had

22   30 patients.  You know, we did a meta-analysis and,

23   you know, it's interesting to me when I see how the

24   meta-analysis were done.  Some people who don't want

25   to believe that glyphosate causes NHL, they choose

```
 1    numbers where exposure wasn't looked at, the general
 2    numbers.
 3           What you're going to hear from me, it's my
 4    opinion that exposure does matter, and I can't tell
 5    you whether it's lifetime years or -- you know, but
 6    some exposure matters.
 7           And latency matters, you know, is it 10
 8    years, is it 20 years?  What's the latency period
 9    here?
10           And follow-up matters.  There is a lot of
11    things that matters.
12           So I think it's not fair to look at the
13    number of patients.  We have to critique the entire
14    study and then take that study and look at it with
15    all the available studies that we know together, and
16    we probably have the same ones, hopefully, but maybe
17    you have different ones than me, and reach a
18    conclusion.
19    Q.   I'm not sure I understand whether the number
20    of cases is or is not important to your opinion --
21    A.   Well, I think I said that.
22    Q.   -- Dr. Schneider, so let me ask a new
23    question.
24    A.   Sure.
25    Q.   If you have 10 or 20 cases, is that a
```

Andrew M. Schneider, M.D.

1    sufficient number of cases to determine whether

2    glyphosate is associated with NHL?

3        A.   So I'm not --

4             MR. HABERMAN:  Objection.

5        A.   Sure.  I'm not a statistician, but I think

6    I've seen that that may be -- have enough

7    statistical power, 20 cases might have enough

8    statistical power, but the important thing is don't

9    take one study out of context.  Let's look at the

10   study in its entirety, look at the other studies,

11   and then we can reach a conclusion together.

12           I'm not here to give statistical opinions,

13   but I am here to look at the data, look at the

14   meta-analysis and critique it, which you haven't

15   really given me the opportunity to do.

16       Q.   Do you have any expert opinion on what would

17   be enough patients to look at and determine whether

18   glyphosate is associated with non-Hodgkin's

19   lymphoma?

20       A.   I would defer that to a --

21            MR. HABERMAN:  Objection; out of the scope.

22       A.   Sure.  I would defer that to a statistician.

23       Q.   You don't know whether 100, 400 or 1,000

24   patients would be enough, fair?

25       A.   Well, I -- no --

```
 1              MR. HABERMAN:  Object.

 2       A.    That's not really fair, because I do think

 3   those extreme numbers are all good.  The question is

 4   I don't know whether 20 or 30 is enough.  I think

 5   100 is probably going to be enough.  I've seen tons

 6   of studies where 100 has been done, so my opinion as

 7   a medical oncologist, not as a statistician, is

 8   that, you know, certainly 100, 400, 1,000 is enough.

 9              Is four enough?  Well, it may have a low

10   statistical significance but we still can look at it

11   and take it for what it's worth.

12       Q.    In your expert opinion as an oncologist and

13   not as a statistician, larger studies are better

14   than smaller studies for evaluating whether Roundup

15   is associated with NHL, correct?

16       A.    You have to look at the study because it's

17   not only about numbers, as I told you before.  It's

18   about, "Okay.  Well, we followed these people for

19   one year."  Well, there is no latency there.  We

20   have to look at the entire study and critique it.

21   We can't just use the number of patients as our

22   means to critique the study.

23       Q.    When you looked at Boffetta, I take it you

24   looked at both NHL data overall and the subtype

25   data, correct?
```

Andrew M. Schneider, M.D.

1      A.   I looked at the article, correct.

2      Q.   The meta-relative risk for NHL overall was

3   1.05 --

4      A.   Can you just show me where you're reading

5   from?  Sorry, I don't have these numbers memorized.

6      Q.   Absolutely.  The one-paragraph abstract on

7   the first page.

8      A.   Okay.

9      Q.   The meta-relative risk for ever-exposure to

10  glyphosate was 1.05 --

11     A.   Yes.

12     Q.   -- and nonsignificant, correct?

13     A.   Correct.

14     Q.   The meta-relative risk for the highest

15  category of exposure was 1.15 and nonsignificant,

16  correct?

17     A.   Right, but again, that's because, in my

18  opinion, they didn't take the right data, but go

19  ahead.

20     Q.   The meta-relative risk for DLBCL was 1.29

21  with a 95 percent confidence interval --

22     A.   So here we go.  Doctor --

23     Q.   Sorry.  Can I finish my question --

24     A.   Oh, I'm sorry.

25     Q.   -- Dr. Schneider?

Andrew M. Schneider, M.D.

```
 1       A.   You want to ask me a question.  I'm sorry.

 2   Go ahead.

 3       Q.   The meta-relative risk for DLBCL was 1.29

 4   with a 95 percent confidence interval of 1.02

 5   to 1.63, correct?

 6       A.   So that means that there is a statistically

 7   significant association with glyphosate in DLBCL

 8   because 1 is not in the confidence interval.

 9       Q.   You're saying that there is a statistically

10   significant evidence of an increased risk in

11   Boffetta for DLBCL and that's evidence for

12   causation, right?

13       A.   Yes.

14       Q.   The authors state that an association with

15   DLBCL cannot be ruled out.

16       A.   Okay.

17       Q.   Correct?

18       A.   Right.

19            MR. HABERMAN:  Objection.

20       A.   That's --

21       Q.   You say that this study is evidence of

22   causation, right?

23       A.   Well, my -- again, in my training, my

24   understanding is that if 1 is not in the confidence

25   interval, it's statistically significant, and I
```

1    think you and I both agreed to that last time.  So

2    1.02 is higher than 1; therefore, it's my opinion,

3    based upon my understanding of statistics, and I'm

4    not a statistician, but my understanding is that

5    Boffetta has in fact showed us that there is a

6    statistically significant association of glyphosate

7    with NHL, and his comment is it can't be ruled out.

8    I would go one step further and say, at least in his

9    study, it's been ruled in.

10    Q.   You would go one step further than the

11    authors of this study and say that they actually

12    have found evidence for causation between glyphosate

13    and DLBCL, true?

14    A.   Well, yes, because it's not 1.00.  It's

15    1.02, and maybe, again, that's too close to 1 for

16    him, but for me, who is not a statistician, we can

17    ask the statisticians, but that proves a

18    statistically significant association.

19    Q.   That is more than the authors were willing

20    to say, correct?

21         MR. HABERMAN:  Objection.

22    A.   Well, you --

23         MR. HABERMAN:  The document speaks for

24    itself.

25    A.   Yeah, the document speaks for itself, right.

Andrew M. Schneider, M.D.

```
 1              MS. ROSS:  Counsel, I'd appreciate it if
 2        you'd limit your objections to form and not coach
 3        your witness.
 4        A.   He's not coaching me.  Come on.  I'm doing a
 5   good job myself.  I don't need any coaching.
 6        Q.   You don't, that's right.
 7        A.   I don't.
 8        Q.   Thank you, Dr. Schneider.
 9        A.   Thank you.
10        Q.   For CLL there was not evidence of an
11   increased risk and there was not evidence of
12   causation in Boffetta, correct?
13        A.   I have to look.  Can you point me to the CLL
14   data?  I don't see it right off the top of my head.
15        Q.   The very same paragraph we were just
16   reading, the first paragraph in the article.
17        A.   Okay.  Correct, but I don't know how many
18   cases he had and what data he used.  I'll have to
19   look at Table 1.
20              That's his comment, correct.
21        Q.   In this meta-analysis of the data on CLL,
22   there is no evidence for an increased risk.  What is
23   your evidence of causation if all of the evidence
24   together in a meta-analysis shows no evidence for an
25   increased risk?
```

Andrew M. Schneider, M.D.

```
 1        A.    That was too hard a question.  Do it slowly

 2    and break it down for me, please.

 3        Q.    Sure.  In this meta-analysis of all of the

 4    data for CLL, there is no evidence for an increased

 5    risk, correct?

 6        A.    That's correct.

 7        Q.    If all of the evidence together --

 8        A.    From this article or in the world of

 9    evidence?

10        Q.    So you told us before that meta-analysis is

11    a tool for combining data from multiple studies,

12    right?

13        A.    Correct.

14        Q.    So in this meta-analysis --

15        A.    Sorry.  Do you mean in Boffetta's

16    meta-analysis?

17        Q.    Yes.

18        A.    Thank you.

19        Q.    Okay.  In Boffetta's meta-analysis in 2021,

20    if all of the evidence together shows no increased

21    risk for CLL, what is your evidence of causation?

22        A.    It doesn't come from this article, it comes

23    from other articles, and I already critiqued the way

24    he did his meta-analysis.

25        Q.    If you will go with me back to the same
```

1    paragraph we were looking at in the abstract that

2    summarizes the data --

3        A.   Yes.

4        Q.   -- the meta-RR or meta-relative risk for

5    follicular lymphoma was .84 with a 95 percent

6    confidence interval of .61 to 1.17, correct?

7        A.   Yes.

8        Q.   Boffetta's results for follicular lymphoma

9    showed no increased risk, correct?

10       A.   Correct.

11       Q.   Does Boffetta 2021 include data from

12   Andreotti 2018?

13       A.   I don't see that.

14       Q.   Boffetta also included Pahwa 2019, right?

15       A.   Which was a pooled analysis, correct, and

16   the --

17       Q.   Do you remember whether Zhang 2019 included

18   Pahwa?

19       A.   Let's just look.  I don't want to make it a

20   memory test.  Can you show it to me?

21       Q.   We will do that if we have time,

22   Dr. Schneider.

23       A.   Okay.  Sure.

24       Q.   Boffetta -- withdrawn.

25            New question:  Are you aware of any

Andrew M. Schneider, M.D.

1    published meta-analysis that actually did include

2    all of the AHS data from Andreotti 2018?

3        A.   So the way I'm going to answer the question

4    is, since you make it a memory contest, is I'm going

5    to go through each of the ones I know and then maybe

6    you can help me and show me them, or else I'll do it

7    from memory, but I -- if I'm wrong, it's because I'm

8    memorizing.  Okay?  To be fair.

9             So let's go through the meta-analysis I

10   know.  How's that?  And then --

11            So there is Schinasi, and I think -- is it

12   Leo or Leon?  There is Zhang, there is the IARC,

13   there is Donato, there is Rana.  Maybe I'm missing

14   some, so...

15       Q.   Does Kabat 2021 ring any bells?

16       A.   You have to show me.  I've already told you

17   I didn't memorize names.  Would you be willing to

18   show me?

19       Q.   Did you do a --

20       A.   No.

21       Q.   -- Google search for glyphosate and

22   meta-analysis and non-Hodgkin's lymphoma?

23       A.   No.

24       Q.   Did you do any Google searches for

25   glyphosate and meta-analyses of non-Hodgkin's

1    lymphoma?

2        A.   No.  I was given the meta-analyses, so I

3    didn't have to do any further searches.  I have at

4    least four to six of them I reviewed.

5        Q.   Exhibit 42 to your deposition is Eriksson

6    2008.

7        A.   Yep.

8        Q.   This is an article that you are familiar

9    with and you reviewed, right?

10       A.   Correct.

11            (Schneider Exhibit 42 was marked for

12   identification.)

13   BY MS. ROSS:

14       Q.   Dr. Schneider, Eriksson 2008 was conducted

15   in Sweden, correct?

16            MR. HABERMAN:  Can you repeat the question?

17       I didn't hear that.

18       A.   It was, correct.

19            MR. HABERMAN:  I'm sorry.  I didn't -- I

20       didn't hear the question.  Can you just repeat

21       it?

22            MS. ROSS:  Sure.

23            THE WITNESS:  She wants to know if Eriksson

24       was in Sweden, and it was.

25            MR. HABERMAN:  Oh, okay.

1     BY MS. ROSS:

2         Q.   If you will go with me to Table VII,

3     Dr. Schneider, that's, I think, on page 1661.

4         A.   Okay.

5         Q.   Do you see that Table VII of Eriksson

6     reports the odds ratios for glyphosate adjusted for

7     other pesticides?

8         A.   I do.

9         Q.   Okay.  The univariate analysis for

10    glyphosate was an odds ratio of 2.02 that was

11    statistically --

12        A.   You're going to have to go slower for me so

13    I can find it.  I'm sorry.

14        Q.   Absolutely.  Table VII.

15        A.   What -- which one are we looking at, to

16    start with, so I know?  Which category, B-cell

17    lymphoma or lymph -- what are we looking at?

18        Q.   Table VII.  I think you're in Table VI.

19        A.   Ah, thank you.

20        Q.   No problem.

21        A.   Okay.  Yes.

22        Q.   Okay.  Table VII of Eriksson gives

23    multivariate and univariate analysis for different

24    agents.  Do you see that?

25        A.   I do.

1    Q.   The unadjusted univariate analysis for

2  glyphosate is 2.02 and statistically significant,

3  right?

4    A.   Correct.

5    Q.   The adjusted odds ratio for glyphosate is

6  1.51 and not statistically significant, right?

7    A.   Correct.

8    Q.   The 95 percent confidence interval includes

9  1.0, true?

10    A.   Correct.

11    Q.   Eriksson 2008 did not report a statistically

12  significant increased risk of NHL with glyphosate

13  use when adjusted for other pesticides, true?

14    A.   You've got to give me a little bit of time

15  to look that up, two minutes, three minutes.

16    Q.   Okay.

17    A.   Thank you.

18         Well, it depends on the days of exposure.  I

19  think when you have greater than 10 days of

20  exposure, it was significant.

21    Q.   You're talking about Table II from Eriksson

22  on page 1659, right?

23    A.   I've got to look.  Yes.

24    Q.   Table II of Eriksson gives odds ratios for

25  less than and equal to 10 days and greater than 10

1    days, correct?

2        A.   Correct.

3        Q.   Eriksson 2008 conducted subgroup analyses

4    based on days of glyphosate-based herbicide

5    exposure, right?

6        A.   Right.

7        Q.   Eriksson 2008 subgroup analyses split

8    glyphosate users into less than or equal to 10 or

9    greater than 10 days, right?

10       A.   Right.

11       Q.   Nothing in Eriksson 2008 indicates they are

12   talking about days per year as opposed to overall

13   days, right?

14       A.   Correct.

15       Q.   In Eriksson 2008 there were 18 -- I'm sorry.

16            New question:  In Eriksson 2008 there were

17   17 cases and nine controls that had greater than 10

18   days of exposure, right?

19       A.   You've got to show me where you're reading

20   at.  I see.  Okay.  17 cases and nine controls,

21   that's correct.

22       Q.   There was wide overlap in the confidence

23   interval between those exposed to glyphosate for

24   less than or equal to 10 days and greater than 10

25   days, correct?

Andrew M. Schneider, M.D.

1      A.   Correct.

2      Q.   There is no reported p for trend in Eriksson

3  comparing less than and greater than 10 days of

4  glyphosate use, right?

5      A.   I don't think you need a p-value when you

6  are looking at confidence intervals because if 1 is

7  not included, then it's statistically significant, I

8  believe, with a p-value of less than .05.

9      Q.   Do you -- we talked a little bit before

10  about p's for trend showing an increased risk with

11  increasing exposure.  Do you recall that?

12      A.   I do.

13      Q.   Can you say that you have any statistical

14  evidence that the two groups we're talking about

15  here, less than or equal to 10 lifetime days and

16  greater than 10 lifetime days in Eriksson 2008, have

17  different risk?

18      A.   Yes.  Yes.  One, the first one, less than 10

19  days, does not -- includes 1, and greater than 10

20  days does not include 1, so, therefore, greater than

21  10 days is statistically significant.

22      Q.   And in your view that means that the two

23  groups are also different from each other?

24      A.   What do you mean by different?

25      Q.   Are they statistically the same or

Andrew M. Schneider, M.D.

```
 1    statistically different?

 2       A.   I'm sorry, I don't understand your question.

 3       Q.   Okay.  That might be a better question for a

 4    biostatistician --

 5       A.   No, I just don't think I know what you're

 6    asking.

 7       Q.   So when there is overlap in the confidence

 8    intervals between two groups --

 9       A.   What do you mean by overlap?

10       Q.   What we see here.  So one confidence

11    interval is .7 to 4.

12       A.   Yes.

13       Q.   The other confidence interval is 1 to --

14    1.04 to 5.37.

15       A.   Yes.

16       Q.   When there is overlap of that type between

17    confidence intervals, do you know one way or another

18    whether from a statistical standpoint you can say

19    that the estimates are different or the same?

20       A.   My understanding is you can.

21       Q.   The odds ratios for less than or equal to 10

22    lifetime days and greater than 10 lifetime days in

23    Eriksson were not adjusted for other pesticides,

24    correct?

25       A.   Correct.
```

1    Q.   Eriksson 2008 included odds ratios for

2  subtypes of non-Hodgkin's lymphoma.  That's Table

3  VI, I think, that you were mentioning before.

4    A.   Yes.

5    Q.   Are you relying on the data from Eriksson

6  2008 for subtypes?

7    A.   Well, we could talk -- again, I'm relying on

8  everything, so we can talk about it and -- would you

9  like to talk about it?

10   Q.   If subtype data are available in a Roundup

11 epidemiologic study, you would consider both the

12 subtype data and the overall data, correct?

13   A.   I'd look at everything, correct.

14   Q.   In Table VI there are values reported for a

15 number of different types of lymphoma, including CLL

16 and DLBCL, right?

17   A.   Table VI?

18   Q.   Yes, Roman numeral VI.

19   A.   Yes.  I don't see -- I don't see the

20 glyphosate.  Am I missing it?  Fungicides,

21 Impregnating agents, Chlorophenicols [sic], Creosote

22 and Other.  I don't see glyphosate there.  Am I

23 missing it?

24   Q.   Try Table III.

25   A.   Okay.

Andrew M. Schneider, M.D.

```
 1        Q.   I think glyphosate is the second to last

 2   column.

 3        A.   Thank you.  You had me looking at the wrong

 4   table, just for the record.  VI doesn't have that,

 5   so it's Table III I have to look at.  Okay.  Thanks.

 6        Q.   Are you looking at the right table now?

 7        A.   I am now.  Thank you.

 8        Q.   Absolutely.  There --

 9        A.   Wait.  Can I -- can I look at it?

10        Q.   Of course.

11        A.   Thank you.

12             So I'm ready for a question.

13        Q.   The odds ratio for glyphosate and CLL in

14   Eriksson was statistically significant, correct?

15        A.   Correct.

16        Q.   The odds ratio for glyphosate and DLBCL was

17   not statistically significant, correct?

18        A.   Correct.

19        Q.   There is not evidence of an increased risk

20   for DLBCL in Eriksson 2008, correct?

21        A.   Correct.

22        Q.   There is, I take it, in your view, evidence

23   for an increased risk for glyphosate in CLL based on

24   the 95 percent confidence interval in Eriksson?

25        A.   I think you'd have to agree with me.  Yes.
```

Andrew M. Schneider, M.D.

1      Q.   I am asking for your opinion --

2      A.   Yes, I mean, clearly.  You said it.  It's

3   3.35 with a confidence interval of 1.42, 7.89, so

4   that's statistically significant.

5      Q.   Table III of Eriksson gives numbers for the

6   total number of cases, right?

7      A.   I think so, yes.

8      Q.   Do you see anything in Table III of Eriksson

9   that gives information for the total number of

10  exposed cases?

11     A.   I'd have to go back and read the article to

12  see what n means, unless you can point to me where

13  it says what n means.  I don't have memorized

14  whether the n is controls, exposed.  I don't know

15  what n means.  Does it say?  I have to read the

16  article.

17     Q.   I don't want you to guess.

18     A.   I have to read the article, if you want me

19  to.

20     Q.   Okay.  You can set that aside.

21          (Schneider Exhibit 43 was marked for

22  identification.)

23  BY MS. ROSS:

24     Q.   Exhibit 43 to your deposition is De Roos

25  2003.  Are you familiar with this article?

1      A.   I'm familiar with -- I'm very familiar, yes.

2      Q.   De Roos 2003 is an article

3   entitled "Integrative assessment of multiple

4   pesticides as risk factors for non-Hodgkin's

5   lymphoma among men."

6           Do you see that?

7      A.   I do.

8      Q.   De Roos 2003 looked at some of the North

9   American case-control studies of glyphosate and

10  non-Hodgkin's lymphoma, right?

11     A.   Yes.

12     Q.   De Roos 2003 limited their analysis to men

13  and excluded women, correct?

14     A.   Correct.

15     Q.   De Roos 2003 talks about two different

16  models that they use, a hierarchical model and a

17  logistic regression, right?

18     A.   Yes.

19     Q.   In the abstract they discussed those methods

20  a little bit.

21     A.   Uh-huh.

22     Q.   In the last part of the methods do you see

23  where they say:  Adjusting the estimates based on --

24     A.   I'm -- you have to show me where.

25     Q.   Sure.  Abstract.

1       A.   Oh, abstract.  Wait.  Okay.  Under Results

2   or Conclusion?

3       Q.   Methods.

4       A.   Methods.  Okay.  Go ahead.

5       Q.   So they talk about adjusting the estimates

6   based on a prespecified variance to make them more

7   stable.  Do you see that?

8       A.   Let me read that.  Okay?

9       Q.   Sure.

10      A.   Okay.  I see that, yes.

11      Q.   There is a discussion a little bit further

12  down in the first page of the article, third full

13  paragraph.

14      A.   I'm sorry.

15      Q.   The paragraph starts "In principle..."

16      A.   Yes.

17      Q.   They state:  Hierarchical regression

18  models --

19      A.   I'm sorry.  I've got to find -- okay.  Yeah,

20  I got it.  Yep.

21      Q.   -- also known as multilevel or multistage

22  models, allow the researcher to specify prior

23  distributions for multiple effect parameters of

24  interest, for example, pesticides effects, and to

25  adjust the observed likelihood estimates towards

1    those prior distributions with the objective of

2    obtaining increased precision and accuracy for the

3    ensemble of estimates.

4            Did I read that correctly?

5        A.    Your English was perfect.

6        Q.    Which is more reliable, a logistic

7    regression or a hierarchical regression?

8        A.    It depends who you ask.  I've read data both

9    ways.  The problem is that, I think with the

10   exception of this article, everybody else did a

11   logistical regression, so it may be hard to then --

12   to interpret this study with other studies.  There

13   is error doing it both ways.

14           And I'm not a statistician, so my answer is

15   that I think it's better asked to a statistician,

16   but I believe there are errors in both ways, and I

17   think if you are going to look at a hierarchical

18   regression analysis in one and everything else is

19   going to be a logistic, that is going to cause

20   problems in evaluating data together.

21       Q.    If you will turn to Table 3 of De Roos with

22   me, Table 3 gives effect estimates for use of

23   various pesticides and NHL incidence, right?

24       A.    Yes.

25       Q.    For glyphosate the logistic regression odds

1    ratio was 2.1 --

2        A.   I'm sorry.  I'm -- what table are you on?

3        Q.   Table 3.

4        A.   I'm on the wrong table.  Sorry.

5        Q.   No problem.  And there's -- so this is

6    broken into insecticides and herbicides.  Glyphosate

7    is about halfway through the herbicides, if you are

8    looking for it.

9        A.   Yep.  Okay.  So let me just find it.

10   Herbicides, glyphosate.  Okay.  I'm with you.

11       Q.   Dr. Schneider, do you also have

12   Dr. Weisenburger's table summarizing the

13   glyphosate --

14       A.   I do this for reference so I can try to keep

15   myself organized, yes.

16       Q.   Glyphosate is about halfway down the

17   herbicides in Table 3.

18       A.   I got it.  I see it.

19       Q.   The logistic regression was 2.1 and

20   statistically significant, correct?

21       A.   Correct.

22       Q.   The hierarchical regression was 1.6 and not

23   statistically significant, correct?

24       A.   Correct.

25       Q.   The number of exposed cases for glyphosate

```
1    was 36 in De Roos 2003, correct?
2        A.   Correct.
3        Q.   You also reviewed a study by McDuffie and
4    colleagues published in 2001, correct?
5        A.   So are we done with this study?
6        Q.   Yes, you can set it to the side.
7        A.   No further questions?
8        Q.   None for now.
9        A.   Okay.  Oh, do you want to give me the study,
10   McDuffie?
11       Q.   You reviewed that study, correct?
12       A.   I did, I know it well, but I'd like to see
13   it.
14       Q.   Absolutely.
15            (Schneider Exhibit 44 was marked for
16   identification.)
17       A.   Thanks.
18       Q.   Exhibit 44 to your deposition is a study by
19   McDuffie published in 2001 titled "Non-Hodgkin's
20   Lymphoma and Specific Pesticide Exposures in Men,"
21   correct?
22       A.   Yes.
23       Q.   This is from the Cross-Canada Study of
24   Pesticides and Health, right?
25       A.   Correct, the same Canada people who didn't
```

1    look at the study when they did their review,

2    correct.

3        Q.    This is a study in Canada, right?

4        A.    Same Canada that didn't mention this study

5    in their treatise, correct.

6        Q.    Canada is not the United States, right?

7        A.    No, this is Canada.

8        Q.    What are you relying on from the McDuffie

9    Cross-Canada Study of Pesticides and Health?

10       A.    Right.  Well, I think it's summarized for my

11   ease.  For greater than two days per year, the

12   relative risk was 2.12 with a confidence interval of

13   1.2 to 3.73.

14       Q.    And for that you are reading from

15   Dr. Weisenburger's table summarizing the Roundup

16   epidemiology, correct?

17       A.    So I'm just reading from that to make my

18   life easier, rather than going to dig it up here.

19   I've read the article, I can find it, but this kind

20   of is a nice summary of the numbers, and the numbers

21   will speak for themselves.  They're not made up.

22       Q.    If you will go with me to Table 1,

23   Dr. Schneider, and tell me when you are there.

24       A.    I'm there.

25       Q.    Table 1 gives a variety of demographic and

1    antecedent personal medical, and other exposures.

2    Do you see that?

3        A.   I do.

4        Q.   A personal medical history of a previous

5    cancer was associated with an odds ratio of 2.43 --

6        A.   I'm sorry.  Where are you looking?

7        Q.   Medical history.

8        A.   Okay.  Got it.  Previous cancer, yes.  Okay.

9    So 73.  Okay.  I'm listening.

10       Q.   A personal history of cancer was associated

11   with an odds ratio of 2.43 that was statistically

12   significant, right?

13       A.   That's what it says, correct.

14       Q.   Mr. Pleu had a personal history of cancer

15   when he was diagnosed with NHL, right?

16       A.   Correct, but the answer is that we need to

17   look at what kind of cancers they were, and, you

18   know, some cancers may predispose to lymphomas and

19   others not, so I think it's important to look at

20   what the cancers were.

21       Q.   Mr. Pleu would fall into the group in

22   McDuffie 2001 that had an increased risk of NHL

23   based on previous cancer history, right?

24       A.   So I've got to, just for fairness, because

25   it's been a while, I don't remember the year of his

1    prostate cancer.  Can I look that up or do you want

2    to tell me?

3        Q.   He was diagnosed with colon cancer in the

4    1980s.

5        A.   Got it.  Oh, right.  So that's an entirely

6    different matter.  We had a lengthy discussion and

7    that, to me, speaks for the -- an inherited

8    microsatellite instable syndrome and has nothing to

9    do with lymphoma.

10       Q.   In your view, Mr. Pleu's likely

11   microsatellite instability, which predisposed him to

12   colon cancer, has nothing to do with his development

13   of non-Hodgkin's lymphoma; is that right?

14       A.   Absolutely.  I think, as a trained

15   oncologist, as a board certified oncologist and

16   someone who has studied this for 33 years, when you

17   see someone with colon cancer at the age of 30, that

18   speaks to a strong possibility of a familial problem

19   and the problem has been identified as

20   microsatellite instability, or MSI, and these

21   patients have a high likelihood of developing colon

22   cancer and this is why he developed it at such a

23   young age, and it has nothing to do with CLL.

24       Q.   In your view, Mr. Pleu should

25   undergo genetic testing to identify his

1    microsatellite instability but has not done that to

2    date, correct?

3        A.   Well, I don't think it's my job to make

4    recommendations for Mr. Pleu's healthcare, but my

5    job is to give causation opinions about his use of

6    glyphosate and his development of CLL, and I stand

7    here today with a very strong opinion, to a

8    reasonable degree of medical certainty, that his

9    colon cancer at age 30 had nothing to do with his

10   development of CLL, but, in fact, the CLL was a

11   direct result of his glyphosate.

12       Q.   Regardless, Mr. Pleu would fall into the

13   group in McDuffie 2001 that had an odds ratio of

14   2.43 that was statistically significant based on his

15   personal previous history of cancer, right?

16       A.   Correct, but that's meaningless when we

17   don't know what these cancers were, and in fact for

18   Mr. Pleu, we know that his colon cancer had nothing

19   to do -- his CLL had nothing to do with his colon

20   cancer.  His colon cancer was a genetic mutation,

21   him being microsatellite unstable.

22       Q.   When the McDuffie authors chose to look at

23   different risk factors, they also looked at family

24   history of cancer in any first degree relative.  Do

25   you see that?

1      A.   I do.

2      Q.   The odds ratio was 1.31 and statistically

3  significant, correct?

4      A.   Let me just find that.  I'm sorry.  Yes.

5      Q.   McDuffie found an increased risk of NHL with

6  a family history of cancer in any first degree

7  relative.

8           Do you recall that Mr. Pleu has a sister who

9  had multiple cancers?

10      A.   I do.  Maybe that's all part of the MSI

11  problem.

12      Q.   Mr. Pleu falls into the group in McDuffie

13  2001 with a odds ratio of 1.31 and a statistically

14  significant increased risk of NHL based on family

15  history, right?

16      A.   Well, yes and no.  I would disagree strongly

17  and state that, you know, we have to look at the

18  data and then you want me to make an analogy.  This

19  is why you have me here as your expert, not just

20  anybody who can read statistical numbers.

21           This gentleman had a colon cancer at the age

22  of 30.  That is because he was MSI and he had a

23  genetic problem, nothing to do with CLL.  And in

24  fact, if you want to refresh my memory and tell me

25  what kind of cancers his sister had, I don't

Andrew M. Schneider, M.D.

1    remember.  We had a lengthy discussion last time

2    about another syndrome which we decided wasn't

3    relevant, but it's my opinion, to a reasonable

4    degree of medical certainty, that he does not fit

5    into this relative risk because his cancer -- and I

6    don't know what these cancers were and I don't know

7    how old they were when they had them, but his cancer

8    at age 30 was a genetic problem, that being

9    microsatellite instability.  He had loss of one of

10   the following proteins.  The proteins in question

11   are MLH1, MSH2, MSH6, PMS2, and EpCAM, E-p-C-A-M.

12   He had a loss of one of those proteins.

13        Q.   Mr. Pleu -- are you offering an --

14             New question:  Are you offering an opinion

15   to a reasonable degree of medical certainty that

16   Mr. Pleu had a loss of one of the following

17   proteins:  MLS1, MLS2, MLS6 --

18        A.   I think it -- no, MS --

19        Q.   I'm sorry.

20        A.   Can you say them again?  I think you

21   misspoke.

22        Q.   So tell me what --

23        A.   Do you want me to say them again?

24        Q.   -- what proteins you're talking about?

25        A.   MLH1.

Andrew M. Schneider, M.D.

1       Q.   Oh, MLH.  Okay.

2       A.   MS --

3       Q.   I was reading and it wasn't making sense to

4    me.

5       A.   MSH2.

6       Q.   Okay.

7       A.   MSH6, PMS2, and EpCAM, E-p-C-A-M.

8       Q.   Is it your degree to a -- is it your opinion

9    to a reasonable degree of medical certainty that

10   Mr. Pleu had a mutation in one of the proteins you

11   just mentioned?

12      A.   So we don't have that data to support my

13   opinion, but if you're asking what I think to a

14   reasonable degree of medical certainty, that is my

15   opinion based on the fact that he had colon cancer

16   at the age of 30, which is, as we all know, a very

17   young age to get colon cancer.  That speaks to a

18   genetic problem, and the most likely problem is a

19   deficiency in one of those proteins.

20      Q.   Mr. Pleu's sister had a number of cancers

21   that she was diagnosed with.  We talked about that

22   at length.

23      A.   I don't remember which they were, though.

24   Do you want to refresh my memory?

25      Q.   I will do my best.

```
 1      A.   Okay.

 2      Q.   I believe they were liver, lung, ovary, and

 3   we were not sure -- and bone, and we were not sure

 4   which of those were primary --

 5      A.   Right.  Yeah.  So liver and bone aren't

 6   primary, so -- did she have breast?  I don't

 7   remember.

 8      Q.   Ovary and lung.

 9      A.   Ovary and lung.  So I don't think those have

10   anything to do with MSI, nor do I think they have

11   anything to do with Roundup.

12      Q.   When a patient in McDuffie had a family

13   history like Mr. Pleu's, of cancer in any first

14   degree relative, they have an increased risk of

15   non-Hodgkin's lymphoma, true?

16      A.   Well, but again, true, but that's why I'm

17   here, to discuss the articles, as we said.  So, one,

18   do we know what kind of cancers they had?  Do we

19   know what age they had them?  And maybe these were

20   people who had cancers at the age of 40 or 50, and

21   I'm not sure what kind of cancers they were.

22           But for the individual case, and that's why

23   I'm here today, to equate the individual patients

24   with why he developed CLL, and I can tell you to a

25   reasonable degree of medical certainty it was not
```

Andrew M. Schneider, M.D.

1     because he had colon cancer at age 30.  In fact, he

2     had colon cancer at age 30 because he had a genetic

3     problem, that being MSI.

4          So, you know, I don't know the data here but

5     that's why you need someone like me to analyze this

6     data and tell you why it fits or it doesn't fit,

7     just like for any other confidence interval and

8     number.

9     Q.   Let's go to Table 2, which discusses

10    herbicides and frequency of exposure to herbicides

11    classified into major chemical classes.  Are you

12    there?

13    A.   Table 2, yes.

14    Q.   Glyphosate is one of the herbicides

15    discussed in Table 2 of McDuffie, correct?

16    A.   I've got to find this.  Give me a second.

17    Yes, I see it.

18    Q.   The number of exposed patients in McDuffie

19    2001 was 51, right?

20    A.   Yes.

21    Q.   This table gives information for NHL overall

22    and no subtype of NHL, correct?

23    A.   Correct.

24    Q.   None of the odds ratios in McDuffie 2001

25    were adjusted for other pesticides, correct?

```
1        A.   Not that I see, correct.

2        Q.   The more adjusted model in McDuffie 2001 is

3    the odds ratios with a superscript B.  Do you see

4    that?

5        A.   No.  I have to look.  Okay.  Yes.

6        Q.   Those --

7        A.   Wait.  Could you just give me a second to

8    read what that means.

9        Q.   Sure.  Yep.

10       A.   Okay.  Yes.

11       Q.   Those odds ratios with a superscript B in

12   McDuffie were adjusted for everything that the odds

13   ratios with the superscript A were, and then

14   significant medical variables, right?

15       A.   Yes.

16       Q.   The more adjusted odds ratio in McDuffie

17   2001 gives an odds ratio of 1.2 that's not

18   significant for glyphosate, correct?

19       A.   Right, but that's because they're now

20   looking at intensity of exposure.

21       Q.   So Table 8 in McDuffie 2001 gives data on

22   frequency of exposure to selected herbicides.  Are

23   you there?

24       A.   Table 8, yes.

25       Q.   You mentioned that the analysis we were just
```

Andrew M. Schneider, M.D.

1    looking at didn't take into account intensity of

2    exposure, right?

3        A.   Right.

4        Q.   The analysis in McDuffie that does take into

5    account intensity of exposure is in Table 8,

6    correct?

7        A.   I'm just trying to find glyphosate.  Where

8    is it?  I don't see it.

9        Q.   The third herbicide down --

10       A.   I got it.  Thank you.  Yes, I got it.  Thank

11   you.

12            Yes.  So we see that for greater than two

13   days in bold is a 2.12, which is statistically

14   significant, yes.

15       Q.   Those are the data from McDuffie 2001 that

16   you are relying on, right?

17       A.   Yes.

18       Q.   The data for glyphosate from Table 8 in

19   McDuffie that gives data for greater than two days

20   per year, that's what we're looking at, right?

21       A.   Yes.

22       Q.   Those data are not adjusted for other

23   pesticides, correct?

24       A.   Correct.

25       Q.   Those data are for NHL as a whole and no

1    subtype of NHL, right?

2        A.    Correct.

3        Q.    The greater than two days per year analysis

4    in McDuffie Table 8 is based on 23 exposed

5    glyphosate cases, right?

6        A.    I've got to look.  Yes.

7        Q.    Zhang 2019, I think, is one of the

8    meta-analysis --

9        A.    Are we done with this?

10       Q.    For now, yes.

11       A.    Okay.  Yes.  You want -- you want to give me

12   Zhang?  I know it well, but do you want to give it

13   to me?

14       Q.    Yes.  I'll ask the introductory question so

15   that our record is clear.  Okay?

16       A.    Sure.

17            THE WITNESS:  Can I go off the record for

18       one second?  How much time are we on the record?

19            THE VIDEOGRAPHER:  We're still on the

20       record.  Do we have an agreement to go off?

21            THE WITNESS:  I just wanted to know how much

22       time we were on the record.

23            MS. ROSS:  We do.

24            THE VIDEOGRAPHER:  Okay.  Off the record --

25            THE WITNESS:  How much time --

```
 1                THE VIDEOGRAPHER:  -- at 2:52 p.m.

 2            (Recess from 2:52 p.m. until 3:05 p.m.)

 3                THE VIDEOGRAPHER:  The time is 3:05 p.m.

 4        This begins Media Unit Number 3, and we are back

 5        on the record.

 6                (Schneider Exhibit 45 was marked for

 7        identification.)

 8    BY MS. ROSS:

 9        Q.   Dr. Schneider, Exhibit 45 to your deposition

10    is an article by Zhang, et al.

11                Do you see that?

12        A.   Yes.

13                (Schneider Exhibit 46 was marked for

14        identification.)

15    BY MS. ROSS:

16        Q.   And Exhibit 46 to your deposition is an

17    article by Andreotti and colleagues entitled

18    "Glyphosate Use in Cancer Incidence in the

19    Agricultural Health Study."  Right?

20        A.   Yes.

21        Q.   At your last deposition you told me you had

22    reviewed the Agricultural Health Study, right?

23        A.   Yes.

24        Q.   Tell me all of your criticisms of the

25    Agricultural Health Study.
```

1      A.   A few of them.  First of all, in the updated

2    analysis only 67 percent of people responded, and

3    they did an imputation.  And although some might

4    think that's okay, I think there's error in

5    imputation.  So I think I'm -- I have a problem with

6    that methodology, number one.

7           So number two, my understanding is that the

8    follow-up was only about eight-and-a-half years, and

9    that may be too short to see the lag time of, you

10   know, 10 to 15 to 30 years, so I think the follow-up

11   might be too short.

12          There may be others.  Let me think.

13          There is -- there may be some opportunity

14   for exposure misclassification.

15          And I think -- I could be wrong -- this is

16   the one where they cut it off at 2005?  So I don't

17   know what -- am I wrong or am I right about that?  I

18   think they cut it off in 2005.  Let me see if I'm

19   right.  Yeah, they did.  They truncated the

20   follow-up and cut it off in 2005.

21     Q.   Show me where you're looking at.

22     A.   Page 515.  Finally, we truncated cancer

23   incidence follow-up in 2005 to be concurrent with

24   the last exposure information.

25     Q.   Do you understand if that was a primary

1    analysis or an additional analysis that they did as

2    a sensitivity analysis?

3        A.    I mean, my understanding was that they

4    stopped looking after 2005 at the data.  Am I wrong?

5    That's my understanding.

6        Q.    Any other criticisms of the Agricultural

7    Health Study as we sit here?

8        A.    Give me a second.  They say:  Second,

9    because we evaluated many cancer sites for potential

10   associations with glyphosate use, we cannot dismiss

11   the possibility that these results were observed by

12   chance and thus should be interpreted with caution.

13       Q.    Do you agree with that?

14       A.    Well, I disagree with their -- with their

15   findings.  And I think, in my mind, one of the big

16   problems was the imputation.

17       Q.    What is the problem with imputation?  If you

18   were explaining that opinion to the jury, how would

19   you explain your criticism of the Agricultural

20   Health Study because of imputation?

21       A.    So they wanted to get data on the other 35

22   percent of people who didn't respond.  So they

23   imputed that data based upon averages and statistics

24   and likely exposures.

25             So when you do that, there's error because

Andrew M. Schneider, M.D.

1    you don't have the actual data.  So they're imputing

2    data, so that creates error.

3        Q.   What would they have -- what should they

4    have done instead?

5        A.   Well, I'm not a statistician, but maybe

6    because only 65 percent of people responded, not

7    publish your study.  You don't have the -- enough

8    data to do it.  I'm not saying that's what they

9    should have done because I'm not a statistician, but

10   I think imputing data creates error.

11       Q.   Are you familiar with other major

12   prospective cohort studies such as, for example, the

13   Framingham Study?

14       A.   Is it the heart study?

15       Q.   Yes.

16       A.   So, again, I've heard of it, but I've -- I'm

17   an oncologist.  I haven't read it.  And, again, I

18   know others have imputed.  I'm not saying that it's

19   never done.  I know it's done, but I think it

20   creates error.

21       Q.   Do you know one way or the other whether

22   imputation is an accepted biostatistical method for

23   dealing with missing data in a prospective study?

24       A.   I believe it is.  However, again, my job is

25   to take the totality of all studies, and this is the

Andrew M. Schneider, M.D.

1    only prospective study that imputed data.  I think

2    we all can see as ordinary people that there's error

3    in imputing data because you're making assumptions

4    which may or may not be true.

5         So for me, one, it was imputation of data.

6    Two, the looking forward was truncated.  Three, I

7    believe the latency period was only about

8    8.1-something years.  It's probably too short.  So

9    for me, this explains why it was a negative study in

10   that it didn't show an association of glyphosate

11   with NHL.

12   Q.   Any other criticisms of the Agricultural

13   Health Study that you intend to offer to the jury?

14   A.   I think that summarizes it.

15   Q.   What were the strengths of the Agricultural

16   Health Study, in your expert opinion?

17   A.   It's a prospective study, so prospective

18   studies are better than retrospective studies.  So

19   that's something good, but I think we negate some of

20   that goodness by not being able to get the data on

21   one-third of the patients.

22   Q.   What other strengths of the Agricultural

23   Health Study are you aware of?

24   A.   Large number of people.  I think in 2003

25   De Roos, it was only, like, 92 people, and I think

1    they added another 300, 400 people.  I forgot the

2    exact number.  It was four times.  And also they had

3    11 more years of follow-up.

4        Q.   For the Agricultural Health Study

5    publication we're looking at -- so you mentioned

6    there was an earlier publication of the Agricultural

7    Health Study by De Roos and colleagues, correct?

8        A.   Correct.  I think we did that one already.

9        Q.   The Agricultural Health Study publication

10   that we're talking about right now was published in

11   2018, right?

12       A.   Yes.

13       Q.   The De Roos paper from 2003 was case-control

14   data, correct?

15       A.   Correct.

16       Q.   There is a De Roos paper from 2005 --

17       A.   Yes.

18       Q.   -- that was an earlier publication of the

19   Agricultural Health Study, correct?

20       A.   Correct.

21       Q.   That, too, was a negative study, right?

22       A.   Correct.

23       Q.   The 2018 publication of AHS was published in

24   the Journal of the National Cancer Institute.  Is

25   that a journal with which you are familiar?

Andrew M. Schneider, M.D.

```
 1      A.   Yes.

 2      Q.   If you'll follow along with me in the

 3   abstract, I'd like to go over some basics.  Okay?

 4      A.   Okay.

 5      Q.   Agricultural Health Study was --

 6      A.   Show me where you're reading from, so I

 7   know.

 8      Q.   Sure.  So take a minute to rereview the

 9   abstract, and then I'll ask you some questions about

10   this study.  Okay?

11      A.   Okay.

12      Q.   The Agricultural Health Study was a study of

13   over 54,000 pesticide applicators, true?

14      A.   True.

15      Q.   The Agricultural Health Study included

16   44,932 people who used formulated glyphosate, true?

17      A.   True.

18      Q.   At the beginning of the study, all 54,000

19   applicators filled out a survey on what pesticides

20   they used, right?

21      A.   Yes.

22      Q.   At enrollment AHS asked --

23      A.   I'm sorry.  Who asked?

24      Q.   At enrollment.

25      A.   Yes.
```

```
 1      Q.   AHS participants recorded the number of
 2   years and days per year they used Roundup, correct?
 3      A.   Correct.
 4      Q.   They were also asked about other pesticide
 5   use, right?
 6      A.   Yes.
 7      Q.   Enrollees in AHS were also asked about
 8   lifetime use; that is, whether they ever used
 9   glyphosate-based herbicides, correct?
10      A.   Yes.
11      Q.   The 54,000 applicators in AHS were also
12   asked specifics about how they used glyphosate-based
13   herbicides and other herbicides?
14      A.   Yes.
15      Q.   Applicators in AHS were asked if they mixed
16   or just applied pesticides, right?
17      A.   Yes.
18      Q.   Did they repair pesticide-related equipment,
19   correct?
20      A.   Yes.
21      Q.   Did they use protective equipment, right?
22      A.   Yes.
23      Q.   How they applied pesticides, correct?
24      A.   Yes.
25      Q.   Applicators filled out this questionnaire
```

Andrew M. Schneider, M.D.

1   when they were applying for renewal of their

2   license, correct?

3       A.   Yes.

4       Q.   You would expect licensed pesticide

5   applicators to have a reasonable idea of what

6   pesticides they used, right?

7            MR. HABERMAN:  Objection.

8       A.   I -- I --

9            MR. HABERMAN:  Speculation.

10      A.   I have no opinion on that.

11      Q.   Can you name any other study of Roundup and

12  non-Hodgkin's lymphoma that contained more detail on

13  how applicators applied Roundup than the

14  Agricultural Health Study?

15      A.   So as I told you before, I gave you

16  strength.  I gave you its weaknesses.  To me, the

17  biggest weakness was the imputation, and their

18  opinion is we can't rule out this is from chance.

19           So, again, I don't have it memorized,

20  obviously, the other studies.  We can go through

21  them one by one and see how they did it, but I will

22  give you this was the only prospective study.

23      Q.   The Agricultural Health Study used cancer

24  registries to assess whether someone had cancer,

25  true?

Andrew M. Schneider, M.D.

1        A.   Again, I'm sure it's all true.  I just -- I

2    just don't have it memorized.

3        Q.   So if you'll go to Page 510 with me, there's

4    the methods section for this paper.

5             Do you see that?

6        A.   I do.

7        Q.   Under Study Design, about halfway down, do

8    you see where it states:  Incident cancer diagnoses

9    were ascertained via linkage to cancer registries in

10   Iowa, enrollment through 2013, and North Carolina,

11   enrollment through 2012?

12       A.   Yes.

13       Q.   AHS used cancer registries to assess whether

14   someone had cancer, right?

15       A.   Yes.

16       Q.   AHS did not rely on questionnaires to

17   determine whether or not someone had cancer.  That

18   information was captured regardless of whether they

19   filled out a follow-up questionnaire, right?

20       A.   Yes.

21       Q.   When it comes to assessing cancer outcomes,

22   AHS did not lose patients to follow-up if they

23   didn't fill out a follow-up questionnaire, correct?

24       A.   I'm not sure that's true.  Can you show me

25   where it says that?

Andrew M. Schneider, M.D.

1      Q.   That's what the meaning of a cancer registry

2   is, right?

3      A.   I'm not sure your statement is true.

4      Q.   You're not sure one way or the other?

5      A.   I can't confirm your opinion is true.

6      Q.   Do you have an expert opinion on whether,

7   when it comes to assessing cancer outcomes, the

8   Agricultural Health Study lost patients to follow-up

9   if they didn't fill out a follow-up questionnaire?

10      A.   So I have to reread the entire -- if you are

11   asking me a specific question, I have to read -- to

12   answer that question, I have to read it again.

13      Q.   It would be misleading to describe the

14   Agricultural Health Study as having lost 37 percent

15   of participants to follow-up if all of these

16   participants had information for cancer outcomes,

17   correct?

18      A.   So my --

19           MR. HABERMAN:  Objection.

20      A.   So my understanding was they didn't complete

21   the questionnaire.  So they were unable to have the

22   data, so they imputed data.

23      Q.   Is it your understandings that there were

24   people who did not fill out the baseline

25   questionnaire?

1    A.   No.  We're talking about the follow-up

2    questionnaire.

3    Q.   AHS used a follow-up phone interview about

4    five years after enrollment, correct?

5    A.   Again, to be fair, just show me, because I

6    don't have these facts memorized.

7    Q.   Sure.  If you stay in the -- in the methods

8    section that we were just looking at, there's an

9    exposure assessment discussion, right?

10   A.   Yes.

11   Q.   There's then a statistical analysis section,

12   correct?

13   A.   Correct.

14   Q.   So I bet between you and I, we can figure

15   out where they talk about the questionnaire.

16   Let's --

17   A.   Sure.

18   Q.   -- see if we can take a look.

19   A.   I'll let you do it, and I'll just wait for

20   your question.

21   Q.   Sure.  Page 510, methods, study design.

22   A.   Give me one second.

23   Q.   Of the --

24   A.   Wait, wait, wait.  Give me a second to find

25   it.  510, right?  I'm ready.  Go ahead.

Andrew M. Schneider, M.D.

```
 1        Q.   Of the enrolled participants --

 2        A.   Where are you reading from?

 3        Q.   The sentence that begins:  Of the enrolled

 4   participants.

 5        A.   I've got to find that.  Where is it?

 6        Q.   Methods section --

 7        A.   I'm --

 8        Q.   -- study designs.

 9        A.   I'm trying to find it.

10        Q.   Third sentence.

11        A.   Third sentence.  Yes, I've got it.  Enrolled

12   participants, yes.

13        Q.   Of the enrolled participants, 63 percent

14   completed a follow-up phone interview approximately

15   five years after enrollment, right?

16        A.   Yes.

17        Q.   For 37 percent, a data-driven multiple

18   imputation procedure was used to impute pesticide

19   use since enrollment.

20        A.   That is true, but where does it say that?

21        Q.   I'm asking you --

22        A.   Oh.

23        Q.   -- as an expert offering opinions on this.

24        A.   Again, that is true, but just to be fair,

25   let's -- where does it say that?  It is true.  I
```

```
 1    believe that it's true, but since you were reading,
 2    let's just see where it says that.  Somewhere it
 3    says it, I'm sure.  I just don't remember where.  Do
 4    you see it?
 5        Q.   So I was asking you a question as someone
 6    who's offering opinions about this paper.  I wasn't
 7    reading from the paper.
 8        A.   Oh, okay.
 9        Q.   If you'd like to see where it says that
10    specifically --
11        A.   No.
12        Q.   -- I can show you.
13        A.   No.  I believe it's true, but, again, just
14    for the record, I'd never want to make this a memory
15    test.  So since I'm under oath, I'd rather just see
16    everything in writing before I say true.
17        Q.   There's a paragraph on the top of Page 510
18    on the right side, and about --
19        A.   I see it.
20        Q.   -- two-thirds through --
21        A.   Yeah.
22        Q.   -- do you see where it says --
23        A.   Right.  That's what I said before, correct.
24        Q.   Okay.  If you'll turn with me to Table 2 of
25    Andreotti, please, Dr. Schneider.
```

Andrew M. Schneider, M.D.

```
1        A.   Table 2.  Yes.

2        Q.   Table 2 is entitled "Cancer incidence in

3   relation to intensity-weighted lifetime days of

4   glyphosate use in the Agricultural Health Study."

5   Right?

6        A.   Yes.

7        Q.   That table begins on Page 512 and continues

8   on to Page 513, right?

9        A.   Yes.

10       Q.   The relative risks for non-Hodgkin's

11  lymphoma are on Page 513, correct?

12       A.   Yes.

13       Q.   For NHL overall, I think you mentioned that

14  there were several hundred cases for glyphosate.  We

15  could add up the different quartiles, but the faster

16  way to do it might be to go to Page 511, under the

17  results section.

18            Second paragraph of results, there is a

19  sentence that talks about the rate ratio and top

20  exposure quartile for NHL.  It's about a third of

21  the way into that paragraph.

22       A.   Okay.

23       Q.   It states:  N equals 440 exposed cases.

24       A.   It's in the first paragraph or second

25  paragraph?
```

```
 1      Q.   The second paragraph.

 2      A.   How far down?

 3      Q.   About a third of the way down.

 4      A.   Yes, I see it.

 5      Q.   There were 440 glyphosate-based herbicide

 6   exposed cases in Andreotti 2018, correct?

 7      A.   Correct.

 8      Q.   If you'll go back with me to Table 2 that we

 9   were just looking at, for the fourth quartile alone

10   for non-Hodgkin's lymphoma, there were 111 exposed

11   cases, correct?

12      A.   Just as an aside, one is non-Hodgkin's

13   lymphoma, the other is non-Hodgkin's lymphoma

14   B-cell.  So I guess -- is the first one not B-cell?

15   I don't -- I'm not sure what that means.

16      Q.   Taking NHL as a whole, there were 111 cases

17   in Q4, correct?

18      A.   Yes.

19      Q.   There were 103 cases in Q4 for NHL B-cell,

20   right?

21      A.   Correct.

22      Q.   Consistent with your understanding that

23   T-cell lymphomas are much rarer than B-cell

24   lymphomas, right?

25      A.   I'm impressed with you.  Very good.
```

Andrew M. Schneider, M.D.

1    Q.   For CLL, there were 27 cases in Q4, correct?

2    A.   Yes.

3    Q.   How many cases overall were there for CLL?

4    A.   Should we add up those numbers, is that the

5    way to do it?

6    Q.   Sure.

7    A.   I don't have a calculator.

8    Q.   Okay.  There are four quartiles and each of

9    them is over 25, right?

10   A.   Correct.

11   Q.   Fair to say over 100 cases of CLL?

12   A.   Correct.

13   Q.   For DLBCL there were 22 cases in Q4, right?

14   A.   Yes.

15   Q.   Or over 100 cases of DLBCL exposed to

16   glyphosate-based herbicides in AHS, right?

17   A.   Yes.

18   Q.   The relative risks for CLL for the Q4

19   exposure was .87 and nonsignificant, right?

20   A.   Correct.

21   Q.   The relative risk for NHL overall in Q4 was

22   .87 and nonsignificant, right?

23   A.   Correct.

24   Q.   Mr. Pleu would fall into the group in

25   Andreotti 2018 that had no increased risk of CLL or

1    NHL overall, right?

2        A.    Correct, but I've already told you why I

3    think that is.

4        Q.    For DLBCL there were -- the relative risk

5    for Q4 was .97 and nonsignificant, right?

6        A.    Correct.

7        Q.    The relative risks for DLBCL are below

8    1.0 for Q2 and Q4 and above 1.0 in terms of point

9    estimates for Q1 and Q3, right?

10       A.    Right.

11       Q.    In all quartiles the confidence

12   interval includes 1.0, right?

13       A.    Correct.

14       Q.    If you analyze data in a study multiple

15   ways, it's possible to get different point estimates

16   by chance, correct?

17             MR. HABERMAN:  Objection.

18       A.    Yeah.  I would leave that to a statistician.

19       Q.    One needs to look for trends in the overall

20   data, rather than just a single number, right?

21       A.    I don't understand your question.

22       Q.    Do you see that this study, unlike some of

23   the other others that we looked at, includes

24   information for a p for trend?

25       A.    Yes, but to be fair, so did Pahwa.

Andrew M. Schneider, M.D.

1    Q.   And the Ps for trend in Pahwa were not

2    statistically significant, correct?

3    A.   We'd have to look at the individual study.

4    I don't have it memorized.

5    Q.   For -- you -- do you have an expert opinion

6    one way or the other whether a standard statistical

7    way to measure trends is a p for trend?

8    A.   As we discussed before, I think it's one way

9    that's acceptable.  There are other ways, and again,

10   I think that this article is flawed because the

11   lag -- the latency is only eight-and-a-half years

12   and 37 percent of data was imputed.

13   Q.   A p for trend of less than .05 tells you

14   that higher exposure is associated with higher risk,

15   correct?

16   A.   I'm sorry.  Say that again slowly.

17   Q.   A p for trend --

18   A.   Yeah.

19   Q.   -- of less than .05 tells you that higher

20   exposure is associated with higher risk, correct?

21   A.   Yes.

22   Q.   A p for trend of greater than .05 means you

23   cannot say that higher exposure is associated with

24   higher risk, right?

25        MR. HABERMAN:  Objection.

Andrew M. Schneider, M.D.

```
 1        A.   Just let me clarify.  Your general

 2   statements are true, but, to me, not applicable to

 3   this study.

 4        Q.   In general --

 5        A.   Yes, in general.

 6        Q.   Okay.  So I'll ask the question again --

 7        A.   Sure.

 8        Q.   -- so it's clear that we're talking in

 9   general.  Okay?

10        A.   Okay.

11        Q.   In general, if a p for trend is greater than

12   .05, you cannot say that higher exposure is

13   associated with higher risk, correct?

14        A.   Correct.

15        Q.   On Page 515 in the discussion section, the

16   first sentence of the first full paragraph on that

17   page begins:  In our study.

18        A.   Yes.

19        Q.   Are you there?

20        A.   Yes, I am.

21        Q.   In our study, we observed no associations

22   between glyphosate use and NHL overall or any of its

23   subtypes.  This lack of association was consistent

24   for both exposure metrics, lagged and unlagged

25   analyses, after further adjustment for pesticides
```

Andrew M. Schneider, M.D.

1   linked to NHL in previous AHS analyses and when we

2   adjusted -- excuse me -- when we excluded multiple

3   myeloma from the NHL group.

4           Do you see that?

5   A.   We really should read the entire paragraph

6   into the record, if you want.

7   Q.   I'll --

8   A.   I see that.

9   Q.   -- stop there and ask my question.

10  A.   Okay.  Sure.

11  Q.   Okay.

12  A.   Do I see it?  The answer, yes, I see what

13  you say.

14  Q.   The statement by the AHS authors describing

15  their own study is true, right?

16  A.   I'm sorry.  Say again.

17  Q.   That statement --

18  A.   What's the --

19  Q.   -- by the AHS authors describing their own

20  study is true, correct?

21  A.   Okay.  I'll stop reading so I can understand

22  your question.

23          What statement?  Tell me the statement and

24  ask me -- you asked me if it's true?  Go ahead.

25  Q.   That the AHS authors observed no association

Andrew M. Schneider, M.D.

1    between glyphosate and NHL overall or any of its

2    subtypes, but that lack of association was

3    consistent for both exposure metrics, unlagged and

4    lagged analyses, after further adjustment for

5    pesticides linked to NHL in previous AHS analyses

6    and when they excluded multiple myeloma.

7        A.   So that's what they say, but, again, I

8    critiqued the study for the reasons I've said.

9        Q.   You do understand that the Agricultural

10   Health Study controlled for other factors that are

11   associated with non-Hodgkin's lymphoma, right?

12       A.   I do, but unfortunately for me, there is a

13   fatal flaw here in two -- in two points -- three

14   points.  One, follow-up wasn't long enough; two,

15   imputation of data; and three -- it will come to me

16   in a second.  Go ahead.

17       Q.   Dr. Schneider, you understand that the AHS

18   controlled for other factors that are associated

19   with NHL, correct?

20       A.   Ask me a specific factor.  I'll tell you if

21   they controlled for it.  How's that?

22       Q.   One of the factors that the AHS authors

23   controlled for was exposure to other pesticides,

24   right?

25       A.   Yes.

Andrew M. Schneider, M.D.

```
1        Q.   You have no criticism of the Agricultural
2   Health Study for adjusting for other pesticides, do
3   you?
4        A.   No.
5        Q.   There were a number of validation studies
6   performed by the authors of the Agricultural Health
7   Study over the years to determine whether their
8   results were reliable.  I did not see any of those
9   validation studies on your references.
10       A.   So I don't know -- I don't know what you're
11  talking about.  You have to show me.
12       Q.   Did you review any of the validation studies
13  from the Agricultural Health Study?
14       A.   I just reviewed this article here.  I'm
15  unaware of anything else.
16       Q.   For example, the AHS authors published their
17  data evaluating how well their imputation worked.
18  That's not on your reference list.  Did you review
19  that publication?
20       A.   Can you show it to me?
21       Q.   I'm asking if you reviewed that --
22       A.   I don't --
23       Q.   -- publication.
24       A.   I can't say whether I reviewed it without
25  seeing it, so I'm asking you to show it to -- I
```

Andrew M. Schneider, M.D.

1    don't even know if it exists.  So if you can show it

2    to me, show me it exists, and I'll tell you whether

3    I saw it or not.

4        Q.   Sitting here as an expert having your

5    deposition taken, do you recall reviewing any

6    studies published by the AHS authors that actually

7    evaluated how well their imputation method worked?

8        A.   So I reviewed many documents, as you know,

9    and I can't tell you one way or the other.  So I

10   would ask you, in the interest of fairness, to show

11   me it, and I'll tell you if I've seen it.

12       Q.   Since that's not on your reference list, we

13   can assume that you're not relying on any studies by

14   the AHS authors looking at their multiple imputation

15   methods for your opinion, correct?

16       A.   So for my opinion, to a reasonable degree of

17   medical certainty, this -- the Andreotti 2018 study,

18   I fully explained my opinions of why it's not a

19   reliable study.  So anything else isn't going to

20   change that.

21            You know, there's going to be error in

22   imputation.  The follow-up is truncated at 2005, and

23   the latency was only eight-and-a-half years, not

24   long enough.

25            I mean, we all agree that sometimes it takes

```
 1    between 15 and 20 to 30 years to see it.  In fact,
 2    if you remember, on our very first hour of our
 3    deposition, you showed me a graph, showed me that
 4    the incidence of lymphoma was going down.  And I
 5    explained to you that's because of the lag -- the
 6    latency period or the lag time.  So I think that's
 7    an important problem in this -- in this study.
 8        Q.   Nothing else is going to change your opinion
 9    that the Agricultural Health Study is fatally
10    flawed, right?
11        A.   I mean, you can show me whatever data you
12    want to --
13             MR. HABERMAN:  Objection.
14        A.   That's not fair.  Show -- you show me
15    something --
16             MR. HABERMAN:  Argumentative.
17        A.   Yeah.  Show me something, and we'll see.
18    Maybe you'll change my opinion.  I don't know.
19        Q.   What did you mean when you stated:  I fully
20    explained my opinions of why it's not a reliable
21    study, so nothing else is going to change that?
22             MR. HABERMAN:  Asked and answered.
23        A.   Yeah.  I don't think I -- if I said that,
24    then -- I think what I said was that since I don't
25    believe the follow-up is long enough, even if you
```

1    show me that the imputation method is good, I'm
2    still going to believe, as Dr. Schneider, a board
3    certified oncologist, that there's error in that
4    thing.
5         I think even the AHS agrees with me because
6    they even say in their article, we can't exclude
7    this is all from chance, so...
8    Q.   The AHS authors also published their data on
9    whether and to what extent --
10   A.   I'm sorry --
11   Q.   -- their --
12   A.   -- weather?  Not weather.  Atmosphere?
13   Q.   Are you listening?
14   A.   I heard "weather."  I was confused.
15   Q.   Right.  The AHS authors also published their
16   data on whether and to what extent their study was
17   subject to miscalculation.  That, too, is not on
18   your reference list.  I take it you're not relying
19   on that study?
20   A.   I'm not relying on it today, but if you want
21   to show it to me, we can discuss it.  I haven't seen
22   it.
23   Q.   The plaintiff lawyers didn't provide it to
24   you in preparing your opinions in this case, right?
25   A.   You've seen everything on my reliance list.

Andrew M. Schneider, M.D.

```
1      Q.   Would you want to review the published data
2   on the robustness of the Agricultural Health Study
3   before offering opinions on its limitations?
4      A.   I think the limitations we can't escape.  So
5   we can't escape an eight-and-a-half year latency.
6   It's too short.  We can't -- let -- you're -- I'm
7   going to try -- please.  We can't escape that.
8           We can't escape that it was truncated at
9   2005.  What would have happened if they followed it
10  more years?  Maybe we would have seen the lymphomas
11  arising because of the longer lag time that we need.
12          I'm not an expert on statistics.  So, again,
13  I do know, and I will acknowledge, that it's a sound
14  principle to do imputation, but I believe there's
15  still error in that.  So I'm open to see any data
16  you want to show me, and we can discuss it, and I'll
17  tell you whether it changes my opinion.
18     Q.   You mentioned two things in your answer.
19  One was eight-and-a-half years of latency, and the
20  other was that the study, in your view, was
21  truncated in 2005, right?
22     A.   Yes.
23     Q.   Show me where in Andreotti 2018 it states
24  that there was only eight-and-a-half years of
25  latency.
```

```
 1      A.   I don't know if it's here.  I may have read
 2   it in someone else critiquing it, but I believe
 3   that's a true statement.  And I can sit there and
 4   look through it if you want me to.  If it's not
 5   there, you can save us time, but I believe others
 6   have told me that.
 7      Q.   Others have told you that the latency in
 8   Andreotti 2018 was limited to eight years?
 9      A.   The median, the median, not the -- obviously
10   there's a range, but the median latency was
11   eight-and-a-half years.
12      Q.   Show me -- so, for example, the -- Andreotti
13   2018 includes a table on 20-year lag, right?
14      A.   Show me.  Where?
15      Q.   Sure.  Table 3.
16      A.   Yes.  Let's see, Table 3.  All right.
17      Q.   The analysis in Table 3 of Andreotti is
18   limited to those people who had at least 20 years
19   between when they began using glyphosate-based
20   herbicides and when they developed non-Hodgkin's
21   lymphoma, correct?
22      A.   Say it again.  I'm sorry.
23      Q.   The data in Table 3 of Andreotti 2018
24   includes data for only those patients who had at
25   least 20 years of lag between when they first
```

Andrew M. Schneider, M.D.

1    started using glyphosate-based herbicides and when

2    they developed non-Hodgkin's lymphoma, correct?

3        A.    Yes.

4        Q.    The data for NHL in that table shows no

5    evidence for an increased risk of NHL with

6    glyphosate-based herbicides, right?

7        A.    Correct.

8        Q.    The data for CLL in Table 3 shows no

9    evidence for an increased risk with glyphosate-

10   herbicides, correct?

11       A.    Correct.

12       Q.    The data for DLBCL shows no evidence for

13   increased risk with use of glyphosate-based

14   herbicides, correct?

15       A.    Correct.

16       Q.    For the other criticism you raised, I think

17   it was that the study was truncated, in your view,

18   in 2005 --

19       A.    Do you want me to -- do you want me to

20   respond to that, or I don't get a chance to respond

21   to your comments?

22       Q.    Right now I'm asking you my question.

23       A.    So you don't want to -- you don't want to

24   hear my response to what you just told me.  Okay.

25       Q.    What is your response?

Case 3:16-md-02741-VC    Document 15887-8    Filed 11/30/22    Page 181 of 214
Andrew M. Schneider, M.D.

1      A.   Okay.  Well, again, there may be some with

2      20-year lag, but most didn't.  The median was only

3      eight-and-a-half years.  For example, in the CLL,

4      the numbers are quite small, as you can see.

5           So, you know, I can't tell you that the

6      statistics is meaningful.  And a criticism of the

7      article is, again, that they did truncate the study

8      and that the median latency was eight-and-a-half

9      years.

10     Q.   For NHL overall there were more than 200

11     cases with 20-year lag, correct?

12     A.   Okay.  But that includes -- I think myeloma,

13     they include, and that shouldn't be included.  And

14     it includes follicular lymphoma.  So, yes, but --

15     Q.   For CLL there were 65 cases with 20-year lag

16     in Andreotti 2018, correct?

17     A.   Correct.

18     Q.   For DLBCL there were -- you're testing my

19     ability to do math in my head, Dr. Schneider.

20          New question.  Are you ready?

21     A.   I'm ready.

22     Q.   For DLBCL there were 50 cases in Andreotti

23     with 20-year lag, correct?

24     A.   Correct.  Small number.

25     Q.   For the 2005 data that you mentioned, I

1    think you pointed me to paragraph -- the first full

2    paragraph in the right column on Page 510, right?

3        A.   I don't remember.

4        Q.   Okay.  There's a discussion in the

5    discussion section, as there often is in an article,

6    of sensitivity analyses that they performed.

7            Do you see that?

8        A.   I mean, I would if you show me where it is.

9        Q.   Okay.  Page 515, first full paragraph on the

10   right.

11       A.   On the right.  It's prospective cohort

12   study?

13       Q.   Yes.

14       A.   Okay.

15       Q.   We expanded a previous analysis of

16   glyphosate use and cancer risk with more than 11

17   years of additional follow-up and more than four

18   times the number of glyphosate-exposed cancer cases.

19           Do you see that?

20       A.   I actually told you that before.  I

21   acknowledge that.

22       Q.   There is a discussion a little further down

23   of the imputation where they say:  We imputed

24   glyphosate exposure information for participants who

25   did not complete the follow-up questionnaire to

Andrew M. Schneider, M.D.

1    evaluate cancer risk in the full cohort.  Right?

2        A.    Correct.

3        Q.    The results for the full cohort, including

4    imputed data, were similar for those that did not

5    include imputed data, but only included people who

6    completed the follow-up questionnaire.  Right?

7        A.    That's what it says.

8        Q.    Finally, we truncated cancer incidence

9    follow-up in 2005 to be concurrent with the last

10   exposure information.

11            Do you see that sentence?

12       A.    I do.

13       Q.    In your view, that sentence means that for

14   all of the analyses in the Agricultural Health

15   Study, they truncated follow-up in 2005.  Am I

16   understanding that correctly?

17       A.    We truncated cancer incidence follow-up --

18   up in 2005 to be concurrent with the last exposure

19   information.

20            So unless you want to show me that it --

21   that they looked after 2005, I don't see it.

22       Q.    Yeah.  So the answer to my question is, yes,

23   in your view, when the authors are discussing

24   truncating data on -- in 2005 in Andreotti 2018,

25   that applies to all of the analyses in their paper

1    and not to the sensitivity analyses they did to

2    check multiple imputation, right?

3        A.   Right.  To be fair, this is getting very

4    statistical and maybe better asked of a

5    statistician, because I gave you my opinion as an

6    oncologist.  And if I'm wrong, you can show me where

7    I'm wrong, and I'll acknowledge that I'm wrong, but

8    I can't do any better than what I've done.

9        Q.   In your expert opinion, Andreotti 2018

10   truncated all of their analyses in 2005 and not just

11   their sensitivity analyses, right?

12       A.   I don't -- I don't know.  I believe that's

13   true, but I would defer that to a statistician, if

14   I'm wrong.

15       Q.   Would you want to review the published data

16   on the robustness of the Agricultural Health Study

17   before offering expert opinions on its limitations?

18       A.   No.  I mean, I would like to see it, and if

19   it changes my opinion, that's great, and I'll be the

20   first one to tell you that my opinion has changed.

21            But as we stand here today, this is my

22   opinion.  I can't imagine -- my opinion is also

23   shared by others, who are reputable, that there is,

24   you know, error in the imputation model.  I think

25   even a layperson could understand that, that if

1    you're making assumptions when you impute, then that

2    leads to error.

3        Q.   Do you know why the plaintiff lawyers didn't

4    provide you with those other articles so you could

5    assess whether they change your opinion?

6        A.   So that couldn't be a real question because

7    you -- you're asking me to guess or speculate?  How

8    could they know that they didn't give me something

9    when I didn't know it existed, right?  That's not a

10   fair question.

11       Q.   Exhibit --

12           MR. HABERMAN:  Objection; calls for

13       speculation.

14       Q.   Exhibit 45 to your deposition you have in

15   front of you as well.  This is the Zhang article,

16   correct?

17       A.   Yes.

18       Q.   Is this a meta-analysis that you reviewed

19   and relied on?

20       A.   Yes.

21       Q.   Did you find it to be compelling?

22       A.   I mean, I found it to be informative, and I

23   took it in a holistic approach with everything else

24   to look at.

25       Q.   What were the strengths of the Zhang

Andrew M. Schneider, M.D.

1    meta-analysis?

2    A.   It included -- give me a second to find it.

3         It included the studies that we've been

4    reviewing, that most people reviewed.

5    Q.   Table 4 might help you.

6    A.   I appreciate that.  Thank you.

7         Right.  So it included De Roos 2003, De Roos

8    2005, Andreotti 2018, Eriksson, Hardell, McDuffie,

9    and Orsi, really the major players of the studies

10   we've reviewed in the last 10 hours together.

11        So it also -- as opposed to the

12   meta-analysis of Chang and -- there was another

13   meta-analysis now that I'm losing already.  They

14   used the numbers which gave exposure, not just

15   ever/never.

16        So we do see some statistically significant

17   exposures; i.e., De Roos 2003, Eriksson 2008,

18   Hardell 2008, McDuffie 2001.  And they did not

19   negate Andreotti.  They included Andreotti, and they

20   included the earlier AHS study from 2005.

21        So in my mind, they fairly looked at the

22   available studies to reach their conclusions.

23   Q.   Okay.  That was a long answer, so I'm going

24   to break that down a little bit.  Okay.

25   A.   I'm allowed to give a long answer.

```
1      Q.   Yes.

2      A.   That's --

3      Q.   And I'm going to break it down.

4      A.   Okay.

5      Q.   Table 4 of Zhang summarizes the studies they

6  included, right?

7      A.   Yes.

8      Q.   Table 4 --

9           MR. HABERMAN:  The document speaks for

10     itself.

11     Q.   -- includes De Roos -- so new question,

12  because the record wasn't clear.

13          Zhang 2019 includes De Roos 2003 and

14  McDuffie 2001, right?

15     A.   I mean, I did that already, in all fairness.

16     Q.   Yes.  I'm breaking it up into separate

17  things.

18     A.   Well, I already answered that question.

19     Q.   So Zhang 2019 --

20     A.   And we're running out of time.  You want to

21  waste time?

22     Q.   -- includes De Roos 2003 --

23          MS. ROSS:  I'm sorry, Susan.  I'll ask my

24     question again.

25          THE COURT REPORTER:  That's all right.
```

Andrew M. Schneider, M.D.

1        Q.   Zhang 2019 includes De Roos 2003 and

2   McDuffie 2001, correct?

3        A.   I already answered that question.  Yes.

4        Q.   Zhang 2019 did not include Pahwa 2019,

5   correct?

6        A.   Correct.

7        Q.   Zhang 2019 did not include Leon 2019, right?

8        A.   Right.  And it shouldn't because those are

9   pooled analysis, where these are case-controlled or

10  cohort studies.  So I don't think a meta-analysis

11  should look at other pooled analysis.

12       Q.   If one were to repeat this meta-analysis

13  today with the most up-to-date data, do you know one

14  way or the other whether you'd want to substitute

15  Pahwa 2019 for De Roos '03 and McDuffie '01?

16       A.   So I already told you that --

17            MR. HABERMAN:  Objection.

18       A.   I mean, I already told you that since Pahwa

19  is a pooled analysis which relies on others, I think

20  it's better to use the original studies, which are

21  either case-controlled or cohort studies.

22       Q.   Do you know if De Roos 2003 was a pooled

23  analysis or an individual study analysis?

24       A.   Well, since not a memory test, show me, and

25  I'll tell you.  I can guess, but if I'm wrong, it's

1    because of memorizing.  We don't want me to guess,

2    right?

3        Q.   If you'll turn with me to Page 194 of the

4    Zhang article and tell me when you're there.

5        A.   I'm there.

6        Q.   One piece of what Zhang and colleagues did

7    was to evaluate study quality, correct?

8        A.   I saw that, yes.

9        Q.   According to the quality assessment of

10   Zhang, et al., the highest quality study in either

11   design category was the AHS 2018 cohort, right?

12       A.   That's a prospective study.  Correct.

13       Q.   Zhang 2019 report that Andreotti 2018 is the

14   highest quality of all the cohort and case-control

15   study they reviewed, right?

16       A.   Because it's a prospective study, but he's

17   commenting on the weakness of the study.

18       Q.   Do you agree with Dr. Zhang and her

19   colleagues that AHS is the highest quality of any

20   study on Roundup and NHL?

21       A.   Well, it depends how you define quality.  Do

22   you want to define it, or do you want me to define

23   it?

24       Q.   Can you answer my question?

25       A.   Yes.  We have to define the word "quality"

Andrew M. Schneider, M.D.

1    to answer the question.  So do you want me to define

2    it or do you want to define it?

3         Q.   Do you agree with Dr. Zhang that the

4    Agricultural Health Study is the highest quality of

5    any study on Roundup and non-Hodgkin's lymphoma?

6         A.   I'll answer it, then, based upon what I

7    think you're asking.

8              Because it's a prospective study, it's a

9    high quality study.  We all agree that prospective

10   studies have a higher quality than retrospective

11   studies.

12             However, there's -- as Dr. Zhang talks about

13   in this paper, there are the inherent problems with

14   the Andreotti study, which I already mentioned.

15        Q.   Are you aware that Dr. Zhang is a retained

16   expert for the plaintiffs in this litigation?

17        A.   One, I don't memorize who are retained

18   experts; two, I don't really care.  I evaluate each

19   article for what it's worth.

20             This appears in a peer-reviewed journal.  I

21   agree with the way he did the meta-analysis, as

22   opposed to people like Chang who actually also are

23   paid for the other side.  I believe he works for --

24   it starts with an E, Excel or Exidor.  So I believe

25   Chang is paid by people who are -- think that

Andrew M. Schneider, M.D.

1    Roundup doesn't cause NHL, and I disagree with

2    Chang's way he did his meta-analysis.

3           And similarly, we talked about Ofas [sic],

4    and he also, I believe, was a paid expert for the

5    other side, and I disagree with what he did.

6           So I don't keep track of who works for who.

7    I'm here to give independent opinions which are

8    unbiased based on my best ability as a medical

9    oncologist, not a statistician, not a toxicologist,

10   and not a veterinarian.

11       Q.   It doesn't matter one way or another to your

12   opinions whether someone served as a paid expert for

13   either side in this litigation in writing an

14   article, true?

15       A.   So for me, I'm not taking that into account.

16   I'm going to look at your data, see how you did it,

17   see what you said, and I'm going to -- maybe I'm

18   naive.  I hope all people are fair and honest and

19   aren't swayed by money.  I certainly am not.

20       Q.   You haven't reviewed any of Dr. Zhang's

21   testimony either at trial or at deposition in any

22   Roundup case, I take it; is that correct?

23       A.   I have not reviewed his deposition

24   testimony, correct.

25       Q.   What were the weaknesses of the Zhang 2019

Andrew M. Schneider, M.D.

1    analysis?

2       A.   It will take me a little bit of time to

3    recall that.  So I may have to read it for 10

4    minutes.

5       Q.   In your expert opinion, sitting here today,

6    without rereading the entire article, are you

7    available to identify any weaknesses in the Zhang

8    2019 meta-analysis?

9       A.   Give me three minutes to think about it, if

10   you'll let me.

11           MS. ROSS:  We'll go off the record for three

12      minutes.

13           THE WITNESS:  Stay on the record.  It's

14      okay.  How much time is left?

15           MS. ROSS:  Not much, which is why I'm asking

16      you --

17           THE WITNESS:  Okay.  How much time is left?

18           THE VIDEOGRAPHER:  Do we have an agreement

19      to go off the record?

20           THE WITNESS:  Yeah, yeah.

21           THE VIDEOGRAPHER:  We need an agreement.

22           MS. ROSS:  No.  Let's keep this on the

23      record.

24      A.   So we're on -- we're going to look at it on

25   the record?

Andrew M. Schneider, M.D.

```
 1       Q.   You were asking how much time was left in

 2   your deposition --

 3       A.   Okay.

 4       Q.   -- Dr. Schneider.

 5       A.   Okay.

 6       Q.   We're still on the record for that.

 7       A.   Okay.

 8       Q.   Then we'll go off the record for you to --

 9       A.   Okay.

10       Q.   -- reread this article --

11            THE WITNESS:  So how much time is left,

12       since you want to be on the record?

13            THE COURT REPORTER:  We've been on the

14       record 3 hours, 12 minutes, and 45 seconds.

15            THE WITNESS:  Okay.

16            MS. ROSS:  We'll go off the record for a

17       minute now.

18            THE WITNESS:  Thank you.

19            THE VIDEOGRAPHER:  Off the record at

20       3:48 p.m.

21            (Recess from 3:48 p.m. until 3:49 p.m.)

22            THE VIDEOGRAPHER:  The time is 3:49 p.m.,

23       and we are back on the record.

24   BY MS. ROSS:

25       Q.   Dr. Schneider, what are the weaknesses of
```

1    the Zhang 2019 analysis, in your expert opinion?

2       A.   So I'm not a statistician, so I'll give you

3    the best I can do, but I would probably defer that

4    to a statistician.

5            However, there was a discussion about the

6    fixed effect model versus the random effect model,

7    and which is better.  And so that may be a weakness

8    of the study.

9            Perhaps -- I did read in one of the things

10   you gave me here way back when, that someone

11   critiqued -- yeah -- Exhibit 40 critiques, actually,

12   Zhang for the way he did a fixed effect model versus

13   a random effect model, but that's not really

14   something I'm an expert in.

15           And maybe the other weakness is that I don't

16   know the extent of the latency that were used.

17      Q.   One weakness of Zhang is you don't know the

18   extent of the latencies that were used in their

19   study; is that right?

20      A.   Correct.

21           MR. HABERMAN:  Objection as to scope.

22      Q.   For your -- withdrawn.

23           New question:  Dr. Schneider, will you turn

24   back with me to Exhibit 35 here --

25      A.   I have 50 exhibits here.  Tell me what it

Andrew M. Schneider, M.D.

1    looks like.

2          THE COURT REPORTER:  They're in order.

3    Q.   They should be in order.

4    A.   Well, why don't you find it for me then?  Do

5    you want me to find it for me or do you want me to

6    look?

7    Q.   You can look.

8    A.   I have to get up there and dig through it.

9    Q.   There you go.

10   A.   See, thank you.  I asked you to help me.

11   Q.   I'll ask you a question before we get to

12   this document.

13   A.   Just for the record, I've never read this

14   document.

15   Q.   At your -- Dr. Schneider, at your last

16   deposition we learned that you received several

17   internal Monsanto Company documents.  Did you ask to

18   see those?

19   A.   No.

20   Q.   Do you know how those documents were

21   selected?

22   A.   No.

23   Q.   Do you know whether you were given a full

24   set of those documents?

25   A.   I don't understand that question.

1    Q.   Have you reviewed any testimony from any

2    Monsanto employee in this case?

3    A.   Testimony?  No.

4    Q.   Correct.  Exhibit 35 is this presentation by

5    the National Toxicology Program, Dr. Stephanie L.

6    Smith-Roe, correct?

7    A.   Yes.

8    Q.   The date on this is September 23rd, 2019,

9    correct?

10   A.   Correct.

11   Q.   If you'll turn with me to the very end of

12   this, there's an acknowledgment page at the very

13   end.

14        Do you see this?

15   A.   Yes.

16   Q.   There are folks acknowledged from the NTP

17   Biomolecular Screening Branch, right?

18   A.   That's what it says.

19   Q.   Four scientists there, correct?

20   A.   I don't know who they are, so I can't tell

21   you if they're scientists, but okay.

22   Q.   Three Ph.D.s and one with a master's in

23   science, right?

24   A.   I don't know what the master's of science

25   is, and I don't know what the Ph.D.s are in.

```
1        Q.   There are two scientists identified from the
2    Ron Mason Lab at the -- at NIEHS.  Do you know what
3    NIEHS stands for?
4        A.   No.
5        Q.   There's a scientist at NIEHS Biostatistics
6    and Computational Biology Branch that's another
7    Ph.D.?
8        A.   Yes.
9        Q.   There are -- one, two, three, four -- five
10   folks from ILS.  I take it you don't know what that
11   is, right?
12       A.   Correct.
13       Q.   Four of them have Ph.D.s, and then there's
14   someone with a bachelor's in science, right?
15       A.   One's a veterinarian, looks like.
16       Q.   Right.
17       A.   Yep.
18       Q.   There's also someone with a Ph.D. from the
19   NTP Associate Director's Office.  Do you see that?
20       A.   I mean, I can read as well as you can.  I
21   see it, yes.
22       Q.   Okay.  There are lots of people from the
23   National Toxicology Program acknowledged in this
24   presentation, fair?
25       A.   One, two, three, four, five, six, seven
```

Andrew M. Schneider, M.D.

```
1    eight, nine, ten, eleven, twelve -- 20 people.
2        Q.   That's 20 scientists involved in NTP's
3    assessment of glyphosate and glyphosate-based
4    formulations' genotoxicity, right?
5        A.   I don't know who they are, so I can't tell
6    you they're all scientists.  For example, Julie Rice
7    has a bachelor of science.  I don't know what her
8    degree is in.
9        Q.   There's a summary -- let's see, one, two,
10   three, four -- five pages in that says:
11   Revisiting --
12       A.   I'm sorry, where am I looking?
13       Q.   Five pages into this document.
14       A.   A document I've never seen before?
15       Q.   Correct.
16       A.   Okay.
17       Q.   Here, NTP discusses findings from IARC.  Do
18   you see that?
19       A.   No.  Maybe I'm not on the right page.  What
20   is it?
21       Q.   Okay.  Next page over, I think.
22       A.   Revisiting Glyphosate Testing at NTP?
23       Q.   Yes.
24       A.   Okay.
25       Q.   There's a rationale given for their testing.
```

Andrew M. Schneider, M.D.

1    Are you there?

2       A.   Okay.

3       Q.   Okay.  There are different interpretations

4    of the potential health effects of glyphosate

5    exposure with regulatory agencies concluding

6    glyphosate is unlikely to be carcinogenic and IARC

7    identifying glyphosate as probably carcinogenic to

8    humans, Group 2A).

9            Do you see that?

10      A.   I see it.

11      Q.   Here, NTP explains their rationale for

12   revisiting glyphosate testing, but you've never seen

13   this document before, right?

14      A.   I've never seen it, so I can't even answer

15   whether it's true because I really haven't had even

16   a chance to look at it or read it.

17      Q.   If you'll go to the next page, flip it over,

18   and the NTP In Vitro Testing Program, are you there?

19      A.   I'm not sure.  This page?

20      Q.   I'll help out.  Okay.  We're both now

21   looking at a slide that says, NTP In Vitro Testing

22   Program at the top, correct?

23      A.   Correct.

24      Q.   NTP states they're going to test glyphosate

25   and glyphosate-based formulations for genotoxicity

1    and induction of oxidative stress, which they

2    identify as key characteristics of carcinogens.

3         Do you see that?

4    A.    In all fairness, you asked me if I can read?

5    Of course I can see it.

6    Q.    Do you agree that genotoxicity and induction

7    of oxidative stress are key characteristics of

8    carcinogens?

9    A.    They can be, correct.

10   Q.    The plan of the National Toxicology Program

11   is to test glyphosate and glyphosate-based

12   formulations for genotoxicity and oxidative stress

13   and to test glyphosate and formulations side by

14   side, right?

15        MR. HABERMAN:  Objection.

16   A.    Yeah.  I mean, you haven't given me the

17   opportunity to -- do you want me to read this page

18   first so I can say correct?

19   Q.    Sure.

20   A.    Okay.

21        MR. HABERMAN:  The document states what it

22   states.

23        THE WITNESS:  Well, right, but she asked --

24   A.    Are you asking me to read or to interpret?

25   If you want me to read, I can read it.  If you want

1    me to interpret, I have to read it.

2        Q.   Dr. Schneider, go ahead and read the page.

3        A.   Okay.

4        Q.   NTP's plan was to test glyphosate and

5    glyphosate-based formulations side by side and to

6    test whether they induced genotoxicity or oxidative

7    stress, correct?

8        A.   Well, it says "Approach."  I don't know if

9    that's the plan.  I mean, this is an approach that

10   they -- I don't know if they did it, they were going

11   to do it.  I'm just reading for the first time.  It

12   says "Approach."

13       Q.   So go with me -- we were looking at the very

14   last page, which gives the acknowledgments.  Turn

15   one page prior to that, and there's a summary on

16   this slide of Glyphosate Vs. Glyphosate-Based

17   Formulations.

18            Do you see that summary?

19       A.   I do.  I've never read it before, but I see

20   it.

21       Q.   Take a minute to read it.

22       A.   Yeah.

23            THE WITNESS:  Can I go off the record -- or

24       on the record.  How much time is left?

25            THE VIDEOGRAPHER:  Ten minutes.

Andrew M. Schneider, M.D.

```
1              THE COURT REPORTER:  We've been on the
2       record --
3              THE WITNESS:  Okay.
4              THE VIDEOGRAPHER:  And we are still on.
5       A.    Okay.  We're on the record.  That's fine.
6   Let me read it and then I can --
7       Q.    Go ahead.
8       A.    Okay.  I read it.
9       Q.    In NTP in vitro studies, there was no
10  evidence that glyphosate, glyphosate IPA or AMPA
11  were genotoxic or that they induced oxidative
12  stress, correct?
13      A.    That's what it says, but, again --
14             MR. HABERMAN:  The document speaks for
15      itself; objection.
16      A.    That's what it says, but I don't -- you
17  know, I don't agree with that, but okay.
18      Q.    Having conducted their own testing and their
19  own studies, NTP concluded there is no evidence that
20  glyphosate, glyphosate IPA or AMPA are genotoxic,
21  true?
22      A.    You haven't shown me the studies.  You --
23             MR. HABERMAN:  Same objection.
24      A.    You haven't shown me the studies.  You're
25  showing a three-line statement which -- you know, I
```

Andrew M. Schneider, M.D.

1   see it says that but I don't know if it's true or

2   not.

3       Q.   When NTP talks about those studies, you've

4   not read the underlying studies by the National

5   Toxicology Program, correct?

6       A.   We already established that I know nothing

7   about the National Toxicology Program.  We've

8   established that you've given me this slide show for

9   the first time, and I just read three lines with no

10  supporting documentation.

11      Q.   Do you agree or disagree with NTP that

12  glyphosate is not genotoxic?

13      A.   My understanding is --

14           MR. HABERMAN:  Objection.

15      A.   -- from the data from IARC, from Weisburger

16  [sic], if I'm getting his name correct, and from my

17  fund of knowledge after studying this for a while,

18  that it's my opinion, to a reasonable degree of

19  medical certainty, as a trained, board certified

20  medical oncologist, that glyphosate is genotoxic.

21      Q.   You disagree with NTP that glyphosate is not

22  genotoxic, true?

23      A.   Right, but to be fair, I haven't even seen

24  their data.

25      Q.   Do you agree or disagree with NTP that

Andrew M. Schneider, M.D.

1    glyphosate does not induce oxidative stress?

2         MR. HABERMAN:  Asked and answered.  He

3    disagrees.

4    A.   Correct.

5    Q.   Genotoxicity and oxidative stress are

6    different concepts, correct, Dr. Schneider?

7    A.   Correct, correct.

8    Q.   Do you agree or disagree with NTP that

9    glyphosate does not induce oxidative stress?

10   A.   I disagree.

11   Q.   As far as your opinions are concerned,

12   you're offering the opinion that glyphosate is

13   genotoxic and induces oxidative stress?

14   A.   Right.

15   Q.   You acknowledge that your opinion is not

16   shared by the scientists at NTP who've evaluated the

17   toxicology of glyphosate, right?

18   A.   So I don't --

19        MR. HABERMAN:  Objection.

20   A.   I don't know anything about NTP.  I don't

21   know who these scientists are, and I've seen no

22   data.  You've given me, for the first time, a

23   document which is a slide show with no data and have

24   given me no opportunity to review it.

25   Q.   On the bottom of the slide --

1          MR. HABERMAN:  Well, let's go off the record

2     for a second so I can get a sense of how much

3     time is left.

4          MS. ROSS:  Sure.

5          THE VIDEOGRAPHER:  Off the record at

6     4:00 p.m.

7          (Recess from 4:00 p.m. until 4:00 p.m.)

8          THE VIDEOGRAPHER:  The time is 4:00 p.m., we

9     are back on the record.

10   BY MS. ROSS:

11    Q.   The slide we were just looking at at the end

12   of this NTP summary states:  Herbicides in

13   glyphosate-based formulations other than glyphosate

14   showed genotoxic activity.

15        I think you told us last time you're not the

16   person to tell us about any herbicides other than

17   glyphosate, right?

18    A.   Correct.

19    Q.   You can set this aside, Dr. Schneider.

20    A.   Okay.

21    Q.   We've had an opportunity over the last --

22   today and on a previous occasion to discuss your --

23    A.   Over the last --

24    Q.   -- opinions --

25    A.   -- ten hours, yes.

1      Q.    -- in this case; is that right?

2      A.    We've had ten-and-a-half hours to discuss my

3   opinions, yes.

4      Q.    Are there any opinions that you intend to

5   offer at trial that we have not had an opportunity

6   to discuss, Dr. Schneider?

7      A.    I think you ought to know my opinions.

8   Again, to be fair, I can't sit here today and tell

9   you we reviewed every article that I might mention,

10  but I think they're somewhat buried in here or on

11  the reliance list.

12         So I'm not sure we've actually verbally

13  discussed every article which may be -- I don't

14  think we discussed Schinasi, for example, which we

15  could have, another a meta-analysis we didn't

16  discuss.  So there may be things we didn't discuss,

17  but they're -- I'm sure they're on my reliance list.

18     Q.    Anything that we didn't discuss that's on

19  your reliance list is fair game at trial, right?

20     A.    Correct.

21     Q.    Other than the materials on your reliance

22  list and what we've discussed in your deposition,

23  are there any opinions that you intend to offer at

24  the trial in this case?

25     A.    I think you know my opinions.

```
 1      Q.    And the answer is no, there are not?

 2      A.    You've heard all my opinions.

 3            MS. ROSS:  Thank you, Dr. Schneider.

 4            THE WITNESS:  Thank you.

 5                      CROSS-EXAMINATION

 6   BY MR. HABERMAN:

 7      Q.    Dr. Schneider, I do have a couple follow-up

 8   questions for you.

 9      A.    Sure.

10      Q.    Okay.  Are you of the opinion, in general,

11   to a medical [sic] degree of medical probability,

12   that Roundup can cause NHL, including DLBCL and CLL?

13            MS. ROSS:  Objection; leading.

14      A.    Yes.  So I've had the opportunity to review

15   the available literature, the case-controlled

16   studies, the cohort studies, the meta-analysis, and

17   the pooled analysis.  And it's my opinion, to a

18   reasonable degree of medical certainty, based upon

19   what I reviewed, that when you look at intensity of

20   exposure, and that could just be days per year or a

21   lifetime exposure, as opposed to just ever/never,

22   that, yes, the data is conclusive that glyphosate

23   causes NHL and specifically diffuse large B-cell

24   lymphoma and CLL.

25      Q.    Okay.  In this case, did you have the
```

Andrew M. Schneider, M.D.

1    opportunity to look at the medical records of Stacey

2    Moore and William Pleu?

3         MS. ROSS:  Objection; leading.

4    A.   So I did review the medical records of

5    Stacey Moore and Mr. Pleu.  I reviewed their

6    exposure history.  I reviewed their other medical

7    conditions.  And I concluded, to a reasonable degree

8    of medical certainty, based upon their medical

9    records and my review of all the data I've discussed

10   previously, that their CLL and diffuse large B-cell

11   lymphoma respectively were caused by their exposure

12   to glyphosate.

13   Q.   Doctor, are you familiar with the concept of

14   a differential diagnosis?

15   A.   Of course.

16   Q.   And can you explain what that is?

17   A.   Sure.  When you have a set of circumstances,

18   a good physician will go through and see what the

19   possible etiologies can be.

20        In this case, we have a known diagnosis of

21   CLL and diffuse large B-cell lymphoma.  And my task

22   was to go through their medical records and then

23   look at the available literature and make an

24   informed opinion, to a reasonable degree of medical

25   certainty, whether their disease was caused by

Andrew M. Schneider, M.D.

1    glyphosate.  And in both situations it was.

2    Q.  And that's opinions that you have in this

3    case?

4    A.  To a reasonable degree of medical certainty,

5    and I see no other causative etiologies for their

6    CLL and diffuse large B-cell lymphoma.

7    Q.  And did you employ the same methodologies

8    here for this case as you would if a patient

9    presented to you with similar questions in your

10   office?

11   A.  Of course.

12        MS. ROSS:  Object to the form.

13   Q.  Did you consider any confounding factors for

14   either of the two cases?

15   A.  Yes.  I looked at -- I looked at all

16   confounding cases.  I looked at their disease

17   history, whether they had any autoimmune diseases,

18   whether they had EBV infection, whether they're

19   transplant patients, history of previous cancer, as

20   we discussed before, and their Roundup exposure.

21        And I reached a conclusion, to a reasonable

22   degree of medical certainty.

23        MR. HABERMAN:  Okay.  Thank you, Doctor.

24   That's all I have for you.

25        THE WITNESS:  Thanks.

1          MS. ROSS:  Thank you, Dr. Schneider.

2          THE WITNESS:  Thank you.

3          MS. ROSS:  We're done.

4          THE WITNESS:  All right.

5          THE VIDEOGRAPHER:  The time is 4:05 p.m.

6     This concludes the recorded video deposition and

7     we are off the record.

8          (Whereupon, the deposition concluded at

9     4:05 p.m. EDT.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Andrew M. Schneider, M.D.

```
 1              C E R T I F I C A T E

 2         I, Susan D. Wasilewski, Registered

 3   Professional Reporter, Certified Realtime Reporter,

 4   Certified Manager of Reporting Services, Certified

 5   Realtime Captioner, and Florida Professional

 6   Reporter, hereby certify that the witness named

 7   herein appeared before me on Wednesday,

 8   July 6, 2022, and was duly sworn.

 9         I FURTHER CERTIFY that I was authorized to

10   and did stenographically report the examination of

11   the witness named herein; that a review of the

12   transcript was requested; and that the foregoing

13   transcript is a true record of my stenographic

14   notes.

15         I FURTHER CERTIFY that I am not related to

16   or an employee of any of the parties, nor am I

17   related to or an employee of any of the parties'

18   attorneys or counsel connected with this action, nor

19   am I financially interested in the outcome of this

20   action.

21         WITNESS my hand this 11th of July, 2022.

22

23   _____

24   Susan D. Wasilewski, RPR, CRR, CMRS, CRC, FPR

25
```

Andrew M. Schneider, M.D.

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully

 5     and make any necessary corrections.  You should

 6     state the reason in the appropriate space on the

 7     errata sheet for any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10     and date it.  It will be attached to your

11     deposition.

12

13          It is imperative that you return the

14     original errata sheet to the deposing attorney

15     within thirty (30) days of receipt of the deposition

16     transcript by you.  If you fail to do so, the

17     deposition transcript may be deemed to be accurate

18     and may be used in court.

19

20

21

22

23

24

25
```

```
 1                    - - - - - -

 2                  E R R A T A

 3                    - - - - - -

 4   PAGE   LINE   CHANGE

 5   _____  _____  _____

 6     REASON: _____

 7   _____  _____  _____

 8     REASON: _____

 9   _____  _____  _____

10     REASON: _____

11   _____  _____  _____

12     REASON: _____

13   _____  _____  _____

14     REASON: _____

15   _____  _____  _____

16     REASON: _____

17   _____  _____  _____

18     REASON: _____

19   _____  _____  _____

20     REASON: _____

21   _____  _____  _____

22     REASON: _____

23   _____  _____  _____

24     REASON: _____

25
```

Andrew M. Schneider, M.D.

```
 1                ACKNOWLEDGMENT OF DEPONENT

 2

 3         I, _____, do hereby

 4    acknowledge that I have read the foregoing pages,

 5    405 through 616, and that the same is a correct

 6    transcription of the answers given by me to the

 7    questions therein propounded, except for the

 8    corrections or changes in form or substance, if any,

 9    noted in the attached Errata Sheet.

10

11

12    _____         _____

13    ANDREW M. SCHNEIDER, M.D.                        DATE

14

15

16

17

18    Subscribed and sworn to before me this

19    _____ day of _____, 20____.

20    My Commission expires: _____

21

22    _____

      Notary Public

23

24

25
```