**WILKINSON STEKLOFF LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonstekloff.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonstekloff.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel:   202-847-4030
Fax:   202-847-4005

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843
Fax: 202-682-1639

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

**BRYAN CAVE LEIGHTON PAISNER LLP**
K. Lee Marshall (CA Bar No. 277092)
(klmarshall@bclplaw.com)
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Tel: 415-675-3400
Fax: 415-675-3434

Jed P. White (CA Bar No. 232339)
(jed.white@bclplaw.com)
120 Broadway, Suite 300
Santa Monica, CA 90401
Tel:  310-576-2100
Fax: 310 -576-2200

*Attorneys for Defendant Monsanto Company*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION, <br><br> *Engilis v. Monsanto Company*, 3:19-cv-07859-VC | MDL No. 2741 <br><br> Case No.: 3:16-md-02741-VC <br><br> **DEFENDANT MONSANTO COMPANY'S NOTICE OF MOTION AND MOTION TO EXCLUDE TESTIMONY OF AMBROSE K. CHARLES, PH.D** <br><br> Hearing date: January 12, 2023 <br> Time: 10:00 am |

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** beginning on January 12, 2023 at 10:00 am, in Courtroom 4 of the United States District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, or as ordered by the Court, Defendant Monsanto Company ("Monsanto") will present its Motion to Exclude Testimony of Ambrose K. Charles, Ph.D.  Monsanto seeks an order excluding opinions of this witness under Federal Rule of Evidence 702.

Dated:  November 30, 2022                         Respectfully submitted,

                                    /s/ *Jed P. White*
                                    Jed P. White
                                    Attorneys for Defendant Monsanto Company

# **TABLE OF CONTENTS**

Page

INTRODUCTION ...........................................................................................................................1

BACKGROUND .............................................................................................................................2

LEGAL STANDARD ......................................................................................................................4

ARGUMENT ...................................................................................................................................5

    I.     The Court Should Exclude Dr. Charles's General Causation Opinions. .....................5

          A.     Dr. Charles is not Qualified to Offer an Opinion on General Causation. ...................................................................................................5

          B.     Dr. Charles' General Causation Opinion is Unreliable. ...............................6

    II.    The Court Should Exclude Dr. Charles's Specific Causation Opinions. .....................9

          A.     Dr. Charles is not Qualified to Offer Opinions on Specific Causation. ...................................................................................................9

          B.     Dr. Charles's Exposure Days Assessment is not Reliable. ............................9

          C.     Dr. Charles's Specific Causation Assessment does not Account for the Actual Dose of Roundup Plaintiff Allegedly Absorbed in his Body. ............................................................................................................11

    III.   The Court Should Exclude Dr. Charles's Opinions On Cancer "Promotion" and the George Study. .................................................................................................13

    IV.   The Court Should Exclude Dr. Charles's Opinions on Alleged Effects on the Reproductive System and on Plaintiff's Other Cancers. .......................................15

CONCLUSION ..............................................................................................................................15

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Borg-Warner Corp. v. Flores*,
    232 S.W.3d 765 (Tex. 2007) .......................................................................................... 11

*Claar v. Burlington N. R.R.*,
    29 F.3d 499 (9th Cir. 1994) ........................................................................................ 8, 12

*Cooper v. Brown*,
    510 F.3d 870 (9th Cir. 2007) ........................................................................................... 5

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) .................................................................................................. 5, 12

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*,
    285 F.3d 609 (7th Cir. 2002) ........................................................................................... 9

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) ...................................................................................................... 15

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig. (No II)*,
    892 F.3d 624 (4th Cir. 2018) ........................................................................................... 8

*McClain v. Metabolife Int'l, Inc.*,
    401 F.3d 1233 (11th Cir. 2005) ..................................................................................... 11

*In re Roundup Prods., Liab. Lit.*,
    3:16-md-02741-VC (N.D. Cal. Feb. 24, 2019) ........................................................ 10, 11

*White v. Ford Motor Co.*,
    312 F.3d 998 (9th Cir. 2002) ........................................................................................... 4

*In re Zoloft Prods. Liab. Litig.*,
    858 F.3d 787 (3d Cir. 2017) ....................................................................................... 8, 12

**INTRODUCTION**

Plaintiff Peter Engilis designated Dr. Ambrose K. Charles, a toxicologist, to offer expert testimony in this case on general and specific causation, exposure, and a variety of other topics. Dr. Charles's own admissions (both in this case and in another Roundup case), however, demonstrate that he is unqualified to offer any of the opinions that he seeks to offer and that his methodology is unsound. The Court should exclude Dr. Charles's opinions for several reasons.

*First*, the Court should exclude Dr. Charles's opinions on general causation—*i.e.,* that Roundup is capable of causing NHL—because Dr. Charles candidly admits he is not an expert on either Roundup or NHL. In fact, he is so ill-informed on Roundup and NHL that he admitted during his deposition that he was not even aware whether NHL existed prior to the time Monsanto began selling Roundup (it did). Dr. Charles also is not a medical doctor, an oncologist, or an epidemiologist, and he has never performed any studies on glyphosate or Roundup. Although his reports mention three types of evidence used to evaluate causation—epidemiology, animal studies, and mechanistic studies—Dr. Charles is not an expert in any of these fields, and his review of various studies in each of these fields was superficial and riddled with numerous errors and inconsistencies. With respect to epidemiology, Dr. Charles relied on irrelevant data for other types of cancers (*i.e.,* multiple myeloma) and for other subtypes of NHL with which Plaintiff was <u>not</u> diagnosed, even where the relevant NHL subtype data was available. Moreover, Dr. Charles admitted that he did not review any of the actual animal or mechanistic/genotoxicity studies, but instead relied exclusively on the analyses of these studies performed by various organizations, most of which disagreed with his ultimate conclusions on these studies. Dr. Charles's general causation opinion therefore should be excluded as unreliable and because he is not qualified to give it.

*Second*, the Court should exclude Dr. Charles's opinions on specific causation—*i.e.,* that Roundup caused Plaintiff's specific cancer, including his specific subtype of NHL, chronic lymphocytic leukemia ("CLL")—for multiple reasons. Dr. Charles bases his specific-causation opinion on a comparison of the total number of hours or days Plaintiff claims he sprayed Roundup (measured by Dr. Charles in what he calls "exposure days") to cherry-picked epidemiology data points, notwithstanding his admission that he is not an expert in epidemiology and has not reviewed the

epidemiology studies in any detail.  Critically, however, the epidemiology data to which he compares Plaintiff's alleged "exposure days" are not adjusted for important confounding variables like exposure to other pesticides, a fundamental defect that previously led this Court to preclude other experts from offering the same types of opinions that Dr. Charles seeks to offer in this case.  Moreover, despite acknowledging (a) the critical importance of absorbed dose to any specific causation assessment, (b) that Roundup can be harmful under his flawed theory only if it is actually absorbed into the body, and (c) that there are absorbed doses of Roundup that have not led to carcinogenic effects in humans, Dr. Charles conceded that he did not even attempt to calculate Plaintiff's absorbed dose of Roundup (if any) in this case.  Dr. Charles instead worked backwards from his pre-ordained conclusion that Roundup must have caused Plaintiff's cancer, "assuming" that Plaintiff had a sufficient absorbed dose because he eventually developed a subtype of NHL.  This conclusion-first and backwards-looking assessment is not science at all and should be excluded as unreliable, speculative, and unhelpful to the jury.

*Third*, the Court should exclude Dr. Charles's opinion that Roundup is a cancer "promoter" as unreliable because Dr. Charles bases that opinion on a single flawed mouse study (the George study) that he has not even read.  All scientific panels and regulators that have reviewed the George study, including both EPA and the International Agency for Research on Cancer ("IARC"), the agency on which Plaintiff so heavily relies, have pointed out the study's significant flaws and have deemed it inadequate for the evaluation of glyphosate.  Nevertheless, Dr. Charles seeks to offer opinions based exclusively on the George study (without citing any evidence in humans) that other plaintiffs' experts in the Roundup litigation previously admitted they would be unwilling and unable to offer.

*Fourth*, the Court should preclude Dr. Charles from offering any opinion about any male reproductive effects allegedly caused by Roundup (which he discusses in his report despite having no relevance to this case) or that Plaintiff's prior bladder cancer and malignant melanoma are, in any way, related to Roundup (which he specifically disclaimed during his deposition).

## BACKGROUND

Plaintiff designated Ambrose K. Charles, Ph.D., a toxicologist,to offer expert opinions on several topics in this case, including both general and specific causation.  *See* White Decl., Ex. A,

Plaintiffs' Amended Rule 26 Specific Causation Expert Disclosures at 2.  Dr. Charles was deposed in this case and in another Roundup case—the *Ferro* case in St. Louis County—and he stands by his testimony in both depositions.  White Decl., Ex. B, Charles *Engilis* Dep. at 10:3-7.  Dr. Charles confirmed during his deposition that all of the opinions that he will offer at trial are contained in the report he prepared for this case.  *See id.* at 15:14-18; *see also* White Decl., Ex. C, Charles *Engilis* Rpt. at 1-33.

As to general causation, Dr. Charles seeks to discuss three types of scientific evidence used to evaluate causation in this context—genotoxicity/mechanistic studies, animal studies, and epidemiology.  *See* White Decl., Ex. C, Charles *Engilis* Rpt. at 17-24.  But he has also conceded repeatedly that he does not have the expertise necessary to provide reliable expert testimony on any of these studies.  *See* White Decl., Ex. D, Charles *Ferro* Dep. at 43:18-44:4; 47:12-19; 49:3-7; 133:16-134:22; 173:10-12.  And his actual review of the scientific evidence in this case was cursory, at best.

As to specific causation, Dr. Charles seeks to opine that Plaintiff's exposures to Roundup caused his particular cancer.  *See* White Decl., Ex. C, Charles *Engilis* Rpt. at 30 ("A full evaluation of all data and evidence available leads to a reasonable scientific conclusion that glyphosate exposure showed a high chance of causing injury to his health and is probably related to the rapid progression to NHL.").  Critically, however, despite recognizing the importance to any specific causation analysis of calculating a person's internal dose (*i.e.,* the amount of a chemical a person needs to absorb in their body to increase their risk), Dr. Charles admitted that he did not attempt to calculate dose in this case.  White Decl., Ex. B, Charles *Engilis* Dep. at 30:19-32:23; 38:22-41:8; 118:11-119:9; Ex. D, Charles *Ferro* Dep. at 29:3-30:3; 31:24-32:1; 401:7-18 ("I don't know the dose.").

Instead of assessing the amount of Roundup that Plaintiff absorbed in his body or even the amount of Roundup that came into contact with Plaintiff's skin, Dr. Charles considered only the amount of *time* Plaintiff claims he sprayed Roundup.  To that end, Dr. Charles reviewed Plaintiff's deposition testimony and fact sheets to estimate the number of hours per day and days per week he sprayed Roundup over the course of his life.  Dr. Charles admits that, where there was conflicting testimony on the length of Plaintiff's Roundup use, he ignored any testimony indicating fewer hours of use and assumed the "worst case" exposure scenario.  White Decl., Ex. B, Charles *Engilis* Dep. at 123:2-127:9.

He then took his inflated estimate of the total number of hours Plaintiff sprayed Roundup and divided that number by eight to calculate the number of 8-hour "exposure days" Plaintiff allegedly sprayed Roundup. *See* White Decl., Ex. D, Charles *Ferro* Dep. at 22:2-23:18; 24:14-25:19; 302:18-303:16. He then compared Plaintiff's alleged "exposure days" to unadjusted data "thresholds" from the McDuffie and Eriksson epidemiology studies, which he claims show that a person with at least two 8-hour exposure days per year (*i.e.,* 16 hours of exposure per year) or ten 8-hour exposure days in their lifetime (*i.e.,* 80 hours of lifetime exposure) is at a significantly increased risk of contracting NHL. White Decl., Ex. B, Charles *Engilis* Dep. at 141:6-142:10. As discussed below, this Court already has precluded other experts in this MDL from offering the same type of "exposure-days" testimony that Dr. Charles seeks to offer in this case.

Dr. Charles also offers opinions on other miscellaneous topics. For instance, Dr. Charles seeks to testify that Roundup is a cancer "promoter," based exclusively on a single discredited mouse study known as the George study—which he admits he has not even read. White Decl., Ex. C, Charles *Engilis* Rpt. at 23-24; Ex. B, Charles *Engilis* Dep. at 135:14-136:1. Dr. Charles also offers opinions in his report on male reproductive effects allegedly caused by Roundup, despite acknowledging that these purported effects have no relevance to the ongoing Roundup litigation or to this case. White Decl., Ex. C, Charles *Engilis* Rpt. at 22-23; Ex. D, Charles *Ferro* Dep. at 262:1-267:8. And Dr. Charles references Plaintiff's prior bladder and skin cancers in his report, despite agreeing during his deposition that he is not opining that Roundup had anything to do with these prior cancers. White Decl., Ex. C, Charles *Engilis* Rpt. at 4-6; Ex. B, Charles *Engilis* Dep. at 36:15-38:14.

## **LEGAL STANDARD**

A proposed expert witness must possess "knowledge, skill, experience, training, or education" sufficient to qualify him as an expert on the subject to which his testimony relates. Fed. R. Evid. 702. When an expert's field of expertise is not related to the subject on which he seeks to offer testimony, such testimony is inadmissible. *See White v. Ford Motor Co.*, 312 F.3d 998, 1008-09 (9th Cir. 2002). Apart from qualifications, expert testimony must be (1) based upon sufficient facts or data, (2) the product of reliable principles and methods, and (3) the result of applying those principles and methods reliably to the facts of the case. Fed. R. Evid. 702. The trial judge is charged with the responsibility

of acting as a gatekeeper to "ensure that any and all scientific testimony … is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). The proponent of the expert bears the burden of proving that the expert's proffered testimony is admissible. *See, e.g.*, *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007).

## ARGUMENT

### I. The Court Should Exclude Dr. Charles's General Causation Opinions.

Dr. Charles first seeks to opine that Roundup generally is capable of causing NHL and the specific subtype of NHL with which Plaintiff has been diagnosed, CLL. Dr. Charles's opinions on general causation should be excluded for two independent reasons.

#### A. Dr. Charles is not Qualified to Offer an Opinion on General Causation.

Dr. Charles is not qualified to offer an opinion regarding any alleged general association between Roundup and NHL. Dr. Charles is not a medical doctor, a pathologist, or an oncologist. *See* White Decl., Ex. D, Charles *Ferro* Dep. at 41:17-43:4. And he specifically admitted that he is **not an expert in either NHL or Roundup,** the two halves of Plaintiff's causation case here. *See id.* at 180:11-13 ("Q. Dr. Charles, are you an expert in non-Hodgkin's Lymphoma? A. No."); 155:1-10 (admitting he is unfamiliar with nearly all of the different subtypes of NHL); 48:25-49:2; 137:5-8; 137:14-138:10 (admitting he is not an expert on Roundup or glyphosate); White Decl., Ex. B, Charles *Engilis* Dep. at 119:23-25 ("Q. NHL existed before Roundup existed, true? A. I don't know.").

Dr. Charles purports to base his general causation opinion on the relevant epidemiology, animal, and mechanistic/genotoxicity studies related to glyphosate and Roundup. But he has specifically conceded that he is not an expert on any of these topics. *See* White Decl., Ex. D, Charles *Ferro* Dep. at 43:18-44:4; 44:8-11; 173:10-12 ("I've never had expertise in epidemiology. I was never trained as an epidemiologist."); 49:3-7; 133:16-134:22 (admitting he is not an expert on genotoxicity or mutagenicity of glyphosate or Roundup and conceding that he has never personally conducted any mechanism studies); 47:12-19 (admitting that he has not been involved in an animal carcinogenicity study since 1984). Based on Dr. Charles own admissions, he is not qualified to opine on general causation in this case. The Court should preclude him from offering any opinions on this topic.

**B.      Dr. Charles' General Causation Opinion is Unreliable.**

Dr. Charles's general causation opinion also should be excluded because it is not based on any sound methodology and is inherently unreliable. Again, although Dr. Charles purports to analyze the relevant epidemiology, animal studies, and mechanistic/genotoxicity studies, his analysis of each of these fields is cursory at best and suffers from significant defects.

1.      <u>Epidemiology</u>

Dr. Charles's general causation opinion is primarily based on his review of a small subset of odds ratios from the following seven epidemiology studies: Eriksson (2008), McDuffie (2001), Andreotti (2018), Leon (2019), Zhang (2019), Pahwa (2019), and Boffetta (2021). Although these and other epidemiology studies addressing the hypothesized association between Roundup and NHL include dozens of odds ratios (the vast majority of which show no increased risk between Roundup and NHL), Dr. Charles focused on only a fraction of the relevant data. *See* White Decl., Ex. C, Charles *Engilis* Rpt. at 17-20; Ex. D, Charles *Ferro* Dep. at 363:23-365:20 (admitting that he cited only seven data points out of hundreds from the various epidemiology studies and that he made numerous errors, cited irrelevant data, and mixed end points to reach his ultimate conclusions).

Dr. Charles's approach to epidemiology is riddled with errors, the combined impact of which makes clear that his opinions on epidemiology and general causation are unreliable. For instance, despite specifically recognizing the importance of using data that has been adjusted for other pesticide use, *see* White Decl., Ex. D, Charles *Ferro* Dep. at 300:3-6 (agreeing that "if an epidemiology study reported risks that were adjusted for other pesticides, you would want to present those [adjusted odds ratios] over unadjusted numbers"), Dr. Charles relied on unadjusted odds ratios from the Eriksson and McDuffie studies. *See id.* at 313:15-315:3; 319:15-327:14; 362:15-23. He also specifically agreed that once the relevant data is properly adjusted for other pesticide use, the increased odds ratios on which he relies to support his general causation opinion vanish and the alleged association between Roundup and NHL disappears. *See id.*

The flaws in Dr. Charles's approach to epidemiology do not stop there. He concedes that one of the alleged odds ratios that he pulled from the McDuffie study and included in his report is not in that study, agreeing that he made a mistake and that this purported odds ratio does not actually support

- 6 -
MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF AMBROSE K. CHARLES, PH.D

his causation opinions. *See id.* at 319:15-327:14. Furthermore, despite agreeing that "[t]here is no reason to rely on [odds ratios or risk ratios for] a different type of cancer that the plaintiff didn't actually have if there were data available for plaintiff's actual [type of] cancer," *id.* at 300:7-24, Dr. Charles routinely ignored data specific to Plaintiff's particular cancer type and instead cited risk ratios for entirely irrelevant cancers that Plaintiff admittedly does not have. For example, Dr. Charles agreed that the relevant data in the Andreotti study showed "no evidence for association with NHL or any NHL subtype," yet Dr. Charles ignored these relevant data points and cited a relative risk for acute myeloid leukemia that he agrees has no bearing on the issues in this case. *See id.* at 335:3-336:24; 338:2-4; 363:2-5 (agreeing that "[t]he value that [he] included in [his] report from Andreotti is not for any kind of non-Hodgkin's lymphoma" and that this was an "error."). Similarly, with both the Leon and Boffetta studies, Dr. Charles selected odds ratios for a subtype of NHL that Plaintiff does not even have (DLBCL), despite agreeing that he should have used a much lower odds ratio that does not show any increased risk of Plaintiff's particular subtype of NHL (CLL). *See id.* at 353:11-360:22; 362:24-363:1; 363:12-16.[1]

Dr. Charles conceded that he did not perform a "deep analysis of all of th[e epidemiology] studies" because he has not been trained to do this. *See* White Decl., Ex. D, Charles *Ferro* Dep. at 339:2-16. Instead, he performed only a surface-level review of some of the relevant epidemiology studies, cherry picking unreliable (and often irrelevant) odds ratios that supported his pre-ordained conclusions and discarding the rest, all without performing any real scientific analysis of the data. *See id.* at 345:21-350:22; 351:1-353:9 (agreeing that he cherry-picked odds ratios from Pahwa, choosing only the highest odds ratios he could find for each Plaintiff, and ignoring other lower odds ratios that he admits were at least equally applicable). Dr. Charles admits that he committed several critical errors, focusing on irrelevant odds ratios that either do not even exist or that pertain to cancers that Plaintiff does not even have, all while ignoring more-relevant data that did not support his conclusions on causation. This "[r]esult-driven analysis, or cherry-picking, undermines principles of the scientific

---

[1] Dr. Charles's reliance on the Zhang meta-analysis is similarly problematic, as that study has been sharply criticized for its faulty methodologies and flawed conclusion. *See* White Decl., Ex. E, EPA, *Memorandum: Glyphosate: Epidemiology Review of Zhang et al. (2019) and Leon et al. (2019) publications for Response to Comments on the Proposed Interim Decision* (Jan. 6, 2020) at 2-13

method and is a quintessential example of applying methodologies . . . in an unreliable fashion." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig. (No II)*, 892 F.3d 624, 634 (4th Cir. 2018); *see also, e.g., Claar v. Burlington N. R.R.*, 29 F.3d 499, 502-03 (9th Cir. 1994) ("Coming to a firm conclusion first and then doing research to support it is the antithesis of the [scientific] method."); *In re Zoloft Prods. Liab. Litig.*, 858 F.3d 787, 796-800 (3d Cir. 2017) (excluding "inconsistent" and "conclusion-driven" analysis). Dr. Charles's general causation opinions should be excluded.

### 2. Animal and Genotoxicity/Mechanistic Studies

Dr. Charles's assessment of the relevant animal and mechanistic/genotoxicity evidence fares no better. He seeks to offer the opinions that Roundup causes cancer in animals and that Roundup is genotoxic. But he has not actually reviewed the individual animal or genotoxicity studies on which he bases these opinions. Indeed, with respect to animal studies, Dr. Charles conceded that he has not reviewed the underlying study reports for any of these studies and that he relied entirely on EPA's and IARC's conclusions about them. White Decl., Ex. D, Charles *Ferro* Dep. at 63:25-67:9. Similarly, Dr. Charles admitted that he has not reviewed any of the actual mechanistic or genotoxicity studies at issue in this case. Rather, he based his conclusion that Roundup is genotoxic solely on a summary of these studies prepared by the Agency for Toxic Substances and Disease Registry ("ATSDR"). *Id.* at 57:21-61:18.

Because Dr. Charles has not actually reviewed the scientific evidence that supports his opinions that Roundup is capable of causing cancer in animals and that Roundup is genotoxic, these opinions are fundamentally unreliable. This is especially true given Dr. Charles's own admission that his conclusions diverge from the conclusions reached by most of the agencies on which he relied—agencies that, unlike Dr. Charles, have expertise on these topics and did actually analyze the underlying studies before reaching their conclusions. *See id.* at 61:24-63:11 (admitting that, despite his lack of expertise on genotoxicity studies and his failure to review the underlying studies, he is providing a stronger opinion on the genotoxicity studies than ATSDR, which concluded that the evidence was "equivocal"); 68:6-69:6 (conceding that EPA, which actually reviewed the underlying animal studies,

disagrees with his conclusions about them).[2] Dr. Charles's general causation opinions based on animal and mechanistic/genotoxicity evidence should be excluded.

## II.   The Court Should Exclude Dr. Charles's Specific Causation Opinions.

Dr. Charles also seeks to opine that Plaintiff was exposed to a sufficient amount of Roundup to cause his cancer and that Roundup actually caused his cancer. The Court should exclude Dr. Charles's specific causation opinions for at least three reasons.

### A.   Dr. Charles is not Qualified to Offer Opinions on Specific Causation.

Dr. Charles is not a medical doctor. White Decl., Ex. D, Charles *Ferro* Dep. at 114:1-2. He is not an oncologist. *Id.* at 42:10-14. And he has never diagnosed or treated cancer. *Id.* at 41:23-42:5. The foundation for Dr. Charles's specific causation opinions is merely his counting up of the number of 8-hour "exposure days" Plaintiff claims he used Roundup and a comparison of those exposure days to exposure thresholds from two epidemiology studies (McDuffie and Eriksson). *See id.* at 22:2-23:18; 24:14-25:19; 302:18-303:16. As discussed above, however, Dr. Charles admits that he also is not an epidemiology expert. *See* White Decl., Ex. D, Charles *Ferro* Dep. at 43:18-44:4; 44:8-11; 173:10-12 ("I've never had expertise in epidemiology. I was never trained as an epidemiologist."). Accordingly, the Court should not allow Dr. Charles to opine on topics that exceed his expertise, including extracting thresholds from studies he is not qualified to evaluate to opine on specific causation. *See*, *e.g.*, *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty.").

### B.   Dr. Charles's Exposure Days Assessment is not Reliable.

Dr. Charles's exposure days assessment, on which his specific causation opinions depend, also should be excluded because it is not reliable and not be helpful to the jury. As described above, to reach his conclusion on specific causation, Dr. Charles reviewed Plaintiff's deposition testimony and fact sheets to determine the number of hours per day and days per week that Plaintiff claims he sprayed Roundup. Despite previously recognizing the inherent difficulties in relying exclusively on a witness's memory of spraying habits from years (or decades) ago, Dr. Charles did absolutely nothing to

---

[2] Dr. Charles also concedes that there is "not adequate data to conclude that glyphosate causes oxidative stress," another mechanism past plaintiffs in the Roundup litigation have speculated creates a potential association between Roundup and NHL. White Decl., Ex. D, Charles *Ferro* Dep. at 63:21-24.

investigate or verify that Plaintiff's claimed exposures were, in fact, reasonable, accurate, or even possible. White Decl., Ex. D, Charles *Ferro* Dep. at 116:6-10; 117:12-118:13; 122:20-123:17. To make matters worse, Dr. Charles admitted that he based his opinions on the absolute "worst case" exposure scenario, meaning that if Dr. Charles found any discrepancy in the amount of time Plaintiff claims he sprayed in a given day or year or in the number of years he claims he sprayed Roundup, Dr. Charles always based his exposure estimate on the higher number. *See, e.g.,* White Decl., Ex. B, Charles *Engilis* Dep. at 123:2-127:9 (conceding that he assumed Plaintiff sprayed for 31 years despite Plaintiff's sworn affidavit in which Plaintiff stated that he sprayed for 26 years and testifying that his assessment assumes the "worst case" scenario); Ex. D, Charles *Ferro* Dep. at 255:1-258:17 (testifying that his assessment is based on the absolute "worst-possible case"). This unscientific approach resulted in rank overestimation of Plaintiff's exposure days.

In addition, Dr. Charles's comparison of Plaintiff's alleged "exposure days" to thresholds from the McDuffie and Eriksson studies is an unreliable methodology. According to Dr. Charles, to be at an increased risk of NHL, a person needs to have at least two 8-hour days (*i.e.,* 16 hours) of Roundup use per year or ten 8-hour days (*i.e.,* 80 hours) of lifetime Roundup use, thresholds Dr. Charles bases on two Roundup epidemiology odds ratios (from the McDuffie and Eriksson studies). *See* White Decl., Ex. B, Charles *Engilis* Dep. at 141:6-142:10. But the data points on which Dr. Charles relies from McDuffie and Eriksson were not adjusted for important confounding variables such as exposure to other pesticides. *See* White Decl., Ex. D, Charles *Ferro* Dep. at 313:15-315:3; 319:15-327:14; 362:15-23. As this Court previously noted when it precluded other plaintiffs' experts from offering the same type of specific causation testimony that Dr. Charles seeks to offer in this case to establish a sufficient "exposure threshold" for Plaintiff's cancer risk, "it is not scientifically sound to quantify [a] risk and assign it to a particular plaintiff using the unadjusted numbers from McDuffie and Eriksson." *See* White Decl., Ex. F, Pretrial Order No. 85 in *In re Roundup Prods., Liab. Lit.*, 3:16-md-02741-VC, at 7-8 (N.D. Cal. Feb. 24, 2019) (also holding that "Dr. Nabhan may not testify that the McDuffie and Eriksson studies stand for the proposition that if someone uses Roundup more than two days per year or more than ten days in their lifetime, their risk of developing NHL doubles."). Like prior experts in this MDL, Dr. Charles should be precluded from "testify[ing] that glyphosate is a substantial causative

factor for anyone who exceeds two days per year or ten lifetime days of Roundup use, because that conclusion is . . . based on unadjusted data" and is thus scientifically unsound and unreliable. *Id.* at 8.

### C. Dr. Charles's Specific Causation Assessment does not Account for the Actual Dose of Roundup Plaintiff Allegedly Absorbed in his Body.

Dr. Charles's specific causation assessment also is inherently unreliable and unhelpful to the jury because it does not account for dose—*i.e.*, the amount of Roundup that Plaintiff allegedly absorbed into his body. Dr. Charles fails to account for dose, even though he himself admits that dose is critical in assessing whether a chemical caused an alleged effect. White Decl., Ex. D, Charles *Ferro* Dep. at 106:17-108:6 (testifying that "[d]ose alone makes the poison" and that dose is a "fundamental principal of toxicology."). Dose, in this context, refers to the amount of Roundup that is absorbed into a person's skin and that reaches a person's blood stream. *See* White Decl., Ex. B, Charles *Engilis* Dep. at 137:23-138:2 ("Dose is the amount of the chemical inside your system, that means inside of your body.").

As Dr. Charles and other plaintiffs' experts have testified in prior Roundup cases, and as courts around the country have frequently acknowledged, an assessment of absorbed dose is critical in any toxicological specific causation analysis: for a chemical to cause cancer, it must be absorbed through the skin and enter the bloodstream. White Decl., Ex. B, Charles *Engilis* Dep. at 41:2-8 (admitting that whether "someone's exposure to glyphosate puts them at a risk of cancer is dependent on the amount and duration of the absorbed dose."); Ex. D, Charles *Ferro* Dep. at 109:17-25; 123:23-124:1 (agreeing that to have any effect on a person's body, "it is necessary to have an internal dose."); Ex. G, Portier *Hardeman* Dep. at 52:2-12 ("for a chemical to cause cancer, it has to be absorbed" and enter the bloodstream); Ex. H, Sawyer *Cervantes* Dep. at 93:22-25; 94:1-100:3 (admitting that Roundup exposure can be harmful only if it is absorbed into the body); *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1242 (11th Cir. 2005) ("Dose is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect."); *Borg-Warner Corp. v. Flores*, 232 S.W.3d 765, 770-73 (Tex. 2007) (discussing importance of dose on causation inquiry and reversing judgment in Plaintiff's favor following jury trial where Plaintiff did not establish sufficient dose to cause alleged injuries).

Despite the undisputed importance of dose when determining specific causation, Dr. Charles's

specific causation assessment does not assess Plaintiff's dose in any way. He admits that he has no opinion about the amount of glyphosate that needs to enter someone's body to increase their risk of NHL; that he does not know the dose, if any, Plaintiff experienced; and that he cannot point to any test that confirms that Plaintiff actually ever absorbed any Roundup in his body. White Decl., Ex. B, Charles *Engilis* Dep. at 30:19-32:23; 38:22-41:8; 118:11-119:9; Ex. D, Charles *Ferro* Dep. at 29:11-30:15; 239:16-240:24; 272:25-273:19. Instead, as described above, the sole determining factor for Dr. Charles's specific causation opinion is the number of hours or days that Plaintiff spent spraying Roundup, without any assessment of the amounts of Roundup (if any) that were absorbed by Plaintiff's skin. Dr. Charles admitted at his deposition that people can be exposed to Roundup but not receive a dose capable of causing harm, and that it is possible Plaintiff's doses were below any level capable of causing harm. White Decl., Ex. B, Charles *Engilis* Dep. at 39:15-41:8; Ex. D, Charles *Ferro* Dep. at 26:7-15; 28:21-23; 29:3-6; 272:25-273:19. In other words, Dr. Charles admits that Plaintiff's dose may have been too low to cause cancer, yet he paradoxically still seeks to offer the opinion that Roundup exposure caused Plaintiff's cancer. White Decl., Ex. B, Charles *Engilis* Dep. at 30:19-32:23.

Underscoring the unreliability of his opinions, Dr. Charles doubled down when asked during a recent deposition in another Roundup case to explain how he reached an opinion on specific causation without assessing dose. During that deposition, Dr. Charles claimed that he did not need to perform a dose calculation in the case because he could "assume" that the plaintiffs received a sufficient dose of Roundup because they both allegedly used Roundup and later developed NHL. White Decl., Ex. D, Charles *Ferro* Dep. at 243:10-22 (Dr. Charles "assumed that the plaintiff in this case had enough of a dose to cause non-Hodgkin's lymphoma because they had non-Hodgkin's lymphoma."). Dr. Charles improperly assumes the same thing here. *See* White Decl., Ex. B, Charles *Engilis* Dep. at 32:8-23 (testifying that Plaintiff "must have received enough dose to cause NHL" because he contracted NHL, despite also acknowledging that he does not actually know what Plaintiff's dose, if any, was). Such a results-driven and backwards-looking approach to specific causation, which "assumes" an association between cause and effect without any evidence that the parties were exposed to enough of the "cause" to establish the supposed "effect," is entirely speculative, unscientific, and not even close to the type of "expert" opinion that can survive review under *Daubert*. *See, e.g.*, *Claar*, 29 F.3d at 502-03; *In re*

*Zoloft Prods. Liab. Litig.*, 858 F.3d at 796-800. Dr. Charles's specific causation opinions should be excluded.

### III. The Court Should Exclude Dr. Charles's Opinions On Cancer "Promotion" and the George Study.

Dr. Charles also seeks to testify that Roundup is capable of "promoting" cancer. *See* White Decl., Ex. C, Charles *Engilis* Rpt. at 23-24. He bases this conclusion on a single mouse study known as the George study—a study that Dr. Charles did not even bother to read. White Decl., Ex. B, Charles *Engilis* Dep. at 135:14-136:1 ("I did not review the study.").

The George study is a small study involving mice in which various combinations of (1) a known carcinogen, (2) a known tumor promotor, (3) Roundup, (4) 2-dimethylbenz[a]anthracene ("DMBA"), and (5) 7, 12-O-tetradecanoyl-phorbol-13-acetate ("TPA") were painted on the mice's skin. White Decl., Ex. I, George, J., et al., *Studies on glyphosate-induced carcinogenicity in mouse skin: A proteomic approach*, 73 Journal of Proteomics 951 (2010) ("George 2010") at 953. The study aimed, in relevant part, to determine if glyphosate *initiated* tumors or if it *promoted* tumors generated by a known tumor initiator. The authors concluded that glyphosate *"failed* to provoke neoplastic development when tested as tumor initiator or complete carcinogen," but, in their view, did show "carcinogenic potential" as a tumor promoter." *Id.* at 954. Dr. Charles's opinions on promotion based on the George study should be excluded for multiple reasons.

*First*, despite basing his opinion on cancer promotion exclusively on the George study, Dr. Charles admitted during his deposition that he has not actually read that study. White Decl., Ex. B, Charles *Engilis* Dep. at 135:14-136:1. He has also agreed that "to evaluate the actual study data from George 2010" and to offer reliable expert testimony about it, an expert "would have to read the underlying study." White Decl., Ex. D, Charles *Ferro* Dep. at 293:18-294:1. Because Dr. Charles has not read or analyzed the George study, any opinions that he purports to offer about the study (including any opinions on cancer promotion) are unreliable and should be excluded.

*Second*, Dr. Charles's opinion on cancer promotion should be excluded because the George study has been repeatedly criticized by multiple regulatory and non-regulatory agencies as scientifically inadequate. Several major national and international agencies, including EPA and IARC, have

evaluated the George study and highlighted the study's significant flaws:

- White Decl., Ex. J, EPA, Office of Pesticide Programs, *Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* (Dec. 12, 2017) at 70 ("A number of studies were judged to be inadequate in protocol, conduct or reporting and were not considered in the analysis of glyphosate . . . An initiation-promotion study (George et al., 2010) in male Swiss mice that tested a commercial formulation of glyphosate (41%) on the skin. Study deficiencies included small number (20) of animals, tested only males, and lack of histopathological examination.").

- White Decl., Ex. K, IARC, *Glyphosate in Some Organophosphate Insecticides and Herbicides: Diazinon, Glyphosate, Malathion, Parathion, and Tetrachlorvinphos, Monograph Vol. 112 on the Evaluation of Carcinogenic Risks to Humans* (2015) at 32 ("Short duration of treatment, no solvent controls, and lack of any histopathological evaluation, Age at start, NR (mice weighed 12–15 g bw) The Working Group concluded this was **an inadequate study for the evaluation of glyphosate**.").

- White Decl., Ex. L, BAuA, Proposal for Harmonized Classification and Labeling: N (phosphonomethyl)glycine; Glyphosate (ISO), CLH Report for Glyphosate (2016) at 66 ("[George] **cannot contribute to a decision on the classification of glyphosate**.").[3]

*See also* White Decl., Ex. D, Charles *Ferro* Dep. at 290:15-23 (conceding that IARC has concluded that George was "an inadequate study for the evaluation of glyphosate."). Despite this consensus view rejecting the George study as inadequate and unreliable, Dr. Charles strays far into the realm of speculation by opining that Roundup can promote cancer in humans based exclusively on his speculative interpretation of a study that he did not actually read.

***Third***, Dr. Charles's opinions on cancer promotion are unreliable and unhelpful to the jury because they are not supported by any human evidence. Instead, Dr. Charles makes an unsupported, speculative leap: he infers from one study of chemicals painted on mouse skin that Roundup can promote cancer in *humans*. Critically, other plaintiffs' experts in the glyphosate litigation (including Dr. Portier) have specifically testified that they *cannot* conclude that glyphosate is a cancer promoter based solely on the George study. *See, e.g.,* White Decl., Ex. G, Portier *Hardeman* Dep. at 157:19-158:18 (Dr. Portier admitting that he would "want to see a lot more evidence" in addition to the George study before affirmatively concluding that glyphosate/Roundup is a cancer promoter). Yet this is precisely what Dr. Charles plans to do in this case, as he cites no evidence in humans or human cells supporting his opinions on cancer promotion. Because Dr. Charles cites no data connecting the George mouse study to his conclusions about Roundup's promotion capabilities in humans, Dr. Charles should

---

[3] The BAuA is Germany's Federal Institute for Occupational Safety and Health.

be precluded from offering any opinion on promotion. *See, e.g.*, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 145 (1997) (excluding animal data where expert failed to adequately extrapolate to humans).

### IV. The Court Should Exclude Dr. Charles's Opinions on Alleged Effects on the Reproductive System and on Plaintiff's Other Cancers.

In his report in this case, Dr. Charles also purports to offer opinions on "male reproductive effects" allegedly caused by Roundup. *See* White Decl., Ex. C, Charles *Engilis* Rpt. at 22-23. But this case has nothing to do with any alleged reproductive effects that Roundup may or may not cause. And in a deposition in a prior Roundup case, Dr. Charles agreed that these alleged reproductive effects have no bearing on the claims at issue in the ongoing Roundup litigation. Indeed, he specifically conceded that he could point to no study linking any of the alleged reproductive effects he references in his report to cancer or NHL—the diseases that Plaintiff claims Roundup caused in this case. White Decl., Ex. D, Charles *Ferro* Dep. at 262:1-267:8. Thus, Dr. Charles's opinions on alleged reproductive effects caused by Roundup are entirely irrelevant and should be excluded.

Dr. Charles also discusses Plaintiff's prior diagnoses with bladder cancer and malignant melanoma in his report in this case. *See* White Decl., Ex. C, Charles *Engilis* Rpt. at 4-6. During his deposition, however, Dr. Charles specifically disclaimed any opinion that Roundup caused or contributed to Plaintiff's prior bladder or skin cancers. White Decl., Ex. B, Charles *Engilis* Dep. at 36:15-38:14. Accordingly, the Court should also preclude Dr. Charles from opining during trial that Roundup played any role in the development of these other cancers.

### CONCLUSION

For the reasons set forth above, the Court should grant Monsanto's Motion to Exclude Testimony of Ambrose K. Charles, Ph.D.

Dated: November 30, 2022              Respectfully submitted,

/s/ *Jed P. White*
Jed P. White
Attorneys for Defendant Monsanto Company

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 30th day of November, 2022, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

> */s/ Jed P. White*
> Jed P. White