# EXHIBIT B

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3    *  *  *  *  *  *  *  *  *  *  *  *  *  *

 4  IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION
    MDL 2741
 5
    This document relates to:
 6  Peter Engilis v. Monsanto Company,

 7                Case No. 3:19-cv-07859-VC

 8    *  *  *  *  *  *  *  *  *  *  *  *  *  *

 9


10

    REMOTE VIDEOTAPED DEPOSITION OF AMBROSE CHARLES, PhD
11

12                  August 17, 2022
              9:08 a.m. to 12:45 p.m.
13

              REPORTED BY ANITA KORNBURGER
14          REGISTERED PROFESSIONAL REPORTER

15

16

17    *  *  *  *  *  *  *  *  *  *  *  *  *  *

18

19

20

21

22

23

24

25
```

```
 1                A P P E A R A N C E S

 2    HOLLINGSWORTH LLP, by
      Mr. John Kalas
 3    Mr. Louis Russo
      1350 I Street NW
 4    Washington, DC 20005
      202-898-5848
 5    lkaas@hollingsworthllp.com
      lrusso@hollingsworthllp.com
 6    Appearing by videoconference on behalf of the
      Defendant.
 7
      SCHLESINGER LAW OFFICES, P.A., by
 8    Mr. Jeffrey Louis Haberman
      1212 SE 3rd Avenue
 9    Fort Lauderdale, FL 33316
      954-320-9507
10    jhaberman@schlesingerlaw.com
      Appearing by videoconference on behalf of the
11    Plaintiffs.

12

13                    I N D E X

14
      Examination by                      Page
15

16    Mr. Kalas. . . . . . . . . . . . . . 5
      Mr. Haberman. . . . . . . . . . . . . 137
17    Mr. Kalas. . . . . . . . . . . . . .145

18

19                  E X H I B I T S

20                                         Page
      Exhibit No.  Description           Identified
21
         1         Expert disclosure. . . . . . . . . 8
22
         2         Notice of deposition. . . . . . . 10
23
         3         Expert report. . . . . . . . . . .14
24
         4         Reliance material. . . . . . . . .16
25
```

1                    E X H I B I T S

2                                                    Page
    Exhibit No.   Description                    Identified

3        5        CV. . . . . . . . . . . . . . . . 22

4        6        June 24th invoice. . . . . . . . .22

5        7        July 5th invoice. . . . . . . . . 22

6        8        E-mail exchange. . . . . . . . . .27

7        9        IARC Q&A. . . . . . . . . . . . . 43

8       10        ATSDR evaluation of glyphosate
9                 from 2020. . . . . . . . . . . . .51

10      11        Connolly paper. . . . . . . . . . 54

11      12        Acquavella study. . . . . . . . . 85

12      13        Risk Assessment of Glyphosate
                  Exposures from Pilot Study. . . . .100
13
        14        IARC monograph 2015. . . . . . . 132
14

15      (Original exhibits attached to original transcript.
                Copies provided to all counsel.)
16

17

18

                            R E Q U E S T S
19

20

                    (There were no requests made.)
21

22

23

24

25

```
 1                 TRANSCRIPT OF PROCEEDINGS

 2             THE VIDEOGRAPHER:  We are now on the

 3    record.  My name is Jackson Love.  I am a

 4    videographer for Golkow Litigation Services.

 5                     Today's date is August 17, 2022,

 6    and the time is 9:08 a.m.

 7                     This remote video deposition is

 8    being held in the matter of Roundup Products

 9    Liability Litigation for the Northern District of

10    California.

11                     The deponent is Ambrose --

12    Dr. Ambrose Charles.

13                     All parties to this deposition are

14    appearing remotely and have agreed to the witness

15    being sworn in remotely.  Due to the nature of

16    remote reporting, please pause briefly before

17    speaking to ensure all parties are heard

18    completely.

19                     Will counsel please identify

20    themselves?

21             MR. HABERMAN:  Jeffrey Haberman from

22    Schlesinger Law Offices on behalf of the plaintiff.

23             MR. KALAS:  John Kalas and Louis Russo

24    from Hollingsworth, LLP, on behalf of Monsanto

25    Company.
```

Ambrose Charles, Ph.D.

```
 1              THE VIDEOGRAPHER:  The court reporter is
 2    Anita Kornburger, and will now swear in the
 3    witness.
 4              AMBROSE CHARLES, MD, called as a
 5    witness herein, having been first duly sworn on
 6    oath, was examined and testified as follows:
 7                    E X A M I N A T I O N
 8    BY MR. KALAS:
 9         Q.   Good morning, Dr. Charles.  How are you?
10         A.   Good morning.
11         Q.   We've never met before; correct?
12         A.   No.
13         Q.   Okay.  My name's John Kalas.  I'm an
14    attorney who represents Monsanto.  And I'll be
15    asking you some questions about your report in the
16    Engilis case today, okay?
17         A.   Okay.
18         Q.   You have been deposed before; correct?
19         A.   Yes.
20         Q.   Okay.  And if you need -- so I assume you
21    know kind of how a depo works, but if you need a
22    break at any time, and if we aren't in the middle
23    of a question, let me know and we'll take a break,
24    okay?
25         A.   Okay.
```

Ambrose Charles, Ph.D.

1        Q.   We're doing this deposition virtually via

2   Zoom; right?

3        A.   Yes.

4        Q.   Okay.  Where are you right now?

5        A.   I'm in Round Rock, Texas.

6        Q.   And where are you in Round Rock?  Are you

7   in your home?  Are you in an office?

8        A.   In my home office.

9        Q.   In your home office.  Is there anyone in

10  the home office with you?

11       A.   No.

12       Q.   Okay.  And are you on your personal

13  computer right now?

14       A.   That's right.

15       Q.   Okay.  Do you have any programs open

16  besides this Zoom application?

17       A.   No.

18       Q.   Okay.  Do you have any files open on your

19  computer right now?

20       A.   No.

21       Q.   Okay.  Do you have any paper documents in

22  front of you right now?

23       A.   I have the Engilis report that I

24  submitted to the counsel, and I have a copy of my

25  resumé that I gave to counsel.  And I have your

Ambrose Charles, Ph.D.

1    letter, I believe, for the deposition --

2        Q.   Okay.

3        A.   -- in this case.  Yep.

4        Q.   All right.  And that's it?

5        A.   That's it.

6        Q.   Okay.  And just starting with that

7    resumé, you provided a resumé that was marked at

8    your earlier deposition with Ms. Ross in the

9    previous matter; correct?

10       A.   That's right.

11       Q.   Okay.  Have you updated that resumé at

12   all since then?

13       A.   This is a somewhat full resumé.  The

14   other one was a two-page short resumé.

15       Q.   Okay.

16            MR. KALAS:  Jeff, if you have an

17   electronic copy of that, could you forward that to

18   us, please?  We'll just get it marked on the

19   record.

20   BY MR. KALAS:

21       Q.   Now, to the extent you are referring to

22   anything on your computer or in paper form that we

23   haven't just discussed now, will you let me know

24   what you're looking at so we can mark it as an

25   exhibit?

```
 1        A.    Okay.

 2        Q.    Okay.  Now, if you see -- I don't know if

 3   you've used this program before, but there's a chat

 4   function down in the bottom.  And if you look at

 5   the chat function, I have put in a link to a Golkow

 6   remote site.  Do you see that?

 7        A.    I see that.  I never used it.

 8        Q.    Okay.  Go ahead and click on the link.

 9   That will take you to the marked exhibits.  And

10   there should be three marked exhibits in there.

11        A.    I clicked the link, yes.

12        Q.    Okay.  You see three marked exhibits?

13        A.    Not yet.  Yes.

14        Q.    Okay.  And the first marked exhibit is, I

15   believe, a document that's called an expert

16   disclosure.  Have you seen that document before?

17        A.    Is this document that you send to the

18   counsel?

19        Q.    Nope.  It's a different document.  It's

20   called Plaintiff's Rule 26 Specific Causation

21   Expert Disclosures.

22        A.    No, I don't think I have seen that.

23        Q.    Okay.  Why don't you take a look at it

24   real quick on your computer.  You can click on

25   Exhibit 1.
```

```
 1        A.    Okay.  Yeah, I have not seen this.

 2        Q.    Okay.  And do you see -- if you go down

 3   to page 2 -- and I'm going to share my screen just

 4   to be efficient here.

 5              You can see -- if you're looking at

 6   the Zoom, you can see what I'm looking at.

 7        A.    Okay.

 8        Q.    And that's page 2 of Exhibit 1, which has

 9   your name at the top.  Do you see that, sir?

10        A.    Yes, sir.

11        Q.    Okay.  And if you just take a moment to

12   read that paragraph to yourself, here, in

13   Exhibit 1.

14        A.    Okay.  Let me -- okay.  Okay, "Plaintiffs

15   may call Dr. Ambrose Charles of Toxfactor

16   Consulting, 3509 Cheyenne Street, Round Rock,

17   Texas" --

18        Q.    Yep, that's the paragraph.  You don't

19   need to read it into the record.

20        A.    Oh, okay.

21        Q.    Just take a moment to read it to

22   yourself.

23        A.    Yes, sir.  Okay.

24        Q.    Okay.  Does that paragraph which is in

25   Exhibit 1 encompass the areas of testimony you
```

1    expect to offer opinions on in the Engilis matter?

2         A.   That's correct.

3         Q.   Okay.  And to that end, are there any

4    opinions that, upon further reflection, you intend

5    to modify or change that you offered in the

6    previous deposition?

7         A.   No.

8         Q.   Okay.  I'm going to mark as Exhibit 2 --

9    or it's pre-marked as Exhibit 2 -- your notice of

10   deposition.

11              Now, this is a document you have in

12   hard copy in front of you.

13        A.   Can I add that I have not seen my

14   previous deposition?  I never had a copy of that to

15   review.

16        Q.   Okay.

17        A.   Okay.

18        Q.   But you can't think of anything you said

19   that you -- sitting here today, you disagreed or

20   you misspoke, at least by your memory?

21        A.   I cannot recall.  You know, that

22   deposition was the month of June.

23        Q.   Right.  Okay.  So Exhibit 2 is your

24   notice of deposition.  And you've seen this

25   document before because you have a copy; right?

```
 1        A.    That's right.

 2        Q.    Okay.  When did you first see it, sir?

 3        A.    I think last week Saturday or Sunday I

 4   received it.

 5        Q.    Okay.  And the notice of deposition, if

 6   you go down to page 5, has a section called Request

 7   For Production.  Do you see that?

 8        A.    Yes.

 9        Q.    Okay.  And I'm going to skip around a

10   little bit here, but starting with entry five

11   there, which is at line 15, it asks for your

12   current CV.  Do you see that?

13        A.    That's correct.

14        Q.    Okay.  And that's what you brought in

15   hard copy today; right?

16        A.    That's correct.

17        Q.    Okay.  And have you sent a copy of that

18   to Mr. Haberman?

19        A.    I did.

20        Q.    Okay.

21              MR. KALAS:  We'd just ask that that be

22   produced.

23   BY MR. KALAS:

24        Q.    Going up to entry number two, it asks for

25   each invoice or bill that Dr. Ambrose has rendered
```

```
1    in connection with his work as expert in litigation

2    involving Roundup, including but not limited to his

3    work regarding plaintiff in this case.  Do you see

4    that, sir?

5         A.   Yes.

6         Q.   Okay.  And have you submitted bills since

7    your last deposition in June to Mr. Haberman?

8         A.   I submitted a bill of the deposition.

9         Q.   Okay.  Have you submitted a bill at all

10   for your work on the Engilis report?

11        A.   Yes, before -- before that deposition.

12        Q.   Okay.

13        A.   I believe.  I don't -- if you can hold --

14        Q.   Sure.

15        A.   I have a copy of that -- printed a copy

16   of that invoice.  Okay.

17        Q.   Okay.  And what was the total amount for

18   that invoice?

19        A.   That date was 6/24/2022.

20        Q.   Okay.  And what was the total amount you

21   invoiced on that invoice?

22        A.   That invoice -- invoice has total of

23   28,800.

24        Q.   Okay.  Thank you.

25        A.   Of which Peter Engilis' bill was 22,050.
```

Ambrose, Charles, Ph.D.

```
1        Q.   Okay.  And since that invoice was
2   submitted, the only other invoice you believe you
3   submitted was for your deposition time in the
4   deposition in the Moore and Plume matters; correct?
5        A.   That's correct.
6        Q.   Okay.  And at that deposition you charged
7   $500 an hour for your lost professional time;
8   right?
9        A.   That's correct.
10       Q.   Okay.  Since that deposition, have you
11  continued to work on Roundup matters?
12       A.   Yes.
13       Q.   Okay.  How much time per week would you
14  estimate you've spent on Roundup matters since that
15  June deposition?
16       A.   It depends, you know.  I cannot tell you
17  exactly how many hours I work per week.  It depends
18  on the work and the time that I get to review.  And
19  also to review these kind of matters, you know, you
20  need to concentrate, you need to find the time for
21  yourself to do these things.
22                So I cannot just pinpoint how
23  many hours.  You know, total hours would
24  be reported --
25       Q.   I'm sorry, I missed the very last
```

1   sentence there.

2       A.   The total hours will be reported in the

3   end when I submit the bill.

4       Q.   Got it.  Well, how about let's --

5   let's -- well, let me back up.

6            Would it be fair to say that you've

7   spent more than ten hours working on Roundup cases

8   since your June deposition?

9       A.   Yes.

10      Q.   Okay.  Would it be fair to say you've

11  spent more than 20 hours working on Roundup cases

12  since your June deposition?

13      A.   Possible.

14      Q.   Okay.

15      A.   I don't have the numbers with me.

16      Q.   Okay.  And of those 20 possible hours, it

17  would have been done at $450 per hour; right?

18      A.   That's correct.

19      Q.   Okay.  Now, just -- we'll come back to

20  Exhibit 2, but another thing I marked is Exhibit 3.

21  And Exhibit 3 is your expert report that was

22  submitted in the Engilis matter.  I'm just calling

23  that up here.  It's here on the screen.

24            Is this a true and correct copy of

25  your expert opinion in this matter?  You can take a

1  moment to scroll through it.  You can control it in

2  the exhibit app.  Go ahead and take the time you

3  need to make sure that you can answer that.

4       A.   Yes, that's my report and that's my

5  signature.

6       Q.   Okay.  And since you rendered your --

7  actually, let me back up and ask a different

8  question.  Strike that.

9            Does this report contain all of the

10 opinions you intend to offer in the Engilis matter?

11      A.   At that point, you know, from the

12 evidence and the literature I had, those were my

13 opinions.

14      Q.   You said at that point.  Sitting here

15 today, are there any additional opinions you did

16 not put in your expert report you intend to offer

17 in the Engilis matter?

18      A.   I cannot think about anything else.

19      Q.   Okay.  Now Mr. Haberman has sent me, I

20 think, a few documents here, so I'm going to mark

21 those as responsive to the notice.  If you just

22 give me a moment to get those loaded on.  Sorry,

23 it's going to take me a second here.

24      A.   No problem.

25      Q.   Okay.  Now, the last tech instruction I

1    think I'll have to do today is just that if you

2    look at that exhibit website I sent you, the Golkow

3    remote website, you need to go to the top and

4    refresh the screen.  And once you refresh the

5    screen, you should see the additional exhibits I

6    have marked as Exhibits 4 through 7.  There should

7    be seven in there once you refresh.

8        A.   Where do I refresh?  I don't see

9    anything.

10       Q.   So refresh is -- I use Firefox, and

11   Firefox is in the top left corner, and it's, like,

12   the circle that has an arrow on it.  I think, I

13   don't know, Google Chrome probably has something

14   very similar.

15            The other thing you could do is just

16   exit out of the Golkow remote site and then click

17   on that link again and go back in.

18       A.   Okay.

19       Q.   Okay?

20       A.   I got it.  There.

21       Q.   Okay.  So Exhibit 4 was a reliance

22   material that I believe is number -- if you go back

23   to Exhibit 3, it's reliance material number 15,

24   document 15, Peter Engilis Roundup affidavit.

25       A.   Yes.

```
 1        Q.   Okay.  And did you rely on Exhibit 4 in

 2   reaching your opinions in this matter?

 3        A.   I must have looked at it.  Yeah, you

 4   know, anything that was important to me I reviewed.

 5   Yes, I must have.

 6        Q.   Okay.  And if it was on your reliance

 7   list, you reviewed it; right?

 8        A.   Yes.

 9        Q.   Okay.  And Exhibit 4 outlines

10   Mr. Engilis' usage history as far as the number of

11   years and the frequency per year he used Roundup;

12   right?

13        A.   Can I open it?

14        Q.   Yeah, absolutely.  I can put it up on the

15   screen too.

16        A.   No, I'll open it.  Yeah.

17        Q.    If that makes it easier.

18        A.   Yeah, he used -- pull this out of my way.

19             Number three says, you know, "I used

20   the Roundup approximately once every two weeks at

21   my Florida residence."  And four, "Roundup

22   approximately once a month at my Summerfield,

23   Florida.  And 1996 to 2002 I used Roundup

24   approximately once a month at my Fort Lauderdale,

25   Florida residence."  Yes.
```

Ambrose, Charles, Ph.D.

1    Q.   Okay.  And so it's your understanding,
2    based on Mr. Engilis' affidavit, that from 1990
3    through 1995 he used Roundup once every two weeks
4    at the DeBary residence only; right?
5    A.   Yes.
6    Q.   Okay.  And then from 1996 to 2002 he
7    used Roundup approximately three times a month at
8    the -- twice at the DeBary residence and once at
9    the Fort Lauderdale residence; correct?
10   A.   Yes.
11   Q.   Okay.  And then from 2003 to 2007 he used
12   Roundup twice a month at the DeBary residence only;
13   right?
14   A.   Say that again, please.
15   Q.   From 2003 to 2007 he used Roundup twice a
16   month at the DeBary residence only; correct?
17   A.   I don't see that in that statement, 2003.
18   Q.   Well, right, because he has a time period
19   encompassing 26 years at DeBary; correct?
20   A.   Yeah, that comes from -- I recall in his
21   deposition, and somewhere in his records, you know,
22   he used Roundup between a period of 1985 through
23   2015.  That is about 29 or 30 years of Roundup use.
24   Q.   Okay.  But I'm asking about this
25   affidavit.  Do you see at the second page

```
 1    Mr. Engilis signed this affidavit?

 2         A.   Yes.

 3         Q.   Do you see that he said, "Under the

 4    penalty of perjury, the foregoing is true and

 5    correct"?

 6         A.   Yes.

 7         Q.   Okay.  So my question's about this

 8    affidavit.  We'll get into the depos and the facts

 9    in a bit.  So I'll preface it with according to

10    this affidavit.

11              According to this affidavit, he

12    applied for 26 years; right?

13         A.   Yes.

14         Q.   Okay.  And I've started off asking you

15    for that 1990 to '95 period because he only applied

16    at one location, according to this affidavit;

17    right?

18         A.   From '95 to 2015.

19         Q.   From '95 -- '90 to '95.

20         A.   I don't have those things on this page,

21    1990 to '95, whether he used.  I don't have --

22         Q.   I'm asking you to look at this page and

23    just make a timeline with me with the dates.

24         A.   Oh.  Can I, you know, draw that or --

25         Q.   Yeah, yeah, if that helps you, sure.  A
```

1    lot of people are visual learners.  Go for it.

2         A.   I'm too old for the visual learning.

3    1995 to -- 1990 to 1995, that's what you said?

4         Q.   Right.  From 1990 to '95 he only applied

5    at DeBary according to this affidavit, and he

6    applied twice -- twice a month; right?

7         A.   Yeah, so '95 comes in between 1990 and

8    2015, right.

9         Q.   Right.  Okay.  Then 1996 he starts using

10   it at the Fort Lauderdale residence in addition to

11   DeBary; correct?

12        A.   1996 he also used -- yes.

13        Q.   Okay.  And so from '96 to 2002 he used

14   Roundup three times a month, twice a month at

15   DeBary and once a month at Fort Lauderdale; right?

16        A.   Yes.

17        Q.   Okay.

18        A.   That's what is written here, yes.

19        Q.   Okay.  And then according to this

20   affidavit, from 2003 to 2007 he's only applying at

21   one property, the DeBary property; right?

22        A.   I cannot just go with you that fast, you

23   know, because you are using different numbers.  And

24   one has to really look into the data.  And that

25   period that you are talking about is accurately

1    reflecting what you said, and his use.  You know, I

2    had to figure it out.  I cannot simply say yes to

3    everything you say.

4        Q.   Well, I said "according to this

5    affidavit."  I'm not asking you to say yes to

6    everything I say.  I'm asking you if this affidavit

7    says that.  Okay?

8             So according to this affidavit, he

9    only applied at DeBary from 2003 to 2007; correct?

10       A.   DeBary in 2007 to?

11       Q.   2003 to 2007.  Five-year period there.

12   '03, '04, '05, '06, '07.

13       A.   He used it from 1990 through 2015.

14       Q.   Yes.  I'm asking you what locations he

15   used it at in that five-year period, sir.

16       A.   There's no five-year period.  That

17   five-year period is included in that broad 1990 to

18   2015.

19       Q.   Okay.  So you don't understand my

20   question about this affidavit, sir, that for the

21   2003 to 2007 period, according to this affidavit,

22   DeBary was the only residence he applied to?

23       A.   You are jumping from three to four to

24   five to four, back to four to three.  So I cannot

25   just keep up with that.  You obviously prepared all

```
 1   this in your mind.  I am not.  So I cannot just

 2   jump into you, sir.

 3        Q.   That's fine.  We'll come back to this

 4   affidavit once we're back into the -- back into the

 5   facts a bit more and --

 6        A.   Okay.

 7        Q.   -- see if we can agree to things.

 8        A.   Okay.  Thank you.

 9        Q.   Exhibit 5.  This is that updated CV;

10   right?

11        A.   Exhibit 5.  Yes.

12        Q.   Okay.  And this CV lays out -- well,

13   strike that.

14             Is this the CV you use only for

15   litigation, or is it a CV you also use

16   professionally?

17        A.   I prepared this for mostly litigation.

18   Most of the material is here.

19        Q.   Okay.

20        A.   And other -- there are other experiences,

21   like leadership and management training and all not

22   included in this one, which is not relevant.

23        Q.   Okay.  Exhibit 6 and 7 are two invoices

24   that were provided to us.  One that is that

25   June 24th invoice you referred to, and the second
```

Ambrose Charles, Ph.D.

```
1    is a July 5th invoice for your deposition time, and
2    then I guess deposition prep and parking.
3              And the total dollar amount for both
4    of them -- the first one's for 28,800, and the
5    second one is for $5,523.82.  Does that seem right
6    to you?
7         A.   Yes.
8         Q.   Okay.  Now going back to Exhibit 3, you
9    have -- if I just go to the first sentence of your
10   expert report, you said, "I have reviewed all
11   pertinent documents," and then you have a -- a
12   superscript, 1 through 16 -- "related to the
13   plaintiff, Mr. Peter Engilis, provided to me by the
14   Schlesinger Law Offices, Fort Lauderdale, Florida,
15   which are considered as facts in this case."
16             Did I read that correctly?
17        A.   That's correct.
18        Q.   Okay.  And when you were putting together
19   this report, you were careful to review all of the
20   facts of this case from those documents that were
21   provided to you in order to reach your opinions;
22   right?
23        A.   Yes.
24             MR. HABERMAN:  Objection.
25   BY MR. KALAS:
```

1        Q.    Okay.

2        A.    I normally look at everything and then

3   pick out relevant information that I need to make

4   out my opinion.

5        Q.    Okay.  And the -- this report that's

6   written here, are these your words or somebody

7   else's words?

8        A.    I'm the sole reviewer.  I am the one who

9   typed it.  I write it.  I correct it.  I print it

10  and I send the report.  There is no one else

11  working for me.

12       Q.    Okay.  And just going down to Exhibits 1

13  through 16, Exhibits 1, 2, 3, 4, 5, 6, 7, 8, 9, 10

14  are sets of medical records; right?

15       A.    Yeah, I believe so.

16       Q.    Okay.  And look through your report at

17  any time.  I'm at pages 30 to 31 looking at that.

18              And those medical records were

19  provided to you by plaintiff's counsel; right?

20       A.    Right.

21       Q.    Okay.  And you reviewed those carefully

22  in order to inform your opinions on the facts in

23  this case; right?

24       A.    Yes.

25       Q.    Okay.

Ambrose Charles, Ph.D.

```
 1        A.    As much as possible.

 2        Q.    Okay.  And then Exhibits 11, 12, 13, 14,

 3   15, and 16, those are litigation documents; right?

 4        A.    That's correct.

 5        Q.    Okay.  And you reviewed those carefully

 6   to inform your opinions in this case; right?

 7        A.    I look at all those things, you know, and

 8   when I -- when you say "review," I review only

 9   relevant matters pertaining to the case.  Other

10   things, no.

11        Q.    Okay.

12        A.    So I think there are documents there that

13   doesn't belong to me and I don't pay attention to

14   that.  But I list everything that I received.

15        Q.    Okay.  You said there's documents there

16   that don't belong to me and I don't pay attention

17   to that.  I guess I don't understand what you mean

18   by that.  Let's take them one at a time.

19        A.    Yeah.

20        Q.    Kathy Engilis deposition, pages 1

21   through 71, 12/13/2021.  You reviewed that document

22   in reaching your opinions; right?

23        A.    That is number 16?

24        Q.    Number 11, sir.

25        A.    Yes.  Yes, I read that.
```

```
 1        Q.   Okay.  Now, Kathy Engilis isn't suing

 2   Mr. -- or strike that.  Kathy Engilis isn't suing

 3   for having non-Hodgkin's lymphoma; right?

 4        A.   No.

 5             MR. HABERMAN:  Objection.

 6   BY MR. KALAS:

 7        Q.   Okay.  Peter Engilis is suing for having

 8   non-Hodgkin's lymphoma; right?

 9             MR. HABERMAN:  Objection.  Well, yes,

10   that's true, but let's not try to confuse him.  I

11   mean, Kathy Engilis is his wife.  She's a loss of

12   consortium claim.  She's suing Monsanto too.

13             MR. KALAS:  I'm going to object to

14   the -- well, strike that.  I'm just going to note

15   that's an improper objection under the rules.

16   BY MR. KALAS:

17        Q.   Dr. Charles?

18        A.   Yes, ma'am -- sir.

19        Q.   Is Kathy Engilis suing for having

20   non-Hodgkin's lymphoma from using Roundup?

21        A.   Counsel will be able to answer that, sir,

22   who is suing who.  I am not in that.

23        Q.   Okay.  When you wrote your report, did

24   you write a report about Kathy Engilis' exposure to

25   Roundup?
```

Ambrose, Charles, Ph.D.

```
1          A.    No.
2          Q.    Okay.  You wrote a report about Peter
3   Engilis' exposure to Roundup; right?
4          A.    That's correct.
5          Q.    Okay.  And document number 16, Peter
6   Engilis' deposition, if you look down there, you
7   actually had a deposition transcript from the
8   person who applied the Roundup; right?
9          A.    That's correct.
10         Q.    Okay.  So if you had a deposition
11  transcript from the person who applied the Roundup
12  and who could talk about their usage of Roundup,
13  why did you also review the deposition of his wife?
14         A.    Because that was given to me.  I wanted
15  to find out, you know, if there was any relevant
16  information for me.
17         Q.    Okay.  And so you read what was given to
18  you in order to find out if there was relevant
19  information, fair?
20         A.    That's right.
21         Q.    Okay.  I'm going to mark as Exhibit 8 an
22  e-mail exchange.  I'm marking it for the record
23  more than anything.  I don't really have a lot of
24  questions for you.
25         A.    You said number eight, sir?
```

Ambrose Charles, Ph.D.

```
1         Q.   I'm going to put it on now.  You're going
2    to have to refresh again.  Sorry.
3         A.   I know.  That's my problem here.
4         Q.   And it's labeled Haberman e-mail
5    exchange.
6         A.   Okay.  Let me see.  Number eight.  Yes,
7    yes.
8         Q.   Okay.  And --
9         A.   Can I open that?
10        Q.   Yeah, you can open it.  You can read it
11   now that I've marked it.  Go for it.
12        A.   Okay.
13        Q.   Just let me know when you're done looking
14   at it.  And I'll ask you just one or two questions.
15   We'll move on.
16        A.   This is from you to Jeff?
17        Q.   Yep.
18        A.   Right?
19        Q.   Yep.  And there's no question pending,
20   but yes, that is from me to Jeff.  But --
21        A.   Okay.
22        Q.   -- just look at it and let me know when
23   you're done.
24        A.   Yes.
25        Q.   Okay.  And the e-mail exchange, if you go
```

1    to the bottom, refers to three documents, documents

2    12, 14 and 15.  Do you see that?

3         A.    Again, back to the reference?

4         Q.    Nope, nope.  I'm asking about the e-mail

5    exchange.  Do you see the e-mail exchange asks

6    about documents 12, 14 and 15?

7         A.    E-mail exchange.  I only have

8    to eight -- okay, let me look at further.  I only

9    have eight here.  Eight one is Haberman e-mail

10   exchange.

11        Q.    Right.

12        A.    I don't have anything --

13        Q.    Yeah.  No, no.  Exhibit 8, that's what

14   I'm asking about.  If you go to the very bottom --

15        A.    Oh, okay.

16        Q.    An e-mail sent on Wednesday, August 10th,

17   at 10:06 a.m.  It asks for documents 14 and 15.  Do

18   you see that?

19        A.    Okay, okay.  I see "Please identify with

20   specificity provided documents 14 and 15 cited."

21   Okay.  Okay.

22        Q.    Yep.  And then if you go up one more, it

23   also says, "Please also provide document 12";

24   right?

25        A.    Oh, yes.

```
 1        Q.   Okay.  Then going back to Exhibit 3,

 2   which is your expert report --

 3        A.   Okay.

 4        Q.   -- if you go down to page 31, starting

 5   with document 15, document 15, the Roundup

 6   affidavit, is what we've marked as Exhibit 4;

 7   right?

 8        A.   Yes, yes.

 9        Q.   Okay.  And then document 12 and

10   document 14 -- document 12 says it's a client info

11   sheet.  Do you see that?

12        A.   Yes.

13        Q.   Okay.  And document 14 says it's a

14   settlement form, final.  Do you see that?

15        A.   Yes.

16        Q.   Okay.  And those are documents you

17   received from Mr. Haberman; correct?

18        A.   That's correct.

19        Q.   Okay.  If we continue on, Dr. Charles,

20   what is the dose of glyphosate that needs to enter

21   someone's body to put them at an increased risk of

22   NHL?

23             MR. HABERMAN:  Objection.  You can

24   answer.

25             THE WITNESS:  What is the dose?
```

1   BY MR. KALAS:

2       Q.   Yes, sir.

3       A.   What is the -- I'll repeat the question

4   just so you make sure you hear it.

5            What is the dose of glyphosate that

6   needs to enter someone's body to put them at an

7   increased risk of NHL?

8            MR. HABERMAN:  Object to form.

9            THE WITNESS:  I don't think --

10           MR. HABERMAN:  Improper hypothetical.

11           THE WITNESS:  -- we don't have a dose.

12   It is all just speculation saying that there is a

13   dose for any chemical to cause any disease.

14   BY MR. KALAS:

15       Q.   Okay.

16       A.   There is no dose, like in a human dose,

17   for any chemical to cause any kind of disease.  It

18   is not established, you know.  I don't think that

19   we have any human experimentation on that.

20       Q.   Well, I just want to make sure I

21   understand your answer.  You said cause; right?

22       A.   Yes.

23       Q.   My question wasn't about cause, okay?  So

24   I just want to make sure you heard my question.

25           My question was, what is the dose of

1   glyphosate that needs to enter someone's body to

2   put them at an increased risk of NHL?

3       A.   If I know the dose, I would get the Nobel

4   prize for that.

5       Q.   Okay.  Then I think I know the answer to

6   this question, but I'll ask it anyway.

7       A.   Yes.

8       Q.   Did Mr. Engilis have a dose of glyphosate

9   that entered his body that put him at an increased

10  risk of NHL?

11      A.   He must have received enough dose to

12  cause NHL.

13      Q.   Okay.  So it's your expert opinion

14  Mr. Engilis had enough dose to increase his risk of

15  NHL, but you don't know what that dose is?  That's

16  fair?

17      A.   That's very fair.  That is the case in

18  every human situation in occupational and

19  environmental exposures and areas.

20      Q.   Okay.  Did Mr. Engilis ever absorb a dose

21  of glyphosate that exceeded any regulatory

22  threshold established for glyphosate?

23      A.   I cannot answer that question.

24      Q.   Okay.  Can you opine -- Well, strike

25  that.

1           Tell me your methodology that you

2    employed to reach the opinion that Mr. Engilis

3    absorbed a dose of glyphosate that put him at an

4    increased risk of NHL.

5        A.   Well, first I look at if Mr. Engilis --

6    Engilis, right, I'm sorry -- Engilis has used

7    glyphosate and how long he used, how he used, and

8    while he was using it, whether he had enough

9    protection or what was the clothing and other

10   protection that you -- you know, clothing and masks

11   or gloves that he used to prevent any exposure.

12           So when I look at all those different

13   things, you know, you find he used glyphosate for a

14   number of years, number one.  Number two, that he

15   has used for the duration that can cause enough

16   exposure.  Enough means enough to cause concern.

17           And third, if there was a concern.

18   Yes, there was a concern, because he had a disease

19   that he claims that it is due to the exposure.

20   Then I look at, you know, what created that excess

21   exposure that he's claiming.  When I look at he was

22   wearing shorts, and sometimes he used the

23   long-sleeved shirts, and he was using open, you

24   know, sandals.  Many times he was bare feet.  His

25   arms and legs were exposed.  Inhalation, dermal

1    exposure, all of those things, you know, can cause

2    absorption or entering the chemical into the body.

3    You cannot interpret the dose unless you measure it

4    at that time.

5              That is how the dose is, you know,

6    calculated.  After the exposure, you look at the

7    concentration of the chemical in your system, in

8    your blood.  Then you can say how much has entered.

9    Here, you are only scientifically or reasonably

10   thinking that, you know, this chemical is absorbed,

11   because this chemical can be absorbed through

12   normal inhalation routes.

13       Q.   Okay.  I think I understand your

14   testimony.  But it was a lot there, so I want to

15   make sure I got it all.  So you first look at

16   whether or not he used the product, the product

17   here being Roundup.  Then you looked at how he used

18   Roundup, how much he used Roundup.  And then you

19   look at whether or not he had enough protection for

20   exposure.  So in other words, you look at PPE.  Is

21   that the first few steps there?

22       A.   That's right.

23       Q.   Okay.  And then after that you look at

24   whether or not how many years an individual used it

25   and what the duration of use was; is that right?

1        A.    That's correct.

2        Q.    Okay.  And then after that you look at

3   all the routes by which the Roundup could get into

4   their body or could get into an individual's body.

5   And the thinking is because Roundup can be absorbed

6   via those routes, it was absorbed; right?

7        A.    That's correct.

8        Q.    Okay.  Okay.  Now, after you've made that

9   conclusion that the Roundup was absorbed, how do

10  you use that to reach -- well, let me back up and

11  strike that question and ask a more basic question.

12            Do you have a causation opinion in

13  this matter?

14        A.    Please explain that.

15        Q.    Sure.  Are you offering an opinion that

16  Roundup generally can cause non-Hodgkin's lymphoma

17  in someone in the world?

18        A.    There are some scientific evidence, you

19  know, pointing towards that.

20        Q.    Okay.  Are you offering the opinion that

21  Roundup did cause non-Hodgkin's lymphoma in

22  Mr. Engilis?

23        A.    When I look at the whole picture of

24  exposure, that's the only chemical that I found

25  that he has the greater exposure during the time of

```
 1   his -- you know, usage history.  I didn't find any

 2   other chemical exposure, either pesticides or other

 3   chemicals, as part of his occupation or any other

 4   way, you know, like, personal habits, drug use.

 5   And I didn't find anything in the records, you

 6   know, that would point out to other chemical

 7   exposure.

 8            So more and more you look at this is

 9   the only chemical that is in the picture that point

10   out to probably this is what is contributing to his

11   conditions.

12       Q.   Okay.  And let me ask another question

13   about your broad opinions, and then we'll get back

14   to the process.

15            Are you offering the opinion that

16   Roundup caused his bladder cancer?

17       A.   I did not make a statement of his bladder

18   cancer.  But how I brought up that particular

19   aspect into my report, because the person, you

20   know, generally gentleman are -- used to wear

21   shorts when they are using chemicals.  It is a

22   practice and an occupational outset and

23   environmental applications, you know, probably they

24   are not protecting their private parts.

25            The lower abdominal area is very well
```

Ambrose Charles, Ph.D.

1    notable to chemical exposure from spread.  When you

2    are especially using shorts or that part is not

3    properly covered.  There are incidents of sulfur

4    associations of testicular cancer, prostate cancer,

5    with the use of NHL.  There are associations, you

6    know, that are reported that are indicating that.

7              So urinary bladder is located in that

8    particular area that we are talking about.  That's

9    the reason I brought that in my discussion.  But

10   not saying that glyphosate caused it.  I have no

11   record of that or any reference to that.  But that

12   is something that one has to be aware of.

13        Q.   Okay.  So if I understand your opinion

14   correctly on the bladder cancer, when you brought

15   it up in your report, you are bringing up the fact

16   that the area of dermal exposure to Roundup is in

17   the area of the bladder, but you are not opining

18   that the Roundup caused the bladder cancer; is that

19   fair?

20        A.   Correct.

21        Q.   Okay.

22             MR. HABERMAN:  I'm sorry to interrupt,

23   and I'm sorry that I'm going to ask to take a break

24   now.  We've only been going a short while, but I

25   need a ten-minute break.

1          MR. KALAS:  Okay.  Let's go off the

2    record for ten minutes.

3          THE WITNESS:  All right.  Thank you.

4          MR. KALAS:  Thank you, Dr. Charles.

5          THE VIDEOGRAPHER:  We are off the record

6    at 9:54 a.m.

7               (Break taken.)

8          THE VIDEOGRAPHER:  We are now back on the

9    record at 10:15 a.m. Eastern daylight time.

10   BY MR. KALAS:

11       Q.   Dr. Charles, are you offering an opinion

12   in this matter that Mr. Engilis' Roundup use caused

13   or contributed to his malignant melanoma?

14       A.   No.

15       Q.   Okay.  Dr. Charles, going back to the

16   methodology that we talked about before the break.

17   After you went through the methodology that you

18   outlined, you came to a conclusion that

19   Mr. Engilis' Roundup use caused or contributed to

20   his NHL, specifically CLL; right?

21       A.   Right.

22       Q.   Okay.  And in order for the Roundup to

23   cause or contribute to his NHL, Mr. Engilis would

24   have had to have absorbed Roundup through the

25   course of his application; right?

1      A.   That's correct.

2      Q.   Okay.  And you are not opining that there

3   are not other factors in Mr. Engilis' life, be it

4   random genetic mutations, idiopathy, his age, what

5   have you, that could have also contributed to his

6   NHL, fair?

7      A.   I'm not, but I have not seen anything

8   that is said to be refuting to that in the reports.

9      Q.   Okay.  And you're not opining that had

10  Mr. Engilis' -- strike that.

11           You're not opining had Mr. Engilis

12  never used Roundup, he would not have gotten NHL,

13  true?

14     A.   True.  That is true.

15     Q.   Okay.  Now, in your last deposition, sir,

16  you were quite candid, frankly, that dose is a

17  different concept than exposure.  Do you recall

18  that testimony?

19     A.   Yes.

20     Q.   Okay.  And you and Ms. Ross talked about

21  the fact that someone can have exposure to a

22  substance but not have any measurable dose.  Do you

23  recall that?

24     A.   That's true.

25     Q.   Okay.  And you talked about a lot,

1    actually, in that deposition, that the father of

2    toxicology said the dose makes the poison.  Do you

3    remember that?

4         A.   That's correct.  That's the accepted

5    general principle of toxicology.

6         Q.   Okay.  Can we agree that there are dose

7    levels of glyphosate that do not lead to

8    carcinogenic effects in people?

9         A.   Yes.

10             MR. HABERMAN:  Objection.

11   BY MR. KALAS:

12        Q.   Okay.  And so whether or not someone's

13   exposure to glyphosate puts them at risk of cancer

14   is dependent on the amount of the absorbed dose,

15   true?

16        A.   It is also dependent on the duration.

17   Carcinogenic particular cancer is not as

18   spontaneous to happening as a disease.  If

19   something is spontaneous, we categorize it as an

20   acute or short-term exposure dose, that is, can be

21   within 24 hours or within two, three days or a

22   week, or maximum within a month's time if you find

23   some kind of toxicity.  That is a short-term

24   toxicity.  But cancer is not one of those kind of

25   responses.  You should have a long duration of

1   exposure.

2       Q.   That's a good point.  So let me -- let me

3   rephrase my question based upon your answer there.

4            Whether or not someone's exposure to

5   glyphosate puts them at a risk of cancer is

6   dependent on the amount and duration of the

7   absorbed dose; is that fair?

8       A.   That's correct.

9       Q.   Okay.  And do you recall also in the last

10  deposition that you talked a bit about hazard and

11  risk?  Do you remember that discussion?

12      A.   I don't remember.  I must have discussed.

13      Q.   Okay.  Well, let's -- if you don't

14  remember, then let's -- let's just kind of

15  establish sort of our guardrails here.

16           Have you heard of the terms hazard and

17  risk?

18      A.   Mr. Kalas, that was 10.5 hours of

19  deposition.  And if I could recall everything that

20  I said there, without a record right in front of

21  me, I have no way of knowing it.

22      Q.   No, no.  I completely understand.  And

23  I'm not trying to be critical, which is why I just

24  want to get ourselves on the same page.

25      A.   Very good.

Ambrose, Charles, Ph.D.

```
1        Q.   Are you familiar with the terms hazard
2    and risk?
3        A.   Yeah, that -- that is one of the first
4    things that we learn in toxicology, even in my
5    graduate school.
6        Q.   Okay.  And what is hazard?
7        A.   Hazard is the danger that is sitting
8    somewhere.
9        Q.   And what is risk?
10       A.   Risk is a consequence of that hazard.
11       Q.   Okay.  And so if you're identifying a
12   hazard, it means you're identifying a potential
13   danger; right?
14       A.   That's correct.
15       Q.   Okay.  And if you're identifying a risk,
16   you're essentially identifying the amount of danger
17   somebody may be in from exposure to that potential
18   danger, fair?
19       A.   Amount, and also where to the risk.
20       Q.   Right.  Just to use an easy, real-world
21   example, a great white shark out in the ocean, that
22   can be a hazard; right?
23       A.   Yeah.
24       Q.   Okay.  But if you're in Colorado, it's
25   probably not a risk to you; fair?
```

1      A.   Fair.

2      Q.   Okay.  Now I'm going to mark as Exhibit 9

3   a document that has been released by IARC regarding

4   a glyphosate monograph.  I'll put that up.  And

5   I'll share my screen as well.

6      A.   Can I get out of this --

7      Q.   Yep.  You can either look at it on your

8   own, but I've got it up on the screen here too if

9   that makes it easy.

10      A.   Let me see.  Oh, okay.  Nine.

11      Q.   Okay.

12      A.   Yeah.

13      Q.   All right.  And you reviewed the IARC

14   monograph on glyphosate; right?

15      A.   Yeah.  I looked at it, yes.

16      Q.   Have you reviewed this document from

17   IARC?

18      A.   I think so.

19      Q.   Okay.  Well, then let's go down to the

20   last request Q and A they have here.  And it says,

21   "What does IARC's classification mean in terms of

22   the probability of developing a cancer."  Did I

23   read that correctly?

24      A.   That is correct.

25      Q.   Okay.  And IARC says here in the second

```
 1    paragraph, "The IARC monograph's evaluation is a

 2    hazard classification.  It indicates the strength

 3    of evidence that glyphosate can cause cancer.  The

 4    probability of developing a cancer will depend on

 5    factors such as the" --

 6         A.    Excuse me.  Excuse me.

 7         Q.    Yeah.

 8         A.    I might be in the wrong, but what does

 9    IARC's classification mean -- okay.  The second

10    paragraph you are reading.  Okay.

11         Q.    Yep.  So let me start at the beginning

12    again.

13         A.    Yes, sir.

14         Q.    The second paragraph says, "The IARC

15    monograph's evaluation is a hazard classification.

16    It indicates the strength of evidence that

17    glyphosate can cause cancer.  The probability of

18    developing a cancer will depend on factors such as

19    the type and extent of exposure and the strength of

20    the effect of the agent."  Did I read that

21    correctly?

22         A.    That's correct.  That's what we were

23    discussing now.

24         Q.    Okay.  Do you agree that an IARC

25    monograph cancer classification indicates the
```

1    strength of evidence that glyphosate can cause

2    cancer?

3              MR. HABERMAN:  Objection.

4              THE WITNESS:  They have classified

5    glyphosate as probably -- probably carcinogenic to

6    humans, group 2A.

7    BY MR. KALAS:

8         Q.   Right.

9         A.   That is the classification.  Whatever

10   they say after that is not the point.  The point

11   is, you know, what is the classification.

12        Q.   Okay.  Do you agree with IARC's statement

13   here that the probability of developing a cancer

14   will depend on factors such as the type and extent

15   of exposure and the strength of the effect of the

16   agent?

17        A.   I agree with that, and also many --

18   several other factors.

19        Q.   Okay.  Let me ask you about that last

20   clause there, the strength of the effect of the

21   agent.  What's that mean as a toxicologist?

22        A.   Strength of the effect --

23        Q.   Yes, sir.

24        A.   -- of the agent.  That is how potent the

25   chemical is.

Ambrose, Charles, Ph.D.

1      Q.   Okay.  Have you reached any conclusions

2   as a toxicologist as to whether or not glyphosate

3   is a potent carcinogen?

4      A.   It has limited evidence that it can cause

5   cancer or -- especially NHL and its sub types.

6      Q.   Okay.  There are some other 2A

7   carcinogens, like I think red meat is one, night

8   shift work, that sort of thing.  How does

9   glyphosate compare in potency to the other 2A

10  carcinogens?

11     A.   How does glyphosate compare to red meat?

12     Q.   Well, I think my -- let me back up and

13  ask maybe a more basic question.

14          Have you done any assessment on the

15  carcinogenic potency of glyphosate?

16     A.   No, I have not.

17     Q.   Okay.  And what does it mean to assess

18  carcinogenic potency?

19     A.   It means that chemical can cause cancer.

20     Q.   Okay.  Now, you said the probability of

21  developing -- or it says here the probability of

22  developing a cancer -- Well, strike that.  I think

23  we already went over that.

24          And so just kind of taking this on and

25  thinking about the IARC monograph, which I can mark

1    if you need to look at it.  But from a toxicologist

2    point of view, does IARC do a hazard assessment or

3    a risk assessment?

4        A.   They say their evaluation is a hazard

5    classification.  That means it is a hazardous

6    chemical and their classification says it is

7    probably carcinogenic to humans.

8        Q.   Right.  And so IARC did not do what's

9    called a risk assessment in toxicology; right?

10       A.   Without risk assessment, they cannot come

11   to that conclusion.

12       Q.   Without risk assessment they cannot come

13   to that conclusion?

14       A.   Come to the conclusion that probably

15   carcinogenic to humans.

16       Q.   Okay.

17       A.   This is a process which lead you to get

18   to that conclusion.

19       Q.   Okay.  That's -- okay.  So in order to

20   conduct a risk assessment, somebody needs to take

21   into account the extent of somebody's dose, right,

22   the type and extent of dose?

23       A.   That's correct.

24       Q.   Okay.  And IARC said that -- Well, strike

25   that.

```
 1              Did IARC take into account dose in

 2   reaching their opinions?

 3        A.   They must have, yes.

 4        Q.   Okay.  Well, let's go to the monograph

 5   and look at where they conduct -- well, let me back

 6   up.

 7              Toxicologists like you, when they

 8   conduct a risk assessment in order to evaluate

 9   whether or not a chemical poses a carcinogenic

10   risk, one of the things they do is something called

11   a benchmark dose methodology; right?

12        A.   That's correct.

13        Q.   Okay.  And what is that?

14        A.   That is the amount of the chemical --

15   different dose levels, you know, you conduct the

16   experimenting on rats and mice.

17        Q.   Okay.

18        A.   You come up with a titration of the dose

19   that can be used for -- for the experiment.  From

20   that particular data, from the animal studies, you

21   know, we come up with a dose level that can cause I

22   will say a cutoff level that can be expose -- that

23   can be dangerous or not dangerous applying the

24   safety factors to it, come up with a benchmark dose

25   that is okay.
```

1      Q.   Okay.  And then from that benchmark dose,

2   do they set a cancer slope factor?

3      A.   That's correct.

4      Q.   Okay.  And what's that?

5      A.   What is cancer slope factor?

6      Q.   Yes, sir.

7      A.   That is ordinary and standard level.

8      Q.   Okay.  And then do they -- do

9   toxicologists put in protective factors to set

10  levels of human exposure?

11     A.   Yes.

12     Q.   Okay.  And -- and that is all part of the

13  risk assessment process; right?

14     A.   That's correct.

15     Q.   Okay.  Did IARC do that risk assessment

16  process we just talked about?

17     A.   I have not done a carcinogenic potency

18  and safety levels that have established, other than

19  this determination.

20     Q.   Okay.  They just determined that it can

21  cause cancer, but not at what dose; fair?

22     A.   Exactly.

23     Q.   Okay.  And you are capable of carrying

24  out the benchmark dose cancer slope factor

25  methodology we just discussed; right?

Ambrose Charles, Ph.D.

```
1        A.    Yes.

2        Q.    Okay.  It's something you've done in your

3   career as a toxicologist?

4        A.    Yes.

5        Q.    Okay.  Did you do that in this case?

6        A.    No.

7        Q.    Okay.  Were you asked to do that in this

8   case?

9        A.    No.

10       Q.    Okay.  Without doing -- or going through

11  that risk assessment process, can you quantify the

12  degree of excess risk a given dose of a chemical

13  can add to someone's background cancer risk?

14       A.    No.

15       Q.    Okay.  And just to be clear, from a risk

16  assessment point of view, you, I, everybody on this

17  Zoom call, we're all exposed to carcinogens every

18  day; right?

19       A.    That's correct.

20       Q.    Okay.  When we walk outside, the sun is a

21  carcinogen, right, or sunlight?

22       A.    To some people.

23       Q.    Okay.  When we go to the gas station to

24  fill up our car, we're exposed to carcinogens;

25  right?
```

1      A.    To some people, yes.

2      Q.    Okay.  When we go in an office building,

3   we're exposed to carcinogens; right?

4      A.    Some people, yes.

5      Q.    Okay.  And those exposures to carcinogens

6   typically don't lead to an excess risk of cancer

7   in -- in the general population; fair?

8      A.    Normally not in general population.

9      Q.    Okay.  Now, getting back to glyphosate

10   for a minute.

11           There are studies in the literature

12   that look at the pharmacokinetics of glyphosate;

13   right?

14      A.    Yes.

15      Q.    And understanding pharmacokinetics is key

16   to understanding and measuring internal dose;

17   right?

18           MR. HABERMAN:  Objection.

19           THE WITNESS:  Yes.

20   BY MR. KALAS:

21      Q.    Okay.

22      A.    If we know the dose.

23      Q.    If we know the dose.  Just give me a

24   moment.  I apologize for the delay here.  I want to

25   mark as Exhibit 10 an ATSDR evaluation of

1    glyphosate from 2020.

2         A.   Yes.

3         Q.   I'm going to put it up on the screen.

4    This document I have up on the screen is a document

5    you reviewed; correct --

6         A.   Yes.

7         Q.   -- Dr. Charles?

8         A.   Yes, yes.

9         Q.   Okay.  And what is it -- what is ATSDR?

10        A.   It is a remote CDC.

11        Q.   Do you rely on ATSDR toxicological

12   profiles in the course of your work as a

13   toxicologist?

14        A.   For many, many years.

15        Q.   Okay.  And I wanted to ask you a bit

16   about their discussions of -- or their discussion

17   of pharmacokinetics in here on glyphosate.

18             They say here in the toxicokinetic

19   data section, they say, "Glyphosate is readily

20   absorbed from the GI tract.  Very little glyphosate

21   is absorbed through the skin.  It is assumed that

22   glyphosate is readily absorbed from the respiratory

23   tract."  Did I read that correctly?

24        A.   I'm trying to -- I opened the document.

25   Can you give me the page number?

1      Q.   Sure.  I'm on page 144 of the document,

2    which is PDF page 156.

3      A.   Oh, okay.

4      Q.   It's chapter three, section 3.1.

5      A.   Looking at page 18 now.

6      Q.   And if you -- if it helps you, if you go

7    back to the Zoom screen, I have it up on the

8    screen.

9      A.   I'm in the physical and chemical

10   properties now.  I don't know if I'm there.

11     Q.   So page 144, PDF page 156.

12     A.   Oh, normal exposure.  Yes, yes.  Okay.

13     Q.   I don't think that's the page I'm at.

14     A.   Page 144.

15     Q.   Yes, sir.

16     A.   Yes, page 3 -- chapter three.

17     Q.   Yes, sir, that's where I'm at.  Okay?

18     A.   Okay.

19     Q.   And I'm just looking at the first bullet

20   point.  It says, "Glyphosate is readily absorbed

21   from the gastrointestinal tract.  Very little

22   glyphosate is absorbed through the skin.  It is

23   assumed that glyphosate is readily absorbed from

24   the respiratory tract."  Did I read that correctly?

25     A.   That's correct.

1        Q.   Do you agree with ATSDR that very little

2   glyphosate is absorbed through the skin?

3             MR. HABERMAN:  Objection, document speaks

4   for itself.  You can answer.

5             THE WITNESS:  In my reading, it can be

6   absorbed through skin also.  I'm trying to find out

7   normal exposure -- limited data.

8   BY MR. KALAS:

9        Q.   Okay.  So my question isn't whether it

10   can be absorbed through the skin.

11        A.   It can be absorbed, because there is

12   radioactive carbons labeled around the formulation

13   applied on the skin, and they have found the

14   radioactivity in the human that indicates

15   absorption.

16        Q.   Well -- okay.  And with all due respect,

17   I don't know if you were answering the question I

18   asked, sir.

19        A.   Yeah, my answer is it can be absorbed

20   through the skin.

21        Q.   Okay.

22        A.   That is your question.

23        Q.   That wasn't my question.

24        A.   Oh, sorry.

25        Q.   So that's why I wasn't sure if you were

1   answering a question I asked.

2            My question is:  Do you agree with

3   ATSDR's statement here that very little glyphosate

4   is absorbed through the skin?

5        A.   Yes.

6        Q.   Okay.

7            MR. HABERMAN:  Objection.

8   BY MR. KALAS:

9        Q.   Moving to the next bullet point, it says,

10  "Absorbed glyphosate is readily distributed via the

11  blood but does not accumulate in any particular

12  organ or tissue."  Did I read that correctly?

13       A.   Yes.

14       Q.   Okay.  Do you agree that absorbed

15  glyphosate is readily distributed via the blood but

16  does not accumulate in any particular organ or

17  tissue?

18       A.   That means it is accumulated and

19  distributed all over the body, in all organs.

20  That's what it means.  When you mean accumulation,

21  when a chemical is absorbed, normally it's

22  accumulated inside the tissue, for example, liver

23  is an organ that take up a lot of chemicals than

24  some other primary.  But if -- you don't see any

25  general specific accumulation in any particular

1    organ.  It is generally distributed, okay?  This is

2    generally absorbed through all organs.  That's what

3    it means.  Not specific accumulation.

4         Q.   Okay.

5              MR. KALAS:  Anita, I saw you went off

6    mute.  Were you going to ask a question?

7              COURT REPORTER:  I was going to, but then

8    I realized what he said.  Thank you.

9    BY MR. KALAS:

10        Q.   So I appreciate that explanation,

11   Dr. Charles.  It sounds to me, but I'm not sure, so

12   I want to make sure I understand:  Do you agree

13   with the statement in the ATSDR toxicological

14   profile for glyphosate that absorbed glyphosate is

15   readily distributed via the blood but does not

16   accumulate in any particular organ or tissue?

17        A.   Yes.  It is distributed almost equally to

18   all organs.

19        Q.   Okay.  Going down -- well, we'll hit

20   bullet point three.  It says, "Glyphosate does not

21   undergo significant metabolism in mammals.  Less

22   than one percent is metabolized to

23   aminomethylphosphonic acid, or AMPA."  Did I read

24   that correctly?

25        A.   That's correct.

Ambrose Charles, Ph.D.

1          Q.   Okay.  Do you agree with that statement?

2          A.   That's correct.

3          Q.   Okay.  Last bullet point here it says,

4     "Approximately two-thirds of an oral dose of

5     glyphosate is excreted in the feces as unabsorbed

6     parent compound.  Most absorbed glyphosate is

7     rapidly excreted in the urine as parent compound."

8               Did I read that correctly?

9          A.   That's correct.

10          Q.   Okay.  Do you agree that most absorbed

11     glyphosate is rapidly excreted in the urine as

12     parent compound?

13          A.   Yes.

14          Q.   Okay.  And does the route of absorption

15     affect that opinion at all?  In other words, if the

16     glyphosate is absorbed via the GI tract, dermal,

17     inhalation, whatever the route of absorption, do

18     you believe most absorbed glyphosate is rapidly

19     excreted in the urine as parent compound?

20          A.   It is excreted within 24 to 48 hours, but

21     there will be residue glyphosate in the --

22               (Interruption by the reporter.)

23     BY MR. KALAS:

24          Q.   No, what was -- the word we didn't catch

25     was "in the," and then you said someplace?

```
 1              COURT REPORTER:  Residue in the what?
 2              THE WITNESS:  In the blood.
 3    BY MR. KALAS:
 4         Q.   The blood.  Okay.
 5         A.   In the blood.  In other studies, you
 6    know, occupational studies among farmers, okay,
 7    when they drew blood and tested for glyphosate,
 8    they found a certain amount of glyphosate.  It
 9    varies, you know, from, you know, about
10    200 micrograms per liter, 1.3 micrograms per liter
11    in various individuals in various populations among
12    farmers, okay?
13              They are the people who use these
14    chemicals in the farm scenarios.  And when they
15    find these chemicals in their blood, that means it
16    is still reading in the blood.  But when you simply
17    say within 24 hours to 48 hours is more excreted or
18    eliminated from the body, those kind of information
19    basically toxicologists get from animal studies.
20              You know, you give a dose of the
21    chemical to the animals and then do the
22    pharmacokinetics in the animals.  That's the kind
23    of information generally reflected in the ATSDR.
24    If we want to look at what the human concentration
25    after they are exposed to, you have to look at some
```

1    other studies.  There is lingering concentration of

2    a chemical in the blood, you know, even after 24 or

3    48 hours.

4        Q.   Okay.  Well, let's -- let's take out the

5    "rapidly," then, from that sentence.

6             Do you agree that the route of

7    excretion for absorbed glyphosate, whenever it's

8    excreted, is going to be the urine?

9        A.   Primarily urine, and some of it must be

10   going through the fecal matter too.

11       Q.   Right.  But primarily urine?

12       A.   Primarily urine, yes.

13       Q.   Okay.  Now, you brought up that a lot of

14   this pharmacokinetic data is based on animal

15   studies; right?

16       A.   That's right.

17       Q.   Okay.

18       A.   And wherever possible, I also reference

19   to human data.

20       Q.   Okay.  Are there any significant

21   pharmacokinetic differences in how glyphosate

22   behaves between animal models and people, in your

23   opinion?

24       A.   We have no data on those kind of

25   comparisons.

Ambrose, Charles, Ph.D.

```
 1        Q.   Okay.  And so I take it you do not have

 2   an opinion sitting here today, because of that lack

 3   of data, that there is a significant

 4   pharmacokinetic difference between animals and

 5   people; fair?

 6        A.   That's correct.

 7        Q.   Okay.  Going down to page 146.

 8        A.   Yes, sir.

 9        Q.   It talks about in vitro studies using

10   human skin samples.  Do you see that?

11        A.   In vitro studies, yes.

12        Q.   Okay.  And they talk here about

13   permeability coefficients in addition to

14   percentages absorbed; right?

15        A.   Yes.

16        Q.   Okay.  And just to define our terms here,

17   a permeability coefficient is the rate of

18   absorbed -- rate of absorption of a particular

19   concentration of a compound over a given period of

20   time; correct?

21        A.   Correct.

22        Q.   Okay.  Meanwhile, a percentage of

23   absorption is the amount that's absorbed at the end

24   of the study, whether it's 24 or 48 hours; right?

25        A.   Yeah, that's correct.
```

Ambrose, Charles, Ph.D.

1      Q.   Okay.  And they talk about the

2  fact -- just getting down to the percentages

3  here -- that undiluted application to human skin

4  samples at doses ranging from 15.4 to

5  154 micrograms per centimeter squared resulted in

6  zero to 0.4 percent dermal absorption over eight

7  hours post-application.

8           And then it says dermal absorption of

9  glyphosate from aqueous solutions of test

10 substance, 1/20th or 1/32nd test substance to

11 water, V over V, during 16 hours post-application,

12 was less than or equal to 2.2 percent.  Did I read

13 that correctly?

14     A.   That's correct.

15     Q.   Okay.  And do you have any reason to

16 disagree that absorption of glyphosate via human

17 skin is somewhere between zero and 2.2 percent over

18 a 16-hour period?

19     A.   That's for centimeter squared.

20          (Interruption by the reporter.)

21          THE WITNESS:  Centimeter squared.

22 BY MR. KALAS:

23     Q.   Right.

24     A.   That is what the data present.

25     Q.   Right.  And my question isn't really

Ambrose, Charles, Ph.D.

```
1    dependent, I think, on the centimeter squared,

2    though if your answer is, that's completely fine.

3              Do you have any reason to disagree, no

4    matter the surface area involved, that the

5    absorption of glyphosate through human skin over a

6    16-hour period will be somewhere between zero and

7    2.2 percent?

8         A.   That's what the data shows, yes.

9         Q.   Okay.  Do you agree -- let me make sure

10   that I -- I think we're good with that document.

11             Do you agree that urine is the most

12   appropriate biomarker for measuring dermally

13   absorbed glyphosate?

14             MR. HABERMAN:  Objection.

15             THE WITNESS:  Blood is the best

16   biomarker, but urine is the one that you finally

17   end up with because that's the easiest biological

18   sample to get.

19   BY MR. KALAS:

20        Q.   Okay.  Now in your expert report -- going

21   back to Exhibit 3.

22        A.   Okay.  Can I get out of this, sir?

23        Q.   Yep.  You can go back to Exhibit 3.

24        A.   Oh, okay.  Okay, I'm there.

25        Q.   Okay.  You talk about the fact, at the
```

1    bottom of page 13, carrying into page 14, that

2    recent human metabolism data has reported as low as

3    one percent urinary excretion of rate of

4    glyphosate.

5              Then you say, "Human exposures

6    extrapolated from urinary glyphosate concentration

7    found that upper band levels may be much closer to

8    the ADI than previously reported."  Did I read that

9    correctly?

10        A.   That's correct.

11        Q.   Okay.  And you cite Connolly for that;

12   right?

13        A.   That's right.

14        Q.   All right.  And the Connolly paper is a

15   biomonitoring paper in applicators; right?

16        A.   That's right.

17        Q.   Okay.  But Dr. Charles, going back

18   to -- to the Connolly paper, do you recall what the

19   Connolly paper cited for that proposition?

20        A.   That's about Europe in ADI, I believe.

21        Q.   No, I'm sorry, that was a bad question.

22   My question was do you recall what the Connolly

23   paper cited for the proposition that one percent of

24   glyphosate would be excreted via the GI tract?

25        A.   One percent urinary excretion, yes.

1       Q.   Yes?

2       A.   Yeah.

3       Q.   Do you recall --

4       A.   Yes.

5       Q.   Okay.

6       A.   I don't have the paper right in front

7    of me, but I'm looking at my report.  That

8    must -- that came from the -- my conclusion from

9    the -- from the paper.

10      Q.   Well, I understand it came from your

11   conclusion from the paper, but my question was a

12   little bit different, which is:  Do you recall what

13   the Connolly paper cited to for that proposition?

14   And if you don't, that's fine.  We can take a look

15   at it.

16      A.   I do not know if it is the study or some

17   other studies that she was quoting on that, yeah.

18      Q.   Okay.  So let's mark the Connolly paper,

19   then.

20      A.   Some biomonitoring data that she was

21   referring to.

22      Q.   Yeah.  So let's mark the Connolly paper.

23   I'll let you know when I have it loaded.  Just give

24   me a moment.

25           Okay, I've marked the Connolly paper

1    as Exhibit 11.  If you refresh, you can see it

2    again.

3         A.   Yes.  Okay.

4         Q.   Do you have it, sir?

5         A.   Yeah, I have the paper.

6         Q.   Okay.  I'm looking at page 3 of 18 of the

7    Connolly paper.  It's a review human biomonitoring

8    of glyphosate exposures state-of-the-art and future

9    research challenges.

10        A.   Yes.

11        Q.   Okay.  And page 3 of 18 talks about the

12   fact that previous back-calculations from urine

13   concentration to a daily intake/systemic dose

14   assumed a urinary excretion of 20 percent of oral

15   glyphosate excreted as unchanged in urine with

16   earlier estimates of 30 percent.  Did I read that

17   correctly?

18        A.   Yes.

19        Q.   And then it says, "Very recent studies

20   suggest that the human's excretion fractions of

21   glyphosate in urine as unchanged glyphosate could

22   be as low as one percent."  And it cites to 30 and

23   31.  Do you see that?

24        A.   Yeah.

25        Q.   Okay.  And if we go down to 30 and 31, 30

1    is a paper by Zoller.  It talks about urine

2    glyphosate levels, a quantitative biomarker of oral

3    exposure, and Faniband talks about human exposure

4    of biomarkers of commonly available or commonly

5    used pesticides.  Do you see that?

6         A.   I don't know what you are talking about.

7    I have not read those papers.

8         Q.   Right.  So that was going to be my next

9    question.  You haven't read those papers; fair?

10        A.   No.

11        Q.   Okay.  But those are the papers that

12   Connolly is citing for the one percent proposition;

13   right?

14        A.   Yeah, when she cited, it is very recent

15   studies.  You know, I thought that is the most

16   recent information that I accept.

17        Q.   Okay.  And Faniband and Zoller -- well,

18   let's take Zoller first.  I understand you haven't

19   read both of them -- but Zoller talks about it

20   being a -- urine glyphosate level is a quantitative

21   biomarker of oral exposure; right?  Oral?

22        A.   Yeah, if he states so.

23        Q.   Okay.  And oral exposure involves the

24   ingestion of glyphosate, right, via the GI tract?

25        A.   Oral is, yes.

Ambrose Charles, Ph.D.

1       Q.   Okay.  And the pharmacokinetics of

2  glyphosate are different via oral exposure than via

3  dermal exposure; right?  We just looked at that in

4  the ATSDR?

5       A.   Yes.

6       Q.   Okay.  Most of oral exposures of

7  glyphosate are not absorbed; correct?

8       A.   Nearly 20 percent of the oral intake was

9  excreted.  That's what you just showed me before,

10  right?

11       Q.   Right.  In the urine; right?

12       A.   In the urine.  Yeah, in the urine.

13       Q.   Okay.  And what that means is that most

14  of that oral exposure is not absorbed via the GI

15  tract; right?

16       A.   20 percent.

17       Q.   Right.  And the other 80 --

18       A.   That -- that means the other 80 is -- go

19  ahead, yeah.

20       Q.   That means the other 80 percent is

21  unabsorbed; right?

22       A.   That's right.

23       Q.   Okay.  And that would be excreted via the

24  feces; right?

25       A.   That's right.

Ambrose, Charles, Ph.D.

1      Q.    Okay.  And the Zoller paper that

2   Dr. Connolly cited for the one percent excretion

3   via the urine also is an oral exposure, at least

4   according to the paper's title; right?

5      A.    Could be.

6      Q.    Okay.  And the pharmacokinetics of an

7   oral exposure of glyphosate may not necessarily

8   track the pharmacokinetics of a dermal or

9   inhalation exposure; fair?

10      A.    Yeah, fair.

11      Q.    Okay.

12      A.    But --

13      Q.    And -- go ahead.

14      A.    But there will be similarities, whether

15   it is dermal exposure, oral exposure.

16   Pharmacokinetics is based on the blood

17   concentration, what is entering the blood.  And

18   from blood, you know, it goes to different organs

19   for distribution, then goes to metabolism, then

20   goes to excretion.  All these processes are

21   considered in the pharmacokinetics.

22      Q.    Okay.  But you aren't saying in your

23   report that urinary excretion may be as low as one

24   percent.  When you say that in your report at the

25   bottom of page 13, you're not saying that urinary

1  excretion following dermal absorption may be as low

2  as one percent; right?

3      A.   Yes.

4      Q.   You are saying that, or yes, I'm not

5  saying that?

6      A.   What I am saying is, you know, whatever

7  is entering the bloodstream, and then it is

8  excreted in the urine, okay, that --

9      Q.   Okay.

10     A.   -- that excretion through the urine, sir,

11 always come from the bloodstream that is filtered

12 in the kidney.  It doesn't go from gastrointestinal

13 system directly to the excretion, okay?  It's

14 through urine.

15     Q.   Okay.  And so -- I think -- I think we're

16 in agreement here and we're on the same page.  I

17 want to make sure.

18          You aren't opining that following a

19 dermal absorption of glyphosate, only one percent

20 is excreted in the urine; correct?

21     A.   That is what the research say.  I had

22 to --

23          (Interruption by the reporter.)

24          THE WITNESS:  Rely -- rely on the

25 published literature, publications, you know, in

1   order to make my opinion.  Because I don't do any

2   research or pharmacokinetic studies on this.

3   BY MR. KALAS:

4       Q.   Well, right.  But the paper we just

5   looked at, you're relying on, is talking about an

6   oral exposure; right?

7       A.   That's right.

8       Q.   Okay.  And so my question is, when you

9   refer to that one percent in your expert report,

10  you're not saying that one percent of glyphosate is

11  excreted via the urine following a dermal exposure?

12      A.   No, I'm not saying that.

13      Q.   Okay.

14      A.   You will find one percent of the total

15  dose enter the body.

16      Q.   Following an oral exposure?

17      A.   Oral exposure or dermal exposure or what

18  enters the body.  One percent of the total amount

19  that was -- got into the body is excreted in the

20  urine.  That's what it means.

21      Q.   Okay.  So now -- so now I need to

22  understand.

23           Is there a paper you can cite

24  following a dermal exposure to glyphosate that

25  shows only one percent is excreted in the urine?

```
 1        A.    It -- it depends on the blood load.

 2              (Interruption by the reporter.)

 3              THE WITNESS:  L-O-A-D.  Load.  L-O-A-D.

 4   BY MR. KALAS:

 5        Q.    Blood load.

 6        A.    It depends.  On the blood load or amount

 7   of the chemical in the blood at that time.

 8        Q.    Okay.  So I don't think you answered my

 9   question, Dr. Charles, with all due respect.

10              My question is, is there a paper you

11   can cite?  Is there a paper --

12              MR. KALAS:  Hold on, Jeff.

13   BY MR. KALAS:

14        Q.    Is there a paper you can cite for me,

15   Dr. Charles, that shows only one percent of

16   glyphosate is excreted via the urine following

17   dermal absorption?

18        A.    No, I have not.

19              MR. HABERMAN:  Asked and answered.

20   BY MR. KALAS:

21        Q.    Okay.  Now turning back to this dermal

22   absorption concept, the absorption of glyphosate

23   through the skin is via something called the

24   intercellular pathway; right?

25        A.    Yes.
```

1          Q.    Okay.  And the intercellular, that word,

2     it just means between cells; right?

3          A.    That's right.

4          Q.    Okay.  And essentially the skin, at least

5     human skin, has an outer layer called the stratum

6     corneum, true?

7          A.    Yes.

8          Q.    Okay.

9          A.    Epidermis.

10         Q.    Okay.  And the epidermis has multiple

11    layers, with its outer layer being the stratum

12    corneum; right?

13         A.    Yeah.

14         Q.    Okay.  And then the epidermis has

15    multiple layers beneath the stratum corneum; fair?

16         A.    Whatever you say, sir.  I'm not

17    describing the anatomical description of skin here.

18         Q.    You don't want to tell an attorney

19    "whatever you say."

20         A.    You are describing the different layers

21    of the skin and asking me if that is right, you

22    know.

23         Q.    Yeah.

24         A.    I'm not answering that question, you

25    know.

Ambrose Charles, Ph.D.

```
1        Q.   Okay.  Now, the stratum corneum, this

2   outer layer of the epidermis, it repels water;

3   correct?

4        A.   Could be.

5             MR. HABERMAN:  Objection.

6   BY MR. KALAS:

7        Q.   Well, you said "could be."  What do you

8   mean by "could be"?

9        A.   Because you mean by your question is

10  there's no water entering the skin through whatever

11  corneum you said.  It is not that.  That, you know,

12  water enters through the skin.  That's why when you

13  are in water for a long time, there is some little

14  bit of unseen edema that will happen, because water

15  penetrates through the skin.

16       Q.   Right.  Okay.  So I appreciate that

17  answer and the -- the detail of that answer.

18            Let me ask a more precise question

19  then.  The stratum corneum, the physiology of the

20  stratum corneum is hydrophobic; fair?

21       A.   Mostly, yes.

22       Q.   Okay.  And hydrophobic means -- to use

23  our Latin -- scared of water, right, doesn't like

24  water?

25       A.   That's right.
```

Ambrose, Charles, Ph.D.

```
 1      Q.   Okay.  And that's why when you or I jump

 2  in a lake or a pool, all the water doesn't

 3  immediately rush into our body; right?

 4      A.   Exactly.

 5      Q.   Okay.  Now, glyphosate is hydrophilic,

 6  true?

 7      A.   Yes.

 8      Q.   Okay.  And hydrophilic, again, going back

 9  to our Latin, that means water loving; right?

10      A.   That's right.

11      Q.   Okay.  It means glyphosate has an

12  affinity to water; fair?

13      A.   Yeah.  It is more water soluble.  That's

14  what the chemistry people will talk.

15      Q.   Okay.

16      A.   I don't believe means water soluble.

17      Q.   Okay.  And so when glyphosate encounters

18  the stratum corneum, the stratum corneum repels the

19  glyphosate; fair?

20      A.   Not entirely.  There is some dermal

21  absorption.

22      Q.   Right.  And we talked about some of the

23  data on that earlier; right?

24      A.   Yeah, yeah.

25      Q.   But generally the glyphosate, the minute
```

1    it encounters the skin, does not rush into the body

2    because that stratum corneum keeps it out; fair?

3         A.    That's fair.  You are talking about the

4    water.  And water contains a chemical.  And how

5    that chemical reacts with the skin is different

6    from the reaction of water with the skin alone.

7         Q.    Right.  But even on -- on dermal

8    absorption studies of just glyphosate alone without

9    any vehicle of water, it's shown that the dermal or

10   the stratum corneum repels that glyphosate, true?

11        A.    There is some dermal absorption.  You are

12   trying to ignore that -- that fact, that glyphosate

13   is having some dermal absorption.  It absorbs

14   through the skin.

15        Q.    Well, right.  What I'm trying to get at

16   is why it goes through that intercellular pathway,

17   is in fact what I'm trying to get at.  I understand

18   there's some dermal absorption.

19             But at any rate, the reason why, in

20   order to enter the body, glyphosate has to go

21   through that intercellular pathway is because -- or

22   between the cells, between the mortar of the cells,

23   so to speak, is because the cells themselves are

24   water hating, or do not like water, right?  And so

25   glyphosate, to get in, gets in between those cells;

1  fair?

2      A.   Yeah, I have no idea of what -- how

3  difficult glyphosate feels to get in.  Yeah, I have

4  no idea.

5      Q.   Okay.  You're not -- you're not an expert

6  on the physiology --

7      A.   I'm not an expert --

8           MR. HABERMAN:  Objection.

9           THE WITNESS:  -- on physiology.  If you

10 looked at my background, physiology is one course

11 that I take for my graduate program, okay?  I am a

12 clinical medical biochemist toxicologist.

13 BY MR. KALAS:

14     Q.   Okay.

15     A.   Okay?

16     Q.   Okay.  Now, the absorption of glyphosate,

17 from the data you've reviewed, is at a steady

18 state; right?

19          MR. HABERMAN:  Objection.

20          THE WITNESS:  Say it again.

21 BY MR. KALAS:

22     Q.   The absorption of glyphosate, the rate of

23 absorption of glyphosate, is considered a steady

24 state absorption, true?

25     A.   It has to be a steady state, then there

1    should be a constant supply of the chemical at the

2    same rate at the site of application.

3         Q.   Right.

4         A.   And that is not the case here.  Here, you

5    know, the application happens at different times,

6    different climate, climatic conditions, different

7    rate, different duration.  So there is -- that one

8    rule of steady state absorb, I cannot completely

9    explain that kind of use pattern and absorption.

10        Q.   Okay.  I guess what I'm trying to get

11   at -- and maybe I should just make this more

12   simple so we're not talking past each other -- is,

13   you know, we looked at that two percent absorption

14   level from the ATSDR after a certain time period.

15             And all I'm really trying to get at

16   is, when you have a two percent absorption, it

17   doesn't mean that that two percent was absorbed

18   immediately the first second it touched the skin.

19   It was absorbed at a state -- a constant state over

20   a period of 16 hours; is that fair?

21             MR. HABERMAN:  Objection.

22             THE WITNESS:  Exactly.  That's why I

23   brought the duration to that point.

24   BY MR. KALAS:

25        Q.   Okay.  How long, Dr. Charles, from the

Ambrose Charles, Ph.D.

1    minute glyphosate hits skin, how long does it take

2    for absorption to start?

3         A.   I have not seen any data on that.

4         Q.   Okay.

5         A.   The latency period of application and

6    absorption time, you know.

7         Q.   Right.  And you haven't -- to be fair to

8    you, looking at your reliance materials, you have

9    not reviewed the internal Monsanto studies on their

10   formulations and the dermal absorption of those

11   formulations; right?

12        A.   Monsanto studies are for animal

13   experimentation?

14        Q.   No, human experimentation.  Human skin,

15   OECD guideline studies on the dermal absorption.

16        A.   No, I have not.

17        Q.   Okay.  Is washing with water effective at

18   removing glyphosate from the skin?

19        A.   It should be, because it is hydrophilic.

20        Q.   Okay.  And because you don't know how

21   long it takes for absorption to begin, or you have

22   no opinion on that sitting here today, it is

23   possible someone could get glyphosate on their

24   skin, wash up with water soon thereafter, and no

25   absorption takes place; fair?

```
1        A.    Yeah, minimal.

2        Q.    Okay.

3        A.    Minimal absorption.

4        Q.    Now, Roundup also contains something

5   called surfactants; right?

6        A.    That's correct.

7        Q.    Okay.  And surfactants, just as a class

8   of chemicals, are in lots of everyday products,

9   true?

10       A.    Yeah, some products have that, you know,

11  especially if they are used in agriculture.

12       Q.    Okay.

13       A.    Yeah.

14       Q.    Are surfactants in dish soap?

15       A.    Yeah.

16       Q.    Are surfactants in shampoo?

17       A.    Yes.

18       Q.    Are surfactants in medicines like

19  Tylenol?

20       A.    I'm not aware of that, Tylenol, yes.

21       Q.    Okay.  Just by virtue of washing our

22  hands correctly after using the restroom, or

23  touching meat, we're exposed to surfactants; right?

24       A.    Yes.

25       Q.    Okay.  And even in people who use
```

1  Roundup, if you added up all the places they're

2  exposed to surfactants just living in daily modern

3  life, Roundup would just be one of many places

4  they're exposed to surfactants, true?

5       MR. HABERMAN:  Objection, incomplete

6  hypothetical.

7  BY MR. KALAS:

8       Q.   I don't know if I caught your answer,

9  sir.

10      A.   I didn't get the question because of the

11  talk in between.

12      Q.   Okay.  Let me ask it again, and then

13  Mr. Haberman can object, and then you can answer.

14      A.   Yeah.

15      Q.   Even in people who use Roundup, even if

16  you added up all the places they're exposed to

17  surfactants living in modern daily life, Roundup

18  would just be one of many places, true?

19      MR. HABERMAN:  Objection.  They're not

20  glyphosate enhanced, though.

21      MR. KALAS:  Mr. Haberman, that's an

22  improper objection, and you know it is.  And we've

23  gone around on this.  It's a speaking objection.

24      MR. HABERMAN:  Yeah, it's an incomplete

25  hypothetical.

1          MR. KALAS:  All right.

2     BY MR. KALAS:

3          Q.   You can answer, Dr. Charles.

4          A.   We are talking about surfactants or

5     glyphosate?

6          Q.   Surfactants, sir.

7          A.   Yeah, surfactants.  And your question was

8     whether we are exposed to surfactants in many

9     places throughout the day, right?

10         Q.   Yes.

11         A.   Yes, we are exposed to.  Yes.

12         Q.   Okay.  Are you offering any opinions on

13    surfactants in this matter?

14         A.   I have not.

15         Q.   Okay.  Now, Dr. Charles, I don't need a

16    break.  I can keep going.  I know we took quite a

17    long break.  But we have been on the record here

18    about 50 minutes.  Are you okay?  Can we keep going

19    or do you need a break?

20         A.   Yeah, we can take a break.

21         MR. HABERMAN:  I need a five-minute

22    break.

23         MR. KALAS:  Let's take five and try to,

24    you know, get back on at 11:15.

25         THE WITNESS:  Sure, yeah.

```
 1              MR. KALAS:  All right.

 2              THE VIDEOGRAPHER:  All right.  It is

 3   11:10 a.m., and we are off the record.

 4                   (Break taken.)

 5              THE VIDEOGRAPHER:  We are now back on the

 6   record at 11:18 a.m. Eastern daylight time.

 7   BY MR. KALAS:

 8      Q.   Dr. Charles, I was looking at your CV on

 9   the break, and I want to ask you just one or two

10   follow-up questions on the CV you provided, which

11   is page -- or, excuse me -- Exhibit 5.

12      A.   Okay, I have it.

13      Q.   All right.  And I'm looking at your

14   teaching and research experience, specifically your

15   graduate teaching participation.

16      A.   Okay.

17      Q.   And one of the classes you taught was

18   pharm tox 504, current issues in environmental

19   toxicology.  Topic, organophosphate and carbamate

20   pesticides.  Do you see that?

21      A.   Yes, yes, yes.  506, biochemical

22   toxicology, right?

23      Q.   No, pharm 504.

24      A.   504, yes.

25      Q.   Okay.  And I assume you don't have any
```

1   class materials left from -- from your teaching of

2   pharm tox 504; is that true?

3        A.   That was in 1985, '86.

4        Q.   Okay.

5        A.   Around that time.

6        Q.   Okay.  So you haven't taught that class

7   for nearly 40 years now; fair?

8        A.   I left the academy's research and

9   teaching and all there.

10       Q.   Okay.  Thank you.  That clears up what I

11   was going to ask.  Okay.

12            Dr. Charles, one of the things you

13   reviewed in reaching your opinions were some of the

14   biomonitoring on glyphosate; right?

15       A.   Can you be really clear about that

16   question?

17       Q.   Yeah.  You reviewed some studies that

18   looked at farmers or --

19       A.   Oh.

20       Q.   -- applicators and what their urinary

21   levels of glyphosate were; right?

22       A.   Yes, yes.

23       Q.   Okay.  And one of the studies that I was

24   looking for but I don't think I saw on your

25   report -- but I'm going to double-check now to make

1    sure -- is a study that appeared in EHP in 2004 by

2    aqua very well a, et al.  Do you recall that study?

3    Are you familiar with that study at all?

4         A.   I think, yes, I am.  That was a Monsanto

5    study, right?

6         Q.   Yeah, Monsanto -- some of the authors of

7    it worked at Monsanto.

8         A.   Yes, yes.  In fact, the first author was

9    working for Monsanto.

10        Q.   Right.  So you are familiar with that

11   study?

12        A.   I saw that study only after -- if it is

13   not listed here -- only after probably I did this

14   report.

15        Q.   When did you see that study?

16        A.   Maybe after -- a few weeks after that.

17        Q.   Okay.  Did you talk to any other experts

18   for plaintiffs in -- in working on the Engilis

19   case?

20        A.   No, I have not contacted anyone.

21        Q.   Okay.

22        A.   Other than counsel.

23        Q.   Have you read any deposition transcripts

24   of plaintiff's experts in the Engilis matter?

25        A.   Deposition of experts?

1        Q.   Yes, sir.

2        A.   Oh, no.  No, no, no.

3        Q.   Okay.  So you didn't get a deposition

4    transcript this past week to read?

5        A.   No.

6        Q.   Okay.  I've marked as Exhibit 12 that

7    study that you're referring to, the Acquavella

8    study.  And if you can just take a look at it.  I'm

9    going to call it up on the screen.

10            And is this study, Exhibit 12, the

11   study you recall looking at before?

12       A.   2004.  Yes.  Probably, yes.

13       Q.   Okay.

14       A.   Yeah, John Acquavella, yes.

15       Q.   Okay.  And this is a study that appeared

16   in the peer-reviewed literature; right?

17       A.   This was a research article.  I'm looking

18   at the journal, Environmental Health Perspectives,

19   yes.

20       Q.   Okay.  And that means it went through

21   peer review; right?

22       A.   Yeah, yes.

23       Q.   And what is peer review?

24       A.   Peer review is people of my peer or

25   general science, related science, they're boarded

1    by every journal.  They will send these papers to

2    them.  They will read it, send some comments,

3    correct it or, if you refuse that, you know, they

4    will make adequate changes.  And if it is worthy to

5    be published, it brings up new information, it will

6    be published.  That's the peer review process.

7         Q.   Okay.  Given you've reviewed this

8    before -- but again, take any time you need to look

9    at it now -- do you have any criticisms of this

10   study, Exhibit 12?

11             MR. HABERMAN:  Objection.

12             THE WITNESS:  It is a study by Monsanto,

13   so --

14   BY MR. KALAS:

15        Q.   Okay.

16        A.   -- that -- that's something that you have

17   to consider when you review it.  It is a biased

18   study -- or not a biased study.  You know, you only

19   look at the context of what is being said in there.

20   If you look at the -- the abstract, that gives you

21   the content of the paper.

22        Q.   Okay.  So other than the fact that some

23   of the authors on this paper worked at Monsanto, do

24   you have any other criticisms of this?

25        A.   I have no other criticisms.

Ambrose, Charles, Ph.D.

1      Q.   Okay.  And just to focus on the single

2  thing you did raise, which is some of the authors

3  worked at Monsanto, this is a study entitled

4  Glyphosate Biomonitoring For Farmers and Their

5  Families:  Results From the Farm Family Exposure

6  Study; right?

7      A.   Yes.

8      Q.   Okay.  And this is a study that looks at

9  what the exposure and potential dose from using

10  glyphosate is in farmers; right?

11      A.   Yes.

12      Q.   Okay.  Is that a good thing for Monsanto

13  to be researching on their own dime, the levels of

14  exposure in people using their products?

15          MR. HABERMAN:  Objection.

16          THE WITNESS:  Yes.  Yeah, it is good.

17  You know, every data is actually generated

18  initially for the Monsanto --

19          (Interruption by the reporter.)

20          THE WITNESS:  Monsanto or any other

21  chemical company who applies for the registration

22  of a product.

23  BY MR. KALAS:

24      Q.   Well, right.  And this study, though,

25  isn't for registration; right?  This study is

1    actually done in the peer-reviewed literature for

2    scientists throughout the world to look at; fair?

3              MR. HABERMAN:  Objection.

4              THE WITNESS:  That's right.

5    BY MR. KALAS:

6         Q.   Okay.  And it's a good thing Monsanto is

7    doing work looking at their product and putting the

8    data out there for scientists to review; correct?

9              MR. HABERMAN:  Objection.

10             THE WITNESS:  I don't know if it is a

11   good thing or a bad thing.  That's a paper that is

12   published, just like any other papers that are

13   published and they have data.  You do some research

14   and you publish your findings.

15   BY MR. KALAS:

16        Q.   Right.  And not all the authors on this

17   paper work at Monsanto; right?

18        A.   Yeah, I think I have seen other papers by

19   John Acquavella.  And he's working somewhere in

20   Europe now, and -- at some other university in

21   Europe.

22        Q.   Well, right.

23        A.   Yeah.

24        Q.   But even at the time this paper was

25   published, there were co-authors from the School of

1    Public Health at the University of Minnesota;

2    right?

3         A.   I see that, yes.

4         Q.   And there was co-authors from the Rollins

5    School of Public Health at Emory University; right?

6         A.   That's correct.

7         Q.   Okay.  And then there were authors from

8    the Exponent Corporation; right?

9         A.   That's right.

10        Q.   Okay.  And the School of Public Health at

11   the University of Minnesota, is that a respected

12   school of public health in the field of toxicology?

13        A.   I have no other way of thinking.

14        Q.   Okay.  And the Rollins School of Public

15   Health at Emory University, is that a respected

16   school of public health in the field of toxicology?

17        A.   Why am I rating all these universities

18   for toxicology now?

19        Q.   Well, the reason I'm asking, sir, is

20   because -- I'll just tell you why I'm asking.

21             I'm asking because you raised as a

22   potential criticism that Monsanto was a co-author

23   on here -- or Monsanto employees were co-authors.

24   And I just want to understand if you also have

25   criticisms of the universities where the other

1    co-authors worked?

2        A.    I did not say it is a criticism.  I said

3    I noticed it, that's all.

4        Q.    Okay.  Do you have criticisms of the

5    University of Minnesota or Emory University schools

6    of public health?

7        A.    I have no criticisms for any -- any of

8    those.

9        Q.    Okay.  So going down to the way this

10   study was conducted, what they did is they enrolled

11   farmers from Minnesota and South Carolina; right?

12       A.    Yeah, I had no remembrance about the

13   facts about this paper right now.  Whatever you are

14   asking, yeah, I believe they are correct then, yes.

15       Q.    Okay.  And what they did is they had

16   something called field observers in this study;

17   right?

18       A.    Yes.

19       Q.    What is a field observer?

20       A.    Who observes the field, you know,

21   supervisors.  That's what I -- my understanding is.

22       Q.    And what they did in this study, the

23   field observers, is they actually watched how the

24   farmers used the pesticides; right?

25       A.    No, I don't think so.

1      Q.   Okay.  Well, let's make sure we're --

2      A.   I do not know the job responsibilities of

3  field super -- I mean, field observers.

4      Q.   Okay.  Well, let's look here.  It says,

5  "Field staff also observed the designated pesticide

6  application to document meteorologic conditions,

7  work practices and family activity patterns that

8  might influence exposure potential."  Do you see

9  that?

10     A.   Who are they?  Are they belonging to some

11  university, like Texas A&M, or -- or some

12  university in Minnesota, you know?

13     Q.   Well --

14     A.   Who are these field observers?

15     Q.   Well, with all due respect, Dr. Charles,

16  I didn't ask you anything about them.  I just asked

17  if you saw what the article says.  So let me --

18     A.   Could you please point out the paragraph

19  of that?

20     Q.   Yeah.  So can you see my screen?  Are you

21  looking at Zoom?

22     A.   Yeah.  No, I'm looking at your screen,

23  sir.

24     Q.   Okay.  Can you see that I'm sharing the

25  article?

1        A.    Yes.

2        Q.    Okay.  So I'm in the top left-hand column

3   on page 322, which is --

4        A.    Oh, okay.  Okay, okay.

5        Q.    It says "field staff."

6        A.    Okay.

7        Q.    Do you see I'm highlighting it?

8        A.    Yes.

9        Q.    Okay.  And so it says, "Field staff also

10  observed the designated pesticide application to

11  document meteorologic conditions, work practices

12  and family activity patterns that might influence

13  exposure potential."  Did I read that correctly?

14       A.    Yes.

15       Q.    Okay.  And what that means is that they

16  had people watching the applicators to document

17  their work practices, right, whoever they may be?

18       A.    Applicators are required to do that, sir.

19       Q.    Okay.  And then they have down here,

20  going into table two, they talk about the field

21  observers' characterization of the farmers on the

22  day of application.  Do you see that?

23       A.    Yes.

24       Q.    Okay.  And so we have farmers -- we have

25  about 30 percent who are not using rubber gloves

1   when mixing and loading; right?

2        A.   Yes.

3        Q.   Okay.  And as a toxicologist who has

4   expertise in exposure and dose, would not using

5   rubber gloves when mixing and loading lead to

6   higher internal doses of glyphosate?

7        A.   Yes.

8        Q.   Okay.  They looked at the acres being

9   treated; right?  And it goes from 10 up to 439.  Do

10  you see that?

11       A.   Are you still in table two?

12       Q.   Yes, sir.  The next -- the next part

13  after rubber gloves says "acres treated."  And the

14  lowest amount is 10, and the highest is 439.  Do

15  you see that?

16       A.   Yes.

17       Q.   Okay.  And just to be clear, Mr. Engilis,

18  even when he was applying at multiple properties,

19  never applied to ten acres; correct?

20       A.   I think he had .32 acres or so at one

21  spot.  Is that right?  I don't know.

22       Q.   Okay.  It wasn't ten, though; fair?

23       A.   It was not ten.

24       Q.   Okay.  And then they talk about whether

25  or not there were pesticide spills during mixing or

1    applying.  Do you see that?

2        A.   Yes.

3        Q.   Okay.  And the field observers observed

4    pesticide spills during mixing and applying, right,

5    in certain applicators?

6        A.   Yes, yes.

7        Q.   Okay.  And as somebody who's a

8    toxicologist with expertise in exposure and dose,

9    would you agree with me that spills of pesticides

10   during mixing or applying would tend to increase

11   the dose in the individual who experiences the

12   spill?

13       A.   Yes.

14       Q.   Okay.  Moving on, it says that they

15   observed skin contact with pesticides in over

16   30 percent of the applicators; right?

17       A.   That's right.

18       Q.   Okay.

19       A.   Can I go back --

20       Q.   Yeah.

21       A.   -- to the acreage?  'Cause you asked it

22   is not ten acres that he applied.  But if you look

23   at .32 acres at one time, and then multiply it with

24   the number of applications, you know, that will

25   give you the total acreage that he used at one time

1    if you consider this a one-time application.

2         Q.    Okay.

3         A.    Okay.

4         Q.    I don't recall if I asked you about the

5    skin contact.  Would observed skin contact with

6    pesticides tend to increase the internal dose of

7    those pesticides?

8         A.    Yes.

9         Q.    Okay.  And Mr. Engilis, in his

10   deposition, did not recall pesticides getting on

11   his skin; right?

12        A.    Directly contaminating his hands, he

13   didn't recall.  And I noticed that.

14        Q.    He did not recall?

15        A.    He did not.

16        Q.    Okay.  Now, the authors here on table

17   three talk about urinary glyphosate values for

18   study participants.  Do you see that?

19        A.    Yes.

20        Q.    Okay.  And what they did in this

21   biomonitoring study is they actually took a

22   pre-application urinalysis; right?

23        A.    Yes.

24        Q.    Okay.  And the reason you would do that

25   in conducting a biomonitoring study is to set a

 1   baseline glyphosate level prior to the application;

 2   fair?

 3        A.   Exactly.

 4        Q.   Okay.  And then they followed

 5   up -- they -- they took urine levels on the

 6   application day, and then they followed up for

 7   three days thereafter; right?

 8        A.   That's right.

 9        Q.   Okay.  And based upon the studies you

10   reviewed, like Connolly, would you agree that

11   72 hours of follow-up of urinalysis is enough time

12   to capture the large majority of excreted

13   glyphosate?

14        A.   Yeah, should be.

15        Q.   Okay.  And going up here to the text of

16   the study, they say, "The maximum urinary

17   concentration for a child, 29 parts per billion,

18   was for a teenage boy who actively assisted his

19   father with the mixing and application.  The boy's

20   father had the highest urinary concentration among

21   applicators.

22             "The field notes documented long

23   periods spent by the farmer repairing the boom

24   sprayer, and evidence of spills when mixing and

25   loading.

Ambrose Charles, Ph.D.

1           "The use of protective gloves was not

2      observed for father or son during mixing or

3      loading, or during the repairs.  The father was

4      also observed to smoke cigarettes while repairing

5      the boom sprayer."

6           Did I read that correctly?

7      A.   Yes.

8      Q.   Okay.  I want to focus here on the boy's

9      father for a moment, who had the highest urinary

10     concentration among applicators.

11          It said that the father spent long

12     periods repairing the boom sprayer and evidence of

13     spills while mixing and loading.  Do you see that?

14     A.   Yes.

15     Q.   Okay.  Spilling while mixing and loading

16     would tend to increase one's dose; fair?

17     A.   Yes.

18     Q.   Okay.  Likewise, the father did not use

19     protective gloves during mixing or loading.  Do you

20     see that?

21     A.   Yes.

22     Q.   Okay.  And then he also -- the father was

23     smoking cigarettes while repairing the boom

24     sprayer.  Do you see that?

25     A.   Yes.

```
 1          Q.   Okay.  And not using gloves when mixing
 2    and loading would tend to increase the dose in the
 3    father; right?
 4          A.   Yes.
 5          Q.   And smoking cigarettes while handling
 6    pesticides would tend to increase the dose in the
 7    father; fair?
 8          A.   Yes.
 9          Q.   Okay.  And I heard you laugh a little
10    there.  This father in this study was doing almost
11    everything to get glyphosate into his body; fair?
12          A.   Yes.
13          Q.   Okay.  Let's look at his maximum dose.
14    If you go to the next paragraph, it says, "The
15    maximum systemic dose for farmer applicators was
16    estimated to be .004 mg/kg, and the distribution of
17    values was highly skewed.  The geometric mean
18    systemic dose was .0001 mg/kg."  Did I read that
19    correctly?
20          A.   That's correct.
21          Q.   Okay.  So the maximum dose in this
22    gentleman who was doing all these things wrong was
23    estimated by these study authors to be .004 mgs per
24    kg; fair?
25          A.   That's fair.
```

Ambrose Char Teso, PH.D.

1    Q.   Okay.  Now, .004 mgs per kg, is that a

2  dose level that puts one at an increased risk for

3  NHL?

4    A.   If he continues that job for a while, for

5  26 years or 30 years, we do not know the

6  consequence.  You are asking about something for me

7  to speculate what will happen to that father you

8  described, you know, whether he will be sick after

9  30 years of exposure in a similar manner that you

10  described.

11    Q.   Well, I actually am not asking about the

12  father in that question.  So let me -- let me make

13  sure we're on the same page and there's no

14  misunderstanding between us.

15    A.   You are describing all those things about

16  that father who mixed and loaded and who smoked

17  cigarettes and all those activities that would lead

18  to a systemic level of 0004 milligrams per kilogram

19  body weight, right?  That's the reason I was

20  referring that father.

21    Q.   Okay.  Well, I had switched gears.  So

22  that's why I said I want to make sure we don't

23  misunderstand one another.

24    A.   Okay.

25    Q.   So that dose, .004 mgs per kg, is that a

1   high enough dose to put somebody at an increased

2   risk of NHL?

3        A.   That's an acute dose, sir.

4        Q.   Okay.  Is a --

5        A.   That is not -- that is not a chronic dose

6   level.  That is an acute dose that was measured at

7   that experiment at that application level.

8        Q.   Is a chronic dose of .004 mgs per kg

9   three times a month over the course of 25 years a

10  high enough dose to put somebody at an increased

11  risk of NHL?

12       A.   That I cannot say that, you know.  I

13  cannot say that.

14       Q.   Okay.

15       A.   I cannot make that kind of predictions,

16  you know, at that dose level what 26 years, you

17  know, what will happen to that particular person.

18       Q.   Okay.  Let's look at another study that I

19  did not see on your MCL.  I'm going to mark it as

20  exhibit -- I think we're up to 13.

21       A.   Can I get out of this?

22       Q.   Yeah, sure.

23       A.   Okay.

24       Q.   I've marked as Exhibit 13 a study that

25  appeared in a journal called Risk Analysis from the

1    year 2020.  Have you seen this study before, sir?

2        A.   No, I have not.

3        Q.   Okay.  And this is entitled Risk

4    Assessment of Glyphosate Exposures from a Pilot

5    Study with Simulated Heavy Residential Consumer

6    Application of Roundup Using a Margin of Safety

7    Approach.  Did I read that correctly?

8        A.   That's correct.

9        Q.   Okay.  And I understand you haven't seen

10   this before, and so if you need to take time to

11   look at it, please do.

12            But just looking at the method

13   section, this is, again, a biomonitoring study.  Do

14   you see that?

15       A.   Yes.

16       Q.   Okay.  And what they did here is they had

17   applicators mixing and using a backpack sprayer

18   applying a commercially available

19   glyphosate-containing herbicide, Roundup Weed and

20   Grass Killer Super Concentrate.  Do you see that?

21       A.   That's correct.

22       Q.   Okay.  And just to be clear,

23   Mr. Engilis -- well, back up.  I'll ask you that in

24   a minute.

25            It says that ten fluid ounces of

1    Roundup concentrate containing 50.2 percent

2    glyphosate was added to the backpack sprayer with

3    four gallons of water to create a .96 percent

4    glyphosate-containing solution.  Do you see that?

5         A.   Yes.

6         Q.   Okay.  And Mr. Engilis, you talk about in

7    your report, using a one percent solution of

8    Roundup; right?

9         A.   Ready to use, yes.

10        Q.   Okay.  And that's a difference between

11   Mr. Engilis and the applicators in this study, is

12   that Mr. Engilis purchased ready to use and so he

13   did not mix and load glyphosate from concentrate

14   and dilute it; fair?

15        A.   Fair.

16        Q.   Okay.  And mixing and loading, as you've

17   seen in multiple biomonitoring studies, and as

18   we've looked at today, is a high exposure event;

19   correct?

20        A.   That's correct.

21        Q.   Okay.  And that's a high exposure event

22   Mr. Engilis did not have; fair?

23        A.   Yes.

24        Q.   Okay.

25             MR. HABERMAN:  Objection.

1   BY MR. KALAS:

2        Q.   Moving on here, it says, "Each applicator

3   sprayed the 677-foot perimeter of the yard at an

4   approximate pace of one foot per second.  Product

5   was continuously sprayed until the backpack sprayer

6   was empty, after which it was refilled and the

7   process was repeated, for a total of four mixing

8   and spraying events per applicator.  This

9   corresponded to a total of 100 minutes with roughly

10  three to five minutes and 20 to 22 minutes for each

11  mixing and spraying event respectively."

12              Did I read that correctly?

13       A.   One problem that I have responding to

14  your question, Mr. Kalas, is that you know this

15  paper and you're reading that, you know, already on

16  that paper, and you're reading portions of that

17  paper and then trying to make me agree or disagree.

18              Unless I study this paper properly and

19  make comparisons with Mr. Engilis' case, I cannot

20  just say yes or no to everything that you ask me.

21  I'm sorry.

22       Q.   Well, my question was did I read that

23  correctly.  I hear your point, but did I read that

24  correctly?

25       A.   Read it again.

```
 1              MR. HABERMAN:  The document speaks for

 2    itself.

 3    BY MR. KALAS:

 4         Q.   Okay.  So I'll read it again.  It says,

 5    "Each applicator sprayed the 677 foot" --

 6         A.   Excuse me.  Could we please number that

 7    one, 2.111 or --

 8         Q.   Yes, I'm in 2.11.

 9         A.   Okay.  Each --

10         Q.   Yeah.  "Each applicator sprayed the

11    677-foot perimeter of the yard at an approximate

12    pace of one foot per second.  Product was

13    continuously sprayed until the backpack sprayer was

14    empty, after which it was refilled and the process

15    was repeated, for a total of four mixing and

16    spraying events per applicator.  This corresponded

17    to a total of 100 minutes with roughly three to

18    five minutes, and 20 to 22 minutes for each mixing

19    and spraying event, respectively."

20              Did I read that correctly?

21         A.   Correct, yes.

22         Q.   Okay.  Did Mr. Engilis ever apply Roundup

23    for a hundred minutes in a given day?

24         A.   In a given day.  I don't believe so.

25         Q.   Okay.  And did Mr. Engilis ever apply
```

1    16 gallons of Roundup in a given day?

2        A.    No.

3        Q.    Did Mr. Engilis even apply a gallon of

4    Roundup in a given day?

5        A.    No.

6        Q.    Okay.  Going up here just a little bit to

7    what they were wearing.  They talk about the fact

8    that there are six study participants per exposure

9    group.  And it says, "For the dermal exposure

10   group, applicators wore T-shirts, athletic shoes,

11   and half-face respirators equipped with OVAG P100

12   cartridges 3M 60921, St. Paul, Minnesota."  Did I

13   read that correctly?

14       A.    Yes.

15       Q.    Okay.  Then they say, "Whereas for the

16   inhalation exposure group, applicators wore Tyvek

17   suits and chemical-resistant gloves, but no

18   respirator."  Did I read that correctly?

19       A.    Yes.

20       Q.    Okay.  Did Mr. Engilis also wear shorts

21   when applying Roundup?

22       A.    Yes.

23       Q.    Did Mr. Engilis also wear T-shirts when

24   applying Roundup?

25       A.    I believe so.  I think yes.

1      Q.   Okay.  Going down here into the

2  study -- and again, I understand you haven't read

3  it, so I'm not asking you to agree or anything like

4  that with the study.

5      A.   Thank you.

6      Q.   They say, "With the second approach --

7  see table four -- calculated total internal doses

8  across the 26.167 hour study period average 29.217

9  micrograms and 109.169 micrograms for the

10  inhalation and dermal exposure groups

11  respectively."

12           And did I read that correctly other

13  than leaving out the ranges there?

14      A.   It is in the -- not the portrait format.

15  It is in the --

16           (Interruption by the reporter.)

17           THE WITNESS:  The layout of the screen is

18  different, and I am -- not really easy to read for

19  me.

20  BY MR. KALAS:

21      Q.   Okay.  I'm on page 11, 3.5.2.

22      A.   I'm on page 10.

23      Q.   Okay.  Next page.

24      A.   Okay.

25      Q.   Can you see it now?

1        A.    Yeah, I can see 3.52.  Okay.

2        Q.    Okay.  It says, "With the second

3    approach, calculated internal dose -- total

4    internal doses across the 26.167 hour study period

5    average 29.217 micrograms and 129.169 micrograms

6    for the inhalation dermal exposure groups

7    respectively."  Did I read that correctly?

8        A.    Correct.

9        Q.    Okay.  Moving on, it says, "Mean internal

10   doses calculated on a per kilogram body weight

11   basis for the applicators and the inhalation dermal

12   exposure groups were .437 micrograms per kilogram,

13   and 1.413 micrograms per kilogram respectively."

14            Did I read that correctly?

15       A.    Correct.

16       Q.    "Margin of safety values for the

17   inhalation and dermal exposure groups averaged 209

18   and 115 respectively."  Did I read that correctly?

19       A.    That's right.

20       Q.    Moving on, it says, "For worst case

21   scenario purposes, using the sum of the highest

22   body weight adjusted internal doses from both the

23   inhalation and dermal exposure groups, i.e.,

24   5.901 micrograms per kilogram, resulted in a

25   combined exposure margin of safety of ten."

Ambrose Charles, Ph.D.

1              Did I read that correctly?

2        A.   That's correct.

3        Q.   Okay.  Now, 5.901 micrograms per kilogram

4   is .0059 milligrams per kilogram, true?

5        A.   That's correct.

6        Q.   Okay.  Is an internal dose of

7   .0059 milligrams per kilogram high enough to put

8   somebody at an increased risk for NHL?

9        A.   We have no dose response measurement on

10  that -- that kind of question.

11       Q.   Okay.  Are you aware of a biomonitoring

12  dose in the literature higher than .0059 mgs per

13  kg?

14       A.   No.

15       Q.   Okay.  Now, one of the things we haven't

16  talked about yet is -- is --

17       A.   Excuse me.

18       Q.   Yeah.

19       A.   If I recall, Connolly's paper where they

20  found out that the urinary excretion that was the

21  biomonitoring data, which they back-calculated the

22  concentration -- or it was reflecting the daily

23  intake, ADI, average daily intake, of somewhere

24  around .5 milligrams per kg.  So if you take that

25  value, that's higher than this.  I don't know if

1    you -- if you understood what I said.

2         Q.   Oh, I understand what you said, but I

3    don't know if I agree with what you said.  Yeah.

4         A.   Yeah, I'm also quoting out of the paper

5    of Connolly that we discussed.

6         Q.   Yeah.  No, I --

7         A.   From that paper, when she states that

8    when they recalculated -- back-calculated, or

9    extrapolated to the average daily intake, that was

10   closer to average daily intake according to the

11   European standard.  You know, that's what I believe

12   their conclusion was.

13        Q.   Okay.  The Connolly paper, again, is

14   using that one percent urinalysis level from the

15   oral exposure studies for that opinion; right?

16        A.   That is not the point.  The point was you

17   are asking whether am I aware of any biomonitoring

18   data that shows a dose level more than

19   0.005 milligrams per kg.

20        Q.   Uh-huh.

21        A.   Yeah.  That I was answering to that,

22   recalling --

23        Q.   Okay.

24        A.   -- a reference into that paper.

25        Q.   Okay.  Is that -- is that figure that

1    you're recalling from the Connolly paper -- and I

2    marked it so you can look at it -- but is that

3    figure from a passive dosimetry or a biomonitoring

4    paper?

5         A.   That's biomonitoring.

6         Q.   Okay.  It's a urinalysis level.  You're

7    sure of it?

8         A.   Yes.

9         Q.   Okay.  All right.  Well, we may go to

10   that paper at a future depo.

11              But in the meantime, Dr. Charles,

12   regulators -- you mentioned the EUADI, regulators

13   set these acceptable risk values; correct?

14        A.   Say that question again.

15        Q.   Regulators set these acceptable

16   intake -- acceptable risk values, be it ADI, RFD,

17   what have you?

18        A.   They are not called risk values.

19        Q.   Okay.  What are they called?

20        A.   They are acceptable daily intake.

21        Q.   Okay.  And regulators, be it EPA or FSIR,

22   what have you, set these sort of values; right?

23        A.   Exactly.

24        Q.   Okay.  And they've set them for

25   glyphosate; right?

1          A.    Exactly.

2          Q.    Okay.  And essentially what the

3    regulators are saying when they set those risk

4    values is that someone can be exposed to a dose

5    every day without suffering a health effect, at

6    least on a general population level; fair?

7          A.    That's correct.  That's a general

8    population, yes.

9          Q.    Okay.  And have you seen any study where

10   an internal dose of glyphosate exceeded any of

11   these regulatory values?

12         A.    No.

13         Q.    Okay.  Is it entirely possible in your

14   mind, Dr. Charles, that IARC is right that

15   glyphosate is a potential carcinogenic hazard, and

16   EPA is right that the US population is not at risk

17   of any carcinogenic outcomes because the dose

18   levels are so low?

19              MR. HABERMAN:  Objection.

20              THE WITNESS:  To answer your question, I

21   am not here in my report or my opinions -- you

22   know, I was not weighing in who is right and who is

23   wrong.  I never made that kind of comparison.  I

24   was only making the statements of presentation to

25   the data by EPA.  This is what EPA did and this is

1   how they came out with these kind of conclusions.

2   This is what the IARC studied.

3               They are generating data or per

4   square values that you said for the protection of

5   the general population.  But they never say in that

6   acceptable daily intake that one person out of

7   10,000 or million will never get the disease if you

8   take this inside this acceptable level.  They never

9   say that.

10              Those numbers are -- I know how

11   those numbers are generated.  I have generated

12   numbers too for standards.  When you develop that

13   standards, we are looking at the general public

14   health protection.  We are never gathering one

15   individual safety regulator, one individual safety.

16   We don't guarantee that in those numbers.

17              However, agencies gather those

18   numbers for regulatory purposes, okay?  They are

19   not giving personal protection and telling every

20   citizen in the United States you will never get

21   cancer at this level if you take every day.  Nobody

22   takes glyphosate or any other chemical or any other

23   drug every day in their whole life in order to

24   produce cancer.

25              But some individuals take it.  Some

1    individuals are exposed to these things, and

2    they -- as a part of their occupation or their

3    habit or their use pattern.  So they have a

4    continuous exposure of the chemical.

5               So I am not here to judge who is

6    right or wrong.  That is not my intent of this

7    opinion.  I was only pointing out Engilis case as a

8    case that here is the case, and what is the weight

9    of evidence.  I have to point out glyphosate

10   exposure, or his use pattern, probably is the

11   likely cause.  The reason is all of the things that

12   I evaluated are not really pointing out the

13   causation.

14   BY MR. KALAS:

15       Q.   Okay.

16       A.   That is what I'm saying.

17       Q.   So my question was not about Mr. Engilis

18   or a specific causation.  My question was much more

19   general than that.

20       A.   I answered that question saying that I am

21   not here to say whether EPA is right or IARC is

22   wrong or right.

23       Q.   And I get that.  And I get that you're

24   not taking a position on that.  But my question

25   wasn't that either.

1           My question was, is it possible both

2   are right?  In other words, is it possible IARC is

3   right that glyphosate's a carcinogenic hazard, and

4   EPA is right that glyphosate does not represent a

5   carcinogenic risk?

6           MR. HABERMAN:  I object to the form of

7   the question and object to the hypothetical

8   contrary to the doctor's report.

9   BY MR. KALAS:

10      Q.   You can answer, sir.

11      A.   Yeah, those two agencies belong to two

12  different continents.  And regulatory decisions are

13  made based on the scientific proof of those bodies

14  and then, you know, bodies and scientific

15  industries of their interests on deciding those

16  kind of things.  You know, I have no -- I have no

17  opinion about it.

18      Q.   Okay.  So I think I understand your

19  answer.  You have no opinion as to whether or not

20  it's possible both IARC and EPA are correct; is

21  that fair?

22           MR. HABERMAN:  Objection.

23           THE WITNESS:  I think I answered your

24  question, sir.

25  BY MR. KALAS:

1        Q.    Okay.  Is that how you answered it?  Did

2    I understand you correctly?

3        A.    I answered --

4              MR. HABERMAN:  Objection, asked and

5    answered.

6              (Interruption by the reporter.)

7              THE WITNESS:  I answered.  That was my

8    answer.

9    BY MR. KALAS:

10        Q.    Okay.  I don't understand your answer.

11    Can you please explain to me your answer?

12              MR. HABERMAN:  I mean, you'll have to go

13    back and read it in the transcript.  It's probably

14    several pages long in the transcript, but that's

15    his response to your question.

16    BY MR. KALAS:

17        Q.    Okay.  And I don't understand.  So if you

18    could please be patient with me, Dr. Charles, and

19    explain your answer.

20        A.    I am patient with you.  I'm not annoyed

21    at all.  I can say -- answer you several times.

22    Will you please repeat the question so that --

23        Q.    Sure.  Was it your answer -- did I

24    understand you correctly that you have no opinion

25    as to whether or not it's possible both IARC and

1    EPA could be right in their regulatory decisions on

2    glyphosate?  Could both be right?

3        A.   Both agencies are right, that's your

4    question?

5        Q.   Yes.  Is that possible, in your opinion?

6        A.   That is a question that I cannot answer.

7    I said those two decisions were made by two

8    different entities.

9        Q.   Got it.  I understand you now.

10       A.   Yeah.

11       Q.   Okay.  Now, what's NIOSH?

12            MR. HABERMAN:  I'm sorry, Dr. Charles,

13   were you finished with your answer, your first --

14            THE WITNESS:  Yes, yes.

15   BY MR. KALAS:

16       Q.   Okay.  What's NIOSH, Dr. Charles?

17       A.   National Institute of Occupational Health

18   and Safety.

19       Q.   Do they put out figures called the REL?

20       A.   Yes.

21       Q.   Okay.  What's an REL?

22       A.   It is exposure limit -- REL stands for --

23            (Interruption by the reporter.)

24            THE WITNESS:  Relative exposure level.

25   BY MR. KALAS:

1      Q.   Okay.  Is there -- how do RELs get set?

2  How does NIOSH decide to set an REL?

3      A.   They do biomonitoring -- not

4  biomonitoring -- monitoring, of course

5  biomonitoring plus air concentrations.  They

6  collect data and then come out with an average or a

7  range of levels, and then they look at different

8  levels of toxicological effects.  Based on the

9  studies available, they come out with a level that

10  will not cause any effect for prolonged

11  time-weighted average exposure using the safety

12  factors.

13      Q.   Okay.  So my question was a bad question,

14  or maybe -- or maybe we just didn't understand one

15  another.  I understand that's how they set an REL

16  as far as what they go through to set it.

17          How do they decide that this chemical

18  is worthy of having an REL set?  That's what I was

19  trying to ask.

20      A.   It is worthy means, you know, the

21  prevalence of this chemical --

22      Q.   Okay.

23      A.   -- that is the worthiness, you know.  I

24  mean, if that is not percent of the chemical in air

25  and there's no need for setting an REL for that.

Ambrose — Char Tes, Ph.D.

1    Q.   Is glyphosate the most widely-used

2   pesticide in the United States?

3    A.   Yes.

4    Q.   Has NIOSH set an REL for glyphosate?

5    A.   I don't think so.  I've not seen any REL

6   for glyphosate.

7    Q.   Okay.  Now I think -- I think your report

8   is pretty clear on this, but just to center

9   ourselves -- 'cause I'm going to get into

10   Mr. Engilis here for a few minutes.

11           You didn't calculate an internal dose

12   for Mr. Engilis; fair?

13           MR. HABERMAN:  Objection.

14           THE WITNESS:  No.

15   BY MR. KALAS:

16    Q.   Okay.  And had you calculated an internal

17   dose for Mr. Engilis, you could have compared that

18   internal dose to regulatory levels; correct?

19    A.   Yes.

20    Q.   Okay.  And unfortunately, Mr. Engilis was

21   diagnosed with CLL at the age of 62 in 2014; right?

22    A.   Can I go back to that internal dose?

23    Q.   Yes.

24           MR. HABERMAN:  Yes.

25           MR. KALAS:  Hold on, hold on.

1    BY MR. KALAS:

2        Q.   Yes, you can, and you can clean up your

3    answer.  Go ahead if you need to.

4        A.   You asked me that if I estimated an

5    internal dose for Mr. Engilis?

6        Q.   I asked if you calculated an internal

7    dose for Mr. Engilis.

8        A.   Oh, I have not calculated that.  I didn't

9    have the data to calculate that internal dose, no.

10       Q.   Right.  Okay.  Now going back to the

11   question I was asking.  Mr. Engilis was diagnosed

12   with CLL in 2014 at the age of 62; right?

13       A.   2014, I believe, yes.  I do not know his

14   age at that time.

15       Q.   Okay.  Unfortunately, there are

16   62-year-olds who are diagnosed with NHL every day

17   in this country, true?

18       A.   Could be.  I don't keep, you know, track

19   of that kind of statistics.

20       Q.   People are diagnosed with NHL in this

21   country who've never used Roundup, true?

22       A.   Could be, yes.

23       Q.   Okay.  NHL existed before Roundup

24   existed, true?

25       A.   I don't know.

```
1         Q.   Okay.  Well, Roundup was put on the

2    market in 1974.  Do you know if NHL existed before

3    1974?

4         A.   Could be.

5         Q.   You really don't know?  You were born in

6    1941, and you'd never heard of NHL until after

7    Roundup came on the market?

8         A.   I did not do research or find out medical

9    science of when it existed and when it is -- it is

10   difficult to know that.  When something comes to

11   your attention, you look at that.  That's all.

12        Q.   You were born in 1941, true?

13             MR. HABERMAN:  I mean, this is just

14   getting argumentative.

15             MR. KALAS:  But I'm just trying to

16   establish facts.

17   BY MR. KALAS:

18        Q.   You were born in 1941, true?

19        A.   That is -- that has no bearing on your

20   question at all.  When I was born is my business

21   and my parents' business.

22        Q.   Okay.  Well, you graduated --

23        A.   You are going out of the boundary.

24        Q.   My question -- my question, with all due

25   respect, sir, is right in the boundary.
```

1                You graduated college in 1963; right?

2        A.    That's correct.

3        Q.    Okay.  How old were you when you

4    graduated college?

5        A.    I was 50 -- I was 19.

6        Q.    19.  Okay.  And in the time period before

7    you graduated college, or after you graduated

8    college when you went to graduate school, can you

9    recall ever hearing of the disease NHL?

10       A.    No.

11       Q.    Okay.  Just because someone has NHL and

12   used Roundup does not mean, in and of itself,

13   Roundup caused their NHL, true?

14       A.    I don't know.

15             MR. HABERMAN:  Objection.

16             THE WITNESS:  I only look at the data and

17   then the correlations.

18   BY MR. KALAS:

19       Q.    Okay.  So you have -- you said, "I don't

20   know," so I want to make sure I understand that

21   answer.

22             You have no opinion as to whether or

23   not just because somebody used Roundup and got NHL

24   means the Roundup caused their NHL?  You aren't

25   offering an opinion on that?

1        A.   I did not make that opinion.  I was

2   looking at the entire case, and his exposure

3   history, and his all other medical history, and the

4   confounding factors of the medical conditions,

5   other types of exposures, personal habits, diets.

6   And all those things, you know, I look at and then

7   see what is the factor that is presenting out.

8   It's only that glyphosate usage, nothing else, that

9   is the reason to cause NHL.

10       Q.   Now, when you conducted your exposure

11   assessment of Mr. Engilis, you were careful; right?

12            MR. HABERMAN:  Objection.

13            THE WITNESS:  You mean that I do

14   carelessly?

15   BY MR. KALAS:

16       Q.   Well, I think you're taking an

17   insinuation on in the question.

18       A.   Your question is not that helpful, sir.

19       Q.   Okay.  Well, then let me rephrase it.

20            When you did your exposure assessment

21   of Mr. Engilis, were you careful to focus on the

22   pertinent facts?

23       A.   Yes.

24       Q.   Okay.  Did you double-check those facts

25   when reaching your opinions?

1      A.    From the records, yes.

2      Q.    Okay.  Do you agree with me that an

3   exposure assessment is only as good as the facts

4   that go into it?

5      A.    From the information I have, yes.

6      Q.    Okay.  Do you agree with me that an

7   exposure assessment that gets the facts, underlying

8   facts wrong, is, per se, unreliable?

9          MR. HABERMAN:  Objection.

10          THE WITNESS:  Whatever is available is

11   used in a scientific methodology to calculate

12   whatever exposure I can come up with.  That's all.

13   I do not have any other information with me.

14   BY MR. KALAS:

15      Q.    Well, my question isn't about what you

16   did.  My question is more of a generic question as

17   somebody -- for someone who's done exposure

18   assessments for many, many years.

19          So I think you thought I was asking

20   about your report, and I'm not.

21      A.    Oh, sorry.

22      Q.    So my question is, do you agree that an

23   exposure assessment that gets the underlying facts

24   wrong is, per se, unreliable?

25      A.    Yeah, what you put in depends -- and out,

1    the result depends on what you put in.

2       Q.   Okay.  Now, we talked about the affidavit

3    before, and I said I was going to get back to it.

4              Do you agree, according to

5    Exhibit 5 -- or, excuse me, Exhibit 4, the

6    affidavit signed by Mr. Engilis -- he applied

7    Roundup from 1990 until 2015?

8       A.   Yes.

9       Q.   Okay.  And I think we already covered

10   this, but you agree he applied a pre-mix Roundup

11   only.  He did not mix and load; correct?

12      A.   That's correct.

13      Q.   And you agree that Mr. Engilis testified

14   that he did not recall Roundup getting on his skin;

15   correct?

16      A.   Correct.

17           MR. HABERMAN:  Objection.

18   BY MR. KALAS:

19      Q.   Okay.  Now, going back to your report,

20   which is Exhibit 3, in your exposure assessment,

21   which is on -- or a portion of it's on page 11,

22   which is -- I'm looking at part eleven, frequency

23   and duration.  You see that?

24      A.   Yes, sir.

25      Q.   You say, "From the data known -- so far

1    known, an attempt is made to extrapolate the number

2    of average possible work hours or days per year for

3    comparison with an occupational time weighted

4    average."  Did I read that correctly?

5         A.   That's correct.

6         Q.   Okay.  And you say, "If Mr. Engilis had

7    spent 24 hours in a year, one hour twice a month,

8    applying Roundup, he would have spent 1272 hours,

9    at a minimum, in 53 years on the property locations

10   mentioned above."  Did I read that correctly?

11        A.   That's correct.

12        Q.   Okay.  Did Mr. Engilis apply Roundup for

13   53 years?

14        A.   No.  That could be an error.  Typo.

15   Should be about 30 years or 32 years.

16        Q.   Okay.  And that error went into the

17   number of time weighted average eight-hour days you

18   calculated here for Mr. Engilis; right?

19        A.   No.

20        Q.   Okay.  You multiplied 24 hours times

21   53 years to reach the number 1272, didn't you?

22        A.   Yeah.  I must have.

23        Q.   Excuse me?  I'm not sure if I heard what

24   you said.

25        A.   I must have.  I was re-looking at that.

1   Bear with me.  Yes, that's an error.

2       Q.   Okay.  And in fact -- and that error got

3   carried over to the next sentence where it says,

4   "This would be equal to about 160 days' time

5   weighted average eight-hour days of occupational

6   exposure, which corresponds to greater than three

7   days' time weighted average days per year."

8            That 160-day figure comes out of that

9   1272 number; right?

10      A.   That's right.

11      Q.   Okay.  And in fact, that number should be

12  lower; right?

13      A.   That's right.

14      Q.   Okay.  And I did some math based upon the

15  affidavit, and I got 24 hours per year.  And I

16  think you have 20 -- it should be 27 years for

17  19 -- or excuse me, 26 years for 1990 to 2015.  And

18  based on that, I got 624 hours over the lifetime.

19  Is that fair?

20      A.   Yeah, I think it is.  His use I have from

21  '85 onwards, he used in his deposition, and

22  other -- '85.

23      Q.   85 what?  I'm sorry, sir.

24      A.   1985 through 2015.  That is his --

25      Q.   Okay.  So are you saying his affidavit is

1    wrong that he signed under the penalty of perjury?

2         A.   I did not say that.  And I said that I

3    have seen other number of years also in the

4    records.  You know, the maximum.  So I was taking

5    the worst case.

6         Q.   Okay.  So which is right, though, 1985 or

7    1990, or do you have no opinion?

8         A.   I have no opinion.  I used 1985 to 2015.

9    About 30 years.

10        Q.   All right.  So let's take 30 years.  30

11   years' time weighted days would be 720 hours; fair?

12        A.   Yeah, that is.

13        Q.   Okay.  720 hours -- and he was diagnosed

14   with NHL when he was 62; right?

15        A.   I don't know the age.

16        Q.   Okay.  Take a look at your report where

17   you talk about his medical history.  You have 64

18   here.  So we'll take 64.  That's on page 4 of your

19   report.  Do you see that?

20        A.   Yes.

21        Q.   Okay.  Now 64, or 720 divided by 64, is a

22   little over ten hours per year; right?

23        A.   Why do you have to divide by 64?

24        Q.   Well, Mr. Engilis was exposed to Roundup

25   over the course of his life, and that exposure to

1    Roundup over the course of his life, in your

2    opinion, led to his increased risk of NHL, true?

3         A.   It is not a course of his life.  The

4    number of years here he started his exposure, that

5    is what is calculated.  And that is --

6         Q.   Okay.

7         A.   -- calculate the risk values based on the

8    ADIs.

9         Q.   Okay.  So you've never heard of an

10   average daily dose being incorporated into a

11   cancer -- a cancer risk level used by regulators?

12        A.   70 years of life, yes.

13        Q.   Yes.  You have heard of that?

14        A.   Yes.

15        Q.   Okay.  And that's how regulators

16   typically approach the question of cancer risk:

17   could somebody have this dose every day of their

18   life over 70 years and be at an increased risk;

19   right?

20        A.   That's right.

21        Q.   Okay.  And so that's why I'm asking about

22   his lifetime; right?

23        A.   Yeah, that -- that's the lifetime

24   exposure.

25        Q.   Okay.

1      A.   Calculated for regulatory purpose.  Here

2   we have an actual exposure date.

3      Q.   Okay.

4      A.   Not when did he start getting exposed.

5   In a general population you cannot come up with a

6   number of lifetime, okay?  Every year everybody

7   should start exposed to chemicals at the age of 10

8   so that, you know, 60 years after that would be 70

9   years of -- 60 years of exposure.  You cannot do

10   that.  So that's why a maximum 70 years is a

11   lifetime exposure for calculations we use.

12             But in Mr. Engilis' case, you know,

13   there is time of exposure that we know, so that is

14   the number most applicable in calculating his case.

15      Q.   Over the course of his life, if you -- if

16   you looked over the course of his life as opposed

17   to just the time period he used Roundup, did

18   Mr. Engilis average two days a year or more of

19   glyphosate exposure?

20      A.   It should be two days.  I didn't

21   calculate that on my -- I'm not making the

22   conversions.  You know, I agree it should be around

23   two.

24      Q.   Okay.  Well, if it was 720 hours over

25   64 years, that would be less than two days, right?

1    'Cause that would be less than 16 hours per year.

2        A.   It's around two days.

3        Q.   Well, it's quite a bit less, isn't it,

4    sir?  720 divided by 64?

5        A.   Yeah, you are taking decimals of exposure

6    time in a person's life, you know, and then you say

7    this is kind of numbers that we are creating.

8        Q.   If you look over the course of his life,

9    would Mr. Engilis' Roundup exposure qualify him to

10   fit within the MacDuffy data?

11       A.   Around two days, yes.

12       Q.   Well, you said around.  Is it more or

13   less?

14       A.   It is two days.  You know, some people it

15   will be two days.  Some people more than two days.

16   Some people can be less than two days, you know.

17       Q.   All right.  Mr. Engilis is one of those

18   who could be less than two days; fair?

19       A.   Yeah, could be.

20            MR. HABERMAN:  Objection.

21   BY MR. KALAS:

22       Q.   Okay.  I want to go to --

23            MR. HABERMAN:  You know, I need -- I'm

24   going to take a five-minute break, bathroom break.

25            MR. KALAS:  Okay.  How much time are we

1  at, Jackson?  'Cause I may just -- I may just

2  reserve the rest of my time.

3          THE VIDEOGRAPHER:  Let's go off the

4  record real quick.  It is 12:15 p.m. and we are off

5  the record.

6               (Break taken.)

7          THE VIDEOGRAPHER:  We are now back on the

8  record at 12:26 p.m. Eastern daylight time.

9  BY MR. KALAS:

10     Q.   Dr. Charles, briefly, the epidemiology

11  section of your report, does that remain identical

12  to the epidemiology section of your report from

13  your previous deposition in the Plume and Moore

14  matters?

15     A.   Yes, except I must have focused little

16  bit on the CLL.

17     Q.   Okay.  And just to be clear, the

18  epidemiology section of your report, you still

19  report, for certain studies only, the CLL odds

20  ratio; for other studies only the NHL odds ratio,

21  true?

22     A.   That's correct.

23     Q.   Okay.  Is it true, Dr. Charles, that

24  Mr. Engilis in his deposition never said he walked

25  around barefoot when applying Roundup?

1            MR. HABERMAN:  Objection.

2            THE WITNESS:  I think I read that in his

3    deposition, yes, bare feet.

4    BY MR. KALAS:

5       Q.   You read that in his deposition or

6    Mrs. Engilis, or do you recall?

7       A.   I don't recall that, but I read it.

8       Q.   Okay.  And if it was in Mrs. Engilis'

9    deposition and not Mr. Engilis' deposition, can you

10   explain to me why, under your methodology, you

11   would still assume he applied in bare feet?

12           MR. HABERMAN:  Objection.

13           THE WITNESS:  I have no answer for that,

14   'cause --

15   BY MR. KALAS:

16      Q.   Okay.  Finally, Doctor, I've marked as

17   Exhibit 14 the IARC monograph on glyphosate.  And I

18   have that open.  I wanted to just ask you briefly

19   about the George study.

20           The George study is the initiation

21   promotion study you discuss in your report.  And I

22   have the section the monograph open here discussing

23   that study.

24           MR. HABERMAN:  What page is that on?

25           MR. KALAS:  In his report or the

1    monograph?

2           MR. HABERMAN:  The mon -- well, if you're

3    going to be asking questions about the monograph,

4    then the monograph.

5           MR. KALAS:  Page 34.

6    BY MR. KALAS:

7       Q.   And just to kind of center ourselves, do

8    you recall the George study and your discussion of

9    it in your report, Dr. Charles?

10      A.   Let me get that, please.

11      Q.   Sure.

12      A.   Page 34.  George, et al., 2010?

13      Q.   Yes, sir.

14      A.   This is the Swiss mice study that I

15   referenced to ATSDR's report.

16      Q.   I don't think so, actually.  I'll show

17   you where in your report you talk about it,

18   actually, and then we'll go back to the monograph.

19   So in your report you discuss this study -- hold

20   on.

21      A.   Look at the mechanism -- I don't know

22   which page it is.

23      Q.   In your report, you discuss this study at

24   page 23.  Mechanism of carcinogenicity.

25      A.   Yes.

1      Q.    Okay.  And this George study is the study

2   you relied on in reaching your opinions on the --

3      A.    Yes.

4      Q.    -- mechanism of carcinogenicity; right?

5      A.    Yeah, that's right.  That is one of the

6   studies that show possible carcinogenic effects.

7      Q.    And IARC, in discussing the George study,

8   stated the following, it says, "The glyphosate

9   formulation appeared to be a tumor promoter in this

10  study.  The design of the study was poor, with

11  short duration of treatment, no solvent controls,

12  small number of animals, and lack of

13  histopathological examination.  The working group

14  concluded that this was an inadequate study for the

15  evaluation of glyphosate."

16          Did I read that correctly?

17     A.    Yes.

18     Q.    Okay.  Do you agree with IARC that the

19  design of the George study was poor?

20     A.    It is what is written there; however, the

21  findings that the mice had cancer and that -- by

22  this combination studies as a promoter, has been

23  referenced by several other scientists and then

24  told that it's an important point to note that, not

25  be discarded.

1    Q.   Okay.  I mean this with no disrespect,

2  but I'm going to move to strike that as

3  nonresponsive.

4           When I asked you if you agreed, you

5  said "it is what is written there."  And I don't

6  think that's responsive to my question.  So I'm

7  going to ask it again, and hopefully we can get on

8  the same page.

9           Do you agree with IARC that the design

10  of the George study was poor?

11           MR. HABERMAN:  Asked and answered.

12           THE WITNESS:  It is what is written here.

13  BY MR. KALAS:

14    Q.   I understand it's written there.

15    A.   That is -- I did not review the study.

16  And I did not know anything about this study from

17  what I read.  So I am just telling my opinion based

18  on what I read.

19    Q.   Okay.  You read the actual George study,

20  though --

21    A.   No, I did not.  That's what I'm saying.

22  I was referencing the study from ATSDR discussions.

23    Q.   Okay.  So you actually haven't gone to

24  the actual George study to read it.  You just were

25  referencing what ATSDR said about it?

Ambrose Char les, Ph.D.

1      A.   Exactly.  That's what I was saying.

2      Q.   That clears things up.  Thank you.  I

3  understand now.

4      A.   That's why I mentioned that, the ATSDR in

5  the beginning when I was referencing that.

6      Q.   Okay.  Do you agree that IARC considered

7  George to be an inadequate study for the evaluation

8  of glyphosate?

9      A.   I did not --

10          MR. HABERMAN:  Objection.

11          THE WITNESS:  -- consider in --

12          (Interruption by the reporter.)

13          MR. HABERMAN:  Yeah, let me -- misstates

14  the document.  But go ahead.  Mischaracterizes the

15  evidence.

16  BY MR. KALAS:

17      Q.   Go ahead, Dr. Charles.

18      A.   What I was saying that I did not consider

19  the adequacy or the inadequacy of this finding.  My

20  consideration was the finding of the study.

21      Q.   Okay.  So when you are reporting the

22  George study in your report, you were not

23  considering whether or not the study was adequate

24  or inadequate, you were just reporting the

25  findings; fair?

Ambrose Charles, PH.D.

```
 1        A.    Exactly.  And that this particular

 2   statement of its inadequacy was not particularly

 3   mentioned in the ATSDR report that I was

 4   referencing to.

 5        Q.    Okay.  But you did read this and see it

 6   in the IARC monograph when you were evaluating the

 7   monograph; right?

 8        A.    Probably, yes.

 9        Q.    Okay.  All right.

10              MR. KALAS:  I'm going to hold on to the

11   rest of my time and turn it over to Mr. Haberman.

12              THE WITNESS:  Nice talking to you,

13   Mr. Kalas.

14              MR. KALAS:  Nice talking to you as well.

15                E X A M I N A T I O N

16   BY MR. HABERMAN:

17        Q.    Doctor, I have some questions for you.

18        A.    Yes, sir.

19        Q.    You were asked questions a few minutes

20   ago about whether you calculated an internal dose

21   for Mr. Engilis.  Do you recall those questions?

22        A.    Yes.

23        Q.    What is the definition of dose?

24        A.    Dose is the amount of the chemical inside

25   your system, that means inside of your body, and
```

1    the amount that you take with respect to the body

2    weight and the time of taking it.

3                  That, in simple words, dose is

4    expressed as milligram weight of any substance

5    taken every day, per day by -- for every kilogram

6    body weight.  That means milligrams per kg per day.

7    The quantity is called the dose.  That is the

8    definition pharmacology and toxicology.

9         Q.    Okay.  And you were asked whether you

10   calculated an internal dose; right?

11        A.    Yes.

12        Q.    Were you able to calculate an internal

13   dose here?

14        A.    I could not calculate an internal dose

15   because there is no monitoring data available on

16   this individual.  I cannot calculate per se, okay,

17   this much is being calculated so I can make

18   calculations per kilogram body weight per day.

19        Q.    Okay.  Now, in any of these cases,

20   actually using your definition of dose, is it

21   actually possible to calculate dose, an internal

22   dose?

23        A.    Internal dose can be calculated if we

24   have data pertaining to that; however, in this case

25   we are talking about the dose effect or dose

Ambrose Char Teng, PH.D.

```
 1   response.  And my discussion is in a different

 2   context.

 3        Q.   And what context are you talking about?

 4        A.   I'm talking about since we do not have a

 5   data -- chemical, biological, physiological,

 6   toxicological data on the dose that is milligram

 7   per kg per body weight, that kind of data is

 8   difficult to obtain in an occupational study or an

 9   environmental exposure study.  There is nobody

10   there to measure anything, and already it is an

11   experimental study.

12             Usually you get cases later, after

13   several years or several months, you know, said

14   there was an exposure.  How are we going to make

15   the internal dose determination at the time?  So we

16   assume what dose and effect.  That in order to

17   cause an effect, there should be an exposure.

18             So then the doctors or a toxicologist

19   will ask how many days have been exposed to these.

20   Say, a week, a month or two months I have been

21   working on this thing.  That gives an approximation

22   of a range of duration of exposure.  That duration

23   of exposure is what epidemiologists usually

24   consider as the dose, an exposure dose.  That means

25   an extent of time he was exposed to certain
```

1    chemicals.

2              But it's difficult to measure that.

3    But we have a response now.  So the duration is

4    correlated with the response is the dose-response

5    relationship we consider in human exposure in such

6    cases.

7         Q.   And did you make that evaluation here in

8    this case for Mr. Engilis?

9         A.   Yes, I did.

10        Q.   And those are the calculations that you

11   went over with Mr. Kalas; is that right?

12        A.   Yes.

13        Q.   Now, it turns out that Mr. Kalas pointed

14   out or identified for you an error in your report;

15   is that right?

16        A.   That's correct.  That was a typo,

17   probably.  And then I saw that -- you know, that

18   number was used for a calculation also.  And I had

19   to readjust that later.

20        Q.   Okay.  So after correcting for that

21   typographical error, do your opinions for

22   Mr. Engilis change?

23        A.   No.

24        Q.   And why not?

25        A.   Because my calculation was three days,

1   and then he calculated it is less than two days, or

2   approximately two days.  These are all two days

3   between three days' exposure.  It's not really

4   particularly important.  In disease in that person

5   we cannot calculate that kind of number.

6       Q.   And the two days per year, what study

7   does that correlate with, what epidemiological

8   study does that correlate with?

9       A.   That is -- I believe it is the MacDuffy

10  study.  MacDuffy.

11      Q.   Now, did you also rely on the Ericson

12  study?

13      A.   Yeah, they talk about -- I think Ericson

14  said he talks about ten lifetime days.

15      Q.   And how does the Ericson study and your

16  calculations here for Mr. Engilis bear on your

17  opinions?

18      A.   I think the Ericson study has said

19  lifetime study will be ten days or more than ten

20  days of lifetime exposure is correlated with NHL in

21  Ericson study.  And I don't have the data in front

22  of me.

23      Q.   Does Mr. --

24      A.   If you -- if you bring that

25  interpretation to MacDuffy data, or whatever we

1    calculated in the Engilis data, two days times

2    number of years, the two days per year, that's what

3    we calculated, approximately.

4              So if you multiply that by 25 or 26 or

5    30 years of exposure, that is the number.  Two by

6    30 years is certainly more than ten days according

7    to Ericson's data.

8         Q.   And does that help inform your opinions

9    in this case?

10        A.   Absolutely.

11        Q.   I don't think you were asked this

12   question, or I'm not sure if you gave this answer,

13   but in addition to considering -- when you were

14   coming up in your methodology -- you were asked

15   questions earlier about your methodology.  Do you

16   recall that?

17        A.   That's correct.

18        Q.   And you talked about identifying the

19   product use, and you talked about identifying how

20   much of the product was used.  And you talked about

21   identifying whether or not protection was used.

22   And you talked about identifying the duration of

23   time and use and the routes of absorption all

24   related to Roundup.  Do you recall identifying

25   those items in discussing your methodology?

1     A.   Yes.  Those -- those studies that we were

2  talking and referencing and discussing were two or

3  three papers, I believe, that he brought to my

4  attention regarding the biomonitoring of farmers or

5  applicators.  Those are experimental studies and

6  one-time application.  That gives some basic

7  information about how much a dose can be exposed.

8  That is at that time point what happened.

9           That doesn't truly reflect in a -- in

10  a normal use history how a person has -- here you

11  put all this restrictions or observance or

12  observations, you know, all the guidelines,

13  everything is there when an experimental study is

14  conducted.  But items of guidelines are not there

15  when an individual is using for a number of years,

16  with his own setup.

17           So there's no direct comparison of the

18  exposure from that study.  Although we can theory

19  think about, we have no idea.  It could be -- if

20  there is an effect, where did that effect come

21  from.  That is what as a toxicologist who review

22  data look at.

23     Q.   Right.

24     A.   When we look at -- yeah.  When we look

25  at -- there are many different scenarios that can

1    cause this effect.  So when we look at everything,

2    what are the data that supports this kind of

3    causation.  What are the things that I can

4    eliminate from the medical reports or from the

5    data, the medical condition, medical reports,

6    deposition, whether he was exposed, anytime use,

7    anything.  I eliminate all those factors, finally

8    you come to what is the factor that stands out?  Is

9    only glyphosate.  Nothing else.

10        Q.   Okay.  And your report -- that's what I

11   wanted to focus on, the elimination of other

12   factors, based on the information that was given to

13   you in order to come up with your opinion in the

14   case, that Roundup caused or substantially

15   contributed to causing Mr. Engilis' NHL.

16        A.   Yes.

17        Q.   I just want to make clear that you did in

18   fact consider a universe of other factors and ruled

19   them out in order to come up with your

20   case-specific opinion.  Did you do that here?

21        A.   Yes.

22             MR. KALAS:  Objection to form.

23             THE WITNESS:  I did.

24             MR. HABERMAN:  Okay.  That's all I have

25   for you.

Ambrose Charles, Ph.D.

```
 1               E X A M I N A T I O N

 2   BY MR. KALAS:

 3        Q.   Few follow-ups, Dr. Charles.

 4               Did Ericson have a statistically

 5   significant increased risk observed for CLL?

 6        A.   No, NHL.  I said NHL.

 7        Q.   Okay.  They did -- they did look -- go

 8   ahead.

 9        A.   CLL is a subtype of NHL.

10        Q.   Right.  And they looked at CLL

11   specifically in that study; right?

12        A.   Yes.

13        Q.   And you recall talking about Ms. Ross

14   last time that they did not see a statistically

15   significant risk for CLL in that study, true?

16        A.    In that one study, yes.

17        Q.   Okay.  Acquavella 2004, the study we

18   looked at and you looked at after serving your

19   expert report, is it true that in those farmers who

20   were applying to those farms, that 40 percent of

21   the farmers did not have detectable levels of

22   glyphosate in their urine?

23        A.   Probably, yes.  I can't attest to that.

24        Q.   Okay.  And so someone can apply

25   glyphosate and not even have a detectable dose in
```

1    their body, true?

2        A.   I don't know.

3        Q.   Okay.  Do you know -- or tell me the

4    methodology you went through to determine that

5    Mr. Engilis had a detectable dose of glyphosate in

6    his body when he applied far less than those

7    farmers.

8        A.   I have not done any biomonitoring to give

9    you that answer.

10       Q.   Okay.  When you were conducting your

11   differential etiology that Mr. Haberman just walked

12   you through, tell me the process you went through

13   to eliminate a genetic predisposition to cancer in

14   Mr. Engilis as the cause of his CLL?

15       A.   I do not have any of his genetic map of

16   his made to say that he has a previous disposition

17   or not.

18       Q.   Okay.  Tell me the process you went

19   through to eliminate endogenous genetic replication

20   errors as the cause or contributing factor to his

21   NHL.

22       A.   I have not done any genetic research on

23   that in order to come to my conclusions.

24           MR. KALAS:  Okay.  I don't have any more

25   questions.  Mr. Haberman, are we done?

1          MR. HABERMAN:  We're done.

2          MR. KALAS:  Okay.  Dr. Charles, thank you

3   for your time.  It was a pleasure meeting you, sir.

4          THE WITNESS:  Thank you very much, and

5   nice meeting you.

6          THE VIDEOGRAPHER:  We are off the record

7   at 12:45 p.m.

8          MR. HABERMAN:  For the court reporter,

9   I'll order the transcript.  And so an e-transcript

10   with scanned exhibits.  Regular delivery is fine

11   for me.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   STATE OF WISCONSIN  )
                         )  ss.
 2   COUNTY OF MILWAUKEE )

 3           I, ANITA KORNBURGER, Registered

 4   Professional Reporter and Notary Public in and

 5   for the State of Wisconsin, do hereby certify

 6   that the preceding deposition was recorded by

 7   me and reduced to writing under my personal

 8   direction.

 9       I further certify that said deposition was

10   taken remotely, with all parties appearing by

11   videoconference, on August 17, 2022, commencing

12   at 9:08 a.m. and concluding at 12:45 p.m.

13       I further certify that I am not a relative

14   or employee or attorney or counsel of any of

15   the parties, or a relative or employee of such

16   attorney or counsel, or financially interested

17   directly or indirectly in this action.

18       In witness whereof, I have hereunto set my

19   hand and affixed my seal of office at

20

21

22   _____
     ANITA KORNBURGER, RPR - Notary
23   Commission #1166910800033

24   My commission expires January 31, 2025.

25
```