# EXHIBIT D

1        IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
                    STATE OF MISSOURI
2
    Paul Ferro, et al.,          )
3                                )
                                 )
4        Plaintiffs,             )
                                 )
5   vs.                          )  Case No. 20SL-CC03678
                                 )
6   MONSANTO COMPANY,            )
                                 )
7                                )
        Defendant.               )
8
9              ********************************
10             ORAL VIDEOTAPED DEPOSITION
11             AMBROSE K. CHARLES, Ph.D.
12                  June 28, 2022
13             ********************************
14      ORAL VIDEOTAPED DEPOSITION OF AMBROSE K. CHARLES,
15   Ph.D., produced as a witness at the instance of the
16   Defendant and duly sworn, was taken in the above-styled
17   and numbered cause on the 28th day of June, 2022, from
18   9:28 a.m. to 6:21 p.m., before April Balcombe-Anderson,
19   Certified Shorthand Reporter and Certified Realtime
20   Reporter in and for the State of Texas, reported by
21   computerized stenotype machine at The Westin Austin
22   Downtown, Conference Room, 310 East 5th Street, Austin,
23   Texas 78701, pursuant to the Missouri Rules of Civil
24   Procedure and the provisions stated on the record or
25   attached hereto.

```
 1                    APPEARANCES
 2   FOR PLAINTIFFS:
 3       MR. JEFFREY L. HABERMAN
         MS. SARAH J. SCHULTZ (VIA REMOTELY)
 4       Schlesinger Law Offices, P.A.
         1212 Southeast Third Avenue
 5       Fort Lauderdale, Florida 33316
         Telephone: 954.467.8800
 6       E-mail: JHaberman@SchlesingerLaw.com
         E-mail: SSchultz@SchlesingerLaw.com
 7
 8   FOR DEFENDANT:
 9       MS. EMMA C. ROSS, M.D.
         MR. JAMES T. COLEMAN
10       GOLDMAN ISMAIL TOMASELLI BRENNAN & BAUM LLP
         200 South Wacker Drive, 22nd Floor
11       Chicago, Illinois 60606
         Telephone: 312.881.5952
12       E-mail: eross@goldmanismail.com
         E-mail: jcoleman@goldmanismail.com
13
     - and -
14
         MR. JOSEPH D. PIORKOWSKI, JR. (VIA REMOTELY)
15       The Piorkowski Law Firm, PC
         1800 K Street, Northwest, Suite 1000,
16       Washington DC 20006
         Telephone: 202.223.5535
17       E-mail: JPiorkowski@PiorkowskiLaw.com
18
     ALSO PRESENT:
19
20       Ambrose K. Charles, Ph.D.,
21       the Witness; and
22       Mr. Jason Lemley,
23       the Videographer; and
24       Ms. April Balcombe-Anderson,
25       the Stenographic Court Reporter.
```

```
 1                    INDEX
 2                                         PAGE
 3  Examination by Ms. Ross ...........................6
 4  Examination by Mr. Haberman ....................400
 5  Signature Page  ................................409
 6  Court Reporter's Certificate ...................411
 7
 8                   EXHIBITS
 9  EXHIBIT           DESCRIPTION            PAGE
10  Exhibit 1     Monsanto Company's Notice of     8
                  Videotaped Deposition of
11                Ambrose K. Charles, Ph.D.
12  Exhibit 2     Dr. Charles' report in the       8
                  matter of Stacey Moore
13
    Exhibit 3     Report of William Pleu made by   9
14                Dr. Charles
15  Exhibit 4     Dr. Charles' work notes about    9
                  Stacey Moore
16
    Exhibit 5     Dr. Charles' work notes about   10
17                William Pleu
18  Exhibit 6     Toxfactor Invoice for Stacey    73
                  Moore case
19
    Exhibit 7     Time Log & Office Hours for     74
20                Moore case
21  Exhibit 8     Taxfactor invoice for William   75
                  Pleu case
22
    Exhibit 9     Time log for William Pleu case  75
23
24
25
```

```
 1                    EXHIBITS (cont.)
 2   EXHIBIT              DESCRIPTION              PAGE
 3   Exhibit 10    Curriculum Vitae of Dr. Ambrose    79
                   K. Charles, Ph.D.
 4
     Exhibit 11    Screenshots from Dr. Charles'      81
 5                 website
 6   Exhibit 12    List of currently regulated        89
                   herbicides for the Texas
 7                 Department of Agriculture
 8   Exhibit 13    Screenshot from the National      158
                   Cancer Institute - Cancer Stat
 9                 Facts: Non-Hodgkin Lymphoma,
                   SEER 2022
10
     Exhibit 14    Glyphosate Use and Cancer         169
11                 Incidence in the Agricultural
                   Health Study by Gabriella
12                 Andreotti and colleagues
13   Exhibit 15    Case report by Zhu, et al         281
14   Exhibit 16    IARC Monograph 112                288
15   Exhibit 17    Eriksson 2008 article             313
16   Exhibit 18    McDuffie 2001 article             319
17   Exhibit 19    Pahwa 2019 article                340
18   Exhibit 20    Leon 2019 study                   353
19   Exhibit 21    Boffetta 2021 study               357
20   Exhibit 22    EPA's Review Decision -           368
                   "Glyphosate - Proposed Interim
21                 Registration Review Decision"
                   from April 2019
22
23                 P-R-O-C-E-E-D-I-N-G-S
24              THE VIDEOGRAPHER:  We are now on the
25   record.  My name is Jason Lemley.  I am the videographer
```

1    for Golkow video services.

2              Today is June 28, 2022 and it is 9:28.

3    This video deposition is being held in Austin, Texas,

4    for Monsanto Company, et al., for the Circuit Court of

5    the City of St. Louis, State of Missouri.  The witness

6    is Dr. Ambrose Charles.

7              Will counsel please identify yourselves

8    for the record?

9              MS. ROSS:  Emma Ross for the defendant.

10   With me is James Coleman from Goldman Ismail, and Joe

11   Piorkowski.

12             MR. HABERMAN:  Jeffrey Haberman from

13   Schlesinger Law appearing on behalf of the plaintiffs.

14             THE WITNESS:  Ambrose Charles.

15             A-M-B-R-O-S-E, Charles, C-H-A-R-L-E-S.

16   I am a toxicologist.

17             MS. ROSS:  And, Sarah, would you identify

18   yourselves for the record, please?

19             MS. SCHULTZ:  Sarah Schultz.  Schlesinger

20   Law Offices, also on behalf of the plaintiffs.

21             THE REPORTER:  I can't hear her.

22             MR. HABERMAN:  Sarah Schultz from my

23   office, Schlesinger Law Offices, also on behalf of the

24   plaintiffs.

25             THE VIDEOGRAPHER:  The court reporter is

```
 1   April Balcombe and will now swear in the witness.

 2              THE REPORTER:  And for the record, my name

 3   is April Balcombe, as stated, and my license number is

 4   5752.

 5              (Witness sworn.)

 6              AMBROSE K. CHARLES, Ph.D.,

 7   having been first duly sworn, testified as follows:

 8                        EXAMINATION

 9   QUESTIONS BY MS. ROSS:

10      Q    Good morning, Doctor.

11      A    Good morning.

12      Q    Would you give us your full name, please?

13      A    Ambrose Charles, last name; and in between,

14   there is a K.

15      Q    Dr. Charles, my name is Emma Ross and I

16   represent Monsanto in this case.  Okay?

17      A    Emma Ross?

18      Q    Yes.

19      A    Okay.

20      Q    At some point today, I am sure I will ask a

21   question that's unclear or uses a term incorrectly or

22   mispronounces something.  If you will ask me to stop and

23   repeat or rephrase the question, I will be happy to do

24   so.  Okay?

25      A    Okay.
```

```
 1      Q     If you answer my question, I will assume you

 2   understood it.

 3      A     Okay.

 4      Q     Is that fair?

 5      A     That's fine.

 6      Q     Is there any reason you cannot give complete

 7   and accurate testimony today?

 8      A     No.

 9      Q     Do you understand that this is my opportunity

10   to ask you questions about you, your opinions, and the

11   bases for those opinions?

12      A     I -- I -- I am not able to ask you a question

13   of what it means?  Only you can ask me questions, right?

14      Q     Right.

15      A     Okay.

16      Q     You have been disclosed as an expert in this

17   case, correct?

18      A     Yeah.

19      Q     And what that means is this is my opportunity

20   at your deposition today to ask you about the opinions

21   you are offering and the bases --

22      A     Okay.

23      Q     -- for these.

24            Do you understand that?

25      A     Understand.
```

 1        Q    For the sake of our court reporter today, we

 2   should both try to speak one at a time.  Is that all

 3   right?

 4        A    All right.

 5        Q    Meaning, please let me finish my question

 6   before you start your answer and I will do my best to do

 7   the same.  Okay?

 8        A    That's correct.

 9                (Exhibit 1 virtually marked.)

10        Q.   (BY MS. ROSS) Exhibit 1 to your deposition is

11   the Notice of Deposition, and there are some notes on

12   that document.

13        A    Yes.

14        Q    Who made those notes?

15        A    I did.

16                (Exhibit 2 virtually marked.)

17        Q.   (BY MS. ROSS) Exhibit 2 to your deposition is

18   your report in the matter of Stacey Moore; is that

19   correct?

20        A    That's correct.

21        Q    There are some notes on that document, right?

22        A    I can't recall.  If we had noticed it, yes.

23        Q    Who made the notes?

24        A    I must have made them when I read it.  This is

25   not -- it's, yeah, maybe several days or last week or

1    something like that.

2        Q    Okay.  So when you were rereviewing your report

3    for Mr. Moore, you might have underlined something or

4    made a note in the margins --

5        A    Yeah.

6        Q    -- correct?

7        A    Yeah.

8        Q    And any notes that are on Exhibit 2, those are

9    your notes on that report?

10       A    Yes, yes.  I am -- I am -- I am the only one

11   who reads it.

12               (Exhibit 3 virtually marked.)

13       Q.   (BY MS. ROSS) Exhibit 3 to your deposition,

14   what is that document?

15       A    That's the William Pleu Report.

16       Q    That is your report in the matter of William

17   Pleu, correct?

18       A    That's correct.

19       Q    There are also some notes in the margins of

20   that document.  Who made those notes?

21       A    I must have.

22               (Exhibit 4 virtually marked.)

23       Q.   (BY MS. ROSS) Exhibit 4 to your deposition has

24   also been marked.  Could you describe for the record

25   what that is, please?

1      A    That's my work notes about Stacey Moore.

2      Q    And Exhibit -- well, before I go there.

3                 Withdrawn.  New question.

4                 When you say, "That is my work notes

5      about Stacey Moore," what does that mean?

6      A    When I read the records that is given to me, it

7      could be a deposition or it could be a Plaintiff Fact

8      Sheet or medical records, when I am reviewing certain

9      information, then a (indiscernible) relationship, you

10     know, like when it started, how long is he -- when

11     each -- even though correlating those kind of things are

12     all over the place.  It is not given to me, a prepared

13     statement to review.  When I read many things like this,

14     I just mark this kind of information for my own

15     reference.

16     Q    Did you prepare the notes in Exhibit 4 before

17     or after your written report?

18     A    Before.

19                 (Exhibit 5 virtually marked.)

20     Q.   (BY MS. ROSS) Exhibit 5 to your deposition, can

21     you identify that for the record, please?

22     A    That's for William Pleu.

23     Q    And the -- the notes in Exhibit 5, these are

24     your work notes for Exhibit -- for --

25     A    Exactly.

1      Q    -- Mr. Pleu, correct?

2      A    That's just my guidance drawing.

3      Q    All right.  I will repeat the question just so

4  we have a clear record since we were talking over each

5  other.

6           Exhibit 5 contains your work notes for

7  William Plue, correct?

8      A    It's that -- if you want to call it work notes,

9  it is work notes, but it is my -- following the events,

10  a chart collected.

11      Q    Did you prepare Exhibit 5 before or after your

12  written report for --

13      A    Before.

14      Q    -- Mr. Pleu?

15      A    Before.

16      Q    Am I correct that all of the opinions you

17  intend to offer are contained in your expert reports for

18  Mr. Pleu and Mr. Moore?

19      A    Yes.

20      Q    You also provided us this morning with some

21  invoices, correct?

22      A    I did not provide.  My counsel has my invoices

23  of two of these individuals.

24      Q    I will rephrase the question.

25           Just before this deposition started,

Ambrose K. Charles, Ph.D.

```
 1    counsel --

 2       A    Yeah.

 3       Q    -- provided us with invoices that you had

 4    submitted in this matter, correct?

 5       A    Correct.

 6       Q    We will come back to talk about those invoices

 7    a little later in the day.  Okay?

 8       A    All right.

 9       Q    Have you ever spoken with Stacey Moore?

10       A    No.

11       Q    Have you ever spoken with William Pleu?

12       A    No.

13       Q    Your information on plaintiff's exposure to

14    glyphosate-based herbicides comes from their sworn

15    deposition testimony and their sworn PFS, or Plaintiff

16    Fact Sheet, correct?

17       A    Yes, and also medical records.

18       Q    Was there any information on the plaintiffs'

19    Roundup exposure in their medical records?

20       A    I don't -- I don't believe so.

21       Q    Plaintiffs' testimony is under oath, correct?

22       A    Yes.

23       Q    There is a court reporter present, right?

24       A    Could be.

25       Q    The court reporter takes down everything that
```

1    the plaintiffs say, right?

2        A    Right.

3        Q    You have no reason to question what a plaintiff

4    said under oath, correct?

5        A    No.

6        Q    You get all of the information you need to form

7    an opinion on whether exposure to glyphosate-based

8    herbicides contributed to a patient's non-Hodgkin's

9    lymphoma from their deposition and their fact sheet,

10   right?

11       A    I take the information, what is in there for my

12   evaluation and consideration.

13       Q    Interviewing plaintiffs is not necessary for

14   you to form an opinion on whether glyphosate-based

15   herbicides contributed to their NHL, correct?

16       A    Looking at the records, you know, I can

17   evaluate the information and come to a conclusion.

18       Q    When you say looking at the records, I can

19   evaluate the information and come to a conclusion, I am

20   correct that you do not need to speak to a plaintiff

21   directly to come to a conclusion on whether --

22       A    That -- that --

23       Q    -- glyphosate caused their non-Hodgkin's

24   lymphoma, correct?

25       A    That's an investigative type of approach.  I

1    don't investigate or asks questions.  My job as a

2    toxicologist is that I am given the data or information.

3    I am looking at the data, and say, what does it say?

4        Q    That was a long answer, so I am going to break

5    it down a little bit.  Okay?

6        A    Okay.

7        Q    To speak to a plaintiff directly would be an

8    investigative approach, right?

9                 MR. HABERMAN:  Objection.

10       A    Of course I haven't investigated.

11       Q.   (BY MS. ROSS) You are a toxicologist, correct?

12       A    Yes.

13       Q    As a toxicologist, you are given the data and

14   information and your job is to look at the data to see

15   what it says, correct?

16       A    Yes.

17       Q    We have talked briefly about the notes that you

18   took before you wrote your expert reports.  Those are in

19   Exhibits 4 and 5; correct?

20       A    Yes.

21       Q    Did you take any other notes in any of your

22   review for the Roundup litigation?

23       A    Other notes means in a draft of the report?

24       Q    Did you -- when you were reviewing the

25   literature, for example, take any notes on the

Ambrose K. Charles, Ph.D.

```
 1    literature on Roundup and non-Hodgkin's lymphoma?

 2         A    I didn't make any separate notes like this.  I

 3    just read the paper.

 4         Q    So I think we can break this down and cut off

 5    some questioning, but I just want to be very clear.

 6    Okay?

 7         A    Yes.

 8         Q    The only notes that you have related to the

 9    Roundup litigation are the notes that you took on

10    William Pleu and Stacey Moore before completing your

11    expert reports, true?

12         A    That's correct.

13         Q    If you will go with me to Exhibit 1 briefly.

14         A    Exhibit 1, yes.

15         Q    Exhibit 1 is the notice of your deposition,

16    correct?

17         A    Yes.

18         Q    There is some highlighting and notes in the

19    margins.  Who created those?

20         A    I created it.

21         Q    For Request Number 3, you see there is a

22    request for materials that you relied on?

23         A    Exactly.

24         Q    What did you write in the margins?

25         A    A reference in the report, "All info is in the
```

```
 1   public domain."

 2       Q    I want to break that down a little bit.  Okay?

 3       A    Sure.

 4       Q    You list references at the end of each of your

 5   reports, correct?

 6       A    Exactly.

 7       Q    Every document that you intend to tell the jury

 8   about in this trial is on your reference list, correct?

 9       A    That's correct.

10       Q    There is nothing that's not on your references

11   that you intend to tell the jury about in the trial --

12       A    No.

13       Q    -- of this case, right?

14       A    No.

15            MR. HABERMAN:  Objection.

16       Q.   (BY MS. ROSS) We've marked your expert reports

17   as Exhibits 2 and 3, correct?

18       A    That's correct.

19       Q    Who prepared your report on Stacey Moore?

20       A    Who prepared?  I prepared.

21       Q    You also prepared your report on William Pleu,

22   correct?

23       A    That's correct.

24       Q    Did anyone assist you in pre- -- in preparing

25   either of those reports?
```

```
1        A     I am the only one.

2        Q     I am correct that all of the opinions you

3   intend to offer at trial about Stacey Moore are in your

4   Moore report, right?

5        A     That's right.

6        Q     I am correct that all of the opinions you

7   intend to offer at trial about William Pleu are in your

8   Pleu report, correct?

9        A     That's correct.

10       Q     I want to talk about your assignment in this

11  case.  Okay?

12       A     Okay.

13       Q     What was your methodology?

14       A     My methodology is looking at the information,

15  you know.  I am asked to review certain data when --

16  when it comes to the personal file -- evaluating, making

17  a determination.

18             The question is whether that glyphosate

19  has any role in causing an actual... Okay.  And so

20  you gain some data and then you look at a whole bunch

21  of data; I separate it into different categories.

22             There is (indiscernible), which is

23  supporting data, is any of the data that is given to

24  me, are supported, what kind of information I have.  I

25  sought them out.  That is one.
```

```
 1                    And the second thing is eliminating

 2   factors.  You know, what are the -- are the

 3   contributing factors (indiscernible) in the report

 4   anywhere, list them.  And it is a multistep process,

 5   and I am going through these steps and then come to a

 6   conclusion.

 7      Q    Okay.  That was a long answer, so I am going to

 8   break it down a little bit.  Okay?

 9      A    Sure.

10      Q    You, in this case, were asked to review certain

11   data?

12      A    Okay.

13      Q    Is that right?

14      A    That's right.

15      Q    And you broke that data down into two separate

16   categories, correct?

17      A    Yeah, yeah.

18      Q    One category was, what are the data that are

19   supportive, correct?

20      A    That's right.

21      Q    The second category was, are there other

22   contributing factors that I can eliminate, true?

23      A    Exactly, yeah.

24      Q    Did you perform your own literature search on

25   whether glyphosate causes non-Hodgkin's lymphoma or did
```

1   you --

2       A    Yes, yes.  I did all of the research myself for

3   that.

4       Q    Tell me how you searched for literature.

5       A    Through the Internet.  I had some of the

6   reports with me already, like ATSDR.  A report that I

7   mentioned there, I already had that thing.

8            And then -- then EPA2017, I had that

9   report with me.

10           Then I had an IARC report long back,

11  that was there in my files somewhere; you know, it was

12  published a long time ago.  And all of the search was

13  through Internet and finding out the papers and then

14  read it and then see if it is useful for me to make an

15  evaluation.

16      Q    When you say "through the Internet," did you

17  perform a Google search?

18      A    Google search.  I also have an NH, you know,

19  access through -- NH access through, what is that?  NIH

20  reports of some of the studies that are available.

21      Q    When you say "NIH reports," are you talking

22  about PubMed?

23      A    Yes, right, yeah.

24      Q    Okay.  So you performed a Google search to

25  identify documents on Roundup and non-Hodgkin's

```
 1   lymphoma, right?

 2       A    That's right.

 3       Q    And you also had a PubMed search --

 4       A    That's right.

 5       Q    -- to identify literature?

 6       A    That's right, yeah.  PubMed search, yeah.

 7       Q    Okay.  Did you perform any other Internet

 8   searches?

 9       A    No.

10       Q    What were the terms that you used in your

11   Google search?

12       A    Glyphosate toxicity, toxicology relation to

13   carcinogenesis.

14              THE REPORTER:  To -- related to what?

15              THE WITNESS:  Carcinogenesis,

16   cancer-causing effects.

17       Q.   (BY MS. ROSS) Did you use those same terms in

18   your PubMed search?

19       A    Yes.

20       Q    Any other terms that you can think of sitting

21   here today?

22       A    I don't recall, you know, but maybe I have -- I

23   might have, but I can't recall.

24       Q    We will get this into more detail when we talk

25   about your individual expert reports, but I'd like to
```

```
 1    summarize some of your methodology.

 2        A    Okay.

 3        Q    Okay?

 4        A    Okay.

 5        Q    You have prepared an opinion about the number

 6    of days that Mr. Moore was allegedly exposed to Roundup,

 7    correct?

 8        A    Yes.

 9        Q    To calculate the number of days Mr. Moore was

10    exposed to Roundup, you took his deposition testimony

11    about the number of days per week and the number of

12    hours per day that he sprayed Roundup, correct?

13        A    Correct.

14             Can I look at the report?

15        Q    Yes.

16        A    This is William Pleu?

17        Q    We are speaking of Stacey Moore right now.

18        A    Stacey Moore.

19             (Reviews report.)

20             Oh, yes.  Yes.

21        Q    Are you there?

22        A    Are you on page 13?

23        Q    I am on page 14, but 13 works as well.

24        A    Okay, okay.

25        Q    Shall I repeat my question?
```

```
 1      A    Yes, please.

 2      Q    Okay.  To calculate the number of days that

 3  Mr. Moore was exposed to Roundup, you took his

 4  deposition testimony about the number of days per week

 5  and the number of hours per day he sprayed Roundup,

 6  correct?

 7      A    That's right.

 8      Q    You converted that into eight-hour workdays,

 9  right?

10      A    That's right.

11      Q    How many days of exposure to glyphosate-based

12  herbicides does someone need to be at increased risk for

13  non-Hodgkin's lymphoma?

14           MR. HABERMAN:  Objection.

15      A    The literature says, you know, more than

16  two days --

17      Q    And in fact --

18      A    -- of exposure per year.

19      Q.   (BY MS. ROSS) That was what I wanted to

20  clarify, so let me ask my question again.  All right?

21           In order to be at an increased risk of

22  non-Hodgkin's lymphoma, does someone need to be

23  exposed to more than two days per year of

24  glyphosate-based herbicides?

25           MR. HABERMAN:  Objection.
```

Ambrose K. Charles, Ph.D.

1       A    That's what the literature says.

2       Q.   (BY MS. ROSS) Do you have an opinion on the

3    number of total lifetime days that somebody needs to be

4    exposed to glyphosate-based herbicides in order to be

5    at --

6       A    No. I --

7       Q    -- an increased risk?

8       A    I have not calculated that.

9       Q    When you said someone needs greater than

10   two days per year of glyphosate exposure, are those

11   eight-hour days?

12      A    Yes, that is what the literature says, not what

13   I said.  I am quoting the literature.

14      Q    In other words, someone needs more than

15   16 hours per year of exposure to glyphosate-based

16   herbicides to be at an increased risk for non-Hodgkin's

17   lymphoma; true?

18      A    That's what the indication is.

19      Q    For Mr. Pleu, you also --

20      A    You -- you are switching to Pleu now from

21   Moore?

22      Q    We are.

23           Right now we are doing just an overview

24   of your opinions, and we will come back to them in

25   more detail.  All --

```
 1      A     But should --

 2      Q     -- right?

 3      A     -- I open them now?

 4      Q     You should.

 5            THE REPORTER:  And just a reminder,

 6   Doctor, to please wait until she finishes for you --

 7            THE WITNESS:  I will.

 8            THE REPORTER:  -- to answer.

 9            THE WITNESS:  I will.

10            THE REPORTER:  Thank you.

11      A     Which page number are we on?

12      Q.    (BY MS. ROSS) I think page 11 gets you there.

13      A     Okay.  Okay.

14      Q     For Mr. Pleu, you calculated the number of days

15   that he was allegedly exposed to Roundup, correct?

16      A     Correct.

17      Q     To calculate the number of days Mr. Pleu was

18   exposed, you took his deposition testimony about the

19   number of hours he said he used glyphosate on the days

20   he sprayed, right?

21      A     Yes.

22      Q     You gave a range of 30 minutes to one hour,

23   right?

24      A     Yes.

25      Q     And for the purposes of your calculations, you
```

```
 1   went with one hour; is that right?

 2       A    That's right.

 3       Q    You combined that with the number of times he

 4   sprayed, which was two to three times every two weeks,

 5   correct?

 6       A    Yes.

 7       Q    For your calculations, you went with three

 8   times every two weeks, correct?

 9       A    That's right.

10       Q    You then converted those numbers into

11   eight-hour workdays, right?

12       A    That's right.

13       Q    That was based on the number of hours and the

14   number of days you got from William Pleu's deposition,

15   correct?

16       A    That's right.

17       Q    You then reported the total number of days in

18   a -- number of days per year, right?

19       A    That's right.

20       Q    If you will go back with me to your Moore

21   report, Exhibit 2.

22            MS. ROSS:  Do you want copies of these,

23   Jeff?

24            MR. HABERMAN:  Yes.

25            MS. ROSS:  Okay.
```

 1                   (Ms. Ross handing documents to

 2                   Mr. Haberman.)

 3       Q.   (BY MS. ROSS) Turn with me to page 18, please,

 4   Doctor.

 5                   Are you there?

 6       A    Yes.

 7       Q    Do you see where in your report you state that

 8   the chronic EPA reference dose for glyphosate is

 9   2.0 milligrams per kilogram per day?

10       A    That's right.

11       Q    Reference dose is an estimate of the quantity

12   of a chemical that a person could be exposed to every

13   day for the rest of their life with no appreciable risk

14   of health effects, correct?

15       A    That's correct.

16                   MR. HABERMAN:  Objection.

17       A    That is the definition of EPA's RfD.

18       Q.   (BY MS. ROSS) No appreciable health effects

19   includes cancer, right?

20                   MR. HABERMAN:  Objection.

21       A    Includes any effects.

22       Q.   (BY MS. ROSS) Cancer is an example of a health

23   effect, true?

24       A    It's a long-term effect.

25       Q    Cancer is not the only example of a health

Ambrose K. Charles, Ph.D.

1    effect, right?

2        A    That's right.  Many effects.

3        Q    No appreciable health effects includes but is

4    not limited to cancer, true?

5        A    That's right.

6        Q    No appreciable health effects includes acute

7    toxic effects, right?

8        A    Yes.

9        Q    It also includes chronic effects, correct?

10       A    Exactly.

11       Q    Cancer is one of the chronic effects, correct?

12       A    By the way, all of these are based on a chronic

13   intake basis but on a daily intake basis.  Chronic

14   exposure, daily intake.

15       Q    Nowhere in your expert report do you say that

16   any of the regulatory authorities that have set a

17   reference dose are wrong, right?

18            MR. HABERMAN:  Objection.

19       A    No, because that is the nation's standard.

20       Q.   (BY MS. ROSS) You have no opinion in your

21   report that a reference dose of 2 milligrams per

22   kilogram per day is inappropriate, right?

23       A    That is debatable because that is a number that

24   is derived from different types of studies and we go

25   through a lot of toxicological evaluations.

```
 1                  It goes through different committees and

 2      agreements and negotiations and all of those kinds of

 3      things going on in the EPA, involving many parties.

 4                  And, finally, scientifically,

 5      particularly on that number -- on a particular number

 6      from which and out of this is derived.  Then it

 7      becomes a law when it is published.

 8      Q    That was a long answer.  Let me see if we can

 9      break it down a little.

10      A    Please.

11      Q    Okay.  So can you point me to anywhere in your

12      report where you state that any of the regulatory

13      authorities who have set reference doses for glyphosate

14      exposure are wrong?

15      A    No, I did not say.

16      Q    Do you agree that a person could be exposed to

17      2 milligrams per kilogram per day of glyphosate with no

18      appreciable health effects?

19                  MR. HABERMAN:  Objection.

20      A    That's EPA standard.

21      Q.   (BY MS. ROSS) You have not calculated

22      independently a no-effect level of glyphosate, true?

23      A    No.

24                  MR. HABERMAN:  Objection.

25      Q.   (BY MS. ROSS) I am correct that you have not
```

```
 1   calculated such a level, right?

 2       A    No, I have not.

 3       Q    You do not have an expert opinion on whether or

 4   at what level of exposure glyphosate is safe, correct?

 5                 MR. HABERMAN:  Objection.

 6       A    No, I have not.

 7       Q.   (BY MS. ROSS) You have no expert opinion on

 8   what internal dose of glyphosate does not cause adverse

 9   health effects, true?

10       A    Repeat, please.

11       Q    You do not have an opinion on what internal

12   dose of glyphosate does not cause adverse health

13   effects; is that correct?

14       A    I have no opinion.

15       Q    You are not offering an opinion about the

16   amount of glyphosate that needs to enter someone's body

17   to increase their risk of NHL, true?

18       A    No.

19                 MR. HABERMAN:  Objection.

20       Q.   (BY MS. ROSS) You are not offering -- just

21   because there was a double negative, let me make sure

22   we're clear.

23                 I am correct that you are not offering

24   an opinion about the amount of glyphosate that needs

25   to enter someone's body to increase their risk of NHL,
```

1    right?

2                    MR. HABERMAN:  Objection.

3        A    I don't know the dose.

4        Q.   (BY MS. ROSS) I am correct that you are not

5    offering an opinion on the amount of glyphosate that

6    entered into any plaintiff's body, correct?

7        A    No.

8                    MR. HABERMAN:  Objection.

9        Q.   (BY MS. ROSS) I am correct that you are not

10   offering such an opinion, right?

11       A    No.

12       Q    When you say, no, are you offering an opinion

13   on the amount of glyphosate that entered any plaintiff's

14   body?

15       A    No.

16                   Could you stay away from double

17   negatives.  When somebody is listening, you know, I

18   can be wrong in answering your question.  You can --

19       Q    I will -- I will do my best.

20       A    I need straightforward questions --

21       Q    Sure.

22       A    -- in this old age.

23       Q    Are you offering an opinion about the average

24   dose of glyphosate to which any plaintiff was exposed?

25       A    Repeat, please.

```
 1      Q    Are you offering an opinion about the average

 2  dose of glyphosate to which any plaintiff was exposed?

 3      A    No.

 4      Q    Are you offering an opinion about the highest

 5  dose of glyphosate to which any plaintiff was exposed?

 6      A    No.

 7      Q    Are you qualified to provide an expert opinion

 8  on the dose of glyphosate that constitutes a risk to

 9  human health?

10      A    Yes.

11      Q    Are you qualified to provide an expert opinion

12  estimating the dose of glyphosate that a plaintiff was

13  exposed to?

14      A    Yes.

15      Q    You did not do that here because the

16  plaintiffs' lawyers did not ask you to; is that right?

17              MR. HABERMAN:  Objection.

18      A    Say again.

19      Q.  (BY MS. ROSS) You did not do that here,

20  correct?

21      A    No, I did not.

22      Q    Why is that?

23      A    Say the question again.  It's not clear to me.

24      Q    Why did you not calculate an internal dose or a

25  reference dose in this case?
```

Ambrose K. Charles, Ph.D.

```
1        A    Because there is no exposure data.

2        Q    Did the plaintiff lawyers ask --

3        A    Because I don't have -- excuse me.

4        Q    No, go ahead.

5        A    Because I do not have any intake information.

6   I don't have any excretory elimination.  I do not have

7   any --

8             THE REPORTER:  You don't have any what?

9        A    Excretory elimination information from the

10  body.  Okay?  That's what excretory means.  And I do not

11  have any particular information about these particular

12  individuals.

13            I am assuming from the -- the volume of

14  the material that he has used, how many hours and how

15  many times and assuming and calculating and

16  estimating, you know, that he must have a reasonable

17  exposure.  That is really -- in most of the cases in

18  personal use or also personal data, there is no

19  measurement.  Then how do you determine?

20       Q.   (BY MS. ROSS) From the volume of material that

21  a plaintiff used, you are assuming that there was a

22  systemic dose, correct?

23       A    Yeah.

24       Q    You disclose no opinions in your report about

25  an estimation or a calculation of plaintiffs' damages,
```

Ambrose K. Charles, Ph.D.

1    true?

2                    MR. HABERMAN:  Objection.

3        A    Damages mean -- what do you mean by damages?

4        Q.   (BY MS. ROSS) Well, I mean --

5        A    Financial -- financial damages or --

6        Q    Financial damages, yes.

7        A    No, no, no.

8        Q    Okay.  So I think we can cut this out, but I am

9    going to --

10       A    That's not my job.

11       Q    Right.  You do not intend to offer any expert

12   opinions on the claims of damages of Mr. Pleu or

13   Mr. Moore, true?

14       A    No.

15                   MR. HABERMAN:  Objection.

16       Q.   (BY MS. ROSS) Are you offering an expert

17   opinion that Mr. Moore's exposure to Roundup caused his

18   non-Hodgkin's lymphoma?

19       A    Yes, probably.

20       Q    Are you offering an expert opinion that

21   Mr. Pleu's exposure to Roundup caused his lymph- --

22                   (Overlapping speakers.)

23       A    Probably, yes.

24       Q.   (BY MS. ROSS) -- -oma disorder?

25                   Are you offering an expert opinion that

```
 1   exposure to Roundup causes non-Hodgkin's lymphoma

 2   generally?

 3       A    Generally -- say that question again.

 4       Q    Are you offering an expert opinion that

 5   exposure to Roundup causes non-Hodgkin's lymphoma

 6   generally?

 7       A    Yes.

 8       Q    When you said, "probably, yes," in response to

 9   my questions about Mr. Moore and Mr. Pleu, can you tell

10   me what you meant?

11       A    The evidence -- or the literature that is

12   there --

13               THE REPORTER:  I didn't understand you.  I

14   am sorry.

15               THE WITNESS:  What part did you not

16   understand?

17               THE REPORTER:  The beginning of your

18   sentence.

19       A    The literature out there, you know, the studies

20   out there, when I evaluate, you know, those are the

21   informations that I take into consideration making a

22   determination that probably it is.

23       Q.   (BY MS. ROSS) Probably Roundup exposure caused

24   Mr. Pleu's --

25       A    Yeah.
```

 1      Q     -- non-Hodgkin's lymphoma disorder, correct?

 2      A     Yes.

 3      Q     Probably Roundup exposure caused Mr. Moore's

 4   non-Hodgkin's lymphoma, right?

 5      A     Yes.

 6      Q     "Probably" to you, does that mean more likely

 7   than not?

 8      A     Yes.

 9      Q     Does "probably" to you mean just over

10   50 percent?

11      A     Enough evidence --

12              MR. HABERMAN:   Objection.

13      A     Enough when I weigh all of the data that I have

14   and all of the, you know, literature information and

15   then put it into my own scientific experience there to

16   evaluate -- I have done so many evaluations in my life,

17   so I have opinions for enforcement in my whole career,

18   about 200-plus opinions, at least, I have written in

19   human-exposure cases for the Department of Agriculture

20   Pesticides mostly, for 99 of them.

21              And so I know how to look and how to

22   derive that information, weigh the situation,

23   circumstances, you know, affects partial -- everything

24   to make an opinion, which has been accepted by the

25   lawyers at that time, so...

1     Q.   (BY MS. ROSS) And when you say "probably," can

2  you put a percentage on that for me?

3           MR. HABERMAN:  Objection.

4     A    Probably I can put maybe 80 percent plus.

5     Q.   (BY MS. ROSS) Your report has nothing in it on

6  anything that -- well, let me ask that question without

7  a --

8     A    Yeah.

9     Q    -- double negative.  Okay?

10    A    Yeah.

11    Q    Does your report contain any opinions on

12  anything that Monsanto did or did not do?

13    A    No.

14           MR. HABERMAN:  Objection.

15    Q.   (BY MS. ROSS) Your Materials Reviewed List does

16  not contain any internal Monsanto documents, true?

17    A    No.

18    Q    You -- are you offering an opinion about

19  Monsanto's conduct at any point in time?

20    A    Not at all.

21    Q    You are not offering --

22           MR. HABERMAN:  Objection.

23    Q.   (BY MS. ROSS) -- any opinion about any of the

24  laboratory contract organizations that Monsanto did or

25  didn't use?

Ambrose K. Charles, Ph.D.

```
1      A    No, no.

2      Q    Are you offering any opinions about how

3  Monsanto characterized studies in the published

4  literature?

5      A    No.

6      Q    Are you offering any opinions on places where

7  glyphosate is or is not used around the world?

8               MR. HABERMAN:  Objection.

9      A    Once more, please.

10     Q.   (BY MS. ROSS) Are you offering an opinion on

11  places around the world where glyphosate is or is not

12  used?

13     A    No.

14     Q    Are you offering an opinion on corporate

15  ethics?

16     A    No.

17     Q    In all of your time at the Texas Department of

18  Agriculture, did you ever ask for internal e-mails in

19  evaluating a pesticide's safety and efficacy?

20     A    Internal e-mails, asking for more data from

21  Monsanto?

22     Q    No.

23     A    No.

24     Q    Internal e-mails between Monsanto employees,

25  did you ever ask to see those to evaluate pesticide
```

Ambrose K. Charles, Ph.D.

```
 1    safety?

 2        A     How -- how that works is when a pesticide

 3    product comes to the State for participation and use --

 4    for approval for use in the state of Texas, a request,

 5    data application fee, everything, comes to the

 6    Department and it goes to the registration section that

 7    is, of course, I managed -- I was (indiscernible) for

 8    about 60 years, so the registration section is one of

 9    the core parts of the division.

10              It goes there.  They look at, if all of

11    the requirements are there.  Then -- they have a

12    checklist.  And it could be data.  It could be a fee.

13    It could be anything that is needed for the

14    registration.

15              The director of registration looks at

16    all of those things.  If there are additional data

17    required, you know, for a registration, then they

18    contact, you know, Monsanto and get the necessary

19    information to make the registration of the product

20    possible.

21              And if there are any questions -- when I

22    was the director of toxicology under assessment for

23    about 15 years, they'd come to me for consulting to

24    see if there is testing that is really required.  So

25    sometimes it is required, and sometimes I will say,
```

Ambrose K. Charles, Ph.D.

```
 1   no, we don't really we have other data to manage.
 2              So it goes that way, and I do not
 3   directly communicate with any companies, you know, to
 4   send me data that I can evaluate.  I never did that.
 5        Q    I am going to break that down a little bit.
 6   Okay?
 7        A    Sure.
 8        Q    You were at the Texas Department of Agriculture
 9   for a number of years, correct?
10        A    For 21 years when I retired.
11        Q    You -- you spent 15 years in risk assessment
12   for pesticides, right?
13        A    That's right.
14        Q    During that time, if a pesticide was going to
15   be registered in Texas, the company would submit
16   information to support that registration to the Texas --
17        A    The Department.
18        Q    -- Department of Agriculture, right?
19        A    That's right.
20        Q    There might be requests for additional data or
21   for a fee to be paid, for example, right?
22        A    That's right.
23        Q    If there were such requests, the Department
24   would go to the company and get the additional data that
25   was needed, right?
```

```
 1      A    Of course.

 2      Q    In all of your time, did you ever -- withdrawn.

 3           Did you ever evaluate glyphosate while

 4  you were at the Texas Department of Agriculture?

 5      A    I must have.  I can't recall, you know, because

 6  every day there is a new pesticide or every week there

 7  is a pesticide case that goes to my desk and then I

 8  evaluate and form an opinion.

 9           You see, for the enforcement, usually

10  you don't go through a report like this.  For

11  enforcement duration, the case will be somebody -- it

12  could be a farm worker exposure, you know, in the

13  south of Texas, or it could be a domestic exposure to

14  a child, or it could be a domestic animal exposure, a

15  horse exposed, cows exposed, you know, those kind of

16  situations; and earlier spraying exposed scorched

17  land, in that area, those kind of cases, you know,

18  from what was sprayed is the chemical that we

19  evaluate.

20           Did I come -- pinpoint glyphosate today?

21  I didn't -- I have no chance of going back and

22  verifying if I did glyphosate.

23      Q    Okay.  We need to be clear on this issue so --

24      A    Sure, sure.

25           (Overlapping speakers.)
```

1    Q.   (BY MS. ROSS) -- I am going to repeat the

2    question.  Okay?

3    A    Yeah.

4    Q    Sitting here today as an expert in this case,

5    you cannot recall an instance when you were at the Texas

6    Department of Agriculture where you evaluated

7    glyphosate, correct?

8    A    That's correct.

9    Q    There may have been enforcement issues as there

10   were for a variety of pesticides over the course of your

11   15 years while you were there, true?

12   A    Exactly.

13   Q    Sitting here, you do not recall any of those

14   being related to glyphosate; right?

15   A    That's correct.  At the same time, I don't

16   recall any other chemicals as well.

17   Q    Are you a medical doctor?

18   A    I am not a medical doctor.  I have a Ph.D. in

19   toxicology and medical biochemistry.

20           I have a Master's degree in

21   biochemistry.

22   Q    Are you a medical doctor?

23   A    No.

24   Q    Do you treat patients?

25   A    I don't treat patients.

Ambrose K. Charles, Ph.D.

```
 1       Q    Do you diagnose patients with non-Hodgkin's

 2  lymphoma?

 3       A    No.

 4       Q    Do you diagnose patients with any condition?

 5       A    No.

 6       Q    Are you an expert in pathology?

 7       A    I have some experience in the patho- --

 8  pathological techniques and in working with

 9  pathologists, but I am not a pathologist.

10       Q    You are not a pathologist --

11       A    No.

12       Q    -- correct?

13            You are not an expert in oncology?

14       A    I am not an oncologist.

15       Q    Are you an expert in urology?

16       A    Neurology?

17       Q    Urology?

18       A    Urology.  No.

19       Q    You are not a general surgeon, correct?

20       A    No.

21       Q    Has anyone ever asked your opinion on the

22  diagnosis or treatment of non-Hodgkin's lymphoma?

23       A    No.

24       Q    Has anyone ever asked for your opinion on the

25  diagnosis or treatment of prostate cancer?
```

1       A    No.

2       Q    Has anyone ever asked you to diagnose the cause

3    of a patient's prostate cancer?

4       A    No.

5       Q    Is there any more common cancer in men as they

6    age that you are aware of than prostate cancer?

7               MR. HABERMAN:  Objection.

8       A    There could be other.  Colon cancer, you know.

9    Prostate is one of the major.  Urinary bladder

10   infections and ur- -- you know, bladder cancer.

11              And as age progresses, not many people

12   make it -- you know, may have later diseases.  And,

13   you know, you can- -- you cannot predict, you know,

14   what kind of cancer unless some (indiscernible) person

15   gets old.

16              THE REPORTER:  Cannot?

17              THE WITNESS:  Gets old.

18      Q.   (BY MS. ROSS) Are you an expert in

19   biostatistics?

20      A    No.

21      Q    Are you an expert in epidemiology?

22              MR. HABERMAN:  Objection.

23      A    I had a few lectures that is part of the

24   biophysics course that we had to take at the Master's

25   level and also at the Ph.D. level.  There are a couple

```
 1    of lectures that we had to attend on statistics.

 2        Q.   (BY MS. ROSS) Dr. Charles, are you an expert in

 3    the conduct of epidemiologic studies?

 4        A    No.

 5        Q    Are you an expert in the interpretation of

 6    epidemiologic studies?

 7        A    I can.

 8        Q    Have you ever conducted a study -- an

 9    epidemiologic study of a risk to humans based on

10    exposure to a chemical?

11        A    No.

12        Q    Have you ever conducted a study to determine

13    whether a chemical caused cancer in rats or mice?

14        A    Yes.

15        Q    Which chemical?

16        A    Mirex.

17        Q    M -- how do you spell that?

18        A    M-I-R-E-X.  That is a banned chemical.  It's

19    not used anymore.  It was being sold at the time when

20    DDT was in place.

21        Q    And what was the study that you conducted?

22        A    We did -- there was -- okay.  Let me go back to

23    my academy years at that time.

24             I was working with the Department of

25    Pharmacology and Toxicology at Albany Medical School,
```

1    Albany, New York, so I was assistant professor there

2    for about four years.

3                 So graduate training, graduate classes,

4    and formation of Ph.D.s and Master students were part

5    of the faculty staff responsibilities.  So I had two

6    or three graduate students for the Master's level and

7    one Ph.D. candidate.  They all graduated and were well

8    placed in different places of this country.  I am

9    really proud of them.

10                So in that capacity, the Ph.D.

11   program -- the Ph.D. candidate was working with Mirex

12   carcinogenesis --

13                THE REPORTER:  With the what?

14                THE WITNESS:  Carcinogenesis.  I am not

15   sure how to -- that's a word.  Carcinogenesis.

16                THE REPORTER:  Thank you.

17                THE WITNESS:  And my accent -- the heavy

18   accent will be a little difficult for you.

19       A    During that time, Mirex was one of the

20   chemicals that was of interest at the Institute of

21   Experimental Pathology and Toxicology as well as the

22   Department of Pharmacology and Toxicology.  We had to

23   join programs.

24                So that graduate student was looking at

25   the mechanism of Mirex in rats, so mostly metabolic

1    interference.  One of the things, you know, like Mirex

2    can do -- it doesn't affect the DNA.

3                     But there are agents that can cause

4    cancer, not directly by interacting with the DNA, but

5    that's promoting or interacting with other functions

6    with the cell.  Mirex is one of them that used to

7    block intercellular communication.

8                     The cells communicate with one another

9    constantly so that they are not -- they never

10   separate.  And if you block that communication, they

11   stop communicating and they can go crazy, so --

12        Q.   (BY MS. ROSS) Dr. Charles, I am going to stop

13   you there.

14        A    You asked me a question --

15                     MR. HABERMAN:  I mean, he has got to

16   answer the question.

17                     (Overlapping, multiple speakers.)

18        A    You asked --

19        Q.   (BY MS. ROSS) Yes.  So my question was, have

20   you ever conducted a study to determine whether a

21   chemical causes cancer in mice?

22        A    You want -- I cannot give you any further -- I

23   have to tell you what that study is.

24        Q    Okay.  So I am going to break that down, and

25   then you can continue if there is more to add.  Okay?

 1      A    Yes, please.

 2      Q    You -- when you were at the -- withdrawn.

 3           When you were in Albany, New York, you

 4   supervised a Ph.D. student who was working on Mirex --

 5      A    Yes.

 6      Q    -- which is now a banned chemical, correct?

 7      A    Yes.

 8      Q    What year was that?

 9      A    That was in 1982, '83, '84, around that time.

10      Q    Somewhere around 1980 to 1984, correct?

11      A    Yeah, exactly.

12      Q    Since 1984 have you ever conducted a study to

13   determine whether a chemical caused cancer in rats or

14   mice?

15      A    I have not from the research academy.  Those

16   are regulatory positions.

17      Q    And since 1984, you have not conducted any such

18   studies, correct?

19      A    No, no.

20      Q    When you were at Albany and supervising your

21   graduate students, this was a study looking at cancer

22   mechanisms using a rat model; is that right?

23      A    Rat model, yes.

24      Q    You are aware that for chemical registration,

25   for pesticides, for example, two-year, long-term rodent

1    carcinogenicity studies are required, right?

2        A    That's correct.

3        Q    Have you ever conducted a two-year, long-term

4    rodent carcinogenicity study for a chemical?

5        A    I was part of a study at the Albany Medical

6    School that instituted -- that I mentioned -- instituted

7    experimental pathology and toxicology exhibits that

8    exist now.  At the time, I was part of that too.

9             At that -- in that place, a two-year rat

10   study was conducted with carrageenans.  That is a kind

11   of dextrose carbohydrate material that is used for a

12   food substitute.

13            So that was being studied in that

14   department for a two-year rat study.  I was part of

15   that, evaluating those data, in -- in the second half

16   of the animal sacrifice in evaluating data collection.

17   When I joined, the study was halfway.

18       Q    Is there anything else that you wanted to add

19   about this study that you supervised your Ph.D. student

20   in looking at Mirex as a cancer promoter?

21            MR. HABERMAN:  Objection.

22       A    That was mostly metabolic interference and as

23   an epigenic mechanism that we call it.  Epigenic is

24   outside its effect on genome.

25       Q.   (BY MS. ROSS) Have you -- well -- ever

1    conducted a study with glyphosate?

2        A    No, I have not.

3        Q    Are you an expert on the genotoxicity or

4    mutagenicity of glyphosate for Roundup?

5                MR. HABERMAN:  Objection.

6        A    I am not an expert, but I have evaluated, read,

7    you know, different studies for different purposes.

8        Q.   (BY MS. ROSS) Are you an expert in weed

9    science?

10       A    No.

11               MR. HABERMAN:  Objection.

12       Q.   (BY MS. ROSS) There are scientists who've spent

13   their careers evaluating strategies for controlling

14   weeds and improving agricultural output, correct?

15               MR. HABERMAN:  Objection.

16       A    Yes.

17       Q.   (BY MS. ROSS) You are not one of them, right?

18       A    I am not one of them, but I know many of them.

19       Q    Would you defer to a weed scientist on the

20   actual use of a pesticide like glyphosate?

21               MR. HABERMAN:  Objection.

22       Q.   (BY MS. ROSS) Your answer was yes?

23       A    What did you -- what did you -- you are too

24   fast and I do not know if you are using positive or

25   negative in that question.  I have to make sure, but I

1    answer.

2        Q    Would you defer to a weed scientist on the

3    actual use of a pesticide like glyphosate?

4        A    Only to weed scientists, but if it is -- if

5    that particular chemical is going to be only affecting

6    the weed, but any chemical we have can have a secondary

7    effect.

8            Weed control chemicals can have a

9    secondary effect on humans or animals or anything, you

10   know.

11       Q    I think I understand the distinction you are

12   making --

13               (Overlapping speakers.)

14       A    Yeah, but --

15       Q.   (BY MS. ROSS) -- so let me ask my question.

16   Okay?

17       A    I understood what your question was, whether

18   this particular -- as far as this chemical is concerned,

19   you are going to defer to the weed scientists.

20       Q    On the use of glyphosate to kill weeds --

21       A    Yeah.

22       Q    -- would you defer to a weed scientist?

23       A    All the --

24               MR. HABERMAN:  Objection.

25       A    All the toxicological studies are over when it

```
 1    is registered.  Okay.

 2                  THE REPORTER:  I am sorry, can you

 3    please -- can you repeat your answer.

 4       A    After all of the toxicological studies are over

 5    and when the product is registered -- okay? -- during --

 6    when weed scientists need to use a chemical, an extract

 7    chemical or a chemical that is not registered in Texas,

 8    they come to the Department of Agriculture and say we

 9    need this chemical because of certain things; the new

10    weed that is coming up, it cannot be controlled by some

11    other herbicides we have, so we need a new chemical that

12    is -- that was found effective in Iowa.

13                  So that is not allowed to be used in

14    Texas.  So we go through then the process of

15    assessment -- okay? -- and then we register that thing

16    with the help of the EPA.  It takes about three months

17    to get that thing done.  Then we leave it to the weed

18    scientists.

19       Q.   (BY MS. ROSS) Right.

20                  Your role is evaluating all of the

21    toxicologic studies and --

22       A    Yes.

23       Q    -- all of the data --

24       A    Yeah.

25       Q    -- prior to registration, correct?
```

1      A    That's correct.

2      Q    After a pesticide is registered for use, you

3  will refer to a weed scientist on the use of that

4  pesticide to control weeds, right?

5      A    We leave it to the farmers to use it.

6      Q    Have you ever been employed by the U.S. EPA?

7      A    Employed?

8      Q    Yes.

9      A    No.

10     Q    Have you ever been employed by an industrial

11  pesticide, chemical, or agricultural company subject to

12  EPA --

13     A    No.

14     Q    -- regulations?

15     A    No, no.

16     Q    Have you ever worked as a pesticide applicator?

17     A    No.

18     Q    Have you ever been involved as part of a

19  corporation's preparation and submission to the U.S. EPA

20  of a registration for a pesticide or herbicide?

21     A    No.

22     Q    Have you ever written an herbicide or a

23  pesticide label?

24     A    Repeat, please.

25     Q    Have you ever written an herbicide or a

Ambrose K. Charles, Ph.D.

```
1    pesticide label?

2        A     Reviewed?

3        Q     Written.

4        A     Oh, I have noted them.

5        Q     You have reviewed --

6        A     But I have reviewed -- I have reviewed some of

7    the pesticide labels.

8        Q     So I will break that into two parts.

9        A     Yes, please.

10       Q     You have reviewed pesticide and herbicide

11   labels in your role as regulator for the Department of

12   Agriculture in Texas?

13       A     Yes.

14       Q     Have you ever written an herbicide or a

15   pesticide label?

16       A     No.

17       Q     Have you -- well, withdrawn.

18       A     Can I add something?

19             MR. HABERMAN:   Yes.

20       Q.    (BY MS. ROSS) Yes.

21       A     As -- as part of the review, we have made

22   modifications, requests for them to modify their label

23   for the State of Texas; they had done it for us.

24       Q     In reviewing herbicide labels for the State of

25   Texas, you have on occasion asked for revisions or
```

1  modifications, correct?

2      A    Exactly.  Yes, that's normal.

3      Q    Have you ever asked for revisions or

4  modifications of the glyphosate label?

5      A    I can't recall.

6      Q    None that you recall sitting here today; is

7  that fair?

8      A    That's fair.

9      Q    Have you ever been asked by EPA to participate

10  in reviewing any publication, potential regulation or

11  other material concerning herbicides or pesticides?

12      A    Regarding pesticides, you know, I would say,

13  yes and no.  Yes, is -- many documents, you know, before

14  they go public, you know, they're sent for State review.

15  Okay?

16            And they will send it to the

17  Commissioner.  The Commissioner will forward it to us.

18  We review those things, and we make opinions and

19  statements on that we -- sometimes we disagree with

20  what EPA is doing.

21            And then the Commissioner -- I will

22  draft it; the Commissioner will sign it, and then we

23  will send the Department's response and add the public

24  input into that particular EPA decision.

25      Q    Are you offering any expert opinions about

Ambrose K. Charles, Ph.D.

```
 1   Roundup advertising?

 2       A    No.

 3       Q    If you will turn with me to the references in

 4   your report.

 5       A    Yeah.  Oh, hold on.  Moore or -- Stacey Moore

 6   or?

 7       Q    Both.

 8       A    Oh, okay.

 9       Q    Let's start with Mr. Moore.

10       A    Okay.

11       Q    Your references are on page 33, correct?

12       A    Yes.

13       Q    Can you confirm for me that there are no

14   Roundup labels on your reference list?

15       A    Number 7, okay.  EPA 2018.  Monsanto

16   Unconditional Label I have on there.

17       Q    Okay.

18       A    PRO -- Roundup PRO Concentrate Herbicide, EPA

19   Registration No. 9323.6.

20       Q    The label that you intend to offer opinions on

21   is the 2018 Monsanto Unconditional Label for Roundup PRO

22   Concentrate, correct?

23       A    Yeah, yeah.

24       Q    Are there any other labels on your Materials

25   list --
```

```
 1      A    I was --

 2      Q    -- for Mr. Moore?

 3      A    -- not given any label.  I didn't find any

 4  label in the documents.

 5      Q    All right.

 6      A    I -- I don't go and search for labels.  I do

 7  not know what products he was using, what is -- I don't

 8  have a picture, photograph, EPA registration number or

 9  anything like that to take the correct label.

10           So I go back and search and then see is

11  there any label that I can rely on that is an EPA

12  label and connected to Monsanto, so I took that.

13      Q    You did not go and search for the Roundup

14  labels for the specific Roundup products that any

15  plaintiff was using, true?

16      A    That's correct.

17      Q    You did a general search for U.S. EPA labels

18  for Roundup, right?

19      A    That's right.

20      Q    The report that you are offering for Mr. Pleu,

21  does that contain any Roundup labels?

22      A    Let me see.

23           MR. HABERMAN:  What was that question?

24           MS. ROSS:  The report you are offering for

25  Mr. Pleu, does that include any Roundup tables.
```

```
 1      A    I referred the same Monsanto label as to

 2   reference number 10 -- no, no, that isn't -- it must be

 3   yours.

 4               I don't have an EPA label here.

 5      Q.   (BY MS. ROSS) Right.

 6               There are no references in here?

 7      A    I had a reason for that, why I didn't use that,

 8   is the other person was using, you know, concentrate --

 9   Roundup concentrate.  That was the word in that.

10               And this person was using Ready to Use,

11   I believe.  I looked for the Ready-to-Use label.  I

12   didn't find anything, so I did not include that.

13      Q    You searched the Internet for a Roundup

14   Ready-to-Use label --

15      A    Yeah.

16      Q    -- right?

17      A    Yeah.

18      Q    Did you ask anyone to provide you with that

19   label?

20      A    No.

21      Q    I understand that you are offering an opinion

22   in this case that glyphosate is genotoxic; is that

23   right?

24      A    That's right.

25      Q    Did you rely on articles in the published
```

Ambrose K. Charles, Ph.D.

1  literature on the genotoxicity of glyphosate?

2      A    I relied on most of the studies reviewed and

3  published by ATSDR, Agency for Toxic Substances and

4  Disease Registry.  It's part of the CDC.

5             They have, you know, a very

6  comprehensive, a real involved EPA, conduct studies

7  independently, independent of EPA reviews.

8             They are -- they're not taking EPAs and

9  publishing them.  But they have reviewed

10  independently.  They're a -- they're a very good

11  source for me, instead of going and looking at EPA

12  studies.

13     Q    I see.

14             Long answer so I will break it up.

15  Okay?

16     A    Yes, please.

17     Q    You -- there is a government agency called

18  ATSDR, right?

19     A    That's right.  That's correct.

20     Q    We will come back to ATSDR a little bit later,

21  but do you recall sitting here what those letters stand

22  for?

23     A    I just told you that ATSDR, Agency for Toxic

24  Substances and Disease Registry.

25     Q    You are familiar with the Agency for Toxic

```
 1    Substances and --

 2        A     Yes, ma'am.

 3        Q     -- Disease Registries?

 4        A     Yes, ma'am, for many years.

 5        Q     Does ATSDR have good scientists?

 6        A     Yes.

 7              MR. HABERMAN:   Objection.

 8        Q.    (BY MS. ROSS) What types of scientists work at

 9    ATSDR?

10        A     What type of scientists?

11        Q     Yes.

12        A     There are epidemiologists.   There are

13    toxicologists.   There are clinicians.   There are many

14    people with MDs, all sort of -- there are chemistry

15    specialty, you know.   They hire people with different

16    specialties, depending on what their needs are.   I don't

17    keep track of their hiring practices.

18        Q     ATSDR has epidemiologists, biostatisticians --

19        A     Yeah.

20        Q     -- toxicologists --

21        A     Exactly.

22        Q     -- chemists --

23        A     Yeah.

24        Q     -- and physicians, correct?

25        A     Exactly, right.
```

```
1        Q    You rely on ATSDR's analysis of the toxicology

2    of chemicals, right?

3                MR. HABERMAN:   Objection.

4        A    That's right.

5        Q.   (BY MS. ROSS) In this case, you relied on

6    ATSDR's analysis of the genotoxicity of glyphosate,

7    true?

8        A    Exactly.

9        Q    You found ATSDR to be a good summary of the

10   glyphosate genotoxicity, true?

11       A    Yes.

12       Q    You did not go back and review every one of the

13   hundreds of genotoxicity studies cited in ATSDR's

14   report, true?

15       A    It is impossible for me to do that, because,

16   number one, accessibility; second -- second being is

17   time.  I don't have my whole life to study glyphosate,

18   you know, toxicity.

19       Q    I am correct that you relied on ATSDR's

20   summary --

21       A    That is a summary that gave me a summary of my

22   information that I needed, where do they stand and where

23   do I pick up from that.

24       Q    Right.  And I just want to make sure we have a

25   clear record so that we don't have to go back to the
```

```
 1   individual studies later.  Okay?
 2       A    Exactly, yes.
 3       Q    So did you rely directly on the published
 4   literature on the genotoxicity of glyphosate, of the
 5   actual individual studies?
 6       A    No, I have not.
 7       Q    Did you review the underlying genotoxicity
 8   studies supporting glyphosate's registration in the
 9   United States or around the world?
10       A    I did not.
11            MR. HABERMAN:  Objection.
12       Q.   (BY MS. ROSS) You relied on ATSDR's summary of
13   the glyphosate toxicity, right?
14       A    Exactly.  That's a Government agency and I
15   trust their evaluation, you know.  My experience, you
16   know, in reading the ATSDR documentation, some reports,
17   you know, goes back for many decades.  I have no doubt
18   to -- you know, I have no reason to disbelieve them.
19       Q    Did you come to your own independent conclusion
20   on whether, taken as a whole, the weight of the evidence
21   shows that glyphosate is genotoxic?
22       A    Exactly, that is solely information for data.
23   The conclusions are independent of what ATSDR says.
24       Q    You reviewed the conclusions of scientific and
25   regulatory authorities who have reviewed all of the
```

1   published and unpublished data on glyphosate, right?

2       A    That's right.

3       Q    Do you know if those scientific and regulatory

4   authorities determined whether the data shows that

5   glyphosate is genotoxic?

6       A    Generally, what I found, ATSDR was -- they have

7   a conclusion of equivocal -- equivocal, what do you

8   say -- how do you say it?

9       Q    Equivocal, correct?

10      A    Equivocal.  Equivocal.

11      Q    I'll re- -- I'll state that back to you and you

12   can say if I am saying it correctly, okay?

13      A    Uh-huh.

14      Q    What you found is that ATSDR's conclusion as to

15   whether glyphosate is genotoxic is the data are

16   equivocal, right?

17      A    Equivocal.  Some of the studies didn't show up

18   something.  Some of the studies showed positive.

19   Especially, what was interesting to me was human cells'

20   toxicity.

21      Q    Equivocal means some studies showed something

22   and some studies did not, right?

23      A    Exactly.

24           MR. HABERMAN:  Objection.

25      Q.   (BY MS. ROSS) Equivocal is different than a

```
1    conclusion that the data supports that glyphosate is

2    genotoxic, right?

3              MR. HABERMAN:  Objection.

4        A    Say it again.

5        Q.   (BY MS. ROSS) Equivocal is different than a

6    conclusion that the data supports that glyphosate is

7    genotoxic, right?

8              MR. HABERMAN:  Objection.

9        A    That is not their conclusion.  That is their

10   opinion, what they found, their statement.  And opinions

11   are made by me.

12       Q.   (BY MS. ROSS) Did you also review the

13   conclusions of scientific and regulatory authorities who

14   reviewed all of the published and unpublished data on

15   glyphosate and determined whether those data show that

16   glyphosate causes oxidative stress?

17       A    I have seen mentioning that kind of thing in

18   results, but there is not adequate data.  And also, that

19   is precise -- exactly something to be explored.  That is

20   what I agreed, you know, but there is still evidence.

21       Q    Your opinion is that there is not adequate data

22   to conclude that glyphosate causes oxidative stress,

23   correct?

24       A    That's right.

25       Q    Are you offering an opinion in this case that
```

Ambrose K. Charles, Ph.D.

```
 1    glyphosate causes cancer in animals?

 2       A    Yes.

 3       Q    What is that opinion?

 4       A    That is primarily from a -- a mole study and

 5    supported by genotoxicity and its effect on chromosomal

 6    effects and being then damaged in -- in human cells, and

 7    where is sort of -- things that I have pointed out in my

 8    report can also support that conclusion.

 9       Q    So let me break that down into pieces.

10       A    Yes, please.

11       Q    Because I think you mentioned a couple of

12    things.  Okay?

13       A    Okay.

14       Q    Did you review the conclusions of the

15    scientific and regulatory authorities around the world

16    who have reviewed the long-term animal carcinogenicity

17    studies for glyphosate?

18       A    Not -- not all -- all the scientists who are

19    reporting, you know, I don't find that kind of access to

20    all of the reports on glyphosate.

21       Q    You reviewed EPA's conclusions, correct?

22       A    Yes, EPA's report, documents in 2017, EPA

23    re-registration document, and then I read some of the

24    EPA publications.  I haven't finished them.

25       Q    The EPA publications that you reviewed are on
```

Ambrose K. Charles, Ph.D.

```
 1   your References list --

 2       A    Yeah.

 3       Q    -- fair?

 4       A    Right, right.

 5       Q    You also reviewed IARC's summary of the

 6   animal --

 7       A    Yeah, yeah.

 8               (Overlapping speakers.)

 9       Q.   (BY MS. ROSS) -- animal carcinogenicity --

10       A    Yeah.

11       Q    -- study, right?

12               (Overlapping speakers.)

13       A    Right, yes.

14               THE REPORTER:  I am sorry.  Please speak

15   one at a time.  This is very challenging, the words, so

16   please.  Okay?

17               Thanks.

18       Q.   (BY MS. ROSS) Did you review the actual study

19   reports for the glyphosate animal carcinogenesis

20   studies?

21       A    Study the reports?

22       Q    You know that animal carcinogenicity studies --

23       A    Oh, you mean to go and look all the two-year

24   studies, that's what you are asking, or --

25               (Overlapping speakers.)
```

1    Q.   (BY MS. ROSS) Let me finish my question and we

2    will go -- yes, so I will be clearer in my question.

3    Okay?

4              There are study reports for each of the

5    long-term rodent carcinogenicity studies --

6    A    Yes.

7    Q    -- true?

8              True?

9    A    Well, yes.

10   Q    Each of those reports is often several thousand

11   pages long, right?

12   A    That's right.

13   Q    I am correct that you did not review the study

14   reports for the long-term animal --

15   A    I did not.

16              (Overlapping speakers.)

17   Q.   (BY MS. ROSS) -- carcinogenic studies?

18   A    I did not.

19   Q    Did you come to your own independent conclusion

20   on whether the mouse and rat studies of glyphosate

21   showed treatment-related tumors?

22   A    Yes.

23   Q    Can you point me toward every reference on your

24   reference list that supports that opinion?

25   A    I put a general reference on IARC -- on ATSDR

1    and IARC.

2        Q    For your conclusion that glyphosate causes

3    cancer in animals, you are relying on ATSDR's 2019

4    report and IARC's 2015 report, correct?

5        A    That's correct.

6        Q    Are there any other references on your

7    materials list you are relying on for your conclusion

8    that glyphosate causes cancer in animals?

9        A    No.

10       Q    Did you -- we -- well, withdrawn.

11               New question.

12               We talked a moment ago about the

13   conclusions of some of the scientific and regulatory

14   authorities around the world, right?

15       A    Yeah.

16       Q    Having worked in pesticide risk assessment for

17   decades, you know that regulators within the United

18   States and around the world evaluate animal studies to

19   determine whether pesticides like glyphosate show

20   carcinogenic potential, right?

21       A    Correct.

22       Q    Regulators within the United States and around

23   the world evaluate in vitro and in vivo studies to

24   determine whether pesticides like glyphosate show

25   potential for genotoxicity or mutagenicity, correct?

1       A    Correct.

2       Q    You reviewed EPA's conclusions on whether the

3   studies of glyphosate in mice and rats show that

4   glyphosate causes cancer in those animals, right?

5       A    Correct.

6       Q    You reviewed EPA's conclusions on whether the

7   studies of glyphosate in mice and rats show any

8   potential for glyphosate to cause cancer in humans,

9   correct?

10      A    Correct.

11      Q    The EPA does not share your conclusion that the

12  studies of mice and rats show that glyphosate is a

13  carcinogen --

14              MR. HABERMAN:  Objection.

15      Q.  (BY MS. ROSS) -- or even a possible carcinogen,

16  right?

17              MR. HABERMAN:  Objection.

18      A    EPA's report?

19      Q.  (BY MS. ROSS) Correct.

20      A    EPA says not likely to be a carcinogen.

21      Q    Yeah.  There are different categories for

22  whether a chemical or a pesticide is likely to be a

23  carcinogen in humans, right?

24      A    Yes.

25      Q    EPA does not share your conclusion, that the

1   studies of mice and rats show that glyphosate is a

2   carcinogen, right?

3       A    We can disagree.

4       Q    And in this case you do disagree?

5               MR. HABERMAN:  Objection.

6       A    Yes, yes.

7       Q.  (BY MS. ROSS) Your view of the studies on mice

8   and rats is also at odds with the conclusions of the

9   study authors themselves, isn't it?

10              MR. HABERMAN:  Objection.

11      A    Say that again, please.

12      Q.  (BY MS. ROSS) Your view of what the studies of

13  glyphosate show is also at odds with the conclusions of

14  the study authors themselves, isn't it?

15              MR. HABERMAN:  Objection.

16      A    Study of -- I mean, what are we talking

17  about --

18      Q.  (BY MS. ROSS) The people -- well, you may not

19  know, so let me back up.

20              Having not reviewed the study reports

21  for carcinogenicity studies of glyphosate, is it fair

22  to say, you can't say, sitting here, one way or the

23  other, whether the conclusion you reached about what

24  those studies show is different from what the study

25  authors say?

```
 1      A    I rely on the experts, you know, at the

 2  regulatory agencies, the CDC or the EPA, when they

 3  review and they make a statement.  You know, it is -- we

 4  always go back and read those.

 5              And some you agree; some you can

 6  disagree.  You know, it's not, you know, solid written

 7  rules, you know, that somebody else saw something and

 8  then made a statement, you agree but

 9  nonscientifically.

10      Q    I think we can break that down a little.

11              You rely on the experts at regulatory

12  agencies, such as the CDC or EPA, when they review and

13  make a statement about glyphosate, right?

14      A    Yeah.

15      Q    Monsanto did a lot of animal testing,

16  especially the early testing, right?

17      A    Yeah.

18      Q    But Monsanto didn't actually do the animal

19  testing directly, did they?

20      A    Did they do the animal testing, Monsanto?

21      Q    Monsanto contracted with companies that did the

22  actual animal testing, right?

23      A    Yeah, usually, there is -- some -- some

24  companies may have internal labs, you know.

25      Q    The companies that -- that folks like Monsanto
```

 1    contract with, they are available not just to Monsanto

 2    but to anybody who needs animal testing, right?

 3              MR. HABERMAN:  Objection.

 4      A    I don't know about that.

 5      Q.   (BY MS. ROSS) Do you know if the companies that

 6    do lab testing are available to a number of different

 7    companies, not just Monsanto?

 8              MR. HABERMAN:  Objection.

 9      A    I -- I know some companies.  I knew -- I don't

10    keep any contact with any of those things -- those

11    companies now, but I don't keep track of what Monsanto

12    does and which company they hire.

13      Q.   (BY MS. ROSS) Speaking generally, you are

14    familiar with contract labs that --

15      A    Yes.

16      Q    -- perform animal testing?

17      A    Yes, yes.

18      Q    Those contract labs do testing for a number of

19    different companies, correct?

20      A    Probably, yes.

21      Q    Their reputation is important to their ability

22    to attract work from a variety of --

23      A    Yes.

24      Q    -- companies, right?

25      A    Yes.

```
 1                    MR. HABERMAN:  Objection.  No foundation.

 2       Q.   (BY MS. ROSS) You are not going to say that

 3  Monsanto controlled the animal studies that were done by

 4  those independent labs, are you?

 5                    MR. HABERMAN:  Objection.

 6       A    No, those labs are controlled, usually licensed

 7  and also seen by EPA because they have to make sure

 8  that, you know, these labs follow the DLT standards.

 9       Q.   (BY MS. ROSS) The independent labs that did

10  studies of glyphosate did the studies and Monsanto had

11  to live with whatever the results were, fair?

12       A    (No response.)

13                    MR. HABERMAN:  Objection.  That's not

14  supported by the evidence.

15       Q.   (BY MS. ROSS) There are other companies other

16  than Monsanto that have sought regulatory approval for

17  glyphosate-based herbicides, right?

18       A    I saw Bayer as a name.  I don't know much about

19  it, and how many companies are really spraying weeds, I

20  don't know.  I don't know.

21       Q    You don't recall from your time at the Texas

22  Department of Agriculture, whether there were companies

23  in addition to Monsanto who had registered

24  glyphosate-based --

25       A    I have --
```

1      Q     -- herbicide?

2      A     -- no recollection.  I retired in 2011, and

3   many of those things, herbicide.

4                THE REPORTER:  Can we take a break,

5   please?

6                MR. HABERMAN:  Yes.

7                MS. ROSS:  Going off the record, the time

8   is 10:36.

9                (Recess from 10:36 a.m. to 10:50 a.m.)

10               THE VIDEOGRAPHER:  Back on the record.

11  The time is 10:50.

12               (Exhibits 6, 7, 9 and 9 virtually marked.)

13     Q.   (BY MS. ROSS) Dr. Charles, I have handed you

14  Exhibits 6, 7, 8 and 9 to your deposition.  For now I

15  want to identify them and we will come back to them

16  later.  You can set those aside and I will come back to

17  them.  Okay.  Okay?

18     A     Oh, okay.

19     Q     Is Exhibit 6 to your deposition your invoice

20  for the Stacey Moore case?

21     A     Yes.

22     Q     Did you prepare that invoice?

23     A     I did.

24     Q     Your invoice states there is a time log

25  attached.

```
 1                    Do you see that?

 2      A    Yes.

 3      Q    (BY MS. ROSS) The time log that was attached to

 4   that invoice is Exhibit 7, correct?

 5      A    That's correct.

 6      Q    Did you prepare the time log for Stacey Moore

 7   for the time that you spent?

 8      A    Yes.

 9      Q    You spent 58 hours total for the Stacey Moore

10   case through May 13th of 2022, correct?

11      A    That's correct.

12      Q    Your hourly rate is $450 an hour?

13      A    That's correct.

14      Q    The total amount you billed through May 13th

15   was $26,100 for the Stacey Moore case, right?

16      A    Yeah, and this invoice -- may I add something?

17      Q    Yes.

18      A    This time shows only -- it dropped.  I did not

19   finalize and make this report at that time.  I spent

20   maybe three hours, four or five hours more to make it

21   final.  That is not included in this bill.

22      Q    Got it.

23                So new question.

24                There are three to five additional hours

25   that you spent finalizing your report --
```

```
 1      A     Yeah.

 2      Q     -- for Stacey Moore --

 3      A     Yeah.

 4      Q     -- that are not included in Exhibit 6, correct?

 5      A     Exactly.

 6      Q     Exhibit 8 is your invoice for William Pleu,

 7   correct?

 8      A     That's correct.

 9      Q     Did you prepare this invoice?

10      A     I did.

11      Q     You see you state in your invoice that there is

12   a time log attached?

13      A     That's correct.

14      Q.    (BY MS. ROSS) Exhibit 9 is your time log for

15   the time that you spent on the William Pleu case,

16   correct?

17      A     That's correct.

18      Q     Did you prepare the time log that is in

19   Exhibit 9?

20      A     Yes.  It's in my handwriting, yes.

21      Q     You can set those aside for now.  Okay?

22      A     Yes.  I may also add that in order to finalize

23   the report for Pleu, I spent maybe another ten hours or

24   so.

25      Q     I see.
```

```
 1      A    Yeah.

 2      Q    In addition to the time included --

 3      A    Exactly.

 4      Q    -- in Exhibit 8 to your deposition for William

 5  Pleu, you spent approximately ten additional hours,

 6  right?

 7      A    Yes, right.

 8      Q    All of that time is also billed at your hourly

 9  rate of 450 an hour, correct?

10      A    That's right.  That's right.

11      Q    At the time of your invoice for Mr. Pleu, you

12  had spent 60 hours, right?

13      A    That's correct.

14      Q    That is at a rate of 450 an hour, correct?

15      A    That's correct.

16      Q    And the total you've invoiced thus far for

17  Mr. Pleu is $27,000, correct?

18      A    Correct.

19      Q    You can set those aside and I will come back.

20      A    Thank you.

21      Q    Before the break, we were talking about rodent

22  carcinogenicity studies; do you recall that?

23      A    Yes, sorry.

24           Yes.

25      Q    I think we can agree on some basics of rodent
```

Ambrose K. Charles, Ph.D.

1    carcinogenicity studies, but let me ask and see.  Okay?

2      A    Yes.

3      Q    There are, of course, important differences

4    between rodents and people, right?

5      A    Yes.

6      Q    We know there can be severe problems with

7    extrapolating from findings in mice to clinically

8    relevant findings in humans, right?

9              MR. HABERMAN:  Objection.

10     A    In some cases, yes.

11     Q.  (BY MS. ROSS) It is not true that -- well, let

12   me ask it without the double negative.  Withdrawn.

13             Am I correct that some animal

14   carcinogens have not been found to be human

15   carcinogens?

16     A    That's correct.

17     Q    You understand that, through chance alone, in a

18   rodent study, there is going to be a certain amount of

19   cancer, right?

20     A    Yes.

21     Q    The question you need to be able to answer is,

22   is the treated group meaningfully different from the

23   control group, right?

24             MR. HABERMAN:  Objection.

25     A    Correct.

1    Q.   (BY MS. ROSS) Based on the review that you have

2    done, is it fair to say that there are some animal

3    studies that did not show any signs of carcinogenicity?

4    A    That's correct.

5    Q    Even a statistically significant response in a

6    rodent study may or may not be biologically significant,

7    right?

8              MR. HABERMAN:  Objection.

9    A    When you do have a rodent study, first, you do

10   both rats and mice.  Both become positive on supporting

11   the other -- each other; then separate evidence.  But if

12   one species becomes positive, another one is negative,

13   but that is -- consider that as partially positive.  It

14   is not discarded as a negative study.

15   Q.   (BY MS. ROSS) When you do a rodent study

16   typically for registration of a pesticide --

17   A    Yes.

18   Q    -- there is a study in both rats and in mice,

19   correct?

20   A    That's correct.

21   Q    In the circumstance where one of those studies

22   is positive and the other is negative, you would

23   consider that potentially positive, correct?

24   A    Correct.

25   Q    We've talked about a number of opinions that we

Ambrose K. Charles, Ph.D.

```
 1   are going to get into in more detail; is that fair?

 2        A    That's fair.

 3        Q    Are there any other expert opinions that we

 4   have not discussed that you intend to offer at trial?

 5        A    No.

 6        Q    I'd like you to -- do you have a copy of your

 7   CV in front of you?

 8        A    Let's see.

 9             Yes, yes.

10        Q    Do you want a copy, or do you have this, Jeff?

11             MR. HABERMAN:  I will take a copy.

12             MS. ROSS:  You can take that one.

13             Dr. Charles, may I have it for just a

14   moment?

15             (Witness complies.)

16        Q    (BY MS. ROSS) Thank you.

17             I have a pretty color copy, so I am

18   going to mark on my copy.

19             (Exhibit 10 virtually marked.)

20        Q.   (BY MS. ROSS) Okay.  Exhibit 10 to your

21   deposition is your CV.  Do you see that, Dr. Charles?

22        A    That's -- yes.

23        Q    Is this CV current and accurate?

24        A    Yes.

25        Q    On page 3 of your CV, you walk through your
```

Ambrose K. Charles, Ph.D.

```
1    education; is that right?

2        A    Yes.

3        Q    You completed your Bachelor's of science,

4    Master's of science, and Ph.D. in India, right?

5        A    That's correct.

6        Q    Then you did an NIEHS Toxicology Research

7    Associateship, correct?

8        A    Yes.

9        Q    What is NIEHS?

10       A    National -- National Institute of Environmental

11   Health Services.

12       Q    Does NIEHS have good scientists?

13       A    Yes.

14       Q    NIEHS has toxicologists, epidemiologists?

15       A    Yes.

16       Q    Biostatisticians, chemists, correct?

17       A    Yes.

18       Q    What do the scientists at NIEHS do?

19       A    They do a national toxicology program.

20   Basically, they support developed standards for cleanup

21   sites, you know, environmental protection and work

22   with -- along with the EPA to develop standards.

23                Standards are regulatory levels that if

24   they've said something is bad or something is not bad,

25   or, okay; it's all based on the numerical numbering
```

Ambrose K. Charles, Ph.D.

 1    system, which may or not -- may or may not have much

 2    to do with the actual effect.

 3        Q    NIEHS does a wide range of things related to

 4    chemical and environmental hazards --

 5        A    Exactly.

 6        Q    -- is that fair?

 7        A    Exactly.

 8        Q    You, on your CV, list Board certifications and

 9    professional affiliations.  Do you see that section?

10        A    Yes.

11        Q    You also list your Board certifications on your

12    website, right?

13        A    I think so, yes.

14        Q    I can -- if -- since you said, "I think so,"

15    let me hand you your website so that we are clear.

16    Okay?

17        A    Yeah, sure.

18             (Exhibit 11 virtually marked.)

19        Q.   (BY MS. ROSS) The type is very small on the

20    exhibit, so tell me if you can read it.

21        A    Yes, I can read it.

22        Q    Okay.  So Exhibit 11 to your deposition is your

23    "About Me" page from Toxfactor Consulting, correct?

24        A    Yes.

25        Q    This is your current website as of June 2022,

```
 1   right?

 2       A     Yes and no.

 3             Yes, it is my website.  No, I have not

 4   touched or corrected data on this website for years.

 5       Q     I see.

 6             You state, "Dr. Charles is Diplomat &

 7   Board Certified in both Toxicology and Forensic

 8   Medicine" --

 9       A     Yes.

10       Q     -- "by the American Board of Forensic Examiners

11   Institute" --

12       A     That's correct.

13       Q     -- "and the American Board of Forensic

14   Medicine"?

15       A     Correct.

16       Q     Did I read that right?

17       A     Yes.

18       Q     You go on to state, "Dr. Charles is recognized

19   as a Fellow of the American College of Forensic

20   Examiners Institute," right?

21       A     A Fellow, yes.

22       Q     You hold yourself out to the public as

23   Board-certified by the American Board of Forensic

24   Medicine, right?

25       A     Yes.
```

Ambrose K. Charles, Ph.D.

1      Q    What does it mean to be Board certified?

2      A    Board certified is the -- the -- the

3  association, what are -- what is that called?  The

4  American College of Forensic Examiners Institute, they

5  evaluate your credentials, number one, your experience,

6  and then they have to pass -- they have an annual

7  accreditation type of exams and certification that they

8  are to annually or biannually or something like that in

9  order to keep that Board certification.

10              After a certain number of years, you

11 know, it is grandfathered.  I don't have to take any

12 more Board certifications, you know.  They consider I

13 am old enough to be [sic] tested.

14     Q    I am going to break that down.  Okay?

15     A    Yes, please.

16     Q    The College of Forensic Examiners Institute

17 evaluates your credentials --

18     A    Yes.

19     Q    -- first, right?

20     A    Yes.

21     Q    Then you have to pass exams for certification,

22 correct?

23     A    Yes.

24     Q    The process is not one that you have to repeat

25 every year as of now, correct?

```
 1      A    Yes, that's right.

 2      Q    When was the last time you had to recertify?

 3      A    That was sometime before I retired, I believe,

 4  you know, sometime maybe 2011, 2010, somewhere --

 5  something around that.  I used to pay the membership fee

 6  and keep that membership active, both certificates

 7  active.  At a certain time, I think they informed me,

 8  you don't -- just quit it.

 9      Q    You last recertified with the American College

10  of Forensic Examiners sometime --

11      A    Sometime, '10, '15.

12      Q    -- sometime 2010?

13      A    Yeah, around that time.

14      Q    Since then you have grandfathered in, so your

15  Board certification is still current, right?

16      A    That's right.

17      Q    Board certification lets people know your

18  qualifications have been vetted by a professional

19  organization, right?

20      A    That's right.

21      Q    Is it important that people looking for an

22  expert know about your qualifications from the American

23  Board of Forensic Medicine?

24      A    Yes.

25              MR. HABERMAN:  Objection.
```

```
 1      Q.   (BY MS. ROSS) You also, in addition to your

 2   Board certification, are a Fellow of the American

 3   College of Forensic Examiners, right?

 4      A    Yes.

 5      Q    Walk me through what it means to be a Fellow of

 6   the American College of Forensic Examiners.

 7      A    Fellow -- Fellow of the organization or the

 8   Forensic Examiners Institute, they elect you to the

 9   Fellowship from your experience and a number of years

10   of, you know, qualified, you know, as scientists of

11   recognition.

12              That is recognition given by -- I don't

13   apply for it.  I don't ask for it.  And then they

14   will, you know, nominate you and then send you a

15   Fellowship certification, saying that you are being

16   considered and elected by the Board to be a Fellow of

17   the, you know, Forensic Institute.

18      Q    Being a Fellow of the American College of

19   Forensic Examiners means you have been elected as a sign

20   of recognition of your expertise in toxicology, right?

21      A    Yes.

22      Q    Is the American College of Forensic Examiners

23   an organization that you are proud to be a part of

24   today?

25              MR. HABERMAN:  Objection.
```

```
 1      A     Yes.  I don't -- I don't find a reason why not.

 2      Q.    (BY MS. ROSS) If someone was asking you today

 3   if you are Board certified in toxicology, the

 4   certifications we talked about right now are what you

 5   would point to, right?

 6      A     Yes.

 7      Q     Is the American Board of Forensic Examiners

 8   Institute still in existence; do you know?

 9      A     I believe so.

10      Q     If you will go with me to page 2 of your CV,

11   back on Exhibit 10, and tell me when you are there.

12      A     Okay.

13      Q     Here you list your "Professional Employment

14   History and Appointments," correct?

15      A     Yes, ma'am.

16      Q     From 1990 to 2005 you were the director and

17   senior pesticide advisor for toxicology and risk

18   assessment in the pesticide program division for the

19   Texas Department of Agriculture, correct?

20      A     You are talking about 1990?

21      Q     Yes.

22      A     To?

23      Q     2005?

24      A     Oh, okay.  Yes.

25      Q     Should I repeat the question?
```

Ambrose K. Charles, Ph.D.

```
 1      A     Yes, yes -- no, no.  Yes.

 2      Q     You spent 15 years in that role, right?

 3      A     Yes.

 4      Q     From May 2005 to August 2011, you were deputy

 5   assistant commissioner for the pesticide division of the

 6   Texas Department of Agriculture, right?

 7      A     Yes.

 8      Q     You retired in 2011; is that right?

 9      A     Yes.

10      Q     Have you been a full-time consultant for the

11   last eleven years?

12      A     Excuse me.

13            I was a full-time available, but I did

14   not do full-time consulting.  I did a few cases and I

15   took a lot of -- a number of years of free time.

16            There are a number of years I didn't do

17   any consulting; there was not consulting, none done at

18   all.  Maybe three, four, five years I did not do in

19   between, you know, no consulting.  I needed time for

20   myself.

21      Q     You also had been enjoying your retirement,

22   not --

23      A     Exactly, exactly.

24            (Overlapping speakers.)

25      Q.    (BY MS. ROSS) -- just --
```

```
 1       A     Exactly.

 2       Q     Texas Department of Agriculture regulates the

 3  registration and use of pesticides in Texas, right?

 4       A     Yes.

 5       Q     Texas Department of Agriculture is designated

 6  as the State's lead agency in the regulation of

 7  pesticide use and application, correct?

 8       A     Yes, everything.  Everything related to

 9  pesticides.

10       Q     Texas Department of Agriculture is responsible

11  for the licensing and training of pesticide applicators,

12  right?

13       A     Yes.

14       Q     Is it all right if I refer -- refer to the

15  Texas Department of Agriculture as TDA?

16       A     Yes.

17       Q     TDA is responsible for overseeing worker

18  protection with pesticides, right?

19       A     Yes.

20              MR. HABERMAN:  Objection.

21       Q.  (BY MS. ROSS) TDA is responsible for

22  registering pesticides for sale in the state of Texas,

23  correct?

24       A     Yes.

25       Q     Various pesticides were regulated when you were
```

```
 1    there at TDA, right?

 2        A     Yes.

 3        Q     TDA continues to regulate the use of pesticides

 4    and herbicides today, right?

 5        A     Yes.

 6        Q     The State of Texas regulates pesticides to

 7    protect humans, animals, and the environment from

 8    potential adverse effects, true?

 9        A     Yes.

10        Q     What herbicides are regulated by the State of

11    Texas?

12        A     What herbicides are regulated?

13        Q     Yes.

14        A     There are some restricted pesticides that also

15    are used in the state of Texas that has a EPA

16    registration level as restricted.  They will have a --

17    specific requirements of training and application

18    methods and things like that, you know, for specific

19    pesticides.  And the question was basically...

20        Q     Is it fair to say you don't have those -- which

21    herbicides are restricted -- memorized?

22        A     I don't have that.

23                    It is a really big list.

24                    (Exhibit 12 virtually marked.)

25        Q.    (BY MS. ROSS) Exhibit 12 to your deposition is
```

Ambrose K. Charles, Ph.D.

```
 1    the list of currently regulated herbicides for the Texas

 2    Department of Agriculture.

 3                 Do you see that?

 4    A     Yes.

 5    Q     2, 4-d is a regulated herbicide in Texas,

 6    correct?

 7    A     Correct.

 8    Q     Do you know why that is?

 9    A     That is particularly for damaging other

10    vegetation if it is not properly applied.

11    Q     MP- --

12    A     That's what I recall, sorry.

13    Q     No, you are fine.

14                 MCPA is a regulated herbicide in the

15    state of Texas, right?

16    A     Yes.

17    Q     Why is MCPA regulated?

18    A     The same reason.

19    Q     Because of the potential to damage other

20    vegetation if not properly applied?

21    A     Other vegetation, other crops.

22    Q     Dicamba is a regulated herbicide in the state

23    of Texas, right?

24    A     That's correct.

25    Q     Why is Dicamba a regulated herbicide?
```

1      A    The same reason.

2      Q    Quinclorac is a regulated herbicide in the

3   state of Texas, right?

4      A    That's correct.

5      Q    Why is Quinclorac regulated?

6      A    The same reason.

7      Q    Does Texas have any restrictions around the use

8   of glyphosate?

9      A    No, not that I know.

10     Q    Glyphosate is not a restricted herbicide in

11   Texas, true?

12               MR. HABERMAN:  Objection.

13     A    That's correct, I think so.

14     Q.   (BY MS. ROSS) That was true when you were with

15   the Texas Department of Agriculture as deputy

16   commissioner, right?

17     A    Yes.

18     Q    That was true when you were with the Texas

19   Department of Agriculture as Director of Toxicology and

20   Risk Assessment, right?

21     A    That's correct.

22     Q    It is true today so far as you know, right?

23     A    That's correct.

24     Q    You were the director of risk assessment for

25   the TDA pesticide programs division for 15 years, right?

1      A    Yes.

2      Q    Approximately, if you had to estimate, how many

3   risk assessments did you perform for pesticides in your

4   career?

5      A    In that capacity, mostly we do risk assessments

6   for Section 18 registrations.  You know, there is a

7   provision in the EPA, FIFRA, federal pesticide law.  The

8   area -- there are two different provisions we call

9   Section 18 and 24(C) clauses.

10              Under Section 18, if a pesticide is not

11   registered in Texas, use of any -- EPA -- it's not

12   even registered, but that pesticide has a reasonable

13   amount of data available, that we know we interact

14   with, you know, a pesticide company's a lot, and a

15   pesticide company's worked with Texas A&M, you know,

16   that agricultural community there.  So those

17   professors interact with them.

18              They let us know that there is a

19   chemical that we need for a particular problem or --

20   not a particular -- a particular pest in certain areas

21   of Texas, you know, affecting the crops.  So we need

22   this pesticide and that is not researched with us.  It

23   is researched -- they started maybe in Florida for,

24   you know, the service industry.  We have some similar

25   problem in Texas.  You know, we need that chemical;

Ambrose K. Charles, Ph.D.

1    it's not researched here.

2              So we go to EPA.  The process according

3    to FIFRA, is the agency do a complete assessment

4    evaluation, going through the studies, and then come

5    out with the URL on -- in conclusions/interpretations

6    and the risk assessment that it may not cause

7    additional risk if we use these things here.

8              That kind of determination is made.  We

9    send it to the EPA.  The EPA takes about -- depending

10   on the necessity or urgency called from the private

11   groups, you know, for particular groups; senators get

12   involved.

13             You know, there's a lot of process in

14   other registration alone.  Congressmen call the EPA

15   and say we need this thing tomorrow.

16             So the EPA works on that kind of

17   schedule.  There is -- always use their work.  They

18   take about a month or two to evaluate and then let us

19   know.  So that is the kind of registration we do on

20   Section 18.

21             And 24(c) is another type of

22   registration.  But I must narrow down.  In 15 years,

23   usually we do -- we get about two to three to four

24   requests per year in order to do Section 18s for

25   specific registration.  They are called special

Ambrose K. Charles, Ph.D.

```
 1   registration or specific registration for...

 2        Q    Let me see if I can break that down and make

 3   sure I am understanding.

 4        A    Yeah, yeah.

 5        Q    Okay?

 6             So you mentioned FIFRA, which is

 7   F-I-F-R-A --

 8        A    Yeah.

 9        Q    -- Section 18, right?

10        A    Yes.

11        Q    Section 18 would be a circumstance where there

12   is a pesticide registered somewhere in the United States

13   but not in Texas, correct?

14        A    Exactly.

15        Q    You might be asked to do a risk assessment for

16   Texas specifically to determine if there are any

17   additional risks to the use of that pesticide in Texas,

18   right?

19        A    Yeah.

20        Q    Your estimate is that you did three to four of

21   those risk assessments per year --

22        A    Approximately.

23        Q    -- approximately, over the 15 years in which

24   you were the director of risk assessment, correct?

25        A    Correct.
```

Ambrose K. Charles, Ph.D.

```
 1      Q    For all of that time -- well, withdrawn.

 2           Three to four risk assessments a year

 3  for 15 years would be somewhere around 60 risk

 4  assessments over the course --

 5      A    Yes.

 6      Q    -- of your career, right?

 7      A    Yes.

 8      Q    Is that how some of the regulations came about

 9  for some of the restricted-use pesticides that we talked

10  about a moment ago?

11      A    Oh, no.

12      Q    Okay.  Those were separate from the risk

13  assessments that you were doing specific to Texas,

14  right?

15      A    Yes.

16      Q    Glyphosate was one of the most used pesticides

17  in the world during the time you were the director of

18  risk assessment for the Texas Department of Agriculture,

19  right?

20      A    It was a pesticide used in Texas.  I do not

21  have the data on the overall use.  I don't know.

22      Q    Do you know if glyphosate was one of the most

23  used pesticides in Texas during the time you were a

24  director of risk assessment --

25      A    Probably.
```

1      Q    -- for Texas?

2      A    Probably, yes.

3      Q    And just so I finish my question.  That was for

4    the --

5               During the time you were director of

6    risk assessment for the Texas Department of

7    Agriculture, glyphosate was probably one of the most

8    used pesticides in Texas; right?

9      A    One of them.  I don't, you know, usually on an

10   everyday basis or a monthly basis keep a use records and

11   amounts used of these pesticides and that.  If that is

12   needed, you know, there are databases; or the companies,

13   we will contact them and find them, how -- how much did

14   you sell in Texas; and they give -- give us the data.

15     Q    Glyphosate use increased dramatically from the

16   early 1990s to 2005, right?

17     A    Yes.

18     Q    Glyphosate use continued to increase after

19   2005, correct?

20     A    Could be.

21     Q    As a director of risk assessment for the Texas

22   Department of Agriculture during that time, you were

23   aware of that, right?

24     A    Yes.

25     Q    How many different manufacturers of glyphosate

1    are out there that you are aware of?

2              MR. HABERMAN:  Objection.

3      A    Monsanto is one and Bayer, I believe, there was

4    a -- an additional company that had a share in this, and

5    I am not sure.  And after that they are, in the

6    registration process at that time, aware, you know.

7              Even if Monsanto has the primary

8    registration, they have sub-registrations, you know, a

9    number of them, and they will have a different type of

10   EPA registration number for that to identify them.  So

11   there may be a number of sub-registrations for the

12   same product.

13     Q.   (BY MS. ROSS) Do you know if glyphosate is

14   generic?

15     A    What was the question?

16     Q    Do you know if glyphosate is off patent or how

17   long glyphosate has been off patent?

18     A    I don't know.

19     Q    Sitting here today, you do not recall ever

20   doing a risk assessment for glyphosate, right?

21     A    I have not.

22     Q    You have not done a risk assessment for

23   glyphosate?

24     A    Not risk assessment.  I might have made an

25   opinion.  I am looking at the health effects for the

```
 1   enforcement, if that was a chemical that was reported to

 2   me at that time.

 3       Q    So in all of your time at the Texas Department

 4   of Agriculture, you never did a risk assessment for

 5   glyphosate, true?

 6       A    No, no.

 7       Q    And when you say, no, I am correct in my

 8   question; right?

 9       A    Yes, you are right.

10       Q    Now, you're obviously familiar with glyphosate

11   as an herbicide, right?

12       A    Am I familiar with glyphosate?

13       Q    Yes.

14       A    Yes.

15       Q    As we've just discussed, glyphosate is widely

16   used in Texas and elsewhere; correct?

17       A    Yes.  Probably, yes.

18       Q    What are the uses of glyphosate?

19       A    It's basically wood -- wood -- a weed

20   eradication chemical pesticide that is used to destroy

21   noxious weeds or unwanted vegetation, I would say.

22       Q    Glyphosate is used to destroy noxi- -- noxious

23   weeds or unwanted vegetation in crops, right?

24       A    That's right.

25       Q    Glyphosate is used in waterways and
```

```
 1   thoroughfares, correct?

 2       A    Right of ways.

 3       Q    Glyphosate is approved for use by consumers, as

 4   well, right?

 5       A    Yes.

 6       Q    Glyphosate can be used directly on crops if

 7   they are Roundup Ready crops, true?

 8       A    I am not sure about that question to answer

 9   because the genetically modified, you know, some issue

10   right there for glyphosate, not to directly use on

11   crops, you know.  They must be genetically modified

12   crops that -- so that glyphosate doesn't kill that crop.

13   Otherwise, you know, it doesn't discriminate any

14   vegetation.

15       Q    I am going to break that up.  Okay?

16       A    Yes, please.

17       Q    Glyphosate is what is known as a nonselective

18   herbicide, right?

19       A    Yes.

20       Q    What that means is that glyphosate kills all

21   plants, not just the bad ones; fair?

22       A    Exactly.

23       Q    You are not offering an expert opinion on

24   genetically modified crops, right?

25       A    No.
```

Ambrose K. Charles, Ph.D.

```
 1        Q    You are -- well, withdrawn.

 2             Is there any other pesticide that you

 3   can substitute for all of the uses of glyphosate?

 4        A    That's a question for the weed scientists at

 5   Texas A&M, not me.

 6        Q    Are you offering any expert opinion about

 7   whether there are other alternatives to glyphosate that

 8   are safer?

 9        A    I am not looking at that; I don't know.

10        Q    Are you offering any other opinion --

11   withdrawn.

12             New question.

13             Are you offering any expert opinion

14   about whether there are other alternatives to

15   glyphosate that are more effective?

16        A    I have not.  I have not provided any opinion.

17        Q    Would you be qualified to do that?

18        A    No.

19        Q    Did you ever tell your colleagues at the Texas

20   Department of Agriculture that glyphosate causes cancer?

21        A    No.

22        Q    Did you ever conclude in all of your years at

23   the Texas Department of Agriculture that glyphosate

24   causes cancer?

25        A    I have not told anybody.
```

1     Q    And did you ever reach that conclusion, whether

2    you shared it with anyone else?

3     A    No.  I know -- I am aware of some studies and

4    the little polls and those kind of things.  As a

5    toxicologist, you know, you keep getting that

6    information and, you know, as part of my, you know,

7    toxicology goal, I update information, you know.  I read

8    many things, articles.

9              You know, even -- even in the early days

10   of glyphosate -- I am just telling you what I am

11   remember -- recall now.  In the early days of

12   glyphosate use, there were reports that even dogs were

13   getting sick while playing in the lawn where

14   glyphosate was used.

15             And -- and then there were reports -- I

16   haven't seen any dog study, not to indicate that.  I

17   was looking for it, but I didn't find.  But there were

18   reports that dogs were getting tumors from glyphosate

19   use because they were exposed to licking the grass and

20   those kind of things, you know.

21             All of those things are early reports

22   of, you know, 20 years or 25 years -- 20 years, long

23   ago.

24             I have that kind of information in my

25   mind, but I have not told anybody, advocated for

Ambrose R. Charles, Ph.D.

```
 1    anybody, you know, but it's information.  There are a
 2    lot of information about different chemicals, you
 3    know, really.
 4        Q    Let me break that down.
 5        A    Yeah, please.
 6        Q    When you were at the Department of Agriculture,
 7    glyphosate was never a restricted-use pesticide, right?
 8        A    No.
 9        Q    Had you reached the conclusion that glyphosate
10    caused cancer, certainly you would have advocated for
11    some restrictions on glyphosate use in your role at the
12    Texas Department of Agriculture, right?
13        A    If I knew.  If I saw any real data at that
14    time.
15        Q    You did not reach a conclusion at the Texas
16    Department of Agriculture that glyphosate caused cancer,
17    true?
18        A    No.
19        Q    I am correct, that you didn't reach such a
20    conclusion?
21        A    I have not reached.
22        Q    You --
23        A    Can you please refrain from double negatives so
24    that I can understand it clearly?
25        Q    I -- I will do my best.
```

```
 1      A      Yeah, yeah, and I know lawyers.  I've worked

 2  with...

 3      Q      Did you at the Texas Department of Agriculture

 4  ever conclude that glyphosate causes cancer?

 5      A      No.

 6      Q      You mentioned some early reports of dogs

 7  licking fields that may have been sprayed with

 8  glyphosate, right?

 9      A      Yes.

10      Q      Those are, as you've mentioned, reports and not

11  actual studies; correct?

12      A      Exactly.

13      Q      You are not relying on any reports of dogs or

14  any other animal licking fields where glyphosate might

15  have been sprayed in order to offer any of the expert

16  opinions you are offering in this case, correct?

17      A      No.

18      Q      When you performed a risk assessment in your

19  professional life, you followed a standard methodology

20  for that; right?

21      A      Yes.

22      Q      Part of the risk assessment is assessing for

23  human health effects, right?

24      A      Yes.

25      Q      A risk assessment can also include evaluating
```

Ambrose K. Charles, Ph.D.

```
 1   environmental impact, right?

 2       A    Exactly.

 3       Q    And a risk assessment can also include impact

 4   on nontarget plants or animal species, right?

 5       A    Yes.

 6       Q    Did you ever do a risk assessment for a

 7   combination glyphosate product with something else?

 8       A    No.

 9       Q    You perform risk assessments on active

10   ingredients, right?

11       A    Yes.

12       Q    That is what everybody does, correct?

13       A    Yes.

14       Q    Part of -- well, withdrawn.

15            A full risk assessment includes

16   characterizing the nature and magnitude of health

17   risks, right?

18       A    Yes.

19       Q    Nature means what is a specific health risk,

20   right?

21       A    Yes.

22       Q    For example, cancer, correct?

23       A    Example.

24       Q    Magnitude means how big is the risk at current

25   levels of actual human exposure, right?
```

1      A    Yes.

2      Q    So first you determine is there a potential

3   hazard, correct?

4      A    Yes.

5      Q    You consider the data in humans for that,

6   right?

7      A    Yes.

8      Q    For a hazard assessment, you consider animal

9   data, correct?

10     A    Yes.

11     Q    You consider studies like cell studies in a

12   petre dish, right?

13     A    Yes.

14     Q    There is a standard battery of regulatory tests

15   done as part of a regulatory hazard assessment.  Do you

16   know what the typical tests are?

17     A    Yes, I have -- I have seen and I have gone

18   through -- I was familiar, I had in my possession, the

19   entire EPA that required a testing list, you know, for

20   different aspects -- for safety, environmental impact,

21   you know, product registration and so on.  I don't have

22   it with me and I don't look at those things, you know.

23     Q    For glyphosate, you reviewed the EPA and ATSDR

24   summaries of the standard battery of regulatory tests,

25   right?

```
 1        A      Exactly.

 2               MR. HABERMAN:   Objection.

 3        Q.   (BY MS. ROSS) In a risk assessment after you've

 4    determined that something is a potential hazard, the

 5    next step is to determine whether there is a risk at

 6    real-life exposure levels, right?

 7        A      Yeah.   Then the next step is to look at if

 8    there is an exposure.

 9        Q      The risk could be a risk to applicators, right?

10        A      Yes.

11        Q      The risk could be a risk to other human beings,

12    correct?

13        A      Yes.

14        Q      You could have a risk to animals or other

15    nontarget organisms, right?

16        A      Yes.

17        Q      Dose alone makes the poison.   You say that on

18    your website, right?

19        A      Yes.

20        Q      It is a fundamental principle of toxicology,

21    that dose alone makes the poison; correct?

22        A      That's not what I said.   It is what the father

23    of toxicology said.

24        Q      Right.   The father of toxicology says that dose

25    alone --
```

1      A    He said --

2      Q    -- made the poison?

3      A    -- it many years ago.

4      Q    In that sense, it is a fundamental principal of

5  toxicology, that dose alone makes the poison, right?

6      A    Exactly.

7      Q    What does it mean that dose alone makes the

8  poison?

9      A    It means, you know, you take -- an example

10  could be, in order to make -- seasoning your food, when

11  you cook, you add salt.  Without salt, you know, it

12  won't taste good; you'll ask for salt; can I have salt?

13  Can you pass that salt?

14            So salt is an everyday chemical that we

15  take.  But if we increase the intake of salt, us --

16  manufacturers, come in.  You have higher blood

17  pressure.  Then you say you have to cut down on salt,

18  or if we increase the amount of salt, that can be

19  toxic.

20            So the dose determines, you know,

21  whether it's leading to something harmful to your

22  health or it is necessary for your health.

23      Q    Salt is poison at some dose, right?

24      A    Yes.

25      Q    Salt is also something we are exposed to every

1    day, correct?

2        A    Yes, yes.

3        Q    Water is poison in some dose, right?

4        A    Yes.

5        Q    Dose is different than exposure, correct?

6        A    Exactly.

7        Q    You can work with a chemical but not have any

8    dose in your body, right?

9        A    If you have sufficient protection.  People work

10   with radiation in their house, and radiation is

11   something that you cannot prevent; but there are suits

12   for you to cover yourself so that you are protected,

13   maximum.

14       Q    That is one reason the Texas Department of

15   Agriculture has guidance on personal protective

16   equipment with use and handling of certain pesticides,

17   right?

18       A    Yes.

19       Q    It is possible to work with a chemical and not

20   have any dose in your body, right?

21            MR. HABERMAN:  Objection.

22       A    Yes.

23       Q.   (BY MS. ROSS) Dose is the issue because dose is

24   what interacts with the body, right?

25            MR. HABERMAN:  Objection.

```
 1      A    I take a correction to my statement.  Can I --
 2  can I make that statement?
 3              MR. HABERMAN:  Yes.
 4      A    You can work with a chemical without getting
 5  any exposure to -- that question is a (indiscernible)
 6  question -- okay? -- which means everybody every day
 7  when they use a chemical, they don't use the protection,
 8  you know.  Even now we are sitting here without a mask,
 9  okay, because we have some kind of confidence in that
10  each other don't carry the virus.
11              So a pers- -- a personal protection is
12  something that is always needed.  Okay?  We take care
13  of some of those things.  But you can work, you know,
14  with a chemical -- without exposure is wrong; you
15  can -- you will have some kind of exposure unless we
16  are having protection.
17      Q.   (BY MS. ROSS) When we talk about dose --
18      A    Yeah.
19      Q    -- whether it's glyphosate or water or salt --
20      A    Yes.
21      Q    -- in order to have any effect on the body --
22      A    Yeah.
23      Q    -- it is necessary to have an internal dose,
24  correct?
25      A    That's why it got called a dose.
```

```
 1     Q    Risk assessment involves assessing what the
 2   threshold dose is of which a potential hazard would
 3   actually pose a risk to human beings, right?
 4     A    Threshold dose, yes.
 5     Q    Risk assessments use dose in the body, right?
 6     A    Yes.
 7     Q    That is because dose is what makes the poison,
 8   right?
 9     A    Exactly.
10     Q    I want to understand how you applied the
11   scientific method to the plaintiffs in this case.  Okay?
12   All right?
13     A    Yes.
14     Q    You relied on Mr. Moore's sworn testimony,
15   right?
16     A    Yes.
17     Q    And actually -- withdrawn.
18          I am going to take one step back.  Okay?
19     A    Okay.
20     Q    We talked about risk assessments using dose in
21   the body, right?
22     A    Yes.
23     Q    Did you perform a full risk assessment of
24   glyphosate here?
25     A    I did not.
```

Ambrose K. Charles, Ph.D.

```
 1      Q    You were not asked to do that, right?

 2      A    I didn't have the data to begin with.

 3      Q    You relied on Mr. Moore's sworn testimony in

 4   forming your opinions, right?

 5      A    The information I have.

 6      Q    Yes.  And that information included Mr. Moore's

 7   sworn testimony, correct?

 8      A    Yes.

 9      Q    You relied on Mr. Moore's sworn Plaintiff Fact

10   Sheet, right?

11      A    Yes.

12      Q    I think we can skip some questions, but let me

13   just be very clear.

14                As we discussed earlier, you did not

15   interview either of the plaintiffs in this case,

16   correct?

17      A    No.

18      Q    Do you know what Mr. Moore looks like?

19      A    No.

20      Q    Do you know what Mr. Pleu looks like?

21      A    No.

22                MR. HABERMAN:  Very handsome.

23      Q.   (BY MS. ROSS) You reviewed some of the

24   plaintiffs' medical records, correct?

25      A    Yes.
```

1    Q    Did you review complete sets of the plaintiffs'

2    medical records from all of their treating doctors?

3    A    Pardon?

4    Q    Did you review complete sets of medical records

5    from all of the plaintiffs' doctors?

6    A    All -- I have a set of records sent to me,

7    given to me.  I will read all of those things I have

8    listed in my reference, you know, the first -- the first

9    references of my report that are indicated by a

10   document, all the things that is given to me by counsel.

11            That's all the information I have as

12   part of the counsel's providing the information and

13   now all of this are my research, reading, studying.

14   Q    That's helpful.  So let me break that down for

15   each plaintiff.  Okay?

16   A    Yes, please.

17   Q    If you'll go to Exhibit 2.  That's your report

18   for Stacey Moore.

19   A    Okay.  Exhibit 2.  Okay.

20   Q    Page 33 gives your "Documents & References."

21            Do you see that?

22   A    33.  Yes, ma'am.

23   Q    You reviewed 63 pages of medical records from

24   Clearview Cancer Institute for Stacey Moore, correct?

25   A    Yes.

Ambrose K. Charles, Ph.D.

```
 1      Q    Those are all of the medical records you

 2   reviewed for Stacey Moore, right?

 3      A    That's all I was given.

 4      Q    Exhibit 3 is your report for Mr. Pleu?

 5      A    Oh, okay, uh-huh.

 6           Yes, ma'am.

 7           Do you need this back, please?

 8      Q    I don't.  You can keep it.

 9      A    Oh, okay.

10           Okay.  Yes.

11      Q    For Mr. Pleu you reviewed 66 pages of medical

12   records from Atlanta Cancer Care, correct?

13      A    Yes.

14      Q    You also reviewed five, plus 58 pages from

15   Georgia Urology PA?

16      A    Yes.

17      Q    That's a total of 63 pages from Georgia Urology

18   PA for Mr. Pleu, correct?

19      A    Yes.

20      Q    Did you review any other medical records for

21   William Pleu?

22      A    No.

23      Q    Are you qualified to interpret a patient's

24   medical records?

25      A    Yes.
```

```
 1      Q    You are not a medical doctor, right?

 2      A    No, no.

 3      Q    Are you qualified to diagnose a patient with

 4 lymphoma?

 5      A    No, I don't practice medicine.

 6      Q    Are you qualified to reach an independent

 7 determination of whether any plaintiff in this case had

 8 lymphoma?

 9      A    I rely on the patients' medical records.

10      Q    You took at face value whatever you read in the

11 medical records as to a patient's diagnosis of lymphoma?

12      A    Diagnosis and treatment.

13           MR. HABERMAN:  Objection.

14      Q.  (BY MS. ROSS) Are you qualified to evaluate

15 whether a patient's treatment was consistent with the

16 standard of care?

17      A    No.

18      Q    You did not see any receipts from Mr. Moore's

19 purchases of Roundup, correct?

20      A    No.  I don't -- I don't recall that I have ever

21 seen any receipts in the reports, no.

22      Q    Would it be good to look at receipts to verify

23 how much Roundup someone used if you could?

24      A    Repeat that question, please.

25      Q    Would it be good to look at receipts to verify
```

1    how much Roundup someone used --

2                    MR. HABERMAN:  Objection.

3    Q.   (BY MS. ROSS) -- if you could?

4    A    No, it's not -- I don't need that information.

5    Q    Why don't you need that information?

6    A    Because I don't investigate anything, okay.

7    Going out and then trying to find out if any of those

8    things are true or not is none of my business.

9                    There should be somebody investigating

10   that, and if you are not sure about what is given

11   here, who is invested in that -- find some

12   investigator, and give me the facts that you have, as

13   an expert who is knowledgeable in these various areas

14   of looking at, I will look at the data; I will

15   evaluate and make certain type of deductions, you

16   know, from my knowledge.

17                   When I look at some data, it is not the

18   printed material alone that is working.  My mind is

19   working.  My knowledge is working.  Background is

20   working.  Everything is working to make a decision on

21   that.  So what all is there is my information and --

22                   THE REPORTER:  I am sorry?

23   A    -- I don't want to go for looking for receipts

24   or a container or anything like that.

25                   You know, if they are interested in me

1    to evaluate that, they have to provide all of it.  I

2    am not investigating it.

3        Q.  (BY MS. ROSS) I will break that down a little

4    bit.  Okay?

5        A    Yes, please.

6        Q    You did not do anything to investigate any

7    plaintiff's use of Roundup, true?

8        A    No.

9                MR. HABERMAN:  Objection.

10       A    I did not investigate.

11       Q.  (BY MS. ROSS) You do not have -- well,

12   withdrawn.

13                Do you have direct, firsthand knowledge

14   of how Stacey Moore sprayed Roundup?

15       A    How he sprayed?

16       Q    Direct, firsthand knowledge of how Stacey Moore

17   sprayed Roundup?

18       A    No, no.

19                MR. HABERMAN:  Objection.

20                What is direct, firsthand knowledge?

21       Q.  (BY MS. ROSS) Did you see any contemporaneous

22   documentation of how Stacey Moore sprayed Roundup?

23                MR. HABERMAN:  Objection.  Vague.

24       A    I think there is a description from the

25   documents.

```
 1       Q.   (BY MS. ROSS) You saw his deposition testimony,

 2    right?

 3                  MR. HABERMAN:  Objection.

 4       A    That's correct.  I think that is where it

 5    was -- it was -- yeah, I don't know.

 6       Q.   (BY MS. ROSS) Did you see any photos or videos

 7    taken at any time that Stacey Moore was spraying

 8    Roundup?

 9       A    I don't believe so.

10       Q    Did you -- withdrawn.

11                  New question.

12                  Besides what Mr. Moore said in his

13    deposition and his Plaintiff Fact Sheet, was there any

14    documentation of any kind that you looked at to

15    determine how much Roundup he used?

16       A    No.

17       Q    I take it you did not see -- well, let me ask

18    it in the positive.

19                  Withdrawn.

20                  New question.

21                  Did you see any records of any kind from

22    before Mr. Moore filed his lawsuit that bear on the

23    question on whether he used Roundup?

24       A    Please, please again.

25       Q    Did you see any records of any kind from before
```

Ambrose R. Charles, Ph.D.

```
 1    Mr. Moore filed his lawsuit that bear on the question of
 2    whether he used Roundup?
 3        A    No.
 4        Q    What your numbers come from is Mr. Moore is
 5    trying to remember in 2022 what weed control products he
 6    used going back three decades, right?
 7        A    Yeah, that was in his statements.
 8        Q    Even with the best of intentions and assuming
 9    complete good faith, you would acknowledge that -- that
10    the exercise of trying to remember how much of a
11    lawn-care product you used in any given month 20 or 30
12    years ago carries with it some uncertainty, right?
13        A    Yes.
14             MR. HABERMAN:  Objection.
15        Q.  (BY MS. ROSS) Would it change your opinion if
16    Mr. Moore never actually used Roundup?
17             MR. HABERMAN:  Objection.  Improper
18    hypothetical.
19        A    Will I change my opinion if he had never used
20    Roundup?
21        Q.  (BY MS. ROSS) Yes.
22        A    Definitely, because my purpose here was, here
23    is a case, okay.  We have some data.  This person has
24    used the Roundup.  So if Roundup has caused his health
25    outcome or whatever it is, that's the only relationship
```

1    I am going through.  I don't have any interest beyond

2    that or after that.

3        Q    Your information started with, we have some

4    data, this person used Roundup; right?

5        A    Yeah, document one, two, or three, I do not

6    know -- recall which one I saw first.

7        Q    If there was actual evidence that Mr. Moore

8    never used Roundup, you would agree it could not cause

9    non-Hodgkin's lymphoma?

10       A    Then there is no need for this exercise.

11       Q    If someone does not use Roundup, they are not

12   at risk for NHL from glyphosate exposure; right?

13              MR. HABERMAN:  Objection.

14       A    If they have not used the Roundup, they are not

15   at risk from exposure to Roundup?  That's what your

16   question was?

17       Q.   (BY MS. ROSS) That was what my question was.

18       A    Yes.  No.

19       Q    I am correct that someone who never used

20   Roundup is not at risk for NHL from glyphosate exposure,

21   right?

22       A    From glyphosate exposure, correct.

23       Q    Let's talk about Mr. Pleu for a moment.  Okay?

24       A    Yes.

25       Q    That is Exhibit 3.

```
 1       A    I forget -- forget to say, yes.

 2            You know, an additional statement that I

 3  will have is, you know, if someone has to get exposed

 4  to Roundup, not necessarily that they should use it,

 5  if they have scratched or come in contact with a

 6  sprayed surface.  You know, he handled the plants or

 7  he walked through the grass barefoot, all right,

 8  something like that, you know, that has skin contact,

 9  you know, that is an exposure.

10       Q    Thank you for that clarification.

11       A    Yes.

12       Q    So let me ask another clarification question.

13  Okay?

14       A    Yes, please.

15       Q    In order to be at risk for NHL from glyphosate

16  exposure, someone has to get Roundup or glyphosate on

17  their skin in some way; correct?

18       A    Contact.

19       Q    And contact could be spraying it directly,

20  right?

21       A    Yes.

22       Q    Contact could also be walking through a sprayed

23  field or coming in contact with aerial spray, right?

24       A    Yes.

25       Q    One needs some form of skin contact with
```

1   glyphosate to be at increased risk of NHL from Roundup

2   exposure, correct?

3               MR. HABERMAN:  Objection.

4       A    Yes.

5       Q.   (BY MS. ROSS) For Mr. Pleu, I am going to

6   see --

7               (Overlapping speakers.)

8       A    Can I --

9       Q.   (BY MS. ROSS) -- if we can --

10      A    It's not the skin alone.

11      Q    Okay.

12      A    Okay.  So you can inhale --

13      Q    Okay.

14      A    -- vapor or dust or anything in the air.  So

15  inhalation is another route of exposure not just through

16  skin alone.  And then it can be through dietary means.

17  Through water -- contaminated water he's using, you

18  know, not properly using the water.  The containers that

19  he used.  The food is not properly --

20              So contamination can happen anywhere in

21  the use area for anything.  That person is not taking

22  care of adequate precautions not to contaminate his

23  work area, he has exposure.  So --

24      Q    This --

25      A    -- my -- my answer is not -- skin alone is not

Ambrose R. Charles, Ph.D.

```
 1   the possible exposure here.
 2        Q    I want to make sure that we are being clear on
 3   what you are giving opinions about --
 4        A    Yes.
 5        Q    -- and what you are not giving opinions about.
 6   Okay?
 7        A    Yes, yes, yes.
 8        Q    You are not offering an opinion that just
 9   dietary exposure to Roundup or glyphosate increases
10   someone's risk of non-Hodgkin's lymphoma?
11        A    No.
12        Q    Am I correct that that's true?
13        A    Correct, correct.
14        Q    In order to be at increased risk of NHL from
15   glyphosate exposure, your opinion is that someone needs
16   to come into contact with glyphosate spray in some way,
17   either inhaled, on a work surface that they have not
18   properly cleaned or skin contact, for example; right?
19        A    Yes.
20        Q    For Mr. Pleu, I am going to ask you some of the
21   same questions that we just talked about with Mr. Moore
22   and, hopefully, we can shut down some questions.
23        A    Okay.
24        Q    Okay?
25        A    Okay, okay.
```

1      Q    You did not see any receipts from Mr. Pleu's

2   purchases of Roundup, true?

3      A    No.

4      Q    You were not there when Mr. Pleu was spraying

5   Roundup, right?

6      A    No.

7      Q    Have you seen any photos or videos taken at the

8   time that Mr. Pleu was spraying Roundup?

9      A    No.

10     Q    Have you seen any records of any kind from

11  before Mr. Pleu filed his lawsuit that bear on the

12  question of whether he used Roundup?

13     A    No.

14     Q    What your numbers come from is Mr. Pleu is

15  trying to remember in 2022 what weed-control products he

16  used going back to 1994, right?

17     A    Yes.

18     Q    If there was actual evidence that Mr. Pleu

19  never used Roundup, you would agree it did not cause his

20  non-Hodgkin's lymphoma, right?

21     A    Yeah, glyphosate may not be responsible if he

22  never has.

23     Q    If Mr. Pleu did not actually get Roundup into

24  his body, Roundup did not cause his non-Hodgkin's

25  lymphoma?

Ambrose K. Charles, Ph.D.

```
 1      A     Yes.

 2      Q     Have you ever personally used Roundup?

 3      A     I have used.

 4      Q     Yes, you have?

 5      A     Yes.

 6      Q     Do you still use Roundup?

 7      A     No.

 8      Q     When did you first use Roundup?

 9      A     Maybe 10, 15 years ago when I was young and

10    lawn -- you know, mowing my own lawnmower, during the

11    time probably, you know, I don't even think that I used

12    the entire can at the time.

13              I bought a can, some container, started

14    using some of the weeds close to the house; and after

15    that, I never used that.  And then I discarded.  When

16    the city came to pick up all of the noxious chemicals,

17    I gave it to them.  And that is maybe 15 or 20 years

18    ago, I never used it.

19      Q     You bought a container of Roundup sometime 10,

20    15, or 20 years ago; is that right?

21      A     Yeah, yeah, I used it two or three times maybe,

22    maximum.

23      Q     And the last time you used Roundup was 10 or

24    15 years ago?

25      A     Yes.
```

Ambrose K. Charles, Ph.D.

```
 1      Q    What is the longest you ever sprayed Roundup?

 2      A    I was particularly using for spot spraying for

 3   a few weeds that were coming in the corner of the yard.

 4   They were not going away.  I bought only for that

 5   purpose and the use for it.

 6      Q    And --

 7      A    That's it.

 8      Q    -- why did you stop using Roundup when you

 9   stopped using it?

10      A    I had other options of -- for weed control.

11      Q    You didn't stop using Roundup because of any

12   concerns about cancer; you had other options of weed

13   control, right?

14      A    I didn't want to use any chemicals, you know,

15   in any amount.  I'm a toxicologist, you know.  I am --

16   that's why, I am not aware of the dose.

17      Q    So when you say you spot sprayed, what is the

18   longest you ever sprayed Roundup?

19           MR. HABERMAN:  Objection.

20      A    Longest?  That one time.

21           MR. HABERMAN:  Objection.

22      Q.   (BY MS. ROSS) Correct.

23      A    At one time.

24      Q    At one time.

25           MR. HABERMAN:  This is immaterial.
```

Ambrose K. Charles, Ph.D.

```
 1      A    Maybe less than a minute.

 2      Q.   (BY MS. ROSS) Maybe?

 3      A    Less than a minute or so.

 4      Q    Less than a minute?

 5      A    Yeah, that's it.  That's a homeowner using it

 6   for a particular weed --

 7      Q    Right.

 8      A    -- a couple of sprays.

 9      Q    When you used Roundup as a homeowner, you maybe

10   sprayed for less than a minute at a time; right?

11      A    Yeah.

12      Q    And then you would stand up, walk over to

13   another weed and spray; correct?

14      A    Yeah, probably.

15      Q    The total process for that, did it ever take

16   you more than 15 minutes?

17                MR. HABERMAN:  Objection.

18      A    For me, for me, question to me is not.

19      Q.   (BY MS. ROSS) No, you never sprayed Roundup for

20   more than 15 minutes when you were spot spraying,

21   correct?

22      A    Not more than five minutes, I would say.

23      Q    Five minutes was the longest you ever sprayed

24   Roundup?

25      A    Yeah, I was not very fond of anything to be
```

 1   used.  I have other means -- now I am using certain

 2   other things for weed control.

 3      Q   What are the other things you use for weed

 4   control?

 5      A   That's --

 6              MR. HABERMAN:  Objection.  That's

 7   irrelevant.

 8      A   That's my trade secret.

 9      Q.  (BY MS. ROSS) You used something --

10      A   Not -- not pesticides, not any herbicides.

11      Q   You --

12      A   Home -- home-use products out there that better

13   describe that.

14      Q   Okay.  So I think I am clear, but I just want

15   to be sure.  Okay?

16      A   Yeah.

17      Q   When you stopped using Roundup in your yard,

18   you used a home-use product that you developed yourself;

19   is that right?

20      A   When I stopped using Roundup?

21      Q   Yes.

22      A   I developed a new product for myself?

23      Q   Is that what you are saying?

24      A   I didn't develop -- no, I did not develop a

25   product.

```
 1        Q     Okay.

 2        A     There are chemicals which I'll also use in our

 3   food available in the market that it can -- I will share

 4   the knowledge of how to use it.  What -- so you can buy

 5   that and then put it in a spray bottle.  You can

 6   literally do the same thing.

 7              I bought, you know, the glyphosate

 8   around -- only for that particular root that was not

 9   going away with my treatment.  I used it a couple of

10   times on that for -- on that.

11        Q     Are you talking about using vinegar or

12   something similar?

13        A     Yes, something like that.

14        Q     Is there something that you've used besides

15   vinegar in your yard?

16        A     No.

17        Q     When you did spray Roundup, did you use

18   Concentrate or Ready to Use?

19        A     Ready to Use.

20              MR. HABERMAN:  Objection.  Immaterial to

21   this case.

22        Q.   (BY MS. ROSS) What is the most Ready to Use

23   that you ever went through?

24              MR. HABERMAN:  The same objection.

25        A     What does the mostly used -- what was the
```

Ambrose to: Charles, Ph.D.

```
 1    question?

 2                  MR. HABERMAN:  Dr. Charles' Roundup use is

 3    not material for the opinions in this case.

 4                  MS. ROSS:  Counsel, I get to ask whatever

 5    questions I want and you can --

 6                  (Overlapping speakers.)

 7                  MR. HABERMAN:  Do you?

 8                  MS. ROSS:  -- have an argument about it.

 9                  MR. HABERMAN:  They have to have a

10    reasonable tie to this case.

11                  MS. ROSS:  They absolutely have a tie to

12    this case.

13                  MR. HABERMAN:  They do not.  They do not.

14                  MS. ROSS:  Usage and his understanding of

15    how you use Roundup is 100 percent relevant and we will

16    go to the judge on that if we need to.  Now I am going

17    to ask my next question.

18                  MR. HABERMAN:  No.  I mean, it is -- it is

19    immaterial to this case.  If you want to call the judge,

20    then call the judge.

21        Q.   (BY MS. ROSS) Dr. Charles --

22                  MR. HABERMAN:  I'm --

23                  (Overlapping speakers.)

24        Q.   (BY MS. ROSS) -- when you used Roundup, you

25    used --
```

```
 1                    MR. HABERMAN:  He already --

 2     Q.  (BY MS. ROSS) -- less than one bottle total in

 3   the entire time that you used it, correct?

 4                    MR. HABERMAN:  He's already testified to

 5   that.

 6     A    I told you I used once or twice for the spray.

 7   After that, I never used the container.  I don't even

 8   remember the container size now.

 9     Q.  (BY MS. ROSS) What personal protective

10   equipment did you use when you were spraying Roundup?

11     A    Gloves.

12                    MR. HABERMAN:  The same objection.

13     Q.  (BY MS. ROSS) Did you get Roundup on yourself

14   when you were spraying?

15     A    No.

16     Q    Where did you buy Roundup?

17     A    Must be from one of the Home Depots or Lowe's

18   or something like that.

19     Q    Do you remember how much it cost?

20                    MR. HABERMAN:  The same objection.

21     A    If I had that kind of memory, you would not ask

22   me this question, to repeat it.

23     Q.  (BY MS. ROSS) I take it you don't remember how

24   much it cost?

25     A    Yeah, I don't remember how much it cost.  There
```

Ambrose K. Charles, Ph.D.

1    are thousands of products there, and I don't know for

2    each of them how much it cost.

3        Q    Was Roundup effective at killing the weeds in

4    your yard that nothing else would kill?

5             MR. HABERMAN:  The same objection.

6        A    Yes, that particular weed.  I can't name the

7    weed, but that particular grass that was growing.  I

8    think it was crab grass or something like that, and I

9    can't remember.

10       Q.   (BY MS. ROSS) How did you pay for Roundup, with

11   cash or a credit card?

12       A    I have both.  I have cash and both, and I do

13   not know -- I don't recall how I make my payments.

14       Q    Is there any reason you can think of to buy

15   Roundup exclusively with cash?

16       A    Pardon?

17       Q    Is there any reason you can think of to buy

18   Roundup with -- exclusively with cash?

19       A    It depends on -- my philosophy of using credit

20   card or with cash, is if I have enough cash, I will

21   spend cash.  If I don't have any cash, a big purchase or

22   something like that, I will use a credit card, you know.

23   Something beyond $20 or 25, I use a credit card.

24   Otherwise, I keep some cash in my wallet, you know.

25   That's how I spend.

Ambrose K. Charles, Ph.D.

```
 1        Q    Do you still do yardwork?

 2        A    No, long back I quit that and someone else -- a

 3   company is doing it for me.

 4        Q    Do you use any other pesticides?

 5        A    No.

 6        Q    You have performed original research on

 7   chemicals as a toxicologist, right?

 8        A    I have done.

 9        Q    You've performed original research on chemicals

10   as a toxicologist, correct?

11        A    Yeah, I told you about the Mirex.

12        Q    Right.

13        A    And also -- see, when I do -- when you say

14   chemicals, you know, foreign chemicals, you know.  I

15   mean, anything is a chemical that is -- a

16   neurotransmitter is a chemical, is a -- you know,

17   something that is getting from protein of an amino acid,

18   you know, doing a lot of things in your body, you know,

19   those are things that I also did research on.

20        Q    Right.

21        A    So if you want it as a chemical, everything is

22   a chemical.  I am a biochemist.

23        Q    So let me ask a more specific question.

24        A    Yes, right.

25        Q    Before you worked as a regulator, you worked in
```

Ambrose K. Charles, Ph.D.

```
 1   academics --

 2      A     Exactly.

 3      Q     -- in academia, correct?

 4      A     Exactly.

 5      Q     In your time in academia in the 1970s and

 6   1980s, you performed research on exogenous chemicals;

 7   right?

 8      A     Yes.

 9      Q     In your time in academia in the 1970s and '80s,

10   you performed research on endogenous chemicals as well,

11   meaning things the body produces; correct?

12      A     Yes, ma'am.

13      Q     Since 1984, have you conducted any research on

14   any exogenous or endogenous chemical?

15      A     No.

16      Q     Have you ever performed a comet assay?

17      A     A what?

18      Q     Yes.

19      A     What was that word?

20      Q     Have you ever performed a comet assay?

21      A     What is the assay?

22      Q     It's C-O-M-E-T, comet?

23      A     Comet assay?

24      Q     Yes.

25      A     No.
```

Ambrose R. Charles, Ph.D.

1      Q      Are you familiar with what a comet assay is?

2      A      No.

3      Q      Have you ever conducted tests to look for

4    oxidative stress?

5      A      Oxidative stress, no.

6      Q      Have you ever conducted testing to look for

7    binucleated micronuclei?

8      A      Binucleated micronuclei, no.

9      Q      Have you ever conducted -- well, withdrawn.

10            Have you ever tried to distinguish

11   between DNA damage due to cytotoxicity and DNA damage

12   due to genotoxicity?

13     A      I have not done any research, but you can read

14   about it in literature.

15     Q      You have not done any original research on

16   genotoxicity, correct?

17     A      No.

18     Q      I am correct that -- well, let me ask the

19   question again.

20            Have you done any original research on

21   genotoxicity?

22     A      No.

23     Q      You mentioned that you've read some of the

24   literature on genotoxicity, right?

25     A      Yes.

Ambrose K. Charles, Ph.D.

1      Q    It's true that if you overwhelm a cell and a

2   cell dies, the cell's DNA may fall apart and that may

3   show up as damage; correct?

4      A    Correct.

5      Q    If you pour too much water on a cell in a petre

6   dish, you can overwhelm the cell --

7      A    Yes.

8      Q    -- right?

9      A    Yes.

10          Can I add something about genotoxicity?

11     Q    Yes.

12     A    I have not done any research on genotoxicity,

13  no, but I have reviewed genotoxicity studies and I have

14  attended many conferences on genotoxicity during my

15  training as a toxicologist.  So familiarity,

16  methodology, all of those things are familiar.

17     Q    You are familiar with the methodology of a

18  number of different in-vitro and in-vivo assays --

19     A    Yes.

20     Q    -- correct?

21     A    Yes, yes.

22     Q    It's true that if you overwhelm a cell and the

23  cell dies, the cell can release radical oxygen species;

24  right?

25     A    Yes, yes.

Ambrose R. Charles, Ph.D.

```
 1      Q    In that circumstance, oxidative stress is a
 2   consequence of cell death and not the cause of cell
 3   death, correct?
 4      A    Yes.
 5      Q    If you wanted to design an experiment to
 6   distinguish between DNA damage due to cytotoxicity and
 7   DNA damage due to genotoxicity, do you know how you
 8   would do that?
 9      A    You may have to use chemicals to cause
10   oxidative stress, or agents, not chemicals, anything
11   that can cause oxidative stress to see if there is a
12   secondary effect on the DNA.
13      Q    There are ways to design experiments that
14   distinguish between oxidative stress due to cytotoxicity
15   and oxidative stress in a viable cell, correct?
16      A    You may be aware of them.  I am not -- I don't
17   know anything about that, the methodology and the tests.
18   I can read them and familiarize myself.
19      Q    Sitting here today as an expert in the case,
20   you have not investigated whether there are ways to
21   design experiments that distinguish between oxidative
22   stress due to cytotoxicity and oxidative due to
23   genotoxicity; right?
24      A    I am a toxicologist.  I am reading the data for
25   this case.
```

Ambrose K. Charles, Ph.D.

```
 1        Q    And how do you -- I -- I am trying to be clear

 2   on whether, sitting here today, you've formed an opinion

 3   on that issue?

 4        A    No.

 5        Q    I think you told me earlier you had not

 6   performed any toxicological tests on glyphosate or

 7   Roundup; is that right?

 8        A    That's right.

 9        Q    Have you ever researched Roundup or glyphosate

10   in any way?

11        A    Research means, you know, lab work that I did?

12        Q    Let me reask -- ask a better question.  Okay?

13        A    Okay.

14        Q    Outside of this case, have you ever researched

15   Roundup or glyphosate in any way?

16        A    No.

17        Q    Have you ever published anything about Roundup

18   or glyphosate?

19        A    No.

20        Q    Have you ever presented on Roundup or

21   glyphosate?

22        A    No.

23        Q    You personally have never performed any bench

24   or lab testing regarding glyphosate, true?

25        A    True.
```

Ambrose t. Charles, Ph.D.

```
 1        Q    You have never performed any tests of how

 2   Roundup affects cells in a petre dish, right?

 3        A    No.

 4        Q    Have you ever performed any test of how Roundup

 5   affects animals?

 6        A    No.

 7        Q    Have you ever tested whether humans exposed to

 8   Roundup have measurable adverse or toxicological

 9   effects?

10        A    No.

11        Q    Has anyone prevented you from doing those

12   experiments?

13        A    Life is so lost.  There are -- there are about

14   1200 products -- more than 1200 products registered

15   in -- in the state of Texas for pesticide products,

16   comes from 650 active ingredients plus by pesticides,

17   okay.

18             And if you expect me as a toxicologist

19   in the regulatory seat doing -- in doing experiments

20   on one of the active ingredients and doing everything

21   that you've just mentioned and I said, no, my answer

22   is, no.  No one can do -- no one really do in the

23   world.

24        Q    We are going to switch topics.

25             MR. HABERMAN:  Why don't we take a break?
```

```
 1                    MS. ROSS:  That sounds great.  Let's go

 2    off the record.

 3                    THE VIDEOGRAPHER:  Going off the record.

 4    The time is 11:59.

 5                    (Recess from 11:59 p.m. to 12:09 p.m.)

 6                    THE VIDEOGRAPHER:  Back on the record.

 7    This marks beginning of Media Number 2.  Time is 12:09.

 8        Q.   (BY MS. ROSS) Dr. Charles, you have your report

 9    for Stacey Moore in front of you, right?

10        A    Yes.

11        Q    And you are on page 8; is that right?

12        A    Yes.

13        Q    Since you are offering opinions about what

14    caused individual plaintiffs to develop non-Hodgkin's

15    lymphoma, I want to talk to you about some of the risk

16    factors for non-Hodgkin's lymphoma.  Okay?

17        A    Yes.

18        Q    If I refer to non-Hodgkin's lymphoma as "NHL,"

19    is that okay?

20        A    Yes.

21        Q    On page 8 of your report, you talk about

22    Potential Confounding or Causative Factors.

23                    Do you see that?

24        A    Yes.

25        Q    Table 3 gives Potential Confounding and
```

1    Causative Factors for non-Hodgkin's lymphoma, right?

2            MR. HABERMAN:  Objection.

3        A    Yes.

4        Q    (BY MS. ROSS) The family history -- or family

5    medical history is the first causative factor you list.

6            Do you see that?

7        A    Yes.

8        Q    Family history of -- you say in your report for

9    Mr. Moore, No apparent family history of cancer or

10   lymphoma?

11       A    Yes.

12       Q    Right?

13       A    Yes.

14       Q    Family history of cancer or lymphoma is a

15   confounder or a causative factor for non-Hodgkin's

16   lymphoma, right?

17       A    Yes.

18       Q    I don't want to go through every one of these

19   that you list out here --

20       A    Yeah.

21       Q    -- now.

22       A    Yeah.

23       Q    Are all of the factors that you list on

24   pages 8, 9, and 10 of your report potential confounders

25   and causative factors for non-Hodgkin's lymphoma?

```
1     A    Yes.  Yes.

2     Q    You understand that non-Hodgkin's lymphoma is a

3   cancer of white blood cells called lymphocytes, right?

4     A    Yes.

5     Q    Lymphocytes are cells of the immune system,

6   correct?

7     A    Yes.

8     Q    How does age increase the risk of non-Hodgkin's

9   lymphoma?

10    A    Age?

11    Q    Yes.

12    A    Your immunity.  Immunity goes down.

13    Q    I think I understood your answer, but I want to

14  be clear.  Okay?

15             Yes?

16    A    Yes.

17    Q    Age is a risk factor for non-Hodgkin's

18  lymphoma, right?

19    A    Yes.

20    Q    As folks get older, do their immune systems get

21  stronger or weaker?

22    A    Weaker.

23    Q    As folks get older, do they also have more

24  opportunities for mutations or mistakes in DNA to occur

25  simply because their cells have divided more times?
```

1       A    Not necessarily.  It depends on other factors,

2    you know.  Many of the habits or any other endogenous

3    chemicals they take or, you know, in their previous,

4    post-genetic factors.

5                 And it is very complex.  You can't just

6    pinpoint as we get -- age, you know, it is not only

7    the immune weakness or lowering of the immune system.

8    Okay?  Probably these are some of the other main

9    reasoning of, you know, people like me at this age can

10   get more infections than a young person like you.

11      Q    Significant exposure to benzene is a factor

12   that you list on page 10 of your report --

13      A    Yes.

14      Q    -- right?

15      A    Yes.

16      Q    How does benzene exposure cause lymphoma

17   non-Hodgkin's?

18      A    It is another -- solvents, you know, that can

19   cause the -- the mechanism of benzene causing -- I am

20   not really sure.  I have not looked at that.  But it is

21   listed in some literature as some, another compounding

22   factor.

23      Q    Benzene is associated with non-Hodgkin's

24   lymphoma, right?

25      A    Yes, associated.  That's what I saw.

```
 1        Q    You have not looked in detail at the literature
 2   on benzine and --
 3        A    No.
 4        Q    -- non-Hodgkin's lymphoma?
 5        A    No.  Benzene is carcinogenic, you know.
 6        Q    Benzene is carcinogenic in general, correct?
 7        A    In -- in humans.
 8        Q    How much benzine must a person be exposed to in
 9   order to increase their --
10        A    I don't have --
11        Q    -- risk of non-Hodgkin's lymphoma?
12        A    I don't have the threshold of it, no.
13        Q    And sometimes we do speak over each other, so
14   let's make an effort not to.  Is that all right,
15   Dr. Charles?
16        A    (No response.)
17        Q    What are some common sources of benzene
18   exposure?
19        A    Mostly gasoline.
20        Q    Is benzene found in cigarette smoke?
21        A    Yes, in very small amounts.
22        Q    Does smoking increase the risk of non-Hodgkin's
23   lymphoma?
24             MR. HABERMAN:  Objection.
25        A    Could or could not be.  It depends on how much
```

1   smoking that person has, and if, medically, they find,

2   you know, a clinician, a doctor who has some indication

3   of smoking related to some lesions that they found in --

4   they should be able to say about it.  But --

5        Q.   (BY MS. ROSS) Let me --

6        A    But there can be one of the factors, you know,

7   toxicologically.

8        Q    I will break that down.  Okay?

9        A    Yes.

10       Q    Smoking can be a factor toxicologically that

11  contributes to non-Hodgkin's lymphoma, right?

12       A    Yes.

13       Q    Whether smoking contributed in a particular

14  case depends on how much smoking a person did, correct?

15       A    Correct.

16       Q    Is there a dose-response relationship between

17  smoking and non-Hodgkin's lymphoma?

18       A    It's not -- it's not clear about it.

19       Q    Does someone with a greater pack year's history

20  have an increased risk compared to someone with fewer

21  pack years of cigarette smoking?

22                MR. HABERMAN:  Objection.

23       A    It's not that clear.

24       Q    Cigarette smoke, as we said, contains benzine;

25  right?

Ambrose K. Charles, Ph.D.

```
 1      A    Minute amounts.

 2      Q    What is it about smoking that increase's

 3  someone's risk of non-Hodgkin's lymphoma?  Is it benzine

 4  or is it something else?

 5               MR. HABERMAN:  Objection.

 6      A    I really do not know what -- what particular

 7  ingredients in the smoke that really cause lymphoma,

 8  but...

 9      Q.   (BY MS. ROSS) Does -- sorry, go ahead.

10      A    Yeah.  But the smoke and smoke ingredients or

11  whatever toxicants that cigarette smoke has is going to

12  the lungs.  Okay.  That's where the smoke goes.  That is

13  where the blood is receiving oxygen.

14               An exchange of chemicals goes through

15  the lungs where all of the white blood cells are

16  there.  Sometimes the smoke goes there.  White blood

17  cells are going to go there in large numbers because

18  they detect there is some body that is foreign to the

19  body.  So lymphocytes may be one of the cells, you

20  know, that is first in the defense.

21      Q    I am going to break that down for folks who

22  don't have a science --

23      A    Yeah.

24      Q    -- background.  Okay?

25      A    What should I do?  Should I do simple answers
```

```
 1   or say -- or can I speak like this?

 2       Q    No, this is fine.

 3       A    Right.

 4       Q    I will break down things if we need to.

 5       A    Okay.

 6       Q    Okay?

 7       A    All right.  All right.

 8       Q    So the lungs are the part of the body where we

 9   get oxygen, right?

10       A    Yes.

11       Q    Blood comes into the lungs to get oxygenated

12   and then goes out to the rest of the body, right?

13       A    Yes.

14       Q    In that blood, there are both red blood cells

15   and white?

16       A    To the heart.

17       Q    Right.

18       A    And rest of the body.

19       Q    Blood is pumped from the heart to the lungs,

20   comes back into the heart and then goes out to the rest

21   of the body, correct?

22       A    Yes.

23       Q    When blood goes to the lungs, there are both

24   red blood cells and white blood cells, right?

25       A    Yes.
```

1    Q    You can have white blood cells in the lungs for

2    other reasons too, for example, to fight foreign

3    invaders or to deal with some problem that the body is

4    experiencing; fair?

5    A    Yeah.

6    Q    Tobacco smoke comes into the lungs, and that's

7    where the exchange happens, correct?

8    A    Yes.

9    Q    Whatever carcinogens are in tobacco smoke go

10   from the outside world into the small capillaries in the

11   alveoli, right?

12              MR. HABERMAN:  Objection.

13   A    Yes.

14   Q.   (BY MS. ROSS) And that's where they would

15   encounter white blood cells, for example; correct?

16   A    You know more of the physiology than me.

17   Q    Does smoking increase the risk of all types of

18   non-Hodgkin's lymphoma?

19   A    I am not sure the data -- about the data.

20   Q    Do you agree with the general proposition that

21   different types of cancer have different causes?

22   A    Different types of cancers have different

23   causes?

24   Q    Yes.

25   A    Yes.

Ambrose v. Charles, Ph.D.

1    Q    Even if it is established that a particular

2    exposure can cause one type of cancer, you cannot

3    conclude that that exposure causes every type of cancer;

4    correct?

5    A    That's correct.

6    Q    You would need to demonstrate that a particular

7    exposure increases the risk of a particular cancer in

8    humans in order to say they are linked, right?

9    A    Yeah, you could use a chemical or an agent

10   related to cancer.

11   Q    Do pesticides cause non-Hodgkin's lymphoma?

12   A    Some of the pesticides are indicated, you know,

13   in some studies, you know.  Deltamethrin, for example,

14   it's another pesticide.

15            THE REPORTER:  Sorry?

16            THE WITNESS:  Deltamethrin.

17   A    Deltamethrin, you know, and there are some

18   other -- DDT was another chemical that is suggested to

19   have causing NHL -- in causing NHL, and it's not using

20   anymore.

21            Bracopectolin (phonetic), that is a

22   chemical that is usually found as a contaminator in

23   water treatment plants, you know.  There are

24   several -- several chemicals that are identified or

25   related or suggested, you know, to have a relationship

```
1    with NHL.

2         Q.   (BY MS. ROSS) Lindane is associated with

3    non-Hodgkin's lymphoma --

4                   (Overlapping speakers.)

5         A    Lindane is one of those.

6         Q.   (BY MS. ROSS) -- is that correct?

7         A    Yes, yes.

8         Q    And that's L-I-N-D-A-N-E?

9         A    Correct.

10        Q    I will repeat my question so we are clear.

11   Okay?

12        A    Yes.

13        Q    Lindane is associated with non-Hodgkin's

14   lymphoma, correct?

15        A    Correct.

16        Q    DDT was associated with non-Hodgkin's lymphoma,

17   true?

18        A    Correct.  But when you say, "associated," it's

19   data suggests.  Okay?  If you are saying associating,

20   that's not one concrete.  It leads to the real cause of

21   causing cancer, NHL, there are many factors that can

22   play into -- our whole body physicality can play into

23   that.  Other disease conditions can play into that.  So

24   simply saying that DDT is associated with NHL is not a

25   full statement in my mind.  I am sorry.
```

```
 1        Q     DDT is not the only thing that increases the

 2   risk of non-Hodgkin's lymphoma, right?

 3        A     Exactly.

 4        Q     DDT does increase the risk of non-Hodgkin's

 5   lymphoma?

 6        A     Yes.

 7        Q     Permethrin increases the risk of non-Hodgkin's

 8   lymphoma, right?

 9        A     Correct.

10        Q     Does malathion increase the risk of

11   non-Hodgkin's lymphoma?

12        A     I have seen that.

13        Q     Does 24D increase the risk of non-Hodgkin's

14   lymphoma?

15        A     I am not really sure about that, 24D.  I am

16   not -- the comment was -- maybe was missed.

17        Q     Does dioxane increase the risk of non-Hodgkin's

18   lymphoma?

19        A     I have not seen dioxane anywhere.

20        Q     Do you know for any of the pesticides that we

21   just talked about that do increase the risk of

22   non-Hodgkin's lymphoma, how mechanistically they

23   increase the risk?

24        A     Mechanism is not really non- -- like I told you

25   about the DDT and any chlorinated compound, any
```

```
 1   chlorinated compounds in this list.  Lindane is another

 2   chlorinated compound.

 3       Q    Let -- I am going to break that down just so we

 4   are clear.  Okay?

 5                New question.

 6                Lindane is one example of a chlorinated

 7   compound --

 8       A    Yes.

 9       Q    -- correct.

10       A    Yes.

11       Q    And chlorinated compounds increase the risk of

12   non-Hodgkin's lymphoma, right?

13       A    That is a general assumption that you are

14   leading.  I am talking about two different chemicals,

15   however, similar properties; like chlorine is part of

16   the molecule.  So what you are asking me, is all

17   chlorinated chemicals can be cancer?  No, it is not.

18       Q    It depends on the particular chemical, right?

19       A    Particular chemical, yes.

20       Q    We need to look at a particular chemical to

21   understand whether that chemical increases the risk of

22   lymphoma, right?

23       A    Yes.

24       Q    How many types of non-Hodgkin's lymphoma are

25   there?
```

1    A    Non-Hodgkin's lymphoma, I have seen in the

2    literature about four or five types.

3    Q    Are you aware that there are over 70 distinct

4    subtypes of non-Hodgkin's lymphoma?

5    A    Yes, I have read that also, about 60 to 70

6    different types of subtypes.

7              I have not seen anywhere a list of all

8    of the 60 or 70 to -- if you can lead me to that

9    reference, I will be grateful.  I want to look at

10   that.  I didn't find it.

11   Q    CLL and DLBCL are two of the most common

12   subtypes of non-Hodgkin's lymphoma, correct?

13   A    CLL and DLBCL, yes.

14   Q    Can you please name the other subtypes of

15   non-Hodgkin's lymphoma?

16   A    I think one, is follicular lymphoma; and

17   another is unspecified, they call it, because they could

18   not identify the membrane proteins of -- when you say

19   subtypes, you know, 70 subtypes -- or -- my

20   understanding, you know, is that when they do

21   histochemical analysis pathologically in the pathology

22   lab, they have antibodies that look for different type

23   of antigens from the cell surface.  They use the

24   histochemical staining to identify different cell types.

25              From that cell types, all right, there

1   is this number of different, you know, like 70, 60

2   types and all.  They are very important only for the

3   treatment of -- for therapy particularly --

4                    THE VIDEOGRAPHER:  Don't mess with the

5   microphone.

6                    Don't mess with the microphone, please.

7   It disrupts the audio.

8                    THE WITNESS:  Oh, I should not touch

9   the -- sorry, when I am talking sometimes.

10                   Sorry about that.

11      A    Histochemically they identify different type of

12  cell types and clusters -- cluster distribution, so to

13  say, in the field of what they are looking at.

14                   So what I was trying to say is what -- I

15  forgot.  I went to 60 different types.  The different

16  types of NHL.

17                   CLL, DCBCL [sic], follicular NHL

18  unspecific and specific, or some kind of

19  classification like that.

20      Q.   (BY MS. ROSS) The three specific types of

21  non-Hodgkin's lymphoma, you can name are DLBCL, CLL, and

22  follicular lymphoma; correct?

23      A    And then there is another category --

24  unspecified is a category.  They could not specify which

25  it is.

```
 1     Q    When you say, "unspecified is a category,"
 2  you're saying in some of the epidemiologic studies that
 3  you reviewed --
 4     A    No.
 5     Q    -- there was a category of unspecified, or are
 6  you saying that you understand it to be the case, that
 7  there is a whole category of non-Hodgkin's lymphoma
 8  called unspecified?
 9     A    Okay.  This is the World Health Organization's
10  classification.
11     Q    Right.
12     A    Unspecified is they could not put them into
13  those three categories --
14     Q    If --
15     A    -- of follicular or SLL, CLL -- CLL is also
16  sometimes mixed with SLL, small lymphocytic.  So they
17  are coming together, SLL and CLL come together sometimes
18  in classification.
19               And unspecified is a category that
20  they've found is -- is pathologically --
21  pathologically diagnosed as NHL but not
22  characteristic -- don't have the characteristics of
23  follicular or CLL or DLBCL.
24     Q    Do you --
25     A    That's what my understanding is.
```

```
 1        Q    Do you know if the World Health Organization

 2   has names for about 65 additional types of non-Hodgkin's

 3   lymphoma?

 4        A    I have not seen that.  And if you have that

 5   reference, then I will be grateful.  60 different

 6   subtypes are individually named?

 7        Q    Yes.

 8        A    Oh.

 9        Q    You have not seen that information?

10        A    I have not seen that information.

11        Q    Is Roundup exposure associated with every one

12   of the NHL subtypes?

13        A    Roundup is associated with every --

14        Q    Is Roundup exposure associated with every one

15   of the non-Hodgkin's lymphoma subtypes?

16             MR. HABERMAN:  Objection.

17        A    As I have just said, you know, Roundup is one

18   of the chemicals along with other chemicals in the

19   literature.

20        Q.   (BY MS. ROSS) How are the different subtypes

21   of -- well, withdrawn.

22             Because I think you answered this, so

23   let me see if I can summarize it for our court

24   reporter.  Okay?

25        A    Yes.
```

1    Q    Different subtypes of non-Hodgkin's lymphoma

2    are diagnosed based on the different markers on the

3    surface of the cell, correct?

4    A    Correct.

5    Q    Different subtypes of non-Hodgkin's lymphoma

6    are treated differently, correct?

7    A    Correct.  That's my understanding, you know,

8    with the science.

9    Q    Some subtypes of NHL require treatment,

10   correct?

11   A    Immediate.

12   Q    Other subtypes of non-Hodgkin's lymphoma can go

13   many years without any treatment whatsoever, correct?

14   A    Under medical care.  They have to constantly be

15   regularly screening their patient.

16   Q    Did both of the plaintiffs in this case receive

17   treatment for non-Hodgkin's lymphoma?

18   A    I think so.  I mean, Pleu did not get -- I

19   think he is under watchful -- clinical watching, I

20   think.  The other one received a treatment.

21   Q    Stacey Moore has been treated for his DLBCL,

22   right?

23   A    Yes, yes.  Drug treatment, yes.

24   Q    William Pleu has never been treated for

25   lymphoma, correct?

Ambrose K. Charles, Ph.D.

```
 1                    MR. HABERMAN:  Objection.

 2       A    Yes, he has been diagnosed and it is not fast,

 3   growing-fast or fast-moving type of an actual -- that

 4   particular categorical CLL SL -- SLL/CLL is slow

 5   growing, so they wait and see where it goes.

 6       Q.   (BY MS. ROSS) NHL, including all of its

 7   subtypes, is among the most common types of cancer in

 8   the United States, correct?

 9                    MR. HABERMAN:  Objection.

10       A    SLL and --

11       Q.   (BY MS. ROSS) Non-Hodgkin's lymphoma --

12       A    Oh.

13       Q    -- including all of its subtypes is among the

14   most common cancer in the United States, correct?

15                    MR. HABERMAN:  Objection.

16       A    I am not aware of the common.  But most of

17   them, a type -- there are groups like in age, you know.

18   It's not very prevalent among young people.  I have not

19   read that literature, but also you mentioned are the age

20   group.

21       Q.   (BY MS. ROSS) As an expert providing opinions

22   on the cause of non-Hodgkin's lymphoma, did you do

23   anything to investigate how common non-Hodgkin's

24   lymphoma is?

25       A    I think I have it written down.  MD Anderson
```

```
 1    and the American Cancer Society, there is a statement

 2    like that.  There is another most -- my own explanation

 3    is because of the lifestyle probably.

 4         Q    Exhibit 13 to your deposition has been marked.

 5                   (Exhibit 13 virtually marked.)

 6         Q.   (BY MS. ROSS) And this is the SEER website from

 7    2022.

 8                   You see that?

 9         A    National Cancer Institute?

10         Q    Yes.

11         A    Yes.

12         Q    So Exhibit 13 is NHL statistics from the

13    National Cancer Institute, correct?

14         A    Yes.

15         Q    Specifically, do you see at the top where it

16    says, "Surveillance, Epidemiology, and End Results

17    Program"?

18         A    Yes.

19         Q    SEER is the Surveillance Epidemiology and End

20    Results Program, correct?

21         A    Yes.

22         Q    That is part of the U.S. National Cancer

23    Institute, correct?

24         A    Correct.

25         Q    The National Cancer Institute is part of the
```

```
 1   NIH, right?

 2       A    Correct.

 3       Q    SEER collects statistics on various cancers in

 4   the United States, right?

 5       A    Yes.

 6       Q    In 2022 it is estimated that 80,470 people will

 7   be diagnosed with non-Hodgkin's lymphoma, correct?

 8       A    80,000 estimated new cases in 2022.

 9       Q    Right?

10       A    Their projection.

11       Q    The National Institute of Health estimates that

12   approximately 80,000 people will be diagnosed with

13   non-Hodgkin's lymphoma in the United States in 2022,

14   correct?

15       A    Yes, that's what the report says.

16       Q    That is, as you said, an estimation or

17   projection.  It's not --

18       A    It's a projection.

19       Q    It's not numbers that we have as of today since

20   2022 is not over, fair?

21       A    Fair.

22       Q    Okay.  On page 2 of this document, do you see

23   where it states, "Lifetime Risk of Developing Cancer"

24   near the top of the page?

25       A    Yes.
```

```
 1      Q    Approximately 2.1 percent of men and women will

 2   be diagnosed with NHL at some point in their lifetime

 3   based on 2017 to 2019 data, correct?

 4      A    Correct.

 5      Q    That would be about two people out of every

 6   100, right?

 7      A    2.1 people.

 8      Q    Approximately one out of every 50 people will

 9   be diagnosed with non-Hodgkin's lymphoma in their

10   lifetime, right?

11           MR. HABERMAN:  Objection.

12      A    One out of -- one out of every 50 people?  Say

13   that sentence again, the ratio.  I am trying to

14   understand.

15      Q.   (BY MS. ROSS) Approximately one out of every 50

16   people in the United States will be diagnosed with NHL

17   in their lifetime, right?

18      A    Two people out of 100.

19      Q    That is the same --

20      A    That's what you said.

21      Q    -- as 1 out of 50, right?

22      A    Yes.

23      Q    I think I can do that math, but if we get more

24   complicated, I might need a calculator.

25           MR. HABERMAN:  Don't sell yourself short.
```

1      Q.   (BY MS. ROSS) On page 3, if you will turn to 3

2    at the very bottom, you see there is a section on, "How

3    Common is This Cancer?"

4      A    Page 3?

5      Q    Yes.

6      A    Okay.

7      Q    Do you see where I am?

8           The very bottom of the page, it

9    states --

10     A    Okay.

11     Q    -- "How Common is this Cancer?"

12          Do you see that?

13     A    Yes.

14     Q    The National Cancer Institute states that,

15   "compared to other cancers, NHL is fairly common,"

16   right?

17          MR. HABERMAN:   Objection.

18     A    Common types of cancer and where are you

19   reading that sentence?

20     Q.   (BY MS. ROSS) The bottom of page 3.

21     A    Bottom --

22     Q    Your previous page.

23     A    Oh.

24          Compared to other cancers non-Hodgkin's

25   lymphoma is fairly -- fairly common.

Ambrose K. Charles, Ph.D.

```
 1      Q    Right.

 2      A    Not most common.

 3      Q    What NIH states is, compared to other cancers

 4   non-Hodgkin's lymphoma is fairly common; correct?

 5      A    Yes, yes.

 6      Q    The next page gives a list of common cancer

 7   types.  I think that's where you are; is that right?

 8      A    Yes.

 9      Q    Non-Hodgkin's lymphoma is the seventh most

10   common cancer in the United States, correct?

11      A    Yes.

12      Q    On page 7, if you will turn with me, there is a

13   section entitled, "Changes Over Time."

14               Are you there?

15      A    Page 5?

16      Q    Page 6.

17      A    Page 6?

18               Yes.

19      Q    According to the National Cancer Institute

20   using statistical models for analysis, age-adjusted

21   rates for new non-Hodgkin's lymphoma cases have been

22   falling on average 1 percent each year over 2010 to

23   2019, correct?

24      A    Correct.

25      Q    There is a figure on the following page, if you
```

```
 1    will turn there with me.

 2        A    Uh-huh.  Okay.

 3        Q    The figure on page 7 of Exhibit 13 --

 4        A    Yes.

 5        Q    -- gives the number of new cases, or the rate

 6    per 100,000 people.

 7                   Do you see that?

 8        A    Yes.

 9        Q    The rates for non-Hodgkin's lymphoma increased

10    from 1975 until about 1995, right?

11        A    Yes.

12        Q    New NHL cases remained flat from 1995 until

13    about 2010, correct?

14                   MR. HABERMAN:  Objection.

15        A    Yes.

16        Q.   (BY MS. ROSS) New NHL cases began to decline in

17    2010 slightly, right?

18                   MR. HABERMAN:  Objection.

19        A    In that graph -- in the top graph?

20        Q.   (BY MS. ROSS) Yes.

21        A    It's not declining.  It's almost steady.

22        Q    So in your view, new cases of NHL stayed steady

23    from about 2010 to 2019?

24        A    From 1995, it is almost steady.

25        Q    You would say that new cases of non-Hodgkin's
```

```
 1    lymphoma remained almost steady from '95 to 2019?

 2        A    Yes.  The thread is declining.

 3        Q    And the -- you pointed out -- we are looking at

 4    the figure of new cases which is at the top of this,

 5    correct?

 6        A    Yes, that green --

 7        Q    Yes.

 8        A    -- graph, yes.

 9        Q    There is also a death rate given that is the

10    dark green, right?

11        A    Yes.

12        Q    The death rate for non-Hodgkin's lymphoma has

13    declined over time, correct?

14        A    Yes.

15        Q    The five-year survival has increased over

16    time -- that's the bottom figure -- right?

17        A    Yeah.  That corresponds with the other thread.

18        Q    Glyphosate use, as we discussed earlier,

19    increased dramatically at the same time non-Hodgkin's

20    lymphoma rates were plateauing; right?

21                MR. HABERMAN:  Objection.

22        A    You mean -- you are talking about the green

23    graph?

24        Q.   (BY MS. ROSS) I am talking now about -- before

25    we talked about your time at the Texas Department of
```

Ambrose R. Charles, Ph.D.

```
 1    Agriculture and the use of glyphosate increasing between

 2    the mid-1990s --

 3        A    Okay.

 4        Q    -- and the present day, right?

 5        A    You are coming back to my work?

 6        Q    I am.

 7        A    Oh, okay.

 8             You -- suddenly you switched from here,

 9    and I am trying to catch up.

10        Q    I will repeat my question.

11        A    Okay.

12        Q    Glyphosate use in the United States increased

13    dramatically at the same time that NHL rates were

14    plateauing, correct?

15        A    That could be.  I don't have the data.

16        Q    Do you have any opinion as to why, at the same

17    time that glyphosate use in the U.S. increased

18    dramatically, NHL rates were plateauing?

19             MR. HABERMAN:  Objection.

20        A    I have no data.  I don't know if it just

21    increased.  I don't have the use data with me.

22        Q.   (BY MS. ROSS) You have no opinion on whether or

23    why glyphosate rates may have increased at the same time

24    NHL rates were plateauing, correct?

25             MR. HABERMAN:  Objection.
```

1    A    I have no data.  The -- you are talking

2    about -- either ask me about this graph for NHL and --

3    or data, what you have on the graph.

4    Q.   (BY MS. ROSS) Yeah.

5    A    And then immediately you are going back to the

6    glyphosate use which is not part of this graph.

7    Q    Right.

8         So I am trying to determine whether you

9    have an expert opinion on this or whether this is an

10   area that you would defer to someone else?

11   A    I have to look in the data and then come up

12   with an opinion.  I cannot just, offhand, come up with

13   an opinion.  But I do not know anything about that, 99

14   divided by one is how the lymphocyte use is or

15   increased.  That's what you said.  This is only your

16   words, not mine.

17   Q    And sitting here today, this is my opportunity

18   to ask you about the questions --

19   A    Yeah.

20   Q    -- you have never -- sorry, withdrawn.

21        Sitting here today, this is my

22   opportunity to ask you about the opinions you intend

23   to offer at trial in this case.  You understand that?

24   A    Okay.

25   Q    Sitting here today as an expert in this case,

Ambrose K. Charles, Ph.D.

1    you do not have an opinion on any relationship between

2    glyphosate use and non-Hodgkin's lymphoma rates in the

3    United States, correct?

4        A    I -- I have only data right in front of me, the

5    glyph- -- not glyphosate -- the new cases that you gave

6    me in the exhibit, new cases of NHL, from 1995 to 2019.

7        Q    And you don't have any data on glyphosate use

8    during that time period?

9        A    I do not -- I told you I do not have any data

10   on glyphosate use to make these two relationships.

11       Q    Since you do not have any data on glyphosate

12   use, I take it you are not offering an expert opinion in

13   this case about that relationship, if any, between

14   glyphosate use and non-Hodgkin's lymphoma rates; right?

15       A    Regarding this graph, I am not making any

16   relationship relating to this graph versus the

17   glyphosate use.

18       Q    Are you making any relationship at all, whether

19   it's this graph or otherwise, about the relationship

20   between glyphosate use and NHL rates in the United

21   States?

22       A    I was only looking at this case in this

23   individual, whether he was exposed probably due to

24   glyphosate exposure causing his NHL.

25       Q    The answer to my question is, no, you aren't

1    making any relationship at all, between the relationship

2    of glyphosate use and non-Hodgkin's lymphoma rates in

3    the U.S., right?

4                    MR. HABERMAN:  Objection.  Asked and

5    answered.

6        A    I am not here to make a national study

7    statement or a statement over years of glyphosate use

8    versus the use of NHL prevalence in the country and in

9    putting this label right now.

10       Q.   (BY MS. ROSS) Patients are diagnose -- well,

11   you said, "right now," so I want to just be very clear.

12       A    Okay.

13       Q    Because your opinions that you intend to offer

14   at trial, you have already formed those, right?

15                    This is my opportunity to ask you about

16   them.  So, presumably, you aren't going to come to

17   trial and talk about something we didn't have an

18   opportunity to talk about today, correct?

19       A    No, not at all, you know.

20       Q    Okay.  Patients are diagnosed with

21   non-Hodgkin's lymphoma every day who have never had any

22   exposure to Roundup, correct?

23       A    Probably, yes.  I do not know.

24       Q    Patients were diagnosed with non-Hodgkin's

25   lymphoma long before Roundup or glyphosate first came on

1    the market in the mid-1970s, correct?

2       A    Yes.

3       Q    In fact, millions of people had non-Hodgkin's

4    lymphoma prior to Roundup coming on the market, right?

5            MR. HABERMAN:  Objection.

6       A    Yeah, but if you look at the graph that you

7    provided me, it is on the increase from 1975 to 1995 and

8    then staying that level almost until 2019.

9       Q.   (BY MS. ROSS) Is it necessary for a person to

10   be exposed to Roundup or glyphosate to develop NHL?

11      A    Not necessarily Roundup.  We talked about the

12   different confounding fac- -- factors that can

13   contribute.  And glyphosate should be one of them.

14      Q    Would you agree that there are many people who

15   have been exposed to and systemically absorbed some

16   amount of Roundup or glyphosate who do not develop

17   non-Hodgkin's lymphoma?

18      A    It's possible.

19      Q    I am marking as Exhibit 14 to your deposition a

20   study by Andreotti and colleagues published in 2018.

21           (Exhibit 14 virtually marked.)

22      Q.   (BY MS. ROSS) You are familiar with this study,

23   correct?

24      A    Andreotti, yes.

25      Q    This is a study that you reviewed in forming

1    your opinions in this case, right?

2        A    Yes.

3        Q    It is listed in your reference materials,

4    correct?

5        A    Yes.

6        Q    You relied on Andreotti 2018 as one of the

7    papers you looked at for NHL and glyphosate use,

8    correct?

9        A    Yes.

10       Q    Do you see under the Results section of the

11   Abstract, where it states, among five, 54,251 -- so

12   54,251 applicators, 44,932 used glyphosate?

13       A    Yes.

14       Q    This study included 44,932 people who used

15   glyphosate, correct?

16       A    Yes.

17       Q    If you will turn with me to page 511 of the

18   paper?

19       A    Yes.

20       Q    There is -- so under the Results -- tell me

21   when you are there.

22       A    Yeah, I am on page 511.

23       Q    The second paragraph under the Results begins

24   "Risk ratios."

25                Do you see that?

Ambrose K. Charles, Ph.D.

1    A    Yes.

2    Q    There is a sentence a little further down that

3    says the rate ratio in the top exposure quartile, and

4    then gives the rate ratio for NHL?

5    A    Can --

6    Q    Do you see where I am?

7    A    Can you give me the word that it starts with,

8    the line.

9    Q    The line starts, "With NHL or any NHL

10    subtypes."  It's about one, two, three --

11    A    "With NHL," yes, I saw that.

12    Q    Okay.  And then there is a sentence that tells

13    you how many glyphosate-exposed NHL cases there were in

14    Andreotti 2018, correct?

15    A    Yes.

16    Q    How many glyphosate-exposed NHL cases were

17    there in Andreotti?

18    A    440.

19    Q    In this study of 44,932 professional pesticide

20    applicators who were exposed to glyphosate, 440 of them

21    were diagnosed with NHL; right?

22    A    Yes.

23    Q    440 out of nearly 45,000 is a little less than

24    1 percent, correct?

25    A    Yeah.

Ambrose K. Charles, Ph.D.

```
 1       Q     You agree that the vast majority of people who
 2   have been exposed to Roundup on a day-in, day-out basis
 3   for much of their professional lives never develop
 4   non-Hodgkin's lymphoma?
 5                 MR. HABERMAN:  Objection.
 6       A     That -- that statistic doesn't help the one
 7   that is affected, you know.  I mean, that one person
 8   is -- is affected.  In a larger number of people, you
 9   take that 44,000 people and then take that one person,
10   how many people are there, that one person, just that
11   one person.  They are all affected, right?
12       Q.   (BY MS. ROSS) Is it true that the vast majority
13   of people who have been exposed to Roundup for much of
14   their professional lives never develop NHL?
15                 MR. HABERMAN:  Objection.
16       A     Yes, this data suggests that.
17       Q.   (BY MS. ROSS) There are also people who have
18   been exposed to glyphosate who would have developed NHL
19   even if they never had been exposed, correct?
20                 MR. HABERMAN:  Objection.
21       A     Where is that sentence?
22       Q.   (BY MS. ROSS) You would expect some people to
23   develop NHL with glyphosate exposure consistent with the
24   back --
25                 (Overlapping speakers.)
```

1    A    Are you --

2    Q.    (BY MS. ROSS) -- ground rate?

3    A    Are you reading from this --

4    Q    No, I am asking from your general --

5    A    Oh.

6    Q    You told me earlier you have expertise in

7    epidemiology; is that right?

8    A    Expertise?

9    Q    Yes.

10    A    I've never had expertise in epidemiology.  I

11    was never trained as an epidemiologist.  I am a basic

12    toxicologist of fundamental science -- basic science.

13    Q    You've never had research experience or other

14    expertise in epidemiology, right?

15    A    I have read a lot of papers in epidemiology for

16    my assessments and I have lectures in my training on

17    epidemiology.  Like anyone else, I can understand --

18    reading scientific papers and understand what they mean.

19    Q    Do you have expertise in epidemiology?

20    A    Expertise -- I do not have any degrees in

21    epidemiology.

22              Do I understand when I read an

23    epidemiology paper?  The answer is, yes.

24    Q    You understand there is background rate of

25    diseases in a population, right?

```
 1      A    Yes.

 2      Q    For NHL, there is a background rate of people

 3  who will be diagnosed with NHL regardless of what they

 4  are exposed to; correct?

 5      A    Yeah.  Probably, yes.

 6      Q    You would expect that some people would develop

 7  NHL regardless of glyphosate exposure consistent with

 8  the background rate of NHL in the general population,

 9  right?

10      A    Yes.

11               MR. HABERMAN:  Objection.

12      A    Yes.

13      Q.   (BY MS. ROSS) In your reading on Roundup and

14  non-Hodgkin's lymphoma, did you run across anything that

15  you would consider unique about the presentation of

16  patients with glyphosate exposure who develop

17  non-Hodgkin's lymphoma?

18      A    Presentation of the people?

19      Q    Yes.

20      A    Please explain that to me.

21      Q    Did you come across, in your preparation of

22  your opinions in this case, any clinical sign, any tests

23  that can be done in a laboratory, any pathological

24  marker, or any examination finding that can distinguish

25  an NHL patient who used Roundup from one who did not?
```

```
 1      A    From -- from examining the patient, examples --
 2  or testing the patient or examining the patient, or
 3  where are you directing the question, please?
 4      Q    Yes, so I can break that down into different
 5  pieces if --
 6      A    Yes.
 7      Q    -- if that will be helpful.
 8      A    Yes, that will be helpful.
 9      Q    Sure.
10      A    Because part of it is a clinical question you
11  are asking.  I am not a diagnostic person.
12      Q    In your work preparing your opinions on whether
13  Roundup causes NHL, did you come across any tests that
14  can be done in a laboratory that can distinguish NHL in
15  a patient who used Roundup from one who did not?
16      A    One of the indicators probably I can say is --
17  I am guessing -- is blood counts, you know.  If there
18  are lymphocytosis, a large number of lymphocytes in the
19  big picture, that is something that needs to be
20  investigated further to find out if this person has any
21  lymphatic disorder, something like that.
22      Q    When you say you are guessing, you are not --
23  tell me what you mean by that.
24      A    Because of my lab and clinical experience,
25  evaluating data and being a lab director for many years,
```

```
 1    in the clinical lab in the hospital, I am telling you,

 2    since you asked me, is there any lab work or lab data

 3    that can be indicative of NHL --

 4         Q    My question is a little different so --

 5         A    Oh, okay.

 6         Q    -- let me be clear.

 7         A    That's what I understood.  Yeah.

 8              You said any --

 9              (Overlapping speakers.)

10         Q.   (BY MS. ROSS) In your --

11         A    Oh, okay.  Go ahead.

12         Q    Okay.  Let me ask the question.

13         A    Yeah.

14         Q    A person with NHL may have elevated white blood

15    cell counts, right?

16         A    Yes.

17         Q    Do you know if elevated white blood cell counts

18    are necessary for a diagnosis of NHL?

19         A    Not necessarily.

20         Q    Do you know if most types of NHL are associated

21    with a high white blood cell count?

22         A    Yes.

23         Q    In your view, most types of NHL should have a

24    white blood cell count?

25         A    If there are normal blood cell counts, okay --
```

```
 1    I didn't say that, you know, all have high WBC count.  I
 2    am saying some of them will show high counts.  Then you
 3    go and look at the differential counts.
 4              Differential counts are various types of
 5    white blood cells.  And then you look at the ratio
 6    that -- you look at the lymphocytes.  And if that
 7    number is very -- higher than expected, then you go
 8    further, exploring the clinical aspect of that.
 9    That's what I was trying to say.
10    Q    Do patients with DLBCL have high white blood
11    cell counts?
12    A    Some of them have; some of them don't have.
13    Q    Do patients with follicular lymphoma have high
14    white blood cell counts?
15    A    Some of them might have; some of them might not
16    have.
17    Q    For a patient who was exposed to Roundup as
18    compared to one who wasn't, can you point me toward any
19    laboratory finding that would, just looking at that lab,
20    tell you whether the patient was exposed to Roundup or
21    not?
22    A    No.
23    Q    Can you point me toward any pathologic marker
24    that would tell you whether someone was exposed to
25    Roundup or not?
```

1        A     I have not come across.

2        Q     Can you point me toward any clinical sign or

3    examination finding that would tell you whether someone

4    was exposed to Roundup or not?

5        A     No.  That is true for many, many chemicals and

6    only -- only a few chemicals -- maybe ten to twenty

7    chemicals may have some biomarkers that you can identify

8    in the lab.  Most of the exposures go unidentified.

9        Q     In your work to prepare your opinions in this

10   case, did you come across any symptom, any feature, any

11   clinical course that could distinguish a patient who

12   used Roundup from one who didn't?

13                  MR. HABERMAN:  Objection.

14       A     From the medical history -- the medical

15   reports, that's what you are asking me?

16       Q.    (BY MS. ROSS) Yes.  Apart from what they say.

17       A     Patient goes to the doctor and say what they

18   have.  That is what -- their statement.  Please don't

19   let the doctor start treating them, okay, without

20   sending them to the lab for further investigations.

21                  So what they say is taken into

22   consideration.

23       Q     Did you see any statements in the medical --

24   you mentioned medical records in your answer --

25       A     Yes, yes.

Ambrose R. Charles, Ph.D.

```
 1      Q      -- just now.
 2             Did you see any statements in any
 3   medical record for Stacey Moore --
 4      A      Okay.
 5      Q      -- concluding that Roundup caused his
 6   non-Hodgkin's lymphoma?
 7      A      No.
 8      Q      Did you see any statement in any medical record
 9   for William Pleu concluding that Roundup caused his
10   lymphocytosis?
11      A      No, I haven't seen any diagnosis related to
12   that.
13      Q      Are you familiar with monoclonal B-cell
14   lymphocytosis?
15      A      I have read on that.
16      Q      Are you an expert on that?
17      A      I have not -- I have not -- you know, I have
18   not done research for many years.  I have not done any
19   particular hematological research other than all the lab
20   techniques and pictures, and evaluating, reading,
21   understanding.  Common -- a general toxicologist what I
22   need to know, I know.
23      Q      So you are not offering any expert opinion in
24   this case about whether or not any plaintiff had
25   monoclonal B-cell lymphocytosis?
```

```
 1      A    No, I am not -- monoclonal, you know, cell, it

 2   is having the same original cell multiplying into

 3   different cells.  That's what it means.  I don't have

 4   any research experience or other opinions or anything

 5   about that.

 6      Q    Are you offering an expert opinion in this case

 7   about whether any plaintiff had monoclonal B-cell --

 8      A    No.

 9      Q    -- lymphocytosis?

10      A    No.

11      Q    Dr. Charles, are you an expert in non-Hodgkin's

12   lymphoma?

13      A    No.

14      Q    If you will go back with me to your report on

15   Mr. Moore.

16      A    Okay.

17      Q    Tell me when you are there.

18      A    Page --

19      Q    I am getting there with you.

20           Let's -- so page 13 of your report, you

21   talk about Mr. Moore's Roundup usage, right?

22      A    Oh, yes.

23      Q    And, actually, let's go back to page 3 for a

24   moment.  If you will --

25      A    Page.
```

Ambrose K. Charles, Ph.D.

```
 1      Q     -- you will turn there with me, please.

 2      A     Page 3?

 3      Q     Yes.

 4      A     Yes.

 5      Q     Mr. Moore used Roundup at Coleman Landscaping

 6  from 1992 to 1995, correct?

 7      A     That's what I found in the record.

 8      Q     Mr. Moore went through a gallon of Roundup

 9  Concentrate a day personally at Coleman Landscaping,

10  right?

11      A     Where are you reading now, please?

12      Q     I think you say that on --

13      A     Page 13.

14      Q     Page 14, maybe.

15      A     He used -- when -- where is --

16      Q     I will repeat my question.

17      A     Yeah.

18      Q     So table 4 gives your calculations of use

19  pattern and duration of exposure for Stacey Moore?

20      A     Yes.

21      Q     Mr. Moore used Roundup at Coleman Landscaping

22  from '92 to '95, correct?

23      A     Yes.

24      Q     Mr. Moore went through a gallon of Roundup

25  Concentrate a day personally at Coleman Landscaping,
```

1   correct?

2       A      That's what the records show.

3       Q      That was Roundup Concentrate, right?

4       A      That was Roundup Concentrate.

5       Q      In your estimation, Mr. Moore mixed a cup of

6   Roundup Concentrate with a gallon of water; is that

7   right?

8       A      That's what the description was, and I took all

9   of this information from his -- either from the

10  deposition or his records that he stated under oath, so

11  I should take at his...

12      Q      Page 13 of your report states, Based on the

13  above calculations and from Moore's statements, it could

14  be seen that he was -- if he has been using one cup of

15  Concentrate diluted to one gallon of water.

16              Do you see where I am?

17      A      Yes.

18      Q      Okay.  For the purposes of your calculations,

19  you took Mr. Moore's reported use at face value, right?

20      A      Yes.

21      Q      You estimated that Mr. Moore had used one cup

22  of Concentrate diluted to one gallon of water, right?

23      A      That was a statement.

24      Q      You state that Mr. Moore went through a gallon

25  of Concentrate a day every single day he used Roundup.

1    And if you will turn with me to page -- page 14.   I

2    think this is the best place for that.

3         A    Uh-huh, yes.

4         Q    Okay.   Tell me when you are there.

5         A    Yes, approximately one gallon per day.

6         Q    Okay.   New question.

7              In preparing your opinions in this case,

8    you state that Mr. Moore went through one gallon of

9    Roundup Concentrate per day every single day he used

10   Roundup from 1992 to 1997, correct?

11        A    Yes.

12        Q    Mr. Moore went through two gallons of Roundup

13   Concentrate per day every single day he used Roundup

14   from 1998 to 2001, correct?

15        A    That's what the report said.

16        Q    Mr. Moore went through a gallon of Roundup

17   Concentrate per day every single day he used Roundup

18   from 2013 to 2017, right?

19        A    Yes, that's what the records show.

20        Q    In your estimation, again, Mr. Moore mixed a

21   cup of Concentrate with about a gallon of water, right?

22        A    That's back to page 13, right, yeah.

23        Q    If he ever read the Roundup label, Mr. Moore

24   would know not to do that; correct?

25              MR. HABERMAN:   Objection.

```
1        A    I don't know.

2        Q.   (BY MS. ROSS) On page 12 of your report, I

3   think you state that -- if you will go there with me for

4   a moment.

5        A    Yeah.

6        Q    Okay.  The last sentence right before section

7   10, are you there?

8        A    Yes.

9        Q    You state, Mr. Moore simply followed the

10  instructions from his supervisors or owners, fully

11  unaware of the label directions for handling, dilutions,

12  or personal safety; right?

13       A    That's what the records show.

14       Q    Stacey Moore never read the Roundup label,

15  right?

16            MR. HABERMAN:   Objection.

17       A    I don't know.

18       Q.   (BY MS. ROSS) Based on his testimony and what

19  you reviewed in -- in preparing your expert opinions --

20       A    That's what I saw.  I recall that.  I do not

21  know whether he's read -- or he received instructions

22  from his supervisors to do that, and we don't -- I

23  really do not know that he had read it or not when he

24  prepared it daily.  And most of time he said, you know,

25  his supervisors told him to do -- or they used to do
```

```
 1    that, the practice was like that, or something like

 2    that.

 3       Q    I think we were talking over each other so I

 4    want to just finish my question.  Okay?

 5       A    All right.  You didn't finish it, I don't

 6    think?

 7       Q    No.

 8       A    Okay.

 9       Q    Stacey Moore, based on the material that you

10    saw in his deposition and that you were provided with,

11    never read the Roundup label; true?

12       A    Yes.

13       Q    Or if he read it, he ignored it; is that fair?

14       A    If he read it, I don't know.

15       Q    Okay.  If Stacey Moore had read the Roundup

16    label, would he have known not to mix a cup of

17    Concentrate with a gallon of water?

18            MR. HABERMAN:  Objection.

19       A    Whatever the label says.  I don't -- I don't --

20    the label -- whatever the label says about the dilution

21    will be the thing that he needs to follow.

22       Q.   (BY MS. ROSS) Did you look at the labeling for

23    Roundup PRO Concentrate to --

24       A    I saw the Concentrate, but they did not give

25    any -- how much to values and all.  That was not -- that
```

1    was a standard EPA level.  The product label that goes

2    with the box, it will have the dilution information.

3        Q    You did not review any Roundup label that has

4    information on how you should dilute Concentrate when

5    you are using it?

6        A    I am not saying, because I did not have a

7    product label that is sold in the market.

8        Q    You don't have any product label that Stacey

9    Moore would have actually had on the Roundup

10   Concentrate --

11       A    No.

12       Q    -- that he was using?

13            If you will turn back with me to where

14   we just were on page 14.

15       A    Yes.

16       Q    Dr. Charles, there are 16 cups in a gallon; is

17   that right?

18            MR. HABERMAN:  Objection.

19            MS. ROSS:  What is the basis of your

20   objection, Counsel?

21            MR. HABERMAN:  I don't know if your

22   calculations are right.

23       Q.   (BY MS. ROSS) Okay.  Dr. Charles, I am going to

24   ask you a different question.  Okay?

25       A    If you give me a calculator, probably I can.

Ambrose R. Charles, Ph.D.

1    Q    Do you know as a toxicologist, sitting here

2    today, how many cups there are in a gallon?

3    A    50 milliliter -- 1,000 gallons is -- I can

4    calculate and then tell you, you know...

5    Q    Okay.  So you converted a cup to milliliters,

6    right?

7    A    Yeah.

8    Q    And then you --

9    A    I --

10   Q    -- converted a gallon to liters; is that right?

11   A    That's right.

12   Q    Okay.

13   A    A U.S. gallon -- gallon in the U.S. is simply a

14   gallon.  Gallon is not usually a British measure.  U.S.

15   gallon is 3.785 liters.  A British gallon is 5 liters.

16   That's why I specifically say U.S. gallon when we are

17   talking here.

18   Q    I am going to do these calculation --

19   A    Yeah, please.

20   Q    -- so we are on the sage page.  Okay?

21        3.785 liters is 3,785 milliliters,

22   right?

23   A    Yes, 3.785 liters.

24   Q    And you state a cup is 237 milliliters, right?

25   A    That's right.  We have to divide that number.

Ambrose v. Charles, Ph.D.

```
1        Q    So if we divide 3,785 divided by --

2        A    237.

3        Q    -- 237?

4             THE REPORTER:  I am sorry, divided by

5   what?

6             MS. ROSS:  237?

7             THE REPORTER:  Thank you.

8        Q.   (BY MS. ROSS) My numbers so far are right;

9   correct, Dr. Charles?

10       A    Yes.

11       Q    The number that that gives you is .0042?

12       A    Cups.

13       Q    So do you know whether it's actually correct

14  that there are .004 --

15       A    No, that's not correct.

16       Q    -- cups in a gallon?

17       A    We want to divide 3,000 -- oh, you're -- you're

18  dividing it by -- 3.785 has to be -- it should be

19  3,785 milliliters --

20       Q    Okay.

21       A    -- divided by 237.

22       Q    So --

23       A    So both should be the same unit, you know.

24       Q    There we go, so 3,785 divided by 237 --

25       A    237.
```

1      Q     -- is what?

2      A     It is 15 -- 16 gal- -- 16 cups.

3      Q     There are 16 cups in a U.S. gallon --

4      A     Exactly.

5      Q     -- correct?

6      A     Yes.  It's not .004.

7            Where did you get that number from?

8      Q     I used the numbers in your report and a

9      calculator?

10     A     What is that?

11           No, you -- you divided by -- you divided

12     liters by amount.  That's why you got that number.

13     Q     Oh, the first time we did it?

14     A     Yeah.

15     Q     Yeah, I am sure that that's not right.

16     A     Yeah, it should be milliliters by milliliters.

17     That's why you can work both into the same units before

18     you divide.

19     Q     So when we do this correctly, you figure out

20     that there are 16 cups in a gallon, right?

21     A     Yes, correct.

22     Q     If Mr. Moore went through a gallon of

23     Concentrate a day and mixed a cup into a gallon each

24     time, he would have mixed Roundup in water 16 times

25     throughout the course of the day, right?

Ambrose R. Charles, Ph.D.

1      A      It could be.

2      Q      What else could it be?

3             MR. HABERMAN:  Objection.

4      A      What?

5      Q.  (BY MS. ROSS) You -- you said it could be, so I

6  just want to be clear.  Is there something else that

7  you --

8      A      You --

9             (Overlapping speakers.)

10     Q.  (BY MS. ROSS) -- think he would have done?

11     A      Your question was -- started with "if."

12     Q      So --

13     A      So I answered, it could be.  I do not know if

14  he really thought he did not do --

15     Q      You don't know if Mr. Moore actually went

16  through a gallon of Concentrate every day, right?

17     A      That's what his statement said.

18     Q      For the purposes of your calculations, you

19  assumed that Mr. Moore went through a gallon of

20  Concentrate every day?

21     A      I did not assume anything, ma'am.  I took that

22  information that he used a gallon per day so that I can

23  do my calculation based on that information.  I made

24  some -- made mistakes, but that was my -- fact that I

25  followed.  I didn't assume anything.

```
 1        Q     You took it as a fact that Mr. Moore --

 2        A     Yes.

 3        Q     -- used a gallon of Concentrate a day?

 4        A     Yes, he told what he did.

 5        Q     When Mr. Moore went through a gallon of

 6   Concentrate a day and mixed a cup into a gallon each

 7   time, he would have mixed Roundup in water 16 times

 8   throughout the course of the day, right?

 9        A     Yes.

10        Q     What type of apparatus did Mr. Moore use to

11   spray Roundup?

12        A     He used a -- if I recall the reading, maybe he

13   had two gallon's sprayer or something like that, a

14   sprayer --

15        Q     Did you --

16        A     -- back sprayer.

17        Q     Mr. Moore, based on your description, I think

18   in your report, used a back -- a backpack sprayer;

19   right?

20        A     Yes, yes.

21        Q     His backpack sprayer held 3 gallons of water, I

22   think you said; is that right?

23        A     I think it was 2 -- back -- back sprayer was

24   2 or 3 gallons.  I do not -- 2 gallons -- no.

25        Q     In table 4, in your "Use Pattern and Duration
```

```
 1    of Exposure," you say he filled a 3-gallon backpack

 2    sprayer.

 3                Do you see that?

 4    A    Table 4?

 5    Q    Yes.

 6    A    Yes, filled in a 3-gallon backpack sprayer,

 7    yes, yes.

 8    Q    Mr. Moore used a backpack sprayer at Coleman

 9    Landscaping that held 3 gallons?

10    A    Yes.

11    Q    Why wouldn't Stacey Moore just fill up the

12    whole backpack sprayer?

13                MR. HABERMAN:  Objection.

14    A    I do not know.

15    Q.  (BY MS. ROSS) Do you know one way or the other

16    whether Mr. Moore mixed a cup of Concentrate into

17    one gallon of water or three gallons of water when he

18    was at Coleman Landscaping?

19    A    I have no answer.

20    Q    You are not offering an opinion --

21    A    No.

22    Q    -- on that?

23    A    No, all that I know is he used one gallon --

24    you know, one cup per one gallon dilution, is part of

25    my...
```

Ambrose R. Charles, Ph.D.

1    Q    If Mr. Moore mixed a cup of Roundup into three

2  gallons instead of one gallon of water, that would cut

3  the concentration he sprayed by 3, right?

4    A    Yes.

5    Q    Then what he sprayed would have been about

6  1 percent glyphosate, right?

7    A    Yes.

8    Q    You don't know whether's that's the case,

9  correct?

10    A    I do not know.

11    Q    Later Stacey Moore used a two-gallon backpack

12  sprayer, I think you say in this -- for example, this

13  table in his home -- or his private landscaping company

14  from '93 to -- withdrawn.

15    A    '98 to '01 --

16    Q    Yes.

17    A    -- self-employed.

18    Q    I will ask a new question.  Okay?

19    A    Yes.

20    Q    Stacey Moore later on used a two-gallon

21  backpack sprayer, right?

22    A    Yes.

23    Q    You say that he mixed a cup of Concentrate into

24  two gallons at that point, correct?

25    A    Did I say that he mixed one cup with two

1    gallons?

2        Q    You did.  In table 4, under 1998 in 2001?

3        A    One cup of Concentrated to two gallons, yes.

4        Q    Let me ask it so that we've got a clear record.

5        A    Yes.

6        Q    Dr. Charles, when Mr. Moore was working in his

7    own landscaping business, how much Concentrate did he

8    mix with how much water?

9        A    His statement was that he used one cup per

10   gallon, that was --

11       Q    And in your table, you say that he used one cup

12   of Concentrate to two gallons of water, right?

13       A    Yeah, those are all coming from his different

14   statements during that time in the deposition.  The

15   deposition is going on, and he used different answers,

16   so I just transcribed that information to exactly what

17   period, what was done.  That's all.

18       Q    Table 4 gives your transcription of the exact

19   information that Stacey Moore gave as to his --

20       A    That's right.

21       Q    -- use of Roundup during various times, right?

22       A    Yes, yes.

23       Q    When you did your calculations, you did not

24   calculate what percentage glyphosate Stacey Moore had

25   when he was mixing one cup of Concentrate into two

1    gallons of water, right?

2        A    I did not do every situation and dilutions.  I

3    did not do.  I only looked at if he took a

4    Concentrate -- one cup of Concentrate Roundup and he

5    valued it according to what he said.

6        Q    He said different things at different times in

7    his deposition, true?

8        A    Probably, yes.

9        Q    When Mr. Moore mixed one cup of Concentrate

10   into two gallons of water, that would half the

11   concentration you calculated in your report, correct?

12       A    Yes.

13       Q    In your report, you state Mr. Moore used

14   Roundup 22 days per month, 12 months a year.  That's

15   your report on page 15.

16       A    Yes.

17       Q    Let's see.  12 times 22 is what?

18       A    Which column are you -- are you reading that?

19       Q    So right now I am just calculating 12 times 22,

20   and then we will add in the 16 years.

21       A    Where -- where does that 22 come from, please?

22       Q    When you say, "The steps of calculation are

23   given below for reference," on page 15.

24       A    Yes, in that one.

25       Q    And you -- you used 22 days per month times

1    12 months, right?

2        A    22 days, yes, yes.

3        Q    12 times 22 is 264, correct?

4        A    Yes.

5        Q    Based on your calculations, Stacey Moore used

6    at least 264 gallons of Roundup Concentrate per year;

7    right?

8        A    Please point out the line to me so that I am

9    following with you because you move from one page

10   (indiscernible) and --

11       Q    Yes.  And you didn't give this number, which is

12   why we are talking about it right now.

13       A    Oh, okay.

14       Q    So I want to be clear --

15            (Overlapping speakers.)

16       A    Okay.  Okay.

17       Q.   (BY MS. ROSS) -- based on your calculations

18   this would be the number.  Okay?

19       A    Yeah, probably is.

20       Q    Yeah.

21            So let me ask my question again.

22            You -- you say 22 days per month, 12

23   months a year for Stacey Moore's Roundup use, right?

24       A    I was calculating based on -- because he was

25   working, right, a working person.  So I was thinking

1    about the workdays and taking the number of workdays and

2    the amount and approximating.  Okay?  I did not have any

3    clear records or a number or anything like that.

4            So you are estimating, you know, how

5    much -- how many days he must have worked and how many

6    hours he worked and those kind of things.

7    Q    And your estimation was that he worked 22 days

8    per week [sic] twelve months a year?

9    A    22 days a week?

10    Q    Sorry, let me reask that question.

11    A    Yeah.

12    Q    Your estimation was that he worked 22 days per

13    month, 12 months a year, correct?

14    A    12 months in a year, yes.

15    Q    12 times 22 is what?

16    A    264.

17    Q    Based on your estimations, Stacey Moore used at

18    least 264 gallons of Roundup Concentrate per year,

19    correct?

20    A    Where are you pointing at now?

21    Q    When you say that he used a gallon of

22    Concentrate per day, if he used Roundup 264 days

23    per year, that would be one gallon per day times 264?

24    A    Yes.

25    Q    Okay.  Our math is correct, right?

```
 1      A     Yes.

 2      Q     Did you do any calculation of how much it would

 3   cost to purchase 264 gallons of Roundup Concentrate per

 4   year?

 5      A     I did not.

 6      Q     Do you know how much a gallon of Roundup

 7   Concentrate costs?

 8      A     I do not know at this point.

 9      Q     Do you have any idea how much a gallon of

10   Roundup Concentrate cost in 1992?

11      A     No, I don't.

12      Q     Do you know how much a gallon cost at any point

13   thereafter?

14      A     I don't.

15      Q     Do you know how much ground one gallon of

16   Roundup Concentrate would cover?

17      A     It depends on the application rate.

18      Q     Do you --

19      A     Usually --

20      Q     Oh, sorry.  Go ahead.

21      A     Excuse me.

22            Usually, there is how many gallons of

23   that dilution per square feet, 100,000, or 500 per

24   acre or whatever.  So the label will say that.

25      Q     Right.
```

```
 1                  So let's assume that Mr. Moore was

 2     applying Roundup as you calculated in your report.

 3     Okay?

 4          A    (No response.)

 5          Q    He's got 16 gallons of 3 percent Roundup to

 6     apply over the course of a day after he's diluted a cup

 7     into a gallon.

 8                  Do you know how much ground that amount

 9     of Roundup would cover?

10          A    A lot of area.

11          Q    Do you have any opinion on whether a single

12     human being could reasonably cover that much ground in a

13     day of spraying?

14          A    I have no idea.

15          Q    Stacey Moore also said he used Roundup at

16     various other employers after Coleman, right?

17          A    Yes.

18          Q    Stacey Moore used Roundup at Hawthorne

19     Apartments from 1996 to 1997 based on your chart; is

20     that right?

21          A    Yeah, that's -- they're all information coming

22     from the documents given to me.

23          Q    From 1998 to 2001, Stacey Moore was employed --

24     self-employed in landscaping, correct?

25          A    Yes.
```

Ambrose R. Charles, Ph.D.

```
 1      Q    From 2013 to 2017, Stacey Moore used Roundup at
 2  The Reserve at Research Park; right?
 3      A    Yes.
 4      Q    Your calculations are based on those years that
 5  were given, right?
 6      A    Yes.
 7      Q    None of Mr. Moore's employers had any sort of
 8  safety postings displayed, right?
 9      A    Yeah, that's what I read.
10      Q    None gave warnings or instructions about
11  Roundup other than how to mix it, correct?
12      A    Obviously, he did not get any ins- --
13  instructions from his supervisors, you know, how to
14  dilute it, or from the label; I do not know, I have not
15  seen that information.
16      Q    Stacey Moore used no personal protective
17  equipment, no gloves.  He wore tennis shoes, a tank top,
18  and a pair of shorts when applying Roundup; correct?
19      A    Yes, that's what I read.
20      Q    Is that consistent with your experience of
21  employers who send their employees to spray pesticides
22  as a former State regulator?
23      A    No.
24      Q    As someone who once had statewide regulatory
25  responsibility for pesticide safety, did it give you any
```

Ambrose v. Charles, Ph.D.

1    pause when Mr. Moore reported that none of his employers

2    provided any guidance whatsoever on the safe use of

3    pesticides?

4        A    No, that's -- that's an occupational

5    requirement that -- under OSHA if it is a registered

6    company.  If there are a number of employees there, you

7    know, they have to be given -- it is according to the

8    requirement.

9        Q    If any of those employers had anything to say

10   about their practices when it came to employees spraying

11   pesticides, would you want to see that?

12       A    Say it again.

13       Q    If any of those employers actually had anything

14   to say about how their employees sprayed pesticides,

15   would you want to see that information?

16       A    Yes.

17       Q    Did you, in fact, consider any information from

18   any of Mr. Moore's former employers in forming your

19   opinion that Mr. Moore sprayed Roundup in the way he

20   described?

21       A    If it is there, I will review it.  If it is not

22   there, I don't have that information.

23       Q    Sitting here today, you don't have that

24   information?

25       A    No.

Ambrose R. Charles, Ph.D.

```
 1      Q    Did you do anything at all to investigate
 2  Mr. Moore's claimed usage of Roundup at Coleman
 3  Landscaping?
 4      A    Did he -- say it again.
 5      Q    Did you do anything to investigate Mr. Moore's
 6  claimed usage of Roundup at Coleman Landscaping?
 7      A    No, I already stated that I never have any
 8  investigative toxicology.
 9      Q    The same would be true if I asked you about
10  Hawthorne Apartments, right?
11      A    Yes.
12      Q    The same would be true for The Reserve,
13  correct?
14      A    Yes.
15      Q    The same would be true of anywhere that
16  Mr. Moore claims to have sprayed Roundup, right?
17      A    Yes.
18      Q    In your view, Mr. Moore did not mix Roundup
19  correctly, right?
20      A    Probably, yes.
21      Q    Did Mr. Moore --
22              MR. HABERMAN:   Objection.
23      Q.  (BY MS. ROSS) -- spill Roundup?
24      A    Pardon?
25      Q    Did he spill Roundup?
```

1      A    I do not know.  I saw the records somewhere

2   that sometimes it gets on his hands, or, you know, when

3   he mixes, you know, those kind of things.

4      Q    Did Stacey Moore say what he did after he

5   spilled Roundup?

6      A    It must be there somewhere, I can't recall.  He

7   must have taken a shower at home when he was ready.

8      Q    I think you say on page 15 of your report --

9      A    Yes.

10     Q    Okay.

11     A    He says, you know, RU Spray often got on his

12   skin.  He says he felt wet and sticky, and on his body

13   and clothes for many hours of the day, making normal

14   inhalation, perhaps, follicular.

15          You know, this person is contaminated

16   with his skin in his arms, clothes, you know.  He can

17   touch anywhere and get contaminated and exposed.

18     Q    I have a few more questions on this topic and

19   then we will switch and take a break; is that okay,

20   doctor?

21     A    Yes, yes.

22     Q    Do you know one way or the other whether --

23   well, actually, you state in your report -- withdrawn.

24          New question.

25          You state in your report that, if mixed

1    according to the labeling instructions, Roundup should

2    be approximately 1 percent glyphosate; right?

3        A    Yes.

4        Q    In Mr. Moore's case, you say that about

5    3 percent of the Roundup he sprayed was likely

6    glyphosate, right?

7        A    Yes.

8        Q    As we've just talked about, that may be an

9    overestimation for some of the time, for example, when

10   he says he mixed a cup of Roundup with two gallons of

11   water in his home landscaping business, right?

12       A    Yes.

13       Q    Regardless, at all times, over 95 percent of

14   the Roundup Stacey Moore sprayed on the weeds was water;

15   correct?

16       A    Yes.

17       Q    Mr. Moore was spraying 3 percent Roundup while

18   working for landscaping companies, right?

19       A    Yes.

20       Q    Those companies are trying to turn a profit,

21   correct?

22       A    Yes.

23       Q    3 percent instead of 1 percent means that

24   Stacey Moore used three times as much Roundup as they

25   needed to kill the plants, right?

 1                    MR. HABERMAN:  Objection.

 2      A    I do not know the facts of that.

 3      Q.   (BY MS. ROSS) Why would Mr. Coleman instruct

 4   his employee to use three times as much Roundup as he

 5   actually needed to kill the weeds?

 6                    MR. HABERMAN:  Objection.  He --

 7      A    I do not know.

 8                    MR. HABERMAN:  -- doesn't have any

 9   knowledge of that.  That has -- that's speculate --

10   calls for speculation.  It's improper.

11      A    I have no information on that.

12      Q.   (BY MS. ROSS) Did it occur to you to

13   investigate that in any way?

14      A    No.

15                    MS. ROSS:  Let's take a break here.

16                    THE VIDEOGRAPHER:  Going off the record.

17   The time is 1:21.

18                    (Lunch recess from 1:21 p.m. to 2:10 p.m.)

19                    THE VIDEOGRAPHER:  Back on the record.

20   The time is 2:10.

21      Q.   (BY MS. ROSS) Hi, Dr. Charles.

22      A    Hello.

23      Q    You understand you're still under oath?

24      A    Yes, yes.

25      Q    If you'll turn to Exhibit 7 with me, please.

Ambrose K. Charles, Ph.D.

```
 1                    This is your time log --

 2      A    Oh, okay.

 3      Q    -- and hours for Stacey Moore.

 4      A    Oh, okay.

 5      Q    Are you there?

 6      A    Yes.

 7               MS. ROSS:  Can we go off the record for

 8   one second?

 9               THE VIDEOGRAPHER:  Going off the record.

10   The time is 2:11.

11               (Recess from 2:11 p.m. to 2:12 p.m.)

12               THE VIDEOGRAPHER:  Back on the record.

13   The time is 2:12.

14      Q.  (BY THE VIDEOGRAPHER) Dr. Charles, we were

15   looking at Exhibit 7 to your deposition, which is your

16   time log for Stacey Moore.

17               Do you see that?

18      A    Yes.

19      Q    Is Exhibit 7 an accurate representation of the

20   time that you spent on Stacey Moore's case through

21   May 15th of 2022?

22      A    Yes.

23      Q    You were retained in this case on April 5th of

24   2022; is that right?

25      A    I don't think I was retained on that day.  That
```

Ambrose K. Charles, Ph.D.

```
 1   was the first -- you mean April 5th, right?

 2       Q    Yes.

 3       A    No.  That was a -- an e-mail con- -- contact

 4   that the counsel has made.

 5       Q    When were you first retained in this case?

 6       A    I think I was retained somewhere around 4/9th

 7   or 4/10th, around that time, because --

 8       Q    You were retained around April 9th or 10th of

 9   2022; is that right?

10       A    Somewhere around that, because soon after, I

11   got the verbal agreement over the phone, you know, you

12   are retained.  I did not receive any fee or anything

13   like that.  I started re- -- receiving these documents.

14   So that's the time I started paying attention to it, but

15   not papers agreement.  Nothing was signed at the time as

16   for retention.

17       Q    You, it appears, sent a contract on April 9th,

18   2022; is that right?

19       A    I think probably that is the date I sent the

20   contract, yes.

21       Q    Do you have a signed contract with the

22   Schlesinger law firm in this case?

23       A    I don't have a copy of that.

24            Counsel has that same contract.

25            MR. HABERMAN:  I think we produced it to
```

1   you guys.

2                MS. ROSS:  You didn't.  So I will just

3   request for the record that we get a copy of

4   Dr. Charles' retention letter.

5                I know we have Dr. Ben Brooke's

6   retention letter.  I might also be wrong on that,

7   Jeff, but can we just have an agreement --

8                MR. HABERMAN:  Yes.

9                MS. ROSS:  -- that if it hasn't been

10  produced, we will have a copy of Dr. Charles' retention

11  letter?

12               MR. HABERMAN:  Yes.

13               MS. ROSS:  Thank you.

14      Q.   (BY MS. ROSS) Dr. Charles, by whom --

15               MR. HABERMAN:  If there is one.  If there

16  is one.

17      A    Say the retention -- I don't have a formal

18  retention letter from the Counsel's office.  I have

19  an -- an ordinary agreement as a consultant when

20  somebody is trying to hire me for a consult.

21               Then I have an agreement with my fee and

22  everything that is a fee schedule.  That which I send

23  to them and then say, I agree with these things.  That

24  is part of the agreement before we start the work.

25      Q.   (BY MS. ROSS) I think I understand.

```
 1                  So you didn't use a retention letter

 2    that was sent to you from Counsel, right?

 3       A    No.

 4       Q    You used your contract that you use for

 5    Toxfactor Consulting, correct?

 6       A    Yes.

 7       Q    Counsel has a copy of the agreement that you

 8    provided them from Toxfactor Consulting, right?

 9       A    Counsel has signed that -- signed the

10    agreement.

11                  MS. ROSS:  Counsel, you'll send me that

12    agreement that you have with Toxfactor Consulting?

13                  MR. HABERMAN:  If we have that, yeah.

14                  MS. ROSS:  Great.

15       Q    (BY MS. ROSS) Dr. Charles, do you require a

16    signed contract whenever you do a new consulting

17    engagement?

18       A    Yeah, I do.

19       Q    Were you retained -- well, withdrawn.

20                  Who retained you in this case?

21       A    I talked to him.  I talked to Mr. Haberman.

22       Q    You talked to Mr. Haberman?

23       A    Yes.

24       Q    And have you ever worked with Mr. Haberman

25    before?
```

```
 1       A    No.

 2       Q    Have you ever worked with any lawyers at the

 3   Schlesinger law firm before?

 4       A    No.

 5       Q    How did they get your name?

 6       A    I do not know how he got his [sic] name, but I

 7   recall when he called me the first time he said that he

 8   got my name from a -- from the Arnold Itkin law firm.

 9       Q    From the Arnold Hitchkin law firm?

10            MR. HABERMAN:   Itkin, I-T-K-I-N.

11       A    Itkin.

12       Q    (BY MS. ROSS) I see.

13       A    Yeah, law firm.   Through his firm, with the law

14   firm, he got my name.

15       Q    Before you were hired in April of 2022, had you

16   formed any opinion on whether glyphosate causes cancer?

17       A    No.

18       Q    Are you relying on any other expert in this

19   case for any other opinions you are offering?

20       A    No.

21       Q    One of the first things that you were provided

22   before you agreed to be an expert was Dr. Sawyer's

23   report, correct?

24       A    Yes.

25       Q    You reviewed Dr. Sawyer's report in the Roundup
```

1    litigation before forming your opinions on Roundup,

2    glyphosate, or these individual plaintiffs, correct?

3         A    I think I received -- so along with other

4    documents around 4/12 or so.

5         Q    On April 7th of 2022, according to your time

6    sheet, you received Dr. Sawyer's report, printed it and

7    reviewed it?

8         A    Oh, yes, yeah, yes, I have, I have seen that,

9    yes.

10        Q    Just so our --

11        A    I crossed that out and I didn't read that.

12        Q    I want to make sure that our -- we aren't

13   talking over each other.  Okay?

14        A    Yes, yes.

15        Q    Your first e-mail contact with Mr. Haberman was

16   on April 5th of 2022, correct?

17        A    Yes.

18        Q    On April 7th of 2022, you were sent the report

19   from Dr. Sawyer, and you printed and reviewed that,

20   correct?

21        A    Yes.

22        Q    On April 9th of 2022, you sent your resume,

23   W-9, and standard consulting contract; correct?

24        A    Yes.

25        Q    On April 12th, you received documents related

```
1    to the plaintiffs in this case?

2        A     Yes.

3        Q     Correct?

4        A     Yes.

5        Q     The timeline we just walked through --

6        A     Yes.

7        Q     -- is the timeline in which you received this

8    document?

9        A     Yes, yes, yes.  I recall now, correct.

10       Q     Are you relying on Dr. Sawyer for any of the

11   opinions that you are offering in this case?

12       A     No.

13       Q     Are you relying on any other expert in this

14   case for any of the opinions you are offering?

15       A     No.

16       Q     When you received and reviewed Dr. Sawyer's

17   report, how did you go about making the determination

18   that Dr. Sawyer and his report are authoritative?

19       A     Reports are?

20       Q     When you received and reviewed Dr. Sawyer's

21   report, how did you go about making the determination

22   that Dr. Sawyer's opinions were authoritative?

23       A     I did not make that statement.

24       Q     When you reviewed Dr. Sawyer's report, did you

25   review any of the cited sources and make any
```

Ambrose R. Charles, Ph.D.

1   determination on your own as to whether his citations

2   were accurate?

3       A    No.

4               Can I add a little more to that?

5       Q    Yes.

6       A    When I -- first, when I received the Sawyer --

7   Sawyer report -- William Sawyer, right?  I think that is

8   his name.  When I got that report, it was not the full

9   report.  Some of the, you know, personal information or

10  initial interrogation or something, all those things

11  were blacked out.

12              It was a PDF file.  When I opened the

13  PDF file and looked through it, a lot of it was not

14  readable.  So I just quickly went through some of the

15  printed matters.  I glanced through on the computer

16  screen.  And then I printed out to read it, you know,

17  because it's very difficult to read that.

18              And then I -- I finished reading and

19  I -- I said, well, that is the report, you know.  I

20  mean, that has nothing to do with me.

21              My opinions are based on -- I have done

22  many of -- several of these assessments, you know,

23  reviewing opinions and all.  So I don't need

24  somebody's opinion to influence me or make a decision.

25              Then I think the next day -- so I think

1    I spoke to him saying that, hey, I received the

2    Williams -- that is what probably the conference call

3    on William Sawyer's report on the next day, 4/8, says.

4                He called me or I called, I don't know.

5    I don't remember.  We talked.  What do you think about

6    this?  I said -- what I said, that's not really useful

7    to me.  That is somebody's report.

8                Even if it's there or something, you

9    know, that is his opinion and I am going to read all

10   the documents you have and see what is in it, other

11   than that I cannot make every- -- any opinion about

12   anything.

13               That's where I started getting in

14   documents.  That's all I know about that.

15       Q    What is your understanding of why you were

16   provided Dr. Sawyer's report?

17       A    I do not know.

18       Q    Between April 12th, 2022, and April 25th of

19   2022, you reviewed Mr. Moore's deposition, medical

20   records, and began drafting your report about Mr. Moore,

21   correct?

22       A    Yes.

23       Q    Between -- well, withdrawn.

24               On April 30th of 2022, you started to

25   review the Roundup epidemiology, correct?

```
 1      A    Yes.

 2      Q    Between April 30th and May 10th of 2022 --

 3      A    Yeah.

 4      Q    -- you reviewed the Eriksson, McDuffie, Leon,

 5   Boffetta, Andreotti, and Pahwa studies, right?

 6      A    Yes.  There may be more studies.  Yeah, there

 7   are -- there is another line there Andreotti, Pahwa

 8   studies, yes.  Seven, I believe.

 9      Q    Yes.

10           Starting on April 30th, 2022, you

11   reviewed Eriksson 2008, McDuffie 2001, Leon, Boffetta,

12   Andreotti and Pahwa, correct?

13      A    Yes.

14      Q    You spent 24.5 hours reviewing literature and

15   editing your report in the period between April 30th and

16   May 10th, right?

17      A    If that's what the records shows.

18      Q    You spent eight hours reviewing the seven

19   epidemiology studies on Roundup and non-Hodgkin's

20   lymphoma, true?

21      A    Yes.  Probably, yes.

22      Q    From May 11th through the 13th, you made some

23   additional edits to your report, correct?

24      A    Yes.

25      Q    And through May 13th, you'd spent 58 hours
```

Ambrose v. Charles, Ph.D.

```
 1   reviewing materials to prepare your opinions about

 2   Mr. Moore, right?

 3       A    Yes.

 4       Q    I think you mentioned you've spent a few more

 5   hours since then; is that correct?

 6       A    I think I -- it's more maybe.  One of them

 7   five hours, another one ten hours.  Which one is which,

 8   I can't remember.

 9       Q    For both Stacey Moore and William Pleu, since

10   submitting your time logs, you've spent a sum of

11   approximately 15 hours, correct?

12       A    Yes.

13       Q    Those additional 15 hours would be billed at

14   your consulting rate of 450 per hour, right?

15       A    Yes.

16       Q    For -- if you'll turn with me to Exhibit 9.

17   This is your time log for Mr. Pleu.

18       A    Yes, ma'am.

19       Q    Your initial contact is the same, right?

20       A    Yes.

21       Q    You were initially contacted about the Pleu

22   case on April 5th of 2022, right?

23       A    Yes.

24       Q    Is that the first time anybody contacted you

25   about the Roundup litigation at all?
```

```
 1      A      No.

 2      Q      When did someone contact you about the Roundup

 3   litigation?

 4      A      My name is there in Expert Institute as an

 5   expert.  So lawyers look at -- or contact Expert

 6   Institute and they contact me.  There is a lawyer here

 7   that would like to talk to you about a case.

 8      Q      I see.

 9             So you had been contacted before April

10   of 2022 about potentially being an expert in the

11   Roundup litigation, right?

12      A      Yes.  By a lawyer from Houston.

13      Q      Okay.  Prior to April of 2022, you had never

14   agreed to be an expert in the Roundup litigation; is

15   that right?

16      A      No.  I have not -- the -- did you start using

17   double negatives again?

18      Q      I did.  Let me ask it again.

19             Before April of 2022, have you ever

20   agreed to be an expert in the Roundup litigation?

21      A      No.

22      Q      Do you know who the lawyer was who contacted

23   you earlier?

24      A      The lawyer who contacted me earlier is --

25             THE WITNESS:  Can I say the name of the
```

1    lawyer?

2             MR. HABERMAN:  Yes.

3    A    Brittany Clark.

4    Q.   (BY MS. ROSS) Brittany Clark?

5    A    She interviewed me over Zoom -- Zoom conference

6    call.

7    Q    Do you know who Ms. Clark was representing?

8    A    That's why I said the Arnold Itkin law firm.

9    Q    Okay.  After that initial contact, all of the

10   dates that we talked about for Mr. Moore also apply to

11   Mr. Pleu, correct?  I will ask -- I was hoping we could

12   shut off some of the questioning, but let me just ask my

13   questions.  Okay?

14             Yes?

15   A    Yes.

16   Q    You agreed to be an expert sometime around

17   April 9th of 2022 for Mr. Pleu's case, right?

18   A    Yes.

19   Q    You received documents related to Mr. Pleu for

20   the first time on April 12th of 2022, right?

21   A    Yes.  Around that, yes.

22   Q    You received a Roundup summary from attorney

23   Haberman on May 16th.  Do you see that?

24   A    Yes.

25   Q    What was that document?

```
 1      A    A Roundup summary.  Oh, that -- I believe that
 2  was a -- a narration of -- somebody in his office, you
 3  know, created a couple of papers about all the cases,
 4  endings, like that, and almost the same medical records
 5  from the chronology of the case involved in a two- or
 6  three-page summary that the law office make -- or made,
 7  and he e-mailed to me and I didn't ask what -- I did not
 8  know what that is.
 9      Q    Did you rely on the summary provided to you by
10  counsel as to the medical records of any of the
11  plaintiffs in this case?
12      A    No.  I just looked through.
13      Q    Between May 16th and May 18th, you reviewed
14  the -- Mr. Pleu's deposition, right?
15      A    Yes.
16      Q    Then you reviewed after that Mr. Pleu's health
17  records, correct?
18      A    Yes.
19      Q    You also reviewed six clinical research papers
20  on CLL and colorectal cancer and prostate cancer to find
21  some causes or explanation, correct?
22      A    Yes.
23      Q    What were those six research papers?
24      A    Those were -- I can't remember what those --
25  where those -- those are the papers that I had written
```

1    "online reading," and then went to the next paper.  I

2    had not printed out any of those from online.  The first

3    was from the -- what Pub you use, NH, NH library, you

4    said, PubMedicine.

5        Q    From PubMed?

6        A    PubMed.

7        Q    Okay.  So you searched for articles on PubMed

8    about CLL, prostate cancer and colorectal cancer?

9        A    Yes.  Just to have some reading involved in it.

10       Q    I will represent to you I saw one paper on your

11   references list about CLL and prostate cancer.  Does

12   that sound right to you?

13       A    CLL and -- yeah, that was a paper that I read

14   later on, when, you know -- when I came to that prostate

15   cancer area, I was trying to see where did prostate

16   cancer come in or what is its lingerer?  Does glyphosate

17   have -- can have a secondary effect or as a stimulator

18   to other type of cancer.

19       Q    Did you include any of the six clinical

20   research papers on CLL and other cancers that you found

21   on your references?

22       A    I -- I have not referenced any of those things.

23   That was my background reading to know.

24       Q    From May 20th on, you continued to review some

25   of Mr. Pleu's medical records, right?

1      A    From 20th onwards.  You see the -- what do you

2    say, the "Ferro" records there, on the 20th, you see --

3      Q    Yes.

4      A    When the counsel sent me e-mail documents, you

5    know, that belong to three or four different people.

6      Q    Yes.

7      A    So three or four different document sets, he

8    sent to me, and then I didn't know what to do with that.

9    So then I was told to start working on more.  So -- so I

10    did that.

11              When I finished that thing, I started

12    with the Ferro.  Then, after spending some time on

13    that, while I was talking to counselor, I said, I

14    started with Ferro.  He said, no, stop Ferro, and then

15    work on Pleu.  That's why I went to Pleu.

16      Q    I see.

17              So the two hours on May 20th that you

18    spent, that say Ferro records, those were hours spent

19    reviewing a plaintiff that we're not here to talk

20    about today, correct?

21      A    Exactly, yes.

22      Q    And as of June 16th, you spent 23.5 hours on

23    Mr. Pleu's case, correct?

24      A    June 16th, yes.

25      Q    Then we get a total number of hours, I believe,

1   on page 2 of --

2      A    Yes.

3      Q    -- Exhibit 9?

4      A    Yes.

5      Q    As of June 17th, counting all of the hours

6   together, you spent approximately 60 hours on Mr. Pleu's

7   case, right?

8      A    That's around that, yes.

9      Q    Between Mr. Moore and Mr. Pleu, we talked about

10  earlier, you had invoiced $26,100 for one of those

11  cases, right?

12     A    Yes.

13     Q    $27,000 for the other, correct?

14     A    Yes.  Plus 15 hours.

15     Q    Plus 15 hours at 450 an hour, right?

16     A    Yes.

17     Q    15 times 450 is 6- -- 6,750, right?

18     A    Yes.

19     Q    For -- all in, for this case, as of today,

20  you've spent approximately 60,000 -- I'm sorry,

21  withdrawn.  New question.

22              Let's do this in steps.

23              53,100 plus 6750, how much is that?

24     A    Somewhere around 60-.

25     Q    As of today, the beginning of your deposition,

1   you spent -- or you billed approximately $60,000 to the

2   Schlesinger law firm for this case, correct?

3       A    Yes.

4       Q    What is your rate for a deposition?

5       A    I believe it is 3500 per day.

6       Q    What do you charge for trial?

7       A    I think it's almost the same, 3500.  I take off

8   for the day.

9       Q    Approximately $3,500 per day --

10      A    Per day, yeah.

11      Q    -- is your rate for trial and deposition

12  testimony, correct?

13      A    Yeah.  Plus -- plus incidental expenses, like,

14  you know, tickets and airfare, staying in a hotel.

15  Those kinds counts extra.

16      Q    Do you charge for travel time?

17      A    Travel time, you know, if it is local, I don't.

18  Local means in the surrounding counties.  If I have to

19  go somewhere else, you know, to Florida or Washington,

20  D.C. or Louisiana, I charge time.

21      Q    If you have to go to St. Louis, Missouri, will

22  you charge for your travel time?

23      A    I will.

24      Q    What will your rate be?

25      A    Same hours.  Or if it is a day, it'd be 3,500,

1    3500.

2        Q    So for every hour of your travel time, you will

3    charge 450 per hour?

4        A    That's right.

5        Q    Will you charge for every hour you are away

6    from home?

7        A    No.

8        Q    You first reviewed anything related to the

9    Roundup litigation on April 7th, 2022, correct?

10       A    Yes.

11       Q    Do you intend to invoice for any additional

12   time we've not talked about so far?

13       A    For these two cases, no.

14       Q    You mentioned these two cases.  You've also

15   reviewed one Federal case that we're not here to talk

16   about today, right?

17       A    I do not know if it is Federal cases.

18            THE WITNESS:  Is it a federal case in

19   fatal injuries?

20            MR. HABERMAN:  (Nodding head.)

21       A    Oh, I don't know.

22       Q.  (BY MS. ROSS) Let me just -- how many cases

23   beyond Mr. Pleu and Mr. Moore have you reviewed?

24       A    One case.

25       Q    Approximately, what is your best estimate of

Ambrose R. Charles, Ph.D.

```
1    time that you've spent to date on that one case?

2        A    I think that was -- that was around -- I -- I

3    don't have a printout with me.  Almost somewhere between

4    25 or 20 or something like that.

5        Q    Somewhere between 20 and 25 hours?

6        A    No.  Hours.

7        Q    20- and $25,000?

8        A    No.  Hours.

9        Q    Okay.  So for the --

10       A    No, no, I'm sorry.

11       Q    No, you are okay.

12       A    20- to $25,000, around that, yeah.

13       Q    Okay.  So fair to say you -- you've spent a

14   similar number of hours on the third case as you have

15   for Mr. Moore?

16       A    Fair to say that.

17       Q    And you've probably billed somewhere around the

18   same amount for that third case as you did for each

19   plaintiff in this case, correct?

20       A    Yes.

21       Q    Have you reviewed any other expert reports

22   besides Dr. Sawyer's?

23       A    No.

24       Q    Have you been provided -- well, withdrawn.

25            Have you ever communicated in any way
```

```
 1   with Dr. Sawyer?

 2       A    No.

 3       Q    Have you ever communicated in any way with

 4   Dr. Ben Brooke?

 5       A    I don't know who he is.

 6       Q    Dr. Andrew Schneider?

 7       A    I don't know who he is.

 8       Q    Dr. Gagne?

 9       A    I don't know who he is.

10       Q    Dr. Nugent?

11       A    I don't know who he is.

12       Q    Dr. Singh?

13       A    I don't know who he is.

14       Q    Have you spoken with any of Stacey Moore's

15   family members?

16       A    No.

17       Q    Have you spoken with any of his healthcare

18   providers?

19       A    No.

20       Q    Have you spoken with any of William Pleu's

21   family members?

22       A    No.

23       Q    Have you spoken with any of William Pleu's

24   healthcare providers?

25       A    No.
```

```
 1       Q    Have you discussed -- we may be able to cut

 2   this short.  Okay?

 3                 Withdrawn.  New question.

 4                 Have you discussed this litigation with

 5   anyone else?

 6       A    No.

 7       Q    Will you turn back with me to your report on

 8   Mr. Moore, please?  I think it's Exhibit 2.

 9       A    My report on who?

10       Q    Stacey Moore, Exhibit 2.

11       A    Yes.  Page 2?

12       Q    We can go to page 12, where you discuss

13   chemical concentration.

14       A    Okay.

15       Q    Dr. Charles, can you confirm that you have no

16   opinion in your report on what surfactant was in the

17   Roundup that Mr. Moore applied?

18       A    No.

19       Q    I'll ask it without the double negative.

20                 Do you have any opinion in your report

21   on what surfactant was in the Roundup Stacey Moore

22   applied?

23       A    No.

24       Q    Are you offering any expert opinion on what

25   surfactant was in the Roundup that Stacey Moore used?
```

```
 1                MR. HABERMAN:  Objection.

 2      A    No.

 3      Q.   (BY MS. ROSS) Is that true for every plaintiff

 4   in this case?

 5      A    That's true.

 6      Q    Do you intend to opine in this case -- case

 7   that Stacey Moore's exposure to surfactants in Roundup

 8   increased his risk of non-Hodgkin's lymphoma?

 9      A    No.

10                MR. HABERMAN:  Objection.

11      Q.   (BY MS. ROSS) Is that true for every plaintiff

12   in this case?

13      A    Yes.

14      Q    From your years at the Texas Department of

15   Agriculture, do you know that surfactants in Roundup

16   varied over time?

17      A    Yes.

18      Q    Surfactants vary from one formulation to

19   another, correct?

20      A    Yes.

21      Q    Mr. Moore testified that he was careful to keep

22   Roundup close and -- and not hit the flowers or things

23   other than the weeds that he intended to kill.

24                Do you recall reading that in his

25   deposition?
```

1    A    No.

2    Q    Do you know if Mr. Moore aimed the Roundup he

3    was spraying at the ground or at himself?

4    A    I can't recall that sentence, you know, but I

5    recall that he sprayed close to the weed or -- you know.

6    Q    Can you explain the physics to me of how it is

7    that someone would get their skin covered in Roundup

8    while spraying the weeds that are down on the ground and

9    not hit the flower beds that are next to them?

10            MR. HABERMAN:  Objection.

11    A    If there is a leak -- if there is a leak in

12    the, you know, sprayer that he is using or handle that

13    he is using, you know.

14    Q.   (BY MS. ROSS) Mr. Moore testified he got

15    Roundup on his skin all day long when he worked as a

16    landscaper, correct?

17    A    Yeah.  He also mentioned that while he was

18    diluting the chemical.

19    Q    Right?

20    A    Transferring it to the sprayer.

21    Q    You state that Roundup spray often got on his

22    skin and he felt wet and sticky, correct?

23    A    That was his statement.

24    Q    If Mr. Moore got Roundup on him, why -- why not

25    wash it off with water?

```
 1              MR. HABERMAN:  Objection.  Calls for

 2    speculation.

 3        A    How would I know?  I don't know.

 4        Q.   (BY MS. ROSS) Not everyone who uses Roundup has

 5    measurable glyphosate in their urine, true?

 6        A    That's true.

 7        Q    In your report, if you'll go with me to

 8    page 17, you have a section that discusses absorption,

 9    distribution, metabolism and excretion, correct?

10        A    Yes.

11        Q    The toxicological profile by ATSDR summarizes

12    the fate of glyphosate-based herbicides in humans,

13    correct?

14        A    Yes.

15        Q    You reviewed ATSDR's 2019 toxicological profile

16    for Roundup, correct?

17        A    Yes.

18        Q    As we talked about earlier, ATSDR is the agency

19    for toxic substances and disease registry, right?

20        A    Correct.

21        Q    How many scientists were involved in ATSDR's

22    2019 evaluation; do you recall?

23        A    I don't know that number.

24        Q    Did those scientists conclude that glyphosate

25    causes cancer?
```

```
 1                MR. HABERMAN:  Objection.

 2      A    I cannot answer that question and I can't

 3   remember -- I think what they had, equivalence, is what

 4   they concluded.  The studies showed that -- half of the

 5   studies -- or some of the studies showed positive

 6   association.  The other half showed a negative

 7   association.  So those are the kind of decisions they

 8   reached.  They did not go one way or the other.

 9      Q.   (BY MS. ROSS) ATSDR concluded that the

10   genotoxicity data for glyphosate were equivocal,

11   correct?

12      A    Yes.

13      Q    ATSDR noted that IARC and EPA had evaluated

14   glyphosate and reached different conclusions about

15   cancer, correct?

16      A    Yes.

17      Q    ATSDR did not conclude one way or the other

18   whether glyphosate causes cancer, true?

19      A    Yeah, that -- that's correct.  ATSDR presented.

20   Now that you have the data and the analysis, they don't

21   make any regulatory decisions.

22      Q    ATSDR states that less than 1 percent of

23   glyphosate is metabolized to AMPA, right?

24      A    Yes.

25      Q    Glyphosate does not bioaccumulate, correct?
```

```
 1       A     Not in large quantities.  Maybe traces.

 2       Q     Trace amounts of glyphosate might

 3  bioaccumulate?  Is that what you're saying?

 4       A     Yes.  Because in my knowledge and experience in

 5  a no chemical is 100 percent washed out of the body.  It

 6  is not -- it is not a clean exit.  It goes for different

 7  tissues.  Certain amount will be retained and most of it

 8  will be excreted.

 9       Q     Are you offering an expert opinion on what

10  percentage of glyphosate is retained or accumulated in

11  the body?

12       A     Not much data on that.

13       Q     And you're not offering an opinion on that?

14       A     No.

15       Q     Correct?

16             Are you offering an expert opinion that

17  glyphosate accumulates in any particular site in the

18  body?

19       A     There are some reports, you know, sporadic, not

20  really confirming.  So I did not call that thing, you

21  know, there is accumulation in certain areas of bone

22  marrow or some places like that, you know.  But I didn't

23  weigh that much -- that information to bring into my

24  discussion because I was not convinced.

25       Q     I'm going to break that down.  Okay?
```

```
 1      A    Yes.

 2      Q    There are some individual studies on whether

 3   glyphosate accumulates in particular sites in the body,

 4   including the bone marrow, right?

 5      A    Yes, yes.

 6      Q    You did not bring that information into your

 7   discussion of glyphosate because you were not convinced

 8   by those studies, correct?

 9      A    Yeah, because I -- I didn't see that report is

10   cited somewhere else or somebody comments on that, how

11   much weight is given by other scientists, and I look at

12   all of those things.  I don't go after this one report.

13      Q    Do you know if anybody other than Dr. William

14   Sawyer has concluded that glyphosate bioaccumulates in

15   the bone?

16      A    I -- I do not know.  I -- I can't recall even

17   what he said.

18      Q    Most of the absorbed chemical is rapidly

19   excreted in the urine, correct?

20      A    Yeah, most of it, yes.

21      Q    You state that Connolly 2020 discusses

22   glyphosate levels in the urine?

23      A    Yes.

24      Q    The average glyphosate concentrations reported

25   for farmers and horticulturists ranged from rather
```

Ambrose K. Charles, Ph.D.

```
 1    smaller boundaries, from 1.35 micrograms per liter to

 2    3.2 micrograms per liter, correct?

 3        A    Correct.

 4        Q    There are biomonitoring studies that have

 5    actually measured glyphosate levels in farmers and other

 6    occupational users of glyphosate, true?

 7        A    Correct.

 8        Q    The average glyphosate concentrations reported

 9    for farmers are 1.25 to 3.2 micrograms per liter, right?

10        A    Where are you reading it?

11        Q    When you state --

12        A    1.35 to 3.2 micro- -- yes.

13        Q    I'll repeat --

14        A    You said 1. -- you said 1.25 or 1.35?

15        Q    I'll repeat my question --

16        A    Yes.

17        Q    -- so it's clear.

18             And I may have misspoken.  So new

19    question, okay.

20             The average glyphosate concentrations

21    reported for farmers are 1.35 to 3.2 micrograms per

22    liter, correct?

23        A    Correct.

24        Q    One microgram per liter is one part per

25    billion, right?
```

 1      A     Correct.

 2      Q     The biomonitoring studies of glyphosate found

 3  average concentrations of glyphosate of 1.35 to 3.2

 4  parts per billion, right?

 5      A     Correct.

 6      Q     You do not dispute those averages, right?

 7      A     No.

 8      Q     The maximum glyphosate concentrations for

 9  occupational users were reported as what range?

10      A     Ten micrograms to 233 micrograms per liter.

11      Q     In other words, the maximum glyphosate

12  concentrations reported in occupational glyphosate users

13  are 10 to 233 parts per billion, right?

14      A     Yes.

15      Q     And, of course, residential users have

16  typically been found to have lower glyphosate levels,

17  correct?

18      A     Possibly, yes, but depending on, you know,

19  occupational use, farmers, if they directly use or are

20  they exposed to their families.  Many -- many different

21  type subgroups of farmers are included in this survey.

22  They are the people who actually use, people who farm,

23  people who live in the vicinity of those people who are

24  doing it in those partial studies.

25      Q     Can you point me toward any facts or data

1    suggesting that glyphosate levels in humans are actually

2    higher than 233 parts per billion?

3        A    I have not seen in a report.

4        Q    60 percent of farmers' urine samples analyzed

5    had detectable levels of glyphosate, right?

6        A    Right.

7        Q    What that means is 40 percent of farmers using

8    glyphosate did not have detectable glyphosate, correct?

9                MR. HABERMAN:  Objection.

10       A    No.  They monitored -- 60 percent of the people

11   they monitored, okay, for glyphosate in their urine had.

12   It doesn't say about the use.  The question is:

13   40 percent of the people who used glyphosate did not

14   have any glyphosate in the urine.  That is not --

15       Q.   (BY MS. ROSS) I see.

16                So in the biomonitoring studies,

17   60 percent of farmers who used glyphosate had

18   glyphosate in their urine?

19       A    Who were likely to be exposed.  Because of

20   their occupational circumstances, there may be

21   opportunities -- higher chance of them being exposed to

22   the chemical.  So that's where the biomonitoring comes

23   to find out the level of distribution of glyphosate in

24   different areas and different population in order to

25   understand what is the basic level of exposure.

Ambrose v. Charles, Ph.D.

```
 1      Q     What percentage of people who were likely to be

 2    exposed to glyphosate because of their occupational

 3    circumstances had no detectable glyphosate in their

 4    urine?

 5      A     They did not find -- 60 percent they found

 6    detectable, and they're -- so you presume or assume that

 7    40 percent did not find any glyphosate, and we do not

 8    know anything about their occupational level.

 9      Q     You go on to state that recent human metabolism

10    data has reported as low as a 1 percent urinary

11    excretion rate of glyphosate?

12      A     Yeah.

13      Q     You got that statement from Connolly 2020,

14    correct?

15      A     Yes.

16      Q     Do you know what Connolly cites for that?

17      A     I can't recall that.

18      Q     Did you actually look at the papers that

19    Connolly cites?

20      A     Cross-reference, I did not do that.  I -- I

21    caught it from her data.

22      Q     You did not actually go and look at the

23    citations in Connolly for urinary excretion of

24    glyphosate, true?

25      A     That is true.  I cannot do that kind of
```

1    reference when I write a review of an opinion, going

2    through every paper.  Connolly's paper may have 30

3    different references.  So I'm not going to go back and

4    check every reference to see what she said is true.

5    Okay?  Her paper is already peer reviewed and published.

6    The scientists respected her opinions.  So my job is not

7    to verify what Connolly said was correct or not.

8        Q    Your job is not to go and verify what Connolly

9    has said?

10       A    I trust and I take the data and reference that

11   information to my report.  That's all.

12       Q    Sitting here -- well, withdrawn.

13            Connolly is a reviewed article, right?

14       A    Connolly, you said?

15       Q    The Connolly paper was a reviewed article?

16       A    Yes.

17       Q    Connolly does not include primary data that

18   they collected, right?

19       A    How -- in their reference?

20       Q    Right.  And those are not references that you

21   went and checked, correct?

22       A    No.

23       Q    I am correct, yes?

24       A    Yes.

25       Q    At page 17 of your report, you say:  Lacking

1    any glyphosate monitoring levels (urine or blood) in

2    Moore's records, it is impossible to numerically

3    determine his daily exposure dose of glyphosate.

4                True?

5        A    True.

6        Q    I want to be sure I understand what that means

7    when you say "impossible."  Okay?

8        A    Okay.

9        Q    You cannot point me to any tests at any time

10   that would confirm that Stacey Moore had measurable

11   glyphosate in his body, true?

12       A    Are you reading that sentence again:  Lacking

13   any glyphosate monitoring level in urine or blood --

14       Q    I'm just asking you a question now.

15       A    Oh, okay.

16       Q    You cannot point me to any test at any time

17   that would confirm that Stacey Moore had any measurable

18   level of glyphosate in his body, right?

19       A    I didn't find any monitoring or any test

20   results.

21       Q    Is it possible that Stacey Moore never had

22   measurable glyphosate in his body?

23                MR. HABERMAN:  Objection.

24       A    I would not know that answer to that question.

25       Q.   (BY MS. ROSS) Can you point me toward any

Ambrose k: Charles, Ph.D.

```
 1   actual medical data that would answer that question?

 2       A    I cannot.

 3       Q    You are speculating that he had systemic

 4   exposure, but you have not seen any blood or other

 5   measurements that would support that, true?

 6       A    I have not.

 7       Q    You are not relying on any measurement of

 8   glyphosate in Stacey Moore's body, since none exists,

 9   correct?

10       A    No.

11       Q    Do you -- well, double negative again.  I'll

12   restate the question.

13              Are you --

14       A    Science -- sorry, scientists are not -- and I

15   am trained with a different brain.  I'm not a

16   double-negative person.  That's your training.

17       Q    Are you relying on any measurement of

18   glyphosate in Stacey Moore's body?

19              MR. HABERMAN:  Objection.

20       A    Am I relying on any documents?

21       Q.   (BY MS. ROSS) Are you relying on any

22   measurement that was taken of glyphosate in Stacey

23   Moore's body?

24       A    I did not see any measurement.

25              MR. HABERMAN:  Objection.
```

1    Q.    (BY MS. ROSS) There are methods for calculating

2    levels of dose exposure to a substance like glyphosate,

3    right?

4    A     For dose of the chemical?

5    Q     Yes.

6    A     Yes.

7    Q     As a toxicologist, are you able to estimate an

8    exposure dose?

9    A     Only if I have available to the proper -- I

10   need the data.  Can I elaborate a little bit on that?

11            MR. HABERMAN:  Yes.

12   Q.    (BY MS. ROSS) Sure.  And then I'll break it

13   down.

14   A     If you want to know the dose, you have to know

15   the absolute exposure amount.  Okay?  Otherwise, you

16   only assume or give an estimation of the dose.  And

17   doses always follow with an effect or no effect.

18   Q     Right.

19   A     If there is an effect, you presume this is an

20   effect.  Okay?  I can now cite an example for that, and

21   what comes to my mind is alcohol intoxication.  A driver

22   is stopped in the road by the police officer.  He finds

23   him intoxicated.  He knows that he has alcohol in his

24   system.  There is no measurement there.  But he has the

25   symptoms and the look of a driver who is drunk.

1                    Unless this person goes back to find out

2    how many drinks he had from that bar or have some

3    measurements of the number of cans or bottles he

4    emptied, there's no way of calculating how much

5    alcohol is there.

6                    However, since we know something about

7    the background of alcohol metabolism, alcohol --

8    toxicokinetics or pharmacokinetics, we can go back and

9    calculate the dose.  Okay?

10                    But in an environment of chemicals,

11   99 percent of the time in an environmental exposure,

12   whether personal exposure or an occupational exposure,

13   nobody sits there to measure any biological material

14   in urinal sample at the time the exposure occurred.

15                    So it is very impossible to have any

16   data of measurements to calculate the dose, but a

17   toxicologist, you'll see in these, if there's an

18   effect, there's an exposure -- there may be an

19   exposure.  Okay?

20                    So how much is that dose to cause this?

21   The dose will be sufficient enough to cause this

22   effect at the (indiscernible) of the -- sufficient

23   enough.  Sufficient enough.  It means enough dose has

24   entered him to cause that effect.

25       Q    That was a long answer.  So I'm going to break

Ambrose to Charles, Ph.D.

```
 1    it down.

 2         A    Right, right.  You can break it down.

 3         Q    Okay.  For environmental exposures, such as

 4    occupational exposures, often no one sits there to

 5    measure biological material in urine or blood, right?

 6         A    Yeah.

 7         Q    It is often impossible to have any measurements

 8    to calculate a dose, correct?

 9         A    Exactly.

10         Q    You assumed, as a toxicologist, that since

11    there was an effect, there must have been an exposure,

12    correct?

13         A    Correct.

14         Q    You do not have any calculation of how much of

15    an exposure that was --

16         A    No.

17         Q    -- systemically?

18         A    No.

19         Q    You assumed that the plaintiff in this case had

20    enough of a dose to cause non-Hodgkin's lymphoma because

21    they had non-Hodgkin's lymphoma, right?

22         A    Yes.

23         Q    You, as a toxicologist, know that there are

24    methods for estimating a dose of exposure to an

25    environmental chemical?  You're familiar with those,
```

Ambrose v. Charles, Ph.D.

1    right?

2        A    Measurements.

3        Q    You know that there are calculations you can do

4    to estimate an internal dose, even when actual

5    measurements have not been taken, correct?

6        A    You have to explain to me that -- that

7    particular statement.

8        Q    I'll break that down, then.

9        A    Yes.

10       Q    You did not disclose any opinion on the rate at

11   which glyphosate might move through the skin, correct?

12       A    Yes.

13       Q    Sitting here today, are you offering an expert

14   opinion on glyphosate's flux or permeability

15   concentration?

16       A    No.

17       Q    Did you disclose any opinion on the surface

18   area of any plaintiff's skin that was actually exposed

19   to glyphosate?

20       A    I had not.

21            MR. HABERMAN:  Objection.

22       Q.   (BY MS. ROSS) Sitting here today, are you

23   offering an expert opinion on the surface area of a

24   plaintiff's body that was exposed?

25       A    I have not.

Ambrose K. Charles, Ph.D.

```
 1      Q    Did you disclose any opinion on the protective

 2   effect of wearing clothing on an internal dose of

 3   glyphosate?

 4      A    Protective clothing, no.

 5      Q    Did you offer or calculate any opinion on the

 6   protective effect, if any, of wearing a T-shirt?

 7      A    I have not.

 8      Q    You are -- well, withdrawn.

 9           Are you offering an expert opinion on

10   the protective effect, if any, of wearing clothing on

11   Roundup exposure?

12      A    I am not.

13      Q    Are you offering an expert opinion on the

14   protective effect, if any, of wearing regular work

15   gloves on Roundup exposure?

16      A    I am not.

17      Q    Have you calculated or estimated an internal

18   dose of glyphosate for Stacey Moore?

19      A    I have not.

20      Q    Is that true for every plaintiff you have

21   looked at?

22      A    Yes.

23           MR. HABERMAN:  Sorry, can you repeat that

24   last question?

25           MS. ROSS:  Sure.
```

```
 1              THE WITNESS:  Internal dose.

 2              (The record was read as requested.)

 3              MR. HABERMAN:  Objection.

 4      Q.   (BY MS. ROSS) You did disclose an opinion on

 5   the number of hours per day, days per year and total

 6   years each plaintiff used Roundup, correct?

 7      A    Yeah.

 8      Q    You did not disclose in your expert reports any

 9   opinion that any trace impurity in manufacturing led to

10   non-Hodgkin's lymphoma, correct?

11      A    No.

12      Q    Are you offering an opinion that there were any

13   manufacturing trace impurities in the Roundup Stacey

14   Moore used?

15      A    No.

16      Q    Are you offering an opinion for any plaintiff

17   you've reviewed that there were any trace impurities in

18   the Roundup they used?

19      A    No.

20      Q    Let's take formaldehyde, as an example.

21   People, in general, are exposed to formaldehyde from a

22   number of different sources that we encounter very

23   frequently, if not on a daily basis, correct?

24      A    Formaldehyde?

25      Q    Yes.
```

Ambrose K. Charles, Ph.D.

```
 1      A    Yes.

 2      Q    That includes formaldehyde that's produced in

 3   our own body, right?

 4      A    Yes.

 5      Q    Common foods, such as bananas, spinach and

 6   onions, also contain trace amounts of formaldehyde,

 7   true?

 8      A    Yes.

 9              MR. HABERMAN:   Objection.

10      Q.   (BY MS. ROSS) Tobacco smoke contains

11   formaldehyde, correct?

12      A    Yes.

13      Q    Did Stacey Moore ever have measurements taken

14   of whether there was formaldehyde from the Roundup he

15   used?

16      A    I have not seen it.

17      Q    Did you calculate a systemic dose of

18   formaldehyde that Mr. Moore was exposed to from Roundup?

19      A    No.

20      Q    As a toxicologist, you know there are

21   calculated levels of formaldehyde that you are

22   considered safe and do not pose a risk to human health,

23   true?

24      A    It does not occur to me.  Formaldehyde does not

25   come to the picture at all.
```

Ambrose R. Charles, Ph.D.

```
 1      Q    I think we can wrap this up and not have to go

 2   through each potential contaminant.  Okay?

 3                New question.  All right?

 4      A    Yes.

 5      Q    Did you perform any exposure-day calculations

 6   to determine how much formaldehyde Mr. Moore may have

 7   been exposed to from Roundup?

 8      A    Formaldehyde was not in the picture.

 9      Q    Do you know how the amount of formaldehyde, if

10   any, Mr. Moore was exposed to from Roundup compared to

11   the amount of formaldehyde he would have been exposed to

12   by eating a banana?

13      A    No.

14      Q    Do you know how the amount of formaldehyde any

15   plaintiff was exposed to from Roundup compared to the

16   amount they might be exposed to by eating a banana?

17      A    No.

18                I like bananas, by the way.  You are

19   making me guilty that I am exposed to formaldehyde

20   every day by eating that.

21      Q    Have you systematically gone through and

22   identified any other products that Mr. Moore may have

23   been exposed to that contained trace amounts of

24   formaldehyde?

25      A    What are other products that he has used?
```

```
 1      Q    Yes.

 2      A    I -- whatever is in his records I know, but I

 3  did not look for formaldehyde impurities, particularly

 4  in any of the products.

 5      Q    For -- that's true for any plaintiff in this

 6  case, right?

 7      A    All the plaintiffs.  That means two plaintiffs.

 8      Q    It would also be true for the third plaintiff

 9  you've reviewed, correct?

10      A    Who?

11      Q    The --

12      A    The Federal case, you mean?

13      Q    Yes.

14      A    Yes, yes.

15      Q    Is formaldehyde associated with non-Hodgkin's

16  lymphoma in humans?

17      A    Formaldehyde -- I haven't seen the

18  formaldehyde -- any linkage in the relations to NHL.

19      Q    I think I can summarize this and we can move

20  on.  New question.

21               Is it your opinion that formaldehyde

22  exposure is associated with an increased risk of

23  non-Hodgkin's lymphoma?

24      A    Again, formaldehyde?

25      Q    Yes.
```

Ambrose R. Charles, Ph.D.

```
 1      A    I -- I don't know how to answer to that.  I
 2  have not reviewed formaldehyde.  I have not seen
 3  anywhere formaldehyde reference to NHL.
 4      Q    It's fair to say that you have not seen any
 5  reference to formaldehyde in non-Hodgkin's lymphoma,
 6  right?
 7      A    Not in my reading.
 8      Q    It's fair to say you cannot quantify how much
 9  formaldehyde exposure increases the risk of NHL, if it
10  does at all, true?
11      A    I have not worked on formaldehyde matters.
12      Q    Nor do you know how the amount of formaldehyde
13  Mr. Moore was exposed to because he sprayed Roundup
14  compared to how much is produced by his own body or how
15  much he might be exposed to by eating a banana, right?
16      A    I do not know how much formaldehyde is produced
17  in his body.
18      Q    Setting formaldehyde aside, are you aware of
19  any other contaminants in Roundup?
20      A    Formaldehyde contaminants in Roundup?
21      Q    Are you aware of any other manufacturing
22  chemicals that might make it into Roundup in trace
23  amounts?
24      A    No, I don't know.
25      Q    In the interest of not wasting your time,
```

1    Dr. Charles, I'm going to see if we can sum this up --

2    A    No.

3    Q    -- so we don't have to --

4    A    You may --

5    Q    -- return to it.

6    A    You may have a few more interesting questions

7    on formaldehyde.

8    Q    Do you, for any of the chemical ingredients or

9    contaminants in Roundup, quantify how much of that

10   chemical the plaintiffs in this case were systemat- --

11   were systemically exposed to?

12              MR. HABERMAN:  Objection.

13   A    Some other chemicals?

14   Q.   (BY MS. ROSS) Yes.

15   A    I think he, in his -- deposition of some

16   statements, I read that he has not used any other

17   pesticides, that kind of statement.

18   Q    And I'm talking about the Roundup he used

19   specifically.  Okay?

20   A    Okay, okay.

21   Q    Did you, for any potential contaminant in

22   Roundup, quantify how much of that chemical the

23   plaintiffs in this case were exposed to?

24   A    No.

25   Q    Did you, for any potential contam- --

1    contaminant in Roundup other than glyphosate, determine

2    whether that chemical has been associated with

3    non-Hodgkin's lymphoma?

4        A    No.  I -- I have not considered any other

5    contaminants.

6        Q    You did not, for any chemical in Roundup other

7    than glyphosate, determine a dose at which there's an

8    increased risk of NHL?

9        A    That's right.

10       Q    You did not compare the dose to any systemic

11   dose in a plaintiff, correct?

12       A    I didn't determine any actual dose.

13            When you say dose, how much is ingested

14   or getting into the body, in the measurement of

15   milligrams, particulate body weight, you know, in a

16   day?  That -- that is the definition of dose.

17            In that case, no, I have not made any

18   determination because I don't know his exposure rate,

19   other than, assuming from the duration that he used

20   and the mode of his application and the amount he used

21   to come out with an -- an estimate in your mind,

22   probably a medium use or a high use or a low use.

23   That -- that is the only conclusions we can reach from

24   the data.

25       Q    Are you relying on the presence or absence of

1    any Roundup contaminant in Stacey Moore --

2        A    No.  No, no.  I have not considered any

3    contaminants.

4        Q    Sorry.

5        A    Sorry.

6        Q    Fine.  Just repeat the question so we have a

7    clean record.  Okay?

8        A    Okay.

9        Q    Are you relying on the presence or absence of

10   any Roundup contaminant for Stacey Moore or William

11   Pleu?

12       A    No.

13             MR. HABERMAN:  Objection.

14       Q.  (BY MS. ROSS) You did not -- you're not --

15   well, double negative.  So a new question.  Okay?

16             Does glyphosate -- are you offering an

17   opinion, to a reasonable degree of scientific

18   certainty, that Roundup or glyphosate accumulates

19   anywhere in the body?

20       A    Probably trace amounts but I have to have more

21   research into that to find out the exact distribution

22   pattern, but I have read articles on that that there is

23   some degree of distribution to different organs.  Not,

24   per se, accumulation.

25             Accumulation is the positions of a

Ambrose v. Charles, Ph.D.

```
 1    particular organ or an affinity to a certain organ, so

 2    that that particular area or organ will be the

 3    positive with the higher amounts of the chemical.

 4    That's what accumulation means.

 5        Q    Distribution and accumulation are different,

 6    correct?

 7        A    Different.

 8        Q    Distribution is where does a chemical go in the

 9    body, right?

10        A    That's right, that's right.

11        Q    Accumulation is where might a chemical build up

12    in the body, correct?

13        A    Exactly.

14        Q    You are not offering any opinions on the

15    accumulation of glyphosate, are you?

16        A    No.

17        Q    If you'll turn with me to page 14 of your

18    report.

19             This is where -- we're back at Table 4.

20    Do you see that?

21        A    Yes.

22        Q    Table 4 in your report for Mr. Moore gives the

23    information you used to calculate his use pattern and

24    duration of exposure, correct?

25        A    Yes.
```

```
 1      Q    To calculate the number of days Mr. Moore was

 2   exposed, you took his testimony about the number of

 3   hours he says he used glyphosate on the days he sprayed,

 4   right?

 5      A    Yes.

 6      Q    Then you estimated he worked 22 days a month,

 7   twelve months a year, right?

 8      A    Yes.

 9      Q    Then you converted the number that you got into

10   eight-hour workdays, correct?

11      A    That's correct.

12      Q    You then report a total number of hours and a

13   total number of days, right?

14      A    Yes.

15      Q    You used the following inputs for your

16   calculation:  16 years, 22 days per month, 12 months per

17   year, right?

18      A    Yes.

19      Q    16 times 22 times 12 is 4,224, correct?

20      A    Could be if you are calculating or --

21      Q    You actually state this on page 15 of your

22   report.

23      A    Oh, this calculation right here you're talking

24   about.  Okay.

25      Q    16 --
```

Ambrose K. Charles, Ph.D.

```
1       A    4,224.

2       Q    Yes.

3              16 times 22 times 12 is 4,224 total days

4  Stacey Moore used Roundup, right?

5       A    That's right.

6       Q    In the 4,224 times that you calculated

7  Mr. Moore used Roundup, he never once read the label; is

8  that right?

9       A    Yes.

10      Q    The next input you used is six to seven hours

11  of spray per day every day he sprayed, right?

12      A    Yeah, that's what the report said.

13      Q    The inputs gave you 264 days of spray per year,

14  as we talked about earlier?

15      A    Yes.

16      Q    Just over five days per week, 52 weeks per

17  year, right?

18      A    Yes.

19      Q    In your calculation, Stacey Moore never took a

20  day off from spraying, five days per week, 52 weeks per

21  year for 16 years straight.  Can we agree you may have

22  overestimated the total number of days Mr. Moore sprayed

23  Roundup?

24              MR. HABERMAN:  Objection.

25      A    These calculations are based on the information
```

1    in his deposition.

2        Q.   (BY MS. ROSS) You say the minimum number of

3    hours he applied Roundup was six hours per day,

4    five days per week, 52 weeks per year for 16 years,

5    right?

6        A    Six -- six hours is what is reported.

7        Q    Do you stand by that as an appropriate minimum

8    of the amount Mr. Moore sprayed?

9             MR. HABERMAN:  Objection.

10       A    That is what you will get in the calculation.

11   If you follow the steps, you know, that's what -- the

12   number you will get.

13       Q.   (BY MS. ROSS) Do you stand by your calculated

14   number?

15       A    Yes.

16       Q    In your table on page 14, you state that

17   Mr. Moore only sprayed six to seven hours per day for

18   four years from 1992 to 1995, right?

19       A    And in '94 to '99 -- well, 1992 to '95, yes,

20   four -- four years.

21       Q    Right.  At no point after that did Mr. Moore

22   testify to spraying Roundup for more than three hours a

23   day, right?

24       A    That's right.

25       Q    You applied six to seven hours per day to

Ambrose R. Charles, Ph.D.

```
 1    16 years instead of four years, true?

 2        A    There is a reason for me doing that.  Okay?

 3                    Again, as a toxicologist, according to

 4    my training and how I see in my science in my field,

 5    we go for worst-case scenario.  Okay?

 6                    If there is a two-hour exposure versus a

 7    three-hour exposure, I take the three-hour.  That's my

 8    training.  You -- you calculate -- EPA also does that.

 9    The worst-case scenario, what will happen.

10                    So that's the way I approached it, not

11    because I was ignoring the lower number of hours he

12    used.

13        Q    The calculations you did were based on a

14    worst-possible-case scenario?

15        A    Exactly.

16        Q    Right?

17        A    Exactly.

18        Q    When Mr. Moore testified he sprayed three hours

19    per day for twelve years of Roundup use, you did not use

20    that for input into your calculations, right?

21        A    No, no, no.

22        Q    Had you used three hours per day for the other

23    12 years of Roundup use you estimate, would your

24    estimate of the total numbers of hours Mr. Moore sprayed

25    go up, go down or stay the same?
```

```
 1        A     It would depend on the numbers and factors you

 2   put in there in the calculation.  It -- it could be less

 3   than this but worst-case scenario, this is the numbers

 4   that you derive from the numbers I used.

 5        Q     You talk about the MSDS in your report at

 6   page 16, if you'll go there.

 7        A     MSDS.  Yes, ma'am.

 8        Q     The MSDS says to wash your hands thoroughly

 9   after handling and before eating, drinking, chewing gum

10   or using tobacco.

11              Did Stacey Moore do that?

12        A     I don't think so.  He did not adhere to a lot

13   of the safety precautions that he has to take.

14        Q     MSDS says not to use Roundup when -- when it's

15   windy.

16              Did Stacey Moore do that?

17        A     Probably most of the time, but he also used it

18   during a windy time but he tried to stay away from that.

19   In other statements, I think in the deposition, you

20   know, I was not using when the wind was really windy, or

21   something like that.

22        Q     The MSDS mentions personal protective

23   equipment.  What personal protective equipment was

24   Stacey Moore supposed to wear and then wash?

25        A     Oh, he -- he should be wearing a mask, you
```

1    know.  Masks means not cloth masks.  It should -- it

2    should be an occupational standard for organic solvents,

3    you know, that type of mask.  Rubber gloves that doesn't

4    have contact, and eyeglasses, protective eyeglasses, and

5    the long-sleeve shirts, long pants and all kinds of

6    things that usually, when they use a chemical.

7         Q    Did Stacey Moore do any of that?

8         A    No.  He was in his day -- daytime work clothes.

9         Q    The MSDS says in normal use and handling

10   conditions, please refer to the label and/or leaflet,

11   right?

12        A    Yes.

13        Q    Did Stacey Moore do that?

14             MR. HABERMAN:  Objection.

15        A    I don't know.

16        Q.   (BY MS. ROSS) If he read it, he ignored it,

17   true?

18             MR. HABERMAN:  Objection.

19        A    I don't know.

20        Q.   (BY MS. ROSS) You are familiar with material

21   safety data -- data sheets, generally, right?

22        A    Yes.

23        Q    These are available to anybody who asks for

24   them, correct?

25        A    Yes.

```
 1                  MR. HABERMAN:  Objection.

 2      Q.  (BY MS. ROSS) MSDS is for occupational users,

 3   correct?

 4                  MR. HABERMAN:  Objection.

 5      A    No.  For anybody.

 6      Q.  (BY MS. ROSS) As you note, an MSDS is available

 7   over the Internet, right?

 8      A    Yes.

 9      Q    Stacey Moore never requested an MSDS, right?

10      A    To my knowledge and experience, you know,

11   people hardly read MSDS.  MSDS is read by people above a

12   certain knowledge who want to gather more information

13   and data.  Ordinary people who use the product, they

14   don't go for MSDS.  Label is the instructions for them.

15   That is the legal document.

16      Q    I'll break that down.  Okay?

17      A    Yes, sure.

18      Q    In your knowledge and experience, ordinary

19   people hardly ever read the MSDS, correct?

20      A    Most of the people don't read it, unless you

21   need more information about it.

22      Q    Since Stacey Moore never read a Roundup label

23   in the thousands of times he used Roundup, would you

24   expect him to have read the MSDS?

25      A    It's up to that individual.
```

1    Q    Page 26 of your report discusses male

2  reproductive effects.  Will you go there with me,

3  please?

4    A    Yes, yes, 26 -- is it 26?

5    Q    26, yes.

6    A    Yes, ma'am.

7    Q    Here you state that there are studies

8  suggesting adverse non-genotoxic reproductive effects on

9  human and animals associated with glyphosate exposure,

10 correct?

11   A    Yes.

12   Q    Non-genotoxic reproductive effects are not

13 cancer, correct?

14   A    Which -- which line are you reading from?

15   Q    I'm asking you a question now.

16         So you mentioned here non-genotoxic

17 reproductive effects, true?

18   A    Please point out in which -- which line you are

19 reading, so that I can be with you and understand what

20 you are reading.

21   Q    Sure.

22         So the sentence we just read references

23 non-genotoxic reproductive effects, correct?  That's

24 the first sentence in your section on page 26.

25   A    26, I am looking at the male reproductive

```
 1    effects.

 2        Q    Yes.  And you --

 3        A    It starts with "Specifically interesting," and

 4    then next sentence is "In vitro incubation."  The next

 5    sentence is "Moreover".

 6               And which sentence are you reading?

 7        Q    Let's start with the first one.

 8        A    Oh, okay.

 9        Q    You say:  Specifically interesting, there are

10    studies suggesting adverse, non-genotoxic reproductive

11    effects.

12        A    Yes.

13        Q    Non -- and now I'm asking you a question about

14    that sentence.  Okay?

15        A    Oh, okay, okay.

16        Q    Non-genotoxic reproductive effects, are those

17    the same as cancer?

18        A    Non-genotoxic can be cancer to -- that is what

19    I am talking about.  Genotoxicity has direct effects on

20    the DNA.  Non-genotoxic is antigenotoxic, indirect

21    mechanism, a separate marker.  That is --

22        Q    Can you point me to any studies or data

23    establishing that any non-genotoxic reproductive effects

24    of glyphosate, specifically, is associated with

25    non-Hodgkin's lymphoma?
```

Ambrose v. Charles, Ph.D.

```
 1       A    I cannot.

 2       Q    Can you point me to any studies or data that

 3  suggests or finds that in vitro incubation of human

 4  sperm with glyphosate causes or contributes to

 5  non-Hodgkin's lymphoma?

 6       A    That's what the report says.

 7       Q    The report you cite talks about sperm motility

 8  and mitochondrial dysfunction, correct?

 9       A    Yes, yes.

10       Q    Can you point me toward any studies or data

11  showing that low-sperm motility causes non-Hodgkin's

12  lymphoma?

13       A    That is cited from the cross-reference 6 that

14  is mentioned there.

15       Q    Cross-reference 6 in your report is --

16       A    The ATSDR.

17       Q    -- the ATSDR?

18       A    Yes.  That -- that report contains that

19  information.

20       Q    If we wanted to see whether decreased sperm

21  motility was associated with non-Hodgkin's lymphoma, we

22  should go to ATSDR's report, correct?

23                 MR. HABERMAN:  Objection.

24       A    I did not -- I did not say NHL.  This is a

25  sperm-modulated decrease.  It's is an experiment so
```

1    acceleration that is captured in the ATSDR report.

2        Q.   (BY MS. ROSS) That was my question, is whether

3    it's linked to non-Hodgkin's lymphoma.  Do you

4    understand that?

5        A    Yeah.

6        Q    Okay.  So let me -- let me reask my question.

7        A    Yes.

8        Q    What studies or data can you point me to that

9    establish that low sperm motility causes non-Hodgkin's

10   lymphoma?

11       A    No, no studies.

12       Q    For any of the data that you cite here about

13   male reproductive effects, can you point me toward any

14   data, published or unpublished, that establish that

15   those effects lead to non-Hodgkin's lymphoma?

16       A    This particular reference, if I recall -- and

17   my write-up was -- my thinking was about testicular

18   cancer, male reproductive effects, that he had some

19   cancer in his reproductive organ.

20       Q    Do you know that DLBCL is a disease of

21   lymphocytes then that can appear anywhere in the body?

22              MR. HABERMAN:  Objection.

23       A    It can have a second wave.  It can promote

24   secondary cancers.

25       Q.   (BY MS. ROSS) DLBCL can occur in a lymph node

Ambrose K. Charles, Ph.D.

1   or in any other part of the body, correct?

2        A    Yes.

3        Q    DLBCL is a cancer that can appear anywhere in

4   the body, not limited to the male reproductive tract,

5   right?

6        A    It can be anywhere.  It can metastasize or

7   spread around the body also.

8        Q    What studies or data can you point me to that

9   show that low sperm motility or any other non-genotoxic,

10  reproductive effect causes DLBCL?

11       A    No.

12       Q    None?

13       A    No.

14       Q    Are you offering an expert opinion?

15       A    Excuse -- excuse me.

16       Q    Yes.

17       A    Since you are repeating that sperm motility,

18  that reference is there in the human reproductive

19  system, glyphosate has some kind of effect that is being

20  noted by researchers in in-vitro studies.  I'm bringing

21  that to attention for discussion.

22       Q    What you're pointing out here --

23       A    I'm not linking sperm motility to NHL, as you

24  are asking.

25       Q    What you're pointing out here is that ATSDR

```
 1    mentions studies of glyphosate and sperm motility,

 2    correct?

 3        A    Exactly.

 4        Q    You are not saying that sperm motility has been

 5    linked to non-Hodgkin's lymphoma, true?

 6        A    Did I say anywhere that?  I didn't say that.

 7        Q    And you're not saying it today?

 8        A    No, no.

 9        Q    Turn back with me -- you can set your report on

10    Stacey Moore aside for -- for the time being,

11    Dr. Charles.

12        A    Oh.

13        Q    If you'll take Exhibit 3.  That's your report

14    on Mr. Pleu.

15        A    Oh, Mr. Pleu.

16             Okay.

17        Q    On page 11, you talk about Mr. Pleu's mode of

18    application for Roundup, correct?

19        A    Page 12 -- 11?

20        Q    11.

21        A    11, okay.

22             I'm a little slow in the afternoon.  I'm

23    a retired person.

24             Yes.

25        Q    You mentioned you're getting a little slow in
```

1    the afternoon.  Would you like to take a short break

2    before we go on to Mr. Pleu, Mr. Charles?

3              MR. HABERMAN:  I have to take a

4    bathroom --

5         A    You can ask me turning pages and following

6    you -- you are very fast for me.

7              MS. ROSS:  Why don't we take a break and

8    go off the record.

9              THE VIDEOGRAPHER:  Going off the record.

10   The time is 3:24.

11             (Recess from 3:24 p.m. to 3:31 p.m.)

12             THE VIDEOGRAPHER:  Back on the record.

13   This marks the beginning of Media Number 3.  The time is

14   3:31.

15        Q.   (BY MS. ROSS) Dr. Charles, we were on your

16   Moore report at page 11.  Are you there?

17        A    Yes.

18        Q    I'm sorry, when I say Moore, we are talking

19   about Mr. Pleu now.

20        A    Yes.

21        Q    On page 11.

22             William Pleu has been using Roundup

23   since 1994 at his wife's own residential property in

24   Canton, Georgia, correct?

25        A    Correct.

1       Q    You -- I think we talked about your -- your

2    methodology with respect to Mr. Moore.  Is it fair to

3    say that it was similar for Mr. Pleu?

4       A    Yes.

5       Q    Do you have any facts or data to suggest that

6    Mr. Pleu was exposed to Roundup in any way that's

7    different from what he testified to in his deposition?

8       A    No.

9       Q    Mr. Pleu started using Roundup in 1994, right?

10      A    Yes.

11      Q    He used Roundup at his house, correct?

12      A    Yes.

13      Q    You would classify Mr. Pleu as a residential

14   user, right?

15      A    Yes.

16      Q    When he applied Roundup, Mr. Pleu would hold

17   the bottle or the sprayer one to three inches away from

18   the weeds, right?

19      A    Yes.

20      Q    Mr. Pleu never sprayed indiscriminately because

21   that would kill something he didn't intend to kill,

22   right?  Do you recall reading that in his deposition?

23      A    In this close-to-the-tar- -- target reach from

24   the original container, not using commercial backpack.

25   He also did weed control.  No, I don't remember the

1    words that you mentioned.

2        Q    Did Mr. Pleu spray when it was windy?

3        A    I don't think so.

4                MR. HABERMAN:  Objection.

5        A    Yes.  He did not do it when it is windy, yes.

6        Q.   (BY MS. ROSS) When he applied Roundup, Mr. Pleu

7    wore boots, shorts, a T-shirt, glasses and work gloves,

8    correct?

9        A    Yes.

10       Q    Mr. Pleu got Roundup on his hands a few times

11   when taking off a glove to get to the bottom of a bottle

12   of Roundup, right?

13       A    Yes.

14       Q    That was on his right hand and no other body

15   part, correct?

16       A    The spray -- the spray?

17       Q    Yes.

18       A    Yes.

19       Q    On those few occasions, Mr. Pleu would then

20   spray his hand with a hose, right?

21       A    Yes.

22       Q    After spraying and doing whatever other

23   yardwork he was going to do that day, he would strip in

24   the garage and shower, correct?

25       A    Yes.

Ambrose K. Charles, Ph.D.

```
 1      Q    You -- withdrawn.

 2            New question.

 3            In your report on page 13, you reference

    the MSDS when you're talking about Mr. Pleu, right?

 5      A    Yes.

 6      Q    Yet you state in your report for William Pleu

    that the MSDS says:  In normal use and handling

 8   conditions, please refer to the label and/or leaflet?

 9      A    Yes.

10      Q    William Pleu's use was normal consumer use,

11   right?

12      A    Yes.

13      Q    Mr. Pleu should refer to the label, right?

14      A    I think so.

15      Q    You do not have any labels in your reference

16   materials for William Pleu, true?

17      A    No.

18      Q    As you did not identify any Roundup labels in

19   your expert report, you're not going to testify to the

20   contents of any Roundup label for Mr. Pleu, right?

21      A    No.

22      Q    Correct?

23      A    Correct.

24      Q    Did William Pleu ever read a Roundup label?

25      A    Not that I know of.
```

1     Q     You have no opinion, sitting here today, that

2  Mr. Pleu ever read or relied on a Roundup label, right?

3     A     No.

4     Q     Right?

5     A     Yes.

6     Q     Double negative, so I will ask it again.

7     A     Okay.

8     Q     Do you have any opinion sitting here today that

9  Mr. Pleu ever read or relied on a Roundup label?

10    A     No.

11    Q     On page 15 of your report for Mr. Pleu, there's

12 a sentence that begins in the second paragraph about

13 halfway down "Lacking any glyphosate monitoring levels."

14              Do you see where I am?

15    A     Beginning of the line?

16    Q     The beginning of a line is "Exposures as

17 opposed to."

18    A     Yes, yes.

19    Q     Lacking any glyphosate monitoring levels (urine

20 or blood) in Pleu's records, it is impossible to

21 numerically determine his exposure level to glyphosate

22 by urine or blood samples.

23              Correct?

24    A     Correct.

25    Q     Can you point me to any test at any time that

Ambrose R. Charles, Ph.D.

1    would confirm that William Pleu had measurable

2    glyphosate in his body?

3         A    I didn't see any data.

4         Q    Is it possible that William Pleu never had

5    measurable glyphosate in his body?

6         A    If he has used that chemical, probably has some

7    exposure.

8         Q    Is it possible that Mr. Pleu's exposure could

9    be below the levels of detection?

10                 MR. HABERMAN:  Objection.

11        A    Possible, not detected yet.  So we do not know.

12        Q.   (BY MS. ROSS) You are not -- well, withdrawn.

13                 Are you relying on any measurement of

14   glyphosate in William Pleu's body?

15        A    No.

16        Q    Are you relying on any estimation or

17   calculation of glyphosate in William Pleu's body?

18                 MR. HABERMAN:  Objection.

19        A    No.

20        Q.   (BY MS. ROSS) On page 23 of your report for

21   Mr. Pleu, you have a section that's similar to what we

22   were talking about for Mr. Moore.

23                 Tell me when you're there.

24        A    Yes.

25        Q    Here you state that:  Rodent studies frequently

1    reported reproductive effects in male rats with

2    increased incidence of prostatitis following chronic

3    exposures.

4                    Do you see where I am?

5        A    Yes.

6        Q    This is a different font in your report.  Why

7    is that?

8        A    A different font?

9        Q    Yes.

10       A    No...

11                   MR. HABERMAN:  What page?

12                   MS. ROSS:  Page 23.

13       A    That was not done purposefully.  That different

14   font, and I also see an underlining, it must have been a

15   computer mistake or something like that.

16       Q.   (BY MS. ROSS) Did you write these sentences in

17   your report?

18       A    Yes.  I wrote the sentence, but I can't

19   remember the different font and line -- underline that.

20       Q    You do not provide a citation for your

21   statement that rodent studies frequently recorded

22   reproductive effects in male rats?

23       A    That came from the cross-reference.

24       Q    Cross-reference here is number 9?

25       A    Number 9, yeah.  It must be the ATSDR.

Ambrose R. Charles, Ph.D.

```
 1      Q    Again, you're referencing ATSDR --

 2      A    Yes, yes.

 3      Q    -- for this correct?

 4      A    Yes, exactly.

 5      Q    We should go to ATSDR's summary for

 6  glyphosate --

 7      A    Yes.

 8      Q    -- to understand what reproductive effects were

 9  noted in the rats and mice, correct?

10      A    Exactly.

11      Q    Mr. Pleu did not have prostatitis.  He had

12  prostate cancer.

13           Do you understand that those are

14  different medical diagnoses?

15      A    Yes.

16      Q    Did you perform a comprehensive review of the

17  scientific literature to determine whether Roundup use

18  is associated with prostate cancer?

19      A    Roundup associated with -- no.

20      Q    We can agree there's no discussion in your

21  report of any human epidemiologic evidence as to whether

22  Roundup is associated with prostate cancer; is that

23  right?

24      A    No.  Glyphosate -- so there, what I was trying

25  to bring is NHL has a secondary promoting effect to
```

```
 1    cause prostate cancer.

 2        Q    Did you cite in your report any human

 3    epidemiologic evidence as to whether Roundup is

 4    associated with prostate cancer?

 5        A    No.

 6        Q    Did you look for that evidence?

 7        A    I didn't find any.

 8        Q    Did you look for it?

 9        A    Yes.

10        Q    Do you know whether any of the studies you cite

11    in your report actually looked at Roundup and prostate

12    cancer?

13        A    No.

14        Q    Do you know if any studies found an increased

15    risk of prostate cancer --

16        A    No.

17        Q    -- with exposure to glyphosate?

18        A    No, no.

19        Q    If you'll go with me back to Exhibit 14 to your

20    deposition, Andreotti 2018.

21                Tell me when you're there.

22        A    Which page is that?

23        Q    Exhibit 14, which is Andreotti 2018?

24        A    Oh, okay.

25                MR. HABERMAN:  Here you go.
```

Ambrose R. Charles, Ph.D.

```
 1      A     Oh.  And which page is that?

 2      Q.    (BY MS. ROSS) We'll start at the first page.

 3      A     Oh.

 4      Q     Andreotti 2018 is an article entitled,

 5   "Glyphosate Use and Cancer Incidents in the Agricultural

 6   Health Study," correct?

 7      A     Correct.

 8      Q     Table 2 of Andreotti begins on page 512.  Are

 9   you there?

10      A     Yes.

11      Q     Table 2 of Andreotti is entitled, "Cancer

12   incidence in relation to intensity-weighted lifetime

13   days of glyphosate use in the Agricultural Health

14   Study," correct?

15      A     Yes.

16      Q     Is prostate cancer listed in this table?

17      A     Yes.

18      Q     For the highest quartile of exposure to

19   glyphosate-based herbicides, there were 571 cases

20   evaluated, correct?

21      A     Yes.

22      Q     The relative risk was .99?

23      A     Yes.

24      Q     The 95 percent confidence interval was .86 to

25   1.13, correct?
```

Ambrose K. Charles, Ph.D.

1      A      Yes, yes.

2      Q      The P for trend was .89, right?

3      A      Yes.

4      Q      There is at least one study on your reference

5   list that looked at glyphosate-based herbicides and

6   prostate cancer, true?

7      A      Which reference is that?

8      Q      The one that we are looking at right now.

9      A      That is -- glyphosate causing prostate cancer,

10  right?

11     Q      There is at least one study on your reference

12  list that is Andreotti 2018 --

13     A      Yes.

14     Q      -- that looked at glyphosate-based herbicides

15  and prostate cancer, true?

16     A      Yes, yes.

17     Q      The relative risks for glyphosate use in

18  prostate cancer in that study were all showing no

19  increased risk, correct?

20     A      Yes.

21     Q      The P for trend is near unity and it's .89,

22  correct?

23     A      Yes.

24     Q      Sitting here today, can you name any study

25  anywhere in the world demonstrating an increased risk of

Ambrose K. Charles, Ph.D.

```
1    prostate cancer in humans using Roundup?

2        A    No.

3        Q    None of Mr. Pleu's treating doctors diagnosed

4    his prostate cancer as secondary to CLL, correct?

5        A    It is secondary -- secondary to other

6    initial -- prostate cancer can be a secondary effect of

7    initial cancer.

8        Q    That's an opinion you are offering as an expert

9    in this case?

10       A    No, that is -- there is a study.

11       Q    And we will get to the study that you cite on

12   that, but I am asking a different question right now.

13       A    Oh, okay.

14       Q    Did any of Mr. Pleu's treating doctors diagnose

15   his prostate cancer as secondary to CLL?

16       A    No.

17       Q    Do you see written -- anywhere in his medical

18   records that his prostate cancer had anything to do with

19   CLL?

20       A    No.

21       Q    Are you aware of any medical doctor, including

22   any expert retained by the plaintiffs, who diagnosed

23   Mr. Pleu's prostate cancer as secondary to CLL?

24       A    No.

25       Q    You are not offering an opinion that Mr. Pleu's
```

```
 1    use of Roundup increased his risk of prostate cancer,

 2    true?

 3        A    No, I am not.  Citing the available literature,

 4    I was trying to speculate a connection.

 5        Q    You referenced Zhu 2019 in your report as a

 6    paper on prostate cancer and CLL, right?

 7        A    290?

 8                  Zhu, et al, is it?  Is this the report

 9    you are talking about?

10        Q    Yes.  On page 27 of your report --

11        A    Yes, yes.  Yeah.

12        Q    -- you reference Zhu 2019?

13        A    Yes.

14        Q    Correct?

15        A    Yes.

16        Q    Zhu 2019 is a case report of two patients with

17    CLL and prostate cancer, right?

18        A    Yes.

19        Q    You understand that case reports in medicine

20    are hypothesis generating?

21                  MR. HABERMAN:  Objection.

22        A    They were -- they are findings, you know.  They

23    are -- you asked about the medical doctors, so, you

24    know, anybody has made an -- an opinion about Pleu's

25    prostate cancer linked to NHL or glyphosate caused,
```

Ambrose K. Charles, Ph.D.

1    okay, I was citing this.  This was a medical doctor, I

2    think he is a surgeon that -- who actually formed and

3    postulated an opinion that it comes as a secondary to

4    the CLL malignancy that he found in this patient.

5        Q.   (BY MS. ROSS) That patient is not William Pleu,

6    right?

7        A    Right.

8        Q    The patient --

9        A    That patient is not William Pleu.  I was

10   citing, that is all, citing this, right.

11                (Exhibit 15 virtually marked.)

12       Q.   (BY MS. ROSS) Exhibit 15 to your deposition is

13   a case report by Zhu, at al, entitled, "Extended

14   lymphadenectomy for high-risk prostate cancer in

15   patients with chronic lymphocytic leukemia" --

16       A    Okay.

17       Q    -- "may not be necessary, a report of two

18   cases."

19       A    Yeah.

20       Q    Do you see that?

21       A    Yeah.

22       Q    Zhu 2019 is a report of two cases, correct?

23       A    Yes.

24       Q    Case reports in medicine are considered the

25   lowest level of evidence, right?

Ambrose R. Charles, Ph.D.

```
1                    MR. HABERMAN:  Objection.

2        A    It is taken with a seriousness depending on the

3    cases.

4        Q.   (BY MS. ROSS) One of the patients here was

5    diagnosed with CLL and prostate cancer at the same time.

6    That's what concomitant means, correct?

7        A    Say it again, on other cases...

8        Q    One of the cases was diagnosed with prostate

9    cancer and CLL at the same time.  That's what

10   concomitant means, right?

11       A    Okay, yes.

12       Q    That's not true of Mr. Pleu, right?

13       A    No, no.

14       Q    Another patient was treated for CLL and

15   diagnosed with prostate cancer years after CLL

16   treatment, right?

17       A    Yes.

18       Q    You understand that chemotherapy treatments for

19   CLL impacts the immune system and increases the risk of

20   subsequent cancers?

21       A    Yes.

22                    MR. HABERMAN:  Objection.

23       Q.   (BY MS. ROSS) Mr. Pleu has never been treated

24   for CLL, right?

25                    MR. HABERMAN:  Objection.
```

1      A    He -- he was under some medication, but not for

2  cancer therapy, chemotherapy, if that's what you are

3  asking me.  Chemotherapy specifically intended for

4  malignancy.

5      Q    Mr. Pleu has taken medications in his life, but

6  he has never been treated for -- with chemotherapy for

7  CLL --

8      A    Chemotherapy --

9      Q    -- correct?

10     A    -- for CLL malignancy?

11     Q    Right.

12     A    Yeah.

13     Q    I am correct that Mr. Pleu has never been

14  treated with chemotherapy for CLL?

15     A    Yeah, yeah.

16     Q    Both of the patients in this case report were

17  symptomatic from CLL and both were treated for CLL, both

18  were at a different stage than Mr. Pleu, correct?

19     A    Yes.

20          MR. HABERMAN:  Objection.

21     Q.   (BY MS. ROSS) Do you know whether, from a

22  medical perspective, it is CLL itself or the

23  immunosuppressing chemotherapy that some patients get

24  for their CLL that leads to an increased risk of other

25  cancers?

```
 1      A    I -- I can't cite any particular studies right

 2   now off my mind, off my brain.  However, when you say

 3   immunosuppressive treatment, that opens the door for

 4   other things.  But doctors are watching that and they

 5   monitor.

 6               They do all the different types of scans

 7   to find out the spread of cancer.  So medical,

 8   clinical monitoring is side by side going on with the

 9   therapy.  They look at the immunosuppressant effect of

10   the patient on therapy and state of their treatment.

11      Q    Have you asked any medical doctors whether they

12   actually consider prostate cancer a secondary cancer

13   following CLL?

14      A    No, this is the only report I found that has

15   some connection with the CLL as a secondary to -- this

16   is -- all this a case study.  Case studies are

17   important.  I don't acknowledge --

18      Q    Zhu 2019 is --

19      A    Because I am a case.  You are a case.  If there

20   is a study, and something happened to me, to report it.

21   You would have to eliminate it, ignore it, you know,

22   because it doesn't count out of 100 people, or 1,000

23   people, so it is not statistically significant.

24               I don't take it that way.  When I look

25   at case studies positively pointing out something, I
```

1    am bringing to their attention the discussion.

2        Q    We were talking over each other so let me

3    repeat my question.  Okay?

4        A    What did I talk over you?

5        Q    Zhu 2019 is a case study, right?

6        A    Yes.

7        Q    Zhu 2019 was the only case study that you found

8    linking CLL and prostate cancer, true?

9        A    Yes.

10       Q    On page 24 of your report for Mr. Pleu -- you

11   can go back there with me, please.

12       A    Which page, page 4?

13       Q    24?

14       A    24.  Okay.

15       Q    Here you describe acute short-term toxicity

16   studies, right?

17       A    On page 24, I am talking about dose-effect

18   relationship at the bottom.

19       Q    Thank you.

20       A    Mechanism of carcinogenicity.

21            THE REPORTER:  Mechanism of what?

22            THE WITNESS:  Carcinogenicity.

23            MS. ROSS:  Carcinogenicity.

24       Q.   (BY MS. ROSS) On page 24 of your Pleu report,

25   you are talking about mechanism of carcinogenicity,

Ambrose K. Charles, Ph.D.

```
 1   correct?

 2       A    Yes, yes.

 3       Q    One thing that you talk about is a mice study

 4   using topical application?

 5       A    Yeah.

 6       Q    The reference you provide -- so let me just

 7   read the whole sentence so we know where we are.  Okay?

 8                A mice study using topical application

 9   of DMBA, a tumor initiator, followed by multiple

10   dermal applications of the glyphosate formulation

11   resulted in formation of skin tumors in 40 percent of

12   the DMBA plus glyphosate treatment group.

13                Do you see that?

14       A    Yes.

15       Q    The citation that you provide for that study is

16   reference number 4, right?

17       A    That's an error.

18       Q    What is the appropriate citation for the study?

19       A    That's in ATSDR.

20       Q    Okay.

21       A    Yeah.

22       Q    Now, as we discussed earlier, you reviewed and

23   relied on ATSDR and IARC for your review of the animal

24   studies; correct?

25       A    Yes, and EPA.
```

1      Q    You did not actually read the paper that is

2   referenced on page 24 of your report about tumor

3   promotion, right?

4              MR. HABERMAN:  Objection.

5      A    No, I did not -- I did not read the paper.  It

6   is a study.  It is a DLB (phonetic) study perhaps that

7   got done by Monsanto or Bayer or somebody.

8      Q.   (BY MS. ROSS) So just so I understand, because

9   the citation was wrong --

10     A    Yeah.

11     Q    -- the study you are referencing here, you

12  reviewed a summary of that study in one of the documents

13  you reviewed, right?

14     A    Exactly, yeah.

15     Q    You relied on IARC's interpretation of the

16  animal data, correct?

17     A    IARC?

18     Q    Yes.

19     A    Interpretation of animal data?

20     Q    Yes.

21     A    Yes.

22     Q    Did you find IARC's interpretation of the

23  animal data to be reliable?

24     A    It is reliable to the half -- more than half of

25  the population in the world.

Ambrose K. Charles, Ph.D.

```
1        Q    What makes it reliable?

2        A    Because their scientists reviewed, evaluated,

3   and then came up with their conclusions.  Their

4   conclusions reaches what you know as tied to a

5   carcinogen.

6        Q    IARC had experts on the conduct and

7   interpretation of animal studies, reviewed various

8   studies of glyphosate, true?

9        A    Yes.

10       Q    IARC interpreted those studies and put together

11  a monograph that you reviewed --

12       A    Yes.

13       Q    -- in preparing your opinions?

14       A    Yes, yes.

15       Q    The tumor promotion study that you mentioned is

16  one of the studies that IARC reviewed and commented on,

17  right?

18       A    Yes.

19            (Exhibit 16 virtually marked.)

20       Q.   (BY MS. ROSS) Exhibit 16 to your deposition is

21  IARC Monograph 112 regarding glyphosate.  Do you see

22  that?

23            Dr. Charles?

24       A    Yes.

25       Q    If you will turn with me to page 32 of the IARC
```

```
 1    monograph.  Tell me when you are there.

 2        A    Yes.

 3        Q    On page 32 of their monograph, IARC discusses

 4    a -- an initiation-promotion study of skin application

 5    of glyphosate-based formulation, correct?

 6        A    Yes.

 7        Q    In that study, the authors looked at

 8    glyphosate, 41 percent, dissolved in ethanol; right?

 9        A    Yes.

10        Q    They looked at DMBA dissolved in ethanol,

11    correct?

12        A    Yes.

13        Q    They looked at TPA dissolved in acetone, right?

14        A    Yes.

15        Q    There were eight different groups in that

16    study, correct?

17        A    Yes.

18        Q    And IARC provides their evaluation of that

19    study in Monograph 112, true?

20        A    I am looking at the study.  Where is the

21    evaluation?

22        Q    Yes.  So there is a Comments section in this

23    table.

24             Do you see that?

25        A    Oh, yeah, I see that.
```

Ambrose K. Charles, Ph.D.

```
 1      Q    IARC's comments on George 2010 -- this is the

 2   study that you were referencing in your report when you

 3   talk about initiation promotion, right?

 4      A    Yeah, this could be the study that ATSDR is

 5   talking about.

 6      Q    And you are not sure one way -- when you say

 7   "could be the study," you are not sure one way or the

 8   other because --

 9      A    No, I reference -- I -- I reviewed ATSDR.

10      Q    And you also reviewed and relied on IARC,

11   right?

12      A    This is the only study I think probably they

13   have.

14      Q    Right.

15           So IARC's description of the George 2010

16   tumor promotion study was a short duration of

17   treatment, no solvent controls and lack of any

18   histopathologic evaluation, right?

19      A    Yes.

20      Q    The working group for IARC concluded this was

21   an inadequate study for the evaluation of glyphosate,

22   correct?

23      A    Yes.

24      Q    IARC's evaluation of this study was that the

25   skin tumors were called papillomas by the authors,
```

Ambrose R. Charles, Ph.D.

1   following gross examination only.

2          Do you see that?

3   A    Yes.

4   Q    You know that there is a difference between

5   histopathologic evaluation, where you look at something

6   under a microscope and gross evaluation, where you look

7   at it with a naked eye, right?

8   A    Yes.

9   Q    For the study that we are talking about here,

10  do you know if any of the regulators that you reference,

11  such as the EPA, also looked at the same study?

12  A    Yes.

13  Q    We can agree that none of those regulators

14  concluded it provides reliable evidence that glyphosate

15  promotes tumors, right?

16          MR. HABERMAN:  Objection.  Misstates the

17  evidence.

18  A    They concluded that it did not form any

19  cancer -- I mean any tumor.

20  Q.   (BY MS. ROSS) Did any regulator that you can

21  name, sitting here today, conclude that the George 2010

22  study provides reliable evidence that glyphosate

23  promotes tumor formation?

24          MR. HABERMAN:  Objection.

25  A    I -- I have a little more to add to your

```
 1   question if you permit me to do that.

 2       Q.   (BY MS. ROSS) I will break it down into two

 3   pieces, but first --

 4               MR. HABERMAN:  No, no.  You can answer the

 5   way --

 6       Q.   (BY MS. ROSS) -- answer my question.

 7               MR. HABERMAN:  You can answer the way you

 8   want to answer the question.  And if you have something

 9   to add, then you can do that too.

10       A    No, my -- the question was a regulator?

11       Q.   (BY MS. ROSS) Yes.

12       A    Okay.  Regulators decide whether there is a

13   tumor or not -- regulators don't do that.  Scientists do

14   that who evaluated.

15       Q    I see.  Okay.

16       A    Okay.

17       Q    So did any scientist --

18       A    That was my answer, yeah.

19       Q    I see.

20               Let me reask my question.  Okay?

21       A    Uh-huh, yeah.

22       Q    Did any scientist at any regulatory authority

23   conclude that the George 2010 tumor promotion study

24   provides reliable evidence that glyphosate promotes

25   tumors in animals?
```

1      A      There may be some false in every study,

2   limitations in every study.   There is not a perfect

3   study.   So if they find some activity of tumor

4   promotion, they make it out of that, you know, there is

5   some activity.

6                Then they put that experimental data

7   into a statistical analysis in number of animals,

8   number of observations, all of these factors go

9   through an analysis to come up whether you come to a

10  conclusion of whether it promotes or not.

11               That is the conclusion that you leave in

12  the corners here.   That doesn't exclude the

13  observations that there were some animals that might

14  have some promotional thing.   Okay?

15               That you'll leave -- read when you go to

16  some report.   That is what probably ATSDR pointed out,

17  there is some promotional effect.

18      Q    In order to evaluate the actual study data from

19  George 2010, you would have to read the underlying

20  study, correct?

21      A    Yeah, the --

22               MR. HABERMAN:   Objection.

23      A    -- whole mouse study.   You know, you have to go

24  through the whole study.

25      Q.   (BY MS. ROSS) You did not do that, correct?

```
 1        A     I did not do that.

 2              MR. HABERMAN:  Objection.

 3        A     Nobody does that.

 4        Q.    (BY MS. ROSS) If you'll please identify for me,

 5   Dr. Charles, anything in your references that supports

 6   the statement in your report that this study indicates

 7   that glyphosate formation functioned as a tumor

 8   promotor?

 9        A     Yes.

10        Q     What is that?

11        A     That's what the study says, you know,

12   glyphosate formulation functioned as a tumor promoter.

13        Q     When you say, "That's what" --

14        A     Because glyphosate treatment to that DMBA

15   group, you know, when they are applied, they are found

16   and increased the tumors probably.

17        Q     What in table -- for that, you are looking at

18   IARC Monograph 112, right?

19        A     No.  I am looking at my report that ATSDR says

20   about skin tumors in 40 percent of the DMBA, plus

21   glyphosate treatment group.

22        Q     So you are relying on ATSDR for this statement?

23        A     Yes, yes.

24        Q     Okay.  Dr. Charles, when you looked at the

25   epidemiology studies in this case, did you use the same
```

1    rigger that you would use in your professional life as

2    you were conducting a risk assessment?

3        A    Epidemiological studies for me is a set of

4    studies that is used to look at -- there is no other

5    evidence for human exposure.  And this is my honest

6    opinion.

7        Q    When you say "epidemiologic studies" --

8        A    Yeah.

9        Q    -- for you are a set of studies used for human

10   exposure --

11       A    No.

12       Q    -- what do you mean by that?

13       A    I -- I will -- I will rephrase that for you to

14   understand.

15       Q    Yes.

16       A    Epidemiological studies are basically survey

17   studies -- survey -- survey results.

18            THE REPORTER:  Sorry?

19       A    You go to a population --

20            THE WITNESS:  Survey, S-U-R-V-E-Y.

21   Survey.

22       A    You go to a population, a selected population,

23   a large population, you will find out information about

24   certain exposure, spread out a questionnaire, get the

25   information, and then put it through a statistical

1  machine, you'll get associations, what you are looking

2  for.

3              That's what the epidemiological study

4  methodology is.  Or you go to a -- a cohort study,

5  like you go to a hospital, you look up the records,

6  how many people had cancer or what -- you know, what

7  were their habits, and put that data into something,

8  you know, and come up with a statistical analysis to

9  find out if there are -- if there are associations.

10  Those are the epidemiological output as a

11  toxicologist.

12              There are epidemiological toxicologists

13  who love their studies.  I am basically a trained

14  person, just look at the basic level of cause and

15  effect.

16              If there is a metabolic association or

17  if there is an exposure-related effect that can be

18  identified in an animal study or in-vitro study or

19  in-vivo study.  That is what we look at.

20              That is the basic reason for millions of

21  dollars of worth, animal studies and ratio studies are

22  designed by EPA.  If the epidemiology studies was the

23  basis of all decisions, then we don't have to spend

24  that much money.

25      Q    I will break that down.  Okay?

Ambrose K. Charles, Ph.D.

```
 1        A     Yes.

 2        Q     There are in vitro and in vivo studies that you

 3   look at as a toxicologist, correct?

 4        A     Yes.

 5        Q     Those are the studies that are typically

 6   evaluated by a regulator to base decisions on, true?

 7        A     Exactly.

 8        Q     There are also at times epidemiologic studies

 9   done, correct?

10        A     Yes.

11        Q     Those are survey studies, right?

12        A     Yes.

13        Q     Epidemiologic studies can be cohort studies

14   which look prospectively at a group of people and follow

15   them to see who develops cancer, right?

16        A     Yes.

17        Q     Epidemiologic studies can also be case control

18   studies?

19        A     Yes.

20        Q     Who look at people who have cancer and people

21   who do not have cancer, right?

22        A     Exactly.

23        Q     You looked at the results of the epidemiologic

24   studies on Roundup and non-Hodgkin's lymphoma, right?

25        A     Yes.
```

1      Q    Did you look to see whether those results were

2    statistically significant?

3              MR. HABERMAN:  Objection.

4      A    Some of them have -- some of them are not

5    statistically significant.  Even if it's not

6    statistically significant, that doesn't really tell you

7    that it -- it doesn't exist at all.  If there is some

8    effect, that is not statistically picked up, but there

9    is some people who are affected by this.

10     Q.   (BY MS. ROSS) You have an understanding that --

11   a basic understanding of statistical significance from

12   your Master's, right?

13     A    Yes.

14     Q    Statistical significance is a measure used to

15   determine whether the results of a study are likely to

16   be due to chance or not, right?

17     A    Exactly.

18     Q    A 95 percent confidence interval that includes

19   one, means the results are not statistically

20   significant, correct?

21     A    Yes.

22     Q    A P-value is less than .05 if the results are

23   statistically significant, yes?

24     A    Significant, yes.

25     Q    A P-value that is greater than .05 means that

```
 1   results are not statistically significant, right?

 2              MR. HABERMAN:  Objection.

 3       A   That's correct.

 4       Q.  (BY MS. ROSS) It is not necessarily the case

 5   that, simply because results are not statistically

 6   significant, there isn't an effect; correct?

 7       A   No.

 8       Q   Are you familiar --

 9       A   Not -- excuse me, can I add?

10       Q   Yes.

11       A   Statistically not significant doesn't mean that

12   there is no effect.

13       Q   Right.

14              Can you define the concept of correcting

15   for multiple comparisons in biostatistics?

16       A   Pardon?

17       Q   Can you define the concept of correcting for

18   multiple comparisons in bio- --

19       A   No.

20       Q   -- -statistics?

21       A   No, I am not familiar with that.

22       Q   You would defer to a biostatistician on that

23   issue?

24       A   Exactly.

25       Q   Did you attempt to be balanced in the way that
```

1    you presented the epidemiologic results in your report?

2         A    I'm very balanced.  I am not biased.

3         Q    For example, if an epidemiology study reported

4    risks that were adjusted for other pesticides, you would

5    want to present those over unadjusted numbers; right?

6         A    Yes.

7         Q    If an epidemiologic study reported on the

8    actual type of non-Hodgkin's lymphoma that a plaintiff

9    had, you would want to present those numbers, right?

10        A    Yes.

11        Q    If an epidemiologic study only reported on NHL

12   overall, it makes sense to use these numbers, correct?

13        A    Yeah, the supporting studies, supporting

14   evidence.

15        Q    If an epidemiologic study reported on NHL and

16   also on other cancers, you would want to use the numbers

17   for NHL as opposed to some other cancer that the

18   plaintiffs here did not have; right?

19        A    Yes.

20        Q    There is no reason to rely on a different type

21   of cancer that the plaintiff didn't actually have if

22   there were data available for plaintiff's actual cancer,

23   right?

24        A    Correct.

25             Excuse me.  Probably that is the reason

```
 1    I did not bring up the prostate from the

 2    epidemiological report that you showed me, the cancer

 3    of the prostate into my discussion because --

 4         Q    Did any plaintiff here have prostate cancer?

 5         A    Yes.

 6         Q    Mr. Pleu?

 7         A    Pleu.

 8         Q    Right.

 9              If you will turn with me to page 23 of

10    your report.

11              Actually, let's go --

12         A    Can you please ignore that underlining and the

13    different font?

14         Q    Yes.  We'll --

15         A    That must have gotten there by a computer --

16         Q    Of course.

17         A    -- issue, yes.

18         Q    In addition to the data on mechanism, you also

19    discussed the epidemiologic data, correct?

20         A    Yes.

21         Q    On page 20 of your report, at the very bottom,

22    the last sentence, begins, "However."

23                   MR. HABERMAN:  What page?

24                   MS. ROSS:  20.

25                   THE WITNESS:  20, yes.
```

```
 1      A    The last line?

 2      Q.   (BY MS. ROSS) The very last sentence --

 3      A    Oh, okay.

 4      Q    -- that begins with, "However."

 5      A    Yes, I am here.

 6      Q    In your report, you state, "all seven primary

 7  human epidemiological studies discussed above postulate

 8  a cause-and-effect correlation; i.e., glyphosate

 9  exposure had a limited, caut- -- cautious, suggestive,

10  or significant association and tendency toward the

11  causation of NHL;" correct?

12      A    Yes.

13      Q    Do you stand by what you wrote in your report,

14  that all seven primary human epidemiologic studies you

15  reviewed find a cause-and-effect correlation between

16  glyphosate and non-Hodgkin's lymphoma?

17      A    Yes.

18      Q    As part of your exposure days analysis, you

19  compared William Pleu's exposure days to those reported

20  in the published literature; true?

21      A    Yes.

22      Q    We talked before about the idea that greater

23  than two days per year means greater than or equal to 16

24  hours, right?

25      A    Yes.
```

1      Q    Is it necessary that someone be exposed to

2   glyphosate for more than one year for them to be at

3   increased risk of NHL?

4      A    No.

5           MR. HABERMAN:  Objection.

6      A    It is not necessary, you know.  The

7   epidemiological data even show that two days exposure

8   can cause some kind of significant association, so...

9      Q.   (BY MS. ROSS) So that could be just greater

10  than 16 hours of exposure for a single year, right?

11     A    Yeah, I mean...

12     Q    Your opinion that William Pleu's Roundup

13  exposure increased his risk of NHL is based on comparing

14  the number of days he reported he was exposed to numbers

15  in the epidemiologic literature, correct?

16     A    Yes.

17     Q    The same is true for Stacey Moore, right?

18     A    Yes.

19     Q    In your report, you reference odds ratios from

20  Eriksson 2008 --

21     A    Yes.

22     Q    -- and Pahwa 2019 for estimates of the risk of

23  non-Hodgkin's lymphoma in those exposed to glyphosate,

24  right?

25     A    Yes.

```
 1      Q    We will talk about those studies in more

 2   detail, but let me see if we can get some clarity on

 3   basic concepts.

 4      A    Okay.

 5      Q    Okay?

 6               New question.

 7               Some studies measured high exposure by

 8   the number of days sprayed per year, correct?

 9      A    Yes.

10      Q    Days per year is a frequency of exposure,

11   right?

12      A    That's right.

13      Q    Some studies reported frequency of exposure --

14      A    Excuse me.  Excuse me.  Also duration.

15      Q    Duration is different than frequency, right?

16      A    No, the hours of exposure that we calculate

17   from number of hours.

18      Q    Right.

19      A    Okay, so that is exposure duration.

20      Q    So I am breaking those up into separate things

21   right now --

22      A    Oh, okay.

23      Q    -- okay?

24      A    Okay.

25      Q    Some studies report frequency of exposure as
```

Ambrose k. Charles, Ph.D.

1  greater than two days per year, correct?

2     A    Yes.

3     Q    Greater than two days per year could be three

4  days per year for one year total for a total of three

5  days, right?

6     A    Yes.

7     Q    Greater than two days per year could also be

8  15 days per year for 20 years for a total of 300,

9  correct?

10    A    Yes.

11    Q    There is no way to tell from greater than

12  two days per year whether the total number of exposure

13  days is 3 or 300, true?

14    A    That's true.

15    Q    To measure highest exposure by the number of

16  days per year, you would want to use the highest number

17  of days per year available, right?

18    A    Exactly.

19    Q    Greater than five days per year is more

20  exposure than greater than two days per year, right?

21    A    Yes.

22    Q    If a study had both greater than two days per

23  year and greater than five days per year, you want to

24  use the greater than five days per year, right?

25    A    Yes.

```
 1        Q     Some studies measured high exposure by the

 2   total number of years sprayed, correct?

 3        A     Yes.

 4        Q     That is what you mentioned a moment ago --

 5        A     Yes.

 6        Q     -- correct?

 7        A     Yes.

 8        Q     Number of years sprayed is a duration of

 9   exposure measure, right?

10        A     Yes.

11        Q     The -- the total number of years sprayed

12   doesn't tell us whether someone sprayed Roundup one time

13   per year or 50 times per year, right?

14        A     Yes.

15        Q     Some studies measured high exposure by

16   cumulative number of days in a lifetime, right?

17        A     Yes.

18        Q     Cumulative-lifetime days tells you how many

19   times over the course of somebody's life they were

20   exposed to Roundup, true?

21        A     Yes.

22        Q     Cumulative-lifetime days of exposure combines

23   frequency and duration, right?

24        A     Yes.

25        Q     And, in fact, you provide cumulative-lifetime
```

```
1    days of exposure for Mr. Pleu and Mr. Moore, correct?

2        A    Yes, yes.

3        Q    What is the most reliable measure of high

4    exposure to glyphosate-based herbicides?  Is it number

5    of days per year, number of years, or

6    cumulative-lifetime days?

7        A    If you look at different reports, they show

8    different numbers, you know, either days or years, you

9    know.

10            Which one is the best number?

11            Okay.  Let me take you back to a little

12   bit of my thoughts.  All the epidemiologic studies are

13   either 3,000 people, 5,000 people or 58,000 people or

14   some other amount are in studies, you know; pooling of

15   them from different countries, different places;

16   putting all the data together; and then still it can

17   come up with any number -- number of years that they

18   are exposed.

19            That is how that data is generated.

20   They are not actual factual data that one person was

21   exposed to.  Okay.  This is the mean of thousands of

22   people that they put into.

23            But what Pleu has is his own statements

24   that I read and that I calculated.  That's not a

25   direct comparison of what you see in the
```

```
 1    epidemiological data.

 2        Q    So --

 3        A    But -- but we have to come there because we

 4    don't have any other data to compare.

 5        Q    The epidemiologic data takes thousands of

 6    people and --

 7        A    Exactly.

 8        Q    -- look across a population at --

 9        A    Yes.

10        Q    -- the either odds ratio or relative risk for

11    exposure in that population, right?

12        A    Exactly.

13        Q    There are also meta-analyses that combine data

14    from multiple studies and give exposure and risk

15    estimates for the total population, right?

16        A    Many countries.

17        Q    Correct?

18        A    Coming from Europe and Canada and U.S.

19        Q    Yes.

20        A    Anything in particular.

21        Q    That, for example, was the Boffetta 2021 paper

22    that you referenced, right?

23        A    Yes, yes.

24        Q    Do you have an opinion on the threshold of

25    Roundup exposure in terms of number of days that
```

Ambrose K. Charles, Ph.D.

1    increases someone's NHL risk?

2        A    I have no threshold that -- other than what's

3    published information that I am relying on.

4        Q    And the published information you are relying

5    on is greater than two days per year, right?

6        A    That's right.

7        Q    To reach your opinion that the plaintiff's

8    Roundup exposure increased his NHL risk, you added up

9    number of days the plaintiff said he was exposed to

10   Roundup, right?

11       A    Yes.

12       Q    And then asked, is that more or less than

13   two days per year; correct?

14       A    Yes.

15       Q    Is there any reason you can think of that the

16   jury can't do that themselves?

17       A    Any reason why the jury can't do that?

18       Q    Yes.

19       A    Do what?  I don't understand.

20            MR. HABERMAN:  Objection.  That calls for

21   a legal conclusion.

22       A    I don't understand that question.

23            MR. HABERMAN:  Legal foundation.

24       Q.  (BY MS. ROSS) Is there any reason you can think

25   of that a jury cannot take a plaintiff's testimony about

1    how much Roundup they sprayed and see if it is more than

2    or less than two days per year?

3        A    Yes.  The jury cannot do that unless you go

4    through the calculations -- I did them with you and we

5    you went through.  Because you get information from the

6    person to the -- I used 30 minutes of -- 30 minutes to

7    an hour.  I used it weekly.  I used it for 15 years or

8    10 years.  I did not use it for three months in winter.

9    In winter, it was only once I used.

10              This kind of information that comes in

11   pieces, you may be able to go through, a mathematical

12   genius, to put down and write down and calculate all

13   of these things, and then come up with the number of

14   total hours probably this person was exposed to during

15   the period that he was saying he was working on.

16              From that number of hours, you are to

17   come up with the number of actual workdays.  That

18   workdays is converted only with a purpose.  That

19   purpose is, we only have epidemiological data to make

20   a (indiscernible) occupational or environmental

21   exposure is only available based on the

22   epidemiological information.

23              We do not have any personal use,

24   per-day, per-hour use information other than this --

25   these kind of isolated cases, how many hours he used.

1    So in order to make an occupational or an enviromental

2    exposure comparison, I have to convert this

3    information to that eight-hour average made by OSHA

4    standard.  I don't think a jury can do that.  If they

5    are, I should be sitting there in that chair as a

6    jury.

7        Q    In your view, members of the jury can't add up

8    the number of hours someone sprayed Roundup and say

9    whether they are greater than --

10       A    The weight is described.

11       Q    -- or less than 16?

12            MR. HABERMAN:  Objection.

13   Mischaracterizes his testimony.

14       A    The weight is described.

15            [Multiple speakers speaking

16            simultaneously]

17       A    The weight is described.

18            THE WITNESS:  Sorry.

19       Q.   (BY MS. ROSS) We were talking over each

20   other --

21       A    Sorry.

22       Q    -- so I will repeat my question.

23            In your view, the members of the jury

24   can't add up the number of hours someone sprayed

25   Roundup and say whether it was greater than 16 hours?

```
 1                    MR. HABERMAN:  Objection.

 2      A    I have no opinion on that.  If the jury can do,

 3  it is good for them.

 4      Q.   (BY MS. ROSS) Do you know if members of the

 5  jury will hear from the plaintiffs about how many days

 6  they say they sprayed Roundup?

 7                    MR. HABERMAN:  Objection.

 8      A    Do I know?

 9      Q.   (BY MS. ROSS) Yes.

10      A    How do I know?

11      Q    I am asking.  Do you know one way or the other

12  whether the jury will hear from the plaintiffs on their

13  use of Roundup?

14                    MR. HABERMAN:  Objection.  Calls for

15  speculation.

16      A    I can only laugh at the question.  How do I

17  know what the jury will give that.  I don't know.

18                    THE REPORTER:  Can we take a break?  I am

19  in a lot of pain.  I need to stretch.

20                    MS. ROSS:  Of course.  Let's go off the

21  record.

22                    THE VIDEOGRAPHER:  Going off the record,

23  the time is 4:17.

24                    (Recess from 4:17 p.m. to 4:28 p.m.)

25                    THE VIDEOGRAPHER:  Back on the record.
```

1    The time is 4:28.

2        Q.   (BY MS. ROSS) Dr. Charles, table 6 in your

3    report about William Pleu summarizes data from some

4    Roundup studies; correct?

5        A    Yes.

6        Q    In your report you describe seven epidemiologic

7    studies, and those are Eriksson 2008, McDuffie,

8    Andreotti 2018, Leon 2019, Zhang 2019, Pahwa 2019, and

9    Boffetta 2021, correct?

10       A    Correct.

11       Q    Those are the studies you are relying on for

12   your opinion that Roundup increases the risk for NHL,

13   right?

14       A    Correct.

15       Q    The first paper you identified is Eriksson

16   2008, and here you cite an odds ratio of 2.36 and an

17   odds ratio of 3.35 per CLL.  Do you see that?

18       A    Yes.

19                 (Exhibit 17 virtually marked.)

20       Q.   (BY MS. ROSS) Exhibit 17 to your deposition is

21   Eriksson 2008, right?  Dr. Charles, this is the exhibit

22   that I just handed you a moment ago.

23       A    Oh, okay.

24       Q    Do you see that Exhibit 17 to your

25   deposition --

```
1      A      Yes.

2      Q      -- is the Eriksson 2008 study?

3      A      Yes.

4      Q      Eriksson 2008 was a 2008 study in Sweden,

5   right?

6      A      Yes.

7      Q      This was not conducted in the United States,

8   correct?

9      A      Yes.

10     Q      If you will turn with me to Table 7 on page

11  1661.

12     A      Yes.

13     Q      Table 7 of Eriksson reports the odds ratio for

14  glyphosate adjusted for other pesticides, right?  That

15  is the multi-variant analysis; correct?

16     A      I just took for -- I am talking about 7 -- yes,

17  okay.

18     Q      So Table 7 from Eriksson gives a univariant

19  odds ratio for glyphosate and multi-variant odds ratio

20  for glyphosate, right?

21     A      Multi-variant, yes.

22     Q      Adjusted for other pesticides, the odds ratio

23  for glyphosate exposure in NHL was 1.51 with a

24  95 percent confidence interval of .77 to 2.94; correct?

25     A      Correct.
```

1      Q    The 95 percent confidence interval includes

2    1.0, right?

3      A    Correct.

4      Q    Eriksson 2008 did not report a statistically

5    significant increased risk of NHL with glyphosate use

6    when adjusted for other pesticides, true?

7      A    I have to really look at the other statement

8    before I say yes.  If you can point out to me a sentence

9    in that -- in that report where you've just mentioned.

10     Q    So do you have an understanding of the

11   difference between a univariant analysis and a

12   multi-variant analysis?

13     A    I do not know really well what the difference

14   is between those two type of analysis.

15     Q    That might be a better question for a

16   biostatistician; is that fair?

17     A    Yes.

18     Q    Table 2 of Eriksson on page 1659 gives exposure

19   to various herbicides.

20              Do you see that?

21     A    Yes.

22     Q    Table 2 of Eriksson 2008 gives odds ratios for

23   less than or equal to ten days and greater than ten days

24   of glyphosate use, right?

25     A    Yes.

Ambrose v. Charles, Ph.D.

1    Q    Eriksson 2008 conducted subgroup analyses based
2    on days of glyphosate-based herbicide use, right?

3    A    Yes, more than ten days and less than ten days.

4    Q    In Eriksson 2008, do you see there are numbers
5    given for the number of cases and the number of controls
6    with greater than ten days of glyphosate exposure?

7    A    Yes, twelve -- twelve cases and nine.

8    Q    Right.  Twelve cases and nine controls had less
9    than or equal to ten days of glyphosate use, right?

10   A    Yes.

11   Q    17 cases and nine controls had more than ten
12   days of glyphosate use, right?

13   A    Yes, yes.

14   Q    There is wide overlap in the confidence
15   intervals between those exposed to glyphosate for less
16   than or equal to ten days and greater than ten days,
17   right?

18   A    Yes.

19   Q    There is no reported P for trend in Eriksson
20   comparing less than or greater than ten days of
21   glyphosate use, right?

22   A    That's right.

23   Q    Do you agree there is no statistical evidence
24   that there is a difference in risk in Eriksson based on
25   the days of exposure?

1       A     There is no statistical difference between the

2    days of exposure, ten or more than ten.

3       Q     Right.

4       A     There is no analysis there.

5       Q     The odds ratios for less than or equal to ten

6    lifetime days and greater then ten lifetime days in

7    Eriksson, do you see anything that indicates those were

8    adjusted for other pesticides?

9       A     Anything -- in that glyphosate -- under the

10   glyphosate, anything -- that I have adjusted for other

11   pesticides, no.

12      Q     If it helps you --

13      A     No.

14      Q     Do you see the text table under 2 --

15      A     Yes.

16      Q     -- that states adjustment was made for age,

17   sex, and year of diagnosis or enrollment?

18      A     Yes.

19      Q     The values for glyphosate in Table 2 of

20   Eriksson were not adjusted for other pesticides,

21   correct?

22      A     No.

23      Q     In your report for Mr. Pleu, you cite the CLL

24   data from Eriksson.

25             Do you consider subtype data to be

1    important?

2        A    Yes.

3        Q    Why is that?

4        A    Because it is a specific number to that

5    particular subtype of basal carcinogen.

6        Q    If you'll turn with me to your table in your

7    Moore report for just a moment.  That's on page 23 of

8    Exhibit 2.

9        A    Page 22?

10       Q    23.

11       A    23.

12       Q    I'd like to compare the tables in your Pleu

13   report and your Moore report for just a moment.  Okay?

14       A    Yes.

15       Q    In your report for Mr. Moore, did you cite any

16   subtype data from Eriksson 2008?

17       A    I did not.  Probably I didn't see it.

18       Q    Did -- do you know if Eriksson 2008 did, in

19   fact, report on DLBCL?

20       A    Yes.

21       Q    The very same table in Eriksson -- well, let's

22   take a step back.  Table 3 in Eriksson 2008 gives

23   exposure to various herbicides divided according to

24   different lymphoma entities, correct?

25       A    Yes.

1      Q    For glyphosate there are data available for

2  both CLL and DLBCL, correct?

3      A    Yes.

4      Q    For CLL, the odds ratio is 3.35 with a

5  95 percent confidence interval of 1.42 to 7.89, right?

6      A    Yes.

7      Q    For DLBCL, the odds ratio is 1.22 with a

8  95 percent confidence interval of .44 to 3.35, right?

9      A    That's right.

10     Q    You chose not to include the information on

11  DLBCL in your report, right?

12               MR. HABERMAN:  Objection.

13     A    I didn't -- I didn't choose that.  It must have

14  been an omission from my part.

15     Q.   (BY MS. ROSS) The next study that you cite

16  in -- in your report is McDuffie.  Do you see that?

17     A    That -- that must have and I will look at it,

18  not purposefully remove that information, probably I did

19  not include it.

20               (Exhibit 18 virtually marked.)

21     Q.   (BY MS. ROSS) Exhibit 18 to your deposition is

22  McDuffie 2001.

23               Do you see that?

24     A    Yes.

25     Q    In your table, you state that the odds ratio

```
1    for McDuffie was 1.26 to 1.47.

2              You see that, right?

3    A    That's correct.

4    Q    You also state in Table 6 of your report on

5    Mr. Pleu that McDuffie showed a statistically increased

6    risk.

7              Do you see that?

8    A    Yes.

9    Q    You didn't provide confidence intervals for the

10   odds ratios you cite for McDuffie, did you?

11   A    Yes.

12   Q    Did you provide confidence intervals in your

13   report for McDuffie?

14   A    No.

15   Q    McDuffie 2001 --

16   A    Can I -- can I -- these were prepared at two

17   different times.  Probably I did not follow the same

18   thought process at that time that I was entering the

19   information.  If I just compared this, then probably I

20   must have done.

21   Q    Okay.  When you say these were prepared at two

22   different times, you mean your report for Mr. Pleu and

23   your report for Mr. Moore, right?

24   A    Yeah, right.  Yeah.

25   Q    In either report did you include the 95 percent
```

1    confidence intervals for McDuffie?  You can compare the

2    two tables if you want?

3        A    Yeah, I did not.  I -- probably I didn't find

4    it.

5        Q    If you'll go with me to Table 1 in McDuffie.

6        A    Yes.

7        Q    Table 1 gives comparisons of demographic,

8    antecedent, person, medical, general pesticide exposures

9    and cigarette smoking histories between cases of NHL and

10   control subjects; right?

11       A    Yes.

12       Q    A personal history of cancer is one of the

13   medical history questions that this study looked at.

14               Do you see that?

15       A    Yes.

16       Q    A history of previous cancer was associated

17   with an odds ratio of 2.43 that was statistically

18   significant in McDuffie, right?

19       A    2.43, yes.

20       Q    Mr. Pleu had a personal history of cancer when

21   he was diagnosed, right?

22       A    I think he had bladder cancer, I think.

23       Q    Colon cancer?

24       A    Colon cancer.

25       Q    Mr. Pleu would fall into the group in McDuffie

```
 1   2001 that had a greater than twofold increased risk of

 2   NHL based on his personal history of cancer, right?

 3       A     Probably, yes.

 4       Q     The same for family history of cancer.  Do you

 5   see that family history of cancer in a first-degree

 6   relative in McDuffie had an odds ratio of 1.31 that was

 7   statistically significant?

 8             Table 1 of McDuffie is where I am.

 9       A    Yes, we were talking about previous cancers,

10   and then what is the next line?  They are talking --

11   family history, yes.

12       Q    Right.

13             So family history of cancer in any

14   first-degree relative was associated with a

15   statistically significant increased risk of cancer in

16   McDuffie, right?

17       A    I see the confidence interval.  Where are the

18   statistics --

19       Q    The 95 percent confidence interval is 1.05 to

20   1.62, correct?

21       A    But there has to be a FP (phonetic) revaluation

22   for that.

23       Q    Do you have an understanding of whether

24   95 percent confidence of 1.05 to 1.62 is statistically

25   significant?
```

1     A     That -- that is significant.  Statistically I

2   say that is a significant observation because 95 percent

3   of the points will come within that confidence level.

4     Q     Do you recall that Mr. Pleu has a sister who

5   has had multiple cancers?

6     A     Yeah.

7     Q     Mr. Pleu would fall into the group in McDuffie

8   2001 with a statistically significant increased risk of

9   NHL based on his family history, right?

10               MR. HABERMAN:  Objection.

11     A     That must be a medical person.  I have no

12   answer for that.

13     Q.   (BY MS. ROSS) If you will turn with me to Table

14   2 in McDuffie.

15     A     Yeah.

16     Q     This is the table that gives, "Herbicides:

17   Frequency of exposure to herbicides classified into

18   major chemical classes and as individual compounds."

19               Do you see that?

20     A     Yes.

21     Q     Glyphosate, or Roundup, is one of those, right?

22     A     Yes.

23     Q     The 95 percent confidence interval -- well, I

24   will back up a little -- there are two sets of odds

25   ratios here.  Odds ratio with a little A subscript and

```
 1   odds ratios with a little B subscript.

 2              Do you see that?

 3   A    Yes.

 4   Q    The A odds ratios are adjusted for the

 5   variables of age and province of residence, right?

 6   A    You are very familiar with this table.  I may

 7   have to take more time to see about it, see where you

 8   are looking at and what you are speaking about.

 9   Q    Of course.

10   A    Yeah.

11   Q    I am looking at -- so for these little

12   superscripts right under the table right there, there is

13   a description.

14   A    Okay, okay.

15   Q    The odds ratios with an A superscript were

16   adjusted for the variables of age and province of

17   residence --

18   A    Yes.

19   Q    -- correct?

20   A    Yes, yes.

21   Q    The odds ratios with a B superscript were

22   adjusted for statistically significant medical

23   variables --

24   A    Yes.

25   Q    -- including history of measles, mumps, cancer,
```

Ambrose v. Charles, Ph.D.

1    allergy desensitization shots, and a positive family

2    history of cancer in a first-degree relative?

3        A    Yes.

4        Q    Neither odds ratios A nor odds ratios B in

5    McDuffie were adjusted for other pesticides, right?

6        A    Yes.

7        Q    For glyphosate, the odds ratio A was 1.26 with

8    a 95 percent confidence interval of .87 to 1.8, right?

9        A    Right.

10       Q    For odds ratio B, that's the more adjusted

11   model in McDuffie, right?

12       A    Right.

13       Q    The odds ratio was 1.2 with a 99 percent

14   confidence interval of .83 to 1.74, correct?

15       A    That's right.

16       Q    In your report you state that the odds ratios

17   were 1.26 to 1.47.  Is that -- neither of those odds

18   ratios is 1.47, so I just wanted to clarify if that was

19   an error in your table or if you know where you got that

20   information.

21       A    I cannot recall that because I am talking

22   about -- it must have come from some other odd ratios --

23       Q    Okay.

24       A    -- not from this table.

25            You are talking about the frequency of

1   exposure plus providing the major chemical classes,

2   glyphosate exposed; 1.26 is correct.

3       Q    Okay.  So --

4       A    And number one -- 1. -- it must be -- 1.47

5   is -- that must be a typo.  It is 1.46.  Right?

6       Q    Okay.  So I think it's actually 1.20?

7       A    2, yeah.

8       Q    So the range actually in your table, in Table 6

9   for McDuffie should be 1.20 to 1.26; correct?

10      A    That's right.  That's right.

11      Q    So can we cross out 1.26 to 1.47 on your Pleu

12  report and just write in 1.20 to 1.26?  Would that be

13  accurate?

14      A    I will be able to tell you about that agreement

15  only after I go through and find out, you know, where

16  did I get that number.  I have, you know -- I have a

17  copy of this at home and I must have looked at it and

18  marked through a pencil or something like that, where

19  that came from, so...

20      Q    The next study -- well, okay.  So if I am

21  understanding you correctly, you have copies of the

22  articles that you reviewed at home --

23      A    Yeah.

24      Q    -- with markings on them?

25      A    Yeah, yeah.

```
 1       Q    You didn't bring any of those today, right?
 2       A    No.  It's public information, which -- or do I
 3  bring a copy of what you have -- already have here?
 4       Q    Sitting here today, you are not sure where the
 5  1.47 that you cite in your table for McDuffie came from?
 6       A    I am sure when I wrote that, you know, but
 7  right now you are -- you are pointing out a table.  I am
 8  trying at different numbers, so I can only tell you that
 9  I have to verify it.
10       Q    And --
11       A    That's my answer.
12       Q    -- can you do that sitting here today or would
13  you need a hard copy?
14       A    Oh, no.  I need time.
15       Q    The next study that you cite in Table 6 is
16  Andreotti 2018, right?
17       A    Yes.
18       Q    Exhibit 14 to your deposition is Andreotti.
19  Can you go back there?
20            Do you have it?
21       A    Deposition -- oh.  That's...
22            Yes.
23       Q    Okay.  Before we go there, just while you are
24  looking at your table in your report, Dr. Charles, can
25  you confirm that the relative risk that you cite in your
```

Ambrose to: Charles, Ph.D.

```
1    table is 2.44 and a 95 percent confidence interval of

2    .44 to 6.32?

3        A    Yes.  What --

4        Q    That is the number that you cite in your

5    table --

6        A    Yes.

7        Q    -- from Andreotti, right?

8        A    Yes.

9        Q    And that's true for both Mr. Pleu and

10   Mr. Moore, correct?

11       A    Yes.

12       Q    That is not for CLL, is it?

13       A    No, that's for NHL.

14       Q    That number is not for DLBCL, is it?

15       A    No, because I don't think, you know, Andreotti

16   gives a classification or the description about

17   different types of, you know -- I am sure about that.

18       Q    So let's go to Table 2 of Andreotti, if you

19   will, and turn with me to the -- so table for Andreotti

20   continues on to two pages, and I'd like you to go to the

21   page that's Table 2 continued.

22       A    Yes.

23       Q    Can you tell me when you are there?

24       A    Yes, this is it here.

25       Q    Okay.  The odds ratio -- you said that this was
```

Ambrose to: Charles, Ph.D.

1    for non-Hodgkin's lymphoma, the number that you cited.

2    But do you see in Table 2 of Andreotti, there is

3    non-Hodgkin's lymphoma with risks for Q1, Q2, Q3, and

4    Q4?

5         A    Lymphoma B-cell?

6         Q    No, non-Hodgkin's lymphoma, to begin --

7         A    Yes, yes.

8         Q    Okay.  The relative risk in Q4 of Andreotti for

9    NHL was .87, right?

10        A    Yes.

11        Q    The 95 percent confidence interval was .64 to

12   1.2, correct?

13        A    Yes.

14             MR. HABERMAN:  Where are you looking?

15             MS. ROSS:  Table 2 of Andreotti,

16   non-Hodgkin's lymphoma.

17             MR. HABERMAN:  Okay.

18        Q.   (BY MS. ROSS) For non-Hodgkin's lymphoma

19   B-cell, for Q4, the relative risk in Andreotti was .86

20   with a 95 percent confidence interval of .62 to 1.19,

21   right?

22        A    Right.

23        Q    CLL is the very next cancer that's given,

24   correct?

25        A    Yes.

1      Q    For CLL, the risk of CLL in folks exposed to

2   glyphosate-based herbicides in Andreotti was .87, a

3   95 percent confidence interval of .48 to 1.58, right?

4      A    Yes.

5      Q    You understand that relative risks less than

6   1.0 indicate a protective effect, right?

7      A    Protective effect?

8      Q    Correct.

9           Does a relative risk that's less than 1

10   mean that people who were exposed to a

11   glyphosate-based herbicide were at increased risk?

12           MR. HABERMAN:  Objection.

13      A    "Protective risk," no, I never heard that

14   expression.

15      Q.  (BY MS. ROSS) You've never heard of a

16   protective effect?

17      A    Protective risk.

18      Q    Okay.  Do you know what a relative risk of

19   greater than 1 means?

20      A    Yeah, it is not more than 1.  It is an excess

21   of risk of 1.

22      Q    Do you know what a relative risk of less than 1

23   means?

24      A    It is less than scale of 1, you know, the

25   person -- data.

Ambrose R: Charles, Ph.D.

1    Q    Yes, what that means -- what a relative risk

2    less than 1 means is that people who had the exposure

3    had less cancer than the people who did not have the

4    exposure, right?

5            MR. HABERMAN:  Objection.

6    A    I can't understand that statement,

7    protective -- the protective part is protected from.

8    That is the way I understood.  Protective effect means,

9    you know, something is protecting you, right?

10   Q    Right.

11   A    Glyphosate is protecting you?  That's what you

12   are saying?

13   Q    So I am just trying at this point to --

14           MR. HABERMAN:  Yes, that is what she is

15   saying.

16   Q.   (BY MS. ROSS) -- make sure you understand what

17   a relative risk is.

18   A    Yes.

19   Q    What is the significance of --

20           MR. HABERMAN:  You can answer.

21   Q.   (BY MS. ROSS) -- of a relative risk less than 1

22   in an epidemiologic study?

23   A    In an epidemiological study, what my answer is,

24   it is less risk in a scale than greater than 1.

25   Q    Less risk than greater than 1, I am not sure I

```
 1    understand what you are saying.

 2        A    Risk is one.

 3        Q    If the risk is one, there is no risk -- no

 4    increased risk at all, right?

 5        A    That's right.

 6        Q    So if the risk is less than one, that means

 7    there is no increased risk, correct?

 8        A    That's right.

 9        Q    If the risk is greater than one, there might be

10    an increased risk, correct?

11        A    Yes.

12        Q    When you --

13        A    I am with you on that, yes.

14        Q    Okay.  When you see a relative risk of .87 like

15    you got here for CLL --

16        A    Yes.

17        Q    -- in the page in a -- in the Andreotti

18    study --

19        A    Yes.

20        Q    -- does that mean that folks exposed to

21    glyphosate had a 13 percent decrease in their risk of

22    cancer?

23        A    No.

24        Q    Why not?

25        A    People who are exposed to glyphosate have less
```

1    than one risk means that they are protected from cancer.

2        Q    A 95 percent confidence interval like the one

3    you have here that goes from .48 to 1.58, that includes

4    the value of 1.0; right?

5        A    Yeah.

6        Q    If a 95 percent confidence interval includes

7    1.0, you can't say there is any difference in risk

8    between the exposed and the unexposed group; right?

9                MR. HABERMAN:  Objection.

10       A    No.  The point here isn't on -- if there are

11   less risks here than 1, that means, you know, there will

12   be less people that will be affected.  If it is more

13   riskier than one, there will be more people in the -- in

14   the population may be affected with that risk.

15       Q.   (BY MS. ROSS) The risks for a DLBCL are given

16   just below CLL in this table.

17                Do you see that?

18       A    What I am trying to convey to you is less than

19   one is not zero.

20       Q    Is it your understanding that a relative risk

21   of zero is the only case in which --

22                (Overlapping speakers.)

23       A    This is -- this is what I understand.

24       Q.   (BY MR. HABERMAN) Let me finish my question, if

25   you would, Dr. Charles, just because this is going to be

1    important later.

2              The way that you understand relative

3    risk, at what point does a relative risk mean there is

4    no increase in the risk in a population?  Is it zero,

5    or is it one?

6         A    It's one.

7         Q    Okay.  So any relative risk that is between

8    zero and one means that there is no increased risk in a

9    population, correct?

10             MR. HABERMAN:  Objection.

11        A    That is a general concept, but below that risk,

12   you know, there is one individual who is more

13   susceptible, for some reason, is riskier, you cannot

14   predict from that kind of ratio risk.  That's what I am

15   trying to convey to you.

16        Q.   (BY MS. ROSS) So we just looked at the data for

17   non-Hodgkin's lymphoma, non-Hodgkin's lymphoma B-cell,

18   and CLL?

19        A    Yes.

20        Q    Correct?

21        A    Yes.

22        Q    For DLBCL in the Agricultural Health Study, the

23   relative risk was .97 in the highest exposed group with

24   a 95 percent confidence interval of .51 to 1.85 --

25        A    Yes.

1      Q    -- right?

2      A    Yes.

3      Q    The value from Andreotti that you included in

4   your Table 6 of your Pleu report --

5      A    Yes.

6      Q    -- that's a relative risk of 2.44 with a

7   95 percent confidence interval of .44 to 6.32, correct?

8      A    Yeah, that's what it shows and that -- I was

9   going through, where did that number come -- came from,

10  you know.

11     Q    I think I can help you with that.

12     A    Yeah.

13     Q    So that is the number in Table 2 for acute

14  myeloid leukemia in the fourth quartile of exposure.

15          It is on page 513 at the very end of

16  Table 2.

17     A    Myeloid leukemia on 2.44.

18     Q    With a 95 percent confidence interval of .94 to

19  6.32.  Now, that's different than what you put in your

20  report, right?

21     A    Oh, yeah.  Probably, yes.

22     Q    Okay.

23     A    Yes, that could be a mistake, you know.  Now I

24  see that.

25     Q    Acute myeloid leukemia is not a type of

```
 1   non-Hodgkin's lymphoma --

 2       A    No.

 3       Q    -- right?

 4       A    No, no.

 5       Q    The value that you included in your report from

 6   Andreotti is not for any kind of non-Hodgkin's lymphoma

 7   whatsoever, correct?

 8       A    Yeah, correct.

 9       Q    The value you included in your report is not

10   for CLL, is it?

11       A    Yes, no.

12       Q    Did you include any of the data for Andreotti

13   for DLBCL in your report?

14       A    No.

15       Q    Did Mr. Pleu have AML, acute myeloid leukemia?

16       A    No, no.

17       Q    Did Mr. Moore have acute myeloid leukemia?

18       A    No.

19       Q    Andreotti did look at the diseases that

20   Mr. Pleu --

21       A    Yes.

22       Q    -- and Mr. Moore actually have, right?

23       A    It must have been an error that passed on from

24   that table to this table.

25       Q    If you will go with me to page 515 in
```

 1    Andreotti.

 2              The first full paragraph begins, "In our

 3    study we observed no associations between glyphosate

 4    use or NHL overall or any of its subtypes," correct?

 5    A    Yes.

 6    Q    That statement by the AAHS authors is true,

 7    right?

 8              MR. HABERMAN:  Objection.

 9              The document speaks for itself.

10    A    (No response.)

11    Q.   (BY MS. ROSS) Did you provide any critical

12    analysis of the Andreotti 2018 study?

13    A    No.

14    Q    Table -- I am sorry.

15              Page 511 of the Andreotti study, if you

16    will turn with me there.

17              The second paragraph under Results

18    states, "Risk ratios for unlagged intensity-weighted

19    lifetime days of glyphosate use and cancer risk are

20    shown in Table 2."

21              That's what we were just looking at,

22    right?

23    A    Okay.

24    Q    Glyphosate use was not associated with total

25    cancer or with lymphohematopoetic malignancies, right?

1       A    Yes.

2       Q    There was also no evidence for association with

3    NHL or any NHL subtypes, correct?

4       A    Correct.

5       Q    When you say in your report that all seven

6    primary human epidemiologic studies postulate a

7    cause-and-effect correlation toward the causation of

8    NHL, can we agree that statement is incorrect?

9               MR. HABERMAN:  Objection.

10      A    All the seven studies, probably not, but the

11   totality of epidemiologic studies, when you look at,

12   there is more association than -- more association

13   favorable to glyphosate -- and that's a link -- than the

14   other studies.

15      Q.   (BY MS. ROSS) The next paper you report in

16   Table 6 of your report on Mr. Pleu is, Leon, et al?

17      A    Yes.

18      Q    Do you see that?

19      A    Yes.

20      Q    In your -- well, withdrawn.

21      A    Yes.

22      Q    So Leon 2019 is another study that you

23   reviewed, correct?

24      A    Yes.

25      Q    Did you consider it to be well conducted?

1      A    Yes.

2      Q    Did you consider it to be a well-conducted

3    study?

4      A    I did not analyze and see, my point there, if

5    you are asking me those questions about epidemiological

6    studies and a deep analysis of all of those studies, you

7    know, I -- I have not done because my training is not to

8    look at the limitations or how they conduct -- that

9    study was designed.  Those things are not my expertise.

10    I was only looking at the data and their supportive or

11    dissenting opinions, the papers.

12      Q    When you state that you did not analyze the

13    epidemiologic studies, am I understanding, you -- you

14    performed no analysis yourself of whether a study was

15    well conducted or not?

16      A    Yes.

17            MR. HABERMAN:  Objection.

18      Q.  (BY MS. ROSS) Zhang 2019 is the next study that

19    you cite, correct?

20      A    Yes.

21      Q    And do you remember, sitting here today,

22    whether Zhang 2019 was a meta-analysis or a primary

23    analysis?

24      A    It shows here it is a meta-analysis of both

25    cohort and case control studies.

1      Q    How?

2                THE REPORTER:  A meta-analysis of what?

3                THE WITNESS:  Case control and a cohort, a

4     C-O-H-O-R-T.

5                THE REPORTER:  Thanks.

6      Q.   (BY MS. ROSS) The next study that you cite is

7     Pahwa 2019, correct?

8      A    Yes.

9      Q    And this is another study that you reviewed and

10    relied on --

11     A    Yes.

12     Q    -- in Roundup and non-Hodgkin's lymphoma?

13     A    Yes.

14     Q    And I take it you did not provide any analysis

15    of whether this was a well-conducted study or not,

16    correct?

17     A    No.

18     Q    Pahwa 2019 contains more data than any of the

19    earlier published case control studies in the United

20    States and Canada, right?

21     A    Yes.

22                (Exhibit 19 virtually marked.)

23     Q.   (BY MS. ROSS) Exhibit 19 to your deposition is

24    the Pahwa 2019 article.

25     A    Oh, thank you.

Ambrose K. Charles, Ph.D.

```
 1      Q    If you will turn with me to page 2.

 2      A    Yes.

 3      Q    The second paragraph on that page begins, In

 4   the 1980s and 1990s, population-based case control

 5   studies were conducted in four states in the U.S.,

 6   Midwest, and six Canadian provinces.

 7           Do you see that?

 8      A    Yes.

 9      Q    And there is a citation given a little bit

10   further down of which studies are included.

11           You see the references 9 and 10?

12      A    Yes.

13      Q    Reference 9 in Pahwa 2019, will you turn to the

14   last pages?  That's the McDuffie study that you

15   reviewed, right?

16      A    Yes.

17      Q    Pahwa 2019 includes data from Canada, Kansas,

18   Iowa, Minnesota, and Nebraska, right?

19      A    Yes.

20      Q    Pahwa 2019 also includes all of the Canadian

21   glyphosate cases in McDuffie 2001, right?

22      A    Yes.

23      Q    Pahwa includes additional data not captured in

24   the McDuffie study, correct?

25      A    Yes.
```

1    Q    Right now McDuffie is a subset of Pahwa, right?

2    A    I didn't understand that question.

3    Q    If we wanted to look at the cases reported in

4    the epidemiologic literature, it would be double

5    counting to include both McDuffie 2001 and Pahwa 2019,

6    right?

7              MR. HABERMAN:  Objection.

8    A    Oh, okay.  That's what you mean, because it is

9    a reference there?

10   Q.   (BY MS. ROSS) Correct.  Because all of the data

11   from Pahwa -- new question.

12             All of the -- as you just said, all of

13   the data from McDuffie 2001 are contained in Pahwa

14   2019, right?

15             MR. HABERMAN:  Objection.

16   A    Yes.

17   Q.   (BY MS. ROSS) It would be double counting to

18   include both the McDuffie study and the Pahwa study in

19   analysis, right?

20             MR. HABERMAN:  Objection.

21   A    But my point that, looking at the most separate

22   studies is, when I looked at the EPA report at the

23   beginning, the 2017 report, they have listed -- that is

24   how I knew about these epidemiological studies that EPA

25   has reviewed and how they reviewed and what are their

Ambrose K. Charles, Ph.D.

1    limitations that they have found, so they have listed

2    all of them.  All of them are separate studies they

3    reviewed, so I listed them as separate studies.

4        Q.   (BY MS. ROSS) In your report for Mr. Pleu, you

5    cite the results for -- from Pahwa for greater than 3.5

6    years, and state that those showed an odds ratio of 2.19

7    and 95 percent confidence interval of .7 to 6.86; right?

8        A    For SLL.

9        Q    For SLL?

10       A    Yeah.

11       Q    Did you find it important that Pahwa considered

12   the risk of NHL for folks who used glyphosate for more

13   than or less than 3.5 years?

14            MR. HABERMAN:  Objection.

15       A    That -- that particular information of year

16   linking to -- number of years linking to a probability

17   of NHL or SLL -- not SLL -- CLL is coming from that

18   citation from the epidemiological study.

19       Q.   (BY MS. ROSS) If glyphosate, in fact, causes

20   non-Hodgkin's lymphoma, you would expect increased risk

21   with increasing years of glyphosate exposure, right?

22            MR. HABERMAN:  Objection.

23       A    I don't have an answer for that.

24       Q.   (BY MS. ROSS) You don't have an independent --

25       A    No.

1       Q     -- opinion on whether increasing years of

2    glyphosate use are associated with an increased risk of

3    NHL; is that right?

4       A     That's right, yes.

5       Q     Do you have an independent opinion on whether

6    increasing days per year of glyphosate use are

7    associated with an increased risk for NHL?

8       A     My lens is only on the published information

9    that I can refer to and then make a comparison to what I

10   have made and find out is there any relationship with

11   public knowledge, you know, published information.

12      Q     Did the -- when you say you compared what you

13   have with the public information, you mean the

14   information in epidemiologic studies, right?

15      A     Epidemiologic studies, yes.

16      Q     The -- did the results for greater than five

17   years of glyphosate use in Pahwa give you meaningful

18   information about Mr. Pleu's risk of NHL?

19      A     No.  It only gave me more than a certain number

20   of years.  There may be a tendency towards causing this

21   disease.

22      Q     If you will go with me to Table 3 in Pahwa 2019

23   and tell me when you are there.

24      A     Pleu?

25      Q     In the study --

```
 1      A    Oh, okay.

 2      Q    -- in Exhibit 19.

 3            That is on page 6.

 4      A    Yes.

 5      Q    Table 3 of Pahwa gives duration of glyphosate

 6   use and associations with NHL overall and histological

 7   subtypes, right?

 8      A    Yes.

 9      Q    And the information in Table 3 is given in

10   number of years of glyphosate use.

11            Do you see that?

12      A    Yes.

13      Q    You mentioned the data in Pahwa are for SLL.

14   That is related to CLL in your view?

15      A    FLL, follicular?

16      Q    No, small lymphocytic lymphoma?

17      A    Yes, SLL.

18      Q    SLL?

19      A    Yes, they are -- they are classified to be with

20   SLL, yes.

21      Q    You know that in the Pahwa study, the authors

22   did not specifically look at CLL, correct?

23            MR. HABERMAN:  Objection.

24      A    Yes, it is in the classification of -- the

25   earlier classification of the subtypes, SLL and CLL are
```

```
 1   given together.  That's in one place.

 2              Number two, in the medical records and

 3   in the diagnosis, of the -- you know, the official

 4   analysis, cytometric analysis, cytogenic analysis,

 5   they always mention SLL/CLL, and they are used

 6   alternatively by some doctors, oncologists.

 7      Q.   (BY MS. ROSS) Right.

 8              So you used the data for SLL as applied

 9   to Mr. Pleu, correct?

10      A    Exactly, because of that reason, I -- I saw

11   there is some similarity that oncologists are using both

12   these two.

13      Q    In Pahwa 2019, their odds ratios again with a

14   subscript or superscript A and B, and then an

15   explanation under the table as to what those mean, do

16   you see that?

17      A    A and B?

18      Q    Yes.

19              The odds ratio A --

20      A    Odds ratio B.  Yes.

21      Q    -- is adjusted for age, sex, state, province,

22   lymphatic or hematopoietic cancer in a first-degree

23   relative, use of a proxy respondent, use of any personal

24   protective equipment; right?

25      A    That's right.
```

Ambrose K. Charles, Ph.D.

```
 1        Q    Odds ratios with a B were adjusted for those

 2   same things, plus the use of 24D Dicamba and malathion,

 3   right?

 4        A    That's right.

 5        Q    In Pahwa 2019 the odds ratio with a superscript

 6   B were adjusted for other pesticides, correct?

 7        A    I am lost in that particular last sentence.

 8   You -- please restate it for me again.

 9        Q    In Pahwa 2019, the odds ratios with a

10   superscript B were adjusted for other pesticides,

11   specifically 24D, Dicamba and malathion, correct?

12        A    E -- you are talking about the subletter E?

13        Q    No.

14        A    I don't see --

15        Q    B, like in boy.

16        A    Oh, B.  Adjusted for age, sex, and state

17   provinces.

18        Q    And the use of 24D Dicamba --

19        A    Yes.

20        Q    -- and malathion --

21        A    Yes.

22        Q    -- correct?

23        A    It also says that, yes.

24        Q    So just so the record is clear, I will repeat

25   my question.  Okay?
```

1     A     Yes.

2     Q     In Pahwa 2019 the odds ratios with a

3     superscript B were adjusted for 24D Dicamba and

4     malathion, correct?

5     A     Yes.

6     Q     For CLL in Pahwa 2019, what was the odds

7     ratio -- well, withdrawn.

8           There -- the data for CLL are not

9     reported in Pahwa 2019, but data for SLL are, right?

10    A     Yes.

11    Q     For SLL, what was the odds ratio for greater

12    than 3.5 days per use -- or I am sorry, for SLL --

13          New question.

14          For SLL in Pahwa 2019 what were the odds

15    ratio for greater than 3.5 years of use adjusted for

16    other pesticides?

17    A     More than two years.

18    Q     Greater than 3.5 years in Table 3?

19    A     I took a number -- number -- more than two

20    years.  3.5 years that -- that I have in my data is

21    greater than 2.

22    Q     The odds ratio for SLL for greater than

23    two days per year is 2.31 and not statistically

24    significant, right?

25    A     Yes.

```
 1      Q    The odds ratio in Pahwa for greater than 3.5

 2  years of use with SLL is 1.94 and not statistically

 3  significant, right?

 4      A    Yes.

 5      Q    For the number of lifetime days in Table 5 of

 6  Pahwa, for SLL, the odds ratio is 2.19 and not

 7  statistically significant, right?

 8      A    Now you are in Table 5?

 9      Q    I am.

10      A    I did not know when you were switching to that,

11  we were -- we were in Table 4.

12      Q    We were just talking through the different

13  numbers for SLL?

14      A    Yes, yes, I have them.

15      Q    Right.

16           So in Table 5, that's where you got the

17  number 2.19 with a 95 percent confidence interval of

18  .7 to 6.86, correct?

19      A    Yes.

20      Q    Can you take a minute and go through the

21  fully --

22      A    Yeah.

23      Q    -- adjusted numbers in Tables 3, 4, and 5 and

24  confirm that the only odds ratio for SLL that is higher

25  than 2 is the odds ratio you cite from Table 5?
```

Ambrose R. Charles, Ph.D.

1     A     No, I picked up that because greater than 3.5

2   years.   Okay?   That is the reason I went for that

3   number, the duration, the number of years, closer to the

4   exposure.

5     Q     Mr. Pleu falls into the group in Pahwa that

6   used for greater than 3.5 years, correct?

7     A     Yeah, yeah.

8     Q     Mr. Pleu also falls into the group in Table 4

9   that used glyphosate for more than two days per year,

10  right?

11    A     Yes.

12    Q     Mr. Pleu falls into the group in Table 5 that

13  used glyphosate for more lifetime days, correct?

14    A     Yes.

15    Q     You can confirm that between the number of

16  years analysis in Table 3, the number of days per year

17  in Table 4 and the number of lifetime days in Table 5,

18  you chose the highest number?

19    A     It was not deliberately chosen.  I saw -- when

20  I was reviewing all of these tables, perhaps I found

21  greater than 3.5 years of exposure; it's a low number in

22  his case.

23    Q     For Mr. Moore, if we go to the table that you

24  used for Mr. Moore in your report.  That's on page 23.

25    A     Yes.

1    Q    There you cite an odds ratio of 2.14 and a

2   95 percent confidence interval of 1.07 to 4.28, correct?

3    A    Yes.

4    Q    That odds ratio did not come from the number of

5   years of use; it came from the number of days per year,

6   right?

7    A    Yes.

8    Q    That's Table 4 in Pahwa, right?

9    A    Yes.  Probably, yes.

10    Q    Can you confirm that the only odds ratio for

11   DLBCL in Tables 3, 4, or 5 adjusted for other pesticides

12   that is greater than 2 with the odds ratio you cite from

13   Table 4?

14    A    Can I find other odd ratios?

15              THE REPORTER:  Can I find what?

16              THE WITNESS:  Odd ratios.

17    Q.  (BY MS. ROSS) Can you confirm that the only

18   odds ratio for DLBCL adjusted for other pesticides that

19   is greater than 2 is the one that you cite from Table 4?

20    A    Adjusted for -- no.  What I have entered here

21   must have been verified and then I entered at that time

22   what I thought is appropriate.  I cannot go back and

23   recall what I was thinking when I entered that.

24              That number is there and it was not, you

25   know -- another thing I want to remind you, these two

Ambrose R. Charles, Ph.D.

1    reports were not compared side by side looking at the

2    table.  And each one was written -- at the time, I go

3    back, take the paper, read it, look at, and whatever

4    is appropriate at that moment, I enter that.

5        Q    And, in fact, if you look at Table 3 in Pahwa

6    for DLBCL, for greater than 3.5 years of glyphosate use,

7    the odds ratio was .93 with a 95 percent confidence

8    interval of .5 to 1.74, correct?

9        A    Table 3?

10            You are talking about the DLBCL?

11       Q    Yes.

12       A    Greater than five years.

13       Q    Greater than 3.5 years?

14       A    3.5 years is .95 -- no, no, sorry.  2.02.

15       Q    That's not adjusted for other pesticides,

16   correct, and that's actually zero to less than 3.5 years

17   of use?

18       A    Yes.

19       Q    Yes.

20            Adjusted for other pesticides for folks

21   who use glyphosate for more than three and a half

22   years, the odds ratio .93 with a 95-percent confidence

23   interval of .5 to 1.74, right?

24       A    Yes.

25       Q    Mr. Moore used glyphosate for more than three

1   and a half years, right?

2       A    Yes, but he used for any years -- he had a

3   different number to use there, more than ten years or

4   ten days or something like that.

5       Q    Exhibit --

6       A    Very close to his use years was the number that

7   I was looking at.  I can find something that is much

8   more related in my mind.  I was thinking of it in my

9   mind, not what you are looking at now.

10              (Exhibit 20 virtually marked.)

11      Q.   (BY MS. ROSS) Exhibit 20 to your deposition --

12              MS. ROSS:  And I apologize, Counsel.  I

13  don't have a copy, but this is Leon 2019.

14              THE WITNESS:  Do you want to see that?

15              MR. HABERMAN:  (Shakes head).

16      Q.   (BY MS. ROSS) Okay.  Dr. Charles --

17      A    Yes.

18      Q    -- Exhibit 20 to your deposition is the Leon

19  2019 study.

20              Do you see that?

21      A    Yes.

22      Q    In your report for Mr. Pleu, if you go back

23  there for a moment, do you see that for Leon 2019, you

24  cite a hazards ratio of 1.36 and a 95 percent confidence

25  level of 1.0 to 1.85, right?

```
1        A    Yeah, right.

2        Q    Leon 2019 is a pooled consortium of

3   agricultural studies, correct?

4        A    It is -- my notes says it is a cohort study.

5        Q.   (BY MS. ROSS) Yes.

6             If you look at the Exhibit 20 in front

7   of you, what is the title of that paper?

8        A    "Pesticide Use and Risk of non-Hodgkin's

9   lymphoid malignancies in agricultural cohorts from

10  France, Norway, and the USA: a pooled analysis from the

11  AGRICOH consortium."

12       Q    Leon 2019 is a pooled consortium of

13  agricultural studies, correct?

14       A    Yes.

15       Q    If you'll turn to page 8 and tell me when you

16  are there.

17       A    Page -- it's a table --

18       Q    Right?

19       A    Table 2.

20       Q    Table 2 in Leon gives the results for a number

21  of different pesticides and several subtypes of NHL as

22  well as NHL overall, right?

23       A    That's right.

24       Q    Do you see glyphosate there?

25       A    Yes.
```

Ambrose R. Charles, Ph.D.

1    Q    For glyphosate the meta-relative risk for NHL

2    overall was .95 with a confidence interval of .77 to

3    1.18, right?

4    A    Yes.

5    Q    For CLL, the hazard ratio was .92 and

6    nonsignificant, right?

7    A    Yes.

8              MR. HABERMAN:  Objection.

9    A    Yes.

10    Q.   (BY MS. ROSS) William Pleu falls into the group

11    in Leon 2019 that had CLL and a hazard ratio of .92 that

12    was nonsignificant, correct?

13    A    Yes.

14    Q    The data you cite in your report are a hazard

15    ratio of 1.36 and a confidence interval of 1.0 to 1.85.

16              Can you confirm that those data are for

17    DLBCL?

18    A    No.

19    Q    If you --

20    A    Not -- not from this table.

21    Q    So if you look at DLBCL -- I believe it's the

22    furthest over -- what is on that table?

23    A    Oh, okay.

24              That's 1.36.

25    Q    I will repeat my question.

 1                For Leon 2019, the hazard ratio of 1.36

 2    with a 95 percent confidence interval of 1.0 to 1.85,

 3    that is for DLBCL, right?

 4        A    Yes.

 5        Q    We can agree that Mr. Pleu does not have DLBCL,

 6    right?

 7        A    That's correct.

 8        Q    The next study you cite that we have not yet

 9    talked about is Boffetta, et al, correct?

10        A    Yes.

11        Q    Boffetta, et al was another meta-analysis,

12    right?

13        A    I didn't hear you well, ma'am.

14        Q    I am sorry.  I will turn back to face you.

15                Boffetta, et al was another

16    meta-analysis that you looked at --

17        A    Yes.

18        Q    -- correct?

19        A    Yes, yes.

20                Can I put this aside or should I hold

21    it?

22        Q    You can.

23                Do you know whether the data that you

24    cite for -- from Boffetta, et al with a relative risk

25    of 1.29 and a 95 percent confidence interval of 1.02

1    to 1.63, if those are data for DLBCL, CLL, or

2    non-Hodgkin's lymphoma overall?

3        A    I think that came from the Boffetta report.

4        Q    Right.

5                And those are the data for DLBCL and not

6    CLL, right?

7        A    Really, I have no reference to look at.

8        Q    We will pull that up on a break as well --

9        A    Yeah.

10       Q    -- and go through that.

11               MS. ROSS:  Why don't we take a short break

12   now.

13               THE WITNESS:  Okay.

14               THE VIDEOGRAPHER:  Going off the record,

15   the time is 5:21.

16               (Recess from 5:21 p.m. to 5:31 p.m.)

17               THE VIDEOGRAPHER:  Back on the record.

18   This marks beginning of Media Number 4.  The time is

19   5:31.

20               (Exhibit 21 virtually marked.)

21       Q.   (BY MS. ROSS) Dr. Charles, Exhibit 21 to your

22   deposition is the Boffetta 2021 study; right?

23       A    Yes.

24       Q    That is the last study that you cite in your

25   report for Mr. Pleu, correct?

```
 1      A    Yes.

 2      Q    In your report for Mr. Pleu you cite a relative

 3  risk of 1.29 and a 95 percent confidence interval of

 4  1.02 to 1.63.

 5           Do you see that in your report?

 6      A    Yes.

 7      Q    The data you cite in your William Pleu report

 8  from Boffetta is for DLBCL and not CLL, right?

 9      A    That's correct.

10      Q    You state in your report that Boffetta did not

11  show the analysis data to any other NHL subtypes.

12           Do you see that in your report for

13  Mr. Pleu?

14           It's on page 20, where you just were.

15      A    Oh.

16      Q    The last sentence -- so at the top of this

17  page, you are talking about Boffetta, et al.

18           Do you see that?

19      A    Yes.

20      Q    And the last sentence in that paragraph on

21  Boffetta states, "This report, however, did not show the

22  analysis data on any other NHL subtypes."

23           Do you see that?

24      A    Oh, on the top.  Okay.

25      Q    Can you read the last sentence in your section
```

Ambrose K. Charles, Ph.D.

1   on Boffetta, et al?

2       A    "This report, however, did not show the

3   analysis data on any other NHL subtypes."

4       Q    Is that a true statement for Boffetta 2021?

5       A    Probably not looking at it right now.

6       Q    If you go to Abstract of Boffetta 2021, can you

7   confirm for me in the very same sentence that gives you

8   data for DLBCL, there are results for CLL?

9       A    Yes.

10      Q    The results for DLBCL were statistically

11  significant, right?

12      A    Yes.

13      Q    You are saying there is statistically

14  significant evidence of an increased risk and that's

15  evidence for causation, correct?

16      A    Yes.

17      Q    The authors say an association with DLBCL

18  cannot be ruled out, and you say this study is evidence

19  of causation.

20              You would agree with me that is more

21  than what the authors are willing to say, right?

22      A    I have mentioned somewhere that that

23  sentence -- you know, that all the associations cannot

24  be ruled out.

25      Q    It would be more accurate to say that an

1    association with DLBCL cannot be ruled out as opposed to

2    saying that there is an association with DLBCL --

3              MR. HABERMAN:  Objection.

4    Q.  (BY MS. ROSS) -- for Roundup, correct?

5              MR. HABERMAN:  Objection.

6    A    Both are meaning the same to me.

7    Q.   (BY MS. ROSS) Boffetta provides a meta-analysis

8    of all of the data on CLL and shows no statistically

9    significant increased risk, correct?

10   A    Lack of association, that's what you are

11   talking about?

12   Q    Correct.

13   A    Exposure for NHL overall, although there is an

14   association for DLBCL, cannot be ruled out.  That means

15   there is some evidence of association.

16   Q    You included the results for DLBCL in your

17   table of data relevant to Mr. Pleu, right?

18   A    Yeah, that's in there, you know.  If it -- it's

19   repetition from the Moore's table.

20   Q    You should have included the data for CLL,

21   right?

22   A    Yes, exactly.

23   Q    Can you confirm, looking at Boffetta 2021, that

24   the results from Boffetta for follicular lymphoma show

25   no increased risk?

Ambrose R. Charles, Ph.D.

1      A     Table?

2      Q     In the Abstract.

3      A     Oh.  Follicular?

4      Q     Yes.

5      A     I don't see that.

6      Q     Do you see a relative risk for follicular

7   lymphoma in Boffetta?

8      A     No.

9      Q     Do you know if Boffetta included data --

10     A     Oh, yes, I see that, yes.  Follicular lymphoma,

11   yes.

12     Q     What was the relative risk in Boffetta for

13   follicular lymphoma?

14     A     It is .84 with a confidence level of .61 to

15   1.17.

16     Q     Does Boffetta 2021 includes data from Andreotti

17   2018?

18     A     Yes.  Probably, yes.

19     Q     Do you know if Boffetta 2021 included all of

20   the data from Andreotti 2018?

21     A     Yeah, they did include all of the data for

22   meta-analysis.

23     Q     If you go to Table 1 of Boffetta, I think it

24   shows you which --

25     A     Yes.

1      Q      -- papers were included.

2      A      Yes.

3      Q      Do you see Andreotti 2018 on that list?

4      A      No, I don't see it.  I see Pawha, Leon, Cocco,

5  Orsi, Eriksson, and Handell [sic].

6                  THE REPORTER:  I am sorry.  I couldn't

7  hear you.

8                  THE WITNESS:  I was reading the names.

9                  Pahwa, Leon, Cocco, Orsi, and Eriksson.

10     Q.    (BY MS. ROSS) And Hardell, correct?

11     A      Hardell.  And Hardell.

12     Q      I want to sum up the epidemiologic data we have

13  walked through, Dr. Charles.  Okay?

14     A      Okay.

15     Q      For Eriksson 2008, in your table, you reported

16  the greater than ten days information and not the

17  findings that were adjusted for other pesticides;

18  correct?

19     A      Right.

20     Q      For Eriksson 2008, you included findings for

21  CLL in your reports but not the results for DLBCL,

22  correct?

23     A      That's right.

24     Q      For Leon 2019, you included the findings for

25  DLBCL in your reports but not CLL, right?

1       A    Yes.

2       Q    For Andreotti 2018, you included a finding for

3    acute myeloid leukemia in your reports but not CLL,

4    DLBCL, or NHL overall; correct?

5       A    Probably, yes.

6       Q    You included both McDuffie 2001 and Pahwa 2019

7    even though all of the cases from McDuffie are included

8    in Pahwa, right?

9             MR. HABERMAN:   Objection.

10      A    That is considered a separate study even if it

11   is included in a full study.

12      Q.   (BY MS. ROSS) For Boffetta 2021, you included

13   the statistically significant findings for DLBCL but not

14   the nonsignificant findings for CLL or NHL overall,

15   right?

16      A    That's right.

17      Q    For Pahwa 2019 you report the lifetime days for

18   CLL and the days per year for DLBCL, right?

19      A    I think we agreed on greater than 3 point

20   years.  That number is correct.

21      Q    Those are different analyses, correct?

22      A    Yes.

23      Q    What they have in common is in both cases they

24   are the highest odds ratios for glyphosate in the

25   subtype in question of any adjusted analysis in Pahwa,

1    right?

2        A    Yes.

3        Q    The table in your report mixes end points,

4    correct?

5        A    Yes.

6        Q    The table in your report uses data that are for

7    cancers the plaintiff didn't have, right?

8        A    Data the plaintiff did not have?

9        Q    Correct.

10              The table in your report uses data for

11    cancers that the plaintiff did not have, correct?

12        A    Yes.  That's odd ratio and it was copied to the

13    table from the paper.  There was -- obviously some error

14    happened.  That doesn't mean that the data doesn't

15    exist.

16        Q    The table in your report uses data in some

17    cases that are unadjusted for other pesticides, correct?

18        A    Yes.

19              MR. HABERMAN:  Objection.

20        Q.   (BY MS. ROSS) The table in your report double

21    counts, right?

22              MR. HABERMAN:  Objection.

23        A    How can it be -- you are trying to discount the

24    McDuffie.  He has a publication, and we see it because

25    it's a publication, not because it is part of somewhere.

1           That means ATSDR has got so many

2    different studies and papers that was published.  When

3    I look at ATSDR, for example, I don't discount other

4    studies, you know, they exist.  That's the way I see

5    it.

6        Q.   (BY MS. ROSS) Was your point in this chart just

7    to show some statistically significant increases in

8    risk?

9        A    No.

10           MR. HABERMAN:  Objection.

11       Q.   (BY MS. ROSS) You took --

12       A    That -- that is not my job.

13       Q    You took seven endpoints out of hundreds of

14   endpoints in these various studies and put them into a

15   table, right?

16       A    Whatever I felt was appropriate in my

17   assessment I included.

18       Q    Now --

19       A    And, of course, I admit there are some --

20   errors happened, but that is not deliberate.

21       Q    If you will turn with me to page 16 of your

22   report for Mr. Pleu.

23           You state that from a regulatory

24   perspective, EPA uses the most current science

25   policies and risk assessment methodologies to assess

Ambrose k. Charles, Ph.D.

```
 1    the risks of glyphosate, correct?

 2         A    Correct.

 3         Q    The EPA has regulatory jurisdiction under FIFRA

 4    to regulate pesticides, insecticides, and those types of

 5    chemicals, right?

 6                   MR. HABERMAN:  Objection.

 7         A    Correct.

 8         Q.   (BY MS. ROSS) Pesticides have to be registered

 9    with EPA and EPA has to approve of the registration,

10    correct?

11         A    That's correct.

12         Q    Part of EPA's responsibility is to review and

13    approve the warnings and labelings that accompany

14    herbicides like Roundup, right?

15         A    That's correct.

16         Q    At no point in its more than 40 years of

17    regulating glyphosate has EPA required a cancer warning

18    on a Roundup label, true?

19                   MR. HABERMAN:  Objection.

20         A    I am not aware of that.

21         Q.   (BY MS. ROSS) You understand in broad terms the

22    regulatory process that the EPA goes through to review

23    glyphosate and chemicals like glyphosate?

24         A    Repeat that question, please.

25         Q    Do you understand in broad terms the regulatory
```

1    process that EPA goes through to review glyphosate?

2        A    Yes.

3        Q    There are points along the way when EPA is

4    making a decision that are open to the public, right?

5        A    Yes.

6        Q    Before the EPA has reached a decision, the

7    public gets to be a part of that process, true?

8                 MR. HABERMAN:  Objection.

9        A    Public -- public is a part of that.  They can

10   send comments.

11       Q.  (BY MS. ROSS) EPA proposes an action and then

12   people get to see that action and send comments to EPA,

13   correct?

14       A    Yeah.

15       Q    EPA then responds to those comments, right?

16                 MR. HABERMAN:  Objection.

17       A    Usually, if you want to hear that response

18   like...

19       Q.  (BY MS. ROSS) There's --

20       A    EPA -- I would like to add that, please --

21       Q    Sure.

22       A    -- before you go.

23                 EPA's response to any public comments

24   is:  We have reviewed those comments.  We deliberated

25   it, and then we have included it in our consideration.

1   Thank you.

2       Q    And when you say that, that's based upon your

3   review of EPA's registration decisions, right?

4       A    Yes.  If you look at Federal register of the

5   publications and go through EPA's response, accepting

6   the public review and comments, what kind of -- we have

7   read it:  We have considered it.  We will include it.

8               So --

9               (Exhibit 22 virtually marked.)

10      Q.   (BY MS. ROSS) When you say that's based on your

11  review of EPA's registration decisions, Exhibit 22 to

12  your deposition is the, "Glyphosate - Proposed Interim

13  Registration Review Decision" from April 2019.

14              Do you see that?

15      A    Yes.

16      Q    You've mentioned that EPA responds to comments.

17              Do you know if there is often another

18  round of comments after those responses?

19      A    I think I am forgetting the process and after

20  the public comments, you know, it -- it goes through the

21  Scientific Advisory Committee probably, yeah.

22              When I said EPA responds, that is a

23  general comment that is said, not particularly related

24  to glyphosate or anything.

25      Q    I think this might help.  If you turn to page 4

1   of Exhibit 22, there is a "Summary of Glyphosate's

2   Registration Review."

3              Do you see that?

4      A    Yes, I am familiar with this -- with these

5   documents.

6      Q    You are familiar with this document?

7      A    Not this document.  I said that I read

8   registration documents of pesticides.

9      Q    To -- well, backing up.

10             If the EPA doesn't approve a

11  registration, then Monsanto cannot sell Roundup or

12  glyphosate, right?

13     A    Correct.

14     Q    EPA continues to approve glyphosate to this

15  day, right?

16             MR. HABERMAN:  Objection.

17     A    EPA continues to?

18     Q.   (BY MS. ROSS) -- approve glyphosate to this

19  day, correct?

20     A    Yes.

21     Q    You are certainly not testifying that Monsanto

22  is violating any Federal regulation or requirement,

23  right?

24     A    Of course not.

25     Q    EPA first approved Roundup or glyphosate in

```
 1   1974, right?

 2      A    I can't remember what year, but if it is

 3   written here as 1974, it is.

 4      Q    Do you -- well, if you'll turn -- so page 4, do

 5   you see where it states, "The first pesticide product

 6   containing glyphosate was registered in 1974"?

 7      A    Yes, yes.  Yeah.  I know it is long back.

 8      Q    EPA first approved Roundup or glyphosate in

 9   1974, correct?

10      A    Yes.

11      Q    It is now 48 years later, right?

12      A    Right.

13      Q    Even today the U.S. EPA does not view

14   glyphosate as a probable human carcinogen, correct?

15               MR. HABERMAN:  Objection.

16      A    They say it is not likely glyphosate is a

17   possible human carcinogen.

18      Q.  (BY MS. ROSS) Do you assume that the scientists

19   of EPA are protective of the public health?

20               MR. HABERMAN:  Objection.

21      A    Their -- their duty is to protect public

22   health.

23      Q.  (BY MS. ROSS) That is also true of the

24   scientists of the European Food Safety Authority, EPSA;

25   correct?
```

```
 1      A    That's correct, I guess.

 2      Q    That is also true of the scientists of the

 3  European Chemicals Agency or ECHA, right?

 4      A    Correct.

 5      Q    That is also true of the scientists at the

 6  Australian Pesticides and Veterinary Medicines

 7  Authority, right?

 8      A    Yes, correct.

 9      Q    That is also true of the scientists at the

10  New Zealand EPA, correct?

11      A    Correct.

12      Q    That is also true of the scientists at the

13  Japan National Institution of Technology and Evaluation,

14  correct?

15      A    Correct.

16      Q    That is also true of the scientists at Health

17  Canada, right?

18      A    Correct.

19           MR. HABERMAN:  Objection.

20      Q.   (BY MS. ROSS) There is not a single regulatory

21  agency that doesn't have the public health at heart,

22  right?

23           MR. HABERMAN:  Objection.

24      A    Yes, correct.

25      Q.   (BY MS. ROSS) Here in Exhibit 22, we are
```

1    looking at the summary of EPA's glyphosate

2    re-registration [sic] review, and it summarizes

3    significant milestones that occurred in EPA's review of

4    glyphosate.

5                    Do you see that?

6                    MR. HABERMAN:   Objection.

7        A    Where is that?

8        Q.   (BY MS. ROSS) Page 4, there is a sentence that

9    states, the following summary -- under "Summary of

10   Glyphosates Registration Review" --

11       A    Yes.

12       Q    -- there is a sentence that begins, "Pursuant

13   to 40 CFR."

14                   Do you see where I am?

15       A    Page 4?

16       Q    Yes, under "Summary of Glyphosate Registration

17   Review."

18       A    Summary, yes.

19       Q    Okay.  "The following summary highlights the

20   docket opening and other significant milestones that

21   have occurred thus far during the registration review of

22   glyphosate."

23                   Do you see that?

24       A    Yes.

25       Q    If you turn to page 6, there is a "Summary of

Ambrose v. Charles, Ph.D.

1    Public Comments on the Draft Risk Assessments and Agency

2    Responses."  Correct?

3        A    Yes.

4        Q    "During the 60-day public comment period for

5    the glyphosate preliminary risk assessments, which

6    opened on February 27th, 2018 and closed on April 30th,

7    2018, the agency received 238,290 comments."  Correct?

8        A    Yes, that is not unusual.

9        Q    Approximately 200 -- withdrawn.

10              "Approximately 2,244 unique submissions

11   were received from various stakeholders."

12              Do you see that?

13       A    Yes.

14       Q    This is what you were mentioning before, that

15   there are rounds of public comments in EPA's review

16   before a final decision is made, right?

17       A    That's correct.

18       Q    EPA then responds to the comments, right?

19       A    Yes.

20       Q    Sometimes there are comments on top of those

21   comments, right?

22       A    Yes.

23       Q    You can have multiple rounds of comments in a

24   pest site review?

25       A    Yes, yes.

Ambrose k. Charles, Ph.D.

1       Q    On page 7, do you see the first full sentence

2   on that page?

3       A    Next page?

4       Q    Yes.  Where it states, "The comments did not

5   result in changes to the agency's risk assessments.  The

6   agency thanks all commentators for their comments and

7   has considered them in developing this PID"?

8       A    Standard sentence.

9       Q    That is exactly what you were just telling

10  us --

11      A    Exactly, yes.

12      Q    -- the EPA does, correct?

13      A    We also make comments, you know, from the

14  State's perspective, sometimes, you know, but everything

15  goes to EPA.  That's all we know.

16      Q    After going through EPA's public notice and

17  comment process, those comments did not result in

18  changes to the agency's risk assessment, right?

19      A    Exactly.

20      Q    There is a section on this page about comments

21  about EPA's cancer evaluation, correct?

22      A    Yes.

23      Q    This describes the agency's discussion about

24  the carcinogenic potential of glyphosate and response to

25  comments about EPA's classification, right?

```
 1      A    Yeah.

 2      Q    The -- the -- there is a paragraph that begins,

 3   "The EPA Response."

 4              Do you see that?

 5      A    Yes.

 6      Q    "The EPA conducted an independent evaluation of

 7   the carcinogenic potential of glyphosate and has

 8   determined that glyphosate is 'not likely to be

 9   carcinogenic to humans.'"

10      A    Yes.

11      Q    Right?

12      A    Yes.

13      Q    That was the EPA's conclusion in 2019, correct?

14      A    Yes.

15      Q    That is still EPA's conclusion today, correct?

16      A    Exactly, yes.

17      Q    That has been EPA's conclusion since EPA began

18   reviewing glyphosate, right?

19              MR. HABERMAN:  Objection.

20      A    Yes.

21      Q.   (BY MS. ROSS) "The Agency's cancer

22   classification is based on a thorough weight-of-evidence

23   review of all relevant data and is in accordance with

24   the Agency's 2005 Guidelines for Carcinogen Risk

25   Assessment."
```

1                   Do you see that?

2        A    Yes.

3                   MR. HABERMAN:   Objection.   The document

4    speaks for itself.

5        Q.   (BY MS. ROSS) Do you disagree that EPA's cancer

6    classification is based on a thorough weight-of-evidence

7    review of all relevant data?

8        A    Excuse me.

9                   Yes.

10       Q    You disagree with that?

11       A    I do not disagree with that.   It's their

12   evaluation, what they do.

13       Q    EPA's cancer classification is based on a

14   thorough weight-of-evidence review of all relevant data,

15   right?

16       A    Yes, based on the data.

17                  MR. HABERMAN:   Objection.

18       Q.   (BY MS. ROSS) The agency presented its draft

19   cancer evaluation to the FIFRA Scientific Advisory Panel

20   in December of 2016, right?

21       A    Yes.

22       Q    That is the Scientific Advisory Panel you were

23   talking about --

24       A    Yes.

25       Q    -- when you said SAP?

1     A    Yes, yes.

2     Q    You know what a FIFRA SAP is, right?

3     A    Constituted of scientists that the EPA selects

4  or other -- other people nominate to be the members of

5  the Scientific Advisory Panel.

6     Q    You were aware that the SAP evaluated

7  glyphosate in 2017?

8     A    I -- I think am.  I have seen that report.

9     Q    Were you aware of the conclusions the SAP

10  reached?

11    A    They were not changing any of the formal risk

12  assessments decisions, yes.

13              THE REPORTER:  I am sorry?

14              THE WITNESS:  Formal risk assessments

15  decisions.

16    Q    (BY MS. ROSS) Is there any study or independent

17  original work that you were aware of that EPA did not

18  have access to at the time of the Scientific Advisory

19  Panel?

20    A    No.  Even in the Scientific Advisory Panel

21  that -- I know some members who have served in the

22  Scientific Advisory Panel and --

23    Q    You are not -- sorry, go ahead.

24    A    No, what I was trying to say, there is even the

25  advisory panel, you know, if there are nine members or

Ambrose R. Charles, Ph.D.

1    twelve members on the panel, you know, a decision comes

2    out, it's not that all twelve panel members agree.

3    Okay.

4                Most of them agree.  Some may have

5    dissenting opinions.  But finally, wanting those --

6    you know, depending on the majority of the people

7    recommending, that is the way the regulation is

8    accepted, the classification is accepted.  Okay?  It's

9    not just a pure science alone.

10    Q    I am going to break that down a little bit.

11    Okay?

12    A    Yes, exactly.

13                Go ahead.

14    Q    There are multiple scientists on the Scientific

15    Advisory Panel --

16    A    Yes.

17    Q    -- correct?

18    A    Yes.

19    Q    Those scientists include toxicologists, right?

20    A    Yes, yes.

21    Q    They include biostatisticians, correct?

22    A    Probably.

23    Q    They include epidemiologists, correct?

24    A    Probably.  I know of the basic scientists like

25    me who are part of, you know, all the assessments.

1     Q     Have you ever served on a FIFRA SAP?

2     A     Oh, I did not.  I, being a State employee, have

3     a vested interest, so I would not be.

4     Q     But you know some scientists who have served on

5     FIFRA at least?

6     A     Usually academia people who work in academia.

7     Q     And the scientists that you know who have

8     served on the FIFRA SAP, are they good scientists?

9     A     I knew -- I knew some people at the time.  I

10    don't have any contacts or remember individuals.

11    Q     You mentioned that sometimes the SAP does not

12    reach full consensus on issues, right?

13                MR. HABERMAN:  Objection.

14    A     Correct.

15    Q.    (BY MS. ROSS) And the view that is reported is

16    the overall view, right?

17    A     That's correct.

18    Q     In here, do you see where it states, "Although

19    the SAP does not reach consensus on several questions,

20    none of the panelists believe that glyphosate should be

21    classified as likely to be carcinogenic to humans or

22    carcinogenic to humans?"

23                MR. HABERMAN:  Objection.

24    A     In -- in this statement, they may be right.  I

25    have no way of finding out that.

1      Q.    (BY MS. ROSS) Are you claiming that Monsanto

2    somehow has control over the Scientific Advisory Panel?

3      A    I never said that.  I don't know.

4      Q    EPA goes on, and there is a sentence at the

5    bottom of page 7 if you're -- if you will look at the

6    registration decision with me.

7      A    Yeah.

8      Q    Do you see where the document states, "EPA's

9    cancer evaluation is more robust than IARC's

10   evaluation"?

11     A    Yes.

12     Q    Do you have an opinion one way or the other

13   whether EPA's evaluation is more robust than IARC's?

14     A    I have no opinion on that.

15     Q    You know that IARC's evaluation only considers

16   data that has been published or accepted for publication

17   in the openly available scientific literature, right?

18     A    That's what they use and they also use -- they

19   also will be using the studies that we are talking

20   about, the animal studies.  Every company that is

21   registering their products in Europe have to submit

22   their data in the European market also.

23     Q    The very last sentence on page 7 says, "The EPA

24   also excluded some studies that were not appropriate for

25   determining the human carcinogenic potential of

Ambrose R. Charles, Ph.D.

1   glyphosate, such as studies in non-mammalian species

2   (i.e. worms, fish, reptiles, and plants) which IARC used

3   in its evaluation."

4              Do you see that?

5      A    For these studies, you know, glyphosate and

6   humans, EPA may not consider that; but for environmental

7   impact, the EPA may consider those statements.

8      Q    Is it a good idea to exclude studies in plants

9   when you are trying to decide if an herbicide will cause

10  harm in humans?

11     A    No.

12     Q    On page 8 --

13     A    However, however --

14     Q    Yes.

15     A    -- it is good to know the residual content of

16  glyphosate in plants if they are used on crops.

17             THE REPORTER:  I am sorry.  I need you

18  to --

19             THE WITNESS:  Residual.

20             THE REPORTER:  -- repeat that.

21             THE WITNESS:  Residual.  Residual,

22  residual.

23             THE REPORTER:  I am not getting you.

24             THE WITNESS:  Residual.

25             MS. ROSS:  Residual content of glyphosate.

Ambrose R. Charles, Ph.D.

```
 1                  THE WITNESS:  Residual.  Yes, there you

 2    are.

 3                  [Multiple speakers speaking

 4                  simultaneously.]

 5                  THE REPORTER:  Thanks.

 6                  THE WITNESS:  I said residual.

 7                  THE REPORTER:  Okay.

 8       Q.  (BY MS. ROSS) I -- I think you may have

 9    misunderstood my question --

10       A    Yes.

11       Q    -- so I will go back.

12       A    Sorry.

13       Q    It is good to know the residual con- -- content

14    of glyphosate in plants when you are considering human

15    health risks, right?  Is that what you just said?

16       A    What I said is if those plants are edible.

17       Q    Okay.  So if plants are edible, you would want

18    to consider how much glyphosate was left in those plants

19    when you are considering --

20       A    Yes.

21       Q    -- human health risks, right?

22       A    Yes, yes, yes.

23       Q    Otherwise, should you include studies of

24    glyphosate affect in plants when you are evaluating

25    human health risks?
```

1    A    No, no.

2    Q    On page 8 of this exhibit, you see where they

3    state, "The agency's cancer evaluation for glyphosate is

4    also more transparent than IARC's"?

5    A    Yes.  That's a statement, yes.

6    Q    Do you have an opinion one way or the other on

7    whether EPA's process is more transparent?

8    A    No.

9    Q    We talked about the elaborate procedure that

10   EPA has to involve the public, anyone who wants to point

11   out errors they made or mistakes they think they see,

12   right?

13   A    Yes.

14   Q    We haven't discussed all of the EPA procedure

15   by a long shot, but there are points along the way when

16   EPA is making a decision, the public gives input,

17   correct?

18   A    Yes.

19   Q    That is not how IARC works, right?

20        MR. HABERMAN:  Objection.

21   A    I do not know.

22   Q.   (BY MS. ROSS) IARC is just a group of

23   scientists, and they go off and reach their own

24   conclusion and then they tell everyone what the

25   conclusion is, right?

Ambrose to Charles, Ph.D.

```
 1                 MR. HABERMAN:  Objection.
 2       A    I have no exposure to IARC's way of doing
 3   things, no exposure, really.  I only know what is in the
 4   United States.  But --
 5       Q.   (BY MS. ROSS) You have no exposure to IARC's
 6   way of doing things, you really just know what's done in
 7   the United States, is that right?
 8       A    That's the regulatory process.  Otherwise, I
 9   have only superficial knowledge about the process, I
10   mean, how the steps operates in this.  I know they have
11   to submit data.  I know they have a review.  I know all
12   those thing -- kind of things, but...
13       Q    There is a sentence in the next paragraph on
14   the line beginning "Assessment," three lines down, and
15   the sentence starts, "The Agency's cancer conclusion."
16                 Do you see that?
17       A    This is page --
18       Q    8?
19       A    8, okay.
20                 "Agency's cancer conclusions."
21                 EPA's response?
22       Q    On page -- are you on page 8?
23       A    Yeah.
24       Q    Okay.  The second full paragraph on page 8 --
25       A    Oh, okay.  Okay.
```

Ambrose K. Charles, Ph.D.

1       Q       -- the second sentence begins, "The agency's

2   cancer conclusion is consistent."

3       A       I am with you.

4       Q       Okay.  EPA states that, The Agenc- -- Agency's

5   cancer conclusion is consistent with other regulatory

6   authorities and international organizations, including

7   Canadian Pest Management Regulatory Agency, the

8   Australian Pesticide and Veterinary Medicine's

9   Authority, the European Food Safety Authority, the

10  European Chemicals Agency, the German Federation

11  Institute for Occupational Safety and Health, the Joint

12  FAO/WHO Meeting on Pesticide Residues, the New Zealand

13  Environmental Protection Authority and the Food Safety

14  Commission of Japan.

15              Did I read that correctly?

16      A       Yes.

17      Q       That's the same as what you cite in your report

18  regarding regulatory conclusions, right?

19      A       Yes.

20      Q       To the extent you know, you agree that the

21  EPA's conclusion that glyphosate is not likely to be

22  carcinogenic is consistent with those regulatory bodies,

23  right?

24      A       Yes.

25      Q       Is it your view that all of these agencies and

```
 1    the EPA have made a mistake when it comes to glyphosate?

 2              MR. HABERMAN:  Objection.

 3        A    It is not my opinion they made a mistake.

 4        Q.   (BY MS. ROSS) You don't have any evidence

 5    that -- well, let me ask it not as a negative.

 6              New question.

 7              Do you have any evidence that Monsanto

 8    controlled all of those agencies around the world?

 9              MR. HABERMAN:  Just the EPA.

10        A    I have no idea.  That's strange.

11        Q.   (BY MS. ROSS) You know that scientists at

12    regulatory bodies around the world have re-examined the

13    alleged cancer risk of glyphosate since the time of the

14    IARC meeting in 2015, correct?

15        A    I don't have any idea.

16              MR. HABERMAN:  I am sorry.  What did you

17    say?

18              THE WITNESS:  What?

19              MR. HABERMAN:  What was your answer?

20              THE WITNESS:  I said --

21        A    Do you have -- can you repeat that?

22        Q.   (BY MS. ROSS) In your report, you say,

23    "Interestingly, pesticide regulatory authorities in

24    Canada, Japan, Australia, and the European Union have

25    completed independent carcinogenicity assessments that
```

```
 1   reached similar conclusions on carcinogenicity as to

 2   that of the U.S. EPA."

 3              Do you see that?

 4   A    Yes.

 5   Q    Regulators include --

 6   A    Yes.

 7   Q    -- experts in animal carcinogenicity studies,

 8   right?

 9   A    Yes.

10   Q    The regulators include experts in genotoxicity

11   studies, right?

12   A    Yes.

13   Q    Regulators include experts in epidemiology,

14   right?

15   A    Yes.

16   Q    You know that every single pesticide regulator

17   that has examined the scientific issues since IARC has

18   concluded that glyphosate and glyphosate formulations

19   are not likely to be carcinogenic, true?

20   A    (No response.)

21              MR. HABERMAN:  Objection.  Calls for

22   speculation.

23   Q.   (BY MS. ROSS) Can you name any scientific

24   regulatory authority anywhere in the world that has

25   concluded glyphosate causes cancer?
```

```
 1        A    Any regulatory bodies?

 2        Q    Yes.

 3        A    You mean some countries that have adopted this

 4   as a carcinogen?

 5        Q    Yes.

 6        A    Any -- any countries, right?  Those are the

 7   regulatory authorities.

 8        Q    Have you -- can you name any scientific or

 9   regulatory agency anywhere in the world that has

10   evaluated the data for glyphosate and concluded that

11   glyphosate causes cancer?

12        A    Regulatory agencies, I do not know, and I do

13   not know anything what is called a "scientific agency."

14   I do not know -- I never heard that term before.

15        Q    Okay.  So I will ask it to not include

16   scientific in the question, okay?

17        A    No, I -- I am sorry --

18             (Overlapping speakers.)

19        A    -- the way I did it --

20        Q.   (BY MS. ROSS) No, that's okay.

21             New question.

22             Do you know any regulatory agency

23   anywhere in the world that has evaluated the data for

24   glyphosate and concluded that glyphosate causes

25   cancer?
```

```
 1       A    No, I don't know.

 2       Q    There are scientists on both sides of the

 3  glyphosate carcinogenicity issue, correct?

 4       A    Yes.

 5       Q    In fact, there are a number of scientists who

 6  do not agree that Roundup causes non-Hodgkin's lymphoma;

 7  true?

 8       A    That's true.

 9       Q    There is not consensus in the scientific

10  community that Roundup causes non-Hodgkin's lymphoma,

11  right?

12       A    That's true.

13            MR. HABERMAN:  Objection.

14       Q.   (BY MS. ROSS) Other than the plaintiffs' other

15  retained experts, are you aware of any scientists who

16  agree with you, that Roundup causes lymphoma?

17            MR. HABERMAN:  Objection.

18       A    The literature gives some evidence, some

19  suggestive evidence that it may have a link.

20            THE REPORTER:  I am sorry.  Was there an

21  objection in there?

22            MR. HABERMAN:  Yes.

23            THE REPORTER:  Okay.

24       Q.   (BY MS. ROSS) You are not saying that the

25  regulatory bodies around the world have all ignored the
```

```
 1   animal studies, are you?

 2       A    I didn't say that.

 3       Q    Are you saying they ignored the mechanism of

 4   action studies?

 5       A    I didn't say that.

 6       Q    Is it your view that those regulatory bodies

 7   are incompetent?

 8       A    I didn't say that.

 9       Q    Do you have any reason to believe that any

10   members on any of those regulatory bodies were corrupt

11   or being paid illicitly?

12       A    I didn't say that.

13       Q    In your report for Mr. Pleu, you talk about

14   assessing overall carcinogenicity of glyphosate-based

15   products and the difference between hazard and risk.

16            That is on page 24 of your report.

17       A    Okay.

18       Q    You are familiar with the concept of hazard

19   identification --

20       A    Yes.

21       Q    -- right, Dr. Charles?

22       A    Yes.

23       Q    In the context of cancer, hazard identification

24   is identifying whether a chemical can cause cancer at

25   any dose, right?
```

```
 1      A    Usually they've tested three different doses in

 2   animals.

 3      Q    Hazard assessment is usually the first step in

 4   doing a risk assessment, correct?

 5      A    Yes.

 6      Q    We talked earlier about risk assessments,

 7   right?

 8      A    Yes.

 9      Q    Risk assessment is done after something is

10   identified as a hazard, correct?

11      A    Yes.

12      Q    If there is no hazard, then there is no risk,

13   true?

14      A    Yes.

15      Q    You can have a hazard without a risk, right?

16           MR. HABERMAN:  Objection.

17      A    Yes.

18      Q.   (BY MS. ROSS) For example, you can have a

19   hazard, but if the exposure to the chemical is low, the

20   risk is not significant; right?

21      A    It depends on -- that depends on if it is a

22   qualitative statement; if it is less, you know, some

23   individuals may respond harshly than others.

24      Q    IARC performed a hazard assessment, correct?

25      A    Pardon?
```

Ambrose R. Charles, Ph.D.

1     Q     IARC --

2     A     Yeah.

3     Q     -- performed a hazard assessment of glyphosate,

4  correct?

5     A     Yes.

6     Q     Did IARC perform a risk assessment?

7     A     Without risk assessment, they cannot come up

8  with a type to a carcinogenic classification.  They must

9  have done it.

10    Q     You are assuming that IARC performed a risk

11  assessment; but do you know sitting here, one way or

12  another, whether IARC actually performs a risk

13  assessment on anything as opposed to hazard assessments

14  on chemicals?

15    A     Ma'am, what I am saying is:  In order to reach

16  a classification of that magnitude, classifying

17  something as a human risk carcinogen to a carcinogen.

18  It goes through the risk assessment process.  It is not

19  just based on some opinion.  It must be a responsible

20  risk assessment process.  Must have the science behind

21  it, that's what I am saying.

22    Q     You believe that IARC conducts a risk

23  assessment to determine whether something is a two-way

24  probable human risk --

25    A     I believe --

1      Q    -- carcinogen?

2      A    I believe.  Otherwise, you know, they cannot

3  have that classification.

4      Q    If we wanted to determine whether IARC actually

5  says that they do hazard assessments or risk

6  assessments, we should look at IARC's classification of

7  glyphosate, right?

8      A    In order to --

9      Q    Determine whether IARC conducts hazard

10  assessments or risk assessments, we should actually look

11  at the IARC documents as to what IARC does, right?

12      A    My understanding is, ma'am, risk -- hazard

13  assessment is the first part of the risk assessment.

14  They are not a separate process.  You are -- you are

15  talking about that as a separate process.  That's why I

16  am confused, you know, what you are talking about.

17      Q    Is it possible for you to be correct in your

18  assessment that there is a cancer hazard with glyphosate

19  and for EPA to be correct that there is no risk?

20           MR. HABERMAN:  Objection.

21      A    Yes.  I can explain it, in my viewpoint.  Why I

22  think like that is, when EPA make a risk-assessment

23  process and develop a number as well as classification,

24  it's not likely to cause cancer in humans.

25           It may take a few minutes.  Okay?  If

1   you give me time, I will do it.  Otherwise, I will

2   stop.  I will answer your questions.

3               MR. TAYLOR:  You can answer --

4       Q.  (BY MS. ROSS) You can answer my question, go

5   for it.

6       A    Yes, yes.

7       Q    And we will -- we will stay a few minutes later

8   if we need to, and that's fine.

9               Go ahead.

10      A    Okay.  When they go through the hazard

11  assessment and with this process of risk assessment,

12  they come up with a number.  That number is generated

13  using safety factors to protect the population of

14  people.

15              That doesn't guarantee a single person's

16  protection, you know, that number.  EPA's regulatory

17  agency is not taking every individual in the United

18  States.  Their -- their risk is not considered.  Their

19  risk is considered at a million level, millions of

20  people.  One in a million or one in -- one in a

21  thousand, that is the kind of risk level that

22  determine -- there is a process to do that.

23              At that level, we say that the risk is

24  not about a million.  This number is okay.  It's not

25  likely.  That doesn't guarantee saying that anybody

1    below that level to one person or two persons in that

2    million population will not get cancer or will not be

3    having any effect on any chemical.

4                    I am not talking about a glyphosate in

5    particular.  I am just talking about the general

6    concept of all of these numbers and dealing with

7    numbers and interpreting and say, yes to that, yes to

8    this -- it's not yes-and-no.

9                    You have to go back to that own

10    individual person who is affected by a -- a disease or

11    something like that.  You have to look at the cause

12    and what must have caused.

13                    Instead of looking at the EPA level,

14    it's at that level, so anything below is not possible,

15    you know.  I don't see it that way, and I don't think

16    that individual scientists don't think that.

17                    But regulatory level is to protect

18    people at the general population, not somebody, you

19    know, who is more susceptible or can be affected by

20    various other factors, you know, that -- we are

21    talking about individual factors.  That's -- I

22    stopped.

23        Q    Are you done with your answer?

24        A    I stopped, yes.

25        Q    On page 17 of your expert report, before that

1    answer, we were talking about the paragraph that says,

2    "Interestingly, pesticide regulatory authorities in

3    Canada, Japan, Australia and the European Union" --

4        A    Yes.

5        Q    -- "have completed independent assessments."

6        A    Yes.

7        Q    You state the U.S. National Institute of

8    Health's National Toxicology Program has also found no

9    evidence of glyphosate causing damage to DNA, correct?

10       A    Yes, yes.

11       Q    As a toxicologist, you are familiar with the

12   National Toxicology Program?

13       A    I think we've discussed it.

14            Move on.

15       Q    Do you respect NTP as an authority in

16   toxicology?

17            MR. HABERMAN:  Objection.

18       A    NTP as an authority in toxicology?

19       Q.  (BY MS. ROSS) Yes.

20       A    I don't think so.

21       Q    Do you respect the scientists at the National

22   Toxicology Program?

23            MR. HABERMAN:  Objection.

24       A    I respect?

25       Q.  (BY MS. ROSS) Yes.

```
 1      A    I don't find any reason why should -- I should

 2   not respect them.

 3      Q    The NTP, or National Toxicology Program,

 4   certainly has the public health foremost in its minds,

 5   right?

 6                MR. HABERMAN:  Objection.

 7      A    I don't know what -- that Public Health

 8   Program, I don't know.

 9      Q.   (BY MS. ROSS) Are you familiar with the

10   National Toxicology Program?

11                MR. HABERMAN:  Objection.

12      A    I was familiar with some aspects of it, and,

13   you know, I was not working there.  I didn't have much

14   time -- time to study what is the National Toxicology --

15   I have a regular job to do.

16                MR. HABERMAN:  I am sorry.  Can we go

17   off -- go off the record and find out how much more time

18   we have?

19                One minute.  All right.  Thank you.

20      Q.   (BY MS. ROSS) I take it as a toxicologist, you

21   have not done any research into the National Toxicology

22   Program, right?

23      A    I didn't have to.  I didn't find that.  But I

24   know generally, they're working under NIH.  They have a

25   national -- they have certain mandates.  They have
```

1    funding.  They work with different methodologies --

2    developing methodologies and, you know, statistical

3    approaches.

4              And with this other program, they

5    develop guidelines for different programs.  They fund

6    the toxicology teaching kind of -- what is that -- aid

7    and giving funds -- grants.  That's the word I was

8    thinking.  Those kind of things, you know, like

9    through NIH money.

10    Q    Does the National Toxicology Program also

11    publish the report on carcinogens in the United States?

12    A    I think so.  There is a report there.

13              MS. ROSS:  Dr. Charles, those are all the

14    questions I have for you today.

15              THE WITNESS:  I also will add that EPA is

16    a good list of all of the carcinogens that they have

17    determined, A, B, C, everything is there.  National

18    Toxicology -- Toxicology Program borrows that

19    information from EPA and other sources to put in their

20    list.  It is not their original idea of a list.

21    Q.    (BY MS. ROSS) Okay.  Since you --

22    A    That's what I understand.

23    Q    -- interjected that onto the record, we have

24    going to --

25              MR. HABERMAN:  No.

1     Q.   (BY MS. ROSS) -- follow it up with two

2    questions.

3              MR. HABERMAN:  No, I am not following up

4    with questions.

5     Q.   (BY MS. ROSS) Is it possible --

6              [Multiple speakers speaking

7              simultaneously]

8              MR. HABERMAN:  I am sorry, I am sorry, he

9    is not following up with the --

10              [Multiple speakers speaking

11              simultaneously]

12              THE WITNESS:  I am not getting --

13              MR. HABERMAN:  He -- the answer is done.

14    I actually have some questions to ask, and then we will

15    be done with the deposition.

16              MS. ROSS:  In that case, I am going to

17    move to strike that last comment that was made with no

18    question pending and that has no foundation.

19              MR. HABERMAN:  Yes --

20              THE WITNESS:  I have no foundation?

21              MR. HABERMAN:  We can deal with that

22    later.

23              THE WITNESS:  I was saying it when --

24    after you stopped.

25              MR. HABERMAN:  Doctor --

1          THE WITNESS:  Your questions were over and

2    the recording is over.  You called it off, and literally

3    I started talking about the National Toxicology.

4          MR. HABERMAN:  Okay.  But that was all

5    captured on the record.

6          THE WITNESS:  Okay.

7          MR. HABERMAN:  All right.

8          THE WITNESS:  I have no problem.  I didn't

9    damage myself.

10          MR. HABERMAN:  Okay.  I am going to ask

11    you some questions.  Okay?

12          THE WITNESS:  Yes, okay.

13                    EXAMINATION

14    QUESTIONS BY MR. HABERMAN:

15    Q    So you test- -- you were asked earlier whether

16    you spoke with any of the plaintiffs, Mr. Moore or

17    Mr. Pleu.  Do you recall that question?

18    A    Yes.

19    Q    And you did not speak with either of them,

20    right?

21    A    No, I did not.

22    Q    Did you feel that the information that they

23    provided under oath was sufficient to come up with the

24    opinions that you came up with in this case for both of

25    them?

1     A    Whether it was insufficient or sufficient, that

2  is a different question, sir.

3     Q    So --

4     A    My point was making the best argument and

5  analysis that I can to what was provided to me.  That is

6  the evidence I have.

7     Q    Were you provided with sufficient evidence by

8  the plaintiffs to come up with the causation opinions

9  that you came up with in this case?

10    A    Not enough.

11    Q    Not enough?

12    A    Yeah.

13    Q    You were not provided enough information from

14  the plaintiffs?

15    A    If I had a label of the product, concentrations

16  that he used actually, those kind of information would

17  have been a little more for my -- my calculations, with

18  the actual numbers.  Here I am making estimates.

19    Q    Okay.  And you were able to come up with the

20  estimates you came up with based on the information that

21  they provided --

22    A    Yes.

23    Q    -- to you?

24    A    Yes.

25    Q    Is it your opinion that Roundup exposure can

1    cause NHL?

2                    MS. ROSS:  Objection.  Leading.

3        A    It is suggested in evidence there in the

4    literature.

5        Q.   (BY MR. HABERMAN) And is it your opinion that

6    Moore's Roundup exposure caused his NHL?

7                    MS. ROSS:  Objection.  Leading.

8        A    Yes.

9        Q.   (BY MR. HABERMAN) And is it --

10       A    There is a connection.  That's what I say.

11       Q    Is it your opinion that Mr. Pleu's Roundup

12   exposure caused his NHL?

13                   MS. ROSS:  Objection.  Leading.

14       A    Perhaps there is a connection there also,

15   but...

16       Q.   (BY MR. HABERMAN) You testified earlier to

17   questions on direct.  You said something that prob- --

18   that it probably caused their cancer --

19       A    Yes.

20       Q    -- do you recall that?

21                   MS. ROSS:  Objection.  Leading.

22       Q.   (BY MR. HABERMAN) And do you recall saying that

23   probably to you meant about 80 percent -- you were asked

24   questions -- you were asked to define what "more likely

25   than not" meant, you were asked if that means 50 plus

1    one and you said that it was about 80 percent.

2              Do you recall that?

3        A    Yes.

4              MS. ROSS:  Object to the form.

5        Q.   (BY MR. HABERMAN) Do you -- that's what you

6    testified to earlier; is that right?

7        A    Yes, yes.

8        Q    The opinions that you've expressed today and

9    the ones that are in your report, are those opinions

10   that you hold to a reasonable degree of medical and

11   scientific certainty?

12       A    Yes.

13       Q    And can you just describe for us what you did

14   to reach the opinions that you did?  In other words,

15   what was your methodology in this case as a

16   toxicologist?

17       A    As a toxicologist in this case, you know, I was

18   given some information about the plaintiff -- the

19   plaintiffs, or the person who used the chemical, how he

20   used it and how much he used it.  Those kind of

21   information.

22              Once I had that information, I looked at

23   where did it happen and duration of exposure,

24   frequency of exposure.  Once I collect all that's

25   necessary -- all available information, over --

1    exposure assessment, in order to make an assessment of

2    how much exposure likely this person must have,

3    amount -- amount used and duration, frequency, and

4    then mode of application, particular -- protection

5    that he has, they're all estimates because we don't

6    have real numbers.

7                    So once I have the risk exposure

8    assessment, that means there is some exposure to this

9    person that could reach the -- and then I am going to

10   do the toxicological studies; that is, are there any

11   pharmacal candidates or toxical candidates that

12   studies absorption, distribution, metabolism, those

13   kind of things to see where all things go, what are

14   the accumulation, any affinity toward any organism,

15   what is the clearance of this chemical, what is going

16   to be metabolized, those kind of studies need to be

17   evaluated.

18                   My next method- -- methodology is

19   looking at the mechanisms.  How does it cause cancer?

20   That's what scientists call.  So is there any evidence

21   in the literature that suggests that glyphosate could

22   cause cancer?

23      Q    And did you find evidence in the literature

24   that glyphosate causes cancer?

25      A    Some studies --

```
 1                    MS. ROSS:  Objection.  Leading.
 2        A     -- are suggesting there could be a link for
 3   cancer and glyphosate.  Some studies did not have
 4   sufficient evidence.  Some studies did not show any
 5   evidence.
 6                    But I had to consider all three.  And if
 7   there are sufficient evidence or a weak evidence that
 8   points towards, I support that information with the
 9   expert -- this person is expert -- expert -- and if
10   there is a mechanism that support a toxicity to that
11   person, I have to take that step.
12                    Then the next thing that I go for -- all
13   the regulatory data that we have, how much is allowed,
14   what level it can be toxic, other medical information
15   about it.
16                    Then I evaluate all of the medical
17   records to find out what kind of diseases and
18   diagnosis and investigations and the doctors'
19   treatment; and anytime they made any diagnosis or
20   interrelationship with these cancers over the course
21   of cancer, did they say anything about in any way in
22   the medical records -- I glanced through.  If I find
23   something, I make a note of it and also I make a
24   historical occurrence of these diseases.
25                    And then they -- I go to the regulatory
```

1    part to find out what is a safe level, how they

2    derive, and what are the different standards that I

3    can come to.

4              And then I bring these -- all of this

5    information together to explore and assess the

6    situation to see what exposure supports.  The exposure

7    supports any -- or any other data supports this

8    exposure.  So that is one methodology.

9              The other half of the methodology, there

10   are many factors that can cause, you know, NHL, you

11   know, lymphoma.  Some are, you know -- very evident,

12   suggested -- many publications they give a list of

13   different to offset your confounding factors.  Then I

14   take all of those factors, go individually through to

15   see if anywhere this person had.  That is called the

16   elimination process.

17   Q.   (BY MR. HABERMAN) You did that in this case?

18   A    In this case.

19   Q    For both Mr. Pleu and Mr. Moore?

20   A    Yes.

21              MS. ROSS:  Object to form.

22   A    And then I finally come -- come to -- towards

23   the ends of what is the deduction from all of these

24   things.  So that's where I was, this person is exposed,

25   this person had a disease, and then duration of the

Ambrose k. Charles, Ph.D.

1   exposure, and then what is the literature to support as

2   evidence to support a conclusion.  Is there a conclusion

3   that I am trying to make to see if there is any

4   supporting evidence that I have gone through?

5              That is how I reach my conclusions.

6   That's the kind of method- -- methodologies that I

7   use.  That is the standard methodology that I use and

8   others use in toxicological assessments.

9        Q.   (BY MR. HABERMAN) And you did that methodology

10  in this case for both Mr. Pleu and for both -- and for

11  Mr. Moore, correct?

12             MS. ROSS:  Objection.  Form.

13       A    I did.

14       Q.   (BY MR. HABERMAN) And after doing that, you

15  were able to come up with the opinions that you've come

16  up with in this case?

17             MS. ROSS:  Objection.  Leading.

18       A    Yes.

19       Q.   (BY MR. HABERMAN) And --

20             MR. HABERMAN:  That's all I have for you.

21  Thank you.

22             MS. ROSS:  Nothing further, Dr. Charles.

23             THE WITNESS:  It's over?

24             MS. ROSS:  Yes.

25             THE VIDEOGRAPHER:  This concludes the

Ambrose R. Charles, Ph.D.

```
1    deposition of Dr. Charles Ambrose.

2                 THE WITNESS:  Can I drink some water?

3                 THE VIDEOGRAPHER:  Going off the record,

4    the time is 6:21.

5                 (Proceedings concluded at 6:21 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Ambrose to: Charles, Ph.D.

```
 1                    CHANGES AND SIGNATURE

 2   PAGE LINE  CHANGE                      REASON

 3   _____

 4   _____

 5   _____

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
```

1       I, AMBROSE K. CHARLES, Ph.D., have read the

2   foregoing deposition and hereby affix my signature that

3   same is true and correct, except as noted above.

4

5                              _____

6                                AMBROSE K. CHARLES, Ph.D.

7

8   THE STATE OF _____)

9   COUNTY OF _____)

10

11       Before me, _____, on this day

12   personally appeared AMBROSE K. CHARLES, Ph.D., known to

13   me or proved to me on the oath of _____ or

14   through _____ (description of

15   identity card or other document) to be the person whose

16   name is subscribed to the foregoing instrument and

17   acknowledged to me that he/she executed the same for the

18   purpose and consideration therein expressed.

19       Given under my hand and seal of office on this _____

20   day of _____, _____.

21

22                              _____

23                                NOTARY PUBLIC IN AND FOR

24                                THE STATE OF _____

25   My Commission Expires: _____

Ambrose K. Charles, Ph.D.

```
 1          IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS

 2                    STATE OF MISSOURI

 3   Paul Ferro, et al.,        )

                                )

 4                              )

          Plaintiffs,          )

 5                              )

     vs.                       )   Case No. 20SL-CC03678

 6                              )

     MONSANTO COMPANY,          )

 7                              )

                                )

 8        Defendant.           )

 9

10        *******************************************

11              REPORTER'S CERTIFICATE

12            ORAL VIDEOTAPED DEPOSITION OF

13               AMBROSE K. CHARLES, Ph.D.

14                  June 28, 2022

15        *******************************************

16        I, April Balcombe-Anderson, Certified Shorthand

17   Reporter in and for the State of Texas, hereby certify

18   to the following:

19        That the witness, AMBROSE K. CHARLES, Ph.D., was

20   duly sworn and that the transcript of the deposition is

21   a true record of the testimony given by the witness;

22        That the deposition transcript was duly submitted on

23   _____ to the witness or to the attorney for

24   the witness for examination, signature, and return to me

25   by _____.
```

```
 1       That pursuant to information given to the deposition
 2   officer at the time said testimony was taken, the
 3   following includes all parties of record:
 4       Mr. Haberman (0h8m)
             Attorney for Plaintiffs
 5

     Ms. Ross (7h0m)
 6           Attorney for Defendant
 7
 8       That the amount of time used by each party at the
 9   time of the deposition is as follows:
10   FOR PLAINTIFFS:
11       MR. JEFFREY L. HABERMAN
         MS. SARAH J. SCHULTZ (VIA REMOTELY)
12       Schlesinger Law Offices, P.A.
         1212 Southeast Third Avenue
13       Fort Lauderdale, Florida 33316
         Telephone: 954.467.8800
14       E-mail: JHaberman@SchlesingerLaw.com
         E-mail: SSchultz@SchlesingerLaw.com
15
16   FOR DEFENDANT:
17       MS. EMMA C. ROSS, M.D.
         MR. JAMES T. COLEMAN
18       GOLDMAN ISMAIL TOMASELLI BRENNAN & BAUM LLP
         200 South Wacker Drive, 22nd Floor
19       Chicago, Illinois 60606
         Telephone: 312.881.5952
20       E-mail: eross@goldmanismail.com
         E-mail: jcoleman@goldmanismail.com
21
     - and -
22
         MR. JOSEPH D. PIORKOWSKI, JR. (VIA REMOTELY)
23       The Piorkowski Law Firm, PC
         1800 K Street, Northwest, Suite 1000,
24       Washington DC 20006
         Telephone: 202.223.5535
25       E-mail: JPiorkowski@PiorkowskiLaw.com
```

Ambrose to: Charles, Ph.D.

1        That a copy of this certificate was served on all

2   parties shown herein on _____ and filed

3   with the Clerk.

4        I further certify that I am neither counsel for,

5   related to, nor employed by any of the parties in the

6   action in which this proceeding was taken, and further

7   that I am not financially or otherwise interested in the

8   outcome of this action.

9        Certified to by me on this ____5th____ day of

10   _____July_____, __2022___.

11

12                              _____

13

                               April Balcombe, CSR, CRR, CRC

14                              Texas CSR 5752

                               Expiration:  07/31/2022

15                              Golkow Litigation Services

                               877.370.DEPS - Fax: 917.591.5672

16

17

18

19

20

21

22

23

24

25