John J. Rosenthal
WINSTON & STRAWN LLP
1901 L St. NW
Washington, DC 20036
Tel: (202) 282-5785
Fax: (202) 282-5100
jrosenthal@winston.com

Jeff Wilkerson (SBN 284044)
WINSTON & STRAWN LLP
300 S. Tryon St., 16th Floor
Charlotte, North Carolina 28202
Tel: (704) 350-7714
Fax: (704) 350-7800
jwilkerson@winston.com

*Attorneys for Defendants Bayer CropScience LP and Monsanto Company*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION<br><br>This document relates to:<br><br>*Scott Koller, et al., v. Monsanto Company, et al.*, Case No. 3:22-cv-04260-VC | MDL No. 2741<br><br>Case No. 3:16-md-02741-VC<br><br>**DEFENDANTS BAYER CROPSCIENCE LP AND MONSANTO COMPANY'S REPLY IN SUPPORT OF MOTION TO DISMISS**<br><br>Date:   December 15, 2022<br>Time:   10:00AM<br>Place:  Via Zoom Webinar<br>Judge:  Hon. Vince G. Chhabria |

## TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................................... 1

RESPONSE TO PLAINTIFFS' "BACKGROUND" ................................................................. 1

 A. Plaintiffs Have Not Plausibly Alleged Key Facts ............................................... 1

 B. 2002 Exceedances And 2004 NNG Study ........................................................... 2

ARGUMENT .............................................................................................................................. 3

I. PLAINTIFFS MISINTERPRET THE REGULATORY FRAMEWORK ...................... 3

 A. Certified Limits .................................................................................................... 4

 B. 7 U.S.C. § 136 Misbranding & 40 C.F.R. 156.10(g)(6) Expiration Dates ............ 6

II. PLAINTIFFS' DEFENSE OF THEIR UCL CLAIMS IS MERITLESS ......................... 6

III. PLAINTIFFS HAVE NOT SHOWN A DUTY TO DISCLOSE ..................................... 7

IV. PLAINTIFFS DO NOT PLAUSIBLY PLEAD FRAUD OR CONCEALMENT ............ 8

V. PLAINTIFFS FAIL TO DISTINGUISH *BUCKMAN* AND *NATHAN KIMMEL* ........... 10

VI. PLAINTIFFS' DEFENSE OF THEIR WARRANTY CLAIMS FALLS FLAT ............ 11

 A. Plaintiffs Must Plead Manifestation ................................................................... 11

 B. The Opposition Shows that Plaintiffs' Express and Implied Warranty Claims Fail ......................................................................................................... 12

VII. THE PRODUCTS ARE NOT NORMALLY AND ORDINARILY USED BY CONSUMERS ................................................................................................................ 13

VIII. PLAINTIFFS DO NOT SHOW THEY LACK AN ADEQUATE REMEDY AT LAW ............................................................................................................................... 13

IX. PLAINTIFFS CANNOT SEEK INJUNCTIVE RELIEF ............................................... 14

CONCLUSION ......................................................................................................................... 15

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anthony v. Pharmavite*,
  2019 WL 109446 (N.D. Cal. Jan. 4, 2019) .................................................................................. 14

*Brown v. Natures Path Foods*,
  2022 WL 717816 (N.D. Cal. Mar. 10, 2022) ............................................................................... 13

*Buckman Co. v. Plaintiffs' Legal Comm.*,
  531 U.S. 341 (2001) ..................................................................................................................... 9

*Chabner v. United of Omaha Life Ins. Co.*,
  225 F.3d 1042 (9th Cir. 2000) ...................................................................................................... 6

*Christian v. Mattel, Inc.*,
  286 F.3d 1118 (9th Cir. 2002) ...................................................................................................... 9

*Collins v. eMachines, Inc.*,
  202 Cal. App. 4th 249 (2011) ....................................................................................................... 7

*Contreras v. Toyota Motor Sales USA, Inc.*,
  2010 WL 2528844 (N.D. Cal. June 18, 2010) ........................................................................... 11

*Davidson v. Kimberly-Clark Corp.*,
  889 F.3d 956 (9th Cir. 2018) ...................................................................................................... 14

*Delarosa v. Boiron, Inc.*,
  2012 WL 8716658 (C.D. Cal. Dec. 28, 2012) ............................................................................ 14

*Edmondson v. LCW Auto. Corp.*,
  2008 WL 11338640 (C.D. Cal. Mar. 10, 2008) .......................................................................... 13

*Garrison v. Oracle Corp.*,
  159 F. Supp. 3d 1044 (N.D. Cal. Feb. 2, 2016) ........................................................................... 8

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008) ...................................................................................................... 3

*Golden Eagle Distrib. Corp. v. Burroughs Corp.*,
  801 F.2d 1531 (9th Cir. 1986) ...................................................................................................... 9

*Hardeman v. Monsanto Co.*,
  216 F. Supp. 3d 1037 (N.D. Cal. 2016) ........................................................................... 10, 14, 15

*Hartless v. Clorox Co.*,
  2007 WL 3245260 (S.D. Cal. Nov. 2, 2007) ................................................................. 6

*Hodsdon v. Mars, Inc.*,
  891 F.3d 857 (9th Cir. 2018) ..................................................................................... 7, 8

*Johansson v. Cent. Garden & Pet Co.*,
  804 F. Supp. 2d 257 (D.N.J. 2011) ............................................................................. 12

*Mirzaie v. Monsanto Co.*,
  2016 WL 146421 (C.D. Cal. Jan. 12, 2015) ............................................................... 14

*Nathan Kimmel v. DowElanco*,
  275 F.3d 1199 (9th Cir. 2002) .................................................................................... 10

*Ogden v. Bumble Bee Foods, LLC*,
  2014 WL 27527 (N.D. Cal. Jan. 2, 2014) ..................................................................... 6

*Reynolds v. S&D Foods, Inc.*,
  1993 WL 61822 (D. Kan. Feb. 8, 1993) ..................................................................... 13

*Siqueiros v. General Motors*,
  2021 WL 2115400 (N.D. Cal. May 25, 2021) ............................................................ 11

*Sonner v. Premier Nutrition Corp.*,
  971 F.3d 834 (9th Cir. 2020) ...................................................................................... 13

*Water, Inc. v. Everpure, Inc.*,
  2011 WL 13176096 (C.D. Cal. Aug. 23, 2011) ............................................................ 7

*Western/Scott Fetzer Co v. Braden Partners, LP*,
  2006 WL 2263827 (N.D. Cal. Aug. 7, 2006) .............................................................. 12

*Wilson v Hewlett-Packard Co.*,
  668 F.3d 1136 (9th Cir. 2012) ...................................................................................... 8

**Statutes**

7 U.S.C. § 136 ....................................................................................................................... 5

7 U.S.C. § 136a ..................................................................................................................... 5

Cal. Food & Ag. Code § 12854 ........................................................................................... 12

**Other Authorities**

40 C.F.R. § 156.10(g) ............................................................................................... 4, 5, 6, 7

40 C.F.R. § 158.300 ............................................................................................................... 4

40 C.F.R. § 158.350 ........................................................................................................... 4, 5

FAO, *FAO Specifications and Evaluations for Agricultural Pesticides* (2016) ........................... 5

**INTRODUCTION**

Plaintiffs have abandoned their sole claim on behalf of a putative nationwide class (Opp. 23 & n.16) and this case now proceeds solely on behalf of a putative California class. But Plaintiffs' Opposition does not cure the fundamental problems with their Complaint. Plaintiffs still provide no facts showing that (1) NNG levels have ever exceeded 1ppm in Products sold to consumers, much less that this occurs regularly; (2) NNG levels in the Products have ever exceeded 1ppm after sale to consumers, much less that this occurs regularly; or (3) NNG is carcinogenic, much less that it poses a cancer risk at realistic exposure levels.

Plaintiffs' defense of their individual claims also falls flat. The defense of their UCL claims relies entirely on a flawed argument that the Products are not registered. The defense of their fraud, CLRA, and fraudulent concealment claims only shows that they cannot allege a duty to disclose. And they point to no warranties related to NNG that could support their breach-of-warranty claims and, even if they did, they do not show that they were breached. In sum, Plaintiffs offer flawed legal theories and wishful conjecture instead of reasonable inferences drawn from plausible facts. For those reasons, and all those discussed below, Defendants' Motion to Dismiss should be granted.

**RESPONSE TO PLAINTIFFS' "BACKGROUND"**

**A.    Plaintiffs Have Not Plausibly Alleged Key Facts**

Plaintiffs' assertion that the Products "expose[] consumers to a carcinogen" (*id*. at 14) is without factual support in their Complaint. Plaintiffs cite studies finding *other* nitrosamines toxic, but many of those tested were *not* toxic, and the studies they cite did *not* test NNG. Compl. ¶ 73.[1]

---

[1] Plaintiffs point to a *single* study that they describe as showing "a statistically significant increase in malignant lymphomas in *male* mice." Compl. ¶ 88 (emphasis added). But that study in fact concluded that there were *no treatment related effects*, that there was *no* similar effect in female mice, and no dose-response. T.J. Long, et al., *CP 76100: Lifetime Carcinogenicity Study in Mice* (Dec. 26, 1984), available at https://www.baumhedlundlaw.com/documents/pdf/monsanto-documents/monsanto-study-lifetime-carcinogenicit-study-in-mice.pdf.

Plaintiffs' Opposition also does not remedy their failure to allege a single example of a Product exceeding 1ppm NNG at or after sale. Plaintiffs assert a "simple math" theory that: (1) final products with glyphosate concentrations over 40% would exceed 1ppm NNG *if* made with glyphosate technical *at its upper certified NNG limit* (2.5ppm); and therefore, (2) the Products must exceed 1ppm. Opp. 5-6. But Plaintiffs do not and cannot allege that the glyphosate technical used to make the Products was at or near its upper certified limits for NNG. *See* MTD 6 & n.7; Opp. 5 n.2.[2]

### B.  2002 Exceedances And 2004 NNG Study

Plaintiffs assert that Monsanto first learned that it could not keep levels of NNG below 1ppm in October 2004, when it completed a study on NNG formation (the "Study"). Opp. 18 & n.12; MDL Dkt. No. 150-19, A. Dyszlewski, et al., *Laboratory Studies of N-nitroso glyphosate (NNG) Formation in Dry Ammonium Glyphosate (MON 8750)* (Oct. 5, 2004). But Plaintiffs misrepresent the Study, which was conducted to investigate exceedances discovered during manufacturing QC efforts on certain batches of bulk dry glyphosate salt.[3] Nitrogen oxide (NOx) gases were suspected as the possible nitrite source, so the Study tested dry glyphosate samples exposed to NOx gases under various conditions.

No reasonable reading of the Study supports Plaintiffs' characterization that it "showed that none of the methods [Defendants] believed could control NNG worked" and "essentially proved that Monsanto … could never 'certify' that the Products would stay below 1 ppm for their entire life cycle." Opp. 7, 18. While the Study confirmed (consistent with existing scientific

---

[2] As Dr. Wratten explained in portions of his testimony (which Plaintiffs omit), since the levels in glyphosate technical were below 1ppm, the levels in final formulated products would be correspondingly lower.

[3] Plaintiffs allege that the Study was prompted by exceedances discovered in 2002 in certain production lots of QuikPro and use this to suggest that the same issues exist in products sold to consumers. Opp. 6. But as they are forced to acknowledge, this issue was *discovered* by Monsanto's quality-control processes, investigated, and traced back to certain batches of bulk dry glyphosate salt. *See* Compl. ¶ 130. Plaintiffs do not and cannot allege that any out-of-spec QuikPro was sold to consumers, or that this issue has *ever* recurred in the production of QuikPro.

literature) that NNG forms in dry glyphosate with sufficient exposure to NOx gas and water, it also showed that: (1) even under extreme and prolonged exposure conditions, a *simple plastic bag* prevented NNG growth of more than about 0.2-0.3ppm; and (2) sodium sulfite was highly effective at preventing NNG growth, particularly at high humidity. *See* MDL Dkt. No. 150-19 at App'x 4, Tests 2, 3, 7 (sulfite highly effective), Tests 5, 10 (packaging highly effective). NNG growth above 1ppm occurred only in samples exposed to extreme conditions without packaging.[4] Notably, Plaintiffs cannot deny that: (1) final Products are sold in airtight packaging and only briefly unsealed during use; (2) the Study found that *even directly at the exhaust pipe* of a running gas engine, NOx was present at only 0.2ppm (0.0 ppm just a few feet away)—*25 times* lower than the level examined in the test they cite; and (3) the *very same test* they cite showed that, even under these extreme conditions, adding just *1%* sodium sulfite cut NNG growth dramatically. *Id*. at 9-10, App'x 4, Test 6. Put simply, the Study does not plausibly support Plaintiffs' allegations.[5]

## ARGUMENT

### I. PLAINTIFFS MISINTERPRET THE REGULATORY FRAMEWORK

Plaintiffs contend that the Products "*can* exceed the certified limits [for NNG]" and are thus "unregistered and illegal to sell." Opp. 1, 9 (emphasis in original). Plaintiffs rely on this "certified limits" theory to defend every one of their claims. *Id*. at 8-11 (UCL claims), 11-12 (CLRA and fraud claims), 18 (fraudulent concealment), 21-22 (breach of warranty). Plaintiffs even seek to substitute their certified-limits argument for allegations that NNG levels above 1ppm are dangerous. *Id*. 22.

---

[4] That is, *daily* exposure to levels of NOx gas (500 to 2500% higher than present *directly at the tailpipe* of a running gasoline engine) and humidity (~80%) *without* protective packaging.

[5] Rather than meaningfully address these issues, Plaintiffs argue that Defendants ask the Court to accept "facts outside the pleadings [and] draw inferences against Plaintiffs." Opp. 15 & n.9. But Plaintiffs incorporated the Study into their Complaint, and they are asking the Court to accept factual assertions the Study contradicts. Plaintiffs are entitled only to *reasonable* inferences drawn from *facts they plausibly allege*. *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

Case 3:16-md-02741-VC   Document 15895   Filed 12/01/22   Page 9 of 20

But as a factual matter, Plaintiffs have not alleged even a *single* example of the Products being sold with NNG levels greater than 1ppm or developing such levels under ordinary conditions of use, much less facts showing that this occurs regularly. And even if Plaintiffs' conclusory factual allegations were credited, their certified-limits argument relies on legally incorrect interpretations of the relevant regulations.

### A.   Certified Limits

Plaintiffs' certified-limits theory alleges: (1) Monsanto was required to certify an upper limit for NNG in the Products at issue under 40 C.F.R. § 158.350; (2) the certified upper limit for these Products is 1ppm; and therefore (3) if the Products could *ever* exceed 1ppm NNG, they are (i) "unregistered" and illegal to sell and (ii) require expiration dates pursuant to 40 C.F.R. § 156.10(g)(6). Opp. 9-10. Plaintiffs' theory is wrong at every step.

*First*, the Products *do not require* a certified upper limit for NNG. Plaintiffs rely on 40 C.F.R. § 158.350(a)'s requirement to certify "an upper limit for each impurity of toxicological significance …." Opp. 1, 3, 9. That requirement applies only "[i]f the product is a technical grade of active ingredient or is produced by an integrated system." 40 C.F.R. § 158.350(a)(3). *Plaintiffs have not alleged and, more importantly, are without any good faith basis to allege, that the Products satisfy this requirement.* The Products are indisputably formulated end-use products, not technical-grade active ingredients. Nor do Plaintiffs have any good faith basis to allege, and they have not alleged, that the Products are produced by an "integrated system." Per EPA regulations, a pesticide is produced by an "integrated system" if it contains an active ingredient that either (1) is *not* derived from an EPA-registered product; or (2) was produced or acquired in a manner that does not "permit its inspection by the EPA under FIFRA sec. 9(a)." 40 C.F.R. § 158.300. Here, Plaintiffs do not and cannot allege that the glyphosate used in the Products is not an EPA-registered active ingredient, nor do they or can they allege that the glyphosate used in the Products was not

4
Defendants' Reply in Support of Motion to Dismiss Plaintiffs' Complaint
Case No. 4:16-MD-02741-VC

subject to FIFRA § 9(a) inspection. The Products thus are not required to have certified limits for NNG as a matter of law.[6]

*Second*, the Roundup® QuikPro and Roundup® Weed & Grass Killer Super Concentrate products that Plaintiffs allege they purchased *do not have* certified limits for NNG.[7] *See* Exs. A & B (Product CSFs). As Plaintiffs' Complaint demonstrates, Monsanto ensures that the Products contain less than 1ppm NNG through effective quality control. But Plaintiffs' allegation that "[n]one of the Products' Confidential Statements of Formula [('CSFs')] permit NNG to exceed 1 ppm" (Compl. ¶ 177) is simply wrong. Opp. 5. As explained, § 158.350(a) requires the Products' CSFs to have certified limits only for "each active ingredient" and "inert ingredients."[8]

*Third*, even if the Products' CSFs included certified upper limits for NNG (which they do not, with the exception of a single product), isolated instances of NNG exceedances would not cause the Products to be "unregistered" as Plaintiffs contend. *See* MTD 9-10; Opp. 2. Plaintiffs' Opposition certainly cites nothing to support that notion.[9]

---

[6] The 1ppm NNG limit for the Products sold in the U.S. flows not from required certified limits in the Products' registrations but from Defendants' internal specifications and Monsanto's commitment to comply with the Food and Agricultural Organization of the United Nation's ("FAO") specifications for glyphosate-based products. *See* FAO, *FAO Specifications and Evaluations for Agricultural Pesticides* (2016). Stated another way, Monsanto has committed to follow a 1ppm limit on formulated products, but that limit is not imposed—as Plaintiffs maintain—by certified limits in the Products' EPA-approved CSFs.

[7] In fact, with one exception, none of the CSFs for the Products at issue have certified NNG limits.

[8] Plaintiffs are correct that *glyphosate technical* has a certified upper level of 2.5pmm for NNG. *See* Opp. 5. Section 158.350(a), as explained, requires technical-grade active ingredients to certify such limits. But as Plaintiffs concede, NNG levels in glyphosate technical are typically well below even 1ppm. Opp. 5 n.2.

[9] Plaintiffs argue that "[w]hen a product does not have 'a statement prohibiting use after a certain date' on the product, then a manufacturer may legally sell a product only if it never exceeds its certified limits for the product's entire life cycle." Opp. 3 (citing § 158.350 & 7 U.S.C. § 136a(a)). But, as discussed, § 158.350 does not require NNG limits for the Products. And § 136a(a) simply prohibits sale of unregistered pesticides. Neither section says anything about "never exceed[ing] limits for the product's entire life cycle." Opp. 3.

### B. 7 U.S.C. § 136 Misbranding & 40 C.F.R. 156.10(g)(6) Expiration Dates

Plaintiffs' misbranding arguments also rely on their flawed certified-limits theory. They argue that "exceeding the certified limits is a significant change in chemical composition," and that § 156.10(g)(6)'s requirement for an expiration date when a product will "change chemical composition significantly" thus applies. Opp. 10. But § 156.10(g) concerns the *ingredient* statement on the label. It requires the disclosure of the percentage by weight of each active ingredient and the total percentage by weight of all inert ingredients. *See* § 156.10(g)(1)-(5). It does not require (or even permit) the listing of impurities or contaminants. *Id.* The reference to changes in chemical composition in § 156.10(g)(6) should therefore be read to refer to changes that render the ingredient statement inaccurate, not to changes in impurities known present at minute levels. Moreover, given that the Products do not require certified limits for NNG, the suggestion that the Products require an expiration date because they can allegedly exceed that limit is nonsensical.

## II. PLAINTIFFS' DEFENSE OF THEIR UCL CLAIMS IS MERITLESS

In support of their "unlawful" UCL claim, Plaintiffs allege that Defendants violated FIFRA by (1) selling unregistered pesticides that (2) were also misbranded by purporting to be registered and failing to include an expiration date. Opp. 7-11; *see also* Compl. ¶ 177. But Plaintiffs' "use of FIFRA as a predicate to a UCL claim is an attempted 'end run' around the express prohibition of private actions under FIFRA…." *Hartless v. Clorox Co.*, 2007 WL 3245260, at *4 (S.D. Cal. Nov. 2, 2007) ("[P]laintiff is precluded from enforcing FIFRA privately by using it as a predicate for her UCL claim ….") (citing cases).[10]

---

[10] *See also Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042, 1048 (9th Cir. 2000) (private action under the unlawful prong of the UCL is forestalled if the predicate statute bars the private action). Plaintiffs' claim that Defendants violated the California Food & Agriculture Code based on the same FIFRA violations is likewise an attempted end run around their inability to state a UCL claim based on FIFRA violations. Opp. 8; *see also Ogden v. Bumble Bee Foods, LLC*, 2014 WL 27527, at *12 (N.D. Cal. Jan. 2, 2014) (UCL claims are barred if "the federal statute underlying the claim contain[s] an express prohibition on private enforcement actions").

Regardless, Plaintiffs' arguments fail because, as discussed, they have not pleaded that NNG levels above 1ppm have *ever* been found at or after sale, much less any danger to consumers who use Products as directed. Additionally, as explained above, there is no legal or factual force to Plaintiffs' assertion that Defendants are selling unregistered Products because they *could* exceed the "certified limits"—NNG certified limits are not required for the Products, and even if they were, and even if there were plausible allegations of exceedances (and there are not), Plaintiffs do not explain why this would render the Products universally "unregistered." *See supra* Sec. I. There is no more merit to Plaintiffs' expiration-date theory. As explained above, NNG is not an "ingredient" in the Products with a certified limit, so the provision related to expiration dates (40 CFR § 156.10(g)(6)) does not apply. *See id.*

Plaintiffs' unfair-prong UCL claim is based on the same "public policy underlying the specific statutory and regulatory provisions discussed" in support of their "unlawful" UCL claim. Opp. 11. It fails for the same reasons.

## III. PLAINTIFFS HAVE NOT SHOWN A DUTY TO DISCLOSE

In support of their CLRA and fraud claims, Plaintiffs argue they need not establish that Defendants owed them a duty to disclose because Defendants made "affirmative misrepresentations" by "selling the products under the guise that they contain[] regsitered herbicides." Opp. 11-12. But the Products *are* registered, and Plaintiffs' claims to the contrary are unsupported. *See supra* Sec. I. Moreover, Plaintiffs cite no authority for the proposition that sale of a product is an affirmative representation about its registration status or compliance with regulations. *See Water, Inc. v. Everpure, Inc.*, 2011 WL 13176096, at *4 (C.D. Cal. Aug. 23, 2011) ("[C]ourts have rejected the theory that one can falsely imply government approval by the act of selling a product alone ….") (collecting cases).

Despite their argument that they need not establish a duty to disclose, Plaintiffs argue in the alternative that they have "adequately pled such a duty [to disclose]" under the test set forth in *Collins v. eMachines, Inc.*, 202 Cal. App. 4th 249, 256 (2011) and its progeny. Opp. 12-13. But

as Plaintiffs acknowledge, *Collins* applies only when the alleged defect "goes to the central function of the Product." Opp. 13; *Collins*, 202 Cal. App. 4th at 258; *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 864-65 (9th Cir. 2018) (no duty to warn about labor practices used in producing chocolate because they were not "related to the chocolate's function as chocolate"). Plaintiffs do not and cannot allege that NNG levels in the Products affect their central function as herbicides. *See* MTD 9-10.

Plaintiffs' argument that there is a duty to disclose because the Products pose an "unreasonable safety hazard" under *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 861-62 (9th Cir. 2018) is also without merit. Opp. 13. Plaintiffs fail to plausibly allege any risk of exposure or harm at all, much less an "unreasonable safety hazard." Plaintiffs argue they "need not prove *anything* at this stage." *Id*. But the problem is not a failure of *proof*; it is that Plaintiffs "do not plead any *facts*" showing that NNG is carcinogenic or, even if it were, that consumers would be exposed to it at levels that pose any safety risk. *Wilson v Hewlett-Packard Co.*, 668 F.3d 1136, 1145 (9th Cir. 2012) (emphasis added).[11]

## IV.  PLAINTIFFS DO NOT PLAUSIBLY PLEAD FRAUD OR CONCEALMENT

Plaintiffs' fraud claim and request for equitable tolling rest on the same flawed argument that there is a duty to disclose (Opp. 16), and thus fail for the reasons discussed above. Without such a duty, Plaintiffs allege (at most) passive concealment—and from EPA, not them. Only active concealment from Plaintiffs is actionable. MTD 11-12; *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1073, 1075-76 (N.D. Cal. Feb. 2, 2016) (defendants do not have a "duty to disclose [] allegedly illegal behavior…. In this circuit, 'affirmative acts' must consist of more than mere passive concealment").

Plaintiffs' Opposition also fails to meaningfully address fraudulent intent. *See* MTD 10-12. Plaintiffs briefly argue that representations by Bayer AG (a non-party) that the Products are

---

[11] Likewise, Plaintiffs' argument that they "allege a 'sufficiently close nexus,' between the defect and the safety issue" (Opp. 15) is a red herring. The problem is not the nexus between defect and risk, it is the failure to plead facts supporting the existence of either.

safe and "Defendants' marketing and sales of Products they knew were likely to surpass legal limits … evidence a clear intent to defraud consumers since they knew that telling the truth would expose them to government scrutiny, reduced profits, and significant liability." Opp. 20. But Plaintiffs do not plausibly allege that NNG renders the products unsafe.[12] Moreover, even if Plaintiffs plausibly alleged that Defendants improperly concealed information from EPA (and they have not), they plead no basis to infer that this was in an effort to defraud consumers.

Plaintiffs' assertion that Defendants do not contest Plaintiffs' constructive knowledge of the alleged risks or diligence (Opp. 18 & n.12) is also baseless. *See, e.g.*, MTD 3, 13. And Plaintiffs' Opposition only confirms that they did not exercise the requisite diligence. In fact, the 2004 Study, which Plaintiffs' Opposition claims "proved" that NNG would grow over 1ppm (Opp. 9), was filed with this Court in March 2017—more than *five years ago*—as an exhibit to a filing signed by a member of Plaintiffs' counsel's own law firm. MDL Dkt. No. 150-19. Plaintiffs' counsel *himself* attended a hearing at which a pending motion to seal those exhibits was discussed. MDL Dkt. No. 182. And the same is true of other documents Plaintiffs incorporate into their Complaint.[13] In short, Plaintiffs' counsel have had access to decades of public record and years of MDL discovery, yet they allege no factual support for their claims—not even a *single instance* in which the Products have been sold at or later developed above 1ppm NNG. That undermines any claim of "diligence," as well as the merits of Plaintiffs' case. *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1127 (9th Cir. 2002) ("The attorney has a duty prior to filing a complaint not only to conduct a reasonable factual investigation, but also to perform adequate legal research that confirms whether the theoretical underpinnings of the complaint are 'warranted by existing law or

---

[12] If anything, Plaintiffs' allegations tend to rebut any suggestion of fraud by showing that Monsanto has, for the decades it has manufactured glyphosate products, closely monitored NNG levels and no out-of-spec product has been sold.

[13] *Compare* MDL Dkt. No. 150-17 (Ex. 13) *with* Compl. ¶ 88; *compare* MDL Dkt. No. 150-18 (Ex. 14) *with* Compl. ¶ 145.

a good faith argument for an extension, modification or reversal of existing law.'") (quoting *Golden Eagle Distrib. Corp. v. Burroughs Corp.*, 801 F.2d 1531, 1537 (9th Cir. 1986)).

## V. PLAINTIFFS FAIL TO DISTINGUISH *BUCKMAN* AND *NATHAN KIMMEL*

Despite claiming that this is "not a fraud-on-the-EPA case" (Opp. 17), Plaintiffs continue to assert that *by deceiving EPA*, Monsanto was able to obtain product registrations and avoid required on-label expiration dates. Opp. 9-10, 18. With the fruits of this deception, Defendants allegedly misled Plaintiffs into believing the Products could never exceed 1ppm NNG. All Plaintiffs' claims depend on this theory, and it is squarely preempted. *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001).

Plaintiffs' argument that *Buckman* is distinguishable because it involved a claim of fraud on *FDA* instead of EPA (Opp. 17) is foreclosed by *Nathan Kimmel v. DowElanco*, which applied *Buckman* to the EPA context. 275 F.3d 1199, 1206 (9th Cir. 2002). Plaintiffs also insist this case is different because they allege an independent state law duty to disclose. Opp. 17. But even if they alleged such a duty (and they do not), it would not save their claims, because they argue that fraud on EPA was *how* Defendants breached that state-law duty. MTD 12; *Nathan Kimmel*, 275 F.3d at 1206 (claims preempted because "[i]t is the alleged fraud-on-the-EPA … which give[s] rise to [the] cause of action").

Moreover, *Hardeman* did not overrule *Nathan Kimmel* and does not save Plaintiffs' claims.[14] *See* Opp. 17-18. In *Hardeman*, this Court and the Ninth Circuit held that EPA's determination that a product poses no safety risk and that a safety warning is not required does not preempt adjudication of a state-law duty to warn claim. *Hardeman*, 216 F. Supp. 3d at 1039. But Hardeman's theory did not rely on proving that EPA was defrauded (or that Hardeman was defrauded through EPA).[15] That is, Hardeman's theory was not that Monsanto was obliged to

---

[14] This Court cited *Nathan Kimmel* as consistent with its preemption decision. *Hardeman v. Monsanto Co.*, 216 F. Supp. 3d 1037, 1039 (N.D. Cal. 2016).

[15] In *Hardeman*, EPA and plaintiffs considered the same information and disagreed with whether a cancer warning was appropriate. Plaintiffs here allege that, but for fraud on EPA, the current registrations and labels would not have been approved and Plaintiffs would not have been misled.

warn him of a supposed failure *to provide EPA* with evidence of carcinogenicity, but rather that glyphosate was *in fact* carcinogenic, that this created a duty to warn, and that he was *in fact* injured as a result. This case is not analogous.

## VI. PLAINTIFFS' DEFENSE OF THEIR WARRANTY CLAIMS FALLS FLAT

### A. Plaintiffs Must Plead Manifestation

Plaintiffs argue that they need not allege that the Products they purchased actually exceeded 1ppm NNG to have Article III standing to seek damages for an economic injury. Opp. 20. That argument misses the point. To plausibly allege a price premium arising from the supposed "defect," they must first plausibly allege the defect and risk *exist*. They cannot do so without plausibly alleging manifestation of the defect or a substantial certainty of future manifestation. *See* MTD 8; *Contreras v. Toyota Motor Sales USA, Inc.*, 2010 WL 2528844, at *6 (N.D. Cal. June 18, 2010) ("Plaintiffs do not allege that their vehicles have manifested the alleged defect…. [The] allegation that their vehicles are worth substantially less than they would be without the alleged defect is conclusory and unsupported by any facts.").[16]

Plaintiffs' attempt to distinguish Defendants' authority because it involved defects manifesting "post-warranty" or products that "worked as warranted" (Opp. 20-21) is also baseless. Those cases hold that plaintiffs cannot state a claim for breach of warranty if they do not allege that a product defect (1) manifested during a relevant warranty period or, (2) if the warranty period is ongoing, is substantially certain to manifest during that period. *See* MTD 8-9 (discussing cases). Plaintiffs allege the relevant warranty period extends through last use. Compl. ¶ 172. They must therefore plausibly allege the Products they purchased manifested or are substantially certain to manifest unsafe NNG levels before then. As explained *supra*, they have not done so.

---

[16] Plaintiffs rely on *Siqueiros v. General Motors*, 2021 WL 2115400, at *14 (N.D. Cal. May 25, 2021). But in that case, there was uncontroverted evidence that the defect existed and caused physical damage to the products at issue, thus plausibly supporting the overcharge theory. *Id.*

### B. The Opposition Shows that Plaintiffs' Express and Implied Warranty Claims Fail

Plaintiffs' Opposition confirms that the only express warranties they rely on are that the Products "conform to the chemical description" and are fit "for the purposes set forth" on their labels. Opp. 21. They do not contest that the Products' labels do not represent anything about NNG, nor do they contest that the Products are effective herbicides. That should be the end of the matter.

Plaintiffs' argument that the "chemical description" is the product name, which is supposedly inaccurate because the products are "unregistered" (Opp. 21) is also baseless. Putting aside that the Products *are* registered, the alleged warranties assert only that the *chemical description on the label* is accurate. A product name is not a chemical description.

Plaintiffs next argue the Products cannot be fit for their specified purposes because "EPA generally bans herbicides that can form nitrosamines over 1ppm" and so has "determined that such products are simply too dangerous to be used at all," and they question whether the Products could be considered "suitable for use" if they contained an "invisible grenade" that could go off at any time. *Id*. But unlike Plaintiffs' alleged defect, grenades actually exist and are dangerous. Plaintiffs, on the other hand, have not identified *any* instance of the Products exceeding 1ppm at or after sale, or any factual basis to conclude that, even if they did, that would pose a safety risk. The Product labels say they are suitable for use killing weeds, and Plaintiffs do not disagree.

Plaintiffs' implied warranty theory fails for the same reason, as it is also based on the claim that the Products cannot be suitable herbicides because they are "unsafe." Opp. 21-22. Defendants need only impliedly warrant that a "'pesticide is reasonably fit for use for any purpose for which it is intended according to any printed statement of the registrant.'" Compl. ¶ 263 (citing Cal. Food & Ag. Code § 12854); MTD 10-11. The only purposes Plaintiffs have identified are those on the label asserting the Products can kill weeds—which they can.

Plaintiffs' attempt to avoid the vertical-privity requirement for implied-warranty claims (Opp. 22) is also flawed. Plaintiffs appeal to an exception for pesticides (Opp. 22), but that applies

only in cases alleging personal injury. *Johansson v. Cent. Garden & Pet Co.*, 804 F. Supp. 2d 257, 264–65 (D.N.J. 2011) ("[A]n exception exists for cases where foodstuffs, drugs, or pesticides have caused *personal injury*."); *Western/Scott Fetzer Co v. Braden Partners, LP*, 2006 WL 2263827, at *4 (N.D. Cal. Aug. 7, 2006) (exception applies where pesticides "were defective and injured *the plaintiffs* who had ingested them") (emphasis added).

## VII. THE PRODUCTS ARE NOT NORMALLY AND ORDINARILY USED BY CONSUMERS

Plaintiffs do not contest that, except for Roundup® Super Concentrate, the Products are marketed to professional users for commercial uses. They argue this is "outside the pleadings" (Opp. 22), but they do not and cannot allege otherwise, and it is *their* burden to plausibly allege that the Products are consumer products. Plaintiffs' only other argument is that the outlets they bought the Products from "clearly sold the Products to ordinary consumers like Plaintiffs" and that they are also sold by other outlets who make sales to "regular consumers." *Id.*[17] That is a red herring. The legal issue is not whether consumers can buy the product, but its "normal and ordinary use," i.e., the purpose for which it is marketed and advertised. *Edmondson v. LCW Auto. Corp.*, 2008 WL 11338640, at *4 (C.D. Cal. Mar. 10, 2008) (collecting cases); *Reynolds v. S&D Foods, Inc.*, 1993 WL 61822, at *3 (D. Kan. Feb. 8, 1993) (although available to consumers, dog food "marketed for kennels and breeders" was not a consumer good). Plaintiffs cannot contest that all but one of the Products are intended for commercial uses and marketed as such.

## VIII. PLAINTIFFS DO NOT SHOW THEY LACK AN ADEQUATE REMEDY AT LAW

Plaintiffs must show they lack adequate remedies at law to sustain their equitable relief claims. Plaintiffs argue this Court previously rejected Defendants' cases in support of this proposition. *See* Opp. 24 & n.17. But the reasoning in those cases has since been embraced by

---

[17] Defendants did not "concede" that five of the retailers where Plaintiffs purchased Products are "for regular consumers." Opp. 22. Monsanto gave three examples of retailers that market themselves as selling professional products. MTD 14 n.16. The other retailers are either professional outlets or sell both professional and consumer products.

the Ninth Circuit. *See Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020) (affirming the district court's dismissal of plaintiff's claims for equitable restitution under the UCL and CLRA, which were pleaded in the alternative, because she "fail[ed] to establish she lacks an adequate remedy at law").[18]

Plaintiffs also fail to meaningfully address how the injunctive relief they seek would redress their claimed injury. They allege (albeit without any factual support), that the Products (1) are sold with varying levels of NNG above and below 1ppm; and (2) form NNG after sale at varying rates depending on numerous factors. *See* Opp. 14. Accepting those conclusory allegations, an expiration date would not tell consumers: (1) whether they are purchasing out-of-spec product; (2) whether their Product, if in-spec, will go out-of-spec the following day or in ten years; or (3) how individual factors of use and storage allegedly impact when and if a Product will go out-of-spec. The requested injunction thus would not redress Plaintiffs' claimed injury. *See* MTD 17.

## IX. PLAINTIFFS CANNOT SEEK INJUNCTIVE RELIEF

Plaintiffs claim that, even if they have an adequate legal remedy for past harm, they can still seek injunctive relief because "they will sustain future harm" without it. Opp. 24. But as explained in the MTD, Plaintiffs lack standing to seek such injunctive relief because they face no "likelihood of future injury." *Delarosa v. Boiron, Inc.*, 2012 WL 8716658, at *6 (C.D. Cal. Dec. 28, 2012). Plaintiffs rely on *Davidson v. Kimberly-Clark Corp.*, where the Court held that the plaintiff had standing to seek injunctive relief because "[k]nowledge that the advertisement or label was false in the past does not equate to knowledge that it will remain false in the future." 889 F.3d 956, 969 (9th Cir. 2018). *Davidson* has no application where, as here, Plaintiffs allege "as a matter

---

[18] Plaintiffs also assert that they lack an adequate remedy at law because their equitable claims are "based on different theories." Opp. 24 (citing *Brown v. Natures Path Foods*, 2022 WL 717816, at *6, n.5 (N.D. Cal. Mar. 10, 2022)). But that is not the relevant legal question. Rather, as the Ninth Circuit has explained, the question is whether the equitable relief sought is to "compensate [the plaintiff] for the same past harm" for which she seeks damages. *Sonner*, 971 F.3d at 838. That is plainly the case here.

14

of scientific fact" that the alleged issue with the product will remain. *Anthony v. Pharmavite,* 2019 WL 109446, at *6 (N.D. Cal. Jan. 4, 2019). Plaintiffs allege that, simply by virtue of their glyphosate concentrations, the Products will necessarily be sold with or eventually develop unlawful levels of NNG. Thus, "[t]he import of Plaintiffs' allegations is that [Monsanto] can do nothing to alter its advertising or product" to limit the formation of unlawful levels of NNG. *Id.*

Plaintiffs' argument that the Ninth Circuit in *Hardeman* fundamentally changed the law of preemption (Opp. 25) is also incorrect. Courts, including this Court in *Hardeman* in a decision affirmed by the Ninth Circuit, have repeatedly held that an injunction requiring a change to pesticide labels is preempted. *Hardeman v. Monsanto,* 216 F. Supp. 3d 1037, 1037-38 (N.D. Cal. 2016); *Mirzaie v. Monsanto Co.*, 2016 WL 146421 (C.D. Cal. Jan. 12, 2015). The Ninth Circuit did not purport to overrule these decisions. And Plaintiffs' argument that *Mirzaie* is distinguishable because the label at issue there "was approved by the EPA" is meritless—the labels at issue here are likewise EPA-approved.

## CONCLUSION

For all these reasons, this Court should grant Defendants' MTD.

Dated: December 1, 2022  /s/ *John J. Rosenthal*

John J. Rosenthal
WINSTON & STRAWN LLP
1901 L St. NW
Washington, DC 20036
Tel: (202) 282-5785
Fax: (202) 282-5100
jrosenthal@winston.com

Jeff Wilkerson (SBN 284044)
WINSTON & STRAWN LLP
300 S. Tryon St., 16th Floor
Charlotte, North Carolina 28202
Tel: (704) 350-7714
Fax: (704) 350-7800
jwilkerson@winston.com