1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SCHLESINGER LAW OFFICES, P.A.**
Jeffrey L. Haberman
Sarah J. Schultz
1212 Southeast Third Avenue
Fort Lauderdale, FL 33316
Telephone: (954) 467-8800
Facsimile: (954) 320-9509
jhaberman@schlesingerlaw.com
sarah@schlesingerlaw.com

*Attorneys for Plaintiff, Peter Engilis*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No: 2741 |
| | Case No.  MDL No. 3:16-md-02741-VC |
| Peter Engilis, Jr., *et al*.,<br><br>          Plaintiff,<br><br>vs.<br><br>Monsanto Company.,<br><br>          Defendant.<br><br>Individual Case No.: 3:19-cv-07859-VC | **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE THE TESTIMONY OF ANDREW SCHNEIDER, M.D.**<br><br>**Hearing date: January 12, 2023**<br>**Time: 10:00 a.m.** |

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE
THE TESTIMONY OF ANDREW SCHNEIDER, M.D.

# TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................................ii

TABLE OF AUTHORITIES ........................................................................................iii

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................... 1

STANDARD OF LAW.................................................................................................. 3

ARGUMENT ................................................................................................................. 5

      I.      Dr. Schneider Is Well-Qualified to Provide Causation Opinions in This Case. ........5

           A. Dr. Schneider's Medical Education and Training Requires an Understanding of Epidemiology. ......................................................6

           B. This Court's Prior *Daubert* Ruling as to Dr. Chadi Nabhan Does Not Support Exclusion of Dr. Schneider's Opinions Here. ................................9

      II.     Dr. Schneider Employed Scientifically Reliable Methodologies to Reach His General and Case-Specific Opinions. .................................................11

           A. Obtaining Peer-Reviewed Scientific Literature via Google Search Does Not Render Dr. Schneider's Opinion Unreliable. ......................................12

           B. Ample Authority Supports Dr. Schneider's Differential Diagnosis Methodology. ......................................................................14

      III.    Dr. Schneider's Review of the Genotoxic and Animal Studies Supports His General Causation Opinions. ......................................................19

CONCLUSION.............................................................................................................. 19

CERTIFICATE OF SERVICE .................................................................................... 20

ii

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Alesi v. Monsanto Co.*
  No. 19-SL-CC03617 Circuit Court St. Louis Cty. (July 22, 2022) ................................................. 8

*Ambrosini v. Labarraque,*
  101 F.3d 129 (D.C. Cir. 1996) ................................................................................................ 15

*Baker v. Dalkon Shield Claimants Trust,*
  156 F.3d 248(1st Cir. 1998) ................................................................................................... 14

*Bland v. Verizon Wireless L.L.C.,*
  538 F.3d 893 (8th Cir. 2008) .................................................................................................. 14

*Bonner v. ISP Technologies, Inc.,*
  259 F.3d 924 (8th Cir. 2001) .................................................................................................. 11

*Clausen v. M/V New Carissa,*
  339 F.3d 1049 (9th Cir. 2003) .......................................................................................... 14, 16

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
  509 U.S. 579 (1993) .................................................................................................................. 4

*Edwards v. Ethicon, Inc.,*
  2014 WL 336923 (S.D. W. Va. July 8, 2014) ........................................................................ 17

*Emblaze Ltd. v. Apple Inc.,*
  52 F. Supp. 3d 949 (N.D. Cal. 2014) ....................................................................................... 5

*Farm Bureau Prop. & Cas. Ins. Co. v. CHN Industrial Am. LLC,*
  2018 WL 2077727 (N.D. Iowa Feb. 5, 2018) ....................................................................... 17

*Heller v. Shaw Indus., Inc.,*
  167 F.3d 146 (3d Cir. 1999) ................................................................................................... 14

*In re Celexa & Lexapro Prod. Liab. Litig.,*
  927 F. Supp. 2d 758 (E.D. Mo. 2013) ..................................................................................... 8

*In re Mirena IUD Prods. Liab. Litig.,*
  169 F. Supp. 3d 396 (S.D.N.Y. 2016) ..................................................................................... 8

*In re Roundup Prod. Liab. Litig.,*
  390 F. Supp. 3d 1102 (N.D. Cal. 2018) .............................................................................. 8, 19

*In re Roundup Prod. Liab. Litig.,*
  No. 3:16-md-02741-VC (N.D. Cal. Feb. 24, 2019) ................................................................. 7

*In re Trasylol Prod. Liab. Litig.,*
  2010 WL 8354665 (S.D. Fla. Dec. 10, 2010) ....................................................................... 17

*In re Viagra (Sildenafil Citrate) and Cialis (Tadalafil) Prod. Liab. Litig.,*
  2020 WL 204115 (N.D. Cal. Jan. 13, 2020) ........................................................................... 4

iii

*Junk v. Terminix Intern. Co. Ltd.*,
   577 F. Supp. 2d 1086 (8th Cir. 2008) ................................................................... 11

*Knight v. Kirby Inland Marine, Inc.*,
   482 F.3d 347 (5th Cir. 2007) .............................................................................. 11

*Kumho Tire Co., Ltd. v. Carmichael*,
   526 U.S. 137 (1999) ............................................................................................ 4

*Lauzon v. Senco Prods., Inc.*,
   270 F.3d 681 (8th Cir. 2001) ............................................................................ 17

*Lust By and Through Lust v. Merrell Dow Pharma., Inc.*,
   89 F.3d 594 (9th Cir. 1996) ................................................................................. 4

*Madison v. Courtney*,
   No. 4:18-cv-00671, 2019 WL 8263428 (N.D. Tex. Jan. 26, 2019) .......................... 12

*Messick v. Novartis Pharm. Corp.*,
   747 F.3d 1193 (9th Cir. 2014) ........................................................................... 14

*Primiano v. Cook*,
   598 F.3d 558 (9th Cir. 2010) .......................................................................... 4, 5

*Sardis v. Overhead Door Corp.*,
   10 F.4th 268 (4th Cir. 2021) ............................................................................. 12

*Sementilli v. Trinidad Corp.*,
   No. 96-16034 (9th Cir. Sept. 16, 1998), *as amended* Nov. 12, 1998 ..................... 14

*Stambolian v. Novartis Pharma. Corp.*,
   2013 WL 6345566 (C.D. Cal. Dec. 6, 2013) ............................................. 16, 17, 18

*United States v. Hankey*,
   203 F.3d 1160 (9th Cir. 2000) ............................................................................. 4

*United States v. W.R. Grace*,
   455 F. Supp. 2d 1181 (D. Mont. 2006) ................................................................. 4

*Westberry v. Gislaved Gummi AB*,
   178 F.3d 257 (4th Cir. 1999) ............................................................................. 14

*Zuchowicz v. United States*,
   140 F.3d 381 (2d Cir. 1998) ............................................................................... 15

**STATUTES**

Fed. R. Evid. 702 ................................................................................... 3, 4, 5

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE
THE TESTIMONY OF ANDREW SCHNEIDER, M.D.

**INTRODUCTION**

Monsanto's Motion to Exclude the testimony of Dr. Andrew Schneider ("Dr. Schneider") is based on a distorted, incomplete characterization of his opinions, a misreading of the applicable law, and an ad hominem broadside.  With respect to general causation, Dr. Schneider used essentially the same methodology as Monsanto's experts to reach his opinion that exposure to glyphosate-based formulations ("GBF") such as Roundup can cause non-Hodgkin's Lymphoma ("NHL").  The simple fact that, after considering the relevant literature, medical records and testimony, Dr. Schneider reached a different conclusion on that question than Monsanto's experts does not render that opinion unreliable or inadmissible. As to specific causation, Dr. Schneider utilized a differential diagnosis, a methodology that is presumptively admissible under the applicable *Daubert* analysis.  Contrary to Monsanto's assertions, Dr. Schneider considered numerous possible alternative causes of Plaintiffs' NHL in the course of conducting this differential diagnosis, and there were no oversights in his analysis that render his conclusion unreliable.  For these reasons, as explained more thoroughly below, Monsanto's motion should be denied.

**BACKGROUND**

***Qualifications.***  Dr. Schneider has been a practicing physician since 1987.  *See* Curriculum Vitae of Andrew Schneider, M.D. (attached hereto as "**Exhibit A**").  He is board-certified in internal medicine (since 1987), oncology (since 1989), and hospice and palliative care (since 2012).  *Id.*  Dr. Schneider completed a fellowship in medical oncology from the esteemed Memorial Sloan Kettering Cancer Center in New York in 1989.  *Id.*  His research regarding cancer and chemotherapies has been published in peer-reviewed medical journals such as the Cancer Research, Cancer, Current Problems Cancer and the Journal of the American Chemical Society. *Id.*

Dr. Schneider is a clinical oncologist; he practices at South Florida Oncology and Hematology Consultants.  Deposition Testimony of Andrew Schneider, M.D. in *Ferro v. Monsanto*,

1

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE
THE TESTIMONY OF ANDREW SCHNEIDER, M.D.

6/13/2022, at 72:19–23 (attached hereto as "**Exhibit B**").  He treats patients with cancer every day.  *Id.*  Over the course of his career, Dr. Schneider has treated hundreds of patients who have Non-Hodgkin's Lymphoma.  *Id.* at 77–78.  Based on his training and experience, Dr. Schneider is an expert in Chronic Lymphocytic Leukemia ma—the sub-type of NHL that is at issue in this case.  *Id.*  Dr. Schneider even specialized in the treatment of lymphoma while he was at Sloan Kettering.  *Id.* at 85:25–86:1.

Dr. Schneider has stayed atop of the oncology literature since he finished his training, including cancer etiology.  *Id.* at 87:3–11.  He has been trained to read, review and critique the very types of medical literature at issue here that predominantly deal with epidemiological evidence, which he has continued to do for the past 33 years.  *Id.,* at. 134:4–10.  Dr. Schneider knows and understands the various terms required to evaluate the epidemiological evidence on which he relies.  *Id.* at 163–168.

***Methodology.***  Plaintiffs disclosed Dr. Schneider as an expert on general and specific causation.  To reach his general causation opinion, Dr. Schneider researched the association between glyphosate/Roundup and NHL.  His internet search generated the relevant studies on which nearly all the experts named in Roundup litigation have reviewed and considered in their respective general causation opinions.  His search resulted in a comprehensive Material Considered List that included the pertinent epidemiological studies, animal studies, and mechanistic studies—the pillars of causation evidence that various courts have found sufficient for opining on general causation in Roundup litigation.  *See* Amended Schneider Reliance List (attached hereto as "**Exhibit C**").  This, coupled with Dr. Schneider's training and extensive experience, makes Dr. Schneider's opinion that exposure to Roundup can cause NHL in general, including CLL, consistent with his expert report.  *See* Expert Report of Andrew Schneider, M.D. (attached hereto as "**Exhibit D**").

2

1  In assessing the specific cases of Plaintiff Peter Engilis, Dr. Schneider reviewed his medical

2  records, fact sheet, and deposition testimony.  This information contained the Plaintiff's respective

3  medical history and Roundup exposure.  Dr. Schneider's case specific opinions are based on a

4  differential diagnosis.  *See* Ex. D, Schneider Expert Report.  Dr. Schneider identified each of the

5  risk factors that are generally known to be associated with NHL.  Dr. Schneider determined that Mr.

6  Engilis did not present with these risk factors.  Based on his review of the medical literature on

7  Roundup and NHL, including case-controlled studies, cohort studies, meta-analysis, and the pooled

8  analysis; determining the intensity of the Plaintiff's respective Roundup exposures; and the fact that

9  they did not have any of the other risk factors mentioned here, Dr. Schneider determined that

10  Roundup caused his CLL.  Ex. D, Schneider Report.

11  What's more, Dr. Schneider's methodology is quite like Monsanto's case-specific

12  oncologist's methodology—Dr. Ran Reshef.  Dr. Reshef is an oncologist hired by Monsanto to give

13  expert opinions on causation.  Like Dr. Schneider, Dr. Reshef conducted an internet search for the

14  materials he relied on. *See* Deposition Testimony of Ran Reshef, M.D., 8/18/2022, at 49:20–50:5

15  (attached hereto as "**Exhibit E**").  When he could not find an article, he asked Monsanto's lawyers

16  for it.  *Id.*  And prior to his initial meeting with Monsanto's lawyers, Dr. Reshef did not read about

17  any association between Roundup and NHL.  *Id.* at 148:15–25.

### STANDARD OF LAW

Fed. R. Evid. 702 controls the admission of expert testimony.  Rule 702 provides that a qualified expert may testify in the form of opinions or otherwise if:

> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) The testimony is based on sufficient facts or data;
> (c) The testimony is the product of reliable principles and methods; and
> (d) The expert has reliably applied the principles and methods to the facts of the case.

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE
THE TESTIMONY OF ANDREW SCHNEIDER, M.D.

In the landmark *Daubert* case, the Supreme Court instructed that that "[t]he inquiry envisioned by Rule 702 is . . . a flexible one."  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 594 (1993). In determining admissibility, courts consider whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.  *Primiano v. Cook*, 598 F.3d 558, 563–64 (9th Cir. 2010).

The four *Daubert* factors—testing; peer review; rate of error; and general acceptance—are mere guidelines for applying Rule 702.  *See United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2000); *see also Lust By and Through Lust v. Merrell Dow Pharma., Inc.*, 89 F.3d 594, 597 (9th Cir. 1996) ("That the expert failed to subject his method to peer-review and to develop his opinion outside the litigation is not dispositive . . . ."); *In re Viagra (Sildenafil Citrate) and Cialis (Tadalafil) Prod. Liab. Litig.*, 2020 WL 204115, at *5 (N.D. Cal. Jan. 13, 2020) ("[E]xpert testimony may still be reliable and admissible without peer review and publication.").

Indeed, the test of reliability is also flexible.  *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).  "The trial court's gatekeeper role, however, is not meant to supplant the adversary system or the role of the jury."  *United States v. W.R. Grace*, 455 F. Supp. 2d 1181, 1188 (D. Mont. 2006). Rather, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596;

> A trial court thus must be sure that its review of expert testimony focuses solely on principles and methodology, not on the conclusions that they generate.  Daubert and Rule 702 are safeguards against unreliable or irrelevant opinions, not guarantees of correctness. A judge must be cautious not to overstep its gatekeeping role and weigh facts, evaluate the correctness of conclusions, impose its own preferred methodology, or judge credibility, including the credibility of one expert over another.  These tasks are solely reserved for the fact finder.

4

*Emblaze Ltd. v. Apple Inc.*, 52 F. Supp. 3d 949, 954 (N.D. Cal. 2014) (internal quotations omitted); *see also Primiano*, 598 F.3d at 565.

## ARGUMENT

### I.   Dr. Schneider Is Well-Qualified to Provide Causation Opinions in This Case.

It is the case for every clinical oncologist that the primary focus of their work is treating their patients.  This includes Monsanto's oncologist, Dr. Reshef.  This does not, however, mean that oncologists are unqualified to testify about the general causes of cancer and, more specifically, the risk factors and causes of developing NHL.  Dr. Schneider is qualified to opine that exposure to Roundup may cause NHL (including CLL) and that Mr. Engilis's exposure to Roundup caused or substantially contributed to causing his respective NHL.  An expert is qualified to testify by knowledge, skill, experience, training, or education.  Fed. R. Evid. 702.  While any one of these points suffices, Dr. Schneider meets all five.

The issue on general causation is whether exposure to Roundup may cause a person's NHL.  Thus, the pertinent subject matters are oncology and NHL.  Dr. Schneider is a board-certified oncologist.  He obtained his board certification in 1989 from Sloan Kettering, a prestigious cancer research center.  During his fellowship, he specifically focused on studying lymphoma. Over the course of his three-plus decades in clinical practice, he has treated hundreds of NHL patients.  He is an expert in treating people with NHL, including the CLL sub-type.  This involves keeping up to date on cancer and the etiologic factors of cancer.  And Dr. Schneider is well-versed in knowing the risk factors associated with NHL.  He is precisely the type of person who should be testifying in a cancer causation case.  After all, if an oncologist had no place in this trial, Monsanto would not have designated its own case-specific oncologist.

**A.  Dr. Schneider's Medical Education and Training Requires an Understanding of Epidemiology.**

Monsanto tries to separate the treatment of a disease from understanding the causation of the disease.  But the two go hand-in-hand. Monsanto contends that Dr. Schneider is not qualified to opine on the cause of cancer because he is not an epidemiologist, biostatistician, geneticist, and that he does not conduct animal bioassays.  (Doc. 29, at 4–5).  Monsanto voices particular concern with the epidemiology aspect.  *See id.*  These arguments are not well taken; they are not supported by the record, nor do they make much sense.  Monsanto's own expert oncologist and counterpart to Dr. Schneider even testified that he has the necessary background in epidemiology, "since the science of oncology is extremely evidence-based and focuses on epidemiologic studies." Ex. E, Reshef Dep. Tr., at 31:6–12.  In other words, you cannot practice oncology absent an understanding of applying epidemiologic studies in a clinical setting.

Dr. Schneider is well-able to read, understand and interpret the peer-reviewed epidemiological articles on the association between Roundup or glyphosate and NHL.  He testified he was *trained* to read these types of articles in general and has been doing so for the past 33+ years.  *See* Ex. B, Schneider *Ferro* Dep. Tr., at 134:2–18.  His deposition testimony demonstrated command of the material terms involved in understanding and critiquing epidemiological studies including: statistical significance; confidence intervals; relative risk; recall bias; confounding factors; and exposure misclassification.  *See generally id.* at 163:5–168.  Dr. Schneider's deposition testimony makes plain that he also had command of the substance of the core epidemiological articles that form the basis of all parties' experts on general causation.  Moreover, Dr. Schneider is familiar with SEER – Surveillance *Epidemiology* and End Results program of the National Cancer Institute.  *Id.* at 113:16–23 (emphasis added). He uses this *epidemiological* tool in his everyday practice—just as Dr. Reshef testified.  *Id.* at 114:15–18.

Moreover, Monsanto contends that "Dr. Schneider testified at deposition that he did not, in fact, rely on the opinions of" other general causation experts in the fields of epidemiology, biostatistics, genotoxicity, and/or animal bioassays.  (Doc. 29, at 9).  That is incorrect.  In the very first paragraph of Dr. Schneider's expert report in this case, he states:

> I have also reviewed and relied upon the general causation opinions regarding the association between Roundup and non-Hodgkin's lymphoma to Plaintiffs' present or past general causation experts.  In addition, I have reviewed, relied upon, and incorporate by reference the expert reports of Christopher Portier, PhD, Dennis Weisenburger, MD, and Ron Schiff, MD.

Ex. D, Schneider Report, at 1.  As Monsanto recognizes, this is of course another avenue which permits Dr. Schneider to provide specific-causation opinions in this case.  (Doc. 29, at 10) (citing *In re Roundup Prod. Liab. Litig.*, No. 3:16-md-02741-VC, ECF 2799, at 2–3 (N.D. Cal. Feb. 24, 2019)) (allowing specific-causation opinions to testify to differential diagnosis because they properly relied on other experts for general causation).

Monsanto's other related concerns regarding statistics or controlling for confounders are taken out of context and are of no moment.  Dr. Schneider does not design the epidemiological studies—he is not expected to do so.  This does not make him unqualified to read, interpret and apply the epidemiological studies that epidemiologists have done to the facts of this case.  Monsanto has no support for such a narrow view of the law on an expert's qualifications.  Monsanto's argument on the Bradford Hill criteria is equally unavailing.

*First*, in a similar Missouri Roundup case (as well as a separate federal MDL), the Court noted that applying Bradford Hill criteria is not required:

> Although the Bradford Hill criteria may be a tool for determining whether an epidemiological study establishes causation it is by no means required and "in the context of a general causation challenge, failure to satisfy the Bradford Hill criteria does not doom admission under *Daubert.* Therefore, whether [a challenged expert] did or did not use the Bradford Hill criteria will not determine the admissibility of his opinions . . . ."

*Alesi v. Monsanto Co.* Case No. 19-SL-CC03617 Circuit Court St. Louis Cty. (July 22, 2022) (citing *In re Celexa & Lexapro Prod. Liab. Litig.*, 927 F. Supp. 2d 758, 766 (E.D. Mo. 2013)) in denying Monsanto's argument that an expert must rely on the Bradford Hill criteria on general causation.

*Second*, even if Dr. Schneider was unfamiliar with the formal name, the epidemiological data he reviewed—the case-controlled studies, cohort studies, meta-analysis, the pooled analysis (that he testified to)—as well as the animal studies and the genotoxic studies, all form the basis for the Bradford Hill criteria. The weight of this data meets the criteria, which is why Dr. Schneider, like Plaintiffs' other experts, can come to a general causation opinion.

In fact, Dr. Reshef, Monsanto's expert oncologist, who has the same qualifications as Dr. Schneider, testified at a recent trial as to how oncologists are necessarily qualified to give cancer-causation opinions based on epidemiology:

> [I]n fact, epidemiology is something that any medical student or internal medicine residents learns to some degree. What is more important is that I am a medical oncologist. And oncology is a very data-driven science. We don't treat patients based on our gut feeling or based on our personal experience. We also don't rely necessarily on our hands. We are not surgeons. We rely on data. So all of our treatment decisions in oncology rely on studies and use tools that are epidemiologic tools. So the same tools used to analyze the question of glyphosate and non-Hodgkin's lymphoma, are things that I use on a daily basis.

*Ferro v. Monsanto*, Trial Transcript, November 8, 2022 Morning Session, at 3166:16–3167:4 (relevant portions attached hereto as "**Exhibit F**").

Like Dr. Reshef (and every other trained oncologist), Dr. Schneider uses epidemiology in his day-to-day practice as a treating physician. He is an expert in the treatment, diagnosis and risk factors of NHL. He has expertise in reading and interpreting epidemiological studies, which he has been doing for over 30 years.

8

**B.  This Court's Prior *Daubert* Ruling as to Dr. Chadi Nabhan Does Not Support Exclusion of Dr. Schneider's Opinions Here.**

Monsanto cites *In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d 1102 (N.D. Cal. 2018) as controlling authority that supports the exclusion of Dr. Schneider's opinions.  (Doc. 29, at 10).  However, a closer look at the holdings of this Court as to Dr. Chadi Nabhan's opinions and the deposition testimony of Dr. Schneider dictates otherwise.  For one, the Court's opinion as to Dr. Nabhan expressly held: "[M]edical doctors do not need to be epidemiologists in order to testify regarding epidemiological studies, ***so long as the expert is qualified by training or experience to interpret these studies*** and his opinions would be helpful to the jury."  *Id.* at 1148 (emphasis added) (citing *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 426 (S.D.N.Y. 2016)).

As Dr. Schneider testified in his deposition, he has been trained to read and review scientific literature for the past 33 years reviews articles when analyzing whether certain risk factors could have caused a patient to develop NHL.  *See* Ex. B, Schneider *Ferro* Dep. Tr., at 133:23–134:18 (emphasis added):

> Q.  Sure. In your view, a risk factor is something that has been associated in some literature with non-Hodgkin's lymphoma?
> A.  Yes.
> Q.  Even if there is other epidemiologic data showing no increased risk, correct?
> A.  I think the way I'd answer that question is, **it's my job, as someone who's been trained to read articles like this for 33 years, to go through the studies**, talk about what studies are positive, what are negative, and then **talk about the flaws of each study**, look at the meta-analysis, and then reach an opinion.
> Q.  As someone who has been trained to read articles like this for 33 years, how do you determine whether or not a risk factor is causal?
> A.  **By looking at the individual articles, by looking at the meta-analysis, looking at the relative risks, looking at whether they're statistically significant, and then coming up with an opinion.**

*See also id.* at 163:5–10 ("Q. Are you familiar with the concept of statistical significance?  A. Yes.  Q. Can you please define that?  A. Sure.  **I've been taught** that a p-value of less than 0.5 is statistically significant.") (emphasis added); *see also id.* at 163:20–164:3 ("Q. You're familiar with a confidence

9

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE
THE TESTIMONY OF ANDREW SCHNEIDER, M.D.

interval, right?  A. Yes.  Q. What is a confidence interval?  A. So in these studies, for example, they looked at relative risks, and instead of giving a p-value, they looked at the 95 percent confidence interval.  And if the number 1 falls in that confidence interval, then it's not significant.").

Monsanto also notes that this Court held, in its ruling as to Dr. Nabhan, that a clinician who merely "summarize[s] many relevant studies, but offer[s] little in the way of critical analysis of the[] studies" renders him unqualified to utilize the studies as a basis for his opinions.  (Doc. 29, at 10). However, Dr. Schneider did explain his analysis and criticisms of the Agricultural Health Study ("AHS") or the 2018 *Andreotti* study, the 2001 *McDuffie* study, and Health Canada dossier studies. His deposition testimony made clear that he knew and was well-familiar with those studies, even if his materials considered list was incomplete.  *See* Ex. B, Schneider *Ferro* Dep. Tr., at 169:19–170:20:

> Q.  You considered the impact, for example, of recall bias in the studies that you're relying on, right?
> A.  Yes.
> Q.  Which studies did you review that suffer from recall bias? Do you have a sense, sitting here today?
> A.  Yeah. Well, I think the big one is AHS 2018, the Andreotti study, which -- where, again, you're going back 30 years and asking a people on questionnaires. And, again, I think 37 percent of the people didn't even respond. But there's clearly a misclassification or recall bias when you have to remember something from 20 or 30 years ago.
> Q.  Did McDuffie 2001 suffer from recall bias?
> A.  Give me a second to find it. I mean, there could be some recall bias in that the -- you had to tell, you know, how many days of exposure you had. But, again, you would think that these things would all work in that they would remember less, not more. And McDuffie was a positive study for greater than two days per year with a relative risk of 2.12 and a 95 percent confidence interval of 1.2 to 3.73. So although there may be some recall bias in McDuffie, I don't think that would have lowered. I think it would only have helped to increase the relative risk.

*See also id.* at 173:4–18 ("Q.  You did consider confounding for each of the studies that you're relying of Roundup and NHL, correct?   A. Correct.   Q. You're aware that some studies addressed confounding by controlling for other pesticides, right?  A. Correct.  Q. Not all studies controlled for other pesticides, true?  A. True.  Q. We would need to look at an individual study to determine whether

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE
THE TESTIMONY OF ANDREW SCHNEIDER, M.D.

that study controlled for other pesticides, right?  A. Right."); *see also id.* at 472:22–473:11 ("Q. In your view, Health Canada has made a mistake when it comes to glyphosate, is that right? . . . A. Sure. In my view, they don't adequately show me their thinking. They don't . . . those two or three pages they don't really, for me, come to a conclusion that they justify.  They don't critique any of the epidemiologic studies. You know, there's been, as you know, meta-analysis and cohort studies and case-control studies. They don't mention any of these.").

This testimony makes clear that Dr. Schneider—just like Defendant's expert oncologist—has been trained to read and does read scientific and medical literature, examine the positives, negatives, and flaws of each study, review meta-analyses and determine the statistical significance, considered recall bias and confounding factors, and render an opinion.  Because Dr. Schneider has been trained to read and interpret epidemiological studies and has over 33 years of experience doing so, he is appropriately qualified to interpret the epidemiological studies he considered in reaching his opinions in this case.  The Court should respectfully deny this aspect of Monsanto's motion.

## II.   Dr. Schneider Employed Scientifically Reliable Methodologies to Reach His General and Case-Specific Opinions.

To prove causation in a toxic tort case, a plaintiff "must show both that 'the alleged toxin is capable of causing injuries like that suffered by the plaintiff in human beings subjected to the same level of exposure as plaintiff, and that the toxin was the cause of the plaintiff's injury.'"  *Junk v. Terminix Intern. Co. Ltd.*, 577 F. Supp. 2d 1086, 1091 (8th Cir. 2008) (quoting *Bonner v. ISP Technologies, Inc.*, 259 F.3d 924, 928 (8th Cir. 2001)). "This is known as general causation and specific causation." *Junk*, 577 F. Supp. 2d at 1091. "General causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury." *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 351 (5th Cir. 2007) (citation omitted).

Dr. Schneider's causation opinions rest on sound methodologies—they are the very ones Monsanto's oncologist uses. Dr. Schneider's internet research into the question of whether Roundup or glyphosate exposure can cause NHL was robust. Dr. Schneider's reliance list is filled with the relevant studies that are at the center of this litigation. *See* Ex. B, Schneider *Ferro* Dep. Tr., at 51:16–23. His deposition testimony demonstrates a full command of the critical literature—both of the material that strongly supports Plaintiffs' claims, and that which does not. *See id.* at 67:17–22, 69:15–18. And Monsanto fails to contend otherwise. Monsanto notably does not argue the substance of the material underpinning Plaintiffs' claims, or that Dr. Schneider did not have command of the substance, or that the amount of literature Dr. Schneider relies on is too small or limited to form opinions.

### A. Obtaining Peer-Reviewed Scientific Literature via Google Search Does Not Render Dr. Schneider's Opinion Unreliable.

Instead, Monsanto takes issue with the "Google" search that Dr. Schneider testified to. Monsanto's argument is disingenuous at best, attempting to misdirect the Court's attention to the method Dr. Schneider used to find the literature rather than focus on the reliability of the literature itself. In fact, Dr. Reshef also conducted an internet search to pull material for his general opinions. When he couldn't find an article, he asked Monsanto's lawyers for help.

There is no law that says that Google cannot be employed to search for relevant medical literature. Indeed, the case law Monsanto cites all stands for the proposition that an expert should not rely on Google for the substance of the expert's opinion—not that an expert can't use Google as a means of obtaining the relevant literature that supports the opinion. *See, e.g., Sardis v. Overhead Door Corp.*, 10 F.4th 268, 289 (4th Cir. 2021) (where an expert—who was testifying about product design standards that he didn't know anything about, instead of actually naming the standards or whether they even existed—told the judge and jury to "Google" the information); *Madison v. Courtney*, No. 4:18-cv-00671, 2019 WL 8263428, at *3 (N.D. Tex. Jan. 26, 2019) (where the expert

12

copied and pasted the definitions of medical terms from Google).  Dr. Schneider did none of these things.  Dr. Schneider does not rely on Google to opine that Roundup causes NHL; he does not copy and paste definitions from Google; and his answer to substantive questions on causation is not "I don't know, Google it!"  Here, the Google search merely generated the medical literature that Dr. Schneider (and every other expert) reviewed, criticized, relies on to support his opinions.

Significantly, in all of the Roundup cases that have been tried to date, the same universe of scientific literature has been relied upon by the parties' experts.   In performing all three types of searches for the terms "Roundup and NHL"—a regular Google search, a Google Scholar search, and a PubMed search—the same articles are generated by the search engines.  Google Scholar is part of Google.  Regardless of how the expert found it, the literature itself was peer-reviewed and reliable.  Under the Court's current analysis, so long as the article was found using Google Scholar or PubMed, the article itself could constitute a reliable basis for the expert's opinions.  This should not be the determinative factor.

By way of comparison, if a lawyer or even the Court wished to find case law—take, for example, *Marbury v. Madison*—there are a number of ways to obtain the opinion.  Whether searching on Westlaw, LexisNexis, HeinOnline, Bloomberg Law, Google Scholar, or a regular Google search, one will find the opinion.  It is then the substance of the court's opinion that matters.  The same is true here.  Using the same reasoning, if a person was tasked with traveling from uptown Manhattan to downtown Manhattan, it does not matter whether the person took the local subway or the express subway, while one route takes longer, both routes enable the person to reach the destination.

The federal *Daubert* standard for reliability of an expert's opinion mandates the existence of sufficient and relevant facts and scientific literature which support the expert's opinion.  Stated differently, the Court's focus should be on whether the materials which underlie the expert's opinion

13

1    are sufficiently reliable to support that opinion.  Consequently, because Dr. Schneider relies upon

2    peer-reviewed, scientific literature which have been found to be a reliable bases for plaintiffs'

3    experts in every Roundup trial that has been tried to date, his opinions are reliable, and he should be

4    permitted to testify at trial.

5        **B.   Ample   Authority   Supports   Dr.   Schneider's   Differential   Diagnosis**
6             **Methodology.**

7        The Ninth Circuit has made clear that an expert physician may testify as to the cause of injury

8    based solely on his experience and review of the medical records.  *See Messick v. Novartis Pharm.*

9    *Corp.*, 747 F.3d 1193, 1198 (9th Cir. 2014); *Sementilli v. Trinidad Corp.*, No. 96-16034 (9th Cir.

10   Sept. 16, 1998), *as amended* Nov. 12, 1998 (per curiam) ("***This court, after Daubert, has held that***

11   ***a medical doctor's testimony regarding the cause of an injury may be based on experience and***

12   ***review of medical records only***.") (emphasis added).  That is exactly what Dr. Schneider does here.

13   Dr. Schneider has 30+ years of experience as an oncologist, he has thoroughly reviewed Mr. Engilis's

14   medical records, he has reviewed the scientific literature, he has reviewed Monsanto internal

15   corporate documents, and he has reviewed depositions specific to this case.

16       Dr. Schneider's specific causation opinion is based on a robust differential diagnosis.  *See*

17   Deposition Testimony of Andrew Schneider, M.D. in *Engilis v. Monsanto*, 8/9/2022, at 29:16–20

18   (attached hereto as "**Exhibit G**") ("Q. And so you conducted what is known as a differential etiology

19   in reaching your opinion that Mr. Engilis's Roundup use caused or contributed to his CLL; correct?

20   A. Correct.").  The Ninth Circuit (and many others) have held that the "[d]ifferential diagnosis is a

21   common scientific technique, and federal courts, generally speaking, have recognized that a properly

22   conducted differential diagnosis is admissible under *Daubert*."  *Clausen v. M/V New Carissa*, 339

23   F.3d 1049, 1057 (9th Cir. 2003); *Accord Bland v. Verizon Wireless L.L.C.*, 538 F.3d 893, 897 (8th

24   Cir. 2008); *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262–66 (4th Cir. 1999); *Heller v. Shaw*

25   *Indus., Inc.,* 167 F.3d 146, 154–55 (3d Cir. 1999); *Baker v. Dalkon Shield Claimants Trust,* 156 F.3d

14

248, 252–53 (1st Cir. 1998); *Zuchowicz v. United States,* 140 F.3d 381, 387 (2d Cir. 1998); *Ambrosini v. Labarraque,* 101 F.3d 129, 140–41 (D.C. Cir. 1996).

Dr. Schenider's report explains in detail his differential etiology, including ruling out recognized risk factors for the development of NHL and other environmental exposures. *See* Ex. D, Schneider Report, at 10–11:

> Risk Factors & Differential Etiology
> Recognized risk factors for the development of NHL include aging, male gender, white ethnicity, geographic location, inherited or acquired immunodeficiency, certain autoimmune disorders, specific types of infection, previous treatment for Hodgkin's lymphoma, certain drugs, occupational and environment exposures, and a family history of malignancies of the blood or bone marrow.  Implicated occupational and environmental exposures include herbicides, organic solvents, other organic chemicals, hair dyes, and smoking . . . .
>
> Mr. Engilis is, of course, a white male, who was 62 years old at the time of diagnosis of his NHL.  Other than Roundup exposure, no risk factors for the development of lymphoma, such as predisposing medical conditions (including immunodeficiency states, autoimmune disorders, immunosuppressive medications, and specific infections), a family history of malignancies of the blood or bone marrow, or other candidate carcinogenic exposures, are identified in Mr. Engilis's medical records or deposition testimony.
>
> Per Mr. Engilis's Plaintiff Fact Sheet, he is negative for the following medical conditions: autoimmune diseases (including but not limited to Crohn's disease, Ulcerative Colitis, HIV), Celiac disease, Diabetes, Eczema, Epstein-Barr virus, Hepatitis B or C, Immunosuppressive Medications, Lupus, Obesity, Organ transplant/stem cells, Psoriasis, Rheumatoid Arthritis, Thyroiditis/Hashimoto's, Ulcers.  Any of the above medical conditions or medications, therefore, are not suggested as related to or as causative factors to the onset of different types of cancers in Mr. Engilis's case.
>
> Mr. Engilis's deposition testimony also indicates that his pertinent environmental exposures are limited to Roundup . . . He denies any exposures to chemicals working as a car/auto mechanic, or using antifreeze or change oil, as a painter or woodworker, or as applying rodenticides, or fungicides.  He was never exposed to asbestos, benzene, diesel fumes, metal lead, or radiation, except the diagnostic x-rays.
>
> It is therefore my conclusion that, to a reasonable degree of scientific and medical certainty, exposure to Roundup can cause NHL in general, and caused or was a substantial factor in causing or contributing to Mr. Engilis's NHL.

1    Despite this, Monsanto contends that Dr. Schneider's deposition testimony failed to rule out

2    the following other factors: Mr. Engilis's "self-reported history of sunburns [as] a primary risk factor

3    for melanoma," random genetic mutations, and whether Mr. Engilis's melanoma and bladder cancer

4    preceded his CLL diagnosis.  (Doc. 29, at 13).  Yet, Dr. Schneider did explain his differential etiology

5    as to each of these.  Ex. G, Schneider *Engilis* Dep. Tr., at 55:17–21 ("A… And ATM mutations are

6    not big causes of bladder cancer, melanoma, and CLL.  I have seen ATM mutations of prostate cancer,

7    for example, breast cancer, I believe.  I don't think they're big ones for those two diseases."); *see also*

8    *id.* at 57:17–58:24:

9

10       Q.      I'm sorry.  Can you rule out that Mr. Engilis had a genetic mutation that caused
                 or contributed to any or all of his cancers without doing genetic testing? . . .
11       A.       So I have knowledge of mutations.  I get requests all the time as part of my
                 work at Century Health, and I also do reviews for Maximum where they ask
12               me to approve just what you're asking.  They're asking me to approve requests
                 for mutational analysis . . . And I know what diseases warrant that and what
13               don't, okay, because that's my job.  And patients with melanoma, for example,
                 we don't do routine mutational analysis.  Patients with CLL, we look at things
14               like heavy chain mutations for TP53 mutations.  We don't look at ATM
                 mutations . . . because it's not indicated.
15

16   *See also id.* at 107:20–108:9 ("Q. But my question is: When you were conducting your differential

17   etiology, did you consider as a potential risk factor a history of primary cancer that preceded the CLL?

18   A. So … we know patients with bladder cancer, for example, don't get CLL.  That's not a factor of

19   CLL.  We already discussed that CLL causes secondary malignancies.  And it's well described in the

20   literature that melanoma and we discussed the TCC of the bladder. . . . My opinion is that they

21   occurred at the same time."); *See also id.* at 124:23–126:15 (explaining why ruled out Mr. Engilis's

22   self-reported history of sunburns as a cause of his melanoma).

23       Notwithstanding, even if this Court finds that Dr. Schneider's differential diagnosis failed to

24   rule every possible explanation, this is not grounds for exclusion according to Ninth Circuit law.  *See*

25   *Clausen*, 339 F.3d at 1058–59.  Significantly, *Daubert* does not require an expert to eliminate every

26   possible potential cause.  *See Stambolian v. Novartis Pharma. Corp.*, 2013 WL 6345566, at *5 (C.D.

16

Cal. Dec. 6, 2013) ("***A medical expert's opinion based upon differential diagnosis normally should not be excluded because the expert has failed to rule out every possible alternative cause of a plaintiff's illness.*** Generally, an expert need not rule out every potential cause in order to satisfy *Daubert*, as long as the expert's testimony addresses obvious alternative causes and provides a reasonable explanation for dismissing specific alternate factors . . . .") (emphasis added); *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 693 (8th Cir. 2001) ("[T]his requirement cannot be carried to a quixotic extreme . . . an expert's causation conclusion should not be excluded because he or she failed to rule out *every* possible alternative cause."); *see also In re Trasylol Prod. Liab. Litig.,* 2010 WL 8354665, at *11 (S.D. Fla. Dec. 10, 2010) ("[D]octors need not rule out every conceivable cause in order for their differential-diagnosis-based opinions to be admissible."); *Farm Bureau Prop. & Cas. Ins. Co. v. CHN Industrial Am. LLC*, 2018 WL 2077727, *7 (N.D. Iowa Feb. 5, 2018) ("There is no rule requiring an expert to eliminate all other explanations before the expert is permitted to explain his or her opinions to the jury. The Eighth Circuit has rejected such a rule."); *Edwards v. Ethicon, Inc.*, 2014 WL 336923, *7 (S.D. W. Va. July 8, 2014) ("[A] physician need not conduct every possible test to rule out all possible causes of a patient's illness, so long as he or she employed sufficient diagnostic techniques to have good grounds for his or her conclusion.").

For example, in *Stambolian v. Novartis Pharma. Corp.*, the Court found plaintiff's expert, Dr. Kraut, performed a sufficiently reliable differential diagnosis because he "engaged in a process of eliminating hypotheses until he reached the most likely conclusion." 2013 WL 6345566, at *5. Specifically, "Dr. Kraut looked to prevailing literature, his own research, personal experience with patients . . . [and] his review of Plaintiff's medical records" when he "ruled out chemotherapy and corticosteroids." *Id.* Like Monsanto's argument, the defendant in *Stambolian* argued Dr. Kraut's methodology was flawed "because Dr. Kraut failed to rule out osteomyelitis and periodontitis as potential causes of her jaw problem." *Id.* However, the *Stambolian* court noted that a differential

diagnosis is not unreliable or inadmissible simply "because the expert has failed to rule out every possible alternative cause of a plaintiff's illness." *Id.* Ultimately, the *Stambolian* court concluded by noting "Defendant's arguments require credibility determinations that go to the weight and not the admissibility of his opinions." *Id.* The same is true in this case.

Here, Dr. Schneider reviewed the relevant literature, the animal studies and the mechanistic or genotoxic studies; he reviewed Mr. Engilis's medical records, which contained their medical history; and he reviewed their deposition testimony and fact sheets which described the Plaintiff's respective exposure history. Dr. Schneider identified each of the risk factors that are generally known to be associated with NHL—including a history of rheumatoid arthritis; medication that suppresses the immune system; long-term steroidal use; post organ transplant; and lymphoproliferative disorders—and determined that Mr. Engilis presented with none of these risk factors. *See* Ex. D, Schneider Report, at 10–11. Dr. Reshef even agrees. Dr. Reshef identified the following risk factors of NHL: chronic infection; immune dysregulation or immunodeficiency; solid organ or bone marrow transplant or patients on immune-suppressive medications, and age. Ex. E, Reshef Dep. Tr., at 75:3–19. Other than age, Mr. Engilis did not present with any of these risk factors. *Id.* at 103:5–104:15.

Dr. Schneider is in good company: Dr. Reshef employed the same methodology: "look through the relevant literature, including both in vitro, animal and human studies, identify the associations and in which context they were discovered, look at the weight of the evidence and the hierarchy of the evidence…" as well as consider a person's medical records, evaluate that person's medical history and exposure history. Ex. E, Reshef Dep. Tr. 150:2–152:5. Dr. Reshef just comes out on the other side.

Dr. Schneider, after completing his differential diagnosis, concluded that Roundup was the probably etiology cause of Mr. Engilis's CLL. Ex. G, Schneider *Engilis* Dep. Tr., at 29:5–11 ("so I

18

1    went through all of the possible etiologic agents for CLL and ruled them out to a large degree.  And

2    then, in my mind, a reasonable degree of medical certainty is left, Roundup, the 24-year exposure, as

3    the most probable etiologic agent for the development of CLL to a reasonable degree of medical

4    probability and certainty.").  That is all that *Daubert* requires.

5

6    **III.    Dr. Schneider's Review of the Genotoxic and Animal Studies Supports His General**
          **Causation Opinions.**

7           Monsanto mischaracterizes the purpose for which Dr. Schneider uses the genotoxic and

8    animal studies.  The genotoxic data supports the biological mechanism of cell damage, which has

9    been shown to promote cellular changes that can occur in NHL.  Biological plausibility is one of the

10   recognized criteria in the Bradford Hill factors.  The animal studies that Dr. Schneider reviewed also

11   support the consistency of the association between Roundup/glyphosate and NHL, as well as the

12   biological plausibility, coherence and experiment criteria of Bradford Hill factors as well.  *See In re*

13   *Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d at 1127–29 (noting that the animal studies and genotoxic

14   studies are pertinent to the biological plausibility criterion that is part of the Bradford Hill analysis).

15   Here, Dr. Schneider is qualified to apply the genotoxic and animal studies and use them as support

16   for his general causation opinion.

17

18

19                                        **CONCLUSION**

20          For the foregoing reasons, this Court should deny Monsanto's Motion to Exclude the

21   Testimony of Dr. Andrew Schneider in its entirety, and grant such other and further relief the Court

22   deems just and proper.

23

24   DATED:  December 14, 2022              Respectfully submitted,

25                                          */s/ Jeffrey L. Haberman*
                                           JEFFREY L. HABERMAN (*pro hac vice*)
26                                         **SCHLESINGER LAW OFFICES, P.A.**

27                                         *Attorneys for Plaintiff, Peter Engilis*

28

                                          19

## CERTIFICATE OF SERVICE

I hereby certify that on December 14, 2022, I served a copy of the foregoing on the Clerk of Court by CM/ECF, which will provide automatic notification to all parties and counsel of record.

By: */s/ Jeffrey L. Haberman*
Jeffrey L. Haberman

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE
THE TESTIMONY OF ANDREW SCHNEIDER, M.D.