1  **SCHLESINGER LAW OFFICES, P.A.**
   Jeffrey L. Haberman
2  Sarah J. Schultz
   1212 Southeast Third Avenue
3  Fort Lauderdale, FL 33316
   Telephone: (954) 467-8800
4  Facsimile: (954) 320-9509
   jhaberman@schlesingerlaw.com
5  sarah@schlesingerlaw.com

6
   *Attorneys for Plaintiff, Peter Engilis*
7

8                            **UNITED STATES DISTRICT COURT**

9                            **NORTHERN DISTRICT OF CALIFORNIA**

10

| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No: 2741 |
|---|---|
|  | Case No.: 3:19-cv-07859-VC |
| Peter Engilis, Jr., *et al.*, | **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE THE TESTIMONY OF JOEL GAGNIER, PH.D.** |
| Plaintiff, |  |
| vs. |  |
| Monsanto Company., | Hearing date: January 12, 2023 |
| Defendant. | Time: 10:00 a.m. |
| Individual Case No.: 3:19-cv-07859-VC |  |

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................................ii

TABLE OF AUTHORITIES ......................................................................................................... iii

INTRODUCTION .......................................................................................................................... 1

BACKGROUND ............................................................................................................................ 1

STANDARD OF LAW ................................................................................................................... 3

ARGUMENT .................................................................................................................................. 5

     I.    Dr. Gagnier's Opinions Are Not Inconsistent............................................................5

     II.   Dr. Gagnier's Opinions Are Based on a Scientifically Reliable Methodology. ........7

          A. Dr. Gagnier Did Not "Cherry-Pick" Data or Engage in Results-Driven Methodologies..................................................................................................7

             i. Dr. Gagnier provided a logical explanation for why he chose not to use numbers adjusted for other pesticide exposure. ...............................................................8

             ii. Monsanto's other criticisms of 'selectively-disclosed' data go to the weight, not the admissibility, of his testimony. ....................................................................10

          B. Dr. Gagnier's Analysis Demonstrates a Causal Link Between Roundup Exposure and NHL, Not Just an Association............................................................................11

CONCLUSION ............................................................................................................................. 14

CERTIFICATE OF SERVICE ..................................................................................................... 15

ii

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE
THE TESTIMONY OF JOEL GAGNIER, PH.D.

# TABLE OF AUTHORITIES

*Page(s)*

**CASES**

*Alesi v. Monsanto Co.*,
  No. 19SL-CC03617 (Mo. Cir. Ct. July 22, 2022) .................................................................. 1

*Bonner v. ISP Technologies, Inc.*,
  259 F. 3d 924 (8th Cir. 2001) ............................................................................................... 12

*Compton v. Subaru of America, Inc.*,
  82 F.3d 1513 (10th Cir. 2007) .............................................................................................. 10

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) ....................................................................................................... 3, 4, 5

*Emblaze Ltd. v. Apple Inc.*,
  52 F. Supp. 3d 949 (N.D. Cal. 2014) ..................................................................................... 4

*Estes Park Taffy Co., LLC v. Original Taffy Shop, Inc.*,
  2017 U.S. Dist. LEXIS 88113 (D. Colo. June 8, 2017) ....................................................... 10

*Feliciano-Hill v. Principi*,
  439 F.3d 18 (1st Cir. 2006) .................................................................................................. 12

*Ferro v. Monsanto Co.*,
  No. 20SL-CC03678 (Mo Cir. Ct. Oct. 13, 2022) ................................................................... 1

*General Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) ............................................................................................................... 5

*Gloser v. Thompson Medical Co., Inc.*,
  32 F.3d 969 (6th Cir. 1994) ................................................................................................. 10

*In re Actos (Pioglitazone) Prods. Liab. Litig.*,
  No. 6:11-md-2299, 2013 WL 6825953 (W.D. La. Dec. 20, 2013) ........................................ 9

*In re Celexa & Lexapro Prod. Liab. Litig.*,
  927 F. Supp. 2d 758 (E.D. Mo. 2013) ................................................................................. 12

*In re Hanford Nuclear Reservation Litig.*,
  292 F.3d 1124 (9th Cir. 2002) ............................................................................................. 11

*In re Roundup Prods. Liab. Litig.*,
  390 F. Supp. 3d 1102 (N.D. Cal. 2018) ................................................................................. 7

*In re Urethane Antitrust Litig.*,
  2012 WL 6681783 (D. Kan. Dec. 21, 2012), *aff'd*, 768 F.3d 1245 (10th Cir. 2014) .................... 10

*In re Viagra (Sildenafil Citrate) and Cialis (Tadalafil) Prod. Liab. Litig.*,
  2020 WL 204115 (N.D. Cal. Jan. 13, 2020) .......................................................................... 4

*In re Viagra Prods. Liab. Litig.*,
  572 F. Supp. 2d 1071 (D. Minn. 2008) ................................................................................ 12

iii

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE
THE TESTIMONY OF JOEL GAGNIER, PH.D.

*Junk v. Terminix Intern. Co. Ltd.*,
  577 F. Supp. 2d 1086, 1093 (S.D. Iowa 2008) ................................................................. 11

*Knight v. Kirby Inland Marine, Inc.*,
  482 F.3d 347, 351 (5th Cir. 2007) .................................................................................... 11

*Kuhn v Wyeth, Inc.*,
  686 F.3d 618, 633 (8th Cir. 2012) .................................................................................... 10

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137, 141 (1999) ................................................................................................... 4

*Lust By and Through Lust v. Merrell Dow Pharma., Inc.*,
  89 F.3d 594, 597 (9th Cir. 1996) ....................................................................................... 4

*Primiano v. Cook*,
  598 F.3d 558, 563–64 (9th Cir. 2010) ............................................................................... 4

*Raytheon Aircraft Co. v. United States*,
  2008 WL 627488, at *2 (D. Kan. Mar. 4, 2008) .............................................................. 10

*Trowbridge v. United States*,
  2009 U.S. Dist. LEXIS 54416, at *8–9 (Idaho June 25, 2009) .......................................... 6

*United States v. Hankey*,
  203 F.3d 1160, 1167 (9th Cir. 2000) ................................................................................. 4

*United States v. W.R. Grace*,
  455 F. Supp. 2d 1181, 1188 (D. Mont. 2006) .................................................................... 4

**STATUTES**

Fed. R. Evid. 702 ........................................................................................................... 3, 4

iv

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE
THE TESTIMONY OF JOEL GAGNIER, PH.D.

## INTRODUCTION

Monsanto does not challenge the qualifications of Dr. Gagnier to offer opinions in the field of epidemiology or meta-analyses, nor could it credibly do so given his impressive credentials. Instead, Monsanto seeks to exclude Dr. Gagnier's opinions based on: (1) a misinterpretation of Dr. Gagnier's analysis and findings as described in his expert report; and (2) the flawed indication that Dr. Gagnier's interpretation of the existing epidemiology as well as the design and execution of his own meta-analysis are unreliable. (*See generally* Doc. 27). The former attack relies on a misreading and misunderstanding of Dr. Gagnier's expert report, whereas the latter argument, on the other hand, primarily rests on distortions of the evidentiary record.

As discussed in greater detail below, Defendants' Motion should be denied as its arguments focus entirely on the weight of Dr. Gagnier's opinions, not their admissibility. Multiple other courts have denied the same motion as to Dr. Gagnier in Roundup cases. *See, e.g., Alesi v. Monsanto Co.*, No. 19SL-CC03617 (Mo. Cir. Ct. July 22, 2022) (Order attached hereto as "**Exhibit A**"); *Ferro v. Monsanto Co.*, No. 20SL-CC03678 (Mo Cir. Ct. Oct. 13, 2022) (attached hereto as "**Exhibit B**").

## BACKGROUND

***Qualifications.*** Dr. Gagnier, a clinical epidemiologist, earned his MSc in clinical epidemiology and health care research in 2005 and his Ph.D. in medical sciences with a focus in clinical epidemiology and health care research in 2009 from the University of Toronto in Toronto, Ontario. *See* Curriculum Vitae of Dr. Joel Gagnier (attached hereto as "**Exhibit C**"). He completed his postdoctoral studies in epidemiologic methods at the School of Public Health, University of Michigan in Ann Arbor. *See id*.

Up until May of 2022, Dr. Gagnier held two titles at the University of Michigan: Associate Professor of Epidemiology and Associate Professor with tenure in the Department of Orthopedic Surgery at Michigan Medicine. *See id*. at 1–2. He is now an Associate Professor in the Department

1

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE
THE TESTIMONY OF JOEL GAGNIER, PH.D.

of Epidemiology and Biostatistics at the Schulich School of Medicine and Dentistry, Western University in London, Ontario. *See id*. at 2. Dr. Gagnier maintains appointments in the Department of Medicine and the Department of Epidemiology and Biostatistics. *See id.*

In addition to his education, training, and experience, Dr. Gagnier has published over 150 peer-reviewed scientific papers, has published several chapters in textbooks, has served as an editor and on editorial boards for several peer-reviewed scientific journals, served as a board member of several research societies, has given over 200 lectures and workshops at local, national, and international scientific meetings, has served as an investigator on numerous clinical studies, has received more than $10 million in extramural and intramural funding to perform such clinical studies, and has performed extensive research including designing meta-analyses and improving design methods for meta-analyses. *See* Expert Report of Dr. Joel Gagnier, at 2 (attached hereto as "**Exhibit D**").

*Methodology.* In this case, Dr. Gagnier was asked to review the epidemiologic literature to determine whether or not there was a cause-and-effect association or not between exposure to glyphosate and the risk of non-Hodgkin's lymphoma. His work involved two prongs of analysis. First, Dr. Gagnier performed a search for systematic reviews and meta-analyses that have already been done on the topic. *See id.* at 5. He also performed his own meta-analysis or comprehensive literature search of relevant databases, such as PubMed (also referred to as Medline); the European medical database (also referred to as Embase); and the Cochrane library. *Id.* at 16.

Upon conducting this literature review, Dr. Gagnier concluded that the most recent meta-analyses and systematic reviews were not fully up-to-date and did not include recently published studies examining the causal relationship between exposure to glyphosate-based formulations, including Roundup, and the development of non-Hodgkin's lymphoma ("NHL"). *See, e.g., id*. at 12–13. Based on that finding, Dr. Gagnier undertook the second prong of his analysis: conducting his

own meta-analysis, which involved extracting the data from the relevant epidemiological studies and combining the data from those studies with well-accepted meta-analytic methods. *See id.* at 17–19. After combining the data, Dr. Gagnier took several steps to ensure the integrity of his meta-analysis, including: (1) evaluating the risk of bias; (2) investigating for publication bias; and (3) ensuring he was not including cumulative data. *See id.*

Dr. Gagnier's meta-analysis examining those exposed to glyphosate at any point in their life showed a statistically significant increased risk for NHL between 15% and 25%. *Id.* at 35. Meanwhile, his meta-analysis examining those exposed to glyphosate at the various highest levels of exposure definitions used in individual studies showed an increased risk of NHL between 38% and 42%. *Id.* at 42. He then summarized the findings of his meta-analysis as follows: "Here I have completed the most up to date, largest and rigorous systematic review and meta-analysis ever completed on the question, 'Does exposure to glyphosate increase the risk or not for NHL?'. Overall, all meta-analyses and sensitivity analyses performed yield the same answer, which is a resounding YES." *Id.* at 50.

## STANDARD OF LAW

Fed. R. Evid. 702 controls the admission of expert testimony. Rule 702 provides that a qualified expert may testify in the form of opinions or otherwise if:

(a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) The testimony is based on sufficient facts or data;
(c) The testimony is the product of reliable principles and methods; and
(d) The expert has reliably applied the principles and methods to the facts of the case.

In the landmark *Daubert* case, the Supreme Court instructed that that "[t]he inquiry envisioned by Rule 702 is . . . a flexible one." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 594 (1993). In determining admissibility, courts consider whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his

conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *Primiano v. Cook*, 598 F.3d 558, 563–64 (9th Cir. 2010).

The four *Daubert* factors—testing; peer review; rate of error; and general acceptance—are mere guidelines for applying Rule 702. *See United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2000); *see also Lust By and Through Lust v. Merrell Dow Pharma., Inc.*, 89 F.3d 594, 597 (9th Cir. 1996) ("That the expert failed to subject his method to peer-review and to develop his opinion outside the litigation is not dispositive . . . ."); *In re Viagra (Sildenafil Citrate) and Cialis (Tadalafil) Prod. Liab. Litig.*, 2020 WL 204115, at *5 (N.D. Cal. Jan. 13, 2020) ("[E]xpert testimony may still be reliable and admissible without peer review and publication.").

Indeed, the test of reliability is also flexible. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). "The trial court's gatekeeper role, however, is not meant to supplant the adversary system or the role of the jury." *United States v. W.R. Grace*, 455 F. Supp. 2d 1181, 1188 (D. Mont. 2006). Rather, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596;

> A trial court thus must be sure that its review of expert testimony focuses solely on principles and methodology, not on the conclusions that they generate. Daubert and Rule 702 are safeguards against unreliable or irrelevant opinions, not guarantees of correctness. A judge must be cautious not to overstep its gatekeeping role and weigh facts, evaluate the correctness of conclusions, impose its own preferred methodology, or judge credibility, including the credibility of one expert over another. These tasks are solely reserved for the fact finder.

*Emblaze Ltd. v. Apple Inc.*, 52 F. Supp. 3d 949, 954 (N.D. Cal. 2014) (internal quotations omitted); *see also Primiano*, 598 F.3d at 565.

4

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE
THE TESTIMONY OF JOEL GAGNIER, PH.D.

**ARGUMENT**

In its Motion, Monsanto does not dispute Dr. Gagnier's qualifications, but instead, argues Dr. Gagnier's opinions are unreliable for two reasons: (1) that Dr. Gagnier's report has "inconsistencies" in his risk calculations; and (2) that Dr. Gagnier's opinions are not based on a scientifically reliable methodology. (Doc. 27, at 10–11). With regard to Defendant's second reliability challenge as to Dr. Gagnier's methodology, Monsanto contends Dr. Gagnier's opinions are unreliable because: (a) he "used unadjusted data in his meta-analyses"; (b) he "cherrypicked unpublished data points in order to reach his desired outcome"; and (c) he "did not analyze causation, but instead analyzed only association." *Id.* at 12–14 (capitalization altered).

The fact that Monsanto disagrees with Dr. Gagnier's opinions, and believes they should have been based on other data, is not grounds to exclude his testimony. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). It is the role and function of the fact finder to hear all the testimony and to determine the appropriate weight to give each witness. Dr. Gagnier applied his expertise to the instant case and relied upon peer-reviewed scientific studies to substantiate his opinions. This more than suffices to establish the reliability and admissibility of his opinions. *See Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579, 590 (1993).

**I.    Dr. Gagnier's Opinions Are Not Inconsistent.**

Monsanto first argues Dr. Gagnier's opinions are unreliable due to "inconsistencies" within his expert report. (Doc. 27, at 10). Specifically, Monsanto points to two areas of Dr. Gagnier's report in which it claims his results or findings are supposedly inconsistent: (1) his findings related to ever exposure of glyphosate-based herbicides and NHL; and (2) his findings related to highest exposure to glyphosate-based herbicides and NHL. *Id.* While the terminology in Dr. Gagnier's expert report is confusing at times, his findings are not inconsistent. In fact, Dr. Gagnier thoroughly explained his methodology used throughout his expert report in a prior deposition:

5

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE
THE TESTIMONY OF JOEL GAGNIER, PH.D.

> Q. I want to see if we can just get some clarity before we draw into the details of your meta-analysis.
> A. Sure.
> Q. You -- the first -- so you did a meta-analysis of ever use of glyphosate-based herbicides and NHL, correct?
> A. Yes.
> Q. You also did a meta-analysis and a series of sensitivity analyses of highest exposure to glyphosate-based herbicides and NHL, true?
> A. Yes.
> Q. The -- in your report, the first result you describe is the first meta-analysis you conducted, right?
> A. It is.
> Q. You then performed a number of sensitivity analyses after that, right?
> A. Yes.
> Q. You used the term "main analysis" in your report, and I just want to make sure that I understand -… what your main analysis is. So does that make sense to you?
> A. Yeah, it does. I'm sorry that I'm -- …but just because there's so many analyses that it's -- the -- saying main analyses is -- is -- is not as specific as it should be.
>     . . .
> Q. Is the first meta-analysis for -- you report in each category for ever use and highest use the main meta-analysis?
> A. Not particularly, no.
>     . . .
> Q. In your view, what is the main analysis that you conducted for ever use of Roundup and NHL?
> A. There are several.

Deposition Testimony of Joel Gagnier, Ph.D., in *Ferro v. Monsanto*, 6/1/2022, at 121:21–123:14 (attached hereto as "**Exhibit E**"). Moreover, with regard to ever exposure, Dr. Gagnier clarified that the interval of increased risk should be 15% to 26%. *See id.* at 179:13–20 ("Q. I'm referring to – so if you go to page 35 of your report – A. Yes.  Q. – you say, "Overall, these results from our main analyses suggest an increased risk of 15 to 25 percent for NHL in those exposed to glyphosate at any point in their life." Do you see that?  A. Yes.  It should be 26 percent, but yeah.").

But even if there were inconsistencies in Dr. Gagnier's report, such inconsistencies should be addressed on cross-examination; they are not reasons to wholesale exclude an expert. *See, e.g., Trowbridge v. United States*, 2009 U.S. Dist. LEXIS 54416, at *8–9 (Idaho June 25, 2009) (denying request to exclude an expert and finding inconsistencies between an expert report and deposition

provide fodder for cross-examination). As this Court has made clear: "case law—particularly Ninth Circuit case law—emphasizes that a trial judge should not exclude an expert opinion merely because he thinks it's shaky, or because he thinks the jury will have cause to question the expert's credibility. So long as an opinion is premised on reliable scientific principles, it should not be excluded by the trial judge; instead the weaknesses in an unpersuasive expert opinion can be exposed at trial, through cross-examination or testimony by opposing experts." *In re Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d 1102, 1109 (N.D. Cal. 2018).

Here, Dr. Gagnier provided a 50-page expert report, thoroughly explaining his methodology (i.e., "complet[ing] the most up to date, largest and rigorous systematic review and meta-analysis ever completed on the question, "Does exposure to glyphosate increase the risk or not for NHL?"), a detailed description of his search methods, his reasons for including and excluding literature from his meta-analysis, the strengths and drawbacks of each study, a risk of bias assessment, and a detailed review of his meta-analytic findings. *See generally* Ex. D, Gagnier Expert Report. Applying the standards set forth in the Ninth Circuit, Dr. Gagnier "went beyond the inquiry conducted by IARC, offering independent and relatively comprehensive opinions that the epidemiological . . . evidence demonstrates glyphosate causes NHL in some people who are exposed to it. Accordingly, [his] opinions are admissible." *In re Roundup*, 390 F. Supp. 3d at 1109.

II. **Dr. Gagnier's Opinions Are Based on a Scientifically Reliable Methodology**.

    A. **Dr. Gagnier Did Not "Cherry-Pick" Data or Engage in Results-Driven Methodologies.**

In the last academic year, Dr. Gagnier has taught a graduate course called, "Systematic Reviews and Meta-Analysis" at the University of Michigan to MPH and PhD students as well as a course in clinical epidemiology at Western University. *See* Ex. C, Gagnier CV. For more than a decade, he taught a class at the University of Michigan called "Systematic Reasoning Meta-Analysis." *Id*. He is also "involved with large research organizations that [perform] meta-analyses"

7

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE
THE TESTIMONY OF JOEL GAGNIER, PH.D.

and has done methodological work in the field of meta-analysis. Ex. E, Gagnier Dep. Tr., at 217:18–218:1.

Significantly, Monsanto has not challenged Dr. Gagnier's qualifications as an expert in the fields of epidemiology and meta-analyses. That did not stop it, however, from claiming that Dr. Gagnier does not know how to conduct a meta-analysis properly. In support of its contention that Dr. Gagnier failed to use reliable methods in conducting his meta-analysis, Monsanto cites to two examples of so-called "cherry-picking" by Dr. Gagnier. (Doc. 27, at 12–13). As discussed below, these contentions are without merit.

### i. *Dr. Gagnier provided a logical explanation for why he chose not to use numbers adjusted for other pesticide exposure.*

Monsanto argues that Dr. Gagnier's meta-analysis is unreliable because he "failed to use data adjusted for other pesticides, despite acknowledging that such adjustment is necessary and appropriate in this case." (Doc. 27, at 12). For one, this statement is misleading. Dr. Gagnier indeed used the multivariate adjusted odds ratio when applying the Hardell study. That odds ratio adjusted for other pesticides. *See* Trial Testimony of Dr. Joel Gagnier, in *Ferro v. Monsanto*, Day 9 (10/31/2022), at 1566:24–1570:10 (relevant portions attached hereto as "**Exhibit F**"). In other instances, Dr. Gagnier did not use the odds ratios that are adjusted for other pesticides. Dr. Gagnier explained that it is sometimes inappropriate to do so because that would lead to an underpowered result. According to Dr. Gagnier, an underpowered multivariate odds ratio is not trustworthy. This does not mean that Dr. Gagnier's use of univariate odds ratios are unadjusted. They are. As Dr. Gagnier testified: "The univariate model was adjusted for age, sex, year, and diagnosis of enrollment. That's an appropriate number of variables. If you were to add the additional variables, this it would be underpowered to use the multivariate odds ratio…." *Id.* Thus, Dr. Gagnier demonstrated a sound, scientific reason for using the odds ratios he used in his meta-analysis.

More importantly, defendant cannot succeed on a motion to exclude testimony by merely relying on an attorney's interpretation of the science, as Monsanto does here. This particular argument does not in any way challenge the first prong of Dr. Gagnier's analysis—*i.e.*, his review of the existing epidemiological literature. Further, it ignores the lengthy explanation Dr. Gagnier provided for not using risk estimates adjusted for other pesticide use, citing the risk of over-adjusting in the absence of compelling evidence showing a link between the other pesticides and NHL:

> The more variables that you put into a regression model, you're always going to get subtler risk ratios, almost always is going to be the case. It doesn't mean that there's a true relationship. It doesn't mean it's necessarily an important variable.
>
> If, you know, if we want to go through a list of, you know, 15 or 18 other herbicides or pesticides to look at the independent relationships and then the toxicological data, the pathological data, all that, if there's good reason to do it, then it should be adjusted for. ***I can't say yes or no that we should uniformly do that because it's a mistake that's often done is to try to over adjust in regression models.***
>
> The beauty is that here they have really large sample sizes, so maybe they can kind of get away with it a little bit. But, you know, it's not – ***it's not simply just saying adjusting is better. It's not. You have to have a good – a very good rationale for why to do that.***

Ex. E, Gagnier *Alesi* Dep. Tr. at 119:14–120:9 (emphasis added); *id.* at 118:15–21 (where Dr. Gagnier explains that you should only adjust for that when "you have a really good reason to think that variable . . . pesticide, herbicide, whatever it may be, has either an independent relationship to the outcome or is an effect modifier for the relationship between glyphosate and [NHL] uniformly doing it just because you think it's important to do or there could be a relationship is not okay.").

In any event, Monsanto is essentially nitpicking around the edges of Dr. Gagnier's methodology rather than mounting a principled challenge to the methodology as a whole. This is argument for cross-examination, not exclusion of testimony. *See* Ex. A, *Alesi* Order, at 17 ("Monsanto's other arguments (e.g., not adjusting for exposure to other pesticides) relate to the *weight* the fact finder should give to his opinions rather than their *admissibility*.") (emphasis in the original); *In re Actos (Pioglitazone) Prods. Liab. Litig.*, No. 6:11-md-2299, 2013 WL 6825953, at *12 (W.D.

9

La. Dec. 20, 2013) ("[T]he fact that the Defendants' might disagree with [an expert's] choices and explanations is fodder for cross-examination, not exclusion.").

    ii. *Monsanto's other criticisms of 'selectively-disclosed' data go to the weight, not the admissibility, of his testimony.*

Similar to the unadjusted data argument, Monsanto alleges that Dr. Gagnier testified that "a researcher should justify the choice of data," but Dr. Gagnier "failed to justify the data he chose to input into his meta-analyses." (Doc. 27, at 13). Not so. As Dr. Gagnier explains in his report, "[f]rom the Pubmed search I found 1,014 citations and from the EMBASE search 952 citations. After deleting duplicates and applying the inclusion and exclusion criteria I was left with 15 unique papers." Ex. D, Gagnier Report, at 19. From those 15 unique papers, Dr. Gagnier then briefly described each one and discussed the methodologic quality, including the particular strengths and any weaknesses of each study. *See id.*

That Defendant can cite to data that Dr. Gagnier did not consider or include in his meta-analysis does not render his opinions unreliable or inadmissible. *See Kuhn v. Wyeth, Inc.*, 686 F.3d 618, 633 (8th Cir. 2012) ("There may be several studies supporting [defendant's] contrary position, but it is not the province of the court to choose between the competing theories when both are supported by reliable scientific evidence."). Any disagreement between Dr. Gagnier and Defendant's experts regarding the interpretation of the literature, while proper for cross-examination, is not a basis to exclude testimony. *Humetrix, Inc. v. Gemplus S.C.A.*, 268 F.3d 910, 919 (9th Cir. 2001) ("To the extent [defendant] sought to challenge the correctness of [plaintiff's] experts' testimony, its recourse is not exclusion of the testimony, but, rather, refutation of it by cross-examination and by testimony of its own expert witnesses."); *see also Estes Park Taffy Co., LLC v. Original Taffy Shop, Inc.*, 2017 U.S. Dist. LEXIS 88113, at *10 n.5 (D. Colo. June 8, 2017) ("[T]he mere fact that a difference of opinion exists does not make [an expert's] conclusions inherently unreliable").

So long as "a logical basis exists for [the] expert's opinion . . . the weaknesses in the underpinnings of the opinion[] go to the weight and not the admissibility of the testimony." *Compton v. Subaru of America, Inc.*, 82 F.3d 1513 (10th Cir. 2007); *Gloser v. Thompson Medical Co., Inc.,* 32 F.3d 969, 975 (6th Cir. 1994) (differences in opinions among experts, including the "decision to rely on certain studies rather than others", go to the weight and credibility, not admissibility); *see also In re Urethane Antitrust Litig.*, 2012 WL 6681783 (D. Kan. Dec. 21, 2012), *aff'd*, 768 F.3d 1245 (10th Cir. 2014) (rejecting defendant's argument that the plaintiff expert "only considered evidence 'cherry-picked' by counsel without considering contrary evidence . . .  [t]he extent to which [the expert] considered the entirety of the evidence in the case is a matter for cross-examination."); *Raytheon Aircraft Co. v. United States*, 2008 WL 627488, at *2 (D. Kan. Mar. 4, 2008) (declining to exclude expert testimony based on allegations of cherry-picking data and finding that "discounting of that evidence does not affect the admissibility of [the] testimony.").

### B. Dr. Gagnier's Analysis Demonstrates a Causal Link Between Roundup Exposure and NHL, Not Just an Association.

Monsanto argues that Dr. Gagnier's opinions are unreliable because he "analyzed only whether select studies showed an *association* between glyphosate and NH.  He did not evaluate *causation*." ( Doc. 27, at 14) (emphasis in the original).  That assertion is plainly incorrect.

To prove causation in a toxic tort case, a plaintiff must show both that the alleged toxin is capable of causing injuries like that suffered by the plaintiff in human beings subjected to the same level of exposure as plaintiff, and that the toxin was the cause of the plaintiff's injury.  *See In re Hanford Nuclear Reservation Litig.*, 292 F.3d 1124, 1133–34 (9th Cir. 2002).  This is known as general causation and specific causation.  *See id*.  "General causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury."  *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 351 (5th Cir. 2007) (citations omitted).

11

A properly qualified expert can base his or her general causation opinion on a review of the relevant peer-reviewed literature. *See, e.g., Junk v. Terminix Intern. Co. Ltd.*, 577 F. Supp. 2d 1086, 1093 (S.D. Iowa 2008). Indeed, that is precisely how Monsanto's experts have reached their opinions on general causation. For example, when defense expert Dr. Ran Reshef was deposed in this case, he explained an appropriate methodology for determining whether an environmental agent caused or contributed to causing NHL, he testified that he "would look through the relevant literature." *See* Deposition Testimony of Ran Reshef, M.D., 8/18/2022, at 150:2–14 (attached hereto as "**Exhibit G**"); *see also* Ex. F, Reshef *Alesi* Dep. Tr., at 49:12–50:10:

> Q.  And is it fair to say in conducting this more thorough literature review that you applied your training, education, and experience as a hematologist and oncologist to reach your opinion on this issue?
>
> A.  Yes, which also includes my training and expertise in biostatistics and basic principles of epidemiology, basic principles of pharmacology and toxicology which have been part of my training as a physician.

Monsanto's key criticism here is that Dr. Gagnier did not follow or apply the Bradford Hill criteria. (*See* Doc. 27, at 14–15). But as the *Alesi v. Monsanto* court explained, "Monsanto's complaint about Dr. Gagnier's not following the Bradford Hill criteria is not a sufficient basis for a motion to exclude." Ex. A, *Alesi* Order, at 18. "Although the Bradford Hill criteria may be a tool for determining whether an epidemiological study establishes causation, it is by no means required . . . [t]herefore, whether [a challenged expert] did or did not use the Bradford Hill criteria will not determine the admissibility of his opinions." *Id.* (quoting *In re Celexa & Lexapro Prod. Liab. Litig.*, 927 F. Supp. 2d 758, 766 (E.D. Mo. 2013)); *see also In re Viagra Prods. Liab. Litig.*, 572 F. Supp. 2d 1071, 1081 (D. Minn. 2008) ("[I]n the context of a general causation challenge, failure to satisfy the Bradford Hill criteria does not doom admission under *Daubert*.").

Moreover, while Monsanto criticizes Dr. Gagnier for not formally applying the Bradford Hill criteria for causation, even defense expert Dr. Reshef has previously conceded that "the Bradford Hill

criteria are not designed to check boxes and count how many are positive and negative." Ex. G, *Alesi Reshef Dep. Tr.*, at 50:20–23.  The mere fact that Dr. Gagnier disagrees with Dr. Reshef's interpretation of the literature does not render his opinion unreliable. *Feliciano-Hill v. Principi*, 439 F.3d 18, 25 (1st Cir. 2006) ("The mere fact that two experts disagree is not grounds for excluding one's testimony."); *Bonner v. ISP Technologies, Inc.*, 259 F. 3d 924, 930 (8th Cir. 2001) ("[I]t is common that medical experts often disagree on diagnosis and causation[;] questions of conflicting evidence must be left for the jury's determination.").

Overall, Dr. Gagnier clearly analyzed causation, and not only an association as Monsanto contends.  Dr. Gagnier, in his report, concluded that "to reasonable degree of scientific certainty . . . that the scientific evidence available from human subjects epidemiologic research points clearly to an increased risk of NHL in those ever exposed to and for high levels of exposure to glyphosate." Ex. D, Gagnier Report, at 50–51.  In fact, Dr. Gagnier reached his general causation opinion before he even performed his own meta-analysis.  As he explained in his report, his literature review included the meta-analysis performed by Dr. Luoping Zhang, *et al.* in 2019—a study that he described as, "best meta-analysis, the highest quality, that I identified in the literature to date." *Id*. at 10.  In addition to a review of the epidemiological literature examining a possible causal relationship between RU and NHL and a meta-analysis synthesizing those studies, the Zhang study also "discuss[ed the relevant] animal studies and possible [cancer-causing] mechanisms." *Id*.  Upon reviewing the Zhang article, Dr. Gagnier concluded that "the evidence they discuss support[s] a strong causal link between glyphosate-based herbicide exposure and NHL." *Id*. at 11.

Thus, even setting aside his own meta-analysis, Dr. Gagnier has certainly rendered an opinion on something more than just whether there is an association between Roundup and NHL; he has identified and relies upon evidence showing a "strong causal link." *Id*.

## CONCLUSION

Based on the foregoing, this Court should deny Monsanto's Motion to Exclude the Testimony of Dr. Joel Gagnier in its entirety, and grant such other and further relief the Court deems just and proper.

DATED: December 14, 2022			Respectfully submitted,

/s/ Jeffrey L. Haberman
JEFFREY L. HABERMAN (*pro hac vice*)
**SCHLESINGER LAW OFFICES, P.A.**

*Attorneys for Plaintiff, Peter Engilis*

14

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE
THE TESTIMONY OF JOEL GAGNIER, PH.D.

**CERTIFICATE OF SERVICE**

I hereby certify that on December 14, 2022, I served a copy of the foregoing on the Clerk of Court by CM/ECF, which will provide automatic notification to all parties and counsel of record.

By: /s/ Jeffrey L. Haberman
Jeffrey L. Haberman