# EXHIBIT B

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
STATE OF MISSOURI

PAUL FERRO, *et al.*,                          )
                                               )
          Plaintiffs,                          )
                                               )        Cause No. 20SL-CC03678 **FILED**
v.                                             )
                                               )        Division No. 18
MONSANTO COMPANY,                              )                            **OCT 1 3 2022**
                                               )
          Defendant.                           )                    JOAN M. GILMER
                                               )            CIRCUIT CLERK, ST. LOUIS COUNTY

## ORDER REGARDING THE PARTIES' MOTIONS TO EXCLUDE EXPERTS

Presently before the Court are motions to exclude experts filed by Defendant Monsanto

Company ("Monsanto") and Plaintiffs. Monsanto has filed the following seven motions to exclude

and accompanying exhibits directed at Plaintiffs' expert witnesses:

1. Monsanto's Motion to Exclude the Opinions of Dr. Andrew Schneider and Memorandum of Law in Support;
2. Monsanto's Motion to Exclude the Testimony of Dr. William R. Sawyer;
3. Monsanto's Motion to Exclude the Testimony of Dr. Alfred Neugut;
4. Monsanto's Motion to Exclude the Testimony of Dr. Joel Joseph Gagnier;
5. Monsanto's Motion to Exclude the Testimony of Dr. Ambrose K. Charles and its Brief in Support;
6. Monsanto's Motion to Exclude the Testimony of Dr. Christopher Portier; and
7. Monsanto's Motion to Exclude the Testimony of Charles Benbrook.

Plaintiffs have filed the following three motions to exclude and accompanying exhibits directed at

Monsanto's expert witnesses:

1. Plaintiffs' *Daubert* Motion to Exclude the Opinions and Testimony of Defense Expert, Cristian Tomasetti, Ph.D.;
2. Plaintiffs' *Daubert* Motion to Exclude the Opinions and Testimony of Defendant's Expert, Joseph DiTomaso, Ph.D.; and
3. Plaintiffs' *Daubert* Motion to Exclude the Opinions and Testimony of Case-Specific Defense Experts, Lauren Smith, M.D. and Ran Reshef, M.D.

The motions are fully briefed.

1

On October 12, 2022, the Court conducted a pretrial conference and heard arguments from counsel on these motions to exclude and other matters. After careful consideration of the legal briefs, exhibits, and oral arguments, the motions were submitted for ruling. The Court hereby makes the following rulings.

## I.    LEGAL STANDARD

Section 490.065, RSMo, governs admissibility of expert testimony:

(1) A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
      (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
      (b) The testimony is based on sufficient facts or data;
      (c) The testimony is the product of reliable principles and methods; and
      (d) The expert has reliably applied the principles and methods to the facts of the case . . . .

Sec. 490.065.2, RSMo.

Expert testimony is therefore admissible only if the expert's knowledge "will help the trier of fact to understand the evidence or to determine a fact in issue." *Id.* The testimony must also be the product of reliable methods that are reliably applied to the case's facts.

"Under section 490.065.2, trial courts must act as gatekeepers to ensure that the testimony sought to be admitted ... is not only relevant, but reliable." *Ingham v. Johnson & Johnson*, 608 S.W.3d 663, 700 (Mo. App. E.D. 2020) (internal quotation marks omitted) (quoting *State ex rel. Gardner v. Wright*, 562 S.W.3d 311, 317 (Mo. App. E.D. 2018); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)). Since this amended version of section 490.065 came into effect in 2017, Missouri courts have used a three-part standard to determine the admissibility of expert opinion testimony: "(1) whether the expert is qualified, (2) whether the testimony is relevant, and (3) whether the testimony is reliable." *State v. Suttles*, 581 S.W.3d 137, 147 (Mo. App. E.D. 2019)

(quoting *Jones v. City of Kansas City*, 569 S.W.3d 42, 54 (Mo. Ct. App. 2019), *overruled on other grounds by Wilson v. City of Kansas City*, 598 S.W.3d 888 (Mo. banc 2020)) (citing *State ex rel. Gardner v. Wright*, 562 S.W.3d 311, 319 (Mo. App. E.D. 2018); *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 561 (8th Cir. 2014)).

As noted by the Supreme Court of Missouri:

> Section 490.065.2 is identical to the Rule 702 of the Federal Rules of Evidence. Where Missouri law adopts language from the Federal Rules of Evidence, federal cases applying those rules are persuasive – though not binding – authority. *State v. Williams*, 548 S.W.3d 275, 285 (Mo. banc 2018). The leading case on Rule 702 is *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), which stressed that Rule 702 is intended to broaden the scope of admissible expert testimony.

*State v. Carpenter*, 605 S.W.3d 355, 361 n.4 (Mo. banc 2020). "[R]eliability, under section 490.065.2, is determined by many factors, including those set out in *Daubert*." *Ingham*, 608 S.W.3d at 700 (internal quotation marks omitted) (quoting *State v. Boss*, 577 S.W.3d 509, 517 (Mo. App. W.D. 2019)). Specifically, courts consider the following factors from *Daubert* when determining the reliability of an expert's testimony:

> (1) whether the expert's technique or theory can be or has been tested; (2) whether the technique or theory has been subject to peer review and publication; (3) the known potential error rate of the technique or theory when applied and the existence and maintenance of standards and controls; and (4) whether the technique or theory has been generally accepted in the scientific community.

*Id.* (quoting *Boss*, 577 S.W.3d at 517; citing *Daubert*, 509 U.S. at 593-94).

While caselaw applying these factors "provide relevant and useful guidance, the *Daubert* factors themselves are not controlling." *Suttles*, 581 S.W.3d at 147.

> The *Daubert* Court described the inquiry trial courts must engage in as "flexible" and cautioned that courts should focus on relevance and reliability while being mindful of the other applicable rules of evidence, including weighing possible prejudice against probative force. *Id.* at 594-95, 113 S.Ct. 2786. The trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system: "Vigorous cross-examination, presentation of contrary evidence, and

3

careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 595, 113 S.Ct. 2786. This is consistent, the Court said, with the "liberal thrust" of the rules and their "general approach of relaxing the traditional barriers to opinion testimony." *Id.* at 588, 113 S.Ct. 2786 (internal quotation marks and citations omitted).

*State ex rel. Gardner v. Wright*, 562 S.W.3d 311, 317–18 (Mo. App. E.D. 2018). "The proponent of the expert testimony must prove its admissibility by a preponderance of the evidence." *Lauzon v. Senco Prod., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) (citing *Daubert*, 509 U.S. at 592).

## II.   DISCUSSION

### A. Monsanto's Motion to Exclude Dr. Andrew Schneider

Dr. Schneider is a clinical oncologist who has been designated by Plaintiffs to offer opinions on general and specific causation.

Monsanto moves to exclude Dr. Schneider's opinions in their entirety. While Monsanto does not dispute that he is qualified as a clinical oncologist to diagnose and treat cancers, it argues he is unqualified to offer opinions on general or specific causation in this case. Dr. Schneider himself has admitted he is not an expert in the specific fields of epidemiology, biostatistics, genetics, genotoxicity, or animal bioassays. Nevertheless, Dr. Schneider testified he has reviewed epidemiology studies to form his opinions. Monsanto also argues Dr. Schneider is unqualified for being unfamiliar with the Bradford Hill criteria.[1] Monsanto also argues Dr. Schneider has not used

---

[1] As explained by the Eastern District of Missouri:

> Developed by Sir Bradford Hill in the 1960s, the criteria are nine factors which researchers often consider when judging whether an observed association is truly causal. The Bradford Hill criteria are: 1) strength of association; 2) consistency; 3) specificity of the association; 4) temporality; 5) dose-response curve; 6) biological plausibility; 7) coherence (with other knowledge): 8) experiment; and 9) analogy.

*In re Celexa & Lexapro Prod. Liab. Litig.*, 927 F. Supp. 2d 758, 765 n.13 (E.D. Mo. 2013) (quoting *In re Neurontin Marketing, Sales Practices, and Prods. Liability Litig.*, 612 F.Supp.2d 116, 132–33 (D. Mass. 2009)).

a scientifically reliable methodology in reaching his opinions. Specifically, Monsanto criticizes Dr. Schneider's research based on studies he located using Google and studies provided to him by Plaintiffs' counsel. Lastly, Monsanto argues Dr. Schneider is not qualified to opine on genotoxicity or animal studies because he concedes he is not an expert in those fields.

Plaintiffs oppose Monsanto's motion to exclude Dr. Schneider. They argue he is qualified under section 490.065.2, RSMo, based on his knowledge and experience gained over his decades of clinical work as a board-certified oncologist. They note Dr. Schneider has treated hundreds of patients with non-Hodgkin's lymphoma ("NHL") like the Plaintiffs in this case. Accordingly, Plaintiffs argue he is well-versed on current cancer treatments and understanding of risk factors associated with NHL. Dr. Schneider testified neither Plaintiff in this case presented with known risk factors that include the following: a history of rheumatoid arthritis; medication that suppresses the immune system; long-term steroidal use; post organ transplant; and lymphoproliferative disorders. Plaintiffs further reject Monsanto's suggestion that Dr. Schneider is unqualified because he is not specifically an expert epidemiologist by noting he is nevertheless able to read, understand, and interpret epidemiological, animal, and mechanistic studies – studies that they assert show glyphosate in Roundup causes NHL. Plaintiffs also oppose Monsanto's argument that caselaw suggests an expert cannot use Google. Rather, Plaintiffs note the examples Monsanto cites to merely establish that experts should not rely on Google search results for the *substance* of their opinions – not that experts may not use Google as a means of locating relevant scientific literature to review in forming their opinions.[2]

---

[2] Monsanto relies on the following cases: *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 289 (4th Cir. 2021) ("[A]t first blush, Dr. Singh's testimony that the ASTM requires manufacturers to test a product that deviates from ASTM D6039's requirements appears relevant. But in reality, Dr. Singh never explained what those testing standards are or if they even exist. Instead, Dr. Singh pointed the district court and the jury to 'Google' for standards he could not identify. No other

The Court finds that Dr. Schneider does not meet the threshold requirements under section 490.065.2, RSMo, to present his testimony to the jury in this case. Dr. Schneider has never testified before about Roundup allegedly causing NHL. While he is a clinical oncologist, that does not make him "qualified as an expert by knowledge, skill, experience, training, or education" to offer general or specific causation opinions in this case. *See* sec. 490.065.2(1), RSMo. The multidistrict litigation ("MDL") court that previously handled Roundup-related cases excluded an expert whose "primary focus is on clinical work." *In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d 1102, 1148 (N.D. Cal. 2018). The MDL court noted that clinician "summarized many relevant studies, but offered little in the way of critical analysis of these studies." *Id.* The same is true with Dr. Schneider who has not provided a reliable basis for his conclusion that glyphosate causes NHL.

In reality, Dr. Schneider's methodology largely consisted of a regular Google search for Roundup and NHL. He did not, for example, run any searches on more scientifically reputable search engines like Google Scholar or PubMed. Basing his general causation opinions on results he found on Google and what Plaintiffs' lawyers gave to him is not a reliable method upon which to form an opinion.

---

witness offered testimony on these unidentified standards. That is patently insufficient to establish a duty to test a product in a certain way and a breach of that duty.") (citation omitted); *Madison v. Courtney*, No. 18-cv-000671-O, 2019 WL 8263428, at *3 (N.D. Tex. Jan. 26, 2019) ("Dr. Gannaway's report, as Madison points out, admittedly provides a series of definitions gathered from Wikipedia. In other words, it appears Dr. Gannaway, instead of turning to medical or dental publications, merely ran a Google search for the terms 'saliva' and 'mucus,' pasted the results, and then concluded, 'These listed secretions would probably have a different look than what I see in the photographs,' with no explanation of how his special knowledge or training assisted him in reaching an expert conclusion.") (citation to the record omitted); *Nobles v. DePuy Synthes Sales, Inc.*, No. 19-cv-3199- RMG, 2020 WL 6710810, at *2 (D.S.C. Aug. 3, 2020) ("Suffice it to say that Google searches by an expert to support an opinion are not an encouraging and confidence building method of research for a purported expert in a field. Plaintiffs' reargument of this issue does not alter the Court's conclusion that Dr. Ayers' opinions regarding alleged defects in the Defendants' mandibular reconstruction plates are not reliable.").

For these reasons, the Court grants Monsanto's motion to exclude directed at Dr. Schneider.  There are other experts put forward by Plaintiffs who will be able to testify on general and specific causation.

### B. Monsanto's Motion to Exclude Dr. William R. Sawyer

Dr. Sawyer is a forensic toxicologist who has been designated by Plaintiffs to offer opinions on general causation, specifically on the topics of "toxicology, occupational and environmental risk assessments of Roundup usage, evaluations of Roundup exposure, and the mechanism of absorption of glyphosate-based formulations through the skin and other exposure pathways."  Monsanto's Ex. A, Plaintiffs' Amended Designation and Disclosure of Retained and Non-Retained Expert Witnesses at 2.[3]

Monsanto moves to exclude Dr. Sawyer's opinions in their entirety.  First, Monsanto argues Dr. Sawyer's opinions on general causation should be excluded because he is not qualified to offer such opinions.  He is not a medical doctor, an oncologist, or an epidemiologist. Additionally, Monsanto points out that Dr. Sawyer is not a board-certified toxicologist after he failed the examination for the American Board of Toxicology twice, which included questions that focused on carcinogenicity and NHL, animal studies, and genotoxicity.

Second, Monsanto argues Dr. Sawyer's opinions should be excluded because his methodology is unreliable.  Dr. Sawyer has never performed any studies on glyphosate or Roundup; rather, he has testified that he would defer to epidemiologists.  Monsanto also argues Dr. Sawyer should be precluded from testifying about animal, mechanistic, or genotoxicity studies without properly extrapolating any results to humans. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136,

---

[3] As used herein, citations to exhibits refer to the exhibits attached to each respective motion to exclude.

145 (1997) (affirming trial court's exclusion of animal data where expert failed to adequately extrapolate to humans).

Third, Monsanto argues Dr. Sawyer should be precluded from offering testimony based on a single mouse study (the George, J., et al., (2010) carcinogenicity study, referred to as the "George Study"), which he did not conduct, that claimed to show Roundup "promoted" cancer development. Monsanto argues that the George Study has been rejected by the U.S. Environmental Protection Agency ("EPA") and the International Agency for Research on Cancer ("IARC") as inadequate for scientific analysis and that Dr. Sawyer has failed to extrapolate the flawed results to cancer development in humans.

Fourth, Monsanto argues Dr. Sawyer's opinions should be excluded as they relate to his claims that trace levels of certain chemicals are carcinogenic and caused or contributed to the development of Plaintiffs' cancer because there is no scientific evidence of causation linking such trace chemicals to cancer at doses remotely comparable to those at issue here. Monsanto specifically notes instances in other Roundup litigation where Dr. Sawyer disclaimed his opinions on trace chemicals.

Finally, Monsanto argues Dr. Sawyer should be precluded from testifying about Monsanto documents, regulatory duties, and the sufficiency of the Roundup label because such testimony is generally beyond the realm of proper expert testimony and is specifically outside of Dr. Sawyer's expertise.

Plaintiffs oppose Monsanto's motion to exclude Dr. Sawyer. First, Plaintiffs argue Dr. Sawyer is qualified as a toxicologist to offer expert opinions in this case based on his specialization in occupational and environmental exposures to carcinogens and his thirty-one years of experience in public health and forensic toxicology. They point out that other courts have rejected Monsanto's

efforts in other Roundup cases to exclude Dr. Sawyer's opinions in their entirety, including the Honorable Brian H. May of this Circuit Court in *Alesi v. Monsanto Co.*, No. 19SL-CC03617 (Cir. Ct. of St. Louis Cty.). Plaintiffs further note that Dr. Sawyer's report utilized the Bradford Hill criteria, discussed six epidemiological studies, and sufficiently addressed how to apply animal studies to humans.

Next, Plaintiffs argue Dr. Sawyer's application of the George Study is reliable and he explains the methodology used therein is commonly used in carcinogenesis studies.

Next, Plaintiffs argue Dr. Sawyer's testimony concerning trace chemicals in Roundup is admissible. They argue Dr. Sawyer's evaluation of Roundup's entire chemical makeup is necessary to determining whether Plaintiffs were exposed to known or suspected carcinogens. According to Dr. Sawyer, the field of toxicology and the EPA itself consider the additive effect of carcinogens.

Lastly, Plaintiffs argue Dr. Sawyer is qualified to testify about what health-related warnings should be included within product labels and that Dauber allows experts to testify about corporate documents as they relate to the basis for his opinions. Plaintiffs note at the end of their opposition brief that "Dr. Sawyer will not be testifying with respect to regulatory duties as alleged by Defendant."

The Court finds that Plaintiffs have met the threshold requirements under section 490.065.2, RSMo, to present Dr. Sawyer's testimony to the jury in this case. He is "qualified as an expert by knowledge, skill, experience, training, or education" as a toxicologist with master's degrees in cellular and molecular biology. *See* sec. 490.065.2(1), RSMo. Dr. Sawyer was subject to a similar motion to exclude in the recent *Alesi* case in this Circuit Court against Monsanto related to Roundup exposure. In that case, Judge May noted: "Numerous courts in other jurisdictions have

9

likewise found Dr. Sawyer was qualified to give expert opinions in other Roundup litigation, including a judge in the Circuit Court of the City of St. Louis." Order Concerning Defendant Monsanto Company's Motions to Exclude at 11, *Alesi v. Monsanto Co.*, No. 19SL-CC03617 (Cir. Ct. of St. Louis Cty. July 22, 2022) (citing Order, *Wade v. Monsanto Co.*, No. 1722-CC00370 (22nd Cir. Ct. Mo., Jan. 21, 2020)). At this point of the litigation, Plaintiffs have met their burden to show by a preponderance of the evidence that Dr. Sawyer's opinions are relevant to the issue of general causation and his testimony is reliable.

Dr. Sawyer applied the Bradford Hill criteria and relied on epidemiological studies. In Missouri, "[e]xpert opinion partially based on other expert opinion is not necessarily inadmissible." *Otwell v. Treasurer of Missouri*, 634 S.W.3d 850, 859 (Mo. App. E.D. 2021) (quoting *Garrett v. Treasurer of State of Mo. as Custodian for Second Injury Fund*, 215 S.W.3d 244, 249 (Mo. App. S.D. 2007)). "Merely because an expert relied on information and opinions of others does not automatically disqualify his testimony[;] [a]s long as such sources serve only as a background for his opinion and are not offered as independent substantive evidence ... he should not be precluded from testifying." *Id.* (alterations and omission in original) (quoting *Peterson v. Nat'l Carriers, Inc.*, 972 S.W.2d 349, 354 (Mo. App. W.D. 1998).

Monsanto's arguments about how Dr. Sawyer interpreted and applied animal studies to reach his conclusion about glyphosate's effect in humans goes towards the weight of his testimony rather than its admissibility and can be property addressed via cross-examination. As explained above, whether an expert like Dr. Sawyer sufficiently "ruled in" or "ruled out" Roundup as a cause of NHL generally or these Plaintiffs' subtypes specifically goes to the weight of the expert's testimony and not admissibility. *See Ingham*, 608 S.W.3d at 710; *Lauzon*, 270 F.3d at 693.

10

While Dr. Sawyer was permitted to testify recently in this Circuit Court, the scope of his testimony was limited by Judge May in the following ways:

- Dr. Sawyer is precluded from offering medical causation opinions at trial for any of the Plaintiffs in this case, as stipulated by Plaintiffs on page 19 of their response memorandum.
- Dr. Sawyer is precluded from offering testimony that trace ingredients in Roundup contribute to any alleged cancer risk posed by Roundup, as stipulated by Plaintiffs on page 31 of their response memorandum.
- Dr. Sawyer is precluded from offering testimony concerning Monsanto company documents, regulatory duties, and the sufficiency of the Roundup label.

Order Concerning Defendant Monsanto Company's Motions to Exclude at 12, *Alesi v. Monsanto Co.*, No. 19SL-CC03617 (Cir. Ct. of St. Louis Cty. July 22, 2022). This Court agrees with Judge May that Dr. Sawyer be precluded from offering testimony concerning Monsanto company documents, regulatory duties, and the sufficiency of the Roundup label.

Unlike the plaintiffs in *Alesi* who stipulated Dr. Sawyer would not offer testimony that trace ingredients in Roundup contribute to any alleged cancer risk posed by Roundup, Plaintiffs here argue such trace chemicals are necessary for Dr. Sawyer's evaluation of the additive effect of carcinogens in Roundup. Nevertheless, Monsanto seeks to hold Dr. Sawyer to his prior statements disclaiming his opinions concerning trace chemicals in Roundup.

For these reasons, the Court grants Monsanto's motion to exclude Dr. Sawyer in part to prohibit him from offering testimony concerning the following topics:

- Dr. Sawyer is precluded from offering testimony concerning Monsanto's regulatory duties as conceded by Plaintiffs on page 15 of their response memorandum;

- Dr. Sawyer is precluded from offering testimony concerning Monsanto company documents and the sufficiency of the Roundup label.

- Dr. Sawyer is precluded from offering testimony on specific causation.

Dr. Sawyer, however, may testify to the amount of Plaintiffs' exposure to Roundup. Prior to offering any testimony that trace ingredients give any additive effect to the risk of cancer, there must be testimony of a reliable foundation for such an opinion. The Court will make the determination at that time. There shall be no mention of trace ingredients in opening statements.

### C. Monsanto's Motion to Exclude Dr. Alfred Neugut

Dr. Neugut is an oncologist with a Ph.D. in pathobiology and a Master's degree in Public Health in epidemiology who has been designated by Plaintiffs to offer opinions on general causation. Specifically, Plaintiffs designated him to testify on the topics of "the epidemiology of glyphosate and cancer, specifically non-Hodgkin lymphoma as well as the mechanism through which glyphosate causes cancer." Monsanto's Ex. A, Plaintiffs' Amended Designation and Disclosure of Retained and Non-Retained Expert Witnesses at 3.

Monsanto moves to exclude Dr. Neugut's opinions in their entirety. First, Monsanto argues Dr. Neugut is not qualified to offer general causation opinions in this case. He is not an expert in animal or mechanistic studies, and Monsanto points to prior testimony in which he was seemingly unfamiliar with epidemiologic study designs. Rather, Monsanto complains Dr. Neugut simply parrots opinions of other experts and the IARC.

Next, Monsanto argues Dr. Neugut's opinions are unreliable and irrelevant. Dr. Neugut bases his opinions largely on a document created by the IARC in 2015 (referred to as a "Monograph") that analyzed data at the time on glyphosate. Monsanto's Ex. E. Monsanto argues the Monograph evaluated whether glyphosate was a cancer *hazard*, not a risk. *See* Monsanto's Ex. F, Preamble to IARC Monographs on the Evaluation of Carcinogenic Risks to Humans at 2. The Preamble provides, in relevant part:

> A cancer 'hazard' is an agent that is capable of causing cancer under some circumstances, while a cancer 'risk' is an estimate of the carcinogenic effects

> expected from exposure to a cancer hazard. The Monographs are an exercise in evaluating cancer hazards, despite the historical presence of the word 'risks' in the title. The distinction between hazard and risk is important, and the Monographs identify cancer hazards even when risks are very low at current exposure levels, because new uses or unforeseen exposures could engender risks that are significantly higher.

*Id.* Even then, the Monograph dated 2015 concluded: "There is *limited evidence* in humans for the carcinogenicity of glyphosate. A positive association has been observed for non-Hodgkin lymphoma." Monsanto's Ex. E at 78 (emphasis in original). The IARC's Preamble defined "Limited evidence of carcinogenicity" as follows:

> The data suggest a carcinogenic effect but are limited for making a definitive evaluation because, e.g. (a) the evidence of carcinogenicity is restricted to a single experiment; (b) there are unresolved questions regarding the adequacy of the design, conduct or interpretation of the studies; (c) the agent increases the incidence only of benign neoplasms or lesions of uncertain neoplastic potential; or (d) the evidence of carcinogenicity is restricted to studies that demonstrate only promoting activity in a narrow range of tissues or organs.

Monsanto's Ex. F at 21. Monsanto argues the conclusion in the IARC's Monograph falls short of the causation requirement in tort law. Because Dr. Neugut bases his opinions on this Monograph and, according to Monsanto, fails to account for post-2015 studies that show no causal link between glyphosate and cancer, Monsanto argues Dr. Neugut's opinions are unreliable and should be excluded.

Plaintiffs oppose Monsanto's motion to exclude Dr. Neugut. They point out that other courts have found Dr. Neugut qualified to offer expert testimony in the field of epidemiology, including the MDL court that previously handled Roundup-related cases. *In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d at 1144. They argue he is clearly an expert in epidemiology and the law does not require an expert's training be as narrowly tailored as Monsanto's contends. Contrary to Monsanto's suggestion that Dr. Neugut is unfamiliar with relevant epidemiology studies,

13

Plaintiffs note he spends five pages of his report discussing and analyzing various epidemiologic studies.

Plaintiffs further argue Dr. Neugut's opinions are based on sound methodology. Plaintiffs assert he applied the Bradford Hill criteria and thoroughly analyzed relevant epidemiologic studies. Plaintiffs also reject Monsanto's critique of the IARC's Monograph on glyphosate. The IARC's "overall evaluation" as concluded in the Monograph is that "[g]lyphosate is *probably carcinogenic to humans*." Plaintiffs' Ex. G at 78 (emphasis in original). Plaintiffs' further quote the Director of IARC who stated: "A charge levelled at the Monographs is that evaluations are divorced from the 'real world' i.e. are made without taking account of realistic human exposures. However, epidemiological studies are a central part of Monograph evaluations and, by definition deal with people exposed in daily life, including at work." Plaintiffs' Ex. H, Briefing Note for IARC Scientific and Governing Council members Prepared by the IARC Director at 8 (Jan. 2018). The IARC Director further stated that "identifying carcinogenic hazards is a crucially important and necessary first step in risk assessment and management; it should be a 'red flag' to those charged with protecting public health" and "should trigger either immediate remedial action (e.g. bans, as with asbestos or access to artificial tanning salons for young people, or labelling of carcinogenic hazards) or further evaluation of the scale of the risk (risk assessment) . . . ." *Id.* at 10. Plaintiffs argue the IARC is a recognized authority and that Dr. Neugut properly relied on its conclusions and other studies when making his conclusions in this case.

The Court finds that Plaintiffs have met the threshold requirements under section 490.065.2, RSMo, to present Dr. Neugut's testimony to the jury in this case. He is "qualified as an expert by knowledge, skill, experience, training, or education" as an oncologist and professor of both cancer research and of medicine and epidemiology. *See* sec. 490.065.2(1), RSMo. Dr.

Neugut applied the Bradford Hill criteria and relied on epidemiological studies. As noted above, "[e]xpert opinion partially based on other expert opinion is not necessarily inadmissible." *Otwell*, 634 S.W.3d at 859 (quoting *Garrett*, 215 S.W.3d at 249). "Merely because an expert relied on information and opinions of others does not automatically disqualify his testimony[;] [a]s long as such sources serve only as a background for his opinion and are not offered as independent substantive evidence ... he should not be precluded from testifying." *Id.* (alterations and omission in original) (quoting *Peterson*, 972 S.W.2d at 354).

Plaintiffs correctly note the MDL court found in 2018 that Dr. Neugut was "eminently qualified and refreshingly candid," but that same MDL court ultimately concluded his testimony at the time was "not sufficiently reliable to be admissible." *In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d 1102, 1144-46 (N.D. Cal. 2018). The MDL court found Dr. Neugut's written reports at the time were "high quality" and "evaluated each of the key epidemiology studies before engaging in a Bradford Hill analysis that took into account all available data across disciplines." *Id.* at 1144. However, the MDL court found his oral testimony at the hearing on *Daubert* motions "was of much lower quality." *Id.* The MDL court listed numerous instances of Dr. Neugut appearing unfamiliar with his own materials and erroneous statements on key issues. *Id.* at 1144-45. "Each problem with Dr. Neugut's testimony is not sufficient, on its own, to justify exclusion. . . . But in combination, the problems with Dr. Neugut's testimony lead the Court to conclude that his opinion is not sufficiently reliable to be admissible." *Id.* at 1146.

Plaintiffs argue in their briefing here that the MDL judge usurped the role of the jury by excluding Dr. Neugut's testimony at the time. Furthermore, Plaintiffs assert Dr. Neugut has since cured the concerns and deficiencies identified by the MDL court in 2018 and that post-2018 studies have shown an association between glyphosate and NHL. Plaintiffs also note that other courts,

specifically two California state courts, have since found Dr. Neugut's opinions to be reliable. *Johnson v. Monsanto Co.*, No. CGC-16-550128, 2018 WL 2324413 (Cal. Super. May 17, 2018); *Johnson v. Monsanto Co.*, No. CGC16550128, 2018 WL 5246323 (Cal. Super. Oct. 22, 2018).

Ultimately, Monsanto's concerns go to the weight rather than the admissibility of Dr. Neugut's opinions. "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Larson v. Kempker*, 414 F.3d 936, 941 (8th Cir. 2005) (quoting *Hose v. Chicago NW Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995)). *See also Alcorn v. Union Pac. R.R. Co.*, 50 S.W.3d 226, 246 (Mo. banc 2001), *overruled on other grounds by Badahman v. Catering St. Louis*, 395 S.W.3d 29 (Mo. banc 2013) ("Any weakness in the factual underpinnings of the expert's opinion or in the expert's knowledge goes to the weight that testimony should be given and not its admissibility.").

In Monsanto's reply memorandum, they ask the Court to strike the September 12, 2022 affidavit signed by Dr. Neugut, attached as Exhibit C to Plaintiffs' response memorandum. Monsanto argues courts in other jurisdictions have struck expert affidavits submitted in response to a motion to exclude if it raised new opinions as prejudicial to the moving party. *See, e.g., Rodgers v. Beechcraft Corp.*, 759 F. App'x 646, 663 (10th Cir. 2018) (affirming trial court's decision to refuse to consider an expert's affidavit that "did not simply emphasize or highlight previous opinions but instead attempted to add new opinions). While submitting such an affidavit is irregular, it does not appear Dr. Neugut's statements therein are truly *substantively* new opinions. For example, he explains IARC's use of hazard assessments compared to risk assessments. This is more of a clarification rather than new or contradictory opinions. *Cf. generally Redd v. DePuy Orthopaedics, Inc.*, 700 F. App'x 551, 553 (8th Cir. 2017) ("A party may not avoid summary

judgment by submitting an affidavit that contradicts rather than clarifies previous sworn testimony.").

The Court finds that Dr. Neugut is qualified and may give his initial opinions on general causation. Monsanto alleges many fallacies in Dr. Neugut's reasons for his opinions that will be subject to cross-examination and go to the weight as opposed to admissibility.

As to the affidavit, the problem, if any, may be that it not only offers new opinions but possibly new reasons for such opinion that should have been disclosed in prior written discovery or deposition prior to the date of the affidavit. If Monsanto wishes to exclude any of the affidavit or all of the affidavit, it should set forth the information to be excluded with cites to prior discovery that should have elicited said information and did not, or give reasons why said discovery was not requested on those matters. This shall be completed the 7 day of Oct, Plaintiffs to respond by 19 day of Oct, Monsanto reply by 2c day of Oct.

### D.  Monsanto's Motion to Exclude Dr. Joel Joseph Gagnier

Dr. Gagnier is a clinical epidemiologist and former naturopathic doctor who has been designated by Plaintiffs to offer opinions on general causation.

Monsanto moves to exclude Dr. Gagnier's opinions in their entirety. First, Monsanto argues Dr. Gagnier's opinions are unreliable because he failed to use data that was adjusted for exposure to other pesticides even though he admitted that adjusting for other pesticides was appropriate. Next, Monsanto complains Dr. Gagnier's causation analysis failed to apply the Bradford Hill criteria and merely reviewed and evaluated the studies that he had included in his meta-analyses when determining an *association* existed between glyphosate and NHL and not *causation*. Lastly, Monsanto argues Dr. Gagnier fails to present any opinion or conclusion linking

Roundup exposure to the specific NHL subtypes affecting Plaintiffs. Monsanto cites extra-jurisdictional caselaw to argue:

> [I]n a toxic tort case, expert testimony on the issue of general causation meets *Daubert*'s 'fit' requirement only if the testimony includes an opinion that (1) exposure to the particular substance at issue, (2) in the dose to which the plaintiff was exposed, (3) for the duration in which plaintiff was exposed, (4) can cause the particular condition(s) of which the plaintiff complains.

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 137 F Supp. 2d 147, 163 (E.D.N.Y. 2001), *aff'd*, 303 F.3d 256 (2d Cir. 2002). In his deposition, Dr. Gagnier expressly stated he was not offering opinions on the causes of these Plaintiffs' specific subtypes of NHL.

Plaintiffs oppose Monsanto's motion to exclude Dr. Gagnier. They argue Dr. Gagnier is undeniably qualified as an expert based on his education and training as an epidemiologist. They argue he properly reviewed the most recent meta-analysis and systematic reviews related to the causal relationship between glyphosate and NHL before conducting his own meta-analysis. Plaintiffs assert Dr. Gagnier's meta-analysis showed those exposed to glyphosate at any point in their life showed a statistically significant increased risk for NHL between 15% and 25% and that those exposed to glyphosate at the highest levels of exposure showed an increased risk of NHL between 38% and 42%.

The Court finds that Plaintiffs have met the threshold requirements under section 490.065.2, RSMo, to present Dr. Gagnier's testimony to the jury in this case. He is "qualified as an expert by knowledge, skill, experience, training, or education" as a clinical epidemiologist. *See* sec. 490.065.2(1), RSMo. The fact that Dr. Gagnier did not offer opinions on the causes of these Plaintiffs' specific subtypes of NHL is not dispositive as Monsanto concedes NHL is an umbrella term and Plaintiffs have designated Dr. Gagnier to testify about general causation rather than specific causation.

18

Dr. Gagnier was subject to a similar motion to exclude in *Alesi*. In that case, Judge May found Dr. Gagnier was qualified to testify. Plaintiffs in this case directly quote from Judge May's Order for the following conclusion, rejecting Monsanto's identical argument based on Dr. Gagnier not following the Bradford Hill criteria:

> Although the Bradford Hill criteria may be a tool for determining whether an epidemiological study establishes causation, *see In re Neurontin*, 612 F.Supp.2d at 133, it is by no means required and "in the context of a general causation challenge, failure to satisfy the Bradford Hill criteria does not doom admission under *Daubert*." *Id.* (citing *In re Viagra Prods. Liab. Litig.*, 572 F.Supp.2d 1071, 1081 (D.Minn.2008)). Therefore, whether [a challenged expert] did or did not use the Bradford Hill criteria will not determine the admissibility of his opinions . . . .

Order Concerning Defendant Monsanto Company's Motions to Exclude at 18, *Alesi v. Monsanto Co.*, No. 19SL-CC03617 (Cir. Ct. of St. Louis Cty. July 22, 2022) (quoting *In re Celexa & Lexapro Prod. Liab. Litig.*, 927 F. Supp. 2d 758, 766 (E.D. Mo. 2013)). Nevertheless, Judge May granted and sustained Monsanto's motion in part to exclude the testimony of Dr. Gagnier to prohibit him from offering testimony concerning the type of lymphoma which any individual plaintiff had. Order Concerning Defendant Monsanto Company's Motions to Exclude at 17-18, *Alesi v. Monsanto Co.*, No. 19SL-CC03617 (Cir. Ct. of St. Louis Cty. July 22, 2022). Dr. Gagnier was permitted to testify that those exposed to glyphosate at any point in their life showed a statistically significant increased risk for NHL in general and not as to the specific cancers of the *Alesi* plaintiffs. *Id.*

This Court agrees with Judge May and grants Monsanto's motion to exclude directed at Dr. Gagnier in part to prohibit him from offering testimony concerning the type of lymphoma which any individual plaintiff has. In all other aspects, Monsanto's motion to exclude directed at Dr. Gagnier is denied in part. Specifically, Dr. Gagnier may testify that those exposed to

19

glyphosate at any point in their life showed a statistically significant increased risk for NHL in general and not as to the specific cancers of Plaintiffs.

### E. Monsanto's Motion to Exclude Dr. Ambrose K. Charles

Dr. Charles is a toxicologist who has been designated by Plaintiffs to offer opinions on general and specific causation. Specifically, Plaintiffs designated him to testify on the topics of "toxicology, occupational and environmental risk assessments of Roundup usage, evaluations of Roundup exposure, and the mechanism of absorption of glyphosate-based formulations through the skin and other exposure pathways." Monsanto's Ex. A, Plaintiffs' Amended Designation and Disclosure of Retained and Non-Retained Expert Witnesses at 2-3.

Monsanto moves to exclude Dr. Charles's opinions in their entirety. First, Monsanto argues he is unqualified to give opinions on general causation and his general causation opinions are unreliable. Monsanto notes Dr. Charles is not a medical doctor, pathologist, or oncologist and he admitted to not being an expert on NHL. Further, Monsanto criticizes his review of epidemiology, animal, and mechanistic/genotoxicity studies as cursory. As with Dr. Gagnier, Monsanto argues Dr. Charles failed to use data that was adjusted for exposure to other pesticides even though he admitted that adjusting for other pesticides was important. Monsanto also argues Dr. Charles ignored data related to these Plaintiffs' specific cancers by, for example, citing conclusions of one study related to acute myeloid lukemia despite that study showing no association with NHL or any subtype thereof.

Second, Monsanto argues Dr. Charles's opinions on specific causation are unreliable. Again, Monsanto notes he is not a medical doctor or oncologist and he has never diagnosed or treated cancer. Monsanto also argues Dr. Charles's opinions based on Plaintiffs' eight-hour "exposure days" based on their claimed use of Roundup is unreliable, unscientific, and unhelpful

to the jury as there is no determination as to what dose of Roundup was actually absorbed by Plaintiffs.

Third, Monsanto argues Dr. Charles's opinion that Roundup is a cancer "promoter" is unreliable. As with Dr. Sawyer, Monsanto argues Dr. Charles should be precluded from offering testimony based on the George Study, which he did not conduct or even read, that claimed to show Roundup "promoted" cancer development. As noted above, Monsanto argues that the George Study has been rejected by the EPA and the IARC as inadequate for scientific analysis. Furthermore, Monsanto asserts Dr. Charles makes the unsupported and speculative conclusion that the George Study of mice establishes cancer development in humans.

Fourth, Monsanto argues Dr. Charles should be precluded from offering testimony about any male reproductive effects allegedly caused by Roundup in light of his conceding during his deposition that such opinions have no bearing in this case.

Finally, Monsanto argues Dr. Charles should be precluded from offering medical opinions that Plaintiff Pleu's exposure to glyphosate and his alleged chronic lymphocytic leukemia ("CLL") contributed to his later development of prostate cancer. Because he is neither a medical doctor nor oncologist and no actual medical doctor has endorsed such a conclusion in this case, Monsanto argues Dr. Charles is unqualified to offer such testimony and such a conclusion is unreliable.

Plaintiffs oppose Monsanto's motion to exclude Dr. Charles. Plaintiffs argue his education and work experience make him qualified to review and understand relevant epidemiological, animal, and genotoxic studies on glyphosate and NHL. His reports in this case utilized the Bradford Hill criteria to show Roundup exposure caused or substantially contributed to causing these Plaintiffs' NHL after reviewing their medical records, fact sheets, and deposition testimony.

Plaintiffs are not offering testimony about treatment of NHL; rather, Plaintiffs seek to offer his testimony which they argue is similar to that offered by Dr. Sawyer in the recent *Alesi* trial in this Circuit Court. Dr. Charles's opinions on "exposure days" in this case are similar to opinions offered by Dr. Sawyer in the *Alesi* trial. Order Concerning Defendant Monsanto Company's Motions to Exclude at 8-9, *Alesi v. Monsanto Co.*, No. 19SL-CC03617 (Cir. Ct. of St. Louis Cty. July 22, 2022). Judge May permitted Dr. Sawyer to testify that the plaintiffs' exposure to Roundup was above the threshold values in the dose-metric studies placing them at a statistically significant increased risk of developing NHL. *Id.* at 12.

Lastly, Plaintiffs argue the Court should reject Monsanto's attempt to exclude what they assert is Dr. Charles's scientifically supported opinion that Plaintiff Pleu's CLL contributed to his development of prostate cancer. They claim his opinion that Plaintiff Pleu's CLL increased the likelihood of secondary tumors, such as prostate cancer, is supported by a peer-reviewed article from 2019 on reported CLL malignancies being responsible for such secondary tumors.

The Court finds that Plaintiffs have met the threshold requirements under section 490.065.2, RSMo, to present Dr. Charles's testimony to the jury in this case. He is "qualified as an expert by knowledge, skill, experience, training, or education" based on his Ph.D. in toxicology and medical biochemistry and his decades of experience in academia and government roles. *See* sec. 490.065.2(1), RSMo. Dr. Charles applied the Bradford Hill criteria and relied on epidemiological studies. As noted above, experts may properly rely on other experts' opinions in reaching their own conclusions. *See Otwell*, 634 S.W.3d at 859. Monsanto's other arguments, including its critique of Dr. Charles not adjusting data for exposure to other pesticides, relate to the *weight* the jury should give to his opinions rather than their *admissibility*. *See Lauzon*, 270 F.3d at 693 (whether an expert "failed to rule out *every* possible alternative cause" goes to weight

and not admissibility) (emphasis in original) (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265 (4th Cir. 1999)).

In Monsanto's reply memorandum, they ask the Court to strike the September 11, 2022 affidavit signed by Dr. Charles, attached as Exhibit H to Plaintiffs' response memorandum.  As with Dr. Neugut, Monsanto argues courts in other jurisdictions have struck expert affidavits submitted in response to a motion to exclude if it raised new opinions as prejudicial to the moving party.  *See, e.g.*, *Rodgers*, 759 F. App'x at 663 (affirming trial court's decision to refuse to consider an expert's affidavit that "did not simply emphasize or highlight previous opinions but instead attempted to add new opinions).  In the affidavit, Dr. Charles takes issue with Monsanto's quoting him as responding to the question whether he was "provided with sufficient evidence by the plaintiffs to come up with the causation opinions that you came up with in this case" by answering "Not enough."  The affidavit provides, in part:

> 7. My response of "not enough" was certainly not intended to mean that I did not have enough information to form my opinions.  Quite the contrary, I drafted lengthy reports and testified at great length that, to a reasonable degree to medical and scientific certainty, exposure to Roundup can cause NHL, and that Mr. Moore's and Mr. Pleu's exposure to Roundup did cause their NHLs, respectively.
> 8. My response was not in any way reflective of the entire data and facts presented and reviewed in these cases.
> 9. Rather, . . . , my response "not enough" pertained only to the 'product concentration' and is centered on the estimate (concentration) of glyphosate in the spray mixture.  I tried to explain the estimates were made from the online product label information I found, not from the product label on the container the Plaintiffs have used.  Of note, this would make no difference in the calculated concentrations.  I only expressed that the concentration on original label will be definite and true, and not 'an estimate' as I presented.  I have selected an EPA product label online of 'Roundup Concentrate' based on the descriptions on the Plaintiff records.
> 10. This was the sole basis of my "not enough' response. . . . .

Plaintiffs' Ex. H at 2-3.  While submitting such an affidavit is irregular, it does not appear Dr. Charles's statements therein are truly *substantively* new opinions.  *Cf. generally Redd*, 700 F.

App'x at 553 ("A party may not avoid summary judgment by submitting an affidavit that contradicts rather than clarifies previous sworn testimony.").

Accordingly, Monsanto's motion to exclude Dr. Charles is denied in part and granted in part. The Court finds that Dr. Charles is qualified and may give his initial opinions on general and specific causation. Monsanto alleges many fallacies in Dr. Charles's reasons for his opinions that will be subject to cross-examination and go to the weight as opposed to admissibility. However, he may not testify that Plaintiff Pleu's CLL caused his prostate cancer as Plaintiffs have failed to show such conclusion is generally accepted.

As to the affidavit, the problem, if any, may be that it not only offers new opinions but possibly new reasons for such opinion that should have been disclosed in prior written discovery or deposition prior to the date of the affidavit. If Monsanto wishes to exclude any of the affidavit or all of the affidavit, it should set forth the information to be excluded with cites to prior discovery that should have elicited said information and did not, or give reasons why said discovery was not requested on those matters. This shall be completed the 17 day of Oct, Plaintiffs to respond by 19 day of Oct, Monsanto reply by 20 day of Oct.

### F.  Monsanto's Motion to Exclude Dr. Christopher Portier

Dr. Portier is a biostatistician who has been designated by Plaintiffs to offer opinions on general causation.

Monsanto moves to exclude Dr. Portier's opinions in their entirety. First, Monsanto argues his opinions are based on unscientific methodologies. Specifically, Monsanto notes other courts have excluded Dr. Portier's "pooling" method that combines data from separate studies to reach a conclusion. For example, the MDL court concluded:

> Although some version of Dr. Portier's pooled approach may well gain traction as
> a means of evaluating the results of multiple rodent studies, it fares poorly under

24

> the traditional *Daubert* criteria. His pooling approach is not subject to objective testing, and it appears to have no identifiable error rate. Although neither of these shortcomings itself requires exclusion, Dr. Portier's method also has not gained general acceptance in the scientific community, nor does it appear to have been subjected to peer review and publication.

*In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d at 1135. As an alternative to excluding Dr. Portier's testimony in its entirety, Monsanto request the Court exclude his pooling data. Monsanto also contends that Dr. Portier's epidemiology testimony would be duplicative and cumulative to the extent the Court permits Plaintiffs' other experts (Dr. Neugut and Dr. Gagnier) to testify.

Second, Monsanto agues Dr. Portier's opinions on animal studies are unreliable because he charry-picks studies and methodologies that support his predetermined conclusions that glyphosate causes cancer.

Lastly, Monsanto argues Dr. Portier fails to properly extrapolate animal studies on glyphosate to humans. Rather, Monsanto contends human epidemiology data exists and shows no causal connection between exposure to glyphosate and cancer.

Plaintiffs oppose Monsanto's motion to exclude Dr. Portier. They argue he is clearly qualified and a recognized leader in his field. Plaintiffs assert Dr. Portier reviewed relevant studies, data produced during discovery, and post-IARC literature searches and applied the Bradford Hill criteria. Specifically, he used data adjusted for use of other pesticides in his conclusion that there is a significant association between exposure to glyphosate and cancer.

Plaintiffs also note that since the MDL court excluded Dr. Portier's opinions based on his pooling method, his method has now been subject to peer-review in his recent publication: *A comprehensive analysis of the animal carcinogenicity data for glyphosate from chronic exposure rodent carcinogenicity studies*, Environmental Health, February 2020. Plaintiffs' Ex. 34; Monsanto's Ex. I. Accordingly, Plaintiffs contend the MDL court's and Monsanto's critiques that

Dr. Portier's method is novel and untested or unreviewed is no longer accurate. Monsanto, however, argues the Court should give little weight to this 2020 publication by claiming the peer reviewers were Dr. Portier's personal contacts and did not provide a critical review of his methods.

Plaintiffs also dispute Monsanto's suggestion that the existence of human studies renders animal studies irrelevant or inferior. According to Dr. Portier, animal carcinogenicity studies play a major role in determining biological plausibility under the Bradford Hill criteria.

The Court finds that Plaintiffs have met the threshold requirements under section 490.065.2, RSMo, to present Dr. Portier's testimony to the jury in this case. He is "qualified as an expert by knowledge, skill, experience, training, or education" based on his Ph.D. in biostatistics and minor in epidemiology and his decades of experience in government and other roles, including contributing to risk assessments for IARC. *See* sec. 490.065.2(1), RSMo. Dr. Portier applied the Bradford Hill criteria and relied on epidemiological, toxicology, mechanistic studies. Additionally, his pooling method has since been subject to peer review. Monsanto's criticism of that peer-review process goes towards the weight of his testimony rather than its admissibility and can be property addressed via cross-examination. It will be up to the jury to accept or reject that testimony. For these reasons, the Court denies Monsanto's motion to exclude Dr. Portier.

### G. Monsanto's Motion to Exclude Dr. Charles Benbrook

Dr. Benbrook is an agricultural economist who has been designated by Plaintiffs to offer opinions on several broad topics, primarily relating to the regulation and labeling of glyphosate-based formulations and Monsanto's corporate conduct.

Monsanto moves to exclude Dr. Benbrook's opinions in their entirety. Monsanto's first main argument is that Dr. Benbrook is not qualified to offer expert testimony in this case. While he has a degree in agricultural economics, he is not a scientist, a lawyer, or a pesticide regulator

such as to make him an expert on Monsanto's legal, regulatory, or ethical obligations, or its compliance with EPA registration or labeling requirements. Furthermore, Monsanto argues Dr. Benbrook lacks any qualifications to testify about the proper interpretation of Monsanto documents or to draw inferences from those documents to opine on Monsanto's state of mind, motives, and intent. Monsanto also notes Dr. Benbrook is the creator and executive director of an organization named Heartland Health Research Alliance Ltd. ("HHRA") that "raises money from, among other sources, plaintiffs' attorneys working on pesticide cases, and directs such money to developing new science on the subject." *See* Monsanto's Motion at 2-3 & 6-7 n.3. In light of his role with HHRA, Monsanto argues his testimony is biased.

Next, Monsanto argues Dr. Benbrook should be precluded from narrating or summarizing Monsanto's documents or offering opinions about Monsanto's intent, motives, or state of mind. According to Monsanto, an expert simply reading or summarizing documents for the jury is not providing helpful testimony because the jury is capable of reading those documents and reaching conclusions about them on its own. Relatedly, Monsanto argues Dr. Benbrook should be precluded from speculating about the EPA's motive, intent, or state of mind related to Monsanto and Roundup.

Next, Monsanto argues Dr. Benbrook's opinions about Monsanto's ethical obligations or compliance should be excluded despite his statement in his deposition that is "an expert in honesty." According to Monsanto, any claim that Monsanto violated federal law and EPA regulations is preempted as EPA itself has the sole power to determine whether its regulations are followed.

Lastly, Monsanto argues Dr. Benbrook should be precluded from testifying about what he believes Monsanto could or should have done differently, including what warnings or labeling

might have been accepted by the EPA. As other courts have found, Dr. Benbrook lacks the qualifications necessary to opine about what warnings should have been included under EPA regulations or what warnings EPA may or may not have accepted.

Plaintiffs oppose Monsanto's motion to exclude Dr. Benbrook. They argue Dr. Benbrook is qualified to give expert testimony in this case and note he has been permitted to testify in some fashion in other Roundup litigation, including twice in Missouri. Plaintiffs' Ex. 21, Order, *Shelton v. Monsanto Co.*, No. 1816-CV17026 (Cir. Ct. of Jackson Cty. Mar. 2, 2022); Order Concerning Defendant Monsanto Company's Motions to Exclude *Alesi v. Monsanto Co.*, No. 19SL-CC03617 (Cir. Ct. of St. Louis Cty. July 22, 2022). Plaintiffs also cite Dr. Benbrook's testimony before Congress as well as his work with multiple governmental entities.[4] Specifically, Plaintiffs quote at length in their response memorandum from reports he authored as Staff Director for the U.S. House of Representatives Subcommittee on Department Operations, Research and Foreign Agriculture ("DORFA") and later as Executive Director of the Board of Agriculture, National Research Council, for the National Academy of Science, as well as related congressional testimony. Plaintiffs further contend Dr. Benbrook's proposed testimony would assist the jury in understanding the voluminous documents that have been produced in this case.

The Court finds that Plaintiffs have met the threshold requirements under section 490.065.2, RSMo, to present Dr. Benbrook's testimony to the jury in this case. Dr. Benbrook has

---

[4] Plaintiffs' 78-page response memorandum in this case is nearly identical to the *Alesi* plaintiffs' 73-page response to Monsanto's motion to exclude Dr. Benbrook in that case. It is worth noting Plaintiffs here add discussion related to additional citations to Dr. Benbrook work by the following entities: (1) the California Regulatory Law Reporter, *Regulatory Agency Action*, Vol. 13, Nos. 2 and 3, Spring/Summer 1993 (Plaintiffs' Exhibit 14); (2) the United States Congress, Office of Technology Assessment, *Biologically Based Technologies for Pest Control*, U.S. Government Printing Office, September 1995 (Plaintiffs' Exhibit 15); and (3) California Department of Pesticide Regulation, *A Guide to Pesticide Regulation in California*, 2017 Update (Plaintiffs' Exhibit 16). *See* Plaintiffs' response memorandum at 58-62.

not been designated to offer expert testimony concerning whether glyphosate and Roundup cause NHL. Rather, Plaintiffs seek to offer his testimony on topics related to pesticide regulation. While his experience may be useful in helping the jury understand what EPA and other regulations say, he may not testify about whether Monsanto complied with such rules and regulations. That is solely the province of the jury. *See Bryant v. Bryan Cave LLP*, 400 S.W.3d 325, 334 (Mo. App. E.D. 2013) ("Expert testimony is properly excluded as to issues where the jury is as capable as the expert in drawing conclusions because the expert opinion would not assist the trier of fact."). Furthermore, once the jury is presented with the facts and testimony concerning alleged causal links between glyphosate and Roundup causes NHL, it will be the jury's determination whether glyphosate and Roundup causes NHL generally and Plaintiffs' NHL specifically.

Dr. Benbrook was subject to a nearly identical motion to exclude and related, lengthy briefing in *Alesi*. In that case, Judge May found Dr. Benbrook was qualified to testify at trial but nevertheless granted and sustained Monsanto's motion to exclude the testimony of Dr. Benbrook in part to prohibit him from offering testimony concerning specific topics. Order Concerning Defendant Monsanto Company's Motions to Exclude at 20-23, *Alesi v. Monsanto Co.*, No. 19SL-CC03617 (Cir. Ct. of St. Louis Cty. July 22, 2022). In this case, Monsanto simply asks this Court to exclude Dr. Benbrook's testimony in its entirety and does not offer specific topics to preclude as the plaintiffs did in *Alesi*.

This Court agrees with Judge May's Order and likewise grants Monsanto's motion to exclude the testimony of Dr. Benbrook in part to prohibit him from offering testimony concerning the following topics:

- Dr. Benbrook is precluded from offering testimony regarding whether Monsanto followed EPA rules.

- Dr. Benbrook is precluded from offering testimony regarding Monsanto corporate documents.

- Dr. Benbrook is precluded from offering testimony regarding Monsanto's intent, motives, or state of mind, including any interpretation of documents that allegedly infer knowledge or intent.

- Dr. Benbrook is precluded from offering testimony regarding the EPA's intent or what it would have done.

- Dr. Benbrook is precluded form offering testimony on whether Monsanto complied with EPA rules.

- Dr. Benbrook is precluded from offering testimony on the sufficiency of Roundup's label.

Specifically, Dr. Benbrook may testify about the following topics:

- Dr. Benbrook may testify as to what EPA regulations say.

- Dr. Benbrook may testify as to what Monsanto did as a matter of fact.

- Dr. Benbrook may testify as to what the pesticide regulatory scheme and pesticide industry standards of care say assuming there are recognized industry standards.

- Dr. Benbrook may testify as to the differences between the genotoxicity datasets evaluated by EPA and IARC but may not offer his opinion that the organizations' positions are diametrically opposite.

- Dr. Benbrook may testify as to the facts of what Monsanto's corporate practices actually are if he provides a factual basis for those corporate practices, but he may not testify as to what he thinks they should be or what he thinks they are.

- Dr. Benbrook may testify about the factual history of Roundup.

While the Court will permit Dr. Benbrook to read what EPA rules say, he may not offer any narration or his opinion on whether Monsanto followed the EPA rules. If the Court finds this testimony has no value, it may stop Dr. Benbrook at any time.

## H. Plaintiffs' Motion to Exclude Dr. Cristian Tomasetti

Dr. Tomasetti is a mathematician who has been designated by Monsanto to offer opinions on general causation. Monsanto designated him to testify on the topics of "cancer etiology, evolution, detection, and risk prediction as related to NHL. Specifically, he will testify regarding the role of random mutations, and the interaction between random mutations, environmental factors, and hereditary factors, in the development of cancer." Plaintiffs' Ex. A, Monsanto's Amended Disclosure of Expert Testimony at 8–9.

Plaintiffs move to exclude Dr. Tomasetti's opinions in their entirety. First, they argue he is not qualified to offer medical causation opinions. Plaintiffs note Dr. Tomasetti is not a medical doctor, did not attend medical school, and has no other experience in assessing the cause of any individual's cancer. Accordingly, they argue he is unqualified to offer general causation opinions on whether glyphosate causes NHL.

Plaintiffs next argue Dr. Tomasetti's causation opinions are speculative and unreliable. He purports to testify that his own research shows over 95% of genetic mutations, including those that cause NHL, are the result of "bad luck," random, or sporadic chance rather than exposure to any environmental factors. Plaintiffs, however, argue Dr. Tomasetti's conclusion is based on insufficient data. Specifically, the assert he relies on a single paper – Love C., et al., *The genetic landscape of mutations in Burkitt lymphoma*, Nat Genet (2012), and its supplement (referred to in the briefing as the "Love paper") – which purports to show the average rate of mutational load in patients with Burkitt Lymphoma. As with Dr. Tomasetti, Plaintiffs argue the Love paper also fails

31

to even consider possible effects of environmental factors. Plaintiffs also argue Dr. Tomasetti admits to not being able to give opinions on the cause of any specific individual's cancer. Lastly, Plaintiffs argue Dr. Tomasetti's methodology has not been published or subject to peer-review and that major institutions have criticized Dr. Tomasetti and others for their "sporadic cancer" theory for failing to adequately address other risk factors.

Monsanto opposes Plaintiffs' motion to exclude Dr. Tomasetti. Monsanto first argues Dr. Tomasetti is amply qualified to testify about general causation in this case. Monsanto asserts he is a respected cancer researcher who has testified in other trials, including the recent *Alesi* trial in this Circuit Court.[5] Monsanto contends Dr. Tomasetti's opinions are based on peer-reviewed research and his own published work. For example, his research focuses on cancer causation, diagnosis, and early detection as well as DNA gene sequencing data and cancer mutations. Monsanto rejects Plaintiffs' criticisms related to specific causation because Dr. Tomasetti is being offered to testify about general causation only.

Monsanto next argues Dr. Tomasetti's opinions are reliable and relevant to this case. Monsanto asserts the scientific community widely agrees that random mutations can cause cancer. Dr. Tomasetti's research purports to show that approximately 96% of all NHL mutations are caused by random replicative errors, less than 4% are caused by environmental exposures, and less than 1% are caused by heredity dispositions. Monsanto argues the fact that his opinions have been published in peer-reviewed journals demonstrates his methods are reliable and generally accepted.

The Court finds that Monsanto has met the threshold requirements under section 490.065.2, RSMo, to present Dr. Tomasetti's testimony to the jury in this case. He is "qualified as an expert by knowledge, skill, experience, training, or education" based on his Ph.D. in applied mathematics

---

[5] The plaintiffs in *Alesi* did not move to exclude or limit Dr. Tomasetti's opinions.

with an emphasis on biostatistics and his experience in research and academia. *See* sec. 490.065.2(1), RSMo.   His general causation opinions are based on reliable methodologies demonstrated by his own substantial research, which has been published in numerous peer-reviewed journals and presented in other litigation.   Plaintiffs' other arguments, including their critique that Dr. Tomasetti did not sufficiently consider environmental factors, relate to the weight the jury should give to his opinions rather than their admissibility. *See Lauzon*, 270 F.3d at 693 (whether an expert "failed to rule out *every* possible alternative cause" goes to weight and not admissibility) (emphasis in original) (quoting *Westberry*, 178 F.3d at 265); *Larson*, 414 F.3d at 941 (quoting *Hose*, 70 F.3d at 974).   *See also Alcorn*, 50 S.W.3d at 246 (Mo. banc 2001) ("Any weakness in the factual underpinnings of the expert's opinion or in the expert's knowledge goes to the weight that testimony should be given and not its admissibility.").

For these reasons, the Court denies Plaintiffs' motion to exclude Dr. Tomasetti.

## I.   Plaintiffs' Motion to Exclude Dr. Joseph DiTomaso

Dr. DiTomaso is a weed scientist who has been designated by Monsanto to offer opinions on "the impact of weeds and invasive plants, control methods employed to manage weeds and invasive plants, and the use of herbicides, including glyphosate-based formulated products, in weed management."   Monsanto's Amended Disclosure of Expert Testimony at 4.   Additionally, he has been designated to offer opinions on how herbicides work, appropriate application methods, herbicide labels, the use and benefits of herbicides in residential, urban, and industrial settings.

Plaintiffs move to exclude Dr. DiTomaso's opinions in their entirety.   Plaintiffs do not question his expertise in the field of weed management; however, they argue his proffered testimony in this case invades the province of the jury.   In addition to the topics listed above, Dr. DiTomaso was designated to "opine on the particular glyphosate-based formulated products

33

applied, and the nature and circumstances of these applications, by Plaintiffs Stacey Moore and William Pleu." *Id.* Plaintiffs assert he intends to testify to the jury that Plaintiffs' descriptions of their Roundup exposures are not credible and that, even if they were credible, any exposures they experienced would have been negligible, if any. Plaintiffs characterize such testimony as attacking Plaintiffs' credibility, which is not a proper subject for expert testimony. *See State v. Churchill*, 98 S.W.3d 536, 538–39 (Mo. banc 2003) ("When determining the admissibility of opinion testimony, expert witnesses should not be allowed to give their opinion as to the veracity of another witness's statement, because in so doing, they invade the province of the jury."). Plaintiffs also object to Dr. DiTomaso's report criticizing Plaintiffs' expert Dr. Charles's opinions that were based, in part, on Plaintiffs' deposition testimony.

Plaintiffs also argue Dr. DiTomaso's opinions lack foundation. He is not a medical doctor, toxicologist, or industrial hygienist. Rather, Plaintiffs contend he disregards Plaintiffs' sworn testimony about their exposure to Roundup based solely on his belief that the amount of exposure claimed was unlikely based on his and other's anecdotal experiences using Roundup and other herbicides.

Lastly, Plaintiffs contend Dr. DiTomaso's only other topics of testimony concern how herbicides work and the alleged benefits of using them. Plaintiffs agree such topics would be within Dr. DiTomaso's area of expertise as a weed scientist, but they argue such topics are irrelevant to any issues in this case and should be excluded.

Monsanto opposes Plaintiffs' motion to exclude Dr. DiTomaso. Monsanto argues he is qualified to give expert opinions on topics beyond the understanding of an ordinary juror.

> These topics include: (1) the types of herbicides available to consumers; (2) the types of spray systems and spray system parts that are commercially available; (3) the amount of time it takes to treat an area with Roundup; (4) standard practices for the use of Roundup with other weed control techniques; (5) the standard uses for

Roundup; (6) how Roundup affects plants that are not grown from genetically-modified "Roundup Ready" seeds; and (7) the principle of "drift" and how that principle applies to herbicide applications.

Monsanto's response memorandum at 5. Monsanto contends each of these topics relate directly to a key issue in the case: Plaintiffs' actual amount of exposure to Roundup through their use of the product.

Monsanto also asserts Dr. DiTomaso has no intent of opining on Plaintiffs' credibility; rather, he intends to educate the jury about weed management and testify that the way Plaintiffs claimed to have used Roundup is inconsistent with Roundup's registered uses and what he considers to be logical weed management practices. Monsanto argues the fact that Dr. DiTomaso's testimony may cause the jurors themselves to question the accuracy or reliability of Plaintiffs' testimony does not turn his expert opinions into impermissible opinions on witness credibility.

Lastly, Monsanto states Dr. DiTomaso is qualified despite his lack of medical credentials to testify about Plaintiffs' dermal *contact* with Roundup as compared to dermal *absorption*. According to Monsanto, such dermal contact falls squarely within his expertise in weed management practices.

The Court finds that Monsanto has met the threshold requirements under section 490.065.2, RSMo, to present Dr. DiTomaso's testimony to the jury in this case. He is "qualified as an expert by knowledge, skill, experience, training, or education" based on his Ph.D. in botany and weed science and work in academia. *See* sec. 490.065.2(1), RSMo.

Plaintiff is correct that "the general rule is that expert testimony is inadmissible if it relates to the credibility of witnesses because it invades the province of the jury." *State v. Link*, 25 S.W.3d 136, 143 (Mo. banc 2000). "However, it is proper for a witness to testify to specific facts that discredit the testimony of another witness, as long as the witness does not comment directly

on the truthfulness of another witness." *Id.* ("[I]t did not invade the province of the jury for Officer Maher to explain the general concept of false sightings. . . . Nor was it improper for him to state specific facts that tended to discredit Ms. Burke's sighting. . . . But it was improper for him to go one step further and say that the police classified the information from Ms. Burke as a false sighting."). Here, Dr. DiTomaso may properly testify about standard uses of Roundup that might contradict Plaintiffs' purported uses so long as he does not "go one step further" and say Plaintiffs' testimony about their use and exposure to Roundup is untruthful.

Plaintiffs' other argument that Dr. DiTomaso's proposed testimony concerning the uses and benefits of herbicides like Roundup is irrelevant to issues in this case fails. "The litigants [in a design defect case] are certainly entitled to assist the jury in defining the term 'unreasonably dangerous' by presenting evidence 'that the utility of a design outweighs its risks, or that consumer expectations were violated, or any other theory of unreasonable dangerousness supported by the evidence.'" *Thompson v. Brown & Williamson Tobacco Corp.*, 207 S.W.3d 76, 90 (Mo. App. W.D. 2006) (quoting *Newman v. Ford Motor Co.*, 975 S.W.2d 147, 154 (Mo. banc 1998)).

For these reasons, the Court denies Plaintiffs' motion to exclude Dr. Tomasetti.

### J. Plaintiffs' Motion to Exclude Dr. Lauren Smith and Dr. Ran Reshef

Dr. Smith is a pathologist and professor of pathology, and Dr. Reshef is an associate professor of medicine. Both of them have been designated by Monsanto to offer opinions on general and specific causation.

Plaintiffs move to preclude Dr. Smith from testifying as to the following topics:

(1) her personal usage of Roundup products; (2) opinions and testimony regarding the truthfulness or credibility of descriptions of their exposures to Roundup; (3) that "bad luck" and/or "random replication error" caused the Plaintiffs' non-Hodgkin's lymphoma ("NHL"); and (4) a number of "other risk factors" for NHL that Dr. Smith does not attribute to causing the Plaintiffs' NHL.

36

Plaintiffs' motion at 1. First, Plaintiffs point to prior testimony by Dr. Smith in which she discussed her own personal use of Roundup. Plaintiffs argue such personal, anecdotal experience is not appropriate for expert testimony. While Plaintiffs do not cite Missouri caselaw directly on point, they cite to cases from other jurisdictions where courts have concluded such testimony is irrelevant and inadmissible. *See, e.g., In re: Tylenol (Acetaminophen) Mktg.*, No. 2436, 2016 WL 3125428, at *4 (E.D. Pa. June 3, 2016) ("Testimony by employees of the defendants about whether they personally take Tylenol is of little relevance to this case. However, the prejudice that such testimony may cause substantially outweighs any probative value it may have."); *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Pracs. & Relevant Prod. Liab. Litig.*, No. 3:09-MD-02100-DRH, 2011 WL 2650948, at *1 (S.D. Ill. June 29, 2011) ("The only evidence that is relevant is the particular plaintiff's evidence and the science that relates to that plaintiff and to the product [oral contraceptives] as a whole. Other purely anecdotal evidence outside of that is rank irrelevance and has no place in the jury's consideration. . . . It would be highly prejudicial for the jury to hear from some people who say they take the product, have their daughters take the product and haven't one day of health problems as a result of it.").

Second, Plaintiffs argue Dr. Smith's characterization of Plaintiffs Moore' and Pleu's usage of Roundup as "strange," "unnecessary," and "confusing" goes beyond her expertise as a pathologist who admits to not being an expert on usage or application of Roundup. Plaintiffs contend such testimony seeks to attack Plaintiffs' credibility, which is not a proper subject for expert testimony. *See Churchill*, 98 S.W.3d at 538–39 ("When determining the admissibility of opinion testimony, expert witnesses should not be allowed to give their opinion as to the veracity of another witness's statement, because in so doing, they invade the province of the jury.").

Third, Plaintiffs argue Dr. Smith and Dr. Reshef are not qualified to offer opinions that NHL is most likely caused by "bad luck" random replication errors as neither is a geneticist. Plaintiffs expressly incorporate their arguments that such "bad luck" or "sporadic" cancer theory is unreliable from their motion to exclude Dr. Tomasetti. At the time Plaintiffs filed their motion, Dr. Reshef had not yet been deposed.[6] Nevertheless, Plaintiffs expected him to offer similar testimony about "bad luck" causation and seek to exclude him from offer such testimony as well.

Lastly, Dr. Smith testified that both Plaintiffs in this case have no evidence of any of the following risk factors: genetic conditions, Epstein-Barr virus, HIV, H. Pylori, rheumatoid arthritis, hashimotos thyroiditis, lupus, organ transplants, and taking methotrexate. Because these risk factors are inapplicable to Plaintiffs Moore and Pleu, Plaintiffs argue Dr. Smith should be precluded from testifying about these other risk factors to avoid confusing the issues or misleading the jury. On the other hand, Dr. Smith testified that smoking, old age, and, in Plaintiff Pleu's case, working at a paper mill, were "unlikely" or merely "possible" causes of these Plaintiffs' cancers. Plaintiffs conclude such speculation and conjecture should be excluded from the jury. While Dr. Reshef had not yet been deposed when Plaintiffs filed their motion, they expected he would offer similar testimony and seek to preclude him from testifying on this topic as well.

Monsanto opposes Plaintiffs' motion to exclude Dr. Smith and Dr. Reshef. Monsanto asserts Dr. Smith is qualified as a practicing hematopathologist and clinical professor of pathology who specializes in diagnosing lymphomas, including NHL. Similarly, Dr. Reshef is a practicing oncologist and hematologist who specializes in diagnosing and treating blood cancers and NHL. Monsanto notes Dr. Reshef has testified without restriction in other Roundup trials, including the

---

[6] Dr. Reshef was deposed the same day Plaintiffs filed their motion to exclude.

recent *Alesi* trial in this Circuit Court.[7]  Monsanto further asserts that both Dr. Smith and Dr. Reshef will testify that Plaintiff Pleu has Monoclonal B-cell Lymphocytosis ("MBL")—a non-cancerous condition that is a precursor to NHL—rather than CLL as he alleges.

Next, Monsanto argues Dr. Smith and Dr. Reshef based their opinions on reliable methods. Contrary to Plaintiffs implication, they did not rely solely on the opinions of Dr. Tomasetti.  Rather, Dr. Smith and Dr. Reshef relied on numerous studies and other peer-reviewed work by other experts, including Dr. Tomasetti.  During his deposition in this case, Dr. Reshef rejected Plaintiffs' characterization of his conclusion as based on "bad luck" theory and, rather, refers to it as "random replication theory" or "naturally occurring."

Monsanto next argues Dr. Smith and Dr. Reshef should not be precluded from discussing other potential risk factors as part of their causation opinions.  Monsanto contends that preventing these experts from discussing Plaintiffs' other potential risk factors would arbitrarily limit their testimony, give the jury the wrong impression that they did not fully evaluate all available information, and restrict their ability to fully explain a crucial aspect of their specific causation opinions.

Lastly, Monsanto argues the Court should deny as moot Plaintiffs' request to exclude Dr. Smith and Dr. Reshef from testifying about their personal use of Roundup and Plaintiffs' request to exclude them from testifying about Plaintiffs Moore and Pleu's use of Roundup.  Monsanto asserts it has not designated either of these two experts to offer opinions on these topics and the testimony Plaintiffs cite from a prior Roundup case were, in Monsanto's counsel's words now, were irrelevant.  In light of this apparent concession, Plaintiffs' reply memorandum rephrases their specific requests for the Court to preclude Dr. Smith's and Dr. Reshef's testimonies as follows:

---

[7] The plaintiffs in *Alesi* did not move to exclude or limit Dr. Reshef's opinions.

(1) their views of any personal usage by Plaintiffs of Roundup products; (2) comments and/or opinions as to any facts at issue regarding the Plaintiffs' usage, application and/or exposure to glyphosate-based herbicides, including Roundup; (3) that "bad luck" and/or "random" genetic mutations caused the Plaintiffs' non-Hodgkin's lymphoma (NHL); and (4) other risk factors for NHL that neither Dr. Smith nor Dr. Reshef not attribute to causing the Plaintiffs' NHL.

Plaintiffs' reply memorandum at 1. *Compare with* Plaintiffs' motion at 1 (moving to preclude Dr. Smith from testifying about "(1) her personal usage of Roundup products").

The Court finds that Monsanto has met the threshold requirements under section 490.065.2, RSMo, to present Dr. Smith's and Dr. Reshef's testimonies to the jury in this case. Dr. Smith is "qualified as an expert by knowledge, skill, experience, training, or education" based on her board certification in anatomic and clinical pathology and hematopathology and experience in both academia and diagnosing NHL. Dr. Reshef is also qualified based on his experience as a practicing hematologist and oncologist as well as his work in academia. *See* sec. 490.065.2(1), RSMo.

Plaintiffs' arguments relating to the "bad luck," "random replication," or "naturally occurring" theory of NHL development or whether Dr. Smith and Dr. Reshef may testify about other risk factors go to the *weight* the jury should give to his opinions rather than their *admissibility*. *See Lauzon*, 270 F.3d at 693 (whether an expert "failed to rule out *every* possible alternative cause" goes to weight and not admissibility) (emphasis in original) (quoting *Westberry*, 178 F.3d at 265); *Larson*, 414 F.3d at 941 (8th Cir. 2005) (quoting *Hose*, 70 F.3d at 974) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination."); *Alcorn*, 50 S.W.3d at 246, *overruled on other grounds by Badahman*, 395 S.W.3d 29) ("Any weakness in the factual underpinnings of the expert's opinion or in the expert's knowledge goes to the weight that testimony should be given and not its admissibility.").

Plaintiffs are correct that Dr. Smith's testimony about her personal use of Roundup has no relevance to the issues whether glyphosate in Roundup can cause cancer generally or whether these Plaintiffs' exposure to Roundup specifically caused their cancer. Consequently, the Court grants Plaintiffs' motion to exclude Dr. Smith and Dr. Resehf in part to preclude them from testifying about their personal use of Roundup or Plaintiffs' use of Roundup, which Monsanto recognizes as moot on pages 17-18 of its response memorandum. In all other respects, Plaintiffs' motion to Dr. Smith and Dr. Resehf is denied in part.

### III.    CONCLUSION

For the reasons stated above, the Court make the following rulings:

1. Monsanto's Motion to Exclude the Opinions of Dr. Andrew Schneider and Memorandum of Law in Support is **GRANTED**. There are other experts put forward by Plaintiffs who will be able to testify on general and specific causation.

2. Monsanto's Motion to Exclude the Testimony of Dr. William R. Sawyer is **GRANTED IN PART** to prohibit him from offering testimony concerning the following topics:

   - Dr. Sawyer is precluded from offering testimony concerning Monsanto's regulatory duties as conceded by Plaintiffs on page 15 of their response memorandum;

   - Dr. Sawyer is precluded from offering testimony concerning Monsanto company documents and the sufficiency of the Roundup label.

   - Dr. Sawyer is precluded from offering testimony on specific causation.

Dr. Sawyer, however, may testify to the amount of Plaintiffs' exposure to Roundup. Prior to offering any testimony that trace ingredients give any additive effect to the risk of cancer, there must be testimony of a reliable foundation for such an opinion. The Court will make

the determination at that time.  There shall be no mention of trace ingredients in opening statements.

3.  Monsanto's Motion to Exclude the Testimony of Dr. Alfred Neugut is **DENIED AND GRANTED IN PART**.  Dr. Neugut is qualified and may give his initial opinions on general causation.  Monsanto alleges many fallacies in Dr. Neugut's reasons for his opinions that will be subject to cross-examination and go to the weight as opposed to admissibility.

As to the affidavit, the problem, if any, may be that it not only offers new opinions but possibly new reasons for such opinion that should have been disclosed in prior written discovery or deposition prior to the date of the affidavit.  If Monsanto wishes to exclude any of the affidavit or all of the affidavit, it should set forth the information to be excluded with cites to prior discovery that should have elicited said information and did not, or give reasons why said discovery was not requested on those matters.  This shall be completed the 17 day of Oct, Plaintiffs to respond by 19 day of Oct, Monsanto reply by 20 day of Oct.

4.  Monsanto's Motion to Exclude the Testimony of Dr. Joel Joseph Gagnier is **GRANTED IN PART** to prohibit him from offering testimony concerning the type of lymphoma which any individual plaintiff has.  In all other aspects, Monsanto's motion to exclude directed at Dr. Gagnier is **DENIED IN PART**.  Specifically, Dr. Gagnier may testify that those exposed to glyphosate at any point in their life showed a statistically significant increased risk for NHL in general and not as to the specific cancers of Plaintiffs.

5.  Monsanto's Motion to Exclude the Testimony of Dr. Ambrose K. Charles and its Brief in Support is **DENIED IN PART AND GRANTED IN PART**.  The Court finds that Dr.

Charles is qualified and may give his initial opinions on general and specific causation. Monsanto alleges many fallacies in Dr. Charles's reasons for his opinions that will be subject to cross-examination and go to the weight as opposed to admissibility. However, he may not testify that Plaintiff Pleu's CLL caused his prostate cancer as Plaintiffs have failed to show such conclusion is generally accepted.

As to the affidavit, the problem, if any, may be that it not only offers new opinions but possibly new reasons for such opinion that should have been disclosed in prior written discovery or deposition prior to the date of the affidavit. If Monsanto wishes to exclude any of the affidavit or all of the affidavit, it should set forth the information to be excluded with cites to prior discovery that should have elicited said information and did not, or give reasons why said discovery was not requested on those matters. This shall be completed the 17 day of Oct, Plaintiffs to respond by 19 day of Oct, Monsanto reply by 20 day of Oct

6. Monsanto's Motion to Exclude the Testimony of Dr. Christopher Portier is **DENIED**.

7. Monsanto's Motion to Exclude the Testimony of Charles Benbrook is **GRANTED IN PART** to exclude the testimony of Dr. Benbrook in part to prohibit him from offering testimony concerning the following topics:

- Dr. Benbrook is precluded from offering testimony regarding whether Monsanto followed EPA rules.

- Dr. Benbrook is precluded from offering testimony regarding Monsanto corporate documents.

- Dr. Benbrook is precluded from offering testimony regarding Monsanto's intent, motives, or state of mind, including any interpretation of documents that allegedly infer knowledge or intent.

- Dr. Benbrook is precluded from offering testimony regarding the EPA's intent or what it would have done.

- Dr. Benbrook is precluded form offering testimony on whether Monsanto complied with EPA rules.

- Dr. Benbrook is precluded from offering testimony on the sufficiency of Roundup's label.

Specifically, Dr. Benbrook may testify about the following topics:

- Dr. Benbrook may testify as to what EPA regulations say.

- Dr. Benbrook may testify as to what Monsanto did as a matter of fact.

- Dr. Benbrook may testify as to what the pesticide regulatory scheme and pesticide industry standards of care say assuming there are recognized industry standards.

- Dr. Benbrook may testify as to the differences between the genotoxicity datasets evaluated by EPA and IARC but may not offer his opinion that the organizations' positions are diametrically opposite.

- Dr. Benbrook may testify as to the facts of what Monsanto's corporate practices actually are if he provides a factual basis for those corporate practices, but he may not testify as to what he thinks they should be or what he thinks they are.

- Dr. Benbrook may testify about the factual history of Roundup.

While the Court will permit Dr. Benbrook to read what EPA rules say, he may not offer any narration or his opinion on whether Monsanto followed the EPA rules.  If the Court finds this testimony has no value, it may stop Dr. Benbrook at any time.

8.  Plaintiffs' *Daubert* Motion to Exclude the Opinions and Testimony of Defense Expert, Cristian Tomasetti, Ph.D. is **DENIED**.

9.  Plaintiffs' *Daubert* Motion to Exclude the Opinions and Testimony of Defendant's Expert, Joseph DiTomaso, Ph.D. is **DENIED**.

10. Plaintiffs' *Daubert* Motion to Exclude the Opinions and Testimony of Case-Specific Defense Experts, Lauren Smith, M.D. and Ran Reshef, M.D. is **GRANTED IN PART** to preclude them from testifying about their personal use of Roundup or Plaintiffs' use of Roundup, which Monsanto recognizes as moot on pages 17-18 of its response memorandum.  In all other respects, Plaintiffs' motion to exclude directed at Dr. Smith and Dr. Reshef is **DENIED IN PART**.

**SO ORDERED:**

Hon. Ellen H. Ribaudo
Circuit Judge, Division 18

10-13-22

45