**SCHLESINGER LAW OFFICES, P.A.**
Jeffrey L. Haberman
Sarah J. Schultz
1212 Southeast Third Avenue
Fort Lauderdale, FL 33316
Telephone: (954) 467-8800
Facsimile: (954) 320-9509
jhaberman@schlesingerlaw.com
sarah@schlesingerlaw.com

*Attorneys for Plaintiff, Peter Engilis*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No: 2741 |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | Case No.: 3:19-cv-07859-VC |
| Peter Engilis, Jr., *et al.*, | PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
|        Plaintiff, | |
| vs. | Hearing date: January 12, 2023 |
| Monsanto Company., | Time: 1:00 p.m. |
|        Defendant. | |
| Individual Case No.: 3:19-cv-07859-VC | |

# TABLE OF CONTENTS

TABLE OF CONTENTS ..............................................................................................................ii

TABLE OF AUTHORITIES .......................................................................................................iii

INTRODUCTION ....................................................................................................................... 1

FACTUAL BACKGROUND ....................................................................................................... 1

STANDARD OF LAW ................................................................................................................ 7

ARGUMENT ............................................................................................................................... 7

    I.      Plaintiffs Consent to the Dismissal of Their Breach of Warranty Claims (Counts IV & V). ............................................................................................... 7

    II.     Plaintiffs Have a Viable Punitive Damages Claim. ................................................ 7

          A. Florida's Choice of Law Analysis Requires the Application of Missouri Law to Plaintiffs' Punitive Damages Claim. ...................................................... 7

              *i. Florida's Choice of Law Analysis.* ........................................................ 7

              *ii. The § 145 Factors Favor the Application of Florida Law.* ............................. 9

              *iii. Missouri Has a Greater Interest in Deterring Monsanto's Wrongful Conduct.* ........................................................................................... 11

          B. Alternatively, in the Event the Court Finds That Florida Law Governs, Fla. Stat. § 768.73(2) Does Not Bar Plaintiffs' Punitive Damages Claim. ............................... 13

              *i. The Prior Punitive Damage Verdicts Awarded Against Monsanto are Insufficient to Punish Monsanto's Behavior.* ............................................. 14

              *ii. At This Time, Monsanto Still Sells Roundup Products Using Glyphosate as the Active Ingredient, and Continues to Deny That Glyphosate or Its Roundup Products are Capable of Causing NHL.* ............................................. 15

              *iii. Request for Evidentiary Hearing.* ...................................................... 16

          C. Plaintiffs Are Entitled to Punitive Damages Under Florida Law as a Result of Monsanto's Conduct. ...................................................................................... 17

CONCLUSION .......................................................................................................................... 19

CERTIFICATE OF SERVICE .................................................................................................... 20

# TABLE OF AUTHORITIES

*Page(s)*

**CASES**

*Aguirre Cruz v. Ford Motor Co.*,
    435 F. Supp. 2d 701 (W.D. Tenn. 2006)...................................................................... 11

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)............................................................................................................ 7

*Bishop v. Florida Specialty Paint Co.*,
    389 So. 2d 999 (Fla. 1980).............................................................................................. 8, 9

*Chiles v. Novartis Pharm. Corp.*,
    923 F. Supp. 2d 1330 (M.D. Fla. 2013)........................................................................ 12

*Crowell v. Clay Hyder Trucking Lines, Inc.*,
    700 So. 2d 120 (Fla. 2d DCA 1997) ................................................................................ 8

*Fisher v. City of Miami*,
    172 So. 2d 455 (Fla. 1965)........................................................................................... 14, 15

*Geery v. Ethicon, Inc.*,
    No. 6:20-cv-1975-RBD (M.D. Fla. Aug. 13, 2021) ..................................................... 12

*Georgia State Conf. of NAACP v. Fayette Cty. Bd. of Comm's*,
    775 F.3d 1336(11th Cir. 2015) .......................................................................................... 7

*Grupo Televisa, S.A. v. Telemundo Comm. Grp., Inc.*,
    485 F.3d 1233 (11th Cir. 2007) ................................................................................... 10, 11

*Hersh v. CKE Restaurant Holdings, Inc.*,
    571 F. Supp. 3d 1046 (E.D. Mo. 2021)......................................................................... 13

*In re Takata Airbag Prods. Liab. Litig.*,
    2016 WL 5848843 (S.D. Fla. Sept. 21, 2016) ................................................................ 9

*Krause v. Novartis Pharm. Corp.*,
    926 F. Supp. 2d 1306 (N.D. Fla. 2013).......................................................................... 12

*Leonard v. Air Evac EMS, Inc.*,
    2006 WL 8459145 (E.D. Mo. Oct. 10, 2006) ............................................................... 13

*Matushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)............................................................................................................. 7

*Neiman Nix v. ESPN, Inc.*,
    772 Fed. Appx. 807 (11th Cir. 2019) ............................................................................. 10

*Piamba Cortes v. Am. Airlines, Inc.*,
    177 F.3d 1272 (11th Cir. 1999) ......................................................................................... 8

*Pysca Panama, S.A. v. Tensar Earth Techs., Inc.*,
    625 F. Supp. 2d 1198 (S.D. Fla. 2008) ........................................................................... 7

iii

*Rinaldi v. Aaron*,
  314 So. 2d 762 (Fla. 1975) ............................................................................................... 14

*Salinero v. Johnson & Johnson*,
  408 F. Supp. 3d 1354 (S.D. Fla. 2019) ............................................................................ 12

*Seals v. Wright Medical Technology, Inc.*,
  2022 WL 16740107 (E.D. Mo. Nov. 7, 2022) .................................................................. 12

*Stardust, 3007 LLC v. City of Brookhaven*,
  899 F.3d 1164 (11th Cir. 2018) .......................................................................................... 7

*Tune v. Philip Morris, Inc.*,
  766 So. 2d 350 (Fla. 2d DCA 2000) ................................................................................... 7


**STATUTES**

Fla. Stat. § 768.73(2) ..................................................................................................... *passim*

Mo. Stat. § 510.261 ................................................................................................................ 8


**OTHER AUTHORITIES**

Restatement (Second) Conflict of Laws § 145 ............................................................... *passim*

Restatement (Second) Conflict of Laws § 146 ....................................................................... 9

Restatement (Second) Conflict of Laws § 6 ...................................................................... 9, 13

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**INTRODUCTION**

As Monsanto notes, Plaintiffs' Complaint asserts claims for strict liability (design defect and failure to warn), negligence, and breach of warranty (express and implied).  (Doc Nos. 1, 28).  Consistent with this Court's repeated instructions not to re-litigate issues previously ruled upon by the Court, Monsanto does not assert arguments as to Plaintiffs' strict liability or negligence claims.  (Doc. 28, at 7).  As a result, Monsanto's motion for summary judgment only asserts attacks on Plaintiffs' breach of warranty claims and Plaintiffs' punitive damages claim.  *Id.*  Plaintiffs do not intend to submit their breach of warranty claims to the jury.

The thrust of Monsanto's motion is aimed at disposing of Plaintiffs' punitive damages claim pursuant to Florida law (and specifically Fla. Stat. § 768.73(2)).  (Doc. 28).  First, Monsanto's motion on this point should be denied because, under Florida's choice of law principles, Missouri law governs Plaintiffs' punitive damages claim.  Alternatively, even if the Court were to apply Florida law, Fla. Stat. § 768.73(2) does not bar Plaintiffs' punitive damages for three reasons: (1) prior punitive damage awards are insufficient in light of Defendant's net worth; (2) the prior awards are insufficient in light of Monsanto's egregious conduct and conscious disregard for the safety of consumers; and (3) the prior awards are insufficient given that Monsanto will continue to sell its glyphosate-based Roundup products for commercial use, and has made abundantly clear it is not discontinuing residential sales of Roundup in 2023 based on any safety concerns.  For these reasons, as explained more thoroughly below, the Court should deny Monsanto's motion as to Plaintiffs' punitive damages claim.

**FACTUAL BACKGROUND**

**I.       Plaintiff, Peter Engilis**

Plaintiff was diagnosed with Chronic Lymphocytic Lymphoma ("CLL"), a subtype of NHL, in November 2014.  *See* Plaintiff Fact Sheet, at 5 (attached hereto as "**Exhibit A**"); Deposition of Peter Engilis, 11/2/2021 (attached hereto as "**Exhibit B**").  Mr. Engilis first began using Roundup in 1990 for residential weed control at his home in Debary, Florida.  *Id.* at 8.  At his Debary residence,

1

he used Roundup twice a month for twenty-five (25) years (1990 to 2015). *Id.* In addition to his Debary residence, Mr. Engilis also used Roundup at his Fort Lauderdale, Florida home occasionally from 1996 to 2002 and at his Summerfield, Florida home once a month from 2012 to 2013. *Id.*

## II.     Monsanto's Roundup Deceit

### A. Monsanto Has Known of an Association Between Glyphosate-Based Herbicides ("GBHs") and Cancer for Decades but Withheld Such Information from the Public.

Monsanto introduced glyphosate, the active ingredient in Roundup, as an herbicide in the 1970's. Prior to that, glyphosate was patented as a descaling agent for industrial boilers, due to glyphosate's ability to combine with, and thus strip, metallic minerals. The EPA's Office of Pesticide Programs processed the initial petition and registration application for glyphosate in the 1970's. Monsanto hired Industrial Bio-Test Laboratories ("IBT") to conduct a majority of the initial studies it provided to the EPA. *See* July 1983 Summary of IBT Review Program (attached hereto as "**Exhibit C**"). After approving the registration of glyphosate based on the IBT data, the EPA learned that IBT generated fraudulent data on behalf of its clients, including Monsanto. *See id.* IBT executives were later indicted and convicted for their fraudulent laboratory practices. *United States v. Keplinger*, 776 F.2d 678. As a result, the EPA invalidated the glyphosate studies. *See* Ex. C.

The EPA required Monsanto to redo toxicological and carcinogenicity studies on glyphosate; Monsanto submitted the first valid mouse carcinogenicity study on glyphosate to the EPA in 1983. *See* 1985 EPA Meeting Minutes (attached hereto as "**Exhibit D**"). Following its review of the study, the EPA concluded that glyphosate "was oncogenic in male mice causing renal tubule adenomas … in a dose-related manner." Expert Report of Charles Benbrook, at 78 (attached hereto as "**Exhibit E**"). Cognizant of the negative effect of the oncogenicity finding, Monsanto set out "to do all that is possible in order to have the Agency reverse its decision." August 28, 1985 Glyphosate Mouse Study Memo (attached hereto as "**Exhibit F**").

The EPA, however, directed that Monsanto conduct a new, additional mouse oncogenicity study. *See* EPA SAP Panel Report (attached hereto as "**Exhibit G**").  Monsanto refused EPA's request to repeat the study (in fact this refusal continues to this day), and attempted to minimize the significance of the oncogenicity finding it had submitted.  *See id.*  But in 1985, the EPA concluded that glyphosate was a Group C oncogene: a possible human carcinogen.[1]  *See* Ex. E, Benbrook Report, at 75–78.

Monsanto, recognizing that the classification of glyphosate as a Group C oncogene would have negative economic repercussions, hired a pathologist to review the "in an effort to persuade the agency that the tumors [in the oncogenicity study] are not related to glyphosate." *Id.* at 72.  One way to do that was to "find" a tumor in the control group.  *See id.*  The pathologist received the actual slides ***after*** he had agreed to assist Monsanto in their efforts to change the EPA's decision.  *See id.*  Following his review, the pathologist claimed to have found a kidney tumor in the control group—a tumor ***not*** found by the original pathologist who conducted the study and not confirmed by EPA scientists.  *Id.*.  This "found" tumor changed the statistical significance of the study's finding in Monsanto's favor, and Monsanto embarked on a lobbying effort to convince the EPA to change the Group C classification.  *Id.*

Monsanto not only refused to conduct studies required by the EPA to determine whether glyphosate and GBHs were oncogenic and/or carcinogenic, but it also refused to conduct studies recommended by its own consultants.  *See* 1999 Letter from Dr. James Parry (attached hereto as "**Exhibit H**").  In the 1990's, several published studies concluded that glyphosate was genotoxic.  *See id.*  Dr. Donna Farmer, Monsanto's Manager of Toxicology Programs, conceded privately within the company that the recommended studies were problematic and Monsanto needed another expert to

---

[1] March 4, 1985 memo re: glyphosate consensus review. *Available at:*
https://archive.epa.gov/pesticides/chemicalsearch/chemical/foia/web/pdf/103601/103601-171.pdf

review the data to dig Monsanto out of the "genotox hole."  1999 Email from Alan Wilson (attached hereto as "**Exhibit I**").  Publicly, however, Monsanto discounted any concern.

Due to Monsanto's concerns about the published genotoxicity studies, Monsanto retained a world-renowned expert in genotoxicty, Dr. James Parry, to review the data and offer his conclusions. *Id.*  Following his review, Dr. Parry provided a report to Monsanto that "glyphosate is a potential clastogenic in vitro" and that "glyphosate mixtures may be capable of inducing oxidative damage in vivo."  *Id.*  In other words, "glyphosate is capable of producing genotoxicity both in vivo and in vitro . . . ."  *Id*.  Dr. Parry recommended that Monsanto conduct further research to determine the genotoxicity of GBHs, the mechanisms giving rise to genotoxicity, and the relevance of these mechanisms to the safety or lack thereof of GBHs.  *See id.*

Monsanto decided that it was not going to do the studies that Dr. Parry suggested.  1999 Email to Donna Farmer (attached hereto as "**Exhibit J**").  From the outset, Monsanto's aim in hiring Dr. Parry was not to determine whether GBHs cause cancer but rather to find an expert who would influence regulators when genotoxicity issues arise to convince them that GBHs do not cause cancer. Not only did Monsanto fail to conduct the studies Dr. Parry deemed necessary to determine Roundup's genotoxicity, but it also failed to produce the Parry Report to the EPA as it was legally required to do under 40 CFR 159.158.  *See* Deposition Testimony of Mark Martens, Vol. 1, 4/7/2017 (attached hereto as "**Exhibit K**").  Further, because Dr. Parry never came around to Monsanto's view of the science, Monsanto would not let him speak to regulators, essentially silencing him from disclosing Roundup's serious human health risks.  *See id.*

**B.  Monsanto Refuses To Test Its Formulated Products.**

Any review by the EPA is limited to the active ingredient glyphosate and does not consider the carcinogenic effect of formulated products, such as Roundup.  However, consumers, like Mr. Engilis, of course, are never exposed to glyphosate alone; they are always exposed to glyphosate and a mix of other product ingredients.  Glyphosate is always used in conjunction with a "surfactant," a

4

chemical which allows glyphosate to adhere to the skin and facilitate the absorption of glyphosate through cell membranes.  Ex. E, Benbrook Report, at 111.  For this reason, published studies have consistently demonstrated that the health risks posed by formulated GBHs are considerably greater than with pure glyphosate alone.  *Id.* at 95, 130–31.

Monsanto's Senior Toxicologist, Dr. Donna Farmer, summed up the significance of Monsanto's failure to test the formulated glyphosate products on September 21, 2009, when she confirmed that Monsanto **"cannot say that *Roundup* does not cause cancer . . . we have not done carcinogenicity studies with 'Roundup.'"**  1999 Email from Donna Farmer (attached hereto as "**Exhibit L**") (emphasis added).

### C. Monsanto Floods the Scientific Literature with Ghostwritten Articles to Bolster the Safety Profile of GBHs.

Monsanto's knowledge of an association between GBHs and NHL was not limited to toxicological and genotoxicity studies.  As more and more studies began to establish an association between GBHs and NHL, including epidemiological studies, Monsanto developed a strategy to "level the playing field" by ghostwriting[2] scientific literature that would help establish the safety of GBHs.

Rather than be transparent with the information it had, such as from Dr. Parry, and to submit that information to the EPA as federal law required it to do, Monsanto instead elected to ghostwrite an article, concluding "Roundup herbicide does not pose a health risk to humans."[3]  Although none of Monsanto's employees are listed as authors, William Heydens, a Monsanto employee, readily admits that he ghostwrote the manuscript and provided final edits to the paper.  Ex. E, Benbrook

---

[2] The World Association of Medical Editors has put forth the following statement regarding ghostwriting: "The integrity of the published record of scientific research depends not only on the validity of the science but also on honesty in authorship . . . The scientific record is distorted if the primary purpose of an article is to persuade readers in favor of a special interest, rather than to inform and educate, and this purpose is concealed. Ghost authorship exists when someone has made substantial contributions to writing a manuscript and this role is not mentioned in the manuscript itself. WAME considers ghost authorship dishonest and unacceptable." http://www.wame.org/policy-statements.

[3] Williams, et al., Safety Evaluation and Risk Assessment of the Herbicide Roundup and Its Active Ingredient, Glyphosate, for Humans, Regulatory Toxicology and Pharmacology, 31, 117–165 (2000).

Report, at 156–67.  The EPA has consistently relied on the ghostwritten Williams *et al.* (2000) paper when evaluating the safety of GBHs.  *See id.*  In 2013, Monsanto ghostwrote another article titled "Review of genotoxicity studies of glyphosate and glyphosate-based formulations."  Monsanto Manuscript Clearance Form (attached hereto as "**Exhibit M**").   The EPA has consistently relied on this ghostwritten article in deciding the safety of GBHs.

Immediately after the International Agency for Research on Cancer ("IARC") found glyphosate to be a probable human carcinogen (Group 2A) in 2015, Monsanto devised a response plan due to the "[s]evere stigma attached to Group 2A Classification."  Ex. E, Benbrook Report.  Part of its attack plan was to convene an expert panel to publish a comprehensive evaluation of glyphosate's carcinogenicity.  *Id.*  Monsanto noted that the genotoxicity section would be important "to prepare their litigation defense."  *Id.* Monsanto proceeded with arranging the expert panel and worked with Intertek, an industry consultancy firm, to create a false impression that the expert panel was independent.  *See id.*

### D. Evidence Reveals Monsanto's Undue Influence on the EPA and Efforts to Undermine IARC's Classification of Glyphosate.

Monsanto developed unusually close relationships with key officials and scientists at EPA's Office of Pesticide Programs.  In 2015, Monsanto conducted several discussions with Jess Rowland, then Deputy Director of the OPP Health Effects Division, regarding a planned review of glyphosate by the Agency for Toxic Substances and Disease Registry (ATSDR), the U.S. agency responsible for assessing toxicity of chemicals.   2015 Email from Heydens (attached hereto as "**Exhibit N**"). Monsanto was concerned that ATSDR would reach a conclusion on glyphosate similar to IARC.  *Id.* During a discussion with Monsanto, Rowland asked for a contact name at ATSDR and told Monsanto, "If I can kill this [the ATSDR review] I should get a medal," recognizing Rowland's efforts in combating the IARC classification.  *Id.*

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**STANDARD OF LAW**

In determining whether a claim can survive summary judgment, courts are required to draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986). Any doubts concerning the appropriateness of granting summary judgment are to be resolved in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Stardust, 3007 LLC v. City of Brookhaven*, 899 F.3d 1164, 1170 (11th Cir. 2018); *Georgia State Conf. of NAACP v. Fayette Cty. Bd. of Comm's*, 775 F.3d 1336, 1345 (11th Cir. 2015) ("If any fact issues exist a trial judge must not make findings but is required to deny the motion and proceed to trial."). The nonmoving party is only required to show evidence supporting the claimed factual dispute so that a jury may resolve the parties' differing version of the truth at trial. *Anderson*, 477 U.S. at 249. Determining witness credibility, weighing evidence, and drawing legitimate inferences from facts are all jury functions. *Id.* at 250–55. Thus, if reasonable minds could differ as to a material fact, summary judgment should be denied. *Id.*

**ARGUMENT**

**I.**   **Plaintiffs Consent to the Dismissal of Their Breach of Warranty Claims (Counts IV & V).**

Plaintiffs do not intend to submit their breach of warranty claims to the jury. Accordingly, Plaintiffs' consent to the dismissal of these claims in Count IV and Count V of Plaintiffs' Complaint and, as a result, will not submit a substantive response as to that claim. (Doc. 28, at Section I).

**II.**   **Plaintiffs Have a Viable Punitive Damages Claim.**

   **A. Florida's Choice of Law Analysis Requires the Application of Missouri Law to Plaintiffs' Punitive Damages Claim.**

   ***i.*** ***Florida's Choice of Law Analysis.***

The first inquiry in a choice-of-law analysis is whether a "true conflict" of laws exists. *Pysca Panama, S.A. v. Tensar Earth Techs., Inc.*, 625 F. Supp. 2d 1198, 1218 (S.D. Fla. 2008) (citing *Tune*

7

*v. Philip Morris, Inc.*, 766 So. 2d 350, 352 (Fla. 2d DCA 2000)).  Here, Missouri law and Florida law present a true conflict as to the applicability of punitive damages in a case where a Defendant has been assessed prior punitive damages verdicts.  *Compare* Mo. Stat. § 510.261,[4] *with* Fla. Stat. § 768.73(2).  Where a true conflict exists, the Florida courts use the most significant relationship test as articulated by the Restatement (Second) Conflict of Laws § 145–146 and § 6 (1971).  *See Bishop v. Florida Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980).

The Restatement (Second) of Conflict of Law provides a two-part test whereby courts must determine which state has the most significant relationship between the parties and the harm or injury, in light of the policy considerations of the two state's laws.  *See Crowell v. Clay Hyder Trucking Lines, Inc.*, 700 So. 2d 120, 123 (Fla. 2d DCA 1997).  Section 145 of the Restatement (Second) Conflict of Laws states:

> **§ 145. The General Principle**
> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>> (a) the place where the injury occurred,
>> (b) the place where the conduct causing the injury occurred,
>> (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and
>> (d) the place where the relationship, if any, between the parties is centered.

Significantly, courts "cannot simply add up the factors delineated in section 145(2) and then apply the law of the sovereign with the greatest numerical total." *Piamba Cortes v. Am. Airlines, Inc.*, 177 F.3d 1272, 1298 (11th Cir. 1999). Section 145 advises that "*[t]hese contacts are to be evaluated according to their relative importance with respect to the particular issue*." Restatement (Second)

---

[4] Because this case was filed on November 11, 2019, the amended version of this Missouri statute (amended on August 28, 2020) does not apply to this case.

Conflict of Laws § 145 (emphasis added).  The Restatement then directs courts to consider the factors enumerated in Section 6 of the Restatement (Second) Conflict of Laws when weighing the interests of each state in a particular case with respect to the issue at hand.

> **§ 6. Choice of Law Principles**
> Section 6 of the *Restatement (Second)* lists the following factors as important choice of law considerations in all areas of law:
>  (a) the needs of the interstate and international systems,
>  (b) the relevant policies of the forum,
>  (c) the relevant policies of other interested states and the relative
>    interests of those states in the determination of the particular issue,
>  (d) the protection of justified expectations,
>  (e) the basic policies underlying the particular field of law,
>  (f) certainty, predictability and uniformity of result, and
>  (g) ease in the determination and application of the law to be applied.

Restatement (Second) Conflict of Laws § 6; *see also In re Takata Airbag Prods. Liab. Litig.*, 2016 WL 5848843, at *3 (S.D. Fla. Sept. 21, 2016).  While § 146 generally requires the application of the forum state's laws, it clears states that such is the case "*unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.*" Restatement (Second) Conflict of Laws § 146 (emphasis added).  In this case, Missouri law has "a more significant relationship under the principles stated in § 6 to the occurrence and the parties." Restatement (Second) Conflict of Laws § 146.  *See Bishop*, 389 So. 2d at 1001 ("[T]he Restatement rule recognizes that ***the state where the injury occurred may have little actual significance for the cause of action***.") (emphasis added).

  *ii. The § 145 Factors Favor the Application of Florida Law.*

   Florida's choice-of-law factors dictate that Missouri (rather than Florida) has the most significant relationship to Plaintiffs' punitive damages claim.  This is because the factors to be considered under the most significant relationship test "are to be evaluated *according to their relative importance with respect to the particular issue.*"  Restatement (Second) Conflict of Laws § 145

(emphasis added); *see also Neiman Nix v. ESPN, Inc.*, 772 Fed. Appx. 807, 809 (11th Cir. 2019). Here, the only particular issue being evaluated under the most significant relationship test is Plaintiffs' punitive damages claim.  As to all other claims, Plaintiffs agree that Florida law should apply.

The Restatement's most significant relationship test is comprised of four factors: (1) the place where the injury occurred; (2) the place where the conduct causing injury occurred; (3) the place where the parties are domiciled; and (4) the place where the relationship is centered.  Restatement (Second) Conflict of Laws § 145.  When evaluating the factors with respect to Plaintiffs' punitive damages claim, Missouri has the most significant relationship to Plaintiffs' punitive damages claim.

***Place Where the Injury Occurred.***  The first factor considers the place where the injury occurred.  While the state where the injury occurred generally has a significant interest, "an important factor in determining which is the state of most significant relationship is the purpose sought to be achieved by the rule of tort law involved.  *If this purpose is to punish the tortfeasor and thus to deter others from following his example, there is better reason to say that <u>the state where the conduct occurred is the state of dominant interest</u> and that its local law should control than if the tort rule is designed primarily to compensate the victim for his injuries.*"  Restatement (Second) Conflict of Laws § 145, cmt. e (emphasis added); *see also Grupo Televisa, S.A. v. Telemundo Comm'n Grp., Inc.*, 485 F.3d 1233, 1241 (11th Cir. 2007).  Thus, while Mr. Engilis's injuries indeed occurred in Florida, the place where the conduct occurred (here, Missouri) has the more dominant interest.

***Place Where the Conduct Causing Injury Occurred.***  As noted above, principal to the § 145 analysis is determining the second factor—where the conduct causing the harm occurred or, in other words, where the conduct justifying punitive damages emanated.  Plaintiffs' punitive damages claim is based almost exclusively on conduct and omissions emanating from Missouri—where all decisions about manufacturing, design, and marketing its Roundup products were made; where knowledge concerning the dangers of Roundup to consumers were accumulated; where the decision to proceed marketing and promoting its defective product were made; where Monsanto internal documents were

created and emanated from; and, where Monsanto was headquartered.  Consequently, there this little question that this critical factor weighs heavily in favor in applying Missouri law to Plaintiffs' punitive damages claim.

**The Parties' Domiciles.**  The third factor considers the domicile of the parties.  Here, the domiciles of the parties here are evenly balanced—Monsanto was headquartered in Missouri, while Mr. Engilis is domiciled in Florida.

**Place Where the Relationship Is Centered.**  The fourth factor involves determining where the parties' relationship is centered.  While true that the harm that Monsanto is alleged to have caused Mr. Engilis occurred largely in Florida, nothing in Monsanto's sales, marketing, or distribution practices suggests that the alleged injury was more likely to occur in Florida than in any other state.  Consequently, the place of injury is fortuitous because the place of injury bears little relation to Monanto's punitive conduct.  By contrast, Monsanto's punitive conduct is centered in Missouri as Monsanto was a corporation headquartered in Missouri, made and designed its products in Missouri, crafted its warnings and marketing materials in Missouri, directed operations in Missouri, and submitted regulatory filings from Missouri.

> ### iii.       Missouri Has a Greater Interest in Deterring Monsanto's Wrongful Conduct.

Courts applying the Restatement (Second) Conflict of Laws analysis have emphasized the deterrence rationale underlying punitive damages.  *Grupo Televisa*, 485 F.3d at 1241 ("[W]hen the primary purpose of the tort rule involved is to deter or punish misconduct, the place where the conduct occurred has peculiar significance."); *see also Aguirre Cruz v. Ford Motor Co.*, 435 F. Supp. 2d 701, 706–07 (W.D. Tenn. 2006) (applying Michigan law over the law of the forum state to punitive damages claim in a design defect and failure to warn case because decisions regarding design, manufacture, and warnings took place in corporate headquarters in Michigan).  With that rationale in mind, it becomes clear that Missouri law should apply to Plaintiffs' claim for punitive damages

because Missouri law demonstrates a greater interest in applying its statute in lawsuits that involve Missouri manufacturers.

In particular, Florida federal case law makes clear that the law of the state where the misconduct occurred has a superior interest to a punitive damage claim. *See Salinero v. Johnson & Johnson*, 408 F. Supp. 3d 1354, 1357 (S.D. Fla. 2019) ("Because punitive damages are meant to deter or punish misconduct, the state where the allegedly defective product was designed and manufactured—that is, New Jersey—has a superior interest here . . . Accordingly, the Court holds that New Jersey law applies to Plaintiffs' punitive damages claims."); *Geery v. Ethicon, Inc.*, No. 6:20-cv-1975-RBD (Doc. No. 142-1, at 17) (M.D. Fla. Aug. 13, 2021) ("Although Plaintiff was injured in Florida, the allegedly defective products were designed and manufactured in New Jersey. As punitive damages are meant to deter or punish misconduct, the state where the misconduct occurred—New Jersey—has a superior interest here."); *Krause v. Novartis Pharm. Corp.*, 926 F. Supp. 2d 1306, 1311–12 (N.D. Fla. 2013) ("Here, despite the fact that the plaintiff's injuries occurred in Florida, the alleged misconduct to be punished by a punitive damage award—that is, the defendant's decisions as to the labeling, packaging, and the warning of the Aredia and Zometa drugs—occurred in New Jersey . . . Therefore, the court finds that the state with the dominant interest and most significant relationship to the issue of punitive damages in this case is New Jersey."); *Chiles v. Novartis Pharm. Corp.*, 923 F. Supp. 2d 1330, 1333 (M.D. Fla. 2013) ("Defendant is correct that New Jersey has a more significant relationship to the issue of punitive damages than Plaintiff's home state in light of Novartis' contacts with New Jersey and the Restatement's § 6 principles. Because the relevant conduct at issue took place primarily in New Jersey, that state's law on punitive damages is applicable under the Florida choice of law analysis. Thus, Defendant's motion to apply New Jersey law to the issue of punitive damages is granted."). The same result should follow here.

Indeed, Missouri has expressed a strong interest in punishing companies headquartered in Missouri and deterring similar conduct by other resident defendants. *See Seals v. Wright Medical*

12

*Technology, Inc.*, 2022 WL 16740107, at *4 (E.D. Mo. Nov. 7, 2022) ("Missouri has an interest in applying its own punitive damages law to inflect punishment and to serve as an example and deterrent to similar conduct occurring in Missouri."); *Hersh v. CKE Restaurant Holdings, Inc.*, 571 F. Supp. 3d 1046, 1054 (E.D. Mo. 2021) ("[P]unitive damages . . . have as their purpose, not the compensation of the plaintiff, but the punishment of the defendant and the deterrence of the offending conduct in the future. Missouri thus has a strong interest in imposing punitive damages for the wrongful conduct of a corporation headquartered in Missouri; [t]o find otherwise would be to gut the very concept of corporate accountability . . . [and] would encourage rampant subterfuge and confusion.") (internal quotations omitted); *Leonard v. Air Evac EMS, Inc.*, 2006 WL 8459145, at *6 (E.D. Mo. Oct. 10, 2006) ("Missouri . . . has expressed a policy preference to punish and deter its resident defendants from misconduct of this nature. This seems especially true in a case such as this where a Missouri company is operating its business in surrounding states, but is directing all of those operations from its Missouri headquarters. Nothing in the Missouri statutes or cases indicates that Missouri intends to create a safe-haven for tortfeasing companies, so long as they only hurt residents of other states.").

Because Missouri law has more significant relationship to the particular issue of punitive damages and because Missouri has a greater interest in applying its punitive damages law to deter conduct emanating from Missouri under the § 6 policy considerations, this Court should apply Missouri law to Plaintiffs' punitive damages claim.

### B. Alternatively, in the Event the Court Finds That Florida Law Governs, Fla. Stat. § 768.73(2) Does Not Bar Plaintiffs' Punitive Damages Claim.

The exception provided in subsection 768.73(2)(b) is by no means a narrow one. To the contrary, it provides:

> (b) In subsequent civil actions involving the same act or single course of conduct for which punitive damages have already been awarded, **if the court determines by clear and convincing evidence that the amount of prior punitive damages awarded was insufficient to punish that defendant's behavior,** the court may permit a jury to consider an award of subsequent punitive damages. In permitting

13

a jury to consider awarding subsequent punitive damages, **the court shall make specific findings of fact in the record to support its conclusion. In addition, the court may consider whether the defendant's act or course of conduct has ceased**. Any subsequent punitive damage awards must be reduced by the amount of any earlier punitive damage awards rendered in state or federal court.

Fla. Stat. § 768.73(2)(b) (emphasis added).  Given the language of this statute, there are several flaws with Defendant's argument.

> **i.      The Prior Punitive Damage Verdicts Awarded Against Monsanto are Insufficient to Punish Monsanto's Behavior.**

Monsanto's briefing practically ignores the statutory limitation set forth in § 768.73(2)(b), which provides that even where punitive damages have already been awarded for certain conduct, they may still be appropriate if "the amount of prior punitive damages awarded was *insufficient to punish that defendant's behavior.*" *Id*. (emphasis added).  Although the statute itself does not define what is insufficient or conversely, what is sufficient, Florida case law sheds some light on how the Florida Supreme Court would make this determination.

In Florida, to determine the amount of punitive damages required to sufficiently punish and deter a particular defendant, the trier of fact considers the nature, extent, and enormity of the wrong, the intent of the party committing it and all circumstances attending the particular incident, as well as the financial position of defendant. *Rinaldi v. Aaron*, 314 So. 2d 762, 763 (Fla. 1975).  Specifically, with respect to the financial position of the defendant, "[t]he theory is-the wealthier the wrongdoer, the greater the award.  Otherwise stated, a relatively small sum might be adequate to punish a poor man.  A much greater sum, for the same wrong, would be needed to punish a rich man." *Fisher v. City of Miami*, 172 So. 2d 455, 457 (Fla. 1965).

Thus, the ultimate question is whether past punitive verdicts have been punishment enough for Monsanto.  They have not.  On this point, the math does not lie.  As of this date, Monsanto states that the punitive damages verdicts upheld against it total somewhere around, or more than, $100 million in the Roundup litigation.  (Doc. 28, at 17).  Bayer AG (who acquired Monsanto in 2018) has

a current net worth of $54.47 billion.[5]  Thus, all of the punitive verdicts identified by Monsanto in

Roundup cases total only about 0.18% of Bayer AG's net worth.  This is unquestionably "a relatively

small sum" of money to Bayer AG/Monsanto.  *See Fisher*, 172 So. 2d at 457.

Given the conduct in question, not even the strong voices of the juries that have deliberated

to date have been adequate to send Monsanto a message.  That is particularly so in view of the reality

that, as set forth in Section II(B)(ii) *infra*, Monsanto's conduct has not "ceased" under Section

768.73(2)(b).  But even if the Court were not fully persuaded by these figures, the Court is required

to make "specific findings of fact" by "clear and convincing evidence."  Fla. Stat. § 768.73(2)(b).

Consequently, the Court should hold an evidentiary hearing to make this determination.  *See*

*discussion infra* at Section II(B)(iii).

> **ii.**    ***At This Time, Monsanto Still Sells Roundup Products Using Glyphosate as the Active Ingredient, and Continues to Deny That Glyphosate or Its Roundup Products are Capable of Causing NHL.***

In determining whether prior punitive damages awards are insufficient, section 768 allows for

consideration of whether Monsanto's conduct has "ceased."  Fla. Stat. § 768.73(2)(b) ("In addition,

the court may consider whether the defendant's act or course of conduct has ceased.").  Here, the

conduct has not ceased.  Even today, Monsanto denies that glyphosate or its Roundup products

containing glyphosate as the main, active ingredient are defective or capable of causing NHL. The

propaganda that Monsanto advocates today is no different from the message it gave to consumers

long ago, despite evidence that its glyphosate-based formulation, Roundup, can cause or contribute

to cause the user to develop NHL.  Monsanto similarly and consistently denies that Roundup can

cause NHL, even in the face of a growing number of peer-reviewed studies that confirm

---

[5] https://www.macrotrends.net/stocks/charts/BAYRY/bayer/net-worth#:~:text=Bayer%20net%20worth%20as%20of%20December%2013%2C%202022%20is%20%2454.47B.&text=Bayer%20AG%20is%20a%20life,of%20health%20care%20and%20agriculture.

epidemiologic evidence that Roundup increases the risk of developing NHL.  Monsanto continues even today to dispute these findings, pointing the finger to other causes or just "bad luck".

In short, Monsanto's position ignores what juries have repeatedly told it. It is clear that Monsanto has learned no lessons from this six-year long litigation; Monsanto still believes they acted reasonably.  To the extent that enduring a 0.18% hit to its net worth can even be considered a true punishment to the company, the fact that Monsanto refuses to acknowledge liability for its actions is proof alone that its conduct has not "ceased" under Section 768.73(2)(b).

What's more, Monsanto claims that "the prior punitive awards have had their intended effect [because] Monsanto is discontinuing the sale of glyphosate-based herbicides in the residential marketplace." (Doc. 28, at 18).  This is misleading for several reasons.  For one, as Monsanto itself points out in its motion, it is **not** discontinuing the sale of glyphosate-based herbicides for residential use "because of any concern about potential carcinogenicity."  *Id.*  Instead, Bayer has chosen to discontinue sales to "manage litigation risk." *Id.* (citing Doc. 28-14 – the July 29, 2021 Bayer Press Release).  The same Press Release clarifies that these measures were taken to "provide comfort to our investors" and improve "cash flow."  (Doc. 28-14).  Moreover, Monsanto states that it intends to remove its glyphosate-based herbicides in 2023 only from "the residential marketplace."  (Doc. 28, at 18).  So it seems Monsanto will still manufacture and sell its glyphosate-based Roundup for commercial use, just not for residential use.  This is not "ceasing" its conduct within the meaning of Fla. Stat. § 768.73(2)(b).

### iii.    Request for Evidentiary Hearing.

Because the Court must make this determination by clear and convincing evidence, Plaintiffs respectfully request an evidentiary hearing on the sufficiency (or insufficiency) of the prior punitive damages awards as punishment for Monsanto's conduct.  Plaintiffs proffer that the prior awards are insufficient for three reasons: (1) the prior awards are insufficient in light of Defendant's net worth; (2) the prior awards are insufficient in light of Monsanto's egregious conduct and conscious disregard

for the safety of consumers; and (3) the prior awards are insufficient given that Monsanto will continue to sell its glyphosate-based Roundup products for commercial use, and has made abundantly clear it is not discontinuing residential sales of Roundup in 2023 based on any safety concerns.

*First*, the Court need look no further than a comparison between the prior punitive damages awards and the Defendant's net worth.  As noted above, all of the punitive verdicts identified by Monsanto in Roundup cases total only about 0.18% of Monsanto's total net worth.  This is clearly insufficient to punish Monsanto.

*Second*, the prior awards are clearly insufficient in light of Monsanto's utter disregard for consumer safety.  *See discussion supra* at Factual Background Part B; *see also discussion infra* at Section II(C).

*Third*, as discussed above, Monsanto will continue to market and sells its Roundup formulation using glyphosate as the main, active ingredient for non-residential purposes going forward.  Likewise, Monsanto even admits that, to this day, its decision to pull Roundup from the market for residential use is in way, shape, or form based on safety concerns or concerns of an increased risk of users developing NHL.  Instead, the concern is for Monsanto's investors and cash flow.  (Doc. 28-14).  It is thus clear that Monsanto has learned no lessons from the prior punitive damage awards.

### C. Plaintiffs Are Entitled to Punitive Damages Under Florida Law as a Result of Monsanto's Conduct.

While the majority of Monsanto's motion for summary judgment as to Plaintiffs' punitive damages claim focuses on the invocation of Fla. Stat. § 768.73(2), Monsanto also seemingly suggests that "[t]he standard for punitive damages in Florida is [so] high" and, therefore, Plaintiffs have insufficient evidence of punitive damages in this case to clear the summary judgment hurdle.  In doing so, Monsanto points exclusively to Florida case law from the 1980s that "urg[es] restraint" in allowing the imposition of punitive damages.  (Doc. 28, at 15–16).

Like many states, Florida allows for punitive damages where the plaintiff demonstrates, by clear and convincing evidence at trial, that the defendant's conduct "was so reckless or wanton in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct."  Florida Standard Jury Instruction 503.1 (JICIV FL-CLE 503.1).  As other juries have found, there is ample evidence of Monsanto's egregious and wanton conduct so as to warrant the award of punitive damages.

Indeed, as this Court is aware, the juries in three previous trials to date that resulted in jury verdict in Plaintiffs' favor have awarded punitive damages, and a substantial one at that: in *Johnson v. Monsanto*, the jury awarded $250 million in punitive damages;[6] in *Hardeman v. Monsanto*, the jury awarded $75 million in punitive damages; and in *Pilliod v. Monsanto*,[7] the jury awarded $1 billion in punitive damages[8] to each of the two plaintiffs.[9]

Monsanto's course of action in hiding the potential hazards of its product and efforts to bury adverse information from regulators and consumers is well documented.  *See discussion supra* in the Factual Background at Part B.  The following highlights Monsanto's despicable conduct:

- In 1999, Monsanto refused to disclose Dr. Parry's findings of genotoxicity to regulators and consumers and refused to conduct additional testing on Roundup's genotoxicity.

---

[6]   https://www.stltoday.com/business/local/jury-orders-monsanto-to-pay-289-million-in-california-roundup-cancer-trial/article_964c9145-996f-5aba-ba8b-fffd4f7da497.html

[7]        https://www.stltoday.com/business/local/jury-hits-bayer-with-80-million-penalty-in-roundup-cancer-case/article_e97a2ed1-d560-5aec-98d8-27d7c34c6748.html

[8]   https://www.stltoday.com/news/national/jury-returns-2-billion-verdict-against-monsanto-for-couple-with-cancer/article_4565be1b-5ed1-5e3a-96db-c9a07ffd983c.html

[9] The *Johnson, Hardeman and Pilliod* the jury's punitive damages awards were under California law. California law permits punitive damages when there is "clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ. Code 3294(a). "Malice" means "despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." *Id.* at § 3294(c)(1). The Ninth Circuit in *Hardeman*, analyzing what it means for a defendant's conduct to be "despicable" and with "conscious disregard", stated that the conduct is "'so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by most ordinary decent people'", and requires that the defendant "'have actual knowledge of the risk of harm it is creating and, in the face of that knowledge, fail[s] to take steps it knows will reduce or eliminate the risk of harm.'" *Hardeman*, 997 F.3d at 971 (citations omitted). The *Hardeman* court, applying this standard, found there was substantial evidence warranting the punitive damages. *Id.* at 971-72. The standard in Georgia and Iowa are no more stringent than that of California; Monsanto motion for summary judgement on punitive damages fails.

18

- Monsanto fought against the EPA's classification of glyphosate as a possible carcinogen because the "the initiation of formal regulatory action would have serious negative economic repercussions."

- The stated goal of Monsanto's Product Safety Center was to "Secure the Base" and defend and maintain Monsanto's global glyphosate business.

- Monsanto hired outside organizations specifically to attack IARC as it was necessary to invalidate the relevance of IARC, prepare their litigation defense, and protect global sales.

- Monsanto refused to conduct studies on Roundup and Roundup formulations despite requests from the EPA and its own consultants.

- Monsanto continued to sell Roundup with POEA even though there were safer alternatives because it was concerned that discontinuing the surfactant could have global consequences.

- Monsanto engaged in ghostwriting of scientific articles to influence regulators and consumers and to support future litigation.

- Monsanto developed a plan to "orchestrate outcry" over IARC's decisions even before IARC determined that Monsanto was a probable human carcinogen.

*See discussion supra* at Factual Background at Part B.  It is this same evidence which has led this Court to permit plaintiff's punitive damages claim to go to the jury.  *See Hardeman v. Monsanto Co.*, 3:16-cv-00525-VC (N.D. Cal.).  This evidence meets and exceeds the standard for punitive damages in Florida.  Try as it might, Monsanto has not and cannot demonstrate as a matter of law that punitive damages are inappropriate and, accordingly, the Court should deny Monsanto's motion seeking to dismiss Plaintiffs' claim for punitive damages.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Monsanto's Motion for Summary Judgment as set forth above.

DATED:  December 14, 2022

Respectfully submitted,

*/s/ Jeffrey L. Haberman*
JEFFREY L. HABERMAN (*pro hac vice*)
**SCHLESINGER LAW OFFICES, P.A.**

*Attorneys for Plaintiff, Peter Engilis*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I hereby certify that on December 14, 2022, I served a copy of the foregoing on the Clerk of Court by CM/ECF, which will provide automatic notification to all parties and counsel of record.

By: */s/ Jeffrey L. Haberman*
Jeffrey L. Haberman

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT