# EXHIBIT E

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

# EXPERT REPORT OF CHARLES M. BENBROOK, PhD

**On Behalf of Plaintiffs Bird, Buchan and Parker**

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

## Table of Contents

LIST OF ACRONYMS..................................................................................................................................5

1.  TASK, QUALIFICATIONS, PRIOR WORK ON LITIGATION AND REPORT ORGANIZATION ...................7

2.  CONCLUSIONS AND OPINIONS ........................................................................................... 13
   A.  RELEVANCE OF OPP'S GLYPHOSATE RISK ASSESSMENT .......................................................13
   B.  THE TOXICITY AND PROPERTIES OF ROUNDUP AND GLYPHOSATE ........................................14
   C.  MONSANTO COMPLIANCE WITH FIFRA AND EPA REQUESTS FOR DATA AND LABEL CHANGES..........16
   D.  THE OPP, ORD AND IARC ASSESSMENTS OF GLYPHOSATE ONCOGENICITY...........................18
   E.  ROUNDUP LABELLING ..........................................................................................................19
   F.  STEWARDSHIP OF ROUNDUP-BRAND HERBICIDES ...............................................................22

3.  PESTICIDE REGULATORY REQUIREMENTS AND COMPLIANCE ............................................. 26
   A.  STATUTORY OBLIGATIONS OF PESTICIDE MANUFACTURERS....................................................26
       1.  Initial Approvals .......................................................................................................26
       2.  Establishing Tolerances ............................................................................................27
       3.  Approval of Labels ...................................................................................................27
       4.  What Distinguishes a Lawful Label from an Unlawful One? .....................................28
       5.  Periodic Re-registration of Previously Approved Products .......................................29
   B.  EPA TESTING REQUIREMENTS.................................................................................................30
   C.  IMPACTS WHEN EPA CLASSIFIES A PESTICIDE AS A POSSIBLE OR PROBABLE ONCOGEN...............35
       1.  Triggering a Special Review and Possible Cancellation Action.................................36
       2.  Impact of the Delaney Clause on Pesticide Tolerance Setting..................................37
       3.  Sections 408 and 409 of the Food, Drug, and Cosmetic Act....................................37

4.  CHANGES IN THE USE OF ROUNDUP ................................................................................. 45
   A.  TRENDS IN THE VOLUME OF GLYPHOSATE USE IN THE U.S. .....................................................45
       1.  Factors Driving Explosive Growth in the Use of Roundup .......................................47
       2.  EPA Rankings of the Most Heavily Applied Pesticides ............................................48
   B.  MONSANTO SHARE OF THE MARKET FOR GLYPHOSATE-BASED HERBICIDES ..........................50
       1.  What Allowed Other Manufacturers to Label and Sell GBHs? .................................50
   C.  NEW REASONS AND WAYS TO APPLY ROUNDUP ....................................................................51
       1.  Monsanto Brings Pre-harvest Crop Desiccation Uses of Roundup to America...........52
       2.  Changes in Roundup Uses Required EPA Approval of Much Higher Tolerances ........52

5.  EPA'S EVALUATION OF PESTICIDE ONCOGENICITY/CARCINOGENICITY ............................... 55
   A. FOCUS IS ON ACTIVE INGREDIENTS .........................................................................................55
       1.  Dietary Exposure Drives EPA Oncogenic Risk Assessments ...................................56
       2.  Roundup Uses Determine Likelihood of Residues in Food ......................................57
       3.  How EPA Addresses Other Types of Risks ..............................................................57
   B. DATA EPA RELIES ON TO ASSESS ONCOGENIC POTENTIAL .....................................................58

6.  INSIGHTS FROM AND CONTROVERSIES OVER GLYPHOSATE ANIMAL FEEDING STUDIES...........60
   A.  EPA'S EVALUATION OF ANIMAL FEEDING STUDIES.................................................................60
       1.  Tumors Observed in Glyphosate Feeding Studies...................................................61
       2.  The SAP Questions EPA's Weight-of-Evidence Assessment of the Animal Studies..........63
       3.  EPA's Office of Research and Development Also Questions OPP's Dismissal of Positive Tumor Data .......65
   B.  BIO/DYNAMICS MOUSE ONCOGENICITY STUDY (KNEZEVICH AND HOGAN, 1983).......................66
       1.  Review of the Bio/dynamics Mouse Study ............................................................67
       2.  Swift Monsanto Response Challenges Classification of Glyphosate as a "Possible Oncogen"...................68
       3.  EPA's Response to Monsanto's Criticisms of the "Possible Oncogen" Classification ................69
       4.  Monsanto Takes Its Appeal to the Tox Branch Chief..............................................70

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

5. OPP Dismisses Monsanto's Historical Control Data Argument ...................................................71
6. Monsanto Takes Its Case to the Director of the OPP Registration Division.................................71
7. Monsanto Hires Another Pathologist to Re-read the Kidney Slides ............................................72
8. Re-sectioning of the Bio/dynamic Mouse Kidney Slides ..............................................................73
9. EPA Response to the Newly Identified Tumor in Control Mouse #1028 .......................................75
C. THE 1986 SAP REVIEW OF THE MOUSE ONCOGENICITY STUDY ......................................................................75
1. Monsanto Increases the "Votes" for Its Interpretation of Mouse Kidney Tumors ......................77
2. SAP Report Recommends a Repeat Study to Resolve the Dispute ................................................78
D. EPA CALLS FOR A REPLACEMENT MOUSE STUDY IN 1986 GLYPHOSATE REGISTRATION STANDARD DOCUMENT ......................79
1. Monsanto Challenges the EPA RS Requirement for a Repeat Mouse Study...................................79
2. EPA Calls for a Specially Designed Study in Response to Monsanto's Refusal to Conduct a Repeat Mouse Study .................................................................................................................................80
3. Monsanto Persistence Pays Off .................................................................................................82

7. THE ASSESSMENT OF GLYPHOSATE/ROUNDUP GENOTOXICITY...................................................... 83

A. EPA GENOTOXICITY DATA REQUIREMENTS, REGISTRANT AND NON-REGISTRANT PUBLISHED STUDIES......................84
1. The Results of GBH Registrant and Non-Registrant Published Genotox Studies............................84
B. MONSANTO SEEKS A "ROUNDUP FRIENDLY" EXPERT IN GENOTOXICITY...................................................87
1. Parry Report #1 ............................................................................................................................88
2. Monsanto Response to Dr. Parry's First Report ...........................................................................88
3. Dr. Parry's Second Report ............................................................................................................89
4. Dr. Parry's Third Report ..............................................................................................................89
5. Monsanto Debates What to Do With Dr. Parry's Reports............................................................89
6. Monsanto's Response to Dr. Parry's Research Recommendations ...............................................91
D. EPA CONCLUSIONS REGARDING THE GENOTOXICITY OF GLYPHOSATE AND GBHS ...................................................94
1. OPP's Assessment of Glyphosate's Genotoxicity..........................................................................94
2. ORD's Assessment of OPP's Genotoxicity Conclusions .................................................................96
E. THE EPA AND IARC ASSESSMENTS OF GLYPHOSATE AND GBH GENOTOXICITY .....................................................96
1. Studies Relied Upon by EPA and IARC ..........................................................................................97
2. Significant Impact of the Year When Studies were Completed .....................................................97

8. EPIDEMIOLOGY STUDIES CONFIRM LINK BETWEEN EXPOSURES TO ROUNDUP AND NHL ......................... 99

A. OPP'S ANALYSIS OF THE EPIDEMIOLOGICAL DATABASE ...................................................................................99
1. OPP's Flawed Assessment of the Factors Explaining Epidemiology Study Results....................100
2. AHS Design Features Limit Ability to Accurately Assess Roundup-NHL Associations .................101
3. The SAP Criticizes OPPs Assessment of the Epidemiological Dataset.........................................106
B. THE ORD ANALYSIS OF GLYPHOSATE-NHL EPIDEMIOLOGY STUDIES ...............................................................107
1. December 14, 2015 ORD Summary Memo...................................................................................108
2. The ORD Meta-Analysis Confirms IARC's Findings .....................................................................110
C. OTHER ASSESSMENTS AND MORE RECENT STUDIES STRENGTHEN THE ASSOCIATION OF HEAVY ROUNDUP USE AND NHL .....112

9. THE IARC CLASSIFICATION AND MONSANTO'S RESPONSE ........................................................................ 114

A. IARC'S JUSTIFICATION FOR ITS "PROBABLE HUMAN CARCINOGEN" CLASSIFICATION ............................................114
B. MONSANTO BRACES FOR UNWELCOMED NEWS FROM IARC ..........................................................................115
1. Monsanto's IARC "Talking Points" Drafted Before the IARC Decision is Released .....................116
2. Monsanto Enlists Its Third Party Network to Criticize the Basis of the IARC Classification ......117
3. Monsanto Receives Advance Warning of the IARC Classification from EPA ...............................119
4. Post-IARC Plans Put Into Motion ...............................................................................................121
5. Heydens Drives the Intertek Project .........................................................................................125
6. Ethical Lapses Catch Up with Monsanto and Intertek................................................................125
C. POLITICAL AND OTHER ACTIVITIES POST-IARC .........................................................................................126
1. Blocking the ATSDR Review of Glyphosate ................................................................................127

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

**10. ROUNDUP FORMULATIONS, HANDHELD SPRAYING EQUIPMENT AND APPLICATOR RISKS .................. 129**

A. HEIGHTENED TOXICITY CAUSED BY THE SURFACTANTS IN FORMULATED ROUNDUP .......................................130
B. EUROPEAN REGULATORS PRESS MONSANTO TO BETTER CHARACTERIZE AND REDUCE RISKS ARISING FROM THE SURFACTANTS IN ROUNDUP...................................................................................................................................................131
    1. *Monsanto Agrees to Phase Out POEA Surfactants in Roundup Sold in Europe.......................................132*
    2. *Evidence of Endocrine Disruption Adds Pressure to Phase out High-Risk Surfactants ............................134*
C. UK FIELD STUDY RAISES ALARM OVER APPLICATOR EXPOSURE RATES ..............................................................135
    1. *Big Impact of Wind and Spray Pattern on Exposures.................................................................137*
    2. *EPA Estimates of the Impact of Application Equipment and PPE on Applicator Exposures are Generally Consistent with the UK Findings....................................................................................................138*
D. MONSANTO EFFORTS TO LOWER EPA ESTIMATES OF THE GLYPHOSATE DERMAL ABSORPTION RATE ....................138
E. MONSANTO TERMINATES TNO STUDY ........................................................................................................139
F. WORKER-SAFETY PROVISIONS REQUIRED IN THE 1986 GLYPHOSATE RS .........................................................141
    1. *Monsanto's Response to the New RS Worker-Safety Provisions.................................................142*
    2. *The Blondell Study Raises Concerns ......................................................................................143*
    3. *EPA Responds "Yes and No" to Monsanto's Request ...............................................................144*
    4. *Monsanto Digs In and Refuses to Add New Worker-Safety Provisions .......................................144*
    5. *PPE Requirements on Roundup Labels....................................................................................145*
G. CONCERNS GROW OVER APPLICATOR EXPOSURES WHEN USING HANDHELD AND BACKPACK APPLICATORS.........146
    1. *European Regulators Raise Worker-Safety Concerns .................................................................147*

**11. MONSANTO EFFORTS TO CONVINCE SCIENTISTS AND REGULATORS THAT ROUNDUP IS SAFE ..............150**

A. MONSANTO'S THIRD PARTY NETWORK OF EXPERTS ......................................................................................150
    1. *The "Glyphosate Scientific Outreach Plan" ...............................................................................151*
    2. *Cherry-Picking Science.........................................................................................................152*
B. MONSANTO'S RELATIONSHIPS WITH "FRIENDLY" SCIENTISTS AND MANAGERS IN THE OFFICE OF PESTICIDE PROGRAMS........152
    1. *Two EPA Officials Provided Key Assistance to Monsanto............................................................153*
C. CORPORATE GHOST-AUTHORSHIP/WRITING ..............................................................................................156
    1. *Gary Williams et al 2000 Paper.............................................................................................157*
    2. *Williams et al 2012...........................................................................................................161*
    3. *Kier and Kirkland 2013 Paper ..............................................................................................162*
    4. *Critical Reviews of Toxicology Special Issue on Glyphosate Risks ...............................................163*
    5. *Other Forms of Ghost-Writing................................................................................................165*
D. RESPONSES TO SCIENTISTS RAISING CONCERNS OVER GLYPHOSATE SAFETY .....................................................167
    1. *Monsanto Response to the IARC Working Group Report.............................................................167*
    2. *Seralini Team ...................................................................................................................168*

**12. PRODUCT STEWARDSHIP AND MONSANTO EFFORTS TO BETTER UNDERSTAND AND MITIGATE ROUNDUP RISKS ...........................................................................................................................172**

A. PESTICIDE STEWARDSHIP..........................................................................................................................173
    1. *The Monsanto Pledge..........................................................................................................175*
    2. *Monsanto's IT&O "Roundup Stewardship Value Package"..........................................................175*
    3. *Bayer Open Letter to Stakeholders -- "Our Vision for Safe and Sustainable Agriculture"......................176*
    4. *Monsanto's "Product Stewardship and The Pledge".................................................................177*
    5. *The FAO Pesticide Code of Conduct.......................................................................................178*
B. UNDERSTATING RISKS AND MUDDYING THE WATER ......................................................................................179
    1. *The IARC Review Process.....................................................................................................179*
    2. *Advertising .......................................................................................................................182*
C. FREEDOM TO OPERATE (FTO) ..................................................................................................................183
    1. *Responding to FQPA Challenges ..........................................................................................184*
    2. *Misleading Statements Regarding Relative Risks ......................................................................185*
    3. *Section 6(a)(2) of FIFRA.....................................................................................................186*

4.    The Epic Scale of Missed Opportunities in the Testing, Regulation and Stewardship of Roundup...........187
APPENDIX A. BACKGROUND .................................................................................................... 188
APPENDIX B. RESUME .............................................................................................................. 190
APPENDIX C. REGULATORY REQUIREMENTS AND COMPLIANCE ...................................... 203
APPENDIX D. DETAILS REGARDING DR. PARRY'S RECOMMENDED GENOTOXICITY ASSAYS ............................. 208

## List of Acronyms and Abbreviations

ADME – Absorption, Distribution, Metabolism and Excretion
AG – Attorney General
AHS – Agricultural Health Study
AMPA – aminomethylphosphonic acid
ATSDR – Agency for Toxic Substances and Disease (USDHHS)
ATV – All terrain vehicle
BRM – Bacterial Reverse Mutation (Ames test)
CARC – Cancer Assessment Review Committee (EPA, OPP)
CE – Clear Evidence
CFR – Code of Federal Regulations
COPE – Committee on Publication Ethics
CRT – *Critical Reviews in Toxicology*
DOI – Declaration of Interest
DORFA – Subcommittee on Department Operation, Research and Foreign Agriculture, Committee on Agriculture, US House of Representatives
DTL - European contract laboratory carrying out skin penetration studies
ED – Executive Director
EE – Equivocal Evidence
EPA – Environmental Protection Agency
ESE – *Environmental Sciences Europe*, a science journal
EUP – Experimental Use Permit
DDV – Dynamic Data Visualization
FAO – Food and Agriculture Organization of the UN
FDA – Food and Drug Administration
FDCA – Food, Drug and Cosmetic Act
FIFRA – Federal Insecticide, Fungicide and Rodenticide Act
FQPA – Food Quality Protection Act
FR – Federal Register
FTO – Freedom to Operate
GBH – Glyphosate-based herbicides
GFT – Glyphosate formulation
GLP – Good Laboratory Practices
GMO – Genetically Modified Organism
HHRA – Heartland Health Research Alliance
HHS – Department of Health and Human Services
IARC – International Agency for Research on Cancer

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

# 3.  Pesticide Regulatory Requirements and Compliance

The federal regulatory process, requirements and standards for decision-making are set forth in the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA). The 1996 Food Quality Protection Act (FQPA) changed the standard and provisions in FIFRA governing the setting of tolerances that allow pesticide residues to be lawfully present in food up to a certain level.

The primary actions governing pesticide regulation at the federal level are described in further detail Appendix C. This chapter addresses key points and information specific to the Environmental Protection Agency's (EPA) regulation of Roundup and other glyphosate-based herbicides (GBHs).

## A. Statutory Obligations of Pesticide Manufacturers

There are four core elements of the pesticide regulatory scheme set forth in FIFRA.

### 1.  Initial Approvals

The first EPA approval of a Roundup label came on April 5, 1974, for "Industrial and Non-Agricultural Uses" and "Home and Farmstead Uses." (MONGLY00245013)  A little over a month later, the first Experimental Use Permit (EUP) was granted for limited Roundup applications on corn, soybeans, wheat and cotton. Additional non-farm uses were added to the first label in October 1974.

The first major farm label was approved by EPA on December 23, 1975 and sanctioned use on corn, wheat, soybeans and small grains (oats, barley, rye).

Key first actions by EPA also included approval of several crop-specific temporary tolerances for the combined residues of glyphosate and its major metabolite aminomethylphosphonic acid (AMPA). On March 5, 1976 Monsanto requested EPA to establish temporary tolerances on cottonseed and cotton forage, and soybean grain, hay and forage in order to allow use of crops grown under an Experimental Use Permit. (MONGLY03579293).

In a letter dated September 7, 1976, EPA approved Monsanto's request for temporary cotton and soybean tolerances. The letter goes on to alert Monsanto that: "*A food additive tolerance is being established for residues of glyphosate and its metabolite in soybean hulls at 20 ppm*."

*In my opinion, the EPA's decision in 1976 that a food-additive tolerance is needed for soybean hulls was consequential and important in this litigation, because it alerted Monsanto that food additive tolerances would be required for many future glyphosate food-crop uses for which the company was preparing tolerance petitions and registration applications for submission to EPA.*

26

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

Why was this important? Because food-additive tolerances were then governed by Section 409 of the Food, Drug and Cosmetic Act (FDCA) that includes the anti-cancer Delaney Clause. This clause states, in effect, it is unlawful to knowingly add a chemical to the food supply that is known to pose a risk of cancer. Residues of pesticides in processed foods that concentrate above the levels in raw agricultural commodities are considered food additives, and hence are subject to the anti-cancer Delaney Clause.

For example. soybean grain is a raw agricultural product not impacted by the Delaney Clause, but residues in soybean hulls, soybean oil and many other food ingredients derived from soybeans are considered "food additives" when the residues present concentrate above levels typically found in raw foods.

By the early 1980s, Monsanto knew it would have to secure dozens of Section 409 tolerances to expand the crop uses of Roundup (soybean and corn oil, wheat germ, vegetable processing wastes), *and in my opinion, Monsanto knew it would likely not be able to do so if glyphosate was found to be a possible, probable or proven oncogen.*

## 2.  Establishing Tolerances

FIFRA directs the EPA to not approve the registration of a food-crop use of a pesticide prior to the establishment of necessary tolerances covering the pesticide residues expected to remain in or on the harvested crop as it leaves the farm.

The tolerance process begins with submission by a pesticide manufacturer of a petition requesting approval of a specific set of tolerances. Such petitions are accompanied by a large data package including residue chemistry, metabolism and toxicology studies. These studies are used by EPA to carry out a detailed set of analyses to determine whether the submitted studies "support" approval of the requested tolerances.

EPA's in-depth assessment of human health risks from pesticide dietary exposures is carried out within the tolerance-setting process. This includes assessment of whether a pesticide poses oncogenic risk. ***It is also why EPA judgements regarding whether a pesticide poses cancer risk are based predominantly on typical levels of exposure to the general public via residues in food***.

## 3.  Approval of Labels

There are two related Roundup labeling issues at the heart of this litigation: (1) the degree to which Monsanto provided adequate warnings and cautionary statements to users relative to potential risks, and (2) whether Roundup labels have included sufficient instructions and use-specific requirements to fulfill the company's obligations under FIFRA.

Pesticide manufacturers write and are responsible for the information conveyed on pesticide product labels. ***Yes, EPA has to approve them, but registrants write them and are responsible for their content.***

27

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

EPA approval does not mean the Agency has conducted a thorough and independent assessment of pesticide uses and risks. It means registrants have satisfied EPA data requirements and that after EPA reviewed the submitted studies, the Agency concluded the studies "support" approval of requested tolerances and labels. The word "support" in the context of EPA pesticide decision-making means that estimated exposures based on registrant-submitted data do not exceed the maximum allowable exposure levels the EPA sets based on the registrant-submitted toxicology studies.

A newly proposed pesticide-product label can authorize applications for:
1. A new pesticide,
2. A new use or uses of an already-registered pesticide,
3. A revised set of label directions, or a new formulation or brand name associated with an existing registration, and
4. Combinations of 2) and 3).

It is widely understood by pesticide manufacturers and most users that "the label is the law." Put simply, a person who applies a pesticide in accord with all label requirements, directions, and restrictions has made a legal application and applications not in accord with provisions on labels are unlawful.

A critical point undercuts one of Monsanto's primary assertions in this litigation -- Roundup product labels are lawful and sufficient because EPA approved them. This is not true.

Pesticide labels are complete and lawful or deficient to the degree that they assure attainment of FIFRA's basic goal -- "avoiding unreasonable adverse effects on man and the environment."

***Labels that do not prevent or avoid "unreasonable adverse effects on man and the environment" following lawful applications render pesticide products containing such labeling misbranded.*** This is why a pesticide registrant's obligations under FIFRA extend beyond just submitting all studies requested by EPA and checking all the boxes in the tolerance petition and registration review processes.

### 4.  What Distinguishes a Lawful Label from an Unlawful One?

Labels that disclose and warn of possible human health or environmental risks, ***and then also*** set forth use directions, warnings and effective steps to mitigate exposures and potential risks are most likely to be lawful because they are crafted to attain FIFRA's basic goal of avoiding adverse impacts. Such labels are also likely to adhere to core industry stewardship standards and responsibilities.

Labels that fail to disclose potential risks, or fall short in requiring measures and warnings designed collectively to mitigate such risks, fall short of meeting FIFRA requirements and are arguably unlawful. They also likely fall short of adhering to generally applicable pesticide-product stewardship and safety standards as set forth in company-specific policy statements and pledges and in the Food and Agricultural Organization's pesticide Code of

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

Conduct to which Monsanto and most major manufacturers have been and remain signatories (for more on the Code of Conduct, see Chapter 12, A., 5).

EPA's review and approval of a requested, new pesticide label or a label change is driven by the answers to three questions:

1. Has the manufacturer submitted valid studies fulfilling all applicable data requirements?
2. Do the science assessments carried out by the relevant branches in OPP "support" approval of the label as proposed?
3. Does the label conform to the detailed specifications set forth by EPA in its regulations governing what must appear on labels, where and in what font?

EPA scientists often identify the need for new or more sophisticated studies to fully "support" a judgement that the available data adequately justify, i.e. **support**, approval of a proposed label. In such cases, the EPA will often grant a time-limited "conditional registration" that specifies additional data or analytical requirements that the registrants must agree to fulfill by a stated date.

*But in my opinion, the key point is that for the most part,* ***EPA's scientific assessment of pesticide risks is based on studies conducted and submitted by registrants***. By virtue of registrant control over the information submitted to EPA, registrants decide upon the scientific information that will be submitted to the EPA.

Registrants also know how EPA will evaluate submitted studies and the science policies governing the methods EPA will utilize in setting exposure thresholds based on submitted studies (e.g. the key chronic Reference Dose, which determines the amount of a pesticide that an individual can ingest daily without exceeding EPA's "level of concern", or acceptable levels of applicator exposures).

In addition, registrants are well aware of how EPA estimates exposures.

***So, registrants know all about the data that EPA will rely on in approving or not approving requested actions, since they generated almost all of it. Registrants also choose the statistical methods, data and findings to highlight in submissions to the Agency, as well those data and findings they regard as not helpful in "supporting" a requested action.***

*As a result and in my opinion, registrants can anticipate before submitting studies whether the submitted data, and findings based on it, "support" the EPA action they are requesting. Not surprisingly, registrants rarely if ever submit data and study conclusions to EPA that they expect will* ***not support approval of the actions they have requested.***

### 5.   Periodic Re-registration of Previously Approved Products

FIFRA requires EPA to update and reassess pesticide studies and risk assessments every 15 years. In this re-registration process, FIFRA requires the EPA to balance the risks and benefits associated with ongoing or altered uses of a pesticide.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

As stated in *Pest Management at the Crossroads*, a book published by Consumers Union in 1996 (Benbrook et al, 1996):

> *"…new pesticides are guilty until proven innocent, with applicants bearing the burden of proof. Old pesticides are innocent until proven guilty, with EPA bearing the burden of proof."* (page 93)

Before restricting the use of a previously registered pesticide, EPA's Office of Pesticide Programs (OPP) must first show, based on credible evidence, that: 1) exposure levels to one or more non-target organism (and especially people), exceed the EPA's "level of concern", and 2) the risks stemming from the ongoing use of the pesticide exceed the benefits flowing from such uses.

It can take years for the EPA to complete a re-registration review for a widely used pesticide like Roundup that is used in hundreds of different ways in a myriad of circumstances. The most recent glyphosate re-registration process started in 2009. EPA's proposed reregistration actions are still under judicial review and the Agency's oncogenicity classification decision remains a subject of intense debate in the scientific and public health communities.

Re-registration reviews tend to take many years to complete when:
- Recent studies published in scientific journals have raised questions about past EPA toxicological determinations,
- There is inadequate data for EPA to accurately calculate levels of exposure to people or other non-target organisms, and
- Registrants are determined to retain all existing uses, defend all tolerances and avoid any requirements or restrictions that might pose a competitive disadvantage.

*In my opinion and has shown clearly in this report, each of the above three circumstances contributed to delays in the recent reregistration review of Roundup and other glyphosate-based herbicides.*

## B. EPA Testing Requirements

Currently applicable EPA toxicology data requirements are set forth in Part 158 of the Code of Federal Regulations. The modern set of pesticide data requirements was promulgated as a Final Rule in the Federal Register on October 24,1984 (Vol. 49, No. 207). The Toxicology Data Requirements table appears on page 42882.

A more recent summary of the slightly modified Part 158 pesticide toxicology data requirements was published in the Federal Register (Vol. 72, No. 207, Friday October 26, 2007). These toxicology data requirements include:
- Eight acute (short-term) studies,
- Four required and three conditionally required sub-chronic studies,
- Two chronic feeding/carcinogenicity studies in two species, typically the mouse and rat,

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

- Two required and one conditionally required developmental toxicity and reproduction studies,
- Three genotoxicity studies, including one Reverse Bacterial Mutation (Ames) test, an *in vitro* mammalian cell assay and an *in vivo* cytogenetics assay, and
- Two required (metabolism and immunotoxicity) and two conditionally required "Special Studies" (dermal penetration and companion animal safety).

Accordingly, prior to registering a new food-use pesticide, the EPA requires a minimum of 21 toxicology studies, and 27 assuming the Agency imposes all conditionally required toxicology study requirements.

It is also important to stress that EPA requires 25 of these 27 studies to be done with technical active ingredients (e.g. glyphosate). Registrants are allowed to choose between active ingredients and formulated end-use products (e.g. Roundup) in the case of two studies (dermal penetration, companion animal toxicity). *All of the key chronic toxicity studies must be done on technical active ingredients, although registrants are always free to run studies on both technical and formulated product.*

1. **Monsanto's Roundup-Related Safety Claims**

Monsanto has frequently stated that Roundup is the most heavily tested pesticide ever and that GBH registrants have generated and submitted to EPA over 800 studies proving the safety of Roundup. Claims of this sort are repeated frequently in media reports, agricultural publications, grower meetings, at conferences and before regulatory agencies (for example, see the August 8, 2019 *AgPro* piece "Glyphosate Overview: Where are We Now?" at https://www.agprofessional.com/article/glyphosate-overview-where-are-we-now).

Such claims have created and perpetuated myths such as "Roundup is non-toxic," "Roundup is safe" and "biodegradable." Other inaccurate statements made by Monsanto representatives and people selling or promoting Roundup use have spread and sustained the myth that Roundup is safe, period, under any circumstances. Other common and erroneous claims include there is "no evidence" or "no studies" or "no credible science" suggesting Roundup poses any risk, including genotoxicity and cancer.

When many plaintiffs were asked in their depositions why they were not more cautious when applying Roundup, or why they did not quickly wash off spray drift falling on their skin, they often responded by saying they were told Roundup was "safe." Three examples follow.

John Barton is a large-scale cotton farmer and plaintiff diagnosed with NHL in 2015. In a May 20, 2019 interview with NBC news he said:
"They said it was as safe as table salt. It's so safe you can drink it."
https://www.nbcnews.com/news/us-news/monsanto-parent-company-bayer-faces-thousands-roundup-cancer-cases-after-n1007246

Larry Domina is a Nebraska corn-soybean farmer and plaintiff. He told the Omaha World-Herald :

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

"They told me several times it is so safe you can drink it."

A video excerpt from his interview appears below (Omaha World-Herald, https://www.omaha.com/livewellnebraska/health/nebraska-could-soon-be-at-center-of-national-legal-battle/article_ea7c33a6-021f-544f-a99f-283ca1780b29.html).



Source video: Omaha World-Herald
https://www.omaha.com/livewellnebraska/health/nebraska-could-soon-be-at-center-of-national-legal-battle/article_ea7c33a6-021f-544f-a99f-283ca1780b29.html

Robert Dickey is another Nebraska corn-soybean farmer diagnosed with NHL and participating in the litigation. In the video posed by the Omaha World-Herald, he says: "He said it's so good that you can even drink it, it's that safe."

*In my opinion, the claim that glyphosate/Roundup is "safe" is not true. Nor is the often-repeated Monsanto claim that glyphosate/GBHs are the most heavily tested pesticide ever, as clear in Table 3.1.*

Table 3.1 shows the number of scientific studies captured in the PubMed database across several areas of pesticide toxicology. Two herbicides (2,4-D and atrazine) and two insecticides (DDT and chlorpyrifos) have been tested more intensively than glyphosate.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

**Table 3.1 The Number of Studies Conducted on Glyphosate and Several Other Pesticides by Category: 1970-March 2019  [PubMed searches]**

| Type of Study | Herbicides | | | | Insecticides | | |
|---|---|---|---|---|---|---|---|
| | Glyphosate or GBHs | 2,4-D | Atrazine | Alachlor | Chlorpyrifos | DDT | Permethrin |
| Cancer | 98 | 231 | 159 | 70 | 220 | 893 | 104 |
| Genotoxicity/Mutations | 261 | 302 | 230 | 51 | 173 | 571 | 278 |
| Epidemiology Studies | 67 | 115 | 103 | 15 | 145 | 752 | 370 |
| Chemistry, Metabolites, and Environmental Fate | 568 | 466 | 1,251 | 239 | 1,005 | 2,453 | 379 |
| Exposure and Biomontioring | 702 | 1,003 | 1,312 | 226 | 2,318 | 3,765 | 896 |
| Reproductive and Developmental Impacts | 210 | 334 | 454 | 35 | 501 | 1,225 | 180 |
| General Health Effects and Risks Assessments | 951 | 834 | 1,276 | 184 | 2,112 | 3,174 | 932 |
| TOTAL | 2,857 | 3,285 | 4,785 | 820 | 6,474 | 12,833 | 3,139 |

A slide in a February 16, 2009 Powerpoint (PPT) by Monsanto toxicologist David Saltmiras summarizes "Glyphosate Mammalian Tox Data Submitted -- 2004 WHO Review." The slide covers the mostly-registrant studies submitted to WHO by 11 companies, reflecting the fact that several companies held their own GBH registrations by 2004.

Across all categories of mammalian toxicology data, Saltmiras identifies 101 submitted studies including 7 chronic feeding studies, four multigenerational studies, six rat and rabbit developmental studies and dozens of genotoxicity assays. Perhaps as many as 100 additional mammalian toxicity studies have been conducted by various registrants since 2004, the majority of which are short-term Bacterial reverse mutation (BRM, or Ames tests) genotoxicity studies.

*In my opinion, about ~200 of the 800+ studies claimed by Monsanto to support the human safety of Roundup are foundational in EPA's evaluation of glyphosate and GBH mammalian toxicity. About 100 of these 200 are BRM/Ames genotoxicity tests done with cell cultures that are quick, inexpensive and insensitive across the diversity of potential genotoxicity mechanisms. The EPA requires just one BRM/Ames test. The additional ~99 BRM/Ames studies add little new information, but do inflate the number of studies that Monsanto and other registrants can cite as reporting no evidence of toxicity.*

Around 600 out of the 800+ safety studies conducted by Monsanto on GBHs include field studies on pesticide residues in food, environmental fate studies, and hundreds of acute toxicity and skin irritation studies in humans, animals and invertebrates.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

1. **Did Monsanto Submit Valid Studies in Fulfillment of EPA Testing Requirements?**

Not always, especially in the 1970s when Monsanto relied heavily on the Industrial BioTest (IBT) laboratory in carrying out dozens of EPA-required toxicology studies.

IBT was a contract laboratory doing toxicological studies destined for submission to EPA for many pesticide manufacturers and the Food and Drug Administration (FDA) for pharmaceuticals in the 1970s and 1980s.

The following details are based on more than a dozen meetings I had with Dr. Adrian Gross in 1981-1983, when I served as the staff director of the House of Representative's Subcommittee with jurisdiction over FIFRA. My meetings with Dr. Gross triggered the Subcommittee's extensive investigation of the IBT debacle and DORFA hearings focused wholly or in part on the IBT scandal.

A routine FDA audit of an IBT test facility was conducted by Dr. Gross in or around 1976. It uncovered possible problems with the conduct of some studies. Soon thereafter, Dr. Gross assumed a position at EPA in the Office of Pesticide Programs. His duties at EPA included conducting routine "Good Laboratory Practices" (GLP) audits at laboratories conducting pesticide toxicity testing.

Based on his previous audit of an IBT laboratory for FDA, Dr. Gross undertook another audit for OPP/EPA of IBT's major testing facility in Northbrook, Illinois. He observed several major deficiencies in several aspects of IBT's testing procedures, animal care and record keeping.

His report to OPP management lead to several more audits and a thorough EPA assessment of all studies done by IBT that supported regulatory actions by the OPP (for a history of the IBT case, see Eliot Marshall, "The Murky World of Toxicity Testing," *Science Magazine*, Vol.226, June 10, 1983; Pilliod v. Monsanto Exhibit 1363).

Most of the initial toxicological data supporting the early tolerance petitions and registrations of glyphosate were done by IBT. The EPA-compiled "IBT Tracking System Report" was released in 1983 at a DORFA hearing. It notes 30 studies done by IBT on glyphosate, of which 17 were invalid and 2 were pending final judgements ("Summary of the IBT Review Program," OPP, July 1983; Pilliod v. Monsanto Exhibit 1364).  The invalid studies included Monsanto's long-term carcinogenicity bioassays in mice and rats fed glyphosate.

On July 1, 1977, OPP generated a one-page summary of the eight toxicology studies used to support establishment of all then-existing glyphosate tolerances. ***These eight studies were submitted between 1972 and 1974, and all were done by IBT.***

An August 21, 1978 memo from William Dykstra of the OPP's Toxicology Branch to Robert Taylor in the Registration Branch discusses the EPA's assessment of the validity of a 2-year chronic feeding study done in Albino rats by IBT. For a variety of reasons, the EPA judged

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

the study to be invalid, *yet it served as the basis of the then-current chronic Reference Dose of 0.1 mg/kg/day (then called an ADI, or Acceptable Daily Intake).*

A July 27, 1982 memo from the Toxicology Division to the Registration Division reported EPA's judgement that the 2-year dog study (No. 651-00565) done by IBT for Monsanto and completed in 1973 was invalid because of missing data, failure to record diet preparation records and other deficiencies.

It took about a decade for EPA to determine that most of the toxicological data submitted to the agency by Monsanto in the mid-1970s were invalid and possibly fraudulent. These were the studies EPA relied on in approving all early glyphosate Experimental Use Permits, tolerances and registration actions.

Problems also arose with some of the replacement studies that Monsanto commissioned to replace invalid IBT studies. One example -- in July 1979, Monsanto decided to terminate a 2-year mouse study on NNG (a glyphosate breakdown product) because of excessive mortality in treated groups of animals. (MONGLY04272266)

Via an agreement with OPP Monsanto repeated most of the invalid IBT studies at different laboratories during the 1980s. In the interim, EPA allowed existing registrations and tolerances to remain in place.

I searched the discovery record from the late 1970s through the 1980s to determine whether Monsanto took steps to alert its customers, sales force and the public health community that current registrations were not supported by valid toxicology data and that added caution should be exercised as a result. *I found no evidence of any such steps.*

*In my opinion from the early 1980s through the late 1980s, Monsanto should have, at a minimum, added such a cautionary statement to its labels and in all educational materials designed for customers, sales people and for distribution to the occupational health community.*

## C.  Impacts When EPA Classifies a Pesticide as a Possible or Probable Oncogen

In the 1980s most of the 1990s, EPA classification of a pesticide active ingredient as a possible oncogen had three substantial consequences:

1. Pesticide products containing the active ingredient would have to be labeled for "restricted use" only (i.e. use only by and sale only to licensed applicators),
2. The EPA could initiate the process leading to product registration cancellations and OPP would be precluded from granting a conditional registration, thereby slowing approval of federal labels, and
3. Approval of any Section 409 tolerances required would be blocked by the Delaney Clause, as would approval of new labels associated with prohibited tolerances.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

Re #1 above, FIFRA sets forth a number of criteria EPA must take into account in deciding whether a pesticide label should include the requirement that only "certified applicators" can spray the product. Pesticides known by EPA to pose possibly significant risks are classified as "Restricted Use" to help assure that people handling and spraying the products have been trained in proper steps to take to minimize exposures via safe handling and application methods.

"Certified applicators" go through required training, periodic testing and re-certification. They can lose their license to apply restricted use pesticide products if they are subject to an enforcement action for misapplying a restricted use product -- an obviously serious consequence for a farmer or person earning their living as a pesticide applicator.

The rules governing possibly oncogenic pesticides and restricted use classification evolved through three Federal Register notices published on September 26, 1984, October 3, 1985, and as a Final Rule on May 3, 1988.

Section 152.170 (b)(vi) of the Code of Federal Regulations sets the final rules governing classification criteria for restricted use pesticides:
> "When used in accordance with label directions, or widespread and commonly recognized practice, the pesticide may cause significant subchronic, chronic or delayed toxic effects on man as a result of single or multiple exposures to the product ingredients or residues."

*In my opinion, the risk of Roundup triggering damage to DNA and NHL clearly falls within the meaning of "significant subchronic, chronic or delayed toxic effects on man."*

### 1.  Triggering a Special Review and Possible Cancellation Action

FIFRA sets forth the terms, conditions and process for a pesticide to gain new registrations, as well as the criteria, reasons and process for EPA to restrict or cancel a use or uses of an already-registered pesticides.

In the 1980s when Monsanto and EPA were intensely focused on and debating the proper cancer-risk classification of glyphosate, Section 162.11 of the Code of Federal Regulations set forth the "Criteria for Determination of Unreasonable Adverse Effects." Any pesticide active ingredient that triggered one or more such risk criteria would be subject to a "rebuttal presumption against registration."

When a risk criterion is exceeded, the EPA issues a report and notice to this effect and explains the basis for its decision. The company is then given a chance to "rebut" the basis for EPA's action. Then, in most cases, the EPA and the registrant proceed to work through and agree on additional testing and label changes to curtail excessive exposures from future uses of the pesticide and more accurately quantify risks.

The risk criterion in Section 162.11(a)(3) states:

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

"(ii) *Chronic Toxicity*. Induces oncogenic effects in experimental mammalian species or in man as a result of oral, inhalation, *or dermal exposure*; or *induces mutagenic effects* as determined by multitest evidence."

*In my opinion, if the 1984 determination of the OPP Toxicology Branch that glyphosate was a "possible oncogen" had been sustained, this decision would have blocked approval of dozens of needed Section 409 tolerances and threatened attainment of many new Roundup labels, including those needed to allow commercial introduction of genetically engineered, Roundup Ready crops.*

*Further, it is my opinion that OPP classification of glyphosate as a "possible oncogen" would have led to the cancellation of some existing labels known to lead to high applicator exposures. It would have almost certainly triggered more restrictive use provisions, coupled with combinations of mandatory Personal Protective Equipment (PPE) and the addition of new warnings and cautionary statements.*

## 2. Impact of the Delaney Clause on Pesticide Tolerance Setting

Special focus throughout the 1980s was directed to the conundrum faced by EPA in working through sometimes conflicting statutory standards applicable in the tolerance-setting process in the case of oncogenic pesticides. The "Delaney Paradox" arises from the then-conflicting mandates in the two statutes governing tolerance-setting (FIFRA and the FDCA). Passage of the Food Quality Protection Act (FQPA) in 1996 changed the tolerance setting process and health standard, and ended the role of the Delaney Clause in pesticide tolerance setting.

FIFRA directs the EPA to apply a risk/benefit balancing standard in deciding whether to approve a pesticide registration, reregister an already-approved pesticide use, or cancel or suspend an existing registration. According to the OPP:

"Before EPA may register a pesticide under FIFRA, the applicant must show, among other things, that using the pesticide according to specifications 'will not generally cause unreasonable adverse effects on the environment.' FIFRA defines the term 'unreasonable adverse effects on the environment' to mean: '(1) any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide, or (2) *a human dietary risk from residues that result from a use of a pesticide in or on any food inconsistent with the standard under section 408 of the Federal Food, Drug, and Cosmetic Act*.'" [Emphasis added]

Quote from: Summary of the Federal Insecticide, Fungicide, and Rodenticide Act, https://www.epa.gov/laws-regulations/summary-federal-insecticide-fungicide-and-rodenticide-act)

## 3. Sections 408 and 409 of the Food, Drug, and Cosmetic Act

A second federal statute establishes the authority for EPA to set tolerances -- the Federal Food, Drug, and Cosmetic Act (FDCA). Section 408 was added to the FDCA in 1954 to provide a mechanism for the FDA to control pesticide-residue levels in food.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

Section 408 authorizes the establishment of tolerances in raw agricultural products at the point they would typically leave the farm gate. Section 408 requires such tolerances be set at levels deemed necessary to: (a) cover the residues that can be expected to occur when a pesticide is used at its maximum label rate under conditions conducive to residues remaining on the harvested crop; and (b) protect public health.

Residues in excess of the applicable tolerance renders food adulterated and unlawful for sale. Responsibility for establishing tolerances under Section 408 was granted to the EPA upon formation of the agency in 1970.

Section 409 of the FDCA provides the FDA general authority to regulate food additives – "any substance the intended use of which results or may reasonably be expected to result…in its becoming a component of the food." 21 USC § 321(s) [1984].

Section 409 goes on to exempt from its provisions pesticide residues in food up to the level authorized by a Section 408 tolerance applicable to a given food-pesticide combination, recognizing that such levels are subject to control via the Section 408-governed tolerance-setting process.

However, in some cases, pesticide residues in raw agricultural commodities concentrate in processed agricultural products, or in the food ingredients derived from raw agricultural commodities. Common examples include residues in raisins, in contrast to the grapes the raisins come from (and indeed any dried food); milling wheat to produce wheat germ, bran and flour; making tomato paste or ketchup from raw tomatoes; or, extracting oils from crops like canola, soybeans or olives.

As in the case with Section 408, Congress granted EPA the responsibility of setting tolerances under the authority embedded in Section 409 of the FDCA. To do so, EPA had to determine how to comply with the provisions set forth in the FDCA's Section 409 when setting so-called "food additive" tolerances.

In 1958, Congress amended Section 409 of the FDCA to include the so-called Delaney Clause (named after its author, New York Congressman James Delaney).  The clause states that "the Secretary of the Food and Drug Administration shall not approve for use in food any chemical additive found to induce cancer in man, or, after tests, found to induce cancer in animals."

The purpose and intent of the Delaney Clause was to prevent FDA approval of ***food additives*** known, or thought to pose cancer risk. The impact on pesticide regulation was not considered as Congress crafted, debated and passed the Delaney Clause.

In the 1970s, the EPA determined that pesticide residues in processed foods that concentrate above the level in the corresponding raw agricultural commodity must be regulated as "food additives," and hence are subject to the Delaney Clause.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

In the 1980s and 1990s, EPA denied the registration of several new pesticides and/or new uses of already-registered pesticides, because OPP had classified the active ingredient as a possible or probable oncogen. The Delaney Clause in Section 409 of the FDCA was the reason cited.

***Glyphosate was among the pesticide active ingredients that was directly impacted by the Delaney Clause from the late 1970s into the 1990s.*** Throughout this period, Monsanto was the sole registrant of GBHs and the only company that had conducted long-term feeding and genotoxicity studies on glyphosate.

The Toxicology Branch within the OPP decided that glyphosate should be classified as a possible oncogen in 1984. This decision posed a significant economic threat to Monsanto, as stated by Frank Serdy, Monsanto's Manager of Federal and State Regulatory Affairs in a March 13, 1985 letter to the OPP Registration Division Director, Doug Campt.

Once glyphosate was classified as a potential oncogen, most future extensions in the range of food crop uses of Roundup would likely require the establishment of Section 409 food-additive tolerances to cover glyphosate residues that would be present at concentrated levels in certain fractions of grains, oilseed and many other crops.

There were several glyphosate Section 409 tolerance petitions in the EPA pipeline throughout the 1980s and several more would be needed to accommodate final approval of the glyphosate tolerances and Roundup labels necessary for Monsanto to commercialize its Roundup Ready seed and herbicide "technology packages."

*In my opinion, the primary years of conflict between Monsanto and EPA over the oncogenic classification of glyphosate occurred between 1984 and the end of 1991. It is also my opinion that the intensity of the debate over glyphosate oncogenicity, and Monsanto's determination to overturn the judgement of the OPP Toxicology Branch, was triggered by the impact on future Roundup sales and profits if OPP retained the "possibly oncogenic" classification of glyphosate.*

## D. Monsanto Adherence to FIFRA's Adverse Effects Reporting Requirement

In crafting the provisions of the modern FIFRA in the early 1970s, Congress was persuaded that even a robust, rigorous, pre-approval pesticide risk-assessment process might miss some circumstances in which a given pesticide use might lead to "unreasonable adverse effects on man or the environment." Plus, Congress knew that progress in the toxicological and risk-assessment sciences might uncover risks not previously recognized or understood.

Accordingly, FIFRA Section 6(a)(2) was added to the statute. It spells out what has come to be known as the "adverse health effects reporting requirement." EPA describes the new information that must be submitted to the EPA by registrants in 6(a)(2) implementing regulations (40 CFR § 159.158):

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

(a) General Information which is reportable under this part must be submitted if the registrant possesses or receives the information, and the information is relevant to the assessment of the risks or benefits of one or more specific pesticide registrations currently **or formerly held** by the registrant. Information relevant to the assessment of the risks or benefits also includes conclusion(s) or opinion(s) rendered by a person who meets any of the following:

(1) Who was employed or retained (directly or indirectly) by the registrant, and was likely to receive such information.
(2) From whom the registrant requested the opinion(s) or conclusion(s) in question.
(3) Who is a qualified expert as described in § 159.153(b).

I highlight the phrase "**or formerly held**" because in several instances, Monsanto chose to conduct new safety studies on no-longer registered formulations of Roundup. *In my opinion and as shown in the discovery record, Monsanto did so to not place in jeopardy existing registrations. This strategy to dodge regulatory scrutiny of newly obtained adverse data was inconsistent with provisions in FIFRA.*

In September, 1997 EPA published a Final Rule in the Federal Register "codifying EPA's interpretation and enforcement policy regarding section 6(a)(2)" of FIFRA, focusing on what information must be submitted under 6(a)(2), when and how often. The Final Rule became effective as of June 16, 1998.

EPA issued on April 3, 1998 Pesticide Registration (PR) Notice 98-3, "NOTICE TO MANUFACTURERS, FORMULATORS, PRODUCERS, DISTRIBUTORS AND REGISTRANTS OF PESTICIDE PRODUCTS." Section VII in this 1998 6(a)(2) guidance document addresses "Expert Opinion Information." It explains the legal responsibilities all registrants faced in their ongoing exchange of information with EPA relative to the possible risks stemming from registered pesticide products.

Section VII begins by stating:
"Conclusions or opinions of experts must be submitted under FIFRA 6(a)(2) if the registrant possesses the information and either 1) the information is otherwise reportable under one of the substantive provisions of the rule; or 2) the registrant knows, or should reasonably know, that the information, alone or in conjunction with other information, *might raise concerns about the continued registration of a pesticide or about the appropriate terms and conditions of registration of a pesticide*. As a general matter, the Agency frequently relies on the 'weight of evidence' in making pesticide regulatory decisions, and it considers expert opinion that tends to confirm or validate otherwise reportable information. In this context, expert opinions can play an important role in Agency decision-making." (Emphasis added)

The PR Notice goes on in Section VII to offer examples of such information reportable under 6(a)(2). These include "scientific opinions that test data demonstrate that a pesticide causes a particular adverse effect".

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

This report discusses in detail two important examples of new information obtained by Monsanto that seemingly falls within the 6(a)(2) reporting requirement: (1) Dr. James Parry's 1999 genotoxicity reports, and (2) reports discussing the findings of dermal absorption studies conducted for Monsanto by the contract laboratory TNO.

## E. State Regulatory Requirements and Actions

While the federal EPA is largely responsible for most aspects of pesticide product safety assessments, some states operate robust regulatory programs that focus on pesticide uses and risk concerns specific to a state or region of the country, or which arise as a result of state law. This is especially true of California.

The authority of the State of California to impose limits in that State on the use of a federally-registered pesticide was one of the most controversial and high-profile issues taken up by the Subcommittee I worked for in 1981-1983. Such issues were a major focus of the California government-commissioned evaluation I did in the early 1990s on the State's roles in pesticide regulation. Tensions arising from State vs. federal roles in pesticide regulation have persisted for decades.

In 1986 California voters passed the Safe Drinking Water and Enforcement Act, otherwise known as Proposition 65. This measure required two major steps by the California government: (1) chemicals or products shown to pose cancer or reproductive risks must be added to a Proposition 65 list, and (2) the labeling of certain consumer products would have to note the risk of birth defects or cancer.

The stated purpose of the second Proposition 65 requirement was to add a cancer or reproductive warning on consumer product labels in order to alert California residents of possible *significant exposures* to chemicals believed to pose risk of cancer, birth defects or reproductive problems.

Proposition 65 modified California laws, including a provision in labor law identifying authoritative bodies that the State would rely on in determining whether a given chemical or product posed a risk of cancer. The list of authoritative bodies included the World Health Organization's International Agency for Research on Cancer, or IARC.

In March of 2015, IARC issued its unexpected decision to classify glyphosate, and hence Roundup brand herbicides as "probable human carcinogens." This triggered the addition of glyphosate to the State's Proposition 65 list, and the beginning of years of litigation brought by Monsanto, other pesticide manufacturers, their surrogates and allied organizations.

It also led manufacturers of glyphosate-based herbicides (GBHs) to acknowledge that GBHs pose cancer risks, at least according to IARC. For example, Material Data Safety Sheets developed by Monsanto for the occupational health community were modified to include the fact that IARC had classified glyphosate as a 2A "probable human carcinogen."

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

1. **Tumors Observed in Glyphosate Feeding Studies**

Minor differences exist in the reporting of the number of tumors observed in the control group and treatment group animals fed glyphosate in the cancer bioassays analyzed by the EPA, the EPA's Scientific Advisory Panel (SAP), IARC, Monsanto scientists and other scientists, including Dr. Chris Portier, the plaintiff's expert testifying on glyphosate animal studies.

But very significant differences exist between the interpretation of the biological significance or relevance of the data showing that certain tumor types in the 15 studies were elevated in treatment groups.

In the 2016 "Glyphosate Issue Paper," EPA provides an analysis of tumors observed in the 15 studies. Across the 15 studies the EPA discusses 12 tumors that occurred in treatment groups at elevated levels based on standard statistical tests of significance. In all cases the EPA deemed the tumors "not treatment related." In explaining the basis for the judgement that the tumors were "not treatment related," the OPP cites nearly a dozen different reasons or justifications.

In the 2016 evaluation report EPA summarized its analysis of the 6 mouse carcinogenicity assays by saying:
> "No tumors were identified for detailed evaluation in 2 of the 6 mouse carcinogenicity studies. In the remaining 4 mouse studies, 3 observed a statistically significant trend in tumor incidences in the hemangiosarcomas, lung adenomas, malignant lymphomas or hemangiomas; however, the agency determined that none of the tumors observed in the mouse are treatment related."

In the 9 rat carcinogenicity assays EPA noted that 7 tumors were elevated in four of the studies and required explanation. But as in the case of the tumors in mouse studies, the EPA concluded that none of these tumors were "treatment related." So, EPA addressed 12 tumors in the "Glyphosate Issue Paper" present in mouse and rat treatment-group animals that were judged not treatment related for various reasons.

The common reasons cited included lack of a monotonic dose response curve or a flat response, reliance on historical control data with a higher tumor incidence than in the concurrent control group, lack of significance in pairwise tests for significance, spontaneous tumors, lack of evidence of progression from adenomas to carcinomas, no similar tumors in other studies, excessively high maximum dose levels and adjustment for multiple comparisons.

I did an analysis of the reasons cited by EPA for the tumors they acknowledge were present at elevated levels but were not treatment-related. *In my opinion and based on my analysis, OPP cited an average of ~3.5 of the above reasons in the course of determining that each of the elevated glyphosate tumors were not treatment related.*

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

Dr. Portier's published analysis reaches a different conclusion. He focused on 13 studies because he regarded two studies included in the EPA analysis as unreliable because the studies were either classified by EPA as invalid or seriously flawed. Across the 13 assays Portier analyzed, 37 tumors were identified as elevated and statistically significant. Dr. Portier's list includes 25 tumors EPA did not address in the "Glyphosate Issue Paper." Portier concludes that the 37 tumors:

> "…demonstrate consistency across studies in the same sex/species/strain for many of these tumors….the strongest evidence shows that glyphosate causes hemangiosarcomas, kidney tumor and malignant lymphomas in male CD-1 mice, hemangiomas and malignant lymphomas in female CD-1 mice, hemangiomas in female Swiss albino mice, kidney adenomas, liver adenomas, skin keratocanthomas and skin basal cell tumors in Sprague-Dawley rats, adrenal cortical carcinomas in female Sprague-Dawley rats and hepatocellular adenomas and skin keratocanthomas in male Wistar rats." (Quoted from Abstract)

According to Portier:

> "…EPA discussed only 7 of 21 statistically significant tumor increases in rats and 5 of the 16 significant tumor incidences in mice."

So, Portier identified 37 tumor types elevated in glyphosate treatment groups, of which EPA regarded zero as treatment related. *In my opinion and based on my analysis showing that the EPA cited about 3.5 reasons on average in dismissing elevated tumors, the EPA made about 130 judgement calls in the course of dismissing the 37 tumors Portier identified in the animal bioassays. Several of these judgement calls were not in accord with EPA cancer risk assessment guidelines.*

I searched the animal feeding study discussions in all pertinent EPA documents reporting its most recent assessment of glyphosate oncogenicity. ***I did not find a single incident in which EPA made a similar judgement call that heightened the Agency's concern over a specific tumor in a glyphosate animal bioassay, and zero cases in which a tumor's incidence was upgraded from "not treatment related" to treatment related***. A simple example is EPA never relied on historical control data to upgrade a tumor from not statistically significant to significant in a glyphosate chronic feeding study.

*In my opinion, OPP's exercise of judgement some 130 times to downgrade an observed, elevated tumor to "not treatment related", in conjunction with zero such judgements elevating a marginally statistically significant tumor to "treatment related" is evidence of systematic bias in OPP's assessment of glyphosate oncogenicity.*

In conducting a weight-of-the evidence assessment of the carcinogenicity assay database, Portier classified the evidence for each tumor observed as Clear evidence (CE), Some evidence (SE), Equivocal evidence (EE) and No evidence (NE). This classification was applied to 28 tumors that occurred once or more in different cancer bioassays. There was clear evidence for 13 tumors (46%), some evidence for 7 (25%), 4 with equivocal evidence (14%) and 4 with no evidence (14%).

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

**2.  The SAP Questions EPA's Weight-of-Evidence Assessment of the Animal Studies**

In light of the ongoing controversy over the EPA versus IARC glyphosate cancer classification, the EPA submitted a set of questions to a Scientific Advisory Panel composed of experts in animal studies, genotoxicity and epidemiology. The Panel met in Washington D.C. for four days (December 13-16, 2016).

This SAP meeting was highly anticipated. The composition of the panel triggered unusual controversy and press coverage. In short, Monsanto and CropLife (the pesticide industry's primary lobby group in DC) had objected to some individuals initially invited to serve on the Panel and convinced EPA to disinvite one member (Dr. Peter Infante, an OSHA epidemiologist and occupational health specialist with years of experience assessing pesticide cancer risks).

This unusual EPA action led to significant change in the composition of the Panel. In light of the need for additional expertise after disinviting Infante, the EPA added three scientists with epidemiology, toxicological and statistical expertise to the Panel (Luoping Zhang, UC Berkeley; Emanuela Taioli, Mt. Sinai School of Medicine; and Lianne Sheppard, University of Washington).

*In my opinion, even a cursory read of the 1,261 page transcript of the SAP meeting shows that these three individuals had a significant impact on the Panel's deliberations*.

They also went on to conduct independent research on glyphosate exposures and cancer risk. Their published papers have played an important role in the litigation.

*In my opinion the research leading to these published papers was triggered in large part by the participation of these scientists in the December 2016 SAP meeting. They recognized the need for better data and more sophisticated studies, had been told by EPA scientists during the SAP meeting that the Agency was not able to conduct the needed studies and chose to do so themselves.*

The transcript of the meeting includes lengthy discussion of the glyphosate oncogenicity animal bioassay database. The Panel revisited EPA's reasons and justification for concluding ***in every case*** that tumors occurring at elevated rates in treatment groups were "not treatment related."

Per usual procedures EPA staff produced an 89-page report entitled "Transmission of Meeting Minutes and Final Report of the December 13-16, 2016 FIFRA SAP Meeting." The report includes several dozen instances where the SAP Panel, or a subset of members, calls for specific changes or additions to the September, 2016 EPA "Glyphosate Issue Paper." But overall:
> "…the Panel was divided with regard to the interpretation of apparently conflicting evidence from the rodent bioassays."

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

Some Panel members "felt that the Agency's weight-of-evidence evaluation gave excessive weight to several factors, including lack of monotonic dose response relationships, historical tumor rates, lack of statistical significance in pair-wise comparisons when there is a significant positive trend, and discounting results at exposures greater than the 'limit dose' of 1,000 mg/kg/day."

In several places the Panel unanimously concludes that the Office of Pesticide Programs did not adhere to the EPA's most recent (2005) *Guidelines for Carcinogen Risk Assessment*. The summary report states (page 50), "The Panel noted that a monotonic dose response relationship is not a criterion for a positive rodent response" in the Agency's cancer guidelines. ***The summary report goes on to state that OPP's flawed reasoning explained away seven positive tumor responses.***

The Panel also highlighted inappropriate OPP use of historical control data to dismiss clearly statistically significant tumor responses in a given assay. "The Agency used this argument [re historical controls] to dismiss increased incidences in the treated group in several studies" (bottom, p. 50).

The SAP report highlights the serious problems with OPP's assessment of the animal bioassay database with a compelling summary statement: "The Agency invoked a four-part 'AND' rule…"

This rule imposed four tests on whether a given positive tumor should be regarded as treatment-related, AND required ALL FOUR to be simultaneously satisfied for any association to be deemed treatment related. And significantly based on the SAP's accounting, ***this OPP decision-rule rendered positive associations "not treatment related" in 13 tumors: 9 specific examples in rat studies and 4 in mouse studies***.

Another set of OPP decisions inconsistent with the EPA's 2005's cancer guidelines were addressed by the Panel. It involved use of the "Sidak-adjusted comparisons with a P-value less than 0.01 as significant and worthy of discussion (i.e. as having 'weight')." The imposition of this stricter statistical standard resulted in several tumors considered significant by some on the Panel being classified as "not treatment related." *In my opinion this change in statistical tests of significance is akin to moving the goalposts in a football game*.

The Panel report also contains the first of several references to the need for and value of a pooled meta-analysis of the animal bioassay data (p. 56). Dr. Portier had provided his pooled meta-analysis to the Panel as part of his written comments. One of the Panel members recommended to EPA that the Agency include the results of Portier's pooled meta-analysis in a table in the revised glyphosate issue paper. The Panel also recommended to EPA that the Agency should conduct such a pooled meta-analysis, but the response was OPP lacked the resources to conduct such an analysis.

One of the important passages in the SAP summary report highlights that the EPA's classification decision is limited to and dependent upon relatively low dietary exposures: "In

the Issue Paper, the statement 'at doses relevant to human health' establishes a condition under which glyphosate is 'not likely to be carcinogenic to humans'."

In the context of this litigation, the OPP's classification of glyphosate as "not likely" to pose cancer risk is marginally relevant to the much-higher exposures to formulated Roundup experienced by applicators. For the September 2016 glyphosate evaluation report to encompass applicator exposures, *the SAP notes that the OPP's classification decision is further conditioned on the assumptions that applicator exposures do not vary significantly from typical dietary exposures, and that applicator exposures to glyphosate-plus-surfactants are no different than exposures to pure glyphosate via residues in food.*

*In my opinion both of OPP's assumptions are demonstrably wrong. For many applicators exposures are much higher through the dermal route than the oral/dietary route and a milligram of glyphosate in a formulated GBH is more toxic than a milligram of pure technical glyphosate.*

In light of EPA's 2005 cancer risk assessment guidelines the report then states: "Many Panel members believe that the EPA did not provide convincing evidence of a lack of carcinogenic effects." These Panelists agreed that there are adequate reasons to reject the Issue Paper's conclusion of "not likely to be carcinogenic in humans." Instead they support a conclusion of "suggestive evidence of carcinogenic potential" under these [2005 EPA] Guidelines.

In the Executive Summary, the Panel highlights several other key points that have emerged as central issues in the litigation. These include the need for animal bioassays on formulated GBHs like Roundup, and the lack of high-quality epidemiological studies in highly exposed populations like the plaintiffs in this litigation, workers in a chemical plant making Roundup and individuals working on the maintenance or repair of spray equipment.

### 3. EPA's Office of Research and Development Also Questions OPP's Dismissal of Positive Tumor Data

In response to the diametrically opposed glyphosate oncogenicity classification decisions reached by the OPP and IARC, then-Administrator Gina McCarthy asked the EPA Office of Research and Development (ORD) to assess and compare the OPP versus the IARC analysis of data relevant in classifying glyphosate oncogenicity.

The conclusions of ORD's assessment are summarized in a December 14, 2015 document entitled "Summary of ORD comments on OPP's and IARC's glyphosate cancer assessment (Bates # EPA-HQ-20 16-01 0431_00000037-39). ORD's review of OPP's and IARC's analysis of the animal studies led to this conclusion:
"OPP (and EFSA) focus on pairwise comparisons (which were generally not significant), while IARC also uses trend tests, which yielded several significant results. In a few cases, OPP reported trend test results that differed from those of IARC but did not report which test they used. EPA's cancer guidelines state that 'Trend tests and pairwise comparison

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

tests are the recommended tests for determining whether chance, rather than a treatment-related effect, is a plausible explanation for an apparent increase in tumor incidence. ***Significance in either kind of test is sufficient to reject the hypothesis that chance accounts for the result***.'" (Emphasis added)

## B.  Bio/dynamics Mouse Oncogenicity Study (Knezevich and Hogan, 1983)

In the regulatory history of glyphosate by far the most controversial rodent cancer bioassay was conducted by Monsanto and submitted to the Agency in 1983. This new mouse oncogenicity study was among the IBT replacement studies submitted by Monsanto to OPP (EPA Accession #: 251007-014; Bio/dynamics Project No. 77-2061). It was conducted by the contract laboratory Bio/dynamics and was submitted to EPA on July 29, 1983, five years after the EPA had informed Monsanto that such a test was required.

The study followed routine design protocols for a chronic feeding study. There were four groups of Charles River CD-1 mice: control, 1,000 ppm glyphosate technical in the animals' diet, 5,000 ppm and 30,000 ppm. There were 50 male mice and 50 female mice in each group. Animals were observed twice daily and mortality during the study was reported as "normal for this age and strain of mice." (MONGLY04275682)

In the section "Results" in its summary report to Monsanto Bio/dynamics states: "No treatment-related effects were demonstrated."  In other words, the study was "negative" for oncogenicity.

But the Bio/dynamics summary report does address a number of statistically significant increases in tumors. Table 1 in the report lists four "microscopic changes" that were elevated in the treatment groups in a statistically significant way: central lobular hepatocyte hypertrophy (elevated in male mice), central lobular hepatocyte necrosis (elevated in males), chronic interstitial nephritis (elevated in males) and proximal tubule epithelial basophilia and hypertrophy (elevated in females).

Bio/dynamics dismisses all four types of lesions noted in their Table 1 by saying "All these findings, however, were of the type and severity common to long-term mouse studies."

The report also stated:
   "The incidence of renal tubule adenomas was 0/49, 0/49, 1/50, and 3/50, in control through high-dose males, respectively. This lesion, however, was not observed in any of the female treatment groups, and, as mentioned previously, this data was not statistically different from control. ***While not observed in control animals in this study***, renal tubule adenomas have previously been observed in control male CD-1 mice of comparable age. The slightly increased incidence of adenomas in the high-dose males was considered spurious and unrelated to glyphosate administration." (Emphasis added; MONGLY04275683)

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

*In my opinion in the male mice, the incidence of four renal tubule adenomas reported by Bio/dynamics clearly follows a statistically significant, upward trend. They became over the next decade the most intensely studied and consequential four adenomas in history. They also possessed seemingly magical powers as explained below.*

### 1. Review of the Bio/dynamics Mouse Study

The importance of OPP's evaluation of the Bio/dynamics mouse oncogenicity study on glyphosate was widely recognized inside EPA and Monsanto and throughout the pesticide regulatory community, especially if deemed "positive" by the Agency.

Such a judgement would change the status-quo classification of glyphosate from "not classifiable as to oncogenicity" to either a "possible" or "probable" oncogen. It would have significantly altered the outcome of a number of pending and forthcoming tolerance petitions and registration applications in the US and placed in jeopardy Monsanto's ability to bring Roundup Ready seed to market.

Two memoranda dated January 31, 1984 were sent from Monsanto toxicologist Lyle Gingerich to four colleagues. (MONGLY04269118; MONGLY04269119-20) The first memorandum reports on a recent conservation Gingerich had with Robert Taylor, the senior official in herbicides section of the OPP Registration Division.

Taylor was responsible for managing the flow through OPP of glyphosate-Roundup herbicide tolerance petitions and registration applications. He also managed interactions between Monsanto and OPP on the fulfillment of data requirements, label changes, data compensation and other issues that arise regarding the regulatory status of Roundup.

In the first January 31, 1984 memo, Gingerich reports on separate, face-to-face meetings on January 31, 1984 with Robert Taylor of the Registration Division and W.L. Burnam, Deputy Director of the Hazard Evaluation Division.

The Gingerich memorandum reports that Taylor told him that W.G. Dykstra of the OPP toxicology division had reviewed the new Bio/dynamics mouse oncogenicity study. The memo states: "R.J. Taylor said that he saw something in writing to indicate that when the review is sent to him it will state that Roundup is an oncogen."

The memo goes on to report that according to OPP's Taylor, various pending tolerance petitions will be denied as a result of this change in OPP's characterization of glyphosate's oncogenic potential. Thus by the end of January 1984, jockeying over whether EPA would determine that glyphosate and Roundup pose cancer risks was underway. The importance of the evolving debate would become clearer to Monsanto, EPA and the pesticide user and regulatory communities as Roundup use rose and Monsanto commercialized Roundup Ready GMO technology.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

In the January 31, 1984 memorandum Gingerich reported that he intends to speak later the same day, again, with Taylor and Burnam of the toxicology branch in order to request "W.G. Dykstra's review and [discuss] what would be an appropriate forum for Monsanto inputs."

Gingerich ends this memo to colleagues with this question: "Do you think it would be appropriate for our legal department to caution EPA on possible premature leaks of this review's conclusions prior to Dr. Kasza's [senior OPP pathologist] re-review and final disposition of the matter?"

Later in the day (January 31, 1984), Dr. Gingerich either met with or spoke on the phone again with Burnam of the OPP toxicology branch, according to the second of two memos Gingerich sent to Monsanto colleagues. It passes along what Burnam had told him:
     "A 'complete' review of the glyphosate mouse study has not been done. There has been no section or branch sign-off of W.G. Dykstra's review. The question of kidney tumors was pointed out by W.G. Dykstra and is being evaluated by either C. Chaisson or Dr. L. Kasza. W.L. Burnam asked that we send in historical control data to document the claims made in our summary. He cautioned that these be from the same laboratory and time period. He said to be sure to report the [historical control] numbers study by study, rather than as an overall average."

This second January 31, 1984 memorandum goes on to say that "R.J. Taylor continues to be concerned that Roundup actions will be held up for a few months until this is resolved." By "this" Gingerich is referring to the classification of glyphosate as a possible oncogen.

### 2.  Swift Monsanto Response Challenges Classification of Glyphosate as a "Possible Oncogen"

The above series of events on January 31, 1984 are remarkable. On the same day during which Monsanto first learned that OPP's evaluation of the Bio/dynamics mouse study was likely to lead to a "possible oncogen" classification, a representative of Monsanto (Gingerich) had:
- At least two face-to-face meetings with senior representatives of the OPP Registration and Toxicology Divisions,
- At least two follow-up calls or meetings with these same individuals, and
- Received a substantive request from Dr. Burnam for more data on historical control rates of the tumors in question.

A little over one month later on February 10, 1984, Hoyt Jamerson of the OPP Registration Division received a memo from William Dykstra of the Toxicology Branch ("TB") addressing the results of the recently submitted Bio/dynamics mouse study. Under "Recommendations," it states:
     "Review of the mouse oncogenicity study indicates that glyphosate is oncogenic, producing renal tubule adenomas, a rare tumor, in a dose-related manor. Therefore, Toxicology Branch considers that the PP#3E2845 [a pending tolerance petition] is not toxicologically supported."

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

The conclusion set forth in the February 10, 1984 memo is the first written confirmation that I know of stating that OPP's TB now regarded glyphosate as a possible oncogen.

On March 20, 1984 Monsanto submitted to OPP historical control data on the incidence of renal tubule adenomas in the control groups of CD-1 mice from past studies. OPP's Burnam had instructed Monsanto to submit historical control data from the same laboratory and roughly from the same time period study by study.

Monsanto submitted such historical control data from Bio/dynamics, as well as from two other "major" contract laboratories. (MONGLY04276057) This is an example of an instance where Monsanto did not follow instructions from EPA regarding submission of supplemental data.

The final memo codifying Dykstra's review of the mouse oncogenicity study was sent to Taylor in the Registration Division on September 4, 1984. In its "Recommendations" section, the Toxicology Division states that "1. Glyphosate was oncogenic in male mice causing renal tubule adenomas, a rare tumor, in a dose-related manner. The study is acceptable as core-minimum data. 2. A [cancer] risk assessment by Toxicology Branch is required."

On February 5, 1985 Monsanto elevated the debate by sending the Director of the OPP Registration Division a letter advancing several arguments in support of the company's conclusion that the renal tubule adenomas in the male mice were not treatment related nor statistically significant.

This February 5, 1985 Monsanto letter set forth six arguments in support of the company's assertion that the observed renal tubule adenomas were not treatment related:

- Tumors were only observed in male mice,
- Renal tubule adenomas were only present at the end of the study, suggesting they were caused by the age of the male mice rather than exposure to glyphosate, and that only benign tumors were observed,
- Another Bio/dynamics, 2-year chronic feeding study in the same strain of mice with N-nitrosoglyphosate (NNG) produced no renal tubule adenomas in any control or treatment group,
- Glyphosate was not mutagenic in a number of genotoxicity assays, and
- A statistical argument suggesting that the dose-related increase in renal tubule adenomas in the male mice was not statistically significant.

### 3. EPA's Response to Monsanto's Criticisms of the "Possible Oncogen" Classification

The Toxicology Branch (TB) review of the data and arguments in the Monsanto letter was conducted by Herbert Lacayo. Based on his statistical analysis of the data Lacayo concluded that "a prudent person would reject the Monsanto assumption that Glyphosate dosing has no effect on kidney tumor production" (February 26, 1984 memorandum, Lacayo to Reto Engler).

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

The OPP held a cancer-assessment peer-review group meeting on February 11, 1985 attended by eight senior scientists in the TB to "evaluate and discuss the data base on Glyphosate, and in particular the potential oncogenic response of Glyphosate." The attendees reviewed the OPP assessment of the new mouse study, as well as the arguments and data submitted by Monsanto in its February 5 letter.

The attendees concurred unanimously that: "In accord with EPA proposed guidelines (FR of Nov. 23, 1984) the panel has classified Glyphosate as a Category C [possible] oncogen."

### 4.   Monsanto Takes Its Appeal to the Tox Branch Chief

A Monsanto-requested meeting was held February 21, 1985 with the OPP Toxicology Branch attended by its Chief Dr. Ted Farber and then-Assistant Chief Burnam.  Gingerich, Frank Serdy and Fred Johannsen represented of Monsanto.

A February 22, 1985 memorandum from Gingerich to Monsanto colleagues characterized the meeting mood as "relaxed, informal, and open." The memo states that Farber called the February 11, 1985 decision by OPP to classify glyphosate as a possible oncogen "an extremely close call and that EPA remains open to any new information that would make their decision easier." (MONGLY04269072)

*In my opinion, when Farber said to Monsanto officials that OPP remains "open to any new information that would make their decision easier," he was referring to a decision to downgrade the classification of glyphosate from "possible oncogen" to "not classifiable as to oncogenicity."*

The memo sets forth Monsanto's goals for the meeting, including:
"(1) see if we could respond to their concerns [the renal tubule adenomas] before any unnecessary comments became a part of the Roundup permanent file. (2) determine exactly what their concerns are. (3) gauge the level of their concern."

Under the heading "Concerns of Toxicology Branch" in Gingerich's February 22, 1985 memorandum, he reports that Farber opened the meeting by describing the conclusions of the OPP toxicology branch review of the mouse oncogenicity study. Specific points noted were:
"Oncogenic in mouse, IARC ranking 'c' [possible human carcinogen]; Company's letter [Monsanto's February 5th letter] was too weak to be convincing; Biologically significant rare tumors; Historical controls [data] not helpful; Will ask to re-section tissues, consider crystal formation, etc."

The meeting memo then states that "Dr. Farber indicated that a substantial re-look at tissues may cause the EPA pathologist [Dr. Kasza] to change his position. If no carcinomas are found the second time, our arguments about 'only benign' tumors would be stronger. *I [Gingerich] read this to mean that the EPA pathologist (Kasza) is open to persuasion.*"

The memo also reports on several questions raised during the meeting. Monsanto representative FJ (Frank Johannsen) asked OPP's Dr. Farber "…what the EPA would be

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

likely to do if we [Monsanto] re-sectioned the slides and found no carcinomas. Dr. Farber said that it would force them to get the internal peer review group together again."

### 5.   OPP Dismisses Monsanto's Historical Control Data Argument

On February 5, 1985 Monsanto sent the Director of the OPP Registration Division a four-page letter transmitting additional information related to the Bio/dynamics chronic mouse study.

On February 26, 1985 an EPA memorandum was sent to OPP statistician Reto Engler, a senior scientist involved in the TB's review of glyphosate's oncogenicity. The memo was written by OPP statistician Herbert Lacayo and sent through and signed off by Bertram Litt, OPP's Statistics Team Leader. During my years working for the DORFA Subcommittee, I met several times with Dr. Engler, Bert Litt and Bob Taylor.

The memo focused on whether the additional mouse historical control data for kidney tumors submitted by Monsanto should alter the OPP assessment of the significance of the reported renal tubular adenomas in the Bio/dynamics study. The summary of the Lacayo statistical review of the historical control data states that "…we can conclude that Glyphosate dosing has a statistically significant effect (at the $p = .006$ level) in the production of kidney tumors in male mice" (i.e. highly statistically significant, since the usual cut-off for significance is $p = 0.05$).

A March 4, 1985 OPP memorandum on the subject "Consensus Review of Glyphosate" codified the conclusion reached by the eight Toxicology Branch scientists who signed the consensus review document. (MONGLY04269067).  The signatories included the Chief of the TB Farber, OPP's senior pathologist Dr. Kasza, who read the Bio/dynamics mouse study slides, Bertram Litt, OPP's senior statistician and William Dykstra, author of the original OPP review of the mouse study.

*In my opinion the March 4, 1985 TB memorandum sent to Robert Taylor in the Registration Division marked the end of the beginning of a protracted and highly impactful debate between OPP and Monsanto over the results of the Bio/dynamics mouse study.*

### 6.   Monsanto Takes Its Case to the Director of the OPP Registration Division

Only two days passed before Monsanto again wrote to OPP, this time to Douglas Campt, then Director of the OPP Registration Division. The five-page March 13, 1985 letter was sent by Frank Serdy, Monsanto's Manager for Federal and State Registration Affairs.

The letter recounts the recent history of OPP's evaluation of the Bio/dynamics mouse oncogenicity study, the numerous meetings involving OPP and Monsanto scientists and asserts that the renal tubule adenomas observed in the male mice in the study are not treatment related nor statistically significant. It also restates the many Monsanto arguments advanced in support of the company's position over the past six weeks. In closing his letter to Campt, Serdy states that:

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

"As you know, glyphosate is an extremely important herbicide to agriculture in the U.S. and around the world. Monsanto is concerned that even the initiation of formal regulatory action would have serious negative economic repercussions which we believe are not justified by the scientific evidence."

In an April 3, 1985 memorandum from Dykstra to the Registration Division's Taylor, the TB's judgement regarding glyphosate's oncogenicity was stated as it had been previously: "Glyphosate was oncogenic in male mice causing renal tubule adenomas, a rare tumor, in a dose-related manner."

### 7.   Monsanto Hires Another Pathologist to Re-read the Kidney Slides

Also on April 3, 1985 Dr. George Levinskas, a scientist in the Monsanto Department of Medicine and Environmental Health, circulated a brief update inside the company stating that:
    "Senior management at EPA is reviewing a proposal to classify glyphosate as a class 'C possible human carcinogen' because of kidney adenomas in male mice. [Private, consulting pathologist] Dr. Marvin Kuschner will review kidney sections and present his evaluation of them to EPA in an effort to persuade the agency that the observed tumors are not related to glyphosate." (MONGLY04277789)

Dr. Kuschner had not been involved with the design, conduct or evaluation of the Bio/dynamics mouse study. He had not previously reviewed the study's kidney slides. *In my opinion it is noteworthy that Levinskas thought Dr. Kuschner's review would be helpful "in an effort to persuade" the EPA that the tumors were not treatment related, given Kuschner had not even seen the study.*

Also on April 3, 1985 a letter was sent by Dr. Aleksanday Knezevich, Senior V-P, Pathology at Bio/dynamics to Dr. Marvin Kuschner, the consulting pathologist hired by Monsanto. (MONGLY04269049) The letter informs Dr. Kuschner:
    "The enclosed shipment is being sent to you at the request of Dr. Tim Long of Monsanto. It contains slides of kidney sections from all animals on the reference study [mouse oncogenicity study]."

In mid-May 1985 Kuschner submitted his report to Bio/dynamics and Monsanto. The company reviewed the report and submitted it to OPP.  The report was, as anticipated by Monsanto before Dr. Kuschner had even received the slides, supportive of Monsanto's "effort to persuade the agency that the observed tumors are not related to glyphosate."

In a June 14, 1985 memo from OPP's senior statistician Rito Engler to Robert Taylor of the Registration Division, Engler reports that after a TB peer-review process:
    "We have determined that the incidence of renal adenomas in male mice (a rare tumor) is inconsistent with the historical control incidence of this tumor. The registrant, in several letters, has refuted our statistical analysis of the data. Basically, the registrant contends that the highest incidence ever observed in historical controls should be used to judge the incidence in the Glyphosate study. The use of any historical control data in this manner is

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

biologically as well as statistically inappropriate and misleading." (Underlining in original).

Then Engler goes on to report that the registrant has now submitted a report "which shows that a re-reading of the kidney slides has revealed one (1) kidney tumor in the mouse control group, but no additional tumors in the treatment groups." In light of this new information, Engler writes that:

> "Given the overall uncertainty concerning the significance of the observed tumor incidence we believe a systematic reevaluation of this kidney lesion has become necessary in order to fully evaluate Glyphosate."

### 8. Re-sectioning of the Bio/dynamic Mouse Kidney Slides

"If the results of the kidney re-sectioning do not resolve the glyphosate issue within OPP, we will be faced with an adverse OPP decision," Gingerich wrote to Monsanto colleagues in an August 20, 1985 memorandum. (MONGLY04268982)

Gingerich also discusses the prospect that OPP might decide to place unresolved science issues before the Agency's Scientific Advisory Panel, especially if a deadlock emerges between the conclusions of Monsanto's and OPP's pathologists.

Gingerich goes on to ask:
> "Can we change the focus of the question to the S.A.P. to: 'Is 30,000 ppm too high [a dose] to be used in a meaningful risk assessment?'…If we assembled 10 respected toxicologists, would all ten agree that the feeding level is too high to be meaningful?"

He then suggests that the 10 toxicologists agreeing with Monsanto's position should be brought to the SAP meeting and asked to speak in support of the company's assessment of the mouse study, given "…the importance of this issue to Monsanto."

Gingerich then explains why he has suggested that all 10 toxicologists should be brought to the SAP meeting:
> "There is a tendency to *'count the votes'* at S.A.P. meetings. We can make a difference by lining up a large number of experts on our side." [Emphasis added]

Note that "our side" refers to Monsanto's stated interpretation of the kidney tumor data, and not an effort to gain deeper scientific understanding of the impact of glyphosate on kidney tumors or the mechanisms through which glyphosate exposures might lead to such tumors.

Eight days later on August 28th Serdy wrote a memo to his colleague Tim Long, another Monsanto scientist working on the effort to change EPA's mind on the mouse oncogenicity study.

Serdy voices confidence that glyphosate will ultimately be shown to be not oncogenic and lays out some "additional steps" if the results of the re-sectioning of the kidneys does not change EPA's mind. First, Serdy writes:

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

"We continue to feel it is important to identify and contact those outside 'experts' who we feel would testify on our behalf both to EPA and SAP that, based on the results, glyphosate is not oncogenic." (MONGLY04268980)

Serdy's second "additional step" is prefaced by acknowledging that "We do not have a lot of faith, presented with the same evidence, Ted Farber [head of OPP Toxicology Branch] will want to back off and change his mind." Serdy then writes:

"Hence we feel that it is equally as important to identify and contact 'experts' in the area of statistics who would be willing to testify both to the EPA and SAP that [a tumor incidence of] 1-0-1-3 cannot be considered statistically significant."

Note that in Serdy's second point he is assuming that EPA has or will accept Dr. Kushner's conclusion that one mouse in the male control group had a renal tubule adenoma that was not detected or reported in the original Bio/dynamics report on the study. In the absence of that additional adenoma in the male mice control group, the tumor incidence would have remained as originally reported, 0-0-1-3 and reflect a trend which is unambiguously dose-related and highly statistically significant, as Lacayo's February 26, 1985 memo had concluded.

Driving home the importance of these "additional steps," Serdy writes that:

"It seems imperative that we continue to do all that is possible in order to have the Agency reverse its decision. Hopefully, the testimony of several respected 'experts' will be enough to cause EPA to change their minds." It is unclear why, but intriguing that Serdy wrote 'experts' in this memo.

The re-sectioning of the male mice kidneys and the re-evaluation of the slides was done by Bio/dynamics, at the request of Monsanto. The OPP pathologist Dr. Kasza had been consulted in the process of developing the procedures. R.F. McConnell, a pathologist consulting with Bio/dynamics, read both the original slides and the slides from the re-sectioned kidneys.

The Bio/dynamics report covering the re-sectioned kidney tumors was dated September 26, 1985 and was submitted to the EPA a few days later.

The significant result in the Bio/dynamics report on the re-sectioned kidney tissues is finding one renal tubule adenoma in the control group of male mice (mouse # 1028). The report states:

"Confirmation of the diagnosis of the original renal tubular adenomas was made, including concurrence with Dr. Marvin Kushner on the presence of a lesion in the control group which represented a developing tumor. No new tumors were found in any of the [other] control or treated groups."

The report concluded: "The renal tumors observed were considered to be incidental and not toxicologically significant."

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

**9.   EPA Response to the Newly Identified Tumor in Control Mouse #1028**

The technical response from the Tox Branch to the September 26, 1985 Bio/dynamics report was done by Dr. Kasza, OPP's senior pathologist. Dr. Kasza was the scientist who had been consulted by Bio/dynamics on the procedures to be followed in the re-sectioning of the kidneys. Kasza's December 4, 1985 memo with his findings was sent to Dykstra, the lead reviewer of the mouse study in OPP's Toxicology Branch.

The single critical question was whether Kasza agreed with Dr. Kuschner and the Bio/dynamics pathologist Dr. McConnell that control male mouse #1028 had a renal tubule adenoma. Kasza requested and re-read the original slides for all male mice, as well as the newly re-sectioned kidney slides. He found no differences in the number of renal tubule adenomas in the treatment groups.

In reference to the tumor in control group mouse # 1028 reported by Kuschner and McConnell, Kasza wrote:

> "It is my opinion that the presence of a tumor cannot be definitely be established. My interpretation is similar to the conclusion of Bio/dynamics' pathology staff and Dr. McConnell, that the lesion 'may be' a proliferative change having the potential to lead to the development of a frank tumor. But as the tissue can be seen under the microscope as a small well-demarcated focal cell aggregate morphologically different from the healthy looking surrounding kidney tissue, this morphological alteration does not represent a pathophysiologically significant change."

*In my opinion, Kasza's reading of the newly sectioned kidney of animal #1028 was that there was a group of cells that looked different and that might become a lesion of some sort, but the cell mass had not reached the stage justifying identification as a renal tubule adenoma, or indeed any other type of tumor.*

*It is also my opinion that all of the EPA pathologists that reviewed the Bio/dynamics mouse kidney slides could not see a renal tubular adenoma in the kidney of control mouse #1028.*

Each of the pathologists paid by Monsanto to assess the kidney slides concurred that there was a renal tubular adenoma in control mouse #1028, *except* for Dr. McConnell, the pathologist working for Bio/dynamics when the kidney slides from the study were fresh and initially read.

## C. The 1986 SAP Review of the Mouse Oncogenicity Study

Kasza's interpretation was accepted within EPA. As a result the EPA and Monsanto were again dead-locked and so OPP decided to seek assistance from its SAP in resolving the conflict.

A January 17, 1986 Federal Register notice announced a two-day SAP meeting on February 11-12, 1986 during which the Bio/dynamics mouse study would be evaluated. Agenda item 1 read:

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

"Review of a set of scientific issues related to apparent oncogenicity being considered by the Agency in connection with the preparation of a Registration Standard for glyphosate."

Monsanto sent a January 23, 1986 letter to Steven Johnson, the senior EPA official who managed the SAP. After noting that the Federal Register notice said the SAP would assess glyphosate's "apparent oncogenicity," the letter stated that:

"Monsanto firmly believes that glyphosate is not an oncogen, and we therefore do not agree with this position taken by the Agency. The Agency is in error in reaching this conclusion…"

The letter argues that the OPP determination does not follow EPA's Proposed Guidelines for Carcinogen Risk Assessment and then adds:

"In addition to Monsanto's own evaluation, this matter has been reviewed by five independent experts. The unanimous conclusion reached by these scientists is that there is no treatment-related oncogenic effect of glyphosate in the chronic mouse study…"

Recall the August 20, 1985 Gingerich memorandum discussed above. It suggested that Monsanto recruit 10 experts to testify before the SAP and that *"[t]here is a tendency to 'count the votes' at S.A.P. meetings*." (MONGLY04268982)

The focus of the glyphosate oncogenicity discussion during the February 11, 1986 SAP meeting was on the histopathology of the kidney slides, and in particular:

- The number of tumors in the male mouse control group,
- The appropriate statistical analysis to use and whether the renal tubule adenoma incidence reached statistical significance, and
- The proper use of historical control data.

The two questions presented to the SAP by the EPA were:

"(1) Based on the Agency's weight of the evidence assessment with emphasis on the mouse kidney tumors, the Agency has classified Glyphosate as a class C (possible human) carcinogen. The Agency specifically requests any comment the Panel may wish to present with regard to its assessment of the weight of the evidence and subsequent determination of carcinogenicity according to the Agency's Cancer Guidelines."

"(2) The Agency requests also that the Panel consider what weight should be given to this marginal increase in kidney tumors, the importance of this type of tumor in the assessment of the carcinogenicity of Glyphosate, and the weight placed on historical and concurrent controls for this type of evaluation."

The primary presentation by EPA was done by Farber and Monsanto's presentation was made by Robert Harness, Director of Environmental and Government Affairs, Dr. Timothy Long, in the company's Medical Department and Wayne Withers.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

1.   **Monsanto Increases the "Votes" for Its Interpretation of Mouse Kidney Tumors**

Monsanto brought to the SAP meeting three experts who had been involved with the study and/or the reading of the controversial kidney slides:
- Kuschner, the consulting pathologist who re-read the original mouse study kidney slides,
- McConnell, the consultant to Bio/dynamics that read the original slides, as well as the re-sectioned slides, and
- Dr. Ira Daly, the Bio/dynamics laboratory director.

Each of these individuals were given opportunities to make short presentations and participate in the Q&A with SAP members.

In addition Monsanto announced to the SAP that they had submitted the data in question to a panel of four consulting experts (Squires, Olsen, Stemmer, Goodman), all of whom agreed with Monsanto's interpretation of the mouse oncogenicity study results. These experts were also in attendance at Monsanto's expense and participated in the Q&A.

One of the invited experts – Dr. Don Goodman – was also asked by Monsanto to represent the conclusions of a second review panel convened at the request of Monsanto by Pathco Inc, a pathology consulting group. The Pathco panel reviewing the same mouse oncogenicity data included five scientists, each also paid by Monsanto (Sourer, Anver, Stranberg, Ward, Goodman).

In his opening statement to the SAP, Harness summarizes the key conclusions reached by each of the Monsanto-invited experts, as well as the expert panel convened at Monsanto's request by Pathco Inc.

Dr. Marvin Kuschner found an additional tumor in the male mouse #1028 in the control group, no additional tumors in the treatment group, switching the study from clearly positive to purportedly negative for renal tubule adenomas. His concluding statement, quoted by Harness, is that "I see no reason to assign carcinogenic potential to glyphosate."

Robert Squires, "In summary, I feel the weight of the evidence strongly suggests the renal adenomas in male mice were naturally occurring and not treatment related." Robert Olsen, "In summary, it is my view that these findings do not support the view that [text cut off]."

Dr. Robert McConnell, "It is and has been the opinion of this pathologist that the tumors were incidental and were not toxicologically significant." Dr. Klaus Stemmer, "The incidence of renal tubule adenomas is in all probability biologically by chance."

Pathco Inc panel (Drs. Sourer, Anver, Stranberg, Ward, and Goodman, who represented the panel at the SAP meeting), "The incidence of renal tubule cell neoplasms in this study are not compound related."

Monsanto's Dr. Timothy Long provided an overview of the back and forth over the mouse

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

study pathology results and then summarized Monsanto's position by stating:

> "The overall incidence [of renal tubular adenomas], therefore, remained at 1-0-1-3. These [kidney section] slides and/or supporting data *have now been reviewed by a total of 10 pathologists and toxicologists and the unanimous conclusion of all the experts is that there is no evidence of any treatment related oncogenicity*." (Emphasis added)

The Monsanto team offering conclusions and presenting data before the SAP included 14 people (i.e. 'votes'): three from Monsanto, three individuals involved with the study, four consulting experts and four additional experts who joined Dr. Goodman (in attendance) on the Pathco Inc panel.

## 2.   SAP Report Recommends a Repeat Mouse Study to Resolve the Dispute

The report providing the SAP panel's answers to the questions EPA had asked was transmitted to the Director of OPP on February 24, 1986 and was released publicly soon thereafter. The section "Panel Response" begins by saying: "In the instance of Glyphosate, the Panel concurs that the data on renal tumors in male mice are equivocal."

The SAP report goes on to state:

> "The vast majority of the pathologists, who examined the proliferative lesion in the male control animal, agreed that the lesion represented a renal adenoma. Therefore, statistical analysis of the data should utilize this datum."

*In my opinion, this conclusion that the "vast majority" of pathologists agreed with the Monsanto interpretation stands in contrast to a statement made by the EPA in its assessment of the differing views on whether control animal #1028 had a renal tubule adenoma.*

In Dr. Faber's presentation to the SAP, he states: "we [EPA] do see an increased incidence statistically…" On the critical issue of whether there was a renal tubule adenoma in control mouse #1028, Dr. Farber's offered his accounting of the differing views: "…perhaps three pathologists saying no [tumor], perhaps four or more pathologists saying yes."

Robert Harness, Director of Environmental and Government Affairs said in his opening comments to the SAP, Harness: "Because glyphosate is the largest selling herbicide in the world, with many registered uses, we consulted a group of scientists to advise us on the questions raised by the EPA and presented to you by Dr. Farber."

Taking into account the uncertainty and disagreement over the number of renal tubule adenomas, the use of historical controls and the statistical methods used to judge whether the observed tumors were treatment related, the SAP's final judgement was equivocal:

> "…the Panel does not believe that it is possible to categorize Glyphosate clearly into Group C (possible human carcinogen) or Group E (no evidence of carcinogenicity in humans). The Panel proposes that Glyphosate be categorized as Group D (not classified) and that there be a data call-in for further studies in rats and/or mice to clarify unresolved questions."

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

### D. EPA Calls for a Replacement Mouse Study in 1986 Glyphosate Registration Standard Document

On August 11, 1986 OPP issued the glyphosate Registration Standard (RS) document setting forth guidance to companies (i.e. Monsanto, then the sole registrant) seeking to register new or retain existing pesticide product labels for herbicides containing glyphosate (the date on the RS document is June 1986; it was released on August 11, 1986 ). (MONGLY00223577)

*In my opinion the RS is a key historical milestone in the EPA's assessment of glyphosate uses, testing, exposures, risks and benefits.*

Key functions of the 1986 RS review and document were to specify required labelling changes, warnings and precautions that must appear on product labels; and, inform Monsanto about the new studies the company must agree to commission and submit to the agency in a timely way in order to retain existing registrations/product labels or win approval of new uses/labels.

The 1986 glyphosate RS document states on page 2:
>"Failure to comply with these requirements [e.g. filling data gaps, adding new worker safety rules] may result in the issuance of a Notice of Intent to Cancel or a Notice of Intent to Suspend (in the case of failure to submit data)."

Under the heading "Chronic Feeding/Oncogenicity Data" the glyphosate RS notes that available studies included 2-year mouse and rat chronic feeding studies and a 1-year dog study. But because of limitations in study design and/or questions over the interpretation of equivocal results, all three of these studies did not satisfy core, OPP chronic feeding study data requirements.

The "Summary Science Statement" in the RS states that **"Repeat oncogenic studies are required in mice and rats**." (Page 5). EPA required the company to repeat the Lankas rat oncogenicity study (which was a repeat of the initial invalid IBT rat study) that failed to reach the Maximum Tolerated Dose and trhe 1983 Bio/dynamic mouse study.

### 1. Monsanto Challenges the EPA RS Requirement for a Repeat Mouse Study

About three weeks after the public release of the glyphosate RS Serdy sent a memorandum to Monsanto colleagues involved in the ongoing debate over glyphosate oncogenicity. In this August 28, 1986 memorandum Serdy outlines "suggestions" for Monsanto's response to the RS's data call-in for repeat mouse and rat oncogenicity studies. (MONGLY04278162)

After describing possible Monsanto arguments to EPA challenging the need for repeat studies, Serdy writes:
>"If successful [EPA drops the requirement], this approach has the following downside: EPA's response may be: 'Fine, don't repeat either study. We will just

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

put you into class C [a possible oncogene under EPA's classification system]'"

Soon after the release of the glyphosate RS document in August 1986 Monsanto communicated to EPA via several channels its disagreement with some of the actions required by EPA in the RS document.

Serdy asserts in a RS-response letter to OPP that:
> "The results of the mouse bioassay do not provide positive, or even suggestive, evidence of carcinogenicity. The most that can be said is that the results were equivocal as, in fact, the Scientific Advisory Panel stated."

In this letter Serdy notes that the company had asked several consulting experts to testify at the SAP meeting. The Serdy letter states that the experts "were asked to evaluate the need for a repeat study. All experts agreed that additional testing is not justified…" (page 2).

I carefully reviewed the verbatim transcript of the testimony of all the Monsanto experts brought to the SAP meeting by Monsanto. ***None of them spoke to the issue or expressed an opinion about whether the mouse study should be repeated.***

### 2. EPA Calls for a Specially Designed Study in Response to Monsanto's Refusal to Conduct a Repeat Mouse Study

In accord with routine OPP procedures, Monsanto's scientific arguments and requests for waivers of RS data requirements, including a repeat mouse study, were reviewed by the relevant branches of OPP.

Monsanto had formally requested waivers for two study requirements in the RS document: (1) an LC-50 inhalation study, and (2) a repeat mouse chronic feeding/oncogenicity study.

Dykstra in the Toxicology Branch reviewed the request and Monsanto's supporting data. He prepared the TB memorandum regarding "Glyphosate – Monsanto Comments to Glyphosate Guidance Document." (MONGLY00223052) Dykstra concurred/approved waiver request (1). On request (2), he wrote:
> "TB does not concur with Monsanto regarding the waiver of the repeat mouse oncogenicity study (see discussion in review section [pages 3-6 of the memo])."

In his review of Monsanto's arguments in support of a waiver for the mouse study, Dykstra wrote:
> "Regarding the need to repeat the mouse oncogenicity study with glyphosate, TB fully concurs with the conclusion and recommendation of the Scientific Advisory Panel (SAP)."

The SAP had concluded that glyphosate be classified as Group D (not classifiable as to oncogenicity) and recommended that replacement studies in mice and rats be carried out. He then writes:

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

"TB believes the oncogenic potential of glyphosate in mice still remains unresolved and that a repeat mouse study is necessary to fully and adequately assess this potential." (MONGLY00223052)

Dykstra's memorandum goes on to say that the new mouse oncogenicity study should be "specially designed" to clarify "certain unresolved questions relating to the potential oncogenicity of glyphosate."

Dykstra sets forth several specific study requirements. First, he recommended retaining the 30,000 ppm high-dose treatment rate, since survival in that group of male mice exceeded survival in the control group and did not exceed the MTD. Second, he recommended that two additional treatment groups should be added to more definitively delineate whether there is a dose-response – 7,500 ppm, and 15,000 ppm. Third, there should be 200 male mice per group to enhance statistical power.

Dykstra proposed other changes to reduce the cost of the repeat study. He stated that the study should focus only on unresolved questions from the first study and only on male mice (cutting the number of animals in half). He also proposed a "tier approach" in the pathology examination phase of the study, focusing first on kidney and liver sections in all groups of male mice. If the "first tier" examination produces no evidence of an oncogenic response, "then additional histopathological examination will not be necessary."

Monsanto continued to resist EPA's call for a new mouse oncogenicity study and has still not redone the Bio/dynamic study nor carried out the special study requested by EPA.

*In my opinion the special study requested by EPA would have likely provided the EPA and Monsanto with the information needed to resolve the controversy over the presence of renal tubular adenomas in mice. It also would have provided Monsanto critical information to help the company decide whether to continue marketing a herbicide to millions of people worldwide that might possibly cause kidney tumors.*

*I further opine that beginning in 1985 and running until a repeat mouse study was submitted, reviewed by EPA and found to be negative, Monsanto should have added to Roundup labels an alert regarding the status of glyphosate/Roundup oncogenicity testing (e.g., "...exposures to this product may increase the risk of certain cancers").*

Similar information should have also been conveyed in glyphosate/Roundup chemical safety data sheets and other information developed for physicians and poison control centers, as well as via other means of communication Monsanto utilized to reach customers, i.e. brochures, leaflets, advertising.

*In my opinion, if a new mouse oncogenicity study had reported a positive response for renal tubular adenomas and/or other tumors, the EPA's "possible oncogen" classification would have remained in place, or upgraded to "probable." Either of these two classifications would have markedly restricted the range of new Roundup crop uses. It also would likely*

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

*have led to the addition of new warnings and worker-safety provisions on most Roundup labels.*

### 3. Monsanto Persistence Pays Off

Eight years of Monsanto-EPA debate ensued over the 1983 mouse study. At multiple points Monsanto found ways to raise new scientific issues in need of exploration with OPP scientists, delaying a final OPP decision on whether the 1983 Bio/dynamics study was positive or negative for cancer.

*In my opinion, throughout the debate over the 1983 Bio/dynamic mouse study, Monsanto demonstrated both its ability and willingness to incrementally raise the stakes facing the OPP on one issue followed by the next. Monsanto made it clear to both OPP and EPA political appointees that this cycle would go on until OPP brought its evaluation of the Bio/dynamics study into alignment with Monsanto's.*

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

# 7.  The Assessment of Glyphosate/Roundup Genotoxicity

The second leg of the three-leg stool supporting assessment of a pesticide's capacity to cause cancer focuses on the mechanism or mechanisms through which exposure to a chemical can trigger cancerous cell growth or accelerate progression to cancer. In the absence of a plausible genotoxicity mechanism, regulators place less weight on data from animal studies or epidemiology suggesting that a given chemical might be an oncogen.

But when there is data pointing to plausible mechanisms through which a chemical might trigger and/or promote cancerous cell growth, regulators are more likely to take action to reduce exposures for chemicals that have been shown to increase tumors in animals or human epidemiological studies.

Scientists search for such mechanisms by deploying a battery of genotoxicity assays. These assays are useful in determining whether a given chemical can cause genetic mutations. In discussing genotoxicity, regulators use the terms "genotoxic" and "mutagenic" and "genotoxicity" and "mutagenicity" to refer to essentially the same thing.

Through genotoxicity assays scientists look for damage to the DNA in genes or disruption in gene expression. Because there are so many different mechanisms through which chemicals can damage DNA or promote aberrant cell growth, scientists have developed many different genotoxicity assays, each designed to detect a given type of DNA damage in a particular cell type and organism.

Both pure glyphosate and formulated GBHs have been extensively tested in a wide range of genotoxicity assays in several different assay systems and organisms. Bacterial reverse mutation (BRM) assays (aka Ames test) are among the simplest, cheapest and quickest genotoxicity assays. For most pesticides, registrants conduct several BRM assays and typically the results are similar. BRM assays account for about one-half of all genotoxicity assays done by registrants on glyphosate. ***All but one was negative*** (data follows in Table 7.1).

Dozens of studies have shown that formulated Roundup is more potent in triggering damage to DNA than technical glyphosate. *In my opinion the way that Monsanto responded to their own studies and published assays demonstrating that Roundup is more toxic than glyphosate is a critical issue in this litigation.*

Another key issue in the litigation arises from what Monsanto told EPA about its internal studies and concerns over the ways that the surfactants in formulated Roundup products accentuated the genotoxicity of Roundup compared to Roundup's active ingredient glyphosate.

In Chapter 9 on the EPA and IARC assessments of glyphosate and Roundup oncogenicity, I explain the significant differences in the way that EPA assessed glyphosate genotoxicity in contrast to IARC's genotoxicity analysis. In Chapter 2, I opine that these differences were

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

primarily responsible for why the EPA and IARC reached diametrically conclusions regarded whether glyphosate and Roundup posed cancer risk to exposed humans.

In this chapter I note EPA's genotoxicity testing requirements and report the number of studies Monsanto and other GBH registrants conducted and submitted to the Agency, as well as the number of genotoxicity assays conducted by scientists not working for a GBH registrant. Last, I explain and analyze key steps in Monsanto's efforts to understand whether its Roundup products were increasing the risk of cancer by damaging DNA.

## A. EPA Genotoxicity Data Requirements, Registrant and Non-Registrant Published Studies

The EPA now requires three genotoxicity assays: a BRM assay, *in vitro* mammalian cell assay and an *in vivo* cytogenetics. (Previously, the third required assay was conditionally required).) In a footnote to the table in the Code of Federal Regulations setting forth pesticide genotoxicity/mutagenicity data requirements, the EPA explains that in the case of genotoxicity assays:

> "At a minimum, an initial battery of mutagenicity tests with possible confirmatory testing is required. Other relevant mutagenicity tests that may have been performed, plus a complete reference list must be submitted." (P. 120, Part 158.510, 40 CFR Ch. 1).

Another footnote in the data requirements table provides further detail on the three types of *in vitro* mammalian cell assay that should be conducted and submitted. In the case of the required *in vivo* cytogenetics assays, the EPA expresses a preference for a rodent bone marrow micronucleus assay.

The first round of mutagenicity and genotoxicity studies on glyphosate were commissioned by Monsanto in the 1970s, conducted by IBT and were found to be invalid and/or fraudulent. The second round was done in the late 1970s and 1980s and fulfilled OPP genotoxicity data requirements.

The laboratories conducting Monsanto-sponsored, cell-assay genotoxicity studies on technical glyphosate in the 1970s through 1990s reported no evidence of mutagenic or genotoxic effects. EPA scientists generally accepted and concurred with their conclusions.

### 1. The Results of GBH Registrant and Non-Registrant Published Genotox Studies

My initial expert report in this litigation was submitted as part of the Dewayne Johnson case and was signed December 21, 2017. Several conclusions and opinions were based on my review of the role genotoxicity testing and evaluation had played in the glyphosate oncogenicity classification decisions made by EPA and IARC.

My genotoxicity analysis and opinions triggered many questions during my deposition on my first 2017 expert report, as well as in subsequent iterations of my report. I was asked many questions about genotoxicity studies Monsanto had conducted and on which the EPA had

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

relied. In some cases I did not know the answer to questions placed to me. This led me to conduct a more thorough analysis of the entire glyphosate and GBH genotox database. My work encompassed registrant studies and non-registrant published studies, as well as my independent assessment of the genotoxicity studies relied on by EPA versus those relied on by IARC.

I realized my findings might be helpful to other scientists and regulators trying to reconcile the conflicting glyphosate and GBH classification decisions reached by EPA and IARC. So, I wrote a paper describing the publicly data available on EPA's and IARC's assessment of GBH and glyphosate genotoxicity. My findings appear in a 2019 peer-reviewed paper (Benbrook, C. "How did the US EPA and IARC reach diametrically opposed conclusions on the genotoxicity of glyphosate-based herbicides?," *Environmental Sciences Europe*, 2019, 31(1). https://enveurope.springeropen.com/articles/10.1186/s12302-018-0184-7).

Much of the data and findings reported in the balance of this chapter draw on this 2019 paper and its supplemental table file published on the journal's website. The data sources and methods used in my analysis are described in the paper.

The following discussion focuses on the genotoxicity tables in the September 2016 draft EPA report, because that is the version of EPA's glyphosate oncogenicity report that I used in my EPA vs. IARC comparison and the tables in my published paper in *ESE*. The genotoxicity-related differences between the September, 2016 and final EPA glyphosate oncogenicity report issued in December 2017 are minor, and do not impact my empirical findings or opinions.

Pages 99-125 of the 2016 EPA assessment of glyphosate's oncogenic potential discuss studies on "Gene Mutations" involving technical glyphosate. Seven tables in this section identify the specific, mostly regulatory studies on glyphosate technical that were considered by EPA and reports whether each study presented data positive for one or more genotoxic responses or were negative for genotoxicity.

The IARC Monograph report has a similar set of tables assessing roughly the same categories of genotoxicity studies addressed in the EPA report, plus four types of studies not considered by EPA: (1) exposed humans, (2) human cells *in vitro* - AMPA, (3) non-human mammals *in vivo* - AMPA, and (4) non-mammalian systems *in vivo* - AMPA. (AMPA is the principal metabolite of glyphosate.

Like the EPA report, the IARC Working Group identifies whether a given study or assay was positive or negative for evidence of genotoxicity. ***But unlike EPA, the IARC Working Group reviewed mostly studies in peer-reviewed journals on both glyphosate technical and formulated GBHs.***

Table 7.1 reports the number of glyphosate and GBH genotoxicity assays undertaken in different categories. Note that the table includes assays on technical glyphosate, GBHs and glyphosate's primary metabolite aminomethylphosphonic acid (AMPA).

Electronically Filed · City of St. Louis · December 30, 2021 · 10:34 PM

The categories track those used by the EPA and IARC in their assessment of the glyphosate and GBH genotox database. Some confusion can arise in discussing the number of positive/negative studies, in contrast to the number of positive/negative assays. This is because many studies report results from multiple assays, some of which may be positive and others negative. In the tables below, the focus is typically on the number of distinct assays undertaken.

**Table 7.1.  Genotoxicity Assays on Glyphosate and Formulated GBHs Conducted by Registrants ("Regulatory") and in Public Literature (see notes)**

| Compound Tested | Number of Assays | | | Number of Positives | | | Percent Positive | | |
|---|---|---|---|---|---|---|---|---|---|
| | Regulatory | Public Literature | Total | Regulatory | Public Literature | Total | Regulatory | Public Literature | Total |
| *GENOTOX ASSAY TYPE* | | | | | | | | | |
| Bacterial Reverse Mutation | | | | | | | | | |
| Glyphosate Technical | 23 | 4 | 27 | 0 | 0 | 0 | 0% | 0% | 0% |
| Formulated GBHs | 28 | 3 | 31 | 0 | 1 | 1 | 0% | 33% | 3% |
| *In Vitro* and *In Vivo* Mammalian Gene Mutation | | | | | | | | | |
| Glyphosate Technical | 4 | 2 | 6 | 0 | 1 | 1 | 0% | 50% | 17% |
| Formulated GBHs | 0 | 1 | 1 | 0 | 1 | 1 | 0% | 100% | 100% |
| *In Vitro* Chromosomal Aberration | | | | | | | | | |
| Glyphosate Technical | 4 | 5 | 9 | 0 | 3 | 3 | 0% | 60% | 33% |
| AMPA | 0 | 1 | 1 | 0 | 1 | 1 | 0% | 100% | 100% |
| Formulated GBHs | 0 | 2 | 2 | 0 | 1 | 1 | 0% | 50% | 50% |
| *In Vitro* Micronuclei Induction in Mammals | | | | | | | | | |
| Glyphosate Technical | 0 | 6 | 6 | 0 | 4 | 4 | 0% | 67% | 67% |
| *In Vivo* Chromosomal Aberration | | | | | | | | | |
| Glyphosate Technical | 5 | 2 | 7 | 0 | 2 | 2 | 0% | 100% | 29% |
| Formulated GBHs | 0 | 8 | 8 | 0 | 6 | 6 | 0% | 75% | 75% |
| *In Vivo* Micronuclei Induction | | | | | | | | | |
| Glyphosate Technical | 14 | 6 | 20 | 1 | 2 | 3 | 7% | 33% | 15% |
| AMPA | 0 | 1 | 1 | 0 | 1 | 1 | 0% | 100% | 100% |
| Formulated GBHs | 15 | 13 | 28 | 0 | 7 | 7 | 0% | 54% | 25% |
| DNA Damage | | | | | | | | | |
| Glyphosate Technical | 2 | 27 | 29 | 0 | 23 | 23 | 0% | 85% | 79% |
| AMPA | 0 | 3 | 3 | 0 | 3 | 3 | 0% | 100% | 100% |
| Formulated GBHs | 0 | 38 | 38 | 0 | 33 | 33 | 0% | 87% | 87% |
| All Assays | | | | | | | | | |
| **Glyphosate Technical** | 52 | 52 | 104 | 1 | 35 | 36 | 2% | 67% | 35% |
| **AMPA** | 0 | 5 | 5 | 0 | 5 | 5 | 0% | 100% | 100% |
| **Formulated GBHs** | 43 | 65 | 108 | 0 | 49 | 49 | 0% | 75% | 45% |
| **All** | 95 | 122 | 217 | 1 | 89 | 90 | 1% | 73% | 41% |

1. Includes assays on glyphosate technical cited in EPA's 2016 "Glyphosate Issue Paper: Evaluation of Carcinogenic Potential," Section 5: Data Evaluation of Genetic Toxicity, Table 5.1, 5.2, 5.3, 5.4, 5.5, 5.6, and 5.7.  Assays on formulated GBHs considered by EPA came from Tables F.1, F.2, F.3, F.4 and F.5 in Appendix F: "Genotoxicity Studies with Glyphosate Based Formulations" (EPA 2016).

2. Also included are additional assays on glyphosate technical, AMPA, and formulated GBHs from IARC Monograph 112 on the carcinogenicity of glyphosate (IARC 2017) from Tables 4.1, 4.2, 4.3, 4.4, 4.5, or 4.6.

As of the end of 2016 registrants had submitted a total of 95 genotox assays to the EPA. Of these, 52 were done with technical glyphosate and 43 on GBHs. Note that BRM assays account for a total of 51 of the total 95 studies, or 54%. These are among the quickest and least expensive types of genotoxicity assays.

The second most common type of genotoxicity study undertaken by registrants was *in vivo* Micronuclei Induction. Twenty-nine of these assays were done by registrants, or 30.5% of the

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

total number. These two major categories of registrant-commissioned genotox assays account for 84% of total assays (80/95).

Scientists not working for registrants carried out 122 assays published in peer-reviewed journals. Of these, 65 were done with formulated GBHs, 52 with technical glyphosate and 5 on AMPA. Unlike the studies conducted by registrants, BRM assays accounted for just 5.7% of the total number (7 out of a total of 122).

Assays designed to detect damage to DNA were the most common choice of scientists not working for GBH registrants. Of the total 122 assays they completed, 68 measured DNA damage, including several studies assessing DNA damage in exposed humans. Registrants carried out only 2 studies in this category.

*In my opinion, these significant differences in the studies registrants chose to carry out in contrast to scientists not working for registrants are striking, but pale in comparison to the number of assays reporting a positive versus a negative genotoxicity response.*

Only one assay out of the 95 carried out by registrants contained a positive result. Not a single registrant assay done with formulated GBHs or AMPA was reported to EPA as positive. Across all the non-registrant assays, 73% reported a positive genotoxic response.

## B.  Monsanto Seeks a "Roundup Friendly" Expert in Genotoxicity

In 1999 Monsanto hired Dr. James Parry as a consultant. Parry was a leading expert in genotoxicity and a professor in the School of Biological Sciences, University of Wales Swansea, in the UK. He was asked to advise the company regarding the validity of recently published scientific papers reporting positive evidence of genotoxicity.

Several published genotoxicity studies done by scientists with no connection to Monsanto had reported one or more positive assays. These included:
- Lioi et al., (1998), Genotoxicity and oxidative stress induced by pesticide exposure in bovine lymphocyte cultures in vitro, *Mutation Research* 403: 13-20),
- Lioi et al., (1998), Cytogenic damage and induction of pro-oxidant state in human lymphocytes exposed in vitro to glyphosate, vinclozolin, atrazine, and DPX-E9636, *Environ. Mol. Mutagenesis* 32: 39-46),
- Bolognesi et al (1997), Genotoxic activity of glyphosate and its technical formulation Roundup, *J. Agric Food Chem* 45: 1957-1962), and
- Clements C, Ralph S, Petras M (1997), Genotoxicity of selected herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay. *Environ Mol Mutagen* 29:277–288.

To gauge how helpful Dr. Parry might be as a "Third-Party Network" member, Monsanto gave him a short-term assignment that entailed reviewing the above recently published genotoxicity papers.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

"The overall weight of evidence indicates there is no convincing evidence that glyphosate induces mutations *in vivo* via the oral route."

OPP then acknowledges evidence of genotoxic responses in some *in vitro* assays involving treating cells with glyphosate, but then states:
"…*in vivo* effects were given more weight than *in vitro* effects particularly when the same genetic endpoint was measured…The only positive findings reported in *in vivo* were seen at relatively high doses that were not relevant for human health risk assessment." (p. 128)

*In my opinion, whether or not the OPP analysis is correct that technical glyphosate does not pose genotoxic risk, this conclusion is only marginally relevant to the evaluation of whether plaintiff exposures to formulated Roundup contributed to the etiology of their non-Hodgkin lymphoma. No plaintiffs in this litigation sprayed a Roundup-brand herbicide containing just technical glyphosate.*

In the "Glyphosate Issue Paper" the OPP evaluation of individual assays on glyphosate genotoxicity is summarized in a series of 7 tables numbered Table 5.1 to Table 7.1. The title in all seven tables state clearly the assays covered in the table were done with "Glyphosate Technical."

*In my opinion the failure of OPP to take into account the more than 100 assays on formulated Roundup and other GBHs is a glaring example of cherry-picking science. It is also surprising that in the section on genotoxicity in the OPP evaluation report, OPP did not explain nor justify its decision to essentially ignore the 100+ studies on formulated GBHs.*

This is especially curious given OPP's stated commitment to and use of weight-of-evidence decision-making. OPP was aware of many published studies showing that formulated Roundup was much more toxic or potent than technical glyphosate in triggering genotoxic responses in a variety of assay systems. *In my opinion, the greater toxicity of formulated Roundup compared to glyphosate was and remains a central issue in the scientific and regulatory communities involved in the re-registration of GBHs.*

The only mention in the OPP "Glyphosate Issue Paper" of the genotoxicity assays on glyphosate-based formulations is in Appendix F. This appendix is entitled "*Genotoxicity Studies with Glyphosate Based Formations*." The **only** text in this appendix states:
"While the focus of this analysis [is] to determine the genotoxic potential of glyphosate, the agency has identified numerous studies conducted with glyphosate-based formulations that contain various concentrations of the glyphosate as well as other components of the end use products are presented in Tables F. 1-5."

The five tables in Appendix F then list the genotoxicity assays that OPP was aware of on GBH formulations, broken into the same general categories as the assays on glyphosate.

One other key point warrants emphasis. The EPA and IARC are in agreement that *in vivo* study results deserve more weight than *in vitro* studies and that studies in humans exposed to formulated GBHs in real-world circumstances are the most valuable type of *in vitro* study.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

between exposure to glyphosate and the risk of NHL were consistent in reporting elevated risks of NHL associated with exposure to glyphosate."

The ORD memo then turns to a discussion of "temporal relationships", i.e. the impact of years of use of glyphosate on NHL risk. One study (Erikson et al 2008) assessed the impact of time since first use and exposures to Roundup:

> "[Eriksson et al] reported that for glyphosate exposure in a 10 year period prior to diagnosis of NHL, the OR=1.11 (95% CI: 0.24-5.08), but for glyphosate exposure that occurred more than 10 years prior to diagnosis of NHL, the OR=2.26 (95% CI=1.16-4.40). This finding, while limited to a single study, is consistent with a biologically relevant induction/latency period for NHL. *This finding suggests that cohort studies without sufficient follow-up time, or other case control studies which do not stratify by time since first exposure could be insensitive to the detection of risk*." (Emphasis added)

This is an important observation because as the ORD memo points out, "The cohort studies by De Roos et al (2005) had a median follow-up time of 6.7 years up through 2001."

The ORD team then highlights another key point -- Odds Ratios rise and are more likely to be statistically significant if the frequency and number of annual exposures among study participants are taken account. The memo then discusses the three studies that did so: Eriksson et al 2008; De Roos et al 2005; and McDuffie et al 2001. *In my opinion the De Roos et al study did not detect an impact of number of spray days because of the significant exposure estimation problems in the AHS.*

In McDuffie et al the unadjusted analysis produced an OR= 1.0 (95% CI 0.63-1.57), but among those applying a GBH 3 or more times per year, the Odds Ratio jumps upward and is significant (OR=2.12 (95% CI=1.2-3.73). In Eriksson et al, the median number of days exposed to a GBH was used to stratify the dataset into people exposed on 10 or fewer days and those exposed to more than 10 days. Again, there was a substantial change in the Odds Ratios from OR=1.69 (95% CI=0.70-4.07) and insignificant for 10 or fewer days of exposure, to OR=2.36 (95% CI=1.04-5.37) and significant.

After discussing a variety of issues possibly impacting the results in a given study and/or across studies (recall bias, confounding, chance), the ORD memo summarizes the results from the IARC and ORD meta-analyses. The key passage states:

> "…the meta-analysis by IARC (2016) had a summary estimate of OR=1.3 (1.03-1.65) and the meta-analysis for this evaluation based on only the five studies which did control for exposure to other pesticides had a summary estimate of OR=1.30 (95% CI=1.02-1.65)." (P. 8)

The ORD memo than explains that its "Causal Evaluation" of the link between GBH exposures and NHL placed the greatest weight on five considerations:

> "1) The overall consistency of the observed increases in risk across a set of seven High and Medium confidence independent results with varied study designs and populations clearly suggests carcinogenic potential.

In the case of formulated Roundup, surfactants increase herbicide efficacy by enhancing the movement of the glyphosate in formulated Roundup through the plant epidermis and into the plant where the glyphosate molecule is protected from rainfall and sunlight.

There are two major categories of inert ingredients. Surfactants are added to formulated herbicides to "interfere with proper membrane function" (MONGLY01700591)

*In my opinion cell membranes in human tissues have evolved in order to enhance the degree to which the membranes protect the DNA inside cells from exposure to possibly harmful chemicals, natural elements like heavy metals and mycotoxins, and bacteria or viruses. It is this valuable function of cell membranes that is impaired by exposure to the surfactants in GBHs.*

The primary surfactants used in Roundup formulations in the US fall within the family of polyoxyethylene-alkylamines (POEA). According to Monsanto a POEA surfactant was generally present in a 3:1 ratio of glyphosate to POEA in the early years of commercial use in the US, with the concentration of POEA falling to ratios around 7:1 in many Roundup brands since ~ year 2000. (MONGLY01700591)

Roundup original (MON 2139) contained 41% of the IPA salt of glyphosate and 15.4% of MON 0818, a tallowamine POEA surfactant, for a ratio of 2.7:1. Roundup Weathermax contained 49% of the potassium salt of glyphosate and 10% of MON 56151 surfactant (a tallowamine/cocoamine blend), for a ratio of 4.9:1 (Terry Kaempfe Powerpoint , February 16, 2009). However, some Roundup brands have nearly equal concentrations of glyphosate technical and surfactants. A few lawn and garden products actually contain more surfactant than glyphosate (e.g. Roundup Weed & Grass Killer RTU Plus: 2% IPA glyphosate, 4% surfactants).

A Monsanto Powerpoint includes a slide "Tallowamine (POEA) Containing Products." After noting other uses of the surfactants in Roundup, the slide states: ***"Surfactants are not biologically 'inert', they can be toxic and this must be addressed."*** (MONGLY06521465)

Another slide in the same presentation is entitled "Roundup is safe" states that "Surfactants in Roundup herbicides are unlikely to produce significant adverse effects to humans or animals ***under normal conditions of exposure***" (emphasis added). (MONGLY06521467)

The presentation does not further explain what is meant by "normal conditions of exposure," but the implication is that unusually high exposure episodes might produce "significant adverse effects to humans."

## A. Heightened Toxicity Caused by the Surfactants in Formulated Roundup

*In my opinion the distinctions between the risks associated with 100% technical glyphosate in contrast to formulated Roundup is critical from the perspective of the accuracy of pesticide mixer-loader and applicator risk assessments.*

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

Almost all of the testing required by the EPA has been on technical glyphosate, including all of the long-term animal oncogenicity tests.  Hence, most EPA and Monsanto judgements and claims relative to the oncogenicity of Roundup are based on tests conducted with technical glyphosate, an herbicide which no one has ever applied for terrestrial weed control. (A few Roundup brands are restricted to aquatic weed control and contain no surfactant).

In the case of technical glyphosate versus formulated Roundup, the risks posed by the latter are greater for three primary reasons:

- The inert ingredients in Roundup (including their impurities) are generally more acutely toxic than glyphosate itself in many bioassays,
- Roundup inert ingredients increase the amount of glyphosate moving through the skin when applicators are exposed, and
- The POEA surfactants in Roundup increase the amount of glyphosate reaching and penetrating cell walls in exposed mammals, and hence heighten the risk of DNA-damage in exposed human populations.

A paper in *The Lancet* appeared in 1988 (Sawada, et al., Probable toxicity of surface-active agent in commercial herbicide containing glyphosate, *The Lancet*, 1(8580): 299) in which the authors attribute acute, glyphosate-herbicide poisoning symptoms among several Japanese patients to the POEA in formulated Roundup. The Japanese team reported that the acute lethal dose (i.e., LD-50) of POEA in animal studies is one-third that of glyphosate, which explains why the LD-50 of glyphosate active ingredient is higher (less toxic) than the LD-50 of Roundup herbicides formulated with POEA.

This article in *The Lancet* triggered attention by independent scientists to the possible human health impacts of the inert ingredients in Roundup herbicides. Damage to red blood cells was among the adverse mammalian impacts of POEA noted by the Japanese scientists. Inert ingredients in formulated pesticide products can also, themselves, contain toxic impurities and contaminants. While technical glyphosate contains the nitrosamine-impurity NNG, the POEA surfactant in formulated Roundup contains 1,4-dioxane.

A US National Cancer Institute bioassay of 1,4-dioxane found that the chemical causes hepatocellular adenomas and carcinomas in the kidneys of rats (https://ntp.niehs.nih.gov/ntp/htdocs/lt_rpts/tr080.pdf).  In 1982 IARC classified 1,4-dioxane as a possible human carcinogen (IARC monographs on the evaluation of the carcinogenic risk of chemicals in humans. Supplement 4, WHO, 1982).  An EPA report from 1986 listed 1,4-dioxane as a probable human carcinogen.

## B.  European Regulators Press Monsanto to Better Characterize and Reduce Risks Arising from the Surfactants in Roundup

The Italian Pesticide Committee, a European regulatory body, held a meeting in July 1999 on the regulation of Roundup. It decided that new genotoxicity studies on both glyphosate and formulated Roundup would be required to assess genotoxicity and DNA repair following OECD Guideline 486 (1998).

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

Monsanto employee Gabrielle Fontana forwarded the news regarding this new genotoxicity study requirement to senior Monsanto scientists including Mark Martens, William Heydens, Donna Farmer, Larry Kier and William Graham in a July 29, 1999 email. (MONGLY00877684)

In response Martens said that the OECD 486 test "is not an unreasonable request but suggest some liver toxicity along with it to explain bumpy responses at the high dose. This test has also been requested by the French for MON 4660 and there *the risk is greater because of extreme liver toxicity*." (MONGLY0877684) I searched and found no evidence in the record that Monsanto had informed regulators of the "*extreme liver toxicity*" of MON 4660.

A few hours later William Heydens adds to the email chain:
"I don't think an in vivo UDS [the OECD 486 test] is reasonable for glyphosate…Now, formulations are obviously another issue…liver toxicity with formulations could be a confounding factor, and we would have to design and conduct the study very carefully (using our alachlor & acetochlor experience) if we are ultimately forced to do it." (MONGLY00877684)

Two days later Donna Farmer adds to this email chain and writes:
"Sorry I am weighing in on this late…It is too premature to discuss conducting any studies. I will not support any studies on glyphosate formulations or other surfactants at this time…" (MONGLY00877684)

*In my opinion, despite numerous studies published in peer-reviewed journals beginning in the late 1980s pointing to the heightened toxicity of Roundup formulations compared to technical glyphosate, Monsanto has never conducted the studies needed to assess these differences, including most of the studies recommended by their genotoxicity consultant William Parry. Moreover, Monsanto has never conducted a long-term animal carcinogenicity study on a GBH formulation or on a POEA surfactant used in the Roundup brands sold in the US.*

## 1. Monsanto Agrees to Phase Out POEA Surfactants in Roundup Sold in Europe

The record shows that European regulators pushed Monsanto to conduct new and better studies on the differences in glyphosate versus Roundup genotoxicity, and did so with increasing determination from 2000 through Monsanto's decision around 2012 to phase out all POEAs in Roundup-brand herbicides sold in Europe.

Importantly, in this period EU regulators were also asking Monsanto for better data to assess how the POEA surfactants in Roundup were impacting the rate at which the glyphosate in formulated Roundup moves through the skin of applicators, especially those people using handheld or backpack sprayers who tend to be much more heavily exposed than applicators sitting in sprayers, planes or tractors with glass and steel cabs and air filtration systems.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

Most of the Monsanto-commissioned studies on dermal absorption rates available to regulators in Europe and the U.S. were done in the 1980s and tested only technical glyphosate. By the mid-2000s, several papers had been published reporting that the POEA surfactants in Roundup likely accounted for the greater genotoxicity of Roundup versus technical glyphosate, and likely because POEA surfactants facilitate passage of glyphosate through the skin epidermis and cell membranes.

In a January 30, 2010 email William Heydens stated that Monsanto continues to defend POEA surfactants because of concern over a "domino effect" on the closely related etheramine surfactants, which Monsanto-Europe was beginning to use in place of POEAs in the hope of appeasing the concerns raised by European regulators. (MONGLY02062439)

Heydens was responding to a January 25, 2010 email from his Europe-based colleague Richard Garnett on the question of whether to phase out high-risk POEA surfactants worldwide instead of just in Europe. After discussing some new studies underway on an alternative surfactant, Garnett wrote:

> "***Anyway, there are non-hazardous formulations so why sell a hazardous one***?" (emphasis added; MONGLY02062440)

Garnett's question is an important one, especially given Monsanto's corporate pledge that product safety is a top priority.

Other documents point to plausible explanations why Monsanto decided to keep manufacturing POEA-based Roundup products in the US and most of the rest of the world, other than in Europe. First, the global supply of the safer surfactant that Monsanto-Europe was switching to was inadequate to meet all of Monsanto's needs. Second, the alternate surfactant would cost about 25% more for the amount in a per gallon for formulated Roundup.

In a June 8, 2010 email regarding Roundup formulations containing POEA surfactants in Argentina, William Heydens wrote to Monsanto colleagues in Argentina:

> "So I would think that a backup plan of reducing POEA content is not sufficient, but rather a POEA-free formulation (or formulations) would be necessary to totally protect your business in Argentina." (MONGLY02013061)

A slide addresses the business impact of the loss of POEA surfactants in a Powerpoint prepared for "Regulatory Leadership Meetings" in November 2010. "Germany is major concern" noting that "restrictions on POEA uses pre-harvest had significant negative impact on sales in 2010." (MONGLY02721133)

The "Strategy in Germany" included three core elements:
- Defend POEAs,
- Register non-POEA formulations, and
- "Managed exit from POEA" to "Avoid a ban"; "Focus: voluntary non-renewal of registrations (e.g. MON 14420 and 2012)", resulting in "***No sales [in Europe] of any POEA products after 2012***" [Emphasis added]. (MONGLY02721133)

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

The discovery record shows that Monsanto-Europe did phase out all POEA surfactants in Roundup-brand herbicides sold on the continent -- both for non-agricultural and agricultural uses -- between 2012 and 2014. As noted above, Garnett characterized this shift as from hazardous formulations to non-hazardous alternatives.

A comparable shift away from high-risk POEA surfactants has still not been undertaken in the Roundup brand herbicides sold in the US. Bayer has announced that beginning in 2023, Roundup brands formulated for the lawn and garden market will not contain glyphosate. It remains to be seen if they will contain POEA surfactants. Bayer has also announced its intention to make no changes in agricultural glyphosate-based herbicides and so it is likely that the Roundup sold for farm and ranch and commercial weed control will continue to contain POEA-based surfactants.

*In my opinion this Monsanto decision flies in the face of its statement that Roundup safety is a top priority, especially in the case of high-exposure application scenarios.*

### 2. Evidence of Endocrine Disruption Adds Pressure to Phase out High-Risk Surfactants

Around year 2000 the European Commission put in place a new set of testing guidelines to assess the degree to which formulated pesticides have the potential to disrupt the functioning of the endocrine system. Such chemicals are generally referred to as "endocrine disruptors" and have been linked to a number of developmental problems, impaired immune response and several chronic diseases, including cancer.

The US Congress directed the EPA to assess the potential of pesticides to disrupt the endocrine system in a provision included in the 1996 Food Quality Protection Act. Monsanto employees in Europe reported to headquarters in April 2002 that European regulators were working on development of a list of possible endocrine disrupting pesticides, and that some new assays might be required on glyphosate and/or formulated Roundup herbicides.

In response to this news William Heydens sent an email at 7:20 a.m. on April 25, 2002 to Donna Farmer. In it he suggests a call to "…to see if there is anything more we should be doing besides the usual 'pay no attention to the man behind the curtain'." He ends this email by saying "…this damn endocrine crap just doesn't go away, does it."

Farmer replies to Heydens at 8:19 a.m. and writes that the "interest[ing] point is that published tests of glyphosate-related endocrine disruption show that pure glyphosate has no effect, but ***formulated product (i.e. Roundup) does***" [Emphasis added]. (MONGLY00885551)

In response to Farmer, Heydens responds at 10:47 a.m. He reports that after discussions with other Monsanto experts, they "…concluded, not surprisingly, that we are in pretty good shape with glyphosate but ***vulnerable with surfactants***" (Emphasis added).

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

had some quality time with EPA OPP Office Director Jack Housenger to dig into key issues and operational matters at that vital department of EPA." (MONGLY07063555)

*In my opinion, like Rowland, Housenger's relationship with Monsanto raises doubt about the objectivity of the OPP's assessment of glyphosate.* The SAP voiced such doubts multiple times during its meeting and agreed unanimously that the OPP did not follow EPA cancer risk assessment guidelines in its review of the carcinogenicity of glyphosate.

*It is also my opinion that in my decades of tracking OPP pesticide decision-making, there has not been a more blatant example of regulatory capture than OPP's cherry-picking of science and manipulation of the SAP process to achieve an outcome advocated by a registrant.*

## C. Corporate Ghost-Authorship/Writing

Monsanto's footprint on the peer-reviewed literature has been sizable:
> "Since the year 2000, we've also published more than 2,000 scientific publications on the safety and benefits of our products."

A sizable portion of these papers, but clearly not all, addressed Roundup toxicity, risks and benefits. (From "Monsanto's Commitment to Safety," accessed from Monsanto website 12/25/2018).

The publication of 2,000 papers over an 18-year period would mean an average per year of 111 per year. In addition to these papers that Monsanto authored and takes credit for, the company has arranged for and supported over the years the publication of dozens more ghost-written papers.

As used in this report, the term "ghost-authorship" and "ghost-writing" refer to two types of contributions to a written document by a person not listed as the author, or among the co-authors of a document:
- Producing the first and original draft of a document or a section(s) of a document, and
- Revising a document or its section(s) in a way that adds to or alters the substantive content of the document.

Each of the above types of ghost-writing are unethical and unacceptable in the scientific and regulatory communities.

As part of Monsanto's campaign to discredit the Seralini paper on the oncogenicity of genetically engineered corn and Roundup (described below) and force the paper's retraction, Monsanto and its network of third-party experts referenced the Committee on Publication Ethics (COPE) "Ethical Guidelines for Peer Reviewers (Irene Hames on behalf of COPE Council, March 2013, v.1, www.publicationethics.org). This COPE document was shared with Wally Hayes, editor of *Food and Chemical Toxicology*, the journal that published the Seralini study.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

The COPE guidelines include that authors and/or reviewers must "declare all potential conflicts of interest" and "recognize that impersonation of another individual during the review process is considered serious misconduct."

In multiple instances Monsanto authors and reviewers failed to disclose obvious conflicts of interest in their interactions with journal editors. Multiple reviews of papers were submitted by one Monsanto scientist that were ghost-written, in whole or part, by others "impersonating" the reviewer-of-record.

A 2005 editorial entitled "Ghost Writing Initiated by Commercial Interests" appeared in the *Journal of General Internal Medicine* (Vol. 20:549). It begins by saying:
> "The integrity of the published record of scientific research depends not only on the validity of the science but also on honesty in authorship…The scientific record is distorted if the primary purpose of an article is to persuade readers in favor of a special interest, rather than to inform and educate, and this purpose is concealed."

### 1.   Gary Williams et al 2000 Paper

The peer-reviewed journal *Regulatory Toxicology and Pharmacology* published in 2000 a paper entitled "Safety Evaluation and Risk Assessment of the Herbicide Roundup and Its Active Ingredient Glyphosate, for Humans" (Williams, GM, Kroes, R, Munroe, AC, Volume 3, pages 117-165).

This Williams et al (2000) paper was called "an invaluable asset" for "Monsanto responses to agencies…Scientific affairs rebuttals…Regulatory reviews" in a Powerpoint presentation dated  December 10, 2010 by David Saltmiras, a Monsanto toxicologist. In the same slide Saltmiras states that "More current external expert publications are now needed to support our FTO and Registration Reviews."

Saltmiras poses a question reminiscent of Gingerich's speculation about "counting the votes" during SAP meetings: "Will weight of evidence be measured by number of publications or quality of the science??" (MONGLY02067858)

The Williams et al (2000) paper emerged from a Monsanto commissioned and paid for project undertaken by the consulting firm then known as Intertek Cantox. (http://www.intertek.com/scientific-regulatory-consultancy/) With funding from Monsanto Cantox commissioned and paid for Dr. Williams and Dr. Kroes to write a review of the human safety of glyphosate and Roundup herbicides. A Cantox employee Dr. Ian Monroe was a third listed co-author.

Dr. Gary Williams was a professor in the Department of Pathology, New York Medical Center, Valhalla, New York. He had been a consultant to Monsanto in the past.
Dr. Robert Kroes worked for ROTOX, University of Utrecht, The Netherlands, and had worked with several Monsanto scientists stationed in Europe.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

Dr. Ian Munro was an employee of Cantox Health Sciences International, the consulting firm hired by Monsanto to produce several peer-reviewed journal articles on glyphosate-based herbicides, in addition to Williams et al. (2000).

The Williams et al. (2000) paper is unusual in its scope and detail. It covers 48 pages in the journal and strives to accomplish two goals. First, it provides a summary of a significant portion of the toxicology test results from Monsanto-commissioned studies done to fulfill regulatory data requirements. It restates Monsanto's findings and conclusions from company-commissioned regulatory studies and introduces them to the broader scientific community as if they were peer-reviewed studies.

Second, the paper discusses scientific findings relevant to the risk characterization and risk assessment of glyphosate and glyphosate-based herbicides. It directs special focus on papers in the peer-reviewed literature that the company regarded as inconsistent with its conclusions with respect to glyphosate oncogenicity and/or the genotoxicity.

The paper's "Purpose and Scope" section states:
> "Certain sectors of the scientific and nonscientific communities have commented on the safety and benefits of pesticide use. With this in mind, parts of this assessment address specific concerns that have been raised by special interest groups. This review will focus on technical glyphosate acid; its major breakdown product aminomethylphosphonic acid (AMPA); its Roundup formulations; and the polyethoxylated tallow amine surfactant (POEA)."

***There is no financial disclosure statement accompanying the paper.***

To determine if a financial disclosure statement had been added, I visited the journal's website on November 25, 2017 and a search was conducted for the Williams et al paper. The search results were to this link:
http://www.sciencedirect.com/science/article/pii/S0273230099913715

The paper is now available for online purchase. The abstract is available for no charge and lists the three authors and their affiliations, but no information is offered on who paid for the study or the substantial role of Monsanto in writing the paper.

The paper's Acknowledgement statement reads in full:
> "The authors acknowledge the assistance of individuals who participated in the preparation of this document. First, we are grateful to those who gathered and made available the large amount of information used to write the manuscript for this document. Second, we thank the toxicologists and other scientists at Monsanto who made significant contributions to the development of exposure assessments and through many other discussions. The authors were given complete access to toxicological information contained in the great number of laboratory studies and archival material at Monsanto in St. Louis, Missouri, and elsewhere. Key personnel at Monsanto who provided scientific support were William F. Heydens, Donna R. Farmer, Marian S. Bleeke, Stephen J. Wratten, and Katherine H. Carr. We also acknowledge the participation and assistance of

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

Douglass W. Bryant and Cantox Health Sciences International for scientific and logistical support in the preparation of the final manuscript."

The second point in the Acknowledgment statement credits "toxicologists and other scientists at Monsanto who made significant contributions to the development of exposure assessments and through many other discussions."

"Significant contributions to the development of exposure assessments" refers to methodological work and data done by Monsanto on exposure assessment, but does not encompass ghost-writing of the sections of the paper on exposure assessment.
The acknowledgement that Monsanto toxicologists and other scientists "made significant contributions through…many other discussions" does not disclose, nor even hint at ghost-writing.

On the role of five "key personnel" at Monsanto the authors state that their participation and assistance entailed "scientific support," a phrase that typically means Monsanto provided access to data, analytical tools or models or other scientific information generated by Monsanto.

*In my opinion and for the above reasons, this Acknowledgement statement is false, incomplete and misleading.*

William Heydens states in a 2015 email that "we", i.e., Monsanto, ghostwrote Williams et al (2000). In discussing plans to ghostwrite another publication in 2015, Heydens states in reference to the new paper:
"...we ghost-write the Exposure Tox & Genetox sections...we would be keeping the cost down by us doing the writing and they would just edit & sign their names so to speak. Recall that is how we handled Williams Kroes & Munro, 2000." (MONGLY00977264)

In addition to Dr. Heydens admitting that he and other Monsanto scientists ghostwrote the Williams et al paper, a Monsanto document-tracking system includes a statement asserting that Heydens was largely responsible for drafting the Williams et al manuscript. (MONGLY02598454)

Heydens' efforts were extensive. He wrote to a colleague "I have sprouted several new gray hairs during the writing of this thing..." (MONGLY0186926)

On June 18, 1999, Douglas Bryant, a Cantox employee, sent a "progress report" on "Roundup documents [papers in preparation by Cantox]" in an email to his principle Monsanto contact, Lisa Drake. He copied two people: William Heydens and Cantox colleague and paper co-author Ian Munro.

On the subject of the Williams et al. (2000) paper on glyphosate health effects, Bryant reports on the status of various reviews, including one by co-authors Kroes and Dick Peterson. He writes:

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

"Bill Heydens, Donna Farmer, Kathy Carr and all those at Monsanto have been helping get the document through QA."

If doing so simply entailed catching and fixing errors, such input would be consistent with the acknowledged role played by Monsanto scientists and toxicologists.

Bryant then outlines the final steps in the process prior to submission of the paper to the journal: Bill Heydens completes the QA changes; sends edited and corrected version back to Cantox to incorporate final comments by the internal-to-Monsanto and Cantox reviewers (e.g. Peterson), and then the paper will be sent to the journal.

Twenty-seven minutes after the Bryant email was sent, Heydens sent this reply to Bryant and the other recipients of the original email. It was addressed to "All," and states:
"A clarification – there is one step missing – I will review the final manuscript with the reviewers comments incorporated (in revision mode so I can find them easily) before it is sent to the publisher. I will commit to conducting this review very quickly. Assuming the reviewers don't throw any surprises (I'm especially thinking of Peterson), I can turn this back around with a very minimal investment of time."

Three days later on June 21, 1999, Heydens sends a two-line email to his colleague Donna Farmer, where he states "And Dougie [referring to Bryant] thinks I would actually leave the final editing to him unsupervised…"  This degree of control over the final submission of the publication to the journal was not disclosed in the acknowledgment statement accompanying the manuscript submitted to the journal.

By September 15th, nearly-three months after the June 18, 1999 Bryant email exchange, there had been multiple calls, exchanges of written material and meetings between Bryant, Cantox and Monsanto regarding the content and finalization of the Williams et al (2000) paper (MONGLY00905085)

The September 15th email from Bryant to Heydens copies Lisa Drake and Katherine Carr of Monsanto, but not any of the co-authors. It states that:
- Bryant is sending a revised draft of the paper to the three co-authors Williams, Kroes, and Munro today,
- The draft manuscript includes "all the changes that were discussed today and during calls last week. Please check it over to be sure that I have been thorough",
- Each co-author is asked "to complete his review and respond so journal submission (*Food and Chemical Toxicology*) can be finalized for September 30, 1999", and
- Thanks everyone "for all your effort (undoubtedly there will be more)…"

Later that same day, September 15, 1999, Heydens sends another short, cryptic email to Donna Farmer and Stephen Wratten. This time he writes (exactly as in email): "FYI – in case you want to see how it ended up (hopefully, that is! – I'll strangle Kroes or Williams if they ask for any re-writes!!)  Bill."  By "it," Heydens is referring to the pre-submission draft of the Williams et al paper.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

*In my opinion, submission of this paper to a peer-reviewed journal consistent with COPE guidelines would have listed some additional Monsanto scientists as the co-authors, including Heydens and Farmer.*

It is not clear in the record whether Munro made any substantive contributions to the paper. In a July 30, 1999 email from Heydens to Munro, Heydens writes: "Everyone at Monsanto has agreed with adding you as an author – please do so." (MONGLY01869261)

## 2.  Williams et al 2012

Monsanto commissioned another team to produce an updated review of recent studies assessing the differential cellular toxicity of glyphosate and formulated Roundup herbicides in 2012. This paper appeared in the *Journal of Toxicology and Environmental Health, Part B Critical Reviews* (15(1): pages 39-96). The lead author was AL Williams (not Gary Williams), and RE Watson and JM DeSesso were listed as co-authors.

Monsanto employee Donna Farmer made significant contributions to the manuscript, but was not listed as a co-author.  In an email sending one round of her work on the manuscript to DeSesso, Farmer states "[a]ttached is the first 46 pages. I added a section in genotox from the Gasnier study ...see attached a critique we did that I took that from. Am working on a section for Gasnier in the mechanistic section. Also we cut and pasted in summaries of the POEA surfactant studies. Attached are more detailed summaries - see Knapp." (MONGLY00919381)

Donna Farmer's name is edited out as a co-author in the draft manuscript attached to the email (MONGLY00919400)

### Developmental and Reproductive Outcomes in Humans and Animals after Glyphosate Exposure:
### A Critical Analysis ~~of the Available Literature~~

Amy Lavin Williams[1, 2]
Rebecca E. Watson[1, 3]
~~Donna R. Farmer[4]~~
John M. DeSesso[1, 2, 84]

The co-authors conducted a detailed review of dozens of studies and concluded:
"An evaluation of this database found no consistent effects of glyphosate exposure on reproductive health or the developing offspring. Furthermore, no plausible mechanisms of action for such effects were elucidated. Although toxicity was observed in studies that used glyphosate-based formulations, the data strongly suggest that such effects were due to surfactants present in the formulations and not the direct result of glyphosate exposure."

The 2012 review was critical of a set of five genotoxicity studies carried out by a team of French scientist led by Dr. R. Belle.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

In an effort to explain the substantial difference in the conclusions expressed by Williams et al. (2012), in contrast to several published studies, a Letter to the Editor by Belle et al. (2012), "Toxicity of Roundup and Glyphosate," Vol 15: pages 233-237) states:

"The authors [of Williams et al (2012)] do not take into account in their interpretation of our results [on] the **very poor cell membrane permeability of pure glyphosate**." (Emphasis added).

In concluding their letter Belle et al. write:

"Although we notice that Monsanto, the manufacturer of Roundup, financed their work, we would have expected strong scientific arguments against our results or alternative findings that would evidence the contrary. This is not the case, and, to our knowledge, our experiments, first published in 2002 and brought to Monsanto's knowledge as early as 1999, have not been demonstrated to be incorrect or biased."

### 3.   Kier and Kirkland 2013 Paper

In 2013 the journal *Critical Reviews in Toxicology* (*CRT*) published a peer-reviewed paper entitled "Review of genotoxicity studies of glyphosate and glyphosate-based formulations" (Vol 43(4)). Two authors were listed -- Monsanto consultant and former employee, Larry Kier and Dr. David Kirkland, a professor and Monsanto consultant.

The abstract of the 2013 paper reports that it updates an earlier review of studies on the genotoxicity of glyphosate and formulated glyphosate-based herbicides. This earlier review was the previously discussed, Monsanto commissioned and ghost-written paper Williams et al. (2000).

A "Monsanto Manuscript Clearance Form" for the 2013 Kier-Kirkland publication is dated February 29, 2012, and lists two authors: "David Saltmiras, Larry Kier (consultant)." Under "Lead Author's Comments," Saltmiras writes: "This work falls under the scope of the EU Glyphosate Task Force and will be a valuable resource in future product defense against claims that glyphosate is mutagenic or genotoxic." (MONGLY02117600)

When published, the authors are listed as Kier and Kirkland. Saltmiras' name is deleted. Accordingly, the 2013 genotoxicity review paper is a ghost-written update of a ghost-written 2000 review.

In the published version of the Kier-Kirkland 2013 paper, the "Declaration of Interest" states:

"Larry Kier and David Kirkland were paid consultants of the Glyphosate Task Force for the preparation of this review. The Glyphosate Task Force is a consortium of 25 European glyphosate registrants, listed on http://www.glyphosatetask-force.org/. Larry Kier is also a past employee of Monsanto Company. Monsanto Company was the original producer and marketer of glyphosate formulations. The authors had sole responsibility for the writing and content of the paper and the interpretations and opinions expressed in the paper are those of the authors and may not necessarily be those of the member companies of the Glyphosate Task Force."

This "Declaration of Interest" is only partially truthful. Kier and Kirkland did not write the paper alone; a third author, David Saltmiras, had contributed substantially to the paper, but is not listed as a co-author (his help is noted in the Acknowledgements).

But in internal emails Saltmiras specifically requests his inclusion as a named author. Kirkland rejects this request, explaining "As much as I agree with recognizing the effort David S has put in, I do not think you can start adding an author at this stage. Apart from anything else, it means the authors would no longer be 'independent'." (MONGLY04086537) According to Kier "David S. was a co-author on the unpublished literature review manuscript which was the first phase of this project which I think qualifies him as a valid contributor to the manuscript."

The authors did not have sole responsibility for the content and Monsanto, through its consultants Kier and Kirkland, and employee Saltmiras, was largely responsible for the content, not the Glyphosate Task Force. (MONGLY02145924-30)  Saltmiras' contributions qualified for co-authorship under COPE guidelines and the failure to disclose his involvement is an example of unethical publishing.

#### 4.   *Critical Reviews of Toxicology* Special Issue on Glyphosate Risks

Another blatant example of Monsanto ghost-writing is the special, IARC-focused issue put out by *CRT*. This special issue was conceived and commissioned by Monsanto when the company learned that IARC would soon issue a monograph discussing the potential of glyphosate-based herbicides to cause cancer.

In an email with the subject "IARC [Response] Planning," Heydens discusses options for producing the papers that will make up the content of the special issue of *CRT*:
> "If we went full-bore, involving experts from all the major areas (Epi, Tox, Genetox, MOA, Exposure - not sure who we'd get), we could be pushing $250K or maybe even more. A less expensive/more palatable approach might be to involve experts only for the areas of contention, epidemiology and possibly MOA (depending on what comes out of the IARC meeting), and ***we ghost-write the Exposure Tox & Genetox sections***. An option would be to add Greim and Kier or Kirkland to have their names on the publication, but we would be keeping the cost down by us doing the writing and they would just edit & sign their names so to speak."  (Emphasis added, MONGLY02078590)

In another planning document titled "Proposal for Post-IARC Meeting Scientific Projects," the creation of a "Publication on Animal Carcinogenicity Data" is discussed. The document states, "Majority of writing can be done by Monsanto, keeping OS$ down."  (MONGLY01228576)

In another email dated May 11, 2015 Michael Koch (Dr. Farmer's boss and head of product safety) notes that Monsanto will attempt to get a "Publication on Animal Data Cited by IARC" and that the ***"Manuscript to be initiated by MON as ghost writers."*** (MONGLY01023968)

The contents of the special issue of *CRT* was a Monsanto-controlled and largely Monsanto-written rebuttal of the evidence cited by IARC in support of its "probably carcinogenic to

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

humans" classification. Each paper had a mix of consultants and "independent" scientists listed as co-authors, but failed to disclose various Monsanto scientists who had made substantive contributions to the papers, including drafting full sections, if not full first drafts.

There are dozens of emails and other documents in the record memorializing the role Monsanto played in the conceptualization, writing, revisions and publication of the papers in the special issue of CRT.  For example: MONGLY00978170, MONGLY00992949, MONGLY00994301, MONGLY00998682, MONGLY00999487, MONGLY01000676, MONGLY01023968, MONGLY011300799, MONGLY01183933, MONGLY01228589, MONGLY02085862, MONGLY02133654, MONGLY00998684 and MONGLY02359008.  Many of the communications are between Monsanto scientists and individuals working for the Canadian consulting firm Intertek. This firm was hired by Monsanto to manage the process of producing the papers that would appear in the special issue of *CRT*.

The consulting firm Intertek is basically the same company that Monsanto hired in 1998 to manage the process of putting together the also-ghost-written Williams et al (2000) review of glyphosate toxicity. Back then the consulting firm's name was CanTox Intertek.

Intertek served as the primary mechanism through which ghost-written material from Monsanto was incorporated in the drafts of the papers that were subsequently reviewed, revised, edited and approved for submission by Monsanto.

In addition Intertek also served as the primary point of contact with the editor of the journal *CRT*. This arrangement shielded the journal's editor from evidence of Monsanto's direct role, not just as a ghost-writer of parts of some of the papers, but as the primary author of several of them and an important contributor to all of them.

In MONGLY00998682, William Heydens' edits on the "Summary Report" paper for the *CRT* special issue are transmitted back to Ashley Roberts, Senior VP of the Food and Nutrition Group at Intertek. Roberts served as the principle point of contact between Monsanto and Intertek, between Intertek and paper co-authors and between Intertek and the journal.

William Heydens organized a group of Monsanto's Third-Party Network experts and consultants for an "Expert Panel Review of the Carcinogenic Potential of the Herbicide Glyphosate" to be held at the 2015 Society for Risk Assessment (SRA) Annual Meeting. (MONGLY01030787)

In a November 3, 2015 email Heydens circulated the panel makeup to John Acquavella and Larry Kier, individuals who had been involved in writing and/or ghost-writing various papers commissioned by Monsanto.

John Acquavella replied about an hour later that his name should be in the co-author list, to which Heydens replies: "I thought we discussed previously that…we would not be able to use you or Larry as Panelists/authors because of your prior employment at Monsanto."

Just over an hour later Acquavella responds to Heydens: "I didn't realize that Bill. Also, I don't think that will be okay with my panelists. *We call that ghost writing and it is unethical.*" *(MONGLY01030787)*

Heydens replied to Acquavella, writing: "We will have to pick this up tomorrow." The next day at 9:25 a.m., Heydens emails Acquavella, copying Donna Farmer, the Monsanto scientist managing Acquavella's consulting work. Heydens proposed a call later in the day. Acquavella responds and sets the time for the call. And then he adds:
> "You guys know me. I can't be a part of deceptive authorship on a presentation or publication. Please note the ICME guidelines below [which he attached to his email] that everyone goes by to determine what is honest/ethical regarding authorship." (MONGLY01030787)

The International Committee of Medical Journal Editors (ICME) guidelines are commonly used in publishing in medical journals ([http://www.icmje.org/recommendations/browse/roles-and-responsibilities/defining-the-role-of-authors-and-contributors.html](http://www.icmje.org/recommendations/browse/roles-and-responsibilities/defining-the-role-of-authors-and-contributors.html)). The COPE guidelines are more generic and are followed by scientists in many fields. The two sets of guidelines on ethical publishing are similar.

On September 26, 2018 the *CRT* issued an Expression of Concern regarding the papers in their special issue containing the series of papers critical of IARC. In it the publisher expressed "concerns over the completeness of acknowledged contributions to the above supplement" and explained "[w]e have not received an adequate explanation as to why the necessary level of transparency was not met on first submission. We thank those who brought this matter to our attention. When reading the articles, we recommend that readers take this context into account. We will continue to work to update these articles and ensure full disclosure of all contributions to them."

Similarly on the same day, three of the named authors on the manuscripts issued Corrigenda, correcting their disclosures and revealing Monsanto's involvement more clearly.   Each of these Corrigendum specifically apologizes for their "errors."

Clearly the Monsanto-driven *CRT* papers did not properly disclose Monsanto's involvement in producing the papers and they were not "independent" reviews.

### 5.   Other Forms of Ghost-Writing

The above cited examples of ghost-writing involve unattributed contributions to papers in peer-reviewed scientific journals that have explicit conflict of interest and disclosure rules prohibiting ghost-writing.

There are other examples of ghost-writing as well.

On August 19, 2008, Dr. Charles Healy, a senior Monsanto scientist, received an email request from the Editor of the journal *Cell Biology and Toxicology* to review a glyphosate genotoxicity

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

paper entitled "Cytotoxicity of herbicide Roundup and its active ingredient, glyphosate in rats." (MONGLY02286842)

He accepted the assignment and contacted his Monsanto colleagues David Saltmiras and Donna Farmer later the same day. He asked them to conduct the review, explaining:
> "You two would be the reviewers in fact and I would then collate your comments and be the reviewer of record."

In this circumstance, it would have been routine for Healy to write back to the Editor and ask for permission to conduct the review with assistance from two Monsanto colleagues. The editor would have likely said "fine," with proper attribution.

The ghost-written Healy review of the paper is nearly five pages, single-spaced. It is about the same length as the paper when it was published about a year later. The Healy review is brutal, rating the paper a 5 on a scale of 1 to 100 (100 top rating) and "unacceptable" for publication.

On September 9, 2008 an email from the journal is sent to Healy stating: "I have had completely opposite reviews on this paper. I would be very grateful for your comments before giving the authors a decision." Later the same day Healy forwarded this message to Saltmiras and Farmer and adds: "Looks like ours will be the deciding vote as to whether the glyphosate paper is published."

A little over a year later, a revised version of the paper reviewed by Healy appeared in the journal *Environmental Toxicology and Pharmacology* (Vol 28:379-385). The author is Nahla S. El-Shenawy.

Rising concerns over Roundup's human health effects in Latin America led to a Monsanto-organized Toxicology Expert Panel meeting in October 2012. David Saltmiras was charged with putting together an invited expert panel for the meeting. A seminar on the history and activities of the EU Glyphosate Expert Advisory Panel was among the presentations Saltmiras was organizing.

In an August 13, 2012 email Saltmiras shares with colleagues that he will invite Sir Colin Berry or Jack Mandel to present talks during the seminar and adds that "I will likely prepare the presentation and send to him to change/adapt as he sees fit."

David Saltmiras engaged in an email discussion on January 26, 2013 with Monsanto-consultant and former employee Larry Kier over whether Saltmiras should be added as a co-author of Kier and Kirkland (2013), since Saltmiras wrote a significant portion of the paper. Saltmiras tells Kier that he had been strongly encouraged by "Senior Monsanto management" to author peer-reviewed publications and that this Kier and Kirkland paper "is the ***fifth such Glyphosate related manuscript I have been involved with over the past few years without co-authorship***." (Emphasis added, MONGLY04086532)

In his 2012 performance evaluation Saltmiras wrote "Successfully facilitated numerous third party expert letters to the editor which were subsequently published..." on the Seralini study. He

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

also "accepted an invitation to be a peer-reviewer for a 'high profile' toxicology journal…peer reviewed several manuscript submissions, wherein my recommendations to reject those manuscripts were accepted/adopted by the Editor." (MONGLY101045300)

As part of his 2015 performance evaluation Saltmiras summarized his glyphosate-related activities, which included "ghost wrote cancer review paper Greim et al. (2015), coord Kier (2015) update to K&K, pushed for Sorahan (2015)." (MONGLY017223742)

*In my opinion, these numerous examples reflect instances of conduct which run counter to the basic precepts of scientific integrity and transparency, and are examples of the lengths to which Monsanto would go to protect Roundup's FTO.*

## D. Responses to Scientists Raising Concerns over Glyphosate Safety

The discovery record contains many examples of Monsanto efforts to:

- Discredit the research findings of scientists whose work is not aligned with Monsanto's judgements regarding glyphosate and Roundup risks,
- Block studies from being published that raise new or reinforce old concerns over Roundup by submitting highly critical reviews to journal editors,
- Look for ways to cut or divert the funding available to scientists deemed as glyphosate-unfriendly, and
- Provide encouragement and financial support to glyphosate-friendly scientists, often through circuitous mechanisms designed to hide Monsanto's fiscal sponsorship.

### 1. Monsanto Response to the IARC Working Group Report

Dr. Consolato Maria Segi is a professor at the University of Alberta, Canada. She was a member of the IARC Working Group that carried out the assessment of the oncogenicity of glyphosate.

After the release of IARC Monograph 112 and announcement of the 2A "probably carcinogenic to humans" classification, Dr. Sergi received a letter dated October 31, 2016 from a U.S. based law firm, Hollingsworth LLP. The firm had been hired by Monsanto to carry out various activities in response to the IARC decision. Several other IARC Working Group members received a similar letter.

According to Dr. Sergi's response dated November 4, 2016, the law firm's letter requested "disclosure of files used in connection with the preparation of the IARC Monograph Volume 112." Prior to responding she consulted with colleagues on the Working Group and at IARC. She replied to Hollingsworth LLP that the files belonged to IARC and that the result of their deliberations were explained in detail in the monograph. She then wrote:
> "I found your letter ***intimidating*** and ***noxious*** even though transparency is
> important…It is impolitic to mention possible consequences without identifying
> the correct background. I find your approach reprehensible and lacking of common
> courtesy even by today's standards. As a graduate of a British educational system,
> I consider your letter ***pernicious***, because it maliciously seeks to instill some