# EXHIBIT K

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

**Case Clip(s) Detailed Report**
**Saturday, August 04, 2018, 2:56:30 PM**

## Johnson v. Monsanto

### Martens, Mark A. (Vol. 01) - 04/07/2017

**1 CLIP (RUNNING 02:25:53.247)**

 Dr. Mart- -- can you please state your ...

**MM-0407-0001018 277 SEGMENTS (RUNNING 02:25:53.247)**

**1. PAGE 10:18 TO 11:08 (RUNNING 00:00:26.676)**

Q Dr. Mart- -- can you please state your name for the record.
A Mark Martens.
Q Okay. And you're a doctor; is that correct?
A I'm a Ph.D. in pharmaceutical sciences and toxicology.
Q Okay. Would you prefer I call you Dr. Martens or Mr. Martens?
A Whatever you like.
Q Which would you prefer?
A Oh, you can call me Mr. Martens. That's fine with me.
Q Okay. So, Mr. Martens, have you had your deposition taken before?
A No.

**2. PAGE 12:19 TO 12:22 (RUNNING 00:00:11.167)**

Q Okay. So what I've given you is marked

**MARTENS 1 -**

as Exhibit 9-1 is your CV. Is that an accurate version of your CV?
A Yes, it is.

**3. PAGE 13:01 TO 14:07 (RUNNING 00:01:03.015)**

So it looks like you have some -- some areas of expertise; is that correct?
A That is correct.
Q Okay. And what are your areas of expertise?
A My areas of expertise throughout my career are, you know, toxicology in all its forms. That means as well experimental, regulatory, as evaluative toxicology.
Q Okay. And it looks like you had marked down "experimental toxicology, regulatory toxicology" -- I missed one -- "hazard and risk assessment, and preclinical development" as your past and current fields of expertise, correct?
A Yes. I can add that when I was at the university, I was also involved in forensic toxicology.
Q Okay. So an update to this would be that you're also an expert in forensic toxicology?
A Yes.
Q Okay. Excellent.
And it looks like -- like you mentioned you've gotten your Ph.D. in the school of pharmacy in 1976; is that correct?
A Yes.
Q And a rough math is around 40 years ago, right?

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

A Right.
Q And so you --
A Yep, 45 years ago, yeah.
Q 45 years ago?
A Yes.

**4. PAGE 14:14 TO 15:01 (RUNNING 00:00:32.773)**

Q Okay. And right now, if you move to the

**MARTENS 1-002 -**

next page, it looks like your current position is a consultant in preclinical development and toxicology; is that correct?
A That is correct.
Q Okay. So can you tell the jury a little bit about what -- what your -- what that means, your current job right now.
A That means that as an independent consultant, I'm asked as well by pharmaceutical companies, chemical companies and agrochemical companies to -- to provide them support in interpreting and in analyzing toxicology studies.

**5. PAGE 15:08 TO 15:14 (RUNNING 00:00:12.357)**

Q Okay. And is -- is Monsanto one of the companies that has hired you as a consultant in that past seven years?
A Yes.
Q Okay. And Monsanto has paid you for that consulting position over the last seven years?
A Yes.

**6. PAGE 15:16 TO 16:11 (RUNNING 00:00:45.899)**

A It's actually the last five years, because I was actually contacted by Monsanto in 2011 for a first contact.
Q Okay. So, just so we're on the same page --
A Mm-hmm.
Q -- in 2011, Monsanto contacted you --
A Mm-hmm.
Q -- to consult for them; is that --
A Right.
Q -- correct?
And what -- what sort of consulting job were you contacted for in 2011?
A That was actually for the analysis of mechanistic studies on another compound than glyphosate for Monsanto.
Q Okay. And have you done consulting work for Monsanto since 2011 on glyphosate?
A Only the last year.
Q Okay. So, yes, you have?
A Yes, I have.

**7. PAGE 17:01 TO 18:08 (RUNNING 00:01:21.130)**

Q So it goes on, your -- your CV goes on to talk about your current and previous positions. And if you go through it, it says here that -- and this

**MARTENS 1-003 -**

is on page 3 of your CV, it says that you were

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

promoted to a Monsanto Science Fellow in 2002; is that correct?
A That's correct.
Q And can you tell the jury what that -- what a Monsanto Science Fellow means?
A A Monsanto Science Fellow is a distinguished degree as a scientist in the Monsanto organization.
Q Okay. So it's a distinguished scientist within Monsanto, you were promoted to that?
A Yes. Right.
Q Okay. And is that a position within Monsanto?
A That is not a position. That is a kind of a degree which should be considered as a parallel type of career path next to the managerial career path and which is reserved for people who are continuously involved in scientific projects and scientific research.
Q So when you were promoted to a Monsanto Science Fellow in 2002, were you a current Monsanto employee at that time?
A Yes.
Q Okay. So is -- are the Monsanto Science Fellow promotions just for Monsanto employees?
A That is just -- well, that is a system that exists in every chemical, agrochemical and pharmaceutical industry which allows career paths for people who want to stick to scientific career paths.

**8. PAGE 18:09 TO 18:13 (RUNNING 00:00:17.622)**

Q Okay. You were a toxicology director in Europe and Africa for Monsanto starting in 1992 and ending in 2004; is that correct?
A Actually, I started with Monsanto in 1989.

**9. PAGE 18:15 TO 19:03 (RUNNING 00:00:28.744)**

A And then I was hired as a manager of toxicology, and then afterwards I was promoted and I graduate to director of toxicology, Europe and Africa, yeah.
Q Okay. So that's a good clarification. You began working for Monsanto in 1989?
A Yes.
Q And when did you quit working for Monsanto?
A At the end of 2003.
Q Okay. So then between 2003 and when they hired you to be a consultant in 2011, did you do any work with Monsanto?
A No.

**10. PAGE 19:09 TO 19:12 (RUNNING 00:00:08.606)**

Q Okay. And you were actually, it looks like, a professor or assistant professor at the -- at St. Louis University in St. Louis, correct?
A Yes.

**11. PAGE 19:16 TO 19:23 (RUNNING 00:00:18.381)**

Q Okay. And you were teaching toxicology to college students.
A No, no, not college students.
Q Okay.

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

A I was teaching toxicology to medical postgraduates, and those were two branches that was experimental and occupational and forensic toxicology.

**12. PAGE 20:05 TO 20:10 (RUNNING 00:00:17.679)**

Q And then you go on to list a few other of your toxicology positions, but the bottom line is that you have been working in toxicology for 45 years, and there would be few people that wouldn't consider you an expert in toxicology; is that correct?

**13. PAGE 20:12 TO 20:12 (RUNNING 00:00:02.042)**

THE WITNESS: Yes.

**14. PAGE 20:22 TO 21:08 (RUNNING 00:00:38.406)**

**MARTENS 1-005 -**

On page 5 of your CV, you also have a lot of experience with international and national organizations. Then you list a couple of pages of those, the EU Commission and Council, the OECD chemicals group. You go on to list -- list a bunch, right?

On the next page, you have experience

**MARTENS 1-006 -**

with IARC, right?
A (The witness nods.)
Q You have experience with the European Council for the chemical industry, if you go down there.

**15. PAGE 21:09 TO 21:17 (RUNNING 00:00:20.496)**

**MARTENS 1-007 -**

You also have experience on the next page with the European Crop Protection Association where it looks like you were participating as a representative of Monsanto, correct?
A Yes, correct.
Q So sometimes you engage with regulatory or international associations on behalf of Monsanto; is that correct?
A Yes.

**16. PAGE 21:18 TO 21:21 (RUNNING 00:00:09.931)**

Q Okay. And you list -- you go through and there's ten organizations that you list, so you have experience with international organizations, correct?

**-KEMARTENS 1-007 - Clear Attached Exhibit martens 1-007**

A That's correct.

**17. PAGE 23:10 TO 23:14 (RUNNING 00:00:06.863)**

Q Okay. And you lived in the United States for two years; is that correct?
A Two years, yes.
Q And then back to Belgium, correct?

Document received by the CA 1st District Court of Appeal.



A Yes.

**18. PAGE 23:20 TO 24:01 (RUNNING 00:00:15.244)**

Q Okay. So you also lecture on toxicology and related sciences, correct?
A Yes.
Q And I counted up really quickly that you have lectured at about seven institutes or universities. Does that sound correct?
A That sounds correct, yeah.

**19. PAGE 24:06 TO 24:09 (RUNNING 00:00:09.662)**

Q Okay. So you've authored -- coauthored a book on -- is that on toxicology as well?
A This is on preclinical development of -- and toxicology is a part of preclinical development.

**20. PAGE 24:13 TO 24:15 (RUNNING 00:00:07.143)**

And then very impressively you speak four languages as well, correct?
A Yes.

**21. PAGE 24:24 TO 25:08 (RUNNING 00:00:37.916)**

What is oxidative stress?
A Oxidative stress is a state of a cell where there is a production of free oxygen radicals, which are inclined actually to damage several molecules in the cell of which DNA.
Q Okay. And how long has the scientific community known about oxidative stress?
A I think that from 1990, '92, there was science developing in that direction as a possible mechanism of carcinogenicity.

**22. PAGE 25:16 TO 25:24 (RUNNING 00:00:23.730)**

Q Okay. So in the early 1990s, it's fair to say that the scientific community was aware that oxidative stress could increase -- could -- could lead to an increased risk of cancer; is that correct?
A That was in the beginning, and, you know, there was more and more information that these were possible mechanisms for carcinogenicity, yes.
Q Sure. And what is the mechanism of how oxidative stress can increase the risk of cancer?

**23. PAGE 27:07 TO 27:22 (RUNNING 00:00:55.911)**

A Right. So oxidative stress is a state of the cell where there is a production of free oxygen radicals. Now, free oxygen radicals are a very reactive species, molecular species, and they bind to the oxidized molecules in the cell of which DNA. So oxidation of DNA and there is oxidation of the nucleotides in the DNA can lead, after cell division, to mutation, which can be a permanent change in the gene, and a permanent change in the gene can also make changes in gene transcription, which can lead to phenotypic change of the cell leading to cancer.
Q Excellent. Thank you.
One other question I -- I have for you is the -- the concept of hazard assessment versus risk assessment. Are you familiar with those two terms?
A Absolutely.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

**24. PAGE 28:02 TO 29:17 (RUNNING 00:01:17.690)**

Q Okay. And is it fair to say that a hazard assessment is considering whether an effect can happen under any circumstance; is that fair?
A That's fair.
Q Okay. And is it fair to say that a risk assessment is considering under what specific circumstance that effect will happen.
A Yes.
Q Okay. I just wanted to make sure I had those -- those straight in my head before we started going.
The first topic we're going to get into is, do you know Dr. James -- the late Dr. James Parry?
A Yes.
Q Did he go by Jim Parry or James?
A That was Jim.
Q Jim? Okay.
A Yeah.
Q Dr. Jim Parry. And were you friends with him?
A Oh, we knew each other from scientific congresses. Friends is a little bit too close.
Q Okay. You were professional acquaintances?
A Yes. Put it that way.
Q And what was -- was Dr. Parry a toxicologist?
A He was a toxicologist specializing in genetic toxicology.
Q Okay. And was he an expert in his field?
A Yes.
Q Okay. He was a good scientist, correct?
A He was a good scientist, yes.
Q Okay. And are you -- he has since passed away. Has --
A Mm-hmm.
Q -- has -- am I correct?
A Yes.
Q I believe sometime in around 2010, '11.
A I don't remember.

**25. PAGE 30:12 TO 31:07 (RUNNING 00:00:38.219)**

Are you familiar with the Bolognesi paper from 1997?
A Yes.
Q Okay. Am I pronouncing that right?
A Bolognesi.
Q Bolo -- okay. Bolognesi. The American way I'm pronouncing it.
A That's okay.
Q Okay. Are you familiar with the Peluso paper --
A Yes.
Q -- from 1998?
A Yes.
Q Okay. And are you familiar with the two Dr. Lioi papers from -- both from 1998?
A Yes, I recall that these have been in our -- are considered, but I -- I didn't actually look at the papers themselves recently.
Q Okay. But you're familiar with all four of those papers --
A Yes. I know about them, yes.

Document received by the CA 1st District Court of Appeal.

**26. PAGE 31:17 TO 32:05 (RUNNING 00:00:30.743)**

Q Okay. So all four of these papers deal with the genotoxicity of glyphosate and/or Roundup, correct?
A Correct, yes.
Q Okay. And you put ourselves -- if we transport back to the 1999 time period right before the turn of the century, all four of those papers came out, correct?
A Yes.
Q They were all 1997 to 1999, correct?
A Yeah, yeah.
Q Okay. And these papers weren't good for the genotox profile of glyphosate and Roundup, correct?

**27. PAGE 32:07 TO 32:09 (RUNNING 00:00:07.087)**

THE WITNESS: I will phrase it this way: They were not in concordance with the existing results on genotoxicity with -- on glyphosate.

**28. PAGE 33:13 TO 33:21 (RUNNING 00:00:26.492)**

So did you go to Monsanto with these papers or did Monsanto come to you, or do you not recall because it's been so long?
A Well, I don't recall that detail, but -- but we both were aware at the same time that these papers had been published and these needed attention.
Q Okay. Excellent.
I'm going to hand you what's been -- what

**MARTENS 2 -**

we are going to mark as -- I guess this will be

**29. PAGE 33:22 TO 33:22 (RUNNING 00:00:05.826)**

Exhibit 2. No, not Exhibit 2. I need 5.

**30. PAGE 34:04 TO 34:10 (RUNNING 00:00:16.925)**

Q And when I hand you e-mails, Mr. Martens, feel free to take all the time you need to read them, and if we need to go off the record to give you more time, we certainly can. Okay? I'm not trying to rush you through any documents.
A Okay. Can I read them now?
Q Sure.

**31. PAGE 35:04 TO 36:13 (RUNNING 00:01:31.955)**

So this is a -- these are what the e-mails from the 19 -- late 1990s look like when they're printed out. The first e-mail was from Donna Farmer, and it was written on December 27th, 1998, which is two days -- two or three days after Christmas back in 1998.
And who is Donna Farmer?
A Dr. Farmer is a product toxicologist located in St. Louis at that time.
Q Okay. And she still is employed with Monsanto, correct?
A I believe so, yes.
Q And at this time was Dr. Farmer your boss?
A No.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

Q No. Was Dr. Farmer on the same sort of level as you within the hierarchy of Monsanto?
A At about the same level at that time, yes.
Q Okay. And did you and Dr. Farmer work a lot together at this point?
A We had for this type of project communications.
Q Okay. And did you and Dr. Farmer get along?
A Yeah.
Q Okay. So this looks like Dr. Farmer was talking about a meeting that y'all had had on December 17th on mutagenicity; is that correct?
A That is correct, yes.
Q And the reason why I think that you were at this meeting is that you write back to her two days later, is that -- or -- yeah, two days later; is that correct? If you look above.
A Yeah, it seems to be correct, yes.

**32. PAGE 36:18 TO 37:03 (RUNNING 00:00:42.486)**

Q So you had a meeting on December 17th of 1998, and ten days later she writes an e-mail to y'all, probably slowed down with the holidays, of course, and about what had happened on December 17th.
And so she has action items from -- "Action items from the meeting, from today's call." So it looks like she had written that simultaneously, and then just circulates that later.
So MON 35050, what is that?
A That is a formulation that has been used by Peluso and Bolognesi for their test system.

**33. PAGE 37:04 TO 37:07 (RUNNING 00:00:09.652)**

Q Okay. So would it be fair to call those the Italian papers? Are they both from Italy?
A It would be fair to call it the Italian formulation.

**34. PAGE 37:13 TO 40:03 (RUNNING 00:02:27.673)**

Q Okay. So this is the -- this is the formulation that was used in the Italian papers, correct?
A Yes, correct.
Q Okay. So you guys are now knowing about this, this is in late 1998, and you are talking about doing tests on formulation blanks of the Italian formulation, correct?
A Yes. That was the idea, yeah.

**MARTENS 2-002 -**

Q Okay. And if you turn to the next page, and if you go down, we talk about -- this is where Dr. Parry is first talked about.
A Mm-hmm.
Q You have other topics, as you can see, as the jury can see, that they had talked about, but in relative part, it says that: "Agreed that an external global network of genotox experts need to be developed."
Do you see that?
A Yes.
Q Okay. "As EU has an immediate" --

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

something there -- "as EU has an immediate need and is critical area now, it was agreed that Mark Martens" --
That's you, correct?
A Yes.
Q -- "would contact Dr. Parry next week to discuss with him his participation in the support of glyphosate -- glyphosate-based formulations, genotox issues." Correct?
A Correct.
Q And that's because you're an expert in toxicology, right?
A Yes.
Q And Dr. Parry is an expert in genotox -- toxicology, correct?
A Yes.
Q So you two would make the perfect pair to work on this issue, correct?
A That's correct.
Q Okay. Then it goes on later to say: "For North America, Gary Williams will be here in early February as part of the Cantox project."
Okay. Who is Gary Williams? Do you know him?
A Yes, I know Gary Williams. He is an authority in the United States on the mechanisms of carcinogenicity and genotoxicity.
Q Okay. And is he a Monsanto employee?
A No.
Q Do you know, to your knowledge, has he ever been a Monsanto employee?
A No. Never.
Q He never has or you don't know?
A He never has to my knowledge, no.
Q Okay. And then it says: "Larry Kier will -- as" -- as, I think it means to say has -- "graciously agreed to join in those discussions."
And who is Larry Kier?
A Dr. Larry Kier was the head of the laboratory of genotoxicology of the Environmental Health Laboratory of Monsanto in St. Louis. So he was the head genotoxicology expert within the organization.
Q Okay. And he is a Monsanto employee?
A He is a Monsanto employee.

**35. PAGE 41:12 TO 41:16 (RUNNING 00:00:11.611)**

right. It's a real -- so Dr. Farmer writes: "It's a real concern that these papers," meaning the Lioi papers, "may create an even bigger problem for us than the Peluso paper. Therefore, we do some things quickly."

**36. PAGE 41:18 TO 41:19 (RUNNING 00:00:03.541)**

THE WITNESS: That is the opinion of Dr. Donna Farmer.

**37. PAGE 41:21 TO 41:23 (RUNNING 00:00:06.740)**

Q Okay. And did you have any -- did you disagree with that opinion?

**-KEMARTENS 2-002 - Clear Attached Exhibit martens 2-002**

A I didn't agree completely actually.

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

**38. PAGE 41:24 TO 42:07 (RUNNING 00:00:26.564)**

Q Okay. Did you agree that the Peluso paper created a problem for Monsanto?
A I agreed that the Peluso was a new type of finding and needed to be addressed.
Q Okay. And so one of the ways that -- that Monsanto was deciding to address it was to have a letter sent from Monsanto Italy or Brussels saying that the -- the data doesn't agree with other data.
A Mm-hmm.

**39. PAGE 43:02 TO 43:03 (RUNNING 00:00:04.119)**

**MARTENS 3 -**

Q I'm going to hand you what will be marked as Exhibit 3.

**40. PAGE 45:08 TO 45:19 (RUNNING 00:00:37.398)**

So if you look again at this e-mail

**MARTENS 3-002 -**

exhibit, again it's a cascade, and it looks like we are about a month later after the last e-mail that we looked at. We are now -- Dr. Farmer is now writing an e-mail on January 27th, '99, and the last one was December 27th, so we're exactly a month later.
And she's talking about minutes from a meeting on 1/15; is that correct?
A Yes.
Q Okay. And you were in fact in attendance

Document received by the CA 1st District Court of Appeal

**MARTENS 3-003 -**

in that meeting.
A Yes.

**41. PAGE 46:14 TO 47:01 (RUNNING 00:00:27.668)**

Number 3 was: "The group recommended testing the full formulations." Correct?
A That's what it says, yes.
Q Okay. And what does the "full formulations" mean?
A The full formulation is actually the active ingredient together with the co-formulants.
Q Okay. So Roundup?
A For example, yes.
Q Okay. Instead of testing just glyphosate or just the surfactants, the "full formulation" means the finished product of Roundup.
A Yes.

**42. PAGE 47:03 TO 47:08 (RUNNING 00:00:20.443)**

And then we -- we scroll down here a little bit more, and we talk about: "One of the full formulations discussed was MON 35050, which we had already determined was the product used in the Peluso and Bolognesi papers," which we've called the Italian formula.

**43. PAGE 47:10 TO 47:23 (RUNNING 00:00:42.640)**

Q "The team was to develop a positive press





Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

release." Correct?
A That's what it says.

MARTENS 3-004 -

Q Okay. And then we get to the next page, where we will spend a little bit of time. We had touched before about Dr. Parry. This group again, which if I can go back to here, in attendance was Donna Farmer, which we talked about Dr. Farmer earlier, Bill Heydens.
Can you tell me who Bill Heydens is?
A Dr. Bill Heydens was my colleague in the United States, mostly responsible in the beginning for glyphosate, and then after also other products. He's a toxicologist.

**44. PAGE 48:04 TO 48:09 (RUNNING 00:00:14.774)**

Q And then that's you. And then Alan Wilson, can you tell me who Alan Wilson is?
A Alan Wilson was the -- the toxicologist working at the Environmental Health Laboratory responsible for biochemical mechanisms and mechanisms of toxicity.

**45. PAGE 48:13 TO 49:12 (RUNNING 00:00:47.462)**

Q Okay. And was Alan Wilson a Monsanto employee?
A Yes.
Q Okay. So this is a Monsanto meeting, correct?
A Yes.
Q Okay. With all toxicologists.
A Mm-hmm.
Q And everyone at that meeting is located in the United States except for you, correct?
A Yes.
Q Okay. Now, if we go back to this -- so we're talking about the external global networks of genotox experts at this meeting, and when talking about the EU, which is -- you know, what's the EU?
A The European Union.
Q Okay. So that would fall under your purview, correct?
A Yes.
Q Okay. We already talked about that Dr. Parry is a recognized genotox expert, right?
A Yes.
Q Okay. What is not known is how he views some of the nonstandard endpoints. Correct?
A Yes.

**46. PAGE 49:13 TO 49:16 (RUNNING 00:00:09.544)**

Q Okay. And those nonstandard endpoints are the endpoints that were evaluated in the Rank article and the Bolognesi article, correct?
A Yes.

**47. PAGE 49:17 TO 49:20 (RUNNING 00:00:11.628)**

Q Okay. So your group of Monsanto toxicologists were saying that, although Dr. Parry is an expert in genotox toxicology, we don't know what his views are on this paper, correct?

Document received by the CA 1st District Court of Appeal.

**48. PAGE 49:24 TO 50:20 (RUNNING 00:00:53.323)**

THE WITNESS: Well, we want to know his opinion on these papers.
BY MS. WAGSTAFF:
Q Yeah, you were just saying --
A Yeah.
Q -- you don't know -- he is an expert, but we don't know what his opinions are, correct?
A Yes.
Q Okay. And so to figure out his opinions, and it says, Before we ask him, meaning Dr. Parry, to get more deeply involved, which is reviewing all the literature, data, or to represent you as a consultant, you wanted to ask Dr. Parry to review a subset of the articles, correct?
A Right.
Q Once again, everyone turns to you, right?
A Mm-hmm.
Q Okay. So it was proposed that Mark Martens, that's you, would contact Dr. Parry and ask him for a written review of the articles by Rank, Bolognesi, Peluso and Lioi, correct?
A Correct.

**49. PAGE 52:02 TO 52:12 (RUNNING 00:00:43.921)**

Q Okay. And then based on his critique of the genotox papers, your group would decide whether or not you would expand his role, correct?
A Yes.
Q Okay. Okay. Once again, y'all are talking about the Lioi papers, the two Lioi papers, and once again, Dr. Farmer says that the Lioi papers may present an even bigger problem because the studies are with glyphosate and are on a more standard endpoints, correct?
A Yes.

**50. PAGE 52:13 TO 52:16 (RUNNING 00:00:07.228)**

Q Okay.
A But the -- I interpreted the Lioi paper and came to the conclusion it's a very low quality paper.

**51. PAGE 52:23 TO 53:04 (RUNNING 00:00:18.506)**

Q But as of right now, we're sitting here in January of -- of '99, this group of Monsanto toxicologists are once again stating that because it's a standard -- has more standard endpoints, the Lioi presents an even bigger problem for Monsanto; is that correct?
A That is correct.

**52. PAGE 53:05 TO 53:07 (RUNNING 00:00:09.969)**

Q Okay. If we then move on to the beginning, because, remember, we've got to go backwards on this.

**53. PAGE 53:08 TO 53:10 (RUNNING 00:00:08.538)**

MS. WAGSTAFF: Yeah. Okay. Okay. Let's see here. These are out of order, so they're confusing me a little bit.

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

**54. PAGE 53:13 TO 53:13 (RUNNING 00:00:02.776)**

MS. WAGSTAFF: No, I got it. I want 110.

**55. PAGE 53:15 TO 53:17 (RUNNING 00:00:14.825)**

MARTENS 3-002 -

Q Okay. So in response to Dr. Farmer writing these notes, you respond, correct?
A That's what I see, yes.

**56. PAGE 54:12 TO 54:13 (RUNNING 00:00:04.727)**

Q It said that you were in agreement with the discussion that you had in St. Louis, correct?

**57. PAGE 54:16 TO 54:17 (RUNNING 00:00:03.472)**

THE WITNESS: Yeah, it was reflecting the meeting.

**58. PAGE 54:19 TO 55:10 (RUNNING 00:00:41.032)**

Q Yeah, okay. And then you also told the group that in the meantime you contacted Dr. Parry, and a letter of authorization with his papers -- with the papers is underway to him, correct?
A Mm-hmm. Yes, that is what it says.
Q Okay. So you were acting on the decisions that had been made at that meeting, correct?
A Yes.
Q Okay. Oh, and it said that -- I forgot an important part -- it said a report is expected by mid-February.
So we're now sitting here in January of -- of -- 28th, and so you're telling the group that Dr. Parry will have his report within a few weeks, correct?
A That's what it says, yes.

**59. PAGE 57:12 TO 58:01 (RUNNING 00:00:35.918)**

Q All right. So, here we are two weeks

0217 -

later, and this is a fax sent on February 15th -- because in Europe you put the month and date opposite of us, correct?
A Yes.
Q -- 1999, and it's a fax from you, from Dr. Mark Martens, and the subject is "Dr. Parry's Report," correct?
A Correct.
Q And you are sending it to Alan Wilson, Donna Farmer and Bill Heydens, correct?
A Correct.
Q So you're sending it to everyone that was at that meeting a few weeks earlier.
A Yes.

**60. PAGE 58:03 TO 58:15 (RUNNING 00:00:35.097)**

And you say: "Dear Alan, Donna and Bill: Please find herewith Professor Parry's evaluation of the four papers." Correct?
A Yes.

Document received by the CA 1st District Court of Appeal.

Q And what were those four papers?
A That was the Lioi paper, the Peluso paper, the Bolognesi and the Rank paper.
Q Okay. And you said you sent him on genotoxicity of glyphosate and Roundup, correct?
A Yes.
Q Okay. And you're asking for comments and guidance on what to do next, correct?
A Yes.

**61. PAGE 58:19 TO 59:03 (RUNNING 00:00:30.379)**

0217-002 -

Q Okay. And so the next page of this document appears to be a cover sheet from Dr. Parry to you. Correct?
A Yes.
Q Okay. Professor James M. Parry. Where was he a professor?
A At Swansea university in the U.K.
Q Okay. And he wrote you this on February 11th, 1999, to Dr. Martens, correct?
A Yes.

**62. PAGE 60:09 TO 60:22 (RUNNING 00:00:35.095)**

Q Okay. And he goes through the papers that Monsanto asked him to review, correct?

0217-005 -

A Yes.
Q Okay. And the first one is the Rank, et al., paper and that was in 1993, right?
A Right.
Q Okay. And this is a Roundup mixture that was tested, correct?
A Yes.
Q Okay. And the conclusion that Dr. Parry found was that: "In vitro evidence of genotoxic effect for Roundup mixtures inadequate in vivo studies."
So tell me what "in vitro" means.

**63. PAGE 61:06 TO 61:18 (RUNNING 00:00:30.667)**

A In vitro testing occurs normally with cells or bacteria or tissues in culture. So that means literally in vitro, you know, either in petri dishes or in culture dishes.
Q Okay. And that's an accepted method of conducting studies, correct?
A Yes.
Q Okay. In toxicology that's very accepted?
A Yes.
Q Okay. And so Dr. Parry's conclusion was: "In vitro evidence of genotoxic effect for Roundup mixture," right?

**64. PAGE 61:24 TO 62:05 (RUNNING 00:00:19.209)**

Q That was the conclusion that Dr. Parry came to?
A That was his conclusion, yes. Mm-hmm.
Q Okay. And then next we looked at the --

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

one of the Italian papers, which is Bolognesi, and

0217-006 -

that was from a couple of years later in 1997, right?
A Yes.

**65. PAGE 62:13 TO 62:16 (RUNNING 00:00:10.796)**

And his conclusions were Dr. Parry found a positive response in vitro SCE for both compounds.
And the both compounds being glyphosate and Roundup, correct?

**66. PAGE 62:20 TO 62:20 (RUNNING 00:00:01.368)**

THE WITNESS: Yes.

**67. PAGE 62:22 TO 63:08 (RUNNING 00:00:26.566)**

Q Okay. So in -- in the Bolognesi test, the authors were studying both glyphosate and Roundup, correct?
A That's correct.
00063:01 Q Okay. So when Dr. Parry is talking in his conclusions about, quote, both compounds, he's referencing glyphosate and Roundup, correct?
A Yes.
Q Okay. So Dr. Parry -- Dr. Parry concluded that there was a positive response in vitro SCE for both glyphosate and Roundup, correct?
A That's what it says.

**68. PAGE 63:15 TO 63:17 (RUNNING 00:00:09.262)**

Q And SCE is another marker looking at the structure of genetic material, correct?
A That is sister chromatid exchanges.

**69. PAGE 63:18 TO 63:23 (RUNNING 00:00:14.854)**

Q Okay. And it --
A This is an indicator top of test of which the biological mechanism is unknown and with some kind of experimental endpoint which was not accepted by regulatory authorities for assessment of genotoxicity.

**70. PAGE 64:07 TO 64:10 (RUNNING 00:00:08.793)**

Q Dr. Parry concluded that the response was at ten times lower concentration for Roundup mixture, correct?
A That's what he said, yes.

**71. PAGE 65:03 TO 65:14 (RUNNING 00:00:33.828)**

Q Dr. Parry concluded that both glyphosate and Roundup mixture produced an increase in DNA strand breaks in mouse liver and kidney, correct?
A That's what he says, yes.
Q Okay. And next he found that glyphosate increased 8-OHdG in mouse liver, which is a marker of oxidative stress, correct?
A Yes.
Q Okay. And then he found that the Roundup mixture increased O dash -- or 8-OHdG in mouse liver and kidney, correct?
A Yes.

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

**72. PAGE 65:20 TO 66:21 (RUNNING 00:01:06.328)**

Q So he concluded oxidative stress -- Dr. Parry concluded oxidative stress with respect to glyphosate and with respect to Roundup, correct?
A Yes, that was what he concluded, yes.
Q Okay. And this was in 1999, correct?
A Yes.

0217-007 -

Q Okay. Next we're moving to the Peluso paper, which was one of the Italian papers we discussed, and we talk about the conclusion that Dr. Parry found for the Peluso paper. And that is that Roundup mixture produced an increase in DNA adducts in the mouse liver and kidney, correct?
A Yes, that was what he concluded.
Q Okay. And then let's move over to --
A May I -- may I say --
Q Sure.
A -- something?
He also concluded that there was no increase in the production of DNA adducts in the presence of glyphosate.
Q Sure.
A And that's important.
Q That's fair. Okay. Sure.
So -- so what you're saying is that he -- he determined that with glyphosate there wasn't, but with Roundup mixture there was?
A Yes.

**73. PAGE 66:23 TO 67:11 (RUNNING 00:01:07.824)**

Next if we turn to the Lioi 1998 paper,

0217-008 -

and if you turn the page to 00 and you look at conclusions there, it looks that Dr. Parry found -- or Dr. Parry concluded that there was an increase in the chromatid aberrations of SCE following glyphosate exposure, correct?

0217-009 -

A That is what he concluded, yes.
Q Okay. Now if you turn to 01, we're talking about his conclusions still, and he found -- Dr. Parry found sister chromatid exchanges induced in human lymphocytes by both glyphosate and Roundup mixture, correct?
A That's what he found -- that's what he concluded, yes.

**74. PAGE 67:13 TO 67:23 (RUNNING 00:00:25.134)**

And he also concluded that the Roundup mixture produced a positive result at a lower concentration, correct?
A That is what he concluded, yes.
Q So Dr. Parry concluded that the Roundup mixture and the glyphosate alone would often produce different results, correct?
A That indeed, yes.
Q Okay. And this was back in 1999 that this was concluded, correct?

Document received by the CA 1st District Court of Appeal.

A Yes.

**75. PAGE 68:15 TO 68:23 (RUNNING 00:00:17.509)**

Q And would you tell the jury, please, what "in vivo" means.
A In vivo means that an experiment is carried out in live animals.
Q Okay.
A In whole organisms.

0217-010 -

Q Okay. And in vivo is an accepted method of testing in toxicology, correct?
A Yes.

**76. PAGE 69:02 TO 69:08 (RUNNING 00:00:22.624)**

Q So if we are looking at his -- at Dr. Parry's conclusions about in vivo studies, he states: "Both glyphosate and Roundup mixture produced positive results in the mouse bone marrow micronucleus assay," and then he cites a study that he has pulled that conclusion from, correct?
A That's the Bolognesi study.

**77. PAGE 69:11 TO 71:01 (RUNNING 00:01:18.373)**

Q Then he -- if you go down to the next paragraph, it says: "The data of Bolognesi indicate that glyphosate is a probable in vivo genotoxin." Correct?
A That is his conclusion.
Q Correct. This is Dr. Parry's conclusion.
A Yes.
Q So Dr. Parry's conclusion in 1999 is that the data of the Bolognesi indicate that glyphosate is a probable in vivo genotoxin, correct?
A What he wanted -- meant to -- what he meant to say is a potential.
Q Well, he didn't say "potential," did he?
A No, no. Well, but that's a question of wording; just to make sure that people understand it right, that is a potential genotoxin.
Q All right. Well, we'll never know if that's what he meant or not because he is not around to tell us that --
A Exactly, mm-hmm.
Q -- and he -- he was -- scientists are precise, correct?
A He was a scientist, yes.
Q And scientists -- when you're a scientist, you need to be precise with your words, correct?
A Well, not in evaluative words. There may be a different choice of words, but yeah.
Q Okay. But Dr. Parry chose not to put in the word "potential," correct?
A He may have chosen as well "potential."
Q Did you take out the word "potential"?
A No.
Q This is the form that the -- this is the form that it came in --
A Oh, yeah.
Q -- and he did not put "potential," did he?
A No, no. He put the words as he put it.

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

Q Okay.
A So we cannot change it.

**78. PAGE 71:25 TO 73:03 (RUNNING 00:01:15.597)**

0217-011 -

Q Okay. Next page, if you go to 03, it says: "The overall" -- are you there?
A Yeah.
Q Okay. "The overall data provided by the four publications produce evidence to support a model that glyphosate is capable of producing genotoxicity, both in vivo and in vitro, by a mechanism based upon the production of oxidative damage."
Is that Dr. Parry's conclusion in 1999?
A Yes.
Q That was given to Monsanto, correct?
A Yes.
Q Okay. And the question raised by these studies are that the -- this is what Dr. Parry is telling you and some of your toxicology expert colleagues, correct?
A Mm-hmm.
Q Is that the role of components of mixture which leads to high levels of activity of Roundup, he is questioning the genotoxic activity observed due to oxidative damage, correct? And the genotoxic -- and can that activity be reduced by anti -- antioxidants, correct?
A Yes.
Q So his recommendations and questions were kind of similar to what you said earlier was that these studies raised new questions that needed to be studied, correct?
A Yes, that's correct.

**79. PAGE 73:04 TO 73:06 (RUNNING 00:00:04.403)**

Q So you were in agreement with Dr. Parry that that's sort of what needed to happen, correct?
A Right. Can I point --

**80. PAGE 73:09 TO 73:22 (RUNNING 00:00:19.360)**

THE WITNESS: Can I point to a sentence which is important --
BY MS. WAGSTAFF:
Q Sure.
A -- which you didn't mention?
Q Sure.
A That he said -- you know, after you mentioned the sentence: "Based upon production of oxidative damage" --
Q Yeah.
A -- he said, "If confirmed."
Q Mm-hmm.
A So that means that he has a hypothetical conclusion and he was seeking confirmation.

**81. PAGE 73:25 TO 74:09 (RUNNING 00:00:12.121)**

Q Doctor, that's fair, because -- and that's confirmed when it says raised -- questions raised by the study --
A Mm-hmm. Right.
Q -- he is saying that there is more

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

questions and more tests that need to be done, which is what you had said when we started --
A Yes.
Q -- talking about this, correct?
A That's correct.

**82. PAGE 74:10 TO 74:24 (RUNNING 00:00:58.639)**

Q So you were in agreement with Dr. Parry?
A Yes. In that sense, yes.
Q Okay. All right. And in fact, if you

0217-012 -

turn to 04, which is the next page, this paper is signed by Dr. Parry.
And actually, B, Dr. Parry recommends that there be tests to determine if -- he recommends that there is an assessment of the individual components of Roundup mixture to determine whether there is any components which act synergistically to increase the potential genotoxicity of glyphosate.
So let's unpack that sentence a little bit since you're an expert in toxicology. Can you explain to me what it means when components act synergistically?

**83. PAGE 74:25 TO 75:04 (RUNNING 00:00:07.360)**

A When components act -- this is a hypothesis --
Q Yeah, yeah.
A -- put forward by Dr. Parry.
Q I just want to know what synergistic --

**84. PAGE 75:05 TO 75:07 (RUNNING 00:00:08.253)**

A Yes. That means that one component is over -- inclined to strengthen the toxicological effect of another component of the synergism.

**85. PAGE 75:23 TO 76:04 (RUNNING 00:00:13.803)**

Q And I'm asking -- we're talking hypothetically still. I'm not asking you what Dr. Parry meant because we can all read the same words on the paper. I'm saying --
A Well, I give you an example --
Q Okay.
A -- just to clarify.

**86. PAGE 76:05 TO 76:22 (RUNNING 00:00:42.802)**

A synergistic effect may be, for example, if a co-formulant produces an inflammatory process, that inflammatory process produces free oxygen radicals. If there is a slight synergism with the other component, then you may have some kind of a combined effect that may be more prominent than the effects caused separately.
Q Okay. That makes sense.
And so Dr. Parry is suggesting an assessment of the individual components of the Roundup mixture, which you have already told me are the active ingredient, which is glyphosate and some surfactants, correct?
A Yes, that's correct.
Q Okay. So he's -- he's saying assess those components to see if they act synergistically

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

when they are together, correct?
A Right. Yes.

**87. PAGE 76:23 TO 77:03 (RUNNING 00:00:11.476)**

Q All right. And -- and this is a -- these

-KE0217-012 - Clear Attached Exhibit 0217-012

are all conclusions and recommendations that were sent to Monsanto toxicologists in February of 1999,
00077:01 correct?
A Yes.
Q Okay.

**88. PAGE 77:09 TO 77:10 (RUNNING 00:00:04.425)**

THE WITNESS: Can I -- can I -- can I just say something?

**89. PAGE 77:15 TO 77:24 (RUNNING 00:00:13.325)**

Q Okay. All right.
A There is something that is very important to mention --
Q Uh-huh.
A -- also in -- in the report of Dr. Parry is that he also lists the flaws of the studies that they've been published. So --
Q Sure.
A Okay. So it's important you are aware of this.

**90. PAGE 79:02 TO 79:13 (RUNNING 00:00:43.994)**

Q And it -- it was February 15th of 1999,

0218 -

and so here what I have marked as Exhibit 5 is an e-mail from Dr. Donna Farmer. If you look at the page that starts with 06 is the e-mail cascade. And it is -- although it is written on April 19th, Donna Farmer states that these are the meeting minutes from February 25th, correct?
A Yes.
Q Okay. So this is actually a meeting that occurred ten days after Dr. Parry had -- and you had circulated the Parry report, correct?
A Correct.

**91. PAGE 80:03 TO 80:20 (RUNNING 00:00:59.483)**

Q So you guys have now had this report for about ten days, and you are meeting to discuss the next step, correct?

0218-003 -

A Yes.
Q Okay. And Dr. Farmer reiterates to you all that: "Dr. Parry concluded on his evaluation of the four articles that glyphosate is capable of producing genotoxicity, both in vivo and in vitro, by a mechanize -- by a mechanism based upon the production of oxidative damage." Correct?
A That's correct.
Q Okay. And we had talked about that before. And that evaluation was based on material

Document received by the CA 1st District Court of Appeal.

that you all had provided Dr. Parry, correct?
A Yes.
Q Okay. And was Dr. Farmer and was the group of people that met happy with Dr. Parry's report?

**92. PAGE 80:22 TO 80:22 (RUNNING 00:00:01.828)**

THE WITNESS: No.

**93. PAGE 82:15 TO 83:14 (RUNNING 00:01:05.548)**

Q All right. So moving on, Dr. Farmer continues to say: "As a follow-up, Mark will contact Dr. Parry, discuss with him the existence of additional data, and ask him to evaluate the full package."
Mark is you, correct?
A Yes.
Q Mark is Dr. Mark Martens. Okay.
"Mark will also explore his interests," meaning Dr. Parry's interests, parentheses, "if we can turn his opinion around, in being a spokesperson for us on these types of issues." Correct?
A That's correct.
Q Okay. So, Dr. Martens, you were tasked with following up with Dr. Parry and getting him additional data to see if you could turn his opinion around, correct?
A I will rephrase that. It was actually providing, you know, supplementary data so that he could put that in his findings into a context of the existing data.
Q Right. And turn his opinion around, correct? It's the words that Donna Farmer used, not me.
A These are the words of Donna Farmer.

**94. PAGE 85:02 TO 85:03 (RUNNING 00:00:03.610)**

MS. WAGSTAFF: This is going to be marked

0270 -

as Exhibit 6.

**95. PAGE 85:12 TO 85:15 (RUNNING 00:00:11.946)**

Q Okay. So were you aware that the toxicologists that were in the United States thought that you did not do a good job with Dr. Parry?
A No.

**96. PAGE 85:18 TO 85:21 (RUNNING 00:00:08.707)**

Q Okay. Were you aware that they no longer wanted you to be the one interacting with Dr. Parry after his report came out?
A No.

**97. PAGE 86:01 TO 86:19 (RUNNING 00:00:54.615)**

0270-002 -

Who is Stephen Wratten?
A Stephen Wratten was a -- a product registration manager in the United States.
Q Okay.
A In charge of glyphosate.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM
Document received by the CA East District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

Q Okay. And so Steve Wratten writes an e-mail on October 31st, 1999, which is a few months after Dr. Parry had given you his report, correct?
A Yes.
Q And he writes an e-mail, and it's called "Comments on Parry write-up," and he writes the e-mail to you, to Donna Farmer, to Dr. Larry Kier, who we talked about.
A Mm-hmm.
Q We talked about Will -- Bill Heydens, and then who's -- who's William Graham?
A Graham, William, is -- was the -- the glyphosate product registration manager for Europe, Africa.

**98. PAGE 87:06 TO 87:21 (RUNNING 00:00:42.601)**

So Dr. Wratten writes to Mark, that's you, and Donna, which is Dr. Farmer, and says -- talking about comments on the Parry write-up: "I was somewhat disappointed in the Parry report."
Do you see that?
A Yes.
Q Okay. And Dr. Wratten says: "Not particularly with his conclusions but just the way that they're presented." Correct?
A Yes, I see that.
Q Okay. And then he goes on to provide -- one, two, three, four, five, six, seven, eight -- eight suggestions on how he can improve his report; is that correct?
A Well, these were comments. I see them as comments.

**99. PAGE 88:02 TO 88:07 (RUNNING 00:00:12.551)**

Okay. So -- so Dr. Wratten writes that he's not particularly disappointed in the conclusions but just the way they're presented, and he gives eight comments on how to improve the Parry report, correct?
A To some extent, yes.

**100. PAGE 88:08 TO 88:13 (RUNNING 00:00:23.589)**

0270-003 -

Q Okay. And then at the very end, Steve Wratten writes, and still talking about the Parry report: "I do not see that he has stuck his neck out at anything at all controversial, and therefore there is little value in the write-up as written that could be useful. Hope it didn't cost much."

**101. PAGE 88:15 TO 89:07 (RUNNING 00:01:00.021)**

"Perhaps this is too harsh, and I don't know what your proposal to him was, but I would -- but I guess I would expect more than this of a professor." Correct?
A That's what he said, yes.
Q Okay. And did that upset you receiving that e-mail?
A Not really.
Q No.
A Because I was also a little bit

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

0270-002 -

disappointed about the form of the report.
Q Okay. So he also asks you and Dr. Farmer if Dr. Parry has ever worked with industry before on this sort of project, correct?

0270 -

A That -- that's what we can read, yes.
Q Okay. And so he sends this to -- Donna Farmer then forwards the e-mail to Alan Wilson.
A Yes, that's what I see.

**102. PAGE 89:11 TO 89:17 (RUNNING 00:00:20.843)**

Q Okay. And Alan Wilson writes back to Dr. Farmer and says: "Two options: We work closely with Parry, someone other than Mark, or we get someone else."
So basically take Mark off the job or we use someone other than Dr. Parry, correct?
A That's what I read.

**103. PAGE 89:24 TO 90:04 (RUNNING 00:00:20.760)**

Q Okay. And so then Donna Farmer responds to Alan Wilson's suggestions and says: "One option: I agree we need someone else to interfere -- interface with Parry."
Meaning she agrees that -- that you should be off the job. Correct?

**104. PAGE 90:07 TO 90:08 (RUNNING 00:00:02.687)**

THE WITNESS: That is what appears from that.

**105. PAGE 90:10 TO 90:17 (RUNNING 00:00:14.820)**

Q Okay. "Right now the only person I think that can dig us out of this genotox hole is the good Dr. Kier."
And that's Dr. Larry Kier?
A Yes.
Q And that's the Monsanto -- long-term Monsanto toxicologist, right?
A Yes. Yes. Genotoxicologist.

**106. PAGE 90:19 TO 91:02 (RUNNING 00:00:22.020)**

And Dr. Farmer goes on to say that she's concerned about leaving the report out there as the final project with his final impressions, correct?
A That's what I read.
Q Okay. So she doesn't -- it looks like she doesn't want to just ignore the project, she wants to make sure it gets cleaned up so it's not the final project, right?
A That's what I read.

**107. PAGE 91:14 TO 91:21 (RUNNING 00:00:20.483)**

Q All right. And then Alan writes back to Donna, Dr. Farmer, and says: "If Larry has the time, that would be great, but we need to be careful we don't get into another Cantox situation that could take some word -- take some time wordsmithing and reaching consensus."

Document received by the CA 1st District Court of Appeal.

Do you know what that means?
A I have no idea.

**108. PAGE 91:22 TO 91:25 (RUNNING 00:00:10.348)**

Q And then says: "Maybe you should invite Parry to St. Louis to get him more familiarized with the complete database." Correct?
A That's what I read.

**109. PAGE 92:06 TO 92:09 (RUNNING 00:00:12.233)**

Q Two -- two -- two toxicologists from the United States have said that you should be pulled off the project, and then they're inviting the European

-KE0270 - Clear Attached Exhibit 0270

expert to St. Louis and not inviting you, are they?

**110. PAGE 92:12 TO 92:12 (RUNNING 00:00:02.227)**

THE WITNESS: That is a possibility.

**111. PAGE 92:22 TO 92:23 (RUNNING 00:00:08.823)**

Q All right. And then our next exhibit

0219 -

will be Exhibit 7.

**112. PAGE 92:24 TO 93:02 (RUNNING 00:00:18.383)**

This is the same e-mail that Dr. Wratten wrote to you and Donna that we were just looking at, to you and Dr. Farmer, and you have interplaced your responses in italics.

**113. PAGE 93:21 TO 94:16 (RUNNING 00:01:02.329)**

Q How many reports did Dr. Parry write for Monsanto?
A I think he wrote -- there was three reports.
Q Okay.
A Yeah. And the first report was only evaluating the four publications that I had sent to him that had problematic results.
And then afterwards I learned ^ Check to put everything into a nice context and to see whether there is concordance in results with other toxicology tests. I sent him a whole battery of -- of test reports which have been as well, you know, produced upon commission by Monsanto but also from some other companies, to allow him to put it into context. So he evaluated all these reports, and there is in the report.
And there is a third notice that he produced as well as a follow-up of that report on the evaluation of all the toxicology studies in combination.

**114. PAGE 95:02 TO 95:10 (RUNNING 00:00:22.987)**

Q Okay. So you received this e-mail from Dr. Wratten on September 1st of 1999 where he's talking about how he is disappointed not in the conclusions but in the way they were presented, correct?

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

A Mm-hmm.
Q And you write back some remarks to Dr. Wratten within his e-mail, correct?
A Yes.

**115. PAGE 95:11 TO 95:23 (RUNNING 00:00:34.133)**

0219-002 -

Q Okay. And the bottom line is you say to him, you say to Dr. Wratten: "Please don't be too negative. It is clear he will need some help to produce a definitive report without twisting his arms. Don't forget that his opinion is well respected, and I am sure he didn't have the time to write it all down as should have been the case; therefore, the need to meet with him." Correct?
A Yes.
Q So you still believed in Dr. Parry and this was your work in generating this report, correct?
A Yes.

**116. PAGE 96:03 TO 96:11 (RUNNING 00:00:21.622)**

0219 -

Q Okay. And then you look at the response that you wrote to the entire group where you say that: "We can now determine for ourselves how such report should look like and give him directions for a rewrite."
So you were going to go to Dr. Parry and give him directions for a rewrite of his report, correct?
A Yep.

**117. PAGE 96:12 TO 96:14 (RUNNING 00:00:05.113)**

Q Okay.
A These were directions for the form of the

-KE0219 - Clear Attached Exhibit 0219

report, not of the content of the report.

**118. PAGE 97:03 TO 97:07 (RUNNING 00:00:13.417)**

0220 -

This is a report by Dr. James M. Parry, correct?
A Yes.
Q This is the same Parry that wrote the February 1999 report.
A Yes.

**119. PAGE 97:09 TO 97:23 (RUNNING 00:00:31.697)**

And this is the "Evaluation of the potential genotoxicity of glyphosate, glyphosate mixtures in component surfactants," correct?
A Yes.
Q So it's the same subject matter area, right?
A Yes.
Q And this is the area you have previously

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

testified that Dr. Parry is an expert, right?
A Yes.
Q Okay. And you had mentioned a few moments ago that you gave Dr. Parry a host of information to review, and it looks like this table is what -- the information you gave him, correct?
A Correct.

**120. PAGE 98:10 TO 98:16 (RUNNING 00:00:32.722)**

0220-005 -

Q -- that ends -- we're going to go to the one that ends 37, 237, please. Where it says that: "The evaluation is that these studies provide some evidence that glyphosate may be capable of inducing oxidative damage under both in vitro and in vivo conditions."
That was his evaluation, correct?

**121. PAGE 98:21 TO 98:21 (RUNNING 00:00:02.490)**

A That is what's in the report. Yes.

**122. PAGE 98:25 TO 99:15 (RUNNING 00:01:04.354)**

Q Okay. And this is consistent with his February of 1999 conclusion, correct?
A The -- the conclusion evaluation he formulated on page 237, pertains to the chapter in "Miscellaneous Endpoints."
Q Okay. Miscellaneous -- okay.
A And miscellaneous endpoints are endpoints that have been pursued by groups, you know, in academia that have been -- actually undertaken experimental tests in all of the mechanism of actions. These were endpoints that were not pursued in the official regulatory studies that were done at Monsanto at that time.
Q Okay. So --
A It's not a general evaluation. It's only pertaining to miscellaneous endpoints.

**123. PAGE 100:16 TO 100:20 (RUNNING 00:00:09.421)**

Q But my question is, is this the same conclusion -- that I had asked five minutes ago, is this the same conclusion that he made in his February of '99 paper?
A Yes.

**124. PAGE 100:24 TO 101:04 (RUNNING 00:00:27.370)**

0220-008 -

Q And then if you go to page end -- or page 40, please, where it says his evaluation is that: "These studies provide evidence that Roundup mixture produces DNA lesions in vivo, probably due to the production of oxidative damage."
That was his evaluation, correct?

**125. PAGE 101:07 TO 101:07 (RUNNING 00:00:02.152)**

THE WITNESS: Yes.

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

**126. PAGE 102:05 TO 102:21 (RUNNING 00:00:44.937)**

THE WITNESS: It's very important to mention that there are some miscellaneous endpoints which gave some, you know, results of concern have been obtained in vivo via routes of administration which are improper for toxicological testing for glyphosate -- exposure scenarios of glyphosate.
This all pertains to results that have been obtained after intraperitoneal injection, which actually produces a specific pathology that otherwise would have never be possible, you know, in normal exposure circumstances to either glyphosate or Roundup.
BY MS. WAGSTAFF:
Q Okay. Thank you.
And the intraperitoneal injection is an acceptable route of exposure for a health hazard assessment, correct?

**127. PAGE 102:23 TO 103:03 (RUNNING 00:00:12.016)**

THE WITNESS: No.
BY MS. WAGSTAFF:
Q It's not. It's not accepted within the field of toxicology as a -- a relevant route of exposure for health hazard assessment? Is that what you're telling me?

**128. PAGE 103:06 TO 103:12 (RUNNING 00:00:19.769)**

THE WITNESS: This is not a relevant route of exposure. This can be used in order to produce some results to explore potential effects that can be produced during that route of exposure, but that route of exposure is absolutely inappropriate for the hazard and risk assessment of pesticides.

**129. PAGE 103:14 TO 103:18 (RUNNING 00:00:16.911)**

Q Okay. All right. So overall

0220-010 -

conclusions -- "Overall Conclusions," let's look at it, page 42.
What does class -- clastogen -- genetic mean?

**130. PAGE 103:21 TO 104:10 (RUNNING 00:00:49.310)**

A Clastogenicity means chromosomal breakage.
Q Okay. So once again, it's talking about mutation, right?
A We like to talk about gene mutations and chromosomal breakage, and these all resort under the term "genotoxicology."
Q Okay. So the overall conclusions, when you've given Dr. Parry more information, is there is published in vitro evidence that glyphosate is clastogenetic and capable of inducing sister chromatid exchange in both human and bovine lymphocytes, and then he cites papers, correct?

0220-011 -

A Correct.

Document received by the CA East District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

Q And if you move on to the next page, page

**131. PAGE 104:15 TO 104:20 (RUNNING 00:00:16.611)**

the production of 8-OHdG in mouse liver, cites a paper; both observations indicate that glyphosate may be capable of inducing a prooxidant state leading to the formation of oxidative damage lesion.
Correct?
A That's a correct --

**132. PAGE 104:25 TO 106:03 (RUNNING 00:01:23.259)**

Q The next conclusion was that a -- of Dr. Parry was that: "A Roundup mixture containing glyphosate was shown to produce 8-OHdG in both the liver and kidney of the mice (Bolognesi). These observations indicate the Roundup mixture is capable of inducing oxidative damage in vivo."
Is that correct?
A That's what he wrote is correct, yes.
Q Okay. And this is -- that's consistent with what he found in the February '99 report that he --
A Yes.
Q Okay. Next on 14, glyphosate-induced single-strand breaks in vivo in the liver and kidney, and he cited those reports, correct?
A Yes.
Q Next, he tells Monsanto that the Roundup mixture produced single-strand breaks in vivo in the liver and kidneys of mice, correct?
A Correct.
Q Okay. And next, he tells -- Dr. Parry tells Monsanto that glyphosate mixture but not glyphosate produced an increase in uncharacterized DNA adducts in vivo in the liver and kidneys of mice, correct?
A That's correct.
Q All right. So Dr. Parry is telling Monsanto that there are differences between glyphosate alone and a glyphosate mixture, correct?

**133. PAGE 106:06 TO 106:06 (RUNNING 00:00:01.310)**

A That's what he said generally.

**134. PAGE 106:09 TO 106:10 (RUNNING 00:00:07.018)**

0220-012 -

Q If you go to the next page, "Specific evaluation of the genotoxicity of glyphosate."

**135. PAGE 106:23 TO 107:02 (RUNNING 00:00:11.839)**

So we can start -- the sentence says: "On the basis of the study of Lioi, I conclude that glyphosate is a potential clastogenic in vitro."
Correct?
A That's what he says, yes.

**136. PAGE 107:03 TO 107:05 (RUNNING 00:00:11.731)**

Q Okay. And then he goes on to say that the Bolognesi study indicates that it may also be clastogenic in vivo, correct?

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

**137. PAGE 107:06 TO 107:11 (RUNNING 00:00:09.649)**

A It may be, yes. The way he --
Q Correct.
A Yeah.
Q So he concludes that it is in vitro and that it may be in vivo, correct?
A It's hypothetical in vivo. Yeah.

**138. PAGE 107:13 TO 107:22 (RUNNING 00:00:24.137)**

And then he goes on the -- so that was the genotoxicity of glyphosate. Now he's looking at the geno -- specific evaluation of the genotoxicity of glyphosate mixtures, correct?
A Mm-hmm.
Q Okay. And he says: "The studies of Bolognesi suggests that glyphosate mixtures may be capable of inducing oxidative damage in vivo." Correct?
A Yes, that's what he says.

**139. PAGE 108:22 TO 108:24 (RUNNING 00:00:05.560)**

Q So he was just putting Monsanto on notice that this may be happening, correct?
A Yes.

**140. PAGE 109:06 TO 109:07 (RUNNING 00:00:04.960)**

what we're going to skip to. We're going to skip to

0220-032 -

page 64.

**141. PAGE 110:05 TO 110:23 (RUNNING 00:00:36.903)**

Q Is -- is this the third report that you were talking about?
A Yes.
Q Okay. So this came after the first two, correct?
A That -- that's what I understand, yes.
Q Okay. And this is the same Dr. Parry that you were -- that we've been talking about all day, correct?
A Yes, correct.
Q Okay. And do you know what the genesis of this report was, why he created this?
A I don't recall it.
Q Okay. But he created this at -- at Monsanto's request, correct?
A That is a possibility. I don't recall.
Q Okay. And is there any chance that this was linked to the second report?
A Yes.

**142. PAGE 112:03 TO 112:07 (RUNNING 00:00:07.409)**

Q And then this one is either an annex to his second report or it's a third report?
A Yes.
Q You're just not sure.
A Yes.

**143. PAGE 112:18 TO 112:20 (RUNNING 00:00:04.603)**

And then this says "Recommendations for Future Work," correct?

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

A Yes.

**144. PAGE 112:25 TO 114:13 (RUNNING 00:02:11.564)**

Q Okay. So it appears to me that this is recommendations for future work based off of his analysis in the second report. Would that make sense?
A That makes sense, yes.
Q Okay. So key questions, and these are key questions that he is posing to Monsanto that still remain after his analyses, correct?
A Yes.
Q Okay. So he's wanting to know if glyphosate is an in vitro clastogen, if it's an in vivo clastogen, if glyphosate is -- if that is true, what is the mechanism of action? And does it lead to other types of genotoxicity activity in vivo such as point mutation induction? Does glyphosate produce oxidative damage? Can we explain the reported genotoxic effects of glyphosate on the basis of the induction of oxidative damage?
Why don't you read the last three so the jury doesn't have to just listen to my voice, starting with 6. You can read it out loud.
A Okay. So if glyphosate is an in vivo genotoxin, is its mechanism of action thresholded?
Q Okay. Number 7.
A "Threshold," it wants to say that you need to have a certain concentration in tissue before that activity takes place.
Q Mm-hmm.
A "Under what conditions of exposure are the antioxidant defenses of the cell overwhelmed?"
Q Okay.
A That is part of the thresholding.
"Are there difference -- differences in the genotoxic activities of glyphosate and glyphosate formulations?"
Q So he's -- he's been telling you in the last two reports that different things happen when he tests glyphosate or glyphosate formulations, right?
A Yes.

**145. PAGE 114:16 TO 115:19 (RUNNING 00:01:21.828)**

Q And then the last one.
A "Do any of the surfactants contribute to the reported genotoxicity of glyphosate formulations?"
Q Okay. So he's saying we need to figure out what the surfactants add to the equation, correct?

0220-033 -

A Yes.
Q Okay. So he also then gives you -- Monsanto some actions that he recommended, correct?
A Yes.
Q Okay. And one of those is to do comprehensive testing on glyphosate formulations, correct?
A Yes.
Q Okay. He says that -- that "Monsanto should evaluate the induction of oxidative damage in vivo and determine the influence of antioxidant

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

status of the animals." Correct?
A Correct.
Q He also says: "Evaluate -- on the assumption that the reported in vitro positive clastogenic data for glyphosate is due to oxidative damage, determine the influence of antioxidants."
Okay. So that's similar to the next one. "Evaluate the clastogenic activity of glyphosate in the presence and absence of a variety of antioxidant activities." Correct?
A That's what I read, yes.

**146. PAGE 116:17 TO 117:03 (RUNNING 00:00:25.626)**

Dr. Parry gave a list of eight questions that were left unanswered, correct?
A That he would like to see answered, yes.
Q Okay. And as a scientist, you would have liked to see those answered as well, correct?
A These were genuine questions, yes.
Q Yeah. Good questions, right?
A These were good questions, yes.
Q Okay. And he provided with a list of actions that Monsanto could take to answer those questions, correct?
A Yes.

**147. PAGE 117:06 TO 117:25 (RUNNING 00:01:01.241)**

So then Dr. Parry says at the very end of

**0220-034 -**

his recommendations: "My overall view is that if there is -- my overall view is that if the reported genotoxicity of glyphosate and glyphosate formulations can be shown to be due to the production of oxidative damage, then a case could be made that any genetic damage would be threshold."
Did I read that correctly?
A You read it, yes.
Q Okay. "Such genetic damage would only be biologically relevant under conditions of compromised

**0220-035 -**

anti -- antioxidant status. If such an oxidative damage mechanism is proved, then it may be necessary to consider the possibility of the susceptible groups within the human population."
Did I read that correctly?
A You read that correctly, yes.
Q Okay. So there is an expert telling Monsanto in 1999 to do tests that may affect the human population, correct?

**148. PAGE 118:03 TO 119:12 (RUNNING 00:01:16.329)**

THE WITNESS: This is a little bit an

**-KE0220-035 - Clear Attached Exhibit 0220-035**

expanded conclusion. You know, he is more or less asking himself the question. If that might be true, then there may be susceptible groups in a population that might be more susceptible in producing an effect. But he forgets to say those effects have been, you know, obtained through intraperitoneal

Document received by the MO 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

injection, whereas the human exposure is not via intraperitoneal injection. And that's a very important nuance.
BY MS. WAGSTAFF:
Q So I don't -- how do you know he forgot to say that?
A I don't know why he didn't point it out. That's why --
Q But he didn't point it out, did he?
A Intra -- well, that is limited to intraperitoneal injection. Not sufficiently --
Q So you may -- you may not agree with what Dr. Parry wrote, but I'm not asking you to rewrite his report.
I'm asking you in 1999, Dr. Parry wrote to Monsanto and -- and did an analysis, gave
00119:01 questions unanswered, right?
A Yes.
Q Proposed actions that could be taken, right?
A Yes.
Q And then stated that the over -- his overall view is that these tests and answers need to be taken, right?
A Yes.
Q And then you need to figure out what -- what group within the human population may be affected, correct?

**149. PAGE 119:15 TO 119:16 (RUNNING 00:00:02.485)**

THE WITNESS: That -- that is what he said.

**150. PAGE 119:18 TO 119:24 (RUNNING 00:00:09.065)**

THE WITNESS: But I don't agree with what he said because --
BY MS. WAGSTAFF:
Q That's -- you can -- that's fine if you don't agree with what he said. I'm just -- that's what he told Monsanto, correct?
A That's what he told Monsanto, yes.

**151. PAGE 121:02 TO 121:07 (RUNNING 00:00:22.436)**

And so that -- that second Parry report, which was the longer one, was sent to you sometime around September of 1999. And you had sent it to Larry Kier, Dr. Donna Farmer, and Bill Heydens around that time, correct?
A Correct.

**152. PAGE 121:16 TO 121:22 (RUNNING 00:00:15.300)**

0221 -

Q So you write to Larry and Donna -- which would be Larry Kier and Donna Farmer, correct?
A Correct.
Q -- on September 16, 1999: "I would like to get some feedback to Jim Parry on his report." Correct?
A Correct.

**153. PAGE 122:03 TO 122:09 (RUNNING 00:00:18.685)**

Q So you're asking these folks for their

Document received by the CA 1st District Court of Appeal.

opinions so you can get some feedback to Dr. Parry, correct?
A That was the intention, yes.
Q Okay. And you cc'd Dr. Bill Heydens on that e-mail, right?
A Yeah, that's what I see.

**154. PAGE 122:20 TO 123:14 (RUNNING 00:00:55.069)**

Q "Mark, all" -- and Mark is you, Dr. Martens, correct?
A That's correct, yes.
Q Okay. He lets you know that he has read the report and he agrees with the comments, right?
A Yes.
Q And there are various things that can be done to improve the report. So, again, they're not completely happy with the report, correct?
A Yes.
Q Okay. And then he says: "Let's step back and look at what we're really trying to achieve here." Right?
A That's in the -- in the mail, yes.
Q Okay. He states that: "Monsanto wants to find/develop someone who is comfortable with the genotox profile of glyphosate/Roundup and who can be influential with regulators and scientific outreach operations when genotox issues arise." Correct?
A That's what I read, yes.

**155. PAGE 123:23 TO 125:09 (RUNNING 00:01:33.976)**

BY MS. WAGSTAFF:
Q Okay. And Bill Heydens is a toxicologist in the United States, correct?
A Yes.
Q For Monsanto, correct?
A Yes.
Q Okay. Dr. Heydens goes on to say: "My read is that Parry is not currently such a person, and it would take quite some time and" money sign, money sign, money sign, slash, "studies to get him there." Correct?
A That's what I read, yes.
Q Okay. "We simply aren't going to do the studies that Parry suggests, period." Correct?
A That's what he said in the memo, yes.
Q Okay. Then he directs the e-mail to you specifically. "Mark, do you think Parry can become a strong advocate without doing this work?" Parry, question mark. Then he says: "If not, we should seriously," underlined, italicized, bolded, "start looking for one or more other individuals to work with." Correct?
A That's what I read, yes.
Q Okay. Then he goes on to say: "We have not made much progress and are currently very vulnerable in this area." Correct?
A That's what I read.
Q Okay. And "this area" means the genotoxicity of glyphosate/Roundup, correct?
A That is correct.
Q "We have to fix that" -- "that" being the vulnerability -- "but only if we make this a high priority now." Correct?
A That's what I read.
Q Okay. So -- and that is in September of

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

1999, correct?
A Yes. That seems correct, yeah.

**156. PAGE 125:11 TO 125:14 (RUNNING 00:00:13.265)**

Did you have any independent

-KE0221 - Clear Attached Exhibit 0221

conversations with Dr. Heydens as to why he did not want to do the studies Parry suggested?
A I don't recall.

**157. PAGE 125:18 TO 125:24 (RUNNING 00:00:16.836)**

Q Did Dr. Parry ever offer to do the studies he was suggesting?
A He had the intention to do some work, yes.
Q When you say "he had the intention to do some work" --
A That's what he was suggesting.

**158. PAGE 126:04 TO 127:05 (RUNNING 00:00:58.148)**

So when you say Dr. Parry had the intention to do the work he suggested, what do you mean -- do you mean that he wanted to do the work he suggested?
A Well, in his laboratory -- it's a typical academic laboratory, he's a professor of the department with Ph.D. students -- and he was exploring the mechanism of oxidative stress and oxidative damage, and he had some ideas about Ph.D. work to do in that direction.
Q Okay. So he had some ideas.
A Yeah, some --
Q And did he complete those ideas?
A Not -- not for the glyphosate.
Q Okay. And Dr. Parry was not a Monsanto employee, correct?
A That's correct.
Q He was never employed by Monsanto, correct?
A Never.
Q So he's an independent scientist from Monsanto, correct?
A Yes.
Q Okay. And did Dr. Parry ever ask for financial support from Monsanto to complete the studies that he had recommended?
A Not that I recall.

**159. PAGE 127:11 TO 127:14 (RUNNING 00:00:13.817)**

Q Okay. If Dr. Parry had suggested and requested samples to complete the studies that he had suggested, do you agree Monsanto should have provided those samples?

**160. PAGE 127:19 TO 128:21 (RUNNING 00:01:16.874)**

THE WITNESS: We were reluctant to place studies in the laboratory of Dr. Parry for a variety of reasons. In the first place, since the results of the studies would be used for regulatory reasons, we would have preferred to have those studies carried out in a laboratory which is accredited for good laboratory practices, and his department was not.

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

Document received by the CA 1st District Court of Appeal.

00128:01

Plus that if he would engage and we engaged on supplementary -- additional testing to prove whether or not there was oxidative stress, we were looking into much more parameters than just genotoxic parameters, like, you know, organ weights, like gross pathology, like histopathology, and his department was not equipped to do these type of assays.

And that is more or less -- that's why we were reluctant to place those studies in his laboratory, but we were very open to listen to him and to follow suggestions.

BY MS. WAGSTAFF:

Q Okay. So you were reluctant to give the -- to let Dr. Parry do the studies. Is that --

A Yes.

Q -- a good summary of what you just said?

A That's a good summary, yes.

Q Okay. So who did the studies?

A The studies -- you know, finally, we started to do the studies.

**161. PAGE 128:22 TO 129:03 (RUNNING 00:00:16.033)**

Q Uh-huh.

A I had contacts with Professor Parry to give suggestions and do some exchange in the design of the studies. But the studies finally have been

00129:01

carried out at the Environmental Health Laboratory of Monsanto in St. Louis, which is a GLP-accredited laboratory.

**162. PAGE 129:04 TO 129:07 (RUNNING 00:00:12.978)**

Q Okay. So of all of the -- the scientists in the world, these studies ended up being done in St. Louis by Monsanto scientists, correct?

A Yes.

**163. PAGE 129:08 TO 129:20 (RUNNING 00:00:37.510)**

Q Okay. And what -- were the studies published?

A The studies -- as soon as the study results were available, we first shared the study results with Professor Parry. We went actually to visit him and give a whole presentation of the study results, and discuss all the ins and outs of the study results. And -- and we can talk later of what his opinion was on the study results.

But the study results had been in the first place presented in the open as opposed to on the Society of Toxicology meeting in San Francisco in 2001.

**164. PAGE 129:21 TO 130:10 (RUNNING 00:00:41.061)**

Q Okay. And who at Monsanto did those studies?

A These studies were conducted by a couple of scientists in the Environmental Health Laboratory under the leadership of Dr. Larry Kier and Kathy

00130:01

Holz, and, you know, Alan Wilson, and I myself had also a big say in the design and conduct of the studies.

Q Okay. And you said that that study was -- when -- when did that study occur?

A That must have been -- well, I don't

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

recall exactly, but it was in 2000s that these studies must have been conducted.
Q And you left in 2003, right?
A Yes.

**165. PAGE 130:11 TO 132:04 (RUNNING 00:02:02.573)**

Q Okay. So you're -- you're saying that the studies that Dr. Parry conducted -- or suggested were conducted by Monsanto at Monsanto's headquarters between 2000 -- well, here we are in -- we were in September of two -- or in April of 2000, and they haven't been done, so they were conducted probably in -- you're saying 2000 or 2001?
A They were conducted somewhere in the second half of 2000. The results were ready -- were ready very early 2001.
Q Okay. And what journals were the results published in?
A The results were not published in a journal. They were published as the proceedings in the Society of Toxicology as a -- it was a poster presentation at the Society of Toxicology, official journal, you know, for the -- as an abstract for the proceedings of the SOT meeting in San Francisco in 2001.
Q Okay. So what was the -- who presented the poster?
A I was at that meeting -- well, there were several of the authors. Well, the way how the poster is presented, there's actually posters posted, then, you know, there's some -- always scientists go to the poster -- actually, you know, is present at the poster to respond to questions that people may have on the poster. So I was part of them, but also I believe also Bill Heydens, et cetera, several others, yeah.
Q So this was not -- these results were not peer reviewed, correct?
A These results were peer reviewed in the process -- it's not a peer reviewed for publication, but they were peer reviewed in the process of the submission of abstracts to the Society of Toxicology of the United States.
Q Okay. So was this -- were these results submitted to a journal?
A These results were later submitted to a journal and published.
Q So these results were -- have been published?
A Yes.

**166. PAGE 132:11 TO 132:21 (RUNNING 00:00:40.378)**

Q Okay. And where was it published?
A What do you mean, what journal?
Q Mm-hmm.
A Let's see. There's the Journal of Agricultural Chemicals, et cetera. I don't recall exactly, but they've been published in 2008.
Q So are you talking about the paper by Heydens, Healy, Hotz, Kier, you, Wilson and Donna Farmer called "Genotoxic potential of glyphosate formulations: Mode-of-action investigations"?
A Yes.

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

**167. PAGE 132:25 TO 133:04 (RUNNING 00:00:16.142)**

for sakeness of a complete record, is this the -- is this the study that Monsanto conducted in response to Dr. Parry's questions and --
A Yes.
Q -- suggestions?

**168. PAGE 133:06 TO 133:07 (RUNNING 00:00:03.615)**

Q Okay. And so let's mark that as Exhibit 10.

**169. PAGE 133:13 TO 134:03 (RUNNING 00:00:45.901)**

But it's your belief and testimony that all of Dr. Parry's questions were answered by that study?
A Let me put it this way: That Dr. Parry had a whole list of recommendations.
Q Mm-hmm.
A And what happened is actually one of the most important recommendations, and he repeated that all the time is, could you repeat the study of Bolognesi, as -- you know, as best as possible, and produce a couple of endpoints, which he addressed like, for example, oxidative stress or oxidative DNA damage.
And then we started to do the study and the plan was actually to present the study results to Dr. Parry and then to see what can happen next.

**170. PAGE 134:15 TO 134:17 (RUNNING 00:00:08.114)**

Q Okay. So if we want to look to the answers for all of Dr. Parry's questions, we can find them all in that report; is that correct?

**171. PAGE 134:20 TO 135:05 (RUNNING 00:00:26.420)**

THE WITNESS: The -- Dr. Parry had a whole list of recommendations, right.
BY MS. WAGSTAFF:
Q Correct.
A And the whole list, the most important -- we took the most important type of, you know, questions. These were recommendations in regard to -- to repeat the results -- to confirm the results that had been found by Peluso and by Bolognesi, and actually address a couple of questions in terms of oxidative damage.

**172. PAGE 135:16 TO 136:14 (RUNNING 00:01:08.609)**

0220-032 -

Q We're going back to Exhibit 8 really quick, and I just want to talk about -- in this Exhibit 8, we went through these in detail --
A Mm-hmm.
Q -- Dr. Parry listed eight questions. Correct?
A Yes.
Q And is it your testimony that the answers to each of these questions can be found within your 2008 article that is entitled "Genotox potential of glyphosate formulations: Mode-of-action investigations"?

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

A Mm-hmm.
Q Okay.
A Just to make clear, we produced a lot of new toxicological evidence, and then the plan was to

-KE0220-032 - Clear Attached Exhibit 0220-032

go to Dr. Parry and see whether, you know, all of his questions still were -- he was satisfied or not. And it was the -- the subject, the topic of the meeting we organized together, we talked to Dr. Parry and to listen to him whether he was satisfied with all the results or whether he would have, you know, other or new recommendations or some of the recommendations that were in here.

**173. PAGE 140:02 TO 140:04 (RUNNING 00:00:06.581)**

And so this was considered an honor to be a Monsanto fellow.
A Yes.

**174. PAGE 141:19 TO 142:05 (RUNNING 00:00:34.209)**

Q Okay. So if you look at this letter, it -- I hope talking about your strengths doesn't embarrass you because that's all this letter talks about, but it talks about how -- this letter is about you, correct?
A Yes.
Q Okay. So it gives you great pleasure to nominate Dr. Mark Martens -- that's you -- for the appointment of the position of Monsanto fellow. That's what we've been talking about, correct?
You've been with Monsanto at that time for 12 years.

**175. PAGE 142:09 TO 143:04 (RUNNING 00:00:57.654)**

Q Okay. And during that time you have developed and sustained technical expertise in various areas of toxicology, most notably metabolism, genotoxicity and carcinogenicity.
And those two at the end are the ones that we've been talking about most today, right?
A Yes.
Q So they're recognizing you for being an expert in this area.
It says that you have established yourself as a highly knowledgeable and credible scientist outside of Monsanto as well.
I assume you don't disagree with that.
A I don't disagree.
Q It says that you had internal leadership and external influence that makes you valuable and effective to support Monsanto's entire profile of products in Europe -- in the Europe/Africa region.
And that would include the Roundup and glyphosate products, right?
A Yes.

**176. PAGE 145:21 TO 147:10 (RUNNING 00:01:59.246)**

Let's talk more about what -- what Dr. Hjelle says about you.
You have -- you were instrumental in convincing a key European expert that reports of genotoxicity with Roundup actually represent effects

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

secondary to cytotoxicity, rather than a primary genotoxic response.
And that was Dr. Parry, right?
A Yes.
Q That's what we've been talking about all morning.
It says that you were also influential or effective in reversing the strong negative regulatory position toward MON 13900 in France.
What's -- what's MON 13900?
A I think it was a grow regulating compound, but I honestly don't recall the detail of that.
Q Okay. And then it says that you have been successful in alleviating concerns over genotoxicity and carcinogenicity, and that's really what your role was with -- with engaging in Parry, right?
A My role in engaging with Parry was to find -- to receive a second opinion and to get Professor Parry to further elucidate, you know, the real significance of those findings by doing supplementary additional testing.
Q Okay. And -- and Dr. Parry's report did not alleviate the concerns over genotoxicity or carcinogen -- carcinogenicity, right?
A Well, what happens is that on the basis of the recommendations of Dr. Parry, we initiated a stepwise research program, and shared those data with Dr. Parry and discussed those results with Dr. Parry so that he could reassess his position on the basis of those new data.
Q Okay. But his reports on their face didn't alleviate the concerns over the genotoxicity, right?

**177. PAGE 147:14 TO 149:07 (RUNNING 00:02:17.155)**

A All of them. The -- the reports that we have been talking about from Dr. Parry were actually an evaluation on -- of the -- the papers of -- you know, that we discussed in the beginning, plus the regulatory genotoxicology work.
Q Okay. So my questions were -- my question was, Dr. Parry's report did not alleviate the concerns over -- over the genotoxicity and carcinogenicity, correct?
A Dr. Parry's report actually expressed a concern with recommendations that we used to produce new toxicological data in concert with Dr. Parry, that we then shared with Dr. Parry to come to a new conclusion on the basis of those data.
Q Okay. And did -- did you share -- did you share Dr. Parry's reports, either of them, report 1 or report 2, with anybody?
A No, because it was a consultancy with Dr. Parry, which actually -- with the intention to lead us to the production of new data which would help us to gain insight in the type of data that were produced by Bolognesi and Peluso.
Q Okay. And you've agreed earlier that the questions raised by Dr. Parry were good questions.
A Yes, mm-hmm.
Q Okay. And they would -- why not share those with other scientists around the world?
A No, because this was a preliminary --

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

Document received by the CA 1st District Court of Appeal.

preliminary evaluation which led to an hypotical -- hypothetical evaluation of assessment of Roundup and glyphosate by Dr. Parry, and we needed actually to first confirm whether or not his hypothesis was value — was valid.
Q Okay. So let me just make sure I understand what happened. Okay?
A Mm-hmm.
00149:01 Q You engaged -- Monsanto engages Dr. Parry to assess some studies that have occurred, correct?
A Right.
Q Okay. And those studies raised some valid concerns about the safety profile of glyphosate and Roundup, right?
A Yes.

**178. PAGE 149:18 TO 150:09 (RUNNING 00:00:29.851)**

Q So you asked him an opinion and he writes a report, and the report is not well received by Monsanto toxicologists.
A Well, the conclusions were well received.
Q Okay.
A The form of the report was not well received.
Q Okay. The conclusions were well
00150:01 received --
A Mm-hmm.
Q -- and eventually Dr. Parry is given more information.
A Yes.
Q And he writes another report with very similar conclusions. We've walked through each of the reports, correct?
A Mm-hmm.

**179. PAGE 150:21 TO 151:15 (RUNNING 00:00:56.752)**

Q Yeah. But it's your opinion that these questions should not be shared with anyone else.
A It was the intention to use those questions and to use the recommendation to initiate further research to address them in a corrective way
00151:01 and to see where exactly that we -- both parties could understand what's actually going on, and whether we have an initiation of oxidative damage and whether possible genotoxicity was secondary to the initiation of oxidative damage.
Q Okay. And I assume by the same token, you never shared — Monsanto never shared the Parry reports with any regulatory agency.
A That was not -- that was internal, you know, expert to our company, you know, information, and exchange of views, which had as the only objective to inspire Monsanto to do some supplementary research and to better understand the effects that have been published by Peluso and Bolognesi.

**180. PAGE 151:20 TO 151:22 (RUNNING 00:00:05.451)**

token that Monsanto never shared the Parry report with any regulatory agencies, correct?
A That's correct.

**181. PAGE 152:01 TO 152:02 (RUNNING 00:00:02.377)**

00152:01 Q Is that correct?

A That's correct, yeah.

**182. PAGE 152:08 TO 152:18 (RUNNING 00:00:28.414)**

Q Okay. And in fact, Monsanto engaged Dr. Parry in a secrecy agreement, right?
A In a confidentiality agreement.
Q Well, the words that you used were

0218 -

secrecy agreement, correct?
A Sometimes these words are used on the document itself. In fact, it's a confidentiality agreement.
Q Okay. It's -- it's -- but it was a secrecy agreement making Dr. Parry contractually agree not to share the results with anyone, correct?

**183. PAGE 152:20 TO 152:24 (RUNNING 00:00:17.101)**

THE WITNESS: Let me rephrase. A confidentiality agreement is signed between an external expert and a company in the case that a company have -- is willing to share confidential data with the expert, and that is general practice.

**184. PAGE 153:04 TO 153:14 (RUNNING 00:00:24.360)**

-KE0218 - Clear Attached Exhibit 0218

Q What is the -- Monsanto gave to Dr. Parry four articles that were in the public domain, correct?
A That -- that is not the issue of a confidentiality agreement. Monsanto provided to Dr. Parry --
Q Mm-hmm.
A -- all its proprietary rights studies, the regulatory studies, which are the property of Monsanto, and it was within that context that the confidentiality agreement was needed.

**185. PAGE 154:04 TO 154:16 (RUNNING 00:00:15.586)**

THE WITNESS: The -- when -- you know, I'm a consultant myself.
BY MS. WAGSTAFF:
Q Mm-hmm.
A If I'm asked by a company to provide advice --
Q Mm-hmm.
A -- on documents which are the property of that company --
Q Mm-hmm.
A -- then always a confidentiality agreement is signed, and this was exactly the same situation.

**186. PAGE 154:20 TO 154:22 (RUNNING 00:00:04.672)**

Q Okay. And you said you received from Professor Parry a signed secrecy agreement, right?
A Right.

**187. PAGE 155:08 TO 155:24 (RUNNING 00:00:35.173)**

Q Okay. So was it your understanding then that Dr. Parry could share his analysis and report

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

with other people?
A Yes.
Q Okay. So it's -- you don't believe that that analysis or report is contained within the secrecy agreement.
A That was not why a secrecy agreement is normally signed for.
Q Okay. And do you think that that report should be kept secret?
A It's an evaluation.
Q Mm-hmm.
A That wasn't an open question. That was never in question. We asked him for an advice, he provided the advice, and then we worked on that advice.

**188. PAGE 156:23 TO 156:25 (RUNNING 00:00:08.543)**

I'm asking you why would the results or -- and/or his analysis need to be subject to a secrecy agreement?

**189. PAGE 157:04 TO 157:08 (RUNNING 00:00:16.431)**

THE WITNESS: Yep. A secrecy or a confidentiality agreement is always signed when an external expert works together with a company, and that company provides the external expert with data which are confidential and have proprietary rights.

**190. PAGE 157:12 TO 157:25 (RUNNING 00:00:23.784)**

I believe I understand your testimony to be that he signed a secrecy agreement because Monsanto gave him secret documents.
A No secret documents. Confidential documents.
Q Okay. So he signed a secrecy agreement because Monsanto gave him confidential documents, correct?
A That is correct.
Q And from those confidential documents, he -- Dr. Parry created a report.
A Mm-hmm.
Q Or an analysis, an evaluation.
A Yes.

**191. PAGE 158:20 TO 159:02 (RUNNING 00:00:22.109)**

Q Right. And what I'm asking is why -- why weren't his results shared more broadly?
A Well, because we were awaiting the results that we would be producing in order to respond to his recommendations and his concerns.
Q Okay. So I am understanding it correctly that no one at Monsanto shared the Parry papers with anyone?

**192. PAGE 159:09 TO 160:10 (RUNNING 00:01:13.997)**

A Well, you know, as far as the whole research project was not terminated, there was no reason to start sharing those evaluations and data with other party.
Q Okay. So the answer is, no, it was not -- the information was not shared outside of Monsanto?
A No, it was not shared outside of Monsanto.

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

Q What is the Glyphosate Task Force?
A The Glyphosate Task Force is -- is a European task force, and I presume there is a similar type of task force in the United States, that more or less -- well, it assembles all the glyphosate, all the companies that bring glyphosate to the market in Europe, and a part of the European Crop Protection Association.
00160:01 Q Okay. And is -- does it have members?
A Yes.
Q Okay. And is Monsanto a member of the Glyphosate Task Force?
A Yes.
Q Okay. Is it a company or a corporation?
A It is a working group that resides under the European Crop Protection Association, which is a European association of crop protection products produced.

**193. PAGE 160:22 TO 161:06 (RUNNING 00:00:20.110)**

Q Okay. Have you done work with the Glyphosate Task Force recently?
A Yes.
Q In what capacity?
00161:01 A I represented the Glyphosate Task Force at the meetings of the European Union, at the European Chemicals Agency for the classification of glyphosate.
Q Okay. And this was recently, correct?
A Yes.

**194. PAGE 161:14 TO 161:21 (RUNNING 00:00:16.961)**

Did you get paid for your work with the Glyphosate Task Force that you just mentioned recently?
A As a consultant, yes.
Q Okay. And does the task force itself pay you for that work?
A Ultimately the task force pays me for the services provided.

**195. PAGE 162:10 TO 162:24 (RUNNING 00:00:41.584)**

Q Okay. And what's that consulting work that you're doing for Monsanto with respect to glyphosate within the last year and a half or --
A That was all in relation to the European classification and resubmission of glyphosate in Europe.
Q Okay. So you were a consultant for the Glyphosate Task Force and also for Monsanto.
A Well, you know, I was -- within the contract that I had with Monsanto, I got sanctioned as a representative of Glyphosate Task Force.
Q Okay. So it was Monsanto who paid you for that work on the Glyphosate Task Force.
A And back charged to the Glyphosate Task Force.

**196. PAGE 163:21 TO 163:22 (RUNNING 00:00:05.699)**

Q So how much money do you believe that you were paid for that consultancy work?

**197. PAGE 164:01 TO 164:10 (RUNNING 00:00:12.701)**

00164:01 A Oh, it must have been something like

Document received by the CA 1st District Court of Appeal.

60,000 Euros.
Q 60,000 Euros --
A Yes.
Q -- is that what you said? Okay.
And that was over a period of -- you said since last summer, and right now it's --
A Eight months, something like --
Q Eight months. Okay.
A Eight or nine months.

**198. PAGE 164:15 TO 164:20 (RUNNING 00:00:15.812)**

And does your consultancy agreement state that you cannot work for Monsanto competitors?
A No.
Q No. There's no clause that says you can only consult for Monsanto?
A There is no exclusivity clause.

**199. PAGE 165:11 TO 166:07 (RUNNING 00:01:20.301)**

Q Okay. We have talked throughout the day about reports that Dr. Parry has written, correct?
A Yes.
Q And each of those reports had certain analyses or -- or evaluations or conclusions contained within them, correct?
A Yes.
Q Did Dr. Parry ever write to you a retraction of those conclusions, evaluations or analyses?
A I don't recall that.
Q Did Dr. Parry ever write a version of a report where his evaluations or conclusions were inconsistent with the ones -- the evaluations and conclusions we looked at today?
A I don't recall such a report.
Q Okay. So -- okay. Did -- did you ever receive any written confirmation from Dr. Parry that Monsanto has satisfied the questions that he posed that we went over today?
A That was written in a meeting report that was sent out by Richard Garnett.

**200. PAGE 166:16 TO 166:18 (RUNNING 00:00:07.547)**

So I'm wondering is there any written confirmation from Dr. Parry that his questions have been answered in any way?

**201. PAGE 166:23 TO 167:14 (RUNNING 00:00:36.674)**

THE WITNESS: The conclusions that were written down by -- the conclusions of the meeting that were written down by Richard Garnett or the conclusions that were reached together with Dr. Parry in his meeting were genuinely reflecting the conclusions that we all together reached at that meeting.
BY MS. WAGSTAFF:
Q Okay. So my question was, did you ever receive written confirmation from Dr. Parry that his questions had been answered, and it sounds like, no, you didn't.
A No, we didn't, but I had a continued relationship with Dr. Parry afterwards as well.
Q Sure. But you never received written confirmation from him, correct?

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

A Not that I recall.

**202. PAGE 169:15 TO 169:16 (RUNNING 00:00:04.880)**

MS. WAGSTAFF: Yeah, and this is what

0209 -

we're going to label Exhibit 12 and --

**203. PAGE 171:20 TO 171:23 (RUNNING 00:00:10.798)**

Q So this appears to be a PowerPoint that you've created. Do you remember this PowerPoint?
A I -- I recall the images when I see them now, yes.

**204. PAGE 172:05 TO 174:06 (RUNNING 00:02:08.909)**

Q So do you remember making this PowerPoint?
A Yes, yes. I remember the -- some of the pictures, yes.
Q All right. And so when you made this, you were not an employee of Monsanto, correct?
A I was an employ -- employee of Monsanto at the time when I made this presentation.
Q Oh, you were. Okay.
A Yeah.
Q So you made this presentation before 2003?
A Yes.
Q Okay. And -- and what did you make this presentation for?
A That presentation was given at the occasion of an internal technology meeting of Monsanto Europe.
Q Okay. And so just help me understand, who was the audience that you were presenting to?
A It was all European Monsanto technology researchers.
Q Okay. And do you remember why you gave this presentation?
A This presentation -- well, Monsanto Europe organizes on a regular basis scientific meetings to educate their personnel and to put them aware of new findings in -- in science that is of application to the agricultural products of Monsanto. And at the tech days 2001, which were organized in Brussels, the theme was surfactants.
Q Okay. At the what days? I just didn't hear what you said.
A Well, there was internal technology meeting days were called the tech days.
Q Oh, tech days. Okay. Got it.
So tech days 2001 was in Brussels --
A Yes.
Q -- and the theme was surfactants.
A Yes.
Q And this was your presentation at that.
A Right.
Q You remember that?
A Right.
Q Okay. And so you put this data together at that point, right?
A Right.
Q Okay. And this isn't a PowerPoint someone else made and gave to you, correct?

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

A No, no, this is my PowerPoint.
Q You made it, this is your thoughts?
A Yes.

**205. PAGE 174:10 TO 174:25 (RUNNING 00:00:52.679)**

Q Okay. So, unfortunately, there aren't names -- or page numbers on it, but I will kind of guide you by picture. Okay?
A Okay.
Q Okay. If you go to the thing that says

0209-015 -

"Surfactant Technology, Specific Toxicity Cases." It's kind of far back, and then it will be easy from there. It looks like this (indicating).
A Yes.
Q Okay.
A I have it.
Q And these are all slides from your PowerPoint, right?
So it looks like you were educating your audience about the toxicology of surfactants, right?
A Yes.

**206. PAGE 175:03 TO 175:13 (RUNNING 00:00:31.127)**

In doing so, you noted the Peluso case, right?
A Yes. One -- well, the results of our additional research were available at that time, and one of the initiatives was actually to inform personnel -- technology personnel in Monsanto about the results.
Q Mm-hmm.
A And also at the same time in parallel, we were preparing the poster for the Society of Toxicology meeting in San Francisco.

**207. PAGE 175:18 TO 177:11 (RUNNING 00:01:50.709)**

Q My question was, in educating these folks, you noted the Peluso case, right?
A Yes.
Q Okay. And you talk about the Peluso case and you talk about MON 35050, which is what we've been talking about all morning, the Italian formulation, right?
A Yes.
Q And that's the -- MON 35050 is also the formulation used in the Peluso and the -- the --
A Bolognesi.
Q -- Bolognesi paper.
A Yes.
Q Right?
A Yes.
Q Okay. And it says: "The in vivo genotoxicity finding was cause of concern to regulatory authorities."
Correct?
A Yes.
Q Okay. So now these are your thoughts that the genotoxicity finding in vivo was of concern, correct?
A Yes.

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

0209-016 -

Q Okay. And this is -- then you're -- you're going on to educate these people who are listening to your presentation about the toxicity of surfactants, and you said: "To better understand the significance, Monsanto undertook research to examine the role of intraperitoneal versus oral, DMSO olive oil versus saline, and then the Italian formulation with and without glyphosate." Right?
A Yes, exactly.
00177:01 Q So I just want to make sure that I understand what additional research Monsanto undertook. Was that the 2008 article that we've been talking about?
A Yes.
Q And was there any other research Monsanto undertook?
A No. That was that research.
Q Okay. And do you remember about what month this presentation occurred in 2001?
A That must have been very early 2001.

**208. PAGE 177:22 TO 178:03 (RUNNING 00:00:14.417)**

Q Okay. And so your -- the -- the results from your new study weren't finalized at this point; is that correct?
A I think they were known by that time,
00178:01 yes.
Q Okay. So do you include them in this PowerPoint?

**209. PAGE 178:05 TO 178:06 (RUNNING 00:00:03.888)**

Yeah, the conclusions of that study were mentioned on a slide.

**210. PAGE 178:14 TO 179:02 (RUNNING 00:00:36.698)**

Q Okay. So this is -- these are your conclusions --
A Mm-hmm.
Q -- from the MON 35050 case.

0207 -

So the MON 350 case is your 2008 study, correct?
A Yes.
Q Okay. And just so we're clear, this is the -- this is the 2008 study that Bill Heydens is the lead coauthor, right?
A Mm-hmm.
Q And it's called "Genotoxic Potential of
00179:01 Glyphosate Formulations: Mode-of-Action Investigations," correct?

**211. PAGE 179:10 TO 179:21 (RUNNING 00:00:38.183)**

Q If this was done in 2001, previous to -- to this research, why did it take seven years to publish it in a journal?
A Well, we were very fast in actually bringing it into the open because we communicated the results via a poster on the -- at the Society of Toxicology meeting in San Francisco. So those

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

results were in the open and were actually shared with the outside world for discussion.
To turn all those results into a publication, that calls for a lot of work, and while that has been done after I left Monsanto in 2003.

**212. PAGE 180:07 TO 180:09 (RUNNING 00:00:13.547)**

-KE0207 - Clear Attached Exhibit 0207

Q Okay. So when you left Monsanto in 2003, the results of this MON 35050 case study were not published, correct?

**213. PAGE 180:16 TO 180:21 (RUNNING 00:00:16.119)**

A They were already put into the open via our poster presentation.
Q Okay. And so this MON 35050 case study, when you left Monsanto in 2013 was not in -- published in a journal, correct?
A That is correct, yes.

**214. PAGE 183:19 TO 183:25 (RUNNING 00:00:20.287)**

Q Well, I will ask one question about your study, that is the 2008 study. Was that a risk assessment?
A It was meant to be a mechanistic study, if I may say so.
Q So is that a risk assessment?
A No.

**215. PAGE 187:24 TO 189:09 (RUNNING 00:01:17.557)**

You are a toxicologist, correct, sir?
A Yes, sir.
00188:01 Q Would you please tell the jury what a toxicologist is.
A A toxicologist is a scientist who studies the effects of chemical substances on the health of animals and men.
Q And you have a Ph.D. in toxicology?
A Yes.
Q Did you start your career as what is called a forensic toxicologist?
A Yes, I did.
Q Would you please explain to the jury what a forensic toxicologist is.
A A forensic toxicologist is a scientist who actually, you know, designs and applies methods of analysis to determine the concentration of toxic substances in body fluids and tissues of people and of victims in order to establish a causal relationship between a crime and, for example, the -- the death of the victim.
Q Okay. And that was a little bit of a technical explanation.
You're one of the scientists that works for police departments or detectives --
A Yes.
Q -- to investigate poisons and other --
00189:01 A Right.
Q -- substances that might have hurt someone in a crime?
A Yes.
Q Is that a -- is that a good explanation?

Document received by the CA 1st District Court of Appeal.

A That is a good explanation, yes.
Q Did you do a residency with Scotland Yard in England?
A Yes, I did.

**216. PAGE 189:10 TO 191:04 (RUNNING 00:02:00.658)**

Q And tell us in a sentence or two what you did there.
A During my residency at Scotland Yard, which is the Metropolitan Police Laboratories in London, I spent time in acquiring knowledge and refining my knowledge in terms of the analysis of toxic substances in body fluids and tissues.
Q After your forensic toxicology work as a student and as a resident at Scotland Yard, what did you go on to do next in your career?
A After my Ph.D., I joined the pharmaceutical industry.
Q Well, what company did you join?
A Continental Pharma in Brussels.
Q And what was your job duty with Continental Pharmaceuticals in Brussels?
A I was the head of the department of mass spectometry, pharmacokinetics and metabolism.
Q You said "pharmacokinetics." What is pharmacokinetics?
A Pharmacokinetics is the study of the behavior of chemical substances in the human body.
Q How the chemicals move through the body?
A And how they are excreted from the body as well.
Q And you said "metabolism." What is that?
A The metabolism is a series of chemical reactions that take place in the liver and which lead to breakdown products, which are -- can be either toxic, nontoxic, and which are excreted through the kidneys from the body.
Q You also mentioned mass spectrometry, and that's a tool that's used to assess chemicals, right?
A That's a tool that is used to identify and characterize and quantify chemicals that, you know, are present in body fluids and tissues.
Q What did you do after your work at Continental Pharma?
A After Continental Pharma, I joined the Belgium authorities as a specialist in clinical biochemistry first, as an inspector, and then afterwards I joined the toxicologists, where I became head of the toxicology department, and actually founded the toxicology department at the National Institutes of Health.

**217. PAGE 191:05 TO 192:11 (RUNNING 00:01:20.009)**

Q And when you say the "Belgian authorities," that's the same as the National Institutes of Health?
A Well, Belgium is a small country, so we don't have a separate institute like National Institutes of Health, but I worked -- at the time it was called the Institute of Hygiene and Epidemiology, which was actually the scientific research institute of the Ministry of Health.
Q Now, sir, as you said, in the United States we have a whole agency called the National Institutes of Health that does scientific research,

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

and we also have the Environmental Protection Agency which regulates pesticides.
In Belgium, does the same organization do both of those things?
A In Belgium, it's a collaboration between the Ministry and the Scientific Institute for Public Health.
Q And that's where you worked, right?
A Yes.
Q How long were you a regulator in Belgium?
A Ten years.
Q And what -- what was your role there? What did you do at the institute?
A I was the head of the department of toxicology, and in that function I was the primary advisor of the Minister of Health of Belgium. And at the same time I had to represent my country at the meetings of the European Union, the commission of the European Union, at OECD, and at other international meetings like, for example, IPCS.

**218. PAGE 192:12 TO 193:05 (RUNNING 00:00:43.717)**

Q Were you involved in inspections of companies and approval of their products?
A That was also --
Q Or disapproval of their products?
A Yes, that was indeed the case.
Q After your work as a regulator in Belgium for 10 years, what did you do next?
A I joined Monsanto in Brussels.
Q What were your responsibilities at Monsanto, broadly speaking?
A At the time when I joined Monsanto, Monsanto had a very large chemical division next to the agrochemical division and the food division, and I was responsible for the whole portfolio of Monsanto products for all these sectors in Europe and Africa.
Q And it was a Europe -- it was a regional responsibility for Europe, Africa and the Middle East?
A Yes.

**219. PAGE 193:14 TO 193:25 (RUNNING 00:00:34.863)**

Now, over your 45-year career as a toxicologist, how many different substances have you worked with toxicologically speaking?
A I've seen the toxicology profiles of at least 1,000 products.
Q And out of the at least thousand products that you have worked with as a toxicologist, how does glyphosate compare regarding -- with regard to toxicity?
A Of all the compounds I assist during my whole career, glyphosate is certainly one of the least toxic I've ever seen.

**220. PAGE 194:05 TO 194:24 (RUNNING 00:00:51.346)**

Q Now, what do toxicologists call the body of studies, the group of studies and scientific data regarding a particular substance like glyphosate?
A As a toxicology dossier.
Q Okay. So the dossier.
How large is the toxicology dossier on glyphosate?
A The toxicology dossier of glyphosate is

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

actually the largest I've ever seen in my whole career.
Q Now, when glypho -- glyphosate is used, of course, to kill weeds, right?
A Yes.
Q How does it do that? What does it do to weeds that makes them die?
A It inhibits specifically an enzyme that is responsible for the production of an amino acid, which is very essential for the survival of the plant. When that enzyme is blocked, then the plant actually starves to death.

**221. PAGE 195:05 TO 195:08 (RUNNING 00:00:10.859)**

Q The enzyme that glyphosate blocks in plants, does that exist in humans?
A No, it does not exist in humans and it does not exist in all mammals.

**222. PAGE 195:14 TO 196:04 (RUNNING 00:00:52.711)**

Q Is it possible for glyphosate to harm humans or cats and dogs and cows and other mammals through the same way that it harms weeds?
A No, that's not possible.
Q I want to talk for a minute about the issue of exposure. Would you please explain to the jury why toxicologists care about exposure.
A Actually, the compound is toxic when the dose is high enough to exert a toxic action. So there are chemicals with a low potential of toxicity and a high potential of toxicity. The chemicals with a low potential of toxicity need much higher doses to cause illness in man; whereas, the chemicals with a high potential for toxicity only need very lower doses and even very minor doses to cause illness in man.

**223. PAGE 198:04 TO 198:19 (RUNNING 00:00:58.118)**

In the real world, what is the level of exposure that humans have to glyphosate?
A The level of exposure is very low, and it has been demonstrated in a farm family study where glyphosate exposure in farmers has been monitored by analyzing glyphosate in urine, and from that project, which has been, you know, carried out on at least 50 -- something like 50 farms -- farmers and their families, we could assess that the quantity that has been absorbed after one day of using glyphosate and applying glyphosate on surfaces as high as 400 acres per day, that the quantity that is absorbed that day is actually about even more than 10 million times lower than the quantities that in one day we had to use in animals in order to, you know, to assess possibly carcinogenicity.

**224. PAGE 205:04 TO 205:16 (RUNNING 00:00:34.059)**

Q Now, you said that Monsanto -- we've just been talking about long-term cariogenicity studies, cancer studies of glyphosate.
A Right.
Q Not of Roundup.
Has Monsanto done long-term cariogenicity studies of Roundup?
A These type of studies were not carried

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

out because they are scientifically of no added value for a very simple reason: If you administer Roundup to, you know, experimental animals for their lifetime, they actually will die from the surfactant before they ever have the occasion to develop cancer.

**225. PAGE 206:03 TO 206:08 (RUNNING 00:00:07.474)**

Surfactants are in dishwashing liquid.
A Yes.
Q They're in bar soap.
A Yes.
Q They're in shampoo.
A Yes.

**226. PAGE 206:14 TO 206:16 (RUNNING 00:00:04.493)**

Q They're in substances that we use to spray on the walls of our house to clean it?
A Yes.

**227. PAGE 206:24 TO 207:15 (RUNNING 00:00:56.311)**

Q And what happens to an animal or a person if they drink, consume surfactants at the levels that you would have to give in a long-term carcinogenicity study?
A As surfactants have the characteristic to be irritating to mucous membranes, so if you drink -- if you are, from a gastrointestinal point of view, are exposed to high concentrations of surfactants, you actually produce a chronic irritation of the mucous membranes of the gastrointestinal tract, and that causes an imbalance of electrolyte exchange, and the result is that, you know, there will be a lot of water extracted from the bloodstream into the gastrointestinal tract. Thereby, you will have a thickening of the blood, which can actually end up into a hypothalamic shock, and of which animals can die.

**228. PAGE 208:02 TO 208:08 (RUNNING 00:00:23.566)**

Q Now, the jury has heard that a lot of the studies on glyphosate, including glyphosate cancer studies, were performed by Monsanto, for example, at the Environmental Health Lab in St. Louis.
How do regulators know that they can trust studies done by industry labs like the Environmental Health Lab at St. Louis?

**229. PAGE 208:13 TO 209:06 (RUNNING 00:00:39.175)**

A The -- the laboratories for toxicology studies are carried out for regulatory purposes. They need to be accredited for good laboratory practices. That means they will have to follow extremely stringent procedures of quality control to make sure that processes are followed, to make sure that at all levels of data production, these data are controllable and can be checked by the authorities.
Q Now, you said "good laboratory practices."
A Mm-hmm.
Q Is that your term?
A No, that's the official term which has been at the highest level possible applied at OECD where at the first time the "good laboratory practices" have been defined.

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

Q Is one of the chapters in your book on good laboratory practices?
A Yes.

**230. PAGE 209:10 TO 209:12 (RUNNING 00:00:05.904)**

Q And have you done good laboratory practices inspections?
A Yes.

**231. PAGE 209:21 TO 209:24 (RUNNING 00:00:13.040)**

Q How do regulators know that industry labs that are following good laboratory practices aren't just cooking the data and making stuff up or telling lies to the regulators?

**232. PAGE 210:01 TO 210:10 (RUNNING 00:00:28.457)**

THE WITNESS: The -- the regulatory authorities organize on a regular basis inspections. And also when the study reports are submitted to the regulatory authorities, they should contain all the inspection reports of the internal quality assurance unit of the laboratory, which is an independent unit in the laboratory reporting to a completely independent management from the laboratory, and making sure that all the procedures are in place and that all the inspections are documented.

**233. PAGE 210:24 TO 211:01 (RUNNING 00:00:09.994)**

Q Why -- how do we know that the people who are watching the scientists and watching the procedures are following the rules?

**234. PAGE 211:03 TO 211:15 (RUNNING 00:00:41.335)**

THE WITNESS: There is -- the quality assurance unit within the toxicology laboratory reporting to outside toxicology laboratory needs to actually to accept on a regular basis inspections from the authorities, and when the inspection reports are acceptable, they acquire what is called a GLP accreditation. And they need to have the GLP accreditation at regular renewals of that in order to stay in function. And when the laboratory has a quality assurance unit or in its role no accreditation, this laboratory has no possibility to submit its test results to the authorities, they will be refused.

**235. PAGE 211:22 TO 212:16 (RUNNING 00:00:51.402)**

Q And the regulators also come in and perform inspections of the lab and the -- the independent auditing unit --
A Yeah.
Q -- for the lab as well, right?
A Yes. On a regular basis.
Q I would like to turn to the issue of Dr. Parry.
When you reached out to Dr. Parry in 1999, you sent him four of the studies that existed at the time on the subject of genotoxicity, correct?
A Yes.
Q And there were other studies that you didn't send him at the time, right?
A Well, the study -- well, there were the

Document received by the CA 1st District Court of Appeal.

studies -- the regulatory studies which have been produced by Monsanto, they were not sent in the first place to Dr. Parry for evaluation because they've been evaluated by the authorities and who came to the conclusion that glyphosate was not genotoxic.

**236. PAGE 212:25 TO 213:03 (RUNNING 00:00:12.090)**

Q And when he did his initial evaluation, as you testified earlier, he hadn't yet looked at the Monsanto studies and the regulatory studies, right?
A Right.

**237. PAGE 213:17 TO 213:23 (RUNNING 00:00:20.285)**

What I'm putting up on the screen is from

0217-011 -

Exhibit 4, Bates number ending 103.
And during Ms. Wagstaff's examination, she highlighted and asked you about the first sentence in that first full paragraph on the page, sir, saying: "The overall data provided by the four publications" --

**238. PAGE 214:04 TO 214:18 (RUNNING 00:00:39.200)**

"The overall data provided by the four publications provide evidence to support a model that glyphosate is capable of producing genotoxicity, both in vivo and in vitro, by a mechanism based upon the production of oxidative damage?"
And you talked about that earlier. I would like to go on and talk about the rest of that paragraph right now, sir.
It says: "If confirmed, such a mechanism of genetic damage would be expected to be produced at high concentrations of the herbicide and would be relevant only when the antioxidant protective mechanisms of the cell are overwhelmed."
Did I read that right?
A Yes.

**239. PAGE 214:24 TO 215:12 (RUNNING 00:00:34.923)**

And -- but what I would like you to do now is explain to the jury what is meant by: You would expect if there is such a mechanism, if such a mechanism exists and such a mechanism is confirmed, then it would be expected to be produced at high concentrations and would be relevant only when the antioxidant protective mechanisms of the cell are overwhelmed.
A Yes.
Q That's a dose statement, correct?

-KE0217-011 - Clear Attached Exhibit 0217-011

A Yes. Yes, correct.
Q Could you explain what he means by the antioxidant protective mechanisms of the cell being overwhelmed by high doses of pesticide?

**240. PAGE 215:15 TO 216:05 (RUNNING 00:00:50.955)**

THE WITNESS: The cell disposes of a whole series of molecules which are of a kind to neutralize free oxygen radicals. One of those

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

molecules is, for example, glutathione, and that is actually a mechanism of the cell to protect itself against oxidative damage.

Now, you can be exposed to a chemical producing oxidative free radicals, but as long as those free radicals -- oxygen free radicals are neutralized by these molecules, nothing is happening because the cell is fully protected.

So only when the stock of those protective molecules is consumed, then there will be free oxygen radicals that will not anymore be neutralized, and they start actually reacting with constituents of the cell of which DNA.

**241. PAGE 216:07 TO 217:21 (RUNNING 00:01:58.851)**

Q So you can have a different outcome with regard to what happens with oxidative damage at low doses versus very high concentrated doses; is that right?
A That is right.
Q Is that what you found when you actually did studies of animals and gave them very high doses orally and intraperitoneally?
A Yes.
Q Now, Dr. Parry made some recommendations for possible steps that Monsanto could take in his -- in his various proposals to you, correct?
A Yes.
Q What did Monsanto do with those recommendations? What work did it carry out in response?
A We developed a program in order -- in a stepwise program, and the first step of that program was, upon request and which we fully accepted, a repeat of the Bolognesi study. That then we found deficiencies with the Bolognesi study. The Bolognesi study was carried out on three animals at only one dose level. Monsanto carried out, you know, this assay on ten animals and on two dose levels, and even investigating the possible influence of the vehicle for intraperitoneal injection on the outcome of the study.

On top of that, Monsanto added more elements to the protocol to investigate the nature and the severity of the cytotoxicity that is produced after intraperitoneal injection to try to understand the relationship between cytotoxicity, oxidative stress and mutagenicity or oxidative damage of DNA.

So all these parameters have been measured in this protocol.
Q And these were done in the GLP certified lab in St. Louis --
A Yes.
Q -- is that right?
A Yep.

**242. PAGE 218:03 TO 218:12 (RUNNING 00:00:31.270)**

Q And -- I'm sorry. What other -- what other modifications and improvements did you make to the Bolognesi study?
A The improvements that were made was, for example, also the selection of the indicator for oxidative stress. It was the NADP, nicotinamide adenine, oxidative stress transcription. It's a complicated term. But it was at that time the most

Document received by the CA 1st District Court of Appeal.

recent methodology in order -- in a very sensitive and specific way to identify oxidative stress.

**243. PAGE 218:18 TO 219:04 (RUNNING 00:00:28.749)**

Q Now, you mentioned -- you talked earlier about how once these results came out, they were provided to the authorities and they were part of a poster presentation in San Francisco; is that right?
A Yes, that's right.
Q And when something is published as a poster presentation, is it available to the general scientific community to see and review?
A Yes. Exactly.
Q And the same results were also published in 2008 in a paper that you were a coauthor on?
A Yes.

**244. PAGE 219:22 TO 220:02 (RUNNING 00:00:15.066)**

0214 -

Q I have marked as Exhibit 18 a February 19th, 2001 e-mail from Bill Heydens to Larry Kier, and you're copied on some of the rest of the thread.
Go ahead and take a look at that, sir, and tell me when you're ready?

**245. PAGE 220:04 TO 220:04 (RUNNING 00:00:02.074)**

Yes, I'm ready.

**246. PAGE 220:14 TO 220:19 (RUNNING 00:00:22.441)**

0214-002 -

Q And on the second page of the two pages of this exhibit is an e-mail from Richard Garnett dated February 16th, 2001, to you and to Donna Farmer, Bill Heydens and Bill Graham, reporting on your meeting with Dr. Parry, correct?
A Yes.

**247. PAGE 221:04 TO 221:14 (RUNNING 00:00:24.178)**

Q Then "The presentation of the results of the MON 35050 study changed the mood because it clarified certain effects found in the Bolognesi and Peluso papers." Correct?
A That's correct.
Q And the MON 35050 study is the one that we were just talking about --
A Right.
Q -- that you performed improving on those earlier studies; is that right?
A That is correct.

**248. PAGE 224:10 TO 225:15 (RUNNING 00:01:22.915)**

Q Okay. Since our -- I'm reading again from Exhibit 18. "Since our previous discussions with him, Professor Parry had begun to comprehend the complexity and range of glyphosate formulations. We clarified this by reviewing the brands, formulations and surfactants used in Europe and the rest of the world. Then reviewed the mutagenicity studies available for the surfactants used in glyphosate

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

formulations. We demonstrated with work undertaken since the previous discussion that structurally related surfactants, etheramines, do not directly cause genotoxicity."
And that was an accurate description of the meeting, correct?
A Yeah. Yes.
Q Now, let's -- I want to go to results.
00225:01 These were the results of the meeting with Professor Parry, correct?
A Yes.
Q "Acceptance that glyphosate is not genotoxic."
And that is acceptance by whom, sir?
A By -- by Professor Parry.
Q "Broad agreement that genotoxic results in some studies with surfactants arose due to oxidative damage rather than direct genotoxicity."
Now, when you -- when -- when Richard Garnett said: "Broad agreement that genotoxic results in some studies was due to oxidative damage rather than direct genotoxicity," what studies did he mean by the "some studies"?

**249. PAGE 225:18 TO 226:23 (RUNNING 00:01:05.506)**

THE WITNESS: Well, I was at the meeting, so I know what it is about. It was the studies with intraperitoneal injection.
BY MR. GRIFFIS:
Q "Recognition of the difference of toxicity between the intraperitoneal and oral routes" -- and you've been explaining that to us, right, the difference between the injection into the
00226:01 belly and drinking?
A Drinking, yes.
Q Drinking.
-- "and that only oral, dermal and inhalation route are taken into consideration for classification in the EU." Correct?
A Yes.
Q And why is it that only oral, dermal and inhalation routes are taken into consideration for classification of substances -- of the toxicity of substances in the EU?
A Well, these are the only acceptable routes of exposure, you know, when, you know, people get into contact with hazardous chemicals.
Q Is it because humans don't get chemicals injected directly into their belly?
A Of course not.
Q "Acceptance of the low quality of the" -- how do you pronounce that, sir?
A Lioi.
Q Lioi.
"Acceptance of the low quality of the Lioi, et al., study."

**250. PAGE 227:03 TO 227:04 (RUNNING 00:00:03.961)**

Q Who was it that was accepting the low quality of the Lioi study?

**251. PAGE 227:06 TO 227:06 (RUNNING 00:00:01.739)**

THE WITNESS: Professor Parry.

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

**252. PAGE 227:08 TO 227:11 (RUNNING 00:00:09.141)**

Q "Professor Parry accepted the argument that no repeat dose study should be necessary on the basis of the NTP data." Correct?
A Yes.

**253. PAGE 227:15 TO 227:21 (RUNNING 00:00:16.633)**

Q And he accepted that you as industry, you couldn't test other people's surfactants, right?
A Yes.
Q You explained that to him?
A Right.
Q And Dr. Parry no longer requested any studies on the final formulation; is that right?

**254. PAGE 227:23 TO 228:25 (RUNNING 00:01:13.540)**

THE WITNESS: Yes.
BY MR. GRIFFIS:
Q So did -- the results of this meeting that you attended with Professor Parry and Richard Garnett, did Professor Parry change his view of what he thought Monsanto should do next?
A Yes. But he asked for one supplementary, one additional study.
Q And that was -- show us where that is on this page, please.
A That is the fourth dash.
Q "Complete the" -- this is under "Actions," "Complete the MON 35050 study with intraperitoneal injection of the MON 35035 formulation minus glyphosate." Correct?
A Yes.
Q And did you do that?
A Yes. And there was no difference.
Q Why was it that Dr. Parry's lab didn't perform the MON 35050 study, sir?

**-KE0214-002 - Clear Attached Exhibit 0214-002**

A The major reason is because he runs a non-GLP accredited laboratory, and he didn't have the capability in doing histopathology studies.
Q He didn't have the capability, why?
A Because he's not a histopathologist. So you need expertise of histopathologist plus a completely equipped laboratory to prepare the tissue samples for microscopic examination.

**255. PAGE 229:24 TO 230:13 (RUNNING 00:00:52.946)**

Q And the procedures that exist in GLP labs to make sure that the data is good, those procedures don't normally exist in academic labs; is that fair?
A No. That's fair.
Q Sir, has any national or multinational regulator, like the European Union, the EPA, et cetera, concluded that glyphosate causes cancer based on the studies that we've been talking about today?
A In the European Union, the European Chemical Agency, and the European Food Safety Authority reviewed all the studies on genotoxicity and carcinogenicity of glyphosate, and they came to the conclusion that glyphosate is not genotoxic and is not a carcinogen.

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

**256. PAGE 232:02 TO 232:25 (RUNNING 00:01:09.408)**

Q What do they do?
A When the pesticide producer wants to put a pesticide onto the marketplace, he has to produce a safety package, which is a whole toxicological dossier, and he has to produce that according to, you know, internationally agreed test guidelines and according to good laboratory practices. All the data that are produced in that context have to be submitted to the authorities, and the authorities actually analyze the data from scratch, and they come to their own conclusions.
Q Do the authorities have experts in toxicology and other areas that enable them to actually evaluate the data?
A They have experts in toxicology, and if they do need experts that are specialized in specific subparts of toxicology, they have the possibility to engage in academic toxicology experts to help them in their assessments.
Q You just spent a significant part of the last year focusing on all of the toxicology evidence about whether glyphosate can cause cancer; is that right?
A Right.

**257. PAGE 233:02 TO 233:04 (RUNNING 00:00:07.824)**

And was it just Monsanto's data and the public -- publicly available published data that you looked at?

**258. PAGE 233:07 TO 234:15 (RUNNING 00:01:24.783)**

THE WITNESS: No. Monsanto produced three carcinogenicity studies, but the total number of regulatory carcinogenicity studies was 12 carcinogenicity studies, because of the -- a lot of the carcinogenicity studies have been produced by other agrochemicals companies putting glyphosate into the marketplace.
BY MR. GRIFFIS:
Q And did you see all of those studies?
A Yes.
Q How many genotoxicity studies did you focus on as part of your analysis?
A In total, it was about 80 genotoxicity studies.
Q That's eight zero?
A Eight zero.
Q Did those -- did the regulators in Europe that you were interacting with look at the Bolognesi study and the other studies that you initially sent to Dr. Parry in 1999?
A Yes.
Q That was among the body of studies that they considered in reaching their conclusions?
A It was the body of published literature which also taken into consideration in the assessment.
Q And what was their conclusion?
A Their conclusion is that the overall weight of evidence and analysis indicated that glyphosate was not genotoxic. And that conclusion was reached at the European chemical -- the agency in unanimity of all member states.

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

Document received by the CA 1st District Court of Appeal.

Q How many member states were involved?
A 28.

**259. PAGE 235:03 TO 236:02 (RUNNING 00:01:11.533)**

Q Good afternoon, Dr. Martens. I am here to ask just some follow-up questions. And so as a result, my questions may bounce around a little as I tried to just write down notes when your attorney was asking you questions.
Fair?
A That's fair.
Q Okay. So when we discuss dosage, that's relating to the risk assessment, correct?
A Yes.
Q Okay. And there's no bright line on dosage -- what dosage will cause an effect in a person, correct?
A Let me give you a little bit in a more precise explanation is, when you study the effects of a chemical and function of dose, that is a -- what is called the dose-effect relationship establishment. Okay?
Q Mm-hmm.
A From a dose-effect relationship establishment, you derive from animal studies the safe dose. That means the highest dose at which you don't see any effect. And that dose, when that is confronted with the level of exposure in reality, in real life, that is risk assessment.

**260. PAGE 236:19 TO 238:17 (RUNNING 00:02:06.219)**

Q Okay. And, in fact, it is very common in toxicology to use high dose testing in animals, correct?
A Yes.
Q And, in fact, it is more common than not to use high dose testing in animals, correct?
A Yes.
Q Okay. And there's a good reason for that, right?
A Yes.
Q Okay. And what's the reason?
A The reason is that for testing in animals, we are obliged by international, you know, test guidelines to dose up until we have very clear signals of toxicity. And then we select doses, and the lowest dose is the dose at which we don't expect to see toxicity, and there is an intermediate dose. And that is -- the reason for that is actually to establish a dose-effect relationship.
Q Okay. And also if the normal incidence of some effect is, let's say, one in a thousand or one in 5,000, that means that if you -- it would take a thousand or 5,000 animals to show that one time, and tests don't use that many animals, do they?
A They -- well, there is a compromise that you -- you will have to achieve, and the compromise for long-term carcinogenicity test is that you use 50 to 60 animals per sex per dose level.
Q Exactly. So if you're only using 50 or 60 animals per sex per dose, you need to really use a high dose analysis, correct?
A Well, you need to actually to -- to dose up, up to the maximum tolerated dose, to make sure if the compound is carcinogenic, you won't miss it.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

Q Correct. And so when your attorney was asking you all about the dosage that was used in these studies that you analyzed, they were following standards and practices that scientists use all over the world, correct?
A Yes.
Q They weren't doing anything abnormal, correct?
A No.
Q They were following the same practices that scientists follow all over that give us results that we -- that are accepted all over the world, correct?
A Yes, insofar they follow the international accepted test guidelines.

**261. PAGE 239:19 TO 239:25 (RUNNING 00:00:22.894)**

Q Okay. You will agree that animal testing is very expensive.
A Absolutely.
Q Do you know the EPA's analysis or position on what a, quote, unsafe chemical is?
A I don't recall that specific test, no. Or that specific text.

**262. PAGE 240:08 TO 240:21 (RUNNING 00:00:33.486)**

Q Sure. I'm just wondering because you work and practice and most of the -- the stuff that you do regulatory-wise is in Europe, correct?
A Yes.
Q You -- what portion of your practice do you interact with the EPA and its guidelines?
A Almost zero.
Q Almost zero?
A Yes.
Q So you may not be familiar with the EPA's definition of what an "unsafe chemical" is, correct?
A I must have been aware of this before I joined the pharmaceutical company. So sometime ago, yes.

**263. PAGE 241:14 TO 242:05 (RUNNING 00:00:28.333)**

A Yes.
Q They were the Lioi -- how do you pronounce that one again?
A Lioi.
Q Lioi. The two Lioi papers.
A No, one Lioi paper.
Q One Lioi paper, the Rank --
A Yes.
Q -- the Bolognesi and the Peluso, right?
A Yes.
Q Were those studies conducted in labs that were following good laboratory practices?
A No.
Q No. And how do you know that?
A Because these were academic labs which were not accredited for GLP; otherwise, that would have been -- appeared in their publications.

**264. PAGE 242:24 TO 243:12 (RUNNING 00:00:31.423)**

Q Okay. And -- and your counsel said even if a lab wasn't GLP operating, it could still be a good lab. Correct?

Document received by the CA 1st District Court of Appeal.

A Yes.
Q Okay. Just because something's not GLP doesn't mean it's a bad lab, right?
A It doesn't mean it's bad science.
Q Okay. And just because something is a GLP lab doesn't mean it's good science, right?
A That's right.
Q So the GLP is just sort of a shortcut like a marriage is a shortcut to a commitment, right?
A No, no, no. The GLP is for what I would call a process control.

**265. PAGE 243:18 TO 244:19 (RUNNING 00:00:58.215)**

THE WITNESS: GLP is a process control part, and has nothing to do with the science. It's all to do with data control, data access, data quality assurance.
BY MS. WAGSTAFF:
Q Okay.
A And there is a science part, and the science part is taken care of in accordance with the internationally agreed test guidelines.
Q Okay. So I think we're on the same page now that GLP labs can have good or bad science --
A Mm-hmm.
Q -- and non-GLP labs can have good or bad science.
A Yes.
Q Okay. It really depends on the scientists.
A It depends on the scientists and the structure of the laboratory.
Q Okay. Gotcha.
And when was this GLP accreditation process created?
A It was created in the -- the end of the '70s, beginning of the '80s.
Q Okay.
A Yeah, because it took a long time to implement it in all laboratories, yeah.

**266. PAGE 244:23 TO 245:02 (RUNNING 00:00:16.962)**

Q Is it -- I assume, and correct me if I'm wrong, but every laboratory has to be GLP accredited.
A Every laboratory that produces data, safety data that have to be submitted for regulatory reasons needs to be GLP accredited.

**267. PAGE 246:05 TO 247:25 (RUNNING 00:01:47.252)**

Q So you're not involved in all of the -- the glyphosate reregistration processes over here in the United States.
A No. It's Europe.
Q Okay. Now, you testified earlier that Monsanto has done three long-term cancer studies --
A Yes.
Q -- involving glyphosate; is that right?
A Yes.
Q I believe you testified that two were rat studies and one was a mouse study.
A Yes.
Q Is that right?
Who conducted those studies?
A There was -- I've got to recall -- the Knezevich and Hogan study was done by a contract

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

laboratory. The Stout and Ruecker study was done at Monsanto. Yes.
Q Okay. So that's two studies. What about the third?
A The third I believe is the Lankas study, and I will have to check that out where it was conducted. Yeah, I've got to check that out.
Q Okay. So when you say Monsanto did three studies, you mean they funded three studies?
A They commissioned three studies, either in their laboratory or in contract laboratories.
Q Okay. And are those studies in published literature?
A No.
Q No. So they're private --
A Well, they've been summarized in reviews, like, for example, the Williams review.
Q Okay. Which is a Monsanto commissioned review as well.
A It's commissioned to an organization that took care of the selection and the recruitment of scientists to do that review.
Q Yeah. So Monsanto did studies and then hired someone to review the studies that they conducted, right?
A Yeah. In order to publish it. Yeah.
Q Okay. But other than using Monsanto to do the studies and then Monsanto to review the studies, no one independently has peer reviewed those studies, correct?

**268. PAGE 248:03 TO 248:11 (RUNNING 00:00:11.670)**

THE WITNESS: These studies have been peer reviewed by the authorities.
BY MS. WAGSTAFF:
Q What authorities?
A Well, the authorities over all in the world.
Q Okay. So does the EPA have all of these studies?
A Yes.

**269. PAGE 248:18 TO 249:10 (RUNNING 00:00:34.410)**

Q Okay. And these other -- and then I think you testified that there were eight other studies.
A Yes, in total there are 12 carcinogenic studies.
Q Okay. So then I guess that would be nine other studies, right?
A Yes.
Q And who created those studies?
A These studies have been commissioned by other companies that put glyphosate into the marketplace.
Q Okay. And where would we find those studies?
A The best way and how to get insight in those studies is actually to read the paper of Greim, et al., where the results of those studies are summarized.

**270. PAGE 249:20 TO 250:02 (RUNNING 00:00:22.834)**

Q Okay. So there are -- there are 12 studies that assess the carcinogenicity of glyphosate

Document received by the CA 1st District Court of Appeal.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

Document received by the CA 1st District Court of Appeal.

that's -- that's not available for the public to review or access; is that correct?
A That's not entirely correct, because the analysis, the evaluation, and the complete description of the studies have been published by Greim, et al.

**271. PAGE 250:10 TO 251:02 (RUNNING 00:00:44.138)**

Q Okay. Who is he?
A He is a cancer specialist, a German cancer specialist.
Q Okay. And who does he work for?
A He's got -- well, he used to work normally for government. He was the head of the MAC Commission in Germany, who was responsible for the environmental exposure levels for carcinogens.
Q Okay. And who paid for that study?
A All the companies that produced the studies contributed to the -- this project.
Q Okay. So the companies get together and they do these studies where no one gets the results or the data, and then they pay someone to summarize all their studies --
A Yes.
Q -- but they don't give anyone the actual studies.

**272. PAGE 251:11 TO 251:22 (RUNNING 00:00:27.268)**

Q Is that correct?
A The -- under a confidentiality agreement, these studies must have been provided to Dr. Greim.
Q Okay. So I could not -- could not find those studies anywhere.
A If you would be a toxicologist and you would be under contract with a company, then you would gain access to those studies.
Q Okay. So I need to be employed by one of those companies and sign a confidentiality agreement to get access to these 12 cancer studies; is that correct?

**273. PAGE 251:24 TO 252:18 (RUNNING 00:00:51.901)**

too fast. If you would be an independent consultant, like I am --
Q Mm-hmm.
A -- and I have been granted access to all these studies for my -- my work in the European Union, I signed confidentiality agreements with every one of all those committees to gain full access to these studies.
Q Okay. And how long did you work for Monsanto? How many years?
A It was about 15 years.
Q And you -- you view yourself as an independent consultant?
A Yes.
Q Okay. So the Farm Family Exposure Study that you've been talking about, who funded that study?
A That was a Monsanto designed study.
Q So Monsanto paid for that study to occur?
A And Monsanto executed the study, yeah.

Electronically Filed - City of St. Louis - December 30, 2021 - 10:34 PM

**274. PAGE 252:19 TO 253:03 (RUNNING 00:00:21.929)**

Q Okay. So other than for Monsanto, any other company, have you ever interacted with the EPA, the United States EPA?
A No.
Q So the only time you've interacted with the EPA is in your role as a Monsanto employee?
A Yes. And it was only for one substance, I believe.
Q And what substance was that?
A Acetochlor.

**275. PAGE 253:13 TO 253:17 (RUNNING 00:00:12.652)**

Q You testified that in the Farm Family Exposure, which is Monsanto's paid-for study, that only 40 -- that 40 percent did not have glyphosate in their urine. Was that your testimony?
A Yes.

**276. PAGE 254:05 TO 254:15 (RUNNING 00:00:18.341)**

BY MS. WAGSTAFF:
Q And is it your testimony as you sit here today that POEA is like soap?
A It's a detergent.
Q So is it your testimony that POEA is like soap?
A Well, soap is a detergent. It acts like soap --
Q Yeah.
A -- and soap is a very general name for detergent.

**277. PAGE 254:22 TO 255:02 (RUNNING 00:00:07.670)**

Q So, yes, it is your testimony that POEA is like soap?
A It's like soap --
Q Yeah.
A -- and the right definition is "surfactant."

**TOTAL: 1 CLIP FROM 1 DEPOSITION (RUNNING 02:25:53.247)**

Document received by the CA 1st District Court of Appeal.