1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SCHLESINGER LAW OFFICES, P.A.**
Jeffrey L. Haberman
Sarah J. Schultz
1212 Southeast Third Avenue
Fort Lauderdale, FL 33316
Telephone: (954) 467-8800
Facsimile: (954) 320-9509
jhaberman@schlesingerlaw.com
sarah@schlesingerlaw.com

*Attorneys for Plaintiff, Peter Engilis*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION<br><br>───────────────────────<br><br>Peter Engilis, Jr., *et al.*,<br><br>      Plaintiff,<br><br>vs.<br><br>Monsanto Company.,<br><br>      Defendant.<br><br>───────────────────────<br><br>Individual Case No.: 3:19-cv-07859-VC | MDL No: 2741<br><br>Case No.: 3:19-cv-07859-VC<br><br>PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE THE TESTIMONY OF AMBROSE CHARLES, PH.D.<br><br>Hearing date: January 12, 2023<br>Time: 10:00 a.m. |

1

**TABLE OF CONTENTS**

2

3

TABLE OF CONTENTS.................................................................................................ii

TABLE OF AUTHORITIES .......................................................................................iii

INTRODUCTION ........................................................................................................ 1

BACKGROUND ......................................................................................................... 2

STANDARD OF LAW................................................................................................. 6

ARGUMENT............................................................................................................... 7

    I.      Dr. Charles Is Well-Qualified to Offer General and Case-Specific Opinions. ..........8

    II.    Dr. Charles Applied Reliable Methodologies in Reaching His General and Case-Specific Opinions.........................................................................10

    A. Dr. Charles' General Causation Opinions.........................................................11

        *i. Epidemiology* ............................................................................................11

        *ii. Animal and Genotoxicity/Mechanistic Studies* ...................................12

    B. Dr. Charles's Specific Causation Opinions. ......................................................12

        *i. Dr. Charles's Exposure Days Assessment Is Reliable.* ...................................13

        *ii. Dr. Charles's Specific Causation Assessment Reliably Estimates the Amount of Exposure Based on Use-Data.*................................................16

CONCLUSION...........................................................................................................19

CERTIFICATE OF SERVICE ..................................................................................20

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE
THE TESTIMONY OF AMBROSE CHARLES, PH.D.

# TABLE OF AUTHORITIES

*Page(s)*

**CASES**

*Alesi v. Monsanto Co.,*
No. 19SL-CC03617 (Mo. Cir. Ct. July 22, 2022)....................................................*passim*

*Avila v. Willits Environmental Remediation Trust,*
633 F.3d 828 (9th Cir. 2011) ........................................................................................ 8

*D.F. ex rel. Amador v. Sikorsky Aircraft Corp.,*
No. cv-00331, 2017 WL 4922814 (S.D. Cal. Oct. 30, 2017) ...................................... 8

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
509 U.S. 579 (1993).................................................................................................. 6, 7

*Emblaze Ltd. v. Apple Inc.,*
52 F. Supp. 3d 949 (N.D. Cal. 2014) ............................................................................ 7

*Ferro v. Monsanto Co.,*
No. 20SL-CC03678 (Mo Cir. Ct. Oct. 13, 2022).................................................*passim*

*Hopkins v. Dow Corning Corp.,*
33 F.3d 1116 (9th Cir. 1994) ........................................................................................ 8

*In re Roundup Prod. Liab. Litig.,*
390 F. Supp. 3d 1102 (N.D. Cal. 2018) ...................................................................... 19

*In re Roundup Prods. Liab. Litig.,*
358 F. Supp. 3d 956 (N.D. Cal. Feb. 24, 2019) ......................................................... 14

*In re Roundup Products Liability Litigation,*
364 F. Supp. 3d 1085 (N.D. Cal. 2019) ..................................................................... 12

*In re Toy Asbestos,*
2021 WL 1201231 (N.D. Cal. Mar. 30, 2021)............................................................. 8

*In re Viagra (Sildenafil Citrate) and Cialis (Tadalafil) Prod. Liab. Litig.,*
2020 WL 204115 (N.D. Cal. Jan. 13, 2020) ................................................................ 6

*Johnson v. Monsanto Co.,*
No. CGC-16-550128, 2018 WL 2324413 (Cal. Super. May 17, 2018)................. 10, 17

*Kumho Tire Co. v. Carmichael,*
526 U.S. 137 (1999).................................................................................................. 7, 14

*Lust By and Through Lust v. Merrell Dow Pharma., Inc.,*
89 F.3d 594 (9th Cir. 1996) .......................................................................................... 6

*Massok v. Keller Indus., Inc.,*
147 Fed. App'x 651 (9th Cir. 2005) ............................................................................. 9

*Monroe v. Zimmer U.S., Inc.,*
766 F. Supp. 2d 1012 (E.D. Cal. 2011)................................................................... 9, 10

iii

*Primiano v. Cook,*
   598 F.3d 558 (9th Cir. 2010) ................................................................. 6, 7

*Southland Sod Farms v. Stover Seed Co.,*
   108 F.3d 1134 (9th Cir. 1997) ................................................................ 14

*States v. Garcia,* 7 F.3d 885 (9th Cir. 1993) ................................................. 8

*United States v. Hankey,*
   203 F.3d 1160 (9th Cir. 2000) ................................................................. 6

*United States v. W.R. Grace,*
   455 F. Supp. 2d 1181 (D. Mont. 2006) .................................................. 7


**STATUTES**

Fed. R. Evid. 702 ...................................................................................... 6, 7, 8

Fed. R. Evid. 703 ...................................................................................... 13, 14


**TREATISES**

Eriksson, *Pesticide exposure as risk factor for non-Hodgkin lymphoma including histopathological subgroup analysis*, 123 INT'L J CANCER 7, 1657-63 (July 2008) ..........................................*passim*

George, J., et al., *Studies on glyphosate-induced carcinogenicity in mouse skin: A proteomic approach*, 2010, J. of Proteomics, Vol. 73, 951–64 (2010) ............................... 17, 18, 19

*IARC Response to Criticisms of the Monographs and the Glyphosate Evaluation*, Prepared by the IARC Director (Jan. 2018)................................................................. 16

McDuffie, H.H., et al., *Non-Hodgkin's Lymphoma and Specific Pesticide Exposures in Men: Cross-Canada Study of Pesticides and Health*, CANCER EPI., BIOMARKERS & PREVENTION, Vol. 10, 1155–1163 (Nov. 2001) ....................................................*passim*

Pahwa, M., et al., *Glyphosate Use and Associations with non-Hodgkin Lymphoma Major Histological Sub-Types: Findings from the North American Pooled Project*, Scand. J. Work Environ. Health 45 (2019) ...................................................... 16

Portier, C.J., *A comprehensive analysis of the animal carcinogenicity data for glyphosate from chronic exposure rodent carcinogenicity studies* (2020)............................ 12

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# INTRODUCTION

This motion is but one more in a chain of meritless broadsides against Plaintiffs' experts.  Dr. Charles is a 57-plus year scientist with a Ph.D. in toxicology and medical biochemistry.  He is eminently qualified to opine that Roundup/glyphosate-based herbicides ("GBHs") can cause NHL, and that Roundup did, specifically, cause Plaintiff's respective NHL.  Dr. Charles' general and specific causation opinions are reliable.  He reviewed the epidemiological data that supports a strong causal association between GBHs and NHL. He reviewed the animal data that demonstrates glyphosate causes cancer in animals.  And he reviewed the genotoxic/mechanistic data, which establishes that glyphosate can cause oxidative stress and DNA damage—a mechanism of carcinogenesis.  Courts have accepted this methodology over and again for meeting the threshold on general causation in Roundup litigation.  *See, e.g., Alesi v. Monsanto Co.*, No. 19SL-CC03617 (Mo. Cir. Ct. July 22, 2022) (Order attached hereto as "**Exhibit A**").  In fact, a Missouri court has already rejected all these arguments against Dr. Charles.  *See Ferro v. Monsanto Co.*, No. 20SL-CC03678 (Mo Cir. Ct. Oct. 13, 2022) (Order attached hereto as "**Exhibit B**").

Dr. Charles' case-specific opinions are also reliable.  He reviewed Plaintiff's medical records, fact sheet, and deposition testimony. He relied on the epidemiological studies to conclude that Plaintiff, Peter Engilis, had an increased risk of developing NHL due to his Roundup exposure.  Dr. Charles considered other chemical, environmental, occupational exposures and any other factors that were pertinent in conducting a differential etiology examination for Mr. Engilis.  Several courts in this jurisdiction have found these methodologies reliable and have denied Monsanto's substantially similar motions.  *See Alesi, supra.*  This Court should apply the same holdings and deny Monsanto's motion.

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE
THE TESTIMONY OF AMBROSE CHARLES, PH.D.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BACKGROUND**

**Qualifications.**  Dr. Charles earned a Ph.D. in toxicology and medical biochemistry from the University of Delhi, India in 1974.  *See* Curriculum Vitae of Ambrose Charles, Ph.D. (attached hereto as "**Exhibit C**").  He earned and Master's degree in biochemistry from the University of Baroda, India, in 1970, and a Bachelor's in science, focusing on chemistry and biology in 1963.  *Id.*  Since that time, prior to immigrating to the United States, he had roles as a clinical chemist conducting research, and was a scientific officer in the Council of Scientific and Industrial Research Center for Biochemicals in Delhi, India.  *Id.*  He is board-certified in toxicology and forensic medicine.

In 1980, Dr. Charles joined the faculty at the University of Maryland as a research associate. He was a fellow at the National Institute of Environmental Health Services in Albany, New York from 1981–1983.  For the next four years he was an assistant professor in the department of pharmacology and toxicology at the Albany Medical College.  From 1987–1990, Dr. Charles was a research scientist for the New York State Department of Health Center for Environmental Health.  *Id.*

Then, for the next twenty-one years, Dr. Charles was a toxicologist for the Texas Department of Agriculture.  *Id.*  For fifteen of those years, from 1990–2005, Dr. Charles was the Director and Senior Science Advisor.  *Id.*  In that capacity, he conducted risk assessments for pesticides. Deposition Testimony of Ambrose Charles, Ph.D., in *Ferro v. Monsanto*, 6/28/2022, at 39:8–12, 86:16–24 (attached hereto as "**Exhibit D**").  Dr. Charles was the Deputy Assistant Commissioner from May 2005 through his retirement in August 2011.  Ex. C, Charles CV.  Since retiring, Dr. Charles has maintained a consulting firm in toxicology.  *Id.*

Dr. Charles has performed around 60 risk assessments for pesticides in his time working for the Texas Department of Agriculture.  Ex. D, Charles *Ferro* Dep. Tr., at 95:1–5.  He is an expert in the interpretation of epidemiologic studies.  *Id.* at 44:5–7.  Dr. Charles used epidemiology in his risk assessments and was trained to understand epidemiological literature.  *Id.* at 173:6–23.  In his role as

2

a regulator, Dr. Charles reviewed pesticide and herbicide labels.  *Id.* at 53:10–13.  And he has been asked by EPA to participate in reviewing publications and potential regulations concerning herbicides or and pesticides.  *Id.* at 54:9–24.  Dr. Charles has written about 200+ opinions on human exposure cases for the Department of Agriculture.  About 100 of those involved pesticides.  *Id.* at 35:13–35.24.

Dr. Charles has also conducted studies to determine whether a chemical caused cancer in rodents.  *Id.* at 44:12–14.  For example, when Dr. Charles was working with the Department of Pharmacology and Toxicology at Albany Medical School, where he was assistant professor, he did bioassays involving the chemical Mirex.  *Id.* at 44:15–16.  He has reviewed genotoxic studies and has attended many conferences on genotoxicity during his training as a toxicologist, so he is well-familiar and qualified to read, review, and interpret genotoxic studies.  *Id.* at 135:12–16.

**Methodology.**  Dr. Charles submitted a report on behalf of Plaintiff Peter Engilis.  *See* Expert Report of Dr. Ambrose Charles (attached hereto as "**Exhibit E**").  To reach his general causation opinions, Dr. Charles performed his own literature search on the association between GBHs and NHL.  Ex. E, Charles *Ferro* Dep., at 18:24–19:23.  He evaluated the animal studies and genotoxic studies on glyphosate as well.  *Id.* at 49:3–7.  His report contains a lengthy comment on the relevant literature, the toxicological evidence of GHBs and NHL, genotoxicity of GHBs, mechanism of carcinogenicity, and dose and effect relationship.  *Id.* at 17–20.  Dr. Charles further notes that human epidemiological studies have documented the various aspects of the Braford Hill criteria at, or more than the 95% confidence threshold level that favored a positive association between glyphosate and NHL.  *See id.*  Consistent with his expert disclosure, Dr. Charles opines, to a reasonable degree of medical certainty, that Roundup/glyphosate can cause NHL.

Dr. Charles also opines that Roundup exposure caused or substantially contributed to causing NHL for Mr. Engilis.  *See generally id.*  Dr. Charles' conducted a comprehensive toxicological assessment to reach these opinions based on Mr. Engilis's reported usage:

3

| | |
|---|---|
| 1 gallon container | = 3.785 liters = 3,785 mL. |
| 1 container lasted for | = maximum 4 months. Minimum 2 months. |
| Approx. use duration or period | = About 12 months. |
| No. of containers needed for 1 year | = 3 to 6. = 11.4 to 22.71 Liters. |
| Frequency of use (couple of times a month) | = ~ 24 times/year. |
| Amount (volume) of RU used per Frequency | = 0.475 to 0.946 Liter/spray time. |
| | = 475 ml to 946 ml of RU per spray time |
| Time spent for each spray incident | = 30 min to 1 hour. |
| Total spray time possibly spent per year max. | = 1 hr. x 24= maximum of 24 hr./year spread out in 24 events. |

From the data so far known, an attempt is made to extrapolate the number of average possible work hours or days per year for comparison with an occupational time-weighted average. If Mr. Engilis had spent 24 hours in a year (1 hr. twice a month) applying RU, he would have spent 1,272 hours at a minimum in 53 years on the property locations mentioned above.  This would be equal to about 160 days (Time-weighted Average 8-hr/day) of occupational exposure which corresponds to >3 days TWA days per year.

*Id.* at 11.

In addition, Dr. Charles' case-specific opinions are based on his review of the Plaintiffs' respective medical records, fact sheets and deposition testimony.  *Id.* at 3–8.  He considered the Plaintiffs' duration and frequency of exposure.  *Id.* at 11–12.  He calculated and assessed how much exposure to Roundup the Plaintiffs had.  *Id.* at 10–11.  He also considered the mode of their Roundup application and whether they used any protection.  *Id.*  He conducted a glyphosate exposure assessment.  *Id.* at 9.  He considered the absorption, distribution, metabolism of glyphosate exposure. *Id.* at 13–14.  He considered the mechanism of carcinogenicity.  *Id.* at 16.  He reviewed the literature. *Id.* at 17–20.  He reviewed regulatory data.  *Id.* at 20.  He considered the Plaintiff's medical history and a number of potential confounding or causative factors:

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE
THE TESTIMONY OF AMBROSE CHARLES, PH.D.

### 6. Potential Confounding or Causative Factors

Following is a summary of known statements pertaining to potential Confounding Factors or Potential Exposures. [2,11,16]

| | |
|---|---|
| Family Medical History. | Father 86 yr. died of heart failure. Mother 70 yr. died of brain hemorrhage. Daughter 33 yr. has multiple sclerosis. Paternal uncle died of esophageal cancer. |
| Alcohol Consumption. | He probably had 3-4 beers all years, never a drinker; he has never drunk coffee and does not use soft drinks with caffeine. |
| Smoking History. | He has never smoked, he has never smoked tobacco products, marijuana, or done illegal drugs. |
| Dietary Habits. | Regular |

Ever been diagnosed with HIV, AIDS?  No.
Significant radiological exposures or CT scans prior to NHL treatment?    No.

Ever lived near or adjacent to a Superfund site? No.
Any unusual or chronic gasoline exposures?    No.

*Id.* at 8–9 (analyzing other potential confounding or causative variables).

Dr. Charles used OSHA's Time-Weighted-Average calculations to determine occupational work exposure, which is in line with epidemiological studies like McDuffie (2001)[1] and Eriksson (2008)[2] that show statistically significant increased rates of NHL associated with glyphosate exposure. These peer-reviewed, epidemiologic studies expressly state that considering exposure days of pesticide use is a dose-response calculation. For instance, McDuffie (2001) states: "We created dose-response levels based on days/year of personally mixing or applying selected herbicides," and noted a statistically significant increased risk between glyphosate used and NHL for a dose interval that is exposure for greater than 2 days per year. *See* Ex. E. Eriksson also notes: "Dose-response

---

[1] McDuffie, H.H., et al., *Non-Hodgkin's Lymphoma and Specific Pesticide Exposures in Men: Cross-Canada Study of Pesticides and Health*, CANCER EPI., BIOMARKERS & PREVENTION, Vol. 10, 1155–1163 (Nov. 2001) (attached hereto as "**Exhibit F**").
[2] Eriksson, *Pesticide exposure as risk factor for non-Hodgkin lymphoma including histopathological subgroup analysis*, 123 INT'L J CANCER 7, 1657-63 (July 2008) (attached hereto as "**Exhibit G**").

analyses regarding herbicides in total and glyphosate yielded an increased OR in the higher exposed group." Ex. H. The higher exposed group meant those exposed to 10 or more lifetime days. *Id.*

Dr. Charles relied on these epidemiological studies to conclude that Plaintiff had an increased risk of developing NHL due to his Roundup exposure. Consistent with his expert disclosure, Dr. Charles opines, to a reasonable degree of medical certainty, that Roundup/glyphosate caused Mr. Engilis's NHL.

## STANDARD OF LAW

Fed. R. Evid. 702 controls the admission of expert testimony. Rule 702 provides that a qualified expert may testify in the form of opinions or otherwise if:

> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) The testimony is based on sufficient facts or data;
> (c) The testimony is the product of reliable principles and methods; and
> (d) The expert has reliably applied the principles and methods to the facts of the case.

In the landmark *Daubert* case, the Supreme Court instructed that that "[t]he inquiry envisioned by Rule 702 is . . . a flexible one." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 594 (1993). In determining admissibility, courts consider whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *Primiano v. Cook*, 598 F.3d 558, 563–64 (9th Cir. 2010).

The four *Daubert* factors—testing; peer review; rate of error; and general acceptance—are mere guidelines for applying Rule 702. *See United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2000); *see also Lust By and Through Lust v. Merrell Dow Pharma., Inc.*, 89 F.3d 594, 597 (9th Cir. 1996) ("That the expert failed to subject his method to peer-review and to develop his opinion outside the litigation is not dispositive . . . ."); *In re Viagra (Sildenafil Citrate) and Cialis (Tadalafil) Prod. Liab. Litig.*, 2020 WL

6

204115, at *5 (N.D. Cal. Jan. 13, 2020) ("[E]xpert testimony may still be reliable and admissible without peer review and publication.").

Indeed, the test of reliability is also flexible.  *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).  "The trial court's gatekeeper role, however, is not meant to supplant the adversary system or the role of the jury."  *United States v. W.R. Grace*, 455 F. Supp. 2d 1181, 1188 (D. Mont. 2006).  Rather, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596;

> A trial court thus must be sure that its review of expert testimony focuses solely on principles and methodology, not on the conclusions that they generate.  Daubert and Rule 702 are safeguards against unreliable or irrelevant opinions, not guarantees of correctness.  A judge must be cautious not to overstep its gatekeeping role and weigh facts, evaluate the correctness of conclusions, impose its own preferred methodology, or judge credibility, including the credibility of one expert over another.  These tasks are solely reserved for the fact finder.

*Emblaze Ltd. v. Apple Inc.*, 52 F. Supp. 3d 949, 954 (N.D. Cal. 2014) (internal quotations omitted); *see also Primiano*, 598 F.3d at 565.

## ARGUMENT[3]

The issues presented in Monsanto's motion have been the subject of extensive litigation, especially concerning whether a toxicologist is qualified to testify on general and case-specific causation.  Courts around the country that have considered Monsanto's arguments has rejected them.  Just recently, a Missouri court ruled that Dr. Charles was qualified to offer his general and specific causation opinions in a Roundup case (both at the *Daubert* stage and following his testimony at trial).  *See* Ex. B, Ferro Daubert Order, at 20–24; *see also Ferro v. Monsanto Co.*, No. 20SL-CC03678 (Mo. Cir. Ct. Nov. 9, 2022) (Order on Defendant's Motion for Directed Verdict at the Close of Plaintiff's

---

[3] Section IV of Defendant's Motion also seeks to exclude Dr. Charles from offering "opinions on male reproductive effects allegedly caused by Roundup" or opinions that "Roundup caused or contributed to Plaintiff's bladder or skin cancers."  (Doc. 30, at 19).  Plaintiffs do not intend to offer any such opinions with Dr. Charles.

7

Evidence) (attached hereto as "**Exhibit H**").  In fact, the *Ferro* court ruled on three separate occasions that Dr. Charles was qualified to offer his general and specific causation opinions and that such opinions were formed using a reliable methodology.  *See id.* at 5.

## I.      Dr. Charles Is Well-Qualified to Offer General and Case-Specific Opinions.

To be qualified, the expert must have sufficient "knowledge, skill, experience, training, or education" to offer his opinion(s).  Fed. R. Evid. 702.  So long as the expert's testimony is "within the reasonable confines of his subject area," a lack of particularized expertise generally goes to the weight of the testimony, not its admissibility.  *D.F. ex rel. Amador v. Sikorsky Aircraft Corp.*, No. cv-00331, 2017 WL 4922814, at *14 (S.D. Cal. Oct. 30, 2017) (quoting *Avila v. Willits Environmental Remediation Trust*, 633 F.3d 828, 839 (9th Cir. 2011) and citing *United States v. Garcia*, 7 F.3d 885, 889–90 (9th Cir. 1993)); *see also Hopkins v. Dow Corning Corp.*, 33 F.3d 1116, 1124 (9th Cir. 1994).

Dr. Charles has been a scientist in the relevant field for almost 60 years.  Dr. Charles has a doctorate in toxicology and medical biochemistry.  He served a toxicologist for the Texas Department of Agriculture for 21 years, where he rose from a Director and Science Advisor to the Deputy Assistant Commissioner.  During that time, he conducted numerous risk assessments on pesticides. Dr. Charles is an expert in the interpretation of epidemiologic studies, which he used in his risk assessments. Dr. Charles has also written about 200+ opinions on human exposure cases for the Department of Agriculture.  About 100 of those involved pesticides.  Ex. D, Charles *Ferro* Dep. Tr., at 35:13–24.

Monsanto chiefly argues that Dr. Charles is not qualified to offer opinions in this case (general or case-specific) because he is not a medical doctor.  (Doc. 30, at 9) ("Dr. Charles is not a medical doctor, a pathologist, or an oncologist."); (Doc. 30, at 13) ("Dr. Charles is not a medical doctor.  He is not an oncologist.  And he has never diagnosed or treated cancer.") (citations omitted).  "An expert's job title, however, is not dispositive of his qualifications."  *In re Toy Asbestos*, 2021 WL

1201231, at *3 (N.D. Cal. Mar. 30, 2021) (citing *Massok v. Keller Indus., Inc.*, 147 Fed. App'x 651, 656 (9th Cir. 2005)) ("[A]n expert need not be officially credentialed in the specific matter under dispute."). Dr. Charles is being offered to opine on an exposure assessment to Roundup, and whether that caused NHL in Mr. Engilis. Dr. Charles is not being offered to discuss the treatment of NHL, nor is he performing any medical diagnosis.

Monsanto lodges a similar argument as to Dr. Charles' opinions on the relevant epidemiologic and animal studies related to glyphosate and Roundup, asserting he is unqualified to do so because he is not an epidemiologist. (Doc. 30, at 9). In doing so, Monsanto mischaracterizes Dr. Charles' deposition testimony concerning his qualifications on animal and mechanistic studies. *See id.* Dr. Charles is clearly qualified to read, interpret, and utilize those types of studies as well. Dr. Charles has conducted studies to determine whether a chemical caused cancer in rodents. Ex. D, Charles *Ferro* Dep. Tr., at 44:12–14. For example, when Dr. Charles was working with the Department of Pharmacology and Toxicology at Albany Medical School, where he was assistant professor, he did bioassays involving the chemical Mirex. *Id.* at 44:15–16. He has also reviewed genotoxic studies and has attended many conferences on genotoxicity during his training as a toxicologist, so he is well-familiar and qualified to read, review, and interpret genotoxic studies. *Id.* at 135:12–16.

*Monroe v. Zimmer U.S., Inc.*, 766 F. Supp. 2d 1012, at 1023–24 (E.D. Cal. 2011) is instructive on this point. There, the defendants challenged plaintiff's biostatistician expert, Dr. Wells, arguing that the expert was "not qualified to testify to whether pain pumps can cause glenohumeral chondrolysis . . . because he is not a qualified expert in medicine or epidemiology" and asked the Court to preclude the expert "from testifying about any studies in the epidemiological and scientific literature." *Id.* The Court, however, explained the fact that Dr. Wells was "not an epidemiologist is not at all decisive, as his understanding of statistical principles and methodology relevant to the design and interpretation of epidemiological studies is thorough and clear." *Id.* at 1024. The Court further

9

emphasized that, "[a] no time d[id] Dr. Wells attempt to offer a medical or epidemiological opinion. Rather, he is an expert in applying statistical principles relevant to the design and interpretation of epidemiological studies." *Id.* As a result, the *Monroe* court denied the motion. *See id.*; *see also Johnson v. Monsanto Co.*, No. CGC-16-550128, 2018 WL 2324413, at *15 (Cal. Super. May 17, 2018) (finding toxicologist, Dr. William Sawyer, qualified to offer testimony regarding his conclusions that were based on the plaintiff's exposure to glyphosate, "animal studies pertaining to glyphosate, and human epidemiological studies pertaining to glyphosate.").

The same is true for Dr. Charles. Here, Dr. Charles does not attempt to offer medical or epidemiological opinions. Instead, he uses his experience and training as a toxicologist in reviewing and interpreting epidemiological studies. Ex. D, Charles *Ferro* Dep. Tr., at 135:12–16; *see also* Ex. B, Ferro Daubert Order, at 22 ("[Dr. Charles] is qualified as an expert by knowledge, skill, experience, training or education, based on his Ph.D. in toxicology and medical biochemistry and his decades of experience in academia and government roles . . . The Court finds that Dr. Charles is qualified and may give his initial opinions on general and specific causation.").

## II.  Dr. Charles Applied Reliable Methodologies in Reaching His General and Case-Specific Opinions.

Dr. Charles' opinions rest on good grounds. On general causation, he employed the same methodologies that other experts employed: he relied on the epidemiological data, the animal testing data, and the genotoxic data to opine that Roundup can cause NHL. The same is true for his specific causation opinion. He estimated, based on his calculations from the data Plaintiff provided by way of sworn testimony, the days/year of Roundup exposure and compared that to the peer-reviewed literature that expressly used that methodology to determine dose-response.

### A.  Dr. Charles' General Causation Opinions.

#### i.       *Epidemiology*

As to Dr. Charles' general causation opinions, Monsanto first criticizes for reviewing a "small set of odds ratios" from the epidemiology studies.  (Doc. 30, at 10).  This critique is meritless.  Dr. Charles reviewed the relevant epidemiology studies, including IARC, which Monsanto neglected to mention on this point.  Dr. Charles' reports therefore comprehensively and adequately covers the epidemiology.  In *Alesi*, Judge May rejected Monsanto's argument that the toxicologist did not follow any valid methodology regarding the epidemiology, and held: "Here, Dr. Sawyer's reliance on studies by other experts and organizations, such as the International Agency for Research on Cancer ("IARC"), meets the standard for admissibility.  *See* Ex. A, *Alesi Daubert* Order, at 12.  Just like Dr. Sawyer, Dr. Charles relies on IARC. What's more, though, is that Dr. Charles also relied on the other epidemiologic studies themselves as well.

Monsanto specifically faults Dr. Charles for relying on Eriksson and McDuffie.  (Doc. 30, at 10).  This is puzzling.  There are ample peer-reviewed epidemiological studies which researched the casual relationship between GBH exposure and the development of NHL, with statistically significant results.  And Eriksson and McDuffie are among them—which all Roundup plaintiffs and their experts have relied upon.  Monsanto further criticizes the use of these studies for not adjusting for confounders like other pesticides.  Monsanto seems to imply that this Court excluded any testimony based on *Eriksson* and *McDuffie*—it decidedly did not.  These studies were featured at length in the *Hardeman* trial.  Following the jury's verdict in favor of Hardeman, this Court concluded, "[P]laintiffs have presented evidence from which a reasonable jury could conclude that glyphosate can cause NHL at human-relevant doses."

> It is difficult to see how there could be no evidence that the risks of glyphosate were "knowable" given the Court's denial of Monsanto's motion to exclude the plaintiffs' causation experts...But the Court previously determined that the plaintiffs' experts offered reliable opinions that glyphosate causes NHL, and they

did so relying almost entirely on scientific evidence that existed when the plaintiffs were using Roundup.

*In re Roundup Products Liability Litigation*, 364 F. Supp. 3d 1085, 1089 (N.D. Cal. 2019).

Moreover, other courts have expressly rejected Monsanto's concerns on whether a given study adjusts for exposure to other pesticides.  Ex. A, *Alesi Daubert* Order, at 17 (finding that not adjusting for confounders "relate to the *weight* the fact finder should give to his opinions rather than their *admissibility*.") (emphasis in original).  Courts have also rejected the very type of "cherry picking" data argument or failure to consider the epidemiology literature that Monsanto claims better supports its theory of the case.  *See id.*, at 4–7, 11–12, and 17.  For these reasons, Dr. Charles' use of epidemiologic studies for his general causation opinion is reasonable and reliable.

### ii.    Animal and Genotoxicity/Mechanistic Studies

Monsanto also takes issue with Dr. Charles' reliance on the animal and genotoxic evidence. (Doc. 30, at 12).  Dr. Charles' opinions stem from his review of IARC, the ATSDR and the peer-reviewed academic article by Dr. Portier.  *See, e.g.,* Ex. E, Charles Report, at 35 (citing Portier, C.J., *A comprehensive analysis of the animal carcinogenicity data for glyphosate from chronic exposure rodent carcinogenicity studies* (2020)).  Dr. Charles' ample experience, including his conducting animal bioassays to study a carcinogen, and review of genotoxic studies over the course of his long career, paired with his review of the relevant literature on these issues, well-meets the threshold on admissibility.  *See* Ex. A, *Alesi Daubert* Order, at 12 (holding, "Monsanto's arguments about how Dr. Sawyer interpreted and applied animal studies to reach his conclusion about glyphosate's effect in humans goes towards the weight of his testimony rather than its admissibility and can be property addressed via cross-examination.").

### B.  Dr. Charles's Specific Causation Opinions.

Dr. Charles' specific causation opinion is reliable.  Dr. Charles' conducted a comprehensive toxicological assessment to reach these opinions.  *See id.*; *see also* Ex. D, Charles *Ferro* Dep. Tr., at

12

403:13–407:18.  Based on Plaintiffs' *sworn* testimony, Dr. Charles considered the Plaintiffs' duration and frequency of exposure.  Monsanto's environmental hazard expert, Dr. Olive, similarly accepted Plaintiffs' testimony in his assessments.  Dr. Charles calculated and assessed how much exposure to Roundup the Plaintiffs had.  He considered the mode of their Roundup application and whether they used any protection.  He conducted a risk exposure assessment.  He considered the absorption, distribution, metabolism of glyphosate exposure.  He considered the mechanism of carcinogenicity. He reviewed the literature.  He reviewed regulatory data.  He considered the Plaintiffs' medical histories and exposure against the many factors associated with NHL.  To determine occupational work exposure, Dr. Charles used OSHA's Time-Weighted-Average.  This is in line with epidemiological studies like *McDuffie* (Ex. F) and *Eriksson* (Ex. G) that show statistically significant increased rates of NHL associated with glyphosate exposure.

### i.   *Dr. Charles's Exposure Days Assessment Is Reliable.*

Monsanto takes aim at Dr. Charles' exposure days assessment, that in actuality, is a dose-response analysis.  (Doc. 30, at 13–15).  On this point, Monsanto offers three arguments, none of which are convincing.

First, Monsanto essentially contends that Dr. Charles's exposure days assessment is unreliable because he relied on Mr. Engilis's sworn testimony and "did absolutely nothing to investigate or verify that Plaintiff's claimed exposures were, in fact, reasonable, accurate, or even possible." (Doc. 30, at 13–14).  There is nothing unreliable about relying on Plaintiff's deposition testimony and Plaintiff Fact Sheet—both *sworn* statements that documented Plaintiff's Roundup usage.  It is unclear what more Monsanto is suggesting be done to "verify" the "accura[cy]" of Mr. Engilis's exposures. *Id.*  In any event, Rule 703 specifically addresses this criticism: "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."  Fed. R.

Evid. 703; *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1142 (9th Cir. 1997) ("The fact that [an expert's] opinions are based on data collected by others immaterial.").

Second, Monsanto takes issue with the fact that Dr. Charles based his opinions on the "worst case exposure scenario." (Doc. 30, at 14). Yet, this is what toxicologists like Dr. Charles are trained to do. *See* Trial Testimony of Dr. Ambrose Charles, in *Ferro v. Monsanto*, Day 10, Morning Session (11/1/2022), at 1753:10–1754:7 (relevant portions attached hereto as "**Exhibit I**") ("Q. Okay. Now, when do you do that, or when you did that calculation, do you employ what is called a worst-case scenario approach? A. Yes. . . . Q. Okay. And is that – is that how you were trained? A. Yes. Q. Is that how [the] EPA do[es] that? A. Yeah. Q. Okay. That's the standard way to – to perform that? A. Yes."). In fact, this demonstrates that Dr. Charles employs the same type of methodology in the courtroom as he does in real world toxicological calculations. *See Kumho Tire Co.*, 526 U.S. at 152 (explaining that the touchstone of reliability is whether an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.").

Finally, Monsanto criticizes Dr. Charles's reliance on the McDuffie (2001) and Eriksson (2008) studies because the data points from those studies "were not adjusted for important confounding variables such as exposure to other pesticides." (Doc. 30, at 14). More specifically, Monsanto to points this Court's February 24, 2019 *Daubert* Order, stating that the Order precludes Roundup MDL experts from "testify[ing] that glyphosate is a substantial causative factor for anyone who exceeds two days per year or ten lifetime days of Roundup use, because that conclusion is . . . based on unadjusted data and is thus scientifically unsound and unreliable." *Id.* (citing *In re Roundup Prods. Liab. Litig.*, 358 F. Supp. 3d 956, at 961–62 (N.D. Cal. Feb. 24, 2019)).

What Monsanto neglects to point out is that the Court further addressed this very issue during the *Hardeman v. Monsanto* trial after this ruling on March 4, 2019. *See Hardeman v. Monanto* Trial

Transcript, Vol. 7 (N.D. Cal. Mar. 4, 2019) (attached hereto as "**Exhibit J**").  In clarifying its ruling as to the McDuffie and Eriksson dose response data, the Court held:

> **THE COURT:** Wait a minute. I don't -- I don't agree with that. My pretty clear recollection of Dr. Weisenburger's testimony was that you were -- you spent a lot of time cross-examining him on this floor that he established. What I concluded is, you know, sort of an artificial floor based on these unadjusted numbers that is not appropriate. But his main point was that Mr. Hardeman has been exposed to so much more than that. It doesn't really matter what the floor is. And, you know, the greater the exposure, the greater the risk. And that point I think is -- I think he is allowed to make that point, and I think that the point that I was trying to make in my rulings on specific causation is that -you know, the general point that risk increases with greater exposure can be made by the general causation experts based in part on *McDuffie* and *Eriksson;* but -- and I think I misspoke earlier and said *Hardell* and *Eriksson,* but I meant *McDuffie* and *Eriksson* -- that basic point can be made. And so the specific causation experts can build on that specific point when they are applying this to Mr. Hardeman, but what the specific causation experts cannot say is that -- is that there is a quantification that can be attached to the risk of somebody who uses Roundup a specific amount . . . So -- but all of that is to say that we -- you know, we should lay the ground rules for Dr. Weisenburger, and **the ground rules I think are that he can say what *McDuffie* and *Eriksson* said in his general causation opinion.**

*Id.* at 968:20–971:8 (emphasis added).  Dr. Charles's reliance on McDuffie and Eriksson falls in line with the Court's ground rules

Dr. Charles did his own exposure days analysis based on the sworn testimony provided by Mr. Engilis as to his frequency and duration of Roundup use.  Ex. E, Charles Report, at 11.  "If Mr. Engilis had spent 24 hours in a year (1 hr. twice a month) applying [Roundup], he would have spent 1, 272 hours at a minimum in 53 years on the property locations mentioned above.  This would be equal to about 160 days . . . [of] exposures."  *Id.*  Just like with Dr. Weisenburger in *Hardeman*, Dr. Charles opines that Mr. Engilis "has been exposed to so much more" just the 'floor' of exposure set forth in McDuffie and Eriksson.  *See* Ex. J, at 968:20–971:8. Dr. Charles reasonably relied on these epidemiological studies to conclude that Plaintiff had an increased risk of developing NHL due to his Roundup exposure.  *See* Ex. A, *Alesi Daubert* Order, at 12 ("Dr. Sawyer may testify that Plaintiffs…exposure to Roundup was above the threshold values in the dose-metric studies placing them at a statistically significant risk of developing NHL.").

Moreover, these peer-reviewed, epidemiologic studies state clearly that considering exposure days of pesticide use is a dose-response calculation. The Ericksson study notes: "Dose-response analyses regarding herbicides in total and glyphosate yielded an increased OR in the higher exposed group." Ex. G. The higher exposed group meant those exposed to 10 or more lifetime days. *See id.* Monsanto's own expert, Dr. Brentley Olive, even agreed that this methodology was one used by scientists to measure dose-response.

> ii.     *Dr. Charles's Specific Causation Assessment Reliably Estimates the Amount of Exposure Based on Use-Data.*

Next, Monsanto argues that Dr. Charles' analysis does not account for the actual dose of Roundup Plaintiffs absorbed. (Doc. 30, at 15). This misses the mark. Monsanto pretends that more is needed than an estimated amount of exposure determined by testimony on the frequency and duration of Roundup use. But that's not the case. Monsanto's argument here is really nothing more than a doubt campaign on the utility of the various epidemiologic studies that show positive associations between glyphosate and NHL and assess dose and risk in real world situations. The fact remains that epidemiological studies "by definition deal with people exposed in daily life, including work. The studies frequently consider the gradient of risk observed with different levels of exposure." *IARC Response to Criticisms of the Monographs and the Glyphosate Evaluation*, Prepared by the IARC Director (Jan. 2018) (attached hereto as "**Exhibit K**").

*McDuffie* (2001), for example, calculated a dose-response from questionnaires that characterized exposure to individual pesticides. *Eriksson* (2008) employed a similar methodology. *Pahwa* (2019),[4]—another study that showed a positive association between GHBs and NHL that Dr. Charles relied on—also gathered information from self-reporting participants. None of these studies

---

[4] Pahwa, M., et al., *Glyphosate Use and Associations with non-Hodgkin Lymphoma Major Histological Sub-Types: Findings from the North American Pooled Project*, Scand. J. Work Environ. Health 45 (2019) (attached hereto as "**Exhibit L**").

accounted for dose in the manner that Monsanto seems to unilaterally require, by measuring a person's blood stream or urine.  (Doc. 30, at 15).

Dr. Charles testified his calculations were not based on actual dose, as he defined it, because he did not have data in the form of excretory elimination—in other words, no urine analyses were done on the Plaintiffs.  Ex. D, Charles *Ferro* Dep., at 31:24–32:12.  But, Dr. Charles clarified that based on use-data, it was reasonable to assume a systemic dose.  *Id.* at 32:16–23. This is exactly in line with the epidemiological studies that Dr. Charles relies on.  Monsanto's argument therefore is the classic strawman, which the Court should reject.

### III.    Dr. Charles' Opinions on the George Study are Reliable.

Monsanto also argues that Dr. Charles should be precluded from testifying about the George tumor promotion study.[5]  (Doc. 30, at 17).  Monsanto made identical arguments in *Johnson* when seeking to overturn the jury's verdict and secure a new trial, to no avail.  *See Johnson v. Monsanto*, Memorandum of Points and Authorities in Support of Defendant Monsanto Company's Motion for New Trial, 2018 WL 4904750, at *15 (Cal. Super., Sept. 18, 2018); 2018 WL 4904751, at *7 (Cal. Super., Sept. 18, 2018) (both citing the plaintiff's reliance on the George study as a basis for disturbing the jury's finding, which the court ultimately rejected when upholding the verdict):

> In the George, J., et al., (2010) carcinogenicity study, glyphosate was demonstrated to have strong tumor-promoting activity. The study documented carcinogenic effects of glyphosate using a 2-stage mouse skin carcinogenesis model and proteomic analysis. The commercial formulation of Roundup Original (glyphosate 41%, POEA = 5%, Monsanto Company, St. Louis, MO, USA) was topically applied to the skin of mice with a body weight of 12-15 g. The glyphosate dose was 25 mg/kg body weight and was applied either two or three times per week . . . .
> The study demonstrated, to within 95% certainty, the carcinogenic potential of glyphosate as a powerful promoter in a two-stage promotion model. The authors concluded in their results section that "These results clearly indicate significant tumor promoting potential of glyphosate in mouse skin model of carcinogenesis."

---

[5] George, J., et al., *Studies on glyphosate-induced carcinogenicity in mouse skin: A proteomic approach*, 2010, J. of Proteomics, Vol. 73, 951–64 (2010) (Doc. 30-10).

17

1
2
3
4
5
6
7
8
9

 As several other courts have done, this Court should overrule Monsanto's objections regarding the George study.  *See* Ex. A, *Alesi Daubert* Order, at 9, 13 (permitting plaintiff's toxicologist to testify on the George study despite Monsanto's argument that the study "has been rejected as inadequate for scientific analysis.).  Monsanto's concern of whether Dr. Charles was relying on IARC for his testimony on the George study is without merit.  Dr. Charles has an entire section in his report dealing with glyphosate as a cancer promoter.  *See* Ex. E, Charles Report.  Indeed, a toxicologist may rely on studies such as IARC for his or her opinions, and that meets the standard for admissibility. Ex. A, *Alesi Daubert* Order, at 12.  Thus, Dr. Charles may rely on IARC for this section.

10
11
12
13
14
15
16
17
18
19
20
21

 With respect to the reliability of the George study, Dr. Charles will testify that 100 mice actually received <u>control</u> solvent (ethanol/acetone)—groups II, IV, V, VI, VII—were without any evidence of papillomas.  Thus, the reliability of this study with respect to the Monsanto's alleged "so called" missing control group is in error and not an issue.  Furthermore, Dr. Charles will explain that the reason various organizations did not use the study to determine whether glyphosate <u>is a carcinogen</u> is that the study was not designed to do so; it followed generally accepted methodology to determine if glyphosate had cancer <u>promotion</u> properties.  It was not a standard animal carcinogenesis bioassay as required in determination of animal chemical carcinogenicity.  The study did not follow the standardized animal bioassay design for carcinogenicity (for example did not have sufficient number of animals per group and terminated animals at 32 weeks—different study protocol than used in the standard animal carcinogenesis bioassay).

22
23
24
25
26
27
28

 Dr. Charles will also testify that defendant's criticism with respect to the study as "universally discredited" is a distortion and a fallacy.  Nowhere in the peer-reviewed toxicological literature has this study been criticized on its merits.  Dr. Charles will explain the methodology as used in the George, et al. study as a well-known and generally accepted procedure.  Finally, Monsanto's argument that the George study is unsupported by human evidence is also meritless.  Animal studies support the consistency of the association between Roundup/glyphosate and NHL, as well as the biological

plausibility, coherence and experiment criteria of Bradford Hill factors as well.  *See In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d 1102, 1127–29 (N.D. Cal. 2018) (noting that the animal studies and genotoxic studies are pertinent to the biological plausibility criterion that is part of the Bradford Hill analysis).  Dr. Charles' application of the George study is thus reliable and highly relevant to the issues at the core of this case, and, as in the *Johnson* trial, should be admitted to assist the jury.

**CONCLUSION**

For the foregoing reasons, this Court should deny Monsanto's Motion to Exclude the Testimony of Dr. Ambrose Charles, and grant such other and further relief this Court deems just and proper.

DATED:  December 14, 2022                    Respectfully submitted,

                                             */s/ Jeffrey L. Haberman*
                                             JEFFREY L. HABERMAN (*pro hac vice*)
                                             **SCHLESINGER LAW OFFICES, P.A.**

                                             *Attorneys for Plaintiff, Peter Engilis*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 14, 2022, I served a copy of the foregoing on the Clerk of Court by CM/ECF, which will provide automatic notification to all parties and counsel of record.

By: <u>*/s/ Jeffrey L. Haberman*</u>
Jeffrey L. Haberman

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE
THE TESTIMONY OF AMBROSE CHARLES, PH.D.