# EXHIBIT E



**TOXFACTOR**
**Toxicology Consulting**

**Ambrose K Charles, PhD., MSc., FACFEI**
Toxicologist / Consultant

Fellow, American College of Forensic Examiners Institute
Diplomate & Board Certified in Toxicology and Forensic Medicine

June 23, 2022

**Peter Engilis Report prepared for and submitted to:**

Attorney Jeffrey L. Haberman
Schlesinger Law Offices
1212 Southeast Third Avenue
Fort Lauderdale, Florida 33316

   **Re:** Peter Engilis: Case No. 1:19-cv-07859-VC, United States District Court, Northern District of California.

I have reviewed all pertinent documents[1-16] related to the Plaintiff Mr. Peter Engilis, provided to me by the **Schlesinger Law Offices**, Fort Lauderdale, Florida, which are considered as facts in this case. The toxicology review, analysis, opinions, and interpretations offered here are based on the facts, and the sources from the scientific literature as well as my professional knowledge, expertise, and best scientific judgment.

The nature and extent of 'Engilis' exposure to pesticides and other possible chemical substances will be addressed in the following sections of the report. His exposure scenario could not be justified as under "occupational," but as "residential" from his use description. The following aspects are carefully and objectively deliberated in my assessments are using generally accepted toxicological principles and methodology and are meant to establish:

  a.  if a hazardous work environment existed for potential toxic exposure,
  b.  if harmful pesticide constituents or other toxic chemicals were present in Engilis' locations of work or at home,
  c.  if the time and duration of exposure coincided with his health or work history,
  d.  if the claimed chemical(s) has contributed to his exposure,
  e.  if the potential chemical exposure probably caused his health problems (toxic outcomes),
  f.  if a reliable dose and effect relationship exists between his exposure and observed health effects,

g.  if the health effects were acute (short-term) and/or chronic (long-term) in nature,

h.  if selected personal protective equipment (PPEs) were used by the person, and finally,

i.  if potential confounding risk factors may have contributed to the onset of Chronic Lymphatic Leukemia - CLL (a subtype of  Non-Hodgkin's Lymphoma-NHL).

## IN THIS REPORT

|     |                                      | Page |     |     |                                      | Page |
| --- | ------------------------------------ | ---- | --- | --- | ------------------------------------ | ---- |
| 1.  | Peter Engilis Case Narrative         | 2    |     | 13. | Personal Protective Equipment        | 12   |
| 2.  | Employment/Work History              | 3    |     | 14. | Absorption, Distribution, Metabolism, and Elimination | 13   |
| 3.  | Peter Engilis Medical History        | 3    |     |     |                                      |      |
| 4.  | NHL Diagnosis & Pathology            | 4    |     | 15. | Other Chemicals                      | 15   |
| 5.  | Other Medical Conditions             | 8    |     | 16. | Human Exposure & Health Risks        | 16   |
| 6.  | Potential Confounding Factors        | 8    |     | 17. | Epidemiological Evidence/NHL         | 17   |
| 7.  | Pre-Existing Conditions              | 9    |     | 18. | Toxicological Evidence/NHL           | 20   |
| 8.  | Glyphosate Exposure Assessment       | 9    |     | 19. | Dose Effect Relationship             | 20   |
| 9.  | Chemical – Glyphosate/Uses           | 9    |     | 20. | Evidence Linking to NHL              | 24   |
| 10. | Locations / Mode of Application      | 10   |     | 21. | Conclusions & Probable Causation     | 27   |
| 11. | Frequency & Duration                 | 11   |     |     |                                      |      |
| 12. | Probable Routes of Exposure          | 12   |     | 22. | Documents & References Cited         | 30   |
|     |                                      |      |     |     | Affirmation & Signature              | 33   |

## 1.   Peter Engilis Case Narrative

Mr. Peter Engilis is presented here as a 71-year-old man, married, born in Buffalo New York, who moved to Fort Lauderdale, FL in 1965, and worked in and owned a real estate company in Florida since 1980. He owned a health care company, 'Preferred Care' for many years and now returned to commercial real estate. He has been diagnosed with urinary bladder cancer twice, skin cancer melanoma, and Non-Hodgkin's Lymphoma (NHL- subtype chronic lymphocytic leukemia (CLL). Prior to 2014, he was a very active person with regular exercise and had a healthy lifestyle riding bicycle 150 miles a week, playing tennis and golf, and seasonal skiing in Colorado. He stopped all these activities in 2018 after his cancer diagnosis of lymphoma and melanoma. He now suffers from anxiety disorder and chronic fatigue and works part-time as his health condition permits. He is on scheduled follow-up visits with his health providers. A review is requested of the case to examine if the suggested chemical (Roundup) exposure probably has a role in causing his adverse health problems.[11,16]

## 2.  Employment / Work History

12/2015 to Present. Self-employed, Real Estate Sales - Salesperson. Balistreri Real Estate Fort Lauderdale, FL.

03/2008 to 02/2018. Self-employed, Administrator of "Home Care Provider." PCC Universal Inc. Debary, FL.

07/1990 to 03/2008. Self-employed, Salesman of new homes, Manned model homes. LQH of Florida Inc. Deltona, FL.

_____

Roundup® (RU) was NOT used at any of these self-employed real estate or health care jobs.

## 3.  Peter Engilis Medical History

Mr. Engilis' medical issues started with a pain in his arm with fatigue that restricted his routine and work schedule much during the end of 2014 and in 2015. He stopped going to work every day.[16] He had bladder cancer and melanoma/skin cancer. He then was diagnosed with chronic lymphocytic leukemia [a](CLL) which he did not know for years that it was a form of non-Hodgkin's lymphoma.[b] He is in too much pain that he is embarrassed and refuses to attend to his own personal or social obligations. He gets occasionally chills and cold sweats at night.[16]

***Notes***

[a]"Stage 1A T1a": Chronic lymphocytic leukemia (CLL) does not usually form tumors. It's generally in the bone marrow and blood. And, in many cases, it spreads to other organs such as the spleen, liver, and lymph nodes by the time it is detected. The outlook for a person with CLL depends on other data, such as the results of lab test and imaging tests. The Rai system of classification followed in the U.S. is based on lymphocytosis. The patient must have a high number of lymphocytes in their blood and bone marrow that is not linked to any other cause (like infection). For a diagnosis of CLL, the overall lymphocyte count does not have to be high, but the patient must have at least $5,000/mm^3$ monoclonal lymphocytes (sometimes called a monoclonal lymphocytosis). Monoclonal means that the cancer cells all came from one original cell. This causes them to have the same chemical pattern which can be seen with special testing. This system divides CLL into 5 stages based on the results of blood tests and a physical exam. **Rai stage 1 Lymphocytosis**, as in Engilis's case, is described as "no enlargement of the lymph nodes, spleen, or liver; red blood cell and platelet counts are near normal but has to be monitored regularly." [1]

[b]Lymphoma is a cancer that begins in the infection-fighting cells of the immune system, called lymphocytes. These cells are in the lymph nodes, spleen, thymus, bone marrow, and other parts of the body. At the start of lymphoma, lymphocytes change and grow out of control. There are two main types of lymphoma: (1) Non-Hodgkin: Most people with lymphoma have this type; (2) Hodgkin: Non-Hodgkin and Hodgkin lymphoma involve different types of lymphocyte cells. Every type of lymphoma grows at a

different rate and responds differently to treatments. Lymphoma is very treatable, and the outlook can vary depending on the type of lymphoma and its stage. A medical approach can help find the right treatment for your type and stage of the illness. (ACS 2022)[1]

## 4.  Medical Diagnosis and Pathology

A summary of Mr. Peter Engilis' diagnosis of health issues from the medical records is given below.[1-10] From 2014 to date he has been dealing with continuous health problems – bladder cancer, melanoma/skin cancer,  and chronic lymphocytic leukemia – a form of non-Hodgkin's lymphoma. The major ones are the sporadic occurrences of cancerous lesions in different areas of his body since 2014 from the age of 64. He has a high-stress lifestyle and had a history of GERD, dyslipidemia, and hypertension.

o  **Bladder Cancer**

Mr. Engilis was first diagnosed with bladder cancer in 2014 by Dr. Frank Mari MD (Primary Care), following a regular visit for detecting blood in the urine, for which he was treated. The bladder cancer recurred within a year. [16]

7/25/2014. CT scan of abdomen and pelvis showed a 3.9 cm mass within the right posterior urinary bladder. A follow-up visit with Dr. Stephen Weiss MD.
His bladder cancer was treated with surgery both times to remove the tumors.[7]

9/17/2014. Dr. Wiess Urologist did cystoscopy on 8/11/14 and 8/25/14 with TURBT. He had a cystoscopy and TURBT (bladder tumor resection and biopsy) at the Advanced Urology Institute, Daytona Beach, FL.[7]

2/10/15. Follow-up after the bladder tumor biopsy and resection (TURBT) done by Dr. Weiss. Pathology showed a papillary urothelial neoplasm of low-grade malignancy. This type of tumor does not require frequent surveillance and has a better prognosis.[7]

o  **Melanoma / Skin Cancer**

April 2014. He went for a regular check-up, and he had an irregular spot on his arm and Dr. Mari noticed it. The next cancer he was diagnosed with was melanoma on his arm. Dr. Mari diagnosed his melanoma by skin biopsy. Dr. Mari sent him to Dr. Walter Haynes and Dr. Shoukas.[16] It was less than the size of a dime, but it was deep which is why they needed a plastic surgeon to close it up. Dr. Hayne removed the melanoma and Dr. Shoukas closed the wound. (Dr. James Shoukas MD).[5]

10/17/2014.  Mr. Engilis had a punch biopsy done of the left dorsal forearm with the finding of a malignant melanoma Clark's level IV at least 1.2 mm in length. (FC Specialists). Dr. James Shoukas finds no lymphadenopathy of his left maxilla, reports about a 2x2 cm palpable lymph node on his left neck (on 10/13/14 at the Lake Mary Plastic & Reconstructive Surgery), and he recommends a wide local excision of the sentinel lymph node to be done by Dr. Walter Hayne at the Adventist Health Systems, FL.[1]

Pathology Report showed malignant melanoma identified as non-risk pathologic "Stage 1A T1a", but requested a complete removal of the lesion extended to peripheral margins (Dr. Manojkumar Patel MD).[1,2,3,9]

11/3 /2014. Dr. Hayne advised systemic treatment with limited surgical excision and after the CAT scan results Engilis may be referred to Dr. Victor Melgen MD, a head and neck surgeon. Dr. Melgen's differential diagnosis was "an infectious reactive lymph node from upper respiratory tract or secondary malignancies, especially of the head and neck including thyroid. [1,2,3,9] (Dr. Stephen Weiss MD).

11/7/2014. A  PET/CT whole-body scan (FC Specialists) showed a conspicuous number of non FDG avid sub centimeter lymph nodes within the bilateral neck and bilateral axillae, also a mild hypermetabolic enlarged lymph node at the lower right jugular region. (Dr. Vivek Gupta MD). Dr. Melgen interpreted it as less likely to represent melanoma, considering the very mild degree of uptake within these lymph nodes, and suggested evaluating for distant metastasis.

11/26/2014. Dr. Walter Haynes[1] performed a wide excision of left arm melanoma and sentinel node biopsy. Nuclear medicine lymphatic imaging of the lymph node was done at the Florida Hospital Fish Memorial.

Pathology Report: Histological evaluation and diagnosis of Sentinel Node left axilla was "Chronic Lymphocytic Leukemia/Small Lymphocytic Lymphoma (CLL/SSL). No evidence of metastatic melanoma. The pathologic AJCC Stage is **1A-T1a** based on the re-excision specimen only as original tumor biopsy findings were not evaluated. The pathology report was consulted with Washington University pathologists and concurred with the findings. (Dr. Louis Dehner MD).[2,3]

February 2021. Mr. Engilis was diagnosed with basal cell carcinoma in February 2021 and had a Mohs surgery. He had a spot on his forehead that did not heal and went to a dermatologist, and he did a biopsy by Dr. Richardson in Fort Lauderdale.[16]

o **Chronic Lymphocytic Leukemia – Non-Hodgkin's Lymphoma**

12/8/2014. The pathology diagnosis of CLL[c] and malignant melanoma was analyzed from an oncological perspective as "Stage 1 (T1aN0) superficial spreading melanoma of the left forearm and CLL on sentinel lymph node as "Stage 1 T1a). The assessment was the CLL will be monitored closely every 3 months and no further treatment is required now for both conditions. (Dr. Santosh Nair MD).[1,2,3,9]

3/9/2015. With the history of early-stage superficial bladder cancer status post fulgeration, there is no evidence of any melanoma and the CLL appears to be stable. Dr. Nair ordered iron studies, B12, folic acid as well as thyroid functions tests. Mr. Engilis reported extreme fatigue. (Dr. Santosh Nair MD).[4]

7/22/2019.  Mr. Engilis met with the oncologist Dr. Barreras for worsening dysphagia, night sweats and low-grade fevers. Dr. Barreras observed that he was diagnosed with CLL in 2015 never was treated and was told to watch and wait but now the disease symptoms have clinically progressed. "Mr. Engilis is very worried." Molecular status of the leukemia is unknown. Recommends: flow, FISH studies, CT scan, may need FCR chemotherapy. (Dr. Luis Barreras MD).[4]

7/31/2019.  CT scan of  soft tissue neck showed (1) Enhancing and necrotic right level 2 and level 3 lymphadenopathy with concerns for metastatic lymph nodes, (2) Soft tissue fullness with no evidence of a discrete lesion involving the posterior laryngeal wall at the level of the false cords. Direct visualization is recommended, (3) Diffusely prominent cervical lymph nodes, and (4) Chronic left maxillary sinusitis. (Dr. George Georgakakis MD).[6]

8/12/2019.  Dr. Barreras noted the patient has extensive adenopathy in the neck area bilaterally as well as small lymph nodes in the axilla and groin areas. Of note, level 2 and level 3 lymph nodes on CT, on the left side are necrotic (usually CLL does not cause this). This is the same side (L) as the melanoma removed from the left forearm. Dr. Barreras reported that  Mr. Engilis is complaining of occasional choking sensation likely due to multiple neck nodes. The drenching sweats are progressing, and he has been

having episodes of severe fatigue that can come on at any time. He has been seeing a psychiatrist/psychologist for this as well.[4]

Physical examination showed bilateral nodes in the neck anterior triangle easily palpable 2 cm, post triangle, easily palpable bilateral axillary nodes 2-3 cm in size. Suspects all the nodes in the neck are likely related to CLL and is suspicious of the necrotic notes therefore he is being referred to ENT for possible lymph node sampling because he wants to make sure that this is not related to melanoma, if all the nodes turn out to be CLL, believes treating this patient with a *possible FCR regimen that would be appropriate* vs Ibrutinib orally. Need to obtain FISH molecular studies.

- o **Psychological Evaluation**

4/3/2018.  Mr. Engilis was directed to a psychological diagnostic interview for his anxiety and panic attacks for the last two years which are becoming worse now. He was deeply anxious about his medical issues of bladder cancer, his surgeries, diagnosis of leukemia which he thinks "the leukemia is not curable and could get worse." He had a follow-up visit on 4/12/18 when he was advised to manage with coping skills such as 5-senses mindfulness, radical acceptance, and encouraging self-talk. He quit his subsequent follow-up visits with the psychologist. (Dr. Jamie Long).[8]

- o **Other**

He has been seeking specialists to help with his anxiety issues starting in 2018 or 2019. His wife is very much worried about him and his fear of cancer because he never had anxiety before.[11]

**Notes:**
(MD Anderson) CLL is a slow-growing type of leukemia. CLL develops from B cells. B cells start out as lymphoid stem cells, then mature into adult B cells, which help fight disease. In CLL, a cancerous B cell grows and multiplies in the bone marrow, lymph nodes, liver, and spleen, resulting in a high white blood cell count. These cancerous cells are not able to fight infection. They also crowd out healthy cells from the marrow and cause enlargement of lymph nodes, liver, and spleen. As a chronic disease, CLL is less aggressive than acute forms of leukemia. The presence of specific genetic mutations and proteins produced by the diseased cells, however, can have a big impact on the patient's prognosis. This disease primarily impacts older patients and is nearly unheard of in children.[18]

### 5.  Other Medical Conditions

Mr. Engilis has never been diagnosed with any of the other medical conditions, complaints, or diseases for which he has been treated, hospitalized, or taken *medications for his illnesses, thus eliminating the use of regular or long-term pharmaceutical drugs, supplements, or other specific systemic treatments. Therefore, these are not suggested as related to or causative factors to the onset of different types of cancers in Engilis' case. Other Medical Conditions listed below were reported as 'Negative'.[1-10,16]

| | |
|---|---|
| Auto-immune diseases(including but not limited to Crohn's disease, Ulcerative Colitis, HIV) | Immunosuppressive Medications |
| | Lupus |
| | Obesity |
| Celiac disease | Organ transplant/stem cells |
| Diabetes | Psoriasis |
| Eczema | Rheumatoid Arthritis |
| Epstein-Barr virus | Thyroiditis/Hashimoto's |
| Hepatitis B or C | Ulcers |

### 6.  Potential Confounding or Causative Factors

Following is a summary of  known statements pertaining to potential Confounding Factors or Potential Exposures.[2,11,16]

| | |
|---|---|
| Family Medical History. | Father 86 yr. died of  heart failure.<br>Mother 70 yr. died of brain hemorrhage.<br>Daughter 33 yr. has multiple sclerosis.<br>Paternal uncle died of esophageal cancer. |
| Alcohol Consumption. | He probably had 3-4 beers all years, never a drinker; he has never drunk coffee and does not use soft drinks with caffeine. |
| Smoking History. | He has never smoked, he has never smoked tobacco products, marijuana, or done illegal drugs. |
| Dietary Habits. | Regular |

Ever been diagnosed with HIV, AIDS?   No.
Significant radiological exposures or CT scans prior to NHL treatment?      No.

Ever lived near or adjacent to a Superfund site?  No.
Any unusual or chronic gasoline exposures?      No.


### 7.  Pre-existing conditions prior to NHL-CLL diagnosis

Engilis' medical history notes that he has hypertension, anxiety, bladder cancer, left arm melanoma, and depression. It appears that the CLL was diagnosed at the same time he was treated for melanoma. He had no apparent past medical history and was reported to be having a healthy and active life until the cancer diagnosis.[11,16]


### 8.  Glyphosate Exposure Assessment

It is very critical to assess the exposure to Glyphosate or Roundup® (RU) since Mr. Engilis has used this chemical continuously at his residences for at about 30 years from 1985 to 2016.[16] Glyphosate and its various formulations are referred hereafter to as GBH (glyphosate-based herbicides). His RU exposure appears to occur by multiple short-term (acute) contact and multiple prolonged (about 26 years) contact. Dermal contact and possibly mild inhalation appear to be the major route of exposure to glyphosate in his case. This observation is consistent with Engilis' statements on personal uses of RU. In the following sections, the extent and possibility of Engilis' exposure to Roundup® are assessed in view of his long-term personal use of RU.


### 9.  Chemical - Glyphosate/Uses

Glyphosate[d] is chemically "phosphonomethyl amino acid (salt)" and sold as a commercial and residential broad-spectrum herbicide in different concentrations for weed control, more explicitly it is widely used both on agricultural and non-agricultural settings. Roundup® (RU) is a ready-to-use product that generally contains about ~ 1% of glyphosate as an active ingredient in its various formulations which also usually contain co-formulants (labeled as 'inert ingredients') or as surfactants and additives.[19] APG (alkyl polyglucoside), POE-APE (polyoxyethylenealkyl ether phosphate), and QAC (quaternary ammonium compound) are examples of such inert ingredients.[17]



[d] Chemical Structure of Glyphosate

Mr. Engilis started using Roundup Weed & Grass Killer from June 1990 in his residential properties including his rental house in Summerfield, Florida, and at his condo in Fort Lauderdale.[11,13,16] He only used ready-to use product (~1%) for residential use, not for commercial. He used it to kill noxious weeds and poison ivy. He estimates he bought Roundup every two to four months. He stopped using it in 2015 Roundup because he was sick. The product was liquid and came in a gallon container with a built-in hand pump and wand trigger sprayer with an end nozzle where it could be adjusted for a fine spray or a fan-type spray. He used the fan setting for the mulched areas 2-3 feet away. At their current property, she would estimate he sprays about half an acre.[11]

He sometimes removed the dead weeds and rake them with the leaves in the fall and winter, but he had a lawn guy who cut the grass, did the edging, and trimmed the trees in all his properties. He read the label, and remembers it said not to use it if it was raining.[16]

## 10.  Locations & Mode of Application

Mr. Engilis lives at present in DeBary, FL since May 1990 (~32 years); before this he also lived in different locations in Florida - Ft Lauderdale (1974-1984), Boca Raton (1984-1990), and Summerfield (2008-2013). The current lot is 20,000 square feet with the lawns in the front and the back. He would spray all along the edges on the left side of the property, about 200 feet and about 2-3 feet wide.[16]

He would use Roundup a one-gallon container which lasts for 2-3-4 months, sprays couple of times a month and taking approximately half an hour to spray the yard. In the back of the property where the trees are, there are all these islands, so he used Roundup in the islands. At the very back of the lot where there was about a 30-foot buffer that was heavily wooded, and it got overgrown so he would spray there as well. There are about 5 islands which would be several thousand square feet combined. The buffer area which is the property line at the back before you get to the golf course is about 100 feet in length, the depth of the area he sprayed was about 30 feet and he would typically spray the entire area with Roundup. He would spray that area at least once a month.

He would also spray the edge of his driveway which along with the islands in the back were the most prevalent areas, so he probably sprayed those two areas more frequently than he did the back buffer area. He would also spray where in the front where the sidewalk is going to the front door, he would spray the area where the shrubs are which is

maybe 8-10 feet deep. The amounts he sprayed in that area varied. On the right side of the house, there's a strip between the grass and the house where there are pavers, and sometimes there would be weeds and he would spot spray there. There was also a section about 16 feet long where he had shrubs and he would spray in there. He also sprayed behind the porch, which was about 30 feet. He would spray the ground around the bushes. There would be cracks in the sidewalk and sometimes he would use the little sprayer there. This use history reflects about 32 years of his RU spraying.

The other properties where lived, though, differed in area wise (one-third to a half-acre) and nature, the use pattern, frequency, and time of spraying were around 20-30 minutes per spray. The estimate below is attempted to know the approximate amount of the material and the total time he spent on the property maintenance free of weeds.[16] Engilis' use pattern appears to be moderate level possibly spraying about 475 to 946 ml (i.e., half a liter to one liter of 1% RU) at one RU use.

| | |
|---|---|
| 1 gallon container | = 3.785 liters = 3,785 mL. |
| 1 container lasted for | = maximum 4 months. Minimum 2 months. |
| Approx. use duration or period | = About 12 months. |
| No. of containers needed for 1 year | = 3 to 6. = 11.4 to 22.71 Liters. |
| Frequency of use (couple of times a month) | = ~ 24 times/year. |
| Amount (volume) of RU used per Frequency | = 0.475 to 0.946 Liter/spray time. |
| | = 475 ml to 946 ml of RU per spray time |
| Time spent for each spray incident | = 30 min to 1 hour. |
| Total spray time possibly spent per year max. | = 1 hr. x 24= maximum of 24 hr./year spread out in 24 events. |

## 11. Frequency & Duration

From the data so far known, an attempt is made to extrapolate the number of average possible work hours or days per year for comparison with an occupational time-weighted average. If Mr. Engilis had spent 24 hours in a year (1 hr. twice a month) applying RU, he would have spent 1,272 hours at a minimum in 53 years on the property locations mentioned above.  This would be equal to about 160 days (Time-weighted Average 8-hr/day) of occupational exposure which corresponds to >3 days TWA days per year.

### 12.  Possible Routes of Exposure

The clothing worn during the normal operation is given under PPEs No other routes of exposure other than dermal or inhalational could be ascertained. Mr. Engilis would spray Roundup in shorts, a long-sleeve T-shirt, and old boat shoes. and would be "barefoot" most of the time. He started being more careful by wearing thin plastic gloves (prevent contact with poison ivy) and shoes sometime after 2010. He might wear blue jeans depending on the temperature. He would wear sunglasses at times or "something" covering his eyes.[11,16] Occasionally he would wear safety goggles and wear a disposable mask. After finishing using Roundup, he would put the bottle back in the garage and then go in the kitchen and wash his hands with soap every time. After doing yard work he would change his clothes in the garage and shower. He would wash his clothes before wearing them again. He doesn't remember ever feeling Roundup on his skin and his wife never saw him getting Roundup on himself while spraying it. From his habit of walking barefoot on the grass while spraying and wearing shorts most of the time over years, the most likely route of exposure is through dermal absorption or through inhalation. More details will also be discussed elsewhere in the report.[11,16] (See also Section 15 for ADME)

### 13.  Personal Protective Equipment (PPEs)

Mr. Engilis statements show he has been walking barefoot and wearing shorts (occasional blue jeans), T-shirts long sleeved, old boat shoes, plastic gloves, and sunglasses. He has taken some measures of personal protection, though cannot be considered as prescribed PPEs. , except wearing his own eyeglasses (not safety glasses). Importantly, in Florida weather, he wore shorts and thin plastic gloves and not rubber gloves while walking barefoot during the spray activity.[16]

RU® Safety Data Sheet (MSDS)[20] is freely available online that directs "Wash hands thoroughly with soap and water after handling and before eating, drinking, chewing gum, using tobacco, using the toilet, or applying cosmetics. Remove Personal Protective Equipment (PPE) immediately after handling this product. Remove soiled clothing immediately and clean thoroughly before using it again. Wash thoroughly and put on clean clothing. Keep working clothes separately. Garments that cannot be cleaned must be destroyed (or burnt)."

MSDS also continues the use of PPEs – "In normal use and handling conditions please refer to the label and/or leaflet. In all other cases the following recommendations would apply.

Respiratory protection. When respirators are required, select NIOSH approved equipment based on actual or potential airborne concentrations and in accordance with the appropriate regulatory standards and/or industry recommendations.

Hand protection. Please observe the instructions regarding permeability and breakthrough time which are provided by the supplier of the gloves. Also take into consideration the specific local conditions under which the product is used, such as the danger of cuts, abrasion, and the contact time. Chemical-resistant gloves (barrier laminate, butyl rubber, nitrile rubber or Viton) Wash gloves when contaminated. Dispose of when contaminated inside, when perforated or when contamination on the outside cannot be removed. Wash hands frequently and always before eating, drinking, smoking, or using the toilet.

Eye protection Use tightly sealed goggles and face protection."[20] Consumers remarkably are not well protected because the product label provides no such adequate instructions.


## 14.  Absorption, Distribution, Metabolism, Excretion (ADME)

Toxicological profile by ATSDR[19] summarizes the fate of GBHs in humans as readily absorbed - from the gastrointestinal tract (ingestion), through the skin (dermal), and from the respiratory tract (inhalation) - and distributed via blood but does not accumulate in any particular organ or tissue. It does not undergo significant metabolism in mammals; <1%  is metabolized to aminomethylphosphonic acid (AMPA). Most of the absorbed chemical is rapidly excreted in the urine.

Connolly et al. (2020)[21] discuss the glyphosate levels in urine found in occupational studies among farmers, amenity horticulturists, and pesticide production workers. The average glyphosate concentrations reported for farmers and horticulturists ranged within rather small boundaries from 1.35 µg/L to 3.2 µg/L. The maximum values ranged from approximately 10 µg/L to 233 µg/L, the highest being detected among farm families (based in South Carolina and Minnesota) while 60% of farmers urine samples analyzed had detectable levels of glyphosate. Recent human metabolism data has reported as low as a 1% urinary excretion rate of glyphosate. Human exposures extrapolated from urinary

glyphosate concentrations found that upper bound levels may be much closer to the ADI than previously reported. Back-calculations based on animal-derived excretion rates suggested that there were no health concerns in relation to glyphosate exposure (when compared with European acceptable daily intake (ADI).[cf.21]

There are several studies, therefore, that could be cited[cf.19] with different levels of urinary values of glyphosate or AMPA in occupationally exposed workers (farmers, forestry, applicators) or in experimental animals. However, Connolly et al.[21] postulated that two different considerations of monitoring data may be applied to the toxicity and toxicokinetics of glyphosate and AMPA: both measures are necessary for environmental exposures as opposed to preferably glyphosate in occupational exposure cases. Lacking any glyphosate monitoring levels (urine or blood) in Engilis' records it is impossible to numerically determine his exposure level of glyphosate through blood or urine measurements. However, there is possible evidence from his use history that Engilis had been exposed to RU on a use or spray event basis, primarily through skin and inhalation exposure through many use years. From his statements, it appears that Engilis had no clear understanding of the chemical exposure and its inherent toxicity or health effects.

The 2005 EPA Guidelines for Carcinogen Risk Assessment[22] agrees that valuable insights ADME and pharmacokinetics (rates of ADME) of a chemical may provide into the likelihood of human cancer risk from exposure to a chemical. Also, understanding the chemical's mechanism of toxicity, potential for accumulation of the substance in tissues and/or organs relevant data to extrapolation of animal toxicity data (particularly chronic toxicity and/or carcinogenicity data) to estimate human health risks.

The U.S EPA ADI of a combination of glyphosate and certain metabolites (AMPA, N-acetyl glyphosate, and N-acetyl AMPA) for humans is 1.0 mg/kg, higher than European ADI. In 2011, the International Estimated Daily Intake (IEDI) of glyphosate and major metabolites was estimated to range from 0-2% of the ADI. The chronic EPA reference dose for glyphosate is 2.0 mg/kg/day. Reference Dose (RfD): The RfD is an estimate of the quantity of chemical that a person could be exposed to every day for the rest of their life with no appreciable risk of adverse health effects. The reference dose is typically measured in milligrams (mg) of chemical per kilogram (kg) of body weight per day.[19]

## 15.  Other Possible Chemical Exposures

Mr. Engilis has not used other pesticides or insecticides other than Raid for a roach. He admitted in his deposition as a non-smoker.[16] He also denied other exposures or circumstances such as possible occupational exposure to industrial chemicals nor had personal habits, meaning no drugs or substance abuse.[16]

Table 5. The list of other possible exposures was tabulated below from Mr. Engilis' deposition and Fact Sheet:

**Habitual Exposures**

- o   Alcohol
- o   Tobacco products other than 'cigarettes'
- o   Marijuana
- o   Illegal drugs – No.

**Occupational/Industrial Exposures**

- o   Car Mechanic – No.
- o   Cleaning/Maid Service – No.
- o   Electrician – No.
- o   Farming/agricultural – No.
- o   Hairdressing - No.
- o   Handled fission products – No.
- o   Handled jet propellant - No.
- o   Handled solvents - No.
- o   Horticultural – No.
- o   Hospitals and Clinics – No.
- o   Landscaping – No.
- o   Metal Working - No.
- o   Painting - No
- o   Pest Exterminator -.No.
- o   Pesticide use – Yes  Raid for cockroaches and wasps.
- o   Petroleum Refinery - No.
- o   Rubber Factory - No.
- o   Schoolteacher – No.
- o   Textile - N0
- o   Woodworking – No.
- o   X-radiation or gamma-radiation (regular exposure) – No.

## 16.  Human Exposure and Health Risks

From a regulatory perspective, EPA used the most current science policies and risk assessment methodologies to assess the risks of glyphosate. The EPA assessed risks to humans from exposure to glyphosate from all registered uses and all routes of exposure and did not identify any risks of concern, unlike that of IARC. Both noncancer and cancer effects were evaluated for glyphosate and its metabolites, aminomethyl phosphonic acid (AMPA), and N-acetylglyphosate. The agency concluded that there are no dietary, residential, nonoccupational bystander, aggregate, or occupational risks of concern, and also no concern of cumulative risks as the chemical does not share a toxic common metabolite or mechanism of toxicity to humans with any other substances.[23] EPA, therefore, on the basis of reviewing available epidemiological, animal carcinogenicity, and genotoxicity data for human carcinogenic potential, has made a regulatory decision that glyphosate is "not likely to be carcinogenic to humans."[24]

Contrary to EPA's decision, the International Agency for Research on Cancer (IARC)[25] evaluated glyphosate and grouped it as Group 2A, "probably carcinogenic to humans" based almost on the same set of toxicological databases. Although both the regulatory agencies have scientific arguments and conclusions in favor their decisions regarding the cancer-causing effects of glyphosate, it necessitates a brief discussion on this prior to establishing any possible linkage between NHL and glyphosate exposure.

Interestingly, pesticide regulatory authorities in Canada, Japan, Australia, and the European Union have completed independent carcinogenicity assessments that reached similar conclusions on carcinogenicity as that of the U.S. EPA. The U.S. National Institute of Health's National Toxicology Program has also found "no evidence of glyphosate causing damage to DNA."  The Joint Meeting on Pesticide Residues of the Food and Agriculture Organization of the United Nations and the World Health Organization's assessment determined that glyphosate is 'unlikely' to pose a carcinogenic risk from exposure through the diet.[25] These regulatory determinations and resulting regulatory standards, however, should be understood as tools to take protective measures to the general population or a subsegment of the population. It does not guarantee individual risk protection that is subjective to many factors.

## 17.  Epidemiological Evidence for NHL

There is a common scientific consensus that epidemiological studies may shed some light on the relationship between pesticide exposure and the etiology of NHL. The following is a brief review of seven such papers: they are Eriksson, et al. (2008),[26] McDuffie, et al. (2001),[27] Andreotti, et al. (2018),[28] Leon, et al. (2019),[29] Zhang, et al. (2019),[30] Pahwa, et al. (2019),[31] and Boffetta et al. 2021.[32]

o   Eriksson et al.[26] reported in a <u>case-control study</u> probing 'exposure to pesticides as a risk factor for NHL' in Sweden from 1999 to 2002 (a 29-month period). They also conducted histopathological evaluations of 819 confirmed B-cell lymphoma tissue samples that also included 239 specimens of diffused large B cell lymphoma (DLBCL) sub-type. The results showed that exposure to glyphosate gave a significant odds ratio (OR) of 2.36, 95% Confidence Interval (CI) 1.04–5.37, for >10 years latency period (post exposure). The data included 17 cases and 9 control subjects and suggested that glyphosate exposure was associated with a statistically significant increased OR for lymphoma (NHL) and the result was strengthened by a tendency to dose-response effect. Dose-Response analysis regarding herbicides in total and glyphosate yielded an increased OR in the higher exposed group.

o   McDuffie et al.[27] reported a Canadian <u>case-control study</u> investigating the association of specific pesticides and NHL found that certain herbicides had a statistically significant risk to NHL (phenoxy-herbicides, OR 1.38 and dicamba, OR 1.88), especially among those reported exposure of 10 hours per year or more. Interestingly, glyphosate OR was not far different from these numbers. Among 114 subjects using Roundup and phosphonic acid-containing mixtures, the OR ranged from 1.26 to 1.47, which further suggested that glyphosate exposure is equally contributing to an increased risk to NHL like those herbicides mentioned above.

o   Andreotti et al. [28] published an updated prospective AHS <u>cohort study</u> consisting of 54,251 licensed pesticide applicators from Iowa and North Carolina, with 82.8% reporting the use of glyphosate. The study included data also from the previous AHS glyphosate study (2005)[cf:15] as well as cancer incidence registries through 2012 and estimated incident rate ratios adjusting for potential confounders such as the use of other pesticides. Among the number of 54,251 applicators, 5,779 incident cancer cases were identified; glyphosate was not statistically associated with cancer at any site. However, among applicators in the highest exposure quartile, there was an

increased risk of acute myeloid leukemia compared with never-users (RR 2.44, 95% CI 0.94-6.32). The overall conclusion of this report was that "no association was apparent between glyphosate and any solid tumors or lymphoid malignancies including NHL and its subtypes," although the authors acknowledged some evidence of increased risk of acute myeloid leukemia among the highest exposed group.

o  Leon et al.[29] investigated the relationship between the occurrences (risks) of lymphoid malignancies and the lifetime (self-reported) pesticide uses from combined data obtained from >300,000 farmers and agricultural workers from France, Norway, and the USA. They included 14 pesticide chemical groups consisting of 33 individual active chemical ingredients to estimate cohort-specific hazard ratios (HR) and CIs which were then combined using random-effects meta-analysis to calculate meta-HRs. While the findings suggested no association of meta-HRs in most cases (2,430 diagnosed NHL cases out of 316,270 farmers), remarkably 'moderately elevated' meta-HRs were seen for glyphosate use and DLBCL (1.36; 95% CI 1.00-1.85). The authors of the report concluded that there exists a chemical (pesticide) specific association with a specific NHL subtype. In other words, glyphosate exposure could be very specific in inducing (a statistically-elevated risk of clinical significance) NHL subtype – DLCBL – diffuse large B-cell lymphoma, the most common type of NHL.

o  Zhang et al.[30] conducted a meta-analysis study to determine whether there was an association between high cumulative exposures to GBHs and increased risk of NHL in humans. This data included the most recent update of the Agricultural Health Study (AHS)[38] cohort of more than 50,000 American pesticide applicators along with five case-control studies.[cf.17] The overall meta-relative risk of NHL in GBH-exposed individuals was seen to increase by 41% (meta-RR 1.41, 95% CI 1.13-1.75). Remarkably, this study also found a consistent high meta-RR of 1.45, 95% CI 1.11-1.91 among high-exposure groups reported in an earlier AHS report.[cf.17] The authors suggested that from the meta-analysis of six human epidemiological studies and evidence from experimental animal and mechanistic studies, there is compelling evidence of a link between exposures to GBHs and increased risk of NHL.

o  Pahwa et al.[31] in a pooled case-control study assessed the associations between glyphosate use metrics and NHL incidence, overall, and by histological sub-types. NHL cases were obtained from cancer registries and hospitals (between 1991 and 1994) in four U.S. states and six Canadian provinces. By performing statistical analysis of 1,690 NHL cases as compared to 5,131 controls considering the impacts

many possible variable factors such as age, sex, use of other pesticides, ever/never uses, duration, frequency, etc. NHL histological subtype characteristics as diagnosed in these cases comprised of a majority – 38% - (647/1690) of the samples with the presence of DLBCL (diffused large B-cell lymphoma). People who 'ever-use' GBHs had an excess of NHL overall (OR 1.43, 95% CI 1.11-1.83) with a statistically significant association for handling glyphosate >2 days/year (OR 1.73, 95% CI 1.02-2.94). The 'never use' frequency of >2 days/year had an association with excess diagnosis of DLBCL (OR 2.14, 95% CI 1.07-4.28). This 'limited evidence' or 'suggestive associations' of NHL-DLBCL and GBH use should not be ignored when considering individual susceptibility to NHL probably exposed to or caused by an external agent in an occupational environment.

o   Boffetta et al.[32] recently did a systematic and comprehensive review of all available 15 relevant epidemiological publications including the above-mentioned studies discussed in this report and performed a random-effects meta-analysis. The results reinforced their previous conclusion "of a lack of an association between exposure to glyphosate and risk of NHL overall, although an association with DLBCL cannot be ruled out." This observation confirms the change in the authors' previous view[11] of a questionable or possible association with DCBCL to a probable association with DCBCL.

o   In summary,

| Study/Report | Study Type | Odds Ratio/ Hazard Ratio (OR / HR) | Dose Intervals | Observations/Association of Glyphosate to CLL/DLBCL |
|---|---|---|---|---|
| Eriksson et al. | Case-control | OR 2.36  95% CI 1.04-5.37 | >10 days/yr. | Significantly elevated OR |
| McDuffie et al. | Case-control | OR 1.26 – 1.47 | >2days/yr | Statistically increased risk |
| Andreotti et al. | Prospective Cohort | RR 2.44  95% CI 0.44-6.32 (relative ratio) | -- | Some evidence of increased risk. |
| Leon et al. | Cohort | HR 1.36  95% CI 1.0-1.85 | -- | Moderately elevated hazard risk and meta-risk. |
| Zang et al. | Cohort/Case-control | RR 1.41 95% CI 1.13-1.75 | Sufficient latency | Significant increase in GBH exposure. |
| Pahwa et al. | Case control | OR 2.14 95% CI 1.07-4.28 | 3.5 days/yr | Suggestive association with limited evidence |
| Boffett et al. | Meta-analysis of 4 studies | RR 1.29   95% CI 1.02-1.63 | -- | An association with DLBCL cannot be ruled out. |

See WHO B-cell Classification under Risk Factors

EPA 2020[23] recently reviewed the meta-analysis of Zhang et al. 2019[30] and Leon et al. 2019[29] to update its 2017 Registration Review of glyphosate[33] and found several strengths and limitations in these studies. EPA was revisiting the relationship of pesticide use and human risk of NHL. EPA's conclusions or significant findings were that these studies did not impact its previous regulatory conclusions and remain supporting that glyphosate is "not likely to be carcinogenic to humans". However, all seven (7) primary human epidemiological studies discussed above postulate a cause-and-effect correlation, i.e., glyphosate exposure had a limited, cautious, suggestive, or significant association and tendency toward the causation of NHL. In a few cases, the studies identified a significant increase in a specific type of NHL – CLL, and DCBCL. The degree of association differed only due to the data strength and possible co-exposure factors. While statistically the 'population/group analysis' is of significance and importance to decipher the probability, practically it does not identify the one individual like Mr. Engilis who had cancers in different systems.

NHL Latency Interval (NLI) of reported exposure to Roundup® to the date of diagnosis of CLL/NHL is about 24 years, as he began using RU in 1990. . His diagnosis of NHL was while he was still healthy and active in his self-employment.

### 18. Toxicological Evidence of NHL

It is contextual to examine the known or possible toxicity of glyphosate considered by regulatory agencies to approve its registered uses.

o **Acute (Short-Term) Toxicity**

A common measure of acute toxicity is the lethal dose ($LD_{50}$) or lethal concentration in air or water ($LC_{50}$) that causes death (resulting from a single or limited exposure) in 50 percent of the treated animals.[34] Glyphosate and formulated products generally have low oral toxicity (Lethal $Dose_{50}$) in rats (4,320 mg/kg), mice (10,000 mg/kg), and in goats (3,530 mg/kg). when ingested. The acute oral $LD_{50}$ in rats is greater than 4320 mg/kg. A similar trend of low toxicity was found in dermal tests in rabbits (2 g/kg), but eye irritation tests in rabbits showed a mild eye irritation that was cleared within a week. It was not found to be a skin sensitizer. As a surfactant herbicide – acute ingestion can cause toxic syndrome – mucosal and gastrointestinal irritation, hypotension, metabolic acidosis, pulmonary insufficiency, and oliguria.

Acute inhalation $LC_{50}$ in rats is greater than 4.43 mg/L based on a 4-hour, nose-only inhalation study(low toxicity), while isopropylamine form of was greater than 1.3 mg/L. Chemicals are considered highly toxic when the $LD_{50}/LC_{50}$ ratio is small and practically non-toxic when the value is large. Inhalation of spray mist may cause oral or nasal discomfort, as well as tingling and throat irritation. However, the $LD_{50}/LC_{50}$ does not reflect any effects from long-term exposure (i.e., cancer, birth defects or reproductive toxicity) that may occur at levels below those that cause death. [19, cf:34]

- o **Signs of Toxicity in Humans**

Data on acute human toxicity symptoms are identified from cases of suicide attempts or accidental ingestions. Typical symptoms are erosion of the gastrointestinal tract, dysphagia or difficulty swallowing, and gastrointestinal hemorrhage. Eye and skin irritation have occasionally been reported from dermal exposure to glyphosate formulations. However, adverse health effects are typically associated with the exposure that occurs while mixing a concentrated product, not the use of dilute spray solutions. Permanent ocular or dermal damage is very rare. Inhalation of spray mist may cause oral or nasal discomfort, as well as tingling and throat irritation. After ingestion of large volume, oral-pharyngeal, mucosal, GI irritation, hypotension, pulmonary insufficiency, metabolic acidosis, and oliguria are reported, presumably caused by the acute ingestion of the surfactant in the formulation. Tachycardia, tachypnea, and significant hyperpyrexia are not usually observed clinically in such cases. However, profound hypotensive shock observed in many of the non-survivors combined with a relative absence of hypovolemia suggests a direct cardiotoxic effect, even death may be associated with severe hypotension, shock, renal failure, or respiratory distress syndrome. Clinically, although at a dose of 5-50 ml of glyphosate in a person may result in no complaints or physical abnormalities, even a small dose of 0.5 ml/kg may result in a risk of serious symptoms in some individuals. (Ellenhorn[29a.]).

- o **Chronic (Long-Term) Human Health Effects**

EPA's (2021) evaluation found no risks of concern to human health from current uses of glyphosate. After evaluating numerous studies from a variety of sources, the Agency found no indication that infants, children, or women are more sensitive to glyphosate. from *in utero* or post-natal exposure. EPA also found no risks of concern for children entering or playing on residential areas treated with glyphosate. On the contrary, IARC

presented "sufficient'' evidence from chronic experimental animals for glyphosate causing cancer, with stronger supporting evidence for causing genotoxicity. The real-world long-term exposures experienced by human populations to a variety of formulations of glyphosate as well as taking all of this into evidence together, the IARC Working Group classified glyphosate as "probably carcinogenic to humans" (Group 2A). Unlike EPA's, this classification of glyphosate is based on "limited" evidence of cancer in humans (from exposures that actually occurred) and "sufficient" evidence of cancer in experimental animals.

o **Genotoxicity**

A thorough evaluation for potential genotoxicity of glyphosate technical and formulations has been done by ATSDR of all available *in vitro* and *in vivo* data on human, animal, and bacterial cell lines.[cf.19] Though ATSDR characterized them as equivocal, there are several studies that showed glyphosate induced significant cellular changes in humans: chromosomal aberrations in peripheral blood lymphocytes, cytotoxicity, decrease in mitotic activity, induction of sister chromatid exchange in lymphocytes, increased frequency of micronuclei, DNA damage in human fibroblasts, human GM38 cells, human HT1080 (fibrosarcoma) cells, human Raji cells, double strand breaks in human lymphocytes, DNA methylation levels, apoptosis of blood mononuclear cells, and oxidative DNA damage due to occupational exposure. To demonstrate the significance, one study on Raji cells is found to cause DNA damage even at a low exposure concentration of 1 or 5 mM for 30 to 60 minutes, with a possibility of subsequent DNA repair. Succinctly, DNA damage in human cells was the most frequently reported clearly positive results from available *in vitro* assays that employed glyphosate formulations.

Similar DNA damage effects were also reported from studies on mice and rats at leukocytes, kidney, and liver cells.[cf.19] However, it should be noted that some agencies, organizations, and/or expert panels (including EPA 2017 and EFSA 2015)[cf.19] have reviewed available genotoxicity data and concluded that the data do not support a genotoxicity role for glyphosate, at least at concentrations relevant to human exposure. In contrast, IARC (2017) concluded that there is strong evidence for the genotoxicity of glyphosate.

o **Male Reproductive Effects**

Specifically interesting to this Engilis' report, there are also studies suggesting adverse non-genotoxic reproductive effects on human and animals associated with glyphosate exposure.[cf:4] *In vitro* incubation of human sperm with glyphosate or RU showed significantly low sperm motility and mitochondrial dysfunction. Moreover, rodent studies frequently reported reproductive effects in male rats with increased incidence of prostatitis following chronic exposures, a significant decrease in abnormal sperm rate, increased testes malondialdehyde levels, decreased glutathione levels, DNA damage in sperm cells, decreased sperm concentration, and degeneration of Sertoli cells in testes, and increased abnormal sperm morphology, etc. These findings particularly indicate glyphosate effects and interference on male reproductive organs and the system. Its effects on kidney functions and the urinary system are not understood.

○ **Mechanism of Carcinogenicity**

The earlier sections exploring the ability of glyphosate or Roundup® to cause cancer obviously showed certain evidence of genotoxicity which is the first stage in cancer formation. A mice study using topical application of dimethylbenz[a]anthracene (DMBA; a tumor initiator) followed by multiple dermal applications of the glyphosate formulation resulted in the formation of skin tumors in 40% of the DMBA + glyphosate treatment group; the first tumor appeared at 130 days compared to no tumors observed in the control group. The results indicate that the glyphosate formulation functioned as a tumor promoter, but not a tumor initiator or complete carcinogen. [Cf:4] There are several more studies in animals to show that glyphosate would cause splenomegaly and organ dysfunction including lytic bone lesions, renal, liver, lung, and kidney damage. Glyphosate also promoted the progression of multiple myeloma in Vk*MYC mice as shown by the development of plasma cell neoplasms. Upregulation of activation-induced cytidine deaminase (AID), a B-cell genome mutator, in bone marrow and spleen was exhibited in wild-type and MM model mice in both acute and chronic study duration (ATSDR 2020)[4]

While it is recognized that glyphosate causes NHL and induces genotoxic effects in human lymphocytes, carcinogenic effects in rodents, and acts as a B-cell genome mutator, its effects on genetic polymorphisms in oxidative stress genes are not well understood and yet to be studied.[cf:37]

In assessing the overall carcinogenicity of glyphosate-based products, several national and international agencies and organizations have analyzed many of the same studies.

These evaluations nevertheless provide different types of determinations: some focus on hazard identification, or whether there is evidence that a chemical can cause an effect, and others focused on carcinogenic risks or the likelihood of cancer effects at levels of exposure typically experienced by humans. In addition, there are large numbers of unpublished guideline studies on glyphosate and the inclusion or exclusion of these may account for the differences in the conclusions reached by these various agencies.[4] Besides establishing regulatory safety guidelines, such studies are useful to explain the causation of cancer in one individual adversely affected by the chemical.

### 19.  Dose and Effect Relationship

The dose-effect relationship is the most fundamental and pervasive concept in toxicology, establishing with reasonable certainty that the effect is related to the dose of the chemical. While epidemiology-survey data use 'relationship of associations' to explain or relate the dose-effects, pharmacology and toxicology disciplines explain 'dose-response' by primarily using experimental data. A reasonable presumption is that any toxic health effect seen is the result of exposure to a known or unknown toxic agent: i.e., (a) there is a chemical that interacts with the system to produce a response (effect), (b) the response and degree of response are related to the concentration of the toxic chemical agent, and (c) the concentration, in turn, must be sufficient (or higher) to elicit a response. This must be the case in most 'residential or occupational exposures' where the actual chemical concentration may never be known nor measured. when the exposures occur in real-time. Realistic exposure assessment depends on the accurate estimation of both doses (exposures) and health effects related to toxicity.

In Engilis case, he was very healthy and active and did not feel any major symptoms for years of his life. However, as repeated exposures occurred, he seriously became ill and symptomatic prior to being seen at Adventist health Systems, Florida. It is, therefore, reasonable to assume, in the absence of previous medical history, that his low-level chemical exposures probably caused many different cancer lesions that began in 2014. This situation may point to a relationship between the chemical doses he received (repeated exposure) and the resulting magnitude of health effects consequential to the exposure.

### 20.  Risk Factors / Evidence Linking to NHL

Toxicological observations and opinions discussed in this assessment show, to a reasonable degree of medical and scientific probability, that Engilis' exposure to RU caused or substantially contributed to causing NHL- CLL subtype, and also his other cancers.

The observation that he used limited protection and lack of protective equipment and poor hygienic practices (walking barefoot) during the chemical uses appear to be indicating inadequate precautions as well as poor hygienic practices. This raises a concern that multiple short-term and/or long-term uses and ensuing contacts would contribute unknowingly to a sustained systemic level of the chemical, though not measured by laboratory methods.

The absorption, distribution, metabolism, and excretion (ADME) and the mechanisms in which the Roundup mixtures are absorbed, distributed to bone marrow and other locations, retention time in such tissues prior to metabolism and excretion are well documented in the literature and reviews.

Research studies - generally-accepted, peer-reviewed – on many markers of genotoxicity identified in different human *in vitro* and *in vivo* systems are referenced in this report. Under the mechanisms of action, glyphosate has been shown to be a promoter of carcinogenesis in experimental animal studies.

Human epidemiolocal studies that have documented the various aspects of the Bradford Hill criteria at, or more than the 95% confidence threshold level have favored a positive association of glyphosate and NHL, especially its specificity to subtypes of NHL. Although such studies had differences in internal statistical designs, meta-analysis, and bio-statistical methodologies employed within each study (which EPA describes as limitations), epidemiologists generally concur with their observations and conclusions on the potential effects of glyphosate. Few of these studies, although do not show significant associations, particularly consider the NHL prevalence among a large population of glyphosate-exposed individuals in the United States, Canada, and several European countries.

The elimination of other concurrent medical conditions, pre-existing medical conditions, possible other exposures, confounding risk factors – all narrow down to the only known

long-term chemical (glyphosate) exposure in Engilis' case, thus RU is the causing agent for NHL-CLL.

Engilis' clinical NHL diagnosis and latency of about 26 years of chemical use and exposure coincide with the minimal latency period discussed in the epidemiological studies. It is noteworthy that studies by Eriksson, et al., (2008) found an increased effect estimate for subjects with more than 10 years of glyphosate exposure prior to diagnosis of NHL, thus favoring a longer NHL latency interval. Interestingly, Pahwa et al. reported consistent evidence of increased SSL among people exposed for >3 years even with shorter latency period.

WHO Classification (World Health Organization).  of **B-cell lymphoma** subtypes based on histological diagnosis: [cf:26]

   a.  Lymphocytic lymphoma/B-CLL(SLL/CLL),
   b.  Follicular grade I-III FL,
   c.  Diffused Large B-Cell Lymphoma,
   d.  Other specified B-cell lymphoma, and unspecified B-cell lymphoma.

In Peter Engilis' case, his diagnosis of CLL is described as a major-specific aggressive subtype.

**CLL risk factors:** A risk factor is anything that increases the chance of developing a disease. Knowing a disease's risk factors can be an important step towards catching it early. It's important to note that not everyone with risk factors will develop the disease. Risk factors for CLL include:[38]

   a.  Family history: People with a parent, sibling or child who has had CLL are more likely to develop the disease.
   b.  Age: Almost 90% of new CLL cases are diagnosed in people aged 55 and older.
   c.  Sex: More men develop CLL than women.
   d.  CLL is more common among white and Black people, while it is very rare among people of Asian descent.
   e.  Agent Orange: Exposure to this chemical is a known risk factor for CLL. (MD Anderson).
   f.  Chemicals: Adding to the above-listed risk factors, scientific literature suggests certain chemicals also as potential risk factors. [MyoClinic, 2022].

As indicated before, Mr. Engilis has developed various types of cancerous lesions at different stages of his life. While searching for a cause or finding answers for the onset of his disease, the medical reports suggest many potential contributing risk factors (as mentioned above), including the epidemiological correlations of exposure to Roundup®. In this context, certain clinical findings by cancer experts are worthwhile to discuss Engilis' health conditions.

Remarkably Zhu et al. 2019.[39] reported that the CLL malignancy he found in his patients is possibly the responsible factor for the increase in secondary tumors such as "prostate cancer". In the case of Mr. Engilis, his skin cancer has been identified concurrently with the diagnosis of CLL. From the clinical discussions of oncologists, it is unclear to decipher which cancer started first (i.e., which one is primary or secondary). Zhu et al.[25] have further added that CLL could initiate likely 'secondary tumors' such as prostate cancer. In the course of time, his chemical use/exposure for a prolonged time probably have triggered the lymphocytes to express into a distinctly diagnosable lesion CLL in 2014 together with his melanoma; Zhu et al postulated that CLL could initiate secondary cancer, as there are animal studies indicating glyphosate as a promoter to carcinogenesis.

Two recent reviews and comprehensive analyses of the relevant carcinogenic properties/ studies of glyphosate and its contribution to NHL deserve further attention.[37,39] These reports analyzed all associated scientific literature (human, animal, and epidemiological), historical data on neoplastic lesions, and mechanistic evidence and presented clear evidence and a significant trend showing that glyphosate causes hemangiosarcomas, kidney tumors, and malignant lymphomas in experimental animals, clearly supporting the IARC's conclusions of carcinogenic effects of glyphosate. [Weisenburger, 2021; Portier, 2020].

## 21.  Conclusions and Probable Causation

The observations, assessments, and the discussion presented above would lead to certain objective conclusions based on toxicologic and scientific principles while probing for probable causes of Engilis' clinical diagnosis and the circumstances that triggered it. It must be cognizant that work conditions at one workplace may not fully represent other localities due to many uncertain hygienic and exposure factors. Evidently, the key facts known from the records are to be carefully considered:

i.  Peter Engilis worked in in a corporate environment in real estate and health care business for up to his entire work life. From 1990, he worked he started using the herbicide glyphosate was regularly (biweekly basis) at his properties and later his health condition deteriorated to the extent that he needed several surgeries and treatments

ii.  Engilis was about 64-65-year-old when he was diagnosed with NHL –" stage 1A-T1a" CLL (NHL, Non-Hodgkin's Lymphoma) of the sentinel node of left axilla. Evidential factors and objective toxicological evaluation would suggest that his regular Roundup® handling and exposure probably were related to NHL/CLL onset and diagnosis.

iii.  NHL has specifically affected Engilis' axillary nodes area along with cancer of the skin appearing on his arm and neck areas; scans and investigations revealed no other organs were affected (although metastasis was doubted by the oncologists). The early and timely diagnosis and treatment were very critical in his total recovery from urinary bladder cancer.

iv.  Medical records were not indicative of other medical conditions that may have possibly concurrently existed or contributed to the onset of NHL, thus these are ruled out as probable causes.

v.  It is evident that Engilis has been using Roundup® Ready-to-Use 1% spray containers, and directly sprayed on brushes and weeds at weekly intervals especially throughout the year, especially in the Florida weather.

vi.  Estimating by the OSHA Time-Weighted-Average (TWA 8 hr./day), Engilis with 26 years of daily grounds-keeping work (biweekly spray use of RU) would be equal to a TWA occupational work exposure for >3 days, based on the duration and frequency of herbicide use. In such a case, the chemical intake into the body (daily dose) would be rationally constant and at a much high level as expected in the 'use scenario'. The human epidemiological studies have demonstrated statistically significant increased rates of NHL associated with glyphosate exposure even at 2 TWA days.[32] These studies include<10 days and greater than 10 days, further substantiating with a toxicological certainty that glyphosate would have contributed to his development of CLL and secondary cancers.

vii.  Engilis has not used any of recommended PPEs for handling pesticides but was wearing only casual attire – the same shorts, t-shirt, sneakers, soaks, etc. for the whole day, suggesting that he was not adequately protected any time at the work for decades of glyphosate use. The label instructs that "Do not apply this product

in a way that will contact workers or other persons, either directly or through drift; Only protected handlers may be in the area during application."

viii.  Absorption: It is evident from his statements that Engilis always had direct contact exposure with Roundup® through skin and inhalation especially by walking barefoot and wearing shorts. This would result in a prolonged daily (chronic) dermal contact exposure and establishing a direct pathway of systemic exposure.

ix.  Dose-Response: Potential impact of glyphosate effects on Engilis' health (and the work environment) depends on how much herbicide he is exposed to (dose), duration, and frequency of exposure, general health of a person, and/or various accompanying exposure factors (sex, age, sensitivity). His pattern of RU use affirms undeniably that his chronic exposure contributed to the NHL. Sadly, there is no monitoring data (urine or blood) available to confirm quantitative glyphosate exposure except for the reported unacceptable repeated use pattern.

x.  Glyphosate is known to cause adverse health effects individually and in combinations, with other pesticides causing known or unknown chronic toxicity to humans, which may depend also on many aforesaid individual variables. In the absence of other confounding factors, glyphosate use could be likely a cause for the onset of his precipitous post-exposure illnesses. He did not have any notable symptoms until the diagnosis.

xi.  Although the daily dose of herbicide exposure is undetermined, the onset of toxic effect (cancerous changes) as diagnosed, and emergency hospitalization positively suggest that the chemical exposure during the years was probably many-fold higher than the acceptable daily intake (ADI) for glyphosate. Prolonged exposure at sufficiently high dose levels could be justified in producing severe health effects.

xii.  Engilis has recognized the acute/subacute chemical toxicity signs early enough may be due to the nature of the chemical to be less acutely toxic in humans. However, various studies are showing subtle genotoxic/chromosomal changes. The absence of acute symptoms denies the causation of the delayed toxic effects from the exposure or the delayed disease etiology that is not well understood.

xiii.  From a toxicology point of view, the long-term health effects ensuing from a limited or repeated toxic exposure are not predictable but may not be ruled out even among healthy individuals without preexisting medical conditions.

xiv.  Engilis' case of toxic health impacts should be reviewed as a 'single case study' instead of a 'group evaluation and interpretation' as a 'case-control study' involving numerous subjects. Survey data that compares workers as a 'control

group' versus an 'exposed group' for identical parameters are not relevant to pinpointing a susceptible individual in the affected group. The solely affected individual may be missed out from the reach of the statistical probability.

xv.   Epidemiological studies suggest that there exists a chemical (pesticide) specific association with NHL. Glyphosate exposure could be linked to inducing (a statistically-elevated risk of clinical significance) NHL subtype – CLL –, the most common type of NHL as observed in the case of Mr. Engilis

xvi.   Latency of NHL: The latency estimates cited in the epidemiological literature demonstrates latency intervals were within a typical range of 2 to 25 years. Initial onset and diagnosis of NHL in Engilis case were within this range, after about 26 years of glyphosate use with few intermittent breaks in other types of employment.

xvii.   Finally, thoughtful consideration of Engilis' health, lack of family history of cancer, non-exposure to other toxic substances, and absence of confounding factors before this episode, would reasonably associate his long glyphosate use history as the only causal factor for the NHL. A full evaluation of all data and evidence available leads to a reasonable scientific conclusion that glyphosate exposure showed a high chance of causing injury to his health and is probably related to the rapid progression to NHL.  No other significant habit, agent, lifestyle, or chemical could be identified or suggested as being associated, promoted, or caused his long-term health problems. Timely medical intervention has expectantly saved him any permanent damage.

## 22.  Documents & References

1. Document 1. Peter Engilis Medical Records, Walter Hayne MD. Adventist Health System, FL. 461504-**11**, pp1-7.
2. Document 2. Peter Engilis Medical Records, Florida Cancer Specialists. 461504-**12**, pp1-63.
3. Document 3. Peter Engilis Medical Records, Mid Florida Hematology and Oncology Center. 461504-**13**, pp1-18.
4. Document 4. Peter Engilis Medical Records, Broward Oncology Associates.  461504-**15**, pp1-14.
5. Document 5. Peter Engilis Medical Records, James Shoukas MD.  Plastic Surgeon, Adventist Health System, FL. 461504-**16**, pp1-10.
6. Document 6. Peter Engilis Medical Records, George Georgakakis MD. Otolaryngology, Head, and Neck, Fort Lauderdale.  461504-**17**, pp1-19.
7. Document 7. Peter Engilis Medical Records, Atlantic Urology Associates/Advanced Urology Institute. 461504-**19**, pp1-18.

8. Document 8. Peter Engilis Medical Records, Jamie Long PsyD. Psychologist.  461504-**21(1,2)**, pp1-12.
9.  Document 9. Peter Engilis Medical Records, Adventist Health Fish Memorial. 461504-**31** pp1-250.

10.  Document 10. Peter Engilis Medical Records, Dr. Walter Hayne MD, Adventist Health Fish Memorial. 461504-**34 (1,2),** pp11-30.
11.  Document 11. Cathy Engilis Deposition. 12/13/2021, pp1-71.
12.  Document 12. Peter Engilis, Client Info Sheet, Schlesinger Law Offices, 13,   pp1-63.
13.  Document 13. Peter Engilis 1st Amendment Plaintiff Fact Sheet.
14.  Document 14. Peter Engilis Settlement Form Final.
15.  Document 15. Peter Engilis. Roundup affidavit.
16.  Document 16. Peter Engilis Jr. Deposition. MDL no.: 2741 Liability Litigation Case No. mdl no.3:16md-02741-Peter Engilis, Jr. and Cathy Engilis v. Monsanto Company Case no.: 3:19-cv-07859-vc. Before United States District Court Northern District of California in Re: Roundup products Nov. 2, 2021. pp1-239.
17. ACS (American Cancer Society). 2022. How Is Chronic Lymphocytic Leukemia Staged? https://www.cancer.org/cancer/chronic-lymphocytic-leukemia/detection-diagnosis-staging/staging.html
18. MD Anderson Cancer Center. 2022. Chronic Lymphocytic Leukemia. https://www.mdanderson.org/cancer-types/chronic-lymphocytic-leukemia.html.
19. ATSDR (Agency for Toxic Substances and Disease Registry). 2020. Toxicological Profile for Glyphosate.  Center for Disease Control. August 2020. pp. 1-319. https://www.atsdr.cdc.gov/toxprofiles/tp214-c4.pdf. Department of Health and Human Services.
20. Monsanto. 2006. Roundup Pro® Concentrate 50.2%. In: MSDS (Material Safety Data Sheet) Reference for Plant Protection Products. 2008. Page M461. Eds. Greenbook. Vance Publishing Corporation, Lenexa, KS.
21. Connolly, A., Coggins, M.A., and Koch, H.M. 2020. Human Biomonitoring of Glyphosate Exposures. Toxics. 8(3): 60-81.
22. EPA Guidelines for Carcinogen Risk Assessment. 2005. U.S EPA 630-P-03-001F, March 2005.
23. EPA 2020. Glyphosate: Interim Registration Review Decision. Case No. 0178. EPA-HQ-OPP-2009-0361. January 2020. pp1-36.
24. EPA 2017. Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential. EPA's Office of Pesticide Programs. DP Barcode: D444689. TXR: 0057688. December 12, 2017.
25. IARC (International Agency for Research on Cancer). 2017. Some organophosphate insecticides and herbicides. IARC monographs on the evaluation of carcinogenic risks to humans vol. 112. World Health Organization. Lyon, France.
26. Eriksson, M., Hardell, L., Carlberg, M., and Akerman, M. 2008. Pesticide exposure as a risk factor for non-Hodgkin lymphoma including histopathological subgroup analysis. Int. J. Cancer, 123:1657-1663.
27. McDuffie, H.H., Pahwa, P., McLaughlin, J.R., Spinell, J.J., Fincham, S., Dosman, J.A., Robson, D., Skinnider, L.F., and Choi, N.W. 2001. Non-Hodgkin's lymphoma and

specific pesticide exposures in men: Cross-Canada study of pesticides and health. Cancer Epidemiol., Biomarkers & Prevention, 10:1155-1163.

28. Andreotti, G. et al. (& 11 authors) 2018. Glyphosate use and cancer incidence in the Agricultural Health Study. J. Natl. Cancer Inst. 110:509-516.

29a. Ellenhorn's Medical Toxicology. 1997. Diagnosis and Treatment of Human Poisoning. [Ed. Matthew J. Ellenhorn., Second Edition. Williams & Wilkins, Baltimore, pp16548-1652.

29. Leon, M.E. et al. (& 16 other authors). 2019. Pesticide use and risk of non-Hodgkin lymphoid malignancies in agricultural cohorts from France, Norway, and the USA: a pooled analysis from the AGRICOH consortium. Int. J. Epidemiol. 48:1519-1535.

30. Zhang, L., Rana, I., Shaffer, R.M., Taioli, E., and Sheppard, L. 2019. Exposure to glyphosate-based herbicides and risk for non-Hodgkin lymphoma: A meta-analysis and supporting evidence. Mutat. Res. 781:186-206.

31. Pahwa, M., Beane Freeman, L.E., Spinelli, J.J., Blair, A., McLaughlin, J.R., Zahm,S.H., Cantor, K.P., Weisenburger, D.D., Punam, Pahwa, P.P., Dosman, J.A., Demers, P.A., Harris, S.A. 2019. Glyphosate use and associations with non-Hodgkin lymphoma major histological sub-types: findings from the North American Pooled Project. Scand. J. Work Environ, Health. 45(6):600-609.

32. EPA. 2017. Glyphosate. Draft Human Health Risk Assessment in Support of Registration Review. EPA-HQ-OPP-2009-0361-0068. D417700. December 12, 2017. pp1-41

33. Boffetta, P., Ciocan, C., Zunarelli, C., and Pira, E. 2021. Exposure to glyphosate and risk of non-Hodgkin lymphoma: an updated meta-analysis. Med. Lav., 112:194-199.

34. EPA. 2020. Glyphosate: Epidemiology review of Zang et al. 2019 and Leon et al. 2019 publications for response to comments on the proposed interim decision. DP Barcode: D455531. January 6, 2020

35. NPIC (National Pesticide Information Center). 2022. Glyphosate Technical Fact Sheet. http://npic.orst.edu/factsheets/archive/glyphotech.html#references. 2022.

36. Weisenburger, D.S. 2021. A review and update with the perspective of evidence that the herbicide glyphosate (Roundup) is a cause of non-Hodgkin lymphoma. Clin. Lymphoma, Myeloma, and Leukemia. 21:621-630.

37. MyoClinic. 2022. Chronic Lymphocytic Leukemia. https://www.mayoclinic.org/diseases-conditions/chronic-lymphocytic-leukemia/symptoms-causes/syc-20352428?p=1

38. Zhu Y., Wang Y., Qian Z., Pan J., Liu Q., Dong B., and Xue, W. 2019. Extended lymphadenectomy for high-risk prostate cancer in patients with chronic lymphocytic leukemia may not be necessary: a report of two cases. BMC Cancer. 19: 676. Published online 2019 Jul 9. doi: 10.1186/s12885-019-5876-x.

39. Portier, C.J. 2020. A comprehensive analysis of the animal carcinogenicity data for glyphosate from chronic exposure rodent carcinogenicity studies. Environ. Hlth. 19:10. https://dol.org/10.1186/s 12940-020-00574-1.

**Affirmation:**

Statements contained herein are based on the documents provided and the literature published or available in the public domain and are true and correct. I am a person of full age and majority and competent to execute this expert analysis and report. I reserve the right to supplement or alter or revise my analysis and opinions as additional relevant data or information is available about this case.

Respectfully submitted,

**Dr. Ambrose K. Charles**
Toxicologist / Consultant
Round Rock, Texas 78665
Ph: Mobile 512-740-6137
June 23, 2022