# EXHIBIT J

```
                              Volume 7

                         Pages 919 - 1002

                UNITED STATES DISTRICT COURT

                NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

EDWARD HARDEMAN,                )
                                )
            Plaintiff,          )
                                )
  VS.                           )      NO. C 16-00525 VC
                                )
MONSANTO COMPANY,               )
                                )
            Defendant.          )
_____ )


                         San Francisco, California
                         Monday, March 4, 2019

                  TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:
                    ANDRUS WAGSTAFF PC
                    7171 W. Alaska Drive
                    Lakewood, Colorado  80226
                BY: AIMEE H. WAGSTAFF, ATTORNEY AT LAW
                    DAVID J. WOOL, ATTORNEY AT LAW

                    MOORE LAW GROUP
                    1473 South 4th Street
                    Louisville, Kentucky  40208
                BY: JENNIFER MOORE, ATTORNEY AT LAW



            (APPEARANCES CONTINUED ON FOLLOWING PAGE)


REPORTED BY:  Marla F. Knox, RPR, CRR
              Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporters
```

1   **APPEARANCES**:   (CONTINUED)

2   For Plaintiff:

3                         THE MILLER FIRM LLC
                          108 Railroad Avenue
                          Orange, Virginia  22960
4                 BY:   **BRIAN BRAKE, ATTORNEY AT LAW**

5   For Defendant:

6                         WILKINSON  WALSH ESKOVITZ LLP
                          2001 M Street, NW - 10th Floor
7                         Washington, D.C.  20036
                  BY:   **BRIAN L. STEKLOFF, ATTORNEY AT LAW**
8                        **RAKESH N. KILARU, ATTORNEY AT LAW**
                         **TAMARRA MATTHEWS JOHNSON, ATTORNEY AT LAW**
9                        **JULIE RUBENSTEIN, ATTORNEY AT LAW**
                         **CALI COPE-KASTEN, ATTORNEY AT LAW**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | <u>**Monday - March 4, 2019**</u>                                        <u>**7:58 a.m.**</u> |
| 2 | **P R O C E E D I N G S** |
| 3 | ---000--- |
| 4 | (Proceedings were heard out of presence of the jury:) |
| 5 | **THE COURT:**  Hi, everybody.  This is on the record. |
| 6 | So we just got a call from a juror, number -- is it the |
| 7 | last one? |
| 8 | **MS. WAGSTAFF:**  In the back row? |
| 9 | **THE COURT:**  Front row, the last person. |
| 10 | **MS. MOORE:**  Ms. Torres. |
| 11 | **THE COURT:**  She thinks she has food poisoning, and she |
| 12 | can't come in today.  My proposal is that since we appear to be |
| 13 | a little bit ahead of schedule, we cancel -- we immediately get |
| 14 | on the phone to the other jurors; tell them to turn around; |
| 15 | that we won't be having trial today and they should plan on |
| 16 | resuming tomorrow. |
| 17 | Any objection to that? |
| 18 | **MS. MOORE:**  No objection, Your Honor. |
| 19 | **THE COURT:**  Then I have a couple things to speak to |
| 20 | you-all about, so I will be back after we call the jurors. |
| 21 | Kristen and Jordan, maybe you can split up the jurors and |
| 22 | call them. |
| 23 | **THE CLERK:**  Court is in recess. |
| 24 | (Recess taken at 7:59 a.m.) |
| 25 | (Proceedings resumed at 8:22 a.m.) |

1      (Proceedings were heard out of presence of the jury:)

2      **THE COURT:**  Okay.  So I have a couple issues I'm ready

3  to talk to you-all about, and then if you have -- if you have

4  anything, you can raise it as well.

5      The first is the Arber testimony.  I went back and looked

6  over Arber's reports and, you know, Mr. Kilaru, I'm not sure

7  what you were trying to feed me on Friday, but whatever it was

8  was inconsistent with what Arber had said in his report, not

9  just not disclosed but inconsistent.

10     You appeared to be saying that Dr. Arber was prepared to

11 offer an opinion that the pathology results hinted at

12 hepatitis C, and that's contrary to what he said in his report.

13 He said that there is nothing in the pathology that indicates a

14 cause for Mr. Hardeman's NHL.  So the opinion that you were

15 attempting to describe on Friday is not admissible.  He cannot

16 present that opinion.

17     I also think that to the extent Arber intends to offer the

18 opinion that he did disclose in his report, which is that the

19 pathology does not indicate any particular cause of

20 Mr. Hardeman's NHL, my sense about that -- you know, continuing

21 from our discussion on Friday -- is that, as I understand it,

22 that's not a contested issue.

23     The Plaintiffs have not disputed that you cannot discern

24 from the pathology what caused Mr. Hardeman's NHL.  If

25 Dr. Arber wants to mention briefly that during his testimony

1  that it's -- that the pathology doesn't suggest a cause, I

2  think that's fine.  If you want to establish during his

3  testimony that that's uncontested, that none of the experts

4  disagree about that, that's fine; but offering a full-length

5  opinion on that or a full-fledged opinion on that explaining

6  why and the ins and outs of why, I think is a waste of the

7  jury's time because it is uncontested.  So I would exclude him

8  from doing more than what I just described on that point.

9          MR. KILARU:  Can I briefly address those points?

10          THE COURT:  Sure.

11          MR. KILARU:  So on the first -- I actually have the

12  report in front of me now which I think will help -- the line,

13  I believe, Your Honor is referring to is in a supplemental

14  report where he says There are no features that would suggest a

15  specific cause for this lymphoma, and Dr. Arber did not intend

16  -- and if I said that he did, I apologize -- does not intend to

17  testify to --

18          THE COURT:  I think there are a number of places in

19  the Arber report where he says something along those lines,

20  right?

21          MR. KILARU:  Well, he says -- well, that is a line in

22  the supplemental report; and so I think that just -- I started

23  there because I think that most nearly described what you said.

24          THE COURT:  Well, I mean let's look at paragraph 25 of

25  his initial report --

1          **MR. KILARU:**  Okay.

2          **THE COURT:**  -- which says, There are no pathological

3     features to suggest a cause of his lymphoma.

4          **MR. KILARU:**  Right, and I think it's true that he

5     believes that -- I think what he would say is I cannot

6     distinguish Mr. Hardeman's NHL from an idiopathic cause of NHL.

7     I think if you look through other portions of the report where

8     he talks about -- for example, if you look earlier in

9     paragraph 18, he talks about the results of a fish test,

10    particularly a DCL6 rearrangement.  And if you look then, if

11    you keep going down, to paragraph 23, he talks extensively

12    about hepatitis C and the potential of hepatitis C to cause

13    mutations over his many years of exposure.

14         **THE COURT:**  I understand that.  I'm not saying that he

15    can't testify that the Plaintiff's experts improperly ruled out

16    hep C.  I'm just saying that he can't testify that the

17    pathology suggests that the cause was hep C, and that would be

18    consistent with what he said in his expert report, not merely

19    undisclosed but inconsistent.

20         **MR. KILARU:**  Well, specifically I think what he would

21    say is not that this DCL6 issue that we talked about makes

22    clear that hepatitis C is the cause.  I think what we intend

23    what he would like to say -- based on his review of the

24    literature and I think this is consistent with his report -- is

25    that there is evidence suggesting that DCL6 at a low level of

 1   correlation is correlated with hepatitis C, and there is no

 2   evidence suggesting that that is correlated with Roundup.   I

 3   think those specific words do not appear in the report, that's

 4   true.   But I do think he talks about the mutation, and he makes

 5   clear that Plaintiff's experts have failed to reliably rule out

 6   hepatitis C as a cause.

 7        **THE COURT:**  I understand the argument.   He is not

 8   permitted to offer that opinion.   It is excluded.

 9        **MR. KILARU:**  Okay.   On the second point, Your Honor,

10   as to -- I guess the question is sort of what the bounds are

11   around his testimony.   I think that we have heard extensive

12   testimony and I think some repetitive testimony from the

13   Plaintiff's experts about the same set of epidemiologic

14   studies, it is not really disputed what their take is on those

15   studies.   I think Dr. Weisenburger is going to comment on that

16   as well.

17        **THE COURT:**  I mean, part of this depends on what

18   Weisenburger says, of course.   It may be what your expert

19   testifies to -- can testify to, may depend in part on what

20   Weisenburger testifies to.

21        **MR. KILARU:**  Right.   I guess that goes to the previous

22   point because I think if Dr. Weisenburger, who never looked at

23   the slides, starts talking about genetic mutations and features

24   of pathology, I think that would open the door to Dr. Arber

25   being able to do so as well.

**PROCEEDINGS**

1        **THE COURT:**  Well, the problem is the -- as I

2   understand it, you know, yes, there are genetic mutations; but

3   there is nothing to link those genetic mutations to

4   hepatitis C, and nobody has offered any opinion that those

5   genetic mutations are caused by hepatitis C.  So, you know, to

6   the extent that Dr. Arber is trying to sneak in an opinion that

7   the -- you know, the fact that there are these genetic

8   mutations suggests that it was hepatitis C, that is something

9   that was not disclosed, and, again, contrary to the report that

10  he prepared.

11       **MR. KILARU:**  I understand that -- that position,

12  Your Honor.  I was making a different point which is if

13  Dr. Weisenburger tries to talk about those same topics, which

14  are also not disclosed in his report and not something he has

15  opined on before, then we think the door would be open for

16  Dr. Arber to do so as well.  I don't think it can only be

17  Dr. Arber who is not allowed to talk about the pathological

18  features and what those mutations are consistent or not

19  consistent with.

20       **THE COURT:**  Well, I don't recall Dr. Weisenburger ever

21  having offered an opinion about the pathology, other than

22  nobody can tell from the pathology how the NHL was caused.

23       **MS. MOORE:**  That's correct, Your Honor.

24       **THE COURT:**  If I'm misremembering that, fine.  But I

25  don't recall him testifying to anything other than that

 1   regarding the pathology.

 2            **MR. KILARU:**  Okay.

 3            **MS. MOORE:**  Your Honor --

 4            **THE COURT:**  The --

 5            **MR. KILARU:**  The reason I raised this point is last

 6   night we received exhibits and demonstratives for

 7   Dr. Weisenburger and some even talk about DCL2, which is one of

 8   the mutations.  So to the extent they are going to go into

 9   that, which I think is not disclosed and not something he

10   talked about --

11            **THE COURT:**  Well, the idea that there is a mutation

12   is -- to me is very different from the idea of what caused the

13   mutation.

14            **MR. KILARU:**  Well, the mutation -- the figures we

15   got -- and, again, I don't know how they intend to use them.

16   We just got this disclosed, so I'm raising this point because I

17   do think that they open the door.  It would change the scope of

18   Dr. Arber's testimony.  But the charts we got were about

19   whether the mutations that are present are consistent with

20   certain findings about hepatitis C and the level of response of

21   someone to -- the level of response based on treatment that

22   someone has, how sustained virological response relates to DCL2

23   mutations present in pathology.  Now, if that testimony is

24   offered -- if those exhibits are offered -- I don't think there

25   is any meaningful distinction between that and Dr. Arber

1  talking about whether those same morphological features of the

2  pathology have anything to do with hepatitis C in a different

3  way.

4       THE COURT:  Well, I think on that point, I'm just not

5  sure that I'm capable of responding to that meaningfully in a

6  vacuum, not having seen the slides, not having heard what

7  Dr. Weisenburger is going to testify to.  You know, I just

8  don't think I can give you a meaningful response to that.

9       MR. KILARU:  Understood, Your Honor.

10       THE COURT:  All I can say is that, you know, that

11  Dr. Arber can offer an opinion on hepatitis C and he can -- he

12  can say that the -- you know, the Plaintiff's experts

13  improperly ruled out hepatitis C, but part of that is not that

14  the pathology results support the view that the NHL was caused

15  by hepatitis C because that was inconsistent with what he said

16  in his report.  That is my ruling on Dr. Arber.

17       MR. KILARU:  Okay.

18       MS. MOORE:  Your Honor, one thing really quickly.

19  Would that also apply to any opinion that Dr. Arber may provide

20  with respect to hepatitis B?

21       THE COURT:  Well, I mean it has to --

22       MS. MOORE:  I just wanted to clarify.

23       THE COURT:  -- because of what he said in his report.

24       MS. MOORE:  Okay.  Thank you, Your Honor.

25       MR. KILARU:  Your Honor, just on the other point, just

1    so I have clarity -- I understand you are saying he can talk

2    briefly about the pathology -- I guess, the question is what

3    does that encompass?  I think we intended to have him show the

4    jury a small -- briefly show the jury a small subset of

5    Mr. Hardeman's pathology and walk through what he sees.  I

6    think that would be appropriate.  I don't think it would be a

7    waste of the jury's time.  We don't intend for it to go on very

8    long.  We think it will be useful for the jury to see actual

9    medical evidence in this case, and especially given --

10        **THE COURT:**  But if it is not in dispute -- if it is on

11   a topic that is not in dispute, what is the point of taking the

12   time to walk the jury through it?  I mean, as I have said, he

13   can say -- I'm guessing the Plaintiffs would not object to him

14   saying that there is nothing in the pathology that would give

15   us a clue about how the NHL was caused.

16        **MS. MOORE:**  That's correct, Your Honor.

17        **THE COURT:**  Okay.  And I'm guessing the Plaintiffs

18   would also not object to you eliciting testimony from Arber

19   that nobody -- none of the experts in this case have argued

20   to -- on either side have argued to the contrary.

21        **MS. MOORE:**  That's correct, Your Honor.

22        **THE COURT:**  Okay.  So you can elicit that.  That's two

23   questions and two answers.  And after that, what is the point?

24        **MR. KILARU:**  Because another pathologist is going to

25   come in, I guess, tomorrow and talk about -- rely on his

**PROCEEDINGS**

1   experience as a pathologist, and he will say -- well, as I

2   understand him to say, there is nothing in the slides that

3   allows me to conclude Roundup is the cause; but nevertheless

4   I'm concluding that Roundup caused Mr. Hardeman's NHL.

5          THE COURT:  Right.  But for reasons based on the

6   material other than the slides.

7          MR. KILARU:  Right.

8          MS. MOORE:  Right.

9          THE COURT:  So what is the point of bringing an expert

10  in to walk the jury through -- to prove what Weisenburger has

11  said, which is that there is nothing in the slides that gives

12  me the ability to determine what caused the NHL?  Why would

13  you -- why would it be appropriate for you to bring in an

14  expert to walk through -- to prove what the Plaintiff's expert

15  has said?

16         MR. KILARU:  Because, Your Honor, one, we think that

17  point helps us.  So it is part of our case to show --

18         THE COURT:  You can talk about it until the cows come

19  home in your closing argument, but the point is we only -- we

20  only offer -- we only present expert opinions to the jury when

21  those expert opinions would be helpful to the jury.  And an

22  opinion on why everybody agrees that you can't tell from the

23  pathology how the NHL was caused is not helpful to the jury.

24         MR. KILARU:  Your Honor, with that I think we

25  respectfully disagree.  Our position on why it is helpful is

**PROCEEDINGS**

1    because that is literally what pathologists do.  It is not what

2    Dr. Weisenburger does.  They don't just look at slides and

3    dismiss them and then move on with their day.  They actually

4    look at the slides.  They actually make diagnoses based on the

5    slides.

6         I think what Dr. Arber doing that would do is, first of

7    all, help rebut the methodologies that Dr. Weisenburger has

8    presented, which are -- I'm not going to look at the slides and

9    rule them out and look at other literature -- I think Dr. Arber

10   showing a jury what a pathologist actually does is helpful for

11   them to understand the distinction between our expert and their

12   expert as opposed to verbally saying, There is nothing in the

13   slides.

14        **THE COURT:**  Okay.  I understand that.  There is

15   nothing in my ruling that precludes you from cross-examining

16   Weisenburger on what pathologists usually do and, you know,

17   that -- and cross-examining him on the fact that his opinion is

18   not based on sort of the heartland of what pathologists usually

19   do.  That's fine.

20        And he will, I'm sure, respond, Yeah, but I'm also

21   qualified in these other areas.  And in terms of what

22   pathologists usually do, we can't -- we don't have any clues

23   about what caused Mr. Hardeman's NHL from that -- which, again,

24   makes it unnecessary for you to present an expert opinion about

25   that.  So certainly you can cross-examine Dr. Weisenburger

PROCEEDINGS

 1   about that, and my ruling doesn't preclude you from doing that.

 2          **MR. KILARU:**  Okay.

 3          **MS. MOORE:**  Thank you, Your Honor.

 4          **THE COURT:**  So that's Dr. Arber.

 5       Now, let's go to the Parry report.  On the Parry report my

 6   view about -- my fundamental view about the Parry report is

 7   that the Parry report was initially excluded -- was excluded

 8   pretrial based on the assumption that Monsanto would not be

 9   contesting the genotoxicity issue.  Monsanto is contesting the

10   genotoxicity issue; and, therefore, testimony about the Parry

11   report can come in.  In other words, the door has been opened

12   to the Parry report.

13       The next question is:  What is the appropriate way to

14   permit the Plaintiffs to present evidence about the Parry

15   report given that there is a very serious 403 issue here, you

16   know, the classic quintessential tail-wagging-the-dog problem.

17       And I think that the appropriate way to permit the

18   Plaintiffs to bring evidence in about the Parry report is two

19   things:  One, the Portier testimony or a portion of the Portier

20   testimony that Monsanto submitted; and two, permitting the

21   Plaintiffs to briefly get into the -- the IARC's conclusion

22   regarding genotoxicity through Dr. Weisenburger.

23       So nothing extensive, but just briefly the IARC's -- you

24   know, the -- during the Portier testimony, the jury learned

25   sort of a one-sentence conclusion that the European regulatory

1  agency reached about genotoxicity.  And similarly in light of

2  that, I think it would be appropriate for Weisenburger to share

3  with -- is he testifying about genotox?  I can't remember.

4       **MS. MOORE:**  Yes, Your Honor.

5       **THE COURT:**  Okay.  To share with the jury the sort of

6  bottom-line conclusion of the IARC regarding genotox, and I

7  can't remember exactly what that conclusion was; but it was in

8  Ms. Wagstaff's opening slide.

9       So in other words, Monsanto has opened the door to that

10 limited amount of information about IARC's conclusion about

11 genotox.  That would be -- and then with respect to Portier's

12 testimony -- let me pull it up here.

13      **MS. WAGSTAFF:**  Your Honor, if I may hand you the

14 Martens testimony.

15      **THE COURT:**  Sure.  But let me just finish this thought

16 before you get there.

17      **MS. WAGSTAFF:**  Sure.

18      **THE COURT:**  So with respect to Portier's testimony, I

19 would think what we are talking about allowing in, beginning on

20 page 772, line 19 down to page 774, line 13 -- sorry, line 17.

21 And then we would remove line 18 on 774, down to the bottom of

22 774, and then we would resume again on line 2 on page 775.  And

23 then go down to line 21 of page 776 -- sorry.  What line did I

24 just say?

25      **MS. WAGSTAFF:**  21 of 776.

1      **THE COURT:**  Yeah.  And then I think line 22 through 25

2  would not be included, page 776.  So applying the Rule 403

3  principles that we have been talking about -- and then back in

4  would be -- starting on line 1 of page 777, that would come in,

5  and then go down to line 16 of 777.

6      So my view is that that testimony should be allowed in.

7  And like I said, Weisenburger could be asked about it briefly,

8  if you bring in the IARC's conclusion about genotox through

9  Weisenburger.  That's my view.  It sounds like you wanted to

10  argue against that.

11      Kristen, do you have that in front of you?

12      **THE CLERK:**  Sorry.

13      **THE COURT:**  Do you have that?

14      **MS. WAGSTAFF:**  Your Honor, I just wanted to explain

15  what we did with respect to Dr. Martens, and why -- I

16  understand what your ruling is, and I'm not necessarily arguing

17  against it -- but I just want to ask one clarifying question.

18      With your order here -- or with your ruling that you just

19  made, the exhibits -- I just don't see -- I have in front of me

20  their Exhibit A, which is a portion of this.  Is your order

21  that the Parry report would then go back to the jury?

22      **THE COURT:**  I was assuming not.

23      **MS. WAGSTAFF:**  Okay.

24      **THE COURT:**  I mean, you could argue for it, but I was

25  assuming not.  Again, trying to strike the balance -- the 403

1   balance here that probably the -- if the -- if that report were

2   admitted as an exhibit, then you would be probably sending us

3   down that rabbit hole; and Monsanto would want to bring in a

4   bunch of other stuff about the Parry report and sort of how

5   things developed since the Parry report.  And the point that I

6   want to make is that, you know, the -- I do think it is

7   appropriate for you to be able to rebut Monsanto's assertions

8   and implications about the genotox evidence with the fact of

9   this report and the conclusions that -- the recommendations

10  that were reached in the report, but I do think that it is

11  still not centrally relevant to the genotox issue.  I don't

12  think it is nearly as relevant as some of the other testimony

13  that Dr. Portier gave about the genotoxicity evidence, for

14  example.

15       So the point is that, you know, we don't want to -- again,

16  we don't want the tail to start wagging the dog.  And I take

17  Monsanto's proposal about including this portion of the Portier

18  evidence to mean -- of the Portier testimony to mean, Well, if

19  we do not believe that we opened the door to anything, but if

20  you, Judge, disagree and you want to cure it, here is the way

21  to cure it that is not going to send us down that rabbit hole

22  and is not going to force us to start putting in a bunch of

23  evidence about how things developed after the Parry report.

24       Do I understand that correctly?

25           MR. STEKLOFF:  I will have more to say, but yes, I

```
 1   think that's true with Dr. Portier.  I think -- one of the
 2   things I might push back on at the moment is allowing
 3   Dr. Weisenburger to say the IARC conclusion, because that's a
 4   whole other step that is -- that paints a completely incomplete
 5   picture when not just -- I mean, this EFSA letter, which I
 6   would like to describe in a moment, was a specific response to
 7   something Dr. Portier himself wrote.  If we are going to
 8   introduce what IARC did -- since IARC, a number of regulatory
 9   bodies including EPA, including Health Canada, including
10   European bodies have come out and disagreed with IARC about
11   genotoxicity, so I don't think -- I realize now we are maybe
12   sort of slicing and dicing in different ways, but I think the
13   IARC part --
14           THE COURT:  Fair enough.  So let's bookmark the IARC
15   part for a moment.  That was your point about submitting that
16   Dr. Portier testimony, correct?
17           MR. STEKLOFF:  Yes, Your Honor.
18           THE COURT:  Okay.  All right.  So, anyway, that's --
19   that was my thinking there, and my assumption was that the
20   Parry report would not come in, but you would be able to
21   establish that Monsanto -- one of Monsanto's internal people
22   reached some conclusions about the genotoxicity evidence in
23   1999.
24           MS. WAGSTAFF:  Can I have a minute to talk to my team
25   about this?
```

PROCEEDINGS

1          THE COURT:  Sure.

2      (Whereupon, a brief pause was had.)

3          MS. WAGSTAFF:  I don't know if we want to move on the

4  to the *Knezevich & Hogan* and re-visit this after.

5          MR. STEKLOFF:  I have some things to say about this

6  first.

7          THE COURT:  Well, I'm not ready to talk about

8  *Knezevich & Hogan* yet.

9          MS. WAGSTAFF:  Okay.

10          THE COURT:  Go ahead.

11          MR. STEKLOFF:  So understanding where you are, I still

12  think it would be -- I would just like to briefly remind the

13  Court how Dr. Portier's testimony played out, because there is

14  one thing that we didn't highlight in our letter yesterday, is

15  what happened on his direct examination before we allegedly

16  opened the door.

17      In his direct examination he -- Dr. Portier at page 35 is

18  asked what IARC's conclusion was about glyphosate.  He says

19  that IARC's conclusion -- was that for glyphosate

20  specifically -- IARC's conclusion was, for glyphosate was

21  that --

22          MS. WAGSTAFF:  Where are you reading?

23          MR. STEKLOFF:  On page 35, line 1 through 18.

24      And he says was, For glyphosate was that probably

25  carcinogenic to humans, humans which is a classification that

 1   has a full categorization to it and rules under which it is

 2   created.

 3        And then he goes onto discuss it being a probable human

 4   carcinogen, that that's -- there are five classifications.

 5   That is the second highest.

 6        And then he goes on to ask, Now following the IARC

 7   classification, do you know if there has been any scientific

 8   response by regulatory agencies to IARC?

 9        He says, There has been a lot.

10        And then turns to this letter -- what I'm now sort of

11   paraphrasing -- what actions did you take?  And he explains

12   that he wrote to the European Union's equivalent of the EPA.

13        He then publishes in front of the jury the letter that he,

14   with approximately 95 scientists sent.  He uses the journal

15   version as opposed to the letter version -- but it is the same

16   content -- to show that he sent this letter to the European

17   Commission to try to persuade them post-IARC that their view on

18   glyphosate was wrong.  We know from opening, that IARC has

19   factored in with the epidemiology, the animal studies, and the

20   genotoxicity studies.  We have also --

21            THE COURT:  But opening statements are not evidence.

22            MR. STEKLOFF:  Understood.

23            THE COURT:  The jury is well aware.

24            MR. STEKLOFF:  Understood.

25        But I still think that that happened.  I know that that

1    happened.

2         I also think that we then saw the three stools -- where he

3    is walking through animal studies, epidemiology and

4    genotoxicity in detail during the three legs of the stool,

5    during his direct examination.  But what I want to highlight is

6    that when he is then shown the letter -- and this is the letter

7    that -- where that is described by Dr. Portier is, We were

8    challenging when EFSA.  EFSA was in the process of rereviewing

9    glyphosate when IARC did their review.  In the IARC review EFSA

10   already said that they didn't think there was a problem with

11   glyphosate.  So when IARC came out, it created a conflict with

12   EFSA, and he goes on.

13        So Mr. Wisner pulls up a portion of the letter that is

14   sent and says, So if you look at the last page here -- I will

15   call it out.  Hopefully you can read it on your screen -- it

16   reads -- so now this is quoting the letter:  The most

17   appropriate and scientifically-based evaluation of the cancer

18   reported in humans and laboratory animals as well as supportive

19   mechanistic data.

20        So he is writing a letter to Europe, highlighting the

21   human studies, the animal studies and the mechanistic studies,

22   is that glyphosate is a probable human carcinogen.  On the

23   basis of this classification summary, on the basis of this

24   conclusion, and in the absence of evidence to the contrary, it

25   is reasonable to conclude that glyphosate formulations should

 1   also be considered like human carcinogens.  Did you see that?

 2        Yes, I --

 3        And then that's where Mr. Wisner turns to highlighting *De*

 4   *Roos*, Dr. De Roos and Dr. Lynch.

 5        So in his direct, he is shown this letter.  He has said

 6   that this is following the IARC review, and the IARC

 7   classification.  And then says, Based on that, I wanted to go

 8   to tell Europe they are wrong about human studies, animal

 9   studies and the mechanistic studies.

10        In our cross -- to be clear what we did -- he was showed

11   that Europe disagreed in a conclusion, and then we had that

12   second line that was shown and that was corrected.  And then

13   there were literally two questions with nothing shown about the

14   fact that Europe disagreed on genotoxicity.

15        The notion that that opens the door to IARC's conclusion,

16   specific conclusion on glyphosate, and all of this Parry

17   stuff -- I mean, I don't think -- I have gone back to the

18   January 28th hearing, that the suggestion was that we could

19   just -- that basically we had to stipulate to the genotoxicity

20   studies, the notion that we couldn't present any evidence that

21   there is a dispute about genotoxicity opens the door to Parry,

22   given all the 403 issues, and that this happened in 1999, and

23   that IARC and the regulatory bodies are looking at a much

24   broader universe of studies that have come out and have been

25   discussed since 1999.  So we are not even comparing apples to

 1   apples.  We are comparing apples to oranges.

 2       I think that we -- I don't think we opened the door.  And

 3   I actually think what our first suggestion is if you think we

 4   opened the door is to say, You can consider Europe disagreed

 5   with Dr. Portier.  You should not specifically consider that

 6   they disagreed with him on genotoxicity because once you open

 7   the door on this Parry stuff, whether we -- let's put IARC to

 8   the side.  Whether you even just use the Dr. Portier testimony,

 9   we are getting into a -- a whole rabbit hole where we then

10   would have to tell the jury.  I think, when Europe made this

11   decision, they were considering many things beyond the initial

12   studies that were available in 1999 that Dr. Parry was looking

13   at, that Europe isn't the only one that came to this conclusion

14   and disagrees with Dr. Portier.

15       I mean, the whole context of that January 28 top three

16   hearing would be -- this would be when we said -- when I went

17   back to the transcript and the full colloquy wasn't in the

18   letter, but it was -- by Mr. Wisner, said, I know what happened

19   in Johnson, and they got up and said, EPA, EPA, EPA.  They made

20   a huge deal that the EPA disagrees constantly with

21   genotoxicity, that is portraying a different thing than I think

22   what is happening here.

23       If the argument was if we came into this trial and said,

24   The whole world disagrees on genotoxicity, and what Dr. Portier

25   is saying puts him completely at the margins with everyone,

1  maybe we would have opened the door.  We have not even come

2  close to that in this trial.  We are not going to do that with

3  our experts who we are calling in our case.  We are not calling

4  a single expert on genotoxicity.

5          THE COURT:  You could.  I mean, you certainly would be

6  entitled to.

7          MR. STEKLOFF:  Right.  And we would open the door and

8  re-visit the Parry issue based on the state of where we are

9  now --

10         THE COURT:  Right.

11         MR. STEKLOFF:  -- where we haven't done that.

12         THE COURT:  The state of where we are now is that

13 Monsanto has taken the position in this trial that -- through

14 various questions that Dr. Portier's position on genotoxicity

15 is incorrect, right?  I mean, isn't that fair?

16         MR. STEKLOFF:  I'm not sure that that's fair.  I think

17 that I said in opening -- and I know opening is not evidence --

18 that the study -- the focus of this case should be on the human

19 studies.  And I showed that slide that was also shown to

20 Dr. Portier during his cross-examination from the World Health

21 Organization group that he was involved in; that if human study

22 data is available, that's -- I'm again, paraphrasing -- that is

23 the priority data that you should be looking at.

24    Then during his cross-examination, there were some

25 questions about, for example, that Paz-y-Mino study to show,

PROCEEDINGS

```
 1   well, you said one thing.  There were further developments
 2   there.  So I think what -- I think what the evidence is thus
 3   far is that mechanistic studies don't really tell you a lot
 4   about geno -- about general causation, and you should be
 5   focusing on the human studies.  I think that's the first thing
 6   we are saying.
 7        And I think the second thing we are saying --
 8        THE COURT:  Okay.  But let me stop you there.  Even
 9   just that, even just that, look, the genotoxicity evidence does
10   not tell you anything or barely tells you anything about the
11   issue of causation.  Well, Monsanto has a report from a doctor
12   that it hired that -- that raised concerns about the
13   genotoxicity of glyphosate.
14        So it seems to me that you are -- you have already said
15   something to the jury -- even before we get to your second
16   point, you have already said something to the jury that is
17   contradicted to a degree by an internal Monsanto document.  And
18   so why shouldn't they be able to cast doubt on Monsanto's
19   assertion to the jury that genotox doesn't matter by
20   establishing that Monsanto hired a doctor to -- or hired an
21   expert to look at the issue of genotoxicity in the late '90s
22   and the expert raised concerns about genotoxicity?
23        MR. STEKLOFF:  Because it doesn't change -- because we
24   have heard about Dr. Portier's -- what Dr. Parry concluded
25   doesn't change the argument that I just made.  The argument of
```

1    let's assume that Dr. Parry's view was correct at the time, it

2    wouldn't change what I would say in closing, which is that --

3         THE COURT:  It wouldn't change what you would say in

4    closing, but it may cast doubt on the idea that genotox doesn't

5    matter, right?  I mean, Monsanto itself investigated genotox --

6    hired somebody to investigate genotox, and that person

7    concluded that genotox -- that it's possibly genotoxic.  I

8    mean, so doesn't -- it seems to me that that cuts against the

9    assertion that Monsanto has already made to the jury

10   effectively that genotox doesn't matter.

11        MR. STEKLOFF:  I guess the issue there then, Judge --

12   Your Honor, is that the motion that we have to -- that we had

13   to go through this trial without mentioning genotoxicity in any

14   way, because if we mention it, we are not going to agree that

15   glyphosate is genotoxic.

16        So if we in any way challenge the validity of the

17   genotoxicity determination or the strength of the determination

18   or the relevance of the determination, that that blows open the

19   door about a 403 issue.

20        THE COURT:  Not blow open the door.  I mean, this is

21   hardly blowing open the door.  This is accepting your proposal

22   to open the door a crack as opposed to blowing open the door.

23        MR. STEKLOFF:  Well, I guess the -- and I -- to be

24   clear, you know, at some point -- I don't want to suggest that

25   we want to do something that blows the door open even further,

PROCEEDINGS

```
1   so I think the line -- if you are going to disagree with my

2   argument and draw a line somewhere and say something needs to

3   come in, I do think that the problem is that telling this part

4   of the Parry story, even through Portier, which is clearly more

5   appropriate under 403 in our view than the Martens' testimony,

6   which we will get to -- still tells an incomplete story because

7   now we have asked --

8        THE COURT:  I think that's true.  And it's

9   Monsanto's -- of course, as always has been the case, Monsanto

10  has the right to call its own genotoxicity expert; testify -- I

11  mean, you have designated genotoxicity experts.  You have

12  presented genotoxicity experts at Phase One.  You have the

13  right -- you know, you have the right to present evidence on

14  this if you wish and blow the door open further if you wish.

15  But the -- you know, that's not the issue.  But I thought that

16  you had proposed this Portier testimony as a -- as sort of a

17  backup proposal for you that would allow us to prevent the tail

18  from wagging the dog, the Parry tail to wag the dog of this

19  trial.

20       MR. STEKLOFF:  That's fair.  And maybe I'm more

21  concerned then about the IARC classification in a way, am I

22  allowed to cross Dr. Weisenburger with the fact that EPA and

23  Health Canada and Europe, beyond the letter to Dr. Portier,

24  have disagreed with IARC?

25       THE COURT:  Yeah, I hadn't really thought that
```

 1   through.  I mean, you may be right about that.  It may be that

 2   they don't want to go down that road.  I don't know.  No, they

 3   probably do want to go down that road, but that may be right.

 4       I mean, it may -- to allow that kind of

 5   cross-examination -- of course, you would have to be able to

 6   cross-examine Weisenburger along those lines; and to allow that

 7   kind of cross-examination may also create the problem of, you

 8   know, making this a trial about the regulatory agencies, which

 9   we established at the outset this was not going to be.

10       So anyway, okay.  I understand that point.  I will think a

11   little further about that issue.

12           MS. WAGSTAFF:  Your Honor --

13           THE COURT:  But my ruling stands on the Portier

14   testimony.  That's coming in as I described it.

15           MR. STEKLOFF:  I have just one question on that.

16           THE COURT:  Yeah.

17           MR. STEKLOFF:  There were --

18           MS. WAGSTAFF:  Your Honor, while he is looking for his

19   notes, if I may, just in the opening statement, which I know is

20   not testimony, there was a slide I'm showing you by

21   Mr. Stekloff that talks about that the EPA has first approved

22   it in 1975; reaffirmed it before IARC, and reaffirmed it

23   multiple times after IARC.  And the EPA doesn't just -- sorry,

24   this is Exhibit 1 to -- or 2 to our *Knezevich & Hogan* letter

25   that we will talk about later -- but this EPA doesn't just look

PROCEEDINGS

```
 1   at human studies.  So we think also that that further opens the

 2   door in their argument, sort of supporting what you just said.

 3         THE COURT:  Well, no, they didn't get into what EPA

 4   looked at.  They just said that the EPA reaffirmed it.  They

 5   didn't -- in opening, they didn't get into the manner by which

 6   the EPA reached that conclusion.  So I disagree with that

 7   point.

 8         MS. WAGSTAFF:  Okay.  Thank you, Your Honor.

 9         And I understand your ruling, and I will just say on the

10   Dr. Martens' testimony that I have just handed you, we were

11   very narrow in what we did.  And, as you know, the actual --

12   there are a couple different steps of the Parry report.  And

13   the final step being the recommendations that Dr. Parry gives

14   and whether or not Monsanto complied with those.  We did not

15   include those in our cuts, just so you know if you are inclined

16   to go back and look at that.

17         And with that, I will accept your ruling.

18         THE COURT:  Okay.  So that will be the ruling.

19   Portier testimony, as I described it, can come in.

20         And I will think further about the IARC issue.  I think

21   that may not have been a good idea on my part to volunteer that

22   to the Plaintiffs.  So I will let you know about that.  Is

23   there anything else -- and as I said, on the mouse study, I'm

24   not ready to talk about that yet.  I will spend some newly

25   found free time today looking at that.
```

```
 1        And then is there anything else that you would like to
 2   talk about today?
 3        MS. WAGSTAFF:  I have one last thing on the Dr. Parry
 4   story.  I assume this is not prejudice as to be able to bring
 5   Dr. Martens' testimony in Phase Two.
 6        THE COURT:  No.  I mean, I haven't looked at it with
 7   an eye towards Phase Two, but certainly not.
 8        MS. WAGSTAFF:  Okay.
 9        THE COURT:  I mean, it seems like, you know, there is
10   not going to be a ton that is inadmissible in Phase Two, which
11   reminds me, we need to talk about setting some deadlines for
12   depo designations for Phase Two and stuff because, you know, I
13   don't -- maybe we should work on that issue now because, you
14   know, the jury will be -- will deliberate on the causation
15   question.  And if they come back yes on causation, you are
16   going to opening statements on Phase Two first thing the next
17   morning; and you have to be ready with your case first thing
18   the next morning.  We are not going to have any delays.
19        MS. MOORE:  We understand.
20        THE COURT:  So in light of that, what -- you know, it
21   seems like we should start talking about the plan for
22   Phase Two.
23        Do you have a plan as of now for which witnesses you are
24   going to call for Phase Two and whose testimony you are going
25   to put in by depo designation and stuff?
```

PROCEEDINGS

 1          **MS. WAGSTAFF:**  Your Honor, we have a few live

 2   witnesses that we are waiting for orders from Your Honor on.   I

 3   think it is Dr. Benbrook.

 4          **THE COURT:**  Oh, yeah.

 5          **MS. WAGSTAFF:**  Dr. Sawyer, Dr. Mills and Johnson.   And

 6   then we have --

 7          **THE COURT:**  You will get those this week.

 8          **MS. WAGSTAFF:**  Okay.

 9       And then we have a list of designations -- people we will

10   bring by video designation.  And I believe we have -- we have

11   been exchanging, behind the scenes, Phase Two designations.

12   And we just received a couple objections last night for three

13   from Ms. Rubenstein, so we can get that ball rolling.  We

14   understand that it was a little bit behind in Phase One.  We

15   will get that rolling.

16          **THE COURT:**  Yeah.  The thing that is very -- one of

17   the challenging things about this trial is that, you know, the

18   deposition designations were due on a certain date, and they

19   didn't come in on that date.  And most of them haven't come in

20   until the trial started.  So I have been reading deposition

21   testimony while I have been hearing live testimony, and it is

22   very hard to keep track of what has come in already and what

23   hasn't.

24       I remember making a comment that -- I think I said

25   something to the effect of, Well, Monsanto has already elicited

**PROCEEDINGS**

1    testimony in this case about Hardeman being in remission.  And

2    that was -- and then I thought about it, and I realized that is

3    not true.  I read testimony -- I read proposed testimony about

4    Hardeman being in remission, but Monsanto hadn't actually put

5    that evidence in it.  So it is very challenging.

6         So, you know, I would like to have -- I understand that

7    this trial is very challenging for everybody; but I would like

8    to try to have a more firm deadline for getting the depo

9    designations in for Phase Two.

10        **MS. MOORE:**  We agree, Your Honor.  And completely

11   understand what the Court is saying on that.

12        We have exchanged deposition designations for all the

13   depositions.  We need to schedule meet-and-confers on

14   Phase Two, and we can do that this week.

15        And if we could, we could come back with a proposal

16   tomorrow, Your Honor, after the parties meet and confer to see

17   what makes the most sense on a firm deadline.

18        **THE COURT:**  It would be my -- my tentative inclination

19   would be to require you to submit depo designations by, like,

20   Sunday or something.

21        **MS. MOORE:**  That wouldn't be a problem, Your Honor.

22        **THE COURT:**  For Phase -- all depo designations for

23   Phase Two due on Sunday.  And I assume that it sounds like we

24   are going to have probably two more days of the Plaintiffs'

25   case on causation.  And then, what, like two days of Monsanto

 1   putting on its case, causation.  Does that sound about right?

 2       MR. STEKLOFF:  My sense -- and we were conferring

 3   about this based on the delay today -- is that the Plaintiffs

 4   will rest -- that we will start our case on Wednesday, and so I

 5   think --

 6       THE COURT:  So Tuesday and most of Wednesday will be

 7   Weisenburger and Reeves and Farmer?

 8       MS. WAGSTAFF:  And Mr. Hardeman.

 9       THE COURT:  And Hardeman.

10       MS. WAGSTAFF:  The Reeves' cut, I believe, is around

11   an hour.  It is hovering around there.  The Farmer is around

12   five minutes.  Mr. Hardeman we think in total will take less

13   than an hour.  And that leaves Dr. Weisenburger, and that is

14   the big unknown.  But we think that if we put him up Tuesday

15   morning, we think that Monsanto will be putting on witnesses

16   either right before or right after lunch on Wednesday.

17       THE COURT:  Okay.  And then so do you have a sense --

18   I mean, obviously you can't predict how long cross-examination

19   is going to be and stuff, but I have sort of chopped Dr. Arber

20   a little bit.  You have Arber, Levine.

21       MR. STEKLOFF:  Levine and Mucci.

22       THE COURT:  And Mucci.

23   So closings on Phase One may take place in the first half

24   of next week, sounds like.

25       MR. STEKLOFF:  I think they will probably take place

 1    on Monday.  I mean, depending on -- I think our case will take

 2    about -- if we start on Wednesday, I think we will fill Friday,

 3    and then depending how long the crosses are maybe go a little

 4    bit into Monday but not much more.  I don't know if we have --

 5    if we rest that day, how Your Honor wants to deal with it, if

 6    you want to do closings all day.

 7            THE COURT:  I think if the evidence bleeds over into

 8    Monday, I think it would be fine just to tell you-all that you

 9    don't have to close immediately at the -- once the evidence --

10    once you rest.  There may be some rebuttal testimony from the

11    Plaintiffs.  But in any event, even if there is not, if you

12    want to just wait until Tuesday morning to do your closings,

13    that's fine.

14            MS. WAGSTAFF:  That would be fine, Your Honor.

15            THE COURT:  And then I will get you a draft, you know,

16    an updated draft of the jury instructions for Phase One

17    shortly.

18            MS. MOORE:  And that brings up a good point,

19    Your Honor.  We also need to re-visit about a deadline for jury

20    instructions for Phase Two.  Remember, we put that off.  So

21    when would you like us to propose jury instructions for

22    Phase Two in the event we get through Phase One?

23            THE COURT:  I'm more concerned with the depo

24    designations.  I want you to get those in on time.  So I don't

25    want you to be distracted by the jury instruction project while

 1   you are working on the depo designations.

 2        So, you know, I would say that if -- I mean, I'm happy to,

 3   you know, be corrected on this; but I think it would probably

 4   be okay to wait until, like, Thursday of next week for you to

 5   get jury instructions in for Phase Two.

 6             **MS. MOORE:**  That sounds fine, Your Honor.

 7             **MS. WAGSTAFF:**  Your Honor, just one logistical

 8   question:  If we -- if the jury comes back with a positive

 9   finding on causation, we will start opening the following

10   morning?

11             **THE COURT:**  Correct.

12             **MS. WAGSTAFF:**  Okay.

13             **MR. STEKLOFF:**  The only issue I have, Your Honor, on

14   Phase Two jury instructions is that how you rule on that design

15   defect issue --

16             **THE COURT:**  Yes.

17             **MR. STEKLOFF:**  -- could impact openings for Phase Two,

18   because I think whether it is consumer expectation or

19   risk-benefit, probably goes to what would be said or

20   potentially said.

21             **THE COURT:**  And my recollection is sort of a blur

22   right now, but my recollection is that you-all have argued that

23   point.  You have submitted briefing on that question.

24             **MS. MOORE:**  That's correct, Your Honor.

25             **THE COURT:**  So it is probably -- I'm probably capable

PROCEEDINGS

1  of ruling on it in advance of the start of Phase Two, even

2  without putting -- without us hashing out jury instructions.

3  So I will do that.

4        MR. STEKLOFF:  Okay.  And then if we are done with

5  that, I have just one housekeeping issue.

6        THE COURT:  Okay.  So just to make sure we are in

7  agreement, so depo designations for Phase Two are due noon on

8  Sunday, okay.

9        Proposed jury instructions for Phase Two are due on

10  Thursday of next week, whatever date that is.

11        THE CLERK:  March 14th.

12        THE COURT:  I will get you your rulings on the

13  expert -- the Phase Two experts.  I will do a ruling on the

14  design defect issue.  I will submit an updated version of

15  Phase One jury instructions in the next couple days.  And there

16  will, of course, be an opportunity to discuss those.  Thursday

17  may be a day to discuss those.  Monday afternoon may be a day

18  to discuss those.  We will see -- we will take a look at -- we

19  will see how the timing is working out.

20        MR. STEKLOFF:  Your Honor, on the design defect issue,

21  I think this is right.  So the issue came up in the motion in

22  limine context when discussing Plaintiff's motion to exclude

23  benefits.

24        THE COURT:  I remember that.

25        MR. STEKLOFF:  I don't think we have fully briefed the

 1   legal -- the full legal issues that would be relevant to

 2   Phase Two on that issue.

 3          **MS. MOORE:**  That's correct.

 4          **MR. STEKLOFF:**  So I don't know if maybe -- I think it

 5   would be important for opening if we can separately brief that

 6   by either late this week or early next week.

 7          **THE COURT:**  Why don't you -- I never allow

 8   simultaneous briefs, but I will allow it this time.  You can

 9   file letter briefs on that issue by noon on Thursday.

10          **MS. MOORE:**  Thank you, Your Honor.

11          **MR. STEKLOFF:**  Thank you.  And then --

12          **THE COURT:**  That's this Thursday.

13          **MR. STEKLOFF:**  Yes.

14      And then my housekeeping issue, Your Honor, is we went

15   back to check the medical records that were used during the

16   three doctor depositions, Mr. Hardeman's treating physicians,

17   on last week; and so we now would move into evidence TX38, 41,

18   42, and 43, which were played during Dr. Ye's deposition.

19      And then we -- on our end -- have a composite medical

20   record, so that is TX1023, and we would just move in specific

21   pages that were shown to the jury or discussed during the

22   deposition, sorry, which are pages 109 through 110, 113 through

23   115, 282 through 283, 381 through 382, 797 through 798, 841

24   through 861, and 1562 through 1564.

25      And we have -- we have and will send redacted versions of

PROCEEDINGS

1   all of those to counsel so they can just verify the ones that

2   are actually sent back to the jury so that all of the personal

3   identifying information is redacted from those at the top of

4   all the medical records.  It has that.  So we would move those

5   into evidence.

6           THE COURT:  Any objection?

7           MS. MOORE:  Your Honor, we would like the opportunity

8   to actually see what those are.  I don't recall off the top of

9   my head.  With respect to the Dr. Ye depo exhibits, those are

10  likely fine.  But these additional pages, I would like the

11  opportunity to review what they are before we -- before we say

12  whether we have an objection.

13          THE COURT:  Okay.

14          MS. MOORE:  Thank you, Your Honor.

15          THE COURT:  On the issue of the sick juror, I think --

16  I'm assuming you-all will agree with this, but I just want to

17  make sure we are on the same page.  If it is, in fact, food

18  poisoning, presumably she will be able to be back tomorrow.  If

19  it is the flu, I assume she has to be excused, given the flu

20  that has been going around and knocking people out for over a

21  week.

22      Everybody agree with that?

23          MS. MOORE:  Yes, Your Honor.

24          MR. STEKLOFF:  Yes, Your Honor.

25          MS. MATTHEWS:  Your Honor, we had one last issue

**PROCEEDINGS**

 1   expecting Plaintiff Hardeman's testimony first thing in the

 2   morning and --

 3            THE COURT:  So first thing, so he will be -- so the

 4   plan for tomorrow is Hardeman will take the stand and then

 5   Weisenburger?

 6            MS. MOORE:  Yes, Your Honor.

 7            THE COURT:  Okay.  Sorry, one other question while I

 8   have it on my mind.

 9        And then Farmer -- we are all set on Farmer.  We know what

10   is coming in on Farmer, correct?

11            MS. MOORE:  Correct.

12            THE COURT:  And then for Reeves, there is some further

13   argument that I need to consider from the parties about the

14   1985 mouse study?

15            MS. MOORE:  Correct.

16            THE COURT:  I have -- I have ruled on which aspects of

17   Reeves can come in subject to further argument on the mouse

18   study issue.  And so the only thing for me to do with respect

19   to Reeves is to issue a ruling on that issue, correct?

20            MS. MOORE:  That's right.  I believe, Your Honor, and

21   we are prepared to do argument on that today, if the Court

22   would like.

23            THE COURT:  Okay.  I'm not sure I'm going to need it,

24   but I have -- you know, both parties have been heard through

25   their filings and all that, and -- but if I need it, I will let

PROCEEDINGS

1   you know.

2          **MS. MOORE:**  Okay.

3          **THE COURT:**  I will look at it this morning most

4   likely.

5          **MS. MOORE:**  Okay.  Thank you, Your Honor.

6          **THE COURT:**  Is there anything else you need from me

7   with respect to Phase One, other than the stuff that I have

8   identified, the jury instructions and the Reeves thing and --

9          **MS. MOORE:**  I don't think so, Your Honor.  There were

10  letter briefs that were submitted last night regarding the

11  Reeves' issue.

12         **THE COURT:**  Yeah.

13         **MS. MOORE:**  I don't think so, Your Honor.

14         **THE COURT:**  Okay.

15         **MS. MOORE:**  I think that's enough.

16         **THE COURT:**  Okay.  And then you were going to say

17  something about Hardeman.

18         **MS. MATTHEWS:**  Yes, Your Honor.

19      We have talked about potential exhibits that the Plaintiff

20  intends to use and we intend to use, and we have an objection

21  to Plaintiff's plan to bring a physical sprayer into the

22  courtroom.  Monsanto's objection is on Rule 401 and 403

23  grounds.  We fully expect Mr. Hardeman to testify about his

24  Roundup use.

25      The concern about the sprayer harkens back to the pretrial

PROCEEDINGS

1    conference on February 13 where Dr. Sawyer, Plaintiff's expert,

2    conducted no exposure analysis whatsoever.   The concerns that

3    bringing in the physical sprayer into the courtroom will invite

4    the jury to try to make some sort of supposition or conclusion

5    about the nature of how Mr. Hardeman used the Roundup, and

6    there isn't an expert that has testified on that.   That issue

7    is not germane.

8        So that is our concern with the physical sprayer bringing

9    brought to the courtroom.

10       THE COURT:   You made reference -- it seems like you

11   were making reference to some discussion we previously had

12   about the sprayer.   I don't recall any such discussion.   Could

13   you remind me --

14       MS. MATTHEWS:   No.   Dr. Sawyer, their exposure expert,

15   who performed no exposure analysis with respect to

16   Mr. Hardeman.   So our concerns that the physical sprayer will

17   invite the jury to try to speculate about how the nature of his

18   spraying could have had some impact when that is not what is at

19   issue in the case.   So that's our concern with the physical

20   sprayer being brought into the courtroom.

21       THE COURT:   Well, I guess I'm not fully understanding

22   the point you are trying to make about exposure.   I want to get

23   a better understanding of that before I -- we turn to the

24   sprayer issue.

25       I mean, part of Dr. Weisenburger's opinion is that

1    Mr. Hardeman was exposed to a great deal of Roundup, right?  Or

2    to be more precise, part of Mr. -- of Dr. Weisenburger's

3    opinion that Roundup caused Mr. Hardeman's NHL is the

4    assumption -- based on Hardeman's testimony -- that Hardeman

5    was exposed to a great deal of Roundup, right, not just a

6    little bit of Roundup, not just two lifetime days or ten

7    lifetime days or whatever.

8         And so obviously Hardeman can testify that he was --

9    about -- you know, the way he sprayed Roundup and the amount of

10   times he sprayed Roundup, how often, et cetera, to help

11   establish that he was exposed to a lot of Roundup, a lot more

12   than the floor that the experts were trying to -- that the

13   Plaintiff's specific causation experts were trying to

14   establish.

15        So given that Mr. Hardeman can testify about how he was

16   exposed to Roundup, what -- what is the -- what is --

17   specifically, what is the objection to sort of -- I guess it

18   sounds like your objection may be he can just describe using

19   the sprayer as opposed to bringing the sprayer in.  Is that

20   what your objection is?

21        **MS. MATTHEWS:**  Well, at the deposition there was a

22   picture, and we have not lodged an objection to the picture.

23   Now they said they intend to bring a physical sprayer.  That

24   was not something that he authenticated or testified about

25   previously, but certainly there was a picture that was marked

**PROCEEDINGS**

1  as an exhibit; and we did not lodge an objection to the

2  picture.

3         THE COURT:  So can you try to articulate for me what

4  is the -- so you are saying it is okay for them to use a

5  picture of the sprayer, but it's not okay to bring in the

6  actual sprayer?

7         MS. MATTHEWS:  Well, I think the actual sprayer, the

8  question is whether it is going to invite the jury to speculate

9  about -- what about that sprayer could have had some role in

10  any purported exposure, and there is no testimony that is

11  supporting that would matter --

12         THE COURT:  Why would it -- why would having the

13  actual sprayer invite such speculation more than having a

14  picture of the sprayer?

15         MS. MATTHEWS:  Well, I think maybe we are down to what

16  is being done with the sprayer.  Maybe it is just simply a

17  matter of it is here and visual, but we did want to flag that

18  issue in terms of what -- where it might lead.  So I certainly

19  don't want to have to --

20         THE COURT:  But I'm not understanding where it might

21  lead.  I guess, I'm not understanding what the objection is.

22      Is it to talking about the sprayer?  Is it to showing a

23  picture of the sprayer?  Is it to having the actual sprayer in?

24  Or is it to what they might do with the sprayer if they bring

25  it in?  I just don't -- I am not understanding what the

 1   objection is.

 2        MS. MATTHEWS:  The objection would be to the physical

 3   sprayer and how they might use it because the picture was not

 4   something we contested, as we discussed.

 5        THE COURT:  Right.  So putting aside the how they

 6   might use it for a second, so your argument is that it is

 7   permissible for them to use a picture of the sprayer; but they

 8   should not be permitted to bring in the actual sprayer,

 9   because --

10        MS. MATTHEWS:  Because we are concerned about the 403

11   implications of whether it will invite the jury to make any

12   sort of speculation about how the use of the sprayer could have

13   influenced exposure where exposure is not something they have

14   offered an expert on and not something that we are even putting

15   at issue.

16        THE COURT:  Okay.  But if you could give me a couple

17   more sentences on how using the actual sprayer would invite

18   speculation in a way that using a picture would not invite

19   speculation.

20        MS. MATTHEWS:  I think it would relate to the -- it

21   would be the use point, Your Honor.  I think the question is,

22   you know, is this something that is just visually here for the

23   jury to see in place of the picture or is it something that is

24   going to be used in some way?  And certainly we want to head

25   these issues off and not have to do something while the jury is

 1    in the box, frankly.  This is to just flag the issue, and the

 2    concern is that visual representation of the sprayer stays

 3    visual and doesn't become something more.  And certainly that

 4    is our concern, in making sure that at no point is the jury

 5    then left to speculate about how a particular use of the

 6    sprayer could have had an influence on what --

 7         **THE COURT:**  I mean, one helpful bit of guidance I can

 8    provide now is that the Plaintiffs are not allowed to spray you

 9    with the sprayer.

10         **MS. MATTHEWS:**  Okay.

11         **THE COURT:**  And they are definitely not allowed to

12    spray me with the sprayer.  No matter --

13         **MS. MOORE:**  We were not going to do that, Your Honor.

14         **THE COURT:**  -- how much they would like to.

15         But other than that, I'm not just sure what I can say at

16    this point.  I mean -- however, given what happened during

17    opening statements, I would be happy to require the Plaintiffs

18    to give me a, you know, step-by-step explanation of what they

19    plan on doing with the sprayer.  And if something -- if, you

20    know, they describe something that is inappropriate, I can tell

21    them that they are not allowed to do it.

22         **MS. MOORE:**  Your Honor, in all seriousness, the

23    sprayer is not going to have anything in it.  Just to be really

24    clear, nobody is going to be sprayed in the room --

25         **THE COURT:**  That's good.

PROCEEDINGS

1        **MS. MOORE:**  -- although that is an interesting visual.

2        It is merely a demonstrative to help illustrate to the

3    jury and for Mr. Hardeman to explain, here is what I used, here

4    is how I mixed it and -- just -- it is a demonstrative.  It is

5    here to help the jury.  You don't need expert testimony for

6    that.  It is just something for Mr. Hardeman --

7        **THE COURT:**  No.  I understand.  But I want you to walk

8    me through it.  What are you going to -- what is he going to

9    say about the sprayer and what are you going to do --

10        **MS. MOORE:**  I'm going to ask him how he applied

11    Roundup.  And he is going to say that he used a 2-gallon

12    pump-up sprayer.

13        And then I am going to ask him if this is similar to the

14    one that he used, and he is going to say yes.

15        How did you use this sprayer?

16        **THE COURT:**  You are going to ask him to step down and

17    demonstrate how he used the sprayer.

18        **MS. MOORE:**  Yes, Your Honor.  It is not going to take

19    that long.  That is basically in a nutshell what we are going

20    to do.

21        **THE COURT:**  Okay.  Tell me a little bit about the

22    sprayer.  Is this something that goes on the back?

23        **MS. MOORE:**  No.  You carry it.  It is a 2-gallon

24    pump-up sprayer.  So it is a plastic 2-gallon thing -- do we

25    have it in the hallway?  It is upstairs.

PROCEEDINGS

```
 1            THE COURT:  It's okay.

 2            MS. MOORE:  It is 2-gallon plastic.  It has got a

 3    plunger and you untwist the plunger.  You pull that out.  You

 4    pour in the Roundup concentrate, and then you have water in

 5    there.  I think it is 4 to 6 ounces of Roundup concentrate to a

 6    gallon of water.  And that is what he is going to explain to

 7    the jury he did.  You put the plunger back in.  You tighten it.

 8    It locks in place, and it's got a little wand on it that you

 9    use to spray.

10            THE COURT:  Is there anything wrong with any of that?

11            MS. MATTHEWS:  No.  I think we are fine with that,

12    Your Honor.

13            MS. MOORE:  Thank you, Your Honor.

14            THE COURT:  Anything else?

15            MR. STEKLOFF:  Just briefly, Your Honor.

16       In the Reeves' deposition I know the focus has been on the

17    1985 study.  I think there are other pending objections, and if

18    we need to work -- for example, we have counters where I think

19    they have objected; and I don't think that there have been

20    rulings on those.  So that's my understanding.  I'm not trying

21    to litigate it now.  I'm just flagging it as something that

22    needs to be resolved before Reeves can be played.

23            THE COURT:  I thought I ruled on the counters also.

24    Did I not?

25            MR. WOOL:  I don't believe so or not the entirety of
```

PROCEEDINGS

1   the counters.

2          **THE COURT:**  Oh, okay.  Hold on a second.

3          **MR. WOOL:**  It is towards the very end of the

4   deposition.

5          **THE COURT:**  Let's just make sure that I know what I

6   need to rule on.

7      (Whereupon, a brief pause was had.)

8          **THE COURT:**  My recollection is that I tweaked this

9   ruling a little bit orally, right?

10         **MR. WOOL:**  Correct.

11         **THE COURT:**  I pulled up the written order that I filed

12  on March 1st.  And then my recollection is that after going

13  through Farmer, I narrowed it a little bit more, right?

14         **MR. WOOL:**  Correct.

15         **THE COURT:**  So that's where we are now, right, on

16  Reeves?

17         **MR. WOOL:**  Yes.

18         **THE COURT:**  Okay.  What more do you need me to do?

19         **MR. WOOL:**  There are some Monsanto counters -- and

20  don't quote me on this -- but I think they begin at 784 and

21  continue from there.  I don't think it's that big of a

22  designation.

23         **MR. STEKLOFF:**  Agreed.

24         **MR. KILARU:**  739.

25         **MR. WOOL:**  Oh, 739.

1      **THE COURT:**  And then there were a couple other ones.

2  I'm looking at my order now, and I'm seeing pages 33 and 35.

3      It said, Overruled.  Tentative argument needed.

4      Did we discuss that?  Did we have argument on that?

5      **MR. WOOL:**  We did not, Your Honor.

6      **THE COURT:**  Okay.  And then pages 544 to 546, I said

7  argument needed.  Did we discuss that?  We didn't resolve that

8  one yet either?

9      **MR. WOOL:**  No.

10     **THE COURT:**  Okay.  Well, what I would propose that we

11  do actually is, if it is okay with you, why don't I go spend

12  another 45 minutes, let's say, with the Reeves stuff, and then

13  come back out and talk about it and kind of have a final

14  resolution with it?

15     **MR. STEKLOFF:**  Sure.

16     I have one other question.  We have time -- I guess, in

17  some way, but I don't want to prolong the day -- but Your Honor

18  said something about Dr. Weisenburger, and I don't know if now

19  is the time to address it.  I also know that Your Honor issued

20  an order this weekend saying you needed to speak to

21  Dr. Weisenburger outside the presence of the jury.

22     **THE COURT:**  Well, my idea on that was simply that we

23  should probably have one more discussion about *Hardell* and

24  *Eriksson* and the dose response issue to make clear what

25  Dr. Weisenburger can and can't say since it is a little

```
 1    trickier with him given that he is offering both a general and
 2    a specific causation opinion.  And it seemed useful to have
 3    that conversation with Ritz in the room last time, so I was
 4    proposing that we just have the conversation with Weisenburger
 5    in the room this time.
 6          MR. STEKLOFF:  I would agree with that, Your Honor.
 7    What I think flagged the concern for me was -- so I think
 8    Mr. Hardeman is going to come in.  He is going to say he used a
 9    lot of Roundup.  And then Dr. Weisenburger is going to then say
10    somehow that that amount of -- whether he can say there was a
11    doubling of the risk based on *McDuffie* and *Eriksson* -- I don't
12    think he can say that -- but even the suggestion that somehow
13    Mr. Hardeman's exposure was -- I mean, I think he can say it
14    met this level of sufficient minimal exposure, whatever that
15    level is, but to say somehow -- to suggest that Mr. Hardeman
16    was in anyway at any sort of higher risk, that was not part of
17    his methodology.
18        You will recall that, in fact, during depositions he
19    testified --
20          THE COURT:  Wait a minute.  I don't -- I don't agree
21    with that.  My pretty clear recollection of Dr. Weisenburger's
22    testimony was that you were -- you spent a lot of time
23    cross-examining him on this floor that he established.  What I
24    concluded is, you know, sort of an artificial floor based on
25    these unadjusted numbers that is not appropriate.
```

 1          But his main point was that Mr. Hardeman has been exposed

 2    to so much more than that.  It doesn't really matter what the

 3    floor is.  And, you know, the greater the exposure, the greater

 4    the risk.  And that point I think is -- I think he is allowed

 5    to make that point, and I think that the point that I was

 6    trying to make in my rulings on specific causation is that --

 7    you know, the general point that risk increases with greater

 8    exposure can be made by the general causation experts based in

 9    part on *McDuffie* and *Eriksson*; but -- and I think I misspoke

10    earlier and said *Hardell* and *Eriksson*, but I meant *McDuffie* and

11    *Eriksson* -- that basic point can be made.  And so the specific

12    causation experts can build on that specific point when they

13    are applying this to Mr. Hardeman, but what the specific

14    causation experts cannot say is that -- is that there is a

15    quantification that can be attached to the risk of somebody who

16    uses Roundup a specific amount.

17          **MR. STEKLOFF:**  But even with the first part, to say

18    that he has -- he is at a much higher risk because he had so

19    much Roundup use, you may recall from the hearing that he tried

20    to make that point, tieing it initially to *McDuffie* and

21    *Eriksson* with saying it is more than -- he used it more than

22    two days per year.  He used it more than ten days.

23          Your Honor then pushed back and said, Well, in those

24    studies that was a -- that's where they divided the dose

25    response question.  But, in fact, there were people in the

1    group using introspective study more than two days or more than

2    ten days who well exceeded those levels.  It wasn't as though

3    they only used it for two days or ten days.

4        And towards the end of the hearing -- I don't have it in

5    front of me -- Your Honor questioned him and said, Well, isn't

6    this what you said, Dr. Weisenburger?

7        And he said, Maybe I shouldn't say that because he

8    conceded --

9            **MS. MOORE:**  That is different.

10           **THE COURT:**  It seems to me that you are just

11   re-arguing the specific causation ruling that I already issued.

12   Because what I said is that -- the point I made, and I think I

13   made it quite clearly in the specific causation ruling -- is

14   that yes, in response -- that is not the core of

15   Dr. Weisenburger's opinion.  That was the -- that was the focus

16   of the discussion in your cross-examination of

17   Dr. Weisenburger, but it is not the core of his opinion when

18   you go back and you read his report.

19       And when you go back and read his report, the takeaway is,

20   you know, he got exposed -- Hardeman was exposed to Roundup a

21   lot.  And the risk of -- the risk of getting NHL from Roundup

22   increases with exposure, and so -- all -- I'm -- in

23   cross-examination there was a lot of focus on this issue, and

24   I'm saying you won on that issue.

25       But that does not prevent Weisenburger from testifying

1   that -- that, you know, the risk increased.  I made very clear

2   in my specific causation ruling that Weisenburger's opinion,

3   which is admissible, is based in significant part on the

4   significant exposure that Mr. Hardeman experienced.

5       So -- but all of that is to say that we -- you know, we

6   should lay the ground rules for Dr. Weisenburger, and the

7   ground rules I think are that he can say what *McDuffie* and

8   *Eriksson* said in his general causation opinion.  He can say

9   that -- as part of his general causation opinion that there is

10  a dose response and that there is reason to believe that the

11  greater the exposure, the greater the risk.

12      In his specific causation opinion, he can testify that

13  because Hardeman was exposed so much, you would expect --

14  that's part of the reason why he doesn't rule out Roundup.  But

15  what he cannot do during his specific causation opinion is

16  quantify the risk that -- that Mr. Hardeman experienced or

17  otherwise attempt to attach numbers to the -- to the risk that

18  somebody experiences based on the amount of glyphosate that

19  they were exposed to.

20      **MS. MOORE:**  I understand, Your Honor.

21      And if the Court would like, we should be able to, given

22  our -- Mr. Stekloff and I talked on a break that -- even with

23  cross, that Mr. Hardeman will be on the stand less than an

24  hour.  It might be a good time to break.  You would have five

25  minutes alone with Dr. Weisenburger before he testifies.  We

1    understand the Court's ruling.

2          THE COURT:  Okay.  Anything else?

3          MR. STEKLOFF:  No, Your Honor.

4          MS. MOORE:  Not from us, Your Honor.

5          THE COURT:  Okay.  So why don't I --

6          MR. BRAKE:  I'm sorry, Your Honor.  Brian Brake.

7       The reason I'm approaching you is to make sure we have a

8    definitive date for the next bellwether trial.  And I assume

9    that is the Stevick complaint.  I have on my calendar May 6th.

10   I don't have an order or something that definitively says that

11   is the date, so I wanted to confirm before we start making

12   plans that that is the date or if that's not the date, what the

13   date is.

14         THE COURT:  Yeah, that's a good question.  And I have

15   been reflecting on that.  And I'm happy to hear discussion from

16   both sides on this question.

17      I have been sort of wondering -- I mean, if -- if this

18   case -- if this trial -- this Hardeman trial were to end in a

19   mistrial, if the jury could not reach a verdict on the question

20   of causation, for example, I would think that we would want to

21   go back and do -- and re-try the case in May on this date that

22   we have identified.

23         MR. BRAKE:  I see.

24         THE COURT:  That's number one.

25      Number two, is if that doesn't happen, if there is a

**PROCEEDINGS**

 1  verdict either in favor of Monsanto or a verdict in favor of

 2  Hardeman, you know, one of the things I was pondering is, Well

 3  at that point there will involve this Johnson verdict.  There

 4  will have been this verdict.  There will have been, presumably,

 5  a verdict in the Alameda County Superior Court case, which is

 6  scheduled to begin, when?

 7          **MS. WAGSTAFF:**  March 18th.

 8          **THE COURT:**  March 18th.  And have they budgeted -- how

 9  much time have they budgeted for that case?  Does anybody know?

10          **MS. WAGSTAFF:**  I think that they have budgeted a week

11  for jury selection with openings to start March 25th, and then

12  I think they have budgeted around six weeks, seven weeks.

13          **MR. BRAKE:**  I think that is approximately correct,

14  Your Honor.

15          **THE COURT:**  Okay.  I wonder -- I mean, just -- you

16  know, it is sort of artificial to focus only on the federal

17  cases.  I mean, if the idea is that, you know, we want to try

18  enough cases, enough bellwethers, to give the parties a sense

19  of sort of how to structure settlement discussions, I wonder if

20  those three will be enough.  And I wonder if those -- at that

21  point, after we have those three verdicts, if it might make

22  sense to press the pause button a little bit for both sides;

23  allow both sides to sort of figure it out how they want to

24  approach settlement issues, such that Ms. Stevick doesn't need

25  to go to trial in May.

PROCEEDINGS

```
 1          That is just sort of a musing at this point.  That is

 2    not -- I'm not expressing a view either way.  I'm happy to

 3    allow the parties to sort of go back and think about it and see

 4    what they want to say to me about it, but it seems to me that

 5    that is one reasonable approach to all of this.

 6          And I understand that you are under a lot of pressure to

 7    get ready for trial and so you would want an answer on that

 8    question fairly soon.

 9          MR. BRAKE:  Yes.  I just need to know whether I'm

10    going or not and when, so I can do what I need to do.  But I

11    think that Your Honor's suggestion may make some sense about

12    waiting to see.  I would just like to have some clarity as to

13    what Your Honor wants to do sooner rather than later.

14          THE COURT:  And then we can also -- I mean, that

15    wouldn't mean putting off the Stevick trial for a long time.

16    It would just mean -- maybe it would be in the fall, for

17    example, as opposed -- or in the late fall or something like

18    that, as opposed to May.

19          But I'm -- I'm available to do it in May, so, you know,

20    that's -- you know, maybe we should just plow ahead and be

21    ready to do it in May.  But I will let everybody kind of think

22    about that a little bit.  And why don't we all pledge to figure

23    that out by the end of this week.  How is that?

24          MR. BRAKE:  Yes, sir.  And we can confirm the May 6th,

25    not necessarily right now, but May 6th is the date that it will
```

1   go, if it does go.  I don't need to know right this moment, but

2   that is one thing I want to confirm.

3       THE COURT:  Yeah.  And I will take a look at how the

4   calendar has evolved since we set that May 6th date, but I

5   think the answer is probably May 6th.  Maybe not.  We will -- I

6   will take a look at what else is on there.

7       MR. BRAKE:  Thank you.

8       MS. WAGSTAFF:  Your Honor, just because it sounds like

9   you might be interested in this information, my law firm has a

10  hard trial date of October in a Montana state court case.  We

11  also had a trial date --

12      THE COURT:  You mean, in a Roundup?

13      MS. WAGSTAFF:  Yes, I'm sorry.  I'm just talking about

14  Roundup cases because I thought you might be interested.

15      THE COURT:  Yeah.

16      MS. WAGSTAFF:  We also had a trial date starting in

17  April in St. Louis County that has been moved because the judge

18  recused himself.  We are trying to get a summer trial date.

19      I think that Ms. Greenwald's firm has an October trial

20  date in St. Louis City.

21      I believe that your law firm has -- when is the Hall trial

22  date?  I think that --

23      MR. BRAKE:  It is coming up, but I'm not exactly sure

24  at this moment.

25      MS. WAGSTAFF:  In St. Louis City.  And then I think

**PROCEEDINGS**

1   that there are just going to be trial dates rotating, starting

2   almost immediately after one finishes.

3           **THE COURT:**  Well, that may -- I mean, one thing we

4   will not do is we will not refrain from scheduling a trial in,

5   say, October because there is a state court trial scheduled in

6   October, because then the state court trial gets moved and we

7   have -- we have missed the opportunity to have a trial at that

8   time.  Nobody -- neither goes to trial, and, you know, we are

9   still going to be here ten years from now not having tried any

10  cases.  So that's one issue.

11          And maybe all of this is an argument for just plowing

12  ahead in May, but I think mainly the parties should go back and

13  start pondering that.  And we will talk about that later this

14  week.

15          **MS. WAGSTAFF:**  Sure.

16          **MR. BRAKE:**  Thank you, Your Honor.

17          **THE COURT:**  Why don't I spend, say, around 45 minutes

18  on the Reeves stuff, and then -- so why don't we -- unless you

19  hear from Kristen otherwise, why don't we plan on resuming at

20  10:30 to talk about the Reeves stuff.  Okay?

21          **MS. MOORE:**  Thank you, Your Honor.

22          **THE CLERK:**  Court is in recess.

23                  (Recess taken at 9:45 a.m.)

24              (Proceedings resumed at 10:45 a.m.)

25          (Proceedings were heard out of presence of the jury:)

PROCEEDINGS

```
 1          THE COURT:   Okay.  So we have the Reeves' testimony,
 2   and we have the mouse study, which is related to the Reeves'
 3   testimony.
 4          On the topic of the mouse study, my view is that, you
 5   know, I don't think it is appropriate to force the Plaintiffs
 6   into the kind of stipulation that the Defendants have proposed.
 7   I think they have to be allowed to put in evidence to establish
 8   this point.  I don't think you can force them to do it by way
 9   of a stipulation or at least in this context, I don't think it
10   would be appropriate to do that.
11          So I think really what the discussion is about, for the
12   mouse study is, you know, is there a way to further limit the
13   testimony that is coming in about it while still allowing the
14   Plaintiffs to present their whole story?  And so that's really
15   what I want to focus the discussion on here is that portion of
16   Reeves' testimony regarding the mouse study and whether there
17   is a way to narrow it.
18          I mean, you saw that I already took a number of steps to
19   narrow it.  I sustained some of the objections to that portion
20   of the testimony about the mouse study.  And, you know, the
21   question is whether there is a reasonable way to further limit
22   it.
23          You know -- so I will hear from you on that.  But I just
24   went through it again, and although it is a little bit long
25   and, you know, it's -- you know, they hammer on it a bit, I
```

 1   think perhaps it is reasonable because it is somewhat of a

 2   complicated topic.  So it does take a little bit of time to

 3   explain.

 4        But anyway, that's my -- those are my thoughts.

 5        MR. KILARU:  Sure, Your Honor.  So I understand these

 6   sort of stipulations can't be a one-sided affair.

 7        THE COURT:  By the way, one other thing I want to

 8   say -- just so that it informs the discussion -- is I have now

 9   looked at the counter-designations.  I think for the most part,

10   the counter-designations are permissible.  There will be some

11   chopping here and there; but I think for the most part, the

12   counter-designations are permissible.

13        And the stuff -- in particular the stuff that Reeves says

14   about the whole mouse study debacle, that -- all of the stuff

15   that you counter-designated about that, I think is appropriate,

16   subject to a couple of exceptions that I flagged that we can

17   talk about a little bit later.

18        MR. KILARU:  Okay.

19        THE COURT:  Okay.

20        MR. KILARU:  Your Honor, I think in the main --

21   understanding your position on this, that makes sense.  I think

22   the reason we had gotten into the stipulation was mostly

23   because the EPA piece does complicate things a little bit, just

24   because it puts EPA regulatory documents into the picture.

25        THE COURT:  Yes.

1      **MR. KILARU:**  So I think even -- I guess there is a

2  question of whether certain portions of the stipulations as to

3  what the EPA did might be admissible instead of Dr. Reeves

4  going through what the EPA memo said just because I don't think

5  we haven't -- understandably so -- gotten into sort of a fuller

6  version of the EPA story.

7      So that's one proposal that we offer.

8      **THE COURT:**  Okay.  So tell -- give me -- spell that

9  out for me a little bit.  Let's go to the deposition testimony

10  and tell me what you are proposing taking out.

11      **MR. KILARU:**  Sure.  So I think -- let me go to -- so,

12  for example, if you start on page 217 -- 217 through 220 --

13      **THE COURT:**  Wait.  Hold on.  Sorry.  Let me get there.

14      **MR. KILARU:**  Of course.

15      (Whereupon, a brief pause was had.)

16      **THE COURT:**  Okay.

17      **MR. KILARU:**  So 217 through 220 is a discussion of an

18  EPA document that basically summarizes the component of EPA's

19  position that glyphosate should be classified as a Category C

20  oncogene.

21      **THE COURT:**  Yes.

22      **MR. KILARU:**  That is a fact that we have at least

23  offered to stipulate to that based on its initial review of the

24  study -- this is point 3 in our stipulation -- our proposed

25  stipulation -- I think that is one way we can trim, avoid

PROCEEDINGS

1   having a lot of EPA testimony come in with something shorter

2   than that.

3          THE COURT:  Right.  But all of this -- all this does

4   is establish that there is this document that was signed onto

5   by this group of eight people, and it expresses a conclusion by

6   the EPA that -- or not -- by the panel.

7          MR. KILARU:  Yes.

8          THE COURT:  That glyphosate is a Category C oncogene.

9   It is not a decision made by the EPA writ large.

10          MR. KILARU:  Right.

11          THE COURT:  It is a decision made by the panel within

12   the EPA, the point that I assume is important for you to make.

13          MR. KILARU:  Fair enough, Your Honor.

14          THE COURT:  And so I think that's -- I would assume

15   that this document would not be admitted into evidence.

16          MR. KILARU:  Okay.

17          THE COURT:  But you would be able to pull out the

18   portions of the document that they do, in fact, pull out in

19   this excerpt and put that in front of the jury.

20          MR. KILARU:  Okay.  That's understood, Your Honor.

21          MR. WOOL:  Thanks.

22          MR. KILARU:  I think there are just a few other --

23          THE COURT:  Sure.

24          MR. KILARU:  -- short things that we proposed, not as

25   much based on the substance, but based on the nature of the

 1  questioning and sort of where it leads to.

 2          **THE COURT:**  Okay.

 3          **MR. KILARU:**  So one example is on page 229.  There is

 4  a section from line 7 through 14.

 5          **THE COURT:**  Yeah.

 6          **MR. KILARU:**  It is sort of the attorney asking, you

 7  know, sort of I think a pretty argumentative question about

 8  whether someone is speculating in the document.  The witness

 9  says that's not all there is.  But I think that exchange

10  probably doesn't add much to the discussion.

11          **THE COURT:**  Well, except that his testimony --

12  testimony preceding that question is an effort to kind of

13  downplay the import of the document and so I think the attorney

14  here is -- Mr. Wisner is kind of pushing back on that, and I

15  don't know -- I didn't find that to be particularly

16  inappropriate.

17          **MR. KILARU:**  I guess on that, Your Honor, I think I

18  recognize it as it is a short section, but I think in context

19  there is sort of -- you know, there has been a fair amount of

20  questioning going in front of -- listing, if you go even back

21  to page 224 -- everything the document says, this point about

22  FJ.  And we continue on, What can we do to get this thing off

23  Group C?  This whole statement is in the document.  I suspect

24  Plaintiffs have arguments they want to make about that.  I

25  don't know that that sort of an attorney question speculating

1  about what's meant by that and an answer that doesn't really

2  confirm or deny it, doesn't add much to the discussion about

3  what the document says.

4         **THE COURT:**  Okay.  But where earlier does it say

5  that's what the document says --

6         **MR. KILARU:**  227, Your Honor at the bottom, it says --

7  line 20, it says, FJ asked, quote, short of a new study or

8  finding tumors in the control group, what else can we do to get

9  this thing off of Group C?

10     He says, It appears that in a meeting with EPA, FJ was

11 asked short of finding a tumor in this control group, what

12 would get this thing off of Group C.

13     So it is in there twice.  And the witness points out other

14 things that are in the document.  And there is another question

15 about how they didn't have the data yet.

16        **THE COURT:**  Okay.  I understand your objection, but

17 that's overruled.

18        **MR. KILARU:**  Okay.

19        **THE COURT:**  That can come in.

20        **MR. KILARU:**  Okay.  Turning to page 243, Your Honor,

21 starting at line 22, there is a -- I think pretty extensive

22 exchange -- maybe it is not that extensive.  It is not that

23 extensive.  I shouldn't have said that.  But actually starting

24 at page 241 through 244, there is sort of back-and-forth about

25 whether it would be appropriate for Monsanto and Dr. Kuschner

1    to have an opinion about the slides before they come in.

2              **THE COURT:**  Yes.

3              **MR. KILARU:**  And there is sort of extensive colloquy

4    about that question.  And then sort of the witness says, I

5    would like to see a document.

6              **THE COURT:**  Yeah.

7              **MR. KILARU:**  I think as a general matter in Phase One

8    from Monsanto's position on the science and on sort of what

9    would be appropriate and not appropriate testing hasn't been

10   something that has been admissible.  And I think this question

11   goes very much to that issue, and I think what follows is

12   actually discussion of the memo to Dr. Kuschner and some other

13   documents that Mr. Wisner presented.  I think subject to our

14   broader objection, which I understand you overruled, we don't

15   have any further objection to the documents and the

16   back-and-forth coming in, so I think this portion of the

17   colloquy should be excluded.

18        I think that probably it is best said that it starts on

19   page 241, line 23 and goes through 244, line 21, because they

20   then proceed in the next portion to talk about the actual

21   documents themselves; and Mr. Wisner lays out a timeline that

22   he believes supports the position that he had, I think, sort of

23   had been arguing for in the back-and-forth.

24             **THE COURT:**  Okay.  I understand that, but I think this

25   exchange is relevant to the credibility of the witness and so

1    I'm overruling that objection.

2        What is next?

3        MR. KILARU:  The last one, Your Honor, is on page 266

4    lines 12 through 20.  I think this is pretty similar to the

5    first objection I raised, so I won't belabor the point; but

6    there is sort of a short colloquy about why someone is putting

7    a word in quotation marks or not.  I actually don't even think

8    the answer to the witness' question is -- one of the

9    definitions of quotation marks means that's not really what I'm

10   saying, right?  And the witness' answer isn't designated.  I

11   think that is all pretty speculative and argumentative.

12       THE COURT:  Okay.  So tell me again where you want me

13   to look.

14       MR. KILARU:  Sure.  266 lines 12 through 20.

15       THE COURT:  Okay.  No.  I think that's -- that's --

16   this is -- this is in reference to a statement by Surdi from

17   the EPA?

18       MR. KILARU:  Yes.

19       THE COURT:  I think that does call for speculation.

20   That has to come out.

21       So that is 266, lines 12 through 20.

22       MR. KILARU:  That's right.

23       THE COURT:  Yeah, that comes out.

24       MR. KILARU:  I think, Your Honor, that would be it

25   subject to, of course, I think our counters to complete this

**PROCEEDINGS**

1    story; and we think that is important.  But I know you said you

2    want to discuss that next, so --

3         **THE COURT:**  Yeah, hold on a second.  Let me pull out

4    the counters.

5         (Whereupon, a brief pause was had.)

6         **THE COURT:**  Most of these I don't need discussion on.

7    I'm just flipping through where I had questions and then I want

8    to discuss with you.

9         (Whereupon, a brief pause was had.)

10        **THE COURT:**  Most of these I don't need discussion on.

11   I'm just flipping through to see where I had questions or an

12   opinion that I wanted to discuss with you.

13        (Whereupon, a brief pause was had.)

14        **THE COURT:**  Okay.  So on the portions of the testimony

15   that Monsanto designated as a response on the issue of the

16   mouse study, my pretty strong inclination -- I'm going to go

17   back and read it one more time -- but my pretty strong

18   inclination is that all of that stuff comes in.  So if there is

19   anything in particular you want to express a beef with, I will

20   give you an opportunity to do that now.

21        And then after that, I wanted to ask about -- the other

22   two things I thought were worth discussing were the one on

23   page 797 about long-term carcinogenicity studies, and the one

24   about -- on page 817 about Acquavella.

25        **MR. KILARU:**  Sorry, Your Honor.  I might have the

1    pages wrong.  I don't believe 797 was designated.

2          **MR. WOOL:**  No.

3          **THE COURT:**  797 was not designated?

4          **MR. KILARU:**  I don't have it as designated.  I think

5    we actually pulled that.  It might have been earlier

6    designated, and we actually pulled that.

7          **THE COURT:**  So you pulled that.  Okay.  Good.

8          **MR. KILARU:**  Yeah.

9          **THE COURT:**  Then what about 817?

10         **MR. KILARU:**  Yes.  We -- this we did continue to

11   designate because I think it is sort of a response to the

12   questions asked of both this witness and then of some other

13   witnesses about the '97 Acquavella memo.

14         **THE COURT:**  Okay.  So that's -- I want to talk about

15   that one.  Then go ahead.

16       Anything from you on the counter-designations?

17         **MR. WOOL:**  On the counters, with respect to the

18   *Knezevich & Hogan* study, I mean, I'm not seeing anything that

19   we would really quarrel with in this little section.

20         **THE COURT:**  Okay.

21         **MR. WOOL:**  Then remind me again where you said you

22   were on the Acquavella.

23         **MR. KILARU:**  817, I believe.

24         **THE COURT:**  Yeah, 817.  So what I have -- this may be

25   an earlier version of what I have -- but -- sorry, an earlier

PROCEEDINGS

```
 1    version of the designations.  So I want to make sure I have it

 2    right here.  So I have on page 817, starting on line 5 there is

 3    some text highlighted in orange.

 4           MR. KILARU:  Yes.

 5           THE COURT:  And then starting on page 818, going

 6    through to page 822 --

 7           MR. KILARU:  Yes.

 8           THE COURT:  -- there is some text highlighted in

 9    green.  And then on page 823, it's again highlighted in orange.

10           MR. KILARU:  That's right.

11           THE COURT:  The orange is what again?

12           MR. KILARU:  I think it's probably a coding issue as

13    much as anything else.  This is all testimony that we would

14    propose to designate.

15           THE COURT:  It is all what you want to designate?

16           MR. KILARU:  Yes.

17           THE COURT:  Okay.  All right.

18        So help me understand this and how it relates to the AHS

19    stuff because it's -- you know, at first when I first started

20    looking at it, my reaction was, Okay.  This is going to be

21    Monsanto's response to the Acquavella stuff.  And then it

22    seemed to start to go beyond that, but I couldn't quite tell.

23        So talk me through this.

24           MR. KILARU:  I think it talks about a different topic,

25    which is this exposure study, but I think it is in the context
```

1  of the response to the AHS, which is why we view this as tied

2  together.  So one of the critiques in the memo is about sort of

3  inaccuracy or unreliability of the exposure data that will be

4  collected by the AHS based on the methods and practices that

5  they are using.  I think that's one of the things that was in

6  the Acquavella internal memo.

7          THE COURT:  Yes.

8          MR. KILARU:  The questioning here -- sorry, what was

9  that?

10          THE COURT:  I said "yes."  Sorry.

11          MR. KILARU:  So the questioning here then goes on and

12  talks about -- see in lines 817 to 818, what did the people who

13  were conducting the AHS, did they respond to these criticisms

14  that were in the memo.

15          THE COURT:  Yeah.

16          MR. KILARU:  And what follows is sort of a discussion

17  of how the AHS folks looked at their survey sort of in response

18  to those critiques that have been voiced in Dr. Acquavella's

19  survey -- in Dr. Acquavella's memo, and then it sort of

20  continues.  There is a study that Monsanto did to sort of help

21  improve the methods of the AHS regarding this farm family

22  exposure study, which looked at the doses that farmers were

23  getting and how those -- to sort of make sure that what the AHS

24  was looking at was consistent with what was sort of happening,

25  I guess, more broadly in terms of farming.

1    **THE COURT:**  Okay.  Why isn't -- to the extent that

2    the -- to the extent that the folks who were conducting the

3    Farm Family Health Study addressed the concerns expressed by

4    Acquavella, and to the extent they did a good job of addressing

5    those concerns, why wouldn't Mucci testify to that?  I mean,

6    why couldn't you just put -- why couldn't you just put the --

7    you don't even have to put the Acquavella memo in front of her,

8    because I assume you wouldn't want to.

9        You could say, you know, This concern has been expressed

10   about the AHS and what did -- what did the AHS folks do to

11   respond to that, and have her testify about that.

12   **MR. KILARU:**  It is certainly another way to do it,

13   Your Honor, but I think several Monsanto witnesses have now

14   been asked about this memo; and so we thought having Monsanto

15   respond to it would be useful.

16   **THE COURT:**  I think the problem is that at some point

17   it sort of bleeds into -- it seems to bleed into Reeves

18   offering expert testimony.  You know, I mean, we are getting

19   into -- you know, on the one hand we have Monsanto's criticisms

20   of the AHS, and we didn't really get into whether those

21   criticisms were valid or anything along those lines.  It is

22   just the fact that Monsanto had a person who was offering

23   criticisms of the AHS.  Then it is for the experts to argue

24   about whether particular criticisms are valid or not.

25       And it seems like here we have got kind of Reeves being

**PROCEEDINGS**

1  drawn into an analysis of the AHS and the reliability of the

2  AHS and the methods used by the people who are conducting the

3  AHS, and that seems to be beyond the scope of what Reeves is

4  supposed to be testifying about.  And so I think it's probably

5  fine to have Mucci do this, but I think this testimony -- my

6  sense is that it goes beyond the scope.

7       **MR. KILARU:**  That's fine, Your Honor.  I think it is

8  consistent with the rulings you have had earlier about experts

9  and so we can pull it down for that purpose.

10      **THE COURT:**  Okay.  So I think that means everything

11 after 817 goes; is that right?

12      **MR. KILARU:**  Yes.  And I actually don't think there

13 was anything else through the rest of the deposition, so I

14 think -- I think that would end the designations at that point.

15      **THE COURT:**  Okay.  Any problem with that concept of

16 Mucci being able to address that?

17      **MR. WOOL:**  Right.  I think that makes more sense, and

18 it is consistent I think with PTO89, so --

19      **THE COURT:**  Which one was PTO89?

20      **MR. WOOL:**  That was the one where Your Honor excluded

21 testimony by Reeves that was commenting on the relevant

22 scientific articles.

23      **THE COURT:**  Okay.  All right.  So that -- so I will --

24 I will issue an order on Monsanto's counters, which just -- let

25 me be clear -- they begin at -- those begin at page 739,

 1    correct?

 2            MR. KILARU:  Yes, Your Honor.

 3            THE COURT:  Okay.  So I will issue an order on that.

 4        As far as the stuff that the Plaintiffs designated for

 5    Dr. Reeves, are we all on the same page?

 6            MR. WOOL:  I think there were two tentative rulings

 7    that we might want to address.

 8            THE COURT:  Okay.  But other than that, we are all

 9    clear about what is coming in and what is not coming in between

10    pages 218 and 292, for example?

11            MR. WOOL:  Yes.  With respect to that, I think we are

12    clear.

13            MR. KILARU:  Yes.

14            THE COURT:  Okay.  All right.  So it is just these

15    loose ends that I -- that we need to tie up.  And one was

16    pages 33 and 35, right?

17            MR. WOOL:  Yes.

18            THE COURT:  So my -- I went back and I looked through

19    all of this again this morning, and my reaction after doing so

20    would be that the designation on 33 could come in and the

21    designation on 35 should not come in.

22            MR. WOOL:  And our argument with respect to the one on

23    35 is -- it sort of goes back to Portier and some questions he

24    got about EFSA, I think.  And, you know, just sort of inputs

25    the genotox into perspective.  Monsanto has emphasized a number

1    of times that it did not sponsor certain studies.  And I think

2    this just sort of adds some context to the jury about how the

3    genotoxicity breaks down, and it sort of provides them with the

4    understanding that Monsanto has had a hand in a number of the

5    genotox studies.

6        And I think also there has been some -- a considerable bit

7    of testimony about NIH and kind of some of these other

8    organizations that are -- that are independent of Monsanto and

9    a real kind of push by Monsanto to put some emphasis on the

10    independent studies.

11        **THE COURT:**  Okay.  I understand that.  I don't think

12    that 35 should come in given the state of the evidence.

13        **MR. WOOL:**  Okay.

14        **THE COURT:**  What is the problem with 33?

15        **MR. KILARU:**  I think as a general matter, Your Honor,

16    with respect to the animal and the toxicological testing, who

17    sort of did the testing hasn't been that germane of an issue in

18    Phase One, so --

19        **THE COURT:**  Well, it becomes more germane with this

20    issue that we have been talking about.  So is there anything

21    inaccurate about the testimony that was --

22        **MR. KILARU:**  I don't believe so, Your Honor.  I think

23    to the extent it sort of ties to the mouse study, we can --

24        **THE COURT:**  Okay.  So that will be allowed.

25        **MR. KILARU:**  Okay.

1          **THE COURT:**  And then what was the other one?

2          **MR. KILARU:**  I think it was 544; is that right?

3          **MR. WOOL:**  Correct, yes.

4          **THE COURT:**  544.  I forgot to go back and look at this

5    one this morning, so give me a second.

6          (Whereupon, a brief pause was had.)

7          **THE COURT:**  Was 547, also -- was 547, 548 also

8    designated or was that withdrawn?

9          **MR. WOOL:**  Yes.  The sections on 547 at the bottom

10   starting on line 19 through 25 are designated, and then on 548,

11   line 1 through 7, and then again at 12 -- well, 12 by itself,

12   and then 16 through 25 were designated.

13         **MR. KILARU:**  I think the testimony on this topic

14   actually goes through 555 --

15         **MR. WOOL:**  Yeah, it continues.

16         **MR. KILARU:**  It is sort of all the same topic.

17         **THE COURT:**  So I guess, you know, my gut reaction to

18   this -- so this goes through 555, you said?

19         **MR. KILARU:**  Yes.

20         **THE COURT:**  I mean, the issue of dermal absorption

21   thus far has not become a contested issue in the trial, right?

22   So I'm -- I guess I'm scratching my head a little bit about

23   whether this should be admissible or not.

24         **MR. WOOL:**  I think there are two issues this sort of

25   goes to.  The first being the dose, and that is something that

1    came up with Dr. Portier on some.  And, I believe, in opening

2    Monsanto made a statement to the effect of that the animals are

3    getting thousands and thousands times higher amounts of

4    glyphosate than humans will ever be exposed to in their life.

5    And I think that sort of goes to the --

6         THE COURT:  But that is not contested to either,

7    right?  Portier admits that too, right?

8         MR. WOOL:  Well, yes, in terms of the dose itself; but

9    this goes to show that if humans do receive a substantial

10   dose -- I think that Mr. Hardeman's specific exposure is

11   probably going to be an issue that I think they probably -- I

12   would assume they are going to ask him about how much he

13   sprayed and that sort of thing.  And this goes to the fact that

14   when he is spraying when he is getting exposed, it is actually

15   getting absorbed.

16        THE COURT:  Well, but those are two different issues.

17   One issue is how much did he spray.  I don't know whether they

18   plan on cross-examining him about that or not.  But one issue

19   is how much did he spray.  And the other issue is how was it

20   absorbed.

21        And thus far, at least as far as I can recall, the issue

22   of absorption has not been put into play.  Like, nobody is

23   arguing -- so, for example, on the epidemiological studies,

24   right, we have *McDuffie* saying what she does.  And we have

25   *Eriksson* saying what he says.  And they talk about the -- you

1  know, the number of -- and we have the AHS talking about usage,

2  and we have the epidemiological studies sort of tied to -- some

3  of them tied to the amount of -- the number of times that

4  somebody used glyphosate, right?

5       MR. WOOL:  Right.

6       THE COURT:  But their conclusions do not depend at

7  all -- as far as I understand it -- anyway -- on the degree to

8  which the glyphosate can or cannot be absorbed through the

9  skin.  They just -- they stop at the issue of how many times

10  did somebody use glyphosate.

11       MR. WOOL:  Right.

12       THE COURT:  And if I'm remembering that correctly, if

13  I'm right about all that, then I guess I'm not quite

14  understanding the relevance of this stuff about dermal

15  absorption.

16       MR. WOOL:  Right.  And maybe this is something that if

17  Hardeman is questioned extensively on actual exposure, how much

18  he got on his skin, you know, then I think maybe this would

19  come in.  I think that if Monsanto sort of walks the line of

20  not getting into protective equipment or kind of his actual,

21  you know, not just the amount of times he used but his actual

22  exposure, then maybe we can keep this out for now.

23       But I think our thought was that they will probably cross

24  that line, and I think that at the point in time when they were

25  questioning Hardeman about the amounts of glyphosate he got on

1    his skin, et cetera, that it's useful for the jury to have a

2    sense as to how the glyphosate is being absorbed into the human

3    body.

4         **THE COURT:**  Okay.  And so one response I want to give

5    you is that I do think there is a difference between exposure

6    and absorption.  So it's not clear to me that even if they

7    cross-examine him a lot about exposure, that that opens the

8    door to the discussion of absorption and -- but it's --

9    obviously, it is difficult to predict and difficult to consider

10   in the abstract.  I mean, we have to see how he is

11   cross-examined.  But that is a basic point that I'm not sure

12   I'm getting.

13        **MR. WOOL:**  Well, I think this sort of kind of feeds

14   into the dose response that -- you know, you have exposure on

15   one hand.  That obviously depends on what sort of protective

16   equipment you are wearing, but then how much is absorbed is

17   kind of the actual dose that you are getting and receiving and

18   so -- to --

19        **THE COURT:**  The studies don't talk about dose response

20   in that way, do they?

21        **MR. WOOL:**  Well, no.  They don't talk about dose

22   response in that way.  They do talk about the amount of

23   glyphosate that is being absorbed and ultimately excreted from

24   the human body.

25        **THE COURT:**  The epidemiological studies?

1          **MR. WOOL:**  No.  I am just talking about the exposure

2     studies on the kind of the 550 range of the deposition.

3          **THE COURT:**  Right.  Right.

4          **MR. WOOL:**  Did I misunderstand the question,

5     Your Honor?  I'm sorry.

6          **THE COURT:**  I'm just saying the epidemiology studies

7     don't talk about it in those terms.  Maybe that is a flaw in

8     the epidemiology studies, but they don't talk about it in those

9     terms.  Your case isn't based on -- you know, you have got your

10    three pillars of the science.  You have got the epidemiology.

11    You have got the animal studies, and you have got the

12    mechanism.  None of that seems to be tied to the issue of

13    absorption or at least the issue of absorption has not been

14    contested thus far.

15         **MR. WOOL:**  Right, I think --

16         **THE COURT:**  Another way to put it is the epidemiology

17    studies, for example, all presume that glyphosate is absorbed

18    somehow; and Monsanto has not done anything to question that as

19    of yet.

20         **MR. WOOL:**  Right.

21         **THE COURT:**  It seems.

22         **MR. WOOL:**  And that sort of goes to my point.  I think

23    we would probably concede that for, you know, the purposes of

24    an affirmative designation, maybe this doesn't come in right

25    now, but pending sort of what sort of questions Mr. Hardeman

**PROCEEDINGS**

 1   gets, you know, then it may become relevant at that point.

 2        THE COURT:  Anything you want to say about that?

 3        MR. KILARU:  No, Your Honor.  We agree that there is a

 4   line that you have drawn between exposure and absorption.  I

 5   highly anticipate that our cross of Mr. Hardeman will stay on

 6   the right side of that line.

 7        THE COURT:  Okay.  You know, I mean, it may be that

 8   I'm missing something when I say that there seems to me to be a

 9   line between exposure and absorption, and maybe that -- it will

10   become apparent that I'm missing something when I hear the

11   cross-examination.  But as I sit here now, I don't think this

12   is relevant to Phase One.

13        MR. KILARU:  I don't think so, Your Honor.  To the

14   question whether you are missing something, I think this

15   actually goes back to the debate we had before trial about

16   whether Dr. Sawyer would testify in Phase One.  He is an

17   absorption expert.  And I think that that is sort of a key

18   distinction between epidemiology and exposure versus absorption

19   on the other end, which we haven't made an issue of.

20        THE COURT:  I remember that now.

21        MR. WOOL:  And to be fair I think that there is a

22   slight distinction to be drawn on the absorption studies

23   between Roundup and glyphosate by itself -- which, again, I

24   don't know if it comes in in our case in chief -- but depending

25   on whether or not Monsanto crosses that line, I think it is

PROCEEDINGS

 1   relevant.

 2         **THE COURT:**  Okay.  Fair enough.  So that will be out

 3   for now.

 4       Anything else to discuss with respect to Reeves or the

 5   mouse study?

 6         **MR. KILARU:**  I think that's everything, Your Honor.

 7         **MR. WOOL:**  Nothing from the Plaintiffs.

 8         **THE COURT:**  Okay.  So I will issue a ruling on the

 9   counter-designations and -- just so you will have that -- like

10   all the preliminary stuff that we haven't talked about.  And so

11   you will have that and it will be ready to go.

12         **MR. KILARU:**  Thanks, Your Honor.

13         **MR. WOOL:**  Thank you.

14         **THE COURT:**  Anybody have anything else?

15         **MS. WAGSTAFF:**  Yes, Your Honor.

16       Do you still have that packet for Dr. Martens that I

17   handed you?

18         **THE COURT:**  I think so.

19         **MS. WAGSTAFF:**  All right.  I forgot that we actually

20   have an affirmative designation irrespective of the Parry

21   story.

22         **THE COURT:**  Okay.

23         **MS. WAGSTAFF:**  So there is actually two sort of

24   sections that we have designated.  We are going to withdraw the

25   first section.

 1          THE COURT:  Okay.

 2          MS. WAGSTAFF:  So our designation that is affirmative

 3   starts on page 235 of the -- if you are looking at it, at the

 4   bottom, it is 235, but it is page 412 -- yeah, 235.  It is in

 5   purple.

 6          THE COURT:  Okay.

 7          MS. WAGSTAFF:  It starts with, Good morning,

 8   Dr. Martens.

 9          THE COURT:  How far does it go?

10          MS. WAGSTAFF:  To 238, about four pages.  If you would

11   like to read it real quick.

12          THE COURT:  Can I read it real quick?

13          MS. WAGSTAFF:  Sure.

14      (Whereupon, a brief pause was had.)

15          THE COURT:  Okay.  So remind me who Martens is again.

16          MS. WAGSTAFF:  He is a Monsanto toxicologist.

17          THE COURT:  Okay.

18      (Whereupon, a brief pause was had.)

19          THE COURT:  My reaction to this is this is for the

20   experts; this is not for the Monsanto witnesses.  What am I

21   missing?

22          MS. WAGSTAFF:  Yeah.  So we would designate this

23   either as affirmatively or as rebuttal testimony, and I would

24   point you to where Monsanto was questioning Dr. Portier on this

25   specific topic, and they ask him:  In the Knezevich study in

**PROCEEDINGS**

1  the high-dose group were exposed to 4,841 milligrams per

2  kilograms per day?

3      Yes, I do see that.

4      That is many, many fold higher than humans are exposed to,

5  correct?  Many hundreds or thousands of fold higher, correct?

6      I really don't know.

7      You have not done that calculation?

8      I have not done that calculation.

9      Do you take issue with it being hundreds or thousands of

10  times higher than what humans are exposed to?

11      It is much higher.  I will give you that.

12      And then they go on and on and ask him questions.  So we

13  would say that this is a party -- a statement by a Monsanto

14  employee stating that actually that is completely in line with

15  the way the toxicology studies are done, and that the high

16  dosing is -- actually, there is nothing unusual about that, and

17  we think that Monsanto's cross-examination of Dr. Portier has

18  put that at issue.

19      **THE COURT:**  But Monsanto's cross-examination of

20  Portier, as you read it to me, did not seem to be intended to

21  imply that this is unusual for toxicology.

22      **MS. WAGSTAFF:**  Well, if you -- I guess it was the

23  inflection in his voice when he was asking it as well where he

24  was saying, You don't take issue with the fact that it is that

25  much higher.  There is certainly suggestion that the high doses

1    that animals are given is unusual, and that was suggested in

2    the opening statement as well.

3            THE COURT:  I don't -- I don't -- so, number one, I

4    don't recall that being the case.

5        But number two -- the more important point -- is that that

6    can be established -- and I understand your point that if

7    the -- if Monsanto, the company, said something different from

8    what Monsanto is saying at trial, then the statement by

9    Monsanto, the company, could come in.  But I think your -- I

10   think the -- I think that the point you are making is far too

11   subtle to justify bringing in what is essentially expert

12   testimony from Dr. Martens on the issue of toxicology.

13       So I think it is appropriate to establish that through

14   examination and cross-examination of the experts, but I'm not

15   going to allow this testimony in.

16           MS. WAGSTAFF:  Thank you, Your Honor.

17           THE COURT:  All right.  Anything else for today?

18           MR. STEKLOFF:  Not from us, Your Honor.  Thank you

19   very much.

20           THE COURT:  Okay.  Enjoy your day off.

21           THE CLERK:  Court is adjourned.

22               (Proceedings adjourned at 11:29 a.m.)

23                       ---oOo---

24

25

**<u>CERTIFICATE OF REPORTERS</u>**

    I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Monday, March 4, 2019

_____

Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
U.S. Court Reporter

_____

Marla F. Knox, RPR, CRR
U.S. Court Reporter