# EXHIBIT M

## IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
## STATE OF MISSOURI

PAUL FERRO, *et al.*,      )
                      )
   Plaintiffs,         )
                      )
v.                    )
                      )
MONSANTO COMPANY,     )
                      )
   Defendant.        )

**FILED**

OCT 13 2022

JOAN M. GILMER
Cause No. 20SL-CC03678IRCUIT CLERK, ST. LOUIS COUNTY

Division No. 18

## ORDER REGARDING DEFENDANT MONSANTO COMPANY'S MOTION FOR SUMMARY JUDGMENT

Presently before the Court is Defendant Monsanto Company's ("Monsanto") Motion for Summary Judgment ("Motion"). The Motion is fully briefed.

On October 12, 2022, the Court conducted a pretrial conference and heard arguments from counsel on this Motion and other matters. After careful consideration of the legal briefs, exhibits, and oral arguments, the Motion was submitted for ruling. The Court hereby makes the following rulings.

### I.   LEGAL STANDARD

A motion for summary judgment should be granted if the pleadings show that there are no issues of material fact and that the moving party is entitled to judgment as a matter of law. Rule 74.04(c); *ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 380 (Mo. banc 1993). A "genuine dispute" is a dispute which is real, not merely argumentative, imaginary, or frivolous. *ITT*, 854 S.W.2d at 382.

### II.   DISCUSSION

Plaintiffs' Petition asserts the following ten counts against Monsanto:

1. Strict liability-failure to warn;
2. Strict-liability-design defect;

1

3.  Negligence;
4.  Violation of the Missouri Merchandizing Practices Act;
5.  Breach of express warranty;
6.  Breach of implied warranties;
7.  Violation of the consumer fraud acts of each Plaintiffs' homes state;
8.  Negligent misrepresentation;
9.  Punitive damages; and
10. Exemplary damages.

These counts are all premised on Plaintiffs' allegations that the chemical compound glyphosate in Roundup caused their cancers and that Monsanto should have included cancer warnings on Roundup products. Specifically, Plaintiff Stacey Moore was diagnosed with Diffuse Large B-Cell Lymphoma ("DLBCL") and Plaintiff William Pleu was diagnosed with Chronic Lymphocytic Leukemia ("CLL"). Both DLBCL and CLL are subtypes of Non-Hodgkin's lymphoma ("NHL").

In Plaintiffs' brief, they expressly consent to the dismissal of Counts V, VII, VIII, and IV. Specifically:

- Plaintiffs expressly consent on page 37 of their brief to the dismissal of Count V for breach of express warranty;
- Plaintiffs expressly consent on page 38 of their brief to the dismissal of Count VII for violation of the consumer fraud acts;
- Plaintiffs expressly consent on page 39 of their brief to the dismissal of Count VIII for negligent misrepresentation; and
- Plaintiffs expressly consent on page 39 of their brief to the dismissal of Count IV under the Missouri Merchandizing Practices Act.

Accordingly, the Court grants Monsanto's Motion for Summary Judgment, in part, to dismiss those claims. The remaining claims at issue and addressed herein are Plaintiffs' claims for failure to warn (Count I), design defect (Count II), negligence (Count III), breach of implied warranties (Count VI), and claims for punitive and exemplary damages (Counts IX and X).

Monsanto argues it is entitled to summary judgment for several reasons. First, Monsanto argues Plaintiffs have failed to produce admissible evidence of general and specific causation in support of their claims. Next, Monsanto argues the laws of Alabama and Georgia apply to

Plaintiffs Moore's and Pleu's claims, respectively, and the laws of those states bar or defeat each Plaintiffs' claims for failure to warn, design defect, negligence, and implied warranties. Monsanto also argues Plaintiffs' claims are preempted by the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq.* Finally, Monsanto argues Plaintiffs' claims for punitive and exemplary damages fail because there is no evidence of malice or wantonness in light of its compliance with regulatory requirements.

## A. Choice of Law

As a preliminary matter, Monsanto argues Alabama substantive law applies to Plaintiff Moore's claims and Georgia substantive law applies to Plaintiff Pleu's claims. Plaintiffs, on the other hand, argue Monsanto has waived this issue and, alternatively, that Missouri law applies.

### i. Waiver

Plaintiffs contend Monsanto has waived any argument that Missouri law is not controlling in this case. Specifically, Plaintiffs suggest "[c]ourts will only apply a foreign state's law if a party brings a choice of law motion and persuades the court that the law of a foreign state should apply" and "it is critical that a defendant identify a choice of law *and file a choice of law motion fairly early in the case*." Plaintiffs' brief at 23 (emphasis added). Plaintiffs argue Monsanto's failure to file such a motion has waived the issue. The three opinions from the Eighth Circuit that Plaintiffs cite, however, do not support such a conclusion. Rather, those cases stand for the noncontroversial proposition that an appellate court will not consider a choice-of-law issue for the first time on appeal. *See, e.g.*, *P & O Nedlloyd, Ltd. v. Sanderson Farms, Inc.*, 462 F.3d 1015, 1017 n.3 (8th Cir. 2006) ("Because choice of law is waived if not timely raised, we need not address the choice of law question *for the first time on appeal* . . . .") (emphasis added); *Kostelec v. State Farm Fire & Cas. Co.*, 64 F.3d 1220, 1224 (8th Cir. 1995) (noting that the parties in a diversity action did not

raise any objection to the district court's choice of law and, therefore, waived any choice-of-law issue); *Wiser v. Wayne Farms*, 411 F.3d 923, 926 (8th Cir. 2005) ("In the choice of law context, in particular, we repeatedly have refused to consider arguments not presented to the district court.").

Plaintiffs claim that "[t]he one and only time Monsanto has noted their position that Georgia and Alabama substantive law should apply to Plaintiffs' claim is in their recently filed motion for summary judgment." Plaintiffs' brief at 23. They are incorrect. In Monsanto's Answer—which was filed more than two years ago on September 8, 2020—it asserted numerous affirmative and other defenses under the laws of other states outside of Missouri. For example, its Separate and Affirmative Defense No. 22 stated, in relevant part: "Plaintiffs' claims for punitive and/or exemplary, aggravated, treble, or double damages are barred and/or limited by operation of state and/or federal law and/or the laws of the District of Columbia, Puerto Rico, and the U.S. Virgin Islands, including, but not limited to, . . . Ala. Code § 6-11-21; . . . O.C.G.A. § 51-12-5.1 . . . ." Plaintiffs did not file any response to Monsanto's separate and affirmative defenses.[1]

Additionally, Monsanto's Separate and Affirmative Defense No. 24 stated, in relevant part: "Plaintiffs' strict liability claims are barred in whole or in part by the Alabama Extended Manufacturer's Liability Doctrine . . . ." Monsanto also filed a Motion to Sever and for Single-Plaintiff Trial in this case (and other Roundup cases) over a year ago on July 14, 2021, arguing, in

---

[1] It is true that, generally, a plaintiff is not required to respond to affirmative defenses raised in a defendant's answer. 15 Mo. Prac., Civil Rules Practice § 55.08:1 *Affirmative defenses and avoidances* (2021 ed.). However, the Supreme Court of Missouri has held "a reply should be filed when a plaintiff desires to avoid or affirmatively attack new and affirmative matter alleged in the answer." *Jaycox v. Brune*, 434 S.W.2d 539, 547 (Mo. 1968), *abrogated on other grounds by State ex rel. Leonardi v. Sherry*, 137 S.W.3d 462 (Mo. banc 2004).

4

part, that it would be unduly prejudiced by a single trial of different plaintiffs' claims based on

different locations with different controlling legal standards, among other differences.[2]

"Waiver is founded upon the intentional relinquishment of a known right." *See Brown v. State Farm Mut. Auto. Ins. Co.*, 776 S.W.2d 384, 386 (Mo. banc 1989) (internal quotation marks omitted). Here, Monsanto has previously asserted that the laws of other states would apply. Consequently, Monsanto has not waived choice-of-law arguments in this case.

### ii.  Choice of law analysis

"With regard to substantive law, a forum state will choose the applicable substantive law according to its own conflict of law doctrines." *Clair v. Monsanto Co.*, 412 S.W.3d 295, 304 (Mo. App. E.D. 2013). "For conflicts of law related to tort claims, Missouri employs the 'most significant relationship' test set forth in Restatement (Second) of Conflict of Laws § 145 (1971)."[3] *Zafer Chiropractic & Sports Injs., P.A. v. Hermann*, 501 S.W.3d 545, 550 (Mo. App. E.D. 2016). Section 145 of the Restatement, Second, on Conflict of Laws (the "Restatement") provides:

> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

---

[2] More fully, Monsanto argued on page 4 of its July 14, 2021 Motion to Sever and for Single-Plaintiff Trial that it "would be unduly prejudiced by a single trial of different plaintiffs' claims rife with differences, including, among other differences: different exposure amounts, frequencies, and durations; different formulations of glyphosate-based herbicides; different subtypes of non-Hodgkin's Lymphoma ('NHL'); different prognoses and treatments; different family histories and risk profiles for NHL; *and different locations with different controlling legal standards.*" (Emphasis added).

[3] Missouri courts refer to this concept as "conflict of law" and "choice of law" interchangeably. *See, e.g., Goede v. Aerojet Gen. Corp.*, 143 S.W.3d 14, 24–25 (Mo. App. E.D. 2004), *abrogated on other grounds by Sanders v. Ahmed*, 364 S.W.3d 195 (Mo. banc 2012) (citing *Kennedy v. Dixon*, 439 S.W.2d 173, 184 (Mo. banc 1969) ("When determining choice-of-law issues in a tort action, Missouri courts apply the 'most significant relationship' test set out in Section 145 of the Restatement, Second, on Conflict of Laws.").

> (a) the place where the injury occurred,
> (b) the place where the conduct causing the injury occurred,
> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
> (d) the place where the relationship, if any, between the parties is centered. These contacts are to be evaluated according to their relative importance with respect to the particular issue.

"[T]hese contacts are not the sole factors for a court to consider. Rather, these contacts are to be taken into account in applying the principles of section 6 to determine the law applicable to an issue." *Goede v. Aerojet Gen. Corp.*, 143 S.W.3d 14, 26 (Mo. App. E.D. 2004), *abrogated on other grounds by Sanders v. Ahmed*, 364 S.W.3d 195 (Mo. banc 2012). Section 6 of the of the Restatement provides:

> (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
> (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

Section 171 of the Restatement further provides: "The law selected by application of the rule of § 145 determines the measure of damages."

Here, Plaintiffs argue the four factors in Section 145(2) of the Restatement weigh in favor of applying Missouri law. According to Plaintiffs: (a) the injury occurred in Alabama (as to Plaintiff Moore) and Georgia (as to Plaintiff Pleu); (b) the place where the conduct causing the injury is Missouri because that is where Monsanto designed, formulated, labeled, and distributed Roundup; (c) Plaintiffs Moore and Pleu are from Alabama and Georgia, respectively, and Monsanto is from Missouri; and (d) the place where the relationship is centered is Missouri where

6

Roundup is formulated, designed, manufactured, labeled, and distributed. Monsanto, on the other hand, argues the state in which each Plaintiff was exposed to Roundup has the most significant relationship to Plaintiffs' claims in this case and, accordingly, the laws of those states should apply.

This precise issue was raised in the recent trial against Monsanto related to Roundup exposure: *Alesi v. Monsanto Co.*, No. 19SL-CC03617 (Cir. Ct. of St. Louis Cty.). The plaintiffs in that case were, like here, non-Missouri residents who used Roundup in other states. The Honorable Brian H. May considered nearly identical arguments from the parties in that case and ultimately concluded "the state in which each Plaintiff was allegedly exposed to Roundup would be the jurisdiction with the most significant relationship to the claims asserted . . . ." Order Concerning Choice of Law at 9, *Alesi v. Monsanto Co.*, No. 19SL-CC03617 (Cir. Ct. of St. Louis Cty. Aug. 7, 2022).

Generally, Missouri courts in personal injury cases apply the law of the place of injury unless another state has a more significant relationship. *Thompson v. Crawford*, 833 S.W.2d 868, 870 (Mo. banc 1992); *Winter v. Novartis Pharms. Corp.*, 739 F.3d 405, 410 (8th Cir. 2014) (citing *Thompson*, 833 S.W.2d at 870). For example, in *Clair v. Monsanto Co.*, residents of California filed suit against Monsanto and Pharmacia Corporation in Missouri state court and asserted claims for strict liability based on design defect and negligence, alleging polychlorinated biphenyls ("PCBs") manufactured and distributed by the defendants caused their NHL. 412 S.W.3d at 300-02. The Court of Appeals, Eastern District, applied Section 145 of the Restatement, Second, on Conflict of Laws and held that California substantive law applied:

> Here, the injuries occurred in California. Plaintiffs came into contact with PCBs in California predominantly. Plaintiffs all reside in California. Plaintiffs have no relationship with Pharmacia other than coming into contact with its products in California. Further, the parties all agree that California law applies to the substantive claims in this case. Therefore, we will look to California substantive law when evaluating the merits of Plaintiffs' points.

*Id.* at 304.

"[T]he Restatement approach to choice of law does not require that all issues in a particular case be controlled by the law of the same state. Under the conflict-of-laws doctrine of *depecage,* different issues in a single case may be decided according to the laws of different states." *Goede,* 143 S.W.3d at 25 (citation omitted).

> Indeed, the Restatement itself contemplates that different states' laws may be applied to different issues in the same case. Section 145(1) provides that "the rights and liabilities of the parties with respect to *an issue* in tort are determined by the local law of the state which, with respect to *that issue,* has the most significant relationship." (Emphases supplied). Continuing, section 145(2) provides that the "contacts are to be evaluated according to their relative importance with respect to *the particular issue.*" (Emphasis supplied). And, as set forth in the comments to section 171, "the state of conduct and injury will not, ..., be the state that is primarily concerned with the measure of damages in a tort action." Accordingly, we find that the trial court may separately analyze the issues of liability and damages in a case, and may properly apply different states' laws to each issue.

*Id.*

On the issue of damages, Missouri courts are clear that a state has the "predominant interest" when deciding damages for injuries "occurring within its boundaries." *Goede,* 143 S.W.3d at 26 (affirming the trial court's determination that Missouri law on damages applied in a wrongful death case based on asbestos exposure in California).[4]

> Where the issue involves a right of recovery as opposed to a question of liability, the domicile of the parties becomes a highly significant contact, as states have a

---

[4] The Supreme Court in *Sanders* abrogated *Goede* solely on the issue of "whether a party must move for directed verdict both at the close of the opposing party's evidence and again at close of all evidence, or whether a sole motion at close of all evidence suffices to preserve the issue." *Sanders,* 364 S.W.3d at 207 (*comparing Goede,* 143 S.W.3d at 18, *with Schnatzmeyer v. Nat'l Life Ins. Co.,* 791 S.W.2d 815, 819 (Mo. App. E.D. 1990)). *Goede* remains good law for the issue of determining choice of law regarding damages. *See, e.g., Brenneman v. Great Wolf Lodge of Kansas City, LLC,* No. 4:15-CV-00683-SRB, 2017 WL 6383979, at *5 (W.D. Mo. Jan. 24, 2017) (relying on *Goede* in concluding Missouri law on damages applied in a choice-of-law analysis were the plaintiff, a Missouri citizen, was injured in Kansas but "Missouri has an overriding interest is obtaining recovery for its citizens").

8

> great interest in applying their own compensation-related laws to their own
> residents, but very little interest in applying those same laws to non-residents.

*Wilson v. Image Flooring, LLC*, 400 S.W.3d 386, 398 (Mo. App. W.D. 2013) (citing *Goede*, 143

S.W.3d at 27). "Where . . . the conflict involves a rule of recovery or question of compensation,

*the domicile of the parties is the most significant contact*." *Id.* (emphasis added).

Here, the record shows Plaintiff Moore's domicile is Alabama and Plaintiff Pleu's domicile

is Georgia. Therefore, Alabama has the most significant relationship to Plaintiff Moore's injuries

that allegedly occurred in Alabama and has the most significant interest in compensating its

Plaintiff Moore's claims. Likewise, Georgia has the most significant relationship to Plaintiff

Pleu's injuries that allegedly occurred in Georgia and has the most significant interest in

compensating its Plaintiff Pleu's claims.

Consequently, Alabama law applies to Plaintiff Moore's claims and Georgia law applies

to Plaintiff Pleu's claims on any issue in which an actual conflict exists with the law of Missouri.

*See Thompson*, 833 S.W.2d at 870; *Clair*, 412 S.W.3d at 304; Order Concerning Choice of Law at

9, *Alesi v. Monsanto Co.*, No. 19SL-CC03617 (Cir. Ct. of St. Louis Cty. Aug. 7, 2022).

### B. Plaintiffs' expert testimony on general and specific causation

Monsanto argues Plaintiffs have offered no admissible evidence of general or specific

causation in this case. In support, Monsanto cites to the arguments made in its seven separate

Motions to Exclude directed at Plaintiffs' expert witnesses.

Generally, the plaintiff in a products liability case "must establish the causal relationship

by expert testimony." *Hagen v. Celotex Corp.*, 816 S.W.2d 667, 670 (Mo. banc 1991). Missouri

courts have noted that "expert testimony is not necessarily required to establish product defect or

unreasonable danger." *Tune v. Synergy Gas Corp.*, 883 S.W.2d 10, 14 (Mo. banc 1994). However,

expert testimony is necessary where "the lay jury [does] not possess the experience or knowledge

of the subject matter sufficient to enable them to reach an intelligent opinion without help."

*Siebern v. Missouri-Illinois Tractor & Equip. Co.*, 711 S.W.2d 935, 939 (Mo. App. E.D. 1986).

*See also Pro Serv. Auto., L.L.C. v. Lenan Corp.*, 469 F.3d 1210, 1214 (8th Cir. 2006) (applying

Missouri law).

> Missouri law holds that unless the injury involves a "sudden onset, visible injury, or an injury that as a matter of common knowledge follows the act ... some expert medical testimony combined with other evidence tending to show with a reasonable certainty that the accident caused the injury is necessary [to prove causation]."

*Eppler v. Ciba-Geigy Corp.*, 860 F. Supp. 1391, 1395 n.3 (W.D. Mo. 1994) (omission and

alteration in original) (quoting *Harris v. Washington*, 654 S.W.2d 303, 306 (Mo. App. E.D. 1983)).

Expert testimony is also required in negligence claims depending on the nature of the

underlying injury.

> The testimony of a lay witness is sufficient to establish the nature, cause and extent of an injury "when the facts fall within the realm of lay understanding." *Griggs v. A.B. Chance Company*, 503 S.W.2d 697, 704 (Mo.App.1973). *See also Pedigo v. Roseberry*, 340 Mo. 724, 102 S.W.2d 600, 606–07 (1937); *State ex rel. Burcham v. Drainage District No. 25*, 272 S.W.2d 712, 716–17 (Mo.App.1954). However, when the injury is a "sophisticated injury, which requires surgical intervention or other highly scientific technique for diagnosis, and particularly where there is a serious question of pre-existing disability and its extent, the proof of causation is not within the realm of lay understanding...." *Griggs*, 503 S.W.2d at 704.

*Williams v. Jacobs*, 972 S.W.2d 334, 340 (Mo. App. W.D. 1998) ("It is not essential to have

medical testimony, however, as a causal connection between an accident and injury can be inferred

in cases where there is a visible injury, or a sudden onset of an injury, or an injury that as a matter

of common knowledge follows the act.") (internal quotation marks omitted).  These court opinions

are consistent with the current version of section 490.065.2(1)(a), RSMo, which provides an expert

witness may testify if "[t]he expert's scientific, technical, or other specialized knowledge will help

the trier of fact to understand the evidence or to determine a fact in issue."

The injuries at issue in this case, the trial Plaintiffs' NHL, is plainly outside the realm of

lay understanding.  As Missouri courts recognize:

> proof of causation in cases involving exposure to a toxic substance typically
> requires a certain degree of scientific expertise. *See Lewis,* 5 S.W.3d at 585. This is
> because "[t]he diagnosis of disease induced by environmental factors is essentially
> 'a scientific undertaking' requiring proof which 'the scientific community deems
> sufficient for that causal link.' " *Id.* (citation omitted). As Defendants note, the
> requirement for expert testimony in cases like the instant matter, coincides with the
> requisite proof of causation in medical injury cases, where the cause of
> sophisticated injuries is not within a layperson's common understanding and,
> therefore, the plaintiff must establish the causal relationship through expert medical
> testimony. *See Brickey v. Concerned Care of the Midwest, Inc.,* 988 S.W.2d 592,
> 596–97 (Mo.App.E.D.1999).

*Brown for Est. of Kruse v. Seven Trails Invs., LLC*, 456 S.W.3d 864, 869–70 (Mo. App. E.D.

2014).  The same is true under both Alabama and Georgia law.  *See generally Tidwell v. Upjohn*

*Co.*, 626 So. 2d 1297, 1300 (Ala. 1993) ("The purpose of expert testimony is to aid the trier of fact

where the subject matter is beyond the ken of the average juror."); *Cowart v. Widener*, 697 S.E.2d

779, 785 (Ga. 2010) ("[S]ometimes the link between a defendant's actions and the plaintiff's injury

is beyond common knowledge and experience. An example would be a toxic tort case . . . .").

For the reasons explained in the separate Order Regarding the Parties' Motions to Exclude

Experts, Plaintiffs' experts in this case generally satisfy the requirements of section 490.065.2(1),

RSMo, to offer their proffered testimony to the jury as limited by the orders stated therein.

Consequently, summary judgment is not warranted on this ground.

### C.  Plaintiffs Moore's and Pleu's Affidavits

Attached to Plaintiffs' Responses to Monsanto's Statement of Undisputed Facts and

Plaintiffs' Counterstatement of Undisputed Material Facts are two new affidavits signed separately

by Plaintiffs Moore and Pleu on September 6, 2022 and submitted as Exhibits W and X,

respectively.

11

Monsanto argues Plaintiffs submitted these affidavits in a bad faith effort to contradict prior

sworn deposition testimony and avoid summary judgment.   Specifically, Monsanto points to

Plaintiff Moore's deposition testimony where he denied ever reading Roundup labels:

> Q. Did you ever read the label of the Roundup containers?
> A. No, sir.

Moore Dep. 70:16-18.  Later in the deposition, Plaintiff Moore did not recall whether he ever read

a Roundup label:

> Q. Did you ever review a label on a Roundup container that opened like an
> accordion?
> A. Not that I recall.

Moore Dep. 204:14-16.  Monsanto cites to similar deposition testimony by Plaintiff Pleu, denying

having ever read a Roundup label:

> Q. Did you read the label on the Roundup?
> A. No.

Pleu Dep. 86:14-15.  Plaintiffs Moore's and Pleu's affidavits, on the other hand, include the

following identical averments, in relevant part:

> 3.      Given the length of time I used Roundup and the amount of times I
>         purchased Roundup, I am familiar with the labeling on the bottle.
> 4.      There was nothing on the labeling of Roundup that warned of cancer.
> 5.      Had there been a cancer warning on any kind of Roundup, I would have
>         seen it.
> 6.      Had there been a warning on the label that said Roundup could cause cancer,
>         I would not have used Roundup.

Monsanto requests the Court disregard or construe against Plaintiffs these affidavits of

Plaintiffs Moore and Pleu.  "[A] party may not avoid summary judgment by giving inconsistent

testimony and then offering the inconsistencies into the record in order to demonstrate a genuine

issue of material fact." *Tiemann v. SSM Reg'l Health Servs.*, 632 S.W.3d 833, 846 (Mo. App.

W.D. 2021) (quoting *ITT Commercial*, 854 S.W.2d at 388).[5]  Additionally, Monsanto requests the

Court award it the attorneys' fees incurred in responding to the two affidavits pursuant to Rule

74.04(g).  That rule provides:

> Should it appear to the satisfaction of the court at any time that any affidavit
> presented pursuant to this Rule 74.04 is presented in bad faith or solely for the
> purpose of delay, the court shall forthwith order the party presenting it to pay to the
> other party the amount of the reasonable expenses that the filing of the affidavit
> caused the other party to incur, including reasonable attorney's fees, and any
> offending party or attorney may be adjudged guilty of contempt.

*Id.*  Courts have opined that contradictory affidavits submitted in response to a motion for summary

judgment directly hinder the purpose of summary judgment proceedings:

> The utility of summary judgment as a procedure for screening out sham issues of
> fact would be diminished if a party who has been examined at length on deposition
> could raise an issue of fact simply by submitting an affidavit contradicting his own
> earlier testimony. . . .  Missouri courts have applied this principle to exclude an
> affidavit offered in a summary judgment proceeding when the affidavit contradicts
> the affiant's previous *sworn deposition testimony*.  <u>The only important caveat to
> this general rule is that the evidence must be affirmatively contradictory.</u>

*McNearney v. LTF Club Operations Co., Inc.*, 486 S.W.3d 396, 408 (Mo. App. E.D. 2016)

(emphasis in original, underline added, citations and internal quotation marks omitted).

   While the exact quotes picked out by Monsanto and noted above appear contradictory to

the averments in the affidavits, other portions of each Plaintiffs' depositions might not be

contradictory.  During Plaintiff Moore's deposition, his answer to the following question shows

he had read at least part of a Roundup label on recommended use:

---

[5] The same is true under Alabama and Georgia caselaw.  *See, e.g., Lady Corinne Trawlers, Inc. v. Zurich Ins. Co.*, 507 So. 2d 915, 917–18 (Ala. 1987) ("[The plaintiff] cannot now be allowed to directly contradict his prior sworn statement just to create an issue of fact in an attempt to avoid summary judgment."); *Walker v. Brannan*, 533 S.E.2d 129, 130–31 (Ga. Ct. App. 2000) ("It is well established that on summary judgment a party's self-contradictory testimony, if unexplained, must be construed against the party-witness, even when the party-witness is the respondent rather than the movant.").

> Q. Do you recall reading any instructions on the label about the weather conditions for using Roundup?
> A. I recall a little bit of it.
> Q. Do you recall whether it said anything about whether you should use Roundup or not use Roundup if it was windy out?
> A. It said recommended use not to but --unless you hold -- I want to say unless you hold it real close because it could spread and hit your flowers or -- I mean, that's a long time ago. And to be honest with you, *I haven't looked at one since*.

Moore Dep. 139:5-17 (emphasis added).  Plaintiff Moore also testified to the following during his

deposition indicating he had not seen a warning on Roundup:

> Q. And prior to seeing the advertisement for lawyers for suing Roundup, you hadn't seen any information connecting Roundup with cancer before?
> A. No. They don't put a great big warning sign on the label or anything that says causes cancer. So, you know, nothing was ever said about it until I seen the advertisement with a lawyer on it.

Moore Dep. 191:14-21.  Further, Plaintiff Moore stated the following on whether the presence of

a warning label would have impacted his decision to use Roundup:

> Q. Is it your testimony that if the Roundup label came with a warning that it could cause cancer that you would not use Roundup or would not have used Roundup?
> A. In my better judgment, yes. I probably -- I probably would not have.
> Q. Would you say --
> A. Nobody wants cancer. So, I mean, if you -- you know, but it's like -- it's two different things. Like I said, I'm addicted to cigarettes. Roundup, I can do without it, you know, if I had known it was going to cause cancer.
> Q. So your testimony is that you would not have used it?
> A. Correct.
> Q. What would you have used instead?
> A. A weedeater.
> Q. Just the physical tool, the weedeater?
> A. Yes, sir.

Moore Dep. 208:15-209:9.  Plaintiff Pleu gave the following answer to whether he "probably"

ever read a Roundup label and whether a cancer warning would have impacted his decision to use

Roundup:

> Q. Earlier you were asked questions about whether or not you ever read the label on the Roundup bottle. Do you think that in all the years that you purchased and

used Roundup, that at some point you probably read or noticed the label on
Roundup?
MR. THOMAS: Objection. Asked and answered.
Q. You can answer.
A. Probably, but I don't remember.
Q. Right. If there was a warning on the Roundup package that said that Roundup -
- use of Roundup can cause cancer, would you have used Roundup?
MR. THOMAS: Objection, form.
A. No.

Pleu Dep. 221:21-222:11.

These statements made by Plaintiffs Moore and Pleu during their respective depositions,

taken in the light most favorable to Plaintiffs, could be interpreted by a jury that each Plaintiff did

some review of a Roundup container in the past.  Each Plaintiff also stated they would not have

used Roundup had there been a warning that it could cause cancer.  *See* Moore Dep. 208:15-209:9;

Pleu Dep. 222:6-11.  As to whether the affidavits are directly contradictory to the Plaintiffs' prior

testimony is debatable.  That question need not to be answered determinatively since that is at least

answered from what Plaintiffs said in their depositions that are subject to the realm of the jury on

the issue of seeing warnings on Roundup products.

### D.   Georgia law applied to Plaintiff Pleu's claims

#### *i    Georgia's statute of repose*

Monsanto argues Georgia's ten-year statute of repose for products liability actions applies

to time-bar Plaintiff Pleu's strict liability claims in Counts I and II and negligence claim in Count

III.  In light of the choice-of-law analysis above, Georgia's statute of repose applies to Plaintiff

Pleu's claims.  *See Grosshart v. Kansas City Power & Light Co.*, 623 S.W.3d 160, 167–68 (Mo.

App. W.D. 2021) ("Generally, Missouri courts consider statutes of repose to be substantive.").

The relevant statute of repose, O.C.G.A. § 51-1-11(b)(2), provides: "No action shall be

commenced pursuant to this subsection with respect to an injury after ten years from the date of

the first sale for use or consumption of the personal property causing or otherwise bringing about the injury." "OCGA § 51–1–11(b)(2) does not provide that the period of repose commences on the date of the 'first sale' of a product by its manufacturer.  It provides that the period of repose commences on the date of the 'first sale for use or consumption.'" *Pafford v. Biomet*, 448 S.E.2d 347, 348 (Ga. 1994); *Campbell v. Altec Indus., Inc.*, 707 S.E.2d 48, 49 (Ga. 2011).  Here, Monsanto notes Plaintiff Pleu first use of Roundup was in 1994.  Accordingly, it argues his claims filed in this case more than 25 years later are time barred.

Plaintiffs argue Monsanto is estopped from relying on Georgia's statute of repose because of its alleged misconduct concealing the dangers of glyphosate in Roundup.  *See Hill v. Fordham*, 367 S.E.2d 128, 131 (Ga. Ct. App. 1988) ("[T]he statute of ultimate repose should not be applied to relieve a defendant of liability for injuries which occurred during the period of liability, but which were concealed from the patient by the defendant's own fraud.").  Plaintiffs argue Monsanto's conduct related to the safety of glyphosate in Roundup amounts to fraud sufficient to estop it from relying on Georgia's statute of repose.

Alternatively, Plaintiffs note that while Plaintiff Pleu initially began purchasing Roundup in 1994, he continued to do so through 2020.  Plaintiffs argue that, if the Court concludes the Georgia statute of repose applies, it cannot bar Plaintiff Pleu from raising claims related to his purchase of Roundup within the preceding ten years of filing this case (i.e., 2010 and onward).  Monsanto correctly points out that Plaintiffs did not cite to any authority for that proposition.

Monsanto replies by arguing Georgia law requires plaintiffs claiming fraudulent concealment present evidence of an affirmative act of fraud.[6]  Further, Monsanto argues Plaintiffs

---

[6] Monsanto's reply brief contains the following quote on page 10: "[T]he acts relied on must be of an affirmative character and fraudulent."  Monsanto attributes that quote to O.C.G.A. § 9-3-96. That statute, however, provides: "If the defendant or those under whom he claims are guilty of a

fail to present any evidence that Monsanto made any direct communication to either Plaintiff Moore or Plaintiff Pleu or evidence that either Plaintiff relied on any alleged conduct by Monsanto in not filing suit sooner. *See UWork.com, Inc. v. Paragon Techs., Inc.*, 740 S.E.2d 887, 898–99 (Ga. Ct. App. 2013) (noting that "for a misrepresentation to a third party to constitute actionable fraud . . . the defrauded party must be induced to act or forbear from acting as a result of the misrepresentation made to the third party").

As a preliminary matter, Georgia's statute of repose can only apply to Plaintiff Pleu's claim for design defect (Count II) as Georgia courts have recognized that O.C.G.A. § 51-1-11(b)(2) does not apply to claims based on failure to warn or negligence. *See Daniels v. Bucyrus-Erie Corp.*, 516 S.E.2d 848, 849 (Ga. Ct. App. 1999) ("The statute of repose does not apply to 'failure to warn' claims."); *Hatcher v. Allied Prod. Corp.*, 796 F.2d 1427, 1428 (11th Cir. 1986) (noting "the Supreme Court of Georgia has held that § 51-1-11 does not apply to negligence claims" after the Eleventh Circuit certified specific questions to the Supreme Court of Georgia, including "Does OCGA § 51-1-11 apply to negligence claims as well as strict liability claims?").

"Georgia law imposes a continuing post-sale duty to warn upon manufacturers." *Tuttle v. Dexcom, Inc.*, No. 1:20-CV-4744-LMM, 2021 WL 8998920, at *13 (N.D. Ga. May 20, 2021). Specifically, O.C.G.A. § 51-1-11(c) provides, in relevant part: "Nothing contained in this

---

fraud by which the plaintiff has been debarred or deterred from bringing an action, the period of limitation shall run only from the time of the plaintiff's discovery of the fraud." The language Monsanto quotes, in reality, appears repeatedly in the "Notes of Decisions" section for O.C.G.A. § 9-3-96 on Westlaw in Westlaw-created summaries of case holdings. Upon review, it appears the first usage of that language was by the Court of Appeals of Georgia quoting Black's Law Dictionary. *Middleton v. Pruden*, 196 S.E. 259, 262 (Ga. Ct. App. 1938) ("To constitute concealment of a cause of action so as to prevent the running of limitations, some trick or artifice must be employed to prevent inquiry or elude investigation, or to mislead and hinder the party who has the cause of action from obtaining information, and the acts relied on must be of an affirmative character and fraudulent.") (quoting Black's Law Dictionary, 3d ed).

subsection shall relieve a manufacturer from the duty to warn of a danger arising from use of a product once that danger becomes known to the manufacturer." *See also Chrysler Corp. v. Batten*, 450 S.E.2d 208, 213 (Ga. 1994) ("That '[n]othing' relieves a manufacturer from the duty to warn reflects the legislature's recognition of the possibility that this duty may not emerge until long after the statute of repose has extinguished any cause of action arising out of the product's sale; that the duty to warn arises 'once th[e] danger becomes known' reflects the existing case law with its actual or constructive knowledge standard."). "This duty to warn is a continuing one and may arise 'months, years, or even decades after the date of the first sale of the product.'" *Watkins v. Ford Motor Co.*, 190 F.3d 1213, 1218 (11th Cir. 1999) (quoting *Batten*, 450 S.E.2d at 211). "[T]he exclusion [in the final sentence of O.C.G.A. § 51-1-11(c)] places failure-to-warn causes of action outside the ambit of the statute of repose, thereby precluding use of the statute to relieve manufacturers of their liability for failing to warn of a danger arising from the use of a product whenever that danger becomes known to the manufacturers." *Batten*, 450 S.E.2d at 213.

Accordingly, "[a]s stated by the Georgia Supreme Court, it is possible to have a situation where the plaintiff is barred from bringing a design defect claim and yet is allowed to proceed with a failure to warn claim based upon the dangers arising from the same alleged design defect." *Watkins*, 190 F.3d at 1219 (citing *Batten*, 450 S.E.2d at 213). Therefore, Georgia's statute of repose cannot be used by Monsanto to bar Plaintiff Pleu's failure to warn claim.

The relevant "first sale" for purposes of applying O.C.G.A. § 51-1-11(b)(2) is not a *particular plaintiff's first purchase* of a product; rather, it concerns the *manufacturer's first sale* to consumers. For example, in *PTI Royston, LLC v. Eubanks*, 861 S.E.2d 115, 263 (Ga. Ct. App. 2021), the Court of Appeals of Georgia considered whether O.C.G.A. § 51-1-11(b)(2) barred strict liability claims under Georgia's Asbestos Claims and Silica Claims Act, O.C.G.A. § 51-14-1 et

seq. The plaintiff sued Johnson & Johnson, PTI Royston, LLC ("PTI"), and others, alleging she

developed ovarian cancer as a result of her daily use of Johnson & Johnson baby power from 1963

until her diagnosis in 2016. *Id.* at 263-64. In discussing the applicability of the ten-year statute of

repose, the Court of Appeals of Georgia noted: "It is undisputed that PTI's first sale of the talc was

in 2005, more than ten years before Eubanks learned of her cancer diagnosis and filed suit." *Id.* at

264. *See also Watkins*, 190 F.3d at 1216 ("there is no dispute that [the plaintiff's pre-owned] 1986

Bronco II was first purchased more than ten years prior to the filing of the instant action" in 1996).

Monsanto began manufacturing and selling Roundup in the 1970's. As in *PTI Royston*

where the plaintiff used talc-containing baby powder until her diagnosis in 2016, Plaintiff Pleu

alleges he used Roundup continuously into 2020. That does not change the fact that the "first sale"

of Roundup was more than forty years ago.

The Court of Appeals of Georgia in *PTI Royston* explained the different analysis and

purpose of statutes of limitations compared to statutes of repose.

> A statute of limitation creates "a time limit for suing in a civil case, based on the
> date when the claim accrued." Black's Law Dictionary (11th ed. 2019). A claim
> accrues "when the injury occurred or was discovered." Id. Thus, for a statute of
> limitation period to begin, a claim must actually exist, as shown by evidence of a
> physical impairment. See *CTS Corp. v. Waldburger*, 573 U.S. 1,15-16 (II) (C), 134
> S.Ct. 2175, 189 L.Ed.2d 62 (2014), superseded by statute as recognized in *In re
> Dow Corning Corp. v. DCC Litigation Facility, Inc.*, 778 F.3d 545, 552 (IV), n. 2
> (6th Cir. 2015) ("[T]he definition of the 'applicable limitations period' presupposes
> that 'a covered civil action' exists.") (citation and punctuation omitted). In contrast,
> the statute of repose is "not related to the accrual of any cause of action; the injury
> need not have occurred, much less have been discovered." 54 CJS, Limitations of
> Actions § 6 (2021). As our Supreme Court explained,
>
>> [a] statute of limitations normally governs the time within which
>> legal proceedings must be commenced after the cause of action
>> accrues. A statute of repose, however, limits the time within which
>> an action may be brought and is not related to the accrual of any
>> cause of action.... A statute of repose stands as an unyielding barrier
>> to a plaintiff's right of action. The statute of repose is absolute; the
>> bar of the statute of limitation is contingent. The statute of

> repose destroys the previously existing rights so that, on the
> expiration of the statutory period, the cause of action no longer
> exists.

(Citations and punctuation omitted.) *Wright v. Robinson*, 262 Ga. 844, 845 (1), 426 S.E.2d 870 (1993); see also *Simmons v. Sonyika*, 279 Ga. 378, 379, 614 S.E.2d 27 (2005); *Howell v. Bates*, 350 Ga. App. 708, 712-713 (2), 830 S.E.2d 250 (2019).

> . . . OCGA § 51-1-11 (b) (2) speaks of the time when an action may no longer be
> *commenced*, regardless of whether the claim has already accrued, and that time is
> triggered by the first sale or use of the product.

*PTI Royston*, 861 S.E.2d at 119–20. *See also CTS Corp. v. Waldburger*, 573 U.S. 1, 16 (2014) ("A statute of repose . . . is not related to the accrual of any cause of action. Rather, it mandates that there shall be no cause of action beyond a certain point, even if no cause of action has yet accrued. Thus, a statute of repose can prohibit a cause of action from coming into existence.") (citation and internal quotation marks omitted).

The Court of Appeals of Georgia in *PTI Royston* further concluded its holding was consistent with the apparent legislative intent in enacting the general tort statute of repose. 861 S.E.2d at 121. Specifically, Georgia courts have noted that "[t]he ten-year statute of repose was enacted in order to address problems generated by the open-ended liability of manufacturers so as to eliminate stale claims and stabilize products liability underwriting." *Batten*, 450 S.E.2d at 212 (citing *Love v. Whirlpool Corp.*, 449 S.E.2d 602 (1994)).[7]

---

[7] Shortly before the pretrial conference on October 12, 2022, Plaintiffs filed a Notice of Supplemental Filing Regarding Georgia's Product Liability Statute of Repose. Therein, they direct the Court's attention to *Love v. Whirlpool Corp.*, 449 S.E.2d 602, 606 (Ga. 1994) and *Capes v. Ethicon, Inc.*, No. 1:19-cv-04895, 2019 WL 11828235, at *4 (N.D. Ga. Dec. 5, 2019), arguing those cases support a "disease exception" to Georgia's statute of repose. The federal district court in *Capes* noted that the statute of repose, specifically subsection O.C.G.A. § 51-1-11(c) "provides for limited exceptions to the ten-year statute of repose *for negligence actions*." 2019 WL 11828235, at *3 (emphasis in original). The plaintiff in that case, however, was seeking to hold the defendants strictly liable. *Id.* "The Georgia Supreme Court has unequivocally barred all claims filed more than ten years after the date of the first sale for use or consumption, without exception, when a plaintiff is seeking to hold a defendant strictly liable." *Id.* Here, the Court has already

In light of this analysis, O.C.G.A. § 51-1-11(b)(2) could apply to bar Plaintiff Pleu's design defect claim because this case was filed more than ten years after Roundup was first sold to consumers.

Nevertheless, Plaintiffs argues Monsanto's conduct related to Roundup amounts to fraud to estop it from relying on Georgia's statute of repose in this case. The Court of Appeals of Georgia also addressed this issue in *PTI Royston*:

> Although it is well settled that a statute of repose cannot be tolled, there are "narrow circumstances [in which] a defendant may be equitably estopped from raising the statute of repose as a defense." *Balotin v. Simpson*, 286 Ga. App. 772, 773, 650 S.E.2d 253 (2007); see also *Rosenberg v. Falling Water, Inc.*, 289 Ga. 57, 60-61, 709 S.E.2d 227 (2011) (discussing context in which doctrine of equitable estoppel can be applied with respect to statutes of repose); *Craven v. Lowndes County Hosp. Auth.*, 263 Ga. 657, 660 (3), 437 S.E.2d 308 (1993); *Wilhelm v. Houston County*, 310 Ga. App. 506, 509 (1) (c), 713 S.E.2d 660 (2011); *Esener*, 240 Ga. App. at 23, 522 S.E.2d 522.
>
> To apply the estoppel doctrine, we look to whether
>
>> the evidence of defendant's fraud or other conduct on which the plaintiff reasonably relied in forbearing the bringing of a lawsuit is found by the [trier of fact] to exist, then the defendant, under the doctrine of equitable estoppel, is estopped from raising the defense of the statute of ultimate repose.
>
> *Esener*, 240 Ga. App. at 23, 522 S.E.2d 522; see also *Wilhelm*, 310 Ga. App. at 509 (1) (c), 713 S.E.2d 660 ("[A] defendant may be equitably estopped from raising the defense of the statute of repose if the plaintiff reasonably relied on a fraudulent act or statement by the defendant that occurred after the plaintiff's injury accrued and, as a result of that fraud, the plaintiff did not file suit until after the repose period expired.") (emphasis omitted).

---

noted above that Georgia's statute of repose does not apply to Plaintiff Pleu's negligence claims. *See Hatcher*, 796 F.2d at 1428 (noting "the Supreme Court of Georgia has held that § 51-1-11 does not apply to negligence claims" after the Eleventh Circuit certified specific questions to the Supreme Court of Georgia, including "Does OCGA § 51-1-11 apply to negligence claims as well as strict liability claims?"). For the reasons explained in this Order, the Court does not find that summary judgment is warranted on Plaintiff Pleu's strict liability claim.

21

861 S.E.2d at 122–23.  The Court of Appeals of Georgia noted the plaintiffs in that case "alleged that PTI falsely represented that talc was safe and asbestos free, and it concealed studies showing otherwise" and "further alleged that PTI acted with intent to deceive and mislead users." *Id.* at 123.  Because "[t]he trial court did not consider whether the Plaintiffs' allegations of fraud were a sufficient basis to preclude PTI from raising the statute of repose defense," the case was remanded to consider the issue.  *Id.*

Here, Plaintiffs have made similar accusations against Monsanto that were made against the defendants in *PTI Royston*.  For example, Plaintiffs have alleged:

- Monsanto was well aware of the genotoxicity of Roundup but it took repeated measures to conceal that information from regulators and Roundup users. . . .
- Monsanto informs Roundup users via advertising and other public statements that Roundup is safe, that Roundup is safe, even though Monsanto admits that it has never tested the product. . . .
- When independent scientists, such as the IARC and researchers performed analyses of the Roundup and cancer outcomes, Monsanto's routine response was to discredit the science through fraudulent means, such as ghostwriting articles attacking the independent scientists' findings, and creating a panel of scientists to review Roundup's carcinogenicity that it publicly stated were "independent" even though they were selected by Monsanto and had a preordained conclusion in advance of the panel's work.

Plaintiffs' brief at 21.  Accordingly, summary judgment cannot be granted on the statute of repose question.

### ii    *Georgia law on failure to warn*

Monsanto argues it is entitled to summary judgment on Plaintiff Pleu's failure to warn claim because he testified that he does not recall reading the warning label on the Roundup he purchased and used.  "Under Georgia law, the failure of a product user to read an allegedly deficient warning is a complete bar to a failure to warn claim." *Terry for Est. of Terry v. Monsanto Co.*, 565 F. Supp. 3d 1359, 1362–63 (M.D. Ga. 2021); *Cobb Heating & Air Conditioning Co. v. Hertron Chem. Co.*, 229 S.E.2d 681, 682 (Ga. Ct. App. 1976) ("This court has held that any

insufficiency of the warning on the label of a product may not be the proximate cause of the fire when the user fails to read the label.").

Plaintiffs first respond by claiming Missouri caselaw establishes "[t]he presumption that plaintiffs will heed a warning assumes that a reasonable person will act appropriately if given adequate information." *Arnold v. Ingersoll-Rand Co.*, 834 S.W.2d 192, 194 (Mo. banc 1992) ("Missouri, like several other states, aids plaintiffs in proving this second part of causation by presuming that a warning will be heeded."). However, as explained above, Georgia law applies to Plaintiff Pleu's claims if it conflicts with Missouri law. Here, Monsanto agues there is no such presumption under Georgia law. *See Dozier Crane & Mach., Inc. v. Gibson*, 644 S.E.2d 333, 336 (Ga. Ct. App. 2007) ("Generally, where there is no evidence that a plaintiff read the allegedly inadequate warning, causation cannot be shown.").

Here, Plaintiff Pleu gave the following answer to whether he "probably" ever read a Roundup label and whether a cancer warning would have impacted his decision to use Roundup:

> Q. Earlier you were asked questions about whether or not you ever read the label on the Roundup bottle. Do you think that in all the years that you purchased and used Roundup, that at some point you probably read or noticed the label on Roundup?
> MR. THOMAS: Objection. Asked and answered.
> Q. You can answer.
> A. Probably, but I don't remember.
> Q. Right. If there was a warning on the Roundup package that said that Roundup - - use of Roundup can cause cancer, would you have used Roundup?
> MR. THOMAS: Objection, form.
> A. No.

Pleu Dep. 221:21-222:11. In light of these statements, there is evidence Plaintiff Pleu at least did a cursory review of a Roundup container over his years of use. The jury should decide whether he actually ever did so to support his failure to warn claim.

### iii  Design or manufacturing defect

Monsanto states: "It is unclear from the Petition whether Mr. Pleu makes a cognizable manufacturing defect claim.  Monsanto addresses such a claim out of an abundance of caution." Monsanto's brief at 26 n.11.  It proceeds to assert Plaintiff Pleu has not presented any evidence that the Roundup products at issue deviated or departed from the products' specifications. *See Lloyd's Syndicate No. 5820 v. AGCO Corp.*, 756 S.E.2d 520, 522 (Ga. 2014) (quoting *Rose v. Figgie International*, 495 S.E.2d 77 (Ga. Ct. App. 1997)) ("[A] design defect necessarily results in all products having the defect, whereas a manufacturing defect will only occur in those products which were improperly manufactured following design.").

Plaintiffs correctly note they have asserted claims for design defect and not manufacturing defect.  Monsanto makes no other argument against Plaintiff Pleu's design defect claim beyond that already addressed concerning Georgia's statute of repose.

### E.  Alabama law applied to Plaintiff Moore's claims

### i.    Alabama law on failure to warn

Monsanto argues it is entitled to summary judgment on Plaintiff Moore's failure to warn claim because he testified that he does not recall reading the warning label on the Roundup he purchased and used.  Monsanto asserts the Alabama Extended Manufacturers' Liability Doctrine ("AEMLD") applies to Plaintiff Moore's claims for failure to warn and negligence. *See Wakeland v. Brown & Williamson Tobacco Corp.*, 996 F. Supp. 1213, 1217 (S.D. Ala. 1998) ("[U]nder Alabama law, a negligence action is merged into a claim under the AEMLD; therefore no separate action for negligence will lie when a plaintiff claims he is injured by a defective and unreasonably dangerous product.").

> In order to establish liability under the AEMLD, the plaintiff must show that an
> injury was caused by one who sold a product in a defective condition that made the

product unreasonably dangerous to the ultimate user or consumer; that the seller
was engaged in the business of selling such a product; and that the product was
expected to, and did, reach the user without substantial change in the condition in
which it was sold.

*Bell v. T.R. Miller Mill Co.*, 768 So. 2d 953, 957 (Ala. 2000). The Supreme Court of Alabama has

plainly held "that a plaintiff who does not read an allegedly inadequate warning cannot maintain a

negligent-failure-to-adequately-warn action unless the nature of the alleged inadequacy is such

that it prevents him from reading it." *E.R. Squibb & Sons, Inc. v. Cox*, 477 So. 2d 963, 971 (Ala.

1985). Because Plaintiff Moore testified that he did not recall reading a Roundup label, Monsanto

argues he cannot maintain his claim for failure to warn.[8] *See* Moore Dep. 70:16-18, 204:14-16.

As noted above, however, Plaintiff Moore's answers to the following questions during his

deposition suggest he had read at least part of a Roundup label on recommended use:

> Q. Do you recall reading any instructions on the label about the weather conditions
> for using Roundup?
> A. I recall a little bit of it.
> Q. Do you recall whether it said anything about whether you should use Roundup
> or not use Roundup if it was windy out?

---

[8] The Supreme Court of Alabama's opinion in *E.R. Squibb & Sons* makes this point clear:

> [P]laintiff still must provide a scintilla of evidence of proximate cause: Did
> defendant Squibb's inadequate warning proximately cause plaintiff's injury? We
> think not.

> The evidence is undisputed that plaintiff did not read any of the instructions or
> warnings Squibb provided on and with its R–U–100 insulin. . . . Even if the warning
> accompanying this insulin had read, "WARNING—N–U–100 USERS: DO NOT
> SUBSTITUTE THIS R–U–100 INSULIN FOR N–U–100 INSULIN WITHOUT
> CONSULTING    YOUR    PHYSICIAN.    SUBSTITUTION    OF    R–U–
> 100 INSULIN FOR N–U–100 INSULIN MAY CAUSE PERMANENT BRAIN
> DAMAGE," it would not have altered this plaintiff's course of action and prevented
> his injury, because he would not have read it. Squibb's inadequate warning,
> therefore, did not cause plaintiff's injury.

477 So. 2d at 970.

A. It said recommended use not to but --unless you hold -- I want to say unless you hold it real close because it could spread and hit your flowers or -- I mean, that's a long time ago. And to be honest with you, *I haven't looked at one since*.

Moore Dep. 139:5-17 (emphasis added).  Further, Plaintiff Moore stated the following on whether

the presence of a warning label would have impacted his decision to use Roundup:

Q. Is it your testimony that if the Roundup label came with a warning that it could cause cancer that you would not use Roundup or would not have used Roundup?
A. In my better judgment, yes. I probably – I probably would not have.
Q. Would you say –
A. Nobody wants cancer. So, I mean, if you – you know, but it's like – it's two different things. Like I said, I'm addicted to cigarettes. Roundup, I can do without it, you know, if I had known it was going to cause cancer.
Q. So your testimony is that you would not have used it?
A. Correct.
Q. What would you have used instead?
A. A weedeater.
Q. Just the physical tool, the weedeater?
A. Yes, sir.

Moore Dep. 208:15-209:9.

Plaintiff Moore's statements are evidence he at least did a cursory review of a Roundup

container over his years of use.  Reasonable minds may differ on whether this testimony is credible.

Accordingly, the jury should decide whether Plaintiff Moore actually ever did so to support his

failure to warn claim.

### ii.   *Alabama law on design defect*

Monsanto also argues it is entitled to summary judgment on Plaintiff Moore's design defect

claim under Alabama caselaw applying AEMLD.

With regard to an AEMLD claim, [the Supreme Court of Alabama] has explained that a plaintiff pursuing such a claim must establish that the product alleged to have caused an injury "is sufficiently unsafe so as to render it defective"; that fact must be established "by proving that a safer, practical, alternative design was available to the manufacturer at the time it manufactured the allegedly defective product." McMahon, 95 So.3d at 772. The existence of a safer, practical, alternative design may, in turn, be established by showing (1) that the injuries inflicted by the product would have been less severe or eliminated by the use of the alternative

26

design and (2) that the utility of the alternative design outweighed the utility of the design actually used.

*Hosford v. BRK Brands, Inc.*, 223 So. 3d 199, 203 (Ala. 2016) (quoting *McMahon v. Yamaha Motor Corp., U.S.A.*, 95 So. 3d 769, 772 (Ala. 2012)). Here, Monsanto asserts Plaintiffs have failed to show via expert testimony or otherwise that a safer or more effective alternative to Roundup exists.

Plaintiffs respond by suggesting a label on Roundup would have made it a safer product. Additionally, Plaintiffs argue Monsanto could have "simply" designed an herbicide that does not contain glyphosate or other cancer-causing agents.

Monsanto rejects Plaintiffs' implication by asserting even if they had an expert to testify a non-glyphosate or non-surfactant product would be a suitable alternative, such a product would be a different product all together and not a "feasible alternative design" under AEMLD.

The Supreme Court of Alabama has noted "the reasonableness of an alternative design is generally a question of fact for the jury" but "there are necessarily some circumstances where a court can appropriately hold as a matter of law that a proposed alternative design is sufficiently different from the allegedly defective product that it is more properly viewed as a design for a different product than as an alternative design of the allegedly defective product." *Hosford v. BRK Brands, Inc.*, 223 So. 3d 199, 205 & 208 (Ala. 2016) (underline in original) (holding that "ionization smoke alarms and dual-sensor smoke alarms are different products").

In *Hosford*, the Supreme Court of Alabama cited to an opinion by the Court of Appeals of Texas: *Brockert v. Wyeth Pharmaceuticals, Inc.*, 287 S.W.3d 760 (Tex. App. 2009). In *Brockert*, the plaintiff claimed the defendant drug manufacturer's product caused her to develop breast cancer. *Id.* at 762. The allegedly defective product was a drug called Prempro, which was a combination of estrogen and progestin. *Id.* The plaintiff argued estrogen alone without progestin

27

was a safer alternative. *Id.* at 769. Such a product, however, already existed and was produced by the same manufacturer: Premarin. *Id.* The Court of Appeals of Texas concluded:

> [A] safer alternative design must be one for the product at issue—here, Prempro. . . . But [the plaintiff] does not explain how Prempro could have been modified or improved; she instead argues that progestin should not have been added to estrogen. In essence, [the plaintiff] argues that the product Prempro should have been a different product: its predecessor Premarin. But, as the supreme court has explained, Texas law does not recognize this sort of categorical attack on a product.

*Id.* at 770–71 (citing *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 384–85 (Tex. 1995)).

The Supreme Court of Alabama in *Hosford* concluded that the plaintiff's position in that case "was effectively the same as that of the appellant in Brockert—both argued that a product was defective and, as evidence of that fact, identified as a safer alternative *another product manufactured by the same manufacturer that allegedly had sold the defective product.*" 223 So. 3d at 207 (emphasis added).

Here, on the other hand, Monsanto has not offered evidence that it produces or markets a product similar to Roundup that differs only in the inclusion or exclusion of glyphosate. Consequently, whether Roundup without glyphosate is a safer, feasible alternative is a question for the jury. *See id.* at 205 ("[T]he reasonableness of an alternative design is generally a question of fact for the jury."). Summary judgment is denied on this ground.

### F. Plaintiffs' claims for breach of implied warranties

Monsanto next argues it is entitled to summary judgment on both Plaintiffs' claims for breach of implied warranties. Both Georgia and Alabama versions of the Uniform Commercial Code ("U.C.C.") recognize two types of implied warranties: merchantability (O.C.G.A. § 11-2-314; Ala. Code 1975 § 7-2-314) and fitness for a particular purpose (O.C.G.A. § 11-2-315; Ala. Code 1975 § 7-2-315). A claim for breach of the implied warranty of merchantability requires evidence that the product was not fit for the ordinary purpose for which it is used. O.C.G.A. § 11-

2-314; Ala. Code 1975 § 7-2-314.  A claim for breach of the implied warranty of fitness for a particular purpose requires proof that, at the time of contracting, the seller knew or had reason to know of a particular purpose for which the product was required.  O.C.G.A. § 11-2-315; Ala. Code 1975 § 7-2-315.  Monsanto also cites to the following official comment to § 2-315 of the U.C.C.:

> A "particular purpose" differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question. For example, shoes are generally used for the purpose of walking upon ordinary ground, but a seller may know that a particular pair was selected to be used for climbing mountains.

U.C.C. § 2-315, cmt. 2.

Here, Monsanto argues Plaintiffs used Roundup for its ordinary purpose—killing weeds— and that it had no evidence that it was aware or on notice of any particular purpose for Plaintiffs' use of Roundup.  Accordingly, Monsanto asserts it is entitled to summary judgment under both Georgia and Alabama law.  *See, e.g.*, *Rivers v. H.S. Beauty Queen, Inc.*, 703 S.E.2d 416, 418–19 (Ga. Ct. App. 2010) ("[B]ecause there is no evidence that Beauty Queen's employees knew that Rivers intended to use the product in any way other than its ordinary purpose, burning scented oil, the trial court correctly granted summary judgment on this claim."); *Shell v. Union Oil Co.*, 489 So. 2d 569, 572 (Ala. 1986) ("[T]he product—made to Goodyear's specifications—performed the job it was intended to do; and the manufacturers' warnings and precautions, accompanying the products, were in keeping with their knowledge of its inherent dangers. Thus, . . . these undisputed facts do not give rise to a warranty of merchantability.").

Plaintiffs respond by arguing both Georgia and Alabama law base implied warranties on purchasers' reasonable expectations that good will be free from significant defects.  *See, e.g.*, *Soto v. CarMax Auto Superstores, Inc.*, 611 S.E.2d 108, 109 (Ga. Ct. App. 2005) (noting that the

warranty of merchantability "protects consumers from defects or conditions existing at the time of sale"). Plaintiffs cite extrajurisdictional cases for the propositions that "[g]oods are not fit for ordinary purposes where they are not fit for the expected or obvious purpose or are unsafe for use in a normal manner" and "[a] product is not fit for a particular purpose if it contains a dangerous characteristic that might cause injury when put to normal or foreseeable use or is unfit to perform its function safely when used in a normal manner." *McLaughlin v. Michelin Tire Corp.*, 778 P.2d 59, 91 (Wyo. 1989).

In light of this caselaw, Monsanto is correct. The very Georgia case Plaintiffs cite affirmed a trial court's grant of summary judgment, in part, because the plaintiff's continued use of the product at issued negated the claim that it was unfit for its ordinary purpose. *See Soto*, 611 S.E.2d at 110 ("By the time Soto abandoned the Blazer and allegedly 'lost confidence,' he had driven it an additional 25,000 miles. . . . [T]his fact inherently negates his claim that the vehicle was unmerchantable at the time of purchase, since it clearly was capable of being driven, the ordinary purpose for which vehicles are used."). Further, as one federal district court applying Alabama law explained:

> [W]hen the evidence shows that the product is so unreasonably dangerous that it is not fit for its intended use, i.e., it is not a merchantable product, both AEMLD and warranty claims remain viable. . . . *On the other hand, if the product is fit for its intended use, even if it contains an inherent danger, the warranty claim, which is concerned only with the commercial viability of the product, is subsumed by the AEMLD claim.*

*Garrison v. Sturm, Ruger & Co., Inc.*, 322 F. Supp. 3d 1217, 1234 (N.D. Ala. 2018) (emphasis added). That district court concluded "when there is no evidence of non-merchantability, other than a general allegation that the product contains inherent dangers, the U.C.C. claim fails." *Id.* at 1235 (internal quotation marks omitted); *see Houston v. Bayer Healthcare Pharms., Inc.*, 16 F.

Supp. 3d 1341, 1346 (N.D. Ala. 2014) (noting that "the commercial code creates only commercial warranties, not safety warranties").

Here, Plaintiffs' claims that Roundup allegedly caused their cancer does not negate Roundup's fitness for its ordinary purpose: killing weeds.  This conclusion is further supported by each Plaintiffs' long-term continued use of Roundup for killing weeds.  Consequently, Monsanto is entitled to summary judgment on Plaintiffs' Count VI for breach of implied warranties.

### G. Preemption

Monsanto next argues it is entitled to summary judgment on all of Plaintiffs' claims because they are both expressly and impliedly preempted by federal law, namely FIFRA, 7 U.S.C. § 136 *et seq.*

"FIFRA creates a comprehensive scheme for the regulation of pesticide labeling and packaging." *Nat'l Bank of Com. of El Dorado, Arkansas v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999) (quoting *Welchert v. American Cyanamid, Inc.*, 59 F.3d 69, 71 (8th Cir. 1995)). Specifically, FIFRA provides the following in relevant part:

**(a) In general**

A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.

**(b) Uniformity**

Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.

7 U.S.C. § 136v.

The crux of Monsanto's argument that Plaintiffs' state law claims are "in addition to or different from" requirements imposed by the U.S. Environmental Protection Agency ("EPA")

under FIFRA is because they are premised on an alleged duty include a cancer warning on Roundup products despite the EPA repeatedly determining glyphosate was not carcinogenic.

This precise issue – whether a state law claim for failure to warn brought by plaintiffs who asserted glyphosate in Roundup caused their NHL – was recently addressed by the United States Court of Appeals for the Ninth Circuit in *Hardeman v. Monsanto Co.*, 997 F.3d 941 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 2834 (2022). In short, the Ninth Circuit thoroughly analyzed the issue and held that reliance on EPA registration is insufficient to conclude FIFRA preempts state common law claims. *Id.* at 956–57; *see also Carias v. Monsanto Co.*, No. 15CV3677JMAGRB, 2016 WL 6803780, at *6 (E.D.N.Y. Sept. 30, 2016) ("EPA's approval of the Roundup label does not preempt plaintiffs' claims."). Monsanto offers no analysis of how specifically Georgia or Alabama common law is inconsistent with FIFRA; rather, Monsanto asserts any state-law labeling requirement is "in addition to or different from" FIFRA's labeling requirements. That argument is unpersuasive.

The Ninth Circuit in *Hardeman* also addressed and rejected Monsanto's argument that claims similar to Plaintiffs' claims here are impliedly preempted by FIFRA. In sum, the Ninth Circuit concluded, "[c]onsidering the responsibility FIFRA places on manufacturers to update pesticide labels and that EPA has allowed pesticide manufacturers to add cancer warnings to labels through the notification process without prior approval, it is not *impossible* for Monsanto to add a cancer warning to Roundup's label." 997 F.3d at 960. *See also Carson v. Monsanto Co.*, 39 F.4th 1334, 1339-40 (11th Cir. 2022) (citing *Hardeman*, 997 F.3d at 956) (noting "[t]he problem for Monsanto is that the EPA's registration process is not sufficiently formal to carry with it the force of law" and "it at most creates a rebuttable presumption of compliance with FIFRA's registration process and nothing more").

Monsanto in the *Hardeman* case petitioned for a writ of certiorari before the Supreme Court of the United States. The Supreme Court invited the Solicitor General to file a brief expressing the views of the United States. The Solicitor General did so on May 10, 2022, and argued the Supreme Court should deny review, in part, because the Ninth Circuit correctly held FIFRA does not expressly or impliedly preempt the state law claim for failure to warn. Brief for the United States as Amicus Curiae, *Monsanto Co. v. Hardeman*, 2022 WL 1489462 (U.S. No. 21-241).

It is true that "the well-settled view that denial of certiorari imparts no implication or inference concerning the [Supreme] Court's view of the merits." *Hughes Tool Co. v. Trans World Airlines, Inc.*, 409 U.S. 363, 365 n.1 (1973). Nevertheless, the Court agrees with the Ninth Circuit's analysis, adopts it, and denies Monsanto's preemption arguments here.

### H. Punitive and exemplary damages

Monsanto argues it is entitled to summary judgment on Plaintiffs' claims for punitive and exemplary damages (Counts IX and X) because they have not and cannot meet the high bar to obtain such relief. It argues both Georgia and Alabama law require a plaintiff show by clear and convincing evidence that its actions related to Roundup amounted to malice, fraud, wantonness, or oppression. *See* O.C.G.A. § 51-12-5.1(b) ("Punitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences."); Ala. Code § 6-11-20(a) ("Punitive damages may not be awarded . . . in a tort action where it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff.").

Monsanto further argues that its compliance with federal regulatory requirements and what it considers to be the overwhelming scientific and regulatory consensus that glyphosate does not cause cancer precludes an award of punitive damages in this case. *Stone Man, Inc. v. Green*, 435 S.E.2d 205, 206 (Ga. 1993) ("[P]unitive damages, the purpose of which is to 'punish, penalize or deter,' are, as a general rule, improper where a defendant has adhered to environmental and safety regulations."); *Richards v. Michelin Tire Corp.*, 21 F.3d 1048, 1059 (11th Cir. 1994) (applying Alabama law and noting "compliance with both federal regulations and industry practices is some evidence of due care" precluding a finding of wantonness for punitive damages); *Alcorn v. Union Pac. R.R. Co.*, 50 S.W.3d 226, 249 (Mo. banc 2001), *overruled on other grounds by Badahman v. Catering St. Louis*, 395 S.W.3d 29 (Mo. banc 2013) ("[C]onformity with the regulatory process does negate the conclusion that the railroad's conduct was tantamount to intentional wrongdoing.").

Compliance with governmental regulations, however, does not necessarily defeat punitive damages *if other evidence suggests intentional wrongdoing. See Gen. Motors Corp. v. Moseley*, 447 S.E.2d 302, 311 (Ga. Ct. App. 1994) ("[N]othing . . . precludes an award of punitive damages where, notwithstanding the compliance with applicable safety regulations, there is other evidence showing culpable behavior."), *overruled on other grounds by Williams v. Harvey*, 311 Ga. 439, 858 S.E.2d 479 (2021), *and abrogated on other grounds by Webster v. Boyett*, 496 S.E.2d 459 (Ga. 1998); *Kirksey v. Schindler Elevator Corp.*, No. CV 15-0115-WS-N, 2016 WL 3189242, at *21 n.39 & 22 (S.D. Ala. June 7, 2016) (noting that, under Alabama law, "code compliance is never a guaranteed insulator from liability; rather, it is merely evidence of due care" and "[c]ompliance with state rules or regulations is never a guarantee of immunity from liability"); *Blanks v. Fluor Corp.*, 450 S.W.3d 308, 403 (Mo. App. E.D. 2014) (distinguishing its facts from

34

*Alcorn*, 50 S.W.3d 226, and noting the plaintiffs presented evidence that "the defendants hid information from regulators, resisted regulatory changes, and never complied with industry standards for ambient air quality standards"). Accordingly, at this stage of the proceedings, Monsanto is not entitled to judgment as a matter of law on Plaintiffs' claims for punitive and exemplary damages.

## I. Claims asserted by Plaintiffs Moore's and Pleu's spouses

Plaintiffs' spouses, Tia Moore and Shelly Pleu, are also named plaintiffs in the Petition. However, they fail to separately plead claims that would entitle them to relief. There is no separate cause of action asserted for loss of consortium or any comparable claim that would entitle Mrs. Moore and Mrs. Pleu to relief. Monsanto raised this issue in its brief at page 11 n.1, but Plaintiffs did not address it in their brief.

In Plaintiffs' Response in Opposition to Monsanto's Motion *in Limine* No. 32 filed on September 29, 2022, they admit the Petition filed on July 16, 2020 does not contain a separately enumerated claim for loss of consortium. Nevertheless, they claim that both parties have operated during the course of this litigation as if Mrs. Moore and Mrs. Pleu and the other spouses named as plaintiffs in the Petition were seeking damages for loss of consortium. Accordingly, Plaintiffs seek leave to amend their Petition to expressly include an enumerated count for loss of consortium on behalf of Mrs. Moore and Mrs. Pleu.

Under Rule 55.33(a):

A pleading may be amended once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the pleading may be amended at any time within thirty days after it is served. *Otherwise, the pleading may be amended only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.*

35

(Emphasis added). Monsanto expressly does not consent to Plaintiffs' request to amend the
Petition in footnote 1 of its Opposition to Plaintiff Moore's Motion *in Limine* to Exclude Certain
Evidence Regarding Irrelevant Matters, Including Family Relationships. "Under [Rule 55.33(a)],
the decision to allow or disallow amendments to pleadings is within the sound discretion of the
trial court." *Lester v. Sayles*, 850 S.W.2d 858, 869 (Mo. banc 1993).

> Factors to consider in the exercise of that discretion include:
>
> > (1) the hardship to the moving party if leave to amend is denied;
> > (2) the reasons for the moving party's failure to include the matter in the
> > original pleadings; and
> > (3) the injustice to the nonmoving party should leave to amend be granted.

*Id.* (quoting *Hospital Development Corp. v. Park Lane Land Co.*, 813 S.W.2d 904, 907 (Mo. App.
1991)). Here, Plaintiffs offer no reason for their failure to include a separate count for loss of
consortium or their failure to seek leave to add such a count over the last two years. Rather, they
argue Monsanto would suffer no prejudice because Monsanto has been prepared to defend against
claims brought by Mrs. Moore and Mrs. Pleu in light of the fact that they were clearly named as
plaintiffs in the Petition and both Plaintiffs Moore and Pleu testified during their depositions about
the impact their cancers have had on their marital relationships.

Plaintiffs further rely on Rule 52.06, which provides, in part: "Parties may be dropped or
added by order of the court on motion of any party or of its own initiative at any stage of the action
and on such terms as are just." Plaintiffs, however, fail to recognize Rule 52.06 is concerned with
misjoinder of parties and not late additions of entirely separate claims.

Loss of consortium is an independent, albeit derivative, cause of action that allows recovery
by "the injured person's spouse for damages suffered as a result of the loss of the injured person's
services, society, companionship, and sexual relations (loss of consortium)." *O'Neal v. Agee*, 8

S.W.3d 238, 242 (Mo. App. E.D. 1999) ("The latter action is derivative only; that is, a spouse cannot recover for loss of consortium if the other spouse has no valid claim for personal injuries.").

It would be unjust to allow Plaintiffs to amend the Petition now to include a new claim at this point. Nowhere in the Petition is anything mentioned that could give rise to a claim for loss of consortium beyond that Mrs. Moore and Mrs. Pleu are married to Plaintiffs Moore and Pleu. There has been no discovery related to possible damages for loss of consortium. Discovery has long since ended and it would be unfeasible to conduct additional discovery even with leave of court and maintain the current trial setting. Furthermore, Mrs. Pleu was only deposed on September 29, 2022 after Monsanto made several attempts over the course of several months to depose her.

Consequently, the Court denies Plaintiffs' request for leave to amend the Petition on the eve of trial and dismisses Mrs. Moore and Mrs. Pleu as plaintiffs in this case.

[Remainder of page intentionally left blank.]

## III.   CONCLUSION

For these reasons, Monsanto's Motion for Summary Judgment is **GRANTED IN PART** as to the following:

1. Count IV under the Missouri Merchandizing Practices Act is **DISMISSED**, which Plaintiffs expressly consent to on page 39 of their brief;

2. Count V for breach of express warranty is **DISMISSED**, which Plaintiffs expressly consent to on page 37 of their brief;

3. Count VII for violation of the consumer fraud acts is **DISMISSED**, which Plaintiffs expressly consent to on page 38 of their brief;

4. Count VIII for negligent misrepresentation is **DISMISSED**, which Plaintiffs expressly consent to on page 39 of their brief;

5. Count VI for breach of implied warranties is **DISMISSED**;

6. Plaintiffs' request for leave to amend the Petition is **DENIED** and Tia Moore and Shelly Pleu are **DISMISSED** as plaintiffs in this case.

In all other aspects, Defendant Monsanto Company's Motion for Summary Judgment is **DENIED IN PART**.

**SO ORDERED**:

Hon. Ellen H. Ribaudo          1C-13-22
Circuit Judge, Division 18