# EXHIBIT A

GERALD SINGLETON, SBN 208783
MARK F. FLEMING, SBN 165770
JOHN C. LEMON, SBN 175847
KRISTEN D. MILLER, SBN 273030
SINGLETON SCHREIBER, LLP
450 A Street, 5th Floor
San Diego, CA 92101
Tel: (619) 771-3473
Fax: (619) 255-1515
Email: gsingleton@singletonschreiber.com
        mfleming@ singletonschreiber.com
        jlemon@ singletonschreiber.com
        kmiller@ singletonschreiber.com

Attorneys for Plaintiff

ELECTRONICALLY FILED
Superior Court of California
County of Santa Cruz
2/8/2022 9:35 AM
Alex Calvo, Clerk
By: Richard Kersten Seago, Deputy

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF SANTA CRUZ

| | |
|---|---|
| NICK VARANELLI, | Case No.  22CV00278 |
| Plaintiff, | |
| v. | **COMPLAINT FOR DAMAGES** |
| MONSANTO COMPANY, a Delaware Corporation, WILBUR-ELLIS COMPANY LLC, a California Corporation, WILBUR-ELLIS FEED LLC, a California Corporation, and DOES 1 through 100, inclusive, | **[DEMAND FOR JURY TRIAL]** |
| Defendants. | |

Plaintiff hereby brings this Complaint, by and through above-captioned counsel, and alleges upon information and belief the following.

/ / /

/ / /

/ / /

/ / /

## NATURE OF THE CASE

1.      This is an action for damages suffered by Plaintiff as a direct and proximate result of Defendants' negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate.

2.      As Defendants knew, or in the exercise of reasonable care should have known, Roundup® and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce and lacked proper warnings and directions as to the dangers associated with its use.

3.      Plaintiff's injuries, like those striking thousands of similarly situated victims across the country, were avoidable.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over Defendants because, based on information and belief, each is a California resident, a corporation and/or entity organized under the laws of the State of California, a foreign corporation or association authorized to do business in California and registered with the California Secretary of State or has sufficient minimum contacts in California, or otherwise intentionally avails itself of the California market so as to render the exercise of jurisdiction over it by the California courts consistent with traditional notions of fair play and substantial notice.   Plaintiff was exposed to Roundup® and/or glyphosate in the State of California and County of Santa Cruz.

## PARTIES

### Plaintiff

5.      At all times relevant to this lawsuit, Plaintiff NICK VARANELLI was a resident and citizen of Santa Cruz and/or Sacramento Counties, California. Plaintiff brings this action for personal injuries sustained by exposure to Roundup ("Roundup"), containing the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA").  As a direct and proximate result of being exposed to Roundup, NICK VARANELLI developed Non-Hodgkin's Lymphoma ("NHL") on or around January 2014 and suffered injuries and damages

COMPLAINT FOR DAMAGES

1   resulting from that diagnosis that continue today. As a result of Defendants' fraudulent

2   concealment of the true risks associated with Roundup and glyphosate, Plaintiff NICK

3   VARANELLI did not reasonably suspect that Roundup was the cause of Plaintiff's NHL until in

4   or around December 2021.

5       **Defendants**

6       6.      Defendant MONSANTO COMPANY is a Delaware corporation, with

7   headquarters and a principle place of business in St. Louis, Missouri.

8       7.      Defendant MONSANTO COMPANY is herein referred to as "MONSANTO".

9       8.      "Roundup" refers to all formulations of MONSANTO products, including, but not

10  limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom

11  Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide,

12  Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass

13  and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II

14  Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup

15  Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate

16  Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup

17  Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-

18  to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra

19  Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed &

20  Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed &

21  Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup

22  Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry

23  Herbicide, or any other formulation  containing the active ingredient glyphosate.

24      9.      Defendant MONSANTO advertises and sells goods, specifically Roundup, in the

25  State of California.

26      10.     Defendant MONSANTO transacted and conducted business within the State of

27  California that relates to the allegations in this Complaint.

28      11.     Defendant  MONSANTO  derived  substantial  revenue  from  goods  and  products

1    used in the State of California.

2         12.    Defendant MONSANTO expected or should have expected its acts to have

3    consequences within the State of California and derived substantial revenue from interstate

4    commerce.

5         13.    Defendant MONSANTO engaged in the business of designing, developing,

6    manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup.

7         14.    Defendant MONSANTO is authorized to do business in California and derives

8    substantial income from doing business in this state.

9         15.    Upon information and belief, Defendant MONSANTO purposefully availed itself

10   of the privilege of conducting activities with the State of California, thus invoking the benefits

11   and protections of its laws.

12        16.    Upon information and belief, Defendant MONSANTO did design, sell, advertise,

13   manufacture and/or distribute Roundup, with full knowledge of its dangerous and defective

14   nature.  To this date, MONSANTO continues to design, sell, advertise, manufacture, and/or

15   distribute Roundup.

16        17.    Defendant WILBUR-ELLIS COMPANY LLC is a California limited liability

17   corporation with its headquarters and principal place of business in San Francisco, California. At

18   all times relevant to this complaint, WILBUR-ELLIS COMPANY, LLC sold and distributed

19   MONSANTO COMPANY products including Roundup, within the State of California.

20        18.    Defendant WILBUR-ELLIS FEED, LLC (with WILBUR-ELLIS COMPANY

21   LLC, "WILBUR-ELLIS") is a California limited liability corporation with its headquarters and

22   principal place of business in San Francisco, California.  At all times relevant to this complaint,

23   WILBUR-ELLIS FEED, LLC sold and distributed MONSANTO products including Roundup,

24   within the State of California.

25        19.    Defendants MONSANTO and WILBUR-ELLIS are collectively referred to

26   throughout this Complaint as "Defendants."

27        20.    The true names and/or capacities, whether individual, corporate, partnership,

28   associate, governmental, or otherwise, of Defendants DOES 1 through 100, inclusive, and each

1   of them, are unknown to Plaintiff at this time, who therefore sues said Defendants by such

2   fictitious names. Plaintiff is informed and believes, and thereon allege, that each Defendant

3   designated herein as a DOE caused injuries and damages proximately thereby to Plaintiff as

4   hereinafter alleged; and that each DOE Defendant is liable to Plaintiff for the acts and omissions

5   alleged herein below, and the resulting injuries to Plaintiff, and damages sustained by Plaintiff.

6   Plaintiff will amend this Complaint to allege the true names and capacities of said DOE

7   Defendants when that same is ascertained.

8                                    **FACTUAL ALLEGATIONS**

9          21.     At all relevant times, Defendant MONSANTO was in the business of, and did,

10  design, research, manufacture, test, advertise, promote, market, sell, and distribute the

11  commercial herbicide Roundup.

12         22.     Defendant MONSANTO is a multinational agricultural biotechnology corporation

13  based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

14         23.     Defendant MONSANTO discovered the herbicidal properties of glyphosate

15  during the 1970's and subsequently began to design, research, manufacture, sell and distribute

16  glyphosate-based "Roundup" as a broad-spectrum herbicide.

17         24.     Glyphosate is the active ingredient in Roundup.

18         25.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses  known

19  to compete with commercial crops grown around the globe.

20         26.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based

21  only on whether a given organism produces a specific enzyme: 5-enolpyruvylshikimic acid-3-

22  phosphate synthase, known as EPSP synthase.

23         27.     Glyphosate inhibits the EPSP synthase that interferes with the shikimic pathway

24  in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

25         28.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems,

26  and roots, and detectable quantities accumulate in the plant tissues.

27         29.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops,

28  commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been

driven largely by the proliferation of genetically engineered crops specifically tailored to resist the activity of glyphosate.

30.     Defendant MONSANTO is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup e.g., "Roundup Ready®." As of 2009, MONSANTO was the world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready® seeds.

31.     The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides. For nearly 40 years, consumers, farmers, and the public have used Roundup, unaware of its carcinogenic properties.

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

32.     The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq*. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA. 7 U.S.C. 136a(a).

33.     The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment."  7 U.S.C. § 136(a)(c)(5)(D).

34.     FIFRA defines "unreasonable adverse effects on the environment" as "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus

1    requires the EPA to make a risk/benefit analysis in determining whether a registration should be

2    granted or allowed to continue to be sold in commerce.

3        35.    The EPA and the State of California registered Roundup for distribution, sale, and

4    manufacture in the United States and the State of California.

5        36.    FIFRA generally requires that the registrant, Defendant MONSANTO, conduct

6    health and safety testing of pesticide products. The government is not required, nor is it able, to

7    perform the product tests that are required of the manufacturer.

8        37.    The evaluation of each pesticide product distributed, sold, or manufactured is

9    completed at the time the product is initially registered. The data necessary for registration of a

10   pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide

11   products through a congressionally mandated process called "re-registration."  7 U.S.C. § 136a-

12   1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and

13   the submission of data for the EPA's review and evaluation.

14       38.    In the case of glyphosate and Roundup, the EPA had planned on releasing its

15   preliminary risk assessment – in relation to the registration process – no later than July 2015. The

16   EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment

17   pending further review in light of the World Health Organization's March 24, 2015 finding that

18   glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of

19   carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

20                    **MONSANTO'S FALSE REPRESENTATIONS**

21                   **REGARDING THE SAFETY OF ROUNDUP**

22       39.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against

23   Defendant MONSANTO based on its false and misleading advertising of Roundup products.

24   Specifically, the lawsuit challenged MONSANTO'S general representations that its spray-on,

25   glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically

26   non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive

27   and misleading about the human and environmental safety of Roundup are the following:

28       a)    Remember that environmentally friendly Roundup herbicide is

biodegradable.  It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences . . .

b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c) Roundup biodegrades into naturally occurring elements.

d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e) This non-residual herbicide will not wash or leach in the soil.  It … stays where you apply it.

f) You can apply [Roundup] with 'confidence because it will stay where you put it' it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganism's biodegrade Accord into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by MONSANTO. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j) Roundup can be used where kids and pets will play and breaks down into natural material.[1]

---

[1] This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

8

40.     On November 19, 1996, Defendant MONSANTO entered into an Assurance of Discontinuance with NYAG, in which MONSANTO agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

    a)  its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

    b)  its glyphosate-containing pesticide products, or any component thereof manufactured, formulated, distributed or sold by MONSANTO, are biodegradable

    c)  its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

    d)  its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

    e)  its glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

    f)  its glyphosate-containing products or any component thereof might be classified as "practically non-toxic".

41.     Defendant MONSANTO did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

42.     In 2009, France's highest court ruled that Defendant MONSANTO had <u>not</u> told the truth about the safety of Roundup. The French court affirmed an earlier judgment that MONSANTO had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."

/ / /

/ / /

/ / /

9

## MONSANTO'S INTENTIONAL CONCEALMENT
## OF ROUNDUP'S HEALTH HAZARDS

43.    Monsanto established and operated an "intelligence fusion center" to surveil and investigate critics of its products, then employed strategies to silence and/or discredit those critics. According to internal documents reviewed by The Guardian[2], these strategies included, but were not limited to the following:

    a)    A series of coordinated actions to attack and discredit Carey Gillam, an investigative journalist and author of the book "Whitewash: The Story of a Weed Killer, Cancer and the Corruption of Science", including paying Google to promote negative reviews and pressuring Reuters to silence or reassign Gillam.

    b)    Monitoring the Singer Neil Young, producing detailed reports regarding his social media activity, analyzing the lyrics of his album "Monsanto Years" and creating a plan to produce content to combat Young's message.

    c)    Conducting intelligence on the not-for-profit advocacy group US Right to Know.

44.    These internal documents also revealed that Monsanto officials were worried about the release of information about Monsanto's financial relationships with scientists, which might support allegations that Monsanto engages in the practice of paying off scientists to "[cover] up unflattering research".

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

45.    As early as the 1980's Defendant MONSANTO was aware of glyphosate's carcinogenic properties.

46.    On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene. Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

47.    In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate,

---

[2] "Revealed: How Monsanto's 'Intelligence Center' Targeted Journalists and Activists", *The Guardian*, August 8, 2019

toxicology, product chemistry, and residue chemistry studies. All the required data was submitted and reviewed.

48.     In October 1991 the EPA published a memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.

49.     In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendant MONSANTO'S Roundup products are more dangerous and toxic than glyphosate alone.  As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.

50.     In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

51.     The study found that Defendant MONSANTO'S Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

52.     In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell-cycle dysregulation.

53.     The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell[s], it was of interest to evaluate the threshold dose of glyphosate affecting cells."

54.     In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

55.     The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other

chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

56.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

57.     The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

58.     The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant MONSANTO.

59.     Defendant MONSANTO knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup.

60.     Defendant MONSANTO knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

61.     Defendant MONSANTO failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup.

62.     Rather than performing appropriate tests, Defendant MONSANTO relied upon flawed industry- supported studies designed to protect MONSANTO'S economic interests rather than Plaintiff and the consuming public.

63.     Despite its knowledge that Roundup was considerably more dangerous than glyphosate alone, MONSANTO continued to promote Roundup as safe.

**IARC CLASSIFICATION OF GLYPHOSATE**

64.     The International Agency for Research on Cancer ("IARC") is the specialized

1    intergovernmental cancer agency of the World Health Organization ("WHO") of the United

2    Nations, which is tasked with conducting and coordinating research into the causes of cancer.

3          65.    An IARC Advisory Group to Recommend Priorities for IARC Monographs during

4    2015–2019 met in April 2014. Though nominations for the review were solicited, a substance must

5    meet two criteria to be eligible for review by the IARC Monographs: 1) there must already be

6    some evidence of carcinogenicity of the substance; and 2) there must be evidence that humans are

7    exposed to the substance.

8          66.    IARC set glyphosate for review in 2015-2016. IARC uses five criteria for

9    determining priority in reviewing chemicals: 1) a potential for direct impact on public health; 2)

10   scientific literature to support suspicion of carcinogenicity; 3) evidence of significant human

11   exposure; 4) high public interest and/or potential to bring clarity to a controversial area and/or

12   reduce public anxiety or concern; and 5) related agents similar to one given high priority by the

13   above considerations. Data reviewed is sourced preferably from publicly accessible, peer-

14   reviewed data.

15         67.    On March 24, 2015, after its cumulative review of human, animal, and DNA studies

16   for more than one year, many of which have been in Defendant MONSANTO'S possession since

17   as early as 1985, the IARC's working group published its conclusion that the glyphosate

18   contained in MONSANTO'S Roundup herbicide is a Class 2A "probable carcinogen" as

19   demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence

20   of carcinogenicity in animals.

21         68.    The IARC's full Monograph was published on July 29, 2015, and established

22   glyphosate as a class 2A *probable* carcinogen to humans. According to the authors, glyphosate

23   demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A

24   classification based on evidence of carcinogenicity in humans and animals.

25         69.    The IARC Working Group found an increased risk between exposure to glyphosate

26   and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk

27   continued after adjustment for other pesticides.

28         70.    The IARC also found that glyphosate caused DNA and chromosomal damage in

13

1    human cells.

2                        **EARLIER EVIDENCE OF GLYPHOSATE'S DANGER**

3          71.     Despite the new classification by the IARC, MONSANTO has had ample

4    evidence of glyphosate and Roundup's genotoxic properties for decades.

5          72.     Genotoxicity refers to chemical agents that are capable of damaging the DNA

6    within a cell through genetic mutations, which is a process that causes cancer.

7          73.     In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana*

8    *catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

9          74.     The study found that tadpoles exposed to Roundup showed significant DNA

10   damage when compared with unexposed control animals.

11         75.     Both human and animal studies have shown that glyphosate and glyphosate-based

12   formulations such as Roundup can induce oxidative stress.

13         76.     Oxidative stress and associated chronic inflammation are believed to be involved

14   in carcinogenesis.

15         77.     The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA

16   and glyphosate-based formulations can induce oxidative stress."

17         78.     In 2006 César Paz-y-Miño published a study examining DNA damage in human

18   subjects exposed to glyphosate.

19         79.     The study produced evidence of chromosomal damage in blood cells showing

20   significantly greater damage after exposure to glyphosate than before in the same individuals,

21   suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on

22   exposed individuals.

23         80.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides'

24   genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is

25   strong."

26         81.     Despite knowledge to the contrary, Defendant MONSANTO maintains that there

27   is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are

28   in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is

genotoxic.

82.     In addition to glyphosate and Roundup's genotoxic properties, Defendant MONSANTO has long been aware of glyphosate's carcinogenic properties.

83.     Glyphosate and Roundup, in particular, have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

84.     Defendant MONSANTO has known of this association since the early to mid-1980s because numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

85.     In 1985 the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded that glyphosate was oncogenic.

86.     In 2003 Lennart Hardell and Mikael Eriksson published the results of two case-controlled studies on pesticides as a risk factor for NHL and hairy-cell leukemia.

87.     The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studied with an increased odds ratio of 3.11.

88.     In 2003 AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

89.     The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

90.     In 2008 Mikael Eriksson published a population-based, case-control study of exposure to various pesticides as a risk factor for NHL.

91.     This strengthened previous associations between glyphosate and NHL.

92.     In spite of this knowledge, Defendant MONSANTO continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

93.     Upon information and belief, these statements and representations have been made

1  with the intent of inducing Plaintiff, the agricultural community, and the public at large to purchase

2  and increase the use of Roundup for Defendant MONSANTO'S pecuniary gain, and in fact, did

3  induce Plaintiff to use Roundup.

4          94.     Defendant MONSANTO made these statements with complete disregard and

5  reckless indifference to the safety of Plaintiff and the general public.

6          95.     Notwithstanding Defendant MONSANTO'S representations, scientific evidence

7  has established a clear association between glyphosate and genotoxicity, inflammation, and an

8  increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft

9  tissue sarcoma.

10         96.     Defendant MONSANTO knew or should have known that glyphosate is

11  associated with an increased risk of developing cancer, including, but not limited to, NHL,

12  Multiple Myeloma, and soft tissue sarcomas.

13         97.     Defendant MONSANTO failed to appropriately and adequately inform and warn

14  Plaintiff of the serious and dangerous risks associated with the use of, and exposure to, glyphosate

15  and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other

16  severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant

17  physical pain and mental anguish, diminished enjoyment of life, and the need for medical

18  treatment, monitoring and/or medications.

19         98.     Despite the IARC's classification of glyphosate as a class 2A probable carcinogen,

20  Defendant MONSANTO continues to maintain that glyphosate and/or Roundup is safe, non-

21  carcinogenic, and non-genotoxic.  And it falsely warrants to users and the general public that

22  independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or

23  genotoxicity in glyphosate and Roundup.

24         99.     Defendant MONSANTO has claimed and continues to claim that Roundup is

25  safe, non- carcinogenic, and non-genotoxic. These misrepresentations are consistent with

26  MONSANTO'S cavalier approach to investigating and ensuring the safety of its products, the

27  safety of the public at large, and the safety of Plaintiff.

28  / / /

## SCIENTIFIC FRAUD UNDERLYING THE SAFETY DETERMINATIONS OF GLYPHOSATE

100.     After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), MONSANTO exerted pressure upon the EPA to change its classification.

101.     This culminated in the EPA's reclassification of glyphosate to Group E, which was based upon evidence of non-carcinogenicity in humans.

102.     In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

103.     On two occasions, the EPA found that laboratories hired by MONSANTO to test the toxicity of its Roundup products for registration purposes committed scientific fraud.

104.     In the first instance, MONSANTO hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup with the EPA.

105.     In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

106.     Three top executives of IBT were convicted of fraud in 1983.

107.     In the second incident, MONSANTO hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup.

108.     In March of 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides."

109.     The investigation lead to the indictments of the laboratory owner and a handful of

1   employees.

2   **MONSANTO'S CONTINUING DISREGARD FOR THE SAFETY OF PLAINTIFF**

3   **AND THE PUBLIC**

4       110.    Defendant MONSANTO claims on its website that "[r]egulatory authorities and

5   independent experts around the world have reviewed numerous long-term/carcinogenicity and

6   genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in

7   Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very

8   high doses, and that it is not genotoxic."

9       111.    Ironically, the primary source for this statement is a 1986 report by the WHO, the

10  same organization that now considers glyphosate to be a probable carcinogen.

11      112.    Glyphosate, and Defendant MONSANTO'S Roundup products, in particular,

12  have long been associated with serious side effects and many regulatory agencies around the

13  globe have banned or are currently banning the use of glyphosate herbicide products.

14      113.    Defendant MONSANTO'S statements proclaiming the safety of Roundup and

15  disregarding its dangers misled Plaintiff.

16      114.    Despite Defendant MONSANTO'S knowledge that Roundup was associated with

17  an elevated risk of developing cancer, MONSANTO'S promotional campaigns focused on

18  Roundup's purported "safety profile."

19      115.    Defendant MONSANTO'S failure to adequately warn Plaintiff resulted in: (1)

20  Plaintiff using and being exposed to glyphosate instead of using another acceptable and safe

21  methods of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn

22  and instruct consumers about the risk of cancer, including NHL, and other injuries associated

23  with Roundup.

24      116.    Defendant MONSANTO failed to seek modification of the labeling of Roundup

25  to include relevant information regarding the risks and dangers associated with Roundup

26  exposure.

27      117.    The failure of Defendant MONSANTO to appropriately warn and inform the EPA

28  has resulted in inadequate warnings in safety information presented directly to users and

1    consumers.

2          118.    The failure of Defendant MONSANTO to appropriately warn and inform the EPA

3    has resulted in the absence of warning or caution statements that are adequate to protect health

4    and the environment.

5          119.    The failure of Defendant MONSANTO to appropriately warn and inform the EPA

6    has resulted in directions for use that are not adequate to protect health and the environment.

7          120.    By reason of the foregoing acts and omissions, Plaintiff has endured and, in some

8    categories continue to suffer emotional and mental anguish, medical expenses, and other

9    economic and non-economic damages, as a result of the actions and inactions of MONSANTO.

10               **PLAINTIFF'S EXPOSURE TO ROUNDUP**

11      **EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS**

12          121.    Plaintiff incorporates by reference all prior paragraphs of this Complaint as if

13   fully set forth herein.

14          122.    The running of any statute of limitations has been tolled by reason of Defendant

15   MONSANTO'S fraudulent concealment. Defendant MONSANTO, through its affirmative

16   misrepresentations and omissions, actively concealed from Plaintiff the true risks associated with

17   Roundup and glyphosate.

18          123.    At all relevant times, Defendant MONSANTO has maintained that Roundup is

19   safe, non-toxic, and non-carcinogenic.

20          124.    Indeed, even today, Defendant MONSANTO continues to represent to the public

21   that Roundup is safe and non-carcinogenic.

22          125.    As a result of Defendant MONSANTO'S actions, Plaintiff was unaware, and

23   could not reasonably know or have learned through reasonable diligence, that Roundup and/or

24   glyphosate contact exposed Plaintiff to the risks alleged herein and that those risks were the

25   direct and proximate result of Defendant MONSANTO'S acts and omissions.

26          126.    Furthermore, Defendant MONSANTO is estopped from relying on any statute of

27   limitations because of its fraudulent concealment of the true character, quality and nature of

28   Roundup. Defendant MONSANTO was under a duty to disclose the true character, quality, and

nature of Roundup because this was non-public information over which MONSANTO had and continues to have exclusive control, and because MONSANTO knew that this information was not available to Plaintiff or to distributors of Roundup. In addition, Defendant MONSANTO is estopped from relying on any statute of limitations because of its intentional concealment of these facts.

127.     Plaintiff had no knowledge that Defendant MONSANTO was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by MONSANTO, Plaintiff could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendant MONSANTO had the ability to and did spend enormous amounts of money in furtherance of its purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only MONSANTO'S representations. Accordingly, Defendant MONSANTO is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

## FIRST CAUSE OF ACTION

## STRICT LIABILITY (DESIGN DEFECT)

128.     Plaintiff incorporates by reference every allegation set forth in the preceding paragraphs.

129.     Plaintiff brings this strict liability claim against MONSANTO for defective design.

130.     At all times relevant to this litigation, MONSANTO engaged in the business of testing, developing, manufacturing, selling, and distributing Roundup products., MONSANTO also engaged in the marketing, packaging, design, and promotion of Roundup® products, thus placing them in the stream of commerce.  These products are defective and unreasonably dangerous to consumers, including Plaintiff. At all times relevant to this litigation, these actions were under the control and supervision of MONSANTO.

131.     At all times relevant to this litigation, Roundup products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous to the public and to the Plaintiff in particular,

132.     At all times relevant to this litigation, Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in California and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by MONSANTO.

133.     Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by MONSANTO were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

134.     Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by MONSANTO were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

135.     At all times relevant to this action, MONSANTO knew or had reason to know that Roundup products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by MONSANTO.

136.     Therefore, at all times relevant to this litigation, Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by MONSANTO were defective in design and formulation, in one or more of the following ways:

    a)   When placed in the stream of commerce, Roundup products were
         defective in design and formulation, and, consequently, dangerous to an
         extent beyond that which an ordinary consumer would contemplate.

b)  When placed in the stream of commerce, Roundup products were
    unreasonably dangerous in that they were hazardous and posed a grave
    risk of cancer and other serious illnesses when used in a reasonably
    anticipated manner.

c)  When placed in the stream of commerce, Roundup products contained
    unreasonably dangerous design defects and were not reasonably safe when
    used in a reasonably anticipated or intended manner.

d)  MONSANTO did not sufficiently test, investigate, or study Roundup
    products and, specifically, the active ingredient glyphosate.

e)  Exposure to Roundup® and glyphosate-containing products presents a risk
    of harmful side effects that outweigh any potential utility stemming from
    the use of the herbicide.

f)  At the time of marketing its Roundup products, Roundup was defective in
    that exposure to Roundup and specifically, its active ingredient
    glyphosate, could result in cancer and other severe illnesses and injuries.

g)  MONSANTO did not conduct adequate post-marketing surveillance of its
    Roundup® products.

h)  MONSANTO could have employed safer alternative designs and
    formulations.

137.    At all times relevant to this litigation, Plaintiff used and/or were exposed to
Roundup products in an intended or reasonably foreseeable manner without knowledge of their
dangerous characteristics.

138.    Plaintiff could not have reasonably discovered the defects and risks associated
with Roundup or glyphosate-containing products before or at the time of exposure.

139.    The harm caused by Roundup products far outweighed their benefit, rendering
these products dangerous to an extent beyond that which an ordinary consumer would
contemplate. Roundup products were and are more dangerous than alternative products and
MONSANTO could have designed Roundup products (including their packaging and sales aids)

to make them less dangerous. Indeed, at the time that MONSANTO designed Roundup®
products, the state of the industry's scientific knowledge was such that a less risky design or
formulation was attainable.

140.    At the time Roundup products left MONSANTO'S control, there was a practical,
technically feasible and safer alternative design that would have prevented the harm without
substantially impairing the reasonably anticipated or intended function of those herbicides.

141.    MONSANTO'S defective design of Roundup products was willful, wanton,
fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of
the Roundup products, including the Plaintiff herein.

142.    Therefore, as a result of the unreasonably dangerous condition of its Roundup
products, MONSANTO is strictly liable to Plaintiff.

143.    The defects in Roundup products caused or contributed to cause Plaintiff's grave
injuries, and, but for MONSANTO'S misconduct and omissions, Plaintiff would not have
sustained Plaintiff's injuries.

144.    MONSANTO'S conduct, as described above, was reckless. MONSANTO risked
the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety
problems associated with Roundup and glyphosate-containing products, and suppressed this
knowledge from the general public. MONSANTO made conscious decisions not to redesign,
warn or inform the unsuspecting public. MONSANTO'S reckless conduct warrants an award of
aggravated damages.

145.    As a direct and proximate result of MONSANTO placing defective Roundup
products into the stream of commerce, Plaintiff has suffered and continues to suffer grave
injuries, and has endured physical pain and discomfort, as well as economic hardship, including
considerable financial expenses for medical care, and treatment.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's
favor for compensatory and punitive damages, together with interest, costs, attorneys' fees and
all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial.

///

1      **SECOND CAUSE OF ACTION STRICT LIABILITY (FAILURE TO WARN)**

2      146.    Plaintiff incorporates by reference every allegation set forth in the preceding

3  paragraphs.

4      147.    Plaintiff brings this strict liability claim against Defendants for failure to warn.

5      148.    At all times relevant to this litigation, Defendants engaged in the business of

6  testing, developing, designing, manufacturing, marketing, selling, distributing, and/or promoting

7  Roundup products, which are defective and unreasonably dangerous to consumers, including

8  Plaintiff, because they do not contain adequate warnings or instructions concerning the

9  dangerous characteristics of Roundup and specifically, the active ingredient glyphosate. These

10  actions were under the ultimate control and supervision of Defendants.

11      149.    Defendants researched, developed, designed, tested, manufactured, inspected,

12  labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of

13  commerce Roundup products, and directly advertised or marketed the products to consumers and

14  end users, including the Plaintiff, and therefore had a duty to warn of the risks associated with

15  the use of Roundup and glyphosate-containing products.

16      150.    At all times relevant to this litigation, Defendants had a duty to properly test,

17  develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain

18  supply, provide proper warnings, and take such steps as necessary to ensure that Roundup

19  products did not cause users and consumers to suffer from unreasonable and dangerous risks.

20  Defendants had a continuing duty to warn the Plaintiff of the dangers associated with Roundup

21  use and exposure. Defendants, as manufacturer, seller, promoter, marketer, or distributor of

22  chemical herbicides is held to the knowledge of an expert in the field.

23      151.    At the time of manufacture, Defendants could have provided the warnings or

24  instructions regarding the risks of Roundup and glyphosate-containing products because they

25  knew or should have known of the unreasonable risks of harm associated with the use of and/or

26  exposure to such products.

27      152.    At all times relevant to this litigation, Defendants failed to investigate, study, test,

28  or promote safety.   It failed to minimize the dangers to users and consumers of its product and to

those who would foreseeably use or be harmed by these herbicides, including Plaintiff.

153.     Despite the fact that Defendants knew or should have known that Roundup posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendants, or scientifically knowable to Defendants, through appropriate research and testing by known methods, at the time Defendants distributed, marketed, promoted, supplied or sold the product. These dangerous properties were not known to end users and consumers, such as Plaintiff.

154.     These products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Defendants have wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup and glyphosate.

155.     At all times relevant to this litigation, Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in California and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted and marketed by Defendants.

156.     At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Roundup products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

157.     Plaintiff could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products either before or at the time of exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendants.

158.     These products were defective because the minimal warnings disseminated with Roundup products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably

1    foreseeable uses, including agricultural and landscaping applications.

2         159.    The information that Defendants did provide or communicate failed to contain

3    relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiff

4    to utilize the products safely and with adequate protection. Instead, Defendants disseminated

5    information that was inaccurate, false, and misleading and which failed to communicate

6    accurately or adequately the comparative severity, duration, and extent of the risk of injuries with

7    use of and/or exposure to Roundup and glyphosate. Defendants continued to aggressively promote

8    the efficacy of its products, even after it knew or should have known of the unreasonable risks

9    from use or exposure. And it concealed, downplayed, or otherwise suppressed, through

10   aggressive marketing and promotion, any information or research about the risks and dangers of

11   exposure to Roundup and glyphosate.

12        160.    To this day, Defendants have failed to adequately and accurately warn of the true

13   risks of Plaintiff's injuries associated with the use of and exposure to Roundup and its active

14   ingredient glyphosate, a probable carcinogen.

15        161.    As a result of their inadequate warnings, Roundup products were defective

16   and unreasonably dangerous when they left the possession and/or control of Defendants, were

17   distributed, marketed, and promoted by MONSANTO, and used by Plaintiff.

18        162.    Defendants are liable to Plaintiff for injuries caused by their negligent or willful

19   failure, as described above, to provide adequate warnings or other clinically relevant information

20   and data regarding the appropriate use of these products and the risks associated with the use of

21   or exposure to Roundup and glyphosate.

22        163.    The defects in Roundup products caused or contributed to cause Plaintiff's

23   injuries, and, but for this misconduct and these omissions, Plaintiff would not have been injured.

24        164.    Had Defendants provided adequate warnings and instructions and properly

25   disclosed the risks associated with Roundup, Plaintiff could have avoided getting cancer.

26        165.    As a direct and proximate result of Defendants placing defective Roundup

27   products into the stream of commerce, Plaintiff have suffered severe injuries and have endured

28   physical pain and discomfort, as well as economic hardship, including considerable financial

expenses for medical care and treatment.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial.

### THIRD CAUSE OF ACTION

### NEGLIGENCE

166.    Plaintiff incorporates by reference every allegation set forth in the preceding paragraphs.

167.    Defendants, directly or indirectly, caused Roundup products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

168.    At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

169.    At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup products. Defendants' duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup, and its active ingredient, glyphosate.

170.    At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care should have known, of the hazards and dangers of Roundup and specifically, the carcinogenic properties of the chemical glyphosate.

171.    Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup products could cause or be associated with Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

172.    Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup were unaware of the risks and the magnitude of the risks associated with the use of, and/or exposure, to Roundup and glyphosate-containing products.

173.    As such, Defendants breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup products, in that Defendants manufactured, marketed, promoted, and sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

174.    Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Defendants have failed to do so. Indeed, Defendants have wrongfully concealed information and has made false and misleading statements concerning the safety of, and/or exposure to, Roundup and glyphosate.

175.    Defendants were negligent in the following respects:

a)  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup products without thorough and adequate pre- and post-market testing;

b)  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

c)  Failing to undertake studies and conduct necessary tests to determine whether Roundup products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d)  Failing to use reasonable and prudent care in the design, research,

28
COMPLAINT FOR DAMAGES

manufacture, and development of Roundup products to avoid the risk of serious harm associated with the prevalent use of Roundup/glyphosate as an herbicide;

e) Failing to design and manufacture Roundup products to ensure they were at least as safe and effective as other herbicides on the market;

f) Failing to provide adequate instructions, guidelines, and safety precautions to those persons whom Defendants could reasonably foresee would use and be exposed to Roundup products;

g) Failing to disclose to Plaintiff, users/consumers, and the general public that use of, and exposure to, Roundup presented severe risks of cancer and other grave illnesses;

h) Failing to warn Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

i) Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup and glyphosate- containing products;

j) Representing that its Roundup products were safe for their intended use when, in fact, Defendants knew or should have known that the products were not safe for their intended purpose;

k) Declining to make or propose any changes to Roundup products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup and glyphosate;

l) Advertising, marketing, and recommending the use of the Roundup products, while concealing and failing to disclose or warn of the dangers known by Defendants to be associated with, or caused by, exposure to Roundup and glyphosate;

m) Continuing to disseminate information to its consumers, which indicate or

imply that MONSANTO'S Roundup products are not unsafe for use in the agricultural and horticultural industries; and

n) Continuing the manufacture and sale of its products with the knowledge that the products are unreasonably unsafe and dangerous.

176. Defendants knew and/or should have known that it was foreseeable that consumers such as Plaintiff would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup.

177. Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup or its active ingredient glyphosate.

178. Defendants' negligence was the proximate cause of the injuries, harm, and economic losses to Plaintiff.

179. Defendants' conduct, as described above, was reckless. Defendants regularly risked the lives of consumers and users of their products, including Plaintiff, with full knowledge of the dangers of these products. Defendants has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Defendants' reckless conduct therefore warrants an award of aggravated or punitive damages.

180. As a proximate result of Defendants' wrongful acts and omissions in placing defective Roundup products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic losses (including significant expenses for medical care and treatment) in an amount to be determined.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial.

///

///

**FOURTH CAUSE OF ACTION**

**FRAUD, MISREPRESENTATION, AND SUPPRESSION**

181.     Plaintiff incorporates by reference the above paragraphs, which detail fraud with specificity.

182.     Defendants fraudulently, intentionally, and/or negligently misrepresented to the public and Plaintiff, both directly and through the media,  scientific literature, and purported "community outreach" programs that Roundup was safe.,  It fraudulently, intentionally, and/or negligently concealed, suppressed, or omitted material, adverse information (i.e., that Roundup was unsafe).

183.     Defendants falsely communicated to the public through direct advertising, product packaging, and ghostwritten articles and editorials that Roundup was safe.  When Defendants misrepresented to the public and Plaintiff that Roundup was safe, it specifically intended that its misrepresentations would cause Plaintiff and other potential consumers to purchase and use Roundup.

184.     Defendants either knew or should have known of the material representations they were making regarding the safety and relative utility of Roundup products.

185.     Defendants fraudulently, intentionally, and/or negligently made the misrepresentations and/or actively concealed, suppressed, or omitted this material information with the specific desire to induce Plaintiff, and the consuming public to purchase and use Roundup products. Defendants fraudulently, intentionally, and/or negligently, knew or should have known that Plaintiff and the consuming public would rely on such material misrepresentations and/or omissions in selecting and applying Roundup products. Defendants knew or should have known that Plaintiff would rely on their false representations and omissions.

186.     Defendants made these misrepresentations and actively concealed adverse information including the risk of non-Hodgkin's lymphoma, at a time when its agents and employees knew or should have known that the product had defects, dangers, and characteristics that were other than what was represented to the consuming public. Specifically, Defendants

misrepresented and actively concealed, suppressed, and omitted that there had been inadequate testing of the safety and efficacy of Roundup, and that prior studies, research, reports, and/or testing had been conducted linking the use of the drug with serious health problems, including non-Hodgkin's lymphoma.

187.   Despite the fact that Defendants knew or should have known of reports of severe risks including non-Hodgkin's lymphoma with Roundup use and exposure, this information was strategically minimized, understated, or omitted in order to create the impression that the human dangers of Roundup were nonexistent, particularly in light of its purported utility.

188.   The fraudulent, intentional and/or negligent material misrepresentations and/or active concealment, suppression, and omissions by Defendants were perpetuated directly and/or indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied by Defendants.

189.   If Plaintiff had known the true facts concerning the risks associated with Roundup exposure, then Plaintiff would have used a safer alternative.

190.   Plaintiff's reliance upon the material misrepresentations and omissions was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Roundup while Plaintiff was not in a position to know the true facts because Defendants overstated the benefits and safety of Roundup and downplayed the risk of lymphoma, thereby inducing Plaintiff to use the herbicide rather than safer alternatives.

191.   As a direct and proximate result of Defendants' acts and omissions, Plaintiff was exposed to Roundup and suffered and will continue to suffer injuries and damages.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial.

/ / /

/ / /

**FIFTH CAUSE OF ACTION**

**VIOLATION OF THE UNFAIR BUSINESS PRACTICES ACT**

192.     Plaintiff incorporates by reference all previous paragraphs of this Complaint and further allege as follows:

193.     Plaintiff brings this cause of action pursuant to California Business & Professions Code § 17500, California Civil Code §§ 1750 et. seq.

194.     Defendants fraudulently, intentionally, negligently, and/or innocently misrepresented to the public, and to Plaintiff, both directly and through the media and purported "community outreach" programs, the safety of Roundup products, and/or fraudulently, intentionally, negligently and/or innocently concealed, suppressed, or omitted material, adverse information regarding the safety of Roundup. This deception caused injury to Plaintiff in violation of California Business & Professions Code § 17500, California Civil Code §§ 1750 et. seq.

195.     The intentional, negligent, and/or innocent misrepresentations and omissions of Defendants regarding the safety of Roundup products were communicated to Plaintiff directly through national and regional advertising, marketing and promotion efforts, as well as packaging and sales aids. The safety of Roundup products was also intentionally, negligently, and/or innocently misrepresented to Plaintiff and the public with the intent that such misrepresentations would cause Plaintiff and other potential consumers to purchase and use or continue to purchase and use Roundup products.

196.     Defendants either knew or should have known of the material misrepresentations they were making regarding the safety and relative utility of Roundup products.

197.     Defendants fraudulently, intentionally, negligently, and/or innocently made the misrepresentations and/or actively concealed, suppressed, or omitted this material information with the specific desire to induce Plaintiff, and the consuming public to purchase and use Roundup products. Defendants fraudulently, intentionally, negligently, and/or innocently, knew or should have known that Plaintiff and the consuming public would rely on such material misrepresentations and/or omissions in selecting and applying Roundup products. Defendants

COMPLAINT FOR DAMAGES

knew or should have known that Plaintiff would rely on its false representations and omissions.

198.     Defendants made these misrepresentations and actively concealed adverse information including the risk of non-Hodgkin's lymphoma, at a time when its agents and employees knew or should have known that the product had defects, dangers, and characteristics that were other than what was represented to the consuming public. Specifically, Defendants misrepresented and actively concealed, suppressed, and omitted that there had been inadequate testing of the safety and efficacy of Roundup and that prior studies, research, reports, and/or testing had been conducted linking the use of the drug with serious health problems, including non-Hodgkin's lymphoma.

199.     Despite the fact that Defendants knew or should have known of reports of severe risks – including non-Hodgkin's lymphoma – with Roundup use and exposure, this information was strategically minimized, understated, or omitted in order to create the impression that the human dangers of Roundup were nonexistent, particularly in light of its purported utility.

200.     The fraudulent, intentional, negligent and/or innocent material mis-representations and/or active concealment, suppression, and omissions by Defendants were perpetuated directly and/or indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied by Defendants.

201.     If Plaintiff had known the true facts concerning the risks associated with Roundup exposure, Plaintiff would have used a safer alternative.

202.     Plaintiff's reliance upon the material misrepresentations and omissions was justified, among other reasons, because those misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Roundup. Plaintiff was not in a position to know the true facts because Defendants overstated the benefits and safety of Roundup and downplayed the risk of lymphoma, thereby inducing Plaintiff to use the herbicide rather than safer alternatives.

/ / /

203.    Federal law and the EPA do not authorize and specifically prohibit the deceptions, misrepresentations, and omissions made by Defendants.

204.    As a direct and proximate result of Defendants' actions and inactions, Plaintiff was exposed to Roundup and suffered and will continue to suffer injuries and damages.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial.

## **PRAYER FOR RELIEF**

Plaintiff prays for judgment against Defendants on each of the above-referenced claims and causes of action as follows:

(1)    Compensatory damages in excess of the jurisdictional amount, including, but not limited to, pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial;

(2)    Compensatory damages to Plaintiff for past and future damages, including, but not limited to, Plaintiff's pain and suffering and for severe and permanent personal injuries sustained by Plaintiff including health care costs and economic loss;

(3)    Economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determines at trial;

(4)    Punitive damages based on Defendants' malicious, oppressive, fraudulent, wanton and reckless behavior;

(5)    Pre-judgment interest;

(6)    Post-judgment interest;

(7)    Plaintiff's reasonable attorney fees;

(8)    The costs of these proceedings; and

(9)    Any and all such other and further relief as this Court deems just and proper.

///

///

///

1

**<u>DEMAND FOR JURY TRIAL</u>**

2

Plaintiff hereby respectfully demands trial by jury as to all issues.

3

Dated:  February 7, 2022                    Respectfully submitted,

4

5

GERALD SINGLETON

6

MARK F. FLEMING
JOHN C. LEMON

7

KRISTEN D. MILLER
Attorneys for Plaintiff

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

36

COMPLAINT FOR DAMAGES