# EXHIBIT C

## No. 22-3075

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

DAVID SCHAFFNER, JR. AND THERESA SUE SCHAFFNER,
*Plaintiffs-Appellees*,

v.

MONSANTO COMPANY,[*]
*Defendant-Appellant.*

On Appeal From The United States District Court For The
Western District of Pennsylvania
No. 2:19-cv-1270-CRE (Eddy, Chief Magistrate Judge)

## BRIEF OF APPELLANT MONSANTO COMPANY

K. Lee Marshall
BRYAN CAVE LEIGHTON
PAISNER LLP
Three Embarcadero Center, 7th
Floor
San Francisco, California
94111-4070
(415) 675-3400

David M. Zionts
Michael X. Imbroscio
Patricio Martínez Llompart
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000

*Counsel for Defendant-Appellant Monsanto Company*

---

[*] Defendant-Appellant Monsanto Company was inaccurately identified in the caption as "Monsanto Corporation."

# DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, and Third Circuit Rule 26.1.1(b), Appellant Monsanto Company discloses the following.

The following are publicly owned corporations that own 10% or more of Appellant Monsanto Company's stock:

1. Bayer AG, BAYRY

The following are publicly owned corporations not a party to this appeal that have a financial interest in the outcome of the litigation and the nature of that interest:

1. Bayer AG, BAYRY (parent company of Monsanto)

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ................................................................. i

TABLE OF AUTHORITIES ................................................................ v

GLOSSARY ...................................................................................... xi

INTRODUCTION ............................................................................... 1

JURISDICTION.................................................................................. 3

ISSUES PRESENTED........................................................................ 4

RELATED CASES ............................................................................. 5

STATEMENT OF THE CASE............................................................. 6

    A.    EPA's Statutory Authority Over Pesticides and Their Labeling ......... 6

    B.    EPA's Consistent Determinations That Glyphosate Does Not Cause Cancer ........................................................................ 11

        1.    EPA Registers And Re-registers Glyphosate, Determining It Is Non-Carcinogenic. ..................................... 11

        2.    An International Working Group Releases a Hazard Assessment for Glyphosate....................................................... 13

        3.    EPA Reiterates Its Determination That Glyphosate Does Not Cause Cancer And Expressly Rejects A Cancer Warning................................................................................. 13

    C.    Procedural History............................................................................ 17

        1.    The Roundup® Multidistrict Litigation................................... 17

        2.    This Suit ..................................................................................... 18

SUMMARY OF ARGUMENT ........................................................... 20

STANDARD OF REVIEW ................................................................ 24

ARGUMENT ............................................................................................ 24

I.  FIFRA Expressly Preempts Plaintiffs' State-Law Failure-to-Warn
    Claim. .......................................................................................... 25

    A.  Plaintiffs' Claim Seeks To Enforce A State-Law Labeling
        Requirement. ........................................................................ 25

    B.  The Alleged State-Law Requirement Is Both In Addition To
        And Different From Requirements Under FIFRA. ............................. 26

        1.  EPA's Pesticide-Specific Labeling Determinations
            Establish "Requirements Under FIFRA." ................................ 28

        2.  Given EPA's Determination That A Cancer Warning Is
            Not Required Under FIFRA, A State Law Requirement
            To Provide A Cancer Warning Is "In Addition To" And
            "Different From" Federal Requirements. ................................ 36

        3.  This Court Should Reject *Hardeman*, Which Wrongly
            Disregards EPA's Role Implementing FIFRA. ........................ 39

            a)  Agency Action with the "Force of Law" Is Not
                Required, But in Any Event Is Present. .......................... 40

            b)  A "Miscellaneous" Provision of FIFRA Does Not
                Make EPA's Labeling Determinations Irrelevant to
                Preemption. ............................................................ 42

II. Impossibility Preemption Also Bars Plaintiffs' Failure-to-Warn
    Claim. .......................................................................................... 47

    A.  Impossibility Preemption Applies Under FIFRA. ............................. 48

    B.  EPA Would Reject Plaintiffs' Desired Cancer Warning. ................... 50

        1.  EPA Has Been Fully Informed of the Supposed
            Justification for a Warning That Glyphosate Causes
            Cancer. .................................................................... 51

        2.  EPA Has Made Clear It Would Not Approve a Warning
            Stating Glyphosate Causes Cancer. ................................... 52

iii

3. EPA's Actions Carry the Force of Law. ................................... 53

CONCLUSION ........................................................................... 57

CERTIFICATE OF COMPLIANCE ........................................... 59

CERTIFICATE OF BAR MEMBERSHIP .................................. 60

CERTIFICATE OF SERVICE ................................................... 61

ADDENDUM ............................................................................. A-1

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Avandia Marketing, Sales, and Prods. Liab. Litig.*,
945 F.3d 749 (3d Cir. 2019) .................................................................52

*Bates v. Dow Agrosciences LLC*,
544 U.S. 431 (2005).................................................................*passim*

*Bausch v. Stryker Corp.*,
630 F.3d 546 (7th Cir. 2010) ...............................................................44

*Caplinger v. Medtronic, Inc.*,
784 F.3d 1335 (10th Cir. 2015) ...........................................................30

*Carson v. Monsanto Co.*,
51 F.4th 1358 (11th Cir. 2022) ............................................................37

*Cohen v. ConAgra Brands, Inc.*,
16 F.4th 1283 (9th Cir. 2021) ...........................................32, 33, 40

*Cooper Indus., Inc. v. Aviall Servs., Inc.*,
543 U.S. 157 (2004)..............................................................................47

*Coventry Health Care of Mo. Inc. v. Nevils*,
137 S. Ct. 1190 (2017)..........................................................................39

*Dow Agrosciences LLC v. Bates*,
332 F.3d 323 (5th Cir. 2003) ...............................................................47

*Drinkwater v. Union Carbide Corp.*,
904 F.2d 853 (3d Cir. 1990) ................................................................23

*Elasaad v. Independence Air, Inc.*,
613 F.3d 119 (3d Cir. 2010) ................................................................23

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)..............................................................................45

*Ferebee v. Chevron Chem. Co.*,
736 F. 2d 1529 (D.C. Cir. 1984)..........................................................34

*Fla. Dep't of Rev. v. Piccadilly Cafeterias, Inc.*,
554 U.S. 33 (2008) ................................................................42

*Free v. Bland*,
369 U.S. 663 (1962) ..............................................................23

*Geier v. Am. Honda Motor Co.*,
529 U.S. 861 (2000) ..............................................................45

*Hardeman v. Monsanto Co.*,
997 F.3d 941 (9th Cir. 2021) ..........................................*passim*

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ..............................................................19

*Horn v. Thoratec Corp.*,
376 F.3d 163 (3d Cir. 2004) ...............................................30

*Hughes v. Bos. Sci. Corp.*,
631 F.3d 762 (5th Cir. 2011) ..............................................31

*In re Incretin-Based Therapies Prods. Liab. Litig.*,
524 F. Supp. 3d 1007 (S.D. Cal. 2021) ..............................54

*Indian Brand Farms, Inc. v. Novartis Crop. Prot. Inc.*,
617 F.3d 207 (3d Cir. 2010) ..........................................32, 37

*Keefe v. Prudential Prop. & Cas. Ins. Co.*,
203 F.3d 218 (3d Cir. 2000) .....................................4, 19, 23

*Kurns v. A.W. Chesterton, Inc.*,
620 F.3d 392 (3d Cir. 2010) ..........................................23, 24

*MacDonald v. Monsanto Co.*,
27 F.3d 1021 (5th Cir. 1994) ..............................................41

*McMullen v. Medtronic, Inc.*,
421 F.3d 482 (7th Cir. 2005) ..............................................25

*In re Medtronic, Inc., Sprint Fidelis Leads Prod. Liab. Litig.*,
623 F.3d 1200 (8th Cir. 2010) ......................................31, 42

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996) ................................................................... 33

*Merck Sharpe & Dohme Corp. v. Albrecht*,
    139 S. Ct. 1668 (2019) ........................................................*passim*

*Mortellite v. Novartis Crop Protection, Inc.*,
    460 F.3d 483 (3d Cir. 2006) ....................................................... 25

*Mut. Pharm. Co., Inc. v. Bartlett*,
    570 U.S. 472 (2013) ............................................................45, 48

*Nat'l Ass'n of Wheat Growers v. Becerra*,
    468 F. Supp. 3d 1247 (E.D. Cal. 2020) .................................13, 14

*Nat'l Meat Ass'n v. Harris*,
    565 U.S. 452 (2012) ................................................................... 25

*Nat. Res. Def. Council v. EPA*,
    38 F.4th 34 (9th Cir. 2022) ................................................7, 15, 35

*Pichler v. UNITE*,
    542 F.3d 380 (3d Cir. 2008) ....................................................... 23

*Reckitt Benckiser, Inc. v. EPA*,
    613 F.3d 1131 (D.C. Cir. 2010) .................................................. 27

*Reckitt Benckiser, Inc. v. Jackson*,
    762 F. Supp. 2d 34 (D.D.C. 2011) .............................................. 42

*Riegel v. Medtronic, Inc.*,
    552 U.S. 312 (2008) ..........................................................*passim*

*In re Roundup Prods. Liab. Litig.*,
    390 F. Supp. 3d 1102 (N.D. Cal. 2018) ...................................... 12

*In re Roundup Prods. Liability Litig.*,
    214 F. Supp. 3d 1346 (J.P.M.L. 2016) ....................................... 16

*Ruckelshaus v. Monsanto Co.*,
    467 U.S. 986 (1984) ..................................................................... 6

*Thornton v. Tyson Foods, Inc.*,
   28 F.4th 1016 (10th Cir. 2022) ..................................................31, 40

*Turek v. Gen. Mills, Inc.*,
   662 F.3d 423 (7th Cir. 2011) .............................................................45

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001)...........................................................................42

*Wyeth v. Levine*,
   555 U.S. 555 (2009).....................................................................39, 46

*In re Zofran (Ondansetron) Prod. Liab. Litig.*,
   57 F.4th 327 (1st Cir. 2023).........................................................50, 52

## Constitutional Provision

U.S. Const. art. VI...............................................................................23

## Statutes

7 U.S.C.
   § 136(bb)........................................................................................6, 27
   § 136(q)(1)(A).............................................................................*passim*
   § 136(q)(1)(F)........................................................................................9
   § 136(q)(1)(G)..................................................................9, 27, 28, 54
   § 136(u)..................................................................................................6
   § 136a(a)..............................................................................................27
   § 136a(c)(1)(C) ........................................................................9, 27, 28
   § 136a(c)(1)(F)................................................................................7, 27
   § 136a(c)(2)(A)................................................................................7, 27
   § 136a(c)(5)(B) ...........................................................................*passim*
   § 136a(c)(5)(C) ......................................................................................6
   § 136a(c)(6)..........................................................................................28
   § 136a(d)................................................................................................8
   § 136a(f)(2) .................................................................................*passim*
   § 136a(g)(1)(A) ......................................................................................7
   § 136a-1 .................................................................................................7
   § 136a-1(b) .............................................................................................7
   § 136a-1(b)(5) ...............................................................................34, 53
   § 136j(a)(1)(A).......................................................................................6
   § 136j(a)(1)(B).........................................................................9, 27, 48

§ 136j(a)(1)(E) .................................................................8, 26, 54
§ 136j(a)(2)(A) ........................................................................48
§ 136j(a)(2)(G) ..........................................................................9
§ 136k ......................................................................................9
§ 136l .......................................................................................9
§ 136v(a) ................................................................................48
§ 136v(b) ...........................................................................*passim*

21 U.S.C.
§ 355(o)(4)(A) ...................................................................53, 54
§ 360k(a) ................................................................................30
§ 607(d) ..................................................................................31
§ 678 .......................................................................................31

28 U.S.C.
§ 1291 .......................................................................................4
§ 1332(a) ...................................................................................4
§ 1407 .......................................................................................4
§ 1446(a) ................................................................................18

Cal. Code Regs. tit. 27, § 25603 ............................................14

Federal Environmental Pesticide Control Act of 1972, Pub. L. No. 92-516, 86 Stat. 973 (1972) ...........................................................42

Pub. L. No. 80-104, § 4(c), 61 Stat. 163, 168 (1947) ...............43

**Regulations and Regulatory Materials**

21 C.F.R.
§ 314.110(a) .......................................................................52, 53
§ 314.125(b)(6) ......................................................................52

40 C.F.R.

§ 152.20 .......................................................................................27
§ 152.44 ...........................................................................................9
§ 152.46 ...........................................................................................9
§ 152.112(f) ........................................................................8, 28, 46
§ 152.166(a) ......................................................................................8
§ 152.170(b)(vi) ................................................................................7
§ 155.56 ............................................................................................8
§ 155.58 ....................................................................................8, 53
§ 156.10(i)(1) ....................................................................................8
§ 156.10(i)(2) ....................................................................................8
§ 156.10(a)(5)(ii) ..............................................................................9
§ 156.10(j) .........................................................................................8
§ 156.10(j)(2) ....................................................................................8
§ 156.60 ............................................................................................8
§ 156.61 ............................................................................................8
§ 156.63 ............................................................................................8
§ 156.65 ............................................................................................8
§ 156.66 ............................................................................................8
§ 156.68 ............................................................................................8
§ 156.69 ............................................................................................8
§ 156.70 ............................................................................................8
§ 156.212 ..........................................................................................8
§ 158.200 .........................................................................................27
§ 158.500 ...........................................................................................7

Final Rule: Glyphosate, Pesticide Tolerances, 73 Fed. Reg. 73,586
(Dec. 3, 2008) ...................................................................11, 53

Final Rule: Glyphosate; Pesticide Tolerances, 67 Fed. Reg. 60,934
(Sept. 27, 2002) .................................................................12, 53

Labeling Requirements for Pesticides and Devices, 49 Fed. Reg.
37960 (Sept. 26, 1984) ...........................................................44

**Other Authorities**

H.R. Rep. No. 80-313 (1947) ............................................................43

# GLOSSARY

| | |
|---|---|
| 1993 Reregistration Eligibility Decision | EPA, Reregistration Eligibility Decision (RED) – Glyphosate (Sept. 1993) |
| 1998 EPA Registration Notice | EPA, Pesticide Registration Notice (PR) 98-10: Notifications, Non-Notifications and Minor Formulation Amendments (Oct. 22, 1998) |
| EPA, Revised Glyphosate Issue Paper | EPA, Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential (Dec. 12, 2017) |
| *Hardeman* U.S. 9th Cir. Br. | Brief of United States as Amicus Curiae in Support of Monsanto, *Hardeman v. Monsanto Co.*, No. 19-16636 (9th Cir.) |
| 2019 Letter to Registrants | EPA, Office of Pesticide Programs, Letter to Glyphosate Registrants Regarding Labeling Requirements (Aug. 7, 2019) |
| 2020 Interim Decision | EPA, Glyphosate: Interim Registration Review Decision Case No. 0178 (Jan. 2020) |
| *Hardeman* U.S. S. Ct. Br. | Brief of United States as Amicus Curiae, *Monsanto Co. v. Hardeman*, No. 21-241 (U.S.) |
| 2022 EPA Letter | Letter from Michal Freedhoff, Assistant Administrator, EPA, to Lauren Zeise, Director, Office of Environmental Health Hazard Assessment, California EPA (Apr. 8, 2022) |
| 2022 Interim Decision Withdrawal | EPA Withdraws Glyphosate Interim Decision (Sept. 23, 2022) |
| FIFRA | Federal Insecticide, Fungicide, and Rodenticide Act |
| IARC | International Agency for Research on Cancer |
| MDA | Medical Device Amendments of 1976 |

## INTRODUCTION

According to the Environmental Protection Agency ("EPA"), glyphosate—the world's most widely-used herbicide—does not cause cancer. That is the formal conclusion, consistently held for decades, of an expert agency exercising congressionally-delegated authority. Acting pursuant to its responsibilities under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), EPA has studied the extensive body of science on glyphosate and repeatedly found that glyphosate is not carcinogenic. Consistent with this determination, EPA has approved dozens of labels bearing no cancer warning for Monsanto's Roundup®-branded glyphosate products. The agency even notified registrants of glyphosate products that a warning stating glyphosate causes cancer would render their products' labeling false and thus misbranded in violation of FIFRA. In short, EPA has determined that glyphosate does not cause cancer, and that a warning stating otherwise is neither required nor allowed under FIFRA. A registrant cannot contravene those agency determinations without exposing itself to seizure of its products, civil penalties, and even criminal punishment.

The premise of the judgment in this case, however, is that Pennsylvania law requires precisely the warning EPA rejects. But FIFRA preempts any state labeling requirement that is "in addition to or different from those required under this subchapter," i.e., under FIFRA. 7 U.S.C. § 136v(b). Congress enacted this express

preemption provision to achieve labeling "Uniformity," *id.*, avoiding a regime of "50 different labeling regimes prescribing the … wording of warnings," *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 452 (2005). And the Supreme Court has stressed that state labeling requirements are preempted unless they are "*genuinely* equivalent" to federal labeling requirements. *Id.* at 454. Here they are not. Again, EPA has repeatedly reviewed Roundup®'s labeling and determined that a cancer warning is not required under FIFRA. A state-law requirement to provide that warning is thus at least "in addition to" what is required under the statute.

Since a cancer warning is not *required* under FIFRA, it does not matter whether EPA might *allow* such a warning. In fact, however, EPA has determined that a warning that glyphosate causes cancer is false, and is thus *prohibited* under FIFRA. For that reason, Plaintiffs' claims are also preempted under basic principles of impossibility preemption: state law may not require Monsanto to issue a warning that federal law forbids.

The summary-judgment ruling incorporated into the judgment below rejected this straightforward application of settled preemption principles. It did so on the flawed basis that EPA's pesticide labeling determinations are irrelevant to preemption under FIFRA. According to the district court, if at a high level of abstraction FIFRA requires warnings about human health risks, and Pennsylvania law requires warnings about human health risks, then state and federal requirements

are equivalent, never mind that the expert agency charged with implementing FIFRA says otherwise.  That cannot be reconciled with FIFRA's plain text, which assigns EPA a critical role in the statutory registration process to determine what safety warnings are required.  It also flouts the Supreme Court's admonition that "nominal equivalence" between state and federal requirements is not enough.  *Bates*, 544 U.S. at 454.  And it contravenes the Court's holding that when a federal agency reviews and approves the safety of a regulated product, that approval establishes federal requirements for purposes of a materially identical express preemption provision. *See Riegel v. Medtronic, Inc.*, 552 U.S. 312, 322 (2008).

This case is one of more than 100,000 actions that seek to second-guess the expert determinations of a federal agency exercising congressionally-delegated authority.  Plaintiffs demand that Monsanto issue a warning that EPA has decided is not required under FIFRA.  Indeed, EPA has decided such a warning is forbidden, exposing Monsanto to federal civil and criminal enforcement if it complies with state law.  The Supremacy Clause and FIFRA do not permit States to put Monsanto to this choice.

## JURISDICTION

Plaintiffs David and Theresa Schaffner, citizens of Pennsylvania, filed a complaint against Defendant Monsanto Company in the Court of Common Pleas of Allegheny County.  Appx0034-0094.  Monsanto, a citizen of Delaware and

Missouri, removed the case to federal court, explaining that because Plaintiffs seek damages for Mr. Schaffner's cancer, the amount in controversy exceeds $75,000. Appx0100-0103. The district court had diversity jurisdiction pursuant to 28 U.S.C. § 1332(a).

On November 13, 2019, the Judicial Panel on Multidistrict Litigation transferred this case to MDL No. 2741 for pretrial purposes pursuant to 28 U.S.C. § 1407. After significant proceedings in the MDL, Monsanto and Plaintiffs reached a settlement agreeing to a stipulated judgment against Monsanto. Pursuant to this agreement, Monsanto retained its right to appeal on preemption grounds—grounds that the MDL court rejected and the parties continue to dispute. Appx0140-141. Plaintiffs will receive a substantial monetary payment under the settlement agreement if the judgment is not reversed. This Court has held it has jurisdiction following such a settlement. *See Keefe v. Prudential Prop. & Cas. Ins. Co.*, 203 F.3d 218, 222-24 (3d Cir. 2000).

On October 3, 2022, the district court entered final judgment against Monsanto. Appx0013. On November 1, 2022, Monsanto timely appealed. Appx0012. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED

1. Whether Plaintiffs' state-law failure-to-warn claim is expressly preempted because it is "in addition to or different from" requirements under FIFRA, 7 U.S.C.

§ 136v(b), and EPA has repeatedly concluded that the warning Plaintiffs seek is not required under FIFRA.

2. Whether impossibility preemption bars Plaintiffs' state-law failure-to-warn claim because Monsanto cannot provide the desired warning without EPA approval, and EPA has determined that the warning is false and not permitted under federal law.

These issues were raised before the MDL court in Monsanto's September 17, 2021 Motion for Summary Judgment, Appx0765-0769 (incorporating arguments raised in prior proceedings before the MDL court), and rejected by that court on February 25, 2022, Appx0026-0027.

## RELATED CASES

This case is one of more than 100,000 in federal and state courts to allege that glyphosate—the active ingredient in Roundup®—causes cancer, and that Monsanto is liable for failing to warn of glyphosate's purportedly carcinogenic properties. Numerous such cases were centralized in a federal MDL. *See* Transfer Order, *In re Roundup Prods. Liability Litig.*, No. 16-md-02741 (J.P.M.L. Oct. 4, 2016). The Ninth Circuit has held that federal law does not preempt these failure-to-warn claims, *Hardeman v. Monsanto Co.*, 997 F.3d 941 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 2834 (2022), and the en banc Eleventh Circuit is currently considering the

issue, *see Carson v. Monsanto Co.*, No. 21-10994 (11th Cir.) (en banc).  Neither this case nor any related case has previously been before this Court.

## STATEMENT OF THE CASE

Monsanto manufactures Roundup®, a line of products for which glyphosate is the active ingredient.  EPA extensively regulates herbicides like Roundup® and for decades has exercised its authority under FIFRA to approve glyphosate and glyphosate products, including Roundup®, for sale and use—without any cancer warnings.[1]  The judgment on appeal holds Monsanto liable under Pennsylvania law for failing to warn that glyphosate causes cancer, notwithstanding EPA's determination that glyphosate does not cause cancer.

### A.    EPA's Statutory Authority Over Pesticides and Their Labeling

FIFRA is a "comprehensive regulatory statute," regulating "the use, … sale[,] and labeling[] of pesticides."  *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 991-92 (1984).  Congress prescribed detailed requirements pursuant to which EPA has authority to register pesticides, and made it unlawful to sell within the United States any pesticide not registered by EPA.  7 U.S.C. § 136j(a)(1)(A).

Before EPA registers a pesticide, it must "determine that the pesticide will not cause 'unreasonable adverse effects on the environment.'"  *Ruckelshaus*, 467 U.S.

---

[1] FIFRA's definition of the term pesticide includes herbicides like Roundup®, which eliminate unwanted vegetation.  7 U.S.C. § 136(u).

at 992 (quoting 7 U.S.C. § 136a(c)(5)(C)).  That includes determining that a pesticide will not pose "any unreasonable risk to man."  7 U.S.C. § 136(bb). Accordingly, "EPA reviews pesticides for potential carcinogenicity," and the agency's resulting "classification will determine how the Agency regulates the pesticide."  Appx1047-1048 (EPA, Evaluating Pesticides for Carcinogenic Potential).  For example, if the agency determines that a pesticide is carcinogenic, it will consider limiting permissible applications through a restricted use classification, 40 C.F.R. § 152.170(b)(vi), and imposing "labeling requirements intended to protect human health," *Nat. Res. Def. Council v. EPA*, 38 F.4th 34, 45 (9th Cir. 2022).  EPA makes these expert determinations only after analyzing exhaustive scientific data. *See* 7 U.S.C. §§ 136a(c)(1)(F), (2)(A); 40 C.F.R. § 158.500.

EPA's initial registration of a pesticide does not complete its work.  For certain pesticides (including glyphosate), Congress required "reregistration," through which EPA determines whether the pesticide continues to meet FIFRA's registration requirements.  *See* 7 U.S.C. § 136a-1.  Re-registration is a formal regulatory process defined by statute to comprise five "phases"—including the gathering and analysis of significant data and the independent verification of data adequacy by EPA—that culminates in "regulatory action," 7 U.S.C. § 136a-1(b), in the form of a "reregistration eligibility decision," Appx0843 (1993 Reregistration Eligibility Decision).

Additionally, FIFRA now requires EPA to conduct registration review every 15 years, through which EPA must again determine whether a registered pesticide meets FIFRA's registration requirements. 7 U.S.C. § 136a(g)(1)(A). Each registration review is extensive and may span many years. Appx1096-1103 (EPA, Registration Review Process). When EPA reaches proposed registration review decisions, it opens them to public notice and comment. 40 C.F.R. §§ 155.56, 155.58. Together, these processes ensure that EPA regularly assesses the evidence concerning registered pesticides and remains up to date on the state of the science.

As part of FIFRA's registration, re-registration, and registration review processes, EPA must approve a pesticide's labeling, which the manufacturer must then use without modification. 7 U.S.C. § 136j(a)(1)(E). Based on its safety assessment, EPA may require a pesticide's labeling to feature specific statements concerning health and safety, such as "human hazard" or "precautionary statements" to convey warnings about potential health risks and mitigation actions, 40 C.F.R. §§ 156.60-156.70; requirements for personal protective equipment, *id.* § 156.212; detailed application directions, *id.* § 156.10(i)(1), (2); or designations for use restricted to "certified applicators," 7 U.S.C. § 136a(d); 40 C.F.R. § 156.10(j). If EPA classifies a pesticide for restricted use due to a finding that the pesticide is carcinogenic, applicable regulations prescribe specific labeling. *See* 40 C.F.R. §§ 156.10(j)(2), 152.166(a); Appx0841-0842 (EPA, Pesticide Regulation Notice

(PR) 93-1: Statement of Restricted Use Classification (Feb. 11, 1993)) (instructing that products not classified for restricted use be labeled differently).

FIFRA prohibits EPA from registering a pesticide unless the agency determines that the pesticide's "labeling … compl[ies] with the requirements of [FIFRA]," 7 U.S.C. § 136a(c)(5)(B), including that the pesticide not be "misbranded as that term is defined in FIFRA," 40 C.F.R. § 152.112(f).   FIFRA defines "misbranded" to mean, *inter alia*, that pesticide labels must include any "warning or caution statement which may be necessary … to protect health and the environment," and must not be "false or misleading in any particular."  7 U.S.C. §§ 136(q)(1)(A), (F), (G), 136a(c)(5)(B); 40 C.F.R. § 156.10(a)(5)(ii).  It is unlawful for any person to distribute or sell a pesticide "if any claims made for it as a part of its distribution or sale substantially differ" from its approved labeling.  7 U.S.C. § 136j(a)(1)(B); *see also id.* (prohibiting claims that differ from "the statement required in connection with [the pesticide's] registration"); *id.* § 136a(c)(1)(C) (statement must include a "complete copy of the labeling").  It is also unlawful for any person "to use any registered pesticide in a manner inconsistent with its labeling."  *Id.* § 136j(a)(2)(G).  A person who violates FIFRA's requirements risks civil and criminal penalties, stop-sale orders, and proceedings to seize the pesticide. *Id.* §§ 136*l*, 136k.

Any proposed change to a pesticide's approved labeling must be approved by EPA, including to ensure that such changes do not violate FIFRA. Every change save for "minor modifications" requires a new application that EPA must approve. 40 C.F.R. §§ 152.44, 152.46. Accordingly, registrants are prohibited from adding a new "health hazard" to the "precautionary statement" portion of the label without prior EPA approval. *See* Appx0150 (1998 EPA Registration Notice) (change to "precautionary statements" does not qualify as "[m]inor label change"). Even where EPA permits a label change without prior approval, it may "initiate regulatory or enforcement action" if the agency "determines" that the change was not consistent with "applicable law or regulations." Appx0161 (1998 EPA Registration Notice).

FIFRA includes an express preemption provision. Titled "Uniformity," it provides that States may "not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter," i.e., under FIFRA. 7 U.S.C. § 136v(b). As the Supreme Court has held, only state-law requirements that are "parallel" to federal law withstand preemption under § 136v(b); if a state labeling requirement is not "*genuinely* equivalent" to a federal labeling requirement, it is preempted. *Bates*, 544 U.S. at 447, 454.

## B.  EPA's Consistent Determinations That Glyphosate Does Not Cause Cancer

### 1.  EPA Registers And Re-registers Glyphosate, Determining It Is Non-Carcinogenic.

EPA first registered glyphosate for use as a pesticide in 1974.  In the nearly fifty years since, EPA has continually evaluated the scientific evidence on glyphosate and repeatedly approved the use of glyphosate as a pesticide, each time concluding that it does not cause unreasonable adverse effects on human health and that it is not likely to be carcinogenic to humans.

For instance, in response to a 1983 mouse study, EPA convened an expert scientific panel in 1986 to evaluate the carcinogenic potential of glyphosate. Appx0954 (EPA, Revised Glyphosate Issue Paper).  After assessing the available studies, the panel considered the evidence "equivocal" and not supporting a conclusion that glyphosate causes cancer, while recommending that EPA call for additional studies.  Appx0954 (EPA, Revised Glyphosate Issue Paper).  EPA did so, and while these studies were ongoing, decided that "the Agency will issue registrations" for glyphosate products and prescribed "Required Labeling" that included no cancer warning.   Appx0822-0825, Appx0826-0840 (1986 EPA Registration Standard).  In 1991, after EPA received and analyzed new animal studies on glyphosate, its Cancer Peer Review Committee classified glyphosate "as

a Group E chemical: 'Evidence of Non-Carcinogenicity for Humans.'" Appx0955 (EPA, Revised Glyphosate Issue Paper).

In 1993, EPA completed its statutory re-registration of glyphosate. The agency determined that the "toxicological data base on glyphosate," including with respect to carcinogenicity, was "adequate and … support[ed] reregistration eligibility." Appx0870 (1993 Reregistration Eligibility Decision); *see also* Appx0882 ("[T]he Agency has sufficient information on the health effects of glyphosate"). Based in part on the agency's conclusion that glyphosate showed "evidence of non-carcinogenicity for humans," EPA "determined that glyphosate products, labeled and used as specified [by EPA], will not pose unreasonable risks or adverse effects to humans." Appx0874, 0882. EPA described this as a "Regulatory Conclusion." Appx0850. In every decade since, EPA has reviewed the scientific data on glyphosate and reached the same conclusion: glyphosate does not cause cancer. *See, e.g.*, Final Rule: Glyphosate, Pesticide Tolerances, 73 Fed. Reg. 73,586, 73,589 (Dec. 3, 2008).[2] EPA's *Glyphosate Issue Paper: Evaluation of Carcinogenic Potential*, completed as part of EPA's most recent registration review,

---

[2] *See also*, *e.g.*, Appx0934-0935 (EPA, Report of the Hazard Identification Assessment Review Committee (Apr. 20, 1998)); Final Rule: Glyphosate; Pesticide Tolerances, 67 Fed. Reg. 60,934, 60,935-60,943 (Sept. 27, 2002); Appx0948-0971 (EPA, Revised Glyphosate Issue Paper).

illustrates the agency's intense focus on the question and robust evaluation of the science.  Appx0959-0960.

2.    <u>An International Working Group Releases A Hazard Assessment For Glyphosate.</u>

In 2015, a working group of the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization, issued a report that classified glyphosate as a "Group 2A" agent, meaning that, in IARC's view, it is "probably carcinogenic to humans" based on "limited" evidence of cancer in humans and "sufficient" evidence in animals.  IARC, Monograph on Glyphosate at 78 (Mar. 2015), https://publications.iarc.fr/549.  IARC's classification reflects a "hazard assessment"—meaning that IARC considered whether glyphosate as a chemical agent is capable of causing cancer under any circumstances, without examining whether any risk exists that it actually does so in real-world conditions.  *See id*., Preamble at 10-11; *see also In re Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d 1102, 1108, 1113-14 (N.D. Cal. 2018) (noting the "limited" and "abstract" nature of IARC's assessment).

3.    <u>EPA Reiterates Its Determination That Glyphosate Does Not Cause Cancer And Expressly Rejects A Cancer Warning.</u>

When IARC released its assessment of glyphosate in 2015, EPA was already engaged in its statutory registration review.  During that review, the agency developed an extensive database on the carcinogenic potential of glyphosate,

13

reviewing 736 studies as part of an open literature review as well as "numerous studies … submitted to the agency."  Appx0959-0960 (EPA, Revised Glyphosate Issue Paper).  The agency specifically examined the studies "included in the evaluation by IARC."  Appx0963.  It further convened a scientific advisory panel to contribute to its analysis.  Appx0955.  After considering IARC's classification, EPA again determined that "[t]he strongest support" is for classifying glyphosate as "'not likely to be carcinogenic to humans.'"  Appx0971.  In 2019, after accounting for public comments, EPA issued a proposed registration review decision in which the agency reiterated both its conclusion that glyphosate is not carcinogenic to humans and its disagreement with IARC—noting that its evaluation was "more robust" and "more transparent" than IARC's and "consistent with" those of "other regulatory authorities and international organizations."  Appx0178-0179; *see also Nat'l Ass'n of Wheat Growers v. Becerra*, 468 F. Supp. 3d 1247, 1259 (E.D. Cal. 2020) ("Every regulator of which the court is aware, with the sole exception of the IARC, has found that glyphosate does not cause cancer or that there is insufficient evidence to show that it does."), *appeal filed*, No. 20-16758 (9th Cir.).

In an August 2019 letter rejecting a cancer warning for glyphosate, EPA again reaffirmed its determination that glyphosate is "not likely to be carcinogenic to humans."  Appx0192.  The proposed warning, which California law automatically requires as a result of IARC's classification, would have required labeling stating

glyphosate is "known" to cause cancer.[3]   In its letter, EPA explained that it
"disagrees with IARC's assessment" and that it had "considered a more extensive
dataset than IARC."   Appx0192.   "Given EPA's determination," the agency
concluded that a warning stating glyphosate causes cancer would render a pesticide
"misbranded pursuant to section 2(q)(1)(A) of FIFRA [7 U.S.C. § 136(q)(1)(A)]"
and ordered registrants to remove such language "from all product labels."
Appx0192-0193.

After considering public comments for a second time, EPA in 2020 finalized
its interim registration review determination that glyphosate does not cause cancer,
and again approved labeling with no cancer warning.  Appx0226-0246 (2020 Interim
Decision).   Various parties sought judicial review of this decision in the Ninth
Circuit.   In response to those suits and a change in administration, EPA again
reviewed its decision in early 2021.   The agency reaffirmed the view espoused
without interruption over the last six administrations:  "glyphosate is not likely to be
a human carcinogen and . . . it does not pose human-health risks of concern."
Appx0982 (*NRDC* U.S. 9th Cir. Br.).

---

[3] *See* Cal. Code Regs. tit. 27, § 25603.  That requirement is enjoined with respect to
glyphosate, in part because it would require manufacturers to make a statement that
is "false and misleading given the weight of authority showing that glyphosate was
not known to cause cancer and did not cause cancer."  *Nat'l Ass'n of Wheat Growers
v. Becerra*, 468 F. Supp. 3d 1247, 1259 (E.D. Cal. 2020), *appeal filed*, No. 20-16758
(9th Cir.).

In April 2022, EPA issued a letter once again reaffirming that the agency "continues to stand behind its robust scientific evaluation of the carcinogenic potential of glyphosate"—namely, that glyphosate is unlikely to cause cancer. Appx1045 (2022 EPA Letter). The letter does not revise EPA's conclusion that "the standard warning language"—stating glyphosate does cause cancer—"was false." Appx1045. Rather, it advises that the agency could approve a label statement stating both that IARC has "classified glyphosate as probably carcinogenic to humans," and that EPA and other regulatory authorities have "determined that glyphosate is not likely to be carcinogenic to humans." Appx1045.

In June 2022, the Ninth Circuit vacated EPA's 2020 Interim Decision, concluding that the agency was required to offer "further analysis and explanation." *Natural Res. Def. Council*, 38 F.4th at 52. As that court explained, vacatur would not be "disruptive" because EPA's 2020 decision had "maintained the status quo" (pursuant to which glyphosate products continued to be registered without cancer warnings being required). *Id*. Consistent with the Ninth Circuit's ruling, EPA announced that it will "revisit and better explain its evaluation of the carcinogenic potential of glyphosate," but that "EPA's underlying scientific findings regarding glyphosate, including its finding that glyphosate is not likely to be carcinogenic to humans, remain the same." Appx1091 (2022 Interim Decision Withdrawal).

### C.    Procedural History

#### 1.    The Roundup® Multidistrict Litigation

Following IARC's 2015 classification, plaintiffs nationwide began suing Monsanto, alleging that Roundup®-branded glyphosate-based herbicides caused their cancer and that Monsanto failed to warn them of glyphosate's purportedly carcinogenic qualities.  The Judicial Panel on Multidistrict Litigation centralized those cases alleging one type of cancer—non-Hodgkins lymphoma—in the Northern District of California, where several cases were already pending.  *In re Roundup Prods. Liability Litig.*, 214 F. Supp. 3d 1346 (J.P.M.L. 2016); *see also*, *e.g.*, *Hardeman v. Monsanto Co.*, No. 3:16-00525 (N.D. Cal. filed Feb. 1, 2016).  Because the judgment on appeal incorporates rulings by the MDL court, Monsanto begins by addressing those rulings.

In one of the initial cases to proceed, Monsanto moved to dismiss on the ground that EPA's determinations that glyphosate does not cause cancer or require a cancer warning expressly preempted claims to the contrary.  Appx0014; *see also* 7 U.S.C. § 136v(b).  The MDL court denied the motion, reasoning that EPA's determinations lacked the force of law—which, citing implied preemption cases, the court considered a prerequisite to express preemption.  Appx0017, 0019.

As the MDL proceeded, Monsanto raised additional preemption arguments, including that implied preemption barred MDL plaintiffs' claims because clear

evidence shows EPA would not approve a label bearing the warning they demand. Appx1314-1349. The MDL court denied a motion for summary judgment raising this argument, holding that implied preemption was unavailable under FIFRA because *Bates* implicitly rejected it and because FIFRA generally permits States to regulate the sale and use of pesticides. Appx0020-0025. As EPA continued to reaffirm its conclusion that glyphosate does not cause cancer, *supra* pp. 13-16, Monsanto filed additional motions for summary judgment in which it supplemented the record based on these developments. Appx1350-1354; Appx1355-1360.

### 2. This Suit

In September 2019, after the MDL court's rulings that FIFRA neither expressly nor impliedly preempts claims that state law requires Roundup® to bear a cancer warning, Plaintiffs David and Theresa Schaffner sued Monsanto in the Court of Common Pleas of Allegheny County. Appx0034-0094. They alleged that Mr. Schaffner used Roundup® from 1988 to 2017 and contracted non-Hodgkins Lymphoma in 2006. Appx0037. Plaintiffs brought six counts against Monsanto under Pennsylvania law, including a failure-to-warn claim, seeking to hold Monsanto liable for causing Mr. Schaffner's cancer. Appx0034-0094. Monsanto removed the case to the United States District Court for the Western District of Pennsylvania pursuant to 28 U.S.C. § 1446(a). Appx0100-0103. The Judicial Panel

on Multidistrict Litigation then transferred the case to the MDL for pretrial proceedings.  Appx0104-0106.

In the MDL, Monsanto moved for summary judgment, including on grounds that the "warning-based claims are expressly preempted" and the "claims are preempted under impossibility preemption."  Appx0767.  Acknowledging that the MDL court had rejected these arguments and directed the parties not to re-brief issues that court had already decided, Monsanto incorporated its prior pleadings before the MDL court "in order to fully preserve the appellate record."  Appx0767.  The MDL court denied the motion "for the reasons set forth in the Court's prior orders."  Appx0026.

The MDL court then recommended remand of this case to the Western District of Pennsylvania, and the Judicial Panel on Multidistrict Litigation remanded it.  Appx0121-0137; Appx0135.  On remand, the parties consented to a magistrate judge exercising jurisdiction.  Appx0137.

The parties also reached a settlement agreement.  Under this agreement, Plaintiffs received an initial payment and agreed to amend their complaint to dismiss all counts against Monsanto except Count II—failure to warn.  Appx0138-0139. Monsanto consented to entry of judgment against it on Count II, but expressly retained the right to appeal such a judgment based on its disagreement with the MDL court's order denying summary judgment on the basis of federal preemption.

Appx0140-0141. The parties further agreed that, if the judgment is not reversed on appeal, Plaintiffs will receive an additional, substantial monetary payment of predetermined amount, "'liquidat[ing] those damages.'" *Keefe*, 203 F.3d at 224 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 371 (1982)) (holding a similar settlement agreement consistent with appellate jurisdiction).

The district court granted Plaintiffs' motion to amend, Appx0004 (Sept. 23, 2022 Text Order), and entered the stipulated judgment against Monsanto on the failure-to-warn claim, Appx0013. Monsanto timely appealed. Appx0012.

## SUMMARY OF ARGUMENT

1. FIFRA expressly preempts "any" state-law "requirements for labeling or packaging in addition to or different from those required under [FIFRA]." 7 U.S.C. § 136v(b). A state-law requirement that Monsanto warn that glyphosate causes cancer is in addition to or different from requirements under FIFRA.

a. *Bates* establishes that a common-law failure-to-warn claim seeks to enforce a state-law "requirement[] for labeling or packaging." Plaintiffs' claim that Monsanto was required by state law to warn of the purportedly carcinogenic properties of glyphosate is thus subject to FIFRA's preemption provision.

b. Since EPA has repeatedly determined that glyphosate does not cause cancer and that no cancer warning is required under FIFRA, a state-law requirement to provide such a warning is both "in addition to" and "different from" federal

requirements. FIFRA preempts state-law labeling requirements that are not "genuinely equivalent" to federal labeling requirements. Under FIFRA, EPA must determine whether a pesticide's labeling contains all necessary health warnings. Over decades, EPA has repeatedly determined that glyphosate is non-carcinogenic and that no cancer warning is required.

*Bates*, and the Supreme Court's interpretation of a materially identical preemption provision in *Riegel v. Medtronic*, confirm that EPA's pesticide-specific determinations give content to the "requirements under FIFRA" for preemption purposes. Thus, in light of EPA's regulatory determinations, there is no requirement under FIFRA to warn that glyphosate causes cancer, and a state-law requirement to do so is "in addition to" federal requirements. Indeed, the agency has determined that such a warning would be false and make a pesticide bearing it violate FIFRA, exposing the registrant to civil and criminal penalties. The alleged state-law requirement is thus also "different from" requirements under FIFRA.

The Ninth Circuit's contrary decision in *Hardeman* was wrong. It denied effect to EPA's regulatory determination that no warning that glyphosate causes cancer is required under FIFRA on the flawed view that EPA's actions do not carry the "force of law." No "force of law" inquiry is necessary here. The express preemption provision that Congress enacted has the force of law, and under Supreme Court precedent, EPA's regulatory decisions inform the application of that

provision.  In any event, EPA's formal decisions, made pursuant to express congressional delegation and subject to notice-and-comment procedures, are textbook agency actions with the force of law.

*Hardeman* further erred in overreading a "Miscellaneous" provision of FIFRA providing that registration is not a defense against commission of an offense.  That provision concerns "offenses" enforced by the federal government; it has nothing to do with state law.  Moreover, Monsanto does not rely on the bare fact of registration to preempt state law, but on EPA's specific and repeated regulatory determinations that glyphosate does not cause cancer and that a cancer warning for glyphosate is not required under FIFRA.  The Ninth Circuit's refusal to give effect to EPA actions through the registration process effectively nullifies FIFRA's express preemption provision, and undermines Congress's express objective of achieving "Uniformity" in pesticide labeling.

2.    Plaintiffs' state-law failure-to-warn claim is likewise barred by impossibility preemption.

a.   Contrary to the MDL court's conclusion, neither *Bates* nor the statute suggests that ordinary principles of impossibility preemption are inapplicable to FIFRA.  Under FIFRA, Monsanto cannot add a warning to the Roundup® label that EPA would reject, and state law may not compel Monsanto to do what is forbidden by federal law.

b.   The requirements of impossibility preemption are satisfied.  *First*, the agency was fully informed of the supposed basis for a cancer warning.  EPA has considered IARC's classification, every piece of evidence relied upon by plaintiffs alleging that glyphosate causes cancer, and the full scientific record on glyphosate, and concluded that glyphosate is not likely to be carcinogenic to humans.

*Second*, the agency has stated that it would reject a cancer warning on glyphosate products.  EPA has repeatedly concluded that glyphosate does not cause cancer.  Accordingly, the agency could not lawfully approve a warning that it does cause cancer, because FIFRA bars EPA from approving labeling making false statements.  Thus, when directly asked, EPA confirmed that it would not approve a proposed California warning stating that glyphosate causes cancer.

*Third*, EPA's determinations carry the force of law—that is, they are made using procedures that lie within the scope of the authority Congress has delegated to EPA.  FIFRA both authorizes and requires EPA to make labeling determinations regarding pesticides that bind registrants and the public.   EPA's regulatory determinations concerning glyphosate were made through formal, statutorily prescribed procedures—indeed, procedures more formal than those that the Supreme Court has said produced agency action with the force of law capable of preempting state law.  *See Merck Sharpe & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1679 (2019).  Nothing more is required for impossibility preemption to apply.

## STANDARD OF REVIEW

An appeal from a stipulated final judgment "draws in question all prior non-final orders and rulings," including "review of the issue decided by the district court in [its] order denying summary judgment." *Keefe*, 203 F.3d at 223 (quoting *Drinkwater v. Union Carbide Corp.*, 904 F.2d 853, 858 (3d Cir. 1990)). This Court therefore reviews the denial of Monsanto's motion for summary judgment, and each of the issues presented on appeal, de novo. *See Pichler v. UNITE*, 542 F.3d 380, 385 (3d Cir. 2008). A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Preemption "is a question of law," *Elasaad v. Independence Air, Inc.*, 613 F.3d 119, 124 (3d Cir. 2010), such that "a judge, not the jury, must decide the pre-emption question," *Merck Sharpe & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1676 (2019).

## ARGUMENT

"[T]he Laws of the United States" are "the supreme Law of the Land." U.S. Const. art. VI. Under the Supremacy Clause, "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Kurns v. A.W. Chesterton, Inc.*, 620 F.3d 392, 395 (3d Cir. 2010) (quoting *Free v. Bland*, 369 U.S. 663, 666 (1962)). Federal preemption may be express, "when a federal law contains express language providing for the preemption

of any conflicting state law," or implied, when a "private party [cannot] comply with both state and federal requirements." *Id.* Here, Plaintiffs' failure-to-warn claim is preempted for both reasons.

# I. FIFRA Expressly Preempts Plaintiffs' State-Law Failure-to-Warn Claim.

FIFRA's "Uniformity" provision expressly preempts state laws that impose "any requirements for labeling or packaging in addition to or different from those required under [FIFRA]." 7 U.S.C. § 136v(b). "For a particular state rule to be pre-empted [by FIFRA], it must satisfy two conditions: (1) "it must be a requirement *for labeling or packaging*," and (2) "it must impose a . . . requirement that is *in addition to or different from* those required under [FIFRA]." *Bates*, 544 U.S. at 444 (quotation marks omitted). Plaintiffs' claim satisfies both conditions, so it is preempted.

## A. Plaintiffs' Claim Seeks To Enforce A State-Law Labeling Requirement.

According to Plaintiffs, when Monsanto failed to warn of the purportedly "carcinogenic characteristics of glyphosate," it violated a Pennsylvania common-law "duty to … package, label, [and] … provide proper warnings … as necessary to" prevent "unreasonabl[e] and dangerous risks." Appx0075-0076 (Complaint). Plaintiffs thus seek to enforce a "requirement[] for labeling or packaging." 7 U.S.C. § 136v(b). As *Bates* held, "the term 'requirements' in § 136v(b) reaches beyond

positive enactments, such as statutes and regulations, to embrace common-law duties" that "set a standard for a product's labeling." 544 U.S. at 443, 446. Thus, a "failure-to-warn claim clearly fulfills the first requirement of the *Bates* test by creating a labeling requirement." *Mortellite v. Novartis Crop Protection, Inc.*, 460 F.3d 483, 491 (3d Cir. 2006).

## B. The Alleged State-Law Requirement Is Both In Addition To And Different From Requirements Under FIFRA.

A state labeling requirement is "in addition to or different from" a federal labeling requirement unless the state and federal requirements are truly "parallel." *Bates*, 544 U.S. at 447. Even "non-conflicting" requirements may be "additional or different." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 459 (2012) (interpreting a similarly worded preemption clause). By limiting States to parallel requirements, FIFRA prevents a State from imposing its own labeling rules; it can only supply "remedies that enforce federal misbranding requirements." *Bates*, 544 U.S. at 451. Accordingly, state requirements must be "*genuinely* equivalent," not just "nominally equivalent," to federal requirements. *Id*. at 454. A "manufacturer should not be held liable under a state labeling requirement subject to § 136v(b) unless the manufacturer is also liable for misbranding as defined by FIFRA." *Id.*; *see also McMullen v. Medtronic, Inc.*, 421 F.3d 482, 489 (7th Cir. 2005) ("State and federal requirements are not genuinely equivalent if a manufacturer could be held liable

under the state law without having violated the federal law." (citing *Bates*, 544 U.S. at 454)).

Monsanto did not violate federal law by failing to warn that glyphosate causes cancer—it would have violated federal law by *making* that warning. EPA, following statutorily-prescribed procedures to exercise authority delegated by FIFRA, has determined that glyphosate does not cause cancer, and made a corresponding regulatory determination that a cancer warning for glyphosate is not required under FIFRA. Indeed, the agency has confirmed that such a warning would be false, making a pesticide that bears it misbranded and subject to federal enforcement action. Because EPA has exercised its statutory authority to determine that FIFRA does not require a cancer warning for glyphosate-based herbicides, a state requirement demanding such a warning is "in addition to" federal requirements. That alone triggers preemption under § 136v(b). Moreover, because EPA has determined that such a warning would be false, and thus violate FIFRA, the alleged state-law duty Plaintiffs seek to enforce is "different from" federal requirements.

1.    EPA's Pesticide-Specific Labeling Determinations Establish "Requirements Under" FIFRA.

EPA's consistent and repeated determinations that glyphosate does not cause cancer, and that there is no requirement to warn that it does cause cancer, establish what is required and what is not required under FIFRA.

a. Under FIFRA's express preemption provision, state law may neither supplement nor contradict any labeling "requirements under [FIFRA]." 7 U.S.C. § 136v(b). FIFRA's text prescribes numerous such requirements. For example, FIFRA requires pesticides not to be "misbranded." *Id.* § 136j(a)(1)(E). Misbranding, in turn, is defined by FIFRA to include labels that do not "contain a warning or caution statement which may be necessary and if complied with … is adequate to protect health and the environment." *Id.* § 136(q)(1)(G). A pesticide is also misbranded if its "labeling bears any statement … which is false or misleading in any particular." *Id.* § 136(q)(1)(A).

FIFRA further requires registrants to adhere to EPA-approved labeling. It is unlawful to sell "any registered pesticide if any claims made for it as a part of its distribution or sale substantially differ from any claims made for it as a part of the statement required in connection with its registration," *id.* § 136j(a)(1)(B), which

includes "a complete copy of the labeling," *id.* § 136a(c)(1)(C).  As the agency puts it, "the label is the law."  Appx0199, 0211 (*Hardeman* U.S. 9th Cir. Br.).[4]

Critically, Congress did not just prescribe these requirements in the abstract— it instructed EPA to determine how those requirements apply to specific pesticides. Congress gave the agency this mandate as part of the statutory registration process, which ensures that EPA both reviews and remains apprised of the relevant science concerning potential safety risks.  No pesticide may be sold in the United States unless EPA has "registered" it—that is, approved it for sale after an extensive scientific review and a determination that the pesticide will not pose an unreasonable risk to human health.  *See supra* pp. 6-7; 7 U.S.C. §§ 136(bb), 136a(a), (c)(1)(F), (c)(2)(A); 40 C.F.R. §§ 152.20, 158.200; *Reckitt Benckiser, Inc. v. EPA*, 613 F.3d 1131, 1133 (D.C. Cir. 2010) ("A FIFRA registration is a product-specific license describing the terms and conditions under which the product can be legally distributed, sold, and used.").

Before registering a pesticide, EPA is statutorily obligated to determine whether a pesticide's labeling carries the health warnings required under FIFRA. EPA reviews a "complete copy" of the proposed "labeling of the pesticide," 7 U.S.C. § 136a(c)(1)(C), and may not register it unless it "determines" that its labeling "compl[ies] with" FIFRA's "requirements," *id.* §§ 136a(c)(5)(B), 136a(c)(6).  Thus,

---

[4] *See also* Appx0947 (EPA, Label Review Manual (Dec. 2016)).

"EPA will approve an application" for registration "only if," *inter alia,* "[t]he Agency has determined that the product is not misbranded as that term is defined in FIFRA." 40 C.F.R. § 152.112(f). And since a pesticide lacking a warning that is "necessary" to "protect health" *is* misbranded, 7 U.S.C. § 136(q)(1)(G), EPA may register a pesticide only if it "determines" that any necessary health warning is provided.

In sum, FIFRA requires the inclusion of any necessary health warning on a pesticide's label, obliges EPA to determine what health warnings FIFRA requires, and prohibits registrants from deviating from an EPA-approved label. Together, FIFRA's text and structure establish that Congress delegated to EPA the role of making scientific determinations regarding pesticide safety, and "determin[ing]" whether the pesticide "compl[ies] with the requirements of [FIFRA]" with respect to the adequacy of a pesticide label's safety warnings. 7 U.S.C. § 136a(c)(5)(B). EPA's actions in discharging these statutory responsibilities necessarily establish, on a pesticide-specific basis, what is required under FIFRA for that pesticide. And where EPA has determined what is—and is not—required under FIFRA for a specific pesticide's labeling, States may not impose additional or different requirements.

b. Supreme Court precedent compels the same conclusion. As the Court explained in *Bates*, EPA "give[s] content to FIFRA's misbranding standards" in a

way that matters for preemption.  544 U.S. at 453; *see also id.* at 455 (Breyer, J., concurring) ("[e]mphasizing the importance of the agency's role in overseeing FIFRA's future implementation").  The Court illustrated the point with an example: if EPA determines a pesticide's labeling should say "CAUTION," a "failure-to-warn claim alleging that a given pesticide's label should have stated 'DANGER' instead of the more subdued 'CAUTION' would be pre-empted."  *Id.* at 453.  EPA determines the toxicity level of an individual pesticide, and thus which of these words is required, through the statutory registration process.  *See*, *e.g.*, Appx0870-0879 (1993 Reregistration Eligibility Decision) (determining toxicity categories for glyphosate); *infra* pp. 36-39.

In a similar context, the Supreme Court held that an agency's premarket approval establishes product-specific federal "requirements" with preemptive effect.  At issue in *Riegel v. Medtronic, Inc.* were the Medical Device Amendments of 1976 ("MDA"), which the Court has described as having a "similarly worded pre-emption provision" to FIFRA.  *Bates*, 544 U.S. at 447; *see* 21 U.S.C. § 360k(a) (preempting "any [state-law] requirement … which relates to the safety or effectiveness of the device" and "is different from, or in addition to, any requirement applicable under [the MDA] to the device").  *Riegel* held that "premarket approval" of a device by the Food and Drug Administration ("FDA") "imposes 'requirements' under the MDA that preempt non-parallel state requirements.  552 U.S. at 323.

That is so, *Riegel* explained, because "FDA may grant premarket approval only after it determines that a device offers a reasonable assurance of safety and effectiveness." *Id.* Thus, "FDA requires a device that has received premarket approval to be made with almost no deviations from the specifications in its approval application, for the reason that the FDA has determined that the approved form provides a reasonable assurance of safety and effectiveness." *Id.*; *see also Caplinger v. Medtronic, Inc.*, 784 F.3d 1335, 1340 (10th Cir. 2015) (Gorsuch, J.) (explaining that "device-specific federal requirements apply" because "the device endured the premarket approval process," and concluding that state-law claims were preempted because "once the FDA approves a device's label as part of the premarket approval process (as it has here), the manufacturer usually may not alter the label's warnings without prior agency approval"); *Horn v. Thoratec Corp.*, 376 F.3d 163, 171 (3d Cir. 2004) ("The FDA, when [premarket] approval is granted, imposes federal requirements.").[5] The same reasoning applies here: like the MDA, FIFRA prescribes a premarket approval process through which the agency must determine the adequacy of the product's labeling, and then generally prohibits unilateral changes.

---

[5] Other circuits agree. *See, e.g.*, *Hughes v. Bos. Sci. Corp.*, 631 F.3d 762, 769 (5th Cir. 2011) (state-law claim preempted if it "would question the sufficiency of the FDA-approved labeling, warnings, and instructions"); *In re Medtronic, Inc., Sprint Fidelis Leads Prod. Liab. Litig.*, 623 F.3d 1200, 1205 (8th Cir. 2010) ("additional warnings" beyond the "FDA-approved warnings" are preempted).

Other circuits interpret similar preemption provisions the same way.  The Federal Meat Inspection Act expressly preempts state labeling "requirements in addition to, or different than, those made under this chapter."  21 U.S.C. § 678.  It also requires the agency to conduct premarket review of product labeling, and to approve labeling only if it is "'not false or misleading.'"  *Thornton v. Tyson Foods, Inc.*, 28 F.4th 1016, 1021 (10th Cir. 2022) (quoting 21 U.S.C. § 607(d)).  The Tenth Circuit recently held that the statute preempts a claim asserting agency-approved labels were deceptive and misleading under state law.  Since the agency "ha[d] already determined that defendants' labels are not deceptive or misleading under federal law," "the state law plaintiffs seek to rely on cannot be coextensive with federal law."  *Id.* at 1024.

The same is true under the Poultry Products Inspection Act ("PPIA").  "[W]hen the agency reviews and approves a label, the agency is deciding that it is *not* false or misleading under the PPIA, and thus the agency 'imposes' a federal requirement within the meaning" of the preemption provision.  *Cohen v. ConAgra Brands, Inc.*, 16 F.4th 1283, 1288 (9th Cir. 2021) (citing *Riegel*, 552 U.S. at 322-23).  Preemption occurs because "[i]f a plaintiff claims that such a label is false or misleading notwithstanding review and approval by [the agency], he is essentially claiming that the agency's decision to approve the label was wrong."  *Id.*  Again, precisely the same is true here.

c. The foregoing does not mean that claims involving EPA-approved labeling are always preempted.  As this Court has recognized, "mere inconsistency between the duty imposed by state law and the content of a manufacturer's labeling approved by the EPA at registration d[oes] not *necessarily* mean that the state law duty [i]s preempted."  *Indian Brand Farms, Inc. v. Novartis Crop. Prot. Inc.*, 617 F.3d 207, 222 (3d Cir. 2010) (emphasis added).  That was true in *Bates*, where the plaintiffs alleged a failure to warn that the pesticide Strongarm was inappropriate for certain soil types.  544 U.S. at 435.  That raised an efficacy issue, and Congress authorized EPA to waive review of pesticide efficacy under FIFRA (in order to focus the agency's efforts on safety and environmental effects).  *Id.* at 440.  Accordingly, EPA "never passed on the accuracy of the statement in Strongarm's original label recommending the product's use 'in all areas where peanuts are grown,'" and its registration approval did "not reflect any determination on the part of EPA that the pesticide will be efficacious or will not damage crops or cause other property damage."  *Id.* (quoting EPA, Pesticide Registration Notice 96-4 at 3 (June 3, 1996)).

Reading *Bates* in harmony with *Riegel*, the rule is straightforward: Where EPA makes no determination of compliance with FIFRA, registration alone does not establish what the federal requirements are.  But, where EPA *does* make a statutory determination of compliance with FIFRA, it does establish what the federal requirements are, and state law may not impose additional requirements.  The

Supreme Court drew precisely this distinction under the MDA. As noted, *Riegel* held that since FDA's premarket approval involved safety and efficacy review, it established device-specific "requirements" under the MDA. By contrast, *Medtronic, Inc. v. Lohr* involved approval of devices based on their "substantial equivalence" with previously-approved devices. 518 U.S. 470, 492-94 (1996). Critically, in that process FDA does not "formally review[]" devices "under the MDA for safety or efficacy," so it does not produce "requirements" for preemption purposes. *Riegel*, 552 U.S. at 323; *accord Cohen*, 16 F.4th at 1287 (under the PPIA, no preemption for "generically approved labels" that "are deemed approved without being submitted for evaluation" by agency). *Bates* is like *Lohr*, where agency approval did not entail review of the relevant labeling issue, made no determination of compliance with the statute, and thus established no requirements under that statute. This case is like *Riegel*, where the agency was required to make a determination on the issue and repeatedly did so, resulting in product-specific federal requirements.

This distinction is reinforced by other aspects of the reasoning in *Bates*. The Court there observed that tort suits can "'aid in the exposure of new dangers associated with pesticides.'" 544 U.S. at 451 (quoting *Ferebee v. Chevron Chem. Co.*, 736 F. 2d 1529, 1541-42 (D.C. Cir. 1984)). That point was apt in *Bates*, where the agency never had occasion to consider the alleged new danger to crops. But tort suits play no role in "exposing" alleged dangers that EPA has not only already

identified, but also concluded (after analyzing the entire body of relevant scientific evidence), are not actual dangers.

> ### 2. Given EPA's Determination That A Cancer Warning Is Not Required Under FIFRA, A State Law Requirement To Provide A Cancer Warning Is "In Addition To" And "Different From" Federal Requirements.

There is no question that "EPA has repeatedly approved the use of glyphosate as a pesticide, each time concluding that it is not likely to be carcinogenic to humans." *Hardeman*, 997 F.3d at 951. In 1993, for example, EPA completed glyphosate's statutory re-registration, "determine[d] that glyphosate can be used without resulting in unreasonable adverse effects to man and the environment," and "therefore [found] that all products containing glyphosate as the active ingredients are eligible for reregistration." Appx0882 (1993 Reregistration Eligibility Decision). In taking this "regulatory action," 7 U.S.C. § 136a-1(b)(5), EPA relied on its 1991 decision to "classif[y] glyphosate in Group E (evidence of non-carcinogenicity for humans)." Appx0874. Similarly, in 2020, EPA issued an interim registration review decision reaffirming its conclusion that glyphosate is not carcinogenic. Appx0246; *see supra* p.15. After the Ninth Circuit vacated the 2020 Interim Decision, which nevertheless maintained "the status quo" because "the Interim Decision imposed no new mitigation measures associated with human health," *Nat. Res. Def. Council*, 38 F.4th at 52, in September 2022 EPA reaffirmed that its "underlying scientific findings regarding glyphosate, including its finding

that glyphosate is not likely to be carcinogenic to humans, remain the same," Appx1091.

Consistent with this determination, though EPA prescribes detailed requirements for the labeling of glyphosate products, *see* Appx1023-1044 (2022 EPA Label Approval), it "has never required labeling warning of a cancer risk posed by Roundup," Appx0211 (*Hardeman* U.S. 9th Cir. Br.).[6] Between 1991 and 2020, moreover, the agency approved at least "forty-four versions of the label for the original formulation of Roundup"—none bearing a cancer warning. Appx0224. The agency continues to approve labels for glyphosate-based herbicides with no cancer warning. *See*, *e.g.*, Appx1023-1044 (2022 EPA Label Approval). EPA has also informed registrants that "[g]iven EPA's determination that glyphosate is 'not likely to be a carcinogen to humans,'" a warning stating glyphosate causes cancer would be "false," making the pesticide "misbranded" in violation of FIFRA. Appx0192-0193 (2019 Letter to Registrants).

In light of these regulatory actions, a state-law requirement to warn that glyphosate causes cancer is not "*genuinely* equivalent" to federal requirements.

---

[6] The U.S. government made this point in a 2020 brief supporting preemption of claims similar to those at issue here. In 2022, the government reversed position on the legal question of whether FIFRA preempts such claims, explaining that it did so "[i]n light of … the change in Administration." Appx1071 (*Hardeman* U.S. S. Ct. Brief). But nothing in the government's brief announcing its new position contradicts the key undisputed factual point: EPA has never determined that FIFRA requires a cancer warning.

*Bates*, 544 U.S. at 454. Every time EPA registered a glyphosate product without a cancer warning, it was obligated by statute to "determine" that the product was not missing any warning that is "necessary" to "protect health." *See supra* pp. 28-30. Since EPA has repeatedly determined that glyphosate is not carcinogenic, it unsurprisingly has also determined that a cancer warning is not necessary to protect health—in other words, that a cancer warning is not required under FIFRA. A state-law claim for failure to provide such a warning thus does far more than "enforc[e] federal misbranding standards," which is all state law may permissibly do. *Bates*, 544 U.S. at 451. Even if there were some question as to whether EPA might *allow* a cancer warning, it has undoubtedly determined that a warning is not *required* under FIFRA. Any state-law requirement to provide such a warning is accordingly "in addition" to requirements under FIFRA, and that is sufficient for Plaintiffs' claim to be preempted.

In fact, however, EPA has gone further, determining that a cancer warning is *prohibited* under FIFRA, because such a warning is "false" and would make the pesticide "misbranded." Appx1092-1093 (2019 Letter to Registrants). EPA explicitly confirmed that such a warning is prohibited in its 2019 letter. That letter, moreover, simply reaffirmed what has been true for decades. EPA had a duty to evaluate, and then re-evaluate, the science concerning any potential safety risk for glyphosate, and it discharged that duty by determining that glyphosate does not

cause cancer. EPA further has a duty to refuse registration for any pesticide with labeling that violates FIFRA, and would have been bound to refuse registration to any pesticide bearing the false statement that glyphosate causes cancer. Accordingly, a state-law requirement to add such a warning is also "different from" requirements under FIFRA.[7]

### 3. This Court Should Reject *Hardeman*, Which Wrongly Disregards EPA's Role Implementing FIFRA.

In *Hardeman v. Monsanto Co.*, 997 F.3d 941 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 2834 (2022), the Ninth Circuit held that claims like those here are not preempted. An Eleventh Circuit panel did likewise, but the full court then granted rehearing and set oral argument for June 2023. *See Carson v. Monsanto Co.*, 51 F.4th 1358 (11th Cir. 2022) (op. on reh'g), *reh'g en banc granted*, 2022 WL 17813843 (11th Cir. Dec. 19, 2022) (en banc).

*Hardeman*'s holding rested on two significant errors. *First*, the court incorrectly imported a "force of law" analysis from implied preemption cases to an express preemption provision, and then misapplied that analysis. *Second*, it overread

---

[7] EPA's determinations that glyphosate does not cause cancer, and that no cancer warning is required (or allowed) under FIFRA, are far different from the sort of "background observation" on which this Court has been "reluctant to base a preemption holding" under FIFRA. *Indian Brand Farms*, 617 F.3d at 224; *see also id.* at 223-24 (rejecting preemption based on single comment by EPA in the "background" section of guidance regarding a different pesticide).

a "Miscellaneous" provision of FIFRA, which provides only that the fact of registration is not an absolute defense to enforcement proceedings, to imply that any EPA determination made during the registration process cannot support preemption. The effect of these conclusions is to write EPA's role out of FIFRA, and this Court should not follow them.[8]

      a)     Agency Action With The "Force of Law" Is Not Required, But In Any Event Is Present.

The Ninth Circuit concluded that "agency action must have the force of law" in order "[t]o establish requirements that can preempt state law under § 136v(b)," and that EPA's actions on glyphosate "do not carry the force of law." *Hardeman*, 997 F.3d at 956-57. That is doubly wrong. Agency action can establish federal requirements for purposes of express preemption whether or not that action has the force of law. And in any event, EPA's actions here do have the force of law.

*Hardeman* derived its force-of-law inquiry from Supreme Court decisions governing implied—not express—preemption. *See id.* at 957 (citing *Wyeth v. Levine*, 555 U.S. 555, 576 (2009)). In implied-preemption cases, where no statute preempts state law, agency action must have the force of law to be relevant, because

---

[8] The judgment here incorporates the MDL court's decision denying express preemption on the same "force of law" ground. Appx0026 (denying summary judgment "for the reasons set forth in … Pretrial Order No. 101"); Appx0020-0025. Since that view has since been adopted by the Ninth Circuit in *Hardeman*, this brief focuses on that decision.

only federal "law" preempts state law under the Supremacy Clause. In express-preemption cases, by contrast, there is no question what "law" does the preempting: the statutory preemption provision. *Cf. Coventry Health Care of Mo. Inc. v. Nevils*, 137 S. Ct. 1190, 1198 (2017) (holding, with respect to a statutory provision stating federal contracts preempted state law, "that the statute, not a contract, strips state law of its force"). FIFRA commands that "requirements under [FIFRA]" for labeling or packaging preempt state law, 7 U.S.C. § 136v(b), and directs EPA to determine the application of FIFIRA's labeling requirements through the registration process, *see supra* pp. 6-9. Nothing more is necessary, because FIFRA's preemption provision has the force of law, it preempts state labeling requirements in addition to or different from what is required under FIFRA, and FIFRA charges EPA with determining what health warnings are required under FIFRA for a particular pesticide.

Presumably for this reason, the Supreme Court has never asked whether agency action has the "force of law" when evaluating express preemption. It did not mention the concept in *Bates*. In *Riegel*, the Court held that "[p]remarket approval … imposes 'requirements' under the MDA," without assessing whether premarket approval is agency action with the force of law. 552 U.S. at 322. Similarly, in other express-preemption contexts, agency approvals of labels have been held to establish requirements "under" a statute for express-preemption purposes, without any force-

41

of-law inquiry.  *See*, *e.g.*, *Thornton*, 28 F.4th 1016; *Cohen*, 16 F.4th 1283.  This Court should apply FIFRA's express-preemption provision the same way.

In any event, the Ninth Circuit was wrong to conclude that EPA's actions lack the force of law.  Where that inquiry applies, it asks whether the agency is exercising "authority Congress has lawfully delegated."  *Merck*, 139 S. Ct. at 1679.  As explained below, EPA's labeling determinations, made in the formal, statutory registration process, are unquestionably an exercise of lawfully delegated authority and have all the indicia of agency action with the force of law.  *See infra* pp. 53-57.  Congress in fact *mandated* EPA to make these determinations.  And if "force of law" is relevant to express preemption, *Riegel* must be read as holding that an agency's product-specific approval carries the force of law; otherwise, "approval" could not "impose[] device-specific 'requirements.'"  *Riegel*, 552 U.S. at 322.  EPA's pesticide-specific registration and label approval is no different.

>    b)  A "Miscellaneous" Provision of FIFRA Does Not Make EPA's Labeling Determinations Irrelevant to Preemption.

*Hardeman* further erred when it held that "EPA's approval of a label" is "not conclusive of FIFRA compliance," because of a provision stating that "'[i]n no event shall registration of an article be construed as a defense for the commission of any offense under this subchapter.'"  997 F.3d at 956 (quoting 7 U.S.C. § 136a(f)(2)); *see also* 7 U.S.C. § 136a(f)(2) (continuing that "[a]s long as no cancellation proceedings are in effect registration of a pesticide shall be prima facie evidence that

the pesticide, its labeling and packaging comply with the registration provisions of this subchapter"). That holding misreads FIFRA's text and cannot be reconciled with Supreme Court precedent.

By its plain terms, § 136a(f)(2) says nothing about preemption. As the Fifth Circuit explained, "[a] claim grounded in state common law is not an offense under FIFRA. Thus, § 136a(f)(2) does not apply," and "has no bearing" on preemption. *MacDonald v. Monsanto Co.,* 27 F.3d 1021, 1025 n.4 (5th Cir. 1994).[9] Further, the provision says only that "registration" may not "be construed as a defense." 7 U.S.C. § 136a(f)(2). But Monsanto does not invoke the bare fact of registration as a defense to a state-law claim. It instead relies on EPA's specific determination that a cancer warning for glyphosate is not required under FIFRA. Congress directed EPA to "determine" that the pesticide label meets FIFRA's requirements *through* the registration process, 7 U.S.C. § 136a(c)(5)(B), but nothing in § 136a(f)(2) suggests that EPA's statutory determination that a cancer warning is not required under FIFRA cannot establish what is required under FIFRA for preemption purposes.[10]

---

[9] *MacDonald* pre-dates *Bates,* but nothing in *Bates* undermines its interpretation of § 136a(f)(2); *Bates* referenced that provision only once, with a "see also" citation, while discussing the statutory background. *See* 544 U.S. at 438.

[10] As another court explained, "Section [136a(f)(2)] stands for the unremarkable proposition that a registration is not a defense against an allegation that a product violates the terms of that registration, just as a valid driver's license is not a defense against a speeding ticket." *Reckitt Benckiser, Inc. v. Jackson*, 762 F. Supp. 2d 34, 45 (D.D.C. 2011); *cf. In re Medtronic, Inc., Sprint Fidelis Leads Prod. Liab. Litig.,*

Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Yet on *Hardeman*'s view, § 136a(f)(2) fundamentally altered the normal operation of express preemption without even mentioning preemption. That inference is all the more untenable given Congress's decision to codify § 136a(f)(2) separate from FIFRA's preemption provision, under the statutory heading "Miscellaeneous." Federal Environmental Pesticide Control Act of 1972, Pub. L. No. 92-516, 86 Stat. 973, 973-75 (1972); *see Fla. Dep't of Rev. v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) ("statutory titles and section headings are tools available for the resolution of a doubt about the meaning of a statute") (quotation marks omitted). Indeed, Congress enacted a predececessor of § 136a(f)(2) in 1947—25 years before FIFRA even had a preemption provision. *See* Pub. L. No. 80-104, § 4(c), 61 Stat. 163, 168 (1947).[11]

---

623 F.3d 1200, 1205 (8th Cir. 2010) (claim that a device-maker "modified or failed to include FDA-approved warnings" was not preempted by MDA).

[11] When FIFRA was originally enacted, the Secretary of Agriculture was required to approve a registration even if the pesticide did not comply with FIFRA. Pub. L. No. 80-104, § 4(c), 61 Stat. 163, 168; *see also* H.R. Rep. No. 80-313, at 5 (1947) (registration is "essentially a device to bring to the attention of the Secretary of Agriculture the economic poisons which are being marketed"). That background explains the original importance of the statute's provision clarifying that registration shall not be construed as a defense.

If § 136a(f)(2) meant that pesticide-specific determinations made during registration cannot support preemption, then the Supreme Court would have been wrong in *Bates*. *Bates* explains that when EPA determines that a pesticide label must say "CAUTION" instead of "DANGER," a state-law requirement of a "DANGER" warning is preempted. *Bates*, 544 U.S. at 453. As the Court explained, an EPA regulation "assigns these warnings to particular *classes* of pesticides based on their toxicity." *Id.* (emphasis added). But the regulation does not assign toxicity levels or warning language to any *particular* pesticide; EPA makes that pesticide-specific determination through the registration process. *Supra* p. 31. On *Hardeman*'s view that § 136a(f)(2) makes any agency action done through registration irrelevant, a State *could* require a "DANGER" warning when EPA requires a "CAUTION" warning, simply by disagreeing with EPA's toxicity determination during registration. In other words, States could do exactly what *Bates* says they cannot.

Nor can *Hardeman*'s approach be squared with *Riegel*. Section 136a(f)(2) may confirm that registration "is not conclusive of FIFRA compliance," *Hardeman*, 997 F.3d at 956, but that is equally true of premarket approval of devices, which is also not conclusive of MDA compliance. A manufacturer may still be liable for violating the MDA, and the mere fact of approval does not prove otherwise. *See, e.g.*, *Bausch v. Stryker Corp.*, 630 F.3d 546, 563 (7th Cir. 2010) (allowing a state-

law claim to proceed against a Class III device manufacturer alleging manufacturing process violated the MDA).

Finally, overreading § 136a(f)(2) would nullify FIFRA's preemption provision. EPA has long made clear that it makes pesticide-specific labeling determinations through individual registration proceedings—not rules—because "it is impossible to prescribe … exact statements for all combinations of ingredients, formulation types, and uses" by rulemaking. Labeling Requirements for Pesticides and Devices, 49 Fed. Reg. 37,960, 37,965 (Sept. 26, 1984). If pesticide-scpecific agency determinations are rendered irrelevant to preemption, States would be free to impose labeling requirements additional or contrary to what EPA, acting through statutorily-mandated procedures, has concluded pesticide labels must say, so long as each jurisdiction purported to require "necessary" health warnings. That is precisely the sort of "nominal[] equivalen[ce]" *Bates* rejects. 544 U.S. at 454. And it contradicts the entire point of FIFRA's preemption provision in achieving "Uniformity," potentially requiring manufacturers "to print 50 different labels" and "driving consumers who buy [pesticide] products in more than one state crazy." *Turek v. Gen. Mills, Inc.,* 662 F.3d 423, 426 (7th Cir. 2011).

This Court should "interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (cleaned up). The

harmonious interpretation of FIFRA is the most natural one.  Section 136a(f)(2) ensures that registration is not a defense when a registrant deviates from the approved label or violates one of FIFRA's many other requirements.  And Section 136v(b) ensures national labeling uniformity, such that when EPA has followed FIFRA's procedures to determine what safety warnings are required under FIFRA, those determinations cannot be overriden by fifty different States.

## II.    Impossibility Preemption Also Bars Plaintiffs' Failure-to-Warn Claim.

Federal law likewise impliedly preempts Plaintiffs' state-law claim that Monsanto must warn that Roundup®, and its active ingredient glyphosate, causes cancer.  *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 869-72 (2000) (an "express pre-emption provision" does not "bar the ordinary working of conflict pre-emption principles").

Under the Supremacy Clause, state law is preempted "where it is 'impossible for a private party to comply with both state and federal requirements.'"  *Mut. Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472, 480 (2013) (citation omitted).  In the years since *Bates*, the Supreme Court has elaborated on the application of implied preemption to regulated manufacturers, particularly in the drug context.  *See Hardeman*, 997 F.3d at 958 ("regulatory preemption in other contexts has developed considerably" since *Bates*).  Drug manufacturers can, under limited circumstances, unilaterally add a new safety warning to a drug's labeling, but "FDA retains

authority to reject labeling changes." *Wyeth*, 555 U.S. at 571. Where FDA would exercise that authority to reject labeling changes, the Supreme Court has held it is impossible for a drug manufacturer to comply with a state-law warning requirement. *Merck*, 139 S. Ct. at 1676. Accordingly, if there is "'clear evidence' that the FDA would not have approved a change to the drug's label," such a determination "pre-empts a claim, grounded in state law, that a drug manufacturer failed to warn consumers of the change-related risks associated with using the drug." *Id*. at 1672 (quoting *Wyeth,* 555 U.S. at 571).

The same analysis applies under FIFRA, and leads to the conclusion that Monsanto cannot comply here with both federal and state law. Federal law prohibits Monsanto from unilaterally adding a warning that glyphosate causes cancer, *see* 40 C.F.R. § 152.112(f); *supra* pp. 6-10, and EPA would not approve such a warning. Accordingly, since it is impossible for Monsanto to comply with a state-law requirement to warn that glyphosate causes cancer, any such requirement is preempted.

## A.    Impossibility Preemption Applies Under FIFRA.

The MDL court refused to apply impossibility preemption at all, holding it categorically unavailable under FIFRA. Appx0022-0023. But *Bates* did not, as the MDL court suggested, "necessarily reject[] the possibility of implied preemption." Appx0023. It said nothing about implied preemption because it did not need to, as

the decision it reviewed turned solely on express preemption. *See Dow Agrosciences LLC v. Bates,* 332 F.3d 323, 329 (5th Cir. 2003); *see also Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) (cautioning against assuming the Court has ruled on "[q]uestions which merely lurk in the record").

Even if *Bates* had implicitly rejected impossibility preemption on the facts of that case, the case for impossibility preemption there was not remotely as strong as it is here. In *Bates*, the plaintiff sought an efficacy warning on which EPA had never made any determination (since the agency had exercised its statutory authority to waive efficacy review), so there could not have been clear evidence that EPA would reject the warning sought. *See* 544 U.S. at 440. Anything the Supreme Court might have concluded *sub silentio* in *Bates* would not rule out impossibility preemption in the very different situation where the agency has focused on and addressed the issue that purportedly requires a warning.

Nor is impossibility preemption inapplicable because "FIFRA allows states to regulate or ban pesticides that have been federally approved." Appx0023 (citing 7 U.S.C. § 136v(a)). Congress drew a distinction between "sale or use" and labeling, and this case concerns labeling. Further, when States regulate sale or use, they may do so only "to the extent the regulation does not permit any sale or use prohibited by this subchapter." 7 U.S.C. § 136v(a). FIFRA prohibits the sale of pesticides that bear safety warnings EPA has not approved, including because EPA has determined

them to be false or misleading. *Id.* §§ 136j(a)(1)(B), (a)(2)(A). Thus, the text of § 136v(a) confirms, rather than displaces, the normal principle that when it is "impossible for a private party to comply with both state and federal requirements," state law must yield. *Mut. Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472, 480 (2013) (quotation marks omitted); *accord Hardeman*, 997 F.3d at 958 (applying *Merck*'s clear evidence standard for impossibility preemption to FIFRA).

### B. EPA Would Reject Plaintiffs' Desired Cancer Warning.

Under *Merck*, when clear evidence shows an agency would deny a labeling change to a regulated product, impossibility preemption precludes any state-law claim based on the failure to make that labeling change. The three criteria *Merck* identified for when this standard is met are: (1) the agency was "fully informed" of "the justifications for the warning" the plaintiff demands; (2) the agency has "informed the … manufacturer that [it] would not approve changing the … label to include that warning;" and (3) the agency's action is "taken pursuant to … congressionally delegated authority" such that it "carr[ies] the force of law." 139 S. Ct. at 1678-79. Clear evidence in this context is not a fact question for juries, but "a matter of law for the judge to decide." *Id.* at 1679.

Here, clear evidence shows EPA would reject the labeling change required by Plaintiffs' failure-to-warn claim. The agency has repeatedly considered and rejected

the view that glyphosate causes cancer, acting through formal, congressionally-mandated procedures.

>    1.    EPA Has Been Fully Informed of the Supposed Justification for a Warning That Glyphosate Causes Cancer.

EPA is "fully informed" of "the justifications for the warning required by state law"—i.e., the evidence that glyphosate is allegedly carcinogenic. *Merck*, 139 S. Ct. at 1678. The agency has repeatedly undertaken in-depth scientific reviews of the evidence on glyphosate's safety, and has concluded that it is not carcinogenic. *See supra* pp. 11-16; Appx0894-0927 (1993 Reregistration Eligibility Decision) (listing over 250 studies identified by the agency as relevant and relied upon by EPA in re-registering glyphosate). EPA has "considered a more extensive dataset than IARC," the organization whose cancer assessment is central to Plaintiffs' claim. Appx0192-0193 (2019 Letter to Registrants); Appx0036, Appx0048-0051 (Complaint). And the agency has independently reviewed the open literature to locate studies relevant to glyphosate's purported carcinogenicity, Appx0959 (EPA reviewed 736 articles for potential relevance), as well as the views of purported expert witnesses on whom Roundup® plaintiffs have relied, Appx0948-0971 (EPA, Revised Glyphosate Issue Paper).

## 2. EPA Has Made Clear It Would Not Approve a Warning Stating Glyphosate Causes Cancer.

EPA has also "informed" registrants of glyphosate-based products, including Monsanto, that it "would not approve changing … the label to include [a cancer] warning." *Merck*, 139 S. Ct. at 1678-79.

It has long been clear that EPA would not approve a warning stating glyphosate causes cancer. In 1993, for example, EPA formally concluded that glyphosate met the requirements for re-registration under FIFRA, relying on its 1991 decision "classif[ying] glyphosate in Group E (evidence of non-carcinogenicity for humans)." Appx0874 (1993 Reregistration Eligibility Decision). Having classified glyphosate as non-carcinogenic and having re-registered it on that basis, EPA could not have approved a warning stating the opposite. A false warning makes a pesticide misbranded under FIFRA, *see* 7 U.S.C. § 136(q)(1)(A), and EPA may not register a pesticide that violates FIFRA's misbranding prohibition, *see id.* § 136a(c)(5)(b). *Accord In re Zofran (Ondansetron) Prod. Liab. Litig.*, 57 F.4th 327, 343 (1st Cir. 2023) ("[W]hen the FDA formally approves a label stating one thing with full and obvious notice of the directly contrary position, one can read the approval as rejecting the contrary position.").

That straightforward conclusion was confirmed by EPA's 2019 letter, informing registrants that a warning stating glyphosate causes cancer (specifically, the warning language required by California's Proposition 65), is a "false and

misleading statement" that renders "pesticide products bearing the Proposition 65 warning statement due to the presence of glyphosate … misbranded" under FIFRA. Appx0192-0193. As the letter explains, "[g]iven EPA's determination that glyphosate is 'not likely to be carcinogenic to humans," "EPA considers that Proposition 65 warning language … to constitute a false and misleading statement." Appx0192-0193.

As noted, in April 2022, EPA stated that it could approve a label stating both that EPA has "determined that glyphosate is not likely to be carcinogenic to humans," and IARC has "classified glyphosate as probably carcinogenic to humans." Appx0192-0193. That letter is irrelevant here, because Plaintiffs demand a label stating that glyphosate causes cancer, which EPA has rejected. *See* Appx0075-0076 (Complaint) (complaining of failure to warn about "the carcinogenic characteristics of glyphosate"). Further, Mr. Schaffner's cancer was diagnosed in 2006, Appx0039 (Complaint), so Monsanto could not have informed him prior to his diagnosis of an IARC classification issued in 2015.

### 3. EPA's Actions Carry the Force of Law.

EPA's determinations that glyphosate does not cause cancer, and that no cancer warning is either required or allowed under FIFRA, carry the force of law. As the Supreme Court held in *Merck*, the touchstone of the "force of law" question is whether the agency's actions "lie within the scope of the authority Congress has

lawfully delegated" to the agency. 139 S. Ct. at 1679. Thus, this Court has held that an "informal phone conversation with an FDA official" lacked the force of law because it was not "'agency action taken pursuant to FDA's congressionally delegated authority.'" *In re Avandia Marketing, Sales, and Prods. Liab. Litig.*, 945 F.3d 749, 760 (3d Cir. 2019) (quoting *Merck*, 139 S. Ct. at 1679). By contrast, the First Circuit recently recognized that FDA's approval of a label that was "fundamentally incompatible with plaintiffs' position" had the force of law. *Zofran*, 57 F.4th at 342. Here, FIFRA plainly authorizes—indeed requires—EPA to determine through the registration process whether a pesticide poses a human health risk and whether its labeling carries necessary warnings.

*Merck* confirms that actions pursuant to a variety of agency procedures authorized by statute carry the force of law. Under the Food, Drug, and Cosmetic Act, *Merck* observes, FDA may disapprove a warning by way of "notice-and-comment rulemaking setting forth labeling standards, by formally rejecting a warning label, or with other agency action carrying the force of law." *Merck*, 139 S. Ct. at 1679 (citations omitted). As an example of agency action formally rejecting a warning label, *Merck* cited regulations under which the agency does no more than communicate its official position on an individual drug to an applicant in a "complete response letter." *Id*. (citing 21 C.F.R. §§ 314.110(a), 314.125(b)(6)).

EPA's statutorily required labeling determinations, made during the statutorily required registration process, are significantly more formal than an FDA "complete response letter."   Such a letter is a product-specific agency correspondence that is not subject to notice and comment or published in the Federal Register.  *See* 21 C.F.R. § 314.110(a).  EPA's registration procedures, by contrast, do entail formal notice and comment.  *See* 40 C.F.R. § 155.58; Appx1096-1103 (EPA, Registration Review Process); *see also* 7 U.S.C. § 136a-1(b)(5) (prescribing a five-phase procedure for re-registration culminating in "regulatory action"). Likewise, EPA has made determinations about glyphosate's lack of carcinogenic potential in setting pesticide tolerances by notice-and-comment rulemaking.  *See*, *e.g.*, Final Rule: Glyphosate; Pesticide Tolerances, 67 Fed. Reg. 60,934, 60,935-60,943 (Sept. 27, 2002); Final Rule: Glyphosate, Pesticide Tolerances, 73 Fed. Reg. 73,586, 73,589 (Dec. 3, 2008).  And EPA's 2019 letter informing all glyphosate registrants that it would not approve a warning that glyphosate causes cancer is comparable to FDA's "complete response letter."

*Merck* also identified 21 U.S.C. § 355(o)(4)(A) as giving rise to "agency action with the force of law."  139 S. Ct. at 1679.  That provision "impose[s] on the FDA a duty to initiate a label change" if it becomes aware of new safety information warranting such a change.  *Id.* at 1684 (Alito, J., concurring).  A three-Justice concurrence elaborated on the import of this provision as "highly relevant to the pre-

emption analysis," because "if the FDA declines to require a label change despite having received and considered information regarding a new risk, the logical conclusion is that the FDA determined that a label change was unjustified." *Id.* at 1684-85; *accord In re Incretin-Based Therapies Prods. Liab. Litig.*, 524 F. Supp. 3d 1007, 1032-33 (S.D. Cal. 2021) (concluding, in light of § 355(o)(4)(A), that "the Court cannot simply ignore the FDA's demonstrated commitment to actively and continuously monitoring the pancreatic safety of incretin mimetics" and that "FDA's silence on this issue is highly relevant to [the] preemption analysis").

Just as FDA has a statutory "duty to initiate a label change" if it becomes aware of information warranting a warning, *Merck*, 139 S. Ct. at 1684 (Alito, J. concurring), EPA has a statutory duty to reject registration if "the label does not contain a warning or caution statement which may be necessary … to protect health." 7 U.S.C. §§ 136(q)(1)(G), 136a(c)(5)(B), 136j(a)(1)(E). If agency action carrying the force of law for preemption purposes includes FDA's inaction reflecting a "determin[ation] that a label change was unjustified," *Merck*, 139 S. Ct. at 1684 (Alito, J. concurring), then EPA's dozens of (and continuing) Roundup® label approvals, together with the agency's explicit determinations in the formal

registration process that glyphosate does not cause cancer, must have preemptive effect.[12]

In short, it is hard to imagine more formal agency procedures than those EPA has used to determine whether glyphosate is carcinogenic. Nor can there be any question that for decades, the agency's answer to that question has been a resounding and definitive no. And if, as Plaintiffs demand, Monsanto had issued a cancer warning that it knew EPA considered false, it would have risked severe civil and criminal penalties for committing a federal misbranding offense. Under the Supremacy Clause, a state law duty to violate federal law in this way is preempted.

## CONCLUSION

The judgment of the district court should be reversed.

---

[12] This conclusion also applies to express preemption to the extent "force of law" is relevant in that context. *See supra* pp. 40-42.

Respectfully submitted,

Dated: February 8, 2023

/s/ *David M. Zionts*

K. Lee Marshall
BRYAN CAVE LEIGHTON PAISNER LLP
Three Embarcadero Center, 7th Floor
San Francisco, California 94111-4070
(415) 675-3400

David M. Zionts (D.C. Bar No. 995170)
Michael X. Imbroscio
Patricio Martínez Llompart
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000

*Counsel for Defendant-Appellant Monsanto Company*

# CERTIFICATE OF COMPLIANCE

1.     This Brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(b) because it contains 12,739 words, excluding the parts of the Brief exempted by Federal Rule of Appellate Procedure 32(f).

2.     This Brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point, Times New Roman font.

3.     Pursuant to Third Circuit Local Appellate Rule 31.1(c), the text of the electronic brief is identical to the text in the paper copies.

4.     Pursuant to Third Circuit Local Appellate Rule 31.1(c), a virus detection program, Advanced Endpoint Protection Cortex XDR Agent v. 7.9.0, has been run on the electronic file and no virus was detected.

/s/ *David M. Zionts*

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to Third Circuit Local Appellate Rule 28.3(d), I certify that the following attorneys whose names appear on the brief are members of the bar of this Court:

K. Lee Marshall

Michael X. Imbroscio

David M. Zionts

/s/ *David M. Zionts*

## CERTIFICATE OF SERVICE

I hereby certify that on February 8, 2023, I caused the foregoing document to be electronically filed with the United States Court of Appeals for the Third Circuit using the appellate CM/ECF System for filing and transmittal of a Notice of Electronic Filing to counsel of record.

/s/ *David M. Zionts*

# ADDENDUM

# TABLE OF CONTENTS

**Page**

7 U.S.C. § 136 ................................................................................... A-1

7 U.S.C. § 136a ................................................................................. A-5

7 U.S.C. § 136a-1 ............................................................................ A-10

7 U.S.C. § 136j ............................................................................... A-11

7 U.S.C. § 136v .............................................................................. A-12

21 U.S.C. § 355 .............................................................................. A-14

40 C.F.R. § 152.44 .......................................................................... A-15

40 C.F.R. § 152.46 .......................................................................... A-16

40 C.F.R. § 152.112 ........................................................................ A- 18

40 C.F.R. § 155.58 .......................................................................... A-19

40 C.F.R. § 156.10 .......................................................................... A-21

40 C.F.R. § 156.60 .......................................................................... A-26

40 C.F.R. § 156.70 .......................................................................... A-27

**7 U.S.C. § 136**         **Definitions**

For purposes of this subchapter—

\*   \*   \*

(p) Label and labeling

    (1) Label
The term "label" means the written, printed, or graphic matter on, or attached to, the pesticide or device or any of its containers or wrappers.

    (2) Labeling
The term "labeling" means all labels and all other written, printed, or graphic matter—

        (A) accompanying the pesticide or device at any time; or

        (B) to which reference is made on the label or in literature accompanying the pesticide or device, except to current official publications of the Environmental Protection Agency, the United States Departments of Agriculture and Interior, the Department of Health and Human Services, State experiment stations, State agricultural colleges, and other similar Federal or State institutions or agencies authorized by law to conduct research in the field of pesticides.

\*   \*   \*

(q) Misbranded

    (1) A pesticide is misbranded if—

        (A) its labeling bears any statement, design, or graphic representation relative thereto or to its ingredients which is false or misleading in any particular;

        (B) it is contained in a package or other container or wrapping which does not conform to the standards established by the Administrator pursuant to section 136w(c)(3) of this title;

(C) it is an imitation of, or is offered for sale under the name of, another pesticide;

(D) its label does not bear the registration number assigned under section 136e of this title to each establishment in which it was produced;

(E) any word, statement, or other information required by or under authority of this subchapter to appear on the label or labeling is not prominently placed thereon with such conspicuousness (as compared with other words, statements, designs, or graphic matter in the labeling) and in such terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use;

(F) the labeling accompanying it does not contain directions for use which are necessary for effecting the purpose for which the product is intended and if complied with, together with any requirements imposed under section 136a(d) of this title, are adequate to protect health and the environment;

(G) the label does not contain a warning or caution statement which may be necessary and if complied with, together with any requirements imposed under section 136a(d) of this title, is adequate to protect health and the environment; or

(H) in the case of a pesticide not registered in accordance with section 136a of this title and intended for export, the label does not contain, in words prominently placed thereon with such conspicuousness (as compared with other words, statements, designs, or graphic matter in the labeling) as to render it likely to be noted by the ordinary individual under customary conditions of purchase and use, the following: "Not Registered for Use in the United States of America".

(2) A pesticide is misbranded if—

(A) the label does not bear an ingredient statement on that part of the immediate container (and on the outside container or wrapper of the retail package, if there be one, through which the ingredient statement

on the immediate container cannot be clearly read) which is presented or displayed under customary conditions of purchase, except that a pesticide is not misbranded under this subparagraph if—

(i) the size or form of the immediate container, or the outside container or wrapper of the retail package, makes it impracticable to place the ingredient statement on the part which is presented or displayed under customary conditions of purchase; and

(ii) the ingredient statement appears prominently on another part of the immediate container, or outside container or wrapper, permitted by the Administrator;

(B) the labeling does not contain a statement of the use classification under which the product is registered;

(C) there is not affixed to its container, and to the outside container or wrapper of the retail package, if there be one, through which the required information on the immediate container cannot be clearly read, a label bearing—

(i) the name and address of the producer, registrant, or person for whom produced;

(ii) the name, brand, or trademark under which the pesticide is sold;

(iii) the net weight or measure of the content, except that the Administrator may permit reasonable variations; and

(iv) when required by regulation of the Administrator to effectuate the purposes of this subchapter, the registration number assigned to the pesticide under this subchapter, and the use classification; and

(D) the pesticide contains any substance or substances in quantities highly toxic to man, unless the label shall bear, in addition to any other matter required by this subchapter—

(i) the skull and crossbones;

(ii) the word "poison" prominently in red on a background

of distinctly contrasting color; and

(iii) a statement of a practical treatment (first aid or otherwise) in case of poisoning by the pesticide.

\*   \*   \*

(bb) Unreasonable adverse effects on the environment

The term "unreasonable adverse effects on the environment" means (1) any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide, or (2) a human dietary risk from residues that result from a use of a pesticide in or on any food inconsistent with the standard under section 346a of title 21. The Administrator shall consider the risks and benefits of public health pesticides separate from the risks and benefits of other pesticides. In weighing any regulatory action concerning a public health pesticide under this subchapter, the Administrator shall weigh any risks of the pesticide against the health risks such as the diseases transmitted by the vector to be controlled by the pesticide.

**7 U.S.C. § 136a**          **Registration of pesticides**

(a) Requirement of registration

Except as provided by this subchapter, no person in any State may distribute or sell to any person any pesticide that is not registered under this subchapter. To the extent necessary to prevent unreasonable adverse effects on the environment, the Administrator may by regulation limit the distribution, sale, or use in any State of any pesticide that is not registered under this subchapter and that is not the subject of an experimental use permit under section 136c of this title or an emergency exemption under section 136p of this title.

\*   \*   \*

(c) Procedure for registration

    (1) Statement required

    Each applicant for registration of a pesticide shall file with the Administrator a statement which includes—

        (A) the name and address of the applicant and of any other person whose name will appear on the labeling;

        (B) the name of the pesticide;

        (C) a complete copy of the labeling of the pesticide, a statement of all claims to be made for it, and any directions for its use;

        (D) the complete formula of the pesticide;

        (E) a request that the pesticide be classified for general use or for restricted use, or for both; and

        (F) except as otherwise provided in paragraph (2)(D), if requested by the Administrator, a full description of the tests made and the results thereof upon which the claims are based, or alternatively a citation to data that appear in the public literature or that previously had been submitted to the Administrator and that the Administrator may consider in accordance with the following provisions:

\*   \*   \*

(c) Procedure for registration

    (2) Data in support of registration

        (A) In general

        The Administrator shall publish guidelines specifying the kinds of information which will be required to support the registration of a pesticide and shall revise such guidelines from time to time. If thereafter the Administrator requires any additional kind of information under subparagraph (B) of this paragraph, the Administrator shall permit sufficient time for applicants to obtain such additional information. The Administrator, in establishing standards for data requirements for the registration of pesticides with respect to minor uses, shall make such standards commensurate with the anticipated extent of use, pattern of use, the public health and agricultural need for such minor use, and the level and degree of potential beneficial or adverse effects on man and the environment. The Administrator shall not require a person to submit, in relation to a registration or reregistration of a pesticide for minor agricultural use under this subchapter, any field residue data from a geographic area where the pesticide will not be registered for such use. In the development of these standards, the Administrator shall consider the economic factors of potential national volume of use, extent of distribution, and the impact of the cost of meeting the requirements on the incentives for any potential registrant to undertake the development of the required data. Except as provided by section 136h of this title, within 30 days after the Administrator registers a pesticide under this subchapter the Administrator shall make available to the public the data called for in the registration statement together with such other scientific information as the Administrator deems relevant to the Administrator's decision.

\*   \*   \*

    (5) Approval of registration

    The Administrator shall register a pesticide if the Administrator determines that, when considered with any restrictions imposed under subsection (d)—

(A) its composition is such as to warrant the proposed claims for it;

(B) its labeling and other material required to be submitted comply with the requirements of this subchapter;

(C) it will perform its intended function without unreasonable adverse effects on the environment; and

(D) when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment.

The Administrator shall not make any lack of essentiality a criterion for denying registration of any pesticide. Where two pesticides meet the requirements of this paragraph, one should not be registered in preference to the other. In considering an application for the registration of a pesticide, the Administrator may waive data requirements pertaining to efficacy, in which event the Administrator may register the pesticide without determining that the pesticide's composition is such as to warrant proposed claims of efficacy. If a pesticide is found to be efficacious by any State under section 136v(c) of this title, a presumption is established that the Administrator shall waive data requirements pertaining to efficacy for use of the pesticide in such State.

\*   \*   \*

(f) Miscellaneous

(1) Effect of change of labeling or formulation

If the labeling or formulation for a pesticide is changed, the registration shall be amended to reflect such change if the Administrator determines that the change will not violate any provision of this subchapter.

(2) Registration not a defense

In no event shall registration of an article be construed as a defense for the commission of any offense under this subchapter. As long as no cancellation proceedings are in effect registration of a pesticide shall be

prima facie evidence that the pesticide, its labeling and packaging comply with the registration provisions of the subchapter.

\*    \*    \*

(g) Registration review

    (1) General rule

        (A) Periodic review

           (i)  In general

           The registrations of pesticides are to be periodically reviewed.

           (ii) Regulations
In accordance with this subparagraph, the Administrator shall by regulation establish a procedure for accomplishing the periodic review of registrations.

           (iii) Initial registration review
The Administrator shall complete the registration review of each pesticide or pesticide case, which may be composed of 1 or more active ingredients and the products associated with the active ingredients, not later than the later of—

                (I) October 1, 2022; or

                (II) the date that is 15 years after the date on which the first pesticide containing a new active ingredient is registered.

           (iv) Subsequent registration review

Not later than 15 years after the date on which the initial registration review is completed under clause (iii) and each 15 years thereafter, the Administrator shall complete a subsequent registration review for each pesticide or pesticide case.

\* \* \*

**7 U.S.C. § 136a-1**       **Reregistration of registered pesticides**

(b) Reregistration phases

Reregistrations of pesticides under this section shall be carried out in the following phases:

(1) The first phase shall include the listing under subsection (c) of the active ingredients of the pesticides that will be reregistered.

(2) The second phase shall include the submission to the Administrator under subsection (d) of notices by registrants respecting their intention to seek reregistration, identification by registrants of missing and inadequate data for such pesticides, and commitments by registrants to replace such missing or inadequate data within the applicable time period.

(3) The third phase shall include submission to the Administrator by registrants of the information required under subsection (e).

(4) The fourth phase shall include an independent, initial review by the Administrator under subsection (f) of submissions under phases two and three, identification of outstanding data requirements, and the issuance, as necessary, of requests for additional data.

(5) The fifth phase shall include the review by the Administrator under subsection (g) of data submitted for reregistration and appropriate regulatory action by the Administrator.

**7 U.S.C. § 136j**  **Unlawful acts**

(a) In general

    (1) Except as provided by subsection (b) of this section, it shall be unlawful for any person in any State to distribute or sell to any person—

        (A) any pesticide that is not registered under section 136a of this title or whose registration has been canceled or suspended, except to the extent that distribution or sale otherwise has been authorized by the Administrator under this subchapter;

        (B) any registered pesticide if any claims made for it as a part of its distribution or sale substantially differ from any claims made for it as a part of the statement required in connection with its registration under section 136a of this title;

        (C) any registered pesticide the composition of which differs at the time of its distribution or sale from its composition as described in the statement required in connection with its registration under section 136a of this title;

        (D) any pesticide which has not been colored or discolored pursuant to the provisions of section 136w(c)(5) of this title;

        (E) any pesticide which is adulterated or misbranded; or

        (F) any device which is misbranded.

\*   \*   \*

**7 U.S.C. § 136v**        **Authority of States**

(a) In general

A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.

(b) Uniformity

Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.

(c) Additional uses

   (1) A State may provide registration for additional uses of federally registered pesticides formulated for distribution and use within that State to meet special local needs in accord with the purposes of this subchapter and if registration for such use has not previously been denied, disapproved, or canceled by the Administrator. Such registration shall be deemed registration under section 136a of this title for all purposes of this subchapter, but shall authorize distribution and use only within such State.

   (2) A registration issued by a State under this subsection shall not be effective for more than ninety days if disapproved by the Administrator within that period. Prior to disapproval, the Administrator shall, except as provided in paragraph (3) of this subsection, advise the State of the Administrator's intention to disapprove and the reasons therefor, and provide the State time to respond. The Administrator shall not prohibit or disapprove a registration issued by a State under this subsection (A) on the basis of lack of essentiality of a pesticide or (B) except as provided in paragraph (3) of this subsection, if its composition and use patterns are similar to those of a federally registered pesticide.

   (3) In no instance may a State issue a registration for a food or feed use unless there exists a tolerance or exemption under the Federal Food, Drug, and Cosmetic Act [21 U.S.C. 301 et seq.] that permits the residues of the pesticides on the food or feed. If the Administrator determines that a registration issued by a State is inconsistent with the Federal Food,

Drug, and Cosmetic Act, or the use of, a pesticide under a registration issued by a State constitutes an imminent hazard, the Administrator may immediately disapprove the registration.

(4) If the Administrator finds, in accordance with standards set forth in regulations issued under section 136w of this title, that a State is not capable of exercising adequate controls to assure that State registration under this section will be in accord with the purposes of this subchapter or has failed to exercise adequate controls, the Administrator may suspend the authority of the State to register pesticides until such time as the Administrator is satisfied that the State can and will exercise adequate controls. Prior to any such suspension, the Administrator shall advise the State of the Administrator's intention to suspend and the reasons therefor and provide the State time to respond.

**21 U.S.C. § 355**        **New drugs**

 (o) Postmarket studies and clinical trials; labeling

    (4) Safety labeling changes requested by Secretary

        (A) New safety or new effectiveness information

        If the Secretary becomes aware of new information, including any new safety information or information related to reduced effectiveness, that the Secretary determines should be included in the labeling of the drug, the Secretary shall promptly notify the responsible person or, if the same drug approved under subsection (b) is not currently marketed, the holder of an approved application under subsection (j).

\*  \*  \*

**40 C.F.R. § 152.44     Application for amended registration.**

(a) Except as provided by § 152.46, any modification in the composition, labeling, or packaging of a registered product must be submitted with an application for amended registration. The applicant must submit the information required by § 152.50, as applicable to the change requested. If an application for amended registration is required, the application must be approved by the Agency before the product, as modified, may legally be distributed or sold.

(b) In its discretion, the Agency may:

    (1) Waive the requirement for submission of an application for amended registration;

    (2) Require that the applicant certify to the Agency that he has complied with an Agency directive rather than submit an application for amended registration; or

    (3) Permit an applicant to modify a registration by notification or non-notification in accordance with § 152.46.

(c) A registrant may at any time submit identical minor labeling amendments affecting a number of products as a single application if no data are required for EPA to approve the amendment (for example, a change in the wording of a storage statement for designated residential use products). A consolidated application must clearly identify the labeling modification(s) to be made (which must be identical for all products included in the application), list the registration number of each product for which the modification is requested, and provide required supporting materials (for example, labeling) for each affected product.

**40 C.F.R. § 152.46**   **Notification and non-notification changes to registrations.**

(a) Changes permitted by notification.

(1) EPA may determine that certain minor modifications to registration having no potential to cause unreasonable adverse effects to the environment may be accomplished by notification to the Agency, without requiring that the registrant obtain Agency approval. If EPA so determines, it will issue procedures following an opportunity for public comment describing the types of modifications permitted by notification and any conditions and procedures for submitting notifications.

(2) A registrant may modify a registration consistent with paragraph (a)(1) of this section and any procedures issued thereunder and distribute or sell the modified product as soon as the Agency has received the notification. Based upon the notification, the Agency may require that the registrant submit an application for amended registration. If it does so, the Agency will notify the registrant and state its reasons for requiring an application for amended registration. Thereafter, if the registrant fails to submit an application the Agency may determine that the product is not in compliance with the requirements of the Act. Notification under this paragraph is considered a report filed under the Act for the purposes of FIFRA section 12(a)(2)(M).

(b) Changes permitted without notification. EPA may determine that certain minor modifications to registration having no potential to cause unreasonable adverse effects to the environment may be accomplished without notification to or approval by the Agency. If EPA so determines, it will issue procedures following an opportunity for public comment describing the types of amendments permitted without notification (also known as non-notification). A registrant may distribute or sell a product changed in a manner consistent with such procedures without notification to or approval by the Agency.

(c) Effect of non-compliance. Notwithstanding any other provision of this section, if the Agency determines that a product has been modified through notification or without notification in a manner inconsistent with paragraphs (a) or (b) of this section and any procedures issued thereunder, the Agency

A-16

may initiate regulatory and/or enforcement action without first providing the registrant with an opportunity to submit an application for amended registration.

**40 C.F.R. § 152.112     Approval of registration under FIFRA sec. 3(c)(5).**

EPA will approve an application under the criteria of FIFRA sec. 3(c)(5) only if:

  (f) The Agency has determined that the product is not misbranded as that term is defined in FIFRA sec. 2(q) and part 156 of this chapter, and its labeling and packaging comply with the applicable requirements of the Act, this part, and parts 156 and 157 of this chapter;

\*     \*     \*

**40 C.F.R. § 155.58      Procedures for issuing a decision on a registration review case.**

(a) The Agency will publish a notice in the Federal Register announcing the availability of a proposed registration review decision or a proposed interim registration review decision. At that time, the Agency will place in the pesticide's registration review docket the Agency's proposed decision and the bases for the decision. There will be a comment period of at least 60 calendar days on the proposed decision.

(b) In its proposed decision, the Agency will, among other things:

(1) State its proposed findings with respect to the FIFRA standard for registration and describe the basis for such proposed findings.

(2) Identify proposed risk mitigation measures or other remedies as needed and describe the basis for such proposed requirements.

(3) State whether it believes that additional data are needed and, if so, describe what is needed. A FIFRA 3(c)(2)(B) notice requiring such data may be issued in conjunction with a proposed or final decision on the registration review case or a proposed or final interim decision on a registration review case.

(4) Specify proposed labeling changes; and

(5) Identify deadlines that it intends to set for completing any required actions.

(c) After considering any comments on the proposed decision, the Agency will issue a registration review decision or interim registration review decision. This decision will include an explanation of any changes to the proposed decision and the Agency's response to significant comments. The Agency will publish a notice in the Federal Register announcing the availability of a registration review decision or interim registration review decision. The registration review case docket will remain open until all actions required in the final decision on the registration review case have been completed.

(d) If the registrant fails to take the action required in a registration review decision or interim registration review decision, the Agency may take appropriate action under FIFRA.

**40 C.F.R. § 156.10       Labeling requirements**

  (a) *General—*

       (1) *Contents of the label.* Every pesticide product shall bear a label containing the information specified by the Act and the regulations in this part. The contents of a label must show clearly and prominently the following:

            (i) The name, brand, or trademark under which the product is sold as prescribed in paragraph (b) of this section;

            (ii) The name and address of the producer, registrant, or person for whom produced as prescribed in paragraph (c) of this section;

            (iii) The net contents as prescribed in paragraph (d) of this section;

            (iv) The product registration number as prescribed in paragraph (e) of this section;

            (v) The producing establishment number as prescribed in paragraph (f) of this section;

            (vi) An ingredient statement as prescribed in paragraph (g) of this section;

            (vii) Hazard and precautionary statements as prescribed in subpart D of this part for human and domestic animal hazards and subpart E of this part for environmental hazards.

            (viii) The directions for use as prescribed in paragraph (i) of this section; and

            (ix) The use classification(s) as prescribed in paragraph (j) of this section.

  *       *       *

(a) *General—*

(5) *False or misleading statements.* Pursuant to section 2(q)(1)(A) of the Act, a pesticide or a device declared subject to the Act pursuant to §152.500, is misbranded if its labeling is false or misleading in any particular including both pesticidal and non-pesticidal claims. Examples of statements or representations in the labeling which constitute misbranding include:

(i) A false or misleading statement concerning the composition of the product;

(ii) A false or misleading statement concerning the effectiveness of the product as a pesticide or device;

(iii) A false or misleading statement about the value of the product for purposes other than as a pesticide or device;

(iv) A false or misleading comparison with other pesticides or devices;

(v) Any statement directly or indirectly implying that the pesticide or device is recommended or endorsed by any agency of the Federal Government;

(vi) The name of a pesticide which contains two or more principal active ingredients if the name suggests one or more but not all such principal active ingredients even though the names of the other ingredients are stated elsewhere in the labeling;

(vii) A true statement used in such a way as to give a false or misleading impression to the purchaser;

(viii) Label disclaimers which negate or detract from labeling statements required under the Act and these regulations;

(ix) Claims as to the safety of the pesticide or its ingredients, including statements such as "safe," "nonpoisonous," "noninjurious," "harmless" or "nontoxic to humans and pets" with or without such a qualifying phrase as "when used as directed"; and

(x) Non-numerical and/or comparative statements on the safety of the product, including but not limited to:

(A) "Contains all natural ingredients";

(B) "Among the least toxic chemicals known"

(C) "Pollution approved"

\* \* \*

(i) *Directions for Use—*

(1) *General requirements—*

(i) Adequacy and clarity of directions. Directions for use must be stated in terms which can be easily read and understood by the average person likely to use or to supervise the use of the pesticide. When followed, directions must be adequate to protect the public from fraud and from personal injury and to prevent unreasonable adverse effects on the environment.

\* \* \*

(2) *Contents of Directions for Use.* The directions for use shall include the following, under the headings "Directions for Use":

(i) The statement of use classification as prescribed in paragraph (j) of this section immediately under the heading "Directions for Use."

(ii) Immediately below the statement of use classification, the statement "It is a violation of Federal law to use this product in a manner inconsistent with its labeling."

(iii) The site(s) of application, as for example the crops, animals, areas, or objects to be treated.

(iv) The target pest(s) associated with each site.

(v) The dosage rate associated with each site and pest.

(vi) The method of application, including instructions for dilution, if required, and type(s) of application apparatus or equipment required.

(vii) The frequency and timing of applications necessary to obtain effective results without causing unreasonable adverse effects on the environment.

(viii) Worker protection statements meeting the requirements of subpart K of this part.

(ix) Specific directions concerning the storage, residue removal and disposal of the pesticide and its container, in accordance with subpart H of this part. These instructions must be grouped and appear under the heading, "Storage and Disposal." This heading must be set in type of the same minimum sizes as required for the child hazard warning. (See table in §156.60(b))

(x) Any limitations or restrictions on use required to prevent unreasonable adverse effects, such as:

   (A) Required intervals between application and harvest of food or feed crops.

   (B) Rotational crop restrictions.

   (C) Warnings as required against use on certain crops, animals, objects, or in or adjacent to certain areas.

   (D) For total release foggers as defined in §156.78(d)(1), the following statements must be included in the "Directions for Use."

\*   \*   \*

(j) *Statement of use classification.* Any pesticide product for which some uses

A-24

are classified for general use and others for restricted use shall be separately labeled according to the labeling standards set forth in this subsection, and shall be marketed as separate products with different registration numbers, one bearing directions only for general use(s) and the other bearing directions for restricted use(s) except that, if a product has both restricted use(s) and general use(s), both of these uses may appear on a product labeled for restricted use. Such products shall be subject to the provisions of paragraph (j)(2) of this section.

(1) *General Use Classification.* Pesticide products bearing directions for use(s) classified general shall be labeled with the exact words "General Classification" immediately below the heading "Directions for Use." And reference to the general classification that suggests or implies that the general utility of the pesticide extends beyond those purposes and uses contained in the Directions for Use will be considered a false or misleading statement under the statutory definitions of misbranding.

(2) *Restricted Use Classification.* Pesticide products bearing direction for use(s) classified restricted shall bear statements of restricted use classification on the front panel as described below:

(i) *Front panel statement of restricted use classification.*

(A) At the top of the front panel of the label, set in type of the same minimum sizes as required for human hazard signal words (see table in paragraph (h)(1)(iv) of this section), and appearing with sufficient prominence relative to other text and graphic material on the front panel to make it unlikely to be overlooked under customary conditions of purchase and use, the statement "Restricted Use Pesticide" shall appear.

(B) Directly below this statement on the front panel, a summary statement of the terms of restriction imposed as a precondition to registration shall appear. If use is restricted to certified applicators, the following statement is required: "For retail sale to and use only by Certified Applicators or persons under their direct supervision and only for those uses covered by the Certified Applicator's certification." If, however, other regulatory restrictions are imposed, the Administrator will define the appropriate wording for the terms of restriction by regulation.

A-25

**40 C.F.R. § 156.60          General.**

Each product label is required to bear hazard and precautionary statements for humans and domestic animals (if applicable) as prescribed in this subpart. Hazard statements describe the type of hazard that may occur, while precautionary statements will either direct or inform the user of actions to take to avoid the hazard or mitigate its effects.

(a) *Location of statements*—

(1) Front panel statements. The signal word, child hazard warning, and, in certain cases, the first aid statement are required to appear on the front panel of the label, and also in any supplemental labeling intended to accompany the product in distribution or sale.

(2) Statements elsewhere on label. Hazard and precautionary statements not required on the front panel may appear on other panels of the label, and may be required also in supplemental labeling. These include, but are not limited to, the human hazard and precautionary statements, domestic animal statements if applicable, a Note to Physician, and physical or chemical hazard statements.

(b) *Placement and prominence*—

(1) Front panel statements. All required front panel warning statements shall be grouped together on the label, and shall appear with sufficient prominence relative to other front panel text and graphic material to make them unlikely to be overlooked under customary conditions of purchase and use. The table below shows the minimum type size requirements for the front panel warning statements for various front panel sizes.

\*    \*    \*

**40 C.F.R. § 156.70**          **Precautionary statements for human hazards**

(a) *Requirement.* Human hazard and precautionary statements as required must appear together on the label or labeling under the general heading "Precautionary Statements" and under appropriate subheadings similar to "Humans and Domestic Animals," "Environmental Hazards" (see subpart E of this part) and "Physical or Chemical Hazards." The phrase "and Domestic Animals" may be omitted from the heading if domestic animals will not be exposed to the product.

(b) *Content of statements.* When data or other information show that an acute hazard may exist to humans or domestic animals, the label must bear precautionary statements describing the particular hazard, the route(s) of exposure and the precautions to be taken to avoid accident, injury or toxic effect or to mitigate the effect. The precautionary paragraph must be immediately preceded by the appropriate signal word.

(c) *Typical precautionary statements.* The table below presents typical hazard and precautionary statements. Specific statements pertaining to the hazards of the product and its uses must be approved by the Agency. With Agency approval, statements may be augmented to reflect the hazards and precautions associated with the product as diluted for use. Refer to
§156.68(b) for requirements for use dilution statements.

\*     \*     \*