**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION<br><br>This document relates to:<br><br>ALL ACTIONS | MDL No. 2741<br>Case No. 16-md-02741-VC<br><br>Hon. Vince Chhabria<br><br>**AMENDED JOINT CASE MANAGEMENT STATEMENT** |

    Plaintiffs' leadership and Monsanto's counsel hereby provide the following updates to the Court in advance of the Case Management Conference on Wednesday, March 29, 2023.

**I.     Christopher Portier Preservation Deposition**

  **A. Plaintiffs' Statement:**

    Monsanto has no basis to argue against the taking of a preservation deposition of Dr. Portier in the MDL. Indeed, on February 15, 2023, this Court overruled Monsanto's steadfast objections to preservation depositions. Dr. Portier is a critically important witness for this MDL; Plaintiffs have the right to include him in their group of experts for preservation depositions.

    While it is true that Dr. Portier's deposition was taken for purposes of trial in March 2022, that deposition was taken in a very different context.  Co-lead counsel Robin Greenwald had an upcoming trial in the City of St. Louis in the case of Neal v. Monsanto, 1722-CC10773.   The trial was scheduled for late March 2022.  Dr. Portier, the Neal Plaintiffs' designated expert, was ill at the time, suffering from a severe heart condition that made appearing live and testifying in person dangerous to his health. Dr. Portier was able to provide trial testimony via deposition within a controlled setting: the deposition was capped each day at 5 hours of testimony, the testimony was taken at Plaintiffs' counsel's office where Dr. Portier took breaks when his health condition required them, and all counsel present,

including counsel for Monsanto, were well aware that Dr. Portier was not well. At the time of giving his deposition testimony, Dr. Portier was not even able to make it through the airport to and from New York without assistance. Indeed, at the beginning of the deposition Dr. Portier explained why he was giving his testimony via deposition and not live at trial. Exhibit A. At the time of giving his deposition testimony, Dr. Portier was uncertain if he would ever again be able to travel for work or, for that matter, ever work again at all.

In summary, at the time Dr. Portier gave his deposition testimony in March 2022, he was in a compromised physical state. His testimony was never used in Neal because that case settled prior to trial. Monsanto never agreed that the deposition would constitute preservation testimony for use in Neal or any other case.

Dr. Portier's health and circumstances have changed since March of 2022. In December 2022, Dr. Portier had heart surgery. Fortunately, that surgery was successful, and Dr. Portier has steadily regained his strength. He informed Plaintiffs' counsel that he is willing and able to travel to the United States and to provide a preservation deposition without substantial physical restrictions.

There are also practical reasons that Plaintiffs should be able to take a preservation deposition of Dr. Portier, even if Monsanto had previously agreed that the March 2022 deposition was a preservation deposition (which it did not). Since the March 2022 deposition of Dr. Portier in the Neal case, there have been significant developments regarding the substance of Dr. Portier's testimony. Most significantly, on September 21, 2022, EPA officially withdrew its Glyphosate 2020 Interim Registration Review Decision (Glyphosate ID) – the very decision on which Monsanto relies in defense of Roundup cases. That decision was the culmination of a five-plus year period of re-registration of Glyphosate by the EPA.

EPA's decision to withdraw the ID followed the United States Court of Appeals for the Ninth Circuit decision on June 17, 2022 that vacated and remanded the human health portion of the Glyphosate ID. See Nat. Res. Def. Council v. U.S. Env't Prot. Agency, 38 F.4th 34 (9th Cir. 2022) ("NRDC").  In the NRDC decision, the Ninth Circuit ruled that EPA's determination that glyphosate is not harmful to human health was "not supported by substantial evidence . . ." NRDC, 38 F.4th at 51. The court emphasized that the human epidemiological studies discussed in EPA's interim decision on glyphosate could actually "be considered suggestive evidence that glyphosate exposure causes NHL." Id. at 46. Indeed, the court observed, "most studies EPA examined indicated that human exposure to glyphosate is associated with an at least somewhat increased risk of developing NHL." Id. The Ninth Circuit further held that the EPA's analysis of these studies regarding glyphosate conflicted with the agency's conclusion that glyphosate is "not likely" to pose a cancer risk in humans. Id. at 47 (citing, inter alia, Pollinator Stewardship Council v. EPA, 806 F.3d 520, 531 (9th Cir. 2015), for proposition that "an agency cannot rely on ambiguous studies as evidence of a conclusion that the studies do not support."). The court found that EPA's conclusion regarding glyphosate violated the agency's own Cancer Guidelines, noting that an agency's "decision to abandon its own guidance without a discernible rationale" renders its conclusions invalid. See id. at 51 (citation omitted). The Ninth Circuit concluded that EPA's violations of its guidelines were "serious".   In response, the EPA stated that "[w]ith respect to the vacated human health portion of the ID, in accordance with the Ninth Circuit's June 17, 2022 decision, EPA intends to revisit and better explain its evaluation of the carcinogenic potential of glyphosate and to consider whether to do so for other aspects of its human health analysis. ." EPA-HQ-OPP-2009-0361-14447_content (5).pdf.   EPA anticipates finalizing its decision about the carcinogenicity of Glyphosate in 2026.

Monsanto spent a considerable amount of time at the March 2022 deposition cross examining Dr. Portier about the EPA re-registration process that concluded in 2020 that Glyphosate is not likely carcinogenic. Those questions are inaccurate and misleading, as the EPA has withdrawn its ID, and by extension the numerous draft documents that lead to the 2020 ID. As Your Honor is aware, Monsanto's main argument in this litigation has been that the EPA, the agency responsible for registering pesticides and thus assessing their carcinogenicity, has concluded time and again that Glyphosate is not likely carcinogenic. But after the Ninth Circuit ruled that EPA's assessment of Glyphosate violated its own internal guidelines, requiring vacatur of the EPA 2020 ID, the EPA withdrew its 2020 ID. A preservation deposition of Dr. Portier should be based on the current state of the law, which vacated the very decision on which Monsanto relies, and the current fact that EPA has withdrawn its registration decision about Glyphosate and will issue a new decision in 2026.

**B. Monsanto's Statement:**

Exactly one month ago, this Court granted Plaintiffs' request for an order providing for preservation depositions of Plaintiffs' general cause experts Dr. Beate Ritz, Dr. Charles Jameson, and Dr. Dennis Weisenburger. During the hearing preceding that determination, Plaintiffs' counsel was asked if another trial preservation was needed for Dr. Christopher Portier. Plaintiffs' counsel answered by recognizing that "a lengthy deposition" of this witness was already completed and that the prior deposition should suffice. (February 15, 2023 CMC Tr. at 16:16) Now, they would like to conduct another preservation deposition of Dr. Portier and request a full do-over of the recent preservation deposition. This request should be denied.

Dr. Portier's preservation deposition took place over three days in March of last year. The deposition covered a wide range of topics and nothing was left on the cutting room floor by either side. In seeking a new deposition from scratch, Plaintiffs' counsel now claims the deposition is too long, too

hard to follow, and that there have been new developments that need to be addressed. The first two issues do not justify a new deposition. Indeed, Co-Lead Counsel in the MDL, Ms. Greenwald, took and defended the deposition of Dr. Portier in March of 2022 so there can be no argument that the MDL plaintiffs were not well represented. Moreover, if Plaintiffs' counsel intend to renew preservation depositions of their general-causation experts every year based on regrets about the depositions they took or evolving scientific or regulatory developments, the purported cost savings and alleged efficiencies of conducting such depositions will quickly evaporate.

Another basis for Plaintiffs counsel's request also raises further concerns regarding the supposed benefit and purpose of permitting preservation depositions. Plaintiffs' counsel previously requested Dr. Portier's preservation deposition based on representations that he was in poor health in advance of a state court trial in Missouri, and Monsanto agreed to the deposition because a witness's poor health is a traditional justification for a trial preservation deposition. *See, e.g.*, *AG Equip. Co. v. AIG Life Ins. Co., Inc.*, No. 07-CV-0556-CVE-PJC, 2009 WL 414046, at *3 (N.D. Okla. Feb. 18, 2009) ("When a witness is suffering from poor health and will likely be unavailable for trial, it is common for parties to take a 'preservation deposition' to memorialize the witness' trial testimony."); *see also In re Roundup Products Liab. Litig.*, No. 16-MD-02741-VC, 2021 WL 5149860, at *1 (N.D. Cal. Nov. 4, 2021) (observing that concerns relating to a witness's "age and health" are "best addressed through a trial preservation deposition"). Now, Plaintiffs' counsel claim that they need yet another preservation deposition of Dr. Portier for precisely the opposite reason—because he is currently healthy. This is unreasonable and shows that Plaintiffs' counsel simply seek a second bite at the apple. In the ordinary course, parties get one chance to obtain the trial testimony necessary to support their cases. Absent extraordinary circumstances, Plaintiffs should not be permitted to take a second preservation deposition of a single witness because an unhealthy witness is now purportedly healthy.

There is also a simple solution to Plaintiffs' desire to question Dr. Portier regarding more recent regulatory or scientific developments that have occurred since his last deposition a year ago: limit any preservation deposition of Dr. Portier to developments that occurred since his last preservation deposition. Indeed, in attempting to resolve this dispute without court intervention, Monsanto offered that exact compromise, but Plaintiffs' counsel refused.

Simply put, Plaintiffs' counsel claimed that efficiency and cost savings warranted the preservation depositions of Dr. Beate Ritz, Dr. Charles Jameson, and Dr. Dennis Weisenburger. However, if the parties are going to have to redo these preservation deposition once a year, then their purpose is negated. Thus, Plaintiffs' counsel's request to preserve Dr. Portier's testimony just a year after it was previously preserved should be denied as unwarranted. At most, if a preservation deposition of Dr. Portier occurs, it should be limited to scientific and regulatory developments that have taken place since the preservation deposition in March 2022.

## II.     Common Benefit Fund

At the February 15, 2023, Case Management Conference, the Court inquired whether it was time to consider disbursing common benefit funds. Plaintiffs agreed that it was an appropriate time to begin this process and recommended a procedure that would involve an internal audit of time submissions and the appointment of a Special Master. In furtherance of that proposal, Co-Lead Counsel submits the following recommendations:

### A. Appointment of a Special Master

This Court has previously recognized that a Special Master is often appointed to "assess the various claims for compensation" and decide how the money should be distributed. This is so because the "allocation of [common benefit] fees is not an exact science" *In re Diet Drugs Prod. Liab. Litig.*, 2003 WL 21641958 (E.D. Pa. May 15, 2003). The Court cannot simply multiply the

number of eligible hours by an hourly rate, as such an unyielding mathematical formula would not properly assess the quality of the work performed by each individual attorney or the value conferred to the MDL. As the Honorable Eldon E. Fallon noted in an Order approving common benefit counsel fees:

> But in the real and imperfect world of litigation it is an accepted fact that not all work hours are entitled to the same compensation rate. The nature of the work, the skill and experience of the party doing the work, and the result achieved all factor into the appropriate allocation. How these factors are weighed injects an unavoidable amount of subjectivity in the analysis. The best that can be done to assure the validity of the analysis is to base the subjectivity quotient on sufficient facts and experience, and to invite input from those affected.

*In re Vioxx Prod. Liab. Litig.,* 802 F. Supp. 2d 740, 774 (E.D. La. 2011).

For these reasons, Plaintiffs agree that a Special Master should be appointed to assist the Court in fairly allocating common benefit fund distributions. The Special Master would be able to closely scrutinize the submissions and recommend a fair and reasonable distribution based on relevant factors, including the quality and value of the work performed. *In re Genetically Modified Rice Litig.*, 764 F. 3d 864, 872-73 (8th Cir. 2014).

Due to the inherent subjectivity in allocating common benefit fees, Plaintiffs respectfully submit that the Court should appoint a Special Master who already has familiarity with the Roundup litigation. A prior understanding of the unique circumstances of this specific MDL will better allow the Special Master to adequately analyze the *quality* of the effort expended by the attorneys and the *significance* of the work undertaken by each counsel. "In a case of this kind, not all types of work are created equal." *Turner v. Murphy Oil USA, Inc.*, 582 F. Supp.2d 797, 810 (E.D. La. 2008). A Special Master that knows which depositions are most beneficial to the MDL, which experts are the most important, and which issues and defenses provide the biggest hurdle to resolution, will prove invaluable in the evaluation of common benefit submissions. Accordingly, Plaintiffs recommend the following individuals to serve as Special Master:

### 1. Kenneth Feinberg

Plaintiffs recommend Kenneth Feinberg to serve as Special Master due to his unparalleled expertise in mass tort litigation, his role as mediator in the MDL and his knowledge of the Roundup litigation and its history. Indeed, the Court initially contemplated that it would be Special Master Feinberg who would assess the claims for common benefit compensation and "prepare a recommendation to the Court for how that money should be distributed." *In re Roundup Products Liability Litigation*, MDL No. 2741, PTO No. 26 at 27 (June 22, 2021).

Plaintiffs understand the Court's hesitance to divert Special Master Feinberg's attention away from other tasks, including the MDL settlement program, however, Co-Lead Counsel has conferred with Mr. Feinberg and he remains willing and able to serve in both capacities. The fact that Mr. Feinberg has mediated Roundup cases with nearly every law firm involved in this MDL will be tremendously valuable in assessing common benefit applications and considering any objections to distribution.

Additional factors weighing in favor of Mr. Feinberg's appointment are cost and time. Co-Lead Counsel have paid, and continue to pay, Mr. Feinberg for serving in his role as court-appointed mediator. Over this time, the parties have assuredly kept Mr. Feinberg knowledgeable about the ebbs and flows of the litigation. A Special Master unfamiliar with the Roundup litigation would need to spend countless hours reviewing court orders, discovery, transcripts, and other critical materials to even get close to the understanding of the litigation that Mr. Feinberg would have on Day One of his appointment. The necessary result would be to delay distributions and reduce the funds available for distribution.

### 2. Randi S. Ellis

Plaintiffs also recommend Randi S. Ellis to serve as Special Master. Ms. Ellis has extensive experience serving in the role of Special Master in complex multi-district litigation.[1] She has previously been appointed as Special Master to assist in the allocation of MDL common benefit fees in the following litigations: *In re: Pradaxa (Dabigatran Etexilate) Products Liability Litigation*, 3:12-md-023385, MDL No. 2385 (S.D. Ill.); and *In re: Just for Men Mass Tort*, 3:16-cv-00638 (S.D. Ill.) and *In re: National Prescription Opiate Litigation*, MDL No. 2804 (N.D. Ohio).

Ms. Ellis also has direct experience mediating Roundup cases and allocating settlement funds to Roundup claimants under various private settlement agreements. As explained above, this prior experience will benefit the Court and the parties in assessing claims for common benefit expenses. Co-Lead Counsel has conferred with Ms. Ellis and she has the availability and time to serve in this capacity should she be appointed by the Court.

### B. Role of Co-Lead Counsel

Pretrial Order No. 12 (PTO 12) required counsel to submit contemporaneous records of common benefit time and expenses, in a form approved by Co-Lead Counsel and the Court, in order to be considered eligible for a common benefit assessment. The overwhelming majority of common benefit hours that were timely submitted for consideration were from the firms of Co-Lead Counsel. The Court has provided further guidance on common benefit procedure since the adoption of PTO 12. For example, in its Order of June 22, 2021, the Court ordered that "when attorneys make claims for compensation from the fund, it must be based only on work performed in the MDL; state court work cannot be compensated."

---

[1] A copy of Ms. Ellis' Curriculum Vitae is attached as Exhibit A.

In order to ease the burden on the Special Master and the Court, Co-Lead Counsel propose that they first undertake an internal audit of the time submissions to assure that the time submitted is limited to work performed in the MDL. The audit will also be the first step in confirming the accuracy of what is submitted. As one Special Master stated: "my various experiences in other MDLs in serving as a Special Master in the role of making allocations among common benefit firms is that it is common place that time entries are simply not accurate in many instances." *In re E.I. Du Pont De Nemours & Co. C-8 Pers. Inj. Litig.*, No. 2-13-MD-2433, 2018 WL 4771524, at *4 (S.D. Ohio Oct. 3, 2018), report and recommendation adopted sub nom. *In re E.I. Du Pont De Nemours Co. C-8 Pers. Inj. Litig.,* No. 2-13-MD-2433, 2018 WL 4810290 (S.D. Ohio Oct. 3, 2018). Co-Lead Counsel can do much of this initial leg-work and reduce the time and expense required of the Special Master.

Co-Lead Counsel would also anticipate submitting a proposed allocation to the Special Master for consideration. "Since lead counsel is typically well-positioned to weigh the relative merit of other counsel's contributions, it is neither unusual nor inappropriate for courts to consider lead counsel's proposed allocation of attorneys' fees ... where the district court retains the ultimate power to review applications and allocations and to adjust them where appropriate." *In re Syngenta AG MIR 162 Corn Litig.,* No. 19-3008, 2023 WL 2262878, at *59–60 (10th Cir. Feb. 28, 2023); quoting *Victor v. Argent Classic Convertible Arbitrage Fund L.P.*, 623 F.3d 82, 90 (2d Cir. 2010); see also *In re High Sulfur Content Gasoline Products Liability Litigation*, 517 F.3d 220 (5th Cir. 2008)(finding that a district court can in its discretion appoint a committee of plaintiffs' counsel to recommend how to divide an aggregate fee award)*; In re Diet Drugs Prods. Liab. Litig.*, 2003 WL 21641958, *6 (E.D. Pa. 2003)(holding that a committee allocating attorneys' fees is "well suited" for that task where it is

comprised of attorneys "with in-depth knowledge of the work performed throughout the course of ... the litigation.").

Of course, the Special Master and ultimately the Court will be the final arbiter of how to divide the common benefit fee. Co-Lead Counsel will work with the appointed Special Master to develop a procedure for communicating with MDL counsel, receiving common benefit materials and/or objections, and the conducting of interviews (if necessary).

DATED: March 16, 2023  Respectfully submitted,

/s/ David Dickens
David Dickens
ddickens@millerfirmllc.com
The Miller Firm LLC
108 Railroad Ave
Orange, VA 22960

/s/ Robin Greenwald
Robin Greenwald
rgreenwald@weitzlux.com
Weitz & Luxenberg, PC
700 Broadway
New York, NY 10003

/s/ Aimee Wagstaff
Aimee Wagstaff
awagstaff@wagstafflawfirm.com
Wagstaff Law Firm
940 Lincoln Sreet
Denver, CO 80203

*Attorneys for Plaintiffs*

/s/ Brian L. Stekloff
Brian L. Stekloff (pro hac vice)
bstekloff@wilkinsonstekloff.com
Rakesh Kilaru (pro hac vice)
rkilaru@wilkinsonstekloff.com
WILKINSON STEKLOFF LLP

2001 M St. NW, 10th Floor
Washington, DC 20036
Tel: 202-847-4030
Fax: 202-847-4005

<u>/s/ Anthony R. Martinez</u>
Anthony R. Martinez
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, MO 64108
Telephone: (816) 474-6550
Fax: (816) 421-5547
amartinez@shb.com

*Attorneys for Defendant*
*MONSANTO COMPANY*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 16th day of March, 2023, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filling to all appearing parties of record.

By: /s/ Anthony R. Martinez