Pages 1-42

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vincent Chhabria,
United States Magistrate Judge

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| ROUNDUP PRODUCTS LIABILITY | ) | |
| LITIGATION, | ) | **Case No. 3:16-MD-2741-VC** |
| | ) | |
| _____ | ) | |
| | ) | |
| SCOTT GILMORE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | **Case No. 3:21-CV-08159-VC** |
| | ) | |
| MONSANTO COMPANY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

San Francisco, California
Thursday, January 12, 2023

**<u>TRANSCRIPT OF PROCEEDINGS</u>**

**APPEARANCES ON NEXT PAGE**

TRANSCRIPTION SERVICE BY:
                    Dipti Patel, CET-997
                    Liberty Transcripts
                    7306 Danwood Drive
                    Austin, Texas 78759
                    (847) 848-4907

2

**APPEARANCES VIA ZOOM VIDEOCONFERENCE:**

For the Plaintiffs:

        MILSTEIN, JACKSON, FAIRCHILD & WADE, LLP
        10990 Wilshire Blvd., Eight Floor
        Los Angeles, California 90024
     BY: **GILLIAN L. WADE, ATTORNEY AT LAW**
          **MARC A. CASTANEDA, ATTORNEY AT LAW**
          **SARA D. AVILA, ATTORNEY AT LAW**

For the Defendants:

        WINSTON & STRAWN, LLP
        1901 L Street NW
        Washington, D.C. 20036
     BY: **JOHN ROSENTHAL, ATTORNEY AT LAW**

        WINSTON & STRAWN, LLP
        300 S. Tryon Street, 35th Floor
        Charlotte, North Carolina 28202
     BY: **JEFF WILKERSON, ATTORNEY AT LAW**

        WILKINSON STEKLOFF
        2001 M Street, NW, 10th Floor
        Washington, D.C. 20036
     BY: **RAKESH KILARU, ATTORNEY AT LAW**

For the Objector:

        STUEVE SIEGEL HANSON LLP
        460 Nichols Road, Suite 200
        Kansas City, Missouri 64112
     BY: **KASEY YOUNGENTOB, ATTORNEY AT LAW**

| | |
|---|---|
| 1 | **Thursday – January 12, 2023** **(2:02 p.m.)** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---oOo--- |
| 4 | **COURTROOM DEPUTY:**  Calling Case Numbers 16-MD-2741, In re |
| 5 | Roundup Products Liability Litigation, and 21-CV-8159, Gilmore |
| 6 | versus Monsanto Company. |
| 7 | Counsel, please state your appearances for the record |
| 8 | starting with the plaintiff, then defendant, and then |
| 9 | objector. |
| 10 | **MS. WADE:**  Good afternoon, Your Honor. |
| 11 | This is Gillian Wade on behalf of plaintiffs and the |
| 12 | proposed settlement class. |
| 13 | **THE COURT:**  Good afternoon. |
| 14 | **MR. CASTANEDA:**  Good afternoon, Your Honor. |
| 15 | Marc Castaneda, counsel for (audio interference). |
| 16 | **THE COURT:**  Hi, we're getting a lot of feedback from you. |
| 17 | Okay.  And now it seems to be gone now that you're muted.  All |
| 18 | right. |
| 19 | Go ahead, Ms. Avila. |
| 20 | **MS. AVILA:**  Good afternoon, Your Honor.  Sara Avila also |
| 21 | for plaintiff. |
| 22 | **THE COURT:**  Is anybody else hearing that feedback, or is |
| 23 | it just on my computer? |
| 24 | **COURTROOM DEPUTY:**  Yeah, I'm hearing it, too. |
| 25 | **THE COURT:**  I think Ms. Avila, it's probably from yours. |

1    So anyway, okay.  Next.

2         **MR. ROSENTHAL:**  Good afternoon, Your Honor.

3         It's John Rosenthal from Winston & Strawn appearing on

4    behalf of Monsanto.

5         **THE COURT:**  Hello.

6         **MR. ROSENTHAL:**  Your Honor.  Can you hear me?

7         **THE COURT:**  I can.

8         **MR. ROSENTHAL:**  Good afternoon.

9         It's John Rosenthal, on behalf of Monsanto.

10        **THE COURT:**  Yeah, I heard you.  Next.

11        **MR. WILKERSON:**  Good afternoon, Your Honor.

12        This is Jeff Wilkerson from Winston & Strawn on behalf of

13   defendant, Monsanto Company.

14        **THE COURT:**  Hi.

15        **MR. WILKERSON:**  Hello.

16        **MR. KILARU:**  Good afternoon, Your Honor.

17        Rakesh Kilaru from Wilkinson Stekloff also on behalf of

18   Monsanto.

19        **THE COURT:**  Hello.

20        **MR. YOUNGENTOB:**  Good afternoon.

21        Kasey Youngentob on behalf of the objectors.

22        **THE COURT:**  Hi.  Okay.  So this is on for a motion for

23   final approval of a class action settlement.  We have one

24   objector here ready to speak.  I assume there is nobody else

25   in the audience in the virtual courtroom who has come to

1    object to the settlement.  Raise your hand if you have.  Okay.

2    I'm not seeing anybody with their hand raised.  All right.

3        So my initial take on this after reviewing the papers, is

4    that there are no -- that the settlement is reasonable, that

5    the settlement amount is reasonable.  I'm happy to hear more

6    from the objectors on why they think it's not.  And my initial

7    reaction on attorney's fees is that the attorney's fees are

8    quite a bit too high, given the nature of the claims, the

9    relatively insubstantial nature of the claims, and the

10   relatively small amount of litigation that needed to occur to

11   get you to this point.

12       I think that something approximating the Ninth Circuit's,

13   you know, 25 percent benchmark seems like it could be much

14   more reasonable, as applied here.  You would -- you know, you

15   would take the -- you would take the, I guess the bottom

16   amount, the floor amount of 23 million, and you would say

17   what's 25 percent of that.  And that would probably be the

18   appropriate amount of attorney's fees in this case.  And it's

19   difficult to imagine awarding anything more, but I'm obviously

20   happy to hear from plaintiff's counsel on that.

21       So why don't we start with -- why don't I start with the

22   plaintiffs on -- just on the settlement?  We'll get to the

23   attorney's fees in a moment.  But why don't you just kind of

24   summarize the settlement so we're all on the same page about

25   how it works and what it does and what the result will be for

1    the class members.  If you could give us a brief summary of

2    that.  And then I'll hear from the objectors and then we can

3    talk about attorney's fees.

4        **MR. ROSENTHAL:**  Your Honor, pardon the interruption.

5    It's John Rosenthal from Monsanto.  Our client was trying to

6    get into the public side to observe and was noting she was

7    having a problem.  So I just wanted to note that to the Court

8    because I don't know whether there's a larger problem of the

9    -- in terms of the public access or it's just unique to this

10   particular individual.

11       **COURTROOM DEPUTY:**  Unique to her.  We have enough spaces.

12       **THE COURT:**  There are a number of people in the virtual

13   courtroom already and plenty of extra spaces available.  So it

14   may be a problem specific to her.

15       **MR. ROSENTHAL:**  Thank you, Your Honor.

16       **THE COURT:**  Okay.

17       Ms. Wade?

18       **MS. WADE:**  Yes.  Thank you, Your Honor.  Yes.  So this

19   settlement is the culmination of several years of litigation

20   of over 18 cases filed both against Monsanto and retailers of

21   the Roundup products at issue across the country.  It provides

22   for --

23       **THE COURT:**  Well, this is one class action that was

24   initially filed in Missouri, right?

25       **MS. WADE:**  This class action was initially filed in

1    Delaware.

2        **THE COURT:**  In Delaware?

3        **MS. WADE:**  Yeah.  This one was filed in Delaware.  But

4    there were -- this class action resolves several of the other

5    cases that were also pending at the same time.

6        **THE COURT:**  Well, I understand that, but it's this --

7    where I am deciding whether to approve a settlement agreement

8    in this case, right?

9        **MS. WADE:**  Correct.  Yes.

10       **THE COURT:**  And there was a battle between this case and

11   multiple other cases for which was going to be the case.  And

12   you won the battle, but I mean, you didn't litigate all 18

13   cases, right?  You weren't the lawyer in all 18 of the cases,

14   right?

15       **MS. WADE:**  I was.  There were --

16       **THE COURT:**  All 18 of them?

17       **MS. WADE:**  Yes.  There were other counsel as well,

18   because they were filed in other states.  But yes, we -- my

19   firm, Milstein, Jackson, Fairchild & Wade, was involved in

20   every single one of those cases that is settled here.

21       **THE COURT:**  And then were there other cases that were

22   filed that you were not the plaintiff in?  You do not

23   represent the plaintiff in, like this Missouri case?

24       **MS. WADE:**  There were a handful of cases where we were

25   coordinating with counsel who's involved in this case that

1  were filed in small claims court in Florida, that I was never

2  counsel of record in.  But those cases are part of the

3  settlement as well, but other than the Missouri case, no.

4     **THE COURT:**  Okay.  But the upshot of all of that is you

5  won, you got to be the sort of lead lawyer in the lead case

6  settling this dispute on a nationwide basis, right?

7     **MS. WADE:**  Yes.

8     **THE COURT:**  Okay.  And what does the settlement do?

9     **MS. WADE:**  So the settlement provides cash consideration,

10  the floor of 23 million and a ceiling of 45 million available

11  for class members to make claims for a 20 percent refund of

12  the actual purchase price of the products at issue.

13        Our expert who prepared a damages analysis for

14  litigation, in one of the cases resolved here today in the

15  Florida (indiscernible) matter against Monsanto came up with a

16  price premium model measuring damages at 31 percent of the

17  price paid on the -- as a maximum.

18     And so we settled the case for 20 cents on the dollar,

19  which we believe represents the best case -- two-thirds of the

20  best case scenario we could have achieved at trial.  The class

21  members were able to make claims for up to one product per

22  year for a 20 percent refund based on the statute of

23  limitations of the respective consumer protection statute in

24  their state.

25     **THE COURT:**  You said one product per year.

1      **MS. WADE:**  Yes, one product per year.  It ranges, I

2  believe, for -- because of some tolling issues related to

3  COVID, I think the range was between 14 years and 4 years --

4      **THE COURT:**  Okay.

5      **MS. WADE:**  -- (indiscernible).

6      The average class member payout per claimant is $55.62,

7  which we're very pleased with.  We had 228,978 valid claims

8  that results in a total cash payout in claims of $12,735,610,

9  giving us an applied claims rate of 2.39 percent, which is

10  right within the range that we expected this to be in the

11  range of the approximate claims rate.

12      That is one of the bases that sort of drove the

13  amount that was -- that we settled for was the expectation

14  that claims would be, you know, in that range between 1 and 6

15  percent.  We had 226,459 claims without proof of purchase

16  submitted and 2,519 claims with proof of purchase.

17      **THE COURT:**  And if I remember correctly, there was a --

18  there was -- was there a difference in what you could get

19  depending on whether you were submitting proof of purchase or

20  not?

21      **MS. WADE:**  No.  Well, not really.  So this case involves

22  about 36 different products, I believe.  I could be wrong.

23  Monsanto would know better than me.  But there was a range of

24  recovery from 50 cents per unit up to $33 per unit, depending

25  on the original costs.  But the three most expensive super

1    concentrate products, that retail for over $100 each did

2    require proof of purchase just for those ones, I think it's

3    only three products.

4         **THE COURT:**  Got it.

5         **MS. WADE:**  So -- right.  And if you had proof of purchase

6    for all of your purchases, then there was no limit, by the

7    way, in terms of what you could get, but I don't think we had

8    anyone do that.  And the average number of units per claim was

9    five and a half.  So most people claimed about five products

10   in the class period.

11        There we had 84 percent of the class, or of the

12   claimants, 193,089 people selected a digital payment method.

13   So most people aren't going to be receiving hard checks,

14   they'll just get an electronic payment.  And we've got 35,889

15   persons requesting a hard check.  So the total cash payout --

16   oh, also, we had 128 claims submitted as a result of extending

17   the notice slightly for persons who may have tried to make a

18   claim after 10 p.m. on the 19th.

19        And we had 108 people who gave valid responses to further

20   requests for information that tried to submit documented

21   claims, and maybe there was a problem.  And the total cash

22   payout is with everything -- with whatever attorney's fees.

23   Well, if the maximum in attorney fees is awarded, plus

24   everything else, all the costs, the notice and administration

25   and the amount and claims is 25,023,461 is where we landed.

1      **THE COURT:**  Okay.  And as it relates to attorney's fees,

2   you are -- you said the total payout was -- is about 25

3   million --

4      **MS. WADE:**  Yes.

5      **THE COURT:**  -- round and down slightly.  And then the you

6   agree to a floor and a ceiling in terms of the amount of money

7   that Monsanto would pay to settle this class action.  And the

8   floor was 23.  Is that right?

9      **MS. WADE:**  Correct.

10      **THE COURT:**  And the ceiling was 45?

11      **MS. WADE:**  Correct.

12      **THE COURT:**  And we talked at the preliminary approval

13   stage, you know, what about the possibility of way more people

14   making claims, then you anticipated such that to make

15   everybody I won't say whole, but to satisfy the payment

16   obligation under the settlement agreement, much more than 45

17   million would need to be paid.  And your response was, well,

18   if that happens, then you should reject the settlement

19   agreement.  And that hasn't happened.

20      So that concern that I expressed at the outset isn't

21   really there anymore.  So the total payment amount is 25

22   million.  Floor of 23, ceiling of 45.  And this floor and

23   ceiling represents the total amount that would -- that

24   Monsanto would pay in not just to the class members, but also

25   attorney's fees and costs.  So the total amount it would be

1  under this settlement $25 million.  And you've -- correct?

2      **MS. WADE:**  Well, the total amount that they would have

3  paid was 45 million, right.  That was the maximum

4  (indiscernible) --

5      **THE COURT:**  I understand.  But the total amount that they

6  would pay under your request under your motion here today is

7  25 million.  And that is roughly $11 million in attorney's

8  fees?

9      **MS. WADE:**  Correct.

10      **THE COURT:**  And then costs are --

11      **MS. WADE:**  Costs are -- I can break this down for you.

12      **THE COURT:**  It's about like 1.2 million or something like

13  that?  Or 1 million?

14      **MS. WADE:**  Yes.  It's just in that range, because the

15  total claims -- notice and claims administration is about

16  826,000.

17      **THE COURT:**  Right.

18      **MS. WADE:**  And the hard costs of the litigation are

19  210,888.  And --

20      **THE COURT:**  And then so roughly a million dollars --

21  roughly $11 million for the class members.  I mean, sorry,

22  roughly $11 million in attorney's fees, or roughly a million

23  dollars in costs.  That's 12 million, and then another roughly

24  $11 million to class members?

25      **MS. WADE:**  Actually 12,735,610.

1          **THE COURT:**  Okay.  12 -- so we'll call it 13 million

2     roughly, for class members.

3          **MS. WADE:**  Right.

4          **THE COURT:**  So that gets us up to close to 20- -- around

5     $25 million, right?

6          **MS. WADE:**  Yes.

7          **THE COURT:**  Now, let's just -- let's say that I conclude

8     that the attorney fee request is too high.  And that I believe

9     that we should be using something akin to the Ninth Circuit

10    benchmark of 25 percent.

11         I think that what I would do in that instance, is say

12    that, you know, you are -- maybe I would -- what I would say

13    is that what the practical -- this is a little complicated,

14    but the practical consequence of that, right, like, let's say,

15    I believe that you should only get the equivalent of 25

16    percent of the settlement amount.  The practical consequence

17    of that, is that the amount -- total amount Monsanto would pay

18    would go down to the floor, right, of 23 million?

19         **MS. WADE:**  There are circumstances under which absolutely

20    that would be the case.

21         **THE COURT:**  Well, I don't understand what that means.  I

22    mean, wouldn't that have to be the case?

23         **MS. WADE:**  Okay.  So it depends how much you cut the fee.

24    But if it goes below 23 million because of that, then the

25    maximum --

1    **THE COURT:**  Because of cutting the fee?

2    **MS. WADE:**  Right.  Then the maximum that would be paid is

3    23 million.  So the net net would be Monsanto would pay less.

4    But depending on how much less it may increase class member

5    individual recoveries pro rata, because if we don't

6    (indiscernible) --

7    **THE COURT:**  So let's say just hypothetically, I said,

8    okay, I'm going to cut your -- I'm going to cut your attorney

9    fee request by $6 million, okay?  That would be lower the

10   total amount to $19 million, right?  From 25 million to 19

11   million.  But there is a floor of how much Monsanto will pay

12   to resolve this case of 23 million.

13    So 4 of those 6 million that I cut from your attorney fee

14   request would be redistributed to the class members, and they

15   would -- the class members would get a higher recovery.  And

16   then 2 of the 6 million that I cut would go back into

17   Monsanto's pocket.  Is that how it would work?

18    **MS. WADE:**  Yes.

19    **THE COURT:**  Okay.  All right.  So again, we'll -- I'll

20   give you a chance to -- and by the way, so under those

21   circumstances, the total settlement amount would be $23

22   million.  And you know, so if we were to measure, you know,

23   what is 25 percent of $23 million, that would be, I think,

24   $5.75 million dollars or something along those lines.  So --

25    **MS. WADE:**  Yes.

1        **THE COURT:**  -- the fee award, the attorney fee award

2   would be under that approach that I'm floating to you, and I'm

3   happy to hear your comments on, under that approach it would

4   be five point -- the fee award would be $5.75 million.

5        **MS. WADE:**  Yes.

6        **THE COURT:**  Okay.  As opposed to the roughly $11 million

7   that you've requested?

8        **MS. WADE:**  Yes.

9        **THE COURT:**  Okay.  All right.  So you'll have a chance to

10  address that.  But let me hear from the objectors first about

11  why this is not -- why you think this is not reasonable.  And

12  again, I just want to -- you know, I think, you know,

13  obviously, the very substantial claims, you know, in this MDL

14  are the -- are the claims by people who allege that they've

15  gotten Non-Hodgkin's Lymphoma from using Roundup.

16       I mean, that's -- those are those substantial claims.

17  These are pretty insubstantial claims, I have to say.  And you

18  know, the -- it seems to me that given how insubstantial the

19  claims are, the recovery for the class members is probably

20  reasonable.

21       And so, Mr. Youngentob, what am I missing?

22       **MR. YOUNGENTOB:**  Yes, Your Honor.  If you don't mind, I'd

23  like to highlight three reasons why I think this settlement

24  should be denied.  So the first is the it's inadequate

25  compensation for the certified class of Missouri purchasers.

1   So it might be true that the nationwide class receives

2   adequate compensation, but the Missouri class does not.  And

3   that leads to the second point, which is that there was --

4        **THE COURT:**  Well --

5        **MR. YOUNGENTOB:**  I'm sorry.

6        **THE COURT:**  On the first point -- well, go -- if you want

7   to summarize your three points first, go ahead.

8        **MR. YOUNGENTOB:**  Yes, Your Honor.  The second point is

9   that there's inadequate representation because this was a

10  distinct subgroup of people that needed representation at the

11  settlement talks.  And without it, that undermines fairness.

12  And then the third point is because of these Bluetooth red

13  flags, I think it undermines your ability to approve the

14  settlement.

15       **THE COURT:**  I didn't -- I'm sorry, I didn't quite

16  understand your third point.

17       **MR. YOUNGENTOB:**  Yes, Your Honor.  So because of the

18  Bluetooth red flags are present, I think it's not possible

19  just to cut the fees, because what it indicates is that class

20  counsel traded their own interests for the interests of the

21  class.

22       **THE COURT:**  Well, I mean, all of it gets back to whether

23  the classes interest has been adequately represented and

24  whether this -- it gets back to whether the settlement

25  adequately kind of vindicates the interest of the class

1  members.  So why -- and you're saying it may very well

2  adequately vindicate the interests of the class members in the

3  other states, but not in Missouri.  So what do you mean by

4  that?

5      MR. YOUNGENTOB:  Yes, Your Honor.  If I could flag a case

6  for you.  It's called Odin USA Meats, where the district court

7  denied settlement, and it specifically rejected the claims

8  that the plaintiffs have made here, which is that the

9  statewide classes should sacrifice their interests in order

10  for the nationwide class to be compensated, which is exactly

11  what's happened here.

12      And indeed, the judge there highlighted that he did not

13  think that there could be adequate representation of that

14  statewide class.  There were, I think, six statewide classes

15  that were not at the settlement conversation.  And Monsanto's

16  own settlements have indicated that this settlement is

17  inadequate.

18      For example, there was a case, Rawa v. Monsanto, and that

19  was about whether or not the concentrate was appropriately

20  represented on the bottles.  But there, the settlement was

21  actually reached by the only class counsel that had certified

22  their statewide class.  And then they reached out to every

23  single plaintiff, and sought to have them sign on, which they

24  did.  And if I can also highlight one other case, the First

25  Circuit just issued --

1          **THE COURT:**  So I'm not suggesting -- I mean, the case

2     that you just cited, I mean, I'm not suggesting that the --

3     you know, the interests of the Missouri class should be, you

4     know, subordinated in any significant way to the interests of

5     the nationwide class.  But I just, I mean, there are lots of

6     different states.

7          And there are different laws in different states and some

8     states laws are more favorable, and some states laws are less

9     favorable, and some jury pools are better than other jury

10    pools.  But I mean, is Missouri really so special compared to

11    all the other states in the union, that there should be a

12    carve out for the class members in Missouri?

13         **MR. YOUNGENTOB:**  Yes, Your Honor.

14         I think it gets to more than the fact that just Missouri

15    law is favorable, but that it was being actively litigated, is

16    already certified, did not face a motion to dismiss, had

17    plaintiffs withstanding.  I think that's enough to create as a

18    distinct subgroup that they needed representation, adequate

19    and independent representation.

20         And even by plaintiffs' own estimates, the Missouri class

21    has at least $20 million in damages.  And that's excluding

22    punitive or attorney's fees.  And ultimately, based on their

23    representations in the papers, the Missouri class is receiving

24    a couple $100,000 at best, and could be as low as tens of

25    thousands of dollars.

1          THE COURT:  When was the Missouri class certified?

2          MR. YOUNGENTOB:  Yes, Your Honor.  That was in March.

3          THE COURT:  In March of '22?

4          MR. YOUNGENTOB:  '21 I believe, Your Honor.  '22.

5          MR. ROSENTHAL:  March 22nd, 2021.

6          MR. YOUNGENTOB:  Yes.

7          THE COURT:  2021?

8          MR. YOUNGENTOB:  Yes, Your Honor.

9          THE COURT:  And it was in the class consisted of -- what

10    was the class definition?

11         MR. YOUNGENTOB:  It was Missouri purchasers of Roundup,

12    and that did include agricultural and individual home use.

13         THE COURT:  Okay.  And why -- and had those class members

14    received notice?

15         MR. YOUNGENTOB:  They had not, Your Honor.  And that's

16    another issue, which is that these Missouri class members

17    couldn't really protect their interests.  And that's been

18    highlighted before by other courts, that when there's no

19    notice provided to class members, it's difficult for them to

20    know whether or not they're members of another class action

21    that might be more valuable for them.

22         THE COURT:  Okay.  And so it's not -- you're not relying

23    so much on the idea that the Missouri law is more favorable

24    than Texas law or North Carolina law or California law or

25    whatever.  You're relying on the fact that this case had, you

1    know, gotten pretty far along.

2         MR. YOUNGENTOB:  I think they're -- both pieces are

3    important.  But what's particularly important was that this

4    case was being actively litigated.  And I think on numerous

5    occasions, we've seen when there is a distinct subgroup of a

6    statewide class action, the courts have to give an extremely

7    hard look before they approve a settlement that washes their

8    claims away, particularly when they're as valuable as these.

9         THE COURT:  Forgive me if this is an ignorant question,

10   but was there anything preventing you from sort of notifying

11   the class members in Missouri of this pending class action

12   that they were a part of?  So that they could sort of choose

13   what they wanted to -- you know, what they want -- which class

14   they wanted to be a part of?

15        MR. YOUNGENTOB:  In all frankness, I'm -- we didn't

16   consider that.  I haven't seen that occur in any other case.

17   Mostly, what I've seen is that the courts have been unwilling

18   to approve the settlements without this knowledge for class

19   members, or when their claims are being actively litigated on

20   a statewide basis.

21        THE COURT:  How -- why hadn't -- had notice not gone

22   around to the class members in Missouri, if the class was

23   certified in March of 2021?

24        MR. YOUNGENTOB:  Yes, Your Honor.  Because in June,

25   Monsanto moved to stay the case before notice had actually

1    been given.

2         **THE COURT:**  Well, because of the MDL -- the JPML process?

3         **MR. YOUNGENTOB:**  No.  So they reached what they say is a

4    term sheet in February, class was certified in March and April

5    --

6         **THE COURT:**  They reached a term sheet with Ms. Wade and

7    her people?

8         **MR. YOUNGENTOB:**  That's correct.

9         **THE COURT:**  Okay.

10        **MR. YOUNGENTOB:**  But Monsanto was silent about that term

11   sheet, or its final execution of any settlement with the court

12   until June, and how it was actively litigating.  It filed

13   multiple writs to the courts of appeals in Missouri, to try to

14   decertify the class.

15        **THE COURT:**  Okay.  So it had reached a term sheet with

16   Ms. Wade in February.  A class was certified in your case in

17   March, and then what was the next thing that happened?

18        **MR. YOUNGENTOB:**  And then they tried to decertify the

19   class between April through June.

20        **THE COURT:**  Okay.

21        **MR. YOUNGENTOB:**  And then finally --

22        **THE COURT:**  On what ground?

23        **MR. YOUNGENTOB:**  I guess they just said that it didn't

24   meet the Missouri Rule 23 essentially.

25        **THE COURT:**  I see.  Okay.  And then?

1      **MR. YOUNGENTOB:**  So then that happened through June.  I

2      think it's June 14, they can correct me.  They notified the

3      court that they've reached a settlement, and they moved for

4      preliminary approval in Delaware.  And they moved to stay the

5      case in Missouri.

6      **THE COURT:**  Okay.  All right.  Anything else from your

7      end?

8      **MR. YOUNGENTOB:**  Yes, Your Honor.  The one thing I'd also

9      want to highlight is this First Circuit case that came out a

10     few weeks ago, Murray v. E-Grocery.

11     **THE COURT:**  Okay.

12     **MR. YOUNGENTOB:**  And in that opinion, the First Circuit

13     noted that when there isn't separate representation for a

14     group with the more compelling or distinct subgroup, that it

15     affects procedural fairness to the point where the court can't

16     sort of do a post hoc evaluation of the claim.  And therefore,

17     it has to deny the settlement.  And the parties have to go

18     back to the drawing board and allow those people to have the

19     representation that they need.

20     **THE COURT:**  Okay.  I will -- I'll make sure to look at

21     that.  But you know, the premise of that is that it's a

22     significantly more compelling subgroup in Missouri.  And that

23     gets back to my original question, which is, you know, as I

24     understand it, the law is favorable in Texas for plaintiffs on

25     this as well.  And the law -- you know, there are -- you know,

1  Louisiana, I mean, there's a lot of variants.

2        And you know, I guess I just want to ask you once again,

3  what makes Missouri so different from every other state in the

4  union, from the standpoint of somebody who is suing Monsanto,

5  asking for a partial refund of -- for the money they spent on

6  a product that that they believe is capable of causing cancer?

7        **MR. YOUNGENTOB:**  Yes, Your Honor.  The MMPA is the most

8  consumer protective statute in the country, but I think that

9  it's important --

10       **THE COURT:**  Well, be more specific than that.

11       **MR. YOUNGENTOB:**  Yes.

12       **THE COURT:**  I want you to Be more specific in explaining

13  why the people in Missouri were in such an advantageous

14  position compared to everybody else around the country on

15  this?

16       **MR. YOUNGENTOB:**  Yes.  So it's both substantive and

17  procedural.  So on the substantive aspect, it's that there's

18  no need to show causation, specific causation.  No need to

19  show reliance.  It's relatively easy to get punitive damages,

20  attorney's --

21       **THE COURT:**  What do you mean specific causation?  I mean,

22  there's no -- there's no injury here.  So there's no need for

23  any plaintiff to show specific causation, right?

24       **MR. YOUNGENTOB:**  Yes.  So you don't have to show that the

25  reason that you purchased the item was because of the unfair

1          practice.  You just have to show that there was a loss that

2          was caused by the unfair practice.

3              **THE COURT:**  Well, I mean, you have -- you have to say,

4          look, had I known that -- I don't even -- I don't quite

5          understand what that means.  I mean, are you telling me a

6          plaintiff in Missouri does not have to say, look, I purchased

7          this product.

8              Had I known that it was capable of causing cancer, I

9          would have spent, you know, 20 percent less on the product,

10         because I would have had to spend that amount of money using

11         personal protective equipment when spraying the product or

12         whatever.  I mean, you're saying that a plaintiff in Missouri

13         wouldn't have to say that?

14             **MR. YOUNGENTOB:**  They don't have to show that had they

15         known they would have purchased a different product, actually.

16         They just have to show that the unfair practice lead to an

17         increased price for that item generally.

18             **MR. ROSENTHAL:**  That's not correct.

19             **THE COURT:**  Okay.  But as a practical matter, I mean,

20         what sort of hurdles, would it -- let's take California, since

21         I am more familiar with California law, okay?  What is a

22         California plaintiff going to have to -- what hurdle is a

23         California plaintiff going to experience in a case like this,

24         that a Missouri plaintiff is not going to experience?

25             **MR. YOUNGENTOB:**  Well, I think Ms. Wade's cases actually

1    highlight that.  In <u>Weeks</u>, her case was dismissed, because

2    they failed to prove -- I can't remember if it was a safe

3    harbor issue there or --

4        **THE COURT:**  I'm asking -- my question to you is consider

5    a California plaintiff and consider a Missouri plaintiff.

6    What is a hurdle that a California plaintiff is going to

7    experience that a Missouri plaintiff is not going to

8    experience?

9        **MR. YOUNGENTOB:**  I think there are differences.  If I can

10   remember the UCL correctly, there are slight differences in

11   reliance.  And there's also the issue of the safe harbor.

12       **THE COURT:**  I mean, with the UCL, reliance is presumed

13   for absent class members if there's a material

14   misrepresentation or omission.

15       **MR. YOUNGENTOB:**  Yes, Your Honor.

16       **THE COURT:**  So what else?

17       **MR. YOUNGENTOB:**  Other than that, I'm not entirely sure.

18   But --

19       **THE COURT:**  I mean, that was the problem I had with your

20   brief, right?  There was a lot of sort of flowery language

21   about how great everything is for Missouri plaintiffs.  And

22   it's like clear sailing for the Missouri plaintiffs compared

23   to everybody else.  But there weren't any specifics.

24       You know, there weren't any -- there wasn't any concrete

25   explanation of how it is that, you know, a -- you know, a

1    hurdle that a California plaintiff might experience that a

2    Missouri plaintiff wouldn't, in a way that would really matter

3    for the outcome of the case.

4        **MR. YOUNGENTOB:**  I think the other issues still, though,

5    is that basically Gilmore had no standing to advocate on

6    behalf of the class, even if that's true.  And I know that

7    Monsanto says he could have just re-pled under Oregon law, but

8    Oregon law, you do have to show reliance.  And --

9        **THE COURT:**  But if you have a problem with a lead

10   plaintiff that those problems, as you I'm sure know, can get

11   cured pretty easily in class actions.  I mean, it happens all

12   the time that people swap out lead plaintiffs in class

13   actions, right?

14       **MR. YOUNGENTOB:**  So I guess on that point, do you mind if

15   I get to the second point, which is procedural, which is that

16   the Missouri class doesn't face any of the risks that go along

17   with class certification.  They also didn't face any motion to

18   dismiss.  So they're in this posture that is --

19       **THE COURT:**  So what would be a basis for a motion to

20   dismiss this case?

21       **MR. YOUNGENTOB:**  I mean, Monsanto moved to dismiss every

22   single one of the plaintiffs' cases, all 18 --

23       **THE COURT:**  Of course it does.  Monsanto moves to dismiss

24   everything, but what would be the basis to dismiss a case like

25   this?

1      **MR. YOUNGENTOB:**  I think

2      **THE COURT:**  (Indiscernible) true, you know, threat of

3  dismissal of a case like this?

4      **MR. YOUNGENTOB:**  It has to be telling that the one case

5  that they did not move to dismiss, one out of all 19 of the

6  cases, is the one that was in Missouri.  And I think --

7      **THE COURT:**  But you're not really answering my question.

8  If Monsanto moot filed a motion to dismiss, you know, this

9  case right now here in California, what would their argument

10  be that I would seriously entertain?

11      **MR. YOUNGENTOB:**  I suppose they would argue preemption as

12  one of their reasons to dismiss.

13      **THE COURT:**  Okay.  But what would the preemption argument

14  be that hasn't already been foreclosed by my prior rulings and

15  Ninth Circuit prior rulings?

16      **MR. YOUNGENTOB:**  I mean, they are still facing a motion

17  to dismiss, right, in that case against Gilmore for a lack of

18  standing.

19      **THE COURT:**  Okay.  Well, we talked about that.  What -- I

20  mean, you got to be able to identify something concrete, it

21  seems to me.

22      **MR. YOUNGENTOB:**  Well, the other issue is that it would

23  be nearly impossible for them to certify it on a nationwide

24  basis.

25      **THE COURT:**  But why not a bunch of subclasses?

1    **MR. YOUNGENTOB:**  I mean, I'm sure they could advocate for

2    that.  And in that case, I think you would need like the court

3    just did in was it, <u>In re Lithium</u>.  The Ninth Circuit said

4    here, you have repealer states and non-repealer states, and

5    they're entitled to different compensation depending on how

6    favorable their law is.  I think it's difficult to say that

7    this case should be any different if you do subgroups.

8        **THE COURT:**  Okay.  Does anybody want to respond to the

9    objections?

10       **MS. WADE:**  I would like to, Your Honor, just a couple of

11   points.

12       **THE COURT:**  Okay.

13       **MS. WADE:**  I just want to point out that I'm not sure if

14   this was clear that the Missouri class was not certified until

15   after this case settled and had gone to mediation or all of

16   these cases settled and had gone to mediation.  There were 18

17   of them.

18       The Missouri case, my understanding, Monsanto could

19   probably speak more to this, but was not really that far

20   along.  There had been a little bit of discovery done in the

21   class certification motion, but that was all.  It wasn't as

22   (indiscernible) --

23       **THE COURT:**  That's not nothing.  I mean --

24       **MS. WADE:**  No, no, no.  It's not nothing.  But my

25   understanding is that it wasn't as far along as it may have

29

1      seemed, is all.

2           It's confusing to me, the complaints about the class

3      members not being on notice in Missouri, because one of the

4      cases objectors relied very heavily on in their objection here

5      is the Rose case involving the exotic dancers wage and hour

6      case that was filed in San Francisco.

7           And in that case, one of the objectors -- it was a

8      similar scenario where there was a federal settlement, but

9      there had been a parallel state action was also filed at some

10     point.  And the objectors, one of the arguments that they

11     raised was to the class notice, one of -- and they objected,

12     procedurally that the class notice was deficient.

13          And also substantively, that it was deficient, because it

14     didn't put the class members on notice of their case, and that

15     they should contact these lawyers and that they have a better

16     case going.  And the court expressly rejected that and said

17     that that was not an abuse of discretion for that to not be in

18     there.  It wasn't necessary or required under Rule 23.

19          **THE COURT:**  I would think under some circumstances, it

20     might be required.  It just depends on, you know, whether

21     there is a significant difference between the two cases.  And

22     there's -- they're really, you know, the members of the -- you

23     know, the smaller class or the other class are in a much more

24     favorable position than the members of the class where the

25     case is being settled, right?

1          **MS. WADE:**  Right.  And I believe that's exactly what the

2     Ninth Circuit found in <u>Rose</u>.  And also just want to point out

3     the objectors have not, or did not, and still have not

4     objected to the notice that was put forth in this case,

5     neither a preliminary approval or now.  And I just want to

6     clarify that the <u>Weeks</u> case was dismissed with prejudice, but

7     it was not because of a reliance or causation issue.

8          It had to do with a very complicated Proposition 65 issue

9     because glyphosate is in the California Prop 65 list and <u>Weeks</u>

10    actually -- <u>Weeks</u> was against Home Depot, not Monsanto, and it

11    is very complicated.  And it's not because of variations of

12    state law or that we would have done better under a different

13    state consumer protection statute.  That's all I have to say.

14         **THE COURT:**  Okay.  On attorney's fees.  You can maybe

15    take a couple of minutes if you want to explain to me why you

16    think that, you know, more than -- I know, it's not -- this

17    isn't -- I mean, it's a slightly different context than the

18    typical settlement.  So it's, you know, what -- you know, it's

19    not exactly -- what I'm proposing is not exactly the Ninth

20    Circuit 25 percent benchmark, but I think it's the closest you

21    can get to it probably.

22         And so as I said, I think these claims are relatively

23    insubstantial.  You know, when you think about the benefit

24    conferred upon the class, again, relatively insubstantial.

25    And that is not to say that I'm suggesting you did a bad job

1  or anything like that.  It's just that the claims by their

2  nature are relatively insubstantial.

3       And you know, there was not a ton of litigation in this

4  case before you, you know, got it to the point of settlement.

5  And it just doesn't seem like there's anything coming close to

6  justifying an award higher than, you know, 25 percent of the

7  settlement amount.

8       **MR. ROSENTHAL:**  Your Honor, I hate to interrupt.  Before

9  we get there, could I just go back and just talk for a second

10  on the objector's points?

11      **THE COURT:**  Briefly.

12      **MR. ROSENTHAL:**  Just briefly, Your Honor.  The bottom

13  line here is that there is no difference in state law.  We

14  pointed that out in our brief.  The standards are the same

15  here, particularly in terms of damages, the key damages.  The

16  differences between Delaware and the differences between

17  Missouri are exactly the same; it's benefit of the bargain.

18  We briefed that.

19      The reality here is that the case really wasn't in any

20  kind of advanced or more advanced posture.  In fact, this is

21  Wade strategy, right or wrong was to file multiple actions

22  across the U.S. in kind of a guerrilla warfare strategy in

23  order to prosecute the cases from different jurisdictions,

24  both at state and federal level, which eventually wound up in

25  the Delaware court, where we ultimately settled it in front of

1   Judge Welsh.

2         In terms of the certification, the court did certify in

3   Missouri, but it's certified under the statute, which is

4   statute limited to purchases for family household and personal

5   use.  And there, the plaintiffs' class is much broader than

6   this class, because it includes agricultural and professional.

7   And there the court did certify the class, but noted that it's

8   going to give the plaintiff the opportunity to go forward and

9   collect affidavits or determine some other means to establish

10  on a common wide, common proof basis who's in the class and

11  what the purchases are?

12        Certainly with respect to household -- the lawn and

13  garden products, that would fall under the statutes, but we

14  have a situation in Missouri where they're not going to be

15  able to establish as a result, that whether a farmer purchased

16  a product for household versus agricultural, or the same thing

17  with respect to a professional landscaper, or a park keeper.

18        So the reality is, while that was certified, we think

19  that chances are, it's highly likely it's going to be

20  uncertified.  We never moved to decertify it.  We did appeal

21  the class certification decision, but we never moved to

22  decertify the class as it was suggested, and the court did

23  stay that entire manner anticipating that this settlement

24  would go forward, which will largely eliminate almost all of

25  that case.

1          **THE COURT:**  Okay.

2     Ms. Wade, do you want to talk about the attorney's fees?

3          **MS. WADE:**  Yes.  Thank you, Your Honor.  So I understand

4     your question, and I was expecting you to ask it.  And that's

5     because this is -- this settlement is different than anywhere

6     I've certainly ever settled a case and in nearly 20 years of

7     practice doing this almost exclusively, and because of the

8     high-low nature of the settlement.

9          And in finding that the high-low numbers that we ended up

10    with at 23 million to 45 million is reasonable when you

11    consider a reasonable claims rate.  That is the same way that

12    we've evaluated our fee request in this case.  And what

13    Bluetooth tells us is that the end result, the end of the day

14    it should be reasonable.  And our position is that the 11.25

15    million that we've requested is reasonable under either the

16    percentage of the fund method, or alternatively it's also

17    reasonable under the lodestar method.

18         And that's because -- so I agree with you 25 percent is

19    the benchmark in the Ninth Circuit.  The question really that

20    is at issue here is how to value the fund in this scenario

21    with the high-low.  And that's where -- that's where we

22    differ.  I would say that's where your question really goes

23    to, I think.

24         **THE COURT:**  You think 25 percent is 25 percent of 45

25    million?  Is that what you're saying?

1    **MS. WADE:**  Yes.  Yes.

2    **THE COURT:**  Really?

3    **MS. WADE:**  Yes.  Because the Ninth Circuit precedent

4    instructs that when determining the size of a fund for

5    purposes of awarding fees, that fee should be awarded based on

6    the total benefits being made available to class members, not

7    based on the amount that's actually claimed.  And that comes

8    from the Williams case.  And then that was further clarified

9    in the Bedolla case, which is also a Ninth Circuit case.

10   **THE COURT:**  Wait, hold on a second.  I mean, I understand

11   that when you have a settlement fund where, you know, the

12   defendant agrees to pay $45 million into a settlement fund,

13   and it's non-reversionary, that the defendant agrees to pay

14   $45 million, and they're out $45 million.

15   **MS. WADE:**  Right.

16   **THE COURT:**  And you say, well, you know, we're going to

17   figure out -- we're going to have to figure out what to do

18   with that money, and how much goes to the attorneys, and how

19   much go to the claimants, and how much go to pay costs.  But

20   it's $45 million.  And you say, well, the benchmark is, you

21   know, 11 million or 11.25 million.  I get that.

22       But this is not a situation in -- I mean, the argument

23   you're making sounds to me no different from an argument in a

24   truly problematically collusive settlement agreement, where,

25   you know, the amount is $20 million -- settlement amount is

1    $20 million, but anything that goes unclaimed, goes back to

2    the defendant.  So it's really an illusory amount.

3        I mean, the -- you know, to peg your attorneys' fees to

4    $45 million.  I mean, you might as well peg it to, you know,

5    the moon.  I mean, it has no greater connection to this case

6    than the moon does, as it turns out, based on the claims that

7    were made.

8        **MS. WADE:**  Based on the claims that were made, that's

9    true.  But I think that that's wrong, that the 45 million is

10   illusory.  And let me tell you why.  Because in <u>Bedolla</u>, what

11   the Ninth Circuit said was that in a claims made -- in a

12   strict claims made settlement situation, the total benefits

13   made available have to consider the economic reality of the

14   claims rate in similar cases.

15       **THE COURT:**  Okay.

16       **MS. WADE:**  And that is exactly what we did here.  In all

17   of those cases, and I understand and agree that are cited by

18   objectors, and that we all know about where there's an assumed

19   100 percent claims rate, and then they say we want 25 percent

20   of that.  And that causes a huge problem, because it's -- it

21   ends up with a disproportionate result.

22       **THE COURT:**  Can I cut you off for just a second and ask

23   you this question?

24       **MS. WADE:**  Yes.

25       **THE COURT:**  Let's say there was no floor to this

1    settlement.  Let's say you came and you said, all right.  You

2    know, we've reached this settlement with Monsanto, and

3    Monsanto has agreed to pay up to $45 million to claimants,

4    plus attorneys' fees.  And, but there's no floor.  There's no

5    $23 million dollar floor.  Okay.  And so, let's say I

6    preliminarily approved that settlement, and then the claims

7    are filed, and it turns out that $1 million worth of claims

8    are filed.  Okay.  So Monsanto ends up having to pay $1

9    million to class members.

10       And then you come and you say, here's our motion for

11   attorneys' fees.  We're asking for $11.25 million.  And the

12   reason we're asking for $11.25 million, is that there was a

13   ceiling of $45 million on the settlement agreement.  Monsanto

14   agreed to pay up to $45 million.  And yes, we know that

15   Monsanto only ended up paying a million dollars, but because

16   they agreed to pay up to $45 million, we should get $11.25

17   million in attorneys' fees.  Would that be appropriate?  Would

18   that be an appropriate way to measure the Ninth Circuit

19   benchmark of 25 percent?

20       **MS. WADE:**  It could be if -- because, what we did --

21       **THE COURT:**  How?

22       **MS. WADE:**  Well, because if you take into account a

23   reasonable claims rate assumption and apply it to the numbers,

24   in order to get to 45 million, if you include all of the

25   benefits, that would have left approximately 32.7 million in

1    claims that was made available, or 32.7 million in money that

2    was available for claims.  And that represents a 6.1 percent

3    claims rate.

4         And courts in this district and in the Ninth Circuit have

5    applied this standard.  Judge Chen did it in the In re MyFord

6    case that was before him.  And what happened there was exactly

7    what you just described.  They assume just 100 percent claims

8    rate or, you know, a claims made with a cap, essentially, and

9    asked for 22 million in fees when I think they were predicting

10   less than 5 million in claims.

11        And so they assumed 100 percent claims rate.  And he said

12   you can't do that, because that's not reasonable.  I want you

13   to go back and calculate this based on a ten percent claims

14   rate because that's more plausible, and then calculate it

15   based on 10 percent of the theoretical amount that's made

16   available.

17        **THE COURT:**  Well, why not just calculate it with

18   reference to the actual amount of recovery of the class?  I

19   don't understand why that is not a much better measure of --

20   because when you're measuring, what are we asking?  We're

21   asking -- you know, first and foremost, we're asking, what

22   sort of benefit did the attorneys get the class members?

23   Right?  I mean, what sort of result -- let's evaluate the

24   result that the attorneys achieved for the class members.

25   Isn't the best measure of that the actual amount of money that

1    the class members are getting?  And not some, you know,

2    ceiling that was reached, you know, that was established in

3    the settlement negotiation?

4         **MS. WADE:**  It is, but it's not the attorneys' fault if

5    for whatever reason, claims aren't made.  Here, the individual

6    class member recovery is strong.  It's over $55 per class

7    member on average.

8         **THE COURT:**  I mean, it's not your fault.  But isn't it

9    the best measure of the results you achieved for the class and

10   the class members?  Right?

11        **MS. WADE:**  Maybe the better way to look at this, would be

12   to look at the -- just a strict lodestar calculation.  Because

13   here if 25 percent of the floor is what is ultimately awarded,

14   that would be more than $2 million less than a --

15        **THE COURT:**  But I don't think that -- the lodestar

16   calculation really passes the straight face test, given what

17   has happened and not happened in this particular case.  I

18   mean, not much has happened, right?  There hasn't been much

19   litigation.  I know there were proceedings, the JPML and

20   whatnot.  But there hasn't been much litigation.  I mean it's

21   really a lawsuit was filed, and it was settled pretty quickly,

22   right?

23        **MS. WADE:**  In Gilmore specifically, but, again in this

24   case that's true, to an extent.  But this case, there's 18

25   cases being resolved here and the lodestar accounts for all of

1    that time.  All of those cases were resolved.  We were counsel

2    in all of them, as were others.  And all of those --

3        **THE COURT:**  But I don't understand is that really the way

4    to think about, you know, attorneys' fees that you filed this

5    case, and you filed a ton of other cases.  And I mean, that

6    just gives you incentive to file 18 cases around the country,

7    and hope you get one of the ones that ends up being the

8    nationwide class action settlement.

9        I mean, all of a sudden, lawyers instead of filing one

10   case and hoping they're going to be the winner, each lawyer is

11   going to file 100 cases to hope that they're going to be the

12   winner.  And then they're going to collect attorneys' fees on

13   all 100 cases that they filed.  I just don't --

14       **MS. WADE:**  No.

15       **THE COURT:**  I don't really get that.

16       **MS. WADE:**  That's not why.  This was a global resolution,

17   that all of the -- it was a coordinated litigation strategy.

18   This was not just see what sticks and see which one settles.

19   We sued Monsanto, and then we also sued retailers of the

20   Roundup products at issue in a coordinated strategy.  And it

21   was that strategy the Monsanto was required to indemnify the

22   retailers.

23       They had to pay for their costs of the defense and also

24   ultimately would have been responsible for paying any judgment

25   awarded against a retailer.  It was putting pressure on them

1    in regards to their customers.  And that was part of our

2    overall strategy.  The release here releases the retailers as

3    well.  And all of the cases are part of the settlement.  This

4    is not in a vacuum just Gilmore.

5          And what the case law on this says about related cases or

6    other cases is did it contribute to the settlement for the

7    class as a whole, and all of those cases 100 percent it was

8    because of those cases.  And because we were pursuing

9    litigation against them on multiple fronts and multiple

10   jurisdictions with this unique strategy of going after the

11   retailers, which was not easy.

12         It was novel, but we really believed in holding someone

13   accountable for not disclosing the risks that certainly the

14   retailers knew about, because they all got Prop 65 notice that

15   this was a problem.  And obviously, it's more complicated than

16   that.  But that is how we got here, not --

17         **THE COURT:**  Okay.

18         **MS. WADE:**  -- filed a bunch of cases, and then just come

19   in here and ask you award --

20         **THE COURT:**  Let me go back and read the materials with

21   these points, with this discussion in mind.  And I'll think

22   about it a little more and then issue a ruling.

23         **MR. YOUNGENTOB:**  Your Honor?

24         **THE COURT:**  Yes.

25         **MR. YOUNGENTOB:**  Do you mind if I highlight --

1      **THE COURT:**  Thirty seconds.  We've been going for an hour

2    and I have to attend to some other matters.  So --

3      **MR. YOUNGENTOB:**  Yes.

4      Judge Davila in the In re Apple Device case that Monsanto

5    actually highlights says that you use the floor to set the

6    fees.  And the other thing is, Judge Corley and Judge Gilliam

7    have both said that you look at the actual claims rate under

8    circumstances like this to set the fee.  That's all, Your

9    Honor.

10     **THE COURT:**  Okay.  Thank you.  And what are those cases?

11   The Corley and Gilliam cases?

12     **MR. YOUNGENTOB:**  Yes.  One was when Judge Corley was

13   magistrate.  That's Lowry v. Rhapsody.  And then --

14     **THE COURT:**  She was just as smart back then.

15     **MR. YOUNGENTOB:**  Yes, Your Honor.  And Chess v.

16   Volkswagen Group of America is the other one.

17     **THE COURT:**  What was the first one?

18     **MR. YOUNGENTOB:**  Lowry v. Rhapsody.

19     **THE COURT:**  Okay.  And then In re Apple is where Judge

20   Davila discusses using the floor.

21     **THE COURT:**  Okay.  All right.

22     **MS. WADE:**  Your Honor, may I just respond to that

23   briefly.  The In re Apple case was a mega --

24     **THE COURT:**  I'll read the case.  You don't need to tell

25   me what the case is.

42

1    **MS. WADE:**  Okay.  All right.

2    **THE COURT:**  And I don't need them.

3    **MS. WADE:**  Yeah.

4    **THE COURT:**  Okay.  Thank you.

5    **MS. WADE:**  Thank you, Your Honor.

6    **COURTROOM DEPUTY:**  Court is adjourned.

7         (Proceedings adjourned at 3:00 p.m.)

8              ---oOo---

9         **<u>CERTIFICATE OF TRANSCRIBER</u>**

10   I, DIPTI PATEL, certify that the foregoing is a true and

11   correct transcript, to the best of my ability, of the above

12   pages of the official electronic sound recording provided to

13   me by the U.S. District Court for the Northern District of

14   California of the proceedings take on the date and time

15   previously stated in the above-entitled matter.

16   I further certify that I am neither counsel for, related

17   to, nor employed by any of the parties to the action in which

18   this hearing was taken.

19   I further certify that I am not financially nor otherwise

20   interested in the outcome of the action.

21   *Dipti Patel*

22   _____

23   DIPTI PATEL, CET-997

24   LIBERTY TRANSCRIPTS                    Date:  April 17, 2023

25

**WWW.LIBERTYTRANSCRIPTS.COM**