# EXHIBIT K



100 N. 18th Street, Suite 415
Philadelphia, PA 19103-2707
Tel:  (445) 201-8900
Fax: (445) 201-8901

www.btlaw.com

Chanda A. Miller
445-201-8920
chanda.miller@btlaw.com

January 18, 2023

The Honorable Abbe F. Fletman
Court of Common Pleas
 of Philadelphia County
Complex Litigation Center
City Hall, Room 622
Philadelphia, PA 19107

      RE:   *In Re: Roundup® Prods. Liab. Litig.*, May Term 2022, No. 550

Dear Judge Fletman:

    Defendants respectfully submit the attached proposed Case Management Orders 5 and 6 in follow up to the January 10, 2023 Case Management Conference and the parties' subsequent meet and confers.  Proposed CMO 5 addresses the provision of Plaintiff Fact Sheets ("PFS") and proposed CMO 6 addresses the case selection process for the first group of trials.  Defendants' revised case selection proposal incorporates the Court's comments from the CMC and discussions with Plaintiffs' liaison counsel, both during the CMC and in subsequent meet and confers.  In summary, defendants propose the following compromise plan:

- Trying the first-filed case (*Caranci*) first, and outside the case selection process (due to its unique, pre-program early discovery posture) **(as originally proposed by Plaintiffs' liaison counsel)**;

- Use of the MDL PFS in a limited, first-filed pool of approximately 50 cases (that includes cases from each Plaintiffs' firm) to identify representative cases;

- Remaining plaintiffs completing the MDL PFS within 120 days **(as originally proposed by Plaintiffs' liaison counsel)**;

- Party selection of 12 additional cases for fact discovery **(the number of workup cases as originally proposed by Plaintiffs' liaison counsel)**;

- Limited party strikes prior to trial selection to remove outliers; and

- Up to 6 single-plaintiff trials **(as originally proposed by Plaintiffs' liaison counsel)**.

    The Roundup® program was established last year to "secure the just, speedy and inexpensive determination of each Roundup case" filed in this Court.  Case Management Order 1, June 6, 2022.  The issue at this early stage of the program is identifying a case selection procedure that best promotes the program's goals.

    The most efficient way for the parties to evaluate the inventory and ultimately maximize judicial resources is to adopt a case selection process that allows the parties to assess the strengths

Atlanta   Boston   California   Chicago   Delaware   Indiana   Michigan   Minneapolis
New Jersey   New York   Ohio   Philadelphia   Raleigh   Salt Lake City   Texas   Washington, D.C.

The Honorable Abbe F. Fletman
January 18, 2023
Page 2

and weaknesses of a representative set of cases. The cases in this litigation can vary in multiple critical areas—for example, which formulation(s) of Roundup® a plaintiff used, how the plaintiff used the product (e.g., residential, commercial, agricultural), the plaintiff's exposure to the product, the plaintiff's underlying risk factors, the diagnosed (or undiagnosed) injury, prognosis, and treatment. Trying only first-filed cases, or even multi-plaintiff trials (which Plaintiffs' liaison counsel suggested after the second round of meet and confers) does not help either party or the Court assess the inventory. It ultimately will thwart the goals of maximizing judicial economy and efficiently resolving cases because it will necessitate additional trials to obtain a representative group. And notably, the fact that Roundup® trials have occurred in other jurisdictions does not alleviate the necessity of identifying and evaluating cases representative of the inventory here—nor does the fact that Defendants have prevailed in the last six cases tried.

**I.    Defendants' Proposal Best Achieves the Program's Goals.**

*The first-filed case is in a unique position and can be tried first. This allows trials to begin while the parties implement a process to identify and work up the first trial group.* The first-filed case, *Caranci v. Monsanto Company, et al.*, June Term 2021 No. 02213, is procedurally in the best position to proceed to trial first if trials are to begin in early 2024. Plaintiffs' liaison counsel advised during the CMC that they want to try *Caranci* first, and Defendants agree that would be appropriate in this unique circumstance because discovery in *Caranci* began before this program was formed. Defendants have a completed PFS, and more importantly, sufficient medical records, to begin depositions. Trying this case first ensures there will not be a delay in starting trials while the necessary steps are taken to evaluate cases and select representative cases for the first trial group. It also addresses concerns raised about delaying the trial in this case in particular.

*Defendants' proposal prioritizes the first-filed cases for trial, and each firm has the opportunity to be represented in the trial pool.* In order to identify the appropriate cases for the first trial group, Defendants propose that 62 cases form the "Initial Bellwether Pool." The cases for this pool will be identified in two ways. First, all of the 54 cases filed in 2021 (other than *Caranci*) are in the pool. Second, the two first-filed cases for firms that did not file cases until 2022 are also included in the pool. Four firms fall within this category, adding 8 cases to the pool. Formulating the Initial Bellwether Pool in this manner directly addresses multiple concerns raised by Plaintiffs' liaison counsel. Defendants' compromise plan now allows the parties to try earlier filed cases first, ensures each firm has a case in the Initial Bellwether Pool, and reduces the number of Plaintiffs who would provide Plaintiff Fact Sheets within the first six weeks. Including all 2021 filings and cases from each firm in the program also ensures Defendants can review and identify cases that are more representative of the entire inventory.

*All parties will have necessary preliminary information about cases in the Initial Bellwether Pool. With that information, all parties will have meaningful input into the cases selected for the first trials, which ensures fairness and a representative group.* As the Court noted during the CMC, the first trial group needs to include Defendants' input on which cases will be tried. Without input from all parties as to which cases are tried in the first group, the trials will not be instructive and any trial outcomes would be meaningless to assessing the whole. Defendants cannot give the necessary input into the initial pool without a sufficient understanding of the cases. Defendants' proposal efficiently facilitates receipt of preliminary information to begin the selection process because the 62 plaintiffs in the "Initial Bellwether Pool" will serve a PFS no later than February 28, 2023. After receipt and evaluation of the PFS, 12 total cases will be selected

**BARNES & THORNBURG** LLP

for the "Discovery Pool," 6 by Plaintiffs and 6 by Defendants. In addition, narrowing the number of Discovery Pool Cases from 45 cases to 12 cases addresses concerns raised during the CMC about the volume of cases subject to further fact discovery at this stage.

***To ensure outlier cases are not in the first group, each side will have the opportunity to remove cases from the Trial Pool prior to expert discovery and trial work-up.*** Defendants' proposal also includes the critical opportunity for both sides to remove outlier cases after the close of fact discovery. This will be accomplished by allowing Plaintiffs and Defendants to each strike up to 2 cases, so that a maximum of 8 cases proceed to expert discovery and trial. This process will ensure that only those cases representative of the pool—i.e., the cases that are most instructive in evaluating the full inventory—proceed to trial in the first group.

***Cases will be tried efficiently and at regular intervals beginning in the first quarter of 2024.*** Defendants' proposal allows trials for the 8 remaining cases to begin in early 2024 in 6-week intervals, beginning shortly after the *Caranci* trial. This will allow the cases to be properly worked up and tried before the end of 2024, which will maximize judicial economy and will not overburden the Court or the parties. Plaintiffs' liaison counsel advised they want to try the *Caranci* case first, which categorizes that trial as a "Plaintiffs' pick." Defendants therefore propose that they pick the next case, and the parties alternate in selecting cases for trial after that. Again, Defendants' compromise proposal provides the parties with 6-9 single-plaintiff trials (including some backup cases), just like Plaintiffs' liaison counsel's initial proposal.

In conclusion, a just and efficient determination of the inventory cannot be accomplished without a case selection process that allows all parties to understand the inventory *and* allows both Plaintiffs and Defendants to have educated input into the earliest trials. In establishing that critical framework, Defendants' proposal best promotes the goals of the program.

II.     **A FIFO (or Modified FIFO) Plan is Inefficient and Prejudicial.**

Starting trials in this litigation by trying the cases in a "first in first out" ("FIFO") order does not promote the just, speedy, and efficient determination of each case in the program. This is because it will not give an accurate assessment of the inventory, and will not allow the parties to evaluate the inventory. Rather, because Plaintiffs control the order in which their cases can be filed (either due to strategic selection, potential statute of limitation issues, or otherwise) and control which cases are dismissed and when, a FIFO plan is nothing more than a plan that allows Plaintiffs to try all of the cases they select first.

Indeed, the comments Plaintiffs' liaison counsel made in support of their modified FIFO plan confirm that is exactly what will happen here. In particular, they explained they are in the process of evaluating their earliest-filed cases with the intention of dismissing cases that would not survive dispositive motions—i.e., the cases that are weakest for Plaintiffs. That necessarily means a FIFO plan (even if modified to include all plaintiffs' firms) would try only those cases selected by Plaintiffs. Reverting to a plan where the first trials are non-representative or potential outlier cases thwarts the goals of the program because it necessarily adds to the number of trials that are necessary in order to have a representative valuation of the inventory.

Although FIFO or similar plans to try cases in groups by plaintiff's firm may ultimately have had value in some litigations, that generally has been when those litigations were mature—i.e., where multiple representative cases in the program have been tried, or where some plaintiffs'

The Honorable Abbe F. Fletman
January 18, 2023
Page 4

firms but not others had the opportunity to test their cases at trial. This litigation is not at that stage. For the reasons discussed above, Defendants' plan, rather than a FIFO plan controlled by Plaintiffs' filings and dismissals, is necessary to achieve the program's goals.

**III.    Multiple-Plaintiff Bellwether Trials Are Precluded by Local Regulation and Unworkable Even in Theory.**

After the CMC and after multiple meet and confers, Plaintiffs' liaison counsel proposed that the trials in this litigation should begin with multi-plaintiff trials.[1] This proposal is prohibited by this Court's regulations, and even if it were not, consolidation is neither supported by the requisite factual record nor a helpful tool for the parties to accurately evaluate the Roundup® inventory. Multi-plaintiff trials would therefore run counter to the program's goals.

For the last decade, Philadelphia General Court Regulation 2012-01 has precluded consolidation of mass tort cases absent agreement of all parties, with the exception of cases in the asbestos program that meet a protocol in that regulation. *See* Gen. Court Reg. 2012-01, Feb. 15, 2012 (Herron, J.). The regulation was reached after months of carefully considering input from the mass tort bar on both the plaintiff and defense side, along with the Court's own extensive experience with multi-plaintiff mass tort trials. In the 2012 regulation, the Court determined that mass tort cases are generally unsuitable for consolidated trials in this jurisdiction, with the exception of the significant benefits in judicial efficiency then to be gained by working through a staggering backlog of asbestos cases. *See id.* at 2 ("The Asbestos Program was by far the one Mass Tort Program most out of compliance with the [ABA ] standards.").

Even if the Court's protocols did not preclude consolidation, the Roundup® program's 164 individual cases filed in the last 18 months hardly presents the urgent backlog of thousands posed by the 2012 asbestos docket, or even other voluminous programs recently managed by this Court. Nor is the litigation expected to reach such levels to justify even a consideration of multi-plaintiff trials. Indeed, Plaintiffs' liaison counsel confirmed during the January CMC that at most, they anticipate filing dozens—not thousands—more cases in the program.[2]

Even in the limited circumstances (not applicable here) where consolidating cases for trial could be an appropriate option, Pennsylvania law requires that the matters "involve a common question of law or fact or [that they] arise from the same transaction or occurrence." *Rost v. Ford Motor Co.*, 151 A.3d 1032, 1054 (Pa. 2016) (quoting Pa. R. Civ. P. 213(a)); *accord* General Court Regulation No. 2013-01 at p. 3 (enumerating fact-intensive threshold criteria to consolidate asbestos cases). Cases in the same mass tort program do not automatically satisfy such an inquiry. *See, e.g.*, *Rost*, 151 A.3d at 1052 (finding error where the record failed to reflect the trial court's consideration or exercise of discretion in consolidation or severance of three asbestos cases). At a minimum, the undeveloped record in this mass tort program precludes the Court from evaluating such factors.

---

[1] Given the significance of this issue to Defendants' due process rights, among others, Defendants respectfully request that if the Court is inclined to consider Plaintiff's proposal in contravention of the prevailing rule, the parties be given an opportunity to fully brief the issue on the record.

[2] By comparison, the Circuit Court of St. Louis City in Missouri, in which a multi-plaintiff trial is scheduled this month, has more than 20,000 plaintiffs with pending cases.

**BARNES & THORNBURG** LLP

The Honorable Abbe F. Fletman
January 18, 2023
Page 5

Given the nature of this litigation, however, it is unlikely that consolidation for trial will ever be appropriate. Among the relevant factors, Roundup® is not a single product but was available in multiple different chemical formulas, concentrations and delivery mechanisms (e.g., ready-to-use, liquid concentrate, dry mix), for use in different settings, with different packaging, labels, and instructions. Although Defendants do not yet have information on the inventory of cases here, it is most probable that plaintiffs used distinct products in different ways, including personal (residential) use and professional use. Defendants also reasonably expect that plaintiffs used the products with differing frequency over varying time spans—during which the formulation of Roundup® changed. And that is all in addition to the individualized causation issues posed by plaintiffs' distinct medical risk factors, histories, diagnosed injuries, prognoses, and treatments, all of which make mass torts classically unsuited for consolidated trials.[3] The jury confusion and prejudice to Defendants that would necessarily flow from these critical differences also preclude consolidation.

For all of those reasons, other courts overseeing cases involving Roundup®-branded products have refused to consolidate cases or found joinder improper. *See, e.g.*, *Rubio v. Monsanto Co.*, 181 F. Supp. 3d 746, 758 (C.D. Cal. 2016) (severing the trials of two Roundup® plaintiffs, noting significant factual differences in the circumstances under which Roundup® was applied by Plaintiffs" as well as plaintiffs' medical histories). Although two courts came to the opposite conclusion with respect to two cases in this litigation, those decisions are outliers and do not compel the same conclusion here. The trial experience in these matters to date provides guidance on why these trials do not involve common issues of fact and should not be tried together.

The same factors listed above which render these Roundup® claims inappropriate for consolidation under the law also make them impossible to strategically evaluate when clustered in groups. Multi-plaintiff trials do not set realistic values or expectations, and would only lead to more and more trials while the parties try to determine the true value of the Pennsylvania inventory. In sum, while Defendants do not see value in multi-plaintiff trials in any litigation, this litigation and this stage of the litigation in particular is not appropriate for multi-plaintiff trials.

Respectfully submitted,

Chanda A. Miller

cc:   Joseph Blum, Defendants' Co-Liaison Counsel
      Rosemary Pinto, Plaintiffs' Co-Liaison Counsel
      Thomas Kline, Plaintiffs' Co-Liaison Counsel
      Tobi Millrood, Plaintiffs' Co-Liaison Counsel

---

[3] For example, there are over 60 subtypes of non-hodgkin's lymphoma and each subtype has its own body of epidemiology showing a lack of association with Roundup®. This would result in separate and distinct expert testimony on the medical causation and treatment for each plaintiff. Each plaintiff's method of applying Roundup® will also vary, and for some plaintiffs there will be substantial evidence introduced regarding whether they even used Roundup® or to what extent. For other plaintiffs, this will not be the case. This is not a mass tort involving a prescribed medication with use proven through medical records.

**BARNES & THORNBURG** LLP