# EXHIBIT A

**KLINE & SPECTER, P.C.**
By:    THOMAS R. KLINE, ESQUIRE
        TOBI L. MILLROOD, ESQUIRE
Attorney I.D. Nos.28895/77764
1525 Locust Street
Philadelphia, PA 19102
(215) 772-1000



*Filed and Attested by the*
*Office of Judicial Records*
*05 AUG 2022 01:56 pm*
*I. LOWELL*

**FELDMAN & PINTO**
By:    ROSEMARY PINTO, ESQUIRE
Attorney I.D. No. 53114
30 South 15th Street, 15th Floor
Philadelphia, PA 19102
(215) 546-2604

ATTORNEYS FOR PLAINTIFF

| | | |
|---|---|---|
| Plaintiffs | § | COURT OF COMMON PLEAS |
| | § | PHILADELPHIA COUNTY |
| | § | CIVIL DIVISION |
| | § | |
| v. | § | MAY TERM 2022 |
| | § | |
| MONSANTO COMPANY | § | NO:00550 |
| c/o Registered Agent | § | |
| CSC of St. Louis County, | § | |
| Inc. | § | JURY TRIAL DEMANDED |
| 221 Bolivar Street | § | |
| Jefferson City, MO 65101 | § | |
| and | § | |
| NOURYON SURFACE CHEMISTRY | § | |
| LLC | § | |
| 100 Matsonford Road, Bldg 5, Suite 550 | § | |
| Radnor, Pennsylvania 19087 | § | |
| and | § | |
| NOURYON CHEMICALS LLC | § | |
| 100 Matsonford Road, Bldg 5, Suite 550 | § | |
| Radnor, Pennsylvania 19087 | § | |
| and | § | |
| NOURYON USA LLC | | |
| 100 Matsonford Road, Bldg 5, Suite 550 | | |
| Radnor, Pennsylvania 19087, | | |
| Defendants. | | |

# NOTICE TO PLEAD

**NOTICE** You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you. YOU SHOULD TAKE THIS PA-PER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

**PHILADELPHIA COUNTY BAR AS- SOCIATION** LAWYER REFERRAL AND INFORMATION SER-VICE 1101 MARKET STREET, 11TH FLOOR PHILADELPHIA, PENNSYLVANIA 19107 TELEPHONE: (215) 238-1701

**AVISO** Le han demandado a usted en la corte. Si usted quiere de- fenderse de estas demandas expuestas en las páginas siguientes, us- ted tiene veinte (20) días de plazo al partir de la fecha de la demanda y la notificación. Hace falta asentar una comparecencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que, si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notifi- cación. Además, la corte puede decidir a favor del demandante y re-quiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos impor-tantes para usted. LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

**ASOCIACION DE LICENCIADOR DE PHILADEL- PHIA** VICIO DE REFERENCIA DE INFORMACION LEGAL 1101 MARKET STREET, 11TH FLOOR PHILADELPHIA, PENNSYLVANIA 19107 TELEFONO: (215) 238-1701

2

Case ID: 220500550

## COMPLAINT – CIVIL ACTION
### (2P-Product Liability)

Plaintiff brings this lawsuit against Defendants. Plaintiff(s) allege(s) as follows:

### PARTIES

#### Plaintiff

1.      Plaintiff is an adult citizen and resident of Pennsylvania.

#### Defendants

2.      Defendant, Monsanto Company (*Monsanto*), is a Delaware corporation with its principal place of business in Missouri. It is a wholly owned subsidiary of Bayer Cropscience, L.P. Its agent for service of process is Corporation Service Company at 2595 Interstate Drive, Suite 103, Harrisburg, Pennsylvania 17110.

3.      Defendant, Nouryon Surface Chemistry LLC, is a Delaware LLC. It has its principal place of business at 100 Matsonford Road, Building 5, Suite 550, Radnor, Pennsylvania. It does not have a Pennsylvania Agent for Service of Process. Its agent for service of process in Delaware is Corporation Service Company at 251 Little Falls Drive, Wilmington, Delaware, 91807.

4.      Defendant, Nouryon Chemicals LLC, is a Delaware LLC. It has its principal place of business at 100 Matsonford Road, Building 5, Suite 550, Radnor, Pennsylvania. Its agent for service of process in Pennsylvania is Corporation Service Company at 2595 Interstate Drive, Suite 103, Harrisburg, Pennsylvania, 17110.

5.      Defendant, Nouryon USA LLC, is a Delaware Limited Liability Company. It has its principal place of business at 100 Matsonford Road, Building 5, Suite 550, Radnor, Pennsylvania. It does not have a Pennsylvania Agent for Service of Process. Its agent for service

3

Case ID: 220500550

of process in Delaware is Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware, 91808.

6.        Defendants Nouryon Surface Chemistry LLC, Nouryon Chemicals LLC, and Nouryon USA LLC will be collectively referred to as *the Nouryon Defendants* or *the Surfactant Defendants*.

## JURISDICTION

7.        Plaintiff incorporates here the earlier paragraphs.

8.        This Court has original jurisdiction over this civil action.[1] By neither rule nor statute does another court have exclusive original jurisdiction over this matter.

9.        The damages Plaintiff seeks, exclusive of interests and costs, exceed the jurisdictional amount requiring arbitration referral. Plaintiff seeks more than $50,000 in damages.

10.        This Court has personal jurisdiction over the Defendants.

11.        This Court has specific jurisdiction over Defendant Monsanto because Monsanto marketed and sold, in Pennsylvania, Roundup that injured Plaintiff in Pennsylvania. Moreover, Defendant Monsanto targeted and sought to serve Pennsylvania. And Plaintiff, a Pennsylvania resident, purchased and used Roundup in Pennsylvania — where the Roundup injured Plaintiff. And so, there is an affiliation between Pennsylvania and Plaintiff's claims against Defendant Monsanto.

12.        This Court has personal jurisdiction over the Nouryon Defendants. The principles of personal jurisdiction set forth in *Daimler AG v. Bauman*[2] apply with equal force to limited-liability companies.[3] That is, a court may exercise jurisdiction over an LLC, through specific

---

[1] 42 Pa. C.S.A. § 931.
[2] 571 U.S. 117 (2014).
[3] *Griggs v. Swift Transp. Co.*, No. 2:17-cv-13480-MCA-SCM, 2018 U.S. Dist. LEXIS 139864 at *4 (D.N.J. Aug. 16, 2018).

Case ID: 220500550

jurisdiction, if the LLC's actions in the forum, or directed to the forum, give rise to the Plaintiff's injuries. And a court may exercise jurisdiction over an LLC, through general jurisdiction, if the LLC is formed in the forum or if it has its principal place of business in the forum.[4]

13.    The Nouryon Defendants all have their principal place of business in Pennsylvania. And so, Pennsylvania has general jurisdiction over the Nouryon Defendants.

14.    But this Court also has specific jurisdiction over the Nouryon Defendants. The Nouryon Defendants' surfactants were combined with glyphosate and put into Roundup. Plaintiff purchased and used this Roundup in Pennsylvania. And the Roundup injured the Plaintiff in Pennsylvania. Moreover, the Nouryon Defendants sought to serve the market of Pennsylvania, and their product injured the Plaintiff, a Pennsylvania resident, in Pennsylvania. And so, there is an affiliation between Pennsylvania and Plaintiff's claims against the Nouryon Defendants.

15.    A federal court would not have jurisdiction over this case, and so it is not removable. There is not complete diversity between the parties, and so there is no federal jurisdiction under 28 U.S.C. § 1332.

16.    For purposes of diversity jurisdiction, a limited liability company's citizenship is determined by the citizenship of all its members.[5]

17.    Defendant Nouryon Surface Chemistry's sole member is Nouryon Chemicals LLC. Defendant Nouryon Chemicals LLC's sole member is Nouryon USA LLC. Defendant Nouryon USA LLC has nine members: Nouryon US Holding 1 Inc., Nouryon US Holding 2 Inc., Nouryon US Holding 3 Inc., Nouryon US Holding 4 Inc., Nouryon US Holding 5 Inc., Nouryon US Holding

---

[4] *Daimle*r, 571 U.S. at 137.

[5] *Johnson v. Smithkline Beecham Corp.*, 724 F.3d 337, 348 (3d Cir. 2013); *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 418 (3d Cir. 2010); *Americold Realty Tr. v. ConAgra Foods, Inc*., 136 S. Ct. 1012, 1015 (2016).

Case ID: 220500550

6 Inc., Nouryon US Holding 7 Inc., Nouryon US Holding 8 Inc., and Nouryon Holding 9 Inc. The Nouryon Holding corporations are all citizens of Pennsylvania because they have their principal place of business in Pennsylvania. And so, because the Nouryon Holding corporations are citizens of Pennsylvania, Defendant Nouryon USA LLC is a citizen of Pennsylvania. Because Defendant Nouryon USA LLC is a citizen of Pennsylvania, Defendant Nouryon Chemicals LLC is a citizen of Pennsylvania. Because Defendant Nouryon Chemicals LLC is a citizen of Pennsylvania, Defendant Nouryon Surface Chemistry LLC is a citizen of Pennsylvania. All the Nouryon Defendants are, therefore, citizens of Pennsylvania.

18.     Plaintiff is also a citizen of Pennsylvania. That is, Plaintiff lives in and is domiciled in Pennsylvania. Plaintiff has his true, fixed, and permanent home in Pennsylvania, and intends to return to Pennsylvania whenever they are absent from Pennsylvania.

19.     Because the Plaintiff and the Nouryon Defendants are all citizens of Pennsylvania there is not complete diversity between the parties, and federal jurisdiction does not exist under 28 U.S.C § 1332.

20.     Because there is no federal diversity jurisdiction under 28 U.S.C. § 1332, the Defendants cannot avail themselves of snap removal — alleging that they removed the case to federal court before a defendant was properly joined or served. Plaintiff is not relying on § 1446(b)(2) to oust federal jurisdiction. Federal jurisdiction never existed, and, by its terms, § 1441(b)(2) does not apply because there is no diversity jurisdiction under § 1332.

21.     A federal court would also not have jurisdiction under 28 U.S.C. § 1331. Plaintiff affirmatively disclaims any damages or actions arising under the constitution, treaties, or laws of the United States. Federal law in no way forms an essential or potential ingredient of Plaintiff's

Case ID: 220500550

claims, and federal law does not create any of Plaintiff's causes of action. Moreover, Plaintiff's right to relief does not depend on resolution of a substantial question of federal law.

22.     Further, Plaintiff raises no claim of admiralty or maritime law, so there is no federal jurisdiction under 28 U.S.C. § 1333.

23.     Plaintiff sues no foreign state or agency, so there is no federal jurisdiction under 28 U.S.C. § 1330. Nor is there federal jurisdiction under 28 U.S.C. § 1346 because the United States is not a defendant. Plaintiff further disclaims any claim arising from an act or omission on a federal enclave, or any claim that Plaintiff John Doe was exposed to Monsanto's glyphosate-containing products on a federal enclave. Plaintiff is also disclaiming any claim that any U.S. Federal Government Officer, Agency, or Department, injured Plaintiff while acting under the color of federal law.

24.     Because a federal court does not have original jurisdiction over this matter, it is not removable under § 1441.

## Venue & Joinder

25.     Venue is proper in Philadelphia County under Pennsylvania Rule of Civil Procedure 2179(a)(2) because this is a personal action against Defendant Monsanto, and Monsanto regularly conducts business in Philadelphia County.

26.     Defendant Monsanto's contacts with Philadelphia have been directly related to, and furthered its corporate objective of selling chemical products, such as Roundup. And it has had these contacts with Philadelphia County in a sufficiently continuous manner so that these contacts can be said to be habitual. And so Defendant Monsanto's contacts with Philadelphia County have been of a quality and of a quantity such that it regularly conducts business in Philadelphia County.

Case ID: 220500550

27.     The core of Defendant Monsanto's business has been selling chemical products, such as Roundup. From its sale of Roundup, it has branched out into selling seeds that Defendant Monsanto genetically modified so that plants grown from those seeds will not be killed when sprayed with Roundup. These genetically modified seeds not only create a market for the seeds themselves but increase sales of Roundup. As discussed later in this Complaint, Defendant Monsanto calls these seeds "Roundup Ready."

28.     Defendant Monsanto has been continuously selling Roundup in Philadelphia County for years. For example, according to Defendant Monsanto's internal documents, in 2011, Monsanto sold $194,455.26 of Roundup in Philadelphia County. In 2012, Monsanto sold $145,147.60 of Roundup in Philadelphia County. In 2013, Monsanto sold $139,439.20 of Roundup in Philadelphia County. In 2014, Monsanto sold $122,950.68 of Roundup in Philadelphia County. In 2015, Monsanto sold $138,889.10 of Roundup in Philadelphia County. In 2016, Monsanto sold $113,809.15 of Roundup in Philadelphia County. Defendant Monsanto made these sales in Philadelphia County through fourteen different retailers that sold its Roundup products. This is just an example of Defendant Monsanto's regular and habitual sale of Roundup into Philadelphia County. Defendant Monsanto has continuously sold Roundup into Philadelphia County for much longer than this mere sample, as discovery will show.

29.     Defendant Monsanto also entered into joint marketing agreements with FMC Corporation to help market Roundup Ready seeds. FMC Corporation was based in Philadelphia County when Defendant Monsanto entered into these agreements with it. Defendant Monsanto entered into these agreements with FMC in 2010 and again in 2015. This joint marketing venture with FMC continued until 2018.

Case ID: 220500550

30. Defendant Monsanto also regularly conducted such additional business in Philadelphia County as discovery will reveal.

31. The Defendants are properly joined because Plaintiff asserts claims against them that arise out of the same transaction, occurrence, or series of transactions or occurrences and common questions of law or fact affect the liabilities of all the Defendants.

## FACTUAL BACKGROUND

32. Plaintiff is a resident of the Commonwealth of Pennsylvania.

33. Plaintiff developed a non-Hodgkin's Lymphoma ("NHL") after being exposed to Roundup, a chemical product designed, manufactured, and distributed by Defendant Monsanto. Plaintiff had substantial exposure to Roundup through use of Defendant Monsanto's Roundup products.

34. After using Defendant Monsanto's Roundup, Plaintiff was diagnosed with a non-Hodgkin's lymphoma ("NHL"). Roundup substantially contributed to and caused Plaintiff's cancer.

35. Plaintiff's NHL is a latent injury. Accordingly, Plaintiff was not aware, and could not reasonably have been expected to be aware of the cause of their NHL. Plaintiff lacked the salient facts behind the cause of his NHL, and he couldn't have been aware of the salient facts through reasonable diligence until less than two years before the filings of Plaintiff's causes of action.

36. Following Plaintiff's diagnosis, Plaintiff suffered numerous effects attendant to NHL, including chemotherapy, blood transfusions and radiation, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup and Defendants' wrongful

9

Case ID: 220500550

conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup.

**Roundup**

37.   In 1970, Defendant Monsanto discovered the herbicidal properties of glyphosate and began marketing it in 1974 under the brand name Roundup. Roundup is a non-selective herbicide used to kill weeds. In addition to the active ingredient glyphosate, Roundup contains the surfactant Polyethoxylated tallow amine (*POEA*) and adjuvants and other so-called "inert" ingredients.

38.   *Roundup* refers to all formulations of Defendant's Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to- Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to- Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

Case ID: 220500550

39.     Glyphosate is the most used herbicide in the world. Since 1974, 3.5 billion pounds of glyphosate has been sprayed in America alone, and another 15.4 billion pounds have been spread worldwide.

40.     Given its widespread usage, glyphosate has contaminated the food chain and is a ubiquitous contaminant of the air, water, and soil where it is used. Glyphosate has been found in the urine of urban dwellers who are not in direct contact with the chemical.

41.     Defendant Monsanto is the world's leading producer of glyphosate. Its glyphosate products are registered in 130 countries and approved for use on over 100 different crops.

42.     On March 20, 2015, the International Agency for Research on Cancer (*IARC*), an agency of the World Health Organization (*WHO*), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

43.     IARC classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are NHL and other hematopoietic cancers, including, but not limited to, lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

44.     Defendant Monsanto, since it began selling Roundup, has represented it as safe to humans and the environment. Indeed, Defendant Monsanto has repeatedly proclaimed, and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup, create no unreasonable risks to human health or to the environment.

11

Case ID: 220500550

45.    Defendant Monsanto participated in a prolonged campaign of misinformation to convince government agencies, farmers, customers, and the general population that its Roundup and other glyphosate-containing products are safe.

46.    On June 21, 2022, Bayer, who acquired Monsanto, and in turn, Roundup, in 2018, issued a press release, stating "the company is transitioning its glyphosate-based products in the U.S. residential Lawn & Garden market to new formulations that have alternative active ingredients beginning in 2023."[6] However, Bayer also added that, "[t]he company is taking this action exclusively to manage litigation risk in the U.S. and not because of any safety concerns…Bayer continues to stand fully behind its Roundup products which are a valuable tool in efficient agricultural production around the world." *Id*.

47.    A report on Glyphosate in urine was published by the Centers for Disease Control and Prevention (CDC) in June of 2022, which used data from a National Health and Nutrition Examination Survey from 2013 to 2014 that involved 2,310 people meant to represent a cross section of the American population.[7] One-third of those involved in the survey were children ranging in age from 6 to 18. This report found detectable levels of Glyphosate in the urine of 81% of the individuals involved in the survey (1,885 out of 2,310). *Id*.

### The Importance of Roundup to Defendant Monsanto's Market Dominance and Profits

48.    The success of Roundup was key to Defendant Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup sales, Defendant Monsanto's agriculture division was outperforming its chemicals division's operating income,

---

[6] *Five Point Plan to Close the Roundup Litigation*, https://www.bayer.com/en/roundup-litigation-five-point-plan#statement (last visited July 12, 2022).
[7] *National Health and Nutrition Examination Survey, Glyphosate*, https://wwwn.cdc.gov/Nchs/Nhanes/2013-2014/SSGLYP_H.htm (last visited July 12, 2022).

Case ID: 220500550

and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Defendant Monsanto needed a strategy to maintain its Roundup market dominance and to ward off impending competition.

49.    In response, Defendant Monsanto began the development and sale of genetically engineered Roundup Ready® (*Roundup Ready*) seeds in 1996. Since Roundup Ready crops are resistant to glyphosate, farmers can spray Roundup onto their fields during the growing season without harming the crop. This allowed Defendant Monsanto to expand its market for Roundup even further; by 2000, Defendant Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready seeds. It also secured Defendant Monsanto's dominant share of the glyphosate/Roundup market through a marketing strategy that coupled proprietary Roundup Ready seeds with continued sales of its Roundup herbicide.

50.    Through a three-pronged strategy of increased production, decreased prices, and coupling Roundup Ready seeds with Roundup, Roundup became Defendant Monsanto's most profitable product. In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Defendant Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

### Scientific Fraud Underlying the
### Testing of Glyphosate/Roundup

51.    Defendant Monsanto hired Industrial Bio-Test Laboratories (*IBT*) to perform and evaluate pesticide toxicology studies relating to glyphosate.

52.    In 1976, the United States Food and Drug Administration (*FDA*) performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT and found the

13

Case ID: 220500550

toxicology studies to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies."

53.     Top IBT executives were convicted of fraudulent laboratory practices in 1983, included among those convicted was a Monsanto employee named Paul Wright.

54.     In 1991, Defendant Monsanto hired Craven Laboratories to perform studies on its pesticides and herbicides, including Roundup. That same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in their testing of pesticides and herbicides.

55.     Defendant Monsanto has ghostwritten or published multiple studies through companies such as Intertek and Exponent, Inc. These studies minimize any safety concerns about the use of glyphosate. Such studies include, but are not limited to, Williams (2000); Williams (2012); Kier & Kirkland (2013); Kier (2015); Bus (2016); Chang (2016); and the Intertek Expert Panel Manuscripts. Defendant Monsanto has also ghost-written editorials to advocate for the safety of glyphosate in newspapers and magazines. Defendant Monsanto failed to disclose the significant role it had in these studies, manuscripts, and editorials.

56.     In 2011, the Federal Institute for Risk Assessment (*BfR*) in Germany initiated a study on the safety of glyphosate. Defendant Monsanto co-opted this study, became the sole provider of data for the study, and ultimately wrote the report which was rubber-stamped by the BfR.

57.     In March 2015, The Joint Glyphosate Task Force at Monsanto's behest is- sued a press release sharply criticizing IARC, stating that IARC's conclusion was "baffling" and falsely claiming that "IARC did not consider any new or unique research findings when making its

14

Case ID: 220500550

decision. It appears that only by deciding to exclude certain available scientific information and by adopting a different approach to interpreting the studies was this possible."

### Defendant Monsanto's Misrepresentations Regarding the Safety of Roundup

58.     Defendant Monsanto has knowingly falsely advertised the safety of Roundup for decades.

59.     For example, in 1996, the New York Attorney General (*NYAG*) filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of glyphosate and/or Roundup are the following:

(a) Remember that environmentally friendly Roundup herbicide is  biodegradable.  It won't build up in the soil so you can use Roundup with confidence along customers' driveways,  sidewalks and fences ...

(b) And remember that Roundup is biodegradable  and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

(c) Roundup biodegrades into naturally occurring elements.

(d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

(e) This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

15

Case ID: 220500550

(f) You can apply Accord with 'confidence because it will stay where you put it' it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

(g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

(h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

(i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

(j) Roundup can be used where kids and pets will play and breaks down into natural material. [This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.]

60.     On November 19, 1996, Defendant Monsanto entered into an Assurance of Discontinuance with NYAG, in which it agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

(a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

(b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are bio- degradable;

(c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

16

Case ID: 220500550

(d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics";

(e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

(f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

61.    On information and belief, Defendant Monsanto has not altered its advertising in the same manner in any other state.

62.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®.  The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[8]

### IARC Classification of Glyphosate

63.    The IARC process for the classification of glyphosate followed IARC's stringent procedures for the evaluation of a chemical agent. Over time, the IARC Mono- graph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

64.    The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

---

[8] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

Case ID: 220500550

65.     One year before a Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month before the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

66.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

67.     In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

68.     On July 29, 2015, IARC issued Monograph 112 for glyphosate. For Volume 112, a Working Group of 17 experts from 11 countries assessed the carcinogenicity of certain herbicides, including glyphosate. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

18

Case ID: 220500550

69.     The studies considered the following exposure groups: occupational exposure of farmers and tree-nursery workers in the United States, forestry workers in Canada and Finland, municipal weed-control workers in the United Kingdom; and para-occupational exposures in farming families.

70.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

71.     Exposure pathways were identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, groundwater, and food.

72.     The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

73.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (*AMPA*). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

74.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

Case ID: 220500550

75.    The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in vitro.

76.    In addition to DNA damage and oxidative stress, studies have suggested that Roundup's association with various serious health conditions is linked to its effect on the digestive system. Specifically, scientists believe the same mechanism that makes Roundup toxic to weeds also makes it toxic to the microbes within the human gut and mucous membranes. When humans are exposed to Roundup, it leads to a chronic inflammatory state in the gut, as well an impaired gut barrier, which can lead to many long-term health effects, including an increased risk of cancer. Defendant Monsanto has deliberately refused to conduct tests on this aspect of Roundup's mechanism of action.

77.    Many Roundup products bear a label which either reads: "glyphosate targets an enzyme found in plants but not in people or pets" or "this Roundup formula tar- gets an enzyme in plants but not in people or pets." These statements are false; it has been established that the human body is host to microorganisms that have the enzyme Defendant Monsanto asserts is not found in humans. Thus, glyphosate targets microbes within the human body that have the enzyme, leading to a variety of adverse health effects.

78.    The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. The results of the study support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (*HCL*), and Chronic Lymphocytic Leukemia (*CLL*), in addition to several other cancers.

Case ID: 220500550

**Other Findings about Glyphosate's Dangers to Human Health**

79.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate.

80.     Per the EPA's technical fact sheet, glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills.

81.     The EPA's fact sheet further states that occupational workers and home gardeners may be exposed to glyphosate by inhalation; dermal contact during spraying, mixing, and cleanup; or touching soil and plants to which glyphosate was applied. Occupational exposures may also occur during glyphosate's manufacture, transport storage, and disposal.

82.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly reported cause of pesticide illness among agricultural workers.

**The EPA's Review of Glyphosate**

83.     In April 2016, personnel within the EPA's Office of Pesticides Program (*OPP*) leaked and posted on the Internet a draft report on glyphosate carcinogenicity, entitled Cancer Assessment Review Committee (*CARC*) report, dated October 2015. The EPA removed the

Case ID: 220500550

document by May 2, 2016, within days of initially posting it online. An EPA spokesperson

subsequently issued a statement on the agency's glyphosate review:

> Glyphosate documents were inadvertently posted to the Agency's docket. These
> documents have now been taken down because our assessment is not final. EPA has
> not completed our cancer review. We will look at the work of other governments
> as well as work by HHS's Agricultural Health Study as we move to make a decision
> on glyphosate. Our assessment will be peer reviewed and completed by end of 2016.

84.     On September 12, 2016, EPA's OPP submitted a report on the carcinogenic

potential of glyphosate, wherein it issued a "proposed conclusion" that glyphosate is "not likely to

be carcinogenic to humans at doses relevant to human health risk assessment." There are no authors

listed on this issue paper, which reiterates and adopts the conclusions of the October 2015 leaked

assessment. The issue paper is based upon a review of industry-sponsored articles and studies. The

OPP acknowledged that it rejected all studies that considered Roundup — the formulated product

— instead of studies that isolated glyphosate because "[g]lyphosate formulations contain various

components other than glyphosate and it has been hypothesized these components are more toxic

than glyphosate alone."

85.     Thus, the OPP notes that dozens of studies considered by IARC were not reviewed

by the OPP because the OPP's "evaluation focused on studies on the active ingredient glyphosate"

and "additional research could also be performed to determine whether formulation components,

such as surfactants, influence the toxicity of glyphosate formulations."

86.     From December 13 to 16, 2016, the EPA held FIFRA Scientific Advisory Panel

(*SAP*) meetings to consider issues raised by the OPP's evaluation of glyphosate. Again, OPP

allowed the SAP to consider only studies of glyphosate alone, and not any study of the formulated

product. In its Charge to the FIFRA SAP, the OPP noted that "[a]lthough there are studies available

on glyphosate-based pesticide formulations, the agency is soliciting advice from the FIFRA

Case ID: 220500550

Scientific Advisory Panel (*SAP*) on this evaluation of human carcinogenic potential for the active ingredient glyphosate only at this time."

87.     The OPP draft assessment therefore does not actually consider the product at issue in this litigation or, more importantly, how glyphosate, in conjunction with surfactants and other chemicals, affects carcinogenicity.

88.     On March 16, 2017, the final SAP meeting minutes and report were released, revealing disagreement and lack of consensus among the scientists on whether there was a positive association between glyphosate exposure and NHL.

89.     The EPA is required to periodically review the registrations of pesticides every 15 years. For pesticides registered before 2007, such as glyphosate, the EPA must complete the registration review by October 1, 2022.[9]

90.     In January 2020, the EPA issued an Interim Registration Review Decision for glyphosate ("Interim Decision"). In summarizing the human-health risk assessment of glyphosate to human-health, the Interim Decision explained that the agency "determined that there are no risks to human health from the current registered uses of glyphosate and that glyphosate is not likely to be carcinogenic to humans."

91.     June 17, 2022, the United States Court of Appeals for the Ninth Circuit, in NRDC v. U.S. EPA[10] vacated the EPA's findings in the Interim Decision, concluding that the EPA's errors in assessing the human-health risk of glyphosate were "serious" and that the analysis underpinning the EPA's "not likely" descriptor were "flawed in various other ways." *Id*.

---

[9] 7 US Code §136a(g)(1)(A).
[10] *National Resources Defense Counsel v. US Environmental Protection Agency*, No. 20-70787 (9th Cir. 2022)

Case ID: 220500550

**Defendant Monsanto's Governmental Ties**

92.     Recently unsealed documents in the federal Roundup MDL litigation reveal the extent to which Defendant Monsanto has been able to leverage its contacts within the EPA to protect glyphosate and Roundup from scrutiny and review.

93.     Internal Monsanto documents, including e-mail communications, demonstrate that Jess Rowland, former Deputy Division Director, Health Effects Division of the EPA's OPP, and formerly the chair of the CARC (the same committee that inadvertently leaked the EPA's glyphosate report in April 2016), repeatedly and directly intervened on Monsanto's behalf. These same documents reveal that Defendant Monsanto was secure in the knowledge that it had allies within the EPA.

94.     To begin, in the months following IARC's initial March 2015 announcement that it had classified glyphosate as a probable carcinogen, Defendant Monsanto turned its attention to the EPA's review of glyphosate. In one April 27, 2015 e-mail, Monsanto official Bill Heydens wrote to colleagues to suggest "approaching EPA and…. ask if there is anything that would help them defend the situation?" His colleague Dan Jenkins responded: "I think you and I could get on the phone w Jess Rowland and discuss this pretty openly. He'll give us straight talk."

95.     The following day, Mr. Jenkins spoke to Mr. Rowland by telephone and then relayed the substance of the conversation for his colleagues in an April 28, 2015 e-mail. Specifically, he reported back that with respect to the CARC investigation, Mr. Rowland had stated: "We have enough to sustain our conclusions. Don't need gene tox or epi I am the chair of the CARC and my folks are running this process for glyphosate in reg review. I have called a CARC meeting in June." Thus, even though the ostensible purpose of the CARC review was to evaluate the exhaustive IARC assessment on glyphosate, and even though the full IARC

24

Case ID: 220500550

monograph on glyphosate would not be completed until July 2015, Mr. Rowland had already formed his conclusion months earlier — in April 2015.

96.    Mr. Rowland also intervened to halt another agency's review of glyphosate. When the Agency for Toxic Substances and Disease Registry (*ATSDR*), a federal public-health agency of the U.S. Department of Health and Human Services, announced in February 2015 that it planned to publish a toxicological review of glyphosate, it was Mr. Rowland who helped Defendant Monsanto stop the ATSDR's investigation. In the same April 28, 2015, e-mail discussed above, Mr. Jenkins explained that Mr. Rowland wanted to help Monsanto stop an investigation concerning the carcinogenicity of glyphosate being conducted by ATSDR. Since ATSDR is not controlled by the EPA, according to Mr. Jenkins, Mr. Rowland had bragged: "If I can kill this I should get a medal." Jenkins cautioned, however, that Monsanto should not "get your hopes up, I doubt EPA and Jess can kill this; but it's good to know they are going to actually make the effort now to coordinate due to our pressing and their shared concern that ATSDR is consistent in its conclusions with the EPA." The ATSDR never published its toxicological profile of glyphosate.

97.    Further, the released documents reveal Defendant Monsanto's confidence that its allies within the EPA would continue to support glyphosate. In an internal memo on glyphosate, Monsanto executives wrote: "We know, but cannot say, that EPA's Office of Pesticide Program scientists strongly feel that glyphosate does not cause cancer and have defended their written determination internally for months." Notably, when Mr. Rowland attended the IARC glyphosate meetings as an observer for the EPA, internal communications indicate Monsanto was not displeased with his attendance since, "we all know Jess."

Case ID: 220500550

**Recent Worldwide Bans on Roundup/Glyphosate**

98.     Countries around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of exposures to Roundup become more widely known.

99.     Countries that have outright banned, imposed restrictions, or issued statements of intent to ban or restrict glyphosate include: Argentina, Australia, Austria, Belgium, Bermuda, Brazil, Canada, Colombia, Czech Republic, Denmark, El Salvador, France, Germany, Greece, India, Italy, Luxembourg, Malta, Netherlands, New Zealand, Portugal, Scotland, Slovenia, Spain, Sri Lanka, Sweden, Switzerland, United Kingdom, and Vietnam.

**EFSA Report on Glyphosate**

100.     On November 12, 2015, the European Food Safety Authority (*EFSA*), the European Union's primary agency for food safety, reported on its evaluation of the Renewal Assessment Report (*RAR*) on glyphosate. The Rapporteur Member State assigned to glyphosate, the German Federal Institute for Risk Assessment (*BfR*), had produced the RAR as part of the renewal process for glyphosate in the EU.

101.     BfR sent its draft RAR to EFSA, and the RAR underwent a peer-review process by EFSA, other member states, and industry groups. As part of the on-going peer review of Germany's reevaluation of glyphosate, EFSA had also received a second man- date from the European Commission to consider IARC's findings regarding the potential carcinogenicity of glyphosate and glyphosate-containing products.

102.     Based on a review of the RAR, which included data from industry-submit- ted unpublished studies, EFSA sent its own report (*Conclusion*) to the European Com- mission,

Case ID: 220500550

finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential according to Regulation (EC) No 1272/2008." EFSA therefore disagreed with IARC: glyphosate allegedly was not genotoxic and did not present a carcinogenic threat to humans.

103.    In explaining why its results departed from IARC's conclusion, EFSA drew a distinction between the EU and IARC approaches to the study and classification of chemicals. Although IARC examined "both glyphosate — an active substance — and glyphosate-based formulations, grouping all formulations regardless of their composition," EFSA explained that it considered only glyphosate and that its assessment focuses on "each individual chemical, and each marketed mixture separately." IARC, on the other hand, "assesses generic agents, including groups of related chemicals, as well as occupational or environmental exposure, and cultural or behavioral practices." EFSA accorded greater weight to studies conducted with glyphosate alone than studies of formulated products.

104.    EFSA went further and noted:

> [A]lthough some studies suggest that certain glyphosate-based formulations may be genotoxic (i.e. damaging to DNA), others that look solely at the active substance glyphosate do not show this effect. It is likely, therefore, that *the genotoxic effects observed in some glyphosate-based formulations are related to the other constituents or "co-formulants"*. Similarly, certain glyphosate-based formulations display higher toxicity than that of the active ingredient, presumably because of the presence of co-formulants. In its assessment, *EFSA proposes that the toxicity of each pesticide formulation and in particular its genotoxic potential should be further considered and ad- dressed by Member State authorities while they re-assess uses of glyphosate-based formulations in their own territories*.

105.    Notwithstanding its conclusion, EFSA did set exposure levels for glyphosate. Specifically, EFSA proposed an acceptable daily intake (*ADI*) of 0.5 mg/kg of body weight per

Case ID: 220500550

day; an acute reference dose (*ARfD*) of 0.5 mg/kg of body weight; and an acceptable operator

exposure level (*AOEL*) of 0.1 mg/kg bw per day.

**Leading Scientists Dispute EFSA's Conclusion**

106.     On November 27, 2015, 96 independent academic and governmental scientists

from around the world submitted an open letter to the EU health commissioner, Vytenis

Andriukaitis. The scientists expressed their strong concerns and urged the commissioner to

disregard the "flawed" EFSA report, arguing that "the BfR decision is not credible because it is

not supported by the evidence and it was not reached in an open and transparent manner."

107.     Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and other

renowned international experts in the field, some of whom were part of the IARC Working Group

assigned to glyphosate.

108.     In an exhaustive and careful examination, the scientists scrutinized EFSA's

conclusions and outlined why the IARC Working Group decision was "by far the more credible":

> The IARC WG decision was reached relying on open and transparent procedures
> by independent scientists who completed thorough conflict-of-interest statements
> and were not affiliated or financially supported in any way by the chemical
> manufacturing industry. It is fully referenced and de- pends entirely on reports
> published in the open, peer-reviewed biomedical literature. It is part of a long
> tradition of deeply researched and highly credible reports on the carcinogenicity
> of hundreds of chemicals issued over the past four decades by IARC and used
> today by international agencies and regulatory bodies around the world as a basis
> for risk assessment, regulation and public health policy.

109.     With respect to human data, the scientists pointed out that EFSA agreed with IARC

that there was "limited evidence of carcinogenicity" for NHL, but EFSA nonetheless dismissed an

association between glyphosate exposure and carcinogenicity. IARC applies three levels of

evidence in its analyses of human data, including sufficient evidence and limited evidence. EFSA's

ultimate conclusion that "there was no unequivocal evidence for a clear and strong association of

Case ID: 220500550

NHL with glyphosate" was misleading because it was tantamount to IARC's highest level of evidence: "sufficient evidence," which means that a causal relationship has been established. However, the scientists argued, "[l]egitimate public health concerns arise when 'causality is credible,' i.e., when there is limited evidence."

110.     Among its many other deficiencies, EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its trend analysis. Indeed, BfR's analysis directly contradicted the Organization for Economic Co-operation and Development (*OECD*) testing guidelines while citing and purporting to follow those same guidelines. For instance, the EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from controls and because the maximum observed response is reportedly within the range of the historical control data." However, according to the scientists, concurrent controls are recommended over historical controls in all guidelines, scientific reports, and publications, and, if it is employed, historical control data "should be from studies in the same timeframe, for the same exact animal strain, preferably from the same laboratory or the same supplier and preferably reviewed by the same pathologist." BfR's use of historical control data violated these precautions: "only a single study used the same mouse strain as the historical controls, but was reported more than 10 years after the historical control dataset was developed." Further deviating from sound scientific practices, the data used by the BfR came from studies in seven different laboratories. The scientists concluded:

> BfR reported seven positive mouse studies with three studies showing increases in renal tumors, two with positive findings for hemangiosarcomas, and two with positive findings for malignant lymphomas. BfR additionally reported two positive findings for tumors in rats. Eliminating the inappropriate use of historical data, the unequivocal conclusion is that these are not negative studies, but in fact document the carcinogenicity of glyphosate in laboratory animals.

Case ID: 220500550

111.     The letter also criticized the EFSA report's lack of transparency and the opacity surrounding the data cited in the report: "citations for almost all of the references, even those from the open scientific literature, have been redacted from the document" and "there are no authors or contributors listed for either document, a requirement for publication in virtually all scientific journals." Because BfR relied on unpublished, confidential industry-provided studies, it is "impossible for any scientist not associated with BfR to review this conclusion with scientific confidence."

112.     On March 3, 2016, the letter was published in the Journal of Epidemiology & Community Health.

**Toxicity of Other Ingredients in Roundup**

113.     In addition to the toxicity of the active ingredient, glyphosate, several studies show that the glyphosate-based formulation in Defendant Monsanto's Roundup products is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.

114.     Roundup consists of from 40 to 60 percent glyphosate. Another ten to fifteen percent is surfactant. The surfactant used in Roundup is polyethoxylated tallow amine — or POEA.

115.     Surfactants, like POEA, allow glyphosate to penetrate into the leaf of a plant, so it can kill the plant. Part of the way POEA does this is that it allows Roundup to lie flat on the leaf so that the oily, waxy leaf surface can absorb the Roundup and the glyphosate.

116.     In the same way that POEA allows Roundup to spread out on the leaf of a plant, it allows Roundup and glyphosate to spread out on human skin. This causes the skin to absorb more of the Roundup and glyphosate.

Case ID: 220500550

117.     But the POEA doesn't just spread Roundup on the skin. POEA increases the amount of time the Roundup and the glyphosate remains on the skin.

118.     POEA is a skin irritant. The body's response to a skin irritant is to dilate the capillary bed and increase blood flow. This increases absorption of Roundup, POEA, and glyphosate.

119.     Studies have shown that POEA increases the dermal absorption of Roundup — as compared to pure glyphosate — by ten percent, which is a statistically significant higher rate of dermal absorption.

120.     The Roundup, glyphosate, and POEA, once they penetrate into the skin, then collect in a reservoir in the epidermis — this reservoir is not immediately absorbed, and, because it is below the skin, it cannot be washed off. Studies have shown this reservoir lasts for as long as seven days.

121.     Because bone is a preferential point of distribution for glyphosate, glyphosate migrates from this reservoir to the bone.

122.     Lymphoma is a cancer that starts in the bones. Lymphatic stem cells are in the bone, the site of the start of the malignancy for NHL.

123.     POEA is banned in Europe. That is, as Defendant Monsanto has admitted in pervious written discovery "the European Commission recommended that member states ban a co-formulant called POEA-Tallowamine from glyphosate-based products."

124.     William Sawyer, Ph.D., an expert toxicologist, has testified that POEA is forty times more toxic than glyphosate alone.

125.     Because of the synergistic effect of combing glyphosate with POEA, Roundup is about 50 times more toxic than glyphosate alone.

Case ID: 220500550

126.     There are surfactants less toxic than POEA, such as contact-lens solution, which is a harmless, nonionic surfactant. Defendant Monsanto has chosen not to use these surfactants in Roundup.

127.     But POEA is not the only other dangerous ingredient in Roundup.

128.     Formaldehyde, a confirmed human carcinogen, is in Roundup.

129.     Ethylene oxide, an extremely powerful sterilization gas that is mutagenic and a human carcinogen, is in Roundup. Ethylene Oxide accumulates in the head space of a Roundup container. People are exposed to higher levels of it when they open a container of Roundup that has been sitting around for a while.

130.     1, 4-dioxane is another contaminant found in Roundup.  IARC has classified 1, 4-dioxane as a possible human carcinogen.

131.     Studies have shown the poisonous effects of having so many toxic substances in Roundup.

132.     In 2002, a study by Julie Marc, entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that Roundup causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.

133.     A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell-cycle dysregulation. The researchers noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle

Case ID: 220500550

disorders such as cancer result from dysfunction of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."

134.     In 2005, a study by Francisco Peixoto, entitled "Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup's effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Peixoto study further suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup formulation.

135.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells. The study tested dilution levels of Roundup and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food. The re- searchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human-cell permeability and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants present in Roundup are not, in fact, inert and that Roundup is potentially far more toxic than its active ingredient glyphosate alone.

136.     The results of these studies were at all times available to Defendants.

137.     Defendant Monsanto's chief toxicologist Donna Farmer has admitted that she cannot say that Roundup does not cause cancer because Monsanto has not performed carcinogenicity studies with the formulated product Roundup, the very product that caused, or

Case ID: 220500550

substantially contributed to cause, Plaintiff John Doe's NHL. Indeed, she admitted that in the 35 years that Defendant Monsanto has marketed Roundup to the public, Monsanto has conducted no chronic carcinogenicity studies on the formulated Roundup product merely because the EPA did not require that such a study be performed for registration of glyphosate.

138.     Defendants thus knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies of Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup.

139.     Despite knowing that Roundup is considerably more dangerous than glyphosate alone, Defendants deceptively continued to promote Roundup as safe.

**Statement of Concern Regarding Glyphosate-Based Herbicides**

140.     On February 17, 2016, a consensus statement published in the journal Environmental Health, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement," assessed the safety of glyphosate-based herbicides (*GBHs*). The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs." The researchers drew seven factual conclusions about GBHs:

1.  GBHs are the most heavily applied herbicide in the world and usage continues to rise;
2.  Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;
3.  The half-life of glyphosate in water and soil is longer than previously recognized;
4.  Glyphosate and its metabolites are widely present in the global soybean supply;
5.  Human exposures to GBHs are rising;
6.  Glyphosate is now authoritatively classified as a probable human carcinogen; and
7.  Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.

Case ID: 220500550

141.     The researchers noted that GBH use has increased approximately 100-fold since the 1970s. Further, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."

142.     The paper attributes uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."

143.     Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."

144.     The researchers also critique the current practice of regulators who largely rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the

Case ID: 220500550

researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."

145.     The researchers also call for greater inclusion of GBHs in government-led toxicology-testing programs:

> [A]fresh and independent examination of GBH toxicity should be under- taken, and . . . this re-examination be accompanied by systematic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicological assessment of the multiple path- ways now identified as potentially vulnerable to GBHs.

146.     The researchers suggest that to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

> [W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking at reproductive capability and frequency of birth defects.

147.     Despite these stated concerns, Defendant Monsanto, to date, has failed to test its formulated Roundup products.

Case ID: 220500550

**The Surfactant Defendants**

148.    According to scientific studies performed on Monsanto's Roundup, the product contains about 15% surfactant as part of its formulation.[11] The type of surfactant used in Roundup was a tallow-based surfactant known as POEA (polyethoxylated tallow amine). POEA refers to a range of non-ionic surfactants that are derived from the rendering and processing of animal fats (tallow).

149.    The specific Nouryon/Akzo Nobel PEOA surfactant, which was purchased by Monsanto for use in Roundup, was referred to by the product number C-6330.

150.    In 2018, for more than ten billion Euros, the Carlyle Group, Inc. purchased Akzo Nobel Specialty Chemicals, a division of Akzo Nobel Inc. It then spun this purchase off to create the Nouryon Defendants. Today, the Nouryon Defendants make the toxic surfactants Defendant Monsanto uses to make Roundup.

151.    The Nouryon Defendants and their predecessors' entities — Akzo Nobel Incorporated, Akzo Nobel Surface Chemistry LLC, and Akzo Nobel Chemicals LLC — developed, researched, manufactured, and marketed surfactants, including POEA. On information and belief, the Nouryon Entities are liable for the acts and omissions of their predecessor entities.

152.    The Nouryon Defendants sold POEA and surfactants to Defendant Monsanto, and Monsanto used these surfactants in Roundup.

153.    The Nouryon Defendants conspired to ensure that the public would not know how toxic POEA and Roundup were.

154.    On March 20, 2013, Daniel Wright of Monsanto e-mailed David Pope, an employee or agent for the Nouryon Defendants' predecessor entities. Ethylene oxide is an ingredient in a

---

[11] https://pubmed.ncbi.nlm.nih.gov/15862083/

37

Case ID: 220500550

surfactant that the Nouryon Defendants sold to Monsanto. Mr. Wright wanted the Nouryon Defendants to take this toxic chemical off the list of ingredients for this surfactant because, if it remained on the list of ingredients, Defendant Monsanto would have to put a cancer-warning label on Roundup it sold in California.

155.     Mr. Wright said to Mr. Pope, the Akzo Nobel agent, "Monsanto uses the C-6330 surfactant in a number of our lawn and garden products. . . . [t]he surfactant contains <0.001% ethylene oxide. We have received communication from our ESH staff that this will cause an issue for us in California by requiring us to show a Prop. 65 warning on our product labels if we continue to use this surfactant."

156.     In California, Proposition 65 requires businesses to provide warnings to Californians about significant exposures to chemicals that cause cancer. These warnings come in the form of warning labels that say that the product "is known to the State of California to cause cancer." Such labels can be referred to as Prop. 65 warnings.

157.     Mr. Wright, in his e-mail to Mr. Pope went on, asking is "there some way [*sic.*] that [ethylene oxide] can be removed from the [safety data sheet for the surfactant]?. . . If Akzo Nobel cnnot [*sic.*] simply remove the ethylene oxide amount from the SDS, would it be possible to steam strip the product?"

158.     David Pope, of Akzo Nobel, wrote back, "Good news. Our regulatory group has decided that we are able to remove the [ethylene oxide] amount from our [Material Safety Data Sheet.]"

159.     Mr. Wright replied, "Thanks for the update. We will remove the Prop65 statement from the two [lawn and garden] formulations that are pending."

Case ID: 220500550

160.     The POEA and other toxic surfactants manufactured, marketed, researched, developed and sold by the Nouryon Defendants were used by Defendant Monsanto to make Roundup.

161.     On its website, Defendant Nouryon brags that Nouryon "operate[s] the world's largest fatty amines facility, located in Morris, Illinois. Amines are key to making surfactants used in industries such as agriculture."

162.     In another internet brochure, Defendant Nouryon states that "Nouryon has a heritage of successful adjuvant products that are trusted by experienced formulators worldwide due to reliable performance and high quality. As a major supplier of adjuvants to the glyphosate industry, we have a range of Adsee$^{TM}$ products to fit your special need."

163.     Defendant Nouryon's toxic surfactants have been combined with Defendant Monsanto's Roundup.

164.     At all relevant times, the Nouryon Defendants had actual or constructive knowledge that their surfactants were toxic.

165.     When the Nouryon Defendants sold their surfactants to Defendant Monsanto, they had actual or constructive knowledge that their surfactants would be combined with glyphosate and included in Roundup. They had actual or constructive knowledge of the toxic synergistic effects of combining their toxic surfactants with glyphosate and including them in Roundup.

166.     Plaintiff used Roundup that included the Nouryon Defendants' surfactants. These surfactants were a substantial cause of Plaintiff's injuries.

## DISCOVERY RULE

167.     Plaintiff reserves the right to plead and invoke the discovery rule. Plaintiff's NHL is a latent injury. Accordingly, under such circumstances, Plaintiff could not reasonably have been

39

Case ID: 220500550

expected to be aware of the cause of their NHL. Plaintiff lacked the salient facts behind the cause of his NHL, and Plaintiff couldn't have been aware of the salient facts through reasonable diligence until less than two years before the filings of Plaintiff's causes of action. Plaintiff also specifically invokes the Federally Required Commencement Date, pursuant to 42 U.S.C. § 9658.

## CLAIMS

### COUNT ONE

### STRICT LIABILITY — DESIGN DEFECT (ALL DEFENDANTS)

167.     Plaintiff incorporates here each allegation set forth above.

168.     At all relevant times, Defendants were engaged in the business of manufacturing, formulating, creating, designing, testing, labeling, packaging, supplying, marketing, promoting, selling, advertising, and otherwise introducing Roundup and the surfactants that went into Roundup.

169.     Plaintiff used Roundup.

170.     Defendants marketed and advertised Roundup and glyphosate-containing products, for use by consumers, including Plaintiff.

171.     The Nouryon Defendants marketed and advertised surfactants to glyphosate manufactures like Defendant Monsanto, but also for end use by consumers, including Plaintiff.

172.     At all relevant times, Roundup reached their intended consumers, users and/or other persons coming into contact with them, including Plaintiff, without substantial change in the condition in which the Defendants designed, produced, manufactured, sold, distributed, labeled, and marketed them.

Case ID: 220500550

173.     At all relevant times, the Defendants' surfactants reached the intended consumers, which included Plaintiffs. Although the surfactants were combined with glyphosate and included in Roundup by Defendant Monsanto, this was the intended result of the Nouryon Defendants when they designed and sold the surfactants to Monsanto. Indeed, these surfactants were designed to be included with glyphosate in products such as Roundup. As such, because the Roundup reached the consumers without substantial change, the surfactants reached the intended consumers, users, and/or other persons without substantial change from the condition in which the surfactants were designed by the Nouryon Defendants to be used by end consumers.

174.     Defendants had a duty to create Roundup and the surfactant that went into Roundup in a way that was not unreasonably dangerous for their normal, intended, or anticipated use.

175.     Defendants' Roundup and glyphosate-containing products were formulated, designed, and manufactured with carcinogens.

176.     The Defendants' surfactants were defective — especially when combined with glyphosate and the other ingredients in Roundup — because their carcinogenic properties made them unreasonably dangerous in that they were dangerous to an extent beyond that which an ordinary consumer, such as the Plaintiffs, would contemplate.

177.     Further the magnitude of the danger associated with use of the surfactants and Roundup, either alone or combined, outweighs the utility of these products.

178.     The dangers of Roundup were unknown to the ordinary consumer and were unacceptable to the ordinary consumer. Plaintiff did not know of these dangers. And if he would have known, these dangers would have been unacceptable to him.

179.     Further a reasonable person would conclude that the probability and seriousness of harm caused by Roundup outweighed the burden or costs of taking precautions.

Case ID: 220500550

180.     Defendants knew, or should have known, of the unreasonable risks of harm associated with the use of and/or exposure to Roundup and glyphosate-containing products, namely their unreasonably dangerous and carcinogenic properties and their propensity to cause cancer, when the products left Defendants' control.

181.     Defendants' Roundup and glyphosate-containing products were defective because their carcinogenic properties made them unreasonably dangerous in that they were dangerous to an extent beyond that which an ordinary consumer, such as the Plaintiff, would contemplate. Further the magnitude of the danger associated with use of Roundup and other cancer-causing chemicals that Defendant Monsanto is financially responsible for outweighs the utility of the products.

182.     At the time of Plaintiff's exposure, Roundup and/or glyphosate-containing products were being used in a normal, intended, or anticipated manner, as a broad- spectrum herbicide and other applications known to Defendants.

183.     Plaintiff was exposed to Defendant Monsanto's Roundup and/or glyphosate-containing products without knowledge of their dangerous characteristics, specifically the carcinogenic risks associated with exposures to those products.

184.     The foreseeable risks associated with exposures to Defendant Monsanto's Roundup and glyphosate-containing products exceeded the alleged benefits associated with their design and formulation.

185.     Defects in Defendants' Roundup and/or glyphosate-containing products were a producing cause, proximate cause, and substantial factor in the development of Plaintiff's cancer.

186.     Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and omissions:

Case ID: 220500550

(a) Economic losses, including medical care and lost earnings; and

(b) Noneconomic losses, including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment of life, impairment of quality of life, past and future.

WHEREFORE, Plaintiff respectfully demands judgment in their favor and against Defendants, in an amount in excess of the applicable arbitration limits, including interest, costs of suit, delay damages, compensatory damages, punitive damages, and such other relief as this Honorable Court may deem appropriate.

## COUNT TWO

## STRICT LIABILITY — FAILURE TO WARN (ALL DEFENDANTS)

187.     Plaintiff incorporates each allegation set forth above.

188.     At all relevant times, Defendants engaged in the business of manufacturing, formulating, creating, designing, testing, labeling, packaging, supplying, marketing, promoting, selling, advertising, and otherwise introducing Roundup and the surfactants Roundup contains.

189.     Defendants marketed and advertised its Roundup and glyphosate-containing products for use by consumers, including Plaintiff.

190.     The Surfactant Defendants marketed and advertised their surfactants to be combined with glyphosate and used by end consumers, including Plaintiff.

191.     Defendants had a duty to warn of the risks associated with the use of its Roundup.

192.     The Surfactant Defendants had a duty to warn of the risks associated with the use of their surfactants, especially when combined with glyphosate and included in Defendant Monsanto's Roundup and glyphosate-containing products.

Case ID: 220500550

193.     Defendants knew, or should have known, of the unreasonable risks of harm associated with the use of and/or exposure to Roundup and glyphosate-containing products, namely their unreasonably dangerous and carcinogenic properties and their propensity to cause cancer. The Surfactant Defendants knew, or should have known, of the unreasonable risks of harm associated with the use of and/or exposure to their surfactants, especially when combined with Roundup and glyphosate-containing products.

194.     Defendants failed to exercise reasonable care to warn of the dangerous carcinogenic risks associated with use of and exposures to its Roundup and the surfactants Roundup contains.

195.     The minimal warnings disseminated with Roundup and glyphosate-containing products were inadequate and failed to communicate the carcinogenic dangers attendant to exposures to and use of the products. The Surfactant Defendants knew Defendant Monsanto's warnings were not sufficient.

196.     As a result of Defendants' inadequate warnings, Defendants' Roundup and surfactants were defective and unreasonably dangerous when they left Defendant Monsanto's possession, control, or both.

197.     Due to the absence of any warning or instruction by Defendants regarding the significant health-and-safety risks posed by Roundup and/or glyphosate-containing products, Plaintiffs were unaware that Defendants' Roundup was unreasonably dangerous and had carcinogenic properties, since such information was not known to the general public.

198.     Plaintiff reasonably relied on the skill, superior knowledge, and judgment of Defendants.

Case ID: 220500550

199.     Had Defendants properly disclosed the risks associated with exposures to Roundup, Plaintiff could have avoided the risk of developing cancer from exposures to Roundup by choosing not to use Roundup.

200.     Instead, Defendants disseminated information that was inaccurate, false, and misleading and that failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup; continued to promote the efficacy of Roundup, even after they knew or should have known of the unreasonable risks from exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup.

201.     Defendants' failure to warn regarding the dangers associated with exposures to Roundup and/or glyphosate-containing products was a producing cause, proximate cause, and substantial factor in the development of Plaintiff's cancer.

202.     Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and omissions:

(a)  Economic losses, including medical care and lost earnings; and

(b)  Noneconomic losses, including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment of life, impairment of quality of life, past and future.

WHEREFORE, Plaintiff respectfully demands judgment in their favor and against Defendants, in an amount in excess of the applicable arbitration limits, including interest, costs of suit, delay damages, compensatory damages, punitive damages, and such other relief as this Honorable Court may deem appropriate.

Case ID: 220500550

## COUNT THREE

## NEGLIGENCE (ALL DEFENDANTS)

203.     Plaintiff incorporates here the earlier paragraphs.

204.     At all relevant times, Defendants were engaged in the business of manufacturing, formulating, creating, designing, testing, labeling, packaging, supplying, marketing, promoting, selling, advertising, and otherwise introducing Roundup and the surfactants Roundup contains.

205.     Plaintiff used Roundup.

206.     Defendants had a duty to exercise reasonable care in the research, design, manufacture, packaging, marketing, advertisement, supply, promotion, sale, and distribution of Roundup and surfactants, including a duty to assure that the products would not cause users to suffer unreasonable, dangerous side effects, including developing cancer.

207.     Defendants had a duty to provide true and accurate information and warnings concerning the risks of using Roundup.

208.     Defendants failed to exercise ordinary care in that they knew, or should have known, of the unreasonable risks of harm associated with the use of and/or exposure to Roundup, namely Roundup's unreasonably dangerous and carcinogenic properties and Roundup's propensity to cause cancer, when the products left Monsanto's control.

209.     Defendants also knew, or in the exercise of reasonable care, should have known that consumers and users of Roundup were unaware of the carcinogenic risks associated with exposures to the products.

210.     Defendants' negligence includes, but is not limited to the following acts and/or omissions:

Case ID: 220500550

a.  Failing to sufficiently test Roundup and glyphosate-containing products to determine whether they were safe for their intended use;

b.  Failing to sufficiently test Roundup and glyphosate-containing products to determine their carcinogenic properties after learning that their formulations could be carcinogenic;

c.  Marketing, advertising, and recommending the use of Roundup and glyphosate-containing products without sufficient knowledge as to their dangerous propensities;

d.  Representing that Roundup and glyphosate-containing products were safe for their intended use when they were not;

e.  Comparing the safety risks and dangers of Roundup and glyphosate-containing products with common everyday foods such as table salt, and other forms of herbicides;

f.  Failing to disclose the risk of serious harm associated with use of and exposures to Roundup and glyphosate-containing products;

g.  Failing to provide adequate instructions, guidelines, and safety precautions to protect the health of those persons whom Defendants could reasonably foresee would use and/or be exposed to Roundup and/or surfactants;

h.  Failing to use reasonable and prudent care in the design, development, and manufacture of Roundup and glyphosate-containing products, so as to avoid the risk of serious harm associated with use of and/or exposures to Roundup;

i.  Failing to sufficiently test the "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic or to increase the toxicity of Roundup;

Case ID: 220500550

j.   Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of exposures to Roundup and glyphosate-containing products;

k.   Failing to sufficiently test the surfactants they made and that were included in Roundup, to determine whether they were safe for their intended use, either alone or when included in Roundup;

l.   Failing to sufficiently test their surfactants, either alone or when included in Roundup, to determine the carcinogenic properties of the surfactants or Roundup, after learning that the surfactants could be carcinogenic, either alone or when included in Roundup;

m.   Marketing, advertising, and recommending surfactants be included in Roundup and glyphosate-containing products without sufficient knowledge as to their dangerous propensities, either alone or when included in Roundup;

n.   Representing that the surfactants they manufactured were safe for their intended use when they were not;

o.   Failing to disclose — or ensure Monsanto disclosed — the risk of serious harm associated with use of and exposures to surfactants, either alone or when included in Roundup;

p.   Working with Monsanto to ensure that customers were not warned about the dangerous qualities of their surfactants, either alone or when included in Roundup;

q.   Continuing to disseminate information to Defendants' consumers and the general public that indicates or implies that Roundup and glyphosate-containing products are not unsafe for use; and

Case ID: 220500550

r.  Continuing to manufacture and sell Roundup, with the knowledge that Roundup was unreasonably safe and dangerous.

211.    It was reasonably foreseeable that consumers, including Plaintiff, would suffer injury and possibly die as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup and surfactants.

212.    Defendants under-reported, underestimated, and downplayed the serious dangers of its Roundup.

213.    Defendants' ongoing negligent decisions to market and distribute Roundup and glyphosate-containing products were a producing cause, proximate cause, and substantial factor in the development of Plaintiff's cancer.

214.    Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and omissions:

(a) Economic losses, including medical care and lost earnings; and

(b) Noneconomic losses, including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment of life, impairment of quality of life, past and future.

WHEREFORE, Plaintiff respectfully demands judgment in their favor and against Defendants, in an amount in excess of the applicable arbitration limits, including interest, costs of suit, delay damages, compensatory damages, punitive damages, and such other relief as this Honorable Court may deem appropriate.

## COUNT FOUR

## NEGLIGENT DESIGN (ALL DEFENDANTS)

215.    Plaintiff incorporates here the earlier paragraphs.

Case ID: 220500550

216.     At all relevant times, Defendants were engaged in the business of researching, creating, testing, designing and otherwise introducing Roundup and the surfactants Roundup contains.

217.     Plaintiff used Roundup.

218.     Defendants had a duty to exercise reasonable care in the research, testing, design, and creation of Roundup and surfactants, including a duty to assure that the products would not cause users to suffer unreasonable, dangerous side effects, including developing cancer.

219.     Defendants failed to exercise ordinary care in that they knew, or should have known, of the unreasonable risks of harm associated with the use of and/or exposure to Roundup, namely Roundup's unreasonably dangerous and carcinogenic properties and Roundup's propensity to cause cancer, when the products left Monsanto's control.

220.     Defendants also knew, or in the exercise of reasonable care, should have known that consumers and users of Roundup were unaware of the carcinogenic risks associated with exposures to the products.

221.     Defendants' negligence includes, but is not limited to the following acts and/or omissions:

       a.  Failing to sufficiently test Roundup and glyphosate-containing products to determine whether they were safe for their intended use;

       b.  Failing to sufficiently test Roundup and glyphosate-containing products to determine their carcinogenic properties after learning that their formulations could be carcinogenic;

Case ID: 220500550

c.  Failing to use reasonable and prudent care in the design, creation, development, and manufacture of Roundup and glyphosate-containing products, so as to avoid the risk of serious harm associated with use of and/or exposures to Roundup;

d.  Failing to sufficiently test the "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic or to increase the toxicity of Roundup;

e.  Failing to sufficiently test the surfactants they made and that were included in Roundup, to determine whether they were safe for their intended use, either alone or when included in Roundup;

f.  Failing to sufficiently test their surfactants, either alone or when included in Roundup, to determine the carcinogenic properties of the surfactants or Roundup, after learning that the surfactants could be carcinogenic, either alone or when included in Roundup;

g.  Representing that the surfactants they manufactured were safe for their intended use when they were not; and

h.  Continuing to manufacture and sell Roundup, with the knowledge that Roundup was unreasonably safe and dangerous.

222.    It was reasonably foreseeable that consumers, including Plaintiff, would suffer injury and possibly die as a result of Defendants' failure to exercise ordinary care in the design, creation, development, and testing of Roundup and surfactants.

223.    Defendants' ongoing negligent decisions on how the design, marketing, and distribution of Roundup and glyphosate-containing products were a producing cause, proximate cause, and substantial factor in the development of Plaintiff's cancer.

Case ID: 220500550

224.     Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and omissions:

    a.  Economic losses, including medical care and lost earnings; and

    b.  Noneconomic losses, including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment of life, impairment of quality of life, past and future.

WHEREFORE, Plaintiff respectfully demands judgment in their favor and against Defendants, in an amount in excess of the applicable arbitration limits, including interest, costs of suit, delay damages, compensatory damages, punitive damages, and such other relief as this Honorable Court may deem appropriate.

## COUNT FIVE

## NEGLIGENT MARKETING (ALL DEFENDANTS)

225.     Plaintiff incorporates here the earlier paragraphs.

226.     At all relevant times, Defendants were engaged in the business of labeling, packaging, marketing, promoting, selling, advertising, and otherwise introducing Roundup and the surfactants Roundup contains.

227.     Plaintiff used Roundup.

228.     Defendants had a duty to exercise reasonable care in the packaging, marketing, advertisement, supply, promotion, sale, and distribution of Roundup and surfactants, including a duty to assure that the products would not cause users to suffer unreasonable, dangerous side effects, including developing cancer.

229.     Defendants had a duty to provide true and accurate information and warnings concerning the risks of using Roundup.

Case ID: 220500550

230.     Defendants failed to exercise ordinary care in that they knew, or should have known, of the unreasonable risks of harm associated with the use of and/or exposure to Roundup, namely Roundup's unreasonably dangerous and carcinogenic properties and Roundup's propensity to cause cancer, when the products left Monsanto's control.

231.     Defendants also knew, or in the exercise of reasonable care, should have known that consumers and users of Roundup were unaware of the carcinogenic risks associated with exposures to the products.

232.     Defendants' negligence includes, but is not limited to the following acts and/or omissions:

    a.  Marketing, advertising, and recommending the use of Roundup and glyphosate-containing products without sufficient knowledge as to their dangerous propensities;

    b.  Representing that Roundup and glyphosate-containing products were safe for their intended use when they were not;

    c.  Comparing the safety risks and dangers of Roundup and glyphosate-containing products with common everyday foods such as table salt, and other forms of herbicides;

    d.  Failing to disclose the risk of serious harm associated with use of and exposures to Roundup and glyphosate-containing products;

    e.  Failing to provide adequate instructions, guidelines, and safety precautions to protect the health of those persons whom Defendants could reasonably foresee would use and/or be exposed to Roundup and/or surfactants;

Case ID: 220500550

f.  Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of exposures to Roundup and glyphosate-containing products;

g.  Marketing, advertising, and recommending surfactants be included in Roundup and glyphosate-containing products without sufficient knowledge as to their dangerous propensities, either alone or when included in Roundup;

h.  Representing that the surfactants they manufactured were safe for their intended use when they were not;

i.  Failing to disclose — or ensure Monsanto disclosed — the risk of serious harm associated with use of and exposures to surfactants, either alone or when included in Roundup;

j.  Working with Monsanto to ensure that customers were not warned about the dangerous qualities of their surfactants, either alone or when included in Roundup;

k.  Continuing to disseminate information to Defendants' consumers and the general public that indicates or implies that Roundup and glyphosate-containing products are not unsafe for use; and

l.  Continuing to manufacture and sell Roundup, with the knowledge that Roundup was unreasonably safe and dangerous.

233.    It was reasonably foreseeable that consumers, including Plaintiff, would suffer injury and possibly die as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup and surfactants.

Case ID: 220500550

234.     Defendants under-reported, underestimated, and downplayed the serious dangers of its Roundup.

235.     Defendants' ongoing negligent decisions to market and distribute Roundup and glyphosate-containing products were a producing cause, proximate cause, and substantial factor in the development of Plaintiff's cancer.

236.     Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and omissions:

   a.  Economic losses, including medical care and lost earnings; and

   b.  Noneconomic losses, including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment of life, impairment of quality of life, past and future.

   WHEREFORE, Plaintiff respectfully demands judgment in their favor and against Defendants, in an amount in excess of the applicable arbitration limits, including interest, costs of suit, delay damages, compensatory damages, punitive damages, and such other relief as this Honorable Court may deem appropriate.

## COUNT SIX

## BREACH OF IMPLIED WARRANTIES (DEFENDANT MONSANTO)

237.     Plaintiff incorporates here the earlier paragraphs.

238.     At all relevant times, Defendant Monsanto was engaged in the business of manufacturing, formulating, creating, designing, testing, labeling, packaging, supplying, marketing, promoting, selling, advertising, and otherwise introducing its Roundup and glyphosate-containing products into the stream of commerce that Plaintiff used.

Case ID: 220500550

239.     At the time Defendant Monsanto marketed, sold, and distributed its Roundup and glyphosate-containing products for use by Plaintiffs, Monsanto knew of their intended use and implicitly warranted that the products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

240.     Before the time that Plaintiff was exposed to the use of Defendant Monsanto's Roundup and glyphosate-containing products, Monsanto impliedly warranted to consumers and those exposed, including Plaintiff, that its Roundup and glyphosate-containing products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

241.     Defendant Monsanto, however, failed to disclose that its Roundup and glyphosate-containing products have dangerous propensities when used as intended and that the use of and/or exposure to its Roundup and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's cancer.

242.     Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendant Monsanto and upon its implied warranties that its Roundup and glyphosate-containing products were of merchantable quality and fit for his intended purpose or use.

243.     Defendant Monsanto's Roundup and glyphosate-containing products were expected to reach, and did in fact reach, consumers and/or users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Monsanto.

244.     At all relevant times to this litigation, Defendant Monsanto was aware that consumers and users of its Roundup and glyphosate-containing products, including Plaintiff, would use the products as marketed by Monsanto, which is to say that Plaintiff was a foreseeable user of Roundup.

Case ID: 220500550

245.     Defendant Monsanto intended that its Roundup and glyphosate-containing products be used in the manner in which Plaintiff was exposed, and Defendant Monsanto implicitly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup was not adequately tested and/or researched.

246.     In reliance on Defendant Monsanto's implied warranty, Plaintiff used or was exposed to Monsanto's Roundup and glyphosate-containing products as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by Defendant Monsanto.

247.      Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate-containing products.

248.     Defendant Monsanto breached its implied warranty to Plaintiffs in that its Roundup and glyphosate-containing products were not of merchantable quality, safe, or fit for their intended use, an/or adequately tested. Defendant Monsanto's Roundup and glyphosate-containing products have dangerous propensities when used as intended and anticipated and can cause serious injuries, including those Plaintiff complains of.

249.     The harm caused by Defendant Monsanto's Roundup and glyphosate-containing products far outweighed their benefits, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

250.     As a direct and proximate result of Defendant Monsanto's wrongful acts and omissions Plaintiff has suffered severe and permanent physical and emotional injuries, including, but not limited to, Plaintiff's diagnosis of NHL. Plaintiff has endured pain and suffering, suffered economic loss (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

Case ID: 220500550

251.     Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and omissions:

   a.   Economic losses, including medical care and lost earnings; and

   b.   Noneconomic losses, including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment of life, impairment of quality of life, past and future.

WHEREFORE, Plaintiff respectfully demands judgment in their favor and against Defendants, in an amount in excess of the applicable arbitration limits, including interest, costs of suit, delay damages, compensatory damages, punitive damages, and such other relief as this Honorable Court may deem appropriate.

## DAMAGES

252.     Plaintiff incorporates here each allegation set forth above.

253.     As a direct and proximate result of Defendants and their conduct described above, Plaintiffs sustained damages, including past and future medical expenses, past and future pain and suffering, past and future mental anguish and disfigurement, past and future earnings loss, costs of purchasing Roundup products, and all other applicable dam- ages.

254.     As a result of Defendants' gross negligence, complete indifference to or conscious disregard for the safety of others, and malice and oppression, Plaintiff seeks punitive damages to punish Defendants and to deter Defendants and others in similar situations from like conduct.

Case ID: 220500550

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks judgment in Plaintiff's favor as follows:

255.       Plaintiff prays for judgment against all Defendants, joint and severally, on each of the claims and causes of action in this Complaint, and as follows:

(a) Awarding compensatory damages in excess of $50,000, including, but not limited to, pain, suffering, emotional distress, loss of enjoyment of life, and other noneconomic damages in an amount to be determined at trial of this action;

(b) Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings, and other economic damages in an amount to be determined at trial  of this action;

(c) Punitive, or exemplary, damages for the wanton, willful, fraudulent, reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and Plaintiff. Plaintiff asks for an amount sufficient to punish Defendants and deter future similar conduct;

(d) Post-judgment interest;

(e) Reasonable attorney's fees;

(f) Costs; and,

(g) Such other and further relief as this Court deems just and proper.

Case ID: 220500550

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for any and all issues.

Respectfully submitted,

**KLINE & SPECTER, P.C.**


By:      */s/ Thomas R. Kline*
THOMAS R. KLINE, ESQUIRE
TOBI L. MILLROOD, ESQUIRE

**FELDMAN & PINTO**

*/s/ Rosemary Pinto*
ROSEMARY PINTO, ESQUIRE


*Attorneys for Plaintiff*

Dated: 08/5/2022

Case ID: 220500550