# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

PATRICIA BERGSTRESSER, as Personal
Representative of the ESTATE OF ALLEN
R. SEEDORFF, deceased,

    Plaintiff,

v.

MONSANTO COMPANY,

    Defendant.

MDL No. 2741

Case No.

**COMPLAINT AND JURY DEMAND**

---

Adam J. Brody (P62035)
Brion B. Doyle (P67870)
VARNUM LLP
Attorneys for Plaintiff
Bridgewater Place, P.O. Box 352
Grand Rapids, MI 49501-0352
(616) 336-6000
ajbrody@varnumlaw.com
bbdoyle@varnumlaw.com

---

Plaintiff, Patricia Bergstresser, as Personal Representative of the Estate of Allen R. Seedorff, deceased, by and through her undersigned counsel, brings this Complaint for damages against Defendant, Monsanto Company ("Defendant" and "Monsanto"), and alleges the following:

## NATURE OF THE CASE

1.    This is an action for damages suffered by Allen Seedorff, deceased, as a direct and proximate result of Defendant's negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising,

1

distribution, labeling, and/or sale of the herbicide Roundup® (hereinafter, "Roundup"), containing the active ingredient glyphosate.

2.     Plaintiff maintains that Roundup and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use.

3.     Mr. Seedorff's injuries, like those striking thousands of similarly-situated victims across the country, were avoidable.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over Defendant and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendant. Defendant is either incorporated and/or has its principal place of business outside of the state in which the Plaintiff resides.

5.     The amount in controversy between Plaintiff and Defendant exceeds $75,000, exclusive of interest and cost.

6.     The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

7.     Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that Defendant conducts business here and is subject to personal jurisdiction in this district. Furthermore, Defendant sells, markets, and/or distributes Roundup within the Western District of Michigan. Also, a substantial part of the acts and/or omissions giving rise to these claims occurred within this district.

## PARTIES

8.     Allen R. Seedorff was a natural person and at all relevant times was a resident and citizen of Calhoun County, Michigan.  Plaintiff, as personal representative of the Estate of Allen

R. Seedorff, brings this action for personal injuries and wrongful death due to Mr. Seedorff's exposure to Roundup, which contains the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA"). As a direct and proximate result of being exposed to Roundup, Mr. Seedorff developed Nodular lymphocyte predominant Hodgkin lymphoma ("NLPHL") and T-cell non-Hodgkin Lymphoma ("non-Hodgkin Lymphoma").

9.    "Roundup" refers to all formulations of Defendant's Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak Herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k Herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer l Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation containing the active ingredient glyphosate.

10.    Defendant, Monsanto Company, by virtue of its merger with Bayer, is a German company with its principal place of business in Leverkusen, Germany.

11.     Defendant advertises and sells goods, specifically Roundup, in Calhoun County in Michigan.

12.     Defendant transacted and conducted business within the State of Michigan that relates to the allegations in this Complaint.

13.     Defendant derived substantial revenue from goods and products used in the State of Michigan.

14.     Defendant expected or should have expected its acts to have consequences within the State of Michigan, and derived substantial revenue from interstate commerce.

15.     Defendant engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup.

16.     Defendant is authorized to do business in Michigan and derives substantial income from doing business in this state.

17.     Upon information and belief, Defendant did design, sell, advertise, manufacture, and/or distribute Roundup, with full knowledge of its dangerous and defective nature.

## FACTUAL ALLEGATIONS

18.     At all relevant times, Defendant was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or has acquired and is responsible for the commercial herbicide, Roundup.

19.     Monsanto is a multinational agricultural biotechnology corporation, formerly based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

20.     In June of 2018, German conglomerate Bayer acquired Monsanto in a multi-billion dollar merger.  Bayer is headquartered in  Leverkusen, Germany.

21.     Defendant Monsanto discovered the herbicidal properties of glyphosate during the 1970s and subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup" as a broad spectrum herbicide. Glyphosate is the active ingredient in Roundup.

22.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

23.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase ("EPSP").

24.     Glyphosate inhibits EPSP and interferes with the organic pathway in plants, resulting in the accumulation of organic acid in plant tissue and ultimately plant death.

25.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

26.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

27.     Defendant is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup.

28.     The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides.

29. For over 40 years, consumers, farmers, and the public have used Roundup, unaware of its carcinogenic properties.

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

30. The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7. U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

31. The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe."

32. FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

33. The EPA and the State of Michigan registered Roundup for distribution, sale, and manufacture in the United States and the State of Michigan.

34. FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

6

35.     In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment — in relation to the registration process — no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's March 24, 2015 finding that glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

## MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP

36.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish.

37.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:  a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk; b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable; c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means; d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics"; e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common

7

consumer products other than herbicides; and f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

38.     Monsanto did not alter its advertising in the same manner in any state other than the State of New York.  *In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law* § 63(15) (Nov. 1996).

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

39.     As early as the 1980s, Monsanto was aware of glyphosate's carcinogenic properties.

40.     On March 4, 1985, a group of EPA's Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.  Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

41.     In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted.

42.     In October of 1991, the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.

43.     In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendant's Roundup products are more dangerous and toxic than glyphosate alone.

44.     In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

45.     The study found that Defendant's Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

46.     In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.  The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."

47.     In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone. The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

48.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.  The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of

glyphosate alone. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

49.     The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant.

50.     Defendant knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Mr. Seedorff from Roundup.

51.     Defendant failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Mr. Seedorff from Roundup.  Rather than performing appropriate tests, Defendant relied upon flawed industry-supported studies designed to protect Defendant's economic interests rather than the consuming public.

## IARC CLASSIFICATION OF GLYPHOSATE

52.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

53.     The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

54.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.[1]  Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

55.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

56.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

57.     In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

---

[1] World Health Organization, <u>IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble</u>, (2006), available at <u>http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.</u>

11

58.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015 to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

59.     The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

60.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

61.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

62.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

63.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma, as well as other types of cancer, and the increased risk persisted after adjustment for other pesticides.

64.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

65.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

66.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid ("AMPA"). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

67.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

68.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.[2] Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

---

[2] Guyton et al., Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon and Glyphosate, 112 IARC Monographs 76, section 5.4 (2015) at 77, available at http://dx.doi.org/10.1016/S1470-2045(15)70134-8.

69.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and non-Hodgkin Lymphoma, Multiple Myeloma, Hairy Cell Leukemia, and Chronic Lymphocytic Leukemia, in addition to several other cancers.

## SCIENTIFIC FRAUD UNDERLYING THE SAFETY DETERMINATIONS OF GLYPHOSATE

70.     After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Monsanto exerted pressure upon the EPA to change its classification.

71.     This culminated in the EPA's reclassification of glyphosate to Group E, which was based upon evidence of non-carcinogenicity in humans.  In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."  On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed scientific fraud.

72.     In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup with the EPA.

73.     In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the

14

toxicology studies conducted for Roundup were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits." Three top executives of IBT were convicted of fraud in 1983.

74.    In the second incident, Monsanto hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup.

75.    In March 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides." The investigation lead to the indictments of the laboratory owner and a handful of employees.

## OTHER FINDINGS ABOUT GLYPHOSATE'S DANGERS TO HUMAN HEALTH

76.    The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

### Release Patterns

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.[3]

---

[3]    U.S. EPA, Technical Factsheet on: Glyphosate, available at http://www.epa.gov/safewater/pdfs/factsheets/soc/tech/glyphosa.pdf.

77.    In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.[4]

## RECENT WORLDWIDE BANS ON ROUNDUP/GLYPHOSATE

78.    Several countries around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup become more widely known.

79.    The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Children, in particular, are sensitive to toxic substances and should therefore not be exposed to it."[5]

---

[4] Cox, Caroline. Glyphosate, Part 2: Human Exposure and Ecological Effects, 15:4 *J Pesticide Reform*, (1995). Peas, W.S., et al. Preventing pesticide-related illness in California agriculture: Strategies and priorities. Environmental Health Policy Program Report. Berkeley, CA: Univ. of Calif. School of Public Health. Calif. Policy Seminar (1993).

[5] Holland's Parliament Bans Glyphosate Herbicides, The Real Agenda, 14 April 2014, available at http://real-agenda.com/hollands-parliament-bans-glyphosate-herbicides/.

80.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[6]

81.     France banned the private sale of Roundup and glyphosate following the IARC assessment for Glyphosate.[7]

82.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."[8]

83.     The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.[9]

84.     In September of 2019, the German government announced its plan to immediately restrict the use of glyphosate, with an ultimate goal of banning the chemical completely by the

---

[6] Christina Sarich,  Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link, Global Research 14 May 2015, available at http://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-following-recent-glyphosate-cancer-link/5449440 ; see Ministério Público Federal, MPF/DF reforça pedido para que glifosato seja banido do mercado naciona, April, 14, 2015, available at http://noticias.pgr.mpf.mp.br/noticias/noticias-do-site/copy_of_meio-ambiente-e-patrimonio-cultural/mpf-df-reforca-pedido-para-que-glifosato-seja-banido-do-mercado-nacional.

[7] Zoe Schlanger, France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N.  Calls it 'Probable Carcinogen", Newsweek, June 15, 2015, available at http://www.newsweek.com/france-bans-sale-monsantos-roundup-garden-centers-after-un-names-it-probable-343311.

[8] Health Minister: Importation of Roundup Weed Spray Suspended. Today in Bermuda, May, 11 2015, available at http://www.todayinbermuda.com/news/health/item/1471-health-minister-importation-of-roundup-weed-spray-suspended.

[9] Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides, Sustainable Pulse, May 25, 2015, available at http://sustainablepulse.com/2015/05/25/sri-lankas-new-president-puts-immediate-ban-on-glyphosate-herbicides/#.VeduYk3bKAw.

end of 2023.[10] Germany is home to Bayer, who recently merged with Monsanto, the manufacturer of Roundup.

## MONSANTO'S CONTINUING DISREGARD FOR THE SAFETY OF ALLEN R. SEEDORFF AND THE PUBLIC

85. Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."

86. Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen. Glyphosate, and Defendant's Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

87. Defendant's statements proclaiming the safety of Roundup and disregarding its dangers misled, among millions of other customers, Mr. Seedorff.

88. Despite Defendant's knowledge that Roundup was associated with an elevated risk of developing cancer, Defendant's promotional campaigns focused on Roundup's purported "safety profile."

89. Defendant's failure to adequately warn Mr. Seedorff resulted in (1) Mr. Seedorff using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and

---

[10] *Bayer's Roundup Woes Deepen as Germany Bans Key Chemical*, The Wall Street Journal, September 4, 2019, available at https://www.wsj.com/articles/bayers-roundup-woes-deepen-as-germany-bans-key-chemical-11567610126

instruct consumers about the risk of cancer, including non-Hodgkin Lymphoma and several other cancers including, but not limited to, subtypes of non-Hodgkin Lymphoma, and other injuries associated with the use of Roundup.

90.     Defendant failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

91.     The failure of Defendant to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

92.     The failure of Defendant to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

93.     By reason of the foregoing acts and omissions, Plaintiff seeks compensatory damages as a result of Mr. Seedorff's use of, and exposure to, Roundup which caused or was a substantial contributing factor in causing Mr. Seedorff to suffer from cancer, specifically NLPHL and non-Hodgkin Lymphoma, which are permanent and lasting in nature.

94.     By reason of the foregoing acts and omissions of Defendant, Mr. Seedorff endured physical pain, emotional and mental anguish, medical expenses, and other economic and non-economic damages, and eventually succumbed to his cancer in April 2020.

### ALLEN R. SEEDORFF'S EXPOSURE TO ROUNDUP

95.     Mr. Seedorff worked as a truck driver for TrimBuilt and Sohigro while also employed as a paid, on-call firefighter for the Newton Township Fire Department.

96.     In his capacity as a driver for TrimBuilt and Sohigro, Mr. Seedorff's job duties included applying Roundup on behalf of customers.  Mr. Seedorff followed all labeling and use instructions as provided on the Roundup product packaging.

97.     Mr. Seedorff's use of and exposure to Roundup spanned over a decade.

98.     Mr. Seedorff was subsequently diagnosed with NLPHL in or around August 2018 and non-Hodgkin Lymphoma in or around August 2019, and he passed away from these illnesses in April 2020.  The development of Mr. Seedorff's NLPHL and non-Hodgkin Lymphoma was proximately and actually caused by exposure to Defendant's Roundup products.

99.     As a result of injuries caused by Mr. Seedorff's exposure to Roundup, Mr. Seedorff incurred significant economic and non-economic damages.

## COUNT I – FRAUDULENT CONCEALMENT

100.    Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

101.    Defendant, through its misrepresentations and omissions regarding the danger and carcinogenic nature of Roundup, actively concealed from Mr. Seedorff the true risks associated with Roundup and glyphosate.

102.    At all relevant times, Defendant has maintained that Roundup is safe, non-toxic, and non-carcinogenic.  Plaintiff believes that the fraudulent misrepresentations described herein were intentional to keep the sales and shareholder values of the Roundup brand – and its products – strong.

103.    Indeed, Defendant continues to represent to the public that the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides is safe.

104.    Despite growing concerns over the safety of Roundup, and mounting evidence of the toxicity of glyphosate to humans, Monsanto made conscious decisions not to reformulate Roundup products, re-label, warn, or otherwise inform the unsuspecting consuming public of the potential and actual dangers involved with the use of Roundup.

105.    As a result of Defendant's actions, Mr. Seedorff was unaware, and could not reasonably know or have learned through reasonable diligence, that Roundup and/or glyphosate contact exposed Mr. Seedorff to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

106.    Furthermore, Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the true quality and nature of Roundup.  Defendant was under a duty to disclose the true quality and nature of Roundup because this was non-public information over which Defendant had and continues to have exclusive control.

107.    Mr. Seedorff had no knowledge that Defendant was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendant, Mr. Seedorff could not have reasonably discovered the wrongdoing at any time prior.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive and/or exemplary damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## COUNT II – NEGLIGENCE

108.    Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

109.    Defendant had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

110.    Defendant failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance,

21

quality control, and/or distribution of Roundup into interstate commerce in that Defendant knew

or should have known that using Roundup created a high risk of unreasonable, dangerous side

effects, including, but not limited to, the development of non-Hodgkin Lymphoma, other cancers

and illnesses, as well as other severe personal injuries which are permanent and lasting in nature.

111.    The negligence by the Defendant, its agents, servants, and/or employees, included

but was not limited to the following acts and/or omissions:

(a)    Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

(b)    Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

(c)    Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that Defendant herein knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

(d)    Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Defendant had knowledge that Roundup is, was, or could be carcinogenic;

(e)    Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

(f)    Negligently failing to adequately and correctly warn Mr. Seedorff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

(g)    Negligently failing to petition the EPA to strengthen the warnings associated with Roundup;

(h)    Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

(i)     Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

(j)     Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

(k)     Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

(l)     Negligently designing, manufacturing, producing, and formulating Roundup in a manner which was dangerous to its users;

(m)     Concealing information from Mr. Seedorff and others, while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations; and

(n)     Improperly concealing from and/or misrepresenting information to Mr. Seedorff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides.

112.     Defendant was negligent and/or violated Michigan law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that it:

(a)     Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

(b)     Failed to accompany its product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

(c)     Failed to accompany its product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

(d)     Failed to accompany its product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

(e)     Failed to warn Mr. Seedorff and others of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the

symptoms, or severity of the side effects including, but not limited to, the development of non-Hodgkin Lymphoma;

(f)    Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

(g)    Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants; and

(h)    Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity.

113.    Despite the fact that Defendant knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendant continued and continues to market, manufacture, distribute, and/or sell Roundup to consumers, including Mr. Seedorff.

114.    Defendant knew or should have known that consumers such as Mr. Seedorff would foreseeably suffer injury as a result of Defendant's failure to exercise ordinary care, as set forth above.

115.    Defendant's violations of law and/or negligence were the proximate cause of the injuries, harm and economic loss that Mr. Seedorff suffered.

116.    As a result of the foregoing acts and omissions, Mr. Seedorff suffered from serious and dangerous side effects including, but not limited to, NLPHL and non-Hodgkin Lymphoma, as well as other severe personal injuries that ultimately led to his death.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive and/or exemplary damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## COUNT III - PRODUCTS LIABILITY (NEGLIGENT DESIGN)

117.    Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

24

118.    At all times herein mentioned, Defendant designed, researched, manufactured, tested, advertised, promoted, sold, and distributed Roundup that was used by Mr. Seedorff.

119.    Defendant's Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendant.

120.    At those times, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular Mr. Seedorff.

121.    Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

122.    Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective in design and/or formulation, in that, when it left the hands of the Defendant manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

123.    At all times herein mentioned, Roundup was in a defective condition and unsafe, and Defendant knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendant.

124.    Defendant did not sufficiently test, investigate, or study its Roundup products. Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

125.    Defendant knew or should have known at the time of marketing its Roundup products that exposure to Roundup could result in cancer and other severe illnesses and injuries.

126.    Mr. Seedorff was exposed to Roundup, as described above, without knowledge of Roundup's dangerous characteristics.

127.    At the time of Mr. Seedorff's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

128.    Defendant with this knowledge voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular Mr. Seedorff.

129.    Defendant had a duty to create a product that was not unreasonably dangerous for its normal, intended use.  Defendant created a product that was and is unreasonably dangerous for its normal, intended use.

130.    Defendant marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed the suspected, probable, and established health risks inherent with its normal, intended use.

131.    Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was manufactured defectively in that Roundup left the hands of Defendant in a defective condition and was unreasonably dangerous to its intended users.

132.    Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to Mr. Seedorff in particular, and Defendant is therefore strictly liable for the injuries sustained by Mr. Seedorff.

133.    Mr. Seedorff could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

134.    By reason of the foregoing, Defendant has become strictly liable to Mr. Seedorff for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

135.    Defendant's defective design of Roundup amounts to willful, wanton, and/or reckless conduct by Defendant.

136.    As a result of the foregoing acts and omission, Mr. Seedorff developed NLPHL and non-Hodgkin Lymphoma, and subsequently passed away from those illnesses in April 2020.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive and/or exemplary damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## COUNT IV - FAILURE TO WARN

137.    Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

138.    Defendant has engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup, and through that conduct has knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it reaches consumers such as Mr. Seedorff who are exposed to it through ordinary and reasonably foreseeable uses.

139.    At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing

products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

140.    At all times herein mentioned, Roundup was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendant and at the time Mr. Seedorff was exposed to and/or ingested the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing NLPHL and non-Hodgkin Lymphoma, as a result of exposure and use.

141.    Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect the health of those exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

142.    Defendant's failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(1)(E) as well as the laws of the State of Michigan.

143.    Defendant could have amended the label of Roundup to provide additional warnings.  This defect caused serious injury to Mr. Seedorff, who used Roundup in its intended and foreseeable manner, and it ultimately lead to his death.

144.    At all times herein mentioned, Defendant had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

145.    Defendant failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a

substantial contributing factor in the development of NLPHL and non-Hodgkin Lymphoma, as in the case of Mr. Seedorff, as well as several other types of cancers.

146.   Defendant failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing cancer from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. Defendant acted with a conscious disregard for the safety of Mr. Seedorff.

147.   At the time of exposure, Mr. Seedorff could not have reasonably discovered any defect in Roundup through the exercise of reasonable care.

148.   Defendant, as the manufacturer and/or distributor of the subject product, is held to the level of knowledge of an expert in the field.  Mr. Seedorff reasonably relied upon the skill, superior knowledge, and judgment of Defendant.

149.   Had Defendant properly disclosed the risks associated with Roundup products, Mr. Seedorff would have avoided the risk of NLPHL and non-Hodgkin Lymphoma by not using Roundup products.  The information that Defendant did provide failed to contain adequate warnings and precautions that would have enabled Mr. Seedorff, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

150.    As a result of its inadequate warnings, Defendant's Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Mr. Seedorff.

151.    As a direct and proximate result of Defendant's actions as alleged herein, and in such other ways to be later shown, the subject product caused Mr. Seedorff to sustain injuries as herein alleged.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive and/or exemplary damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## <u>COUNT V - BREACH OF IMPLIED WARRANTIES</u>

152.    Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

153.    At all times herein mentioned, Defendant manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup as a broad spectrum herbicide.  These actions were under the ultimate control and supervision of Defendant.

154.    At the time Defendant marketed, sold, and distributed Roundup for use by Mr. Seedorff, Defendant knew of Roundup's intended use and impliedly warranted the product to be of merchantable quality and safe and fit for this use.

155.    Defendant impliedly represented and warranted to Mr. Seedorff and users of Roundup, the agricultural community, and/or the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.  These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

156.    Mr. Seedorff and/or the EPA did rely on said implied warranty of merchantability of fitness for particular use and purpose.

157.    Mr. Seedorff reasonably relied upon the skill and judgment of Defendant as to whether Roundup was of merchantable quality and safe and fit for its intended use.

158.    Roundup was injected into the stream of commerce by Defendant in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

159.    Defendant breached the aforesaid implied warranties, as its herbicide Roundup was not fit for its intended purposes and uses.

160.    As a result of the foregoing acts and omission, Mr. Seedorff developed NLPHL and non-Hodgkin Lymphoma, and subsequently passed away from those illnesses in April 2020.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive and/or exemplary damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## COUNT VI – BREACH OF EXPRESS WARRANTIES

161.    Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

162.    Defendant had a duty to exercise reasonable care in the research, development, design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion, sale, and release of its Roundup products, including a duty to:

(a)    Reasonably assure that its products did not cause the user unreasonably dangerous side effects;

(b)    Warn of dangerous and potentially fatal side effects; and

      (c)     Disclose adverse material facts, such as the true risks associated with the use of Roundup and glyphosate when making representations to the consuming and general public.

163.    Defendant expressly represented to Mr. Seedorff and the consuming public, through statements made by Defendant on labels and packaging, and in publications and advertisements, that Roundup products were safe to use and did not pose a risk of harm to humans.

164.    These express representations include incomplete warnings and instructions that purport – but fail – to include the complete array of risks associated with the use of and/or exposure to Roundup and glyphosate.  Defendant knew and/or should have known that the risks expressly included in Roundup warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant expressly represented that its Roundup products were safe and effective, that they were safe and effective for use by individuals such as Mr. Seedorff, and/or that they were safe and effective as agricultural herbicides.

165.    The representations about Roundup, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations. Defendant placed its Roundup products into the stream of commerce for sale and recommended use without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup and its active ingredient glyphosate.

166.    Defendant breached these warranties. Its Roundup products were defective, dangerous, unfit for use, did not contain labels representing the true and adequate nature of the

risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Defendant breached the warranties by, among other things:

(a)     Representing through labeling, advertising, and marketing materials that its Roundup products were safe, and intentionally withholding and concealing information about the risks of serious injury and disease associated with use of and/or exposure to Roundup and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

(b)     Representing that Roundup products were safe for use and fraudulently concealing information that demonstrated that glyphosate, the active ingredient in Roundup, had carcinogenic properties, and that its Roundup products, therefore, were not safer than alternatives available on the market.

167.    In utilizing Roundup products, Mr. Seedorff relied, to his detriment, on the skill, judgment, representations and foregoing express warranties of Defendant.

168.    Said warranties and representations were false in that Roundup products were not, in fact, safe or fit for their intended use.

169.    As a result of the foregoing breach of express warranty by Defendant, Mr. Seedorff suffered injuries and damages as alleged herein.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive and/or exemplary damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## COUNT VII – VIOLATION OF § 445.903 OF THE MICHIGAN CONSUMER PROTECTION ACT ("MCPA")

170.    Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

171.    Defendant's conduct in manufacturing, designing, engineering, fabricating, assembling, constructing, testing, examining, warranting, distributing, and/or marketing

Roundup products was an unfair or deceptive act or practice in the conduct of any trade or commerce, in violation of Michigan Comp. Laws Ann. § 445.903 – otherwise known as the "Michigan Consumer Protection Act."

172.     Specifically, Section 903 of the Act provides in relevant part as follows:

> Unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce are unlawful and are defined as follows: *** (a) Causing a probability of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services.  *** (c) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has sponsorship, approval, status, affiliation, or connection that he or she does not have.  *** (e) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.  *** (p) Disclaiming or limiting the implied warranty of merchantability and fitness for use, unless a disclaimer is clearly and conspicuously disclosed.  *** (s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer.

173.     Mr. Seedorff, as a purchaser and/or user of Roundup products, is a consumer within the meaning of the Act because Defendant's business practices involve trade or commerce, are addressed to the market generally, and otherwise implicate consumer protection concerns.

174.     Mr. Seedorff relied on representations that Roundup products were safe to use and free from defects and/or that Defendant would, upon the discovery of a defect or potential harm to the consumer, notify the consumer of such a defect or potential for harm.

175.     Defendant has labeled and advertised Roundup products as targeting "an enzyme found in plants but not in people or pets," and has otherwise presented an image and marketing materials, including approving and airing commercials that show users of Roundup applying the

product in shorts and t-shirts and without masks or other protective gear, suggesting that Roundup does not target an enzyme in, or otherwise affect, humans and animals.

176. These representations are deceptive in that they omit the truth about Roundup, namely that its active ingredient, glyphosate, targets a bacterial enzyme found in humans and animals, and which affects the health of humans and animals who are in contact with glyphosate and other glyphosate formulations such as Roundup.

177. Defendant knowingly and willfully did not sell Roundup as advertised.

178. Defendant intended that Mr. Seedorff would rely on the deception by purchasing, using, and continuing to purchase and use Roundup, unaware of the harm caused by Roundup products as described herein.

179. Mr. Seedorff was entitled to know that there was a significant risk of developing NLPHL and non-Hodgkin Lymphoma, as well as several other subtypes of cancer as the studies relied upon in Plaintiff's Complaint have demonstrated, as that fact would have been material in Mr. Seedorff's decision to purchase and use Roundup products.

180. Mr. Seedorff would not have purchased Roundup products had Defendant represented the potential for harm – of which Defendant was fully aware – to Mr. Seedorff by using Roundup products.

181. As a result of Defendant's omissions and willfully deceitful conduct, Mr. Seedorff sustained injuries, including those in connection with Mr. Seedorff's NLPHL and non-Hodgkin Lymphoma diagnosis and associated health care costs and economic losses.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive and/or exemplary damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendant on each of the above-referenced claims and causes of action awarding:

(a)     Compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

(b)     Economic damages in the form of medical expenses, out-of-pocket expenses, and other economic damages in an amount to be determined at trial of this action;

(c)     Punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of the Defendant who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to Mr. Seedorff in an amount sufficient to punish Defendant and deter future similar conduct, to the extent allowed by applicable law;

(d)     Pre-judgment interest;

(e)     Post-judgment interest;

(f)     Plaintiff reasonable attorneys' fees;

(g)     Plaintiff the costs of these proceedings; and

(h)     Such other and further relief as this Court deems just and proper.

Respectfully submitted,

**VARNUM, LLP**
Attorneys for Plaintiff

Dated: April 21, 2023      By:    /s/*Brion B. Doyle*
                                       Adam J. Brody (P62035)
                                       Brion B. Doyle (P67870)
Business Address, Telephone, and E-mail:
         Bridgewater Place, P.O. Box 352
         Grand Rapids, MI 49501-0352
         (616) 336-6000
         ajbrody@varnumlaw.com
         bbdoyle@varnumlaw.com

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all issues.

Respectfully submitted,

**VARNUM, LLP**
Attorneys for Plaintiff

Dated: April 21, 2023      By:    /s/*Brion B. Doyle*
                                         Adam J. Brody (P62035)
                                       Brion B. Doyle (P67870)
Business Address, Telephone, and E-mail:
         Bridgewater Place, P.O. Box 352
         Grand Rapids, MI 49501-0352
         (616) 336-6000
         ajbrody@varnumlaw.com
         bbdoyle@varnumlaw.com

16397018_1.docx

# SUMMONS IN A CIVIL ACTION
## UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN

PATRICIA BERGSTRESSER, as Personal
Representative of the ESTATE OF ALLEN R.
SEEDORFF

v.

MONSANTO COMPANY

Case No.

Hon.

TO: MONSANTO COMPANY
ADDRESS:
800 N. Lindbergh Blvd
Saint Louis, MO 63167

---

A lawsuit has been filed against you.

YOU ARE HEREBY SUMMONED and required to   serve
upon plaintiff, an answer to the attached complaint or a motion
under Rule 12 of the Federal Rules of Civil Procedure within
_____ days after service of this sum mons on you (not
counting the day you received it). If y ou fail to respond,
judgment by default will be entered against you for the relief
demanded in the complaint. You must also file your answer
or motion with the Court.

The Court has offices in the following locations:

399 Federal Building, 110 Michigan St., NW, Grand Rapids, MI 49503
P.O. Box 698, 330 Federal Building, Marquette, MI 49855
107 Federal Building, 410 W. Michigan Ave., Kalamazoo, MI 49007
113 Federal Building, 315 W. Allegan, Lansing, MI 48933

PLAINTIFF OR PLAINTIFF'S ATTORNEY NAME AND ADDRESS
Brion B. Doyle (P67870)
Varnum LLP
P.O. Box 352
Grand Rapids, MI 49501-0352
(616) 336-6000

CLERK OF COURT

By: Deputy Clerk                                    Date

---

## PROOF OF SERVICE

This summons for _____ MONSANTO COMPANY _____ was received by me on _____.
(name of individual and title, if any)                                                      (date)

☐ I personally served the summons on the individual at _____
on _____.                                                                  (place where served)
        (date)

☐ I left the summons at the individual's residence or usual place of abode with _____, a person
                                                                                                                    (name)
of suitable age and discretion who resides there, on _____, and mailed a copy to the individual's last known address.
                                                                                      (date)

☐ I served the summons on _____, who is designated by law to accept service
                                                            (name of individual)
of process on behalf of _____ on _____.
                                            (name of organization)                                        (date)

☐ I returned the summons unexecuted because _____.

☐ Other (specify) _____.

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____.

I declare under the penalty of perjury that this information is true.

Date: _____

_____
Server's signature

Additional information regarding attempted service, etc.:

_____
Server's printed name and title

_____
Server's address