**PODHURST ORSECK, P.A.**
Steven C. Marks
(smarks@podhurst.com)
Kristina M. Infante
(kinfante@podhurst.com)
Pablo Rojas
(projas@podhurst.com)
One Southeast 3rd Avenue, Suite 2300
Miami, FL 33131
Tel: (305) 358-2800
Fax: (305) 358-2382
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE : ROUNDUP PRODUCTS LIABILITY LITIGATION<br><br>This document relates to:<br><br>*Salas v. Monsanto Company, et al.*<br>Member Case No. 3:21-cv-06173-VC | MDL No. 2741<br><br>Case No. 3:16-md-2741-VC<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION TO EXCLUDE DR. REID SMEDA'S TESTIMONY**<br><br>Hearing:<br>Date: July 27, 2023<br>Time: 10:00 A.M.<br>Place: San Francisco Courthouse<br>            Courtroom 4 – 17th Floor |

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on July 27, 2023 at 10:00 A.M., in Courtroom 4 of the United States District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, or as ordered by the Court, Plaintiff Nancy Salas will present her Motion to Exclude Dr. Reid Smeda's Testimony. Plaintiff seeks an order excluding opinions of this witness under Federal Rule of Evidence 702.

Dated: June 15, 2023                                Respectfully Submitted,

**PODHURST ORSECK, P.A.**

<u>/s/ Steven C. Marks</u>
Steven C. Marks
Attorney for Plaintiff Nancy Salas

## PLAINTIFF'S MOTION TO EXCLUDE DR. REID SMEDA'S TESTIMONY

Plaintiff, Nancy Salas, respectfully moves to preclude the testimony of Defendant Monsanto Company's expert, Dr. Reid Smeda, and in support thereof states as follows:

This is a personal injury case in which the Plaintiff, Ms. Salas alleges that she was diagnosed with stage IV non-Hodgkin's lymphoma and that her use of Roundup and herbicides manufactured by Monsanto Company was a substantial contributing factor. *See* Complaint ¶¶ 140, 150. The Defendant, Monsanto Company ("Monsanto"), has retained Dr. Smeda as a case-specific expert. *See* Monsanto Company's Rule 26 Designation and Disclosure of Specific Causation Expert Testimony (attached as Exhibit 1 at 4). Dr. Smeda intends to offer testimony about "different aspects that relate to weed science topics including a number of them" such as weed competition for growth factors, direct and indirect losses caused by weeds, basics of weed management, and methods of weed management. *See* Smeda Dep. Tr. at 24:22-27:17 (attached as Exhibit 2) (referred to throughout as "Smeda Dep. Tr.") As he explained at deposition, Dr. Smeda's opinions in this case are, in relevant part, that Ms. Salas' reported frequency of spraying Roundup is somehow not credible.

Dr. Smeda's opinions should be excluded for several independent reasons. First, Dr. Smeda does not have the appropriate qualifications to support his assertions. He is a professor of Weed Science in the Division of Plant Sciences at the University of Missouri. *See* Expert Report of Dr. R.J. Smeda (attached as Exhibit 3 at 1). Dr. Smeda is not a toxicologist, epidemiologist, oncologist, or medical doctor of any kind. *See* Smeda Dep. Tr. at 30:14-31:8. Indeed, despite purporting to offer evidence about the irrelevant history and economics of weed control, he is neither an economist nor a historian. *See* Dr. Smeda's CV (attached as Exhibit 4 at 1).

Second, Dr. Smeda's testimony is not based upon sufficient facts or data. Although Dr. Smeda purports to conclude that Ms. Salas did not spray as much Roundup on her property as

she says, Dr. Smeda never (1) personally inspected the property, (2) conducted a quantitative analysis or estimate of the area sprayed, (3) determined which weed species were present on the property and subject to spraying, or (4) analyzed historical weather data that might inform the pattern of weed growth on the property. *See* Smeda Dep. Tr. at 46:3-15; 72:4-12; 87:1-3; 97:11-13. As will be outlined further below, Dr. Smeda's opinions amount to little more than speculation about how much Roundup "would have" needed to be sprayed on Ms. Salas' property. Ultimately, Dr. Smeda employed *no meaningful or scientific methodology* in reaching his conclusions.

Third and relatedly, Dr. Smeda's theories would not assist the trier of fact. His opinions are speculative and unscientific and irrelevant to any triable issue to be decided by the jury. Dr. Smeda concededly will not and cannot opine about the risk of non-Hodgkin's lymphoma which is the subject of this litigation. Dr. Smeda's testimony can, at best, only mislead the jury or confusingly duplicate the opinions of Monsanto's other experts. Thus, Plaintiff respectfully requests that the Court exclude Dr. Smeda's opinions in their entirety.

Fourth, even if Dr. Smeda's opinions otherwise satisfied the *Daubert* standard, they should be excluded because they boil down to opinions about Ms. Salas' credibility. The upshot of Dr. Smeda's testimony in this case is that Ms. Salas is somehow not to be believed about how much Roundup she sprayed on her property. Expert testimony about matters of credibility is inadmissible, as this is solely for the jury to decide. *See United States v. Azure*, 801 F.2d 336, 340 (8th Cir. 1986).

Thus, Plaintiff respectfully requests that the Court exclude Dr. Smeda's opinions in their entirety.

**BACKGROUND**

I. **Monsanto's Disclosures**

Monsanto's Disclosure designated Dr. Smeda as a case-specific expert. *See* Exhibit 1 at 4. Dr. Smeda intends to opine as to "overarching aspects related to weed control…" and he has a "case-specific report on Salas." *See* Smeda Dep. Tr. at 24:3-10. Dr. Smeda's specific opinions related to Ms. Salas include that (1) glyphosate is ideally suited for her use, (2) Ms. Salas overestimates her use Roundup, (3) Ms. Salas did not follow proper weed management practices, (4) Ms. Salas overestimates her contact with Roundup, and (4) that Plaintiff's experts Dr. Knopf and Dr. Sawyer base their analyses on Ms. Salas' inaccurate reports. *See* Exhibit 3 at 40-46.

Based on his "opinions" about these topics, Dr. Smeda also intends to rebut the expert testimony of Plaintiff's experts Dr. Kevin Knopf and Dr. William Sawyer, who are respectively a highly qualified oncologist and a highly qualified toxicologist. *See* Pl.'s Rule 26 Specific Causation Expert Disclosures (attached as Exhibit 5 at 3-4). Namely, Dr. Smeda opines that Dr. Knopf and Dr. Sawyer's opinions are flawed because they relied on Ms. Salas' sworn testimony about how frequently she sprayed Roundup. In other words, Dr. Smeda believes that Dr. Knopf and Dr. Sawyer should instead have based their opinions not on the sworn testimony of the person who actually sprayed the Roundup at issue in this case, but instead on the hunches of a weed scientist who never visited the property or conducted any quantitative analysis.

**II. Dr. Smeda's Qualifications**

Dr. Smeda is a professor of Weed Science in the Division of Plant Sciences at the University of Missouri. *See* Exhibit 3 at 1. He also has a Ph.D. in Horticulture from Purdue University. *See id.* at 1. Importantly, Dr. Smeda does not specialize in toxicology, oncology, or epidemiology. *See* Smeda Dep. Tr. at 30:14-31:8. Dr. Smeda also has no background in history or economics to discuss the history of weed control and the economic, safety, and aesthetic benefits of herbicides. *See* Exhibit 4 at 1.

PLAINTIFF'S MOTION TO EXCLUDE DR. SMEDA'S TESTIMONY

### III. Dr. Smeda's Facts and Data

As noted above, Dr. Smeda purports to have developed opinions about how much Roundup "would have" been sprayed at Ms. Salas' property. Although he did not make a quantitative estimate of how much "would have been sprayed," he opines that it is less than Ms. Salas testified to under oath. *See* Smeda Dep Tr. at 43:6-13.

To develop these opinions, Dr. Smeda testified that he "reviewed Google Earth images and property records…" as well as "labels and safety data sheets of likely products she claims to have used." *See* Smeda Dep. Tr. at 41:12-19. He also "…consulted various websites to determine the soil characteristics and weather patterns for Key Largo, Florida." *See id.* However, he conducted no quantitative estimate of the likely spray area. Instead, he simply looked at property records and images from Google Earth. *See id.*

It is undisputed that Dr. Smeda never personally inspected or observed the property at issue. *See* Smeda Dep. Tr. at 42:2-7. In fact, Dr. Smeda has never been to the Key Largo area at all. *See* Smeda Dep. Tr. at 42:9-18. Dr. Smeda considered average weather information for Key Largo, but not the actual historical weather information for the years during which Ms. Salas sprayed Roundup at her property. In short, for the most part, Dr. Smeda's consideration of facts and data was cursory: it relied on Google searches and generalizations, rather than first-hand observations or scientific data sources.

### IV. Dr. Smeda's Methodology

It is difficult to describe Dr. Smeda's "methodology," because he did not employ a discernible methodology at all. Dr. Smeda did not even arrive at a precise quantitative assessment or estimate about how much Roundup he believes Ms. Salas sprayed.

To the extent that Dr. Smeda described anything resembling a methodology, he explained that he did not conduct any studies, but instead relied on soil data from a "USDA publication"

*See* Smeda Dep. Tr. at 62:2-14. Dr. Smeda also considered weather averages for Key Largo rather than analyzing historical weather patterns during the actual years that Ms. Salas sprayed. *See* Smeda Dep. Tr. at 57:2-12. As noted above, Dr. Smeda has never been to Key Largo where the property is located. *See* Smeda Dep. Tr. at 42:9-10.

Astoundingly, Dr. Smeda conducted no quantitative assessment of how much Roundup "would have" been sprayed per square foot or linear foot. *See* Smeda Dep. Tr. at 45:7-23. He simply conducted no meaningful quantitative analysis at all. His views are not supported by any science or methodology and should be excluded. *See United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004) (holding no abuse of discretion when the court excluded testimony because of a failure to establish the opinions were methodologically reliable or sound).

### V. Dr. Smeda's Opinions in the Context of this Case

The central questions of this case are (1) whether Roundup causes cancer and (2) whether Roundup was a substantial cause of Ms. Salas' cancer. Dr. Smeda opines as to what he believes the frequency of spraying "*would need* to be…" on Ms. Salas' property. *See* Smeda Dep. Tr. at 69:11-22. However, this opinion is not only unsupported by facts, data or methodology; it also would not assist the jury.

The jury in this case will hear sworn testimony about how much Roundup Ms. Salas *did* spray. Dr. Smeda's opinions about how much spraying "would need" to have occurred would be irrelevant at best. Moreover, Dr. Smeda's opinions effectively constitute opinions about Ms. Salas' credibility. As noted further below, the jury's central liability assessment in this case will concern issues of whether Roundup caused Ms. Salas' cancer, and Dr. Smeda's opinions do not directly concern that question.

**LEGAL STANDARD**

*Daubert "…*affirms the trial court's role as gatekeeper and provides some general standards that the trial court must use to assess the reliability and helpfulness of proffered expert testimony.*" See* Advisory Committee Notes to Fed. R. Evid. 702. Under the *Daubert* standard, a witness may testify as an expert if: (1) the testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the expert has reliably applied the principles and methods to the facts of the case. *Id.* Several factors to consider in determining whether the *Daubert* requirements are fulfilled include: (1) whether the expert's theory can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential error rate and the existence and maintenance of standards controlling its operation; and (4) whether the technique has widespread acceptance within the relevant scientific community. *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 580 (1993). The defendant in this case has the burden to show, by a preponderance of the evidence, that their expert's testimony meets the *Daubert* requirements. *See Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005).

**ARGUMENT**

Dr. Smeda's testimony should be excluded for several independent reasons. First, he lacks the relevant qualifications to reveal his opinions formed in this case. Second, his testimony is based on insufficient facts and data, as he (1) never interviewed Ms. Salas, (2) never sought out data specific to the property, and (3) never inspected the property. Furthermore, Dr. Smeda's testimony is not the product of science or methodology, as he failed to (1) perform quantitative calculations, (2) collect soil samples or conduct an inventory of the specific weed species on the property, (3) analyze historical weather patterns during the relevant spraying period, or (4) visit Key Largo where the property is located. Finally, Dr. Smeda's opinions would not assist the jury

8

PLAINTIFF'S MOTION TO EXCLUDE DR. SMEDA'S TESTIMONY

because they are speculative, confusing, and unrelated to the actual triable issues that will be before the jury.

### I. Dr. Smeda's testimony should be excluded because he lacks the relevant qualifications to provide the opinions formed in this case.

It is undisputed that Dr. Smeda is not a toxicologist or an epidemiologist, and he has no medical training. *See* Smeda Dep. Tr. at 30:14-23; *see also* Exhibit 4 at 1. Although Dr. Smeda is not a qualified toxicologist, he discusses toxicity in his report related to "an oral comparison" between glyphosate's "acute toxicity relative to other compounds" specifically in rats. *See* Smeda Dep. Tr. at 32:5-24. At best, this means that Dr. Smeda intends to testify about how herbicides are toxic *to animals*—an irrelevant issue in this case and an opinion that can only confuse and mislead the jury. At worst, this means that Dr. Smeda intends to testify about the toxicity of herbicides *to humans*, a subject matter in which he has no discernible expertise.

By his own admission, Smeda stated "I'm not a cancer expert, so I'm here to address weed science aspects." Smeda Dep. Tr. at 30:9-10.

Importantly, Dr. Smeda has only given deposition testimony in two other cases and he has not testified at trial. *See* Smeda Dep. Tr. at 79:7-23; *see also* Exhibit 3 at 3. This case would likely be the first case in which Dr. Smeda's opinions would be admitted and presented to a jury.

### II. Dr. Smeda's testimony should be excluded because it is based on insufficient facts and data.

Dr. Smeda never sought to develop firsthand knowledge in this case. In Dr. Smeda's deposition, he stated "it wouldn't take a long period of time to be able to treat the weeds that were in areas where she was working" and "…from the description provided…in addition to my extensive experience with herbicides over the last 30 years, especially with glyphosate but also many other herbicides, it appeared inconsistent with what was necessary to manage the weeds

9

PLAINTIFF'S MOTION TO EXCLUDE DR. SMEDA'S TESTIMONY

that would have been on those properties." *See* Smeda Dep. Tr. at 43:18-25; 48:18-20. That quotation demonstrates what Dr. Smeda did—or rather, how little he did—to collect relevant information.

Dr. Smeda discusses his opinions on the amount of spraying that would be expected, but he never interviewed Ms. Salas. Rather, Ms. Salas testified under oath as to her spraying patterns. Additionally, Dr. Smeda has no personal knowledge of the Key Largo environment where Ms. Salas' property is located. *See* Smeda Dep. Tr. at 42:9-10.

Further, Dr. Smeda admitted in his deposition that there are multiple variations of plant species and that the plant species "…is one factor that influences the rapidity of development." *See* Smeda Dep. Tr. at 71:25-72:3. Although he admitted that the growth depends on the specific plant species and soil, Dr. Smeda did not seek out data specific to this property, but rather analyzed it at the highest level of generality. He did not actually identify the weed species that *were present* in the areas where Ms. Salas sprayed. Rather, Dr. Smeda admitted, "…I'm not familiar with the specific species that could have been there but, again, the description were weeds, and if she's treating plants that were very small, these are likely weeds that are emerging from seed, so they're likely starting small and growing and it would take sometime for them to be able to develop." *See* Smeda Dep. Tr. at 72:7-12.

Additionally, Dr. Smeda did not personally enter or inspect the property. Dr. Smeda stated that he "…reviewed Google Earth images and property records for the two properties at which Ms. Salas alleges that she used Roundup…" *See* Smeda Dep. Tr. at 41:12-14. Dr. Smeda opines that "Due to the height of the weeds, Ms. Salas would have applied Roundup in a downward direction and direct skin contact from application would be minimal to nonexistent" and "[e]ven though Ms. Salas testified to spraying under windy conditions, her potential for contact based on off-target movement of the product is minimal." *See* Exhibit 3 at 44-45.

However, again, Dr. Smeda has never personally visited or inspected the property and is opining about mere speculations. *See* Smeda Dep. Tr. at 42:2-7.

**III.    Dr. Smeda's testimony should be excluded because it is not the product of science or methodology.**

Just as Dr. Smeda did not seek out sufficient facts or data to reach his conclusions, he also applied no science or methodology whatsoever in reaching his conclusions. Dr. Smeda did not (1) perform quantitative calculations, (2) collect soil samples or conduct an inventory of the specific weed species on the property, (3) analyze historical weather patterns, or (4) visit the Key Largo area. This is critical because Dr. Smeda's opinions in this case are *inherently* quantitative. Dr. Smeda cannot reasonably opine that Ms. Salas "would have" sprayed or "would have needed to spray" less Roundup than he testified to spraying *without* actually calculating how much spraying "would have" occurred or did occur. Dr. Smeda's lack of any quantitative analysis *alone* renders his opinions inadmissible.

**A.    Dr. Smeda did not perform any quantitative calculations.**

Dr. Smeda's opinions center on how much Roundup Ms. Salas "would have" sprayed on her property. But when asked if he had performed any quantitative analysis of the approximate square footage that Ms. Salas would have needed to spray, he replied " . . . I don't have a specific square footage." *See* Smeda Dep. Tr. at 46:3-7. Dr. Smeda never calculated or estimated how much Roundup Ms. Salas sprayed, how many sprays Ms. Salas performed, how many feet Ms. Salas covered when spraying, or any other metric of Ms. Salas' spraying. He did no quantitative calculation at all.

**B.    Dr. Smeda did not collect soil samples or conduct an inventory of the weed species on the property.**

11

PLAINTIFF'S MOTION TO EXCLUDE DR. SMEDA'S TESTIMONY

When Dr. Smeda was asked whether he conducted "…any analysis of the nutrients in the soils at Ms. Salas' property.." he replied "I didn't conduct any specific studies, no." *See* Smeda Dep. Tr. at 62:2-14. Rather than visiting Ms. Salas' property and collecting accurate soil samples, Dr. Smeda relied on general soil data from a USDA publication. *See* Smeda Dep. Tr. at 62:2-14.

Dr. Smeda also failed to conduct an inventory of the weed species on the property. He does not know which species were present, he could not testify as to the growth patterns of these species, and he could not testify about which areas in the property would present one species as opposed to another. This is critical because as Dr. Smeda himself admitted, different species of weeds grow at different rates. *See* Smeda Dep. Tr. at 53:13-16.

**C. Dr. Smeda relied on averages rather than analyzing historical weather patterns.**

Dr. Smeda merely analyzed weather "averages" rather than looking at the larger historical context. *See* Smeda Dep. Tr. at 57:2-12. Dr. Smeda retrieved the weather data in his report from "Weatherspark.com." *See* Smeda Dep. Tr. at 55:25-56:6. When Dr. Smeda was asked whether the averages reflected in Figure 3 of his report cover all or any of the years from 2004 to 2014, he responded "I don't know that it specifically does but, again, it identifies the annual rainfall pattern so it's very likely it would have been generated for a number of years." *See* Smeda Dep. Tr. at 57:13-21.

Dr. Smeda was also specifically asked whether he analyzed *historical weather patterns* for the relevant years of 2004 to 2014. *See* Smeda Dep. Tr. at 56:11-12. Dr. Smeda replied "…I don't recall the specific period of time that this was estimated, but I believe it was more than one year." *See* Smeda Dep. Tr. at 56:11-17. Dr. Smeda's reliance on average weather patterns rather than historical data is problematic. Ms. Salas sprayed during certain years for which historical weather data is available; she did not spray during any abstract "average" year. Dr. Smeda's

12

PLAINTIFF'S MOTION TO EXCLUDE DR. SMEDA'S TESTIMONY

failure to consider historical weather data is indicative of the cursory and casual nature of his "methodology."

**D. Dr. Smeda has never been to the Key Largo area.**

Dr. Smeda lives in Missouri and has never lived in South Florida. *See* Smeda Dep. Tr. at 39:3-4. Not only has Dr. Smeda never lived in the state of Florida, but he has never been to the Key Largo area, where the property is located. *See* Smeda Dep. Tr. at 42:9-10. As Dr. Smeda stated, he has been to Orlando, Miami, Kissimmee and the Panhandle of Florida, but he has never driven to the Florida Keys or been to Key Largo. *See* Smeda Dep. Tr. at 42:9-18. Dr. Smeda has no personal knowledge of the area where Ms. Salas' property is located or even the part of the state where the property is located.

Although ordinarily an expert need not live or visit the location of the facts giving rise to a case, Dr. Smeda's lack of any first-hand experience with the Florida Keys matters in the context of this case. By Dr. Smeda's own admission, weed growth patterns are highly local: they depend on local species and local weather. The fact that he lacks any first-hand knowledge of Monroe County and undertook only a very cursory review of local soil characteristics and average weather patterns fails the methodological rigors of the *Daubert* standard.

**E. Dr. Smeda seeks to testify about his general report on the history of weed control and the benefits of herbicides which are unsupported by any methodology and wholly irrelevant to Ms. Salas' case.**

During Dr. Smeda's deposition, he noted that he intends to testify at trial about his general report, which "…encompass[es] the overarching aspects related to weed control…" *See* Smeda Dep Tr. at 24:2-8. His general report discusses the benefits of glyphosate use as well as the "cultural, biological, and mechanical control measures" of herbicides. *See* Exhibit 3 at 3-4.

In short, Dr. Smeda intends to testify about the historical context of weeds and glyphosate at trial, and specifically about the aesthetic, safety, and economic benefits of herbicides. *See* Exhibit 3 at 15, 31. Dr. Smeda's opinions are clearly inadmissible for at least three independent reasons.

First, Dr. Smeda's testimony about the benefits of herbicides or their history is not supported by any cognizable methodology. Dr. Smeda's theories are based on—at most—a review of a handful of historical articles about weed control. This review did not involve the application of any scientific methodology. Second, Dr. Smeda is unqualified to offer this testimony. He is not an historian or an economist, so he cannot offer "expert" testimony about the history of herbicides or their economic benefits. Third, Dr. Smeda's opinions about these topics are wholly irrelevant to this case and would not assist the jury. The jury in this case will <u>not</u> be asked to assess the economic or aesthetic benefits of glyphosate or Roundup or to weigh Ms. Salas' injuries against the benefits of weed control. It is important to note that Dr. Smeda was designated as a *case specific* expert, and his opinions in his general report are irrelevant to Ms. Salas' case.

Additionally, just because there may be benefits to herbicides does not lead to the conclusion that there are no harmful health repercussions and that Roundup did not cause Ms. Salas' cancer. Because Dr. Smeda is relying primarily on his educational experience, it remains "…the burden of the proponent of this testimony to explain how that experience led to the conclusion he reached, why that experience was a sufficient basis for the opinion, and just how that experience was reliably applied to the facts of the case." *United States v. Frazier,* 387 F.3d 1244, 1265 (11th Cir. 2004). Ultimately, the "court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *Id.* Here, there is "an insufficient nexus between the

experience proffered by the expert and the essential opinion propounded" and Dr. Smeda's testimony should be excluded. *Id.* at 1266.

**IV. Dr. Smeda's testimony should be excluded because his theories would not assist the trier of fact.**

Expert testimony is used where the expert "will help the trier of fact to understand the evidence or to determine a fact in issue." *See* Fed. R. Evid. 702.  Dr. Smeda's testimony is not helpful to the trier of fact for two independent reasons: (1) his opinions are merely speculative, and (2) his opinions about the credibility of Ms. Salas' testimony are irrelevant and for the jury to decide.

Dr. Smeda discusses throughout his deposition what he believes "would need" to happen on Ms. Salas' property, such as how "…there wouldn't be a need to spray with the level of frequency that she's described." *See* Smeda Dep. Tr. at 69:15-17. However, the question isn't what *would have* had to happen, but what *did* happen. Ms. Salas has direct knowledge of her own spraying patterns and has testified under oath.

To the extent that Dr. Smeda's opinions are that Ms. Salas' sworn testimony is not credible, that is an opinion about her credibility and not the product of her sworn testimony. "An expert 'may not go so far as to usurp the exclusive function of the jury to weigh the evidence and determine credibility.'" *United States v. Azure*, 801 F.2d 336, 340 (8th Cir. 1986) (quoting *United States v. Ward*, 169 F.2d 460, 462 (3d Cir.1948)). Dr. Smeda's testimony should be excluded, as his opinions fail every aspect of *Daubert*, they are speculative, they have no bearing on any claim or defense in this case and they serve no discernable purpose other than to confuse the jury and provide extraneous information.

## CONCLUSION

The central issue in this case is whether Roundup was a substantial cause of Ms. Salas' non-Hodgkin's lymphoma. No aspect of Dr. Smeda's opinions would assist the jury in determining this issue. More importantly, no triable issue that will be decided by the jury would be assisted by his opinions about weed science and weed control. For the above stated reasons, Dr. Reid Smeda's deposition testimony should be excluded under the *Daubert* standard. Thus, Plaintiff respectfully requests this Court to grant Plaintiff's Daubert Motion against Dr. Smeda's deposition testimony.

Respectfully submitted,

**PODHURST ORSECK, P.A.**

*/s/ Steven C. Marks*
Steven C. Marks
(smarks@podhurst.com)
Kristina M. Infante
(kinfante@podhurst.com)
Pablo Rojas
(projas@podhurst.com)
One Southeast 3rd Avenue, Suite 2300
Miami, FL 33131
Tel: (305) 358-2800
Fax: (305) 358-2382
*Counsel for the Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on June 15, 2023, I electronically filed the foregoing document with the Clerk for the United States District Court for the Northern District of California using the CM/ECF system, which shall send electronic notification to counsel of record.

By: */s/ Steven C. Marks*
STEVEN C. MARKS
*Counsel for the Plaintiff*