**WILKINSON STEKLOFF LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonstekloff.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonstekloff.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel:  202-847-4030
Fax: 202-847-4005

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel:  202-898-5843
Fax: 202-682-1639

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel:  202-662-6000

**BRYAN CAVE LEIGHTON PAISNER LLP**
K. Lee Marshall (CA Bar No. 277092)
(klmarshall@bclplaw.com)
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Tel:  415-675-3400
Fax: 415-675-3434

Jed P. White (CA Bar No. 232339)
(jed.white@bclplaw.com)
120 Broadway, Suite 300
Santa Monica, CA 90401
Tel:  310-576-2100
Fax: 310-576-2200

*Attorneys for Defendant Monsanto Company*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION, | MDL No. 2741<br><br>Case No.: 3:16-md-02741-VC |
| *Delorme-Barton v. Monsanto Company*, 3:18-cv-01427-VC | **DEFENDANT MONSANTO COMPANY'S MOTION TO EXCLUDE TESTIMONY OF ROBERT CONRY, M.D.**<br><br>Hearing:<br>Date:  July 27, 2023<br>Time:  10:00 a.m.<br>Place:  San Francisco Courthouse, Courtroom 4 – 17th Floor |

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on July 27, 2023 at 10:00 a.m., in Courtroom 4 of the United States District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, or as ordered by the Court, Defendant Monsanto Company ("Monsanto") will present its Motion to Exclude Testimony of Robert Conry, M.D. Monsanto seeks an order excluding opinions of this witness under Federal Rule of Evidence 702.

Dated: June 16, 2023                                Respectfully submitted,

                                                    /s/ *Jed P. White*
                                                    Jed P. White
                                                    Attorneys for Defendant Monsanto Company

**INTRODUCTION**

Plaintiff Karen Delorme-Barton designated Dr. Robert Conry, an oncologist, to offer expert opinion testimony that Roundup caused her follicular lymphoma, a type of non-Hodgkin Lymphoma ("NHL"). Dr. Conry is a practicing oncologist who has spent his career diagnosing and treating cancer – not determining its causes. In his own words, determining the specific cause of a particular patient's cancer is not central to what he does in his practice. Yet, that is exactly what he seeks to do in this case. To reach his specific causation opinion, Dr. Conry purports to apply a differential diagnosis/etiology methodology. This methodology requires two steps be performed: (1) creating a list of all potential causes of the Plaintiff's NHL, and (2) ruling out plausible alternative causes until arriving at a conclusion that exposure to Roundup specifically caused the Plaintiff's NHL. But Dr. Conry's opinions must be excluded because he did not reliably perform either step. As became clear at his deposition, Dr. Conry's methodology is based, not on scientific principles, but on his pre-ordained conclusion that Roundup must have caused Plaintiff's NHL. Dr. Conry has been disclosed in several recent Roundup cases, but no court has yet ruled on his methodology and opinions, and he has not yet been challenged in the MDL. For the reasons set forth below, this Court should exclude Dr. Conry's specific causation opinion.

**BACKGROUND**

Plaintiff designated Dr. Conry to testify on a range of topics, including:

> human blood cancers, causes of blood cancer, including exposure to glyphosate and Roundup, cancer diagnosis, cancer effects, cancer treatments, the clinical practice of medicine generally and, specifically, as to Plaintiff Karen Delorme-Barton, the cause or causes of her NHL, her clinical course and pain and suffering, the reasonableness and necessity of her respective medical treatment and expenses, issues relating to the consequences of her cancer treatment, and her long-term prognosis.

**Ex. A**, Plaintiff's Rule 26 Specific Causation Expert Disclosure at 2-3. Dr. Conry has been disclosed only as a specific causation expert and, as confirmed in his report and at deposition, he is not offering general causation opinions in this case. **Ex. B**, Conry *Delorme-Barton* Rpt. at 10 ("I am not, however, offering a general causation opinion regarding Roundup or glyphosate."); **Ex. C**, Conry *Delorme-Barton* Dep. at 40:2-3 ("As described or stated in my report, I'm acting as a specific causation expert in this matter with Karen."). Therefore, at minimum, Dr. Conry should be precluded from offering any

- 1 -
MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF ROBERT CONRY, M.D.

testimony as to general causation because he has disclaimed such opinions.

The heart of Dr. Conry's opinion in this case is that exposure to glyphosate caused Plaintiff's NHL, *i.e.*, specific causation. Dr. Conry claims that he used a "differential diagnosis" or "differential etiology" in this case to reach the conclusion that Plaintiff's NHL was caused by exposure to Roundup. Notably, this opinion falls outside his clinical practice. **Ex. C**, Conry *Delorme-Barton* Dep. at 179:16-21 ("I think the focus of a clinical visit with a medical oncologist is sort of, okay, you've got this lymphoma. This is the stage. There are – what's the treatment going forward. How are we going to manage this. Not so much focus on how did it start."). Dr. Conry has also admitted in deposition testimony in a recent Roundup case in state court that there is not complete consensus in the oncology community that glyphosate or Roundup causes NHL generally, **Ex. D**, Conry *Jacobs* Dep. at 60:9-18, and in another case he was unable to identify even a single oncologist who believes that Roundup or glyphosate can cause NHL who is not a paid expert on behalf of plaintiffs in litigation against Monsanto. **Ex. E**, Conry *Griswold* Dep. Vol. I at 165:6-166:15. As demonstrated below, Dr. Conry's specific causation opinion is made for litigation and does not pass *Daubert* Scrutiny.

## **LEGAL STANDARD**

A proposed expert witness must possess "knowledge, skill, experience, training, or education" sufficient to qualify him as an expert on the subject to which his testimony relates. Fed. R. Evid. 702. When an expert's field of expertise is not related to the subject on which he seeks to offer testimony, such testimony is inadmissible. *See White v. Ford Motor Co.*, 312 F.3d 998, 1008-09 (9th Cir. 2002). Apart from qualifications, expert testimony must be (1) based upon sufficient facts or data, (2) the product of reliable principles and methods, and (3) the result of applying those principles and methods reliably to the facts of the case. Fed. R. Ev*id.* 702. The trial judge is charged with the responsibility of acting as a gatekeeper to "ensure that any and all scientific testimony … is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). The proponent of the expert bears the burden of proving that the expert's proffered testimony is admissible. *See*, *e.g.*, *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007).

# ARGUMENT

Dr. Conry purports to reach his specific-causation opinion—that exposure to Roundup caused Plaintiff's NHL—by applying a differential etiology (sometimes called a "differential diagnosis"). The Ninth Circuit recognizes two steps to this methodology, each of which must be performed reliably to render the expert's opinion admissible. *See Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1057 (9th Cir. 2003). First, the expert must "compile a comprehensive list" of causes that are "generally capable of causing the patient's symptoms or mortality." *Id.* at 1058. An opinion is not reliable when the expert rules-in a potential cause that is not capable of causing the observed injury, or fails to consider an alternative hypothesis that could also explain the injury. *Id.* Second, after ruling-in all potential causes, the expert must reliably eliminate all hypotheses that cannot explain the plaintiff's injury, until the expert arrives at the specific cause. *Id.* When undergoing this process of elimination, the expert must "provide reasons for rejecting alternative hypotheses using scientific methods and procedures and the elimination of those hypotheses must be founded on more than subjective beliefs or unsupported speculation." *Id.* (internal quotations omitted).

It is not sufficient for an expert to simply assert he or she performed a differential diagnosis. *McClain v. Metabolife Int'l Inc.,* 401 F.3d 1233, 1253 (11th Cir. 2005) ("[A]n expert does not establish the reliability of his techniques or the validity of his conclusions simply by claiming that he performed a differential diagnosis on a patient."); *Soldo v. Sandoz Pharms. Corp.,* 244 F. Supp. 2d 434, 551 (W.D. Pa. 2003) ("[T]he mere statement by an expert that he or she applied differential diagnosis in determining causation does not *ipso facto* make that application scientifically reliable or admissible."). Courts have consistently held that expert opinions that pay lip service to this methodology but do not reliably apply it should be excluded. *See, e.g., In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig.,* 892 F.3d 624, 642-45 (4th Cir. 2018). Instead, trial courts must "delve into the particular witness's method of performing a differential diagnosis to determine if his or her ultimate conclusions are reliable." *Poust v. Huntleigh Healthcare,* 998 F. Supp. 478, 496 (D.N.J. 1998). A court's investigation must include confirmation that the expert considered alternative causes. *Id.* ("[A]t the core of differential diagnosis is a requirement that experts at least consider alternative causes.") (citation and quotation omitted); *see also Guinn v. AstraZeneca Pharm. LP*, 602 F.3d 1245,

1253 (11th Cir. 2010) (expert's opinion was properly excluded where differential diagnosis failed to consider alternative causes and this was deemed unreliable).

Dr. Conry claims that he used this methodology to determine the cause of Plaintiff's cancer. **Ex. B**, Conry *Delorme-Barton* Rpt. at 5. But the methodology performed by Dr. Conry in this case strays far from any reliable methodology, because his process is designed to lead to his pre-ordained conclusion. Indeed, as Dr. Conry admitted in a recent deposition in another Roundup case, "it was important for me to come to the conclusion that glyphosate Roundup, you know, there's sufficient evidence that it's a significant contributing factor among the other factors that I considered for these plaintiffs." **Ex. E**, Conry *Griswold* Dep. Vol. I at 94:17-21. In reality, Dr. Conry does not reliably engage in either required step of a differential diagnosis. The Court should exclude his opinion.

### A. Dr. Conry's Specific Causation Opinion Should Be Excluded Because He Did Not Reliably Rule In Roundup as a Possible Cause of Plaintiff's NHL.

As an initial matter, Dr. Conry agrees that, to rule in Roundup as a possible cause of Plaintiff's NHL, there must be a reliable basis to conclude that Roundup is capable of causing NHL. **Ex. C**, Conry *Delorme-Barton* Dep. at 156:16-23. Although Dr. Conry has affirmatively stated that he is not offering general causation opinions in this case and that his specific causation opinion "assumes that the conclusions of the special experts on general causation and genotoxicity of glyphosate are true, and that glyphosate is genotoxic and carcinogenic to humans," **Ex. B**, Conry *Delorme-Barton* Rpt. at 19, he nevertheless suggested in his deposition that his testimony may touch on epidemiology, animal model, and genotoxicity studies as part of his specific causation opinion. *See, e.g.*, **Ex. C**, Conry *Delorme-Barton* Dep. at 12:17-22, 40:2-11 ("And I have, you know, reviewed the genotoxicity animal model studies and original epidemiology studies and reviewed more thoroughly the meta-analyses and have understood the material in formulating my opinion that glyphosate Roundup belongs on a list of potential causes for NHL."). Dr. Conry, however, is not qualified to opine on these topics.

Dr. Conry is a treating physician with little to no expertise in the scientific fields relevant to assessing general causation in this case, namely, epidemiology, genetics, toxicology, genotoxicity, and animal cancer studies. Indeed Dr. Conry admits he is not an epidemiologist by training. **Ex. C**, Conry *Delorme-Barton* Dep. at 78:11-14. He also is not a toxicologist or exposure expert, and has never

published any epidemiological or genotoxicity research on Roundup, or published any study regarding NHL.  See **Ex. D**, Conry *Jacobs* Dep. at 39:9-40:25.  While he purports to be able to assess and opine from data and studies in these disciplines concerning the alleged association between glyphosate and NHL, Dr. Conry has demonstrated an inability to answer basic questions about those studies, ultimately deferring to others with different expertise on important details.  For example, on the subject of his reliance on epidemiological data, Dr. Conry admitted he did not know the difference between a pooled study and a meta-analysis, stating "That's more of an epidemiology question.  It's beyond what I have to know to place glyphosate Roundup on my list of causes of NHL."  **Ex. C**, Conry *Delorme-Barton* Dep. at 66:18-23.  In other recent Roundup cases, Dr. Conry has admitted in deposition testimony that controlling for other pesticide exposure was important in epidemiological data, but could not identify which studies he relied on actually did so, instead deferring to others with actual expertise.  *See*, *e.g.*, **Ex. D**, Conry *Jacobs* Dep. at 63:21-64:10; **Ex. E**, Conry *Griswold* Dep. Vol. I at 248:12-22.  Dr. Conry clearly lacks the expertise and training to offer this type of general causation testimony.  And despite his representations that he will not do so, an order from this Court precluding him from straying far beyond his expertise is still necessary.

Dr. Conry's "ruling in" of Roundup is further unreliable because he has no quantitative understanding of Plaintiff's *absorbed dose* of glyphosate—*i.e.*, the amount of glyphosate to which Plaintiff was exposed that was actually absorbed into her skin, and he has offered no other reliable basis to conclude that her alleged Roundup exposure caused her NHL.  In a toxic exposure case like this, assessing the amount of a substance that is actually *absorbed* into the body—not just the amount to which a person is exposed—is critical to assessing whether someone's exposure to a substance can be considered a possible cause of an illness or injury.  *See*, *e.g.*, *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1242 (11th Cir. 2005) ("Dose is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect."); *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671 (6th Cir. 2011) (excluding an expert for failing to reliably rule in benzene exposure as a possible cause because the expert "formulated his opinion on dose 'without any exposure data, only having been told that [Pluck] had been 'heavily' exposed to benzene in her water'"); *Borg-Warner Corp. v. Flores*, 232 S.W.3d 765, 770-73 (Tex. 2007) (discussing importance of dose on causation inquiry and reversing

judgment in Plaintiff's favor following jury trial where Plaintiff did not establish sufficient dose to cause alleged injuries).

Dr. Conry ignores the concept of dose altogether, and instead purports to base his specific causation opinion on Plaintiff's alleged exposures to Roundup, opining that she had sufficient exposures for him to rule in Roundup as a potential cause of her NHL.  To do so, Dr. Conry summarizes Plaintiff's alleged use of Roundup, as documented in her Plaintiff Fact Sheet, deposition testimony, and from one phone interview he conduct with her.  **Ex. B**, Conry *Delorme-Barton* Rpt. at 12.  From this he calculates that she used Roundup for a period of 35 years including over 3,000 application sessions of varying lengths.  *Id.* at 18.  Based on this assessment and nothing else, Dr. Conry opines that "this risk factor substantially contributed to Ms. Delorme-Barton's risk of developing NHL." *Id.* Nowhere in Dr. Conry's report or deposition testimony does he venture any opinion on an absorbed dose Plaintiff experienced from these spraying applications.  And remarkably, Dr. Conry does not assess Plaintiff's exposure either, *i.e.*, the amount of Roundup that actually contacted Plaintiff's skin during these applications and would thus be available as a *potential* dose.

Dr. Conry admitted in his deposition that Plaintiff's level of exposure was a critical part of his opinion.  **Ex. C**, Conry *Delorme-Barton* Dep. at 155:14-21 ("And then I think level of exposure plays into it.  I think, you know, Karen doesn't just meet the definitions of Roundup risk based on the McDuffie and Eriksson papers that just require two uses per year and/or ten uses lifetime.  But she used it, I think I calculated roughly, 3,000 times in the span of 35 years.").  But Dr. Conry notably testified that "there are other individuals involved in this case and in cases like this that try to assess Karen's Roundup use," an apparent deferral to an exposure expert who will provide an assessment or some quantification of Plaintiff's use and exposure to Roundup.  **Ex. C**, Conry *Delorme-Barton* Dep. at 92:22-24.  But Plaintiff has not disclosed any exposure expert or any specific causation expert other than Dr. Conry.  No one will be able to calculate Plaintiff's exposure at trial.

Accordingly, Dr. Conry's report and deposition testimony not only fail to identify a sufficient dose of Roundup necessary for an individual to develop NHL, he also does not analyze a threshold level of exposure, or that Plaintiff met that threshold, tied to any scientifically reliable data.  Thus, even if it were sufficient under *Daubert* to use time spent spraying as a proxy for exposure, and exposure in

turn as a proxy for absorbed dose, Dr. Conry's opinion does not meaningfully address these topics. In other words, Dr. Conry is not assessing dose, he is not assessing actual exposure, and he is not even assessing "exposure-days" as that concept has been defined by other plaintiff's experts with which this Court is familiar. Indeed Dr. Conry's deferral at deposition to an exposure expert that Plaintiff has not actually disclosed is an admission that his opinion alone cannot get Plaintiff across the specific causation threshold. His purported basis to rule in Roundup as a cause of Plaintiff's NHL – essentially, that Plaintiff used a lot of Roundup – is divorced from any scientifically reliable basis and is inadmissible.

### B. Dr. Conry's Specific Causation Opinion Should Be Excluded Because He Did Not Rule Out Potential Alternative Causes.

Dr. Conry also did not complete the necessary second step of the differential etiology methodology: even if Dr. Conry had properly "ruled in" glyphosate exposure as a cause of each Plaintiff's NHL, he did not attempt to rule out—or even consider—potential alternative causes. *See Clausen*, 339 F.3d at 1057. This failure renders his opinions unreliable. *See id.*; *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig. (No. II) MDL 2502*, 892 F.3d 624, 645 (4th Cir. 2018) ("*Daubert* requires more" than an export "dismiss[ing] other possible causes in favor of [the product at issue] in a cursory fashion."); *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265 (4th Cir. 1999) ("A differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation.").

Dr. Conry in fact dismisses the very concept of ruling out alternative causes, claiming that NHL has what he calls a "multi hit process." **Ex. C**, Conry *Delorme-Barton* Dep. at 146:19-147:9. According to Dr. Conry, "you rule out some and you acknowledge that some others may exist," then you do your best to "draw, you know, what conclusions you can about which one predominates . . . ." *Id.* at 146:19-23. Dr. Conry's uniquely unscientific view of the ruling out part of a differential diagnosis is perhaps best exemplified by his dismissive approach to the natural causes responsible for most NHL cases—he simply ignores the prospect in his methodology. But Dr. Conry has previously admitted that the majority of NHL cases have no identifiable cause and/or no accepted recognized risk factors that apply. **Ex. E**, Conry *Griswold* Dep. Vol. I at 77:14-78:18 ("Q: And is it correct that in the vast majority

of non-Hodgkin lymphoma cases you're not able to identify a specific cause of their non-Hodgkin lymphoma? A: It's true that in the majority some of the recognized risk factors do not apply."). He has also previously acknowledged that "random DNA replication errors" are "something that just happens in the natural course of being human, which is correct. That as our DNA replicates over and over during our lifetimes, there can be and generally are replication errors that occur that can make a contribution to our future development of cancer." **Ex. D**, Conry *Jacobs* Dep. at 53:10-21.

On that subject of genetic mutations that naturally occur as one ages, Dr. Conry acknowledged that the risk of NHL increases with age, and that it is 10 times more common to be diagnosed with follicular lymphoma at ages 60-64, like Plaintiff, than it is at ages 30-34. **Ex. C**, Conry *Delorme-Barton* Dep. at 143:20-144:3, 144:18-145:2. He further acknowledged that these genetic mutations can result in cancers even in the absence of exposure to environmental risk factors. **Ex. C**, Conry *Delorme-Barton* Dep. at 149:10-15 ("That's been published and seems plausible."); *see also* **Ex. D**, Conry *Jacobs* Dep. at 103:9-16 (acknowledging that individuals develop NHL without ever being exposed to Roundup, and that not all individuals who are exposed to Roundup will develop NHL).

Yet Dr. Conry inexplicably leaps to the conclusion that Plaintiff's NHL must have been caused by Roundup exposure. But as this Court has previously recognized, to be admissible, "<u>an expert must have a way to differentiate Roundup users who developed NHL because they used the product from Roundup users who would have developed NHL regardless</u>." *In re Roundup*, 358 F. Supp. 3d at 959 (emphasis added). Dr. Conry cannot do so. Even worse, Dr. Conry apparently does not believe doing so is necessary to render his opinion—despite Ninth Circuit law to the contrary. Dr. Conry intends to opine that, even when the independently sufficient force of naturally occurring genetic mutations is operating in one's body, he can still determine that environmental exposure to Roundup caused the cancer without needing to rule out a natural cause: "And, yes, some percentage of those [mutations] may occur spontaneously due to DNA replication, but then others can be promoted by a carcinogen like Roundup . . . . And even if half or two-thirds of the mutations occur due to replication errors, you still wouldn't have a cancer if you didn't get the other third of the mutation of the other half of the mutations caused by the environmental source such as Roundup." **Ex. C**, Conry *Delorme-Barton* Dep. at 151:2-12. This is contradictory and unscientific speculation, particularly when Dr. Conry further

admits that there is no specific signature or marker that would specifically indicate Roundup over any other carcinogen. **Ex. C**, Conry *Delorme-Barton* Dep. at 147:10-148:6.

That is Dr. Conry's fatal flaw here. Dr. Conry is unable to offer any reliable method for placing Plaintiff in one category and not the other, and thus any such testimony is unreliable and cannot possibly be helpful to a jury tasked with that very assessment. Dr. Conry's report does not address whether or to what extent Plaintiff's NHL may be the result of random genetic mutations. A differential diagnosis that purports to identify a cause when most instances of the disease arise as part of the body's natural processes is simply speculation, lacks scientific reliability, and does not meet the minimal scientific standards required of an expert opinion by *Daubert*. This reflects a straightforward, common-sense application of *Daubert* itself. Where most cases of a disease arise as a part of the body's natural internal processes, an expert who claims to pinpoint one external risk factor through a differential diagnosis—without even considering that natural cause—is simply speculating.

Ultimately, Dr. Conry engages in an "always Roundup" methodology that determines Roundup to be the cause no matter the exposure. But exposure alone is not enough, and Dr. Conry is not able to explain with any coherent scientific methodology why this is enough evidence for him to conclude that Roundup is the causes of the Plaintiff's NHL. His opinion must therefore be excluded.

## CONCLUSION

For all these reasons, the Court should grant Monsanto's motion to exclude the opinion testimony of Plaintiff's expert witness Dr. Conry.

Dated:  June 16, 2023                    Respectfully submitted,

/s/ *Jed P. White*
Jed P. White
Attorneys for Defendant Monsanto Company

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 16th day of June, 2023, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

/s/ *Jed P. White*
Jed P. White