Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
CASE NO. 3:16-md-02741-VC
CASE NO. 3:20-cv-01363-VC

IN RE:  ROUNDUP PRODUCT  ) MDL NO. 2741
LIABILITY LITIGATION,   )
                        ) DEPOSITION TAKEN
                        ) ON BEHALF OF THE
ESTATE OF KENZIE        ) PLAINTIFFS
ELIZABETH MURDOCK, KYLE ) BY: NOTICE
A. MURDOCK, ADM'R, KYLE ) TAKEN:  MARCH 16, 2023
A. MURDOCK, INDIVIDUALLY )
AND MANDI L. MURDOCK    )
                        )
    PLAINTIFFS          )
                        )
VS.                     ) WITNESS:
                        ) THOMAS R. BUTTS, Ph.D.
MONSANTO COMPANY,       )
                        )
    DEFENDANT           )
        * * * *   * * * *
    The deposition of THOMAS R. BUTTS,
Ph.D., via Zoom videoconferencing on behalf of the
defendant before CAMELA A. HUGHES, Registered Merit
Reporter and Notary Public in and for the State of
Kentucky at Large, on Thursday, March 16, 2023,
commencing at the approximate hour of 9:00 a.m.
    Said deposition was taken pursuant to
notice previously filed, for purposes of discovery
and any and all other purposes allowed under the
Federal Rules of Civil Procedure

Page 2

 1              APPEARANCES
 2
 3    ON BEHALF OF THE PLAINTIFFS:
 4        (Via Zoom)
 5      Mr. Jerome P. Prather
        Garmer & Prather, PLLC
 6      141 North Broadway
        Lexington, Kentucky  40407
 7      Jprather@garmerprather.com
 8
        ON BEHALF OF THE DEFENDANT:
 9
          (Via Zoom)
10
11      Mr. Marchello D. Gray
        Mr. David I. Schifrin
12      Hollingsworth, LLP
        1350 Street NW
13      Washington, DC 20005
        mgray@hollingsworthllp.com
14      dschifrin@hollingsworthllp.com
15
16      Mr. Barry J. Koopmann
          Nelson Mullins
17    1600 Utica Avenue South, Suite 750
        Minneapolis, Minnesota 55416
18      barrykoopmann@nelsonmullins.com
19
20      * * * *      * * * *
21
22
23
24
25

Page 3

 1              INDEX
 2    Caption Page.................................    1
 3    Appearances.................................    2
 4    Index.......................................    3
 5    Exhibits....................................    4
 6    Examination by Mr. Prather.................6-135
 7    Reporter's Certificate....................  136
 8    Deponent's Signature......................  137
 9    Errata Sheet..............................  138
10
11
12          * * * *      * * * *
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

 1              EXHIBITS
 2    Plaintiffs' Exhibit No. 1....................   11
 3    (Notice of Deposition)
 4    Plaintiffs' Exhibit No. 2....................   13
 5    (Curriculum vitae)
 6    Plaintiffs' Exhibit No. 3....................17-18
 7    (Witness' report)
 8    Plaintiffs' Exhibit No. 4....................18-19
 9    (Butts material list considered of 1/23/23)
10    Plaintiffs' Exhibit No. 5....................   19
11    (Butts material list considered of 3/15/23)
12    Plaintiffs' Exhibit No. 6....................21-22
13    (Butts invoices)
14    Plaintiffs' Exhibits No. 7...................   73
15    (Photos of 2081 Rayburn)
16    Plaintiffs' Exhibit No. 8....................   79
17    (Marked up Exhibit No. 5)
18
19
20
21
22
23
24
25

Page 5

```
 1        COURT REPORTER:  We're on the
 2   record.  Today is March 16th, 2023.
 3   The time is approximately 9:24 a.m.  We
 4   are here to take the remote Zoom
 5   deposition of Dr. Thomas Butts.
 6        Would counsel please introduce
 7   themselves and state whom you
 8   represent?
 9        MR. PRATHER:  This is Jay Prather.
10   I'm here on behalf of the estate of
11   Kenzie Murdock and her family.
12        MR. GRAY:  Marchello Gray on behalf
13   of defendant, Monsanto.
14        MR. SCHIFRIN:  David Schifrin, also
15   on behalf of Monsanto.
16        MR. KOOPMANN:  Barry Koopmann on
17   behalf of Monsanto.
18   -------------------------
19
20
21
22
23
24
25
```

Page 6

```
 1              THOMAS RICHARD BUTTS,
 2   having been first duly placed under oath, was
 3   examined and deposed as follows:
 4              EXAMINATION
 5   BY MR. PRATHER:
 6   Q.     Good morning, Dr. Butts.  Would you
 7   state your full name for the record, please?
 8   A.     Sure.  It is Thomas Richard Butts.
 9   Q.     And do you go by Tommy Butts?
10   A.     Yeah, most people call me Tommy.
11        MR. PRATHER:  Before we continue, I
12        just want to confirm with the court
13        reporter that on the recorded video,
14        Dr. Butts' video is being pinned?
15        COURT REPORTER:  Correct.
16        MR. PRATHER:  It wasn't showing up
17        that way for me for some reason, but
18        it's been one of those days.
19   BY MR. PRATHER:
20   Q.     Dr. Butts, where are you today?
21   A.     We are in Little Rock at the Marriott
22   hotel.
23   Q.     Who is in the room with you?
24   A.     I'm sorry, I had a hard time hearing
25   that.
```

Page 7

```
 1   Q.     Who is in the room with you?
 2   A.     Oh, okay.  Sure.  It is Mr. Schifrin
 3   and Mr. Marchello.
 4   Q.     Anyone else in the room, besides those
 5   two?
 6   A.     No.
 7   Q.     What is your professional address?
 8   A.     My professional address, like my work
 9   address?
10   Q.     Correct.
11   A.     Be 2001 Highway 70 East.  That's
12   Lonoke, Arkansas.
13   Q.     Is that a University of Arkansas
14   facility?
15   A.     Yes.
16   Q.     What kind of facility is that?
17   A.     It's just an off-campus research and
18   extension center.
19   Q.     Where is Lonoke in relation, say, to
20   Fayetteville or Little Rock?
21   A.     It's about, you know, roughly speaking,
22   30 minutes east of Little Rock, which is about three
23   hours or so away from Fayetteville.
24   Q.     And you're an employee of the
25   University of Arkansas, correct?
```

Page 8

```
 1   A.     Yes, that's correct.
 2   Q.     What is your current position there?
 3   A.     Oh, okay.  Sorry, my Zoom screen
 4   changed.  Okay.  I'm an extension weed scientist with
 5   the University of Arkansas.
 6   Q.     And how long have you been in that
 7   particular position?
 8   A.     Just a little over four years, going
 9   into my fifth year.
10   Q.     Dr. Butts, have you ever been deposed
11   before in any context?
12   A.     I have not, no.
13   Q.     Let me go over just a few ground rules
14   with you.  It's always a little more difficult over
15   Zoom.  I think we've got that part worked out, and
16   you're doing well so far.  Probably the most
17   important rule is that you and I do not talk over the
18   top of each other because the court reporter just
19   can't take down if two people are talking at the same
20   time, okay?
21   A.     Yes.
22   Q.     The second rule is, it's important that
23   you verbalize your answers.  So if it's a yes or no
24   answer, please say yes or no, rather than just
25   nodding or shaking your head or saying uh-huh or
```

Page 9

1   huh-huh, which are very hard to take down on paper.
2   A.      Yeah, that makes sense.
3   Q.      The third thing is, that if ever you do
4   not understand one of my questions -- that is certain
5   to happen today -- please ask me to either repeat the
6   question or rephrase it and I'll be happy to; but
7   otherwise, I'll assume that you understood the
8   question before you ask; is that fair?
9   A.      Yes, it is.
10  Q.      Or before you answer, I'm sorry.  And I
11  think the final rule is; if you need to take a break
12  at any time during the deposition today, and I don't
13  think we'll be going too horribly long -- but we'll
14  probably want to take some breaks -- just so say.  As
15  long as there's not a question pending on the floor,
16  I'm happy to take a break at any time.
17  A.      Okay.  Sounds good.
18  Q.      And then this is probably implied, but
19  it's important that you speak loudly and clearly and
20  slowly, and especially since we're on the phone audio
21  and it's not quite as loud as it was before, so that
22  we can all hear you.  And I may have to ask you to
23  speak up or repeat something a time or two, and so
24  that will be fine.
25  A.      That sounds good.  I'll be honest, I

Page 10

1   might have to as well.  It's a little bit kind of
2   quiet on our end, too, through the conference
3   speaker.  For the most part, I think I'm hearing it,
4   but every now and then.
5   Q.      I've got this fancy microphone here
6   that's got a volume control.  Is that helping any?
7   A.      A little bit.
8   Q.      I've got that turned up as high as I
9   can.  But please -- please ask me to speak up if ever
10  you can't hear me.
11  A.      Yeah, sounds good.
12  Q.      Dr. Butts, do you have any ties to
13  Western Kentucky; ever lived there, gone to school
14  there, have any family members there, anything along
15  those lines?
16  A.      No, I don't have any schooling there or
17  family there, no.  Nothing along those lines in
18  Western Kentucky.
19  Q.      This case, although it's part of an
20  MDL, it will be tried in the Federal District Court
21  in Paducah, Kentucky.  Have you ever been to Paducah?
22  A.      I've not been there, specifically.  I
23  have driven through it, you know, from some travels
24  and things, but not there specifically.
25  Q.      And the same thing, my clients live in

Page 11

1   -- Kenzie lived in Calloway County, Kentucky.  They
2   lived in the county, but the county seat there is
3   Murray, Kentucky.  Have you ever been there?
4   A.      I have not been in Murray, no.
5   Q.      And have you ever had any affiliation
6   or cooperation with Murray State University?  I know
7   there's some agricultural and veterinary programs
8   tied to Murray State.
9   A.      No, not that I recall anyway.  No.
10  Yeah, connections with Murray State.
11  Q.      I'm going to go on and share my screen
12  and put up on here what I'm going to mark as Exhibit
13  No. 1 to the deposition, and this is what's called
14  the notice of deposition.  It's simply the document
15  scheduling this today and requesting that you bring
16  certain documents with you, if you have them.  Have
17  you seen this document before?
18  A.      Yes, I have.
19          (Said document is filed with
20          this deposition and marked as
21          Exhibit No. 1 for purposes of
22          identification.)
23  Q.      And I acknowledge -- so on Page 2 that
24  I'm showing here on the screen, there are eight
25  requests, and I acknowledge that we got a response in

Page 12

1   advance yesterday evening from Monsanto's attorneys.
2   I know you've provided some of these documents
3   already, but I want to go through these one by one.
4           So the first request was for your
5   up-to-date curriculum vitae, including a list of all
6   publications you've authored in the last ten years
7   that are in any way related to issues in this case.
8           When we received your expert disclosure
9   on -- around February 1st of this year, we received
10  this copy of an 11-page CV, and I've got the first
11  page on the screen now.  Is this your most current
12  CV?
13  A.      Yeah.  Can we just scroll down through
14  to the bottom, just to check all the pages?
15  Q.      Sure.  When you say the bottom, did you
16  want to go through each page?
17  A.      Yeah, just so I can make sure that the
18  different components were there.
19  Q.      I'm going to make it a little bit
20  smaller, so hopefully we can see the whole page at a
21  time on the screen.  Is that still big enough for you
22  to see?
23  A.      Yes.  Yeah, that's fine.
24  Q.      Tell me when to go on.
25  A.      Go ahead, yeah.  Okay.  Yep.  Yeah,

Page 13

1   okay, we can go through these presentations.  Yeah.
2   Yep, go ahead.  Yes, that's still correct.  Yes, yes.
3   So that, yeah, is my most up-to-date CV.  Nothing's
4   changed since we submitted that.
5           MR. PRATHER:  So we will mark this
6   as Exhibit No. 2 to the deposition.
7           (Said document is filed with this
8           deposition and marked as Exhibit No. 2
9           for purposes of identification.)
10  Q.       The next thing that we asked for were
11  any updated notes, reports, or other documents
12  generated or authored by you related to the subject
13  matter of this case.  We obviously received the
14  report that was dated January 23rd of 2023.  Have you
15  prepared any updates to that report since that date?
16  A.       No updates to that report, and no new
17  notes or anything along those lines, either.
18  Everything -- yeah, just no new updates there.
19  Q.       Sorry, I've got too many things open on
20  my screen.  I'll try to keep these in better order.
21  So I will go on and mark -- so I'm putting in front
22  of you now what we received on January 23rd.  It's a
23  25-page report, and we'll go down here towards the
24  end.  Is that your signature?
25  A.       Yes, that is my signature.

Page 14

1   Q.       And does this appear -- I'm happy to go
2   all the way through it.  It's 25 total pages.  The
3   first section ends at Page 16, which says conclusion,
4   summary, and opinions.  And then the case with
5   certain opinions restart on the 17th page, which is
6   No. 1, and continues down to your signature line on
7   numerical Page 9.  Does that appear to be your
8   complete report?
9   A.       Yes, it does appear to be my report.
10  Q.       In your preparation of this case or
11  work on this case, did you make any handwritten notes
12  or electronic notes on a sheet of paper, or in a
13  computer file, anything like that?
14          MR. GRAY:  Object to the form of
15          this question, to the extent it calls
16          for materials protected by the parties'
17          agreement.  But you can answer.
18  A.       All that I had was a document when I
19  had reviewed Mr. Murdock's deposition, but all of
20  those notes were placed into this specific report on
21  this case.  So there's nothing extra, outside of
22  what's in the specific report.
23  Q.       What kind of document was that?  Was
24  that a handwritten document or a computer document?
25  A.       No, it was a Word document.

Page 15

1   Q.       And those are notes you made in the
2   course of reviewing Mr. Murdock's deposition
3   transcript?
4   A.       Sorry, could you repeat that question?
5   Q.       Yeah.  Did I understand you to say
6   those were words you made -- excuse me, those are
7   notes you made simultaneously with -- or during the
8   course of your review of Mr. Murdock's deposition
9   transcript?
10  A.       Yeah, it was just me writing down, you
11  know, the facts that he stated from his deposition.
12  Q.       Did it have any other commentary or any
13  other information in it, other than your notes of his
14  deposition?
15  A.       No.  It was -- yeah, it was just me
16  reading through his deposition and taking down notes
17  that pertained, or would pertain to my specific
18  report.  That was it.
19  Q.       Was that something that you used in the
20  preparation of your report?
21  A.       In the preparation of the report?  Yes.
22  Again, it contributed to basically the fact section
23  within that specific report.  It was just me taking
24  the material that Mr. Murdock testified to use for
25  that fact section.

Page 16

1   Q.       Were those notes in any way formulated
2   or styled as a letter to counsel in this case, that
3   is, Monsanto's counsel?
4   A.       Sorry, could you please repeat that?  I
5   just kind of missed it.
6   Q.       Sure.  Were those notes in any way
7   formulated as a letter to Monsanto's counsel, letter
8   or e-mail to Monsanto's counsel?
9           MR. GRAY:  Object to form, but you
10          can answer.
11  A.       No, not at all.  All it was was a
12  literally just me taking the facts of the case from
13  Mr. Murdock's deposition, so I had it condensed into
14  one file so I could write that report.
15          MR. PRATHER:  I would request a
16          copy of that document be produced after
17          the deposition.
18          MR. GRAY:  I think we -- I think
19          this has kind of been gone over in
20          other depositions; but based on
21          pretrial order No. 7, it's our position
22          that those notes won't be discoverable.
23          But we're happy to talk about it off
24          the record or after the deposition or
25          something.

Page 17

1      MR. PRATHER: Yeah, we can address
2   that later. I want to make sure it's
3   on the record, and I want to make sure
4   we're treating this consistently across
5   all witnesses in the case.
6   Q.      Okay. Were there any other notes that
7   you -- strike that.
8          I know some experts will make margin
9   notes as they review documents and depositions or
10  medical records, scientific articles, that sort of
11  thing. Did you make any such notes?
12  A.    No.
13          MR. GRAY: Same objection as
14      previous, but you can answer.
15  A.    No, I did not.
16  Q.    All right. Our third -- let me go back
17  here to your -- strike that.
18          MR. PRATHER: Camie, did we mark
19      the exhibit already?
20          COURT REPORTER: No.
21          MR. PRATHER: Okay. I want to mark
22      the report that's shown on the screen
23      now that was just identified as Exhibit
24      No. 3.
25          (Said document is filed with this

Page 18

1   deposition and marked as Exhibit No. 3
2   for purposes of identification.)
3   Q.      And then back to the notice, the third
4   request and the fourth request somewhat go together;
5   but the third request is any documents that the
6   deponent has considered in forming any opinions in this
7   case, including but not limited to medical records,
8   correspondence, memorandum -- memoranda, e-mails,
9   letters, et cetera.
10          And request No. 4 is any medical or
11  scientific articles, literature or publications of
12  any kind that the deponent has relied on in forming
13  his opinions and/or will rely upon for the testimony
14  at the trial of this action.
15          Dr. Butts, prior to the deposition --
16  or with your report, we were provided a document
17  titled Dr. Thomas Butts' materials considered list,
18  and I have -- that is on the screen now. Before it
19  was provided, except for ease of reference, I've
20  added in the top right corner the date that we
21  received it or the date that it was dated, at least
22  one -- excuse me, the date of the report that it was
23  attached to, which was 1/23 of 2023, and let's go on
24  and mark that as Exhibit No. 4.
25          (Said document is filed with this

Page 19

1   deposition and marked as Exhibit No. 4
2   for purposes of identification.)
3   Q.      And then the next document I have on
4   the screen here is another document with the same
5   title, and it was provided to us yesterday evening
6   after the close of business. And this is dated -- so
7   I've added the date that it was produced to us, which
8   is 3/15/2023, and let's go on and mark that as
9   Exhibit No. 5.
10          (Said document is filed with this
11      deposition and marked as Exhibit No. 5
12      for purposes of identification.)
13  Q.      So first, let me ask you, Dr. Butts,
14  between these two documents, does this include any --
15  do they list all documents that will be responsive to
16  request No. 3 and 4 for any materials or scientific
17  literature that you have considered in forming your
18  opinions in this case?
19          MR. GRAY: Object to form, but you
20      can answer.
21  A.    Well, particularly the second one
22  because we did update it, which is we added a couple
23  documents on there. So particularly the second one,
24  that's the most up-to-date MCL, you know, provide the
25  documents that, you know, that we -- that I reviewed

Page 20

1   to form the basis of my opinions on this.
2          I will clarify, though, just to say,
3   you know, based on my past experiences and other
4   things, there's a lot of things that play into my
5   opinions, but these were the documents that we
6   reviewed and considered in particular for this case.
7   Q.      All right. We will come back to these
8   lists and talk about them in more -- more
9   specifically later on in the deposition. But let's
10  now go on to my next request which is No. 5. It
11  lists all the testimonies you've ever given in a
12  deposition, hearing, or trial. In your report, it
13  stated that you had never testified at a deposition
14  or trial before. Is that still true?
15  A.    Yes, that's still true.
16  Q.      And I don't think your report
17  specifically said anything about hearings, but have
18  you given any sworn testimony in any court hearing
19  that was not in a deposition or trial?
20  A.    No, I have not.
21  Q.      Number 6 is all documents showing your
22  usual billing rates, the amount of time spent and the
23  amount of time actually billed for work relating to
24  Kenzie Murdock. I believe in your report you stated
25  your billing rates, and I've forgotten exactly where

Page 21

1  those were. We'll come back to that in a minute,
2  regardless, but do you keep any document with a fee
3  schedule separate from what you stated in your
4  report?
5  A.      I'm sorry, just so I can clarify, did
6  you ask if I kept another document with my fee
7  schedule; is that what it was? Was that the
8  question?
9  Q.      Yes. Do you have a published fee
10  schedule that you send out to show what your fees are
11  that's separate from what's in report?
12  A.      Got you. No, I do not.
13  Q.      And then we received last night three
14  invoices. Let's mark these collectively as Exhibit
15  No. 6. It's a three-page exhibit. One of them is
16  dated 12/31/22, one is dated 1/31/23, and one is
17  dated 2/28/23. Are these the only three invoices you
18  have issued in this case so far to Monsanto?
19  A.      So just to clarify that, you know, I've
20  issued these to Hollingsworth, LLP, there as you
21  can see, but yeah, these are the three that I've
22  issued to Hollingsworth; the only three.
23          MR. PRATHER: So we'll mark those
24          as Exhibit No. 6.
25          (Said document is filed with this

Page 22

1  deposition and marked as Exhibit No. 6
2          for purposes of identification.)
3  Q.      And then that takes us back to the
4  notice. Request No. 7 was for any correspondence or
5  communication you've had with any other expert
6  retained by Monsanto relating to this case, including
7  Dr. Braunschweig and Mr. Leslie -- that's a typo --
8  should be Ungers with an S. Have you had any
9  correspondence by e-mail or letter with either of
10  those experts?
11  A.      No, I have not.
12  Q.      Have you ever -- have you had any
13  correspondence with any other expert witness from
14  Monsanto, the experts are typically what are called
15  general causation experts, that have been disclosed
16  as experts in the litigation?
17          MR. GRAY: Object to form to the
18          extent you're inquiring beyond this
19          particular case, but you can answer.
20  A.      No, I have not had any discussions with
21  any other experts on this litigation.
22  Q.      And the final request, No. 8, was for
23  any document, including electronic documents sent you
24  to by Monsanto or any person acting on behalf of
25  Monsanto, that's not protected by privilege relating

Page 23

1  to exposure to or carcinogenicity of glyphosate.
2  Dr. Butts, I think there's some documents listed on
3  your materials that you likely received from
4  Monsanto's attorneys, would be people acting on
5  behalf of Monsanto. Does that list, that most
6  up-to-date list that we marked as Exhibit No. 5,
7  include any documents that you would have received
8  from Monsanto or any representative of Monsanto?
9  A.      So in that up-to-date MCL, that is a
10  combination of different files that I found, as well
11  as, you know, being sent to me from some
12  Hollingsworth attorneys; but that would encompass,
13  again, all the materials considered for this specific
14  case.
15  Q.      My question was a little bit different.
16  Were there any materials sent to you by Monsanto or
17  the attorneys for Monsanto who hired you that are not
18  included on that list?
19          MR. GRAY: Objection. You can
20          answer.
21  A.      No, there's no additional documents.
22  Those -- that would include all the documents.
23  Q.      Okay. Thank you. What did you do --
24  let me preference this as you've not given any
25  deposition before. I do not want to know any

Page 24

1  conversations you've had, the substance of any
2  conversations that you've had with Mr. Gray,
3  Mr. Schrifrin, and Mr. Koopmann, or any other
4  attorney for Monsanto. But with that caveat, what
5  did you do to prepare for today's deposition?
6  A.      Just reviewed my reports and, you know,
7  a little bit of the depositions and things like that.
8  That was the extent.
9  Q.      Did you have a meeting with counsel and
10  talk to them in advance of the deposition?
11  A.      Yes, we did have a few meetings just to
12  discuss, you know, review materials on the case.
13  Q.      Were those in person or were they over
14  Zoom like we're having this deposition today?
15  A.      Most of them were over Zoom. We did
16  have one in-person meeting.
17  Q.      Do you recall how many times you met
18  with them over Zoom and specifically to prepare for
19  the deposition?
20  A.      No, I honestly can't recall. I know on
21  the -- you know, on the invoices it has how many
22  times I met with them. But between, you know, case
23  review materials or preparing for deposition, you
24  know, I couldn't give you a good estimate there, but
25  that at least gives you the idea of when we met.

Page 25

1  Q.      And you anticipated my next question.
2  Between January 30 -- I'm sorry. I believe the first
3  meeting listed is on January 2nd, but that was before
4  your report was produced. After that, between
5  January 31st and February the 16th, you had four
6  meetings with counsel listed. And it looks like each
7  meeting was -- well, they were two or three hours per
8  meeting. Does that sound like all the meetings, or
9  had you had other meetings after this invoice was
10  issued?
11  A.      So those would be all the meetings for
12  those months. We have had -- again, I can't remember
13  offhand, but we have had a meeting or so here in
14  March, now that we've moved into March.
15         MR. PRATHER: I will ask that when
16            you send a subsequent invoice to
17            Hollingsworth for those meetings and
18            today's deposition, that a copy of that
19            be produced to us.
20  Q.      Did you talk to anyone else, anyone at
21  your university or any other persons for any reason
22  in preparation for today's deposition?
23  A.      No, I did not.
24  Q.      I now want to direct your attention to
25  what we've marked as Exhibit No. 2, which is your CV.

Page 26

1  I'll go back up to the beginning. It's a fairly
2  lengthy document, so I'm not going to
3  go over it line by line, but I'm happy to pull any
4  page up on the screen if you need to refer to it for
5  any reason.
6         My first question is, does this have a
7  complete statement of your degree-seeking education?
8  A.      You just want to throw it up on the
9  screen just so we're all kind of looking at the same
10  thing; would that be okay?
11  Q.      I'm sorry, I thought -- I had it up on
12  my screen. I didn't realize I wasn't sharing it.
13  Now can you see that?
14  A.      Yes, now I can. Thank you. So, sorry,
15  could you repeat the question now? I'm sorry.
16  Q.      My question was, at least starting with
17  your undergraduate education, does the CV, does it
18  include a complete statement of your degree-seeking
19  education?
20  A.      Yes. Yeah, because it's my undergrad,
21  master's and my doctorate, yes.
22  Q.      And of your employment in the field?
23  A.      Yes, that includes my -- my positions,
24  yes.
25  Q.      And I don't know a lot about your

Page 27

1  field, but is there any sort of professional
2  licensure that you either hold or that would be
3  available to you in your field?
4  A.      I guess just -- could you clarify a
5  little bit more? I mean, there's a few different,
6  you know, potential like licenses or certifications.
7  So I guess is there something specific, or do you
8  want me to just give you a couple of the licenses? I
9  mean, I just want to clarify it, I guess.
10  Q.      And like I said, I'm not familiar
11  enough with your field to know exactly what it may
12  be. For instance, Mr. Ungers, who was another expert
13  who testified who was an industrial hygienist, told
14  us that to practice in the State of Illinois, he had
15  to have a state industrial hygienist license that
16  other states where he practiced did not require. So
17  that would be one type of license.
18         You know, I don't know if there's a
19  weed scientist license that's offered by any state,
20  for instance. That's kind of what I'm getting at.
21  A.      I understand a little better. So
22  there's not a -- I would say there's not a specific
23  weed science license. I would say I do have a
24  commercial pesticide applicator's license, and I've
25  held that -- well, I had one in Wisconsin. I don't

Page 28

1  know if I had one in Nebraska when I was student
2  there, but I have one again in Arkansas here. And
3  it's basically just -- it's a license to legally
4  apply pesticides.
5  Q.      And is that similar to the license that
6  Mr. Murdock testified that he has in Kentucky?
7  A.      Somewhat. So Mr. Murdock testified
8  had a private applicator's license, I believe, which
9  it's a little bit of a different testing procedure
10  than a commercial applicator's license.
11  Q.      Would the difference be -- I don't mean
12  to put words in your mouth, but would the difference
13  be that a private license allows you to apply
14  pesticides to your own land, and a commercial license
15  allows you to apply pesticides for hire to the land
16  of other people?
17  A.      Yes. That's pretty much the exact
18  definition, yeah.
19  Q.      Is there a Board certification
20  available in your field?
21  A.      No, there's no type of Board
22  certification. Again, other than like for our
23  degrees, we're a thesis-based, committee-based
24  approach. So we go through a committee to earn our
25  degrees, but following that there's no board or

Page 29

1    anything along those lines.
2    Q.      Just to clarify a few things; you're
3    not a physician, a medical doctor, correct?
4    A.      I am not a medical doctor, no.
5    Q.      And you're not an epidemiologist?
6    A.      I am not an epidemiologist, no.
7    Q.      You're not a toxicologist?
8    A.      I am not a toxicologist.
9    Q.      You're not an industrial hygienist?
10   A.      I am not an industrial hygienist.
11   Q.      And you're not a statistician?
12   A.      Though I'm not a statistician by, you
13   know, the term, but I have significant statistician
14   experience just with our degrees. We have to run
15   stats for all of our research trials, those kind of
16   things. So by the letter of the law, I'm not a
17   statistician, but I do have a lot of experience
18   there.
19   Q.      And I understand when you're writing
20   document papers, you have to be familiar with
21   statistics, so you've probably taken classes in
22   statistics; is that fair?
23   A.      Yeah, I've taken classes. I have
24   performed, you know, several different variations of
25   statistics, you know, those kinds of things. But

Page 30

1    again, you know, up to the full extent of being
2    labeled statistician, yes, I would not be considered
3    that.
4    Q.      You do not have an advanced degree in
5    statistics?
6    A.      Correct, yes. I should say, correct, I
7    do not have an advanced degree.
8    Q.      Thank you for that. This is a broad
9    question, and I don't know how to answer in a way
10   that it's -- or ask it in a way that's not broad. So
11   I'm just seeking, at least to start with, kind of a
12   general summary, but tell me about your experience
13   with Roundup and glyphosate, in general, in terms of
14   either your use of it or your academic work. We
15   don't have to go article by article, but kind of tell
16   me how that is factored into your personal and
17   professional life.
18           MR. GRAY: Objection. That
19           question is broad-based, but you can
20           answer if you can, Doctor.
21   A.      Sure. So basically I've used or, you
22   know, learned about glyphosate based products for
23   many years. So I grew up on a farm and around those
24   farms I, you know, would use glyphosate based
25   products around the home both, and then also in our

Page 31

1    field crops that we grew. So just growing up I was
2    around it through -- in personal experiences with
3    using it.
4            Once I went to school and was in the
5    agronomy weed science world, I've studied glyphosate
6    pretty intently, as far as its effectiveness on
7    controlling weeds in the field, program approaches,
8    you know, looking at it from, you know, the drop a
9    size standpoint, different things along those lines,
10   you know, what it does in spray solutions; all those
11   kind of things.
12           So, you know, I've had vast experience
13   just with both using it personally around the home,
14   in agricultural crops, but then also in our research
15   world where we're using it for, again, in researching
16   it with the effectiveness and other things along
17   those lines.
18   Q.      Thank you. That answers my question
19   well. Do you have similar levels of experience with
20   other herbicides as well as insecticides?
21   A.      So insecticides, you know, I have less
22   experience on. I will say, because, you know, as a
23   professional, I'm a weed scientist. I don't deal
24   with the entomology side of things a lot. I have a
25   little bit of experience there. But other

Page 32

1    herbicides, yes, I have significant experience with,
2    again, kind of the same things, you know, using those
3    in different situations, even around the home for
4    like a vegetable garden or things like, but then also
5    with my position researching different herbicides and
6    their effectiveness for controlling weeds.
7    Q.      And anything that you have published as
8    a result of your research, either in peer review
9    journals or through presentations or conference
10   programs, et cetera, is that all set out in your CV?
11   A.      Yeah. Yes, it should be. All the
12   refereed publications are still there, right there on
13   the screen, and then I think the next page or two is
14   -- I guess I can't remember offhand now, looking at
15   that, if the next couple pages were all of my
16   scientific presentations, or if it was just from the
17   past three or four years. I can't remember offhand
18   now, but it's -- I guess I could look real quick.
19   Yeah, for the most part that is literally everything
20   on that standpoint.
21   Q.      And are you looking at a copy of your
22   CV that's in your hand?
23   A.      Yes. I was just going to pull up the
24   -- so, yeah. Okay. I see. So the 110 meeting
25   abstracts and presentations, that was just from the

Page 33

1  last three years. I've got that on the document
2  there. So there would be, you know, some additional
3  abstract presentations and stuff that were provided.
4         Basically, that would have been before
5  my current position. It would have been when I was
6  in graduate school, but all the publications are for
7  sure there.
8  Q.    Have you done any research work on the
9  effects of glyphosate on human -- Roundup or
10  glyphosate on human health, human physiology;
11  anything along those lines?
12  A.    No, I have not performed any studies in
13  relation to the human health aspects.
14  Q.    So is it fair to say that your research
15  into glyphosate, which, you know, appears to be
16  fairly extensive, based on your CV, is related to the
17  use and effectiveness of glyphosate in agricultural
18  setting on the crops?
19         MR. GRAY: Object to form, but you
20  can answer.
21  A.    So I would say my professional
22  experience is with, you know, the use of it, so
23  application procedures, you know, drift mitigation
24  strategies and then the effectiveness of it in row
25  crops. But again, I'd just like to emphasize, too,

Page 34

1  I've had significant experience using it growing up
2  around the home and things like that as well.
3         So both personal use, but professional
4  use as well, and so there's a multitude of different
5  uses there.
6  Q.    Can you describe for me the field of
7  weed science?
8         MR. GRAY: Could you repeat the
9  question?
10  A.    Yeah.
11  Q.    Could you describe for me the field of
12  weed science?
13  A.    Just to make sure I heard that
14  correctly, describe the field of weed science; is
15  that the question?
16  Q.    That was my question, yes.
17  A.    Okay. So I'll be honest, that's a very
18  broad sweeping question. I mean, weed science, we
19  encompass a lot of different things. You know, just,
20  I guess, in generalities, you know, weed science
21  covers, you know, the control of weed species
22  affecting multitude of different areas. It could
23  include row crops, turf grass, non-crop areas,
24  horticultural crops, all those kind of things. But
25  the weed science, we'll also investigate, you know,

Page 35

1  weedocology and biology, understanding how they grow,
2  you know, how they reproduce; all those types of
3  things.
4         Another big aspect of weed science
5  anymore is the -- what I call the application
6  technology world. So it's understanding the sprayer
7  equipment, nozzles, adjuvants, you know, how that
8  affects -- or could impact drift mitigation; those
9  kind of things. You know, again, in generalities
10  that kind of hits a lot of the big points; the
11  managing weeds, the understanding application
12  methods, the multiple different settings they can be
13  used in, and then a lot of the ecology/biology type
14  background stuff.
15  Q.    When you start talking about the
16  application equipment, that sounds to me, as a
17  layperson, like it may be getting into the field of
18  engineering. Do you have any degrees or training or
19  classes in engineering as part of your educational
20  background?
21         MR. GRAY: Object to form.
22  A.    So I don't have an advanced degree in
23  engineering. I did take a handful of engineering
24  type classes, going through my different degrees. I
25  also -- I mean, you are correct in the aspect that

Page 36

1  application technology has a strong engineering
2  background, and I have collaborated and coordinated
3  with several different engineers as well. So I've
4  had experience working with others and dealing with
5  that aspect throughout my entire Ph.D. and my time
6  now at Arkansas as well.
7  Q.    As we sit here today, can you recall
8  any of the specific courses you've taken in
9  engineering?
10  A.    I can't remember offhand what those
11  courses would have been called. Yeah, I honestly
12  can't remember what they would have been.
13  Q.    Would they have been courses taught in
14  an engineering school that allowed the enrollment of
15  agricultural students, or would they have been in a
16  college of agriculture specifically for ag students?
17  A.    So it would have been -- you know, I
18  know at least one or two of them would have been at
19  Nebraska, and the University of Nebraska has what is
20  like an agricultural engineering department. So it's
21  kind of a merger of the two, I guess, to answer your
22  question. Right. It's agricultural students, but
23  it's also an engineering program. So it would have
24  been in that area.
25  Q.    I understand what you're saying. I --

Page 37

```
 1    my background in undergrad was in economics and I had
 2    friends in agricultural economics, and it was just
 3    the same classes with different examples and
 4    textbooks.
 5    A.      Exactly.  Exactly.
 6            MR. GRAY:  Jay, are you still using
 7    the CV?
 8            MR. PRATHER:  Yeah, we're still
 9    talking about it.  We're about finished
10    up.  I'm leaving it up on the screen on
11    purpose.
12    Q.      Dr. Butts, what do you consider to be
13    your specialty within your field?
14    A.      I would say, I kind of have a two "pet"
15    specialties within my field.  So one would be just
16    the applied weed science aspects.  So, again, you
17    know, understanding the effectiveness of different
18    herbicide programs from controlling weeds in field
19    crops, understanding the agronomic practices that go
20    into managing weeds, those kind of things.
21            But then I also would say I have
22    expertise and in a specialty within that application
23    technology world.  So, again, understanding the
24    application equipment, nozzles, its effect on spray
25    coverage and weed control, but also on drift impacts.
```

Page 38

```
 1    Q.      In looking at your publications, it
 2    looked to me -- like it seemed like you had done a
 3    lot specifically within rice production.  Is that a
 4    specialty or subspecialty of yours?
 5    A.      So in my time here at Arkansas, my
 6    position as an extension weed scientist is
 7    technically labeled, more particularly, to rice and
 8    soybean, so that's kind of been more of a focus while
 9    I've been at Arkansas.  But I still have experiences
10    here with other crops as well.  I do some work in
11    corn and peanuts, and a few other things here.
12            And then in my previous areas, when I
13    was at Nebraska and Wisconsin in the midwest, it was
14    heavily corn and soybean based cropping systems I was
15    in.  So the rice is just a recent thing because it's
16    a primary crop in Arkansas where I'm at.
17    Q.      Since you've been at the University of
18    Arkansas extension, how much of your professional
19    time has been devoted to rice crops, specifically?
20    A.      I mean, it's probably difficult to
21    estimate on that front, but, you know, I would
22    roughly say while I've been at Arkansas, it's maybe,
23    let's say, 35 percent of my time is spent in rice.
24    Q.      In terms of your professional work, I
25    see at the top of your CV where it says positions
```

Page 39

```
 1    held, in your current position, you say it's
 2    75 percent extension and 25 percent research; is that
 3    correct?
 4    A.      Yes, that's correct.
 5    Q.      Is it fair to say you don't have any --
 6    none of your time is spent on teaching and extensive
 7    teaching semester-based courses for undergraduate or
 8    graduate students?
 9    A.      So I would say -- I wouldn't say, you
10    know, no time goes to teaching.  I do have a handful
11    of guest lectures that I provide, you know, at least
12    one or two a year.  So there's a very little amount
13    where I go to teaching classes, like courses during a
14    semester, but that is not a part of my job
15    appointment.
16            I will say, though, on the teaching
17    aspect, a big part of my position, which isn't
18    necessarily factored in there, is helping to teach
19    graduate students or, you know, post doc, things like
20    that.  So it's not again classroom instruction, but
21    it's teaching in other forms.
22    Q.      Are you a tenured track -- in a
23    tenure-tracked position?
24    A.      I am not.  At Arkansas, extension
25    oriented faculty members are nontenured track.
```

Page 40

```
 1    Q.      Tell me what the difference is between
 2    what you described as extension and research work.
 3    A.      Sorry, could you just repeat that
 4    question?
 5    Q.      Sure.  Tell me what the difference is
 6    between what you describe as extension work and
 7    research work on your CV.
 8    A.      I understand.  Okay.  So research work
 9    is generally where we're conducting those research
10    trials, you know, investigating problems in the
11    field, conducting field greenhouse trials, laboratory
12    trials; all those kinds of things.  So it's
13    conducting things to answer question, collect data,
14    you know, that kind of stuff, writing papers, those
15    publications, reports; those kind of things.
16            On the extension front, the extension
17    position is more about taking that information and
18    making it available to, you know, the general public,
19    whether that's, you know, farmers, homeowners, crop
20    consultants, applicators, all that kind of stuff.
21    It's basically taking any of that research based
22    information, presenting it to growers, helping
23    them -- or that whole audience I mentioned, you know,
24    presenting it to them so that they can use it and
25    improve, you know, their weed control strategies.
```

Page 41

1  And basically just answering a lot of questions,
2  providing recommendations, again, that kind of stuff.
3  Q.      I saw you mention, I think, on your CV,
4  that you have generated various videos and Podcasts.
5  I believe that was down under the extension service
6  section towards -- towards the end under extension
7  activities.  And I've gone on YouTube and found the
8  University of Arkansas extension service where there
9  were various YouTube videos that featured you.
10         Have you produced any videos that
11 appear elsewhere that would not appear on that
12 University of Arkansas section?  And particularly,
13 you know, videos in relation to weed science.  I'm
14 not interested in your children's birthday parties.
15 A.      So I guess videos produced for the
16 University of Arkansas or videos produced, in
17 general, that I've done throughout my professional
18 career?  I just kind of want to clarify that, I
19 guess.
20 Q.      Videos related to your scientific or
21 professional work, wherever they were produced.  Are
22 there any others I'd find other than on the YouTube
23 feed of the University of Arkansas?
24 A.      So -- and I guess I'll just clarify
25 there a little bit, too.  So, you know, the

Page 42

1  University of Arkansas, like extension service has a
2  YouTube page.  We also have our own weed science
3  YouTube page.  I don't know if that's the one you
4  found or not.  So there's -- like I can't remember
5  exactly what it's called, it's like Arkansas weed
6  science YouTube channel or something.
7         So that would contain some videos
8  there.  The only other video I can think of that
9  would not be on that page was I did create a video at
10 Nebraska based on some sprayer technology.  And that
11 would not, obviously, since I was at Nebraska, that
12 wouldn't be on the Arkansas web page, but I can't
13 remember specifically where that one posted through
14 Nebraska.  But that's the only other one --
15 Q.      I'm sorry, I didn't mean to interrupt
16 you.  Do you think it was posted on YouTube?
17 A.      I would assume it's somewhere out
18 there, but I can't remember for sure, honestly.  That
19 was about seven years ago, I think, when I created
20 that.  It was when I was a graduate student out
21 there.  So it -- I would think it would be on YouTube
22 but, again, it was dealing with a sprayer technology,
23 the pulse width modulation sprayers.
24 Q.      And it says you've been involved with a
25 Podcast called Weeds AR Wild.  Where would I find

Page 43

1  that Podcast?
2  A.      So you can find that, you know, pretty
3  much any Podcasting app.  So like Google Podcast,
4  Apple Podcast, that kind stuff, and you just have to
5  search for the Arkansas Row Crops Radio.  It's
6  basically a series within our extension service,
7  Arkansas Row Crops Radio.
8  Q.      Got it.  Do you live on a farm now?
9  A.      I mean, I guess I wouldn't consider it
10 a farm.  We're in the country and we have some
11 chickens and things, but it's not like a full-fledged
12 row crop farm or anything.
13 Q.      You do not currently grow row crops;
14 you do have some amount of livestock?
15 A.      Yeah.  If anything, it would be
16 considered like a small hobby farm kind of thing.
17 Q.      I understand that you've never given a
18 deposition before, but aside from that, before you
19 got involved in the Roundup litigation with Monsanto,
20 because we'll talk about that separately in a minute,
21 had you ever submitted an expert report, or opinion,
22 or consulted with lawyers as an expert of any sort in
23 any other type of litigation?
24 A.      So I -- I get confused kind of on the
25 legal terms of all of this, but I did, you know, I

Page 44

1  guess consult maybe is the best word, you know, on
2  one other case; but no reports were ever submitted,
3  no -- the case did not go, you know, anywhere.  It
4  was just kind of dropped.  So it was just a few
5  initial discussions, basically, but that was it
6  otherwise.
7  Q.      I don't want to know the identity of
8  any of the people or anything that would identify it
9  specifically, but what was the nature of that case?
10 A.      I'm trying to remember.  It's been a
11 couple of years now.  It was a -- I think it was a
12 drift incident onto some, like, organic crop
13 production, and they were just looking for basically
14 expertise in applications and drift mitigation
15 strategies; that kind of thing.
16 Q.      Do you recall if you were consulted by
17 the attorneys for the plaintiffs, that is the party
18 that has claimed to have been hurt, or the defendant,
19 that is the party who was claimed to have caused
20 injury?
21 A.      I believe it was the plaintiff.
22 Q.      Was that in Arkansas?
23 A.      No, it was not.
24 Q.      Do you recall what state it was in?
25 A.      Colorado maybe.

Page 45

```
 1    Q.        Were you paid for your consulting in
 2  that case?
 3    A.        Yes, I believe I was.
 4    Q.        Are there any other cases, separate and
 5  apart from the Monsanto Roundup litigation, where
 6  you've been consulted in any way as part of
 7  litigation?
 8    A.        I'm sorry, did you say separate from
 9  the --
10    Q.        Yes, not including Roundup and
11  Monsanto.
12    A.        No, that would have been the only other
13  one.
14    Q.        I would like to share my screen again
15  and go back to your report.  And if I can look at my
16  -- so if I'm reading off the screen it's just because
17  my highlighted copy of your report is off to the
18  side, and I'm trying to find the right page.  So just
19  above Section No. 2, I think, right here, just about
20  -- Section 2 where it says impacted weeds, it says
21  you're being compensated at rate of $400 per hour for
22  professional services, 250 for travel, 500 per hour
23  for deposition testimony, and 650 per hour for trial
24  testimony.  Are those rates all current?
25    A.        Yes, those rates are all current for my
```

Page 46

```
 1  professional time compensation.
 2    Q.        And then I'm going to come over here to
 3  Exhibit No. 6, which are your invoices, and I believe
 4  you've already testified that this is -- these are
 5  all the invoices you've submitted to date, correct?
 6    A.        Yes.  Yeah, for this case, those are
 7  all invoices I've submitted to date.
 8    Q.        And I'm going to quickly try to do some
 9  math in my head.  2800 and 7600 comes out to be about
10  10,400, I think, and then 3200 would be 13,600.  Does
11  that sound like the right total of these three
12  invoices for the Murdock case?
13    A.        Yeah, that sounds, again, about
14  correct.  I'm not good with doing math in my head
15  either so -- but that sounds about right based on
16  those three.
17    Q.        About how many hours have you worked in
18  between your February 28th deposition -- I'm sorry,
19  your February 28th invoice and your deposition today?
20    A.        I can't remember specifically, but I
21  would say maybe around six hours as an estimate.
22    Q.        And that would be consulting work at
23  the $400 per hour?
24    A.        Correct, yes.
25    Q.        And then obviously, I assume you intend
```

Page 47

```
 1  to bill for your time spent in this deposition today
 2  at the amount that you stated, which was 500 per
 3  hour?
 4    A.        Yes.  Correct.  For my professional
 5  time today in deposition, it would be that $500 an
 6  hour.
 7    Q.        And then are you charging for your
 8  travel time to get to the Marriott in Little Rock?
 9    A.        Yes, that would be correct.
10    Q.        At 250 per hour?  About how long was
11  your drive here each way today?  I guess you don't
12  know what your drive home will be, but how long was
13  your drive to get there today?
14    A.        It was about an hour.
15    Q.        Would you expect it to be the same
16  going home?
17    A.        Yeah, it should be about the same to go
18  home.
19    Q.        Have you testified -- well, have you
20  been consulted by Hollingsworth or any other
21  attorneys from Monsanto, for Monsanto in other cases
22  related to Roundup?
23           MR. GRAY:  Object to form.  I'm not
24           sure -- can I have the question again?
25           I'm not sure what that was.
```

Page 48

```
 1    Q.        Have you been consulted by
 2  Hollingsworth or other attorneys for Monsanto, in
 3  other cases relating to Roundup exposure?  It's just
 4  a yes or no question.
 5           MR. GRAY:  Object to form to the
 6           extent you're seeking information on
 7           other cases, but you can answer.
 8    A.        You just mean have I been like declared
 9  in other cases or working on other cases?  I'm still
10  a little confused by the question, I guess.
11    Q.        No, not have you been -- so the word
12  lawyers would use would be disclosed as an expert.
13  That's not what I'm asking.  I'm asking whether
14  lawyers for Monsanto have consulted you about any
15  other cases relating to Roundup, other than the
16  Kenzie Murdock case?
17           MR. GRAY:  Same objection, but you
18           can answer.
19    A.        So if I'm understanding correctly,
20  whether I've been consulted on other cases, I would
21  say no.  I don't think I've been -- I don't think
22  I've had any consultation on other cases.
23    Q.        Have you billed Hollingsworth or
24  Monsanto for any work related to the Roundup
25  litigation that does not involve Kenzie Murdock's
```

Page 49

```
 1   case?
 2           MR. GRAY: Object to form, but you
 3       can answer.
 4   A.      Yes, I have.  There would be one other
 5   invoice for a different case.
 6   Q.      So it sounds to me then that you have
 7   been consulted on another case?
 8   A.      Okay.  I guess I'm just confused by the
 9   terminology then.  I'm just not understanding the
10   consultant.  I thought you were -- I thought that
11   meant like they were consulting me on other cases or
12   something.  I don't know, I'm sorry, I guess I just
13   don't understand.  But, yes, I have worked on one
14   other case for -- and like I said, it was one
15   invoice.
16   Q.      Have you prepared a report in that
17   case?
18   A.      No, I have not.
19   Q.      I assume then, as far as you know, you
20   have not been disclosed as an expert for Monsanto in
21   that other case?
22   A.      Again, I'm not exactly sure, because I
23   don't understand that whole process.  I don't think
24   so.
25   Q.      And have you been scheduled to give a
```

Page 50

```
 1   deposition in that other case?  Is it on your
 2   calendar?
 3           MR. GRAY: Object to form, but you
 4       can answer.
 5   A.      No, I have not.
 6   Q.      Do you happen to know if that other
 7   case is pending in federal court or state court?
 8   A.      I don't know.
 9   Q.      Can you tell me overall about how much
10   money you have billed Monsanto for work on all
11   Roundup cases combined?  That would include the
12   roughly 13,400 you billed in this case, plus anything
13   you've billed on any other case.
14           MR. GRAY: Object to form, but you
15       can answer.
16   A.      I don't remember an exact number.  It
17   would -- I mean, is an estimate okay?
18   Q.      Yes, your best estimate is fine.
19   A.      I mean, best estimate it's, you know,
20   maybe somewhere around, including the Murdock case
21   that we're talking about, somewhere around 20,000.
22   Q.      And I assume, based on what we've
23   talked about, that you have not had any other
24   significant income that would be related to
25   litigation, work with litigation, apart from your
```

Page 51

```
 1   Roundup litigation in that one other case that you've
 2   told us about?
 3           MR. GRAY: Object to form.  You can
 4       answer.
 5   A.      Correct.  Yeah.  I don't have any other
 6   significant income from any kind of litigation.
 7   Q.      The other Roundup case that you have
 8   been consulted on or that you've done some work on
 9   for Monsanto, does that happen to involve a case
10   either pending in Kentucky or where the farms were in
11   Kentucky or the Roundup -- it may not be a farming
12   case, but the Roundup application case was in
13   Kentucky?
14           MR. GRAY: Object to form, but you
15       can answer, if you can.
16   A.      I can't remember specifically, but I'm
17   pretty sure it was not in Kentucky.
18   Q.      What attorney or law firm first hired
19   you for work in this case, in the Kenzie Murdock
20   case?
21   A.      So I've been retained by Hollingsworth
22   from the start.
23   Q.      Do you recall who originally contacted
24   you?
25   A.      No, I don't remember.
```

Page 52

```
 1   Q.      Do you know how the lawyers at
 2   Hollingsworth found you?
 3           MR. GRAY: Object to form to the
 4       extent that calls for communications
 5       between the lawyers and him; but you
 6       can answer, if you can.
 7   A.      No, I really -- I don't know it at all.  I
 8   mean, you know, with my extension appointment, my
 9   e-mail and expertise is on the -- on-line, pretty
10   available, so I get a lot of different e-mails and
11   phone calls and stuff.  So outside of that, yeah, I
12   don't know how --
13   Q.      Have you ever advertised your
14   availability to serve as an expert witness in an
15   expert witness directory, or a legal publication, or
16   anything else like that?
17   A.      No, I have not.
18   Q.      You have never visited the Murdock's
19   farm in Western Kentucky, correct?
20   A.      I have not visited the farm myself, no.
21   I have, you know, looked at those site inspection
22   photos, but I have not visited the farm, no.
23           MR. PRATHER: I've lost track of
24       exactly when we started, but I think
25       we've been going for close to an hour.
```

1    Let's take a five or ten-minute break.
2         MR. GRAY:  Sure.
3         (A brief break was taken.)
4         COURT REPORTER:  We're back on the
5    record.
6    Q.    Dr. Butts, I'm going to move on to your
7    list of materials considered.  I'm going to try to
8    share my whole screen now and put up, side by side,
9    which we've marked as Exhibit No. 4 on the left which
10   is the 1/23 list, and Exhibit 5 on the right which is
11   the 3/15 list.
12        Because these were just produced and I
13   didn't get them until fairly late last night -- they
14   came after I left the office -- I haven't had a
15   chance to go through them line by line.  Can you tell
16   me as we're sitting here what the difference is
17   between these two documents?
18   A.    So I can't remember specifically what
19   we added.  There was -- I know there was a couple
20   documents that got added, but I can't remember
21   specifically which ones.
22   Q.    Can you tell me what the nature of the
23   documents were?
24   A.    I can't remember offhand either.  One,
25   I think, that comes to mind, was the oncologist's

1    deposition, is that Dr. Schiff?  I think that was one
2    of them.  I honestly don't remember what the other
3    ones were.
4    Q.    Were they -- were the others in the
5    nature of scientific literature, or were they in the
6    nature of what I'll just call court proceedings or
7    court documents, like deposition reports?
8    A.    Without seeing the ones that were
9    different again, I can't remember offhand.  I really
10   can't.
11   Q.    It looks like the first one that you
12   submitted has a total of 120 entries on seven pages,
13   and the next one has 124 entries on eight pages; is
14   that right?
15   A.    Yes, that's right.
16   Q.    And looking at the bottom, the last
17   four entries on both appear to me to be the same.  So
18   the documents that you have added or interspersed
19   were not added to the end; is that fair?
20        MR. GRAY:  Jay, just to maybe save
21        you some time, I think we added just
22        Dr. Sawyer's report and depo and
23        Dr. Schiff's report and depo.
24   Q.    Okay.  Dr. Butts, did you actually read
25   the two reports; the report of Dr. Sawyer, the

1    toxicologist, and Dr. Schiff, the oncologist?
2    A.    I read parts of their reports.  I
3    didn't read their reports in entirety.
4    Q.    How did you select the parts of the
5    reports that you read?
6    A.    I read the portions that were
7    regarding, you know, Roundup contact with
8    Ms. Murdock.
9    Q.    What about the depositions of those two
10   experts; did you read them?
11   A.    Again, I didn't read them in entirety,
12   but I read them for the parts pertaining to, you
13   know, Roundup contact, the things in which, you know,
14   again, fall into my expertise.
15   Q.    After reading those, did any of your
16   opinions change from what was stated in your report
17   originally?
18        MR. GRAY:  Object to form, but you
19        can answer, if you can.
20   A.    So my overall opinions, you know, did
21   not change from what's in the specific report, but --
22   basically my opinion, you know, in the report that
23   we've written, we did not have Dr. Schiff's
24   deposition yet, so like he's not directly included in
25   my specific report.  But my opinions remained the

1    same, and I cover his deposition as well as his
2    report as well.
3    Q.    So your opinion remains the same?
4    A.    Yes, that would be correct.
5    Q.    Do you intend to testify to specific
6    criticisms of Dr. Schiff's testimony, opinions, or
7    conclusions that is not included in your report?
8        MR. GRAY:  Object to form, but you
9        can answer.
10   A.    So basically, I guess, just to kind of
11   try and clarify; so Dr. Schiff's report, as far as
12   the Roundup contact, you know, exposure piece follows
13   similarly with what Dr. Sawyer's is.  So, you know,
14   my expert opinions would basically follow suit in
15   that aspect.  So again, I would -- my opinion on
16   Dr. Schiff's report in regards to the Roundup
17   contact, there would be some -- again, I counter some
18   of those facts presented by Dr. Schiff.  It'd be
19   similar, again, to what my report says for
20   Dr. Sawyer.
21   Q.    So is it fair to say that your opinions
22   related to, or your criticisms of Dr. Sawyer, you
23   would apply to Dr. Schiff, but you don't have other
24   new opinions to add to that?
25        MR. GRAY:  Object to form, but you

1           can answer.
2   A.     So in generalities, I would say that's
3 correct. I can't remember exactly offhand the
4 specifics in Dr. Schiff's report; but in generalities
5 it would be the same kind of premise that, you know,
6 the potential for contact was minimal.
7   Q.     Dr. Butts, do you understand if you
8 come to trial and testify, I'm entitled to know in
9 advance what the nature of the substance of your
10 opinions are, and today this deposition is my only
11 opportunity to find that out from you. So if you do
12 have other opinions that were not stated, related to
13 Dr. Sawyer, that you intend to testify about relating
14 to Dr. Schiff's report or conclusions, you need to
15 tell me those today, if you intend to testify about
16 them at trial.
17         MR. GRAY: What's the question?
18   Q.     My question is, does he have any other
19 opinions that he has not told me about relating to
20 Dr. Schiff that are not encompassed in his opinions
21 that were stated in the report relating to
22 Dr. Sawyer?
23         MR. GRAY: I'll object to the
24       question. It's been asked and
25       answered, but you can answer.

1   A.     So, I mean, again, just to clarify,
2 with Dr. Schiff's report, I can't remember
3 specifically offhand all the, you know, specific
4 language and things that he has in there. But in
5 general, you know, my opinion is similar to
6 Dr. Sawyer's in the aspect that, you know, I disagree
7 with the exposure date listed, the potential for
8 contact that both Dr. Sawyer and Dr. Schiff listed.
9   Q.     I'm going to -- bear with me just a
10 second while I change around my exhibits on the
11 screen. Okay. I'm putting back up, just the Exhibit
12 No. 4, which was the first materials considered list,
13 because I had a couple specific things I wanted to
14 ask you about, and numbers in my notes are obviously
15 based on the report that I had at the time I prepared
16 my outline.
17       First, on this first page between 8 and
18 13, there is a -- what appears to be an author. It's
19 capital B, lower case F, capital R. What is that?
20   A.     I don't know specifically what that --
21 the author, whatever, that is. I don't know
22 specifically what that piece is.
23   Q.     Well, this is on your list of materials
24 considered. Would this be a foreign organization?
25 Is it a publication? Is it something else? These

1 are materials that you say you've considered in this
2 case.
3         MR. GRAY: Object to form. You can
4       answer.
5   A.     I mean, so in No. 9, it looks like it's
6 in parenthesis which appears to be German, but what
7 that is, I don't know what, specifically; if that's
8 an organization or what that is specifically.
9   Q.     Are these documents you found on your
10 own, or are these documents that were provided to
11 you, these numbers 8 through 13, the BfR documents.
12   A.     The 8 through 13 would have been
13 provided to me from Hollingsworth.
14   Q.     Did you review those documents?
15   A.     Briefly; just a glance over.
16   Q.     And what impact did they have on your
17 opinion?
18         MR. GRAY: Object to form. You can
19       answer.
20   A.     Again, just most of those were, you
21 know, regulatory type documents, I believe, and so
22 it's just background information on some of the
23 regulatory aspects in other countries regarding
24 glyphosate.
25   Q.     I'm going to go down to -- towards the

1 end to 95, 96, and 97. I can make this a little bit
2 bigger. I'm sorry, 95, 96, and 98. So 95 is a
3 plaintiff fact sheet of Kyle Murdock, which is a
4 court document produced in this litigation. Did you
5 review that entire document?
6   A.     I mean, I skimmed over it. I didn't,
7 you know, read it in its entirety; but, yes, I
8 reviewed it.
9   Q.     I think part of the information that
10 was included in that was the various purchases or
11 uses of Roundup during part of Kenzie's lifetime, the
12 part that he was able to obtain receipts or records
13 for, as well as other pesticides that had been used
14 on his farm. Did you make any kind of analysis of
15 what the various pesticides used on the farm were,
16 what the component parts were, et cetera?
17         MR. GRAY: Object to form;
18       compound, but you can answer if you
19       can.
20   A.     Can I just clarify the question? I
21 mean, it was basically did I take any of those
22 records for -- could you just clarify, I guess, I'm
23 sorry, just to make sure I've got it correct?
24   Q.     Sure. Did you make any sort of
25 analysis of what chemicals -- what pesticides were

Page 61

1    used and what the active chemical ingredients in
2    those pesticides were on the farm?
3    A.      So I -- you know, I guess I don't know
4    specifically what you mean by analysis.  I do know in
5    my specific report, you know, with one of my opinions
6    of, you know, that I believed the report of the
7    amounts of glyphosate used in the row crop acres, I
8    did use some of those receipt documents or whatever
9    kind of do a calculation of the total amount of
10   glyphosate that was used on a year on the farm.  But
11   outside of that, I didn't do any other sort of
12   analysis.
13   Q.      And that's fair, and that's the type of
14   thing I'm talking about.  You know, by way of an
15   example, for instance, I believe Dr. Sawyer went
16   through all the chemicals and made an analysis of
17   active ingredients and looked at the IARC
18   classifications of each chemical, non-glyphosate
19   chemical was also reported as used on the farm.  Did
20   you do anything like that?
21           MR. GRAY:  Object to form, but you
22           can answer.
23   A.      So again, it's -- the only thing that I
24   did would be -- is what's included in my specific
25   report, where within that one year I took basically

Page 62

1    all products that were glyphosate-containing.  And so
2    that included a few pre-mixes, that included
3    glyphosate only products, and basically I just did a
4    rough calculation on the total that was purchased and
5    the total that might be required for the row crop
6    acreage, but that was the extent of an analysis that
7    I conducted.
8    Q.      Only related to glyphosate?
9            MR. GRAY:  Object to form.  I think
10           it misstates the testimony, but you can
11           answer.
12   A.      It was glyphosate-based products.
13   Again, there were several other products on that
14   list, you know, different adjuvants and other things
15   like that; but I was just doing the analysis to
16   compare to what Mr. Murdock stated he had sprayed in
17   his row crop field.
18   Q.      The next document, No. 96, it's a legal
19   term for a specific document called the plaintiff's
20   answers to the defendant's first set of
21   interrogatories.  Do you recall that document?
22   A.      You know, maybe vaguely.  If you have
23   it that you'd want to show, I could probably be --
24   you know, I could remember easier that way.  Again,
25   there's a lot of those documents I looked at, but --

Page 63

1    Q.      Do you recall if there was anything
2    specific in Mr. Murdock's answers to interrogatories
3    that was important to your review of this case --
4            MR. GRAY:  Object to form.
5    Q.      -- or that changed your opinions in
6    your review of this case?
7            MR. GRAY:  Object to form, but you
8            can answer, if you can.
9    A.      I don't remember specifically what was
10   included in those interrogatories.  So I'd have to
11   take a look to, I guess, remember or determine that.
12   I just don't remember what information specifically
13   was included in that versus the other documents.
14   Q.      And No. 98, it just states records
15   produced by plaintiff, Kyle Murdock.  Can you tell me
16   more specifically what those records were?
17   A.      Again, you know, there were several
18   different things that we -- that I looked at
19   regarding this case.  So, you know, there's a handful
20   of different things; the site inspection photos, the
21   deposition.  I think he provided some, you know,
22   pictures, you know, of sprayers.  Again, that's a
23   handful of the things.  I can't remember all the
24   records specifically that I looked at, but that's a
25   handful of things that come to mind.

Page 64

1    Q.      No. 103 is the legal document titled,
2    or I'll tell you, it's the plaintiffs' -- title is
3    the second amended complaint in this case.  What was
4    important to you about your review of the second
5    amended complaint?
6            MR. GRAY:  Object to form.  You can
7            answer, if you can.
8    A.      Again, I don't remember that specific
9    document offhand.  If you had it, I could take a look
10   and try and remember, but I don't remember
11   specifically offhand without -- without seeing it.
12   Q.      And back near the beginning on Page 2,
13   it lists two depositions, Kyle Murdock and
14   Mandi Murdock.  I know in your report there are
15   several references to Kyle Murdock's testimony about
16   his spraying activities, how he sprayed when Kenzie
17   went with him, that sort of thing, that's
18   specifically mentioned in your report.  Was there
19   anything else important to you about Kyle Murdock's
20   deposition testimony that was not included in your
21   report, specifically?
22           MR. GRAY:  Object to form, but you
23           can answer.
24   A.      Again, I can't remember every bit and
25   piece from the entirety of Mr. Murdock's deposition.

Page 65

1  I would say in my specific report it covers the
2  necessary details for my opinions to be developed.
3  Q.      What about Mandi Murdock's deposition?
4  I don't recall any reference to that deposition in
5  your report.  Was there anything important to your
6  conclusions that you learned from Mandi Murdock's
7  deposition?
8          MR. GRAY: Object to form.  You can
9  answer.
10  A.      Again, I can't remember specifically,
11  you know, what was in which deposition and those
12  different things.  I know I reviewed both
13  depositions, but pieces that came out of each of
14  those, that when they went in my specific report, I
15  can't remember specifically.
16  Q.      And then back on Page 1 of this
17  exhibit, entry number -- well, that's my typo.  Bear
18  with me for just a second while I find what I was
19  looking for.  There we go.  It wasn't entry No. 5; it
20  was entry No. 57, my typo.  Google Earth images of
21  2081 Rayburn Road in Murray, Kentucky.
22          There are several images that were
23  produced to us last night, and I haven't put those up
24  yet.  That's probably the best thing to do, so I'm
25  going to stop this while I pull these photos up.

Page 66

1  Bear with me for just a second because I can't
2  display it right in our system because of the file
3  type, the way it was sent.  I have to download it to
4  my desktop.  It says I've got 15 seconds left.
5          I think this will be the easiest way to
6  do it.  Give me just a second.  I apologize, but
7  again I only got these yesterday evening, and I had
8  already left the office.  I didn't have access to
9  this computer.  Here we go.  Sorry for that delay.
10          So I'm going to show you -- these are
11  the various photos from Google Earth that were
12  produced to us yesterday evening.  Can you see that?
13  A.      Yes, I can.
14  Q.      It looks like there are seven files.
15  And I apologize, I don't know why it's going on and
16  off.  I think it was because it was synching on my
17  computer.  Number one, where did you obtain these
18  seven Google Earth photos?
19  A.      Where did I obtain them?
20  Q.      Yes.  Did you download them yourself,
21  or did somebody provide them to you?
22  A.      Oh, okay.  The Hollingsworth attorneys
23  supplied these to me.
24  Q.      Did you ask for them or -- let me
25  strike that.

Page 67

1          Did you ask for specific photos, or did
2  they select the photos that were sent you to?
3          MR. GRAY: Object to the form.  I
4          think that gets into work product, but
5          you can answer, Doctor.
6  A.      I didn't ask for any specific photos.
7  There was a file I was provided with, with numerous
8  photos.
9  Q.      I'm going to go -- just go through
10  these quickly one by one.  This first one -- these
11  are all titled 2081 Rayburn Road, which I will
12  represent to you is the address of the farm office,
13  farm shop.  I think we see it here with the little
14  drop pin, sort of here.  The first one is April 2016,
15  the second one is also April 2016, and it looks to be
16  zoomed out a little bit further.  Below that is
17  July 2006, below that is June 2004, below that is
18  June 2008, below that is November 1998, and below
19  that is September 2013.  Have you seen all seven of
20  these aerial photos before?
21  A.      I believe I have.  Again, I've looked
22  at a lot of documents and a lot of photos, so I can't
23  remember everything specifically.  But yes, I viewed
24  the Google Earth photos of this location before.
25  Q.      Were there any other aerial photos of

Page 68

1  the Murdock farms that you reviewed, besides these
2  seven?
3  A.      Not that I recall.
4  Q.      Mr. Murdock, in his discovery, produced
5  a number of aerial photos of the various tracts of
6  land that they farmed, not all of which were
7  contiguous with the farm here at 2081 Rayburn Road.
8  Do you recall reviewing those?
9  A.      I guess, maybe, if those were the ones
10  that had like boundaries drawn around some fields --
11  Q.      Yes.
12  A.      -- that were a part in his deposition,
13  I guess, maybe.  Yeah, I think I do remember those.
14  Q.      Did you do any comparison between those
15  and these Google Earth photos provided to you by
16  Hollingsworth?
17  A.      No, I did not.
18  Q.      It appears that these are seven photos
19  of the same location, generally taken over time, a
20  series of photos as early as 1998 and as late as
21  2016.  Were there any changes, over time, seen in
22  these photos that were important to your review of
23  this case?
24          MR. GRAY: Object to form, but you
25          can answer.

Page 69

1    A.    So, I mean, the main thing that I would
2    say that these photos played, in my opinion, on was
3    the, you know, the non-crop spraying areas around the
4    buildings, around the grain bin, those kinds of
5    things. And from, you know, the earliest time
6    period, which again I think it's 1998 there to 2016,
7    you know, it appeared from this aerial view that
8    there were changes at least in the number of
9    buildings or, you know, which buildings were there,
10   which weren't there, that kind of thing, that would
11   impact, you know, the amount of non-crops area
12   spraying necessary.
13   Q.    So if I am understanding you correctly,
14   and I don't want to put words in your mouth, but your
15   main interest in these photos was that you were
16   trying to use them to determine how much time would
17   be necessary to spray Roundup on the areas that were
18   not part of the row crop farming?
19         MR. GRAY: Object to form. You can
20   answer, if you can.
21   A.    With these specific photos that you're
22   showing me right here, where it's basically an aerial
23   view of the shop farm, specifically, you know, I was
24   primarily using these specific photos for, you know,
25   the assessment of spraying in the non-crop areas,

Page 70

1    again, around those buildings, around the livestock
2    facility, those kinds of things.
3    Q.    So that would include the chicken barns
4    down here?
5    A.    I'm sorry, could you repeat that?
6    Q.    That would include the chicken barns
7    that you see down here on the lower left?
8    A.    It's still kind of skipped out. The
9    chicken barns down there on the left, what's the
10   question about those?
11   Q.    Do you have any understanding of
12   whether these chicken barns you see on the lower left
13   were part of the Murdock farm?
14   A.    I don't know specifically, no.
15   Q.    And if we go back to the first photo
16   that we looked at that was zoomed in a little bit
17   closer, what about these various barns and buildings
18   here around the 2081 area, specifically, that would
19   include all of these -- the area around all of these
20   buildings?
21   A.    Please repeat that again. I'm having a
22   hard time hearing all of this.
23   Q.    The area that you were considering as
24   non-crop spray areas, would that include all of this
25   area that we see on the April 26th -- April 2016

Page 71

1    photo here that is zoomed in that shows the various
2    buildings and structures at the 2081 Rayburn Road
3    address?
4          MR. GRAY: Object to form, but you
5          can answer.
6    A.    I mean, yes, again, in generality, this
7    was what I was considering. It was also considering
8    some of the testimony from Dr. Murdock with the
9    different buildings and areas that he listed off.
10   Q.    In this 2081 area, I'm going to draw a
11   picture around this building that's in the upper
12   center. Do you see that blue circle I just drew?
13   A.    Yes, I do.
14   Q.    Do you -- do you have any understanding
15   of what that building is?
16   A.    I mean, it would appear to be a house;
17   but I, from this small view on the screen, I can't
18   tell specifically.
19   Q.    Do you know who lives there?
20   A.    Not specifically, no, I do not.
21   Q.    I'm going to draw -- that was in blue.
22   There's a blue circle. I'm now going to draw a red
23   square around another building down here, at the
24   bottom center of the photo. Do you have any
25   understanding of what that building is?

Page 72

1          MR. GRAY: Hang on one second.
2          Mr. Prather, is it possible to have the
3          photo be full screen?
4          MR. PRATHER: Yeah, I can do that.
5          Hang on just a second.
6    Q.    Can you see that now? Is that a little
7    bit better?
8    A.    Better, yes.
9    Q.    So let's go back, you know, try again
10   just to clarify. I've drawn a blue circle around
11   this house in the upper center of the photo, and you
12   told me you were not familiar with what -- with who
13   lived there or what that structure was, other than it
14   appears to be a house; is that correct?
15   A.    Yeah. When it's zoomed in more, it
16   does -- I mean, I would say it is a house. But yeah,
17   as far as who lives there, I'm still not aware.
18   Q.    And then, go back and use my drawing
19   skills again, the red box I'm now drawing around the
20   structure in the bottom center of the photo, do you
21   have any understanding of what that structure is?
22   A.    I mean, again, it would appear to maybe
23   be a house. It's difficult to tell from the aerial
24   view.
25   Q.    Do you have any idea who might live in

Page 73

1 that house?
2 A.      No, I do not know who lives there.
3 Q.      Now, I'm going to draw a yellow square
4 around another structure that's to the right side of
5 the road, or the east of the road, looking at this
6 photo.  Do you have any understanding of what that
7 structure is?
8 A.      And again, it would appear to be a
9 house.
10 Q.      Do you know who lives there?
11 A.      I do not know who lives there.
12          MR. PRATHER:  Okay.  I want to mark
13          the seven documents we had produced
14          yesterday.  They're identified as 2081
15          Rayburn Road, that we just went through
16          collectively, as Exhibit No. 7.
17            (Said documents are filed with this
18            deposition and marked as Exhibit No. 7
19            for purposes of identification.)
20 Q.      Bear with me for just a minute while I
21 get my other documents back up.
22          Going back to what we have marked as
23 Exhibit No. 4 and 5 -- let's see if I can share the
24 screen -- let's talk specifically about Exhibit 5
25 now, which is the most updated, has 124 entries.  Do

Page 74

1 you see that?
2 A.      Yes, I do.
3 Q.      All right.  So I'm going to go back to
4 the beginning of that.  You know, this is a fairly
5 lengthy document.  First, who actually prepared this
6 document?  Did you prepare it or did Monsanto's
7 attorneys prepare it?
8          MR. GRAY:  Object to form, but you
9          can answer.
10 A.      This specific document, you know,
11 formatting-wise and everything, was prepared by
12 Hollingsworth's attorneys.  I just contributed some
13 of the articles to this.
14 Q.      Obviously, there are documents from
15 this litigation that we've talked about, the
16 plaintiffs' fact sheet, the photographs, the
17 complaint, you know, things that were provided by
18 Ms. Murdock's family.  Other than those documents
19 that were generated in this litigation, are there any
20 documents on here that you reviewed specifically for
21 Kenzie Murdock's case that would not apply to any
22 other case that you have reviewed relating to
23 Roundup?
24          MR. GRAY:  Object to form; but you
25          can answer, if you can.

Page 75

1 A.      Just -- I'm sorry, could you please
2 repeat the question?
3 Q.      Sure.  Other than the documents that
4 were generated in this lawsuit, the court type
5 documents, the depositions, and reports that were
6 specific to Kenzie that were provided to you, are
7 there any other documents on here that relate
8 specifically to -- or only to your review of Kenzie
9 Murdock and not to your opinions about glyphosate in
10 general?
11 A.      So I would say, you know, there's
12 several documents on this list that kind of apply to
13 both, you know, that both apply specifically to a
14 farming operation in Kentucky where it's at, but
15 there are the documents that are also, you know,
16 broad spectrum, can be -- that are not necessarily
17 specific, but can be considered more general.  I'd
18 say it's a little bit of both.
19 Q.      Can you tell me which documents that
20 you would say -- you would consider to be related
21 specifically to Kenzie's -- to your review of
22 Kenzie's case, other than the court documents?
23          MR. GRAY:  Object to form; but you
24          can answer, if you can.
25 A.      So, again, it's -- I mean, just to

Page 76

1 restate it.  There's several papers in here that we
2 cited that are -- that can be considered general, but
3 also directly apply to that area in Kentucky.  For
4 example, I believe there's, you know, a couple of
5 different publications looking at, you know, the
6 effect of no tillage and, you know, soil erosion;
7 those kind of things.
8          And I know Mr. Murdock testified to
9 using no tillage, and the effect that glyphosate has
10 in those areas.  The -- again, I can't remember which
11 paper specifically, but things like that where they
12 do pertain to this case in that aspect, but also can
13 be considered generally.
14 Q.      Roughly speaking, how many of these
15 documents were provided to you by the attorneys at
16 Hollingsworth versus documents that you went out and
17 found on your own?
18 A.      I don't know if I could give you a
19 percentage, an accurate percentage there for an
20 estimate.
21 Q.      Do you have a hard copy of this
22 document in front of you?
23 A.      Yes, I do.
24 Q.      Will you be able to go through that and
25 mark which of those documents were given -- provided

Page 77

1   to you by attorneys for Monsanto?
2           MR. GRAY:  Object to form.  Answer
3       if you can.
4   A.      I mean, for the most part I could.  The
5   one thing I would say is that, you know, some of our
6   searches overlapped a little bit.  But I mean, for
7   the most part, yeah, I could differentiate between
8   the two.
9           MR. PRATHER:  Okay.  Well, let's
10          take a break and go off the record for
11          a few minutes and let you go through
12          and either circle or put a checkmark by
13          each of the documents that you believe
14          that was provided to you by the
15          attorneys at Hollingsworth or other
16          attorneys from Monsanto.
17          THE WITNESS:  I'm sorry, could you
18          just restate that quick?
19          MR. PRATHER:  Sure.  We'll go off
20          the record for a minute, and I'd like
21          you to go through and put a checkmark
22          next to each of the documents, on the
23          most recent materials considered list,
24          that were originally provided to you by
25          the attorneys at Hollingsworth or any

Page 78

1   other attorneys from Monsanto.
2           MR. GRAY:  Okay, that's fine.
3           MR. PRATHER:  Okay.  Let's go off
4       the record for just a moment.
5           COURT REPORTER:  We're off the
6       record.
7           (A brief break was taken.)
8           COURT REPORTER:  We're back on the
9       record.
10  Q.      Dr. Butts, while we took a break, were
11  you able to take what had previously been marked as
12  Exhibit 5 and place a checkmark by each of the
13  documents that you recall receiving from the lawyers
14  for Monsanto?
15  A.      Yes, I did.
16  Q.      And during the break while you were
17  doing that, did you have the assistance of the
18  lawyers who are there with you in doing that?
19          MR. GRAY:  Object to form, but you
20          can answer.
21  A.      No, I did not.  I just went through it
22  myself.
23          MR. PRATHER:  Okay.  Let's mark
24          that document that you've marked up as
25          Exhibit No. 5 -- I'm sorry, Exhibit No.

Page 79

1       8, which -- it's a different version of
2       Exhibit No. 5.  And we'll figure out
3       after the deposition -- you know, I'll
4       -- the attorneys can get it to the
5       court reporter for inclusion.
6           (Said document is filed with this
7           deposition and marked as Exhibit No. 8
8           for purposes of identification.)
9   Q.      Were there any particular documents on
10  that list that you considered more important than the
11  others to your opinions in this case?
12          MR. GRAY:  Object to form, but you
13          can answer.
14  A.      I mean, I would -- I would say that I
15  considered all of these different things, you know,
16  within forming my opinions.  Were there certain ones
17  that played a larger role?  Yes, I would agree with
18  that statement.
19  Q.      Can you tell me if there are any
20  specific ones that are -- you would consider the most
21  important to your opinions?
22          MR. GRAY:  Object to form.
23  A.      No, not specifically.  You know, which
24  ones were the most important.  I don't think I could
25  go through and tell you that specifically.  It's kind

Page 80

1   of a combination of a variety of things there that
2   helped form opinions.
3   Q.      Okay.  Sorry, I lost my train of
4   thought.  Bear with me for a second.  Is it your
5   testimony that you have reviewed -- I'm sorry, strike
6   that.
7           So the question I was going to ask you
8   is, within your report, there are a number of
9   citations that are just in line with the text,
10  parenthetical citations.  Are all of the documents
11  that you cited in your report included in the
12  materials considered?
13  A.      Yes, everything that I cited in there
14  is in the materials considered.
15  Q.      I did not see any medical records
16  listed on that document.  Is it fair to assume you
17  did not review any of Kenzie's medical records?
18          MR. GRAY:  Object to form.  That
19          misstates this document, but you can
20          answer.
21  A.      So, you know, again, all these
22  documents I've reviewed in some form or fashion.
23  Some were, you know, more in-depth reviews than
24  others, but in regards, you know, to my opinions it
25  was -- I reviewed -- the documents that are in my

Page 81

1  specific report or the documents that played a role
2  in my specific report were more in-depth to the weed
3  control application, you know, those kinds of
4  aspects.
5      Q.      Thank you for that, Doctor, but
6  respectfully that wasn't my question.  My question
7  was yes or no, did you review any of Ms. Murdock's
8  medical records?
9          MR. GRAY:  Objection, but you can
10  answer.
11      A.      So, again -- well, you know, I've
12  considered everything that's in my materials
13  considered list.  I don't remember specifically if I
14  reviewed, you know, specific medical reports.  I know
15  throughout the review of some of my documents there
16  were some -- some medical things that came across
17  while I was reading and again just generally
18  reviewed.  But I don't remember specifically, you
19  know, which documents, like which medical documents
20  or whether those medical documents were in other
21  documents I was reviewing.  I don't remember
22  specifically.
23      Q.      Did you talk to or interview any of
24  Kenzie Murdock's doctors?
25      A.      I did not.

Page 82

1      Q.      Did you talk to or interview anybody
2  else with knowledge of any of the facts of this case?
3          MR. GRAY:  Object to form, but you
4  can answer if you can.
5      A.      I'm sorry, I missed that question.
6  Could you please repeat it?
7      Q.      Did you talk to or otherwise interview
8  any other person with any factual knowledge of the
9  facts in this case; so the Kenzie Murdock case?
10      A.      No, I did not.
11      Q.      What subtype of -- excuse me, what
12  subtype of lymphoma did Kenzie Murdock have?
13      A.      I'm not aware.  Again, you know, my
14  opinions and my expertise in this case was dealing
15  with the weed science herbicide related aspects, not
16  the human health aspect.
17      Q.      I'm going to now put back up on the
18  screen your expert report so we can talk about that.
19  Can you see that?
20      A.      Yes, I can.
21      Q.      All right.  For some reason, we're on
22  Page 3.  I'm not sure why.  We identified this
23  earlier.  I want to go through some of the substance
24  of your opinions, but to start with, what is your
25  definition of a weed?

Page 83

1      A.      A weed can be a lot of things; but in
2  general, it's a plant out of place.
3      Q.      Can you tell me what you mean by out of
4  place?
5      A.      I mean, that can be a multitude of
6  things, this is very general to try and answer.  But,
7  you know, in row crops, if we're speaking
8  specifically about row crops, it's unwanted, you
9  know, weeds that are present within those crops.  If
10  it's around the home, it's just unwanted vegetation,
11  you know, that can be problematic to the buildings,
12  that can be problematic to, you know, harboring other
13  pests, things like that.  It can be a range of
14  things, but it's basically just, you know, unwanted
15  vegetation.
16      Q.      In considering weeds within your
17  profession, do you differentiate between native
18  plants that are classified as weeds and invasive
19  species that are classified as weeds?
20      A.      Can you just restate that question?
21  I'm sorry, I didn't understand.
22      Q.      Sure.  In your profession as a weed
23  scientist, do you differentiate between native
24  species and invasive species when considering weeds?
25      A.      So in some aspects of the weed science

Page 84

1  discipline, in general, yes, we do, we differentiate
2  between native and invasive.  I will say in my line
3  of work we generally don't differentiate.  If it's
4  unwanted vegetation, it's unwanted vegetation.
5      Q.      In terms of the terminology you used in
6  your report, do you agree that both herbicides and
7  insecticides are included in the definition of
8  pesticides?
9      A.      Yes.  If pesticide -- yes, in the
10  definition of a pesticide, yes, herbicides,
11  insecticides, fungicides, all fall under that
12  category.
13      Q.      So, in other words, all herbicides are
14  pesticides, but not all pesticides are herbicides?
15      A.      Yes, that is a correct assessment.
16      Q.      Do you agree that the first 16 pages of
17  your report -- I'm going to go down to Page 16, this
18  is where it ends, where Page 16 ends -- do you agree
19  that the first 16 pages of your report are about
20  weeds, in general, and are not specific to Kenzie's
21  case?
22          MR. GRAY:  Object to form, but you
23  can answer.
24      A.      So, you know, kind of like we talked
25  about with the, like the documents on my MCL, I would

Page 85

1  say they tend to be -- they ten to be general --
2  generalized statements and things, but there are
3  things in there that do directly apply to the Murdock
4  case. You know, like I previously mentioned, the no
5  tillage example. So again, it is general, but there
6  are things in there that do specifically still apply.
7  Q.       Anything in that first 16 pages,
8  though, could apply to any Roundup case if, for
9  instance, they're using the same farming techniques
10  or whatnot that you are talking about?
11  A.       Well -- so, yeah, again, I would say
12  that they can apply generally across the board for
13  application techniques for different areas, but also
14  some of those things can be applied directly to the
15  area that's being used, to the specific, you know,
16  hand wands that were used for the non-crop spraying,
17  those kind of things. So again, it's a little bit of
18  both worlds, generalized but also specific.
19  Q.       And then in terms of applying those
20  general statements to Kenzie's case, that would
21  really start in the second section. It starts at the
22  17th page of the exhibit, but the page number
23  restarts at one, with the heading case specific
24  opinions. Would you agree with that?
25         MR. GRAY: Object to form.

Page 86

1  A.       I'll be honest, I'm sorry, I didn't --
2  like the first half seems kind of cutting in and out.
3  I missed it.
4  Q.       So the generalized opinions that apply
5  -- some of which apply to Kenzie's case, the specific
6  application of those opinions, such as stating that
7  Kenzie used a hand wand or her father sprayed a
8  certain way, that specific application would begin on
9  the 17th page of the exhibit where the page numbers
10  restart at Page No. 1, under the heading case
11  specific opinions, correct?
12         MR. GRAY: Object, but you can
13  answer.
14  A.       On that Page 17 is where, you know, the
15  more specific opinions are presented for the Murdock
16  case. Again, with the -- the report or the, you
17  know, the previous part of this report, again, they
18  may be more generalized, but there's parts in there
19  that can still be directed specifically to Western
20  Kentucky, and the Murdock farming operation, and
21  non-crop spraying as well.
22  Q.       The case specific opinion, the part
23  that's labeled as such, extends from page --
24  numerical pages one through nine where your signature
25  is; is that correct?

Page 87

1  A.       Yes, that is correct.
2  Q.       It is your opinion that chemical weed
3  killers are necessary for farms and homeowners, and
4  that glyphosate is a uniquely good weed killer,
5  right?
6         MR. GRAY: Objection, compound.
7  Answer if you can.
8  A.       So, again, you know, I would emphasize
9  that chemical weed control herbicides are definitely
10  a very important part of successfully managing weeds,
11  whether it's a homeowner, whether it's row crops,
12  anything like that; and glyphosate is a big piece of
13  that puzzle. It is very effective. It's just a --
14  it's a very broad spectrum. So, yes, it is a very
15  important herbicide to be able to be used in multiple
16  different settings.
17  Q.       And part of your opinion that was
18  stated in your general opinions is that it would be
19  bad for society, as a whole, if Roundup were taken
20  off the market, correct?
21  A.       Yes, I would agree with that assessment
22  because again, if glyphosate were to be taken off the
23  market, many, you know, more toxic alternatives would
24  tend to be used in the system. You know, there's a
25  paper that's in my MCL, that kind of helped explain

Page 88

1  that with glyphosate becoming on the market, that
2  our, you know, toxicity quotients have decreased over
3  the years because of that.
4  Q.       And will you agree that if a product
5  with useful justifiable uses also injured some of its
6  users by its very nature, that the product's
7  manufacturer should be responsible for compensating
8  victims of that harm?
9         MR. GRAY: Object to form, scope;
10  it calls for a legal conclusion.
11         Answer if you can, Doctor.
12  A.       Determining any legal ramifications or,
13  you know, company background is out of my scope to
14  answer here.
15  Q.       Do you understand that that principal
16  that I just stated has been at the center of products
17  liability law in the United States for generations?
18         MR. GRAY: Same objection. You can
19  answer, if you can, Doctor.
20  A.       So, again, I don't know, you know, any
21  of the legal background or ramifications of some of
22  those things. It's out of my scope.
23  Q.       In the general section of your report,
24  the first 16 pages, you mentioned problems caused by
25  various specific weeds. I just wanted to ask you

Page 89

1    about a couple of those, and I apologize if I butcher
2    some of these names.  But one of them you mention was
3    Tamarisk.  Did I say that right?
4    A.        Yeah.  Could you, just since we have
5    the document here, can we just pull back up to that
6    section, so I can see specifically what you're -- I
7    mean, I know what you're referring to, but since it's
8    here, if I could just see it, it helps visualize it.
9    Q.        I'm happy to.  I'm just looking at my
10   copy to find the page.  I didn't put the page in my
11   notes.  I think it's on Page 2.  So yeah, about three
12   lines from the bottom of this page, one such example
13   of this is Tamarisk?
14   A.        Yes.
15   Q.        That's a Western U.S. weed, isn't it?
16   A.        Again, so in this section, I mean, that
17   was just one such example like is listed there.  And
18   so, you know, that one weed can consume 200 to 300
19   gallons of water per day, which we had that citation
20   for.  But weeds in general, whether we're in Western
21   United States, or Arkansas, or Kentucky, they can
22   still use a significant amount of water.  That was
23   just a specific example that the Weed Science Society
24   of America provided.
25   Q.        Thank you for that answer, Doctor, but

Page 90

1    it did not answer my question.  My question was,
2    isn't Tamarisk a Western U.S. weed, yes or no?
3            MR. GRAY:  Object to form.  Asked
4            and answered, but you can answer again.
5    A.        Specifically, I don't know the
6    geography of exactly where Tamarisk is distributed
7    across the United States, so I honestly couldn't say.
8    Q.        Is Tamarisk present in the Jackson
9    Purchase region of Kentucky?
10   A.        I honestly don't know.  Again, I'll
11   just reiterate, I don't know the distribution of
12   Tamarisk and where it is across the entirety of the
13   United States.  You know, again, I'd reemphasize,
14   weeds can travel very easily and be spread in areas
15   that we don't even know they are.  And also again,
16   that was just an example of the amount of water that
17   one weed can use.  Weeds in general can still use a
18   significant amount of water.
19   Q.        If Tamarisk is not present out at the
20   Murdock's farm, it wouldn't be relevant to the water
21   use on the Murdock's farm, would it?
22           MR. GRAY:  Object to form, but you
23           can answer.
24   A.        Again, I'm reemphasizing that that was
25   just one example provided from the Weed Science

Page 91

1    Society of America of the total amount of water that
2    one plant could use.  All weeds do use extra water
3    from the system.  So that one weed, if it's not
4    located on the farm, it still provides an example of
5    the impact that weeds have on water allocation.
6    Q.        Can you name any weed that has ever
7    been present on any of the Murdock's farms that would
8    use 200 to 300 gallons of water per day for one week?
9            MR. GRAY:  Object to form and to
10           the extent I think it misstates and
11           misunderstands the statement in the
12           report, but you can answer if you can,
13           Doctor.
14   A.        So I'm not a evapotranspiration
15   specialist and so I can't, you know, specifically say
16   how much water plants use.  I know, you know,
17   Mr. Murdock had testified that Palmer amaranth, you
18   know, was on his farm, Pigweeds, and those are very
19   prolific water users.  What that specific amount of
20   water is, I can't say.
21   Q.        Onto the next page, on Page 3, the
22   second paragraph is on the subject of aquatic weeds.
23   Do you see that?
24   A.        Yes, I do.
25   Q.        Do you know -- did you investigate what

Page 92

1    water courses were present on any of the Murdock's
2    farms?
3    A.        No, I did not investigate any water
4    courses.  Again, this is, you know, generally across
5    the board where weeds can impact, you know, different
6    areas and what those potential issues can arise from,
7    these different areas where weeds can impact human
8    interactions.
9    Q.        Down on the bottom of Page 3, I'll try
10   to underline it, if you can see that, but there's a
11   statement here about study related to cattle and
12   sheep deaths in 17 Western states in 1978.  Do you
13   see that?
14   A.        Yes, I do.
15   Q.        Is Kentucky a Western state?
16   A.        Kentucky is not a Western state, but,
17   again, this is a citation to, again, potential
18   potential problems from poisonous plants.  And like I
19   already mentioned with, you know, Mr. Murdock
20   testifying he has Pigweeds, you know, Palmer amarant
21   is known to accumulate nitrates and can also poison
22   livestock and things like that.  So this is an
23   example of other situations that can occur directly
24   in that area.
25   Q.        Did the Murdock's have any pastured

Page 93

1    livestock on their farm?
2    A.      Not that I'm aware of; but, again, that
3    doesn't necessarily just pertain to livestock.  It
4    can pertain to multiple animal species.
5    Q.      Do you have any opinion on whether
6    glyphosate is a human carcinogen?
7    A.      Again, I entrust in the EPA as a weed
8    scientist in the United States, and the EPA has
9    mandated that it is a non-cancer causing agent.
10   Q.      Is that your opinion or the EPA's
11   opinion?
12           MR. GRAY:  Object to form, but you
13           can answer.
14   A.      As a weed scientist in the USA, I
15   entrust in the EPA's decision that it is a non-cancer
16   causing agent.
17   Q.      Do you intend to come to the trial of
18   this case in Paducah, Kentucky, and tell the jury
19   there that glyphosate is not a carcinogen, is not a
20   human carcinogen?
21           MR. GRAY:  Object to form, but you
22           can answer.
23   A.      I would just again, reiterate that, you
24   know, as a weed scientist, I entrust in the EPA as
25   our regulatory body, and they have stated that it is

Page 94

1    a non-carcinogen.
2    Q.      Do you intend to testify at trial that
3    glyphosate is not a human carcinogen?
4            MR. GRAY:  Objection, asked and
5            answered.
6    Q.      He has not answered it.  It's a yes or
7    no question.  Do you intend to testify to that at
8    trial?
9            MR. GRAY:  Object to the form.  You
10           can answer, as you need to, Doctor.
11   A.      Again, I would just reiterate that as a
12   weed scientist, my human health assessments comes
13   from the U.S. EPA, as our regulatory body, and the
14   U.S. EPA has determined that it is a non-carcinogen.
15   Q.      You've told me that three times.  My
16   question is, do you intend to testify about the
17   carcinogenicity of glyphosate at trial, because if
18   you do, we need to go through, in some depth, of your
19   qualifications to offer that opinion so that we can
20   bring that up before the court.  If you do not intend
21   to offer that testimony at trial, we can skip over
22   that.  But I need to know, yes or no, if you intend
23   to offer that testimony.
24           MR. GRAY:  Object to form.  His
25           opinions and the scope of his opinions

Page 95

1            are laid out in his report, as you
2            have.  He's answered this question
3            three times now.  You can answer it
4            again, Doctor.
5    A.      Yes.  I mean, I would again, just
6    reiterate that I would emphasize, as a weed scientist
7    I entrust in the U.S. EPA as a regulatory body, and
8    they have determined it is a non-cancer causing
9    agent.  That is my opinion.
10   Q.      Dr. Butts, please list for me every
11   class that you've ever taken in cancer biology.
12   A.      I have not taken any classes in cancer
13   biology.
14   Q.      Please tell me every test -- class
15   you've taken in cellular biology.
16   A.      I've not taken any courses in cellular
17   biology.
18   Q.      Please tell me every class you've taken
19   in organic chemistry.
20   A.      I had one course at UW Madison in
21   organic chemistry.  It was, I think, just general
22   organic chemistry.
23   Q.      Please tell me every class you have
24   taken in human biology at the college level or
25   higher.

Page 96

1    A.      I don't remember the specific course,
2    what it was called, but I had a -- it was a general
3    biology, human biology course at UW Platteville in my
4    undergrad.
5    Q.      Have you ever been enrolled in medical
6    school?
7    A.      I have not been enrolled in medical
8    school.
9    Q.      Have you ever been a principal
10   investigator on any research trial relating to any
11   form of human cancer?
12   A.      Sorry, can you just repeat that?  I
13   missed the first part.
14   Q.      Have you ever been a principal
15   investigator on any research trial relating to any
16   form of human cancer?
17   A.      No, I have not been a PI on a -- any of
18   those kinds of studies.
19   Q.      Have you ever assisted in such -- have
20   you ever assisted in any such investigation?
21   A.      I have not assisted in any such
22   investigations.
23   Q.      Have you ever been a principal
24   investigator on any clinical trial relating to cancer
25   in animals?

Page 97

1    A.      No, I have not.  Again, my background
2  is in weed science and entrusting the EPA for these
3  regulatory decisions.
4    Q.      Doctor, have you ever assisted in the
5  investigation of any clinical trial involving cancer
6  in any animal?
7    A.      No, I have not.
8    Q.      Have you ever talked to any qualified
9  expert about the mechanisms of cellular changes that
10  lead to human cancer?
11          MR. GRAY:  Object to form, but you
12      can answer.
13    A.      No, I have not.
14    Q.      What have you individually done to
15  determine whether glyphosate has any mechanism that
16  leads to cellular changes that are associated with
17  cancer?
18          MR. GRAY:  Object to form, but you
19      can answer.
20    A.      I have not done any research or --
21  along those lines of glyphosate and its implications
22  in potentially causing cancer.  Again, my expertise
23  is in the weed science aspect and how we correctly
24  apply these herbicides and use them and how that
25  could play into potential for contact.

Page 98

1    Q.      Dr. Butts, have you ever studied the
2  genotoxicity of glyphosate?
3    A.      I have not.
4    Q.      Have you ever read anything about the
5  genotoxicity of glyphosate?
6    A.      I have not.
7    Q.      Can you tell me how the genotoxicity
8  profile of glyphosate relates to our knowledge of
9  human cancer?
10    A.      No, I cannot.  Again, my opinions are
11  not based on these aspects.  They're based on the
12  weed control efforts, application methods, and what
13  our regulatory body in the United States, the U.S.
14  EPA, has determined.
15    Q.      Have you ever talked to any oncologist
16  about whether glyphosate is associated with human
17  cancer?
18    A.      I have not discussed anything with
19  oncologists.
20    Q.      Have you ever talked to any
21  epidemiologists about whether glyphosate is
22  associated with human cancer?
23    A.      I have not spoken with any of the
24  epidemiologists.
25    Q.      Have you ever conducted any

Page 99

1  epidemiological study into whether glyphosate is
2  associated with human cancer?
3    A.      No, I have not.
4    Q.      Have you ever conducted any
5  epidemiological study as to whether glyphosate is
6  associated with animal cancer?
7    A.      No, I have not.
8    Q.      Are you familiar with an agency called
9  IARC?
10    A.      Yes.  I mean, I'm vaguely familiar with
11  IARC.
12    Q.      It's an agency of the World Health
13  Organization, correct?
14    A.      Correct.
15    Q.      Do you acknowledge that IARC classifies
16  glyphosate as a group 2A probable human carcinogen?
17    A.      Well, I'm aware that's IRAC's
18  classification, yes.
19    Q.      Do you agree that IARC is a research
20  body, rather than a regulator?
21          MR. GRAY:  Object to form.
22    A.      I'm unaware of, you know, if they
23  perform research or what that -- what their specific
24  agency goals are, but I do know that they are not a
25  regulatory body.

Page 100

1    Q.      The United States EPA is a regulatory
2  body, correct?
3    A.      Yes, that is correct.
4    Q.      Have you ever been a registered
5  lobbyist?
6    A.      Have I ever been?
7    Q.      Yes.
8    A.      No, I have not.
9    Q.      Have you ever lobbied the EPA on behalf
10  of Monsanto or any other company?
11          MR. GRAY:  Object to form.
12    A.      No, I have not.
13    Q.      Have you ever lobbied any state, local,
14  or federal legislative body in any way, on any topic
15  relating to agriculture?
16          MR. GRAY:  Object to form.  You can
17      answer, if you can.
18    A.      No, I have not lobbied for --
19    Q.      I meant to ask you this earlier,
20  jumping back a little bit.  I had asked you at length
21  about your experience in litigation.  Have you -- but
22  outside of litigation, have you ever been paid by
23  Monsanto, in any capacity, as a consultant, as a
24  lecturer, as a writer on their behalf, or for any
25  other type of work, as either an employee or an

1  independent contractor, for Monsanto?
2  A.      I guess just to clarify, are you asking
3  if like me personally have been paid or received
4  funds for doing some of that work, or --
5  Q.      Correct.
6  A.      So me personally, no, I have not been
7  paid by Monsanto for any of those things you listed.
8  Q.      What about your institution, does the
9  extension service or any other part of the college of
10 agriculture at the University of Arkansas receive
11 funding from Monsanto?
12 A.      So my research program -- I started
13 after, you know, Monsanto was purchased, so just to
14 clarify there.  You know, my research program has not
15 received any funding from Monsanto.  But, from Bayer,
16 yes, my research program has received, you know, some
17 funds to conduct a handful of field trials.
18 Q.      Were any of those field trails related
19 to glyphosate?
20 A.      Not necessarily specifically, but
21 glyphosate was included in those trials.
22 Q.      Do you have any idea what portion of
23 your programs outside funding comes from Bayer?
24 A.      So, again, this is an estimate because
25 I don't have these numbers, you know, memorized

1  offhand; but, you know, rough estimate is it's
2  normally probably like a 1/20th of my entire research
3  program maybe comes from Bayer.
4  Q.      So about 5 percent roughly?
5  A.      Correct.  Yeah, about 5 percent or so.
6  Q.      Are you familiar with a surfactant
7  referred to as POEA?
8  A.      Vaguely.  I'm familiar with surfactants
9  in general, like the specific, you know, chemistry,
10 like the POEA, you know, I'm not real familiar with
11 that specific.
12 Q.      Are you aware that POEA is a common
13 surfactant in various formulations of Roundup that
14 are sold in the United States?
15         MR. GRAY:  Object to form, but you
16 can answer.
17 A.      Again, I'm not exactly familiar.  I'm
18 just aware of, you know, surfactants in those
19 formulated products, but what the specific chemistry
20 of it is, I'm not fully aware.
21 Q.      Would you agree that surfactants
22 promoted have in some active chemical in weed control
23 formulations -- that's a poor question.  Let me start
24 over.
25         Will you agree that surfactants promote

1  the adhesion to leaves of the actual chemicals that
2  are active in weed control formulations?
3  A.      Yes.  Yeah, I would agree that
4  surfactants help -- yes, like you said, they help
5  with the adhesion of spray droplets to be retained on
6  leaf surfaces.
7  Q.      What about human skin, do surfactants
8  increase adhesion of those droplets to human skin?
9          MR. GRAY:  Object to form and
10 scope.  But you can answer if you can.
11 A.      I'm not aware of, you know, how
12 droplets and things interact with human skin.  I've
13 never looked at or conducted any kind of studies with
14 human skin.
15 Q.      You mentioned the LD 50 in your report,
16 and my understanding of an LD 50 is that that is the
17 dosage or exposure at which a particular substance
18 would be expected to result in the death of
19 50 percent of the subjects in a defined population.
20 Is that fair?
21         MR. GRAY:  Object to form.  Answer
22 if you can.
23 A.      Yes, that sounds correct.  So the LD 50
24 is a lethal dose that would be required to kill
25 50 percent of whatever test population it is, and

1  basically all chemicals, products, you know, have
2  some sort of LD 50.
3  Q.      And I think in your report you compared
4  the LD 50's of various products ranging from
5  herbicides all the way to acetaminophen in terms of
6  milligram per kilogram; is that fair?
7  A.      Yes.  I mean, again, if we want to turn
8  to a certain page just so it's up, you know, that
9  would help again recall my memory bank.  But, yes,
10 that sounds familiar that I compared several
11 different products or provided what their LD 50's
12 were.
13 Q.      It looks like you had a lot of them
14 here on Page 9.
15 A.      Yeah, I think that's the main paragraph
16 right there.
17 Q.      And you're comparing the LD 50 for
18 various populations here, but will you agree with me
19 that the direct comparison of milligrams per
20 kilogram, one substance to another, is not useful
21 unless you also consider it in relation to the
22 strength or the milligrams that are distributed in
23 any particular application?
24         MR. GRAY:  Object to form, but you
25 can answer that, if you can, Doctor.

Page 105

1   A.      I'm not sure I understand the question.
2   Q.      Well, these -- these various substances
3   that you have listed, various LD 50's for -- these
4   are typically, if not always, delivered as part of a
5   solution or preparation, not individually at full
6   strength, correct?
7   A.      Well, I mean, all of these different
8   products -- I guess I'm still confused.  Are you
9   saying that they're delivered with other things or
10  delivered with other -- I'm still confused, I guess.
11  Q.      Well, first, since humans don't ingest
12  pure caffeine, they drink coffee or tea or Cola and
13  get caffeine that way.  They don't ingest pure
14  Vitamin D.  They take a pill that is -- has a defined
15  amount of Vitamin D within that pill, right?
16  A.      Yeah.  So, I mean, whatever it is,
17  there's certain percentages or varying rates.  That
18  applies for all of these different things.  I mean,
19  the herbicides, as well as the other, you know,
20  non-herbicide examples I provided there.
21  Q.      So, for instance, if we're going to
22  look at Gramoxone -- I may be pronouncing that wrong
23  -- the LD 50 is at 3 milligrams per kilogram, and
24  compare that with ammonium nonanoate -- did I say
25  that anywhere close to right?

Page 106

1   A.      It's close enough, yeah.
2   Q.      The LD 50 is between 3,000 and 5,000
3   milligrams per kilogram.  It's not useful in
4   comparing which of those is more toxic, unless we
5   know how much of that substance is delivered to the
6   population?
7   A.      So those values still provide us, you
8   know, based on -- it's all based in like active
9   ingredient basically.  And so again, that's as close
10  of a comparison as you can really possibly make to
11  compare an active ingredient versus an active
12  ingredient.
13  Q.      But those active ingredients are only
14  one small part of the delivery system, whether that
15  delivery is a pill or a spray -- a chemical spray or
16  a cup of coffee, right?
17          MR. GRAY:  Object to form, but you
18          can answer.
19  A.      Well, I would say there, again, yeah,
20  they are a part.  What kind of part they make up, I
21  can't exactly say.  You know, like on a herbicide
22  front, herbicides make up a very small portion of
23  what's being carried.  The majority is water there.
24  If we talk about like, say, you know, Vitamin D, you
25  know, or another one of those like in a vitamin, I'm

Page 107

1   not exactly sure what percentage that would, you
2   know, make up that kind of thing.
3   Q.      And my point is, if we're trying to
4   compare what a lethal dose is, one of these to the
5   other, we have to know what the strength is of that
6   concentration that they're delivering?
7   A.      Well, again, with any of these, though,
8   even -- you don't necessarily need to know the
9   strength.  You just need to -- these comparison
10  levels, this is what is required to kill 50 percent
11  of those doses.  So, you know, with caffeine again
12  like, you know, your example, you're not directly
13  injecting it, but a certain amount of cups of coffee
14  would get you there.  So it's the same premise.  Like
15  this is the amount of active that's required to cause
16  that lethal dose of 50 percent of the population.
17  Q.      And to know how many cups of coffee are
18  going to kill 50 percent of the human population,
19  you'd have to know how much caffeine was in a cup of
20  coffee?
21          MR. GRAY:  Could you repeat that
22          question one more time, Mr. Prather?
23  Q.      To know how many cups of coffee it
24  would take to kill 50 percent of the human
25  population, you would have to know, not just what the

Page 108

1   LD 50 is for caffeine, but also what the -- how much
2   caffeine is in each cup of coffee?
3          MR. GRAY:  I would object to the
4          form to the extent that it misstates
5          this -- what we're talking about here.
6          These LD 50's are talking about
7          animals, but you can answer the
8          question.
9   A.      I guess I'm still kind of
10  misunderstanding the questions maybe, but the LD 50's
11  give us a value to compare those actual active
12  agreements and their -- you know, their toxicity to
13  kill 50 percent of the test population.  And so in
14  this -- you know, in this paragraph, we're looking at
15  glyphosate requires a significant amount more than a
16  lot of these other prod -- like herbicide products,
17  we're talking, or even some other generalized, you
18  know, every day things that we're talking about.
19          So, again, it is variable on like the
20  carrier, but this is just strictly comparison,
21  comparing how much is required to kill 50 percent of
22  -- in this -- in most of these cases it's -- rats are
23  the test animal population.
24  Q.      So let's put it this way:  If I wanted
25  to know how much glyphosate -- how much of glyphosate

1   containing product had to be delivered to a rat to
2   reach its LD 50 population, I would have to know both
3   the milligrams per kilogram of the LD 50, and I would
4   also have to know how much glyphosate is in the
5   formulation that's being delivered?
6   A.      I mean, so -- I'm still confused.
7   These are based on the amount of active ingredients,
8   so the amount of that -- it's basically that amount
9   of glyphosate is what would be needed to inject into
10   rats directly to kill 50 percent of that population.
11   Q.      But we don't use pure glyphosate in
12   agriculture, do we?  It's always part of a
13   formulation?
14   A.      So, yeah, everything is formulated
15   products.  You know, some have varying levels of
16   what's in there and there's all -- there's different
17   proprietary things.
18   Q.      And that's exactly my point.  To know
19   how much of the product it would take to reach the
20   LD 50, you have to know not only the LD 50 of
21   glyphosate, but also what the concentration is in the
22   product that you're concerned?
23   A.      But there are LD 50's for all different
24   chemistries.  I mean, those are created for almost
25   everything -- or not almost everything.  They are

1   created for everything, and again, you know, lethal
2   dose here is comparing the active ingredients in my
3   example; but everything has an LD 50, and all of
4   those would be out there.  And the EPA has looked at
5   an immense amount of data and concluded, even from
6   that amount of data, that glyphosate is a non-cancer
7   causing agent.
8   Q.      Dr. Butts, you're going pretty far off.
9   You still haven't answered my question, which I think
10   is a fairly simple question.  But let me try to give
11   it in a very concrete example.  If I were to come to
12   you with a container of say, Roundup Powermax -- I
13   think is the name of one of the formulations -- and I
14   were to say how many ounces of this Roundup Powermax
15   must you deliver to a rat in order to achieve the
16   LD 50 of -- in order to expose the rat to the LD
17   5600 milligrams per kilogram, you would have to look
18   at what the concentration of glyphosate was in the
19   Powermax product I just brought you, correct?
20   A.      In that example to provide the -- that
21   specific amount of glyphosate, yes, you would have to
22   know the active load and --
23   Q.      And it would be the -- I'm sorry, I
24   didn't mean to interrupt.
25   A.      Go ahead.

1   Q.      And that would be true for any
2   substance we're talking about?  If we want to know
3   how much of a delivery agent we have to deliver to
4   reach the LD 50, you would have to consider the
5   concentration of the active ingredient in the
6   delivery substance?
7   A.      So, again, if we're trying to get to
8   the point of calculating on a total aspect, like, you
9   know, back to the cups of coffee, that you need to
10   know the total cups of coffee, yes, you would need to
11   know how much caffeine is in each cup of coffee.  But
12   these numbers are not based on that.  These are based
13   on the amount of active ingredient that it would take
14   to get there.
15   Q.      Thank you.  You have made my point.  We
16   can go on now.  To Kenzie's case specifically, did
17   you do any mathematical calculations of Kenzie's
18   exposure to glyphosate?
19   A.      No, I did no mathematical calculations
20   on the exposure.  It's based on experience with the
21   application methods and, you know, the deposition of
22   Mr. Murdock on where she was in vicinity to the
23   Roundup.
24   Q.      Could you have made calculations,
25   mathematical calculations of how much glyphosate, how

1   much an active ingredient she was exposed to?
2           MR. GRAY:  Object to form, but you
3   can answer, if you can.
4   A.      No, I don't believe I could do a
5   mathematical calculation because, again, kind of like
6   in my specific report, I outlined being in an
7   enclosed cab with an air filtration system and spray
8   being behind you and directed downwards, you know,
9   there's very minimal potential for contact there.
10   And I don't know of anything of trying to calculate
11   what kind of contact potential there is with all
12   those factored into that scenario.
13   Q.      Did you review the calculations that
14   were made by Mr. Ungers, the expert from Monsanto,
15   and Dr. Sawyer, the expert for the plaintiff in this
16   case?
17   A.      I generally reviewed Dr. Sawyer's
18   report and what he considered to make those
19   calculations.  I didn't really investigate the
20   calculations themselves, just what he kind of
21   considered in his calculations.  I did not look at
22   the other report.
23   Q.      You did not look at Dr. Ungers'
24   calculations?
25   A.      No, I did not.

Page 113

1  Q.        And I did not see in any -- strike
2  that.
3         I saw you made a reference to -- in
4  your report to the number of days or hours of
5  exposure that Dr. Sawyer used in his calculations,
6  but I didn't see any other comments on his specific
7  calculations or formulas in his report. Does that
8  mean you don't intend to come and comment on
9  Dr. Sawyer's specific calculations at the trial?
10         MR. GRAY: Object to form, but you
11         can answer, if you can.
12  A.        No, the -- the specific calculations,
13  I'm not familiar with, you know, where those are
14  generated from, those kind of things. What I'm
15  familiar with is the potential for contact. Like I
16  already mentioned with the row crop sprayer, you
17  know, that was considered basically a full exposure
18  event, in which case it would be, you know, again,
19  very minimal potential for contact based on enclosed
20  cab, air filtration system, how those sprayers
21  operate.
22         And so that's where my dissension with
23  those -- you know, estimates come in. Not -- again
24  the specific calculation, I'm not aware -- or follow
25  those calculations precisely.

Page 114

1  Q.        So you are not going to come to trial
2  and say Dr. Sawyer arrived at this number, but it
3  should have been this number instead?
4         MR. GRAY: Object to form, but you
5         can answer.
6  A.        Again, I don't have a specific number.
7  My main opinion is that the potential for contact is
8  extremely minimal based on the application practices
9  that were used, where she was in the vicinity to the
10  Roundup; those types of things.
11  Q.        And your testimony is you don't have
12  the information you would need to calculate a
13  specific number?
14         MR. GRAY: Object to form. It
15         misstates his testimony, but you can
16         answer.
17  A.        Again, these application processes and
18  these different events, that are a lot of complex
19  interactions occurring, a lot of different things
20  going on in the background that aren't built into
21  those calculations. Those calculations just, you
22  know, assume the contact occurs 100 percent of the
23  time.
24         And so, again, I'm not aware of any
25  calculations. I don't have any calculations to

Page 115

1  actually factor in the complex nature that's
2  occurring with these applications. And, again, like
3  I've already mentioned with the enclosed cab, air
4  infiltration systems, spray being behind and directed
5  away from those cabs, all those sorts of things are
6  not factored into those calculations.
7  Q.        Do you agree that Kenzie Murdock rarely
8  wore a specific PPE, personal protective equipment,
9  while handling Roundup?
10  A.        Based on Mr. Murdock's testimony, I
11  would agree it sounded like she, you know, did not
12  wear PPE a lot of the time.
13  Q.        Does Roundup's label direct users to
14  wear PPE?
15  A.        I'm sorry, I missed that question.
16  Q.        Does Roundup's label direct users,
17  applicators to wear PPE?
18         MR. GRAY: Object to the form. The
19         question is overly broad; but you can
20         answer, if you can, Doctor.
21  A.        I was going to say, I would just
22  clarify, you know, there's a lot of different Roundup
23  of labels, and some of those labels have different
24  requirements on them. In general, you know, for the
25  Roundup for row crop use, they do specify, you know,

Page 116

1  certain things as PPE to be worn.
2  Q.        And what kind of PPE is specified?
3  A.        So again, it's very dependent on the
4  specific product. I mean, is there a specific
5  product you'd like to discuss or just generalities?
6  Q.        Just tell me in generalities, in your
7  knowledge as a weed scientist and as a commercial
8  applicator, what does Roundup label direct or
9  recommend applicators use as PPE?
10         MR. GRAY: Object to the form. It
11         is vague and overly broad; but you can
12         answer, if you can.
13  A.        So in general, like we're talking about
14  Roundup Powermax II or Roundup Powermax III, which is
15  probably, you know, what I'm most familiar with in
16  recent years, you know, those products generally
17  recommend long sleeve shirts, pants, shoes and
18  gloves, chemical resistance gloves.
19  Q.        If Roundup were not absorbed through
20  the skin, then why would long sleeves, pants and
21  shirts and rubber gloves be necessary?
22         MR. GRAY: Object to form. Also
23         beyond the scope; but you can answer,
24         if you can.
25  A.        There's a variety of reasons outside of

Page 117

1    absorption to wear PPE, one of which is just a lot of
2    different herbicides and chemicals can be skin
3    irritants, so just trying to avoid that aspect of
4    irritating the skin.
5    Q.      Is glyphosate a skin irritant?
6    A.      What's that?
7    Q.      Is glyphosate a skin irritant?
8    A.      I'm unsure. I'm not familiar with
9    those aspects of the chemistries.
10   Q.      Are there other components of the
11   formulation of Roundup Powermax II or Powermax III
12   that are skin irritants?
13           MR. GRAY: Object to form. Asked
14           and answered, but you can answer.
15   A.      Again, I'm not aware of, you know,
16   what's a skin irritant or what's not a skin irritant.
17   Q.      Do you know the differences in the air
18   filtration systems between the John Deere sprayers
19   and the Spray-Coupe sprayer cabs that the Murdocks
20   had used on their farm over the years?
21   A.      If I'm aware of any specific
22   differences between the Spray-Coupe and the
23   John Deere; is that what you're asking?
24   Q.      Yes, specifically the -- well, not --
25   yes, are you aware of any differences in the air

Page 118

1    filtration systems for the cabs, between the
2    Spray-Coupes and the John Deere models that the
3    Murdocks had on their farm?
4    A.      I'm not aware of any differences. I
5    know Mr. Murdock testified that he, you know, they
6    had the cabin filters, enclosed cabs, doors and
7    windows were all shut, and that everything was
8    maintained, regardless of which sprayer it was;
9    Spray-Coupe or the John Deere.
10   Q.      So just to be clear, you're not going
11   to come and testify at trial about the differences of
12   the mechanical components of the filtration systems
13   between those various pieces of equipment?
14           MR. GRAY: Object to form; but you
15           can answer, if you can.
16   A.      So, again, I -- the specifics between
17   the Spray-Coupe and the John Deere and their air
18   filtration system, I'm not aware of. They -- again,
19   they both contained air filtration systems, had air
20   filters. Mr. Murdock testified that they, you know,
21   were well maintained. I mean, that's where my
22   opinion lies.
23   Q.      I believe based on your report you're
24   aware that Kenzie's parents, I believe mostly her
25   father, maybe her mother as well, reported that

Page 119

1    Kenzie would pressure wash the tractors or sprayers
2    from time to time?
3    A.      Yes, I'm aware that she -- they stated
4    she would pressure wash the sprayers and other
5    equipment.
6    Q.      Could pressure washing those sprayers
7    have a tendency to make residual glyphosate go
8    airborne?
9    A.      No, I don't believe that to be the case
10   at all. Even if there is any residual glyphosate on
11   a sprayer, that would not make it go airborne. It
12   would -- the water would mix. It would dilute it
13   down even further than it's already diluted. There
14   would be minimal opportunity there for glyphosate to
15   be available.
16   Q.      What is your basis that if there were
17   residual glyphosate on the machines being pressure
18   washed that it would not go airborne?
19   A.      Because glyphosate's not a volatile
20   chemical. It doesn't just go airborne. It needs to
21   be carried in a solution.
22   Q.      Could it form a solution with the water
23   from the pressure washer?
24   A.      Again, like I just stated, you know, it
25   could form a solution, but it would be so heavily

Page 120

1    diluted with all of the water, it's already a diluted
2    product that would have been on the sprayer, if any
3    was on the sprayer, and then you're diluting it even
4    further by washing it. That would be such a
5    minuscule amount that it'd be negligible.
6    Q.      But that's a different question,
7    Dr. Butts. My question was could the active power
8    washing, a pressure washing a sprayer or other piece
9    of farm equipment, if it had residual glyphosate on
10   the equipment, could the act of pressure washing it
11   make -- create a solution that makes that glyphosate
12   in whatever the concentration is go airborne?
13           MR. GRAY: Object to the form.
14           Asked and answered, but you can answer
15           again.
16   A.      Again, it's not going to go airborne.
17   You're not -- it's not able to go airborne. It's
18   trapped in a solution, and that solution would not be
19   airborne. And then again, that solution is so
20   diluted from all -- it's already diluted from what
21   would be spraying. It's now diluted from all the
22   pressure washing. The amount that is possible there
23   is absolutely miniscule.
24   Q.      Have you ever quantified the amount of
25   glyphosate that could be present in a rebound spray

Page 121

1    from pressure washing farm machinery?
2    A.    I have not performed a study on that
3    along those lines.
4    Q.    Do you have any criticism of how the
5    Murdock farms -- the Murdock family or the employees
6    of the Murdock farms mixed and sprayed glyphosate?
7        MR. GRAY: Object to the form of
8        the question; but you can answer,
9        Doctor.
10   A.    There's a lot to unpack there. In
11   general, I would say, for the most part, from the
12   deposition of Mr. Murdock, he followed best
13   application practices. You know, from a mixing
14   standpoint, they were using appropriate fittings and
15   things like that, so that seemed appropriate. The
16   one caveat would be that both -- or Mr. Murdock
17   stated both him and, you know, Ms. Murdock rarely
18   wore PPE that would be, you know, required by the
19   label. But overall, their application practices,
20   from what Mr. Murdock testified, would be sound;
21   drift reduction, you know, application practices.
22   Q.    Do you intend to offer any criticisms
23   of how Murdock's farms stored chemicals on their farm
24   property?
25       MR. GRAY: Again, object to form,

Page 122

1        but you can answer.
2    A.    I don't believe I have any opinions on,
3    you know, how they stored chemicals on the farm. I
4    don't think I have anything in my specific report on
5    that.
6    Q.    Do you have any opinions on what other
7    chemicals Kenzie Murdock was exposed to and whether
8    they might -- any of those chemicals might lead to
9    cancer?
10       MR. GRAY: Object to form; scope,
11       but you can answer.
12   A.    So, again, that's kind of a broad
13   question. So as far as the other chemicals causing
14   cancer, I have no opinion on that front. That's out
15   of my scope. But I will say I do have opinions on
16   the other chemicals being used, primarily, especially
17   from the non-crop side because it was testified that,
18   you know, the row crop sprayers would be drained and
19   leftover chemical would be used in the non-crop
20   sprayers around different areas. And, you know, like
21   in those receipts say, there were several other
22   products, several other active ingredients, several
23   residual type herbicides, which would all impact the
24   amount of glyphosate necessary to be used in the
25   non-crop areas. So from that aspect, I would have

Page 123

1    opinions on the other products used.
2    Q.    And what are your opinions on other
3    products used? Do you have an opinion of whether it
4    was appropriate or inappropriate to mix those
5    products?
6        MR. GRAY: Object to form, but you
7        can answer.
8    A.    So, again, it's difficult to say
9    with -- I mean, we were just presented with a receipt
10   and a list of products. And so knowing what
11   combinations or, you know, what different things, I
12   can't say specifically because that's kind of
13   dependent, you know, from tank mix to tank mix.
14   But, you know, in general, I mean, it's common
15   practice to have tank mixtures, to use leftover
16   chemical in a non-crop sprayer; those kinds of
17   things.
18   Q.    Do you intend to offer any opinions
19   that any of those other chemicals that were mixed
20   contributed to Kenzie's development of non-Hodgkin's
21   lymphoma?
22       MR. GRAY: Object to form and scope
23       and asked and answered, but you can
24       answer again.
25   A.    So again, my aspect of those other

Page 124

1    chemicals -- my opinions will not deal with the human
2    health aspects. It's the aspects of that, you know,
3    especially if residual herbicides were in those tank
4    mixtures; it would require less Roundup to be sprayed
5    in those non-crop areas.
6    Q.    I want to go back to your report. I'll
7    put it on the screen. This is a section beginning on
8    page -- at the very bottom of Page 8 of the case
9    specific portion of the opinions, just before your
10   conclusion, and this is your section that you
11   discussed Dr. Sawyer's calculations. Can you see
12   that?
13   A.    I do see that.
14   Q.    You have reviewed part of Dr. Sawyer's
15   report, but not all of it, correct?
16       MR. GRAY: Objection, but you can
17       answer.
18   A.    Yes, I've reviewed parts of his report
19   that pertained to the contact.
20   Q.    And you've reviewed parts of
21   Dr. Sawyer's deposition but not all of it, correct?
22       MR. GRAY: Object to form, but you
23       can answer.
24   A.    Again, I've reviewed the deposition,
25   but focused on the -- the parts pertaining to

Page 125

1 glyphosate contact.
2 Q.      Do you have any comment or opinions
3 related to Dr. Sawyer's methods, calculations, and
4 conclusions that are not included in this paragraph
5 on Page 8 to 9 of your report?
6 A.      I'm sorry, could you just repeat that
7 question?
8 Q.      Do you have any opinions or criticisms
9 that relate to Dr. Sawyer's methods, calculations, or
10 conclusions that are not included in your paragraph
11 here on Page 8 to 9 of your report?
12          MR. GRAY:  Object to the form of
13          the question, but you can answer.
14 A.      So again, I believe, you know, my
15 opinions provided in this paragraph summarize
16 all my opinions based on his calculations for the
17 potential for contact.  It's kind of like what we
18 discussed before with the -- you know, the amount of
19 time of exposure kind of thing.  So I believe that
20 this covers my opinions, based on the potential for
21 contact, based on Dr. Sawyer's report.
22 Q.      If you review any additional portions
23 of Dr. Sawyer's report or testimony, and develop new
24 opinions based on that, or if you consider what
25 you've already reviewed and develop new or different

Page 126

1 opinions based on that, will you agree to tell
2 Monsanto's attorneys so that they can let us know
3 that before trial?
4          MR. GRAY:  Object to form, but you
5          can answer.
6 A.      Yes.  If my opinions would change based
7 on any other review of materials, I would notify.
8 Q.      And I believe we've sufficiently
9 covered Dr. Schiff and that your review, I think it's
10 fair to paraphrase, simply would appear to confirm
11 your opinions related to Dr. Sawyer, would be
12 consistent with your opinions related to Dr. Sawyer
13 in terms of your opinions on Dr. Schiff's exposure
14 testimony; is that fair?
15          MR. GRAY:  Object to form, but you
16          can answer.
17 A.      Yes, I believe that's a fair
18 assessment.  It's roughly the same concerns with the
19 amount of potential.  I do think some of the numbers
20 provided in Dr. Schiff's report were -- like the
21 amount of times, you know, Ms. Murdock was spraying
22 and things were different than Dr. Sawyer's, so there
23 may be specifics there.  But in general, it's the
24 fact of those exposure amounts.
25 Q.      The same question related to

Page 127

1 Dr. Schiff, if you review any other parts of his
2 opinions or you reconsider what you've already
3 reviewed and that affects your opinions in any way,
4 will you agree to the let Monsanto's attorneys know
5 that so they can inform us of that before trial?
6          MR. GRAY:  Object to form, but you
7          can answer.
8 A.      If my opinions were to change at all
9 through review of more material, yes, I would notify
10 Hollingsworth attorneys.
11 Q.      Have you read the IARC monograph on
12 glyphosate?
13 A.      I've looked over that document.  I've
14 reviewed it, but I wouldn't say I've read it cover to
15 cover in-depth.
16 Q.      Do you intend to comment on the
17 accuracy of any of the statements or conclusions by
18 IARC in that monograph?
19 A.      So I would say, you know, specifically
20 on the IARC monograph, I don't have an opinion, other
21 than the fact that it's a non-regulatory body.  You
22 know, we entrust in the U.S. EPA for our decisions,
23 and they've determined it's a non-cancer causing
24 agent, regardless of IRAC's determination.  That
25 would be the -- my opinions from that standpoint.

Page 128

1 Q.      But you don't intend to testify about
2 the methodology or conclusion, specific conclusions
3 of IARC one way or another?
4 A.      Sorry, the mic dropped out there.  What
5 was the ending of that?
6 Q.      You don't intend to testify about the
7 methodologies, conclusions, or data relied on by
8 IARC, one way or the other, than other just to
9 comment that IRAC's conclusion differs from the EPA's
10 conclusion; is that true?
11          MR. GRAY:  Object to form.  You can
12          answer, if you can.
13 A.      So, again, the specific data and
14 reports and things in that IARC report, I don't have
15 -- I'm not aware of what those specific studies and
16 things are.  Again, I would just reiterate that I
17 would indicate that that's a non-regulatory body.
18 Our U.S. EPA is a regulatory body, and they review,
19 you know, a significant amount of data as well to
20 come to their conclusions.  And they've concluded
21 that glyphosate is a non-carcinogen.
22          MR. PRATHER:  I'm pretty close to
23          being finished, but I've got a few more
24          questions, and I want to look over my
25          notes.  Let's take about a five-minute

Page 129

1  break right now.  Is that okay with
2  everyone?
3      MR. GRAY:  Sure.
4      COURT REPORTER:  We are off the
5  record.
6      (A brief break was taken.)
7      COURT REPORTER:  We're back on the
8  record.
9  Q.   Dr. Butts, I'm going to go back to
10 Exhibit No. 3, which is your report.  And on Page 4
11 of the -- Page 4 of the general section at the
12 beginning, I just want to clarify and confirm that
13 that photograph of a weed growing out of a curb,
14 that's not anything taken on the Murdock farm
15 property, correct?
16 A.   No, that picture is not from the
17 Murdock property.
18 Q.   And the same with the three pictures of
19 weeds on Page 5, of weeds growing very structured,
20 none of those photos were taken on the Murdock farm
21 property; correct?
22 A.   Again, yeah, none of those pictures
23 were taken from the Murdock property.  I will say,
24 though, those weeds are present in that area of
25 Kentucky, but they are not specifically from the

Page 130

1  Murdock farm.
2  Q.   And the photos of the particular
3  consumer glyphosate formulations of Roundup that
4  appear on Page 14 of the general section of your
5  report, you're not representing that those are the
6  particular Roundup formulations or delivery systems
7  used on the Murdock farm; correct?
8  A.   Correct.  I'm not -- no, within the
9  receipts and some of the other training products are
10 the ones more that I referred to used on the farm,
11 not these ones.
12 Q.   What we have pictures of here are more
13 what a homeowner would go to a hardware store or a
14 consumer goods store and purchase, not what a large
15 scale agricultural user would use, correct?
16 A.   Correct.  Yeah, these were just
17 examples of other ways that Roundup can be used.  The
18 pictures that are involved in this, in the general
19 report of, you know, the row crop sprayers, the
20 pump-up sprayers with the hand wand, those are more
21 applicable to the Murdock application method -- or
22 methods of application -- excuse me.
23 Q.   We've talked about some of your
24 disagreements with Dr. Sawyer and Dr. Schiff.  Do you
25 have any other disagreements with their testimonies

Page 131

1  or reports, as we sit here today, that we've not
2  covered?
3      MR. GRAY:  Object to form, but you
4      can answer.
5  A.   I mean, again, you know, my opinions,
6  particularly with Sawyer, but will relatively apply
7  to Schiff, are represented in my specific report
8  there.  I can't remember any other specific
9  complaints offhand or disputes offhand.  Again, most
10 of my opinions there are presented in that specific
11 report.
12 Q.   What journals do you regularly read
13 within your profession?
14 A.   I'm sorry, I kind of missed that
15 question.  Could you please restate that?
16 Q.   What scientific journals do you
17 regularly read within your profession?
18 A.   So scientific journals I regularly
19 read; is that correct?
20 Q.   Yes.
21 A.   Weed Technology, Weed Science, Tech
22 Management Science.  Those are probably my main ones.
23 Maybe you, you know, biosystems engineering.  Those
24 are probably the main ones, I would say.
25 Q.   And do you consider those four journals

Page 132

1  to be reliable sources of information within your
2  field?
3  A.   Yes, most definitely.
4  Q.   Are there any textbooks that you would
5  refer to that would be specific -- specifically with
6  regard to any of the issues that you intend to
7  testify about in this case?
8      MR. GRAY:  Object to form, but you
9      can answer.
10 A.   I mean, not necessarily specifically, I
11 guess.  I would say one of the textbooks that comes
12 to mind is the -- and I can't remember the exact
13 title.  I think it's just Pesticide Application
14 Methods, I think is the title.  But that textbook has
15 been a part of my, you know, learning process of
16 application technologies and application methods and
17 things and has kind of developed some background for
18 my expertise in that area.
19     So that might be one that, again, not
20 specifically per se, but -- that has developed some
21 of my opinions over the years.
22 Q.   Do you recall who the author of
23 Pesticide Application Methods is?
24 A.   I want to say Matthews, but I'm not
25 100 percent on that.

Page 133

```
 1    Q.      Is that a reliable textbook?
 2          MR. GRAY:  Object to form.  You can
 3       answer.
 4    A.      Yes, it's a reliable textbook.
 5    Q.    Is there anything that you wanted to
 6    review in this case, but haven't had the opportunity
 7    to?
 8    A.      Just offhand, nothing specific comes to
 9    mind.  I mean, I've been able to review a lot of very
10    different documents and information presented through
11    depositions.  So nothing specific comes to mind, I
12    guess.
13    Q.      Do you agree that if you review any
14    additional materials before trial, you will let
15    Monsanto's lawyers know that so that they can tell
16    us?
17    A.      Yes.  I would agree that if I review
18    any other materials or my opinions change, I will
19    notify the Hollingsworth attorneys.
20    Q.      Between what is in your report and what
21    we have talked about today during your deposition, do
22    you agree or have we covered all of the opinions you
23    hold in this case?
24          MR. GRAY:  Object to form, but you
25       can answer.
```

Page 134

```
 1    A.      Well, I mean, all of my opinions
 2    referring to this case are presented in my report.  I
 3    will just say, depending on the context or line of
 4    questioning, you know, some extra, you know, pieces
 5    may be brought up; but my specific opinions are
 6    provided in these reports for this case.
 7    Q.      And I'm sorry, I didn't catch the last
 8    part because there was a loud truck going by my
 9    office.  Did you say your specific opinions were
10    what?
11    A.      So I was just saying that my opinions
12    are presented in this report, you know.
13    Q.      And I think we've already covered, if
14    you develop any new opinions of any type or
15    additional or change of opinions, you will let the
16    attorneys know so that they can tell us?
17          MR. GRAY:  Objection, asked and
18       answered.
19    A.      Yes.  If I develop any new opinions on
20    further review of material, I will let Hollingsworth
21    attorneys know.
22          MR. PRATHER:  Those are all the
23       questions I have for you.  Thank you
24       for your time.
25          MR. GRAY:  I may have just two or
```

Page 135

```
 1       three.  Let's take a break here and
 2       we'll be back.
 3          COURT REPORTER:  We're off the
 4       record.
 5          (A brief break was taken.)
 6          COURT REPORTER:  We are back on the
 7       record.
 8          MR. GRAY:  I just wanted to come
 9       back on to say we do not have any
10       questions for this witness.  Dr. Butts,
11       you are free to go.
12          COURT REPORTER:  We are off the
13       record at approximately 12:54 p.m.
14       --------------------------
15          (DEPOSITION CONCLUDED)
16       _____
17
18
19
20
21
22
23
24
25
```

Page 136

```
 1    STATE OF KENTUCKY   )
      COUNTY OF FAYETTE   )
 2
 3          I, CAMELA A. HUGHES, Registered Merit
 4    Reporter and Notary Public, State of Kentucky at
 5    Large, certify that the facts stated in the caption
 6    hereto are true; that at the time and place stated in
 7    said caption the witness named in the caption hereto
 8    personally appeared before me and that after being by
 9    me duly sworn, was examined by counsel; that said
10    testimony was taken down in stenotype by me and later
11    reduced to typewriting, by computer, under my
12    direction and the foregoing is a true and complete
13    record of the testimony given by said witness.
14          The deposition was submitted to the
15    witness for reading and signature as set forth
16    herein.
17          My commission expires:  June 10, 2025.
18          In testimony whereof, I have hereunto
19    set my hand and seal of office on this the     day
20    of March, 2023.
21
22       _____
         CAMELA A. HUGHES
23       Certified Court Reporter
         Certification No. 2004BD48 (KY)
24       Registered Merit Reporter
         Notary Public, State-at-Large
25       Notary ID 580730
```

Page 137

```
1              SIGNATURE PAGE
2
3          I, the undersigned, do hereby certify,
4     that I have read the foregoing deposition given by
5     me, DR. THOMAS R. BUTTS, on March, 16th, 2023 and
6     acknowledge it to be true and accurate.
7
8
9              DR. THOMAS R. BUTTS
10
11         Subscribed and sworn to before me by
12                  this       day of
13         , 2023.
14         My commission expires _____,
15     20__.
16
17             NOTARY PUBLIC
18
19
20
21
22
23
24
25
```