EXHIBIT
C

Glyphosate Litigation
Dr. Thomas R. Butts
Weed Scientist General Report

1. Background

I am currently an Assistant Professor, Extension Weed Scientist with the University of Arkansas System Division of Agriculture. My research and Extension efforts focus on identifying novel weed management strategies for Arkansas rice and soybean cropping systems through diversified approaches. These strategies include the utilization of cultural, mechanical, and chemical practices used in a holistic system for weed management. The overall goal is to provide sound, effective, and applicable weed management practices to Arkansas and Mid-South rice and soybean growers battling complex weed problems in their fields. A primary focus is placed on identifying the impact of precision agriculture and application technologies on weed management as these tools continue to grow in popularity. Further emphasis is placed on helping to increase herbicide application knowledge, safety, and effectiveness, both from ground-based and aerial applications. Dissemination of information through multiple sources to a broad audience (homeowners, farmers, consultants, and colleagues) is an important aspect of my Extension program and includes print publications, social media, county/state/national meetings, one-on-one field visits, and timely video and podcast episodes.

I am originally from southern Wisconsin where I grew up working on and around small dairy farms. From a young age, I learned the importance of weed control, including the safe handling and use of herbicides such as glyphosate both around the home and on the farm. I attended the University of Wisconsin-Platteville where I completed my Bachelor of Science in Agricultural Business with a minor in Soil and Crop Science in 2012. Subsequently, I earned my Master of Science degree in 2015 from the University of Wisconsin-Madison in Agronomy-Weed Science. I investigated the influence of integrated weed management strategies, including soybean row width, seeding rate, and herbicide program, on pigweed management across the Midwest and Midsouth. Additionally, I conducted herbicide resistance screenings on several pigweed species from Wisconsin and reported the first confirmed incidences of glyphosate-resistant common waterhemp and Palmer amaranth within the state. I then pursued my Ph.D. from the University of Nebraska-Lincoln in Agronomy-Weed Science which I completed in 2018. There, I researched the influence of application technologies, in particular pulse-width modulation (PWM) sprayers, on droplet size, droplet velocity, and spray pattern uniformity. Additionally, I studied the influence of spray droplet size from PWM sprayers on herbicide efficacy and spray drift mitigation. Prior to my current role, I also worked at the University of Wisconsin-Madison as a Postdoctoral Research Associate investigating the role of underlying factors stimulating a soybean yield response from foliar fungicides.

Currently, I have authored or coauthored over 50 peer-reviewed publications, more than 60 research series reports, over 50 Extension and outreach publications, and more than 40 scientific meeting abstracts. Additionally, I have given over 190 Extension and invited speaker presentations, produced tens of videos, 30 or more podcasts, and been mentioned in, quoted in, or authored at least 140 popular press articles. In total, this outreach allows me to connect with approximately 20,000 growers, agronomists, consultants, applicators, and homeowners per year regarding weed control and herbicide usage.

I have been an active member and served in leadership roles within the Arkansas Crop Protection Association, Southern Weed Science Society, Weed Science Society of America, American Society of Agronomy, National Agricultural Aviation Association, Rice Technical Working Group, and ASTM International. Additionally, I have been honored with several awards including American Society of Agronomy Excellence in Extension Awards for "SPORTS: A Weed Control Acronym", "Arkansas Row Crops Radio", and "Herbicide Resistance Traits: Quick Reference Guide." I was also awarded the 2019 Weed Science Society of America Outstanding Graduate Student Award and 2019 Excellence in Symposium and Publication Management Award from ASTM International.

For more details on publications and research, visit my Google scholar profile (https://scholar.google.com/citations?user=5WWVx2kAAAAJ&hl=en) or ResearchGate profile (https://www.researchgate.net/profile/Thomas-Butts). Additionally, my curriculum vitae is attached hereto as Attachment A. A list of materials considered in this case is attached hereto as Attachment B. I have never testified at deposition or trial.

I am being compensated at a rate of $400 per hour for case-related professional services, $250 per hour for travel, $500 per hour for deposition testimony, and $650 per hour for trial testimony. Case related expenses are invoiced at cost.

## 2. Impact of Weeds

Weeds are problematic and are detrimental to agriculture, humans, wildlife, infrastructure, and other native vegetation for a variety of reasons (Weed Science Society of America (WSSA), 2016a). They can reduce the yield of field crops and garden vegetables. Weeds can impact the quality of flowers for cut-flower production and grain quality of crop commodities. They can cause illness, severe skin irritation, and even death to humans, pets, and livestock if ingested or, in some cases, if they come into contact with skin. Unwanted vegetation, especially those weeds with strong rooting structures, can destroy roads, sidewalks (Fig. 1), and building foundations. Climbing and viny weeds (e.g., kudzu) can affect forest quality, as well as wildlife food and movement, and can interfere with human structures such as buildings, power poles/lines, and other important communication, electrical, and energy transmission lines (Fig. 2).

Weeds can severely degrade agriculture and forest productivity. Previous research has estimated that in 2005, weeds caused a reduction of 12% in overall crop yields, representing a $33 billion annual loss in yield potential (Pimentel et al., 2005). In 2016, a summary from the Weed Science Society of America Weed Loss Committee estimated that weeds caused an average of 50% yield loss in corn and $27 billion lost annually (Soltani et al., 2016). In 2017, the same committee estimated that weeds caused an average of 52% yield loss in soybean equating to a loss of over $16 billion annually (Soltani et al., 2017). Weeds can also reduce protein levels in cereal crops and reduce grain quality causing price dockages when the grain is sold. Furthermore, weeds can severely outcompete desired crops or vegetation for required resources such as sunlight, nutrients, and water. One such example of this is tamarisk. A single tamarisk plant has been shown to consume 200-300 gallons of water per day, creating a microclimate drought or significantly increasing irrigation costs (Weed Science Society of America (WSSA), 2016a).

2

Weeds and their biomass have also been shown to negatively influence greenhouse gas emissions. This may include $CO_2$, methane, and nitrous oxide depending on the specific environmental conditions, weed species, density, and control strategies (Bailey et al., 2015). In forestry, weeds can contribute to rampant wildfires, poison wildlife, and reduce quality forage forcing wildlife to move or starve (Weed Science Society of America (WSSA), 2016a). In residential areas, dense weed populations are potential hosts for dangerous wildlife such as rodents and snakes. These weedy areas also harbor insects such as ticks which carry diseases impacting both residents and pets.

Aquatic weeds can also have a major impact on humans and wildlife. Water lettuce serves as a breeding ground for mosquitoes which are not only a nuisance, but also can carry diseases (Weed Science Society of America (WSSA), 2016a). Invasive weed species can hinder human uses of water (recreational activities, irrigation, etc.) by blocking entire waterways, reduce native beneficial aquatic plant growth, increase flooding risk, and impair hydro generation (Howard and Harley, 1997). Additionally, in areas where people rely on water for travel and livelihoods, aquatic weeds can reduce the fish catch, isolate individuals from their homes or towns, and reduce aquatic biodiversity. Invasive plants have been shown to negatively impact aquatic environments and fish communities by increasing habitat complexity, introducing hypoxia, releasing allelopathic chemicals, and reducing fish food quality (Schultz and Dibble, 2012). Management of these invasive plants is crucial to maintaining a healthy aquatic ecosystem.

Some weeds are poisonous plants such as poison ivy, poison oak, poison hemlock, castor bean, nightshade, and poison sumac and are widely distributed across the United States. These plants can cause severe skin irritations and even more severe complications depending on exposure and tolerance levels varying from person to person. One of the primary recommended weed management methods for these severely detrimental plants is to use glyphosate because it is highly effective and allows the individual to manage the weed without handling the poisonous plants directly (Kingsbury, 1964; Klingman et al., 1983). Outside of poisonous plants, weeds can also negatively impact human health due to their pollen shed aggravating allergies. For example, common ragweed can release one billion pollen grains per plant (Weed Science Society of America (WSSA), 2016a). This intense pollen release triggers allergic reactions for nearly 36 million Americans annually. Another weed, myrtle spurge, releases a milky sap that can cause dermatitis and eye irritation, but also harbors other pests such as fire ants and other venomous insects (Weed Science Society of America (WSSA), 2016a). Management of these weeds is crucial to maintaining public health.

Poisonous plants have also negatively impacted livestock and wildlife. Previous research estimated poisonous plants caused 1% - 3.5% of cattle and sheep deaths in 17 western states (Nielsen, 1978). Additionally, as a result of these poisonous plant livestock deaths, approximately $107 million was lost annually. Poisonous weeds have also been known to cause toxicity and death of horses and other livestock. For example, common groundsel can cause irreparable liver damage due to toxic alkaloids if ingested by cattle, horses, or sheep (Weed Science Society of America (WSSA), 2016a). Hydrilla has been known to contain a deadly toxin that has killed birds when ingested, including eagles, coots, ducks, and geese.

In addition to all of the aforementioned problems weeds cause, unwanted vegetation can also impair aesthetics and negatively impact daily activities. This may entail obscuring waterways

which can limit recreational activities such as boating, fishing, or water sports. Weeds can deter visitors to a community park or garden, limiting a community gathering site. Unwanted vegetation can also negatively impact building structures (destroying foundations, siding, or roofs) and potentially reduce the profitability/clientele base for primary residences and rental properties (such as VRBO or AirBNB). Additionally, by leaving weeds uncontrolled, they will persist for years and continue to increase in severity due to their seedbank survival whether in a farmers field, a community lake, or a homeowner's garden (Weed Science Society of America (WSSA), 2016b). Some weeds produce upwards of 600,000 seeds per plant (Keeley et al., 1987) which can cause drastic shifts in ecosystems and be challenging to manage the soil seedbank.

Weed management is an ever-changing, evolving process given the introduction of new undesired plants. An estimated 500 introduced plant species have become serious invasive pests (Pimentel, 2009). The annual cost of introduced weeds to the United States agricultural economy due to crop losses and herbicide costs is approximately $26 billion (Pimentel, 2009). This value does not account for the estimated 4.5% increase in the cost of food for every 1% decrease in crop yield, nor does it account for approximately $11 billion in environmental and public health impacts (Pimentel, 2009). Additionally, weed control makes up a significant proportion of the $36 billion spent on management for lawns, gardens, and golf courses (Pimentel, 2009). With so many detrimental impacts caused by weeds, it is vital to have safe and effective management tools, such as glyphosate.



Fig. 1. Example of the adaptability and extreme capabilities of weeds to grow where they wish and impact infrastructure.



Fig. 2. Examples of weeds (e.g., kudzu) taking over forests, power lines, and buildings. Photos courtesy of https://thegroundtruthproject.org/crossing-the-divide-kentucky/kentucky_final_04/, http://encyclopediaofalabama.org/article/h-2483, and https://nyis.info/invasive_species/kudzu/.

3.   Weed Management Tools

There are numerous weed management tools that can be implemented to mitigate the harmful impact of weeds across situations (field crops, homeowners, rights-of-way, aquatic, etc.). The wide array of weed management strategies is most easily classified into five separate categories that are described under the integrated weed management umbrella. These categories include prevention, cultural, mechanical, biological, and chemical. Prevention is an all-encompassing category that describes methods to mitigate or eliminate weeds from becoming a problem. Prevention methods can include using black fabric and mulch in a garden, preemergence residual herbicides, or weed seedbank management.

Weed seed has been found to survive and lie dormant in the soil for many years (Weed Science Society of America (WSSA), 2016b). Weed seedbank management is a critical tool to successfully manage weeds long-term regardless of the situation (field crops, homeowner lawn/landscaping, rights-of-way, aquatic, etc.). Alternative strategies to destroy weed seed can

be implemented such as seed destructors (Schwartz-Lazaro et al., 2016), use of microwaves, and composting materials containing weed seeds (Parish, 1990).

Non-chemical control methods (cultural, mechanical, and biological) can be more difficult and expensive to implement; however, they can be very effective at weed management if introduced into a well-managed, integrated system (i.e., in conjunction with chemical control methods) and close attention to detail is followed (Parish, 1990). Cultural techniques such as crop rotation, planting date manipulation, and increasing plant populations as well as mechanical techniques such as tillage, flame-weeding, or hand-weeding can be effective weed management tools (Bond and Grundy, 2001; Parish, 1990), but are often not feasible or readily adopted due to a variety of reasons. Crop rotation may be difficult due to landowner requirements, soil types, or other negative growing conditions (Butts et al., 2022). Increasing planting populations or plant densities can be more expensive due to increased seed costs (both in agriculture and gardens). Mechanical techniques such as hoeing, pulling, mowing, and tillage can also be effective but similarly have drawbacks. Tillage destroys soil texture, leads to increased erosion, and creates numerous weed flushes in a year that need to be continuously battled (difficult to stay ahead in both field crops and homeowner situations). Tillage also requires the use of machinery, which can be dangerous to use, and significantly more fuel consumption. Hand-weeding is expensive in field crop situations and can reduce the quality of life for homeowners in residential settings (time spent weeding compared to other activities, sore muscles and increased likelihood of body pain, potentially physically handling poisonous plants, etc.). In addition to the cultural and mechanical strategies, a few successful developments have also occurred to manage weeds biologically using insect pests to predate seeds and foliage (Timmons, 2005). However, biological control methods at this time are extremely limited, and often very difficult to register as there is a potential for the biological component to become its own invasive species.

Chemical weed control is the most commonly used method, often because it is safe and effective, and the quickest, easiest, and least labor-intensive. There are many herbicides available for use across markets including field crops, turfgrass, woody brush, aquatics, etc. (Barber et al., 2021). Broad-spectrum herbicides, such as glyphosate, are excellent options especially when there is a diverse weed spectrum present (grasses and broadleaves). In these situations, a single herbicide (glyphosate) rather than multiple different chemistries can be sprayed to manage all weed species, and its low use rate coupled with its safe environmental qualities, provides an effective option for all users.

Integrated weed management is a holistic approach that combines these cultural, mechanical, biological, and chemical control techniques to achieve the desired weed control objective. The use of integrated weed management strategies, and not a sole reliance on a single method of management, often aids in environmental stewardship, long-term economics, and the preservation of vital weed management tools (i.e., reducing the selection pressure for the evolution of herbicide resistance) (Duke and Powles, 2009; Shaner, 2014b). This multi-year focus on weed management can increase the effectiveness of future weed management efforts, increase the longevity of vital weed management tools (like herbicides such as glyphosate), maintain quality and profitability of the desired area (whether a cropping system or homeowner garden), and decrease negative impacts on an environment by not repeating similar practices year after year (thereby reducing the likelihood of an eco-shift).

### 4. Development of herbicides

Chemical weed control began over a century ago with just a few inorganic compounds (Kraehmer et al., 2014; Timmons, 2005). Around the middle of the century, the first organic herbicide compounds began to be synthesized. Research regarding the release of the first herbicide (2,4-D) in the 1940's indicated that a burndown application prior to planting could eliminate 1-3 cultivations (Gianessi and Williams, 2014). Targeted herbicide research began in the 1950s; however, the initial research was crude and direct; herbicide candidates progressed from screens purely on the basis of satisfying farmers' requirements. Through the 1970's and 80's, additional research avenues were implemented including mode of action evaluation and the implementation of analytical tools to understand plant pathways. Between 1960 and 1972, Monsanto Co. tested 51,000 compounds in search of an effective systemic herbicide for controlling perennial weeds (Franz et al., 1997). Of these 51,000 compounds, fewer than 150 were subjected to advanced field testing and only 3, including glyphosate, became commercial herbicides. Glyphosate was officially commercialized in 1974.

Herbicides work in a variety of different ways. Some herbicides are soil-applied (preemergence residual) while others are foliar-applied (postemergence). Soil-applied herbicides kill plants before they emerge out of the soil and must be taken up through the roots. Foliar-applied herbicides kill plants once they have emerged but can be active through multiple ways (contact vs. systemic). A contact herbicide only kills plants where the spray solution comes into contact with the plant (kills outside->in) while a systemic herbicide moves throughout the plant (kills inside->out) (Fig. 3). Following application, systemic herbicides must be absorbed through the plant cuticle, then translocated throughout the plant to different regions to affect the desired target site. Throughout this entire process, there are many avenues in which the application can go awry, and the desired biological effect may not be achieved. Spray drift can occur, weed cuticles may be too waxy/hairy to achieve successful absorption, environmental stresses (drought) may limit the translocation of sugars (and herbicides) within the plant, and different weed species may metabolize (digest) herbicide chemistries at different paces resulting in mixed levels of activity. Glyphosate is a systemic, foliar-applied herbicide that has little to no soil activity (due to strong soil adsorption). It is extremely effective, especially with formulated adjuvant packages (e.g., Roundup), at being absorbed within different weed species leaf structures, translocates well throughout the plant, and has slow enough herbicidal activity to take advantage of this superior translocation capability (Duke and Powles, 2008). Glyphosate is also applied using large droplets, which minimizes the potential for drift. Most current glyphosate-based herbicides are pre-packaged with a surfactant adjuvant. The addition of a surfactant (soap) helps to break the surface tension of the water-glyphosate spray solution, allowing for spray droplets to spread on and adhere to the leaf surface and aid in absorption to enhance its activity.

Today, herbicides are used on more than 90% of the acreage of field crops, vegetables, fruits, nuts, and specialty crops annually (Gianessi and Williams, 2014). As an indicator of their importance, previous reports released by an expert committee in Denmark concluded that a total ban on pesticides would result in a reduction of farmers' income by 20-90% (Kudsk and Streibig, 2003). Since new herbicides being introduced to the marketplace has decreased

significantly (Kudsk and Streibig, 2003), utilizing all available "tools in the toolbox" safely and effectively is required for successful weed management regardless of the situation.



Fig. 3. Illustration of contact vs. systemic herbicides. Courtesy of www.lccdnet.org.

5. Benefits of glyphosate-based herbicides

As previously discussed, glyphosate is a systemic, non-selective herbicide which rapidly translocates throughout the plant and kills annual and perennial weed species, both grasses and broadleaves. It works by inhibiting the 5-enolpyruvylshikimate-3-phosphate synthase (EPSPS), a key enzyme in the shikimate pathway. Only glyphosate has been identified to control plants through this mechanism, resulting in no analogs or alternative chemical classes targeting this same pathway making glyphosate a unique, ideal herbicide (Duke and Powles, 2008). Glyphosate also has the benefit of being one of the most heavily researched herbicides in the history of pesticides. A search on the Weed Technology (https://www.cambridge.org/core/journals/weed-technology) and Weed Science (https://www.cambridge.org/core/journals/weed-science) journal webpages results in 2,337 and 2,005 individual results, respectively. Additionally, nearly 20,000 scientific publications and patents involving glyphosate have been published in the past 40 years (Duke, 2018).

Glyphosate is a once-in-a-lifetime herbicide discovery due to its positive attributes and safety profile (Duke and Powles, 2008). The first goal of every herbicide is that it is safe and effective at controlling weed species. As a non-selective herbicide, glyphosate is extremely effective at controlling a wide range of both grass and broadleaf weed species postemergence (Franz et al., 1997). Glyphosate is so effective at controlling weeds that zero survey respondents reported heavy weed pressure following 5 years of glyphosate-resistant cropping system usage and 36-70% of respondents indicated their overall weed pressure had been reduced (Kruger et al., 2009). Additionally, because of the high levels of control achieved with glyphosate, fewer applications and reduced pounds of herbicide active ingredient are required per area. Once a

8

herbicide meets the efficacy criteria, before it ever becomes close to commercialization, it must be tested for environmental impacts and toxicity.

Glyphosate also has a favorable environmental profile. Compared with past and present herbicides, it is one of the most environmentally safe least acutely toxic (Duke, 2018). Additionally, the LD50 (dose required to kill 50% of test animals) of glyphosate is 5,600 mg/kg, an extremely low-level acute toxicity rating. In comparison, other herbicides such as Liberty (1,620 mg/kg LD50) and Gramoxone (3 mg/kg LD50) are much more acutely toxic. When compared to organic herbicides, ammonium nonanoate (3,200 – 5,000 mg/kg LD50) and acetic acid (3,310 mg/kg LD50) are again more acutely toxic. Even daily products such as acetaminophen (Tylenol) (1944 mg/kg LD50), caffeine (192 mg/kg LD50), and Vitamin D (10 mg/kg LD50) are more acutely toxic to mammals (Pomeroy, 2016). Glyphosate is also non-toxic to birds, fish, insects, and most bacteria, as well as has been shown to not bioaccumulate. Glyphosate also binds tightly to the soil limiting leaching and half-life because it is readily degraded by soil microbes (Borggaard and Gimsing, 2008; Duke and Powles, 2008). In addition, glyphosate does not readily volatilize due to its very low vapor pressure ($5.7 \times 10^{-8}$ Pa at 25°C), limiting the potential for off-target movement (Shaner, 2014a).

Glyphosate has also enabled the widespread adoption of conservation tillage practices (minimal or no physical disturbance of the soil in production agricultural practices). Conservation tillage has shown significant benefits including 96% less erosion, 66% reduction in fuel consumption, reduced $CO_2$ emissions, enhanced water quality, improved water and fertilizer use efficiency, and higher soil biological activity (increased microbes, earthworms, other living entities as their environment is undisturbed and soil moisture can be maintained), among others (Derpsch et al., 2010; Triplett and Dick, 2008). Furthermore, severe erosion (Fig. 4) and water runoff (primarily phosphorus movement) from areas with heavy conventional tillage has led to the development of the large hypoxic zone in the Gulf of Mexico. The overuse of tillage was also the primary driver for the Dust Bowl events of the 1930's that drastically negatively impacted the agricultural and ecological systems of the Midwest. Conservation tillage has also lowered the amount of water needed for crops because no soil disturbance occurs (Derpsch et al., 2010), increased crop yield likely because of the higher moisture level in the soil (Triplett and Dick, 2008), and reduced the amount of labor and fuel used that would be needed for tilling. Finally, conservation tillage has also been shown to provide climate protection benefits by reducing $CO_2$ emissions and influencing nitrous oxide emissions, both major contributors to global greenhouse gas emissions (Angers and Eriksen-Hamel, 2008; Bailey et al., 2015; Mooney and Sjogersten, 2022; Six et al., 2004).

Glyphosate has provided a much needed weed control tool to enable the widespread adoption of conservation tillage and enhance natural resource conservation (Gianessi and Williams, 2014; Triplett and Dick, 2008). From 1999 through 2009, acres farmed using conservation tillage increased by nearly 15 million acres per year globally (Derpsch et al., 2010). Survey data elucidated that tillage intensity declined more in glyphosate-resistant cotton (45%) and soybean (23%) cropping systems than in non-glyphosate-resistant cropping systems (Givens et al., 2009b). Additionally, due to the emergence of glyphosate-resistant Palmer amaranth in Georgia, cotton grower herbicide costs more than doubled, in-crop cultivation increased to 44% of acres, preplant tillage increased to 20% of the acres, and post-harvest deep tillage increased to 19% of the acres every 3 years (Sosnoskie and Culpepper, 2014). Without the use of

conservation tillage, a new "dust bowl" returned in 2022 in areas across the United States (https://civileats.com/2022/06/06/a-wild-windy-spring-is-creating-a-soil-erosion-nightmare-for-farmers/).

The ease of use, economical cost, and diverse weed spectrum controlled have contributed to glyphosate becoming one of the most frequently used herbicides across field cropping systems from fall applied, preplant burndown, and postemergence over-the-top application standpoints (Givens et al., 2009a). As of 2009, glyphosate-resistant traits had been adopted on 38%, 97%, and 96% of survey respondents' corn, cotton, and soybean acres (Shaw et al., 2009) due to its ease of use and highly effective weed control across different cropping systems. The herbicide resistance trait technology across cropping systems also helped to establish some crop rotations in areas previously dedicated to a continuous cropping system. Previous research also aimed to quantify the value of glyphosate in the United Kingdom. Without glyphosate, farmers would experience an additional $473/ha in costs to produce wheat (increased cultivation & herbicide applications), food costs would need to increase 40% to maintain farmer income, a 25% increase in emissions would be predicted, and 49% more man hours per year would be required for crop production affecting the farmer's quality of life (Cook et al., 2010).

Glyphosate-resistant cropping systems have exhibited reductions in herbicide expenses (estimated savings of over $1 billion) with increased yields (Gianessi, 2008). Increased yields are vital for our food crop production moving into the future, both from a commercial and local scale. The Food and Agriculture Organization of the United Nations estimates that by 2050, world food output needs to increase substantially, particularly in Africa and South America, to meet the needs of the increasing global population (Alexandratos and Bruinsma, 2012). Glyphosate and glyphosate-based cropping systems have provided an economical and efficient method for aiding food growers with their weed control in a simplistic manner improving their quality of life by reducing other more laborious weed control strategies.

Financial benefits of genetically engineered crops, including glyphosate-resistant technologies, have been estimated to provide a benefit of $46 billion globally in soybean, $334 million in the United States in soybean, and $164 million in the United States in cotton (Smyth et al., 2015). Additionally, these benefits included a 37% reduction in chemical use, 22% increase in yields, and a 68% increase in farmer profits, as well as estimations that approximately one-fourth to one-third of the total benefits accrued to the end consumers, not just the farmers or innovators (Smyth et al., 2015). Glyphosate-resistant crops account for $33 billion of annual United States exports. Further, in the United States, 90% and 70% of soybean and cotton acres, respectively, are glyphosate-resistant; in some other countries, 100% of the soybean acres are glyphosate-resistant (e.g., Argentina) (Duke and Powles, 2008). Research from Australia estimated that if glyphosate were to be removed as a weed control option, farms more heavily invested in crops would experience significant declines in profit and farming systems would shift more heavily to sheep production, thereby increasing greenhouse gas emissions (Walsh and Kingwell, 2021).

Outside of production agriculture, glyphosate holds benefits in many other areas as well. Glyphosate is an effective weed management tool for landscaping and homeowner use. It helps to reduce or completely eliminate hand-weeding which can be expensive, time-consuming, and can reduce the quality of life for homeowners in residential settings. For example, weeds such as

poison ivy should not be removed by hand due to severe skin irritation potential. Glyphosate provides an effective control measure while eliminating potential contact with the toxic plant. Since glyphosate has systemic activity (translocates and kills from within the plant), it also provides benefits to gardeners or homeowners trying to control certain perennial species that may regrow from rooting structures such as yellow nutsedge or johnsongrass. If these plants are pulled but not all of the root structure is removed (i.e., some breaks off when pulled), these weeds can regrow. Glyphosate helps to eliminate this opportunity as it translocates to the roots/rhizomes and kill them in addition to the aboveground plant material.

Glyphosate is also used safely and effectively in many other environments including in parks, forests, rangelands, pastures, golf courses, schools, railroad crossings, highway on-ramps, roadsides, around power lines, and industrial uses. Weed control may be necessary in these different areas for a wide variety of purposes including reduction of fire hazards, improved visibility/access, reduction of vermin habitat and cover, ease of maintenance, improved surface drainage and aesthetics, as well as many others. Overall, glyphosate provides many benefits to a wide audience and a broad span of environments for the highly effective management of vegetation. It does so in an environmentally safe capacity, and it is often much more economical with an increased ease of use. Importantly, given the myriad of environments which require the use of herbicides, glyphosate benefits all members of society by resulting in cleaner air and water compared to the use of available alternative herbicides. Moreover, the use of glyphosate substantially reduces the need for tillage, thereby reducing the detrimental effects of global warming.



Fig. 4. Example of possible soil erosion (gully formation) from conventional, full-tillage agricultural use. Photo courtesy of https://en.wikipedia.org/wiki/Erosion.

6.   Methods of Application of Glyphosate-Based Herbicides

11

Glyphosate-based herbicides can be applied using numerous methods. In field crops and rights-of-way, glyphosate can be applied through aerial application equipment such as fixed-wing aircraft (Fig. 5), helicopters, and even small unmanned aerial systems (drones). It can also be applied through ground spray equipment (Fig. 6) that may vary in boom width from 30-feet up to 120-feet wide. Both application methods (ground and aerial) are commonly used across the United States. For example, in Arkansas, herbicide applications in field crops are split almost evenly between ground and aerial spray equipment (Butts et al., 2021). Glyphosate is widely used in burndown applications (prior to planting) and across cropping systems which contain the glyphosate resistance trait. This application equipment is often for large-scale applications, and spray tanks range in size from 400 to 1,500 gallons.

Glyphosate can also be applied on a much smaller scale for homeowner use (e.g., sidewalks, fencerows, foundation, etc.). These applications often use a backpack, pump-up sprayer (Fig. 7) or a 4-wheeler sprayer. These sprayers typically range in size from 2 to 15 gallons, and most often use a hand wand to apply the product. Although on a smaller scale, the same safety precautions and application procedures should be utilized as in larger scale applications for field crops or rights-of-way. Additionally, ready-to-use (RTU) glyphosate-based products are available that come pre-formulated in self-contained packaging with an attached sprayer to facilitate ease of use and eliminate the need for mixing (Fig. 8). These and other spray equipment are designed not to leak and typically apply glyphosate-based products at low pressure.

The label provides the level of personal protective equipment (PPE), if any, that should be worn when mixing and applying a herbicide. The label for each specific glyphosate product also



provides information on application methods, safety procedures, mixing instructions, and other use patterns.

Fig. 5. Image of an aerial herbicide application (Air Tractor 802A) and the boom/nozzle setup.



Fig. 6. Image of commonly used ground sprayers: (left) a self-propelled commercial sprayer, (right) a pull-behind privately-owned sprayer.



Fig. 7. Image of a pump-up, backpack sprayer (left) and a pump-up, hand carry sprayer (right) commonly used for homeowner herbicide applications.

 

Fig. 8. Image of ready-to-use (RTU) glyphosate-based products used for homeowner herbicide applications.

### 7.  Alternative pesticides & management strategies are less effective

Glyphosate is an extremely effective, broad-spectrum, non-selective herbicide that has a wide range of uses (Franz et al., 1997). Very few, if any, alternative herbicides can do what glyphosate can do when it comes to removing a diverse spectrum of weed species with high levels of control from a single application (Duke and Powles, 2008). In both agricultural and residential uses, a single application of glyphosate can provide high levels of control of a wide range of weed species such as grass species, common cocklebur, sicklepod, ragweeds, and spurges, among others. There are no alternatives that are as effective as glyphosate and can control all of these weed species because most other herbicides are extremely selective in their weed spectrum (Barber et al., 2021). For example, for lawns or turfgrass use, 2,4-D and dicamba are often alternatives applied; however, they have no grass activity and only control certain broadleaf weed species. The systemic translocation of glyphosate provides complete death of a susceptible plant species by moving throughout the entirety of the plant. In contrast, some herbicide alternatives such as glufosinate (Liberty) or paraquat (Gramoxone) are contact-based herbicides which only kill the plant where spray droplets deposit, often resulting in incomplete control or regrowth.

Weed control continues to be one of the most challenging facets of agriculture, rights-of-way, and homeowner landscaping management. Herbicides are a more viable option to manage weeds as other alternatives such as hand-weeding can be extremely laborious (and difficult to find labor sources) and expensive. Reports have indicated hand-weeding can be as expensive as $24/acre for Palmer amaranth removal in the Mid-South (Riar et al., 2013) to greater than $500/acre in baby lettuce fields (Fennimore, 2014). Tillage may also be used for weed management in some areas; however, tillage can have adverse effects on other aspects of the

14

environment and is often not considered sustainable long-term (Derpsch et al., 2010; Six et al., 2004).

Even in organic agriculture, herbicides are applied to manage problematic weeds to allow for the successful cultivation of their crop (Wilcox, 2011).  Organic does not mean that no pesticides are used in the system, rather it requires growers to use products that are not synthetically produced. These pesticides are generally much less effective, requiring a significant amount more active ingredient to be applied per acre in a growing season as well as increasing fuel costs and emissions. Further, higher cost per acre and less crop yield per acre render organic agriculture unfeasible for producing sufficient food for the global population. Additionally, tillage and hand-weeding are often tactics employed by organic farming systems to aid in weed management efforts which are typically uneconomical and less environmentally friendly as previously discussed.

Data has shown herbicide use has increased over the past 30 years in herbicide-resistant or genetically engineered crops, such as glyphosate-resistant corn and cotton; however, herbicide use increased at a much more rapid pace in non-herbicide-resistant and organic crops (Kniss, 2017). This not only highlights the effectiveness of glyphosate as a herbicide, but also indicates if glyphosate were to be removed as an option for growers or organic agriculture was mandated, herbicide use would increase at significant rates in major U.S. field crops and food costs would substantially increase.

### 8.  Alternative pesticides and organic products are more toxic

Not only is glyphosate generally a more effective option for weed control compared to alternatives, it is also often less toxic (Wilcox, 2011). Herbicide label signal words, determined by the United States Environmental Protection Agency, are one indication of this as they describe the acute toxicity of the herbicide product (Caution < Warning < Danger/Poison). Glyphosate products are designated with a signal word of Caution. In comparison, products such as glufosinate and 2,4-D are designated with a Warning signal word, and another product, paraquat has a Danger/Poison designation. Additionally, products labeled for organic use can also be more toxic. For example, ammonium nonanoate has a Warning designation and acetic acid has a Danger/Poison signal word. More specifically, the LD50 (dose required to kill 50% of test animals) of glyphosate is 5,600 mg/kg. In comparison, other herbicides such as glufosinate (1,620 mg/kg LD50) and paraquat (3 mg/kg LD50) are more toxic. When compared to organic herbicides, ammonium nonanoate (3,200 – 5,000 mg/kg LD50) and acetic acid (3,310 mg/kg LD50) are again more toxic. Even daily products such as acetaminophen (Tylenol) (1944 mg/kg LD50), caffeine (192 mg/kg LD50), and Vitamin D (10 mg/kg LD50) are more acutely toxic to humans (Pomeroy, 2016).

Further research has shown that herbicide acute hazard quotients (sum of the amount of each herbicide applied per hectare divided by the acute toxicity of each herbicide) have decreased over the past 30 years for most crops including corn, soybean, and cotton (Kniss, 2017). In fact, the only crop evaluated to have an increase in acute toxicity quotients was winter wheat in which glyphosate is minimally used because there is no glyphosate-resistant trait. Moreover, chronic hazard quotients (sum of the amount of each herbicide applied per hectare divided by the chronic toxicity of each herbicide) were evaluated, and no consistent trend emerged. Herbicide chronic toxicity in corn has remained relatively equal, decreased in soybean,

and increased in cotton. Meanwhile, glyphosate use increased through the late 1990's, and has remained at a consistent level through 2015. In that final year, glyphosate accounted for 26%, 43%, and 45% of the herbicide-area-treatments in corn, soybean, and cotton, respectively, but only accounted for 0.1%, 0.3%, and 3.5% of the total chronic hazard quotients (Kniss, 2017). All of this data indicates that if glyphosate were to be removed from the market, not only would alternative, significantly more toxic herbicides be substituted in, but they would often require more applications due to reduced efficacy.

### 9.  Conclusion/Summary of Opinions

Glyphosate is a once-in-a-lifetime herbicide, and also a once-in-a-lifetime weed control tool. Weed control and invasive vegetation management is critical to many walks of life including farmland, aquatic areas, rights-of-way, industrial applications, gardens, and other homeowner use. Weeds can reduce yields of crops and garden vegetables, reduce quality of garden flowers or other crops, be destructive to equipment and buildings, and potentially harm human and animal health depending on potential toxins (i.e., poison ivy, poison hemlock, jimsonweed, etc.). As such, there is a critical need for an effective strategy to manage these weed species in a safe, efficient, and effective manner.

Glyphosate is highly effective at eliminating unwanted diverse vegetation including annual and perennial weed species and grass and broadleaf weed species. Glyphosate (in combination with a surfactant) does this through its enhanced absorption capabilities and slower internal activity which takes advantage of its increased translocation capabilities. The multitude of available application options also provides flexibility to the user to correctly and accurately apply the herbicide where it needs to go to maximize its effectiveness and safety.

Additionally, glyphosate has opened the door for crop rotation and other practices such as conservation tillage to increase. These practices enhance the biodiversity of the environment, as well as decrease negative consequences of traditional agriculture such as soil erosion, soil moisture loss, and greenhouse gas emissions.

Glyphosate is one of the most researched herbicides globally with tens of thousands scientific publications and patents published on it. As a result, the overwhelming majority of data support the use of glyphosate for the control of unwanted vegetation in a safe and effective way. Most of this research also indicates glyphosate has low acute toxicity. In addition, because glyphosate is strongly adsorbed to soil and does not volatilize, it has a highly favorable environmental profile.

Overall, glyphosate is a needed option for a diverse, large clientele base to manage unwanted and potentially hazardous vegetation. Glyphosate has been shown to increase crop yields, improve quality of desired vegetation, and improve profitability of its users. With the exponentially increasing world population and diminishing food supply, economical, safe, and effective weed management options are needed to meet these demands. As such, every possible tool is needed in the toolbox, and glyphosate is one of the most important tools that can aid in this task.

<u>Case-Specific Opinions</u>

*Introduction*

In forming my opinions in this case, I have reviewed the complaint, discovery responses, Plaintiff Fact Sheet, and documents provided by plaintiffs. I have also reviewed the depositions of Kyle and Mandi Murdock and all accompanying exhibits. I have not conducted an inspection of the Murdock farm, but I have reviewed Google Earth images of the farm, as well as photographs taken during a site inspection of the farm. I have also reviewed the report prepared by plaintiffs' expert, Dr. Sawyer. For a complete list of the materials considered, please see the attached MCL. I reserve the right to supplement my opinions based on any future site inspection and/or based on other information that becomes available.

*Facts*

The Murdock family currently operates an approximate 4,000-acre farm in Kentucky and Tennessee. They farm multiple crops including corn, soybean, wheat, tobacco, and hemp. Roughly each year, their acreage is operated as approximately 50% corn and 50% soybean; tobacco and hemp acres are minimal as each is roughly only 100 acres total. Additionally, wheat is grown during an alternate season, i.e., planted in the fall, harvested early summer, and then double-crop soybean is planted post wheat harvest. In the 1990's and early 2000's, the farm was approximately 2,000 to 2,500 acres, and grew to its current size in the early 2010's. The Murdock's claim that each year they run the same pesticide program across all of their respective crop acres (i.e., all corn acres are treated similarly, all soybean acres are treated similarly). Herbicides were used on all crop acres except the hemp acres (nothing is labeled for use in this crop). Mr. Murdock stated the corn crop typically received two total herbicide applications (one burndown prior to planting and one postemergence application); it typically also received a fungicide application by agricultural aircraft late-season. Mr. Murdock stated the soybean crop typically received three total herbicide applications (one burndown prior to planting and two postemergence applications); some fungicide and insecticide applications were made to the soybean crop by Mr. Murdock, but not every year. Mr. Murdock stated tobacco did not generally receive herbicide applications other than potentially something specific for grasses but did typically receive insecticides such as Dipel or Orthene. Finally, Mr. Murdock stated the wheat crop would generally have the ground tilled (disked) prior to planting (no herbicide applied for burndown), and only a spring herbicide application occurred to manage wild onion. Mr. Murdock estimated that to spray all 4,000 acres of corn, soybean, tobacco, and hemp crop land for burndown prior to planting the crops, it would take roughly 7 total days. To spray the entirety of the approximately 2,000 acres of corn postemergence, Mr. Murdock estimated it would require roughly 8-9 days total (spaced out when time and weather would allow). Mr. Murdock stated this spraying would all occur between March to July or August, but spraying did not occur every day, only when needed to follow the aforementioned management plans. Mr. Murdock also acknowledged that there were a significant number of aerial applications that would occur in wheat and late-season corn around their farm (generally fungicides being applied); some on their farm acres, but most on neighboring acres.

1

Mr. Kyle Murdock has been the primary pesticide applicator for the farm since at least the mid-1990's. This has included herbicides, insecticides, and fungicides. He stated that he holds a private pesticide applicator's license in Kentucky, and he first received that in the 1990's (does receive recurrent training approximately every 5 years). Mr. Murdock stated he has operated numerous sprayers over the years. For their field crops, prior to 2007, Mr. Murdock stated they owned and operated a self-propelled Spra-Coupe (Figure 1) which was a 60-ft boom, 400-gallon tank, and was automatic flow rate adjustable to accurately maintain output (monitor controlled and based on GPS travel speed). Following that, Mr. Murdock stated they owned and operated a John Deere 6700 self-propelled sprayer (Figure 2). This sprayer was operated from 2010-2017 or 2018, had a 60-ft boom, and was again automatic flow rate adjustable. Currently, Mr. Murdock stated they operate two separate self-propelled sprayers, a John Deere 4630 sprayer (80-ft boom, 600-gallon tank) and a John Deere 4730 sprayer (100-ft boom, 800-gallon tank). Both sprayers are automatic flow rate adjusted, have overlap control, and have section control (7 sections). All self-propelled sprayers have had enclosed cabs with filtration systems, and Mr. Murdock states these filters and other sprayer components were routinely serviced and maintained. Photos from the site inspection also indicated the sprayers were very well maintained, kept in a roofed building, and the sprayer cab was well sealed. There was no indication of damage or exposure to the elements.



Figure 1. Enclosed cab Spra-Coupe self-propelled sprayer used on the Murdock farm. Image courtesy of exhibit 12 of Mr. Kyle Murdock's deposition.



Figure 2. Enclosed cab John Deere self-propelled sprayers used on the Murdock farm. Images courtesy of exhibit 10 of Mr. Kyle Murdock's deposition.

In addition to their field crop self-propelled sprayers, Mr. Murdock stated they also operated smaller non-crop spray equipment and spot sprayers (Figure 3). One of these sprayers included a pull-behind sprayer (operated from 1998-2010) that had a 30-ft boom and flow rate was operator controlled (not automatic based on GPS speed). There were 2-three-point hitch sprayers (approximately 50-gallon tanks) each of which had a hand spray wand, and one had a boomless nozzle (that sprays approximately 15-ft out). Another spot sprayer with a hand spray wand and approximately a 50-to-60-gallon tank was on a skid plate to sit inside the bed of a side by side (UTV) or truck. The final spot sprayer had a 25-to-30-gallon tank and was placed on the back of a 4-wheeler. This sprayer had both a boom along the back and a hand spray wand. Mr. Murdock stated these spot sprayers were used for managing weeds and other unwanted vegetation around the shop, chicken barns, house, grain bins, tobacco barns, and other small areas to keep it clean and neat. He further stated these would be attached to open cab tractors, 4-wheelers, or side by sides. Mr. Murdock stated glyphosate was a common herbicide used for these applications; however, other herbicide mixtures that had been drained from the field crop sprayers (leftover mixes) could be added to these sprayers for weed removal. Mr. Murdock estimated these applications around buildings and other non-crop areas occurred up to 4 to 6 times per year and would generally take a full day to spray them (may not occur all in the same day but spaced out when time and weather allows). Mr. Murdock stated that Kenzie Murdock would accompany him while he sprayed in non-crop areas 10-12 times per year and would often just ride beside him while he sprayed.

3



Figure 3. Non-crop spot sprayers used on the Murdock property. Images courtesy of exhibits 16 and 19 of Mr. Kyle Murdock's deposition.

Mr. Murdock had numerous spraying practices that he stated he followed. He stated he changed nozzles for each crop but would spray the entire crop with the same set of nozzles (i.e., corn and soybean would have two separate sets of nozzles, but all ~2,000 acres of soybean would be sprayed with one set, and all ~2,000 acres of corn would be sprayed with another set). He stated he used a water truck (3,200 gallons) to refill the sprayer in the field, as a result there was always at least one other individual around when he was spraying. For mixing, Mr. Murdock stated they used a mixing tank on the sprayer where all chemicals would be added first with a little bit of water and flushed into the main spray tank. Mr. Murdock estimated this method allowed for mixing/refilling the sprayer to take only approximately 5 to 7 minutes. Mr. Murdock stated most of the time, the self-propelled sprayers used in their field crops would apply tank-mixtures of herbicides (multiple herbicides in the same tank load). Mr. Murdock also stated he factored in the environmental conditions when applying chemicals and adjusted his application practices based on these conditions as well. He stated he generally considered anything over a 15-mph wind speed was considered a "no spray" condition; however, he did mention if they got behind, sometimes they decided they needed to go anyways. Mr. Murdock stated he used a boom height of 2 to 4 feet above the crop/weed canopy but would try to lower the boom height if the wind was blowing and would sometimes raise the height slightly if on rough terrain to avoid boom damage. Additionally, most of the time, he stated he did not use a drift reduction adjuvant (DRA); however, on occasion if the wind was a little greater than normal, he would add a DRA in the sprayer to protect sensitive crops around them. Mr. Murdock stated the other non-crop and spot sprayers, including the 4-wheeler sprayer, were used in similar fashion. He stated these sprayers would apply Roundup by itself at times but would also apply leftover mixes that had been drained from the self-propelled crop sprayers as a way to "recycle" any leftover chemical (Page 199 of Mr. Kyle Murdock's deposition). Mr. Murdock noted that in his nearly 30-year career of applying herbicides (from the mid-90's to present), he only remembered an instance or two of a drift complaint; one where he was alleged to have killed a garden and another where some damage occurred on wheat.

4

When questioned regarding herbicide labels and personal protective equipment (PPE), Mr. Murdock acknowledged he rarely read product labels or safety data sheets, and rarely followed the complete list of PPE required. Although he indicated that reentry intervals (REI) were not enforced, he said that generally once they left a farm, they did not return on the same day. He also acknowledged that he had never reviewed or read the drift management guidelines on herbicide labels. Mr. Murdock also indicated there was no hard record-keeping for most of his years on the farm for things like crop variety, herbicides used, quantities used, spray dates, etc.

Mr. Murdock's children, including Kenzie, never operated the self-propelled field sprayers for spraying purposes. However, Mr. Murdock claims that the children would ride with him while he was spraying, and it was estimated that Kenzie rode with him approximately 15-20 times per year for 4 to 5 hours each time. Mr. Murdock stated that Kenzie rode with him in both the Spra-Coupe and John Deere sprayers from when she was approximately 2 years old until she was 16 or 17. The frequency of these rides decreased as Kenzie got older. Mr. Murdock stated when she or others would ride with him, the doors and windows would always be closed. Although Kenzie rode along fairly often, she never operated nor rode along while insecticide applications were made to the tobacco crop according to Mr. Murdock. Mr. Murdock claims that Kenzie also helped with the mixing process such as hooking up hoses to the mixing tank. Mr. Murdock testified that when she helped with this, she did not wear any PPE, but she did wash her hands once spraying was finished. Numerous individuals within the farm business helped mix over the years, and Mr. Murdock, his father (Kenzie's grandfather), Nathan (farm business partner), and migrant workers were around the equipment most frequently for the entire spray application process. Mr. Murdock stated when cleaning up following mixing or spray applications, there was a hose attached to the water truck if the need arose to rinse off in the field. Additionally, Mr. Murdock stated the entire self-propelled sprayer equipment had a consistent cleaning and maintenance schedule in which the sprayer was completely cleaned 3 to 5 times per year. He also stated following an application and when switching tank-mixes, the spray tanks and booms would be cleaned out thoroughly. The first cleaning mix would be sprayed out on a tolerant crop, and the second cleaning would be dumped out on the ground at the farm.

Mr. Murdock testified that Kenzie would also frequently drive the 4-wheeler in which the sprayer was equipped; however, Mr. Murdock was not sure that she ever had used the sprayer, and he stated that she had not used it while he was present and watching (Page 178 of Mr. Kyle Murdock's deposition). Mr. Murdock stated that she would assist with draining leftover chemical from the self-propelled field crop sprayers into smaller, hand sprayers (such as on the 4-wheeler or 3-point hitch mounted sprayers), and Mr. Murdock would try to have her wash her hands following this process. Following a day of spraying, Mr. Murdock would rinse his hands off, shower, and wash his clothes (separately from all others in the family). Mr. Murdock stated he believes Kenzie's exposure to Roundup could have occurred from riding with him on the farm or from other neighboring farmers applying the product and Kenzie driving through or near those fields on her 4-wheeler. Mr. Murdock also believes she would have potentially been exposed when she did laundry at home and may have included some of Mr. Murdock's work clothes into the same load. Mr. Murdock did not note any other instances in which he thinks Kenzie would have been exposed to Roundup.

5

Mr. Murdock stated Roundup was first used on the Murdock farming operation in the mid-1990's and had been used every year since then. Mr. Murdock states that Roundup was a very good (effective) chemical for lots of years because it would deal with a lot of weed problems. He stated in recent years, they have begun dealing with glyphosate resistance issues on their farm. Mr. Murdock stated they have consistently sprayed a quart per acre (32 fl oz/ac) rate in burndown and postemergence applications over-top of corn and soybean. The Murdock farming operation has been majority no-till, and Mr. Murdock stated that Roundup helped improve their crop yields and maintain weed-free environments. He also acknowledged that Roundup does not have residual activity (doesn't work in the soil), it only works when applied and contacts plants foliarly. Based on the receipts obtained from various crop protection product suppliers, multiple glyphosate containing products (Sequence, Halex GT, Roundup PowerMax, among others) were used each year, and other non-glyphosate-containing products were also used in large-scale farming operation quantities. Mr. Murdock also stated that he still currently utilizes glyphosate-based products on the farm.

*Opinion*
*The alleged frequency and time spent spraying glyphosate in the row crops is consistent with what would be needed to control for weeds on the farm.*

Overall, the frequency with which glyphosate was applied was reasonable based on the size of the farming operation and crops grown. At their location in Kentucky, it is common for all field crop acres to receive a burndown application of glyphosate for control of problematic weed species such as Italian ryegrass, winter annual broadleaves (which were present in site inspection photos), and annual bluegrass. Additionally, it is a very common practice in their region for soybean acres to receive two postemergence herbicide applications and for corn to receive one postemergence application for controlling weeds such as pigweed (Palmer amaranth and/or waterhemp) and grass species. The amount of time reported to spray these acres was also reasonable. On average, applicators can cover an estimated 50 to 100 acres in an hour depending on land topography, mixing and refill times, and other cropping factors. Taking a middle of road estimate, if Mr. Murdock could cover 75 acres/hour, operating for 8 hours per day, it would take approximately 7 days to cover the entire 4,000 acres sprayed for burndown. This is consistent with his estimate. It is also conceivable that postemergence applications within the crop would take slightly longer due to slowing down the sprayer to avoid any damage to the crop (running over crop rows). Therefore, in general, it would take roughly 30 spray days to cover all cropping acres with the number of applications required, which is consistent with Mr. Murdock's testimony.

*The alleged volume of glyphosate use in the row crops is consistent with what would be needed to control weeds on the farm.*

The amount of glyphosate estimated to have been sprayed on the field crops was also reasonable. To put some numbers behind the amount of glyphosate used, based on Exhibit #30 of Mr. Murdock's deposition, in 2019 there was approximately 1,370 gallons of Roundup

6

PowerMax II purchased, 18 gallons of Tomahawk purchased, 990 gallons of Halex GT purchased, and 995 gallons of Sequence purchased. Labeled rates for these herbicides include 32 fl oz/acre for Roundup PowerMax II and Tomahawk, 64 fl oz/acre for Halex GT, and 56 fl oz/acre for Sequence. Therefore, these amounts purchased would cover approximately 9,814 acres of crops (total applied area). Since all crops received a burndown application, corn received one postemergence application, and soybean received two postemergence applications, this would equal approximately 10,000 total applied acres that would be sprayed throughout a growing season (4,000 acres for the burndown, 2,000 acres for corn, and 4,000 acres for soybean). Accordingly, the total theoretical applied acres based on crops (10,000) is similar to the amount of acres that could be covered with the purchased products (~9,814).

*The alleged volume of glyphosate use in non-crop areas may exceed what would be necessary to control weeds in those areas.*

The alleged glyphosate use in the non-crop areas may exceed what would be necessary to manage weeds effectively in those areas. Mr. Murdock stated that applications in these areas occurred up to 4 to 6 times per year and would generally take a full day to spray them. Four to six applications of glyphosate on the same area, each requiring one full day of spraying, exceeds what would be needed to effectively manage weeds in those areas. However, if Mr. Murdock meant that approximately 4 to 6 total applications were made (i.e., not all non-crop areas were each sprayed 4 to 6 times) and it took approximately 1 full day in total to make these applications, that would be consistent with what would be needed to effectively manage unwanted vegetation in those areas. Additionally, in many instances, these spot sprayers were filled with leftover chemical from the self-propelled field crop sprayers, often tank-mixtures of multiple chemicals. These tank-mixtures would reduce the overall total volume of Roundup that would be used in these non-crop areas, and would also reduce the total number of applications required if containing residual herbicides.

*Kenzie Murdock likely came into minimal contact with Roundup.*

Ms. Kenzie Murdock likely came into minimal contact with Roundup based on the sprayers used and her limited use around the non-crop spot sprayers. Ms. Murdock never applied Roundup herself from the self-propelled field crop sprayers; rather, she rode with her father in the self-propelled sprayers when glyphosate was applied. These sprayers had enclosed cabs with air filtration systems that were regularly maintained, were operated with the doors and windows closed, and had the spray boom affixed behind the sprayer. Additionally, as the sprayer moved forward, spray would be directed downwards and away from the cab. Even though Mr. Murdock stated he had not reviewed the drift management guidelines presented on herbicide labels, he operated these self-propelled sprayers using best management practices for drift reduction (less than 15-mph wind speed, lowered boom heights, and use of drift reduction adjuvants if conditions warranted). All of these factors would lead to miniscule potential for Ms. Murdock to come into contact with Roundup while her father was spraying it on crop land.

7

It is also unlikely that Ms. Murdock had any significant contact with Roundup when she either applied or accompanied her father while he was applying glyphosate with the non-crop spot sprayers. These sprayers deliver the herbicide at low pressure and close to the ground, so as to minimize the potential for off-target movement. This is necessary to avoid damage to surrounding vegetation. It is therefore unlikely that Ms. Kenzie Murdock was exposed to significant drift occurring from these applications, as any such drift would also have caused substantial damage to nearby desirable vegetation. As stated previously, Mr. Murdock also understood and used best application practices to minimize the potential for off-target movement. In fact, Mr. Murdock indicated he could only remember of 2 such drift incidences in his nearly 30-year career of applying herbicides.

Although Mr. Murdock claims that Kenzie Murdock may also have been exposed to Roundup while cleaning spray equipment, pressure washing spray equipment is not likely to lead to significant contact with glyphosate. The product would have been significantly diluted due to the volume of water used and extremely limited amounts of spray that would accumulate on the sprayer (again, spray is directed down and away from the sprayer).

Mr. Murdock also claims that Kenzie Murdock could have come into contact with Roundup when she assisted him with mixing. Although it is possible that she came into minimal contact with Roundup during this process, it would have been a rare occurrence and the amount of Roundup she would have contacted would have been negligible. The equipment and hoses used for mixing herbicides on the field crop sprayers described by Mr. Murdock are designed not to leak in order to prevent damage to non-target vegetation, chemical waste, and exposure to herbicides, many of which are far more toxic than Roundup. Additionally, Ms. Murdock would rinse her hands off following these interactions, which would have minimized her contact with the herbicide.

Finally, the likelihood of contact from driving a 4-wheeler through neighboring crops would again be miniscule. Assuming the neighbors were applying Roundup, the rainfastness of glyphosate products is generally between 30 minutes to 4 hours. This means by that point, glyphosate can no longer be washed off a leaf surface and therefore, would likely not be available to be transferred to other equipment or people. As a result, Ms. Murdock would have had to drive through while the sprayer was there or almost immediately following the sprayer leaving the field to have any potential for contact. It is highly unlikely that Ms. Murdock would have driven through a field that she knew was being sprayed or was recently sprayed without knowing what was sprayed, as many herbicides and pesticides used in agricultural production are far more acutely toxic than Roundup or other glyphosate-based products. Doing so would also risk tracking the sprayed product onto desirable vegetation that she later drove over. Overall, the potential for glyphosate contact by Ms. Murdock, both as a participant and bystander, would have been exceptionally low.

*Dr. Sawyer's calculations are based on inconsistent use patterns of glyphosate-based herbicides.*

Dr. Sawyer's states that Kenzie was spot spraying 10-12 times per year for a total of 1-2 hours each time. This far exceeds what would be required to effectively manage weeds on the

property and likely includes a significant amount of time spent riding around and not actively spraying. However, even if Kenzie was operating the spot sprayers this amount of time, it is likely she had minimal contact with Roundup. First, Mr. Murdock indicated that sometimes, but not always, these spot sprayers were filled with Roundup alone. In many instances, these spot sprayers were filled with leftover chemical from the self-propelled field crop sprayers, often tank-mixtures of multiple chemicals. This would have reduced the total amount of Roundup herbicides used, and would also have reduced the number of applications required to effectively manage weeds if residual herbicides were included. Additionally, Dr. Sawyer's report indicates that Kenzie was exposed to the drift and mist from these applications. However, glyphosate-based products like Roundup are not applied as a mist; they are typically applied using low pressure sprayers that deliver large droplets and minimize the potential for off-target movement. Any significant drift would also deposit Roundup on other plant surfaces in the area (gardens, lawns, trees, etc.), resulting in significant damage. As no drift injury incidences were indicated, it is unlikely drift occurred. Further, it is unlikely Kenzie came into contact with Roundup while in the enclosed cab self-propelled field crop sprayers. These sprayers were operated with doors and windows closed and had air filtration systems that were regularly maintained (per Mr. Murdock's deposition). This would all but eliminate potential exposure from the spray applications. Additionally, these sprayers have the spray boom situated on the back side of the sprayer with nozzles facing downward. Therefore, as the sprayer would be driving forward, the spray would be emitted downward towards the ground and the sprayer would travel away from the emitted spray droplets resulting in miniscule potential for spray to impact the cab of the sprayers. Finally, Dr. Sawyer also described these sprayers as "aerosol sprayers." This is not how these sprayers operate. An aerosol consists of extremely fine particles that are often suspended in air. These sprayers emit droplets much larger than aerosols with the finest droplets used in agricultural settings taking less than 5 seconds to fall from 5 feet in the air.

*Conclusion*

The Murdock family operates a 4,000-acre field crop farm in Kentucky and Tennessee. Although Mr. Kyle Murdock's reports of the amount and use frequency of Roundup herbicides on their farm and property are generally consistent with what would be required to effectively manage their weeds, the potential for Ms. Kenzie Murdock's contact with Roundup herbicide was extremely low. Mr. Murdock's reports of his best application practices used (reduced boom heights, not spraying with winds above 15-mph, use of drift reduction adjuvants), the use of enclosed cab self-propelled sprayers with air filtration systems, and Ms. Kenzie Murdock infrequently being around the applications, indicates there was minimal opportunity for her contact with Roundup. Additionally, there was minimal potential for contact for Ms. Murdock from washing equipment (dilution), using mixing equipment (designed not to leak), and from non-crop spot sprayers (low pressure, large droplets, minimal drift potential). Finally, contact with Roundup from driving through a sprayed area would have required entering a field the same time as a sprayer or immediately following its departure, which would be highly unlikely.

Thomas R. Butts, Ph.D.          1/23/2023