# EXHIBIT 2

```
 1                UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
 2

 3                           - - -

 4
     IN RE:  ROUNDUP PRODUCTS        :   MDL NO. 2741
 5   LIABILITY LITIGATION            :
     _____:   MDL CASE NO. 3:16-
 6   This document relates to:       :   MD-02741-VC
                                     :
 7   Nancy Salas v. Monsanto         :
     Company                         :
 8   Case No. 3:20-CV-06173-VC       :
     _____:
 9

10                           - - -
                           VOLUME 1
11                   Friday, August 5, 2022

12                           - - -

13

14          Remote videotaped stenographic deposition of

15   KEVIN B. KNOPF, M.D., M.P.H., conducted at the location

16   of the witness in Oakland, California, commencing at

17   approximately 8:10 a.m., on the above date, before

18   Rosemary Locklear, a Registered Professional Reporter,

19   Certified Realtime Reporter and California CSR (#13969).

20

21                           - - -

22

23

24              GOLKOW LITIGATION SERVICES
           877.370.3377 ph | 971.591.5672 Fax
25                    deps@golkow.com
```

**Exhibit 2 Page 1**

```
 1   APPEARANCES:  (All appearances via remote technology)

 2

 3          PODHURST ORSECK, P.A.
            BY:  PABLO ROJAS, ESQUIRE
 4          projas@podhurst.com
            One Southeast 3rd Avenue, Suite 2300
 5          Miami, Florida 33131
            (305) 358-2800
 6          Appearing on behalf of the Plaintiff

 7

 8          ARNOLD & PORTER KAYE SCHOLER, L.L.P.
            BY:  DAVID A. KERSCHNER, ESQUIRE
 9          David.Kerschner@arnoldporter.com
            BY:  JOSEPH KLEMME, ESQUIRE
10          Joseph.Klemme@arnoldporter.com
            250 West 55th Street
11          New York, New York 10019-9710
            (212) 836-8000
12          Appearing on behalf of the Defendant Monsanto
            Company
13

14
            MORRIS MANNING & MARTIN
15          BY:  CAROLINE W. SUYDAM, ESQUIRE
            csuydam@mmmlaw.com
16          Atlanta Financial Center
            3343 Peachtree Road, N.E., Suite 1600
17          Atlanta, Georgia 30326
            (404) 495-8485
18          Appearing on behalf of the Defendant Home Depot

19

20                         - - -

21

22

23

24

25
```

**Exhibit 2 Page 2**

```
 1   ExpertConnect?
 2   A.      I'm sorry.  When?
 3   Q.      Yes.  When?
 4   A.      I don't recall the exact dates that I was first
 5   engaged by Mr. Rojas's firm.  Sometime in 2022.
 6           And so as soon as -- as soon as their email came
 7   saying that I was retained by his firm, I deleted that
 8   email because I have communications from Mr. Rojas at
 9   that point.
10   Q.      Had you worked on any Roundup litigations before
11   you worked with Mr. Rojas's firm?
12   A.      No.  This was the first time.  This is the first
13   case I've worked on for Roundup, I think.
14   Q.      How many -- how many cases have you worked on
15   through ExpertConnect?
16   A.      Are you asking related to Roundup or related
17   to --
18   Q.      Well, start in general.
19   A.      Oh.  I believe they reached out to me to become
20   an expert sometime in 2021, and so probably a handful of
21   cases before my engagement with Mr. Rojas.
22   Q.      And how many Roundup cases have you worked on
23   through ExpertConnect?
24   A.      I've been retained for a number of cases, I
25   think two with Mr. Rojas's firm.  This -- this case was
```

Exhibit 2 Page 3

Golkow Litigation Services                                  Page 13

```
 1   the first one that -- earliest one that had a report
 2   date by me, but I think there are other cases that I'm
 3   working on with Roundup with different firms.
 4   Q.      Do you know what firms those are?
 5   A.      I had a list at my home office of which firms
 6   they are.
 7           There are one or two firms in South Carolina;
 8   there's a firm in Ohio, I think the attorney's name is
 9   Jim O'Brien; there's another firm, I think his name is
10   Finley, who may be in South Carolina.  There are a
11   handful of firms.
12   Q.      Have there been any cases in the Roundup
13   litigation that you have declined to take on?
14   A.      I'm not sure I've declined a case yet.
15   Q.      When you were first contacted, did you do any
16   research before responding to ExpertConnect?
17   A.      Yes.  Some.
18   Q.      What did you do?
19   A.      If I'm remembering the history, there might have
20   been another attorney who had asked me something about
21   Roundup and maybe sent me an expert report but I did not
22   engage with that person.
23           I think I followed the litigation a little bit
24   in the lay press and had done some general research
25   along the way about causality of lymphoma, but probably
```

Exhibit 2 Page 4

Golkow Litigation Services                                    Page 14

 1  peer-reviewed papers and I'm looking at the abstracts to
 2  see if I have a firm answer to his question.
 3          MR. KERSCHNER:  Doctor, if it's going to take a
 4  while, you can review it --
 5          THE WITNESS:  No.
 6          MR. KERSCHNER:  -- during a break and then I can
 7  come back.
 8          THE WITNESS:  It will take -- it will take 30
 9  seconds.  Hold on.
10          MR. KERSCHNER:  Okay.
11          THE WITNESS:  I don't see anything specifically
12  related to the epidemiology of Roundup and non-Hodgkin's
13  lymphoma in my publications.
14  BY MR. KERSCHNER:
15  Q.    So I'm correct, you've never published anything
16  about Roundup.
17  A.    That would be correct, I believe.
18  Q.    Your CV mentions that you're part of the
19  Leukemia & Lymphoma Society Patient Services Committee.
20        Do you still --
21  A.    I think that --
22  Q.    Do you still work --
23  A.    I think that was in the past.
24  Q.    Oh, okay.
25  A.    That was in --

Exhibit 2 Page 5

Golkow Litigation Services                              Page 50

```
 1   Q.      Not anymore.
 2   A.      When I was in San Francisco, I think I had a
 3   patient or two who wanted to involve me with the local
 4   chapter of the Leukemia & Lymphoma Society and I did
 5   some work for them.
 6   Q.      Have you ever designed or conducted a scientific
 7   research regarding Roundup?
 8   A.      No, I have not designed or conducted a
 9   scientific research regarding Roundup.
10   Q.      Have you ever designed or conducted scientific
11   research regarding any pesticide or herbicide?
12   A.      There's a descriptive study about academic
13   researchers and what happens when they report toxicity.
14           So, for example, one of the people in one of
15   those studies is named Tyrone Hayes, who did some work
16   regarding mutagenicity of a product.  I'm a co-author on
17   that study, but I did not specifically look into his
18   work, apart from just understanding what had happened to
19   him.  So it's not specifically related to Roundup and
20   non-Hodgkin's lymphoma.
21   Q.      So I'm correct, then, you have not designed or
22   conducted scientific research regarding any pesticide or
23   herbicide.
24   A.      I think that's a correct statement.
25   Q.      Other than your discussions with medical
```

Exhibit 2 Page 6

Golkow Litigation Services                                Page 51

1          MR. KERSCHNER:  Yeah.  I don't need any
2    HIPAA-protected information.
3          Thank you, Mr. Rojas.  That -- please -- yeah,
4    that's an important clarification.
5    BY MR. KERSCHNER:
6    Q.    I'm just asking you if you in your medical
7    practice recall a specific time where you asked an
8    individual patient if they had been exposed or not to
9    glyphosate or Roundup.
10   A.    I'm sure along the way I've asked patients if
11   they've been exposed to any sort of pesticides or
12   herbicides.
13   Q.    But specifically --
14   A.    I don't think --
15   Q.    -- to Roundup.
16   A.    I don't think I would say, have you been exposed
17   to Roundup?
18   Q.    How many patients do you see on an average week?
19   A.    You know, this week, inpatient service, it's
20   been about 100 patients.  Outpatient service, earlier in
21   my career I would see 80 to 100 patients a day.  Now
22   that I'm division chief, I try and -- try and see -- I
23   mean 80 to 100 patients a week.
24         Now that I'm division chief and since taking
25   this job, I've had more administrative time so I

Exhibit 2 Page 7

Golkow Litigation Services                                    Page 56

```
 1   that come in my office or hospital.
 2           I wouldn't say I have a specialty, like I only
 3   treat T-cell lymphoma.  I have a colleague who only
 4   treats CNS lymphoma.  I can't say I'm that specialized
 5   in lymphoma.
 6   Q.      Do you treat patients with mantle cell lymphoma?
 7   A.      I've treated patients with mantle cell lymphoma,
 8   yes.
 9   Q.      Can you approximate how many?
10   A.      Over the 20 years I've been treating patients
11   and in my --
12   Q.      Let's do the last five years, if you can do
13   that.
14   A.      Last five years.
15           So mantle cell lymphoma is maybe 3 to 5 percent
16   of lymphoma, so over the past five years, not a whole
17   lot of mantle cell lymphoma patients.
18   Q.      Is it under ten?
19   A.      It's probably under -- probably under 10 or
20   between 10 and 20.  I'm not sure I could give an exact
21   number.
22   Q.      And in an average week right now, how many
23   lymphoma patients, non-Hodgkin's lymphoma, patients do
24   you see?
25   A.      So my job is set up as either inpatient or
```

Exhibit 2 Page 8

Golkow Litigation Services                              Page 65

 1  A.     You know, an interesting thing we see here --
 2  and I've read only one sort of review epidemiological
 3  article but I'm curious -- at this hospital, where we
 4  see a lot of Hispanics from Latin America, we see like a
 5  very high incidence of B-cell acute lymphoblastic
 6  leukemia.  And that's been reported in California.  And
 7  a lot of them are migrant farmworkers.
 8         But I've not specifically asked them about their
 9  exposure to Roundup at that point because at that point
10  they have it.  But since I've started reviewing the
11  epidemiologic literature here, I probably would try and
12  seek out whether anybody else has looked at that,
13  whether it's just somehow related to their genetics or
14  they are being exposed to it or there's a
15  gene/environment interaction.
16  Q.     Just to get back to my question, am I right that
17  you don't know for certain whether or not any of your
18  patients have used Roundup?
19  A.     Sitting here today, I can't recall.  I think it
20  was more common that my patients used Roundup when I
21  worked in Annapolis, Maryland, than when I've worked in
22  San Francisco.
23  Q.     And you specifically asked those patients in
24  Maryland about their use of Roundup?
25  A.     Sitting here today, I'm not sure how often I

Exhibit 2 Page 9

Golkow Litigation Services                                    Page 68

```
 1   Q.      And the pathological features, clinical
 2   presentation, causes, and treatments of all of those
 3   different subtypes differ from each other; right?
 4   A.      They differ from each other but some of them
 5   have similarities.  You know, low-grade lymphomas have
 6   more similarities to each other than a low-grade
 7   lymphoma might to high-grade lymphoma.  And, you know,
 8   we classify them, and we certainly use similar drugs in
 9   some of them and similar approaches in some of them.  So
10   they're not 60 totally distinct.  I mean, it's not like
11   the difference between lymphoma and colon cancer.
12   Q.      But something --
13   A.      They have a lot in common.
14   Q.      -- can be a cause of one type -- subtype of
15   non-Hodgkin's lymphoma but not necessarily another.
16   A.      Yeah.  But that would be very hard because of,
17   you know, how many cases you have, for example, in a
18   case-control study and the relative frequency of
19   different lymphomas.
20   Q.      You can't just assume that because a substance
21   has been found to be the cause of one type of -- subtype
22   of non-Hodgkin's lymphoma it therefore causes all
23   non-Hodgkin's lymphomas; right?
24   A.      Well, I would be very concerned if it causes
25   lymphoma that it's going to increase the risk for all
```

Exhibit 2 Page 10

Golkow Litigation Services                                    Page 92

 1   A.      I'm relying in large part on the general

 2   experts' report and opinions and I've also validated

 3   that and believe it as well, but I think the general

 4   experts have had -- spent more time reviewing the

 5   epidemiologic literature and pondering that, and that I

 6   think happened in 2017, 2018, whenever the general

 7   expert reports were written.

 8           So I'm not saying, oh, I'm only going to believe

 9   what they say, but I am, I think, here as a specific

10   expert, not as a general causation expert.

11   Q.      When you formed your opinion, did you just

12   assume that Roundup was a risk factor for non-Hodgkin's

13   lymphoma as part of your differential diagnosis?

14           MR. ROJAS:  Object to the form.

15           THE WITNESS:  Yeah.  I don't think I would say I

16   just assumed that.  I read general causations experts

17   and made sure I agreed with them and I reviewed the

18   studies myself and made sure I agreed with them.  So I

19   didn't just totally rely on that, you know.  It was a

20   sort of trust-but-verify-type situation.

21   BY MR. KERSCHNER:

22   Q.      Did you do any independent analysis to confirm

23   whether or not Roundup is a risk factor or did you

24   simply rely on the reports and information provided by

25   the general causation experts?

Exhibit 2 Page 11

Golkow Litigation Services                                Page 102

```
 1   A.      As I -- as I tried to say earlier, when I
 2   submitted this report regarding the specific causation
 3   for Ms. Salas's non-Hodgkin's lymphoma, I cited the
 4   articles that I had read at that point, and I had read
 5   the expert review report and I had read some of these
 6   materials, to the extent that I thought I should as a
 7   specific causation report.
 8           If I were asked to be a general causation
 9   expert, I would read these studies much, much closer and
10   try and understand why the language differs from 6.1 to
11   6.3.
12   Q.      Have you read the entire IARC Monograph 112 on
13   glyphosate?
14   A.      I have read through it.  I'm not sure I got to
15   the very end and I'm not sure I read it as detailed and
16   closely as I would if I were a general causation expert.
17   Q.      Do you understand what limited evidence means
18   when IARC writes it in Section 6.1?
19   A.      I think in the Preamble it might have said what
20   they mean by limited evidence, but I'm not --
21   Q.      Let take a look at that.
22   A.      -- a hundred percent sure what they mean by
23   limited evidence.
24   Q.      Why don't we pull up the Preamble.
25           THE COURT REPORTER:  And this is the reporter.
```

Exhibit 2 Page 12

Golkow Litigation Services                                      Page 103

```
 1   specific risk ratio because I haven't memorized them.
 2           I think the Zhang meta-analysis, which I thought
 3   was very well done, the risk ratio was somewhere between
 4   1.41 and maybe 2.  I've seen some risk ratios of greater
 5   than 2 in some of the case-control studies, but I would
 6   have to review those specific studies to get you the
 7   exact risk ratios.
 8   Q.      And do you know the risk ratio for an
 9   association between glyphosate and mantle cell lymphoma;
10   correct?
11   A.      I think it may be hard to give a risk ratio --
12   and this harkens back to your earlier question -- just
13   between glyphosate and mantle cell lymphoma because it's
14   a less common subtype of mantle cell lymphoma.  So I'm
15   having to impute that causality of this between all
16   non-Hodgkin's lymphoma might be proportionate in
17   proportion to the frequency of non-Hodgkin's lymphomas.
18   But, obviously, we have more follicular lymphoma and
19   diffuse large-cell lymphoma out there than we do mantle
20   cell lymphoma.
21           I would say again it's my opinion that, more
22   likely than not, Roundup was a substantial factor in
23   causing Ms. Salas's non-Hodgkin's lymphoma.
24   Q.      On Page 8 of your report --
25   A.      Yes.
```

Exhibit 2 Page 13

Golkow Litigation Services                                    Page 115

```
 1   environment.
 2           So I think I was trying to write there to say
 3   that causation is multifactorial and it can be a
 4   combination of both genetic and environmental factors.
 5   Q.      In the next paragraph you say, "There are
 6   congenital cancer-causing genes (i.e., germline
 7   mutations) and genes acquired through our lifetimes
 8   (i.e., somatic gene mutations) that are involved in the
 9   causal pathway of carcinogenesis."
10           Do you see that?
11   A.      Yes.  Yes, sir.
12   Q.      And germline mutations are changes in the DNA
13   that you inherit from your parents; right?
14   A.      Yes.
15   Q.      And somatic mutations are changes in the DNA
16   that happen after conception and they're not inherited;
17   right?
18   A.      Right.  Correct.
19   Q.      And they continue to happen throughout our
20   lives; right?
21   A.      Yes.
22   Q.      Both somatic and germline mutations can cause a
23   person to develop cancer, regardless of whether they've
24   been exposed to Roundup; right?
25   A.      Yeah.  But the way I think about causality is
```

Exhibit 2 Page 14

Golkow Litigation Services                                     Page 117

```
 1   right?
 2   A.      No, it doesn't always work.
 3   Q.      And sometimes you get mutations that aren't
 4   repaired that could eventually lead down the path of
 5   carcinogenesis; right?
 6   A.      Yeah.  But even, you know, if you were to say
 7   that a certain cancer is caused by an accumulation of
 8   genetic mutations, it's a multifactorial thing and some
 9   subsequent genetic mutations might be related to an
10   environmental toxin.
11   Q.      Right.  But in most cases of cancer, you would
12   agree that the genetic mutations that have led to that
13   cancer are not necessarily caused by environmental
14   factors; right?
15           MR. ROJAS:  Object to form.
16           THE WITNESS:  Well, every cancer is a little
17   different.  For example, I think the pathway for colon
18   cancer that was worked out by Vogelstein at Johns
19   Hopkins, you know, along the way there are probably
20   environmental exposures that affect your pathway from
21   normal colon tissue, to polyp, to carcinoma, to more
22   extensive carcinoma.  So I think gene-environmental
23   interactions are also possible along the way.
24           That's -- I think that's true in lymphoma.  For
25   example, if we say that hep. C is a risk factor for
```

Exhibit 2 Page 15

Golkow Litigation Services                                    Page 119

```
 1   splenic lymphoma villus lymphocytes, there might be
 2   antecedent somatic gene mutations that make it more
 3   likely because not everybody who has hep. C gets splenic
 4   lymphoma, and a lot of people have hep. C.
 5            So I think it's not quite so black and white.
 6   BY MR. KERSCHNER:
 7   Q.       I understand it's not black and white, but my
 8   question is simply that you would agree that there are
 9   cancers that -- strike that.
10            There are individuals who will develop cancer
11   due to gene mutation that have nothing to do with
12   environmental factors; right?
13   A.       I think that statement is the true, but as
14   humans we're always exposed to environmental factors.
15   Q.       And you can't necessarily definitively say
16   whether or not a cancer was caused by only an
17   environmental factor, genetic mutation and an
18   environmental factor, or only a genetic mutation; right?
19            MR. ROJAS:  Object to the form.
20            THE WITNESS:  Yeah.  What I've said here is that
21   it's my opinion that, more likely than not, Roundup was
22   a substantial cause in this patient's non-Hodgkin's
23   lymphoma.
24   BY MR. KERSCHNER:
25   Q.       But in this case, you can't rule out
```

Exhibit 2 Page 16

Golkow Litigation Services                              Page 120

```
 1   A.        Probably, yes.
 2   Q.        Right.  And that calls into question the
 3   veracity of the data; right?
 4   A.        It does, except the other expert reports and
 5   other people seem to put some credence in this study.
 6             I -- you know, hairy cell leukemia is such a
 7   rare cancer, it wouldn't be one I would design a study
 8   to do myself, but the unadjusted odds ratio was positive
 9   so I think that's why people are quoting this study
10   with, you know, an odds ratio of 3.04.
11   Q.        But you put it in your report, and that's kind
12   of what I want to focus on.
13   A.        Yeah.
14   Q.        But you would agree, you know, it's not a very
15   strong study because of the small numbers and the fact
16   that it's not statistically significant in the adjusted
17   finding, it calls into question the veracity of the
18   findings.
19   A.        Sure.  I'll agree with that.
20   Q.        So then I think you corrected me that I
21   skipped a study.  So let's go back.  I'm sorry.
22             And do you recall if this study, Hardell, says
23   anything specific about mantle cell lymphoma?
24   A.        I don't recall that, but I would totally be
25   unsurprised because mantle cell lymphoma is a rare
```

Exhibit 2 Page 17

Golkow Litigation Services                                    Page 198

1   subtype of lymphoma, so I think it's going to be hard

2   to, unless you specifically did a case-control study of

3   mantle cell lymphoma patients with exposure to

4   glyphosate.

5   Q.      Right.  But if it talked about mantle cell

6   lymphoma, considering that you're doing a case-specific

7   analysis, you would have written that in your report;

8   right?

9           MR. ROJAS:  If I may just interject, I'm going

10  to instruct Dr. Knopf not to answer.

11          I mean, we've gone a while on this.  Any sort of

12  general causation questions, I think his testimony has

13  been clear that he's a specific causation expert.

14          I know that this is the sort of this background

15  section of the report, and that was in error.  We can

16  sort of amend to focus on the specific causation, which

17  is what he's retained to do, what he's testified that

18  he's been retained to do, and the only -- we're not

19  going to offer him as a general causation expert.  I

20  think he's been clear that he's not been retained as

21  one.  He will not offer an opinion at trial about

22  general causation.

23          So, you know, you're, of course, welcome, David,

24  to ask any questions about sort of the specific

25  causation aspects of the methodology and his opinions

Exhibit 2 Page 18

Golkow Litigation Services                                Page 199

```
 1   STATE OF CALIFORNIA           )

 2   COUNTY OF LOS ANGELES         )

 3              I, ROSEMARY LOCKLEAR, a Certified Shorthand

 4   Reporter of the State of California, duly authorized to

 5   administer oaths pursuant to Section 2025 of the

 6   California Code of Civil Procedure, do hereby certify

 7   that

 8              KEVIN B. KNOPF, M.D., M.P.H., the witness in

 9   the foregoing deposition, was by me duly remotely sworn

10   to testify the truth, the whole truth and nothing but

11   the truth in the within-entitled cause; that said

12   testimony of said witness was stenographically reported

13   by me, a disinterested person, and was thereafter

14   transcribed under my direction into typewriting and is a

15   true and correct transcription of said proceedings, to

16   the best of my ability.

17              I DO FURTHER CERTIFY that I am neither a

18   relative nor employee nor attorney nor counsel of any of

19   the parties to this action, and that I am neither a

20   relative nor employee of such attorney or counsel, and

21   that I am not financially interested in the action.

22          *Rosemary Locklear* (signature)

23

24   ROSEMARY LOCKLEAR, RPR, CRR, CSR 13969

25
```

Exhibit 2 Page 19

Golkow Litigation Services                                Page 240