# EXHIBIT C

STATE OF NEW YORK
SUPREME COURT: COUNTY OF ERIE

---

CARLISHA SHAW,

                Plaintiff,

v.

UBER,
RAISER, LLC,
UBER TECHNOLOGIES, INC.,
DANIEL GHEBRUE and
JENNIFER M. LEUMER,

                Defendants.

**AFFIDAVIT**

Index No.: 805492/2018

---

CELLINO LAW, LLP and
CELLINO & BARNES P.C.

                Petitioners,

v.

LOONEY INJURY LAW PLLC and
JOHN W. LOONEY, ESQ.

                Respondents.

---

STATE OF NEW YORK    )
COUNTY OF ERIE        ) ss.:

John W. Looney, being duly sworn, deposes and says:

1. I am an attorney at law, duly licensed to practice law in the State of New York and the sole shareholder of the law firm Looney Injury Law PLLC.

2. I submit this Affidavit to respond to the Notice of Petition and Petition filed January 14, 2022 by Cellino Law LLP and Cellino & Barnes, P.C. seeking relief pursuant to Judiciary §475 Law to determine attorneys' claims and rights to compensation based on a December 10, 2021 arbitration award after a November 19, 2021 arbitration hearing, obtained by me, working at my law firm, Looney Injury Law PLLC, on behalf of Plaintiff Carlisha Shaw, in

this action (the "Action").

3. Ms. Shaw's retainer agreement with Looney Injury Law PLLC and her prior retainer agreements with Petitioners provided for payment of attorneys' fees upon a recovery, pursuant to a contingency fee agreement providing for 33 1/3% of the gross recovery, based upon Ms. Shaw's election to have her lawyers advance and pay all disbursements on the case.

4. Based on Ms. Shaw's election to have disbursements advanced and paid by her lawyers, the total contingent attorneys' fee (the "Total Fee") payable by plaintiff equals one/third of the gross recovery obtained in the Arbitration award, a sum known to the parties, but supposed to be kept confidential, per the terms of the arbitration agreement.

5. I performed substantial work for Ms. Shaw for four years, including, without limitation:

   a. engaged the client and informed her of her rights and legal options;
   b. engaged an investigator and conducted a thorough investigation;
   c. obtained voluminous hospital and medical records and reports;
   d. followed the client through her no-fault medical treatment for pain and orthopaedic care and three surgeries and obtained additional, follow-up medical records and reports;
   e. obtained employment records relating to the client's employment and no-fault wage claims;
   f. handled various no-fault filings and issues regarding denials of coverage, filed necessary forms and made necessary disclosures;
   g. prepared the summons and complaint;
   h. filed and served the Summons and Complaint to commence the Action and then filed and served the Amended Summons and Complaint;
   i. reviewed the Answer and defenses asserted therein;
   j. reviewed various defense discovery demands;
   k. prepared and served a Verified Bill of Particulars and demand for defendant's Verified Bill of Particulars;

l. prepared and served discovery demands and responses to defense discovery demands;

m. coordinated client's multiple Independent Medical Examinations (IMEs) for both no-fault and defense;

n. appeared and conducted four Examinations Before Trial (EBTs);

o. negotiated specific terms with insurance defense counsel for a binding arbitration;

p. prepared for and conducted a confidential, binding arbitration to conclusion on November 19, 2021, after leaving Cellino Law LLP, for reasons explained below, based upon Ms. Shaw's election to retain Looney Injury Law PLLC to advocate her case at the binding arbitration hearing;

q. obtained a favorable arbitration award for Ms. Shaw rendered by arbitrator Daniel Cavaliero, Esq. on December 10, 2021.

6. Cellino Law LLP agreed to defer allocation of its' claimed proportional share of any contingent fee earned in the Action, based on legal work performed on the case, until the conclusion of the case, as confirmed in writing in Cellino Law LLP's November 23, 2021 letter to me (Petition and Affidavit of Gregory Pajak, Exhibit M).

7. The case was resolved in a contested arbitration hearing - in which Ms. Shaw was represented by me at Looney Injury Law PLLC.

8. Based on the work performed and respective contributions by counsel on behalf of Ms. Shaw in the Action, and for the reasons set forth below, Looney Injury Law PLLC's reasonable allocable share should be 90% of the Total Fee, with 10% of the Total Fee allocable to Petitioner Cellino Law LLP.

9. Petitioner Cellino & Barnes, P.C. lacks standing in this case and can work out any claim with Cellino Law LLP pursuant to the corporate dissolution agreement, bargained for after highly publicized, intense litigation by and between Ross Cellino and the late Stephen Barnes, the shareholders of Cellino & Barnes, P.C.

10. The Barnes Firm has no standing in this attorney fee dispute.

11. The Barnes Firm is constrained by the corporate dissolution agreement between Ross Cellino and the late Stephen Barnes who bargained for and negotiated its terms including a formula for dividing attorneys' fees between their new, respective law firms (Cellino Law, LLP and The Barnes Firm).

12. Ross Cellino, as a former shareholder of Cellino & Barnes, P.C., can adequately represent the interests of the dissolved entity. In other words, whatever percentage of the attorney fee in this case goes to Cellino Law LLP can be split with The Barnes Firm according to their ongoing arrangement wherein they both use a formula.

13. In this particular case, since I chose to join Cellino Law LLP, Ms. Shaw's case automatically went to Cellino Law LLP upon the dissolution of Cellino & Barnes, P.C. in October 2020. This was already bargained for as well between Ross Cellino and the late Stephen Barnes.

14. Ms. Shaw then chose to leave Cellino Law LLP and retained Looney Injury Law PLLC. This was her own choice.

15. I was compelled to resign from and leave Cellino Law LLP on November 11, 2021 for several reasons, summarized below. To protect the privacy of clients, current and former workers at Cellino Law LLP and attorneys in the community, I have redacted names known to Petitioners.

16. For starters, Ross Cellino created an atmosphere of anxiety from the start of Cellino Law LLP (literally on Day 1 of the new law firm), after all of his employees at Cellino & Barnes, P.C. had lived through the tension and hostility for over three years during the dissolution process.

4

17. Ross Cellino gave a relatively brief speech via zoom to all Cellino Law LLP attorneys and staff on the first day of his new firm. He told everyone while he was excited on the one hand to start this new venture, he was nervous on the other hand and hoped the phone would ring. He was not demonstrating as the sole leader of the firm that he was determined to make it work.

18. Thereafter, Ross Cellino wore his anxiety on his sleeve. On a daily basis I could see it on his face. In the beginning, I felt sorry for him because I knew he was under a lot of stress. It became pretty clear to me early on that he was not up for the challenge of running a law firm by himself. (Everyone internally at Cellino & Barnes, P.C. knew Stephen Barnes was the driving force behind that now dissolved law firm even if he or she chose to join Ross at his new law firm.)

19. Ross Cellino expressed concern over money on a regular basis, often saying "I am having severe cash flow problems. I am not sure we are going to make it as a firm." It was his mantra. His sole concentration was on the money he was spending that he did not want to spend.

20. Ross Cellino's anxiety morphed into paranoia where he thought the attorneys were against him - he admitted to me in my office that he resented the attorneys for taking advantage of him (financially) during the dissolution process "when you guys had all the leverage". I pointed out to him that he was the one who filed for dissolution, not the attorneys.

21. Ross Cellino's paranoia eventually morphed into outright panic. He would walk around the office to remind the attorneys to settle more cases, so he could advertise more, so the phone would ring more (like a boiler room or sweatshop operation).

22. As a historical reminder, prior to forming Cellino Law LLP, Ross Cellino had turned the thriving Cellino & Barnes, P.C. law firm into a house divided. He then filed to

dissolve this overwhelmingly successful law firm in May 2017. Though he stated multiple reasons for doing so, the only reason that has stood the test of time was so that his daughters could work with him. For the record, Jeanna Cellino is one of the most pleasant lawyers I have worked with over the 22 years I worked there (not to mention her excellent legal skills).

23. Having your daughters work for you at your law firm is fine. I would do the same thing. However, having one of them run the law firm is another thing entirely. Ross allowed Annmarie Cellino to use her accounting skills rather than her legal skills. To her credit, she used those skills right away. The problem was she almost immediately started scolding her father openly about spending too much money on Cellino Law LLP. She knew exactly how much money he was spending because she was acting as the firm accountant and was overseeing the firm financially. She told him to "quit spending my inheritance" at least three times in my presence before Ross abruptly took away attorneys' salaries, a bargaining chip he used during the split to induce me and the other attorneys to choose him over Stephen Barnes. I don't criticize Annmarie Cellino for being a good accountant or for being vigilant about the spending of money she believed was being spent unnecessarily. The only criticism I am making here is that Ross Cellino put his daughter in a position where she had an obvious conflict of interest. She saw the amount of money going out the door and was duly concerned about her future inheritance.

24. Ross Cellino claimed during the dissolution that he wanted to change attorney compensation but changed his mind instead.

25. Again, Ross Cellino constantly talked about his severe cash flow problems. Every conversation I had with him (or overheard him openly in front of staff) would be about money, specifically his money and how much he was spending and how we needed to help him more by

settling more cases. He was blaming the attorneys for a problem he created, constantly intimating it was somehow the attorneys' fault or outright said it: "If you guys settled more cases, then I could advertise more, and the phone would ring."

26. Taking away the attorneys' salaries of course hurt the attorneys financially. The greater problem from that action was the irreparable harm it caused to Ross Cellino's reputation. I knew (and I think I speak for all of the current and former attorneys) that Ross was not a keeper of promises. My (our) trust in him was gone. His word meant nothing thereafter. All the Cellino Law LLP non-family attorneys agreed on that.

27. My greatest concern over time as Ross Cellino ramped up the pressure to settle more cases was his lack of concern about the clients' chances of a meritorious recovery. He explicitly expressed that he cared more about his own bottom line than anything else.

28. By taking away attorneys' salaries, Ross Cellino put additional financial pressure on the attorneys to settle more cases because the attorneys would be concerned about getting behind financially themselves in their weekly draws with compounding weekly debt that we owed back to Ross at the end of the month. This was always the danger of working on a draw, but it became more pronounced at Cellino Law LLP because he was not bringing in the cases adequately (like we had been at Cellino & Barnes, P.C. in years prior). Ross had known this, too. He told all of the attorneys during the dissolution process that he was going to pay us salaries because the first three to four years were going to be difficult starting up a new law firm.

29. It became apparent to me rather quickly (by observation and by listening) that Ross Cellino had no vision for the future, or at least not one he could verbalize. He displayed no leadership abilities whatsoever. There was no direction for the firm. I told Ross that Cellino Law,

7

LLP was like a rudderless ship in the middle of the ocean. We were just bobbing up and down on the waves at the whim of the elements.

30. If there were any misunderstandings on my part, from October 2020 onward, it became crystal clear to me during a Cellino Law, LLP attorney meeting on or about June 24, 2021 that I had to consider leaving to protect my clients. At that meeting, Ross Cellino told us that he was cutting our salaries. He said he was getting his financial house in order. He told each of us that we should get our own financial houses in order as well. He said we should consider leaving. He said he would leave if he were us. He told us we were on a sinking ship. Coming from the captain of the ship, Ross Cellino's speech was distressing to say the least.

31. By telling us he had to get the firm's financial affairs in order, Ross Cellino created an immediate sense of urgency for himself and for all his employees. I found this odd because it was inconsistent with his original promises and stated desire to hire everyone for his new law firm. He threw money around like a drunken sailor trying to get all of the attorneys and staff to go with him. He made financial promises he would not keep. And the proof was in his actions. Once Ross got the attorneys and staff he wanted, he started to get rid of them.

32. Ross Cellino fired his Executive Assistant, who had left a good corporate job to join the firm, just a few weeks into the new firm. She was not replaced.

33. An attorney manager was let go after just a couple of months with the firm. He had left a solid, long term job with GEICO to join Cellino Law LLP. He was not replaced.

34. The firm's one and only Workers Compensation attorney was fired. He was not replaced.

35. One of the firm's three mass tort attorneys was fired. He was not replaced.

36. Two of the firm's six attorneys in the Rochester office were fired and not replaced.

37. Three of the firm's fifteen attorneys downstate (LI and NYC) resigned, went to a competitor law firm and were not replaced.

38. One attorney, who Ross Cellino insulted as "fat, dumb & happy" in front of the other attorneys in the Buffalo office, resigned. He was not replaced.

39. Six loyal legal assistants out of eleven in the Rochester office were fired and not replaced.

40. The firm accountant was fired and not replaced.

41. The receptionist at one of the downstate offices was fired and not replaced.

42. Upon information and belief, five legal assistants in the Buffalo office were fired and not replaced.

43. Ross Cellino promised a very bright future to all of these employees and he took on a great responsibility when doing so. He did not see the problem with that sort of behavior. He did not see his own people and their needs. He only saw them as pawns and used them to his own benefit without any consideration for their benefit. He did not elevate them; he discarded them. I cannot testify to his thoughts. I can only testify to his actions and his actions were devious.

44. In September 2021, Ross Cellino came into my office and told me about an Arizona law firm that was set up for the sole purpose of advertising for Personal Injury (PI) cases in New York. The Arizona law firm would then refer the cases to PI lawyers across New York State. Ross said the Arizona law firm was backed by private equity firms in NYC. He asked for my thoughts on this. I said it sounds suspicious to me. Ross then said he signed an agreement

9

with the Arizona law firm to be the Arizona law firm's exclusive referral source. I said it seems like the Arizona law firm was simply skirting the ethics rules in New York where non-lawyers cannot share in law firm profits. Ross said he did not understand my position since he will be sharing profits with the Arizona law firm. I pointed out that ultimately he will be sharing profits with the private equity firms in NYC and they are non-lawyers. I said it would make me uncomfortable and I would never do it. He looked at me perplexed and said he already did it.

45. The final straw for me came in October 2021, when Ross Cellino came into my office and told me he met with a criminal defense attorney for a defendant in one of our current PI cases. Ross said he invited the attorney to the Cellino Law mansion for a meeting. Ross said he told the attorney he wanted the defendant's parents to take out a $200,000 home equity loan to add to the future settlement and have their son pay them back in exchange for a reduction in the criminal charges pending against him. Ross said any parent would want to do that for one of their children to get them out of trouble. Ross did not tell anyone about the meeting ahead of time. He did not consult with our client about it either. He took this action on his own.

46. I told Ross Cellino something does not feel right to me about that. I told Ross it feels like a bribe or maybe extortion would be the better word. I told Ross it almost certainly has to be unethical and it could possibly be criminal. I advised him to stop. I told him not to advance his plan whatsoever. Rather that understanding my concern and possibly sharing in it, Ross doubled down. He said I was over-reacting.

47. The next day after that jolting meeting, I called an attorney at the Attorney Grievance Committee. I ran a hypothetical question by him using the information above. We then determined I should meet with Ross Cellino along with a witness present and extract myself from the situation by having nothing further to do with it and by discouraging Ross from

10

consummating the deal. I did exactly that. I met with Ross and Denis Bastible in my office. I had Ross repeat the story in front of Denis, but Ross said he could not remember if he actually said $200,000 or some other figure. Other than that, he verified the story to Denis. In any event, I knew at that moment I had to leave Cellino Law, LLP. I could not stay any longer with Ross Cellino who could risk his license to practice law with such a carefree attitude and hurt his law firm if it were to go under. I told him to think about all of his employees and their families. I told him to think about all the clients and their families. Again, I cannot testify to his thoughts. I can only testify to his actions and his actions were unethical.

48. Approximately two weeks later, I extracted myself from Ross Cellino and his law firm. I resigned on November 11, 2021.

49. I continue to represent the client in the matter mentioned above – that client and 78 other clients chose my law firm over staying with Cellino Law LLP. In an attempt to get this particular client back (and hurt me in the process), Ross Cellino offered to cut his fee for this client from 30% to 10% and "was willing to go even lower" if the client would come back to him rather than sticking with me.

50. For background purposes only to explain why the fee was 30% rather than the customary 33 1/3%, Ross Cellino had previously offered to waive disbursements in order to get the above client to retain Cellino Law LLP. When I advised Ross that it was totally improper and unethical to waive disbursements, he lowered the attorney fee instead from 33 1/3% to 30%.

51. During the three years and four months that dissolution dragged on, it became more and more challenging for the attorneys to continue to represent their clients (never mind get more clients). My clients were calling me and asking if the firm was going to survive. I told each and every one of them I had no idea what the future held, but no matter what happened, I would

11

keep fighting for them. I promised them I would always be at their side no matter what and I never broke that promise.

52. Carlisha Shaw was one of those clients. I represented Carlisha Shaw 100% of the time. I performed 100% of the work on her case. I positioned the case to get the best possible result. I brought Ms. Shaw's case to a favorable conclusion. I chose arbitration rather than a trial because it was in Ms. Shaw's best interests. Frankly, arbitration was preferable to a jury trial because I would have had to explain myself to the jurors (yet again) why I worked for Ross Cellino.

53. Given the foregoing circumstances, I was compelled to leave Cellino Law LLP to protect Ms. Shaw's interests, to protect all of my clients' best interests and to protect my professional reputation.

*John W. Looney*
John W. Looney

Sworn to before me this
25th day of January, 2022

*Andre L Kinsman*
Notary Public

12

FILED: ERIE COUNTY CLERK 01/25/2022 03:44 PM
NYSCEF DOC. NO. 45    Case 3:16-md-02741-VC   Document 16895-3   Filed 06/26/23   Page 13 of 13   RECEIVED NYSCEF: 01/25/2022

12 of 12