**WILKINSON STEKLOFF LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonstekloff.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonstekloff.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel:  202-847-4030
Fax: 202-847-4005

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel:  202-898-5843
Fax: 202-682-1639

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel:  202-662-6000

**BRYAN CAVE LEIGHTON PAISNER LLP**
K. Lee Marshall (CA Bar No. 277092)
(klmarshall@bclplaw.com)
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Tel:  415-675-3400
Fax: 415-675-3434

Jed P. White (CA Bar No. 232339)
(jed.white@bclplaw.com)
120 Broadway, Suite 300
Santa Monica, CA 90401
Tel: 310-576-2100
Fax: 310-576-2200

*Attorneys for Defendant Monsanto Company*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741<br><br>Case No.: 3:16-md-02741-VC |
| *Estate of Kenzie Elizabeth Murdock, et al. v. Monsanto Co.*,<br>Case No. 5:20-cv-00023 | **DECLARATION OF JED P. WHITE IN SUPPORT OF DEFENDANT MONSANTO COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY OF THOMAS R. BUTTS, PH.D.**<br><br>Hearing:<br>Date:   July 27, 2023<br>Time:   10:00 a.m.<br>Place:   San Francisco Courthouse,<br>            Courtroom 4 – 17th Floor |

BRYAN CAVE LEIGHTON PAISNER LLP
ONE METROPOLITAN SQUARE
211 NORTH BROADWAY, SUITE 3600
ST. LOUIS, MISSOURI 63102-2726

DECLARATION OF JED P. WHITE IN SUPPORT OF MONSANTO'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION TO EXCLUDE DR. BUTTS

I,      Jed P. White, declare as follows:

1.      I am an attorney at law admitted to practice before all of the courts in the state of California.  I am an attorney with the law firm Bryan Cave Leighton Paisner LLP, counsel of record for Defendants Monsanto Company ("Monsanto") in the above-referenced action.  I am over eighteen years of age and am fully competent to make this Declaration in Support of Monsanto Company's Response in Opposition to Plaintiff's Motion to Exclude Dr. Thomas Butts Testimony. Except where otherwise stated, I have personal knowledge of the following, and if called upon to testify as a witness, I could and would competently testify to the matters stated herein.

2.      Attached hereto as **Exhibit 1** is a true and correct copy of Monsanto's Company's Rule 26 Designation and Disclosure of Specific Causation Expert Testimony, dated January 24, 2023.

3.      Attached hereto as **Exhibit 2** is a true and correct copy of Dr. Thomas Butts' expert report with his curriculum vitae attached as Exhibit A and his materials considered list attached as Exhibit B in the above-captioned matter, dated March 22, 2023.

4.      Attached hereto as **Exhibit 3** is a true and correct copy of excerpts from the deposition of Dr. Thomas Butts in the above-captioned matter, dated March 16, 2023.

5.      Attached hereto as **Exhibit 4** is a true and correct copy of an excerpt of *Ferro et al., v. Monsanto Company*, Order Regarding the Parties Motions to Exclude Experts, dated

6.      Attached hereto as **Exhibit 5** is a true and correct copy of an excerpt of the hearing in *Neal v. Monsanto*, dated March 22, 2022.

7.      Attached hereto as **Exhibit 6** is a true and correct copy of an excerpt of *Caballero v. Monsanto*, Order on Pretrial Matters Including Summary Judgment, Sargon Challenges, Motions in Limine, Requests for Judicial Notice, dated

8.      Attached hereto as **Exhibit 7** is a true and correct copy of an excerpt of the trial transcript in *L. Johnson v. Monsanto*, dated June 9, 2022.

9.      Attached hereto as **Exhibit 8** is a true and correct copy of an excerpt of *D. Johnson v. Monsanto*, Order on Monsanto's Omnibus Sargon Motion; Monsanto's Motion for Summary

Bryan Cave Leighton Paisner LLP
One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, Missouri 63102-2726

Bryan Cave Leighton Paisner LLP
One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, Missouri 63102-2726

1   Judgment; Plaintiff's Omnibus Sargon Motion; Plaintiff's Motion for Summary Adjudication,

2   dated May 17, 2018.

3       10.    Attached hereto as **Exhibit 9** is a true and correct copy of an excerpt of the trial

4   transcript in *Wyzik v. Monsanto Co.*, dated October 27, 2022.

5       I hereby declare under penalty of perjury under the laws of the State of California and the

6   United States of California that the foregoing is true and correct.

7

8       Executed June 29, 2023, at Santa Monica, California.

9

10       Jed P. White

11       **CERTIFICATE OF SERVICE**

12       I HEREBY CERTIFY that on this 29th day of June, 2023, a copy of the foregoing was filed

13   with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all
     appearing parties of record.

14       */s/ Jed P. White*

15       Jed P. White

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

Julie du Pont
(Julie.dupont@arnoldporter.com)
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
Telephone: (212) 836-8572
Facsimile: (212) 836-6714

Brian Stekloff
(bstekloff@wilkinsonstekloff.com)
WILKINSON STEKLOFF LLP
2001 M Street, N.W.
10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005

Eric G. Lasker
(elasker@hollingsworthllp.com)
HOLLINGSWORTH LLP
1350 I Street, N.W.
Washington, DC 20005
Telephone: (202) 898-5800
Facsimile: (202) 682-1639

*Attorneys for Defendant*
*MONSANTO COMPANY*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 |
| | Case No. 3:16-md-02741-VC |
| This document relates to: | |
| *Estate of Kenzie Elizabeth Murdock, Kyle A. Murdock, Adm'r, Kyle A. Murdock, individually, and Mandi L. Murdock v. Monsanto Company* | |
| Case No. 3:20-cv-01363-VC | |

- 1 -

## MONSANTO COMPANY'S RULE 26 DESIGNATION AND DISCLOSURE OF SPECIFIC CAUSATION EXPERT TESTIMONY

Defendant Monsanto Company ("Monsanto") submits the following Designation and Disclosure of Expert Testimony, identifying persons who may provide expert testimony pursuant to Rule 702 of the Federal Rules of Evidence and Pretrial Orders 150 and 171. Because their analyses are based on scientific data that is confidential under applicable law and regulation, Monsanto designates the expert reports served contemporaneously with this disclosure as Confidential Material pursuant to the Protective and Confidentiality Order, Pretrial Order No. 30, entered in MDL No. 2741. Monsanto submits its Designations and Disclosure of Expert Testimony subject to the following reservation of rights:

(1)     The right to supplement or amend this disclosure based upon any rulings of the Court or any other court decisions that affect the scope of evidence in this trial or in the event Plaintiffs alter or amend their witness list;

(2)     The right to supplement or amend this disclosure in order to address any new opinions—whether generic or case-specific—by Plaintiffs' experts;

(3)     The right to elicit and offer testimony, either through direct examination or cross-examination, of all witnesses designated or identified by Plaintiffs or Monsanto as an expert or person with specialized knowledge, training, or experience;

(4)     The right to call as a witness any expert designated by Plaintiffs;

(5)     The right to call un-designated rebuttal expert witnesses whose testimony cannot reasonably be foreseen until the presentation of evidence against Monsanto;

(6)     The right to withdraw or de-designate the designation of any expert prior to testimony, and positively to aver that such previously designated expert will not be called as a witness at trial and to re-designate that expert as a consulting expert who cannot be called by opposing counsel;

(7)    The right to elicit expert testimony at trial from any qualified person which would be of benefit to the jury to determine material issues of fact pursuant to the Federal Rules of Civil Procedure;

(8)    The right, as allowed by the Federal Rules of Civil Procedure and applicable law, to offer amended and/or supplemental expert opinions based on: (1) receiving additional discovery, including but not limited to updated medical records, fact witness depositions, exhibits introduced at depositions, documents produced, materials produced; (2) expert depositions and/or any supplemental expert disclosures by any party; (3) new literature or scientific studies.

(9)    The right to introduce testimony from any third-party fact witness with special expertise, knowledge, or experience relevant to the issues in this litigation;

By identifying the witnesses below, Monsanto does not intend to waive any of its objections to deposition testimony, exhibits, or other evidence or argument. Monsanto reserves the right to call the following experts at trial and provides the expert reports, curricula vitae, and reference lists for the following experts:

A.    **Case-Specific Experts**

1.    **Leslie J. Ungers, MS, CIH**
       **Ungers & Associates, Inc.**
       **1101 Saint Gregory Street**
       **Cincinnati, Ohio 45202**

Mr. Ungers is providing an expert report, materials considered list, list of prior testimony, and CV.

Dates for Mr. Ungers's deposition will be provided upon request.

2.    **Thomas R. Butts, Ph.D.**
       **University of Arkansas**
       **Assistant Professor and Extension Weed Scientist**
       **115 Plant Sciences Building**
       **Fayetteville, Arkansas 72701**

Dr. Butts is providing an expert report, materials considered list, and CV.

R. 26 DESIGNATION AND DISCLOSURE OF SPECIFIC CAUSATION EXPERT TESTIMONY

Dates for Dr. Butts's deposition will be provided upon request.

**3.   Ira Braunschweig, M.D.**
    **Montefiore Medical Center**
    **111 East 210th Street**
    **Bronx, NY 10467-2401**

Dr. Braunschweig is providing an expert report, materials considered list, list of prior testimony, and CV.

Dates for Dr. Braunschweig's deposition will be provided upon request.

DATED: January 24, 2023                    Respectfully submitted,

                                           /s/ *Julie du Pont*
                                           Julie du Pont
                                           (Julie.dupont@arnoldporter.com)
                                           ARNOLD & PORTER KAYE SCHOLER LLP
                                           250 West 55th Street
                                           New York, NY 10019
                                           Telephone: (212) 836-8572
                                           Facsimile:(212) 836-6714

                                           /s/ *Brian Stekloff*
                                           Brian Stekloff
                                           (bstekloff@wilkinsonstekloff.com)
                                           WILKINSON STEKLOFF LLP
                                           2001 M Street, N.W.
                                           10th Floor
                                           Washington, DC 20036
                                           Telephone: (202) 847-4000
                                           Facsimile: (202) 847-4005

                                           /s/ *Eric Lasker*
                                           Eric G. Lasker
                                           (elasker@hollingsworthllp.com)
                                           HOLLINGSWORTH LLP
                                           1350 I Street, N.W.
                                           Washington, DC 20005
                                           Telephone: (202) 898-5800
                                           Facsimile:(202) 682-1639

                                           *Attorneys for Defendant*
                                           *MONSANTO COMPANY*

R. 26 DESIGNATION AND DISCLOSURE OF SPECIFIC CAUSATION EXPERT TESTIMONY

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 24, 2023, a true and correct copy of the foregoing

Designation and Disclosure of Specific Causation Expert Testimony was served by electronic

mail on the following counsel of record:

Robin Greenwald, Esq.
*RGreenwald@weitzlux.com*
Weitz & Luxenberg
700 Broadway
New York, NY 10003
*Co-Lead Counsel for Plaintiffs in MDL No. 2741*

Aimee Wagstaff, Esq.
*aimee.wagstaff@andruswagstaff.com*
Andrus Wagstaff
7171 W. Alaska Drive
Lakewood, CO 80226
*Co-Lead Counsel for Plaintiffs in MDL No. 2741*

David Dickens, Esq.
*ddickens@millerfirmllc.com*
The Miller Firm LLC
108 Railroad Ave.
Orange, VA 22960
*Co-Lead Counsel for Plaintiffs in MDL No. 2741*

Jerome P. Prather
*jprather@garmerprather.com*
Garmer & Prather, PLLC
141 North Broadway
Lexington, KY 40507

Dennis L. Null, Sr., Esq.
*nulldlaw@yahoo.com*
Law Office of Dennis L. Null
1209 Cuba Road
Mayfield, KY 42066

*Counsel for Plaintiffs Estate of Kenzie Elizabeth Murdock, Kyle A. Murdock, Adm'r, Kyle A.
Murdock, individually, and Mandi L. Murdock*

- 1 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*/s/ Albert Cora*
Albert Cora
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019
Attorneys for Defendant
*MONSANTO COMPANY*

R. 26 DESIGNATION AND DISCLOSURE OF SPECIFIC CAUSATION EXPERT TESTIMONY

# EXHIBIT 2

Glyphosate Litigation
Dr. Thomas R. Butts
Weed Scientist General Report

1. Background

I am currently an Assistant Professor, Extension Weed Scientist with the University of Arkansas System Division of Agriculture. My research and Extension efforts focus on identifying novel weed management strategies for Arkansas rice and soybean cropping systems through diversified approaches. These strategies include the utilization of cultural, mechanical, and chemical practices used in a holistic system for weed management. The overall goal is to provide sound, effective, and applicable weed management practices to Arkansas and Mid-South rice and soybean growers battling complex weed problems in their fields. A primary focus is placed on identifying the impact of precision agriculture and application technologies on weed management as these tools continue to grow in popularity. Further emphasis is placed on helping to increase herbicide application knowledge, safety, and effectiveness, both from ground-based and aerial applications. Dissemination of information through multiple sources to a broad audience (homeowners, farmers, consultants, and colleagues) is an important aspect of my Extension program and includes print publications, social media, county/state/national meetings, one-on-one field visits, and timely video and podcast episodes.

I am originally from southern Wisconsin where I grew up working on and around small dairy farms. From a young age, I learned the importance of weed control, including the safe handling and use of herbicides such as glyphosate both around the home and on the farm. I attended the University of Wisconsin-Platteville where I completed my Bachelor of Science in Agricultural Business with a minor in Soil and Crop Science in 2012. Subsequently, I earned my Master of Science degree in 2015 from the University of Wisconsin-Madison in Agronomy-Weed Science. I investigated the influence of integrated weed management strategies, including soybean row width, seeding rate, and herbicide program, on pigweed management across the Midwest and Midsouth. Additionally, I conducted herbicide resistance screenings on several pigweed species from Wisconsin and reported the first confirmed incidences of glyphosate-resistant common waterhemp and Palmer amaranth within the state. I then pursued my Ph.D. from the University of Nebraska-Lincoln in Agronomy-Weed Science which I completed in 2018. There, I researched the influence of application technologies, in particular pulse-width modulation (PWM) sprayers, on droplet size, droplet velocity, and spray pattern uniformity. Additionally, I studied the influence of spray droplet size from PWM sprayers on herbicide efficacy and spray drift mitigation. Prior to my current role, I also worked at the University of Wisconsin-Madison as a Postdoctoral Research Associate investigating the role of underlying factors stimulating a soybean yield response from foliar fungicides.

Currently, I have authored or coauthored over 50 peer-reviewed publications, more than 60 research series reports, over 50 Extension and outreach publications, and more than 40 scientific meeting abstracts. Additionally, I have given over 190 Extension and invited speaker presentations, produced tens of videos, 30 or more podcasts, and been mentioned in, quoted in, or authored at least 140 popular press articles. In total, this outreach allows me to connect with approximately 20,000 growers, agronomists, consultants, applicators, and homeowners per year regarding weed control and herbicide usage.

I have been an active member and served in leadership roles within the Arkansas Crop Protection Association, Southern Weed Science Society, Weed Science Society of America, American Society of Agronomy, National Agricultural Aviation Association, Rice Technical Working Group, and ASTM International. Additionally, I have been honored with several awards including American Society of Agronomy Excellence in Extension Awards for "SPORTS: A Weed Control Acronym", "Arkansas Row Crops Radio", and "Herbicide Resistance Traits: Quick Reference Guide." I was also awarded the 2019 Weed Science Society of America Outstanding Graduate Student Award and 2019 Excellence in Symposium and Publication Management Award from ASTM International.

For more details on publications and research, visit my Google scholar profile (https://scholar.google.com/citations?user=5WWVx2kAAAAJ&hl=en) or ResearchGate profile (https://www.researchgate.net/profile/Thomas-Butts). Additionally, my curriculum vitae is attached hereto as Attachment A. A list of materials considered in this case is attached hereto as Attachment B. I have never testified at deposition or trial.

I am being compensated at a rate of $400 per hour for case-related professional services, $250 per hour for travel, $500 per hour for deposition testimony, and $650 per hour for trial testimony. Case related expenses are invoiced at cost.

## 2. Impact of Weeds

Weeds are problematic and are detrimental to agriculture, humans, wildlife, infrastructure, and other native vegetation for a variety of reasons (Weed Science Society of America (WSSA), 2016a). They can reduce the yield of field crops and garden vegetables. Weeds can impact the quality of flowers for cut-flower production and grain quality of crop commodities. They can cause illness, severe skin irritation, and even death to humans, pets, and livestock if ingested or, in some cases, if they come into contact with skin. Unwanted vegetation, especially those weeds with strong rooting structures, can destroy roads, sidewalks (Fig. 1), and building foundations. Climbing and viny weeds (e.g., kudzu) can affect forest quality, as well as wildlife food and movement, and can interfere with human structures such as buildings, power poles/lines, and other important communication, electrical, and energy transmission lines (Fig. 2).

Weeds can severely degrade agriculture and forest productivity. Previous research has estimated that in 2005, weeds caused a reduction of 12% in overall crop yields, representing a $33 billion annual loss in yield potential (Pimentel et al., 2005). In 2016, a summary from the Weed Science Society of America Weed Loss Committee estimated that weeds caused an average of 50% yield loss in corn and $27 billion lost annually (Soltani et al., 2016). In 2017, the same committee estimated that weeds caused an average of 52% yield loss in soybean equating to a loss of over $16 billion annually (Soltani et al., 2017). Weeds can also reduce protein levels in cereal crops and reduce grain quality causing price dockages when the grain is sold. Furthermore, weeds can severely outcompete desired crops or vegetation for required resources such as sunlight, nutrients, and water. One such example of this is tamarisk. A single tamarisk plant has been shown to consume 200-300 gallons of water per day, creating a microclimate drought or significantly increasing irrigation costs (Weed Science Society of America (WSSA), 2016a).

Weeds and their biomass have also been shown to negatively influence greenhouse gas emissions. This may include $CO_2$, methane, and nitrous oxide depending on the specific environmental conditions, weed species, density, and control strategies (Bailey et al., 2015). In forestry, weeds can contribute to rampant wildfires, poison wildlife, and reduce quality forage forcing wildlife to move or starve (Weed Science Society of America (WSSA), 2016a). In residential areas, dense weed populations are potential hosts for dangerous wildlife such as rodents and snakes. These weedy areas also harbor insects such as ticks which carry diseases impacting both residents and pets.

Aquatic weeds can also have a major impact on humans and wildlife. Water lettuce serves as a breeding ground for mosquitoes which are not only a nuisance, but also can carry diseases (Weed Science Society of America (WSSA), 2016a). Invasive weed species can hinder human uses of water (recreational activities, irrigation, etc.) by blocking entire waterways, reduce native beneficial aquatic plant growth, increase flooding risk, and impair hydro generation (Howard and Harley, 1997). Additionally, in areas where people rely on water for travel and livelihoods, aquatic weeds can reduce the fish catch, isolate individuals from their homes or towns, and reduce aquatic biodiversity. Invasive plants have been shown to negatively impact aquatic environments and fish communities by increasing habitat complexity, introducing hypoxia, releasing allelopathic chemicals, and reducing fish food quality (Schultz and Dibble, 2012). Management of these invasive plants is crucial to maintaining a healthy aquatic ecosystem.

Some weeds are poisonous plants such as poison ivy, poison oak, poison hemlock, castor bean, nightshade, and poison sumac and are widely distributed across the United States. These plants can cause severe skin irritations and even more severe complications depending on exposure and tolerance levels varying from person to person. One of the primary recommended weed management methods for these severely detrimental plants is to use glyphosate because it is highly effective and allows the individual to manage the weed without handling the poisonous plants directly (Kingsbury, 1964; Klingman et al., 1983). Outside of poisonous plants, weeds can also negatively impact human health due to their pollen shed aggravating allergies. For example, common ragweed can release one billion pollen grains per plant (Weed Science Society of America (WSSA), 2016a). This intense pollen release triggers allergic reactions for nearly 36 million Americans annually. Another weed, myrtle spurge, releases a milky sap that can cause dermatitis and eye irritation, but also harbors other pests such as fire ants and other venomous insects (Weed Science Society of America (WSSA), 2016a). Management of these weeds is crucial to maintaining public health.

Poisonous plants have also negatively impacted livestock and wildlife. Previous research estimated poisonous plants caused 1% - 3.5% of cattle and sheep deaths in 17 western states (Nielsen, 1978). Additionally, as a result of these poisonous plant livestock deaths, approximately $107 million was lost annually. Poisonous weeds have also been known to cause toxicity and death of horses and other livestock. For example, common groundsel can cause irreparable liver damage due to toxic alkaloids if ingested by cattle, horses, or sheep (Weed Science Society of America (WSSA), 2016a). Hydrilla has been known to contain a deadly toxin that has killed birds when ingested, including eagles, coots, ducks, and geese.

In addition to all of the aforementioned problems weeds cause, unwanted vegetation can also impair aesthetics and negatively impact daily activities. This may entail obscuring waterways

which can limit recreational activities such as boating, fishing, or water sports. Weeds can deter visitors to a community park or garden, limiting a community gathering site. Unwanted vegetation can also negatively impact building structures (destroying foundations, siding, or roofs) and potentially reduce the profitability/clientele base for primary residences and rental properties (such as VRBO or AirBNB). Additionally, by leaving weeds uncontrolled, they will persist for years and continue to increase in severity due to their seedbank survival whether in a farmers field, a community lake, or a homeowner's garden (Weed Science Society of America (WSSA), 2016b). Some weeds produce upwards of 600,000 seeds per plant (Keeley et al., 1987) which can cause drastic shifts in ecosystems and be challenging to manage the soil seedbank.

     Weed management is an ever-changing, evolving process given the introduction of new undesired plants. An estimated 500 introduced plant species have become serious invasive pests (Pimentel, 2009). The annual cost of introduced weeds to the United States agricultural economy due to crop losses and herbicide costs is approximately $26 billion (Pimentel, 2009). This value does not account for the estimated 4.5% increase in the cost of food for every 1% decrease in crop yield, nor does it account for approximately $11 billion in environmental and public health impacts (Pimentel, 2009). Additionally, weed control makes up a significant proportion of the $36 billion spent on management for lawns, gardens, and golf courses (Pimentel, 2009). With so many detrimental impacts caused by weeds, it is vital to have safe and effective management tools, such as glyphosate.



Fig. 1. Example of the adaptability and extreme capabilities of weeds to grow where they wish and impact infrastructure.



Fig. 2. Examples of weeds (e.g., kudzu) taking over forests, power lines, and buildings. Photos courtesy of https://thegroundtruthproject.org/crossing-the-divide-kentucky/kentucky_final_04/, http://encyclopediaofalabama.org/article/h-2483, and https://nyis.info/invasive_species/kudzu/.

### 3.   Weed Management Tools

There are numerous weed management tools that can be implemented to mitigate the harmful impact of weeds across situations (field crops, homeowners, rights-of-way, aquatic, etc.). The wide array of weed management strategies is most easily classified into five separate categories that are described under the integrated weed management umbrella. These categories include prevention, cultural, mechanical, biological, and chemical. Prevention is an all-encompassing category that describes methods to mitigate or eliminate weeds from becoming a problem. Prevention methods can include using black fabric and mulch in a garden, preemergence residual herbicides, or weed seedbank management.

Weed seed has been found to survive and lie dormant in the soil for many years (Weed Science Society of America (WSSA), 2016b). Weed seedbank management is a critical tool to successfully manage weeds long-term regardless of the situation (field crops, homeowner lawn/landscaping, rights-of-way, aquatic, etc.). Alternative strategies to destroy weed seed can

be implemented such as seed destructors (Schwartz-Lazaro et al., 2016), use of microwaves, and composting materials containing weed seeds (Parish, 1990).

Non-chemical control methods (cultural, mechanical, and biological) can be more difficult and expensive to implement; however, they can be very effective at weed management if introduced into a well-managed, integrated system (i.e., in conjunction with chemical control methods) and close attention to detail is followed (Parish, 1990). Cultural techniques such as crop rotation, planting date manipulation, and increasing plant populations as well as mechanical techniques such as tillage, flame-weeding, or hand-weeding can be effective weed management tools (Bond and Grundy, 2001; Parish, 1990), but are often not feasible or readily adopted due to a variety of reasons. Crop rotation may be difficult due to landowner requirements, soil types, or other negative growing conditions (Butts et al., 2022). Increasing planting populations or plant densities can be more expensive due to increased seed costs (both in agriculture and gardens). Mechanical techniques such as hoeing, pulling, mowing, and tillage can also be effective but similarly have drawbacks. Tillage destroys soil texture, leads to increased erosion, and creates numerous weed flushes in a year that need to be continuously battled (difficult to stay ahead in both field crops and homeowner situations). Tillage also requires the use of machinery, which can be dangerous to use, and significantly more fuel consumption. Hand-weeding is expensive in field crop situations and can reduce the quality of life for homeowners in residential settings (time spent weeding compared to other activities, sore muscles and increased likelihood of body pain, potentially physically handling poisonous plants, etc.). In addition to the cultural and mechanical strategies, a few successful developments have also occurred to manage weeds biologically using insect pests to predate seeds and foliage (Timmons, 2005). However, biological control methods at this time are extremely limited, and often very difficult to register as there is a potential for the biological component to become its own invasive species.

Chemical weed control is the most commonly used method, often because it is safe and effective, and the quickest, easiest, and least labor-intensive. There are many herbicides available for use across markets including field crops, turfgrass, woody brush, aquatics, etc. (Barber et al., 2021). Broad-spectrum herbicides, such as glyphosate, are excellent options especially when there is a diverse weed spectrum present (grasses and broadleaves). In these situations, a single herbicide (glyphosate) rather than multiple different chemistries can be sprayed to manage all weed species, and its low use rate coupled with its safe environmental qualities, provides an effective option for all users.

Integrated weed management is a holistic approach that combines these cultural, mechanical, biological, and chemical control techniques to achieve the desired weed control objective. The use of integrated weed management strategies, and not a sole reliance on a single method of management, often aids in environmental stewardship, long-term economics, and the preservation of vital weed management tools (i.e., reducing the selection pressure for the evolution of herbicide resistance) (Duke and Powles, 2009; Shaner, 2014b). This multi-year focus on weed management can increase the effectiveness of future weed management efforts, increase the longevity of vital weed management tools (like herbicides such as glyphosate), maintain quality and profitability of the desired area (whether a cropping system or homeowner garden), and decrease negative impacts on an environment by not repeating similar practices year after year (thereby reducing the likelihood of an eco-shift).

6

### 4. Development of herbicides

Chemical weed control began over a century ago with just a few inorganic compounds (Kraehmer et al., 2014; Timmons, 2005). Around the middle of the century, the first organic herbicide compounds began to be synthesized. Research regarding the release of the first herbicide (2,4-D) in the 1940's indicated that a burndown application prior to planting could eliminate 1-3 cultivations (Gianessi and Williams, 2014). Targeted herbicide research began in the 1950s; however, the initial research was crude and direct; herbicide candidates progressed from screens purely on the basis of satisfying farmers' requirements. Through the 1970's and 80's, additional research avenues were implemented including mode of action evaluation and the implementation of analytical tools to understand plant pathways. Between 1960 and 1972, Monsanto Co. tested 51,000 compounds in search of an effective systemic herbicide for controlling perennial weeds (Franz et al., 1997). Of these 51,000 compounds, fewer than 150 were subjected to advanced field testing and only 3, including glyphosate, became commercial herbicides. Glyphosate was officially commercialized in 1974.

Herbicides work in a variety of different ways. Some herbicides are soil-applied (preemergence residual) while others are foliar-applied (postemergence). Soil-applied herbicides kill plants before they emerge out of the soil and must be taken up through the roots. Foliar-applied herbicides kill plants once they have emerged but can be active through multiple ways (contact vs. systemic). A contact herbicide only kills plants where the spray solution comes into contact with the plant (kills outside->in) while a systemic herbicide moves throughout the plant (kills inside->out) (Fig. 3). Following application, systemic herbicides must be absorbed through the plant cuticle, then translocated throughout the plant to different regions to affect the desired target site. Throughout this entire process, there are many avenues in which the application can go awry, and the desired biological effect may not be achieved. Spray drift can occur, weed cuticles may be too waxy/hairy to achieve successful absorption, environmental stresses (drought) may limit the translocation of sugars (and herbicides) within the plant, and different weed species may metabolize (digest) herbicide chemistries at different paces resulting in mixed levels of activity. Glyphosate is a systemic, foliar-applied herbicide that has little to no soil activity (due to strong soil adsorption). It is extremely effective, especially with formulated adjuvant packages (e.g., Roundup), at being absorbed within different weed species leaf structures, translocates well throughout the plant, and has slow enough herbicidal activity to take advantage of this superior translocation capability (Duke and Powles, 2008). Glyphosate is also applied using large droplets, which minimizes the potential for drift. Most current glyphosate-based herbicides are pre-packaged with a surfactant adjuvant. The addition of a surfactant (soap) helps to break the surface tension of the water-glyphosate spray solution, allowing for spray droplets to spread on and adhere to the leaf surface and aid in absorption to enhance its activity.

Today, herbicides are used on more than 90% of the acreage of field crops, vegetables, fruits, nuts, and specialty crops annually (Gianessi and Williams, 2014). As an indicator of their importance, previous reports released by an expert committee in Denmark concluded that a total ban on pesticides would result in a reduction of farmers' income by 20-90% (Kudsk and Streibig, 2003). Since new herbicides being introduced to the marketplace has decreased

7

significantly (Kudsk and Streibig, 2003), utilizing all available "tools in the toolbox" safely and effectively is required for successful weed management regardless of the situation.



Fig. 3. Illustration of contact vs. systemic herbicides. Courtesy of www.lccdnet.org.

5. Benefits of glyphosate-based herbicides

As previously discussed, glyphosate is a systemic, non-selective herbicide which rapidly translocates throughout the plant and kills annual and perennial weed species, both grasses and broadleaves. It works by inhibiting the 5-enolpyruvylshikimate-3-phosphate synthase (EPSPS), a key enzyme in the shikimate pathway. Only glyphosate has been identified to control plants through this mechanism, resulting in no analogs or alternative chemical classes targeting this same pathway making glyphosate a unique, ideal herbicide (Duke and Powles, 2008). Glyphosate also has the benefit of being one of the most heavily researched herbicides in the history of pesticides. A search on the Weed Technology (https://www.cambridge.org/core/journals/weed-technology) and Weed Science (https://www.cambridge.org/core/journals/weed-science) journal webpages results in 2,337 and 2,005 individual results, respectively. Additionally, nearly 20,000 scientific publications and patents involving glyphosate have been published in the past 40 years (Duke, 2018).

Glyphosate is a once-in-a-lifetime herbicide discovery due to its positive attributes and safety profile (Duke and Powles, 2008). The first goal of every herbicide is that it is safe and effective at controlling weed species. As a non-selective herbicide, glyphosate is extremely effective at controlling a wide range of both grass and broadleaf weed species postemergence (Franz et al., 1997). Glyphosate is so effective at controlling weeds that zero survey respondents reported heavy weed pressure following 5 years of glyphosate-resistant cropping system usage and 36-70% of respondents indicated their overall weed pressure had been reduced (Kruger et al., 2009). Additionally, because of the high levels of control achieved with glyphosate, fewer applications and reduced pounds of herbicide active ingredient are required per area. Once a

8

herbicide meets the efficacy criteria, before it ever becomes close to commercialization, it must be tested for environmental impacts and toxicity.

Glyphosate also has a favorable environmental profile. Compared with past and present herbicides, it is one of the most environmentally safe least acutely toxic (Duke, 2018). Additionally, the LD50 (dose required to kill 50% of test animals) of glyphosate is 5,600 mg/kg, an extremely low-level acute toxicity rating. In comparison, other herbicides such as Liberty (1,620 mg/kg LD50) and Gramoxone (3 mg/kg LD50) are much more acutely toxic. When compared to organic herbicides, ammonium nonanoate (3,200 – 5,000 mg/kg LD50) and acetic acid (3,310 mg/kg LD50) are again more acutely toxic. Even daily products such as acetaminophen (Tylenol) (1944 mg/kg LD50), caffeine (192 mg/kg LD50), and Vitamin D (10 mg/kg LD50) are more acutely toxic to mammals (Pomeroy, 2016). Glyphosate is also non-toxic to birds, fish, insects, and most bacteria, as well as has been shown to not bioaccumulate. Glyphosate also binds tightly to the soil limiting leaching and half a relatively short half-life because it is readily degraded by soil microbes (Borggaard and Gimsing, 2008; Duke and Powles, 2008). In addition, glyphosate does not readily volatilize due to its very low vapor pressure ($5.7 \times 10^{-8}$ Pa at 25°C), limiting the potential for off-target movement (Shaner, 2014a).

Glyphosate has also enabled the widespread adoption of conservation tillage practices (minimal or no physical disturbance of the soil in production agricultural practices). Conservation tillage has shown significant benefits including 96% less erosion, 66% reduction in fuel consumption, reduced $CO_2$ emissions, enhanced water quality, improved water and fertilizer use efficiency, and higher soil biological activity (increased microbes, earthworms, other living entities as their environment is undisturbed and soil moisture can be maintained), among others (Derpsch et al., 2010; Triplett and Dick, 2008). Furthermore, severe erosion (Fig. 4) and water runoff (primarily phosphorus movement) from areas with heavy conventional tillage has led to the development of the large hypoxic zone in the Gulf of Mexico. The overuse of tillage was also the primary driver for the Dust Bowl events of the 1930's that drastically negatively impacted the agricultural and ecological systems of the Midwest. Conservation tillage has also lowered the amount of water needed for crops because no soil disturbance occurs (Derpsch et al., 2010), increased crop yield likely because of the higher moisture level in the soil (Triplett and Dick, 2008), and reduced the amount of labor and fuel used that would be needed for tilling. Finally, conservation tillage has also been shown to provide climate protection benefits by reducing $CO_2$ emissions and influencing nitrous oxide emissions, both major contributors to global greenhouse gas emissions (Angers and Eriksen-Hamel, 2008; Bailey et al., 2015; Mooney and Sjogersten, 2022; Six et al., 2004).

Glyphosate has provided a much needed weed control tool to enable the widespread adoption of conservation tillage and enhance natural resource conservation (Gianessi and Williams, 2014; Triplett and Dick, 2008). From 1999 through 2009, acres farmed using conservation tillage increased by nearly 15 million acres per year globally (Derpsch et al., 2010). Survey data elucidated that tillage intensity declined more in glyphosate-resistant cotton (45%) and soybean (23%) cropping systems than in non-glyphosate-resistant cropping systems (Givens et al., 2009b). Additionally, due to the emergence of glyphosate-resistant Palmer amaranth in Georgia, cotton grower herbicide costs more than doubled, in-crop cultivation increased to 44% of acres, preplant tillage increased to 20% of the acres, and post-harvest deep tillage increased to 19% of the acres every 3 years (Sosnoskie and Culpepper, 2014). Without the use of

conservation tillage, a new "dust bowl" returned in 2022 in areas across the United States (https://civileats.com/2022/06/06/a-wild-windy-spring-is-creating-a-soil-erosion-nightmare-for-farmers/).

The ease of use, economical cost, and diverse weed spectrum controlled have contributed to glyphosate becoming one of the most frequently used herbicides across field cropping systems from fall applied, preplant burndown, and postemergence over-the-top application standpoints (Givens et al., 2009a). As of 2009, glyphosate-resistant traits had been adopted on 38%, 97%, and 96% of survey respondents' corn, cotton, and soybean acres (Shaw et al., 2009) due to its ease of use and highly effective weed control across different cropping systems. The herbicide resistance trait technology across cropping systems also helped to establish some crop rotations in areas previously dedicated to a continuous cropping system. Previous research also aimed to quantify the value of glyphosate in the United Kingdom. Without glyphosate, farmers would experience an additional $473/ha in costs to produce wheat (increased cultivation & herbicide applications), food costs would need to increase 40% to maintain farmer income, a 25% increase in emissions would be predicted, and 49% more man hours per year would be required for crop production affecting the farmer's quality of life (Cook et al., 2010).

Glyphosate-resistant cropping systems have exhibited reductions in herbicide expenses (estimated savings of over $1 billion) with increased yields (Gianessi, 2008). Increased yields are vital for our food crop production moving into the future, both from a commercial and local scale. The Food and Agriculture Organization of the United Nations estimates that by 2050, world food output needs to increase substantially, particularly in Africa and South America, to meet the needs of the increasing global population (Alexandratos and Bruinsma, 2012). Glyphosate and glyphosate-based cropping systems have provided an economical and efficient method for aiding food growers with their weed control in a simplistic manner improving their quality of life by reducing other more laborious weed control strategies.

Financial benefits of genetically engineered crops, including glyphosate-resistant technologies, have been estimated to provide a benefit of $46 billion globally in soybean, $334 million in the United States in soybean, and $164 million in the United States in cotton (Smyth et al., 2015). Additionally, these benefits included a 37% reduction in chemical use, 22% increase in yields, and a 68% increase in farmer profits, as well as estimations that approximately one-fourth to one-third of the total benefits accrued to the end consumers, not just the farmers or innovators (Smyth et al., 2015). Glyphosate-resistant crops account for $33 billion of annual United States exports. Further, in the United States, 90% and 70% of soybean and cotton acres, respectively, are glyphosate-resistant; in some other countries, 100% of the soybean acres are glyphosate-resistant (e.g., Argentina) (Duke and Powles, 2008). Research from Australia estimated that if glyphosate were to be removed as a weed control option, farms more heavily invested in crops would experience significant declines in profit and farming systems would shift more heavily to sheep production, thereby increasing greenhouse gas emissions (Walsh and Kingwell, 2021).

Outside of production agriculture, glyphosate holds benefits in many other areas as well. Glyphosate is an effective weed management tool for landscaping and homeowner use. It helps to reduce or completely eliminate hand-weeding which can be expensive, time-consuming, and can reduce the quality of life for homeowners in residential settings. For example, weeds such as

poison ivy should not be removed by hand due to severe skin irritation potential. Glyphosate provides an effective control measure while eliminating potential contact with the toxic plant. Since glyphosate has systemic activity (translocates and kills from within the plant), it also provides benefits to gardeners or homeowners trying to control certain perennial species that may regrow from rooting structures such as yellow nutsedge or johnsongrass. If these plants are pulled but not all of the root structure is removed (i.e., some breaks off when pulled), these weeds can regrow. Glyphosate helps to eliminate this opportunity as it translocates to the roots/rhizomes and kill them in addition to the aboveground plant material.

Glyphosate is also used safely and effectively in many other environments including in parks, forests, rangelands, pastures, golf courses, schools, railroad crossings, highway on-ramps, roadsides, around power lines, and industrial uses. Weed control may be necessary in these different areas for a wide variety of purposes including reduction of fire hazards, improved visibility/access, reduction of vermin habitat and cover, ease of maintenance, improved surface drainage and aesthetics, as well as many others. Overall, glyphosate provides many benefits to a wide audience and a broad span of environments for the highly effective management of vegetation. It does so in an environmentally safe capacity, and it is often much more economical with an increased ease of use. Importantly, given the myriad of environments which require the use of herbicides, glyphosate benefits all members of society by resulting in cleaner air and water compared to the use of available alternative herbicides. Moreover, the use of glyphosate substantially reduces the need for tillage, thereby reducing the detrimental effects of global warming.



Fig. 4. Example of possible soil erosion (gully formation) from conventional, full-tillage agricultural use. Photo courtesy of https://en.wikipedia.org/wiki/Erosion.

6.  Methods of Application of Glyphosate-Based Herbicides

Glyphosate-based herbicides can be applied using numerous methods. In field crops and rights-of-way, glyphosate can be applied through aerial application equipment such as fixed-wing aircraft (Fig. 5), helicopters, and even small unmanned aerial systems (drones). It can also be applied through ground spray equipment (Fig. 6) that may vary in boom width from 30-feet up to 120-feet wide. Both application methods (ground and aerial) are commonly used across the United States. For example, in Arkansas, herbicide applications in field crops are split almost evenly between ground and aerial spray equipment (Butts et al., 2021). Glyphosate is widely used in burndown applications (prior to planting) and across cropping systems which contain the glyphosate resistance trait. This application equipment is often for large-scale applications, and spray tanks range in size from 400 to 1,500 gallons.

Glyphosate can also be applied on a much smaller scale for homeowner use (e.g., sidewalks, fencerows, foundation, etc.). These applications often use a backpack, pump-up sprayer (Fig. 7) or a 4-wheeler sprayer. These sprayers typically range in size from 2 to 15 gallons, and most often use a hand wand to apply the product. Although on a smaller scale, the same safety precautions and application procedures should be utilized as in larger scale applications for field crops or rights-of-way. Additionally, ready-to-use (RTU) glyphosate-based products are available that come pre-formulated in self-contained packaging with an attached sprayer to facilitate ease of use and eliminate the need for mixing (Fig. 8). These and other spray equipment are designed not to leak and typically apply glyphosate-based products at low pressure.

The label provides the level of personal protective equipment (PPE), if any, that should be worn when mixing and applying a herbicide. The label for each specific glyphosate product also



provides information on application methods, safety procedures, mixing instructions, and other use patterns.

Fig. 5. Image of an aerial herbicide application (Air Tractor 802A) and the boom/nozzle setup.



Fig. 6. Image of commonly used ground sprayers: (left) a self-propelled commercial sprayer, (right) a pull-behind privately-owned sprayer.



Fig. 7. Image of a pump-up, backpack sprayer (left) and a pump-up, hand carry sprayer (right) commonly used for homeowner herbicide applications.



Fig. 8. Image of ready-to-use (RTU) glyphosate-based products used for homeowner herbicide applications.

7. **Alternative pesticides & management strategies are less effective**

Glyphosate is an extremely effective, broad-spectrum, non-selective herbicide that has a wide range of uses (Franz et al., 1997). Very few, if any, alternative herbicides can do what glyphosate can do when it comes to removing a diverse spectrum of weed species with high levels of control from a single application (Duke and Powles, 2008). In both agricultural and residential uses, a single application of glyphosate can provide high levels of control of a wide range of weed species such as grass species, common cocklebur, sicklepod, ragweeds, and spurges, among others. There are no alternatives that are as effective as glyphosate and can control all of these weed species because most other herbicides are extremely selective in their weed spectrum (Barber et al., 2021). For example, for lawns or turfgrass use, 2,4-D and dicamba are often alternatives applied; however, they have no grass activity and only control certain broadleaf weed species. The systemic translocation of glyphosate provides complete death of a susceptible plant species by moving throughout the entirety of the plant. In contrast, some herbicide alternatives such as glufosinate (Liberty) or paraquat (Gramoxone) are contact-based herbicides which only kill the plant where spray droplets deposit, often resulting in incomplete control or regrowth.

Weed control continues to be one of the most challenging facets of agriculture, rights-of-way, and homeowner landscaping management. Herbicides are a more viable option to manage weeds as other alternatives such as hand-weeding can be extremely laborious (and difficult to find labor sources) and expensive. Reports have indicated hand-weeding can be as expensive as $24/acre for Palmer amaranth removal in the Mid-South (Riar et al., 2013) to greater than $500/acre in baby lettuce fields (Fennimore, 2014). Tillage may also be used for weed management in some areas; however, tillage can have adverse effects on other aspects of the

14

environment and is often not considered sustainable long-term (Derpsch et al., 2010; Six et al., 2004).

Even in organic agriculture, herbicides are applied to manage problematic weeds to allow for the successful cultivation of their crop (Wilcox, 2011).  Organic does not mean that no pesticides are used in the system, rather it requires growers to use products that are not synthetically produced. These pesticides are generally much less effective, requiring a significant amount more active ingredient to be applied per acre in a growing season as well as increasing fuel costs and emissions. Further, higher cost per acre and less crop yield per acre render organic agriculture unfeasible for producing sufficient food for the global population. Additionally, tillage and hand-weeding are often tactics employed by organic farming systems to aid in weed management efforts which are typically uneconomical and less environmentally friendly as previously discussed.

Data has shown herbicide use has increased over the past 30 years in herbicide-resistant or genetically engineered crops, such as glyphosate-resistant corn and cotton; however, herbicide use increased at a much more rapid pace in non-herbicide-resistant and organic crops (Kniss, 2017). This not only highlights the effectiveness of glyphosate as a herbicide, but also indicates if glyphosate were to be removed as an option for growers or organic agriculture was mandated, herbicide use would increase at significant rates in major U.S. field crops and food costs would substantially increase.

### 8. Alternative pesticides and organic products are more toxic

Not only is glyphosate generally a more effective option for weed control compared to alternatives, it is also often less toxic (Wilcox, 2011). Herbicide label signal words, determined by the United States Environmental Protection Agency, are one indication of this as they describe the acute toxicity of the herbicide product (Caution < Warning < Danger/Poison). Glyphosate products are designated with a signal word of Caution. In comparison, products such as glufosinate and 2,4-D are designated with a Warning signal word, and another product, paraquat has a Danger/Poison designation. Additionally, products labeled for organic use can also be more toxic. For example, ammonium nonanoate has a Warning designation and acetic acid has a Danger/Poison signal word. More specifically, the LD50 (dose required to kill 50% of test animals) of glyphosate is 5,600 mg/kg. In comparison, other herbicides such as glufosinate (1,620 mg/kg LD50) and paraquat (3 mg/kg LD50) are more toxic. When compared to organic herbicides, ammonium nonanoate (3,200 − 5,000 mg/kg LD50) and acetic acid (3,310 mg/kg LD50) are again more toxic. Even daily products such as acetaminophen (Tylenol) (1944 mg/kg LD50), caffeine (192 mg/kg LD50), and Vitamin D (10 mg/kg LD50) are more acutely toxic to humans (Pomeroy, 2016).

Further research has shown that herbicide acute hazard quotients (sum of the amount of each herbicide applied per hectare divided by the acute toxicity of each herbicide) have decreased over the past 30 years for most crops including corn, soybean, and cotton (Kniss, 2017). In fact, the only crop evaluated to have an increase in acute toxicity quotients was winter wheat in which glyphosate is minimally used because there is no glyphosate-resistant trait. Moreover, chronic hazard quotients (sum of the amount of each herbicide applied per hectare divided by the chronic toxicity of each herbicide) were evaluated, and no consistent trend emerged. Herbicide chronic toxicity in corn has remained relatively equal, decreased in soybean,

and increased in cotton. Meanwhile, glyphosate use increased through the late 1990's, and has remained at a consistent level through 2015. In that final year, glyphosate accounted for 26%, 43%, and 45% of the herbicide-area-treatments in corn, soybean, and cotton, respectively, but only accounted for 0.1%, 0.3%, and 3.5% of the total chronic hazard quotients (Kniss, 2017). All of this data indicates that if glyphosate were to be removed from the market, not only would alternative, significantly more toxic herbicides be substituted in, but they would often require more applications due to reduced efficacy.

### 9.  Conclusion/Summary of Opinions

Glyphosate is a once-in-a-lifetime herbicide, and also a once-in-a-lifetime weed control tool. Weed control and invasive vegetation management is critical to many walks of life including farmland, aquatic areas, rights-of-way, industrial applications, gardens, and other homeowner use. Weeds can reduce yields of crops and garden vegetables, reduce quality of garden flowers or other crops, be destructive to equipment and buildings, and potentially harm human and animal health depending on potential toxins (i.e., poison ivy, poison hemlock, jimsonweed, etc.). As such, there is a critical need for an effective strategy to manage these weed species in a safe, efficient, and effective manner.

Glyphosate is highly effective at eliminating unwanted diverse vegetation including annual and perennial weed species and grass and broadleaf weed species. Glyphosate (in combination with a surfactant) does this through its enhanced absorption capabilities and slower internal activity which takes advantage of its increased translocation capabilities. The multitude of available application options also provides flexibility to the user to correctly and accurately apply the herbicide where it needs to go to maximize its effectiveness and safety.

Additionally, glyphosate has opened the door for crop rotation and other practices such as conservation tillage to increase. These practices enhance the biodiversity of the environment, as well as decrease negative consequences of traditional agriculture such as soil erosion, soil moisture loss, and greenhouse gas emissions.

Glyphosate is one of the most researched herbicides globally with tens of thousands scientific publications and patents published on it. As a result, the overwhelming majority of data support the use of glyphosate for the control of unwanted vegetation in a safe and effective way. Most of this research also indicates glyphosate has low acute toxicity. In addition, because glyphosate is strongly adsorbed to soil and does not volatilize, it has a highly favorable environmental profile.

Overall, glyphosate is a needed option for a diverse, large clientele base to manage unwanted and potentially hazardous vegetation. Glyphosate has been shown to increase crop yields, improve quality of desired vegetation, and improve profitability of its users. With the exponentially increasing world population and diminishing food supply, economical, safe, and effective weed management options are needed to meet these demands. As such, every possible tool is needed in the toolbox, and glyphosate is one of the most important tools that can aid in this task.

<u>Case-Specific Opinions</u>

*Introduction*

In forming my opinions in this case, I have reviewed the complaint, discovery responses, Plaintiff Fact Sheet, and documents provided by plaintiffs. I have also reviewed the depositions of Kyle and Mandi Murdock and all accompanying exhibits. I have not conducted an inspection of the Murdock farm, but I have reviewed Google Earth images of the farm, as well as photographs taken during a site inspection of the farm. I have also reviewed the report prepared by plaintiffs' expert, Dr. Sawyer. For a complete list of the materials considered, please see the attached MCL. I reserve the right to supplement my opinions based on any future site inspection and/or based on other information that becomes available.

*Facts*

The Murdock family currently operates an approximate 4,000-acre farm in Kentucky and Tennessee. They farm multiple crops including corn, soybean, wheat, tobacco, and hemp. Roughly each year, their acreage is operated as approximately 50% corn and 50% soybean; tobacco and hemp acres are minimal as each is roughly only 100 acres total. Additionally, wheat is grown during an alternate season, i.e., planted in the fall, harvested early summer, and then double-crop soybean is planted post wheat harvest. In the 1990's and early 2000's, the farm was approximately 2,000 to 2,500 acres, and grew to its current size in the early 2010's. The Murdock's claim that each year they run the same pesticide program across all of their respective crop acres (i.e., all corn acres are treated similarly, all soybean acres are treated similarly). Herbicides were used on all crop acres except the hemp acres (nothing is labeled for use in this crop). Mr. Murdock stated the corn crop typically received two total herbicide applications (one burndown prior to planting and one postemergence application); it typically also received a fungicide application by agricultural aircraft late-season. Mr. Murdock stated the soybean crop typically received three total herbicide applications (one burndown prior to planting and two postemergence applications); some fungicide and insecticide applications were made to the soybean crop by Mr. Murdock, but not every year. Mr. Murdock stated tobacco did not generally receive herbicide applications other than potentially something specific for grasses but did typically receive insecticides such as Dipel or Orthene. Finally, Mr. Murdock stated the wheat crop would generally have the ground tilled (disked) prior to planting (no herbicide applied for burndown), and only a spring herbicide application occurred to manage wild onion. Mr. Murdock estimated that to spray all 4,000 acres of corn, soybean, tobacco, and hemp crop land for burndown prior to planting the crops, it would take roughly 7 total days. To spray the entirety of the approximately 2,000 acres of corn postemergence, Mr. Murdock estimated it would require roughly 8-9 days total (spaced out when time and weather would allow). Mr. Murdock stated this spraying would all occur between March to July or August, but spraying did not occur every day, only when needed to follow the aforementioned management plans. Mr. Murdock also acknowledged that there were a significant number of aerial applications that would occur in wheat and late-season corn around their farm (generally fungicides being applied); some on their farm acres, but most on neighboring acres.

1

Mr. Kyle Murdock has been the primary pesticide applicator for the farm since at least the mid-1990's. This has included herbicides, insecticides, and fungicides. He stated that he holds a private pesticide applicator's license in Kentucky, and he first received that in the 1990's (does receive recurrent training approximately every 5 years). Mr. Murdock stated he has operated numerous sprayers over the years. For their field crops, prior to 2007, Mr. Murdock stated they owned and operated a self-propelled Spra-Coupe (Figure 1) which was a 60-ft boom, 400-gallon tank, and was automatic flow rate adjustable to accurately maintain output (monitor controlled and based on GPS travel speed). Following that, Mr. Murdock stated they owned and operated a John Deere 6700 self-propelled sprayer (Figure 2). This sprayer was operated from 2010-2017 or 2018, had a 60-ft boom, and was again automatic flow rate adjustable. Currently, Mr. Murdock stated they operate two separate self-propelled sprayers, a John Deere 4630 sprayer (80-ft boom, 600-gallon tank) and a John Deere 4730 sprayer (100-ft boom, 800-gallon tank). Both sprayers are automatic flow rate adjusted, have overlap control, and have section control (7 sections). All self-propelled sprayers have had enclosed cabs with filtration systems, and Mr. Murdock states these filters and other sprayer components were routinely serviced and maintained. Photos from the site inspection also indicated the sprayers were very well maintained, kept in a roofed building, and the sprayer cab was well sealed. There was no indication of damage or exposure to the elements.



Figure 1. Enclosed cab Spra-Coupe self-propelled sprayer used on the Murdock farm. Image courtesy of exhibit 12 of Mr. Kyle Murdock's deposition.



Figure 2. Enclosed cab John Deere self-propelled sprayers used on the Murdock farm. Images courtesy of exhibit 10 of Mr. Kyle Murdock's deposition.

In addition to their field crop self-propelled sprayers, Mr. Murdock stated they also operated smaller non-crop spray equipment and spot sprayers (Figure 3). One of these sprayers included a pull-behind sprayer (operated from 1998-2010) that had a 30-ft boom and flow rate was operator controlled (not automatic based on GPS speed). There were 2-three-point hitch sprayers (approximately 50-gallon tanks) each of which had a hand spray wand, and one had a boomless nozzle (that sprays approximately 15-ft out). Another spot sprayer with a hand spray wand and approximately a 50-to-60-gallon tank was on a skid plate to sit inside the bed of a side by side (UTV) or truck. The final spot sprayer had a 25-to-30-gallon tank and was placed on the back of a 4-wheeler. This sprayer had both a boom along the back and a hand spray wand. Mr. Murdock stated these spot sprayers were used for managing weeds and other unwanted vegetation around the shop, chicken barns, house, grain bins, tobacco barns, and other small areas to keep it clean and neat. He further stated these would be attached to open cab tractors, 4-wheelers, or side by sides. Mr. Murdock stated glyphosate was a common herbicide used for these applications; however, other herbicide mixtures that had been drained from the field crop sprayers (leftover mixes) could be added to these sprayers for weed removal. Mr. Murdock estimated these applications around buildings and other non-crop areas occurred up to 4 to 6 times per year and would generally take a full day to spray them (may not occur all in the same day but spaced out when time and weather allows). Mr. Murdock stated that Kenzie Murdock would accompany him while he sprayed in non-crop areas 10-12 times per year and would often just ride beside him while he sprayed.

3



Figure 3. Non-crop spot sprayers used on the Murdock property. Images courtesy of exhibits 16 and 19 of Mr. Kyle Murdock's deposition.

Mr. Murdock had numerous spraying practices that he stated he followed. He stated he changed nozzles for each crop but would spray the entire crop with the same set of nozzles (i.e., corn and soybean would have two separate sets of nozzles, but all ~2,000 acres of soybean would be sprayed with one set, and all ~2,000 acres of corn would be sprayed with another set). He stated he used a water truck (3,200 gallons) to refill the sprayer in the field, as a result there was always at least one other individual around when he was spraying. For mixing, Mr. Murdock stated they used a mixing tank on the sprayer where all chemicals would be added first with a little bit of water and flushed into the main spray tank. Mr. Murdock estimated this method allowed for mixing/refilling the sprayer to take only approximately 5 to 7 minutes. Mr. Murdock stated most of the time, the self-propelled sprayers used in their field crops would apply tank-mixtures of herbicides (multiple herbicides in the same tank load). Mr. Murdock also stated he factored in the environmental conditions when applying chemicals and adjusted his application practices based on these conditions as well. He stated he generally considered anything over a 15-mph wind speed was considered a "no spray" condition; however, he did mention if they got behind, sometimes they decided they needed to go anyways. Mr. Murdock stated he used a boom height of 2 to 4 feet above the crop/weed canopy but would try to lower the boom height if the wind was blowing and would sometimes raise the height slightly if on rough terrain to avoid boom damage. Additionally, most of the time, he stated he did not use a drift reduction adjuvant (DRA); however, on occasion if the wind was a little greater than normal, he would add a DRA in the sprayer to protect sensitive crops around them. Mr. Murdock stated the other non-crop and spot sprayers, including the 4-wheeler sprayer, were used in similar fashion. He stated these sprayers would apply Roundup by itself at times but would also apply leftover mixes that had been drained from the self-propelled crop sprayers as a way to "recycle" any leftover chemical (Page 199 of Mr. Kyle Murdock's deposition). Mr. Murdock noted that in his nearly 30-year career of applying herbicides (from the mid-90's to present), he only remembered an instance or two of a drift complaint; one where he was alleged to have killed a garden and another where some damage occurred on wheat.

When questioned regarding herbicide labels and personal protective equipment (PPE), Mr. Murdock acknowledged he rarely read product labels or safety data sheets, and rarely followed the complete list of PPE required. Although he indicated that reentry intervals (REI) were not enforced, he said that generally once they left a farm, they did not return on the same day. He also acknowledged that he had never reviewed or read the drift management guidelines on herbicide labels. Mr. Murdock also indicated there was no hard record-keeping for most of his years on the farm for things like crop variety, herbicides used, quantities used, spray dates, etc.

Mr. Murdock's children, including Kenzie, never operated the self-propelled field sprayers for spraying purposes. However, Mr. Murdock claims that the children would ride with him while he was spraying, and it was estimated that Kenzie rode with him approximately 15-20 times per year for 4 to 5 hours each time. Mr. Murdock stated that Kenzie rode with him in both the Spra-Coupe and John Deere sprayers from when she was approximately 2 years old until she was 16 or 17. The frequency of these rides decreased as Kenzie got older. Mr. Murdock stated when she or others would ride with him, the doors and windows would always be closed. Although Kenzie rode along fairly often, she never operated nor rode along while insecticide applications were made to the tobacco crop according to Mr. Murdock. Mr. Murdock claims that Kenzie also helped with the mixing process such as hooking up hoses to the mixing tank. Mr. Murdock testified that when she helped with this, she did not wear any PPE, but she did wash her hands once spraying was finished. Numerous individuals within the farm business helped mix over the years, and Mr. Murdock, his father (Kenzie's grandfather), Nathan (farm business partner), and migrant workers were around the equipment most frequently for the entire spray application process. Mr. Murdock stated when cleaning up following mixing or spray applications, there was a hose attached to the water truck if the need arose to rinse off in the field. Additionally, Mr. Murdock stated the entire self-propelled sprayer equipment had a consistent cleaning and maintenance schedule in which the sprayer was completely cleaned 3 to 5 times per year. He also stated following an application and when switching tank-mixes, the spray tanks and booms would be cleaned out thoroughly. The first cleaning mix would be sprayed out on a tolerant crop, and the second cleaning would be dumped out on the ground at the farm.

Mr. Murdock testified that Kenzie would also frequently drive the 4-wheeler in which the sprayer was equipped; however, Mr. Murdock was not sure that she ever had used the sprayer, and he stated that she had not used it while he was present and watching (Page 178 of Mr. Kyle Murdock's deposition). Mr. Murdock stated that she would assist with draining leftover chemical from the self-propelled field crop sprayers into smaller, hand sprayers (such as on the 4-wheeler or 3-point hitch mounted sprayers), and Mr. Murdock would try to have her wash her hands following this process. Following a day of spraying, Mr. Murdock would rinse his hands off, shower, and wash his clothes (separately from all others in the family). Mr. Murdock stated he believes Kenzie's exposure to Roundup could have occurred from riding with him on the farm or from other neighboring farmers applying the product and Kenzie driving through or near those fields on her 4-wheeler. Mr. Murdock also believes she would have potentially been exposed when she did laundry at home and may have included some of Mr. Murdock's work clothes into the same load. Mr. Murdock did not note any other instances in which he thinks Kenzie would have been exposed to Roundup.

Mr. Murdock stated Roundup was first used on the Murdock farming operation in the mid-1990's and had been used every year since then. Mr. Murdock states that Roundup was a very good (effective) chemical for lots of years because it would deal with a lot of weed problems. He stated in recent years, they have begun dealing with glyphosate resistance issues on their farm. Mr. Murdock stated they have consistently sprayed a quart per acre (32 fl oz/ac) rate in burndown and postemergence applications over-top of corn and soybean. The Murdock farming operation has been majority no-till, and Mr. Murdock stated that Roundup helped improve their crop yields and maintain weed-free environments. He also acknowledged that Roundup does not have residual activity (doesn't work in the soil), it only works when applied and contacts plants foliarly. Based on the receipts obtained from various crop protection product suppliers, multiple glyphosate containing products (Sequence, Halex GT, Roundup PowerMax, among others) were used each year, and other non-glyphosate-containing products were also used in large-scale farming operation quantities. Mr. Murdock also stated that he still currently utilizes glyphosate-based products on the farm.

*Opinion*
*The alleged frequency and time spent spraying glyphosate in the row crops is consistent with what would be needed to control for weeds on the farm.*

Overall, the frequency with which glyphosate was applied was reasonable based on the size of the farming operation and crops grown. At their location in Kentucky, it is common for all field crop acres to receive a burndown application of glyphosate for control of problematic weed species such as Italian ryegrass, winter annual broadleaves (which were present in site inspection photos), and annual bluegrass. Additionally, it is a very common practice in their region for soybean acres to receive two postemergence herbicide applications and for corn to receive one postemergence application for controlling weeds such as pigweed (Palmer amaranth and/or waterhemp) and grass species. The amount of time reported to spray these acres was also reasonable. On average, applicators can cover an estimated 50 to 100 acres in an hour depending on land topography, mixing and refill times, and other cropping factors. Taking a middle of road estimate, if Mr. Murdock could cover 75 acres/hour, operating for 8 hours per day, it would take approximately 7 days to cover the entire 4,000 acres sprayed for burndown. This is consistent with his estimate. It is also conceivable that postemergence applications within the crop would take slightly longer due to slowing down the sprayer to avoid any damage to the crop (running over crop rows). Therefore, in general, it would take roughly 30 spray days to cover all cropping acres with the number of applications required, which is consistent with Mr. Murdock's testimony.

*The alleged volume of glyphosate use in the row crops is consistent with what would be needed to control weeds on the farm.*

The amount of glyphosate estimated to have been sprayed on the field crops was also reasonable. To put some numbers behind the amount of glyphosate used, based on Exhibit #30 of Mr. Murdock's deposition, in 2019 there was approximately 1,370 gallons of Roundup

6

PowerMax II purchased, 18 gallons of Tomahawk purchased, 990 gallons of Halex GT purchased, and 995 gallons of Sequence purchased. Labeled rates for these herbicides include 32 fl oz/acre for Roundup PowerMax II and Tomahawk, 64 fl oz/acre for Halex GT, and 56 fl oz/acre for Sequence. Therefore, these amounts purchased would cover approximately 9,814 acres of crops (total applied area). Since all crops received a burndown application, corn received one postemergence application, and soybean received two postemergence applications, this would equal approximately 10,000 total applied acres that would be sprayed throughout a growing season (4,000 acres for the burndown, 2,000 acres for corn, and 4,000 acres for soybean). Accordingly, the total theoretical applied acres based on crops (10,000) is similar to the amount of acres that could be covered with the purchased products (~9,814).

*The alleged volume of glyphosate use in non-crop areas may exceed what would be necessary to control weeds in those areas.*

The alleged glyphosate use in the non-crop areas may exceed what would be necessary to manage weeds effectively in those areas. Mr. Murdock stated that applications in these areas occurred up to 4 to 6 times per year and would generally take a full day to spray them. Four to six applications of glyphosate on the same area, each requiring one full day of spraying, exceeds what would be needed to effectively manage weeds in those areas. However, if Mr. Murdock meant that approximately 4 to 6 total applications were made (i.e., not all non-crop areas were each sprayed 4 to 6 times) and it took approximately 1 full day in total to make these applications, that would be consistent with what would be needed to effectively manage unwanted vegetation in those areas. Additionally, in many instances, these spot sprayers were filled with leftover chemical from the self-propelled field crop sprayers, often tank-mixtures of multiple chemicals. These tank-mixtures would reduce the overall total volume of Roundup that would be used in these non-crop areas, and would also reduce the total number of applications required if containing residual herbicides.

*Kenzie Murdock likely came into minimal contact with Roundup.*

Ms. Kenzie Murdock likely came into minimal contact with Roundup based on the sprayers used and her limited use around the non-crop spot sprayers. Ms. Murdock never applied Roundup herself from the self-propelled field crop sprayers; rather, she rode with her father in the self-propelled sprayers when glyphosate was applied. These sprayers had enclosed cabs with air filtration systems that were regularly maintained, were operated with the doors and windows closed, and had the spray boom affixed behind the sprayer. Additionally, as the sprayer moved forward, spray would be directed downwards and away from the cab. Even though Mr. Murdock stated he had not reviewed the drift management guidelines presented on herbicide labels, he operated these self-propelled sprayers using best management practices for drift reduction (less than 15-mph wind speed, lowered boom heights, and use of drift reduction adjuvants if conditions warranted). All of these factors would lead to miniscule potential for Ms. Murdock to come into contact with Roundup while her father was spraying it on crop land.

It is also unlikely that Ms. Murdock had any significant contact with Roundup when she either applied or accompanied her father while he was applying glyphosate with the non-crop spot sprayers. These sprayers deliver the herbicide at low pressure and close to the ground, so as to minimize the potential for off-target movement. This is necessary to avoid damage to surrounding vegetation. It is therefore unlikely that Ms. Kenzie Murdock was exposed to significant drift occurring from these applications, as any such drift would also have caused substantial damage to nearby desirable vegetation. As stated previously, Mr. Murdock also understood and used best application practices to minimize the potential for off-target movement. In fact, Mr. Murdock indicated he could only remember of 2 such drift incidences in his nearly 30-year career of applying herbicides.

Although Mr. Murdock claims that Kenzie Murdock may also have been exposed to Roundup while cleaning spray equipment, pressure washing spray equipment is not likely to lead to significant contact with glyphosate. The product would have been significantly diluted due to the volume of water used and extremely limited amounts of spray that would accumulate on the sprayer (again, spray is directed down and away from the sprayer).

Mr. Murdock also claims that Kenzie Murdock could have come into contact with Roundup when she assisted him with mixing. Although it is possible that she came into minimal contact with Roundup during this process, it would have been a rare occurrence and the amount of Roundup she would have contacted would have been negligible. The equipment and hoses used for mixing herbicides on the field crop sprayers described by Mr. Murdock are designed not to leak in order to prevent damage to non-target vegetation, chemical waste, and exposure to herbicides, many of which are far more toxic than Roundup. Additionally, Ms. Murdock would rinse her hands off following these interactions, which would have minimized her contact with the herbicide.

Finally, the likelihood of contact from driving a 4-wheeler through neighboring crops would again be miniscule. Assuming the neighbors were applying Roundup, the rainfastness of glyphosate products is generally between 30 minutes to 4 hours. This means that by that point, glyphosate can no longer be washed off a leaf surface and therefore, would likely not be available to be transferred to other equipment or people. As a result, Ms. Murdock would have had to drive through while the sprayer was there or almost immediately following the sprayer leaving the field to have any potential for contact. It is highly unlikely that Ms. Murdock would have driven through a field that she knew was being sprayed or was recently sprayed without knowing what was sprayed, as many herbicides and pesticides used in agricultural production are far more acutely toxic than Roundup or other glyphosate-based products. Doing so would also risk tracking the sprayed product onto desirable vegetation that she later drove over. Overall, the potential for glyphosate contact by Ms. Murdock, both as a participant and bystander, would have been exceptionally low.

*Dr. Sawyer's calculations are based on inconsistent use patterns of glyphosate-based herbicides.*

Dr. Sawyer's states that Kenzie was spot spraying 10-12 times per year for a total of 1-2 hours each time. This far exceeds what would be required to effectively manage weeds on the

property and likely includes a significant amount of time spent riding around and not actively spraying. However, even if Kenzie was operating the spot sprayers this amount of time, it is likely she had minimal contact with Roundup. First, Mr. Murdock indicated that sometimes, but not always, these spot sprayers were filled with Roundup alone. In many instances, these spot sprayers were filled with leftover chemical from the self-propelled field crop sprayers, often tank-mixtures of multiple chemicals. This would have reduced the total amount of Roundup herbicides used, and would also have reduced the number of applications required to effectively manage weeds if residual herbicides were included. Additionally, Dr. Sawyer's report indicates that Kenzie was exposed to the drift and mist from these applications. However, glyphosate-based products like Roundup are not applied as a mist; they are typically applied using low pressure sprayers that deliver large droplets and minimize the potential for off-target movement. Any significant drift would also deposit Roundup on other plant surfaces in the area (gardens, lawns, trees, etc.), resulting in significant damage. As no drift injury incidences were indicated, it is unlikely drift occurred. Further, it is unlikely Kenzie came into contact with Roundup while in the enclosed cab self-propelled field crop sprayers. These sprayers were operated with doors and windows closed and had air filtration systems that were regularly maintained (per Mr. Murdock's deposition). This would all but eliminate potential exposure from the spray applications. Additionally, these sprayers have the spray boom situated on the back side of the sprayer with nozzles facing downward. Therefore, as the sprayer would be driving forward, the spray would be emitted downward towards the ground and the sprayer would travel away from the emitted spray droplets resulting in miniscule potential for spray to impact the cab of the sprayers. Finally, Dr. Sawyer also described these sprayers as "aerosol sprayers." This is not how these sprayers operate. An aerosol consists of extremely fine particles that are often suspended in air. These sprayers emit droplets much larger than aerosols with the finest droplets used in agricultural settings taking less than 5 seconds to fall from 5 feet in the air.

*Conclusion*

The Murdock family operates a 4,000-acre field crop farm in Kentucky and Tennessee. Although Mr. Kyle Murdock's reports of the amount and use frequency of Roundup herbicides on their farm and property are generally consistent with what would be required to effectively manage their weeds, the potential for Ms. Kenzie Murdock's contact with Roundup herbicide was extremely low. Mr. Murdock's reports of his best application practices used (reduced boom heights, not spraying with winds above 15-mph, use of drift reduction adjuvants), the use of enclosed cab self-propelled sprayers with air filtration systems, and Ms. Kenzie Murdock infrequently being around the applications, indicates there was minimal opportunity for her contact with Roundup. Additionally, there was minimal potential for contact for Ms. Murdock from washing equipment (dilution), using mixing equipment (designed not to leak), and from non-crop spot sprayers (low pressure, large droplets, minimal drift potential). Finally, contact with Roundup from driving through a sprayed area would have required entering a field the same time as a sprayer or immediately following its departure, which would be highly unlikely.

Thomas R. Butts, Ph.D.          1/23/2023

ATTACHMENT A

# Thomas R. Butts, Ph.D.

**Education:**

| University of Nebraska-Lincoln | University of Wisconsin-Madison | University of Wisconsin-Platteville |
|---|---|---|
| Doctorate of Philosophy | Masters of Science | Bachelor of Science |
| Agronomy-Weed Science | Agronomy-Weed Science | Agricultural Business |
| August 2018 | May 2015 | December 2012 |

**Positions Held:**

*Nov. 2018 – Present*, Assistant Professor, Extension Weed Scientist, University of Arkansas System Division of Agriculture (75% Extension, 25% Research)

*Aug. 2018 – Nov. 2018*, Postdoctoral Research Associate, University of Wisconsin-Madison

*May 2015 – Aug. 2018*, Graduate Research Assistant, University of Nebraska-Lincoln

*Jan. 2013 – May 2015*, Graduate Research Assistant, University of Wisconsin-Madison

**Funding:**

*Total:* $3,184,492

*My share:* $1,506,798

*Sources:* Arkansas Rice Research and Promotion Board, Arkansas Soybean Promotion Board, USDA-NIFA, USDA-ARS, United Soybean Board, Industry Collaborators

**Refereed Journal Publications** (52 total, 13 first author, 1 supervisee as first author, 19 committee member of student as first author):

[†] Denotes graduate student under my direction

[‡] Denotes graduate student wherein serving as a committee member

[§] Denotes employee under my supervision

1. Avent, T.[‡], Norsworthy, J.K., **Butts, T.R.**, Roberts, T.L., Bateman, N.R. (2023). Rice tolerance to acetochlor with a fenclorim seed treatment. *Weed Technology*. ***(Accepted, in press)*** DOI: 10.1017/wet.2022.102.

2. Kouame, K.B.J.[§], **Butts, T.R.**, Werle, R., Johnson, W.G. (2023). Impact of volatility reduction agents on dicamba and glyphosate spray solution pH, droplet dynamics, and weed control. *Pest Management Science*. ***(Accepted, in press)***. DOI: 10.1002/ps.7258.

3. Godara, N.[‡], Norsworthy, J.K., **Butts, T.R.**, Roberts, T.R., Gbur, E.E. (2023). Quizalofop-resistant rice response to quizalofop when exposed to low rates of glyphosate and imazethapyr. *Weed Technology*. ***(Accepted, in press)***. DOI: 10.1017/wet.2022.71.

4. Avent, T.[‡], Norsworthy, J.K., **Butts, T.R.**, Roberts, T.L., Bateman, N.R. (2023). Evaluation of rice tolerance and weed control with acetochlor and fenclorim. *Weed Technology*. ***(Accepted, in press)*** DOI: 10.1017/wet.2022.93.

5. Godara, N.[‡], Norsworthy, J.K., **Butts, T.R.**, Roberts, T.L., Gbur, E.E. (2022). Response of quizalofop-resistant rice to sequential quizalofop applications under differential environmental conditions. *Weed Technology*. ***(Accepted, in press)*** DOI: 10.1017/wet.2022.95.

6. Farr, R.B.[‡], Norsworthy, J.K., Kouame, K.B.J.[§], Barber, L.T., **Butts, T. R.,** Roberts, T. L. (2022). Integration of multiple weed management practices on cotton economics and Palmer amaranth (*Amaranthus palmeri*) populations. *Weed Technology*. ***(Accepted, in press)*** DOI: 10.1017/wet.2022.92.

7. Avent, T.[‡], Norsworthy, J.K., **Butts, T.R.**, Roberts, T.L., Bateman, N.R. (2022). Fenclorim rice safening and weed control with fall-applied acetochlor and pyroxasulfone. *Agrosystems, Geosciences, & Environment.* ***(Accepted, in press)*** DOI: 10.1002/agg2.20345.

8.  Hwang, J., Norsworthy, J.K., Piveta, L.B., Souza, M.C.C.R., Barber, L.T., **Butts, T.R.** (2023). Metabolism of 2,4-D in resistant *Amaranthus palmeri* S. Wats. (Palmer amaranth). *Crop Protection*. 165:106169. DOI: 10.1016/j.cropro.2022.106169.

9.  **Butts, T.R.,** Fritz, B.K., Kouame, K.B.J.[§], Norsworthy, J.K., Barber, L.T., Ross, W.J., Lorenz, G.M., Thrash, B.C., Bateman, N.R., Adamczyk, J.J. (2022). Herbicide spray drift from ground and aerial applications: Implications for potential pollinator foraging sources. *Scientific Reports. 12*:18017. DOI: 10.1038/s41598-022-22916-4.

10. **Butts, T.R.,** Kouame, K.B.J.[§], Norsworthy, J.K., Barber, L.T. (2022). Arkansas rice: Herbicide resistance concerns, production practices, and weed management costs. *Frontiers in Agronomy*, 4, 881667. DOI: 10.3389/fagro.2022.881667.

11. Godara, N.[‡], Norsworthy, J.K., **Butts, T.R.,** Roberts, T.R., Gbur, E.E. (2022). Effects of early-season soil moisture and nitrogen applications on tolerance of quizalofop-resistant rice to quizalofop. *Crop, Forage, & Turfgrass Management*. 8(2):e20199. DOI: 10.1002/cft2.20199.

12. Patterson, J.A.[‡], Norsworthy, J.K., **Butts, T.R.,** Gbur, E.E. (2022) Benzobicyclon for weedy rice control in quizalofop- and imidazolinone-resistant rice systems. *Weed Technology*. 36(4):497-505. DOI: 10.1017/wet.2022.47.

13. Priess, G.L.[‡], Norsworthy, J.K., Godara, N.[‡], Mauromoustakos, A., **Butts, T.R.,** Roberts, T.L., Barber, L.T. (2022). Confirmation of glufosinate-resistant Palmer amaranth and response to other herbicides. *Weed Technology*, 36(3), 368-372. DOI: 10.1017/wet.2022.21.

14. Hwang, J., Norsworthy, J.K., Houston, M.M., Piveta, L.B., Priess, G.L.[‡], Zaccaro-Gruener, M.L., Barber, L.T., **Butts, T.R.** (2022). Large-scale evaluation of physical drift and volatility of 2,4-D choline in cotton: Summary of a four-year field study. *Pest Management Science, 78*(8), 3337-3344. DOI: 10.1002/ps.6960.

15. Hwang, J., Norsworthy, J.K., Gonzalez-Torralva, F., Piveta, L.B., Priess, G.L.[‡], Barber, L.T., **Butts, T.R.** (2022). Absorption, translocation, and metabolism of florpyrauxifen-benzyl and cyhalofop-butyl in multiple herbicide-resistant barnyardgrass [*Echinochloa crus galli* (L.) P. Beauv.]. *Pesticide Biochemistry and Physiology, 180*, 104999. DOI: 10.1016/j.pestbp.2021.104999.

16. Hwang, J., Norsworthy, J.K., Gonzalez-Torralva, F., Piveta, L.B., Barber, L.T., **Butts, T.R.** (2022). Cross-resistance of barnyardgrass [*Echinochloa crus-galli* (L.) P. Beauv.] to aryloxyphenoxypropionate herbicides. *Pesticide Biochemistry and Physiology*, 184, 105089. DOI: 10.1016/j.pestbp.2022.105089

17. Hwang, J., Norsworthy, J.K., Gonzalez-Torralva, F., Priess, G.L.[‡], Barber, L.T., **Butts, T.R.** (2022). Non-target-site resistance mechanism of barnyardgrass [Echinochloa crus-galli (L.) P. Beauv.] to florpyrauxifen-benzyl. *Pest Management Science, 78*(1), 287-295. DOI: 10.1002/ps.6633.

18. Kouame, K.B.J.[‡], Savin, M.C., Rangani, G., **Butts, T.R.,** Bertucci, M.B., Burgos, N.R. (2022). Transpiration responses of herbicide-resistant and -susceptible Palmer amaranth [*Amaranthus palmeri* (S.) Wats.] to progressively drying soil. *MDPI Agriculture*, 12(3), 335. DOI: 10.3390/agriculture12030335.

19. Beesinger, J.W.[‡], Norsworthy, J.K., **Butts, T.R.,** Roberts, T.R. (2022). Impact of environmental conditions and agronomic practices on rice injury caused by florpyrauxifen-benzyl. *Weed Technology, 36*(1), 99-100. DOI: 10.1017/wet.2022.3.

20. Beesinger, J.W.[‡], Norsworthy, J.K., **Butts, T.R.,** Roberts, T.R. (2022). Rice tolerance to multiple applications of florpyrauxifen-benzyl alone and followed by benzobicyclon. *Crop, Forage, & Turfgrass Management*, 8(1), e20162. DOI: 10.1002/cft2.20162.

21. Zaccaro-Gruener, M.L., Norsworthy, J.K., Brabham, C., Barber, L.T., **Butts, T.R.,** Roberts, T.L., Mauromoustakos, A. 2022. Evaluation of dicamba volatilization when mixed with glyphosate using imazethapyr as a tracer. *Journal of Environmental Management*, 317, 115303. DOI: 10.1016/j.jenvman.2022.115303.

22. Farr, R.B.[‡], Norsworthy, J.K., Barber, L.T., **Butts, T.R.,** Roberts, T.R. (2022). Utility of roller wiper applications of dicamba for Palmer amaranth control in soybean. *Pest Management Science*, 78(6), 2151-2160. DOI: 10.1002/ps.6838.

23. Farr, R.B.[‡], Norsworthy, J.K., Barber, L.T., **Butts, T.R.,** Roberts, T.R. (2022). Utility of isoxaflutole-based herbicide programs in HPPD-tolerant cotton production systems. *Weed Technology*, 36(2), 229-237. DOI: 10.1017/wet.2022.15.

24. Carvalho-Moore, P., Norsworthy, J.K., Gonzalez-Torralva, F., Hwang, J., Patel, J.D., Barber, L.T., **Butts, T.R.,** McElroy, J.S. (2022). Unraveling the mechanism of resistance in a glufosinate-resistant *Amaranthus palmeri* accession. *Weed Science*. 70(4):370-379. DOI: 10.1017/wsc.2022.31.

25. Kouame, K.B.J.[‡], Bertucci, M.B., Savin, M.C., Bararpour, T., Steckel, L.E., **Butts, T.R.,** Willett, C.D., Machado, F.G., Burgos, N.R. (2022). Resistance of Palmer amaranth (*Amaranthus palmeri*) to S-metolachlor in the Mid-southern United States. *Weed Science*. 70(4):380-389. DOI: 10.1017/wsc.2022.37.

26. Priess, G.L.[‡], Popp, M.J., Norsworthy, J.K., Roberts, T.R., Mauromoustakos, A., **Butts, T.R.** (2022). Optimizing weed control using dicamba and glufosinate in eligible crop systems. *Weed Technology*. 36(4):468-480. DOI: 10.1017/wet.2022.44.

27. Beesinger, J.W.[‡], Norsworthy, J.K., **Butts, T.R.,** Roberts, T.R. (2022). Palmer amaranth control in furrow-irrigated rice with florpyrauxifen-benzyl. *Weed Technology*. 36(4):490-496. DOI: 10.1017/wet.2022.42.

28. Kouame, K.B.J.[‡], Savin, M.C., Willett, C.D., Grantz, E., Bertucci, M.B., **Butts, T.R.,** Burgos, N.R. (2022). S-metolachlor persistence in soil as influenced by within-season and inter-annual herbicide use. *Environmental Advances*. 9:100318. DOI: 10.1016/j.envadv.2022.100318.

29. Shah, D.A., **Butts, T.R.,** Mourtzinis, S., Rattalino-Edreira, J.I., Grassini, P., Conley, S.P., Esker, P.D. (2021). A machine learning interpretation of the contribution of foliar fungicides to soybean yield in north-central United States. *Scientific Reports, 11*(18769). DOI: 10.1038/s41598-021-98230-2.

30. Samples, C.A., **Butts, T.R.,** Vieira, B.C., Irby, J.T., Reynolds, D.B., Catchot, A. L., Kruger, G.R., Dodds, D.M. (2021). Effect of deposition aids tank-mixed with herbicides on cotton and soybean canopy deposition and spray droplet parameters. *Agronomy Basel, 11*(2), 278-281. DOI: 10.3390/agronomy11020278.

31. Priess, G.L.[‡], Norsworthy, J.K., Farr, R.B.[‡], Mauromoustakos, A., **Butts, T.R.,** Roberts, T.L. (2021). Impact of auxin herbicides on Palmer amaranth groundcover. *Weed Technology*. 35(5), 768-778. DOI: 10.1017/wet.2021.74.

32. Moraes, J.G., **Butts, T.R.,** Anunciato, V.M., Luck, J.D., Hoffmann, W.C., Antuniassi, U.R., Kruger, G.R. (2021). Nozzle selection and adjuvant impact on the efficacy of glyphosate and PPO-inhibiting herbicide tank-mixtures. *Agronomy Basel, 11*(4), 754-767. DOI: 10.3390/agronomy11040754.

33. **Butts, T.R.,** Barber, L.T., Norsworthy, J.K., Davis, J.A. (2021). Survey of ground and aerial herbicide application practices in Arkansas agronomic crops. *Weed Technology, 35*(1), 1-11. DOI: 10.1017/wet.2020.81.

34. Burgos, N.R., **Butts, T.R.,** Werle, I.S., Bottoms, S., Mauromoustakos, A. (2021). Weedy rice update in Arkansas, USA and adjacent locales. *Weed Science, 69*(5), 514-525. DOI: 10.1017/wsc.2021.45.

35. Alves, S., Vieira, B.C., **Butts, T.R.,** Silva, S.M., Da Cunha, J.P.A.R., Kruger, G.R. (2020). Drift potential from glyphosate and 2,4-D applications as influenced by nozzle type, adjuvants, and wind speed. *Applied Engineering in Agriculture, 36*(5), 687-696. DOI: 10.13031/aea.13604.

36. Franca, L.X., Dodds, D.M., **Butts, T.R.,** Kruger, G.R., Reynolds, D.B., Mills, J. A., Bond, J.A., Catchot, A.L., Peterson, D.G. (2020). Droplet size impact on lactofen and aciflurofen efficacy for Palmer amaranth (*Amaranthus palmeri*) control. *Weed Technology, 34*(3), 416-423. DOI: 10.1017/wet.2019.133.

37. Franca, L.X., **Butts, T.R.,** Kruger, G.R., Reynolds, D.B., Mills, J.A., Bond, J.A., Catchot, A.L., Dodds, D.M., Peterson, D.G. (2020). Evaluation of optimal droplet size for control of Palmer amaranth (*Amaranthus palmeri*) with aciflurofen. *Weed Technology, 34*(4), 511-519. DOI: 10.1017/wet.2020.11.

38. Vieira, B.C., **Butts, T.R.,** Rodrigues, A.O., Schleier III, J.J., Fritz, B.K., Kruger, G.R. (2020). Particle drift potential of glyphosate plus 2,4-D choline pre-mixture formulation in a low-speed wind tunnel. *Weed Technology, 34*(4), 520-527. DOI: 10.1017/wet.2020.15.

39. **Butts, T.R.,** Luck, J.D.,  Fritz, B.K., Hoffmann, W.C., Kruger, G.R. (2019). Evaluation of spray pattern uniformity using three unique analyses as impacted by nozzle, pressure, and pulse-width modulation duty cycle. *Pest Management Science, 75*(7), 1875-1886. DOI: 10.1002/ps.5352.

40. **Butts, T.R.,** Samples, C.A., Franca, L.X., Dodds, D.M., Reynolds, D.B., Adams, J.W., Zollinger, R.K., Howatt, K.A., Fritz, B.K., Hoffmann, W.C., Luck, J.D., Kruger, G.R. (2019). Droplet size impact on dicamba plus glyphosate tank-mixture efficacy. *Weed Technology, 33*(1), 66-74. DOI: 10.1017/wet.2018.118.

41. **Butts, T.R.,** Samples, C.A., Franca, L.X., Dodds, D.M., Reynolds, D.B., Adams, J.W., Zollinger, R.K., Howatt, K.A., Fritz, B.K., Hoffmann, W.C., Luck, J.D., Kruger, G.R. (2019). Optimum droplet size using a pulse-width modulation sprayer for applications of 2,4-D choline plus glyphosate. *Agronomy Journal, 111*(3), 1425-1432. DOI: 10.2134/agronj2018.07.0463.

42. **Butts, T.R.,** Butts, L.E., Luck, J.D., Fritz, B.K., Hoffmann, W.C., Kruger, G.R. (2019). Droplet size and nozzle tip pressure from a pulse-width modulation sprayer. *Biosystems Engineering, 178*, 52-69. DOI: 10.1016/j.biosystemseng.2018.11.004.

43. **Butts, T.R.,** Vieira, B.C., Latorre, D.O., Werle, R., Kruger, G.R. (2018). Competitiveness of herbicide-resistant waterhemp (*Amaranthus tuberculatus*) with soybean. *Weed Science, 66*(6):729-737. DOI: 10.1017/wsc.2018.45.

44. Vieira, B.C., **Butts, T.R.,** Rodrigues, A.O., Golus, J.A., Schroeder, K.P., Kruger, G.R. (2018). Spray particle drift mitigation using field corn (*Zea mays* L.) as a drift barrier. *Pest Management Science, 74*(9):2038-2046. DOI: 10.1002/ps.5041.

45. **Butts, T.R.,** Samples, C.A., Franca, L.X., Dodds, D.M., Reynolds, D.B., Adams, J.W., Zollinger, R.K., Howatt, K.A., Fritz, B.K., Hoffmann, W.C., Kruger, G.R. (2018). Spray droplet size and carrier volume effect on dicamba and glufosinate efficacy. *Pest Management Science, 74*(9):2020-2029. DOI: 10.1002/ps.4913.

46. **Butts, T.R.,** Moraes, J.G., Kruger, G.R. (2018). Impact of plugged venturi-nozzle air inclusion ports on droplet size distribution. *Pesticide Formulation and Delivery Systems: 38th Volume, Innovative Application, Formulation and Adjuvant Technologies.* ASTM STP 1610, B.K. Fritz and T.R. Butts, Eds. ASTM International, West Conshohocken, PA, pp. 76-88, DOI: 10.1520/STP161020170199.

47. **Butts, T.R.,** Hoffmann, W.C., Luck, J.D., Kruger, G.R. (2018). Droplet velocity from broadcast agricultural nozzles as influenced by pulse-width modulation. *Pesticide Formulation and Delivery Systems: 38th Volume, Innovative Application, Formulation and Adjuvant Technologies.* ASTM STP 1610, B.K. Fritz and T.R. Butts, Eds. ASTM International, West Conshohocken, PA, pp. 24-52, DOI: 10.1520/STP161020170192.

48. **Butts, T.R.,** Miller, J.J., Pruitt, J.D., Vieira, B.C., Oliveira, M.C., Ramirez II, S., Lindquist, J.L. (2017). Light quality effect on corn growth as influenced by weed species and nitrogen rate. *Journal of Agricultural Science, 9*(1):15-27. DOI: 10.5539/jas.v9n1p15.

49. **Butts, T.R.,** Norsworthy, J.K., Kruger, G.R., Sandell, L.D., Young, B.G., Steckel, L.E., Loux, M.M., Bradley, K.W., Conley, S.P., Stoltenberg, D.E., Arriaga, F.J., Davis, V.M. (2016). Management of pigweed (*Amaranthus* spp.) in glufosinate-resistant soybean (*Glycine max*) in the Midwest and mid-South. *Weed Technology, 30*(2):355-365. DOI: 10.1614/WT-D-15-00076.1.

50. Meyer, C.J., Norsworthy, J.K., Young, B.G., Steckel, L.E., Bradley, K.W., Johnson, W.G., Loux, M.M., Davis, V.M., Kruger, G.R., Bararpour, M.T., Ikley, J.T., Spaunhorst, D.J., **Butts, T.R.** (2016). Early-season Palmer amaranth and waterhemp control from preemergence programs utilizing 4-hydroxyphenylpyruvate dioxygenase-inhibiting and auxinic herbicides in soybean. *Weed Technology, 30*(1):67-75. DOI: 10.1614/WT-D-15-00100.1.

51. Bailey, R.R., **Butts, T.R.,** Lauer, J.G., Laboski, C.A.M., Kucharik, C.J., Davis, V.M. (2015). Effect of weed management strategy and row width on nitrous oxide emissions in soybean. *Weed Science, 63*(4):962-971. DOI: 10.1614/WS-D-15-00010.1.

52. Meyer, C.J., Norsworthy, J.K., Young, B.G., Steckel, L.E., Bradley, K.W., Johnson, W.G., Loux, M.M., Davis, V.M., Kruger, G.R., Bararpour, M.T., Ikley, J.T., Spaunhorst, D.J., **Butts, T.R.** (2015). Herbicide program approaches for managing glyphosate-resistant Palmer amaranth (*Amaranthus palmeri*) and waterhemp (*Amaranthus tuberculatus* and *Amaranthus rudis*) in future soybean-trait technologies. *Weed Technology, 29*(4):716-729. DOI: 10.1614/WT-D-15-00045.1.

---

## Recent (Last 3 Years) Professional Meeting Abstracts & Presentations (110 total):

[†] Denotes undergraduate or graduate student under my direction
[‡] Denotes graduate student wherein serving as a committee member
[§] Denotes employee under my supervision

### Beltwide Cotton Conference

1. Fleming, J.A., Norsworthy, J.K., Bagavathiannan, M.V., Kumar, V., Manuchehri, M.R., Barber, L.T., **Butts, T.R.** (2022). Johnsongrass resistance to glyphosate and aryloxyphenoxypropionate herbicides: Implications for management in cotton. *Beltwide Cotton Conferences*. Pg 33 (6).

2. Godara, N.[‡], Norsworthy, J.K., Priess, G.L.[‡], Piveta, L.B., Houston, M.M., Barber, L.T., **Butts, T.R.** (2022). Large-scale evaluation of Enlist One off-target movement: A three-year summary. *Beltwide Cotton Conferences*. Pg 34 (1).

3. Castner, M., Norsworthy, J.K., Priess, G.L.[‡], Carvalho-Moore, P., Hwang, J.I., **Butts, T.R.** (2022). Use of radio-labeled herbicides to understand interactions between dicamba and glufosinate. *Beltwide Cotton Conferences*. Pg 53 (7).

4. Godara, N.[‡], Norsworthy, J.K., Priess, G.L.[‡], Barber, L.T., **Butts, T.R.** (2022). Response of difficult-to-control Palmer amaranth accessions to eleven herbicide groups. *Beltwide Cotton Conferences*. Pg 53 (8).

5. Beesinger, J.W.[‡], Norsworthy, J.K., **Butts, T.R.,** Piveta, L.B. (2021). Influence of Palmer amaranth size and nozzle selection on glufosinate, dicamba, and 2,4-D combinations. *Beltwide Cotton Conferences*. Pg 28 (7).

6. Priess, G.L.[‡], Norsworthy, J.K., Farr, R.B.[‡], Castner, M., **Butts, T.R.,** Barber, L.T. (2021). Quantifying reductions in Palmer amaranth groundcover following an auxin herbicide application. *Beltwide Cotton Conferences*. Pg 45 (4).

### American Society of Agronomy (ASA) Annual Meeting

7. France, O.W., Poncet, A.M., Sears, E.L., Rothrock, G.P., Norsworthy, J.K., **Butts, T.R.,** Hardke, J.T. (2021). Evaluation of weed detection in rice using drone remote sensing technology. *ASA, CSSA, SSSA International Annual Meeting*. 260-4. Salt Lake City, UT.

8. **Butts, T.R.** (2020). Spray volume effect on droplet size, coverage, and weed control from aerial herbicide applications. *ASA, CSSA, SSSA International Annual Meeting*. Precision Agriculture Community. Paper ID: 131383. Virtual.

9. **Butts, T.R.,** Hardke, J.T. (2020). Direct to consumer: Mass text messaging educational campaigns. *ASA, CSSA, SSSA International Annual Meeting*. Extension Education Community. Poster ID: 131381. Virtual.

### Southern Weed Science Society (SWSS) Annual Meeting

10. Noe, S.C.[‡], Norsworthy, J.K., Avent, T.H.[‡], Smith, T.C., Houston, M.M., **Butts, T.R.** (2022). Does a fenclorim seed treatment safen rice to a delayed preemergence application of microencapsulated acetochlor on a clay soil? *Southern Weed Science Society Annual Meeting*. 75:9. Austin, TX.

11. Reed, N.H.[†], **Butts, T.R.,** Norsworthy, J.K., Hardke, J.T., Barber, L.T., Bond, J.A., Poncet, A., Davis, B.M.[§], Sumner, M.[§] (2022). Impact of drill spacing and nozzle selection on spray coverage and weed control in rice. *Southern Weed Science Society Annual Meeting*. 75:11. Austin, TX.

12. Cotter, B.[‡], Norsworthy, J.K., Castner, M.C., Piveta, L.B., **Butts, T.R.** (2022). Does coating urea with florpyrauxifen-benzyl reduce risk for damage to adjacent soybean? *Southern Weed Science Society Annual Meeting*. 75:13. Austin, TX.

13. Godara, N.[‡], Norsworthy, J.K., Piveta, L.B., Cotter, B.[‡], **Butts, T.R.** (2022). Effect of sub-lethal rates of glyphosate on Provisia rice tolerance to quizalofop. *Southern Weed Science Society Annual Meeting*. 75:14. Austin, TX.

14. Castner, M., Norsworthy, J.K., Priess, G.L.[‡], Carvalho-Moore, P., Hwang, J.I., **Butts, T.R.** (2022). Use of radio-labeled herbicides to understand interactions between dicamba and glufosinate. *Southern Weed Science Society Annual Meeting*. 75:41. Austin, TX.

15. Arnold, C.H.[†], Norsworthy, J.K., Castner, M.C., Barber, L.T., **Butts, T.R.** (2022). Effect of application timing on rice tolerance to fluridone. *Southern Weed Science Society Annual Meeting*. 75:45. Austin, TX.

16. Fleming, J.A., Norsworthy, J.K., Bagavathiannan, M.V., Kumar, V., Manuchehri, M.R., Barber, L.T., **Butts, T.R.** (2022). Do new herbicide technologies for grain sorghum differ in effectiveness on johnsongrass accessions? *Southern Weed Science Society Annual Meeting*. 75:48. Austin, TX.

17. Avent, T.H.[‡], Norsworthy, J.K., Roberts, T.L., **Butts, T.R.** (2022). Effect of planting depth and a fenclorim seed treatment on rice tolerance to acetochlor under cold, wet conditions. *Southern Weed Science Society Annual Meeting*. 75:50. Austin, TX.

18. Gonzalez-Torralva, F., Norsworthy, J.K., Carvalho-Moore, P., Piveta, L.B., Priess, G.L.[‡], Barber, L.T., **Butts, T.R.,** McElroy, J.S. (2022). Is a target site mutation responsible for resistance to glufosinate in Palmer amaranth (*Amaranthus palmeri*)? *Southern Weed Science Society Annual Meeting*. 75:78. Austin, TX.

19. Hwang, J., Norsworthy, J.K., Carvalho-Moore, P., Barber, L.T., **Butts, T.R.** (2022). Metabolism-based resistance of Palmer amaranth (*Amaranthus palmeri* S. Wats.) to S-metolachlor. *Southern Weed Science Society Annual Meeting*. 75:82. Austin, TX.

20. **Arnold,** C.H.[†], Norsworthy, J.K., Carvalho-Moore, P., Piveta, L.B., Barber, L.T., **Butts, T.R.** (2022). Is rice tolerant to early-season applications of dicamba. *Southern Weed Science Society Annual Meeting*. 75:132. Austin, TX.

21. Carvalho-Moore, P., Norsworthy, J.K., Hwang, J., Gonzalez-Torralva, F., Priess, G.L.[‡], Barber, L.T., **Butts, T.R.,** McElroy, J.S. (2022). Initial insights into the mechanism of glufosinate resistance in Palmer amaranth. *Southern Weed Science Society Annual Meeting*. 75:151. Austin, TX.

22. Adams, L.[‡], Barber, L.T., Norsworthy, J.K., **Butts, T.R.** (2022). Distribution of herbicide-resistant Italian ryegrass in Arkansas. *Southern Weed Science Society Annual Meeting*. 75:161. Austin, TX.

23. Norsworthy, J.K., Zaccaro-Gruener, M., Piveta, L.B., Barber, L.T., **Butts, T.R.** (2022). Dicamba and 2,4-D residues in Palmer amaranth: When were the herbicides applied? *Southern Weed Science Society Annual Meeting*. 75:224. Austin, TX.

24. Hwang, J., Norsworthy, J.K., Piveta, L.B., Barber, L.T., **Butts, T.R.** (2022). Metabolism of aryloxyphenoxypropionic acid herbicides by resistant barnyardgrass [*Echinochloa crus-galli* (L.) P. Beauv.]. *Southern Weed Science Society Annual Meeting*. 75:228. Austin, TX.

25. Avent, T.H.[‡], Norsworthy, J.K., Fleming, J.A., Zaccaro-Gruener, M., **Butts, T.R.** (2022). Rice cultivar tolerance to microencapsulated acetochlor and a fenclorim seed treatment. *Southern Weed Science Society Annual Meeting*. 75:234. Austin, TX.

26. Cotter, B.[‡], Norsworthy, J.K., Arnold, C.H.[†], Avent, T.H.[‡], **Butts, T.R.** (2022). Coating of florpyrauxifen-benzyl on urea for control of key weeds in rice. *Southern Weed Science Society Annual Meeting*. 75:235. Austin, TX.

27. Noe, S.C.[‡], Norsworthy, J.K., Avent, T.H.[‡], Houston, M.M., **Butts, T.R.** (2022). Barnyardgrass and weedy rice control in response to Warrant rate and application timing. *Southern Weed Science Society Annual Meeting*. 75:236. Austin, TX.

28. Reed, N.H.[†], **Butts, T.R.,** Norsworthy, J.K., Hardke, J.T., Barber, L.T., Bond, J.A., Poncet, A., Davis, B.M.[§], Sumner, M.[§] (2022). Cultural weed management strategies for rice: Effects of drill spacing and rice cultivar. *Southern Weed Science Society Annual Meeting*. 75:237. Austin, TX.

29. Collie, L.M.[§], Barber, L.T., Doherty, R.C., Hill, Z.T., Ross, A., **Butts, T.R.** (2022). Evaluation of fluridone in a peanut weed control program. *Southern Weed Science Society Annual Meeting*. 75:255. Austin, TX.

30. McCormick, A.N.[§], **Butts, T.R.,** Collie, L.M.[§], Dillon, T.W.[§], Davis, J. (2021). Evaluation of multiple growth regulating herbicides effect on soybean injury at vegetative and reproductive growth stages. *Southern Weed Science Society Annual Meeting*. 74:120. Virtual.

31. **Butts, T.R.,** Barber, L.T., Norsworthy, J.K. (2021). White-margined flatsedge (*Cyperus flavicomus* Michx.): Controlling this new problematic weed in Arkansas rice. *Southern Weed Science Society Annual Meeting*. 74:121. Virtual.

32. Davis, B.M.[§], Collie, L.M.[§], **Butts, T.R.,** Johnson, D. (2021). Herbicide programs for combating old and new weed species in a row rice production system. *Southern Weed Science Society Annual Meeting*. 74:124. Virtual.

33. Collie, L.M.[§], Davis, B.M.[§], Ellis, A., Barber, L.T., **Butts, T.R.** (2021). Air temperature effect on barnyardgrass (*Echinochloa crus-galli*) control from postemergence rice herbicides. *Southern Weed Science Society Annual Meeting*. 74:135. Virtual.

34. Ross, A., Barber, L.T., **Butts, T.R.,** Doherty, R.C., Hill, Z.T., Collie, L.M.[§] (2020). Evaluation of Weed Control with Multiple Cover Crop Termination Timings. *Southern Weed Science Society Annual Meeting*. 73:59. Biloxi, MS.

35. Smith, L.G.[†], McCormick, A.N.[§], Dillon, T.W.[§], Davis, B.M.[§], **Butts, T.R.,** Collie, L.M.[§] (2020). Nozzle Type and Arrangement Effect on Spray Coverage. *Southern Weed Science Society Annual Meeting*. 73:74. Biloxi, MS.

36. McCormick, A.N.[§], Dillon, T.W.[§], Davis, B.M.[§], **Butts, T.R.,** Collie, L.M.[§] (2020). Nozzle Type Effect on Coverage, Canopy Penetration, and Weed Control Using Enlist One and Liberty in Enlist E3 Soybean. *Southern Weed Science Society Annual Meeting*. 73:75. Biloxi, MS.

37. Collie, L.M.[§], Barber, L.T., **Butts, T.R.,** Ross, A., Doherty, R.C., Hill, Z.T. (2020). Evaluation of Weed Control Programs in Furrow Irrigated Rice. *Southern Weed Science Society Annual Meeting*. 73:76. Biloxi, MS.

38. **Butts, T.R.** (2020). Importance of Nozzle Selection for Ground and Aerial Herbicide Applications. *Southern Weed Science Society Annual Meeting*. 73:199. Biloxi, MS.

39. Barber, L.T., Norsworthy, J.K., **Butts, T.R.** (2020). Two Year Assessment of the Integrated Harrington Seed Destructor in Arkansas. *Southern Weed Science Society Annual Meeting*. 73:201. Biloxi, MS.

**Weed Science Society of America (WSSA) Annual Meeting**

40. Carvalho-Moore, P., Norsworthy, J.K., Gonzalez-Torralva, F., McElroy, S., Barber, L.T., **Butts, T.R.** (2022). Glufosinate-resistant Palmer amaranth: An update on the resistance mechanism. *Weed Science Society of America Annual Meeting*. 62:28. Virtual.

41. Carvalho-Moore, P., Norsworthy, J.K., Hwang, J., Zaccaro-Gruener, M.L., Barber, L.T., **Butts, T.R.** (2022). Absorption, translocation, and metabolism of glufosinate in glufosinate-resistant Palmer amaranth. *Weed Science Society of America Annual Meeting*. 62:185. Virtual.

42. Priess, G.L.[‡], Norsworthy, J.K., Farr, R.B.[‡], **Butts, T.R.** (2021). Reductions in Palmer amaranth groundcover following an auxin herbicide application. *Weed Science Society of America Annual Meeting*. 61:2. Virtual.

43. **Butts, T.R.,** Barber, L.T., Norsworthy, J.K. (2021). White-margined flatsedge (*Cyperus flavicomus* Michx.): Controlling this new problematic weed in Arkansas rice. *Weed Science Society of America*

*Annual Meeting*. 61:9. Virtual.

44. Farr, R.B.[‡], Norsworthy, J.K., **Butts, T.R.,** Beesinger, J.W.[‡], Avent, T.H.[‡], Priess, G.L.[‡] (2021). Utility of roller wiper applications of dicamba for Palmer amaranth (*Amaranthus palmeri*) management. *Weed Science Society of America Annual Meeting*. 61:36. Virtual.

45. Hwang, J., Norsworthy, J.K., Torralva, F.G., Priess, G.L.[‡], Barber, L.T., **Butts, T.R.** (2021). Non-target-site resistance of barnyardgrass [*Echinochloa crus-galli* (L.) P. Beauv.] to florpyrauxifen-benzyl. *Weed Science Society of America Annual Meeting*. 61:39. Virtual.

46. Farr, R.B.[‡], Norsworthy, J.K., Barber, L.T., **Butts, T.R.,** Priess, G.L.[‡], Beesinger, J.W.[‡] (2021). What's old is new again: Revisiting alternative weed management strategies for Palmer amaranth (*Amaranthus palmeri*) control. *Weed Science Society of America Annual Meeting*. 61:150. Virtual.

47. **Butts, T.R.,** Barber, L.T., Norsworthy, J.K., Ross, W.J., Lorenz, G.M., Adamczyk, J.J. (2021). Spray drift of florpyrauxifen-benzyl from ground spray equipment and agricultural aircraft. *Weed Science Society of America Annual Meeting*. 61:207. Virtual.

48. Collie, L.M.[§], Barber, L.T., **Butts, T.R.,** Doherty, R.C., Hill, Z.T., Ross, A. (2020). Evaluation of weed control programs in furrow-irrigated rice (*Oryza sativa*). *Weed Science Society of America Annual Meeting*. 60:70. Maui, HI.

49. Pearrow, N., Sandoski, C., Davis, B.M.[§], **Butts, T.R.** (2020). Evaluation of benzobicyclon and ALS-inhibiting herbicide combinations for control of northern jointvetch (*Aeschynomene virginica*) and hemp sesbania (*Sesbania herbacea*) in drill seeded rice (*Oryza sativa*). *Weed Science Society of America Annual Meeting*. 60:75. Maui, HI.

50. McCormick, A.N.[§], Dillon, T.W.[§], Davis, B.M.[§], **Butts, T.R.,** Collie, L.M.[§] (2020). Nozzle type effect on coverage, canopy penetration, and weed control using Enlist One and Liberty in Enlist E3 soybeans. *Weed Science Society of America Annual Meeting*. 60:231. Maui, HI.

51. Barber, L.T., **Butts, T.R.,** Norsworthy, J.K. (2020). Trials and tribulations with the Integrated Harrington Seed Destructor in Arkansas. *Weed Science Society of America Annual Meeting*. 60:438. Maui, HI.

52. McCormick, A.N.[§], Smith, L.G.[†], Dillon, T.W.[§], **Butts, T.R.,** Davis, B.M.[§], Collie, L.M.[§] (2020). Nozzle type and arrangement effect on spray coverage. *Weed Science Society of America Annual Meeting*. 60:537. Maui, HI.

**American Peanut Research & Education Society (APRES) Annual Meeting**

53. Prostko, E.P., Abbott, C.C., **Butts, T.R.,** Grichar, W.J., Marshall, M.W. (2021). Peanut response to soil-applied Liberty (glufosinate). *American Peanut Research & Education Society Annual Meeting*.

**Arkansas Crop Protection Association (ACPA) Research Conference**

54. Reed, N.[†], **Butts, T.R.,** Norsworthy, J.K., Hardke, J.T., Barber, L.T., Bond, J.A., Davis, B.M.[§], Sumner, M.[§] (2021). Quantifying the impact of drill spacing and rice cultivar on weed management. *Arkansas Crop Protection Association Research Conference*, 25:2 paper, Fayetteville, AR.

55. **Fleming**, J.A., Norsworthy, J.K., Barber, L.T., **Butts, T.R.,** Cotter, B.L.[‡] (2021). Effectiveness of herbicides for johnsongrass control in northeast Arkansas: What works and where? *Arkansas Crop Protection Association Research Conference*, 25:4 paper, Fayetteville, AR.

56. Avent, T.H.[‡], Norsworthy, J.K., Fleming, J.A., Zaccaro-Gruener, M.L., **Butts, T.R.** (2021). Evaluation of rice cultivar tolerance to Warrant and fenclorim. *Arkansas Crop Protection Association Research Conference*, 25:6 paper, Fayetteville, AR.

57. Arnold, C.H.[†], Norsworthy, J.K., Moore, P.C., Piveta, L.B., Barber, L.T., **Butts, T.R.** (2021). Effects of early season applications of dicamba on rice. *Arkansas Crop Protection Association Research Conference*, 25:9 paper, Fayetteville, AR.

58. France, O.W., Poncet, A.M., Sears, E.L., Rothrock, G.P., Norsworthy, J.K., **Butts, T.R.,** Hardke,

J.T. (2021). Can remote sensing technology be used to identify weedy areas in rice. *Arkansas Crop Protection Association Research Conference*, 25:20 poster, Fayetteville, AR.

59. Piveta, L.B., Norsworthy, J.K., Barber, L.T., **Butts, T.R.** (2021). Evaluation of Palmer amaranth accessions for sensitivity to glufosinate and dicamba. *Arkansas Crop Protection Association Research Conference*, 25:22 poster, Fayetteville, AR.

60. Noe, S.C.[‡], Norsworthy, J.K., Avent, T.H.[‡], Houston, M.M., **Butts, T.R.** (2021). Evaluation of Warrant for weedy rice and barnyardgrass control. *Arkansas Crop Protection Association Research Conference*, 25:30 paper, Fayetteville, AR.

61. Godara, N.[‡], Norsworthy, J.K., **Butts, T.R.,** Barber, L.T., Roberts, T.L. (2021). Effects of soil moisture and nitrogen applications on Provisia rice tolerance to quizalofop. *Arkansas Crop Protection Association Research Conference*, 25:32 paper, Fayetteville, AR.

62. Beesinger, J.W.[‡], Norsworthy, J.K., Roberts, T., Barber, L.T., **Butts, T.R.** (2020). Effect of Soil Moisture and Flood Establishment on Rice Injury from Florpyrauxifen-benzyl. *Arkansas Crop Protection Association Research Conference*. 24:1. Fayetteville, AR (virtual).

63. Priess, G.L.[‡], Norsworthy, J.K., Castner, M.C., Farr, R.B.[‡], Zaccaro, M.L., **Butts, T.R.** (2020). Optimizing POST Herbicide Options in the XtendFlex® Technology. *Arkansas Crop Protection Association Research Conference*. 24:21. Fayetteville, AR (virtual).

**Rice Technical Working Group (RTWG)**

64. Priess, G.L.[‡], Norsworthy, J.K., Piveta, L., Brabham, C., Barber, L.T., **Butts, T.R.** (2020). Field Evaluation of Barnyardgrass Accessions to Loyant and other Rice Herbicides. *SERA 18 – Rice Technical Working Group*. 38:17:5. Orange Beach, AL.

65. Norsworthy, J.K., **Butts, T.R.,** Barber, L.T. (2020). Notable Insights from Arkansas Rice Weed Control and Tolerance Research. *SERA 18 – Rice Technical Working Group*. 38:32:1. Orange Beach, AL.

66. Davis, B.M.[§], **Butts, T.R.,** Sandoski, C.A. (2020). Salvage Options for Indian Jointvetch (*Aeschynomene indica*) and Hemp Sesbania (*Sesbania herbacea*) using ALS-inhibiting Herbicides and Benzobicyclon in Drill-Seeded Rice. *SERA 18 – Rice Technical Working Group*. 38:87. Orange Beach, AL.

67. **Butts, T.R.,** Fritz, B.K., Jank, P., Gill, M., Bretthauer, S. (2020). Droplet Size Deposition, Spray Pattern Uniformity, and Coverage from Aerial Applications. *SERA 18 – Rice Technical Working Group*. 38:95. Orange Beach, AL.

**Extension Activites:**
- 63 Extension and outreach publications
- 14 videos
- 27 podcasts (Lead organizer of the "Weeds AR Wild" podcast series)
- 175+ popular press articles
- 66 Research Reports (AR B.R. Wells Rice Research Studies and AR Soybean Research Studies)
- 220 Extension, invited speaker, and field day presentations
- Established the AR Extension Specialist mass text service
- Primary online media contact for UAEX Weed Science & website manager (uaex.uada.edu/weeds)
- Reach approximately 20,000 growers, agronomists, and consultants per year

**Awards:**

| | | | |
|---|---|---|---|
| 3rd Place, Excellence in Extension, Digital Comms., ASA | *2021* | CASNR Milton E. Mohr Teaching Fellowship | *2016* |
| 3rd Place, Excellence in Extension, Short Publication, ASA | *2021* | IANR Larrick and Whitmore Travel Grant – | *2016* |
| Excellence in Extension, Short Publication, ASA | *2020* | 1st Grad. Poster – NCWSS Annual Meeting | *2015* |
| WSSA Outstanding Graduate Student | *2019* | 3rd Grad. Team-UNL-Weed Olympics | *2015* |

| | | | |
|---|---|---|---|
| Excellence in Symp. and Pub. Management – ASTM Int. | 2019 | 2nd Grad. Team–UNL-Weed Olympics | 2015 |
| 1st Grad. Oral – ASA Int. Ann. Meeting | 2017 | 2nd Grad. Poster–WSSA Annual Meeting | 2015 |
| 2nd Grad. Poster – ASA Int. Ann. Meeting | 2017 | W. Rothermel Agron. Scholarship-UW | 2014 |
| ARD Shear-Miles Research Fellowship – UNL | 2017 | O.N. Allen Scholarship – UW-Madison | 2014 |
| 1st Grad. Team-UNL-NCWSS Weed Contest | 2017 | 2nd Grad. Paper – NCWSS Annual Meeting | 2014 |
| 2nd Grad. Ind. – NCWSS Weed Contest | 2017 | 2nd Grad. Team-UW-NCWSS Weed Contest | 2014 |
| 1st Grad. Weed I.D. – NCWSS Weed Contest | 2017 | 2nd Grad. Ind. – NCWSS Weed Contest | 2014 |
| Gerald O. Mott Meritorious Student in Crop Science Award | 2017 | 1st Grad. Herb. I.D. – NCWSS Weed Contest | 2014 |
| 1st Grad. Education Video – NCWSS Annual Meeting | 2016 | American FFA Degree Recipient | 2010 |

## Professional Organizations:

| | |
|---|---|
| National Agricultural Aviation Association (NAAA) | *2021-Present* |
| Arkansas Crop Protection Association (ACPA) | *2019-Present* |
| Arkansas County Agricultural Agents Association (ACAAA) | *2019-Present* |
| Southern Weed Science Society (SWSS) | *2019-Present* |
| American Society of Agronomy (ASA) | *2016-Present* |
| Weed Science Society of America (WSSA) | *2013-Present* |

## Service & Leadership:

| | |
|---|---|
| ASA Crop, Forage, & Turfgrass Management Journal Associate Editor | *2022-Present* |
| ASA A432.2 Agronomic Education and Extension Award Committee Member | *2022-Present* |
| SWSS Newsletter Editor (Ex-Officio Board Member) | *2021-Present* |
| SWSS Computer Committee | *2021-Present* |
| SWSS Student Program Committee (Chair in 2021-2022) | *2019-2022* |
| WSSA W11 Extension Committee | *2022-Present* |
| WSSA W3P US-HRAC Herbicide Resistance Management Award Subcommittee | *2020-Present* |
| SERA-18, Rice Technical Working Group – 2022 Local Arrangements Committee | *2020-Present* |
| ACPA Board of Directors (Academic Representative) | *2019-Present* |
| ACPA Research Conference Student Contest Chair | *2020-Present* |
| Pest Management Science Journal Reviewer | *2019-Present* |
| Transactions of the ASABE Journal Reviewer | *2019-Present* |
| Weed Technology Journal Reviewer | *2016-Present* |
| Co-Editor, 38th Pesticide Formulation and Delivery Systems STP, ASTM International | *2017-2018* |
| Chair, Equipment and Application Methods Special Committee, NCWSS | *2017-2018* |
| Organizer/Moderator, NCWSS Symposium, "Taking the Next Step: Preparing for your Career" | *2017* |
| NCWSS Board of Directors Graduate Student Representative | *2016-2017* |
| Numerous Department, Extension, and Division of Agriculture Special Committees | *2019-Present* |

## Student Mentorship:

- Co-Chair of 2 M.S. student committees
- Current or past service on 9 M.S. student committees
- Current or past service on 5 Ph.D. student committees
- Supervised 6 undergraduate student research assistants

## Teaching Experience:

| | |
|---|---|
| University of Arkansas-Fayetteville, FAYETTEVILLE, AR | *2020-2021* |

*CSES 3342 Cereal Grain Production (Guest Lecturer)*
*CSES 4143 Principles of Weed Control (Guest Lecturer)*
   Provided a guest lecture and exam questions specific to both courses.

| | |
|---|---|
| Arkansas State University, JONESBORO, AR | *2020* |

*AGRI 3813 Agricultural Biosystems I (Guest Lecturer)*
>Provided two guest lectures entitled, "Weeds and the Need for Integrated Weed Management" and "Challenges of Integrated Weed Management and Spray Applications."

University of Nebraska-Lincoln, LINCOLN, NE                                                   *2016*
*AGRO 896 Weed Contest Preparatory Class (Co-instructor)*
>Prepared students for the annual NCWSS Weed Contest; topics covered included: sound agronomic practices, weed I.D., and effective weed management.

University of Wisconsin-Madison, MADISON, WI                                                  *2014*
*SC_AGRON (075) Weed ID & Management (Instructor)*
>Coordinated six-week short course class (three lectures and two demonstration labs per week) including lesson plan, quiz, and exam creation, about proper weed I.D. and management strategies.

ATTACHMENT B

### Dr. Thomas Butts Materials Considered List (*Murdock v. Monsanto*)

1.  Alexandratos, N & J. Brunsma, *World Agriculture Towards 2030/2050: The 2012 Revision*, EFSA Working Paper, FAO, Rome (2012).

2.  Angers, D. Eriksen-Hamel, N., *Full-Inversion Tillage and Organic Carbon Distribution in Soil Profiles: A Meta-Analysis,* 72 Soil Sci. Soc'y of Am. 1370 (2008).

3.  APVMA (Australian Pesticides and Veterinary Medicines Authority), *Regulatory Position: Consideration of the Evidence for a Formal Reconsideration of Glyphosate*, Australian Government (2016).

4.  ATSDR (Agency for Toxic Substances and Disease Registry), *Toxicological Profile for Glyphosate – Draft for Public Comment*, US Dep't of Health and Human Services (Mar. 2019).

5.  Bailey, R. et al., *Effect of Weed Management Strategy and Row Width on Nitrous Oxide Emissions in Soybean*, 63 Weed Sci. 962 (2015).

6.  Barber, L. et al., *MP44: Recommended Chemicals for Weed and Brush Control*, University of Arkansas System Division of Agriculture, Cooperative Extension Service, Little Rock, AR (2021).

7.  BAuA (German Federal Institute for Occupational Safety and Health), *Proposal for Harmonized Classification and Labeling: N (phosphonomethyl)glycine; Glyphosate (ISO)*, CLH Report for Glyphosate (2016).

8.  BfR – CLH Report: Proposal for Harmonised Classification and Labelling, Regulation (EC) No 1272/2008 (CLP Regulation), Annex VI, Part 2 – Glyphosate (2016).

9.  BfR (Bundesinstitut für Risikobewertung), *Does Glyphosate Cause Cancer?*  BfR Communication No. 007/2015 (Mar. 23, 2015).

10. BfR, Assessment of IARC Monographies Volume 112 (2015); Glyphosate, Renewal Assessment Report: Glyphosate Addendum I to RAR (2015).

11. BfR, Final Addendum to the Renewal Assessment Report: Glyphosate (Oct. 2015).

12. BfR, *Toxicology and Metabolism, Renewal Assessment Report: Glyphosate Volume 3 Annex B.6* (2015).

13. BfR, Toxicology and Metabolism, Renewal Assessment Report: Glyphosate Volume 3 Annex B.6 (2015).

14. Bond, E. & A. Grundy, *Non-Chemical Weed Management in Organic Farming Systems*, 41 Weed Rsch. 383 (2001).

15. Borgaard, O. & A. Gimsing, *Fate of Glyphosate in Soil and the Possibility of Leaching to Ground and Surface Waters: A Review*, 64 Pest Mgmt. Sci. 441 (2008).

16. Bridges, D., *Impact of Weeds on Human Endeavors*, 8 Weed Tech. 392 (1994).

17. Butts, T. et al., *Arkansas Rice: Herbicide Resistance Concerns, Production Practices, and Weed Management Costs*, 4 Frontiers in Agronomy 881667 (2022).

18. Butts, T. et al., *survey of Ground and Aerial Herbicide Application Practices in Arkansas Agronomic Crops*, 35 Weed Tech. 1 (2021).

19. Cook, S. et al., *How Valuable is Glyphosate to UK Agriculture and the Environment?*, 21 Outlooks on Pest Mgmt. 280 (2010).

20. Deposition of Kyle Murdock, *Murdock v. Monsanto Co.,* No. 5:20-cv-00023 (N.D. Cal. June 8, 2022) (with exhibits).

21. Deposition of Mandi Murdock, *Murdock v. Monsanto Co.,* No. 5:20-cv-00023 (N.D. Cal. Aug. 3, 2022) (with exhibits).

22. Derpsch, R. et al., *Current Status of Adoption of No-Till Farming in the World and Some of Its Main Benefits*, 3(1) Int'l J. Agriculture & Biological Engineering 1 (2010).

23. Derpsch, R., *History of Crop Production, With and Without Tillage*, 3 Leading Edge 150 (2004).

24. Dill, G., *Glyphosate-Resistant Crops: History, Status and Future*, 61 Pest Mgmt. Sci. 219 (2005).

25. Duke, S. & S. Powles, *Glyphosate-Resistant Crops and Weeds: Now and in the Future*, 12(3&4) J. Agrobiotechnology Mgmt. & Econ. 346 (2009).

26. Duke, S. & S. Powles, *Mini-Review, Glyphosate: A Once-in-a-Century Herbicide*, 64 Pest Mgmt. Sci. 319 (2008).

27. Duke, S., *The History and Current Status of Glyphosate*, 74 Pest Mgmt. Sci. 1027 (2018).

28. ECHA (European Chemicals Agency), Opinion: Proposing Harmonized Classification and Labelling at EU Level of Glyphosate (ISO); N-(phosphonomethyl)glycine, Committee for Risk Assessment (Mar. 15, 2017).

29. EFSA (European Food Safety Authority), *Conclusion on the Peer Review of the Pesticide Risk Assessment of the Active Substance Glyphosate*, 13 EFSA J. 4302 (2015).

30. EPA (Environmental Protection Agency), CARC, *Glyphosate: Report of the Cancer Assessment Review Committee* (Oct. 1, 2015).

31. EPA, FIFRA SAP, *Meeting Minutes and Final Report No. 2017-01: EPA's Evaluation of the Carcinogenic Potential of Glyphosate* (Mar. 16, 2017).

32. EPA, *Glyphosate – Interim Registration Review Decision Case Number 0178* (Jan. 2020).

33. EPA, *Glyphosate – Proposed Interim Registration Review Decision Case Number 0178* (Apr. 2019).

34. EPA, Memorandum from Cathryn Britton, Branch Chief, Risk Management and Implementation Branch V, Pesticide Re-Evaluation Decision on *Withdrawal of the Glyphosate Interim Registration Review Decision* to Glyphosate Registration Review Docket (EPA-HQ-OPP-2009-0361) (Sept. 21, 2022).

35. EPA, Memorandum from Dana L. Friedman on *Response from the Pesticide Re-Evaluation Division (PRD) to Comments on the Glyphosate Proposed Interim Decision* (Jan. 16, 2020).

36. EPA, Memorandum from David J. Miller on *Glyphosate: Epidemiology Review of Zhang et al. (2019) and Leon et al. (2019) Publications for Response to Comments on the Proposed Interim Decision* to Christine Olinger (Jan. 16, 2020).

37. EPA, Memorandum from Gregory Akerman, Ph.D., Risk Assessment Branch 3, Health Effects Division (HED) (7509P) on *Glyphosate. Study Summaries for Genotoxicity Studies* to Khue Nguyen, Risk Manager Reviewer and Neil Anderson, Risk Manager, Pesticide Registration Division (RD;7508P) (Sept. 13, 2016).

38. EPA, Memorandum from Monique M. Perron on *Glyphosate: Response to Comments on the Proposed Interim Decision Regarding the Human Health Risk Assessment* to Steven Peterson (Jan. 13, 2020).

39. EPA, Memorandum from Monique Perron, Sc.D., Toxicologist, Risk Assessment Branch 1/Health Effects Division (RAB1/HED; 7509P) on *Glyphosate: Draft Human Health Risk Assessment in Support of Registration Review*, to Caitlin Newcamp, Chemical Review Manager, Pesticide Reevaluation Division (PRD; 7508P) (Dec. 12, 2017).

40. EPA, Office of Chemical Safety and Pollution Prevention, Letter from Michael L. Goodis, Director of Registration Division, EPA Office of Chemical Safety and Pollution Prevention, on Labeling Requirements for Products that Contain Glyphosate to Registrant (Aug. 7, 2019).

41. EPA, Office of Chemical Safety and Pollution Prevention, Letter from Michael Freedhoff, Ph.D., Assistant Administrator, EPA Office of Chemical Safety and Pollution Prevention on OEHHA Proposition 65 Language to Dr. Lauren Zeise, Director, Office of Environmental Health Hazard Assessment, California Environmental Protection Agency (Apr. 8, 2022).

42. EPA, Office of Pesticide Programs, *Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* (Sept. 12, 2016).

43. EPA, Office of Pesticide Programs, *Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* (Dec. 12, 2017).

44. EPA, Press Release, *EPA Takes Action to Provide Accurate Risk Information to Consumers, Stop False Labeling on Products*, Office of Chemical Safety and Pollution Prevention (Aug. 8, 2019).

45. EPA, Press Release, *EPA Withdraws Glyphosate Interim Decision* (Sept. 23, 2022).

46. Expert Report of William R. Sawyer, Ph.D., *Murdock v. Monsanto Co.,* No. 5:20-cv-00023 (N.D. Cal. Nov. 21, 2022)

47. Fennimore, S., *The Role of Hand-Weeding in Weed Management*, UC Weed Science, Weed Control, Management, Ecology, and Minutia, https://ucanr.edu/blogs/blogcore/postdetail.cfm?postnum=14405 (last accessed Aug. 18, 2022).

48. Food and Agriculture Organization of the United Nations, *Global Agriculture Towards 2050* (2009), http://www.fao.org/fileadmin/templates/wsfs/docs/Issues_papers/HLEF2050_Global_Agriculture.pdf

49. Food and Agriculture Organization of the United Nations, *The future of food and agriculture – Alternative pathways to 2050* (2018), http://www.fao.org/3/I8429EN/i8429en.pdf.

50. Food and Agriculture Organization of the United Nations, *The future of food and agriculture – Trends and challenges* (2017), http://www.fao.org/3/a-i6583e.pdf.

51. Franz, J. et al., *Glyphosate: A Unique Global Herbicide ACS Monograph 189*, American Chemical Society (1997).

52. Gianessi, L & A. Williams, *The Importance of Herbicides for Natural Resource Conservation in the USA*, *in Convergence of Food Security, Energy Security and Sustainable Agriculture* 333 (D. Songstad et al. eds., 2014).

53. Gianessi, L., *Economic Impacts of Glyphosate-Resistant Crops*, 64 Pest Mgmt. Sci. 346 (2008).

54. Giesy, J. et al., *Ecotoxicological Risk Assessment for Roundup® Herbicide*, 167 Revs. Of Envtl. Contamination & Toxicology 35 (2000).

55. Givens, E., et al., *A Grower Survey of Herbicide Use Patterns in Glyphosate-Resistant Cropping Systems*, 23 Weed Tech. 156 (2009).

56. Givens, W. et al., *Survey of Tillage Trends Following the Adoption of Glyphosate-Resistant Crops*, 23 Weed Tech. 150 (2009).

57. Google Earth images of 2081 Rayburn Road Murray, KY 42071.

58. Hanson, B. et al., *Herbicide-Resistant Weeds Challenge Some Signature Cropping Systems*, 68 California Agriculture 142 (2014).

59. Health Canada, *Proposed Re-evaluation Decision PRVD2015-01 Glyphosate*, Health Canada Pest Management Regulatory Agency (Apr. 13, 2015).

60. Health Canada, *Re-evaluation Decision RVD2017-01 Glyphosate*, Health Canada Pest Management Regulatory Agency (Apr. 28, 2017).

61. Health Canada, *Statement from Health Canada on Glyphosate*, Health Canada Pest Management Regulatory Agency (Jan. 11, 2019).

62. Henry, M., *The Contribution of Landscaping to the Price of Single Family Houses: A Study of Home Sales in Greenville, South Carolina*, 12 J. Env't Horticulture 65 (1994).

63. Howard, G.W. & K.L. Harley, *How Do Floating Aquatic Weeds Affect Wetland Conservation And Development? How Can These Effects Be Minimised?*, 5 Wetlands Ecology & Mgmt. 215 (1997).

64. Hunter, M. & D. Brown, *Spatial Contagion: Gardening Along the Street in Residential Neighborhoods*, 105 Landscape & Urban Planning 407 (2012).

65. IARC (International Agency for Research on Cancer), *IARC Monograph Vol. 112 on the Evaluation of Carcinogenic Risks to Humans, Some Organophosphate Insecticides and Herbicides: Diazinon, Glyphosate, Malathion, Parathion, and Tetrachlorvinphos* (2015).

66. IARC,. *Agents Classified by the IARC Monographs, Volumes 1-132*, https://monographs.iarc.who.int/agents-classified-by-the-iarc/ (last accessed Aug. 17, 2022).

67. Japan Food Safety Commission, *Glyphosate Summary*, 4 Food Safety 93 (2016).

68. Jepson, P. et al., *Selection of Pesticides to Reduce Human and Environmental Health Risks: A Global Guideline and Minimum Pesticides List*, 4 Lancet Planet Health e56 (2020) with supplementary materials.

69. JMPR (Joint Meeting on Pesticide Residues), *Pesticide residues in food – 2016: Evaluations 2016 – Part II – Toxicological*, Special Session of the Joint Meeting of the FAO Panel of Experts on Pesticide Residues in Food and the Environment and the WHO Core Assessment Group on Pesticide Residues (May 9-13, 2016).

70. JMPR, *Joint FAO/WHO Meeting on Pesticide Residues, Summary Report* (May 9-13, 2016).

71. Keeley, P.E., et al., *Influence of Planting Date on Growth of Palmer Amaranth (Amaranthus Palmeri)*, 35 Weed Sci. 199 (1987).

72. Klingman, D. et al., *Poison Ivy, Poison Oak, and Poison Sumac: Identification, Poisoning, and Control*, Washington, D.C. (1983).

73. Kniss, A., *Long-Term Trends in the Intensity and Relative Toxicity of Herbicide Use*, 8 Nature Commc'n 14865 (2017).

74. Kraehmer, H. et al., *Herbicides as Weed Control Agents: State of the Art: I. Weed Control Research and Safener Technology: The Path to Modern Agriculture*, 166 Plant Physiology 1119 (2014).

75. Kruger, G. et al., *U.S. Grower Views on Problematic Weeds and Changes in Weed Pressure in Glyphosate-Resistant Corn, Cotton, and Soybean Cropping Systems*, 23 Weed Tech. 162 (2009).

76. Kudsk, P. & J. Streibig, *Herbicides – A Two Edged Sword*, 43 Weed Rsch. 90 (2003).

77. Mensink, J. et al., *Environmental Health Criteria for Glyphosate*, World Health Organization (1994).

78. Monsanto Company, Label for Roundup® PowerMax Herbicide (2007) [MONGLY15270591-MONGLY15270720].

79. Monsanto Company, Label for Roundup® PowerMax Herbicide (2017).

80. Monsanto Company, Label for Roundup® PowerMax II Herbicide (2017).

81. Monsanto Company, Label for Roundup® WeatherMax Herbicide (2002) [MONGLY15270111-MONGLY15270132].

82. Monsanto Company, Label for Roundup® WeatherMax Herbicide (2017).

83. Mooney, S. & S. Sjorgersten, *Greenhouse Gas Emissions Rise Due to Tillage*, 3 Nature Food 246 (2022).

84. Nandula, V. et al., *Glyphosate-Resistant Weeds: Current Status and Future Outlook*, 16 Outlooks on Pest Mgmt. 183 (2005).

85. Nielsen, D., *The Economic Impact of Poisonous Plants on the Range of Livestock Industry in the 17 Western States*, 31 J. Range Mgmt. 325 (1978).

86. OEHHA (Office of Environmental Health Hazard Assessment), *OEHHA Statement Regarding US EPA's Press Release and Registrant Letter on Glyphosate*, Cal. EPA (Aug.

12, 2019).

87. OEHHA, *No Significant Risk Level: Glyphosate*, Final Statement of Reasons, Title 27, California Code of Regulations, Section 25705(b) Specific Regulatory Levels Posing No Significant Risk (Apr. 10, 2018).

88. OEHHA, *Proposition 65 No Significant Risk Levels (NSRLs) for Carcinogens and Maximum Allowable Dose Levels (MADLS) for Chemicals Causing Reproductive Toxicity*, Cal. EPA (Mar. 2021).

89. Oerke, E., *Centenary Review - Crop Losses to Pests*, 144 J. Agricultural Sci. 31 (2006).

90. Ozkan, H. & H. Zhu, *Effect of Major Variables on Drift Distances of Spray Droplets*, The Ohio State University (Apr. 4, 2016).

91. Parish, S., *A Review of Non-Chemical Weed Control Techniques*, 7 Biological Agric. & Horticulture 117 (1990).

92. Photographs taken during December 6, 2022 site inspection of 2081 Rayburn Road, Murray, KY 42071.

93. Pimentel, D., et al., *Update on the Environmental and Economic Costs Associated With Alien-Invasive Species in the United States*, 52 Ecological Econ. 273 (2005).

94. Pimentel, D., *Invasive Plants: Their Role in Species Extinctions and Economic Losses to Agriculture in the USA* in Management of Invasive Weeds (Inderjit eds., 2009).

95. Plaintiff Fact Sheet of Kyle Murdock.

96. Plaintiff Kyle Murdock's Answers to Defendant Monsanto Company's First Set of Interrogatories, *Murdock v. Monsanto Co.*, No. 3:20-cv-01363 (N.D. Cal. June 8, 2022).

97. Pomeroy, R, *The Biggest Myth About Glyphosate* (Feb. 10, 2016), Real Clear Science, https://www.realclearscience.com/blog/2016/02/the_biggest_myth_about_glyphosate.html.

98. Records produced by Plaintiff Kyle Murdock.

99. Riar, D. et al., *Assessment of Weed Management Practices and Problem Weeds in Midsouth U.S. Soybean: A Consultant's Perspective*, 27 Weed Tech. 612 (2013).

100. Rosegrant, M. et al., *Food Security in a World of Natural Resource Scarcity – The Role of Agricultural Technologies*, International Food Policy Research Institute (2014).

101. Schultz, R. & E. Dibble, *Effects of Invasive Macrophytes on Freshwater Fish and Macroinvertebrate Communities: The Role of Invasive Plant Traits*, 684 Hydrobiologia 1 (2012).

102. Schwartz-Lazaro, L. et al., *Harvest Weed Seed Control – An Alternative Method for Measuring the Soil Seedbank*, University of Arkansas System Division of Agriculture, Cooperative Extension Service, Little Rock, AR (2016).

103. Second Amended Complaint, *Murdock v. Monsanto Co.*, No. 3:16-md-02741 (N.D. Cal. Sept. 23, 2021), ECF No. 13796.

104. Shaner, D., *Lessons Learned from the History of Herbicide Resistance*, 62 Weed Sci. 427 (2014).

105.  Shaner, D.L., *Herbicide Handbook*, 10 Weed Sci. Soc'y of Amer. Champaign (2014).

106.  Shaw, S. et al., *Using a Grower Survey to Assess the Benefits and Challenges of Glyphosate-Resistant Cropping Systems for Weed Management in U.S. Corn, Cotton, and Soyvbean*, 23 Weed Tech. 134 (2009).

107.  Six, E. et al., *The Potential to Mitigate Global Warming with No-Tillage Management is Only Realised When Practised in the Long Term*, 10 Global Change Biology 155 (2004).

108.  Smyth, S. et al., *Global Economic, Environmental and Health Benefits form GM Crop Adoption*, 7 Global Food Security 24 (2015).

109.  Soltani, N. et al., *Potential Corn Yield Losses from Weeds in North America*, 30 Weed Tech. 979 (2016).

110.  Soltani, N., et al., *Perspectives on Potential Soybean Yield Losses from Weeds In North America*, 31 Weed Tech. 148 (2017).

111.  Sosnoskie, L. & A. Culpepper, *Glyphosate-Resistant Palmer Amarant (Amaranthus palmeri) Increases Herbicide Use, Tillage, and Hand-Weeding in Georgia Cotton*, 62 Weed Sci. 393 (2014).

112.  Timmons, F., *A History of Weed Control in the United States and Canada*, 53 Weed Sci. 748 (2005).

113.  Triplett, G. & W. Dick, *No-Tillage Crop Production: A Revolution in Agriculture!*, 100 Agronomy Journal 153 (2008).

114.  Walsh, A. & R. Kingwell, *Economic Implications of the Loss of Glyphosate and Paraquat on Australian Mixed Enterprise Farms*, 193 Agric. Systems 103207 (2021).

115.  Weed Science Society of America (WSSA), *About weed seeds and their longevity*, https://wssa.net/wp-content/uploads/Weed-Seed-Factsheet-2016.pdf (last accessed July 23, 2022).

116.  Weed Science Society of America (WSSA), *Facts About Weeds*, https://wssa.net/wp-content/uploads/WSSA-Fact-SheetFinal.pdf (last accessed July 23, 2022).

117.  Wilcox, C., *Mythbusting 101: Organic Farming > Conventional Agriculture* (July 18, 2011), Scientific American, https://blogs.scientificamerican.com/science-sushi/httpblogsscientificamericancomscience-sushi20110718mythbusting-101-organic-farming-conventional-agriculture/.

118.  World Health Organization (WHO), *Agents Classified by the International Agency for Research on Cancer (IARC) Monographs, Volumes 1-132* (last updated Aug. 12, 2022), available at https://monographs.iarc.who.int/agents-classified-by-the-iarc/.

119.  WSSA, *About Weed Seeds and Their Longevity*, https://wssa.net/wp-content/uploads/Weed-Seed-Factsheet-2016.pdf (last accessed July 23, 2022).

120.  Zimdahl, R., *The Etymology of Herbicide*, 17 Weed Sci. 137 (1969).

# EXHIBIT 3

1      UNITED STATES DISTRICT COURT
       NORTHERN DISTRICT OF CALIFORNIA
2          CASE NO. 3:16-md-02741-VC
           CASE NO. 3:20-cv-01363-VC
3

4  IN RE:  ROUNDUP PRODUCT      )  MDL NO. 2741
   LIABILITY LITIGATION,        )
5                               )  DEPOSITION TAKEN
                                )  ON BEHALF OF THE
6  ESTATE OF KENZIE             )  PLAINTIFFS
   ELIZABETH MURDOCK, KYLE      )     BY:  NOTICE
7  A. MURDOCK, ADM'R, KYLE      )  TAKEN:  MARCH 16, 2023
   A. MURDOCK, INDIVIDUALLY     )
8  AND MANDI L. MURDOCK         )
                                )
9       PLAINTIFFS              )
                                )
10 VS.                          )  WITNESS:
                                )  THOMAS R. BUTTS, Ph.D.
11 MONSANTO COMPANY,            )
                                )
12      DEFENDANT               )

13        *   *   *   *            *   *   *   *

14           The deposition of THOMAS R. BUTTS,

15  Ph.D., via Zoom videoconferencing on behalf of the

16  defendant before CAMELA A. HUGHES, Registered Merit

17  Reporter and Notary Public in and for the State of

18  Kentucky at Large, on Thursday, March 16, 2023,

19  commencing at the approximate hour of 9:00 a.m.

20           Said deposition was taken pursuant to

21  notice previously filed, for purposes of discovery

22  and any and all other purposes allowed under the

23  Federal Rules of Civil Procedure

24

25

                                                    1

1                      APPEARANCES

2


3          ON BEHALF OF THE PLAINTIFFS:

4                 (Via Zoom)

5            Mr. Jerome P. Prather
             Garmer & Prather, PLLC
6              141 North Broadway
           Lexington, Kentucky  40407
7           Jprather@garmerprather.com

8
           ON BEHALF OF THE DEFENDANT:
9
                 (Via Zoom)
10

11          Mr. Marchello D. Gray
            Mr. David I. Schifrin
12          Hollingsworth, LLP
              1350 Street NW
13          Washington, DC 20005
          mgray@hollingsworthllp.com
14       dschifrin@hollingsworthllp.com

15


16          Mr. Barry J. Koopmann
             Nelson Mullins
17     1600 Utica Avenue South, Suite 750
          Minneapolis, Minnesota 55416
18      barrykoopmann@nelsonmullins.com

19          *   *   *   *          *   *   *   *

20

21

22

23

24

25

                                                 2

1  held, in your current position, you say it's

2  75 percent extension and 25 percent research; is that

3  correct?

4  A.          Yes, that's correct.

5  Q.          Is it fair to say you don't have any --

6  none of your time is spent on teaching and extensive

7  teaching semester-based courses for undergraduate or

8  graduate students?

9  A.          So I would say -- I wouldn't say, you

10  know, no time goes to teaching.  I do have a handful

11  of guest lectures that I provide, you know, at least

12  one or two a year.  So there's a very little amount

13  where I go to teaching classes, like courses during a

14  semester, but that is not a part of my job

15  appointment.

16                 I will say, though, on the teaching

17  aspect, a big part of my position, which isn't

18  necessarily factored in there, is helping to teach

19  graduate students or, you know, post doc, things like

20  that.  So it's not again classroom instruction, but

21  it's teaching in other forms.

22  Q.          Are you a tenured track -- in a

23  tenure-tracked position?

24  A.          I am not.  At Arkansas, extension

25  oriented faculty members are nontenured track.

39

1    Q.          Tell me what the difference is between

2    what you described as extension and research work.

3    A.          Sorry, could you just repeat that

4    question?

5    Q.          Sure.  Tell me what the difference is

6    between what you describe as extension work and

7    research work on your CV.

8    A.          I understand.  Okay.  So research work

9    is generally where we're conducting those research

10   trials, you know, investigating problems in the

11   field, conducting field greenhouse trials, laboratory

12   trials; all those kinds of things.  So it's

13   conducting things to answer question, collect data,

14   you know, that kind of stuff, writing papers, those

15   publications, reports; those kind of things.

16            On the extension front, the extension

17   position is more about taking that information and

18   making it available to, you know, the general public,

19   whether that's, you know, farmers, homeowners, crop

20   consultants, applicators, all that kind of stuff.

21   It's basically taking any of that research based

22   information, presenting it to growers, helping

23   them -- or that whole audience I mentioned, you know,

24   presenting it to them so that they can use it and

25   improve, you know, their weed control strategies.

40

1    And basically just answering a lot of questions,

2    providing recommendations, again, that kind of stuff.

3    Q.        I saw you mention, I think, on your CV,

4    that you have generated various videos and Podcasts.

5    I believe that was down under the extension service

6    section towards -- towards the end under extension

7    activities.  And I've gone on YouTube and found the

8    University of Arkansas extension service where there

9    were various YouTube videos that featured you.

10           Have you produced any videos that

11    appear elsewhere that would not appear on that

12    University of Arkansas section?  And particularly,

13    you know, videos in relation to weed science.  I'm

14    not interested in your children's birthday parties.

15    A.        So I guess videos produced for the

16    University of Arkansas or videos produced, in

17    general, that I've done throughout my professional

18    career?  I just kind of want to clarify that, I

19    guess.

20    Q.        Videos related to your scientific or

21    professional work, wherever they were produced.  Are

22    there any others I'd find other than on the YouTube

23    feed of the University of Arkansas?

24    A.        So -- and I guess I'll just clarify

25    there a little bit, too.  So, you know, the

41

1    restate it.  There's several papers in here that we

2    cited that are -- that can be considered general, but

3    also directly apply to that area in Kentucky.  For

4    example, I believe there's, you know, a couple of

5    different publications looking at, you know, the

6    effect of no tillage and, you know, soil erosion;

7    those kind of things.

8              And I know Mr. Murdock testified to

9    using no tillage, and the effect that glyphosate has

10   in those areas.  The -- again, I can't remember which

11   paper specifically, but things like that where they

12   do pertain to this case in that aspect, but also can

13   be considered generally.

14   Q.        Roughly speaking, how many of these

15   documents were provided to you by the attorneys at

16   Hollingsworth versus documents that you went out and

17   found on your own?

18   A.        I don't know if I could give you a

19   percentage, an accurate percentage there for an

20   estimate.

21   Q.        Do you have a hard copy of this

22   document in front of you?

23   A.        Yes, I do.

24   Q.        Will you be able to go through that and

25   mark which of those documents were given -- provided

76

1    Q.            Did you talk to or interview anybody
2    else with knowledge of any of the facts of this case?
3                      MR. GRAY:  Object to form, but you
4                      can answer if you can.
5    A.            I'm sorry, I missed that question.
6    Could you please repeat it?
7    Q.            Did you talk to or otherwise interview
8    any other person with any factual knowledge of the
9    facts in this case; so the Kenzie Murdock case?
10   A.            No, I did not.
11   Q.            What subtype of -- excuse me, what
12   subtype of lymphoma did Kenzie Murdock have?
13   A.            I'm not aware.  Again, you know, my
14   opinions and my expertise in this case was dealing
15   with the weed science herbicide related aspects, not
16   the human health aspect.
17   Q.            I'm going to now put back up on the
18   screen your expert report so we can talk about that.
19   Can you see that?
20   A.            Yes, I can.
21   Q.            All right.  For some reason, we're on
22   Page 3.  I'm not sure why.  We identified this
23   earlier.  I want to go through some of the substance
24   of your opinions, but to start with, what is your
25   definition of a weed?

82

1    discipline, in general, yes, we do, we differentiate

2    between native and invasive.  I will say in my line

3    of work we generally don't differentiate.  If it's

4    unwanted vegetation, it's unwanted vegetation.

5    Q.          In terms of the terminology you used in

6    your report, do you agree that both herbicides and

7    insecticides are included in the definition of

8    pesticides?

9    A.          Yes.  If pesticide -- yes, in the

10   definition of a pesticide, yes, herbicides,

11   insecticides, fungicides, all fall under that

12   category.

13   Q.          So, in other words, all herbicides are

14   pesticides, but not all pesticides are herbicides?

15   A.          Yes, that is a correct assessment.

16   Q.          Do you agree that the first 16 pages of

17   your report -- I'm going to go down to Page 16, this

18   is where it ends, where Page 16 ends -- do you agree

19   that the first 16 pages of your report are about

20   weeds, in general, and are not specific to Kenzie's

21   case?

22              MR. GRAY:  Object to form, but you

23              can answer.

24   A.          So, you know, kind of like we talked

25   about with the, like the documents on my MCL, I would

84

1     say they tend to be -- they ten to be general --

2     generalized statements and things, but there are

3     things in there that do directly apply to the Murdock

4     case.  You know, like I previously mentioned, the no

5     tillage example.  So again, it is general, but there

6     are things in there that do specifically still apply.

7     Q.          Anything in that first 16 pages,

8     though, could apply to any Roundup case if, for

9     instance, they're using the same farming techniques

10    or whatnot that you are talking about?

11    A.          Well -- so, yeah, again, I would say

12    that they can apply generally across the board for

13    application techniques for different areas, but also

14    some of those things can be applied directly to the

15    area that's being used, to the specific, you know,

16    hand wands that were used for the non-crop spraying,

17    those kind of things.  So again, it's a little bit of

18    both worlds, generalized but also specific.

19    Q.          And then in terms of applying those

20    general statements to Kenzie's case, that would

21    really start in the second section.  It starts at the

22    17th page of the exhibit, but the page number

23    restarts at one, with the heading case specific

24    opinions.  Would you agree with that?

25                    MR. GRAY:  Object to form.

85

1    A.           I'll be honest, I'm sorry, I didn't --
2    like the first half seems kind of cutting in and out.
3    I missed it.
4    Q.           So the generalized opinions that apply
5    -- some of which apply to Kenzie's case, the specific
6    application of those opinions, such as stating that
7    Kenzie used a hand wand or her father sprayed a
8    certain way, that specific application would begin on
9    the 17th page of the exhibit where the page numbers
10   restart at Page No. 1, under the heading case
11   specific opinions, correct?
12                    MR. GRAY:  Object, but you can
13                    answer.
14   A.           On that Page 17 is where, you know, the
15   more specific opinions are presented for the Murdock
16   case.  Again, with the -- the report or the, you
17   know, the previous part of this report, again, they
18   may be more generalized, but there's parts in there
19   that can still be directed specifically to Western
20   Kentucky, and the Murdock farming operation, and
21   non-crop spraying as well.
22   Q.           The case specific opinion, the part
23   that's labeled as such, extends from page --
24   numerical pages one through nine where your signature
25   is; is that correct?

                                                      86

1    A.          Yes, that is correct.

2    Q.          It is your opinion that chemical weed

3    killers are necessary for farms and homeowners, and

4    that glyphosate is a uniquely good weed killer,

5    right?

6                MR. GRAY:  Objection, compound.

7                Answer if you can.

8    A.          So, again, you know, I would emphasize

9    that chemical weed control herbicides are definitely

10   a very important part of successfully managing weeds,

11   whether it's a homeowner, whether it's row crops,

12   anything like that; and glyphosate is a big piece of

13   that puzzle.  It is very effective.  It's just a --

14   it's a very broad spectrum.  So, yes, it is a very

15   important herbicide to be able to be used in multiple

16   different settings.

17   Q.          And part of your opinion that was

18   stated in your general opinions is that it would be

19   bad for society, as a whole, if Roundup were taken

20   off the market, correct?

21   A.          Yes, I would agree with that assessment

22   because again, if glyphosate were to be taken off the

23   market, many, you know, more toxic alternatives would

24   tend to be used in the system.  You know, there's a

25   paper that's in my MCL, that kind of helped explain

87

1    that with glyphosate becoming on the market, that
2    our, you know, toxicity quotients have decreased over
3    the years because of that.
4    Q.          And will you agree that if a product
5    with useful justifiable uses also injured some of its
6    users by its very nature, that the product's
7    manufacturer should be responsible for compensating
8    victims of that harm?
9                    MR. GRAY:  Object to form, scope;
10                   it calls for a legal conclusion.
11                   Answer if you can, Doctor.
12   A.          Determining any legal ramifications or,
13   you know, company background is out of my scope to
14   answer here.
15   Q.          Do you understand that that principal
16   that I just stated has been at the center of products
17   liability law in the United States for generations?
18                   MR. GRAY:  Same objection.  You can
19                   answer, if you can, Doctor.
20   A.          So, again, I don't know, you know, any
21   of the legal background or ramifications of some of
22   those things.  It's out of my scope.
23   Q.          In the general section of your report,
24   the first 16 pages, you mentioned problems caused by
25   various specific weeds.  I just wanted to ask you

                                                    88

1    about a couple of those, and I apologize if I butcher

2    some of these names.  But one of them you mention was

3    Tamarisk.  Did I say that right?

4    A.          Yeah.  Could you, just since we have

5    the document here, can we just pull back up to that

6    section, so I can see specifically what you're -- I

7    mean, I know what you're referring to, but since it's

8    here, if I could just see it, it helps visualize it.

9    Q.          I'm happy to.  I'm just looking at my

10   copy to find the page.  I didn't put the page in my

11   notes.  I think it's on Page 2.  So yeah, about three

12   lines from the bottom of this page, one such example

13   of this is Tamarisk?

14   A.          Yes.

15   Q.          That's a Western U.S. weed, isn't it?

16   A.          Again, so in this section, I mean, that

17   was just one such example like is listed there.  And

18   so, you know, that one weed can consume 200 to 300

19   gallons of water per day, which we had that citation

20   for.  But weeds in general, whether we're in Western

21   United States, or Arkansas, or Kentucky, they can

22   still use a significant amount of water.  That was

23   just a specific example that the Weed Science Society

24   of America provided.

25   Q.          Thank you for that answer, Doctor, but

89

1    it did not answer my question.  My question was,

2    isn't Tamarisk a Western U.S. weed, yes or no?

3                    MR. GRAY:  Object to form.  Asked

4                    and answered, but you can answer again.

5    A.              Specifically, I don't know the

6    geography of exactly where Tamarisk is distributed

7    across the United States, so I honestly couldn't say.

8    Q.              Is Tamarisk present in the Jackson

9    Purchase region of Kentucky?

10   A.              I honestly don't know.  Again, I'll

11   just reiterate, I don't know the distribution of

12   Tamarisk and where it is across the entirety of the

13   United States.  You know, again, I'd reemphasize,

14   weeds can travel very easily and be spread in areas

15   that we don't even know they are.  And also again,

16   that was just an example of the amount of water that

17   one weed can use.  Weeds in general can still use a

18   significant amount of water.

19   Q.              If Tamarisk is not present out at the

20   Murdock's farm, it wouldn't be relevant to the water

21   use on the Murdock's farm, would it?

22                   MR. GRAY:  Object to form, but you

23                   can answer.

24   A.              Again, I'm reemphasizing that that was

25   just one example provided from the Weed Science

                                              90

1    Society of America of the total amount of water that

2    one plant could use.  All weeds do use extra water

3    from the system.  So that one weed, if it's not

4    located on the farm, it still provides an example of

5    the impact that weeds have on water allocation.

6    Q.          Can you name any weed that has ever

7    been present on any of the Murdock's farms that would

8    use 200 to 300 gallons of water per day for one week?

9                    MR. GRAY:  Object to form and to

10                   the extent I think it misstates and

11                   misunderstands the statement in the

12                   report, but you can answer if you can,

13                   Doctor.

14   A.          So I'm not a evapotranspiration

15   specialist and so I can't, you know, specifically say

16   how much water plants use.  I know, you know,

17   Mr. Murdock had testified that Palmer amarant, you

18   know, was on his farm, Pigweeds, and those are very

19   prolific water users.  What that specific amount of

20   water is, I can't say.

21   Q.          Onto the next page, on Page 3, the

22   second paragraph is on the subject of aquatic weeds.

23   Do you see that?

24   A.          Yes, I do.

25   Q.          Do you know -- did you investigate what

91

1    water courses were present on any of the Murdock's

2    farms?

3    A.          No, I did not investigate any water

4    courses.  Again, this is, you know, generally across

5    the board where weeds can impact, you know, different

6    areas and what those potential issues can arise from,

7    these different areas where weeds can impact human

8    interactions.

9    Q.          Down on the bottom of Page 3, I'll try

10   to underline it, if you can see that, but there's a

11   statement here about study related to cattle and

12   sheep deaths in 17 Western states in 1978.  Do you

13   see that?

14   A.          Yes, I do.

15   Q.          Is Kentucky a Western state?

16   A.          Kentucky is not a Western state, but,

17   again, this is a citation to, again, estimate the

18   potential problems from poisonous plants.  And like I

19   already mentioned with, you know, Mr. Murdock

20   testifying he has Pigweeds, you know, Palmer amarant

21   is known to accumulate nitrates and can also poison

22   livestock and things like that.  So this is an

23   example of other situations that can occur directly

24   in that area.

25   Q.          Did the Murdock's have any pastured

                                                        92

1    livestock on their farm?

2    A.          Not that I'm aware of; but, again, that

3    doesn't necessarily just pertain to livestock.  It

4    can pertain to multiple animal species.

5    Q.          Do you have any opinion on whether

6    glyphosate is a human carcinogen?

7    A.          Again, I entrust in the EPA as a weed

8    scientist in the United States, and the EPA has

9    mandated that it is a non-cancer causing agent.

10   Q.          Is that your opinion or the EPA's

11   opinion?

12              MR. GRAY:  Object to form, but you

13              can answer.

14   A.          As a weed scientist in the USA, I

15   entrust in the EPA's decision that it is a non-cancer

16   causing agent.

17   Q.          Do you intend to come to the trial of

18   this case in Paducah, Kentucky, and tell the jury

19   there that glyphosate is not a carcinogen, is not a

20   human carcinogen?

21              MR. GRAY:  Object to form, but you

22              can answer.

23   A.          I would just again, reiterate that, you

24   know, as a weed scientist, I entrust in the EPA as

25   our regulatory body, and they have stated that it is

93

1    offhand; but, you know, rough estimate is it's

2    normally probably like a 1/20th of my entire research

3    program maybe comes from Bayer.

4    Q.          So about 5 percent roughly?

5    A.          Correct.  Yeah, about 5 percent or so.

6    Q.          Are you familiar with a surfactant

7    referred to as POEA?

8    A.          Vaguely.  I'm familiar with surfactants

9    in general, like the specific, you know, chemistry,

10   like the POEA, you know, I'm not real familiar with

11   that specific.

12   Q.          Are you aware that POEA is a common

13   surfactant in various formulations of Roundup that

14   are sold in the United States?

15              MR. GRAY:  Object to form, but you

16              can answer.

17   A.          Again, I'm not exactly familiar.  I'm

18   just aware of, you know, surfactants in those

19   formulated products, but what the specific chemistry

20   of it is, I'm not fully aware.

21   Q.          Would you agree that surfactants

22   promoted here in some active chemical in weed control

23   formulations -- that's a poor question.  Let me start

24   over.

25              Will you agree that surfactants promote

                                                    102

1   the adhesion to leaves of the actual chemicals that

2   are active in weed control formulations?

3   A.          Yes.  Yeah, I would agree that

4   surfactants help -- yes, like you said, they help

5   with the adhesion of spray droplets to be retained on

6   leaf surfaces.

7   Q.          What about human skin, do surfactants

8   increase adhesion of those droplets to human skin?

9                  MR. GRAY:  Object to form and

10                 scope.  But you can answer if you can.

11  A.          I'm not aware of, you know, how

12  droplets and things interact with human skin.  I've

13  never looked at or conducted any kind of studies with

14  human skin.

15  Q.          You mentioned the LD 50 in your report,

16  and my understanding of an LD 50 is that that is the

17  dosage or exposure at which a particular substance

18  would be expected to result in the death of

19  50 percent of the subjects in a defined population.

20  Is that fair?

21                 MR. GRAY:  Object to form.  Answer

22                 if you can.

23  A.          Yes, that sounds correct.  So the LD 50

24  is a lethal dose that would be required to kill

25  50 percent of whatever test population it is, and

103

1    basically all chemicals, products, you know, have
2    some sort of LD 50.
3    Q.          And I think in your report you compared
4    the LD 50's of various products ranging from
5    herbicides all the way to acetaminophen in terms of
6    milligram per kilogram; is that fair?
7    A.          Yes.  I mean, again, if we want to turn
8    to a certain page just so it's up, you know, that
9    would help again recall my memory bank.  But, yes,
10   that sounds familiar that I compared several
11   different products or provided what their LD 50's
12   were.
13   Q.          It looks like you had a lot of them
14   here on Page 9.
15   A.          Yeah, I think that's the main paragraph
16   right there.
17   Q.          And you're comparing the LD 50 for
18   various populations here, but will you agree with me
19   that the direct comparison of milligrams per
20   kilogram, one substance to another, is not useful
21   unless you also consider it in relation to the
22   strength or the milligrams that are distributed in
23   any particular application?
24                    MR. GRAY:  Object to form, but you
25                    can answer that, if you can, Doctor.

104

1    A.            I'm not sure I understand the question.

2    Q.            Well, these -- these various substances

3    that you have listed, various LD 50's for -- these

4    are typically, if not always, delivered as part of a

5    solution or preparation, not individually at full

6    strength, correct?

7    A.            Well, I mean, all of these different

8    products -- I guess I'm still confused.  Are you

9    saying that they're delivered with other things or

10   delivered with other -- I'm still confused, I guess.

11   Q.            Well, first, since humans don't ingest

12   pure caffeine, they drink coffee or tea or Cola and

13   get caffeine that way.  They don't ingest pure

14   Vitamin D.  They take a pill that is -- has a defined

15   amount of Vitamin D within that pill, right?

16   A.            Yeah.  So, I mean, whatever it is,

17   there's certain percentages or varying rates.  That

18   applies for all of these different things.  I mean,

19   the herbicides, as well as the other, you know,

20   non-herbicide examples I provided there.

21   Q.            So, for instance, if we're going to

22   look at Gramoxone -- I may be pronouncing that wrong

23   -- the LD 50 is at 3 milligrams per kilogram, and

24   compare that with ammonium nonanoate -- did I say

25   that anywhere close to right?

105

1    A.           It's close enough, yeah.

2    Q.           The LD 50 is between 3,000 and 5,000

3    milligrams per kilogram.  It's not useful in

4    comparing which of those is more toxic, unless we

5    know how much of that substance is delivered to the

6    population?

7    A.           So those values still provide us, you

8    know, based on -- it's all based in like active

9    ingredient basically.  And so again, that's as close

10   of a comparison as you can really possibly make to

11   compare an active ingredient versus an active

12   ingredient.

13   Q.           But those active ingredients are only

14   one small part of the delivery system, whether that

15   delivery is a pill or a spray -- a chemical spray or

16   a cup of coffee, right?

17                MR. GRAY:  Object to form, but you

18                can answer.

19   A.           Well, I would say there, again, yeah,

20   they are a part.  What kind of part they make up, I

21   can't exactly say.  You know, like on a herbicide

22   front, herbicides make up a very small portion of

23   what's being carried.  The majority is water there.

24   If we talk about like, say, you know, Vitamin D, you

25   know, or another one of those like in a vitamin, I'm

106

1   not exactly sure what percentage that would, you

2   know, make up that kind of thing.

3   Q.          And my point is, if we're trying to

4   compare what a lethal dose is, one of these to the

5   other, we have to know what the strength is of that

6   concentration that they're delivering?

7   A.          Well, again, with any of these, though,

8   even -- you don't necessarily need to know the

9   strength.  You just need to -- these comparison

10  levels, this is what is required to kill 50 percent

11  of those doses.  So, you know, with caffeine again

12  like, you know, your example, you're not directly

13  injecting it, but a certain amount of cups of coffee

14  would get you there.  So it's the same premise.  Like

15  this is the amount of active that's required to cause

16  that lethal dose of 50 percent of the population.

17  Q.          And to know how many cups of coffee are

18  going to kill 50 percent of the human population,

19  you'd have to know how much caffeine was in a cup of

20  coffee?

21                  MR. GRAY:  Could you repeat that

22                  question one more time, Mr. Prather?

23  Q.          To know how many cups of coffee it

24  would take to kill 50 percent of the human

25  population, you would have to know, not just what the

107

1    LD 50 is for caffeine, but also what the -- how much
2    caffeine is in each cup of coffee?
3                          MR. GRAY:  I would object to the
4                    form to the extent that it misstates
5                    this -- what we're talking about here.
6                    These LD 50's are talking about
7                    animals, but you can answer the
8                    question.
9    A.          I guess I'm still kind of
10   misunderstanding the questions maybe, but the LD 50's
11   give us a value to compare those actual active
12   agreements and their -- you know, their toxicity to
13   kill 50 percent of the test population.  And so in
14   this -- you know, in this paragraph, we're looking at
15   glyphosate requires a significant amount more than a
16   lot of these other prod -- like herbicide products,
17   we're talking, or even some other generalized, you
18   know, every day things that we're talking about.
19                    So, again, it is variable on like the
20   carrier, but this is just strictly comparison,
21   comparing how much is required to kill 50 percent of
22   -- in this -- in most of these cases it's -- rats are
23   the test animal population.
24   Q.          So let's put it this way:  If I wanted
25   to know how much glyphosate -- how much of glyphosate

108

1    containing product had to be delivered to a rat to

2    reach its LD 50 population, I would have to know both

3    the milligrams per kilogram of the LD 50, and I would

4    also have to know how much glyphosate is in the

5    formulation that's being delivered?

6    A.          I mean, so -- I'm still confused.

7    These are based on the amount of active ingredients,

8    so the amount of that -- it's basically that amount

9    of glyphosate is what would be needed to inject into

10   rats directly to kill 50 percent of that population.

11   Q.          But we don't use pure glyphosate in

12   agriculture, do we?  It's always part of a

13   formulation?

14   A.          So, yeah, everything is formulated

15   products.  You know, some have varying levels of

16   what's in there and there's all -- there's different

17   proprietary things.

18   Q.          And that's exactly my point.  To know

19   how much of the product of it would take to reach the

20   LD 50, you have to know not only the LD 50 of

21   glyphosate, but also what the concentration is in the

22   product that you're concerned?

23   A.          But there are LD 50's for all different

24   chemistries.  I mean, those are created for almost

25   everything -- or not almost everything.  They are

109

1    created for everything, and again, you know, lethal

2    dose here is comparing the active ingredients in my

3    example; but everything has an LD 50, and all of

4    those would be out there.  And the EPA has looked at

5    an immense amount of data and concluded, even from

6    that amount of data, that glyphosate is a non-cancer

7    causing agent.

8    Q.          Dr. Butts, you're going pretty far off.

9    You still haven't answered my question, which I think

10   is a fairly simple question.  But let me try to give

11   it in a very concrete example.  If I were to come to

12   you with a container of say, Roundup Powermax -- I

13   think is the name of one of the formulations -- and I

14   were to say how many ounces of this Roundup Powermax

15   must you deliver to a rat in order to achieve the

16   LD 50 of -- in order to expose the rat to the LD

17   5600 milligrams per kilogram, you would have to look

18   at what the concentration of glyphosate was in the

19   Powermax product I just brought you, correct?

20   A.          In that example to provide the -- that

21   specific amount of glyphosate, yes, you would have to

22   know the active load and --

23   Q.          And it would be the -- I'm sorry, I

24   didn't mean to interrupt.

25   A.          Go ahead.

110

1    Q.           And that would be true for any
2    substance we're talking about?  If we want to know
3    how much of a delivery agent we have to deliver to
4    reach the LD 50, you would have to consider the
5    concentration of the active ingredient in the
6    delivery substance?
7    A.           So, again, if we're trying to get to
8    the point of calculating on a total aspect, like, you
9    know, back to the cups of coffee, that you need to
10   know the total cups of coffee, yes, you would need to
11   know how much caffeine is in each cup of coffee.  But
12   these numbers are not based on that.  These are based
13   on the amount of active ingredient that it would take
14   to get there.
15   Q.           Thank you.  You have made my point.  We
16   can go on now.  To Kenzie's case specifically, did
17   you do any mathematical calculations of Kenzie's
18   exposure to glyphosate?
19   A.           No, I did no mathematical calculations
20   on the exposure.  It's based on experience with the
21   application methods and, you know, the deposition of
22   Mr. Murdock on where she was in vicinity to the
23   Roundup.
24   Q.           Could you have made calculations,
25   mathematical calculations of how much glyphosate, how

111

1    Q.            So you are not going to come to trial

2    and say Dr. Sawyer arrived at this number, but it

3    should have been this number instead?

4                     MR. GRAY:  Object to form, but you

5                 can answer.

6    A.            Again, I don't have a specific number.

7    My main opinion is that the potential for contact is

8    extremely minimal based on the application practices

9    that were used, where she was in the vicinity to the

10   Roundup; those types of things.

11   Q.            And your testimony is you don't have

12   the information you would need to calculate a

13   specific number?

14                     MR. GRAY:  Object to form.  It

15                 misstates his testimony, but you can

16                 answer.

17   A.            Again, these application processes and

18   these different events, that are a lot of complex

19   interactions occurring, a lot of different things

20   going on in the background that aren't built into

21   those calculations.  Those calculations just, you

22   know, assume the contact occurs 100 percent of the

23   time.

24                     And so, again, I'm not aware of any

25   calculations.  I don't have any calculations to

114

1    actually factor in the complex nature that's
2    occurring with these applications.  And, again, like
3    I've already mentioned with the enclosed cab, air
4    infiltration systems, spray being behind and directed
5    away from those cabs, all those sorts of things are
6    not factored into those calculations.
7    Q.          Do you agree that Kenzie Murdock rarely
8    wore a specific PPE, personal protective equipment,
9    while handling Roundup?
10   A.          Based on Mr. Murdock's testimony, I
11   would agree it sounded like she, you know, did not
12   wear PPE a lot of the time.
13   Q.          Does Roundup's label direct users to
14   wear PPE?
15   A.          I'm sorry, I missed that question.
16   Q.          Does Roundup's label direct users,
17   applicators to wear PPE?
18              MR. GRAY:  Object to the form.  The
19              question is overly broad; but you can
20              answer, if you can, Doctor.
21   A.          I was going to say, I would just
22   clarify, you know, there's a lot of different Roundup
23   of labels, and some of those labels have different
24   requirements on them.  In general, you know, for the
25   Roundup for row crop use, they do specify, you know,

115

1    certain things as PPE to be worn.

2    Q.            And what kind of PPE is specified?

3    A.            So again, it's very dependent on the

4    specific product.  I mean, is there a specific

5    product you'd like to discuss or just generalities?

6    Q.            Just tell me in generalities, in your

7    knowledge as a weed scientist and as a commercial

8    applicator, what does Roundup label direct or

9    recommend applicators use as PPE?

10                      MR. GRAY:  Object to the form.  It

11                      is vague and overly broad; but you can

12                      answer, if you can.

13   A.            So in general, like we're talking about

14   Roundup Powermax II or Roundup Powermax III, which is

15   probably, you know, what I'm most familiar with in

16   recent years, you know, those products generally

17   recommend long sleeve shirts, pants, shoes and

18   gloves, chemical resistance gloves.

19   Q.            If Roundup were not absorbed through

20   the skin, then why would long sleeves, pants and

21   shirts and rubber gloves be necessary?

22                      MR. GRAY:  Object to form.  Also

23                      beyond the scope; but you can answer,

24                      if you can.

25   A.            There's a variety of reasons outside of

116

1    absorption to wear PPE, one of which is just a lot of

2    different herbicides and chemicals can be skin

3    irritants, so just trying to avoid that aspect of

4    irritating the skin.

5    Q.          Is glyphosate a skin irritant?

6    A.          What's that?

7    Q.          Is glyphosate a skin irritant?

8    A.          I'm unsure.  I'm not familiar with

9    those aspects of the chemistries.

10   Q.          Are there other components of the

11   formulation of Roundup Powermax II or Powermax III

12   that are skin irritants?

13                  MR. GRAY:  Object to form.  Asked

14                  and answered, but you can answer.

15   A.          Again, I'm not aware of, you know,

16   what's a skin irritant or what's not a skin irritant.

17   Q.          Do you know the differences in the air

18   filtration systems between the John Deere sprayers

19   and the Spray-Coupe sprayer cabs that the Murdocks

20   had used on their farm over the years?

21   A.          If I'm aware of any specific

22   differences between the Spray-Coupe and the

23   John Deere; is that what you're asking?

24   Q.          Yes, specifically the -- well, not --

25   yes, are you aware of any differences in the air

117

1     opinions on the other products used.

2     Q.          And what are your opinions on other

3     products used?  Do you have an opinion of whether it

4     was appropriate or inappropriate to mix those

5     products?

6                        MR. GRAY:  Object to form, but you

7                        can answer.

8     A.          So, again, it's difficult to say

9     with -- I mean, we were just presented with a receipt

10    and a list of products.  And so knowing what

11    combinations or, you know, what different things, I

12    can't say specifically because that's kind of

13    dependent, you know, from tank mix to tank mix.

14    But, you know, in general, I mean, it's common

15    practice to have tank mixtures, to use leftover

16    chemical in a non-crop sprayer; those kinds of

17    things.

18    Q.          Do you intend to offer any opinions

19    that any of those other chemicals that were mixed

20    contributed to Kenzie's development of non-Hodgkin's

21    lymphoma?

22                       MR. GRAY:  Object to form and scope

23                       and asked and answered, but you can

24                       answer again.

25    A.          So again, my aspect of those other

                                                    123

1    chemicals -- my opinions will not deal with the human

2    health aspects.  It's the aspects of that, you know,

3    especially if residual herbicides were in those tank

4    mixtures; it would require less Roundup to be sprayed

5    in those non-crop areas.

6    Q.          I want to go back to your report.  I'll

7    put it on the screen.  This is a section beginning on

8    page -- at the very bottom of Page 8 of the case

9    specific portion of the opinions, just before your

10   conclusion, and this is your section that you

11   discussed Dr. Sawyer's calculations.  Can you see

12   that?

13   A.          I do see that.

14   Q.          You have reviewed part of Dr. Sawyer's

15   report, but not all of it, correct?

16              MR. GRAY:  Objection, but you can

17              answer.

18   A.          Yes, I've reviewed parts of his report

19   that pertained to the contact.

20   Q.          And you've reviewed parts of

21   Dr. Sawyer's deposition but not all of it, correct?

22              MR. GRAY:  Object to form, but you

23              can answer.

24   A.          Again, I've reviewed the deposition,

25   but focused on the -- the parts pertaining to

                                                          124

1    STATE OF KENTUCKY    )
     COUNTY OF FAYETTE    )
2

3                    I, CAMELA A. HUGHES, Registered Merit

4    Reporter and Notary Public, State of Kentucky at

5    Large, certify that the facts stated in the caption

6    hereto are true; that at the time and place stated in

7    said caption the witness named in the caption hereto

8    personally appeared before me and that after being by

9    me duly sworn, was examined by counsel; that said

10   testimony was taken down in stenotype by me and later

11   reduced to typewriting, by computer, under my

12   direction and the foregoing is a true and complete

13   record of the testimony given by said witness.

14                    The deposition was submitted to the

15   witness for reading and signature as set forth

16   herein.

17                    My commission expires:  June 10, 2025.

18                    In testimony whereof, I have hereunto

19   set my hand and seal of office on this the ____ day

20   of March, 2023.

21

22                              _____
                                CAMELA A. HUGHES
23                              Certified Court Reporter
                                Certification No. 2004BD48 (KY)
24                              Registered Merit Reporter
                                Notary Public, State-at-Large
25                              Notary ID 580730

                                                           136

# EXHIBIT 4

# IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
## STATE OF MISSOURI

PAUL FERRO, *et al.*,                    )
                                         )
    Plaintiffs,                        )
                                         )    Cause No. 20SL-CC03678 **FILED**
v.                                       )
                                         )    Division No. 18
MONSANTO COMPANY,                        )                    **OCT 13 2022**
                                         )
    Defendant.                         )         **JOAN M. GILMER**
                                              CIRCUIT CLERK, ST. LOUIS COUNTY

## ORDER REGARDING THE PARTIES' MOTIONS TO EXCLUDE EXPERTS

Presently before the Court are motions to exclude experts filed by Defendant Monsanto

Company ("Monsanto") and Plaintiffs. Monsanto has filed the following seven motions to exclude

and accompanying exhibits directed at Plaintiffs' expert witnesses:

1. Monsanto's Motion to Exclude the Opinions of Dr. Andrew Schneider and Memorandum of Law in Support;
2. Monsanto's Motion to Exclude the Testimony of Dr. William R. Sawyer;
3. Monsanto's Motion to Exclude the Testimony of Dr. Alfred Neugut;
4. Monsanto's Motion to Exclude the Testimony of Dr. Joel Joseph Gagnier;
5. Monsanto's Motion to Exclude the Testimony of Dr. Ambrose K. Charles and its Brief in Support;
6. Monsanto's Motion to Exclude the Testimony of Dr. Christopher Portier; and
7. Monsanto's Motion to Exclude the Testimony of Charles Benbrook.

Plaintiffs have filed the following three motions to exclude and accompanying exhibits directed at

Monsanto's expert witnesses:

1. Plaintiffs' *Daubert* Motion to Exclude the Opinions and Testimony of Defense Expert, Cristian Tomasetti, Ph.D.;
2. Plaintiffs' *Daubert* Motion to Exclude the Opinions and Testimony of Defendant's Expert, Joseph DiTomaso, Ph.D.; and
3. Plaintiffs' *Daubert* Motion to Exclude the Opinions and Testimony of Case-Specific Defense Experts, Lauren Smith, M.D. and Ran Reshef, M.D.

The motions are fully briefed.

On October 12, 2022, the Court conducted a pretrial conference and heard arguments from counsel on these motions to exclude and other matters. After careful consideration of the legal briefs, exhibits, and oral arguments, the motions were submitted for ruling. The Court hereby makes the following rulings.

## I.   LEGAL STANDARD

Section 490.065, RSMo, governs admissibility of expert testimony:

(1) A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) The testimony is based on sufficient facts or data;
> (c) The testimony is the product of reliable principles and methods; and
> (d) The expert has reliably applied the principles and methods to the facts of the case . . . .

Sec. 490.065.2, RSMo.

Expert testimony is therefore admissible only if the expert's knowledge "will help the trier of fact to understand the evidence or to determine a fact in issue." *Id.* The testimony must also be the product of reliable methods that are reliably applied to the case's facts.

"Under section 490.065.2, trial courts must act as gatekeepers to ensure that the testimony sought to be admitted ... is not only relevant, but reliable." *Ingham v. Johnson & Johnson*, 608 S.W.3d 663, 700 (Mo. App. E.D. 2020) (internal quotation marks omitted) (quoting *State ex rel. Gardner v. Wright*, 562 S.W.3d 311, 317 (Mo. App. E.D. 2018); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)). Since this amended version of section 490.065 came into effect in 2017, Missouri courts have used a three-part standard to determine the admissibility of expert opinion testimony: "(1) whether the expert is qualified, (2) whether the testimony is relevant, and (3) whether the testimony is reliable." *State v. Suttles*, 581 S.W.3d 137, 147 (Mo. App. E.D. 2019)

2

with an emphasis on biostatistics and his experience in research and academia.  *See* sec. 490.065.2(1), RSMo.   His general causation opinions are based on reliable methodologies demonstrated by his own substantial research, which has been published in numerous peer-reviewed journals and presented in other litigation.  Plaintiffs' other arguments, including their critique that Dr. Tomasetti did not sufficiently consider environmental factors, relate to the weight the jury should give to his opinions rather than their admissibility.  *See Lauzon*, 270 F.3d at 693 (whether an expert "failed to rule out *every* possible alternative cause" goes to weight and not admissibility) (emphasis in original) (quoting *Westberry*, 178 F.3d at 265); *Larson*, 414 F.3d at 941 (quoting *Hose*, 70 F.3d at 974).  *See also Alcorn*, 50 S.W.3d at 246 (Mo. banc 2001) ("Any weakness in the factual underpinnings of the expert's opinion or in the expert's knowledge goes to the weight that testimony should be given and not its admissibility.").

For these reasons, the Court denies Plaintiffs' motion to exclude Dr. Tomasetti.

## I.   Plaintiffs' Motion to Exclude Dr. Joseph DiTomaso

Dr. DiTomaso is a weed scientist who has been designated by Monsanto to offer opinions on "the impact of weeds and invasive plants, control methods employed to manage weeds and invasive plants, and the use of herbicides, including glyphosate-based formulated products, in weed management."  Monsanto's Amended Disclosure of Expert Testimony at 4.  Additionally, he has been designated to offer opinions on how herbicides work, appropriate application methods, herbicide labels, the use and benefits of herbicides in residential, urban, and industrial settings.

Plaintiffs move to exclude Dr. DiTomaso's opinions in their entirety.  Plaintiffs do not question his expertise in the field of weed management; however, they argue his proffered testimony in this case invades the province of the jury.  In addition to the topics listed above, Dr. DiTomaso was designated to "opine on the particular glyphosate-based formulated products

applied, and the nature and circumstances of these applications, by Plaintiffs Stacey Moore and William Pleu." *Id.* Plaintiffs assert he intends to testify to the jury that Plaintiffs' descriptions of their Roundup exposures are not credible and that, even if they were credible, any exposures they experienced would have been negligible, if any. Plaintiffs characterize such testimony as attacking Plaintiffs' credibility, which is not a proper subject for expert testimony. *See State v. Churchill*, 98 S.W.3d 536, 538–39 (Mo. banc 2003) ("When determining the admissibility of opinion testimony, expert witnesses should not be allowed to give their opinion as to the veracity of another witness's statement, because in so doing, they invade the province of the jury."). Plaintiffs also object to Dr. DiTomaso's report criticizing Plaintiffs' expert Dr. Charles's opinions that were based, in part, on Plaintiffs' deposition testimony.

Plaintiffs also argue Dr. DiTomaso's opinions lack foundation. He is not a medical doctor, toxicologist, or industrial hygienist. Rather, Plaintiffs contend he disregards Plaintiffs' sworn testimony about their exposure to Roundup based solely on his belief that the amount of exposure claimed was unlikely based on his and other's anecdotal experiences using Roundup and other herbicides.

Lastly, Plaintiffs contend Dr. DiTomaso's only other topics of testimony concern how herbicides work and the alleged benefits of using them. Plaintiffs agree such topics would be within Dr. DiTomaso's area of expertise as a weed scientist, but they argue such topics are irrelevant to any issues in this case and should be excluded.

Monsanto opposes Plaintiffs' motion to exclude Dr. DiTomaso. Monsanto argues he is qualified to give expert opinions on topics beyond the understanding of an ordinary juror.

> These topics include: (1) the types of herbicides available to consumers; (2) the types of spray systems and spray system parts that are commercially available; (3) the amount of time it takes to treat an area with Roundup; (4) standard practices for the use of Roundup with other weed control techniques; (5) the standard uses for

Roundup; (6) how Roundup affects plants that are not grown from genetically-modified "Roundup Ready" seeds; and (7) the principle of "drift" and how that principle applies to herbicide applications.

Monsanto's response memorandum at 5. Monsanto contends each of these topics relate directly to a key issue in the case: Plaintiffs' actual amount of exposure to Roundup through their use of the product.

Monsanto also asserts Dr. DiTomaso has no intent of opining on Plaintiffs' credibility; rather, he intends to educate the jury about weed management and testify that the way Plaintiffs claimed to have used Roundup is inconsistent with Roundup's registered uses and what he considers to be logical weed management practices. Monsanto argues the fact that Dr. DiTomaso's testimony may cause the jurors themselves to question the accuracy or reliability of Plaintiffs' testimony does not turn his expert opinions into impermissible opinions on witness credibility.

Lastly, Monsanto states Dr. DiTomaso is qualified despite his lack of medical credentials to testify about Plaintiffs' dermal *contact* with Roundup as compared to dermal *absorption*. According to Monsanto, such dermal contact falls squarely within his expertise in weed management practices.

The Court finds that Monsanto has met the threshold requirements under section 490.065.2, RSMo, to present Dr. DiTomaso's testimony to the jury in this case. He is "qualified as an expert by knowledge, skill, experience, training, or education" based on his Ph.D. in botany and weed science and work in academia. *See* sec. 490.065.2(1), RSMo.

Plaintiff is correct that "the general rule is that expert testimony is inadmissible if it relates to the credibility of witnesses because it invades the province of the jury." *State v. Link*, 25 S.W.3d 136, 143 (Mo. banc 2000). "However, it is proper for a witness to testify to specific facts that discredit the testimony of another witness, as long as the witness does not comment directly

on the truthfulness of another witness." *Id.* ("[I]t did not invade the province of the jury for Officer Maher to explain the general concept of false sightings. . . . Nor was it improper for him to state specific facts that tended to discredit Ms. Burke's sighting. . . . But it was improper for him to go one step further and say that the police classified the information from Ms. Burke as a false sighting."). Here, Dr. DiTomaso may properly testify about standard uses of Roundup that might contradict Plaintiffs' purported uses so long as he does not "go one step further" and say Plaintiffs' testimony about their use and exposure to Roundup is untruthful.

Plaintiffs' other argument that Dr. DiTomaso's proposed testimony concerning the uses and benefits of herbicides like Roundup is irrelevant to issues in this case fails. "The litigants [in a design defect case] are certainly entitled to assist the jury in defining the term 'unreasonably dangerous' by presenting evidence 'that the utility of a design outweighs its risks, or that consumer expectations were violated, or any other theory of unreasonable dangerousness supported by the evidence.'" *Thompson v. Brown & Williamson Tobacco Corp.*, 207 S.W.3d 76, 90 (Mo. App. W.D. 2006) (quoting *Newman v. Ford Motor Co.*, 975 S.W.2d 147, 154 (Mo. banc 1998)).

For these reasons, the Court denies Plaintiffs' motion to exclude Dr. Tomasetti.

### J.  Plaintiffs' Motion to Exclude Dr. Lauren Smith and Dr. Ran Reshef

Dr. Smith is a pathologist and professor of pathology, and Dr. Reshef is an associate professor of medicine. Both of them have been designated by Monsanto to offer opinions on general and specific causation.

Plaintiffs move to preclude Dr. Smith from testifying as to the following topics:

(1) her personal usage of Roundup products; (2) opinions and testimony regarding the truthfulness or credibility of descriptions of their exposures to Roundup; (3) that "bad luck" and/or "random replication error" caused the Plaintiffs' non-Hodgkin's lymphoma ("NHL"); and (4) a number of "other risk factors" for NHL that Dr. Smith does not attribute to causing the Plaintiffs' NHL.

36

While the Court will permit Dr. Benbrook to read what EPA rules say, he may not offer any narration or his opinion on whether Monsanto followed the EPA rules. If the Court finds this testimony has no value, it may stop Dr. Benbrook at any time.

8.  Plaintiffs' *Daubert* Motion to Exclude the Opinions and Testimony of Defense Expert, Cristian Tomasetti, Ph.D. is **DENIED**.

9.  Plaintiffs' *Daubert* Motion to Exclude the Opinions and Testimony of Defendant's Expert, Joseph DiTomaso, Ph.D. is **DENIED**.

10. Plaintiffs' *Daubert* Motion to Exclude the Opinions and Testimony of Case-Specific Defense Experts, Lauren Smith, M.D. and Ran Reshef, M.D. is **GRANTED IN PART** to preclude them from testifying about their personal use of Roundup or Plaintiffs' use of Roundup, which Monsanto recognizes as moot on pages 17-18 of its response memorandum. In all other respects, Plaintiffs' motion to exclude directed at Dr. Smith and Dr. Reshef is **DENIED IN PART**.

**SO ORDERED**:

Hon. Ellen H. Ribaudo               10-13-22
Circuit Judge, Division 18

# EXHIBIT 5

IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
STATE OF MISSOURI
Honorable Michael K. Mullen, Judge


EARL NEAL, et al.,                )
                                  )
        Plaintiffs,               )
                                  )
vs.                               )Cause No. 1722-CC10773
                                  )
MONSANTO COMPANY,                 )
                                  )
        Defendant.                )



TRIAL TRANSCRIPT

March 22, 2022

Volume 1B






Tina M. Givens, RPR, CCR #481
Official Court Reporter, Division 8
St. Louis City Circuit Court
22nd Judicial Circuit

# A P P E A R A N C E S

**COUNSEL FOR PLAINTIFFS:**

```
WEITZ & LUXENBERG, PC
   BY:  ROBIN GREENWALD
   rgreenwald@weitzlux.com
   BY:  JERRY KRISTAL
   jkristal@weitzlux.com
   BY:  JAMES (Jacksy) BILSBORROW
   jbilsborrow@weitzlux.com
   BY:  WILLIAM A. WALSH
   wwalsh@weitzlux.com
   BY:  KRISTEN B. MILLER
   kmiller@weitzlux.com
   700 Broadway, Floor 5
   New York, New York  10003
   Tel:  212.558.5500


WEITZ & LUXENBERG, PC
   BY:  JOSEPH J. MANDIA, ESQUIRE
   200 Lake Drive East, Suite 210
   Cherry Hill, New Jersey  08002
   Tel:  856.755.1115


NIEMEYER, GREBEL & KRUSE
   BY:  MARK R. NIEMEYER
   niemeyer@ngklawfirm.com
   BY:  MICHAEL S. KRUSE
   kruse@ngklawfirm.com
   211 N. Broadway, Suite 2950
   St. Louis, Missouri  63102
   Tel:  314.241.1919
```

**COUNSEL FOR DEFENDANT MONSANTO COMPANY:**

GOLDMAN ISMAIL TOMASELLI BRENNAN & BAUM LLP
  BY:  TAREK ISMAIL
  tismail@goldmanismail.com
  200 South Wacker Drive
  22nd Floor
  Chicago, Illinois  60606
  Tel:  312.681.6000


THOMPSON COBURN LLP
  BY:  BOOKER SHAW
  bshaw@thompsoncoburn.com
  One US Bank Plaza
  St. Louis, Missouri  63101
  Tel:  314.552.6087


BRYAN CAVE LEIGHTON PAISNER
  BY:  STEFANI L. WITTENAUER
  stefani.wittenauer@bclplaw.com
  One Metropolitan Square
  211 North Broadway, Suite 3600
  St. Louis, Missouri  63102
  Tel:  314.259.2000


HUSCH BLACKWELL
  BY:  ERIK L. HANSELL
  erik.hansell@huschblackwell.com
  190 Carondelet Plaza, Suite 600
  St. Louis, Missouri  63105
  Tel:  314.480.1505


ALSO PRESENT:

LISA SCHROEDER - Senior Paralegal, Husch Blackwell
lisa.schroeder@huschblackwell.com

1           THE COURT:  I have no problem with

2     that.  I have a problem where it crosses the

3     line, similar to something we talked about on

4     one of the defense witnesses earlier today where

5     we said you can't talk about the intent of

6     Monsanto or the motive of Monsanto.

7           I think the corollary here is you

8     can't comment on the credibility of what the

9     plaintiff testified to on something as specific

10    as the backpack leaking or something like that.

11          MS. ROSS:  Yes, your Honor.  And I

12    believe we're on the same page.  It would be

13    similar to an expert talking about how fast a

14    car was moving based on tire tread marks.  And

15    certainly an expert can offer testimony --

16          THE COURT:  Right.

17          MS. ROSS:  -- that if credited by a

18    jury might lead them to conclude that somebody

19    else's testimony is not credible.  That is a

20    separate issue from commenting on the

21    credibility of a witness.

22          THE COURT:  So I'll allow Dr. Ditomaso

23    to testify, but not about -- I'm going to rule

24    out his ability to testify on credibility of a

25    witness.

1          Does that make sense?

2          MS. ROSS:  We are not offering him on

3     that issue.

4          Thank you, your Honor.

5          THE COURT:  Well, let's talk about

6     this.  This is the one, so we're clear.  "Dr.

7     Ditomaso himself" -- I'm reading from page 7 --

8     "himself made clear in his deposition that he

9     will not be testifying that plaintiffs are

10    lying, but rather that based on his experience

11    and knowledge in the field, many aspects of

12    plaintiffs' alleged use of Roundup do not square

13    with standard practice and scientific methods."

14         So is that still what you intend?

15         MS. ROSS:  So with respect to

16    crediting -- so what plaintiffs claim they used

17    Roundup to do, Dr. Ditomaso will testify as to

18    what they effect would have been had Ozie Parker

19    sprayed Roundup on his crops from 1975 to 1990.

20         Dr. Ditomaso will comment on orchard

21    management and weed management in the context of

22    how glyphosate would be applied.

23         THE COURT:  And Mr. Kristal, to the

24    last part of what Ms. Ross said, you're fine

25    with that.

1          MR. KRISTAL:  Yes.  But that's

2     different than what your Honor asked.

3          THE COURT:  It is, ish, but I'm okay

4     with where we are, so.

5          MR. KRISTAL:  In other words, the

6     comparison and, therefore, Mr. So-and-so, was

7     not accurate.  That part is the problem.

8          THE COURT:  Right.

9          MR. KRISTAL:  There's no problem

10    having an expert say in my opinion this is how

11    it would be done and if it was done this way

12    this is what would happen, and then the lawyer

13    is arguing Mr. Parker couldn't have done it

14    because you heard what the expert said.

15         THE COURT:  It's very similar to the

16    opposite side, same rule.  So I'll allow

17    Dr. Ditomaso to testify but not concerning the

18    credibility of the witnesses in this case.

19         MR. KRISTAL:  And the last part is the

20    negligible contact.  And I could find the pages

21    that everything he's saying is based solely on

22    his experience from 1995 forward with his

23    personal use and with people he's training that

24    you don't get more than negligible amounts.  And

25    that is not science.  That's simply an

1

## REPORTER'S CERTIFICATE

2
        I, Tina M. Givens, Registered
3
Professional Reporter & Certified Court
Reporter, do hereby certify that I am the
4
Official Court Reporter for Division 8 of the
Circuit Court of the City of St. Louis, State of
5
Missouri; that on March 22, 2022, I was present
in Division 7 and reported all the proceedings
6
had in the case of EARL NEAL, et al.,
Plaintiffs, vs. MONSANTO COMPANY, Defendant,
Cause No. 1722-CC10773.

7

8
        I further certify that the foregoing
pages contain a true and accurate reproduction
9
of the proceedings.

10

11

12
        I hereunto set my hand on this 22nd
day of March, 2022.

13

14

15

16

17

    /s/ Tina Givens
18
    Tina Givens, CCR #481

19

20

21

22

23

24

25

# EXHIBIT 6

ELECTRONICALLY
FILED

SUPERIOR COURT OF THE STATE OF CALIFORNIA

CONTRA COSTA COUNTY

1/24/2020
K. BIEKER, CLERK OF THE COURT
SUPERIOR COURT OF CALIFORNIA
COUNTY OF CONTRA COSTA - MARTINEZ
T.Ciardella, DEPUTY CLERK

Case No. MSC19-01821

KATHLEEN CABALLERO,

                  Plaintiff

V.

MONSANTO COMPANY,

                  Defendant

**ORDER ON PRETRIAL MATTERS INCLUDING SUMMARY JUDGMENT, *SARGON* CHALLENGES, MOTIONS IN LIMINE, REQUESTS FOR JUDICIAL NOTICE**

Part I  Pages 1-30

The Court held pre-trial hearings over the course of several days.  In that time, it heard argument on Monsanto's motion for summary judgment, thirteen requests to exclude expert testimony (largely based on *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal. 4th 747 ("*Sargon*"), forty-three motions in limine, eighty-four requests for judicial notice, and several ancillary matters.  It also conducted its usual pretrial conference resulting in additional rulings.

This Order addresses those matters.  Any pre-trial ruling not included in this Order is evidenced in the daily transcripts.

**I.    Introduction**

Ms. Caballero's case was originally filed in San Francisco Superior Court.  It was then transferred to the Alameda Superior Court and included with the Judicial Council Coordination Proceedings in docket no. 4953.  There, Ms. Caballero moved for a preference in setting.  The motion was granted and the case transferred to Contra Costa County for trial.  Thus, this court

1

exercises "jurisdiction over the action in accordance with the orders and directions of the coordination trial judge." Cal. Rules of Court, Rule 3.543(e).

To that end, the Court has carefully considered the "Order on Applicability of JCCP and *Pilliod* Orders in Individual Trials" filed November 25, 2019 by the Coordination Trial Judge, the Honorable Winifred Y. Smith. In that order, the Coordination Court held,

> "Plaintiffs' request that the court's orders on the admission and exclusion of
> evidence and on general causation in the JCCP and in *Pilliod v.*
> *Monsanto*...should be extended to all the cases in the JCCP is denied." *Id.* at p.1.

It further ordered, "on a JCCP-wide basis...there is good cause for any trial judge to reconsider the court's prior orders on the admission of evidence and general causation." *Id.* at p.10.

However, the Coordination Trial Judge then cautioned,

> "Principles of consistency and judicial efficiency suggest that trial judges who
> hear evidence motions in future Roundup cases might want to consider the orders
> of this court just as this court considered the orders in *Johnson* and in the federal
> MDL for their persuasive value. (Order of 3/18/19 at 3:10-4:24.) (See also CCP
> 404.1 [coordination is to avoid "the disadvantages of duplicate and inconsistent
> rulings"].) This court will not order other trial judges to use a wheel that was
> designed based on the evidence in the JCCP and in *Pilliod* in the summer of 2019.
> Other trial judges might, however, independently decide to consider or follow this
> court's orders as a way to avoid the effort of reinventing the wheel." Order on
> Applicability of JCCP and *Pilliod* Orders in Individual Trials, filed November 25,
> 2019 at p.10-11.

8) Dr. Benbrook may not offer an opinion about whether Monsanto misled the EPA. He has insufficient basis to do so.

9) Dr. Benbrook may not testify on Monsanto's motive, intent or state of mind. He has adduced no basis for doing so other than reading and narrating documents. See points 4 and 5 immediately above.

10) Counsel said he wants Dr. Benbrook to testify about "the entire history of glyphosate." That is excluded. To a considerable extent, this relies on matters that violate *People v. Sanchez*.

If, by the time Dr. Benbrook testifies, plaintiff seeks to expand his testimony by allowing him to testify about hearsay statements that have been proven by competent evidence or that are covered by a hearsay exception, plaintiff shall make an offer of proof, outside the presence of the jury, no less than two days before he testifies. Plaintiff may amend that offer to include any additional competent evidence that was adduced on the day before Dr. Benbrook testifies.

One last caution. The Court has read the prior transcripts carefully. In some instances, either counsel or Dr. Benbrook did not take sufficient care to follow the rules that had been given in limine. E.g. *Pilliod* transcript, compare p. 3475 (no testimony about political affiliation) with p. 3501 (discussing Democrats and Republicans); see also p. 3521 (alluding to criminal prosecution re IBT which had apparently been excluded). The Court orders plaintiff's counsel to review this order carefully with Dr. Benbrook so there are no violations.

### G. Plaintiff's Motions

#### 1. Joseph DiTomaso

Plaintiff moves to exclude the testimony of Dr. Joseph DiTomaso, a weed scientist at the University of California at Davis. Essentially, plaintiff argues that Dr. DiTomaso is going to usurp the function of the jury by urging it to accept Mr. Caballero's testimony over Ms. Caballero's.

30

As Monsanto explains, that is not what Dr. DiTomaso will do.   He is a distinguished scientist who teaches "weed science." That work includes, among other things, weed control options.  He is also a Cooperative Extension Specialist and provides practical information to the general public about weed control.  Monsanto offers him to discuss how Roundup is used.  His subjects include, "the types of herbicide available to farmers, the types of sprayers that are commercially available, the amount of time it takes to treat a plot of land with Roundup, how much and how often Roundup is typically used, standard practices for the use of Roundup with other weed control techniques, the standard uses for Roundup in nurseries and small farms, and the principle of "drift" and how that principle applies to herbicide applications." Monsanto's Opposition to *Sargon* Motion to Exclude Joseph M. DiTomaso, Ph.D. at 4:24-28.

Dr. DiTomaso has reviewed the deposition testimony of plaintiff and of her former husband.  He is prepared to opine that Ms. Caballero's description of her use of Roundup is unrealistic.  For example, he observes that she testified that she sprayed Roundup between rows of sugarcane.  But, he observes, Roundup is not recommended for use once the crop emerges aboveground.  Plaintiff says that Mr. Caballero testified that they never sprayed the sugarcane, and therefore fears that Dr. DiTomaso will instruct the jury to believe Mr. Caballero rather than Ms. Caballero.  That is not a fair import of the testimony he has given so far, and the court will be alert to any appropriate objections should he seek to do that.

Similarly, Dr. DiTomaso will testify that it is unlikely that plaintiff used an eight to ten gallon backpack sprayer to apply Roundup, because such a backpack sprayer does not exist, and if it did, would weigh approximately 100 pounds. *Id.* at 2:10-11.

Plaintiff's reply brief quotes two short excerpts in which her counsel asked if the witness found Ms. Caballero's testimony credible. Plaintiff Kathleen Caballero's Reply in Support of Plaintiff's Sargon Motion to Exclude the Opinions and Testimony of Dr. Joseph M. DiTomaso, Ph.D. at 2:15-23.  But Dr. DiTomaso did not appear to offer any such opinion in his report or his

own statement of his opinions.  That was cross-examination by plaintiff's counsel.  If counsel

does not wish to have such a statement in evidence he need not ask the question.

Plaintiff then argues that if Dr. DiTomaso testifies, it should be allowed to impeach that

testimony with evidence of Mr. Caballero's "prior acts of moral turpitude." Plaintiff's *Sargon*

Motion to Exclude the Opinions and Testimony of Joseph M. DiTomaso, Ph.D. at 8:1-2.  That is

the subject of a separate motion in limine and is dealt with below.

Plaintiff's motion to exclude or limit the testimony of Dr. DiTomaso is denied.

Plaintiff makes an allied argument: if Dr. DiTomaso is allowed to testify as to the

benefits of Roundup, then plaintiff should be able to introduce all evidence about the negative

effects of Roundup, including the development of genetically modified organisms ("GMO"),

Monsanto's sale of patented seed, its destruction of non-GMO agriculture and a further parade of

horribles.

Obviously this raises concerns under Ev. C. § 352.  This trial is about whether Roundup

caused Ms. Caballero's NHL.  It is also about whether punitive damages should be awarded.

However, all that requires a careful balancing.  Not everything that plaintiff considers a bad act

by Monsanto is relevant to punitive damages in *this* case.

Dr. DiTomaso may discuss the eight points that were listed on pages 1 and 2 in his expert

report in the *Giglio* case. Hoke Declaration, Exhibit 8, p.32-33; Exhibit 3 to Exhibit 8, the expert

report, pages 1 and 2.  He may describe the history of the development of Roundup, what

properties Monsanto was seeking in an herbicide, and how Roundup met those objectives.   But

the more he opines generally on the benefits of Roundup in the history of world agriculture, the

more he opens the door to wider cross-examination.  At the conclusion of his direct testimony

the parties and the court will discuss, outside the presence of the jury, the extent to which

plaintiff seeks to cross-examine.  The general rule to be applied is that the cross-examination

must be within the scope of the direct examination.

1   or otherwise satisfies a condition of admissibility, it must file and serve a pleading specifying

2   what it believes to be the result of the ruling and identifying the further action it seeks from the

3   court.

4   **VI.    The Deferred Prosecution Agreement**

5           At oral argument, plaintiff provide the court and defense counsel with a set of papers that

6   were filed on November 21, 2019 in the United States District Court for the District of Hawaii.

7   The first pleading is entitled "Deferred Prosecution Agreement for Defendant Monsanto

8   Company."

9           Plaintiff says he wishes to use it, but was unable to articulate how he wishes to do so.

10  Monsanto objects.

11          No reference will be made in opening statements to this filing, the events discussed in

12  this set of papers, or Monsanto's plea to Count 3 (a misdemeanor violation of 7 U.S.C.

13  136j(a)(2)(K) of an Information included in this set of papers.  Should plaintiff wish to refer to

14  these matters or put the set of papers (or some part of them) in evidence, she must first seek

15  permission outside the presence of the jury.

16

    Date: January 24, 2020

17

18

19

20

21

22                                                  Barry P. Goode
                                                    Judge, Superior Court
23

24

25

# EXHIBIT 7



COURT REPORTING

LEGAL VIDEOGRAPHY

VIDEOCONFERENCING

TRIAL PRESENTATION

MOCK JURY SERVICES

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS





NAEGELI
DEPOSITION & TRIAL



(800) 528-3335

NAEGELIUSA.COM

# IN THE CIRCUIT COURT OF THE STATE OF OREGON FOR JACKSON COUNTY

LARRY JOHNSON and GAYLE JOHNSON,

      Plaintiffs,

v.

MONSANTO COMPANY, a
corporation; EAGLE POINT
HARDWARE, LLC, a
corporation,

      Defendants.

_____

TRANSCRIPT OF

JURY TRIAL - DAY TWELVE

HELD ON
THURSDAY, JUNE 9, 2022

BEFORE
THE HONORABLE CHARLES KOCHLACS

JACKSON COUNTY CIRCUIT COURTHOUSE
100 SOUTH OAKDALE AVENUE
MEDFORD, OREGON 97501

1                          **APPEARANCES**

2

3   **For the Plaintiffs:**

4   Charles Miller, Esquire

5   Eric Pearson, Esquire

6   **HEYGOOD ORR & PEARSON**

7   6363 North State Highway 161, Suite 450

8   Irving, TX 75038

9   (214) 237-9001

10  (214) 237-9902 Fax

11  charles@hop-law.com

12

13  David Linthorst, Esquire

14  **ANDERSEN MORSE & LINTHORST**

15  1730 East McAndrews, Suite A

16  Medford, OR 97504

17  (541) 773-7000

18  (541) 608-0535 Fax

19  david@andersenlaw.com

20

21

22

23

24

25

1                    **APPEARANCES CONTINUED**

2

3    Kimberly Loutey,Esquire

4    **KIRKENDALL DWYER**

5    4343 Sigma Road, Suite 200

6    Dallas, TX 75244

7    (877) 503-1595

8

9    **For the Defendants:**

10   Frederic Norris, Esquire

11   **HUSCH BLACKWELL, LLP**

12   1999 Harrison Street, Suite 700

13   Oakland, CA 94612

14   (510) 768-0650

15   (510) 768-0651 Fax

16   rick.norris@huschblackwell.com

17

18

19

20

21

22

23

24

25

```
 1                 APPEARANCES CONTINUED

 2

 3  Dominic Campanella, Esquire

 4  BROPHY SCHMOR, LLP

 5  201 West Main Street, 5th Floor

 6  Medford, OR 97501

 7  (541) 772-7123

 8  (541) 772-7249 Fax

 9  dcampanella@brophylegal.com

10  rbennett@brophylegal.com

11

12  Kurt Mathas, Esquire

13  George Lombardi, Esquire

14  Karalena Guerrieri, Esquire

15  WINSTON & STRAWN, LLP

16  35 West Wacker Drive

17  Chicago, IL 60601

18  (312) 558-5600

19  (312) 558-5700 Fax

20  kmathas@winston.com

21

22

23

24

25
```

1              **APPEARANCES CONTINUED**

2

3    Alexandra Whitworth

4    **BRYAN CAVE LEIGHTON PAISNER LLP**

5    120 Broadway, Suite 300

6    Santa Monica, CA 90401

7    (310) 576-2100

8    (310) 576-2200 Fax

9    alex.whitworth@bryancave.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**NAEGELI**
DEPOSITION & TRIAL

**(800)528-3335**
**NAEGELIUSA.COM**

 1  I've raised, your Honor.  So we'd just like some

 2  guidance.  And, frankly, we don't think this witness

 3  should be allowed to testify at all.

 4          **THE COURT:**  Okay.

 5          **MR. NORRIS:**  Yes, your Honor.  I know you

 6  like guidance from other courts.  Weed scientists

 7  have testified in two other prior trials.  It's

 8  never been excluded on a weed science basis.

 9          And I am not going to suggest that -- she

10  is not going to talk about "feed the world."  I want

11  to be very clear about that.  Your Honor, in the

12  motion in limine on that, allowed us to introduce

13  evidence as to the utility around the home, and

14  that's all she's going to talk about and how it

15  works around the home.

16          She's going to talk about how Roundup

17  works and how over time, when you reduce the weed

18  burden on the property, the number of weeds go down

19  and the amount of spraying would need to go down

20  over time.  And it -- and which goes slightly to the

21  weight and credibility of whether or not they were

22  spraying as much as they say that they were spraying

23  on this property. That is perfectly proper to call

24  some -- into question the amount of use or the

25  amount of bottles that were used on the property.

1   That is solely within the province of an expert

2   witness to talk about and to address why that might

3   not be needed, and also the times of year that

4   sprays would be needed based on her experience here

5   in Oregon with weeds and when they grow, where they

6   grow, how they grow.

7         And -- but, no, she's not -- she's not a

8   medical doctor.  She's not going to talk about Mr.

9   Johnson and whether his cancer was caused by

10  Roundup.  She's not going to talk about dermal

11  absorption issues, which I think they raised. She's

12  going to talk about weeds, how they work, how

13  Roundup works on those weeds, how it works with --

14  operates with a shikimate pathway to kill those

15  weeds.  And how -- and to the extent she's talking

16  about labels, she's going to talk about as a weed

17  scientist how they rely upon the EPA for what's on

18  the label and that guides the way that they work

19  with not just Roundup but other herbicides that they

20  use in their job.

21        Her testimony is not likely to last more

22  than, you know -- this is not a -- this is a

23  component of our case, but it's a -- it's likely to

24  be maybe 45 minutes to an hour at most on direct

25  examination, just hitting on the topics within her

1  area of expertise.  Is there anything else?

2          **THE COURT:**  Here's --

3          **MS. LEE:**  Go ahead.

4          **THE COURT:**  The utility around the house,

5  that's fine.  How it works is fine.  Weeds go down

6  over time is fine. But I just don't see the

7  testimony about he shouldn't have used so much.

8  Like that's not -- is that on the label?  Like --

9          **MR. NORRIS:**  She's not going to say that.

10 She's absolutely not going to say that.

11         **THE COURT:**  My notes say "shouldn't have

12 used so much."

13         **MR. NORRIS:**  No.  She's not going to use

14 those words in any way, shape, or form.  She's just

15 going to say that the way he described using it was

16 proper.  Most likely, wouldn't have needed six or

17 more bottles per year.  That seems a little bit

18 high.  But otherwise, the way he used it was

19 consistent.

20         She's also going to talk about the fact

21 that she went on the site inspection, she saw the

22 property, she took photographs of the weeds at the

23 property.  As it relates to other chemicals, she's

24 not going to talk about the other chemicals in the

25 shed.

1          **MS. LEE:**  Yeah.

2          **MR. NORRIS:**  But she took, you know,

3    photographs when she was there.

4          **THE COURT:**  So six or more bottles seeming

5    high, that almost seems like that would benefit you,

6    because he sprayed all that lawn.

7          **MR. PEARSON:**  But what they're doing,

8    Judge -- and I mean, they basically said this.

9    They're trying to bring in someone who's a weed

10   science expert with all the credibility that

11   entails.  She's highly educated.  She's highly

12   qualified as a weed scientist.  And they're trying

13   to, in a sort of backhanded way, attack Mr.

14   Johnson's credibility about his usage.  Counsel even

15   admitted that.

16          But unless they're going to concede the

17   connection between -- between Roundup and cancer,

18   whether he used a lot or a little, you know, again,

19   the jury -- the jury is the judge of Mr. Johnson's

20   credibility.  They're trying to get her to say, "He

21   didn't need to use this much.  Therefore, I don't

22   think he really told the truth about what he did

23   use."

24          Because let's say she proves he used too

25   much Roundup.  That has no relevance.  The only

1  relevance could be if she's implying -- and counsel

2  just said that's exactly what they're doing -- that,

3  "No reasonable person would have used as much

4  Roundup as Mr. Johnson said he did, and here's why,

5  as a weed scientist, he didn't need to do that.

6  Therefore, what I'm telling you, jury, is Mr.

7  Johnson was lying.  And you shouldn't believe what

8  he said."

9          **THE COURT:**  Okay.  So that's improper if

10  that's --

11          **MR. PEARSON:**  That's exactly.

12          **THE COURT:**  If they're saying six or more

13  bottles seems high, or seems like a lot --

14          **MR. PEARSON:**  For 40 -- over 40 years?

15          **MR. NORRIS:**  No.  Per year.

16          **MS. LEE:**  The testimony is per year.

17          **MR. PEARSON:**  Again, Judge.  Let's say --

18          **THE COURT:**  Are they trying to say, well,

19  he's lying about that?

20          **MR. PEARSON:**  Yes.

21          **THE COURT:**  Or that's the amount he used

22  and that seems high?  There's a difference.

23          **MR. PEARSON:**  The only utility of that

24  argument, again, they're not conceding Roundup

25  causes cancer.  So more use means more likely to

1  have cancer, they're not making that argument.

2  They've dropped the misuse defense.  They've agreed

3  they're not going to allege Mr. Johnson misused the

4  product. They don't have any kind of comparative or

5  contributory argument.

6         So if the argument is Mr. Johnson used too

7  much Roundup, that's not relevant to any issue in

8  trial.  The only relevance -- and counsel admitted -

9  - is they're trying to say, "Look, jury, wink, wink,

10  nod, nod, Mr. Johnson lied to you. There's no way he

11  used this much, because if he used that much, that

12  was way more than he needed to use."

13         And they're doing it in the guise of an

14  expert, whose testimony will have greater weight

15  with the jury.  And they shouldn't be allowed to

16  bring in an expert to try to attack Mr. Johnson's

17  credibility.  The jury is the judge of his

18  credibility.  If they can explain some other

19  relevance of this allegation that it shouldn't have

20  taken that much Roundup to control his weeds, then,

21  fine.  But the only reason to do that is to try to

22  impugn Mr. Johnson's credibility.  And that's

23  improper use of an expert.

24         **THE COURT:**  Okay.  So we've got -- okay.

25         Mr. Norris, anything?

1           **MR. LOMBARDI:**  Your Honor, if I may, we --

2    Mr. Johnson's credibility is at issue in this case,

3    obviously. And we are entitled -- we don't have to

4    accept that he actually used six to eight bottles.

5    One way to establish that is for a weed scientist to

6    go on the property, as she did, review the property,

7    and make determinations of her own as to what would

8    be necessary to actually get rid of weeds.

9           And she is entitled to testify that once

10   you use Roundup, it's an effective herbicide and

11   weeds don't just continually come back.  And she's

12   entitled to talk about what the climate's like

13   around here and whether it's -- we've heard that he

14   sprayed from March through October.  We're entitled

15   to introduce evidence that calls into question that.

16          And so she's not going to -- she's not

17   going to specifically say Mr. Johnson did or did not

18   tell the truth. She's going to say objectively, as

19   an expert, how -- how Roundup works, how it gets rid

20   of weeds, and what would be necessary on a property

21   like this.  And so it's totally appropriate.

22          **THE COURT:**  So she's going to come in and

23   say how much she thinks is necessary for this

24   property based on --

25          **MR. LOMBARDI:**  Her -- she's been to the

1 property, and you know, she's looked at all the

2 places that he says he sprayed and so forth.  And

3 also taking into account the weather around here,

4 which we've heard about from Plaintiffs.

5       **THE COURT:**  Nonetheless, he still could be

6 telling the truth and just using a lot of Roundup.

7 It could go either way.

8       **MS. LEE:**  Absolutely.

9       **MR. LOMBARDI:**  Yeah.  He could.  And that

10 will be for the jury to decide.

11       **THE COURT:**  Okay.  I'm going to allow this

12 testimony.

13       **MR. PEARSON:**  What about the labels, your

14 Honor? That was the last thing I wanted to mention.

15 They said that weed scientists rely on the EPA for

16 labels.  I guess they're going to try to argue that

17 only the EPA can control the label; Monsanto can't

18 control the label.  Those are issues that are way

19 outside of her purview.  I don't know what she could

20 add to the labels.  They're black and white and

21 there's --

22       **THE COURT:**  She relies on the labels?

23       **MR. NORRIS:**  That's it.

24       **MR. PEARSON:**  Weed scientist.

25       **MS. LEE:**  That's all she's going to say.

1        **MR. PEARSON:**  So what?

2        **THE COURT:**  I think she can testify.  That

3  -- that's fine with me.

4        **MR. PEARSON:**  Okay.

5        **THE COURT:**  Thank you.

6        **MR. MATHAS:**  Your Honor, very briefly.

7  One more issue before you bring in the jury, and I

8  know you want to get them in here.  We've talked

9  about some exhibit issues, and yesterday there was a

10  discussion of getting us the remaining exhibits that

11  Plaintiffs were likely to use in cross-examination.

12  We did get an amended exhibit list yesterday.  We

13  didn't get additional exhibits with it.

14        But there is one exhibit that was on the

15  exhibit list that we have concerns about, your

16  Honor.  It's Exhibit-414. We've prepared a bench

17  brief that I would like to hand up to your Honor.

18  And we'd be happy to take up any issues with

19  Exhibit-414 at sidebar before it's offered, but we

20  just don't want the document being put up.

21        **THE COURT:**  When will it be offered?

22        **MR. ORR:**  It's not going to be offered

23  today.

24        **THE COURT:**  Okay.  So can you brief -- get

25  me the bench brief?

1                    <u>REPORTER CERTIFICATION</u>

2          I, PHOEBE S. MOORHEAD, Registered Professional

3    Reporter, do hereby certify:

4          That the foregoing proceedings were taken before me

5    at the time and place set forth herein and were taken down by

6    me in shorthand and thereafter transcribed into typewriting

7    under my direction and supervision;

8          That the foregoing pages contain a true and

9    correct transcription of my said shorthand notes so taken.

10         I FURTHER CERTIFY that I am neither counsel for nor

11   related to any party to said action nor in anywise interested

12   in the outcome thereof.

13         Certified and dated this 10th day of June, 2022.

14

15

16

17   _____
              PHOEBE S. MOORHEAD, RPR, CRR

18            Certified Shorthand Reporter
              for the State of Utah

19

20

21

22

23

24

25

# EXHIBIT 8



**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF SAN FRANCISCO**

# Document Scanning Lead Sheet

May-17-2018  3:24 pm

Case Number: CGC-16-550128

Filing Date: May-17-2018 3:23

Filed by:  DANIAL LEMIRE

Image: 06341189

ORDER

DEWAYNE JOHNSON VS. MONSANTO COMPANY ET AL

001C06341189

**Instructions:**
Please place this sheet on top of the document to be scanned.

**F I L E D**

San Francisco County Superior Court

MAY 1 7 2018

CLERK OF THE COURT

BY: _____
Deputy Clerk

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO

|  |  |
|---|---|
| DEWAYNE JOHNSON, ET AL.<br><br>Plaintiffs,<br><br>vs.<br><br>MONSANTO COMPANY, ET AL.<br><br>Defendants. | Case No. CGC – 16-550128<br><br>**ORDER ON (1) MONSANTO'S OMNIBUS *SARGON* MOTION; (2) MONSANTO'S MOTION FOR SUMMARY JUDGMENT; (3) PLAINTIFF'S OMNIBUS *SARGON* MOTION; (4) PLAINTIFF'S MOTION FOR SUMMARY ADJUDICATION** |

Plaintiff Dewayne Johnson brought this products liability action against Monsanto alleging he contracted non-Hodgkin lymphoma (NHL) as a result of his exposure to glyphosate, which is contained in Monsanto's herbicides such as Roundup®. Complaint ¶¶ 74-75. Five motions are presently before me: (1) Monsanto's Motion to Exclude Johnson's Experts; (2) Monsanto's Motion for Summary Judgment or Summary Adjudication; (3) Johnson's Motion to Exclude Improper Opinions of Monsanto's Experts; (4) Johnson's Motion for Summary Adjudication; and (5) Johnson's Motion for Judicial Notice.

I heard argument May 10, 2018.

**I.      Requests for Judicial Notice and Evidentiary Issues**

These rulings apply only to the motions decided in this order, and not to the trial.

clinical manifestation." *Id.* Dr. Kuzel also explained that a 1 cm. mass contains about one billion cells, and that it would likely take multiple years to go from single cells to hundreds of millions. *Id.* At deposition, Dr. Kuzel testified that he has "no comment about latency period in specifics of glyphosate and non-Hodgkin's lymphoma. I have specifics about latency in general," explaining that this was because "there is no link to glyphosate in non-Hodgkin's lymphoma so there is no way to calculate what the latency period would be" so it is "hard to speculate on latency periods. But latency periods for carcinogens are in general long, years." *Id.*, Ex. B at 105:18-24, 139:21-140:20. Dr. Kuzel did state that he would not consider it possible that glyphosate caused mycosis fungoides unless, in the absence of a fairly prolonged exposure, the exposure had been five to ten years prior. Edwards Decl., Ex. 15 at 145:2-13.

Johnson argues that Dr. Kuzel's latency opinions should be excluded because he did not employ any methodology to reach them. Motion, 3-4. In opposition, Monsanto focuses on testimony from Johnson's experts that it views as consistent with Dr. Kuzel's latency opinions and his discussion of the amount of time it takes for tumors to grow. Opposition, 3-4.

Dr. Kuzel's deposition testimony reveals that his opinion on latency periods relating to *Johnson's* specific mycosis fungoides is speculative, and it is excluded on that basis. Dr. Kuzel himself states that it is "hard to speculate on latency periods" and offers nothing to support his opinion except generalities about cell reproduction. *Sargon*, 55 Cal.4th at 771. But Dr. Kuzel does have sufficient expertise to discuss latency generally.

### iii.    Noncompliance with Treatment Recommendations

Dr. Kuzel opines that Johnson's condition "may have been exacerbated by his inconsistent compliance with and refusal of some treatments." Hoke Decl., Ex. A at 5. At deposition, Dr. Kuzel testified that it is impossible for him to know whether Johnson's condition

was exacerbated because he cannot observe what would have happened if Johnson had received the treatments he missed. *Id.*, Ex. B at 159:9-161:16. Dr. Kuzel also testified that a question about one specific missed treatment would be better directed to the treating physician. *Id.*, Ex. B at 160:22-161:12.

As Monsanto aptly describes Johnson's motion, "Because Dr. Kuzel could not say for sure whether noncompliance hurt Plaintiff, Plaintiff now moves to prevent him from saying that it may have." Opposition, 4-5.

The argument here is similar to Johnson's implicit position as to Dr. Kuzel's opinion as to other factors associated with mycosis fungoides. As was the case there, the motion to exclude Dr. Kuzel's opinion is denied. Dr. Kuzel's opinion is based on subject matter within his expertise.

### c.  Benefits of Glyphosate

Johnson seeks an order excluding the opinion of Dr. Kassim Al-Khatib. Proposed Order, 1. Johnson's motion is based solely on relevance and duplicative of a motion in limine. Motion, 8; Opposition, 7-8. The pertinent motion in limine was denied. *See* April 3, 2018 Order, 3. In Johnson's reply brief, which followed denial of the motion in limine, Johnson made no mention of Dr. Al-Khatib's opinion. Reply, 10 (requesting only exclusion of opinions of Drs. Kuzel, Mucci, and Rider). For the reasons alluded to in my order denying the motion in limine, some portions of Dr. Al-Khatib's opinion may be relevant. April 3, 2018 Order, 3:10-15. Whether or not the request has been abandoned, the motion to exclude Dr. Al-Khatib's opinion as irrelevant is denied.

of 2002), Ex. 19 (introduced to show the Monsanto's employee believed it was inappropriate to say that Roundup does not cause cancer because Monsanto had not done carcinogenicity studies with Roundup as of 2009), Ex. 21 (introduced as evidence that Monsanto had a practice of ghostwriting scientific literature about glyphosate in and around 2015), Ex. 22 (introduced as evidence that Monsanto ghost wrote scientific literature about glyphosate as far back as 1999), Ex. 24 (introduced as evidence of Monsanto's sponsorship of literature for the purpose of defending products liability claims regarding glyphosate in 2012), Ex. 25 (introduced to show that Monsanto calculated the benefits of securing certain experts to lend credibility to their sponsored studies in 2012).

Thus there are triable issues of material fact and I must deny the motion.

**Summary and Conclusion**

(1) Monsanto's Omnibus *Sargon* Motion:  I exclude (A) Dr. Portier's pooling analysis and any conclusions that depend on it; (B)  Dr. Sawyer's water permeability test and cancer slope opinions; (C)  Dr. Benbrook's testimony as listed above (6 topics); (D) Mills' opinion as to Johnson's total lost income assuming employment until two years before his life expectancy, unless and until evidence that Johnson would have worked until two years before his life expectancy is offered. Otherwise the motion is denied.

(2)  Johnson's Omnibus *Sargon* Motion: I exclude (A) Dr. Rider's opinion that the epidemiological evidence precludes the conclusion that there is a causal relationship between glyphosate exposure and NHL (assuming she intends to express such an opinion); (B)  Dr. Kuzel's mycosis fungoides latency opinion, although Dr. Kuzel may opine generally as to latency for cancers.  Otherwise, the motion is denied.

(3)  Monsanto's motions for summary judgment and adjudication: these are denied.

(4)  Johnson's motion for summary adjudication: this is granted.

Dated: May **16**, 2018

Curtis E.A. Karnow
Judge Of The Superior Court

## CERTIFICATE OF ELECTRONIC SERVICE
### (CCP 1010.6(6) & CRC 2.260(g))

I, DANIAL LEMIRE, a Deputy Clerk of the Superior Court of the County of San Francisco, certify that I am not a party to the within action.

On **MAY 17 2018** , I electronically served THE ATTACHED DOCUMENT via File & ServeXpress on the recipients designated on the Transaction Receipt located on the File & ServeXpress website.

Dated: **MAY 17 2018**

T. Michael Yuen, Clerk

By: _____
     DANIAL LEMIRE, Deputy Clerk

# EXHIBIT 9

Page 155

1      IN THE CIRCUIT COURT OF THE 17TH JUDICIAL
                       CIRCUIT
2          IN AND FOR BROWARD COUNTY, FLORIDA

3

   RICHARD WYZIK, et al.,
4
              Plaintiffs,
5                                   CASE NO.
         -against-                  CACE21-002871
6
   MONSANTO COMPANY,
7
              Defendant.
8

9

10              JURY TRIAL (IN COURT)
                       AND
11          MOTION HEARING (VIA ZOOM)

12          Broward County Courthouse
               201 SE 6th Street
13        Fort Lauderdale, Florida 33301

14               10/27/2022
               9:48 a.m. (EDT)
15               VOLUME 2
               PAGES 155 - 291
16

17

18

19

20      BEFORE:  THE HONORABLE PATTI ENGLANDER
        HENNING, PRESIDING
21

22

23

24      REPORTED BY:  AMANDA GORRONO, CLR
        CLR NO. 052005-01
25      JOB NO. 218985

Page 156

```
 1   A P P E A R A N C E S
 2   ON BEHALF OF PLAINTIFFS RICHARD WYZIK, et al.:
 3     Juan Bauta, Esquire
       Daniel DiMatteo, Esquire
 4     The Ferraro Law Firm
       600 Brickell Avenue
 5     Miami, Florida 33131
 6
 7
 8
 9
10
11
12
     ON BEHALF OF DEFENDANT MONSANTO COMPANY:
13
       Anthony Upshaw, Esquire
14     McDermott Will & Emery
       333 Avenue of the Americas
15     Miami, Florida 33131
16
17
18   COCOUNSEL ON BEHALF OF DEFENDANT MONSANTO
     COMPANY:
19
       Pamela Yates, Esquire
20     Arnold & Porter
       777 South Figueroa Street
21     Los Angeles, California 90017
22
23
24
25
```

Page 157

```
 1               I N D E X
 2                                              PAGE
 3   JURY TRIAL - PROSPECTIVE JUROR HARDSHIPS   158
     (CONT'D)
 4   (IN COURTHOUSE)
 5                                              209
     MOTION HEARING (VIA ZOOM)
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 158

```
 1        THE COURT CLERK:  Panel is
 2   entering.
 3        (Prospective Jurors entering.)
 4        THE BAILIFF:  All accounted for,
 5   Your Honor.
 6        THE COURT:  Thank you.
 7   You-all may be seated.
 8        MR. BAUTA:  Thank you, Judge.
 9        THE COURT:  Good morning, ladies
10   and gentlemen.  I think it will be
11   easier if I do two things.  One, if I
12   take my mask off to be able to speak
13   with you, you'll hear me more clearly.
14   Number two, if I stand up, I think it
15   will be a better visual between me and
16   you, so I will do both.  However, I do
17   want you to know that the choice of
18   wearing a mask is yours.
19        If you wish to have a mask and
20   don't have one with you at this time,
21   we do have masks to provide for you.
22   I will tell you that they are not the
23   N95s or the KN95s, because when the
24   court ordered them, it was early on in
25   COVID when they were telling us paper
```

Page 159

```
 1   masks were okay.  That's what we have,
 2   but I will provide you with two of
 3   them if you have concerns so you can
 4   double mask if you wish to.
 5        But again, that choice is yours,
 6   I will just ask that you please
 7   provide courtesy to whatever choice
 8   anybody has decided to make.
 9        It was no doubt, I'm sure, that
10   you noticed when you were downstairs
11   that all of you came up into this
12   courtroom, that you have all been
13   called for this trial, that I'm going
14   to be having here.
15        What I would like to do is
16   introduce myself to you, tell you a
17   little bit of what the process is
18   going to be.  My name is Judge Patti
19   Englander Henning.  I am a circuit
20   judge here in Broward County and
21   that's also the 17th Judicial Circuit
22   We are in divisions and I sit in the
23   Complex Civil Division.  As the name
24   sounds, it is hearing cases that are
25   more complex either because of the
```

Page 220

1        MR. UPSHAW:  So taking that one
2   down, we're done with that one.  So
3   that was No. 8.
4        So we can start back at the top
5   of the list because I thought those
6   were the ones that were easy.  Let's
7   start back at the top of the list,
8   Your Honor, with Plaintiffs' motion to
9   exclude Dr. McElroy.
10       MR. BAUTA:  So, Judge,
11  Dr. McElroy has a Ph.D.  If you read
12  our papers, in basically weed science.
13  And I don't have a problem with him
14  talking about things that are within
15  his expertise.
16       But the depositions have
17  revealed that he also wants to talk
18  about licensing requirements in
19  Florida, about what information
20  Mr. Wyzik would have gained through
21  these licensing requirements even
22  though he himself is not licensed in
23  Florida.  He's not part of the
24  regulatory scheme in Florida.  He's
25  got no information about that other

Page 221

1   than having read the initial statute.
2        He has not reviewed the
3   materials that are provided by Florida
4   for licensing and so as a result of
5   that, he should not be allowed to just
6   get up there and say, well, this is
7   what's required in the Florida and
8   this is what the licensing scheme is
9   and this is what this would have done
10  for Mr. Wyzik, what information
11  Mr. Wyzik should have gleaned from it.
12       He can certainly talk about that
13  Roundup works and how it works on a
14  weed, but that's it.  That's his
15  background.  He's not a lawyer, a
16  regulator.  He's not someone that's
17  done anything other than deals with
18  people in landscaping and in golf
19  courses about how to manage weeds.
20       MR. MEYERS:  Good afternoon.
21  This is Daniel Meyers on behalf of
22  Monsanto.  We're just working through
23  some sound to make sure that there's
24  not an echo.
25       MR. BAUTA:  We hear you fine, if

Page 222

1   that's what you're concerned about.
2        MR. MEYERS:  Okay.  Is there not
3   an echo?
4        THE COURT:  Not one that bothers
5   us.
6        MR. MEYERS:  I will keep going
7   then.
8        Hearing Mr. Bauta, it sounds
9   like the only thing that he raised
10  just now is whether or not Dr. McElroy
11  can offer an opinion that Mr. Wyzik
12  and Greener Image did not have a
13  license.
14       I would like to note that was
15  not raised in a motion of limine or in
16  their Daubert motion.  It was actually
17  raised in a motion in limine and it
18  was Motion in Limine No. 13 that the
19  Court denied back on July 20th.  So
20  I'm a little surprised to be hearing
21  that argument now.
22       To remind the Court, Dr. McElroy
23  is going to simply be informing the
24  jury that there are licensing
25  requirements in Florida for certain

Page 223

1   pesticides and the reason for those
2   are so that licensed users of the
3   chemicals such as Roundup have proper
4   training about the chemicals, they
5   learn about how to use them, they
6   learn about safety precautions, PPE.
7        He is -- nobody is going to be
8   claiming that Mr. Wyzik violated the
9   law or anything that he would need a
10  legal degree for.
11       So the fact that it wasn't
12  raised in their Daubert motion and
13  that the Court already denied this
14  motion in limine, we think that
15  Mr. Bauta's request today should be
16  denied.
17       MR. BAUTA:  Judge, I think the
18  issue on --
19       MR. MEYERS:  Mr. Bauta, you're
20  on mute.  We can't hear you.  I'm
21  sorry.  I apologize.  One second.
22  There we go.
23       MR. BAUTA:  Okay.  Are we good?
24       MR. MEYERS:  We're good.
25       MR. BAUTA:  Now the echo is

Page 224

1 there.
2       MR. MEYERS:  I'll go on mute.
3       THE COURT:  Right.
4       MR. BAUTA:  Judge, I think when
5 you, to the extent we addressed this
6 before, you had mentioned that you
7 didn't know how he was going to be
8 able to talk about licensing from an
9 evidentiary standpoint, and if that's
10 what we're going to do, then let's see
11 what happens when they put him on the
12 stand.
13       THE COURT:  Okay.
14       MR. UPSHAW:  All right.  Judge,
15 the next one, which is the Plaintiffs'
16 request for judicial notice, with the
17 Court's permission, I would like to
18 move that to the end.  The gentleman,
19 Mr. Soriano, who is going to argue
20 that, is actually on his way here from
21 the airport -- he should be here about
22 the time that we finish these up.
23       So we agree to No. 3.  The next
24 one is No. 4, which is Plaintiffs'
25 Motion in Limine No. 15, improper

Page 225

1 bolstering.
2       MR. BAUTA:  Judge, this is a
3 motion that's really just designed to
4 have a conversation about the rules in
5 Florida because the depositions that
6 Monsanto wants to use in this case
7 that have been taken in other
8 jurisdictions do a great amount of
9 bolstering of experts.  They have
10 witnesses that basically go through on
11 direct the various studies that have
12 addressed the glyphosate issue in
13 great detail.  And that would be
14 improper in Florida.
15       As the Court knows, Florida's
16 rule on bolstering is different than
17 the federal rule is different than
18 what you have in a lot of states.  And
19 so when you have these depositions
20 that are being imported from these
21 jurisdictions that allow bolstering,
22 it creates an issue.
23       And so one of the things that's
24 been going on is we've been trying to
25 work out our page and line

Page 226

1 designations.  But, obviously, when
2 witnesses go on in a very detailed
3 analysis of a study to support their
4 opinions that, that Roundup doesn't
5 cause cancer or any other disease,
6 then that creates a problem.  And so
7 we haven't been able to work those out
8 in deposition because of this, in my
9 opinion, misunderstanding of how
10 bolstering works in Florida.
11       And so rather than fight it out
12 in a small, in lots of little battles
13 we did a motion in limine, just to
14 have a conversation about bolstering.
15       THE COURT:  Okay.  Who's got
16 this one?
17       MS. FILIPPAZZO:  Good afternoon,
18 Your Honor.
19       MR. BAUTA:  Oh, that's really
20 bad.
21       MS. FILIPPAZZO:  This is
22 Jennifer --
23       THE COURT:  Yeah.  You have to
24 be on.
25       MS. FILIPPAZZO:  Okay.  Good

Page 227

1 afternoon, Your Honor.
2       THE COURT:  They have to be off.
3 They have to mute.
4       MS. FILIPPAZZO:  Sorry, Judge.
5 Bear with us a second.
6       Thank you.  Sorry about that,
7 Your Honor.
8       Good afternoon.  Jennifer
9 Filipazzo for Defendant Monsanto.
10       Your Honor, we agree with
11 Claimants.  We understand the
12 bolstering rule in Florida.  Where
13 there is a disagreement is the actual
14 application of how it is to be taken
15 care of and addressed at trial.  And
16 that's where the disconnect occurs.
17       And Mr. Bauta named some
18 depositions, and we have been trying
19 to work with counsel to go through
20 those deposition transcripts for --
21 the first witness I will use for
22 example is William Haydens.
23       William Haydens is not an
24 expert.  He is actually a fact
25 witness.  He was deposed in his

Page 288

1    MR. BAUTA:  Okay.  I'll take a
2  look at Mr. Kay.  Do I have his -- do
3  I have his questionnaire?
4    MS. YATES:  Yes.  You have all
5  of these nine people, our
6  questionnaires on panels one through
7  four.
8    MR. BAUTA:  Okay.
9    MS. YATES:  We are now hastily
10  going through the panel from this
11  morning.
12    MR. BAUTA:  Okay.
13    MS. YATES:  And if I see any I
14  think we might agree on, we'll get
15  those to you immediately.
16    MR. BAUTA:  Okay.
17    MS. YATES:  Thank you, Your
18  Honor.
19    MR. BAUTA:  Thanks, Judge.
20    THE COURT:  Okay.  Sounds good.
21  We'll see you tomorrow morning.
22    We've got the jurors coming at
23  9:00.  It's going to take a while to
24  get them set up.
25    Matthew, do me a favor and

Page 289

1  shuffle the cards so that that's done.
2  And anybody who is a no-show, we will
3  fill in.
4    THE COURT CLERK:  So if, let's
5  say, No. 10 doesn't show up, we'll
6  move someone from the back?
7    THE COURT:  Right.  You will
8  already have them done and just put in
9  a different -- the next person or
10  something and move them along.  Or if
11  you've already made up the list, just
12  put in the name so we've got a full
13  group.
14    MR. UPSHAW:  Your Honor, we'll
15  get the list tomorrow morning?
16    THE COURT:  Yes.
17    MR. UPSHAW:  In order, right,
18  one two, three, four, five.
19    THE COURT:  And, Matthew, if you
20  call me back, do you want to check the
21  messages off the phone from her?  I
22  don't know how to do it from here.
23    THE CLERK:  Yeah.  I can do
24  that, Judge.
25    I think I just need the pass

Page 290

1  code.
2    THE COURT:  I'll give you her
3  code.  All right.  Then we'll see
4  you-all tomorrow.
5    (Adjourned at 5:19 p.m. until
6  October 28, 2022, at 9:00 a.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 291

1    CERTIFICATE OF SHORTHAND REPORTER
2        NOTARY PUBLIC
3    I, Amanda Gorrono, the officer
4  before whom the foregoing trial was
5  taken, do hereby certify that the
6  foregoing transcript is a true and
7  correct record of the testimony given;
8  that said testimony was taken by me
9  stenographically and thereafter
10  reduced to typewriting under my
11  direction; and that I am neither
12  counsel for, related to, nor employed
13  by any of the parties to this case and
14  have no interest, financial or
15  otherwise, in its outcome.
16    IN WITNESS WHEREOF, I have
17  hereunto set my hand this 27th day of
18  October, 2022.
19
20  _Amanda Gorrono_
21  _____
22  AMANDA GORRONO, CLR
   CLR NO:  052005 - 01
23  Notary Public in and for the State of New
   York
24  County of Suffolk
   My Commission No.  01G06041701
25  Expires:  01/07/2023