# EXHIBIT C

---

**Page 1**

William Sawyer, Ph.D.

```
 1                 UNITED STATES DISTRICT COURT
 2               NORTHERN DISTRICT OF CALIFORNIA
 3
 4   * * * * * * * * * * * * * * *    MDL NO. 2741
 5   IN RE:  ROUNDUP PRODUCTS    *    Case No. MDL No.
     LIABILITY LITIGATION        *
 6                                    3:16-MD-02741-VC
 7   * * * * * * * * * * * * * * *
     This document relates to:
 8
     Estate of Kenzie Elizabeth Murdock, et al.,
 9
     vs.
10
     Monsanto Company.
11
     Case No. 5:20-cv-00023
12
13                        * * * * *
14
15
16           The remote video deposition of
17           WILLIAM SAWYER, Ph.D., taken via Zoom
18           videoconference on the 23rd day
19           of February, 2023, commencing at
20           approximately 9:16 a.m. CST.
21
22
23
24
25
```

---

**Page 2**

William Sawyer, Ph.D.

```
 1                  A P P E A R A N C E S
 2   FOR THE PLAINTIFF:
 3              GARMER & PRATHER
                141 North Broadway
 4              Lexington, Kentucky 40507
                BY:  Jerome Prather, Esquire
 5                   jprather@garmerprather.com
 6
     FOR THE DEFENDANT:
 7
                NELSON MULLINS
 8              1600 Utica Avenue South, Suite 750
                Minneapolis, Minnesota 55416
 9              BY:  Barry Koopmann, Esquire
                     barry.koopmann@nelsonmullins.com
10
11
12
13
14
15   VIDEOGRAPHER:
16              Julie Robinson
17
18
19              Lois Anne Robinson, RPR, RDR, CRR
                Court Reporter
20
21
22
23
24
25
```

---

**Page 3**

William Sawyer, Ph.D.

```
 1                    I N D E X
 2   EXAMINATION                               PAGE
 3   By Mr. Koopman                              5
 4   By Mr. Prather                            121
 5                    * * * * * * *
 6   EXHIBITS
 7   Deposition Exhibit Number 1                 9
 8     Notice of Deposition
 9   Deposition Exhibit Number 2                12
10     2/13/23 invoice for professional services
11   Deposition Exhibit Number 3                13
12     2/13/23 invoice for deposition
13   Deposition Exhibit Number 4                17
14     Curriculum vitae
15   Deposition Exhibit Number 5                17
16     List of deposition and trial testimony
17   Deposition Exhibit Number 6                25
18     Murdock file materials - to be provided by witness
19   Deposition Exhibit Number 7                28
20     Fee schedule
21   Deposition Exhibit Number 8                29
22     Initial expert report
23   Deposition Exhibit Number 9                30
24     Updated expert report
25
```

---

**Page 4**

William Sawyer, Ph.D.

```
 1   VIDEOGRAPHER:
 2           We are now on the record.  My name is
 3   Julie Robinson.  I'm a videographer for Golkow
 4   Litigation Services.
 5           Today's date is February 23rd, 2023,
 6   and the time is 9:16 a.m. Central time.
 7           This remote video deposition is being
 8   held in the matter of The Estate of Kenzie
 9   Elizabeth Murdock, et al., versus Monsanto
10   Company, et al.
11           The witness is William Sawyer, Ph.D.
12           All parties to this deposition are
13   appearing remotely and have agreed to the witness
14   being sworn in remotely.  Due to the nature of
15   remote reporting, please pause briefly before
16   speaking to ensure all parties are heard
17   completely.
18           Counsel, please identify yourselves for
19   the record, after which the court reporter will
20   swear in the witness.
21   MR. PRATHER:
22           This is Jay Prather on behalf of the
23   plaintiffs.
24   MR. KOOPMANN:
25           Barry Koopmann on behalf of Monsanto.
```

William Sawyer, Ph.D.

```
 1              WILLIAM SAWYER, Ph.D.,
 2     the witness, after having first been
 3   duly sworn to tell the truth, the whole truth,
 4   and nothing but the truth, was examined and
 5   testified as follows:
 6              EXAMINATION
 7   BY MR. KOOPMANN:
 8   Q       Good morning, Dr. Sawyer.  Would you
 9   please state your full name for the record.
10   A       Yes.  William R. Sawyer.
11   Q       Dr. Sawyer, I know you're familiar with
12   how a deposition works, so I'll just give you a
13   couple quick reminders.
14           If you don't understand one of my
15   questions, please just ask me to repeat it or
16   rephrase it.  Okay?
17   A       Very good.
18   Q       Okay.  And if you answer a question,
19   I'll assume that you understood the question as I
20   asked it.  Is that fair?
21   A       Yes.
22   Q       If you refer to anything in the course
23   of answering one of my questions, will you let me
24   know what that is?
25   A       Yes.
```

William Sawyer, Ph.D.

```
 1   Q       And I would just ask that you refrain
 2   from texting or emailing or anything like that
 3   while we are on the record here today.  Is that
 4   fair?
 5   A       Yes.
 6   Q       Okay.  And throughout today's
 7   deposition I may refer to non-Hodgkin's lymphoma
 8   as NHL, just so we're on the same page on that.
 9   Okay?
10   A       Yes.
11   Q       So my job today, sir, is to ask you
12   questions about your opinions on the Murdock
13   case, and I need you to provide answers to the
14   best of your recollection and memory.  Are you
15   prepared to do that today?
16   A       Yes.
17   Q       Are you taking any medications that
18   would impact your ability to provide truthful and
19   accurate answers?
20   A       No.
21   Q       Dr. Sawyer, what did you do to prepare
22   for your deposition today?
23   A       I reviewed some of the expert reports
24   issued by defendants.  And when I say "reviewed,"
25   in part, not -- not fully.  Those reports
```

William Sawyer, Ph.D.

```
 1   included the CIH expert, Leslie Ungers,
 2   U-N-G-E-R-S.  And I also briefly reviewed
 3   portions of the weed expert's report.
 4           I also very recently received the
 5   deposition -- well, depositions of Mr. and Mrs.
 6   Murdock.  And I've, again, reviewed those, but
 7   not -- not fully, not in great detail.
 8   Q       Did you read any other documents in
 9   preparation for today's deposition?
10   A       Yes.  I've brought up and have on the
11   screen currently my report dated --
12           Well, where'd she go?
13           -- November 21st, 2022, as well as my
14   updated report dated February 21st, 2023.
15   Q       Okay.  Are there any other documents
16   that you reviewed specifically in preparation for
17   the deposition?
18   A       Well, I did review my Murdock file just
19   to refresh my memory what is in it.  And, of
20   course, I opened up a number of these tabs.  I
21   can go through them if you wish.  I think there's
22   a total of 25 tabs.
23   Q       And when you say "tabs," what -- is it
24   like one big PDF that has separate bookmarks in
25   it, or what sort of tabs are you referring to?
```

William Sawyer, Ph.D.

```
 1   A       These are separate files.
 2   Q       Okay.
 3   A       Primarily PDF files.  Some are actual
 4   subdirectories.  For example, number 3 is a
 5   subdirectory of medical records, and when I open
 6   that, there's 15 different PDF sets of medical
 7   records.
 8   Q       Did you have any meetings with counsel
 9   in preparation for today's deposition?
10   A       I did -- I did speak with plaintiff's
11   counsel.  I think it was on Monday of this week.
12   Q       Was that Mr. Prather?
13   A       Yes.
14   Q       How long did you speak on Monday?
15   A       Oh, I'd have to look that up.
16   Q       That's fine.
17   A       Yeah, I can't -- I can't really give
18   you a number of minutes.  I just don't recall.
19   It was a fairly lengthy call.  I can look it up
20   in my...
21   Q       That's okay.
22   A       Get it precisely, if you --
23           I have an entry here.  Conference.
24   Yeah.  Okay.  So on February 20th, I had a
25   conference with Attorney Prather for one hour, 18
```

William Sawyer, Ph.D.

1   minutes.

2   Q     Did you have any other meetings or

3   calls with any other attorneys or with

4   Mr. Prather in preparation for the deposition

5   other than that one?

6   A     No.

7   Q     Okay.  Was anybody else present during

8   that meeting or call other than you and

9   Mr. Prather?

10   A     I don't believe so.

11   Q     When did you receive the depositions of

12   Mr. and Mrs. Murdock?

13   A     Yesterday at 4:38 p.m.

14   Q     So you did not have those depositions

15   available to you at the time you issued either of

16   your reports in this case?

17   A     That's correct.

18   Q     And when did you receive the reports of

19   Mr. Ungers and Dr. Butts?

20   A     February 21st, 10:19 a.m.

21        (DEPOSITION EXHIBIT NUMBER 1

22        WAS MARKED FOR IDENTIFICATION.)

23   MR. KOOPMANN:

24   Q     I'm going to share my screen with you.

25   Can you see a deposition notice on your screen,

William Sawyer, Ph.D.

1   sir?  Can you see that, Dr. Sawyer?

2   MR. KOOPMANN:

3        Can y'all hear me?

4   THE WITNESS:

5        Hmm.  No, not hearing you.

6   MR. PRATHER:

7        So I can hear you fine.  Barry, I think

8   Dr. Sawyer might be having trouble with his

9   headphones.

10   MR. KOOPMANN:

11   Q     Dr. Sawyer, can you hear me now?

12        All right.  Let's go off --

13   VIDEOGRAPHER:

14        Want me to go off the record?

15   A     Okay.  I can hear you.  I had to reset

16   my audio.

17   MR. KOOPMANN:

18        Okay.  Let's stay on the record, then.

19   Q     Dr. Sawyer, can you see on your screen

20   the deposition notice?

21   A     Yes.  And I also have the identical

22   document open on my screen as well.

23   Q     Okay.  I'll mark this as Deposition

24   Exhibit 1 to the notice [sic].

25   MR. KOOPMANN:

William Sawyer, Ph.D.

1        And, Miss Robinson, I'll just provide

2   these exhibits to you after the deposition.

3   Q     Dr. Sawyer, you said you have a copy of

4   this.  Did you have a chance to go through the

5   various requests for production that are listed

6   here and see if you have any of those documents?

7   A     Yes, I did.  And I sent this morning by

8   email to Attorney Prather four different

9   documents.

10   Q     Okay.  What were those?

11   A     Um, fee schedule, invoice for the

12   deposition, invoice for the work performed to

13   date, and cases of depositions and trials over

14   the past four years.

15   MR. PRATHER:

16        Barry, if I may interject, just to

17   clarify, because I don't think Dr. Sawyer

18   remembered this.  He sent me most of those

19   documents after our meeting on Monday, and the

20   documents he sent me this morning were the same

21   documents I had -- we had already sent to you,

22   other than the fee schedule I emailed this

23   morning.  That was the only new document.

24   MR. KOOPMANN:

25        Okay.  Thank you.

William Sawyer, Ph.D.

1   Q     So, Dr. Sawyer, Mr. Prather's office

2   passed along, I think, all of that information

3   you've just referenced, and I've -- I've got some

4   of it here.  I'll pull it up on the screen and

5   see if we're talking about the same thing.

6        This is an invoice we received dated

7   February 13th, 2023.  Is this an invoice that you

8   prepared?

9   A     It is.

10   Q     Okay.  And this shows work from April

11   23rd, 2021, through February 11th, 2023, totaling

12   $25,277.66.  Is that right?

13   A     Yes.

14   Q     And that was for 32.2 hours of work?

15   A     Yes.

16   Q     Okay.  And then we also --

17   MR. KOOPMANN:

18        I'll mark this as Deposition Exhibit 2.

19        (DEPOSITION EXHIBIT NUMBER 2

20        WAS MARKED FOR IDENTIFICATION.)

21   MR. KOOPMANN:

22   Q     And we also received an invoice for

23   your deposition time.  That invoice is dated

24   February 1st, 2023, and for half-day of

25   deposition, the charge is $5,200.  Is that

William Sawyer, Ph.D.

1  correct?

2  A      Yes.

3  Q      All right.  I'll mark this as

4  Deposition Exhibit 3.

5         (DEPOSITION EXHIBIT NUMBER 3

6         WAS MARKED FOR IDENTIFICATION.)

7  MR. KOOPMANN:

8  Q      Have you prepared any other invoices

9  for your work in this case?

10  A      No.

11  Q      How much time have you spent working on

12  the Murdock case since February 11th, 2023, that

13  you have not yet invoiced?

14  A      Um, on the --

15         Well, let me look at my book here.

16         On the 20th and 21st of February I

17  worked very diligently and assessed about 146

18  agricultural-related products for any potential

19  carcinogenicity, which I remember took the entire

20  remainder of the day on Monday and part of

21  Tuesday.  So I can't really give you the

22  number of hours.  Perhaps -- perhaps ten hours.

23  I don't know exactly.

24  Q      And when do you plan on issuing an

25  invoice to plaintiff's counsel for that work?

---

William Sawyer, Ph.D.

1  A      Well, probably within the next week or

2  so.

3  MR. KOOPMANN:

4         Okay.  I would note a request for the

5  record that we be provided with a copy of that

6  invoice once it's received by Mr. Prather.

7  A      That also included completing and

8  submitting the updated report.

9  MR. KOOPMANN:

10  Q      Number 1 on the Request For Production

11  in deposition notice marked as Exhibit 1 asked

12  for documents sufficient to show the total amount

13  that you have billed in connection with your work

14  as an expert in litigation involving Roundup,

15  including but not limited to your work regarding

16  plaintiffs in this case.

17         Have you -- do you have documents that

18  you could provide that would show that total

19  amount?

20  A      Not directly, but yes.  In prior -- in

21  the prior 71 depositions, I have provided to

22  defendant my invoices.  I have never made an

23  effort to, over the past six years, to sum them

24  all up myself, but I have been providing them as

25  requested.

---

William Sawyer, Ph.D.

1  Q      Number 3, the request number 3 asks for

2  all documents you'll consider in support of your

3  deposition testimony in this case.  You've

4  referenced some of the documents you've read in

5  preparation for your deposition, and then I

6  understand you've included a list of materials

7  considered with your reports.  Is that correct?

8  A      Yes.

9  Q      And between those things that you

10  mentioned today and the things listed in your

11  materials considered list included with your two

12  reports that we'll mark as exhibits shortly, does

13  that encompass all the documents that you're

14  considering in support of your deposition

15  testimony?

16  A      Well, it depends on what the term

17  "documents" means.  I mean, I have a document

18  which I reviewed this morning which it's possible

19  I may use portions of to answer questions today,

20  and that document is simply a report which I

21  issued in another Monsanto case.

22  Q      Okay.  And what was the purpose of you

23  referring to that report today?

24  A      It contains some scientific methodology

25  detail that I suspect could be an issue of -- a

---

William Sawyer, Ph.D.

1  subject of issue today.

2  Q      And what is that subject matter?

3  A      For example, the inappropriate use of

4  noncancer endpoint regulatory limits to evaluate

5  whether or not Miss Murdock's NHL was related to

6  her glyphosate exposures.

7  Q      Number 4 on the deposition notice asks

8  for all documents that you reviewed, referred to,

9  and/or relied on in forming any opinion related

10  to this case.  Would that include the documents

11  listed in your materials considered lists that

12  are included with your report and your updated

13  report?

14  A      Yes.

15  Q      Okay.  Number 5 asks for your current

16  CV.  We were sent this document that I'm showing

17  on the screen.  Does this --

18  A      Go to page -- go to page 2, please.

19  Q      Sure.

20  A      Yeah, it looks --

21         The top is cut off a little.  I think

22  it says January of '23.  Yeah.

23         Yeah, it's up to date.

24  Q      Okay.  I'll mark this as Deposition

25  Exhibit 4.

William Sawyer, Ph.D.

1     (DEPOSITION EXHIBIT NUMBER 4
2     WAS MARKED FOR IDENTIFICATION.)
3  MR. KOOPMANN:
4  Q     Number 6 asks for your testimony list.
5  We've been provided with this one that starts
6  with the Armstrong deposition on February 9th,
7  2023.  Is this an up-to-date deposition and
8  testimony list?
9  A     It is.
10  Q     Okay.  We'll mark this as Deposition
11  Exhibit 5.
12     (DEPOSITION EXHIBIT NUMBER 5
13     WAS MARKED FOR IDENTIFICATION.)
14  MR. KOOPMANN:
15  Q     We were provided with a fee schedule.
16  This one is dated January 1st, 2021, that we
17  received.  Is this an up-to-date fee schedule?
18  A     No.
19  Q     Okay.
20  A     Well, I thought I sent the new one over
21  this morning, but, of course, it's possible I
22  sent an older one.  I could take a look, if you'd
23  wish, and --
24  MR. PRATHER:
25     Barry, I emailed you, just before the

William Sawyer, Ph.D.

1  deposition started, with his 2023 fee schedule.
2  MR. KOOPMANN:
3     Okay.  I'll pull that up.
4     Well, let me just...
5  Q     Number 7 on the deposition notice asked
6  for all communications you've had with these
7  various individuals, including the Murdocks,
8  Kenzie Murdock's physicians, and/or Monsanto.
9     Have you brought along any
10  communications that would be responsive to that
11  request?
12  A     No.  I have none.
13  Q     Number 8 asks for communications
14  between you and any -- anyone regarding the
15  potential carcinogenicity of herbicides,
16  including but not limited to glyphosate,
17  glyphosate-based herbicides, and Roundup that are
18  not protected from disclosure by the attorney
19  work product doctrine or any protective
20  agreement.
21     Do you have any documents that are
22  responsive to that request?
23  A     No.
24  Q     Number 9 asks for all documents sent to
25  you by counsel for plaintiffs since your initial

William Sawyer, Ph.D.

1  retention in glyphosate litigation that are not
2  protected from discovery.
3     Sounds like you've got an electronic
4  set of file materials on your computer.  Is that
5  right?
6  A     Yes.  The only document that is
7  responsive to that particular issue is the --
8     I'll open it.  It's an email from
9  Shannon Williams, and it simply has an
10  attached -- a letter from the late Bill Garmer,
11  who provided a list of materials that were being
12  sent.  And I'd be happy to give this to you.
13  It's -- it's simply a referencing of documents
14  that were provided on May 20th, 2021.
15  Q     Yeah.  If you could please provide that
16  to Mr. Prather, he can send it my way and we can
17  include it as an exhibit.
18  MR. PRATHER:
19     Barry, let me interject.  I -- you
20  know, I don't really mind you knowing -- knowing
21  what -- I think you're welcome to ask him what we
22  sent.  But the correspondence itself between a
23  consulting expert at the time and our firm, I
24  don't -- I think that's protected from
25  disclosure.

William Sawyer, Ph.D.

1  MR. KOOPMANN:
2     Well, I think if you've named the
3  witness as a testifying expert and it's
4  correspondence regarding, you know, the provision
5  of materials that the expert's to use in forming
6  his opinions, that it's discoverable.
7     But take a look at -- at, you know, at
8  some point and see if you agree with, you know,
9  based on what you're reading in the letter, with
10  that or -- or are claiming that it's protected.
11  But --
12  MR. PRATHER:
13     So I -- I don't have the letter in
14  front of me.  And, like I said, I have no
15  objection to him telling you, either through --
16  through this letter or testimony, what we've sent
17  him.  But I don't know whether there might be any
18  other statements in that letter that might be
19  protected from disclosure.
20  MR. KOOPMANN:
21     Okay.  Well, I'd ask that you just take
22  a look once you see a copy and make a
23  determination of whether it's discoverable under
24  Rule 26 or it's not.  And if it is, send me a
25  copy, please.

William Sawyer, Ph.D.

```
 1   MR. PRATHER:
 2        Okay.
 3   MR. KOOPMANN:
 4   Q     So, Dr. Sawyer, in your electronic file
 5   materials that you referenced earlier, do you do
 6   any highlighting or marking-up in those
 7   documents?
 8   A     I can look.  I -- I'd highlight
 9   considerably my draft report, because the
10   highlights form the basis of questions that I ask
11   during interview.  But as I continue working in
12   that same MS Word file month after month, by the
13   time it's done, the highlights are essentially
14   gone.
15        I noticed today, when I was reviewing
16   this morning, my updated report still has some
17   blue highlights in it --
18        I can tell you the page number.
19   Q     I saw that.
20   A     -- simply because -- simply because I
21   forgot to erase them, even though I'd already
22   answered the issues that I intended to assess.
23        So, yeah.  I mean, there might be some
24   spotty highlighting --
25   Q     Yeah.
```

William Sawyer, Ph.D.

```
 1   A        -- in my reports.  It's possible.
 2   Q        How about any of the documents that
 3   you read in the course of preparing your opinions
 4   for this case?  Not your draft reports but in
 5   that sort of source material.  Do you do any
 6   highlighting or marking up of materials there?
 7   A        Well, I tried.  I know I did manage to
 8   figure out how to do an area highlight using a
 9   PDF program this morning, because there was a
10   couple things in the industrial hygiene report
11   issued by defendants' expert which I wished to
12   highlight.
13        So, yeah, I mean, there are a couple
14   highlights, but not much, because the file was
15   unreadable.  It was not a --
16        In other words, it was like a scan of a
17   Xerox copy type file, so I couldn't word-search
18   it.  So when I did find some areas of interest, I
19   highlighted using a PDF area highlight method.
20   MR. KOOPMANN:
21        So, Mr. Prather, I would just ask that
22   Dr. Sawyer's file materials be transmitted to us,
23   and I'll -- I'll reserve an exhibit for that.
24   Okay?
25   MR. PRATHER:
```

William Sawyer, Ph.D.

```
 1        I just want to make sure we're clear on
 2   what you're -- when you say Dr. Sawyer's file
 3   materials.  I mean, that could be very expansive.
 4   Are you referring specifically to the documents
 5   he's highlighted or every document he's received
 6   in this particular case or every document he's
 7   reviewed in relation to the entire Roundup
 8   litigation?  Because I would certainly object to
 9   that as already being disclosed.
10   MR. KOOPMANN:
11        Well, I don't think he needs to --
12        I'm not asking that he provides every
13   document on his materials considered list.  But
14   it sounds like he's got a discreet Murdock file
15   that's electronic on his computer with 25 tabs
16   that he referenced earlier.  And, so, it should
17   be pretty easy to just make a copy of those files
18   and send them electronically to you, and then you
19   can send them to me and the court reporter, and
20   we'll include it as the expert's file.
21   MR. PRATHER:
22        Yeah.  And I'm not objecting to that.
23   I just want to make sure we've got the same
24   parameter of what we're -- what we're talking
25   about as his file.
```

William Sawyer, Ph.D.

```
 1        So you're referring specifically to his
 2   electronic file that he's described as having 25
 3   tabs.
 4   MR. KOOPMANN:
 5        Yeah.  Whatever his file is for this
 6   case that, you know, he's looking at on his
 7   computer.
 8        Presumably, every document on his
 9   materials considered list that he's ever read in
10   the Roundup deposition doesn't go into the
11   Murdock file, even though I recognize that it
12   forms the, you know, basis, in part, of his
13   opinions here.  I just want a copy of his
14   Murdock, you know, materials that he's got in his
15   Murdock file.
16   MR. PRATHER:
17        I think I understand your request.
18   MR. KOOPMANN:
19        Okay.
20   A        Keep in mind, that includes the email
21   document that was of discussion a few minutes
22   ago.
23   MR. PRATHER:
24        Yeah.  I will review it for any claim
25   of privilege before we send it on.
```

William Sawyer, Ph.D.

```
1   MR. KOOPMANN:
2         Yeah.
3         So we'll reserve a spot at Exhibit 6
4   for those electronic file materials.
5         (DEPOSITION EXHIBIT NUMBER 6
6         TO BE SUPPLIED AND MARKED FOR
7         IDENTIFICATION.)
8   MR. KOOPMANN:
9   Q     Do you have any hard-copy documents
10  with you today, Dr. Sawyer, that, you know, you
11  brought along for ease of reference during the
12  deposition?
13  A     No.  Entirely electronic.
14  Q     On the invoice dated -- marked -- or --
15  sorry -- February 13th, it says that on June
16  21st, 2021, you reviewed the medical summary
17  regarding Kenzie Murdock.
18        Do you know what I'm referring to when
19  I say that?
20  A     Let me open the --
21  Q     Let me pull it up here, the invoice.
22  So...
23  A     Okay.  I have it open.  Yeah.
24  Q     You have the invoice open or the
25  medical summary open?
```

William Sawyer, Ph.D.

```
1   A     The full invoice from February 13th.
2   Q     Okay.  Do you see in the reference on
3   June 21st, 2021, it says "file review, review the
4   medical summary"?
5   A     Yeah.
6   Q     What is that document?
7   A     This is a five-page document.  At the
8   top line it reads "Murdock, comma, Kenzie
9   E/448452/F DOB 06-03-2001 (19 years) vd
10  01-22-2017," and it lists an otoscopic exam, oral
11  cavity, pharyngeal, et cetera, et cetera.
12        So, basically, it's a set of five pages
13  of medical records.
14  Q     Okay.  And that's a document that
15  you've got included in your Murdock electronic
16  file?
17  A     It is.
18  Q     Who prepared that summary?
19  A     Kenzie Murdock primary care medical
20  center, printed on June 11th, 2020, by Morton,
21  comma, Kristin.
22  Q     So it's a medical summary prepared by
23  one of her treating physicians?
24  A     It would appear that way.
25  Q     Okay.  So is it fair for me to
```

William Sawyer, Ph.D.

```
1   understand that so far in this case you've spent
2   approximately 40 hours working on the case, or a
3   little over 40 hours?
4   A     Yes.
5   Q     Did you make any notes during your
6   review of file materials other than, you know,
7   what you put in a draft report?
8   A     No notes that I recall, but some
9   highlights.
10  Q     Have you exchanged any correspondence
11  with any of Miss Murdock's treating physicians?
12  A     No.
13  Q     Have you exchanged any correspondence
14  with the Murdocks themselves?
15  A     No.
16  Q     I'm sharing on my screen the fee
17  schedule that I received from Mr. Prather this
18  morning.  This one's dated January 1st, 2023.  Is
19  this an up-to-date copy of your fee schedule,
20  Dr. Sawyer?
21  A     I'm not seeing it.  But I can open mine
22  up, I suppose.
23  Q     Well, let's -- let's make sure you can
24  see what I'm sharing on my screen, because
25  that'll be important for the rest of the
```

William Sawyer, Ph.D.

```
1   deposition.
2   MR. KOOPMANN:
3         Jay, can you see it?
4   MR. PRATHER:
5         Yes, although I will say it is small on
6   my screen.  And while I can see the document,
7   it's very hard to read.
8         That helped.
9   A     Okay.  I see it.
10  MR. KOOPMANN:
11  Q     Okay.  Is that a copy of your current
12  fee schedule, Dr. Sawyer?
13  A     Yes.
14  Q     Okay.  We'll mark that as Deposition
15  Exhibit Number 7.
16        (DEPOSITION EXHIBIT NUMBER 7
17        WAS MARKED FOR IDENTIFICATION.)
18  MR. KOOPMANN:
19  Q     Dr. Sawyer, do you know what the
20  current amount of money that you have made from
21  being an expert witness on behalf of plaintiffs
22  in the Roundup litigation is as of today?
23  A     No.  Over the past six years, I have
24  not ever made any attempt to tally up such.  I
25  know that Monsanto has kept track of it and has
```

William Sawyer, Ph.D.

1  tallied up everything to date.
2      Q      Sir, was it important to you to perform
3  a thorough review of information in forming your
4  opinions in this case?
5      A      Certainly.
6      Q      Now, in this case you prepared two
7  reports, as we've -- or as you mentioned earlier.
8  First one I'm sharing on my screen here is dated
9  November 21st, 2022, and it's a PDF that's 292
10  pages long.  Is that a copy of your initial
11  report for this case, Dr. Sawyer?
12      A      Yes.
13      Q      Okay.  We'll mark that as Exhibit 8.
14      (DEPOSITION EXHIBIT NUMBER 8
15      WAS MARKED FOR IDENTIFICATION.)
16  MR. KOOPMANN:
17      Q      And then you prepared an updated report
18  dated February 21st, 2023, which is a PDF that's
19  309 pages long, which I'm sharing on the screen
20  here.  Is that a copy of your updated report,
21  Dr. Sawyer?
22      A      It is.
23      Q      Why did you prepare an updated report?
24      A      Number one was to more fully and
25  carefully examine all other agricultural chemical

William Sawyer, Ph.D.

1  products that were at the farm at some point in
2  time between 2001 and 2019 and determine whether
3  or not there was any carcinogenic potential of
4  such products.
5      Secondly, I expanded the genotoxicity
6  section in the general causation portion of the
7  report, which I've already been questioned on in
8  several Monsanto depositions over the past few
9  weeks, and I also changed the order of sections
10  of the report so it flows together better.
11      And in the exposure assessment section
12  of the report, I more clearly explained my
13  reliance on studies that included multifactorial
14  analyses versus studies that did not include
15  multifactorial analyses for other pesticide
16  interference.
17      Q      And then you prepared an updated
18  calculation of her systemic dose of glyphosate;
19  correct?
20      A      Yes.  However, the exposure day
21  calculations did not change.
22      Q      Do you intend for your updated report
23  that we're marking as Exhibit 9 to include all
24  your opinions regarding Miss Murdock's case?
25      (DEPOSITION EXHIBIT NUMBER 9

William Sawyer, Ph.D.

1      WAS MARKED FOR IDENTIFICATION.)
2      A      I'm sorry.  Could you repeat that?  I
3  wasn't -- I missed your -- your question date.
4  MR. KOOPMANN:
5      Q      Sure.
6      Do you intend for your updated report
7  that we're marking as Exhibit 9 to include all of
8  your opinions in this case regarding
9  Miss Murdock?
10      A      Yes.  And I should point out that no
11  opinions changed between the original report and
12  the update.
13      Q      Although your systemic dose calculation
14  changed; correct?
15      A      Right, but not my opinion regarding
16  that number.
17      Q      If there's information in your original
18  report from November 2022 that was not carried
19  over to your updated report, is it fair for me to
20  assume that was purposeful?
21      A      Yes.
22      Q      Was there any information that you did
23  not have available to you when you prepared your
24  report dated November 21st, 2022, that you
25  received after November 21st, 2022, and were able

William Sawyer, Ph.D.

1  to discuss in this new report?
2      A      No.
3      Q      You mentioned that in your updated
4  report you more fully and carefully went through
5  all of the ag products that were potentially used
6  at the farm between 2001 and 2019 and determined
7  whether there was any carcinogenic potential with
8  those products?  Is that right?
9      A      Yes.  There were, not counting
10  duplicates, approximately 146 different products.
11  And --
12      Q      And you've listed those.  Sorry.
13      A      Yes.  Yes.  And I actually researched
14  what the active ingredients were for each product
15  and whether or not it was carcinogenic.
16      Q      Okay.
17      A      Or -- and/or known to cause NHL in
18  humans.
19      Q      And I saw in your initial report from
20  November 2022 that you referenced reviewing lists
21  of chemicals that the Murdocks provided.  Is it
22  those lists of chemicals that were provided that
23  you then reviewed more carefully and discussed in
24  your updated report dated February 21st, 2023?
25      A      Yes.  There were four different lists.

William Sawyer, Ph.D.

1  One was a James Ray Murdock product list.  There
2  was the Kyle Murdock product list, the Murdock &
3  Sons product list, and the Musser, M-U-S-S-E-R,
4  Murdock Farms product list.
5  Q        And those are included in your
6  electronic file materials for the Murdock case?
7  A        Yeah.  They're combined and in
8  alphabetical order with duplicates removed.
9  MR. PRATHER:
10          Barry, I'm sorry to interrupt.  I'm
11 having a technical problem.  Could we go off the
12 record for a moment?
13 MR. KOOPMANN:
14          Sure.
15 VIDEOGRAPHER:
16          Off the record.  The time is 9:56 a.m.
17          (OFF THE RECORD.)
18 VIDEOGRAPHER:
19          We are back on the record.  The time is
20 10:01 a.m.
21 MR. KOOPMANN:
22 Q        So, Dr. Sawyer, why is it that you
23 provided a new systemic dose calculation in your
24 updated report dated February 21st, 2023?
25 A        To answer that, I need to look at my

William Sawyer, Ph.D.

1  report.  But I can't really do that with the
2  share on.
3  Q        Can you do it now?
4  A        Yeah.
5           Yes.  There were two input factors that
6  I revised.
7  Q        And why did you do that?
8  A        Because during the midpoint of her
9  personal application of Roundup using the
10 25-gallon sprayer pulled behind the ATV from 2008
11 to 2017, her average body weight was 56.2
12 kilogram; whereas, my earlier report had it at
13 74.4 kilogram, which is incorrect.
14          Also, the other change was that her
15 spray time, or her -- yeah, spray time was
16 generally -- generally 1.5 hours, not 2 hours.
17 Q        Why was 74.4 kilograms, the amount of
18 her weight that you used in your initial report
19 from November, why was that wrong?
20 A        Well, according to the available
21 medical records, Miss Murdock's weight ranged
22 from 76 pounds on March 11th, 2010, to 172 pounds
23 on February 7th, 2018.  The midpoint of this
24 range is 124 pounds, or 56.2 kilogram.
25 Q        And how did you decide to determine

William Sawyer, Ph.D.

1  that that's the particular weight that you should
2  use in your systemic dose calculation for your
3  updated report?
4  A        Simply that it gives a midpoint
5  measurement as opposed to the minimal or maximal.
6  Q        And the end result from the new
7  calculation you performed or the new inputs you
8  used in this calculation was that her systemic
9  dose went down by one-hundredth of a -- a point?
10 A        Right.  And rather than .02
11 milligram-per-kilogram-per-day systemic dose, it
12 was 0.019 milligram per kilogram per day.  And
13 that's why I stated earlier my opinions haven't
14 changed.  I mean, that's really a nonsignificant
15 change.  I just thought it was more accurate to
16 use a midpoint approach on her weight.
17          And in further review of the documents,
18 I think that 1.5 hours spray time is a more
19 conservative value.  Even though she did spray it
20 for two hours at times, I think the 1.5 hours is
21 conservative.  And, thus, I chose to use that
22 value rather than maximal value.
23 Q        So the applied dose that was in your
24 initial report was wrong?
25 A        No.  It was correct.  If we looked at

William Sawyer, Ph.D.

1  her maximal spray time, it was correct.  So this
2  is simply a more conservative approach using the
3  1.5-hour spray time.  So there's nothing wrong.
4  It's simply choosing a more conservative value in
5  making the calculation.
6  Q        But the systemic dose calculation in
7  your November 2022 report was wrong?
8  A        No, not at all.  It was accurate for
9  her body weight at her later years, and it used
10 her maximal spray time of two hours rather than
11 the more conservative 1.5 hours.
12 Q        But at trial in this case, you intend
13 to tell the jury that her systemic dose is what's
14 set forth in your updated report?  Is that true?
15 A        Yes.  But I -- I may also tell -- tell
16 the jury that at her two-hour application time,
17 on days where she sprayed for two hours in those
18 later years when she weighed 74.4 kilogram, that
19 is an accurate calculation.  It just represents a
20 different time point.
21 Q        Are there any changes that are
22 necessary to your updated report?
23 A        No.
24 Q        Do you stand by all the statements
25 included in your updated report?

William Sawyer, Ph.D.

```
 1  A        With respect to my ultimate opinions,
 2  yes.  However, I do realize that after I wrote my
 3  report, there was finally a deposition of
 4  Mr. Murdock, and there are some slight variations
 5  in his testimony versus what he told me on
 6  interview.  But none of the differences were of
 7  any significant consequence.
 8  Q        Do you remember or have in mind any
 9  of --
10           Strike that.
11           Do you have in mind what any of those
12  variations were between what he reported to you
13  in your interviews with him and what you read in
14  his deposition?
15  A        No.
16  Q        And your updated report contains all
17  the opinions that you intend to give at trial and
18  the bases for those opinions?  Is that true?
19  A        Yes.
20  Q        At page 300 of your updated report, you
21  include a list of materials reviewed that are
22  specific to Kenzie Murdock's case.  Is that
23  right?
24  A        Yes.
25  Q        And that is a complete list of the
```

William Sawyer, Ph.D.

```
 1  materials that you had reviewed at the time that
 2  you issued your updated report; correct?
 3  A        Yes.  However, I should point out that
 4  in my electronic file, the single items contain
 5  additional electronic files.  So we see there are
 6  seven items referenced here, but when we look at
 7  my electronic file, there's 25.  And that's
 8  simply due to, for example, here, medical
 9  records, 15 files, et cetera.
10  Q        And, then, since you issued your report
11  on February -- your updated report on February
12  21st, you received the depositions of Mr. and
13  Mrs. Murdock and some of the defense expert
14  reports?  Is that correct?
15  A        Yes.
16  Q        Okay.  Did you have access to all the
17  information you needed to formulate your opinions
18  in this case?
19  A        Yes.
20  Q        Is there anything that you wanted to
21  see but were not able to obtain?
22  A        Yes.  An interview of Kenzie.
23  Q        Anything else?
24  A        No.
25  Q        Did you review actual medical
```

William Sawyer, Ph.D.

```
 1  records --
 2           Well, you mentioned the summary that
 3  was apparently prepared by one of
 4  Kenzie Murdock's medical treatment providers, and
 5  then you reviewed other medical records that are
 6  included in your electronic file materials?
 7  A        Yes.  And I reviewed specific to
 8  looking for potential confounding factors, such
 9  as, for example, if she had received multiple,
10  multiple CT scans prior to the malignancy or if
11  she had been treated with cyclophosphamide or
12  other drugs that are known to cause NHL.
13           These are things I looked for in the
14  medical records I received.  Primarily what I
15  focused on was the pathology records, just to be
16  certain that the diagnosis that I am using in my
17  report is the actual diagnosis by the pathologist
18  and that I clearly understand the -- the exact
19  aspects of that diagnosis made by the
20  pathologist.
21           Not that I am offering in any way to
22  assess the accuracy of the diagnosis.  That's not
23  what I'm doing.  I just want to make sure in my
24  report that I am referencing the correct
25  information.
```

William Sawyer, Ph.D.

```
 1  Q        Other than that summary of
 2  Miss Murdock's medical history that you
 3  referenced earlier that appeared to be prepared
 4  by one of her treatment providers, did you review
 5  any other summaries of her medical records
 6  prepared by anyone else?
 7  A        Well, yeah.  There were some, one- or
 8  two-paragraph summaries within the medical
 9  records.
10  Q        How about summaries prepared by
11  counsel?
12  A        No.
13  Q        Did you have anyone in your office
14  prepare any summaries of medical records that you
15  reviewed?
16  A        No.  Just -- just what's in the report.
17  Q        Did you review the deposition of
18  Dr. Sima Jeha?
19  A        Could you spell that, please?
20  Q        Yes.  The first name is S-I-M-A.  Last
21  name is J-E-H-A.  She was Kenzie Murdock's
22  oncologist.
23  A        No.  I think I may have reviewed some
24  information by her, but I focused on the actual
25  objective laboratory data, such as the flow
```

William Sawyer, Ph.D.

1  cytometry studies, you know, the amino
2  histochemical stains, and the ultimate diagnosis
3  by the pathologist.
4          I had no reason to focus on the
5  treatment plan.  What I focused on was any
6  information within medical records that could
7  potentially serve as confounding factors in the
8  development of her NHL, as well as confirmation
9  of the pathology, and that is the confirmation of
10 the diagnosis that she ultimately received, and
11 that is the T-lymphoblastic lymphoma.  So I
12 really had no interest in reviewing the treatment
13 records.
14 Q       You interviewed Mr. Murdock on two
15 occasions; correct?
16 A       Yes.
17 Q       Did you ever interview Mrs. Murdock?
18 A       No.
19 Q       Why not?
20 A       My understanding was, in speaking with
21 Mr. Murdock -- Murdock twice, that she really
22 didn't have any significant experience with the
23 farm operations, and especially the Roundup.
24 Q       Did you interview Kenzie Murdock's
25 grandfather that she used to ride on the ATV with

William Sawyer, Ph.D.

1  while he was spraying Roundup or other
2  glyphosate-based herbicides?
3  A       No.
4  Q       Why not?
5  A       I didn't think it was necessary.  I had
6  more than enough information in terms of her
7  hands-on spraying, which is the primary data that
8  I'm relying on.
9  Q       For your systemic dose calculation?
10 A       Yes.  And -- and her nature of exposure
11 in terms of wearing the shorts and the
12 short-sleeved shirt with clogs or sandals, no
13 PPE -- that is, personal protective equipment --
14 and so on.
15 Q       And you mentioned the one piece of
16 information you would like to have received in
17 this case but didn't is an interview with
18 Miss Murdock.  And you were unable to do that
19 because she's, unfortunately, deceased; right?
20 A       Yes.  And her date of death preceded my
21 involvement in this matter by a number -- good
22 number of years.
23 Q       Okay.  So you had to rely on what
24 Mr. Murdock could recall from his observations of
25 Miss Murdock's interactions with Roundup or other

William Sawyer, Ph.D.

1  glyphosate-based herbicides?
2  A       Yes.
3  MR. PRATHER:
4          Barry, if I could, I just want to point
5  out during that series of questions you asked
6  about both Kenzie Murdock and Mandy Murdock, and
7  you've referred to Miss Murdock now, and both of
8  them are now deceased.  So there may be some
9  ambiguity about who he wanted to interview and
10 who he did not.
11 MR. KOOPMANN:
12         Okay.  I didn't think there was, but I
13 will clarify that.  Thank you.
14 Q       Mr. -- Dr. Sawyer, was it Mrs. Mandy
15 Murdock that you wanted to interview or was it
16 Kenzie Murdock?
17 A       Well, Kenzie, obviously, because she
18 was the applicator, and direct information from
19 her would have been helpful.  For example, I
20 would have asked her if the nozzle clogged, how
21 did she clean it, was she wearing gloves, did she
22 mouth-blow the nozzle.  I mean, there's a lot of
23 fine details that I would ask her that her father
24 may not have been aware of, other subtle
25 questions regarding --

William Sawyer, Ph.D.

1          For example, did -- you know, were your
2  legs chilled from the mist, from the drift, or
3  were they always dry?  You know, I would ask
4  questions of that sort.  And that's not the type
5  of question I could ask her dad.  So, I mean,
6  there --
7          That's why I brought that up, that it
8  would have been helpful.  I would have been able
9  to learn more if I had that opportunity to
10 interview her.
11 Q       And what Mr. Murdock was able to
12 provide you in terms of information regarding
13 Kenzie's spraying, that was based on his
14 recollection of events dating, in some instances,
15 back to 2007 or earlier; correct?
16 A       Right.  But it was his first- --
17 firsthand observation.  I found it to be highly
18 consistent and credible.
19 Q       Why was it that you interviewed
20 Mr. Murdock twice?
21 A       In writing my report, I noticed that
22 there were questions I should have asked which I
23 did not.
24 Q       Do you remember what those were?
25 A       No.

William Sawyer, Ph.D.

```
1   Q        Did you take notes during those calls?
2   A        No.  Everything was taken down by
3   either Jen or Bonnie in my office into the MS
4   Word file as we proceeded.
5   Q        Was there anybody else besides you,
6   Mr. Murdock, and Jen or Bonnie on the calls that
7   you had with Mr. Murdock?
8   A        No.
9   Q        Were these Zoom calls or telephone
10  calls?
11  A        Telephone.
12  Q        Did you ever meet him in person?
13  A        No.
14  Q        Do you have a recollection of how long
15  each call lasted with Mr. Murdock?
16  A        Should be on my invoice.
17  Q        If it's not on the invoice, do you have
18  any recollection?
19  A        I could make an estimate.  But I think,
20  rather than estimating, I'll simply look at the
21  invoice.
22  Q        All right.
23           All right.  I'm sharing my screen.
24  Let's see.  July 28th, 2021, looks like almost an
25  hour for that first interview.  Is that right?
```

William Sawyer, Ph.D.

```
1   A        Yeah.
2   Q        And then December 9th, almost two hours
3   for that interview.
4   A        Yes.
5   Q        Between preparing for it and
6   interviewing him; right?
7   A        Yeah.  So on that, I can't -- I can't
8   really discriminate.  I suspect I spent much more
9   time preparing than the actual interview, but
10  I -- I really can't give a breakdown on that.
11  Q        Have you ever talked to any of
12  Kenzie Murdock's doctors?
13  A        No.
14  Q        Have you spoken with any fact witnesses
15  besides Mr. Murdock?
16  A        No.
17  Q        Have you talked to any of the
18  plaintiff's other experts in this case?
19           Not regarding this case, no.
20  Q        Did you conduct or take a chemical
21  inventory for this case or just use the list of
22  chemicals that were provided to you?
23  A        I relied on the four lists of
24  agricultural chemical products, tank cleaners and
25  other materials.
```

William Sawyer, Ph.D.

```
1   Q        You've described the work that you
2   did -- I think it was on February 20th and 21st
3   of 2023 -- to sort of go through those lists and
4   look up the active ingredients in those products
5   and then investigate the carcinogenicity.  How
6   did you go about doing that, generally?
7   A        Well, I used the trade name of the
8   product and the manufacturer, went online and
9   found the ingredients for that product, and then
10  I assessed the product using the IARC listings of
11  chemicals of all different carcinogenic ratings.
12  Q        Did you conduct any kind of site visit
13  or inspection in this case?
14  A        No.
15  Q        Why not?
16  A        I didn't think it was necessary.  I
17  don't really think I would have gained much by
18  knowledge that would be useful for me.  If I were
19  a weed expert, perhaps I would.  But I'm a
20  toxicologist.  And I generally review on medical
21  records, pathology records, history, and so on.
22  Q        Are there ever instances in lawsuits
23  involving Roundup where you do perform a site
24  inspection or site visit?
25  A        Well, there could be.  I mean, there
```

William Sawyer, Ph.D.

```
1   could be circumstances where a site visit would
2   be helpful.
3   Q        Have you done that in the past in other
4   cases?
5   A        I have, yes.  One case in particular
6   involved a young child who played in the yard
7   that was being -- well, was treated and still
8   wet, in many cases.  In fact, on a patio that had
9   weeds growing between the cracks.  And I actually
10  wanted to see firsthand whether or not there was
11  any significant exposure routes for the crawling
12  child.
13           And that is the case that was in
14  California, northern California.  Two of them,
15  actually, two cases that were handled.  And they
16  were both cases handled by Brent Wisner and
17  Pedram Estra- -- Esfandiary.
18  Q        So in this case, you did not inspect in
19  person any of the equipment at Murdock Farms that
20  Kenzie would have either ridden in or on while
21  spraying Roundup?  Is that right?
22  A        No.  I didn't need to as I had
23  photographs of the 25-gallon sprayer.  I noted
24  that it was an electric-powered pressurized
25  sprayer.
```

William Sawyer, Ph.D.

1  Q       So you relied on photographs rather
2  than an in-person inspection of the equipment?
3  Is that right?
4  A       Right.
5          Again, I'm not too concerned with the
6  equipment.  What's important to me is whether
7  it's an aerosol or a controlled atomization
8  nozzle.
9          And it's clear in this case it was an
10 aerosol application from a electric pump which
11 produces a much higher output of aerosol than
12 that of a prepackaged sprayer or even a backpack
13 sprayer.
14 Q       And you did not inspect in person any
15 of the sprayers that Kenzie Murdock may have used
16 to spray Roundup?  Is that true?
17 A       Correct.  I relied on photographs and
18 descriptions provided by Mr. Murdock.
19 Q       So in your updated report you list some
20 objectives that you had.  I'll share my screen
21 here.  It's on page 4 of your updated report.
22         You indicate there that your
23 toxicological assessment had four fundamental
24 objectives, the first of which was to arrive at
25 scientifically reliable exposure dose and

William Sawyer, Ph.D.

1  frequency estimations for Miss Murdock based on
2  the -- upon the available objective evidence.  Is
3  that right?
4  A       Yes.
5  Q       And in this case, the available
6  evidence regarding Kenzie Murdock's exposure was
7  obtained from the Plaintiff Fact Sheet and your
8  two interviews of Mr. Murdock.  Is that correct?
9  A       And photos.  Yes.
10 Q       Is it true that your ultimate dose
11 estimation is only as good as the information
12 that is provided to you?
13 A       Yes.  But with respect to the body
14 weights that's confirmed in the medical records,
15 the duration of spray time and frequency was
16 observed firsthand by her father.  I had no
17 reason to believe that would not be accurate.
18         But if it was the case that it was not
19 accurate and Mr. Murdock was misremembering
20 things because of the passage of time, that would
21 affect the accuracy of your opinions; right?
22 A       Depends on the degree of error.  If
23 there was highly significant differences, then
24 yes.  But that does not appear -- appear to be
25 the case.

William Sawyer, Ph.D.

1  Q       You don't have any direct firsthand
2  personal knowledge of Miss Murdock's exposure to
3  or use of Roundup, though; right?
4  A       I'm not sure I understand the question.
5  Q       I mean, you never saw her spray
6  Roundup.  You have to rely on the firsthand
7  experience of her father in that regard; correct?
8  A       In this case, yeah.  We have no choice.
9  She's deceased.
10 Q       And when it comes to your second
11 objective in your report, which is to identify
12 any potential confounding toxicological risk
13 factors contributing to her NHL onset and risk
14 level, you have the same limitation, basically;
15 that you have to rely on the information that
16 you're provided.  Is that right?
17 A       Correct.  But I believe I was provided
18 reliable information, based upon review of the
19 documents themselves.  They're highly detailed
20 product identifications and quantities and so on.
21 Q       And, sir, you're not a medical doctor;
22 correct?
23 A       No.  No.  I'm a Ph.D. toxicologist.  I
24 trained through a medical school program, but my
25 degree is a Ph.D. toxicologist.

William Sawyer, Ph.D.

1  Q       Are you an epidemiologist?
2  A       No.  However, I have studied
3  epidemiology as part of my training as a Ph.D.
4  toxicologist.  I've taught a section of
5  epidemiology at the medical school for nearly 20
6  years, and I've used epidemiological studies on a
7  daily basis through my practice over the past 34
8  years.
9  Q       You're not an oncologist, are you?
10 A       No.
11 Q       You're not a geneticist?
12 A       No, although I do have a master's
13 degree in molecular and cell biology, which, of
14 course, is heavily focused on molecular genetics.
15 So I do have training and expertise in that
16 field.  But I would not hold myself out as a
17 geneticist.
18 Q       To the extent that Miss Murdock had
19 other medical conditions other than NHL, would
20 you agree that her medical records and physicians
21 are the best source for that information?
22 A       Yes.  And I relied on those records.
23 Q       Do you agree that Miss Murdock was
24 diagnosed with T-lymphoblastic lymphoma?
25 A       That's what I said a few minutes ago.

William Sawyer, Ph.D.

1    Yes.

2    Q    And that type of lymphoma primarily

3  affects children; right?

4    A    I will defer that to the oncologist

5  with respect to frequency rates and so on.

6    Q    Are you going to tell the jury in this

7  case that you ruled out other possible causes of

8  Miss Murdock's NHL other than Roundup?

9    A    As -- as a toxicologist, issues that

10  are related to toxicology, such as benzene

11  exposures or smoking or so on, of course.

12  However, there are areas that the oncologist will

13  evaluate, which I would defer if you ask.

14    Q    In your report, your updated report,

15  did you discuss everything that you considered

16  significant about Kenzie Murdock's medical

17  history?

18    A    Yes.

19    Q    How do you determine whether an

20  exposure factor increases a risk of developing

21  T-lymphoblastic lymphoma versus significantly and

22  substantially increasing that risk?

23    A    That is, whether the studies are above

24  the 95 percent confidence interval?  I should say

25  at or above the 95 percent confidence interval,

William Sawyer, Ph.D.

1  which indicates a statistically -- statistically

2  significant increase.  And substantial is not

3  well defined in the toxicological literature.

4  There is, in epidem- -- epidemiology some

5  readings that involve doubling of the risk, which

6  is considered substantial.  And we have more than

7  doubling the risk in this case.

8    Q    Dr. Sawyer, on page 211 of your report,

9  which I'm showing on the screen here, you

10  indicate the Murdock home resides in an

11  agricultural community with widespread use of

12  Roundup by both the Murdocks and neighboring

13  farmers in the field surrounding the family's

14  residential property in which Miss Murdock played

15  and roamed as a young child.

16    Where did you obtain that information

17  that Kenzie Murdock, as a child, played and

18  roamed in the fields surrounding the family's

19  residential property?

20    A    Her father explained that she not only

21  played but used her bicycle or, later on, ATV and

22  roamed about the properties.

23    Q    And that was based on his recollection?

24    A    Yes.

25    Q    Why did you note that neighboring

William Sawyer, Ph.D.

1  farmers used Roundup in the fields surrounding

2  the family's residential property?

3    A    Simply because there is the possibility

4  of bystander exposure, which would be additive to

5  her direct exposures.

6    Q    Did you consider the neighbors' Roundup

7  use in determining Kenzie Murdock's total

8  exposure frequency and glyphosate systemic dose?

9    A    Yes, I considered it.  But I know from

10  using the EPA formula for bystander exposure

11  compared to direct exposure, the differential is

12  generally at least a hundred times higher with a

13  direct applicator versus bystander.  Thus, the

14  bystander exposures, although additive, are

15  really not significant.

16    Q    So, and for that reason, did you decide

17  to not include that specific type of exposure in

18  calculating your exposure frequency or systemic

19  dose for Miss Murdock?

20    A    No.  No.  And not for that reason.  The

21  reason I could not calculate is that -- or the

22  reason is I could not calculate a bystander

23  exposure simply because there was no information

24  as to frequency of application of neighboring

25  fields or what -- you know, whether Miss Murdock

William Sawyer, Ph.D.

1  played or roamed in those fields at the time they

2  were being sprayed.  There's simply no historical

3  information regarding that, and it's unreasonable

4  for anyone to even remember such detail.

5    Q    Sharing on the screen -- well, same

6  page, 211, the bottom of the page, you indicate

7  episodic dermal contact with Roundup -- Roundup

8  as a consequence of anecdotal childhood exposures

9  are not included in exposure calculations for

10  toxicological assessment of exposure events.

11    A    That's true.

12    Q    Okay.  And why did you not include the

13  episodic dermal contact with Roundup as a

14  consequence of anecdotal childhood exposures in

15  your exposure calculations?

16    A    Insufficient data as to when and

17  duration of time.  For example, Mr. Murdock did

18  explain that when he was spraying the residential

19  property, she would be out playing very often,

20  sometimes on her bike.

21    So certainly there was some potential

22  of exposure, but not enough data to perform any

23  type of quantitative analysis.

24    Q    There are no medical records or other

25  documentation in this case that confirm or

William Sawyer, Ph.D.

1  reference Miss Murdock's exposure to Roundup;
2  correct?
3  A        Correct.
4  Q        And Mr. Murdock was not with Kenzie
5  when she was spot-spraying from the all-terrain
6  vehicle at all times; correct?
7  A        That's right.
8  Q        He was doing his own work on the farm
9  some of those times; right?
10 A        Yes.
11 Q        Okay.  And the farm is a pretty
12 significant operation, isn't it?
13 A        Yes.  But during many of the spray
14 applications, he mixed it and prepared it and
15 sent her out spraying and had direct observation,
16 as I said earlier.  Just because he has other
17 duties doesn't mean he did not observe her.
18 That's just simply not true.
19 Q        The farm was up to 4,000 acres at one
20 point.  Is that correct?
21 A        Yes.
22 Q        That's a lot of ground to cover?
23 A        Well, it depends.  By aerial spray, not
24 really.
25 Q        And Mr. Murdock was only able to

William Sawyer, Ph.D.

1  provide you with estimates of how much time
2  Kenzie spent spraying; correct?
3  A        Yes.
4  Q        He couldn't provide you with exact
5  amounts of time, could he?
6  A        Correct.  But the frequency and
7  cumulative exposure days is far beyond that in
8  the studies that resulted in statistically
9  significant increased rates of NHL.
10 Q        And the estimates that Mr. Murdock was
11 able to provide were based on what he perceived
12 to be average amounts of time spent spraying; is
13 that correct?
14 A        Yes.  And I used the lower end at 1.5
15 hours.
16 Q        And the estimates were based on what he
17 perceived to be averages in terms of the
18 frequency with which he engaged in spot-spraying
19 from the ATV; right?
20 A        Could you repeat that, please?
21 Q        Sure.
22          The estimates that he provided were
23 based on what he perceived to be averages in
24 terms of the frequency with which he engaged in
25 spot-spraying from the ATV; correct?

William Sawyer, Ph.D.

1  A        Yes.
2  Q        Okay.  And these averages he provided
3  were based on his recollection of events dating
4  back to as much as 19 years earlier from the time
5  of your interviews; correct?
6  A        No.  She did not start spraying on her
7  own at age 4.
8  Q        What year -- at what age did she start?
9  Was it age 7?
10          Do you have that in front of you, sir?
11 A        Working on it.
12 Q        Okay.
13 A        Yes.  On page 218, line 3,
14 approximately 7 years old.
15 Q        So he was providing information during
16 interviews in 2021 regarding his daughter's
17 activities as a 7-year-old in 2008?
18 A        Yes.
19 Q        Did Mr. Murdock provide you with any
20 information regarding how much of the one- to
21 two-hour period in which he'd be out on the ATV
22 spot-spraying Roundup that was spent actually
23 spraying Roundup as opposed to riding around from
24 spot to spot?
25 A        No.

William Sawyer, Ph.D.

1  Q        Do you have an understanding of how
2  many of the fields at the Murdock farm that
3  Kenzie would have sprayed from the ATV?
4  A        No.
5  Q        Do you have an understanding of how
6  many acres Kenzie would have sprayed from the
7  ATV?
8  A        No.
9  Q        Is it your understanding that the
10 spraying that Kenzie did on her own from the ATV,
11 the spot-spraying, that that was -- I guess you'd
12 call it nonagricultural spraying?
13 A        Correct.
14 Q        So it was spraying around the buildings
15 on the property or maybe the house or things like
16 that?
17 A        Yes.
18 Q        Okay.  Would you agree that a
19 significant portion of that one- to two-hour
20 period in which she was spot-spraying from the
21 ATV would have been spent riding from spot to
22 spot rather than actually spraying?
23 A        Probably not, after reviewing the map
24 on page 215, figure 26.  It's clear that the
25 structures are very close together, and there are

William Sawyer, Ph.D.

1 numerous structures that have perimeter sprayed.
2 And it's not as if she had to spend much time at
3 all moving from one structure to another.
4 Q        Did Mr. Murdock ever tell you that he
5 saw Kenzie get Roundup on her skin?
6 A        I can't answer that either way.
7 Q        Did you ask him that?
8 A        Yes.  She sprayed using a mist or a
9 stream, as appropriate for the situation.  She
10 was exposed to the drift and mist on the open
11 vehicle both when actively spraying and when
12 riding along with her grandfather while he
13 sprayed.  Footnote 451, which is from the
14 telephone interview on December 9th, '21.
15 Q        So when you say that she was exposed to
16 the mist, that means that the mist contacted her
17 skin?
18 A        Yes.
19 Q        And that's something that Mr. Murdock
20 recalled from his time observing Kenzie spray
21 Roundup?
22 A        Yeah.  Yes.  He recalled the mist and
23 the drift contacting her directly, yes, wearing
24 shorts, T-shirts, and clogs or sandals.  Not well
25 protected, no PPE.

Golkow Litigation Services                Page 61

William Sawyer, Ph.D.

1 MR. KOOPMANN:
2          Let's go off the record and take a
3 five- or seven-minute break.
4 MR. PRATHER:
5          You read my mind --
6 VIDEOGRAPHER:
7          Off the record.  The time is --
8          So sorry.  Off the record.  The time is
9 10:54 a.m.
10          (OFF THE RECORD.)
11 VIDEOGRAPHER:
12          We are back on the record.  The time is
13 11:05 a.m.
14 MR. KOOPMANN:
15 Q        Dr. Sawyer, on page 246 of your updated
16 report, you include as table 23 a calculation of
17 Kenzie Murdock's total exposure days.  Is that
18 correct?
19          Sorry.  Let me share my screen.
20          Is that what I'm looking at on the
21 screen, Dr. Sawyer?
22 A        I'm just looking at my report.  Table
23 20?
24 Q        23.
25 A        Table 23.  Okay.

Golkow Litigation Services                Page 62

William Sawyer, Ph.D.

1          Yes.
2 Q        Okay.  And, so, in calculating Kenzie
3 Murdock's total exposure days, you included both
4 riding in sprayers from 2004 through 2018 and
5 instances where she was spraying with the
6 25-gallon tank from the time she was 7 years old
7 through 2017.  Is that right?
8 A        Yes.  However, my focus is really upon
9 the spraying with the 25-gallon tank with a
10 midpoint of 110 exposure days, which is far
11 beyond any of the requirements in the studies.  I
12 think that's most significant since the riding in
13 sprayers was for equal amount of time, far less
14 exposure in the air-conditioned cab than that of
15 her actually spraying in clogs, sandals, shorts
16 and short-sleeved shirt, especially with a low
17 statute [sic] height with a larger proportion of
18 her body being in the drift zone.  That is, she's
19 much lower to the ground than a -- you know, a
20 person who's six feet tall.
21          So, you know, I put a lot of weight on
22 that 110 midpoint and less weight on the riding
23 in sprayers.
24 Q        And, in that regard, you, in
25 calculating her systemic dose, only included the

Golkow Litigation Services                Page 63

William Sawyer, Ph.D.

1 time spent spot-spraying from the ATV.  Is that
2 right?
3 A        That's correct.
4 Q        Okay.  And can you explain for me why
5 you used both her spot-spraying from the ATV and
6 her riding in sprayers in calculating her total
7 exposure days, but then when it came to
8 calculating her systemic dose, you only used the
9 time spent spot-spraying from the ATV?
10 A        Yeah.  She was using an aerosol
11 pressurized sprayer, motorized, which actually
12 has a higher output than a backpack hand-crank
13 sprayer, and the study I compared her to included
14 sprayers using drill coveralls, leather boots,
15 long-sleeved shirt, face plate, and they were
16 protected with some degree of PPE.  And she was
17 not.  She was basically naked arms, legs, feet --
18 or naked legs, feet, hands, and forearms.
19          So my comparison is very conservative.
20 And I can't make a systemic dose calculation of
21 her riding in a sprayer without using the POEM
22 methodology.  And I really didn't have enough
23 input information to calculate the POEM and
24 didn't think it was really that important because
25 the dose received from spraying and her age range

Golkow Litigation Services                Page 64

William Sawyer, Ph.D.

1  and height and code of dress -- that is, lack of
2  PPE -- profoundly increased her systemic dosage
3  compared to that of riding in the air-conditioned
4  cab.
5          So, again, my focus has been on that
6  110 midpoint spray days, spraying with a
7  25-gallon motorized sprayer.
8  Q       Wouldn't it have been a more
9  conservative approach in calculating her total
10 exposure days to only look at the days that she
11 spent spot-spraying from the ATV?
12 A       That's what I did.  Yeah.
13 Q       But in calculating her total exposure
14 days, you included the time spent riding in
15 sprayers as well.
16 A       No.  That's not true.  Look at table
17 23.  You can see I've itemized out spraying with
18 25-gallon tank, 2008 through 2017, total of 10
19 years, events per year, and then I have the
20 exposure days specific to that 110 midpoint
21 range, 100 to 120.  So that's not true at all.  I
22 think -- I think you need to reexamine that table
23 23.
24 Q       But the total exposure days that are
25 listed in table 23 include not only the range of

William Sawyer, Ph.D.

1  100 to 120 that was spent spraying with the
2  25-gallon tank from the ATV but also these
3  amounts that are listed for riding in sprayers;
4  correct?
5  A       That's true.  But I've also separately
6  itemized the spraying with a 25-gallon tank so we
7  could specifically focus on that.  And that is
8  the most significant finding.
9  Q       So if you were asked at trial what your
10 opinion is regarding the midpoint of
11 Miss Murdock's total exposure days, what number
12 would you provide?
13 A       I would provide the information that I
14 just stated in the answer before the last
15 question.
16 Q       What number would you provide?
17 A       It's a rather lengthy paragraph that I
18 just presented.  I could do it again, but it
19 might eat up a lot of time.  It's up to you.
20 Q       Well, my question is really:  Is the
21 midpoint that you would provide if asked what the
22 total exposure days' midpoint was that you
23 calculated, is it 110 or is it 278?
24 A       I will explain to the jury that the
25 most substantial exposure she sustained was

William Sawyer, Ph.D.

1  spraying with 25-gallon tank.  And for that
2  particular practice, which occurred over ten
3  years, she accumulated 110 exposure days with a
4  range of 100 to 120 exposure days.
5          I would also explain that there was
6  additional exposure while riding in the sprayers.
7  However, the systemic dosage on those days was
8  far less than that she received directly spraying
9  with a 25-gallon tank wearing shorts, sandals,
10 clogs, and short-sleeved shirts.
11 Q       Did Miss Murdock ever wear socks with
12 her sandals or Crocs?
13 A       Excuse me.
14          Uncertain.
15 Q       Did you ask her father that?
16 A       I don't recall.
17 Q       I think you indicated earlier that
18 Miss Murdock -- Kenzie's height or her stature is
19 important in -- in conducting your toxicological
20 analysis?  Is that true?
21 A       Yes.  That's true.
22 Q       And why is that?
23 A       A young person, for example, when she
24 first started spraying, was at a lower stature,
25 and the drift that is produced during the

William Sawyer, Ph.D.

1  spraying of Roundup would impact a greater
2  percentage of her body than a tall person.
3  Q       Do we know the height from which
4  Miss Murdock sprayed weeds with the hand-actuated
5  wand sprayer that she used on the ATV?
6  A       Well, yeah.  We know that a 7-year-old
7  is not fully grown but shorter than an adult type
8  of the same person.
9          We know as an adult or -- well, almost
10 an adult, at age 17, she was five-foot-five.
11 However, she was not five-foot-five at 7 years
12 old.
13 Q       But we don't know the height or the
14 distance between the end of the nozzle that the
15 Roundup was coming out of and the ground when she
16 was using that hand-actuated spraying wand;
17 correct?
18 A       I don't understand the question.
19 Sorry.
20 Q       I mean, you could -- you could hold the
21 wand this far above the ground or you could hold
22 it this far above the ground or some other
23 distance; right?
24 A       Well, you can also...
25 Q       And we don't know that distance is what

William Sawyer, Ph.D.

1    I'm asking.  Correct?
2          (Background talking)
3    MR. KOOPMANN:
4          We're getting some interference from
5    somebody.  We're hearing somebody else speak.  Is
6    that your office, Dr. Sawyer?
7    A     Yeah.  Hold on one sec.
8          It's interfering with the deposition.
9          All right.  So let's go through your
10   question again.  I'm so sorry.
11   Q     My question is simply:  Do we know how
12   high from the ground Miss Murdock held the end of
13   the spray wand when she was spraying Roundup from
14   the ATV?
15   A     Yes.  It's highly variable.  It depends
16   on the height of the weed or whether one is
17   shooting weeds that are actually growing up a
18   fence and holding the -- the wand at a
19   parallel-to-the-ground position.  It's highly
20   variable.
21   Q     And you don't know what that is; right?
22   A     Yeah, we do.  We know that it
23   encompasses the full range of weeds.  And I'm
24   sure your weed expert can explain a weed can be
25   three foot tall or six inches tall.

William Sawyer, Ph.D.

1          In fact, your expert, in his report,
2    shows a photo of electrical line poles completely
3    engulfed in weeds.  I mean, it -- weeds are
4    different heights.
5          And to argue that I cannot specifically
6    state how tall the weeds were is really not a
7    reasonable question for me to answer.  I mean,
8    they're all different heights.
9    Q     Part of Miss Murdock's stature in this
10   case was determined by the sort of, I guess you'd
11   say, riding height from the ATV from which she
12   was spraying; correct?
13   A     Not necessarily.  She was not on the
14   ATV spraying at all times.  She was off it -- on
15   and off it during spraying, depending on the
16   specifics of what she was spraying at that time
17   point.
18   Q     Did you take any --
19         Well, and because you didn't inspect
20   the ATVs from which she sprayed, you don't know
21   the -- how high those ATVs enable the occupants
22   to ride.  Is that true?
23   A     Well -- well, on the ATV, that's true.
24   However, based upon Mr. Murdock's observation,
25   she sprayed Roundup while riding along on the ATV

William Sawyer, Ph.D.

1    utility vehicle and while standing alongside the
2    stopped vehicle.
3    Q     Is it your understanding that the --
4    that when Kenzie sprayed Roundup in this
5    spot-spraying from the ATV or standing alongside
6    the ATV, that she was always using the
7    hand-actuated spraying wand, or did she also use
8    the boom on the back of that sprayer?
9    A     My understanding was she used the
10   handheld wand.
11         And with respect to the height of the
12   ATV, whether the ATV is 10 inches off the ground
13   or two feet off the ground, the fact is she had
14   her bare legs hanging over each side of the ATV
15   and, again, sandals and clogs.  So she clearly
16   had exposures even while on the ATV.
17   Q     Do you know whether she applied Roundup
18   in windy conditions?
19   A     No.
20   Q     Do you know the droplet size for the
21   25-gallon sprayer she used when spraying from the
22   ATV?
23   A     Yes.  It was an aerosol sprayer, not
24   a -- not a controlled atomization unit.  So we
25   know, based upon generally accepted peer-reviewed

William Sawyer, Ph.D.

1    studies, that the aerosol sprayer puts out a
2    large range, a full range of droplets, and these
3    droplets can be from a size that basically drops
4    out onto the ground very rapidly to very small
5    atomicized [sic] aerosol that remains in the form
6    of a drift for a prolonged period of time.
7          The aerosol covers that entire range.
8    Only the controlled atomization units release a
9    homogenous particle size that has a greater
10   ability to drop to the ground.
11   Q     You didn't take any measurements in
12   this case or do any analysis to determine what
13   the exact amount of Roundup product that Kenzie
14   could have sprayed from the sprayer that she used
15   was, did you?
16   A     I don't understand the question.
17   Sorry.
18   Q     Is it true that different hand-actuated
19   spray wands will put out different amounts of
20   liquid in a given period of time?
21   A     Based upon pressure, yes.  And in this
22   case, it was a -- an electronic pump as opposed
23   to a hand crank or a -- or a finger crank, as
24   used on the prepackaged Roundup.  So certainly
25   this falls into a category of a much higher

William Sawyer, Ph.D.

1  output compared to the hand-activated units.

2  Q        And did you take any measurements in

3  this case to quantify the amount of output of

4  liquid from the sprayer that Kenzie used?

5  A        No.  But that data's already been

6  published in the literature.  And I referenced in

7  my report information regarding aerosol and its

8  wide range of particle size and drift.

9  Q        Dr. Sawyer, would you agree that the

10 circumstances of exposure play a key role in any

11 toxicological investigation?

12 A        That's too broad of a question.  I

13 can't answer the way it's worded.

14 Q        When you're assessing an individual's

15 risk of developing cancer from exposure to a

16 substance, does it matter whether that person was

17 wearing PPE?

18 A        Again, that is dependent upon the

19 substance we're dealing with.  So it's too -- too

20 broad of a question to answer.

21 Q        How about with respect to glyphosate?

22 Does it matter then?

23 A        If you present a question to me, I'll

24 try.

25 Q        When you're assessing an individual's

William Sawyer, Ph.D.

1  risk of developing cancer from exposure to

2  glyphosate, does it matter whether the person was

3  wearing PPE?

4  A        Yes.

5  Q        And does it matter whether the person

6  washed off the glyphosate if they happened to

7  come into contact with it?

8  A        It helps.  However, the studies I've

9  referenced in my report demonstrate that there is

10 a -- a timeline in terms of how rapidly dermal

11 absorption occurs and, also, that even if washed

12 off, there remains a substantial amount of

13 Roundup found within the epidermis, which has

14 potential for continued dermal absorption.

15 Q        So does the length of time after coming

16 into contact with the product before it gets

17 washed off matter?

18 A        I think I just answered that.

19 Q        Is that yes?

20 A        If the court reporter could please read

21 back my earlier answer, that would be helpful.

22 Q        Oh, that's okay.  Let me just ask it

23 again.  It will be quicker, I think.

24          Does the length of time after coming

25 into contact with glyphosate or Roundup before it

William Sawyer, Ph.D.

1  gets washed off matter?  It's just yes or no.

2  A        I don't know what you mean by "matter."

3  Q        Is it something that needs to be

4  considered in conducting a toxicological

5  assessment of whether the person's risk of

6  developing NHL was increased?

7  A        It is a factor that I assessed and did

8  so in this case.  That is, the sooner the skin

9  surface is washed with soap and water, the

10 greater amount could be prevented from

11 absorption.  However, absorption starts very

12 rapidly with Roundup, and even washing it within

13 an hour or two, it does not prevent systemic

14 exposure from occurring.

15 Q        Exposure days are different than

16 exposure dose.  Is that right?

17 A        Yes.  I've made that very clear in my

18 updated report.

19 Q        And just to be clear, though, there

20 could be exposure in the sense of the use of

21 Roundup, but that doesn't necessarily translate

22 into contact with the skin; right?

23 A        Yes.  Potential dermal exposure, as

24 discussed in page 129 in my current report, is

25 what's measured upon the surface of the skin or

William Sawyer, Ph.D.

1  the clothing and the noncontrolled dermal

2  exposure, NCDE, defined as the amount of

3  glyphosate that contacted the skin, and then the

4  dermal absorption percentage resulting in a

5  systemic dose.  So the PDE is simply what's

6  impacting --

7          Let's say a person is wearing long

8  pants, long sleeves, face shield, and so on.  The

9  PDE is simply what's impacting the protected

10 body, but the NCDE is defined as the amount of

11 glyphosate that actually contacts the skin.  And,

12 then, by applying the dermal absorption factor,

13 one can then determine the actual systemic dose.

14 And that's what I did in this case.

15 Q        Do you intend to tell the jury that

16 your exposure days that you listed in table 23 of

17 your report means time that Kenzie Murdock spent

18 actually and physically -- in physical contact

19 with the product?

20 A        No.  Simply that's the days that she

21 used the product.

22 Q        And you're not able to tell the jury

23 what number of hours Miss Murdock was in actual

24 physical contact with Roundup; is that right?

25 A        Correct.  However, her exposure days

William Sawyer, Ph.D.

1  substantially exceed that within the human
2  peer-reviewed studies that accounted for
3  multifactorial analyses and resulted in a
4  statistically significant increased risk of NHL.
5  Q      And you would agree that Roundup
6  exposure is not harmful unless it contacts the
7  body and gets into the body; right?
8  A      Yes.
9  Q      So exposure days and applied dose are
10  not the same thing; correct?
11  A      I don't understand your question with
12  respect to the term "applied dose."  I don't know
13  if you're referring to systemic dose or just
14  what.
15  Q      Well, you used the term "applied dose"
16  in your updated report when you provided the
17  calculations that we talked about a little
18  earlier.  Let me find the spot.
19         Yeah.  On page 239 of your report --
20  I'm sharing it on the screen now -- you provided
21  a calculation there for applied dose being 54.4
22  milligrams per day, a calculation that we talked
23  about earlier in the deposition.
24         So my question was:  Exposure days as
25  set forth in table 23 and applied dose are not

William Sawyer, Ph.D.

1  the same thing; right?
2  A      Yeah.
3         What page are you looking at?
4  Q      239.
5  A      Yeah.
6         Oh.  Well, yeah, I -- I -- instead of
7  saying applied -- that's a little confusing.
8  That's the -- the noncontrolled dermal dose.  In
9  other words, what's actually contacting the skin
10  is then multiplied by a dermal absorption factor.
11  Q      Yeah.  In your first report in this
12  case from November, you called that fact or that
13  factor a dermal exposure, but here you're calling
14  it applied dose.  And I was wondering why there
15  was a change in terminology there.
16  A      Well, specifically in keeping with the
17  passive diffusion studies, that's considered a
18  noncontrolled dermal exposure.  In other words,
19  this is the amount that's actually contacting the
20  skin.  And that amount is then multiplied by the
21  dermal absorption factor to achieve the systemic
22  dose per kilogram of body weight.
23  Q      So exposure days is the amount of time
24  that Miss Murdock had the opportunity to come
25  into contact with Roundup.  Is that fair?

William Sawyer, Ph.D.

1  A      No.  It's a little bit misleading.
2  It's -- it's actually the days that she did have
3  contact with the glyphosate.
4         I mean, it's not possible to get on an
5  ATV and spray and walk around next to this ATV
6  with a sprayer without some level of contact.
7  Q      And then applied dose, as you've used
8  the term on page 239 of your report, is the
9  amount of Roundup that you believe Miss Murdock
10  was exposed to in a 1.5-hour day of spraying from
11  the ATV or alongside the ATV; right?
12  A      Yes, except it's a very conservative
13  estimate in that it's compared to aerosol
14  sprayers who were wearing leather boots and
15  coveralls, long-sleeved shirt, face shield.
16         And she simply was not fitted with any
17  PPE.
18         So I'm comparing someone who would
19  obviously have achieved a higher noncontrolled
20  dermal exposure due to the lack of the drill
21  coveralls and so on.
22  Q      Is it true that you don't know for
23  certain how much Roundup contacted Miss Murdock's
24  body?
25  A      No.  That's incorrect.  She clearly had

William Sawyer, Ph.D.

1  a greater degree of contact than that in the
2  Machado study, which I have referenced, because
3  of her lack of PPE.  So I am certain to
4  reasonable toxicological certainty that her
5  exposure exceeded that of the individuals who
6  were studied in the Machado analyses.
7  Q      But isn't it true that what you're
8  providing is an estimate based on the data
9  provided in the Machado-Neto study?
10  A      Yes.  But they were better protected.
11  They were -- they, compared to her, they were far
12  better protected.  I mean, I think it's pretty
13  obvious.  I'm a little surprised you don't --
14  don't see that.
15  Q      So here, what you're providing is a
16  calculated estimate of Miss Murdock's applied
17  dose and systemic dose based on the applied dose
18  and systemic dose that the applicators in the
19  Machado-Neto study experienced; correct?
20  A      Yes.
21  Q      Okay.  That study involved glyphosate
22  applicators in eucalyptus tree forests in Brazil;
23  is that right?
24  A      Yes.
25  Q      And, so, what you did to assess Kenzie

William Sawyer, Ph.D.

```
 1   Murdock's applied and systemic dose of glyphosate
 2   in this case was you looked at the estimated
 3   exposure of glyphosate applicators who were using
 4   lever-operated knapsack sprayers to spray weeds
 5   in the eucalyptus forest while wearing personal
 6   protective equipment; right?
 7   A        Yes.  These were hand-crank sprayers.
 8   They were not electronic motors.
 9   Q        Okay.  And that was --
10   A        And eucalyptus forest is not to --
11            If you look at photos of the eucalyptic
12   forest, you're generally dealing with keeping the
13   weeds away from the immature plants.
14   Q        Kenzie Murdock never used one of the
15   lever-operated knapsack sprayers used by the
16   Brazilian eucalyptus sprayers in this study, did
17   she?
18   A        No.  But they're both fitted with
19   aerosol spray heads, and her sprayer had the
20   capacity to operate at a much higher volume than
21   that of the hand-cranked backpack sprayer.
22   Q        The Machado-Neto study doesn't report
23   how tall the weeds were that were being sprayed
24   in the eucalyptus forest by the applicators, does
25   it?
```

William Sawyer, Ph.D.

```
 1   A        No.
 2   Q        Do you know the flow rate of the
 3   lever-operated knapsack sprayers used by the
 4   applicators in the Machado-Neto study?
 5   A        No.  But I know it's less than a
 6   electric motor-operated system.
 7   Q        And you don't know the flow rate of the
 8   sprayer that Kenzie Murdock used on the ATV;
 9   correct?
10   A        Not necessarily.
11   Q        What is the flow rate?
12   A        Greater than that used in the
13   hand-crank study.
14   Q        Can you give me --
15   A        Again -- again, the study was using a
16   device which did not have the capacity to put out
17   the same volume of spray that she had.
18            And what was the flow rate of the
19   sprayer that Kenzie Murdock used on the ATV?
20   A        Greater than that of the backpack
21   sprayer.
22   Q        Can you be any more specific than that?
23   A        No.
24   Q        Do you know how the droplet size
25   produced by the backpack sprayers in the
```

William Sawyer, Ph.D.

```
 1   Machado-Neto study compared to the droplet size
 2   produced by the sprayer Kenzie Murdock used?
 3   A        Yeah.  Similar.  They're both aerosol
 4   spray heads, and they produce a full range of
 5   particle size; that is, from large drops to very
 6   fine aerosol that remains airborne.  That is a
 7   generally accepted fact in the literature
 8   regarding aerosol spray heads.
 9   Q        Was the glyphosate formulation used in
10   the Machado-Neto study the same as the Roundup
11   used by Kenzie Murdock?
12   A        I'll have to open the study and look,
13   because I don't recall offhand.  I think it was
14   in -- I think that is actually in the study.
15            Okay.  The Roundup solution in the
16   Machado-Neto study was glyphosate at 480 gram per
17   liter.
18            And it states on page 310 "was added to
19   the spraying solution of Roundup."  That was the
20   copper oxychloride tracer.
21            And the glyphosate solution, 48 gram
22   per liter, is a very common concentration of
23   glyphosate prior to dilution.
24   Q        And was that the concentration of the
25   glyphosate used by Kenzie Murdock?
```

William Sawyer, Ph.D.

```
 1   A        Appears to be variable.  Some of the
 2   Roundup products used were actually more
 3   concentrated on the Murdock farm.  Others were at
 4   approximately 480 gram per liter.  Depends on the
 5   product.  There was Roundup PowerMAX, Roundup
 6   PowerMAX 2, Roundup WeatherMAX.  Also product
 7   from Helena called Showdown.
 8   Q        Dr. Sawyer, is it true that you don't
 9   know exactly how much glyphosate may have gotten
10   into Miss Murdock's bloodstream or any of her
11   organs?
12   A        No, that's not true.
13   Q        So what is the exact amount of
14   glyphosate that may have gotten into
15   Miss Murdock's bloodstream or any of her organs?
16   A        Dose of 0.019 milligram per kilogram
17   per day.  And the studies I've referenced in my
18   report by -- by Ridley & Brewster reveal that
19   bone and bone marrow have the propensity to
20   maintain glyphosate far beyond any other organ in
21   the body.  That is, the ADME studies demonstrate
22   that systemic glyphosate has a longer life in the
23   bone or bone marrow than other tissues in the
24   body.
25            In the Ridley study which I've
```

William Sawyer, Ph.D.

1  referenced, I've also shown the disappearance
2  curves for plasma versus bone marrow.
3          So the distribution of glyphosate to
4  the bone and bone marrow, the location where stem
5  cells are damaged with the occurrence of NHL
6  occurring, are really key in this case because
7  that is --
8          Brewster, even after 7 days, there was
9  still measurable glyphosate in the bone but
10  nowhere else in the body other than the total
11  carcass measurement.
12  Q      Doctor, would you agree or disagree
13  that there is a way to use Roundup that results
14  in an applied dose of zero and a systemic dose of
15  zero?
16  A      Well, I -- I wouldn't say -- you know,
17  you could say zero. But, I mean, near zero I
18  think would be a -- more appropriate term. I
19  mean, I won't disagree with zero, but I think
20  near zero is more accurate.
21  Q      And under those circumstances, as a
22  forensic toxicologist, would you say, to a
23  reasonable degree of scientific certainty, that
24  the person's use of Roundup was a cause or a
25  substantial contributing factor to that person's

William Sawyer, Ph.D.

1  NHL if their applied dose or systemic dose was
2  near zero?
3  A      Correct. I -- I agree.
4  Q      You would say it's a cause or a
5  contributing cause?
6  A      No, no. That would not be -- if it was
7  zero or very close to -- as possibly to zero as
8  one could imagine.
9  Q      Are you aware of anyone other than
10  yourself who has utilized the Machado-Neto study
11  to calculate the systemic dose of Roundup in a
12  specific individual?
13  A      I have no way to answer that question.
14  I suppose I'd have to contact Dr. Machado and see
15  if he has any information on that. I mean,
16  that's -- that's just not a reasonable question.
17  Q      It fair to say that, as you sit here
18  today, you're not aware of anyone else other than
19  yourself who has used the Machado-Neto study to
20  calculate the systemic dose of Roundup in a
21  specific individual?
22  A      No, it's -- it's not a fair question
23  because Machado actually provided a rate of
24  error, standard deviation, number of subjects.
25  So I think it's an unfair question.

William Sawyer, Ph.D.

1          The answer is it's already been done in
2  the Machado study. That's what the study did.
3  So trying to create me as doing something novel
4  is -- is not correct. I'm simply presenting
5  what's already been done within a known rate of
6  error in a generally accepted study.
7  Q      Are you aware of anyone other than
8  yourself and the authors of the Machado-Neto
9  study who utilized that study to calculate the
10  systemic dose of Roundup in a specific
11  individual?
12  A      Well, that's -- yes. That's what the
13  study was designed to do. And that's exactly
14  what the study did. I -- I explained to you that
15  it calculated the potential dermal exposure and
16  the noncontrolled dermal exposure and then went a
17  step further and calculated, at a 2 percent
18  dermal absorption rate, the systemic dose.
19  That's what the study did.
20          I'm merely comparing a half-naked girl
21  to the sprayers in the study who were wearing
22  protective gear. I'm underestimating her
23  exposure by making that comparison.
24  Q      And I'm aware that Machado and Neto did
25  that, the authors of that study, and then you've

William Sawyer, Ph.D.

1  done that. But my question is: Are you aware of
2  anyone else who's used the methodology in the
3  Machado-Neto study and the data they reported
4  there to calculate the systemic dose of a
5  substance that a particular individual received?
6  A      Yes. I'm aware of a number of Monsanto
7  defense experts who have used passive diffusion
8  studies to calculate systemic dose. That has
9  been done by several different Monsanto defense
10  experts, not using Machado but other passive
11  diffusion studies similar to Machado.
12  Q      So are you aware of anyone other than
13  yourself or the authors of the Machado-Neto study
14  who utilized the Machado-Neto study to calculate
15  the systemic dose of Roundup in a specific
16  individual?
17  A      Same exact answer, if the court
18  reporter could please read it back.
19  Q      Well, respectfully, sir, I don't think
20  it was the same answer, because you provided
21  information about other sort of similar
22  calculations that some Monsanto experts did, and
23  I want to specifically know whether you're aware
24  of anyone other than yourself or the authors of
25  the Machado-Neto study who have used that

William Sawyer, Ph.D.

1  particular study to calculate the systemic dose
2  of Roundup in a specific individual.
3      A       I already answered that.
4      Q       Well, I need you to answer it again.
5  Yes or no?  Are you aware of somebody other than
6  yourself and them?
7      A       I answered it in great detail a moment
8  ago.  I'm not gonna play this game where you want
9  a -- I guess we call it a snippet to take out of
10 context.  That's why I explain things very
11 carefully in my answer.
12     Q       So name who it is that you're aware of
13 that's used that study to calculate the systemic
14 dose of Roundup in a specific individual other
15 than yourself and Machado-Neto, and then we'll
16 move on.
17     A       I explained that Monsanto defense
18 expert toxicologists have used passive diffusion
19 studies very similar to Machado in calculating
20 systemic dose.
21     Q       How often did Miss Murdock feel Roundup
22 on her skin or clothing?
23     A       I'm so sorry, but she -- she died
24 before I could interview her.
25     Q       So is -- is it the case that we don't

William Sawyer, Ph.D.

1  know the answer to that question?
2      A       Well, I think it's pretty obvious.
3  She's not alive.  I couldn't ask her those
4  questions.
5      Q       And her father didn't know the answer
6  to that question; right?
7      A       I -- I don't know.  It would be an
8  unreasonable question.  I didn't ask it.
9      Q       So is it true that no one knows the
10 frequency or degree to which Miss Murdock felt
11 Roundup on her skin or clothing?
12     A       I'm sorry.  Could you repeat that?
13     Q       Is it true that no one knows the
14 frequency or degree to which Miss Murdock felt
15 Roundup on her skin or clothing?
16     A       Well, again, you know, she -- she --
17 she passed on before I was involved, and I had no
18 opportunity to ask her that question.  It's
19 just --
20         I know you keep pounding me with that,
21 but I -- there's nothing I could do.
22     Q       Is it true that your exposure-day
23 calculation is not intensity-weighted?
24     A       It is intensity-weighted.
25     Q       How so?

William Sawyer, Ph.D.

1      A       By the fact that the intensity of spray
2  coming out of a motorized pump sprayer is greater
3  than that -- than a hand-crank backpack sprayer.
4          It's sort of like the intensity of
5  water coming out of a garden hose versus a fire
6  hydrant hose.  There's a big difference.  Even
7  though I can't say how many gallons per minute
8  come out of a hose versus a fire hydrant,
9  certainly that fire hydrant puts out more water
10 than the hose and -- and -- than a garden hose.
11         And that's what we're dealing with
12 here, with a powerful motor-operated sprayer,
13 which I included a photo of in my report, versus
14 the typical hand-crank, lever-operated backpack
15 sprayer as used in the Machado study.
16     Q       And, so, how do you accomplish that
17 intensity weighting in performing the
18 calculations that you performed to arrive at her
19 applied dose or systemic dose?
20     A       As I said repeatedly, the Machado dose
21 is an underestimate -- presents her as an
22 underestimate of exposure.  Her exposure was
23 greater than that in the Machado study.
24         So my calculation using the Machado
25 study of 0.019 milligrams per kilogram per day is

William Sawyer, Ph.D.

1  based on 1.5 hours of spray time and is based on
2  hand-lever-operated sprayers versus the more
3  powerful motorized sprayer.  So my calculation of
4  intensity in systemic dose is an underestimate.
5      Q       There are people who have developed
6  T-lymphoblastic lymphoma who have absolutely no
7  exposure to Roundup; right?
8      A       Yes.
9      Q       And there are people who have developed
10 NHL with no risk factors for the disease; right?
11     A       Correct.  But there's also Roundup
12 applicators who compare to background and show a
13 statistically significant increased rate of NHL
14 in multiple studies, some of which included
15 multifactorial analyses for potential confounding
16 factors such as other pesticides.
17     Q       Is it true, though, that because there
18 are people that have developed T-lymphoblastic
19 lymphoma or NHL with no exposure to Roundup, that
20 there's no way for you to say to a reasonable
21 degree of scientific certainty that but for using
22 Roundup, Miss Murdock would have avoided
23 developing NHL?
24     A       Well, I'm gonna have to answer that in
25 two parts.  Number 1 is I'm not the oncologist,

William Sawyer, Ph.D.

1 and I'd appreciate it if you don't put me into

2 that role.

3         What I can tell you is that the people

4 who you referred to who developed NHL without any

5 exposure to Roundup, that's what we call a

6 background population.

7         And the Roundup applicators have a

8 statistically significant increased risk at the

9 95 percent confidence interval compared to that

10 background level and, in many cases, more than

11 doubling the risk.

12         So my response as a toxicologist is

13 was -- simply that the dose was significant, was

14 certainly well within the range to statistically

15 and significantly increase her risk.

16         Now, that's why I asked that you

17 involve the oncologist in making a final

18 determination.

19         I'm pointing out in my report numerous

20 products and materials I've assessed for

21 potential confounding factors, but, ultimately,

22 the oncologist will be providing the opinion on

23 causation, not me.  So I hope I'm clear on that.

24 Q       Dr. Sawyer, on page 247 of your report,

25 which I'll share on the screen here, you compare

William Sawyer, Ph.D.

1 your exposure-day calculation for Miss Murdock

2 with the six different epidemiology studies

3 you've listed; correct?

4 A       On page 249?

5 Q       247.

6         You indicate there that Miss Murdock's

7 cumulative 278 non-time-weighted exposure days

8 lies within the highest tertile and quartile of

9 applicator "lifetime day" exposures as defined in

10 the Andreotti study.  Her exposure exceeds the

11 ever-use threshold of the Leon, Zhang, and

12 De Roos studies, and her 10 to 14 years of

13 exposure and exposure lag time are within the

14 ranges associated with the onset of lymphoma.

15         And then you also note that her -- she

16 sustained an average of 20 non-time-weighted

17 exposure days per year which exceed the

18 two-days-per-year threshold of the Pahwa study.

19 Right?

20         Is that right, sir?

21 A       I don't know.  I'm finding it.

22 Q       Can you see my screen?  I'm sharing my

23 screen with everybody in the deposition.

24 A       No.  It's too small.

25         What page are you on?

William Sawyer, Ph.D.

1 Q       207 -- I'm sorry.  247.

2 A       Which exceeds the two days per year.

3 Yeah, that's right.

4 Q       So those are the epidemiological

5 studies that you intend to use to support your

6 conclusion that Miss Murdock had a statistically

7 significant increased risk of developing NHL from

8 her exposure to glyphosate; right?

9 A       Yes.  Because the three remaining

10 studies, Eriksson 2008, Meloni 2021, and McDuffie

11 2001, were not used for dose metric comparisons

12 as they did not adequately adjust for

13 interference from co-exposures to other

14 pesticides.

15 Q       Then on page 268 of your updated

16 report, which I'm sharing on the screen there,

17 you indicate that Miss Murdock's glyphosate dose

18 quantified as frequency of use was compared to

19 reference doses in the six epidemiological

20 studies that applied multivariable analyses to

21 report pesticide-adjusted subtype results at

22 statistically significant increased risk.  Is

23 that right?

24 A       Yes.

25 Q       And then you list the studies there?

William Sawyer, Ph.D.

1 A       Yes.

2 Q       Okay.  In the De Roos study from 2022,

3 where in that study does it say that there was a

4 statistically significant increased risk of NHL

5 among glyphosate applicators?

6 A       In the ever never analysis.  Or I

7 should say never, slash, ever analysis.

8 Q       Can you direct me on the screen here to

9 where it says that?

10 A       No.  I'd have to pull up the study and

11 look at it.

12 Q       Table 3 in the De Roos 2020 study

13 indicates associations between occupational

14 herbicide use and risk of NHL and NHL subtypes.

15 Is that right?  Is that what it says there, sir?

16 A       Yes.

17 Q       Okay.  And then there's a row or

18 several rows devoted to glyphosate; right?

19 A       Right.  And there's a logistic

20 regression of 2.1, which is more than doubling

21 the risk, with a confidence interval of 1.1 to

22 4.0, which is statistically significant.

23 Q       And where is that at in the glyphosate

24 section?

25 A       Table 3, under herbicides.

William Sawyer, Ph.D.

```
1   Q        That's herbicides in general; right?
2   A        No.  It's different herbicides.  Each
3   one's tested individually.
4   Q        Okay.  And when we look at the
5   glyphosate individual results, there is no
6   statistically significant increased risk shown in
7   this table; right?
8   A        No.  That's not correct.  Logistic
9   regression of 2.1, confidence interval of 1.1 to
10  4.0.
11  Q        Where are you reading from when you
12  read that?
13  A        Table 3.
14  Q        Where at in table 3?
15  A        Looks like nine rows from the bottom.
16           And I'll also alert you to the footnote
17  that each estimate is adjusted for use of all
18  other pesticides listed in table 3, age, and
19  study site.
20           This is a multifactorial analysis
21  study.  If you go back in history and you read
22  the Judge Chhabria's analysis, he refers to this
23  study and its significance because it's a
24  multifactorial analysis.  I think you'd have to
25  go back and look at the original Daubert report
```

William Sawyer, Ph.D.

```
1   prepared by Judge Chhabria.
2   Q        The authors of this study say on page
3   8 -- I can highlight it here for you --
4   "glyphosate use was not associated with all NHL
5   in our main analysis."
6            Is that correct?  Do they say that,
7   sir?
8   A        I'm not gonna answer that question
9   without reading the paragraph, because it could
10  be mistakenly taken out of context.  So you'll
11  have to allow me to read the paragraph to answer
12  the question.  Thank you.
13  Q        Can you see it on the screen?
14  A        I have the study open.
15  Q        Okay.  Let me know when you're done
16  reading it.
17           Have you had a chance to read it, sir?
18  A        Yes.
19  Q        And did the authors of this study
20  conclude that glyphosate use was not associated
21  with all NHL in their main analysis?
22  A        Maybe we're looking at the wrong
23  sentence.  The sentence I'm reading is "because
24  these analyses of multiple pesticides modeled the
25  pesticides simultaneously, any subject," et
```

William Sawyer, Ph.D.

```
1   cetera.
2            Is that the sentence you're reading?
3   Q        No.  The sentence I'm reading is
4   highlighted on the screen for everybody.
5   "Glyphosate use was not associated with all NHL
6   in our main analysis."
7            All right.  We'll move on, Dr. Sawyer.
8   That's okay.
9            Are you aware of any studies that show
10  a statistically significant increased risk for
11  T-lymphoblastic lymphoma specifically from
12  glyphosate exposure?
13  A        Yes.
14  Q        Okay.  What studies are those?
15  A        Andreotti 2018, page 6, statistically
16  significant finding of T-cell NHL in category M1
17  with a 5-year and a 20-year lag.
18           Well, no.  With a 20-year lag, it was
19  statistically significant, but markedly elevated
20  at five-year.
21  Q        Are you aware of any other studies that
22  show a statistically significant increased risk
23  for T-lymphoblastic lymphoma from glyphosate
24  exposure besides Andreotti?
25  A        I don't recall.
```

William Sawyer, Ph.D.

```
1   Q        So table 3 in the Andreotti study is
2   what you're referring to that shows the 2.97
3   relative risk in the M1 group?  Is that right?
4   A        Yes.
5   Q        All right.  Do you know why the authors
6   don't have any relative risk listed for the M2
7   group with more significant exposure?
8   A        Only one case.
9   Q        And, so, why does -- help me understand
10  why that means that there's no relative risk
11  listed.
12  A        Well, I'll defer that to the
13  statistician who will explain the mathematics and
14  requirement of more than one.
15  Q        Do you know why there's no P trend
16  listed for the M1 relative risk of 2.97?
17  A        Yes.  Because there was only one case.
18  Q        No.  But for group M1, there were nine
19  cases, and the relative risk was 2.97.  But,
20  then, over on the right-hand side next to that,
21  it doesn't list a P trend for that number like it
22  does for the other subtypes of NHL.
23  A        Because it -- because there's only one
24  case.  And without having a result for M2, there
25  were no --
```

William Sawyer, Ph.D.

1    You have to have at least three ranking
2    values to determine whether it's a P trend.
3    Again, it's the fact because there's only one
4    case, so it couldn't be calculated.
5    Q    The author's conclusion in this study
6    was that there was no association apparent
7    between glyphosate and any solid tumors or
8    lymphoid malignancies overall, including NHL and
9    its subtypes.  Is that right?
10    A    Yes.
11    Q    Do you know why they reached that
12    conclusion if what you say about table 3 is
13    correct, that there was a statistically
14    significant increased risk of non-Hodgkin's
15    lymphoma T-cell associated with glyphosate
16    exposure?
17    A    Yeah.  Well, the statistically
18    significant value speaks for itself.  The problem
19    is there's insufficient data throughout the
20    entire study to draw a conclusion regarding the
21    T-cell NHL.
22        But you asked me earlier if there was
23    any evidence, statistically significant evidence,
24    and I answered yes, and I took you to it.
25    Q    And this is -- the Andreotti study is

William Sawyer, Ph.D.

1    the sum total of the studies that you can refer
2    me to today that show a statistically significant
3    increased risk for T-lymphoblastic lymphoma from
4    glyphosate exposure.  Is that right?
5    A    I didn't understand the question.
6    Q    The Andreotti study is the only study
7    that you can refer me to today that you're aware
8    of that shows a significant -- statistically
9    significant increased risk for T-lymphoblastic
10    lymphoma from glyphosate exposure.  Is that
11    right?
12    A    I'm gonna have to check the other
13    studies, because I already answered it once and
14    told you I don't recall at the moment.  But if
15    you wish me to answer that yes or no, then I'll
16    have to pull up some studies and look.
17    Q    If you don't recall, that's okay.
18    A    There may -- there may be.  But I just
19    don't recall.
20    Q    You note on page 262 of your updated
21    report that Miss Murdock was not known to have
22    been significantly exposed to pesticides or
23    herbicides other than Roundup.  What's your basis
24    for that statement?
25    A    Interview with her father.

William Sawyer, Ph.D.

1    Q    Are the potential chemical confounding
2    factors that you identified in this case those
3    listed in that table of 146 different
4    agricultural products?
5    A    In part.  Also, you'll have to look at
6    table 20, I believe.  Let me take a look.
7        Yes, table 20 as well.
8    Q    Okay.  And you say there -- you marked
9    "no" in the row regarding any unusual or chronic
10    gasoline exposures.  What does that mean, any
11    unusual or chronic gasoline exposures?
12    A    Yes.  I ask that question, and I
13    specifically ask if you routinely washed your
14    hands with a gasoline-soaked rag, was there a
15    leaky underground storage tank that produced
16    gasoline fumes on a long-term basis in your home
17    or any other unusual gasoline exposures beyond
18    simply pumping gasoline into a lawnmower or into
19    a -- into a motor vehicle.
20    Q    What does exposure to petroleum
21    products mean in that table?
22    A    Any type of petroleum product.  And I
23    request anything from paint thinner, petroleum
24    naphtha, kerosene, just any type of petroleum
25    product.  Even though much of what I just named

William Sawyer, Ph.D.

1    are not carcinogens at all, I do try to get the
2    interviewee to really think back about any kind
3    of petroleum products.
4    Q    Miss Murdock presumably would have put
5    gas in some of the vehicles on the farm during
6    her lifetime?  Is that fair to assume?
7    A    Yeah.  So what?  It's not linked to
8    NHL, gasoline into a car or a can.
9    Q    Is exhaust from a diesel engine
10    carcinogenic?
11    A    If you were to live in the Holland
12    Tunnel in New York City, I would say yes, or
13    certain locations that have been shown to produce
14    very high PM 2.5 levels.  There are studies that
15    show that.  But certainly not in the agricultural
16    air in a farm.  There's simply no possibility of
17    accumulating particulate matter 2.5 or even PM 10
18    to the degree that has been shown to cause cancer
19    in human studies.
20    Q    Is exhaust from a gasoline engine
21    carcinogenic?
22    A    Again, if you park your car in a ramp
23    garage with the motor running and do that day and
24    night for years, possibly.
25        But, again, you're completely

William Sawyer, Ph.D.

1  disregarding the factor of dose, dose and
2  duration.  And to just throw out and say diesel,
3  somebody has a diesel tractor, that -- that
4  doesn't cut it.  The studies show that you have
5  to have sustained chronic exposure to PM 2.5 or
6  PM 10 over a certain number of years to see the
7  statistically significant rise in heart disease,
8  stroke, and certain cancers.
9  Q       When Miss Murdock was operating or
10  riding on all-terrain vehicles at the farm, she
11  would have been exposed to exhaust from the
12  vehicle's engine; correct?
13  A       Yes, in open farmland, not -- not in a
14  tunnel or an enclosed environment or in a garage.
15  Q       Do you have any photos of the ATVs used
16  by Miss Murdock?
17  A       I'll look.
18          No.
19  Q       Did you attempt to assess
20  Miss Murdock's exposure to any Roundup
21  ingredients or byproducts besides glyphosate?
22  A       Yes.
23  Q       Which ones?
24  A       I assumed that she had exposure, for
25  the sake of this assessment, to all 146 chemicals

William Sawyer, Ph.D.

1  listed in table...
2  Q       Well, my question was a little
3  different.  I was wondering if you assessed
4  Miss Murdock's exposure to any Roundup
5  ingredients or byproducts besides glyphosate.
6  A       Are you referring to such products such
7  as N-nitroso glyphosate or formaldehyde or items
8  of that sort?
9  Q       Anything you're aware of in Roundup.
10  A       I have not.  The only other thing I
11  will be -- chemical I will be referring to in
12  front of the jury is POEA, which is in the
13  Roundup.  Glyphosate and POEA.  I will not be
14  discussing any co-contaminants such as
15  formaldehyde or N-nitroso glyphosate or methylene
16  oxide.  It's not in my report, and I will not be
17  discussing those things.  Only POA -- POEA and
18  glyphosate.  And I hope that's very clear.
19  Q       Are you aware of any exposure that
20  Kenzie Murdock had to wood dust?
21  A       No.
22  Q       Do you agree that wood dust is
23  associated with cancer?
24  A       Certain hardwoods can be.  And it's
25  highly dependent upon occupational exposure dose

William Sawyer, Ph.D.

1  and duration.
2  Q       Okay.
3  A       And, again, you cannot have --
4  disregard dose and duration.  That's an important
5  element in assessing potential confounding
6  factors.
7  Q       Is wood smoke a carcinogen?
8  A       Again, if one were to receive a
9  sufficiently high chronic exposure -- that is,
10  PM 2.5, PM 10 levels above a certain threshold
11  for a number of years -- there is study evidence
12  of certain malignancies.
13          Again, that would be extraordinarily
14  unlikely in open farmland to have air pollution
15  of an area that could potentially impact a
16  resident.
17          And I have the Google Earth imagery and
18  photos, and there is a tremendous amount of open
19  farmland there.  I can't see any possibility of a
20  small smoke fire producing widespread PM 10 and
21  PM 2.5 levels.  It's just not reasonable.
22  Q       Have you eliminated Miss Murdock's
23  exposure to other pesticides as a cause or
24  substantial contributing factor of her NHL?
25  A       Yes.  I have not --

William Sawyer, Ph.D.

1          If you look at table 24, I think it
2  is --
3          Let's see.
4          Yes.  On table 21, I have identified
5  any potential carcinogens.
6          Atrazine was used at the farm, but it's
7  not a human carcinogen that is known to cause
8  NHL.
9          And you'll notice I also noted in table
10  21 on page 228 that there was some 2,4-D used,
11  which later in my report I have a statement from
12  Monsanto.  Monsanto states no, that it is not a
13  carcinogen; however, it is a human -- or animal
14  carcinogen and can potentially produce -- it's a
15  beef, class 3, animal carcinogen.  So it's not
16  known to cause NHL in humans.
17  Q       Are you aware of any evidence in this
18  case indicating that Miss Murdock read any of the
19  warnings on the Roundup containers?
20  A       No.
21  Q       Did you consider the possibility that
22  just the fact that Miss Murdock lived on a farm
23  significantly or substantially increased her risk
24  of developing NHL?
25  A       I did assess that.  That's why I spent

William Sawyer, Ph.D.

```
1   so much time.  You have no idea what it took to
2   produce table 21, which is about six pages long
3   of products, and to actually go through each
4   product and pick out the chemicals in those
5   products and determine whether they're
6   carcinogens.  I painstakingly carried out such a
7   procedure to do just that.
8   Q        In your report at page 211, you
9   referenced some Epstein-Barr virus test results.
10  Why did you note those?
11  A        Simply because there has been some
12  discussions in the literature that potentially
13  link an increased risk, and especially in African
14  studies, of NHL with Epstein-Barr.  And that
15  opinion will be provided by the oncologist, not
16  I.
17  Q        Figure 25 -- figure 25 in your report,
18  which I'm showing on the screen, shows Kenzie as
19  a young girl on a tractor with her brother and
20  her grandfather; right?
21           Can you hear me, sir?
22  MR. KOOPMANN:
23           All right.  Let's go off the record.
24  A        Okay.
25           Yeah.  This is -- I'm in the middle of
```

William Sawyer, Ph.D.

```
1   a deposition.  Don't call.
2   MR. KOOPMANN:
3            All right.  Are we off the record?
4   VIDEOGRAPHER:
5            No.  You want to go off the record
6   still?
7   MR. KOOPMANN:
8            Yeah.
9   VIDEOGRAPHER:
10           Okay.  Off the record.  The time is
11  12:43 p.m.
12           (OFF THE RECORD.)
13  VIDEOGRAPHER:
14           We are back on the record.  The time is
15  12:45 p.m.
16  MR. KOOPMANN:
17  Q        Dr. Sawyer, why is it that you noted in
18  figure 25 in parentheses that both of
19  Miss Murdock's hands are in direct contract --
20  contact with tire guards in this photo?
21  A        Simply that a tire guard, a fender, has
22  the potential to be wetted from what is on the
23  tire.
24  Q        Are you aware of that tractor in that
25  photo ever being used for agricultural purposes
```

William Sawyer, Ph.D.

```
1   during Kenzie's lifetime?
2   A        No.  It's just an example that when
3   riding in a tractor, hands touch other pieces.
4   And that was -- I pointed out in my report with
5   the actual spray equipment that Kenzie rode in
6   that her dad had highly contaminated hands from
7   spray nozzle problems and so on, and there is a
8   cross-contamination that occurs with a tractor
9   because of touching things that become
10  cross-contaminated.  That's the point I'm trying
11  to make.
12  Q        Right beneath table 21 in your report,
13  you indicate that Miss Murdock was not reported
14  to have been exposed to these chemicals or
15  substances except for potential bystander
16  exposures or single events, as previously cited.
17  Is that right?
18  A        Right.
19  Q        And is that based on Mr. Murdock's
20  information that he provided to you?
21  A        Yes.
22  Q        So Mr. Murdock remembered glyphosate
23  exposure but not exposure to the other chemicals
24  on this list of approximately 146?
25  A        I'm not sure.  As I said, I prepared
```

William Sawyer, Ph.D.

```
1   this table under the assumption that there was
2   potential exposure to these substances.
3            As far as reading into the mind of
4   Mr. Murdock, I suggest you ask him that question.
5   Q        On page 246 of your report, right in
6   the center of the page that I'm showing there,
7   you note that Roundup spray application
8   conditions are subject to a range of variables,
9   including but not limited to, and then you list
10  various things, including weather and terrain,
11  condition of skin.  And then you go on to say "I
12  have assessed these various parameters with
13  respect to Miss Murdock's systemic dose."
14           How did you do that?
15  A        Well, if you read above it, the PPE is
16  one consideration; whether or not there was
17  abrasions to the skin.  And I did not find any
18  evidence of that.  She wasn't -- there was no
19  part of her being scratched and abraded with red,
20  irritated skin, which would enhance absorption.
21           The terrain, there was no hills or
22  steep embankments or trenches that would have
23  impacted the drift.  For example, in a sugar cane
24  operation, there's a narrow pathway, and when one
25  sprays in that narrow pathway with sugar -- sugar
```

William Sawyer, Ph.D.

1  cane six or eight feet tall, it -- it's next to
2  impossible to avoid the drift.  But the terrain
3  in this case was flat.  There really wasn't any
4  special created conditions.
5       And the weather, we don't have any
6  information on.  Frequency and duration, we do
7  know.  So, you know, these are things that I
8  assessed.
9  Q       Right.
10 A       They're considerations.
11 Q       Did you -- how did you assess the
12 terrain?  Did you ask Mr. Murdock about that?
13 A       Yes.  And I also looked at the aerial
14 views available on -- on the Google Earth.
15 Q       And Mr. Murdock said there are no hills
16 or steep embankments?
17 A       Yeah.  There are no significant sharp
18 hills or terrain characteristics that would cause
19 the aerosol drift to be trapped while spraying.
20 Q       Okay.  And did you ask Mr. Murdock
21 about her -- the condition of her skin?
22 A       No.  But I asked him what she did.  And
23 she didn't do anything that involved working in a
24 thorny environment with potential for scratching
25 and bleeding.

William Sawyer, Ph.D.

1  Q       So -- all right.  I'm referring you now
2  to page 261 of your report, which is a section
3  dealing with obesity and BMI as potential NHL
4  risk factors, and you say in this section of the
5  report that "Miss Murdock's BMI at the time of
6  her NHL diagnosis lies within the NIH's category
7  of obesity class 2, 35 to 39.9 grams per meter
8  squared."
9       Did I read that correctly?
10 A       Yeah.
11 Q       Okay.  And that's your understanding?
12 Because in your first report you had indicated
13 that her BMI was 27, and in your updated report
14 you're saying it's between 35 and 39.9.  So which
15 is it?
16 A       Well, I need to look at table 19.
17      All right.  So table 19, her highest
18 BMI was on February 7th, 2018, at 28.6.
19 Q       So is this sentence wrong, that first
20 sentence -- first full paragraph on page 261?
21 A       That's correct.  It is wrong.  Table 19
22 is correct.
23 Q       You go on to say in this paragraph
24 "hypothetically, if her BMI was 5 kilograms per
25 meter squared above the obesity cutoff of 30

William Sawyer, Ph.D.

1  kilograms per meter squared, he may have
2  experienced a small 7 to 13 percent increased
3  DLBCL risk.  Her more than doubling of risk from
4  her Roundup exposures would have added to her
5  endogenous background risk level."
6       I just need your help in understanding
7  what you're saying there.
8  A       That's -- all of that, that's wrong.  I
9  copy/pasted something in from another report.
10 Q       Okay.  So this whole paragraph involves
11 some other plaintiff, not Kenzie Murdock?
12 A       Correct.
13 Q       I noticed on the first page of your
14 updated report you indicate that you provided a
15 brief summary of information regarding Mr. Eric
16 Armstrong.  That doesn't belong in this report
17 either, does it?
18 A       No.  And it's Armstrong's obesity.
19 Q       Is there anything else in your updated
20 report that relates to Eric Armstrong and not
21 Kenzie Murdock?
22 A       Not that I know of.
23 Q       Your analysis in this case does not
24 take into account the specific surface area of
25 Miss Murdock's skin that could have been exposed

William Sawyer, Ph.D.

1  to Roundup, does it?
2  A       Yes, it does.
3  Q       How does it do that?
4  A       Through the passive diffusion study.
5  Q       Of the Brazilian eucalyptus glyphosate
6  applicators?
7  A       Yes.  It's a real-world measurement of
8  how much contact there is as potential dermal
9  exposure and then the calculated noncontrolled
10 dermal exposure.  It was a -- basically, workers
11 who had cotton patches stuck all over their body
12 at different locations and measured the impact of
13 the spray.  And the dose calculation is based
14 upon square -- quantity per square centimeter.
15 Q       You did not calculate the concentration
16 of Roundup PowerMAX following dilution with
17 water, did you?
18 A       No.  But that -- my understanding was
19 that, through interview, that the dilution was
20 carried out as per the specification.
21 Q       Your analysis in this case did not
22 include a calculation of a lifetime average daily
23 dose, did it?
24 A       No.  That would be absolutely
25 inappropriate because the studies to compare to

William Sawyer, Ph.D.

```
 1    are noncancer studies.  LADDs at -- lifetime
 2    average dose, has to be compared to cancer
 3    studies, not RFDs or other noncancer studies.
 4    That would be a breach of methodology.
 5              In toxicology, noncancer effects are
 6    compared on -- to noncancerous studies; whereas,
 7    cancer risk has to be compared to long-term
 8    animal bioassays and human epidemiologic data.
 9    Q        To your knowledge, was Miss Murdock's
10    bone marrow ever tested for the presence of
11    glyphosate?
12    A        It was not.
13    Q        Do you know when Miss Murdock had her
14    first malignant cell that appeared in her body?
15    A        That's an impossible question to
16    answer.  Absolutely impossible.
17    Q        So there's no validated scientific test
18    or method or procedure that can tell you when the
19    first malignant cell appeared in a specific
20    patient?
21    A        Of course not.  That's an invalid
22    question.  It's misleading.
23    Q        Can you state, to a reasonable degree
24    of medical certainty, that there was any
25    glyphosate in Miss Murdock's body when her first
```

William Sawyer, Ph.D.

```
 1    cancerous cells appeared?
 2    A        Same answer regarding the first
 3    cancerous cell.
 4    Q        It's impossible to say?
 5    A        It's an impossible question.  It's just
 6    a very misleading question.
 7    Q        Do you agree that there's published
 8    literature that indicates that being a farmer as
 9    a long-held occupation independently increases
10    the risk of NHL?
11    A        Only with respect to farmers who use
12    pesticide ropes to apply pesticide --
13    insecticides to their cattle and other farm
14    animals.  I am familiar with -- with those
15    studies.
16              You know, as far as farmers who didn't
17    use any chemical application ropes, I'm not sure.
18    Q        Your initial report in this case that
19    we've marked as Deposition Exhibit 8, you
20    indicated that "Miss Murdock's weight reveals a
21    maximal BMI of approximately 27, which is not
22    obese.  Additionally, her BMI was at that level
23    for a relatively short period of time.
24    Miss Murdock's risk of NHL was not significantly
25    and substantially increased by her BMI."
```

William Sawyer, Ph.D.

```
 1              Did you intend to include that
 2    paragraph in your updated report?
 3    A        No.  It was based upon Mr. Armstrong's
 4    BMI.
 5    Q        So the paragraph that we saw in your
 6    updated report regarding the patient being obese,
 7    that related to Mr. Armstrong; right?  And you
 8    accidentally included it in your updated report?
 9    A        Correct.
10    Q        Now my question's about your initial
11    report regarding Miss Murdock where you said
12    "Miss Murdock's weight reveals a maximal BMI of
13    approximately 27, which is not obese.
14    Additionally, her BMI was at that level for a
15    relatively short period of time.  Miss Murdock's
16    risk of NHL was not significantly and
17    substantially increased by her BMI."
18              My question is:  Is that paragraph
19    accurate and is that an opinion that you intend
20    to offer in this case?
21    A        Yeah.
22    Q        Is there any published data that says
23    that in order for a person's BMI to put them at
24    an increased risk of NHL, that the person must be
25    at that BMI for a certain period of time?
```

William Sawyer, Ph.D.

```
 1    A        I don't recall.  I'd have to pull the
 2    studies.
 3    Q        You indicate in your --
 4              I think in both of your reports, but
 5    let's see.
 6              Yeah.  You indicate in your updated
 7    report at page 260 that Larsson and Wolk,
 8    W-O-L-K, reported a slight increased risk (7
 9    percent) of NHL observed with a 5 kilogram per
10    meter squared increment in BMI over 16 studies.
11              Is that right?
12    A        Right.  Greater than -- 5 -- that
13    increment of 5 is above 30.
14    Q        And, so, if Miss Murdock's BMI was 22
15    but then increased to 27, according to that
16    study, her risk of NHL would have increased 7
17    percent with that increase in BMI?
18    A        No.  That's not what the study reads.
19    If a person was obese, that would be at least 30.
20    And five points above the threshold of 30, then
21    that would apply.  That is strictly for obesity.
22              In this case, she was never obese, and
23    that does not apply at all.
24    Q        All right.  Dr. Sawyer, between what is
25    in your updated report and what we've discussed
```

William Sawyer, Ph.D.

```
 1   today, have we covered all of your -- or does
 2   that cover all of your opinions and the bases for
 3   your opinions in this case?
 4   A        No.
 5   Q        Okay.  What have we missed or what's
 6   not contained in your report?
 7   A        I have other opinions contained in the
 8   report.  I didn't hear you say the word "in the
 9   report," so I guess I misunderstand.
10   Q        Yeah.  Between what's in the report and
11   what we've covered today, does that cover all of
12   your bases for your opinions and your opinions?
13   A        Yes.
14   Q        All right.  That's all the time I have.
15   Thank you, sir.
16                 EXAMINATION
17   BY MR. PRATHER:
18   Q        Dr. Sawyer, just a couple of quick
19   follow-up questions.
20            Number 1, have all the opinions that
21   you've expressed today and in your report been
22   expressed to a reasonable degree of probability
23   in the field of toxicology?
24   A        Yes.  To a reasonable toxicologic
25   certainty, yes.
```

William Sawyer, Ph.D.

```
 1   Q        And in Kentucky law, the standard is
 2   reasonable probability, not reasonable certainty,
 3   which I believe is a lower standard.  Are all of
 4   your opinions to a reasonable degree of
 5   toxicology probability?
 6   A        Yes.
 7   Q        Did you apply the same methodol- --
 8   methodology and rigor in reaching your opinions
 9   in this case that you have applied with
10   availability of similar data in your analysis of
11   other glyphosate cases?
12   A        Yes.
13   Q        Did you apply the same rigor in
14   developing your opinions in this case that you
15   use in the regular practice of your profession of
16   an assay con- -- excuse me -- assay toxicologist?
17   MR. KOOPMANN:
18            Object to form.
19   A        Yes.
20   MR. PRATHER:
21   Q        In terms of the systemic absorbed dose
22   conclusions that you relied on in the Matando
23   [sic] study, has that methodology that you relied
24   on been challenged with any peer-reviewed
25   literature that you're aware of?
```

William Sawyer, Ph.D.

```
 1   A        No.  It's never been challenged.
 2   There's never been any editorials or complaints
 3   with respect to that study.  It's been
 4   peer-reviewed.  The study has a measurement for
 5   rate of error with respect to standard deviation.
 6   It's a study that has been published for many
 7   years and has been well accepted.
 8   Q        Would you characterize the methodology
 9   that you relied upon in relation to this case as
10   a conservative or an expansive approach to
11   determining estimated dose exposure?
12   A        Very conservative, based upon her
13   complete lack of PPE and bare legs, arms, with
14   sandals or clogs -- or Crocs, rather -- compared
15   to the applicators in the study who were fitted
16   with drill coveralls, long sleeves, face shield,
17   leather boots, et cetera.
18   Q        Thank you.
19            And I have the same question with
20   regard to your calculation of exposure days.  I
21   know you cited several studies, but did you --
22   did you calculate exposure days based on accepted
23   methodology in the field of toxicology?
24   MR. KOOPMANN:
25            Object to form.
```

William Sawyer, Ph.D.

```
 1   A        Yes.  I specifically followed the
 2   methodology within the peer-reviewed
 3   epidemiologic studies as referenced.
 4   MR. PRATHER:
 5   Q        And I understand with the
 6   qualifications on exposure days that you
 7   discussed at some length.  In your opinion, were
 8   your conclusions in terms of exposure days
 9   consistent with your opinions related to systemic
10   absorbed dose?
11   A        Yes.  And I wrote in my report that I
12   use both in tandem.  I'm not relying only on
13   systemic dose or only upon the exposure days but
14   both.
15            And if we look at the systemic dose,
16   she's basically at the 90th percentile as
17   published in the review studies by Solomon.  And
18   I should point out Solomon is a consultant for
19   Monsanto.  So using their own data, basically,
20   she's at the 90th percentile of applicators'
21   systemic dose level.
22            And when we look at exposure days,
23   she's in great excess of exposure days in the
24   published studies that result in a statistically
25   significant increased rate of NHL.
```

William Sawyer, Ph.D.

1  Q       All right.  I want to switch gears just
2  a little bit.  Mr. Koopmann asked you some
3  questions about -- or asked you a question
4  relating to whether your opinions would be
5  affected or the accuracy of your opinions would
6  be affected if Kyle -- if Kyle Murdock had
7  misremembered any of the information that he told
8  you.  Do you remember that question?
9  A       Yes.
10  Q       I have two follow-ups on that.  Number
11  1, do you know of any evidence that there were
12  significant inconsistencies in -- or any other
13  reason to believe that Kyle Murdock's information
14  he gave you might not be reliable?
15  MR. KOOPMANN:
16          Object to form.
17  A       No.  In fact, I found no major
18  inconsistencies between the interviews versus his
19  deposition that I recently read.  The consistency
20  was very good, actually.
21  MR. PRATHER:
22  Q       And -- and assuming that Kyle, for the
23  sake of argument, assuming that Kyle had
24  misremembered something, couldn't that mean, just
25  as likely, that your report, because of that,

William Sawyer, Ph.D.

1  underestimated Kenzie's exposure rather than
2  overestimating it, as was implied?
3  MR. KOOPMANN:
4          Object to form.
5  A       Yes.
6  MR. PRATHER:
7  Q       Mr. Koopmann had asked you some
8  questions about the De Roos study, whether it
9  indicated a statistically significant association
10  between glyphosate and lymphoma, NHL, that you
11  did not -- and he moved on before you got to
12  answer the whole question.
13          Is it your opinion that that study
14  does, in fact, indicate that there is a
15  statistically significant association between
16  glyphosate exposure and the development of NHL?
17  MR. KOOPMANN:
18          Object to form.
19  A       It does.  What he didn't allow me to
20  explain was that there were two analyses.  One is
21  the standard analysis, which was highly
22  significant, and then there was a more demanding
23  analysis called a hier- -- hierarc- --
24  hierarchical analysis, which was not
25  statistically significant.

William Sawyer, Ph.D.

1  Q       Dr. Sawyer, those are all the questions
2  I have for you.  Thank you.
3  VIDEOGRAPHER:
4          Other counsel?
5  MR. KOOPMANN:
6          No further questions.
7  VIDEOGRAPHER:
8          All right.  That concludes the
9  deposition.  The time is 1:13 p.m.
10          (OFF THE VIDEO RECORD.)
11  MR. KOOPMANN:
12          Lois, I need an expedited copy of this
13  transcript.
14  THE COURT REPORTER:
15          How many days?
16  MR. KOOPMANN:
17          What's feasible for you?  We have a
18  deposition of a witness next on the 28th, so I'd
19  like to, you know, have him have the chance to
20  read it, if he can.
21  THE COURT REPORTER:
22          How about Monday?
23  MR. KOOPMANN:
24          What day is that?
25  THE COURT REPORTER:

William Sawyer, Ph.D.

1          Monday is the 27th.  I was just
2  thinking two days, but I can probably get it to
3  you over the weekend.
4  MR. KOOPMANN:
5          Yeah, that'd be better, in case he has,
6  you know, some more time...
7  THE COURT REPORTER:
8          Your deposition is the 28th, you say?
9  MR. KOOPMANN:
10          Yeah.
11  THE COURT REPORTER:
12          Well, you might need it tomorrow.
13          Mr. Prather, how about you?  Do you
14  need a copy of the deposition?
15  MR. PRATHER:
16          I do need a copy, PDF only.
17  THE WITNESS:
18          I'd like to read and review and read
19  and sign.
20  THE COURT REPORTER:
21          Yes, sir.
22          Okay.  Jay, do you need it expedited in
23  any manner?
24  MR. PRATHER:
25          I do not need it expedited.

William Sawyer, Ph.D.

```
1    THE COURT REPORTER:

2            All right.

3         (Deposition concluded at 1:16 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

---

William Sawyer, Ph.D.

```
1              C E R T I F I C A T E

2

3         I do hereby certify that the above and

4    foregoing transcript of proceedings in the matter

5    aforementioned was taken down by me in machine

6    shorthand, and the questions and answers thereto

7    were reduced to writing under my personal

8    supervision, and that the foregoing represents a

9    true and correct transcript of the proceedings

10   given by said witness upon said hearing.

11        I further certify that I am neither of

12   counsel nor of kin to the parties to the action,

13   nor am I in anywise interested in the result of

14   said cause.

15

16

17

18        LOIS ANNE ROBINSON, RPR, RMR
          REGISTERED DIPLOMATE REPORTER
19        CERTIFIED REALTIME REPORTER

20

21

22

23

24

25
```

---

William Sawyer, Ph.D.

```
1              E R R A T A   P A G E

2

3         I, WILLIAM SAWYER, Ph.D., the witness
     herein, have read the transcript of my testimony,
4    and the same is true and correct, to the best of my
     knowledge, with the exceptions of the following
5    changes noted below, if any:

6    Page/Line  Word/Words to be changed   Correct Word

7    _____  _____       _____

8    _____  _____       _____

9    _____  _____       _____

10   _____  _____       _____

11   _____  _____       _____

12   _____  _____       _____

13   _____  _____       _____

14   _____  _____       _____

15   _____  _____       _____

16   _____  _____       _____

17   _____  _____       _____

18   _____  _____       _____

19   _____  _____       _____

20   _____  _____       _____

21

22              _____
                WILLIAM SAWYER, Ph.D.
23

24

25
```

---

William Sawyer, Ph.D.

```
1            DECLARATION OF WITNESS

2

3         I, the undersigned, declare under penalty

4    of perjury that I have read the foregoing

5    transcript, and I have made any corrections,

6    additions, or deletions that I was desirous of

7    making; that the foregoing is a true and correct

8    transcript of my testimony contained herein.

9         EXECUTED this _____ day of _____,

10   2023, at _____, _____.
                (City)                (State)
11

12

13

14

15

16              _____
                WILLIAM SAWYER, Ph.D.
17

18

19

20

21

22

23

24

25
```