**WILKINSON STEKLOFF LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonstekloff.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonstekloff.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel:  202-847-4030
Fax:  202-847-4005

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843
Fax: 202-682-1639

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel:  202-662-6000

**BRYAN CAVE LEIGHTON PAISNER LLP**
K. Lee Marshall (CA Bar No. 277092)
(klmarshall@bclplaw.com)
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Tel:  415-675-3400
Fax:  415-675-3434

Jed P. White (CA Bar No. 232339)
(jed.white@bclplaw.com)
120 Broadway, Suite 300
Santa Monica, CA 90401
Tel: 310-576-2100
Fax: 310-576-2200

*Attorneys for Defendant Monsanto Company*

**IN THE UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE:  ROUNDUP PRODUCTS LIABILITY LITIGATION, | MDL No. 2741 |
| | Case No.:  3:16-md-02741-VC |
| *Salas v. Monsanto Company, et al.*, 3:21-cv-06173-VC | **DECLARATION OF JED P. WHITE IN SUPPORT OF DEFENDANT MONSANTO COMPANY'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE DR. JOSHUA SCHAEFFER'S TESTIMONY**<br><br>Hearing:<br>Date:    July 27, 2023<br>Time:    10:00 a.m.<br>Place:    San Francisco Courthouse, Courtroom 4 – 17th Floor |

Bryan Cave Leighton Paisner LLP
One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, Missouri 63102-2726

I,      Jed P. White, declare as follows:

1.      I am an attorney at law admitted to practice before all of the courts in the state of California.  I am an attorney with the law firm Bryan Cave Leighton Paisner LLP, counsel of record for Defendants Monsanto Company ("Monsanto") in the above-referenced action.  I am over eighteen years of age and am fully competent to make this Declaration in Support of Monsanto Company's Response in Opposition to Plaintiff's Motion to Exclude Dr. Joshua Schaeffer's Testimony.  Except where otherwise stated, I have personal knowledge of the following, and if called upon to testify as a witness, I could and would competently testify to the matters stated herein.

2.      Attached hereto as **Exhibit 1** is a true and correct copy of Monsanto's Company's Rule 26 Designation and Disclosure of Specific Causation Expert Testimony, dated July 25, 2022.

3.      Attached hereto as **Exhibit 2** is a true and correct copy of Dr. Joshua Schaeffer's expert report with his curriculum vitae attached as Exhibit A in the above-captioned matter, dated March 22, 2023.

4.      Attached hereto as **Exhibit 3** is a true and correct copy of excerpts from the deposition of Dr. Joshua Schaeffer in the above-captioned matter, dated March 22, 2023.

5.      Attached hereto as **Exhibit 4** is a true and correct copy of an excerpt of Mathematical Models for Estimating Occupational Exposure to Chemicals (2nd ed. 2009) (13.3.2).

6.      Attached hereto as **Exhibit 5** is a true and correct copy of excerpt of Dr. William Sawyer's expert report in the above-captioned matter, dated June 22, 2022.

7.      Attached hereto as **Exhibit 6** is a true and correct copy of the Environmental Protection Agency's Draft Human Health Risk Assessment in Support of Registration Review, dated December 12, 2017.

8.      Attached hereto as **Exhibit 7** is a true and correct copy of excerpt of Agency for Toxic Substances and Disease Registry, Toxicological Profile for Glyphosate, Ch. 7 "Regulations and Guidelines," dated August 2020.

I hereby declare under penalty of perjury under the laws of the State of California and the United States of California that the foregoing is true and correct.

Bryan Cave Leighton Paisner LLP
ONE METROPOLITAN SQUARE
211 NORTH BROADWAY, SUITE 3600
ST. LOUIS, MISSOURI 63102-2726

Executed June 29, 2023, at Santa Monica, California.

Jed P. White

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 29th day of June, 2023, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

/s/ Jed P. White
Jed P. White

Bryan Cave Leighton Paisner LLP
One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, Missouri 63102-2726

# EXHIBIT 1

Julie du Pont
(Julie.dupont@arnoldporter.com)
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
Telephone: (212) 836-8572
Facsimile: (212) 836-6714

Brian Stekloff
(bstekloff@wilkinsonstekloff.com)
WILKINSON STEKLOFF LLP
2001 M Street, N.W.
10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005

Eric G. Lasker
(elasker@hollingsworthllp.com)
HOLLINGSWORTH LLP
1350 I Street, N.W.
Washington, DC 20005
Telephone: (202) 898-5800
Facsimile: (202) 682-1639

*Attorneys for Defendant*
*MONSANTO COMPANY*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | Case No. 3:16-cv-05658-VC |
| | MDL No. 2741 |
| This document relates to: | |
| Nancy Salas, v. Monsanto Company | |
| Case No. 3:21-cv-06173 | |

- 1 -

## MONSANTO COMPANY'S RULE 26 DESIGNATION AND DISCLOSURE OF SPECIFIC CAUSATION EXPERT TESTIMONY

Defendant Monsanto Company ("Monsanto") submits the following Designation and Disclosure of Expert Testimony, identifying persons who may provide expert testimony pursuant to Rule 702 of the Federal Rules of Evidence and Pretrial Orders 150 and 171. Because their analyses are based on scientific data that is confidential under applicable law and regulation, Monsanto designates the expert reports served contemporaneously with this disclosure as Confidential Material pursuant to the Protective and Confidentiality Order, Pretrial Order No. 30, entered in MDL No. 2741. Monsanto submits its Designations and Disclosure of Expert Testimony subject to the following reservation of rights:

(1)     The right to supplement or amend this disclosure based upon any rulings of the Court or any other court decisions that affect the scope of evidence in this trial or in the event Plaintiff alters or amends his witness list;

(2)     The right to supplement or amend this disclosure in order to address any new opinions – whether generic or case-specific – by Plaintiff's experts;

(3)     The right to elicit and offer testimony, either through direct examination or cross-examination, of all witnesses designated or identified by Plaintiff or Monsanto as an expert or person with specialized knowledge, training, or experience;

(4)     The right to call as a witness any expert designated by Plaintiff;

(5)     The right to call un-designated rebuttal expert witnesses whose testimony cannot reasonably be foreseen until the presentation of evidence against Monsanto;

(6)     The right to withdraw or de-designate the designation of any expert prior to testimony, and positively to aver that such previously designated expert will not be called as a witness at trial and to re-designate that expert as a consulting expert who cannot be called by opposing counsel;

(7)     The right to elicit expert testimony at trial from any qualified person which would be of benefit to the jury to determine material issues of fact pursuant to the Federal Rules of Civil Procedure;

(8)     The right, as allowed by the Federal Rules of Civil Procedure and applicable law, to offer amended and/or supplemental expert opinions based on: (1) receiving additional discovery, including but not limited to updated medical records, fact witness depositions, exhibits introduced at depositions, documents produced, materials produced; (2) expert depositions and/or any supplemental expert disclosures by any party; (3) new literature or scientific studies.

(9)     The right to introduce testimony from any third party fact witness with special expertise, knowledge or experience relevant to the issues in this litigation;

By identifying the witnesses below, Monsanto does not intend to waive any of its objections to deposition testimony, exhibits, or other evidence or argument. Monsanto reserves the right to call the following experts at trial and provides the expert reports, curriculum vitae, and reference lists for the following experts:

A.     **Case-Specific Experts**

**1.     Daniel A. Arber, M.D.**
**University of Chicago**
**5841 S. Maryland Ave.**
**S327, MC 3083**
**Chicago, IL 60637**

Dr. Arber is providing an expert report; materials considered list; list of prior testimony and CV.

Date available for deposition:  August 19, 2022.

**2.     Matthew Matasar, M.D.**
**Memorial Sloan Kettering Cancer Center**
**225 Summit Avenue**
**Montvale, NJ  07645**

Dr. Matasar is providing an expert report; materials considered list; list of prior testimony and CV.

Date available for deposition:  August 9, 2022.

**3.     Joshua Schaeffer, Ph.D., M.S., CIH**
        **122A Environmental Health Building**
        **Colorado State University**
        **Fort Collins, CO  80523**

Dr. Schaeffer is providing an expert report; materials considered list; list of prior testimony and CV.

Dates available for deposition: August 16, 2022 and August 19, 2022

**4.     Dr. Reid Smeda, PhD**
        **University of Missouri – CAFNR**
        **2-64 Agriculture Building**
        **Columbia, MO 65211**

Dr. Smeda is providing an expert report; materials considered list; list of prior testimony and CV.

Dates available for deposition:  August 17, 18 and 19, 2022

**B.     Treating Physicians**

Out of an abundance of caution, Monsanto also reserves the right to call Nancy Salas's treating physicians as non-retained experts who may offer a mixture of fact and opinion testimony based on their knowledge or experience, including but not limited to:

1.     **Dr. David Jose Sandoval-Sus**
       MD/Hematology/Oncology
       801 N Flamingo Rd
       Pembroke Pines, FL 33028

Dr. Sandoval-Sus is Ms. Salas's treating oncologist. The opinion testimony he will offer, and the basis for that testimony - which is set forth in his deposition testimony and his medical records for Ms. Salas - includes but is not limited to: general information about NHL; Ms. Salas's treatment history; there was nothing unique about Ms. Salas's presentation or testing to differentiate her from other NHL patients; and that Ms. Salas is in complete remission.

2.      **Dr. Fernando Madueno**
        Manuel Vargas, MD/Oncology
        603 N Flamingo Road, Suite 151
        Pembroke Pines, FL 33028

Dr. Madueno is Ms. Salas's treating oncologist. The opinion testimony he will offer, and the basis for that testimony - which is set forth in his deposition testimony and his medical records for Ms. Salas - includes but is not limited to: general information about NHL; Ms. Salas's treatment history; there was nothing unique about Ms. Salas's presentation or testing to differentiate her from other NHL patients; and that Ms. Salas is in complete remission.

DATED: July 25, 2022                     Respectfully submitted,

                                         /s/ *Julie du Pont*
                                         Julie du Pont
                                         (Julie.dupont@arnoldporter.com)
                                         ARNOLD & PORTER KAYE SCHOLER LLP
                                         250 West 55th Street
                                         New York, NY 10019
                                         Telephone: (212) 836-8572
                                         Facsimile:(212) 836-6714


                                         /s/ *Brian Stekloff*
                                         Brian Stekloff
                                         (bstekloff@wilkinsonstekloff.com)
                                         WILKINSON STEKLOFF LLP
                                         2001 M Street, N.W.
                                         10th Floor
                                         Washington, DC 20036
                                         Telephone: (202) 847-4000
                                         Facsimile: (202) 847-4005


                                         /s/ *Eric Lasker*
                                         Eric G. Lasker
                                         (elasker@hollingsworthllp.com)
                                         HOLLINGSWORTH LLP
                                         1350 I Street, N.W.
                                         Washington, DC 20005

R. 26 DESIGNATION AND DISCLOSURE OF EXPERT TESTIMONY

Telephone: (202) 898-5800
Facsimile:(202) 682-1639


*Attorneys for Defendant*
*MONSANTO COMPANY*

R. 26 DESIGNATION AND DISCLOSURE OF EXPERT TESTIMONY

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 25, 2022, a true and correct copy of the foregoing

Designation and Disclosure of Expert Testimony was served by electronic mail on the following

counsel of record:

Robin Greenwald
*RGreenwald@weitzlux.com*
Weitz & Luxenberg
700 Broadway
New York, NY 10003
*Co-Lead Counsel for Plaintiffs in MDL No. 2741*

Aimee Wagstaff
*Aimee.wagstaff@andruswagstaff.com*
Andrus Wagstaff
7171 W. Alaska Drive
Lakewood, CO 80226
*Co-Lead Counsel for Plaintiffs in MDL No. 2741*

David Dickens
*ddickens@millerfirmllc.com*
The Miller Firm LLC
108 Railroad Ave.
Orange, VA 22960
*Co-Lead Counsel for Plaintiffs in MDL No. 2741*

Kristina Marie Infante
Pablo Rojas
Steven Craig Marks
*kinfante@podhurst.com*
*projas@podhurst.com*
*smarks@podhurst.com*
Podhurst Orseck, P.A.
One SE 3rd Avenue, Suite 2300
Miami, FL 33131
*Counsel for Plaintiff Nancy Salas*

<u>/s/ Albert Cora</u>

Albert Cora
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York NY 10019

- 1 -

# EXHIBIT 2


EXHIBIT
0003
Joshua Schaeffer
03.22.23

# EXPERT REPORT

## Salas

## Vs.

## Monsanto Company

**Prepared by:**
**Joshua W. Schaeffer, PhD, MS, CIH**
**Schaeffer Occupational Health Associates, LLC**

## I. Summary

I am the principal industrial hygienist at Schaeffer Occupational Health Associates, LLC. I have over 20 years of experience in industrial hygiene that integrates a background in biochemistry and toxicology. I am an ABIH Certified Industrial Hygienist®, which requires training, experience and proficiency in anticipating, recognizing, assessing, and controlling hazards to protect the health and safety of people in the workplace and community. I have conducted exposure assessments, as well as recommended interventions and control strategies to improve health outcomes in workers and community members in various environments.

I have been retained to provide expertise on the subject of pesticide exposure, specifically with regard to commercially available products containing N-(phosphonomethyl)glycine (glyphosate). There are allegations that glyphosate is associated with causing Non-Hodgkin's Lymphoma, which is an umbrella term that includes subtypes of cancer present in the lymphatic tissue. Glyphosate was introduced in 1974 as a non-selective herbicide to control the growth of weeds and grasses for agricultural, commercial, and residential purposes. Because glyphosate is highly soluble in water, a range of aqueous products are manufactured, including concentrate or ready-to-use variations. To promote the uptake of glyphosate by the plant, surfactants are added to the liquid formulations.

Given my training and qualifications (see below), I have the experience and expertise to provide consultation and expert opinions on estimates of past exposures to and systemic doses of glyphosate based on assessments of existing data, historical information, and professional judgment. While I will perform a thorough assessment to estimate the dermal exposure and any resulting systemic dose experienced by the plaintiff in this specific case, I will not determine causation of the plaintiff's NHL.

## II. Qualifications

**a. 1997-2001.** I hold a Bachelor of Arts from the College of Wooster where my field of study was biochemistry (degree completion: 5/2001). The College of Wooster is nationally recognized for its mentored undergraduate research and senior capstone program (also known as: Independent Study; I.S.). My research was focused on the synthesis of a specific template molecule for the development of a chemical sensor specific for the quantitation of the pesticide: 1,1-bis(4chlorophenyl)-2,2,2-trichloroethane (DDT).

**b. 2002-2006.** I served as the laboratory director at Chematox Laboratory, Inc. (Boulder, CO) – a forensic toxicology laboratory. I worked with a wide client base, including community members, businesses, coroners, police departments, and attorneys to provide analytical services and expert consultation with regard to the absorption, distribution, metabolism, and excretion of a variety of substances.

**c. 2006-2007.** I accepted a position as a graduate research associate in the Department of Nutrition PhD Program at Case Western Reserve University (Cleveland, OH). During this time, I applied metabolomic and stable isotope techniques to characterize pathways and mechanisms associated with fatty acid oxidation in a murine model of very-long-chain acyl-CoA dehydrogenase deficiency (a rare metabolic disorder in humans). Here, I gained

in-depth knowledge of theory and application of equipment and instrumentation used routinely in the identification, confirmation, and quantification of biological and chemical species. Over the course of this year, I designed studies and experiments in addition to developing and executing analytical strategies to adequately address research questions and objectives.

**d.  2007-2008.** I entered a graduate program that allowed me to pursue my interests in toxicology and to study exposure pathways and adverse outcomes of toxicants. I entered the Master of Science in Toxicology Program at Colorado State University and earned my degree. During this time, I acquired in-depth knowledge in the fundamentals of toxicology based on a rigorous curriculum focused on the effects of toxicants on the health of the humans.

**e.  2008-2013**. I matriculated into the Industrial Hygiene Ph.D. Program in the Department of Environmental and Radiological Health Sciences at Colorado State University. I was a graduate trainee in the Center for Disease Control and National Institute of Occupational Safety and Health-funded Mountain and Plains Education Research Center. I participated in collaborations across five different occupational health and safety disciplines, including occupational and environmental medicine, to address risks and hazards present in the workplace and communities. As a trainee, I developed the necessary framework for addressing real-world questions in the arena of industrial hygiene and environmental health.

My doctoral training was primarily in the areas of exposure assessment of occupational aerosols. Specifically, I evaluated two different sampling methods (one prescribed by the Occupational Safety and Health Administration) used to collect airborne methylene bisphenyl diisocyanate (MDI). This chemical is highly reactive and is used extensively to manufacture a wide range of polyurethane products (including coatings, adhesives, sealants, and elastomers). Occupational overexposure to MDI can cause a range of respiratory reactions, most notably respiratory sensitization. Once sensitized, individuals may respond with an asthmatic response at relatively low levels of re-exposure. My results demonstrated that both sampling methods underestimated the amount of diisocyanate, even under laboratory conditions (data not published), and that further research is needed to improve the sampling methods that yield accurate results.

In 2010, I accepted a 50% FTE position as an industrial hygienist in the Division of Environmental and Occupational Health Sciences (DEOHS) at National Jewish Health (Denver), a leading respiratory hospital in the United States. In general, I provided industrial hygiene services and served as a resource regarding the measurement and quantification of chemical and biological exposures as part of research grants and consultation with physicians. I helped staff and physicians identify potential exposures from specific sources and processes while assessing the likelihood that those exposures could cause harm to a patient. If needed, I would provide consultation and help patients

determine the best control strategy and personal protective equipment to limit harmful exposures.

I was one of the principal researchers on a study funded by the Bureau of Justice Assistance (a component of the Department of Justice) to investigate biological and chemical exposures in (at the time) illegal indoor marijuana grow operations that first responders and law enforcement could encounter upon entering these environments. We reported high concentrations of airborne fungal spores as compared to background concentrations and recommended respiratory protection to reduce exposures. In addition to this study, I conducted research and assessments in a wide range of other environmental settings, including exposures to beryllium, hazards in the electric power industry, indoor environmental pollutants in patient homes, and diisocyanate exposure in an autobody shop. During this time, I was afforded various opportunities to complement my education and training in exposure and health outcomes.

In 2012, I started Schaeffer Occupational Health Associates (SOHA), LLC to provide consultation services on exposure assessments of occupational and environmental health hazards. Through SOHA, I provide technical expertise, objective assessments, and services that promote health and safety in the workplace and community. Using the paradigm of 'anticipation-recognition-evaluation-control', SOHA aims to address questions and concerns related to exposures to chemical, biological, and physical agents in a wide range of settings, and provide recommendations and solutions that are technically sound and economically feasible. The SOHA framework integrates evidence-based strategies and methodologies for conducting exposure assessments and evaluating occupational and environmental hazards.

f. **2013-2015.** I accepted a postdoctoral fellowship in the High Plain Intermountain Center for Agricultural Health and Safety (HICAHS) and the Department of Environmental and Radiological Health Sciences at Colorado State University. Here, I conducted multi-disciplinary research in the field of agricultural health and safety. The HICAHS is a CDC/NIOSH-funded agricultural center that is focused on improving the health and safety of workers and communities associated with agriculture, forestry, and fishing industries in the High Plains and Rocky Mountain region, which includes the states of Colorado, Montana, North Dakota, South Dakota, Utah, and Wyoming. My research efforts were focused on characterizing exposure-response patterns of inhalable aerosols (i.e., those of biologic and inorganic origin) among dairy workers and developing effective control strategies, especially with regard to economic and cultural contexts of the industry.

g. **2015-present.** I transitioned to a research faculty position at Colorado State University. In 2017, I became an American Board of Industrial Hygiene Certified Industrial Hygienist (CIH). As a CIH, I am globally recognized for my education, experience, competence and ethics in industrial hygiene. In 2018, I competed for and accepted a tenure-track faculty position at Colorado State University. With this position, I have integrated teaching responsibilities and service to the university in addition to maintaining my research. I have continued to investigate occupational and environmental exposures and to evaluate

interventions and control strategies to reduce exposure and improve the health of workers and community, especially those vulnerable to adverse outcomes. Recently, I was a lead author on a pilot study published in the International Journal of Environmental Research and Public Health that presented results on airborne exposures among sugarcane workers in Guatemala. In this pilot study, we collected and analyzed air samples for particulate matter, silica, heavy metals, and glyphosate. In this study, we did not detect measurable glyphosate in the air samples.

A copy of my CV is attached as Exhibit A. All of my opinions expressed herein are held to a reasonable degree of scientific certainty. My customary rate for my professional time is $425 an hour for reviewing materials, writing reports, and for depositions or trial testimony. A list of the materials considered is attached as Exhibit B. Finally, my deposition and testimonial history is provided as Exhibit C.

## III. Industrial Hygiene: Fundamentals and Principles

Industrial hygiene is a multidisciplinary profession that is based on the science of protecting and enhancing the health, safety, and environment of people at work and in their communities. To effectively address human exposures to hazards in the environment, industrial hygiene is largely based on core scientific disciplines, including natural sciences (i.e., physics, chemistry, biology) and engineering. Further, industrial hygienists must demonstrate that they can participate in and contribute to interdisciplinary collaborations with practitioners in other fields, including but not limited to toxicology, epidemiology, and biostatistics. Hence, the industrial hygiene discipline (as it is recognized today) is broad and diverse and constantly evolving to anticipate-recognize-evaluate-control realized issues, as well as critical issues emerging on the horizon. Therefore, practitioners must demonstrate in-depth knowledge and technical expertise acquired from extensive education and training when conducting activities across the exposure-health continuum. These activities include characterizing properties and behavior of hazards, determining routes of exposure, measuring (or reconstructing) exposure, estimating dose, determining health effects based on toxicology and physiology, and recommending control strategies (based on data, standards, and exposure limits).

Industrial hygienists will often reconstruct exposures and doses for a variety of reasons, which include risk assessment and health complaints/illnesses. In these situations, exposures have already occurred, which requires estimates to be derived retrospectively. Industrial hygienists use their experience and expertise to systematically evaluate historical information, existing data, relevant determinants to reconstruct exposures and estimate absorption of substances via different routes and pathways. In general, absorption is referred to as the process by which toxicants move across physiological barriers and membranes, which in turn, results in the toxicant entering the blood stream. While this process of exposure reconstruction varies in scope, scale and complexity depending on the scenario, it is germane to modeling exposures to pesticides. The predominant route of exposure to some pesticides is dermal contact and loading that results in absorption, or movement across the skin depending on the chemical and individual exposure scenario.

## IV. Properties of Skin

Schaeffer Occupational Health Associates, LLC
Expert Report
Case Number: MDL No. 3:16-md-02741-VC (Salas)

With a surface area ranging from 1.5 to 2 m², the skin is the largest human organ. The skin provides myriad functions that include thermal, electrolyte, hormonal, metabolic, and immune regulation. Moreover, the skin acts as physiological barrier to the external environment and serves as the first line of defense against exposure to foreign substances, including synthetic and natural chemicals. These foreign substances may be classified as a toxin or a toxicant depending on the source. Briefly, toxins typically refer to those substances that are produced by biological substances and capable of causing adverse effects while toxicants are used to describe toxic substances that are the result of human activities (Klaasen 2001).

Two key components of the skin are: the epidermis and the dermis. The epidermis is avascular and may consist of up to six unique layers (depending on anatomical site): stratum corneum (outermost layer), stratum lucidum, intermediate zone, stratum granulosum, stratum spinosum, and stratum germinativum (Figure 1). The stratum corneum consists of tightly packed keratinized cells (or terminally differentiated corneocytes), which are flat, non-nucleated cells that are biologically inactive. These keratin-containing cells are surrounded by non-polar lipids – namely long-chain ceramides. As a result, these lipids create a hydrophobic barrier.

In general, absorption is referred to as the process by which those substances foreign to the human body, including toxicants, move across physiological barriers and membranes into the systemic circulation (Klaasen 2001). Dermal absorption is the complete transport of chemicals across the stratum corneum and other layers of the skin that are subsequently available for uptake by the capillary network located at the dermal-epidermal junction (Kielhorn 2006). Given the hydrophobic barrier (as described above), the penetration (or entry into a specific layer of skin) of polar compounds is greatly impeded by the lipid matrix. Thus, the permeation (penetration through distinct layers) and ultimately dermal absorption of such compounds is greatly slowed and reduced based on the need for intercellular transport between the keratinized corneocytes. On the other hand, the stratum corneum favors lipophilic compounds and allows for non-polar compounds to pass through its lipid matrix with ease based on transcellular absorption via the corneocytes (Kielhorn 2006).

6

Schaeffer Occupational Health Associates, LLC
Expert Report
Case Number: MDL No. 3:16-md-02741-VC (Salas)

Despite the integral role of the stratum corneum, the skin is not impenetrable. Even polar compounds will eventually engage in passive transport subject to a number of factors, to include concentration, time, availability, condition of the skin, etc. Such compounds moving through the skin are subject to the principles of passive diffusion. Diffusion across a membrane as described by Fick's laws, suggest that the movement of compounds from a higher concentration to a lower concentration occurs at a given rate, such that the rate of transfer in mass/cm²/time (or flux) is



*Figure 1. A cross section of the human skin demonstrating the different layers at a macroscopic (a) and cellular (b) level that a toxicant must penetrate to enter systemic circulation (Kielhorne 2006).*

proportional to the change in concentration over time. For calculating dose in dermal absorption studies, the steady state flux can offer a more precise illustration of the movement of a compound through the stratum corneum over a period of time; however, percent absorbed offers a simpler method for calculation of systemic availability. Percent absorbed can also correct overestimations resulting from binding within stratum corneum reflected in the determined permeability constant ($K_p$). This, of course, assumes that compounds are indeed involved in passive transport and do not bind within the stratum corneum, which can result in a reservoir effect where the release of a substance into the systemic circulation may be delayed (if absorption even occurs). This effect has been well documented for lipophilic compounds. Passage of dermal exposures through the layers of skin that result in systemic doses, therefore, can be measured by utilizing flux.

Based on the structure of the skin, the dermal penetration and absorption of toxicants (i.e., human-made substances or by-products) is a highly orchestrated event and complex process. When conducting a dermal exposure assessment, factors that can influence the potential for penetration must be considered. These factors include vapor pressure, molecular weight/size, and solubility of the substance, as well as condition of the skin, use of personal protective equipment (or covered vs. uncovered skin), and environmental conditions (e.g., humidity and temperature). Solubility can be described using the octanol/water partition coefficient, which is often used to predict dermal absorption of a substance. This coefficient ($\log P_{ow}$, $K_{ow}$) represents the ratio of the concentration of the solute (or chemical) in octanol as compared to the concentration observed in water, which is ultimately a measure of its solubility in terms of hydrophilicity or hydrophobicity. This measurement is important when considering toxicokinetics and reconstructing exposure. For example, those values of $K_{ow}$ that are between 1 and 3 denote high potential whereas negative values suggest low potential for dermal absorption based on the solubility of the substance.

Hereinafter, the aforementioned factors will be described and evaluated in the context of exposure to glyphosate (a commonly used herbicide) based on scientific literature, including peer-reviewed journal articles and reports from guideline studies. Subsequently, this report will present estimates of past exposures to and systemic doses of glyphosate based on assessments of existing data, historical information, and professional judgment as they relate to this case.

## V. Background on *N*-(phosphono-methyl) glycine (glyphosate)

*N*-(phosphono-methyl) glycine (commonly referred to as glyphosate) is one of the most commonly used herbicides by both professional applicators and consumers on a global scale (Andreotti 2017; Crump 2019; Solomon 2019). First registered for use in 1974 by the US EPA, glyphosate has been used to control the growth of weeds and grasses for agricultural, commercial, and residential purposes. Glyphosate acts as a potent and specific inhibitor of the 5-enolpyruvylshikimate 3-phosphate synthase (EPSPS) – an enzyme in the shikimate pathway (present in plants and microbes), which accounts for synthesis of aromatic amino acids (ATSDR 2019). Specifically, EPSPS catalyzes the intermediate necessary for the production of phenylalanine, tyrosine, and tryptophan. The phytotoxicity of glyphosate is derived from the overall reduction of protein synthesis in the plant. Glyphosate is selectively toxic to plants as the shikimate pathway is not found in mammals (Anadon 2009; ATSDR 2019; Solomon 2019).

In general, glyphosate is comprised of a phosphonomethyl group attached to glycine with a molecular formula of $C_3H_8NO_5P$ (relative molar mass = 169.07; ATSDR). As such, glyphosate is a phosphonate (or ester of phosphonic acid). It is important to note that while glyphosate is an organophosphorous compound – it is not considered an organophosphate (e.g., parathion, malathion, and chlorpyrifos), which is a class of pesticides that exhibit a phosphate ester functional group. Given the structure and phosphorylating capability of organophosphates, these pesticides inhibit acetylcholinesterase in insects. Unlike glyphosate that is selectively toxic to plants via the shikimate pathway, organophosphates target an enzyme that is also present in human health. Acetylcholinesterase will facilitate the breakdown of acetylcholine, a neurotransmitter, via hydrolysis into choline and acetic acid. When acetylcholinesterase is inhibited, cholinergic effects are induced and symptoms such as salivation, lacrimation, urination, diarrhea, GI distress, emesis, and bradycardia can manifest.

As a pure substance, glyphosate is a white, odorless solid. Glyphosate is a non-volatile chemical based on a vapor pressure of $9.8 \times 10^{-8}$ mmHg (or $1.3 \times 10^{-2}$ mPa) at 25 °C. The vapor pressure is used to describe the likelihood of a liquid or solid to disperse as vapors at a given temperature. The higher the vapor pressure, the more volatile the chemical. Vapor pressure is an important property to consider when conducting an exposure/risk assessment. Inhalation of vapors may be a major route of exposure for those liquids or solids with high vapor pressures (i.e., $> 3 \times 10^{-3}$ mmHg). The vapor pressure of glyphosate is orders of magnitude less than what would be considered a volatile compound. Even at a temperature of 45 °C, the vapor pressure of glyphosate increases to only $1.94 \times 10^{-7}$ mmHg (PubChem). As noted by the IARC, exposure to vapors of glyphosate is not likely at normal temperature and pressure (25 °C and 1 atmosphere) given the low vapor pressure, especially when formulated as the isopropylamine salt.

Glyphosate is a weak acid and generally soluble in water (11.6 g/L at 25 °C). However, salts of glyphosate are commonly formulated to yield products that are readily water soluble. For example, glyphosate is commonly available as an isopropylamine salt, which increases its water solubility to 1,050 g/L at 25 °C (ATSDR 2019). The octanol/water partition coefficient ($\log P_{ow}$, or $K_{ow}$) of glyphosate has been reported in the literature, ranging from -3.4 to -1.7 (Nielsen 2009; ATSDR 2019). As stated above, the $K_{ow}$ represents the ratio of the concentration of the solute (or chemical) in octanol as compared to the concentration observed in water, which is ultimately a measure of hydrophilicity or hydrophobicity. This ratio is typically expressed in the logarithmic form where negative values suggest that glyphosate is hydrophilic (positive values indicate hydrophobicity) and has a low potential for dermal absorption, especially as compared to those chemicals with a $K_{ow}$ between 1 and 3. This measurement is important when considering toxicokinetics and reconstructing exposure (please see Section VI below).

Glyphosate has been continuously eligible for re-registration based on meeting the standard promulgated under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), which mandates a review of each existing pesticide every 15 years. On average, 281 million pounds of glyphosate were applied on a yearly basis (between 2002 and 2016) across agricultural settings (i.e., citrus fruit, field crop, and tree nut operations) while 24 million pounds were applied to non-agricultural setting, including homeowner market that accounted for 5 million pounds applied annually (EPA 2020). Glyphosate can be applied using a variety of techniques to cover large area, including airplanes and trucks mounted with spray booms. Residential spot treatments are typically achieved using handheld equipment (e.g., wand/lance connected to a reservoir). In a study to estimate the exposure to six different herbicides (including glyphosate) among workers in the California Department of Transportation, researchers demonstrated a wide range in the amount of glyphosate that was mixed and applied. For example, those workers that applied glyphosate while operating a truck equipped with a boom and a hand gun applied ~40-49 lb of active ingredient per day. On the other hand, those workers that applied glyphosate using a hand-held wand applied ~0.6 to 12.1 lb/day. Further, workers using the hand-held wand also mixed and loaded glyphosate spray mix in an amount ranging from 3.0 to 24.1 lb/day.

The USEPA publishes the Reference Dose (RfD) for assessing risk of exposures to glyphosate. The RfD is experimentally derived from the no-observed-adverse-effect level (NOAEL), which is the highest identified dose that does not elicit a statistically or biologically significant effect from a toxicological standpoint. Further, the NOAEL can be further reduced by orders of magnitude by applying uncertainty and modifying factors. The factors address differences between humans and laboratory animals, as well as between sensitive subgroups in the human population. Hence, the RfD is a benchmark that represents a maximum acceptable oral dose across a lifetime that is without 'appreciable risk' of deleterious effects. Agencies in other countries publish the Acceptable Daily Intake (ADI), which is similar to the RfD (both based on the NOAEL), to guide risk assessors. The RfD for glyphosate in the U.S. is 1 mg/kg body mass/day, which is the same as the ADI published by the Food and Agricultural Organization of the United Nations (FAO-JMPR) and the Food Safety Commission of Japan (FSCJ). The ADIs published by the European Food Safety Agency (EFSA) and the Pest Management Regulatory Agency of Health Canada (PMRA) are 0.5 and 0.3 mg/kg body weight/day. Additionally, the Australian

Pesticides and Veterinary Medicines Authority (APVMA) determined an ADI of 0.3 mg/kg body weight/day.

The USEPA published its most recent Interim Registration Review Decision (Case 0178) in January 2020. This report described changes since the Proposed Interim Registration Review Decision in April 2019. These changes were focused on spray drift management labeling and rotational crop timing; no changes were noted to the agency's risk assessment for glyphosate. The USEPA and other international organizations (e.g., EFSA ,FAO-JMPR and PMRA) have maintained their decision that glyphosate is not likely to be carcinogenic based on exposure levels.

In 2015, the International Agency for Research on Cancer (IARC) classified glyphosate as 'probably carcinogenic to humans (Group 2A)'. Further, the Office of Environmental Health Hazard Assessment (OEHHA) within the California EPA adopted the IARC's decision. Accordingly, the OEHHA published a No Significant Risk Level (NSRSL) of 1.1 mg/day (or 1100 µg/day) for glyphosate. As stated in in the Glyphosate Proposition 65 Safe Harbors document (published by the OEHHA), the NSRL is 'based on the most sensitive scientific study deemed to be sufficient quality'. The Proposition 65 no-significant-risk value is one excess case of cancer per 100,000 people exposed.

## VI. Toxicokinetics of glyphosate

Toxicokinetics refers to an exposure and dose of a toxicant and its subsequent time course in the body based on absorption, distribution, biotransformation (i.e., metabolism), and elimination (Klaassen 2001). Given the low vapor pressure, inhalation of glyphosate is considered to be a negligible route of exposure (see Section IX). Further, residential application is typically achieved via a wand that can be adjusted to deliver a preferred spray pattern. When used to treat specific areas, exposure (if any) will be localized to the hands and lower extremities in most scenarios as opposed to a full body exposure.

Based on the chemical properties of glyphosate, dermal penetration is considered to be the primary route of exposure to the herbicide. The dermal penetration of glyphosate is low for human and is not expected to result in a remarkable systemic dose based on the scientific literature reviewed below.

### a. Absorption

Based on use patterns, physical properties of glyphosate, inhalation exposure and passive dosimetry data (discussed later), the primary route of exposure during application of glyphosate-based herbicides is dermal absorption. Thus, studies have focused on evaluating the absorption of glyphosate through the skin as opposed to other possible routes of negligible exposure, such as oral ingestion or inhalation.

The lipid-based stratum corneum acts as a natural and effective barrier to glyphosate and glyphosate formulations. As discussed, glyphosate has a low $K_{ow}$ (-3.4 to -1.7), which is characteristic of a hydrophilic chemical. Additionally, the $K_{ow}$ for the glyphosate

isopropylamine salt is -5.4. While glyphosate is a weak acid and generally soluble in water, it is commonly formulated as a salt to yield products with increased water solubility. For example, 1,050 grams of the isopropylamine salt formulation is soluble in one liter of water as opposed to 11.6 g/L of the glyphosate acid (IARC 2017; ATSDR 2019).

Based on the chemical and physical properties of glyphosate, it is likely that glyphosate deposited on the skin during application will reside on the stratum corneum for an extended time before penetration occurs. Various studies have determined that the penetration of glyphosate does not usually exceed 2% of the deposition or exposure (Franz 1983; Wester 1991; Nielsen 2009). Using an *in vitro* model with human skin samples, Nielsen et al. (2009) determined that the lag time (or time to penetrate through the skin) for glyphosate is eight hours. Franz et al. demonstrated that glyphosate does not bind in the stratum corneum, and glyphosate reaches dermis soon after penetration. (Franz 1983) The dermis is a poor barrier for glyphosate, however, and glyphosate present in the dermis is systemically distributed. As such, a reservoir effect is unlikely with glyphosate.

Skin studies (e.g., *in vitro* and *in vivo*) illustrate that glyphosate and glyphosate formulations have a low flux (mass of glyphosate/cm² of skin/time) and small fractional absorption. Wester (1991) evaluated the percutaneous absorption of glyphosate (from different dilutions of Roundup formulation) in rhesus monkeys. Two separate doses of glyphosate were administered intravenously as well as topically to rhesus monkeys. The topical application was localized to the bellies of rhesus monkeys; belly plates were used to minimize interference of the applied dose. The intravenous administration provided insight into the disposition of glyphosate in the body given the complete systemic availability of the herbicide. Based on two different doses presented in Table 3, nearly 100% of the glyphosate available in the systemic circulation was eliminated via the urine (Dose A: 94.9±8.6; Dose B: 98.8±3.8). This finding suggests that urine is the primary route of elimination. Because dermal absorption of glyphosate will mimic the distribution, metabolic, and excretion pathway of an IV-administered dose, absorption of glyphosate can be estimated based on the amount in the urine.

Based on the results observed in Table 4 of Wester et al. (1991), the topical application of glyphosate (i.e., in Roundup formulation) suggests a dermal absorption rate between 0.8% (Dose D) and no more than 2.2% (Dose C) from topical application of know amount of glyphosate. In the topical application of glyphosate, the percent eliminated via feces from Dose C was comparable to that observed from the two different IV-administrated doses. However, it should be noted that feces was the primary route of elimination for the glyphosate that was absorbed from Dose D. This is most likely attributed to the ingestion of glyphosate in this experiment as it does not follow the same pattern as Dose A-C. Ingestion of glyphosate in this experiment was confirmed by Dr. Daniel Bucks (see Testimony), who testified that the study monkeys were able to touch their bellies post-administration of the glyphosate dose. Consequently, hand-to-mouth movement likely resulted in an oral dose of glyphosate. Though recovery of glyphosate was only around 80%, subsequent tissue analysis did not reveal glyphosate in the body, suggesting total recovery of remaining glyphosate and loss of 20-25%

Schaeffer Occupational Health Associates, LLC
Expert Report
Case Number: MDL No. 3:16-md-02741-VC (Salas)

glyphosate during procedure. In other words, glyphosate was not observed to accumulate in the skin or body.

In Nielsen et al. (2009), the authors conducted an *in vitro* study using human skin to evaluate the deposition and percutaneous penetration of nine different compounds with increasing lipophilicity (glyphosate being the least). The authors observed that the relative skin deposition (diffusion area: 2.12 cm$^2$) increased with increasing $K_{ow}$ (or increasing lipophilicity). As such, the deposition and penetration of glyphosate (a hydrophilic compound) was minimal. From this study, glyphosate was concluded to exhibit a relatively low flux rate (~24 ng/cm$^2$-h). Over an experimental period of 48 h, less than 1% of the applied dose (glyphosate concentration: 4 mg/ml; 424 μg/cm$^2$ of skin) was considered to have penetrated the skin (based on the percent recovery from the receptor chamber). Total recovery of glyphosate was over 92% and total skin deposition was at 0.7%. These findings by Nielsen et al. were comparable to results/finding from earlier studies. The inters-study reproducibility further substantiates these observations regarding the penetration, permeation, and absorption of glyphosate.

Studies evaluating the absorption of glyphosate have also considered the permeability of glyphosate formulations. Though permeability is affected by the concentration of glyphosate versus glyphosate neat, data does not suggest that the use of surfactants appreciably affects the rate of absorption (Franz 1983). Several studies evaluate flux rates and permeability based on formulated products, including Roundup® formulations. These data do not report significant variation in overall percent absorbed when compared to neat glyphosate.

Davies (2017) conducted *in vitro* human skin permeation of glyphosate acid using various formulations, including gel, concentrated and diluted glyphosate formulations (which would be anticipated in spray products). Mean flux rates were calculated based on absorption over a 6-hour exposure time and 24-hour evaluation. The mean flux rate calculated for the concentrated formulation (i.e., 360 mg/ml) was 0.034 μg/cm$^2$/hour, which is similar to the flux (0.023 μg/cm$^2$/hour) observed by Nielsen et al. after application of a 4 mg/ml to the experimental model. However, the mean flux rate for the aqueous spray strength dilution (i.e., 1.35 mg/ml) was 0.0002 μg/cm$^2$/hour. Total recoveries of glyphosate following the absorption period were all reported at or above 100%, and over 97% of remaining glyphosate was removed through skin wash of the outer layer.

In a much earlier study, Franz (1983) evaluated the permeation of three glyphosate formulations through *in vitro* human skin samples. Samples were observed over a 48-hour time frame, and less than 0.2% of all three formulations were absorbed. Total absorption measured included glyphosate present in dermis. The average amounts of glyphosate absorbed were calculated at 1.61 μg/cm$^2$ for MON0139 and 2.26 μg/cm$^2$ for concentrated Roundup formulation. The amount of glyphosate absorbed from the diluted Roundup Spray Mix was considerably lower (i.e., 0.10 μg/cm$^2$), which can be attributed to the lower concentration. Interestingly, however, the percent absorption for the diluted formulation was actually higher than that of the concentrated formulations. Seemingly, rates taper off after reaching a certain concentration. Again, the remaining unabsorbed glyphosate was recovered

in total through skin washes. Total recovery of glyphosate from all samples were around 100%, and very little glyphosate remained within the sample itself. Rather, unabsorbed glyphosate remained on the outer skin surface, and over 92% of glyphosate doses were removed by wash with water.

Based on the studies above, it is clear that surfactants do not appreciably increase dermal absorption. The purpose of surfactants (in general) is to lower surface tension of the herbicide droplet and promote spreading across the plants' surface. In both Franz 1983 and Ridley (2017), an increase in dermal absorption of glyphosate was not observed between spray formulations of Roundup as compared to the concentrated form. The amounts of glyphosate absorbed from the spray mix formulation was less than that of the concentrated formula.

### b. Distribution and Metabolism

Glyphosate in the dermis encounters lymphatic capillaries and blood vessels that facilitate systemic distribution.  Since *in vivo* human studies effectively cannot be conducted to evaluate distribution in humans, *in vivo* animal studies should be considered. Animal data suggests that, once systemically available, glyphosate is distributed widely throughout the body, with no particular target of interest. Systemically available glyphosate is dynamic - temporarily increasing and decreasing in different tissues at varying rates. Any rise or increase of glyphosate is not permanent; no accumulation or burden of glyphosate has been observed. Minimal glyphosate has been reported to remain in the body seven days after intravenous administration. Further, despite extensive distribution to tissues, glyphosate is poorly metabolized in mammals. As such, glyphosate is eliminated quickly and unchanged (see Section VI Subpart c - 'Elimination').

Using radiolabeled glyphosate, researchers have demonstrated the distribution of the pesticide in the body. For example, Wester (1991) evaluated residual tissue distribution of glyphosate. The disposition of glyphosate following intravenous administration in rhesus monkeys resulted in near total recovery of dose within 7 days of administration, between 96.4 and 99.8%; urine accounted for approximately ≥95% of recovery (Wester 1991). A majority of the urinary excretion occurred in the first 24 hr.  Tissue analysis of sacrificed rhesus monkeys following topical application of glyphosate, and subsequent 7-day urinary excretion period, revealed no remaining glyphosate in any organ tissues, fat, bone marrow, spinal column, or CNS fluid. Moreover, excretion of glyphosate occurred unchanged. Glyphosate has not been observed to metabolize well in the body. (Ridley 1988; ATSDR 2019). The main metabolite of glyphosate after ingestion is aminomethylphosphonic acid (AMPA), which is attributed to microbial breakdown in the GI tract (Anadón 2009).  Two peer-reviewed studies evaluating the metabolite profile of glyphosate revealed little metabolism of glyphosate to AMPA (e.g., <0.1% of total dose) and its presence was predominantly identified in the colon (Brewster 1991; Anadón 2009). Inter-study agreement was also observed with a study conducted by Monsanto (Howe 1988).

Other studies have characterized the distribution of glyphosate to specific tissues and organs hypothesized to serve as storage depots/sites. Ridley (1988) evaluated the distribution of glyphosate in rats following intravenous administration of glyphosate. The dose was measured

in tissues seven days post-administration and ranged from 0.05 to 0.09% of the dose. Here, the highest portion of glyphosate was measured in the bone. Of note, glyphosate in bone marrow did not mirror the levels found in bone. Briefly, low level radioactivity was present in bone marrow along with other tissues (e.g., eyes, thyroid, and stomach), but precise quantitation was not achieved. This finding was substantiated in the Wester et al. (1991) study as no radio-labeled glyphosate (Roundup formulation) was detected in the bone marrow in rhesus monkeys after seven days.

Similar to Ridley, Brewster (1991) evaluated the tissue distribution in rats following an oral dose of glyphosate. Accumulation in various tissues were monitored at 2, 6.3, 28, 96, and 168 hours following administration. After seven days, the average percent of glyphosate present was 1.16% of the administered dose. Though glyphosate accumulation peaked in bone later than in most other tissue, at 6.3 hours, glyphosate did not continue to increase in bone over the remainder of the seven days. Rather the percentage of glyphosate in bone continued to decrease to less than 1.1% of the administered dose after 168 hr.

In summary, any glyphosate that is absorbed is widely distributed throughout the body and remains unchanged except potentially a nominal amount that is metabolized (e.g., AMPA). Hence, there is no evidence for toxication or metabolic activation of glyphosate. Further, studies have demonstrated that glyphosate does not accumulate in the body. After 90 hours, a small percent of glyphosate was detected in rodents – mainly in the bone. However, after 168 hours (or 7 days), glyphosate was ~ 1 ppm – or less than 1.1% of the administered oral dose. Hence, glyphosate is expected to be eliminated from the body.

### c.  Elimination

As discussed above, glyphosate that is absorbed into the stratum corneum and available in the dermis will be systemically distributed throughout the body. Dermal absorption of glyphosate is similar to intravenous administration in that the absorbed glyphosate dose is systemically available. Studies using IV-administered doses ensure complete systemic availability.
Therefore, *in vivo* animal studies observing the patterns of IV-administered glyphosate doses accurately depict the distribution, metabolic, and excretion pathway of dermally absorbed glyphosate. Much like for distribution and metabolism of glyphosate, animal studies have been used to determine the excretion behavior for glyphosate.

A range of studies have evaluated elimination of glyphosate from oral, dermal, and intravenous doses. From these studies, glyphosate was found to be eliminated from the body quickly. Orally administered doses are available in the GI tract and will be eliminated through feces (Brewster 1991). However, glyphosate absorption via the GI tract also produces a systemically available dose, which is eliminated in the urine. Colvin (1973) demonstrated that 8.3-10.5% of ingested glyphosate by rats was eliminated via urine and that a plateau was reached after four days of continuous feeding. This was evident in the amount contained in both the urine and feces – matching the intake of the herbicide. In Chan & Mahler 1992, approximately 80 and 75% of orally administered glyphosate doses (5.6 and 56 mg/kg, respectively) in rats were eliminated within the 24 hours following administration. In

Brewster et al., approximately 36 and 51% of the glyphosate was eliminated in the urine and feces seven days after a single oral dose (neat glyphosate). Zoller et al. (2020) characterized urinary excretion of glyphosate in human participants (n=12) after ingestion of a dose that was 25% of the ADI (simulating a likely exposure from consumption). Most of the glyphosate excretion was complete within 10-20 hours after ingestion with a range of 0.57 to 1.68% of the administered dose present in the urine (which is ~20x less than what has been reported in animal studies). Low recovery of glyphosate in the urine from human consumption was also observed in a recent study; however, data were limited to only three volunteers (Faniband 2021). Additionally, in this study, they characterized the urinary concentration of glyphosate in 197 participants from the general population. The max concentration observed was 3.39 µg/L, which was orders of magnitude lower than those three volunteers that ingested glyphosate at a dose that was 50% of the ADI.

Topical and intravenous administration studies provide relevant representations of the disposition of glyphosate, especially as it relates to elimination, in the context of dermal absorption. In Chan & Mahler 1992, glyphosate was administered intravenously (5.6 mg/kg) in addition to the two different oral doses. These researchers demonstrated that urine was the primary route of elimination with 98% of the glyphosate dose excreted within the initial 24-hour period following administration (Chan & Mahler 1992). Minimal (0.3-3%) of the glyphosate was eliminated via feces. Wester (1991), as discussed above, also reported on the elimination data of glyphosate following both topical and intravenous administration. Intravenous administration ensured full systemic availability of the administered dose, and over 94% of the dose was eliminated via the urine within 7 days. Nearly 100% of the doses were recovered. A topical administration study was also conducted. Two doses of glyphosate were applied to rhesus monkeys. Following application, monkeys were restrained in chairs and belly plates were placed on their lower bellies. As stated above, the percent of glyphosate eliminated via feces from Dose C was comparable to that observed from the two different IV-administrated doses. On the contrary, feces was the primary route of elimination for Dose D, which suggested ingestion of glyphosate. No restraints for hand/arm movement was confirmed – which in turn, allowed monkeys access to the application sites.[1] With hand-to-mouth activity after application of the glyphosate, it is not surprising that a higher percentage of elimination by feces instead of urine was observed. Furthermore, recoveries for the topically administered doses were lower, at 75-80%. Given the observed issues, this study's reported excretion of dermally administered glyphosate by means of feces does not provide meaningful data and should not discount the remaining literature indicating urine elimination as the primary pathway for systemically available glyphosate.

Half-life is another important parameter to consider when characterizing the temporal aspects of a substance in the body. This parameter describes the time required to decrease the chemical concentration in the blood or plasma by half. The half-life of glyphosate has been estimated from several studies. Anadón et al. (2009) determined a half-life of 9.9 hours for glyphosate after IV-administration in rats. Similarly, Connolly et. al. (2018) estimated a

---

[1] According to the Deposition of Dr. Daniel Bucks, a graduate student at that time in the Wester lab, the authors observed hand to mouth activity during the topical administration portion of the study.

glyphosate half-life in humans was an average of 7.25 hours (Connolly 2018). Recently, Zoller et al. estimated a half-life of 9 hours – demonstrating comparable findings across studies (Zoller 2020).

In summary, the information above suggests that the dermal absorption of glyphosate is low and its fate in the body is rapid distribution in extravascular tissues with nominal biotransformation. Maximal tissue levels (except the small intestine) have been demonstrated after 6.3 hours (in rats) from a single oral dose of glyphosate. Several studies have estimated a short half-life, including Connolly et al. that reported ~7.5 hours in humans. Ultimately, glyphosate does not accumulate in the body and is eliminated quickly – a majority of it is excreted within the first 24 hours.

## VII. Glyphosate exposure and biomonitoring

Results from animal intravenous administration studies (described above) best illustrate the elimination of glyphosate following dermal exposure, without encountering the complications of topical application. Thus, elimination studies validate the basis for urinalysis as a measure of glyphosate exposure in biomonitoring studies. Various biomonitoring and passive dosimetry studies were conducted in order to more accurately observe glyphosate exposures and resulting doses in humans. By conducting biomonitoring studies in relevant populations, realistic exposures to and systemic doses in applicators and bystanders can be determined. Several biomonitoring and passive dosimetry studies were later reviewed in Solomon 2016, and data were normalized and expressed as systemic dose levels.

The body of biomonitoring data suggests that applicators had the greatest level of exposure when compared to that of bystanders and the general public. Applicator exposures range from 0.000013 mg/kg/day to 0.0046 mg/kg/day for those with detectable glyphosate levels, suggesting low systemic doses of glyphosate and minimal exposure to glyphosate during general spraying practice (Solomon 2016). Higher doses were generally associated with unusual handling of product, a lack of PPE, direct skin exposure, etc. (Acquavella 2004). In one study, the mean systemic dose observed in farmers was 0.0001 mg/kg, with 90% of farmers below 0.001 mg/kg. (Acquavella 2004). Systemic doses in backpack sprayers in another study were recorded at 0.000013 mg/kg to 0.0021 mg/kg.

As part of the Farm Family Exposure Study, Acquavella et al. (2004) ascertained real-world systemic doses of glyphosate among farmer and their families. Urine samples were collected from study participants the day before, the day of, and three days after application of glyphosate. Despite the occupational setting and high risk for exposure, glyphosate was not detected in 40% and 73% of the samples on application day and day 3, respectively. Of the 60% of farmers with detectable glyphosate levels in urine on the day of application, the authors calculated a geometric mean (GM) concentration of 3.2 ppb (or 0.0001 mg/kg); of these, the highest value was 233 ppb (0.004 mg/kg). Maximum urinary concentration amongst applicators was observed in a farmer repairing a boom sprayer. In addition to not wearing gloves, this applicator was noted to have been smoking while repairing. Urinary concentrations measured in bystander spouses and children were similarly low, and maximum systemic doses were estimated at 0.00004 mg/kg in spouses and 0.0008 mg/kg in children. Authors noted that systemic dose estimates for all

participants were below the U.S. EPA's reference dose for glyphosate. Further, not every exposure resulted in a measurable value for glyphosate among farmers in this study.

The findings in Acquavella confirmed previous biomonitoring studies. Cowell 1990 measured pesticide exposure of applicators at three separate nurseries maintained by the USDA Forest Service. Of pesticides and locations studied, glyphosate exposure was reported at two locations. Applicator exposure was measured by both urine sampling and passive dosimetry. Urine biomonitoring for all applicators were averaged and normalized, resulting in an estimated average dose of 6.5 $\times10^{-5}$ mg/kg/hr. Another similarly structured biomonitoring study by the same authors reported an average dose of 3.14 $\times10^{-5}$ mg/kg/hr in forest workers. The USDA Forest Service sponsored this study to monitor those workers that mixed and applied the herbicide using backpack sprayers.

In Bleeke (2007), urinary biomonitoring was conducted in a group of applicators using backpack sprayers. Glyphosate exposures were monitored over a five-day period, extending from one day prior to three days post-application. Mixers/loaders and applicators were observed through each part of the spraying process. Despite observed exposures, systemic doses were calculated from urinary concentrations. Systemic doses for all groups ranged between 1.3 $\times10^{-5}$ mg/kg and 2.07 $\times10^{-3}$ mg/kg.

Solomon 2016 reviewed the available biomonitoring studies conducted on exposed applicators. Data from both published and unpublished literature were normalized and low systemic doses were consistently observed. Solomon reported a range of urine glyphosate concentrations that was between 1.3$\times10^{-5}$ mg/kg/day to 4.6 $\times10^{-3}$ mg/kg/day; the 90th percentile systemic dose was 1.4 $\times10^{-3}$ mg/kg/day. Solomon 2016 noted that these levels were far below regulatory reference doses set by US EPA (1.0 mg/kg/day), EFSA (0.5 mg/kg/day), and JMPR/WHO (1.0 mg/kg/day). Oral reference doses were normalized for comparison with dermally absorbed systemic doses, based on 20% absorption in GI tract. Adjusted RfDs or ADIs as follows: 0.2 mg/kg/day (US EPA Chronic RfD), 0.1 mg/kg/day (EFSA ADI), and 0.2 mg/kg/day (JPMR ADI). Biomonitoring and dosimetry data fall well below the lowest normalized regulatory reference dose.

In 2020, two studies were published in the peer-reviewed literature focused on exposures to glyphosate that simulated heavy residential application to generate a worst-case scenario among consumer applicators. In the first study, Pierce et al. conducted an exploratory study to characterize relative contributions of dermal and inhalation exposures on urinary concentrations of glyphosate and AMPA. Participants were assigned to either a dermal or inhalation exposure group and were instructed to wear applicable PPE so only one route of exposure was possible. For example, those in the dermal exposure group wore shorts and t-shirts and donned respirators while those in the inhalation exposure group donned Tyvek coveralls and chemical resistant gloves yet no respirator. The arithmetic mean of airborne glyphosate was 0.0047 mg/m³. Additionally, dermal patch concentrations were highest in those samples collected from the shins of participants. The arithmetic means for the right and left shin were 0.15 and 0.14 µg/mm²,

respectively. Peak urinary glyphosate concentrations of ~17 and 311 ng/ml[2] were observed at 3 hours post-application for both inhalation and dermal exposures, respectively. After 24 hours, urinary concentrations returned to baseline after exposure. It is worth noting that that amount of herbicide applied in this residential simulation (16 gallons per participant) was commensurate with agricultural use and may be considered a worst-case scenario exposure of a residential applicator.

In another study, Kougias et al. (2020) used a margin of safety approach to assess the urinary concentrations of glyphosate among participants in the study described above. The benchmark dose used in this assessment was the ADI as it provides the most conservative benchmark value of 0.3 mg/kg/day. The ADI was divided by 5 to normalize to 20% absorption of an oral dose of glyphosate. As a result, a value of 0.06 mg/kg/day (or 60 µg/kg/day) was derived for comparison to systemic doses. As such, they were able to calculate a margin of safety as part of this risk assessment using two different approaches for urine volume. The margin of safety (MOS) is calculated by dividing the ADI (benchmark dose) by the calculated internal dose. While individual MOS calculations were performed for the dermal and inhalation data, they also assessed a combined MOS for dermal and inhalation exposures. Further, to determine a worst-case scenario, the highest internal dose from the dermal and inhalation exposures (after adjusting for bodyweight) were selected from the applicator groups. This approach required using data from two different participants. The MOS for each approach was 14 and 10 based on a maximum internal dose of 4.347 and 5.901 µg/kg. Those MOS values above 1 are deemed acceptable while those less than 1 are not likely acceptable. Additionally, these values are similar to the highest occupational exposures and systemic doses observed in Acquavella et al., which further supports a worst-case scenario.

In comparison to biomonitoring, passive dosimetry is a procedure that is conducted by trained/experienced practitioners that strategically place patches on participants to measure exposure at various portions of the body. (Solomon 2016). The resulting exposures can then be extrapolated to inform exposure patterns and, more generally, overall dose estimates. Depending on the exposure scenario and patch location, dose estimates could be biased to higher or lower values. For example, a patch may wholly miss an exposure or collect a splash that would be extrapolated to an entire region/area. Consequently, calculated exposures and systemic dose ranges vary greater as compared those observed in biomonitoring studies. As noted by Solomon (2019), a fold change greater than 117,000 was observed in the dosimetry data.

Though dose determinations are not as accurate as actual biomonitoring, exposure assessments can be conducted based on passive dosimetry data. Moreover, dosimetry studies help inform application patterns. For example, dosimetry studies suggest that exposure during hand spraying is mostly to the lower legs while backpack sprayers exhibit a higher percentage of exposure on their back torso compared to their front torso. Observed patterns can be used to identify areas of likely exposure when conducting a retrospective exposure assessment. Lavy et al. (1992) used passive dosimetry methodology to evaluate glyphosate exposure in nursery workers. Exposure

[2] this value was identified as a statistical outlier and when removed the highest concentration was 57 ng/ml

Schaeffer Occupational Health Associates, LLC
Expert Report
Case Number: MDL No. 3:16-md-02741-VC (Salas)

was measured for applicators, weeders, and scouts. Applicators exhibited the highest resulting dose estimates with an average dose of 7.2 ×10$^{-4}$ mg/kg/hr (highest estimated dose at 1.7×10$^{-3}$ mg/kg/hr). Patch analysis reported greatest exposure around ankles and thighs, with less than 2% of total exposure to the remaining portions of the body. It is noteworthy that in this assessment, Lavy et al. observed higher values from the dermal dosimetry as compared to the biomonitoring data they concurrently collected from the participants. Despite higher values, margin of safety was orders of magnitude greater than 1, which is considered acceptable.

Later studies further evaluated glyphosate exposure using passive dosimetry. Edmiston et al. (1995) measured glyphosate exposure in California Department of Transportation (Caltrans) mixer/loader/applicators and other application personnel. Monitoring involved full-body dosimetry using 100% cotton shirts and long johns and periodic face/neck and hand wipes. The average inhalation and dermal exposure measured for exposed workers was 29.0 and 2460.2 μg/person, respectively. The combined average dose was estimated at 8.96×10$^{-4}$ mg/kg.

Johnson et al. (2005) evaluated glyphosate exposure to applicators using all-terrain vehicles and back-pack sprayers. Results were normalized and included in the Solomon 2016 review discussed below. Exposure patterns and the resulting dose estimates were within the ranges reported by Solomon (Solomon 2016; Solomon 2019). Of note, the authors observed that the majority of exposure by either ATV or CDA application was to the legs, generally to the lower legs.

Solomon 2016 and Solomon 2019 reviewed the available body of passive dosimetry data, including several of the studies discussed above. The updated review built on the previous publication using published and unpublished studies that reported exposures and risk assessments of glyphosate. The updated Solomon 2019 analysis reported an estimated dose range of 3.0 ×10$^{-6}$ mg/kg/day to 3.4 ×10$^{-2}$ mg/kg/day, representing the 10th and 90th percentiles. Comparing to the biomonitoring data discussed above, the range of biomonitoring doses reported (0.000013 to 0.0046 mg/kg/day) fell within the range of passive dosimetry data.

Though dermal exposure has been identified as the primary route of exposure to glyphosate, several studies have considered inhalation as a method for glyphosate exposure. These studies have found glyphosate exposure via inhalation to be minimal. Jauhiainen (1991) measured exposures to airborne glyphosate in forest workers in Finland across one week (sampling times ranged from one to six hours). Using liquid impingers to collect personal breathing zone samples, these researchers quantitated glyphosate in theses samples using gas chromatography/mass spectrometry. Those samples collected during mid-week were low – containing <1.25μg/m³. Two samples collected at the end of the week yielded measurable concentrations: 2.8 and 15.7μg/m³ in workers' breathing zone. Findings from this study were comparable to inhalation exposures observed by Edmiston et al. (1995). These researchers measured glyphosate exposure in California Department of Transportation (Caltrans) mixer/loader/applicators and other application personnel and reported an average glyphosate exposure in personal breathing zone samples (using glass fiber filters) of 29 μg/person based on a ventilation rate of 14 L/min.

Several studies also reported observations relating to the effect of PPE on glyphosate exposure. Oltmanns et al. 2016 demonstrated that residential users can reduce exposure generally by

wearing long pants and full-coverage shoes (i.e. tennis shoes, boots, etc.) Protection of most commonly exposed areas of the body can result in a substantial reduction in contact with or exposure to glyphosate. Specifically, cotton fabric has been shown to offer a 50% reduction to exposure. Use of gloves decreases exposure to hands, and use of chemically-resistant gloves can reduce exposure by 80%. (Wester 1996). Biomonitoring studies reported lower concentrations of glyphosate in urine in applicators using PPE. For example, Acquavella 2004 reported a mean urine concentration of glyphosate of 1.5 ppb for farmers wearing rubber gloves while mixing when compared to farmers not wearing gloves (9.7 ppb). Lavy et al. (1992) deployed paired patches on nursery workers on the outside and inside of their clothing and determined a clothing penetration value of 22.9%, which may be an overestimate if workers donned multiple layers of clothing. Oltmanns et al. 2016 evaluated the impacts of various types of PPE, with exposure reductions ranging from 50% to over 90%. Clothing was reported as offering a 70% protective factor. Johnson et al. (2005) observed a 90% clothing protection factor following proper use of coveralls.

Therefore, the joint body of passive dosimetry and biomonitoring data provide realistic measurements of glyphosate exposure and subsequent systemic doses in applicators and the general population. These data help confirm that exposure to glyphosate during application is minimal and resulting doses are far below regulatory references. Passive dosimetry data further illustrates patterns of exposure, suggesting that application methods result in the majority of exposure to the legs. Exposure levels are further affected by use of PPE, suggesting protective factors of over 50%. Finally, exposure resulting from inhalation of glyphosate during application has been shown to be minimal.

## IX. Epidemiology

Epidemiological studies conducted in select populations can serve to best extrapolate disease impact on humans of any given chemical. A number of epidemiologic studies have evaluated the effect of pesticide exposure on the risk of developing non-Hodgkin's Lymphoma (NHL). More recent studies have evaluated the impact of glyphosate, specifically, on the risk of NHL in certain populations. A review of the available literature, assessed for accuracy and reliability of reported data, does not indicate that glyphosate exposure, or exposure to GBHs, result in an increased risk of NHL.

The Agricultural Health Study is a prospective study that began in 1993 to ascertain how various factors (e.g., lifestyle and genetics) impact the health of agricultural workers and farming populations. Andreotti et al. (2018) reported findings on glyphosate and cancer incidence (including NHL) of more than 57,000 individuals that are licensed pesticide applicators. This study provides a robust evaluation of dose-response using an exposure intensity approach (previously reported by Coble et al. 2012). Instead of a crude "days of use" metric, this approach is a validated, intensity weighted algorithm for determining use that accounts for several factors often associated with dose, such as PPE use and application methodology. After exclusion of participants with cancer, not living in North Carolina or Iowa, or not reporting information regarding glyphosate use, a total of 44,932 study participants were identified in this follow-up study. Quartiles (Q1-Q4) were used for categories for lifetime days of glyphosate ranging from: 1-13.74, 13.75-38.74, 38.75-108.4, and, ≥108.5. During the follow-up period, just under 7300

incident cancers were diagnosed. The study authors reported no association between glyphosate use and total cancer, lymphohematopoietic malignancies, or NHL (including any subtypes). This lack of association was observed in unlagged and lagged exposures. Andreotti et al. noted that for the unlagged analysis 'the rate ratio in the top exposure quartile was 0.87 for NHL', which included 440 exposed cases. The 95% confidence interval for this ratio included the null (95% CI: 0.64-1.20). Hence, no evidence for a dose response or increased risk of NHL with increased exposures was observed in this study. The risk patterns for the lagged were similar with a null association. The exposure quartiles in the 5-year lag were below 1 except in Q3 (RR: 1.05). The relative risk was below 1 in Q3 in the 20-year lag (RR: 0.98) while Q1 and Q2 were 1.22 and 1.15, respectively. All confidences intervals included the null in both the 5-year and 20-year lag with no evidence of a dose response.

In addition to this cohort study, case-control studies have been conducted to evaluate the association between glyphosate exposure and NHL (McDuffie 2001; Eriksson 2008; Orsi 2009) For example, McDuffie et al. (2001) investigated potential increased risks of NHL due to pesticide exposures in a population of over 2000 men across six Canadian provinces. The study evaluated exposure to several different types of pesticides and adjusted for statistically significant risk factors (namely a family history of cancer in a first-degree relative). Of the total study population, 51 cases and 133 controls reported glyphosate exposure. Overall glyphosate use was not noted to be associated with an increased risk of NHL based on an adjusted OR of 1.20 (95% CI: 083-1.74). To evaluate a dose response, glyphosate use was stratified by the following days of use: unexposed, less than or equal to 2 days, or greater than 2 days. The authors reported an observed dose response for glyphosate use, with a statistically significant odds ratio of 2.12 (95% CI: 1.20-3.73) for greater than 2 days of use. However, the authors did not control for other possible confounding variables, such use of other pesticides. It is widely recognized that recall bias is an inherent limitation in case-control studies that rely on memory of exposures (Grimes and Schulz 2002). McDuffie et al. also recognized this limitation, including potential for misclassification of exposure.

Eriksson et al. (2008) conducted a similar case-control study to evaluate potential association between pesticide use and NHL in the Swedish population. Glyphosate use was based on a small study population (N=47) and individual cases of NHL totaled only 29. Eriksson attempted to measure odds of developing NHL by using a >10 days of exposure metric, finding several statistically significant associations between glyphosate use and NHL. Overall glyphosate use and >10 days of exposure to glyphosate was associated with increased risk, 2.02 and 2.36 respectively. Resulting OR of 1.51 (95% CI: 0.77-2.94) following multivariate analyses was no longer significant. Further, no intensity-weighting was attempted when determining appropriate exposure metrics.

In 2019, Pahwa et al. performed a pooled analysis of case-control studies of NHL cases in the US and Canada (North American Pooled Project). The goal of this study was to further analyze the potential relationship of glyphosate use and NHL, including specific subtypes, using a larger number of cases and controls identified in the cancer registries from four US states and six Canadian provinces. This analysis, after adjusting for use of other chemicals (2,4-D, dicamba, and malathion), demonstrated no statistically significant association between ever glyphosate use and NHL overall with no pattern of increasing risk with increasing years of use. The authors note that

exposure to other pesticides confound the association between glyphosate and NHL overall. With large numbers of exposed cases and controls, Pahwa et al. provide greater insight into the exposure-response relationship of glyphosate and NHL as compared to previous studies limited by small sample size and power.

Crump (2019) further evaluated the potential for different types of biases in both the case-control and cohort studies. The study considered the possibility of recall and selection biases in the glyphosate dataset. Odds ratios from select studies were analyzed to determine whether reported risk estimates of certain studies were artificially elevated due to inherent study biases. Crump concluded that the case-control studies, Eriksson and McDuffie, showed strong evidence of statistical bias within the results that were not properly addressed during analysis. Thus, the resulting data from such studies are far less reliable than that of AHS studies.

Review articles have been conducted to address the accuracy of the odds ratios reported in the body of epidemiology studies. In a meta-analysis, Zhang et al. (2019) reported a meta-risk ratio of 1.41 (95% CI: 1.13-1.75) that suggested a link between glyphosate and NHL. On the contrary, Leon et al. (2019) observed a null association between ever glyphosate use and NHL among three large international cohorts: the French AGRICAN, Norwegian CNAP, and the US AHS. Further, Donato et al. (2020) performed an updated meta-analysis of the available literature, determining that occupational exposure to glyphosate does not result an increased risk of NHL. The study authors commented that publication bias and other biases may have resulted in overestimated risks reported in other meta-analyses.

Kabat et al. (2021) conducted a sensitivity analysis to ascertain the magnitude of effect that the differences in the meta-analyses (including exposure definitions and bias in case control studies) had on the estimate of association. While they did not observe an association between ever exposure of glyphosate and NHL risk, the main takeaways from this study are that: (1) interpret the results from any meta-analysis with caution (e.g., biases from studies likely exacerbated) , (2) selection of estimates from studies can play a pivotal role in an association (or lack of) between exposure and response, and (3) combining studies can reduce the strength/impact of an individual, high quality study. The authors note that the AHS study (Andreotti et al. 2018) 'provides the most reliable and precise information regarding the risk of NHL following glyphosate exposure'.

Epidemiology studies have been reviewed by several regulatory agencies in their assessment of glyphosate. After review of the available literature and epidemiologic data, the EPA concluded that glyphosate is "not likely to be carcinogenic to humans".

## X. Case specific information

The goal of my assessment was to estimate Ms. Salas' dermal exposure and potential  systemic dose of glyphosate. I used information from Ms. Salas' testimony and scientific evidence related to glyphosate exposure and toxicology. My assessment and attendant calculations required consideration of Ms. Salas' pattern of use and different risk factors. The series of calculations included in my dermal exposure model to estimate the plaintiff's:

- absorbed dose per event
- maximum dose event per event
- daily dose.
- average daily dose (ADD) on a per kilogram bodyweight basis specific to the plaintiff.

I employed a conservative approach when selecting input values specific to the plaintiff (e.g., application time, body surface area, and body weight). The purpose of this approach was to yield a worst-case exposure and dose of glyphosate that Ms. Salas may have experienced. To complete the assessment, Ms. Salas' ADD was compared to the Reference Dose, which is published by the Environmental Protection Agency. This value is derived from the no-observed-effect dose in the most sensitive animal tested. While a comparison to the Reference Dose was performed, the result of this comparison did not identify the causation of the plaintiff's lymphoma.

**Plaintiff Background:**

Ms. Salas is a 67-year-old female that was diagnosed with NHL in June 2020[3]. She alleges that her exposure to glyphosate resulted in the development of NHL[4]. According to Ms. Salas' deposition on 09DEC21, her dates of residential application spanned eight years (i.e., from  2006 to 2014)[5]; however, according to the PFS, the plaintiff first began using Roundup in 2004 and stopped in 2014[6]. She indicated that she applied Roundup at her side-by-side properties in Key Largo.  She testified that she and her husband purchased 605 Portia Circle in 2006, 2007, or 2008 and purchased 601 Portia Circle in 2008[7]. However, according to PFS, she lived in Key Largo from 2004-2011[8].

She currently resides in Miami, Florida and has lived there since approximately 2016[9]. Ms. Salas indicated that their 605 Portia Circle was foreclosed on in 2012 or 2013 after her husband passed away in 2010[10]. Consequently, she moved into 601 Portia Circle at that time[11].  Ms. Salas testified that she lived at this property for several years and spent the weekends in Miami[12]. According to the plaintiff, she sold the property but was unable to recall if the sale was in 2014 or 2015[13].

**<u>Occupational history:</u>**

---

[3] PFS. Page 2: Section II; Page 5: Section V.
[4] December 09, 2021 Deposition, pg. 163, 15-17
[5] December 09, 2021 Deposition, pg. 192, 5-12, pg. 26, 15-18, pg. 46, 21-22
[6] PFS. Page 8: Section VII.
[7] December 09, 2021 Deposition, pg. 24, 7-11,  pg. 25, 19-21, pg. 27, 23
[8] PFS. Page 8: Section VII.
[9] December 09, 2021 Deposition, pg. 13, 8-12
[10] December 09, 2021 Deposition, pg. 87, 5-8
[11] December 09, 2021 Deposition, pg. 26, 19-22, pg. 27, 2-7
[12] December 09, 2021 Deposition, pg. 47, 5-10
[13] December 09, 2021 Deposition, pg. 26, 15-18

After passing the GED, Ms. Salas attended the University of Miami and earned a paralegal certificate[14]. She worked as a paralegal for approximately 20 years at various law firms in the Miami area. Her job duties included document review, discovery, and translation. In 2000, Ms. Salas worked as an assistant to the owner of EV Construction[15]. Here, the plaintiff performed office/clerical work and addressed insurance/compliance issues[16]. After eight years in this position at EV Construction, Ms. Salas retired in 2008[17].

### Family and medical history:

Ms. Salas was born on ███████████ in Havana, Cuba[18]. The plaintiff's father was assassinated in Cuba when the plaintiff was 2 years old; no medical history of the father was presented during the deposition or in the plaintiff fact sheet[19]. She moved to the United States when she was five years old[20]. The plaintiff's mother had cirrhosis and died in 1998 after a liver transplant[21]. No history of caner noted in Ms. Salas' family.

The plaintiff was 50 years old when she started using Roundup in 2004. According to medical records from 21Dec2018, Ms. Salas weighed 86.4 kilograms (kg), which may not represent her weight in 2004[22].

Ms. Salas reported that she has arthritis in her hands 'from typing'[23] and has been diagnosed with fibromyalgia[24]. She was not prescribed any medication for either condition. She had a herniated disc but no surgery was required; however, she continues to experience pain in her back[25].

Ms. Salas testified that she is taking medication for high blood[26], high cholesterol[27], depression[28], and anxiety[29]. Ms. Salas reported that she has chronic sinusitis, which can present as headaches[30]. She has not been prescribed medication. She indicated the she also 'suffers' from allergies, which may lead to bronchitis[31]. Ms. Salas indicated that she will develop

---

[14] December 09, 2021 Deposition, pg. 14, 6-10
[15] PFS. Page 2: Section II.
[16] December 09, 2021 Deposition, pg. 32, 18-21
[17] December 09, 2021 Deposition, pg. 204, 19-23
[18] December 09, 2021 Deposition, pg. 13, 6-7, 13-14
[19] December 09, 2021 Deposition, pg. 164, 7-9, 15-16, 22-23
[20] December 09, 2021 Deposition, pg. 13, 15-16
[21] December 09, 2021 Deposition, pg. 165, 12-24
[22] Exhibit 5. Section: Vitals and Measurements; December 09, 2021 Deposition, pg. 134, 8-10, 16-19
[23] December 09, 2021 Deposition, pg. 112, 2-11
[24] December 09, 2021 Deposition, pg. 112, 7-8
[25] December 09, 2021 Deposition, pg. 113, 9-17
[26] December 09, 2021 Deposition, pg. 136, 2-5, 18-20
[27] December 09, 2021 Deposition, pg. 136, 18-20, pg. 137, 1-2
[28] December 09, 2021 Deposition, pg. 113, 18-24, pg. 116, 6-13
[29] December 09, 2021 Deposition, pg. 117, 2-4, 22-24
[30] December 09, 2021 Deposition, pg. 141, 20-24
[31] December 09, 2021 Deposition, pg. 113, 4-8

bronchitis on an annual basis and that symptoms will last for about a week[32]. When she was younger, the plaintiff had pneumonia, which started as bronchitis[33]. Ms. Salas does not take any medication to treat the sinusitis or allergies.

Other exposures: During the deposition, Ms. Salas testified that she smoked for four years (1994-1998) and would smoke a half of a pack per day[34]. However, her smoking status was listed as a current (11-20 cigarettes/day) in her medical records from 1998 and 2020[35].

### Plaintiff's use of Roundup :

Ms. Salas testified that her intended use of Roundup was for residential application[36]. She purchased Roundup (primarily at Home Depot) on a weekly basis[37]. Initially, the plaintiff was unable to recall the specific product purchased/used in the treatment of her properties[38]. During the deposition, Ms. Salas described that she used Roundup products that varied in size. For example, she remembered using a 'couple-of-gallon' container connected to a spray nozzle via tubing while the other product that she used needed to be mixed[39]. Ms. Salas later confirmed that she used both the ready-to-use and concentrate products[40]. While she followed the instructions for mixing the concentrate with water, the plaintiff was unable to recall volumes or percentages used in either product of glyphosate[41].

The plaintiff does not remember reading the instructions on how often to apply Roundup[42]. She used Roundup all year and did not avoid application on windy days [43]. The plaintiff recognized that the product she applied was effective – i.e., killing unwanted weeds on her property. Despite this noted efficacy, Ms. Salas testified that she would apply Roundup on a weekly basis during the summer months[44]. She typically scheduled her applications in the morning when the air temperature was cooler[45]. When the plaintiff applied Roundup to her property, she did not continuously spray the product. Instead, she performed spot treatment of weeds on her property[46]. Additionally, the plaintiff indicated that she was frequently interrupted by her neighbors when applying the herbicide[47].

---

[32] December 09, 2021 Deposition, pg. 143, 2-1
[33] December 09, 2021 Deposition, pg. 113, 1-2
[34] December 09, 2021 Deposition, pg. 137, 18-25
[35] December 09, 2021 Deposition, pg. 138, 1-6
[36] PFS. Page 8: Section VII
[37] December 09, 2021 Deposition, pg. 74, 1-5, pg. 80, 20-24
[38] December 09, 2021 Deposition, pg. 42, 19-22
[39] December 09, 2021 Deposition, pg. 42, 22-25
[40] December 09, 2021 Deposition, pg. 43, 3-9, 10-12, pg. 48, 11-21
[41] December 09, 2021 Deposition, pg. 44, 2-10
[42] December 09, 2021 Deposition, pg. 102, 14-17
[43] December 09, 2021 Deposition, pg. 75, 10-15, pg. 88, 17-20
[44] December 09, 2021 Deposition, pg. 73, 7-10, pg. 75, 10-15
[45] December 09, 2021 Deposition, pg. 76, 2-11, pg. 88, 3-8
[46] December 09, 2021 Deposition, pg. 76, 21-23
[47] December 09, 2021 Deposition, pg. 76, 6-11

When using Roundup, the plaintiff alleged that she wore a t-shirt, shorts, and open-toe sandals (e.g., flip-flops)[48]. Additionally, Ms. Salas noted that she donned 'lobster' gloves during several applications/events; she realized that the gloves were not waterproof[49]. The plaintiff testified that different parts of her body were exposed to Roundup when she was mixing and spraying the product[50]. Ms. Salas recalled a specific event where she spilled the concentrate product (after mixing with water) on her legs[51]. The plaintiff noted that she immediately went inside and showered[52].

The plaintiff also indicated that she was exposed to the product when a 'wind gust hit' or if she was 'distracted' when applying/spraying[53]. Further, she recalled 'accidentally' spraying Roundup in an upwards fashion 'many times'[54]. Ms. Salas was unable to recall the number of times that she was exposed from spilling/spraying Round[55]. At the end of each application, Ms. Salas would wash her hands with soap and water or shower[56]. Additionally, she would also change her shoes or take them off before going inside her home[57].

## XI. Exposure reconstruction

Ms. Salas' past exposure to glyphosate was assessed using a reconstruction process to estimate a dose given the absence of detailed sampling and/or biological monitoring data. This process is retrospective in nature and is largely based on information provided by the plaintiff and applicable peer-reviewed publications and technical reports. Accordingly, the exposure reconstruction was based on the following information:

-   Roundup product(s) used and concentration(s)
-   Exposed body surface areas
-   Frequency and duration of use
-   Protective clothing and applicable clothing protection factors

To estimate Ms. Salas' historical dose of glyphosate, a dermal exposure estimation model was used. The first step in this model was to calculate an absorbed dose per event (Equation 1).

$$DA_{event} = K_p \text{ x } C_w \text{ x } t_{event} \qquad\qquad (\text{Equation 1})$$

$DA_{event}$= absorbed dose per event (mg/cm²-event)
$K_p$ = permeability coefficient in water, cm/hr

---

[48] December 09, 2021 Deposition, pg. 95, 17-24; pg. 96, 8-11; PFS. Page 8: Section VII.
[49] December 09, 2021 Deposition, pg. 96, 8-11
[50] December 09, 2021 Deposition, pg. 101, 1-9
[51] December 09, 2021 Deposition, pg. 99, 5-13
[52] December 09, 2021 Deposition, pg. 100, 19-24
[53] December 09, 2021 Deposition, pg. 101, 5-7
[54] December 09, 2021 Deposition, pg. 90, 19-23
[55] December 09, 2021 Deposition, pg. 101, 24-25, pg. 102, 1-9
[56] December 09, 2021 Deposition, pg. 83, 4-10, pg. 97, 6-8, pg. 101, 18-23
[57] December 09, 2021 Deposition, pg. 83, 11-12

$C_w$ = concentration of the substance in water, mg/cm$^3$
$t_{event}$ = duration of event, hr/event

This model applies a permeability coefficient ($K_p$), which can be derived using the $K_{ow}$ and the molecular weight or determined experimental (Keil, 2009). As stated above, the $K_{ow}$ represents the ratio of the concentration of the solute (or chemical) in octanol as compared to the concentration observed in water, which is ultimately a measure of hydrophilicity or hydrophobicity. This ratio is typically expressed in the logarithmic form where negative values suggest that glyphosate is hydrophilic (positive values indicate hydrophobicity).

To determine the experimental $K_p$, the flux (mass of glyphosate/cm$^2$ of skin/time) is calculated from the linear part of a penetration curve (absorption of glyphosate versus time). This curve is generated by data using an *in vitro* system. Nielsen et al. characterized the percutaneous penetration of glyphosate (4 mg/ml; 424 μg/cm$^2$ of skin) using static diffusion cell with human skin samples (thickness ranging from 0.7 to 0.9 mm). From this experiment, the maximal flux of 23.6 ng/cm$^2$-h was estimated, and in turn, yielded a $K_p$ value of 0.059 μm/hr. As compared to eight other test compounds (e.g., carbamates and organophosphates) in this study, the permeability coefficient of glyphosate was the lowest observed by several orders of magnitude.

Once established, the permeability coefficient can be used to calculate the flux and the dermal absorbed dose rate per event based on different concentrations. For example, the permeability coefficient multiplied by the concentration of glyphosate on the skin yields flux (mass of glyphosate/cm$^2$ of skin/time). As stated above, the plaintiff testified that she used both a concentrate and ready-to-use mix but could not remember the product names. Based on Ms. Salas' years of use, she most likely used Roundup Weed and Grass Killer (ready-mix) and Roundup Weed and Grass Killer (Concentrate Plus) – using the concentrate more often[58]. The concentration of glyphosate isopropylamine salt in the ready-mix and concentrate was 2% and 18%, respectively. These concentrations are expressed as a percent weight-to-weight – i.e., weight of the active ingredient to the weight of the liquid. This percent was converted to a mass concentration (mg/cm$^3$) to yield the appropriate units to determine the flux. The amount of active ingredient, or glyphosate acid, was determined in each product using Equations 2, 3:

Amount of glyphosate isopropylamine salt = %[1] x Density of the Product[2]     (Equation 2)

      [1] represents % as reported on the label
      [2] represents the product density as reported on the safety data sheet

Amount of glyphosate isopropylamine salt in the ready-mix Roundup:

- 2% x 1.0252 grams/cm$^3$ = 0.020 grams/cm$^3$
- 0.020 grams/cm$^3$ x 1000 milligram(mg)/1 gram= 20 mg/cm$^3$

** 1 gram is equal to 1000 mg

---

[58] December 09, 2021 Deposition, pg. 95, 9-13

Amount of glyphosate isoproplyamine salt in the concentrate Roundup:

- 18% x 1.0775 grams/cm$^3$ = 0.194 grams/cm$^3$
- 0.194 grams/cm$^3$ x 1000 milligram(mg)/1 gram= 194 mg/cm$^3$

** 1 gram is equal to 1000 mg

Amount of glyphosate acid = amount of glyphosate isopropylamine salt/1.35[1]       (Equation 3)

[1] represents the conversion factor based on the 1.35x difference between the molecular weight of the glyphosate isopropylamine salt (228.19 g/mol) and glyphosate acid (169.07 g/mol)

- Amount of glyphosate acid in the ready-mix Roundup = 15 mg/cm$^3$ (20/1.35)

- Amount of glyphosate acid in the concentrate Roundup = 144 mg/cm$^3$ (194/1.35)

Depending on the purpose, different volumes of the concentrate Roundup can be mixed with water. The plaintiff testified that she followed the instructions for mixing the concentrate with water[59]. The label on the container for the Roundup Weed and Grass Killer (Concentrate Plus) recommends using 6 fluid ounces of product for best results. To provide a conservative estimate of the plaintiff's exposure, it was assumed that 6 fluid ounces was mixed with 1 gallon of water as this is the highest volume of the product that's recommended on the label. The final concentration of the glyphosate after mixing 6 fluid ounces in 1 gallon of water was determined using the following equation:

$$\text{Concentration}_1 \times \text{Volume}_1 = \text{Concentration}_2 \times \text{Volume}_2 \qquad \text{(Equation 4)}$$

where Concentration 1 (C1) represents the starting concentration of the concentrate Roundup, Volume 1 (V1) represents the starting volume of concentrate Roundup, Concentration 2 (C2) represents the final concentration of the concentrate Roundup, and Volume 2 (V2) represents the final volume of the product after mixing with water

To determine C2, Equation 4 was used as follows:

- 144 mg/ml[1] x 177 ml[2] = C2[3] x 3962 ml[4]

[1] represents the concentration of glyphosate acid in the container (C1; see Conversion 1)

[2] represents the volume (V1) used from the container – 6 fluid ounces converted to ml

(1 oz = 29.5 ml; 6 oz x 29.5 ml /oz = 177 ml)

[3] represents the final concentration of the product to be applied (C2)

---

[59] December 09, 2021 Deposition, pg. 44, 2-10

[4] represents the final volume of product after adding water (V2)

(1 gallon of water is equal to 3,785 ml; according to the label, the concentrate is added to a gallon of water; the total volume is the sum of 3785 ml + 177 ml = 3962 ml)

**The final concentration (C2) is 6.4 mg/ml; or 6.4 mg/cm³**

\* cm³ is equal to 1 ml

The dermal absorbed dose per event (mg/ cm²-event; Equation 1) is a key input variable in the dermal exposure estimation model for determining average daily dose (Equation 5).

$$ADD = \frac{DA_{event} \times EV \times EF \times ED \times SA}{BW \times AT} \qquad \text{(Equation 5)}$$

ADD= average daily dose (mg/kg-day)
$DA_{event}$= absorbed dose per event (mg/cm²-event)
EV= event frequency (events/day)
EF = exposure frequency (days/year)
ED= exposure duration (years)
$SA^1$ = skin surface area available for contact (cm²)
BW = body weight (kg)
AT = average time (days)

[1] The surface area of skin exposed to glyphosate was based on the activity and tasks performed by the plaintiff.

**Plaintiff-specific exposure reconstruction**

The exposure reconstruction was performed on the plaintiff's use of Roundup Weed and Grass Killer (ready-mix) and Roundup Weed and Grass Killer (Concentrate Plus) for a total of 10 years. It should be noted that Ms. Salas' use was approximately 8 years based on her testimony during her deposition. However, to generate a worst-case exposure and dose estimate, I relied on the plaintiff fact sheet instead. In this document, the plaintiff reported 10 years of use. Based on the plaintiff's testimony, it is unclear if she used both the ready-mix and the concentrate products interchangeably across those 10 years of use. To estimate the plaintiff's dose, I used a model presented in *Mathematical Models for Estimating Occupational Exposure to Chemicals*, which is a publication by the American Industrial Hygiene Association.

 This model integrates plaintiff's frequency and duration (see subsections: A, B, C, D, E) of glyphosate use, as well as:

- bodyweight of the plaintiff (F)
- the max surface area of plaintiff's skin that was potentially exposed (G)
- experimentally-derived permeability coefficient (H)

- concentration of glyphosate (I)

**A. EV= event frequency (events/day):**

- 1 event per day

**B. EF = exposure frequency (days/year):**

- 52 days/year (total)

The exposure frequency is based on the testimony from the plaintiff indicating that she applied Roundup 1 day per week across the entire calendar year at various locations. The plaintiff indicated that she may have used the concentrate more than the ready-mix towards the end of her Roundup use. The magnitude and duration of this increase were unclear. As such, it was assumed that she used the ready-mix for 26 days/year and the concentrate for the other 26 days/year.

* this represents a conservative input value as it is unlikely that Roundup would have been applied on a weekly basis across the calendar year. The plaintiff also testified that she most likely did not apply Roundup every week all year long[60].

**C. ED= exposure duration (years):**

- 10 years: Roundup Weed and Grass Killer (Ready-to-use and Concentrate Plus)

The exposure duration is based on the PFS from the plaintiff indicating that she started applying Roundup in 2004 and then stopped in 2014.

**D. AT = average time (days):**

Roundup Weed and Grass Killer (Ready-to-use and Concentrate Plus):
- 10 years
- 3,650 days** (10 years x 365 days)

**this represents the total number of days the plaintiff applied Roundup based on her testimony

**E. $t_{event}$ = duration of event, hr/event:**

Mixing:

- 0.25 hr/event

Application:

- 4 hr/event *

---

[60] December 09, 2021 Deposition, pg. 75, 10-15

* this represents a conservative input value to apply across the plaintiff's 10 years of use. The plaintiff indicated that her application may take the 'whole morning'[61]. Because start and stop times were not identified – it was assumed that she started at 8a and finished by 12p. Additionally, in the event that the plaintiff was exposed to Roundup, it is unlikely that there was immediate deposition on the skin at the onset of each event and that deposition would be consistent and complete for the entirety of the event time. However, the use of 4 hr as a duration for each application was determined from Ms. Salas' testimony and provides a worst-case estimate of exposure and dose.

## F.  BW = body weight (kg):

- 190 lb*
- 86.4 kg**

* the weight used in the dermal exposure model was 190 lb, which was in her medical report from 21Dec18.

** 1kg is equal to 2.2 lb

## G.  SA = skin surface area available for contact (cm²):

Based on Ms. Salas' testimony and her use pattern of Roundup, her exposure to glyphosate was most likely localized to her lower legs. This is consistent with the exposure science literature. For example, Lavy et al. observed that the ankles and thighs among nursery workers received the largest amount of glyphosate. The plaintiff described that her arms may have been exposed if the spray drifted due to a gust of wind[62]. This model does not include the surface areas of the arms. To further support this decision, Lavy et al. also observed that only 1.1% of glyphosate exposure occurred on the forearms. Based on this empirical data/evidence, the arms are not considered a major body part that is typically exposed. If an exposure (or exposures) to the arms occurred, there was adequate coverage of exposed skin to estimate a worst-case dose (see below).

The surface area (cm²) was computed for the feet, legs, and one hand (based on testimony[63]) using the U.S. EPA's Exposure Factors Handbook (EPA, 2011). The value used for the surface area of each body part represents the 95th percentile of surface area of skin based on observations/measurements collected. Hence, the use of this max surface area represents another conservative input, especially as it assumes that there is uniform distribution of the product to this area. It is unlikely that an exposure covered the entire surface area of the specified body part. The body surface area included in this model was not adjusted as the plaintiff did not wear protective clothing.

Exposed surface areas during mixing and application are summarized below:

---

[61] December 09, 2021 Deposition, pg. 76, 2-11
[62] December 09, 2021 Deposition, pg. 44, 2-10
[63] December 09, 2021 Deposition, pg. 45, 3-5

➢ **Mixing:**

    Surface area of exposed hand:

        o  Hands (unadjusted surface area; total for two hands): 1060 cm²

        o  Hands (adjusted surface area; one hand): 530 cm²

        o  Hands (adjusted surface area; ¼ total area of one hand): 133 cm²

    Total dermal contact surface (mixing): 133 cm²

➢ **Application:**

    Surface area of exposed feet:

        o  Feet (unadjusted surface area; total): 1460 cm²

        o  Feet (adjusted surface area; top half): 730 cm²

    Surface area of exposed legs:

        o  Legs (unadjusted surface area of lower legs; total): 2860 cm²

        o  Legs (adjusted surface area; front half of lower legs): 1430 cm²

    Surface area of exposed hands:

        o  Hands (unadjusted surface area; total): 1060 cm²

        o  Hands (adjusted surface area; front half of one hand): 265 cm²

    Total dermal contact surface: 2425cm² (730 + 1430 + 265 cm²)

**H. $K_p$ = permeability coefficient in water, cm/hr:**

-   $5.9 \times 10^{-6}$ cm/hr (Nielsen et al. 2009)

**I.  $C_w$ = concentration of the substance in water, mg/cm³:**

| <u>Ready-mix Roundup</u><br><u>(No Mixing):</u> | <u>Concentrate Roundup</u><br><u>(Starting Concentration):</u> | <u>Concentrate Roundup</u><br><u>(Final Concentration):</u> |
|---|---|---|
| -   15 mg/cm³ * | -   144 mg/cm³ ** | -   6.4 mg/cm³ ** |

* this represents the concentration of glyphosate acid in the ready-mix Roundup product that the plaintiff most likely used for 10 years

** this represents the concentration of glyphosate acid in the concentrate Roundup product (before mixing) that the plaintiff most likely used for 10 years

*** this represents the concentration of glyphosate acid in the concentrate Roundup product (after mixing) that the plaintiff most likely used for 10 years

## Calculations

**1.  Absorbed dose per event:**

Based on the Roundup product used by the plaintiff, her estimated application time, and the permeability coefficient of glyphosate (derived experimentally by Nielsen et al. 2009), the absorbed dose per event was determined using Equation 1:

$$DA_{event} = K_p \text{ x } C_w \text{ x } t_{event}$$

## Application:

<u>1a. Ready-mix Roundup:</u>

$DA_{event} = 5.9 \text{ x } 10^{-6} \text{ cm/hr } * 15 \text{ mg/cm}^3 * 4 \text{ hr/event}$

$$\boxed{DA_{event1} = \ 0.00035 \text{ mg/cm}^2\text{-event}}$$

<u>1b. Concentrate Roundup:</u>

$DA_{event} = 5.9 \text{ x } 10^{-6} \text{ cm/hr } * 6.4 \text{ mg/cm}^3 * 4 \text{ hr/event}$

$$\boxed{DA_{event2} = \ 0.00015 \text{ mg/cm}^2\text{-event}}$$

**Mixing**:

1c. Mixing Concentrate Roundup:

$DA_{event}$ = 5.9 x $10^{-6}$ cm/hr * 144 mg/cm³ *0.25 hr/event

$$\boxed{DA_{event3}= 0.0002 \text{ mg/cm}^2\text{-event}}$$

## 2.  Maximum dose per event:

The maximum dose per event was estimated using the DAevent equation with two additional input variables: surface area and body weight to determine a bodyweight-adjusted dose of glyphosate that is specific to the plaintiff per event frequency (i.e., 1 time per application day).

$$\text{Maximum dose per event} = \frac{K_p \text{ x } C_w \text{ x } t_{event} \text{ x SA}}{EV \text{ *BW}}$$

2a. Ready-mix Roundup during application:

$$\text{Maximum dose per event} = \frac{5.9 \text{ x } 10^{-6} \text{ cm/hr * 15 mg/cm}^3 \text{ * 4 hr/event x 2425 cm}^2}{86.4 \text{ kg * 1 application event/day}}$$

Maximum dose per event = 0.86 mg/ 86.4 kg/day

$$\boxed{\text{Maximum dose per event} = 0.01 \text{ mg/kg/day; or 0.86 mg/day}}$$

2b. Concentrate Roundup during application:

$$\text{Maximum dose per event} = \frac{5.9 \text{ x } 10^{-6} \text{ cm/hr * 6.4 mg/cm}^3 \text{ * 4 hr/event x 2425 cm}^2}{86.4 \text{ kg * 1 application event/day}}$$

Maximum dose per event = 0.37 mg/ 86.4 kg/day

$$\boxed{\text{Maximum dose per event} = 0.004 \text{ mg/kg/day; or 0.37 mg/day}}$$

2b. Concentrate Roundup during mixing:

$$\text{Maximum dose per event} = \frac{5.9 \text{ x } 10^{-6} \text{ cm/hr * 144 mg/cm}^3 \text{ * 0.25 hr/event x 133 cm}^2}{86.4 \text{ kg * 1 application event/day}}$$

Maximum dose per event = 0.028 mg/86.4 kg/day

> Maximum dose per event = 0.0003 mg/kg/day; or, 0.028 mg/day

### 2c. Concentrate Roundup during mixing and spraying:

The plaintiff's maximum daily dose of the concentrate Roundup is the sum of the dose associated with mixing and applying the product:

Maximum dose per event =

$$\frac{(5.9 \times 10^{-6} \, \text{cm/hr} * 6.4 \, \text{mg/cm}^3 * 4 \, \text{hr/event} \times 2425 \, \text{cm}^2) +}{(5.9 \times 10^{-6} \, \text{cm/hr} * 144 \, \text{mg/cm}^3 * 0.25 \, \text{hr/event} \times 133 \, \text{cm}^2)}{86.4 \, \text{kg} * 1 \, \text{application event/day}}$$

Maximum dose per concentrate event = 0.40 mg/86.4 kg/day

> Maximum dose per event = 0.005 mg/kg/day; or, 0.40 mg/day

### 3. Average Daily Dose:

### 3a. Ready-mix Roundup during application

$$\textbf{ADD} = \frac{(DA \, event_1 \times EV_1 \times ED_1 \times EF_1 \times SA_1)}{BW \times AT}$$

$DA event_1$ = 0.00035 mg/cm²-event
$EV$ = 1 event/day
$ED_1$ = 10 years
$EF_1$ = 26 days/year
$SA$ = 2425 cm²
$BW$ = 86.4 kg
$AT$ = 3650 days

$$\textbf{ADD} = \frac{(0.00035 \, \text{mg/cm}^2\text{-event} * 1 \, \text{event/day} \times 10 \, \text{years} \times 26 \, \text{days/year} \times 2425 \, \text{cm}^2)}{86.4 \, \text{kg} \times 3650 \, \text{days}}$$

$$\textbf{ADD} = \frac{223 \, \text{mg}}{315360 \, \text{kg-day}}$$

> $ADD_1$ = 0.0007 mg/kg-day

Schaeffer Occupational Health Associates, LLC
Expert Report
Case Number: MDL No. 3:16-md-02741-VC (Salas)

## 3b. Concentrate Roundup during application:

$$ADD = \frac{(DA\ event2 \times EV2 \times ED2 \times EF2 \times SA2)}{BW \times AT}$$

DAevent2 = 0.00015 mg/cm²-event
EV = 1 event/day
ED2 = 10 years
EF2 = 26 days/year
SA = 2425 cm²
BW = 86.4 kg
AT = 3650 days

$$ADD = \frac{(0.00015\ mg/cm^2\text{-}event^* \ 1\ event/day \times 10\ years \times 26\ days/year \times 2425\ cm^2)}{86.4\ kg \times 3650\ days}$$

$$ADD = \frac{95\ mg}{315360\ kg\text{-}day}$$

ADD2 = 0.0003 mg/kg-day

## 3c. Concentrate Roundup during mixing:

$$ADD = \frac{(DA\ event1_3 \times EV3 \times ED3 \times EF3 \times SA3)}{BW \times AT}$$

DAevent3 = 0.0002 mg/cm²-event
EV3 = 1 event/day
ED3 = 10 years
EF3 = 26 days/year
SA3 = 133 cm²
BW = 86.4 kg
AT = 3650 days

$$\frac{(0.0002\ mg/cm^2\text{-}event \ * \ 1\ event/day \ * \ 10\ years \times 26\ days/year \times 133\ cm^2)}{86.4\ kg \times 3650\ days}$$

$$ADD = \frac{7\ mg}{315360\ kg\text{-}day}$$

ADD3 = 0.00002 mg/kg-day

3c. Ready-mix + Concentrate application + Concentrate mixing:

The average daily dose from exposure to ready-mix (ADD1) and concentrate Roundup, which includes applying (ADD2) and mixing (ADD3),  was calculated using the following equation:

$$ADDtotal: ADD1+ADD2+ADD3$$

This ADD is representative of the plaintiff's exposure from using both products across 10 years.

$$ADDtotal =  0.001 \text{ mg/kg-day}$$

$$\boxed{ADD = 0.001 \text{ mg/kg-day; or } 0.089 \text{ mg/day}}$$

## XIII. Conclusion

Dermal exposure assessments can be qualitative or quantitative based on the information and data that are available. I evaluated the plaintiff's exposure and dose of glyphosate using a quantitative model adapted from  the *Mathematical Models for Estimating Occupational Exposure to Chemicals* – a publication by the American Industrial Hygiene Association. The outputs from this model included:

- Absorbed dose per event
- Maximum dose per event
- Average daily dose

During the deposition, Ms. Salas described her glyphosate use, which included mixing and applying the product at two different properties in Key Largo, Florida. Exposure and dose were reconstructed using plaintiff-specific variables such as body weight, body surface area, application frequency and duration. Additionally, I relied on other values reported in peer-review journal articles and technical reports to complete the exposure model. Using this model, I estimated a worst-case dose of 0.001 mg/kg-day of glyphosate that the plaintiff may have experienced from applying Roundup at her property. This estimate is based on the plaintiff indicating that she switched between using Roundup Concentrate and the ready-mix Roundup over 10 years.

Ms. Salas' average daily dose of 0.001 mg/kg/day was three orders of magnitude (or >1,000x) below the EPA's Reference Dose (RfD) of 1 mg/kg/day. Further, the plaintiff's estimated dose unadjusted for bodyweight was 0.089 mg/day, which was 12x lower than the California OEHHA's NSRL of 1.1 mg/day. This dose of 0.089 mg/day was based on an application schedule of once per week, 52 weeks per year, for 10 years. Note that Ms. Salas' average daily dose was calculated based on a 10-year exposure duration as opposed to the NSRL, which is based on a daily dose for a 70-year lifetime.

In the absence of biomonitoring data that is specific to the plaintiff, this model provides an estimate of her dose. Like any study or evaluation, my estimate is subject to limitations that need

considered. I explicitly considered the data and testimony in my report and provided context regarding the validity of my estimate. Further, the average daily dose of glyphosate calculated is most likely an overestimate based on the assumptions of the dermal surface area exposed, uniform distribution of the Roundup on the dermal surface area, and the duration of the application event. Hence, I believe that this calculation and assessment provide a better representation of the plaintiff's risk of exposure and dose of glyphosate than using exposure days.

Often plaintiff's experts compare the plaintiff's exposure days to thresholds reported in the epidemiological studies conducted by McDuffie et al. and Eriksson et al. There is uncertainty regarding this assessment and how it translates to risk for NHL given the limitations of those two studies. For example, statistical bias was noted by Crump in his evaluation. Moreover, the Pahwa et. al. analysis (after adjusting for use of other chemicals) demonstrated that the association between ever glyphosate use and NHL was not statistically significant overall with no pattern of increasing risk with increasing years of use. It should be noted that multiple authors on the McDuffie et al. study were co-authors on the Pahwa et al. study. While my report does not provide an opinion as to the causes of NHL, my estimate of the plaintiff's average daily dose indicates that the plaintiff's dose did not exceed the EPA RfD or the California NSRL for glyphosate.

Signature:

Joshua W. Schaeffer, PhD, MS, CIH                                   Date: 25July2022
Schaeffer Occupational Health Associates, LLC

# EXHIBIT A

# JOSHUA W. SCHAEFFER
## SCHAEFFER OCCUPATIONAL HEALTH ASSOCIATES, LLC

## EDUCATION

**PhD** in **Environmental Health** (specialization in **Industrial Hygiene**), 05/2013
Colorado State University, Fort Collins, CO
>> **Dissertation:** Evaluation and Resolution of Two Sampling Methods for Airborne Aromatic Diisocyante Monomers

**MS** in **Environmental Health** (specialization in **Toxicology**), 05/2008
Colorado State University, Fort Collins, CO
>> **Comprehensive examination**

**PhD Student** in **Nutritional Biochemistry and Metabolism**, 08/2006 – 06/2007
Case Western University School of Medicine, Cleveland, OH
>> **Research topic:** Characterizing Metabolic Pathways in VLCAD Knockout Mice Using Metabolic $^2$H Labeling and Mass Spectrometry

**BA** in **Biochemistry**, 05/2001
The College of Wooster, Wooster, OH
>> **Thesis:** The Synthesis of 1-(4-Mercaptopheynl)-1,1-di-(4-hydroxyphenyl)ethane (MDHE) Template Molecule for the Development of a Molecularly Imprinted sol-gel-based Chemical Sensor for the Quantitation of DDT (1,1-bis(4chlorophenyl)-2,2,2-trichloroethane)

## PROFESSIONAL CERTIFICATION

**Certified Industrial Hygienist** #11376                                                   2017-present

## PROFESSIONAL EXPERIENCE

**Associate Professor,** Occupational and Environmental Health                    2022 – present
>> Department of Environmental and Occupational Health, Colorado School of Public Health, Aurora, CO

**Associate Professor,** Occupational and Environmental Health                    2022 – present
>> Department of Environmental and Radiological Health Sciences, Colorado State University, Fort Collins, CO

**Director**, Environmental Public Health Concentration, Undergraduate Program in          2020– present
Biomedical Sciences, Department of Environmental and Radiological Health Sciences, Colorado State University

**Associate Department Head for Undergraduate Education**,                    2020– present
Department of Environmental and Radiological Health Sciences, Colorado State University

**Assistant Professor,** Occupational and Environmental Health                    2015 – present
>> Department of Environmental and Occupational Health, Colorado School of Public Health, Aurora, CO

**Assistant Professor,** Occupational and Environmental Health                    2015 – present
>> Department of Environmental and Radiological Health Sciences, Colorado State University, Fort Collins, CO

**Postdoctoral Fellow,** Occupational and Environmental Health                    2013 – present
>> Department of Environmental and Radiological Health Sciences, Colorado State University, Fort Collins, CO

**Research Associate II,** Occupational and Environmental Health                    2012 – present
>> Department of Environmental and Radiological Health Sciences, Colorado State University, Fort Collins, CO

**Industrial Hygienist (Researcher and Consultant),** Department of Medicine          2011 – 2012
>> Division of Occupational and Environmental Sciences, National Jewish Health, Denver, CO

**Researcher/Consultant,** Toxicology Associates, Denver, CO                    2011

**Industrial Hygiene (Consultant),** Art School League of Denver, Denver, CO          2009 – 2011

**Research Assistant,** Center of Environmental Medicine          2007 – 2008

    Department of Environmental and Radiological Health Sciences, Colorado State University, Fort Collins, CO

**Laboratory Director,** Chematox Laboratory, Inc. Boulder, CO          2002 – 2006

## HONORS AND AWARDS

- ➢   Diploma of Excellence, Teaching at Gheorghe Asachi Technical University (Iasi, Romania)          2018
- ➢   Keynote Speaker at the AIHA Rocky Mountain Section Fall Tech Conference, 2010
- ➢   Jerry Lynch Memorial Scholarship, The American Industrial Hygiene Foundation, 2010
- ➢   Environmental Health Sciences Outstanding Graduate Student Award, Colorado State University, 2009 – 2010
- ➢   James D. Defield Memorial Scholarship Recipient, Colorado State University, 2009
- ➢   CDC/NIOSH Mountain and Plains Education Research Center Trainee in Industrial Hygiene, 2008 – 2010

## PROFESSIONAL AFFILIATIONS

| | |
|---|---|
| Colorado Environmental Health Association | 2020 |
| National Environmental Health Association | 2020 |
| International Society for Exposure Science | 2017 |
| American Thoracic Society | 2017 |
| Colorado Clinical & Translational Science (CCTSI) | 2015 |
| International Society for Computational Biology, Member | 2013 |
| American Conference of Governmental Industrial Hygienists, Member | 2010 |
| American Public Health Association, Member | 2010 |
| The American Association for the Advancement of Science, Member | 2009 |
| American Industrial Hygiene Association, Rocky Mountain Section, Member | 2009 |
| American Industrial Hygiene Association, Rocky Mountain Student Section, Member | 2009 |
| American Industrial Hygiene Association, Member | 2009 |

## PROFESSIONAL DEVELOPMENT

| | |
|---|---|
| **Agile Leadership Development Workshop** | 2021-2022 |
| **Write Winning NIH & NSF Grant Proposals: A virtual seminar in two parts** | Spring 2021 |
| **Dermal Exposure Assessment Virtual Conference: Introduction to SkinPerm and Course Conclusion** | Fall 2020 |
| **Dermal Exposure Assessment Virtual Conference: Quantitative Dermal Exposure Assessments and Use of Sampling Data in Dermal Exposure Assessments** | Fall 2020 |
| **Dermal Exposure Assessment Virtual Conference: Qualitative Dermal Exposure Assessments and Introduction to Quantitative Dermal Exposure Assessments** | Fall 2020 |
| **Dermal Exposure Assessment Virtual Conference: Course Welcome and Introduction to Qualitative Dermal Exposure Assessments** | Fall 2020 |
| **Webinar: Ventilation, Surface Disinfection and PPE Considerations for the IP and IH** | Fall 2020 |
| **Exposure Assessment Strategies and Statistics** | Fall 2020 |
| Presenter at **CVMBS Online Teaching Boot Camp** | Fall 2020 |

| | |
|---|---|
| **Summer CVMBS Online Course Development Program** | 2020 |
| **Diversity, Inclusivity, and Equity Training,** The Institute for Learning and Teaching<br>Colorado State University | Spring 2019 |
| **Teaching Squares Peer Observation Program,** The Institute for Learning and Teaching<br>Colorado State University | Fall 2018 |
| **Science Teaching Fellow,** Mobile Summer Institute on Scientific Teaching<br>National Science Foundation, National Academy of Sciences, Howard Hughes Medical Institute,<br>Helmsley Charitable Trust | Summer 2018-present |
| **Best Practices in Teaching**, Academy for Teaching and Learning, College of Veterinary and<br>Biomedical Sciences, Colorado State University | Spring 2018 |
| **Education Seminar Series**, Academy for Teaching and Learning, College of Veterinary and<br>Biomedical Sciences, Colorado State University | Spring 2017 |

➢ *Using Screen Sharing Software to Strengthen Student Interactions in the Classroom* (April 24)
➢ *Maximizing the Use of Canvas in Your Course* (March 6)

## PROFESSIONAL SERVICES AND COMMITTEES

### Regional, National, and International Service

| | |
|---|---|
| **Representative,** College of Veterinary Medicine and Biomedical Sciences, Teaching and Learning Committee,<br>Colorado State University | 2021- |
| **Member,** Virtual Reality Initiative Advisory Board, Colorado State University, | 2021- |
| **Alternate Representative**, College of Veterinary Medicine and Biomedical Sciences, Occupational Health<br>Committee Colorado State University, | 2017- |
| **External reviewer** for the College of Medicine Research Awards,<br>the University of Saskatchewan | 2020 |
| **Member**, Biomedical Curriculum Committee,<br>College of Veterinary Medicine and Biomedical Sciences | 2020-present |
| **Chair**, Undergraduate Education Committee, Department of Environmental and Radiological Health Sciences, | 2020-present |
| **Member**, Graduate Education Committee, Department of Environmental and Radiological Health Sciences, | 2020- |
| **Past Chair**, Biosafety and Environmental Microbiology Committee, AIHA | 2020-2021 |
| **Chair**, Biosafety and Environmental Microbiology Committee, AIHA | 2019-2020 |
| **Vice Chair**, Biosafety and Environmental Microbiology Committee, AIHA | 2018-2019 |
| **Planning Committee,** Assembly on Environmental, Occupational, and Population Health,<br>American Thoracic Society | 2017-present |
| **Committee Member,** Assembly on Environmental, Occupational, and Population Health,<br>American Thoracic Society | 2017-present |
| **Committee Member,** Environmental and Radiological Health Sciences Undergraduate Education Committee | 2017-present |
| **Secretary**, Biosafety and Environmental Microbiology Committee, AIHA | 2017-2020 |
| **Director**, Research and Emerging Issues for the High Plains Intermountain Center for Agricultural Health and<br>Safety | 2016-2021 |

**Peer-Review Publication**
1. Journal of Nanoparticle Research
2. Environmental Research
3. Scientific Reports
4. Science of the Total Environment

**Grant reviewer** for the Southwest Center for Occupational and Environmental Health Pilot Proposals
2016-present

**Grant reviewer** for the High Plains Intermountain Center for Agricultural Health and Safety Pilot Proposals
2015-present

**Co-Chair** of the Microbial Sequencing and Bioinformatics Workshop at Colorado State University, Fort Collins, CO, 04/2015
➢ A hands-on approach to high-throughput DNA sequencing, bioinformatics pipelines and data analysis to address research questions related to animal, environmental, and human health.

**Co-Chair** of the 6th Annual Public Health Symposium at Colorado State University — Microbial Ecology in a Changing World: Emerging Issues in Antimicrobial Resistance, Fort Collins, CO, 04/2015

**Planning Committee Co-Chair** for International Dairy Research Consortium Workshop, at the 7th International Symposium for Safety & Health in Agricultural & Rural Populations: Global Perspectives, Saskatoon, SK, 10/2014

**Member** of International Dairy Research Consortium to collaborate on research and outreach projects to improve the health and safety among dairy workers internationally

**Delegate** of Colorado Marijuana Health & Safety Workgroup at Colorado Department of Public Health and Environment, 2014 – present
➢ *A multi-disciplinary and interagency work group: addressing occupational and public health issues in the Colorado marijuana industry; identifying emerging trends and issues; engaging stakeholders; developing best practices; and disseminating technical and general knowledge through written and oral communications.*
➢ **Co-chair** of Occupational Health Sub-Committee, 2014 – present
➢ **Member** of Existing Knowledge Sub-Committee, 2014 – 2015

**Director** of International Affairs Committee, American Industrial Hygiene Association Rocky Mountain Section, 2011 – present

**Industrial Hygiene Student Representative** to the Association of University Programs in Occupational Health and Safety, 2011
*Educated US Senate and Congressional offices about the importance of occupational safety and health research and education.*

The AIHA RMS International Committee **Representative** and **Workshop Presenter** at Technical University Gheorghe Asachi, Iasi, Romania, 2011
*Presented a three-day occupational and environmental health fundamentals workshop on toxic metal exposures and controls.*

**Chair** of the Occupational and Environmental Health Session at ISSIM 2011 Congress, Technical University Gheorghe Asachi, Iasi, Romania, 2011

**International Chair**, AIHA Rocky Mountain Student Section, 2011

**Interdisciplinary Research Coordinator**, Mountain and Plains Education Research Center, 2011

**Outreach Activity Correspondent**, Mountain and Plains Education Research Center, 2010 – 2011

**Guest Member**, Students and Early Career Professionals Volunteer Group, American Industrial Hygiene Association, 2010 – 2011

**Vice Chair**, American Industrial Hygiene Association Student Local Section Council, 2010-2011

**Newsletter Editor**, American Industrial Hygiene Association, Rocky Mountain Student Section, 2009 – 2010

**Industrial Hygiene Student Representative**, Mountain and Plains Education Research Center, Development of Interdisciplinary Symposium, 2009 – 2010

**Environmental and Radiological Health Sciences Representative**, College of Veterinary Medicine and Biomedical Sciences Research Day Planning Committee, Colorado State University, 2009 – 2010

**Student Representative of Graduation Education and Affairs Committee,** Department of Environmental and Radiological Health Sciences, Colorado State University, 2009 – 2010

**Coordinator**, Interdisciplinary Collaboration Project with Colorado State University OSHA Consultation Program on a National Emphasis Program for Lead Exposures in Local Indoor Firing Ranges, 2009

**President**, American Industrial Hygiene Association Rocky Mountain, Student Section, 2009 – 2011

National Student Section of the Year 2010

**Chair** of Mountain and Plains Education Research Center Practicum, "Multi-disciplinary Approach to Worker Health and Safety" in Problem Based Learning in Occupational and Environmental Health, 2009

## TEACHING EXPERIENCE

**Instructor,** Colorado State University                                                         Fall 2020-present
Introduction to Biomedical Sciences (VMBS 100, 3 credits)

**Instructor,** Colorado State University                                                         Spring 2020-present
    Introduction to Environmental Health (ERHS 230, 3 credits)

**Instructor,** Colorado State University                                                         Spring 2018-present
    Introduction to Environmental Health (ERHS 220, 3 credits)

**Instructor,** Colorado State University                                                         Fall 2016-present
    Industrial Hygiene and Air Pollution (ERHS 350, 3 credits)

**Co-Instructor,** Colorado State University

Environmental Health Field Methods (ERHS 230, 3 credits)                         Fall 2016-present

Environmental Health Field Methods (ERHS 230, 3 credits)                         Spring 2017-present

Environment, Safety, and Health Management (ERHS 580A2, 3 credits)                         Fall 2010
    *Co-developer of course
    Lectures Presented: "DOT Overview," "DOT: Marking Packages," "DOT: Classifying Hazardous Materials,"
    "DOT: Completing Manifests," and "DOT: Preparing Shipments"

**Guest Lecturer,** Colorado State University

"Silica Exposures and Health Effects" in Environmental Toxicology (ERHS 446; Fall 2021)

"Introduction to Exposure Science" in Introduction to Environmental Health (ERHS 220; Fall 2020)

"Occupational Health and Safety" in Introduction to Environmental Health (ERHS 220; Fall 2020)

"The Air We Breathe: An Introduction to Air Quality" in Environmental Toxicology (ERHS 446), Fall 2019

"Occupational Dermatoses" in Toxicological Pathology (ERHS 603), Fall 2019

    "Aromatic Diisocyanate Monomers: Toxicology, Sensitization, and Occupational Asthma" in Industrial
    Toxicology (ERHS 504), Spring 2014, 2018, 2020, 2022

    "Occupational Dermatoses" in Industrial Hygiene (ERHS 526), Fall 2009, 2010, 2012

    "Occupational Dermatoses" in Advanced Occupational Health (ERHS 536), Spring 2010

    "Noise Measurement: Interpretation" in Occupational Noise Control (ERHS 656), Fall 2009

    "Environmental Noise" in Occupational Noise Control (ERHS 656), Fall 2009

"Gas Chromatography Principles" in Environmental Toxicology Field Methods (ERHS 230), Spring 2008
Included Lab: "Simple Construction of Gas Chromatograph for Detection of Halocarbon Compounds"

## Student Committees and Mentoring

### Current Students (Undergraduate Research)

Veronica Neujahr
Research Topic: *Particulate Matter Exposures and Kidney Injury/ Sugarcane Workers and Chronic Kidney Disease of Unknown Origin*

Yin Htin Wang
Research Topic: *Collaborative Health Research on the Microbiome and the Environment (CHROME*)

Michael Desch
Research Topic: *Collaborative Health Research on the Microbiome and the Environment (CHROME*)

### Graduated Undergraduate Students

Jordan Lesansee
Research Topic: Particulate Matter Exposures and Kidney Injury/ Sugarcane Workers and Chronic Kidney Disease of Unknown Origin

Monica Ortiz
Research Topic: After the Flood: Investigating the health consequences of mold growth in homes damaged during Hurricane Harvey

Thomas Griffin (Undergraduate Honor's Thesis)
Title*: Using a GIS Approach to Assess Antimicrobial Resistance in a Dairy Setting*

Coral Isaacs
Research Topic: Air-Liquid Interface Culture for Assessing Bioaerosol-Induced Airway Inflammation
Internship: Indoor Air Quality in Elementary Schools

➢ High Honors at the Environmental Health, 2018 Celebrate Undergraduate Research and Creativity Symposium (CURC)

Zachary Johnson
Research Topic: *Collaborative Health Research on the Microbiome and the Environment (CHROME*)

Zac Frieband
Research Topic: *The Public Health Application of Mindfulness, Meditation, and Virtual Reality: A Literature Review with Emphasis on the Default Mode Network*

Aly Dressler
Research Topic: *Collaborative Health Research on the Microbiome and the Environment (CHROME)*

Annie Wickum
Research Topic: *Hypertonic Saline Nasal Lavage: An Intervention for Bioaerosol-Exposed Dairy Workers*

Anam Riaz (University of Punjab, Lahore, Pakistan)
Research Topic: *Collaborative Health Research on the Microbiome and the Environment (CHROME*)

Devin Clark
Research Topic: Lung Microbiome and Exhaled Breath

Emily Cunis (Undergraduate Honor's Thesis)
Title: *Children's Community Outreach Safety and Wellness Activity Book*

Nolan Green
Research Topic: *Collaborative Health Research on the Microbiome and the Environment (CHROME*)

Peter Seel (Undergraduate Honor's Thesis)
Title: *Analysis of Antimicrobial Resistance and Local Resistome at a Colorado Dairy Farm*

Laura Krause (Undergraduate Honor's Thesis)
Title: *Bacterial preservation during air sampling of culturable bioaerosols*

> High Honors at the Environmental Health, 2014 Celebrate Undergraduate Research and Creativity Symposium (CURC)

**Current Students (Graduate)**

Carly Chesterman: Toxicology
Master of Science, Environmental and Radiological Health Sciences, Colorado State University
Role: Committee Member

Alissa Threatt: Toxicology
Master of Science, Environmental and Radiological Health Sciences, Colorado State University
Role: Committee Member

Casey McDermott: Toxicology
Doctor of Philosophy, Environmental and Radiological Health Sciences, Colorado State University
Role: Committee Member

Mollie Murphy: Environmental Health (specialization in Industrial Hygiene)
Master of Science, Environmental and Radiological Health Sciences, Colorado State University
Role: Advisor

Colton Castro: Environmental Health (specialization in Industrial Hygiene)
Master of Science, Environmental and Radiological Health Sciences, Colorado State University
Role: Advisor

George Peterson: Environmental Health (specialization in Industrial Hygiene)
Doctor of Philosophy, Environmental and Radiological Health Sciences, Colorado State University
Role: Advisor

Jessica Nunez: Environmental Health (specialization in Industrial Hygiene)
Title: *Carriage of MRSA Among Dairy Farm Workers in the High Plains*
Master of Science, Environmental and Radiological Health Sciences, Colorado State University
Role: Advisor

Grant Erlandson: Environmental Health (specialization in Industrial Hygiene)
Title: *Hypertonic Saline Rinse and its Effect on Nasal Inflammation and Microbiome in Dairy Workers*
Doctor of Philosophy, Environmental and Radiological Health Sciences, Colorado State University
Role: Advisor

James Seidel: Environmental Health (specialization in Industrial Hygiene)
Title: *Effects of a Nasal Lavage Intervention on Pulmonary Function Among Dairy Workers*
Doctor of Philosophy, Environmental and Radiological Health Sciences, Colorado State University
Role: Advisor

Jessica Drapcho: Environmental Health (specialization in Industrial Hygiene)
Plan A, currently working on EPA funded project: *Sustainable Places, Health and Education Research in Schools*
Master of Science, Environmental and Radiological Health Sciences, Colorado State University
Role: Co-Advisor

Lauren Massengill: Environmental Health (specialization in Industrial Hygiene)
Plan A, currently working on EPA funded project: *Sustainable Places, Health and Education Research in Schools*
Master of Science, Environmental and Radiological Health Sciences, Colorado State University
Role: Co-Advisor

Kyle Root: Environmental Health (specialization in Industrial Hygiene)
Title: *Sustainable Places, Health and Education Research in Schools*
Doctor of Philosophy, Environmental and Radiological Health Sciences, Colorado State University
Role: Advisor

**Graduated Graduate Students**

**2017**

Grant Erlandson: Environmental Health (specialization in Industrial Hygiene)
Plan A, currently working on EPA funded project: *Sustainable Places, Health and Education Research in Schools*

Master of Science, Environmental and Radiological Health Sciences, Colorado State University
Role: Advisor

Sarah Maynard: Environmental Health (specialization in Industrial Hygiene)
Plan B, Title: *A Clinical Review of Diisocyanate Exposure*
Master of Science, Environmental and Radiological Health Sciences, Colorado State University
Role: Co-Advisor

<u>2016</u>
Kevin Hedges: Environmental Health
Advisor: Robert Mulley
Title: *Assessment and Control of Respirable Cystalline Silica in Quarries and Dimension Stone Mills*
Doctor of Philosophy, School of Exercise and Health Sciences, Edith Cowan University (Australia).
Role: Examiner

Margaret Escobar: Environmental Health (specialization in Industrial Hygiene)
Title: *Filter Based Methods Assessment: Culturing Resistant Bacteria from Inhalable Bioaerosols*
Master of Science, Environmental and Radiological Health Sciences, Colorado State University
Role: Co-Advisor

Laura Krause: Environmental Health (specialization in Industrial Hygiene)
Title: *A Comparative Analysis Between the rFC And LAL Endotoxin Assays for Agricultural Air Samples*
Master of Science, Environmental and Radiological Health Sciences, Colorado State University
Role: Co-Advisor

Chris Quinn-Vawter: Environmental Health (specialization in Industrial Hygiene)
Title: *Indoor Air Quality in Newly Constructed Green, Retro-fitted Green, and Conventionals Schools*
Master of Science, Environmental and Radiological Health Sciences, Colorado State University
Role: Co-Advisor

<u>2015</u>
Brad Stanard: Toxicology
Title: *Thresholds of Toxicological Concern (TCC) for Anticancer Compounds Derived from Mechanism-based Models for Developmental and Reproductive Toxicity Predictive Estimation and Application to Pharmaceutical Drug Development and Manufacturing Operations*
Doctor of Philosophy, Environmental and Radiological Health Sciences, Colorado State University.
Role: Committee Member

Desmond Menon: Environmental Health
Advisor: Jacques Oosthuizen
Title: *An Evaluation of Children's Exposures to Respirable Particulates, Environmental PM$_{2.5}$, PAHs, and Metal Compounds in the South West of Western Australia*
Doctor of Philosophy, School of Exercise and Health Sciences, Edith Cowan University (Australia).
Role: Examiner

## Invited Lectures and Symposia

"Agricultural Health and Safety" at the University of Colorado Anschutz Medical Campus (Colorado School of Public Health), Aurora, CO, Fall 2017

"Potential Exposures in Illegal Marijuana Grow Operations" at the AIHA-Rocky Mountain Section Lunch and Learn, Thornton, CO, Spring 2014

➢ 1 contact hour for ABIH Certification Maintenance

"Microbiome of Dairy Bioaerosols and Worker Health Implications" at the Jennie Smoly Caruthers Biotechnology Building (Knight Lab), University of Colorado Boulder, CO, Summer 2013

"Introduction to Toxicological Principles and Toxic Metals" at Technical University Gheorghe, Asachi, Iasi, Romania, Spring 2011

➢ Included lectures over multiple days as part of an Industrial Hygiene Workshop

"Evaluation of Field Sampling Methods for Airborne Aromatic Diisocyanates to Accurately Determine Worker Exposure" Division of Environmental and Occupational Health Sciences at National Jewish Health, Denver, CO, Fall 2010

"Electrical Hazards: An Introduction to the Occupational Safety and Health Administration 10-hour Course to Promote Safety in the Hispanic Community" Radio Show Interview with "Dona Inez" on !Arriba Mi Negocio!, Denver, CO, Fall 2010

## RESEARCH ACTIVITIES

### Proposed/Pending Grant Support (with total costs)

HHS-NIH R01 (Newman), 07/01/20 – 06/30/25
Exposures and kidney health among women in Central America
The objective of this study is to identify exposures and environmental determinants to better understand the heavy burden of kidney injury among female sugarcane and non-sugarcane workers in Guatemala and Nicaragua.

### Current Grant Support

NSF (PI: Vandewoude), 2021-2026
*BII: Regional OneHealth Aerobiome Discovery Network (BROADN)*
The objective of this study was to characterize the aerobiome – i.e., composition, disturbances, physical/chemical properties, and impacts – over scales ranging from the Earth's surface to the atmosphere. I will provide expertise in occupational bioaerosol exposures, sampling and monitoring of bioaerosol samples, and data interpretation.  I will help lead occupational exposure assessments and fieldwork activity, including coordinating sampling campaigns, training the exposure assessment team.
Role: Co-Investigator

HHS-NIH-NIEHS R01 (PIs, Newman, Adgate, Schaeffer), 01/01/21 – 12/31/25
*Particulate exposure and kidney health*
The objectives of this study are to assess exposure to respirable particles among sugarcane workers in Guatemala during harvesting operations and to characterize the chemical composition of the particulate matter and identify hazardous constituents associated with kidney injury.

HHS-NIH R21 (PI, Janitz), 04/01/21 – 03/31/23
*Aeroallergens, Air Pollution and Respiratory Health in the Chickasaw Nation*
The objective of this study is to ascertain if asthma exacerbations (measured by a GPS-enabled metered-dose inhaler) are associated with elevated aeroallergens and anthropogenic air pollution.
Role: Co-Investigator

HHS-CDC-NIOSH R01 (PI, Schaeffer), 07/01/20 – 06/30/24
*Antimicrobial Resistant Bacteria: Exposures and Health of Cattle Workers*
The objective of this study is to improve knowledge of the microbiome, resistome and virome among cattle workers by using high-throughput DNA sequencing and measurements.

HHS-NIH R01 (PI, Johnson), 07/01/20 – 06/30/25
*Silica Nephropathy and Chronic Kidney Disease of Unknown Etiology*
The objective of this study is to characterize and evaluate potential mechanisms of silica- induced kidney injury using an animal model and human renal biopsies.
Role: Co-Investigator

NIEHS Time-Sensitive R21 (PI, Schaeffer), 2018-2020; NCE 2021
*After the Flood: Investigating the health consequences of mold growth in homes damaged during Hurricane Harvey*
$275,000, Role: Principal Investigator

CDC/NIOSH (PI, Reynolds and Schaeffer), 2018 – 2021
3 U54 OH008085-15S1A1
*Evaluation of the effectiveness of a nasal rinse intervention*
$1,333,453; Role: Co-Principal Investigator

## Completed Grant Support

CDC NIOSH HICAHS (PIs, Fierer and Schaeffer), 11/2017- 08/2018
*Assessment of occupational exposures to aerosolized Mycobacteria in Colorado dairy*
$25,000; Role: Co-Principle Investigator

CDC NIOSH HICAHS Emerging Issues Program 2016
*Distribution of Antibiotic-Resistant Bacteria in Bioaerosols on Colorado Dairy Farms*
$30,000; Role: Principal Investigator

CDC NIOSH HICAHS (PI, L'Orange), 11/2016-08/2017
*A Novel, Low-Cost Method for Assessing Personal Aerosol Exposures in Real-Time*
$20,000; Role: Co-Investigator

CDC NIOSH Mountain and Plains Education Research Center (PI, Tsai), 11/2016-08/2017
*Exposure Characterization and Health Effects Associated with Particles Released from Shredding Toner-Printed Paper*
*$10,000; Role: Co-Investigator*

EPA-G2013-STAR-H1
(PI, Cross), 2014 – 2018
*Sustainable Places, Health and Education Research in Schools*
$999,387; Role: Co-Investigator; Team lead for exposure assessment
                                    ***Invention Disclosure Submitted***
Colorado Public Health Faculty Seed Grant (PIs Magzamen and Schaeffer), 11/2014 – 08/2015
*Multidisciplinary Approaches to Agricultural Antimicrobial Resistance and Human Health Impacts*
$20,000; Role: Co-Principal Investigator

CDC NIOSH Mountain and Plains Education and Research Center (PIs Davidson, Davidson, and Schaeffer)
T42OH009229-08, 07/2014 – 06/2015
*Microbial Sampling and Metagenomics Approaches for Workplace Exposure Studies*
$15,000; Role: Co-Principal Investigator

CDC/NIOSH, 1U01OH010840 (PIs Magzaemen, Reynolds, Schaeffer), 09/2014 – 08/2017
*Design and Evaluation of Interventions to Improve Dairy Worker Respiratory Health*
The goal of this study is develop and implement sustainable interventions that reduce microbial exposures to
address health disparities and improve respiratory health in the dairy workforce.
$823,794; Role: Co-Principal Investigator

CVMBS College Research Council (PIs McConnel and Reynolds), 2014 – 2015
*Characterizing microbial community impacts on the survival and dissemination of E. coli O157:H7 on dairie s*
The goal of this study is to understand transmission dynamics of *E. coli* O157:H7 across space and time in a dairy.
$20,000; Role: Co-Investigator

HHS/CDC/NIOSH, R01OH010295-02 (PIs Volckens, Anthony, Sleeth, MPI) 07/2012 – 06/2016
*Design, Evaluation, & Validation of a Next-Generation Inhalable Aerosol Sampler*
This project will develop a low-cost, easy to use, disposable aerosol sampler for occupational exposure assessment.
$1,161,528; Role: Co-Investigator

Amazon Web Service in Education Research Grant (PI, Schaeffer), 02/2014 – 02/2016
EDU_R_FY2014_Q1_ColoradoStateU_Schaeffer
$10,000; Role: Principal Investigator

The CSU Water Center (PIs, Magzamen and Schaeffer), 11/2013 – 05/2014

*Characterizing Biological Pollutants in Agricultural Runoff at Colorado Dairies*
$25,000; Role: Co-Principal Investigator

CDC NIOSH HICAHS (PIs, Bisha, Chandler, Davidson, Schaeffer), 11/2013 – 11/2014
*Modified Bioaerosol Sampling for Presence of Viruses in Agricultural Environments*
$25,000; Role: Co-Principal Investigator
        ***Invention Disclosure Submitted***

CDC NIOSH Mountain and Plains Education Center (PI, Schaeffer), 07/2013 – 06/2014
T42OH009229-07
*Modeling and Predicting Microbiomes in Dairies: A Metagenomic Assessment of Bioaerosols*
$17,500; Role: Principal Investigator

CDC/NIOSH (PI, Reynolds), 2012 – 2016
2 U54 OH008085
*Bioaerosol Exposures and Models of Human Response in Dairies*
 $1,969,297; Role: Co-Investigator

Bureau of Justice Assistance (PI, Martyny), 10/2011 – 09/2012
2010-DJ-BX-0316
*Marijuana Grow Operation Evaluation Project*
$280,500; Role: Co-Investigator, Industrial Hygienist Research Associate II, and Operations Coordinator

CDC/NIOSH Mountain and Plains Education Center (PI, Brazile), 05/2009 – 05/2010
1T42OH009229-01
*An Evaluation of Two Toluene Diisocyanate Sampling Methods*
$8,000; Role: Co-Investigator, Doctoral Student

College of Veterinary Medicine and Biomedical Sciences College Research Council, Colorado State University
(PI, Brazile), 08/2008 – 08/2009
*Comparison of Two Methylene Bisphenyl Isocyanate Sampling Methods*
$20,000; Role: Co-Investigator, Doctoral Student
        ***Invention Disclosure Submitted***

**Un-funded Projects as PI, Co-PI, or Co-I (with total costs)**

Bertarelli Foundation (PI, Chapple), 06/01/21 - 05/31/24
*Connectivity: Hidden Pathways of Anthropogenic Contaminants in BIOT*
The goal of this project is to source and track transport of different contaminants across the western Indian Ocean
and describe the effects that these contaminants have on organismal fitness and ecosystem structure and resilience.

HHS-NIH-NIAID (PI, Jathar), 07/01/21 - 06/30/23
*Studying the Size-Resolved Concentrations and Viability of SARS-CoV-2 in Human Expiratory Aerosols*
The goal of this project is to develop a method to measure size-resolved properties of viral aerosols and apply this
method to characterize the viability of SARS-CoV-2 in expiratory aerosols from patients diagnosed with COVID-
19.

HHS-NIH-NIAID (PI, Jathar), 2020
*Size-Resolved Concentrations and Viability of SARS-CoV-2 in Expiratory Aerosols from Animal Models*
The goal of this project was to develop a novel method to study the size-reolved viral properties of aerosols and
apply this method to understand the concentrations and viability of SARS-CoV-2 aerosols shed by animal models
infected with COVID-19.

NSF Small Business Innovation Research and Small Business Technology Transfer Phase 1 Program
(PIs, Jathar, Bosco-Lauth, Schaeffer), 07/01/2020 – 06/30/2022
*Rapid Identification of SARS-2 and other Viruses*

The objective of this study is to develop technology that interfaces with an existing system to identify airborne viruses in real-time.

## BIBLIOGRAPHY

**Peer-Reviewed Articled (in development)**

**Peer-Reviewed Articles**

Leibler, JH,  Abdelgadir, A, Seidel, J, White, RF, Johnson, WE, Reynolds, SJ, Gray, GC and **Schaeffer, JW.** Influenza D virus exposure among US cattle workers: A call for surveillance. *Manuscript submitted and currently under review.*

Sasai F, Rogers KL, Orlicky DJ, Stem A, **Schaeffer J**, Garcia G, Fox J, Ray MS, Butler-Dawson J, Gonzalez-Quiroz M, Leiva R, Taduri G, Anutrakululchai S, Venugopal V, Madero M, Glaser J, Wijkstrom J, Wernerson A, Brown JM, Johnson RJ, Roncal-Jimenez CA. Inhaled silica nanoparticles cause chronic kidney disease in rats. *Am J Physiol Renal Physiol* (2022); PMID: 35635324.

Benka-Coker, WO, Young, BN, Oliver, S, Schaeffer, JW,  Manning, D, Suter, J, Cross, J, Magzamen, S. Sociodemographic variations in the association between indoor environmental quality in school buildings and student performance. *Building and Environment* 2021; 206 (2021) 108390.

Young, BN, Benka-Coker, WO, Weller, ZD, Oliver, S, **Schaeffer, JW**, Magzamen, S. How does absenteeism impact the link between school's indoor environmental quality and student performance? *Building and Environment* 2021; 203 (2021) 108053

**Schaeffer, JW**, Adgate JL, Reynolds SJ, Butler-Dawson J, Krisher L, Dally M, Johnson RJ, James KA, Jaramillo D, Newman LS. A Pilot Study to Assess Inhalation Exposures among Sugarcane Workers in Guatemala: Implications for Chronic Kidney Disease of Unknown Origin. 2020. *International Journal of Environmental Research and Public Health*; 17: 5708. PMID: 32784623

Root, K*, Magzamen, S., Sharp, J., Van Dyke, M., Reynolds, S., **Schaeffer, JW**. Application of the Environmental Relative Moldiness Index in Indoor Marijuana Grow Operations. *Annals of Work Exposures and Health* 2020; 64: 728. PMID: 32706020

Martenies, S., **Schaeffer, JW.**, Erlandson, G*, Bradford, M., Poole, JA., Wilson A., Reynolds, S., Magzamen, S. Associations Between Bioaerosol Exposures and Lung Function Changes Among Dairy Workers in Colorado 2020. *Journal of Occupational and Environmental Medicine* [Epub ahead of print]

Erlandson, G*, Magzamen, S, Carter, E, Sharp, J, Reynolds, S, **Schaeffer, JW**. Characterization of Indoor Air Quality on a College Campus: A Pilot Study. *International Journal of Environmental Research and Public Health* 2019; 16: 2721. PMID: 31366132

**Schaeffer, JW**, Chandler, JC, Davidson, M, Magzamen, SL, Pérez-Méndez, A, Reynolds, SJ, Goodridge, LD, Volckens, J, Franklin, AB, Shriner, SA, Bisha, B. (2018) Detection of Viruses from Bioaersols using the Anion Ion Exchanger. Journal of Visualized Experiments (JoVE)

Davidson, M.E., **Schaeffer, J.W.,** Clark, M.L., Magzamen, S., Brooks, E.J., Keefe, T.J., Bradford, M., Roman-Muniz, N., Mehaffy, J.M., Dooley,G., Poole, J., Mitloehner, F.M., Reed, S., Schenker, M.B., Reed, S. and Reynolds, SJ. Personal Exposure of Dairy Workers to Dust, Endotoxin, Muramic Acid, Ergosterol and Ammonia on Large-Scale Dairies in the High Plains Western United States. Journal of Occupational and Environmental Hygiene in press

**Schaeffer, J.W.,** Reynolds, S.J., Magzamen, S., VanDyke, A., Gottel, NR, Gilbert, JA, Owens, SM, Hampton-Marcell, JT, Volckens, J. (2017) Size, Composition, and Source Profiles of Inhalable Bioaerosols from Colorado Dairies. Environmental Science & Technology PMID: 28492313

Chandler, JC, **Schaeffer, JW**, Davidson, M, Magzamen, SL, Pérez-Méndez, A, Reynolds, SJ, Goodridge, LD, Volckens, J, Franklin, AB, Shriner, SA, Bisha, B. (2017) A method for the improved detection of aerosolized influenza viruses and the male-specific (F+) RNA coliphage MS2. Journal of Virological Method 246: 38-41

Nonnenmann MW, Gimeno, D, Levin, J, Douphrate, D, Boggaram, V, **Schaeffer JW**, Gallagher, M, Hornick, M, Reynolds SJ. (2017) Pulmonary function and airway inflammation among dairy parlor workers after exposure to inhalable aerosols. American Journal of Industrial Medicine 60: 255-263

Magzamen, S., Mayer, AP., Barr, S., Bohren, L., Dunbar, B., Manning, D., Reynolds, S.J., **Schaeffer, J.W.**, Suter, J., Cross, JE. (2016) A Multidisciplinary Research Framework on Green Schools: Infrastructure, Social Environment, Occupant Health and Performance. Journal of School Health 87 (5): 376-387

Magzamen, S., Mayer, AP., **Schaeffer, J.W.**, and Reynolds, S.J. (2105) Advancing A Multidisciplinary Research Framework On School Environment, Occupant Health And Performance. Indoor Air 25 (5): 457-461

Arteaga, V.E., Mitchell, D.C., Matt, G.E., Quintana, P.J.E., **Schaeffer, J.W.**, Reynolds, S.J., Schenker, M.B., Mitloehner, F.M.(2015) Occupational Exposure to Endotoxin in $PM_{2.5}$ and Pre and Post-Shift Lung Function in California Dairy Workers. Journal of Environmental Protection 6: 552-565

Hawley, B., **Schaeffer, J.W.**, Poole, J.A., Dooley, G.P., Reynolds, S.J., Volckens, J.(2015). Differential Response of Human Nasal and Bronchial Epithelial Cells Upon Exposure to Size-fractionated Dairy Dust. Journal of Toxicology and Environmental Health, Part A 78: 583-594

**Schaeffer JW**, Sargent L, Sandfort D, Brazile W.(2013). A Comparison of Two Sampling Methods for the Detection of Airborne Methylene Bisphenyl Diisocyanate. Journal of Occupational and Environmental Hygiene 10: 213-221

Reynolds SJ, Nonnenmann MW, Basinas I, Davidson M, Elfman L, Gordon J, Kirychuck S, Reed S, **Schaeffer JW**, Schenker M, Schlunssen V, Sigsgaard T.(2013). Systematic Review of Respiratory Health Among Dairy Workers. Journal Agromedicine 18 (3): 219-43

Martyny JW, Serrano KA, **Schaeffer JW**, Van Dyke MV.(2013). Potential Exposures Associated with Indoor Marijuana Growing Operations. Journal of Occupational and Environmental Hygiene 10:622-639

**Other Publications**

2015    One Health White Paper: Antimicrobial Resistance. Colorado State University.
        Other Contributors: Keith Belk, Sheryl Magzamen, Paul Morley, Noelle Noyes, Stephen Reynolds, and Claire Tucker (lead author)

2001    The Synthesis of 1-(4-Mecaptophenyl)-1, 1-di-(4-hydroxyphenyl) ethane (MDHE) Template Molecule for the Development of a Molecularly Imprinted Sol-Gel Based Chemical Sensor for the Quantitation of DDT (1,1-Bis(4-chlorophyenyl)-2,2,2-trichloroethane). Undergraduate Thesis Submitted in Partial Fulfillment of the Requirements for the Degree of Bachelor of Arts.

**Podium and Poster Presentations**

### Podium Presentations

**Schaeffer, JW**. Bioaerosol Exposures and Health Implications. Fluids and Health Conference. Cargèse, Corsica/France. July 2019.

**Grant Erlandson,** Kyle S. Root, Sheryl Magzamen , Stephen J. Reynolds & Joshua W. Schaeffer. Influence of Building Type on Indoor Air Pollutants on a College Campus. American Industrial Hygiene Conference and Exposition, 2018.

**Schaeffer, JW**, Magzamen S, Reynolds, S. A day in the life of a dairy worker: Part I. International Society for Exposure Sciences, Durham, North Carolina, October 15-17, 2017.

Reynolds, S., Magzamen S, **Schaeffer, JW.** A day in the life of a dairy worker: Part II. International Society for Exposure Sciences, Durham, North Carolina, October 15-17, 2017.

Reynolds, SJ, VanDyke A, Magzamen S, **Schaeffer, JW.** Dairy Exposures to Airborne Endotoxins and B-Glucans. NIOSH State of the Science Meeting, Denver, Colorado, June 21-23, 2017.

Reynolds, SJ, **Schaeffer, JW,** Magzamen S, Burket, V, VanDyke A, Mehaffy, J, Escobar, M, Anderson, K, Tooker, B, Brindley, S, Newman, L, Volckens, J, Magzamen, S. Dairy bioaerosol exposures and inflammatory markers in workers: A panel study. NIOSH State of the Science Meeting, Denver, Colorado, June 21-23, 2017.

VanDyke A**, Schaeffer, JW,** Magzamen S, Reynolds, S. Dairy Exposures to Airborne Endotoxins and B-Glucans. American Industrial Hygiene Conference and Exposition, Seattle, Washington, June 4-7th, 2017.

Ellwood, C, **Schaeffer, JW**, Luna, B. The AIHA-RMS International Committee – Who we are, What we do, and How you Benefit. American Industrial Hygiene Association Rocky Mountain Section/American Society of Safety Engineers Fall Technical Conference, Arvada, Colorado, September, 19, 2017.

J.C. Chandler, **J.W. Schaeffer**, M. Davidson, S.L. Magzamen, A. Pérez-Méndez, S.J. Reynolds, L.D. Goodridge, J. Volckens, A.B. Franklin, S.A. Shriner, and B. Bisha. A Method for the Improved Detection of Aerosolized Influenza Viruses Using Impingers That Incorporate Anion Exchange Resin. International Association for Food Protection Annual meeting, Tampa, FL., July 9-12, 2017.

**Schaeffer, JW**, Magzamen S, Noyes N, VanDyke A, Tryon, J, Bradford, M, Davidson M, Escobar M, Owens, S, Marcell, J, Volckens J and Reynolds, SJ. Agricultural Dust in the Wind: Microbial Communities and their Resistant Genes. Nordic Meeting on Agricultural Occupational Health & Safety, Bilund, Denmark. August 25, 2016

Reynolds, SJ, Schaeffer, JW, Magzamen S, VanDyke A, Davidson M, Mehaffy J, Escobar M, Anderson K, Tooker, B, Brindley, S, Newman, L, Volkcens J. Cytokine Profiles Among Dairy Workers. Nordic Meeting on Agricultural Occupational Health & Safety, Bilund, Denmark. August 25, 2016

**Schaeffer, JW**, Podium: Large Particle Exposures and Attendant Health Effects Among Dairy Workers: Progress and Future Directions. International Congress on Rural Health, Lodi, Italy. September 09, 2015

Kimberly Anderson, **Josh Schaeffer**, John Mehaffy, Jessy Tryon, Amanda VanDyke, Mary Bradford, Stephen Reynolds, Renee Anthony, Darrah Sleeth, John Volckens.  Inhalable Particulate Exposure in Colorado Dairies. American Association for Aerosol Research Conference in October 2015, Minneapolis, MN.

Chandler, JC, Davidson, M, **Schaeffer, JW**, Pérez-Méndez, A, Volckens, J, Magzamen, S, Goodridge, LD, Reynolds, S, and Bisha, B. Development of an Improved Sampling Method for Concentrating Viruses from Bioaerosols. 2015 International Association for Food Protection Annual Meeting.  25-28 July, 2015. Portland, OR.

Reed, S., **Schaeffer, JW,** Podium: Bioaerosol Measurements and Worker Exposure on Australian Dairies. American Industrial Hygiene Conference and Exposition, Salt Lake City, Utah. June 3, 2015

**Schaeffer, JW,** Podium: Interventions to reduce microbial exposures and improve respiratory health among dairy farm workers. American Industrial Hygiene Conference and Exposition, Salt Lake City, Utah. June 3, 2015

Davidson ME, **Schaeffer JW**, Reed S and Reynolds SJ. Bioaerosol sampling in the 21st Century: is there still a place for culture-based assessments? AIOH Annual Conference; Melbourne; 2014

**Schaeffer, JW,** Davidson, M.E., Van Dyke, A., Krause, L., Tryon, J., Bradford, M., Volckens, J., Reynolds, S.J., Podium: Microbial Communities of Inhalable Bioaerosols at Colorado Dairies. 7th International Symposium: Safety & Health in Agricultural & Rural Populations: Global Perspectives, Saskatoon, Saskatchewan. October 22, 2014

Davidson, M.E., **Schaeffer, JW**, Volckens, J., Reynolds, S.J., Podium: Extraction of RNA from Rhino-Probe™ Samples: The Good, the Bad and the Ugly. 7th International Symposium: Safety & Health in Agricultural & Rural Populations: Global Perspectives, Saskatoon, Saskatchewan. October 22, 2014

**Schaeffer, JW**, Davidson, M.E., Van Dyke, A., Krause, L., Tryon, J., Bradford, M., Volckens, J., Reynolds, S.J., Podium: Size Characterization and Composition of Inhalable Bioaerosols at Colorado Dairies. Nordic Meeting on Agricultural Occupational Health & Safety, Porvoo, Finland. August 26, 2014

Davidson, M.E., **Schaeffer, JW**, Hawley, B., Bradford, M., Volckens, J., Reynolds, S.J., Podium: Use of Rhino-Probe™ Sampling for Analyzing Cross-Shift Variation in the Expression of IL8, IL6 and TNF alpha in Nasal Epithelial Cells from Colorado Dairy Workers. Nordic Meeting on Agricultural Occupational Health & Safety, Porvoo, Finland. August 26, 2014

### Poster Presentations

Erlandson, G*, Reynolds, S, Magzamen, S, Fierer, N, Sharp, J, Nonnenmann, M, , Jones, K, Sharp, J, Wickum*, **Schaeffer, JW**. Effectiveness of a Low-Cost Intervention: Changes to Cytokines and Microbiome Among Bioaerosol Exposed Dairy Workers [virtual poster presentation]. American Industrial Hygiene Conference & Exposition. May 2020.

Erlandson, G*, Reynolds, S, Magzamen, S, Fierer, N, Sharp, J, Nonnenmann, M, , Jones, K, Sharp, J, Wickum*, **Schaeffer, JW**. Hypertonic Saline Rinse and Its Effect on Nasal Inflammation and Microbiome in Dairy Workers [virtual poster presentation]. Mountains and Plains Educational Research Center Research Day. March 2020

Nunez, J*, Reynolds, S, Bisha, B, Erlandson, G*, Seidel, J*, Bradford, M, **Schaeffer, JW**. Carriage of MRSA Among Dairy Farm Workers in the High Plains [virtual poster presentation]. Mountains and Plains Educational Research Center Research Day/American Industrial Hygiene Conference & Exposition. March/May 2020

Seidel, J*, Erlandson, G*, Labadie, J, Magzamen, S, Sharp, J, Jones, K, Nonnenmann, M, Reynolds, S, **Schaeffer, JW**. Does the use of a nasal lavage intervention improve pulmonary function for dairy workers? [virtual poster presentation]. Mountains and Plains Educational Research Center Research Day/American Industrial Hygiene Conference & Exposition. March/May 2020

Seidel, J*, Magzamen, S, Erlandson, G*, Labadie, J, , Sharp, J, Jones, K, Nonnenmann, M, Reynolds, S, **Schaeffer, JW** Does the use of a nasal lavage intervention improve pulmonary function for dairy workers? [oral presentation]. Colorado State University's CVMBS Research Day. Fort Collins, CO. January 2020

Erlandson, G, Reynolds, S, Magzamen, S, Nonnenmann, M, Jones, K, Sharp, J, Wickum, A, **Schaeffer, JW**. Hypertonic Saline Nasal Lavage Intervention in Dairy Workers [poster presentation]. Joint Annual Meeting of the International Society of Exposure Science and International Society of Indoor Air Quality and Climate. Kaunas, Lithuania. August 2019

Erlandson, G, Reynolds, S, Magzamen, S, Nonnenmann, M, Jones, K, Sharp, J, Wickum, A, **Schaeffer, JW**. Hygienic Intervention and Its Effect on Nasal Inflammation and Microbiome in Dairy Workers [poster presentation]. Western Agricultural Safety and Health Conference. Seattle, WA. August 2019

Nunez, J, Reynolds, S, Bisha, B, Erlandson, G, Seidel, J, Bradford, M, **Schaeffer, JW**. Carriage of MRSA Among Dairy Farm Workers in the High Plains [poster presentation]. Western Agricultural Safety and Health Conference. Seattle, WA. August 2019

**Grant Erlandson**, Stephen Reynolds, Sheryl Magzamen, Matthew Nonnenmann, Ken Jones, Julia Sharp, Annie Wickum, and Joshua Schaeffer. HYPERTONIC SALINE NASAL LAVAGE INTERVENTION IN DAIRY WORKERS. Mountain and Plains Education Research Center Research Day, 2019/ American Industrial Hygiene Conference and Exposition, 2019 / Mountain and Plains Education Research Center Research Day, 2020.

  ➢ **AIHA Rocky Mountain Local Section Best Industrial Hygiene Poster (2020)**
  ➢ **AIHA Occupational and Environmental Epidemiology Committee Best Student Poster (2018)**
  ➢ **AIHA Social Concerns Committee Best Student Poster (2018)**

Isaacs, C, Magzamen, S, Reynolds, S, **Schaeffer, JW**. Indoor Air Quality in Elementary Schools in North Denver [poster presentation]. American Industrial Hygiene Conference & Exposition. Minneapolis, MN. May 2019

Isaacs, C, Magzamen, S, Reynolds, S, Schaeffer**, JW**. Indoor Air Quality in Elementary Schools in North Denver [poster presentation]. Celebrate Undergraduate Research and Creativity Symposium. Fort Collins, CO. April 2019
> **High Honors Award**

Kyle S. Root, Julia L. Sharp, Sheryl Magzamen, Stephen J. Reynolds, Michael Van Dyke, **Joshua W. Schaeffer**. The Fungal Burden of Indoor Marijuana Grow Operations: ERMI VS. Microscopy: The Application of the Environmental Relative Moldiness Index in Indoor Marijuana Grow Operations, (Presented at the 2018 American Industrial Hygiene Conference and Exposition, May 21-23, 2018, Philadelphia, PA), Student Presenter, Poster,
> **Biosafety and Environmental Microbiology Committee Best Student Poster**

Isaacs, C, Izzo, I, Volcken, J, Reynolds, S, Schaeffer, JW. Air-Liquid Interface Culture for Assessing Bioaerosol-Induced Airway Inflammation [poster presentation]. Celebrate Undergraduate Research and Creativity Symposium. Fort Collins, CO. April 2018
> **High Honors Award**

Kyle S. Root, Julia L. Sharp, Sheryl Magzamen, Stephen J. Reynolds, Michael Van Dyke, **Joshua W. Schaeffer**. Indoor Marijuana Grow Operations: Estimation of Fungal Burden Utilizing the Environmental Relative Moldiness Index (ERMI). The16[th] Annual Regional National Occupational Research Agenda (NORA) Young/New Investigators Symposium, Salt Lake City, UT, April 19-20, 2018

Kyle S. Root, Julia L. Sharp, Sheryl Magzamen, Stephen J. Reynolds, Michael Van Dyke, **Joshua W. Schaeffer**. Is the Environmental Relative Moldiness Index Suitable for Indoor Marijuana Grow Operations? The 2018 Mountain and Plains Education and Research Center Research Day, Broomfield, CO, April 5, 2018

Stenkamp-Strahm, C, Magzamen, S, McConnel, C, Abdo, Z, VanDyke-Gonnerman, A, **Schaeffer, J**, Reynolds, S. Microbial community drivers of E. coli O157 shedding in early lactation dairy cattle. International Association for Food Protection Annual Meeting, Tampa, FL, July 9-12, 2017.

Erlandson, G, Root, KS, Magzamen, S, Reynolds, SJ, **Schaeffer, JW**.  Influence of Building Type on Indoor Pollutants on a College Campus. American Industrial Hygiene Conference and Exposition, Seattle, Washington, June 4-7[th], 2017.

Erlandson, G, Root, KS, Magzamen, S, Reynolds, SJ, **Schaeffer, JW**.  Pilot Indoor Air Quality Study in Three Higher Education Buildings.  8th Annual Mountain and Plains Education Research Center Research Day Symposium, Westminster, Colorado, March 09, 2017.

> **Best Poster Award**

VanDyke, A, **Schaeffer, JW**, Magzamen, S, Krause, L, Reynolds, SJ. Task Based Exposure to Airborne Endotoxins and β-Glucans Among Dairy Workers. American Industrial Hygiene Conference and Exposition, Baltimore, Maryland. May 25, 2016
> **2nd Place Best Overall Poster Award**
> **2nd Place Best Student Poster Award**

**Schaeffer, JW**, Davidson, ME., Epperson, LE., Reynolds, SJ., Strong, M. and Davidson, RM. Microbial sampling and metagenomics approaches for workplace exposure studies. 7th Annual Mountain and Plains Research Day Symposium, Westminster, Colorado. March 26, 2015

Escobar, M., **Schaeffer, JW**, McConnel, C., Davidson, M., and Reynolds, S., Poster: Occupational Exposure to Antibiotic Resistant Bacteria During Calf-Rearing on a Colorado Dairy. 7th Annual Mountain and Plains Research Day Symposium, Westminster, Colorado. March 26, 2015

> **Best Poster Award**

Van Dyke, A., **Schaeffer, JW**, Davidson, M.E., Bisha, B., Hanson, J.D.H., Reynolds, S.J., Poster: Comparative Analysis of Bacterial and Fungal Communities in Three Dairy Parlors Through the Use of Pyrosequencing, Riboprinting, Culture Techniques, and Microscopy. 7th International Symposium: Safety & Health in Agricultural & Rural Populations: Global Perspectives, Saskatoon, Saskatchewan. October 21, 2014

Van Dyke, A., **Schaeffer, JW**, Davidson, M.E., Bisha, B., Hanson, J.D.H., Reynolds, S.J., Poster: Effect of Environmental Factors on Isolation and Identification of Potential Pathogenic Species of Bacteria and Fungi from Bioaerosols in Three Dairy Parlors. American Industrial Hygiene Conference and Exposition, San Antonio, Texas. June 4, 2014

> ➤ **Best Microbiology Student Poster Award**

Krause, L., **Schaeffer, JW**, Van Dyke, A., Davidson, M.E., Bisha, B. Reynolds, S.J., Poster: Evaluation of Bacterial Preservation During Air Sampling of Culturable Bioaerosols. Celebrate Undergraduate Research and Creativity Symposium (CURC), Fort Collins, Colorado. April 15, 2014

> ➤ Also presented at American Industrial Hygiene Conference and Exposition, San Antonio, Texas. June 4, 2014

Moses, X.J.E, Newman, L.S., Kosnett, M.J., Reynolds, S.J., **Schaeffer, JW**, Tarasova, M., Poster: Indoor Air Quality: An Investigation into a Unique Building. American College of Occupational and Environmental Medicine & American Occupational Health Conference, Baltimore, Maryland. May 3, 2014

**J.Schaeffer,** M. Davidson, B. Bisha, T. Keefe, S. Reynolds, Poster: Modeling and Predicting Microbiomes in Dairies: A Metagenomic Assessment of Bioaerosols. CDC/NIOSH Mountain and Plains Education Research Center Research Day, Golden, Colorado. April 3, 2014

**Schaeffer, JW**, Volckens, J., VanDyke-Gonnerman, A., Davidson, M., Reynolds, SJ., Poster: Particle Size Characterization of Agricultural Aerosols in Two Colorado Dairies using a High-Volume Cloud Impactor. American Industrial Hygiene Conference and Exposition, Montreal, Canada. May 18, 2013

VanDyke-Gonnerman, A., Reynolds, S., Davidson, M., **Schaeffer, JW**, Poster: Comparative Analysis of Bacteria and Fungi Communities Through the Use of Pyrosequencing, Ribotyping, Culture Techniques, and Microscopic Analysis in Two Dairy Parlors. American Industrial Hygiene Conference and Exposition, Montreal, Canada. May 18, 2013

> ➤ **Best Microbiology Student Poster Award**

Middaugh, B., McGlothlin, J.D., **Schaeffer, JW**, Major, D., Poster: Two Decades of Student Research. American Industrial Hygiene Conference and Exposition, Portland, Oregon. May 14, 2011

**Schaeffer, JW**, Middaugh, B., Major, D., Poster: A Review: NIOSH Education and Research Centers. American Industrial Hygiene Conference and Exposition, Portland, Oregon. May 14, 2011

**Schaeffer, JW,** Sandfort, D., Brazile, W.J., Poster: Evaluation of Field and Laboratory Desorbed Sample Methodologies for Airborne Aromatic Diisocyanate Monomers, Specifically Methylene Bisphenyl Diisocyanate (MDI) and Toluene Diisocyanate (TDI) to Accurately Determine Worker Exposure. Mountain and Plains Education Research Center Third Annual Research Symposium, Loveland, CO. November 11, 2010

**Schaeffer, JW,** Stoke, S., Stinson, K., Witter, R., Poster: Potential Health Hazards at an Art School in Denver. American Public Health Association, Denver, CO. November 10, 2010

**Schaeffer, JW,** Sandfort, D., Brazile, W.J., Poster: Evaluation and Resolution of Field and Laboratory Desorbed Sample Methodologies for Airborne Methylene Bishphenyl Diisocyanate (MDI) to Accurately Determine Worker Exposure. Mountain and Plains Education Research Center Occupational and Environmental Health Research Symposium, Denver, CO. January 16, 2009

EXHIBIT B

**Dr. Joshua Schaeffer's Materials Considered List (*Salas v. Monsanto Co.*)**

1. Abdelghani, A., *Assessment of the Exposure of Workers Applying Herbicide Mixtures (2,4-D + Roundup, Garlon-3A + Roundup), Toxicity and Fate of These Mixtures in the Environment* (June 30, 1995) [MONGLY00296949 – MONGLY00296997].

2. Acquavella, J. et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, 112 Envtl. Health Persp. 321 (2004).

3. Anadon, A., *Toxicokinetics of Glyphosate and its Metabolite Aminometyhl Phosphonic Acid in Rats*, 190 Toxicology Letters 91 (2009).

4. Andreotti, G. et al., *Glyphosate Use and Cancer Incidence in the Agricultural Health Study*, 110(5) J. Nat'l Cancer Inst. 509 (2018).

5. Andreotti, G. et al., *Response to Sheppard and Shaffer*. 111(2) J. Nat'l Cancer Inst. 216 (2019).

6. APVMA (Australian Pesticides and Veterinary Medicines Authority), *Regulatory Position: Consideration of the Evidence for a Formal Reconsideration of Glyphosate*, Australian Government (2016).

7. APVMA, *Final Regulatory Position: Consideration of the Evidence for a Formal Reconsideration of Glyphosate*, Australian Government (2017).

8. Armstrong, T.F., *Additional Information to Support the Registration of Roundup® Herbicide, Rodeo® Herbicide, Landmaster® Herbicide, Shackle® Herbicide, Roundup® L&G Herbicide, Shackle® C Herbicide, and Polado® Plant Growth Regulator – Selected Product Chemistry to Support the Continued Registration of Glyphosate (N-Phosponomethylglycine)* (June 30, 1986) [MONGLY00141067-MONGLY00141285].

9. ATSDR (Agency for Toxic Substances and Disease Registry), *Toxicological Profile for Glyphosate – Draft for Public Comment*, US Dep't of Health and Human Services (Mar. 2019).

10. Babu, R. et al., *The Influence of Various Methods of Cold Storage of Skin on the Permeation of Melatonin and Nimesulide*, 86 J. Controlled Release 49 (2003).

11. Beasley, R.K. et al., *Product Chemistry to Support the Continued Registration of Glyphosate (N-Phosponomethylglycine)* (June 1989) [MONGLY00529582-MONGLY00529611].

12. Benson, B., *21-Day Dermal Toxicity Study in Rabbits* (Mar. 10, 1982) [MONGLY02020607 – MONGLY02020798].

13. BfR (Bundesinstitut für Risikobewertung), *Assessment of IARC Monographies Volume 112 (2015); Glyphosate, Renewal Assessment Report: Glyphosate Addendum I to RAR* (2015).

14. BfR Press Release, *Glyphosate assessment: BfR rejects plagiarism accusations* (Sept. 20, 2017).

15. BfR, *Toxicology and Metabolism, Renewal Assessment Report: Glyphosate*, Volume 3 Annex B.6 (2015).

1

16. Bleeke, M., *MON 78294: An Applicator Exposure Study Conducted in Spain (Autumn 2005) Using Biomonitoring*, Charles River Laboratories (Oct. 11, 2007) [MONGLY00668430 – MONGLY00668967].

17. Boffetta, P. et al., *Exposure to Glyphosate and Risk of Non-Hodgkin Lymphoma: an Updated Meta-Analysis,* 112 Med. del Lavoro 194 (2021).

18. Brewster, D. et al., *Metabolism of Glyphosate in Sprague-Dawley Rats: Tissue Distribution, Identification, and Quantification of Glyphosate-Derived Materials following a Single Oral Dose*, 17 Fundamental and Applied Toxicology 43 (1991).

19. BROWSE, *Bystanders, Residents, Operators and WorkerS Exposure Models for Plant Protection Products* (2013).

20. Chan, P. & J. Mahler, *NTP Technical Report on Toxicity Studies of Glyphosate Administered in Dosed Feed to F344/N Rats and B6C3F Mice*, US Dep't of Health and Human Services, Public Health Service, Nat'l Inst. of Health (July 1992).

21. Chu, I. et al., *Skin Reservoir Formation and Bioavailability of Dermally Administered Chemicals in Hairless Guinea Pigs*, 34 Food & Chem. Toxicology 267 (1996).

22. Coble, J. et al., *An Updated Algorithm for Estimation of Pesticide Exposure Intensity in the Agricultural Health Study*, 8 Int'l J. Envtl. Res. Pub. Health 4608 (2011).

23. Colvin, J., *Final Report on CP 67573 Residue and Metabolism: The Dynamics of Accumulation and Depletion of Orally Ingested N-Phosphonomethylglycine-14C*, Monsanto Company (Sept.-Oct., 1973) [MONGLY00432084 – MONGLY00432090].

24. Connolly, A. et al., *Characterising Glyphosate Exposures among Amenity Horticulturists Using Multiple Spot Urine Samples*, 221 Int'l J. Hygiene & Envtl. Health 1012 (2018).

25. Connolly, A. et al., *Evaluating Glyphosate Exposure Routes and Their Contribution to Total Body Burden: A Study among Amenity Horticulturalists*, 63(2) Annals of Work Exposures and Health 133 (2019).

26. Connolly, A. et al., *Exploring the Half-Life of Glyphosate in Human Urine Samples*, 222(2) Int'l J. Hygiene & Envtl. Health 205 (2018).

27. Connolly, A. et al., *Exposure Assessment Using Human Biomonitoring for Glyphosate and Fluroxypyr Users in Amenity Horticulture*, 220 Int'l J. Hygiene & Envtl. Health 1064 (2017).

28. Connolly, A. et al., *Glyphosate in Irish Adults-A Pilot Study in 2017*, 165 Int'l J. Hygiene & Envtl. Health 235 (2017).

29. Connolly, A. et al., *Sensitive and Selective Quantification of Glyphosate and Aminomethylphosphonic Acid (AMPA) In Urine of the General Population by Gas Chromatography-Tandem Mass Spectrometry*, 1158 J. Chromatography B 122348 (2020).

30. Cowell, J. & J. Steinmetz, *Assessment of Forest Worker Exposures to Glyphosate during Backpack Foliar Applications of Roundup® Herbicide* (Mar. 1990) [MONGLY00155787 – MONGLY00155805].

31. Cowell, J. & J. Steinmetz, *Assessment of Forestry Nursery Workers Exposure to*

2

*Glyphosate during Normal Operations* (Feb. 1990) [MONGLY00155594 – MONGLY00155613].

32. Crump, K., *The Potential Effects of Recall Bias and Selection Bias on the Epidemiological Evidence for the Carcinogenicity of Glyphosate*, 40(4) Risk Analysis 696 (2019).

33. Curwin, B. et al., *Urinary and Hand Wipe Pesticide Levels Among Farmers and Non-Farmers in Iowa*, 15 J. Exposure Analysis & Envtl. Epidemiology 500 (2005).

34. Curwin, B. et al., *Urinary Pesticide Concentrations Among Children, Mothers and Fathers Living in Farm and Non-Farm Households in Iowa*, 51 Annals of Occupational Hygiene 53 (2007).

35. Davies, D., *360 g/L Glyphosate SL Formulation (MON 76879) – In Vitro Absorption through Human Dermatomed Skin using [14C]-Glyphosate* (Aug. 8, 2017) [MONGLY08731728 – MONGLY08731783].

36. Davies, D., *500 g/L Glyphosate SL Formulation (MON 76952) – In Vitro Absorption through Human Dermatomed Skin using [14C]-Glyphosate* (Aug. 2, 2016) [MONGLY08731670 – MONGLY08731727].

37. Davies, D., *7.2g/L Glyphosate Gel Formulation (MON 76258) – In Vitro Absorption through Human Dermatomed Skin using [14C]-Glyphosate* (Apr. 27, 2015) [MONGLY08731571 – MONGLY08731681].

38. Davies, D., *72g/L Glyphosate Gel Formulation (MON 76829) – In Vitro Absorption through Human Dermatomed Skin using [14C]-Glyphosate* (Apr. 16, 2015) [MONGLY08731524 – MONGLY08731570].

39. De Roos, A. et al., *Cancer Incidence among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study*, 113 Envtl. Health Persp. 49 (2005).

40. De Roos, A. et al., *Integrative Assessment of Multiple Pesticides as Risk Factors for Non-Hodgkin's Lymphoma among Men*, 60 J. Occupational & Envtl. Med. E11 (2003).

41. Declaration of Martha Sandy, Ph.D., in Support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment and Defendant's Cross-Motion for Summary Judgment, *National Ass'n of Wheat Growers v. Xavier Becerra*, No. 2:17-cv-02401 (E.D. Cal. Dec. 11, 2019), ECF No. 127.

42. Deposition of Daniel Bucks, Ph.D., *Winston v. Monsanto Co.*, No. 1822-CC00515 (Mo. Cir. Ct. St. Louis City Sept. 17, 2019) (only pages 107-108, 187-194).

43. Deposition of Nancy Salas, *Salas v. Monsanto Co.*, No. 3:21-cv-06173 (N.D. Cal. Dec. 9, 2021) (with exhibits).

44. Deposition of William Sawyer, *Bognar v. Monsanto Co.*, No. 18SL-CC02199 (Mo. Cir. Ct. St. Louis Cty. Jan, 10, 2020).

45. Deposition of William Sawyer, *Kane v. Monsanto Co.*, No. 1622-CC10172 (Mo. Cir. Ct. St. Louis City Jan. 11-12, 2020).

46. Deposition of William Sawyer, Ph.D., *Cazier v. Monsanto Co.*, No. DC-17-833C (Jud. Dist. Ct. Gallatin Cty. Apr. 30, 2019).

47. Deposition of William Sawyer, Ph.D., *Johnson v. Monsanto Co.*, No. CGC-16-550128

(Cal. Super. Ct. S.F. Cty. Feb. 26-27, 2018).

48. Deposition of William Sawyer, Ph.D., *Peterson v. Monsanto Co.*, No. 1622-CC01071 (Mo. Cit. Ct. St. Louis City Aug. 23, 2018).

49. Deposition of William Sawyer, Ph.D., *Peterson v. Monsanto Co.*, No. 1622-CC01071 (Mo. Cit. Ct. St. Louis City Oct. 16, 2018).

50. Deposition of William Sawyer, Ph.D., *Pilliod v. Monsanto Co.*, No. RG17862702 (Cal. Super. Ct. Alameda Cty. Feb. 6, 2019).

51. Deposition of William Sawyer, Ph.D., *Stevick v. Monsanto Co.*, No. 16-cv-02341-VC (N.D. Cal. Dec. 20, 2018).

52. Deposition of William Sawyer, *Seitz v. Monsanto Co.*, No. 1722-CC11325 (Mo. Cir. Ct. St. Louis City Jan. 14-15, 2020).

53. Deposition of William Sawyer, *Whitby v. Monsanto Co.*, No. 19SL-CC04020 (Mo. Cir. Ct. St. Louis Cty. Jan. 22, 2020).

54. Donato, F. et al., *Exposure to Glyphosate and Risk of Non-Hodgkin Lymphoma and Multiple Myeloma: An Updated Meta-Analysis*, 111 La Medicina Del Lavoro 63 (2020).

55. Dosemeci, M. et al., *A Quantitative Approach for Estimating Exposure to Pesticides in the Agricultural Health Study*, 46 Annals of Occupational Hygiene 245 (2002).

56. Durkin, P., *Glyphosate – Human Health and Ecological Risk Assessment Final Report*, Syracuse Environmental Research Associates, Inc. (May 25, 2011) [MONGLY00310942 – MONGLY00311277].

57. ECHA (European Chemicals Agency), *Opinion: Proposing Harmonized Classification and Labelling at EU Level of Glyphosate (ISO); N-(phosphonomethyl)glycine*, Committee for Risk Assessment (Mar. 15, 2017).

58. Edmiston, S. et al., *Exposure of Herbicide Handlers in the Caltrans Vegetation Control Program*, Cal. EPA (Apr. 27, 1995) [MONGLY00311960 – MONGLY00312005].

59. EFSA (European Food Safety Authority), *Conclusion on the Peer Review of the Pesticide Risk Assessment of the Active Substance Glyphosate*, 13 EFSA J. 4302 (2015).

60. EFSA, *Guidance on Dermal Absorption*, 15(6) EFSA Journal 4873 (2017).

61. EFSA, *Guidance on Dermal Absorption*, EFSA Panel on Plant Protection Products and their Residues (2012).

62. EFSA, *Guidance on the Assessment of Exposure of Operators, Workers, Residents and Bystanders in Risk Assessment for Plant Protection Products* (2014).

63. EPA (Environmental Protection Agency), *Dermal Exposure Assessment: A Summary of EPA Approaches*, Nat'l Ctr. for Envtl. Off. of Res. and Dev. (Sept. 2007).

64. EPA, *Glyphosate – Interim Registration Review Decision Case Number 0178* (Jan. 2020).

65. EPA, *Glyphosate – Proposed Interim Registration Review Decision Case Number 0178* (Apr. 2019).

66. EPA, *Integrated Risk Information System (IRIS), Chemical Assessment Summary of*

*Glyphosate; CASRN 1071-83-6* (1993).

67. EPA, *Label Review Manual Chapter 10: Worker Protection Label* (Feb. 2016).

68. EPA, Memorandum from Dana L. Friedman on *Response from the Pesticide Re-Evaluation Division (PRD) to Comments on the Glyphosate Proposed Interim Decision* (Jan. 16, 2020).

69. EPA, Memorandum from David J. Miller on *Glyphosate: Epidemiology Review of Zhang et al. (2019) and Leon et al. (2019) Publications for Response to Comments on the Proposed Interim Decision* to Christine Olinger (Jan. 16, 2020).

70. EPA, Memorandum from Donna Davis, Risk Assessor, RAB VII, Health Effects Division (7509P) on *Alkyl Alcohol Alkoxylate Phosphate and Sulfate Derivatives (AAAPDs and AAASDs – JITF CST 2 Inert Ingredients) Human Health Risk Assessment to Support Proposed Exemption from the Requirements of a Tolerance When Used as Inert Ingredients in Pesticide Formulations* to Kerry Leifer, Team Leader, Inert Ingredient Assessment Branch, Registration Division (7505P) (June 8, 2009).

71. EPA, Memorandum from Donna Davis, Risk Assessor, RAB VII, Health Effects Division (7509P) on *Alkyl Alcohol Alkoxylates (AAA – JITF CST 1 Inert Ingredient) Human Health Risk Assessment to Support Proposed Exemption from the Requirement of a Tolerance When Used as an Inert Ingredient in Pesticide Formulations* to Kerry Leifer, Team Leader, Inert Ingredient Assessment Branch, Registration Division (7505P) (July 14, 2009).

72. EPA, Memorandum from Donna Davis, Risk Assessor, RAB VII, Health Effects Division (7509P) on *Alykl Amine Polyalkoxylates (JITF CST 4 Inert Ingredients) Human Health Risk Assessment to Support Proposed Exemption from the Requirement of a Tolerance When Used as Inert Ingredients in Pesticide Formulations* to Kerry Leifer, Team Leader, Inert Ingredient Assessment Branch, Registration Division (7505P) (April 3, 2009).

73. EPA, Memorandum from Donna Davis, Risk Assessor, RAB VII, Health Effects Division (7509P) on *Methyl Poly(Oxyethylene) $C_8 – C_{14}$ Alkylammonium Chlorides (MPOACs – JITF CST 7 Inert Ingredients) Human Health Risk Assessment to Support Proposed Exemption from the Requirements of a Tolerance When Used as Inert Ingredients in Pesticide Formulations* to Kerry Leifer, Team Leader, Inert Ingredient Assessment Branch, Registration Division (7505P) (June 2, 2009).

74. EPA, Memorandum from Donna Davis, Risk Assessor, RAB VII, Health Effects Division (7509P) on *Sodium and Ammonium Naphthalensulfonae Formaldehyde Condensates (SANFCs – JITF CST 11 Inert Ingredients) Human Health Risk Assessment to Support Proposed Exemption from the Requirement of a Tolerance When Used as Inert Ingredients in Pesticide Formulations* to Kerry Leifer, Team Leader, Inert Ingredient Assessment Branch, Registration Division (7505P) (May 28, 2009).

75. EPA, Memorandum from Lata Venkateshwara on *Glyphosate: Amended Residential Exposure Assessment for a Registration Review* to Caitlin Newcamp (Dec. 12, 2017).

76. EPA, Memorandum from Monique M. Perron on *Glyphosate: Response to Comments on the Proposed Interim Decision Regarding the Human Health Risk Assessment* to Steven Peterson (Jan. 13, 2020).

77. EPA, Memorandum from Monique Perron, Sc.D., Toxicologist, Risk Assessment Branch 1/Health Effects Division (RAB1/HED; 7509P) on *Glyphosate: Draft Human Risk*

*Assessment in Support of Registration Review*, to Caitlin Newcamp, Chemical Review Manager, Pesticide Reevaluation Division (PRD; 7508P) (Dec. 12, 2017).

78. EPA, Office of Chemical Safety and Pollution Prevention, Letter from Michael L. Goodis, Director of Registration Division, EPA Office of Chemical Safety and Pollution Prevention, on Labeling Requirements for Products that Contain Glyphosate to Registrant (Aug. 7, 2019).

79. EPA, Office of Chemical Safety and Pollution Prevention, Letter from Michael Freedhoff, Ph.D., Assistant Administrator, EPA Office of Chemical Safety and Pollution Prevention on OEHHA Proposition 65 Language to Dr. Lauren Zeise, Director, Office of Environmental Health Hazard Assessment, California Environmental Protection Agency (Apr. 8, 2022).

80. EPA, Office of Pesticide Programs, *Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* (Sept. 12, 2016).

81. EPA, Office of Pesticide Programs, *Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* (Dec. 12, 2017).

82. EPA, Office of Prevention, Pesticides and Toxic Substances, *Health Effects Test Guidelines: OPPTS 870.7600 Dermal Penetration* (August 1998).

83. EPA, *Reregistration Eligibility Decision (RED) – Glyphosate* (Sept. 1993).

84. Eriksson, M. et al., *Pesticide Exposure as Risk Factor for Non-Hodgkin Lymphoma Including Histopathological Subgroup Analysis*, 123 Int'l J. Cancer 1657 (2008).

85. Espanhol-Soares, M. et al., *Procedures to Evaluate the Efficiency of Protective Clothing Worn by Operators Applying Pesticide*, 57(8) Annals of Occupational Hygiene 1041 (2013).

86. European Commission, Assessment Group on Glyphosate, *Procedure and Outcome of the Draft Renewal Assessment Report on Glyphosate, June 2021* (June 15, 2021).

87. Expert Report of William Sawyer regarding Plaintiff Larry Jenkins, *Seitz v. Monsanto Co.*, No. 1722-CC11325 (Mo. Cir. Ct. St. Louis City Jan. 13, 2020).

88. Expert Report of William Sawyer, *Caballero v. Monsanto Co.*, No. MSC 19-01821 (Cal. Super. Ct. Contra Costa Cty. Oct. 31, 2019).

89. Expert Report of William Sawyer, Ph.D., *Salas v. Monsanto Co.*, No. 3:21-cv-06173 (N.D. Cal. Jun. 22, 2022).

90. Faniband, M. et al., *Human Experimental Exposure to Glyphosate and Biomonitoring of Young Swedish Adults,* 231 Int'l J. Hygiene & Env't. Health 113657 (2021).

91. Franz, T., *Evaluation of the Percutaneous Absorption of Roundup Formulations in Man Using an In-Vitro Technique* (Aug. 30, 1983) [MONGLY00135633 – MONGLY00135646].

92. Franz, T., *Percutaneous Absorption: On the Relevance of In Vitro Data*, 64 J. Investigative Dermatology 190 (1975).

93. Gillezeau, C. et al., *The Evidence of Human Exposure to Glyphosate: A Review*, 18 Envtl. Health 2 (2019) with supplementary tables.

94.  Gillezeau, C. et al., *Update on Human Exposure to Glyphosate with A Complete Review of Exposure in Children,* 19 Env't Health 115 (2020).

95.  Guyton, K. et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon, and Glyphosate*, 16 Lancet Oncology 490 (2015).

96.  Hadfield, N., *Glyphosate Acid – In Vitro Absorption Through Abraded Rabbit Skin Using [14C]-Glyphosate* (Apr. 18, 2012) [MONGLY01284534 – MONGLY01284570].

97.  Health and Safety Executive, *Operator Exposure*, http://www.hse.gov.uk/pesticides/topics/pesticide-approvals/pesticides-registration/data-requirements-handbook/operator-exposure.htm.

98.  Health Canada, *Re-evaluation Decision RVD2017-01 Glyphosate*, Health Canada Pest Management Regulatory Agency (Apr. 28, 2017).

99.  Health Canada, *Statement from Health Canada on Glyphosate*, Health Canada Pest Management Regulatory Agency (Jan. 11, 2019).

100.  Hobbs, T. et al., *Measurement of Blood Volume in Adult Rhesus Macaques (Macaca Mulatta)*, 54 J. Am. Ass'n for Lab. Animal Sci. 687 (2015).

101.  Holmgaard, R. & J. Nielsen, *Dermal Absorption of Pesticides – Evaluation of Variability and Prevention*, Danish Ministry of the Environment (2009).

102.  Hoppe, H., *Determination of Glyphosate Residues in Human Urine Samples from 18 European Countries*, Medical Laboratory Bremen (June 6, 2013).

103.  Howe, R. et al., *Metabolism of Glyphosate in Sprague-Dawley Rats. Part II. Identification, Characterization, and Quantification of Glyphosate and its Metabolites after Intravenous and Oral Administration*, Monsanto Report No. MSL-7206 (Feb. 1988) [MONGLY06062970 – MONGLY06063128].

104.  IARC (International Agency for Research on Cancer), *Preamble: IARC Monographs on the Identification of Carcinogenic Hazards to Humans* (Amended Jan. 2019).

105.  IARC, *IARC Monograph Vol. 112 on the Evaluation of Carcinogenic Risks to Humans, Some Organophosphate Insecticides and Herbicides: Diazinon, Glyphosate, Malathion, Parathion, and Tetrachlorvinphos* (2015).

106.  Inter-Organization Programme for the Sound Management of Chemicals (IOMC), International Programme on Chemical Safety (IPCS), *Environmental Health Criteria 242: Dermal Absorption* (2014).

107.  Japan Food Safety Commission, *Glyphosate Summary*, 4 Food Safety 93 (2016).

108.  Jauhiainen, A. et al., *Occupational Exposure of Forest Workers to Glyphosate During Brush Saw Spraying Work*, 52 Am. Indus. Hygiene Ass'n J. 61 (1991).

109.  JMPR (Joint Meeting on Pesticide Residues), *Pesticide residues in food – 2016: Evaluations 2016 – Part II – Toxicological*, Special Session of the Joint Meeting of the FAO Panel of Experts on Pesticide Residues in Food and the Environment and the WHO Core Assessment Group on Pesticide Residues (May 9-13, 2016).

110.  JMPR, *Pesticide Residues in Food – Report of the 1994 Joint FAO/WHO Meeting of Experts* (1994).

111. Johnson, P. et al., *Operator Exposure When Applying Amenity Herbicides by All-Terrain Vehicles and Controlled Droplet Applicators*, 49 Annals of Occupational Hygiene 25 (2005).

112. Kabat, G. et al., *On Recent Meta-Analyses of Exposure to Glyphosate and Risk of Non-Hodgkin's Lymphoma in Humans*, Cancer Causes & Control (2021).

113. Kasting, G. & L. Bowman, *Electrical Analysis of Fresh, Excised Human Skin: A Comparison with Frozen Skin*, 7 Pharm. Res. 1141 (1990).

114. Keil, C. et al., *Mathematical Models for Estimating Occupational Exposure to Chemicals* (2nd ed. 2009).

115. Kielhorn, J. et al., International Programme on Chemical Safety (IPCS), *Environmental Health Criteria 235: Dermal Absorption* (2006).

116. Korchevskiy, A., *Using Benchmark Dose Modeling for the Quantitative Risk Assessment: Carbon Nanotubes, Asbestos, Glyphosate,* 41 J. Applied Toxicology 148 (2020).

117. Kougias, D. et al., *Risk Assessment of Glyphosate Exposures from Pilot Study with Simulated Heavy Residential Consumer Application of Roundup® Using a Margin of Safety (MOS) Approach,* Soc'y  Risk Analysis (2020).

118. Kramer, R., *Herbicide Applicator Exposure to N-Nitroso-Glyphosate during Application of Roundup Herbicide and Field Re-Entry* (Apr. 1978) [MONGLY01313767 – MONGLY01313816].

119. Kruger, M. et al., *Detection of Glyphosate Residues in Animals and Humans*, 4(2) J. Envtl. Analytical Toxicology 1000210 (2014).

120. Lake, R., *Health Risk Assessment: Glyphosate, Report FW14022*, Institute of Environmental Science and Research Limited for the Ministry of Health (2014).

121. Lavy, T. et al., *Conifer Seedling Nursery Worker Exposure to Glyphosate*, 22 Archives Envtl. Contamination & Toxicology 6 (1992).

122. Leon, M. et al., *Pesticide Use and Risk of Non-Hodgkin Lymphoid Malignancies in Agricultural Cohorts from France, Norway and the USA: A Pooled Analysis from the AGRICOH Consortium*, Int'l J. Epidemiology (2019).

123. Lesmes-Fabian, C. et al., *Dermal Exposure Assessments of Pesticide Use: The Case of Sprayers in Potato Farms in the Columbia Highlands*, 430 Science of the Total Environment 202 (2012).

124. Letter from J.W. Worley on *Potential Formaldehyde Exposure from Wetcake, MON-0139, and Roundup® Herbicide* to T.F. Armstrong, T.W. Fuhremann, F.S. Serdy, J.L. Hammond, and M.J. Pulwer (June 3, 1985) [MONGLY04267028-MONGLY04267034].

125. Letter from Stephen Wratten, Manager, Registrations, Monsanto Company on *Glyphosate Technical Herbicide (EPA Reg. No. 524-421) Amendment: Basic Confidential Statement of Formula Nominal Active Ingredient and Impurity Levels RD 1660* to James Tompkins,

Team Leader, Document Processing Center, EPA, Office of Pesticide Programs (Nov. 9, 2005) [MONGLY00209535-MONGLY00209558].

126. Lunchick, C. et al., *Operator and Field Worker Occupational Exposure Databases and Modeling*, in Hayes' Handbook of Pesticide Toxicology 1139, 1139-1155 (2010).

127. Machado-Neto, J. et al., *Safety of Working Conditions of Glyphosate Applicators on Eucalyptus Forests Using Knapsack and Tractor Powered Sprayers*, 64 Bulletin of Envtl. Contamination and Toxicology 309 (2000).

128. Maibach, H., *Summary: Elimination of 14C-Glyphosate in Rhesus Monkeys Following a Single Dose, & Percutaneous Absorption of 14C-Glyphosate in Roundup® Formulation in Rhesus Monkeys Following a Single Topical Dose*, University of California School of Medicine (Apr. 1, 1983) [MONGLY02142251 – MONGLY02142265].

129. Mandel, J. et al., *Biomonitoring for Farm Families in the Farm Family Exposure Study*, 31(Suppl. 1) Scandinavian J. Work Env't Health 98 (2005).

130. Manning, M., *Assessment of Worker Exposure to Glyphosate during Mist Blower Application of Roundup Herbicide* (Nov. 1991) [MONGLY01299836 – MONGLY01299849].

131. McDuffie, H. et al., *Non-Hodgkin's Lymphoma and Specific Pesticide Exposures in Men: Cross-Canada Study of Pesticides and Health*, 10 Cancer Epidemiology, Biomarkers & Prevention 1155 (2001).

132. Mesnage, R. et al., *Glyphosate Exposure in a Farmer's Family*, 3 J. Envtl. Protection 1001 (2012).

133. Monsanto Company, Label for Roundup® Ready-to-Use Weed & Grass Killer III (2012).

134. Monsanto Company, Label for Roundup® Weed & Grass Killer Concentrate Plus (2009) [MONGLY10529152-MONGLY10529157].

135. New Zealand Environmental Protection Authority, *Risk Assessment Methodology for Hazardous Substances* (May 2018) (draft).

136. Ngo, M. et al., *Percutaneous Absorption and Exposure Assessment of Pesticides*, 30 J. Applied Toxicology 91 (2010).

137. Nielsen, J. et al., *Storage Conditions of Skin Affect Tissue Structure and Subsequent In Vitro Percutaneous Penetration*, 24 Skin Pharmacology & Physiology 93 (2011).

138. Nielsen, J. et al., *The Usual Suspects – Influence of Physicochemical Properties on Lag Time, Skin Deposition, and Percutaneous Penetration of Nine Model Compounds*, 72 J. Toxicology Envtl. Health, Part A 315 (2009).

139. Nielsen, J., *Defense against Dermal Exposures is Only Skin Deep: Significantly Increased Penetration through Slightly Damaged Skin*, 299 Archives of Dermatological Res. 423 (2007).

140. Niemann, L. et al., *A Critical Review of Glyphosate Findings in Human Urine Samples and Comparison with the Exposure of Operators and Consumers*, 10 J. Consumer Protection & Food Safety 3 (2015).

141. OECD (Organisation for Economic Cooperation and Development), *Guidance Document for the Conduct of Skin Absorption Studies* (Mar. 5, 2004).

142. OECD, *Guidance Notes on Dermal Absorption* (Aug. 18, 2011).

143. OECD, *Guideline for the Testing of Chemicals - Skin Absorption: In Vitro Method* (Apr. 13, 2004).

144. OEHHA (Office of Environmental Health Hazard Assessment), *Proposition 65 No Significant Risk Levels (NSRLs) for Carcinogens and Maximum Allowable Dose Levels (MADLS) for Chemicals Causing Reproductive Toxicity*, Cal. EPA (Oct. 2018).

145. OEHHA (Office of Environmental Health Hazard Assessment), *Statement Regarding US EPA's Press Release and Registrant Letter on Glyphosate*, Cal. EPA (Aug. 12, 2019).

146. OEHHA, *Proposition 65 No Significant Risk Levels (NSRLs) for Carcinogens and Maximum Allowable Dose Levels (MADLS) for Chemicals Causing Reproductive Toxicity*, Cal. EPA (Oct. 2018).

147. Oltmanns, J. et al., *Effectiveness of Personal Protective Equipment against Dermal Exposure – A Comparative Study*, Federal Institute for Occupational Safety and Health (2016).

148. Orsi, L. et al., *Occupational Exposure to Pesticides and Lymphoid Neoplasms among Men: Results of a French-Control Study*, 66 J. Occupational & Envtl. Med. 291 (2009).

149. Pahwa, M. et al., *Glyphosate Use and Associations with Non-Hodgkin Lymphoma Major Histological Sub-Types: Findings from the North American Pooled Project*, Scandinavian J. Work Env't Health (2019) with supplementary materials.

150. Park, A., *N-nitroglyphosate and Formaldehyde Validations in MON 76879 (Amended from MSL0028679* (May 2, 2018) [MONGLY14519595-MONGLY14519639].

151. Perry, M. et al., *Historical Evidence of Glyphosate Exposure from a U.S. Agricultural Cohort*, 18 Envtl. Health 42 (2019).

152. Pierce, J. et al., *Pilot Study Evaluating Inhalation and Dermal Glyphosate Exposure Resulting from Simulated Heavy Residential Consumer Application of Roundup ®*, 32 Int'l F. Respiratory Res. 354 (2020).

153. Rages, D., *Accelerated Aging Data to Support the Registration of MON 79991 Herbicide Formulation*, Monsanto Co. (Nov. 16, 2012) [MONGLY01210670-MONGLY01210742].

154. Rages, D., *Analytical Profile of Glyphosate Technical (Wetcake)/MON 77973 from Monsanto Luling Plant* (Apr. 30, 2004) [MONGLY00209753-MONGLY00209817].

155. Rages, D., *Analytical Profile of Glyphosate Technical (Wetcake)/MON 77973 from Monsanto Muscatine Plant* (Apr. 30, 2004) [ONGLY00209818-MONGLY00209884].

156. Rages, D., *Analytical Profile of MON 0139 Technical from Monsanto Muscatine Plant* (Jan. 5, 2007) [MONGLY00210657-MONGLY00210720].

157. Rages, D., *Glyphosate, Dicamba, NNG and Formaldehyde Method Validations in MON 76838* (Feb. 7, 2014) [MONGLY00744163-MONGLY00744221].

158. Rauws, T. et al., *Determination of Formaldehyde and NNG Content in MON 76952 after 2 Years Storage at Ambient Temeratures* (Apr. 24, 2018) [MONGLY14615083-MONGLY14615088].

159. Ridley, W. & K. Mirly, *Volume 1: The Metabolism of Glyphosate in Sprague Dawley Rats – Part 1. Excretion and Tissue Distribution of Glyphosate and Its Metabolites following Intravenous and Oral Administration*, Monsanto Company (Mar. 23, 1988) [MONGLY00148193 – MONGLY00148787].

160. Riordan, A., *Evaluation of Glyphosate Use and Non-Hodgkin's Lymphoma – A Preliminary Trend Assessment*, American Industrial Hygiene Association (2020).

161. Smith, S., *240 g/L Glyphosate SL Formulation (MON 79546) – In Vitro Absorption through Human Dermatomed Skin Using [14C]-Glyphosate* (Feb. 12, 2014) [MONGLY08731410 – MONGLY08731464].

162. Smith, S., *7.2 g/L Glyphosate Gel Formulation (MON 76904) – In Vitro Absorption through Human Dermatomed Skin using [14C]-Glyphosate* (July 23, 2015) [MONGLY08731619 – MONGLY08731699].

163. Smith, S., *720 g/kg Glyphosate SG Formulation (MON 79991) – In Vitro Absorption through Human Dermatomed Skin Using [14C]-Glyphosate* (Feb. 12, 2014) [MONGLY08731465 – MONGLY08731523].

164. Solomon, K., *Estimated Exposure to Glyphosate in Humans via Environmental, Occupational, and Dietary Pathways: An Updated Review of the Scientific Literature*, Pest Mgmt. Sci. (2020).

165. Solomon, K., *Glyphosate in the General Population and In Applicators: A Critical Review of Studies on Exposures*, 46 Critical Revs. Toxicology 21 (2016).

166. Suarez-Larios, K. et al., *Screening of Pesticides with the Potential of Inducing DSB and Successive Recombinational Repair*, 2017 J. Toxicology 3574840 (2017).

167. Tarazona, J. et al., *Glyphosate Toxicity and Carcinogenicity: A Review of the Scientific Basis of the European Union Assessment and its Differences with IARC*, 91 Archives of Toxicology 2723 (2017).

168. Temple, W., *Review of the Evidence Relating to Glyphosate and Carcinogenicity*, New Zealand Environmental Protection Authority (Aug. 2016).

169. Thomas, K. et al., *Assessment of a Pesticide Exposure Intensity Algorithm in the Agricultural Health Study*, 20 J. Exposure Sci. and Envtl. Epidemiology 559 (2010).

170. Thongsinthusak, T. et al., *Guidance for the Preparation of Human Pesticide Exposure Assessment Documents*, Cal. EPA (May 4, 1993).

171. Transcript of Proceedings, *Johnson v. Monsanto Co.*, No. CGC-18-550128 (Cal. Super. Ct. S.F. Cty. July 26, 2018) (testimony of Dr. William Sawyer).

172. Transcript of Proceedings, *Pilliod v. Monsanto Co*., No. RG17862702 (Cal. Super. Ct. Alameda Cty Apr. 11, 2019) (testimony of Dr. William Sawyer).

173. Van Burgsteden, J., *In Vitro Percutaneous Absorption Study with [14C]glyphosate using Viable Rat Skin Membranes*, TNO Nutrition and Food Research (Jul. 29, 2003)

[MONGLY01285806 – MONGLY01285848].

174. Ward, R., *360g/L Glyphosate SL Formulation (MON 52276) In Vitro Absorption of Glyphosate through Human Epidermis* (Feb. 12, 2010) [MONGLY00698737 – MONGLY00698789].

175. Ward, R., *450 g/L Glyphosate SL Formulation (MON 79545) In Vitro Absorption of Glyphosate through Human Epidermis, DLT-09-093* (Feb. 12, 2010) [MONGLY00698684 – MONGLY00698736].

176. Ward, R., *480 g/L Glyphosate SL Formulation (MON 79351) In Vitro Absorption of Glyphosate through Human Epidermis* (Feb. 12, 2010) [MONGLY00698790 – MONGLY00698842].

177. Wester, R., et al., *Glyphosate Skin Binding, Absorption, Residual Tissue Distribution, and Skin Decontamination*, 16 Fundamental and Applied Toxicology 725 (1991).

178. Wester, R., et al., *In Vitro Percutaneous Absorption of Model Compounds Glyphosate and Malathion from Cotton Fabric into and through Human Skin*, 34 Food and Chemical Toxicology 731 (1996).

179. Wozniak, E. et al., *Glyphosate Affects Methylation in the Promoter Regions of Selected Tumor Suppressors as Well as Expression of Major Cell Cycle Apoptosis Drivers in PBMCs (in vitro study)*, 63 Toxicology in Vitro 104736 (2020).

180. Wozniak, E. et al., *The Mechanism of DNA Damage Induced by Roundup 360 PLUS, Glyphosate and AMPA in Human Peripheral Blood Mononuclear Cells – Genotoxic Risk Assessment*, 120 Food & Chem. Toxicology 510 (2018).

181. Wratten, S. et al., *MSL 0025540: Amended Report Updating MSL 0023134 A Review and Discussion of Glyphosate Toxicology Test Materials* (Mar. 4, 2014) [MONGLY00574022-MONGLY00574084].

182. Zhai, H., et al., *Skin Decontamination of Glyphosate from Human Skin In Vitro*, 45 Food and Chemical Toxicology 2258 (2008).

183. Zhang, L. et al., *Exposure to Glyphosate-Based Herbicides and Risk for Non-Hodgkin Lymphoma: A Meta-Analysis and Supporting Evidence*, 781 Mutation Research/Reviews in Mutation Research 186 (2019).

184. Zoller, O. et al., *Urine Glyphosate Level As A Quantitative Biomarker of Oral Exposure.* 228 Int'l J. & Hygiene and Env't Health 113526 (2020).

# EXHIBIT C

**Dr. Joshua Schaeffer, Ph.D.**

In the past four years I have given sworn expert testimony in the following matters:

*Carl Savory, et al. v. Monsanto Co.* (deposition)
United States District Court Northern District of California. Case No. 3:20-cv-08051 (3:16-md-02741, MDL No. 2741). August 27, 2021.

# EXHIBIT 3

Joshua Schaeffer, Ph.D.
March 22, 2023

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

MDL NO. 2741
CASE NO.: 3:16-MD-02741-VC


IN RE:  ROUNDUP PRODUCTS
LIABILITY LITIGATION
_____

This document relates to:


NANCY SALAS v. MONSANTO
COMPANY; BAYER CORPORATION;
BAYER AG;ANDREW JACK CONROY;
HOME DEPOT U.S.A.,INC.;KLI
SHELL LUMBER & HARDWARE,
LLC ;and ORLANDO VALDES.

Member Case No:
3:21-cv-06713-VC
_____


REMOTE VIDEOTAPED
CONFERENCE DEPOSITION
OF
JOSHUA SCHAEFFER, Ph.D.


Wednesday, March 22, 2023
2:02 p.m. - 4:15 p.m.
LOCATION:  By Videoconference


Reported By:

DONNA GUNION, Court Reporter, FPR
Notary Public, State of Florida
U.S. Legal Support, Inc.
Miami Office
305-373-8404

Joshua Schaeffer, Ph.D.
March 22, 2023

```
 1                 APPEARANCES VIA ZOOM:

 2
     On behalf of the Plaintiff:
 3
           PODHURST ORSECK, P.A.
 4         ONE S.E. 3rd AVENUE
           SUITE 2300
 5         MIAMI, FLORIDA 33131
           305-358-2382
 6         PROJAS@PODHURST.COM

 7         BY: PABLO ROJAS, ESQUIRE

 8
     On behalf of the Defendant HOME DEPOT:
 9
           MORRIS, MANNING & MARTIN, LLP
10         3343 PEACHTREE ROAD NE
           #1600
11         ATLANTA, GEORGIA 30326
           404-233-7000
12         CSUYDAM@MMMLAW.COM

13         BY: CAROLINE W. SUYDAM, ESQUIRE

14
     On behalf of the Defendant MONSANTO COMPANY:
15
           HOLLINGSWORTH LLP
16         1350 I STREET, NW
           WASHINGTON, D.C. 20005
17         202-898-5800
           DMURNER@HOLLINGSWORTHLLP.COM
18
           BY:  DANIEL J. MURNER, ESQUIRE
19              ABIGAIL REECER, ESQUIRE

20
     Also Present:
21
     Videographer:  AURELIO ROMAN
22

23

24

25
```

Joshua Schaeffer, Ph.D.
March 22, 2023

1    A.    Yes.

2    Q.    I don't know if you're able to tell me without

3  the benefit of seeing more pages whether this is a

4  current copy of it.

5    A.    I mean, if you want to just scroll down, I can

6  take a look.  It appears to be the correct first page,

7  yes.

8    Q.    Maybe your publications or professional

9  commitments would --

10    A.    Um-hm.  I don't know what page you're on right

11  now but that appears so far that it is my CV.

12    Q.    Okay.  I mean, it seems you would agree with me

13  at least current enough in the sense that it has, for

14  example, an entry for 2022 to present for your position

15  as an associate professor at the Colorado School of

16  Public Health.

17        Have there been any significant changes to your

18  professional activities or affiliations let's say in

19  calendar year 2022 and what's transpired of 2023?

20    A.    Again, I mean, I'm here representing Schaeffer

21  Occupational Health Associates.  I'm not here

22  representing the university and there have not been any

23  major changes.

24    Q.    Fair enough.

25        Let me ask you about the first professional

Joshua Schaeffer, Ph.D.
March 22, 2023

1  certification listed here.  Your certification as a

2  Certified Industrial Hygienist, which organization offers

3  that certification?

4      A.   It's called the American Board of Industrial

5  Hygiene.  It's ABIH.

6      Q.   And what is industrial hygiene as a general

7  matter?  I know I think you described it in your report,

8  but if you can give me sort of a brief verbal overview?

9          MR. MURNER:  Objection.  Form.  You can answer.

10          THE WITNESS:  Okay.

11          Industrial hygiene in general is looking to

12      anticipate, recognize, evaluate and control exposures

13      to hazards in the work place and community.

14  BY MR. ROJAS:

15      Q.   The use of the word industrial, does that mean

16  that the discipline is focused on industrial settings or

17  does it focus on other settings as well?

18      A.   Yeah, so I think it's -- if I have a little

19  latitude, I think it's an old term as of right now and so

20  it is focused on work place exposures but if you look at

21  AIHA, the American Hygiene Industrial Association, they

22  have expanded that by definition to really include

23  community exposures as well.

24      Q.   I see here that you are an associate professor,

25  at least per the CV, in two departments at -- well, at

Joshua Schaeffer, Ph.D.
March 22, 2023

 1   different universities in Colorado, excuse me.  Is that

 2   still the case today?

 3       A.   Well, I am faculty at Colorado State University

 4   and affiliate faculty at Colorado School of Public

 5   Health.  I'm not here representing them as part of this.

 6   This is my work with Schaeffer Occupational Health

 7   Associates.

 8       Q.   And I understand that completely.  I'm just

 9   trying to get a sense of your professional experience and

10   your background and that sort of thing, but understood.

11   You're not here in any capacity other than what I think

12   you represent to me and I understand that.

13            So what have you taught, what courses in what

14   areas at the Colorado School of Public Health?

15       A.   The Colorado School of Public Health, I have

16   taught several lectures focused on agricultural

17   exposures.  Agricultural health and safety.  My main

18   position -- again, that's an affiliate faculty position,

19   and my main position is at Colorado State University

20   where I do most of my teaching.

21       Q.   In what areas have you taught at Colorado State?

22       A.   Sure.  I'm in the environmental public health

23   undergraduate program and so I teach intro to

24   environmental public health.  I have a class that is

25   environmental health field methods.  Another class

Joshua Schaeffer, Ph.D.
March 22, 2023

```
 1    looking at the principles of occupational safety and
 2    health.  Intro to biomedical sciences.  And then I do
 3    some guest lectures in the graduate program as well,
 4    looking at or guest lecturing in industrial hygiene
 5    classes at the graduate level as well as in toxicology
 6    classes in the undergraduate level.
 7         Q.   In your capacity as an associate professor at
 8    either of these two schools, and I know a little bit
 9    further down you were previously an assistant professor
10    at both universities as well, have you ever delivered a
11    lecture or a course dealing in any way with glyphosate?
12              MR. MURNER:  Objection.  Form.
13              THE WITNESS:  I have not given any lectures
14         specifically focused on glyphosate.  It may have come
15         up in a discussion.
16    BY MR. ROJAS:
17         Q.   I don't know if you're able to see this line item
18    from when you were a laboratory director at ChemaTox
19    Laboratory in Boulder, Colorado.
20         A.   Yes.
21         Q.   What did that job entail?
22         A.   That job was forensic toxicity and so I was the
23    lab director there during that time and worked with
24    analyzing samples for various reasons in different cases,
25    concerned citizens, you know, so it was really analyzing
```

Joshua Schaeffer, Ph.D.
March 22, 2023

1   samples, and interpreting and providing the results to

2   the respective parties.

3      Q.   And I think I understand that part of your work

4   there involved analyzing the absorption, the human body's

5   absorption of certain substances, correct?

6      A.   At that time, it was, I would say the majority of

7   the work was blood alcohols so looking at analyzing blood

8   samples for blood alcohol as well as breath samples.

9      Q.   There's a reference here in the professional

10  development section to a Dermal Exposure Assessment

11  Virtual Conference:  Introduction to SkinPerm and Course

12  Conclusion, looks to be in fall 2020.  What was that?

13     A.   Yeah.  That was a, again, a just professional

14  development workshop provided by the American Industrial

15  Hygiene Association and so it was an opportunity for

16  continuing my education.

17     Q.   It looks like I guess at that virtual conference

18  there were a number of sort of courses that you received.

19  Is that fair?

20     A.   If you give me -- I mean, I can take a look.

21  Correct, there were 3 to 4 different sessions.

22     Q.   All right.  Was that a one day workshop or

23  conference, excuse me, or multi-day?

24     A.   It was multi-day.

25     Q.   Would you consider yourself an expert in dermal

Joshua Schaeffer, Ph.D.
March 22, 2023

1   absorption, the human body's absorption of substance

2   through the skin?

3          MR. MURNER:  Objection.  Form.

4          THE WITNESS:  Well, I would consider myself an

5      expert in exposures and looking at those exposures and

6      estimating and modeling those exposures to calculate a

7      dose.

8   BY MR. ROJAS:

9      Q.   And is that a daily part of your work today,

10  calculating exposures?

11         MR. MURNER:  Objection.  Form.

12         THE WITNESS:  Again, it's -- it varies.  My job

13     varies and so it depends on what's happening that week

14     so, yes, I mean, it's very hard to say.  I can't

15     answer.  There's -- I wear a lot of different hats as

16     part of my job.

17  BY MR. ROJAS:

18     Q.   And I apologize, I appreciate you answering my

19  question rigorously because I used the word daily and I'm

20  only a lawyer but I wear different hats, too so it's hard

21  for me to remember what I do on a daily basis.  Let me

22  ask you, I guess, a more general question.

23         Do you regularly conduct analyses of exposure as

24  part of your work today?

25         MR. MURNER:  Objection.  Form.

Joshua Schaeffer, Ph.D.
March 22, 2023

1           THE WITNESS:  Can you -- I'm just trying to make

2      sure that I understand your question and can answer it

3      accurately.  Can you just tell me what you mean by

4      exposure?

5   BY MR. ROJAS:

6      Q.   Sure.  I think when I asked you whether you were

7    an expert in dermal exposure, I think you explained to me

8    and among other things you're an expert in sort of

9    calculating doses and analyzing that and human body's

10   exposure to substances as I understood it, and my

11   question was whether you regularly conduct such analyses

12   as part of your work sitting here today.

13           MR. MURNER:  Objection.  Form.

14           THE WITNESS:  I conduct exposure assessments

15      frequently as part of my work.

16   BY MR. ROJAS:

17      Q.   And in what settings does that come up?  When is

18    the last time you recall conducting an exposure

19    assessment?

20      A.   It's hard to say, but as part of my job, as part

21    of Schaeffer Occupational Health Associates, as part of

22    my job, again at the university, which I'm not here

23    representing, wearing these many different hats, I do

24    conduct exposure assessments.  I just -- it's frequent.

25      Q.   Okay.  Let me go --

Joshua Schaeffer, Ph.D.
March 22, 2023

```
1   assessments.  Objective assessments of exposure and

2   working with various partners.

3       Q.   Who are Schaeffer Occupational Health Associates'

4   clients or partners?  And I don't need an itemized list,

5   but just what types of partners or clients does the LLC

6   work with?

7           MR. MURNER:  Objection.  Form.

8           THE WITNESS:  It's been several different firms.

9       Several different -- sorry, not firms but facilities

10      or businesses that I've helped out with.

11  BY MR. ROJAS:

12      Q.   And I don't know if there's a typical project but

13  when Schaeffer Occupational Health Associates works with

14  a facility or business, are you conducting exposure

15  assessments on individual human beings?  Are you

16  consulting on how to make the facility a more

17  occupationally safe place?  What sort of activities or

18  services do you offer?

19      A.   Sure.  I do -- it's been focused on exposures,

20  indoor air quality, air contaminants, and as well as

21  dermal exposures as well.  And so -- and trying to think

22  about controls and offer suggestions or recommendations

23  based on those results.

24  BY MR. ROJAS:

25      Q.   And are we mostly talking about the occupational
```

Joshua Schaeffer, Ph.D.
March 22, 2023

1    BY MR. ROJAS:

2        Q.    Sure.  Like, I know, for example, I'll just

3    represent to you that my sense is that on your materials

4    considered list, there are a number of academic

5    publications concerning glyphosate and so, you know, I

6    understand that out in the world there, folks with

7    different specialties that do academic research, produce

8    academic publications about glyphosate, various aspects

9    of it, and my question for you is, have you yourself ever

10   done any academic research concerning glyphosate?

11       A.    Again, not here representing my academic research

12   but we have conducted a study where we were looking at

13   exposures among a vulnerable population for kidney

14   injury, looking at, because it's of unknown etiology,

15   what's happening.  Nobody understands what's really going

16   on and so our take on this was looking at inhalation

17   exposures as potential contributors to the development of

18   this injury.  There's been a lot of focus on thermal

19   stress and so we've looked at it a little bit

20   differently, and so one of the compounds we looked at was

21   glyphosate.

22       Q.    Has that research been concluded?  Have you

23   reached a conclusion?

24             MR. MURNER:  Objection.  Form.

25             THE WITNESS:  Can you be more specific on what

Joshua Schaeffer, Ph.D.
March 22, 2023

1  exposure reconstruction?

2    A.   My methodology starts in that section and then

3  basically goes through kind of somewhat of a step-by-step

4  process of the information that I gathered and used as

5  part of my model.

6    Q.   And I think I'm following the model and the

7  calculations to the best of my ability.  Am I right in

8  understanding that you didn't use exposure days as an

9  exposure metric?

10    A.   Well, I've seen studies looking at exposure days.

11  I used a different approach and looked at trying to

12  estimate an actual exposure average daily dose as opposed

13  to looking at exposure days.

14    Q.   Do you disagree with the use of exposure days as

15  a metric for glyphosate exposure?

16    A.   Again, I use a different approach as part of my

17  methodology for looking at the exposure.  I think there

18  are some limitations with using exposure days.

19    Q.   What are those limitations?

20    A.   It's hard, it's difficult for me to understand

21  what the exposure is in those events.

22         During the application, what was the exposure.

23  Was it a drop.  So it's just -- those are some

24  limitations that I see so in looking at using the AIHA

25  model that I used, which is recognized and respected

Joshua Schaeffer, Ph.D.
March 22, 2023

1  model, I went that route.

2      Q.   Understood.  Is it your opinion that the model

3  that you employed is superior, more reliable than an

4  exposure days calculation?

5          MR. MURNER:  Objection.  Form.

6          THE WITNESS:  More superior than?  I didn't --

7  BY MR. ROJAS:

8      Q.   Well, I used a compound question.  I said

9  superior, more reliable so let me go with superior.  Is

10  it your view or opinion that the model that you employed

11  is superior to using an exposure days calculation?

12         MR. MURNER:  Objection.  Form.

13         THE WITNESS:  And the last part was exposure

14     what?

15  BY MR. ROJAS:

16     Q.   An exposure days calculation.

17     A.   I guess I don't know what you mean by superior.

18  Like, in what way, I guess?  I don't know.  Sorry.

19  Again, I want to make sure that I'm answering your

20  question.

21     Q.   No, that's fine.

22         Let me put it this way:  I understood you to

23  explain to me that you made a choice to employ this model

24  as opposed to going with exposure days, correct?

25     A.   Correct.  I employed this route, this AIHA dermal

Joshua Schaeffer, Ph.D.
March 22, 2023

1   exposure model as opposed to other models, correct.

2       Q.   And why is that?

3       A.   Because that's the model that is recognized in

4   American Industrial Hygiene Association.  It's a

5   resource.  It's respected, so that's why.

6       Q.   And are you aware of any studies in the

7   literature that use a metric of lifetime days of

8   glyphosate use, for example?

9            MR. MURNER:  Objection.  Form.

10           THE WITNESS:  Am I aware of those studies?

11  BY MR. ROJAS:

12      Q.   Yes.

13      A.   I have reviewed several studies that have used

14  days, yes.

15      Q.   And do you have sort of any criticism of the use

16  of days in those studies as a metric?

17      A.   Well, I think those studies maybe at the time

18  had -- again, there's limitations in using that exposure

19  days and so there's limitations to that and I think with

20  the -- yep, I -- the studies you're referring to, I think

21  there are limitations to using exposure days.

22           I guess that's just the way I'll end it.

23      Q.   Are there limitations to the model that you

24  employed?

25      A.   Well, in any model there will be certain

Joshua Schaeffer, Ph.D.
March 22, 2023

1    limitations and so while there may be limitations in my

2    model, I try to build in what I can to provide a -- so my

3    model assumes that Ms. Salas's exposure was greater than

4    what she probably likely encountered.

5         Q.   What are the limitations?  I know how you sort of

6    attempted to maybe control for those limitations but what

7    are the limitations of the model that you employed?

8         A.   Well, the model employs looking at input

9    variables and so depending on Ms. Salas's testimony,

10   depending on the testimony that's provided and the

11   information that's provided, that's the information and

12   so thinking about -- thinking about the input variables,

13   I guess would be a limitation.

14        Q.   Any others that you can think of right now, any

15   other limitations?

16        A.   Not at this time.

17        Q.   Okay.  I'm going to stop sharing the screen, if

18   that's okay.  It seems you might be referring or have the

19   benefit of your digital copy, but let me know if there's

20   any objection to me stopping sharing the screen.

21             There is a reference to your report, and I can

22   tell you what I'm looking at.  It's Page 38.  It's

23   basically the last page with writing on it.  It's got

24   your signature as well.  Let me know when you're there.

25        A.   I'm here.

Joshua Schaeffer, Ph.D.
March 22, 2023

1      Q.   Okay.  I'm focused on the last sentence and I'll

2   just read it into the record for clarity just so you know

3   what sentence I'm referring to.

4           It says, "While my report does not provide an

5   opinion as to the causes of NHL, my estimate of the

6   plaintiff's averages daily dose indicates that the

7   plaintiff's dose did not exceed the EPA, RFD or the

8   California NSRL for glyphosate."

9           Do you see that sentence there?

10     A.   I do.

11     Q.   Let me sort of piggyback off that to ask you

12   first some housekeeping questions.

13          You say, you write that your report does not

14   provide an opinion as to the causes of NHL.  Do you

15   intend in this case to offer any expert testimony about

16   the causes of non-Hodgkin's lymphoma as a general matter?

17          MR. MURNER:  Objection.  Form.

18          THE WITNESS:  While I'm not here to provide

19     expert testimony on NHL or the causes, I did evaluate

20     Mrs. Salas's dose and compared it to the regulatory

21     thresholds.

22   BY MR. ROJAS:

23     Q.   Understood.  I understand that your report

24   doesn't basically contain a causation opinion, a cancer

25   causation opinion.  Is that right?

Joshua Schaeffer, Ph.D.
March 22, 2023

1          MR. MURNER:  Objection.  Form.

2          THE WITNESS:  Again, I try to be as comprehensive

3      as I could in my report with my opinions, and while

4      I'm not providing a causation of NHL, my report does

5      report out the estimated dose that Ms. Salas likely

6      incurred, and compared that to a regulatory threshold.

7  BY MR. ROJAS:

8      Q.   Right, and I know I see here that you refer to

9  the EPA, RFB California NSRL and I know earlier your

10  report also cites and refers to other regulatory

11  thresholds.  So if I'm understanding your methodology,

12  you conducted the exposure assessment that you did and

13  you estimated her exposure and then you compared it to

14  these regulatory thresholds, but it's important for me to

15  understand the scope of your testimony just so I know

16  what to ask you about now.  And obviously I don't want to

17  be surprised at trial if you offer an oncological

18  causation opinion, so I just want to be absolutely clear

19  that you are not presently offering an opinion about the

20  cause of Ms. Salas's cancer, correct?

21          MR. MURNER:  Objection.  Form.

22          THE WITNESS:  Again, while I'm not here to

23      provide an expert opinion on the causation of cancer,

24      I again, estimated -- my report does have the

25      estimated dose and compared that to the regulatory

Joshua Schaeffer, Ph.D.
March 22, 2023

```
 1        threshold.
 2   BY MR. ROJAS:
 3        Q.   Would you be qualified to offer an opinion about
 4    the cause of Ms. Salas's cancer?
 5             MR. MURNER:  Objection.  Form.
 6             THE WITNESS:  Again, I'm not here to provide an
 7        expert --
 8   BY MR. ROJAS:
 9        Q.   I'm sorry, that wasn't my question.  My question
10    was, would you be qualified to offer an opinion about the
11    cause of Ms. Salas's cancer?
12             MR. MURNER:  Counsel, you've got to let him
13        answer the question.
14             MR. ROJAS:  I know, but he's giving me the can't
15        response to everything and these aren't trick
16        questions.  They're very straightforward.
17   BY MR. ROJAS:
18        Q.   You conducted an exposure assessment.  We've been
19    talking about it, I get that, and you've explained to me
20    very clearly what you've done.  My question is very
21    simple.
22             Would you be qualified to offer an expert opinion
23    about the cause of Ms. Salas's cancer?
24             MR. MURNER:  Objection.  Form.  Asked and
25        answered.
```

Joshua Schaeffer, Ph.D.
March 22, 2023

1           THE WITNESS:  While I'm not here to provide an

2      expert opinion on the causation of NHL, my report does

3      have reported an exposure dose and compared it to

4      regulatory threshold.  And based on that, it is below

5      any regulatory threshold.

6   BY MR. ROJAS:

7      Q.   Okay.  Fair enough.  I'm going to move to strike

8   as nonresponsive I don't know how many of the last few

9   questions, but that's fine.  I see that we're getting

10  nowhere with this.

11          For what it's worth, I'm not trying to trick you,

12  sir.  It's just important for me and my client to

13  understand the scope of your opinions.  I think I know at

14  a minimum they include this exposure assessment, and

15  hopefully today we can drill down a little bit into how

16  you reached it, but I need to understand the scope of

17  your opinions, where they begin and where they end.

18          So it's not a devious trick question.  Let me

19  move on to a different topic.

20          The regulatory thresholds, I know here in this

21  sentence that I just read into the record there's a

22  reference to EPA, RFD, California NSRL, I know earlier in

23  your report there's references to regulatory thresholds,

24  for example, from Health Canada.

25          My question is, to your knowledge, these

Joshua Schaeffer, Ph.D.
March 22, 2023

1  regulatory thresholds that you referred to, do they

2  consider cancer risks and cancer end points?

3      A.   The EPA reference dose references -- is based on

4  a no observable adverse effect level and the CAL NSRL is

5  a no significant risk level.  My understanding is that it

6  is a no significant risk level for cancer.

7      Q.   Okay.  What about the other -- if you know -- the

8  other regulatory thresholds?  For example, the Health

9  Canada one and the other cited in your report and feel

10  free to refer to that page in your report if you like to.

11          To your knowledge do they consider cancer risks

12  and cancer threshold end points?

13      A.   I will refer to my report.

14      Q.   Okay.

15          MR. MURNER:  Counsel, after Doctor Schaeffer

16      answers, whenever it's good timing for you, we're

17      about at an hour, I think we would appreciate a break.

18          MR. ROJAS:  That's fine.  After the next answer

19      is a good time.

20          THE WITNESS:  So the other regulatory thresholds

21      you mentioned, Health Canada, those are EDIs that are

22      very similar to EPAs, RFD.

23  BY MR. ROJAS:

24      Q.   In your opinion are those regulatory thresholds

25  reliable thresholds for understanding cancer risk?

Joshua Schaeffer, Ph.D.
March 22, 2023

1           MR. MURNER:  Objection.  Form.

2           THE WITNESS:  Are you talking about all of them?

3    BY MR. ROJAS:

4       Q.   We can take them one at a time.  Let's start with

5    -- well, let's take them one at a time.

6           What about EPA, RFD?  Do you think that's a

7    reliable threshold for understanding the cancer risk of

8    glyphosate?

9           MR. MURNER:  Objection.  Form.

10           THE WITNESS:  The RFD, my understanding is the

11        RFD is based on the no observable effect level, so no

12        adverse effects occur at or below that level.

13    BY MR. ROJAS:

14       Q.   Can I understand you to mean that that includes

15    adverse effects from cancer?

16       A.   Again, I'm using that as looking at it in terms

17    of know observable adverse effect level and so using that

18    as a potential or as a regulatory threshold for exposure.

19       Q.   What about the CAL NSRL?  Does that -- do you

20    find that to be a reliable threshold for understanding

21    the cancer risks of glyphosate?

22       A.   The CAL NSRL is based on risk and so thinking

23    about it in terms of in excess of one, thinking about the

24    risk of cancer and exposure and -- so it is set as a no

25    significant risk level for developing cancer based on

Joshua Schaeffer, Ph.D.
March 22, 2023

1    exposure.

2            MR. ROJAS:  I realize I've gone over because we

3        had decided to go on a break and I lost track of time.

4        Let's take five minutes and come back at 3:10.

5            THE VIDEOGRAPHER:  The time is three minutes

6        after three.  We're going off the video record.  Stand

7        by.

8            (A discussion was held off the record.)

9            (A brief recess was taken from 3:05 p.m. to

10   3:16 p.m.)

11           THE VIDEOGRAPHER:  The time is 3:17 p.m. and

12       we're back on the video record.

13   BY MR. ROJAS:

14       Q.   Okay.  Just a quick point of clarification,

15   Doctor.

16           I understand that the model that you employed to

17   calculate and assess Ms. Salas's glyphosate exposure does

18   not take inhalation into account.  Is that right?

19           MR. MURNER:  Objection.  Form.

20           THE WITNESS:  Well, I did consider -- I did

21       consider inhalation and yeah, I mean, I considered it

22       but I did not include it just -- I didn't think it

23       would add or contribute, you know, significantly to

24       the overall exposure.

25

Joshua Schaeffer, Ph.D.
March 22, 2023

1  BY MR. ROJAS:

2      Q.   Right, and to be a little more precise with my

3  question, you considered -- I know there's a discussion

4  of it, but it didn't factor into your calculations

5  directly, correct?

6      A.   I did not, I did not include it in my

7  calculations, correct, yeah.

8      Q.   Can you just explain why not?

9      A.   Yeah.  Just based on what I have read in the

10  literature, I don't -- it didn't seem that it was going

11  to materially add to the exposure, and thinking about the

12  way that Ms. Salas applied the product as a spot

13  treatment, targeted treatment of the weed, it seemed that

14  it was going to be the positioning of the wand or the

15  applicator would be kind of closer to the weed.

16      Q.   Do you use Roundup yourself?

17      A.   Yeah, I've used weed killers.  I don't know that

18  I've, I don't know, that's --

19      Q.   Do you live in a house or an apartment?

20      A.   A house.

21      Q.   And you have a lawn, I take it?

22      A.   I do have a lawn.

23      Q.   Okay.  So you don't know for sure one way or the

24  other whether you used a Roundup branded product?

25      A.   I currently -- I don't know if I've used it or

Joshua Schaeffer, Ph.D.
March 22, 2023

1   not.  I don't do a lot of my yard.  I should.  I should
2   do more.
3       Q.   I think we all should.
4            So have you ever used like a one based applicator
5   or excuse me, a one based application device yourself of
6   any product?
7       A.   It's been a long time, yeah.
8       Q.   Okay.  I hesitate do get back into this type of
9   question because I don't -- I want to preface it with to
10  be as clear as possible, that it's not a trick question.
11           I think you testified clearly earlier about the
12  scope of your opinions and I understood that testimony.
13  I'm going to ask you a slightly different question, which
14  is, setting aside what expert opinions you formed and
15  what expert conclusions you've reach, do you just
16  personally have a view one way or the other about whether
17  glyphosate or Roundup caused Ms. Salas's cancer?
18           MR. MURNER:  Object to form.  Scope.
19           THE WITNESS:  I'm not -- I mean, I'm not here to
20      really provide an opinion, expert opinion on that.  I
21      mean, I'm here to provide an expert opinion on the
22      exposure and dose and how that compares to the
23      literature and regulatory thresholds, yeah.
24  BY MR. ROJAS:
25      Q.   What about in your review of the literature?  I

Joshua Schaeffer, Ph.D.
March 22, 2023

1  know that you have an extensive materials considered

2  list.  There's a lot of epidemiological type of

3  literature in there, as far as I can tell, and a lot of

4  it is discussed at some length in your report.

5          Do you have a view, based on the epidemiological

6  literature, about whether glyphosate can cause cancer as

7  a general matter, not specific to Ms. Salas but as a

8  general matter?

9          MR. MURNER:  Objection.  Form.

10          THE WITNESS:  I can say that based on what I've

11      reviewed in the literature at this time, that I do not

12      see an association with glyphosate exposure and

13      cancer.

14  BY MR. ROJAS:

15      Q.  When we were talking about the exposure

16  assessment that you conducted in this case, the model,

17  the calculations, I believe you referred to it by some

18  acronym.  Did I hear you correctly?

19          If it helps at all, and I have terrible hearing

20  but I heard something like AIHAA?

21      A.  Oh, yes, I said AIHA, the American Industrial

22  Hygiene Association, and that's a professional

23  organization and they have different resources available

24  and that's a model that is included in one of the

25  resources.

Joshua Schaeffer, Ph.D.
March 22, 2023

1    Q.   Got it.  Okay.

2         So the model that you employed in this case is a

3    model that's included in one of these AIHA resources,

4    correct?

5    A.   Yes.

6    Q.   Do you know what resource that is, what it's

7    title is or --

8    A.   I believe I have it in my report.

9    Q.   Give me a second.  I don't see it there using a

10   Control F tool, but that's fine, I can follow up on that

11   at a later time.

12   A.   Would you -- I'm happy to try to locate it.

13   Q.   Maybe during the next break, if you don't mind.

14   A.   Sure.

15   Q.   Or I can come back to it later, but maybe I'll

16   just move right along.

17        I know, based on the materials considered list

18   that we received earlier today during the deposition via

19   email, that you reviewed Doctor William Sawyer's

20   deposition testimony in the Nancy Salas case, correct?

21   A.   I reviewed it.

22   Q.   And it looks like you've also reviewed Doctor

23   Sawyer's deposition testimony in several other Roundup

24   related cases, correct?  If it helps, I can put it up on

25   the screen.

Joshua Schaeffer, Ph.D.
March 22, 2023

1  BY MR. ROJAS:

2      Q.   Right.  You told me that you used an AIHA

3  exposure assessment model in assessing Ms. Salas's

4  exposure, right?

5      A.   I used a model to estimate the exposure, yes.

6      Q.   And to your knowledge, did the Andreotti et al.,

7  study use that model for the individuals that it -- whose

8  exposure it assessed?

9      A.   My recollection is they did not use the AIHA

10  model.

11      Q.   Does that render the Andreotti study unreliable

12  in your view?

13          MR. MURNER:  Objection.  Form.

14          THE WITNESS:  Unreliable in -- I mean, I'm just

15      trying to think about -- I'm just trying to think

16      through this.

17          I relied on Andreotti as an epidemiological study

18      where they looked at it in terms of longitudinal

19      prospective cohort, and my approach was trying to

20      reconstruct an exposure and estimate the dose based on

21      that exposure.

22  BY MR. ROJAS:

23      Q.   So, you know, is it fair to say that the exposure

24  assessment that you conducted just from a methodological

25  standpoint, it's obviously different from the one in

Joshua Schaeffer, Ph.D.
March 22, 2023

1          (A brief recess was taken from 3:42 p.m. to

2    4:00 p.m.).

3          THE VIDEOGRAPHER:  The time is 4:00 p.m. and

4      we're back on the video record.

5   BY MR. ROJAS:

6      Q.   Thank you.

7          So, I just have a couple of sort of concluding

8    questions, again about the scope of your opinions.

9          Have you formed an opinion in this case one way

10   or the other about whether Ms. Salas accurately reported

11   her use of Roundup?

12          MR. MURNER:  Objection.  Form.

13          THE WITNESS:  I go by what -- I went by her

14      testimony.

15   BY MR. ROJAS:

16      Q.   Okay.  Do you have any reason to believe that her

17   testimony about her use of Roundup is inaccurate?

18          MR. MURNER:  Objection.  Form.

19          THE WITNESS:  I, I went by her testimony and, you

20      know, hold the information as best I could to

21      estimate, to reconstruct that exposure and calculate a

22      dose based on that exposure so I did the best I could,

23      and again tried to build in, you know, where I could

24      so that the model assumes that her exposure was

25      greater than what she likely encountered.

1                    CERTIFICATE OF OATH

2

3    THE STATE OF FLORIDA          )

4    COUNTY OF MIAMI-DADE          )

5


6            I, Donna Gunion, Florida Professional Reporter,
     Notary Public, State of Florida, certify that JOSHUA
7    SCHAEFFER, Ph.D. appeared via Zoom on the 22nd day of
     March, 2023 and was duly sworn.

8
             WITNESS my hand and official seal.
9
             DATED: 03/30/2023
10

11

12
     _____
13              Donna L. Gunion, FPR
            Notary Public - State of Florida
14             COMMISSION # HH 126082
             Commission Expires 8/3/2025
15

16

17

18

19

20

21

22

23

24

25

Joshua Schaeffer, Ph.D.
March 22, 2023

1                      CERTIFICATE OF REPORTER

2

3    THE STATE OF FLORIDA        )

4    COUNTY OF MIAMI-DADE         )

5

6            I, Donna L. Gunion, Florida Professional
     Reporter and Notary Public in and for the State of
7    Florida at large, do hereby certify that I was authorized
     to and did stenographically report the deposition of
8    JOSHUA SCHAEFFER, Ph.D. in the foregoing proceedings and
     was by me duly sworn to testify to the truth, the whole
9    truth, and nothing but the truth; that said proceedings
     were taken before me at the time and place therein set
10   forth and is a true record of my stenographic notes.

11           I further certify that I am neither a relative,
     employee, attorney or counsel of any of the parties, nor
12   am I relative or employee of any of the parties or
     connected with the action, nor am I financially
13   interested in the action.

14           In witness whereof, I have hereunto subscribed
     my name.
15
             DATED: 03/30/2023, at Miami, Dade-County,
16   Florida.

17

18   _____

19              Donna L. Gunion, FPR
            Florida Professional Reporter

20

21

22

23

24

25

# EXHIBIT 4

# Dermal Exposure Modeling



*By*
*Jennifer Sahmel, CIH, CSP*
*Mark Boeniger, CIH*
*Jeffrey Knutsen, PhD*
*Wil ten Berge, PhD*
*M. Cathy Fehrenbacher, CIH*

## 13.0   Overview

A number of modeling methods have been developed to estimate exposure and absorption of substances via the dermal route. The modeling techniques presented in this chapter may assist the industrial hygienist or risk assessor in estimating dermal loading on the skin, dermal absorption into the stratum corneum, or dermal penetration into the viable epidermis and bloodstream. Although only detailed sampling or biological monitoring measurements of individual exposure scenarios provide the most accurate estimates of dermal exposures, for situations where it is impossible or impractical to collect any sampling data, modeling may be a useful surrogate for exposure estimation or risk prioritization. The methods presented in this chapter include basic models to characterize chemical loading on the skin surface (defined by mass per unit surface area) as well as more involved models that estimate the mass of absorption through the stratum corneum for both organic and inorganic chemicals in an aqueous solution. Dermal exposure to chemicals in a gas or vapor form is also briefly discussed. The U.S. EPA has also addressed certain non-aqueous exposure scenarios such as exposure to soil, but these are less well developed than the models for aqueous solutions and are therefore not discussed in this chapter. Finally, examples are presented to the user of several of the modeling techniques presented in the chapter.

## 13.1   Background

The skin is an extremely complex physical, metabolic, and immunologically active organ which, described in the simplest terms, consists of the outer stratum corneum, the viable epidermal and the vascular dermis.[1] The stratum corneum is an extremely thin layer of flattened, dead keratinized skin cells in a lipid matrix. In healthy skin, the stratum corneum provides an effective barrier to some foreign agents, such as bacteria, and helps to maintain the body's water balance and temperature. In certain cases, the stratum corneum may also reduce or delay the absorption of chemicals through the skin. It should be noted that skin that has been damaged or compromised by previous chemical exposure or environmental factors such as wind, water, or humidity will provide a very different level of protection from chemical exposures than healthy skin.[2] Substances that contact the skin may evaporate or be physically transferred away from the surface of the skin, may be absorbed into the stratum corneum and be reversibly or irreversibly retained, or may penetrate into the viable epidermis and subsequently the vascular dermis and bloodstream where they may be metabolized. The stratum corneum has a lipid structure that holds the dead skin cells in place, and this structure is believed to provide the predominant barrier to chemical skin absorption through its densely packed arrangement of both lipid and protein components.[1] The viable epidermis is composed of living cells and is more aqueous and hydroscopic. This bi-layer configuration of the lipid-rich stratum corneum and the aqueous epidermis further contributes to the barrier properties of the skin. The skin is a complex system, with several potential pathways for transport and loss of substances contacting its surface. Many factors affect sorption into the skin, including physicochemical properties of the contaminant, skin age, skin condition, anatomical location of the contact, skin temperature, and hydration.[3,4]

This chapter provides a brief overview of methods available for estimating dermal exposure and skin permeation and discusses data sources for select model input values. Where available, default input values are identified, although these should be evaluated carefully for applicability to specific exposure scenarios. Biological monitoring is the ultimate tool for assessing total body exposure, although the number of reference standards and methods currently available may limit the applicability of this approach.

## 13.2 Modeling Dermal Exposure Potential

The process of judging dermal exposure potential is subject to the risk assessor's level of expertise and familiarity with the work tasks being performed, as well as the amount of detailed information collected during the assessment.[5] The U.S. EPA has noted that, in general, exposure duration, exposure frequency, and contact rate are likely to be the most sensitive parameters in an exposure assessment.[6] Several studies have noted that the processes of transferring chemicals to the clothing and skin can be quite variable and complex. Clothing and skin can become contaminated via impaction of aerosols, splashes, immersion, and contact with surfaces containing the chemical. The clothing may completely protect the skin, or it may become a depot for long-term transfer.[7–9]

There have been several relatively detailed approaches developed in order to standardize the approach for assessing dermal exposure. Most of these methodologies are based on a detailed conceptual model presented by Schneider et al.[10] This conceptual model describes the processes of mass transport of contaminants between the environment and the skin and is an excellent reference on the general mechanisms of skin exposure. Exposure assessment tools that have been developed based on this model typically include a series of standard questions that may be presented using a computer questionnaire format. The exposure assessment tool may then automatically generate ranking or default exposure values based on the responses provided, compared against an empirical database of exposure measurements.[11–13] An example of this conceptual model using default exposure parameter factors has been described in detail for spray painters' exposure to solvents.[14,15] Such exposure assessment tools may help provide a more consistent and detailed perspective regarding the workplace variables that could influence exposure magnitude than the industrial hygienist or risk assessor might otherwise develop.

One dermal exposure assessment tool using a computer questionnaire survey instrument is called DREAM (DeRmal Exposure Assessment Method). DREAM uses a structured approach to dermal exposure assessment of chemical or biological agents and provides semi-quantitative estimates of exposure.[16] It guides the development of estimates for exposure on the outside clothing layer (potential exposure) as well as on skin (actual exposure), and it provides insight into the distribution of dermal exposure over the body. Exposure route estimates obtained from the tool incorporate the frequency, probability and intensity of exposure.

The REACH guidance recommends a conservative estimate of 100% dermal absorption for a substance with a molecular weight of smaller than 500 and 10% with a MW greater than 500 and a log $K_{ow}$ (octanol/water partition coefficient) of less than -1 or greater than 4. However, compound specific differences in the dermal absorption process and the kinetic aspects of dermal absorption in this guidance are essentially ignored.[17]

The above approaches and references can be useful in refining an individual's ability to better understand and identify the magnitude of dermal exposures. Similar efforts to further refine and validate dermal exposure assessment models will hopefully continue into the future using advanced statistical approaches and other methods.[18] The ability of these models to reflect actual exposures, and the extent of their practical value, depends on the industrial hygienist's level of expertise and the accuracy of the model inputs.

## 13.3 Modeling Dermal Risk Potential

The quantification of exposure is only meaningful in the context of our knowledge and understanding of the health risks associated with particular levels of exposure. The RiskofDerm toolkit is one example of a method available to assist in dermal exposure risk assessment and management. This free toolkit was developed within the European Union (EU) and was primarily designed for use by small to medium-sized businesses.[19,20] This tool guides the user through a decision tree based on questions about chemicals used and the exposure situations encountered. It then translates the responses into broad data categories of hazard and exposure that lead to a rough estimate of health risks related to dermal exposure. RiskofDerm can be downloaded free over the internet.[21]

When an existing dermal risk assessment or estimation tool is not available, an occupational exposure limit (OEL) can be used in some instances to help differentiate acceptable from unacceptable exposures. However, nearly all OELs for chemical agents are presented in units of airborne concentrations in the breathing zones of workers. The need for the development of dermal exposure limits, along with possible approaches to setting these limits, have been discussed by many others.[22–25] Limits related to dermal exposure could be based on: (1) workplace surface contamination levels; (2) skin or clothing contamination levels; (3) estimations or biological measures of exposure or internal dose; or (4) an allowable duration of unprotected exposure. Although OELs directly addressing quantitative dermal exposures have not yet been systematically developed, there are approaches available that can be very useful, even in the absence of dermal-specific OELs.

Five different types of models are presented below to assist in the evaluation of dermal exposures. The first provides a methodology to calculate a dermal or total body dose equivalent based on an existing airborne OEL (§13.3.1). The second model compares this calculated OEL equivalent to a simple exposure estimation based on skin loading and a fractional or complete skin absorption value for the agent of interest (§13.3.2). The third model

uses Fick's second law of diffusion and applies a permeability coefficient to estimate the absorbed dose of aqueous chemical solutions or neat chemicals through the stratum corneum (§13.3.3). The fourth model uses an OEL equivalent value and a permeability coefficient to determine an allowable skin exposure duration time for an agent of interest based on a calculated estimate of skin absorption (§13.3.4). The fifth model can be used to estimate hand-to-mouth contact related to dermal exposure (§13.3.5). The sixth model is used to estimate risk-based surface wipe screening levels (§13.3.6).

## 13.3.1 Estimating a Dermal OEL Dose Equivalent Using an Existing Airborne OEL

When dermal exposure limits are unavailable and the toxic effect of a chemical is systemic, an airborne OEL, expressed in units of airborne concentration, may be converted to a metric of dermal exposure. Although a worker's respiration rate varies with activity, workers may breathe about 11–19 m³ of air in an 8-hour workday when working at moderate physical activity. The U.S. EPA's Exposure Factors Handbook (Table 5-25) reports measured inhalation rates for adults at a variety of exertion levels.[26]

Thus, an estimated total body dose can be created by converting an inhalation exposure limit expressed in mg/m³ to a dose in units of mg/day using the following relationship

Exposure dose (mg/day) = OEL (mg/m³) ×
inhaled air volume (m³/day)                   (13-1)

One can then estimate the potential total body dose in mg/day and compare it to an estimated dermal loading. A few publications have proposed related strategies for addressing the contribution of dermal exposure.[30,31] Note that this approach is valid only for compounds that exert their toxicity as a systemic effect (e.g., carcinogens affecting target organs other than the skin, liver toxicants, kidney toxicants). It is not appropriate to use this methodology for agents for which the primary health effect

is local tissue response (e.g., corrosives, eye irritation, or contact allergens). Additionally, it is important to review the documentation for the OEL and to apply this technique only in cases where the studies used to derive the inhalation OEL were based on systemic toxicity via multiple routes of exposure rather than inhalation toxicity alone. When dealing with local skin effects, toxicological data specific to that effect is required for assessing risk. It should be noted that the level of physical activity used for this calculation should be selected carefully, as this parameter can affect the allowable exposure dose significantly. And finally, a careful review of the literature supporting the inhalation OEL must be conducted before using this approach because factors such as the percent of the inhaled dose actually absorbed at the OEL can be critical considerations.

## 13.3.2 Dermal Exposure Estimation Assuming Complete or Fractional Absorption

A simple, but potentially imprecise, model for estimating dermal exposure dose is to assume that a finite mass of a contaminant is deposited on the skin and a complete or fractional amount is subsequently absorbed. Variations of this approach can be used to estimate skin uptake of chemicals in soil or uptake associated with a thin film of liquid deposited on the skin.[32] This approach assumes that deposition over the exposed skin surface area is uniform and that the process of absorption is sufficiently slow so that one can separate the deposition from the absorption process. The method also can be used to preliminarily interpret wipe sampling data.[33] A considerable amount of dermal deposition data has been collected to assess occupational exposure to pesticide handlers and operators, but data for most industrial operations are limited.[34] Input values for the quantity deposited on the skin and the absorption fraction will likely contribute substantially to the uncertainty associated with this model.

Some considerations related to parameter selection must be carefully evaluated before using this model. First, although empirical measurements of the fraction of chemical absorbed have been published in the literature, such data must be used with care because of the specificity of these measurements to the particular scenario under evaluation. Care is required because reporting of the fraction of a chemical absorbed makes some assumptions about steady state conditions, where in reality, the dermal absorption rate is variable over time. Specifically, for a single applied dose, the rate of absorption decreases as a consequence of absorption that has already occurred, depleting the surface concentration over time. As a result, it may be difficult or impossible to use data from a study reporting fraction or percent absorbed to estimate the mass of a chemical absorbed for other dermal exposure scenarios. Studies reporting percent absorption may also report the percent absorbed over a 24-hour period rather than an 8-hour work day. Further, many other factors

**Table 13.1 — Summary of Adult Inhalation Rates for Short-Term Exposure Studies**

| | Arithmetic Mean (m³/hr) Activity Level | | | | | |
|---|---|---|---|---|---|---|
| Rest | Sedentary | Light | Moderate | High | Reference | |
| 0.5 | 0.5 | 1.4 | 2.4 | 3.3 | Adams, 1993 (Lab protocols)[27] | |
| — | 0.6 | 1.2 | 1.8 | — | Adams, 1993 (Field protocols) | |
| 0.4 | 0.4 | 0.7 | 1.4 | 3.6 | Layton, 1993 (Short-term exposure)[28] | |
| 0.4 | — | 0.6 | 1.5 | 3.0 | Layton, 1993 (3rd approach) | |
| — | — | 1.0 | 1.6 | 3.0 | Linn et al., 1992[29] | |

*Mathematical Models for Estimating Occupational Exposure to Chemicals, 2nd edition*

including skin condition, the presence of chemical mixtures, and skin washing or decontamination practices may dramatically affect percent absorbed values.

Second, a major assumption of this model is that skin loading (i.e., mg/cm$^2$) is proportional to the number of loading events, such that each event is additive and contributes equally to the final loading. Once deposited, it is assumed that the mass of chemical on the skin does not deplete over time. However, intuition and limited studies suggest that this is an unrealistically high loading. Third, the selection of a value for number of events per day can dramatically affect the model results and must be carefully considered in order to appropriately estimate dermal loading.[35]

This simplified absorption model will provide a typically conservative dermal exposure dose that can be used to estimate the potential daily dermal absorbed dose in units of mg/day, assuming deposition on the skin is followed by absorption. Once the estimated dermal absorbed dose has been determined, it can be compared to an OEL expressed in units of mg/day (Equation 13-1). Equation 13-2 presents the methodology for estimating dermal absorbed dose, assuming deposition followed by absorption.

$$DA = S \times Q \times FQ \times ABS \times WF \qquad (13-2)$$

where:

DA = dermal absorbed dose rate, mg/day
S = surface area of skin available for contact, cm$^2$
Q = quantity of mixture deposited on the skin per event, mg/cm$^2$ – event
FQ = contact frequency, number of events per day, #/day
ABS = fraction of applied dose absorbed through the skin per event, unitless
WF = weight fraction of the substance in the mixture, unitless

**S (Surface Area of Skin)**

To calculate the surface area of potentially exposed skin, the industrial hygienist should gather information on activities and tasks performed by each worker, along with the types and number of skin surfaces (e.g., one hand, two hands) potentially exposed during the activities. Worker activities can significantly influence the amount of a substance deposited on the skin, as well as the location of contact. The U.S. EPA's Exposure Factors Handbook (Table 6-4) provides estimates of skin surface areas for both males and females[26]:

It may be necessary to compute dermal absorbed doses for different parts of the human body, as the quantity of deposition may vary by surface area. As a result, this equation should be used to calculate a dose only for limited surface areas of skin where loading is likely to be uniform (i.e., the hands).[36] Although the hands are often identified as a site of higher exposure, other parts of the body also may receive substantial exposures. In a 1992 study, for example, during mixing/loading of pesticides, high exposure at the lower leg occurred because most of the operations involved pouring liquid from one container to another below the waist level.[37] Another researcher found unusually high

**Table 13.2 — Surface Area by Body Part for Adults (m$^2$)**

| Body part | Men | | | | | Women | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | N[a] | Mean | (sd)[b] | Min. | - Max. | N | Mean | (sd) | Min. | - Max. |
| Head | 32 | 0.118 | (0.0160) | 0.090 | - 0.161 | 57 | 0.110 | (0.00625) | 0.0953 | - 0.127 |
| Trunk (incl. Neck) | 32 | 0.569 | (0.104) | 0.306 | - 0.893 | 57 | 0.542 | (0.0712) | 0.437 | - 0.867 |
| Upper extremities | 48 | 0.319 | (0.0461) | 0.169 | - 0.429 | 57 | 0.276 | (0.0241) | 0.215 | - 0.333 |
| Arms | 32 | 0.228 | (0.0374) | 0.109 | - 0.292 | 13 | 0.210 | (0.0129) | 0.193 | - 0.235 |
| Upper arms | 6 | 0.143 | (0.0143) | 0.122 | - 0.156 | - | - | - | - | - |
| Forearms | 6 | 0.114 | (0.0127) | 0.0945 | - 0.136 | - | - | - | - | - |
| Hands | 32 | 0.084 | (0.0127) | 0.0596 | - 0.113 | 12 | 0.0746 | (0.00510) | 0.0639 | - 0.0824 |
| Lower extremities | 48 | 0.636 | (0.0994) | 0.283 | - 0.868 | 57 | 0.626 | (0.0675) | 0.492 | - 0.809 |
| Legs | 32 | 0.505 | (0.0885) | 0.221 | - 0.656 | 13 | 0.488 | (0.0515) | 0.423 | - 0.585 |
| Thighs | 32 | 0.198 | (0.1470) | 0.128 | - 0.403 | 13 | 0.258 | (0.0333) | 0.258 | - 0.360 |
| Lower legs | 32 | 0.207 | (0.0379) | 0.093 | - 0.296 | 13 | 0.194 | (0.0240) | 0.165 | - 0.229 |
| Feet | 32 | 0.112 | (0.0177) | 0.0611 | - 0.156 | 13 | 0.0975 | (0.00903) | 0.0834 | - 0.115 |
| TOTAL | | 1.94[c] | (0.00374)[d] | 1.66 | - 2.28[e] | | 1.69[c] | (0.00374)[d] | 1.45 | - 2.09[e] |

[a] number of observations.
[b] standard deviation.
[c] median (see Table 6-2).
[d] standard error.
[e] percentiles (5th - 95th).
Source: Adapted from U.S. EPA, 1985.

exposure at the legs due to frequent contact with spray nozzles during loading of pesticides.[38] In a separate study, high exposure at the thighs was reportedly due to workers rubbing their hands against their pants at the thigh area during pesticide operations.[39] The Pesticide Handlers Exposure Database (PHED) has been designed to facilitate estimations of pesticide exposures during mixing/loading, application, and flagging operations, based on application method, formulation type, procedure, equipment, clothing scenario, and other factors.[34]

### FQ (Frequency of Events per Day)

Care must be taken in interpreting the number of exposure events occurring per day when using this model because it assumes that skin loading is always proportional to the number of events. Other equations (provided below) will provide more realistic ways to address the loading and subsequent absorption of an agent through the epidermis. In using this equation, the industrial hygienist or risk assessor must carefully consider whether each "event" will result in additional loading of the skin. The majority of experimental studies investigating dermal transfer and retention have been documented after a single exposure event. However, in this equation, it is presumed that during repeated events (or contacts), the amount of the agent retained on the skin will increase additively with each event in proportion to the number of contacts; this approach is likely to overestimate skin loading. The actual amount of agent contacting and subsequently retained on the skin may vary over several orders of magnitude depending on the way specific activities are performed by the worker and the physical nature of the agent matrix. If one assumes an unreasonably large number of events or contacts for the purposes of this model input, it will in turn result in an unreasonably high estimate of dermal loading over the period of interest. A more realistic scenario is that eventually the exposed area of skin would become "saturated" when the skin's capacity to retain the substance reaches its maximum level. After this point, additional exposure events would be unlikely to result in additional skin loading.[40,41] One way to address this issue when using this particular model is to consider assigning the number of exposure events (FQ) for periods of work separated by changes in work routine or skin decontamination.

### Q (Quantity Deposited on Skin)

The amount of a substance deposited on the skin has been shown to vary by activity; for solids, parameters such as particle size may be the primary factor in the deposition rate.[42] A variety of methods can be used to measure the amount of contaminant deposited on the skin, and numerous summaries have been prepared.[7,42–48] Methods that can be used for measuring dermal exposure or the exposure source include absorbent pad or clothing sampling, glove and hand wash sampling, surface wipe sampling, fluorescent tracers, and other techniques.

Additional information on dermal sampling techniques can be found in Appendix II of *A Strategy for Assessing and Managing Occupational Exposures*, 3rd edition.[49]

In the absence of dermal exposure monitoring data, potential default values for the amount retained on the skin per event (Q) are presented in Table 13.3. These values can be used for industrial scenarios to develop screening level estimates of potential dermal exposure. Note that these default values are based on a limited amount of data. The data can generally be used to represent exposure received by workers wearing no personal protective equipment. Some of the samples were collected on surrogate skin (e.g., cotton gloves), which may result in upwardly biased estimates of actual exposure. The reported physical skin loading is 1.3–10.3 mg/cm² for liquids.[50] A study of the amount of liquid insect repellent applied to the skin found that for most persons, the average application quantity was approximately 2 mg/cm². The upper limit was restricted to about 4 mg/cm² due to runoff from the skin.[51] Analysis of collected field data estimate median soil loadings to be 0.25 mg/cm² (50th percentile) and up to 1.7 mg/cm² (95th percentile) for most situations.[52] Studies also confirm that the amount of soil retained on the skin is influenced by the individual tasks.[42,45,46] The properties of the soil (e.g., particle size, moisture) may also influence soil adherence rates. The EPA Exposure Factors Handbook provides recommendations for soil adherence values for a variety of exposure scenarios.[26]

A loading of about 5 mg/cm², assuming particles ≤ 35 mm in diameter and a density of 2.6 g/cm³, will completely cover the skin, forming a "monolayer" of coverage. Finer soils, like clay, will form a monolayer of loading with only about 2.5 mg/cm².[53] Any skin surface loading of particles that does not completely cover the skin can be presumed to have a mass loading equal to the above monolayer loadings times the fraction (or area) of skin covered by the particles. A loading of particles greater than this monolayer loading will probably not contribute significantly to additional percutaneous absorption.

### ABS (Fraction of applied dose absorbed)

In this model, a constant fraction of the deposited contaminant is used to approximate the amount absorbed. In reality, however, the fraction of chemical absorbed into the skin is dependent on both concentration applied to the skin and duration of exposure. Thus, the absorbed fraction can vary substantially from one study to another and will be specific to the scenario under evaluation. The mass of chemical that ultimately penetrates the skin is typically determined by how much of the chemical is absorbed into the stratum corneum within the first 30 minutes. However, for some chemicals, such as those which are very lipophilic, penetration may continue for several days.[54–56] In practice, default fractional absorption assumptions are based on a very limited number of 24-hour *in vivo* animal exposure studies, primarily with pesticides.[57] Thus, the use of these absorption fractions may overestimate the

*Mathematical Models for Estimating Occupational Exposure to Chemicals, 2nd edition*

**Table 13.3 — "Q" Values: Amount of Contaminant Retained on the Skin per Event that can be assumed for Screening-Level Assessments of Dermal Exposure to the Hands[50]**

| Type of Contact[1] | Typical Examples | S[2] (cm²) | Q[3] (mg/cm²) | Resulting Dermal Contact (mg) |
|---|---|---|---|---|
| Routine, direct handling of solids – 2 hands | • Filling/dumping containers of powders, flakes, granules<br>• Weighing powder/scooping/mixing (e.g., dye weighing)<br>• Handling wet or dried material in a filtration and drying process | 840 | (3.7)[5] | up to 3100[4] |
| Routine contact with surfaces – 2 hands – solids | • Handling bags of solid materials (closed or empty) | 840 | (1.3)[5] | up to 1100[4] |
| Routine immersions, 2 hands – liquids | • Handling wet surfaces<br>• Spray painting | 840 | 1.3 – 10.3 | up to 8700 |
| Routine contact, 2 hands – liquids | • Maintenance<br>• Manual cleaning of equipment<br>• Filling drum with liquid | 840 | 0.7 – 2.1 | up to 1800 |
| Incidental contact, 2 hands – liquids | • Connecting transfer line | 840 | 0.7 – 2.1 | up to 1800 |
| Incidental contact, 1 hand –liquid | • Sampling<br>• Ladling liquid/bench scale liquid transfer | 420 | 0.7 – 2.1 | up to 900 |

Table 13.3 Notes:

[1] The terms "routine" and "incidental" reflect typical EPA/Office of Pollution Prevention and Toxics/Chemical Engineering Branch (CEB) judgments on likelihood of contact for the example activities.

[2] Values of the skin surface area of the hands taken from: EPA Exposure Factors Handbook, 1997 and are for the mean values of men.

[3] Selected ranges of "Q" values for liquid handling activities taken from: A Laboratory Method to Determine the Retention of Liquids on the Surface of Hands, Exposure Evaluation Division, Office of Pollution Prevention and Toxics, US EPA, EPA 747-R-92-003, September, 1992.

[4] Values for dermal contact for solids handling activities were taken from: Lansink, C.J.M., M.S.C. Breelen, J. Marquart, and J.J. van Hemmen: Skin Exposure to Calcium Carbonate in the Paint Industry. Preliminary Modeling of Skin Exposure Levels to Powders Based on Field Data (TNO Report V 96.064). Rijswijk, The Netherlands: TNO Nutrition and Food Research Institute, 1996.

[5] Estimated; not provided by CEB.

penetrated dose when the exposure duration is shorter than 24 hours. Keep in mind that some environmental agents will be absorbed through the skin during the exposure event, some will be absorbed after the event (if not removed before the next event), and some will be removed before absorption occurs. Thus, as discussed above, the exposure value used may lead to an overestimate of actual systemic absorption. Some regions or divisions of the U.S. EPA have recommended using ABS = 0.10 as the default absorption factor for organic chemicals when no empirical data are available, whereas others have preferred to assume complete absorption with ABS = 1.0.[50,58] As a result, default values, in the absence of empirical data, may differ by a factor of nearly 10-fold depending on the assumption.[35] In reality, there can be a wide range of actual absorption fractions experienced with different compounds and over various durations of skin contact. If empirical skin absorption values specific to the scenario under evaluation are available, they should be used where

applicable. Empirical skin absorption values can be found in a number of original studies in the peer reviewed literature; a selected number can also be found in the U.S. EPA's report on dermal exposure assessment.[32]

**WF (Weight fraction of the substance in the mixture, unitless)**

When a chemical is present in a mixture, its concentration, or weight fraction, must be considered to estimate dermal exposure. A useful approximation is to assume that the mass of a specific chemical penetrating the skin after dermal exposure to a mixture is roughly proportional to the concentration of the chemical within the mixture. For example, if an individual is dermally exposed to a mixture containing a chemical at a concentration of 10 parts per million (ppm) by weight, then WF = 10 mg chemical / 1,000,000 mg mixture = 0.00001. If an individual is exposed to a neat liquid chemical, then WF = 1.

## Model Application

When applying this model to estimate dermal exposure, all five terms in Equation 13-2 are multiplied together, arriving at the dermal absorbed dose rate in units of mg/day. Therefore, when applying this model, the exposure assessor implicitly assumes that dermal exposure is proportional to each of the following: the surface area of skin exposed, the quantity of mixture deposited, exposure frequency, the fraction of chemical absorbed, and the weight fraction of chemical in the mixture. He or she must consider this fact and understand potential biases and limitations of the model as described. Other models based on Fick's law of diffusion (as discussed below) may provide more realistic estimates of dermally absorbed dose rates. Example 1 below demonstrates the potential application of this model.

### 13.3.3 Dermal Exposure Estimation Using Average Daily Dose

The U.S. EPA in the Risk Assessment Guidance for Superfund (RAGS) Supplemental Guidance for Dermal Risk Assessment (as well as in the Exposure Factors Handbook and the Dermal Exposure Assessment Guidance documents) describes a dermal exposure estimation model in which the absorbed dose can be derived using either a permeability coefficient (for aqueous solutions) or a fraction of absorbed dose (for non-aqueous and non-steady state conditions such as exposure to soil).[6,26,35] In this model, the skin is considered to have two discrete layers with different penetration potentials: the stratum corneum and the viable epidermis. The model is based on Fick's law of diffusion, which describes the concentration of a chemical within the skin as functions of both the distance traveled into the skin and time. Ultimately, Fick's law is used here to predict the rate at which chemicals are absorbed by the stratum corneum under steady conditions. Methods for estimating percutaneous absorption using permeability coefficients have been developed for aqueous solutions or neat liquids and for vapors and gases. These methods require information about the chemical's permeability coefficient (distance per time) in water. This model can be used to evaluate both organic and non-organic chemicals.

Note that the model below is only applicable to non-carcinogens and calculates the average daily dose (ADD); the Lifetime Average Daily Dose (LADD) should be used to evaluate carcinogens. In the main conceptual equation, the dose rate is averaged over the period of exposure and a daily dose is expressed as mass per unit of body weight per day[6]:

$$ADD = \frac{DA_{event} \times EV \times ED \times EF \times SA}{BW \times AT} \qquad (13\text{-}3)$$

where

$ADD$ = average daily dose, mg/kg-day
$DA_{event}$ = absorbed dose per event, mg/cm²-event
$EV$ = event frequency, events/day
$ED$ = exposure duration, years
$EF$ = exposure frequency, days/year
$SA$ = skin surface area available for contact, cm²
$BW$ = body weight, kg
$AT$ = averaging time, days,
  • for non-carcinogenic effects, $AT = ED$
  • for carcinogenic effects, $AT = 70$ years = 25,550 days

### Absorbed Dose per Event for an Aqueous Vehicle ($DA_{event}$)

For aqueous solutions, a permeability coefficient is used to calculate the mass of chemical absorbed per exposure event per unit area of skin (i.e., mg/cm²-event). The permeability coefficient, $K_p$, is a function of (1) the distance of chemical diffusion (i.e., the thickness of the stratum corneum), (2) the membrane/vehicle partition coefficient (defined in this equation as the octanol/water solubility partition coefficient, $K_{ow}$), and (3) the effective diffusion coefficient, $D_{sc}$, cm²/hr. $K_p$ can be estimated simply from the chemical's molecular weight, MW, and $K_{ow}$ using one of several empirical regression equations. Additionally, the RAGS Supplemental Guidance for Dermal Risk Assessment provides hundreds of $K_p$ values for common chemical substances in Appendix B.[6] The $K_p$ value can also be estimated using the SkinPerm tool, a simple computer-based model that will also estimate quantitative absorption values for dermal exposures to both liquids and vapors. This tool is available for free download from the internet (http://home.planet.nl/~wtberge/).[59] The website includes a description of the assumptions underlying the revised Robinson equation (Equation 13-8), which is used by SkinPerm to estimate $K_p$. The physicochemical data needed to estimate $K_p$ are stored in an associated database for a number of common chemicals. If the appropriate chemical properties are available to the user, $K_p$ can be estimated for chemical substances not contained in the SkinPerm database. Alternatively, $K_p$ can be obtained using modeling tools on both the NIOSH and the Syracuse Research Center websites.[60,61]

Given the appropriate value for the permeability coefficient $K_p$, one can estimate the dermal absorbed dose rate per event using Equation 13-4:

$$DA_{event} = K_p \times C_w \times t_{event} \qquad (13\text{-}4)$$

where

$DA_{event}$ = dermal absorbed dose rate per event, mg/cm²-event
$K_p$ = appropriate permeability coefficient in water, cm/hr
$C_w$ = concentration of the substance in water, mg/cm³
$t_{event}$ = duration of event, hr/event

**Alternative Equation for Absorbed Dose per Event (DA$_{event}$) for Single Events and for Neat Chemicals**

An alternative equation for DA$_{event}$ can be used in the event that only the dose of interest is for a single specific event. This equation can also be used to estimate the dermally absorbed dose for substances in a vehicle other than water or as a neat chemical:

$$DA_{event} = K_{p,veh} \times C \times SA \times t_{event} \qquad (13\text{-}5)$$

where

DA$_{event}$ = dermal absorbed dose rate per event, mg/event
K$_{p,veh}$ = appropriate permeability coefficient in the vehicle of interest, cm/hr
C = concentration of the substance in vehicle of interest, mg/cm$^3$
(note that for neat liquids, C = $\rho$, the density of the liquid)
SA = surface area of skin, cm$^2$
t$_{event}$ = duration of event, hr/event

The permeability coefficient K$_{p,veh}$ may be difficult to determine for most chemicals in specific nonaqueous vehicles. In these cases, K$_p$ can be approximated by:

$$K_{p,veh} = K_p \times \frac{C_w^{sat}}{C_{veh}^{sat}} \qquad (13\text{-}6)$$

where

K$_p$ = appropriate permeability coefficient in water, cm/hr
C$_w^{sat}$ = the saturation concentration of the vehicle of interest in water
C$_{veh}^{sat}$ = the saturation concentration of the chemical of interest in the vehicle of interest
K$_p$ = appropriate permeability coefficient in water, cm/hr

Note that if the chemical is neat, then C$_{veh}^{sat}$ is equivalent to the chemical's density. The above equation is based on two main approximations: (1) that the stratum corneum is not significantly altered by the chemical in a vehicle other than water, and (2) that the chemical activity of the chemical at its saturation concentration in water is roughly the same as its activity when saturated in the second vehicle. Note the somewhat counter-intuitive prediction that the dermal flux of a chemical saturated at a relatively high concentration in a particular vehicle, or present as a neat liquid, will be equivalent to the predicted flux of the same chemical at its relatively low saturation concentration in water. This prediction is in agreement with theoretical predictions[62] as well as the empirical observations of Bunge and Romonchuk, who demonstrated that phenanthrene in water at its saturation concentration exhibited nearly the same dermal flux as phenanthrene saturated in silicone oil, even though the saturation

concentration in the oil was several orders of magnitude higher.[63] Other empirical studies have shown that the dermal flux for skin absorption from a saturated aqueous solution of benzene and for neat benzene were similar, a phenomenon that is true for several other solvents, but may not be true for all.[3,64]

**Derivation of K$_p$ for use in DA$_{event}$: Diffusion through the Skin from Aqueous Solutions or Neat Liquids**

In its simplest form, if concentration remains steady, then the permeability coefficient, K$_p$, is essentially the speed at which a chemical diffuses through the skin with units of cm/hr. The flux of a chemical is then the permeability coefficient multiplied by the concentration of chemical on the surface of the skin, a result of Fick's Law of Diffusion:

$$\text{Flux (mg/cm}^2\text{/hr)} = K_p \times \text{Concentration (mg/cm}^3)$$

A number of equations have been used to define K$_p$ for aqueous solutions. For example, part E of the EPA's risk assessment guidance for superfund document provides a relatively simple correlation[6]:

$$\log K_p = -2.80 + 0.66 \times \log K_{ow} - 0.0056 \times MW \qquad (13\text{-}7)$$

where

K$_{ow}$ = octanol-water partition coefficient of the chemical
MW = molecular weight of the chemical, g/mol

The current revised Robinson model provides another, more comprehensive, means to estimate the skin permeation and lag time for highly hydrophilic and highly lipophilic chemicals. This method has the smallest residual variance relative to similar equations.[65,66] A quantitative structure-activity relationship (QSAR) for the skin permeability coefficient from aqueous solution (K$_p$) has been developed on the basis of the following starting points.

- Resistance against mass transfer is assumed to be only in the stratum corneum, the outermost layer of the dermis.
- Permeation is assumed to occur via two pathways in the stratum corneum, the transcellular route through the protein corneocytes (dead, flattened skin cells) (K$_{pro}$) and the intercellular route through the extracellular lipid matrix which holds the corneocytes in place (K$_{lip}$).
- Transfer from the stratum corneum to the viable epidermis is assumed to be controlled by the water solubility of the permeating substance. The water solubility may be enhanced by the presence of water soluble organic solvents like ethanol in the permeating solution.
- The viable epidermis is not assumed to be a limiting factor for permeation. For water soluble

compounds the viable epidermis does not form a barrier compared to the stratum corneum. The permeability coefficient of the stratum corneum increases with increasing lipophilicity, but the permeability coefficient of the viable epidermis will also increase. The reason for this is that the blood solubility of lipophilic compounds is higher than the water solubility, due to the presence of about 1% blood lipids. The removal rate of a substance from the viable epidermis by skin blood increases with increasing lipophilicity, but the amount in the viable epidermis available for permeation decreases due to decreasing water solubility.

The revised Robinson model is based on the rate of chemical diffusion through lipids and proteins in the stratum corneum, along with the subsequent rate of diffusion through the aqueous viable epidermis. As shown in Equation 13-8, if the rate of diffusion through the aqueous viable epidermis is rapid (i.e., $K_{aq}$ is large), then diffusion is limited by the lipids and proteins of the stratum corneum.

$$K_p = \cfrac{1}{\cfrac{1}{K_{lip} + K_{pro}} + \cfrac{1}{K_{aq}}} \qquad (13\text{-}8)$$

where

$K_p$ = overall aqueous permeability coefficient, cm/hr
$K_{lip}$ = permeability coefficient of the lipid matrix fraction of the stratum corneum, cm/hr
$K_{pro}$ = permeability coefficient of the protein fraction of the stratum corneum, cm/hr
$K_{aq}$ = permeability coefficient of the viable layer of the epidermis, posing an aqueous barrier, cm/hr

The estimation of $K_p$ for this model considers two parallel pathways (for either lipophilic or hydrophilic compounds) via the lipid and protein fractions of the stratum corneum, in addition to the viable epidermis as an aqueous barrier. As mentioned above, $K_p$ multiplied by the chemical concentration (mg/cm$^3$) results in the flux of chemical through the skin (mg/cm$^2$-hour). Note that the chemical concentration can never exceed the chemical's solubility in water. A database of measured permeability coefficients and physicochemical properties of numerous substances was used to evaluate the revised Robinson model and provide estimates of $K_p$ for a wide range of chemicals in an aqueous vehicle.[67] Note that the following equations are used to estimate $K_p$ in an aqueous vehicle only. To estimate $K_p$ for other vehicles, appropriate adjustments must be made, as described above.

The permeability coefficient of the lipid fraction of the stratum corneum, $K_{lip}$, in cm/hr can be estimated using Equation 13-9:

$$\log K_{lip} = -2.59 + 0.7318 \times \log K_{ow} - 0.006832 \times MW \qquad (13\text{-}9)$$

where

$K_{ow}$ = octanol-water partition coefficient of the chemical, and
$MW$ = molecular weight, g/mol.

The permeability coefficient of the protein fraction of the stratum corneum ($K_{pro}$) in cm/hr can be estimated using Equation 13-10:

$$K_{pro} = \frac{0.043}{MW^{1.36}} \qquad (13\text{-}10)$$

To estimate the permeability coefficient of the viable layer of the epidermis, Bunge and Cleek (1995) treated this layer as a pseudo-liquid in which chemicals would theoretically partition equally between the viable epidermis and water.[68] Their estimates assume that diffusivity scales with MW$^{-½}$ and that a chemical with MW = 50 g/mol would exhibit a diffusivity of $10^{-6}$ cm$^2$/s (ten-fold slower than a comparable molecule would likely diffuse in water). Equation 13-11 results from this formulation, using a viable epidermis thickness of 100 μm:

$$K_{aq} = \frac{2.5}{\sqrt{MW}} \qquad (13\text{-}11)$$

Note that the permeability coefficients outlined above are influenced by the molecular volume of the chemical. Smaller molecules tend to diffuse faster, and larger molecules tend to diffuse more slowly. To a very good approximation for most chemicals, MW is a reasonable indication of the molecular volume, as chemicals with larger molecular weights tend to be more voluminous. However, the molecular volumes of chemicals containing very dense atoms such as halogenated compounds tend to be smaller than anticipated using correlations with other chemicals.

### Derivation of $K_p$ for use in $DA_{event}$: Diffusion through the Skin from Vapors and Gases

At least one study has provided recommendations for evaluating diffusion through the skin from vapors and gases.[69] To estimate the skin permeability coefficient from gases, the permeability coefficient from aqueous solutions can be modified through multiplication with the water/air partition coefficient. The water/air partition coefficient ($K_{wa}$) is defined as follows in Equation 13-12:

$$K_{wa} = \frac{R \times T \times W_{sb}}{VP \times MW} \qquad (13\text{-}12)$$

where

$R$ = gas constant in 8.314 Joule/mol/degree Kelvin
$T$ = temperature in degree Kelvin

*Mathematical Models for Estimating Occupational Exposure to Chemicals, 2nd edition*

$W_{sb}$ = Chemical solubility in water (g/m$^3$)
VP = Chemical vapor pressure at temperature T in degrees Kelvin
MW = molecular weight

Multiplication of $K_p$ and $K_{wa}$ produces the permeation coefficient of the skin, $K_{p,sk\text{-}air}$ (cm/hour) for gaseous compounds:

$$K_{p,sk\text{-}air} = K_{wa} \times K_p \qquad (13\text{-}13)$$

For gaseous compounds permeating the skin quickly, the diffusion from the air to the skin surface may become the rate-limiting factor. To take this effect into account it is assumed that a layer of stagnant air is present between the skin surface and workroom air. The thickness, δ, of this air layer is estimated to be 3 cm for light work clothing, based on a 1993 study.[70]

The air diffusion constant ($D_{air}$, in cm$^2$/hour) and the permeability coefficient of the stagnant-air boundary layer on the skin ($K_{p,air}$, cm/hour) are formulated as follows:

$$D_{air} = 360 \sqrt{\frac{76}{MW}} \qquad (13\text{-}14)$$

and:

$$K_{p,air} = \frac{D_{air}}{\delta} \qquad (13\text{-}15)$$

where

δ = 3 cm

Finally, the overall $K_{p,sk\text{-}air,air}$ (in cm/hour) is controlled by the diffusion through the air boundary layer on the skin ($K_{p,air}$) and diffusion through the skin ($K_{p,sk\text{-}air}$):

$$K_{p,sk\text{-}air, air} = \frac{1}{\dfrac{1}{K_{p,sk\text{-}air}} + \dfrac{1}{K_{p,air}}} \qquad (13\text{-}16)$$

As with the dermal flux for aqueous solutions, the dermal flux of gaseous chemicals is estimated by multiplication of the $K_{p,sk\text{-}air,air}$ with the atmospheric concentration of the chemical, $C_{air}$ (mg/cm$^3$):

Flux (mg/cm$^2$/hr) = $K_{p,sk\text{-}air, air} \times C_{air}$ (mg/cm$^3$)

The atmospheric concentration is limited by its vapor pressure: $C_{air,max}$ = MW × VP / R × T, where T is in degrees Kelvin.

The advantage of this simple approach is that it provides an estimate of the skin permeation of vapors when the permeability coefficient from aqueous solutions is known. This model will estimate a high permeation rate for gaseous aniline, nitrobenzene, and glycol ethers and a very low permeation rate for hydrocarbons such as benzene and toluene. Thus, this model's estimates are consistent with real-world observations. Ignoring the air boundary layer, $K_{p,air}$, in the equation for the permeability coefficient of gases will result in larger estimates of the skin permeation rate.

Although some mathematical models can be used to estimate the amount of a contaminant in an aqueous media permeating the skin, there is still much to be learned about the process. The revised Robinson Model, which is useful for estimating the permeability coefficient, is recommended over the other models that have been evaluated.

**Estimation of Lag Time**

The permeability coefficients discussed above describe the permeation rate at steady state. In reality, it may take some time before steady state has been achieved. The following equations can be used to better characterize this phenomenon:

$$K_p = \frac{P_{scw} \times D_{sc}}{h_{sc}} \qquad (13\text{-}17)$$

$$t_{lag} = \frac{h_{sc}^2}{6D_{sc}} = \frac{h_{sc}P_{scw}}{6K_p} \qquad (13\text{-}18)$$

$$D_{sc} = \frac{h_{sc}^2}{6t_{lag}} = \frac{h_{sc}K_p}{P_{scw}} \qquad (13\text{-}19)$$

where

$t_{lag}$ = lag time (hour)
$P_{scw}$ = partition coefficient stratum corneum/water
$D_{sc}$ = diffusivity stratum corneum (cm$^2$/hour)
$h_{sc}$ = thickness stratum corneum (cm)

The lag time and the diffusivity may be estimated from the steady state permeability coefficient and the partition coefficient between stratum corneum and water, which is specific for each substance. A database of measured partition coefficients between wet stratum corneum and water has been compiled.[71] The wet stratum corneum/water partition coefficient $P_{scw}$ was approximated by:

$$P_{scw} = 0.72 \times K_{ow}^{0.43} \qquad (13\text{-}20)$$

The lowest $P_{scw}$ of the database was about 0.2, which is the experimental wet stratum corneum/water partition coefficient of water. Because substances with smaller values of $K_{ow}$ were not part of the database, it is not advisable to use the above equation to estimate $P_{scw}$ for these substances, since it is assumed that the same partition coefficient applies. In these cases, a value of $P_{scw}$ = 0.2

should selected.  For the estimation of the lag time, the thickness of the hydrated stratum corneum should be used, with $h_{sc} = 0.002$ cm.

**Fraction of dermal absorption of a volatile liquid deposited on the uncovered skin**

When a volatile liquid chemical is deposited on the skin, a fraction of the volume will volatilize and a fraction may be absorbed into the stratum corneum.  For risk assessments, the absorbed fraction may need to be estimated.  This requires an understanding of the initial rate of absorption (dermal flux) of neat liquid into the stratum corneum in mg/cm²/hour and an understanding of the initial rate of evaporation from the skin in mg/cm²/hour.  The fraction of dermal absorption when a volatile liquid is deposited on uncovered skin, such as hands and forearms is given by:

$$\text{Fraction absorbed} = \frac{J_{dermal,neat}}{J_{dermal,neat} + J_{evap,neat}} \quad (13\text{-}21)$$

The initial dermal flux into the stratum corneum might be approximated by:

$$J_{dermal,neat} = K_{p,veh} \times \rho = \left[ K_p \frac{C_w^{sat}}{\rho} \right] \rho = K_p \times C_w^{sat} \quad (13\text{-}22)$$

where

$J_{dermal,neat}$ = Dermal flux of neat chemical (mg/cm²/hr)
$\rho$ = density of the neat liquid (mg/cm³)
$K_p$ = aqueous permeability coefficient (cm/hour)
$C_w^{sat}$ = the saturation concentration of the vehicle of interest in water
$k_{p,veh}$ = appropriate permeability coefficient in the vehicle of interest, cm/hr

The evaporation rate of a liquid film[72] might be approximated by:

$$J_{evap,neat} = \frac{MW \times VP}{9.57 \times T} \quad (13\text{-}23)$$

where

$J_{evap,neat}$ = Evaporative flux of neat chemical (mg/cm²/hr)
$MW$ = Molecular weight
$VP$ = Vapor pressure in Pascal at the temperature T in degrees Kelvin
$T$ = Temperature in degrees Kelvin

It is not necessary to use the equations presented in this section if the evaporative flux is small relative to the dermal flux.  However, it provides a useful means of estimating a more realistic dermal absorption when working with volatile chemicals in the open air (e.g., cleaning and painting) when a fraction is likely to volatilize.

### 13.3.4 Dermal Exposure Estimation Using Acceptable Skin Exposure Duration

Dermal exposure criteria do not need to be thought of only in terms of surface concentrations or mass loading.  An alternative approach is to think of exposure in terms of duration.[73] The premise here is that longer contact time results in greater skin absorption and potential for toxic effect.  As an acceptable toxicologically-based criterion, the previously introduced concepts can be used to derive an OEL equivalent for chemicals that are systemically toxic.  This model estimates the amount of time required to exceed the OEL equivalent dose when exposure is via the skin route.

$$\text{Skin absorption time (hr)} = \frac{\text{Total absorption at OEL (mg)}}{\text{Skin area (cm}^2) \times \text{Flux (mg/cm}^2 - \text{hr)}} \quad (13\text{-}24)$$

If the skin absorption time is larger than the lag time, this equation is valid.  In the event that the skin absorption time is found to be smaller than the lag time, the accuracy of this equation is diminished.  One should realize that in the case of an infinite dermal dose, only 60% of its steady state flux is achieved after a period that will be approximately equal to the lag time.

**Total Absorption at OEL (mg)**

This estimate can be calculated using the OEL conversion described in Equation 13-1.

**Skin area (cm²)**

The combined surface area of the skin can be estimated for the hands, hands and forearms, or for any other extent of skin surface that is expected to be potentially exposed.  These areas can be taken from the table of skin surface areas presented above.

**Flux (mg/cm²-hr) and $K_p$ (cm/hr)**

The flux of chemical through the skin can be determined empirically or taken from the literature if available, or else estimated.  As discussed above, flux is defined as: $K_p \times$ Concentration.  $K_p$ is measured in cm/hr and expresses the speed of penetration of chemicals through skin.  The Potts and Guy and revised Robinson equations are presently the most commonly used regression equations for this purpose, with the revised Robinson equation being used most commonly.[32,74]

Once $K_p$ is obtained, it and the concentration (which must be in units of mg/mL) of the chemical can be substituted for the flux in Equation 13-25 as follows.  A scenario demonstrating this approach is also provided in Example 3 at the end of this chapter.

*Mathematical Models for Estimating Occupational Exposure to Chemicals, 2nd edition*

Skin Absorption Time (hr) =

$$\frac{\text{Total absorption at OEL (mg)}}{K_p \text{ (cm/h)} \times \text{Concentration (mg/ml)} \times \text{skin area (cm}^2)} \qquad (13\text{-}25)$$

It is important to note that $K_p$ can be significantly affected by the type of solution carrying the chemical contaminant of concern, for example whether the agent is in an aqueous or organic solvent. The $K_p$ used in Equation 13-25 must be the appropriate value for the occupational situation that one is trying to model (i.e., aqueous, nonaqueous). However, the Potts and Guy and revised Robinson equations are simply multiple regression equations fitted to empirical human *in vitro* skin permeation data obtained from experiments of chemicals in aqueous solutions only.[66,74] Fortunately for simplicity's sake, for single chemicals not in a mixture or solution, the permeation rate is often about the same as for a saturated aqueous solution, as long as the components of the solution itself do not alter the skin.[75] However, for complex mixtures, there might be appreciable differences in $K_p$ and there are no equations yet that have been successful in estimating these situations. The most reliable method to determine $K_p$ for nonaqueous solutions is to test the compound mixture using *in vitro* or *in vivo* test methods.

## 13.3.5   Estimating Hand-to-Mouth Contact Related to Dermal Exposure

Hand-to-mouth contact is a path of dermal exposure that applies to substances which are ingested as a result of handling a product or chemical. Exposure via this route occurs by "direct" and "indirect" transfers of chemical. Direct transfer occurs when the chemical in the product is transferred to the hand, which is then followed by transfer from the hand to the mouth, usually by touching the mouth or lips with the hand, by nail biting, or finger or thumb sucking. Indirect hand-to-mouth transfer occurs when contaminated products are handled followed by handling or touching of food, cigarettes, drinking straws, silverware, clothing, door knobs, or other objects. The contribution of exposures via this route to total exposure has been considered recently in at least one review of occupational exposures.[76]

A study by Camann, et al. (2000) assessed the fraction of three pesticides removed from the hands of three adult volunteers using gauze wipes moistened with human saliva, artificial saliva, and a surfactant (1.3% dioctyl sulfosuccinate or DSS). Results showed that the average removal efficiency for all three pesticides was 48.3% for human saliva, 42.1% for artificial saliva, and 55% for DSS. Based on these data, the removal efficiency for hand-to-mouth transfer was estimated to be approximately 50%.[77]

The U.S. Consumer Product Safety Commission (CPSC) has developed an estimate of the percent of dislodgeable residue on the hands that is ingested daily by children, based on soil, in order to estimate exposures to copper chromate arsenic (CCA) on playground equipment. The CPSC found large variability and uncertainty in the available data, and therefore combined reasonable upper and lower bound values reported for soil ingestion and skin adherence to estimate a percent residue on the hands that may be ingested. The estimates for children ranged from 3% to 700% per day, with an average of 43% for both direct and indirect hand-to-mouth activities together.[78]

The U.S. CPSC has used the hand-to-mouth transfer efficiency of 50% measured by Camann, et al.[77] to estimate lead exposures to children's polyvinyl chloride products. The U.S. Environmental Protection Agency's Office of Pesticide Programs has also used this value for estimating hand-to-mouth exposures to pesticides.[79] More recently, the California Environmental Protection Agency's (CalEPA) Office of Environmental Hazard Assessment (OEHHA) has proposed using a default value of 50% for direct dermal transfer and 25% for indirect dermal transfer when assessing exposure to lead in fishing tackle products under Proposition 65, in their guidelines for hand-to-mouth transfer of lead exposure from fishing tackle products.[80] OEHHA cautions that the guidelines are intended to be specific to fishing tackle, but the concepts and equations provided are valuable and may be applicable to other scenarios following appropriate analysis.

OEHHA provides equations to estimate intake associated with both direct and indirect dermal exposure associated with hand-to-mouth activity. The guidance document defines a direct hand-to-mouth transfer factor as the mass transferred to the mouth divided by the mass on the surface area of that part of the hand which is in contact with the mouth, per contact. An indirect hand-to-mouth transfer factor is defined as the fraction of mass on the portion of the hand that comes in contact with an intermediate object and subsequently comes in contact with the mouth. These transfer factors are reported as a fraction or percent of the total available mass. Intake associated with hand-to-mouth activity is defined as follows:

$$\text{Intake}_{HM} = \text{Intake}_{HM\ direct} + \text{Intake}_{HM\ indirect} \qquad (13\text{-}26)$$

Intake associated with direct hand-to-mouth exposure is defined as follows:

$$\text{Intake}_{HM direct} = L_{hand\text{-}D} \times SA_D \times f_{direct} \times \lambda_D \times t \qquad (13\text{-}27)$$

where

$L_{hand\text{-}D}$ = the loading on the part of the hand touching the mouth, in units of mass per surface area of skin, μg/cm$^2$

$SA_D$ = the surface area of the part of the hand in direct contact with the mouth, cm$^2$

$f_{direct}$ = the direct hand-to-mouth transfer factor, presented as a fraction or percentage

$\lambda_D$ = the frequency of direct hand-to-mouth contact, e.g., #/hr

t = the number of hours of activity

The indirect transfer factor, $f_{indirect}$, is defined as the transfer of mass to an intermediate object and then subsequent introduction of the mass from the intermediate object into the mouth by the hand, with the potential for some loss of mass from the hand before contact with the mouth. It can be estimated as follows:

$$f_{indirect} = f_{direct} \times (1 - f_{loss}) \qquad (13\text{-}28)$$

where

$f_{loss}$ = the fraction of mass loading lost during intermediate contacts

Intake associated with indirect hand-to-mouth exposure is therefore defined as follows:

$$\text{Intake}_{HMdirect} = L_{hand\text{-}I} \times SA_I \times [f_{direct} \times (1 - f_{loss})] \times \lambda_I \times t \qquad (13\text{-}29)$$

where

$L_{hand\text{-}I}$ = the loading on the part of the hand touching the intermediate object, in units of weight per surface area, $\mu g/cm^2$

$SA_I$ = the surface area of the hand in contact with the material reaching the mouth

$\lambda_I$ = the frequency of indirect hand-to-mouth object contact, e.g., #/hr

t = the number of hours of activity

Hand-to-mouth contact is an area of dermal exposure assessment where additional research is needed to accurately estimate exposures resulting from hand-to-mouth transfer, although the above equations help to conceptually frame the exposure potential. Example 4 below demonstrates a potential application of this approach.

## 13.3.6 Derivation of risk-based wipe surface screening levels

The Risk Assessment Guidance for Superfund (RAGS) equations allow for the assessment of total risk from exposure via inhalation, incidental ingestion, and skin contact.[6] These equations can be modified to allow for calculation of screening level surface concentration limits that are health-based. It should be noted, however, that these equations are intended to compute risk estimates based on a 24-hour exposure time rather than the more typical 8-hour exposure time for most occupational scenarios. Input variables include exposure factors that are based on default assumption values or preferably are empirically known. Models for both carcinogens and non-carcinogens will be presented. The general risk equation is:

$$\text{Total Risk} = \text{Risk}_{dermal} + \text{Risk}_{ingestion} + \text{Risk}_{inhalation} \qquad (13\text{-}30)$$

### Risk for Carcinogens

For carcinogenic chemicals, the estimated increase to an individual's lifetime background risk for cancer can be calculated from the carcinogenic slope factor ($CSF_p$) for exposure pathway $p$ (mg/kg-day)$^{-1}$ and the lifetime average daily intake ($LADI_p$) for exposure pathway $p$ (mg/kg-day):

$$\text{Risk}_p = CSF_p \times LADI_p \qquad (13\text{-}31)$$

LADI for each pathway of exposure is calculated using the following equation:

$$LADI_p = \frac{C_{surface} \times CR_p \times EF \times ED}{BW \times AT_{lifetime} \times 365 \text{ days/yr}} \qquad (13\text{-}32)$$

where

$C_{surface}$ = surface concentration (mg/m²)

$CR_p$ = exposure pathway specific contact rate (m²/day)

$EF$ = exposure frequency (days/yr)

$ED$ = exposure duration (yr)

$BW$ = body weight (kg)

$AT_{lifetime}$ = carcinogenic averaging time (yr)

By factoring the components of LADI into Equation 13-32 for each pathway and selecting an acceptable target risk (TR), the equation (13-33) now appears below.

Acceptable target risks vary depending on the population and regulatory agency assigning the risk level, but generally range from $1 \times 10^{-4}$ to $1 \times 10^{-6}$. Note that each contact rate for each pathway is in units of m²/day and the cancer slope factors are each in units of (mg/kg-day)$^{-1}$. Algebraically rearranging Equation 13-33 so that $C_{surface}$ is separated out, and its units adjusted from mg/m² to $\mu g/100cm^2$, the equation becomes 13-34 below.

Next, the contact rates must be calculated. Exposure variables are included, along with prerequisite assumptions

$$TR = \frac{C_{surface} \times [(CR_{dermal} \times CSF_{dermal}) + (CR_{ingestion} \times CSF_{ingestion}) + (CR_{inhalation} \times CSF_{inhalation})] \times (EF \times ED)}{(BW \times AT_{lifetime} \times 365 \text{ days/yr})} \qquad (13\text{-}33)$$

$$C_{surface} = \frac{TR \times BW \times AT_{lifetime} \times 365 \times 10}{(CR_{dermal} \times CSF_{dermal} + CR_{ingestion} \times CSF_{ingestion} + CR_{inhalation} \times CSF_{inhalation}) \times EF \times ED} \qquad (13\text{-}34)$$

about their magnitude to calculate separate contact rates for a dermal risk equation ($CR_{derm}$), the ingestion risk equation ($CR_{ingestion}$), and for inhalation ($CR_{inhale}$). For more details about this modeling approach, refer to the reference publication.[81] To calculate $CR_{dermal}$, it consists of the following factors:

$$CR_{dermal} = SA_d \times F_d \times EV \times FT_{ss} \times DAF \qquad (13\text{-}35)$$

where

$CR_{dermal}$ = dermal contact rate, m²/day
$SA_d$ = dermal surface area available for absorption, m²
$F_d$ = fraction of available dermal area contacted on a given day
$EV$ = contact frequency with surface, day⁻¹
$FT_{ss}$ = fraction of dust transferred from surface to skin
$DAF$ = dermal absorption efficiency

To calculate $CR_{ingest}$, the following equation is used:

$$CR_{ingest} = SA_g \times F_g \times EV \times FT_{ss} \times FT_{ftm} \times HTME \qquad (13\text{-}36)$$

where

$CR_{ingest}$ = ingestion contact rate, m²/day
$SA_g$ = dermal surface area available for ingestion, m²

$F_g$ = fraction of available dermal area that contacts mouth
$EV$ = contact frequency with surface, day⁻¹
$FT_{ss}$ = fraction of dust transferred from surface to skin
$FT_{ftm}$ = fraction of dust transferred from skin to mouth
$HTME$ = number of hand-to-mouth events

Calculating $CR_{inhale}$ considers the resuspension of surface contaminants into the air as a source of inhalation exposure. Empirical data for resuspension of dust from surfaces due to typical physical activities and air movement presently is very limited, and is considered site-specific. Available data used for extrapolation to other scenarios therefore should be considered rough estimates.[82]

$$CR_{inhale} = IR_i \times K \qquad (13\text{-}37)$$

where

$CR_{inhale}$ = inhalation contact rate, m²/day
$IR_i$ = inhalation rate, m³/day
$K$ = re-suspension factor, m⁻¹

Cancer slope factors and dermal absorption efficiency fractions can be found for many compounds online at the U.S. EPA.[58]

## Risk for Non-Carcinogens

For non-carcinogenic effects of chemicals, a slightly different approach is used for calculating risk. A hazard quotient of risk (HQ) is simply the ratio of the estimated

average daily intake for each pathway ($ADI_p$) to the acceptable intake. Thus, when the hazard quotient is less than 1, the exposure does not exceed the acceptable dose. Acceptable dose estimates are provided by the U.S. EPA for many chemicals and are referred to as reference doses for each pathway ($RfD_p$). They can be found at the same site that was provided above in reference to cancer slope factors for carcinogens. This relationship is expressed as:

$$HQ = ADI_p / RfD_p \qquad (13\text{-}38)$$

As with the $LADI_p$, the $ADI_p$ is an estimate of an average daily intake. However, the averaging time used for the $ADI_p$ is the average for chronic exposure duration, not the lifetime average. Equation 13-39 is used to estimate the $ADI_p$:

$$ADI_p = \frac{C_s \times CR_p \times EF \times ED}{(BW \times AT \times 365 \text{ days/year})} \qquad (13\text{-}39)$$

where

$ADI_p$ = average daily intake for pathway p, mg/kg-day
$C_s$ = surface concentration, mg/m²
$CR_p$ = route specific contact rate, m²/day
$EF$ = exposure frequency, day/year
$ED$ = exposure duration, year
$BW$ = body weight, kg
$AT$ = averaging time, year = exposure duration, year

Setting the target hazard quotient (THQ) to 1 (the maximum acceptable ratio of $ADI_p/RfD_p$) and including the sum of all pathways, Equation 13-38 can be expanded by including the factors shown in Equation 13-39 that equal $ADI_p$. Algebraically rearranging this expanded equation for all pathways so that $C_s$ is separated out provides Equation 13-40:

$$C_s = \left[ \frac{THQ}{\dfrac{CR_{dermal}}{RfD_{dermal}} + \dfrac{CR_{ingest}}{RfD_{ingest}} + \dfrac{CR_{inhale}}{RfD_{inhale}}} \right] \times$$

$$\left[ \frac{BW \times AT \times 365 \text{ days/yr}}{EF \times ED} \right] \times CF \qquad (13\text{-}40)$$

where

$C_s$ = surface concentration (mg/100cm²)
$CF$ = 10 - conversion factor: 10 (mg/100 cm²) / (mg/m²)

Example 5 below uses the above approach for polychlorinated bisphenyls to illustrate how to calculate surface concentrations for carcinogens.

## 13.4    Exposure Modeling — What to Do with Dermal Exposure and Risk Estimates

One of the primary reasons for estimating dermal exposure is to identify exposures that are unacceptable and need to be controlled. This can be quite challenging considering the uncertainties associated with attempting to quantify dermal exposure or absorbed dose. However, methodologies are available to begin the effort of evaluating the potential for an unacceptable skin exposure. Where possible, use of an OEL equivalent, Biological Exposure Index (BEI®), or Biological Environmental Exposure Level (BEEL) to evaluate dose estimates should be used. Although the results of the model estimations might be uncertain, they are still useful in making determinations about prioritizing resources for managing skin exposures.

## 13.5    Evaluation of Methodologies and Approaches to Dermal Exposure Modeling

Various approaches can be used to assess skin exposure and absorbed dose, and though several of these approaches have been validated for specific scenarios, the general applicability of these methods to industrial settings has not been fully evaluated. The permeability coefficient approach is useful to estimate skin permeation in aqueous media, but it might have limited utility in many industrial settings where solvent mixtures and other nonaqueous media are common. This is because the Kp value is not easily calculated for non-aqueous solutions. If this value can be experimentally determined, it may be possible to apply the models presented in this chapter to determine flux and mass absorbed. Because the equations imply that the exposed skin is fully immersed in an infinite volume of liquid (i.e., the exposed concentration and surface area are assumed to remain steady), in some cases the application of this approach to industrial activities can misrepresent the exposure scenario. A far more realistic scenario is to consider a finite volume of chemical deposited on the skin that is subsequently removed by one or more mechanisms, such as washing or evaporation. In some cases, the chemical may be reloaded onto the skin in periodic intervals.

It can be difficult to describe the many nuances of an individual's daily work activities through models. As with any model, the use of the appropriate input or parameter values is critical and can significantly affect the final model outcomes. The default absorption approach described in Equation 13-2 may be relevant to a wider range of scenarios, but it is based on numerous simplifying assumptions and is used most appropriately for screening level assessments.

### 13.5.1    Standardization of Data Collection and Reporting

Standardization dermal exposure data collection and reporting of data would help to make modeling inputs and results more reliable. In many studies, the data have been normalized by time or quantity, and some studies present individual data points, ranges, or statistical descriptors without data points. If exposure has been normalized by time or quantity, the time or quantity should be presented with the data. Some investigators report only total exposure for a given body section or combination of sections, while others report data as unit loading rate (such as from pad samples). Again, data reporting requirements must be linked to data interpretation and the need for increased transparency.

Many factors contribute to the magnitude of the dermal exposure, but factors such as duration of exposure, quantity handled, effect of washing, chemical loss through evaporation, effect of skin hydration (e.g., migration of contaminants, contaminants dripping off the skin) and effect of skin damage have not received sufficient evaluation. A more developed understanding of these factors will aid in improving our capabilities to appropriately assess dermal exposure.

### 13.5.2    Data Interpretation

Numerous assumptions and uncertainties are inherent in the approaches currently used to estimate workplace-related dermal exposure. The impact of many of these assumptions has not been fully evaluated. Some of these assumptions and uncertainties include:

- Extrapolating the deposition on absorbent sampling pads to assume uniform deposition within a specific area of the body
- Normalizing exposure measurements by quantity of chemicals handled or by exposure time
- Assuming that the retention rate on absorbent pads is equivalent to that of the skin
- Inadequately characterizing variability due to the selection of collection media and handling conditions used
- Selecting widely varying exposure duration times for dermal exposure monitoring studies
- Using varying standards for quality assurance between studies
- Extrapolating from a specific contaminant (e.g., active ingredient) to total mass
- Differing workplace conditions, work practices, etc., which may significantly impact the dermal exposure level measured

*Mathematical Models for Estimating Occupational Exposure to Chemicals, 2nd edition*

### 13.5.3    Workplace-Related Dermal Exposure Activity Patterns

Information and data on activity patterns in industrial environments are limited. Although data have been collected for some activities in the pesticides industry and in a few non-industrial environments, additional data are needed for a variety of activities and age groups. Tools such as DREAM and RiskofDerm may help to standardize dermal exposure and activity pattern characterization. Dermal exposure for a given body area can vary over a range of several orders of magnitude. Individual practices and activities can significantly impact the exposure received, and little information is available with which to characterize the worker activities and to estimate the dermal exposure for any given task in a workplace environment. Information on personal protective equipment (PPE) and other control measures used to mitigate dermal exposure also should be collected when gathering information on activity patterns.

### 13.5.4    Assessment of the Effectiveness of Control Measures

Although data on permeation of single contaminants through glove materials is becoming more commonplace, the effectiveness of gloves and other control measures during actual use is still poorly characterized. Information on barrier effectiveness has been collected in many pesticides studies, but interpretation and use of this information may be unreliable because of glove contamination due to hygiene practices and use practices, as well as other factors. The actual protection afforded by chemical protective clothing may be much lower than that demonstrated in laboratory evaluations of glove permeation, because factors such as elevated glove temperature due to the skin temperature, the pressure exerted on the glove material during use of the glove (e.g., stretching of glove), as well as cross-contamination may impact the protection provided in the field. Many types of engineering and process controls will presumably reduce or mitigate dermal exposures in addition to inhalation exposures, but the efficiency of these measures in the reduction of dermal exposure potential has not been routinely investigated. In some cases, administrative controls and modifications of work practices may also aid in reducing exposures due to surface contamination, secondary contamination, etc.

### 13.6    Dermal Modeling Research Needs

Additional monitoring data to better estimate dermal exposure in workplace settings are needed, and standardization of data collection and assessment methods for measuring indoor surface contamination or estimating human exposure from contact with these surfaces is recommended. While hand exposure often constitutes the majority of the total body exposure, exposure to other parts of the body does occur, and non-hand exposure may be an important contribution to the total dose. Finally, additional information on worker activities and practices and guidance in interpretation of exposure monitoring data would greatly enhance our ability to evaluate dermal exposures in a consistent and meaningful fashion.

### 13.7    Examples of Dermal Exposure Assessments

#### 13.7.1    Example 1 — Screening Assessment of Dermally Absorbed Dose

An industrial hygienist was contacted to investigate an incidence of skin disease among maintenance workers responsible for repairing water service lines for a facility. The initial basic characterization and information gathering revealed that workers reported some "tingling" sensation in their hands, but the primary symptom was dryness and peeling of the skin of the hands. Acrylamide grouting compounds were used by the workers, and the potential for dermal exposure had likely been reduced over time by various process changes. However, glove use was still required for portions of the grouting task and skin contact was possible due to misuse or inadequacy of the gloves. The ACGIH® TLV® for acrylamide (0.03 mg/m³ as a time-weighted average or TWA) was selected as the OEL to be used for judging whether exposures were acceptable. Exposure during the grouting operation was believed to occur primarily through skin contact.

Acrylamide is an animal carcinogen as defined by ACGIH® and has been identified as a suspected human carcinogen.[83] The TLV® carries a skin notation which cautions that the potential for significant contribution to the overall exposure by the dermal route exists. There are no quantitative dermal exposure limits for acrylamide, and ACGIH® has not established a BEI®. Although there was no prior sampling data to measure skin exposure, the industrial hygienist determined that the health hazard was potentially significant based on the health complaints and his personal observations. The industrial hygienist proceeded to use modeling to try to make a more definitive exposure judgment. Converting the airborne inhalation OEL to total body dose using Equation 13-1 provided an equivalent total body dose of 0.3 mg/day:

Total Body Dose OEL: (0.03 mg/m³) × (10 m³/day) =
0.3 mg/day total body dose

Because no dermal monitoring data were available, a screening level estimate of potential dermal dose was developed using Equation 13-2 and default values from Tables 13.2 and 13.3. Specific activities included mixing

the two-part acrylamide product (acrylamide as powder with activator and other materials), evaluating the consistency of the acrylamide gel (manually pouring a small amount of liquid mixture from one cup to another), assembling the grouting equipment, and using the equipment to fill the leak in the water line.

Using Equation 13-2:

$$DA = S \times Q \times FQ \times ABS \times WF$$

where

DA = dermal absorbed dose rate, mg/day
  S = surface area of skin available for contact, $cm^2$
  Q = quantity of mixture deposited on the skin per event, $mg/cm^2$ — event
 FQ = contact frequency, number of events per day, 1/day
ABS = fraction of applied dose absorbed through the skin per event, unitless
 WF = weight fraction of the substance in the mixture, unitless

The potential dermal absorbed dose estimates summarized in Table 13.4 were developed. The skin absorption of acrylamide has been determined to be approximately 25%, based on laboratory studies conducted by several researchers.[84] When compared with the computed dermal OEL of 0.3 mg/day, the screening level estimates (column DA in Table 13.4) identified a potentially unacceptable exposure, even though it was acknowledged that the screening level estimates were believed to overestimate the true dose. The industrial hygienist took immediate action to reduce dermal exposures by instituting improvements in the glove practices, housekeeping, and prescribed work practices controls. Skin exposure monitoring also was performed to confirm that the work practices and protective equipment were effective. Also, the bags of powdered acrylamide were replaced with a liquid form of acrylamide, further reducing the potential contribution of exposure due to inhalation.

Follow-Up Information: Following the implementation of health hazard controls, the measured dermal exposure using hand washes and wipes ranged between 0.017–0.090 mg/day for the various job activities. The surface

contamination measurements ranged from 0.0062–0.234 mg/100 $cm^2$ on top of the acrylamide mixing tank. The major sources of exposure were now contact with contaminated work surfaces, equipment, and tools. Comparison of the measured skin exposures with the 0.3 mg/day (after adjusting for fraction dermally absorbed) indicated that exposures could be effectively controlled (i.e., 0.004–0.02 mg/day for the absorbed dermal exposures).

The industrial hygienist appreciated that the skin surface sampling measurements probably underestimated the actual exposure to some extent, but the greater than 10-fold difference in absorbed dose when compared to the OEL provided a reasonable margin of safety. Nevertheless, the surface contamination measurements indicated that exposures could be reduced further. The industrial hygienist sought additional ways of reducing dermal exposures, such as evaluating possible substitutes for acrylamide grout.

## 13.7.2 Example 2 — Assessment of Dermal Exposure Potential and Hazard Assessment for Benzene

Benzene is a common organic solvent that can affect the nervous and hematopoietic systems and can cause leukemia. A skin designation is given by the ACGIH® TLV® committee, indicating dermal absorption is a potentially significant route of exposure and may lead to systemic effects.[83] Benzene is present in small quantities (~1%) in vehicle fuel because of its antiknock properties in unleaded fuel. This concentration was determined experimentally by Adami et al., who found benzene concentrations in gasoline of 0.39%, 0.74%, and 1.06%.[85] Nevertheless, concerns have been raised that the benzene in vehicle fuel may result in a potentially significant exposure to automotive repair workers who are exposed to fuel during the disassembly of carburetors, cleaning of fuel injectors, changing of fuel filters, replacing and repairing of fuel tanks and fuel lines, as well as cleaning of parts and the skin using gasoline. A risk assessment was performed to estimate the daily exposure to workers through unprotected skin among automotive repair professionals specializing in such work at a large service repair shop.

**Table 13.4 — Screening Level Estimates of Acrylamide Dermal-Absorbed Dose During Grouting Activities**

| Activity | S, $cm^2$ | Q, $mg/cm^2$ | WF | FQ, 1/day | ABS Fraction | DA, mg/day |
|---|---|---|---|---|---|---|
| Pour acrylamide into tank | 840 (two hands) | 3.7 (dump bags of powder) | 1 | 1 | 0.25 | 777 |
| Manually test for consistency | 420 (one hand) | 0.7–2.1 (sampling) | 0.05 | 1 | 0.25 | 4–11 |
| Assemble equipment 7.4–22 | 840 (one hand) | 0.7–2.1 (connecting transfer line) | | 0.05 | 1 | 0.25 |
| Perform grouting | 840 (two hands) | 1.3–10.3 (assume similar to handling wet surfaces) | 0.05 | 2 | 0.25 | 27–216 |

Air samples were also taken to measure potential inhalation exposure during some actual repair work. The geometric mean 8-hr TWA concentration for benzene during personal monitoring was 0.06 mg/m³.[86] These concentrations are less than 10% of the ACGIH® TLV® of 0.5 ppm (1.6 mg/m³), indicating a low concern for benzene inhalation exposure from gasoline during repair work.

However, a study using both biological monitoring and air sampling of benzene exposure postulated that a large percentage of the total exposure to garage repair professionals was through the skin, which raised concern for dermal overexposure among the workers in the present situation.[87] Benzene is relatively volatile and much evaporates from the skin upon contact, but there is potential for absorption of a small fraction of the applied dose. One in vivo study found that that 0.14% of an applied dose of pure benzene is absorbed through the skin of rhesus monkeys, and 0.05% through human skin on the forearm following application of a thin layer of benzene.[88] Another *in vivo* human study showed that an applied dose of pure benzene to the forearm resulted in an average total absorption of $0.07 \pm 0.04\%$ and an applied dose to the palm resulted in an average total absorption of $0.13 \pm 0.04\%$ of the applied dose.[89] However, it has also been noted that absorption can increase through damaged skin by about 5-fold, which could be the case among these workers.

Using the above information and the following assumptions, a hazard assessment of dermal exposure was conducted for these workers. First, an estimated total body dose OEL equivalent was calculated using Equation 13-1:

Exposure dose (mg/day) = OEL (mg/m³) × inhaled air volume (m³/day)

It was determined that the vehicle maintenance tasks resulted in a light to moderate activity level during the work day, and therefore a value of 11 m³/day was selected (Table 13.1). The TLV® of 0.5 ppm (1.6 mg/m³) was used as the OEL equivalent:

Exposure dose (mg/day) = 1.6 mg/m³ × 11 m³/day = 17.6 mg/day

It should be noted that the use of this method to calculate the dermal OEL may not leave as sufficient a margin of error as might be found for inhalation exposures, since although an assumption is made that 100% of an inhaled dose is subsequently absorbed, in reality it may be only a small fraction of this dose which is actually absorbed. For example, in the case of benzene, it has been reported that 46% of inhaled benzene is absorbed.[90] This "safety factor" should be considered when using equivalent dose methods for evaluating dermal exposures. It was assumed from observations, interviews and work records that each worker had the potential for 20 skin contacts with benzene per day (FQ = 20/day). Because of the low viscosity of benzene in gasoline, which could allow it to drip and easily spread over contacted skin, it was assumed

that approximately 150 cm² per hand, or 300 cm² of skin surface area could be contaminated during each episode (S = 300 cm²). To estimate skin loading (Q), a value of 2.1 mg/cm² was used, based on the values in Table 13.3 for routine or incidental contacts with liquids and according to the EPA's 1992 guidance document on determining the retention of liquids on the surface of the hands.[91] For the absorption estimate (ABS), a conservative value based on the empirical studies of 1% absorption was used. This absorption value is also well over 5 times the absorption rate of 0.13% for benzene reported by the two studies above, and might be an appropriate conservative value to select if the industrial hygienist is interested in accounting for the potential for increased absorption due to damaged skin. It was assumed that the concentration of benzene on the skin was a function of its concentration in gasoline (~1%), as measured empirically by Adami, et al. (2006).[85] Using Equation 13-2 as a screening calculation, the amount of benzene potentially absorbed through the skin was calculated:

$$DA = S \times Q \times FQ \times ABS \times WF$$

$$DA = 300\ cm^2 \times 2.1\ mg/cm^2 \times 20/day \times 0.01 \times 0.01 = 1.26\ mg/day$$

It should be noted that this screening calculation is conservative because it does not take into account the mass of benzene which could evaporate from the skin prior to absorption. This screening calculation indicates preliminarily that exposures to benzene for this vehicle repair professional scenario may not reach the daily OEL for benzene based on dermal exposure alone, although it likely would be a more significant route of exposure than inhalation, which, based on the exposure measurements cited above, would result in a dose of approximately 0.06 mg/m³ × 11 m³/day = 0.66 mg /day. Therefore, the more robust equation for $DA_{event}$ and a $K_p$ value for benzene were also used to confirm this initial screening calculation in a more quantitative manner using Equation 13-5.

$$DA_{event} = K_{p,veh} \times C \times SA \times t_{event}$$

or

$$DA_{event} = Flux \times SA \times t_{event}$$

Adami et al. reported a measured $K_p$ value for benzene in gasoline on human skin *in vitro* of $K_p$ = 0.00044 cm/hr. They reported a dermal flux for benzene in gasoline of 0.002 mg/cm²-hr.[85] These values were used to calculate the estimated dermal absorption dose in the equations that follow. Similar $K_p$ values for benzene have been derived experimentally in other *in vitro* studies of pure benzene on human skin.[88,92,93] Another study, Blank, et al. (1985), also experimentally measured the $K_p$ of benzene in gasoline on human skin in vitro and reported a value of $K_p$ = 0.0014 cm/hr, which was significantly higher than the values reported in the other four studies.[94] It is unclear why Blank et al. measured a $K_p$ value that was so much higher

than other studies, although it is possible that the time in which the *in vitro* skin was in contact with the solvents used in the study may have caused damage to the skin. As a result, this $K_p$ value was not used in this example. However, this reported $K_p$ value might be appropriate for use in situations where, for example, the industrial hygienist is concerned about generating a conservative estimate of skin uptake where it is believed that worker skin damage has occurred.

Using the reported flux value in the above equation for $DA_{event}$ and again using an assumed skin surface area of $SA = 300$ cm$^2$ and an assumed direct contact time with gasoline on the hands of 20 contacts/day × 6 min/contact × 1 hr / 60 min = 2 hr/day, the following dermal absorbed dose can be estimated:

$DA_{event}$ = 0.002 mg/cm$^2$-hr × 300 cm$^2$ × 2 hr/day = 1.2 mg/day

Using the empirical $K_p$ value provided and a concentration of 1%, the flux is equal to:

Flux = $K_p$ × Concentration = 0.00044 cm/hr × 10 mg/cm$^3$ = 0.0044 mg/cm$^2$-hr

This flux is twice that reported in the Adami study because the highest weight concentration of benzene in gasoline reported in the study was used (10 mg/cm$^3$ or 1%), resulting in a dermal absorbed dose of:

$DA_{event}$ = 0.0044 mg/cm$^2$-hr × 300 cm$^2$ × 120 minutes × 1 hr/60 minutes = 2.6 mg/day.

Both values (using the parameters selected) were well below the calculated dermal OEL equivalent of 17.6 mg/day. It should also be noted that even if an assumption of 8 hours/day of continuous contact with benzene in gasoline were used in this equation, the results of the calculation would still indicate that the total absorbed dose of benzene via the dermal route would be below the calculated dermal OEL equivalent.

$DA_{event}$ = 0.0044 mg/cm$^2$-hr × 300 cm$^2$ × 8 hours = 10.6 mg/day

For comparison, $K_p$ was also estimated using the revised Robinson model equation (Equation 13-8). The molecular weight and $K_{ow}$ for benzene were obtained from the SRC web site (MW = 78.11 g/mol; log $K_{ow}$ = 2.13) for use in the revised Robinson model for calculating $K_p$.[60] The revised Robinson model, as shown in Equation 13-8, was used for this calculation:

$$K_p = \cfrac{1}{\cfrac{1}{\cfrac{1}{K_{lip} + K_{pro}} + \cfrac{1}{K_{aq}}}}$$

where

$K_p$ = overall permeability coefficient, cm/hr
$K_{lip}$ = permeability coefficient of the lipid matrix fraction of the stratum corneum, cm/hr
$K_{pro}$ = permeability coefficient of the protein fraction of the stratum corneum, cm/hr
$K_{aq}$ = permeability coefficient of the viable layer of the epidermis, posing an aqueous barrier, cm/hr

The permeability coefficient of the lipid fraction of the stratum corneum, Klip, in cm/hr can be estimated using Equation 13-9:

log $K_{lip}$ = -2.59 + 0.7318 × log $K_{ow}$ − 0.006832 × MW

log $K_{lip}$ = -2.59 + 0.7318 × 2.13 − 0.006832 × 78.11 = -1.565

$K_{lip}$ = 10$^{-1.565}$ = 0.027

The permeability coefficient of the protein fraction of the stratum corneum ($K_{pro}$) in cm/hr can be estimated using Equation 13-10:

$$K_{pro} = \frac{0.043}{MW^{1.36}}$$

$K_{pro}$ = 0.043/(78.11)$^{1.36}$ = 0.00011

The permeability coefficient of the viable epidermal layer ($K_{aq}$) in cm/hr can be estimated using Equation 13-11:

$$K_{aq} = \frac{2.5}{\sqrt{MW}}$$

$K_{aq}$ = 2.5/(78.11)$^{1/2}$ = 0.283

Substituting values for $K_{lip}$, $K_{pro}$, and $K_{aq}$ into the revised Robinson equation yields:

$K_p$ = 0.025 cm/hr

Alternatively, $K_p$ can be estimated directly using the correlation in RAGS part E (Equation 13-7):

log $K_p$ = -2.80 + 0.66 × log $K_{ow}$ − 0.0056 × MW

$K_p$ = 10$^{\wedge}$(-2.80 + 0.66 × log $K_{ow}$ − 0.0056 × MW) = 0.015 cm/hr

Because the above estimations for $K_p$ are based on an aqueous vehicle, $K_p$ must be adjusted. The solubility of benzene in water is $C_w^{sat}$ = 1.8 mg/mL. Benzene is completely miscible with gasoline, and therefore $C_w^{sat}$ = 880 mg/mL. As described in Section 13.3.3., $K_p$ is adjusted using Equation 13-6:

$K_{p,veh}$ = 1.8 mg/mL / 880 mg/mL × 0.025 cm/hr = 5.1×10$^{-5}$ cm/hr.

*Mathematical Models for Estimating Occupational Exposure to Chemicals, 2nd edition*

Although this predicted value of $K_{p,veh}$ is smaller than empirically observed (about $4.4 \times 10^{-4}$ cm/hr), RAGS Part E reports a 95% UCL on $K_p$ of 0.37 cm/hr, which, when adjusted to account for gasoline as the vehicle equates to:

$K_{p,veh}$ = 1.8 mg/mL / 880 mg/mL $\times$ 0.37 cm/hr = $7.6 \times 10^{-4}$ cm/hr

which is greater than both the empirical measurement and the predicted value of $K_p$. The estimated flux can then be substituted into the equation for $DA_{event}$, assuming 20 events per day:

$DA_{event}$ = 0.00076 cm/hr $\times$ 10 mg/cm$^3$ $\times$ 300 cm$^2$ $\times$ 120 min/day $\times$ 1 hr/60 min = 4.56 mg/day

or, assuming a full 8-hour work day of continuous exposure:

$DA_{event}$ = 0.00076 cm/hr $\times$ 10 mg/cm$^3$ $\times$ 300 cm$^2$ $\times$ 8 hr/day = 18.24 mg/day

This estimate is likely higher than the estimates developed using the empirical data because of the use of the 95th percentile UCL adjustment for the modeled $K_p$ value. Overall, the estimations presented in Example 2 show that model results can be quite variable and have the potential to be significantly higher or lower than empirical measurements, depending on parameter selection. Further, these estimates do not take into account skin condition or skin damage, which may affect results substantially. Although dermal exposure and risk modeling can be valuable for characterizing the potential for dermal absorption and systemic toxicity from specific chemicals, the results in this example underscore the uncertainty inherent in modeling dermal exposures. This is particularly true for chemicals in non-aqueous solutions, and highlights the importance of careful selection of the model inputs. It is possible that for some industrial dermal exposure scenarios, the appropriate data will not be available to determine with sufficient certainty the quantitative potential for dermal exposure through modeling alone. Empirical data should always be used for as many model inputs as possible.

### 13.7.3   Example 3 — Estimation of Acceptable Skin Exposure Duration

For comparison, Equations 13-24 and 13-25 using the acceptable skin absorption time (SAT) can also be used to determine whether benzene in gasoline exposures might be acceptable under the scenario for vehicle mechanics described in Example 2. Using either form of this equation, one can estimate how long workers might be able to work unprotected with benzene-containing gasoline if gloves were not handy or the work could not easily be performed while wearing gloves. Equation 13-25 was used to estimate an acceptable skin exposure time for this work.

Skin Absorption Time (hr) =

$$\frac{\text{Total absorption at OEL (mg)}}{K_p \text{ (cm/h)} \times \text{Concentration (mg/ml)} \times \text{skin area (cm}^2)}$$

Using the calculated dermal OEL equivalent of 17.6 mg/day and the empirical values for flux and Kp for benzene in gasoline reported in Adami et al.[85], and the reported concentration of benzene in the gasoline (1% or 10 mg/cm$^3$), the acceptable skin absorption time would be in the range of 13.3–29.3 hours. The difference in SAT values seen when using the empirical $K_p$ value versus the empirical flux to calculate SAT is due in large part to the use of a more conservative default value of 1% for benzene by weight in gasoline, when in actuality the measured average concentration in the study was 0.73%. In any case, these calculations appear to confirm the results obtained using the equation for $DA_{event}$, indicating that the dermal OEL equivalent for benzene exposure in the vehicle repair scenario described above is unlikely to be reached during an 8-hour work day:

Skin Absorption Time =

$$\frac{1.6 \text{ mg/m}^3 \times 11 \text{ m}^3}{0.00044 \text{ cm/hr} \times 10 \text{ mg/cm}^3 \times 300 \text{ cm}^3} = 13.3 \text{ hrs}$$

Or, using the reported flux value,

Skin Absorption Time =

$$\frac{1.6 \text{ mg/m}^3 \times 11 \text{ m}^3}{0.002 \text{ mg/cm}^2 - \text{hr} \times 300 \text{ cm}^2} = 29.3 \text{ hrs}$$

This calculation seems to confirm the possibility in this scenario that overexposure to benzene through the dermal route would be relatively unlikely if dermal flux is similar to that reported in the study by Adami et al. However, as noted above, if the skin is damaged by exposure to other solvents or by repeated exposures to gasoline over time, the resulting dermal exposures may be significantly higher than those estimated here. Care should always be taken when working with solvents, especially when the work occurs on a routine basis or when significant direct contact with the skin occurs.

### 13.7.4   Example 4 — Assessment of Dermal Exposure to Lead by Dermal Absorption and Hand-to-Mouth Exposure

Exposure estimates for all routes of exposure for a jewelry product were developed as part of an evaluation of compliance with the California Proposition 65 Maximum Allowable Dose Level (MADL) of 0.5 µg/day, and the U.S. CPSC policy of 15 µg/day. The jewelry product was a

bracelet containing 12 silver beads with a measurable extractable lead content. Both dermal absorption and ingestion via hand-to-mouth contact following dermal exposure were evaluated for the product. Table 13.5 presents key default assumptions and variables used in the estimates.

First, a dermal loading of lead on the skin (based on research involving skin contact with lead-containing objects) was determined. These values were then used to estimate the potential ingestion exposure from hand-to-mouth contact and dermal absorption based on normal wear and use of the bracelet.

### Estimated Dermal Loading of Lead from the Silver Beads

A dermal exposure assessment for lead conducted by the Institute of Occupational Medicine (IOM) in Edinburgh, United Kingdom was used to estimate these dermal loading values.[95] In this study, researchers collected hand wipe samples after six volunteers handled pure lead materials with various geometries. A total of 18 data points were collected, based on a single contact with lead, ranging from less than the limit of detection (<LOD) to 1.84 µg lead / cm² skin, with a median value of 0.225 µg/cm² and a 95th percentile of 1.04 µg/cm².

A total of three laboratory experiments resulted in soluble/extractable lead masses for the silver bracelet beads of 5100 µg, 7800 µg and 9500 µg. Each silver bracelet bead weighed approximately 0.69 g, therefore containing between 0.74% and 1.4% extractable lead by weight.

The results of the IOM study were extrapolated to estimate dermal lead exposure from the silver bracelet beads by multiplying the IOM study results by the extractable lead content measured in the beads. Estimates of the total potential dermal lead loading onto the skin, Lskin, for the silver beads therefore ranged from:

$$L_{skin} = 0.225 \ \mu g/cm^2 \times 0.74\% = 0.0017 \ \mu g/cm^2$$

to

$$L_{skin} = 1.04 \ \mu g/cm^2 \times 1.4\% = 0.015 \ \mu g/cm^2$$

### Estimated Hand-to-Mouth Exposure to Lead for the Silver Beads

This exposure route involved the direct transfer of lead from the skin to the mouth from touching a lead-containing material and then performing hand-to-mouth activities such as touching the mouth, nail biting, or consumption of food. Hand-to-mouth transfer can be estimated using Equation 13-27[80]:

$$M_{hand\text{-}mouth} = L_{skin} \times SA \times f_{direct} \times \lambda_D \times t,$$

where

$M_{hand\text{-}mouth}$ is the daily mass of lead transferred to the mouth (µg/day),
$L_{skin}$ is the loading of lead on the hands (µg/cm²),
SA is the portion of the surface area of the hand in contact with the silver beads on the bracelet (cm²),
$f_{direct}$ is the hand-to-mouth transfer factor,
$\lambda_D$ is the rate of hand-to-mouth contact (#/hr), and
t is the amount of time the hand remains loaded with lead (hr/day).

$L_{skin}$ is estimated above for the bracelet and ranges from 0.0017 µg/cm² to 0.015 µg/cm². One half of the surface area of the 12 beads on the bracelet was used to estimate the area of dermal contact with the hand, palm and fingers during normal wear and periodic repositioning of the bracelet. Thus, A = 12 × ½ × 4π × (½ × 0.5 cm)² = 4.7 cm². A value of 50% was selected for $f_{direct}$, based on the study by Camann, et al.[77] who studied the dermal removal of pesticides. A value for hand-to-mouth contact of $\lambda_D$ = 9 /hr for adults was selected, based on Table 13.5. A value of t = 16 hours/day was selected to represent the number of waking hours in a day for adults in which the hand-to-mouth activity might occur. Therefore, hand-to-mouth estimates using this method range between:

$$M_{hand\text{-}mouth} = 0.0017 \ \mu g/cm^2 \times 4.7 \ cm^2 \times 50\% \times 9 \ /hr \times 16 \ hr/day = 0.58 \ \mu g/day$$

$$M_{hand\text{-}mouth} = 0.015 \ \mu g/cm^2 \times 4.7 \ cm^2 \times 50\% \times 9 \ /hr \times 16 \ hr/day = 5.1 \ \mu g/day$$

### Table 13.5 — Assumptions Used in the Exposure Estimates for a Bracelet with Silver Beads

| Parameter | Value(s) | Unit | Note / Reference |
|---|---|---|---|
| Diameter of one silver bead | 5 | mm | Measurement |
| Silver bead weight | 0.69 | g | Measurement |
| Silver bead extractable lead | 5100–9500 | µg | Laboratory results |
| Dermal loading of pure lead | 0.225–1.04 | µg/cm² | IOM, 2006[95] |
| Frequency of hand contact with bracelet for adults (medium and large bracelets), $\lambda_A$ | 5–10 | 1/day | Professional judgment |
| Dermal absorption fraction for Lead, $ABS_d$ | 0.001 | — | Extrapolated from cadmium (Washington state, 2004)[96] |
| Permeability Coefficient for Lead, $K_p$ | 1×10⁻⁴ | cm/hour | U.S. EPA, 2004[6] |
| Hand-to-mouth transfer factor for lead, $f_{direct}$ | 50% | — | Camann et al., 2000[77] |
| Rate of hand-to-mouth contact for adults, $\lambda_D$ | 9 | 1/hr | Cal EPA OEHHA, 2007[80] |
| Waking hours for adults | 16 | hr | Professional judgment |

*Mathematical Models for Estimating Occupational Exposure to Chemicals, 2nd edition*

However, as will be shown, the above methodology provides estimates that are unrealistically high, as they exceed the mass of lead originally loaded onto the skin. Bounding estimates of exposure via this pathway are therefore made by estimating the mass of lead originally loaded onto the skin and conservatively assuming that all of the lead that was transferred to the hand touching the bracelet over the course of the day is ultimately transferred to the mouth. Therefore, $M_{hand-mouth}$ is limited by $\lambda_A$:

$$M_{hand-mouth} = L_{skin} \times A \times \lambda_A$$

where

$M_{hand-mouth}$ is the mass of lead transferred to the mouth (µg),
$L_{skin}$ is the loading of lead on the hands (µg/cm²).
A is the portion of the surface area of the hand in contact with the silver beads on the bracelet (cm²), and
$\lambda_A$ is the rate of bracelet-to-hand contact (#/day) for adults.

Using these values, the estimates of $M_{hand-mouth}$ for adults wearing the medium or large size bracelets range between:

$$M_{hand-mouth} = 0.0017 \text{ µg/cm}^2 \times 4.7 \text{ cm}^2 \times 5/\text{day} = 0.040 \text{ µg/day}$$

$$M_{hand-mouth} = 0.015 \text{ µg/cm}^2 \times 4.7 \text{ cm}^2 \times 10/\text{day} = 0.71 \text{ µg/day}$$

The above estimates better reflect a day's hand-to-mouth transfer mass, as they are based on the more realistic assumption that lead is not constantly contaminating the transfer hand from the bracelet throughout the day. The previous estimates were larger, but relied on the assumption of continuous lead contamination over the 16-hour period in which hand-to-mouth activities might occur. The bounding estimates calculated here for the silver beads on the bracelet exceed the 0.5 µg/day MADL for lead under Proposition 65 but are below the U.S. CPSC policy recommendation for maximum chronic daily ingestion of lead by children of 15 µg/day.

### Estimated Dermal Absorption of Lead from the Silver Beads

Once loaded onto the skin via dermal contact, the mass of lead absorbed dermally at the site of the bracelet was estimated using the U.S. EPA's Risk Assessment Guidance for Superfund (RAGS), Volume I: Human Health Evaluation Manual, Part E, Supplemental Guidance for Dermal Risk Assessment methodology for inorganic compounds in an aqueous solution.[6] This mass, $DA_{event}$, is given by:

$$DA_{event} = K_p \times t \times SA \times C_w,$$

where

$K_p$ is the permeability coefficient in cm/hr,
t is time in hours,

SA is the surface area of skin in contact with the beads, and
$C_w$ is the chemical concentration in water or a thin film of sweat on the dermal surface in µg/cm³.

The U.S. EPA has reported the permeability coefficient for lead as $K_p = 1\times10^{-4}$ cm/hr.[6] As a bounding estimate, t = 24 hours was selected to characterize the amount of time the skin was likely to be in contact with the beads of the bracelet and remain loaded with lead in a typical day.

One fourth the surface area of a sphere with the same diameter as a silver bracelet bead (diameter = 0.5 cm) was used to estimate the area of dermal contact. For the 12 silver metal beads on the bracelet, it was estimated that approximately ¼ of the surface area of each bead would be continuously in contact with the skin when the bracelet is worn. Thus, the surface area of skin in contact with the beads was equal to:

$$A = 12 \times ¼ \times 4\pi \times (½ \times 0.5 \text{ cm})^2 = 2.4 \text{ cm}^2$$

$C_w$ was estimated based on the dermal loading estimates (§13.7.4) using a film thickness of 0.006 cm to characterize the thickness of sweat on the dermal surface.[97] Therefore, estimates for $C_w$ range from:

$$C_w = 0.0017 \text{ µg/cm}^2 / 0.006 \text{ cm} = 0.28 \text{ µg/cm}^3$$

to:

$$C_w = 0.015 \text{ µg/cm}^2 / 0.006 \text{ cm} = 25 \text{ µg/cm}^3.$$

Dermal exposure estimates for the bracelet therefore range from:

$$DA_{event} = 1 \times 10^{-4} \text{ cm/hr} \times 24 \text{ hr} \times 2.4 \text{ cm}^2 \times 0.28 \text{ µg/cm}^3 = 0.0016 \text{ µg}$$

to:

$$DA_{event} = 1 \times 10^{-4} \text{ cm/hr} \times 24 \text{ hr} \times 2.4 \text{ cm}^2 \times 2.5 \text{ µg/cm}^3 = 0.014 \text{ µg}.$$

The above is the estimated range of dermal absorption from wearing a bracelet with twelve 5-mm beads over one 24-hour period. In this instance, the lower and upper bound estimates calculated were below both the 0.5 µg/day MADL for lead under Proposition 65, and the U.S. CPSC policy recommendation for maximum chronic daily ingestion of lead by children of 15 µg/day.

### 13.7.5   Example 5 — Derivation of acceptable surface concentrations for carcinogens

Initial surface wipe samples taken at the Pentagon following the crash of a hijacked airliner on September 11, 2001 identified polychlorinated biphenyls and assorted dioxins and furans. Site-specific, risk-based surface screening levels were needed in order to assure protection

$$C_{surface} = \frac{TR \times BW \times AT_{lifetime} \times 365 \times 10}{(CR_{dermal} \times CSF_{dermal} + CR_{ingestion} \times CSF_{ingestion} + CR_{inhal} \times CSF_{inhal}) \times EF \times ED} \qquad (13\text{-}34)$$

of emergency response and remediation workers, as well as office workers once the building was cleared for normal occupancy. An approach that would include all possible routes of exposures specific to the Pentagon, such as provided in Equation 13-30, was needed.[98]

Because PCBs, dioxins and furans are considered carcinogenic, the first step was to obtain cancer slope factors (CSF) and decide on input variable values needed to calculate lifetime average daily intake (LADI) for each route of exposure using the following equations 13-31 and 13-32:

$$Risk_p = CSF_p \times LADI_p$$

$$LADI_p = \frac{C_{surface} \times CR_p \times EF \times ED}{BW \times AT_{lifetime} \times 365 \text{ days/yr}}$$

Some of the values used for site-specific exposure assumptions came from the USEPA Exposure Factors Handbook and some assumption were based on professional judgment.[26] Calculation of an acceptable surface concentration come from Equation 13-34 (see above).

A target risk (TR) rate of $1 \times 10^{-4}$ was selected. Although it is at the least protective end of the range recommended by the USEPA for National Priority List site remediation, it is often more protective than standards recommended by the Occupational Safety and Health Administration for workers. To compute each of the three contact rate factors a few assumptions about the variables have to be made. The first contact rate for dermal exposure is from Equation 13-35:

$$CR_{dermal} = SA_d \times F_d \times EV \times FT_{ss} \times DAF$$

The following assumptions relative to dermal exposure were made:

$SA_d$ = 0.198 m² (total surface area of hands and forearms of an adult male)[26]

$F_d$ = 0.25 (fraction of dermal surface area available for contact that comes in contact each day)

$EV$ = 3 (contact frequency per day)

$FT_{ss}$ = 0.1 (fraction of dust transferred to surface to skin and remains on the skin)

$DAF$ = 0.14 (dermal absorption efficiency, in this case based on empirical data)

Thus, $CR_{dermal}$ = 0.0021 m²/day.

Next, the contact rate for ingestion exposure is calculated using Equation 13-36:

$$CR_{ingest} = SA_g \times F_g \times EV \times FT_{ss} \times FT_{ftm} \times DAF$$

The additional variables used in this equation include:

$F_g$ = 0.1 (fraction of available skin area that contacts mouth)

$FT_{ftm}$ = 0.3 (fraction of dust transferred from skin to mouth)

$HTME$ = 3 (hand-to-mouth events per day)
$SA_g$ in this case equals 0.084 m² which is the surface are of two hands.[26]

Thus, $CR_{ingest}$ = 0.0023 m²/day.

Finally, an inhalation contact rate is computed from Equation 13-37:

$$CR_{inhale} = IR_l \times K$$

The variables and values used here include:

$IR_l$ = 15 m³/day (inhalation volume for a moderately active worker)[26]

$K$ = $5 \times 10^{-8}$ m⁻¹ (this dust re-suspension factor is at the lower range representing lighter or less dust producing activities such as walking)[82]

Thus, $C_{Rinhale}$ = $7.5 \times 10^{-7}$ m²/day.

Incorporating the $CR_p$ values into the overall equation for calculating site-specific surface limits:

$$C_{surface} =$$

$$\frac{TR \times BW \times AT_{lifetime} \times 365 \times 10}{(CR_{dermal} \times CSF_{dermal} + CR_{ingestion} \times CSF_{ingestion} + CR_{inhal} \times CSF_{inhal}) \times EF \times ED}$$

where

$TR$ = $1 \times 10^{-4}$
$BW$ = 71.8 kg (body weight)[26]
$AT_{lifetime}$ = 70 years
$EF$ = 7 days for remediation worker and 250 days per year for an office worker
$ED$ = 1 year for remediation worker and 25 years for an office worker

After substituting all the values for the variables in the above equation, surface concentration resulting in a risk of cancer health effects at $1 \times 10^{-4}$ was computed to be 0.012 µg/100cm² for remediation worker exposure patterns. All 12 of the initial wipe samples taken were less than this concentration. For the returning Pentagon office worker, the surface concentration resulting in a 1 in 10,000 cancer risk was computed to be $1.4 \times 10^{-5}$ µg/100cm². A few of the wipe samples taken contained concentrations greater than this limit. But because the sampling locations were

*Mathematical Models for Estimating Occupational Exposure to Chemicals, 2nd edition*

selected to represent surfaces appearing to have the most contamination, that the exposure assumptions used for the risk-based evaluation were considered protective, and that the concentrations detected were either below or only slightly higher than available screening levels, it was decided that additional sampling was not necessary and that adverse health effects among exposed Pentagon personnel were unlikely.

Upon careful consideration of the variables in each equation above, it should be clear that the value chosen for each one is typically not a hard and empirically determined measure. Some of the estimates are based on a precedent established by prior experience and judgment, while others are based solely on the professional judgment of the current user. The range of possibilities for each variable are potentially broad, and choosing the incorrect value might have significant impact on the determination of risk potential and the actions that are taken to prevent exposure. Thus, these computations must be done with care and with full knowledge that they are only estimates, and should always be supplemented by additional tools and approaches for monitoring the exposure and health of potentially affected populations. Additional advanced techniques, such as Monte Carlo analysis (see Chapter 19), can produce a probability distribution range based on thousands of possibilities for choosing variable parameters.

# 13.8   References

1.  **Elias, P.M. and K.R. Feingold (eds.):** *Skin Barrier.* London: Informa HealthCare, 2005.
2.  **Chilcott R. and S. Price (eds.):** *Principles and Practice of Skin Toxicology.* San Francisco, CA: Wiley, Inc., 2008.
3.  **Leung, H. and D.J. Paustenbach:** Techniques for Estimating the Percutaneous Absorption of Chemicals Due to Occupational and Environmental Exposure. *Appl. Occup. Environ. Hyg. 9(3):*187–197 (1994).
4.  **Grandjean, P.:** "Skin Penetration: Hazardous Chemicals at Work." A report prepared for the Commission of the European Communities, Directorate-General Employment, Industrial Relations and Social Affairs. London, England: Taylor & Francis, 1990.
5.  **Burstyn, I. and K. Teschke:** Studying the determinants of exposure: a review of methods. *Am. Ind. Hyg. Assoc. J. 60(1):*57–72 (1999).
6.  **U.S. Environmental Protection Agency (EPA):** Risk Assessment Guidance for Superfund (RAGS). Volume I: Human Health Evaluation Manual (Part E, Supplemental Guidance for Dermal Risk Assessment). EPA/540/R/99/005. Office of Superfund Remediation and Technology Innovation. Washington D.C.: U.S. Environmental Protection Agency, July 2004.
7.  **Fenske, R.A.:** Dermal exposure assessment techniques. *Ann. Occup. Hyg. 37:*687–706 (1993).
8.  **Marquart, H., S. Maidment, J.L. McClaflin, and M.C. Fehrenbacher:** Harmonization of future needs for dermal exposure assessment and modeling: a workshop report. *Appl. Occup. Environ. Hyg. 16:*218–227 (2001).
9.  **American Chemistry Council:** Methods for Assessing Matrix Effects on Oral and Dermal Absorption and Dermal Contact and Transfer. White Paper HHEA-3. Report prepared by ICF Consulting. Arlington, VA, 2001.
10. **Schneider, T., R. Vermeulen, D.H. Brouwer, J.W. Cherrie, H. Kromhout, and C.L. Fogh:** Conceptual model for assessment of dermal exposure. *Occup. Environ. Med. 56:*765–73 (1999).
11. **Marquart, J., et al.:** Determinants of Dermal Exposure Relevant for Exposure Modeling in Regulatory Risk Assessment. *Ann. Occup. Hyg. 47(8):*599–607 (2003).
12. **Goede, H.A., et al.:** Classification of dermal exposure modifiers and assignment of values for a risk assessment toolkit. *Ann. Occup. Hyg. 47(8):* 609–618 (2003).
13. **Warren, N., H.A. Goede, T. Scha, R. Oppl, H.J. Schipper, and J.J. Van Hemmen:** Deriving Default Dermal Exposure Values for Use in a Risk Assessment Toolkit for Small and Medium-Sized Enterprises. *Ann. Occup. Hyg. 47:*619–627 (2003).
14. **Brouwer, D.H., et al.:** A dermal model for spray painters. Part I: subjective exposure modelling of spray paint deposition. *Ann. Occup. Hyg. 45(1):*15–23 (2001).
15. **Semple, S., et al.:** A dermal model for spray painters. Part II: estimating the deposition and uptake of solvents. *Ann. Occup. Hyg. 45(1):*25–33 (2001).
16. **Van-Wendel-de-Joode, B., D.H. Brouwer, R. Vermeulen, J.J. Van Hemmen, D. Heederik, and H. Kromhout:** DREAM: a method for semi-quantitative dermal exposure assessment. *Ann. Occup. Hyg. 47:*71–87 (2003).
17. **European Chemicals Agency:** Technical Guidance Documents on Registration, Evaluation, Authorisation, and Restriction of Chemicals (REACH), 2008. http://guidance.echa.europa.eu/ guidance_en.htm.
18. **Rajan-Sithamparanadarajah, R., et al.:** Patterns of dermal exposure to hazardous substances in European Union workplaces. *Ann. Occup. Hyg. 48(3):*285–97 (2005).
19. **Oppl, R., F. Kalberlah, P.G. Evans, and J.J. Van Hemmen:** A Toolkit for Dermal Risk Assessment and Management: an Overview. *Ann. Occup. Hyg. 47:*629–640 (2003).
20. **Schuhmacher-Wolz, U., F. Kalberlah, R. Oppl, and J. J. Van Hemmen:** A Toolkit for Dermal Risk Assessment: Toxicological Approach for Hazard Characterization. *Annals of Occupational Hygiene 47:* 641-652, 2003.

21. **Eurofins:** Eurofins Product Testing — RISKOFDERM project, European Community, RTD Project : QLK4-CT-1999-01107. http://product-testing.eurofins.com/services/research—development/projects-on-skin-exposure-and-rotection/riskofderm—-skin-exposure-and-risk-assessment.aspx.

22. **Fenske, R.A., and J.J. van Hemmen:** Occupational Skin Exposure to Chemical Substances: Setting Limits. *Ann. Occup. Hyg. 38(4):*333–336 (1994).

23. **Bos, P. M., D.H. Brouwer, H. Stevenson, P.J. Boogaard, W.L. de Kort, and J.J. van Hemmen:** Proposal for the assessment of quantitative dermal exposure limits in occupational environments: Part 1. Development of a concept to derive a quantitative dermal occupational exposure limit. *Occup. Environ. Med. 55:*795–804 (1998).

24. **Brouwer, D.H., L. Hoogendoorn, P. M. Bos, P. J. Boogaard, and J. J. van Hemmen:** Proposal for the assessment to quantitative dermal exposure limits in occupational environments: Part 2. Feasibility study for application in an exposure scenario for MDA by two different dermal exposure sampling methods. *Occup. Environ. Med. 55:*805–11 (1998).

25. **Sartorelli, P., et al.:** Percutaneous penetration studies for risk assessment. *Environ. Toxicol. Pharmacol., 8:*133–152 (2000).

26. **U.S. Environmental Protection Agency (EPA):** Exposure Factors Handbook. EPA/600/P-95/002Fa. Office of Research and Development, Washington, D.C.: National Center for Environmental Assessment, August 1997.

27. **Adams, W.C.:** Measurement of breathing rate and volume in routinely performed daily activities, Final Report. California Air Resources Board (CARB) Contract No. A033-205. June 1993. 185 pgs.

28. **Layton, D.W.:** Metabolically consistent breathing rates for use in dose assessments. *Health Physics 64(1):*23–36 (1993).

29. **Linn, W.S. and D.A. Shamoo:** Hackney, J.D. Documentation of activity patterns in "high-risk" groups exposed to ozone in the Los Angeles area. In: *Proceedings of the Second EPA/AWMA Conference on Tropospheric Ozone,* Atlanta, Nov. 1991. pp. 701–712. Pittsburgh, PA: Air and Waste Management Association, 1992.

30. **Fiserova-Bergerova, V., J.T. Pierce, and P.O. Droz:** Dermal Absorption Potential of Industrial Chemicals: Criteria for Skin Notation. *Am. J. Ind. Medicine 17:*617–635 (1990).

31. **DeCock, J., D. Heedrik, H. Kromhout, and J.S.M. Boleij:** Strategy for Assigning a "Skin Notation": A Comment. *Ann. Occup. Hyg. 40:*611–614. (1996).

32. **U.S. Environmental Protection Agency (EPA):** Dermal Exposure Assessment: Principles and Applications; Interim Report (EPA/600/8-91/011B). Washington, D.C.: U.S. Environmental Development, 1992.

33. **Leung, H. and D.J. Paustenbach:** Techniques for Estimating the Percutaneous Absorption of Chemicals Due to Occupational and Environmental Exposure. *Appl. Occup. Environ. Hyg. 9(3):*187–197 (1994).

34. **Health and Welfare Canada, U.S. Environmental Protection Agency, and National Agricultural Chemicals Association:** Pesticide Handlers Exposure Database (PHED), February, 1992. [PHED Version 1.1 update, 1995].

35. **McDougal, J.N. and M. Boeniger:** Methods for Assessing Risks of Dermal Exposures in the Workplace. *Crit. Rev. Tox. 32:*291–327 (2002).

36. **VanRooij, J.G.M., J.G.C. de Roos, M.M. Bodelier-Bade, and F.J. Jongeneelen:** Absorption of Polycyclic Aromatic Hydrocarbons through the Human Skin: Differences Between Anatomical Sites and Individuals. *J. Toxicol. Environ. Health 38:*355–368 (1993).

37. **Knaak, J.B., M.A. Al-Bayati, O.G. Raabe, J.L. Wiedmann, J.W. Pensyl, J.H. Ross, A.P. Leber, and P. Jones:** Mixer-Loader-Applicator Exposure and Percutaneous Absorption Studies Involving EPTC Herbicide. Biological Monitoring for Pesticide Exposure, Measurement Estimation, and Risk Reduction. Washington, D.C.: American Chemical Society, 1992.

38. **Knarr, R.D., G.L. Cooper, E.A. Brian, M.G. Kleinschmidt, and D.G. Graham:** Worker Exposure During Aerial Application of a Liquid and a Granular Formulation of Ordram Selective Herbicide to Rice. *Arch. Environ. Contam. Toxicol. 14:*523–527 (1985).

39. **Lavy, T.L., J.S. Shepard, and D.C. Bouchard:** Field Worker Exposure and Helicopter Spray Pattern of 3,4,5-%, Bull. *Environ. Contam. Toxicol. 24:*90–96 (1980).

40. **Roff, M. and J. Wheeler:** Dislodgeable residues from hard surfaces: Interim report, IR/ECO/00/11. Health and Safety Laboratory, Biomedical Sciences Group. United Kingdom, 2000.

41. **Brouwer, D.H., et al.:** Transfer of contaminants from surface to hands: experimental assessment of linearity of the exposure process, adherence to the skin, and area exposed during fixed pressure and repeated contact with surfaces contaminated with a powder. *Appl. Occup. Environ. Hyg. 14(4):*231–39 (1999).

42. **Kissel, J., K. Richter, and R. Fenske:** Field Measurements of Dermal Soil Loading Attributes to Various Activities: Implications for Exposure Assessment. *Risk Anal. 16:*116–125 (1996).

43. **McArthur, B.:** Dermal Measurements and Wipe Sampling Methods: A Review. *Appl. Occup. Environ. Hyg. 7(9):*599–606 (1992).

44. **Ness, S.A.:** *Surface and Dermal Monitoring for Toxic Exposures.* New York: Van Nostrand Reinhold, 1994.

45. **Kissel, J. K. Richter, R. Duff, and R. Fenske:** Factors Affecting Soil Adherence to Skin in Hand-Press Trials. Bull. Environ. *Contamin. Toxicol. 56:*722–728 (1996).

*Mathematical Models for Estimating Occupational Exposure to Chemicals, 2nd edition*

46. **Driver, J.H., J.J. Konz, and G.K. Whitmyre:** Soil adherence to human skin. Bull. Environ. *Contam. Toxicol. 43*:814–820 (1989).

47. **Que Hee, S.S., B. Peace, C.S. Clark, J.R. Boyle, R.L. Bornschein, and P.B. Hammond:** Evolution of efficient methods to sample lead sources, such as house dust and hand dust, in the homes of children. *Environ. Res. 38*:77–95 (1985).

48. **Brouwer D., M. Boeniger, and J. van Hemmen:** Hand Wash and Manual Skin Wipes. *Ann. Occup. Hyg. 44*:501–510 (2000).

49. **Ignacio, J.S. and W.H. Bullock (eds.):** *A Strategy for Assessing and Managing Occupational Exposures*, 3rd edition. Fairfax, VA: American Industrial Hygiene Association, 2006.

50. **U.S. Environmental Protection Agency (EPA):** Options for revising CEB's Method for Screening-Level Estimates of Dermal Exposure., Final Report, June 2000, Chemical Engineering Branch, Economics, Exposure and Technology Division, Washington DC.

51. **Rutledge, L.C.:** Some Corrections to the Record on Insect Repellents and Attractants. *J. Am. Mosquito Cont. Assoc. 4*:441–425 (1988).

52. **Finley, B.L., P.K. Scott, and D.A. Mayhall:** Development of a standard soil-to-skin adherence probability density function for use in Monte Carlo analyses of dermal exposure. *Risk Analysis 14*: 555–569 (1994).

53. **Kromhout, H., W. Fransman, R. Vermeulen, M. Roff, and J.J. van Hemmen:** Variability of Task-Based Dermal Exposure Measurements from a Variety of Workplaces. *Ann. Occup. Hyg. 48*:187–196 (2004).

54. **Rougier, A., D. Dupuis, C. Lotte, and R. Roguet:** The measurement of the stratum corneum reservoir. A predictive method for in vivo percutaneous absorption studies: influence of application time. *J. Invest. Dermatol. 84(1)*:66–68 (1985).

55. **Rougier, A., C. Lotte, and D. Dupuis:** An original predictive method for in vivo percutaneous absorption studies. *J. Soc. Cosmetic Chemists 38*:397–417 (1987).

56. **Rougier, A.:** Predictive Measurement of In Vivo Percutaneous Absorption. In *Prediction of Percutaneous Penetration Methods, Measurements, Modeling*. Scott, R.C., R.H. Guy, and J. Hadgraft (eds.). London: IBC Technical Services, 1990.

57. **Maibach, H.I. and R. Feldman:** Systemic Absorption of Pesticides Through the Skin of Man, In: Occupational Exposure to Pesticides, Report to the Federal Working Group on Pest Management. From the Task Group on Occupational Exposure to Pesticides. Washington, DC: White House Council on Environmental Quality, Federal Working Group on Pest Management, 1974.

58. **U.S. Environmental Protection Agency (EPA):** Region IX Preliminary Remediation Guidelines, Toxicity Tables (http://www.epa.gov/Region9/waste/sfund/prg/index.htm). [Accessed on April 1, 2009].

59. **ten Berge, W.:** QSARS of Skin Permeation for Chemicals Webpage. http://home.planet.nl/~wtberge/qsarperm.html. [Accessed on April 1, 2009].

60. **Syracuse Research Center:** Physical Properties Database (PHYSPROP). http://www.syrres.com/what-we-do/product.aspx?id=133. [Accessed on April 1, 2009].

61. **National Institute for Occupational Safety and Health:** Skin Exposures & Effects Webpage, Skin Permeation Calculator. Centers for Disease Control and Prevention, http://www.cdc.gov/niosh/topics/skin/skinPermCalc.html. [Accessed on April 1, 2009].

62. **Theeuwes, F., R. Gale, and R. Baker:** Transference: A comprehensive parameter governing permeation of solutes through membranes. *J. Membrane Sci. 1*:3–16 (1976).

63. **Bunge, A.L. and W.J. Romonchuk:** Measuring Skin Permeability Coefficients of Highly Lipophilic Compounds, Final Report, Award No. R-82951801. Submitted to the U.S. Environmental Protection Agency (EPA), July 31, 2006.

64. **Jakasa, I., N. Mohammadi, J. Kruse, and S. Kezic:** Percutaneous Absorption of Neat and Aqueous Solutions of 2- Butoxyethanol in Volunteers. *Internatl. Arch. Occup. Env. Health 77*:79–84 (2004).

65. **ten Berge, W.:** A Simple Dermal Absorption Model: Derivation and Application. *Chemosphere*, 2009. [In Press].

66. **Wilschut, A., W.F., ten Berge, P.J. Robinson, and T.E. McKone:** Estimating Skin Permeation. The Validation of Five Mathematical Skin Permeation Models. *Chemosphere 30*:1275–1296 (1995).

67. **Vecchia B.E. and A.L. Bunge:** (Chapter 3) Skin absorption databases and predictive equations. In *Transdermal Drug Delivery.* Guy, R.H. and J. Hadgraft (eds.). New York: Marcel Dekker, 2002.

68. **Bunge, A.L. and R.L. Cleek:** A New Method for Estimating Dermal Absorption from Chemical-Exposure .2. Effect of Molecular-Weight and Octanol Water Partitioning. *Pharma. Res. 12*:88–95 (1995).

69. **Wilschut, A. and W.F., ten Berge:** Two Mathematical Skin Permeation Models for Vapours. Perspectives in Percutaneous Penetration (PPP) Conference, 4B: La Grande Motte, France (1997).

70. **Lotens, W.A. and L.J.A. Wammes:** Vapour Transfer in Two Layer Clothing due to Diffusion and Ventilation. *Ergo. 36(1)*:1223–1240 (1993).

71. **Vecchia B.E. and A.L. Bunge:** Partitioning of Chemicals into Skin: Results and Predictions (Chapter 4). In *Transdermal Drug Delivery.* Guy, R.H. and J. Hadgraft (eds.). New York: Marcel Dekker, 2002.

72. **European Chemicals Agency:** Guidance on information requirements and chemical safety assessment Chapter R.14: Occupational Exposure Estimation, Appendix R 14.1, May 2008. (http://echa.europa.eu/reach_en.asp).

73. **Walker, J.D., C. Whittaker, and J.N. McDougal:** Role of the TSCA Interagency testing committee in meeting the U.S. government data needs: designating chemicals for percutaneous absorption rate testing. In *Dermatotoxicology*, 5th edition. Marzulli, F.N. and H.I. Maibach (eds.). Bristol, PA: Taylor & Francis, 1996. pp. 371–381.

74. **Potts, R.O. and R.H. Guy:** Predicting skin permeability. *Pharm. Res. 9:*663–669 (1992).

75. **Bunge, A.L., G.L. Flynn, and R.H. Guy:** Predictive Model for Dermal Exposure Assessment. In *Water Contamination and Health: Integration of Exposure Assessment, Toxicology, and Risk Assessment.* Wang, R. (ed.). New York: Marcel Dekker, 1994.

76. **Cherrie, J.W., S. Semple, Y. Christopher, A. Saleem, G.W. Hughson, and A. Phillips:** How important is inadvertent ingestion of hazardous substances at work? *Ann. Occup. Hyg. 50(7):* 693–704 (2006).

77. **Camann, D.E., T.K. Majumdar, and P.W. Geno:** Evaluation of saliva and artificial salivary fluids for removal of pesticide residues from human skin. Southwest Research Institute, San Antonio, TX and ManTech Environmental Technology, Inc., Research Triangle Park, NC for U.S. EPA. National Exposure Research Laboratory, Research Triangle Park, NC. EPA/600/R00/041, 2000.

78. **U.S. Consumer Product Safety Commission:** Briefing Package. Petition to ban chromate copper arsenate (CCA)-treated wood in playground equipment (Petition HP01-3). Washington, DC, February, 2003.

79. **U.S. Environmental Protection Agency (EPA):** Policy paper from the Science Advisory Council for Exposure, Policy Number 12. Recommended revisions to the Standard Operating Procedures (SOPs) for residential exposure assessments, Washington, DC, 2001.

80. **California Environmental Protection Agency, Office of Environmental Health Hazard Assessment (OEHHA):** Safe Drinking Water and Toxic Enforcement Act off 1986 (Proposition 65). Draft: Guideline for Hand-to-Mouth Transfer of Lead Exposure from Fishing Tackle Products. Interpretive Guideline No. 2007-001. May 2007.

81. **May, L.M., B. Gaborek, T. Pitrat, and L. Peters:** Derivation of risk based wipe surface screening levels for industrial scenarios. *Sci. Total Environ. 288:*65–80 (2002).

82. **Sansone, E.B.:** Redispersion of Indoor Surface Contamination and its Implications. *Treatise on Clean Surface Technology*, Vol. 1. New York: Plenum Press, 1987. pp 261–290.

83. **American Conference of Governmental Industrial Hygienists (ACGIH®):** Threshold Limit Values (TLVs®) for Chemical Substances and Physical Agents and Biological Exposure Indices (BEIs®). Cincinnati, Ohio: American Conference of Governmental Industrial Hygienists, 2007.

84. **Ramsey, J., J. Young, and S. Gorzinski:** "Acrylamide: Toxicodynamics in Rats." 1984. [Unpublished Dow Chemical Company Report.] In Assessment of Health Risks from Exposure to Acrylamide. Washington, D.C.: U.S. Environmental Protection Agency/Office of Toxic Substances, 1990.

85. **Adami, G., F. Larese, M. Venier, P. Barbieri, F. Lo Coco, and E. Reisenhofer:** Penetration of benzene, toluene, and xylenes contained in gasolines through human abdominal skin *in vitro. Tox. in Vitro (20):*1321–1330 (2006).

86. **Javelaud, B., et al.:** Benzene Exposure in Car Mechanics and Road Tanker Drivers. *Int. Arch. Occup. Environ. Health 71:*277–283 (1998).

87. **Laitinen, J., J. Kangas, K. Pekari, and J. Liesivuori:** Short-term Exposure to Benzene and Gasoline at Garages. *Chemosphere 28(1):*197–205 (1994).

88. **Franz, T.J.:** Percutaneous Absorption of Benzene. (Chapter 5). In *Adv. Modern Environ. Toxicol. Applied Toxicology of Petroleum Hydrocarbons*, vol. 6. Princeton, N.J.: Princeton Scientific Publishers, Inc., 1984. pp. 61–70.

89. **Modjtahedi, B.S. and H.I. Maibach:** In vivo percutaneous absorption of benzene in man: Forearm and palm. *Food Chem. Tox. (46):*1171–1174 (2008).

90. **Rusch, G.M., B.K. Leong, and S. Laskin:** Benzene metabolism. *J. Toxicol. Environ. Health 2(suppl):*23–26 (1977).

91. **Cinalli, C., C. Carter, A. Clark, and D. Dixon:** A Laboratory Method to Determine the Retention of Liquids on the Surface of Hands. U.S. Environmental Protection Agency. EPA 747-R-92-003, September 1992.

92. **Hanke, J., T. Dutkiewicz, and J. Piotrowski:** The Absorption of Benzene through Human Skin. *Int. J. Occup. Environ. Health. 6:*104–111 (2000).

93. **Loden, M.:** The in Vitro Permeability of Human Skin to Benzene, Ethylene Glycol, Formaldehyde, and n-Hexane. *Acta Pharmacol. et Toxicol. 58:*382–389 (1986).

94. **Blank, I.H. and D.J. McAuliffe:** Penetration of Benzene through Human Skin. *J. Invest. Dermatol. 85:*522–526 (1985).

95. **Sleeuwenhoek, A. and M. van Tongeren:** "Assessment of dermal exposure to inorganic lead caused by direct skin contact with lead sheet and moulded PVC profiles." Institute of Occupational Medicine, Research Report TM/06/04. Edinburgh, United Kingdom: December 2006.

*Mathematical Models for Estimating Occupational Exposure to Chemicals, 2nd edition*

96. **Washington State Department of Ecology:** Response to Questions from the Science Advisory Board May 2004. pp. 5–10. "Lead Exposure from Dermal Contact with Lead-Contaminated Soils." 2004.

97. **U.S. Environmental Protection Agency (EPA):** A Laboratory Method to Determine Retention of Liquids on the Surfaces of Hands. Washington D.C., Office of Pollution Prevention and Toxics., EPA/747/R-92/003. 1992.

98. **Gaborek, G.J., J.M. Mullikin, T. Pitrat, L. Cummings, and L.M. May:** Pentagon surface wipe sampling health risk assessment Presented at 2002 Toxicology and Risk Assessment Conference, Cincinnati, Ohio. U.S. Army Center for Health Promotion and Preventive Medicine, Aberdeen Proving Ground, Maryland (2002).

# EXHIBIT 5

**TCAS**

**Toxicology Consultants & Assessment Specialists, LLC**

Toxic Exposures · Environmental Testing · Risk Assessment · Forensic Toxicology · Causation Evaluation

June 22, 2022

Steven C. Marks, Esq.
Podhurst Orseck, P.A.
SunTrust International Center
One S.E. Third Ave., Suite 2300
Miami, FL  33131

**Re: Nancy Salas v.  Monsanto**

Dear Attorneys Marks:

Per your request regarding this matter, I have reviewed the complete list of pertinent documents as compiled in Appendix A. Based upon the information provided and the application of generally accepted toxicological methodology and referenced sources as cited herein, I have stated my opinions in this matter to reasonable toxicological certainty.

Throughout this report, I am relying on the medical diagnostic specific causation opinions of physicians. Although I have provided summary information regarding Ms. Salas' medical history and diagnoses as reported in her partial medical records, I am limiting my opinions specifically to Ms. Salas' dose and dose-response compared to the human epidemiological studies of glyphosate applicators. With respect to additional opinions, I have evaluated glyphosate/Roundup constituent formulations, absorption, distribution, metabolism, and excretion, (ADME) and Roundup's mechanism of action regarding genotoxicity and promotion. Additionally, I have identified other toxicological exposures that could potentially serve as confounding factors.

Salas, Nancy v. Monsanto
June 22, 2022
Page 2

# Contents

1. Introduction ...................................................................................................................6
   Overview of Toxicological Methodology ........................................................................7
   Objectives ......................................................................................................................7
2. Plaintiff Background Summary ......................................................................................9
   Past Medical/Surgical History .....................................................................................10
   NHL Diagnosis and Pathology .....................................................................................11
   Family Medical History .................................................................................................12
   History of Tobacco, Alcohol, and Drug Use .................................................................12
   Residential History .......................................................................................................13
   Employment History .....................................................................................................13
   Roundup Exposure ......................................................................................................14
      Roundup Product Used and Method of Application ...............................................14
      Personal Protective Equipment (PPE) .................................................................14
   Interview with Nancy Salas .........................................................................................15
      Exposure Factors ................................................................................................15
      Potential Confounding Exposures .......................................................................19
   NHL Latency Interval ....................................................................................................20
3. Scope of Exposures ....................................................................................................20
   Methodology to Measure Glyphosate Dose per Applicator Studies .............................20
      8-Hour, Time-Weighted Exposure Day Calculations ...........................................22
      Non Time-Weighted Exposure Day Calculations .................................................23
   Calculation of Absorbed Dose .....................................................................................24
      Dermal Exposure using Passive Dosimetry to Calculate Systemic Dose .............24
         Dose Analyses using the Machado-Neto et al. (2000) Knapsack Sprayer Study.........24
         Conclusions Regarding Systemic Dosage .....................................................28
         Conclusions Regarding Ms. Salas' Systemic Dose Level ...............................28
         Underestimations of Exposure .......................................................................30
4. Glyphosate Human NHL Studies .................................................................................31
   Summary of Epidemiological Studies ...........................................................................32
   Comparisons of Exposure Days to Human Epidemiological Studies .............................38
   Unreliable Meta-Analysis of Glyphosate and NHL Risk ...............................................38
   Inserm Collective Expert Report ..................................................................................42
      Carcinogenic and Mutagenic Findings ................................................................43
      New NHL Data .....................................................................................................43
5. Personal Protective Equipment (PPE) and Measured Dermal Exposure Levels ...................44
   Penetration of Glyphosate through Clothing.................................................................44
   Lack of Personal Protective Equipment (PPE) .............................................................45
   Dermal Exposures to Applicators in U.S. National Parks .............................................47
   Example of Exposure to 1,4-dioxane from Roundup (no gloves, short sleeves) ...................48
   Omission of PPE Labeling Recommendations by Monsanto .........................................50
      Key Points Pertaining to Exposed Body Parts ....................................................52

Salas, Nancy v. Monsanto
June 22, 2022
Page 3

Meetings of Manufacturing Chemists Association ............................................................. 53

6. Glyphosate Exposure & Toxicity .................................................................................... 54
  Monsanto's Glyphosate Biomonitoring and Dose Measurement Reliability..................... 54
  Glyphosate (Roundup) History and Use......................................................................... 56
    Contaminants within Roundup (Surfactants, Adjuvants and Co-formulants).................. 57
    Cancer or Tumor Promotion....................................................................................... 60
  Roundup and Glyphosate Genotoxicity .......................................................................... 68
    Genotoxic Findings................................................................................................... 68
  OECD Approved Comet Methodology - MCA Meeting minutes ....................................... 69
    Comet Assay validity ................................................................................................ 69
    Genotoxic Agents, Promotors and Inadequately Studied Chemicals ............................ 70
    Oxidative Stress in Farmers Using Herbicides & PPE Protection ................................. 71
  Genotoxicity Among Glyphosate Applicators in Brazil ..................................................... 72
    Studies Demonstrating Genotoxicity and Mutagenic Effects of Glyphosate .................. 75
    Further Evidence of Genotoxic Effects ....................................................................... 78
    Lucia et al. (2022)** - Human Genotoxicity ................................................................. 81
    Makris et al (2022)** - Oxidative Stress of Glyphosate and AMPA in Children .............. 83
    Wozniak et al. Studies ............................................................................................. 84
      Comparison of Doses in the Wozniak et al. Studies to Actual Human Exposures ........ 85
    Suarez-Larios et al. (2017) Study ............................................................................. 87
    Hao et al. (2019) Study of Roundup Inhalation Toxicity to Humans ............................. 88
      Study Design....................................................................................................... 89
      Study Findings .................................................................................................... 89
    Mesnage et al. (2021A) ........................................................................................... 91
      Study Design....................................................................................................... 91
      Study Findings .................................................................................................... 92
      Study Limitations ................................................................................................ 94
    Mesnage et al. (2021B) ........................................................................................... 95
    Kwiatkowska et al. (2017) Study of DNA Damage from Glyphosate Exposure ............... 96
      Study Design....................................................................................................... 96
      Study Findings .................................................................................................... 97
    Lioi et al. (1998) ..................................................................................................... 98
    Applicators - Genotoxic Study of Pesticides (Aiassa et al. 2019) ................................ 101
  Eaton et al. Study on Glyphosate/AMPA-Induced Oxidative Stress** ............................. 103
    Prasad Study: Chromosomal Aberrations and Micronuclei in Bone Marrow Cells ......... 104
  Summary of the potency of POEA-formulated GBH vs. Glyphosate Technical** ............... 107
    Genotoxicity of Roundup, Glyphosate, and POEA/Tallowamine (POEA) in Fish ............ 109
    Modes of Action and Safety Considerations ............................................................... 111
    Adverse Effects of Glyphosate on Human Gastrointestinal (GI) Microbiome ................. 112
  Glyphosate (Roundup) Formulations: Chemical and Physical Information........................ 114
  Toxicological Considerations of Exposure and Dose ...................................................... 119
    Systemic Dose......................................................................................................... 119
  Glyphosate Elimination in Bone and Bone Marrow as per Monsanto** ............................ 120

Salas, Nancy v. Monsanto
June 22, 2022
Page 4

Half-Life Elimination Phases ................................................................................. 122
Study Findings ...................................................................................................... 122
Glyphosate Elimination Rate in Bone Marrow vs. Plasma .................................... 124
Summary .............................................................................................................. 127
Brewster Rat Study Characterizing Glyphosate Distribution & Excretion ............. 128
Human Biomonitoring and Glyphosate Exposure ...................................................... 130
Human Glyphosate Excretion in Urine - Lower than Found in Animal Studies ....... 131
Risk Characterization Using New 1% Urinary Glyphosate Excretion in Humans ........... 132
Curwin et al. (2016) Comparing pesticide exposures - farm vs. non-farm families ......... 133
Controlled Dermal vs. Inhalation Residential Applicator Urine Glyphosate Levels ......... 134
Routes of Exposure .................................................................................................... 138
Ingestion .............................................................................................................. 138
Inhalation ............................................................................................................. 138
Respirable Dust and Atmospheric Glyphosate Exposure ................................ 138
Dermal Absorption ............................................................................................... 140

7. Dermal Absorption of Glyphosate .......................................................................... 141
The Dermal Barrier .................................................................................................... 141
Percutaneous Absorption of Glyphosate .................................................................... 144
Percutaneous Absorption Models .......................................................................... 145
Dermal Absorption in Vivo Measurement Methods ........................................... 146
Dermal Absorption in Vitro Measurement Methods ........................................... 146
Dosing Techniques and Measurement Considerations................................ 148
In vitro Dermal Absorption of Herbicides through Rat versus Human Skin ......... 149
"Triple Pack" Methodology ............................................................................... 149
Dermal Absorption Correspondence Between Monsanto and DTL Laboratory ................. 151
DTL Laboratory Human Epidermis Preparation Methods ....................................... 151
Dermal Absorption and Pharmacokinetic Studies of Glyphosate ................................ 153
Models Used to Measure Glyphosate Dermal Absorption ..................................... 153
Maibach Study (1983) ...................................................................................... 153
Wester et al. Study (1991) ............................................................................... 156
Concern of Cross-Contamination in the Wester et al. Study (1991) ............. 159
Review of Monsanto Studies .............................................................................. 161
Monsanto in vitro Absorption Study of Glyphosate by DTL (2010) - (MON 79545) 450 g/L
Glyphosate SL Formulation (MON 79545) ......................................................... 161
Tape Stripping ............................................................................................. 163
Monsanto in Vitro Absorption Study of Glyphosate by DTL (2010) - (MON 52276) ................ 165
Monsanto in Vitro Absorption Study of Glyphosate by DTL (2010) - (MON 79351) ................ 165
Monsanto in Vitro Absorption Study of Glyphosate by DTL (2015) - (MON 76829) 72 g/L
Glyphosate Gel Formulation ............................................................................... 166
Monsanto in Vitro Absorption Study of Glyphosate by DTL (2015) - (MON 76258) 7.2g/L
Glyphosate Gel Formulation ............................................................................... 167
Monsanto in vitro Absorption Study of Glyphosate by DTL (2016) - (MON 76952) 500 g/L
Glyphosate SL Formulation ............................................................................... 169

Monsanto in vitro Absorption Study of Glyphosate by DTL (2015) - (MON 76879) 360 g/L Glyphosate SL Formulation .................................................................................................. 171

Effects of Temperature on Skin Used in Laboratory Experiments ................................. 173

Summary of Monsanto Studies ............................................................................................. 174

Studies, Reviews & Articles Impacted by Wester and Maibach Studies ......................... 179

Regulatory Guidance on Dermal Absorption and Recovery ............................................. 183

Monsanto Communications with Respect to Pharmacokinetics ....................................... 184

Factors Intensifying Dermal Absorption of Glyphosate ................................................... 188

Co-Formulants ................................................................................................................... 189

Surfactants .......................................................................................................................... 190

Humectants .......................................................................................................................... 192

Adjuvants ............................................................................................................................. 193

Enhanced Absorption Due to Skin Damage .................................................................. 193

Glyphosate's Role in Skin Damage ................................................................................. 194

Indirect Disclosures of Surfactant and Co-Formulant Toxicity ....................................... 194

Examples of Surfactant and Co-Formulant Toxicity ......................................................... 196

Regulatory Considerations Based on Surfactant and Co-Formulant Toxicity ................ 196

Monsanto TNO Dermal Penetration Study with Co-Formulant Cocoamine ................... 197

Monsanto's Knowledge of the Effects of Surfactants on Dermal Penetration** ................... 201

Study on POEA Absorption, Distribution and Excretion in Rats and Humans** ................. 202

Correspondence Regarding Monsanto Skin Absorption Studies** ................................... 203

Other Factors Increasing Dermal Absorption ............................................................... 205

Endocrine Disrupting Effects of Glyphosate ...................................................................... 207

Serra et al. (2021) .............................................................................................................. 207

Ingaramo et al. (2020) ....................................................................................................... 207

Other Factors Increasing Dermal Absorption ............................................................... 210

8. Toxicological Assessment of Additional Exposure Factors ........................................... 211

Non-Hodgkin's Lymphoma Latency Estimates ................................................................... 211

Assessment of Additional Potential NHL Risk Factors ...................................................... 214

Benzene as Potential NHL Risk Factor ........................................................................... 214

Smoking as Potential NHL Risk Factor .......................................................................... 220

Smokeless Tobacco ............................................................................................................ 223

Obesity and BMI as Potential NHL Risk Factors ........................................................... 225

Alcohol Consumption is not a Potential NHL Risk Factor ............................................ 225

Carcinogenicity of Other Herbicides & Pesticides According to Monsanto .................. 226

Summary of Objective Toxicological Factors ...................................................................... 227

Evidential Considerations ................................................................................................. 228

Summary and Conclusions ................................................................................................. 232

Appendix A: Documents and References ............................................................................... 234

Previously Disclosed Documents ......................................................................................... 234

New Documents and References within the Nancy Salas Report ...................................... 260

Materials Reviewed Specific to Nancy Salas ...................................................................... 261

Salas, Nancy v. Monsanto
June 22, 2022
Page 6

# 1. Introduction

This section outlines the report objectives and provides an overview of the methodology employed to assess the historical exposures sustained by Ms. Nancy Salas, the plaintiff in the current matter, to Monsanto's Roundup[1] product. Ms. Salas was diagnosed with mantle cell lymphoma, Stage IV, a form of B-cell non-Hodgkin's lymphoma (NHL), allegedly as a result of repeated exposures to this product.

Section 2 assesses factors relevant to Ms. Salas' background and specific dose based on the Eriksson (2008)[2] study which used 8-hour, time-weighted *exposure days* (as defined in the human epidemiological glyphosate studies). I have also provided a total exposure dose consistent with the methodology applied in the Andreotti et al. (2018),[3] McDuffie et al. (2001),[4] Leon et al. (2019),[5] Zhang et al. (2019),[6] and Pahwa et al. (2019)[7] studies.

This report also identifies and reviews potential toxicological confounding etiological factors including medical history, familial first-generation malignancies, and histories of tobacco, alcohol, and drugs of abuse. Chemical, pharmaceutical, and radiological potential confounding factors have also been identified. It is important to reiterate that Ms. Salas' glyphosate exposure dose has been ascertained using the same methodology employed within the generally accepted human epidemiological glyphosate applicator studies using both total *exposure day* and 8-hour, time-weighted *exposure day* metrics.

---

[1] Hereinafter referred to as Roundup.

[2] Eriksson, M., et al., "Pesticide exposure as risk factor for non-Hodgkin lymphoma including histopathological subgroup analysis," 2008, International Journal Cancer, Vol.123, pp. 1657 – 1663.

[3] Andreotti, G., et al., "Glyphosate Use and Cancer Incidence in the Agricultural Health Study," 2018, JNCI J Natl Cancer Inst., Vol.110 (5), doi: 10.1093/jnci/djx233. Note that quartiles of exposure in this study were indexed as "lifetime days of glyphosate use." Since the Agricultural Health Study (AHS) is a null study, there is no reason to compute from the algorithm "intensity-weighted lifetime days of glyphosate use."

[4] McDuffie H., et al., "Non-Hodgkin's lymphoma and specific pesticide exposures in men: Cross-Canada study of pesticides and health," 2001, Cancer Epidemiology, Biomarkers & Prevention, Vol.10, pp. 1155 – 1163.

[5] Leon, Maria, et al., "Pesticide use and risk of non-Hodgkin lymphoid malignancies in agricultural cohorts from France, Norway and the USA," 2019, International Journal of Epidemiology, pp. 1–17.

[6] Zhang, L., et al., "Exposure to Glyphosate Based Herbicides and Risk for Non-Hodgkin Lymphoma: A Meta-Analysis and Supporting Evidence," July-September 2019, Mutation Research/Reviews in Mutation Research, Volume 781, pp. 186-206. https://doi.org/10.1016/j.mrrev.2019.02.001.

[7] Pahwa, M. et al., "Glyphosate use and associations with non-Hodgkin lymphoma major histological sub-types: findings from the North American Pooled Project," 2019 Jun 27, Scand J Work Environ Health. pii: 3830. doi:10.5271/sjweh.3830

Salas, Nancy v. Monsanto
June 22, 2022
Page 232

passive dosimetry calculations placed her 1.5-hour *exposure day* dosage (**0.012 mg/kg/day**) within the upper range of applicators as published in review studies by Solomon (see **Figure 4**).

## Summary and Conclusions

My toxicological assessment of the current matter includes assessment of the human epidemiological studies previously discussed, the dose/response (biological gradient), strength of association, consistency and coherence of the six primary studies (that include dose metrics), and the studies of various chemical formulants and additives found in the Roundup product as well as experimental evidence including absorption, distribution (i.e., measurement in bone marrow), metabolism and excretion (ADME), and the various mechanisms of carcinogenesis (including genotoxicity, impairment of DNA repair mechanisms, tumor promotion, and progression). Additionally, I have focused on dermal absorption, the manner and degree to which Roundup penetrates the skin, the lack of adequate PPE, additive toxicological effects of POEA and POEA derivatives used in the product, and the mechanisms of action of glyphosate.

I have carefully examined Ms. Salas' history for potential confounding chemical, pharmaceutical, and other toxicological factors and found none (see **Table 2**). There are no cancer diagnoses in her family. She drinks minimal alcohol. Her short-lived smoking history is not a statistically significant NHL risk factor nor is her obesity.

Ms. Salas came into physical contact with liquid Roundup during mixing and applications and contacted Roundup liquid on her bare skin and feet when spraying. Her Roundup activities resulted in a midpoint of **124 8-hour, time-weighted *exposure days*** consistent with a statistically significant increased **OR of 2.36** (1.04-5.37). Her **516 non time-weighted *exposures days*** are consistent with more than doubling of the risk, OR=**2.12** (1.20–3.73), as well as exceeding the statistical ranges within the cited meta-analyses. Her systemic absorbed dosage (**0.012 mg/kg/day**) based on the passive dosimetry methodology of Machado-Neto is within the upper range of applicators as published in review studies by Solomon.[492]

---

[492] Solomon, K., "Glyphosate in the general population and in applicators: a critical review of studies on exposures," 2016, Critical Reviews in Toxicology, Vol. 46, No. S1, 21-27.

Solomon, K., "Estimated exposure to glyphosate in humans via environmental, occupational and dietary pathways: an updated review of the scientific literature," 2019, Pest Management Science, 76(9), pp. 2878–2885. https://doi.org/10.1002/ps.5717

Salas, Nancy v. Monsanto
June 22, 2022
Page 233

Thus, her episodic chronic Roundup exposures are at the very high end of systemic dosage among applicators and far above the thresholds within the studies associated with statistically significant increased rates of NHL above the 95% confidence interval. Ms. Salas' dose is far above the NHL risk level thresholds previously identified within the human epidemiological studies.

Ms. Salas usual attire when applying Roundup consisted of shorts, tee-shirt, ankle socks, Sketcher-brand shoes and prescription sunglasses.  Thus, Ms. Salas' systemic exposure dose is significantly underestimated as the Machado workers used PPE including drill overalls with long sleeves, hood, disposable semi-facial mask, and leather shoes. Her dermal exposure was increased beyond those of the aforementioned passive diffusion studies of applicators who wore gloves.

Based upon multiple, applicable, peer-reviewed, and generally accepted studies (as cited herein) and on the basis of Ms. Salas' reported exposures to Monsanto's Roundup product, it is my opinion, to reasonable toxicological certainty, that these exposures were above the threshold levels within the studies and significantly and substantially increased her risk of development of NHL.


_____
_____
William R. Sawyer, Ph.D.
Chief Toxicologist

# EXHIBIT 6



# UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
## Washington, DC 20460

## AUTHENTICATION

I, Delores Barber, attest that I am the Director of the Information Technology and Resources Management Division (ITRMD) of the United States Environmental Protection Agency (EPA or Agency) and that the attached documents are true, correct, and compared copies of the file copies in my legal custody, consisting of:

MEMORANDUM Dated: 12/12/2017
To: Caitlin Newcamp (OPP)
From:  Monique M. Perron, Anwar Y. Dunbar Ph.D., Tom Bloem, Lata Venkateshwara (OPP)

Re: Glyphosate. Draft Human Health Risk Assessment in Support of Registration Review (41 pages).

Subscribed under the penalty of perjury on this _7th_ day of _June_ , 2018.

_Delores Barber_

Delores Barber, Director
Information Technology and Resources Management Division (ITRMD)

## CERTIFICATION OF TRUE COPY

I, Wendy Blake, certify that I am the Associate General Counsel, General Law Office, Office of General Counsel, of the United States Environmental Protection Agency; that I am the designee of the General Counsel for the purpose of executing certifications under 40 C.F.R. sec. 2.406; that I have duties in Washington, District of Columbia; and that the official whose signature appears above has legal custody pursuant to 40 C.F.R. sec. 2.406 of the original documents, copies of which are attached, as witnessed by my signature and the official seal of the United States Environmental Protection Agency.

_Wdy L. Blake_

Wendy L. Blake
Associate General Counsel
General Law Office
Office of General Counsel

Date: ___6/11/18___



# UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
## WASHINGTON, D.C. 20460

OFFICE OF
CHEMICAL SAFETY AND
POLLUTION PREVENTION

## MEMORANDUM

**Date:**       December 12, 2017

**Subject:**    **Glyphosate.** Draft Human Health Risk Assessment in Support of Registration Review.

| | |
|---|---|
| **PC Codes:** 417300; 103601; 103603; 103604; 103605; 103607; 103608; 103613; | **DP Barcode:** D417700 |
| **Decision No.:** 487242 | **Registration Nos.:** multiple |
| **Petition No.:** not applicable | **Regulatory Action:** Registration Review |
| **Risk Assessment Type:** Single Chemical Aggregate | **Case No.:** 178 |
| **TXR No.:** NA | **CAS No.:** 1071-83-6; 38641-94-0; 70393-85-0; 114370-14-8; 40465-76-7; 69254-40-6; 34494-04-7; 70901-12-1 |
| **MRID No.:** NA | **40 CFR:** 180.364 |

**From:**       Monique M. Perron, Sc.D., Toxicologist
                Anwar Y. Dunbar, Ph.D., Pharmacologist
                Tom Bloem, Chemist
                Lata Venkateshwara, Chemist
                Risk Assessment Branch 1/Health Effects Division (RAB1/HED; 7509P)

**Through:**    Christine L. Olinger, Branch Chief
                George F. Kramer, Ph.D., Senior Chemist
                RAB1/HED (7509P)

**To:**         Caitlin Newcamp, Chemical Review Manager
                Neil Anderson, Branch Chief
                Pesticide Reevaluation Division (PRD; 7508P)

The Office of Pesticide Programs (OPP) HED assesses the risks posed to humans from exposure to pesticide chemicals. The PRD of OPP asked HED to evaluate hazard and exposure data and conduct dietary, occupational, residential, and aggregate exposure assessments, as needed, to estimate the risk to human health that will result from all registered uses for glyphosate (*N*-(phosphonomethyl)glycine) in support of Registration Review. The human health risk assessment was provided by Monique Perron, the hazard characterization by Anwar Dunbar and Monique Perron, the residue chemistry review and dietary exposure assessment by Tom Bloem, the occupational/residential exposure assessments were by Lata Venkateshwara, and the drinking water assessment by James Hetrick of the Environmental Fate and Effects Division (EFED).

# Table of Contents

1.0 EXECUTIVE SUMMARY ............................................................................................ 3

2.0 HED CONCLUSIONS ................................................................................................ 6
    2.1 Data Deficiencies .................................................................................................. 6
    2.2 Tolerance Considerations ...................................................................................... 6
    2.3 Label Recommendations ....................................................................................... 7

3.0 INTRODUCTION ...................................................................................................... 7
    3.1 Chemical Identity .................................................................................................. 7
    3.2 Registered Application Scenarios ......................................................................... 7

4.0 HAZARD CHARACTERIZATION AND DOSE-RESPONSE ASSESSMENT .................. 9
    4.1 Toxicology Studies Available for Analysis ......................................................... 10
    4.2 Absorption, Distribution, Metabolism, & Elimination (ADME) ........................... 11
    4.3 Toxicological Effects .......................................................................................... 12
    4.4 Safety Factor for Infants and Children (FQPA SF) ............................................. 13
    4.5 Toxicity Endpoint and Point of Departure Selections ........................................ 13

5.0 DIETARY EXPOSURE AND RISK ASSESSMENT .................................................... 17
    5.1 Summary of Plant and Livestock Metabolism Studies ....................................... 17
    5.2 Residues of Concern Summary and Rationale .................................................... 19
    5.3 Food Residue Profile .......................................................................................... 20
    5.4 Drinking Water Residue Profile .......................................................................... 21
    5.5 Dietary Risk Assessment .................................................................................... 21

6.0 RESIDENTIAL (NON-OCCUPATIONAL) EXPOSURE/RISK CHARACTERIZATION .... 22
    6.1 Residential Handler Exposure ............................................................................ 22
    6.2 Post-Application Exposure .................................................................................. 22
    6.3 Residential Risk Estimates for Use in Aggregate Assessment ........................... 23
    6.4 Non-Occupational Bystander Post-Application Inhalation Exposure and Risk Estimates ..... 23
    6.5 Non-Occupational Spray Drift Exposure and Risk Estimates ............................. 24

7.0 AGGREGATE RISK ASSESSMENT ........................................................................ 25

8.0 CUMULATIVE EXPOSURE/RISK CHARACTERIZATION ........................................ 25

9.0 OCCUPATIONAL EXPOSURE/RISK CHARACTERIZATION .................................... 26

10.0 INCIDENT AND EPIDEMIOLOGICAL ANALYSIS ................................................ 27

ATTACHMENT A:  CHEMICAL NAMES AND STRUCTURES ........................................ 28
ATTACHMENT B:  TOXICITY PROFILE TABLES ......................................................... 29
ATTACHMENT C:  HED-RECOMMENDED TOLERANCES AND INTERNATIONAL RESIDUE
LIMITS .......................................................................................................................... 35
ATTACHMENT D:  PHYSICOCHEMICAL PROPERTIES ................................................. 39
ATTACHMENT E:  REFERENCES .................................................................................. 40
ATTACHMENT F:  DIETARY EXPOSURE ESTIMATES ASSOCIATED WITH SUBSISTENCE
FISHING ........................................................................................................................ 41

## 1.0  EXECUTIVE SUMMARY

***Background:***  Glyphosate is a nonselective Group 9 herbicide that is currently registered for pre- and post-emergence application to a variety of fruit, vegetable, and field crops. Glyphosate is also currently registered on turf (including golf courses and residential lawns) and on aquatic application scenarios.  Tolerances are established for residues of glyphosate in/on numerous plant commodities at 0.2-400 ppm (40 CFR §180.364(a)) and for the combined residues of glyphosate and *N*-acetyl-glyphosate (expressed as glyphosate) in/on field corn, soybean, canola, aspirated grain fractions (AGF), and livestock commodities at 0.1-310 ppm.  The Glyphosate Reregistration Eligibility Decision (RED) document was issued September 1993.  HED completed a human health risk assessment scoping document in support of Registration Review on 3-June-2009 (D362745, J. Van Alstine *et al.*) and responded to public comments concerning this assessment on 28-Dec-2009 (D369999, J. Van Alstine *et al.*).  The most recent human health risk assessment was completed on 14-November-2012 (D398547, T. Bloem *et al.*).

***Hazard Characterization:***  Glyphosate exhibits low toxicity across species, durations, life stages, and routes of exposure.  In most of the studies in its hazard database, effects are seen at doses at or above the limit dose (>1000 mg/kg/day).  The observed effects included:  decreases in body weights and minor indicators of toxicity to the eyes, liver, and/or kidney.  There were no effects observed in route-specific dermal and inhalation studies.  There was no evidence that glyphosate is neurotoxic or immunotoxic.

Glyphosate showed no evidence of increased quantitative or qualitative susceptibility following *in utero* exposures to rats or rabbits.  In rats, maternal and developmental toxicity was observed only at or above the limit dose.  In rabbits, maternal toxicity was comprised mainly of clinical signs (diarrhea, few and/or soft feces) and no developmental toxicity was observed.  In one of the two-generation rat reproductive toxicity studies, no adverse effects were seen in the parental animals including reproductive toxicity.  While there was an increased postnatal quantitative susceptibility, offspring effects were observed only at the limit dose (1000 mg/kg/day) and consisted of delayed age and increased weight at attainment of preputial separation (PPS).

Glyphosate is categorized as having low acute toxicity for the oral, dermal, and inhalation routes (Toxicity Categories III or IV).  It is a mild eye irritant (Toxicity Category III), slight skin irritant (Toxicity Category IV), and is not a dermal sensitizer.

As part of Registration Review, the Agency collaborated with Health Canada's Pest Management Regulatory Agency (PMRA) to conduct an open literature review in 2012.  A subsequent search of the open literature was conducted more recently by the Agency to supplement the joint review with PMRA.  The only studies found to be appropriate for quantitative use identified no-observed adverse-effect levels (NOAELs) at doses well above the points of departure (PODs) currently used for risk assessment.  As a result, there was no impact on the hazard characterization or draft human health risk assessment for glyphosate from open literature studies (TXR No. 0056885).

Additionally, the Agency reevaluated the human carcinogenic potential of glyphosate, which included a weight-of-evidence evaluation of data from animal toxicity, genotoxicity, and epidemiological studies.  This evaluation was presented to the Federal Insecticide, Fungicide, and Rodenticide Scientific Advisory Panel (FIFRA SAP) and was subsequently updated based on their review.  The Agency concluded that glyphosate should be classified as "not likely to be carcinogenic to humans."

The developmental rabbit study was selected to evaluate chronic dietary and incidental oral exposures (NOAEL = 100 mg/kg/day).  A total uncertainty factor of 100X (10X interspecies, 10X intraspecies and 1X FQPA SF) was applied to these exposures scenarios.  An acute dietary endpoint was not selected since there were no effects observed in the database attributable to a single dose. Dermal and inhalation endpoints were not selected since there was no toxicity observed in route-specific toxicity studies and there was no concern for increased quantitative susceptibility to offspring.

***Food Quality Protection Act (FQPA) Safety Factor (SF):***  The Agency recommends the FQPA SF be reduced to 1x.  This recommendation is based on the following considerations:  (1) the toxicological database for glyphosate is complete ; (2) there is no evidence of quantitative or qualitative fetal susceptibility in rats or rabbits following *in utero* exposure in the developmental studies; (3) there is no evidence of neurotoxicity in the glyphosate database, including the neurotoxicity battery; (4) the offspring effects in one of the two-generation reproductive toxicity studies (delayed age and increased weight at attainment of PPS) occurred at the limit dose with a clear NOAEL and the PODs used for risk assessment are protective of the observed offspring effects; and (5) the dietary and residential exposure analyses are conservative and do not underestimate exposure.

***Dietary (food and water) Risk Assessment:***  A chronic dietary risk assessment was conducted using the Dietary Exposure Evaluation Model - Food Consumption Intake Database (DEEM-FCID ver. 3.16) which incorporates consumption data from United States Department of Agriculture (USDA) National Health and Nutrition Examination Survey, What We Eat in America, (NHANES/WWEIA; 2003-2008).  Acute and cancer dietary risk assessments were not conducted since an appropriate endpoint attributable to a single dose was not identified for the general U.S. population or any population subgroup and glyphosate is classified as not likely to be a human carcinogen.  The chronic analysis assumed tolerance-level residues, 100% crop treated, DEEM (ver. 7.81) default processing factors, and modeled drinking water estimates (direct application to water scenario).  The resulting chronic risk estimates (food and water) were <100% of the chronic population-adjusted dose (cPAD) and are therefore less than HED's level of concern (children 1-2 years old were the most highly exposed population subgroup at 23% the cPAD).

In response to concern from segments of the general public related to the presence of glyphosate in human milk, the EPA Biological and Economic Analysis Division Analytical Chemistry Branch (BEAD-ACB) analyzed human milk samples collected by the National Children's Study for residues of glyphosate and the glyphosate metabolites *N*-acetyl-glyphosate and AMPA (aminomethyl phosphonic acid; see Attachment A for structures).  A total of 39 samples from 39 mothers were analyzed.  Glyphosate, *N*-acetyl-glyphosate, and AMPA were not detected in the samples (glyphosate limit of quantitation (LOQ)/limit of detection (LOD) = 10 ppb/3.3 ppb; metabolite LOQ/LOD = 30 ppb/10 ppb) (ACB Project #B14-46, L. Podhorniak, 13-May-2015).

***Residential and Non-Occupational Exposure and Risk Assessment:***  Residential exposure to glyphosate may occur as a result of the currently registered turf (including golf courses and residential lawns) and aquatic application scenarios.  An updated residential exposure assessment was conducted to reflect HED's 2012 Residential Standard Operating Procedures (SOPs), policy changes for body-weight assumptions, updated POD, and updates to HED's inputs for aquatic/swimmer assessments.

Based on the registered turf and aquatic use patterns, there is a potential for short-term dermal and inhalation exposure to residential handlers (mixing, loading, and applying) and short-term dermal, inhalation, and incidental oral exposure from post-application activities. Since short- and intermediate-term dermal or inhalation PODs were not selected, a quantitative exposure and risk assessment was not completed for these routes of exposure. However, children may have short-term post-application incidental oral exposures from hand-to-mouth behavior on treated lawns and swimmers (adult and children) may have short-term post-application incidental oral exposures from aquatic uses. The resulting margins of exposure (MOEs) do not exceed HED's level of concern (LOC). It is noted that the short-term assessment is protective of intermediate-term exposure as the incidental oral PODs for these durations are identical.

***Aggregate Risk Assessment:*** In accordance with the FQPA, HED must consider and aggregate pesticide exposures and risks from three major sources: food, drinking water, and residential exposures. Based on the registered/proposed agricultural and residential uses, HED conducted short-term (food, water, residential incidental oral) and chronic (food and water) aggregate risk assessments. The resulting aggregate risk estimates are all less than HED's LOC. It is noted that the short-term assessment is protective of intermediate-term exposure as the relevant PODs for these durations are identical.

***Occupational Risk Assessment:*** For glyphosate, based on the currently registered use patterns, there is a potential for short-term dermal and inhalation exposure to occupational handlers (mixing, loading, and applying) as well as short-term dermal and inhalation exposure from post-application activities. Since short- and intermediate-term dermal or inhalation endpoints were not selected, a quantitative exposure risk assessment was not completed for these routes of exposure.

***Human Studies:*** This risk assessment relies in part on data from studies in which adult human subjects were intentionally exposed to a pesticide or other chemical. These data, which include the 2012 Residential SOPs (Lawn/Turf), are (1) subject to ethics review pursuant to 40 CFR 26, (2) have received that review, and (3) are compliant with applicable ethics requirements. For certain studies, the ethics review may have included review by the Human Studies Review Board. Descriptions of data sources, as well as guidance on their use, can be found at the Agency website (https://www.epa.gov/pesticide-science-and-assessing-pesticide-risks/occupational-pesticide-handler-exposure-data).

## 2.0  HED Conclusions

No data deficiencies were identified in the toxicological, residue chemistry, or occupational/residential exposure databases.  In addition, the aggregate (food, water, and residential) risk assessments resulted in exposures less than HED's LOC (occupational exposure assessment is unnecessary; see above).  HED notes that several crop groups have been updated since tolerances for residues of glyphosate were originally established.  A summary of tolerance updates to align established glyphosate tolerances with the updated crop groups is provided in Section 2.2.2.  As described in Section 2.3, this assessment assumes that all glyphosate labels are consistent with the uses described in the use summary submitted by the Joint Glyphosate Task Force.  Provided the tolerance (see Section 2.2.2) and label (see Section 2.3) issues are addressed and standards are submitted to the National Pesticide Repository as indicated in the next paragraph, HED concludes that the human health risk assessment supports continuation of the current registered glyphosate uses.

The following standards should be submitted to the address specified below (extended zip code must be used):  glyphosate, *N*-acetyl-glyphosate, glyphosate internal standard (2-$^{13}$C and $^{15}$N; 3-$^{13}$C and $^{15}$N).

USEPA - Thuy Nguyen
National Pesticide Standards Repository
701 Mapes Road
Fort Meade, MD  20755-5350

## 2.1  Data Deficiencies

None.

## 2.2  Tolerance Considerations

## 2.2.1  Enforcement Analytical Method

Adequate methods are available to enforce the currently established crop and livestock tolerances.

## 2.2.2  Recommended Tolerances

HED evaluated the glyphosate residue chemistry database to determine if the established tolerances conform to the current practices and to determine if the crop group/subgroup tolerances could be updated to the current crop group/subgroup definitions.  Based on this analysis, HED is recommending for establishment of the tolerances listed in Attachment C Table C.1.  With the establishment of these tolerances, the following tolerances should be deleted: acerola; aloe vera; ambarella; asparagus; atemoya; avocado; bamboo, shoots; banana; biriba; breadfruit; cactus, fruit; cactus, pads; canistel; cherimoya; custard apple; date, dried fruit; durian; feijoa; fig; fruit, stone, group 12; guava; ilama; imbe; imbu; jaboticaba; jackfruit; longan; lychee; mamey apple; mango; mangosteen; marmaladebox; noni; nut, tree, group 14; olive; palm heart; papaya; papaya, mountain; passionfruit; pawpaw; persimmon; pineapple; pistachio; pomegranate; pulasan; rambutan; rose apple; sapodilla; sapote, black; sapote, mamey; sapote, white; soursop; Spanish lime; star apple; starfruit; sugar apple; Surinam cherry; tamarind; vegetable, leafy, brassica, group 5; vegetable, leafy, except brassica, group 4; watercress, upland; and wax jambu.

## 2.2.3  International Harmonization

Attachment C includes a summary of the currently established U.S. glyphosate tolerances and the Codex and Canadian maximum residue limits (MRLs).  As indicated in the attachment, since the U.S. and Canadian residue definitions differ, harmonization of the tolerance value is not feasible. The U.S. and Codex residue definitions are identical; however, harmonization is not appropriate as either the available residue data for the registered uses of glyphosate show residues higher than the Codex MRL or the Codex MRL is too high to be a measure of misuse.

## 2.3  Label Recommendations

As part of Registration Review, the Joint Glyphosate Task Force (JGTF) provided information concerning the labeled application scenarios for the following products (see Docket EPA-HQ-OPP-2009-0361):  EPA Reg. Nos.:  100-1182, 228-713, 524-343, 524-475, 524-537, 524-549, 524-579, 4787-23, and 62719-556.  HED notes that there are additional registered products and that the labeled instructions for these products should be consistent with the application scenarios summarized by the JGTF.  HED notes that all labels should specify the following rotational crop restrictions:  treated fields may be rotated to a labeled crop at any time and may be rotated to a non-labeled crop 30 days after application.

## 3.0  Introduction

Glyphosate is a non-selective herbicide that acts by blocking the activity of the 5-enolpyruvylshikimate-3-phosphate synthase (EPSPS) enzyme, which is involved in the synthesis of the amino acids tyrosine, tryptophan, and phenylalanine.

## 3.1  Chemical Identity

The chemical structure and nomenclature for glyphosate are presented in Table 3.1.  Attachment D provides a summary of the physicochemical properties of technical grade glyphosate.

| Table 3.1.  Test Compound Nomenclature. | |
| --- | --- |
| Compound |  |
| Common name | glyphosate |
| Company experimental name | DPX-B2856 |
| IUPAC/CAS name | *N*-(phosphonomethyl)glycine |
| CAS registry number | 1071-83-6 |

## 3.2  Registered Application Scenarios

Glyphosate is registered for pre- and post-emergence application to a variety of fruit, vegetable, and field crops.  Post-emergent applications are typically soil-directed for all but genetically modified crops where over-the-top applications are permitted.  Harvest-aid (desiccant) applications are also registered for a number of cereal grain, legume vegetable, non-grass animal feed, and oilseed crops. The JGTF provided tables concerning the labeled application scenarios for the following products: EPA Reg. Nos.: 100-1182, 228-713, 524-343, 524-475, 524-537, 524-549, 524-579, 4787-23, and 62719-556.  The information provided in the tables are an adequate representation of these labels with adequate residue data available to support the specified food/feed application scenarios. Glyphosate is also currently registered for application to turf (including golf courses and residential lawns) and for aquatic application

HED notes that there are additional registered products and requests that the registrants verify the following concerning the application scenarios specified for these products: (1) for each specific application scenario, the application rates are equal to or less than those specified in the above products and the RTI/PHI (retreatment interval/preharvest interval) are equal to or greater than those specified in the above products and (2) all food/feed crop labels indicate that treated fields may be rotated to a labeled crop at any time and may be rotated to a non-labeled crop 30 days after application.

## 3.3 Anticipated Exposure Pathways

Based on the registered agricultural and residential uses, dietary (food and water) and incidental oral (turf and aquatic application scenarios) exposures are possible and were assessed. Dermal and inhalation exposures are also anticipated but were not assessed due to the lack of toxicity via these routes (see Section 4.0). Humans may be exposed to glyphosate in food and drinking water, since glyphosate may be applied directly to growing crops and application may result in glyphosate reaching surface and ground water sources of drinking water. There are residential uses of glyphosate; and non-occupational exposure to glyphosate via spray drift is possible. There is the potential for dermal and inhalation exposures from the residential application of registered glyphosate products by adults. In addition, there is the potential for residential post-application exposures for both adults (dermal only) and children (dermal and incidental oral) from contact with previously treated turf. Occupational exposures are expected from the application (dermal and inhalation) of glyphosate and from reentry into previously treated areas. This risk assessment considers the relevant exposure pathways based on all of the proposed uses of glyphosate. Note that quantitative exposure assessments are conducted only if adverse effects are observed for the duration and route of exposure.

## 3.4 Consideration of Environmental Justice

Potential areas of environmental justice concerns, to the extent possible, were considered in this human health risk assessment, in accordance with U.S. Executive Order 12898, "Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations," (https://www.archives.gov/files/federal-register/executive-orders/pdf/12898.pdf). As a part of every pesticide risk assessment, OPP considers a large variety of consumer subgroups according to well-established procedures. In line with OPP policy, HED estimates risks to population subgroups from pesticide exposures that are based on patterns of that subgroup's food and water consumption, and activities in and around the home that involve pesticide use in a residential setting. Extensive data on food consumption patterns are compiled by the U.S. Department of Agriculture's National Health and Nutrition Examination Survey, What We Eat in America, (NHANES/WWEIA) and are used in pesticide risk assessments for all registered food uses of a pesticide. These data are analyzed and categorized by subgroups based on age and ethnic group. Additionally, OPP is able to assess dietary exposure to smaller, specialized subgroups and exposure assessments are performed when conditions or circumstances warrant (see Attachment F). Whenever appropriate, non-dietary exposures based on home use of pesticide products and associated risks for adult applicators and for toddlers, youths, and adults entering or playing on treated areas post-application are evaluated. Spray drift can also potentially result in post-application exposure and it was considered in this analysis. Further considerations are also currently in development as OPP has committed resources and expertise to the development of specialized software and models that consider exposure to other types of possible bystander exposures and farm workers as well as lifestyle and traditional dietary patterns among specific subgroups.

## 4.0  Hazard Characterization and Dose-Response Assessment

The Agency strives to use high-quality studies when evaluating the hazard of pesticide chemicals and considers a broad set of data during this process.  A wide range of potential adverse effects are assessed using acute, subchronic, chronic, and route-specific studies predominately from studies with laboratory animals in addition to epidemiologic and human incident data.  All studies are thoroughly reviewed to ensure appropriate conduct and methodologies are utilized, and that sufficient data and details are provided.

For all pesticides, there are toxicology data requirements that must be submitted to the Agency for registration.  These studies, defined under the 40 CFR Part 158 Toxicology Data Requirements, provide information on a wide range of adverse health outcomes, routes of exposure, exposure durations, species, and lifestages.  They typically follow the Organization for Economic Co-operation and Development (OECD) accepted protocols and guidelines, which ease comparisons across studies and chemicals.  Data may also be available to elucidate a chemical's hazard from the open scientific literature, structurally related chemicals, physiologically-based pharmacokinetic (PBPK) or biological dose-response models, biomonitoring, or other exposure studies/analyses.

In 2012, OPP published a guidance document to provide guidance procedures for considering and using open literature toxicity studies to support human health risk assessment[1].  This guidance assists OPP scientists in their judgement of the scientific quality of open literature publications.  More specifically, the document discusses how to screen open literature studies for journal articles/publications that are relevant to risk assessment, how to review potentially useful journal articles/publications and categorize them as to their usefulness in risk assessment, and how the studies may be used in the risk assessment.

In recent years, the National Academy of Sciences National Research Council (NRC) has encouraged the Agency to move towards systematic review processes to enhance the transparency of scientific literature reviews that support chemical-specific risk assessments to inform regulatory decision making[2].  The NRC defines systematic review as "a scientific investigation that focuses on a specific question and uses explicit, pre-specified scientific methods to identify, select, assess, and summarize the findings of similar but separate studies"[3].  Consistent with NRC's recommendations, EPA's Office of Chemical Safety and Pollution Prevention is currently developing policies and procedures in order to employ fit-for-purpose systematic reviews.

The hazard characterization, evaluation of potential endpoints, selection of PODs, and the SFs for glyphosate reflect a weight-of-evidence evaluation across multiple lines of evidence.  Consistent with Agency policy, this evaluation focuses on studies performed with the active ingredient glyphosate and not studies performed with pesticide formulations containing glyphosate.  Many studies examining pesticide formulations containing glyphosate were evaluated in the literature review memo; however, none of the existing studies are sufficiently robust for deriving PODs for risk assessment.

---

[1]  U.S. EPA (2012). *Guidance for considering and using open literature toxicity studies to support human health risk assessment.* http://www.epa.gov/pesticides/science/lit-studies.pdf
[2]  NRC 2011. "Review of the Environmental Protection Agency's Draft IRIS Assessment of Formaldehyde"; NRC 2014. "Review of EPA's Integrated Risk Information System (IRIS) Process"
[3]  NRC (2014). Review of EPA's Integrated Risk Information System (IRIS) process. Washington, DC: The National Academies Press. http://www.nap.edu/catalog.php?record_id=18764

## 4.1 Toxicology Studies Available for Analysis

The hazard database for glyphosate is complete.  Since the 2012 risk assessment (D398547, T. Bloem *et al.*, 14-Nov-2012), immunotoxicity and neurotoxicity (acute and subchronic) studies have been submitted and reviewed, and are included in this hazard characterization.  The current human health risk assessment also includes the re-evaluation of the carcinogenic potential of glyphosate.  Attachment A includes a summary of the glyphosate toxicological database, and includes the following studies:

> (1) Acute toxicity following oral, dermal and inhalation exposure; eye and dermal irritation and dermal sensitization;
> (2) Acute and subchronic neurotoxicity in rats;
> (3) Subchronic oral toxicity in rats, mice, and dogs;
> (4) Subchronic dermal and inhalation toxicity in rats;
> (5) Chronic toxicity in rats and dogs;
> (6) Carcinogenicity in mice and rats;
> (7) Developmental toxicity in rats and rabbits;
> (8) Reproductive and postnatal toxicity in rats;
> (9) Metabolism studies in rats;
> (10) Immunotoxicity; and
> (11) Mutagenicity/genotoxicity studies in *vivo* and *in vitro*.

A number of literature studies were either found via a systematic review of the open scientific literature or were submitted to the Agency.  These studies have been considered as part of Registration Review (TXR #0056885).  In conjunction with Health Canada's PMRA, a literature search was performed in late 2011 and early 2012.  A total of 67 studies (obtained from 62 individual references) were reviewed for potential use in human health risk assessment.  None of these studies had an impact on the hazard characterization or PODs selected for the Registration Review draft human health risk assessment for glyphosate.  The majority of the literature studies were found to be unacceptable for a variety of reasons.  For example, some studies did not meet the minimum criteria to be considered eligible (e.g., the study was not found to be the primary source of the data, was not publicly available, or not presented as a full article).  Of the studies that met the minimum criteria, the most common limitations/deficiencies were related to the nature of the test substance(s) used for exposure (e.g., using commercial formulations, lack of test material validation).  Most studies used commercial formulations or dilutions; however, direct measurements of the active ingredient were not conducted in order to determine actual dose concentrations and/or identification information was not provided for the formulation used (e.g., EPA registration number).  As a result, potential effects could not be attributed to defined exposure concentrations.  A limited number of studies were deemed acceptable and appropriate for consideration in risk assessment; however, any observed effects were observed at doses higher than the selected PODs.

As part of Registration Review, the Agency has reviewed and updated the experimental toxicology literature search since the joint search with PMRA, using the concepts consistent with systematic review, such as detailed tracking of search terms and which literature have been included or excluded.  The literature review was conducted in PubMed for the time period January 2012 to October 2015 and yielded 392 articles.  This list was then cross-referenced with other studies submitted during that time to the Agency by non-profit groups or members of the

public and another seven studies were added for review bringing the total number of articles to 399. Since the goal of the literature search was to identify relevant and appropriate open literature studies that had the potential to impact human health risk assessment, most of the studies were not considered to be within the scope of the search due to the subject of the research (i.e., ecological and fate studies, crop composition studies, pest management studies, method generating, hypothesis generating, exposure and monitoring) or not relevant in general. Additionally, several articles were not appropriate due to the type of article (i.e., review, commentary, editorial, article retraction, news article, abstract only, not available in English). Similar to the search conducted with PMRA, many of the studies concerning human health used commercial formulations; however, direct measurements of the active ingredient were not conducted in order to determine actual dose concentrations and/or identification information was not provided for the formulation used. As a result, potential effects could not be attributed to defined glyphosate exposure concentrations. None of the studies from this more recent review were found to have an impact on the hazard characterization or draft human health risk assessment for glyphosate.

Additionally, a systematic review of the open literature was performed in 2016 to identify relevant and appropriate open literature studies that could inform the human carcinogenic potential of glyphosate. Details and results of this systematic review can be found in the Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential (D444689; 12-DEC-2017; TXR#0057688)

## 4.2 Absorption, Distribution, Metabolism, & Elimination (ADME)

A comprehensive review of the available data on the absorption, distribution, metabolism and excretion (ADME) of glyphosate was presented in the issue paper for the FIFRA Scientific Advisory Panel (SAP) in December, 2016[4]. In the issue paper, EPA reviewed 12 excretion, metabolism and tissue distribution studies with parent glyphosate, two metabolite disposition studies characterizing the disposition of AMPA and N-Nitroso-N-(phosphonomethyl)glycine (NPMG); and one metabolite disposition study with *N*-acetyl-glyphosate. The review also included a disposition study performed by NTP and two literature studies; a toxicokinetic study performed by Anadon *et al.* (2009), and a tissue distribution and metabolite quantification study performed by Brewster *et al.* (1991) An overall summary of these data are presented below.

Oral exposure is considered the primary route of concern for glyphosate. The maximum absorption from the GI tract for glyphosate was estimated to be approximately 30%-40% based upon radiolabel detected in the urine. In general, the amounts of glyphosate detected in tissues were negligible indicating low tissue retention following dosing. Parent glyphosate is the principal form excreted in urine and feces. The primary route of excretion following oral administration of glyphosate is the feces, as verified by the intravenous dosing and bile cannulation experiments. Within the dose ranges tested, elimination was essentially complete by 24 hours indicating that glyphosate does not bioaccumulate.

---

4- *Glyphosate Issue Paper: Evaluation of Carcinogenic Potential, EPA's Office of Pesticide Programs, 2016.*
https://www.epa.gov/sites/production/files/2016-
09/documents/glyphosate_issue_paper_evaluation_of_carcincogenic_potential.pdf

Multiple studies examined the pharmacokinetics of a single dose of radiolabeled glyphosate ranging from 5.6 – 400 mg/kg.  Across these studies, time to reach peak plasma concentrations ($T_{max}$) appeared to increase with increasing dose; however, the reported range of $T_{max}$ (1-5.5 hours) suggests only a slight shift in absorption kinetics occurs despite large increases in dose. In the one study that tested two doses[5], data graphically show that peak blood levels were only roughly 3-fold with a 10-fold increase between the two doses.  Reported area under the curve (AUC) values indicated conflicting results regarding whether linear or non-linear absorption kinetics was occurring at higher doses.

## 4.2.1  Dermal Absorption

A dermal absorption study is not available in the toxicity database.  However, a dermal absorption factor is not needed since no dermal hazard was identified and thus quantification of dermal risk is not required (see Section 4.5.1).

## 4.3  Toxicological Effects

Glyphosate exhibits low toxicity across species, durations, life stages and routes of exposure.  In most of the studies in its hazard database, effects are seen at doses at or above the limit dose (>1000 mg/kg/day).  A total 14 acceptable chronic toxicity/carcinogenicity studies (6 mouse and 8 rat) were available for review.  Among the effects observed were decreases in body weights and minor indicators of toxicity to the eyes, liver, and kidney.  There were no effects observed in route-specific dermal and inhalation studies.  There is no evidence that glyphosate is neurotoxic or immunotoxic.

Glyphosate showed no evidence of increased quantitative or qualitative susceptibility following *in utero* exposure to rats or rabbits.  In rats, maternal and developmental toxicity was seen at or above the limit dose.  In rabbits, maternal toxicity manifested primarily as clinical signs (diarrhea, few/soft feces) and developmental toxicity (decreased fetal weight) was seen only at high doses.  In a three-generation reproductive toxicity study conducted in 1981, prior to the establishment of the Part 158 Test Guidelines, there was an increased incidence of renal tubule dilation at doses which did not cause parental toxicity in the $F_3$ generation.  This finding was judged to be spurious and unrelated to treatment since a more extensive evaluation in the two subsequent reproduction studies conducted at much higher doses in accordance with the Part 158 Test Guidelines did not replicate these findings.  In a second reproduction toxicity study, offspring toxicity (decreased body-weight gain during lactation without a corresponding decrease in absolute body weight) was seen at the same dose that caused parental toxicity.  In the third reproduction toxicity study conducted in accordance with the revised 1998 test protocol, offspring effects were observed above the limit dose in the absence of parental toxicity and consisted of delayed age (almost 3 days) and increased weight at attainment of PPS.

Glyphosate is categorized as having low acute toxicity following oral, dermal, and inhalation exposure, since all studies are in Toxicity Categories III or IV.  It is a mild eye irritant (Toxicity Category III), slight skin irritant (Toxicity Category IV), and is not a dermal sensitizer.

---

[5] NTP (1992). NTP technical report on the toxicity studies of Glyphosate (CAS No. 1071-83-6) Administered In Dosed Feed To F344/N Rats And B6C3F1 Mice. Toxic Rep Ser 16: 1-d3.

## 4.4  Safety Factor for Infants and Children (FQPA SF)

The Agency recommends that the FQPA SF be reduced to 1X.  This recommendation is based on the considerations described in the subsequent sections.

### 4.4.1  Completeness of the Toxicology Database

The toxicology database for glyphosate is adequate for characterizing toxicity and quantification of risk for food and non-food uses.  The following acceptable studies are available for evaluation: developmental toxicity studies in rats and rabbits, three multi-generation reproductive toxicity studies in rats, acute and subchronic neurotoxicity studies in rats; and chronic toxicity/carcinogenicity studies in mice and rats.

### 4.4.2  Evidence of Neurotoxicity

There is no evidence of neurotoxicity following acute and repeated exposures in the neurotoxicity battery or in the other toxicity studies.

### 4.4.3  Evidence of Sensitivity/Susceptibility in the Developing or Young Animal

The database contained two pre-natal developmental toxicity studies in rats and rabbits and three reproductive toxicity studies (two studies performed for two generations, 1 study performed for three generations).  There is no evidence of increased susceptibility (quantitative or qualitative) following *in utero* exposures to rats and rabbits.  In rats, no maternal or developmental toxicity was seen at any dose including the limit dose.  In rabbits, developmental toxicity was seen at doses higher than the doses that caused maternal toxicity.  In the three-generation study conducted in 1981 prior to the institution of the current Test Guidelines and Good Laboratory Practices, focal tubular dilation of the kidneys was observed in the offspring.  This finding was judged to be spurious and unrelated to treatment since more extensive evaluations in subsequent reproduction studies conducted at much higher doses did not replicate the offspring effects.  Of the two-generation reproduction studies, there was no evidence of increased susceptibility in the offspring in one study.  In the other study conducted in accordance with the revised 1998 Test Guidelines, evidence of increased susceptibility in the offspring manifested as delayed age and increased weight at attainment in the absence of parental toxicity; however, concern is low for the offspring effects since the effects were observed above the limit dose (1000 mg/kg/day), a clear offspring NOAEL was established for the observed effects, there was no evidence of reproductive toxicity in the adults, and the PODs used for overall risk assessment would address this concern.

### 4.4.4  Residual Uncertainty in the Exposure Database

The dietary exposure analysis is conservative as it assumed tolerance level residues and 100% crop treated.  The residential exposure analysis is also considered conservative as it is based on the 2012 Residential SOPs.

## 4.5  Toxicity Endpoint and Point of Departure Selections

A summary of the toxicological doses and endpoints for glyphosate used in human health risk assessment are summarized in table 4.5.4.

**4.5.1  Dose-Response Assessment**

***Acute Dietary Endpoint (All Populations):***  An acute reference dose (aRfD) was not established, based on the absence of an appropriate toxicological endpoint attributable to a single exposure (dose), including fetal toxicity in developmental toxicity studies.

***Chronic Dietary Endpoint:***  The toxicology database contains long-term toxicity studies in mice, rats and dogs.  However, these studies demonstrate that glyphosate is of very low toxicity following repeated oral exposure to experimental animals.  In dogs, there was no evidence of toxicity at the highest dose (500 mg/kg/day) tested.  Among the 14 combined chronic toxicity/carcinogenicity studies (6 mice and 9 rats), treatment-related effects were seen only at or near the limit dose in rats, and in mice at doses that exceeded the limit dose by over 4-fold.  Rabbits were seen to be the most sensitive species.  Consequently, the pre-natal developmental toxicity study in rabbits (MRID 44320616) was selected as the critical study for chronic dietary risk assessment.  The POD is the maternal NOAEL of 100 mg/kg/day based on maternal toxicity (diarrhea, few and/or no feces) observed at the lowest-observed adverse-effect level (LOAEL) of 175 mg/kg/day and the highest dose tested (300 mg/kg/day).  Similar clinical findings (diarrhea, soft and/or liquid feces, no feces) were also seen at the same dose (175 mg/kg/day) and at a higher dose (350 mg/kg/day) in another study in rabbits (MRID 00046362).  Although this endpoint is not typically considered to be an adverse effect per se, it was seen in a dose-dependent manner in two studies, and is protective all of the other effects and durations in the database.

A chronic population adjusted dose (cPAD) of 1.0 mg/kg/day was derived from a maternal NOAEL of 100 mg/kg/day and the application of a 100-fold factor that included a 10X UF for inter-species extrapolations, 10X UF for intra-species variations, and a 1X FQPA SF.  Since the endpoint of concern is based on maternal toxicity, it is appropriate to assess chronic dietary risk to all population subgroups.  Furthermore, the cPAD will be protective of all the effects seen in the long-term studies in mice and rats.  An additional SF for the use of short term study for long term risk assessment was not applied since the weight-of-evidence shows toxicity occurred at much higher doses in the other species and thus would provide adequate protection for long-term risk assessment.

***Incidental Oral Short- and Intermediate-Term:***  The developmental toxicity study in rabbits was also chosen for the short- and intermediate-term incidental oral endpoint.  The POD (i.e., maternal NOAEL) was 100 mg/kg/day based upon clinical signs of toxicity (diarrhea, few and/or no feces) at the LOAEL of 175 mg/kg/day.  The LOC is 100 based upon a 100-fold factor that included a 10X UF for inter-species extrapolations, 10X UF for intra-species variations, and a 1X FQPA SF.  The POD is appropriate for the population (i.e., infants and children) and duration of concern.  It is also protective of the offspring effects observed above the limit dose in the multi-generation reproduction studies.

***Short- and Intermediate-Term Dermal:***  A POD for short- and intermediate-term dermal exposure risk assessment was not selected since no dermal or systemic toxicity was seen at the limit dose (1000 mg/kg/day) following repeated dermal application to rabbits for 21-days.  Although there is an increased postnatal quantitative susceptibility in one of the two-generation reproductive studies, the effects are observed above the limit dose through the oral route, and are of low concern for dermal risk assessment.  Consequently, quantification of dermal risk is not required.

***Short- and Intermediate-Term Inhalation:*** A POD for short- and intermediate-term inhalation exposure risk assessment was not selected since there were no portal of entry effects or systemic toxicity seen following inhalation exposure to rats up to the highest concentration tested (0.36 mg/L). Although there is an increased postnatal quantitative susceptibility in one of the two-generation reproductive studies, the effects are observed above the limit dose through the oral route, and are of low concern for inhalation risk assessment. Therefore, quantification of inhalation risk is not required.

### 4.5.2  Recommendation for Combining Routes of Exposures for Risk Assessment

Since PODs were not selected for assessing risks via the dermal and inhalation routes of exposure, combined risks from other routes are not required.

### 4.5.3  Cancer Classification and Risk Assessment Recommendation

As part of Registration Review, the Agency reevaluated the human carcinogenic potential of glyphosate. The Agency collected and analyzed a substantial amount of data informing the carcinogenic potential of glyphosate and utilized the "Framework for Incorporating Human Epidemiological & Incident Data in Health Risk Assessment."[6] The framework provides the foundation for evaluating multiple lines of scientific evidence and includes two key components: problem formulation and use of the mode-of-action/adverse-outcome-pathway (MOA/AOP) frameworks. A comprehensive analysis of data on glyphosate from submitted guideline studies and the open literature was performed. This includes epidemiological, animal carcinogenicity, genotoxicity, metabolism, and mechanistic studies. Guideline studies were collected for consideration from the toxicological databases for glyphosate and glyphosate salts. A fit-for-purpose systematic review was executed to obtain relevant and appropriate open literature studies with the potential to inform the human carcinogenic potential of glyphosate. Furthermore, the list of studies obtained from the toxicological databases and systematic review was cross-referenced with recent internal reviews, review articles from the open literature, international agency evaluations, and a list of studies provided by registrants.

Available data from epidemiological, animal carcinogenicity, and genotoxicity studies were reviewed and evaluated for study quality and results to inform the human carcinogenic potential of glyphosate according to the 2005 Guidelines for Carcinogen Risk Assessment. Additionally, multiple lines of evidence were integrated in a weight-of-evidence analysis using the modified Bradford Hill Criteria considering concepts, such as strength, consistency, dose response, temporal concordance, and biological plausibility. The totality of the data has been used by the Agency to inform cancer classification descriptors according to the 2005 Guidelines for Carcinogen Risk Assessment.

In December 2016, the Agency convened the FIFRA SAP to review this evaluation and the evaluation was subsequently updated to address their comments[7]. Based on a weight-of-evidence evaluation, the Agency has concluded that glyphosate is classified as "not likely to be carcinogenic to humans." (D444689; 12-DEC-2017; TXR# 0057688 and G. Akerman, 12-DEC-2017; D444688; TXR#0057689)

---

6 https://www3.epa.gov/pesticides/EPA-HQ-OPP-2008-0316-DRAFT-0075.pdf
7 https://www.epa.gov/sap/fifra-scientific-advisory-panel-meetings

## 4.5.4  Summary of PODs and Toxicity Endpoints Used in Human Risk Assessment

**Table 4.5.4.  Summary of Toxicological Doses and Endpoints for Glyphosate for Use in Human Health Risk Assessments[1].**

| Exposure/ Scenario | POD | Uncertainty/ FQPA SF | RfD, PAD, LOC | Study and Toxicological Effects |
|---|---|---|---|---|
| Acute Dietary (General Population, including Infants and Children) | An endpoint of concern (effect) attributable to a single dose was not identified in the database. Quantification of acute dietary risk to general population including infants and children is not required. | | | |
| Chronic Dietary (All Populations) | NOAEL = 100 mg/kg/day | UF$_A$ = 10x UF$_H$ =10x FQPA SF = 1x | cPAD = cRfD = 1.00 mg/kg/day | Developmental Toxicity Study – Rabbit (MRID 44320616): Maternal LOAEL = 175 mg/kg/day based on dose-dependent clinical signs (diarrhea, few and/or no feces).  These findings were also seen in another study in rabbits at a similar same dose (MRID 00046362). |
| Short- (1-30 days) and Intermediate-(1-6 months) Term Incidental Oral | NOAEL = 100 mg/kg/day | UF$_A$ = 10x UF$_H$ =10x FQPA SF = 1x | LOC (residential) = MOE < 100 | Developmental Toxicity Study – Rabbit (MRID 44320616): Maternal LOAEL = 175 mg/kg/day based on dose-dependent clinical signs (diarrhea, few and/or no feces).  These findings were also seen in another study in rabbits at a similar same dose (MRID 00046362). |
| Short- (1-30 days), Intermediate (1-6 months) Term Dermal | A dermal endpoint was not selected; therefore, quantification of dermal risks is not required. | | | |
| Short- (1-30 days), Intermediate (1-6 months) Term Inhalation | An inhalation endpoint was not selected, therefore, quantification of inhalation risks is not required. | | | |
| Cancer (oral, dermal, inhalation) | Classification:  "Not likely to be carcinogenic to humans." | | | |

[1]  UF = uncertainty factor, FQPA SF = FQPA Safety Factor, NOAEL = no-observed adverse-effect level, LOAEL = lowest-observed adverse-effect level, PAD = population-adjusted dose (a = acute, c = chronic) RfD = reference dose, MOE = margin of exposure, LOC = level of concern, HDT = highest dose tested, UF$_A$ = extrapolation from animal to human (interspecies), UF$_H$ = potential variation in sensitivity among members of the human population (intraspecies).

## 4.6  Endocrine Disruption

As required by FIFRA and the Federal Food, Drug, and Cosmetic Act (FFDCA), EPA reviews numerous studies to assess potential adverse outcomes from exposure to chemicals. Collectively, these studies include acute, subchronic, and chronic toxicity, including assessments of carcinogenicity, neurotoxicity, developmental, reproductive, and general or systemic toxicity. These studies include studies that may be susceptible to endocrine influence, including effects on endocrine target organ histopathology, organ weights, estrus cyclicity, sexual maturation, fertility, pregnancy rates, reproductive loss, and sex ratios in offspring.  For ecological hazard assessments, EPA evaluates acute tests and chronic studies that assess growth, developmental and reproductive effects in different taxonomic groups.  As part of its Registration Review for glyphosate, EPA reviewed these data and selected the most sensitive endpoints for relevant risk assessment scenarios from the existing hazard database.  However, as required by FFDCA section 408(p), glyphosate is subject to the endocrine screening part of the Endocrine Disruptor Screening Program (EDSP).

EPA has developed the EDSP to determine whether certain substances (including pesticide active and other ingredients) may have an effect in humans or wildlife similar to an effect produced by a "naturally occurring estrogen, or other such endocrine effects as the Administrator may designate."  The EDSP employs a two-tiered approach to making the statutorily required

determinations.  Tier 1 consists of a battery of 11 screening assays to identify the potential of a chemical substance to interact with the estrogen, androgen, or thyroid (E, A, or T) hormonal systems.  Chemicals that go through Tier 1 screening and are found to have the potential to interact with E, A, or T hormonal systems will proceed to the next stage of the EDSP where EPA will determine which, if any, of the Tier 2 tests are necessary based on the available data.  Tier 2 testing is designed to identify any adverse endocrine-related effects caused by the substance, and establish a dose-response relationship between the dose and the E, A, or T effect.

Under FFDCA section 408(p), the Agency must screen all pesticide chemicals.  Between October 2009 and February 2010, EPA issued test orders/data call-ins for the first group of 67 chemicals, which contains 58 pesticide active ingredients and 9 inert ingredients.  A second list of chemicals identified for EDSP screening was published on June 14, 2013[8] and includes some pesticides scheduled for Registration Review and chemicals found in water.  Neither of these lists should be construed as a list of known or likely endocrine disruptors.

Glyphosate is on List 1 for which EPA has received all the required Tier 1 assay data.  The Agency has reviewed all of the assay data received for the appropriate List 1 chemicals and the conclusions of those reviews are available in the chemical-specific public dockets (see EPA-HQ-OPP-2009-0361).  For further information on the status of the EDSP, the policies and procedures, the lists of chemicals, future lists, the test guidelines and the Tier 1 screening battery, please visit our website.[9]

## 5.0  Dietary Exposure and Risk Assessment

The registrants have adequately addressed the residue chemistry deficiencies identified in the scoping document (D361315, T. Bloem, 14-Jan-2010).

### 5.1  Summary of Plant and Livestock Metabolism Studies

***Primary Crops:***  Metabolism studies conducted with non-transgenic crops have been previously submitted and reviewed.  Studies in corn, cotton, soybeans, and wheat indicate that the uptake of glyphosate from soil is limited, but the residues which are taken up are readily translocated. Foliarly applied glyphosate is readily absorbed and translocated throughout apples, coffee, dwarf citrus, grapes and pears.  Metabolism occurs via *N*-methylation and ultimately yields *N*-methylated glycines and phosphonic acids.  Based on these data, HED concluded that the residue of concern in non-transgenic plants is glyphosate (D. Duffy, 3-Jun-1974; C. Trichilo, Reregistration Standard, 15-Jul-1985; D179870, R. Perfetti, 13-Oct-1992; D183202 (RED), R. Perfetti, 27-Oct-1992; R. Perfetti, 17-Mar-1994).  Metabolism studies have also been submitted on glyphosate-tolerant canola (RT73; D242628, T. Bloem, 30-Nov-1998) and glyphosate-tolerant field corn (Roundup Ready® field corn; D217539, G. Kramer, 14-Mar-1996).  The glyphosate-tolerant canola and field corn varieties were genetically modified to express the EPSPS gene derived from *Agrobacterium sp.* (strain CP4) which codes for an EPSPS protein that is not inhibited by glyphosate.  The glyphosate-tolerant canola and corn were also genetically engineered to express the oxidoreductase gene which codes for a protein that converts glyphosate to the non-herbicidal AMPA.  Metabolism

---

8 See http://www.regulations.gov/#!documentDetail;D=EPA-HQ-OPPT-2009-0477-0074 for the final second list of chemicals.

9 http://www.epa.gov/endo/

in these varieties of transgenic canola and corn was essentially the same as the non-transgenic plants. Therefore, it was concluded that the terminal residue to be regulated, in non-transgenic plants and transgenic corn and canola modified to express the *Agrobacterium sp.* EPSPS and oxidoreductase genes, is glyphosate.

Subsequent to these decisions, HED approved DuPont requests concerning application of glyphosate to Optimum™ GAT™ soybean, Optimum™ GAT™ field corn, and Optimum® GLY Canola. These soybean, field corn, canola varieties were genetically engineered to express the *gat*4601 or *gat*4621 genes (derived from *Bacillus licheniformis*; soil bacterium) which confer tolerance to glyphosate via conversion of parent to the non-herbicidal *N*-acetyl-glyphosate. The Optimum™ GAT™ field corn and soybean varieties were also engineered to express the *zm-hra* gene (modified version of the acetolactate synthase (ALS) gene) which encodes for an ALS protein which is not sensitive to the ALS-inhibiting herbicides. As a result of the introduction of these seed lines, HED concluded that the residues of concern in soybean, field corn, and canola for tolerance expression and risk assessment should change from glyphosate to the combined residues of glyphosate and *N*-acetyl-glyphosate (expressed in glyphosate equivalents; D346713, T. Bloem, 12-Mar-2008; D357880, T. Bloem, 29-Oct-2008; D361315, T. Bloem, 14-Jan-2010; D394964, T. Bloem, 15-Nov-2011).

***Livestock:*** The qualitative nature of the residue in livestock following dosing with glyphosate and AMPA is adequately understood. Studies with lactating goats and laying hens fed a mixture of glyphosate and AMPA indicate that the primary route of elimination was by excretion (urine and feces). The HED Metabolism Assessment Review Committee (MARC) determined that the terminal residue to be regulated in livestock is glyphosate (D179870, R. Perfetti, 13-Oct-1992; D183202 (RED), R. Perfetti, 27-Oct-1992; R. Perfetti, 17-Mar-1994).

Since the Optimum™ GAT™ soybean and field corn metabolism studies resulted in significant residues of *N*-acetyl-glyphosate, DuPont submitted summaries of *in vitro* (rumen fluid, fertile hen egg, and rat liver S9 supernatant) and *in vivo* (rat metabolism study) studies conducted with the *N*-acetyl-glyphosate metabolite and submitted goat and hen metabolism studies conducted with the *N*-acetyl-glyphosate metabolite. Based on these data and the glyphosate metabolism studies, HED concluded that the residues of concern in livestock following consumption of glyphosate and *N*-acetyl-glyphosate, for tolerance expression and risk assessment purposes, are glyphosate and *N*-acetyl-glyphosate (D346713, T. Bloem, 12-Mar-2008; D361315, T. Bloem, 14-Jan-2010).

***Rotational Crops:*** A confined rotational crop study has been previously submitted/reviewed which employed an application rate of 3.7 lb ae/acre and carrot, lettuce, and barley as rotational crops (plantback intervals (PBIs) of 30, 119-125, and 364 days; MRIDs 415432-01 and -02, A. Abramovitch, 14-Oct-1992). Glyphosate residues were <0.01 ppm in/on all rotational crops except for barley grain from the 125-day PBI plot which had a glyphosate residue of 0.018 ppm. Based on these data, HED concluded that residues in rotational crops will be insignificant provided the labels specify a 30-day PBI for all nonlabeled crops (D200041, G. Kramer, 12-May-1994; field rotational crop study has not been submitted and is not required).

***Environmental Fate:*** It is assumed that the glyphosate salts dissociate rapidly to form glyphosate acid and the counter ion. Because glyphosate acid will be a zwitterion (presence of both negative (anionic) and positive (cationic) electrostatic charges) in the environment, it is expected to speciate into dissociated species of glyphosate acid in soil, sediment, and aquatic environments. The

environmental fate data for glyphosate, with the exception of a photodegradation study (MRID 44320643), did not address the impact of environmental fate processes on different species of glyphosate acid.

The major route of transformation of glyphosate identified in laboratory studies is microbial degradation.  In soils incubated under aerobic conditions, the half-life of glyphosate ranges from 1.8 to 109 days and in aerobic water-sediment systems is 14 - 518 days.  However, anaerobic conditions limit the metabolism of glyphosate (half-life 199 - 208 days in anaerobic water-sediment systems).  In laboratory studies, glyphosate was not observed to break down by abiotic processes, such as hydrolysis, direct photolysis on soil, or photolysis in water at pH 7.  In the field, soil dissipation half-lives for glyphosate were measured to be 1.4 - 142 days.  Although the variability in glyphosate dissipation rates cannot be statistically correlated to any specific test site properties, dissipation half-lives tend to be higher at test sites in the central to northern United States.  Along with significant mineralization to carbon dioxide, the major degradate of glyphosate is AMPA.

The available field and laboratory data indicate that glyphosate adsorbs strongly to soil.  Based on the low vapor pressure of glyphosate, volatilization from soils will not be an important dissipation mechanism.  HED concluded that glyphosate is the only residue of concern in drinking water.

## 5.2  Residues of Concern Summary and Rationale

As indicated in Section 4.2, the only identified metabolite from the rat metabolism study was AMPA which was found in the excreta.  Excluding the DuPont glyphosate-tolerant plant metabolism studies, the plant and livestock metabolism studies resulted in a similar profile with glyphosate and AMPA being the main residues.  In the DuPont glyphosate-tolerant plant metabolism studies, *N*-acetyl-glyphosate was also a major residue.  *N*-acetyl-glyphosate is not anticipated to be more toxic than glyphosate based on the available toxicity data, similar structure to glyphosate, and the lack of lack of structural alerts for carcinogenicity, mutagenicity and endocrine effects (D345923, P. Shah *et al.*, 18-Mar-2008).

In 1992, the HED Metabolism Committee determined that, based on toxicological considerations, AMPA need not be regulated, and in 1994, it was determined that, based on toxicological considerations, AMPA need not be regulated regardless of levels observed in foods or feeds.  *N*-acetyl-AMPA was detected as one of the metabolites formed in certain transgenic crops and was excluded as a residue of concern based on residue and toxicity considerations (D345923, P. Shah *et al.*, 18-Mar-2008).  The decision that AMPA and *N*-acetyl-AMPA need not be regulated, regardless of levels observed in foods or feeds, was revisited for the glyphosate registration review risk assessment.  HED believes the decision to not regulate AMPA is still appropriate based on the following toxicological considerations:  (1) the parent active ingredient glyphosate has a very low level of toxicity based on HED's database of guideline studies; (2) glyphosate toxicity studies are being used in endpoint selection; (3) the effects in the available subchronic study for AMPA (body weight loss and histopathologic lesions of the urinary bladder) occur at a dose greater than the limit dose (1,200 mg/kg/day) which is four fold higher than the point of departure being used in risk assessment; and (4) the points of departure selected are protective for the observed toxicity due to AMPA.

A summary of the residues of concern in primary crops, livestock, rotational crops, and drinking water for the tolerance expression and dietary risk assessments is presented in Table 5.2.

Glyphosate                          Human Health Risk Assessment                          D417700

| Table 5.2.  Residues of Concern for Tolerance Expression and Risk Assessment. | | |
|---|---|---|
| Matrix | Residues Included in Risk Assessment | Residues Included in Tolerance Expression |
| primary crops (excluding soybean and field corn) | glyphosate | glyphosate |
| soybean and field corn | glyphosate and *N*-acetyl-glyphosate | glyphosate and *N*-acetyl-glyphosate |
| livestock | glyphosate and *N*-acetyl-glyphosate | glyphosate and *N*-acetyl-glyphosate |
| rotational crops | glyphosate | glyphosate |
| drinking water | glyphosate | not applicable |

## 5.3  Food Residue Profile

For most crops, tolerances are at or near the LOQ and reflect the fact that only soil-directed applications are permitted.  Significantly higher tolerance are established for those crop where harvest-aid (desiccant) applications are registered and for the tolerant crops where over-the-top applications are permitted.

Provided all labels conform to the application scenarios specified in the JGTF summary (see Section 3.2), the residue chemistry database is sufficient to support the current registrations; no additional residue chemistry data are required.  HED evaluated the glyphosate residue chemistry database to determine if the established tolerances conform to the current practices and to determine if the crop group/subgroup tolerances could be updated to the current crop group/subgroup definitions.  Based on this analysis, HED is recommending for establishment of the tolerances listed in Attachment C Table C.1.  A subgroup 24D tolerance was not recommended as glyphosate is not registered for application to dragon fruit (representative crop).  It is noted that for the remaining recommended crop groups/subgroup tolerances, the application scenarios within a crop group/subgroup were not consistent in every instance.  Despite this, HED is recommending for the crop group/subgroup tolerances as the differences were minor and unlikely to lead to a significant difference in residues.  With the establishment of the tolerances listed in Attachment C Table C.1, the following tolerances should be deleted:  acerola; aloe vera; ambarella; asparagus; atemoya; avocado; bamboo, shoots; banana; biriba; breadfruit; cactus, fruit; cactus, pads; canistel; cherimoya; custard apple; date, dried fruit; durian; feijoa; fig; fruit, stone, group 12; guava; ilama; imbe; imbu; jaboticaba; jackfruit; longan; lychee; mamey apple; mango; mangosteen; marmaladebox; noni; nut, tree, group 14; olive; palm heart; papaya; papaya, mountain; passionfruit; pawpaw; persimmon; pineapple; pistachio; pomegranate; pulasan; rambutan; rose apple; sapodilla; sapote, black; sapote, mamey; sapote, white; soursop; Spanish lime; star apple; starfruit; sugar apple; Surinam cherry; tamarind; vegetable, leafy, brassica, group 5; vegetable, leafy, except brassica, group 4; watercress, upland; and wax jambu.

In response to concern from segments of the general public related to the presence of glyphosate in human milk, the BEAD-ACB analyzed human milk samples collected by the National Children's Study for residues of glyphosate and the glyphosate metabolites *N*-acetyl-glyphosate and AMPA (ACB Project #B14-46, L. Podhorniak, 13-May-2015).  A total of 39 samples from 39 mothers were analyzed using a fully validated liquid chromatography with tandem mass spectroscopy (LC-MS/MS) method which has a high level of specificity for the target analytes.  Glyphosate, *N*-acetyl-glyphosate, and AMPA were not detected in the samples (glyphosate LOQ/LOD = 10 ppb/3.3 ppb; metabolite LOQ/LOD = 30 ppb/10 ppb).  Storage stability data are available validating the storage interval (ACB Project #B14-46, L. Podhorniak, 26-Apr-2016).

## 5.4  Drinking Water Residue Profile

D440486, J. Hetrick, 15-Jun-2017

Table 5.4 is a summary of the worst-case EDWCs when considering all registered uses.  Based on these estimates, the chronic dietary assessment assumed a concentration in water of 75 ppb.  The monitoring data provided in Table 5.4 were derived from the United States Geological Survey (USGS) National Water-Quality Assessment Program (NAWQA).  The groundwater monitoring data with high glyphosate concentrations provided in Table 5.4 are associated with subsurface drains and, therefore, they are not representative of groundwater sourced drinking water.  Typically, tile drain fields form preferential flow pathways into tile drains, which allows for a less torturous flow pathway when compared to advection-dispersion flow, as assumed in the groundwater model.

| Table 5.4.  Drinking Water Concentrations. | | | |
|---|---|---|---|
| Drinking Water Source | Crop Scenario/Model | 1-in-10-year average daily ($\mu$g/L) | 1-in-10-year annual average ($\mu$g/L) |
| Surface Water | direct application to surface water/Pesticide Water Calculator (ver. 1.52) and Variable Volume Water Model (ver. 1.02). | 700 | **75** |
| | monitoring[2] | 35 | 2.8 |
| Ground Water | Crop Scenario/Model | Peak ($\mu$g/L) | Post-Breakthrough Average ($\mu$g/L) |
| | turf - 40 lbs ae/acre/PRZM-GW (ver. 1.52)[1] | no breakthrough | |
| | monitoring[3] | 285 | 20.6 |

[1]  PRZM-GW = pesticide root zone mode- groundwater
[2]  Monitoring sites with dissolved glyphosate data and watershed areas greater or equal to 0.04 km[2] are assumed to be capable of supporting a CWS.  A watershed area of 0.04 km[2] represents a lower bound watershed area for a surface source drinking water.
[3]  The indicated highest glyphosate concentration in groundwater is from a subsurface drain in Hamilton County, IA (USGS 423232093151801), which is not representative of a drinking water intake location.

## 5.5  Dietary Risk Assessment

D429229, T. Bloem, 30-Nov-2017

A chronic dietary risk assessment was conducted using DEEM-FCID (ver. 3.16) which incorporates consumption data from USDA NHANES/WWEIA (2003-2008).  Acute and cancer dietary risk assessments were not conducted since an appropriate endpoint attributable to a single dose was not identified for the general U.S. population or any population subgroup and glyphosate is classified as not likely to be a human carcinogen, respectively.  The chronic analysis is highly conservative in that it assumed tolerance-level residues, 100% crop treated, DEEM (ver. 7.81) default processing factors, and modeled drinking water estimates (direct application to water scenario).  The resulting chronic risk estimates (food and water) were <100% of the cPAD and are therefore less than HED's level of concern (children 1-2 years old were the most highly exposed population subgroup at 23% the cPAD).  Table 5.5 is a summary of the chronic dietary exposure estimates.

| Table 5.5.  Summary of Chronic Dietary Exposure and Risk. | | | |
|---|---|---|---|
| Population Subgroup | cPAD (mg/kg/day) | Exposure (mg/kg/day) | %cPAD[1] |
| General U.S. Population | | 0.089771 | 9.0 |
| All Infants (< 1 year old) | | 0.138338 | 14 |
| **Children 1-2 years old** | | **0.228379** | **23** |
| Children 3-5 years old | | 0.212036 | 21 |
| Children 6-12 years old | 1.00 | 0.147749 | 15 |
| Youth 13-19 years old | | 0.088362 | 8.8 |
| Adults 20-49 years old | | 0.074650 | 7.5 |
| Adults 50-99 years old | | 0.061258 | 6.1 |
| Females 13-49 years old | | 0.069318 | 6.9 |

[1]  The bolded %cPAD represents the population with highest risk.

## 6.0  Residential (Non-Occupational) Exposure/Risk Characterization

D398862, L. Venkateshwara, 30-Oct-2012

Residential exposure to glyphosate may occur as a result of the currently registered turf (including golf courses and residential lawns) and aquatic application scenarios.  These uses were previously assessed in 2012 (Memo, L. Venkateshwara, D398862, 30-Oct-2012), and that assessment reflects HED's 2012 Residential SOPs, policy changes for body-weight assumptions, and updates to HED's inputs for aquatic/swimmer assessments.  The exposure and risk estimates from the previous assessment are summarized here.  It should be noted, however, that the MOEs have been updated to reflect a revised POD, the aquatic use scenario has been updated to reflect a higher application rate identified in the JGTF use matrix, and the aquatic scenario inputs have been updated to reflect the draft Aquatic SOP (November, 2015).

### 6.1  Residential Handler Exposure

Based on the registered residential use patterns, there is a potential for short-term dermal and inhalation exposures to homeowners who mix and apply products containing glyphosate (residential handlers).  However, since short- and intermediate-term dermal and inhalation PODs were not selected due to the lack of toxicity via these routes, a quantitative exposure risk assessment was not completed.

### 6.2  Post-Application Exposure

Post-application dermal and inhalation assessments were not quantitatively assessed since short- and intermediate-term dermal or inhalation PODs were not selected.  However, based on the registered use patterns, children may have short-term post-application incidental oral exposures from hand-to-mouth behavior on treated lawns and swimmers (adults and children) may have short-term post-application incidental oral exposures from the aquatic use.  It is noted that the short-term assessment is protective of intermediate-term exposure as the incidental oral PODs for these durations are identical.

Table 6.2.1 presents the post-application incidental oral MOE values calculated for children 1 to <2 years old after applications of glyphosate to turf.  Table 6.2.2 presents the post-application incidental oral ingestion MOE values calculated for adults and children 3 to <6 years old after aquatic applications of glyphosate.  The post-application MOEs do not exceed the LOC for any of the scenarios assessed (LOC for MOEs <100).  It is noted that the lifestages selected for risk assessment are considered protective for the exposures and risks for any other potentially exposed lifestages.

The incidental oral scenarios for the turf assessment (i.e., hand-to-mouth, object-to-mouth, and soil ingestion) should be considered inter-related and it is likely that they occur interspersed amongst each other across time.  Combining these scenarios would be overly-conservative because of the conservative nature of each individual assessment.  Therefore, none of the incidental oral scenarios were combined.

| Table 6.2.1.  Post-application Incidental Oral Risk Estimates for Application of Glyphosate to Turf[1]. | | | |
|---|---|---|---|
| Lifestage | Post-application Exposure Scenario | Exposure (mg/kg/day) | Short-term MOEs[5] |
| Children 1 to <2 year old | Hand-to-Mouth[2] | 0.1565 | 640 |
| | Object-to-Mouth[3] | 0.00481 | 21,000 |
| | Incidental Soil Ingestion[4] | 0.00034 | 290,000 |

[1]  Based on the maximum labeled rate specified in the Roundup® Weed & Grass Super Concentrate, EPA Reg. No. 71995-25.
[2]  Hand-to-Mouth = Hand residue loading (mg/cm²)*fraction hand surface area mouthed/event (0.127/event)*typical surface area of one hand (150 cm²)*exposure time (1.5 hrs/day)*number of replenishment intervals/hr (4 intervals/hr)*(1-(1-saliva extraction factor 0.5)^number of hand-to-mouth contact events per hour 13.9 events/hr); *Hand Residue Loading* = fraction of ae on hands compared to total surface residue from dermal TC study (0.06)*dermal exposure (mg))/typical surface area of one hand (150 cm²).
[3]  Object-to-Mouth = ((Object Residue (µg/cm²)*CF1 (1.0E-3 mg/ug)*Object Surface Area Mouthed/Event (10 cm²/event))*(Exposure Time (1.5 hrs/day)*#Replenishment Intervals/hr (4))*(1-((1-Extraction by Saliva (0.48))^(#Object-to-Mouth Events/hr (8.8 events/hr))/#Replenishment intervals/hr))))/Body Weight (11 kg).
[4]  Soil Ingestion = (Soil Residue (7.0746975 µg/g) *Ingestion Rate (50 mg/kg/day) *CF(0.000001))/Body Weight (11 kg).
[5]  MOE = NOAEL/Daily Dose (mg ae/kg/day); Oral NOAEL = 100 mg/kg/day. LOC is for MOEs <100.

| Table 6.2.2.  Post-Application Swimmer Risk Estimates for Aquatic Application of Glyphosate. | | | | |
|---|---|---|---|---|
| Exposure Scenario | Application Rate (lb ae/acre)[1] | Maximum Concentration in water (mg/L)[2] | Exposure (mg/kg/day)[3] | Short-term MOE[4] |
| Ingestion of water, Adult | 8 | 0.737 | 0.000046035 | 2,200,000 |
| Ingestion of water, Children 3 to <6 years old | | | 0.000484583 | 210,000 |

[1]  Application rate from registered labels for aquatic weed control using glyphosate IPA salt (label = EPA Reg. No. 524-343 identified in the JGTF Use Matrix as the highest aquatic rate).  Note this rate is higher than previously assessed in D398862.
[2]  Maximum concentration in water (top 4 ft) = 8 lb ae/acre x 1A/43,560 ft² x 454,000 mg/lb x 4ft x ft³/28.32 L = 0.737 mg/L.
[3]  PDR, incidental oral exposure = concentration, C_w (mg/L) x ingestion rate, IgR (L/hr) x exposure time, ET (hrs/d) x 1/BW (adult = 80 kg; children (3 to <6 years old) = 19 kg).
[4]  MOE = NOAEL/PDR; short-term incidental oral NOAEL = 100 mg/kg bw/d.  LOC is for MOEs <100.

## 6.3  Residential Risk Estimates for Use in Aggregate Assessment

Table 6.3 reflects the residential risk estimates that are recommended for use in the aggregate assessment.  The recommended residential exposure scenario for use in the adult aggregate assessment reflects short-term incidental oral exposure to treated aquatic areas (post-application exposure).  The recommended residential exposure scenario for use in the child aggregate assessment reflects short-term incidental oral exposure to children 1 to <2 years old from treated turf (post-application exposure).  As indicated above, the short-term assessment is protective of intermediate-term exposure (identical incidental oral POD for these durations) and the lifestages selected for aggregate risk assessment are considered protective for the exposures and risks for any other potentially exposed lifestage.

| Table 6.3.  Recommendations for the Residential Exposures for the Glyphosate Aggregate Assessment. | | | | | |
|---|---|---|---|---|---|
| Lifestage | Exposure (mg/kg/day)[1] | | | Total Exposure (mg/kg/day) | MOE[2] |
| | Dermal | Inhalation | Oral | | |
| **short-term** | | | | | |
| Adults | not applicable | | 0.000046035 | 0.000046035 | 2,200,000 |
| Children 1 to <2 year old | | | 0.1565 | 0.1565 | 640 |

[1]  Post-application exposure represents high-end incidental oral exposure for the relevant exposure duration.
[2]  Residential post-application MOE = Incidental oral NOAEL / Residential post-application total exposure; LOC for MOEs <100.

## 6.4  Non-Occupational Bystander Post-Application Inhalation Exposure and Risk Estimates

Volatilization of pesticides may be a source of post-application inhalation exposure to individuals nearby pesticide applications.  The Agency sought expert advice and input on issues related to volatilization of pesticides from its FIFRA SAP in December 2009, and received the SAP's final report on March 2, 2010 (http://www.regulations.gov/#!documentDetail;D=EPA-HQ-OPP-2009-

0687-0037).  The Agency has evaluated the SAP report and has developed a Volatilization Screening Tool and a subsequent Volatilization Screening Analysis (http://www.regulations.gov/#!docketDetail;D=EPA-HQ-OPP-2014-0219).  During Registration Review, the Agency will utilize this analysis to determine if data (i.e., flux studies, route-specific inhalation toxicological studies) or further analysis is required for glyphosate.

## 6.5  Non-Occupational Spray Drift Exposure and Risk Estimates

Off-target movement of pesticides can occur via many types of pathways and it is governed by a variety of factors.  Sprays that are released and do not deposit in the application area end up off-target and can lead to exposures to those it may directly contact.  They can also deposit on surfaces where contact with residues can eventually lead to indirect exposures (e.g., children playing on lawns where residues have deposited next to treated fields).  The potential risk estimates from these residues can be calculated using drift modeling coupled with methods employed for residential risk assessments for turf products.

The approach to be used for quantitatively incorporating spray drift into risk assessment is based on a premise of compliant applications which, by definition, should not result in direct exposures to individuals because of existing label language and other regulatory requirements intended to prevent them.[10]  Direct exposures would include inhalation of the spray plume or being sprayed directly.  Rather, the exposures addressed here are thought to occur indirectly through contact with impacted areas, such as residential lawns, when compliant applications are conducted.  Given this premise, exposures for children (1 to 2 years old) and adults who have contact with turf where residues are assumed to have deposited via spray drift thus resulting in an indirect exposure are the focus of this analysis analogous to how exposures to turf products are considered in risk assessment.

Several glyphosate products have existing labels for use on turf, thus it was considered whether the risk assessment for that use would be considered protective of any type of exposure that would be associated with spray drift.  If the maximum application rate on crops adjusted by the amount of drift expected is less than or equal to existing turf application rates, the existing turf assessment is considered protective of spray drift exposure.  The currently registered maximum single agricultural application rate of glyphosate for several scenarios is at 8.0 lb ae/acre (grass pastures, forestry, and Christmas tree farms).  The highest fraction of spray drift noted for any application method immediately adjacent to a treated field results in a deposition fraction of 0.26[11] of the application rate.  A quantitative spray drift assessment for glyphosate is not required because the maximum application rate for the relevant uses multiplied by the 0.26x adjustment factor for drift (8.0 lb ae/acre x 0.26 = 2.08 lb ae/acre) is less than the assessed maximum direct spray residential turf application rate (10.5 lb ae/acre; D398862, L. Venkateshwara, 30-Oct-2012).  As a result, the turf post-application assessment is protective for any potential exposures for any glyphosate products.  The turf post-application MOEs have been previously assessed and are based on the revised SOPs for Residential Exposure Assessment (i.e., see above in Section 6.2).

---

10 This approach is consistent with the requirements of the EPA's Worker Protection Standard which, when included on all labels, precludes direct exposure pathways.

11  Tier 1 output from the aerial application using fine to medium spray quality based on AgDrift® output files

## 7.0  Aggregate Risk Assessment

In accordance with the FQPA, HED must consider and aggregate pesticide exposures and risks from three major sources:  food, drinking water, and residential exposures.  Based on the registered/proposed agricultural and residential uses, HED conducted short-term (food, water, residential incidental oral) and chronic (food and water) aggregate risk assessments.  Acute and cancer aggregate risk assessments were not conducted since an appropriate endpoint attributable to a single dose was not identified for the general U.S. population or any population subgroup and glyphosate is classified as not likely to be a human carcinogen, respectively.  In addition, although an intermediate-term assessment was not conducted, the short-term assessment is protective of intermediate-term as the PODs for these durations are identical.

***Short-Term Aggregate Risk Assessment:***  For children, short-term aggregate exposure includes chronic dietary (food and water) and incidental oral ingestion exposure resulting from the turf use (highest exposure of all possible scenarios).  For adults, short-term aggregate exposure includes chronic dietary exposure (food and water) and incidental oral ingestion exposure resulting from the aquatic use (highest exposure of all possible scenarios).  Table 7.0 is a summary of the short-term aggregate exposures and risk estimates.  Since the aggregate MOEs are ≥260, short-term aggregate exposure to glyphosate does not exceed the LOC (LOC for MOEs <100).  HED notes that the lifestages selected for short-term aggregate risk assessment and the resulting aggregate MOEs are protective for any other potentially exposed lifestage.

| Table 7.0.  Short-Term Aggregate Exposure. | | | | |
|---|---|---|---|---|
| Population | Exposure (mg/kg/day) | | | Aggregate MOE[2] |
| | Dietary[1] | Incidental Oral[1] | Combined | |
| Adults 20-49 years old | 0.076405 | 0.000046035 | 0.076451 | 1,300 |
| Children 1 to <2 year old | 0.230916 | 0.1565 | 0.387416 | 260 |

[1]  See Table 5.4 (dietary) and Table 6.3 (incidental oral); highest dietary exposure for children and adults was selected.

[2]  Aggregate MOE = 100 mg/kg/day (short-term incidental oral NOAEL) ÷ combined exposure (mg/kg/day).

***Chronic Aggregate Risk Assessment:***  Since there are no long-term exposures expected based on the use pattern, aggregate chronic risk assessment only takes into consideration dietary (food and water) exposure only.  The chronic aggregate exposure and risk estimates do not exceed HED's LOC (≤23% cPAD; see Section 5.4).

## 8.0  Cumulative Exposure/Risk Characterization

Unlike other pesticides for which EPA has followed a cumulative risk approach based on a common mechanism of toxicity, EPA has not made a common mechanism of toxicity finding as to glyphosate and any other substances.  For the purposes of this assessment, therefore, EPA has not assumed that glyphosate has a common mechanism of toxicity with other substances.  In 2016, EPA's OPP released a guidance document entitled, *Pesticide Cumulative Risk Assessment: Framework for Screening Analysis*[12].  This document provides guidance on how to screen groups of pesticides for cumulative evaluation using a two-step approach beginning with the evaluation of available toxicological information and if necessary, followed by a risk-based screening

---

12 https://www.epa.gov/pesticide-science-and-assessing-pesticide-risks/pesticide-cumulative-risk-assessment-framework

approach.  This framework supplements the existing guidance documents for establishing common mechanism groups (CMGs)[13] and conducting cumulative risk assessments (CRA)[14]. During Registration Review, the Agency will utilize this framework to determine if the available toxicological data for glyphosate suggests a candidate CMG may be established with other pesticides.  If a CMG is established, then a screening-level toxicology and exposure analysis may be conducted to provide an initial screen for multiple pesticide exposure.

## 9.0  Occupational Exposure/Risk Characterization

There is the potential for occupational handler and post-application dermal and inhalation exposure; however, due to the lack of toxicity via these routes, no dermal or inhalation PODs were selected for glyphosate.  Therefore, a quantitative occupational exposure assessment was not conducted.

***Restricted Entry Interval:***  Glyphosate is classified as Toxicity Category IV via the dermal route and Toxicity Category IV for skin irritation potential.  It is not a skin sensitizer.  Short- and intermediate-term post-application were not quantitatively assessed since short- and intermediate-term dermal endpoints were not selected.   Under 40 CFR 156.208 (c) (2), ai's classified as Acute III or IV for acute dermal, eye irritation and primary skin irritation are assigned a 12-hour REI.  Therefore, the [156 subpart K] Worker Protection Statement interim REI of 12 hours is adequate to protect agricultural workers from post-application exposures to glyphosate.

REIs may be further reduced if certain criteria are met in accordance with the Pesticide Registration (PR) Notice 95-3 [Reduction of WPS Interim REIs for Certain Low Risk Pesticides][15].  In PR Notice 95-3, there are a set of criteria listed for the active ingredient that must be met for chemicals to be eligible for a reduced REI.  These criteria include:

●The active ingredient is in Toxicity Category III or IV based upon data for acute dermal toxicity, acute inhalation toxicity, primary skin irritation, and primary eye irritation.  Acute oral toxicity data were used if no acute dermal data were available.  If EPA lacked data on primary skin irritation, acute inhalation, or primary eye irritation of the active ingredient, then the Agency reviewed data on that end-point for similar active ingredients (analogs), and excluded such active ingredients from consideration for the reduced REI, if the analog is in Toxicity Category I or II for that endpoint.
●The active ingredient is not a dermal sensitizer (or in the case of biochemical and microbial active ingredients, no known reports of hypersensitivity exist).
●The active ingredient is not a cholinesterase inhibitor (N-methyl carbamate and organophosphate) as these chemicals are known to cause large numbers of pesticide poisonings and have the potential for serious neurological effects.
●No known reproductive, developmental, carcinogenic, or neurotoxic effects have been associated with the active ingredient.  If active ingredients did not have data available for these chronic health effects, then EPA considered data on appropriate chemical and biological analogs.  Active ingredients that have been classified as carcinogenic in Category B (probable human carcinogen) or Category C with a potency factor, Q* (possible human carcinogen, for which quantification of potential risk is considered appropriate), or are scheduled for HED's Cancer Peer Review process, were omitted from consideration.

---

13 Guidance For Identifying Pesticide Chemicals and Other Substances that have a Common Mechanism of Toxicity (USEPA, 1999).
14 Guidance on Cumulative Risk Assessment of Pesticide Chemicals That Have a Common Mechanism of Toxicity (USEPA, 2002).
15 Available: http://www.epa.gov/PR_Notices/pr95-3.html

●EPA does not possess incident information (illness or injury reports) that are "definitely" or "probably" related to post-application exposures to the active ingredient.

Upon review of the criteria for the <u>active ingredient only</u>, it appears that glyphosate is consistent with the criteria in PRN 95-3 that allow for a 4-hour REI.  **Note**: *The PR Notice also includes similar criteria for the end-use product.  These criteria have not been evaluated by HED.*  Based solely on the active ingredient criteria, HED would recommend for reduction of the REI for glyphosate.

## 10.0  Incident and Epidemiological Analysis
D417808, S. Recore *et al.*, 6-Feb-2014

HED found that the acute health effects reported to the incident databases queried are consistent with the previous incident report, and the other databases and medical literature reviewed.  These health effects primarily include dermal, ocular, and respiratory effects.  Effects are generally mild/minor to moderate meaning the symptoms were minimally traumatic and resolved rapidly.  The relatively high (absolute) number of reported glyphosate incidents across the reviewed databases is likely a result of glyphosate being among the most widely used pesticides by volume.  It should be noted that most of the incidents reported are minor in severity.  Pesticide Incidents from OPP Incident Data System (IDS; 2008 to 2012), California's Pesticide Incident Surveillance Program (PISP; 2005 to 2010), Sentinel Event Notification System for Occupational Risk (SENSOR)-Pesticides (1998 to 2009), the Agency-sponsored National Pesticide Information Center (NPIC; 2007-2013), and American Association of Poison Control Centers (AAPCC; 2001 to 2012) data were reviewed.  The incident data available from IDS and NPIC suggest that homeowner mixing/loading/applying (usually due to human errors and container leaks) are responsible for almost half of the reported incidents.  SENSOR-Pesticides incident data are consistent with IDS and NPIC, also suggesting that application of glyphosate results in the most reported incidents.  The incident data available from CA PISP suggests that occupational handling of equipment is responsible for most incidents due to equipment leaks and malfunction.  Based on the data in SENSOR, IDS, and NPIC, it appears that the children's exposures are due to postapplication exposure, accidental ingestion, and tampering with the product.

The medical-case literature reviewed indicates that most of the accidental ingestions of glyphosate formulations resulted in mild symptoms such as irritation of oral and upper gastrointestinal mucosa and were self-limited.  However, intentional ingestions caused moderate to severe symptoms and involved multiple organ systems.

While HED identified several dozen glyphosate environmental epidemiology studies, few of these studies reflected an *a priori* research interest in the potential role of glyphosate and chronic disease outcomes, and most studies were hypothesis-generating in nature.  Given this and other limitations of these studies, there is insufficient evidence to conclude that glyphosate plays a role in any of the health outcomes studied across this epidemiologic database.  EPA will continue to follow the literature concerning the potential role of the chemical in certain cancer and non-cancer outcomes.

Attachment A:  Chemical Names and Structures.
Attachment B:  Toxicity Profile Tables.
Attachment C:  HED-Recommended Tolerances and International Residue Limits.
Attachment D:  Physicochemical Properties.
Attachment E:  References
Attachment F:  Dietary Exposure Estimates Associated with Subsistence Fishing.

Glyphosate                    Human Health Risk Assessment                    D417700

## Attachment A:  Chemical Names and Structures

| Compound | Structure |
|---|---|
| Glyphosate<br><br>*N*-(phosphonomethyl)glycine |  |
| *N*-Acetyl-glyphosate<br><br>*N*-acetyl-*N*-(phosphonomethyl)glycine |  |
| AMPA<br><br>(aminomethyl)phosphonic acid |  |
| *N*-Acetyl-AMPA<br><br>[(acetylamino)methyl]phosphonic acid |  |

## Attachment B:  Toxicity Profile Tables

## B.1    Toxicology Data Requirements

The requirements (40 CFR 158.340) for uses of glyphosate are in Table B.1.  Use of the new guideline numbers does not imply that the new (1998) guideline protocols were used.

| Table B.1.  Toxicological Data Requirements for Glyphosate. | Technical | |
|---|---|---|
| Study | Required | Satisfied |
| 870.1100    Acute Oral Toxicity .................................................. | yes | yes |
| 870.1200    Acute Dermal Toxicity .............................................. | yes | yes |
| 870.1300    Acute Inhalation Toxicity ......................................... | yes | no[1] |
| 870.2400    Primary Eye Irritation ............................................. | yes | yes |
| 870.2500    Primary Dermal Irritation ........................................ | yes | yes |
| 870.2600    Dermal Sensitization ............................................... | yes | yes |
| 870.3100    Oral Subchronic (rodent) ......................................... | yes | yes |
| 870.3150    Oral Subchronic (nonrodent) .................................... | yes | no[2] |
| 870.3200    21-Day Dermal ....................................................... | yes | yes |
| 870.3465    90-Day Inhalation .................................................. | yes | yes |
| 870.3700a  Developmental Toxicity (rodent)................................. | yes | yes |
| 870.3700b  Developmental Toxicity (nonrodent)............................ | yes | yes |
| 870.3800    Reproduction ......................................................... | yes | yes |
| 870.4100a  Chronic Toxicity (rodent) ......................................... | yes | yes |
| 870.4100b  Chronic Toxicity (nonrodent) .................................... | yes | yes |
| 870.4200b  Oncogenicity (mouse) .............................................. | yes | yes |
| 870.4300    Chronic/Oncogenicity.............................................. | yes | yes |
| 870.5100    Mutagenicity—Gene Mutation - bacterial.................... | yes | yes |
| 870.5300    Mutagenicity—Gene Mutation - mammalian................ | yes | yes |
| 870.5xxx    Mutagenicity—Structural Chromosomal Aberrations ... | yes | yes |
| 870.5xxx    Mutagenicity—Other Genotoxic Effects...................... | yes | yes |
| 870.6100a  Acute Delayed Neurotoxicity (hen) ............................ | no | no |
| 870.6100b  90-Day Neurotoxicity (hen)...................................... | no | no |
| 870.6200a  Acute Neurotoxicity Screening Battery (rat) ............... | yes | yes |
| 870.6200b  90-Day Neurotoxicity Screening Battery (rat).............. | yes | yes |
| 870.7485    General Metabolism ................................................. | yes | yes |
| 870.7600    Dermal Penetration ................................................. | no | no |
| 870.7800    Immunotoxicity ...................................................... | yes | yes |

[1]  The requirement for an acute inhalation $LC_{50}$ study was waived.
[2]  This is not considered a data gap because there is a chronic dog study in the database.

Glyphosate                         Human Health Risk Assessment                         D417700

**Table B.2.  Acute Toxicity Profile.**

| Guideline No. | Study Type | MRID(s) | Results | Toxicity Category |
|---|---|---|---|---|
| 870.1100 | Acute oral [rat] | 41400601 | $LD_{50}$ > 5,000 mg/kg | IV |
| 870.1200 | Acute dermal [rabbit] | 41400602 | $LD_{50}$ > 5,000 mg/kg | IV |
| 870.1300 | Acute inhalation | None | The requirement for an acute inhalation $LC_{50}$ study was waived | None |
| 870.2400 | Acute eye irritation [rabbit] | 41400603 | Corneal opacity or irritation clearing in 7 days or less | III |
| 870.2500 | Acute dermal irritation [rabbit] | 41400604 | Mild or slight irritant | IV |
| 870.2600 | Skin sensitization [guinea pig] | 41642307 | Not a sensitizer | None |

**Table B.3.  Subchronic, Chronic, and Other Toxicity Profile.**

| Guideline No. | Study Type | MRID No. (year)/ Classification /Doses | Results |
|---|---|---|---|
| 870.3100 | 90-Day Oral Toxicity (Mice) | 00036803 (1979) Acceptable/guideline 0, 5000, 10000, 50000 ppm (0, 944/ 1530, 1870/2740, 9710/ 14800 mg/kg/day [M/F]) | NOAEL = 1870/2740 mg/kg/day [M/F]. LOAEL = 9710/14800 mg/kg/day [M/F] based on decreased body weight. |
| 9870.3100 | 90-Day oral toxicity range finding (Rat) | 40559401 (1987) Acceptable/guideline 0, 1000, 5000, or 20000 ppm (0, 63, 317, 1267 mg/kg/day) | NOAEL = 1267 mg/kg/day. LOAEL = not established. |
| 870.3150 | 90-Day oral toxicity (Rat) – AMPA | 00241351 (1979) Acceptable/guideline 0, 400, 1200, 4800 mg/kg/day [M/F] | NOAEL = 400 mg/kg/day [M/F]. LOAEL = 1200 mg/kg/day [M/F] based on body-weight loss and histopathological lesions of the urinary bladder. |
| 870.3150 | 90-Day oral toxicity (Dog)- AMPA | 43334702 0, 8.8, 26.4, 88, or 264 mg/kg/day | NOAEL= 264 mg/kg/day. LOAEL= not established. No toxicity at the highest dose tested. |
| 870.3200 | 21-Day dermal toxicity (Rabbit) | 00098460 (1982) Acceptable/guideline 0, 100, 1000, 5000 mg/kg/day | NOAEL = 1000 mg/kg/day in males and females. LOAEL = 5000 mg/kg/day based on slight erythema and edema on intact and abraded skin of both sexes, and decreased food consumption in females. |
| 870.3465 | 28-Day inhalation toxicity (rat) | 00137704 (1983) Acceptable/guideline 0, 0.05, 0.16, or 0.36 mg/L | NOAEL = 0.36 mg/L (HDT). LOAEL not established based on 6 hours/day, 5 days/week for 4 weeks. |
| 870.3700a | Prenatal developmental in rodents (Rat) | 00046362 (1980) Acceptable/guideline 0, 300, 1000, 3500 mg/kg/day via gavage during Gestation Days (GD) 6-19 | **Maternal** NOAEL = 1000 mg/kg/day. LOAEL = 3500 mg/kg/day based on based on inactivity, mortality, stomach hemorrhages and reduced body-weight gain. **Developmental** NOAEL = 1000 mg/kg/day. LOAEL = 3500 mg/kg/day based on increased incidence in the number of fetuses and litters with unossified sternebrae and decreased fetal body weight. |
| 870.3700a | Prenatal developmental in rodents (Rat) | 44320615 (1996) Acceptable/guideline 0, 250, 500, or 1000 mg/kg/day via gavage during gestation days (GD) 6-15 | **Maternal** NOAEL = 1000 mg/kg/day. LOAEL = not established. **Developmental** NOAEL = not established. |
| 870.3700a | Prenatal developmental in rodents (Rat) - AMPA | 43334705 (1991) Guideline 0, 150, 400, or 1000 mg/kg/day via gavage during GD 6-19 | **Maternal** NOAEL = 150 mg/kg/day. LOAEL = 400 mg/kg/day based clinical signs (hair loss, soft stools and mucoid feces). **Developmental** NOAEL = 400 mg/kg/day. LOAEL = 1000 mg/kg/day based on decreased fetal body weight. |
| 870.3700b | Prenatal developmental in (Rabbit) | 00046363 (1980) Acceptable/guideline 0, 75, 175, or 350 mg/kg/day via gavage during GD  6-27 | **Maternal** NOAEL = 75 mg/kg/day. LOAEL = 175 mg/kg/day based on based on mortality, diarrhea, soft stools, and nasal discharge. **Developmental** NOAEL = 350 mg/kg/day (HDT). LOAEL = not established. |

**Table B.3.  Subchronic, Chronic, and Other Toxicity Profile.**

| Guideline No. | Study Type | MRID No. (year)/ Classification /Doses | Results |
|---|---|---|---|
| 870.3700b | Pre-natal Developmental Toxicity-Rabbit | (1996) Acceptable/guideline 44320616 0, 100, 175, or 300 day via gavage during GD7-19 | Maternal NOAEL = 100 mg/kg/day. Maternal LOAEL = 175 mg/kg/day based on dose-dependent clinical signs (diarrhea, few/no feces). Developmental NOAEL = 300 mg/kg/day. Developmental LOAEL = not established. |
| 870.3800 | Reproduction and fertility effects, three-generation (Rat) | 00105995 (1981) Acceptable/guideline 0, 3, 10, or 30 mg/kg/day in the diet. | **Parental/Systemic** NOAEL = 30 mg/kg/day (HDT). **Reproductive** NOAEL = 30 mg/kg/day (HDT). **Offspring** NOAEL = 10 mg/kg/day. LOAEL = 30 mg/kg/day based on focal dilation of the kidney in male F3b pups. |
| 870.3800 | Reproduction and fertility effects, two-generation (Rat) | 41621501 (1990) 0, 2000, 10,000, or 30,000 ppm (0, 250, 500, and 1500 mg/kg/day) in the diet. | **Parental/Systemic** NOAEL = 500 mg/kg/day in males and females. LOAEL = 1500 mg/kg/day in males and females based on soft stools, decreased body-weight gain and food consumption.  Focal dilation of the kidney observed at 30 mg/kg/day in the three-generation study was not observed at any dose level in this study. **Reproductive** NOAEL = 1500 mg/kg/day (HDT) in males and females. **Offspring** NOAEL = 500 mg/kg/day in males and females. LOAEL = 1500 mg/kg/day in males and females based on decreased body-weight gain during lactation. |
| 870.3800 | Reproduction and fertility effects, two-generation (Rat) | 48865101 (2012) Acceptable/guideline 0, 1500, 5000, or 15,000 ppm (0/0, 121/126, 408/423, or 1234/1273 mg/kg/day [M/F]) in the diet | **Parental/Systemic** NOAEL = 1234/1273 mg/kg/day in males and females. The LOAEL for parental toxicity was not observed. **Reproductive** NOAEL = 1234/1273 mg/kg/day (HDT) in males and females. **Offspring** NOAEL = 408/423 mg/kg/day in males and females. LOAEL = 1234/1273 mg/kg/day in males and females based on delayed age and increased weight at attainment of PPS. |
| 870.4100a | Chronic toxicity (dog) | 00153374 (1985) Acceptable/guideline 0, 20, 100, or 500 mg/kg/day [M/F] via gelatin capsule | NOAEL = 500 mg/kg/day [M/F]. LOAEL = not established. |
| 870.4200 | Combined Chronic Toxicity/Carcinogenicity (Rat) | 00093879 (1981) Minimum 0, 3, 10, or 34 mg/kg/day in the diet | NOAEL = 34 mg/kg/day. LOAEL = not established.  High dose not adequate to assess carcinogenicity.  Another study requested (see below). |
| 870.4200 | Combined Chronic Toxicity/Carcinogenicity (Rat) | 41643801, 41728701 (1990) 0, 2000, 8000, or 20000 ppm 0, 362/447, or 940/1183 mg/kg/day [M/F] in the diet. | NOAEL = 362/447 mg/kg/day [M/F]. LOAEL = 940/1183 mg/kg/day[M/F] based on decreased body-weight gain in females, decreased urinary pH in males, increased incidence of cataracts and lens abnormalities in males, and increased absolute and relative (to brain) liver weight in males. |
| 870.4200 | Combined Chronic Toxicity/Carcinogenicity (Rat) | 49631701 (1993) Acceptable/guideline 0, 10, 100, 300, or 1000 mg/kg/day [M/F] in the diet. | NOAEL=100 mg/kg bw/day [M/F]. LOAEL = 300 mg/kg bw/day [M/F] based on pronounced cellular alterations of the parotid and mandibular salivary glands. |
| 870.4200 | Combined Chronic Toxicity/Carcinogenicity (Rat) | 49704601 (2001) Acceptable/guideline 0, 2000, 6000, or 20,000 ppm 0,121/145, 361/437, and 1214/1498 mg/kg/day [M/F] in the diet. | NOAEL = 361/437 mg/kg bw/day [M/F]. LOAEL = 1214/1498 mg/kg bw/day [M/F] based on kidney papillary necrosis. |

**Table B.3.  Subchronic, Chronic, and Other Toxicity Profile.**

| Guideline No. | Study Type | MRID No. (year)/ Classification /Doses | Results |
|---|---|---|---|
| 870.4200 | Combined Chronic Toxicity/Carcinogenicity (Rat) | 40214007, 41209905, 41209907 (1987) Acceptable/guideline 0, 100, 500, and 1000 ppm 0, 4.2/5.4, 21.2/27 or 41.8/55.7 mg/kg/day [M/F] in the diet. | NOAEL = 100 ppm (4.2/5.4 mg/kg/day [M/F]) LOAEL = 500 ppm (21.2/27.0 mg/kg/day [M/F]) based upon decreased LDH levels at 6 and 12 months. |
| 870.4200 | Combined Chronic Toxicity/Carcinogenicity (Rat) | 49987401 (1994) Acceptable/guideline 0, 6.3/8.6, 59.4/88.5, and 595.2/886 mg/kg/day [M/F] in the diet. | NOAEL ≥ 10,000 ppm (740.6 mg/kg/day) A LOAEL was not established. |
| 870.4200 | Combined Chronic Toxicity/Carcinogenicity (Rat) | 50017103, 50017104, 50017105 (1997) Acceptable/guideline 0, 3000, 10000, or 30000 ppm 0, 104/115, 354/393 and 1127/1247 mg/kg bw/day [M/F] in the diet. | NOAEL = 3000 ppm (104/115 mg/kg/day) LOAEL = 10000 ppm (354/393 mg/kg/day) based upon retarded growth in males throughout the study. |
| 870.4200 | Combined Chronic Toxicity/Carcinogenicity (Rat) | 49957404 (2009) Acceptable/guideline 0, 1500, 5000, and 15,000 ppm 0, 86/105, 285/349 or 1077/1382 mg/kg/day [M/F] in the diet. | NOAEL is ≥ 1077/1382 mg/kg/day. A LOAEL was not established.  Transient liver enzyme activity for mid-dose males and high-dose males and females were observed, in addition to increased adipose infiltration of the bone marrow in high-dose males. Both effects were not considered adverse. |
| 870.4300 | Carcinogenicity (Mouse) | 00130406 (1983) Acceptable/guideline 0, 1000, 5000, or 30,000 ppm 0, 161/195, 835/968, 4945/6069 mg/kg bw/day [M/F] in the diet. | NOAEL = 835/968 mg/kg bw/day [M/F]. LOAEL = 4945/6069 mg/kg bw/day [M/F] based on increased centrilobular hepatocellular necrosis in high-dose males and proximal tubular epithelial basophilia in high-dose females. |
| 870.4300 | Carcinogenicity (Mouse) | 41643801, 41728701 (1990) Acceptable/guideline 0, 1000, 5000, or 30000 ppm 0, 150, 750, or 4500 mg/kg/day [M/F] in the diet. | NOAEL = 750 mg/kg/day [M/F]. LOAEL = 4500 mg/kg/day [M/F] based on significant decreased body-weight gain in both sexes, hepatocyte necrosis and interstitial nephritis in males, and increased incidence of proximal tubule epithelial basophilia and hypertrophy in the kidney of females. |
| 870.4300 | Carcinogenicity (Mouse) | 49631702 (1993) Acceptable/guideline 0, 98/102, 297/298, 988/1000 mg/kg bw/day [M/F] in the diet. | NOAEL = 1000 mg/kg bw/day. A LOAEL was not identified. |
| 870.4300 | Carcinogenicity (Mouse) | 49957402 (2009) Acceptable/guideline 0, 500, 1500, or 5000 ppm 0, 71.4/97.9, 234.2/299.5, or 810/1081.2 mg/kg bw/day [M/F] in the diet. | NOAEL ≥ 5000 ppm (234.2/299.5 mg/kg/day) A LOAEL was not established. |

**Table B.3.  Subchronic, Chronic, and Other Toxicity Profile.**

| Guideline No. | Study Type | MRID No. (year)/ Classification /Doses | Results |
|---|---|---|---|
| 870.4300 | Carcinogenicity (Mouse) | 50017108, 50017109 (1997) Acceptable/guideline 0, 1600, 8000, or 40000 ppm 0, 165/153.2, 838.1/786.8, or 4348/4116 mg/kg bw/day [M/F] in the diet. | NOAEL = 8000/1600 ppm (838.1/153.2 mg/kg/day [M/F])<br><br>LOAEL = 40000 ppm (4116 mg/kg/day [M] based on a significant increase in overall incidence of anal prolapse which corresponded to erosion/ulcer of the anus histopathologically.<br><br>LOAEL = 8000 (838.1 mg/kg/day [F]) based upon retarded growth with statistically significant decreases in weight at week 6 and weeks 9-24. |
| 870.4300 | Carcinogenicity (Mouse) | 40214006, 41209907 (1987) Acceptable/guideline 0, 11.7/16, 118/159, and 991/1341 mg/kg bw/day [M/F] in the diet. | NOAEL = 1000 ppm (11.7/16 mg/kg/day [M/F])<br><br>LOAEL = 8000 ppm (118/159 mg/kg/day [M/F] based upon an increased incidence of white matter degeneration in the lumbar region of the spinal cord in males, and an increased incidence of epithelial hyperplasia of the duodenum in females. |
| 870.6200a | Acute neurotoxicity screening battery | 44320610 (1996) Acceptable/guideline 0, 500, 1000, 2000 mg/kg [M/F] | Neurotoxicity NOAEL = 2000 mg/kg/day [M/F]. Neurotoxicity LOAEL was not observed. Systemic NOAEL = 2000 mg/kg/day [M/F]. Systemic LOAEL was not observed. |
| 870.6200b | Subchronic neurotoxicity screening battery | 44320612 (1996) Acceptable/guideline 0, 2000, 8000, 20000 ppm (0, 155.5/ 166.3, 617.1/672.1, 1546.5/1630.6 mg/kg/day [M/F]) | Neurotoxicity NOAEL = 1546.5/1630.6 mg/kg/day [M/F]. Neurotoxicity LOAEL was not observed. Systemic NOAEL = 1546.5/1630.6 mg/kg/day [M/F]. Systemic LOAEL was not observed. |
| 870.7800 | Immunotoxicity (Mouse) | 48934207 (2012) Acceptable/guideline 0, 500, 1500, 5000 ppm (0, 150, 499, 1448 mg/kg/day [F] | Immunotoxicity NOAEL = 1448 mg/kg/day. Immunotoxicity LOAEL was not observed. Systemic NOAEL = 1448 mg/kg/day. Systemic LOAEL was not observed. |

1-   The entire battery of additional metabolism, genotoxicity and mutagenicity studies considered by EPA can be found in the *Glyphosate Issue Paper: Evaluation of Carcinogenic Potential, EPA's Office of Pesticide Programs, 2016*.

**Table B.4  Acute, Subchronic, and Other Toxicity Profile for *N*-Acetyl-Glyphosate**

| Guideline No. | Study Type | MRID No. (year)/ Classification /Doses | Results |
|---|---|---|---|
| 870.1100 (*N*-Acetyl-Glyphosate) | Acute Oral Toxicity (Rat) | 47007901 (2004) Acceptable/guideline 5000 mg/kg [M/F] | LD$_{50}$ = greater than 5000 mg/kg in male and female rats. |
| 870.3100 (*N*-Acetyl-Glyphosate) | 90-Day oral toxicity (Rat) | 47119201 (2007) Acceptable/guideline 0, 180, 900, 4500, and 18,000 ppm M: 0, 11.3, 55.7, 283, and 1157 mg/kg/day F: 0, 13.9, 67.8, 360, and 1461 mg/kg/day | NOAEL = 1157/1461 mg/kg/day (m/f), highest dose tested. LOAEL = was not established. |
| 870.5100 | Bacterial Gene Mutation | 47007905 (2004) Acceptable/guideline 0, 100, 333, 1000, and 5000 µg/ per plate | Non-mutagenic when tested up to 5000 ug/plate, in presence and absence of activation in S. *typhimurium* strains TA100, TA1535 and TA1537 and in Escheria coli strain WP2urvA. |

Glyphosate                      Human Health Risk Assessment                      D417700

**Table B.4  Acute, Subchronic, and Other Toxicity Profile for *N*-Acetyl-Glyphosate**

| Guideline No. | Study Type | MRID No. (year)/ Classification /Doses | Results |
|---|---|---|---|
| 870.5300 | In Vitro Mammalian Gene Mutation Test (CHO/HGPRT) | 47007902 (2006) Acceptable/guideline 0, 250, 500, 1000, 1500, and 2091 μg/ml | Non-mutagenic at the HGPRT locus in Chinese hamster ovary cells tested up to 2091 μl/ml, in presence and absence of metabolic activation. |
| 870.5300 | *In vitro* Chromosomal Aberration Assay in Chinese Hamster Ovary (CHO) cells | 47007903 (2004) Acceptable/guideline 0, 19.0, 27.1, 38.8, 55.4, 79.1, 113, 161, 231, 329, 471, 672, 960, 1370, 1960, and 2800 μg/ml ± S9 0, 960, 1370, 1960, and 2800 μg/ml – S9 | No evidence of chromosomal aberration in Chinese Hamster Ovary cells when tested at doses up to 2800 μg/mL with or without metabolic activations. |
| 870.5395 | Mouse Bone Marrow Micronucleus Test | 47007904 (2006) Acceptable/guideline 0, 500, 1000, 2000 mg/kg [M/F] 30 mg/kg Cyclophosphamide | No chromosomal aberrations were detected in male and female mice at doses up to 2000 mg/kg. |
| 870.7485 | Metabolism and pharmacokinetics (Rat) | 47007906 (2004) Acceptable/guideline 15 mg free acid equivalent/kg | Absorption was estimated to be approximately 66% of the administered dose as estimated based on urinary excretion.  The mean maximum concentrations in blood and plasma were 2.93 and 5.31 μg equiv./g at 1 and 2 hours post-dose, respectively.  The half-life was 20.1 h in blood and 15.6 h in plasma.  After 168 h post-dose, only 0.2% of the dose remained in the carcass, and 2.8% of the dose was isolated in the cage wash and wipe.  A total of 97.25% of the dose was identified, and 97.18% of the dose was identified as parent.  The remaining 0.07% of the identified dose was glyphosate, isolated in the feces.  In the plasma, 100% of the sample radioactivity was identified as the parent.  Similarly, 99.3-100% of the radiolabeled compounds from each sample was identified as parent in the urine and feces |

**Attachment C:  HED-Recommended Tolerances and International Residue Limits**

HED evaluated the glyphosate residue chemistry database to determine if the established tolerances conform to the current practices and to determine if the crop group/subgroup tolerances could be updated to the current crop group/subgroup definitions.  Based on this analysis, HED is recommending for establishment of the tolerances listed in Table C.1.  With the establishment of these tolerances, the following tolerances should be deleted:  acerola; aloe vera; ambarella; asparagus; atemoya; avocado; bamboo, shoots; banana; biriba; breadfruit; cactus, fruit; cactus, pads; canistel; cherimoya; custard apple; date, dried fruit; durian; feijoa; fig; fruit, stone, group 12; guava; ilama; imbe; imbu; jaboticaba; jackfruit; longan; lychee; mamey apple; mango; mangosteen; marmaladebox; noni; nut, tree, group 14; olive; palm heart; papaya; papaya, mountain; passionfruit; pawpaw; persimmon; pineapple; pistachio; pomegranate; pulasan; rambutan; rose apple; sapodilla; sapote, black; sapote, mamey; sapote, white; soursop; Spanish lime; star apple; starfruit; sugar apple; Surinam cherry; tamarind; vegetable, leafy, brassica, group 5; vegetable, leafy, except brassica, group 4; watercress, upland; and wax jambu.

Table C.2 is a summary of the U.S. tolerances and the Canadian and Codex MRLs.  For the majority of the crops, the U.S. and Codex residue definitions are identical.  However, the Canadian residue definition differs in that it includes AMPA and N-acetyl-AMPA.  Since the U.S. and Canadian residue definitions differ, harmonization of the tolerance value is irrelevant.

HED has evaluated the Codex MRLs and the U.S. tolerance to determine if harmonization is appropriate.  HED determined that harmonization of the forage, fodder, and hay tolerances are unnecessary as these commodities are not important in terms of international trade.  For the remaining commodities where there are both U.S. and Codex tolerances, HED determined that harmonization was either inappropriate as the Codex MRL is too high and would not be an adequate measure of misuse (sugar beet and popcorn) or the available residue data resulted in residues higher than the current Codex MRL (banana, sweet corn, sunflower seed, dry pea, dry bean, hog meat byproducts, poultry meat, and poultry meat byproducts).

| Table C.1.  HED Recommended Changes to the Tolerance Level or Commodity Definition. | | | | |
|---|---|---|---|---|
| Current | | HED-Recommended | | |
| Commodity | Tolerance (ppm) | Commodity | Tolerance (ppm) | Comment |
| Soybean, forage | 100.0 | Soybean, forage | 100 | update to the current practice concerning significant figures |
| Soybean, hay | 200.0 | Soybean, hay | 200 | |
| Soybean, hulls | 120.0 | Soybean, hulls | 120 | |
| Soybean, seed | 20.0 | Soybean, seed | 20 | |
| Fruit, stone, group 12 | 0.2 | Fruit, stone, group 12-12 | 0.2 | update to the current crop group definitions; coconut was excluded from the tree nut crop group tolerances as the residues were not within 5x (coconut tolerance at 0.1 ppm) |
| Nut, tree, group 14 | 1.0 | Nut, tree, group 14-12 (except coconut) | 1.0 | |
| Vegetable, leafy, except brassica, group 4 | 0.2 | Vegetable, leafy, group 4-16 | 0.2 | |
| Vegetable, leafy, brassica, group 5 | 0.2 | Vegetable, *Brassica*, head and stem, group 5-16 | 0.2 | |
| several | 0.2-0.5-- | Vegetable, stalk and stem, subgroup 22A | 0.5 | |
| | 0.2 | Vegetable, leaf petiole, subgroup 22B | 0.2 | |
| | 0.2 | Fruit, tropical and subtropical, edible peel, group 23 | 0.2 | |
| | 0.2 | Fruit, tropical and subtropical, small fruit, inedible peel, group 24A | 0.2 | |
| | 0.2 | Fruit, tropical and subtropical, medium to large fruit, | 0.2 | |

Glyphosate                            Human Health Risk Assessment                            D417700

**Table C.1.  HED Recommended Changes to the Tolerance Level or Commodity Definition.**

| Current | | HED-Recommended | | |
|---|---|---|---|---|
| Commodity | Tolerance (ppm) | Commodity | Tolerance (ppm) | Comment |
| | | smooth, inedible peel, group 24B | | |
| | 0.2 | Fruit, tropical and subtropical, large fruit, rough or hairy, inedible peel, group 24C | 0.2 | |
| | 0.2 | Fruit, tropical and subtropical, vine, inedible peel, group 24E | 0.2 | |

**Table C.2.  Summary of US and International Tolerances and Maximum Residue Limits.**

| Residue Definition[1] | | | | |
|---|---|---|---|---|
| US | | Canada | Mexico[2] | Codex[3] |
| 40 CFR §180.364 (a) All except livestock, canola, field corn, AGF, and soybean: glyphosate. livestock, canola, field corn, AGF, and soybean:  glyphosate and N-acetyl-glyphosate (expressed as glyphosate) | | All except livestock, canola, and field corn:  glyphosate and AMPA. Livestock, dry soybeans, canola, and field corn:  glyphosate, AMPA, N-acetyl-AMPA (not include in the livestock MRLs)**, and N**-acetyl-glyphosate. | -- | All except soya bean and maize: glyphosate. Soya bean and Maize:  glyphosate and N-acetyl-glyphosate (expressed as glyphosate). |

| Tolerance/MRL (ppm) | | | | |
|---|---|---|---|---|
| Commodity | US | Canada | Mexico[2] | Codex[3] |
| Alfalfa, seed | 0.5 | -- | -- | -- |
| Almond, hulls | 25 | -- | -- | -- |
| Animal feed, nongrass, group 18 | 400 | -- | -- | -- |
| Artichoke, globe | 0.2 | -- | -- | -- |
| Barley, bran | 30 | 10 barley | -- | 20 wheat bran, unprocessed |
| Beet, sugar, dried pulp | 25 | -- | -- | -- |
| Beet, sugar, roots | 10 | 10 | -- | 15 sugar beet |
| Beet, sugar, tops | 10 | -- | -- | -- |
| Berry and small fruit, group 13-07 | 0.2 | -- | -- | -- |
| Betelnut | 1.0 | -- | -- | -- |
| Blimbe | 0.2 | -- | -- | -- |
| Cacao bean, bean | 0.2 | -- | -- | -- |
| Carrot | 5.0 | -- | -- | -- |
| Chaya | 1.0 | -- | -- | -- |
| Citrus, dried pulp | 1.5 | -- | -- | -- |
| Coconut | 0.1 | -- | -- | -- |
| Coffee, bean, green | 1.0 | -- | -- | -- |
| Corn, pop, grain | 0.1 | 3 | -- | 5 maize |
| Corn, sweet, kernel plus cob with husk removed | 3.5 | 3 | -- | 3 |
| Cotton, gin byproducts | 210 | -- | -- | -- |
| Dokudami | 2.0 | -- | -- | -- |
| Epazote | 1.3 | -- | -- | -- |
| Fish | 0.25 | -- | -- | -- |
| Fruit, citrus, group 10-10 | 0.5 | -- | -- | -- |
| Fruit, pome, group 11-10 | 0.2 | -- | -- | -- |
| Fruit, tropical and subtropical, edible peel, group 23 | 0.2 | -- | -- | -- |
| Fruit, tropical and subtropical, small fruit, inedible peel, group 24A | 0.2 | -- | -- | -- |
| Fruit, tropical and subtropical, medium to large fruit, smooth, inedible peel, group 24B | 0.2 | banana - 0.05 | -- | -- |
| Fruit, tropical and subtropical, large fruit, rough or hairy, inedible peel, group 24C | 0.2 | -- | -- | -- |
| Fruit, tropical and subtropical, vine, inedible peel, group 2EA | 0.2 | -- | -- | -- |
| Fruit, stone, group 12-12 | 0.2 | -- | -- | -- |
| Galangal, roots | 0.2 | -- | -- | -- |

Glyphosate                               Human Health Risk Assessment                               D417700

**Table C.2.  Summary of US and International Tolerances and Maximum Residue Limits.**

**Residue Definition[1]**

| US | Canada | Mexico[2] | Codex[3] |
|---|---|---|---|
| 40 CFR §180.364 (a) All except livestock, canola, field corn, AGF, and soybean: glyphosate. livestock, canola, field corn, AGF, and soybean:  glyphosate and N-acetyl-glyphosate (expressed as glyphosate) | All except livestock, dry soybeans, canola, and field corn:  glyphosate and AMPA. Livestock, dry soybeans, canola, and field corn:  glyphosate, AMPA, N-acetyl-AMPA (not include in the livestock MRLs)**, and N**-acetyl-glyphosate. | -- | All except soya bean and maize: glyphosate. Soya bean and Maize:  glyphosate and N-acetyl-glyphosate (expressed as glyphosate). |

**Tolerance/MRL (ppm)**

| Commodity | US | Canada | Mexico[2] | Codex[3] |
|---|---|---|---|---|
| Ginger, white, flower | 0.2 | -- | -- | -- |
| Gourd, buffalo, seed | 0.1 | -- | -- | -- |
| Governor's plum | 0.2 | -- | -- | -- |
| Gow kee, leaves | 0.2 | -- | -- | -- |
| Grain, cereal, forage, fodder and straw, group 16, except field corn, forage and field corn, stover | 100 | -- | -- | 400 barley straw and fodder, dry; 100 oat straw and fodder, dry; 50 sorghum straw and fodder, dry; 300 wheat straw and fodder, dry |
| Grain, cereal, group 15 except field corn, popcorn, rice, sweet corn, and wild rice | 30 | 10 barley; 5 wheat; 15 oats; 15 barley, wheat (milling fractions, excluding flour); 35 oats milling fractions, excluding flour | -- | 30 cereal grains (except maize and rice) |
| Grass, forage, fodder and hay, group 17 | 300 | -- | -- | 500 hay or fodder (dry) of grasses |
| Herbs subgroup 19A | 0.2 | -- | -- | -- |
| Hop, dried cones | 7 | -- | -- | -- |
| Kava, roots | 0.2 | -- | -- | -- |
| Kenaf, forage | 200 | -- | -- | -- |
| Leucaena, forage | 200 | -- | -- | -- |
| Mioga, flower | 0.2 | -- | -- | -- |
| Nut, pine | 1.0 | -- | -- | -- |
| Nut, tree, group 14-12 (except coconut) | 1.0 | -- | -- | -- |
| Oilseeds, group 20, except canola | 40 | 10 seeds (borage, cuphea, echium, gold of pleasure, hare's ear mustard, milkweed, mustard seed (condiment and oilseed type), oil radish, poppy seed, sesame, sweet rocket); 3 flax seed; 40 undelinted cotton seed | -- | 40 cotton seeds 7 sunflower seed |
| Okra | 0.5 | -- | -- | -- |
| Oregano, Mexican, leaves | 2.0 | -- | -- | -- |
| Palm heart, leaves | 0.2 | -- | -- | -- |
| Palm, oil | 0.1 | -- | -- | -- |
| Pea, dry | 8.0 | 5 peas | -- | 5 peas (dry) |
| Peanut | 0.1 | -- | -- | -- |
| Peanut, hay | 0.5 | -- | -- | -- |
| Pepper leaf, fresh leaves | 0.2 | -- | -- | -- |
| Peppermint, tops | 200 | -- | -- | -- |
| Perilla, tops | 1.8 | -- | -- | -- |
| Pistachio | 1.0 | -- | -- | -- |
| Quinoa, grain | 5.0 | -- | -- | -- |
| Rice, grain | 0.1 | -- | -- | -- |
| Rice, wild, grain | 0.1 | -- | -- | -- |
| Shellfish | 3.0 | | -- | -- |
| Spearmint, tops | 200 | | -- | -- |
| Spice subgroup 19B | 7.0 | -- | -- | -- |
| Stevia, dried leaves | 1.0 | -- | -- | -- |
| Sugarcane, cane | 2.0 | -- | -- | 2 |
| Sugarcane, molasses | 30 | -- | -- | 10 |
| Sweet potato | 3.0 | -- | -- | -- |
| Tea, dried | 1.0 | -- | -- | -- |

Glyphosate                                    Human Health Risk Assessment                                    D417700

**Table C.2.  Summary of US and International Tolerances and Maximum Residue Limits.**

**Residue Definition[1]**

| US | Canada | Mexico[2] | Codex[3] |
|---|---|---|---|
| 40 CFR §180.364 (a) All except livestock, canola, field corn, AGF, and soybean: glyphosate. livestock, canola, field corn, AGF, and soybean:  glyphosate and N-acetyl-glyphosate (expressed as glyphosate) | All except livestock, dry soybeans, canola, and field corn:  glyphosate and AMPA. Livestock, dry soybeans, canola, and field corn:  glyphosate, AMPA, N-acetyl-AMPA (not include in the livestock MRLs)**, and N**-acetyl-glyphosate. | -- | All except soya bean and maize: glyphosate. Soya bean and Maize:  glyphosate and N-acetyl-glyphosate (expressed as glyphosate). |

**Tolerance/MRL (ppm)**

| Commodity | US | Canada | Mexico[2] | Codex[3] |
|---|---|---|---|---|
| Tea, instant | 7.0 | -- | -- | -- |
| Teff, forage | 100 | -- | -- | -- |
| Teff, grain | 5.0 | -- | -- | -- |
| Teff, hay | 100 | -- | -- | -- |
| Ti, leaves | 0.2 | -- | -- | -- |
| Ti, roots | 0.2 | -- | -- | -- |
| Ugli fruit | 0.5 | -- | -- | -- |
| Vegetable, bulb, group 3-07 | 0.2 | -- | -- | -- |
| Vegetable, *Brassica*, head and stem, group 5-16 | 0.2 | -- | -- | -- |
| Vegetable, cucurbit, group 9 | 0.5 | -- | -- | -- |
| Vegetable, foliage of legume, subgroup 7A, except soybean | 0.2 | -- | -- | 200 bean fodder 500 pea hay or pea fodder (dry) |
| Vegetable, fruiting, group 8-10 (except okra) | 0.1 | -- | -- | -- |
| Vegetable, leaf petiole, subgroup 22B | 0.2 | -- | -- | -- |
| Vegetable, leafy, group 4-16 | 0.2 | -- | -- | -- |
| Vegetable, leaves of root and tuber, group 2, except sugar beet tops | 0.2 | -- | -- | -- |
| Vegetable, legume, group 6 except soybean and dry pea | 5.0 | 4 beans, dry lentils | -- | 2 beans (dry) 5 lentil (dry) |
| Vegetables, root and tuber, group 1, except carrot, sweet potato, and sugar beet | 0.2 | -- | -- | -- |
| Vegetable, stalk and stem, subgroup 22A | 0.5 | asparagus - 0.5 | -- | -- |
| Wasabi, roots | 0.2 | -- | -- | -- |
| Water spinach, tops | 0.2 | -- | -- | -- |
| Yacon, tuber | 0.2 | -- | -- | -- |
| Canola, seed | 20 | 20 | -- | 30 |
| Cattle, meat byproducts | 5.0 | 2 kidney of cattle; 0.2 liver of cattle | -- | 5 edible offal mammalian |
| Corn, field, forage | 13 | -- | -- | -- |
| Corn, field, grain | 5.0 | 3 | -- | 5 maize |
| Corn, field, stover | 100 | -- | -- | 150 maize fodder (dry) |
| Egg | 0.05 | 0.08 | -- | 0.05* |
| Goat, meat byproducts | 5.0 | 2 kidney of goats; 0.2 liver of goats | -- | 5 edible offal mammalian |
| Grain aspirated fractions | 310 | -- | -- | -- |
| Hog, meat byproducts | 5.0 | 2 kidney of hogs; 0.2 liver of hogs | -- | 5 pig, edible offal of |
| Horse, meat byproducts | 5.0 | 2 kidney of horses; 0.2 liver of horses | -- | 5 edible offal mammalian |
| Poultry, meat | 0.10 | 0.08 | -- | 0.05* |
| Poultry, meat byproducts | 1.0 | 2 kidney of poultry; 0.2 liver of poultry | -- | 0.5 poultry, edible offal of |
| Sheep, meat byproducts | 5.0 | 2 kidney of sheep; 0.2 liver of sheep | -- | 5 edible offal mammalian |
| Soybean, forage | 100 | -- | -- | -- |
| Soybean, hay | 200 | -- | -- | -- |
| Soybean, hulls | 120 | -- | -- | -- |
| Soybean, seed | 20 | 20 dry soybeans | -- | 20 soya bean (dry) |
| ***MRLs with No US Equivalent*** | | | | |
| Alfalfa fodder | -- | -- | -- | 500 |
| Meat (from mammals other than marine mammals) | -- | 0.08 meat of (cattle, goats, hogs, horses, and sheep) | -- | 0.05* |
| Milk | -- | 0.08 | -- | 0.05* |

Glyphosate                         Human Health Risk Assessment                         D417700

**Table C.2.  Summary of US and International Tolerances and Maximum Residue Limits.**

| Residue Definition[1] | | | | |
|---|---|---|---|---|
| US | Canada | Mexico[2] | Codex[3] | |
| 40 CFR §180.364 (a) All except livestock, canola, field corn, AGF, and soybean: glyphosate. livestock, canola, field corn, AGF, and soybean: glyphosate and N-acetyl-glyphosate (expressed as glyphosate) | All except livestock, dry soybeans, canola, and field corn: glyphosate and AMPA. Livestock, dry soybeans, canola, and field corn: glyphosate, AMPA, N-acetyl-AMPA (not include in the livestock MRLs), **and N-**acetyl-glyphosate. | -- | All except soya bean and maize: glyphosate. Soya bean and Maize: glyphosate and N-acetyl-glyphosate (expressed as glyphosate). | |

| Tolerance/MRL (ppm) | | | | |
|---|---|---|---|---|
| Commodity | US | Canada | Mexico[2] | Codex[3] |
| Fat of (cattle, goats, hogs, horses, poultry and sheep) | -- | 0.15 | -- | -- |

Completed: M. Negussie; 08/31/15

[1] glyphosate = $N$-(phosphonomethyl)glycine; N-acetyl-glyphosate = N-acetyl-N-(phosphonomethyl)glycine; AMPA = aminomethylphosphonic acid.

[2] Mexico adopts US tolerances and/or Codex MRLs for its export purposes.

[3] * = absent at the limit of quantitation (LOQ); Po = postharvest treatment, such as treatment of stored grains.  PoP = processed postharvest treated commodity, such as processing of treated stored wheat. (fat) = to be measured on the fat portion of the sample. MRLs indicated as proposed have not been finalized by the CCPR and the CAC.

## Attachment D:  Physicochemical Properties

The physicochemical properties of technical grade glyphosate are presented in Table D.1. Glyphosate is water soluble with a low Log Kow.

**Table D.1.  Physicochemical Properties of the Technical Grade Glyphosate.**

| Melting point | 189.5 ± 0.5 °C | The Pesticide Manual, 13th Edition |
|---|---|---|
| pH | 1.9 at 20 °C | |
| Density | 1.705 g/cm³ at 20 °C | |
| Water solubility | 10.5 g/L at 20 °C | |
| Solvent solubility | acetone            0.078 g/L<br>methanol          0.231 g/L<br>hexane             0.026 g/L<br>ethyl acetate     0.012 g/L<br>dichloromethane  0.233 g/L<br>n-octanol          0.020 g/L<br>propan-2-ol      0.020 g/L<br>toluene            0.036 g/L | European Commission:  Glyphosate 6511/VI/99-final, 21-Jan-2002 |
| Vapor pressure | $1.31 \times 10^{-2}$ mPa at 25 °C | The Pesticide Manual, 13th Edition |
| Dissociation constant, $pK_a$ | 0.8 (1st phosphonic), 2.3 (carboxylate), 6.0 (2nd phosphonic), and 11.0 (amine) | Knuuttila.  1979 Acta Chem. Scand. B 33:623-626 |
| Octanol/water partition coefficient, Log($K_{OW}$) | -3.2 (pH 2-5, 25 °C) | European Commission:  Glyphosate 6511/VI/99-final, 21-Jan-2002 |
| UV/visible absorption spectrum | ε = 0.086 (295 nm) | |

## Attachment E:  References

| Tracking Code | Author | Date | Title |
|---|---|---|---|
| **Risk Assessment and Scoping Documents** | | | |
| D345923 | P. Shah *et al.* | 18-Mar-2008 | Glyphosate-Isopropylammonium and Pyrithiobac Sodium.  Human-Health Risk Assessment for Application to Glyphosate-Tolerant Soybean. |
| D362745 | J. Van Alstine *et al.* | 3-Jun-2009 | Glyphosate. Human-Health Assessment Scoping Document in Support of Registration Review. |
| D369999 | J. Van Alstine *et al.* | 28-Dec-2009 | Glyphosate. Public Comments Regarding the Health Effects Division's (HED's) Human-Health Assessment Scoping Document in Support of Registration Review of 3-JUN-2009. HED's Response to Public Comments. |
| D398547 | T. Bloem *et al.* | 14-Nov-2012 | Glyphosate. Section 3 Registration Concerning the Application of Glyphosate to Carrots, Sweet Potato, Teff, and Oilseeds (Crop Group (CG) 20) and to Update the CG Definitions for Bulb Vegetable (CG 3-07), Fruiting Vegetable (CG 8-10), Citrus Fruit (CG 10-10), Pome Fruit (CG 11-10), and Berry (CG 13-07). Human-Health Risk Assessment. |
| **Toxicology** | | | |
| TXR No. 0056885 | M. Perron | 12-DEC-2017 | Glyphosate: Literature Review |
| TXR No. 0057299 | J. Rowland | 10-01-2015 | Evaluation of the Carcinogenic Potential of Glyphosate |
| -- | OPP | 12-Sep-2016 | Glyphosate Issue Paper: Evaluation of Carcinogenic Potential |
| **Incident Report** | | | |
| D417808 | S. Recore et al. | 6-Feb-2014 | Glyphosate: Tier II Incident Report |
| **Dietary Exposure** | | | |
| D440486 | J. Hetrick | 15-Jun-2017 | Drinking Water Assessment for the Registration Review of Glyphosate. |
| D429229 | T. Bloem | 30-Nov-2017 | Dietary Exposure Analysis in Support of Registration Review. |
| ACB Project B14-46 | L. Podhorniak | 18-Sep-2015 | Analysis of Human Milk for Incurred Residues of Glyphosate and its Metabolites. |
| **Residential Exposure** | | | |
| D398862 | L. Venkateshwara | 30-Oct-2012 | Glyphosate. Occupational and Residential Exposure Assessment for a Proposed Use on Carrots, Sweet Potato, Teff and Oilseeds (Harvest Aid). |
| **Residue Chemistry** | | | |
| D200041 | G. Kramer | 12-May-1994 | Label Amendment for Roundup (Glyphosate) |
| D217539 | G. Kramer | 14-Mar-1996 | Glyphosate in or on Corn Forage. Evaluation of Residue Data and Analytical Methods. |
| D242628 | T. Bloem | 30-Nov-1998 | Glyphosate residues in/on glyphosate tolerant canola seed and canola meal. Amendment of 24-August-1998. |
| D346713 | T. Bloem | 12-Mar-2008 | Glyphosate-Isopropylammonium and Pyrithiobac Sodium. Application to Glyphosate-Tolerant Soybeans. Summary of Analytical Chemistry and Residue Data. |
| D357880 | T. Bloem | 29-Oct-2008 | Glyphosate and Pyrithiobac Sodium. Amended Section 3 Registration to Permit the Rotation to Glyphosate-Tolerant Field Corn and Glyphosate-Tolerant Soybean Following Application to Glyphosate-Tolerant Cotton and Revision of the Field Corn Tolerance Expression. Summary of Analytical Chemistry and Residue Data. |
| D361315 | T. Bloem | 14-Jan-2010 | Glyphosate and Pyrithiobac Sodium in/on Glyphosate-Tolerant Soybean. Review of Amendment Dated 9-December-2008 Submitted in Response to Residue Chemistry Deficiencies Identified in D346713 (T. Bloem, 12-Mar-2008). |
| D394964 | T. Bloem | 15-Nov-2011 | Glyphosate. Section 3 Registration for Application of the Isopropylamine Salt of Glyphosate to DuPont™ Optimum® GLY Canola. Summary of Analytical Chemistry and Residue Data. |
| **Literature Studies** | | | |
| -- | A. Anadon | 2009 | Toxicokinetics of glyphosate and its metabolite aminomethyl phosphonic acid in rats |
| -- | D. Brewster | 1991 | Metabolism of Glyphosate in Sprague-Dawley Rats: Tissue Distribution, Identification, and Quantitation of Glyphosate-Derived Materials following a Single Oral Dose |

**Attachment F:  Dietary Exposure Estimates Associated with Subsistence Fishing.**

Glyphosate is registered for direct application to water with fish (0.25 ppm) and shellfish (3.0 ppm) tolerances established (180.364(a)(1)).  Although these tolerances were incorporated into the dietary exposure analysis, the employed consumption database does not consider consumption levels associated with subsistence fishing.  Making the conservative assumptions that an adult (69-kg body weight) or child (10-kg body weight) will consume on a chronic basis 200 grams/day or 25 grams/day, respectively, of fish and shellfish and assuming tolerance-level residues, the resulting exposure estimates are <1% of the cPAD.  Therefore, exposure to glyphosate for individuals who consume fish/shellfish on a regular basis is not significantly different from that of the general population.  The fish/shellfish consumption rates were attained from the State of Washington Department of Ecology Fish Consumption Rates Technical Support Document (Tables 1 and A.1).

# EXHIBIT 7



# Toxicological Profile for Glyphosate

**August 2020**



U.S. Department of Health and Human Services
Agency for Toxic Substances and Disease Registry

## DISCLAIMER

Use of trade names is for identification only and does not imply endorsement by the Agency for Toxic Substances and Disease Registry, the Public Health Service, or the U.S. Department of Health and Human Services.

# FOREWORD

This toxicological profile is prepared in accordance with guidelines developed by the Agency for Toxic Substances and Disease Registry (ATSDR) and the Environmental Protection Agency (EPA). The original guidelines were published in the Federal Register on April 17, 1987. Each profile will be revised and republished as necessary.

The ATSDR toxicological profile succinctly characterizes the toxicologic and adverse health effects information for these toxic substances described therein. Each peer-reviewed profile identifies and reviews the key literature that describes a substance's toxicologic properties. Other pertinent literature is also presented, but is described in less detail than the key studies. The profile is not intended to be an exhaustive document; however, more comprehensive sources of specialty information are referenced.

The focus of the profiles is on health and toxicologic information; therefore, each toxicological profile begins with a relevance to public health discussion which would allow a public health professional to make a real-time determination of whether the presence of a particular substance in the environment poses a potential threat to human health. The adequacy of information to determine a substance's health effects is described in a health effects summary. Data needs that are of significance to the protection of public health are identified by ATSDR and EPA.

Each profile includes the following:
   (A) The examination, summary, and interpretation of available toxicologic information and epidemiologic evaluations on a toxic substance to ascertain the levels of significant human exposure for the substance and the associated acute, intermediate, and chronic health effects;

   (B) A determination of whether adequate information on the health effects of each substance is available or in the process of development to determine the levels of exposure that present a significant risk to human health due to acute, intermediate, and chronic duration exposures; and

   (C) Where appropriate, identification of toxicologic testing needed to identify the types or levels of exposure that may present significant risk of adverse health effects in humans.

The principal audiences for the toxicological profiles are health professionals at the Federal, State, and local levels; interested private sector organizations and groups; and members of the public.

This profile reflects ATSDR's assessment of all relevant toxicologic testing and information that has been peer-reviewed. Staffs of the Centers for Disease Control and Prevention and other Federal scientists have also reviewed the profile. In addition, this profile has been peer-reviewed by a nongovernmental panel and was made available for public review. Final responsibility for the contents and views expressed in this toxicological profile resides with ATSDR.

Patrick N. Breysse, Ph.D., CIH
Director, National Center for Environmental Health and
Agency for Toxic Substances and Disease Registry
Centers for Disease Control and Prevention

<u>*Legislative Background</u>

The toxicological profiles are developed under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (CERCLA or Superfund).  CERCLA section 104(i)(1) directs the Administrator of ATSDR to "…effectuate and implement the health related authorities" of the statute.  This includes the preparation of toxicological profiles for hazardous substances most commonly found at facilities on the CERCLA National Priorities List (NPL) and that pose the most significant potential threat to human health, as determined by ATSDR and the EPA.  Section 104(i)(3) of CERCLA, as amended, directs the Administrator of ATSDR to prepare a toxicological profile for each substance on the list.  In addition, ATSDR has the authority to prepare toxicological profiles for substances not found at sites on the NPL, in an effort to "…establish and maintain inventory of literature, research, and studies on the health effects of toxic substances" under CERCLA Section 104(i)(1)(B), to respond to requests for consultation under section 104(i)(4), and as otherwise necessary to support the site-specific response actions conducted by ATSDR.

# VERSION HISTORY

| Date | Description |
| --- | --- |
| August 2020 | Final toxicological profile released |
| April 2019 | Draft for public comment toxicological profile released |

# CONTRIBUTORS & REVIEWERS

Hana R. Pohl, M.D., Ph.D. (Lead)
Melanie Buser, M.P.H.
Breanna Alman, M.P.H.
Selene Chou, Ph.D.
Mike Fay, Ph.D.
Carolyn Harper, Ph.D.
Susan Zells Ingber, A.B., M.S.P.P.
Jennifer Przybyla, Ph.D.
Jane Li, Ph.D.
Angela Ragin-Wilson, Ph.D.
Henry Abadin, M.S.P.H.

ATSDR, Division of Toxicology and Human Health Sciences, Atlanta, GA

David W. Wohlers, Ph.D.
Mario Citra, Ph.D.
Christina Coley, B.S.
Lisa Ingerman, Ph.D., D.A.B.T.

SRC, Inc., North Syracuse, NY

Kaley Beins, M.P.H.
Lauren Brown, M.S., D.A.B.T.
Paulina Do, M.P.H.
Adriana Antezana, M.P.H.
Hannah Derrick, B.S.
Kerry Diskin, Ph.D.
Andrea Chiger, M.P.H.

Abt Associates, Rockville, MD

Chimeddulam Dalaijamts, PhD

Texas A&M University (under subcontract to Abt Associates)

# REVIEWERS

**Interagency Minimal Risk Level Workgroup:**
Includes ATSDR; National Center for Environmental Health (NCEH); National Institute for Occupational Health and Safety (NIOSH); U.S. Environmental Protection Agency (EPA); National Toxicology Program (NTP).

**Additional reviews for science and/or policy:**
ATSDR, Division of Community Health Investigations; ATSDR, Office of Science; NCEH, Division of Laboratory Science; NCEH, Division of Environmental Health Science and Practice. EPA.

# PEER REVIEWERS

1. Annaclaire De Roos Ph.D., M.P.H., Associate Professor, Environmental and Occupational Health, Dornsrife School of Public Health, Drexel University, Philadelphia, Pennsylvania

2. David A. Eastmond, Ph.D., Professor and Toxicologist, Department of Molecular Cell and Systems Biology, University of California, Riverside, Riverside, California

3. Renata Marino Romano, Ph.D., Professora Adjunta, Departamento de Farmácia, Universidade Estadual do Centro-Oeste – UNICENTRO, Guarapuava, Brazil

These experts collectively have knowledge of toxicology, chemistry, and/or health effects. All reviewers were selected in conformity with Section 104(I)(13) of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended.

Peer reviewers for subsequent revision to Section 2.19 (Cancer) and Appendix A (MRL Worksheets) in the Toxicological Profile for Glyphosate were:

1. James V. Bruckner, Ph.D., Professor of Pharmacology & Toxicology, Department of Pharmaceutical & Biomedical Sciences, College of Pharmacy, University of Georgia

2. David A. Eastmond, Ph.D., Professor and Toxicologist, Department of Molecular Cell and Systems Biology, University of California, Riverside, Riverside, California

3. Paul J. Mills, Ph.D., Professor of Family Medicine and Public Health, University of California, San Diego

4. Renata Marino Romano, Ph.D., Professora Adjunta, Departamento de Farmácia, Universidade Estadual do Centro-Oeste – UNICENTRO, Guarapuava, Brazil

ATSDR scientists review peer reviewers' comments and determine whether changes will be made to the profile based on comments. The peer reviewers' comments and responses to these comments are part of the administrative record for this compound.

The listing of peer reviewers should not be understood to imply their approval of the profile's final content. The responsibility for the content of this profile lies with ATSDR.

# CONTENTS

DISCLAIMER................................................................................................................................... II
FOREWORD.................................................................................................................................... III
VERSION HISTORY........................................................................................................................ VI
CONTRIBUTORS & REVIEWERS .................................................................................................. VII
CONTENTS..................................................................................................................................... VIII
LIST OF FIGURES........................................................................................................................... XI
LIST OF TABLES............................................................................................................................. XII
CHAPTER 1. RELEVANCE TO PUBLIC HEALTH .......................................................................... 1
  1.1      OVERVIEW AND U.S. EXPOSURES ........................................................................... 1
  1.2      SUMMARY OF HEALTH EFFECTS ............................................................................. 3
  1.3      MINIMAL RISK LEVELS (MRLs) ................................................................................. 7
CHAPTER 2. HEALTH EFFECTS .................................................................................................... 10
  2.1      INTRODUCTION ......................................................................................................... 10
  2.2      DEATH ........................................................................................................................ 47
  2.3      BODY WEIGHT ........................................................................................................... 47
  2.4      RESPIRATORY ........................................................................................................... 49
  2.5      CARDIOVASCULAR .................................................................................................... 61
  2.6      GASTROINTESTINAL ................................................................................................. 62
  2.7      HEMATOLOGICAL ...................................................................................................... 64
  2.8      MUSCULOSKELETAL ................................................................................................. 64
  2.9      HEPATIC ..................................................................................................................... 64
  2.10     RENAL ......................................................................................................................... 67
  2.11     DERMAL ...................................................................................................................... 69
  2.12     OCULAR ...................................................................................................................... 69
  2.13     ENDOCRINE ............................................................................................................... 70
  2.14     IMMUNOLOGICAL ...................................................................................................... 72
  2.15     NEUROLOGICAL ........................................................................................................ 72
  2.16     REPRODUCTIVE ........................................................................................................ 74
  2.17     DEVELOPMENTAL ..................................................................................................... 77
  2.18     OTHER NONCANCER ................................................................................................ 80
  2.19     CANCER ...................................................................................................................... 80
  2.20     GENOTOXICITY .......................................................................................................... 128
  2.21     MECHANISMS OF ACTION ........................................................................................ 139
CHAPTER 3. TOXICOKINETICS, SUSCEPTIBLE POPULATIONS, BIOMARKERS, CHEMICAL
              INTERACTIONS ......................................................................................................... 144
  3.1      TOXICOKINETICS ...................................................................................................... 144
    3.1.1      Absorption ...................................................................................................... 144
      3.1.1.1      Inhalation Exposure ............................................................................. 144
      3.1.1.2      Oral Exposure ...................................................................................... 144
      3.1.1.3      Dermal Exposure ................................................................................. 145
    3.1.2      Distribution .................................................................................................... 146
      3.1.2.1      Inhalation Exposure ............................................................................. 146
      3.1.2.2      Oral Exposure ...................................................................................... 146
      3.1.2.3      Dermal Exposure ................................................................................. 147
      3.1.2.4      Other Routes of Exposure ................................................................... 148
    3.1.3      Metabolism .................................................................................................... 148
    3.1.4      Excretion ........................................................................................................ 150
      3.1.4.1      Inhalation Exposure ............................................................................. 150
      3.1.4.2      Oral Exposure ...................................................................................... 150
      3.1.4.3      Dermal Exposure ................................................................................. 151
      3.1.4.4      Other Routes of Exposure ................................................................... 151
    3.1.5      Physiologically Based Pharmacokinetic (PBPK)/Pharmacodynamic (PD) Models ................... 152
    3.1.6      Animal-to-Human Extrapolations .................................................................... 152

3.2     CHILDREN AND OTHER POPULATIONS THAT ARE UNUSUALLY SUSCEPTIBLE..............152
3.3     BIOMARKERS OF EXPOSURE AND EFFECT .........................................................................153
    3.3.1   Biomarkers of Exposure ..............................................................................................154
    3.3.2   Biomarkers of Effect ....................................................................................................154
3.4     INTERACTIONS WITH OTHER CHEMICALS .......................................................................154
CHAPTER 4. CHEMICAL AND PHYSICAL INFORMATION ........................................................156
4.1     CHEMICAL IDENTITY .............................................................................................................156
4.2     PHYSICAL AND CHEMICAL PROPERTIES ..........................................................................156
CHAPTER 5. POTENTIAL FOR HUMAN EXPOSURE ....................................................................159
5.1     OVERVIEW .................................................................................................................................159
5.2     PRODUCTION, IMPORT/EXPORT, USE, AND DISPOSAL ..................................................159
    5.2.1   Production .....................................................................................................................159
    5.2.2   Import/Export ...............................................................................................................163
    5.2.3   Use ................................................................................................................................163
    5.2.4   Disposal ........................................................................................................................166
5.3     RELEASES TO THE ENVIRONMENT .....................................................................................167
    5.3.1   Air .................................................................................................................................167
    5.3.2   Water .............................................................................................................................168
    5.3.3   Soil ................................................................................................................................169
5.4     ENVIRONMENTAL FATE .........................................................................................................170
    5.4.1   Transport and Partitioning ...........................................................................................171
    5.4.2   Transformation and Degradation ..................................................................................174
5.5     LEVELS IN THE ENVIRONMENT ...........................................................................................181
    5.5.1   Air .................................................................................................................................183
    5.5.2   Water .............................................................................................................................184
    5.5.3   Sediment and Soil .........................................................................................................184
    5.5.4   Other Media ..................................................................................................................184
5.6     GENERAL POPULATION EXPOSURE ....................................................................................194
5.7     POPULATIONS WITH POTENTIALLY HIGH EXPOSURES ................................................200
CHAPTER 6. ADEQUACY OF THE DATABASE .............................................................................201
6.1     Information on Health Effects .....................................................................................................201
6.2     Identification of Data Needs ........................................................................................................204
6.3     Ongoing Studies ...........................................................................................................................208
CHAPTER 7. REGULATIONS AND GUIDELINES ..........................................................................210
CHAPTER 8. REFERENCES ...............................................................................................................212


APPENDICES
APPENDIX A.  ATSDR MINIMAL RISK LEVELS AND WORKSHEETS.......................................A-1
APPENDIX B.  LITERATURE SEARCH FRAMEWORK FOR GLYPHOSATE ..............................B-1
APPENDIX C.  USER'S GUIDE ............................................................................................................C-1
APPENDIX D.  QUICK REFERENCE FOR HEALTH CARE PROVIDERS .....................................D-1
APPENDIX E.  GLOSSARY ...................................................................................................................E-1
APPENDIX F.  ACRONYMS, ABBREVIATIONS, AND SYMBOLS ................................................F-1

# LIST OF FIGURES

1-1. Noncancer Health Effects Found in Animals Following Oral Exposure to Glyphosate Technical.................. 4

1-2. Summary of Sensitive Targets of Glyphosate Technical – Oral ...................................................... 8

1-3. Overview of the Number of Animal Studies Examining Glyphosate Technical Health.............................. 16

2-2. Overview of the Number of Studies Examining Glyphosate Formulations Health Effects* ...................... 17

2-3. Levels of Significant Exposure to Glyphosate Technical – Oral ................................................ 29

2-4. Risk of non-Hodgkin's Lymphoma Relative to Self-Reported Glyphosate Use or Exposure................... 116

2-5. Risk of Multiple Myeloma Relative to Self-Reported Glyphosate Use or Exposure............................ 117

3-1. Chemical Structures of Glyphosate and Aminomethylphosphonic Acid (AMPA)................................... 148

5-1. Agricultural Application Trends of Glyphosate in the United States According to U.S.
Geological Survey (USGS) Data ........................................................................................ 165

5-2. Degradation of Glyphosate Under Aerobic Conditions ......................................................... 174

6-1. Summary of Existing Health Effects Studies of Animals Orally Exposed to Glyphosate by Endpoint)*...202

6-2. Summary of Existing Health Effects Studies on Glyphosate Formulations (Listed by Endpoint)*.......... 203

# LIST OF TABLES

1-1. Minimal Risk Levels (MRLs) for Technical Glyphosate ................................................................ 9

2-1. Description of Selected Glyphosate Formulations ...................................................................... 11

2-2. Levels of Significant Exposure to Glyphosate Technical – Oral ................................................ 18

2-3. Levels of Significant Exposure to Glyphosate Formulations – Oral ......................................... 34

2-4. Levels of Significant Exposure to Glyphosate Technical – Dermal ........................................... 46

2-5. Noncancer Outcomes in Humans Exposed to Glyphosate-Containing Products ...................... 51

2-6. Summary of Meta-Analyses of Results from Studies Examining Possible Association Between Self-Reported Use of Glyphosate and Lymphohematopoietic Cancers ............................................ 82

2-7. Cancer Outcomes for Solid Tumor-Types in Humans Exposed to Glyphosate-Containing Products ............................................................................................................................................ 87

2-8. Lymphohematopoietic Cancer Outcomes in Humans Exposed to Glyphosate-Containing Products .......................................................................................................................................... 101

2-9. Incidences of Selected Tumors in Sprague-Dawley Rats Administered Technical Glyphosate (98.7% purity) in the Diet for up to 26 Months .............................................................................. 119

2-10. Incidences of Selected Tumors in Albino Sprague-Dawley Rats Administered Technical Glyphosate (96.5% Purity) in the Diet for 2 Years ....................................................................... 120

2-11. Incidences of Renal Tubular Cell Tumors in Male CD-1 Mice Administered Technical Glyphosate (99.78% Purity) in the Diet for up to 24 Months ....................................................... 123

2-12. Incidences of Tumors in Male and Female CD-1 Mice Administered Glyphosate (≥97.5% Purity) in the Diet for up to 104 Weeks .......................................................................................... 123

2-13. Carcinogenicity Classification ................................................................................................. 126

2-14. Genotoxicity of Glyphosate Technical *In Vitro* ..................................................................... 128

2-15. Genotoxicity of Glyphosate Technical *In Vivo* ...................................................................... 130

2-16. Genotoxicity of Glyphosate Formulations *In Vitro* ............................................................... 130

2-17. Genotoxicity of Glyphosate Formulations *In Vivo* ................................................................ 132

4-1. Chemical Identity of Glyphosate and Glyphosate Isopropylamine[a] ...................................... 157

4-2. Physical and Chemical Properties of Glyphosate and its Isopropylamine Salt[a] .................... 158

5-1. Glyphosate Salts ....................................................................................................................... 160

5-2. Companies Manufacturing Products Under Pesticide Code 417300 (Glyphosate) ................. 161

5-3. Glyphosate AI (Pounds) Usage Trends from 1990 to 2014 ..................................................... 166

5-4. Lowest Limit of Detection Based on Standards ....................................................................... 182

5-5. Summary of Environmental Levels of Glyphosate .................................................................. 182

5-6. Outdoor Air Monitoring Data for Glyphosate ......................................................................... 183

5-7.  Glyphosate and its Degradation Products in Water Samples in Major U.S. River Basins ............... 184

5-8.  Surface Water Monitoring Data for Glyphosate ............................................................. 186

5-9.  Groundwater Monitoring Data for Glyphosate ............................................................. 189

5-10.  Sediment and Soil Monitoring Data for Glyphosate ................................................... 191

5-11.  Available Glyphosate Human Monitoring Data ............................................................ 196

6-1.  Ongoing Studies on Glyphosate ................................................................................ 209

7-1.  Regulations and Guidelines Applicable to Glyphosate ................................................. 210

# CHAPTER 1.  RELEVANCE TO PUBLIC HEALTH

## 1.1   OVERVIEW AND U.S. EXPOSURES

Glyphosate is a phosphonoglycine non-selective herbicide, first registered for use by the EPA in 1974.

Glyphosate is typically manufactured for commercial use as a salt available in soluble liquid and granule

formulations.  Herbicide formulations employing glyphosate salts are commonly produced in

combination with additives, inert ingredients, and surfactants.  The salt derivatives enhance absorption of

glyphosate from the surface of the plant or leaf structure, but are not the herbicidally active portion of the

compound.  Specific formulations vary in composition and are marketed under numerous trade names

(NPIRS 2017; PAN 2009).  Commercial products containing glyphosate may have concentrations ranging

from 0.96 to 94 w/w%.  For example, the common herbicide, Roundup®, has product formulations

containing glyphosate in concentrations ranging from 0.96% to as much as 71% (w/w) (NPIRS 2017;

PAN 2016b).

Glyphosate is the active ingredient in a variety of broad spectrum herbicidal products for residential,

commercial, and agricultural purposes.  Selected agricultural commodities such as roundup-ready corn

and soybeans have been genetically modified to be resistant to damage when glyphosate is applied to

control undesirable weeds.  Glyphosate is produced commercially in the United States as a technical-

grade substance (glyphosate technical) with a purity of ≥80%, though the purity is usually >90% (IPCS

1994, McBean 2011).  In 2007, U.S. agricultural use of glyphosate was approximately 82,800 tons and

non-agricultural use of glyphosate was approximately 9,300 tons (Battaglin et al. 2014). For the purposes

of this Profile, the phrase "non-agricultural use" refers to the use of glyphosate outside of agriculture or

farmland, such as to control weeds on a roadside, in a garden, or other use by homeowners.. In 2014, U.S.

agricultural use of glyphosate was approximately 124,953 tons and non-agricultural use of glyphosate was

approximately 13,260 tons (Benbrook 2016).  The manufacture and use of glyphosate has led to its direct

release into the environment (EPA 1993).  Once glyphosate enters the environment, it has low potential

for environmental bioavailability and is unlikely to bioaccumulate; the chemical is either degraded by

microbial processes or inactivated by adsorption to soil (Shushkova et al. 2010; Smith and Oehme 1992).

Glyphosate is expected to adsorb to soils under most environmental conditions; therefore, leaching into

groundwater is minimal (Smith and Oehme 1992).  Glyphosate may enter surface waters due to its use in

some aquatic environments.  Volatilization of glyphosate is not an important fate process based on its low

vapor pressure and ionic nature (Smith and Oehme 1992).  Transport in the air after spray applications is

dependent on meteorological conditions; ground and aerial applications can result in spray drift, which may affect non-target plants (PAN 2009; Yates et al.1978).

The general population may be exposed to glyphosate by dermal contact with consumer products, crops, foliage, or soils containing residues of this chemical; ingestion of plants, crops, foods, or waters containing residues of this chemical; and inhalation of mist or spray during the use of products containing this chemical.  As a result of its widespread usage, glyphosate is present at low levels in a wide range of foods (FAO and WHO 2016).  The greatest potential for exposure can be expected for people who use glyphosate products at home and for populations residing near agricultural areas and crop farms, manufacturing and processing plants where glyphosate is produced or used, and hazardous waste disposal sites containing glyphosate.

Occupational exposure of glyphosate may occur via inhalation, dermal contact, and/or ocular contact during manufacture, transport, use, and disposal.  Farmers and home gardeners using herbicides containing glyphosate may be exposed to glyphosate via inhalation, dermal contact, and/or ocular contact as well.  People may be exposed to glyphosate upon entering areas where it has been recently applied.  Dermal contact appears to be the major route of exposure to glyphosate for people involved in its application.

Children are expected to be exposed to glyphosate by the same routes as adults in the general population.  Products containing glyphosate should be kept out of the reach of children.  Due to increased hand-to-mouth activity and playing habits, children are more likely to come into contact with glyphosate residues that may be present in soil.  Glyphosate is not likely to bioaccumulate in breast milk (Bus 2015) and was not detected in breast milk from lactating mothers with detectable glyphosate in their urine (McGuire et al. 2016).  In one small study, neither glyphosate nor its major degradation product, aminomethylphosphonic acid (AMPA), were detected in the maternal or fetal cord serum of pregnant subjects (Aris and LeBlanc 2011).

See Chapter 5 for more detailed information regarding concentrations of glyphosate in environmental media.

## 1.2   SUMMARY OF HEALTH EFFECTS

Information regarding the toxicity of glyphosate comes primarily from oral studies in laboratory animals exposed to glyphosate technical.  No information was located regarding health effects in humans exposed to glyphosate technical; human exposures are to herbicides that contain glyphosate and other ingredients or to glyphosate residues in selected food sources.  Human studies have reported possible associations between glyphosate herbicide use and various health outcomes.  A few animal studies evaluated the effects of inhalation or oral exposure to glyphosate formulations containing surfactant and additional unspecified substances.  Reported effects may be due, at least in part, to the surfactant.  Furthermore, glyphosate formulations vary in specific components and their relative proportions, thus precluding meaningful comparisons of toxic effect levels.  Therefore, Figure 1-1 contains summary information related only to glyphosate technical.

# CHAPTER 7.  REGULATIONS AND GUIDELINES

Pertinent international and national regulations, advisories, and guidelines regarding glyphosate in air, water, and other media are summarized in Table 7-1.  This table is not an exhaustive list, and current regulations should be verified by the appropriate regulatory agency.

ATSDR develops MRLs, which are substance-specific guidelines intended to serve as screening levels by ATSDR health assessors and other responders to identify contaminants and potential health effects that may be of concern at hazardous waste sites.  See Section 1.3 and Appendix A for detailed information on the MRLs for glyphosate.

## Table 7-1.  Regulations and Guidelines Applicable to Glyphosate

| Agency | Description | Information | Reference |
|---|---|---|---|
| **Air** | | | |
| EPA | RfC | Not evaluated | IRIS 1989 |
| WHO | Air quality guidelines | No data | WHO 2010 |
| **Water & Food** | | | |
| EPA | Drinking water standards and health advisories | | EPA 2012d |
| | 1-Day (10-kg child) | 20 mg/L | |
| | 10-Day (10-kg child) | 20 mg/L | |
| | DWEL | 70 mg/L | |
| | National primary drinking water regulations | | EPA 2009b |
| | Maximum Contaminant Level | 0.7 mg/L | |
| | Maximum Contaminant Level Goal | 0.7 mg/L | |
| | RfD | 1.0 mg/kg/day[a] | EPA 2017d |
| WHO | Drinking water quality guidelines | Not established[b] | WHO 2017 |
| FDA | EAFUS | No data[c] | FDA 2013c |
| **Cancer** | | | |
| HHS | Carcinogenicity classification | No data | NTP 2016 |
| EPA | Carcinogenicity classification | Not likely to be carcinogenic to humans | EPA 2017c, 2017d, 2020 |
| IARC | Carcinogenicity classification | Group 2A[d] | IARC 2017 |
| **Occupational** | | | |
| ACGIH | TLV | No data | ACGIH 2016 |
| OSHA | PEL (8-hour TWA) for general industry | No data | OSHA 2016b |
| | PEL (8-hour TWA) for shipyards and construction | No data | OSHA 2016c |
| | PEL (8-hour TWA) for construction | No data | OSHA 2016a |

7. REGULATIONS AND GUIDELINES

### Table 7-1.  Regulations and Guidelines Applicable to Glyphosate

| Agency | Description | Information | Reference |
|--------|-------------|-------------|-----------|
| NIOSH | REL (up to 10-hour TWA) | No data | NIOSH 2016 |
| **Emergency Criteria** | | | |
| EPA | AEGLs-air | No data | EPA 2016b |
| DOE | PACs-air | No data | DOE 2018 |

[a]EPA's Office of Pesticides Program (OPP) published an interim registration review decision on glyphosate in January 2020, which finalized the Glyphosate Draft Human Health Risk Assessment in Support of Registration Review. The human health risk assessment derived an RfD of 1.0 mg/kg/day based on the same study that ATSDR used for derivation of the acute-duration MRL.
[b]Glyphosate and aminomethylphosphonic acid occur in drinking water at concentrations well below those of health concern, so a guideline value was not deemed necessary.
[c]The EAFUS list of substances contains ingredients added directly to food that FDA has either approved as food additives or listed or affirmed as GRAS.
[d]Group 2A: Probably carcinogenic to humans.

ACGIH = American Conference of Governmental Industrial Hygienists; AEGL = acute exposure guideline levels; CFR = Code of Federal Regulations; DOE = Department of Energy; DWEL = drinking water equivalent level; EAFUS = Everything Added to Food in the United States; EPA = Environmental Protection Agency; FDA = Food and Drug Administration; HHS = Department of Health and Human Services; IARC = International Agency for Research on Cancer; NIOSH = National Institute for Occupational Safety and Health; NTP = National Toxicology Program; OSHA = Occupational Safety and Health Administration; PAC = Protective Action Criteria; PEL = permissible exposure limit; REL = recommended exposure limit; RfC = inhalation reference concentration; RfD = reference dose TLV = threshold limit values; TWA = time-weighted average; WHO = World Health Organization