# EXHIBIT 1

## Expert Report of Dr. R.J. Smeda

### *Salas v. Monsanto Company*

Dr. R.J. Smeda
Professor of Weed Science
Division of Plant Sciences
University of Missouri
Columbia, MO 65211

### *Background*

I am a Professor of Weed Science in the Division of Plant Sciences at the University of Missouri. I began as an Assistant Professor in 1996, was promoted to Associate Professor in 2003 and promoted again to Full Professor in 2012.  Prior to my employment at Missouri, I was both a Post-Doctoral Research Associate and then a Plant Physiologist with the United States Dept. of Agriculture, Agricultural Research Service (USDA-ARS) in Stoneville, MS.  I earned my B.S. at Michigan State University in 1982, majoring in Crop and Soil Science with a minor in Integrated Pest Management.  I went on to obtain an M.S. in Horticulture from Michigan State University in 1985. In 1990, I obtained a Ph.D. in Horticulture from Purdue University.

Through personal and professional use, I have used glyphosate annually since 1982. I was raised much of my early life on a strawberry farm in southwest Michigan. Weeds were a major obstacle in our production practices, and my family and I spent many hours hoeing and pulling weeds. We used herbicides judiciously in places around the farm, including annual applications of glyphosate-based herbicides such as Roundup.

While obtaining my M.S. degree, I applied glyphosate on numerous tree fruit research projects.  In my Ph.D. program, I used glyphosate for burcucumber management as well as for control of cover crops in a tomato project. I also applied glyphosate for strawberry and vegetable research experiments for my major advisor.  As a Plant Physiologist with the USDA-ARS beginning in 1991, I applied glyphosate annually for spring control of winter annual weeds, as well as for post-emergence weed control in glyphosate-resistant soybeans and cotton.

Since 1996, I have used glyphosate annually for weed control in corn, soybeans and industrial vegetation management in my role at the University of Missouri.  In all of these instances, I personally mixed and applied glyphosate-based herbicides using a variety of methods, including but not limited to backpack sprayers, handheld sprayers, and tractor pulled spraying equipment. Many of my graduate students apply glyphosate-based herbicides as part of their research program as well. I teach students in-depth about the biological traits of weeds that contribute to their success in the ecological niches that



EXHIBIT
0002
Reid Smeda
03.22.23

weeds invade. I teach students that glyphosate is a useful tool in the battle against weeds and is an essential component of an integrated approach to weed management. All students and Post-doctoral associates conduct research focused on weed science projects, and each person in my program assists in field application of herbicides.

Part of my faculty responsibility includes instruction of an introductory weed science course for undergraduate students. Over a 25-year period, I have taught more than 800 students. Some of the important course topics include: weed identification; herbicide mechanism and mode of action; herbicide symptomology; sprayer calibration; weed biology; weed management systems in over eight crops; and methods of integrated weed management, among other topics. I also instruct students about herbicide labels, proper protective equipment, minimizing off-target movement of pesticides, storage and disposal of herbicides, as well as determining application rates and proper usage. We also discuss the importance of glyphosate as a weed management tool in both crop and non-crop areas.

Over the course of my career, I have received several awards. In 2001, the American Society of Agronomy recognized me with a Certificate of Excellence Award for the development of teaching materials.  I was recognized by the College of Agriculture, Food, and Natural Resources (CAFNR), and was awarded the CAFNR Junior Faculty Teaching Award in 2002 and the Golden Apple Teaching Award in 2009.  Within the weed science community, I was awarded the Distinguished Achievement Award in Education by the North Central Weed Science Society in 2009.

Similarly, I have received awards for my research. In 1992, the USDA-ARS recognized me with a Quality Paper of the Year award. In 1996, I was given the Outstanding Research Award by the Mississippi Weed Science Society. The American Society of Agronomy recognized my research in 1999 with an Extension Publication Certificate of Merit. Also in 1999, the North Central Weed Science Society awarded me the Young Scientist Award. The Agronomy Club voted me the Outstanding Agronomy Faculty in 2002. I was also recognized with an award by The National Roadside Vegetation Management Association for my contribution to research in non-crop areas in 2008.

Contributing science-based research to the literature enables weed scientists to continue protecting crops, animals, and people from the negative impacts of weeds. Over the course of my career, I have published over seventy-five peer-review articles in scientific journals, eleven articles in extension publications, more than fifty articles in trade publications, and nine book chapters. Currently, I have initiated preparation of a textbook for Weed Science.

I am a member of several societies prominent in the area of weed science: North Central Weed Science Society; Weed Science Society of America; International Weed Science Society; and American Society of Agronomy.

My opinions expressed below are based upon my research, experience, and knowledge of the discipline of weed science. Unless otherwise stated, these opinions are held to a reasonable degree of scientific certainty. I reserve the right to amend this report if I

become aware of additional information, and to respond to testimony of plaintiffs' experts at deposition or trial. I reserve the right to use demonstratives if I testify at trial. For additional information regarding my academic and professional background, and for materials I reviewed in preparation for writing this report, please see my CV attached as Attachment A and my materials considered list, attached as Attachment B.

I have not testified at trial or deposition in the last four years.

I am currently being paid $110 per hour for expert witness services in the field of weed science and travel, $155 per hour for deposition preparation and testimony, and $175 per hour for trial testimony.

### Introduction

The simplest definition of a weed is a plant out of place (W.S. Blatchley 1912, cited in Zimdahl 2018), but that only begins to describe the negative impact they have had on society. Before plants identified as crops were cultivated, man was familiar with the poisons and other negative traits associated with some plants. Archeologists have identified "proto-weeds" among a mixture of small grains in a hunter-gatherer camp in Israel dated over 23,000 years ago (Snir et al., 2015). In ancient Rome, Pliny the Elder recognized that oleander, a perennial flowering shrub, generated honey laced with toxins (Seher et al., 2020). Once plants were cultivated as food for feeding people and animals, the full impact of weeds on crops was realized. Weeds reduce the quantity and quality of all crops produced. In addition, weeds can affect the health of people and animals by generating poisonous compounds or triggering allergic reactions. The presence of weeds decreases safety along transportation corridors, facilitates wildfires, and harbors undesirable rodents and reptiles. Weeds also tarnish the beauty of natural areas, reduce property values, and compromise the use of land and aquatic areas for recreational use. They are a detriment to almost every facet of society and have little to no practical benefits.

Weed science evolved as a discipline to address the myriad negative impacts of weeds by focusing on the biology and management of weeds in all areas. Management of weeds began with intensive hand labor and later turned to animal and mechanized control. However, the development of herbicides launched weed management into a new era. Of the herbicides produced, glyphosate stands alone in its utility, effectiveness, and safety. Unlike many herbicides, glyphosate has low toxicity and minimal negative impacts on the environment. Glyphosate has revolutionized farming methods through development of soil conservation methods such as no-till and minimum tillage. In non-crop areas, the activity of glyphosate on perennials provides a tool to fight invasive species. In urban areas, the safety of glyphosate enables homeowners to effectively control weeds that threaten the health and safety of people and animals. This report will illustrate the longstanding and deleterious impact of weeds on society and the development of methods to minimize this impact. Specifically, I will discuss cultural, biological, and

mechanical control measures, and the introduction of herbicides in general and glyphosate in particular. Glyphosate-based herbicides remain the most used herbicides worldwide. This report will also summarize the benefits of glyphosate use, mechanism of glyphosate activity in plants, spectrum of weed control, methods of application with benefits of adjuvants, as well as fate in the environment. Finally, this report will offer a description of alternatives to glyphosate in the context of needed weed control in crop and non-crop areas.

*Weed Competition for Growth Factors*

Weeds are relentless in their desire and ability to persist and spread. They have several characteristics that make them highly competitive with, and deleterious to, desirable plants. All weeds produce seed, which continually contribute to seed levels for future infestations. Distribution of weed seed occurs by natural means (wind, water) or humans (equipment). This continual spreading ensures that weeds will further impact crop production.  Weeds are endemic in soil, but depend on soil disturbance for emergence. It is common to find individual weed species across broad geographies.  This is the result of environmental plasticity, the ability of weeds to rapidly adapt to different environments, such that they can thrive under stressful conditions (drought, compacted soils, low nutrient levels, etc.) where desirable plants cannot.  As if that were not enough, seeds of weeds exhibit differential dormancy, meaning that not all weed seeds will emerge every year.  For example, seeds of *Amaranthus* species can retain viability over 10 years. Weeds are also prolific reproducers. Annual weeds such as *Amaranthus* can each produce up to 1,000,000 seeds (Sellers et al. 2003). Finally, weeds are also pioneer plants, indicating they fill open areas in disturbed soils (see below).

Weeds, like other plants, utilize space to take advantage of the critical growth factors (light, water, nutrients, carbon dioxide, and oxygen) important for plant development and reproduction. Many weed species exhibit characteristics resulting in distinct advantages over a crop species and other desirable plants. For example, some weeds grow taller than crops or use a vining growth habit to compete for critical sunlight. Below ground, a competitive weed such as common cocklebur can produce up to 50% more fine roots than soybean plants, contributing to greater competition for soil water and nutrients (Bozsa and Oliver, 1990).

Although all weeds are competitive with and negatively impact desirable plants, various species have evolved different life cycles that make their control more challenging and even more necessary. Some weeds are annuals, growing rapidly, producing large numbers of seeds, and choking crop plants every year. Other weeds grow over two years (biennials) and can eliminate native plants in non-crop areas. Perennial weeds return each year, producing both seeds and underground vegetative structures. Perennial weeds pose the most significant threat to crop plants as well as other desirable plant species. These weeds tolerate many management practices, and their resilience necessitates specialized herbicides such as glyphosate. Weeds of all life cycles are

present in almost every setting where weeds exist, which further illustrates the need for continual weed management.

The occurrence of plants in natural areas follow stages of succession. After soil is disturbed, annual weeds quickly emerge.  Over the course of time, annual weeds are replaced by biennial broadleaves and then perennial grasses. Eventually, shrubs and then trees will fill that habitat until a mature forest of hardwood species is present. The entry point of weeds into a crop or non-crop habitat thus occurs with disturbance of the soil. Disturbance can take many forms: mechanical tillage, planting and harvesting crops, fires, soil erosion, mowing, etc.  Because farmers mostly grow annual crops, constant soil disturbance ensures the continual presence of weeds.

*Direct and Indirect Losses Caused by Weeds*

Weeds' negative influence on adjacent crop plants begins soon after crop emergence. As root and then shoot systems develop, larger amounts of growth factors are needed to sustain further growth. Because the roots and shoots of both crop plants and weeds begin to overlap, the supply of needed growth factors in the occupied space is less than the combined demand of the plants, which is the definition of competition. From that point forward, the growth factor that is limited will ultimately reduce crop plant potential. This form of competition results in direct losses in crop yield, and the extent of the losses depends upon the particular weed species, crop species, duration of competition, and environmental parameters (nutrient supply in the soil and soil moisture from rainfall). For each crop, there exists a critical weed-free period, which is a period of time where weed management is important to minimize crop yield losses (Hartzler, 2009). If weeds are not managed sufficiently during this time, irreversible crop yield losses will result. Yield reductions such as this are referred to as direct losses and they can be staggering.

<u>Effects On Crops – Direct Loss</u>

The Food and Agriculture Organization ("FAO") expects human populations globally to reach 9.8 billion by 2050, with food needs expected to increase up to 200%.[1] Because most of the available, arable land worldwide is currently in use, this requires greater productivity on existing land.

Left uncontrolled, weeds significantly reduce the critical supplies of U.S. crops and those around the world (Figure 1). Weeds annually eat the food of roughly one billion people worldwide (Pacanoski, 2007) and have a tremendously detrimental financial impact. It is estimated that untreated weeds in corn in the U.S. and Canada reduce yields by an average of 50% and resulted in $26.7 billion in monetary losses from the years 2006 to 2013 (Soltani et al., 2016). In soybean, another major agronomic crop, surveys from 2007-2013 predicted that unchecked weed competition would result in a 52.1% yield loss in the U.S. and Canada at a monetary cost of $17.2 billion (Soltani et al., 2017). Some older studies show that despite control efforts, yield losses caused by weeds across 58

---

[1] www.fao.org/3/x0262e/x0262e23.htm

different commodities in Canada amounted to $984 million (in 1991) and the impact of weeds in the U.S. exceeded $20 billion annually (in 1992) (Swanton et al., 1993; Bridges, 1992). A study conducted in Australia from 2001-2002 determined that total losses from weeds sustained by crops and animals amounted to $2.22 billion (Sinden et al., 2004).



**Figure 1. Monetary losses in crop yields resulting from weed competition with various crops. In the first three bars from the left, crop losses are despite attempts to control the weeds. In the last two bars, crop losses are represented where no effort was made to control the weeds.**

Smaller acreage crops are also impacted by weeds. For dry beans, crop yields would be reduced by 71.4% without weed control, which would amount to a $722 million loss for the U.S. and Canada (Soltani et al., 2018A). Sugar beets, a major source of sugar in the U.S. and Canada, are also sensitive to weed competition. Over a 15-year period (2002-2017), uncontrolled weeds would have reduced sugar beet yields by 70%, costing approximately $1.28 billion (Soltani et al., 2018B). The totality of crop yield losses due to weeds is not uniform and generally has a disproportionate effect on less fortunate areas. In developed countries, weeds on average rob 5% of crop yields, whereas weeds reduce

crop yields by 25% in under-developed countries, despite efforts to control weeds (Koch, 1992).

<u>Effects On Crops – Indirect Loss</u>

Crops are also subject to indirect losses due to weeds. A major source of indirect loss is where the presence of weeds can preclude crop harvest. For example, farmers cannot harvest corn that is adjacent to giant ragweed or risk expensive damage to the combine and costly delays in harvest. In other instances, the presence of specific species in a crop can result in significant devaluation of the crop. Canada thistle is a highly undesirable weed in fields of green peas. The seedheads of Canada thistle are similar in size to peas and cannot be distinguished from peas during harvest and processing. Should a single seedhead be found in a can of green peas, the manufacturer could be forced to recall the product. In wheat, wild garlic seedheads mature at the time wheat is harvested and are highly likely to cause off-flavor issues for wheat used for making bread (Zimdahl, 2018).

Weeds also cause indirect losses by their ability to transmit diseases to adjacent crops. As weeds and crops are grouped together into families, a disease in one species is likely to also affect all other plants in the same family. Numerous insects can transmit viruses from weeds to commercial crops, requiring crop managers to expend resources for insect management (Duffus, 1971). Sucking insects can also vector other pathogens. The perennial weed johnsongrass (*Sorghum halepense*) is susceptible to maize dwarf mosaic virus, which can be transmitted through aphids that feed on infected johnsongrass and then transfer the virus to corn leaves (Knoke et al., 1974). Once infected, reductions in grain yield from the virus are unavoidable.

<u>Effects On Animals</u>

All weeds are noxious, but some are poisonous and can have severe impacts on animal health. A survey of animal producers in 17 western states determined that annual losses to grazing animals by poisonous plants totaled over $340 million (James et al., 1992). Although animals often avoid eating poisonous plants when other forage plants are available, lethal concentrations can be disguised in consumed hay and forage. Poison hemlock is a common biennial weed in Europe and the U.S. As little as 16 mg/kg of body weight is lethal to cattle, and smaller doses can result in severe lifelong illness. (Binev et al., 2007). Many species in the *Solanaceae* family are also toxic. Jimsonweed, a common annual weed in Midwestern fields, has toxic effects on chickens when weeds seeds are accidentally incorporated into corn meal and digested (Day and Dilworth, 1984). Weeds also pose serious threats to household pets and other domesticated animals. The U.S. Animal Poison Control Center reported that between 2001 and 2003, 697 cats and dogs were poisoned by consumption of poisonous plant parts; the mortality from some plants (castor bean) was up to 9% of consumption incidents (Milewski and Kahn., 2006).

Some weeds deter animal grazing, which can limit weight gain of domesticated animals. Leafy spurge is an invasive perennial weed invading grazing lands in the northern Great Plains. Mixed with desirable forages, leafy spurge causes cattle to exhibit an aversion to

feeding. This resulted in an estimated economic impact of $144.4 million in 1985 alone for Montana, North Dakota, South Dakota, and Wyoming (Bangsund and Leistritz, 1991).

### Effects On Humans

Weeds also negatively impact human health. Accidental consumption of weeds that mimic the appearance of desirable plants can be lethal. Poison hemlock mimics wild carrot and the herb parsley. The toxicity of poison hemlock in humans is 1 g/kg body weight (Binev et al. 2007). A study from 1994-2001, found 10,400 accidental poisoning incidences in children 6-12 years old caused by poisonous plants (Vassilev et al., 2004). In 1998 alone, 1,675 people in France were poisoned by consumption of poisonous mushrooms (Jo et al., 2014).

Other weeds release compounds that result in allergic reactions (e.g. ragweeds; *Ambrosia* spp.) affecting millions of people annually. In Hungary, over two-thirds of the population are sensitive to airborne pollen, with over 60% of pollen sensitivity caused by Ambrosia spp. (Makra et al., 2007). Brazilian pepper, a tree native to Brazil and highly invasive in Florida and Hawaii, causes respiratory difficulty and skin rashes in humans (Morton, 1978). More than 100 plant species induce contact dermatitis, most notably poison ivy (*Rhus radicans*) (Ziska et al., 2007). Because this species is readily spread by seed through birds living in urban trees, poison ivy is common. Urushiol is the active compound inducing dermatitis, with two of every three people sensitive. Human contact with plant parts containing urushiol for up to seven years after plants die can still result in mild to severe dermatitis (Goldstein, 2004).

Weeds also jeopardize human safety in other ways. Weeds growing in undesirable places can impair pedestrian and motorist visibility along roadsides and railroad rights-of-ways, creating serious safety hazards. Roadside vegetation both attracts and shields moose and other animals, increasing the potential for serious and deadly accidents (Rea, 2003). Each year in the U.S., there are more than 1.5 million deer collisions with motorists, resulting in losses of more than $1 billion in property value and more than 200 human fatalities (Mastro et al. 2008). In industrial areas, residues of weeds near the railroad ballast or adjacent to storage facilities of flammable substances increase fire hazards. In Western parts of the U.S., residues of invasive species such as downy brome (*Bromus tectorum*) have fueled wildfires with devastating consequences.

The presence of weeds can also affect property values. In the United Kingdom, land infested with the invasive species Japanese knotweed can result in a significant reduction in property values, even resulting in banks refusing mortgage applications from potential buyers of the property (Santo, 2017). Weeds can reduce the aesthetic image of areas such as lawns or overgrown vacant lots; this could reduce the perceived property value (Bridges, 1994).

Many cities have recognized the costly impact of weeds and have regulations controlling the height of grass or weeds. For example, in Columbia, MO, a Public Health Nuisances

ordinance requires vegetation for all properties within the city limits to be kept under twelve inches in height.[2] Property owners can be fined if city officials discover taller vegetation, and the city can send contractors to mow the property at the owner's expense.

Collectively, weeds can damage transportation corridors; their management can increase taxpayer burdens. For example, in Arizona, the department of transportation spends in excess of $80,000 annually to manage invasive species on roadsides (Howery and Ruhle, 1996). One weed, camelthorn, can grow up through twelve inches of concrete, speeding the breakdown of pavement and increasing taxpayer burdens. *Id*

Weeds provide cover and food for undesirable species such as rodents and snakes (Parkhurst, 2010). Rodents use weeds as both a food source and protective cover. Snakes are attracted to rodents as a food source and use vegetation as cover (Knight, 1997). Each year in the U.S. over 8,000 bites from venomous snakes occur, with symptoms ranging from transient localized pain and swelling to fatalities following hemotoxic and neurotoxic damage (Juckett and Hancox, 2002). Removal of the food source and shelter is one of the best deterrents to snakes and other pests and rodents.

### Effects On Aquatic Areas

The presence of weeds in aquatic areas is also problematic. Weeds growing along ditches can slow the drainage of water from crop fields following large rainfall events, which can leave crops under water and susceptible to damage. In other areas, weeds can slow the flow of water from rivers into canals where it is used for irrigation. This decreases efficiency in areas where water is needed for crop production. Aquatic weeds can also reduce recreational activities in water (e.g., boating, swimming, etc.) and harbor undesirable and dangerous species (e.g., snakes, alligators, etc.). For land adjacent to water bodies, weeds displacing native vegetation can facilitate soil erosion, which contributes nutrients that silt in water channels, thereby reducing water quality and resulting in hypoxia zones in larger bodies of water (e.g., the Gulf of Mexico). Many weeds have spread to distinctly new geographies (termed invasive species) and have displaced native species. The presence of invasive plants can upset ecological cycles resulting in lack of food and shelter for native organisms. Invasive exotic species can enter a new habitat following disturbance and speed up the process leading to extinction of native species (Gurevitch and Padilla, 2004). Often, invasive species do not respond to natural control methods (e.g., other plants, insects, pathogens) and thus spread unchecked.

In sub-tropical areas, some weed species have negative impacts throughout the year. For example, Alligatorweed can clog drainage channels and reduce water runoff following rainfall, which causes flooding that destroys crops, homes, and businesses. Invasions of water hyacinth once covered almost 30,000 acres of Lake Victoria in Africa, the second-

---

[2] https://www.como.gov/health/environmental-health/public-health-nuisances/city-public-health-nuisances/weed-ordinance/

largest freshwater lake in the world (Mailu, 2001). This impacted the livelihoods of over 40 million people by reducing the availability of clean water, increasing mosquito vectored diseases, limiting fishing, reducing water as a transportation source, and limiting water flow for generating electricity.

Effects On Non-Crop Areas

Weeds impact the biodiversity of plants in the environment, upsetting ecological cycles. For example, loss of a dominant plant species outcompeted by an alien species can reduce the food source of animals that in turn, are used as a food source by other animals. More than 4,600 alien plant species have been introduced to the Hawaiian Islands since the 1900's (Smith, 1985). At specific elevations and rainfall regimes, these introduced species have outcompeted native plants, leading to widespread extinction. A review of the impact of weeds on ecosystems in national parks across the world concluded that weeds reduced the diversity of species in parks, thus impacting the ability of land to support the plethora of animal species (Lonsdale, 1992). In the southwestern U.S., populations of invasive Tamarisk trees along rivers reduced water table levels that disrupted reproduction of different bird and fish species (Lonsdale, 1992). The U.S. National Park Service targets control of thistle species more often than other species because thistles reduce the visibility of park landscapes as well as movement of park visitors (Loope, 1992).

**Basics of Weed Management**

Documented impacts of weeds on human activities date back to approximately 10,000 B.C., when crops were initially cultivated for food production (Hay, 1974). At that time, hand removal was the dominant activity to remove weeds. Artifacts from circa 6,000 B.C. show weed removal was augmented by hand tools at that time. More recently (i.e., 1,000 B.C.), domesticated animals were used to increase the amount of land that could be used for crop production. The development of steel implements and the gasoline/diesel engine in the 1920's to 1940's led to widespread use of mechanical weed management. During that time, the first synthetic herbicides were also developed. These compounds had varying levels of effectiveness on weeds, and some had risks to human health and the environment. These initial innovations were not ideal and the continued adverse impacts of weeds spurred the continued evolution of approaches to weed management.

Weed management is an essential set of steps or processes designed to minimize the economic, health and/or ecological impact of weeds on adjacent plants, people, and animals. Three basic tenets comprise weed management: 1) prevention; 2) eradication; and 3) control (Zimdahl, 2018). Prevention techniques reduce the opportunity for introduction of weeds. Eradication is elimination of all certain living plants and plant propagules (seeds, viable vegetative structures) from an area. Control, which is often interchangeably used with the term management, is the use of cultural, mechanical, biological, and chemical techniques to kill germinating or emerged weeds. For long-term success, management techniques should be used together or sequentially. This process

is referred to as integrated weed management (IWM). IWM is a sub-set of a term referring to all pests, namely integrated pest management (IPM).

### Prevention

Prevention utilizes specific practices and tools that preclude seeds or vegetative propagules from germinating or growing in a target area. The high cost (monetary and human resources) of addressing established weeds makes prevention an important practice. One prevention technique is the use of clean crop seed (weed seeds screened out following harvest and before packaging). For some seed sold commercially, such as turfgrass seed, there is a certification process to guarantee the absence of invasive seeds and minimization (<2% by weight) of general weed seed. Another technique is sanitization of equipment. For example, before tillage equipment used to prepare land is moved from one field to another, water or specialized tools are often used to clean off soil or weed structures to prevent them from being transferred to another area. This is also true for planting equipment, combines, and lawnmowers. Sanitation of topsoil and organic mulches is important to preclude introduction of weed seeds.

Weed prevention is so important that it is required by federal law. The Federal Seed Act (FSA) of 1939 is enforced by the Agricultural Marketing Service housed within the U.S. Department of Agriculture, which regulates the interstate transport of agricultural and vegetable seeds.[3] Seed must be free of all noxious weeds and other weeds must be minimized and declared on seed labels. Violators are subject to monetary penalties and restrictions in further seed sales.

### Eradication

Eradication of weeds in a specific area is very difficult to achieve, but should be attempted for weeds that impose significant, detrimental effects. Weed eradication is only achievable when a weed is first observed in a new area or occupies a small area. For example, witchweed is a parasitic weed found on the African continent that invades roots of grass crops such as sorghum and corn. Infected crops have little or no yield.  In the U.S., witchweed was first discovered in a North Carolina corn field in 1956 (Werth et al., 1984). Strict quarantines and use of ethylene to stimulate witchweed emergence has reduced the incidence of the parasitic weed by >99% on over 432,000 acres (Tasker and Westwood, 2012). Strict quarantines and restricted movement of soil and plant products in infested areas were successful to isolate target weed species, an example of the objective of the Plant Protection Act of 2000.

### Control

Control is the most widely practiced method to minimize negative impacts of weeds. There are numerous approaches to enact weed control and these can be categorized as cultural, mechanical, biological, and chemical practices. Best practices for controlling weeds involve using IWM practices where these control techniques are used in concert.

---

[3] https://www.ams.usda.gov/rules-regulations/fsa

For almost all cropping systems, conventional and organic, the money spent to minimize the impacts of weeds is mostly used on control practices. Over-dependence or repeated use of a mechanical practice such as tillage can have serious detrimental impacts to the soil and environment and can increase selection for weeds tolerant to tillage.

### Methods of Weed Management

#### Cultural

Cultural practices for weed management involve manipulation of crop conditions to advantage desirable crops over the weeds with which they compete. For example, some farmers plant crops such as soybeans in narrow rows (7.5 inches or less) compared to traditional rows (30 inches) to promote rapid canopy closure as soybeans grow and prevent new weed emergence. However, this technique is only effective later in the growing season because weeds initially emerge with the crop and are unaffected by crop row spacing. Crop rotations are also a cultural practice for weed control. In the U.S., many farmers rotate between soybeans and corn, which balances nutrient use and prevents buildup of insect and pathogen levels. However, weed seed is viable in the soil seedbank for many years, and upon rotation back into soybeans will emerge and be problematic. Another cultural practice involves cover crops. Grass plants such as wheat, rye, and oats release chemicals from roots that inhibit the development of adjacent plants (termed allelopathy). Following fall establishment, cover crops are terminated in early spring prior to planting main crops. Emerging crops are largely unaffected by decaying cover crops, and residues continue to suppress weeds from residual allelopathy and physical shading for up to six weeks (Smeda and Weller, 1996). However, actively growing cover crops deplete soil moisture, thus impacting the growth of the subsequent crop.  Other farmers use inorganic mulches such as plastic within crop rows for cultural weed control.  This practice is very expensive, resource intensive, and involves the use of fossil fuels in the production of the plastic used.  Often the plastic cannot be reused thus creating additional waste by-product. This method is only used in high-value small fruit or vegetable crops and is not feasible at scale or in lower-margin crops. Overall, cultural practices require specialized equipment, additional time and monetary resources, and greater management inputs, which limit the acreage that can be managed effectively.

Water is also a cultural practice used for weed control in very limited circumstances.  In rice, crops are flooded with water (3-5 inches in depth) for much of the growing season. Rice can translocate absorbed oxygen from the leaves to roots for respiration. However, most weed species and all other crop species lack this ability, thereby limiting this practice to rice.

Humans have been so desperate to control weeds they have even set fire to their fields as a means to eliminate weeds from their land. In pasture and forestry areas, controlled burning eliminates plant species not tolerant to the extreme heat as well as weed seed laying on the surface. Most trees and dormant pasture species tolerate the short but extreme heat from fires. Often after harvest of agricultural crops, residues are burned.

Given the inherent dangers to people and property, the use of fire to control weeds is only effective in a very limited set of circumstances and for a very limited set of trained applicators. When not used properly, fires can easily get out of control and injure humans and burn adjacent homes and property. Fires also release fine particulates into the atmosphere, which are second only to $CO_2$ in affecting global warming (Li et al., 2010). Controlled burning also contributes to smoke passing over roads, reducing motorist visibility and inhalation of the smoke can negatively impact human health.

<u>Mechanical</u>

Mechanical control took on a greater role with the development of the cast-iron plow (1797), which was initially pulled by a horse. Following invention of tractors in 1889, the use of machinery to pull tillage equipment quickly replaced animal and human labor (Zimdahl, 2018). Today, there are many different pieces of tillage equipment. Some are used to prepare soil for planting (termed primary tillage), while other equipment was designed to pass between crop rows (termed secondary tillage). One of the limitations of tillage is damage to the structure of the soil. Tillage equipment is heavy and compacts soils, which can limit water percolation and root penetration of crop plants. Mechanical cultivation in established crops is a relatively slow process and the rapid growth of weeds (some up to 2 inches per day) can result in plants quickly growing beyond the stage where they are susceptible. In addition, mechanical cultivation cannot be carried out when soil conditions are wet (a common situation in the Midwest during the growing season). Tillage can be effective on small, seedling species, but the disturbance which destroys emerged species also brings buried seed to the surface, stimulating new populations. Thus, reliance on tillage for weed control requires repeated usage throughout the growing season. Additionally, for perennial weed species, tillage cuts up underground vegetative structures, serving to multiply weeds and magnify the population (Ross and Lembi, 2009). Tillage also contributes to global warming by impacting $CO_2$ emissions; adoption of no-till versus conventional tillage practices reduces emissions by 66.6% in corn, soybean, and wheat production areas (West and Marland, 2002). Utilization of tillage hastens water losses from soil, critical to proper crop plant development in areas with limited annual precipitation.  In fact, tillage was a significant factor contributing to the amount of displaced topsoil during the tragic Dust Bowl in the US during the 1930's (Lockeretz, 1978). Additional consequences of tillage will be described later in this report.

Mowing is a common practice for mechanical control of weeds in non-agricultural spaces, but only reduces above ground biomass of the targeted species in limited areas. Between established rows of long-term perennials (small fruit, tree fruit and nut crops) and in turfgrass areas, mowing is a common method of managing plant height (and thereby competition) and seed production. However, mowing can serve to spread wind-borne seed and has no impact on reducing reproduction of perennial weeds. Although mechanical weed control aesthetically improves the appearance of treated areas, these practices are labor as well as time intensive, are not as effective or efficient as herbicidal control, and also promote carbon emissions. Mowing equipment cannot reach all

locations where weed control in needed or desired such that mowing is an available option only in limited settings.

### Biological

Biological control is the use of living organisms, referred to as biotic agents, to reduce weed populations to economically acceptable levels. The biotic agents physically consume weed tissue or act as pathogens to reduce the viability and thus competitiveness of weeds. Biological control practices are only effective in very limited areas where a specific invasive species has been introduced from a distinct geographical area. Thus, in many areas with native weed populations, biotic agents are not effective. Biological control can be effective on some specific species. However, crop fields are infested by a plethora of weeds, and management of a single species is relatively useless. A survey of 593 corn, soybean, and winter wheat fields was conducted in Canada from 1988-1989 and identified 82 different weed species (Frick and Thomas, 1992). Also, for biological control to be successful, the biotic agent must establish an equilibrium with the target weed, which permits the weed to have some negative impact on adjacent crops. In essence, biological control has limited applicability and is best adapted for use in non-crop areas where some level of weed competition can be tolerated.

### Chemical

The development of chemical weed control practices was necessary because of the inability of other practices to effectively control all target species. Exclusive reliance on cultural practices is extremely labor intensive and unsustainable in non-agrarian economies. Cultural practices are effective for early germinating weeds, but prominent annual species emerge throughout the growing season, continually threatening crop yields. Many herbicides exhibit residual activity in the soil, thus preventing weed competition over a greater portion of the growing season. Also, several cultural practices cannot be used in agronomic crops (e.g. flooding, fire, plastic mulches) because they will damage crops or are not economical. Mechanical weed control has some efficacy at eliminating weeds prior to crop planting, but thereafter can only remove weeds between crop rows. Weeds emerging in the crop row are the most competitive with crop plants, as roots directly compete for water and nutrients, and shoots compete for light.

Chemical weed control utilizes formulations containing natural (plant extracts) or synthetic ingredients to kill herbaceous plants. These formulations are known as herbicides. The development of herbicides was one of the most significant achievements that contributed to the safe, effective, and economical management of most weeds that impact crop and non-crop areas. One of the many advantages of herbicides is that selective herbicide applications often result in minimal or no damage to non-target plants. Herbicides also control a wide spectrum of weeds and do so in areas where other techniques may fail, such as directly adjacent to crop plants. The weed spectrum controlled includes annuals, biennials, and perennials.

One of the greatest benefits of herbicides is treatment of large areas in a short period of time.  This allows farmers to expand the number of acres they can farm efficiently. The average farm size in 1900 was 146 acres and only 216 acres in 1950 (Stanton, 1990). As recently as 2016, average farm sizes had grown to 442 acres in the U.S. (Freese, 2017), with many farms producing corn and soybeans exceeding 1,000 acres. As farm sizes have increased, mechanical methods become even less efficient methods to control weeds. Herbicides are also more economical than other weed control techniques, in terms of both money and time. Mechanical weed control costs an average of $3 more per acre compared to chemical practices, and several trips over the field are needed with heavy mechanical equipment to adequately control weeds (Armstrong et al. 1968). On farms, weed control is considered a variable cost (compared to fixed costs such as crop seed and land rent), and farmers are interested in reducing variable costs to improve profitability. Grain yields for corn can be similar for both mechanical and chemical weed control practices. However, the net return was consistently higher where herbicides were used (Mohler et al., 1997). In addition to efficacy, chemical weed control for corn requires from two to three fold less time than various mechanical methods (Lague and Khelifi, 2001). During establishment of eucalypt trees in Australia, mulches, mechanical methods, and herbicides were compared for effectiveness of weed control; results clearly showed herbicides were superior in performance and more cost-effective (George and Brennan 2002).

In addition to cropped areas, herbicides are advantageous in non-crop areas. They can be applied directly to target plants, limiting damage to adjacent desirable plants. Herbicides can also be applied in areas where other techniques cannot be used. This includes: the ballast area containing railroad tracks, adjacent to signs and guardrails on roadsides, in aquatic areas, adjacent to fuel storage tanks and pumping stations, under solar panel fields, around petroleum and gas drilling sites, on steep sloped areas (bridge abutments), and many other locations. Herbicides are also easy to apply and do not require the sophisticated equipment and training that other methods of weed control require.

### Herbicide Development

The shortcomings of many weed management practices contributed to the need for inventing herbicides. Herbicides have made farming safer, more efficient, and profitable. In 2020, one U.S. farmer is expected to feed about 166 people, which is an increase from feeding 25.8 people in 1960.[4] The benefits of adopting herbicide use in residential, industrial, and commercial areas are also evident, as they are safer and more effective than alternative practices. The use of herbicides is often more economical than other methods, enabling use on more areas and precluding the negative impact of weeds (described above). Adoption of herbicides lowers the risk of human injury associated with

---

[4] https://www.fb.org/newsroom/fast-facts

other techniques. Herbicides also enable weed control in difficult to access areas such as deforested areas, steep slopes, and aquatic areas.

Herbicides have had a far greater impact on human efforts used to manage weeds than any other weed management technique developed previously. In developing countries, the labor to manage weeds consumes 30-70% of the time necessary to produce crops (Koch, 1992). In Togo, a 1988 study estimated that in the absence of herbicides, 556,000 acres of corn would require over forty-nine million work hours to mechanically remove weeds for optimum yield. Prior to development of herbicides in the U.S., a combination of tillage and hand weeding was used for weed control, with five to thirteen hours of hand pulling and hoeing per acre necessary for corn, cotton, and soybean (Gianessi and Reigner, 2007). In cotton alone, each herbicide application substituted for hand labor reduced the expended time necessary for weed control by 19.8 hours per acre. Without herbicides, a large amount of human labor would be necessary to carry out hand weeding.

Prior to the development of synthetic compounds, the first herbicides were salts or acids of inorganic chemicals. Beginning in the middle of the 19th century, lime (calcium carbonate) was applied in Europe for control of horsetail (Timmons, 2005). Over the next 60 years, different salts such as copper and iron sulfate, as well as strong acids including nitric and sulfuric, were applied for control of broadleaf weeds in cereal crops. In Kansas during the early 1900's, salt (sodium chloride) was applied for weed control on roadsides and railroad rights-of-way at rates up to twenty tons per acre. Salt was also advocated for control of perennials in Europe, with selectivity between crops and weeds maintained by applying salt directly to the crown of weeds (Smith and Secoy, 1976). Unfortunately, these early and rudimentary inorganic chemicals were often ineffective on weeds, caused injury to crop plants, and posed health risks to people, animals and other organisms.

Petroleum oils were also used for weed control. Beginning around 1914, heating oils were used to control garlic in cereal crops (Timmons, 2005). They were applied to leaves and smothered plants by preventing gas exchange through stomates. By 1920, petroleum oils were applied to the base of undesirable trees, resulting in loss of cambium function and plant death (Timmons, 2005). However, oils were readily flammable and sparked fires, were cumbersome to apply, and had other less desirable properties.

The modern era of chemical weed control began with development of the phenoxyacetic compounds during the early 1940's. The focal compound was 2,4-D, a mimic of the natural hormone auxin and highly selective for control of broadleaf plants (Timmons, 2005). The efficacy of 2,4-D fueled the development of many new herbicides.  By 1940, there were 15 commercial herbicides in the U.S. and Canada. However, that number grew to 25 in 1950, and by 1969, there were 75 synthetic herbicides (Timmons, 2005). Between 1970 and 2005, another 184 commercial herbicides were released (Appleby, 2005). Part of the success of herbicides was reflected in rapid adoption once they were introduced.  Between 1962 and 1964, U.S. areas treated with herbicides increased from 90 to 120 million acres. The rise in herbicide use is also evident by the percentage of pesticides applied. In 1960, of all pesticides applied, herbicides only represented 18%.

By 2008, that number had increased to 76% (Fernandez-Cornejo et al., 2014). In terms of areas treated with herbicides, herbicide application was applied to 5-10% of corn, wheat, and cotton acres in 1952. By 1980, 90-99% of corn, soybean, and cotton acres were treated with herbicides. The four major herbicides applied included: glyphosate, atrazine, acetochlor, and metolachlor.

Glyphosate is a truly unique herbicide. Between 1960 and 1972, Monsanto screened over 51,000 chemical compounds for herbicidal properties, with glyphosate (N-phosphonomethyl glycine) being only one of three compounds developed into a commercial herbicide. It was patented in 1974 (Franz et al., 1997). Glyphosate belongs to the family of aminomethylphosphonic acids, and over 200 derivatives of this family were screened between 1960 and 1970 before glyphosate was identified (Franz et al., 1997).

### *Uptake, Translocation, and Metabolism of Herbicides in Plants*

Herbicides are categorized into families based upon structure, as structural similarity results the same mode of action. The mode of action is the total impact of an herbicide from the time a sensitive plant (weeds) is treated until plant death. The specific disruption of a plant process is termed the mechanism of action. Families of herbicides are placed together in groups, with each herbicide inhibiting some plant biochemical or physical activity (mechanism of action) in the same way. Often, herbicides with similar mechanisms and modes of action have similar physical properties. Although there are hundreds of herbicides in use today, they are grouped by mode of action into 27 groups (WSSA).

Disruption of plant function by herbicides commences only when compounds enter plant cells.  Uptake into plants can occur from the soil or from treated leaves. Some herbicides are applied to the soil, taken up by germinating seedlings, and translocated to growing tissue through the transport portal for water and nutrients called the xylem. These types of compounds are termed preemergence or PRE herbicides. Other herbicides are applied to plant leaves, taken up by simple diffusion into cells, and then utilize the transport pathway for sugars and other plant products, the phloem, to reach target plant cells. Compounds applied to plant foliage are termed postemergence or POST herbicides.

All herbicides can be taken up and translocated throughout plants, but resulting damage depends on whether plants are sensitive or not. Herbicides can be classified as non-selective or selective. Non-selective herbicides will cause damage to all plants, whereas selective herbicides will result in damaging some plants but not others. In addition to selectivity of herbicides, some rapidly disrupt plant function, leading to visible symptomology and plant death. This activity describes a contact herbicide, which kills plant tissue shortly after exposure. Alternatively, other postemergence herbicides disrupt plant function slowly, delaying the onset of symptoms and plant death. This activity describes a systemic herbicide, which allows the compound to utilize the phloem and/or

xylem. Slower acting herbicides allow for compounds to translocate throughout plants, effectively controlling all sensitive plants, including perennials.

The selectivity of herbicides depends upon specific identification and inhibition of pathways unique to plants. Most herbicides target processes unique to plants versus higher order organisms (animals, plants), including photosynthesis, amino acid synthesis, and fatty acid synthesis (membrane construction). Other target processes include cell division and elongation (mitosis). Interestingly, our knowledge of herbicides arresting cell mitosis in plants was instrumental in identification of compounds that slowed or reversed uncontrollable cell mitosis (cancer) in humans and animals. Finally, other herbicides uncouple carefully controlled processes such as plant growth, by mimicking plant specific hormones such as auxin.

Survival of plants when challenged with herbicides depends upon several factors. Plants that survive low but not higher doses of herbicides are termed tolerant. Tolerant plants likely exhibit a mechanism that facilitates crop survival following uptake of an herbicide. One such mechanism is metabolism, a process where the herbicide is dismantled into small pieces and rendered inactive. Many plants have in common a set of enzymes that degrade chemicals such as insecticides, fungicides, and herbicides. Unlike many herbicides, glyphosate is poorly metabolized in plants, which partially explains the broad spectrum of sensitive weeds.

Underlying characteristics that make glyphosate a successful herbicide include rapid uptake into plant cells following application to leaves, with most of the herbicide taken up within 48 hours. Glyphosate is then transported to energy sinks in plants through the phloem, which includes above- and below-ground growth centers. Glyphosate is especially active on rapidly growing plants, which render small weeds especially sensitive. Because the effects of glyphosate in sensitive plants are slow to develop, plants unknowingly accumulate lethal concentrations of glyphosate.

### *Introduction to Glyphosate*

Glyphosate is unique in how it interacts with plants. This section will address the effect of glyphosate on plants, from initial uptake to final symptomology and plant death. Additionally, I discuss the impacts of glyphosate on the environment and non-target organisms.

Herbicides either inhibit a critical plant process or stimulate a buildup of toxins in plant cells that becomes lethal to the plant. In the case of glyphosate, plant cells are strongly inhibited from synthesis of specific amino acids. Following application, glyphosate readily translocates to target cells through the phloem. Over a period of 10-14 days after exposure, meristems of sensitive plants initially turn yellow (chlorotic), then brown (necrotic), followed by plant death. The same target enzyme is present in all plants and is the only enzyme inhibited, hence the broad-spectrum activity of glyphosate.

Glyphosate is extraordinarily effective and safe because it targets the shikimic acid pathway, a critical pathway in plant function. This pathway is readily active in plants and microorganisms, but absent in humans, animals, birds, fish, and insects (Franz et al., 1997). In all other organisms, the products of the shikimate pathway are acquired through ingested food. *Id.* Thus, glyphosate exhibits a high level of safety with such a limited host range. The target enzyme of glyphosate is in the chloroplast, an organelle critical in making the proteins that fuel plant growth. It is estimated that up to 20% of all carbon cycled through plants pass through the shikimic acid pathway, with target products including intermediate proteins identified as pigments, co-factors used in photosynthesis (tetrahydrofolate, ubiquinone), secondary metabolites, and the aromatic amino acids tyrosine, tryptophan, and phenylalanine (Franz et al., 1997).

Glyphosate's efficacy is due to the simplicity of the molecule and the importance of the plant functions inhibited. It is a competitive inhibitor of the enzyme enolpyruvyl shikimate-3-phosphate synthase (EPSPS) (Steinrucken and Amrhein, 1980). Glyphosate is a derivative of important compounds called amino acids, specifically glycine (Figure 2). Glycine is one of twenty important amino acids, which are the building blocks of proteins. It binds to the EPSPS and precludes binding of the native substrate, phosphoenol pyruvate (PEP) (Figure 3). In molecular studies, glyphosate only has affinity for EPSPS. On a molecule for molecule basis, glyphosate is greater than sixty-fold more effective than PEP for binding to EPSPS. In addition, once glyphosate binds to EPSPS, it is not released, further slowing the natural formation of aromatic amino acids. The unique specificity of glyphosate results in effective control of treated, sensitive plants with only a single application. EPSPS is almost identical in structure across many higher plants, an indication of the importance of the enzyme and partially explaining the broad-spectrum activity of glyphosate (Cajacob et al. 2004).



**Figure 2.  Structure of the herbicide glyphosate (N-phosphono-methyl-glycine).**



**Figure 3.  Mechanism of action of the herbicide glyphosate, which is a specific inhibitor of the enzyme enol-pyruvul-shikimate-3-phosphate synthase (EPSPS).  Up to 20% of all carbon generated by plants is shunted through the shikimate pathway.  The end product of the pathway is synthesis of the three aromatic amino acids, tryptophan, phenylalanine, and tyrosine.**

Compared to other herbicides, glyphosate has little to no deleterious impacts on the environment. Extensive testing has shown that glyphosate readily binds to soil particles (termed adsorption), and exhibits no residual activity (WSSA, 2014). Therefore, although glyphosate is highly water soluble, adsorption to soil precludes horizontal and vertical leaching, preventing glyphosate from contaminating groundwater. Strong adsorption also permits immediate establishment of desirable plants (seeds or seedling transplants) without the potential for herbicide injury. Volatilization is the tendency of a chemical to move from a liquid phase to a gas phase (vapor); a compound such as gasoline is highly volatile. Although several herbicides can volatize during the application process, glyphosate does not. Thus, glyphosate is less prone to drift, and human applicators are less likely to have potential contact with glyphosate when applying in the normal course and according to label instructions. Glyphosate's longevity in the environment, expressed as half-life, has been studied in a wide range of soils. Glyphosate is tightly bound to soil, and the half-life is typically 47 days in soil – much shorter than many other herbicides (Table 1) (WSSA 2014).

Table 1. Relative half-life of herbicides in a soil environment (in days). The half-life expresses the time required for 50% of the herbicide to degrade to secondary compounds. For example, if one pound of herbicide were applied with a half-life of 50 days, one would expect 0.5 pounds of herbicide to remain in the soil 50 days after application. Table adapted from WSSA (2014).

| Herbicide active ingredient | Soil half-life (days) |
|---|---|
| Mesotrione | 21 |
| Indaziflam | 150 |
| Tebuthiuron | 450 |
| Metribuzin | 60 |
| Bentazon | 20 |
| Diuron | 90 |
| Chlorosulfuron | 40 |
| Imazethapyr | 90 |
| Atrazine | 60 |
| Acetochlor | 21 |
| Picloram | 90 |
| Glyphosate | 47 |

Additional studies concluded that glyphosate residues do not build up in the environment (bioaccumulate), nor does glyphosate resist breakdown (i.e. glyphosate does not show persistence) (Solomon and Thompson, 2003). In sum, glyphosate specifically targets a pathway critical to plant function, exhibits broad spectrum weed control, and has minimal environmental impacts because it is non-volatile and readily tied up and degraded in soil.

### *Glyphosate Toxicity*

Glyphosate is benign toward non-target organisms. Only the EPSPS enzyme in plants and microbial populations interact with glyphosate. This makes it one of the least acutely toxic herbicides available. Every pesticide receiving registration by EPA must pass a series of extensive and stringent tests. These tests are conducted at doses both below and above those expected to have adverse impacts on the environment and non-target organisms. Results enable scientists to estimate the probability the compound will exhibit toxic effects under typical use conditions and at normal use rates.

Extensive testing has been conducted with glyphosate and its major metabolite, aminomethylphosphonic acid (AMPA) to determine the $LD_{50}$ value, the dose necessary to be lethal to 50% of a target organism population. Units are expressed as milligrams of a chemical per kilogram of body weight for the target organism. Among 118 unique herbicide active ingredients, glyphosate exhibited 90% less chronic toxicity and was 94% less acutely toxic (Kniss, 2016). Some examples of acute toxicity comparisons for glyphosate and other commonly used herbicides are listed in Table 2.

**Table 2. Acute toxicity values for commonly used herbicides in soybeans and corn. Values for acute toxicity are based upon the LD$_{50}$ (lethal dose to kill 50% of a population). LD$_{50}$ values were based on the response of rats to oral exposure over a 24-month period. Table adapted from Kniss (2016).**

| Herbicide active ingredient | Acute toxicity (LD$_{50}$) (mg/kg) |
|---|---|
| Paraquat | 112 |
| 2,4-D | 699 |
| Pendimethalin | 1,050 |
| Metribuzin | 1,090 |
| Bentazon | 1,100 |
| Fomesafen | 1,250 |
| Clethodim | 1,690 |
| Dicamba | 1,707 |
| Glufosinate-ammonium | 1,910 |
| Acetochlor | 2,148 |
| Sulfentrazone | 2,689 |
| Atrazine | 3,090 |
| S-metolchlor | 3,877 |
| Mesotrione | 5,000 |
| Glyphosate | 5,600 |

The average American is exposed to a range of chemicals. The LD$_{50}$ based on acute toxicity (rats) is compared for glyphosate to several other common household products (Table 3). Among herbicides used by the average person, glyphosate's acute toxicity is comparable or poses a much lower risk. Notably, many of the organic herbicides that would presumably be used to replace glyphosate, are up to 2.8 times more acutely toxic (Table 3).   In addition, glyphosate is tens of times less acutely toxic than common household items like caffeine and Tylenol (Table 3).

**Table 2. Comparison of oral LD$_{50}$ (rats) for commonly used chemicals around the household as well as organic compounds available for weed control. The lower the value, the more toxic the substance.**

| Chemical | Acute toxicity (LD$_{50}$) (mg/kg) |
|---|---|
| Nicotine | 9 |
| Bleach | 192 |
| Caffeine | 192 |
| Diquat (herbicide) | 231 |
| Tylenol | 328 |
| Ammonia | 350 |
| Codeine | 427 |
| 2,4-D (herbicide) | 699 |
| Pendimethalin (herbicide) | 1,050 |

| | |
|---|---|
| Pelargonic acid (organic herbicide | 2,000 |
| Laundry detergent (clear) | 2,000 to 4,400 |
| Raid insecticide (multiple active ingredients) | 2,000 to 6,150 |
| Mothballs | 2,200 |
| Clove oil (organic herbicide) | 2,650 |
| Salt (table) | 3,000 |
| Vinegar – acetic acid (organic herbicide) | 3,310 |
| Imazaquin (Image; herbicide) | >5,000 |
| Glyphosate (Many trade names; herbicide) | 5,600 |

Another method used to capture the relative toxicity of an herbicide applied in crop production systems over time is the Hazard Quotient (Stoner and Eitzer, 2013). This is determined by the total amount of herbicide used per given area divided by the toxicity (acute or chronic) of each active ingredient. In a study using this approach and the $LD_{50}$ value of pesticides for rats, the environmental impact of representative herbicides used for soybeans that are glyphosate-resistant and non-resistant were modeled for 1400 Midwest farms. Considering acute mammalian toxicity, herbicide programs for the Glyphosate Resistant ("GR") soybean technology were more environmentally friendly than the non-GR technology across all farms (Nelson and Bullock, 2003). From 1990-2015, the hazard quotient in soybeans was reduced by 68%, with much of that decrease attributed to substitution of glyphosate for more toxic herbicides (Kniss, 2016).

*Adjuvants*

Formulation is a process whereby a class of compounds called adjuvants are added to the active ingredient to increase its effectiveness. In and of themselves, adjuvants do not have herbicidal properties; instead, adjuvants exhibit several properties such as stabilizing the active ingredient in a dry or liquid form, buffering the pH, or modifying plant surface properties to improve the activity of herbicides. For example, some adjuvants reduce the freezing point of chemicals in the herbicide container. Other adjuvants known as emulsifiers, prevent the hydrophilic and lipophilic components of the herbicide solution from separating into different layers, which can reduce efficacy. Glyphosate is chemically an acid and unstable. However, it is stabilized through use of a salt (isopropyl amine, potassium). Although many herbicides form suspensions in water that require constant agitation, glyphosate is highly water soluble and forms a true solution, and therefore does not require mixing during use (WSSA Handbook, 2014). A major challenge for POST herbicides is penetration into plant leaves. Plant surfaces are covered with a cuticle, which has a highly lipophilic surface composed of interlocking layers of wax (epicuticular

wax). This wax helps to slow the loss of water from the surface, a process called evapotranspiration. Beneath this layer is a less lipophilic layer (cutin), which is comprised of lipids with embedded waxes. Layered under the cutin is pectin, a porous and somewhat hydrophilic layer. Without assistance, spray solutions that contain glyphosate will form individual droplets on the epicuticular wax. Adjuvants called wetting agents reduce the surface tension on cuticles, resulting in uniform wetting of the leaf surface. Another adjuvant present in the spray solution of glyphosate is a nonionic surfactant (NIS). This material modifies the epicuticular waxes to improve glyphosate absorption into plants. Because glyphosate uptake into plants follows a concentration gradient, glyphosate will move from a concentrated solution on the leaf cuticle to less concentrated areas in cell layers (mesophyll and palisade cells) beneath the cuticle. Although NIS facilitates glyphosate uptake into plants, the cuticle of a plant is malleable, whereas another surface such as human skin is much thicker and fixed. Therefore, surfactants for herbicides do not improve herbicide uptake into people. In sum, adjuvants improve the activity of herbicides in plants, enabling herbicides to be effective at lower rates.

### Label and Personal Protective Equipment (PPE)

Accompanying each formulated product used by the public is a US EPA approved label, which serves as the legal instructions for proper use. Information in the label is based upon results following extensive testing of the product on target and non-target organisms, as well as environmental impacts. Although most labels go into extensive detail, there are signal words that quickly summarize the relative safety of a product based upon short-term acute toxicity. Selection of a signal word is based upon studies for oral, inhalation and dermal exposure, as well as eye exposure. These signal words are: caution, warning, danger, and danger-poison. Caution indicates chemicals with low toxicity. Warning identifies chemicals with medium toxicity. Danger references chemicals that are highly toxic, while danger-poison is accompanied by skull and crossbones to indicate the compound can be lethal if ingested (Fishel, 2018).

The popularity and compatibility of glyphosate has contributed to development of several hundred glyphosate containing herbicides, each one with a label describing proper use. For glyphosate alone formulations, the signal word most often mentioned on the label of concentrated formulations is <u>caution</u>, the lowest category of toxicity. This is clearly displayed in capital letters near the beginning of the label. The label also contains very clear directions for safe use by all users, including identifying proper protective equipment (PPE).

Concentrated formulations, (used most often by agricultural and non-crop users) have higher amounts of glyphosate in each container to improve handling and efficiency. However, ready-to-use (RTU) formulations, which have far less glyphosate by volume, are most popular among urban residential users. The largest difference between RTU and concentrated formulations of glyphosate is the amount of glyphosate. RTU formulations typically contain <1% by weight per volume of glyphosate, whereas concentrated formulations contain about 41% glyphosate by weight per volume.

Directions for use of RTU products are simplified because these products are specifically designed to be applied directly on weeds targeted for removal, i.e. not a broadcast application.

### Benefits of Glyphosate

Although strictly used for weed control, glyphosate's influence on society and the environment has been far-reaching and affects almost every way in which humans interact with the environment and our food supply. This section will address chemical properties such as low usage rate and effectiveness on a broad spectrum of weed species.

*Glyphosate Utility in Agricultural Settings*

Glyphosate was a widely used herbicide by the early 1980's, but the development and release of glyphosate-resistant (GR) crops was a dramatic breakthrough that led to even wider adoption. (Dill, 2005). These crops were referred to as Roundup Ready® (RR), and included soybean (1996), corn (1997) and later cotton, canola, alfalfa, sugar beets, and sweet corn. Superior weed control performance, among other benefits, contributed to growers quickly adopting GR crops, with production rates of major crops such as soybean exceeding 80% of planted acreage in the U.S. within 8 years of commercialization (Dill, 2005). In Argentina, adoption of RR soybeans was also rapid, reaching 90% by 5 years (1996-2001) after introduction (Brookes and Barfoot, 2005). Among all agronomic crops, soybeans have the most labeled herbicides available for grower usage. The attraction of GR soybeans speaks to the preference of using glyphosate over many other herbicides for weed control. As of 2019, adoption rates of herbicide-tolerant soybeans, cotton, and corn exceeded 90%.[5] (Between 1996 and 2013, more than 432 million acres globally were planted with glyphosate-resistant crops (James, 2014)).

Underlying the adoption of RR crops are several benefits attributable to glyphosate. First, glyphosate is effective at relatively low amounts. Many herbicides preceding glyphosate were active at rates measuring multiple pounds per acre. However, farmers discovered that at rates generally less than 1 pound per acre, glyphosate was more effective than other herbicides. Therefore, increased glyphosate usage and concomitant reductions in the use of other herbicides has resulted in an overall reduction in herbicide load in the environment. In 2005 alone, broad adoption of herbicide-resistant crops in the U.S. resulted in a reduction of 31 million kg of pesticides compared to a similar area where herbicide-resistant crops were not used; 27 million kg of that reduction resulted from application of lower use rate herbicides (Sankula, 2006). Further, it was estimated that adoption of crops with genetically modified resistance to at least one pesticide reduced total pesticide use up to 7.9 million pounds in some instances (Heimlich et al., 2000). Comparing GR and non-GR crops, the intensity of herbicide use increased faster for non-GR crops compared to GR corn and cotton (Kniss, 2016). Between 2004 and 2015,

---

[5] USDA-ERS; https://www.ers.usda.gov/data-products/adoption-of-genetically-engineered-crops-in-the-us/recent-trends-in-ge-adoption.aspx).

herbicide use intensity decreased for soybean, a clear reflection of the introduction of GR soybean. A study with U.S. university weed scientists in 2001 found that replacement of glyphosate with other herbicides to provide equivalent weed control in soybeans would require 0.5 pounds of additional active ingredient per acre. Nationwide this would have totaled 25 million additional pounds of herbicide used (Gianessi et al. 2002). Greater use of glyphosate also resulted in reduced use of potentially harmful chemicals. Glyphosate replaced herbicides that were considered three to sixteen fold more acutely toxic and 1.3- to 1.6-fold more persistent in the environment (Heimlich et al., 2000).

Another benefit of glyphosate is its ability to control a wide spectrum of weeds and its flexibility in controlling weeds variable in size. Growers utilizing GR crops can manage all weeds that previously escaped other management techniques and do so with glyphosate alone. Many postemergence herbicides must be applied prior to weeds reaching 4 inches in height or reduced weed control would result. However, glyphosate is effective on small as well as larger weeds, depending on the rate used. This increases flexibility for farmers in making applications, a great benefit when adverse weather conditions for applying herbicides is common. Before the introduction of postemergence glyphosate use, mixtures of several herbicides were necessary to achieve the spectrum of weeds controlled by glyphosate alone (Gianessi, 2005). For example, Roundup Powermax is noted to kill over 110 annuals, 61 biennials and vegetative perennials, and more than 66 woody brush and vine species. Expansion of corn and soybean acres in states such as Kansas and South Dakota were partially the result of glyphosate activity on perennial weeds such as field bindweed and Canada thistle. Part-time farmers especially benefitted from GR crops, as utilization of glyphosate simplified weed management decisions and resulted in consistently higher levels of weed control. Operators of smaller farms realized up to 15.9% higher off-farm income following adoption of herbicide-resistant soybeans, much in response from time savings associated with weed control practices (Fernandez-Cornejo et al., 2007).

Effective weed control reduces competition with crops, boosting crop yields. This is necessary to meet the food needs of the growing human population. Some models project that by 2050 global demand for food will increase up to 110% from 2005 demands (Tilman et al., 2011). Using this estimate, an additional 2.47 billion acres of land would need to be converted to farmland by 2050. This would lead to greenhouse gas emissions of $CO_2$ reaching an additional ~3 gigatons per year (Tilman et al., 2011). A more environmentally friendly approach is to increase crop productivity per unit of land, which lessens demand to convert land into cropping areas and preserve more natural areas (Duke, 2015). The use of glyphosate to control weeds and the development of glyphosate-resistant crops was a technological breakthrough needed to intensify crop production without increasing the need for expanded land use, ultimately reducing food insecurity. Between 1980 and 2010, soybean and corn yield per acre that followed introduction of GR crops continued to increase, owing to improved crop performance and weed control (Duke et al., 2012). Improved weed control with glyphosate also reduced the amount of weed tissue (plant parts and seed) present in harvested crops, improving crop seed quality (Green, 2012).

Improvements in weed control due to the use of glyphosate have also led to increased farmer profitability and productivity, the latter sustaining farms to meet growing food demand.  In 2004 alone, broad adoption of GR soybeans increased net farm income in the U.S. by $415 million (Brookes and Barfoot, 2005). Eliminating tillage practices alone saved soybean growers $385 million per year (Gianessi et al., 2002). Because glyphosate was a lower-cost herbicide compared to other herbicide options for growers, herbicide manufacturers were forced to reduce non-glyphosate herbicide costs, resulting in an additional savings of $216-307 million per year (Carpenter and Gianessi, 2002). Between 1996 and 2012, use of GR crops saved growers more than $45 billion worldwide (Brookes and Barfoot, 2014). For soybeans and canola, these savings increased farm income approximately 5%. In 2005, the average weed management costs in non-GR canola were $39 per acre, whereas costs in GR canola were about $24 per acre (Sankula, 2006). The economic benefit of growing GR soybean was attributed to both yield increases following improved weed management (38%) and reduced weed management costs (62%) (Brookes and Barfoot, 2014). Widespread adoption suggests that growers saw a benefit from growing RR crops, namely consistency in weed control and improved production efficiency. RR crops are an important component of exports to many countries for human and animal consumption. In 2017, soybean, corn, and cotton exports totaled $21.58, $9.12, and $5.83 billion, respectively according to the USDA-ERS.[6]

The lack of soil activity following application of glyphosate as well as effective weed control profoundly changed grower practices for land preparation prior to planting crops. For example, the need for soil tillage was reduced, giving rise to the practice of minimum or no-till farming: a practice where crops are planted into soils with minimal or no disturbance. In a survey of almost 1,200 growers from 6 major agronomic states, tillage intensity for glyphosate-resistant cotton and soybean areas was reduced by 45% and 23%, respectively (Givens et al. 2009). Following the adoption of RR crops, 33% of the growers surveyed in Mississippi and North Carolina adopted conservation tillage practices (Givens et al. 2009). Because soil disturbance is a primary factor that stimulates weed emergence, reduced tillage resulted in less weed pressure shortly after crop emergence.

The environmental benefits of adopting reduced tillage are significant. Conventional tillage leaves soil exposed to wind and water erosion. In Kansas, every inch of soil lost was estimated to result in reductions of 1.8 bushels per acre of soybean and 1.7 bushels per acre of wheat (Havlin et al., 1995). Crop losses due to soil erosion are not easily replaced, as mineralization of sub-soil into usable soil requires thousands of years. Over a 10-year period in Indiana, corn and soybean yield losses ranged from 9-18% and 17-24%, respectively, when comparing sites with severe versus slight soil erosion (Weesies et al., 1994). Soil tillage contributes to high levels of soil loss into streams, lakes and eventually rivers, where sediments can fill in bodies of water and reduce water quality. A

---

[6] www.ers.usda.gov/data-products/foreign-agricultural-trade-of-the-united-states-fatus/us-agricultural-trade-data/

comparison of two different watersheds revealed that forty-one-fold greater sediment drained into Chesapeake Bay from conventional-till versus no-till corn. Sediments also release nutrients such as nitrogen (N) and phosphorous (P), with convention-till releasing 13.8-fold more total N and 20.1-fold more total P than no-till soils (Angle et al., 1984). Both N and P contribute to development of anaerobic zones (hypoxia) in water bodies. Therefore, adoption of reduced tillage with GR cropping systems has significantly improved water quality.

Reduction in tillage due to glyphosate use has led to drastic reductions in carbon emissions. In 2014 alone, the savings in fuel consumption because of reducing soil tillage was equivalent to driving two million fewer vehicles (Duke and Powles, 2008). Lower equipment traffic over land resulted in less consumption of fossil fuels, with some estimations that adoption of GR crops could save up to 5.7 gallons of fuel per acre (Fawcett and Towery, 2002). Reduced tillage decreases equipment needs for growers, thereby decreasing required storage space and saving equipment repair and depreciation costs. In another economic study, the cost of winter wheat production using traditional tillage (TT) versus conservation tillage (CT) was compared, with differences based on weed management techniques (Nail et al., 2007). Glyphosate was the major cost of weed control in CT systems whereas tillage supplemented weed control in TT systems. From 1998 to 2005, net returns in the TT system were $0.95 per acre lower, mainly due to higher fuel costs. However, net returns in the CT system increased up to $2.58 per acre, primarily because of the low cost of glyphosate (Nail et al., 2007). In Germany, a survey was conducted with 896 farmers, whose land use represented 39.1% of the arable area (Steinmann et al., 2012). Without glyphosate, soil tillage to remove weeds prior to crop planting was used by 71.4% of the farmers; this dropped to 38.1% with adoption of glyphosate use. Nationwide, it was estimated that the economic benefit of using glyphosate versus soil tillage and application of other post-emergence herbicides was between $79 and $202 million Euros per year (Steinmann et al., 2012).

Adoption of reduced tillage systems results in other tangible benefits to the environment. In semi-arid areas, soil water retention is greater in conservation versus traditional tillage – aided by improvements in soil porosity and retention of crop residue on the soil surface. In dry years, more plant available soil water can result in significantly higher plant yields (Moreno et al., 1997). Therefore, adoption of reduced tillage practices conserves soil water and permits crop production in a broader range of geographical areas. Changes in soil tillage also impact weed seed longevity in the soil. Arthropods (insects) are a significant contributor to digesting weed seeds in the soil. These predators consumed 2.3-fold more seeds of four weed species in no-till compared to conventional tillage soils (Brust and House, 1988). One of the biggest impacts of adopting conservation tillage practices has been greater sequestration of carbon in the soil. Between 1996 and 2012, changes in soil tillage following utilization of herbicide-resistant crops precluded an estimated 204 billion tons of $CO_2$ emission into the atmosphere (Barfoot and Brookes, 2014).

Utilization of RR crops also enabled growers to minimize herbicide injury to crops, which can be a significant challenge. Annually, weed scientists at land-grant universities rank herbicide performance and crop safety for all herbicides registered for U.S. agronomic crops. Glyphosate was recognized as "highly safe" (Kells and Renner, 1999). Characteristics of herbicides and weed-management programs are important elements that growers consider when selecting glyphosate-resistant crops. In a survey of 1,176 farmers that were planting herbicide-resistant crops, crop safety was one of the most important factors that growers considered when adopting weed management technology (Hurley et al., 2009). Recently, an assessment of over 650 chemicals was conducted to identify pesticides with lower use risks and minimum adverse effects to the environment and bystanders to determine the best components of sustainable IPM practices (Jepson et al., 2020). Analytical procedures classified glyphosate as a lower risk pesticide and recommended it for inclusion in the safest IPM programs.

*Glyphosate Utility in Non-Crop Settings*

The utility of glyphosate for weed control goes far beyond field crop applications. A significant number of invasive weeds have encroached into non-crop areas. Many of these species are perennials and pose a threat for motorist and pedestrian safety along roads, as well as diminishing the natural beauty of scenic parks. Uncontrolled, these invasive species will lead to extinction of many native plants, which will have repercussions for the survival of birds, animals, insects, and other organisms that depend on the ecosystem established by native plants. The systemic activity of glyphosate in perennial species and non-persistence in the soil results in a relatively high degree of safety for adjacent, non-target species. The broad-spectrum effectiveness of glyphosate gives land managers a simple option for addressing weed control, rather than the need to mix multiple herbicides to control the plethora of target weeds encountered. Applications of glyphosate are also effective on weeds near or over aquatic areas. At rates of glyphosate up to four-fold the recommended dose, impacts on aquatic organisms were negligible (Solomon and Thompson, 2003). Glyphosate is relatively inexpensive, another important consideration for the large, non-crop areas that require treatment. Because of the broad diversity of weed species populating non-crop areas, glyphosate is the primary herbicide option to control weeds, especially in areas where non-chemical methods are not possible. Glyphosates provides a safe, economical, and effective means to control weeds in non-crop areas and may in fact be the only weed control option in some difficult to reach areas

*Glyphosate Utility for Homeowners*

Weeds are present in urban landscapes for several reasons. Because weeds invade disturbed areas, the constant presence of human activity to maintain turf and landscape areas is ideal for weed development. Many weeds in urban areas produce seeds that are disseminated by wind (dandelions, horseweed), machines (lawnmowers), or birds (poison ivy, honeysuckle), thus ensuring constant re-introduction. Also, many urban landowners are not familiar with and/or unable to provide proper lawn care. Therefore, improper

29

mowing, fertilization, aeration, pest management, and irrigation weakens turfgrass and other species, and encourages weed encroachment.  Fences favor the development of climbing weeds (field bindweed, honeyvine milkweed) and cannot be reached with mowing equipment. Many landscape plants are mulched with organic materials (wood-based) or topsoil which is spread over gardens and yards, introducing new weeds from seed or vegetative structures.

Several factors make weed management in landscape and lawn areas challenging. First, the proximity of weeds and desirable vegetation (turf, ornamentals) as well as the diversity of landscape and turf species make selection of an herbicide difficult. Another challenge is the lack of basic weed identification skills among urban landowners. Without this knowledge, selection of various herbicides appropriate to control all weeds (annuals to perennials) is problematic. Similarly, most urban landowners are not familiar with the processes for identifying and differentiating between different herbicides for the various types of weed control needed or their properties. Homeowners often wait until weeds are quite large before deciding to apply an herbicide. Glyphosate simplifies the weed control process because of the broad-spectrum applicability and flexibility in the size of weed controlled. Glyphosate products allow homeowners to use one product on all weeds. Additionally, glyphosate containing herbicides are highly soluble in water and often formulated with sufficient adjuvants for immediate use. There are several RTU formulations that enable applicators to make safe applications directly from the container, thereby eliminating all contact with the pesticide. Following use, pesticide storage is also problematic. While farmers have dedicated, isolated areas for storage, homeowners often store herbicides in easy to access areas in garages and storage sheds. The attractiveness of glyphosate is that it can be stored and used safely around children and pets, with no requirement for a pesticide applicators license. Combining glyphosate's low required use rates with low acute toxicity compared to alternative herbicides and household chemicals, the public can have confidence that glyphosate alone can simply, safely, and economically solve their weed control problems.

Another challenge is the proximity of urban use areas to water drainage systems; rainfall can take excess pesticides in urban areas and release them directly into sewage systems where they can load streams and larger bodies of water. For watersheds that drained into the Marne River in France, scientists determined that pesticide use for agricultural areas was approximately 4,300 tons per year while that for residential areas was only forty-seven tons (Blanchoud et al., 2007). However, runoff experiments from residential (primarily impervious surfaces) and agricultural areas showed the pesticide runoff was equivalent (1,100 tons per year). In an Ohio watershed study over three years, 98.2% of glyphosate remained in treated soils, even following high rainfall events (Edwards et al., 1980). Because glyphosate tightly adsorbs to soil (WSSA, 2014), leaching or runoff into drainage systems following urban applications is low.

Because of negative associations with weeds, urban landowners are increasingly using more herbicides. Between 1994-2007 pesticide sales in the home and garden market

increased 60%, with herbicides representing the largest share, especially glyphosate containing products (EPA 2011).  In 2001, urban use of herbicides in the U.S. totaled thirty-two million pounds, with glyphosate use second only to 2,4-D (tracking non-residential pesticide use in CA report).  The EPA estimated in 2011 that over forty-one million households use herbicides (EPA 2011).

Among the many techniques for weed removal are available to homeowners, glyphosate use is the most preferred. Weed species such as poison ivy pose significant health risks to homeowners and should not be pulled by hand or mowed. For the many homeowners suffering from allergies, direct contact with weeds can also trigger allergic reactions. Additionally, weeds are established in many areas (between sidewalk cracks, adjacent to buildings) where effective removal by hand or mechanically is difficult because shoots can break off and plants will simply regrow. Root systems of established weeds are not easy to remove and can be an injury risk for children or elderly citizens. The use of a broad-spectrum herbicide such as glyphosate provides a single solution to remove unwanted vegetation in a timely and economic manner with the least exposure to the weeds.

*Glyphosate Utility in Other Urban Areas*

Besides homeowners, glyphosate use in urban areas is also common in the landscape industry.  Mechanical weed removal is a labor-intensive process in landscape beds. Herbicides, especially glyphosate, are some of the safest, as well as time- and cost-efficient methods of weed control and, depending upon the particular herbicide, results in minimal detrimental impact to the environment (Marble et al., 2015).  Underlying reasons for herbicide use include safety, aesthetics, and a proven increase in the property value for improved landscapes (Henry 1994). Herbicides selected for use in landscape settings must include compounds that can be selectively applied and not damage adjacent, desirable plants. Except for residual herbicides, all postemergence herbicides registered for use in lawn and landscape settings have the potential to damage adjacent, desirable plants (Marble et al., 2015).  Also, these herbicides must have properties where off-target movement is minimal, reducing damage to desirable plants and turf (Koterba et al., 2010; Marble et al., 2015). Glyphosate exhibits all of these properties, making it a popular choice for weed management in the landscape industry.

Glyphosate use in urban areas is carried out by people associated with state, county, and city (departments of transportation, state parks) organizations, local municipal parks and recreation personnel, commercial landscape and lawn care professionals, as well as private citizens.  Each entity has a singular goal: improve the safety, aesthetics, and utility of property and natural areas. The range of education and training for use of glyphosate and other pesticides ranges from no training (typical homeowner) to licensed pesticide applicators. This means there is a need for untrained pesticide applicators to use safe, effective products with minimal potential to damage the environment. Glyphosate is a low acute toxicity herbicide and is safe for use as directed.

There are many reasons why glyphosate-based herbicides are superior to organic compounds for weed control in urban settings, including efficacy, ease of use, and safety. (Evans and Bellinder, 2009) explored adoption of organic herbicides and found that the organic compounds that were effective included acetic acid and extracted oils from natural plants. However, these compounds have demonstrated toxic properties and their use creates serious risk for homeowners and other non-sophisticated users. Additionally, organic alternatives to glyphosate may be less effective and more expensive (Carpenter and Meyer, 1999; Marble et al. 2015). Desirable handling properties (ease of mixing with water, no staining of treated surfaces), efficacy (controls annuals, biennials, and perennials), lack of soil residual activity (no damage to desirable vegetation subsequently planted after application), and low volatility contribute to glyphosate being widely used in the landscape industry. In Florida, glyphosate's effectiveness is the reason that this herbicide is used more widely in landscape and non-turf areas than any other (Marble et al., 2020). In sum, the long track record of safe and effective use of glyphosate cannot be equaled by any other available compound on the market.

### Herbicide Application

Development of pesticides including herbicides for weed management coincided with a need to build equipment to apply the chemicals. For optimum activity, application equipment must uniformly and accurately deliver herbicides to target areas. One objective of spray equipment is to place the herbicide specifically in a location where it can be absorbed (soil or foliar) by target weeds. Another objective is to apply the herbicide such that there is minimal potential contact with the applicator. A third objective is to ensure that the spray solution only reaches the target area, thus minimizing off-target movement to both non-target plants and organisms as well as the environment. With all herbicide applications, the user must follow herbicide label directions to determine accurate chemical rates and proper protective equipment to ensure user safety. In most situations, herbicides are solubilized in water and delivered as small droplets in a spray solution. Other adjuvants are included in the solution to serve one or more functions: condition the water; emulsify the herbicide; improve uptake into plants (foliar applications); and synchronize droplet size, reducing potential for drift.

Ground-based sprayers include stand-alone, motorized equipment driven over grower fields or sprayers pulled by tractors. Depending on the design, sprayers can treat small fields or be equipped with booms up to 120 feet wide, operate up to twenty miles per hour, and quickly cover large agricultural areas. Another method to deliver herbicides is through use of hand-held or backpack equipment. Backpack sprayers are carried by individuals and used typically to treat smaller areas (less than one acre) that can include crop fields or non-crop areas. For homeowners, hand-held, pump-up sprayers containing pesticides are used to deliver chemicals through a single nozzle boom to target areas. These sprayers are self-contained to minimize pesticide contact with people.  In addition, the spray is delivered through a single, covered nozzle from an extended boom, which delivers the herbicide just above the target weed. In sum, ground applicators are designed

to optimize herbicide contact with target weeds and minimize if not eliminate potential pesticide contact with human applicators.

Aerial application is another method to deliver herbicides. Fixed wing aircraft or helicopters are equipped with a boom and nozzles; this technique is used in more specialized applications such as forested areas, steep slopes, or over the top of tall crops.

In many situations, glyphosate is applied as a water-based solution, partially because of the solubility in water. Glyphosate is quite compatible with many other herbicides, so it is not uncommon to be applied with one or several other herbicide modes of action. Applications are made through ground-based and aerial sprayers because glyphosate is labeled for numerous crop and non-crop situations. No matter the application system for application of glyphosate-based formulations, from an RTU spray bottle to a tractor boom, each is specifically designed to apply the herbicide directly to the targeted location and mitigate, if not eliminate the potential for contact with the human applicator.

### Alternatives to Glyphosate

Currently, there are more than 235 herbicide active ingredients labeled for weed control worldwide (WSSA, 2014). Each active ingredient has unique chemical properties: selectivity (crop and weed) or lack of selectivity; timing as preemergence and/or postemergence; activity that is contact or systemic; and characteristics in the environment (volatility, persistence, etc.). The introduction of glyphosate in 1974 and widespread use still today, despite the rise of some prominent, resistant weed species, is evidence of the desirable herbicidal activity and minimal impact on non-target species.

Movement away from herbicides for weed control and widespread adoption of organic methods would be disastrous. Using crop yield data from 2014 from over 10,000 organic farmers, yields of a broad number of organic crops only reached 67% of that attained by conventional crops (Kniss, 2016). In addition, organic herbicides are up to 20-fold higher in cost versus glyphosate and labeled primarily in states with larger acreage of organic crops like California and Oregon. The composition of organic herbicides are acids or oils extracted from plants (e.g., clove oil), and they are non-selective, contact chemicals. Finally, organic herbicides are not without risk, as most of them are more acutely toxic than glyphosate.

In considering the spectrum of weeds controlled, there are no other herbicides that compare to glyphosate. For example, 2,4-D belongs to a class of herbicides known as auxin mimics and is non-selective toward broadleaf species. However, there is no control of grass and sedge species, which are also present with broadleaf weeds in crop fields. Also, specific inhibitors of the enzyme acetyl coenzyme A carboxylase (ACCase) are non-selective to grass species, but not sedge and broadleaf species. There are also no ACCase inhibitor resistant crops, rendering important grass crops such as corn, rice, and wheat susceptible. Non-selective herbicides such as paraquat effectively control all annual weed species contacted, but the lack of translocation results in very poor control of biennial and perennial weed species. Also, paraquat is more than fifty times more

acutely toxic than glyphosate. Glyphosate exhibits activity on many broadleaf, grass, and sedge species; farmers can simply use glyphosate to kill all target species rather than a mixture of different chemicals.

Glyphosate is not a risk for inducing crop injury where labeled for use. The introduction of crops with engineered resistance to glyphosate ensured almost complete immunity for crops. This factor made adoption of GR crop use easy for growers, because concerns about crop safety following herbicide use are significant.  In a majority of instances, the size or placement of the crop seed or differential metabolism of crops versus weeds resulted in crop survival but weed death. However, depending on environmental stresses (drought, air temperatures, nutritional deficiencies, or flooded conditions) and herbicide rate applied (if over the labeled rate), many herbicides resulted in some level of crop injury. The rate of preemergence herbicides that result in effective weed control and no crop injury is narrow, with environmental stresses often influencing crop response. Symptoms can include reduced crop emergence, stunting of root and shoot development, and malformed leaf tissues. Postemergence herbicides such as bentazon, acifluorfen, and 2,4-DB are applied for weed control in soybean. Each herbicide results in significant visible injury on soybeans up to twenty-one days after application, although crop yields are not reduced (Kapusta et al., 1986). Despite the lack of crop yield reductions attributable to early season crop injury from conventional herbicide use, delaying crop development or damaging the crop canopy encourages additional weed emergence and competition with crops. GR crops do not exhibit sensitivity to glyphosate, even at rates up to 100-fold higher than the rate needed for complete control of sensitive weeds.

Greater adoption of alternative herbicides to glyphosate will increase weed control costs. Using different herbicide programs in cotton that resulted in a minimum of 95% weed control, glyphosate was compared to traditional residual and postemergence herbicides. Glyphosate reduced weed control costs by 24-55% (Askew and Wilcut, 1999). In soybeans, a 2001 study found that an herbicide program that replaced glyphosate would cost an additional $20 per acre (Gianessi, 2005).  For the 50 million acres of GR soybeans planted in 2001, that was an estimated savings of $1 billion. The net return of weed management costs and forage yield of conventional versus glyphosate-resistant alfalfa (a perennial crop) was similar during the year of alfalfa establishment (Wilson and Burgener, 2009). However, the lack of effective herbicides for perennial weed control in conventional alfalfa can extend the time that alfalfa can be grown by one to several years, which is a significant cost-savings.

### *Summary*

Early man discovered that some plants (later termed weeds) were not beneficial as a food source, and worse, other species were poisonous to humans and animals or induced allergic reactions. Later domestication of plants and animals as sources of food and clothing formed the foundation for production agriculture and fueled significant increases in human populations. However, production agriculture led to soil disturbance and the emergence of weeds as major competitors for resources meant for crops and animals.

To combat weeds, mechanical implements as well as human and animal labor were employed. These methods were labor intensive and often contaminated air and water resources. Development of industrial-based societies pulled many people away from an agrarian-dependent lifestyle, necessitating less labor and requiring more efficient methods of weed control. Approximately seventy-five years ago, chemical herbicides were discovered that resulted in cost- and time-efficient control of weeds, with limited environmental impact. From 2,4-D to now more than 180 different chemicals, herbicides are critical for protecting crop yields, sustaining animal populations, and enabling us to meet the food needs of the world's growing population. In addition, herbicides also manage weeds that infest aquatic areas, urban ornamental and turf areas, as well as non-crop forest and prairie habitats. Discovery and registration of glyphosate in 1974 was revolutionary in humans' battle against weeds, allowing non-selective control of weeds with all life cycles (annuals, biennials, perennials). Attributes contributing to the popularity of glyphosate include: its inherent safety, broad-spectrum and highly effective weed control, reduced use rate compared to many other herbicides, widespread availability of high-yielding agronomic crop varieties and hybrids with relative immunity (glyphosate-resistant), relatively low cost and compatible with many other pesticides, low acute toxicity for non-target organisms, low propensity for bioaccumulation in the environment, and formulations easy to use by licensed applicators as well as the general public. The importance of glyphosate was perhaps described best by Duke and Powles (2008), who referred to glyphosate as "a once in 100-year herbicide".

## Specific Opinions Related to Plaintiff Nancy Salas

### Introduction

In forming my opinions in this case, I have reviewed Ms. Nancy Salas' complaint for personal injury, responses to Monsanto's interrogatories and requests for admission, deposition and all accompanying exhibits, and Plaintiff Fact Sheet. In addition, I reviewed Google Earth images and property records for the two properties at which Ms. Salas alleges she applied Roundup®, as well as labels and Safety Data Sheets of likely products she claims to have used. I also consulted various websites to determine the soil characteristics and weather patterns for Key Largo, FL. To date, I have not conducted a site inspection of those properties, but should the opportunity be provided to do so in the future, I reserve the right to supplement my opinions based thereupon or based on other additional information I ascertain.

Ms. Salas is a 68-year-old female who currently resides in Miami, FL. She claims to have used Roundup® products in residential settings from approximately 2004 until 2014. She claimed to use two different products: one that came in a 1-2 gallon container with a hose and nozzle (p.42) and a concentrated product that was mixed in a container that she pumped before applying (p. 43). Both types of sprayers had a hose with a wand and nozzle on the tip.

### Use of Roundup®

Ms. Salas used Roundup® products at only two locations: 601 and 605 Portia Circle, Key Largo, FL 33037 (p. 29). The total lot size for the 601 property was 10,106 ft$^2$, while the lot size for the 605 property was 7,340 ft$^2$. She claims to have applied Roundup® 3-4 times per month all year long and sometimes every week during the summer (p. 73 & 75). She further testified the weeds were usually small when she treated them (p. 93). Ms. Salas was the only one in her family who applied the Roundup® products (p. 109).

Ms. Salas testified that she began using the Roundup® products very soon after moving into or assuming ownership of both properties (p. 69). Ms. Salas first purchased the 605 property and purchased the 601 property 2-4 years thereafter (p.46). Ms. Salas could not recall specific dates of ownership during her deposition, but her Plaintiff Fact Sheet indicates she first moved to Key Largo, FL in 2004. Ms. Salas used both Ready-to-Use (RTU) and concentrated Roundup® products, but toward the end of her time using Roundup® products, she used the concentrated product because it covered a larger area (p. 95). The Roundup® products were purchased mainly at the Florida City Home Depot. She drove by this location and purchased Roundup® every Friday during her trips to Miami (p. 78-79). Occasionally, Roundup® products were also purchased at other locations.

Ms. Salas described that she spent considerable time working in the yards of both properties and would often spend the entire morning spraying and pulling weeds (p. 76).

36

When spraying, Ms. Salas testified that she sprayed everything and did not spot spray (p. 75). She also described spraying until the container was empty. The grounds of both properties consisted of gravel and river stone as well as cement (p. 51).

Ms. Salas testified that she sprayed in the morning (p. 76, 88) when it was "breezy" (p. 72). She did not avoid spraying when it was really windy because the wind made the air temperature feel cooler (p. 88). Ms. Salas testified that she generally tried to point the tip of the wand in a downward direction while spraying because the treated weeds were generally small (p. 93). However, she accidentally sprayed Roundup® in the air "many times" (p. 90).  During use, Ms. Salas stated she spilled Roundup® on herself many times (p. 97). She recalled an instance in which she spilled Roundup® on herself after becoming distracted (p. 97-99).  She testified that after the incident she immediately went inside to shower (p. 100).  Ms. Salas testified that she would typically wash up after any spill incidents (p. 101).

When asked if the Roundup® products killed the weeds she treated, Ms. Salas testified that they did, but that weeds would still be there the next day (p. 73).  Ms. Salas also testified that some weeds were "not killable," and she would pull these weeds by hand immediately after spraying them (p. 77). As noted below, Ms. Salas wore lobstering gloves while spraying (p. 96).

Ms. Salas stated that after using a container of the RTU glyphosate product, she rinsed it clean with water and recycled the container (p. 77). As for the glyphosate concentrate product, she stored this at either the 601 or 605 properties and used all of the contents of the container (p. 105).

Ms. Salas testified that she wore a t-shirt, shorts, and flip flops while applying Roundup® (p. 95).  Ms. Salas also wore sunglasses, sometimes a visor, and lobstering gloves (p. 96).  When she was done spraying, Ms. Salas always tried to wash her hands with soap and water (p. 97).

Concerning the 605 property, Ms. Salas testified that she sprayed along the fence line between the 605 and 601 properties from the road all the way back to the boat dock (p. 52-53) (Figure 1). She also sprayed weeds around the cut-ins where trees were planted (p. 53). In addition, Ms. Salas testified that she sprayed the cracks in the sidewalk and between where the street connected to the driveway (p. 54). On the southern side of the 605 property, she sprayed near the fence line, around and inside a tiki hut (20 feet long), bathroom, and fishing table (p. 56), each of which had wooden floors. She also treated along the southern and northern fence lines of both 601 and 605 Portia Circle. Along the western side of the 605 property (considered the front of the house), Ms. Salas claims she sprayed all over in front of the house (p. 52). Ms. Salas testified that she stopped using Roundup® products on the 605 property in 2011 or 2012, a year or two after her husband Ernesto died (p. 80).





Figure 1. Images of 605 Portia Circle, Key Largo, FL.

Regarding the 601 property, Ms. Salas testified that she used Roundup® products in the entire front of the property from the fence line with the 605 property to the canal on the north side of the property (p. 60) (Figure 2). Ms. Salas further testified that she used Roundup® all the way around the 601 property (p. 61). On the north side, Ms. Salas claims she sprayed Roundup® products around the palm trees, the fountain area, and the dock porch (p. 66). She also sprayed along a wall (made of wood) that was at the boat line (p. 68). On the south side of the 601 house, she used Roundup® along the

sidewalk, in the little cutouts adjacent to the house, as well as in front and behind the
AC unit (p. 69). She sold the 601 property in 2014 or 2015.





Figure 2. Images of 601 Portia Circle, Key Largo, FL.

## Opinions

### *Glyphosate is ideally suited for Ms. Salas' use*

The sub-tropical climate of the Florida Keys supports growth of a large number of native and exotic plant species, both annuals and perennials. For this reason, it is important for homeowners to use a broad-spectrum herbicide to control the variety of weed species that may be present. Glyphosate is a non-selective, broad-spectrum herbicide that effectively controls over 180 weed species. It is also one of the few herbicides available to the public that controls perennial species. With Ms. Salas' intention to manage all types of weeds on the property of 601 and 605 Portia Circle, glyphosate would have been ideally suited for use.

### *Ms. Salas overestimates her use of Roundup®*

Ms. Salas likely overestimates the areas of 601 or 605 Portia Circle requiring treatment. Ms. Salas described spraying large parts of her property in almost a broadcast like fashion (pp. 52, 64, 75-76). However, based upon my review of the relevant materials, it is evident that the surface of the ground for both 601 and 605 Portia Circle consisted of sand, river gravel/stone, or cement. The cement would be impermeable to weed emergence, and sealed surfaces would not require treatment. For the 605 property, it appeared that cement made up a majority of the property area. Thus, Ms. Salas would not need to treat these areas; at most, she would need to spot spray random weeds that came up through any cracks. For the 601 property, it appeared that most of the area was covered in river gravel/stone.  Ms. Salas testified that there was a "heavy, thick plastic liner" underneath the gravel (p. 72-73). This fabric is typically black and serves as an effective weed barrier for weeds emerging from seed. Although Ms. Salas describes widespread spraying on the 601 and 605 property, the presence of impermeable cement and river gravel/stone with an underlying plastic liner likely precluded the need to spray everywhere. Rather, it is likely that these areas would only require spot treatments.  Although Ms. Salas testified that she often spent entire mornings out in the yard, she only would have needed to spray a small fraction of this time.

Ms. Salas likely also overestimates the frequency of spraying needed to achieve her weed control objective.  Ms. Salas states that she used Roundup® 3-4 times per month all year long. With this frequency of use, weed development would be minimal, and plant size during treatment would be small at best; before long, there would be few weeds, if any, left to treat. Following application of a glyphosate-based herbicide, weeds stop growing and within 4 days begin turning yellow (chlorotic). Chlorosis would turn to necrosis (browning), and up to 14-21 days later, weeds would be dead.  Although full plant death may not occur for several weeks, the symptoms of plant injury would be readily apparent. After glyphosate is applied, new weeds can emerge, but it takes several weeks to reach a size warranting treatment.  Thus, Ms. Salas would not have needed to apply nearly every week as she claims.

Moreover, with successive glyphosate applications, the weed pressure in Ms. Salas' yards would have decreased over time, requiring less frequent treatments each year to achieve the same level of weed control. The ability of weeds to emerge is directly related to the number of seeds and propagules in the soil, referred to as the soil seedbank. This seedbank is recharged annually by mature weeds producing seeds, but also from seeds introduced via the environment (e.g. wind, animals, flooding). Ms. Salas describes continuous use of glyphosate over a 10-year period. With minimal opportunity for weeds to complete their life cycle and generate seeds, weed emergence rates would slow over time, significantly reducing the volume of weeds and the need for continuous applications of Roundup® products.

Climatic conditions in the Florida Keys also suggest that Ms. Salas overestimates the needed frequency of glyphosate applications. Weed emergence annually depends primarily on adequate air temperatures as well as rainfall. Southern Florida is a sub-tropical climate with sufficient air temperatures year-round to stimulate weed emergence. However, rainfall patterns vary throughout the year, and weed emergence is low with minimal rainfall. Therefore, there would be significant periods of time where weed control practices would preclude constant use of Roundup® products for weed control. Rainfall patterns in Key Largo, FL are divided into a wetter season (4.7 months; later May to mid-October) and a drier season (7.3 months; mid-October to later May) (Figure 3). With the majority of rainfall occurring between early May to mid-October, weed emergence would occur primarily during that period, precluding the need to spray 3-4 times per month year-round.



Figure 3. Probability of daily rainfall over a calendar year for Key Largo, FL (https://weatherspark.com/y/18617/Average-Weather-in-Key-Largo-Florida-United-States-Year-Round).

Temperature also plays a key role in weed emergence and establishment. Air temperatures in Key Largo are sufficient to promote year-round plant growth (Figure 4). However, under limited rainfall (dry conditions described above), higher temperatures would limit moisture availability to plants, reducing both weed emergence and growth potential. Therefore, the combination of moderate air temperatures and limited rainfall for a period of over 7 months of the year would significantly reduce weed emergence and growth, concomitantly reducing the need for continuous glyphosate applications.



Figure 4. Mean daily low and high air temperature for Key Largo, FL (https://weatherspark.com/y/18617/Average-Weather-in-Key-Largo-Florida-United-States-Year-Round).

In addition, the lack of key nutrients in soils common to southern Florida also limits weed growth and the need for continuous applications of glyphosate-based herbicides. Soils in Key Largo are based on limestone, resulting in an alkaline soil, with a pH ranging from 7.2 to 8.2 (USDA-NRCS, 1995). In many urbanized areas in the Florida Keys, the soil classification is a Udorthent, a reference to soils consisting of limestone with crushed, coral bedrock spread over the original soil (USDA-NRCS, 1995). The consistency of the material is a mixture of extremely gravelly sand and marl; marl is a common material used to raise soil pH (Barber, 1984). The soil pH has a dramatic impact on nutrient availability for plants, which is critical to sustaining plant growth (Figure 5). Macro- and micro-nutrients support photosynthesis, synthesis of critical sugars, proteins, and amino acids as well as plant structure (leaves, stems, and roots) and other functions important in a plant's life cycle. A lack of any one nutrient can be a

limiting factor for plant growth and development. At the pH range common for Key Largo soils, availability of the macro-nutrient nitrogen (the most limiting nutrient for plant growth) becomes limiting. In addition, micro-nutrients such as iron, manganese, boron copper, and zinc are also limited in availability. This would result in slower overall growth rates for plants, again reducing the need for persistent applications of glyphosate. Finally, plants growing in Key Largo would be subject to exposure to salt, either from salt winds or periodic storm surges. Salt stress also limits the growth rate of many plants, including weeds.



Figure 5. The availability of critical nutrients for plant growth related to soil pH. An alkaline soil occurs at a pH beginning above 7.5 (https://ucanr.edu/sites/Salinity/Salinity_Management/Effect_of_salinity_on_soil_propert ies/Effect_of_pH_sodicity_and_salinity_on_soil_fertility_/).

Although glyphosate does not exhibit residual activity in the soil, the time needed for new seedlings to emerge, become established, and be of sufficient size to spray and physically remove plants would be several weeks, even in a sub-tropical climate such

as Key Largo. Therefore, Ms. Salas would not need to spray Roundup® products as frequently as she claims.

All told, the volume of Roundup® products Ms. Salas claims to have purchased (a container weekly during her trip to Miami) (p. 78-79) far exceeds the amount needed to treat the weeds at 601 and 605 Portia Circle. Even small bottles of concentrated Roundup® Weed and Grass Killer product will make up to 6 gallons of spray mix, which is far in excess of what Ms. Salas would have needed to apply every week, as she claims.

### Ms. Salas did not follow proper weed management practices

Ms. Salas did not follow proper weed management practices, including the manner in which she used Roundup®.

For example, Ms. Salas testified that she pulled weeds immediately after treating with glyphosate (p. 77). One of the reasons to use any herbicide to control weeds is to eliminate the need to pull weeds by hand. Glyphosate is particularly well-suited to accomplish this task because it is a non-selective, broad-spectrum herbicide that will control nearly all weeds in a residential setting. However, hand pulling any treated vegetation would reduce the effectiveness of glyphosate on any remaining weed tissue (shoots and roots). Thus, not only is there no reason for Ms. Salas to have pulled the weeds by hand after spraying, she likely reduced the effectiveness of her own herbicide applications in doing so.

In addition, Ms. Salas carelessly applied Roundup® products. Ms. Salas stated that she often sprayed in windy conditions to avoid the south Florida heat. However, typical Roundup® labels provide that the product should be applied when wind speeds are calm.  Applying under these conditions is important to reduce drift to adjacent, desirable plants and minimize off-target movement of the herbicide.  Ms. Salas also stated that she often accidentally sprayed Roundup® up in the air (p. 90). However, Ms. Salas stated that she treated the weeds when they were small, so any spray would have been directed downward toward the weeds. In addition, Ms. Salas testified that she spilled on herself after becoming distracted while mixing concentrated Roundup® product. It is important to pay attention while mixing any herbicide, including Roundup®.

### Ms. Salas overestimates her contact with Roundup®

Ms. Salas likely had minimal contact with Roundup®. Given her claimed frequency of use, any weeds requiring treatment would have been small at the time of treatment. Due to the height of the weeds, Ms. Salas would have applied Roundup® in a downward direction, and direct skin contact from application would be minimal to non-existent. Indeed, when asked about the distance of the nozzle tip for the sprayer from the target weeds, Ms. Salas testified that the tip of the wand was close to the weeds (p. 90). It is therefore highly unlikely that Ms. Salas came into contact with any Roundup® while applying.

Even though Ms. Salas testified to spraying under windy conditions, her potential for contact based on off-target movement of the product is minimal.  Roundup® RTUs and handheld sprayers like the one Ms. Salas described produce large, coarse droplets at minimal pressure; as a result, the droplets quickly fall to the ground. Ms. Salas testified that she applied with the tip of the nozzle close to the weeds; in these circumstances, the chances of her coming into contact with the herbicide due to wind drift is minimal.  In addition, glyphosate is practically non-volatile, so there would be no drift due to volatilization.

Ms. Salas also testified to frequent use of RTU formulations. RTUs are closed containers and designed for single use. There is no need to open the container and come into contact with the product or potentially spill the product. Although Ms. Salas testified that she spilled Roundup® on herself a number of times, she generally described proper hygiene practices regarding immediate washing of her skin and removal of affected clothing. These practices would also have reduced any potential contact with the herbicide.

Finally, with the high air temperatures (>80 F) almost year-round in Key Largo, treated surfaces would dry quickly, minimizing skin contact when walking over the area in the clothing (shorts) and footwear (sandals or flip-flops) that Ms. Salas described (p. 95). In addition, Ms. Salas stated she wore lobster gloves several times during application of Roundup® products (p. 96), which would have further reduced her potential for contact during those applications.

### *Opinions regarding plaintiff's experts*

Dr. Kevin Knopf and Dr. William Sawyer base their analyses on Ms. Salas' likely overestimation of the frequency and extent of her use of Roundup® products. Dr. Knopf states that Ms. Salas had extensive exposure over time based on Roundup® usage 3-4 times per month (p. 12 of expert report). However, as discussed above, this is likely an overestimate of the amount of spraying Ms. Salas needed to do to achieve her weed control objective. The limited area requiring application of Roundup® products, declining weed populations over time, and environmental factors limiting weed emergence at different times during the year indicate that Ms. Salas would not have needed to spray as frequently or as much as she claims.

Similarly, Dr. Sawyer bases his analysis on the characterization that spraying was a "year-round" activity, pointing out that weeds grow quickly in the Key West environment (p. 15 of Sawyer expert report). However, as previously discussed, there are many factors that limit the emergence of weeds and time necessary for weeds to develop even in sub-tropical climates, which would extend the duration between periods where treatment of weeds would be warranted. Dr. Sawyer also states that Ms. Salas would mix up more than one container of Roundup® product on any given day (p. 14 of Sawyer expert report). However, Ms. Salas stated that she would typically spray until the receptacle was finished (p. 75-76), and her testimony does not address mixing up

45

multiple tanks of diluted Roundup® products on a given day. To the extent she did refill while spraying, she would not have done so while using an RTU product, as RTU containers are not designed for re-use.

## Conclusion

From approximately 2004-2014, Ms. Salas purported to intensively use Roundup® products on one or both adjacent properties in Key Largo, FL (601 and 605 Portia Circle, Key Largo, FL). This included 3-4 applications per month all year long. This was despite limited soil nutrient levels and long periods of little or no rainfall on vegetation that would require weeks to reach a treatable size. She claimed to have followed product use directions but often pulled weeds out immediately after spraying and sprayed herbicide solution into the air, despite the location of target weeds close to the ground. Ms. Salas use of glyphosate is likely overestimated, and she likely overestimates her contact with and exposure to Roundup®, notwithstanding the fact that she often times did not follow proper weed management practices.

**Dated: July 22, 2022**

_____
Dr. R.J. Smeda
Professor of Weed Science
University of Missouri

# ATTACHMENT B

### Dr. Reid Smeda's Materials Considered List (*Salas v. Monsanto Co.*)

1.  Adama Essentials, Label for Atrazine 4L.

2.  Angle, J. et al., *Nutrient Losses in Runoff from Conventional and No-Till Corn Watersheds*, 13 J. Env't Quality 431 (1984).

3.  Appleby, A., *A History of Weed Control in the United States and Canada – A Sequel*, 53 Weed Sci. 762 (2005).

4.  APVMA (Australian Pesticides and Veterinary Medicines Authority), *Regulatory Position: Consideration of the Evidence for a Formal Reconsideration of Glyphosate*, Australian Government (2016).

5.  Armstrong, D. et al., *Economic Comparison of Mechanical and Chemical Weed Control*, 16 Weed Sci. 369 (1968).

6.  Askew, S. & J. Wilcut, *Cost and Weed Management with Herbicide Programs in Glyphosate-Resistance Cotton (Gossypium hirsutum)*, 13 Weed Tech. 308 (1999).

7.  ATSDR (Agency for Toxic Substances and Disease Registry), *Toxicological Profile for Glyphosate – Draft for Public Comment*, US Dep't of Health and Human Services (Mar. 2019).

8.  Bangsund, D. & F. Leistritz, *Economic Impacts of Leafy Spurge on Grazing Lands in the Northern Great Plains*, North Dakota State University Agriculture Economic Report No. 275-S (1991).

9.  Barber, S., *Liming Materials and Practices* in Soil Acidity and Liming Volume 12 (F. Adams ed., Agronomy Monographs, 1984).

10. Barfoot, P. & G. Brooks, *Key Global Environmental Impacts of Genetically Modified (GM) Crop Use 1996-2012*, 5 GM Crops & Food 149 (2014).

11. BAuA (German Federal Institute for Occupational Safety and Health), *Proposal for Harmonized Classification and Labeling: N (phosphonomethyl)glycine; Glyphosate (ISO)*, CLH Report for Glyphosate (2016).

12. BfR (Bundesinstitut für Risikobewertung), *Does Glyphosate Cause Cancer?* BfR Communication No. 007/2015 (Mar. 23, 2015).

13. BfR, *Assessment of IARC Monographies Volume 112 (2015); Glyphosate, Renewal Assessment Report: Glyphosate Addendum I to RAR* (2015).

14. BfR, *CLH Report: Proposal for Harmonised Classification and Labelling, Regulation (EC) No 1272/2008 (CLP Regulation), Annex VI, Part 2 – Glyphosate* (2016).

15. BfR, *Final Addendum to the Renewal Assessment Report: Glyphosate* (Oct. 2015).

16. BfR, *Toxicology and Metabolism, Renewal Assessment Report: Glyphosate Volume 3 Annex B.6* (2015).

17. Binev, R. et al., *Intoxication with Poison Hemlock (Conium Maculatum L.) in Calves*, 5 Trakia J. Sci. 40 (2007).

18. Blanchoud, H. et al., *Contribution by Urban and Agricultural Pesticide Uses to Water Contamination at the Scale of the Marne Watershed*, 375 Sci. Total Env't 168 (2007).

19.   Borgaard, O. & A. Gimsing, *Fate of Glyphosate in Soil and the Possibility of Leaching to Ground and Surface Waters: A Review*, 64 Pest Mgmt. Sci. 441 (2008).

20.   Bozsa, R. & L. Oliver, *Competitive Mechanisms of Common Cocklebur (Xanthium strumarium) and Soybean (Glycine max) during Seedling Growth*, 38 Weed Sci. 244 (1990).

21.   Bridges, D., *Crop Losses Due to Weeds in the United States*, Weed Science Society of America, Champaign, IL (1992).

22.   Bridges, D., *Impact of Weeds on Human Endeavors*, 8 Weed Tech. 392 (1994).

23.   Brookes, G. & P. Barfoot, *Economic Impact of GM Crops: The Global Income and Production Effects 1996-2012*, 5 GM Crops & Food 65 (2014).

24.   Brookes, G. & P. Barfoot, *GM Crops: The Global Economic and Environmental Impact – The First Nine Years 1996-2004*, 8 AgBioForum 187 (2005).

25.   Brust, G. & G. House, *Weed Seed Destruction by Arthropods and Rodents in Low-Input Soybean Agroecosystems*, 3 Am. J. Alt. Agric. 19 (1988).

26.   Cajacob, C. et al., *Engineering Resistance to Herbicides, in* Handbook of Plant Biotechnology (Paul Christou & Harry Klee eds., 2004).

27.   Carpenter, J. & L. Gianessi, *Trends in Pesticide Use Since the Introduction of Genetically Engineered Crops, in* Economic and Environmental Impacts of Agbiotech: A Global Perspective (Nicholas G. Kalaitzandonakes ed., 3d ed. 2002).

28.   Carpenter, P. & M. Meyer, *Edina Goes Green Part III: A Survey of Consumer Lawn Care Knowledge and Practices*, 9 HortTechnology 491 (1999).

29.   Chandler, J., *Economics of Weed Control in Crops*, 268 Am. Chem. Soc'y Symp. Series 9 (1985).

30.   Complaint for Personal Injuries, *Salas v. Monsanto Co.*, No. 2020-02071-CA-01 (Fla. Cir. Ct. Miami-Dade Cnty. Sept. 28, 2020).

31.   Complaint for Personal Injuries, *Salas v. Monsanto Co.*, No. 2021-000615-CA-01 (Fla. Cir. Ct. Miami-Dade Cnty. Nov. 11, 2021).

32.   Day, E. & B. Dilworth, *Toxicity of Jimsonweed Seed and Cocoa Shell Meal to Broilers*, 63 Poultry Sci. 466 (1984).

33.   Deposition of Nancy Salas, *Salas v. Monsanto Co.*, No. 3:21-cv-06173 (N.D. Cal. Dec. 9, 2021) (with exhibits).

34.   Derpsch, R. et al., *Current Status of Adoption of No-Till Farming in the World and Some of Its Main Benefits*, 3(1) Int'l J. Agriculture & Biological Engineering 1 (2010).

35.   Derpsch, R., *History of Crop Production, With and Without Tillage*, 3 Leading Edge 150 (2004).

36.   Dill, G., *Glyphosate-Resistant Crops: History, Status and Future*, 61 Pest Mgmt. Sci. 219 (2005).

37.   Dow AgroSciences, LLC, Label for Pelagronic Acid (2004).

38. Duffus, J., *Role of Weeds in the Incidence of Virus Diseases*, 9 Ann. Rev. Phytopathology 319 (1971).

39. Duke, S. & S. Powles, *Glyphosate-Resistant Crops and Weeds: Now and in the Future*, 12(3&4) AgBioForum 346 (2009).

40. Duke, S. & S. Powles, *Mini-Review – Glyphosate: A Once in a Century Herbicide*, 64 Pest Mgmt. Sci. 319 (2008).

41. Duke, S. et al., *Glyphosate Effects on Plant Mineral Nutrition, Crop Rhizosphere, Microbiota, and Plant Disease in Glyphosate-Resistant Crops*, 60 J. Agric. Food Chemistry10375 (2012).

42. Duke, S., *Perspectives on Transgenic, Herbicide-Resistance Crops in the United States Almost 20 Years After Introduction*, 71 Pest Mgmt. Sci. 652 (2015).

43. ECHA (European Chemicals Agency), *Opinion: Proposing Harmonized Classification and Labelling at EU Level of Glyphosate (ISO); N-(phosphonomethyl)glycine*, Committee for Risk Assessment (Mar. 15, 2017).

44. Edwards, W. et al., *A Watershed Study of Glyphosate Transport in Runoff*, 9 J. Env't Quality 661 (1980).

45. EFSA (European Food Safety Authority), *Conclusion on the Peer Review of the Pesticide Risk Assessment of the Active Substance Glyphosate*, 13 EFSA J. 4302 (2015).

46. EPA (Environmental Protection Agency), *Glyphosate – Proposed Interim Registration Review Decision Case Number 0178* (Apr. 2019).

47. EPA, CARC, *Glyphosate: Report of the Cancer Assessment Review Committee* (Oct. 1, 2015).

48. EPA, FIFRA SAP, *Meeting Minutes and Final Report No. 2017-01: EPA's Evaluation of the Carcinogenic Potential of Glyphosate* (Mar. 16, 2017).

49. EPA, *Glyphosate – Interim Registration Review Decision Case Number* 0178 (Jan. 2020).

50. EPA, Health Effects Division, *Glyphosate. Study Summaries for Genotoxicity Studies* (Sept. 13, 2016).

51. EPA, Memorandum from Dana L. Friedman on *Response from the Pesticide Re-Evaluation Division (PRD) to Comments on the Glyphosate Proposed Interim Decision* (Jan. 16, 2020).

52. EPA, Memorandum from David J. Miller on *Glyphosate: Epidemiology Review of Zhang et al. (2019) and Leon et al. (2019) Publications for Response to Comments on the Proposed Interim Decision* to Christine Olinger (Jan. 16, 2020).

53. EPA, Memorandum from Monique M. Perron on *Glyphosate: Response to Comments on the Proposed Interim Decision Regarding the Human Health Risk Assessment* to Steven Peterson (Jan. 13, 2020).

54. EPA, Memorandum from Monique Perron on *Glyphosate: Draft Human Health Risk Assessment in Support of Registration Review* to Caitlin Newcamp (Dec. 12, 2017).

55. EPA, Office of Chemical Safety and Pollution Prevention, *EPA Takes Action to Provide Accurate Risk Information to Consumers, Stop False Labeling on Products* (Aug. 8, 2019).

56. EPA, Office of Chemical Safety and Pollution Prevention, Letter from Michael L. Goodis, Director of Registration Division, EPA Office of Chemical Safety and Pollution Prevention, on Labeling Requirements for Products that Contain Glyphosate to Registrant (Aug. 7, 2019).

57. EPA, Office of Chemical Safety and Pollution Prevention, Letter from Michael Freedhoff, Ph.D., Assistant Administrator, EPA Office of Chemical Safety and Pollution Prevention on OEHHA Proposition 65 Language to Dr. Lauren Zeise, Director, Office of Environmental Health Hazard Assessment, California Environmental Protection Agency (Apr. 8, 2022).

58. EPA, Office of Pesticide Programs, *Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* (Sept. 12, 2016).

59. EPA, Office of Pesticide Programs, *Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* (Dec. 12, 2017).

60. EPA, *Pesticide Industry Sales and Usage: 2006 and 2007 Market Estimates* (2011).

61. Evans, G. & R. Bellinder, *The Potential Use of Vinegar and a Clove Oil Herbicide for Weed Control in Sweet Corn, Potato, and Onion*, 23 Weed Tech. 120 (2009).

62. Expert Report of Kevin B. Knopf, MD, MPH, *Salas v. Monsanto Co.*, No. 3:21-cv-06173 (N.D. Cal. June 23, 2022).

63. Expert Report of William Sawyer, Ph.D., *Salas v. Monsanto Co.*, No. 3:21-cv-06173 (N.D. Cal. Jun. 22, 2022).

64. FAO (Food & Agriculture Organization of the United Nations), *The Future of Food and Agriculture – Trends and Challenges* (2017).

65. FAO, *Global Agriculture Towards 2050* (2009).

66. FAO, *The future of Food and Agriculture – Alternative Pathways to 2050* (2018).

67. Fawcett, R. & D. Towery, *Conservation Tillage and Biotechnology. How New Technologies Can Improve the Environment by Reducing the Need to Plow*, Conservation Technology Information Center (CTIC), West Lafayette, IL (2002).

68. Fernandez-Cornejo, J. et al., *Off-Farm Income, Technology and Farm Economic Performance*, USDA Economic Research Report No. 36 (2007).

69. Fernandez-Cornejo, J., R. Nehring, C. Osteen, S. Wechsler, A. Martin, and A. Vialou. 2014. Pesticide use in U.S. Agriculture: 21 selected crops, 1960-2008. USDA-ERS, Bulletin 124. 80 pp.

70. Fishel, F., *Pesticide Labeling: Signal Words*, University of Florida IFAS Extension, PL-100 (2018).

71. Fleischmann's Vinegar Company, Inc., Label for Vinagreen.

72. Franz, J. et al., *Glyphosate: A Unique Global Herbicide ACS Monograph 189*, American Chemical Society (1997).

73. Franz, J. et al., *Glyphosate: A Unique Global Herbicide ACS Monograph 189*, Am. Chem. Soc'y (1997).

74. Freese, B., *Number of Farms in US Drops as Acreage Size Grows*, Successful Farming (Feb. 17, 2017), https://www.agriculture.com/news/business/farms-in-us-drops-size-grows.

75. Frick, B. & A. Thomas, *Weed Surveys in Different Tillage Systems in Southwestern Ontario Field Crops*, 72 Canadian J. Plant Sci. 1337 (1992).

76. George, B. & P. Brennan, *Herbicides Are More Cost Effective Than Alternative Weed Control Methods for Increasing Early Growth of Eucalyptus Dunnii and Eucalyptus Saligna*, 24 New Forests 147 (2002).

77. Gianessi, L & A. Williams, *The Importance of Herbicides for Natural Resource Conservation in the USA*, in *Convergence of Food Security, Energy Security and Sustainable Agriculture* 333 (D. Songstad et al. eds., 2014).

78. Gianessi, L. et al., *Economic and Herbicide Use Impacts of Glyphosate-Resistant Crops*, 61 Pest Mgmt. Sci. 241 (2005).

79. Gianessi, L. et al., *Plant Biotechnology: Current and Potential Impact for Improving Pest Management in US Agriculture, an Analysis of 40 Case Studies*, National Center for Food and Agricultural Policy, Washington, DC (2002).

80. Gianessi, L. et al., *The Value of Herbicides in U.S. Crop Production*, 21 Weed Tech. 559 (2007).

81. Giesy, J. et al., *Ecotoxicological Risk Assessment for Roundup® Herbicide*, 167 Revs. Of Envtl. Contamination & Toxicology 35 (2000).

82. Givens, W. et al., *Survey of Tillage Trends Following the Adoption of Glyphosate-Resistant Crops*, 23 Weed Tech. 150 (2009).

83. Goldstein, N., *The Ubiquitous Urushiols: Contact Dermatitis from Mango, Poison Ivy, and Other "Poison" Plants*, 63 Hawaii Med. J. 231 (2004).

84. Google Earth images of 601 Portia Circle, Key Largo, FL 33037.

85. Google Earth images of 605 Portia Circle, Key Largo, FL 33037.

86. Green, J., *The Benefits of Herbicide-Resistant Crops*, 68 Pest Mgmt. Sci. 1323 (2012).

87. Guravitch, J. & D. Padilla, *Are Invasive Species a Major Cause of Extinctions*, 19 Trends in Ecology & Evolution 470 (2004).

88. Hanson, B. et al., *Herbicide-Resistant Weeds Challenge Some Signature Cropping Systems*, 68 California Agriculture 142 (2014).

89. Hartzler, B., *The Cost of Convenience: The Impact of Weeds on Crop Yields*, Proc. 21st Ann. Integrated Crop Mgmt. Conf. (Jan. 12, 2009).

90. Havlin, J. et al., *Enhancing Agricultural Profitability and Sustainability: Great Plains Dryland Conservation Technologies*, Kansas State University (1995).

91. Hay, J., *Gain to the Grower from Weed Science*, 22 Weed Sci. 439 (1974).

92. Health Canada*, Proposed Re-evaluation Decision PRVD2015-01 Glyphosate*, Health Canada Pest Management Regulatory Agency (Apr. 13, 2015).

93. Health Canada, *Re-evaluation Decision RVD2017-01 Glyphosate*, Health Canada Pest Management Regulatory Agency (Apr. 28, 2017).

94. Health Canada, *Statement from Health Canada on Glyphosate*, Health Canada Pest Management Regulatory Agency (Jan. 11, 2019).

95. Heimlich, R. et al., *Genetically Engineered Crops: Has Adoption Reduced Pesticide Use?*, 273 Agric. Outlook 13 (2000).

96. Henry, M., *The Contribution of Landscaping to the Price of Single Family Houses: A Study of Home Sales in Greenville, South Carolina*, 12 J. Env't Horticulture 65 (1994).

97. Howery, L. & G. Ruyle, *Noxious Weeds: A Disaster Looking for a Place to Happen in Arizona*, University of Arizona Cooperative Extension (1996).

98. Hurley, T. et al., *Characteristics of Herbicides and Weed-Management Programs Most Important to Corn, Cotton, and Soybean Growers*, 12 AgBioForum 269 (2009).

99. IARC (International Agency for Research on Cancer), *IARC Monograph Vol. 112 on the Evaluation of Carcinogenic Risks to Humans, Some Organophosphate Insecticides and Herbicides: Diazinon, Glyphosate, Malathion, Parathion, and Tetrachlorvinphos* (2015).

100. James, C. 2014. Global status of commercialized Biotech/GM crops: 2013. ISAAA Brief. 46-2013.

101. James, C., *Global Status of Commercialized Biotech/GM Crops: 2013*, Int'l Serv. for the Acquisition of Agri-Biotech Applications (2009).

102. James, L. et al., *Impact of Poisonous Plants on the Livestock Industry*, 45 J. Range Mgmt. 3 (1992).

103. Japan Food Safety Commission, *Glyphosate Summary*, 4 Food Safety 93 (2016).

104. Jepson, P. et al., *Selection of Pesticides to Reduce Human and Environmental Health Risks: A Global Guideline and Minimum Pesticides List*, 4 Lancet Planet Health e56 (2020) with supplementary materials.

105. JMPR (Joint Meeting on Pesticide Residues), *Pesticide residues in food – 2016: Evaluations 2016 – Part II – Toxicological*, Special Session of the Joint Meeting of the FAO Panel of Experts on Pesticide Residues in Food and the Environment and the WHO Core Assessment Group on Pesticide Residues (May 9-13, 2016).

106. JMPR, *Joint FAO/WHO Meeting on Pesticide Residues, Summary Report* (May 9-13, 2016).

107. Jo, W-S., A. Hossain, and S-C. Park. Toxicological profiles of poisonous, edible and medicinal mushrooms. Mycobiology 42:215-220.

108. Juckett, G. & J. Hancox, *Venomous Snakebites in the United States: Management Review and Update*, 65 Am. Fam. Physician 1367 (2002).

109. Kapusta, G. et al., *Yield Response of Weed-Free Soybeans (Glycine max) to Injury from Postemergence Broadleaf Herbicides*, 34 Weed Sci. 304 (1986).

110. Kells, J. & K. Renner, *Weed Control Guide for Field Crops*, Michigan State University Extension Bulletin E-434 (1999).

111. Knight, J., *Coping with Snakes in Montana*, Montana State University Extension Bulletin MT9617 (1997).

112. Kniss, A., *Relative Toxicity of Herbicide Use in the United States 1990-2015*, Peer J. Preprints (Oct. 20, 2016).

113. Knoke, J.K., et al., *Distribution of Maize Dwarf Mosaic and Aphid Vectors in Ohio*, 64 Phytopathology 639 (1974).

114. Koch, W., *Impact of Weeds on Developing Countries,* Proc. Of the First Int'l Weed Control Congress 127 (1992).

115. Koterba, M.T., et al., *Pesticides in Groundwater in the Anacostia River and Rock Creek Watersheds in Washington, D.C., 2005-2008.* U.S. Geological Survey Scientific Investigations Report 2010-5130 (2010).

116. Laguë, C., et al., *Energy Use and Time Requirements for Different Weeding Strategies in Grain Corn,* 43 Canadian Biosystems Eng'g 13 (2001).

117. Li, H., et al., *Agricultural Fire Impacts on the Air Quality of Shanghai During Summer Harvestime,* 10 Aerosol and Air Quality Rsch. 95 (2010).

118. Lockeretz, W., *The Lessons of the Dust Bowl: Several Decades before the Current Concern with Environmental Problems, Dust Storms Ravaged the Great Plains, and the Threat of More Dust Storms Still Hangs Over Us.* 66 Am. Scientist 560 (1978).

119. Lonsdale, W., *The Impact of Weeds in National Parks,* Proc. First Int'l Weed Control Congress, Melbourne 145 (1992).

120. Loope, L. *An Overview of Problems with Introduced Plant Species in National Parks and Reserves of the United States. In: Alen Plant Invasions in Native Ecosystems of Hawaii Management and Research*, *eds Stone, C., et al.,* Honolulu: Cooperative National Park Resources Studies Unit, University of Hawaii (1992).

121. Mailu, A., *Preliminary Assessment of the Social, Economic and Environmental Impacts of Water Hyacinth in the Lake Victoria Basin and the Status of Control,* 102 Australian Ctr. for Int'l Agric. Rsch. Proc. 130 (2001).

122. Makra, L., *The History and Impacts of Airborne Ambrosia (Asteraceara) Pollen in Hungary,* 44 Grana 57 (2007).

123. Marble, C., et al., *Use of Glyphosate and Herbicide Alternatives for Weed Control in Florida Landscape Planting Beds,* Univ. Fla. Extension, EP580 (2020).

124. Marble, S.C., A.K. Koeser, and G. Hasing. 2015. A review of weed control practices in landscape planting beds: Part II – Chemical weed control methods. HortSci. 50:857-862.

125. Marra, M., et al., *The Net Benefits, Including Convenience, of Roundup-Ready Soybeans: Results from a National Survey,* NSF Ctr. for IPM Technical Bulletin 2004-3 (2004).

126. Mastro, L., et al., *Deer-Vehicle Collision Prevention Techniques,* 2 Human-Wildlife Conflict 80 (2008).

127. Mensink, J. et al., *Environmental Health Criteria for Glyphosate*, World Health Organization (1994).

128. Milewski, L. et al., *An Overview of Potentially Life-Threatening Poisonous Plants in Dogs and Cats,* 16 J. Veterinary Emergency and Critical Care 25 (2006).

129. Mohler, C. et al., Evaluation of Mechanical Weed Management Programs for Corn (Zea Mays), 11 Weed Tech. 123 (1997).

130. Monsanto Company, Label for Glyphosate Ready-to-Use Herbicide (Jan. 3, 2007).

131. Monsanto Company, Label for Roundup® Original Herbicide (2003) [MONGLY15269664].

132. Monsanto Company, Label for Roundup® Ready-to-Use Weed & Grass Killer III (2012).

133. Monsanto Company, Label for Roundup® Ready-to-Use Weed & Grass Killer III (2014) [MONGLY10528951, MONGLY10528859-MONGLY10528861].

134. Monsanto Company, Label for Roundup® ULTRA Herbicide (Oct. 18, 2016).

135. Monsanto Company, Label for Roundup® Weed & Grass Killer Concentrate Plus (2009) [MONGLY10529152-MONGLY10529157].

136. Monsanto Company, Label for Roundup® Weed & Grass Killer Super Concentrate (2012).

137. Monsanto Company, Label for Roundup® Weed & Grass Killer Super Concentrate (2010) [MONGLY10529482-MONGLY18529487].

138. Monsanto Company, Label for Roundup® Weed & Grass Killer₁ Ready-to-Use (2002) [MONGLY10529758-MONGLY1059759].

139. Monsanto Company, Material Safety Data Sheet for Roundup® Ready-to-Use Weed & Grass Killer (July 5, 2006) [MONGLY00055956-MONGLY00055963].

140. Monsanto Company, Material Safety Data Sheet for Roundup® Weed & Grass Killer Ready-to-Use (July 22, 2002) [MONGLY00054178-MONGLY00054185].

141. Monsanto Company, Safety Data Sheet for Roundup® Ready-to-Use Weed & Grass Killer III (Jan. 23, 2012) [MONGLY00028976-MONGLY00028987].

142. Monsanto Company, Safety Data Sheet for Roundup® Weed & Grass Killer Super Concentrate (Oct. 16, 2009) [MONGLY00028892-MONGLY00028900].

143. Moreno, F., et al., *Soil Physical Properties, Water Depletion and Crop Development under Traditional and Conversation Tillage in Southern Spain,* 41 Soil and Tillage Rsch. 25 (1997).

144. Morton, J., *Brazilian Pepper – Its Impact on People, Animals, and the Environment,* 41 Economic Botany 353 (1978).

145. Nail, E., et al., *Diesel and Glyphosate Price Changes Benefit the Economics of Conversation Tillage versus Traditional Tillage,* 94 Soil and Tillage 321 (2007).

146. Nandula, V. et al., *Glyphosate-Resistant Weeds: Current Status and Future Outlook*, 16 Outlooks on Pest Mgmt. 183 (2005).

147. Nelson, G., et al., *Simulating a Relative Environmental Effect of Glyphosate-Resistant Soybeans,* 45 Ecological Econ. 189 (2003).

148. NuFarm, Label for Diquat 2L.

149. OEHHA (Office of Environmental Health Hazard Assessment), *OEHHA Statement Regarding US EPA's Press Release and Registrant Letter on Glyphosate*, Cal. EPA (Aug. 12, 2019).

150. OEHHA, *Proposition 65 No Significant Risk Levels (NSRLs) for Carcinogens and Maximum Allowable Dose Levels (MADLS) for Chemicals Causing Reproductive Toxicity*, Cal. EPA (Oct. 2018).

151. Oerke, E., *Centenary Review - Crop Losses to Pests*, 144 J. Agricultural Sci. 31 (2006).

152. Ozkan, H. & H. Zhu, *Effect of Major Variables on Drift Distances of Spray Droplets*, The Ohio State University (Apr. 4, 2016).

153. Pacanoski, Z., *Herbicide Use: Benefits for a Society as a Whole – A Review,* 13 Pakistan J. of Weed Sci. Rsch. 135 (2007).

154. Parkhurst, J., *Managing Wildlife Damage: Snakes,* Virginia Coop. Extension Publ'n 420-021 (2010).

155. Plaintiff Fact Sheet of Nancy Salas (original and amended).

156. Plaintiff's Responses to Defendant Monsanto Company's Interrogatories, *Salas v. Monsanto Co.*, No. 3:21-cv-06173 (N.D. Cal. Dec. 15, 2021).

157. Plaintiff's Responses to Defendant Monsanto Company's Request for Admissions, *Salas v. Monsanto Co.*, No. 3:21-cv-06173 (N.D. Cal. Dec. 15, 2021).

158. Property Records re 601 Portia Circle, Key Largo, FL 33037.

159. Property Records re 605 Portia Circle, Key Largo, FL 33037.

160. Rea, R., *Modifying Roadside Vegetation Management Practices to Reduce Vehicular Collisions with Moose, Alces alces,* 9 Wildlife Biology 81 (2003).

161. Rosegrant, M. et al., *Food Security in a World of Natural Resource Scarcity – The Role of Agricultural Technologies*, International Food Policy Research Institute (2014).

162. Ross, M., et al., *Applied Weed Science,* Prentice Hall, Upper Saddle River, N.J. (2009).

163. Sankula, S., *Quantification of the Impacts on US Agriculture of Biotechnology – Derived Crops Planted in 2005.* Washington DCL Nat'l Ctr. for Food and Agricultural Pol'y (2006).

164. Santo, P., *Assessing Diminution in Value of Residential Properties Affected by Japanese Knotweed,* 6 J. Bldg. Surv., Appraisal & Valuation 211 (2017).

165. Seher, A., et al., Chapter 10, *Charavita, in Medicinal Plants of South Asia,* Hanif, M., et al. 126 (2020).

166. Sellers, B., et al., *Comparative Growth of Six Amaranthus Species in Missouri,* 51 Weed Sci. 329 (2003).

167. Sinden, J., et al., *The Economic Impact of Weeds in Australia,* CRC Weed Management (2004).

168. Smeda, R., et al., Potential of Rye (*Secale cereale*) for Weed Management in Transplant Tomatoes (*Lycopersicon Esculentum*), 44 Weed Sci 596 (1996).

169. Smith, A., *Early Chemical Control of Weeds in Europe,* 24 Weed Sci. 594 (1976).

170. Smith, C., et al., *Impact of Alien Plants on Hawaii's Native Biota*, ResearchGate (1985).

171. Snir, A., et al., *The origin of cultivation and proto-weeds, long before Neolithic farming,* 10 PLoS One 10(7): e0131422 (2015).

172. Solomon, K., et al., *Ecological Risk Assessment for Aquatic Organisms from Over-Water Uses of Glyphosate,* 6 J. Toxicology. Env't. Health. Part B 289 (2003).

173. Soltani, N., et al., *Perspectives on Potential Soybean Yield Losses from Weeds in North America*, 31 Weed Sci. 148 (2017).

174. Soltani, N., et al., *Potential Cord Yield Losses from Weeds in North America*, 30 Weed Sci. 148 (2016).

175. Soltani, N., et al., *Potential Yield Loss in Sugar Beet Due to Weed Interference in the United States and Canada*, 32 Weed Sci., 749 (2018B).

176. Soltani, N., et al., *Potential Yield Losses in Dry Bean Crops Due to Weeds in the United States and Canada*, 32 Weed Sci. 342 (2018A).

177. Stanton, B., *Changes in Farm Size and Structure in American Agriculture in the Twentieth Century*, Cornell Univ. Agriculture Experiment Station, 90-8 (1990).

178. Steinmann, H., et al., *Use and Benefits of Glyphosate in German Arable Farming*, 42 Crop Prot. 164 (2012).

179. Steinrucken, H., et al., *The Herbicide Glyphosate is a Potent Inhibitor of 5-enolpyruvylshikimic acid-3-phosphate synthase*, 94 Biochemistry Biophysics Res. Comm. 1207 (1980).

180. Stoner, K., *Using a hazard quotient to evaluate pesticide residues detected in pollen trapped from honey bees (Apis mellifera) in Connecticut*, PLoS One 8, e77550 (2013).

181. Swanton, C., et al., *Crop Losses Due to Weeds in Canada*, 7 Weed Tech. 537 (1993).

182. Tasker, A., et al., *The U.S. Witchweed Eradication Effort Turns 50: a Retrospective and Look-Ahead on Parasitic Weed Management*, 60 Weed Sci. 267 (2012).

183. Tilman, D., et al., *Global Food Demand and the Sustainable Intensification of Agriculture*, 108 Proc, Nat'l Acad. Sci. 20260 (2011).

184. Timmons, F., *A History of Weed Control in the United States and Canada*, 53 Weed Sci. 748 (2005).

185. United States Department of Agriculture, *Soil Survey of Monroe County, Keys Area, Florida*, Natural Resources Conservation Service (1995).

186. University of California, *Effect of pH, Sodicity, and Salinity on Soil Fertility*, Salinity Management, available at https://ucanr.edu/sites/Salinity/Salinity_Management/Effect_of_salinity_on_soil_properties/Effect_of_pH_sodicity_and_salinity_on_soil_fertility_/ (last visited July 22, 2022).

187. University of California, Integrated Pest Management Program, *Susceptibility of Weeds to Herbicide Control* (2016), http://ipm.ucanr.edu/PMG/r730700411.html (last accessed Dec. 2017).

188. USDA, (U.S. Department of Agriculture), Economic Research Service, *Adoption of GE Crops in the U.S.* (2017), https://www.ers.usda.gov/data-products/adoption-of-genetically-engineered-crops-in-the-us.aspx (last accessed Dec. 2017).

189. USDA, *Non-Citrus Fruits and Nuts. National Agricultural Statistics Services* (2002).

190. USDA, *Terrestrial Plants*, https://www.invasivespeciesinfo.gov/terrestrial/plants (last accessed Dec. 2017).

191. Vassilev, Z., et al., *Trends in Major Types of Poisoning Exposures in Children Reported to a Regional Poison Control Center*, 1994-2001, 43 Clinical Pediatrics 573 (2004).

192. Weatherspark.com, *Climate and Average Weather Year-Round in Key Largo, Florida*, available at https://weatherspark.com/y/18617/Average-Weather-in-Key-Largo-Florida-United-States-Year-Round (last visited July 21, 2022).

193. Weesies, G., et al., *Effect of Soil Erosion on Crop Yield in Indiana: Results of a 10 Year Study,* 49 J. Soil Water Conserv. 597 (1994).

194. Werth, C., et al*., Genetic Uniformity in an Introduced Population of Witchweed (Striga asiatica) in the United States*, 32 Weed Sci. 645 (1984).

195. West, T., et al., *A Synthesis of Carbon Sequestration, Carbon Emissions, and Net Carbon Flux in Agriculture: Comparing Tillage Practices in the United States*, 91 Agric. Ecosystems and Env't 217 (2002).

196. Willowood USA, Label for Willowood Paraquat 3SL (2018).

197. Wilson, R., et al., Evaluation of Glyphosate-Tolerant and Conventional Alfalfa Weed Control Systems during the First Year of Establishment, 23 Weed Tech. 257 (2009).

198. WSSA, *Herbicide Handbook*, Tenth Edition (2014).

199. Zillow.com, Property Details re 601 Portia Circle, Key Largo, FL 33037, available at https://www.zillow.com/homedetails/601-Portia-Cir-Key-Largo-FL-33037/45829269_zpid/ (last visited July 21, 2022).

200. Zillow.com, Property Details re 605 Portia Circle, Key Largo, FL 33037, available at https://www.zillow.com/homedetails/605-Portia-Cir-Key-Largo-FL-33037/45829270_zpid/ (last visited July 21, 2022).

201. Zimdahl, R., *Fundamentals of Weed Science*, Acad. Press, Cambridge, Mass. (2018).

202. Zimdahl, R., *The Etymology of Herbicide*, 17 Weed Sci. 137 (1969).

203. Ziska, L., et al., Rising Atmospheric Carbon Dioxide and Potential Impacts on the Growth and Toxicity of Poison Ivy (*Toxicodendron radicans*), 55 Weed Sci. 288 (2007).