# EXHIBIT 2

Reid Smeda
March 22, 2023

1           UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF CALIFORNIA
2              SAN FRANCISCO DIVISION

3                  MDL NO. 2741
                CASE NO.: 3:16-MD-02741-VC
4

5    IN RE:  ROUNDUP PRODUCTS
     LIABILITY LITIGATION
6    _____

7    This document relates to:

8

9    NANCY SALAS v. MONSANTO
     COMPANY; BAYER CORPORATION;
10   BAYER AG; ANDREW JACK CONROY;
     HOME DEPOT U.S.A.,INC.; KLI
11   SHELL LUMBER & HARDWARE,
     LLC;and ORLANDO VALDES.
12
     Member Case No:
13   3:21-cv-06713-VC
     _____
14

15

16              REMOTE VIDEOTAPED
            CONFERENCE DEPOSITION
                     OF
17              REID SMEDA, Ph.D.

18
                Wednesday, March 22, 2023
19              10:04 a.m. - 12:57 p.m.
                LOCATION:  By Videoconference
20

                   Reported By:
21

            DONNA GUNION, Court Reporter, FPR
22          Notary Public, State of Florida
               U.S. Legal Support, Inc.
23                 Miami Office
                  305-373-8404
24

25

```
 1                    APPEARANCES VIA ZOOM:

 2
     On behalf of the Plaintiff:
 3
          PODHURST ORSECK, P.A.
 4        ONE S.E. 3rd AVENUE
          SUITE 2300
 5        MIAMI, FLORIDA 33131
          305-358-2382
 6        PROJAS@PODHURST.COM

 7        BY: PABLO ROJAS, ESQUIRE

 8
     On behalf of the Defendant HOME DEPOT:
 9
          MORRIS, MANNING & MARTIN, LLP
10        3343 PEACHTREE ROAD NE
          #1600
11        ATLANTA, GEORGIA 30326
          404-233-7000
12        CSUYDAM@MMMLAW.COM

13        BY: CAROLINE W. SUYDAM, ESQUIRE

14
     On behalf of the Defendant MONSANTO COMPANY:
15
          HOLLINGSWORTH LLP
16        1350 I STREET, NW
          WASHINGTON D.C. 20005
17        202-898-5800
          MGRAY@HOLLINGSWORTHLLP.COM
18
          BY: MARCHELLO D. GRAY, ESQUIRE
19            DAVID I. SCHIFRIN, ESQUIRE

20

21

22   Also Present:

23   Videographer:  KYLE HANKINS

24

25
```

Reid Smeda
March 22, 2023                                          30

1     the label.

2   BY MR. ROJAS:

3     Q.   Fair enough.  So I think I understand your

4   description of what you intend to testify about and we

5   can get into that.  My question was a little bit

6   different, which is, have you formed an opinion about the

7   causation, one way or the other, of Ms. Salas's cancer?

8          MR. GRAY:  Same objection.

9          THE WITNESS:  I'm not a cancer expert, so I'm

10      here to address weed science aspects.

11  BY MR. ROJAS:

12    Q.   Understood.  At the risk of being tedious, I need

13  to be thorough, it's part of my job.

14          So are you an oncologist?

15    A.   I am not.

16    Q.   Are you a toxicologist?

17    A.   No.

18    Q.   Are you an epidemiologist?

19    A.   No.

20    Q.   Do you consider yourself qualified to offer

21   opinions about oncology?

22          MR. GRAY:  Object to form.

23          THE WITNESS:  That's not my area of expertise.

24  BY MR. ROJAS:

25    Q.   Do you consider yourself qualified to offer

Reid Smeda
March 22, 2023                              31

1  expert opinions about human toxicology?

2          MR. GRAY:  Object to form.

3          THE WITNESS:  No.

4  BY MR. ROJAS:

5     Q.   And do you consider yourself qualified to offer

6  expert opinions about epidemiology?

7          MR. GRAY:  Object to form.

8          THE WITNESS:  I'm not an epidemiologist.

9  BY MR. ROJAS:

10    Q.   Let me go back to your report and focus on the

11 area concerning glyphosate.  Give me just one moment.  I

12 lost my place here.

13         Here we go.  Screen share.

14         All right.  Do you see, sir, here at the bottom

15 of Page 18 of your report there is a section entitled,

16 "Introduction to glyphosate"?

17    A.   I see that.

18    Q.   And the first sentences reads that -- I'm going

19 to quote it briefly:

20         "Glyphosate is unique in how it interacts with

21    plants."

22         Do you see that?

23    A.   I do.

24    Q.   So you're familiar with the interaction between

25 glyphosate and plants, correct?

Reid Smeda
March 22, 2023                              32

1        A.    I am, yes.

2        Q.    And would you consider yourself an expert in that

3    area?

4        A.    Yes.

5        Q.    I'll scroll down a little bit.  There's a section

6    here called "Glyphosate Toxicity" beginning on Page 21.

7              Do you see that?

8        A.    I do.

9        Q.    And I understand that this section in part deals

10   with glyphosate's toxicity as applied to animals, such as

11   rats, correct?

12       A.    Oral comparison for the LD50 is acute toxicity

13   using rats, yes.

14       Q.    Do you consider yourself an expert in the sort of

15   animal toxicity of glyphosate?

16             MR. GRAY:  Object to form.

17             THE WITNESS:  I'm not a toxicologist.  That was

18      not the intent of the descriptions contained herein.

19   BY MR. ROJAS:

20       Q.    What was the intent?

21       A.    It was to compare glyphosate to other commonly

22   used herbicides as well as other materials that are not

23   herbicide, and describe its acute toxicity relative to

24   other compounds.

25       Q.    So you're familiar with the acute toxicity of

Reid Smeda
March 22, 2023                                    37

1   not a cancer expert, does this table, to your knowledge

2   and based on your expertise and professional background,

3   tell us anything about whether glyphosate is carcinogenic

4   or not, one way or the other?

5         MR. GRAY:  Same objection.  You can answer.

6         THE WITNESS:  I am not a cancer expert.

7   BY MR. ROJAS:

8     Q.   As a noncancer expert, do you have any sense of

9   whether this table tells us anything about the

10  carcinogenicity of cancer?

11        MR. GRAY:  Object to form.  But you can answer,

12     Doctor.

13        THE WITNESS:  I'm here as a weed scientist and

14     again, as I've described, this table just outlines the

15     acute toxicity of glyphosate versus other comparative

16     herbicides and shows that it has a low acute toxicity.

17  BY MR. ROJAS:

18    Q.   Understood.  So is it your view that this table

19  does not tell us anything about the carcinogenicity of

20  cancer or that you do not know, because you're not a

21  cancer scientist, whether this table tells us anything

22  about the carcinogenicity of glyphosate?

23    A.   I'm not a cancer expert.  Again, this is just to

24  compare acute toxicity of glyphosate versus other

25  commonly used herbicides, and it has a low acute

Reid Smeda
March 22, 2023                                    38

1   toxicity.

2       Q.    Let me ask you in more general terms.  With the

3   understanding that, as you've repeatedly told me, you're

4   not a cancer expert, do you have any view, expert or

5   otherwise, about whether glyphosate causes cancer?

6           MR. GRAY:  Object to form to the extent it's

7       calling for nonexpert opinions, but you can answer,

8       Doctor.

9           THE WITNESS:  I'm not a cancer expert.  That's

10      outside my area of expertise.

11  BY MR. ROJAS:

12      Q.    Okay.  Do you, yourself, in a personal or

13  professional capacity, still apply glyphosate containing

14  herbicides today?

15      A.    Yes, I do.

16      Q.    When is the last time that you can recall

17  applying a glyphosate-containing herbicide?

18      A.    It was sometime last fall of 2022.

19      Q.    And was that in a personal or professional

20  capacity?

21      A.    That was in a professional capacity.

22      Q.    When is the last time that you can recall

23  applying a glyphosate-containing herbicide in a personal

24  capacity?

25      A.    It was sometime late last summer.

Reid Smeda
March 22, 2023                                    43

1    your view of Google Earth images inform your opinions

2    about the likely extent of her use of Roundup?

3        A.   They aligned with the other pictures and

4    photographs that I saw as part of the other exhibits that

5    were put up here in this case.

6        Q.   Okay.  Let me scroll down a little bit.  I'm on

7    Page 40 now.  Do you see this bolded text that says, "Ms.

8    Salas overestimates her use of Roundup"?

9        A.   I do.

10       Q.   And is it still your opinion, sitting here today,

11   that the estimate that Ms. Salas has provided of how much

12   Roundup she used is a likely overestimate?

13       A.   Yes, it is.

14       Q.   Can you describe the methodology by which you

15   reached that conclusion?

16            MR. GRAY:  Object to form.  You can answer,

17       Doctor.

18            THE WITNESS:  So from the description provided

19       just in terms of what she was using glyphosate for and

20       where it had been applied on both of these properties,

21       in addition to my extensive experience with herbicides

22       over the last 30 years, especially with glyphosate but

23       also many other herbicides, it appeared inconsistent

24       with what was necessary to manage the weeds that would

25       have been on those properties.

Reid Smeda
March 22, 2023                                    46

1   information I was provided.

2   BY MR. ROJAS:

3      Q.   So sitting here today, do you have a quantitative

4   estimate, one way or the other, about the square footage

5   of the area of either or both of those properties where

6   Roundup was likely applied by Ms. Salas?

7      A.   I don't have a specific square footage but,

8   again, looking at the description of where it was used,

9   looking at the photographs, it would have been just some

10  fraction of that property if you look at the entire

11  square footage because, as indicated from the

12  photographs, there was cement on especially one of the

13  properties, and there were a lot of stones and other

14  things covering the soil on the other property, as well

15  as on the 605 property.

16     Q.   You say "a fraction."  Do you know, if not

17  specifically, approximately what fraction of either

18  property?

19     A.   I don't have a specific number.

20     Q.   Okay.  I'm going to, sort of piggybacking on what

21  you just told me, I want to focus on a sentence.  If it's

22  helpful, I will highlight it.  Obviously the highlighting

23  is mine, it's not original to the document, but it says,

24  the sentence here that says:

25          "Although Ms. Salas describes widespread spraying

Reid Smeda
March 22, 2023                                    47

1      on the 601 and 605 property, the presence of

2      impermeable cement and river gravel/stone with an

3      underlying plastic liner likely precluded the need to

4      spray everywhere."

5           What do you mean, "everywhere"?

6      A.    Ms. Salas, at some point in her records,

7   described broadcast spraying over portions of her

8   property, and this sentence was to describe that where

9   she identified where she was spraying, from the

10  photographs, other areas contained cement and weeds don't

11  grow through cement.  It's also described where there was

12  the presence of some of this gravel or stone and some

13  mention of an underlying plastic liner, which likely

14  would have resulted in weeds coming up in sporadic areas.

15     Q.    Then the next sentence, I'll just continue with

16  my highlighting, reads:

17          "Rather, it is likely that these areas would only

18     require spot treatments."

19          What is the basis for that statement?

20     A.    One of the bases is if you do have cement that's

21  present, weeds are not going to come up through cement.

22  They may come up through the cracks, and where she

23  described she sprayed along specific areas likely where

24  weeds would emerge.  Also, weeds are not going to come up

25  directly under stones.  They would have to come up in

Reid Smeda
March 22, 2023                                    48

1  other areas around those and, as a result, you would end

2  up with not a need to spray everywhere, but just spot

3  treat those areas where weeds do come up.

4      Q.   And then the next sentence reads, I'll highlight

5  that one, too -- oops, sorry about that:

6          "Although Ms. Salas testified that she often

7      spent entire mornings out in the yard, she only would

8      have needed to spray a small fraction of this time."

9          Let me ask you a couple of questions about that.

10          As a matter of plain English, I understand that

11  when you say that should would only have needed to spray

12  a small fraction of the time, what you're referring to or

13  what you're saying is that she would only have needed to

14  spray a small fraction of an entire morning.

15          Is that fair?

16      A.   She indicated other activities that she was doing

17  outside, such as pulling weeds, and for the areas that

18  she described, it wouldn't take a long period of time to

19  be able to treat the weeds that were in areas where she

20  was working.

21      Q.   As part of your work in this case, did you do any

22  quantitative estimate of how much time Ms. Salas would

23  have needed to spray these two properties, in your

24  opinion?

25      A.   I didn't need to do any quantitative work from

Reid Smeda
March 22, 2023                                    66

1      Q.   Do you know whether all Roundup labels contain

2   such a provision?

3      A.   Well, it's quite well-known that glyphosate is an

4   effective herbicide so certainly you want to put it where

5   it's going to do its work on the weeds.

6           So there's usually a description for appropriate

7   conditions, and a wind speed would be one of those

8   factors that would be considered.

9           So certainly I would say most, if not all, labels

10  would likely have a description of making sure that you

11  use the product properly.

12     Q.   I'll scroll down to the section that starts here

13  at the bottom of Page 44, with the header, "Ms. Salas

14  overestimates her contact with Roundup."  Do you see

15  that?

16     A.   I do.

17     Q.   I'm going to focus here on the sentence that

18  says:

19          "Due to the height of the weeds, Ms. Salas would

20      have applied Roundup in a downward direction and

21      direct skin contact from application would be minimal

22      to nonexistent."

23          What is the basis for that opinion?

24     A.   Ms. Salas described that she used glyphosate

25  three to four times per month, sometimes weekly in the

Reid Smeda
March 22, 2023                                    67

1    summer.  She stated that she treated the weeds when they

2    were small because the weeds then would be close to the

3    ground.  With the type of equipment that she used, this

4    would have been putting glyphosate in a downward

5    direction with her standing nearby treating those weeds.

6        Q.   I'm going to scroll up a little bit.  In the

7    preceding paragraph, you write, "Ms. Salas also stated

8    that she often accidently sprayed Roundup in the air."

9            Do you see that?

10       A.   I see that.

11       Q.   Do you believe that she accidently sprayed

12   Roundup in the air or do you think that didn't happen?

13           MR. GRAY:  Object to form.

14           THE WITNESS:  Well, certainly I wasn't there when

15       she sprayed, but it wouldn't make a lot of sense to

16       spray glyphosate in the air.  The objective is to

17       spray the weeds which are close to the ground and

18       that's what you would want to focus on.

19   BY MR. ROJAS:

20       Q.   Is it your view, then, that if you are spraying

21   downward, it is unlikely or impossible to come into

22   dermal contact with Roundup?

23           MR. GRAY:  Object to form.  Save the testimony

24       but you can answer.

25           MR. ROJAS:  I'm just asking what his testimony

Reid Smeda
March 22, 2023                                    68

1        is.

2   BY MR. ROJAS:

3        Q.   Go ahead, sir.

4        A.   Having used that type of equipment for a number

5   of different years, the spray that generally comes out of

6   that is in coarse droplets that quickly reach the ground

7   and your objective would be to spray the weeds, so that

8   would be in a downward fashion as you're directing those

9   weeds, and with the design of that type of equipment,

10  contact would be minimal.

11       Q.   And that's based on your personal use of this

12  type of equipment.  Is that right?

13       A.   That's certainly a large part of it, would be my

14  experience.  But it's also, having looked at the

15  equipment as well, that that's how it's designed and it

16  comes out in coarse droplets, so naturally it's a place

17  that you'd want to put them in a downward fashion to

18  control weeds.

19       Q.   Let me scroll down a bit here to the section on

20  45 with the header, "Opinions regarding plaintiff's

21  experts."  Do you see that?

22       A.   I do.

23       Q.   Did you review the reports of Doctor Kevin Knopf

24  and Doctor William Sawyer?

25       A.   I was provided documents and I did look at those,

Reid Smeda
March 22, 2023                          70

1   described, do you have any other criticisms of the

2   methodology of either Doctor Knopf or Doctor Sawyer?

3       A.   I'm not a toxicologist so in terms of various

4   methods of calculating the types of things that they did

5   in their reports, I'm not an expert but I will say that

6   having had extensive use of the type of equipment and

7   using glyphosate, I believe that she would have had

8   minimal contact with the material with the coarse spray

9   droplets that were used, and it would not need to be a

10  spraying three to four times per month, sometimes weekly

11  in the summer.  I think perhaps two to three applications

12  per year would have been more than adequate to be able to

13  manage the weeds in her properties.

14      Q.   Okay.  Let me highlight this sentence here.  I

15  know we already talked a little bit about this subject,

16  I'll just read.  It says:

17          "Similarly, Doctor Sawyer bases his analysis on

18      the characterization that spraying was a, quote,

19      year-round, unquote, activity, pointing out that weeds

20      grow quickly in the Key West environment."

21          And it references Page 15 and a parenthetical

22  citation, Page 15 of Doctor Sawyer's report.

23          Do you see that sentence?

24      A.   I do.

25      Q.   Do you disagree with Doctor Sawyer's

1  quickly development occurs, depend on the species?

2      A.   Certainly the species is one factor that

3  influences the rapidity of development, yes.

4      Q.   Have you formed any opinions or have any

5  understanding in this case of the species of weeds that

6  may have grown on Ms. Salas's property?

7      A.   So I'm not familiar with the specific species

8  that could have been there but, again, the description

9  were weeds, and if she's treating plants that were very

10 small, these are likely weeds that are emerging from

11 seed, so they're likely starting small and growing and it

12 would take sometime for them to be able to develop.

13     Q.   Do you know as a general matter what weeds are

14 typical of the Key Largo environment?

15     A.   So again, the specific species would likely

16 depend, but there were, as described in this report, a

17 number of factors that limit development.  The pH

18 certainly had something to do with that.  The patterns of

19 rainfall and the temperature variation.

20          So even though there could be a specific species

21 that I'm not aware of, these weeds are all going to

22 follow those same types of weed biology patterns;

23 emergence, time for development, and with Ms. Salas's

24 description of this frequency of glyphosate application,

25 again, it's an excellent herbicide.  It would have taken

Reid Smeda
March 22, 2023                                    73

1    sometime for any species to grow back.

2       Q.   Let me stop sharing the screen and just ask you

3    some questions irrespective of the document.

4            We talked earlier about your extensive career in

5    agronomy, horticulture and weed science.  Have you ever

6    done any research in weed science in the climatic

7    conditions present in Key Largo?

8       A.   Specific questions in Key Largo, those

9    conditions, not necessarily; however, I did do in one

10   year a series of trials that were done in Kissimmee,

11   Florida, in that very hot region, because I was working

12   on some test plots looking at different herbicides.

13           And so I was down there several times in one year

14   and I had a chance to see and observe weed emergence of

15   different species and I treated those.

16      Q.   Other than that experience in Kissimmee, have you

17   done any other weed science work, research or analysis in

18   the State of Florida?

19      A.   In the State of Florida, no, but living in

20   Mississippi, it certainly got hot and humid there and we

21   had a lot of weeds there.  Different setting but not

22   specifically down in Florida, but, again, weeds are going

23   to follow certain types of patterns and whether it's one

24   temperature a little higher than another, these weeds are

25   all going to be controlled by biological factors and

1   concentrate, that would be diluted in water and it would

2   make a larger amount of total spray solution.

3          Certainly the RTU, ready-to-use glyphosate, you

4   would just be spraying it out of a container that you

5   were using and you would go and you would spray the weeds

6   that you were targeting in the areas that we've talked

7   about.

8   Q.   Do you have a view as to how it came to be that,

9   at least according to you, Ms. Salas overstated her use

10  of Roundup?  Meaning, do you think she misremembered?

11  A.   Well, again, based on my extensive experience and

12  understanding of how glyphosate works having used the

13  similar type of equipment that Ms. Salas alleges that she

14  used and knowing the patterns of weed emergence, and

15  where the weeds would have been treated on those

16  properties, it just wouldn't take very much time, maybe

17  ten to 20 minutes.  Could have been maybe two, three,

18  possibly even four times per year to be able to control

19  those weeds.

20         So based upon that and, like I said, my extensive

21  experience with glyphosate, she would have been spot

22  spraying weeds where they would have come up, but it just

23  would not have added up to the frequency of use that has

24  been reported just because of how well glyphosate works

25  and what it was doing.

Reid Smeda
March 22, 2023                                    97

1  because you're spraying Roundup?

2      A.   No, we don't.  We believe that we're involved in

3  the realm of following the PPE requirements for

4  glyphosate, and we believe it's safer if we're wearing

5  that PPE.

6      Q.   Earlier today you were also -- throughout the day

7  you were asked some questions about your familiarity with

8  Ms. Salas's property and, in particular, whether or not

9  you visited her properties.  Do you recall that?

10      A.   I do.

11      Q.   You have not visited either of Ms. Salas's

12  properties, correct?

13      A.   I have not, no.

14      Q.   And is it your understanding that Ms. Salas is no

15  longer in ownership or possession of those properties?

16      A.   That's my understanding, yes.

17      Q.   And would that be the reason that you weren't

18  able to visit them?

19      A.   Yes, that would be the reason I couldn't go.

20          MR. ROJAS:  Object to the form.

21  BY MR. GRAY:

22      Q.   And despite not being able to visit those

23  properties, were you able to gather enough information

24  and resources to reach your opinions in this case?

25      A.   With all the different documents that I was

Reid Smeda
March 22, 2023                                    98

1   provided and research and the pictures that we could do,

2   yes, I could adequately arrive at those conclusions.

3        Q.   Earlier you were asked some questions about the

4   carcinogenicity of Roundup.  Do you recall that?

5        A.   I do.

6        Q.   You testified that you're not a cancer expert.

7   Is that correct?

8        A.   That is correct.

9        Q.   So given that, in your field or in your line of

10  work, what would you rely on to understand the

11  carcinogenicity of a substance?

12       A.   I really on the EPA to give me the guidelines

13  necessary.

14       Q.   Okay.  And I again recognize that's not your

15  expertise, but are you aware of what the EPA has stated

16  about the carcinogenicity of glyphosate?

17       A.   Yes, sir.

18       Q.   And what's that?

19       A.   They've arrived at the conclusion that it's not a

20  probable carcinogen.

21            MR. GRAY:  Doctor, depending on what you may be

22       asked by the other lawyers, that's all the questions I

23       have for you right now.

24            MS. SUYDAM:  I don't have anything.

25            MR. ROJAS:  I don't have anything either.

Reid Smeda
March 22, 2023                          102

```
1              CERTIFICATE OF OATH

2

3   THE STATE OF FLORIDA        )

4   COUNTY OF MIAMI-DADE        )

5

6          I, Donna Gunion, Florida Professional Reporter,
    Notary Public, State of Florida, certify that REID SMEDA,
7   Ph.D. appeared via Zoom on the 22nd day of March, 2023
    and was duly sworn.
8
           WITNESS my hand and official seal.
9
           DATED: 03/30/2023
10

11

12
    _____
13          Donna L. Gunion, FPR
         Notary Public - State of Florida
14          COMMISSION # HH 126082
         Commission Expires 8/3/2025
15

16

17

18

19

20

21

22

23

24

25
```

Reid Smeda
March 22, 2023                                    103

```
 1                   CERTIFICATE OF REPORTER

 2

 3   THE STATE OF FLORIDA        )

 4   COUNTY OF MIAMI-DADE        )

 5

 6           I, Donna L. Gunion, Florida Professional
     Reporter and Notary Public in and for the State of
 7   Florida at large, do hereby certify that I was authorized
     to and did stenographically report the deposition of REID
 8   SMEDA, Ph.D. in the foregoing proceedings and was by me
     duly sworn to testify to the truth, the whole truth, and
 9   nothing but the truth; that said proceedings were taken
     before me at the time and place therein set forth and is
10   a true record of my stenographic notes.

11           I further certify that I am neither a relative,
     employee, attorney or counsel of any of the parties, nor
12   am I relative or employee of any of the parties or
     connected with the action, nor am I financially
13   interested in the action.

14           In witness whereof, I have hereunto subscribed
     my name.
15
             DATED: 03/30/2023, at Miami, Dade-County,
16   Florida.

17

18   _____

19             Donna L. Gunion, FPR
           Florida Professional Reporter

20

21

22

23

24

25
```