# EXHIBIT A



1          UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF CALIFORNIA
2
                    MDL No. 2741
3
                    Case No. 3:16-md-02741-VC
4

5
   IN RE: ROUNDUP PRODUCE LIABILITY
6  LITIGATION

7  ---------------------------------

8  Karen Delorme-Barton

9  v.

10 Monsanto Company

11 Case No. 3:18-cv-01427-VC

12 ---------------------------------

13

14

15

16      ZOOM DEPOSITION OF JOHN MURPHY, PH.D

17        April 24, 2023 at 10:01 a.m.

18               Virtual Room

19

20

21

22
    ----------Jennifer A. Doherty, CSR--------------
23        Certified Court Stenographer

24

25

John Murphy, Ph.D.

```
 1   APPEARANCES:

 2       WEITZ & LUXENBERG, P.C.
         BY: Benjamin Goldman, Esq.
 3       220 Lake Drive East, Suite 210
         Cherry Hill, New Jersey 08002
 4       bgoldman@weitzlux.com
         For the Plaintiff.
 5


 6


 7       HOLLINGSWORTH, LLP
         BY: Daniel Murner, Esq.
 8       1350 I Street, NW
         Washington, DC 20005
 9       dmurner@hollingsworthllp.com
         For the Defendant.
10


11


12
     ALSO PRESENT:  Ranjit Dhindsa, Esq., Abigail Reecer,
13   Esq., Chantel Khali, Esq. and Alex Jandrow,
     Videographer
14

15

16

17

18

19

20

21

22

23

24

25
```

Exhibit A Page 2

John Murphy, Ph.D.

```
 1                     I N D E X
       Testimony of:                    Direct   Cross
 2
       JOHN MURPHY PH.D
 3          by Mr. Goldman              4
            by Mr. Murner                        160
 4

 5

 6                   E X H I B I T S
       No.            Description                For I.D.
 7
       Exhibit 1  Notice of Deposition           8
 8
       Exhibit 2  Curriculum Vitae               34
 9
       Exhibit 3  Expert Report of John Murphy   34
10
       Exhibit 4  "Risk Assessment of Glyphosate
11                 Exposures From Pilot Study
                   with Simulated Heavy Residential
12                 Consumer Application of Roundup
                   using a Margin of Safety (MOS)
13                 Approach"                      96

14     Exhibit 5  Inhalation Toxicology; "Pilot
                   study evaluating inhalation and
15                 dermal glyphosate exposure resulting
                   from simulated heavy residential
16                 consumer application of Roundup  118

17     Exhibit 6  Website                         119

18     Exhibit 7  Home Page for Cardno ChemRisk   145

19     Exhibit 8  Website Focus Areas             146

20

21

22

23                 **EXHIBITS SENT TO ATTORNEY GOLDMAN**
24

25
```

**Exhibit A Page 3**

John Murphy, Ph.D.

1        A.    I provide no opinion on that matter.

2        Q.    Okay.  And then your analysis of the

3    exposure levels for Ms. Delorame-Barton, you

4    reviewed her deposition testimony; is that right?

5        A.    Yes.

6        Q.    Okay.  And in your report you also use a

7    series of photographs from Google Earth and I

8    believe also realty company websites; is that

9    right?

10       A.    I used photos from the exhibit set, from

11   Google Earth Pro and from publicly available real

12   estate sites that show the property.

13       Q.    Okay.  And in reviewing and using the

14   testimony of Ms. Delorame-Barton in conducting your

15   analysis, did you question the accuracy of

16   Ms. Delorame-Barton's testimony?

17             MR. MURNER:  Objection, form.

18       A.    When I read through the testimony, I did

19   not question its accuracy.

20       Q.    Okay.  So would it be accurate -- would it

21   be -- would it be accurate to say with regards --

22   with regards to your use of the deposition

23   testimony, you accepted everything that she said as

24   true and accurate in the -- in using it for your

25   analysis?

John Murphy, Ph.D.

1   that?

2        A.   Yes.

3        Q.   Okay.  Do you have any images of the way

4   the property appeared from any time between 1976 and

5   1986?

6        A.   I don't, offhand, I don't think so.  I

7   think the Google Earth images only go to the early

8   1990s.  But the images that I did have did

9   correspond to characteristics or features that she

10  described.  There were no anomalies or, you know,

11  things that she had described there that were no

12  longer there.  So everything seemed consistent in

13  terms of what she had described.

14            I think with one of the other properties,

15  there were -- there were some differences, but with

16  this one, I think it was consistent.

17       Q.   Okay.  So the images that you viewed from

18  Google Earth appeared consistent with

19  Ms. Delorame-Barton's testimony about the features

20  of the Palos Heights address; is that right?

21       A.   I think she described some trees having

22  been present on one side of the driveway that were

23  no longer there, but I'd have to check.  But, yeah,

24  I -- I considered her description to be consistent

25  with the visual imagery I was able to obtain for

John Murphy, Ph.D.

1    this property.

2         Q.   Okay.  And then going back down to figure

3    8, figures 8 through 13 on pages 42 through 40 -- 44

4    of your report.  You do -- you have no reason to

5    believe that any of these images -- any of these

6    satellite images depict the property between the

7    years of 1976 and 1986?

8                   MR. MURNER:  Objection, form.

9         A.   The date is actually indicated on each of

10   the photos --

11        Q.   Right.

12        A.   -- in the upper left corner you can see --

13   yeah --

14        Q.   Exactly.

15                  THE COURT REPORTER:  So sorry, on

16   each of the photos and the?

17        A.   The upper left corner of each photo

18   indicates the date --

19        Q.   Right.

20        A.   The photos -- the photos that I selected,

21   for each of these properties, I looked at all the

22   photos that were available on Google Earth as far

23   back as they could go.  I chose a photo that

24   provided imagery, first of all, that was not

25   obscured by foliage.

**Exhibit A Page 6**

John Murphy, Ph.D.

1              So I generally selected photos that were

2      from, you know, the spring or the fall so that we

3      can clearly see property features, and I selected

4      photos that depicted features that she described.

5      So I tried to get photos that were fair

6      representations of the property features that she

7      described.

8          Q.   Okay.  So in the upper left -- let's start

9      with figure 8.  And it appears -- and -- well, let's

10     just start with figure 8.  So in the upper left-hand

11     corner of the image on -- the Google Earth image on

12     figure 8, it indicates that, and tell me if this is

13     correct, it seems to indicate that the photograph of

14     this property on Google Earth are available between

15     1999 and 2018; is that right?

16         A.   It's too small for me to read on your --

17     your screen, but if you're representing that to be

18     the case, then I -- I have no reason to doubt you.

19         Q.   Oh, no.  Absolutely.  Let me see if I can

20     zoom in.

21         A.   Sure.

22         Q.   Okay.  Okay.  View, zoom in again.  Okay.

23     Here, is that helpful?

24         A.   Yes, that's helpful.

25         Q.   Okay.  And so you would agree that it

John Murphy, Ph.D.

```
 1   appears that Google images available for this -- for

 2   this property are taken -- are -- were -- were

 3   between 1999 and 2018; is that right?

 4        A.   Yes.

 5        Q.   Okay.  Do you know if there are any images

 6   that were available before 1999?

 7        A.   I do not know if any images were available

 8   before 1999.

 9        Q.   Okay.  Do you recall viewing any images

10   before 1999?

11        A.   No, I don't recall any before 1999.

12        Q.   Okay.  And the image that you ultimately

13   chose to analyze and include in your report is one

14   from April 2, 2013; is that right?

15        A.   Yes.

16        Q.   Okay.  And let me -- let me just check

17   here.  Not the same as the image in figure 7, which

18   is from November 1, 2012, the year before; is that

19   right?

20        A.   Yes.

21        Q.   Okay.  But then the 2013 image in figure

22   8, is this -- is that the same 2013 image that's in

23   figure 9?

24        A.   Yes, it turned out that when zooming in on

25   certain features, some photos provided better
```

John Murphy, Ph.D.

```
 1   resolution than others.  So I tried to select those
 2   that gave the best depiction.
 3       Q.   Okay.  So you chose this image based on
 4   the resolution and also the -- the visibility which
 5   was not obscured by foliage; is that right?
 6               MR. MURNER:  Objection.
 7               MR. GOLDMAN:  I'm sorry, I missed
 8   that, Counsel.
 9       A.   Yeah, she -- she -- so I wanted to get a
10   photo that showed questions.
11               THE COURT REPORTER:  I'm sorry,
12   there's some breakage right there.  Was there an
13   objection?
14               MR. GOLDMAN:  I don't know.
15       A.   Maybe you can repeat the question.
16               MR. MURNER:  Hold on, sir.  The court
17   reporter asked if there was an objection.  And I
18   just want to make it clear there was an objection.
19   I think unfortunately we're having some lag here.
20               MR. GOLDMAN:  Okay.  I think you
21   might have -- are you on mute, Daniel?  He's
22   showing -- no, I can hear you.  Okay.  I trust that
23   you're okay.
24   BY MR. GOLDMAN:
25       Q.   All right.  So now, Dr. Murphy, you made
```

Exhibit A Page 9

John Murphy, Ph.D.

1  some -- a comment about bushes that you said weren't

2  there.  What did you mean by that?  I missed that?

3  I think we lost him.  No, I didn't.

4       A.   No, I didn't say portions weren't --

5                 THE COURT REPORTER:  I'm sorry, I'm

6  sorry.

7       A.   I said that she had described spraying --

8  can I be heard?

9                 THE COURT REPORTER:  We're breaking

10 up.

11      A.   Can you hear me?

12                THE COURT REPORTER:  It's breaking.

13      A.   Hello?

14      Q.   I can -- it seems like you're smoother

15 now.  There are occasion -- there are times when you

16 sometimes get a little choppy.

17      A.   Okay.  Hotel Internet, it's the best we

18 can do.

19                MR. GOLDMAN:  Okay.  Madam reporter,

20 are we -- how are we doing now?

21                THE COURT REPORTER:  You're doing

22 well.

23                MR. GOLDMAN:  Thank you.  How's the

24 doctor doing?

25                THE COURT REPORTER:  He's still

John Murphy, Ph.D.

1  breaking up, and I can see he's -- he's freezing as

2  well.

3            MR. GOLDMAN:  Right.  Okay.  So let's

4  try to proceed and see how we go.  And but, Madam

5  Reporter, of course always please jump in if there's

6  any issue with any answer.

7  BY MR. GOLDMAN:

8     Q.   So, Dr. Murphy, I know you've -- I know

9  you've said this twice, but I don't think we got the

10  full answer.  Could you please repeat a third time.

11           What was your comment about the bushes?

12  Because it sounded like you were saying that there

13  might have been something that she reported spraying

14  which didn't appear on the image, but I'm not sure

15  if that's right?

16     A.   It's -- it's not what I said.  What I said

17  was that in the case of this particular property,

18  she had described spraying at the base of the bushes

19  along the borders of the property.  So I selected

20  photos that I thought fairly illustrated the

21  features that she was describing.

22           So in this -- in this particular photo,

23  photo -- figure 8 and 9, I think it is evident you

24  can see that there are mature bushes that are --

25  that are there.

John Murphy, Ph.D.

1        Q.    Okay.

2        A.    So it's consistent with her description.

3        Q.    Okay.  Do you recall if there were prior

4   Google Earth photographs that did not fairly depict

5   what she testified to?

6        A.    I do not recall seeing any that struck me

7   as being inconsistent with this property, no.

8        Q.    Okay.  But you would agree that if she

9   lived in the Palos Heights property between 1976 and

10  1986 the Google Earth image that you're including in

11  your report is 27 to 37 years older than the time

12  that she would have resided at that property; is

13  that right?

14       A.    The photo's not 27 to 37 years older.  The

15  photo is newer.  Her time of residence was 27 to 37

16  years earlier.

17       Q.    Fair enough.

18       A.    Yeah.  But the features are consistent

19  with her description.

20       Q.    Okay.  So --

21       A.    The --

22       Q.    Right.  So but you would agree that, you

23  know, even though I might have misstated the

24  direction of the relationship, there's a 27 to 37

25  year gap between the image that you're including in

John Murphy, Ph.D.

1   your report and the time that she actually -- that

2   Ms. Delorame-Barton actually resided at the Palos

3   Heights address; is that right?

4              MR. MURNER:  Objection, form.

5      A.   Based on the time of her reported

6   occupancy that would be correct.

7      Q.   Okay.  And you've testified that the 2013

8   Google Earth image seemed consistent to you with her

9   deposition testimony; is that right?

10             MR. MURNER:  Objection, form.

11     A.   The Google Earth image contained features

12  that were similar to those that she described in her

13  testimony.

14     Q.   Okay.  But would you agree that the Google

15  Earth image is one that you really don't know

16  whether it fairly and accurately represents the

17  landscaping at the Palos Heights address 27 to 37

18  years earlier?

19             MR. MURNER:  Objection, form.

20  Scope.

21     A.   All I can say is that the features she

22  described appear in the photo, and that was the

23  basis for the measurements.

24     Q.   Okay.  So would you agree that based on

25  the 2013 Google Earth image, you can't tell the

John Murphy, Ph.D.

1   square footage of the landscaping features at the

2   Palos Heights address 27 to 37 years before the

3   photo was taken?

4              MR. MURNER:  Objection, form.

5      A.   I don't know that I would agree with the

6   characterization.  You know, I've seen properties

7   where, you know, trees and bushes last for decades

8   and decades.  And, again, the features that she

9   described were consistent in terms of the location

10  and nature with what appears in this photo.  So I

11  think what I've done in terms of the area estimates

12  is reasonable and consistent with her description

13  and her testimony.

14     Q.   Based on your review of the deposition

15  testimony, you never saw any point in the deposition

16  at which any counsel put the 2013 Google Earth image

17  to Ms. Delorame-Barton and asked if it was a fair

18  and accurate representation of the landscaping at

19  that address between 1976 and 1986?

20             MR. MURNER:  Objection, form.

21     A.   I have no knowledge as to whether that may

22  have occurred or not.

23     Q.   All right.  And you have never seen any

24  image of the landscaping at the Palos Heights

25  address between 1976 and 1986, have you,

John Murphy, Ph.D.

1    Dr. Murphy?

2        A.    No, I have not.

3        Q.    Then with regards to -- we might -- we

4    might zoom in again, but let me zoom out just as we

5    move through the document.

6              But based on your analysis of the square

7    footage that you blocked off in the 2013 Google

8    image, Google Earth image, you determined that the

9    amount of Roundup that Ms. Delorame-Barton claimed

10   she sprayed during her deposition at that address

11   was plausible that she actually did spray at that

12   address?

13             If -- I know -- if that question was

14   complicated or confusing, please ask me to repeat

15   it.

16             MR. MURNER:  Objection, form.

17       A.    I -- I didn't conclude that it was

18   plausible.  I concluded that it was close to the

19   range that she had described, and I explained in my

20   report the implication for my dose estimate.

21       Q.    Okay.  Based on -- and the basis of this

22   estimate was your application of -- I think -- what

23   you -- what I think you described as the recommended

24   rate of Roundup application from a spray bottle; is

25   that right?

John Murphy, Ph.D.

1           MR. MURNER:  Objection, form.

2      A.   The --

3           THE COURT REPORTER:  He's frozen.

4      A.   -- application rate per label is probably

5  the more precise way of describing it.

6           THE COURT REPORTER:  He has to

7  repeat.

8  BY MR. GOLDMAN:

9      Q.   I know.  I have to stop you, Doctor.  You

10  froze again.

11      A.   Okay.

12      Q.   So -- yeah, if you could -- if you could

13  repeat that answer, that would be helpful.  If you'd

14  like me to repeat the question, I'd be happy to.

15      A.   Please repeat the question.

16      Q.   Okay.  In reviewing the -- in reviewing

17  Ms. Delorame-Barton's deposition testimony and the

18  2013 Google Earth image, you determined that it was

19  plausible that she sprayed the amount of Roundup

20  that she reported spraying over the area that you

21  blocked off in the Google Earth image; is that

22  right?

23           MR. MURNER:  Objection, form.

24      A.   That's not what I say in the report.  I

25  provide a dose estimate based on the areas that I

Exhibit A Page 16

John Murphy, Ph.D.

1    identified, and indicate that if she had sprayed the

2    amount -- and the -- and that the volume that would

3    be needed to spray that area in accordance with

4    label coverage rate was lower than the quantity that

5    she recalled spraying.  But if her recollection was

6    correct, then it would mean that her dose would be

7    higher than I estimated by 25 to approximately 85

8    percent.  I need to see the exact part of the

9    report, but that's approximately the difference.

10        Q.   Okay.  So when you're doing her -- when

11   you're conducting the actual dose estimate, the

12   basis for the dose estimate is the areas that you

13   blocked off on the Google Earth images; isn't that

14   right?

15             MR. MURNER:  Objection, form.

16        A.   The basis for the volume estimates are

17   the --

18             THE COURT REPORTER:  You broke up.

19        A.   -- blocked off.  Many other variables

20   are --

21             THE COURT REPORTER:  You broke up.

22   All right.

23        Q.   I'm sorry, Doctor.  You're going to have

24   to back up again.

25        A.   Okay.

John Murphy, Ph.D.

```
1       Q.   Okay.  I know we're playing a lot of start

2   and stop, but let's -- let's see.  I know I'm asking

3   long questions and you're giving longer answers in

4   response, so let's go.

5            I had asked you if the basis for your dose

6   calculation was the areas that you blocked off on

7   the 2013 Google Earth image of the Palos Heights

8   address?

9                 MR. MURNER:  Objection, form.

10      A.   Basis is probably not the right word

11  because the -- the dose estimate considers a number

12  of variables.  The surface area -- as a variable is

13  relevant --

14                THE COURT REPORTER:  I didn't get all

15  that.

16      A.   -- the surface area as a variable -- can

17  you hear me now?

18                MR. GOLDMAN:  No, I'm sorry.

19  Counsel, we might have to --

20                THE WITNESS:  Hello?

21                MR. GOLDMAN:  Is there any way we can

22  try to ameliorate the situation?  We can take a 15,

23  half an hour break.  But I can't hear you now.

24                MR. MURNER:  Let's do a -- I think

25  ten minutes will be fine.
```

John Murphy, Ph.D.

1    describe the analysis that I'm asking you whether or

2    not you undertook.

3             Did you, one, calculate the square footage

4    that you believed Ms. Delorame-Barton described

5    spraying in her deposition through a reference to

6    the areas that you blocked off in the Google Earth

7    2013 image and then compare that amount of Roundup

8    application with the actual volume of Roundup

9    application that Ms. Delorame-Barton described using

10   in her deposition to determine whether or not the

11   actual amount that she described using in her

12   deposition was plausible?

13            MR. MURNER:  Objection, form.

14       A.   Okay.  You've asked three separate things,

15   so I'll respond seriatim.  I did use the Google

16   Earth Pro tool to calculate the individual surface

17   areas as shown in figures 8 through 13, which I

18   identified based on property features and locations

19   described by the plaintiff in her testimony.

20            I tabulated the total of those areas and

21   used the total area in combination with the label

22   application rate to calculate the total volume of

23   dilute solution that would be required to treat

24   those areas.

25            And in terms of concluding on the

John Murphy, Ph.D.

1   public.

2   BY MR. GOLDMAN:

3        Q.   So what you're describing -- tell me if

4   this is fair.  You're describing having undertaken a

5   hypothetical analysis assuming that -- that

6   Ms. Delorame-Barton's testimony is true?

7                MR. MURNER:  Objection, form.

8        A.   I did an analysis based upon the

9   information she provided in her transcript or that

10  appears in the transcript.

11       Q.   Okay.  And you would agree that

12  Ms. Delorame-Barton is in a better position than you

13  personally to know how much Roundup she sprayed at

14  the Palos Heights address between 1976 and 1986;

15  isn't that right?

16       A.   I don't know that I would agree with that,

17  no.

18       Q.   You don't agree with that?  You think that

19  you personally are in a better position to determine

20  how much Roundup Ms. Delorame-Barton sprayed on each

21  session of spraying at the Palos Heights address?

22                MR. MURNER:  Objection, form.  Asked

23  and answered.

24       A.   Oh, no.  I simply said I didn't agree with

25  your characterization.  And I don't agree with the

John Murphy, Ph.D.

1      A.   Well, as a starting point, in research

2  involving individuals' recollections of their past

3  uses of products and their exposures, the abundance

4  of the literature indicates that people's

5  recollections are very, very poor, and they tend to

6  overstate their exposures.  Particularly when they

7  are ill with a condition that they attribute to

8  their exposure.  So that's the starting point as a

9  foundational idea.

10         The second is that having been deposed in

11  two prior cases and reviewing case materials to see

12  that recollection of past use is often very

13  uncertain, full of gaps.  I think there's lots of

14  evidence in her transcript that she was uncertain

15  about certain particulars.

16         So, you know, like I said, I'm not

17  asserting that I -- that she has better knowledge of

18  it or that I have better knowledge of it.  The

19  reality is there are uncertainties.

20         But it's ultimately immaterial because my

21  analysis with respect to her dose at Palos Heights

22  and at Roswell recognizes that there's a discrepancy

23  between the volumes that I arrive at through my

24  methodology and her stated usage volumes.  And I

25  also state the incremental effect that that would

John Murphy, Ph.D.

1   way to account for the bare midriff associated

2   with -- and also the bare shoulders associated with

3   a two-piece bathing suit top while spraying Roundup

4   at the Palos Heights address?

5               MR. MURNER:  Objection, form.

6        A.   It was not necessary to do so.  And hence,

7   I did not do so.

8        Q.   Okay.  So -- then you also analyzed in

9   your report the different sprayers that were used in

10  the application of Roundup at the different

11  addresses that -- where Ms. Delorame-Barton was

12  present.  Do you recall that?

13       A.   What do you mean analyzed the different

14  sprayers?

15       Q.   Well, you -- the report discussed them; is

16  that right?

17       A.   Yes, I discussed the ones that she

18  described using, correct.

19       Q.   Okay.  Right.  On page 70, you see figure

20  1.  It's the discharge novel -- nozzle of the Dial

21  N' Spray.  Do you recall that?

22       A.   Yes, uh-huh.

23       Q.   Okay.  So above, it says the down spray

24  does not produce a spray droplets comparable to the

25  two-gallon sprayer ready-to-use Roundup sprayer.

John Murphy, Ph.D.

1   Instead it was, as noted by plaintiff, it discharges

2   either a direct stream, like a garden hose, or

3   fan-shaped fountain discharge by virtue of the

4   configuration of the novel -- nozzle.  And that's

5   figure 30 -- I guess that's -- I guess figure 38 in

6   the text is referring to the figure 1 below it?

7       A.   Yeah, my apologies, that's -- that's --

8   it's -- that's the one 38, yes.

9       Q.   It's clear enough for me.  We're here

10  together, we're figuring it out.  Okay.

11          It says -- then it says neither of these

12  modes would produce driftable droplets, i.e., those

13  with an aerodynamic diameter of under 100

14  micrometers.  With a two-gallon and ready-to-use

15  Roundup sprayers, it is droplet drift, plus any

16  inadvertent self-spraying or contact with sprayed

17  surfaces, that accounts for skin contact and

18  inhalation exposure, and hence, the systemic dose.

19          You say that neither of these modes

20  associated with the Dial N' Spray sprayer would

21  produce driftable droplets; is that right?

22      A.   Yes.

23      Q.   Okay.  What is your basis for -- for

24  saying that in your report?

25      A.   I purchased one and tested it.

John Murphy, Ph.D.

1        Q.   Okay.  When you tested it, did you record
2    the results of this test?
3        A.   Visually only.
4        Q.   Okay.  Did you test -- did you purchase
5    the -- this sprayer and test it in order to produce
6    the report in this matter?
7        A.   Yes, I did.
8        Q.   Okay.  Do you still have that Dial N'
9    Spray?
10       A.   Yes, I do.
11       Q.   Okay.  And your basis for saying that
12   neither of these modes would produce a driftable
13   droplet is based on your own personal observation;
14   is that right?
15       A.   It's based on observation as well as my
16   understanding of the physics of how those droplets
17   are produced and the relationship between droplet
18   production and the characteristics of the orifice
19   and the nozzle.  So, yeah, so it's based on my -- my
20   understanding as an expert of that aspect of aerosol
21   physics.
22       Q.   Okay.  You didn't take any measurements
23   associated with this informal test you undertook of
24   the Dial N' Spray nozzle, did you?
25       A.   No.  It's like -- it's like watching water

John Murphy, Ph.D.

```
 1   come out of a hose.  It's fairly obvious that it
 2   doesn't produce driftable droplets.
 3       Q.   Is the question of whether or not a nozzle
 4   produces driftable droplets something that is
 5   amenable to being tested with any kind of technology
 6   that would sense whether or not driftable droplets
 7   are actually produced?
 8       A.   Yes, it can be tested.
 9       Q.   Okay.  How would that -- how would that
10   work?
11       A.   Well, with this particular device,
12   probably the best way to do it would be to add a
13   fluorescent dye to the liquid and then discharge.
14   And determine whether, in fact, driftable droplets
15   are detected as a result of the discharge.
16            So you'd basically design a little
17   experiment, and you'd shoot out the liquid and you
18   would -- you would shroud the discharge area.  And
19   then you would determine afterward by way of
20   ultraviolet light whether you're actually getting --
21   ultraviolet light and a microscope as to whether
22   you're actually getting driftable droplets.
23       Q.   Okay.  And I assume you can do that in a
24   controlled environment in a -- in a lab; is that
25   right?
```

John Murphy, Ph.D.

1      A.   You could, yes.

2      Q.   Yeah.  And I'm sure that the lab could

3   also reproduce different wind conditions that might

4   affect the drift of a -- of a spray nozzle?

5      A.   Presumably, it could be done.

6      Q.   Yeah.  Okay.  And that type of experiment

7   would give you a -- you know, a more accurate answer

8   as to whether or not the nozzle actually produces

9   driftable droplets; is that right?

10              MR. MURNER:  Objection, form.

11      A.   It would -- it would be a more

12   quantitative answer.

13      Q.   Okay.  Is it desirable to have a more

14   quantitative answer in a -- from a scientific

15   perspective?

16      A.   More information is always better.  I

17   don't think it would alter the conclusion in this

18   case.

19      Q.   Okay.  But you certainly didn't use

20   ultraviolet light to determine whether or not

21   driftable droplets were produced by the Dial N'

22   Spray sprayer; is that right?

23      A.   No, I didn't have time to do it.

24      Q.   And you didn't have -- and then you didn't

25   use a microscope to determine whether or not

John Murphy, Ph.D.

```
1    driftable droplets were produced by the Dial N'

2    Spray sprayers; is that right?

3         A.   That's correct, I did not.

4         Q.   Okay.  And you didn't undertake this

5    informal test of the Dial N' Spray sprayer in a

6    controlled laboratory environment, did you?

7                   MR. MURNER:  Objection.

8         A.   No.

9                   MR. MURNER:  Form.

10        A.   I did not do it in a controlled

11   environment in a laboratory, correct.

12        Q.   Okay.

13        A.   I did it --

14        Q.   Where?

15        A.   In a field setting.

16        Q.   In a -- in a field setting?

17        A.   Uh-huh.

18        Q.   Like in the -- in the -- hypothetically in

19   the yard of a residential property?

20        A.   Rural property.

21        Q.   Rural property?  Okay.

22        A.   Yeah.

23        Q.   So -- so outdoors at a rural property; is

24   that right?

25        A.   Correct.
```

John Murphy, Ph.D.

```
1        Q.   And that's the basis for your conclusion
2   that the Dial N' Spray sprayer does not produce
3   driftable droplets?
4                  MR. MURNER:  Objection, form.
5        A.   My -- the basis is my observation of the
6   fluid discharge behavior of the nozzle.
7        Q.   Right.  When you -- when -- and you made
8   that observation when you went outside in a rural
9   property and attached with the hose and looked at
10  it; is that right?
11       A.   Correct.
12       Q.   All right.  Aside from this observation --
13  and I assume this -- this was a single observation;
14  is that right?
15       A.   Yes, correct.
16       Q.   Okay.  Aside from the single observation
17  outside of that rural property, do you have any
18  other basis for the assertion that neither of the
19  modes of discharge from the Dial N' Sprayer would
20  produce driftable droplets?
21       A.   No, apart from my examination of it and
22  the test, no.
23       Q.   Right.  Okay.
24       A.   This device is actually from the 1970s, I
25  think, or the '80s.  I can't recall the exact era,
```

John Murphy, Ph.D.

```
 1                C E R T I F I C A T E

 2   COMMONWEALTH OF MASSACHUSETTS
     Worcester, ss.
 3

 4              I, Jennifer A. Doherty, Certified

 5   Shorthand Reporter and Notary Public duly

 6   commissioned and qualified in and for the

 7   Commonwealth of Massachusetts, do hereby certify

 8   that the witness came before me on the 24th day of

 9   April, 2023, who was by me duly sworn to testify to

10   the truth of their knowledge concerning the matters

11   in controversy in this cause; and that the

12   deposition is a true record of the testimony given

13   by the deponent.

14              I further certify that I am not

15   related to or employed by any of the parties to the

16   action, and further that I am not a relative or

17   employee or financially interested in this action.

18

19        IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY

20   HAND AND SEAL THIS 26TH DAY OF APRIL, 2023.

21

22                      _____

23                      Notary Public
                        My Commission Expires:
24                      October 19, 2023
                        CSR No. 1398F95
25
```