# EXHIBIT A

William G. Johnson, Ph.D., M.S.

```
 1                UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3  IN RE: ROUNDUP PRODUCTS     )  MDL No. 2741
                                )
 4   LIABILITY LITIGATION       )  Case No. MDL No.
                                )  3:16-md-02741-VC
 5  -------------------------   )
                                )
 6   This document relates to:  )
                                )
 7                              )
    Karen Delorme-Barton v.     )
 8  Monsanto Company            )
                                )
 9  Case No. 3:18-cv-01427-VC   )

10                    - - -

11          WILLIAM G. JOHNSON, PH.D., M.S.

12              Monday, May 22, 2023

13                    - - -

14

15          Remote videotaped deposition of

16  WILLIAM G. JOHNSON, PH.D., M.S., held remotely at the

17  location of the witness, commencing at 10:04 a.m., on

18  the above date, before Juliana F. Zajicek, Registered

19  Professional Reporter, Certified Shorthand Reporter

20  and Certified Realtime Reporter.

21

22                    - - -

23          GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax
24              Deps@golkow.com
```

William G. Johnson, Ph.D., M.S.

```
 1                  A P P E A R A N C E S :
                (ALL PARTIES APPEARED REMOTELY)
 2

 3   ON BEHALF OF THE PLAINTIFF:

 4        WEITZ & LUXENBERG P.C.
          Fisher Building
 5        3011 West Grand Boulevard, 24th Floor
          Detroit, Michigan 48202
 6        313-800-4170
          BY:  GREGORY STAMATOPOULOS, ESQ.
 7           gstamatopoulos@weitzlux.com

 8
          WEITZ & LUXENBERG P.C.
 9        700 Broadway
          New York, New York 10003
10        212-558-550
          BY:  CHANTAL KHALIL, ESQ.
11           ckhalil@weitzlux.com

12
     ON BEHALF OF DEFENDANT MONSANTO COMPANY:
13
          HOLLINGSWORTH LLP
14        1350 I Street, N.W.
          Washington, DC 20005
15        202-898-5800
          BY:  DAVID I. SCHIFRIN, ESQ.
16           dschifrin@hollingsworthllp.com;
             NEIL S. BROMBERG, ESQ.
17           nbromberg@hollingsworthllp.com

18
     ALSO PRESENT:
19
          HANNA NOVAK, Paralegal
20        Weitz & Luxenberg P.C.

21

22   THE VIDEOGRAPHER:

23        CAROLIN DE LA ROSA,
          Golkow Litigation Services
24
```

Exhibit A Page 2

William G. Johnson, Ph.D., M.S.

```
 1                    I N D E X

 2   WITNESS:                             PAGE:

 3    WILLIAM G. JOHNSON, PH.D., M.S.

 4        EXAM BY MR. STAMATOPOULOS............    5

 5        EXAM BY MR. SCHIFRIN................   293

 6        FURTHER EXAM BY MR. STAMATOPOULOS....  297

 7

 8                     * * * * *

 9                   E X H I B I T S

10   DR. WILLIAM JOHNSON EXHIBIT         MARKED FOR ID

11    No. 1      Dr. William Johnson's Supplemental    38
                 Materials Considered List
12
              No. 2      Document titled "Dimensions of       59
13                       Discovery, Sponsored Program
                         Awards, May 2010"
14
              No. 3      Combination of documents titled      72
15                       "Dimensions of Discovery,
                         Sponsored Program Awards," from
16                       May 2010 to September 2020

17    No. 4      Spreadsheet titled "Sponsored        138
                 Program Awards Given to Professor
18               William G. Johnson at the
                 Department of Botany and Plant
19               Pathology at Purdue University"

20    No. 5      Roundup Ready Xtend Crop System      154
                 Channel YouTube video by Extension
21               Weed Scientist Dr. William Johnson
                 at Purdue University (Retained by
22               Counsel Stamatopoulos)

23    No. 6      Curriculum Vitae, Attachment A to    166
                 Dr. Johnson's report
24
```

**Exhibit A Page 3**

William G. Johnson, Ph.D., M.S.

```
 1                    E X H I B I T S

 2   DR. WILLIAM JOHNSON EXHIBIT          MARKED FOR ID

 3      No. 7    Purdue Extension, Weed Science    172
                 article titled "Glyphosate -
 4               Manganese Interactions and Impacts
                 on Crop Production: The
 5               Controversy," by Camberato, wise
                 and Johnson
 6
        No. 8    Article titled "Glyphosate         233
 7               resistance threatens Roundup
                 hegemony"
 8
        No. 9    Expert Report of William G.        257
 9               Johnson, Ph.D., M.S. Professor and
                 Extension Weed Scientist,
10               Department of Botany and Plant
                 Pathology, Purdue University
11
        No. 10   Defendant Monsanto Company's       289
12               Responses and Objections to
                 Plaintiff's Notice to Take Oral
13               and Videotaped Deposition of
                 William Johnson, Ph.D.
14

15

16

17

18

19

20

21

22

23

24
```

William G. Johnson, Ph.D., M.S.

```
 1   our res -- responsibility as a weed scientist is to

 2   train users of -- of herbicides to follow the label

 3   and to help with label interpretation, and if that

 4   relates to industrial hygiene, then -- then that would

 5   be an area that -- that's peripherally related to the

 6   field that I work in.

 7       Q.   What is your understanding of the field of

 8   industrial hygiene?

 9       MR. SCHIFRIN:  Objection; beyond the scope.

10   BY THE WITNESS:

11       A.   Yeah, I'm not an expert in industrial

12   hygiene.  What I can comment on if there is any of

13   those topics that fall within the herbicide label and

14   a -- and a user of a herbicide asks for clarification

15   in interpreting that label, those are things that --

16   that I can help with.

17   BY MR. STAMATOPOULOS:

18       Q.   And you are not an industrial hygienist,

19   correct?

20       A.   That is correct.

21       Q.   Okay.  Do you know any industrial

22   hygienists?

23       A.   No, not off the -- off the top of my head

24   I do not know any industrial hygienists.
```

William G. Johnson, Ph.D., M.S.

1    of Botany and Plant Pathology at Purdue University in

2    West Lafayette, Indiana, correct?

3         A.    Yes, that's correct.

4         Q.    And your primary research focus is on weed

5    science with an emphasis on agronomic crops, correct?

6         A.    Yes, that's correct.  I also have

7    extension responsibilities and some minor teaching

8    responsibilities as well.

9         Q.    What do you mean by "extension

10   responsibilities"?

11        A.    The way I would characterize extension

12   responsibilities is that's the adult -- that's the

13   education of the adult learners that our -- our

14   clientele farmers, custom applicators, ag retail

15   employees, certified crop advisers, the people that

16   serve the -- the crop protection industry, the farmers

17   and the other folks that serve the crop protection

18   industry.

19        Q.    So kind of walk me through what a day in

20   Dr. Johnson's -- a day at Purdue.

21              Are you in a classroom teaching students

22   or are you mostly working with farmers?

23        MR. SCHIFRIN:  Objection to the form, narrative,

24   vague.

Exhibit A Page 6

William G. Johnson, Ph.D., M.S.

```
 1   board, the state chemist office, and there have been

 2   EPA officials in -- in some of those meetings, but it

 3   wasn't -- I've never gone to Washington, DC to testify

 4   in front of EPA.

 5       Q.    And how many of those meetings have you

 6   attended?

 7       A.    The ones that have been local here, there

 8   has probably been three or four of those.

 9       Q.    Do you recall when the last meeting

10   involving the EPA you attended occurred?

11       A.    It's about two years ago.  Actually, it

12   would have been longer than that.  It was probably

13   three or four years ago.

14       Q.    Do you recall the substance of those

15   meetings?

16       A.    Yeah, the substance had to do with

17   off-target movement of dicamba herbicide.

18       Q.    Did any of those meetings involve

19   glyphosate?

20       A.    The specific target for those meetings was

21   dicamba.

22       Q.    Have you ever submitted any written

23   communications to the EPA?

24       A.    Not that I'm aware of.
```

Exhibit A Page 7

William G. Johnson, Ph.D., M.S.

1        Q.     Have you ever been retained by the EPA as

2    a consultant on any subject?

3        A.     No.

4        Q.     Is there any reason today that you are not

5    going to be able to give fair and accurate testimony?

6        A.     Say why you are not -- no, no.

7        Q.     So you haven't taken any prescription

8    medications, drugs, alcohol, anything that's going to

9    impair your ability to offer testimony in this matter?

10       A.     No, I have not.

11       Q.     When were you initially contacted by

12   Hollingsworth regarding a role as a potential expert

13   witness in this matter?

14       MR. SCHIFRIN:  Objection to form.

15             Are you talking about Ms. Delorme-Barton's

16   case or the Roundup litigation as a whole?

17   BY MR. STAMATOPOULOS:

18       Q.     Let's start broadly.  I guess the Roundup

19   litigation as a whole.

20       A.     Three or four years ago.  Two or --

21   somewhere between two and four years ago.

22       Q.     Okay.  And I don't want to -- again, I

23   don't want to know the substance of any contact you

24   had with Hollingsworth, but can you tell me who

William G. Johnson, Ph.D., M.S.

```
 1   efficacy, labeled uses in agronomic crops and -- and

 2   those sorts of things.

 3           You know, the EPA has determined that EPA

 4   (sic) is a safe herbicide and so that's who I look to

 5   for a regulatory agency, so my -- my day-to-day work

 6   involves how to use glyphosate in -- in agronomic

 7   crops.  You know, I use it on my personal property to

 8   control weeds on my personal property and -- and

 9   basically that's, you know, the type of background

10   that I -- that I bring into this.

11   BY MR. STAMATOPOULOS:

12       Q.   So I'm going to move to strike that as

13   nonresponsive.

14           The question I had asked you is:  Had you

15   reviewed any information related to glyphosate and/or

16   glyphosate-based Roundup and an association to

17   non-Hodgkin's lymphoma prior to your first contact

18   with the Hollingsworth firm?

19       MR. SCHIFRIN:  Objection; beyond the scope and

20   assumes facts not in evidence.

21   BY THE WITNESS:

22       A.   Yes, so the ans -- the answer to that

23   question is, as a member of -- as a practicing weed

24   scientist, you are aware of information that
```

**Exhibit A Page 9**

1   circulates through popular press on various topics

2   like this.  So I'm -- I'm aware of information.  Have

3   I, you know, had -- prior to that had I reviewed a

4   bunch of scientific documents, the answer is no

5   because I'm not a toxicology expert and that's --

6   that's not an area that I'm -- I'm knowledgeable --

7   knowledgeable about or intend to provide any testimony

8   on.

9   BY MR. STAMATOPOULOS:

10      Q.    Did you receive any articles or data from

11  Monsanto or Bayer or their attorneys after the date

12  they first contacted you but prior to the date that

13  you agreed to ask -- act as an expert witness?

14      A.    So, again, I -- I would state that I'm not

15  retained by Monsanto/Bayer in this litigation.  I am

16  retained by the -- the law firm to provide comments

17  on -- on documents that they provide, in addition to

18  utilize my training and expertise as a -- as a

19  practicing weed scientist to provide expert opinions

20  on these particular cases -- on this particular case.

21      Q.    And do you recall what documents you

22  received from the firm Hollingsworth?

23      MR. SCHIFRIN:  Objection; foundation and vague.

24          Are you still -- are you still talking

William G. Johnson, Ph.D., M.S.

1              And so over the course of my career, there

2     has probably been somewhere between 25 or 30 different

3     private companies that have provided funding to my

4     university to -- to do research.  And basically the --

5     the money comes to the university, the university sets

6     it up in an account, and then I can utilize that to

7     spend on labor, supplies, and that sort of thing.

8              So I have done work for all of the major

9     chemical companies, I -- I have done sponsored work

10    for all of the major chemical companies as -- as part

11    of a contract with the university, I've done work for

12    commodity groups like the Indiana Soybean Alliance,

13    the Missouri Soybean Association, the United Soybean

14    Board.  I've done funded work with the U -- with the

15    U.S. Department of Agriculture as well.

16             So, again, that -- that's -- that's how we

17    run our research programs at a university.  We have

18    to -- to solicit external funding to -- to do that

19    sort of thing and the funding comes from a number of

20    different sources.

21        Q.   Have you received any funding from Bayer

22    and/or Monsanto over the course of your -- of your

23    career at Purdue?

24        MR. SCHIFRIN:  Objection to form.

William G. Johnson, Ph.D., M.S.

1   submitted where you were the lead?

2       A.    I was not -- again, I'll indicate again I

3   was not the lead on that proposal.  There is a chance

4   my name was on it because Indiana was one of the six

5   or seven states that was participating in it, but --

6   but I was not the lead on that proposal.

7       Q.    And earlier I believe, if I recall your

8   testimony correctly, you testified that the Purdue

9   University doesn't provide any funding for research.

10          Is that -- is that correct?

11      A.    Purdue doesn't provide enough funding to

12  maintain a long-term, sustainable research program.

13  When faculty members such as myself are hired, we get

14  a startup package that gives us enough money to

15  operate for a couple of years, but then it states very

16  clearly in the job announcement, in our job

17  description, that we must develop a sustainable,

18  externally funded research program in order to be

19  successful -- or in order to be -- well, I guess

20  successful is the -- the best term.

21      Q.    So research projects are primarily

22  dependent on external funding sources, including from

23  sources from companies like Monsanto and Bayer?

24      MR. SCHIFRIN:  Objection to the form and to the

William G. Johnson, Ph.D., M.S.

1    agronomic cropping systems scenario, how the

2    technology can help our farmers grow a safe and

3    abundant supply of food, and typically, you know, the

4    checks can come at any time during the year, but in a

5    lot of cases with these contracts, the checks are cut

6    to the university after the data is delivered, which

7    is typically in the fall of the year.

8         Q.    And I wasn't asking -- I understand the

9    process, but I'm asking specifically, do you recall

10   the specific research that was done in September

11   of 2020?

12        A.    Well, the research was done over the

13   summer of 2020, and that entry is simply when the --

14   when the check hit whatever register is necessary to

15   make it into this publication.

16        Q.    So I'm going to exit out of the share

17   screen for a second and I'm going to introduce the

18   next exhibit.

19               (WHEREUPON, a certain document was

20                marked Dr. William Johnson Deposition

21                Exhibit No. 4, for identification, as

22                of 05/22/2023.)

23   BY MR. STAMATOPOULOS:

24        Q.    And, Dr. Johnson, remind me, when did you

William G. Johnson, Ph.D., M.S.

1    first start at Purdue?

2         A.    2002.

3         Q.    So you have passed 20 years at the

4    University of Purdue.

5              Have you at least been in the -- the weed

6    biology -- or the biology department?

7         A.    I am -- I am in the Botany and Plant

8    Pathology Department at Purdue.

9         Q.    I apologize.  So you have always been in

10   the same department?

11        A.    At -- at Purdue I've always been in the

12   same department, yes.

13        Q.    Okay.  And so I'm going to introduce

14   what's going to be Exhibit 4.  This is a -- an

15   exhibit that we created.  It lists all of the entries

16   that we just went over.  I'm going to give you a

17   second to open it on your screen and then I will share

18   my screen as well.

19             Dr. Johnson, are you able to see my

20   screen?

21        A.    Yes.

22        Q.    Okay.  And so we went over several entries

23   from 2010 to approximately 2020.

24             Prior to 2010, did you ever receive any

William G. Johnson, Ph.D., M.S.

1    United States that's responsible for evaluating data

2    regarding the safe and effective use of a pesticide.

3    I rely on the EPA to provide this information for

4    any -- for glyphosate or any herbicide that's

5    registered.  EPA has concluded that glyphosate is safe

6    to use and that's why it continues to remain on the

7    market.

8        Q.    My question was a little different,

9    Dr. Johnson, and I'm going to move to strike the

10   nonresponsive portion of your answer.

11            But is it correct to say that you have no

12   independent basis to understand whether or not the EPA

13   is correct or incorrect since you don't read and

14   interpret human epidemiological studies?

15       MR. SCHIFRIN:  Object to form, asked and

16   answered.

17   BY THE WITNESS:

18       A.    I'll stand by my previous answer.

19   BY MR. STAMATOPOULOS:

20       Q.    Have you reviewed any of the underlying

21   epidemiological studies that the EPA has reviewed

22   relating to glyphosate or glyphosate-based herbicides?

23       A.    I've not reviewed the studies, but I rely

24   on the EPA to conduct this assessment of the data

William G. Johnson, Ph.D., M.S.

```
 1   that's available and to determine whether or not a
 2   product is safe and effective to use, and through
 3   their review multiple times they have determined
 4   that -- that glyphosate is safe, not likely to be
 5   carcinogenic, and -- and it's still on the market and
 6   available to use.
 7        Q.    My question is whether you are capable of
 8   evaluating whether the EPA, in terms of any
 9   conclusions that they have reached regarding
10   epidemiology, either got it right or didn't get it
11   right.
12             Are you able to evaluate that?
13        MR. SCHIFRIN:  Objection; asked and answered.
14   BY THE WITNESS:
15        A.    I'll stand by my previous answer.
16   BY MR. STAMATOPOULOS:
17        Q.    When it comes to anything that the EPA
18   writes about the epidemiology of glyphosate or
19   glyphosate-based herbicides, is it fair to say that
20   because you are not qualified in the field of
21   epidemiology, you are not able to evaluate whether the
22   EPA was right or wrong in their evaluation?
23        MR. SCHIFRIN:  Objection; asked and answered.
24   BY THE WITNESS:
```

William G. Johnson, Ph.D., M.S.

1       Q.    Are you -- and I believe you've testified

2   several times now, but are you a human toxicologist?

3       A.    I have -- I have answered that question

4   previously and I am not a human toxicologist, a

5   causation expert, a hematologist or any type of a

6   human tox -- toxicity expert.

7       Q.    Therefore, you are not able to interpret

8   any human tox -- toxicological studies done on

9   glyphosate or Roundup, correct?

10      MR. SCHIFRIN:  Objection to form, asked and

11  answered several times at this point.

12  BY THE WITNESS:

13      A.    I stand by my previous answer.

14  BY MR. STAMATOPOULOS:

15      Q.    Do you consider yourself an expert on

16  dermal absorption of chemicals, including herbicides,

17  into the body or the mechanisms by which those

18  chemicals can be absorbed in the body?

19      MR. SCHIFRIN:  Objection to form and beyond the

20  scope.

21  BY THE WITNESS:

22      A.    Yeah, that's beyond the scope of my

23  expertise.  I can offer some opinions on potential for

24  contact, but not absorption or translocation within

William G. Johnson, Ph.D., M.S.

1        MR. SCHIFRIN:  Objection; beyond the scope.

2   BY THE WITNESS:

3        A.    So I'm -- I'm aware that there are points

4   of potential contact, but in terms of being an

5   exposure expert, that's -- that's an area outside my

6   area of expertise.

7   BY MR. STAMATOPOULOS:

8        Q.    One route of exposure would be dermal

9   through the skin, correct?

10       MR. SCHIFRIN:  Objection; beyond the scope,

11  form.

12  BY THE WITNESS:

13       A.    Could you restate --

14       MR. SCHIFRIN:  Incomplete hypothetical.

15             Sorry.  You can go ahead.

16  BY THE WITNESS:

17       A.    Could you restate the question?

18  BY MR. STAMATOPOULOS:

19       Q.    Sure.

20             One route of exposure would be dermal

21  through the skin, correct?

22       MR. SCHIFRIN:  Same objection.

23  BY THE WITNESS:

24       A.    One route of -- of contact would be

William G. Johnson, Ph.D., M.S.

1      Q.      Have you ever consulted with OSHA on

2    issues related to glyphosate or Roundup?

3      A.      No.

4      Q.      Have you ever consulted with the National

5    Cancer Institute on issues related to glyphosate-based

6    Roundup?

7      A.      Nope.  No.

8      Q.      Do you consider yourself to be an expert

9    regarding the EPA registration process for pesticides?

10     A.      I'm an expert with regard to label

11   interpretation.  I understand some of the applied

12   field research that's submitted for the -- for the

13   registration package, but in terms of the toxicology

14   package that needs to be submitted, that's an area

15   outside my area of expertise.

16     Q.      For instance, what -- do you know what

17   tests Monsanto was required to perform on Roundup or

18   any glyphosate-based formulated product prior to

19   receiving EPA registration?

20     MR. SCHIFRIN:  Objection.

21   BY MR. STAMATOPOULOS:

22     Q.      Do you have any idea?

23     MR. SCHIFRIN:  Objection; beyond the scope.

24   BY THE WITNESS:

William G. Johnson, Ph.D., M.S.

1      A.     Yeah, as I stated earlier, I understand

2   some of the applied field studies that have to be

3   submitted for the registration package, but in terms

4   of the -- the toxicology information that's requested,

5   that's an area of out -- outside my area of expertise.

6   BY MR. STAMATOPOULOS:

7      Q.     Have you ever been involved in any way in

8   the registration of any pesticide or herbicide by the

9   EPA?

10      A.     In terms of directly submitting data to

11   EPA, no.  We have conducted numerous field trials, so

12   two -- numerous field trials and published that data,

13   excuse me, in -- in research reports and -- and

14   peer-reviewed articles, so as EPA has assessed --

15   accessed information from applied field trials from

16   many different states, it is possible that they've

17   accessed information from our field research program

18   and we didn't know about it.

19      Q.     Do you know one way or another if they've

20   accessed research from your field research?

21      A.     I have -- I have no way of knowing that.

22      Q.     Would you say that the EPA always gets

23   everything right?

24      MR. SCHIFRIN:  Objection; form, vague.

William G. Johnson, Ph.D., M.S.

1  BY THE WITNESS:

2      A.   I would say that the EPA is a regulatory

3  agency that -- that I rely on to make the

4  determination of whether or not a product is safe and

5  effective to use.  So it's a regulatory agency that I

6  rely on and -- and I trust that they make the right

7  decisions.

8  BY MR. STAMATOPOULOS:

9      Q.   Has the EPA ever got anything wrong?

10     MR. SCHIFRIN:  Objection; beyond the scope and

11  vague.

12  BY THE WITNESS:

13     A.   Yeah, I don't have an answer to that

14  question.  It's -- like I said, the EPA is -- is the

15  organization that -- that I rely on to provide these

16  recommendations -- or to provide the registration to

17  make the decision on whether or not a product is safe

18  and they write the label in terms of how to handle it

19  safely and -- and make the product efficacious when

20  followed according to label directions.

21  BY MR. STAMATOPOULOS:

22     Q.   Do you know if the EPA has guidelines to

23  assess whether or not an herbicide presents any risk

24  to human health?

William G. Johnson, Ph.D., M.S.

1              Is that -- is that an opinion that you

2    have?

3        A.    Well, the -- the four opinions I have are

4    stated on -- starting on Page 61, and we can go

5    through each of these individually or however you

6    would like to go through them.

7        Q.    On Page 61 of your report you state that:

8              "KDB's claimed applications far exceed

9    what would have been necessary to control weeds on

10   these properties."

11             Does that statement necessarily mean that

12   plaintiff is incorrect about her usage?

13       A.    The purpose is not to question anyone's

14   credibility, but based on -- on my experience working

15   with glyphosate in my -- in my -- in my work world and

16   on my -- on four different personal properties that

17   I've lived on since 1990 -- or early 1990s, that the

18   number of applications are in excess of what would

19   have been needed.

20             And what I do in this report here is I --

21   I explain why.  So when a -- when a person first moves

22   on to a property that has never been treated, you'll

23   treat more frequently, particularly in the spring when

24   things just start to green up, and then particularly

William G. Johnson, Ph.D., M.S.

1    A.    Yeah, I think I go back to my previous

2    answer.  I'm not questioning what anybody said.  I'm

3    just questioning that that -- the number of times that

4    the property was treated exceeds what would have been

5    necessary.  And, again, that's based on 30 years of

6    experience and doing that on -- on my own personal

7    properties, properties that -- that were these size

8    and properties as large as 10 acres that I lived on in

9    Missouri and then two-and-a-half acres that I live on

10   now.  I also lived in -- on a quarter-acre size lot

11   when I -- when I lived in -- in town when I lived in

12   Missouri.  And also spraying, you know, around the

13   farmstead, at my dad's farmstead, and also on our

14   Purdue farms.

15   Q.    Are you more likely than plaintiff to know

16   about her actual usage?

17   MR. SCHIFRIN:  Object to form.

18   BY THE WITNESS:

19   A.    So I think you are asking the same

20   question that you just asked, and all I'm stating here

21   is I'm not questioning what she said in her

22   deposition.  I'm just stating that the amount of

23   glyphosate and the number of times that were sprayed

24   are more than -- than what would have been needed to

William G. Johnson, Ph.D., M.S.

1  have a -- a -- a nice, prim and proper looking

2  property.

3  BY MR. STAMATOPOULOS:

4      Q.    Does spraying at your own properties

5  qualify you as an expert?

6      MR. SCHIFRIN:  Objection; calls for a legal

7  conclusion and mischaracterizes his previous testimony

8  about the bases for his opinions.

9  BY THE WITNESS:

10     A.    So, again, I've done research with

11 glyphosate herbicide in agronomic settings since

12 the -- the mid to late 1980s.  I've sprayed glyphosate

13 on my personal properties starting in about 1992, and

14 I've lived on four or five different properties

15 ranging in size from a quarter-acre up to ten acres.

16 So I've got a lot of experience.

17         My current property I've lived on now for

18 21 years.  The first couple of years I lived on this

19 two-and-a-half acre property I probably sprayed once a

20 month, you know, maybe in -- in April and May I might

21 have sprayed twice a month.  By the time we got to

22 August and the rainfall events come less frequently, I

23 don't spray as often.

24         Now after living on that property as long

William G. Johnson, Ph.D., M.S.

1   BY THE WITNESS:

2        A.    Well, I think it -- it states pretty

3   clearly here that -- that she would not have needed to

4   spray for as long as -- as was mentioned in the

5   deposition testimony.

6   BY MR. STAMATOPOULOS:

7        Q.    Is it possible that she was -- that she

8   sprayed as much she testified during her deposition?

9        MR. SCHIFRIN:  Objection; incomplete

10  hypothetical.

11  BY THE WITNESS:

12       A.    I mean, it's possible, but there is --

13  there would be nothing to spray.  So, again,

14  glyphosate is very effective on -- on weeds,

15  particularly small weeds.  If she were spraying

16  frequently, she was going to be treating small weeds.

17  And given the time that it takes for a weed to die and

18  the fact that it takes additional time for new weeds

19  to come up and she is continually treating, killing

20  weeds and depleting the seed bank, there just wouldn't

21  been -- wouldn't have been anything to spray after,

22  you know, several rounds of -- of spraying early in

23  her residency on those properties.

24  BY MR. STAMATOPOULOS:

1    body, that she was pretty accurate when making the

2    applications, she was very careful not to kill grass

3    or Leyland Cypress trees, indicating no spray drift

4    occurred, which means wind wasn't blowing the spray

5    around.  She was very careful not to kill desirable

6    vegetation.

7            And so, given the -- the care that she

8    takes -- that she took in making these spray

9    applications, it is just unlikely that she was ever in

10   a situation where she had contact with glyphosate.

11       Q.   And you read Ms. Barton's --

12   Delorme-Barton's deposition testimony, correct?

13       A.   Yes.

14       Q.   And do you recall her testimony in her

15   deposition stating that she was wet as a result of

16   spraying Roundup and that it was all over her legs,

17   arms, stomach, feet, clothes and shoes?

18       MR. SCHIFRIN:  Object to form.

19   BY THE WITNESS:

20       A.   So, yes, she indicated that those parts of

21   her body were wet, but the definition of "wet" can

22   mean different things to different people.  Wet could

23   be a couple of spray drops, all right.

24            Again, she was utilizing sprayer -- spray

William G. Johnson, Ph.D., M.S.

1  excuse me -- that she was pretty accurate, surgical

2  and precise with these spray applications just

3  indicates that -- that contact was unlikely.

4  BY MR. STAMATOPOULOS:

5      Q.    Did she ever testify that -- that she had

6  minimal contact with Roundup during her deposition?

7      A.    So I made this -- I developed this opinion

8  based on reading the documents and my knowledge of the

9  spray equipment and the fact that the glyphosate as a

10  herbicide is -- is nonvolatile, so it doesn't turn

11  into a gas, the spray application equipment, the

12  pump-up sprayer has a wand that you hold away from the

13  body, it's -- it applies a spray solution under low

14  pressure which produces large droplets.  And, again, I

15  am going back to her testimony about indicating that

16  she did not get spray on desirable vegetate --

17  vegetation and that she was pretty accurate, surgical

18  and precise with these applications.

19      Q.    Did you read Ms. Delorme-Barton's

20  husband's deposition?

21      A.    Yes.

22      Q.    Okay.  And do you recall that he testified

23  under oath that he saw that her legs were wet from

24  Roundup usage?

William G. Johnson, Ph.D., M.S.

1     A.    Yes, I saw that, but, again, "wet" means

2  different things to different people.  You are putting

3  on these spray applications in summer weather, the

4  wetness could be due to sweat, and may -- it may

5  not -- it may not be due to spray -- spray particles.

6     Q.    Would you be more knowledgeable about

7  plaintiff's actual exposure to Roundup than her

8  husband?

9     MR. SCHIFRIN:  Objection to form and -- and

10  beyond the scope to the extent that the term

11  "exposure" has meant anything other than potential for

12  contact with the skin.

13  BY MR. STAMATOPOULOS:

14     Q.    You can answer, Dr. Johnson.

15     A.    So could you restate the question?

16     Q.    Sure.

17           Would you be more knowledgeable about

18  plaintiff's actual exposure to Roundup than her

19  husband?

20     MR. SCHIFRIN:  Same objections.

21  BY THE WITNESS:

22     A.    So, again, I'm not going to comment on

23  exposure because exposure implies what happens to the

24  herbicide after contact with the skin and when it

William G. Johnson, Ph.D., M.S.

1       A.      Could you repeat that question?

2       Q.      Sure.

3               Do you dispute that Dr. Conry's opinions

4    are based on plaintiff's reported usage?

5       A.      Dr. Conry appeared to just take the -- the

6    usage statements from Ms. Delorme-Barton's deposition

7    and -- and use those in his calculations.

8       Q.      So you don't dispute that his opinions are

9    based on plaintiff's reported usage, correct?

10      MR. SCHIFRIN:  Objection; asked and answered.

11   BY THE WITNESS:

12      A.      Yeah, I -- I don't dispute that he took

13   the -- the data that was provided in

14   Ms. Delorme-Barton's deposition, but as I stated

15   earlier, the -- the amount of times that

16   Ms. Delorme-Barton claimed the properties were sprayed

17   and -- and the amount of glyphosate used are in excess

18   of -- of what would have been needed.

19   BY MR. STAMATOPOULOS:

20      Q.      Is it possible that Karen Delorme-Barton

21   had a regular practice of -- of spraying Roundup more

22   than was needed?

23      MR. SCHIFRIN:  Objection; incomplete

24   hypothetical, calls for speculation.

William G. Johnson, Ph.D., M.S.

1    BY THE WITNESS:

2         A.    I mean, it doesn't seem prudent to go out

3    with a container of spray when there is nothing to

4    spray.  So that amount of treatment frequency would

5    have resulted in essentially no weeds to spray in the

6    areas that were treated.  So it -- it just seems like

7    it's -- you know, it's exercise at -- at this point.

8    BY MR. STAMATOPOULOS:

9         Q.    What further opinions do you anticipy --

10   anticipate testifying to which are not in your report?

11        MR. SCHIFRIN:  Objection; foundation.

12   BY THE WITNESS:

13        A.    Do you -- can you add more context to that

14   question?

15   BY MR. STAMATOPOULOS:

16        Q.    Sure.

17              Are all of your expert opinions in this

18   case -- case contained in the report that you

19   produced?

20        A.    I have the -- the four opinions that

21   were -- that -- that are outlined here in this report

22   with regard to Ms. Delorme-Barton.  I can also, if

23   asked, I can comment on -- on areas that are within

24   my -- my area of expertise as a weed scientist.

William G. Johnson, Ph.D., M.S.

1      A.    No, because that's not part of my job

2   responsibility, but that -- again, those are -- those

3   are very simple calculations.  They are elementary

4   school-type calculations.

5      Q.    In your experience do individuals, when

6   they encounter weeds that are resistant to glyphosate,

7   increase the amount of glyphosate that they are using?

8      MR. SCHIFRIN:  Objection to form, to the extent

9   it calls for speculation.

10  BY THE WITNESS:

11     A.    So -- so in agronomic crops when -- when

12  lower rates of glyphosate fail to control weeds,

13  the -- the usual response is that they -- they go back

14  and they spray higher rates with subsequent

15  applications until it gets to -- until you hit the --

16  you -- you hit a point where the -- where glyphosate

17  fails to control the weeds with several applications.

18  BY MR. STAMATOPOULOS:

19     Q.    Do you have a sense of -- of whether there

20  are more glyphosate-resistant weeds now than there

21  have been in the past?

22     MR. SCHIFRIN:  Objection to form.

23  BY THE WITNESS:

24     A.    So you'll -- you need more context on that

William G. Johnson, Ph.D., M.S.

```
 1        THE VIDEOGRAPHER:  The time -- the time is

 2   6:04 p.m.  Off the record.

 3                 (WHEREUPON, a recess was had

 4                  from 6:04 to 6:05 p.m.)

 5        THE VIDEOGRAPHER:  The time is 6:05 p.m., back

 6   on the record.

 7                 FURTHER EXAMINATION

 8   BY MR. STAMATOPOULOS:

 9        Q.    Dr. Johnson, counsel for Monsanto just

10   asked you a few follow-up questions from the

11   deposition earlier, and I believe you testified that

12   herbicide resistance did not apply for residential

13   users.

14            Do you recall that testimony?

15        A.    The statement I made was herbicide

16   resistance is not a major problem for -- for the --

17   the residential users of glyphosate.

18        Q.    And what is the basis for your belief that

19   herbicide resistance is not a major problem for

20   herbicide users?

21        A.    We had a herbicide resistance testing

22   program a few years ago.  We -- we received no samples

23   whatsoever to test from the residential market.  They

24   all come from agronomic crops.  And we simply do not
```

William G. Johnson, Ph.D., M.S.

1   get questions from home -- homeowners about

2   herbicide-resistant weeds in -- in residential

3   settings.  All of the questions come from agronomic

4   crops.

5       Q.    So is it my understanding that you have no

6   data or information with respect to herbicide

7   resistance for residential users?

8       MR. SCHIFRIN:  Objection; mischaracterizes his

9   testimony.

10  BY THE WITNESS:

11      A.    My testimony was it hasn't been a problem

12  expressed by the clientele that I serve.  And what

13  that -- what that implies then, when we don't get

14  samples sent in for testing, we don't get phone calls

15  or things like that, that it isn't a problem for that

16  audience because if that audience had a problem, they

17  are -- they are an audience that's not bashful about

18  calling County-Level Extension.

19  BY MR. STAMATOPOULOS:

20      Q.    So that -- is that the sole basis for your

21  conclusion that herbicide resistance is not a major

22  problem for residential users is because you didn't

23  receive any calls to the hotline?

24      A.    Well, we -- we don't have what we call a

William G. Johnson, Ph.D., M.S.

```
 1                REPORTER'S CERTIFICATE

 2

 3              I, JULIANA F. ZAJICEK, a Registered

 4      Professional Reporter and Certified Shorthand

 5      Reporter, do hereby certify that prior to the

 6      commencement of the examination of the witness herein,

 7      the witness was duly remotely sworn by me to testify

 8      to the truth, the whole truth and nothing but the

 9      truth.

10              I DO FURTHER CERTIFY that the foregoing is

11      a verbatim transcript of the testimony as taken

12      stenographically by me at the time, place and on the

13      date hereinbefore set forth, to the best of my

14      availability.

15              I DO FURTHER CERTIFY that I am neither a

16      relative nor employee nor attorney nor counsel of any

17      of the parties to this action, and that I am neither a

18      relative nor employee of such attorney or counsel, and

19      that I am not interested directly or indirectly in the

20      outcome of this action.

21

22

23

24      JULIANA F. ZAJICEK, Certified Reporter
```

Exhibit A Page 34