# EXHIBIT D

ATTORNEY GENERAL OF THE STATE OF NEW YORK
ENVIRONMENTAL PROTECTION BUREAU
_____

In the Matter of

Assurance No. 23-025

**Investigation by LETITIA JAMES,
Attorney General of the State of New York,** of

**Bayer CropScience LP and Monsanto
Company**,

Respondents.
_____

## ASSURANCE OF DISCONTINUANCE

The Office of the Attorney General of the State of New York ("OAG")

commenced an investigation pursuant to Executive Law §§ 63(12) and (15) and

General Business Law ("GBL") Article 22-A into potential violations of a November

19, 1996 Assurance of Discontinuance ("1996 AOD") entered into by Monsanto

Company, as well as allegedly false and misleading claims made by Bayer

CropScience LP and Monsanto Company (collectively, "Respondents")  in

advertisements for Roundup® pesticide products containing the active ingredient

glyphosate. This Assurance of Discontinuance ("Assurance") contains the findings of

the OAG's investigation and the relief agreed to by the OAG and Respondents,

whether acting through their respective directors, officers, employees,

representatives, agents, affiliates, or subsidiaries (collectively, the "Parties").

## OAG's FINDINGS

1.      In the mid-1990s, the OAG investigated Respondent Monsanto Company ("Monsanto") for alleged false and misleading advertising practices due to claims made by Monsanto in broadcast and print media regarding its Roundup® brand glyphosate-containing herbicides, such as "[g]lyphosate is less toxic to rats than table salt" and "herbicides by Monsanto . . . carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

2.      On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the OAG, pursuant to New York Executive Law § 63(15), to settle alleged violations of GBL § 350 and the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), as a result of allegedly false and misleading claims concerning its Roundup® brand of glyphosate-based products. A copy of the 1996 AOD is attached hereto as Exhibit A.

3.      Pursuant to the 1996 AOD, Monsanto agreed to immediately cease and desist from making these specific claims, among others, unless the statements were qualified and substantiated as required by the AOD, as well as pay the OAG $50,000 in costs. (1996 AOD ¶ 6.)

4.      The 1996 AOD applies to Monsanto, as well as "its subsidiaries, its agents, assigns, successors (including purchasers of product lines), employees, officers and any other individuals or entities through whom it may act." (1996 AOD at 8.)

5.      Monsanto also agreed to "immediately cease and desist from publishing or broadcasting any advertisements that represent, directly or by implication that: . . . glyphosate-containing pesticide products *or any component thereof* are safer or less toxic than common consumer products other than herbicides." (1996 AOD ¶ 3) (emphasis added.)

6.      The 1996 AOD also required that Monsanto "immediately cease and desist from publishing or broadcasting any advertisements that represent, directly or by implication, that: its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk," unless "Monsanto has evidence to substantiate the representations." (1996 AOD ¶ 3(a).)[1]

### Bayer Acquires Monsanto

7.      Monsanto was acquired by Bayer AG ("Bayer") on June 7, 2018, for approximately $63 billion. A definitive agreement for the acquisition was reached on September 14, 2016.

8.      Monsanto continues to exist as a corporate entity, but now operates as part of Bayer CropScience LP, headquartered in Saint Louis, Missouri. Bayer is the ultimate parent company of Bayer CropScience LP and Monsanto.

### Roundup®

9.      The Roundup® brand is one of the leading herbicide brands by market share in the United States. The primary active ingredient in certain Roundup®

---

[1] A supplemental Assurance of Discontinuance was entered into between Monsanto and the OAG on April 14, 1998 ("1998 AOD").

brand herbicides is glyphosate.  Certain Roundup® formulations have several other active and inert ingredients.

10.     The United State Environmental Protection Agency ("EPA") defines an inert ingredient as "any substance (or group of structurally similar substances if designated by the Agency), other than an 'active' ingredient, which is intentionally included in a pesticide product."

11.     Many formulations of Roundup® brand glyphosate-containing products contain surfactants, compounds which increase how much of the active ingredient can penetrate plants by lowering the surface tension of a liquid, the interaction at the surface between two liquids (called interfacial tension), or that between a liquid and a solid. Surfactants are generally considered an inert ingredient and are not separately disclosed, per EPA regulations, on the herbicide's chemical description on the product labels.

12.     Respondents' consumer Roundup® products are referred to as Lawn & Garden products ("Roundup L&G Products"), most of which currently contain glyphosate as the primary active ingredient and are formulated, marketed, and distributed within the United States pursuant to an agency and distribution agreement with The Scotts Company LLC. For purposes of this Assurance, the term "Roundup L&G Products" will refer only to those products containing glyphosate as an active ingredient.

13.     Respondents estimate that from 2015 through 2021, there were $117.8 million in sales to New York consumers of Roundup L&G Products. As a result of

tort litigation alleging glyphosate is carcinogenic to humans, in July 2021, Bayer announced that it intends to stop selling Roundup L&G products containing glyphosate in the United States beginning in 2023.

### Scientific Studies

14.   Certain recent studies have found that glyphosate, the active ingredient in Roundup® brand herbicides, targets the key enzyme of the shikimate metabolic pathway in plants, prokaryotes, and fungi, which indicates it may have unsuspected impacts on the diversity and composition of microbial communities, including the human gut microbiome. Leino et al., *Classification of the glyphosate target enzyme (5-enolpyruvylshikimate-3-phosphate synthase) for assessing sensitivity of organisms to the herbicide*, 408 J. Haz. Mats. 124556 (2021), https://doi.org/10.1016/j.jhazmat.2020.124556; *see also* Robin Mesnage & Michael N. Antoniou, *Computational modelling provides insight into the effects of glyphosate on the shikimate pathway in the human gut microbiome*, 1(10) Current Research in Tox. 25-33 (2020), https://doi.org/10.1016/j.crtox.2020.04.001 (explaining that further investigation using advanced molecular profiling techniques is needed to ascertain the effects of glyphosate and glyphosate-based herbicides on the function of the human gut microbiome, with consequent health implications).

15.   Numerous scientific studies have been done on Roundup® formulations more broadly. A number of these studies have determined that Roundup®, as formulated, may have adverse impacts on non-target species,

particularly pollinators and aquatic species. Certain of these studies are listed below.

16.     A 2018 study concluded that exposing bees to glyphosate disrupted their beneficial gut microbiota, potentially affecting their health and effectiveness as pollinators. Motta et al., *Glyphosate perturbs the gut microbiota of honey bees*, 115 (41) PNAS 10305-10310 (2018), https://doi.org/10.1073/pnas.1803880115.

17.     A 2019 study examining glyphosate's effects on honey bee gut microbiota found that glyphosate residues may affect honey bee fitness, including harmful sublethal impacts such as negatively affecting learning performance, reducing short-term memory, and causing navigational issues resulting in increased time and pathing of homeward flight. Blot et al., *Glyphosate, but not its metabolite AMPA, alters the honeybee gut microbiota*, 14(4) PLoS One e0215466 (2019), https://doi.org/10.1371/journal.pone.0215466.

18.     A 2021 study that compared multiple glyphosate-based herbicides including Roundup® Ready-To-Use® found it likely that surfactants or other co-formulant inert ingredients caused comprehensive matting of bee body hair, causing death by incapacitating their gas exchange system, with bees exposed to Roundup® Ready-To-Use® exhibiting 94% mortality over a 24-hour period. Straw et al., *Roundup causes high levels of mortality following contact exposure in bumble bees*, 58(6) J. Appl. Ecol. 1167-1176 (2021), https://doi.org/10.1111/1365-2664.13867.

19.     A 2007 study explains, "[i]nert ingredients can increase the ability of pesticide formulations to affect significant toxicologic end points, including

developmental neurotoxicity, genotoxicity, and disruption of hormone function. They can also increase the potential for exposure by increasing dermal absorption, decreasing the efficacy of protective clothing, and increasing environmental mobility and persistence. Inert ingredients can increase the phytotoxicity of pesticide formulations as well as the toxicity to fish, amphibians, and microorganisms." Cox et al., *Unidentified Inert Ingredients in Pesticides: Implications for Human and Environmental Health. Environmental health perspectives*, 114(12) Env't H. Persp. 1803-1806 (2007), https://doi.org/10.1289/ehp.9374.

20.     A 1994 technical report also found that surfactants may adversely affect aquatic organisms because they can emulsify mucus on gill surfaces. Sylvia S. Talmage, *Environmental and Human Safety of Major Surfactants: Alcohol Ethoxylates and Alkylphenol Ethoxylates*, Taylor & Francis (1994).

**The OAG's Investigation**

21.     In 2020, the OAG commenced an investigation into whether Respondents had violated the 1996 AOD and engaged in false advertising regarding Roundup® and other glyphosate-containing herbicide products.

22.     The OAG served Respondents Bayer CropScience LP and Monsanto with a subpoena dated December 16, 2020.

23.     The OAG also requested that Respondents substantiate the claims made in their advertisements, as required by the 1996 AOD.

**Respondents' Advertisements Regarding Roundup**

24.     Respondents advertise, market, and promote their Roundup® products for commercial purposes through a wide range of broadcast, print, and online media (including television, radio, magazines, packaging, brochures, point-of-purchase displays, websites, and online videos).

25.     On October 1, 2019, a video was posted to YouTube that asserted, "Roundup® weed and grass killer products won't harm anything but weeds." Roundup® brand, *Learn the Basics of Roundup® Weed & Grass Killer Products - Are They Safe?*, YouTube (Oct. 1, 2019), https://www.youtube.com/watch?v=ZnzL83ekgkw&list=PLtmUSVQcnRdvC-Uv72Oofbifmu_EAsRPQ&index=2. This video is no longer publicly available.

26.     At least five exemplars of videos that likewise claim "Roundup® weed and grass killer products won't harm anything but weeds" were provided to OAG over the course of this investigation.

27.     Bayer maintains a website that claims: "Glyphosate-Based Roundup™ Products . . . do not pose a threat to the health of animal wildlife. In fact, glyphosate is an important tool that can help preserve the environment and biodiversity." *Glyphosate-Based Roundup™ Products for Homeowner Use*, Bayer Global, https://www.bayer.com/en/glyphosate-homeowner-use.aspx (last updated July 28, 2022). Bayer CropScience ran a campaign on Facebook from September 16 to October 1, 2018, that linked to a Bayer website titled "Research and Safety Record: Let's Talk About Glyphosate." *Bayer Crop Science*, Facebook Ad Library, https://www.facebook.com/ads/library/?id=503196257191062 (last visited March 14,

2023), which in turn linked to the *Glyphosate-Based Roundup™ Products for Homeowner Use* website.

28.     Bayer also maintains a website that claims that glyphosate allows farmers, by virtue of reduced tillage, to "protect the environment for insects, birds, and wildlife" including "pollinator species," with no indication as to what actual product formulations (and what inert ingredients) are included in these applications. Bayer Global, https://www.bayer.com/en/agriculture/article/surprising-biodiversity-benefits-glyphosate (last updated January 25, 2023).

29.     Bayer also maintains a website that claims:

> Surfactants and soaps help dissolve fats in water. That, of course, is why we use them to clean clothes, dishes, and hands. While they remove dirt and grease, they also dissolve bacterial cell membranes. That's why washing your hands prevents the spread of disease. Do the same with cells growing in a laboratory and the soap will kill them just like the bacteria on our hands. Drink a bottle of soap and you will get sick. Spray concentrated soapy water on insects, and they die. Same goes for plants. Soaps are sold as organic insecticides and herbicides. You'll see them on product labels as "salts of fatty acids" but that's just another way of saying, "soap".

*Secret ingredients: what's really in your weed killer?*, Bayer Global,

https://www.bayer.com/en/agriculture/article/secret-ingredients-whats-really-your-weed-killer (last updated January 11, 2023).

30.     Bayer has posted videos to its YouTube channel containing statements by Bayer employees comparing surfactants in Roundup® to common household products which OAG believes is intended to emphasize Roundup's purported safety. One Bayer employee stated "Surfactant is like a detergent. You get more surfactant

residues on your forks and knives and plates when you wash them in the dishwasher than you would from any kind of exposure on a plant."

31.    In another YouTube video, a Bayer employee stated of Roundup®, "The formulations are simple. Glyphosate is the active ingredient. You have surfactants in there like a detergent, like laundry detergent or shampoo. . . most surfactant exposure comes from shampoos, soaps and detergents at home. You have more surfactant residues on your plates and forks and knives from washing them in the dishwasher than any crop will have at any time." The accompanying slide shown in the video stated "Most surfactant exposure comes from shampoos, soaps, and detergents at home."



32.    These videos were removed from YouTube during the course of this investigation.

Conclusions

33.     Executive Law §63(12) entitles the OAG to seek an order enjoining persistent fraud and illegality in the conducting or transaction of business and directing restitution and damages related thereto.

34.     GBL Article 22-A, Consumer Protection from Deceptive Acts and Practices, prohibits false and misleading advertising in New York State. GBL § 350.

35.     Respondent Monsanto previously entered into the 1996 AOD pursuant to Executive Law § 63(15).

36.     The OAG finds that Respondents' actions are in violation of Executive Law § 63(12) and GBL Article 22-A, as well as a breach of Monsanto's obligations under the 1996 AOD.

37.     Specifically, the OAG finds that Respondents made comparisons between ingredients in Roundup L&G Products and common consumer products, claiming by implication that Roundup L&G Products are safer or less toxic than such consumer products, specifically dish detergent and soap. These statements were made in direct violation of Respondents' obligations under the 1996 AOD.

38.     Based upon the studies listed in paragraphs 14-20, the OAG further finds that Respondents did not adequately substantiate their advertisements that "Roundup® weed and grass killer products won't harm anything but weeds," and similar claims that Roundup® is safe and non-toxic.

39.     Pursuant to Executive Law § 63(15), Respondents' breaches of the 1996 AOD constitute prima facie evidence that Respondents have engaged in false and deceptive advertising in violation of GBL Article 22-A.

40.     Solely for the purposes of this Assurance, Respondents neither admit nor deny the OAG's Findings, paragraphs 1-39 above. Provided however, Respondents disagree with the conclusions and import of the studies referenced in paragraphs 14-20 and have provided scientific literature they believe more accurately reflects the present state of the relevant science. This AOD does not reflect a scientific finding by the OAG that Respondents' products have caused harm to pollinators or aquatic species.

41.     Respondents have agreed to this Assurance in settlement of the violations described above. The entry into this AOD does not constitute an admission by Respondents of liability, wrongdoing or violation of applicable law or obligations.

42.     Respondents represent and warrant that Bayer CropScience LP and Monsanto Company, and their subsidiaries, are the only Bayer-owned entities (including Bayer's direct and indirect subsidiaries) involved in the advertisement, marketing, and sale of Roundup L&G Products.

43.     The OAG finds the relief and agreements contained in this Assurance appropriate and in the public interest. THEREFORE, the OAG is willing to accept this Assurance pursuant to Executive Law § 63(15), in lieu of commencing a

statutory proceeding for violations of Executive Law § 63(12) and GBL Article 22-A based on the conduct described above.

IT IS HEREBY UNDERSTOOD AND AGREED, by and between the Parties:

## RELIEF

44.     <u>Scope of Assurance</u>: This Assurance applies to Respondents' Roundup L&G Products. This Assurance shall not be deemed a waiver of Respondents' First Amendment rights.

45.     <u>General Injunction</u>: Respondents, including their agents, assigns, successors, employees, officers, and any other individuals or entities through whom they may act, shall not engage, or attempt to engage, in conduct concerning Respondent's Roundup L&G Products in violation of Executive Law § 63(12) and GBL Article 22-A.

46.     <u>Specific Injunctions</u>:

   a.  Respondents, including their agents, assigns, successors, employees, officers, and any other individuals or entities through whom they may act, will immediately cease and desist from publishing or broadcasting advertisements in New York that represent, directly or by implication, that:

   i.   their Roundup L&G Products "won't harm anything but weeds";
   ii.  as to pollinators and aquatic species, their Roundup L&G Products are safe, non-toxic, harmless or free from risk to pollinators and aquatic species, unless Respondents substantiate such representations;

      iii.  their Roundup L&G Products brand products, or any component thereof, are safer or less toxic than common consumer products other than herbicides.

b.  Respondents will immediately remove any advertisement from the internet, any website, video, or otherwise, that represents, directly or by implication the above claims referenced in a.(i-iii). Respondents will remove the statements identified in the OAG's findings, paragraphs 25-31. This shall not require removal of the entire webpage, article, or videos referenced therein, but only the removal of the specific statements identified.

c.  Respondents will immediately inform, in writing, its distributors and any retailers to whom it directly provides advertising material in New York State that they are to immediately cease and desist from disseminating any advertising material that contains any of the statements contained in paragraph 46 above and/or that in any way violate the terms of this Assurance.

d.  Acceptance of this Assurance by the OAG is not an approval or endorsement by OAG of any of Respondents' policies, practices, or procedures, and Respondents shall make no representation to the contrary.

e.  Respondents shall pay to the State of New York a penalty of $100,000 for each material default in the performance of any obligation under this paragraph occurring after the effective date of the Assurance,

provided however, that (1) such penalty shall not apply to any default cured by Respondents pursuant to paragraph 49; (2) such penalty shall apply to an allegedly violative advertisement only once, not to each alleged exposure to consumer(s) or customer(s); and (3) if the OAG elects to pursue this penalty, it must do so in lieu of, and not in addition to, any monetary relief (including any monetary penalty, damages, disgorgement, or restitution) related to the alleged material default. For the avoidance of doubt, the OAG's election to pursue a penalty under this paragraph shall not limit the OAG's ability to obtain injunctive and non-monetary equitable relief.

47.    This AOD shall not govern Respondents' conduct regarding:

a.   regulatory activities related to the registration and approval of their products before any governmental regulatory agency,

b.   educational activities related to agricultural and industrial uses of their products, such as conducting research and studies, and responding to the same by third parties,

c.   legislative activities related to their products, and

d.   litigation activities related to their products, such as defending their products before a court, administrative body, or other governmental entity.

48.   <u>Relationship to 1996 AOD and 1998 AOD</u>: This Assurance is intended to supersede and replace the 1996 AOD and 1998 AOD, which will cease to have any legal force after the effective date of this Assurance.

49.   <u>Oversight/Monitoring</u>:

a.   *Periodic Compliance Report and Certification*: Respondents shall provide the OAG with a report detailing their compliance with the requirements set forth in this Assurance, paragraphs 45-47, to be submitted to the OAG within 90 days from the date of execution of this Assurance. At such time, Respondents shall also provide a certification affirming their compliance with the requirements set forth in this Assurance. The report and certification shall be in writing and shall set forth in detail the manner and form of compliance with this Assurance. The report and certification shall be signed by Respondents. Thereafter, a report of compliance and certification of compliance shall be submitted to the OAG on an annual basis for the following six (6) years. In any case where the circumstances warrant, the OAG may require Respondents to file an interim report of compliance and/or certification of compliance upon 90 days written notice.

b.   *Compliance Report or Certification on Demand*: At any time through six years from the effective date, and upon 90 days written notice from the OAG, but not more than twice per calendar year, Respondents

shall provide the OAG with a report detailing and/or certification affirming its compliance with the requirements set forth in this Assurance, paragraphs 45-47.

c.  The OAG shall provide Respondents with a written notice of any claimed violation of this Assurance. The OAG and Respondents shall meet and confer within 30 days from the receipt of such written notice. Further, the Respondents shall have a reasonable period not to exceed 30 days to remedy any claimed violation in the performance of any obligation within this Assurance.

d.  If Respondents fail to resolve the claimed violation to the satisfaction of the OAG, or to provide adequate substantiation for a claim covered by paragraph 46, the OAG shall promptly notify Respondents and may thereafter commence the civil action or proceeding contemplated in paragraph 43, *supra*, in addition to any other investigation, action, or proceeding, and that evidence that the Assurance has been violated shall constitute prima facie proof of the statutory violations described in paragraphs 1-43, pursuant to Executive Law § 63(15).

50.  <u>Monetary Relief:</u>

a.  *Monetary Relief Amount*: Respondents shall pay to the State of New York $6,900,000.00 (the "Monetary Relief Amount"). Payment of the Monetary Relief Amount shall be made in full within ten (10) days of the effective date of this Assurance.

b.  Payments shall be made by wire transfer pursuant to instructions
provided by the OAG.

c.  The Monetary Relief Amount ($6,900,000.00) shall, as authorized by
Executive Law § 63(16), be held by the OAG in a designated account
and used to prevent, abate, restore, mitigate, or control prior or
ongoing water, land, or air pollution affecting pollinators, threatened
or endangered aquatic species, and their habitat, including but not
limited to, habitat management, restoration, and enhancement, as well
as pollinator research, monitoring, education, and outreach, as further
detailed in the 2020 New York State Pollinator Protection Plan
Update.

## MISCELLANEOUS

<u>Subsequent Proceedings.</u>

51.  Respondents expressly agree and acknowledge that the OAG may,
subject to prior compliance with the informal dispute resolution process described in
Paragraph 49(c)-49(d), initiate a subsequent investigation, civil action, or
proceeding to enforce this Assurance, and agree and acknowledge that in such
event:

a.  any statute of limitations or other time-related defenses are tolled from
and after the effective date of this Assurance;

b.  the OAG may use statements, documents, or other materials produced or provided by the Respondents prior to or after the effective date of this Assurance;

c.  any civil action or proceeding must be adjudicated by the courts of the State of New York, and that Respondents irrevocably and unconditionally waive any objection based upon personal jurisdiction, inconvenient forum, or venue;

d.  evidence of a violation of this Assurance shall constitute prima facie proof of a violation of the applicable law pursuant to Executive Law § 63(15).

52.     If a court of competent jurisdiction determines that a Respondent has violated the Assurance, such Respondent shall pay to the OAG the reasonable cost, if any, of obtaining such determination and of enforcing this Assurance, including – without limitation – legal fees, expenses, and court costs.

Effects of Assurance:

53.     This Assurance is not intended for use by any third party in any other proceeding.

54.     All terms and conditions of this Assurance shall continue in full force and effect on any successor, assignee, or transferee of the Respondents. Respondents shall include in any such successor, assignment or transfer agreement a provision that binds the successor, assignee or transferee to the terms of the

Assurance. No party may assign, delegate, or otherwise transfer any of its rights or obligations under this Assurance without the prior written consent of the OAG.

55.     Nothing contained herein shall be construed as to deprive any person of any private right under the law.

56.     Any failure by the OAG to insist upon the strict performance by a Respondent of any of the provisions of this Assurance shall not be deemed a waiver of any of the provisions hereof, and the OAG, notwithstanding that failure, shall have the right thereafter to insist upon the strict performance of any and all of the provisions of this Assurance to be performed by the Respondents.

<u>Communications:</u>

57.     All notices, reports, requests, and other communications pursuant to this Assurance must reference Assurance No. 23-025, and shall be in writing and shall, unless expressly provided otherwise herein, be given by hand delivery; express courier; or electronic mail at an address designated in writing by the recipient, followed by postage prepaid mail, and shall be addressed as follows:

    a.  If to the Respondents, to: Robyn Buck, or in his/her absence, to the person holding the title of Senior Counsel, Litigation, Bayer U.S.

    b.  If to the OAG, to: Assistant Attorney General Christopher Gore, or in his absence, to the person holding the title of Bureau Chief, Lem Srolovic, Environmental Protection Bureau.

Representations and Warranties:

58.     The OAG has agreed to the terms of this Assurance based on, among other things, the representations made to the OAG by the Respondents and their counsel and the OAG's own factual investigation as set forth in the Findings, paragraphs 1-43 above. The Respondents represent and warrant that neither they nor their counsel have made any material representations to the OAG that are inaccurate or misleading. If any material representations by Respondents or their counsel are later found to be inaccurate or misleading, this Assurance is voidable by the OAG in its sole discretion.

59.     No representation, inducement, promise, understanding, condition, or warranty not set forth in this Assurance has been made to or relied upon by the Respondents in agreeing to this Assurance.

60.     The Respondents represent and warrant, through the signatures below, that the terms and conditions of this Assurance are duly approved. Respondents further represent and warrant that Respondents, by Robyn Buck, as the signatory to this Assurance, is a duly authorized officer acting within the scope of her authority that has the power to bind Respondents to this Assurance.

General Principles:

61.     Unless a term limit for compliance is otherwise specified within this Assurance, the Respondents' obligations under this Assurance are enduring. Nothing in this Agreement shall relieve Respondents of other obligations imposed by any applicable state or federal law or regulation or other applicable law.

62.     Respondents agree not to take any action with respect to the OAG, or to make or permit to be made any public statement about this Assurance that is contrary to or inconsistent with this Assurance or creates the impression that the Assurance is without legal or factual basis. Nothing in this paragraph limits the Respondents' ability to advance legal or factual defenses in litigation, regulatory proceedings, or response to potential claims regarding the same or similar conduct implicated by this Assurance, except with respect to the OAG's efforts to enforce this Assurance.

63.     Subject to paragraph 49, nothing contained herein shall be construed to limit the remedies available to the OAG in the event that the Respondents violate the Assurance after its effective date.

64.     This Assurance may not be amended except by an instrument in writing signed on behalf of the Parties to this Assurance.

65.     In the event that any one or more of the provisions contained in this Assurance shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Assurance.

66.     Respondents acknowledge that they have entered this Assurance freely and voluntarily and upon due deliberation with the advice of counsel.

67.     This Assurance shall be governed by the laws of the State of New York without regard to any conflict of laws principles.

68.     The Assurance and all its terms shall be construed as if mutually drafted with no presumption of any type against any party that may be found to have been the drafter.

69.     This Assurance may be executed in multiple counterparts by the parties hereto. All counterparts so executed shall constitute one agreement binding upon all parties, notwithstanding that all parties are not signatories to the original or the same counterpart. Each counterpart shall be deemed an original to this Assurance, all of which shall constitute one agreement to be valid as of the effective date of this Assurance. For purposes of this Assurance, copies of signatures shall be treated the same as originals. Documents executed, scanned and transmitted electronically and electronic signatures shall be deemed original signatures for purposes of this Assurance and all matters related thereto, with such scanned and electronic signatures having the same legal effect as original signatures.

70.     The effective date of this Assurance shall be June 14, 2023.

LETITIA JAMES
Attorney General of the State of New York
28 Liberty Street
New York, NY 10005


By:     *Christopher Gore*
        _____
        Christopher C. Gore
        Assistant Attorney General
        Environmental Protection Bureau


        *John Rosenthal*
        _____
        John J. Rosenthal
        *Counsel for Respondents*

BAYER CROPSCIENCE LP

By: _____
Robyn Buck
Senior Assistant General Counsel
Litigation, Bayer U.S.

STATE OF MISSOURI          )
                           )    ss.:
COUNTY OF ST. LOUIS        )

On the _8th_ day of _June_ in the year 2023 before me personally came Robyn Buck to me known, who, being by me duly sworn, did depose and say that she resides in St. Louis County, Missouri; that she is Senior Assistant General Counsel, Litigation, of Bayer CropScience, the corporation described in and which executed the above instrument; that she knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by authority of the board of directors of said corporation, and that she signed her name thereto by like authority.

Sworn to before me this
_8_ day of _June_, 2023          _____
                                 NOTARY PUBLIC

Anne MacDonald
Notary Public - Notary Seal
State of Missouri
Commissioned for St. Louis County
My Commission Expires: April 04, 2025
Commission Number: 12632458

MONSANTO COMPANY

By: _Robyn Buck_

Robyn Buck
Senior Assistant General Counsel
Litigation, Bayer U.S.

STATE OF MISSOURI      )
                       )    ss.:
COUNTY OF ST. LOUIS    )

  On the 8th day of June in the year 2023 before me personally came Robyn Buck to me known, who, being by me duly sworn, did depose and say that she resides in St. Louis County, Missouri; that she is Senior Assistant General Counsel, Litigation, of Monsanto Company, the corporation described in and which executed the above instrument; that she knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by authority of the board of directors of said corporation, and that she signed her name thereto by like authority.

Sworn to before me this
8 day of June , 2023

_Anne MacDonald_

NOTARY PUBLIC

Anne MacDonald
Notary Public - Notary Seal
State of Missouri
Commissioned for St. Louis County
My Commission Expires: April 04, 2025
Commission Number: 12632458

Exhibit D Page 25