# EXHIBIT C

## **EXPERT REPORT OF WILLIS NAVARRO, M.D.**

**(RE: Karen Delorme-Barton)**

**INTRODUCTION**

This report represents a summary of my review and analysis of governmental and other reports and data published in the scientific literature regarding glyphosate and glyphosate-based formulations (collectively referred to as "glyphosate"), an herbicide that has been used globally for decades. It also includes a review of medical records and documents pertaining to Karen Delorme-Barton and my opinions on the issue of whether glyphosate causes cancer generally and whether it caused or contributed to Ms. Delorme-Barton's lymphoma. The purpose of this document is to provide my medical and scientific opinions as a practicing academic malignant hematologist and oncology expert, as well as a drug developer and clinical scientist in biotechnology. My opinions are based on my assessment of the currently available information regarding the carcinogenicity of glyphosate, the medical records and documents pertaining to Karen Delorme-Barton listed in the attached Materials Considered List, as well as my education, training, clinical and research experience, and generally accepted principles in the oncology and research communities.

All opinions herein are held to a reasonable degree of medical and scientific certainty, utilizing the same scientific rigor I follow in my clinical and research activities. The materials and literature I considered, reviewed and/or relied upon are set forth in the Materials Considered List attached as Exhibit A. In sum, my opinions are that glyphosate is not a human carcinogen generally and that any exposure to glyphosate that Ms. Delorme-Barton may have experienced was not a significant risk factor for and did not cause or contribute to the development of her lymphoma.

**MY BACKGROUND**

I am a hematologist and medical oncologist licensed to practice in California and Minnesota, and am Board Certified in Hematology through 2031. I received my medical degree from the University of California at San Francisco (UCSF) in 1990 and completed my internship and residency in internal medicine at Yale-New Haven Hospital (1990-1993), followed by two years spent teaching at Long Island Jewish Medical Center and Syosset Community Hospital, with an academic appointment at the Albert Einstein School of Medicine (1993-1995). I returned to California in 1995 to start a fellowship in hematology/oncology (1995-1998) and in bone marrow transplantation, both at UCSF (1998-1999). I then joined UCSF faculty in 1999 and was in full-time academic clinical practice from 1999 to 2005, and in part-time ongoing academic clinical practice from 2005 onward.

In 2005, I joined Genentech as an Assistant Medical Director in BioOncology. In that position, I was able to focus on research regarding solid tumors, including writing and executing clinical protocols, addressing safety signals, and interacting with various internal functional groups to provide clinical input as needed. I worked on the creation of an observational database for the use of Avastin treatment in breast cancer as a means to gather real-world data. During my time at Genentech, I also maintained my academic appointment at UCSF and a practice in General Oncology at San Francisco General Hospital treating a variety of solid and hematologic tumors, including lung, breast, colon, pancreatic, kidney, head and neck, nasopharyngeal, and gastric cancer, as well as hematologic malignancies including lymphomas, leukemias, and plasma cell dyscrasias, including myeloma.

Exhibit C Page 1

In 2008, I joined the National Marrow Donor Program in Minneapolis, Minnesota, as Vice President and Medical Director of Transplant Services. At the same time, I served as the Scientific Director for a clinical trials infrastructure called the Resource for Clinical Investigations in Blood and Marrow Transplantation contained within the Center for International Blood and Marrow Transplant Research (Minneapolis and Milwaukee, WI). For the next six years, I worked with transplant centers around the country and conducted clinical research, including designing and running clinical trials on treatments for lymphoma and leukemia patients. During this time, I served as protocol officer for several research protocols that resulted in publications on topics in malignant hematology and bone marrow transplantation, including key findings regarding the impact of obesity or HIV on outcomes of hematopoietic cell transplants for lymphoma and leukemia, both in the autologous and allogeneic setting. I also worked closely with pediatric colleagues to develop a long-term follow-up protocol to capture late effects and complications following blood and marrow transplants in children, including assessments of delayed onset organ damage and secondary malignancies as a consequence of the transplant procedure.

Following my tenure at Be the Match, I joined Atara Biotherapeutics as Vice President, Clinical Science from July 2014 until December, 2021. Atara is an allogeneic T-cell immunotherapy company that develops treatments for patients with cancer, autoimmune, and viral diseases. Atara's T-cell immunotherapies are designed to precisely recognize and target cancerous or diseased cells without affecting normal, healthy cells. While at Atara, I led the development of tabelecleucel, a cellular therapy product that consists of EBV-directed cytotoxic T lymphocytes extracted from normal donors. Essentially, tabelecleucel represents EBV-specific immunity in a vial; that is, tabelecleucel is an adoptive immunotherapeutic that confers EBV immunity transferred from a normal EBV+ donor to a patient with immunodeficiency to treat EBV-driven cancers, including lymphomas. At Atara, I was also involved in a variety of activities related to drug development such as safety assessments, review of adverse event reports, and clinical trial design with regard to various malignancies, including solid tumors and hematopoietic cancers. Since December 2021, I remain a consultant for Atara, providing advice regarding the ongoing development efforts there.

In December 2021, I joined Aadi Bioscience, Inc. (Aadi), where I am Vice President of Clinical Development and Pharmacovigilance. I lead Clinical Development at Aadi as well as Pharmacovigilance (Drug Safety). Aadi developed and now markets *nab*-sirolimus (FYARRO$^{TM}$), an inhibitor of the mTOR pathway, for cancer and other indications. Regarding Pharmacovigilance (PV), a function in the pharmaceutical and biotechnology industries dedicated to protecting patients by analyzing safety data, there are many parallels between PV and the type of assessments performed to define the safety of herbicides and pesticides. In both settings, collected data regarding adverse events are used to quantify risk using statistical techniques to sort out events (such as development of cancer case) that are random and unassociated to a particular substance or medication from those events that can be associated.

Though I have been in biotechnology since 2005, I have retained my academic affiliations, most recently at the University of Minnesota. While at UCSF, I was an Associate Clinical Professor of Medicine in the Adult Leukemia and Bone Marrow Transplant Program from 1999-2019. Because of a move to full-time residency in Minnesota as of 2019, I joined the faculty at the University of Minnesota as an Adjunct Professor of Medicine in the Division of Hematology/Oncology/ Transplantation, where I now actively care for patients. I attend clinic there once every 1-2 weeks. I also teach trainees and participate in Division programs and activities, including clinical trials (with the exception of any Aadi or Atara clinical trials from which I would recuse myself to avoid any conflict of interest). I currently treat patients with acute and chronic leukemias, including CLL, as well as lymphomas, myeloproliferative and

myelodysplastic disorders, plasma cell dyscrasias, and a variety of other malignant hematologic disorders.

My experience in over 2 decades of treating patients, conducting clinical research, and designing and running clinical trials on cancer treatments has required me to study and understand how cancer develops, and the molecular and genetic bases of various malignancies. I routinely review and evaluate epidemiologic data, as well as *in vitro*, *in vivo*, and animal data. My clinical and professional obligations require the ability to understand, synthesize, and apply clinical and research judgment to all types of data, whether it be human (epidemiologic and *in vivo*) data, animal data, or laboratory (*in vitro*) data. A copy of my current curriculum vitae is attached as Exhibit B.

As an academic malignant hematologist and oncologist at UCSF and the University of Minnesota, I routinely diagnose and treat patients with cancer. Such care requires understanding not only the diagnosis and treatment, but also the etiology of the disease. Simultaneously, I have been a drug developer for the last 18 years. As a senior leader in biotechnology, I bring extensive experience examining and understanding risk and benefit of medicines. As both an academic oncologist and as a drug developer, I bring a comprehensive perspective to considerations involved in the alleged carcinogenicity of substances, including glyphosate.

Many of the patients I care for in clinical academic practice are quite complex; likewise, so are the clinical trial subjects who participate in clinical trials I have designed and run. As we conduct a clinical trial, drug safety is a critical area of study and adverse events (AEs) are the means by which safety is assessed. Some AEs are easily attributed to the participant's underlying disease; other AEs may clearly stem from the drug candidate. Often however, AEs cannot easily be characterized as related or not related to the drug candidate until sufficient data has been collected. Attribution is a critical aspect of drug development: if significant AEs are falsely assigned to the drug candidate, that drug candidate may not be developed or approved despite significant potential benefit. Conversely, if in fact the drug candidate is responsible for a significant toxicity, inappropriately assigning attribution to an alternative cause could lead to significant harm to the recipients not only in the clinical trial but also following commercial approval. As with many scientific questions, methodology is important and premised on a consideration of the totality of data. Consider this example: in a study of Drug X for gastric cancer, abdominal pain was seen at a slightly increased, statistically significant rate, suggesting in this single study that drug candidate X causes abdominal pain. However, in three other studies of Drug X in other non-gastric cancers, no excess abdominal pain is seen. In this case, the most likely explanation is that Drug X is not associated with abdominal pain but rather, gastric cancer patients experienced abdominal pain because of their underlying disease. This only became clear when the totality of safety data for Drug X was evaluated.

This methodologic experience is directly relevant to the assessment of whether any particular exposure may be causally related to a disease or other outcome. My understanding of the Bradford Hill criteria used in the area of epidemiology to determine associations between exposures and outcomes is that there is substantial similarity and overlap with the translational research and disease treatment approach. So whether I am assessing drug or substance safety or causation (as I am here), the methodology is the same: data is considered across all studies in which the drug or substance is being evaluated in order to increase the power of the findings and to determine whether there is a reliable signal or potentially problematic association; and only if that threshold of a meaningful association is met, then the reliability of each test or study is assessed and the resulting data are weighed in that context; the temporality between drug use or exposure and the event is considered; the plausibility of the drug or substance in causing the outcome is assessed; and the consistency or inconsistency between

the laboratory data and human data is evaluated. This quest to deduce to the best of one's ability the underlying truth is a critical aspect of drug development and causation assessment.

**CONSIDERATIONS IN THE ASSESSMENT OF DATA**

In the drug development process, a target involved in the pathophysiology of a disease process is typically first identified in basic science research, followed by creation of a potential therapeutic that disrupts or alters that aberrant pathway or process. This is often referred to as translational research. For example, in CML, a single molecular mutation resulting from the random translocation of genetic material between chromosomes 9 and 22 creates a new fusion gene and resulting protein called bcr/abl. The bcr/abl fusion protein is necessary and sufficient to lead to CML. Imatinib was then created by pharmaceutical chemists to disrupt the transforming effect of bcr/abl protein, thereby reversing the malignant phenotype of affected hematopoietic cells. The new compound was tested in laboratory animal-based models of CML and was found to have substantial anti-CML activity. At that point, the drug candidate was then ready for first-in-human trials (Phase I) to ascertain safety and the maximum tolerated dose in humans. In Phase II clinical trials, safety was further explored and an initial assessment of efficacy performed. In Phase III, the new drug candidate (in this case, imatinib) was then tested versus standard treatments in a randomized, controlled study to prove (or disprove) that the drug candidate was better than the current standard of care. The randomized, controlled study is the optimal way to control for bias and confounders, and is considered the best way to find the truth—that is, whether in fact a drug is truly better than the standard of care. Imatinib worked so well that it and subsequent follow-on compounds have now all but supplanted the previous standard treatments for CML: interferon and bone marrow transplantation.

This classic drug development pathway, from basic mechanistic research of pathophysiology to drug candidate synthesis to pre-clinical animal model testing and finally to clinical trials in patients with the disease under study, leading to filing for marketing authorization for successful candidates, is the standard approach to drug development. It is analogous to the methodology that I use here in assessing the weight and reliability of the data regarding the potential carcinogenicity of glyphosate, akin to the analysis and interpretation of safety data as part of drug development. In sum, the drug development process is highly informative regarding the understanding of the relationship between a particular substance and a disease process, including cancer. Whether one refers to a drug candidate or a chemical (like glyphosate), or any substance, the framework of the translational research pathway is intended to ultimately lead to an understanding of what impact the drug candidate/substance will have in humans. That drug discovery or translational methodology goes both ways in terms of disease etiology. What we know about the likely causal pathway for a disease like cancer will inform us on how to target the development of a drug that will effectively treat it.

Although the randomized controlled study is the gold standard for the drug approval process, sometimes such a study is not possible in other contexts, such as that of a chemical. In the case of a chemical compounds, the regulatory authorities look at the quality of the data that can be generated from non-randomized studies, assessing the potential biases, confounders, and limitations to decide how well that study represents truth. Non-randomized study designs each have the potential for bias and confounding, but the degree to which these issues are problematic is based on study design. Cohort studies that are prospective in design help to mitigate some bias and confounding by the fact that they are prospective and, therefore, the researchers do not know *a priori* what the results should be. Case-

control studies can be more difficult to adjust for confounding when they examine multiple different exposures in the same study, so they need to be assessed in that regard. Additionally, studies that are performed *ad hoc* on pre-existing data are particularly prone to the influence of bias.

In terms of the scientific hierarchy of data, *in vitro* preliminary studies that precede or simply supplement human studies are subordinate to human studies. Data from well-designed human epidemiology studies of ample statistical power carry the greatest weight with respect to scientists and clinicians. Other data that may, depending upon reliability, be considered include *in vivo* mechanistic studies in mammalian systems, laboratory animal model data, *in vitro* results using human model systems, and *in vitro* tests on non-human systems. These types of studies may be important to provoke or guide further study, or to generate hypotheses pertinent to safety or efficacy in certain settings, but they do not necessarily correlate with outcomes in humans. There are innumerable examples in published literature of the failure of *in vitro* or animal data to accurately translate to humans. This is a reflection of the limitations of animal models to adequately replicate the extraordinarily complex human setting. In other words, we have learned quite well how to cure a variety of cancers in mice, but achieving that same goal in humans has been elusive because people and mice are different.

Another key consideration when evaluating the import of animal studies is that the dosing of the test substance is typically not representative of the real world, with doses used often much higher than would be seen in human exposure in order to ensure that if a rodent cancer risk is present, it will be detected. Looking at some glyphosate rodent studies, glyphosate was added to the test animals' feed at remarkably high levels, sometimes several orders of magnitude higher than a human glyphosate user would ever experience. The minimal effect of such a high oral dose of glyphosate in fact is a testament to the relatively low toxicity of glyphosate in animals and a reflection of the fact that glyphosate targets enzyme pathways crucial to plant growth that do not exist in animals. In other words, because of the inherit limitations of animal studies in general, they should not be interpreted to faithfully represent what will happen in humans. Simply put, there are too many biological differences between animals and humans to reliably extrapolate or draw a conclusion about a cause and effect.

In the case of glyphosate, the *in vitro* and *in vivo* genotoxicity and animal data must be evaluated through this lens. Certainly, these data are important to evaluate and may be given weight in certain circumstances; but from a scientific standpoint, the human studies are numerous and the question of carcinogenicity is effectively addressed by the availability of substantial human data from many different types of studies, including a large, well-designed prospective cohort study (the Agricultural Health Study), which will be discussed below. In other words, reliable human data that is substantial in numbers and statistical power and that, by definition, reflects real-world conditions of use and dose levels, will necessarily supersede any findings reported in isolated laboratory or animal data. In my opinion, that is the case with glyphosate.

In circumstances where the question is to understand the effects of exposure to a substance like glyphosate, controlled studies (meaning prospective studies where there are well-defined inclusion and exclusion criteria to define the test population, and so on), allow for strong conclusions about the effects of a given substance. In this case, the Agricultural Health Study ("AHS") fits the criteria for a well-designed, appropriately targeted, significantly powered, and prospectively designed study that yields compelling data. In my opinion, the AHS has generated robust and reliable data clearly demonstrating that glyphosate is not a significant risk factor for cancers generally, nor for NHL specifically (Andreotti 2018).

5

Exhibit C Page 5

In reviewing glyphosate data assessing whether or not there is the relationship to cancer, it is critical to consider biological plausibility and general principles of carcinogenesis in humans. It is also important to recognize that cancer is not one disease. Different types of cancer in different organs and sometimes different types of cancer within one organ have different pathophysiology. Cancer is a stochastic and multifactorial disease such that even in rare cases where a specific genetic cause of cancer has been discovered, we know that many other factors play into whether or not cancer manifests in a particular patient. For example, BRCA1 is an inherited gene defect that significantly predisposes a woman to a variety of cancers including breast cancer and ovarian cancer. Yet, not every individual who carries the BRCA1 gene will develop cancer despite the dramatic increase in their risk of such cancers (Chen and Parmigiani 2007). Rarely can we determine the specific cause or causes of a particular person's cancer.

In large part, this is because there is a high degree of randomness to cancer development. The simple act of living results in DNA changes that may or may not increase a person's risk of cancer. When there are genetic changes that result in malignant transformation of cells, a person's cellular repair mechanisms and/or immune surveillance system usually repairs the damage and/or prevents further growth. If a person's repair mechanisms and immune surveillance system miss the aberrant cell and it has the chance to survive and grow, then cancer may develop over time. Cancer typically requires more than one genetic "hit" to result in clinically evident disease and then the cancer protection mechanisms (DNA repair, immune surveillance to destroy transformed cells, and programmed cell death) must also fail. In other words, cancer is the result of gradual accumulation of mutations (inherited, congenital, and acquired) in driver genes (López-Lázaro 2018) that successively confer growth advantage and lead to uncontrolled proliferation of malignant cells that go unchecked by one's inherent protection mechanisms.

The cellular and genetic activity that results in changes that may lead to most cancers are currently thought to likely occur as a result of a series of random replication errors. Tissues that undergo more replication cycles as a normal part of their life face increased risk of malignant transformation simply because of the increased risk of random DNA replication errors. Current data indicate that the number of replication cycles may be generally more important for carcinogenesis than the impact of environmental exposures. Environmental factors may be particularly relevant for lung cancer (mostly cigarette smoking, but also air pollution and other exposures). But most other cancers are likely driven primarily by replication cycles and consequent accumulation of DNA replication errors (Tomasetti 2017). This explains, in part, why humans spontaneously develop cancer with or without a known inciting exposure or significant risk factor, irrespective of geography or environmental exposures. It also helps to explain why there is an increase in incidence of all cancers observed with increasing age, irrespective of geography and environment.

**GLYPHOSATE AND CARCINOGENICITY GENERALLY**

The largest prospective and most rigorous study conducted to date regarding the carcinogenicity of pesticides and herbicides is the Agricultural Health Study (AHS), a prospective cohort study looking at a population most likely to have been exposed to glyphosate (pesticide applicators). In this prospective cohort study in Iowa and North Carolina, 57,310 pesticide applicators recruited in 1993-1997 were followed for the long term. Note that the focus of the study was a population of workers at risk for repeated pesticide exposures far more frequent and intense than the occasional residential user. At the time of enrollment, a survey of pesticide/herbicide exposure for 50 selected agents was collected, followed by a telephone interview for 63% of participants conducted between 1999-2005. Estimates of

exposure were calculated based on participant reports of use characteristics such as use of personal protective equipment, years and days per year of use, and application method. For the 37% of participants who did not complete a follow-up interview, imputation was used to estimate exposure. Cancer cases among the participants were ascertained via cancer registries in Iowa and North Carolina after enrollment. Among the 54,251 subjects included in the updated analysis in 2018 (Andreotti 2018), 44,932 (82.8%) reported ever using glyphosate. After a careful analysis and review of the data, Andreotti and colleagues concluded that "In this large, prospective cohort study, no association was apparent between glyphosate and any solid tumors or lymphoid malignancies overall, including NHL and its subtypes." The AHS was the first to examine prospectively collected data to determine whether or not there is an epidemiologic link between cancer and glyphosate exposure in humans and, as noted above, found no statistically significant increase in risk.

As I will discuss in more detail below, the AHS investigators looked specifically at the question of whether there was an association between cancer and exposure to various pesticides, including glyphosate. They found no association between glyphosate exposure and cancer in the initial analysis (De Roos 2005); and in the most current analysis with longer follow-up, no association between glyphosate and cancer was identified (Andreotti 2018). Additionally, although there are quite a number of other types of studies involving glyphosate, most found no statistically significant increase in the overall increase in risk of NHL when controlling for other exposures (Cantor 1992, Cocco 2013, Leon 2019, Orsi 2009, McDuffie 2001). Those studies that did find an association, all of which were case-control studies subject to a variety of limitations including selection bias, found that the association was weak statistically. For example, a study by Hardell and colleagues (2002) using the case-control design identified 8 cases and 8 controls and, on that basis and with almost no data, concluded that an association could be made. If even one case or control were recategorized or found to be incorrectly placed in the groups, the results would dramatically change. This type of finding is too unreliable and unstable. In order to draw an accurate conclusion, the collective data must be evaluated in the context of study design, etc., as described above. In the non-controlled setting, whether they be observational cohort or case-control studies, there are a variety of biases and challenges that must be considered when assessing the quality and reliability of the data. This is especially true when the dataset under consideration is small. In such cases, even modest bias can dramatically impact the outcome of the analysis. In sum, factors such as the study design, quality of data collection, reproducibility, and reliability of the data, the overall size of the dataset, the applicability of the findings to the clinical situation in question, and the biological plausibility based on understanding of the pathophysiology of the disease state under study must be considered. With regard to glyphosate, the human data are compelling and collectively, led by the Agricultural Health Study, a prospective cohort study, establish its safety and non-carcinogenicity.

In addition to the published literature regarding glyphosate, I also reviewed and considered reports from the US EPA, Health Canada, European Chemicals Agency (ECHA), European Food Safety Agency, Joint Meetings on Pesticide Residue (JPMR), the regulatory agencies for Australia, New Zealand, and Japan, the IARC, as well as related literature which includes both human and non-human *(in vitro*, *in vivo* genotoxicity, and animal) data.

The first pesticide (herbicide) product containing glyphosate was initially registered in 1974. The US EPA has performed multiple reviews since that time, including the issuance of a Glyphosate Registration Standard in 1986 that updated the Agency's toxicity database for glyphosate. In 1991, a peer review by the Agency's Carcinogenicity Peer Review Committee (CPRC) to incorporate new data available at that time was added into a new assessment for carcinogenicity. Following that review, the

Agency classified glyphosate as a Group E chemical: "Evidence for Non-Carcinogenicity for Humans" based upon a lack of evidence for carcinogenicity in mice and rats and the lack of concern for mutagenicity.

A re-registration eligibility decision (RED) for glyphosate was completed in 1993, concluding that glyphosate was eligible for re-registration. In 2015, another review of to evaluate evidence regarding carcinogenicity was performed, including studies submitted by the Registrant and those available in the published literature; this review resulted in a classification of "Not Likely to be Carcinogenic to Humans".

In 2017, following review of additional studies of glyphosate, the US EPA's Office of Pesticide Programs published a monograph entitled "Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential", dated December 12, 2017. The methodology used, the literature and studies considered, and the approach to the analysis were discussed in the 216 page document in great detail. The work considered available *in vitro*, laboratory animal, and human epidemiologic data. The conclusion from this exhaustive review was that "the available data and weight-of-evidence clearly do not support the descriptors 'carcinogenic to humans', 'likely to be carcinogenic to humans', or 'inadequate information to assess carcinogenic potential'. For the 'suggestive evidence of carcinogenic potential' descriptor, considerations could be looked at in isolation; however, following a thorough integrative weight-of-evidence evaluation of the available data, the database would not support this cancer descriptor. The strongest support is for 'not likely to be carcinogenic to humans'".

The US EPA published a Proposed Interim Registration Review Decision (PID) in April 2019 and a follow up Interim Registration Review Decision in January 2020. Each time, the EPA reviewed and evaluated the data regarding glyphosate and addressed concerns and commentaries regarding the data. The methodical steps taken for the 2019 review are outlined by the EPA and included: development of a publicly published work plan for the review; convening of a scientific advisory panel with publicly available agenda, transcripts, and final report; a 60-day public comment period to allow interested parties and stakeholders to provide information to the US EPA; followed by a 60-day review of the PID itself before finalization. From the perspective of a clinician and researcher, my opinion is that this stepwise, transparent process led to a scientifically valid decision about the lack of carcinogenicity of glyphosate and its continued registration for use in the United States. The comprehensive approach by the EPA and its consistent re-evaluation of evolving data over time at multiple time points since initial registration further underscores the reliability of its conclusion.

The US EPA was aware of the IARC conclusion of probable carcinogenicity for glyphosate and, in fact, public comments included some from those who agreed with the IARC conclusions. The EPA responded to those comments, noting that the US EPA's cancer evaluation is more robust that IARC's in that it included more studies, some of which IARC had not considered. In addition, the US EPA noted that they excluded some low-level genotoxicity studies in non-mammalian species (i.e., worms, fish, reptiles, plants) noting that these models are not appropriate for assessment of human carcinogenicity. I wholeheartedly concur with this principle. The US EPA also responded to comments from the public comment process regarding the use of industry studies. It noted that while industry studies were considered, they adhered to rigorous standards and each study was subjected to individual review to assess study conduct and conclusions, including a peer review process for this aspect of the review. Some of these studies had been submitted confidentially as part of the manufacturer's registration application and are not publicly available as they contain intellectual property and trade secrets. In my opinion as a researcher, this evaluation process was important and valid.

In sum, based on my own review of the data, I concur with the conclusions arrived at by the US EPA regarding the safety of glyphosate and hold the opinion to a reasonable degree of medical and scientific certainty that glyphosate is not a human carcinogen.

Several other regulatory agencies around the world also evaluated the safety of glyphosate and its potential carcinogenicity. On 15 March 2017, the Committee for Risk Assessment (RAC) of the European Chemicals Agency (ECHA) published its opinion regarding glyphosate risk. The RAC is the scientific committee that represents the ECHA in the assessment of risk for various chemicals used in the European Union (EU). Similar to the US EPA process, the draft RAC opinion, derived from a review of pertinent studies of glyphosate compiled into a dossier, was subjected to public review and comment. The report describes the studies that were considered and the conclusions drawn regarding each reviewed aspect of glyphosate toxicity assessments. Based on mammal data, glyphosate was not classified as causing acute toxicity via the oral, dermal, or inhaled route, nor was glyphosate noted to have single exposure-specific target organ toxicity, including no skin corrosion/irritation nor skin sensitization. Eye irritation was noted in mammalian animal models, warranting classification for eye damage in Category 1. Regarding repeated exposure target-organ toxicity, a review by ECHA of all the animal data was performed and the conclusion was that specific target organ toxicity—repeated exposure classification for glyphosate was not warranted.

Importantly, the ECHA carefully reviewed the mutagenicity data and noted that the majority of studies showed no evidence for mutagenicity; in particular, those that were guideline-compliant did not show any evidence of mutagenicity. The RAC noted that 16 different Ames tests, a common assay performed in bacteria to look for evidence of mutagenesis, were reported in the literature; all were negative, indicating that glyphosate is not mutagenic or genotoxic in bacterial test systems. Likewise, all mammalian cell-based gene mutation studies were negative. Other *in vitro* genotoxicity assays performed included testing for sister chromatid exchange (SCE) and DNA strand breaks. Some of these tests were positive and some were negative, but other studies examining induction of DNA synthesis (associated with DNA repair) were negative, thereby contradicting the few positive DNA strand break and SCE results; these stresses should have induced the cells i*n vitro* to initiate DNA repair but did not appear to do so. The consistent negative results on the most reliable and most relevant mutagenicity studies, the inconsistent results among the less probative genotoxicity studies, and the negative findings in DNA synthesis studies, combine to demonstrate that glyphosate and its formulations do not have mutagenic properties.

The RAC also reviewed human data derived from occupational or environmental exposures and found that the majority of studies showed no genotoxicity or the exposure within the studied population was too low to account for the findings, perhaps in some cases confounded by concurrent exposure to other pesticides/chemicals. The RAC specifically called out two studies reporting potential effects (Paz-y-Miño 2007; Bolognesi 2009), but noted significant methodological flaws and inconsistencies in exposure that impacted the relevance and reliability of these two studies (e.g., issues with micronucleus test findings and timing of or extent of exposure to glyphosate). Subsequently, Paz-y-Miño and colleagues in 2011 found no chromosomal or DNA alterations among Ecuadorians living near an area of aerial spraying of herbicides.

The ECHA specifically points out differences in methodology utilized by the RAC of ECHA vs IARC. Like the US EPA, RAC did not consider non-mammalian animal models appropriate for the assessment of human carcinogenicity. The RAC also commented about the transparency of the ECHA process in

contrast to the closed process of IARC. Based on my review, I agree with the RAC conclusion that glyphosate is not a germ cell mutagen.

With respect to carcinogenicity, the RAC considered human epidemiologic data, laboratory animal data, as well as the *in vitro* studies assessing mutagenicity contained within the dossier. After careful review of the data, the RAC concluded that, ". . . based on the [human] epidemiologic data as well as the data from long-term studies in rats and mice, taking a weight of evidence approach, no classification for carcinogenicity is warranted". That is to say, the Committee for Risk Assessment representing the ECHA concluded that there is no evidence that glyphosate causes cancer of any type. I agree.

Additionally, Health Canada published evaluation reports in 2017 and 2019 for glyphosate and, similar to the US EPA and ECHA, concluded that glyphosate 1) is not genotoxic and is unlikely to pose a human cancer risk, and 2) does not pose a dietary, occupational, and residential exposure risk to human health. Health Canada also confirmed the safety of the surfactants and various glyphosate formulations. As with the US EPA and ECHA assessment processes, public comment was permitted for the draft reports before finalization. Health Canada commented about the IARC conclusions and noted that while Health Canada, similar to the US EPA and ECHA (as well as several other countries), considered health risk, IARC considered only hazard classification and ignored the level of human exposure, an important factor in the determination of health impact of a substance.

Additional national regulatory authorities and joint bodies (JMPR) looked at the data on glyphosate and, consistent with all other regulatory bodies, concluded that glyphosate is not a carcinogen. The Australian Pesticides and Veterinary Medicines Authority (APVMA) and the New Zealand Environmental Protection Agency (NZ EPA) also published their assessments regarding glyphosate. The APVMA, Australia's regulatory body in charge of registration of glyphosate, in response to the IARC's assessment of glyphosate, requested that the Australian Department of Health conduct a review of glyphosate with respect to carcinogenicity. The APVMA concluded that glyphosate exposure does not pose a carcinogenic risk to humans. The APVMA also stated that no reconsideration of registration is required. Likewise, the NZ EPA concluded that "The overall conclusion is that – based on a weight of evidence approach, taking into account the quality and reliability of the available data – glyphosate is unlikely to be genotoxic or carcinogenic to humans and does not require classification under HSNO as a carcinogen or mutagen." Thus, in concurrence with the US, EU, and Canadian regulatory authorities, both Australian and New Zealand regulatory authorities also concluded that glyphosate is not a carcinogen and should continue to be available for use.

Based on the thoughtful, transparent, and scientifically rigorous assessment process used by the aforementioned agencies, as well as numerous regulatory agencies around the world and my own review of the pertinent literature and scientific data, I conclude to a reasonable degree of medical and scientific certainty that glyphosate is not a human carcinogen and does not pose a hazard to human health. The lack of evidence for carcinogenicity for glyphosate is supported by animal models (Greim, 2015) and, most critically, by strong epidemiologic data as reviewed and discussed in the regulatory reports mentioned above.

Given the conclusions of glyphosate reports from the US EPA, Health Canada, the European Chemicals Agency, the European Food Safety Agency, the Joint Meetings on Pesticide Residues, and regulators in Australia, New Zealand, and Japan, it is apparent that the non-governmental IARC report stands out as an outlier – it is the only report concluding that glyphosate is a probable carcinogen. The

IARC conclusion that glyphosate is a "probable carcinogen" is incongruous with the totality of the available data and otherwise global consensus, which could be attributable, at least in part, to the fact that IARC conducts hazard assessments (i.e., can the substance at issue cause an undue effect under any circumstances and at any dose) rather than human health risk assessments that evaluate the data under real world conditions.

It is notable that IARC has also concluded that several common, everyday use items are carcinogenic including cell phones (2013), red meat (2018), and hot water (2018). Also notable is IARC's conclusion in 1991 that coffee is carcinogenic, only to reverse themselves in 2018. Moreover, the FDA recently published a carefully conducted and comprehensive assessment of the risk of cell phone use with respect to carcinogenesis after reviewing all pertinent laboratory-based and epidemiologic-based studies and concluded, in contradistinction to IARC, that cell phone use has not been shown to pose an increased risk for cancer of any kind. All in all, the IARC's conclusions for a variety of common substances appear to be at odds with other scientific and regulatory agencies; in my opinion, IARC has on several occasions drawn conclusions that appear to be inconsistent, unreliable, and refuted by different government agencies across different countries. The same is true with respect to its conclusion about glyphosate.

**GLYPHOSATE, NON-HODGKIN LYMPHOMA (NHL) GENERALLY AND FOLLICULAR LYMPHOMA (FL) SPECIFICALLY**

Follicular lymphoma (FL) is the most common type of low grade (also called indolent) non-Hodgkin lymphoma (NHL) and constitutes about 22% of all newly diagnosed NHL cases in the U. S. (National Comprehensive Cancer Network 2023). The diagnosis is optimally made via excisional biopsy as was performed for the Plaintiff. Risk factors for the development of FL include older age (peak age 75-79), male sex, white non-Hispanic race, hepatitis C infection, a diagnosis of Sjögren's syndrome, use of hair dye, and smoking. Interestingly, the incidence rates for FL in the US have held steady from 2000 to 2016 (Cerhan 2020).

With respect to pesticides and herbicides, various investigators have performed analyses to ascertain whether pesticides in general and in some studies, glyphosate specifically, are associated with NHL, including FL. As mentioned earlier, the highest quality study examining whether or not there is an association between pesticide use and various malignancies is the AHS. With respect to glyphosate and NHL broadly, and FL specifically as a subset of NHL, Andreotti and colleagues (2018) examined the dataset and compared those never exposed to glyphosate to those who were exposed to a lesser or greater degree, divided into four levels (quartiles) of exposure for B cell NHL as a whole and three levels (tertiles) of exposure for follicular lymphoma. If glyphosate were causative, one would expect that with increasing exposure, there would be more cases of NHL and FL compared to the non-exposed control group. What Andreotti found is that there is no difference between different exposure levels, including the highest level of exposure, and non-exposed individuals for either NHL as a whole, or FL specifically. The relative risk for development of NHL and FL for the control group is set at 1.00 since NHL and FL occurs in people in general with no known glyphosate exposure; this glyphosate-unexposed group therefore represents the baseline rate of NHL and FL incidences. With a 20-year lag for B cell NHL, which is sufficient time to see development of NHL if it is going to occur as a result of an exposure, the p value for trend for increasing rates of NHL with increased exposure was 0.49, and the relative risk for each of the four quartiles of exposure included 1.00, indicating no association between glyphosate and B cell NHL. Likewise, for follicular lymphoma, a subset of NHL, the p value for trend for increasing rates of NHL with increased exposure was 0.82 and the relative risk for each of the three tertiles of exposure included

11

Exhibit C Page 11

1.00, indicating no association between glyphosate and FL as well. The AHS is the gold standard study because it collected data on so many people prospectively; it collected exposure data via a survey of the professional applicators themselves rather than calculating exposure as some studies have attempted, and the large population has been followed for many years, giving sufficient time to see an effect if there was one to be seen.

There have been numerous case-control studies attempting to assess glyphosate and NHL risk, but they are all plagued by similar issues. The main issue is selection bias and, in some cases, a lack of adjustment for other risk factors for NHL. These studies are all retrospective, meaning that the question is asked and then the data are collected, as opposed to the prospective AHS in which the data were collected and then the questions were asked. This is important because it is possible to unintentionally sway the results by selecting which participants are cases and which are controls. Despite these shortcomings, multiple case-control studies have been published because these studies tend to be easier to conduct than prospective cohort studies. Orsi and coworkers (2009) examined cases of lymphoma collected in several French hospitals and asked the cases about pesticide exposure, including to glyphosate. This study reported associations between some pesticides (though not glyphosate) with multiple myeloma and Hodgkin lymphoma, but none of the broad array of pesticides, including glyphosate, were associated with NHL in general; this was indicated in the study by an odds ratio of 1.0 (95% confidence interval of 0.5-2.7), indicating no increased risk of NHL with glyphosate exposure. With respect to FL specifically, the odds ratio for development of FL after glyphosate exposure was 1.4 with a 95% confidence interval of 0.4-5.2 (so also was not statistically significant). The very wide confidence interval is a reflection of the fact that only 3 FL cases in the entire case-control study were exposed to glyphosate.

Likewise, in Cantor et al. (1992), the relative risk of NHL development after glyphosate exposure versus controls was 1.1 with a 95% confidence interval (CI) of 0.7-1.9. Since the CI range included 1, that means that there was no association. With respect to the FL subgroup specifically, Cantor and coworkers pointed out that no significant associations were found between FL and any of the pesticide families examined, including glyphosate. McDuffie and colleagues (2001) looked at the incidence of NHL in several Canadian provinces and found that the relative risk of NHL after glyphosate exposure was 1.2 with a 95% CI of 0.83-1.74, once again negative. This study was limited by a lack of quantitative exposure data and small numbers (there were 51 cases in the study—a very small number for an epidemiologic study). FL was not specifically analyzed in that study, likely because of the already small number of NHL cases. Another tiny case-control study from Sweden by Hardell and Eriksson (1999) was too small to interpret (4 cases of NHL). Some of the cases from that study were included in a subsequent study by Hardell (2002) that combined NHL and hairy cell leukemia (HCL), and showed no association when controlling for other risk factors for NHL and HCL development, with a relative risk of 1.85 and a 95% CI of 0.55-6.2. Since the CI crossed 1, this study found no association. Note that there were only 8 cases of NHL/HCL with glyphosate exposure, once again far too few cases to ascertain any valuable information. This very small number was reflected in the wide confidence interval. Eriksson and his group published another case-control study in 2008 using cases and controls in Sweden and found that the relative risk for DLBCL, another type of NHL, was 1.22 with a 95% CI of 0.44-3.35, again a negative study.

More recently, Leon (2019) published the results of a cohort study in European and American farmers that found that the hazard ratio for NHL was 0.95 (95% CI: 0.77-1.18) and for FL was 0.79 (95% CI 0.52-1.21); since the CIs included a risk of 1.00, the risk numbers were statistically non-significant. This means there was no increase in risk for either NHL as a whole or FL specifically. The main problem

with this study is that it captured glyphosate exposure based on the crops that the European farmers grew, rather than their actual exposures via a questionnaire. Most of the data (83.8%) in this study was from EU farmers. In other words, the EU farmer was assigned glyphosate exposure or no exposure based not on a questionnaire but purely on the type of product that s/he grew. This potentially led to a significant issue with misassignment of exposure or non-exposure. Nevertheless, this study showed no association between glyphosate and NHL/FL.

Pahwa in 2019 also examined the risk of NHL/FL in a case-control study with cases derived from cancer registries in four US states and six Canadian provinces. The analysis, after controlling for other pesticide exposures and other risk factors for NHL and FL, reported a relative risk of 1.08 (95% CI: 0.66-1.77) and 0.75 (95% CI 0.31-1.80) for the highest exposed group for NHL and for FL, respectively; because the 95% confidence interval included 1.0 for both analyses, there was no NHL or FL association seen with glyphosate. The p value to look for a dose-response relationship between levels of glyphosate exposure and the incidence of NHL and FL was also negative at p=0.9 and p=0.4 for NHL and FL respectively, indicating no dose-response relationship for either NHL or FL. Based on these case-control study data, there is no reliable or consistent association seen between glyphosate and NHL/FL, a conclusion that is in line with the AHS study.

Additionally, a meta-analysis by Boffetta and colleagues published in 2021 combined data from Hardell 2002, Eriksson 2008, Orsi 2009, Cocco 2013, Leon 2019, and Pahwa 2019 to ascertain whether there was any collective effect of glyphosate on the incidence of NHL. This analysis found a relative risk of 1.05 with a 95% CI of 0.90-1.24, also negative for an association between glyphosate use and NHL in general.

There are two recent papers that explore glyphosate or glyphosate-containing herbicide formulations in laboratory animal model systems. Tizhe and colleagues (2023) published a study of the change in levels of several immune system-relevant biological molecules after exposure to glyphosate or glyphosate-based herbicides (GBH) with or without pre-treatment with zinc. The authors report that exposure to GBH resulted in immunotoxicity in the rats as manifested by decreased IgG and IgM levels, increased TNF-alpha, and decreased lymphocytes in immune organ tissues. These effects were mitigated by zinc supplementation prior to GBH exposure. However, there are several critical issues that make the interpretation of this study challenging. First, studies evaluating the immune system using animal models may not correlate with human immune system effects of the test article, in this case glyphosate.

A dramatic example of this concept in the drug development sphere was the experience in the United Kingdom of a Phase I (first-in-human) dose escalation study of TeGenero's anti-CD28 antibody proposed for the treatment of autoimmune disorders (Attarwala 2010). In primates, the antibody was well-tolerated, and dose finding in primates served to inform the Phase 1 study. The drug was administered to healthy human volunteers at a dose of 1/500[th] of the safe primate dose but within a few minutes after first dose, 6 subjects became critically ill with what was later recognized to be a cytokine storm, where sudden intense immune activation leads to the rapid production of various immunologic cytokines. Multiple volunteers required management in the intensive care unit. As a result of this catastrophic event, the company was ultimately dissolved. In this dramatic example, animal studies did not accurately predict the behavior of the molecule in the human system. This is the rule rather than the exception. As stated previously, animal studies may generate hypotheses that can be tested but should never be the bases for conclusions with regard to human effects.

Other important limitations of the Tizhe study are that no other immune levels except TNF-alpha were measured and found to be abnormal. Interestingly, the levels of IL-1-beta actually decreased rather than increased. There are many relevant molecules in the immune system, so it is disappointing and not helpful that only two molecules of this extremely complicated system were assessed (e.g., IL-4, IL-2, MIP1-alpha, etc.). Regarding the test doses, as with other animal models of glyphosate, the dose of glyphosate was so high that the rats lost weight in the 16-week study, indicating that they were experiencing toxicity from doses that are not at all representative of occupational or incidental exposures. The authors note that IgG levels were suppressed by GBH but notably, the effect on IgG was more markedly suppressed with the zinc control. All in all, the findings in this study are difficult to interpret and have no meaningful significance to humans.

The other recent paper that utilized an animal model was that by Zancanaro et al. (2022). In this study, the test subjects were Swiss mice exposed to glyphosate for only 5 days. They then measured the impact of this brief exposure to several oncogenes (bax, bcl2, and p53) and also looked at organ-specific antioxidant levels in liver, lung, and kidney. The issues with the model system (in this case mice) are similar to those of the rats in the Tizhe work. Critically, it is not clear that markedly different mouse antioxidant pathways correlate to human pathways. In any case, the investigators found that there is no clear and consistent change in the total antioxidant levels among the test groups and no clear dose effect was observed. Likewise, for p53, there is also no clear dose effect and inconsistent effects on bax, bcl2, and p53. In fact, it is not clear what the variation in these protein levels actually represents in terms of effect on the B lymphocytes in humans; so as with the Tizhe paper, the relevance of this work to human NHL development is lacking.

Another recent paper by Chang and colleagues (2023) reported the results of their study of a subset of participants in the Agricultural Health Study (AHS) examining glyphosate urinary levels and oxidative stress markers (8OHdG, 8-isoprostane, and MDA). One key problem with this study is that there was no evident control of exposure to other agents that may coincide with glyphosate exposure but which were not measured. It is stated in the paper that those who were recent or high lifetime users of glyphosate also were noted to have recent exposures to 2,4-D (87%, versus the farming controls with 22% with recent 2,4-D exposure), another pesticide that may have contributed to oxidative stress molecule formation. No other agents were measured or queried; thus it is possible that the findings of oxidative stress levels may be due to other compounds the subjects were exposed to, but there is not adequate information in the paper to sort that issue out. Given these limitations, I believe it is difficult to draw conclusions from this work. Most importantly, the AHS itself has shown no increased risk of malignancies from glyphosate exposure, so the relevance of oxidative stress measurements given the strong epidemiologic data showing no increased risk of cancer, is lacking. With a wealth of human data, there is no need to look at surrogate markers of cancer that do not correlate with outcome data.

Benbrook, et al. also recently published an opinion review piece in 2023 that summarizes the genotoxicity data on multiple studies of glyphosate performed since 2016. Regarding the title "Genotoxicity Assays Published since 2016 Shed New Light on the Oncogenic Potential of Glyphosate-Based Herbicides", I am at a loss to understand how "genotoxic assays since 2016" shed new light on oncogenic potential when the human epidemiologic data do not support an association between glyphosate and NHL. The "oncogenic potential" is irrelevant when there is no evidence of glyphosate causing NHL. In other words, the meaning of "oncogenic potential" falls flat when the human studies do not find any evidence of association; that is, whatever "potential" that may be identified appears not to have amounted to any relevant human effect.

I am also concerned with the obvious conflict that the authors have with regard to their significant involvement in the glyphosate litigation. The bias of Benbrook and colleagues is evident even within the introduction of the paper wherein they state that "A growing body of evidence points to GBH exposure-driven adverse impacts on human reproduction [22–29] and upon the incidence of certain cancers, especially non- Hodgkin lymphoma [30–43]." Papers cited to justify that statement in fact do not support that assertion. For example, Andreotti (2018) is included as supportive, but in point of fact, Andreotti and colleagues state in their conclusion that "In this large, prospective cohort study, no association was apparent between glyphosate and any solid tumors or lymphoid malignancies overall, including NHL and its subtypes." Likewise, though including Chang (2016) among the citations purported to support an association, Chang states at the conclusion of the abstract for the paper that "Thus, a causal relationship has not been established between glyphosate exposure and risk of any type of LHC [lymphohematopoietic cancer]." Likewise, the 2005 paper by De Roos and colleagues, also cited by Benbrook as supportive of a glyphosate-NHL association states in the discussion section of the paper that "There were rather few cases of NHL for inclusion in this analysis (=92); nevertheless, the available data provided evidence of no association between glyphosate exposure and NHL incidence". Leon (2019) also stated regarding glyphosate that "We did not observe an association between risk of NHL overall and ever use of glyphosate, a broad spectrum herbicide used in agriculture and other settings." It is unclear why Benbrook included these references as supportive when, in fact, the authors themselves state the opposite.

**CLINICAL HISTORY AND OPINIONS RE KAREN DELORME-BARTON**

The Plaintiff is a 70 year-old woman (date of birth 5/5/1952) with a past medical history of chronic disabling low back pain and sciatica, hypertension, hyperlipidemia, and endometrial carcinoma for which she underwent a hysterectomy and oophorectomy in 2006. She remains well from the standpoint of endometrial carcinoma following her definitive surgical resection. She apparently has no family history of hematologic cancer, including no family history of lymphoma.

In early 2016, the Plaintiff developed acute pain radiating down the left leg which was felt to represent a recurrence of her sciatica-like syndrome.  She was treated with prednisone which afforded her some relief, but the pain recurred and she underwent a radiographic evaluation with an MRI to further assess her pain. That scan revealed the presence of significant lymphadenopathy for which she underwent a follow-up CT scan confirming the presence of lymphadenopathy in the chest and abdomen. She then had a left axillary lymph node biopsy that diagnosed Grade 1 follicular lymphoma (FL), a low grade lymphoma. The patient refused a bone marrow biopsy for staging, so it was uncertain whether bone marrow disease was present; but disease was present in the psoas muscle, an extranodel site. Following the diagnosis and because her pain was felt to be due to the newly diagnosed follicular lymphoma, treatment with bendamustine/rituximab (B/R) was initiated. Unfortunately, she developed a Grade 3 skin reaction after each of the two cycles of B/R. A PET/CT scan performed after the second cycle of B/R showed an excellent partial response. The treatment regimen was switched to cyclophosphamide, vincristine, prednisone, and rituximab (R-CVP), and four cycles were administered. Following completion of a total of six cycles of treatment (2 cycles of B/R and 4 of R-CVP), a repeat PET/CT showed a near complete response and a follow-up PET/CT subsequently confirmed a complete response. The Plaintiff has been observed since that time and has remained well with no clinical evidence of recurrence as of January of 2023.

Exhibit C Page 15

The Plaintiff's presentation, evaluation, treatment, and response to treatment were all typical for FL. The decision to initiate therapy for FL is usually based on the whether or not there is an FL reason for pain or organ dysfunction. In the Plaintiff's case, the decision to initiate therapy was based on the presence of pain felt to be due to the lymphoma, a decision that seems appropriate given the clinical situation.

FL is the second most common type of NHL and occurs more frequently in older adults. At the time of diagnosis, Ms. Delorme-Barton was 63 years of age. This age is near the peak incidence of FL and was her most significant risk factor for FL. As discussed in this report, the scientific data, both from the prospective AHS study and from numerous case-control studies, does not find any association between NHL generally or FL specifically and glyphosate exposure. So I do not consider any glyphosate exposure to have been a FL risk factor for Ms. Delorme-Barton. There is mention in the medical record that she was employed for a time in an industrial setting, but no further details were evident to clarify whether or not she was exposed to chemicals of any kind. There is also mention in the record of an exposure to a carpet cleaning chemical and subsequent mild pneumonitis.

With respect to the risk of FL with increasing age, the figure below from Cerhan (2020) shows the incidence rates by age group for FL derived from the U.S. SEER program from 18 cancer registries (SEER18) in the United States with data from 2000 to 2016. This graph demonstrates the dramatically increased incidence of FL with increasing age. Note that the scale is logarithmic for the y-axis, representative of incidence. This means that the incidence is even more profound with increasing age than would be seen with a linear scale. For example, the incidence of FL is about 10-fold higher for age 60-64 than 30-34.



Exhibit C Page 16

The reason that age is so important as a risk factor for FL relates to the fact that with increasing age, there is a progressive opportunity for a higher number of DNA repair errors that are not appropriately corrected and accumulate over time, as discussed by Tomasetti and colleagues (2017). This is the case for most cancers including NHL/FL. In clinical practice, the vast majority of NHL/FL cases have no identifiable cause other than advancing age, which correlates with the accumulation of random DNA replication errors over time. Such is the case for Ms. Delorme-Barton. Fortunately, FL is a low grade/indolent form of NHL and Ms. Delorme-Barton had a complete response to treatment. Records indicate that she was symptom-free as of January 2023 and her long-term prognosis is appears to be favorable based on her excellent response to treatment.

**CONCLUSIONS**

In sum, based on my education, training, clinical experience, scientific research experience, and review and evaluation of the published medical and scientific literature, it is my opinion to a reasonable degree of medical and scientific certainty that glyphosate is not a human carcinogen and does not increase the risk of or cause or substantially contribute to causing NHL, including FL. Accordingly, with regard to Ms. Delorme-Barton's exposure to glyphosate, it my opinion to a reasonable degree of medical and scientific certainty that such exposure did not increase her risk of FL and did not cause or substantially contribute to causing her FL. Further, it is my opinion that Ms. Delorme-Barton's FL was most likely caused by the accumulation of random and unrepaired genetic events over time, as is the case with most cancers.

These opinions are based on the information available to date; I reserve the right to supplement or add to my opinions based on any review of additional materials, deposition testimony, or documents with which I am provided. My hourly pretrial consulting rate is $550 per hour; my trial preparation rate is $675 per hour; and my testimony (deposition or trial) is billed at a flat rate of $4,500 per day. I have testified in one deposition in the past four years (Bruce Pied v. Monsanto, et al., Third Circuit, State of Hawaii, 19-1-834K, June 29, 2022).

Date: March 28, 2023

*[signature]*
Willis Navarro, M.D.