Robin Greenwald (*Pro Hac Vice*)
**WEITZ & LUXENBERG, P.C.**
700 Broadway
New York, NY 10003
Telephone: (212) 558-5500
Facsimile: (212) 344-5461
rgreenwald@weitzlux.com

*Attorney for Plaintiff*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741<br><br>Case No. 3:16-md-02741-VC |
| This document relates to:<br><br>*Karen Delorme-Barton v. Monsanto,*<br>3:18-cv-01427-VC | **PLAINTIFF'S *DAUBERT* MOTION TO PRECLUDE THE OPINIONS AND TESTIMONY OF DEFENDANT MONSANTO'S PROPOSED EXPERT DR. GRAHAM SLACK, M.D.**<br><br>Hearing:<br>Date:  July 27, 2023<br>Time: 10:00a.m. PDT<br>Place: Courtroom 4, 450 Golden Gate Ave.<br>         San Francisco, CA 94102 |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that, on July 27, 2023, at 10:00a.m., in Courtroom 4 of the United States District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, or as ordered by the court, before District Judge Vince Chhabria, Plaintiff will and hereby moves to Preclude the Opinions and Testimony of Monsanto Company's Proposed Expert Dr. Graham Slack, M.D.

This motion to exclude the testimony of Dr. Graham Slack is based on this supporting memorandum, all pleadings and papers on file in this matter, and such further oral and documentary evidence and papers as the Court may consider at the time of the hearing.

Dated: June 30, 2023                              Respectfully submitted,

                               By:     */s/ Robin L. Greenwald*
                                       Robin L. Greenwald (*Pro Hac Vice*)
                                       **WEITZ & LUXENBERG, P.C.**
                                       700 Broadway, Fifth Floor
                                       New York, NY 10003
                                       Telephone: 212-558-5802
                                       Facsimile: (212) 344-5461
                                       rgreenwald@weitzlux.com

PLAINTIFF'S DAUBERT MOTION TO PRECLUDE THE OPINIONS AND TESTIMONY OF DEFENDANT
MONSANTO COMPANY'S PROPOSED EXPERT DR. GRAHAM SLACK, M.D.

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................- 1 -

LEGAL STANDARD.....................................................................................................- 2 -

ARGUMENT .................................................................................................................- 3 -

   I.   Dr. Slack's Opinions Are Improperly Predicated Upon Scientifically and Methodologically Unsound Theories.........................................................................- 3 -

   II.  The Tomasetti Articles Relied Upon by Dr. Slack for His Specific Causation Opinion are Population-Based Statistical Studies that Cannot Be Relied Upon to Prove Specific Causation as to Ms. Delorme-Barton...............................................................- 7 -

   III.   Dr. Slack is Not Qualified to Opine that "Bad Luck" or Random Genetic Mutations are the Sole Cause of Plaintiff's Follicular Lymphoma. ..........................................- 10 -

   IV.   Dr. Slack Should Be Precluded From Discussing "Risk Factors" for Ms. Delorme-Barton's NHL.......................................................................................................- 11 -

   V.  Dr. Slack Must Be Precluded from Testifying that Glyphosate Use and NHL Incident Rates Are Not Correlated.....................................................................................- 12 -

CONCLUSION............................................................................................................- 15 -

PLAINTIFF'S DAUBERT MOTION TO PRECLUDE THE OPINIONS AND TESTIMONY OF DEFENDANT
MONSANTO COMPANY'S PROPOSED EXPERT DR. GRAHAM SLACK, M.D.

# TABLE OF AUTHORITIES

**Cases**

*Building Industry Association of Washington v. Washington State Building Code Council*,

    683 F.3d 1144, 1154 (9th Cir. 2012) ...................................................................................... 2 -

*Carnegie Mellon Univ. v. Hoffmann-LaRoche, Inc.*,

    55 F. Supp. 2d 1024, 1040 (N.D. Cal. 1999) ......................................................................... 15

*Chapman v. Monsanto Co.*,

    No. 20-01277 (N.D. Cal. Jan. 21, 2022) ................................................................................. 1

*City of Pomona v. SQM North America Corp.*,

    750 F.3d 1036, 1043 (9th Cir. 2014) ............................................................................... 3, 12

*D.F. ex rel. Amador v. Sikorsky Aircraft Corp.*,

    No. 13-331, 2017 WL 4922814, at *14 (S.D. Cal. Oct. 30, 2017) ........................................ 2

*Daubert v. Merrell Dow Pharmaceuticals, Inc. (Daubert II)*,

    43 F.3d 1311, 1321 n.17 (9th Cir. 1995) ....................................................................... 3, 4, 15

*Dep't of Toxic Substances Control v. Technichem, Inc.*,

    No. 12-05845, 2016 WL 1029463, at *1 (N.D. Cal. Mar. 15, 2016) ...................................... 3

*General Electric Co. v. Joiner*,

    522 U.S. at 146 ................................................................................................................ 4, 15

*Griswold, et al., v. Monsanto*,

    Case No. 1922-CC1126 (Cir. Ct. Cty St Louis). ..................................................................... 6

*In re Conagra Foods, Inc.*,

    302 F.R.D. 537, 556 (C.D. Cal. 2014) ................................................................................. 10

*In re Incretin-Based Therapies Prod. Liab. Litig.*,

    524 F. Supp. 3d 1007, 1049 (S.D. Cal. 2021) .................................................................. 4, 10

*In re Roundup Prod. Liab. Litig.*,

    390 F. Supp. 3d 1102, 1111 (N.D. Cal. 2018) .............................................................. 2, 3, 12

*Messick v. Novartis Pharmaceuticals Corp.*,

    747 F.3d 1193, 1196 (9th Cir. 2014) ...................................................................................... 3

*Metcalf v. Barretts Minerals, Inc., et al.*,

    Case No. 22STCV21416, Superior Court of the State of California for the County of Los

    Angeles ................................................................................................................................ 8

*Rink v. Cheminova, Inc.*,

    400 F.3d 1286, 1292 (11th Cir. 2005) .................................................................... 15

*Rodman v. Otsuka Am. Pharm., Inc.*,

    564 F. Supp. 3d 879, 888-991 (N.D. Cal. 2020) ........................................................ 15

*Rodriguez v. JLG Indus., Inc.*,

    No. 11-04586, 2012 WL 12882925, at *6 (C.D. Cal. Oct. 29, 2012) ........................................ 15

*Turck v. Baker Petrolite Corp.*,

    10 F. App'x 756, 766 (10th Cir. 2001) .................................................................... 15

*U.S. v. Mejia*,

    545 F.3d 179, 198 (2d Cir. 2008) ............................................................................ 3

**Rules**

Fed. R. Evid. 702 ............................................................................................................ 2

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Plaintiff Karen Delorme-Barton ("Plaintiff") respectfully moves for an Order precluding the testimony of Defendant Monsanto Company's proposed specific causation expert Graham Slack, M.D.[1] Regarding the medical cause of Plaintiff's non-Hodgkin lymphoma (NHL), Dr. Slack, a practicing oncologist, opines that "[i]n all likelihood her lymphoma was due to random chance" and "I could not identify any environmental factor in the medical records I reviewed that would have been likely to contribute to the development of her lymphoma." Greenwald Decl.[2], Ex. A, at 117:3-4, 15-18, Dr. Graham Slack Dep. Tr. (Apr. 25, 2023). His testimony is unreliable.

First, Dr. Slack relies on articles by mathematician, Dr. Christian Tomasetti, Ph.D. ("Tomasetti").[3] whose methodology is based on insufficient data, speculative, incapable of being tested, and generally not accepted. Greenwald Decl., Ex. A, 125:24-19, 167:11-17, 168:24-171:8. Monsanto Company ("Monsanto") cannot bootstrap unqualified specific causation opinions through the guise of a medical expert who cannot confirm Tomasetti's findings with medical evidence as it relates to this specific Plaintiff.

Second, the Tomasetti articles upon which Dr. Slack relies for his specific causation opinion are population-based statistical studies that cannot be used for specific causation.

---

[1] While this Court previously denied Plaintiff's motion to preclude the testimony of Dr. Slack, that motion was on different grounds that are not raised here. See Pretrial Order No. 271, *Chapman v. Monsanto Co.*, No. 20-01277 (N.D. Cal. Jan. 21, 2022), ECF No. 28.
[2] Refers to Declaration of Robin L. Greenwald in Support of Plaintiff's *Daubert* Motion To Preclude the Opinions and Testimony of Monsanto Company's Proposed Expert Dr. Slack, attached hereto.
[3] Greenwald Decl., Ex. B, Tomasetti C., *et al.,* (2017); Greenwald Decl., Ex. C; Tomasetti C., & Vogelstein B. (2015).

PLAINTIFF'S DAUBERT MOTION TO PRECLUDE THE OPINIONS AND TESTIMONY OF DEFENDANT MONSANTO COMPANY'S PROPOSED EXPERT DR. GRAHAM SLACK, M.D.

Third, Dr. Slack lacks the requisite specialized training, knowledge, skills, and/or experience to offer expert testimony that random genetic mutations caused Plaintiff's NHL.

Fourth, Dr. Slack should not be permitted to opine about Plaintiff's NHL risk factors because, although he mentions her age and race, he admits he does not consider them risk factors. His musings about other general risk factors for NHL are irrelevant and would not aid jury's understanding of the specific causation underlying Plaintiff's case.

Finally, Dr. Slack should be precluded from offering testimony comparing glyphosate use and NHL incidence rates because his analysis is unreliable, as those opinions require the assumption that two distinct, incongruent sets of data capture the same populations – assumptions that Dr. Slack could not and cannot support because they are demonstrably false.

## LEGAL STANDARD

"Experts may not automatically testify before a jury." *In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d 1102, 1111 (N.D. Cal. 2018) (Chhabria, J.). The district court acts as a "gatekeeper", and Defendant carries the burden of establishing the admissibility of its experts' testimony. *Id.* (citing *Building Industry Association of Washington v. Washington State Building Code Council*, 683 F.3d 1144, 1154 (9th Cir. 2012)).

Rule 702 provides that "the expert must have sufficient 'knowledge, skill, experience, training, or education' to offer the opinion." *In re Roundup*, 390 F. Supp. 3d at 1111 (citing Fed. R. Evid. 702). Likewise, the expert's testimony must be "'within the reasonable confines of his subject area[.]'" *Id.* at 1111-12 (quoting *D.F. ex rel. Amador v. Sikorsky Aircraft Corp.*, No. 13-331, 2017 WL 4922814, at *14 (S.D. Cal. Oct. 30, 2017)).

The Court must also determine the testimony to be both relevant and reliable for it to be admissible. *Id.* at 1112 (citing *City of Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1043

(9th Cir. 2014)). "'Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry,'" *id.* (citing *City of Pomona*, 750 F.3d at 1044), meaning that the "testimony must 'fit' the question the jury must answer." *Id.* (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc. (Daubert II)*, 43 F.3d 1311, 1321 n.17 (9th Cir. 1995)). "This bar is cleared where the evidence 'logically advances a material aspect of the proposing party's case.'" *Id.* (quoting *Messick v. Novartis Pharmaceuticals Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014)).

Expert testimony must have "'a reliable basis in the knowledge and experience of the relevant discipline.'" *Id.* (quoting *City of Pomona*, 750 F.3d at 1044). The Court should "'determin[e] whether the analysis undergirding the experts' testimony falls within the range of accepted standards governing how scientists conduct their research and reach their conclusions.'" *Id.* (quoting *Daubert II*, 43 F.3d at 1317). "Both unsound methods and unjustified extrapolations from existing data" can result in exclusion of an expert. *In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d 1102, 1112 (N.D. Cal. 2018). See also *Dep't of Toxic Substances Control v. Technichem, Inc.*, No. 12-05845, 2016 WL 1029463, at *1 (N.D. Cal. Mar. 15, 2016). Likewise, testimony is not reliable when the expert merely "'regurgitate[s] information" from source materials without further analysis. *Id.* (quoting *U.S. v. Mejia*, 545 F.3d 179, 198 (2d Cir. 2008)).

## <u>ARGUMENT</u>

### I.   Dr. Slack's Opinions Are Improperly Predicated Upon Scientifically and Methodologically Unsound Theories.

Dr. Slack relies on the studies of mathematician Dr. Tomasetti to conclude: "Like the vast majority of patients with lymphoma, Ms. Delorme-Barton's follicular lymphoma is most likely due to genetic alterations accumulated over a lifetime." Greenwald Decl., Ex. D, at 17, Expert Report of Dr. Graham Slack. He performs no analysis in rendering that opinion. Dr. Tomasetti is

a mathematician and economist. *See* Greenwald Decl., Ex. E, Tomasetti Curriculum Vitae at 2. He is not a medical doctor, pathologist, geneticist, epidemiologist, or toxicologist, s*ee* Greenwald Decl., Ex. F, at 6:22-7:5; 13:19-22, Dr. Cristian Tomasetti Dep. Tr. (Jan. 4, 2022), and admits that his "theory", standing alone, does not apply when determining an individual's specific causation.

The court should preclude expert testimony relying on Dr. Tomasetti's "bad luck" theory, as his methodology is unreliable, incapable of being tested, and premised on insufficient and unreliable data.[4] What is more, it is not capable of testing to determine *the cause of a particular person's cancer. In re Incretin-Based Therapies Prod. Liab. Litig.*, 524 F. Supp. 3d 1007, 1049 (S.D. Cal. 2021), *aff'd*, No. 21-55342, 2022 WL 898595 (9th Cir. Mar. 28, 2022)("'Trained experts commonly extrapolate from existing data. *Daubert* and the Federal Rules of Evidence prohibit the admission of opinion evidence that is connected to existing data only by the ipse dixit of the expert.'")(quoting *General Electric Co. v. Joiner*, 522 U.S. at 146). Unsurprisingly, Dr. Tomasetti's conclusion—that over 95% of mutations in NHL are random—is heavily criticized.

Plaintiff has located 54 published articles criticizing Dr. Tomasetti's "random bad luck" theory.[5] By way of example, several scientists in a 2019 article in the European Journal of Epidemiology, criticized Tomasetti's "bad luck" theory because "the claim that cancer is mostly explained by intrinsic random factors is unsupported by data and theoretical models." *See* Greenwald Decl., Ex. J, at 439, Perduca, V., *et al.*, *Stem Cell Replication, Somatic Mutations and*

---

[4] Plaintiff also moves to exclude the testimony of Dr. Tomasetti and incorporates by reference the arguments set forth in that motion.
[5] *See, e.g.*, Greenwald Decl., Ex. G, Plutynski, *Is cancer a matter of luck?*, Biology & Philosophy 36(1):1-28 (2021); Greenwald Decl., Ex. H, Sornette *et al.*, *Debunking mathematically the logical fallacy that cancer risk is just "bad luck,"* EPJ Nonlinear Biomedical Physics 3(10) (2015). Plaintiff cites here only to two of many examples of published articles that criticize Dr. Tomasetti's "bad luck" theory. A list of citations to articles criticizing his theory, is also attached hereto as Greenwald Decl., Ex. I.

*Role of Randomness in the Development of Cancer*, Eur. J. of Epidemiology (2019) 34:439-445. They conclude that ***"this is a purely statistical analysis,"* and cannot be used to assess attribution in an individual case: "nothing can be inferred about the probability for an individual to develop cancer in a given tissue given his/her LSCD [lifetime stem cell divisions]."** *Id.* at 440. Moreover, "it is not possible to give a straightforward interpretation of such a correlation [between cancer risk and lifetime stem cell divisions] in terms of fraction of risk attributable to some etiological factor." *Id.* at 441. The article further demonstrates that Dr. Tomasetti's theory finds little support in the data and is a far cry from general acceptance in the scientific community. And other scientists explain that "for [Tomasetti's] argument to hold, one must have reliable measurements of the number of stem cells in the tissue and their division rates and assume that cancers are unlikely to arise from mutations occurring in non-stem cells;" however, "these critical parameters and assumptions lack experimental substantiation." *See* Greenwald Decl., Ex. K, at 762, Rozhok, A, *et al.*, *A Critical Examination of the "Bad Luck" Explanation of Cancer Risk*, Cancer Prev. Res. (2015) 8(9): 762-764. "The reality is that we do not currently have a good understanding of SC [stem cell] numbers, their division frequencies for most human tissues, and the diversity of cell types or environmental perturbations that can initiate cancer and lead to progression." *Id.* Adding to that foundation of doubt, "[f]or multiple tissues, Tomasetti and Vogelstein use mouse data to derive human stem cell [] division rates, but these rates for human SC have not been verified experimentally and may be off by orders of magnitude." *Id.* The authors challenge the entire premise of Tomasetti's novel theory—that the incidence of cancer is linearly correlated with the number of stem cell mutations—by giving examples and showing that "cell divisions and mutation accumulation frequently do not correlate with cancer occurrence, arguing against a simple relationship between the two." *Id.* at 763.

In addition, the International Agency for Research on Cancer's 2020 World Cancer Report cautioned that "[t]he terminology 'sporadic cancers' reflects a currently dynamic but incomplete knowledge of the etiology and pathogenesis of a biologically and morphologically heterogeneous class of diseases," *see* Greenwald Decl., Ex. L, at 152, IARC World Cancer Report (2020), and summarizes the body of research contradicting Tomasetti's theory. *See id.* at 152 (citing papers showing that from 20% to 80% of cancers and cancer deaths result from avoidable environmental factors). The 2020 IARC report warned that the Tomasetti's "sporadic cancer" theory "does not adequately address the complexity of interactions already established in epidemiological and experimental studies that describe the burden of cancers that may be attributable to avoidable or remediable risk factors." *Id.* at 153.

Even Monsanto's own medical causation expert in another Roundup case, *Griswold, et al., v. Monsanto,* is critical of Dr. Tomasetti's "bad luck" theory. Case No. 1922-CC1126 (Cir. Ct. Cty St Louis). Dr. David Grinblatt, an oncologist/hematologist at Northshore University Health System in Chicago and clinical associate professor at the University of Chicago Pritzker School of Medicine, testified that Dr. Tomasetti's "bad luck" article is "not like the best paper on lymphagenesis" and/or specific to "lymphagenesis," including the development of NHL. Greenwald Decl., Ex. M, at 205:15-206:23, Dr. David Grinblatt Dep. Tr. (Nov. 15, 2022). He admitted that Dr. Tomasetti's "bad luck" theory is not related to the development of NHL. *Id.* at 48:20-23, 71:10-12, 225:13-16:

> Q:    It sounds like you don't believe random genetic mutations relate to non-Hodgkin's lymphoma at all, correct?
> A:    Correct.

*Id.* at 225:13-16. Dr. Grinblatt further explained:

> "The word 'gene mutation' is a very, you know—it's really, in lymphoma, there is a mutation, which is like a specific location on the DNA that's damaged, is different than a translocation where there is not a damage. So, gene mutation is very different than genetic alterations. There's genetic alterations and mutations. In lymphoma usually we're looking at alterations rather than mutations.

*Id.* at 125:3-12.

In Dr. Slack's opinion, Plaintiff had a chromosomal translocation t(14;18) that was a "necessary but not sufficient abnormality to develop what we call classic follicular lymphoma…" Greenwald Decl., Ex. A, at 123:7-17, 124:18-125:1. He does not know what caused that translocation:

> Q:     Do you have any evidence of what would have caused the translocation?
> A:     Do I have evidence of what would have caused that translocation in Ms. Delorme-Barton, no.

*Id.* at 125:2-5.

Because Dr. Tomasetti's "bad luck" theory is not methodologically sound, reliable, nor generally accepted, Dr. Slack's reliance on that theory for specific causation, without any medical causation nexus, should be excluded.

**II.     The Tomasetti Articles Relied Upon by Dr. Slack for His Specific Causation Opinion are Population-Based Statistical Studies that Cannot Be Relied Upon to Prove Specific Causation as to Ms. Delorme-Barton.**

Dr. Tomasetti's articles pertain to cancer generally; they do not relate to the specific cause of an individual's cancer.  Dr. Tomasetti admits that his 2015 and 2017 co-authored papers on the prevalence of sporadic mutations in the general population[6] (which were met with considerable criticism) are only applicable to population groups, not individuals. He stood by his statement that

---

[6] *See generally* Greenwald Decl., Exs. B & C.

PLAINTIFF'S DAUBERT MOTION TO PRECLUDE THE OPINIONS AND TESTIMONY OF DEFENDANT MONSANTO COMPANY'S PROPOSED EXPERT DR. GRAHAM SLACK, M.D.

he's "not aware of any way, as of today, not aware of any scientific way to attribute a specific mutation to a specific cause." Greenwald Decl., Ex. F, at 47:12-48:19.[7]

In *Metcalf v. Barretts Minerals, Inc., et al.*, Case No. 22STCV21416, Superior Court of the State of California for the County of Los Angeles, a cosmetic talc case involving a plaintiff with mesothelioma, the medical expert for the defense in that case, Dr. Brian Taylor, who was relying upon one of the Tomasetti articles, (Greenwald Decl., Ex. N, at 27:20-22. Dr. Brian Taylor Dep. Tr. (June 2, 2023), testified that both of Tomasetti's articles do not pertain to specific causation of "any" cancer:

> Q:    Right, because the Tomasetti articles, 2015 and the follow-up, they aren't articles that would pertain to specific causation, correct?
> A:    Well, I agree. They do not pertain to specific causation.
> Q:    As it relates to any cancer, right?
> A:    I would agree with that as well.
> Q:    Okay. Why? Why?
> A:    Because they don't provide the detail that is able to relate to specific causation. For example, any cancers have multiple potential environmental causes. They lump them all together in that as to whether mutations are potentially caused by environmental factors. So how could you apply that to specific causation for individual carcinogens in a type of cancer? That's not what the purpose of the article was.

*Id*. at 80:22-81:12.

Based upon the fact that Dr. Tomasetti only studied populations which did not consider glyphosate and/or glyphosate-based Roundup populations as a control group, and did not study individuals, and since Dr. Tomasetti admits that there is no "scientific way to attribute a specific mutation to a specific cause," it would be impermissible to allow Dr. Slack to rely upon Dr. Tomasetti's articles as his sole basis for his specific causation opinions related to Plaintiff's NHL.

---

[7] The only exception Dr. Tomasetti offered was "a BRCA mutation inherited from parents," Greenwald Decl., Ex. F, at 48:9-12, which is not relevant here.

Dr. Slack cannot, through any medical evidence, link Ms. Delorme-Barton's NHL to Tomasetti's "bad luck" theory. Specifically, Dr. Slack testified that he cannot point to any evidence in any of Ms. Delorme-Barton's medical records, other than the fact that she had a t(14;18) chromosomal translocation (which he does not know the cause of) that affirmatively supported his opinion that her NHL was specifically caused by "bad luck." Greenwald Decl., Ex. A, at 154:20-166:14. This specific translocation is characteristic of NHL and, thus, its finding is to be expected as it is present in 70-90% cases of Follicular lymphoma. Greenwald Decl., Exhibit O, at 2, Chiu, B.C., *et al.,* (2008) *The utility of t(14;18) in understanding risk factors for non-Hodgkin lymphoma*, J. Natl. Cancer Inst. Monogr., (39):69-73.  It is noteworthy that Dr. Slack highlighted Plaintiff's t(14; 18) translocation, as there is a body of evidence indicating that the "…presence of the t(14;18) is not sufficient for the development of NHL because it occurs in healthy individuals at a frequency of 10–50%" and findings "…suggest that pesticides contribute to the development of NHL through pathways involving the t(14;18)." *Id.* at 5. When asked whether there was anything in Plaintiff's diagnostic images (x-rays, CT scans, MRIs) that affirmatively prove that her NHL was caused by random replicative errors, he testified:

> Q:    What words actually affirmatively prove? I want you to give me a sentence, a line, any words that you believe affirmatively prove your opinion that Karen Delorme-Barton's follicular lymphoma was caused by random replicative errors. Go ahead.
>        …
> A:    There will be no words...

Greenwald Decl., Exhibit A, at 163:12-21. As it related to whether Ms. Delorme-Barton's medical records could affirmatively prove that "bad luck" caused her NHL, he testified: "I'm trying to prove a negative here so there's not going to be much to point to." *Id*. at 165:22-166:14.

Dr. Slack's opinions boil down to reliance on an inadmissible opinion by another Monsanto expert, Dr. Tomasetti. Furthermore, Dr. Slack has not, from a medical causation perspective,

independently analyzed the data from the Tomasetti articles: "A: I have not reviewed that raw data, no." *Id.* at 152:12-15. At its core, Dr. Slack's specific causation opinions are not his own. As stated above, Dr. Tomasetti's opinions are, inter alia, unreliable, speculative, and incapable of being tested. Those same grounds preclude Dr. Slack from relying on those opinions.

## III.   Dr. Slack is Not Qualified to Opine that "Bad Luck" or Random Genetic Mutations are the Sole Cause of Plaintiff's Follicular Lymphoma.

Dr. Slack also lacks the requisite specialized training, knowledge, and experience to offer expert testimony that random genetic mutations were the sole cause of Plaintiff's follicular lymphoma.  Greenwald Decl., Ex. D, at 17 ("Ms. Delorme-Barton's follicular lymphoma is most likely due to random genetic alterations accumulated over a lifetime."); Greenwald Decl., Ex. A, at 116:23-118:8 (testifying that Plaintiff's cancer is "mostly likely" caused by "bad luck," *i.e.*, "random genetic mutations" that occur "due to the natural processes of the human body"); *In re Incretin-Based Therapies Prod. Liab. Litig.*, 524 F. Supp. 3d 1007, 1043 (S.D. Cal. 2021), *aff'd*, No. 21-55342, 2022 WL 898595 (9th Cir. Mar. 28, 2022) ("Dr. Gale therefore cannot blindly rely on the statistician's reports in forming his medical causation opinion. Rather, prior to relying on other's opinions, he must have first 'conducted an independent evaluation of that evidence.'") (quoting *In re Conagra Foods, Inc.*, 302 F.R.D. 537, 556 (C.D. Cal. 2014))) (excluding testimony).

While Dr. Slack is a pathologist, he is not a geneticist, toxicologist, epidemiologist, or biostatistician. To the extent he reviews genetic sequencing, he does so only to *diagnose* patients with cancer, not to determine whether environmental – or other -- factors are capable of causing genetic mutations and cancer.  Greenwald Decl., Ex. A, at 78:2-14.  Dr. Slack has never looked at genetic sequencing for the purposes of determining whether there are specific genes associated with or related to a person who has had exposure to glyphosate-based herbicides. Greenwald Decl.,

Ex. A, at 78:15-79:12. Although he admits that he could, theoretically, perform a study examining whether there's any type of genetic signatures for those people, he has not done so. *Id.* at 79:13-20. Nor is he aware of any such studies in humans or animals. *Id.* at 79:20-80:16. Dr. Slack is not relying upon genetic sequencing in this case. *Id.* at 124:4-17 ("Q: Have you seen any genetic sequencing that has been done related to Karen Delorme-Barton?  A: I've not seen any sequencing data from her tumor."). Accordingly, even if this Court were to accept Dr. Tomasetti's "bad luck" theory (which it should not), Dr. Slack lacks the qualifications to conclude that Plaintiff's follicular lymphoma was caused by random genetic mutations.

## IV.    Dr. Slack Should Be Precluded From Discussing "Risk Factors" for Ms. Delorme-Barton's NHL.

Dr. Slack's testimony is that Ms. Delorme-Barton's follicular lymphoma was "most likely" caused by "random genetic mutations" that occur "due to the natural processes of the human body." Greenwald Decl., Ex. A, 116:23-118:8. Although Dr. Slack mentions Plaintiff's age and race as potential risk factors, he also admits that he cannot support those assertions.  It necessarily follows that his musings about other general risk factors for NHL are irrelevant and inadmissible.

In his expert report, Dr. Slack states that "Ms Delorme-Barton's age and race/ethnicity both increased her risk for developing follicular lymphoma." Greenwald Decl., Ex. D, at 17. But during his deposition, Dr. Slack acknowledged that this opinion is unsubstantiated:

> Q:    As it relates to non-Hodgkin's lymphoma and since you have in the opinion that her race/ethnicity increased her risk for developing follicular lymphoma, is there something about her race or ethnicity that makes her stem cell division rate different based upon other races and ethnicities?
> A:    I'm not aware of any data that connects race, follicular lymphoma and stem cell replication rate.
> Q:    If follicular lymphoma was caused by random replicative errors, do you have an explanation as to why we would see a difference based off of race and ethnicity in follicular lymphoma?
> A:    I cannot connect those two.

Q:      []  Do you have any opinion or explanation as to why race or ethnicity would increase her risk of developing follicular lymphoma?

A:      I don't think it's understood why race and/or ethnicity showed difference in lymphoma incidence.

Q:      So is that statement based off of any type of statistic study, any reliance material?

A:      Nothing I have available to me.

Greenwald Decl., Ex. A, 172:25-173:24. Dr. Slack's inability to support age and race as potential risk factors for Plaintiff's NHL requires exclusion of that testimony. *In re Roundup*, 390 F. Supp. 3d at 1112 (to be reliable, an expert's testimony must have "'a reliable basis in the knowledge and experience of the relevant discipline.'") (quoting *City of Pomona*, 750 F.3d at 1044).

Dr. Slack does not identify any potential environmental risk factors for Plaintiff's NHL; he testified that no other risk factors are applicable to her cancer. *See, e.g.*, Greenwald Decl., Ex. A, at 117:11-18 ("I could not identify any environmental factor in the medical records I reviewed that would have been likely to contribute to the development of her lymphoma" – because he does not believe Roundup causes NHL); *id.* at 117:19-118:4 ("I did not see any evidence that she had an inherited [genetic] defect."). Given Dr. Slack's admitted lack of understanding of race/ age as risk factors and his admission that she doesn't have other risk factors, he must be precluded from offering opinions as to potential risk factors which would confuse the issues, mislead the jury, and be unduly prejudicial.

## V.    Dr. Slack Must Be Precluded from Testifying that Glyphosate Use and NHL Incident Rates Are Not Correlated.

Dr. Slack must also be precluded from offering testimony comparing glyphosate usage and NHL incidence rate because his analysis (to the extent he claims to have done one) is unreliable. Dr. Slack purports to show that Roundup does not cause NHL by comparing glyphosate use in the United States to new cases of NHL in the U.S. for the period of 1974 through 2014:

> [Roundup] was introduced as a commercial product in 1974 (EPA 2017). In that year 635,000 kg of glyphosate was applied across the United States. Since then, it has seen a marked increase in usage, buoyed mainly by the introduction of genetically engineered glyphosate-tolerant crops in 1996.  It is now the most widely used herbicide in the U.S. with over 125,000,000 kg applied in 2014, a near 200-fold increase over a 40 year period (EPA 2017). As noted above, the association between farming and lymphoma risk was observed before the introduction of glyphosate (Cantor 1982, Cantor 1984, Shumacher 1985) and lymphoma incidence has been on the decline in the U.S. since 2008 while glyphosate usage has increased (EPA 2017, SEER 2019)[.]

Greenwald Decl., Ex. D, at 8-9. In essence, Dr. Slack attempts to argue that Roundup is not causative of NHL because, if it were, the rate of NHL would increase as the volume of glyphosate applied increased. That opinion is entirely speculative, unfounded, and methodologically unsound.

While Dr. Slack's argument could have surface appeal to a juror, it is presenting unknown data, pertaining to an unknown population, compiled in an unknown manner, applying unknown principles, to reach a hypothesis. Dr. Slack admitted that he does not know which states' populations are included in the glyphosate usage data, nor did he know what SEER NHL incidence rate data he relies upon. Greenwald Decl., Ex. A, 187:9-199:13, 211:8-212:1. When asked, "[i]s it your understanding that the SEER data is based off every state in the United States?," he conceded, "I believe it is a national database but participation varies across states." Greenwald Decl., Ex. A, at 193:10-14. Dr. Slack was likewise ignorant about the glyphosate usage data that he relied upon. Greenwald Decl., Ex. A, 181:22-182:7 ("Q: Do you know what the raw data is that supports the 200 increase over 40-year-period you cite in your report? A: Not right now, no. Q: Did you at any time understand as to how the increase in the usage of glyphosate that cite to here was calculated? A: Right now I don't recall how they would have calculate[d] it.");[8]

---

[8] Notably, when questioned by Plaintiff's counsel, Dr. Slack could not identify the source of the data he used for glyphosate usage. Greenwald Decl., Exhibit A, 190:3-22, 199:1-13.  He only recalled his data source – but still not the underlying raw data source – following an extended break, and during questioning by Monsanto's counsel.  *Id.* at 208:8-210:8.

PLAINTIFF'S DAUBERT MOTION TO PRECLUDE THE OPINIONS AND TESTIMONY OF DEFENDANT MONSANTO COMPANY'S PROPOSED EXPERT DR. GRAHAM SLACK, M.D.

Dr. Slack conceded that "it would be of interest to know" which populations were covered by both sets of data "[b]ecause you want to know if it was data *representative of the population in question.*"  Greenwald Decl., Ex. A, 192:21-194:22. He then proceeded to defend his reliance upon unknown data to prove a lack of correlation by arguing: "I would assume it's representative until proven otherwise" and "I'm making the assumption that the data is representative so I'm comparing apples to apples until proven otherwise."  Greenwald Decl., Ex. A, 194:23-198:12.

Dr. Slack's assumptions are demonstrably false and easily proven otherwise. The SEER data, readily available online, does not capture nationwide incidences of NHL because it does not include data from all states. In its early data collection years, very few states provided data to SEER and, as of 2023, that number increased to just over 20 states. *See* About the SEER Registries, National Cancer Institute, https://seer.cancer.gov/registries/. In other words, *less than half of the states* provide cancer data to SEER even today, s*ee* Greenwald Decl., Exhibit P, Map of States Contributing to SEER, National Cancer Institute. Among the states now reporting, seven of them did not report until 2018 – four years after the period depicted in Dr. Slack's report (which ends at 2014). And perhaps most critically, the states with the highest glyphosate usage nationwide do not participate in the SEER program.  Compare Greenwald Decl., Exhibit Q, Map of Estimated Agricultural Use for Glyphosate, 2014, U.S. Geological Survey[9], with Exhibit P, Map of States Contributing to SEER. Meanwhile, the data on glyphosate usage was collected from multiple sources that captured different time periods and were integrated together.

---

[9] *available at*
https://water.usgs.gov/nawqa/pnsp/usage/maps/show_map.php?year=2014&map=GLYPHOSATE&hilo=L&disp=Glyphosate

PLAINTIFF'S DAUBERT MOTION TO PRECLUDE THE OPINIONS AND TESTIMONY OF DEFENDANT MONSANTO COMPANY'S PROPOSED EXPERT DR. GRAHAM SLACK, M.D.

Courts exclude opinion evidence which is connected to existing data only by the ipse dixit of the expert; analytical gaps between the data and opinion proffered warrants exclusion of the expert's testimony. *Carnegie Mellon Univ. v. Hoffmann-LaRoche, Inc.*, 55 F. Supp. 2d 1024, 1040 (N.D. Cal. 1999)(quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 144 (1997)); *accord Rodriguez v. JLG Indus., Inc.*, No. 11-04586, 2012 WL 12882925, at *6 (C.D. Cal. Oct. 29, 2012) (to "satisfy Rule 702's reliability requirement . . . '[e]xpert opinions must be based on facts which enable [the expert] to express a reasonably accurate conclusion.'")(quoting *Turck v. Baker Petrolite Corp.*, 10 F. App'x 756, 766 (10th Cir. 2001)). Dr. Slack's unsupported assumption that the data sets from distinct and incomplete sources underpin his conclusions is not a reliable basis for an expert's opinions. It is this kind of scientifically unsupported assumptions that *Daubert* prohibits. *See, e.g.*, *Rodman v. Otsuka Am. Pharm., Inc.*, 564 F. Supp. 3d 879, 888-991 (N.D. Cal. 2020), *aff'd*, No. 20-16646, 2021 WL 5850914 (9th Cir. Dec. 9, 2021)(finding that expert's opinions were "not the product of reliable principles or methods" where expert compared data collected from various sources "[b]ecause Dr. Plunkett extrapolated conclusions beyond the scope of her sources"); *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005)(affirming exclusion of expert testimony because expert's method of transposing data from distinct sources was "based on such conjecture and rough approximation lacks the 'intellectual rigor' required by *Daubert*").

## <u>CONCLUSION</u>

For the reasons set forth above, the Court should grant Plaintiff's Motion and exclude the opinions of Dr. Slack.

Dated June 30, 2023                                     Respectfully submitted,

                                                       By:    */s/ Robin L. Greenwald*
                                                              Robin L. Greenwald
                                                              **WEITZ & LUXENBERG, P.C.**
                                                              700 Broadway, Fifth Floor
                                                              New York, NY 10003
                                                              Telephone: 212-558-5802
                                                              Facsimile: (212) 344-5461
                                                              rgreenwald@weitzlux.com

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 30th day of June 2023, a copy of the foregoing was

filed with the Clerk of the Court through CM/ ECF system which sent notice of the filing to all

appearing parties of record.

                                                       */s/ Robin Greenwald*

                                                       *Attorneys for Plaintiff*