# EXHIBIT A

Robert Tarone, Ph.D.

```
 1             IN THE UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                    CIVIL DIVISION

 4  ------------------------------X  MDL No. 2741

 5  IN RE:  ROUNDUP PRODUCTS          Case No.

 6  LIABILITY LITIGATION              16-md-02741-VC

 7  ------------------------------X

 8       IN THE CIRCUIT COURT OF ST. LOUIS COUNTY

 9                  STATE OF MISSOURI

10  ---------------------------

11  JAMES ADAMS JR, et al.,

12             Plaintiffs,

13  V.                      Case No. 17SL-CC02721

14  MONSANTO COMPANY,

15             Defendant.

16  ---------------------------

17     VIDEOTAPED DEPOSITION OF ROBERT TARONE, PHD

18

19              FRIDAY, MARCH 10, 2023

20                 9:24 a.m. EST

21

22  Stenographically Reported by:

23  Denise Dobner Vickery, CRR, RMR

24
```

Exhibit A Page 1

Robert Tarone, Ph.D.

1

2

3

4

5

6

7

8                           Friday, March 10, 2023

9                           9:24 a.m. EST

10

11           Deposition of ROBERT TARONE, PHD,

12   held at the offices of:

13

14           MOTLEY RICE LLC

15           401 9th Street NW

16           Suite 630

17           Washington, DC 20004

18

19

20           Pursuant to notice, before Denise

21   Dobner Vickery, Certified Realtime Reporter,

22   Registered Merit Reporter, and Notary Public in

23   and for the District of Columbia.

24

Robert Tarone, Ph.D.

1   APPEARANCES:

2

3   Representing the Plaintiff SHARLEAN GORDON:

4         WAGSTAFF LAW FIRM

5         BY:  AIMEE WAGSTAFF, ESQ.

6         940 N. Lincoln Street

7         Denver, CO 80203

8         303.376.6360

9         Awagstaff@wagstafflawfirm.com

10

11

12  Representing the Defendant MONSANTO COMPANY:

13        BARTLITBECK LLP

14        BY:  LINDLEY J. BRENZA, ESQ.

15        1801 Wewatta Street, Suite 1200

16        Denver, CO 80202

17        303.592.3130

18        lindley.brenza@bartlitbeck.com

19

20

21  ALSO PRESENT:

22        VINCE ROSICA, Videographer/Trial Tech

23        KEVIN ROWE, Paralegal, Wagstaff Law Firm

24

Exhibit A Page 3

Robert  Tarone,  Ph.D.

```
 1   APPEARANCES:  (Continued)

 2

 3   ALSO PRESENT VIA VIDEOCONFERENCE:

 4          TARA  KING,  Esq.,  Wagstaff  Law  Firm

 5          JEFF  SELDOMRIDGE,  ESQ.,  Miller  Firm  LLC

 6          CHELSEA  L.  MONROE,  ESQ.,  Motley  Rice  LLC

 7          LAURA  HOLCOMB,  Paralegal,  Motley  Rice  LLC

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Exhibit A Page 4

Robert Tarone, Ph.D.

```
1    We did work for governments, other than the United

2    States.  We did a wide variety of work, and they

3    were usually just to do specific studies.  And if

4    I was assigned to take part in a given study, I

5    did.

6         Q.     All right.  So since you can't

7    define consulting for me, let me ask another

8    question.

9               Would private companies hire IEI for

10   advice?

11        A.     Yes.

12        Q.     Okay.  Is that consulting?

13        A.     The company is consulting with the

14   company?  I would say that.  IEI was --

15        Q.     Okay.

16        A.     -- was hired as consult to consult

17   the company.

18        Q.     And as an employee, you were

19   receiving a salary, right?

20        A.     I was receiving a salary.

21        Q.     Okay.  And you were doing what they

22   told you, right?

23        A.     Yes.

24        Q.     Okay.  So you were consulting with
```

**Exhibit A Page 5**

Robert Tarone, Ph.D.

```
1    the private companies that hired IEI, right?

2                        MR. BRENZA:  Object to form.

3                        THE WITNESS:   Indirectly.  I

4         guess I would agree with that.  Yeah.

5    BY MS. WAGSTAFF:

6         Q.     Okay.  And if you sat in on meetings

7    with a company that hired IEI for consulting, you

8    were consulting with that company, right?

9         A.     Yeah.

10                       MR. BRENZA:  Object to form.

11        Vague.

12                       THE WITNESS:   I don't -- that

13        didn't happen very often because my role

14        was primarily, again, as a statistician.

15        So I was more involved in analysis and

16        just working within the company, not with

17        --

18   BY MS. WAGSTAFF:

19        Q.     And --

20        A.     -- not with people in other

21   companies.

22        Q.     And I understand it didn't happen

23   very often, but it happened, right?

24        A.     I assume it did.
```

Exhibit A Page 6

Robert Tarone, Ph.D.

```
1   didn't think I needed one.

2        Q.     And you've been -- you've been

3   speaking with Monsanto's lawyers since the last

4   deposition, right?

5                  MR. BRENZA:  Object to form.

6                  THE WITNESS:  Yes.

7   BY MS. WAGSTAFF:

8        Q.     Okay.  And after you got

9   subpoenaed -- and we'll go into more detail -- but

10  after you got he subpoenaed by my office to show

11  up today, you spoke to Monsanto's lawyers on

12  numerous occasions, right?

13       A.     Not numerous actually, but I

14  immediately texted Mr. Vales and told him that I

15  had received a subpoena.  He asked me to e-mail it

16  to him, which I did, and it was a few days and

17  then -- because I asked him.  I mean, I didn't

18  really understand -- I'm sure you will tell me --

19  why I should be forced to testify.

20       Q.     Yeah.

21       A.     But he said, you know, it's just the

22  way it was.  And I think the date was -- didn't

23  work.  The original date was the 2nd, which

24  apparently didn't work for -- for him or for
```

Exhibit A Page 7

Robert Tarone, Ph.D.

1                    You see that?

2         A.        Yes.

3         Q.        Okay.  And you didn't produce --

4    you -- you came to the office with -- you showed

5    up at the deposition this morning with about four

6    inches of documents in a couple of different

7    binders, which are being copied right now; is that

8    correct?

9         A.        Correct.

10        Q.        And those are how you -- those are

11   the documents that you believe were in response to

12   this?

13        A.        To the best possible, I mean.

14        Q.        Okay.

15        A.        Given --

16        Q.        So --

17        A.        Given that the deposition just said

18   "Roundup Products Liability Litigation," I wasn't

19   sure, and many of these don't apply to me.  They

20   talk about the last five years.

21        Q.        Okay.

22        A.        Depositions, money received, etc.

23        Q.        Okay.  So once we get those

24   documents back, because they are being copied, I'm

Exhibit A Page 8

Robert Tarone, Ph.D.

1    A.    Yep.

2    Q.    Okay.  And you produced that today

3  as part of your production.

4    A.    (Nods head).

5    Q.    All right.

6         MR. BRENZA:  I'd also let the

7      record reflect that there's a

8      bibliography attached to the CV.

9  BY MS. WAGSTAFF:

10   Q.    Okay.  So before we get into the

11 substance of your opinions, I want to talk about

12 how you became involved in this debate.

13         Fair?

14   A.    Fair.

15   Q.    Okay.  So you are not now nor have

16 you ever been a member of any IARC Working Group;

17 is that right?

18   A.    No.  My only association with IARC

19 is, I went there to IARC twice because I

20 coauthored their scientific monograph on how to

21 analyze rodent studies.

22   Q.    All right.  Move to strike as

23 nonresponsive.

24         You are not now currently or ever

Robert Tarone, Ph.D.

1  have been a member of any IARC Working Group, have

2  you?

3       A.    No.

4       Q.    Okay.  You are not -- so -- so you

5  have never been a member of any IARC Working Group

6  that ever analyzed glyphosate, right?

7       A.    No.  Anything.

8       Q.    You've never been an invited

9  specialist to IARC; is that right?

10      A.    No.

11      Q.    You've never been an observer at any

12  IARC meeting; is that right?

13      A.    No.

14      Q.    Is that right?

15      A.    That's correct.

16      Q.    Okay.  (Laugh).  Just -- I'm just

17  saying the record needs to reflect I asked you a

18  question and you said no, and I said is that

19  right.  You said no, but your answer was that's

20  right.

21      A.    (Laugh).

22      Q.    Well, reading -- reading the

23  transcript later.

24      A.    Got you.  I got you.  (Laugh).

Robert Tarone, Ph.D.

1    That's correct.

2          Q.      Okay.  So let me -- let me rephrase

3    the question then.

4          A.      No, that's correct.

5          Q.      Over the past 35 years, other than

6    the book chapter you wrote in 1986, you've had no

7    involvement in developing or implementing any of

8    IARC's policies or procedures, correct?

9          A.      That would be correct.

10         Q.      Okay.

11         A.      I've had a lot of interactions with

12   them discussing their policies and procedures, but

13   they're all in the open literature for all to

14   read.

15         Q.      All right.  And you would agree that

16   you were not present for any of the Working

17   Group's discussions about glyphosate?

18         A.      I was not.

19         Q.      You were not consulted by any member

20   of the Working Group while they were assessing

21   glyphosate?

22         A.      No, I was not.

23         Q.      And you did not personally

24   contribute any data, studies, or any information

Robert Tarone, Ph.D.

1  to Working Group 112 before they met in March

2  2015, correct?

3      A.      That is correct.  I was basically

4  ignorant of glyphosate scientific literature at

5  the time that meeting took place.

6      Q.      Okay.  And at the time of that

7  meeting, you didn't speak to anyone while they

8  were there, correct?

9      A.      No, I did not.

10      Q.      Okay.  And since that meeting, in

11  fact, you have not spoken to any of the voting

12  members, invited specialists, or observers that

13  were part of Monograph 112; is that correct?

14      A.      I think.  Yeah, that would be

15  correct.  There weren't many of them that I knew

16  but I -- and I haven't spoken to any of them.

17      Q.      And so it was not until September of

18  2015 when Monsanto attorneys reached out to your

19  company for advice that you first learned of

20  Monograph 112?

21      A.      Well, I knew about Monograph 112,

22  but these monographs come out on a regular basis,

23  and I don't read them all in-depth.  And I did

24  read the summary of the Monograph 112, but aside

Robert Tarone, Ph.D.

1    from that, no.

2         Q.    So let me -- let me rephrase it

3    because I don't think -- I'm asking "correct"

4    questions and you're answering with a yes or no.

5         A.    Okay.

6         Q.    So we're kind of using different

7    language.  (Laugh).

8         A.    I'll try to keep that in mind.

9         Q.    Or I'll try to keep that in mind

10   when I ask my questions that you like yes or no.

11        A.    No, that's all right.

12        Q.    It was not until September 2015 when

13   Monsanto lawyers came to your office and hired

14   your company for advice that you first reviewed

15   Monograph 112, right?

16        A.    Well, even at that time, I didn't

17   review it.  I reviewed it immediately after that

18   meeting.

19        Q.    Okay.

20        A.    And by -- how did you rephrase the

21   question again?

22              MS. WAGSTAFF:  Can you reread.

23              (The reporter read the record

24        on page 46 lines 12-15.)

Robert Tarone, Ph.D.

```
 1                    THE WITNESS:   I just want to
 2           clarify a little bit.  Because we were
 3           not hired for any period.  This was one
 4           -- it was one lawyer, by the way.  I
 5           believe his name was Mr. Lasker.
 6   BY MS. WAGSTAFF:
 7        Q.       Uh-huh.
 8        A.       And he called the company CEO and,
 9   again, as I said, we -- we -- meaning some people
10   in the company, including the CEO, the company
11   president, and other couple of other people around
12   the world -- had been in a pretty lengthy
13   published exchange with the IARC Working Group
14   about some of their policies and procedures.
15                 And so I assume that's why the
16   lawyer contacted the CEO, but he asked for a
17   meeting and we held a three-hour meeting.
18        Q.       Yeah and move to strike the
19   speculation of why Monsanto's lawyers called you.
20                 But my question is -- is different,
21   and I know that you want to answer that.
22                 But my question is:  Until
23   Monsanto's lawyers came to your office in
24   September of 2015 and paid your company money for
```

1   your advice as to Monograph 112, you had not

2   reviewed or analyzed Monograph 112?

3        A.     I had not.  And the advice was for

4   the IARC Monograph Program, their policies and

5   procedure, not Monograph 112.

6              And there was no discussion of

7   anything strictly related to glyphosate.

8   Glyphosate was obviously the reason he was there

9   because he was trying -- they were trying to

10  understand why only IARC in the entire world had

11  declared glyphosate to be carcinogenic.

12       Q.     Well, move to strike.  That's --

13  that's --

14             So -- so you're testifying here

15  today under oath --

16       A.     Yes.

17       Q.     -- that that meeting that you had

18  with Mr. Lasker in September of 2015 you did not

19  discuss IARC 112?

20       A.     Not the details of the glyphosate

21  chapter per se.  It was about the product.  I

22  mean, it was about -- they were trying to

23  understand what IARC does when they make a

24  decision about carcinogenicity of any compound.

Robert Tarone, Ph.D.

1      Q.     So --

2      A.     The discussion was about policies,

3  procedures, criteria that IARC used.

4             And glyphosate -- I mean, it was

5  clear to the CEO that glyphosate was a reason he

6  was there, but I don't remember discussing any

7  specific.  In fact, I was not familiar with any

8  specifics of the chapter on glyphosate in

9  Monograph 112.

10     Q.     So it was clear to you also that he

11  was there because of glyphosate, right?

12     A.     He was there trying to understand

13  how it was they came to their opinion.

14     Q.     And it was clear to you at the

15  meeting that he was there because of the

16  glyphosate opinion, right?

17     A.     Yes.

18     Q.     Okay.  And that's why after the

19  meeting, you went and reviewed Monograph 112,

20  right?

21     A.     That is correct.

22     Q.     You reviewed Monograph 112 because

23  Monsanto's lawyers came to your office where you

24  worked and paid your company money for your

Robert Tarone, Ph.D.

1      Q.      Okay.  And then you began -- you

2  testified earlier or last time that you began

3  e-mailing with Monsanto employee, David Saltmiras.

4              Do you remember that?

5      A.      I did.  Very -- that was very near

6  the time of that meeting, and it was after I read

7  the chapter.  And as I said, it became very clear

8  to me that there was some funny business going on

9  in how they were handling the rodent data.

10             And reading the Monograph, they

11  cited a review paper on which Mr. Salt -- was it

12  Saltmiras?  Is that how you pronounce it?  He was

13  the coauthor and -- and it said that this paper

14  had supplementary tables showing the tumor data,

15  which is exactly what I was looking for.

16             So I contacted Mr. -- Dr. Saltmiras

17  by mail, by e-mail.

18      Q.      All right.  I'm actually going to

19  stop you right here.

20             Because my question was:  Did you

21  e-mail with Dr. Saltmiras?

22      A.      I did.

23      Q.      I never asked you what you e-mailed

24  about.

Robert Tarone, Ph.D.

1   wanted to make sure before I summarized my views

2   on the paper, and he advised me that they were

3   probably the same.

4        Q.      All right.  And so he advised of a

5   toxicologist.

6                And the then next, in fact, you

7   testified that Dr. Saltmiras invited you to

8   Helsinki?

9        A.      (Nods head).

10       Q.      You should have taken him up on

11   that.

12       A.      No thanks.  I don't want to be paid

13   by anybody.

14       Q.      And he was inviting you on behalf of

15   Monsanto to defend glyphosate, right?

16       A.      Yeah.  There was some kind of a

17   European meeting in Helsinki.  They were holding

18   meetings all over the continent because they were

19   debating whether to re-licence glyphosate for use

20   in Europe.

21       Q.      Right.  And I think -- I think you

22   testified earlier that Dr. Saltmiras was extending

23   that invitation on behalf of Monsanto?

24       A.      That was my impression, yes.

Robert Tarone, Ph.D.

1      Q.      You don't know that, right?

2      A.      I don't know what?

3      Q.      I don't want you to assume anything

4   in your deposition today.

5              You just said --

6      A.      I mean, I know some weren't because

7   I had people come up to me after my talk who

8   wanted me to get involved with different

9   pesticides that had nothing to do with Monsanto,

10  and I told everybody no.

11     Q.      Okay.  So Monsanto's lawyers come

12  down to your office.  They pay your company money

13  for advice.  They come back down a few weeks

14  later.  One of their employees invites you to

15  Finland to defend glyphosate.

16             And then they next offer you to come

17  down to CropLife America, which is a trade

18  organization defending pesticide companies, right?

19     A.      Yes.

20     Q.      Okay.  So you don't have -- you

21  don't think at all that that chain of events leads

22  you to believe that -- that Dr. Saltmiras is

23  inviting you as a Monsanto employee?

24     A.      Oh, absolutely not.  I mean --

Robert Tarone, Ph.D.

1      Q.      All right.

2      A.      -- because he was part of this group

3   and was aware of my work.

4      Q.      Monsanto employee invites you to

5   speak and present, right?

6      A.      Yes.

7      Q.      At CropLife America.

8              And tell me what you understand

9   CropLife America to be.

10     A.      Well, I knew it was a lobbyist

11   group.

12     Q.      For who?

13     A.      For pesticide producers apparently

14   because that's what everybody talked about when

15   they came up after my talk.

16     Q.      What sort of things were they

17   saying?

18     A.      They wanted me to get involved with

19   their specific insecticide or herbicide.

20     Q.      All right.  And then you testified

21   before the House Senate Space and Technology

22   Committee to defend your papers; is that correct?

23     A.      Correct.

24     Q.      So is that fair to say you testified

Robert Tarone, Ph.D.

```
 1   BY MS. WAGSTAFF:

 2        Q.      All right.  And so your -- just to

 3   be clear, your -- what you're telling the world

 4   when you -- when you write this is that the

 5   purpose of your 2019 deposition was to defend your

 6   public -- published papers on the IARC glyphosate

 7   classification.

 8              So how did that dep -- that 2019

 9   deposition come about?  Did you call Monsanto and

10   say, hey, I need to defend my papers?

11        A.      No.

12        Q.      Okay.  So then did Monsanto call you

13   and say, hey, do you want me to depose you so you

14   can defend your papers?

15              Because you're not a party to this

16   litigation.  So if the purpose was to defend your

17   papers, how did that come about?

18        A.      Well, I'm sure it came about with a

19   discussion with Mr. Vales, but I don't remember

20   exactly.  It was -- it was just that I was curious

21   because my papers were not playing a role, didn't

22   seem to be playing a role in the litigation, and I

23   guess it was suggested to me that -- because I

24   would not and I did not want to be paid to be a
```

Robert Tarone, Ph.D.

1    witness.

2              So that was what was proposed is to

3    be deposed and then maybe, you know, the papers

4    can come into the -- into the court cases.

5        Q.    Okay.  So you just talked about

6    Mr. Vales.

7              Who is Mr. Vales?

8        A.    Mr. Vales was the lawyer who I first

9    met at the first deposition.

10       Q.    So you met him at the first

11   deposition?

12       A.    That's correct.

13       Q.    But you just said that you just --

14       A.    Yeah, I don't know.

15       Q.    You had testified earlier --

16       A.    I --

17       Q.    -- that you met with him?

18       A.    Yeah, I don't know.  I don't really

19   remember.  There must have been a phone call or

20   something before that.  I don't remember exactly.

21   I'm sure it was with him because there was no one

22   else that I communicated with.

23       Q.    All right.  So you testified in your

24   2019 transcript, which I can pull up -- I have

Robert Tarone, Ph.D.

```
 1   call him.

 2        A.      I wouldn't have known to call him.

 3        Q.      Okay.  And then you get deposed,

 4   right?

 5        A.      Correct.

 6        Q.      And so you are deposed by Monsanto.

 7                And that is to -- and in that

 8   deposition, it's Monsanto's lawyers asking you

 9   questions first?

10        A.      Correct.

11        Q.      And you guys walk through your

12   opinions.

13                And you believe the purpose of that

14   was so that your opinions could be used in court?

15        A.      Correct.

16        Q.      And you -- and you met with -- and

17   when you met with Mr. Vales before, do you think

18   that you talked about the scope of your deposition

19   and what he would ask you?

20        A.      I really can't remember that

21   meeting, but I imagine -- it was based on the

22   papers I published.  So I imagine there was some

23   discussion of those papers.

24        Q.      All right.  So you discussed the
```

Robert Tarone, Ph.D.

1  papers in your in-person meeting and you discussed

2  sort of the scope of your -- your deposition and

3  what he would ask you.  And then you are deposed

4  and then the world shuts down for a couple of

5  years.

6           And then you -- you showed us this

7  morning your text messages with Monsanto's lawyer,

8  and they began shortly after this deposition in

9  2020.

10          I looked at it real quickly, but I

11 believe the first text message that we were

12 produced was --

13          What was the date of the first text

14 message?

15          January 8, 2020.  And you said you

16 were texting with him as recently as this week,

17 which is 2023.

18          So you have been --

19    A.    When I received the subpoena.

20    Q.    When you received the subpoena.

21          So began text messaging Monsanto

22 lawyer.

23          And what other communications have

24 you had with Monsanto's lawyers since this last

Robert Tarone, Ph.D.

1   deposition?

2        A.      I have sent Mr. Vales copies of

3   anything that I published, and there have been

4   what, three or four since the deposition.

5        Q.      Okay.  So --

6        A.      It's basically been just keeping him

7   informed of my work.

8        Q.      Okay.  You produced this morning and

9   we'll go over in more detail later, but you

10  produced this morning some e-mail communication

11  you've had with Mr. Vales.

12       A.      Vales.

13       Q.      Vales.  Sorry.  I've never met him

14  in person or else.

15       A.      (Laugh).

16       Q.      It takes that for me to butcher

17  someone's name usually.

18               This is a document you produced this

19  morning.

20               I was impressed with the fact that

21  my law firm has seven lawyers and he has 12,000

22  lawyers.  That's a lot of lawyers.  He's got

23  20,000 people and 200 locations in his -- in his

24  -- in his law firm.

```
 1                      MS. WAGSTAFF:  If you want to
 2          pass them out, Kevin.
 3    BY MS. WAGSTAFF:
 4          Q.      This is something you sent to him.
 5    Your comments submitted to EFSA.
 6                  And EFSA stands for?
 7          A.      This one I think I know.
 8                  European Food Safety Association
 9    or -- yeah, probably that.
10          Q.      And what you're asking him is, "Why
11    is Bayer ignoring my papers?"
12          A.      Yeah, I was a little bit surprised
13    about that.
14          Q.      Did that bother you?
15          A.      Well, more than Bayer.  I mean, it
16    bothers me that other people have largely ignored
17    my papers.  But this EFSA and there was another
18    one, EcHA, was part of some European evaluation of
19    the science about glyphosate, and they had, you
20    know, places where you could submit comments.
21                  And the main reason I sent comments
22    was just to bring my papers to their attention.
23    So that's why and, you know, it did bother me.
24          Q.      Yeah, it bothers you because you
```

Robert Tarone, Ph.D.

1      Q.      All right.  So back to my chart.

2              So we just showed that you have

3    been -- oh, that's not right -- text messaging

4    Monsanto lawyers.

5              And you continued to e-mail and call

6    Monsanto lawyers from 2019 to 2023; is that fair?

7      A.      Yes.

8      Q.      Okay.  So then any other

9    communication that you can remember you had

10   between your last deposition and when you were

11   subpoenaed, which I think your subpoena was in

12   February last month?

13     A.      (Nods head).

14     Q.      Okay.  So you were -- so I -- my

15   client subpoenaed you, right?

16     A.      Yes.

17     Q.      So plaintiffs subpoenaed you.

18             All right.  And so what you

19   testified earlier that when you got subpoenaed,

20   first person you called was Monsanto; is that

21   right?

22             MR. BRENZA:  Object to form.

23   BY MS. WAGSTAFF:

24     Q.      You texted.

Robert Tarone, Ph.D.

1    communication you've had with plaintiffs' lawyers

2    next, okay, and we're going to see what sort of

3    independence you have, and we'll let the jury

4    decide.

5              But you provided a deposition to

6    defend your papers on glyphosate.

7         A.      (Nods head).

8         Q.      You could have said:  No, Monsanto,

9    I don't want to inject myself into the litigation.

10             But you chose to inject yourself

11   into the litigation, which is why you are sitting

12   here today.

13                  MR. BRENZA:  Argumentative.

14                  THE WITNESS:   I do realize

15         that now, but I did not -- I did not --

16                  MR. BRENZA:  There's no

17         question pending.

18                  THE WITNESS:   But I did not

19         realize that at the time of the first

20         deposition.

21   BY MS. WAGSTAFF:

22        Q.      Okay.  So after you were subpoenaed,

23   you texted Monsanto's lawyer, you called

24   Monsanto's lawyer, and you discussed the substance

Robert Tarone, Ph.D.

1   of the depo?

2          A.      Very briefly.

3                  MR. BRENZA:  And I'm just

4          going to put on the record.  I'm going to

5          move to strike counsel's colloquy.

6   BY MS. WAGSTAFF:

7          Q.      Okay.  And then what did you do?

8          A.      Basically went through my e-mails,

9   my folders.  I don't have a lot of e-mails left,

10  but I have folders, and tried to accumulate

11  everything that was responsive to the request for

12  documents.  And that's basically what I've been

13  doing since I got the deposition.

14         Q.      Okay.  And so how many times on the

15  phone do you think you talked to Mr. Vales?

16         A.      After I got the deposition?

17         Q.      Yes.

18         A.      Three.

19         Q.      Three times.  Okay.

20         A.      The third time was because he said

21  he was not going to be here.

22         Q.      Okay.  So that was recently?

23         A.      It was probably last week, I guess.

24  I don't know.  Yeah.

Robert Tarone, Ph.D.

1    there's a clear record.

2                    So your involvement with glyphosate

3    began in September of 2015 with an in-person

4    meeting with Monsanto lawyers?

5         A.     Correct.

6         Q.     Okay.  And that was a three-hour

7    in-person meeting in which Monsanto paid your

8    company money for opinions about the IARC process?

9         A.     Correct.

10        Q.     Which both you and your employer

11   knew related to the glyphosate 112 because they

12   were Monsanto lawyers, correct?

13        A.     Correct.

14        Q.     All right.  Then you had another

15   second in-person meeting a couple weeks later with

16   three Monsanto lawyers, correct?

17        A.     Correct.

18        Q.     All right.  And then you began an

19   e-mail --

20        A.     For which -- for which no pay was

21   received.

22        Q.     Okay.  And we can stipulate you have

23   not been paid since that.  Okay?

24                    Is that fair?

Robert Tarone, Ph.D.

1    Technology Committee in February of '18 to defend

2    your glyphosate opinions, right?

3         A.    Correct.

4         Q.    At some point shortly thereafter,

5    Mr. Vales gets a hold of you some way or another,

6    and you two start communicating.

7               And you guys decide collectively

8    that a deposition needs to happen to defend your

9    papers on your glyphosate opinions, correct?

10        A.    Correct.

11        Q.    And then you have an in-person with

12   Mr. Vales for a couple of hours where you discuss

13   the scope of your deposition and a couple of other

14   phone calls after, correct?

15        A.    Correct.

16        Q.    And then, finally, you're deposed by

17   Monsanto so that your opinions could be used in

18   court cases, correct?

19        A.    Correct.

20        Q.    All right.  And then you began text

21   messaging Monsanto lawyers shortly thereafter, and

22   they started in 2020 and they continued until last

23   week or until this week, which is 2023, right?

24        A.    Correct.

Robert Tarone, Ph.D.

1          Q.      All right.  And you continued to

2    e-mail and call Monsanto lawyers from 2019 to 2023

3    this entire time, correct?

4          A.      Correct.  One lawyer.

5          Q.      One lawyer.

6                  And we've gone through a couple of

7    those e-mails where you were annoyed that Monsanto

8    or that Bayer was not using your papers, right?

9          A.      Well, in this European opinion.

10         Q.      Right.  You were annoyed that Bayer

11   was not using your papers in a European opinion,

12   right?

13         A.      That's correct.

14         Q.      All right.  And then when plaintiffs

15   subpoenaed you -- my office specifically --

16   instead of calling me, you texted Monsanto

17   lawyers.  You called Monsanto lawyers, had three

18   phone calls with them.

19                 You discussed the substance of your

20   deposition, and a new introduction was made to you

21   of a new Monsanto's lawyer who would be here on

22   behalf of Monsanto; is that correct?

23         A.      That's correct.

24         Q.      All right.  Let's take a break and

Robert Tarone, Ph.D.

1        Q.        Your main criticism from what I can

2    tell of IARC 112 appears to relate to the animal

3    study analyses; is that right?

4        A.        Definitely.

5        Q.        Okay.

6        A.        I do have criticism of -- in the

7    first paper, I did express some concerns about the

8    epidemiology, and those are greater now than they

9    were then.

10        Q.        Okay.  I understand that.

11                  But your main concern seems to be

12    the animal study?

13        A.        Definitely.  It's definitely the

14    rodent study.

15        Q.        So who was the sub-chair of the

16    animal studies group of IARC 112?

17        A.        Oh, I don't know him, but it was I

18    think Matthew Ross?

19        Q.        Okay.  Matthew Ross was the head of

20    the mechanistic study.

21                  Would it surprise you that Bill

22    Jameson?

23        A.        Okay.  Jameson.  No.  I know the

24    names, but I don't know.  I don't know the man

Robert Tarone, Ph.D.

1    carcinogen, right?

2         A.      As stated in the abstract of my

3    paper.

4         Q.      Okay.  And we can agree that IARC

5    has four subcategories?

6         A.      (Nods head).

7         Q.      What are those four subcategories?

8         A.      The first is something to do with

9    dose exposure, the second is epidemiology, the

10   third is rodent studies, and the fourth is

11   mechanisms.

12        Q.      Okay.  And you don't have any

13   criticism of the exposure group or the mechanism

14   group?

15        A.      I rarely even read the exposure.

16   It's -- it's just trying to document what the

17   level of human exposure is.

18        Q.      Okay.  So you don't have any

19   criticism of the exposure subgroup?

20        A.      No.

21        Q.      And you don't have any criticism of

22   the mechanism subgroup?

23        A.      I think they overstated the

24   mechanisms, but I'm not a toxicologist.  So I'm

**Exhibit A Page 34**

Robert Tarone, Ph.D.

1   not an expert and that's why I've never put it in

2   my papers.

3        Q.      Okay.  So you're not offering any

4   criticisms of the mechanism subgroup?

5        A.      I'm not a toxicologist.  I think

6   people who say it's a strong mutagen I've done

7   work with people who do mutagenesis, and I've seen

8   no evidence that would support that.  But that's

9   just -- that's an opinion --

10       Q.      Okay.  So you're --

11       A.      -- by a non-toxicologist.

12       Q.      You're not offering an expert

13  opinion --

14       A.      No, I'm not.

15       Q.      -- on anything criticizing the

16  mechanism group?

17       A.      I'm not.

18       Q.      And the mechanism group, to be

19  clear, found that there was strong evidence,

20  right?

21       A.      Right.

22       Q.      Okay.  So -- so we don't have to

23  talk about that one because you're not offering

24  any opinions on that mechanism group.  All right.

Robert Tarone, Ph.D.

1   for epidemiology.

2          Q.      Okay.  So those are actually both in

3   the Preamble.

4                  So the Preamble and its updates are

5   actually very important to the deliberation

6   process?

7          A.      Yeah, and I accepted them, as I

8   said.

9          Q.      Okay.  But you don't keep up with

10  it.  You are an IARC --

11         A.      I've only --

12         Q.      -- scholar, but you don't keep up --

13         A.      I'm not an IARC --

14         Q.      -- with the definition.

15         A.      I'm not an IARC scholar.

16         Q.      You're not an IARC scholar.  Okay.

17         A.      Again, my work has focused on

18  glyphosate and on only Monograph 112.  So it's

19  only the Preamble as existed then, and I accepted

20  that.  I accepted their criteria, and I showed

21  that if you didn't exclude the studies, the tumor

22  rates they did, there's way no one can conclude

23  that it was a rodent carcinogen.

24         Q.      Okay.  So --

Robert Tarone, Ph.D.

1       A.      No -- no good scientist.

2       Q.      So you're not IARC expert?

3       A.      No, I'm not an IARC expert.

4       Q.      Okay.  And you've never really

5   analyzed any monograph but for 112?

6       A.      No, I've looked at other ones.  I

7   mean, I've read other ones when I'm interested in

8   a classification.

9       Q.      Okay.  And you're not an expert in

10  the IARC process?

11                  MR. BRENZA:  Calls for a legal

12          conclusion.

13                  THE WITNESS:  Well, I have

14          criticized the IARC.  So, I mean, I am

15          aware of certain things that I think are

16          wrong with it.

17                  As I said, starting in about

18          2008 and going up until, I guess, even

19          continuing, some of us have been

20          criticizing some of the things that the

21          Monographs Program does that we think are

22          not good for unbiased deliberations.

23                  These -- these discussions

24          started in NCI.  We published a

Robert Tarone, Ph.D.

1      Q.      And what did -- and it says:

2              "The Working Group then assesses

3      whether the particular mechanism is likely to be

4      operative in humans."

5              Do you see that?

6      A.      Yes, I do.

7      Q.      Okay.  Likely to be operative in

8      humans.

9              Okay.  What did Working Group 112

10     find?  What was their evaluation on the mechanism

11     group?

12     A.      I know it was stronger than I had

13     thought was.  I don't know the exact category.

14     Q.      Well, it's either weak, moderate, or

15     strong.

16     A.      Well, what was it?  You know.

17     Q.      You don't know?

18     A.      I don't pay attention that much to

19     mechanism, except that I think that they're

20     starting to put too much weight on mechanisms to

21     make up for weak animal and epidemiology data.

22     Q.      Okay.  So you don't know, as you sit

23     here today opining on Monograph 112, what --

24     A.      I'm opining on the animal studies.

Robert Tarone, Ph.D.

1      Q.      Specimens derived from humans?

2      A.      Yeah, probably drawing blood from

3   people who have been exposed.  Probably mainly

4   blood samples, but yeah.

5      Q.      Maybe cellular data also, or no?

6      A.      It could be biological specimens.

7   Maybe they take scrapes.  I don't know.

8      Q.      Okay.  Do you have any idea what

9   mechanism Monograph 112 found?

10     A.      I've heard members say that they

11  found strong evidence of genotoxicity, which,

12  again, as someone who knows a little bit about

13  genotoxicity, I find that an overstatement.

14     Q.      Okay.  Any other -- I'm sorry.

15     A.      Yeah.  I think they also mention

16  oxidative stress, which is sort of an indirect

17  mechanistic thing.

18     Q.      Okay.  And do -- does genotoxicity

19  occur in the human body?

20     A.      Oh, it definitely does.  Some things

21  are highly genotoxic.

22     Q.      Does oxidative stress happen in the

23  human body?

24     A.      It does.

Robert Tarone, Ph.D.

1        Q.      Okay.

2        A.      That's for them to answer, not me.

3        Q.      Okay.  So in your first deposition,

4    you stated that -- that you couldn't access them.

5    So you reached out to Dr. Saltmiras.

6        A.      That's -- well --

7        Q.      Okay.

8        A.      It's probably my mistake.  I had to

9    buy that.

10       Q.      Okay.  But you testified to that?

11       A.      Yeah.

12       Q.      And then within a day or two, you

13   were writing to Dr. Saltmiras of your opinion of

14   the -- of the supplemental tables.

15       A.      (Nods head).

16       Q.      You had, as you sit here today --

17       A.      And by the way, I did manage to get

18   them myself.

19       Q.      Okay.  As you sit here today in 2023

20   --

21       A.      Uh-huh.

22       Q.      -- you have no idea if IARC 112

23   animal group had access to the supplemental tables

24   and didn't use them, or if they had -- or if they

Robert Tarone, Ph.D.

1    did not have access to the supplemental tables.

2    You have no idea, right?

3         A.    No.

4         Q.    You have no idea?

5         A.    They should have had them, but, no,

6    I don't.  Maybe the IARC -- the IARC staff should

7    have provided them to the Working Group.  I do not

8    know.

9               I've never said, by the way, that

10   this was on purpose.  What I've said is that they

11   did exclude -- and there's no question about it --

12   from those supplementary tables, they excluded

13   entirely data that would have argued against

14   carcinogenicity.

15        Q.    I understand that's your opinion,

16   Doctor.  I'm asking a different question.

17        A.    It's not an opinion.  It's a fact.

18   My paper showed it.

19        Q.    It's -- it's not a fact.

20        A.    It is a fact.

21        Q.    But I understand that you are dug in

22   on that and that is fine.

23        A.    Well --

24        Q.    But I'm asking -- the question I'm

Robert Tarone, Ph.D.

1   master's degrees to people who came in.

2          Q.      Okay.  You just --

3          A.      Cancer prevention I think.

4          Q.      All right.  You just talked about

5   how you're mad that IARC is not -- is not

6   responding to you.

7                  Didn't we read an e-mail earlier

8   today about how Bayer wasn't responding to you?

9          A.      No, no.  I was just surprised that

10  they ignored the papers when they --

11         Q.      Okay.

12         A.      If, in fact, it's as I read it.

13         Q.      Right.  We --

14         A.      The document that was reviewed came

15  from material that was supplied by -- I forget the

16  word they use.  But it was a person who was

17  supplying.  It would have been Bayer in this case.

18  And my papers weren't cited.  That did surprise

19  me.

20         Q.      Right.  So Bayer is ignoring you, as

21  you put here.

22                 You're asking Mr. Vales --

23         A.      Yeah.

24         Q.      -- "Why is Bayer ignoring me?"

Robert Tarone, Ph.D.

1              Can you cite to me any reference at

2     all -- because I haven't seen it in any of your

3     papers -- that requires that even says it's a

4     scientifically sound method that if you look at

5     the male, you have to look at the female?

6         A.      Yeah.  I mean, that's just science.

7     I'm sorry.

8         Q.      Can you cite anything to me?

9         A.      No one should even need a citation

10    for that.

11        Q.      Well --

12        A.      That's -- that's basic science.

13        Q.      There's a lot of scientists that

14    don't agree with you.

15              So your --

16        A.      Oh, you mean you got a lot of

17    scientists that say if you have a carcinogen, that

18    it shouldn't affect both sexes?

19        Q.      People have said that.

20        A.      (Laugh).

21        Q.      So you have nothing to cite to me

22    that says that it is more of a carcinogen because

23    it affects both sexes.  You have nothing to cite

24    to me?

Robert Tarone, Ph.D.

1    Reuters acknowledges the author consulted

2    representing Monsanto and that payment was

3    received.

4              So they start off by saying, yeah,

5    we know about this because he acknowledges --

6    acknowledged it in his paper.  But then the

7    sentence you just read -- I'm sure it was

8    intentional.  That's what they want people to

9    think and people have thought this.

10             The way they wrote it, it looks like

11   he didn't -- he didn't report a conflict of

12   interest, which is totally untrue.  I mean, it's

13   just --

14        Q.    Okay.

15        A.    They're good at this.  They're very

16   good at this.

17        Q.    And then it says:

18             "IARC can re-evaluate substances

19   when a significant body of new scientific data is

20   published in the openly available scientific

21   literature."

22             You see that?

23        A.    I see that.

24        Q.    So IARC can reevaluate a substance,

Robert Tarone, Ph.D.

1    right?

2          A.      And by the way, they did -- what's

3    the date?  In 2000.  Every five years they have a

4    committee meet that sets the priorities for agents

5    to be considered --

6          Q.      Yeah.

7          A.      -- in the next five years.

8          Q.      We're going to get to that.

9          A.      Oh, but I'm just going to point out.

10   The last time they did it, which was 2019, they

11   also evaluated -- they had the committee evaluate

12   past -- it was from a number of years, but it

13   included glyphosate, and they included the list of

14   papers that they gave to the committee to -- to do

15   the evaluation.

16         Q.      Uh-huh.

17         A.      They didn't include my papers, but

18   they included the mutation research meta-analysis,

19   which was published much later, that showed the

20   result they wanted.  So.

21         Q.      It just seems like a lot of people

22   are ignoring you.

23         A.      It is true.

24         Q.      Yeah.

Robert Tarone, Ph.D.

1    A.      I mean, it is.

2    Q.      It must be frustrating.

3    A.      Yeah.  It's life.

4              MS. WAGSTAFF:  So this is

5    number 34, Lin.  34.

6              MR. BRENZA:  33.

7              MS. WAGSTAFF:  34.

8              THE WITNESS:   (Laugh).

9    Here's 33.

10             MS. WAGSTAFF:  33 is his

11   paper.

12             THE WITNESS:  Oh, no, that's

13   what he's got.

14             MS. WAGSTAFF:  33 is his paper

15   that he just handed me out of his stack.

16             MR. BRENZA:  Oh, okay.  I'm

17   off by one then.

18             THE WITNESS:  Do you have

19   that paper?

20             MS. WAGSTAFF:  Do you have a

21   staple?  Can you staple that?

22             MR. BRENZA:  I have one

23   somewhere but not --

24             MS. WAGSTAFF:  Just write on

Robert Tarone, Ph.D.

```
 1     Monograph's Program monograph.
 2          Q.   What's generally contained in the
 3     preamble?
 4          A.   It's just a description of the methods
 5     that IARC uses, criteria they use to come to
 6     various decisions about carcinogenicity of the
 7     compound that they're studying.
 8          Q.   Does it include standards and
 9     definitions that IARC then uses in its analysis?
10          A.   In making its inferences, yes.
11          Q.   One of the areas that we -- that you
12     addressed last time was the -- the standards for
13     evaluating carcinogenicity in experimental animals
14     on --
15          A.   Right.
16          Q.   -- Page 20.  Do you see that?
17          A.   Right.
18          Q.   And one of the questions that's
19     addressed by this is what constitutes sufficient
20     evidence of carcinogenicity.  Do you see that?
21          A.   Correct.
22          Q.   And it's -- reading from that tagline
23     it says, "The working group considers that a
24     causal relationship has been established between
25     the agent and an increased incidence of malignant
```

Robert Tarone, Ph.D.

1    neoplasms or of an appropriate combination of

2    benign and malignant neoplasms," and then it goes

3    on from there.  Do you see that?

4        A.    Right.

5        Q.    What's the significance of that?

6        A.    The significance of this is that if

7    you're going to come to a conclusion that there is

8    sufficient evidence of rodent carcinogenicity,

9    then it has to be based on the analysis of either

10   malignant neoplasms or a combination of, as I say

11   appropriate combination, of benign and malignant

12   neoplasms.

13       Q.    Does that have any -- does that play

14   any role in your concerns about what IARC did with

15   respect to glyphosate?

16       A.    It -- it does.  I mean, they weren't --

17   in the papers I published, so I was primarily

18   interested in just how I would analyze data.  So I

19   don't believe I made a big issue of this.  But

20   this does mean that if you do an analysis based

21   only on benign tumors, then you can't use that to

22   justify a conclusion that there's sufficient

23   evidence of carcinogenicity.

24              So, for example, in the mouse study,

25   the analyses based only on adenomas.  They can

Robert  Tarone,  Ph.D.

1    provide evidence -- maybe you can conclude that

2    there's limited evidence of carcinogenicity, but

3    they don't contribute it to deciding that there's

4    sufficient evidence.

5         Q.    And when you're talking about "the

6    mouse study," you're talking about the mouse study

7    that IARC relied on?

8         A.    The first CD mouse -- CD-1 mouse study,

9    right.  There were two.  They were the same design

10   and the same strain of mouse, but this is the

11   first one that they spent most of the time in

12   monograph describing.

13        Q.    And the problem there was that the

14   tumors were something called an adenoma?

15        A.    In the original pathology -- it's

16   peculiar.  I don't know that I've ever seen this

17   before, but they actually presented results for

18   the original pathology down at the lab that did

19   the study.  And then after a pathology review

20   group, they had slightly different numbers because

21   a pathologist reviewed the slides and --

22        Q.    Well, we'll get to that.

23        A.    Yeah.

24        Q.    Yeah.  We'll get to that.

25        A.    Yeah.  I mean, so there's two.  But the

Robert Tarone, Ph.D.

```
1    first study, the first -- the original pathology,

2    that was only adenomas.

3         Q.    Okay.

4         A.    And that -- that is statistically

5    significant even if you use the correct, Exact

6    P-value.  They report a P-value of .016 which is

7    too small, but even the Exact P-value is .039, so

8    that would be a significant -- definitely a

9    significant finding.

10         But since it's based only on benign

11   tumors, that would really be of no value in coming

12   to the conclusion that they did come to.

13        Q.    All right.  I'm going to -- I want to

14   direct you to another part of the preamble the

15   part that deals with the criteria to be

16   classified -- for a compound to be classified as

17   Group 2A it appears on Page 22 --

18        A.    Okay.

19        Q.    -- of the preamble.

20         I want to -- what I want to do is go

21   through a demonstrative that Plaintiffs' counsel

22   created with you last time and just make some

23   corrections if you would.  So I'm going to hand

24   this to you.  It's been previously marked as

25   Exhibit 13.
```

Robert Tarone, Ph.D.

```
 1    right?

 2         A.   Yes, as far as I know.

 3         Q.   Okay.  So if you turn to the preamble,

 4    which I don't know if you marked it as an exhibit

 5    or if we just talked about it.

 6              MR. BRENZA:  We marked it as 32.

 7              MS. WAGSTAFF:  That was from the last

 8         deposition, so --

 9              THE WITNESS:  All right.  I've got it.

10              MS. WAGSTAFF:  Okay.

11              Because you started at 40 today.  I

12         think you said what number was it, and then

13         you...

14              MR. BRENZA:  Okay.

15              MS. WAGSTAFF:  Yeah, I used it last

16         Friday and marked it as 32.

17              MR. BRENZA:  Okay.

18    BY MS. WAGSTAFF:

19         Q.   If you turn to the -- if you turn to

20    Page 20 of the monograph --

21         A.   Yes.

22         Q.   -- okay, where we're talking about

23    sufficient evidence of carcinogenicity?

24         A.   Correct.

25         Q.   Mr. Brenza was asking you today about
```

Robert Tarone, Ph.D.

```
1    that first sentence.

2         A.    Correct.

3         Q.    Specifically with an increased

4    incidence of malignant neoplasms or of an

5    appropriate combination of benign and malignant

6    neoplasms.

7         A.    Correct.

8         Q.    Do you see that?

9         A.    Yes.

10        Q.    And I believe that you said that you

11   had not written on that before.  You did not

12   include that -- that criticism in your papers.

13        A.    No.  My -- my papers were based solely

14   on the way that the working group deliberated, not

15   what they based their conclusion on.

16        Q.    Okay.  So any criticism you have of

17   that now of -- of -- related to that sentence that

18   you said earlier is -- was not in your published

19   papers and it's a new opinion that you've

20   generated for this deposition.

21        A.    Well, it points out a fact that you

22   have to make an analysis based on -- it's not an

23   opinion.  It's right here in black and white.  If

24   you're going to make a conclusion of sufficient

25   evidence, you have to base it on an analysis that
```

Robert Tarone, Ph.D.

```
 1      includes malignant tumors.

 2           Q.    But it -- but it --

 3           A.    And it's clear.

 4           Q.    Well, it says or --

 5           A.    It's not an opinion.

 6           Q.    -- an appropriate combination.

 7           A.    But that's malignant tumors as well.

 8                 THE COURT REPORTER:  Excuse me.  Excuse

 9      me.  I didn't get your question.

10           A.    There have to be malignant tumors

11      include --

12                 THE COURT REPORTER:  Excuse me.  I

13      didn't get your question.

14                 MS. WAGSTAFF:  I'll start over.

15           Q.    You did not include this as a criticism

16      in either of your published papers, right?

17           A.    No, I did not.

18           Q.    Okay.  If you pull your papers, which I

19      believe are 46 and 47...

20           A.    Okay.

21           Q.    Okay.  So one of the things that you

22      spoke -- a criticism you spoke about with respect

23      to the animal data in Monograph 112 is that you

24      stated if you combine the kidney data -- one of

25      the specific criticisms was that if you combine
```