# EXHIBIT C

CONFIDENTIAL

Page 1

```
 1        SUPERIOR COURT OF THE STATE OF CALIFORNIA
                 COUNTY OF CONTRA COSTA
 2      KATHLEEN CABALLERO,                *
                                           *
 3           Plaintiff,                    *
                                           *
 4       vs.                               * CASE NO.:
                                           * MSC 19-01821
 5      MONSANTO COMPANY, et al.,          *
                                           *
 6           Defendants.                   *
                         - - - - - - - - -
 7        SUPERIOR COURT OF THE STATE OF CALIFORNIA
                 COUNTY OF RIVERSIDE
 8      TRESSA COTTON,                      *
                                           *
 9           Plaintiff,                    *
                                           *
10       vs.                               *  CASE NO.
                                           *  RJI1903180
11      MONSANTO COMPANY, FOSTER-          *
        GARDNER, INC. AND DOES 1-50,       *
12                                         *
             Defendants.                   *
13                         - - - - - - - - -
14                  **CONFIDENTIAL**
15            Deposition of ROBERT TARONE, Ph.D.,
16      taken with simultaneous videotape recording on
17      Tuesday, December 17, 2019, beginning at 10:03
18      a.m., at the offices of Veritext Legal Solutions,
19      2301 Research Boulevard, Suite 200, Rockville,
20      Maryland, before Ilana E. Johnston, Notary Public.
21      Reported by:  Ilana E. Johnston
```

CONFIDENTIAL

Page 2

1       APPEARANCES:

2

3       On behalf of Plaintiff Kathleen Caballero (via

4       telephone):

5                    STEVEN J. BRADY, ESQUIRE

6                    Brady Law Group

7                    1015 Irwin Street

8                    San Rafael, California 94901

9                    415-459-7300 (voice)

10                   415-459-7303 (fax)

11                   steve@bradylawgroup.com

12                        and

13                   CURTIS HOKE, ESQUIRE

14                   The Miller Firm, LLC

15                   The Sherman Building

16                   108 Railroad Avenue

17                   Orange, Virginia 22960

18                   540-672-4224 (voice)

19                   540-672-3055 (fax)

20                   choke@millerfirmllc.com

21

CONFIDENTIAL

Page 3

```
 1        APPEARANCES:
 2        On behalf of Plaintiff Treesa Cotton (via
 3        telephone):
 4                    JENNIE LEE ANDERSON, ESQUIRE
 5                    Andrus Anderson, LLP
 6                    155 Montgomery Street, Suite 900
 7                    San Francisco, California 94104
 8                    415-986-1400 (voice)
 9                    415-986-1474 (fax)
10                    jennie@andrusanderson.com
11        On behalf of Defendants Monsanto Company,
12        Wilbur-Ellis Co., LLC and Wilbur-Ellis Feed, LLC:
13                    JOHN R. VALES, ESQUIRE
14                    STEPHEN M. TURNER, ESQUIRE
15                    Dentons US, LLP
16                    101 JFK Parkway
17                    Short Hills, New Jersey 07078-2708
18                    973-912-7100 (voice)
19                    973-912-7199 (fax)
20                    john.vales@dentons.com
21                    stephen.turner@dentons.com
```

CONFIDENTIAL

Page 4

1        APPEARANCES:  (Continued)

2

3        On behalf of Defendants Monsanto Company,

4        Wilbur-Ellis Co., LLC and Wilbur-Ellis Feed, LLC:

5                     ERIC G. LASKER, ESQUIRE

6                     Hollingsworth, LLP

7                     1350 I Street, N.W.

8                     Washington, DC 20005

9                     202-898-5843 (voice)

10                    202-682-1639 (fax)

11                    elasker@hollingsworthllp.com

12                         and (via telephone)

13                    JAIME R. SIMON, ESQUIRE

14                    Winston & Strawn, LLP

15                    35 West Wacker Drive

16                    Chicago, Illinois 60601-9703

17                    312-558-5600 (voice)

18                    312-558-5700 (fax)

19                    jrsimon@winston.com

20      ALSO PRESENT:

21                    Gene Aronov, Videographer

Page 32

1        it's -- it was not exactly a world champion, but it

2        was asymptotic properties of maximum likelihood

3        estimators and some results in nonlinear

4        regression.

5                Q.    That's identified in your CV too.

6                A.    That's identified on the CV.

7                Q.    Okay.  So I think you mentioned that you

8        went to work for the National Cancer Institute

9        after you earned your Ph.D.

10               A.    That's right, almost immediately after.

11               Q.    Okay.

12               A.    Started in July of 1974.

13               Q.    What did that work entail, sir?

14               A.    Well, I was assigned to the mathematical

15       statistics and applied mathematics section.  And

16       we -- our job was twofold.  One was to do

17       mathematical research, develop statistical methods

18       that were useful in cancer research.  But equally

19       important we were to consult with researchers all

20       around, in any laboratory, whatever setting.

21       Anybody at the Cancer Institute that needed help

CONFIDENTIAL

1    with statistics we were there to help them out.

2         Q.   And National Cancer Institute, is that a

3    governmental organization?

4         A.   Right.  It's part of the National

5    Institutes of Health.

6         Q.   Okay.  And where is it located?

7         A.   Bethesda, Maryland.

8         Q.   Okay.  And over what time period did you

9    remain employed with the National Cancer Institute?

10        A.   Until 2002.

11        Q.   Okay.  And did your position change at

12   all from the time you started in 1974 until 2002?

13        A.   Well, the first two years I was not in a

14   permanent position.  It was like a postdoc

15   position.  So then when I got out on the GS,

16   that's, you know, the lowest level, and then I

17   worked my way up, and eventually the last eight

18   years I was the -- I was a section head.

19        Q.   A section head of what?

20        A.   At that -- the name had changed.  It was

21   now the statistical research and application

CONFIDENTIAL

Page 35

1            And we would meet twice a week, sit

2       around a table.  Everybody who might remotely have

3       some contribution, there were toxicologists,

4       veterinarians, exposure experts, and we would go

5       through the numerous tables that were generated,

6       data tables, generated by each study.  And we would

7       come to a consensus as to whether or not the

8       chemical caused cancer or not, and we'd write the

9       technical reports.

10           Q.   Okay.  And were those technical reports

11      then published?

12           A.   They were, they were published.  I mean,

13      they're available as government documents with blue

14      cardboard covers.  I mean, I think you can probably

15      find some still at -- in certain libraries that --

16      if such libraries exist.  I know the library at NIH

17      is basically all computer now.  But no, they were,

18      they were documents that were published.

19           Q.   In the course of that work did you

20      become familiar with analyzing and assessing animal

21      studies?

1          A.    Oh, absolutely.  I mean, it was hands-on

2     looking at, as I said, there's numerous tables for

3     every study, looking at, you know, the amount of

4     food consumed by each animal, weight gain, survival

5     and the pathology.  When they died, every organ was

6     looked at to see if there was evidence of cancer.

7     So I got a lot of hands-on experience.

8               I also at this time was, during the

9     whole period, writing statistical papers,

10    developing methods for analyzing rodent carcinogen

11    assays.  And, in fact, because of my experience and

12    my papers, the International Agency for Research on

13    Cancer asked me to co-author their text on how to

14    analyze animal carcinogen bioassays.  So I'm a

15    co-author.

16              I should point out that there's -- IARC

17    is a -- is part of the World Health Organization.

18    And their goal -- their purpose is to promote and

19    conduct research into the causes of cancer.  They

20    have several programs.  The one of greatest

21    interest to glyphosate is the IARC Monographs

1      Program that publishes monographs reporting on how

2      they classify different agents as to their

3      carcinogenic potential.

4              But they also have a separate scientific

5      monograph series.  And I co-authored Volume 79 in

6      that scientific monograph series on how to analyze

7      rodent carcinogenicity assays.  So I know how to

8      analyze them, and I have extensive experience

9      actually doing it.

10             Q.   If you look at your bibliography,

11     Exhibit T-6 --

12             A.   Uh-huh.

13             Q.   -- do you see in there the publication

14     that you authored for IARC?

15             A.   I'll find it.  It was in 1986.  Yes,

16     it's reference No. 74 in my bibliography.  John

17     Gart was the first author, Statistical Methods in

18     Cancer Research, Volume III, The Design and

19     Analysis of Long-term Animal Experiments.

20             Q.   Okay.  And do you know how it was that

21     IARC came to select you for that role?

CONFIDENTIAL

Page 48

1    every paper because they were the principal

2    investigators.  They were the NCI people sort of in

3    charge of the study.

4            Q.   Dr. Blair was a principal investigator

5    of the Agricultural Health Study?

6            A.   Yes, yes, he was.

7            Q.   Okay.  And likewise, Alavanja as well?

8            A.   Michael Alavanja, yes.

9            Q.   Okay.  Okay.  So certainly they would

10    be, they would be aware of the results of the

11    Agricultural Health Study?

12            A.   Yes, as much as anybody.

13            Q.   Okay.  What caused you to leave the NCI?

14            A.    It just felt like it was time.  I was

15    growing a little bit unhappy with the work ethic of

16    a lot of the people at NIH.  People tend to get,

17    you know, sort of lazy if they don't have to do

18    work.  So I just thought it was time.  Plus I

19    wanted to see what it was like to work in a small,

20    small business.

21            Q.   So where did you go?

CONFIDENTIAL

Page 49

1              A.    I went to a company called the

2       International Epidemiology Institute, which was

3       founded by Bill Blot, who is the CEO, and he was my

4       branch chief and my supervisor before he left to

5       start this company, and Joe McLaughlin, who was an

6       epidemiologist, very well-known around the world.

7       And Bill, Bill Blot is a statistician, but he's as

8       much an epidemiologist as he is a statistician.  So

9       they founded the company, and they asked me if I

10      would be interested in coming to work for them, and

11      I said yeah, let's give it a shot.

12             Q.    And over what time period did you work

13      with the IEI?

14             A.    From 2002 to June 30th of 2016.

15             Q.    Okay.  And could you describe the work

16      that you performed with International Epidemiology

17      Institute?

18             A.    Right.  My, my title was Biostatistics

19      Director, and I was involved in almost, or I can't

20      say almost every, but many of the large projects

21      that they worked on.  The largest project and by

CONFIDENTIAL

Page 53

1    related to -- it was related to IARC, and I'm sure

2    that it was because we had had this debate for

3    years with IARC, and the concern of the lawyer who

4    represented Monsanto was, you know, how is it

5    possible that when every other agency around the

6    world has evaluated glyphosate, has concluded that

7    it's not a carcinogen, how is it possible that IARC

8    would come to a different conclusion.

9            So the discussion was about aspects of

10   the IARC Monograph Program that might explain this.

11   One, for example, is their evaluation of hazard

12   rather than risk, at least at that time.  I believe

13   they have changed it now, so the title of their

14   monographs now says risk instead of hazard.

15           It was -- the discussion was entirely

16   about procedures at IARC, how they chose members

17   for the working groups that evaluated these, what

18   were their criteria for membership, what were their

19   criteria for determining whether an agent is a

20   carcinogen.

21       Q.   Okay.  Did you -- was there any

CONFIDENTIAL

Page 54

1    compensation provided for that meeting?

2         A.   The company I worked for, IEI, was paid

3    $750 for my -- it was a three-hour meeting roughly,

4    and they were paid $750.

5         Q.   Did you personally receive any

6    compensation for that meeting?

7         A.   No.  As I said, I was on salary, and by

8    that time I wasn't receiving a bonus at the end of

9    the year.  So I received no compensation at all

10   from the meeting.

11        Q.   To your knowledge, was there any other

12   compensation provided beyond that $750?

13        A.   Bill Blot, the CEO, participated in the

14   same meeting, so he also received $750, which went

15   to IEI.

16        Q.   Okay.  So total payments to IEI were?

17        A.   $1,500.

18        Q.   Okay.  Okay.  Do you know whether IEI

19   ever was paid additional amounts from Monsanto?

20        A.   No.  I asked our, I asked our

21   administrator about both Bayer and Monsanto.  I was

CONFIDENTIAL

Page 57

1    The time is 11:10 a.m.

2          Q.   Dr. Tarone, before the break you

3    described a meeting that you attended for which the

4    Institute of Epidemiology received a payment of

5    $1,500.  Do you recall that meeting?

6          A.   That's correct.

7          Q.   In that meeting you met for about three

8    hours with the lawyer or lawyers from Monsanto?

9          A.   A lawyer, yeah.

10         Q.   Okay.  You said you did not receive any

11   compensation personally for that meeting.

12         A.   No.

13         Q.   And you have not received any

14   compensation since that meeting.

15         A.   No.

16         Q.   Okay.  Did you ever meet subsequently

17   with any Monsanto lawyers after that meeting?

18         A.   Yeah.  There was about a two-hour

19   meeting a few weeks later in our office, the same

20   lawyer and two younger lawyers, and it was

21   basically a statistics seminar.  And I did not

CONFIDENTIAL

1      invoice for it.  It was just -- I mean, I love

2      teaching statistics.  For me it was a pleasure to

3      talk about various aspects of statistical analysis,

4      particularly as they applied to the glyphosate

5      study, things like exact tests versus continuous

6      tests, one-sided p-values versus two-sided

7      p-values, multiple comparisons and the problems of

8      handling the fact that in these animal studies for

9      males and females each 20 different organs are

10     looked at and you're bound to have a few false

11     positives pop up from time to time.  The difficult

12     thing is to determine what's a likely false

13     positive and what may be a true effect of the

14     chemical agent.

15             Q.   Is that a common issue that you see in

16     animal studies --

17             A.   Yes.

18             Q.   -- are false positives?

19             A.   Yeah.  And not just animal studies.

20     It's also common in epidemiology, some of the

21     agricultural health studies where you're looking at

**Exhibit C Page 15**

CONFIDENTIAL

Page 60

1     interpret it, you can argue forever about the

2     strength of the evidence, the p-value and whatnot.

3     The way to solve it, the way to answer it is to

4     have a replicant study and see if this marginal

5     result replicates or if it goes away.  And more

6     often than not it goes away.

7          Q.   What happens if it goes away?  Then what

8     do you conclude?

9          A.   Then you conclude that the original

10    result was probably a false positive.  John

11    Ioannidis at Stanford published a famous paper back

12    in 2005 on why most published research findings are

13    false.  That was the title of the paper.

14              And, in fact, that's true.  Most

15    published research findings are false.  Most of the

16    headlines you see in the paper are, in fact, false.

17    And it's very difficult sometimes to tease out true

18    positives from false positives.

19         Q.   Okay.  Did you ever have any

20    communications with anyone employed by Monsanto

21    separate and apart from the meetings you just

CONFIDENTIAL

Page 61

1      described?

2           A.   Yes.  I had contact with a scientist.

3      I'm not sure exactly what type of scientist he was.

4      His name is David Saltmiras, I believe is how you

5      pronounce it.  When I read the IARC glyphosate

6      chapter and discovered what I saw were serious

7      problems, I noticed that they -- IARC cited in the

8      reference list a paper by Greim, G-r-e-i-m, and two

9      co-authors.  Saltmiras was one of the co-authors.

10               And it said it was a review study of all

11     the rodent studies on glyphosate.  And since I

12     wanted to see what the tumor rates were for

13     these -- there were several that were excluded from

14     the glyphosate monograph.  And so I bought this

15     paper from Critical Reviews in Toxicology where it

16     was published.

17               And reading it I saw that there were

18     supplemental tables that contained the tumor rates,

19     the summary tumor rates for all of the studies they

20     looked at.  And this, of course, is exactly what I

21     wanted.  A lot of the tables that were in the paper

Page 62

1    did not contain the information I was looking for,

2    but the supplementary material I wanted.

3            So I tried to download it from the site,

4    the journal site, where I had bought the paper, and

5    I was unsuccessful.  So I sent an e-mail to

6    Saltmiras.  Since he's a co-author I figured he

7    could just send me a PDF of the tables, the

8    supplementary material.  And before he could reply,

9    I figured out how to download them from the journal

10   site.

11       Q.   You figured out how to download the

12   supplementary tables?

13       A.   The supplementary tables, right.

14       Q.   So did you end up communicating with

15   Mr. Saltmiras?

16       A.   I did because as I was reviewing these

17   tumor tables from the two mouse studies, I noticed

18   that for one of the tumors of interest, which was

19   hemangiosarcomas, that the other study, the other

20   mouse study reported hemangiomas and

21   hemangioendotheliomas as opposed to hemangiomas and

**Exhibit C Page 18**

CONFIDENTIAL

Page 75

1          Q.   Sir, I've handed you what's been marked

2      as Exhibit T-11, a copy of the preamble from the

3      IARC Monographs Program.  It's also been previously

4      marked in the case as Exhibit 15-8 during the

5      deposition of Dr. Christopher Portier of

6      September 5th, 2017.  Does this, sir, look to be

7      the preamble to you?

8          A.   Yes, it does.

9          Q.   Did you have any involvement yourself in

10     the preparation of the preamble?

11         A.   No, aside from co-authoring that

12     scientific monograph No. 79, which involved two

13     trips to Lyon to meet with the other co-authors,

14     one at the beginning and one at the ending, I've

15     had no experience with IARC whatsoever.

16         Q.   Okay.  You've described a process

17     whereby IARC considers animal studies and also

18     human studies and then identifies whether or not

19     those studies provide sufficient evidence or

20     limited evidence of carcinogenicity --

21         A.   Right.

CONFIDENTIAL

Page 91

1              So when I saw that they had converted

2       p-values greater than .06 to p-values less than.04,

3       if nothing else, it's an indication that, you know,

4       they were really working really hard to try to

5       provide evidence that glyphosate caused these

6       tumors.  And it turns out this program I used to

7       calculate the exact p-values also calculates

8       approximate p-values based on the standard normal

9       distribution, which is a nice bell-shaped curve

10      that everybody is used to seeing.

11              Well, the exact distribution for these

12      trend tests, because of the very high doses at the

13      highest exposure level, are far from nice and

14      symmetric, and it's guaranteed that if you

15      calculate the continuous approximation you're going

16      to get a smaller p-value when you have a tumor

17      increase.

18              So it suggests to me that there were

19      people on the working group that were concerned

20      about concluding that glyphosate caused these

21      tumors if they couldn't get the p-values less than

CONFIDENTIAL

Page 93

1    reported both.  And, in fact, there were no kidney

2    tumors in female mice.  They were fed the same

3    extremely high dose levels of glyphosate, and none

4    of them developed kidney tumors.

5         Q.   So you're saying that the Greim

6    supplement tables reported results for both male

7    and female mice.

8         A.   Yeah.  These technical reports that the

9    original laboratories produce have multiple tables

10   because every organ is looked at when an animal

11   dies and is sectioned and looked at by pathologists

12   for signs of cancer.  So there are multiple.  But

13   it's always the same in males and females except

14   for things likes breast and prostate, of course.

15   But for the major organs they're looked at in both

16   males and females.

17        Q.   Okay.  And these tables, do you know

18   whether or not these supplemental tables were

19   available to IARC?  Can you tell that?

20        A.   They apparently were because the IARC

21   monograph cites the Greim paper as a reference and

Page 94

1    discusses it in a section on reviews immediately

2    after they discussed the two mouse studies that

3    they relied on.

4         Q.   So are you referring to page 34?

5         A.   34, Review articles, yes.  They cite

6    Greim, et al. right off the top, and moreover --

7         Q.   So it says, and I'm referring here to

8    page 3 point -- pardon me, page 34, section 3.13,

9    Review articles, you're referring, sir, to the

10   beginning of that starting Greim, et al.?

11        A.   Right.

12        Q.   What does it say?  Can you read that

13   first sentence?

14        A.   Greim, et al. have published a review

15   article containing information on five long-term

16   bioassay feeding studies in mice.  Of these

17   studies, one had been submitted for review to EPA

18   and one to JMPR.  And these are the two studies

19   that were discussed earlier in the chapter on

20   glyphosate.

21        Q.   Continue on, if you could.

CONFIDENTIAL

Page 129

1        Oncology article, the working group itself said no,

2        this is a poor study.  It can't be relied upon.

3             Q.   So referring to the mouse studies

4        considered by IARC, they considered just the first

5        two studies --

6             A.   That's right.

7             Q.   -- listed on Table 3.1?

8             A.   That's it exactly.

9             Q.   Okay.  And summarize for us the -- your

10       critique of information omitted from those two

11       studies reported in IARC.

12            A.   In both of the two examples that IARC

13       relied upon for eventually saying it was

14       sufficiently carcinogenic, the renal tumors in the

15       first study and the hemangiosarcomas in the second

16       study, the working group excluded completely

17       exculpatory evidence in -- for renal tumors in the

18       second study and hemangiosarcomas in the first.  So

19       they were selectively reporting results that

20       supported their conclusion that it causes tumors in

21       mice while excluding equally strong exculpatory

Exhibit C Page 23

CONFIDENTIAL

Page 132

1     study was not done to show that glyphosate causes

2     kidney cancer.  There was no a priori reason to

3     believe that glyphosate caused any particular

4     cancer at all.

5              So what they did is they picked the most

6     extreme value, and they admit this, they have a

7     sentence saying nothing else was seen, the most

8     extreme result from about 40 comparisons that were

9     made in male and female mice, marginally

10    significant, and no good statistician would come to

11    a conclusion that that's sufficient evidence on the

12    basis of one study alone.  That's even before you

13    realize that they excluded the exculpatory data

14    from the second study.

15         Q.   And they excluded the female mice data

16    from the first study too.

17         A.   From both, yeah.  That's less important.

18    I mean, they were, they were 0's.  It definitely

19    didn't support carcinogenicity of glyphosate.

20         Q.   And in the second study, study 11 for

21    kidney tumors, there was -- what was reported --

CONFIDENTIAL

Page 137

1      male mice, hemangiosarcomas in male mice and

2      pancreatic islet cell adenomas in male rats so --

3      and in each of those three cases they excluded

4      exculpatory data.

5           Q.   And where did you find the data for

6      rats?

7           A.   Again -- well, actually, I already had

8      it.  As it turns out, the World Health Organization

9      had pub -- they published a -- it's much smaller

10     than the IARC monograph, but they, they also

11     evaluate chemicals, and they had previously

12     evaluated glyphosate, and they had the tumor rates

13     for that study.  But the Greim --

14          Q.   Supplement?

15          A.   -- supplementary material also had the

16     rates, and they're the same.

17          Q.   So IARC would have had the data for all

18     three studies available to them.

19          A.   That's right.  They should have had,

20     they should have had access to the rates for the

21     rats that they did not report.

CONFIDENTIAL

Page 151

1      guess their motives.

2            Q.   Was Dr. Blair involved in that paper

3      that you just referenced?

4            A.   He was involved in the 2013 paper, and

5      he was -- I'm pretty sure he was a co-author of the

6      2014 paper.  He was not a co-author of the most

7      recent paper in JNCI.

8            Q.   And he was chair of the IARC working

9      group?

10           A.   He was chair of the IARC working group.

11     He certainly would have known that there was data

12     much more extensive than the one published paper

13     that they had to rely on.

14                MR. VALES:  Okay.  All right.  I just

15     want to take a quick five-minute break.  I may be

16     done, but I want to take a quick five-minute break.

17                THE VIDEOGRAPHER:  We are going off the

18     record.  The time is 1:34 p.m.

19                     (Recess.)

20                THE VIDEOGRAPHER:  We are back on the

21     record.  The time is 1:46 p.m.

Page 187

1          Q.    So you think the Zhang paper is also

2     junk science; is that right?

3          A.    It's tendentious.  They have a point of

4     view.  The three -- three of the co-authors were on

5     the EPA scientific advisory panel, and it's pretty

6     clear they were dissidents, and this was, this was

7     their effort to support their case that glyphosate

8     causes NHL.  By the way, an epidemiologist named

9     Geoffrey Kabat in New York City has written a very

10    good review of that Zhang, et al. paper.

11         Q.    Isn't it true that the dissident

12    scientists, including Dr. Zhang that you referred

13    to, had originally voted in favor of the EPA

14    finding that glyphosate was not a likely human

15    carcinogen?

16         A.    I agreed with most of what the EPA

17    concluded, but I also remember that they left open

18    the possibility that glyphosate caused NHL, which

19    is very convenient.  And that's what this

20    meta-analysis was apparently attempting to show.

21         Q.    Can you and I both agree that -- well,

1       you told me before you're not a toxicologist.

2       You're a medical statistician.  Correct?

3              A.   Correct.  I'm definitely not a

4       toxicologist.

5              Q.   And you're not a cell biologist,

6       correct?

7              A.   No.

8              Q.   Is that correct?

9              A.   That's correct.  I've worked with both

10      as a consulting statistician but --

11             Q.   We can both -- okay.  We can both agree

12      you're not a weed scientist, correct?

13             A.   Correct.

14             Q.   And we can both agree you're not trained

15      in oncology.  You're not an oncologist.

16             A.   Well, I have extensive experience in

17      almost every area of cancer research, but I'm not a

18      medical oncologist, no.

19             Q.   You don't have any type of certification

20      as an oncologist, correct?

21             A.   No.

CONFIDENTIAL

Page 189

```
 1              Q.   Is that correct?

 2              A.   That's correct.

 3              Q.   And you don't have any type of

 4        certification as a medical hematologist or any

 5        other hematologist, correct?

 6              A.   No, I don't, but I know how to analyze

 7        data.

 8              Q.   And you don't have any certification as

 9        a pathologist, correct?

10              A.   That's correct.

11              Q.   And --

12              A.   That's why I've never made opinions

13        about any of those in any of my papers.  My papers

14        refer only to statistical errors.

15              MR. BRADY:  I move to strike everything

16        after no.

17              Q.   Can you explain to us again when --

18        well, I'm looking at some e-mails that I will ask

19        for Mr. Hoke to provide to the reporter, but before

20        I do that, give me one moment here please.

21              Doctor, do you know a Dr. Tamika Sims,
```

CONFIDENTIAL

Page 193

1          Q.    -- a Monsanto employee.

2          A.    I would not say a number, and I never

3    met him in person.  He was on the phone for my talk

4    at CLA.  Never met him in person.

5          Q.    Your talk for -- okay.  CLA, that's

6    CropLife America?

7          A.    Exactly.

8          Q.    That's what you call them?

9          A.    Well, I think that's what it is.  I

10   just -- CLA, I know it's a lobbyist for

11   agribusiness.  That's all I know.

12         Q.    So you told us before that back when the

13   glyphosate or the Monsanto working -- strike that.

14              You told us earlier that when the IARC

15   working group for Monograph 112 that studied

16   glyphosate met between March 3rd and March 10th in

17   Lyon, France you had no idea that that meeting was

18   going on, correct?

19         A.    No, no, I did not.

20         Q.    You hadn't -- it was publicly announced,

21   but you just weren't aware of it at that point --

Exhibit C Page 30

CONFIDENTIAL

Page 194

1           A.   No, I don't, I don't --

2           Q.   -- because you had no interest in

3      glyphosate.

4           A.   No, I don't follow regularly which

5      monograph working groups meet and what they're

6      going to evaluate.  I mean, it's not something I

7      do.

8           Q.   And you had no interest in glyphosate

9      back in March of 2015 --

10          A.   No.

11          Q.   -- at the time that that working group

12     was meeting, correct?

13          A.   No, aside from it being one of the --

14          Q.   Is that correct?

15          A.   Yeah, I did not aside from it being one

16     of the 50 pesticides we asked about on the

17     Agricultural Health Study.

18          Q.   Okay.  But you had no direct interest or

19     involvement with glyphosate --

20          A.   No.

21          Q.   -- back when the working group was

CONFIDENTIAL

Page 197

1          A.    That's right.

2          Q.    And IEI provides, it says on your

3     website, biomedical research to, I guess, industry

4     and the -- and government?  Is that what you claim

5     you do there?

6          A.    That's what, that's what's been -- yeah,

7     it does private -- it's a private company that does

8     medical research studies.

9          Q.    And the overwhelming majority of the

10    work that you do at IEI is funded by industry,

11    correct?

12         A.    That's totally untrue.  As I, as I

13    stated earlier, by far the biggest work product for

14    both money and time is running the Southern

15    Community Cohort Study, which is, which is funded

16    by an NCI grant.  And that is, that is jointly done

17    with Vanderbilt University and Meharry University.

18         Q.    You're not truly a professor at any

19    university.  You receive some kind of a, I guess --

20    what's the word when they make you sort of an

21    honorary professor at Vanderbilt?  Is that right?

CONFIDENTIAL

Page 206

1      malathion was also junk science.

2            A.   I just don't think it's -- I don't think

3      it should be classified as a probable human

4      carcinogen.  I didn't call it junk science.  That's

5      not as bad as glyphosate because that will probably

6      come down to a difference of opinion, whereas the

7      glyphosate decision is based on just plain faulty

8      science, horribly faulty science.

9            MR. BRADY:  Okay.  Why don't we take a

10     break here and he can change media.  Ten minutes,

11     guys.  Thank you.

12                 THE VIDEOGRAPHER:  We are going off the

13     record.  This is the end of media unit No. 3.  The

14     time is 2:49 p.m.

15                      (Recess.)

16     (Jamie Simon left the deposition during the break.)

17                 THE VIDEOGRAPHER:  We are back on the

18     record.  This is the beginning of media unit No. 4.

19     The time is 3:02 p.m.

20           Q.   Okay.  Dr. Tarone, you told us a few

21     minutes ago that the Monsanto lawyers told you that

Page 207

1    they were surprised that IARC had determined that

2    glyphosate was a probable human carcinogen,

3    correct?

4         A.   I don't -- they might have told Bill

5    Blot that because once the -- once we had the

6    meeting, it was all about IARC procedures and

7    really not about glyphosate.  But he must, he must

8    have told Bill Blot that that was what was causing

9    this meeting because that's what Bill related to

10   me.

11        Q.   Okay.  Bill told you they were surprised

12   by that, right?

13        A.   He said it was related to the glyphosate

14   classification and the fact that no one else agreed

15   with IARC.

16        Q.   Okay.  Were you aware that Monsanto had

17   put together an extensive perception management

18   response to the IARC finding of glyphosate being a

19   probable human carcinogen before the working group

20   voted?

21        A.   No.  I wasn't aware of any such thing

CONFIDENTIAL

1          Priorities for the IARC Monographs during

2          2020-2024, marked.)

3                    MR. BRADY:   Okay.   Just give me a

4          minute.   I think we're about done, Doctor.

5               Q.   Doctor, you told us at the beginning

6          that you spent two hours, I'm sorry, you told us

7          that you spent three hours meeting with Monsanto's

8          lawyer with your boss, the CEO at IEI, in September

9          of 2019, correct?

10              A.   September of 2015.

11              Q.   '15.   Correct?

12              A.   Correct.

13              Q.   And then you told us you spent a couple

14         of hours meeting with four more Monsanto lawyers

15         shortly after that but that you didn't charge them

16         anything for that because you like lecturing on

17         statistics; is that right?

18              A.   That's correct.   It was three, three

19         lawyers.   It was about statistical, entirely

20         about --

21              Q.   I'm sorry.   Do you remember who any of

**Exhibit C Page 35**

CONFIDENTIAL

Page 230

1          those lawyers were?

2                  A.    Eric Lasker was the first lawyer, and he

3          was at the second meeting as well.  It was a young

4          man and a young woman that were with him in the

5          second stay, second meeting.

6                  Q.    And you gave them a free lecture on

7          biostatistics.  That's your testimony, right?

8                  A.    That is -- that's exactly what happened.

9                  Q.    And were these the biostatistics

10         regarding why it was that you believed that

11         glyphosate should not have been labeled a probable

12         carcinogen in humans by the IARC working group?

13                 A.    Not really.  It dealt mainly with

14         issues, like, as I said before, one-sided versus

15         two-sided tests, how to calculate exact p-values,

16         approximations of exact p-values.

17                 My main objections to the glyphosate

18         classification and deliberations was the exclusion

19         of exculpatory, clearly exculpatory data, and that

20         was not a topic we discussed.

21                 Q.    Okay.