# EXHIBIT E

82 Opinion paper

# On the International Agency for Research on Cancer classification of glyphosate as a probable human carcinogen

Robert E. Tarone

The recent classification by International Agency for Research on Cancer (IARC) of the herbicide glyphosate as a probable human carcinogen has generated considerable discussion. The classification is at variance with evaluations of the carcinogenic potential of glyphosate by several national and international regulatory bodies. The basis for the IARC classification is examined under the assumptions that the IARC criteria are reasonable and that the body of scientific studies determined by IARC staff to be relevant to the evaluation of glyphosate by the Monograph Working Group is sufficiently complete. It is shown that the classification of glyphosate as a probable human carcinogen was the result of a flawed and incomplete summary of the experimental evidence evaluated by the Working Group. Rational and effective cancer prevention activities depend on scientifically sound and unbiased assessments of the carcinogenic potential of suspected agents. Implications of the erroneous classification of glyphosate with respect to the IARC Monograph Working Group deliberative process are discussed. *European Journal of Cancer Prevention* 27:82–87 Copyright © 2017 Wolters Kluwer Health, Inc. All rights reserved.

European Journal of Cancer Prevention 2018, 27:82–87

Keywords: carcinogen classification, glyphosate, International Agency for Research on Cancer

Robert Tarone retired in 2016 after 28 years as Mathematical Statistician at the US National Cancer Institute and 14 years as Biostatistics Director at the International Epidemiology Institute. Rockville, Maryland, USA

Correspondence to Robert E. Tarone, PhD, 1455 Research Boulevard, Suite 550, Rockville, MD 20850, USA
Tel: +1 301 310 3654; fax: +1 301 424 1053; e-mail: bob@iei.us

Received 20 May 2016 Accepted 31 May 2016

## Introduction

In March 2015, the International Agency for Research on Cancer (IARC) convened a Monograph Working Group to assess the carcinogenicity of five organophosphate pesticides. As a result of this Working Group for volume 112 of the IARC Monographs on the Evaluation of the Carcinogenic Risk of Chemicals to Humans, the herbicide glyphosate was assigned a 2A classification, indicating that glyphosate was 'probably carcinogenic to humans' (Guyton *et al.*, 2015; IARC, 2015a). The IARC classification is at variance with other recent evaluations of the carcinogenic potential of glyphosate (Bundesinstitut für Risikobewertung, 2015), and has been criticized widely for a variety of reasons, including the makeup of the Working Group, the selection of studies to be considered in the evaluation process, and the IARC goal of evaluating carcinogenic hazard (defined by IARC as the 'capability of causing cancer under some circumstances') rather than carcinogenic risk (e.g. the likelihood of causing cancer under actual exposure conditions) (Academics Review, 2015; Science Media Centre, 2015; Porterfield, 2016).

Subsequent to the IARC classification, an evaluation of glyphosate by the European Food Safety Authority (EFSA) concluded that glyphosate was unlikely to pose a carcinogenic threat to humans (European Food Safety Authority, 2015). Although there are differences in the evaluation criteria resulting in the two conflicting conclusions of carcinogenic potential, an open letter with 96 signees was sent to the EFSA commissioner strongly opposing the EFSA decision on glyphosate and endorsing the IARC classification (Portier *et al.*, 2015), with subsequent publication of a related 94-author commentary (Portier *et al.*, 2016). The corresponding author, Christopher Portier, was an 'Invited Specialist' for the IARC Monograph 112 Working Group that evaluated glyphosate (Guyton *et al.*, 2015; IARC, 2015b). Portier's participation in the Working Group evaluating glyphosate has been questioned because of his affiliation with the advocacy group, Environmental Defense Fund, particularly as researchers with ties to industry are usually excluded from participation on IARC Working Groups (IARC, 2015b; Porterfield, 2016; Zaruk and Entine, 2016).

A recent joint meeting of the United Nations and WHO panels on the health effects of pesticide residues (JMPR) reviewed the potential carcinogenicity of glyphosate at levels consumed in food (World Health Organization, 2016a). The JMPR review concluded that glyphosate was unlikely to pose a carcinogenic risk to humans from dietary exposure (World Health Organization, 2016a). This conclusion was not considered to be contradictory to the IARC classification because of the possibility that glyphosate might cause cancer at higher exposure levels or through nondietary routes of exposure (World Health Organization, 2016b). The controversy surrounding the IARC classification of glyphosate as a probable carcinogenic hazard, however, remains unresolved.

0959-8278 Copyright © 2017 Wolters Kluwer Health, Inc. All rights reserved.

DOI: 10.1097/CEJ.0000000000000289

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

Exhibit E Page 1

Criticisms noted previously of the IARC Monograph 112 Working Group and the IARC glyphosate classification all have some merit, but it has not been generally recognized that IARC's 2A classification for glyphosate is based on an incomplete and flawed evaluation of those studies determined by the IARC staff to be relevant to assessing the carcinogenic potential of glyphosate. This is particularly true for the evaluation of animal carcinogenicity studies.

**Animal studies**

For studies discussed below, the strength of the dose–response in tumor rates with increasing glyphosate exposure level will be measured using two-sided $P$-values on the basis of the exact Cochran–Armitage trend test (Gart et al., 1986). IARC concluded that there was sufficient evidence that glyphosate caused cancer in animals, primarily on the basis of two studies in CD-1 mice (IARC, 2015a). In the first study, groups of 50 male and female CD-1 mice were fed diets containing 0, 1000, 5000, and 30 000 ppm glyphosate. This study reported a positive trend in renal tubule adenomas in male CD-1 mice (0/49, 0/49, 1/50, and 3/50; $P = 0.019$). Despite the small numbers of tumors, this finding was deemed consequential because of the relative rarity of renal tubule tumors in CD-1 mice. The United States (US) Environmental Protection Agency requested additional pathological examination of renal tumors in this study, including the convening of a Pathology Working Group (IARC, 2015a). As a result of the additional pathology, one new renal tubule adenoma was discovered in a control animal and three of the four original renal tubule tumors were upgraded from adenoma to carcinoma. This resulted in conventionally nonsignificant positive trends in carcinomas (0/49, 0/49, 1/50, and 2/50; $P = 0.063$) and in adenomas and carcinomas combined (1/49, 0/49, 1/50, and 3/50; $P = 0.065$). On the basis of these marginal findings, the IARC Working Group concluded that this study showed that glyphosate caused renal tubule tumors in male CD-1 mice.

Immediately after the sentence in the IARC Monograph 112 glyphosate chapter reporting the original renal tubule adenoma findings in the first CD-1 mouse study for males comes the following remarkable sentence: 'No data on tumours of the kidney were provided for female mice.' Unstated is who exactly was supposed to provide these data on female mice to IARC. IARC has been evaluating the potential for carcinogenicity of agents for 40 years and the IARC staff is certainly aware of how rodent carcinogenicity studies are routinely carried out and reported (e.g. pathology findings are reported for a variety of organs and systems, including the kidneys, for both male and female animals). Yet, despite the allegedly rigorous, transparent, thorough, and careful evaluation process followed by Monograph Working Groups (Pearce et al., 2015), IARC apparently made no effort to obtain the kidney pathology findings for female CD-1 mice. In fact, the tumor summaries for this and the other rodent carcinogenicity studies of glyphosate relied upon by the Working Group were made available to IARC before the Monograph 112 Working Group meeting in a review paper (Greim et al., 2015; IARC, 2015a). A supplement to the review paper contains the summary pathology tables for each of the rodent studies reviewed. The CD-1 mouse study in question is mouse study 10 in the Greim et al. (2015) review, and the pathology table reports no renal tubule tumors in female CD-1 mice (0/50, 0/50, 0/50, and 0/50). Thus, there is no support in female mice for the marginal findings in male mice with respect to kidney tumors.

Even if the female CD-1 mouse data had been included in the IARC deliberations, the Working Group might still have concluded that there was evidence of a sex-specific carcinogenic effect. An even more disturbing omission from the Working Group deliberations, however, argues against this interpretation. The second CD-1 mouse study reported in the IARC Monograph glyphosate chapter is mouse study 11 in the Greim et al. (2015) review. Inexplicably, particularly in view of the significance given to the marginal kidney tumor findings in the previously evaluated CD-1 mouse study, the paragraph in the IARC glyphosate chapter reporting on the second CD-1 mouse study does not even mention kidney pathology. In the second CD-1 mouse study, groups of male and female mice were fed diets with glyphosate at doses calibrated to result in exposure levels of 0, 100, 300, and 1000 mg/kg of body weight. No renal tubule tumors were observed in female mice in this study (0/50, 0/49, 0/50, and 0/50). Kidneys were examined for 50 male mice in each of the four exposure groups in this study, and two renal tubule adenomas (one in the control group and one in the lowest dose group) and two renal tubule carcinomas (again, one in the control group and one in the lowest dose group) were observed. That is, although a few of these relatively rare renal tubule tumors were observed in males in the first CD-1 mouse study, primarily in the two highest dose groups, the few such tumors in males in the second CD-1 mouse study were observed only in the control and the lowest dose groups. It is apparent that these two studies together provide no evidence whatsoever to support the hypothesis that glyphosate causes renal tubule tumors in male CD-1 mice.

The paragraph on the second CD-1 mouse study in the IARC glyphosate chapter reports an increase in hemangiosarcomas in male mice (0/50, 0/50, 0/50, 4/50; $P = 0.0036$). As was the case with kidney tumors in the first CD-1 mouse study, there was no supporting evidence of increased hemangiosarcoma risk in female mice at the highest exposure levels in this study (0/50, 2/49, 0/50, and 1/50). Similar to the situation with kidney tumors, however, there is no mention of hemangiosarcomas in the discussion of the first CD-1 mouse study in the glyphosate chapter despite the reported hemangiosarcoma increase in the second study. A few hemangiomas and hemangiosarcomas

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

(reported as hemangioendotheliomas in the summary pathology tables) were reported in the first CD-1 mouse study. For male mice, one hemangioma was reported in the lowest dose group and one hemangiosarcoma was reported in the middle dose group, providing no support for the increased rate of hemangiosarcomas at the highest glyphosate exposure level among males in the second CD-1 mouse study. More of these blood vessel tumors were reported for females than for males in the first CD-1 mouse study. They were reported by organ site in the summary pathology tables for the first study, but assuming that no mouse had more than one such tumor, the summary incidence rates in female mice for hemangiomas and hemangiosarcomas are 1/50, 1/50, 6/50, and 4/50 ($P=0.302$) and for hemangiosarcomas, these are 1/50, 0/50, 5/50, and 4/50 ($P=0.130$). All except one of the hemangiomas and hemangiosarcomas in the two studies were observed in organs or tissues in which they most often occur in control CD-1 mice (i.e. spleen, liver, mesentery, and uterus). The evaluation of both mouse studies together does not provide credible evidence that glyphosate causes blood vessel tumors in CD-1 mice.

Only two statistically significant tumor increases were observed in the two CD-1 mouse experiments relied upon by the IARC Working Group in arriving at the glyphosate carcinogen classification; they were observed only among male mice, involved a small number of animals, and were not supported by increased tumor rates among female mice in the same study or male mice in the other study. The first increase was for renal tubule adenomas in the original pathology report in the first study and the second increase was for hemangiosarcomas in the second study. The claim that significant increases in malignant tumors were observed in both CD-1 mouse studies evaluated by the IARC glyphosate Working Group (Portier et al., 2015) is incorrect, and a reasonable synthesis of the evidence from both mouse studies does not support a conclusion that glyphosate is a mouse carcinogen.

Although the rat carcinogenicity studies reviewed by the IARC Working Group provide no evidence that glyphosate causes malignant tumors, the IARC glyphosate chapter concluded that there was some evidence that glyphosate caused adenomas, particularly pancreatic islet cell adenomas in male Sprague–Dawley rats. Such tumors are not particularly rare in Sprague–Dawley rats, and the evaluation of the three Sprague–Dawley rat studies relied upon by IARC does not provide evidence of a dose–response relation with glyphosate exposure. Tumor rates were reported in the glyphosate chapter for only two of the Sprague–Dawley rat studies. In one study, the observed incidence rates for pancreatic islet cell adenomas in a control group and three groups exposed to increasing glyphosate levels among male rats are 1/58, 8/57, 5/60, and 7/59. There is no evidence of a dose–response in the three glyphosate-exposed groups, and as noted in an earlier review of this study by the World Health Organization (1994) the control group rate appears to be unusually low. In a second study, the observed incidence rates for pancreatic islet cell adenomas in male rats are 0/50, 5/49, 2/50, and 2/50, again providing little evidence of increased tumor rates with increasing glyphosate exposure. The pancreatic islet cell adenoma rates are not reported in the IARC glyphosate chapter for the third Sprague–Dawley rat study evaluated by the Working Group, but it is rat study 3 in the Greim et al. (2015) review. The rates for male rats in this study in the control group and four increasing glyphosate exposure levels are 7/50, 1/24, 2/17, 2/21, and 1/49. This is a mirror image of the tumor pattern in the first Sprague–Dawley rat study, which the Working Group considered to provide evidence that glyphosate might induce tumors, in that it is the highest glyphosate exposure level for which the pancreatic islet cell adenoma rate appears to be unusually low, and there is no evidence of a dose–response in the other four exposure groups. A synthesis of the data from all three rat studies does not support the conclusion that glyphosate is associated with increased pancreatic islet cell adenoma rates in male Sprague–Dawley rats.

The IARC Working Group concluded that increased incidence rates in one of the three Sprague–Dawley rat studies of liver adenomas in males (2/44, 2/45, 3/49, and 7/48; $P=0.035$) and thyroid C-cell adenomas in females (2/57, 2/60, 6/59, and 6/55; $P=0.068$) also provided evidence that glyphosate is an animal carcinogen. The other two Sprague–Dawley studies relied upon by the Working Group, however, provided no evidence that glyphosate increased the risk of liver or thyroid C-cell adenomas, and none of the three Sprague–Dawley studies provided evidence that glyphosate was associated with increased incidence of liver carcinomas or thyroid C-cell carcinomas (Greim et al., 2015). The highlighting of selective marginally significant tumor increases in a single study without noting the complete absence of supporting evidence of tumor increases in two other studies using the same rat strain is a highly questionable scientific practice. Once again, a synthesis of the data from all three rat studies does not provide evidence in support of the hypothesis that glyphosate is associated with increased liver or thyroid C-cell tumor rates in Sprague–Dawley rats.

Glyphosate would not have been classified by IARC as a probable human carcinogen except for the Working Group's conclusion that there was sufficient evidence of carcinogenicity in animals. When all relevant data from the rodent carcinogenicity studies of glyphosate relied upon by the Working Group are evaluated together, it is clear that the conclusion that there is sufficient evidence that glyphosate is an animal carcinogen is not supported empirically. Even a conclusion that there is limited evidence of animal carcinogenicity would be difficult to support on the basis of the rodent carcinogenicity assays of glyphosate reviewed by the IARC Working Group.

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

Exhibit E Page 3

### Epidemiology

There is general agreement among various national and international agencies and groups that have evaluated glyphosate, including IARC, that the evidence for human carcinogenicity is limited. The IARC Monograph 112 Working Group focused on non-Hodgkin's lymphoma (NHL), but the case made by IARC for a possible role of glyphosate in the etiology of NHL is quite weak (Science Media Centre, 2015). For example, the only significant finding reported for NHL and glyphosate in a US study (De Roos et al., 2003) is of questionable evidentiary weight. Glyphosate was one of 47 different pesticides evaluated for associations with NHL in this pooled analysis of case–control studies, and each pesticide was assessed using two different statistical methods. A significant association was reported between glyphosate and NHL for only one of the statistical methods applied (standard logistic regression). As is common practice with IARC Working Groups, the relative risk estimate and confidence interval from the logistic regression that are reported in the IARC glyphosate chapter are reproduced exactly as presented in the published paper (De Roos et al., 2003), without any adjustment for the large number of pesticides evaluated and the multiple statistical comparisons performed in the study. This practice exaggerates the significance of the reported risk estimate.

The sporadic positive findings for NHL and glyphosate observed in case–control studies were not confirmed in a large US cohort study, the Agricultural Health Study (AHS) (De Roos et al., 2005), and this appeared to temper somewhat the IARC Working Group conclusion on the evidence for human carcinogenicity of glyphosate. Portier et al. (2015, 2016) discount the AHS glyphosate finding because of the small number of NHL cases included in the 2005 analysis, but this raises a question about the investigation of a possible association between glyphosate exposure and NHL in the AHS. An updated assessment of NHL risk within the AHS was published recently (Alavanja et al., 2014). This study was based on follow-up through 2010 in North Carolina and through 2011 in Iowa, so that it would have added a decade of additional NHL cases to the earlier evaluation of glyphosate in the AHS (De Roos et al., 2005). Inexplicably, although previous studies evaluating associations between a single disease and multiple pesticides in the AHS have included pesticides from all four classes, insecticides, herbicides, fungicides, and fumigants (Alavanja et al., 2003, 2004; Engel et al., 2005; Lee et al., 2007; Andreotti et al., 2009; Landgren et al., 2009; Dayton et al., 2010; Dennis et al., 2010; Kamel et al., 2012; Koutros et al., 2013; Starling et al., 2014), the NHL update excluded all herbicides (Alavanja et al., 2014). The Overall Chair of the March 2015 Working Group for IARC Monograph 112 was a coauthor on the NHL update paper (Alavanja et al., 2014). In view of the potential value of an updated analysis of glyphosate and NHL risk within the AHS in the 2015 IARC Working Group deliberations on glyphosate, the exclusion of herbicides from the 2014 paper is difficult to comprehend or justify. Updated analyses in the AHS of herbicides using the NHL cases and statistical methods of the recent paper (Alavanja et al., 2014) should be published as soon as possible to provide for a more complete evaluation of the possible association between glyphosate exposure and NHL risk in humans.

### IARC Working Group composition and deliberative process

The incomplete and flawed synthesis of experimental data resulting from the glyphosate deliberations of the Monograph 112 Working Group is difficult to reconcile with the recent unconditional defense of the IARC Monograph Program evaluation process by 124 researchers from around the world (Pearce et al., 2015). Despite questions that have been raised about IARC Working Group composition and certain dynamics of consensus decision making in ad-hoc deliberative bodies that can result in a considerable potential for error (Brown, 2000; Sunstein, 2006; Boffetta et al., 2009; McLaughlin et al., 2010a, 2010b, 2011; Erren, 2011; McLaughlin and Tarone, 2013), IARC officials and defenders apparently see no reason to consider modifications to what they consider to be 'the best approach available' (Wild and Cogliano, 2011; Pearce et al., 2015). Evidence from recent Working Groups suggests that steps taken in 2005 to 'increase transparency' in the IARC Monograph process because of a perceived undue influence of 'industrial stakeholders' (Samet, 2015) may have gone too far. It is not uncommon for epidemiologists in a Working Group to be selected on the basis of having published positive findings about cancer risk associated with an exposure being evaluated. Participants with dissenting opinions should be sought for inclusion on Working Groups, with conflicts of interest clearly identified, but not used to automatically exclude potential participants (May, 2011). Furthermore, all types of conflicts of interest should be recognized, including those arising as a result of pursuit of professional advancement, future funding opportunities, personal recognition, and public policy activism or advocacy (PLoS Medicine Editors, 2008; McLaughlin et al., 2010a, 2011; Erren, 2011; Brown et al., 2014; Curry, 2016; Trinquart et al., 2016).

The role of IARC staff in guaranteeing that all relevant information is made available to a Working Group is critically important, as is the responsibility of Working Group members to evaluate and report on all relevant data in the final Monograph text. The selective omission of data from IARC Working Group deliberations is not restricted to the evaluation of rodent studies or to the glyphosate deliberations. For example, an embalmer case–control study played a major role in the questionable IARC conclusion that formaldehyde causes leukemia in humans (Hauptmann et al., 2009; IARC, 2012), but

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

the odds ratio of 0.1 (95% confidence interval, 0.01–1.2) for nasopharyngeal carcinoma among embalmers in this study (Hauptmann *et al.*, 2009) was ignored by the same IARC Working Group in its deliberations on the alleged association between formaldehyde and nasopharyngeal carcinoma (McLaughlin and Tarone, 2013). Continuing to disregard numerous specified difficulties that can adversely affect decision making by IARC Working Groups, including the role played by nonfinancial and nonindustry conflicts of interest, will only serve to undermine the scientific credibility of the IARC Monographs Program (McLaughlin and Tarone, 2013). Rational and effective cancer prevention activities depend on scientifically sound and unbiased assessments of the carcinogenic potential of suspected agents by international agencies and national regulatory bodies. Arguing by authority in large numbers (Pearce *et al.*, 2015), without dealing empirically with the many specific questions and issues that have been raised, will not serve the goal of improving either the IARC deliberative process or the integrity of the carcinogen classifications arrived at by Monograph Working Groups.

## Acknowledgements
### Conflicts of interest

In 2015 Robert Tarone consulted with a lawyer representing Monsanto Corporation about various general aspects of the IARC Monograph Program (e.g. criteria for selecting working group members and for determining the carcinogen hazard classification level of an agent). The International Epidemiology Institute was paid $750 for this consultation.

## References

Academics Review (2015). IARC glyphosate cancer review fails on multiple fronts. Available at: http://academicsreview.org/2015/03/iarc-glyphosate-cancer-review-fails-on-multiple-fronts/?utm_source=feedburner&utm_medium=feed&utm_campaign=Feed%3A+AcademicsReview+%28Academics+Review%29. [Accessed on 1 August 2016.].

Alavanja MC, Samanic C, Dosemeci M, Lubin J, Tarone R, Lynch CF, *et al.* (2003). Use of agricultural pesticides and prostate cancer risk in the Agricultural Health Study cohort. *Am J Epidemiol* 157:800–814.

Alavanja MC, Dosemeci M, Samanic C, Lubin J, Lynch CF, Knott C, *et al.* (2004). Pesticides and lung cancer risk in the Agricultural Health Study cohort. *Am J Epidemiol* 160:876–885.

Alavanja MC, Hofmann JN, Lynch CF, Hines CJ, Barry KH, Barker J, *et al.* (2014). Non-Hodgkin lymphoma risk and insecticide, fungicide and fumigant use in the Agricultural Health Study. *PLoS One* 9:e109332.

Andreotti G, Freeman LE, Hou L, Coble J, Rusiecki J, Hoppin JA, *et al.* (2009). Agricultural pesticide use and pancreatic cancer risk in the Agricultural Health Study cohort. *Int J Cancer* 124:2495–2500.

Boffetta P, McLaughlin JK, La Vecchia C, Tarone RE, Lipworth L, Blot WJ (2009). A further plea for adherence to the principles underlying science in general and the epidemiologic enterprise in particular. *Int J Epidemiol* 38:678–679.

Brown AW, Ioannidis JP, Cope MB, Bier DM, Allison DB (2014). Unscientific beliefs about scientific topics in nutrition. *Adv Nutr* 5:563–565.

Brown R (2000). *Group processes*, 2nd ed. Malden, MA: Blackwell Publishing. pp. 167–224.

Bundesinstitut für Risikobewertung (2015). Does glyphosate cause cancer? BfR communication no. 007/2015. Available at: http://www.bfr.bund.de/cm/349/does-glyphosate-cause-cancer.pdf. [Accessed on 1 August 2016.].

Curry J (2016). Violating the norms and ethos of science. Climate Etc. Available at: https://judithcurry.com/2016/01/31/violating-the-norms-and-ethos-of-science/. [Accessed on 1 August 2016.].

Dayton SB, Sandler DP, Blair A, Alavanja M, Beane Freeman LE, Hoppin JA (2010). Pesticide use and myocardial infarction incidence among farm women in the Agricultural Health Study. *J Occup Environ Med* 52:693–697.

Dennis LK, Lynch CF, Sandler DP, Alavanja MCR (2010). Pesticide use and cutaneous melanoma in pesticide applicators in the Agricultural Health Study. *Environ Health Perspect* 118:812–817.

De Roos AJ, Zahm SH, Cantor KP, Weisenburger DD, Holmes FF, Burmeister LF, Blair A (2003). Integrative assessment of multiple pesticides as risk factors for non-Hodgkin's lymphoma among men. *Occup Environ Med* 60:E11.

De Roos AJ, Blair A, Rusiecki JA, Hoppin JA, Svec M, Dosemeci M, *et al.* (2005). Cancer incidence among glyphosate-exposed pesticide applicators in the Agricultural Health Study. *Environ Health Perspect* 113:49–54.

Engel LS, Hill DA, Hoppin JA, Lubin JH, Lynch CF, Pierce J, *et al.* (2005). Pesticide use and breast cancer risk among farmers' wives in the Agricultural Health Study. *Am J Epidemiol* 161:121–135.

Erren TC (2011). IARC's plea for traditional 'expert' working groups – a recipe for problems? *Int J Epidemiol* 40:1727–1728.

European Food Safety Authority (2015). Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate. *EFSA J* 13:4302.

Gart JJ, Krewski D, Lee PN, Tarone RE, Wahrendorf J (1986). Statistical methods in cancer research (volume III): the design and analysis of long-term animal experiments (IARC Scientific Publications No 79). Lyon, France: IARC Press. pp. 81–86.

Greim H, Saltmiras D, Mostert V, Strupp C (2015). Evaluation of carcinogenic potential of the herbicide glyphosate, drawing on tumor incidence data from fourteen chronic/carcinogenicity rodent studies. *Crit Rev Toxicol* 45:185–208.

Guyton KZ, Loomis D, Grosse Y, El Ghissassi F, Benbrahim-Tallaa L, Guha N, *et al.* (2015). Carcinogenicity of tetrachlorvinphos, parathion, malathion, diazinon, and glyphosate. *Lancet Oncol* 16:490–491.

Hauptmann M, Stewart PA, Lubin JH, Beane Freeman LE, Hornung RW, Herrick RF, *et al.* (2009). Mortality from lymphohematopoietic malignancies and brain cancer among embalmers exposed to formaldehyde. *J Natl Cancer Inst* 101:1696–1708.

IARC (2012). *Formaldehyde: Chemical agents and related occupations. IARC monographs on the evaluation of carcinogenic risks to humans Vol 100F*. Lyon, France: IARC Press. pp. 401–435.

IARC (2015a). *Glyphosate: Some organophosphate insecticides and herbicides: diazanon, glyphosate, malathion, parathion, and tetrachlorvinphos. IARC monographs on the evaluation of carcinogenic risks to humans Vol 112*. Lyon, France: IARC Press.

IARC (2015b). *List of participants: Some organophosphate insecticides and herbicides: diazanon, glyphosate, malathion, parathion, and tetrachlorvinphos. IARC monographs on the evaluation of carcinogenic risks to humans Vol 112*. Lyon, France: IARC Press.

Kamel F, Umbach DM, Bedlack RS, Richards M, Watson M, Alavanja MCR, *et al.* (2012). Pesticide exposure and amyotrophic lateral sclerosis. *Neurotoxicology* 33:457–462.

Koutros S, Beane Freeman LE, Lubin JH, Heltshe SL, Andreotti G, Barry KH, *et al.* (2013). Risk of total and aggressive prostate cancer and pesticide use in the Agricultural Health Study. *Am J Epidemiol* 177:59–74.

Landgren O, Kyle RA, Hoppin JA, Beane Freeman LE, Cerhan JR, Katzmann JA, *et al.* (2009). Pesticide exposure and risk of monoclonal gammopathy of undetermined significance in the Agricultural Health Study. *Blood* 113:6386–6391.

Lee WJ, Sandler DP, Blair A, Samanic C, Cross AJ, Alavanja MC (2007). Pesticide use and colorectal cancer risk in the Agricultural Health Study. *Int J Cancer* 121:339–346.

May RM (2011). Science as organized scepticism. *Philos Trans A Math Phys Eng Sci* 369:4685–4689.

McLaughlin JK, Tarone RE (2013). False positives in cancer epidemiology. *Cancer Epidemiol Biomarkers Prev* 22:11–15.

McLaughlin JK, La Vecchia C, Tarone RE, Lipworth L, Blot WJ (2010a). Response (letter). *J Natl Cancer Inst* 102:134–135.

McLaughlin JK, Lipworth L, Tarone RE, La Vecchia C, Blot WJ, Boffetta P (2010b). Authors' response (letter). *Int J Epidemiol* 39:1679–1680.

McLaughlin JK, Boffetta P, La Vecchia C, Lipworth L, Blot WJ, Tarone RE (2011). Problems with IARC's 'expert' working groups. *Int J Epidemiol* 40:1728–1729.

Pearce N, Blair A, Vineis P, Ahrens W, Andersen A, Anto JM, *et al.* (2015). IARC monographs: 40 years of evaluating carcinogenic hazards to humans. *Environ Health Perspect* 123:507–514.

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

PLoS Medicine Editors (2008). Making sense of non-financial competing interests. *PLoS Med* 5:e199.

Porterfield A (2016). Glyphosate battles: why different European agencies came to different cancer conclusions. Genetic Literacy Project. Available at: https://www.geneticliteracyproject.org/2016/04/18/glyphosate-battles-different-european-agencies-came-different-cancer-conclusions/. [Accessed on 1 August 2016.].

Portier CJ, Armstrong B, Baguley BC, Baur X, Beliaev I, Bellé R, et al. (2015). Open letter: review of the carcinogenicity of glyphosate by EFSA and BfR. Available at: http://www.zeit.de/wissen/umwelt/2015-11/glyphosat-offener-brief.pdf. [Accessed on 1 August 2016.].

Portier CJ, Armstrong BK, Baguley BC, Baur X, Belyaev I, Bellé R, et al. (2016). Differences in the carcinogenic evaluation of glyphosate between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority (EFSA). *J Epidemiol Community Health* 70:741–745.

Samet JM (2015). The IARC monographs: critics and controversy. *Carcinogenesis* 36:707–709.

Science Media Centre (2015). Expert reaction to carcinogenicity classification of five pesticides by the International Agency for Research on Cancer (IARC). Available at: http://www.sciencemediacentre.org/expert-reaction-to-carcinogenicity-classification-of-five-pesticides-by-the-international-agency-for-research-on-cancer-iarc/. [Accessed on 1 August 2016.].

Starling AP, Umbach DM, Kamel F, Long S, Sandler DP, Hoppin JA (2014). Pesticide use and incident diabetes among wives of farmers in the Agricultural Health Study. *Occup Environ Med* 71:629–635.

Sunstein CR (2006). Deliberating groups versus prediction markets (or Hayek's challenge to Habermas). *Episteme* 3:192–213.

Trinquart L, Johns DM, Galea S (2016). Why do we think we know what we know? A metaknowledge analysis of the salt controversy. *Int J Epidemiol* 45:251–260.

Wild CP, Cogliano VJ (2011). A plea on behalf of expert evaluation and the experts involved. *Int J Epidemiol* 40:253.

World Health Organization (1994). *Glyphosate Environmental Health Criteria 159 International Programme on Chemical Safety*. Geneva, Switzerland: WHO. pp. 77–78.

World Health Organization (2016a). Joint RAO/WHO meeting on pesticides. Available at: http://www.who.int/foodsafety/jmprsummary2016.pdf. [Accessed on 1 August 2016.].

World Health Organization (2016b). Food Safety: frequently asked questions. Available at: http://www.who.int/foodsafety/faq/en/. [Accessed on 1 August 2016.].

Zaruk D, Entine J (2016). IARC-Gate? Are Europe's anti-chemical enviros conspiring to suppress conflict-of-interest scandal? *Genetic Literacy Project*. Available at: https://www.geneticliteracyproject.org/2016/04/07/iarc-gate-europes-anti-chemical-enviros-conspiring-suppress-conflict-interest-scandal/. [Accessed on 1 August 2016.].

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

Regulatory Toxicology and Pharmacology 98 (2018) A1–A4

Contents lists available at ScienceDirect

# Regulatory Toxicology and Pharmacology

journal homepage: www.elsevier.com/locate/yrtph





Editorial

# Conflicts of interest, bias, and the IARC Monographs Program[1]

ARTICLE INFO

Keywords:
IARC Monographs Program
Glyphosate
Conflicts of interest

In a recent commentary, Infante et al. (2018) defend the International Agency for Research on Cancer (IARC) against what they claim to be a concerted effort by corporate interests to discredit the agency. The authors endorse IARC's classification of the broad-spectrum herbicide, glyphosate, as a probable human carcinogen (Guyton et al., 2015; IARC, 2017a), and indicate that many of those who have criticized the IARC glyphosate classification have been funded by Monsanto. In particular, they falsely claim that my paper Tarone (2018) was paid for by Monsanto. The basis for this claim appears to be a post on the IARC website noting my participation in a three hour meeting in September 2015 with a lawyer representing Monsanto to discuss the IARC Monographs Program review process (IARC, 2017b). This meeting was known to IARC only because I acknowledged it in my published paper (Tarone, 2018), a paper that was first published online in August 2016. No payment was received for writing the paper, nor was I requested to write the paper by anyone associated with Monsanto.

What motivated me to write the paper on the IARC glyphosate classification was what I perceived to be an extremely poor scientific evaluation of glyphosate by the Monograph 112 Working Group. If scientists associated with industry had performed such an incomplete summary of the studies relied upon by IARC in the evaluation of glyphosate, they would correctly be accused of severe bias, and perhaps even fraud. The many and ardent supporters of IARC, however, refuse to hold Working Group members to the same standards. Infante et al. (2018) are following the lead of IARC in refusing to deal with specific criticisms of the IARC glyphosate deliberations, preferring instead to question the motivations of anyone daring to criticize the Monograph 112 Working Group (IARC, 2017b). It is particularly offensive that Infante et al. (2018) label Reuters science reporter, Kate Kelland, as "a defender of Monsanto". Kelland raised numerous legitimate questions about the IARC Monographs Program, and her reporting brought to light serious problems with the Monograph 112 Working Group deliberations on glyphosate (Kelland, 2016, 2017a, 2017b, 2017c; Reuters staff, 2017).

Those who defend the Monograph 112 Working Group deliberations on glyphosate endorse the selective inclusion of evidence from the studies relied upon by IARC that is interpreted as supporting a claim of carcinogenicity, while simultaneously excluding equally strong, or stronger, exculpatory evidence from the very same studies. The Working Group concluded that the epidemiologic evidence of glyphosate carcinogenicity is limited (Guyton et al., 2015; IARC, 2017a), and thus the IARC classification of glyphosate as a probable human carcinogen relied heavily on the conclusion by the Working Group that rodent carcinogenicity studies of glyphosate provide sufficient evidence of animal carcinogenicity. The conclusion regarding rodent carcinogenicity was based primarily on tumor rates for renal tubule tumors and hemangiosarcomas in male CD-1 mice and on pancreatic islet cell adenomas in male Sprague-Dawley rats (Guyton et al., 2015). This conclusion is not supported by the very rodent studies relied upon by IARC in the glyphosate deliberations.

The Monograph 112 Working Group relied upon a pair of two-year carcinogenicity studies using CD-1 mice. Exposed animals in the glyphosate rodent studies did not have reduced survival compared to control animals, and thus, as was the case in Working Group deliberations, statistical analyses will be based on tumor rates without adjustment for differential survival. Nearly one page in the glyphosate chapter of Monograph 112 is devoted to the discussion of the first mouse study, and although approximately 20 organs or tissues were evaluated histopathologically in both male and female mice, the discussion is entirely devoted to a marginally significant increase in renal tubule tumors observed in male mice only. Remarkably, there is no discussion of any tumor rates for female mice in this study. The final tumor rates in male mice for renal tubule adenomas and carcinomas after a pathology working group review were 1/49, 0/49, 1/50 and 3/50 at glyphosate dose levels of 0, 157, 814, and 4841 mg/kg bw, respectively (one-sided $p = 0.065$ based on the exact distribution of the Cochran-Armitage trend statistic (Gart et al., 1986)). Although the glyphosate chapter of Monograph 112 does not identify the statistical method used by the Working Group, the reported p-value of 0.034 for this comparison in Monograph 112 appears to be based on the normal

---

[1] Robert Tarone retired on June 30, 2016 after 28 years as Mathematical Statistician at the National Cancer Institute and 14 years as Biostatistics Director at the International Epidemiology Institute.

https://doi.org/10.1016/j.yrtph.2018.09.005
Received 14 July 2018; Received in revised form 22 August 2018; Accepted 4 September 2018
Available online 05 September 2018
0273-2300/ © 2018 Elsevier Inc. All rights reserved.

approximation to the exact distribution of the trend statistic, which provides a poor approximation to the exact p-value because the exact distribution is so highly skewed (i.e., approximate one-sided p-values for a direct association will be smaller than the corresponding exact p-values). Nevertheless, in spite of the small numbers of renal tumors observed in this study, the Working Group deemed this marginally significant increase in renal tumors with increasing glyphosate level to be particularly consequential because of the alleged rarity of renal tumors in unexposed CD-1 mice, and on the basis of this one study concluded that glyphosate caused renal tumors in male CD-1 mice. Reaching such a conclusion based upon marginal significance for the most extreme finding from dozens of statistical comparisons in both male and female mice is scientifically unsound, but the problems with the Working Group deliberations on the glyphosate rodent studies go much deeper than this.

Quite remarkably, particularly in view of the importance given to renal tumors in the discussion of the first CD-1 mouse study, there is no mention whatsoever of kidney pathology in the one paragraph devoted to the second CD-1 mouse study in Monograph 112. One would think that the Working Group would be highly motivated to determine if the marginal renal tubule tumor increase for male mice in the first study would be replicated in the second CD-1 mouse study. In fact, the tumor rates in male mice for renal tubule adenomas and carcinomas in the second study were 2/50, 2/50, 0/50, and 0/50 at glyphosate levels of 0, 100, 300, and 1000 mg/kg bw, respectively (Greim et al., 2015; Tarone, 2018) ($p = 0.042$ for an *inverse* association between renal tumors and glyphosate level). These findings contradict both the claim of extreme rarity for renal tumors in unexposed male CD-1 mice and the marginally significant increase in renal tumors observed in the first mouse study. Taken together, these two studies provide no evidence whatsoever that glyphosate causes renal tumors in male CD-1 mice, contrary to the conclusion of the Working Group.

In the single paragraph of the Monograph 112 glyphosate chapter summarizing the second CD-1 mouse study, the Working Group reported a significant increase in hemangiosarcomas in male mice, with rates of 0/50, 0/50, 0/50 and 4/50 ($p = 0.0036$). This was the only statistically significant finding for malignant tumors in all of the mouse and rat studies relied upon by the Working Group, and could be taken as evidence that extremely high glyphosate exposure levels might cause blood vessel malignancies in some mice. Once again, the Working Group should have been highly motivated to determine if the extreme high-dose male finding for hemangiosarcomas in the second CD-1 mouse study was replicated in the first mouse study. Glyphosate constituted 3% of the diet in the highest exposure group of the first study, so it would be expected to replicate an extreme high-dose effect if one existed for hemangiosarcomas. The male hemangiosarcoma rates in the first CD-1 mouse study were 0/49, 0/49, 1/50, and 0/50 (Greim et al., 2015; Tarone, 2018). These rates provide no evidence of increased hemangiosarcoma risk at the highest glyphosate level, but this exculpatory evidence, once again, was excluded from the Working Group deliberations.

The glyphosate rat studies reviewed by the Working Group provided no evidence of increases in malignant tumors associated with glyphosate exposure, but a few findings with benign tumors were reported that the Working Group found to be suspicious. In particular, the Working Group reported tumor rates for pancreatic islet cell adenomas from two studies in male Sprague-Dawley rats that were interpreted as evidence of possible tumorigenicity, even though there was no supporting evidence in female rats. For both of these studies the Working Group concluded that there "was no statistically significant positive trend in the incidence of pancreatic tumors, and no apparent progression to carcinomas." Nonetheless, significant pairwise comparisons of low dose groups to control groups for male rats were noted in both studies as possible evidence of tumorigenicity. The Working Group did not report pancreatic islet cell adenoma rates from the third Sprague-Dawley rat study that they relied upon, but these rates for males were 7/50, 1/24, 2/17, 2/21, and 1/49 at glyphosate dose levels of 0, 10, 100, 300, and 1000 mg/kg bw, respectively (Greim et al., 2015; Tarone, 2018) ($p = 0.027$ for an *inverse* association between glyphosate and pancreatic islet cell adenomas). Again, exculpatory evidence was excluded from the glyphosate deliberations reported in Monograph 112.

The systematic exclusion in Working Group deliberations of exculpatory evidence from the very glyphosate rodent studies relied upon by IARC is inexcusable, particularly by an influential agency such as IARC, and calls into question the effusive praise from the many IARC defenders for the supposed high quality and thoroughness of IARC Monographs Program procedures (Infante et al., 2018; Pearce et al., 2015; Portier et al., 2016). It would be difficult to support even a conclusion of limited animal carcinogenicity of glyphosate based on an honest, rigorous, and complete synthesis of the rodent carcinogenicity studies relied upon by the Monograph 112 Working Group. It is incumbent upon the defenders of IARC to address the highly questionable and selective summary of glyphosate rodent studies forthrightly, rather than to question the motivation of critics of the IARC glyphosate classification and to continue to argue from authority that IARC Monograph procedures are beyond reproach (Infante et al., 2018; Pearce et al., 2015; Portier et al., 2016).

Infante et al. (2018) state that scientific controversies such as those surrounding the IARC glyphosate classification "should be resolved by scientific experts who do not have a conflict of interest." I agree that such controversies should be resolved by open scientific debate, which is why I published the paper on the IARC glyphosate classification (Tarone, 2018). Although the paper was published online in August 2016, not one of the examples of selective data exclusion raised in the paper has been refuted. I welcome an open debate by scientific experts of the issues raised in my paper, including those related to epidemiologic studies. That debate should include consideration of legitimate scientific arguments by knowledgeable scientists, including those who are perceived to have a conflict of interest; conflicts of interest should be clearly identified, but arguments should be evaluated based on their scientific merit (May, 2011, Rothman, 1993, Tarone, 2018).

It is noteworthy that Infante et al. (2018) characterize the 94 authors of a 2016 paper defending the IARC glyphosate classification (Portier et al., 2016) as "international independent scientists". The first author, Christopher Portier, was an Invited Specialist on the Monograph 112 Working Group, and began working for a law firm in litigation against Monsanto shortly after the IARC glyphosate classification was announced (Ridley, 2017). Eight other coauthors of the 2016 paper were members of the Monograph 112 Working Group, and would likely be highly motivated to defend the IARC glyphosate classification to which they contributed. Two of these eight are also providing expert testimony in the Monsanto litigation (Wagstaff et al., 2017). It seems obvious that some might see conflicts of interest where others see independent science. Similarly, although it is stated with regard to Infante et al. (2018) that "All authors report no conflict of interest," an acknowledgement of serving as an expert consultant for plaintiffs in glyphosate litigation would appear to constitute a clear financial conflict of interest. Furthermore, having served in the past as chiefs of the IARC Monographs Program would appear to constitute a conflict of interest in a commentary defending and praising the IARC Monographs Program. Nonfinancial conflicts of interest can be every bit as powerful as financial conflicts of interest (Brown et al., 2014, Curry, 2016, Erren, 2011, McLaughlin et al., 2011, PLoS Medicine editors, 2008, Rothman, 1993, Trinquart et al., 2016). Conflicts of interest are ubiquitous and inevitable in any scientific controversy, but arguments should be evaluated based on the quality of the science and evidence supporting them, not on their source. Portier (2016) submitted comments to the US Environmental Protection Agency for consideration by the Scientific Advisory Panel evaluating glyphosate. In spite of the fact that Portier did not disclose his involvement in the Monsanto litigation in his comments, I responded to them based on their scientific merit, without making an issue of the conflict of interest (Tarone, 2016). A truly open

Exhibit E Page 8

*Editorial*  *Regulatory Toxicology and Pharmacology 98 (2018) A1–A4*

debate will almost always include scientists with perceived or actual conflicts of interest, and their arguments should stand or fall on their merits.

Regulatory decisions and the development of rational and effective cancer prevention policies depend on scientifically sound and unbiased assessments of carcinogenic potential. When the rodent tumor data from the glyphosate studies relied upon by IARC are properly evaluated, the classification of glyphosate as a probable human carcinogen is not consistent with IARC criteria and should be retracted or revised. Erroneous carcinogen classifications like that of glyphosate raise serious questions about IARC Monographs Program procedures, including the criteria for selecting Working Group Members (Erren, 2011, McLaughlin et al., 2011, McLaughlin and Tarone, 2013, Tarone, 2018). There are a variety of cognitive biases that affect the dynamics of consensus decision making by *ad hoc* deliberative bodies such as Monograph Working Groups (Bikhchandani et al., 1998, Brown, 2000, Erren, 2011, Lorenz et al., 2011, Sunstein, 2006). Scientists are not immune to the influence of information cascades, reputational cascades, and availability cascades that can influence the dynamics of deliberations in *ad hoc* deliberative bodies, and such problems are exacerbated in IARC Working Groups when the selection criteria for membership produce conditions conducive to group-think (Brown, 2000, Sunstein, 2006).

If Working Group membership is restricted so that only one side of a controversy is promoted in deliberations, or one side is promoted much more strongly than the other side, then the outcome of the deliberations can virtually be preordained. The systematic exclusion by IARC of researchers with real or perceived industry conflicts of interest decreases the likelihood that the strongest arguments defending a suspect agent against claims of carcinogenicity will be presented and discussed during Working Group deliberations, and thus increases the probability that the agent will be classified as posing a carcinogenic hazard to humans, regardless of the strength or weakness of evidence supporting that conclusion. In fact, the current IARC Monographs Program process seems at times to be akin to a criminal trial with a prosecutor and a biased jury, but no defense counsel.

Many types of competing interests, not just corporate or financial interests, pose a threat to the integrity of the IARC Monographs Program. The Monographs Program should seek to include researchers with dissenting opinions in Working Groups; conflicts of interest should be clearly identified, but not used to automatically exclude potential participants (May, 2011, Rothman, 1993). The approach taken by IARC leadership and IARC defenders to reject such concerns as unfounded and to argue by authority that current IARC Monograph procedures cannot be improved (Infante et al., 2018, Pearce et al., 2015, Wild and Cogliano, 2011, Wild and Straif, 2011) serves only to undermine the long-term scientific value of the IARC Monographs Program, and does not serve the best interests of regulatory decision making or public health.

## Funding

The author reports that there was no funding source for the work that resulted in the commentary or the preparation of the commentary.

## Conflicts of interest

The author declares no conflicts of interest.

## Acknowledgments

This commentary was submitted to the American Journal of Industrial Medicine (AJIM), where it was rejected with the offer that a letter focused on competing interest concerns related to Infante et al. (2018) and Tarone (2018) would be considered for publication. The senior editor of AJIM declared that he had no conflict of interest in the review and publication decision regarding Infante et al. (2018), even though he, like all four authors of the commentary in question, is a Collegium Ramazzini Fellow. Such a non-financial conflict of interest might introduce bias both in the review of the original commentary and in decisions regarding manuscripts critical of that commentary. The commonly held view that only financial conflicts of interest need routinely be declared is naïve and should be abandoned.

The International Epidemiology Institute was paid $750 for the author's participation in the September 2015 meeting with a Monsanto lawyer. Monsanto was the original manufacturer of glyphosate. With the exception of this meeting, neither the author nor the International Epidemiology Institute has ever been paid for work by Monsanto or for work related to glyphosate or any other pesticide. Bayer purchased Monsanto in 2018; neither the author nor the International Epidemiology Institute has been paid for work by Bayer.

## Transparency document

Transparency document related to this article can be found online at https://doi.org/10.1016/j.yrtph.2018.09.005.

## References

Bikhchandani, S., Hirshleifer, D., Welch, I., 1998. Learning from the behavior of others: conformity, fads, and information cascades. J. Econ. Perspect. 12, 151–170.
Brown, R., 2000. Group Processes, second ed. Blackwell Publishing, Malden MA, pp. 167–224.
Brown, A.W., Ioannidis, J.P., Cope, M.B., Bier, D.M., Allison, D.B., 2014. Unscientific beliefs about scientific topics in nutrition. Adv. Nutr. 5, 563–565.
Curry, J., 2016. Violating the norms and ethos of science. Climate January 31. https://judithcurry.com/2016/01/31/violating-the-norms-and-ethos-of-science/.
Erren, T.C., 2011. IARC's plea for traditional 'expert' working groups – a recipe for problems? Int. J. Epidemiol. 40, 1727–1728.
Gart, J.J., Krewski, D., Lee, P.N., Tarone, R.E., Wahrendorf, J., 1986. Statistical Methods in Cancer Research (Vol III): the Design and Analysis of Long-term Animal Experiments. IARC Press, Lyon, France, pp. 81–86 (IARC Scientific Publications No 79).
Greim, H., Saltmiras, D., Mostert, V., Strupp, C., 2015. Evaluation of carcinogenic potential of the herbicide glyphosate, drawing on tumor incidence data from fourteen chronic/carcinogenicity rodent studies. Crit. Rev. Toxicol. 45, 185–208.
Guyton, K.Z., Loomis, D., Grosse, Y., et al., 2015. Carcinogenicity of tetrachlorovinphos, parathion, malathion, diazanon, and glyphosate. Lancet Oncol. 16, 490–491.
Infante, P.F., Melnick, R., Huff, J., Vainio, H., 2018. Commentary: IARC Monographs Program and public health under siege by corporate interests. Am. J. Ind. Med. 61, 277–281.
International Agency for Research on Cancer, 2017a. IARC Monographs on the Evaluation of Carcinogenic Risks to Humans. Some Organophosphate Insecticides and Herbicides, vol. 112 IARC Press, Lyon, France.
International Agency for Research on Cancer, 2017b. IARC Responds to Reuters Article of 14 June 2017. https://governance.iarc.fr/ENG/Docs/IARC_responds_to_Reuters_15_June_2017.pdf.
Kelland, K., 2016. How the World Health Organization's Cancer Agency Confuses Consumers. April 18. Thomsonreuters.com https://www.reuters.com/investigates/special-report/health-who-iarc/.
Kelland, K., 2017a. Cancer Agency Left in Dark over Glyphosate Evidence. June 14. Thomsonreuters.com https://www.reuters.com/investigates/special-report/glyphosate-cancer-data/.
Kelland, K., 2017b. In Glyphosate Review, WHO Cancer Agency Edited Out "non-carcinogenic" Findings. October 19. Thomsonreuters.com https://www.reuters.com/investigates/special-report/who-iarc-glyphosate/.
Kelland, K., 2017c. Large U.S. Farm Study Finds No Cancer Link to Monsanto Weedkiller. November 9. Thomsonreuters.com https://www.reuters.com/article/us-health-cancer-glyphosate/large-u-s-farm-study-finds-no-cancer-link-to-monsanto-weedkiller-idUSKBN1D916C.
Lorenz, J., Rauhut, H., Schweitzer, F., Helbring, D., 2011. How social influence can undermine the wisdom of crowd effect. Proc. Natl. Acad. Sci. U.S.A. 108, 9020–9025.
May, R.M., 2011. Science as organized skepticism. Philos. Trans. A Math. Phys. Eng. Sci. 369, 4685–4689.
McLaughlin, J.K., Boffetta, P., La Vecchia, C., Lipworth, L., Blot, W.J., Tarone, R.E., 2011. Problems with IARC's 'expert' working groups. Int. J. Epidemiol. 40, 1728–1729.
McLaughlin, J.K., Tarone, R.E., 2013. False positives in cancer epidemiology. Cancer Epidemiol. Biomark. Prev. 22, 11–15.
Pearce, N., Blair, A., Vineis, P., et al., 2015. IARC Monographs: 40 years of evaluating carcinogenic hazards to humans. Environ. Health Perspect. 123, 507–514.
PLoS Medicine Editors, 2008. Making sense of non-financial competing interests. PLoS Med. 5, e199.
Portier, C., 2016. Glyphosate Issue Paper: Evaluation of Carcinogenic Potential. October 4. https://www.regulations.gov/document?D=EPA-HQ-OPP-2016-0385-0371.
Portier, C.J., Armstrong, B.K., Baguley, B.C., et al., 2016. Differences in the carcinogenic

Editorial

Regulatory Toxicology and Pharmacology 98 (2018) A1–A4

evaluation of glyphosate between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority (EFSA). J. Epidemiol. Community Health 70, 741–745.

Reuters staff, 2017. Reuters Wins Journalism Awards from Foreign Press Association and American Association for Advancement of Science. November 22. Thomsonreuters.com https://www.reuters.com/article/rpb-foreignpressassociation/reuters-wins-journalism-awards-from-foreign-press-association-and-american-association-for-the-advancement-of-science-idUSKBN1DM1GN.

Ridley, M., 2017. The Glyphosate Scandal. Mattridley.co, uk October 23. http://www.rationaloptimist.com/blog/the-glyphosate-scandal/.

Rothman, K.J., 1993. Conflict of interest: the new McCarthyism in science. J. Am. Med. Assoc. 269, 2782–2784.

Sunstein, C.R., 2006. Deliberating groups versus prediction markets (or Hayek's challenge to Habermas). Episteme 3, 192–213.

Tarone, R.E., 2016. Response to Comments Prepared by Christopher Portier (Dated October 4, 2016) for the Glyphosate EPA SAP Meeting. October 27. https://www.regulations.gov/document?D=EPA-HQ-OPP-2016-0385-0443.

Tarone, R.E., 2018. On the International Agency for Research on Cancer classification of glyphosate as a probable human carcinogen. Eur. J. Cancer Prev. 27, 82–87.

Trinquart, L., Johns, D.M., Galea, S., 2016. Why do we think we know what we know? Int. J. Epidemiol. 45, 251–260.

Wagstaff, A., Greenwald, R., Miller, M., 2017. Plaintiff's Response in Opposition to Monsanto Company's *Daubert* and Summary Judgement Motion Based on Failure of General Causation Proof and *Daubert* Motion to Strike Certain Opinions of Monsanto Company's Expert Witnesses. pp. 3–7. October 27. https://www.baumhedlundlaw.com/pdf/monsanto-documents/daubert-brief/Plaintiffs-1-Response-in-Opposition-to-Monsanto-Companys-Daubert-and-Summary-Judgment-Motion.pdf.

Wild, C.P., Cogliano, V.J., 2011. A plea on behalf of expert evaluation and the experts involved. Int. J. Epidemiol. 40, 253.

Wild, C.P., Straif, K., 2011. Expert working groups – a reliable recipe. Int. J. Epidemiol. 40, 1730–1731.

Robert E. Tarone[1]
14 Chantilly Ct., Rockville, MD, 20850, United States
E-mail address: robertotarone@gmail.com

[1] Robert Tarone retired on June 30, 2016 after 28 years as Mathematical Statistician at the National Cancer Institute and 14 years as Biostatistics Director at the International Epidemiology Institute.

Exhibit E Page 10