# EXHIBIT F

# Gmail

Robert Tarone <​███████​>

## IARC

**David Lindsay** <​███████​>  Mon, Aug 9, 2021 at 10:53 AM
To: Robert Tarone <​███████​>

Dear Bob,

Once again I must thank you for all of your effort to put me in the picture. It is really kind of you to go to so much trouble to inform me of your experience and views, as well as those of other people who have the professional knowledge to challenge IARC and their approach. I really appreciate this.

You do seem to be in accord with the way in which IARC have stuck with their system of classification and the contentious wording that they use. What I fail to understand is why they have to use this system at all. Why can't they assess individual chemical risks by giving a detailed summary and a conclusion that is relevant to that substance rather like the EFSA or the FDA would? Their conclusions could also contain a summary of what further data they think it is necessary to provide.

The more general issue concerning the use of long-term rodent bioassays and their limitations/ relevance to the assessment of cancer risks in humans, is not addressed by IARC. They should be at the forefront of proposing new methodologies, or at the very least responding publicly to scientists who have ideas for new approaches.

Frankly I don't know what more should be done since any professional criticism seems to have no effect and the industries affected by their reviews are almost invariably supine. Not even the US Congress seems to be capable of taking a stand on reform almost as though they daren't upset the consumer/environmental groups who increasingly influence the political agenda.

Sorry to be rather pessimistic. I'd appreciate you to continue feeding me with the encouragement I need.

 Kind regards,

David

Its hard for me to know what more can be done.

> On 7 Aug 2021, at 19:55, Robert Tarone <​███████​> wrote:
>
> David:
>
> I was babysitting grandkids yesterday, so I just finished reading your email.  I have been raising most of the questions regarding IARC that you are concerned about for some time.  In addition to publishing in peer-reviewed journals, I have contacted several scientists I have collaborated with in the past and who have expressed concerns about the direction science has taken recently.  Nobody has been able to explain adequately how or why IARC seems to be completely unaccountable for its actions, regardless of how poor the scientific justification for its decisions may be.  I have not gone out of my way to promote my criticism of IARC, but neither have I hidden my concerns under a bushel.  I testified before the US House Committee on Science, Space and Technology in hearings about ending funding for the IARC Monographs Program, but those hearings appear to have had no impact on funding at all.  There was plenty of blustering for the cameras by members of the Committee (no doubt providing content for local news broadcasts in member districts), but there was no change to funding.  I was deposed in December 2019 as an unpaid fact witness for two California trials in January 2020.  The purpose of the deposition was to defend my published papers on the IARC glyphosate classification so they could be cited by defense lawyers in the trials.  The

plaintiff lawyers tried to get my testimony excluded, but the judge denied their request (the judge clearly understood that I was qualified and also understood my papers - first attachment). The first case settled (a Bayer lawyer indicated that my deposition played a role) and the second case never went to trial, because it became apparent that Bayer had decided to agree to a class settlement (a very unfortunate decision in my view since there is no credible scientific evidence that glyphosate is a carcinogen).

My interactions with the IARC Monographs Program staff began with my co-authoring a 2008 paper in *Journal of the National Cancer Institute* on false positive results in cancer epidemiology studies. We were not critical of IARC (the first author worked in the IARC Monographs Program at the time), but we received a very defensive letter to the editor from a couple of IARC scientists. About the same time, one of IARC's main defenders, Paolo Vineis, wrote a critical commentary in *International Journal of Epidemiology* about our paper. Our rebuttals in *JNCI* and *IJE* to these critics started a lengthy back and forth (including contributions by Cristopher Wild, the head of IARC at the time - evidence that we had hit a nerve). The second attachment summarizes many of the points made in our exchanges with IARC staff. This paper was written to refute a horrible paper by IARC staff published in *Cancer Epidemiology, Biomarkers and Prevention* that claimed to demonstrate that there was no problem with false positives in cancer epidemiology studies. The IARC paper, even though completely wrong, was never retracted (common in epidemiology, I am afraid). It is interesting to reflect on the Appendices of our paper, in which we noted specific IARC carcinogen classifications that we disagreed with). A short time later, IARC moved coffee from a 2B to a 3 classification (still too high, but at least in the correct direction). Then recently, IARC did away with category 4, thus removing the need to correct the classification of caprolactam. I think that IARC should have a category 4, for agents unlikely to be carcinogenic, and at least one agent, coffee, should be in category 4. As you noted, IARC staff are allowed to get away with completely ignoring scientific criticism (of IARC procedures, or of specific IARC carcinogen classifications), but another of their tricks is that when they do respond (usually indirectly) to a critical paper, they often respond in a different journal than that in which the criticism is published. The response to our *CEBP* paper was a 124-author paean to IARC published in *Environmental Health Perspectives* (the NIEHS house journal that will publish anything IARC wishes). As an aside, my co-author on the *CEBP* commentary, Joe McLaughlin, died unexpectedly later in the year the paper was published, and I have been pretty much jousting with IARC alone since his death.

The incestual (scientifically speaking) relationships among Ramazzini, NIEHS and IARC are strong and detrimental to science. Two of the co-authors of the Infante et al. paper I responded to in *RTP* were ex-employees of NIEHS (as is Chris Portier, who appears to have been largely responsible for the glyphosate carcinogen classification). There must be something in the North Carolina water. I notice that Portier has worked his way onto the Ramazzini Fellow list, which is chock full of activists and advocates, some of whom allegedly once did science. I am not sure how Linda Birnbaum keeps her job as NIEHS Director, where she funds friendly scientists to produce "research" supporting the dangers of endocrine disruption.

If you have not already discovered David Zaruk, I think you will find his writing to be of considerable interest. He is a Canadian professor (I think of science communication or something similar) who lives and works in Belgium and blogs under the name, Risk-Monger. He was raising questions about IARC procedures and the IARC glyphosate classification before I had even looked into problems with Monograph 112. He is a fervent critic of the IARC Monographs Program, and lost a teaching position because of his IARC criticism. One of his major interests is the role US tort lawyers play in IARC carcinogen classifications. His SlimeGate blog entries will provide a good entry into his thinking. https://risk-monger.com/issues/slimegate/

That's all for now. I look forward to future interactions. As you note, the issues I have raised have had no impact on how the Monographs Program does its business. In the March 2019 meeting of the advisory panel to set priorities for agents to be considered for IARC Monographs in the next five years, panel members were asked to review a large number of past IARC classifications, including glyphosate. My two papers were not included in the references provided for the panel's consideration, and the panel rubber stamped the glyphosate classification as a probable carcinogen. It appears that the self correcting mechanism of science is missing in action.

Best regards,

Bob

On Fri, Aug 6, 2021 at 12:12 PM David Lindsay <█████████> wrote:
> Dear Robert,
>
> I am extremely grateful to you for sending me the article you wrote concerning the IARC procedures for the classification of glyphosate. It raises a number of concerns that I have long felt about the value of the

IARC process and I would value your reaction to my concerns. I hope that you will forgive my lack of knowledge of a field that you clearly are an expert in, but I would appreciate your reactions to my concerns.

It has long seemed odd that organisations like IARC and its parent body WHO go to such great lengths to ensure the selection of experts on their panels for evaluation of toxicological data are "independent". You clearly illustrate the focus they place on ensuring there is no conflict of interest from commercial interests whilst ignoring other, equally important, conflicts of interest.

All chemicals that are approved for use by regulatory authorities are dependant on data provided by the manufacturers. These data may give rise to questions about the data that require further work to be satisfied in order that that the products can be licensed for use.

What I cannot understand is why there is a process which depends on the provision of data by industry but when it comes to issues of public health, great pains are taken to exclude any industrial scientists or advisors to industry from the process. Nonetheless such "independent" panels consider data generated by industry.

Another issue I would like to raise is the apparent relationship between the staff of NIEHS/NTP and the Ramazzini Institute. This Institute has a somewhat opaque funding structure but given the work they undertake I assume a substantial amount of their funding comes from NIEHS or NTP. The Fellows of the Institute include past and present members of NIEHS/ IARC Working Groups e.g., J. Bucher (Ass Director NTP, NIEHS); A K Miller K Straif etc. Fiorella Belpoggi who is Director of the Cesare Maltoni Cancer Research Centre - part of the Ramazzini Foundation - has been a member of the Advisory Group recommending priorities for IARC monographs. It is interesting that she is the person who has undertaken work on glyphosate, aspartame and radiofrequencies. These studies have not evaded criticism but it would appear this has no effect on the continual funding base of the Centre or of her close involvement with IARC.

When the Institute first called a press conference in 2005 to publicize its conclusions on the potential carcinogenicity of aspartame, there was criticism that the communication strategies used by the Institute were not transparent, that they were focused on sensationalizing the results, and used them to actively mislead the media. According to this author they did not meet proper risk communication criteria [Lofstedt RE (2008) Risk Management 10. 257-284]. This would seem to be par for the course as far as this institute is concerned and raises the question as to whether it is a deliberate action on their part to go public to secure further funding.

As you point out in your article, the fact that the scientists who rose to defend the approach taken by IARC in carcinogen classification, are scientists many of whom have had some connection with the process, or have benefitted from funding by the NTP or NIEHS. This lack of transparency, and the lack of any response on the part of IARC to your detailed critique, indicates to me that there is something seriously wrong with the operation of the Agency. It could perhaps extend to the work of the NTP and the NIEHS also. As you rightly point out scientific controversy is always present, especially in extrapolating high-dose, rodent bioassay data to human risk. But this debate should be open and transparent.

A recent paper {Doe et al (2019) Reg Toxicol & Pharmacol.103: 124-129} criticised the concept that chemicals are either a carcinogen or non-carcinogen and outlined a process whereby the use of a long-term rodent bioassay could be replaced. This appears to have had no reaction from IARC, NTP or the regulatory agencies. It seems incredible that these agencies should not appear to be at the forefront of creative thinking about ways of improving the assessment of carcinogenic risk.

It also seems extraordinary that IARC make no attempt to undertake hazard assessment. The level of exposure is so fundamental to any safety assessment. Why do they ignore this?

IARC's system of classification of chemicals into 1) carcinogenic; 2a) probably carcinogenic; 2b) possibly carcinogenic or 3) not classifiable as to its carcinogenicity to humans leads to a situation where many chemicals are given a categorization which creates uncertainty and concern about their safety-in-use. The media and general public are left with an impression that they are exposed to unacceptable cancer risks.

Very few of the chemicals that IARC has prioritised for review have been classified as posing little or no risk to human health. Chemicals with up to 100-million-fold differences in their potency, or likelihood to cause cancer, have been grouped into the same category.

The process takes no account of the context of the carcinogenic risk potential since it does not involve any process of risk assessment and takes no account of the potential anti-carcinogenic chemicals or

processes that may be brought into play at normal levels of exposure, especially in the context of chemicals present in the human diet. Nor does the process involve any attempt to undertake a comparative cancer risk assessment e.g., with the risks of obesity and cancer risk, or attempt to assess the cancer health risks with those of other health risks or benefits.

IARC seems incapable of accepting any changes in its classification system or of responding to the criticisms of scientists who are not influenced by the IARC process. As you are probably well aware the chemical industry has objected to the IARC approach. This resulted in a US congressional committee beginning a review in 2017 into US federal funding of IARC suggesting that IARC had a record of "controversy, retractions and inconsistencies." The US chemical trade organisation argued to the committee that IARC's findings led to alarming headlines and unnecessary public concern. The fact that President Biden has restituted the US support for WHO might suggest that there will be no congressional pressure put on the IARC to institute reforms.

Much damage is created in the minds of the general public who are more and more suspicious of the use of industrial chemicals and non-natural compounds. They are convinced that natural and organically-produced foods are healthy, whereas manufactured products are not. These views are frequently fuelled by the toxicological community. Moreover, the effect it is having on industry is incalculable. Rather than fight any review by "independent" scientists they are prone to avoid litigation and adopt a low profile.

I was very interested to know that your detailed analysis of the glyphosate data indicated that there was evidence of an inverse relationship between dose and incidence of renal tumours. It could be argued that this is not the only example of where there might be a non-linear dose-response relationship. This is rarely observed because it would involve too many rodents to study effects at low doses and doses that are more relevant to human exposure levels.

I've long had a concern about the use of the rodent bioassay particularly in the context of assessing the safety of food additives or natural food constituents or contaminants. The approach is reductionist and takes no account of the effect of other dietary constituents on the overall risk. Invariably importance is attached to any Random Controlled Trials that may have been undertaken and these are rarely, if ever, undertaken with scientific rigour depending as they do on the accurate measurement of intake over a long period of time. Something that is incredibly difficult to achieve with any accuracy. Whilst the toxicologists can argue that they have ensured that consumers have not been exposed to unacceptable risks, the issue of benefit has never been given similar scientific evaluation. A consequence of emphasising risk is to have created a situation whereby consumers think there are always risks attached to chemicals added to food and never benefits.

Given the fact that IARC have not responded to any one of the issues raised in your paper, it seems that they regard themselves as beyond criticism and can continue to be seen as protectors of the public health. I am inclined to think that the important issues you have raised will have no impact which is very concerning. I can see no way in which the current process could be changed as the scientists who are part of the system would appear to have the overwhelming support of the international community and the principal sponsors. Perhaps you have some thoughts about what action(s) might have the potential to bring about a reappraisal of IARC's cost effectiveness and undermine their continued promotion of the opinion that they are inviolate from any conflict of interest, unlike their critics?

I look forward to any further thoughts you may have and thank you again for providing me with such a stimulating paper.

Yours very sincerely,


David

> On 5 Aug 2021, at 16:12, Robert Tarone <▇▇▇▇▇▇▇▇▇▇▇▇> wrote:
>
> David:
>
> Attached is the RTP paper, which demonstrates that the summary of glyphosate rodent studies by the Monograph 112 Working Group is completely erroneous. Remarkably, the fraudulent classification of glyphosate as a probable human carcinogen in 2015 has neither been retracted nor revised by IARC, which has not refuted a single one of the claims in my papers.
>
> Bob Tarone

> On Thu, Aug 5, 2021 at 6:25 AM David Lindsay <███████> wrote:
>
> Dear Dr Tarone,
>
> I am interested in reading the article you published in Reg Toxic Pharm (2018) 98 A1-A4.
> I am unable to read this online and am told there is no abstract available.
>
> I would be very grateful if you were able to send me a copy of this article.
>
> Yours sincerely,
>
> David G Lindsay, Ph.D.
>
> 44 Park Gate
> Somerhill Rd
> Hove
> BN3 1RL
> UK
>
> <RTP.infante_final.pdf>

<court.order_tarone.pdf><cebp.fp.pdf>