# EXHIBIT H

   Robert Tarone <​█████████████​>

## CLML letter in December issue
2 messages

**Robert Tarone** <​█████████████​>  Wed, Nov 30, 2022 at 10:38 AM
To: "Vales, John R." <​█████████████​>

FYI. Letter has appeared in the December print issue.

📎 **weisenburger.letter_final.pdf**
　　101K

---

**Vales, John R.** <​█████████████​>  Wed, Nov 30, 2022 at 10:40 AM
To: Robert Tarone <​█████████████​>

Looks great, nicely done Bob.


Best regards,

Jack


   **John R. Vales**
Partner

What's Next? The answer is Talent. With more than 20,000 people, 12,000 lawyers and 200 locations, Dentons has the talent for what you need, where you need it.

D +1 973 912 7129   |   M +████████   |   O +1 212 768 6792   |   US Internal 57129
█████████
Bio   |   Website

Dentons US LLP


LuatViet > Fernanda Lopes & Associados > Guevara & Gutierrez > Paz Horowitz Abogados > Sirote > Adepetun Caxton-Martins Agbor & Segun > Davis Brown > East African Law Chambers > Eric Silwamba, Jalasi and Linyama > Durham Jones & Pinegar > LEAD Advogados > For more information on the firms that have come together to form Dentons, go to dentons.com/legacyfirms


Dentons is a global legal practice providing client services worldwide through its member firms and affiliates. This email may be confidential and protected by legal privilege. If you are not the intended recipient, disclosure, copying, distribution and use are prohibited; please notify us immediately and delete this copy from your system. Please see dentons.com for Legal Notices.

**From:** Robert Tarone <██████████████>
**Sent:** Wednesday, November 30, 2022 10:38 AM
**To:** Vales, John R. <██████████████>
**Subject:** CLML letter in December issue

**[WARNING: EXTERNAL SENDER]**

[Quoted text hidden]

## Bob Tarone

| | |
|---|---|
| **From:** | David Zaruk <​█████████​> |
| **Sent:** | Friday, November 04, 2022 11:14 AM |
| **To:** | Bob Tarone |
| **Subject:** | RE: more glyphosate nonsense |

Hi Bob,

My apologies for the delay in replying – I have been dealing (relentlessly) with certain issues still with my former university, my ministry and now the courts. I was a whistleblower who then got fired for criticizing my management for not acting earlier to protect students (there are, as of now, 28 victims of sexual abuse from my former boss which were reported to me). Now after my university (KU Louvain) was in the Belgian media for not acting to discipline a professor (who is now in prison for raping a student), my story has suddenly become "mediatique". At least the students now have protective measures in place and a means to raise complaints.

I have not seen this IARC document and I suspect it was an internal briefing for any media communications. 2018 was a busy year for them. What is interesting is that they are re-writing reality with a less than accurate timeline on Portier, on when glyphosate was added to a monograph on insecticides and indeed on Kelland's work. It looks like most of this was written by Guyton as she was using examples from her time in the EPA on formaldehyde (where she has now returned).

It is worth writing an article on this document and their delusions. As I suspect it is confidential, could you track where you obtained it so I know if it is not publicly accessible (at which point I will make it so)?

Have a nice weekend
David


**From:** Bob Tarone <​█████████​>
**Sent:** Monday, 3 October 2022 16:17
**To:** David Zaruk <david@zaruk.com>
**Subject:** more glyphosate nonsense

David:

Hope this message finds you well.

If you haven't seen it already, I thought you would be interested in my recent letter to the editor of *Clinical Lymphoma, Myeloma and Leukemia* in response to a review by Dennis Weisenburger (a piece of litigation porn). I worked with Geoffrey Kabat on his Genetic Literacy Project commentary on my letter, which is linked below (letter appended at the end). We link to a couple of your blog posts. If IARC was a legitimate scientific agency I would think they would feel obligated to respond to the criticism, but my guess is they will continue simply to ignore it.

https://geneticliteracyproject.org/2022/09/27/crucial-misrepresentations-about-glyphosate-the-worlds-best-selling-herbicide-continue-to-haunt-farmers-and-threaten-agriculture-this-scientist-explains-how-the-un-agency-iarc-misinterpret/

Coincidentally, I stumbled upon the attached January 2018 defense of the glyphosate classification that is attributed to the IARC Director. You may well be aware of this document, but somehow I had missed it previously. It completely ignores my papers and any of my criticism of the rodent tumor deliberations (the link to the IARC post criticizing my paper in footnote 8 of the attached defense no longer works, so there is nothing in the defense that might draw attention to my papers). Remarkably, it blames the changes in the initial glyphosate draft noted by Kate Kelland in one of her Reuters articles on the fact that the draft relied on the industry sponsored rodent review paper by Greim et al. (noted in my letter to the editor). I find it hard to believe that IARC would depend heavily upon an industry review for their draft, but if true, then it is even more remarkable that IARC staff did not provide the exculpatory evidence contained in the supplementary material of Greim et al. to the Working Group. Dishonest doesn't begin to describe the IARC Monographs Program response to criticism of the fraudulent glyphosate classification.

Best regards,

Bob



Robert Tarone <█████████████████>

# Update
3 messages

**Vales, John R.** <█████████████████>  
To: Robert Tarone <█████████████████>

Thu, Nov 11, 2021 at 11:11 AM

Dear Bob, Happy Veteran's Day, and thank you for your service to our great country.

I wanted to let you know that Monsanto played portions of your deposition testimony yesterday in the Stephens v. Monsanto trial, which is occurring remotely in San Bernardino, California Superior Court. About 1 hour of testimony came in yesterday, and it is expected that about 5 more minutes of testimony will be played on the next trial date, November 22. The trial is expected to conclude in December. I will ensure to update you on the outcome.

Separately, I have not received further information regards the Company's submissions to RMS, but have advised of your concerns.

I hope that you and your family have a happy Thanksgiving.

Best regards,

Jack

---

**大成 DENTONS**

**John R. Vales**
Partner

What's Next? The answer is Talent. With more than 20,000 people, 12,000 lawyers and 200 locations, Dentons has the talent for what you need, where you need it.

D +1 973 912 7129   |   M +█████████████   |   O +1 212 768 6792   |   US Internal 57129
█████████████
Bio   |   Website

Dentons US LLP

Fernanda Lopes & Associados > Guevara & Gutierrez > Paz Horowitz Abogados > Sirote > Adepetun Caxton-Martins Agbor & Segun > Davis Brown > East African Law Chambers > Eric Silwamba, Jalasi and Linyama > Durham Jones & Pinegar > LEAD Advogados > Rattagan Macchiavello Arocena > Jiménez de Aréchaga, Viana & Brause > Lee International > Kensington Swan > Bingham Greenebaum > Cohen & Grigsby > For more information on the firms that have come together to form Dentons, go to dentons.com/legacyfirms

Dentons is a global legal practice providing client services worldwide through its member firms and affiliates. This email may be confidential and protected by legal privilege. If you are not the intended recipient, disclosure, copying, distribution and use are prohibited; please notify us immediately and delete this copy from your system. Please see dentons.com for Legal Notices.

**Robert Tarone**   
To: "Vales, John R." <​>  
Tue, Nov 16, 2021 at 9:13 AM

John:

Thanks John. I've been dealing with Covid for the last week. I got an infusion yesterday of Regeneron monoclonal antibodies, so hopefully I have turned the corner.

A day before receiving your email I got an email from a retired California toxicologist, Brian Mathison, who seems to follow the California Roundup trials closely. I had not heard from him in a while, but he contacted me to let me know that my deposition had been used in the San Bernardino trial. He indicated that he thought the defense was doing much better than in previous trials.

Thanks again, and stay well.

Bob
[Quoted text hidden]

**Vales, John R.**   
To: Robert Tarone <​>  
Tue, Nov 16, 2021 at 9:21 AM

Bob, thank you for your note. I am sorry to hear that you contracted Covid. Hopefully, the infusion of Regeneron will prove effective.

Thank you as well for the info on Brian Mathison. It does appear that he is closely following the trial, as he has many updates on trial developments in his twitter feed – including a discussion of your testimony. I agree it would appear the evidence is coming in stronger in this case than in the initial three trials. I am thankful the jury was able to hear a portion of your testimony. I will let you know how it turns out.

Feel better, and stay strong.

Regards,

Jack

 **John R. Vales**
Partner

What's Next? The answer is Talent. With more than 20,000 people, 12,000 lawyers and 200 locations, Dentons has the talent for what you need, where you need it.

D +1 973 912 7129 | M + [redacted] | O +1 212 768 6792 | US Internal 57129
[redacted]
Bio | Website

Dentons US LLP

Fernanda Lopes & Associados > Guevara & Gutierrez > Paz Horowitz Abogados > Sirote > Adepetun Caxton-Martins Agbor & Segun > Davis Brown > East African Law Chambers > Eric Silwamba, Jalasi and Linyama > Durham Jones & Pinegar > LEAD Advogados > Rattagan Macchiavello Arocena > Jiménez de Aréchaga, Viana & Brause > Lee International > Kensington Swan > Bingham Greenebaum > Cohen & Grigsby > For more information on the firms that have come together to form Dentons, go to dentons.com/legacyfirms

Dentons is a global legal practice providing client services worldwide through its member firms and affiliates. This email may be confidential and protected by legal privilege. If you are not the intended recipient, disclosure, copying, distribution and use are prohibited; please notify us immediately and delete this copy from your system. Please see dentons.com for Legal Notices.

**From:** Robert Tarone <[redacted]>
**Sent:** Tuesday, November 16, 2021 9:14 AM
**To:** Vales, John R. <[redacted]>
**Subject:** Re: Update

**[WARNING: EXTERNAL SENDER]**

John:

[Quoted text hidden]



**Robert Tarone** <███████████████>

## Comments

Robert Tarone <████████████████>  
To: "Vales, John R." <████████████████>

Mon, Nov 1, 2021 at 11:51 AM

Attached are my comments submitted today to the EFSA.

I really am curious to know why Bayer apparently ignored my papers, if there is any way you can shed light on the situation.

Thanks.

Bob  
[Quoted text hidden]

📄 EFSA_AGG.comments.docx  
13K

The suggestion that the IARC classification of glyphosate as a probable carcinogen differs from the conclusions of all other evaluations of the carcinogenic potential of glyphosate around the world only because IARC failed to take multiple comparisons into account in the evaluation of rodent studies does not adequately address the serious deliberative errors made in IARC's assessment of glyphosate. The Monograph 112 Working Group had to exclude entirely exculpatory evidence from the rodent studies relied upon by IARC in order to come to its erroneous conclusion that glyphosate is a probable carcinogen (Tarone RE – *Eur J Cancer Prev* 2018;27:82-87 and *Regul Toxicol Pharmacol* 2018;98:A1-A4). The failure to cite these peer-reviewed papers in the comprehensive RMS review is inexcusable. The first paper was published online in August of 2016, and none of the deficiencies noted in the Monograph 112 Working Group deliberations has been disputed by IARC or its defenders. There were, in fact, more significant decreases in tumor rates with increasing glyphosate exposure level than significant increases both in the studies relied upon by IARC (*Regul Toxicol Pharmacol* 2018;98:A1-A4) and in the larger body of rodent studies evaluated in the RMS review (Crump et al. – *Toxicol Sci* 2020;175:156-167). There is no credible evidence supporting the conclusion that glyphosate causes tumors in rodents, and without its conclusion that there was sufficient evidence of animal carcinogenicity the Monograph 112 Working Group could not, based on the published IARC criteria, have come to the overall conclusion that glyphosate is a probable human carcinogen. I coauthored IARC Scientific Monograph No. 79 on the statistical analysis of animal carcinogen bioassays, and can state with authority that the deliberative errors by the Working Group in its summary of glyphosate rodent studies are scientifically indefensible.

Because the meta-analysis reported by Zhang et al. (*Mutat Res* 2019;781:186-206) is being strongly promoted by those claiming that glyphosate is a carcinogen, it would seem advisable to provide more information in the RMS AGG report to allow an assessment of its reliability. Kabat et al. (*Cancer Causes and Control* 2021;32:409-414) provide a detailed examination of the mechanistic assumptions underlying the choice of estimates included in the Zhang et al. meta-analysis, and demonstrate that the currently available evidence does not support those mechanistic assumptions. In particular, the assumption of a long latency period for development of NHL, without which Zhang et al. could not have produced a significant summary meta-estimate, is not supported by available evidence. Kabat et al. also provide summaries of recent meta-analyses of glyphosate epidemiology studies through the year 2020, including the paper by Leon et al. (*Int J Epidemiol* 2019;48:1519-1535) cited in the RMS AGG report. Meta-analyses that incorporate the most recently updated risk estimates from epidemiologic studies of glyphosate and NHL provide no evidence whatsoever that glyphosate is associated with NHL risk.

   Robert Tarone <█████████>

## Comments

Vales, John R. <█████████>   Tue, Oct 26, 2021 at 3:24 PM
To: Robert Tarone <█████████>

Hi Bob, good speaking with you today. I will let you know if your prior testimony ends up getting presented in the Stephens trial. Also, I would be grateful if you sent me a copy of your comments to the EFSA and ECHA. Thank you.
Regards, Jack

   **John R. Vales**
Partner

What's Next? The answer is Talent. With more than 20,000 people, 12,000 lawyers and 200 locations, Dentons has the talent for what you need, where you need it.

D +1 973 912 7129   |   M +█████████   |   O +1 212 768 6792   |   US Internal 57129
█████████
Bio   |   Website

Dentons US LLP



Fernanda Lopes & Associados > Guevara & Gutierrez > Paz Horowitz Abogados > Sirote > Adepetun Caxton-Martins Agbor & Segun > Davis Brown > East African Law Chambers > Eric Silwamba, Jalasi and Linyama > Durham Jones & Pinegar > LEAD Advogados > Rattagan Macchiavello Arocena > Jiménez de Aréchaga, Viana & Brause > Lee International > Kensington Swan > Bingham Greenebaum > Cohen & Grigsby > Sayarh & Menjra > For more information on the firms that have come together to form Dentons, go to dentons.com/legacyfirms

Dentons is a global legal practice providing client services worldwide through its member firms and affiliates. This email may be confidential and protected by legal privilege. If you are not the intended recipient, disclosure, copying, distribution and use are prohibited; please notify us immediately and delete this copy from your system. Please see dentons.com for Legal Notices.

**Bob Tarone**

| | |
|---|---|
| From: | Nathan A. Schachtman <nathan@schachtmanlaw.com> |
| Sent: | Thursday, March 04, 2021 2:04 PM |
| To: | Bob Tarone |
| Subject: | Re: query about depositions |

Bob,

The general rule is that depositions, like testimony in court, and other documents produced in discovery are public documents. There are probably some court reporters who might quarrel with this statement because they are keen to force everyone to go through them, and so they can charge multiple times for the transcript. Deposition transcripts are regularly quoted, exchanged, uploaded to the internet, etc.

There are some exceptions. In many cases, especially those involving claims of health effects, there are suggestions from both sides that deposition transcripts and other materials should be marked confidential, and available only to parties in the case, or those who have signed a non-disclosure affidavit. Even here, there is typically a standing order in the case that requires parties and counsel to designate what is to be kept from public view, and to state why. If the other side disagrees, then the issue may be put before the court for a judicial determination. If the deposition is taken subject to a court's protective order, this fact is usually clearly displayed on the first page of the deposition.

There are some depositions that are completely confidential. Take for example, the issuance of a subpoena to a researcher for his underlying data. The research moves to quash the subpoena on grounds that the data are confidential. It would not be uncommon for the court to "split the baby," by allowing production, and even the researcher's deposition, under a "protective order," which made everything protected by court order, subject to the court's contempt-of-court supervision.

Reversing the order of questions, I can answer definitively about the court order. Unless the court order is clearly franked "filed under seal," or "confidential," or "for parties and counsel only," or some such verbiage, the court order is clearly in the public domain, and can be freely cited, quoted, and distributed.

As for the deposition itself, my answer has to be hedged more. I don't know whether the transcript was marked confidential, or "subject to a protective order." If you have a copy, please check and let me know.

But even if the transcript were franked as confidential, I am not sure that is the end of the matter. I would want to know that the transcript was not later filed as an exhibit to a motion or a brief in court – without asking the court to accept the filing "under seal," which would alert the clerk of the court to not allow public access to this part of the filing. In other words, confidential status can be lost by how the parties and their counsel handle materials subsequently. Transcripts of testimony that are read in open court will lose their confidential status.

1

Exhibit H Page 11

Finally, I will note that the firm that is prosecuting many of the glyphosate cases, Baum & Hedlund, has posted many documents to its website, including many that contain "confidential" labels.

The following search string in Google yielded over one hundred hits, some of which are probably duplicates:

tarone site:https://www.baumhedlundlaw.com/

I have not culled through the hits to see if your transcript was there. If your transcript documented that your testimony undermined Gillam's narrative, I doubt that the Baum firm would have put it online.

Finally, the suggestion that a deposition transcript is confidential because the case has settled seems silly. I know some of the defense counsel involved (at Kirkland & Ellis), and if you would like me to talk to someone higher up the foodchain there, I would be happy to do so. If the transcript is not marked confidential, that really is the end of the matter. If it is marked confidential, you can show the blogger the court order and tell him or her that you will support an application to the court to remove the confidential designation. The blogger can file a motion even in a settle case to obtain contents of the court file.

If you would like to discuss in real time, I would be happy to take your call. I tried to cover everything you asked, but I may have missed a bit here or there.

Best.

Nathan

--
Nathan A. Schachtman
325 East 79th St., Apt. 16-D
New York, NY 10075
(212) 600-4912
Nathan@SchachtmanLaw.com
http://SchachtmanLaw.com

------ Original Message ------
From: "Bob Tarone" <​          ​>
To: "nathan@schachtmanlaw.com" <nathan@schachtmanlaw.com>
Sent: 3/4/2021 11:03:06 AM
Subject: query about depositions

Dear Mr. Schachtman:

I have a couple of questions about depositions, and Geoffrey Kabat suggested that you would be able to answer them. I think you are aware of my criticism of the IARC classification of glyphosate as a probable human carcinogen, and much of what we know about procedural issues related to the glyphosate deliberations at IARC has come from depositions in California Roundup cases that have been made public. I have never understood how some of these

2

Exhibit H Page 12

depositions have made it into the public domain, and this is my first general question. Who has ownership of depositions in toxic tort cases, and under what circumstances can depositions be made public?

My second question is more specific, and relates to my deposition in December 2019 as an unpaid fact witness. The purpose of the deposition was to defend my two published papers on the IARC glyphosate deliberations, because the defense law firm (hired by Bayer after Monsanto lost the first three cases in California) wanted to rely on them in two upcoming Roundup trials in California. Inexplicably, to me anyway, it appears that my papers played no role in the Monsanto defense in the first three cases. A Bayer lawyer had approached me to serve as a paid expert witness, but I declined because I knew my testimony would be considered to be tainted by industry bias if it was paid for by Bayer. Both January 2020 cases settled before going to trial. A month ago I was approached by an investigative blogger who was interested in looking into my criticism of the IARC glyphosate deliberations. She was concerned, however, about the claims by IARC and its defenders (particularly at US Right to Know) that I am a Monsanto consultant. I have acknowledged the 2019 deposition in two peer-reviewed publications, and the blogger asked if I could provide her with a transcript of the deposition, in which I assert under oath that I have never been a Monsanto (or Bayer) consultant. I asked the Bayer lawyer, and he said that because the two cases had settled, the deposition was not in the public domain, was classified as confidential, and could not be shared. Does this seem correct?

Although both California cases settled, the judge filed a document titled, "Order on pretrial matters including summary judgment, *Sargon* challenges, motions in limine, requests for judicial notice". In this court order he denies a motion by the plaintiff lawyers to have my opinion excluded. The judge noted my status as a non-retained expert witness, stated that my scientific work was not paid for by Monsanto, and provided a clear and succinct summary of my qualifications and my published critique of the IARC deliberations. Thinking that this order might satisfy the blogger's concerns about Monsanto ties, I asked the Bayer lawyer if I could provide her with the portion of the order in which the judge concluded that I was qualified to offer an opinion. The lawyer said I could do so only if the court order was in the public domain (something I would have expected him to know). I would appreciate your opinion on this question. The US Right to Know has effectively smeared Reuters science writer, Kate Kelland, because she based a 2017 news article on exhibits from a deposition of Aaron Blair (which is available online) that USRTK claims are not in the public domain. It is not clear to me that Kelland did anything illegal, but I don't want to get anyone in trouble by providing a document that should be treated as confidential.

Thanks for your consideration.

Best regards,

3

 Gmail          Robert Tarone <████>

## glyphosate

**Robert Tarone** <████>     Mon, May 4, 2020 at 10:43 AM
To: douglaslweed <████>

Doug:

It has been over two months since you last communicated with me about the glyphosate controversy and indicated that you would stay in touch. Ordinarily I would not bug you, but I can't tell you how many times in the past 5 years I have sent my IARC/glyphosate papers to people requesting them, they have responded initially with interest, and then I never hear from them again. I am beginning to get paranoid (I have been told by numerous colleagues that IARC and its defenders have been sliming me to anyone who will listen). Gio Gori told me (only half joking) that they would kill me if they could. So I am just curious what you think of my papers, and for what purpose you requested them.

Thanks.

Bob

On Tue, Feb 25, 2020 at 9:07 AM douglaslweed <████> wrote:
> Bob,
>
> Thanks! And sorry for not responding sooner. Your experiences with publishing are troubling to say the least.
>
> I will stay in touch.
>
> Doug
>
>
> Sent from my Verizon, Samsung Galaxy smartphone
>
>
> -------- Original message --------
> From: Robert Tarone <████>
> Date: 2/25/20 7:37 AM (GMT-06:00)
> To: ████
> Subject: glyphosate
>
> Doug:
>
> Did you get my response to your email with the attached documents?
>
> Bob

 Gmail

Robert Tarone <​​​​​​​​​​​​​​​​​​​​​​​​>

## A publication request (and a blast from the past)

**Robert Tarone** <​​​​​​​​​​​​​​​​​​​​>
To:

Tue, Feb 18, 2020 at 11:25 AM

Doug:

Good to hear from you. I have attached the EJCP paper as finally published in print. My experience with this paper was the strangest I encountered in over 40 years of publishing in scientific journals. I assume you have seen my *Regulatory Toxicology and Pharmacology* paper (probably where you found my gmail address), which provides some details about the paper. It was accepted online in August of 2016. In December 2016 IARC (Loomis, Guyton, and Straif) submitted a letter to the *EJCP* editor, which he sent to me for review. The IARC folks didn't rebut any of the scientific issues I raised in the paper (because they could not), but chose to raise technical issues about whether the paper met the international standards for a research paper and, of course, to attempt to smear me as a Monsanto tool with a financial conflict of interest. I told the editor that the letter should be published, and submitted my response to the IARC letter. The editor accepted both letters and sent them to the publisher for processing. The representative of the publisher apparently realized for the first time that my paper might be controversial, and told the editor that neither letter would be published, and he also indicated that I should make a few changes in my paper before it would be published. I can't know whether someone at IARC got to the publisher, but unknown to me, the IARC folks had filed a complaint with the Committee on Publication Ethics (COPE) based largely on the issues they raised in their letter to the *EJCP* editor. It appeared that they were trying to get my paper retracted, but the editor was a stand up guy, and after over a year of back-and-forth communications between the editor and COPE the paper was finally published in print in January 2018 (with three minor changes - I agreed with the editor that it was worth making the changes to get the paper in print).

I have been involved in published exchanges with IARC Monographs Program staff and IARC defenders since 2008 about what I perceive to be problems with Monograph Working Groups procedures, but even I would never have believed that IARC would produce a fraudulent classification like that in Monograph 112 for glyphosate. The fact that the classification still stands is disgraceful, and is a condemnation not just of IARC Monographs staff, but also the larger scientific community. I have not been shy about circulating my papers among numerous researchers I have collaborated with over time, and although nobody finds any errors in my papers, most folks seem to be largely untroubled by the IARC fraud - either they don't want to be seen as critical of IARC or they don't want to be seen as defending Monsanto. Science seems to take a back seat when it comes to glyphosate. I also testified before the House Science, Space and Technology committee, and although several reporters came up to me after my testimony asking questions, nobody wrote an article about the fraud at IARC. Gary Taubes was one of the few researchers who expressed serious concern, and he tried to get the *Science* news editor interested in opening an investigation of the IARC glyphosate classification. The editor indicated that he had always wondered why IARC was alone in its assessment of glyphosate, but in the end he decided that it would be too much of "a morass" for any of his reporters to cover. The errors made by the Monograph 112 Working Group are so basic, that any competent science writer should have no trouble investigating them.

I assume you mean you are deep into the glyphosate controversy, and if so I would be glad to help you in any way I can. I know as much as anyone about the peculiarities in the IARC glyphosate deliberations, both with regard to the rodent studies and the epidemiology studies. I don't know if you have seen Geoffrey Kabat's commentary in *Issues in Science and Technology* (Fall 2019 issue), but I have also attached it for your information. *IST* is a quarterly journal, and they publish responses to articles in a Forum section in the subsequent issue. I have attached the responses to Kabat's commentary from the Winter 2020 issue. Unfortunately, the editor shortened my response without informing me, and the edits weakened the tone of my response. All *IST* articles are accessible online without subscription if you want to peruse them at the journal website.

Again, I'm not sure what you have seen, but I have also attached an excellent paper by Kenny Crump evaluating evidence of recall bias in the case-control studies of glyphosate. This has obvious implications with regard to the terrible meta-analysis published by Zhang et al. in *Mutation Research*. I sent detailed comments to the *Mutation Research* editor shortly after the Zhang paper was published online, indicating why the paper should not be published without major changes, but he obviously was not impressed and published the paper without change. I can forward you the email I sent to Dr. DeMarini if you are interested. Kabat makes some of the points I made in his *IST* commentary.

Portier just published a terrible paper on the rodent studies in *BMC Environmental Health* (he knows how to pick a journal - the two editors in chief and several associate editors are Collegium Ramazzini Fellows). It was clearly written with litigation in mind, not science. Joe Haseman has been trying for some time to get his paper summarizing all rodent studies of glyphosate published, so I sent it to Joe (my focus has very much been on the IARC Monographs Program, so I

have not evaluated in depth the rodent studies IARC did not rely on). He wrote a scathing review of Portier's paper, which hopefully he will submit to the journal. I find in interesting that experienced "old hands" like Crump (who had trouble getting his paper published), Haseman, and yours truly have trouble getting our papers on glyphosate published, while anti-pesticide activists seem to have little trouble getting their points of view in print.

Enough for now.

Bob

On Mon, Feb 17, 2020 at 12:50 PM <​​​​​​​​​​​​​​​​> wrote:
> Hi Bob,
>
> It's been too long since we've had a chance to touch base. Hope you're doing well. As you can see, I am in SLC now (past 8 years) doing my solo consulting gig. Been busy. I was hoping you could send me a pdf of your paper in Eur J Cancer Prev (2018) on IARC. I'm deep into this now and your perspective is both good and helpful.
>
> If you're ever out this way, please look me up. It would be great to spend some time chatting.
>
> All the best,
>
> Doug
>
> Douglas L. Weed, M.D., M.P.H., Ph.D.
> Founder and Managing Member
> DLW Consulting Services, LLC
> 1302 N. Oak Forest Rd. Salt Lake City, UT 84103
>
> 301.980.0197 fax: 801.359.8939
>
> THE INFORMATION CONTAINED IN THIS EMAIL IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE DESIGNATED RECIPIENTS NAMED ABOVE. This message may contain information protected by the attorney-client privilege or work product doctrine from disclosure and use by anyone other than the intended recipients. If you are not the intended recipient, please immediately forward the email back to our email address listed above without reviewing, disseminating, or copying the email or any information contained therein.

**4 attachments**

- **EJCP.glyphosate_2018.pdf**
  126K
- **Kabat - Who's Afraid of Roundup.pdf**
  1902K
- **IST.Forum.docx**
  21K
- **crump.risk_analysis.pdf**
  653K