# EXHIBIT F

# Expert Report of Cristian Tomasetti, Ph.D.

## BACKGROUND AND QUALIFICATIONS

I am an Associate Professor of Oncology and Biostatistics at Johns Hopkins University (JHU), in the Division of Biostatistics and Bioinformatics of the Department of Oncology of the School of Medicine, and in the Department of Biostatistics of the Bloomberg School of Public Health.

After a Ph.D. in Applied Mathematics from the University of Maryland, College Park in December 2010, I was a Ruth L. Kirschstein National Research Service Award Postdoctoral Fellow in the Department of Biostatistics of the Harvard School of Public Health and in the Department of Biostatistics and Computational Biology of the Dana-Farber Cancer Institute until June 2013, when I was recruited to become an Assistant Professor at JHU. At the end of 2017 I was promoted to the rank of Associate Professor.

My work is recognized internationally for the paradigm-shift contributions to the current understanding of cancer etiology and tumor evolution. I have published several leading-author papers in Science, Nature, and Proceedings of the National Academies of Sciences. The two Science papers discovering that a large fraction of cancer and many of its mutations are attributable to the normal divisions of our cells, rather than to environmental and inherited factors, were ranked #4 and #15 by Altmetric for the attention they received among any research paper published in any field of any scientific journal for the years 2015 and 2017, respectively. I have been invited to give more than 80 talks on these topics at national and international conferences and seminars, several of which as a keynote speaker.

I also lead the effort to develop classification algorithms for the early detection of cancer, and its risk prediction, using a combination of mathematical modeling and machine learning. In 2018, I published with my collaborators a new blood test methodology called CancerSEEK, for the early detection of eight different cancer types, in the journal Science. The test has been recently successfully evaluated as a cancer screening tool on 10,000 people (Lennon et al. Science 2020).

Since 2014 I have been responsible for the design and teaching of the graduate course in probability theory to JHU Biostatistics PhD students, arguably the most theoretical course in a graduate statistics program.

1

As a Principal Investigator my research projects have been supported with millions of dollars in funding by the John Templeton Foundation and the Maryland Cigarette Restitution Fund. I am also supported as co-Investigator by the Lustgarten Foundation, the Marcus Foundation, and the NIH/NCI. My research lab currently employs six students. See my CV for more detail, and my website at https://www.cristiantomasetti.com/

## MY FINDINGS IN CANCER ETIOLOGY AND TUMOR EVOLUTION

How do we go from a perfectly healthy tissue to a premalignant tumor and all the way to a full-blown cancer? Understanding what causes cancer and its evolution are among the most fundamental problems in cancer research. As a scientist I apply my expertise in applied mathematics, statistics, and tumor evolution to shed new light on these problems.

**Cancer is the end result of the gradual accumulation of DNA damage**, specifically mutations, that "drive" cells to become cancer cells by making them multiply out of control (Garraway 2013, Stratton 2009, Vogelstein 2013). **But what causes these mutations** in the first instance? Before I started publishing my findings in 2015, the prevailing view, if not the only one, among cancer researchers and the general public alike was that cancer is caused by either inherited (H) factors, like a harmful inherited mutation in the APC gene in familial adenomatous polyposis (Nishisho Science 1991) syndrome patients, or by harmful lifestyle and environmental (E) factors, like smoking (Peto BMJ 2000) or exposure to asbestos (Zha Cancer Science 2019). Every major cancer research institution and every major publication on cancer etiology at that time presented cancer as due to either H or E factors, with long lists of inherited genes, carcinogens, and lifestyle factors. This was the paradigm (see Figures 1 and 2 for some examples from the American Cancer Society, Cancer Research UK, Wikipedia, and IARC/WHO). In those figures only H and E factors are listed. There is no mention of the harmful effects of the normal, endogenous accumulation of mutations that occur in our cells even in the absence of those H and E factors. What that means is that essentially all cancer cases were considered due to either an E or H factor, with the American Cancer Society reporting in its main publication that "environmental factors (as opposed to hereditary factors) account for an estimated 75-80% of cancer cases and deaths in the US." (Cancer Facts & Figures 2014 - ACS, page 55).

What the accepted paradigm described above implies then is that when a patient is diagnosed with cancer there must be an E or H factor as its cause. And if hereditary mutations are not present the cause must then be some environmental exposures or lifestyle factor behind that cancer. This view can be agonizing to patients and their

families, as it suggests that in every case either environmental or hereditary factors are responsible for cancer development. Consider, for example, a child with cancer. The message the above paradigm offers is that either the child inherited a bad mutation from his parents or the parents failed to avoid exposing the child to certain carcinogens and lifestyles, compounding a terrible circumstance (childhood cancer) with an emotional burden (that the parents are somehow at fault). Even if terrible, however, what really matters ultimately is if that message is true. What my research has discovered is that this simplistic view of cancer etiology is not the correct view. Specifically, that paradigm is wrong because it fails to mention that an important source of harmful mutations, and therefore of cancer, has nothing to do with hereditary and environmental, lifestyle factors but simply with the normal processes of cell division and DNA duplication normally occurring billions of times a day in our bodies, in the absence of harmful exogenous exposures.

I will now provide some details on how, over the last decade, my research has proved that paradigm wrong. Problems with the accepted paradigm became evident in stages.

The first problem I observed for that paradigm occurred in 2012 during my postdoctoral position at Harvard. As I have already mentioned, cancer is the end result of the accumulation of harmful mutations, termed "driver" mutations because they are known to drive the process of tumorigenesis, as opposed to the "passenger" ones, the unharmful ones. E and H factors are supposed - according to the old paradigm - to be essentially the only factors causing those driver mutations. However, whether an E factor causes a driver or a passenger mutation is overall a random event in nature: it depends on where the mutation randomly hits the DNA. In fact, by far, the great majority of the mutations caused by any E factor are not driver mutations but rather passenger ones, even when considering powerful carcinogenic factors like tobacco smoking (Stratton Nature 2009, Garraway Cell 2013, Vogelstein Science 2013). Then, under the existing paradigm, one would expect that essentially all of the DNA mutations found when sequencing the sample of a patient's cancer tissue would have to be caused by E and H factors. After all, we are sequencing a cancer tissue, rather than a healthy one, with tens or hundreds of mutations in its exome DNA.

3



Figure 1 - The causes of cancer according to Cancer Research UK, the American Cancer Society, and Wikipedia in 2014-2015.



Figure 2 - The causes of cancer according to IARC/WHO.

To investigate the issue, I built a mathematical model of tumor evolution. My model predicted that the opposite was true: that, instead, a majority of the DNA mutations present in a cancer tissue would have been there anyway, simply due to the mutations that our tissues accumulate normally every time our cells divide and not because of an E or H factor. Even just the amount of the normal mutations that occurred before the start of the tumorigenesis process seemed to represent the majority of the total number of mutations found later in the cancer (Tomasetti PNAS 2013). Analysis of the sequencing data from hundreds of cancer samples supported the prediction of the mathematical model and indicated that, overall, a majority of the observed mutations would have been in the tissues of those patients even in the absence of cancer, and in fact, at least for a portion of those mutations, even in the absence of environmental exposures (Tomasetti PNAS 2013). A main finding was indeed that the observed mutation rate - e.g. estimated to be $6.4 \times 10^{-10}$ (SE: $1.1 \times 10^{-10}$) (6.4 per 10 billion) per

5

**Exhibit F Page 5**

base per cell division in normal lymphocytes - was remarkably similar to the normal background mutation rate acting in our healthy cells, i.e. in the same order of magnitude (1 - 5 x $10^{-10}$) (1-5 per 10 billion) (Jones PNAS 2008, Tomasetti PNAS 2013, and references therein). Then, **this implied that a relevant portion of the mutations we find in cancers are not caused by exogenous environmental or lifestyle (or even H) factors but rather by endogenous mutational processes that are a normal part of every living cell.** And this contradicts the standard paradigm as it indicates that cancer may not be just due to mutations caused by E and H factors, but also by random mutations that we normally accumulate in our organs.

My analysis was based on sequencing data from cancer tissues. However, my prediction that normal tissues typically carry many mutations has been subsequently validated by several successive sequencing studies in healthy tissues, to the point that the journal Science recently asked me to write a commentary for the latest of these studies to summarize all of the results obtained in the past few years (Tomasetti Science 2019 and the references therein). The experimental evidence is now overwhelming: large numbers of mutations are normally present even in our non-cancerous tissues and accumulate over the course of our life. Moreover, in these studies it has been proven that our normal tissues also carry and accumulate over time several dangerous driver mutations (see Tomasetti Science 2019 and the references therein).

The biological reason is simple. Our normal cells, every time they divide, must duplicate their DNA, and since the copying of the DNA is not perfect, they accumulate several random replicative mutations in their DNA, even without the influence of E and H factors. While some of these DNA mistakes are corrected by DNA repair mechanisms, some are not and end up accumulating in our cells over the course of our life. This is the normal background rate of DNA mutations per cell division in our healthy, normal cells. It is a fact of life. Nothing in our human bodies is perfectly error-proof. It is like when we type: if the keyboard has a missing key (equivalent to an H factor) or if we are exhausted (equivalent to an E factor), we will make several typos, but even if our keyboard is brand new and we are perfectly rested we will end up making some typos (Figure 3). I call these leftover, unrepaired, mutations the "bad luck" or replicative (R) factor in cancer since normal cell division is their source. They are unavoidable and they accumulate at every cell division, like a clock, so much so that scientists now use them to estimate time using this "molecular clock". It has been estimated that ~3-6 of these mutations occur on the genome every time a cell divides (Jones PNAS 2008, Tomasetti PNAS 2013, and references therein). We can add to this normal mutational load by carrying from birth harmful inherited (H) mutations or by exposure to harmful carcinogens and lifestyles (E) (Figure 3).

6



Figure 3 - Random replicative mutations (R): random errors made by normal polymerases during normal DNA replication in cells (e.g. typing). R is the "baseline" mutation rate to which environmental and inherited factors can add.  Photos by Paweł Zawistowski and Gözde Otman from FreeImages.

While it has been known for a long time that these DNA replication errors occur, it was always thought that they played only a very minor role. And that is why no one was listing them among the causes of cancer. The problem is that no one had actually calculated the expected number of these R mutations in the cells of various human tissues.

My 2013 PNAS study led me then to the next logical step. If even normal cells in healthy tissues accumulate a lot of mutations, then before answering the question of how much of cancer is due to environmental or hereditary factors, we need to measure the mutational contribution of this normal process. That is, before assigning proportions of cancer cases to E or H we need to understand the role of R. There was a third factor to consider now, given by the normal random replicative mutations (R), that no one measured before. But how to measure it?

In my research I have developed 3 different ways to measure the role of the mutations caused by normal cell replication (R). Importantly all 3 methods agree on the conclusion that, while there are exceptions like lung cancers in patients who smoke, or skin cancer and sunlight exposure, overall a majority of the mutations we observe in cancers are actually attributable to R.

The idea for the first method was this: as these R mutations occur every time a cell divides, to measure the role of R we need to know how many cells there are in a given tissue and how often they divide. Given those two numbers, I expected that the larger the number of cells (some organs are bigger than others) and the larger the frequency of cell divisions in an organ (stem cells divide more often in certain organs than others) the more that organ would contain mutations, and therefore the higher the risk of getting cancer in that organ. This is indeed what I discovered across a large selection (n=31) of different tissues (Tomasetti Science 2015). A very strong significant correlation (0.81 Pearson's correlation, 95% CI 0.63 - 0.90, P< 0.00000001) was found between the total number of stem cell divisions in a tissue and its cancer risk (Figure 4, from Figure 1 of Tomasetti Science 2015). This is an extremely large correlation across 5 orders of magnitude in cancer risk, indicating that the number of stem cell divisions and therefore the total number of R mutations can explain 2/3 of the variation in cancer risk across the tissues considered.

As an intuitive example of what this means consider the following. It has been experimentally estimated that the colon has 30,000,000,000 cells, which divide every 4-5 days, while the bone in our arms contains 300,000,000 cells (100 times less than in colon), and they divide only once every 15 years (Tomasetti Science 2015). It is not surprising then that colon cancer has a much higher risk to occur in the lifetime of a person than bone cancer of the arm, in fact ~1,000 more probable, given the much larger amount of R mutations accumulating in colon compared to bone, independently of any additional effect by E or H factors. The combining of so many different tissues together was expected to essentially average out the effects of any given E and H factor on the correlation analysis, since their effects are usually restricted to a few tissues (especially when considering the 25 tissues without strong exposures).



Figure 4 - The strong correlation between cancer risk and the total number of stem cell divisions (and the total number of R mutations) in the lifetime of an organ (from Figure 1 in Tomasetti Science 2015).

The paper published in Tomasetti Science 2015 caused a strong reaction, maybe not surprisingly, given the simplicity of the point and the paradigm shift it was causing with respect to the way we understand what causes cancer. It was ranked #4 by Altmetric for the attention it received among any research paper published in any field of any scientific journal for the year 2015.

Some criticisms on our methodology were expressed in a paper by Song et al. (Song Nature 2016) to which we answered, joined by several world-leading mathematical and statistical experts, with a paper in Nature proving how each of their analyses were flawed (Tomasetti Nature 2017).

Additional opposition came from epidemiologists. In particular, the International Agency for Research on Cancer (IARC), which is the cancer research unit of WHO, published soon afterwards a letter signed by its director and other scientists in the same journal, Science, where they "strongly argued against" our conclusions. The three main arguments against our results were: 1) the uncertainty in the experimental estimates on number of cells and division rates that we obtained from the peer reviewed and

9

published literature; 2) the fact that some major cancer types (e.g., breast) were not included in our analysis; and finally that 3) our choice of performing the analysis on "the U.S. population is also arbitrary. A different population with different cancer patterns would have provided different results" (Wild Science 2015).

IARC's first criticism was already fully and properly addressed in the paper, albeit in the supplementary material. We first addressed IARC's remaining criticisms in our response to their letter, where we express our strong doubts that their concerns could be correct (Tomasetti Science Response 2015). A full scientific response came in our next paper on the subject (Tomasetti Science 2017). In that follow-up study, we showed that even adding the two most important organs in terms of cancer incidence that were not included in the original analysis (breast and prostate), did not change at all our results. As to the final criticism, we proved using IARC's own data, publicly available on their GLOBOCAN website, that the results we had obtained for the U.S. population were essentially unchanged when analyzing all of the other countries of the world for which data were available. Specifically, we were able to repeat the analysis using 423 cancer registries, over 69 different countries, representing the majority of the world population. The strong statistically significant median correlation was the same (Pearson's correlation = 0.80) with the 95% range of correlations across countries being 0.67 - 0.84, i.e. inside the original confidence interval provided for the U.S. This is equivalent to repeating the experiment 69 times on independent datasets, obtaining each time a result that is consistent with the original confidence interval provided, and with the same median point estimate (0.80). It is difficult to imagine a stronger independent validation of our original findings than this one. IARC never replied or commented on these new findings based on IARC's own data.

I find it surprising that representatives of IARC still uses Figure 2 to describe what causes cancer. I believe it represents a disservice to the scientific community, and the general public alike, by not providing the most current and balanced depiction of the available scientific evidence on what causes cancer.

In the same Tomasetti Science 2017 paper I also developed a new way to assess the role of R in cancer causation, by estimating the proportion of mutations across all major 32 cancer types that could be currently explained by E and H factors. The results, erring on the conservative side, i.e. overestimating the role of E and H, were that, for all cancer combined, at most 29% and 5% of all mutations were respectively attributable to E and H factors, with the remaining 66% presumably to R (organ-specific estimates are provided in the supplementary materials of that paper). Even though the estimates were extremely conservative with respect to what is currently known, we cannot exclude that other E and H factors will be discovered in the future, potentially decreasing the

proportion attributable to R. Nevertheless, with the aging of the general population caused by an increasing life expectancy (which will have the effect of increasing R), the proportion due to R may in fact increase. Importantly, in the paper, we have also provided a lower bound for the proportion due to R and have shown how R cannot be reasonably less than 40% and almost certainly much higher. Therefore, this study confirmed the fundamental role of R mutations in cancer overall.

Given the large attention this follow-up study received, the American Association for Cancer Research (AACR) invited me to debate the topic in a two-speaker Forum in Washington for their 2017 Annual meeting. Walter Willett, Professor of Epidemiology at Harvard, was to argue against the paper. A few months later, Walter Willet decided to write a Policy Forum in the journal Science with me and a few other colleagues to express a consensus of opinions about the overall importance for the role that R, as well as E and H, play in cancer etiology (Song Science 2018). Today, I believe this consensus view has been generally accepted in the scientific community.

In my most recent study (Afsari et al. eLife 2021), I developed a novel technique, called SuperSigs, that can detect the so-called "mutational signatures" left on the DNA by various etiological factors. This supervised methodology outperforms the previous unsupervised method, which is considered the gold standard in cancer genomics. SuperSigs is able to predict an exposure, i.e. the presence of the deleterious effects caused by factors like smoking, simply based on the mutational pattern found in the cancer of a patient. SuperSigs was trained and then validated across 30 different cancer types on what are the largest cancer genomic databases available in the world: The Cancer Genome Atlas (TCGA) and the International Cancer Genome Consortium (ICGC), having >11,000 and >22,000 cancer patients' samples, respectively. The use of SuperSigs enabled several new biological findings and insights. In one analysis presented in the paper, SuperSigs was used to assess the proportion of mutations found in cancer that are attributable to R, with an average estimate equal to 69% across the 30 cancer types. Importantly, SuperSigs is a completely orthogonal method to both of the previous methods (Tomasetti Science 2015, Tomasetti Science 2017) which I used to assess the role of R. Therefore, the striking consistency of the estimates across all three studies – 65% (Tomasetti Science 2015), 66% (Tomasetti Science 2017), and 69% (Afsari et al. eLife 2021), respectively – provides strong evidence for the major role attributable to R, i.e. "bad luck," in cancer causation.

The latest World Cancer Report 2020 by IARC includes for the first time a section reporting on my findings and on the role that random replication errors (bad luck) play in cancer (see Section 3.1 of their report on page 152). This represents important progress, even though they still misstate our conclusions by mistakenly reporting that

"the authors concluded that approximately two thirds of global cancer incidence may be attributable to random replication errors", something we never claimed.

Recently I have published two more papers providing further evidence for the relationship between normal cell divisions, R mutations, and cancer risk (Tomasetti PNAS 2019, Lahouel PNAS 2020). While cancer incidence increases with age, in the first paper we have experimentally shown how at older ages human tissues slow down their cell division and therefore the accumulation of mutations, and how this is consistent with the deceleration in cancer incidence observed at older ages in several cancer types (Tomasetti PNAS 2019). In the second paper, we have used a new mathematical model that by modeling the dynamics of the total number of cells and their divisions through all the phases in the lifetime of an organ (development, homeostasis, tumorigenesis) is able to overall fit the cancer incidence of several cancer types (among which leukemia, colorectal, and pancreatic cancer) using only the background mutation rate (Lahouel PNAS 2020). This suggests that R plays a major role in the occurrence of those cancers.

Overall, this body of work has created a new, broader and now broadly accepted paradigm on cancer etiology, adding R mutations as a key factor when thinking about cancer causation. This has been a remarkable scientific evolution of how we should think about this terrible disease, going from the classical point of view of asking what exposure, lifestyle, or inherited mutation must have caused cancer in a patient, to a new understanding that in many cases nothing but R caused the cancer, while in others R provided the baseline number of mutations to which E and H may have added harmful mutations. In the absence of an exposure to a proven cancer-causing E or H factor it is reasonable to attribute a given cancer to R.

The current evidence indicates that **NHL is one of the most random ("bad luck") cancers we know of, almost completely due to R factors**. Based on available epidemiological data and my studies, I can say that as of today relatively few NHL cases are attributable to H and E factors at the population level. For example, Cancer Research UK estimates that E factors currently account for only 3% of NHL cancer cases (cancerresearchuk.org/health-professional/cancer-statistics/statistics-by-cancer-type). And in the paper Tomasetti Science 2017 we estimated that <5% (NHL) of all the mutations found in NHL are due to E or H factors.

Finally, we note how well NHL fits in the same plot presented in Figure 4, by adding it in Figure 5 (orange point). The estimate for the number of stem cell divisions is the same one of CLL, and the lifetime cancer risk of NHL is estimated to be 0.022 about 4 times greater than CLL (https://seer.cancer.gov/statfacts/html/nhl.html).



Figure 5 - The strong correlation between cancer risk and the total number of stem cell divisions (and the total number of R mutations) in the lifetime of an organ. Blue points from Figure 1 in Tomasetti Science 2015. Green (prostate) and red (breast) points from Tomasetti Science 2017. With respect to the original figure, an orange circled point has been added for NHL.

## HUMAN EPIDEMIOLOGICAL STUDIES ON GLYPHOSATE AND NHL

**Based on a comprehensive literature review of the many human epidemiological studies that have been conducted, I can conclude that there is no convincing evidence that glyphosate use is associated with NHL.** The largest, highest quality, prospective cohort studies found no significant association. And all case-control studies consistently produced negative, non-significant results, with estimates of the odds ratio becoming smaller in time. Specifically, the largest, most recent, and most reliable data - which are coming from large prospective cohort studies - show no significant association and no consistent trend between the use of glyphosate-based formulations and NHL, or any of its subtypes (Andreotti 2018, Leon 2019). And the most recent analysis of case-control data also shows no significant association of glyphosate with NHL (Pahwa 2019) after a multiple comparison correction. Older and smaller case-control studies, which reported a possible association between glyphosate and NHL in

some analyses, suffer from several limitations, including but not limited to failure to correct for multiple comparisons and failure to adjust for other exposures.

It is relevant to note that in all published studies on glyphosate and NHL a multiple comparison correction was never performed (or, at least, was never reported or published) to control for the large number of statistical analyses. While this may be typical in a first series of studies attempting to detect a potential association, it should be superseded by proper statistical correction when later attempting to prove an actual association, in order to exclude chance alone. **The fact that no statistically significant association of glyphosate use with NHL has been found, after three decades of many large high-quality epidemiological studies, is consistent evidence against the existence of any association.**

In the following I will provide my specific comments to the most relevant of all the human epidemiological studies I reviewed.

- **Prospective Cohort Studies**

The most reliable data on whether glyphosate is associated with NHL come from the Agricultural Health Study (AHS), most recently published by Andreotti and colleagues in 2018 (**Andreotti JNCI 2018**). The **Agricultural Health Study (AHS)** is a prospective cohort of licensed pesticide applicators from North Carolina and Iowa described in ref. (6) of the paper: 54,251 applicators, of which 44,932 (82.8%) used glyphosate, including 5,779 incident cancer cases (79.3% of all cases). This paper updated the previous evaluation of glyphosate (found to be non-significant) with cancer incidence from registry linkages through 2012 (North Carolina)/2013 (Iowa). Lifetime days and intensity-weighted lifetime days of glyphosate use were based on self-reported information from enrollment (1993–1997) and follow-up questionnaires (1999–2005). Incidence rate ratios (RRs) and 95% confidence intervals (CIs) using Poisson regression, controlling for potential confounders, including use of other pesticides, were estimated.

**Out of the 22 cancer type categories reported, none of the 12 blood related cancer categories have any statistically significant evidence of a harmful effect. Similarly, when testing the linear trends for each one of them there was no statistical significance.** The authors performed more than 20 statistical tests to check for any trend and available evidence and they did not even control for multiple testing, something needed when performing multiple tests, because there was nothing statistically significant even before that correction. **In a large study like this one, this represents a lack of any convincing evidence for a harmful effect of glyphosate in**

**NHL. Moreover, focusing on overall NHL - where the number of patients is relatively high, with 135 cancers among unexposed and 440 among exposed - the rate ratio (RR) is lower in each of the exposed quartiles than in the unexposed group. That is the opposite of what we would expect to observe if glyphosate increased the risk of NHL.** One could critique this paper's interpretation of the results for AML in the absence of either statistical significance or correction for multiple comparisons. Overall, however, this study was well-designed and provides a high level of evidence for the conclusion that there is no association between NHL and formulated glyphosate. In conclusion, in this study there is no evidence of an association between glyphosate and NHL.

The only other prospective cohort data published to date on whether formulated glyphosate is associated with NHL comes from a 2019 publication by Leon and colleagues (**Leon IJE 2019**). This was a meta-analysis combining three prospective cohort studies: the French **AGRICAN** (n=127282), the Norwegian **CNAP** (n=137821), and the North American Agricultural Health Study (**AHS**), a large prospective cohort of licensed pesticide applicators enrolled in Iowa or North Carolina (n=51167), for a total of 316270 participants. More specifically, there was "a pooled analysis of three large agricultural worker cohorts. Cox regression models were used to estimate cohort-specific hazard ratios (HRs) and 95% confidence intervals (CIs), which were combined using random effects meta-analysis to calculate meta-HRs." Importantly, data for AHS were included through 2010 in North Carolina and 2011 in Iowa, whereas Andreotti 2018 included two additional years of data in both states (cutoffs of 2012 and 2013 respectively). Thus, Leon 2019 includes some, but not all, of the AHS data presented in Andreotti. The three studies are different methodologically - e.g., and perhaps most significantly, both European cohorts relied on exposure matrices or census data to determine pesticide exposure, whereas AHS directly queried participants about pesticide use.

Leon and colleagues found **no association between formulated glyphosate and NHL overall** (HR 0.95, 95% CI: 0.77-1.18), and no association for three of four hematopoietic malignancies for which data were separately reported (follicular lymphoma, CLL/SLL, and multiple myeloma/plasma cell leukemia). The authors reported that only 3 analyses showed any association with any NHL: Terbufos in NHL, Deltamethrin in CLL/SLL, and glyphosate in DLBCL with a HR=1.36 (95%CI: 1-1.85) (Table 2). Of these three, the result for glyphosate was not statistically significant since it contained the value 1 in the 95% confidence interval, and therefore chance cannot be excluded. Moreover, hundreds of analyses were performed, and no correction for multiple comparisons was reported. When properly corrected, the lower bound of the 95% confidence interval for the effect of glyphosate in DLBCL is much smaller than 1. Specifically, as it can be

15

calculated that the standard deviation of the log of the meta-HR (mHR) is equal to 0.157 and given that just in Table 2 there are 232 confidence intervals reported (without even counting the p-values), the Bonferroni corrected 95% confidence interval becomes **(0.76 – 2.43).** Therefore, the claimed association is far from having any statistical significance.

Also, the reported HR for glyphosate and DLBCL in the AHS subgroup, a nonsignificant 1.20, becomes even lower in Andreotti 2018's more up-to-date analysis of DLBCL (with data through 2012/2013) in each quartile (at most 1.13) with an inconsistent trend across categories, supporting a finding of no association.

In conclusion, several large prospective cohort studies did not find any significant association between formulated glyphosate use and NHL.

- **Case-Control Studies**

In addition to the cohort studies discussed above, a number of case-control studies have been published evaluating the potential association between formulated glyphosate and NHL (Cantor 1992, Hardell 1999, McDuffie 2001, Hardell 2002, De Roos 2003, Eriksson 2008, Orsi 2009, Hohenadel 2011, Cocco 2013, Pahwa 2019). The main limitations of these studies include: failure to adjust for co-exposures such as other pesticides; failure to correct for multiple comparisons; the presence of significant publication bias; and the retrospective design and the biases that may occur as a result, such as recall bias. Even disregarding these limitations, several studies did not find any significant association between formulated glyphosate and NHL, with estimated ORs that became smaller in later and larger studies. A discussion and some examples of those issues are provided below.

*Impact of co-exposures.* It is a fundamental principle of observational research that adjusting for potential confounders is critical in evaluating whether an observed relationship indicates a true relationship. In some studies, a possible statistical relationship was observed between glyphosate and NHL in a univariate analysis but was no longer present after adjustment for co-exposures via a multivariate analysis (Hardell 2002, Eriksson 2008). In the North American case-control studies in particular, while earlier studies were not entirely consistent in whether they adjusted for other pesticides (Cantor 1992, McDuffie 2001, De Roos 2003), the latest, most complete data from that case control dataset show no association between Roundup and NHL after adjusting for just three pesticide exposures: 2,4-D, dicamba, and malathion (Pahwa 2019). Also, the use of subjects unexposed to any pesticide as the reference controls

(e.g. Hardell 1999, Hardell 2002, Cocco 2013, Eriksson 2008) will overestimate the true effect in a univariate analysis.

*No significant associations and diminishing ORs in later, larger studies.* The Swedish studies initially presented in Hardell 1999 did not find a significant association, and the estimated OR=2.3 became 1.85 in Hardell 2002 and 1.51 in another Swedish study presented in Eriksson 2008, all not significant. Similarly, the Orsi 2009 French study did not find any association (OR=1). The North American studies by Cantor 1992, McDuffie 2001, and Hohenadel 2011 also did not find a significant association for overall glyphosate exposure. De Roos 2003 estimated, in a second analysis using logistic regression, an OR=2.1 (the first analysis, using hierarchical regression, was not significant, OR=1.6). This second analysis was also not significant after adjusting for multiple comparisons (see below), and became a non-significant 1.13 in the latest, most complete data analysis in Pahwa 2019 (where these data were combined with McDuffie (see below) and with additional cases not included in either previously published study). Similarly, the OR=2.12 for the subgroup of >2 days/year in McDuffie 2001, which was not adjusted for multiple comparisons as well as not adjusted for multiple exposures, is not significant once adjusted for multiple comparisons (see below), and became a non-significant 1.73 in Pahwa 2019, after combining with additional cases (43 cases in the group >2 days/year reported in Pahwa Table 4 versus 23 cases in the same exposure group reported in McDuffie Table 8) and correcting for multiple exposures and multiple comparisons (see below).

*Effects of publication bias.* When considering the evidence provided by all available epidemiological studies, an important potential limitation is given by the fact that there may be a bias in what has been published versus what has been not. Negative results are generally much harder to publish, especially in prominent journals, and many times researchers may therefore decide to abandon a study with negative results even before submitting a manuscript. A major consequence is that positive results are greatly overrepresented. This in turns will affect the overall assessment of a potential harmful association, especially in meta-analyses, whose key advantage – a much larger sample size that enables to greatly reduce the uncertainty, i.e. the width of the confidence interval around the estimated OR/RR – becomes its greatest flaw, by combining highly bias estimates together, ending up with an even more erroneous, biased result. Currently, there are a few statistical methods available that have been designed to test for the presence of publication bias. One is the funnel plot, another one is Egger's test. After selecting all the available non-overlapping epidemiological data via a systematic review (McDuffie 2001, Hardell 2002, De Roos 2003, Eriksson 2008, Orsi 2009, Cocco 2006, Leon 2019), Donato et al. 2020 performed both analyses. These analyses detected clear publication bias (see the funnel plot in their Figure 4; also, the Egger's

17

test p=0.02). These tests indicate that we are looking at a severely biased literature. This is particularly true considering that the Egger's test has low statistical power to detect publication bias, with a statistically significant result often present only in the presence of strong bias. The significant presence of publication bias is not surprising as we know of instances where publication bias was clearly present with respect to glyphosate specifically—for example, in the North American Pooled Project where 2 of the 4 underlying studies (Hoar 1986 and Zahm 1990) did not report results for glyphosate, but those studies did in fact have glyphosate cases and controls because they were included in later pooled analyses (Pahwa 2019). Therefore, the overall assessment – and even more the meta-analyses – will suffer of a significant bias in favor of finding a harmful association between glyphosate and NHL even when the association is not actually there. This implies that much caution should be used in assessing the current epidemiological literature on human data. However, as I will show in the following sections, even in the presence of a significant bias, which favors the finding of a harmful association, no significant association was found.

*Impact of recall bias.* In general, retrospective studies are more prone to certain biases than prospective ones. For example, cancer patients may remember past exposures differently than healthy controls. This phenomenon is known as recall bias, and likely impacted many of the case-control studies evaluating glyphosate and NHL (*see* EPA OPP 2017, EPA 2019, Crump 2019). Proxy bias is a related form of bias, and is also apparent in several of the case-control studies described above (De Roos 2003, Pahwa 2019). For example, exclusion of proxies in Pahwa 2019 resulted in a lowering of the odds ratio from 1.13 (95%C.I.:0.84–1.51) to 0.95 (95%C.I.:0.69-1.32), even without adjusting for multiple comparisons.

*Effects of correcting for multiple comparisons.* According to standard statistical theory, when providing p-values or confidence intervals, it is an important requirement to correct for multiple comparisons when performing multiple statistical tests and comparisons. This is the only way to ensure that those p-values and confidence intervals carry any statistical evidence, by controlling for Type-I error. As I discuss below, there are cases when simply controlling for the expected proportion of false positives may be sufficient, but even then, a correction for multiple comparisons should be performed. I will now describe the effect of correcting for multiple comparisons using three relevant papers as examples.

The most recent and comprehensive evaluation of the case-control data on glyphosate and NHL was published by Pahwa and colleagues in 2019 (**Pahwa Scand J Work Environ Health 2019).** Associations between glyphosate use and NHL incidence overall and by histological sub-type were evaluated in a pooled analysis of case–control

studies: 1690 NHL cases and 5131 controls. This study combined 4 US States (Nebraska, Minnesota, Iowa, Kansas) and 6 Canadian provinces (Ontario, British Columbia, Quebec, Alberta, Manitoba, Saskatchewan) to form the so called **NAPP** (North American Pooled Project). Logistic regression was used to estimate adjusted odds ratios (OR) and 95% confidence intervals (CI). This study combined underlying data from several previously published case-control studies (Cantor 1992, Hoar 1986 (glyphosate data not reported in original publication), Zahm 1990 (glyphosate data not reported in original publication), McDuffie 2001/ Hohenadel 2011, De Roos 2003) resulting in more exposed cases and a more comprehensive analysis than any of the earlier publications. Pahwa and colleagues found that, "after adjustment for other pesticides, **the OR for NHL overall with "ever use" was 1.13 (95% CI 0.84–1.51)",
i.e. no significant association.** However, in a sub-analysis they reported an OR =1.73 (95%CI: 1.02-2.94) for >2 days/year glyphosate use in NHL (Table 4), an OR =2.14 (95%CI: 1.07-4.28) for >2 days/year glyphosate use in DLBCL (Table 4), both with non-significant trend tests, and an OR =1.08 (95%CI: 1.01-1.16) for the ordinal measure (10 lifetime days) in SLL (Table 5). The lack of a significant trend is interesting as having the preceding category of exposed patients (0-2 days/year) with an OR well below the risk in the control group, does not make sense if glyphosate actually increased the risk: people exposed having less cancers than the non-exposed ones. In fact, the authors correctly stated "however, as with the other sub-types, consistent patterns of association across different metrics were not observed." A key question is whether those results are statistically significant, as they are apparently reported to be in the abstract of the paper, or not. The short answer is no, once a correction for the multiple comparisons is performed. I will provide here the details. Pahwa 2019 reports using logistic regression in order to derive their point estimates (OR) and confidence intervals. Now, the logarithm of the OR is the $\beta$ coefficient:

$$log\ (OR)\ =\ log\ \left(\frac{P_1}{1-P_1}\ /\ \frac{P_0}{1-P_0}\right) = \beta\ ,\ \text{i.e.}\ \ OR\ =\ e^{\beta}.$$

It is well known that the distribution of the maximum likelihood estimate of $\beta$ is asymptotically normal. We can then use the Wald statistics, $z = \hat{\beta}\ /\ s_{\hat{\beta}}$ , and a (1-$\alpha$)% two-sided confidence interval of $\beta$ is:

$$\hat{\beta} \pm z_{1-\alpha/2}\ \ s_{\hat{\beta}}.$$

Using the above expression, and setting $\alpha$ =0.05 to obtain a 95% confidence interval, which implies $z_{1-\alpha/2}$ = 1.96, we see that in Pahwa 2019, $\hat{\beta}\ =\ log(1.73) = 0.5481214$ and $s_{\hat{\beta}} = 0.2705552$, for the >2 days/year glyphosate use in NHL, $\hat{\beta}\ =\ log(2.14)\ =$

19

0.7608058 and $s_{\hat{\beta}} = 0.3536465$ for >2 days/year glyphosate use in DLBCL, and $\hat{\beta} = log(1.08) = 0.07696104$ and $s_{\hat{\beta}} = 0.03645866$, for the ordinal measure (10 lifetime days) in SLL.

However, in that study the authors performed many statistical tests and comparisons. Specifically, I count 100 confidence intervals reported in their main text, and 60 p-values. As I mentioned above, from a statistical point of view, it is then necessary to correct for the multiple comparisons. A standard approach is provided by the so-called "Bonferroni correction". Given the 100 confidence intervals reported, using Bonferroni we should set $\alpha$ =0.05/100 = 0.0005 to obtain a 95% confidence interval that has been corrected for multiple comparisons. This implies that now $z_{1-\alpha/2} = 3.480756$. Therefore, the 95% confidence intervals corrected for multiple comparisons are **(0.67-4.44)** for the >2 days/year glyphosate use in NHL, **(0.62-7.33)** for >2 days/year glyphosate use in DLBCL, and **(0.95-1.23)** for the ordinal measure (10 lifetime days) in SLL. All clearly not having any statistical significance. In a similar fashion, given the 60 p-values, using Bonferroni we should set $\alpha$ =0.05/60 = 0.0008. Thus, none of the p-values is statistically significant. If I controlled for all confidence intervals and p-values at once, i.e. 100+60=160 comparisons, the results would have been even stronger in the negative sense.

The above correction is made to control for the so-called "family-wise error rate" (FWER). I will discuss some alternative corrections, typically used for p-values, that have more power but are still controlling for FWER. I will show how the results are far from significant even when using these alternative corrections, specifically the Holm-Bonferroni step-down procedure and the Hochberg step-up procedure. Recall that in both the Holm-Bonferroni step-down and Hochberg step-up procedures the *n* p-values are ordered from lowest to highest, $P_{(1)}, \ldots, P_{(n)}$. Subsequently, starting with the smallest p-value, in the Holm-Bonferroni the first *k-1* null hypotheses are rejected, at a significance level $\alpha$, if *k* is the smallest index for which

$$P_{(k)} > \frac{\alpha}{n+1-k}.$$

Similarly, starting with the largest p-value, in the Hochberg step-up procedure (assuming non-negative dependence), the first *k* null hypotheses are rejected, at a significance level $\alpha$, if *k* is the largest index for which

$$P_{(k)} < \frac{\alpha}{n+1-k}.$$

20

**Exhibit F Page 20**

We can apply these methods to the 60 p-values reported in Pahwa 2019, in which the only p-values below 0.05 are (ranked from the smallest one): 0.002, 0.01, 0.01, 0.02, 0.02, 0.02, 0.03, 0.03, 0.03, 0.04. Holm-Bonferroni rejects all of them, even when just using $n$=60 rather than $n$=160, as $P_{(1)} = 0.002 > 0.05/60 = 0.0008$. Hochberg also rejects all of them as none of them satisfies the above requirement. Note that this analysis is including all 60 p-values, i.e. also those reported by Pahwa 2019 for tests that were performed without controlling for other co-exposures (2,4-D, dicamba and malathion). The small 0.002 p-value was from that group. If we considered only the 30 p-values obtained from analyses that were properly adjusted for co-exposures, both Holm-Bonferroni and Hochberg reject all of them as $P_{(1)} = 0.03 > 0.05/30 = 0.0017$. As for the Bonferroni correction, we can apply these procedures to confidence intervals, given the relationship between a test of size $\alpha$, its p-value, and the associated (1-$\alpha$)% confidence interval, since the null hypothesis $\beta$=0 is not rejected if the value 0 is contained in the (1-$\alpha$)% confidence interval. However, it is clear that both procedures would again declare not significant the three confidence intervals in Pahwa 2019, as the value $e^0 = 1$ is contained in all those intervals once corrected by $\alpha/(n+1-k)$ for $k$=1, 2, 3, respectively. Finally, some may argue that it may be sufficient to control for the "false discovery rate" (FDR), i.e. the expected proportion of type I error, rather than for the more stringent FWER. The standard way to control the FDR is by using the Benjamini-Hochberg method which rejects the first $k$ null hypotheses, at a significance level $\alpha$, if $k$ is the largest index for which

$$P_{(k)} \leq \alpha \frac{k}{n}.$$

I strongly disagree with using an FDR correction for at least two reasons. 1) Controlling only for the FDR, i.e. the expected proportion of false rejections of the null, is a sensible approach when for example scientists are in the initial *discovery* phase of testing tens of thousands of genes, in order to find some potential candidate genes, which are then subject to further, more rigorous testing. But when the goal is to prove beyond a reasonable doubt that a given association is real, as in our case after several decades of rigorous epidemiological research on glyphosate, we are not anymore in a discovery phase. Rather, we are in a confirmatory one, where simply controlling for FDR becomes clearly less than ideal. And in fact, in clinical trials, controlling only for the FDR is considered inappropriate. 2) In a study with so many comparisons with say only a very few of them possibly statistically significant, like in Pahwa 2019, the point is precisely to control for the FWER, to make sure that those few results that have the appearance to be significant are real. However, even if we disregarded the two points above and decided to control only for the FDR, it is clear from the formula above that neither p-values nor confidence intervals in Pahwa 2019 would be significant. That is, **the results reported in Pahwa 2019, are far away even from passing the**

21

**Exhibit F Page 21**

**requirements on statistical significance expected from a simple investigative preliminary study.** This is essentially as much of a negative result as you can get in demonstrating any harmful effect of glyphosate on NHL.

Let us now consider, as another example, the effect of a multiple comparison correction on the **De Roos 2003** results. The authors also report using logistic regression in order to derive their point estimates (OR) and confidence intervals. Using the expressions above, and setting $\alpha$ =0.05 to obtain a 95% confidence interval, which implies $z_{1-\alpha/2} = 1.96$, we see that in De Roos 2003, $\hat{\beta} = log(2.1) = 0.7419373$ and $s_{\hat{\beta}} = 0.3287536$, for glyphosate use in NHL (see their Table 3).

However, the authors performed many comparisons. Specifically, I count 47 confidence intervals reported just for the logistic regression analyses in their Table 3. It is then necessary to correct for the multiple comparisons. Using Bonferroni correction, we should set $\alpha$ =0.05/47 = 0.0011 to obtain a 95% confidence interval that has been corrected for multiple comparisons. This implies that now $z_{1-\alpha/2} = 3.263616$. Therefore, the 95% confidence interval for glyphosate in De Roos 2003 becomes **(0.72-6.14)**, when corrected for multiple comparisons, i.e. not statistically significant. If I controlled for all confidence intervals reported in the paper, the results would have been even stronger in the negative sense.

Nothing significant is found if instead of Bonferroni we used Holm-Bonferroni, or Hochberg, or even Benjamini-Hochberg, as the most significant confidence interval, the one associated with sodium chlorate (see their Table 3), becomes (0.61, 27.76) when corrected for multiple comparisons. Therefore, a proper statistical correction for the multiple comparisons is by itself enough to render all the results in Table 3 *not* statistically significant.

Finally, the OR=2.12 (95%CI: 1.20-3.73) for >2 days/year in **McDuffie 2001** becomes a not significant **(95%CI: 0.90-5.0)**, when using a Bonferroni correction even just for the seventeen confidence intervals reported in the same Table 8.

Therefore, if one adjusts for multiple comparisons, **not one of the case-control studies cited above found a significant association between formulated glyphosate and NHL, not even in any of the sub-analyses.**

In 2019, Zhang and colleagues published a meta-analysis combining some data from Andreotti 2018 (Q4 20-year lag only) with earlier published case-control data, using exclusively the >2 days/year subgroup analysis from McDuffie 2001, exclusively the >10 lifetime days subgroup analysis from Eriksson 2008, and only the logistic (not

hierarchical) regression from De Roos 2003, along with ever/never analyses of glyphosate exposure and NHL risk from Hardell 2002 and Orsi 2009. I do not find methodologically appropriate from a statistical point of view the combining of such different populations (Q4 2-year lag, >10 lifetime days, >2 days/year) as it ends up treating different categories of exposure as the same. Not surprisingly, this meta-analysis has been the subject of valid criticisms by independent scientists and by scientists at regulatory bodies (EPA 2020, Kabat 2021); nevertheless, a more recent publication was able to report results using data from Pahwa 2019, which includes the data from McDuffie 2001 and De Roos 2003, along with additional data from the North American Pooled Project (Kabat 2021, see below).

Kabat 2021 is the most recent published meta-analysis of all available and non-overlapping epidemiological data that uses direct assessment of pesticide exposure of both prospective cohort and case-control studies. These authors included the most recent AHS cohort data reported in Andreotti 2018 and replaced De Roos 2003 and McDuffie 2001 with the more recent and more comprehensive data reported in Pahwa 2019. Importantly, they appropriately included *all* data from Andreotti 2018, which is appropriate as there was no significant trend for increasing risk with increasing exposure in any analysis (including the lagged analyses). As noted, the authors did not include the data from Leon 2020 (which found no significant association RR=0.95) because other than with the AHS, there was not direct assessment of pesticide exposure used. With these logical updates and using the same standard methodology for combining the available data (fixed and random effects models) similarly used in Zhang et al. 2019, no significant association was found between the use of formulated glyphosate and the development of NHL overall (RR=1.05; 95%C.I.:0.87-1.28). This is striking given that no statistical correction for the multiple comparisons was performed and that Donato et al. provided evidence (detailed above) of significant publication bias that favors the finding of a harmful positive association.

In conclusion, in both the prospective cohort and the case-control studies I have reviewed, I have not found any convincing evidence of a harmful role of glyphosate in NHL in humans. It is not surprising then – in fact, the opposite would be – that all national and international pesticide regulatory agencies like the European Food Safety Authority (EFSA), the European Chemicals Agency (EChA), the US Environmental Protection (EPA), and Health Canada report a lack of any significant evidence for an association between glyphosate and NHL (EFSA 2015, EChA 2017, EPA 2019, Health Canada 2019). For example, in **Health Canada 2019** it is stated that "The objections raised did not create doubt or concern regarding the scientific basis for the 2017 re-evaluation decision for glyphosate. Therefore, the Department's final decision will stand…Our scientists left no stone unturned in conducting this review…To help ensure

an unbiased assessment of the information, Health Canada selected a group of 20 of its own scientists who were not involved in the 2017 re-evaluation to evaluate the notices of objection. **No pesticide regulatory authority in the world currently considers glyphosate to be a cancer risk to humans at the levels at which humans are currently exposed**."

## MECHANISM, ANIMAL MODELS & GENOTOXICITY

When considering if an exposure may cause cancer in humans, **epidemiological studies in humans are by far the most important ones to consider.** This is true for several reasons.

First, there are **fundamental differences between the biology of rodents and human biology**. While studies in mice and cell lines are extremely valuable in many research endeavors, a recent study I published (Tomasetti PNAS 2019) shows how lab mice will inflate the effect of a carcinogen when compared to humans because cell division does not decelerate with aging in mice. Given the known power law relationship between cell divisions and cancer risk, it follows that the cancer incidence in lab mice will not decelerate but continue to grow like a power law when aging, contrary to humans. This is indeed what has been observed in mice (see reference in my PNAS 2019). In contrast, the decelerating effects in humans have been proven in large epidemiology datasets of many cancer types, among which NHL (see both SEER US and UK Cancer Research data). **This implies that any harmful effect estimated in lab mice should be expected to be significantly smaller in humans as DNA damage is highest at cell division.** Given that, any differences in survival between experimental groups of rodents may, if not properly accounted for, impact results and complicate any potential inference to humans. For example, by properly controlling for age, Crump 2020 "found a statistically significant trend toward more animals surviving to final sacrifice at higher doses in several of the bioassays" they analyzed (see their Table 2). This can be problematic for any analysis attempting to attribute increasing numbers of tumors to increasing glyphosate exposure rather than simply to longer lifespan, and this is compounded given that the rate of cell division does not decrease in rodents as it does in humans (Tomasetti PNAS 2019). Also, not all substances that cause tumors in mice or rats cause tumors in humans, even at similar concentrations; inherent biological differences may in part explain these differences (MacDonald 2004, Anisimov 2005, Dale 2006, Bracken 2009, Newman 2019).

This is also true of mechanism studies such as those examining genotoxicity and oxidative stress: simply because a particular exposure might cause a given effect in a

cell line *in vitro* or in an animal at extremely high doses (e.g., by intraperitoneal injection) does not mean that it will cause the same effect in the course of actual, human-relevant exposures at human-relevant doses (EPA 2017). Moreover, we must consider the relevance of a mechanism being considered to the outcome of interest. Some mechanisms that may operate *in vitro*—such as cytotoxicity that results in the release of free oxygen species—may not, in practice, lead to cancer *in vivo*. For an interesting example where this might be at play, see the results of recent NTP studies evaluating glyphosate's ability to induce genotoxicity and oxidative stress (Rice 2018, Rice 2019, Swartz 2019).

Second, in many animal studies the concentrations used are by far higher than what humans get realistically exposed to. Thus, even if there were some potential effect observed at the highest dose levels in rodents - and there does not appear to be any significant one - one would need to, of course, consider how that relates to human exposure (if at all) before concluding it had any relevance whatsoever to humans. In this case, rodents in the high-dose groups were exposed to doses in feed ranging from 5,000 to 50,000 parts per million, or 50 million parts per billion (Greim 2015, EPA 2017). For comparison, in one study of farmers spraying glyphosate as part of their occupation, the average urinary level of glyphosate on day of application was 3.2 parts per billion, and the highest observed level was 233 parts per billion (Acquavella 2004). This indicates **a vast difference in dosage between humans and rodents, making the comparison of the results observed in rodents at those extreme concentrations essentially irrelevant for inferring the actual effect in humans, given the concentrations observed in humans.**

Finally, as I showed already for the human study, **we always need to control for multiple comparisons.** To determine how many positive results we would expect *by chance alone*, we must consider how many tests have been conducted in the animal study and how many comparisons are at play. For example, in the case of glyphosate, more than a dozen long-term rodent carcinogenicity studies have been conducted (Greim 2015, EPA 2017, Crump 2020, Portier 2020). Each of those studies included males and females, along with controls and multiple dosing groups. Typically, dozens of tumor types were evaluated per study, and for each tumor type multiple comparisons (trend tests and pairwise) could be, and in many cases were, made. As a result of the richness of the data set alone, one would expect to see positive results (and negative results, where exposed groups had lower tumor incidences than unexposed controls) *by chance alone*. Thus, the fact that for some tumor types there seemed to be an effect in one sex or the other in a few of the many reported statistical tests performed does not indicate that glyphosate caused rodents to develop tumors. Rather, a proper statistical correction for the multiple comparisons is required, i.e., a more thoughtful approach to

assessing causation is needed (see, e.g., BfR 2015, EFSA 2015, Greim 2015, ECHA 2017, EPA 2017, Crump 2020). Crump 2020 performed a detailed analysis of the effect of accounting for multiple comparisons on the results of the 15 bioassay studies examined by the U.S. EPA through Docket EPA-HQ-OPP-2016-0385. Six of these fifteen studies were excluded due to incomplete data or confounding. This is similar to the IARC 2015 report, which was based on some information from ten bioassays (though not the full bioassays themselves) (*see* IARC 2015, Tarone 2018 ("When all relevant data from the rodent carcinogenicity studies of glyphosate relied upon by the Working Group are evaluated together, it is clear that the conclusion that there is sufficient evidence that glyphosate is an animal carcinogen is not supported empirically.")).

Crump 2020 randomly assigned animals to different dose groups to build a null distribution, and then presented three different analyses based on a continuity-corrected poly-3 test, which is a survival-adjusted Cochran-Armitage test. The results, which can be seen in Figure 1 of Crump 2020, clearly show a lack of any convincing evidence for a carcinogenic effect of glyphosate in these animal studies. In fact, between the two options, that figure would rather suggest an anti-carcinogenic effect of glyphosate, given the much larger concentration of p-values that are close to the value of 1. Table 4 also shows how none of the p-values were significant once corrected for multiple comparisons.

Based on my review of the data and the published statistical analyses of the various animal bioassays with glyphosate, and similar to the conclusions reached by various regulatory agencies throughout the world (BfR 2015, EPA 2017, EFSA 2015, ECHA 2017, New Zealand  2016, Australia 2017, Health Canada 2017), the reliable data do not support a carcinogenic effect of glyphosate in animals.

## CONCLUSION

Based on my review of the published data, there is no significant association much less a causal relationship, between glyphosate or formulated glyphosate and NHL. This is not surprising, since based on my own research, the vast majority of mutations in NHL appear to be explained simply by replication errors.

## COMMENTS ON PLAINTIFFS' EXPERT REPORTS

I have reviewed the reports submitted by the plaintiffs in this litigation, including the reports of Drs. Ritz, Portier, and Jameson. I disagree with some of their methodology

and with many of the conclusions they reach, as those conclusions in many cases are not supported by the data from which they are drawn.

For example, there are multiple statistical mistakes in **Dr. Ritz's report**, including double-counting of the data (*see* Ritz Report at p. 15), and using unadjusted values where adjusted ones are reported. These mistakes end up misrepresenting the true effect size (*see* Ritz Report at p. 14), and under-weighting the largest, most recent prospective cohort study (Andreotti 2018), even disregarding some of their major results. To count the same data more than once and then state that the results are "consistent" is a methodological mistake. To state that the human studies provided results that are "unequivocal" in favor of an association between glyphosate use and NHL is in my opinion a misrepresentation of the reality and the published data. In fact, as I have demonstrated in the previous sections of this report, no study showed any statistically significant association. Given the results of all the epidemiological studies in humans, the even stronger conclusion that "to a reasonable degree of scientific certainty, glyphosate causes NHL" - something that goes even beyond the IARC claims of "probably carcinogenic" - does not rest on any solid scientific basis.

**Dr. Portier**'s various analyses of both human and animal data also suffer from several critical flaws. Regarding the human data, Dr. Portier uses an inappropriate analytical framework, applies it inappropriately, and in so doing reaches a conclusion that is unsupported by the data he cites. For example, Figure 1 in Dr. Portier's initial report is an inappropriate analytical framework because, as in Dr. Ritz's report, it includes double-counting of data (see Portier Report at p. 16, Figure 1). To count the same data more than once, and then state that "the first obvious conclusion to be drawn from Figure 1 is that all of the mean OR/RR estimates are consistently ≥1" is a serious methodological mistake. Moreover, to use as evidence of a positive association the number of studies that had an OR/RR >1 versus <1, to then obtain a p-value, even when these estimates are not statistically significant and there is a proven (Donato 2020) significant publication bias among them, is methodologically wrong. I cannot stress enough how it is not proper statistical practice to combine a set of biased and non-significant estimates, like RRs or ORs, across several studies in order to claim some evidence for a harmful effect. This is particularly true when combining case-control studies, as they can greatly suffer from recall bias, which in turns makes a potential publication bias even more severe (EPA 2019, Kabat 2021). Thus, the fact that several RR/OR point estimates, even most of them, may happen to be above the value of 1 does not automatically imply anything from a statistical point of view.

I will provide an example of blindly using statistically non-significant and potentially biased point estimates - without conducting a proper statistical evaluation of the

assumptions - to reach statistical conclusions as Dr. Portier did. In Leon 2019 Table 2, the authors report a meta-HR=1.36 (95%CI: 1-1.85) for the effect of glyphosate in DLBCL, which they claimed to be "moderately elevated". I have already shown in a previous section how in fact the Bonferroni corrected 95% confidence interval becomes (0.76 – 2.43), far away from any statistical significance. But let us ignore my correction and instead take that meta-HR at face value, as well as all other meta-HRs reported by the authors in Table 2 for DLBCL. I count a total of forty-five meta-HR reported across all pesticides and active ingredients in that table. Among those, six have values above one, two are equal to one, and all the other thirty-seven are below one. Assume the null hypothesis that the listed pesticides and active ingredients are neutral with respect to DLBCL, i.e. each meta-HR is equal to one. Due to randomness we expect that - just by chance - some meta-HR will be estimated to be >1 and some <1, with a 0.5 probability for each one of those two alternatives. A binomial test with a 0.5 null probability of having a meta-HR>1 for each one of them, would allow us to conclude that the probability of this result under the null is only P=0.00000164, since $2 \times \text{pbinom}(6,43,0.5,\text{lower.tail} = \text{TRUE}) = 1.636e\text{-}06$. Even if we wanted to control this probability with a Bonferroni correction for those forty-five meta-HR with associated confidence intervals (P=0.00000164 x 45 = 0.0000738), or even for all 232 confidence intervals and 232 p-values reported in that study in Table 2 (P=0.00000164 x 232 x2 = 0.000761), we would reject the null hypothesis. Thus, we would conclude that there is very strong statistically significant evidence of an overall protective effect among those forty-five pesticides and active ingredients against DLBCL. I will let the reader decide if they believe that this is a statistically significant result.

Dr. Portier also states: "Only three of the epidemiological studies provided information on biological gradients in their publications" (page 74 of his report) and then mentions how these studies seem to provide support for a gradient. However, 1) there is significant publication bias (Donato 2020) in those studies; 2) both Pahwa 2019 and Andreotti 2018, which are large high-quality studies, considered this issue and found no biological gradient; 3) I have already shown how nothing is statistically significant in those three studies.

I will now comment on Dr. Portier's statements regarding the animal carcinogenicity and genotoxicity data, which I have already discussed in a previous section of my report. Briefly, in his expert report, Dr. Portier's search for statistical significance (or even non-significance with a p <0.10) without regard for the hundreds and sometimes thousands of tests that could be performed on those large datasets – i.e. failing to properly correct for multiple comparisons - leads him to conclusions that are not supported statistically. However, in a recent paper (Portier Environ Health 2020), Dr. Portier recognizes the problem of evaluating animal cancer studies involving "a large number of statistical tests

that could lead to false positive", and dedicates a small section on page 11 of his paper to the potential for "false positive errors" in his results. I will therefore focus on this section, as his most up-to-date assessment of the animal carcinogenicity data for glyphosate from chronic exposure rodent carcinogenicity studies, completely depends on the correctness of this section.

Dr. Portier does not properly correct for multiple comparisons, but rather calculates the probability that all the results he claimed to be "statistically significant" (i.e. a trend test with p ≤0.05) in the paper - a total of 41 among the 496 evaluations performed - are false positives. Of note, Dr. Portier only looked for significance in the direction of harm and did not consider any results showing negative trends (*see* Crump 2020). Using a binomial test, he obtained a P=0.001. This would seem to imply that at least one and possibly more of those trends should be statistically significant, i.e. true positives. There are many problems with both this calculation and how Dr. Portier uses this result. For example:

1) There appear to be some basic mathematical mistakes in the calculations of Dr. Portier. For example, by my count, the total of so-called "statistically significant" tests in his most recent paper is 39 and not 41, as I count 16 of them in Table 3, 14 in Table 4, and 9 in Table 5 (bolded results counted, not including (common trend) results based on pooled data). Thus, the probability calculated by Dr. Portier should be P=0.004 and not P=0.001.

2) Dr. Portier included in his calculations for the total number of significant trend tests, "a few evaluations done against historical controls" for tumors that rarely (<1%) appear in untreated animals. Given that it does not appear Dr. Portier controlled for how many rarely appearing tumors could have appeared in the experiments analyzed, to only test a posteriori only for tumors that showed up in my specific experiments but that are rare in untreated animals, will essentially end up finding them almost always to be significant because  - by definition - I am testing them against historical control data, that are what define those tumor to be rare in the control population. And in fact, not surprisingly, among those "few" – 9 to be precise (see his Additional File 1) – a striking 8 of them are significant. Thus, the inclusion of these 9 historical controls, ends up adding 8 significant trends to the analysis, where 8 is a large number, relatively to the other 31 significant ones, out of the 496 evaluations. Moreover, the fact that most guidelines call for using historical data for these tumors does not mean that that is ideal. From a within-study statistical perspective, the ideal control is the within-experiment control. Therefore, a more correct calculation of the probability is performed by considering only the 31 "significant" trends with within-experiment controls out of 487 (=496-9) evaluations that did not include the historical

controls. Maybe not surprisingly, as soon as those "few" extra tests are properly removed, the same calculation results in a non-significant probability P=0.10. Thus, based on the same methodology used by Dr. Portier, the trends reported in the paper can be all false positives and simply due to chance. I would like to add that even to the non-statistically-trained person it should be concerning that removing only 9 out of 496 tests the probability goes from P=0.001 to P=0.1, i.e. a hundred fold difference, completely eliminating any statistical significance, just because of these rare tumors that are not properly controlled for. I consider a serious omission the fact that this was not even mentioned by the author, especially as these 9 tests were added ad hoc using both a different methodology and different controls.

3) The methodology used by Dr. Portier using a simple binomial test is not a proper statistical methodology to control for the multiple comparison problem. I do not see any justification for this choice rather than the well-established proper statistical approach. I have already discussed in previous section how critical it is to control to the FWER especially for cases like this one when only relatively few tests seem positive among the many hundreds performed. I have also already listed what are the standard methodologies. The binomial test is essentially useless in assessing the Type-1 error. Not surprisingly, using Bonferroni (or its alternatives) and given the p-values provided in Tables 3, 4, and 5, none of the results reported in those tables are statistically significant when controlling for the FWER. In fact, none of the results are statistically significant even if only controlling for the much weaker FDR typically used in a preliminary investigative study rather than in a confirmatory study like this one (see my previous section). Therefore, the statements of Dr. Portier as well as his "summary of level of evidence" with 13 "CE" - i.e. "clear evidence…data demonstrate a causal linkage between glyphosate and the tumor" - are not supported statistically.

4) Related to points 2) and 3), Dr. Portier has also not controlled for all possible cancer types but rather he has conditioned his probability calculation on only those cancer types that showed up a posteriori having an apparently significant trend in at least one cohort. This is statistically not correct. Essentially, by doing so, we end up picking and choosing only the trends with apparent significance to then say that there seems to be some significance. A completely circular argument. As I have shown in points 1-3, none of the results are statistically significant.

A proper alternative to using Bonferroni or the other methods I listed above to control for multiple comparisons is to estimate the null distribution to then assess the probability of Type-1 errors. This type of calculation can be found in Crump 2020, as

I have already discussed, showing no significant evidence of a harmful effect of glyphosate in the rodent studies.

**Dr. Jameson**, when describing his method for evaluating the human epidemiological studies, makes the following concerning statement "I learned that epidemiologists consider case-control studies particularly valuable for determining the carcinogenicity of an agent because their design facilitates exposure assessment and reduces the potential for certain biases" indicating that he is basing his methodology and opinion on what supposedly he has learned from experts in human epidemiological data rather than on his own judgement of the value of case-control vs cohort studies. He thus misses to recognize how, as a general rule, prospective cohort studies are generally considered superior evidence as compared to case-control studies. This belief makes him downplay the importance of the results presented for example in Andreotti 2018. His entire summary (pages 17-19 of his original report) of the human epidemiological data is therefore exclusively dedicated to the case-control studies, and he puts little to no weight in the better designed Andreotti 2018. Moreover, in several cases he misstates the results, claiming statistical significance that instead, as we already discussed, does not exist. For example, on page 17 of his report, he states that "My review of the literature finds that the two case-control studies from the United States and Canada, and the two case-control studies from Sweden indicated statistically significant positive associations between exposure to glyphosate and NHL." And at the end of page 18 he incorrectly claims that "the three meta-analyses I reviewed are good examples of objective evaluations and show a consistent positive association between glyphosate and NHL. Drawing on the Bradford-Hill criteria for causality, I would state that the observations are consistent (relative risks and meta analyses are positive for the case control studies), significant, …" to support his conclusions. Based on the overall assessment I provided in my report, I consider his claims and conclusions to be not statistically supported by the evidence. Finally, Dr. Jameson reaches similarly erroneous statistical conclusions regarding the animal carcinogenicity data for glyphosate—albeit conclusions that are at times different from Dr. Portier's.

All of the opinions expressed in this report are mine and reflect my training, education, and experience as a biostatistician and expert in cancer etiology. I hold them to a reasonable degree of scientific certainty, and I approached the issues discussed in this report using the same rigor and methodology that I employ in my research and regular practice. I reserve the right to supplement my opinions should new evidence become available. I also reserve the right to comment on the opinions or testimony of others. I am compensated for my time at a rate of $500 per hour. A list of cases in which I have provided expert testimony in the last four years is attached.

_____
Cristian Tomasetti, PhD
Associate Professor, Division of Biostatistics & Bioinformatics
Department of Oncology
Johns Hopkins University


February 12, 2021