**Exhibit "4"**

```
 1              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
 2

 3                        - - -

 4
      IN RE:  ROUNDUP PRODUCTS      :  MDL NO. 2741
 5    LIABILITY LITIGATION          :
      _____:  MDL CASE NO. 3:16-
 6    This document relates to:     :  MD-02741-VC
                                    :
 7    Nancy Salas v. Monsanto       :
      Company                       :
 8    Case No. 3:20-CV-06173-VC     :
      _____:
 9

10                        - - -
                        VOLUME 1
11              Friday, August 5, 2022

12                        - - -

13

14           Remote videotaped stenographic deposition of

15    KEVIN B. KNOPF, M.D., M.P.H., conducted at the location

16    of the witness in Oakland, California, commencing at

17    approximately 8:10 a.m., on the above date, before

18    Rosemary Locklear, a Registered Professional Reporter,

19    Certified Realtime Reporter and California CSR (#13969).

20

21                        - - -

22

23

24              GOLKOW LITIGATION SERVICES
            877.370.3377 ph | 971.591.5672 Fax
25                 deps@golkow.com
```

```
 1   APPEARANCES:  (All appearances via remote technology)

 2

 3           PODHURST ORSECK, P.A.
             BY:  PABLO ROJAS, ESQUIRE
 4           projas@podhurst.com
             One Southeast 3rd Avenue, Suite 2300
 5           Miami, Florida 33131
             (305) 358-2800
 6           Appearing on behalf of the Plaintiff

 7

 8           ARNOLD & PORTER KAYE SCHOLER, L.L.P.
             BY:  DAVID A. KERSCHNER, ESQUIRE
 9           David.Kerschner@arnoldporter.com
             BY:  JOSEPH KLEMME, ESQUIRE
10           Joseph.Klemme@arnoldporter.com
             250 West 55th Street
11           New York, New York 10019-9710
             (212) 836-8000
12           Appearing on behalf of the Defendant Monsanto
             Company
13

14
             MORRIS MANNING & MARTIN
15           BY:  CAROLINE W. SUYDAM, ESQUIRE
             csuydam@mmmlaw.com
16           Atlanta Financial Center
             3343 Peachtree Road, N.E., Suite 1600
17           Atlanta, Georgia 30326
             (404) 495-8485
18           Appearing on behalf of the Defendant Home Depot

19

20                            - - -

21

22

23

24

25
```

```
 1   ALSO PRESENT:

 2

 3          MELISSA BARDWELL, Video Operator

 4

 5                          - - -

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2

 3   WITNESS                                    PAGE

 4

 5   KEVIN B. KNOPF, M.D., M.P.H.

 6

 7              By Mr. Kerschner                  9

 8

 9              By Mr. Rojas                    235

10

11                    - - -

12

13                 EXHIBIT INDEX

14   NUMBER                                   MARKED

15

16   Knopf-1       6-page document dated 7/29/22    20
                   entitled "Defendant Monsanto
17                 Company's Amended Notice to
                   Take Oral and Videotaped
18                 Deposition of Dr. Kevin B.
                   Knopf"
19
     Knopf-2       16-page document dated 5/15/13   30
20                 entitled "Kevin B Knopf MD
                   MPH"
21
     Knopf-3       15-page document dated 6/23/22   33
22                 entitled "Expert Report of
                   Kevin B. Knopf, MD, MPH, In
23                 Support of Specific Causation
                   On Behalf of Nancy Salas"
24

25
```

```
 1                    EXHIBIT INDEX (Continued)

 2     NUMBER                                              MARKED

 3

 4     Knopf-4          6-page document dated 6/23/22          74
                        entitled "Plaintiff's Rule 26
 5                      Specific Causation Expert
                        Disclosures"
 6
       Knopf-5          92-page document entitled            95
 7                      "Glyphosate"

 8     Knopf-6          27-page document dated 2006          104
                        entitled "IARC Monographs on
 9                      the Evaluation of Carcinogenic
                        Risks to Humans"
10
       Knopf-7          12-page article dated 3/24/17        127
11                      entitled "Stem cell divisions,
                        somatic mutations, cancer
12                      etiology, and cancer
                        prevention"
13
       Knopf-8          93-page document dated 3/24/17       131
14                      entitled "Supplemental
                        Materials for Stem cell
15                      divisions, somatic mutations,
                        cancer etiology, and cancer
16                      prevention"

17     Knopf-9          216-page document dated             149
                        12/12/17 entitled "Revised
18                      Glyphosate Issue Paper:
                        Evaluation of Carcinogenic
19                      Potential"

20     Knopf-10         9-page document dated 1/16/20       152
                        entitled "Memorandum"
21
       Knopf-11         8-page article dated 11/18/08       191
22                      entitled "Occupational
                        exposure to pesticides and
23                      lymphoid neoplasms among men:
                        results of a French
24                      case-control study"

25
```

```
 1                    EXHIBIT INDEX (Continued)

 2   NUMBER                                          MARKED

 3

 4   Knopf-12        26-page document dated 1/22/20      224
                     entitled "Specific Causation
 5                   Report of Ronald Kapolnek,
                     Case No. 3:18-cv-04014"
 6

 7
     (Exhibits retained by the court reporter and attached to
 8   transcript.)

 9

10                            - - -

11

12                   INSTRUCTIONS NOT TO ANSWER

13

14   Pages 199, 207, 208, 209, 212, 213, 214, 215, 216, 217,
                     218, 219, 220, 221, 229
15

16
                              - - -
17

18

19

20

21

22

23

24

25
```

1          VIDEO OPERATOR:  We are now on the record.

2          My name is Melissa Bardwell, videographer for

3     Golkow Litigation Services.  Today is August 5th of

4     2022, and the time now is 8:10 a.m.

5          This remote video deposition is being held in

6     reference to the Roundup Products Liability Litigation

7     relating to Nancy Salas versus Monsanto Company.

8          Our deponent today is Kevin Knopf, M.D.

9          All parties to this deposition are appearing

10    remotely and have agreed to the witness being sworn in

11    remotely.

12         Due to the nature of remote reporting, please

13    pause briefly before speaking to ensure all parties are

14    heard completely.

15         Would counsel present please identify themselves

16    for the record, after which would our court reporter,

17    Ms. Rosemary Locklear, please swear in the witness.

18         MR. KERSCHNER:  David --

19         MR. ROJAS:  Good morning.  This is Pablo Rojas.

20    I'm counsel for Ms. Salas.

21         I have a housekeeping issue that I want to

22    address, but perhaps we can do so after other attorneys

23    make their appearances.

24         Thank you.

25         MR. KERSCHNER:  Sure.

 1          David Kerschner for the Defendant Monsanto.

 2          MR. KLEMME:  Joseph Klemme for the Defendant

 3     Monsanto.

 4          MS. SUYDAM:  Caroline Suydam for Defendant Home

 5     Depot.

 6          MR. ROJAS:  Okay.  I -- the issue that I wanted

 7     to raise very briefly is that, as you all know,

 8     Dr. Knopf is a treating physician, and we had set this

 9     up on a day when we anticipated that he would have a

10     minimal amount of treatment responsibilities.  And I

11     think that will still be the case, but I understand from

12     Dr. Knopf that due to sort of a logistical change where

13     he's at, there may be a couple of instances throughout

14     the day where, in addition to the usual comfort breaks

15     and stuff like that, he may need to step away for a few

16     minutes for some kind of treatment- or patient-related

17     matter.

18          So we'll keep those to a minimum, and I don't

19     want it to get in any way in the way of the full

20     deposition that you guys are entitled to, but I just

21     wanted to flag that we may have a couple of those

22     patient-related breaks today.

23          MR. KERSCHNER:  Completely understand.  We'll

24     take it as it comes and, you know, we'll deal with it if

25     we have to.

```
 1         Thank you --

 2         MR. ROJAS:  Okay.

 3         MR. KERSCHNER:  -- for informing me.

 4         MR. ROJAS:  Appreciate it.

 5         MR. KERSCHNER:  Doctor --

 6         KEVIN B. KNOPF, M.D., M.P.H., having been duly

 7  sworn, was examined and testified as follows:

 8                         EXAMINATION

 9  BY MR. KERSCHNER:

10  Q.     Good morning, Doctor.

11         My name is David Kerschner.  As you just heard,

12  I represent the Defendant Monsanto in this case, and

13  I'll be taking your deposition today.

14         Can you hear me?

15  A.     Yes.  Nice to meet you.

16  Q.     All right.  Nice to meet you as well.

17         And can you for the record just let us know your

18  business address, please.

19  A.     My work address is 1411 East 31st -- East 31st

20  Street, Oakland, California.

21  Q.     And is that where you are today?

22  A.     Yes, that's where I am right now.

23  Q.     Is there anyone in the room with you today?

24  A.     No.

25  Q.     And I am taking this deposition by video link;
```

1    correct?

2    A.      Yes.  Correct.

3    Q.      Have you ever been deposed before?

4    A.      Yes, I have.

5    Q.      So you understand the rules of a deposition?

6    A.      Yes, I think so.

7    Q.      I won't go over them all today, but just so

8    we're on the same page, if you answer a question, I'll

9    assume you've understood it, and if you don't understand

10   it, please ask me for clarification.

11   A.      Yes.  Thanks.

12   Q.      Is that --

13           How did you end up becoming an expert in this

14   litigation?

15   A.      In this particular case, I was connected with

16   Mr. Rojas's firm by a third-party agency.

17   Q.      And what's that third-party agency?

18   A.      I think the name is ExpertConnect.

19           It's an agency that looks for experts to connect

20   them to attorneys and probably other areas of commerce

21   as well.

22   Q.      Do you work for ExpertConnect?

23   A.      No, I do not.

24   Q.      So they're just a third-party feeder to find

25   experts for lawyers.

1   A.      I believe they're a matching service.  I have no

2   formal business relationship with ExpertConnect.

3   Q.      Do you have a written retainer agreement with

4   ExpertConnect?

5   A.      No.  I have my usual agreements on my profile

6   there, and then they're in the business of finding

7   attorneys who might be interested in working with me.

8   Then there's a process where some questions are asked,

9   and if it looks like the attorney is interested in

10  working with me, then they interview me, the attorney.

11  Q.      Did you have any email communications with

12  ExpertConnect about working on this litigation?

13  A.      The email would be a query to me about if I'm

14  interested in working on the case.  And there is a

15  platform they have where I indicate, I think, my initial

16  thoughts or if I have any conflict of interest.

17          Then they send that platform to an attorney, and

18  there's an email from them that says, you know, you have

19  filled out this request, which I usually don't keep

20  those emails.

21          And then if there's an attorney who's interested

22  in speaking with me about a case, ExpertConnect will

23  send me an email saying so and so wishes to speak with

24  you, and communications about setting up a time.

25  Q.      Do you have that initial form that you filled

1    out that you sent to ExpertConnect?

2    A.      No.  It's on their website, and I don't have

3    access to it.

4    Q.      Do you have any of the communications between

5    yourself and ExpertConnect?

6    A.      Not anymore.  I mean, when I say I filled out

7    the form for them, I usually delete that email because

8    it's a lot of emails.  Then they say so and so will wish

9    to talk to you, and I'll keep that email until that talk

10   happens.

11          Then if there's an interview with me and that

12   person, ExpertConnect I think arranges with that person

13   to match me with some sort of arrangement there, and

14   then they will send me an email saying you've been

15   retained on Case 0-blah, blah, blah.  Those emails I

16   discard once I've established a relationship with an

17   attorney who wants to work with me.

18   Q.      There's no reason you couldn't ask ExpertConnect

19   to get your form, right, that you filled out?

20          MR. ROJAS:  Object to the form.

21          You can answer, Doctor.

22          THE WITNESS:  I suppose I could ask them if they

23   have that original information.

24   BY MR. KERSCHNER:

25   Q.      When did you delete your communications with

1    ExpertConnect?

2    A.      I'm sorry.  When?

3    Q.      Yes.  When?

4    A.      I don't recall the exact dates that I was first

5    engaged by Mr. Rojas's firm.  Sometime in 2022.

6            And so as soon as -- as soon as their email came

7    saying that I was retained by his firm, I deleted that

8    email because I have communications from Mr. Rojas at

9    that point.

10   Q.      Had you worked on any Roundup litigations before

11   you worked with Mr. Rojas's firm?

12   A.      No.  This was the first time.  This is the first

13   case I've worked on for Roundup, I think.

14   Q.      How many -- how many cases have you worked on

15   through ExpertConnect?

16   A.      Are you asking related to Roundup or related

17   to --

18   Q.      Well, start in general.

19   A.      Oh.  I believe they reached out to me to become

20   an expert sometime in 2021, and so probably a handful of

21   cases before my engagement with Mr. Rojas.

22   Q.      And how many Roundup cases have you worked on

23   through ExpertConnect?

24   A.      I've been retained for a number of cases, I

25   think two with Mr. Rojas's firm.  This -- this case was

1   the first one that -- earliest one that had a report

2   date by me, but I think there are other cases that I'm

3   working on with Roundup with different firms.

4   Q.      Do you know what firms those are?

5   A.      I had a list at my home office of which firms

6   they are.

7           There are one or two firms in South Carolina;

8   there's a firm in Ohio, I think the attorney's name is

9   Jim O'Brien; there's another firm, I think his name is

10  Finley, who may be in South Carolina.  There are a

11  handful of firms.

12  Q.      Have there been any cases in the Roundup

13  litigation that you have declined to take on?

14  A.      I'm not sure I've declined a case yet.

15  Q.      When you were first contacted, did you do any

16  research before responding to ExpertConnect?

17  A.      Yes.  Some.

18  Q.      What did you do?

19  A.      If I'm remembering the history, there might have

20  been another attorney who had asked me something about

21  Roundup and maybe sent me an expert report but I did not

22  engage with that person.

23          I think I followed the litigation a little bit

24  in the lay press and had done some general research

25  along the way about causality of lymphoma, but probably

1   prior to the engagement with Mr. Rojas, I did not do a

2   lot of specific research regarding this issue.

3   Q.      When did you first develop the opinion -- well,

4   actually, strike that.

5           Is it your opinion that Roundup or -- and

6   glyphosate can cause non-Hodgkin's lymphoma?

7           MR. ROJAS:  Object to the form.

8           THE WITNESS:  Yes.

9   BY MR. KERSCHNER:

10  Q.      And when did you develop that opinion?

11  A.      You know, earlier in my reading of epidemiology

12  about lymphoma and risk factors, pesticides came up as

13  an opinion, data regarding farmers came up as an

14  opinion.  And as the news about Roundup came up, I

15  suspected it might be a substantial factor in causing

16  lymphoma, but before I was engaged by Mr. Rojas, I did

17  not review specific epidemiology, I think general

18  epidemiology, and I think one of the articles came out

19  in 2021 that I may have read.

20  Q.      Do you know what article that is?

21  A.      I think there's an article by Weisenburger in

22  2021 in a journal that I get, one of the journals that

23  comes to my address.

24  Q.      So let me just try and get the timeline.

25          Before you were -- so it was after you were

1    retained by Mr. Rojas's firm that you first developed

2    the opinion that Roundup can cause non-Hodgkin's

3    lymphoma.

4    A.      I wouldn't say it that way, no.  I suspected it

5    causes non-Hodgkin's lymphoma well in advance of when I

6    was retained on this case.

7    Q.      But that wasn't based upon --

8            MR. ROJAS:  David, are you -- just to be clear,

9    are you asking him a formal expert opinion or what sort

10   of opinion?

11           MR. KERSCHNER:  His opinion on Roundup in this

12   litigation.

13   BY MR. KERSCHNER:

14   Q.      So, Dr. Knopf, you said that you had done a

15   little bit of background research, you followed the

16   litigation before your retention, but to a reasonable

17   degree of medical certainty, your opinion regarding

18   Roundup and non-Hodgkin's lymphoma was developed after

19   the retention; right?

20   A.      Yeah.  I would not have --

21           MR. ROJAS:  Object to form.

22           THE WITNESS:  I don't think I would have

23   rendered a specific causality opinion with my name on it

24   with a report until after I reviewed the epidemiologic

25   literature.

```
 1   BY MR. KERSCHNER:

 2   Q.      And that was after you were retained; right?

 3   A.      Yes.

 4   Q.      You mentioned you've read an article by

 5   Weisenburger?

 6   A.      Yes.

 7   Q.      Do you know that that author was a paid -- a

 8   paid expert by plaintiffs in this litigation?

 9   A.      I don't think I did at the time.  It occurred in

10   one of the peer-reviewed journals that I receive.

11   Q.      Does it matter to you in your opinion whether or

12   not the author of the article is paid by one side in the

13   dispute?

14           MR. ROJAS:  Object to the form.

15           THE WITNESS:  I'm not sure how to answer that.

16           In litigation such as this, typically, authors

17   are often paid by one side or the other.

18   BY MR. KERSCHNER:

19   Q.      And it's important to disclose that in the

20   article; correct?

21   A.      I think it helps --

22           MR. ROJAS:  Object to the form.

23           THE WITNESS:  I think it helps.  I think there's

24   some articles I've read where the authors have no

25   relationship to the lawsuit and I've noted that when I
```

1    read the article.

2    BY MR. KERSCHNER:

3    Q.      But if the author does have a relationship to a

4    particular side of the lawsuit, they should disclose

5    that information in the article; correct?

6    A.      I think it's a standard practice in the

7    oncologic literature to disclose if you have any

8    potential conflict of interest in an article.

9    Q.      But you should also disclose the particular side

10   of which your conflict is on; right?

11   A.      Well, in oncology, most of -- articles about

12   certain drugs and the drugs may be written as, you know,

13   this drug had this sort of response.  The ethics code in

14   oncology say that you are to disclose if you're a

15   consultant for that company.  And I like to see in an

16   article if somebody is a consultant on the issue at

17   hand.

18   Q.      For example, Doctor, if you were to publish on

19   Roundup and non-Hodgkin's lymphoma, you would disclose

20   that you have worked for the plaintiffs in this

21   litigation; right?

22   A.      Yes.

23           MR. ROJAS:  Object to the form.

24           THE WITNESS:  I think -- I think that would be

25   an ethical thing to do, yes.

```
 1   BY MR. KERSCHNER:

 2   Q.      Did you meet with any attorneys before you

 3   agreed to offer opinions in this litigation?

 4   A.      Meet with any attorneys specifically about this

 5   litigation?

 6   Q.      Yes.

 7   A.      No, not that I recall.

 8   Q.      And you have a retainer agreement with

 9   Mr. Rojas's firm?

10   A.      Yeah.  I'd like to clarify that previous

11   question.

12           I think there was an attorney I spoke with but I

13   was not, that I remember, involved in the case, but he

14   and I may have talked that there was these lawsuits

15   going on.

16   Q.      And who was that attorney?

17   A.      Ken Lumb in Chicago.

18   Q.      And is Mr. Lumb associated -- do you know what

19   firm Mr. Lumb is associated with?

20   A.      No.  I would have to look that up for you.

21   Q.      And did you do any work with Mr. Lumb?

22   A.      I don't believe I did any work related to

23   Roundup.

24   Q.      When did you have this discussion with Mr. Lumb?

25   A.      I'd have to look up the date for that.  It's
```

1   either 2022 or 2021.

2   Q.      Have you done any other work with Mr. Lumb?

3   A.      Yes.

4   Q.      In other litigations.

5   A.      Only as an expert.  Nothing has gone to

6   litigation.

7   Q.      Those -- but those matters are not Roundup

8   matters.

9   A.      No, I don't think I'm working on Roundup with

10  Mr. Lumb.

11          MR. KERSCHNER:  Let's mark Exhibit -- what will

12  be Exhibit 1 to your deposition as the Amended Notice of

13  Deposition.

14          (Exhibit Knopf-1 was marked for identification.)

15          MR. KERSCHNER:  I think what's going to happen

16  is we're going to upload it to the exhibit link and then

17  my colleague is going to share his screen so you can see

18  it, you'll have a copy of it, and we will make this work

19  in the remote environment.

20          THE WITNESS:  Thank you.

21          MR. KERSCHNER:  Joe, are you able to go ahead

22  and do that?

23          There we go.

24          And we're going to mark this Notice as Exhibit 1

25  to the deposition, and it will be uploaded into the

 1    exhibit link so everyone can get it.

 2           And if someone doesn't have access, just let us

 3    know and we'll work it out.

 4    BY MR. KERSCHNER:

 5    Q.     Have you seen this before, Doctor?

 6    A.     Can you scroll down a little bit?  Is this the

 7    list of nine things?

 8    Q.     Yeah.  Could you go to the exhibit that will

 9    have the document requests.

10    A.     Yes, I've seen this --

11    Q.     Is that what you're referring to?

12    A.     I have seen this before, yes.

13    Q.     And these are the Requests for Production for

14    this deposition; right?

15    A.     Yes.

16    Q.     Have you gone through this list to determine if

17    you have any documents that are responsive to any of

18    these requests?

19    A.     Yes, I've gone through this list.

20    Q.     And do you have any documents that are

21    responsive to these requests?

22    A.     So Number 1 and Number 2, I do not, as I've not

23    invoiced anything at this point.  I think I obtained a

24    retainer here.

25           Number 3, when I prepared my report that we've

1  supplied, there are references to articles in that

2  report, I think maybe about 20 of them, that are in the

3  public domain.  So apart from that, I don't think there

4  were any additional documents that formed my initial

5  opinion on Ms. Salas's case.

6          If you wanted the original articles, I think I

7  spoke with counsel, and I did not think that was what

8  that intent was meant for Number 4.

9          MR. ROJAS:  Sorry.  Can I -- can I -- you should

10  continue your answer to the question but I do want to

11  clarify, Doctor, that, generally speaking, throughout

12  this deposition I'm going to instruct you not to answer

13  questions or to answer, to provide any testimony, about

14  substantive communications about this case that you may

15  have had with us.

16          So you can answer, as you have been already,

17  Mr. Kerschner's questions about compensation, maybe any

18  data that we provided to you but, under the rules,

19  please don't testify about substantive communications

20  with us as counsel.

21          I have a comment for after you but I don't want

22  to interrupt the remainder of your answer to

23  Mr. Kerschner's question, so go ahead.

24          MR. KERSCHNER:  Thank you.

25

1   BY MR. KERSCHNER:

2   Q.      And that's right.  I'm not interested in the

3   substance of the communications you've had with counsel.

4           Why don't just I go -- why don't we go one at a

5   time --

6   A.      Sure.

7   Q.      -- through the requests just to make life easier

8   for us.

9           So I think you've answered on three.

10          Four, the actual documents you've reviewed, are

11  those -- I don't -- well, would those all be listed in

12  the materials considered lists that are part of your

13  report?

14  A.      Yes, there are references at the end of my

15  report.

16  Q.      So there are no additional documents outside of

17  what's referenced in that list that you would have

18  reviewed or referred to in forming your opinion in this

19  case.

20  A.      Not at forming this opinion, no.

21  Q.      Number 5, we have a copy of your CV that was

22  provided with your report.

23          Is that an updated copy?

24  A.      It's updated as of 2022.  There may be

25  additional publications I have, but I haven't updated

1    that.

2    Q.      We'll look at that shortly.

3            Number 6, any testimony you provided in the last

4    four years?

5    A.      Yes, I've provided that.

6    Q.      And that's just -- how many -- how many cases is

7    that?

8    A.      I had a deposition about a month ago.

9    Q.      Other than that, there's been no other testimony

10   you've provided in the last four years.

11   A.      No, sir.

12   Q.      Number 7 is communications with several

13   individuals.

14           Did you check to see if you had any

15   communications with these individuals?

16   A.      Yes, I did, and I don't believe I've had

17   communication with these individuals.

18   Q.      Number 8, communications more generally that are

19   not subject to attorney-client privilege regarding

20   Roundup, glyphosate.

21           Do you have any other communications?

22   A.      No, I don't believe so.

23   Q.      Number 9, anything you were sent by counsel

24   about your initial retention?

25   A.      I think all documents that -- how does it read?

Warning

1          Any document that was relevant to forming my

2    initial opinion in this case I think has been provided.

3    Q.      And those would be on that materials considered

4    list?

5    A.      Yeah.  In the references at the end of the

6    article.

7    Q.      You said that you haven't submitted any

8    invoices.  Do you intend to?

9    A.      Yes.

10   Q.      What is your current rate for -- your hourly

11   rate?

12   A.      My current hourly rate is $500 an hour.

13   Q.      Is that for both review, drafting, and

14   deposition, or is there separate rates?

15   A.      That's a rate for review and drafting.  I think

16   for deposition I have to charge either by the half day

17   or the full day at higher --

18   Q.      Is that the same for trial testimony?

19   A.      I think that would be roughly the full-day

20   deposition for a trial.

21   Q.      What's that rate?

22   A.      Around $8,000, 8,500, for a full day.

23   Q.      How many hours have you spent so far in the

24   Roundup litigation?

25   A.      It would be very hard for me to come up with an

1    exact number.

2    Q.      Can you estimate?

3    A.      Are you asking about how many hours I spent to

4    prepare my opinion regarding Nancy Salas or how many

5    hours in total?

6    Q.      We'll break it down a little bit.

7            Just in -- overall, in all your work in the

8    Roundup litigation, roughly how many hours have you

9    spent so far?

10           MR. ROJAS:  And, Dr. Knopf, in general, if

11   you're able to estimate, by all means, I'll allow

12   Mr. Kerschner to clarify.  I don't think he wants you to

13   guess as to any questions that he's asking you, but if

14   you're able to estimate, please answer.

15           MR. KERSCHNER:  Yeah.

16   BY MR. KERSCHNER:

17   Q.      I certainly don't want a random guess, but

18   you've done the work, you're going to invoice for it, so

19   what would be your estimate based on that?

20   A.      Somewhere around a hundred.  It's going to be a

21   guess.

22           I -- what I would usually do is go back and

23   count out how many hours I spent doing each sort of

24   task.

25   Q.      So roughly a hundred hours, and that's at the

1   $500-an-hour rate?

2   A.      That's a very rough estimate.  I can't say how

3   certain that number is.

4   Q.      And of those hundred hours, how much was spent

5   specifically on Nancy Salas's case?

6   A.      So I spent a certain number of hours reviewing

7   her records, reviewing the epidemiology, writing this

8   initial report which you have.

9          Then subsequent to that initial opinion and

10  submission of the report and communication with the

11  attorney about the report, I've spent additional time

12  reviewing additional epidemiologic literature,

13  additional communication, reviewing others' depositions,

14  others' reports, the reports that you've provided to me

15  I reviewed, and reading additional articles in the

16  published literature.

17  Q.      Is that on top of the one hundred hours you

18  spent generally on the litigation?

19  A.      I'm not sure how much of that hundred hours is

20  that work after and the work before.

21  Q.      I'm just -- and my apologies for the confusion.

22         The hundred hours is inclusive of the work that

23  you've mentioned specific for Nancy Salas or would that

24  Nancy Salas work we've just talked about be in addition

25  to those hundred hours you had initially spent on the

1   Roundup litigation?

2   A.      I think part of that hundred hours would

3   represent the initial work to get the initial report to

4   Nancy Salas but then I've spent additional time reading

5   epidemiologic literature, which I think is important to

6   general opinions both about the epidemiology of Roundup

7   and lymphoma as well as reaffirming my views in this

8   Nancy Salas case, and then there's been additional time

9   reviewing other expert reports, depositions, the

10  Monsanto expert reports which were provided on

11  July 25th.

12  Q.      So all that time together, the initial time that

13  was about a hundred hours on the initial report, then

14  additional time reading literature, reaffirming your

15  views, looking at the reports, depositions, expert

16  reports which were recently provided, what's that total

17  time then?

18  A.      I'm not sure I've totaled up an exact number of

19  hours.  I'm going to say it's somewhere between 100 or

20  150 or -- there are additional hours I've spent just

21  reviewing some basic epidemiologic principles.  I

22  don't --

23  Q.      So close -- is about --

24  A.      -- think it's all billable time.

25  Q.      -- 200 hours of billable time a good estimate?

1    A.      No, I don't think it's all billable time.  I

2    mean, I think if I'm reading just to enhance my general

3    knowledge, I'm not sure I would bill a specific attorney

4    for that.

5    Q.      But you will have billed them for the time

6    you've spent on this case, though; right?

7    A.      I think it's appropriate to bill that firm for

8    the time I've spent physically on this case, but time I

9    take to review general literature and think more about

10   it, I'm not sure it's in the purview to bill this firm.

11          You know, if it's related to this case

12   specifically, I think it would be appropriate to bill

13   this firm.  If I read some general --

14   Q.      Who would you bill, then?

15   A.      What?

16   Q.      I'm sorry.  I did not mean to cut you off.  Go

17   ahead.

18   A.      Oh.

19          If I read some general articles regarding

20   Roundup to enhance my knowledge, I'm not sure who I

21   would bill.  I have to ask other attorneys what the

22   appropriate situation is there, whether I just do it on

23   my own or I bill specific firms.

24          MR. KERSCHNER:  I'm going to mark what will be

25   Exhibit 2 to your deposition.

```
 1          And this is a copy of your CV that was provided

 2   to us.

 3          (Exhibit Knopf-2 was marked for identification.)

 4   BY MR. KERSCHNER:

 5   Q.     So I want to just start on the top.

 6          Do you see that this is a copy of your CV?

 7   A.     Yes.

 8   Q.     It says Version:  May 15th, 2013, on the top.

 9          Is that right?

10   A.     It's probably not right.

11          If you go down to the Publications, that would

12   probably give me a better estimate for what date it is.

13   Q.     Yeah.  Okay.  Why don't we do that, because

14   there are certainly publications from after 2013 on

15   here, which I was trying to figure out when this resume

16   is from.

17   A.     So I would say that CV probably was updated in

18   2021 and needs updating in 2022 but the initial 2013

19   date probably is just held there from when I had to

20   create it for a grant application.

21   Q.     Understood.

22          Are there any articles or any work that you need

23   to update to this CV that has to do with either

24   non-Hodgkin's lymphoma or Roundup?

25   A.     No, not specifically, sir.
```

 1    Q.      What about in general?

 2    A.      I think there have been a couple publications

 3    since Number 58, and I may update those articles here.

 4    Q.      And did any of those articles speak towards

 5    non-Hodgkin's lymphoma?

 6    A.      Not specifically, sir.

 7    Q.      Anything look at potential causes or risk

 8    factors for cancer, in general?

 9    A.      Not specifically.

10    Q.      In general?

11    A.      No, not specifically about what causes cancer.

12    There's an article about academic freedom and such, but

13    I don't think it specifically addresses what causes

14    cancer.

15    Q.      Any of the articles relate to Roundup or

16    glyphosate?

17    A.      No, I don't think I've actually written many

18    articles directly talking about glyphosate and a

19    non-Hodgkin's lymphoma link.

20    Q.      If you go to the top, you're currently

21    practicing in Oakland, California; right?

22    A.      Correct.

23    Q.      You're licensed in California and Maryland; is

24    that right?

25    A.      I was licensed in Maryland but I think that

1   license has expired, and I have not renewed it.

2   Q.      So you're only licensed to practice in

3   California.

4   A.      My medical license is in the state of

5   California, yeah.

6   Q.      Have you ever practiced medicine in the state of

7   Florida?

8   A.      No, I have not practiced medicine in the state

9   of Florida.

10  Q.      Do you have any connection to the state of

11  Florida?

12  A.      I've been there several times.

13  Q.      Other than just traveling there, professionally,

14  connections to the state of Florida?

15  A.      I have a few colleagues who are oncologists in

16  the state of Florida, but I don't think I really have

17  many professional roots in the state of Florida.

18  Q.      We'll refer back to the CV from time to time so

19  we'll -- you know, we can always go back to it, and if

20  you have a copy of it in hard copy, that's fine too, but

21  for now we're going to put it aside.

22          MR. KERSCHNER:  I'm going to mark what will be

23  the next, I guess the third exhibit to your deposition,

24  which will be a copy of your expert report in this

25  litigation.  And that will be Exhibit 3 to the

```
 1   deposition.

 2            (Exhibit Knopf-3 was marked for identification.)

 3            MR. KERSCHNER:  Joe, do we have that up?

 4            There we go.

 5   BY MR. KERSCHNER:

 6   Q.       Do you recognize this as your expert report,

 7   which I've marked as Exhibit 3?

 8   A.       Yes, sir.

 9   Q.       Did you write this report?

10   A.       Yes.

11   Q.       Did anybody assist you in the writing of this

12   report?

13            MR. ROJAS:  Again, Dr. Knopf, I don't think --

14   unless, David, you disagree -- that Mr. Kerschner wants

15   you to specify about communications that you may have

16   had with us substantively about the case for the report.

17   BY MR. KERSCHNER:

18   Q.       I'm not asking about communications with

19   counsel.  I just want to know if there's anyone else

20   other than yourself who assisted in drafting the report.

21   A.       No.  I wrote this report myself.

22   Q.       When did you first write the report?

23   A.       The date of June 23rd, 2022, is probably when it

24   was finalized, and I probably wrote it in the spring of

25   2022.
```

1    Q.      Does this report contain all of the opinions you

2    intend to give in Ms. Salas's case?

3    A.      This report tends -- includes everything that I

4    used to form my specific opinion regarding the nature of

5    Roundup and causality to non-Hodgkin's lymphoma.

6            Since June 23rd, '22, I have read additional

7    articles in the epidemiologic literature and reviewed

8    additional depositions and testimony that might inform

9    my further opinion so I can't say that everything I

10   would say is necessarily in this article.

11   Q.      What --

12   A.      And also --

13   Q.      -- articles and opinions -- and depositions are

14   you referring to?

15   A.      So I've read many epidemiologic studies after

16   this report was written, but --

17   Q.      And they're not on your materials considered

18   list?

19   A.      No; because my opinion that I intend to give in

20   this case is encompassed by the articles and words in

21   this particular article.

22   Q.      So then your opinions in this report do

23   encompass all of the opinions you intend to give

24   specific to Ms. Salas's case.

25   A.      I'm not sure how to answer that.

1    The other things I've read have confirmed this

2    opinion.  Nothing has really changed my opinion from

3    this point.  So in the sense that you're asking that,

4    yes, this article can change the opinions I intend to

5    give in this case; however, I'm curious about the

6    epidemiology and kept reading and that has, I guess,

7    opinions in it.  It hasn't changed any substantive

8    opinions about this case or what I intend to give.

9    Q.    And so what articles did you read that are not

10   contained in this report that you -- that you mentioned

11   just before?

12   A.    So all the articles that form my opinion for

13   this case when I wrote it are contained in the reference

14   list there, and that's not going to change for the

15   opinion I intend to give.

16       Since that time, I've read the -- through at

17   least once the expert opinions that you provided from

18   your experts, your general causation experts, and your

19   specific experts.  I've read a couple more epidemiologic

20   studies and a little bit more epidemiology about

21   non-Hodgkin's lymphoma.  I would say it's not going to

22   change any opinion substantively that I read in this

23   case.

24       I re-read some of the articles here and I've

25   read some additional articles that I found were

1   interesting about the development of the evidence for

2   causality, but none of them have changed my opinion that

3   I intend to give in this case from what's written in

4   this article, in this report.

5   Q.      And I'm just trying to understand, what are the

6   names or titles or authors of those additional articles?

7   A.      I'm not sure I can recite the names for you

8   completely.

9           I can say I read a piece by Benbrook that I

10  found on the Internet that discusses why there's a

11  difference between the findings of the IARC and the EPA.

12  That was interesting, and that's not referenced here.

13          I re-read the Zhang meta-analysis several times

14  to understand how she did her search routine and how she

15  did her filter and the original articles in her

16  meta-analysis, which I believe are all referenced in

17  this list.

18          The expert opinions I read and the depositions I

19  read after this to understand more about the nature of

20  the case and how I might prepare for this deposition.

21  Q.      So other than the Benbrook article, which we'll

22  talk about in a moment, are there any other papers that

23  you reviewed that are not on the materials considered

24  list after you drafted your report?

25  A.      So one question here is about what might cause

1  lymphoma, alternative explanations, which I think I

2  encompassed pretty well on this list, but I believe

3  since this list I read another article about the

4  epidemiology of non-Hodgkin's lymphoma.

5  Q.      And what article is that?

6  A.      I don't recall the name of that article as I'm

7  sitting here.  I can obtain it for you if you like.

8  Q.      That would be great, if you could do that,

9  not -- you don't have to do it at the moment, but maybe

10  during a break if you could get the name of that

11  article, that would be helpful.

12          MR. ROJAS:  Yeah.  And, obviously, if, David,

13  you want to follow up with us as counsel, we can --

14          MR. KERSCHNER:  Yeah.

15          MR. ROJAS:  -- sort of collect the full

16  universe, you know.

17          MR. KERSCHNER:  That was my next question.

18  BY MR. KERSCHNER:

19  Q.      Are you able to get the universe of studies that

20  you would have reviewed after you wrote your report that

21  are not on your materials considered list?

22          I think you mentioned Benbrook and then one

23  article on other causes.

24  A.      There was an article I just read last week

25  about -- by Zhang, who did meta-analysis, discussing why

```
 1    her meta-analysis differed from her subsequent

 2    meta-analysis, very, you know, sort of complex

 3    epidemiology that I read to be curious about how the

 4    levels of evidence are decided and how her article

 5    differs.  I can get the title of that for you as well.

 6         If you want the expert reports I've written

 7    [sic], you know, I think you have all the ones that

 8    Monsanto has sent to me.

 9    Q.    So other than the Benbrook article you

10    mentioned, the article by Zhang, and then the one

11    article on some risk factors, those are -- and then the

12    expert reports you've read, that's the universe of

13    material that you would have reviewed that's not

14    included in your report?

15    A.    Can I take a minute to look at the references

16    here just to see --

17    Q.    Sure.

18    A.    -- if anybody is jumping to mind?

19         I think there's an article that really doesn't

20    touch on epidemiology but is just an overview article on

21    treatment of mantle cell lymphoma that was published in

22    the New England Journal of Medicine in 2022, probably

23    after I prepared this report, and the authors there are

24    Jim Armitage and Dan Longo.

25    Q.    So I'll ask --
```

1  A.     It's not an epidemiology article; it's a review

2  article on, you know, diagnosis, prognosis, treatment of

3  mantle cell lymphoma.

4  Q.     I want to go back to the Benbrook article.

5         Are you aware that Benbrook is another expert

6  who's been paid by plaintiffs in this litigation?

7  A.     I -- I -- I think he stated that in his article,

8  yes, that he was a plaintiff.

9  Q.     Did you take that into consideration when

10 reviewing his article?

11 A.     I noted that that was the case.

12        I think in this litigation there are people who

13 are working for plaintiff and people who are working for

14 defense.  I'm not going to say per se that that changes

15 the validity of what they're saying, but it's something

16 I note when I interpret an article.

17 Q.     Looking at the materials considered list that

18 we've referenced in your report, did you compile this

19 list?

20 A.     Yeah, that's all my typing.

21 Q.     Did you actually go out and search for the

22 articles?

23 A.     I did not do a literature search myself for all

24 these articles.  Some of them are articles I have in my

25 home office that I included that I thought were

1    interesting and I had searched for before.

2    Q.    Did -- were any of the articles provided to you?

3          MR. ROJAS:  Object to the form.

4          THE WITNESS:  I don't think any of these

5    articles have been provided to me by Mr. Rojas's firm,

6    no.

7    BY MR. KERSCHNER:

8    Q.    So you went out and did the research, whether

9    they were in your office originally or you found them as

10   part of this case, but you were the one who identified

11   all of the articles written in this report.

12   A.    So in this matter I'm -- and this was a

13   distinction -- I'm asked as a specific expert on

14   causality, not a general expert on causality, so I had

15   reviewed general experts' reports, and some of their

16   articles to me looked interesting and worth including in

17   my report.

18         So those articles were not provided to me, but

19   I'm relying on the opinions of the experts in causality

20   here for some of the relevant epidemiology, and then I

21   think I have done some epidemiologic research in

22   addition to that, and then there are some articles here

23   on causality that I haven't seen elsewhere in this

24   litigation so far that I thought were interesting and

25   relevant to the nature of causality.

1  Q.      If you didn't run a literature search, how do

2  you know you have all the relevant articles?

3  A.      I did not run a complete literature search but,

4  for example, the Zhang meta-analysis details their

5  literature search quite well, how they used a filter to

6  come up with the most important articles, case-control

7  studies and cohort studies.  So I am, in part, relying

8  on the experts' opinion regarding which articles are

9  also important.

10  Q.      If there have been articles that came out

11  subsequent to Zhang, you wouldn't have included those;

12  right?

13  A.      I think the Weisenburger article is 2021 and the

14  Zhang article is 2019 so I think I've included some

15  articles here that postdate the Zhang meta-analysis.

16  Q.      Other than -- and how did you find the

17  Weisenburger article?

18  A.      Weisenburger article comes in a journal called

19  "Clinical Lymphoma, Myeloma, and Leukemia" that comes to

20  my house.  It's a journal I've published articles in for

21  and reviewed articles for.  So before I got involved in

22  the glyphosate litigation, I had glanced at that article

23  and read through it at some point when it just came.

24  Q.      Have you ever published on the topic of the

25  causes or risk factors of non-Hodgkin's lymphoma?

1   A.      So I've published on non-Hodgkin's lymphoma.  If

2   I've -- if I've published on causes or risk factors,

3   it's been a very small part of the articles I've done on

4   non-Hodgkin's lymphoma.

5   Q.      Let me ask a more specific question.

6           Have you ever published an article where the

7   subject or theme of the article was specific to the

8   causes or risk factors of non-Hodgkin's lymphoma?

9   A.      No, I have not.

10  Q.      Have you ever given a presentation specific to

11  the causes or risk factors of non-Hodgkin's lymphoma?

12  A.      Yes, I have.

13  Q.      When was that?

14  A.      Well, I work as an attending at the hospital

15  here and we have medical students and residents, and

16  every time I'm the inpatient attending I give a talk on

17  lymphoma to them and I always highlight what the

18  potential risk factors are during that talk as part

19  of --

20  Q.      When was the last time --

21  A.      Well, yeah.

22  Q.      When was the last time you gave that talk?

23  A.      Within the past few months.

24  Q.      Do you use slides when you give that

25  presentation?

1  A.      You know, I created a slide deck for that

2  presentation before.  I don't know if I still have that

3  slide deck.  Typically, I give those talks in a

4  conference room on a whiteboard with markers.

5  Q.      Do you have an outline that you've used?

6  A.      I definitely have an outline in my head because

7  I give sort of the same talk each time and I discuss

8  risk factors as part of that talk.

9  Q.      Do you talk to the medical students about

10  Roundup or glyphosate as one of the risk factors?

11  A.      So it's medical students, interns, and

12  residents, because we have an internal medicine program

13  here.

14        As the whole talk, which may last an hour, I

15  might mention that there's data linking Roundup to

16  non-Hodgkin's lymphoma in the same part of the talk

17  where I might talk about HIV as a risk factor for

18  certain subsets of non-Hodgkin's lymphoma.

19  Q.      You said you might talk about it.

20        You gave the speech, the conference, a few

21  months ago.  Do you specifically recall telling the med

22  students, residents, and others in your discussion that

23  Roundup or glyphosate is a risk factor for non-Hodgkin's

24  lymphoma?

25  A.      You know, so it's not a -- it's a conference

1    room.  It's usually a small conference of four people

2    rather than a big talk.

3         And there have been prominent cases in the

4    newspapers in Northern California about one of the

5    Roundup litigation cases where a janitor had a very high

6    jury award.  So certainly around the time that happened

7    I would say, look, there's litigation going on about

8    Roundup as a causative agent in non-Hodgkin's lymphoma.

9    Q.    Other than referencing litigation, do you tell

10   the medical students and residents that you speak to

11   that it is your opinion that Roundup or glyphosate is a

12   risk factor or cause of non-Hodgkin's lymphoma?

13        MR. ROJAS:  Object to the form.

14        THE WITNESS:  In a sense.  I talk about the data

15   regarding people who work on farms and pesticides and

16   Roundup that they're exposed to, but if it's an hour

17   talk, that might be 20 seconds.

18        We don't go into the detailed epidemiology,

19   because the purpose of the talk mostly is to have them

20   understand how to diagnose and treat lymphoma and the

21   different subtypes of lymphoma.

22   BY MR. KERSCHNER:

23   Q.    So it's your testimony that you tell -- during

24   that talk, that you tell the med students and the

25   residents that are sitting in that conference room that

1    Roundup and glyphosate is a cause of non-Hodgkin's

2    lymphoma.

3           MR. ROJAS:  Object to the form.

4           THE WITNESS:  You know, it would be more like

5    this:  It would be like, there is some data linking

6    pesticides and Roundup to non-Hodgkin's lymphoma.  Have

7    you seen anything in the newspaper about this?  Because

8    I also talk to the house staff about current events and

9    things like that.  But nothing on any level related to

10   the report I prepared here regarding the epidemiology of

11   Roundup and non-Hodgkin's lymphoma.

12   BY MR. KERSCHNER:

13   Q.     And, again, you said that's what it would be

14   like.

15          I'm asking specifically, when you gave this last

16   talk, did you or did you not say that Roundup or

17   glyphosate is a cause of non-Hodgkin's lymphoma?

18   A.     I would say it more like there is a lot of

19   litigation going on regarding the relationship of

20   Roundup as being a substantial cause in causing

21   non-Hodgkin's lymphoma and there seems to be some

22   epidemiologic evidence of this.

23          But that talk was probably before I started

24   reviewing the epidemiology myself, so I'm not sure I

25   would go very deep into it.

1    Q.      You said it was a couple months ago.

2            So as of a couple months ago, you hadn't formed

3    an opinion about Roundup and non-Hodgkin's lymphoma?

4            MR. ROJAS:  Object to the form.

5            THE WITNESS:  I'm not exactly sure what you're

6    answering [sic].

7            I formed opinions that Roundup is a substantive

8    cause in non-Hodgkin's lymphoma for a long time before I

9    was ever asked to become an expert.

10           It was not a definitive opinion, and I would

11   think that my opinion is much stronger after taking the

12   time to review the literature per se, but I had a

13   suspicion that it was a substantial cause for a while

14   before I ever was asked to be an expert, specific

15   expert, in this.

16   BY MR. KERSCHNER:

17   Q.      So let's go back to the last time you gave the

18   talk because, again, you said what it would be.  I'm

19   asking you specifics; right?

20           Did you or did you not in that last talk say

21   that Roundup or glyphosate is a substantial cause for

22   non-Hodgkin's lymphoma?

23   A.      I'm not sure I would say it that way because I'm

24   not lecturing on all the nuances of epidemiology because

25   the residents and interns usually have not taken much

1    epidemiology courses.

2         So it would be a general talk, these are the

3    things that have been shown to link to non-Hodgkin's

4    lymphoma.  And I hit on all the viruses, and then I say,

5    there are environmental toxins that are linked to

6    non-Hodgkin's lymphoma, including pesticide data from

7    the '80s and '90s.

8         I might talk about Nebraska and why it's a

9    prominent lymphoma institution, and I would say

10   something like, it appears that Roundup is a potential

11   cause in causing non-Hodgkin's lymphoma.  Have you seen

12   any of these newspaper releases or things on the TV?

13        Because when I give a talk in a small audience,

14   I'm also asking questions and trying to stimulate their

15   understanding of things.

16   Q.    Again, you said you would say something so let

17   me ask the question.  And I need you to just listen to

18   the specific question.  I'm asking about what actually

19   happened, not what would happen.

20        Did you say that Roundup -- that it appears that

21   Roundup is a potential cause of non-Hodgkin's lymphoma

22   in the last talk you gave to medical students and

23   residents about lymphoma?  Yes or no?

24   A.    I'm not sure exactly what I said at the last

25   talk I gave to the residents about non-Hodgkin's

1    lymphoma.

2    Q.      So you don't recall one way or another whether

3    or not you mentioned glyphosate or Roundup as a cause of

4    non-Hodgkin's lymphoma in that last talk.

5    A.      I can't say for sure.

6            I think in these talks I've given in the past

7    year, if the case is more prominent, I might say, do you

8    see the data showing Roundup as a cause of non-Hodgkin's

9    lymphoma?  Have you seen this lawsuit?

10           You know, because I try and tie what I'm

11   teaching the residents to things that they'll encounter

12   in their life.

13           So I'm not sure I said it in the legalese sense

14   that you just used.

15   Q.      Do you normally base your discussions with

16   medical students and your medical decisions on lawsuits?

17   A.      Not at all.

18           MR. ROJAS:  Object to the form.

19           THE WITNESS:  Not at all, unless I'm talking to

20   them about medical malpractice issues and how to avoid a

21   lawsuit.

22           Sometimes I -- you know, for example, if I give

23   a cause -- a talk on breast cancer, you know, I'll say,

24   did you know that failure to diagnose breast cancer is

25   probably the most common lawsuit for an internist as

1    well as an OB-GYN?

2         And I'll say, this is what you do to avoid being

3    in that trap, and talk about how to work up a breast

4    mass and how not to stop the workup just because the

5    mammogram looks normal.

6         And I might say, you know, you're going to be a

7    doctor for a long time, it's likely that you'll be named

8    in a lawsuit, and these are the steps you might want to

9    take to protect yourself with breast cancer.  But I

10   wouldn't say that sort of thing in a talk on lymphoma.

11   BY MR. KERSCHNER:

12   Q.    Have you ever written a publication relating to

13   Roundup?

14   A.    I don't know if I've written something

15   specifically related to Roundup.

16   Q.    And have you ever published anything that talks

17   about glyphosate or Roundup?

18   A.    Could I take a minute to review my CV?  I have

19   it on my desktop here.

20   Q.    Sure.

21        MR. ROJAS:  Would you guys mind, just for my

22   benefit, scrolling to that, whoever is in control of the

23   screen share, to that part of the CV?

24        MR. KERSCHNER:  I think that's where we are.

25        THE WITNESS:  I'm just looking at the

 1   peer-reviewed papers and I'm looking at the abstracts to

 2   see if I have a firm answer to his question.

 3          MR. KERSCHNER:  Doctor, if it's going to take a

 4   while, you can review it --

 5          THE WITNESS:  No.

 6          MR. KERSCHNER:  -- during a break and then I can

 7   come back.

 8          THE WITNESS:  It will take -- it will take 30

 9   seconds.  Hold on.

10          MR. KERSCHNER:  Okay.

11          THE WITNESS:  I don't see anything specifically

12   related to the epidemiology of Roundup and non-Hodgkin's

13   lymphoma in my publications.

14   BY MR. KERSCHNER:

15   Q.     So I'm correct, you've never published anything

16   about Roundup.

17   A.     That would be correct, I believe.

18   Q.     Your CV mentions that you're part of the

19   Leukemia & Lymphoma Society Patient Services Committee.

20          Do you still --

21   A.     I think that --

22   Q.     Do you still work --

23   A.     I think that was in the past.

24   Q.     Oh, okay.

25   A.     That was in --

Kevin B. Knopf, M.D., M.P.H., Volume 2

1    Q.      Not anymore.

2    A.      When I was in San Francisco, I think I had a

3    patient or two who wanted to involve me with the local

4    chapter of the Leukemia & Lymphoma Society and I did

5    some work for them.

6    Q.      Have you ever designed or conducted a scientific

7    research regarding Roundup?

8    A.      No, I have not designed or conducted a

9    scientific research regarding Roundup.

10   Q.      Have you ever designed or conducted scientific

11   research regarding any pesticide or herbicide?

12   A.      There's a descriptive study about academic

13   researchers and what happens when they report toxicity.

14           So, for example, one of the people in one of

15   those studies is named Tyrone Hayes, who did some work

16   regarding mutagenicity of a product.  I'm a co-author on

17   that study, but I did not specifically look into his

18   work, apart from just understanding what had happened to

19   him.  So it's not specifically related to Roundup and

20   non-Hodgkin's lymphoma.

21   Q.      So I'm correct, then, you have not designed or

22   conducted scientific research regarding any pesticide or

23   herbicide.

24   A.      I think that's a correct statement.

25   Q.      Other than your discussions with medical

1   students -- are you a professor that teaches an actual

2   lecture?

3   A.     So I'm an associate professor of

4   pharmacoeconomics at the University of South Carolina, I

5   am assistant clinical professor at UCSF School of

6   Medicine.

7          I have given various talks.  I don't think I've

8   given a talk specifically on Roundup and non-Hodgkin's

9   lymphoma.

10  Q.     So apart from your work in this case, am I right

11  you've never written or presented information or

12  opinions about glyphosate, Roundup, and non-Hodgkin's

13  lymphoma?

14  A.     I would say that's correct, yes.

15  Q.     Have you ever been involved in the manufacture,

16  testing, or marketing of chemical products?

17  A.     Manufacture, testing, or marketing of chemical

18  products.  No, I have not.

19  Q.     Have you ever worked at the Environmental

20  Protection Agency?

21  A.     No, I've not worked at the EPA.

22  Q.     Have you ever designed or conducted animal

23  studies?

24  A.     I've done research with a principal investigator

25  regarding animal physiology of pregnant sheep.

1   Q.      Have you ever --

2   A.      Has nothing to do with Roundup.

3   Q.      Have you ever designed or conducted an animal

4   study looking at the impact of a foreign agent on the

5   animal at all?

6   A.      No, I have not done that sort of research.

7   Q.      Do you have any specialized expertise in

8   designing or conducting or interpreting animal studies?

9   A.      I have my general knowledge about animal

10  physiology and such but I'm not a veterinarian, no.  I

11  don't have any specific expertise in that.

12  Q.      Have you ever designed or conducted a

13  genotoxicity study?

14  A.      No, I have not designed or conducted

15  genotoxicity studies.

16  Q.      Do you have any special expertise in designing,

17  conducting, or interpreting genotoxicity studies?

18  A.      Well, I think I've had some classes and lectures

19  along the way discussing genotoxicity, mutagenicity,

20  pharmacokinetics, pharmacodynamics, and I have some

21  training in cancer prevention and control with some

22  lectures probably there about genotoxicity.  So I've had

23  some education about it but I would not say I'm an

24  expert in that area, no.

25  Q.      Have you ever personally used Roundup?

```
 1   A.      No, I have not used Roundup.

 2   Q.      Have you ever used any glyphosate-based

 3   products?

 4   A.      No, I have not.

 5   Q.      You're not a pathologist; correct?

 6   A.      Correct.  I'm not a pathologist.

 7   Q.      You're not qualified to look at a tissue under a

 8   microscope and determine whether or not you're looking

 9   at non-Hodgkin's lymphoma?

10   A.      Well, we review those slides at tumor boards and

11   I've reviewed them with pathologists and I've had

12   lectures where they're reviewed and we look at

13   photomicrographs of them, but I would not say I'm

14   qualified to do it professionally.

15   Q.      You're not an exposure expert; correct?

16   A.      Meaning I'm not an expert to exposure to toxins

17   or --

18   Q.      Let me clarify.  And you're right, that was not

19   a good question.

20           You're not an expert in determining the amount

21   of a substance an individual has been exposed to;

22   correct?

23   A.      Well, I mean, we take histories for patients and

24   we take histories regarding their exposure to tobacco

25   products and, you know, in medicine we take histories
```

Kevin B. Knopf, M.D., M.P.H./Volume 2

 1    regarding potential exposure to other carcinogenicity

 2    agents and in general medicine we take exposure

 3    histories to this or that.  So I've had training in it,

 4    but I don't know what you mean by an expert.  It's not

 5    my area of expertise, no.

 6    Q.      When you take histories regarding patients'

 7    exposures, do you ask them about exposure to glyphosate?

 8    A.      If they have lymphoma, I might ask them, have

 9    you been exposed to any pesticides, herbicides?

10    Q.      And I'm asking about a specific patient.

11            Do you -- have you ever asked a specific patient

12    who had lymphoma whether or not they've been exposed to

13    glyphosate or Roundup?

14    A.      I probably have, yeah.

15    Q.      You remember a specific patient you asked about

16    that?

17            MR. ROJAS:  Dr. Knopf, I think these are yes or

18    no questions that you can answer but -- David, please

19    correct me again if I'm wrong -- I don't think

20    Mr. Kerschner was asking you on a first- and last-name

21    basis --

22            MR. KERSCHNER:  No.

23            MR. ROJAS:  -- to talk about your past patients.

24    So these are yes or noes, and please go ahead and

25    answer.

```
 1          MR. KERSCHNER:  Yeah.  I don't need any
 2   HIPAA-protected information.
 3          Thank you, Mr. Rojas.  That -- please -- yeah,
 4   that's an important clarification.
 5   BY MR. KERSCHNER:
 6   Q.     I'm just asking you if you in your medical
 7   practice recall a specific time where you asked an
 8   individual patient if they had been exposed or not to
 9   glyphosate or Roundup.
10   A.     I'm sure along the way I've asked patients if
11   they've been exposed to any sort of pesticides or
12   herbicides.
13   Q.     But specifically --
14   A.     I don't think --
15   Q.     -- to Roundup.
16   A.     I don't think I would say, have you been exposed
17   to Roundup?
18   Q.     How many patients do you see on an average week?
19   A.     You know, this week, inpatient service, it's
20   been about 100 patients.  Outpatient service, earlier in
21   my career I would see 80 to 100 patients a day.  Now
22   that I'm division chief, I try and -- try and see -- I
23   mean 80 to 100 patients a week.
24          Now that I'm division chief and since taking
25   this job, I've had more administrative time so I
```

1    probably see a less, lower number of patients a week.

2    Q.      In the past month, how many non-Hodgkin's

3    lymphoma patients do you think you've seen?

4    A.      Somewhere between 20 and 50, I would think.

5            MR. ROJAS:  David, whenever you have a chance, I

6    don't mean to interrupt your flow, it's up to you right

7    now, but a five-minute break.  I just need to go to the

8    bathroom and get a water.  I'm going to have a nagging

9    cough if we don't do it.

10           MR. KERSCHNER:  We can do it now.  That's fine.

11           MR. ROJAS:  Okay.  So let's say 12 --

12           MR. KERSCHNER:  Any time is good.

13           MR. ROJAS:  All right.  Can we say 12:21

14   Eastern?  I forget what time zone you're in but --

15           MR. KERSCHNER:  Yeah.  Back in about five.

16   That's fine with me.

17           MR. ROJAS:  All right.  Thank you.

18           VIDEO OPERATOR:  Time is 9:16 a.m.

19           We are off the record.

20           (Recess, 9:16-9:24 a.m.)

21           VIDEO OPERATOR:  Time now is 9:24 a.m.

22           We are back on the record.

23   BY MR. KERSCHNER:

24   Q.      Doctor, you're not a regulatory expert; correct?

25   A.      I'm not a what?

```
1   Q.      Regulatory expert.

2   A.      No.  I mean, I understand some things about

3   regulation from my time at the NIH but I'm not a

4   regulatory expert.

5   Q.      You're not an expert on EPA regulations;

6   correct?

7   A.      No, I'm not an expert on EPA regulations.

8   Q.      You understand that at the EPA there are expert

9   toxicologists and epidemiologists and physicians?

10  A.      Yes, I understand those kinds of people work for

11  the EPA.

12  Q.      And you're not qualified to testify about the

13  warnings on the label for Roundup?

14  A.      Well, I'm saying -- I would say I'm not a

15  specific expert on EPA and warning labels and things

16  like that but I think I have some background

17  epidemiology.  And if somebody were to ask me an opinion

18  about warning labels and the process and, you know, you

19  learn about how warning labels got put on cigarette

20  packs when you study public health, I have some opinion

21  but I would not say I'm an expert.  It's not my

22  full-time job at all.

23  Q.      But you're not qualified as an expert to testify

24  about whether or not the warnings on a Roundup product

25  are adequate, under the regulations from the EPA and the
```

 1   relevant laws.

 2          MR. ROJAS:  Object to the form.

 3          THE WITNESS:  So I -- I'm retained in this case

 4   as a specific expert on Ms. Salas's case, not a general

 5   expert, and I'm relying, in part, on general experts'

 6   views and the literature they've read, which I've tried

 7   to read some of.

 8          I'm not sure I understand the question.  If I

 9   was asked a question about my opinion about warning

10   labels and things like that, I might have an opinion.  I

11   don't know if it's the most expert opinion out there but

12   I would certainly have an opinion from my background in

13   public health and medicine and my -- I mean, I've

14   trained in a lot of this.

15          MR. KERSCHNER:  Right.

16          THE WITNESS:  That --

17   BY MR. KERSCHNER:

18   Q.     But that opinion wouldn't be informed by

19   specific EPA regulations and guidances as it pertains to

20   pesticide and herbicide labels.

21          MR. ROJAS:  Object to the form.

22          THE WITNESS:  Yeah.  I mean, in one sense, no,

23   but in another sense, if there is a topic out there that

24   I want to really understand well, I typically would

25   start reading articles about it through the lens of

1  epidemiology and evidence-based medicine and try to

2  understand it better, and I would have an opinion.

3          I don't know what you mean by an expert opinion

4  per se.  I think it would be a more informed opinion

5  than, you know, somebody who works at the grocery store

6  but it would not be an expert opinion.  But I think the

7  term "expert" is kind of a relative term.

8  BY MR. KERSCHNER:

9  Q.      Well, you said you would read these articles and

10 you would get yourself up to speed, but in terms of as

11 for your opinions in this case that you put together in

12 your report, you don't have the expertise and you

13 haven't reviewed the specific EPA regulations to be able

14 to testify as an expert on whether or not they're -- you

15 know, the labels for Roundup were adequate, pursuant to

16 EPA regulations; right?

17         MR. ROJAS:  Object to the form.

18         THE WITNESS:  Yeah.  So as I mentioned, I read

19 the really interesting article by Benbrook about why the

20 EPA conclusions differed from the IARC conclusions,

21 which was very interesting scientifically and

22 epidemiologically.

23         And if somebody asked me about what the EPA

24 found, I might say, well, I read this article that says

25 this or this or this, but it's not my full-time job to

1    understand the EPA process.  So I'm not sure what --

2    BY MR. KERSCHNER:

3    Q.    Other than Benbrook's article, do you have any

4    information about the EPA as it pertains to labeling?

5    A.    No, I do not under -- I do not know what the

6    specific EPA labeling was, but I've read epidemiology

7    about why the IARC study concluded that Roundup was a

8    substantial carcinogen and the EPA did not.  And I would

9    be able to offer that opinion and say, well, I think,

10   you know, I believe what the IARC came up with and I

11   don't believe what the EPA came up with.  So I could

12   offer that sort of opinion.

13   Q.    You're not a rheumatologist; right?

14   A.    A rheumatologist?  No, I'm not a rheumatologist.

15   Q.    You have no medical training in mental health;

16   correct?

17   A.    I would say -- I would not say that.  I've had

18   some mental training in medical -- I've had some

19   training in mental health.

20         You know, we do -- I've had courses in

21   psychology, neurology, pharmacology of psychiatry, a

22   six-week psychiatry rotation, a lot of contact with

23   psychiatrists, psychologists, social workers by the

24   nature of my taking care of cancer patients.

25         I'm not a mental health professional as my

1   career but it's really some part of what I do because

2   cancer patients tend to have a lot of mental distress

3   and I need to know how to diagnose a little bit of

4   depression and anxiety, where that interfaces with their

5   illness, know when to seek expert advice from a

6   psychiatrist.

7            Where I work now, we don't really have access to

8   a lot of psychiatrists so on a day-to-day basis we might

9   have to interpolate what the patient's psychosocial

10  history is as regards it affects my ability to do my job

11  as a hematologist/oncologist.

12  Q.      You mentioned six-week rotations and courses.

13  That was when you were back in residency and medical

14  school; right?

15  A.      So in medical school, in residency, there's a

16  lot of teaching regarding psychiatry and psychiatric

17  aspects of care, there's a lot of, you know, rotations

18  with psychiatrists, teaching psychiatrists medicine and

19  learning from them.  I have friends who are

20  psychiatrists, professionals --

21  Q.      I'm not asking about your friends, Doctor.

22            I just want to know, the courses you mentioned

23  and the rotation you mentioned, that was for you when

24  you were back in medical school and back in your

25  residency; right?

1          MR. ROJAS:  Sorry, David.  If you could let him

2    complete.  I know he wasn't answering your question --

3          MR. KERSCHNER:  He's not answering the question.

4    He's talking about friends and running the clock.  I

5    want to try and get this depo over.

6          MR. ROJAS:  He's not -- no.  Come on.  No.  No.

7    No.  He's -- no.  Excuse me.  He's answering to the best

8    of his ability.  If you don't like it, you can ask again

9    and try to clarify it, but don't just say --

10          MR. KERSCHNER:  I -- that's what I'm doing.  I'm

11    trying --

12    BY MR. KERSCHNER:

13    Q.     Doctor, let me ask a specific question;

14    hopefully, you can answer it.

15          You mentioned that you had courses on psychiatry

16    and a six-month rotation.  Is that back when you were in

17    residency and medical school?

18    A.     In medical school I had courses in psychiatry

19    and a six-week rotation.

20    Q.     Okay.  Since then --

21    A.     I would say --

22    Q.     -- have you had any formal training on mental

23    health?

24    A.     Yes.  I've had, you know, a three-year

25    residency, three-year fellowship.  A lot of that time

1    has been talking to psychiatrists, understanding

2    psychiatric illnesses, reading selective articles on

3    psychiatry, articles on psychopharmacology.

4            There's a lot we do in oncology related to

5    drugs, pain, psychiatric overlay.  So I've not had no

6    training in psychiatry since medical school.

7    Q.      Are you offering any opinions regarding

8    Mrs. Salas's mental health conditions?

9    A.      I don't think I wrote anything about her mental

10   health condition in my report.

11   Q.      So you're not offering any opinions about her

12   mental health condition.

13   A.      As I sit here today, I have not prepared any

14   specific opinions about her mental health, but were you

15   to ask me a question about her mental health, I would

16   feel obligated to answer to the best of my ability.

17   Q.      Outside of what I may ask you, you're not

18   offering opinions on her mental health; correct?

19   A.      At this time, I've not been asked to offer any

20   opinions about her mental health, no.

21   Q.      You mentioned you treat patients with

22   non-Hodgkin's lymphoma.

23           Do you treat all subtypes or do you have a

24   specialty?

25   A.      I think I've treated, you know, all subtypes

```
 1    that come in my office or hospital.
 2           I wouldn't say I have a specialty, like I only
 3    treat T-cell lymphoma.  I have a colleague who only
 4    treats CNS lymphoma.  I can't say I'm that specialized
 5    in lymphoma.
 6    Q.     Do you treat patients with mantle cell lymphoma?
 7    A.     I've treated patients with mantle cell lymphoma,
 8    yes.
 9    Q.     Can you approximate how many?
10    A.     Over the 20 years I've been treating patients
11    and in my --
12    Q.     Let's do the last five years, if you can do
13    that.
14    A.     Last five years.
15           So mantle cell lymphoma is maybe 3 to 5 percent
16    of lymphoma, so over the past five years, not a whole
17    lot of mantle cell lymphoma patients.
18    Q.     Is it under ten?
19    A.     It's probably under -- probably under 10 or
20    between 10 and 20.  I'm not sure I could give an exact
21    number.
22    Q.     And in an average week right now, how many
23    lymphoma patients, non-Hodgkin's lymphoma, patients do
24    you see?
25    A.     So my job is set up as either inpatient or
```

1   outpatient.  In outpatient I would see in an average

2   week somewhere between five and ten lymphoma patients.

3   On the inpatient service right now we have one patient

4   with diffuse large-cell lymphoma getting chemotherapy,

5   so this week it's one.

6   Q.      As part of your care and treatment of patients

7   with non-Hodgkin's lymphoma, do you attempt to determine

8   the cause of their non-Hodgkin's lymphoma?

9   A.      So once I see a patient with non-Hodgkin's

10  lymphoma in my clinic, the exact cause of it is not as

11  important because it's already been established that

12  they have it.

13          So I might do as part of my social history

14  asking some questions about possible exposures to

15  non-Hodgkin's lymphoma but at that point it's not so

16  relevant because the horse is out of the barn.  They

17  already have the lymphoma.

18  Q.      When you treat patients with non-Hodgkin's

19  lymphoma, do you talk to them about the impact of random

20  genetic mutations in the body and the immune system and

21  how that could have led to the development of

22  non-Hodgkin's lymphoma?

23  A.      Not all the time.  If they ask, I can talk about

24  risk factors for non-Hodgkin's lymphoma, as in what ones

25  I think they have and what ones I think they didn't

```
 1   have.
 2          I'd have to say I've been at this hospital for
 3   the past four years, which is a public, county hospital
 4   that serves the poor and underserved.  The patients here
 5   are a little bit or a lot less likely to ask questions
 6   about how did I get this.
 7          When I was in private practice with higher,
 8   upper socioeconomic status of patients, they were more
 9   often to ask, how did I get this?  And if they asked how
10   did I get this lymphoma, I might go through, well, these
11   are the known risk factors for lymphoma and it's
12   possible that your lymphoma was just a random genetic
13   thing.
14   Q.     Have you --
15   A.     If they had HIV, as many of the patients had, I
16   would say, you know, HIV is a significant risk factor
17   for non-Hodgkin's lymphoma.
18          So it would depend on the patient, sir.
19   Q.     Have you ever treated a patient who's used
20   Roundup, that you know used Roundup?
21   A.     I am sure some of my patients have used Roundup,
22   but I've not always asked each patient if they've used
23   Roundup.
24   Q.     Do you have any specific recollection of a
25   patient that you know used Roundup?
```

1  A.      You know, an interesting thing we see here --

2  and I've read only one sort of review epidemiological

3  article but I'm curious -- at this hospital, where we

4  see a lot of Hispanics from Latin America, we see like a

5  very high incidence of B-cell acute lymphoblastic

6  leukemia.  And that's been reported in California.  And

7  a lot of them are migrant farmworkers.

8       But I've not specifically asked them about their

9  exposure to Roundup at that point because at that point

10  they have it.  But since I've started reviewing the

11  epidemiologic literature here, I probably would try and

12  seek out whether anybody else has looked at that,

13  whether it's just somehow related to their genetics or

14  they are being exposed to it or there's a

15  gene/environment interaction.

16  Q.      Just to get back to my question, am I right that

17  you don't know for certain whether or not any of your

18  patients have used Roundup?

19  A.      Sitting here today, I can't recall.  I think it

20  was more common that my patients used Roundup when I

21  worked in Annapolis, Maryland, than when I've worked in

22  San Francisco.

23  Q.      And you specifically asked those patients in

24  Maryland about their use of Roundup?

25  A.      Sitting here today, I'm not sure how often I

1    would have asked them about their use of Roundup.

2           That was 2000 to 2006 so it was not as prominent

3    in the literature as a risk factor.  I think some of the

4    studies here may have antedated 2006, but a lot of the

5    epidemiology came after 2002.  So I -- I -- without

6    reviewing the records, I wouldn't know for sure if I

7    asked them about Roundup.

8           (Interruption.)

9           THE WITNESS:  Sorry.

10          MR. KERSCHNER:  That's okay.

11   BY MR. KERSCHNER:

12   Q.    Have you ever diagnosed a particular case of

13   non-Hodgkin's lymphoma as being caused by Roundup?

14   A.    The way I -- I think about non-Hodgkin's

15   lymphoma is that causation can be multifactorial.

16          It's my opinion that Roundup, exposure to

17   Roundup, is a substantial factor in causing

18   non-Hodgkin's lymphoma but, sitting here today, I'm not

19   sure I could come up with a case where their only risk

20   factor was non -- was exposure to Roundup and I said,

21   oh, this is a case that was caused by Roundup.

22          I'd also add that once they're diagnosed, I

23   don't spend quite as much time thinking about the cause

24   of the illness because it's not helpful to the patient

25   at that point.

1  Q.      Are you offering any opinions with regard to the

2  benefits of Roundup?

3  A.      I don't think that's in my report, about the

4  benefits of Roundup, so I -- unless somebody asked me

5  what the benefit is, then I could talk, but I'm not an

6  expert in weed control.

7  Q.      But unless asked, you're not planning to offer

8  opinions about the benefits of Roundup.

9  A.      You know, I think I would defer to somebody

10  who's studied it more, the benefits of Roundup.  I don't

11  think it's really something I'm thinking I'm going to be

12  asked or have a huge opinion on.

13  Q.      You've mentioned earlier that you've testified

14  before in deposition.  That's as an expert; right?

15  A.      Yeah.

16  Q.      How many times have you testified as a paid

17  expert in a lawsuit?

18  A.      Somewhere between 12 and 36, I imagine.

19  Q.      And you stand by the reports and testimony

20  you've given in your prior cases?

21  A.      Yeah.  And, you know, I -- when I have been

22  deposed or been a consultant for a lawsuit, I would only

23  take those suits if I believed that, you know, what was

24  going on was -- what I was being asked to opine on was

25  correct.  I've declined suits where I did not think

1    there was appropriate mismanagement or such.

2         So when I've been retained as an expert, I have

3    given my opinion, which has been that I believe whatever

4    was asked of me to opine on.  I don't give testimony if

5    I don't believe what's going on is the actual truth.

6    Q.    And includes writing your report; right?  You

7    wouldn't write a report with something that you didn't

8    think was the truth.

9    A.    No.  I stand behind my work.

10   Q.    Is it fair that of the 12 to 36 cases that

11   you've testified in in your career over 75 percent have

12   been for the plaintiff?

13   A.    I don't know if it's exactly 75 percent or 60

14   percent but, you know, most of the lawsuits in

15   California are plaintiff as a result of limitations on

16   pain and suffering microcap.  So I would say more than

17   half have been for the plaintiff, yes.

18   Q.    And is the majority of your litigation work in

19   the medical malpractice field?

20   A.    Yes.

21   Q.    And in those cases you'd be testifying against

22   the care of a different physician; right?

23   A.    Yeah.  I mean, if it's defense, then it's

24   defending the care of the physician who's being named as

25   appropriate and within the standard of medical care.  If

1    it's on the plaintiff side, then the deposition would be

2    pointing out what was wrong in that particular case,

3    failure to diagnose, delaying diagnosis, mismanagement,

4    that sort of thing.

5    Q.      In your medical malpractice cases what percent

6    are plaintiff versus defendant that you work on?

7    A.      I would say more than 50 percent are plaintiff

8    versus defense.

9    Q.      What percentage of your current income comes

10   from expert work in litigation?

11   A.      In any given year, less than 10 percent of my

12   total income.

13   Q.      Do you know how much you've been paid in the

14   last five years for working as an expert in litigation?

15   A.      Ballpark, it's probably less than 100,000 in the

16   past five years.

17   Q.      You could determine it from your tax returns if

18   you needed to; right?

19   A.      Yeah, I could.  I have -- every year I keep a

20   spreadsheet of what money is coming in so I can prepare

21   a tax return, yes.

22   Q.      Sounds like fun.

23   A.      Well, I have to -- I mean, I prepare an Excel

24   spreadsheet with money coming in and what I think are

25   deductible expenses and every year I send it to my

1  accountant in Chicago and then we have a phone call to

2  talk about what taxes to pay.

3  Q.      Is this the first case you've worked on for the

4  Podhurst firm?

5  A.      Yes, it is.

6          Just to clarify, this is also the first case

7  I've worked on regarding Roundup legislation.

8  Q.      Is this the first litigation you've worked on

9  where you're testifying that a chemical has caused

10 non-Hodgkin's lymphoma?

11 A.      Yes, I would say that's true.

12 Q.      Have you ever testified as an expert in court

13 that any -- strike that.

14         Have you ever testified regarding causation of

15 cancer in an -- in litigation?

16 A.      You know, I can't recall if it was a specific

17 part of testimony.  I don't ever know if opposing

18 counsel asks me what caused this person's cancer or was

19 there an alternative cause.  It's possible, but I don't

20 think it's likely that that's been the substance of my

21 prior depositions.

22 Q.      Have you ever had an opinion excluded by a

23 court?

24 A.      No, I have not.

25 Q.      You've co-authored articles by -- with Dr. Chadi

1    Nabhan; correct?

2    A.      Yes.

3    Q.      How did you meet Dr. Nabhan?

4    A.      So there's a research group run by my friend,

5    Dr. Charlie Bennett, who I knew when I was a resident in

6    Chicago and he was an oncology attending, and he has a

7    research group called SONAR that looks at adverse

8    reactions to drugs that meets on some Wednesdays.  And I

9    got to know Chadi Nabhan that way.  And I think that's

10   the main way I got to know Chadi Nabhan.  And that's how

11   I've come to author papers with him.

12   Q.      Have you ever discussed with Dr. Nabhan the

13   Roundup litigation?

14   A.      No, I have not.

15           MR. KERSCHNER:  Let's mark the next exhibit,

16   which will be your Disclosure, the Rule 26 Disclosure.

17           (Exhibit Knopf-4 was marked for identification.)

18           MR. KERSCHNER:  And if we can just scroll down

19   to the page that has Dr. Knopf on it.

20   BY MR. KERSCHNER:

21   Q.      Doctor, we've lost you.

22   A.      Sorry.  I'm just getting a can of water.

23   Q.      Okay.

24   A.      Okay.

25   Q.      And if you need a break, just let us know.

 1   A.      No.  No.  No.

 2   Q.      Okay.  Doctor, I'm handing you what is going to

 3   be marked as Exhibit 4 to your deposition.  This is the

 4   Case-Specific Rule -- Expert Disclosure for Ms. Salas's

 5   case.

 6           Have you seen this document before?

 7   A.      I believe I have.

 8   Q.      When did you see it?

 9   A.      I don't remember exactly when it was sent to me

10   but, you know, there was some back and forth about when

11   this deposition would be and then I think when the date

12   was picked at this date, Mr. Rojas's firm sent me this

13   document.

14   Q.      But you didn't see it before it was finalized

15   and submitted.

16   A.      I'm not sure I understand.  I've only seen one

17   version of this and I looked at it once.

18   Q.      So you didn't make any drafts or any edits to

19   this Disclosure.

20   A.      No, I did not draft or edit this document.

21   Q.      And it says that you're offering -- you'll

22   testify on issue of specific causation regarding whether

23   exposure to glyphosate and/or glyphosate-based

24   formulated products was a substantial factor

25   contributing to plaintiff, Nancy Salas's, developing

1    non-Hodgkin's lymphoma, specifically mantle cell

2    non-Hodgkin's lymphoma.

3           Do you see that?

4    A.     Yes, I do see that.

5    Q.     And you mention in this report you are not

6    offering opinions regarding general causation; correct?

7    A.     I would say I -- I'm not retained as a general

8    causation expert.

9           If you were to ask me a question that is general

10   causation, I think I would answer to the -- to my

11   ability rather than just say I'm not here to talk about

12   general causation, but with the caveat that I was not

13   retained as a general causation expert.

14   Q.     Are you relying on the expert reports and

15   opinions of others for the general causation opinion in

16   this litigation?

17   A.     So, in part, I can defer to the general

18   causation experts because they've written their reports

19   and I've reviewed some of them and I've agreed with what

20   was written and I think that they're high-quality

21   reports, but I'm not completely reliant on them.  I

22   think, you know, the nature of who I am and what I do

23   for a living, I want to convince myself of some of the

24   things as well.

25           So, for example, I mentioned that I read the

1    Benbrook study, which talks about how there might be

2    differences in the animal studies based on whether it's

3    pure glyphosate or it's got a surfactant.  So if you

4    were to ask me a question, I might say, well, I think

5    this is but I'm not here as a general causation expert.

6    I'm not exactly sure what the appropriate legal way to

7    do that is, if that answers your question.

8    Q.      Kind of.

9            What are the -- who are the experts that you are

10   relying on as part of your general causation opinion?

11   A.      So I think the experts that Mr. Rojas's firm

12   have are Chadi Nabhan, Al Neugut, Portier.

13           There was a toxicology expert that I -- I know

14   Dr. Lawlor was one but I think they had a general

15   toxicology expert whose name started with J.  I have --

16   I may have reviewed another general expert report, but I

17   think those are the -- and maybe I think Weisenburger

18   prepared general expert reports for this firm.  So I --

19   Q.      And you've reviewed all of those reports?

20   A.      Not as in depth as I would like.  I mean, I like

21   to read things over and over, but I've reviewed those

22   reports, yes.

23   Q.      Have you spoken with any of those experts about

24   their general causation opinions?

25   A.      No, I have not.

1    Q.      In your expert report you say that you've

2    performed a differential diagnosis as to the cause of

3    Ms. Salas's non-Hodgkin's lymphoma.

4           Does that summarize the methodology by which you

5    confirmed that Roundup was a cause of Ms. Salas's

6    non-Hodgkin's lymphoma?

7    A.      Yeah.  I think that's a way to approach it, a

8    differential diagnosis, by excluding other things that

9    caused it and applying Bradford Hill criteria.  And I

10   wrote that in the report so that I -- it would come out

11   succinct and get across what I wished to say, but

12   there's other evidence, I think, out there showing

13   general causation of Roundup and non-Hodgkin's lymphoma.

14   Q.      Again, I'm just focused on the specific-cause

15   question.  And the method by which you have determined

16   that on the specific side is a differential diagnosis?

17   Is that fair?

18   A.      In the report that I wrote I performed a

19   diagnosis and excluding other risk factors for causation

20   of her non-Hodgkin's lymphoma, yes, I think that's fair.

21   Q.      And it's fair that you don't perform that same

22   type of differential diagnosis as to the cause of a

23   patient's non-Hodgkin's lymphoma in your medical

24   practice outside of litigation; right?

25   A.      No.  You know, what I do is when I see somebody

1  with lymphoma, whether I ask them or I observe -- you

2  know, if I saw somebody with anaplastic large-cell

3  lymphoma of the breast, I would say, does she have a

4  breast implant, because taking it out might cause a

5  remission?

6      I would search for viruses, particularly if I

7  saw splenic lymphoma with villus lymphocytes and HIV,

8  which can really affect treatment and prognosis, I might

9  ask about.  So it might not be formally written in my

10  medical report but at least it's something I'm

11  considering when I see these patients.

12  Q.      Specific to patients with mantle cell lymphoma,

13  do you perform the same type of differential diagnosis

14  on those patients in your practice as you did for

15  Ms. Salas's case in this litigation?

16  A.      Oh, I think I was much more explicit, you know,

17  because this is a specific expert report, about all of

18  the potential risk factors I could think of for

19  non-Hodgkin's lymphoma.  But any patient that I saw for

20  mantle cell lymphoma I would, you know, during past

21  medical history say, are there any autoimmune disorders,

22  are there any, you know, immunodeficiency, because those

23  things might affect not just whether or not they

24  developed it but how I treat that patient.

25  Q.      Right.  I understand you get a medical history

1   as part of your care and treatment, but the differential

2   diagnosis of going through each one and ruling them out

3   the way you've done for Ms. Salas, that's not something

4   you typically do with your mantle-cell-lymphoma

5   patients; is that correct?

6   A.      I would not take the time to write a

7   differential diagnosis of causation of a patient's

8   mantle cell lymphoma in a general medical report.  It's

9   just not usually done in clinical practice.

10  Q.      Are you offering any opinions on the way

11  Monsanto marketed Roundup in the United States?

12  A.      I don't think I've been asked to offer any

13  opinion about marketing of Roundup in the United States.

14  Q.      But you're not intending to do that.

15  A.      I did not intend to discuss the marketing of

16  Roundup, no.

17  Q.      Are you offering any opinions about any aspect

18  of Monsanto's conduct in this litigation?

19          MR. ROJAS:  Object to the form.

20          THE WITNESS:  Object to form?

21          MR. ROJAS:  Yeah.  Sorry.  But you can answer

22  every time I do that unless I tell you otherwise.

23          THE WITNESS:  I mean, I don't know what's going

24  to be asked of me down the line.

25          If somebody asked if I had an opinion about the

1  marketing of the product and, you know, the history of

2  how it was used and Monsanto-resistant crops and what I

3  thought about that, I think I would feel compelled to

4  offer my opinion, but it's not my intention to write

5  about marketing and things like that.

6  BY MR. KERSCHNER:

7  Q.      Are you offering any opinions about Ms. Salas's

8  diagnosis and treatment -- actually, strike that.

9          Are you offering any opinions on the way

10  Ms. Salas's physicians diagnosed and treated her

11  non-Hodgkin's lymphoma?

12  A.      In my report I think I've summarized how she

13  presented and how she was diagnosed so I've offered my

14  opinion about that.

15  Q.      Are you offering any opinions criticizing the

16  way that she was diagnosed and treated?

17  A.      I'm not offering any opinions regarding critique

18  of her medical care because I was not retained as an

19  expert to critique her medical care.

20  Q.      So you're not questioning Ms. Salas's doctors'

21  diagnosis and treatment.

22  A.      Not at this time.  They seemed like good doctors

23  who were well intentioned and treated her appropriately.

24  Q.      And I understand you may be asked questions that

25  you would respond to, but based on your Disclosure and

1   what your intended opinions are, you're not offering

2   opinions outside of the specific cause of Ms. Salas's

3   mantle cell lymphoma; correct?

4   A.    No, I don't intend to offer opinions about

5   marketing or her treatment appropriateness at this point

6   in time.

7   Q.    So outside of her specific cause of Ms. Salas's

8   mantle cell lymphoma, you don't have any intention of

9   offering any other opinions; right?

10   A.    I don't intend to offer additional opinions

11   unless somebody asks me to, no.

12   Q.    Do you know what an odds ratio is?

13   A.    Yes.

14   Q.    And it's something that provides the estimate of

15   a risk; right?

16   A.    It's a way of estimating risk, yes.

17   Q.    And often when an odds ratio is reported, isn't

18   it called a confidence interval?  Right?

19   A.    Yes.

20   Q.    And that provides a range of values on either

21   side of the odds ratio?

22   A.    Yeah.  Usually they take a 95 percent confidence

23   interval, assuming a normal distribution.

24   Q.    And when -- so when a confidence interval

25   includes 1, then that would result in a statistically

1  significant finding, assuming the risk ratio is

2  positive.

3  A.      So if the confidence interval, if the point

4  estimate is 1 and the confidence interval is from 1 to a

5  higher number, that is considered a statistically

6  significant study in the epidemiologic literature and --

7  Q.      Well, am I right, if the confidence interval

8  includes -- actually includes 1, that wouldn't be

9  statistically significant?  It has to be greater than 1.

10  A.      Yeah; but I -- I want to digress a little bit.

11         You know, when I was studying epidemiology, some

12  of the professors said, it's not just the confidence

13  interval but also look at the magnitude of the odds

14  ratio.

15         For example, if you have an odds ratio of 4 but

16  the confidence interval is .98 to 27, that actually

17  provides some intriguing evidence about causality.  And

18  there are some things called the bias-variance ratio

19  that have to do with sample size and such.

20         And there's also another school of evidence

21  called Bayesian evidence and Bayesian statistics.  And I

22  think I have put some of those articles in my report

23  because there are, I think, some problems with

24  frequentist statistics and people assuming that P-value

25  means everything and not crossing the -- you know, a

1  confidence interval that crosses 1 definitely excludes

2  something as not being causation.

3       So I think it's a little bit more nuanced than

4  just does it cross 1 or not, but it's nicer when it is

5  above 1 only in the confidence interval.

6  Q.    But just in terms of the definition of

7  statistical significance, the confidence interval would

8  have to be greater than 1.

9  A.    In the frequentist definition of statistical

10 significance the confidence interval needs to be greater

11 than 1, but in terms of generating epidemiological

12 evidence, particularly if you use Bayesian statistics

13 and you think about the magnitude of the odds ratio and

14 the bias, it changes a little bit.  I don't think it's

15 black and white.

16 Q.    And statistical significance, if something does

17 not reach the point of statistical significance, by

18 definition, that means that it is something that

19 could -- a finding that could equally be due to chance;

20 right?

21 A.    Well, again, I think whether it's just my

22 interest, but I put some articles there about P-values

23 and, you know, the earth is flat, P less than .05, and

24 causality and statistical inference, to try and

25 highlight the nuances regarding some of this.

1      I think I put another article there about the

2  danger of dichotomization from the British Medical

3  Journal because when you dichotomize variables, you

4  might miss out on important information such as

5  dose-response, risks, things.

6      So I think there's a lot of statisticians and

7  epidemiologists that I follow and who are somewhat

8  frustrated by overreliance on P-values.  But one

9  definition is the one you just said, yes.

10  Q.     So would you agree, though, that if a finding is

11  not statistically significant, by definition, you can't

12  rule out that it is due to chance?

13  A.     That is a classic definition of a P-value.  But

14  there are a lot of assumptions in these studies that

15  make it very hard to interpret that.

16  Q.     But, in general, do you agree with that

17  statement that if something has not reached statistical

18  significance, you can't rule out that the finding may be

19  due to chance?

20  A.     No, you cannot completely rule out the whole

21  hypothesis if it doesn't reach statistical significance.

22  Q.     You mentioned situations where there could be a

23  point up to, you know, over 4 and you've got a

24  confidence interval close to 1.  But when you're dealing

25  with situations where your point estimate is closer to,

1    you know, 1.5 or 2 and you're seeing findings that

2    aren't statistically significant, that calls into

3    question whether or not it is a -- not a chance finding;

4    right?

5    A.      That would give pause about whether or not the

6    finding was due to chance alone.  I would agree to that.

7    Q.      You agree that there's a hierarchy in scientific

8    evidence?

9            MR. ROJAS:  Object to the form.

10           THE WITNESS:  So I deal a lot with clinical

11   situations where we like to have a prospective,

12   randomized, controlled trial, and the hierarchy, a lot

13   of epidemiologists I follow critique that hierarchy in

14   the pyramid of evidence as being antiquated and not

15   really a way of assessing the truth correctly.  But I

16   would agree that there are many articles out there

17   discussing the hierarchy of evidence in epidemiology and

18   clinical medicine.

19   BY MR. KERSCHNER:

20   Q.      You agree that in assessing causality, human

21   data is more important to the assessment than animal

22   data and mechanism data; right?

23   A.      I think causality is a complicated, multifaceted

24   thing.  I think -- I think human data is very important

25   in assessing causality of risks of environmental toxins.

1    Q.      But in that assessment, human data, animal data,

2    and mechanism data aren't three equal pillars in the --

3    in the analysis; right?  Human data is the most

4    important.

5    A.      I would think human data is more important than

6    animal data, but animal data can sometimes be very

7    important.

8    Q.      Right.  But they're not equal in importance,

9    human, mechanism, and animal; right?

10           MR. ROJAS:  Object to the form.

11           THE WITNESS:  I think I would prefer to see

12   human data rather than animal data, but I -- it's nice

13   to also have animal data.

14           I'm sorry if I'm not answering your question

15   clearly.

16           MR. KERSCHNER:  No.  I think you've answered it.

17   Thank you.

18   BY MR. KERSCHNER:

19   Q.      And in terms of human data, there's multiple

20   different study types; right?  One would be a cohort

21   study and case-control studies, you have clinical

22   trials, you've got meta-analysis; right?  Those are all

23   different types of human data.

24   A.      Those are some of the studies of human data,

25   yes.

1  Q.      And you would agree that not all human data is

2  equal in that regard.

3          MR. ROJAS:  Object to the form.

4          THE WITNESS:  Well, in clinical medicine the

5  prospective, randomized, clinical trial some say is a

6  gold standard, and that -- you know, when we see that in

7  a clinical trial, for example, in my day-to-day job

8  trying to diagnose and treat cancer and hematology

9  diseases, you really like to have a prospective,

10  randomized, clinical trial.

11          You cannot do a prospective, randomized,

12  clinical trial with something that you think might

13  carcinogenic because it's unethical and you couldn't

14  randomize somebody to a known carcinogen.  So that

15  wouldn't fly.

16          So I think clinical trial data is kind of off

17  the table if we're discussing --

18          MR. KERSCHNER:  Right.

19          THE WITNESS:  -- Roundup and it's relation to

20  non-Hodgkin's lymphoma.

21          Some people say that meta-analyses are a higher

22  level of evidence than cohort studies or case-control

23  studies.

24          I took a course in meta-analysis, and there's a

25  lot of nuances with how to do them correctly.  So,

1  classically, people say a meta-analysis has a higher

2  weight of evidence than cohort, case-controlled studies

3  but I think I would call that sometimes into question.

4        It really depends on how well each of the

5  studies is done, how well the meta-analysis is done, and

6  every epidemiological study has some potential for bias,

7  confounding, measurement error, misclassification,

8  statistical flaws.  So it's not always black and white.

9        MR. KERSCHNER:  Fair.

10  BY MR. KERSCHNER:

11  Q.      But you wouldn't hold up a meta-analysis, a

12  case-controlled study, and a cohort study as -- just as

13  in a general study design as being equal levels of human

14  data; right?

15  A.      Well, I think they're very different ways of

16  trying to get at evidence in humans.

17  Q.      Just like, for example, animal studies,

18  mechanism studies, and human data are not equal pillars

19  of data, you would say the same thing for prospective

20  study -- cohort studies, case-controlled studies, and

21  meta-analysis; right?

22  A.      I think so.

23        You know, we can cure cancer in mice all the

24  time and almost never does that translate into curing

25  cancer in humans.

1          In epidemiology, I think case -- and I think I

2    wrote some of this in my report.  Case-control studies

3    have different pros and cons than cohort studies and

4    different studies than meta-analysis.

5          And I think I said earlier that I have read the

6    Zhang meta-analysis a few times because I thought it was

7    well done and included control, case-control, studies

8    and a cohort study and methodologically it's different

9    from a case-control study and a cohort study.  But a

10   poorly done cohort study is different from a

11   case-control study but I think, you know, if a study is

12   poorly controlled, poorly done, then I might put less

13   evidential weight on that study, as Zhang did when they

14   discarded a majority of the studies in this situation.

15   Q.      Assuming the studies are all done well, they're

16   not three equal pillars, right, case-control, cohort,

17   and meta-analysis?  Right?

18   A.      Yeah; but I think it's rarely -- rarely in

19   epidemiology that all studies are done equally well.

20   Q.      And, similarly, when assessing causation, animal

21   studies, mechanism studies, and human studies are also

22   not three equal pillars.

23   A.      They're probably unequal pillars, yes.

24   Q.      And you agree that there have been chemicals

25   that have shown to cause cancer in laboratory animals

1    but not in people; right?

2    A.      I'm not an expert on animal carcinogenicity, but

3    I suppose that's possible, yes.

4    Q.      There are things that are toxic to animals but

5    not humans; right?

6    A.      Yes.  Although I think it's nice to see, you

7    know, animal toxicity and genotoxicity as part of the

8    whole scheme of causal inference for what might cause

9    disease in humans, particularly when the animal is

10   evolutionarily closer to the human.

11   Q.      There are things that are toxic to rats that are

12   not toxic to humans; right?

13   A.      Coumadin is toxic to both rats and humans.  I

14   mean --

15   Q.      Well, at certain doses.  But, for example,

16   chocolate would be -- is toxic to rats but, thank God,

17   chocolate is not toxin to humans; right?

18   A.      I didn't know how toxic chocolate was to rats.

19   I mean, there's probably a dose-response where some

20   chocolate is not too toxic to rats.

21   Q.      But you're not an expert on that issue.

22   A.      No, I'm not an expert on animal toxicity.

23   Q.      Non-Hodgkin's lymphoma is a group of over 60

24   distinct diseases; right?

25   A.      Yes.

```
1    Q.      And the pathological features, clinical

2    presentation, causes, and treatments of all of those

3    different subtypes differ from each other; right?

4    A.      They differ from each other but some of them

5    have similarities.  You know, low-grade lymphomas have

6    more similarities to each other than a low-grade

7    lymphoma might to high-grade lymphoma.  And, you know,

8    we classify them, and we certainly use similar drugs in

9    some of them and similar approaches in some of them.  So

10   they're not 60 totally distinct.  I mean, it's not like

11   the difference between lymphoma and colon cancer.

12   Q.      But something --

13   A.      They have a lot in common.

14   Q.      -- can be a cause of one type -- subtype of

15   non-Hodgkin's lymphoma but not necessarily another.

16   A.      Yeah.  But that would be very hard because of,

17   you know, how many cases you have, for example, in a

18   case-control study and the relative frequency of

19   different lymphomas.

20   Q.      You can't just assume that because a substance

21   has been found to be the cause of one type of -- subtype

22   of non-Hodgkin's lymphoma it therefore causes all

23   non-Hodgkin's lymphomas; right?

24   A.      Well, I would be very concerned if it causes

25   lymphoma that it's going to increase the risk for all
```

```
 1    subtypes of non-Hodgkin's lymphoma.  And I think you'd
 2    have a harder time with a rarer subtype of non-Hodgkin's
 3    lymphoma.
 4          But if a substance, for example, was found to
 5    increase the probability of developing non-Hodgkin's
 6    lymphoma but not colon cancer or not prostate cancer, I
 7    would group all the lymphomas together as possibly
 8    related or probably related in this case to the exposure
 9    of interest.
10    Q.     So it's your testimony, to a reasonable degree
11    of medical certainty, that as long as a substance is
12    known to be a risk factor for one subtype of
13    non-Hodgkin's lymphoma, it is therefore a risk factor
14    for all subtypes of non-Hodgkin's lymphoma?
15          MR. ROJAS:  Object to the form.
16          THE WITNESS:  I can't be a hundred percent
17    certain for all.
18          I mean, there was -- there was one study linking
19    Roundup to hairy cell leukemia, which is an extremely
20    rare subtype of B-cell non-Hodgkin's lymphoma, but I
21    think it's a general causation for all lymphomas, but I
22    cannot be a hundred percent sure that -- you know, for
23    example, adult T-cell leukemia lymphoma has a very
24    strong relationship to a virus, and maybe you need to
25    have that virus to have that lymphoma and maybe because
```

1    of that and the relative risk or odds ratio of that

2    virus and that lymphoma, that something else might not

3    be a substantive cause.  It depends on other things that

4    might or might not cause it so --

5    BY MR. KERSCHNER:

6    Q.       For example, if an external factor was shown to

7    cause follicular lymphoma, could you then extrapolate

8    that and say it is a cause of all other subtypes of

9    non-Hodgkin's lymphoma?

10   A.       I would say if something was, you know,

11   reasonably shown to cause follicular lymphoma, that I

12   would be very concerned that it causes other B-cell

13   lymphomas and potentially other T-cell lymphomas.

14   Q.       Are you a hundred percent certain that

15   glyphosate causes non-Hodgkin's lymphoma?

16   A.       I'm above 50 percent but I am not, probably, at

17   a hundred percent.

18   Q.       What about mantle cell lymphoma?  Would you say

19   you're above 50 percent that it causes mantle cell

20   lymphoma?

21   A.       Yes.  As I wrote in my report, I thought it was

22   more likely than not that Roundup was a substantial

23   factor in the causing of this patient's mantle cell

24   non-Hodgkin's lymphoma.

25   Q.       But you're not a hundred percent certain that

1    Roundup can cause mantle cell lymphoma.

2    A.      There are very few things in life I'm a hundred

3    percent certain of.

4    Q.      And this isn't one of them.

5    A.      I would say it's more likely than not, above 50

6    percent.

7    Q.      Do you agree with IARC's conclusion in 2015 that

8    there is limited evidence in humans for the

9    carcinogenicity of glyphosate?

10   A.      So I don't have the IARC report with me, but I

11   think -- I think it was more strongly worded than that,

12   particularly --

13   Q.      Why don't we -- why don't we look at that.  I'll

14   mark, I think it would be -- I think we're up to

15   Exhibit 5?  Would someone throw something up on the --

16   okay.  Exhibit 5.  Why don't we mark the IARC monograph.

17           (Exhibit Knopf-5 was marked for identification.)

18   BY MR. KERSCHNER:

19   Q.      And do you have that there?  Can you see it?

20   And this is Monograph 112 on glyphosate.

21           And if you -- we've shown it in the chat and we

22   can also -- we've put it in the exhibit share, which I

23   think you could then download it.  But, you know, are

24   you able to see what --

25   A.      You gave it a 2A, right, which was the second

1  page?

2  Q.      Got it.  I just want to make sure before we get

3  into -- I just want to make sure you can see the

4  document that we've marked.

5  A.      Yeah, I can see the IARC report.  Yeah.

6  Q.      And this is the IARC's monograph on glyphosate;

7  correct?

8  A.      Yes.  It doesn't have the Preamble, but this is

9  the subsection on glyphosate, yes.

10  Q.      We -- I can -- I can get you the Preamble.  Let

11  me just -- let's go -- let's do this first and then

12  we'll look at the Preamble.

13          Let's go to Page 78, please.  And that's where

14  we begin the Evaluation.

15          Do you see that?

16  A.      Uh-huh.

17  Q.      And then 6.1, it says [as read], "There is

18  limited evidence in humans for carcinogenicity of

19  glyphosate."

20          Do you see that?

21  A.      I see that, yes.

22  Q.      Do you agree with that statement?

23  A.      No; because elsewhere the IARC report said it

24  was a probable carcinogen.

25          I mean, it created quite a wave when this report

 1    was listed.  It was -- I don't have all their categories

 2    but they said it was a 2A, which was the second -- a

 3    probable human carcinogen.

 4    Q.      So you disagree with what IARC said here, that

 5    there's limited evidence in humans for the

 6    carcinogenicity of glyphosate.

 7    A.      I'm seeing that, but then elsewhere I've seen

 8    probable carcinogen --

 9    Q.      Oh.

10    A.      -- in the same report somehow so --

11    Q.      We could scroll down.  I don't want to -- I'm

12    not hiding anything.  Sorry.

13            I think you're referring to 6.3?

14    A.      Okay.

15    Q.      You see it says, "Glyphosate is probably

16    carcinogenic to humans."

17            Do you see that?

18    A.      Yeah.  So maybe 6.1 is like, this is where we've

19    started from, but then their conclusion is probably

20    carcinogenic to humans.

21    Q.      And do you understand what it means when they

22    have concluded that there's a -- sorry.

23            Actually, have you talked to anyone at IARC to

24    understand that 6.1 is where they began and 6.3 is their

25    conclusion?

1    A.      I haven't spoken to anyone from the IARC, no.

2    Q.      Okay.

3    A.      But I -- as I --

4    Q.      And do you know what it means when they say

5    there's limited evidence in humans for the

6    carcinogenicity of glyphosate?

7    A.      You know, I'm happy to answer these questions.

8    I just understand that I am a specific causation expert

9    here, not a general causation expert, and these are more

10   general-causation-expert questions, which you're free to

11   ask.

12          MR. ROJAS:  And, David, if I may --

13   BY MR. KERSCHNER:

14   Q.      You cite --

15          MR. ROJAS:  -- I know we talked about the

16   interruption thing before.  If you can -- if you can

17   please try.  He was a couple sentences in and you cut

18   him off so let's --

19          MR. KERSCHNER:  I apologize.

20          MR. ROJAS:  No problem.

21   BY MR. KERSCHNER:

22   Q.      You cite to the IARC report in your -- in your

23   opinion, correct, for this case?

24   A.      I do.

25   Q.      Are you not relying on the IARC report for your

Kevin B. Knopf, M.D., M.P.H. - Volume 2

```
 1   opinion?
 2   A.      So, as I've said, I'm relying on the general
 3   causation experts and their reports and how they
 4   interpret IARC.
 5           So I've also reviewed the IARC report but they,
 6   I think, pretty clearly stated in their general
 7   causation reports that the IARC report was a landmark
 8   study showing that Roundup was a substantial carcinogen
 9   risk factor for non-Hodgkin's lymphoma.
10           And I'm not exactly sure how to interpret the
11   difference between Statement 6.1 and Statement 6.3.  It
12   could be that 6.1 is saying, this is where we're
13   starting from and we feel there's limited evidence.
14           I'm not sure I can even say the veracity of that
15   statement because there were certainly some case-control
16   studies before IARC met that were suggestive of a
17   causation between Roundup and non-Hodgkin's lymphoma.
18           And it seems to me that Statement 6.3 is saying
19   something different than 6.1, with the caveat that I've
20   been not been retained as a general causation expert,
21   that I'm also relying on the general causation experts
22   who have interpreted this study as saying that Roundup
23   is causative of non-Hodgkin's lymphoma.
24   Q.      As part of your differential diagnosis, at some
25   point you had to rule in Roundup as a potential cause
```

1    for Ms. Salas's non-Hodgkin's lymphoma; correct?

2    A.      That is correct.

3    Q.      And are you relying on anything in your report

4    that discussed the epidemiology or IARC relating to

5    non-Hodgkin's lymphoma to make that rule-in point or are

6    you simply just deferring to general causation experts

7    and assuming that Roundup causes cancer for your

8    opinion?

9            MR. ROJAS:  Object to the form.

10           THE WITNESS:  Yeah.

11           So if I disagreed with the general experts'

12   opinion about causation of Roundup and lymphoma and

13   their report of the IARC, their interpretation of the

14   IARC report, which I think was stated as probably

15   carcinogenic, if I disagreed with that, I probably would

16   not have accepted the case.

17           So I am, in a sense, relying on their expert

18   opinion but I think, you know, as the nature of what I

19   do every day, I like to know the evidence myself.

20           So I am not completely relying on their expert

21   report but for purposes of this deposition or further

22   testimony, I think that was how I was approaching it,

23   that I'm being asked as a specific expert, not a general

24   expert, on causality.

25

1   BY MR. KERSCHNER:

2   Q.      So when you wrote about the IARC in your report,

3   you did not intend to rely on it to form the basis of

4   your opinions?

5           MR. ROJAS:  Object to the form.

6           THE WITNESS:  Well, I may not be answering the

7   question clearly.

8           I'm deferring to the general experts who have

9   reviewed all the epidemiologic literature and I think

10  maybe reviewed more studies than I did or maybe read the

11  IARC report more closely or maybe knew the members or

12  the process for the IARC.

13          You know, I read Al Neugut's deposition, which

14  was on the Internet, how he handled questions like this.

15          I don't want to cop out and say I'm only relying

16  on the general experts' causation because I also believe

17  it to be true, so I have my own opinion about it, but

18  I'm not here today as a -- as a general expert on

19  causation of Roundup and non-Hodgkin's lymphoma.

20          In my report I'm generating a specific

21  assessment of whether Roundup was a substantial

22  causative factor in this patient's non-Hodgkin's

23  lymphoma.  I'm relying in large --

24  BY MR. KERSCHNER:

25  Q.      Have you read --

1  A.      I'm relying in large part on the general

2  experts' report and opinions and I've also validated

3  that and believe it as well, but I think the general

4  experts have had -- spent more time reviewing the

5  epidemiologic literature and pondering that, and that I

6  think happened in 2017, 2018, whenever the general

7  expert reports were written.

8         So I'm not saying, oh, I'm only going to believe

9  what they say, but I am, I think, here as a specific

10 expert, not as a general causation expert.

11 Q.      When you formed your opinion, did you just

12 assume that Roundup was a risk factor for non-Hodgkin's

13 lymphoma as part of your differential diagnosis?

14        MR. ROJAS:  Object to the form.

15        THE WITNESS:  Yeah.  I don't think I would say I

16 just assumed that.  I read general causations experts

17 and made sure I agreed with them and I reviewed the

18 studies myself and made sure I agreed with them.  So I

19 didn't just totally rely on that, you know.  It was a

20 sort of trust-but-verify-type situation.

21 BY MR. KERSCHNER:

22 Q.      Did you do any independent analysis to confirm

23 whether or not Roundup is a risk factor or did you

24 simply rely on the reports and information provided by

25 the general causation experts?

```
 1   A.      As I -- as I tried to say earlier, when I
 2   submitted this report regarding the specific causation
 3   for Ms. Salas's non-Hodgkin's lymphoma, I cited the
 4   articles that I had read at that point, and I had read
 5   the expert review report and I had read some of these
 6   materials, to the extent that I thought I should as a
 7   specific causation report.
 8           If I were asked to be a general causation
 9   expert, I would read these studies much, much closer and
10   try and understand why the language differs from 6.1 to
11   6.3.
12   Q.      Have you read the entire IARC Monograph 112 on
13   glyphosate?
14   A.      I have read through it.  I'm not sure I got to
15   the very end and I'm not sure I read it as detailed and
16   closely as I would if I were a general causation expert.
17   Q.      Do you understand what limited evidence means
18   when IARC writes it in Section 6.1?
19   A.      I think in the Preamble it might have said what
20   they mean by limited evidence, but I'm not --
21   Q.      Let take a look at that.
22   A.      -- a hundred percent sure what they mean by
23   limited evidence.
24   Q.      Why don't we pull up the Preamble.
25           THE COURT REPORTER:  And this is the reporter.
```

```
 1   Can we go one at a time, please?

 2          MR. KERSCHNER:  I'm sorry.

 3          Let's go to -- let's pull, let's go mark

 4   Exhibit 6, which is the Preamble.

 5          (Exhibit Knopf-6 was marked for identification.)

 6   BY MR. KERSCHNER:

 7   Q.     And if we go to Page 19, I think it is, yeah, on

 8   the bottom, do you see it says, "Limited evidence of

 9   carcinogenicity"?

10   A.     And the print is a little small on my screen.

11   Which --

12   Q.     Sorry.  We could -- we could zoom in a bit.

13   It's not an eye test.

14          MR. KERSCHNER:  And I think we've got to go a

15   little further, Page 19 of the -- of the document.  It

16   will say "19" on the top right.  And go down -- yeah.

17   If we go down to the bottom of that page, right there,

18   it's perfect.

19   BY MR. KERSCHNER:

20   Q.     Do you see it says, "Limited evidence of

21   carcinogenicity"?

22   A.     Yeah.  [As read] "A positive association has

23   been observed between exposure to an agent for which a

24   causal interpretation is considered by the Working Group

25   to be credible."
```

1          So maybe that's where they thought they were

2    starting from before --

3    Q.      But it continues.

4    A.      -- they put out the report.

5    Q.      It says, "but chance, bias or confounding could

6    not be ruled out with reasonable confidence."

7          Do you see that?

8    A.      I'm reading that there, yes.

9    Q.      And do you agree with what the IARC working

10   group said about the evidence of carcinogenicity for

11   glyphosate in humans, that chance, bias, or confounding

12   could not be ruled out with reasonable confidence?

13   A.      Well, to me, that means I think they're starting

14   with an objective view that they've seen some evidence

15   about it and they want to make sure it's not due to

16   chance, bias, or confounding and that's why they're

17   doing the report.

18   Q.      I'm sorry.  You keep saying "they started."

19         Where are you getting your testimony from that

20   they've started from the position of limited evidence

21   and at any point changed that?

22   A.      Well, I think the wording they have was that it

23   was a Group 2A probable human carcinogen.  So --

24   Q.      And how does that differ from the concern --

25   from their conclusion that it is -- that -- about the

1    limited evidence of carcinogenicity?

2    A.      Well, I'm not sure exactly how they make their

3    final report but limited, to me, sounds much less

4    concerning than probable.

5    Q.      Right.  And they've defined limited to say that

6    chance, bias, confounding cannot be ruled out with

7    reasonable confidence, and I want to know if you agree

8    with that statement that when it comes to Roundup and

9    non-Hodgkin's lymphoma, that the -- and an association

10   between the two, that chance, bias, or confounding

11   cannot be ruled out with reasonable confidence.

12           Do you agree with that statement?

13   A.      Well, I want to make sure I'm answering this

14   correctly.

15           Since this report came out, there's been other

16   reports.  And the Dennis Weisenburger report in 2021 was

17   influential in my thinking and the Zhang meta-analysis

18   was influential in my thinking that it is probable, and

19   I think the Weisenburger articles and his article in

20   2021 were very convincing to me.

21           So I'm not sure why the statement in 6.1 differs

22   from 6.3 and I'm not sure what exactly they mean by

23   limited.

24   Q.      Well, we have the definition of "limited

25   evidence of carcinogenicity" here.

1    A.      Yeah.

2    Q.      So I just want to know, it sounds like you

3    disagree with the statement.  Is that correct?

4            MR. ROJAS:  Object to the form.

5            THE WITNESS:  I agree they wrote this statement

6    here.  I'm not sure I agree in 2022 with this statement.

7            I was not part of the IARC committee and I'm --

8    you know, I don't know how they go from this to

9    probable, unless they're saying limited evidence but

10   probable.  I mean --

11   BY MR. KERSCHNER:

12   Q.      Do you understand the IARC conducted something

13   called a hazard assessment or a risk assessment?

14   A.      I'm not exactly sure which terminology they used

15   there.

16   Q.      Do you know what a hazard assessment is?

17   A.      I'm not completely sure how a hazard assessment

18   differs from a risk assessment.

19   Q.      And you don't know one way or another which one

20   IARC did, hazard or risk assessment; right?

21   A.      Well, I could certainly read it if you point me

22   to the discussing of how they assessed it.

23   Q.      I'm just -- I'm asking, sitting here today, do

24   you know one way or another if they did a hazard

25   assessment or a risk assessment?

1   A.       I know that they said it was a probable human

2   carcinogen, and that's what I put in my report.

3   Significant carcinogenicity in animals and review of

4   epidemiology led to a Group 2A classification.

5           I don't know if that's hazard or risk.  To me, I

6   think things in terms of risk.  Hazard ratios I think is

7   more of a Bayesian term.  So no, I don't know for sure

8   if it's hazard assessment or risk assessment.

9   Q.       I want to go to your report, which we've marked,

10  I want to say as Exhibit, probably I think 3.

11          MR. ROJAS:  Three, yeah.

12          MR. KERSCHNER:  Three, yeah.

13  BY MR. KERSCHNER:

14  Q.       On Page 11 you list a series of factors that you

15  say were used to determine whether causal inference was

16  appropriate here.

17          Do you see that?

18  A.       Yes.

19  Q.       And there are seven factors?

20  A.       Yes.

21  Q.       The first one is temporal relationship?

22  A.       Yes.

23  Q.       How much time does it take for Roundup to cause

24  a person's non-Hodgkin's lymphoma?

25  A.       So I -- I'm going to again say I was asked to be

```
 1    a specific causation expert in this case rather than a
 2    general causation expert, so I have read some of these
 3    articles about the lag time and, to my recollection, I
 4    think, is it ten years, but I am not -- I have not
 5    memorized those numbers per se.
 6    Q.      So when you say that the causal inference on the
 7    nature of glyphosate exposure and the development of
 8    non-Hodgkin's lymphoma, as you cite in your report and
 9    you list those factors, those factors are not part of
10    your methodology in this case.
11    A.      No.  By temporal relationship I was referring
12    more to something simpler, which is that if somebody has
13    non-Hodgkin's lymphoma and then after diagnosis they
14    used Roundup, one wouldn't be able to say that causality
15    works that way.  The temporal relationship has to be
16    that they used it before the development of a
17    malignancy.  That's --
18    Q.      And does it matter how long before they develop
19    non-Hodgkin's lymphoma that they stopped using Roundup?
20    A.      I think there's a latency period, which has been
21    addressed by the general experts in this case, and I
22    believe that is, in part, true, yes.
23    Q.      So you're not offering any opinions about
24    latency between Roundup exposure and non-Hodgkin's
25    lymphoma; correct?
```

1   A.      If you really wanted me to offer opinions about

2   latency and Roundup exposure, I'd be happy to review the

3   relevant studies and come up with my synthesis of it.

4           What I recall off the top of my head is that

5   some of the articles said a latency period should be 10

6   to 20 years, two years of --

7   Q.      Right.  I'm not asking you to go do it.

8           I'm saying, for your opinions in this case, are

9   you offering opinion, to an reasonable degree of medical

10  certainty, regarding the latency period between the use

11  of glyphosate/Roundup and non-Hodgkin's lymphoma?

12  A.      As I sit here today, no, but I -- I'm intrigued

13  and I might look that up myself, as I'm curious, but I'm

14  not retained as a general causation expert so --

15  Q.      So for all -- sorry.  Go ahead.

16  A.      No.  Please ask.

17  Q.      So these factors in your report, Factors 1

18  through 7 on Page 11, you're not offering an opinion on

19  any of those factors as it pertains to Roundup and

20  non-Hodgkin's lymphoma.

21          MR. ROJAS:  Object to the form.

22          THE WITNESS:  I'm offering an opinion, as I've

23  stated in my report, about those factors as relation to

24  this patient's specific development of non-Hodgkin's

25  lymphoma.

1          I think temporality is one of the classic key

2    features of the Bradford Hill criteria on causality and

3    I think this patient definitely used Roundup before she

4    developed lymphoma so, in that sense, it fulfills that

5    criteria of temporality.

6          If she had used it after development of

7    non-Hodgkin's lymphoma, I don't believe I would have

8    prepared this report and say there was a causal

9    relationship.

10          I'm not right now at this point going to offer

11    an opinion about duration of exposure and the nature of

12    that.  I'm just speaking broadly about temporality.

13          The way I think about temporality, a little

14    different.  So there's no like hard-and-fast rule that

15    the temporal relationship has to be this many years

16    after you used a purported carcinogen because I think of

17    causation of carcinogens as cancers of probabilistic

18    distribution.  So it's possible with shorter periods of

19    latency that a cancer could happen and it's possible

20    with longer periods of latency.

21          My review of the literature from the general

22    experts, some of them critiqued one of the studies, I

23    think the AHS study, as saying that they did not have

24    enough latency in the people who responded to the study,

25    and there was a low response rate of maybe 37 percent or

```
 1   40 percent, that biased that study towards the null and

 2   makes it less reliable as a piece of information for

 3   causality between Roundup and non-Hodgkin's lymphoma.

 4        I think Zhang included that study in her

 5   meta-analysis, which still showed a high odds ratio that

 6   was statistically significant, even including that

 7   study.

 8        I think I read another study -- so I read

 9   another study by Zhang which sort of critiqued --

10   BY MR. KERSCHNER:

11   Q.   Doctor, I'm sorry to cut you off, but you -- I'm

12   going to move to strike as nonresponsive.

13        You've got to answer the question being asked

14   here.  I appreciate you've got a lot to say, and your

15   counsel is entitled to ask you questions, but I simply

16   asked whether or not you were going to rely on those

17   seven factors.  To me, that's a yes or no question --

18   A.   Yes, I am going to rely on those --

19   Q.   -- whether you are or you're not.

20   A.   I am, yes.

21   Q.   Okay.  Thank you.

22        And you --

23        MR. ROJAS:  Note my usual objection to the

24   interruptions.

25        Go ahead, David.
```

1          THE WITNESS:  You diverted to latency and

2     discussing latency so I was trying to answer the

3     questions about latency to the best of my ability.

4          MR. KERSCHNER:  I'm just -- I'm just looking for

5     you to answer the question asked.

6     BY MR. KERSCHNER:

7     Q.     For your case-specific methodology in

8     Ms. Salas's case, how many years before the development

9     of non-Hodgkin's lymphoma does someone have to use

10    Roundup for you to consider there to be a temporal

11    association?

12    A.     I don't think I have a specific number of years.

13    I mean, I think it would be unlikely if they sprayed it

14    on Tuesday and were diagnosed with lymphoma on Thursday.

15         I think a longer duration of use prior to the

16    development of lymphoma is more suggestive of a strong

17    temporal relationship.  I would think a number of years

18    should be sort of a way to think about it.

19    Q.     Did you calculate how long glyphosate can remain

20    in an individual's body as part of your case-specific

21    methodology to determine temporal relationship in

22    Ms. Salas's case?

23    A.     So, again, I'm relying on other experts

24    regarding the toxicology and how long it stays in

25    someone's body.

 1          And there was just a news report -- and I
 2   haven't read the epidemiologic study -- saying that a
 3   fairly high percentage of Americans have glyphosate in
 4   their body who are not actually spraying it, including
 5   you and I, and I don't know the temporality there.
 6          So I am, in part, relying on the expert who
 7   calculated her total exposure days and duration but in
 8   my report I said she used it from 2004 to 2013 and again
 9   from 2008 to 2014 and she was diagnosed at least ten
10   years after the start of using it, so by one definition
11   of latency, I think I've answered that question.
12   Q.     I'm sorry, Doctor.  I just asked if you did
13   anything to calculate the amount of time glyphosate can
14   remain in an individual's body as part of your
15   case-specific assessment.
16   A.     I did not do any specific calculations --
17   Q.     Thank you.
18   A.     -- of how long Roundup can remain in the body as
19   part of my specific case assessment, no.
20   Q.     The next thing is strength of association.
21          In your opinion, as part of your case-specific
22   analysis for Ms. Salas, what is the risk ratio for an
23   association between glyphosate and non-Hodgkin's
24   lymphoma in humans?
25   A.     I don't know that I'm prepared to give you a

1  specific risk ratio because I haven't memorized them.

2       I think the Zhang meta-analysis, which I thought

3  was very well done, the risk ratio was somewhere between

4  1.41 and maybe 2.  I've seen some risk ratios of greater

5  than 2 in some of the case-control studies, but I would

6  have to review those specific studies to get you the

7  exact risk ratios.

8  Q.     And do you know the risk ratio for an

9  association between glyphosate and mantle cell lymphoma;

10 correct?

11 A.     I think it may be hard to give a risk ratio --

12 and this harkens back to your earlier question -- just

13 between glyphosate and mantle cell lymphoma because it's

14 a less common subtype of mantle cell lymphoma.  So I'm

15 having to impute that causality of this between all

16 non-Hodgkin's lymphoma might be proportionate in

17 proportion to the frequency of non-Hodgkin's lymphomas.

18 But, obviously, we have more follicular lymphoma and

19 diffuse large-cell lymphoma out there than we do mantle

20 cell lymphoma.

21      I would say again it's my opinion that, more

22 likely than not, Roundup was a substantial factor in

23 causing Ms. Salas's non-Hodgkin's lymphoma.

24 Q.     On Page 8 of your report --

25 A.     Yes.

1   Q.      Yeah.  You say -- and I'll read it to you -- you

2   say, "An exposure is associated" -- well, let's find the

3   right spot so I can show you where we are.

4   A.      Yeah.  Which paragraph?  I have my report here.

5   Q.      So if you look at, on Page 8, that -- the first

6   full paragraph, the last sentence --

7   A.      First paragraph?

8   Q.      The last sentence of the first full paragraph

9   reads, "An exposure is associated and then the

10  determination of a causal relationship is necessary -

11  studies of disease etiology address a combination of

12  genetic and environmental factors in causation."

13          What does that sentence mean?

14  A.      So causality of cancer is multi-factor, and it's

15  hard to say that one factor definitely caused cancer.

16          I mean, I think the strongest things we have is,

17  you know, there is a strong relationship between

18  extensive smoking history and small-cell lung cancer,

19  for example, or if you had radiation for breast cancer

20  and you get a sarcoma in the radiated field.

21          But there's also congenital germline and

22  subsequent genetic mutations and then there's something

23  called the gene-environment interaction where some

24  people with certain genetic makeups are more prone to

25  developing cancer as an exposure to a toxin in the

1    environment.

2         So I think I was trying to write there to say

3    that causation is multifactorial and it can be a

4    combination of both genetic and environmental factors.

5    Q.    In the next paragraph you say, "There are

6    congenital cancer-causing genes (i.e., germline

7    mutations) and genes acquired through our lifetimes

8    (i.e., somatic gene mutations) that are involved in the

9    causal pathway of carcinogenesis."

10        Do you see that?

11   A.    Yes.  Yes, sir.

12   Q.    And germline mutations are changes in the DNA

13   that you inherit from your parents; right?

14   A.    Yes.

15   Q.    And somatic mutations are changes in the DNA

16   that happen after conception and they're not inherited;

17   right?

18   A.    Right.  Correct.

19   Q.    And they continue to happen throughout our

20   lives; right?

21   A.    Yes.

22   Q.    Both somatic and germline mutations can cause a

23   person to develop cancer, regardless of whether they've

24   been exposed to Roundup; right?

25   A.    Yeah.  But the way I think about causality is

 1    there's -- there's -- it's a multi-factor process, and

 2    so some people who have somatic mutations in combination

 3    with exposure to Roundup might develop non-Hodgkin's

 4    lymphoma versus somebody who has somatic gene mutations

 5    that is not exposed to Roundup who doesn't develop

 6    non-Hodgkin's lymphoma.

 7         So I harken back to that it's a Bayesian,

 8    multifactorial way to think about causality and so it's

 9    not quite that black and white.  But I agree with what I

10    wrote there.

11    Q.    And DNA mutations are happening constantly in

12    our cells; right?

13    A.    Yes.

14    Q.    And they occur in our immune cells as well.

15    A.    Yes.

16    Q.    And as immune cells recognize foreign objects in

17    our body, it's those mutations that allow them to fight

18    those foreign objects and that stops us from getting

19    sick all the time; right?

20    A.    Yeah.  In a sense, yes.

21    Q.    And, you know, in order to do that, our immune

22    system inherently undergoes these mutations; right?

23    A.    Yes.  We also have DNA repair mechanism for

24    mutations as well.

25    Q.    But that repair mechanism doesn't always work;

1    right?

2    A.      No, it doesn't always work.

3    Q.      And sometimes you get mutations that aren't

4    repaired that could eventually lead down the path of

5    carcinogenesis; right?

6    A.      Yeah.  But even, you know, if you were to say

7    that a certain cancer is caused by an accumulation of

8    genetic mutations, it's a multifactorial thing and some

9    subsequent genetic mutations might be related to an

10   environmental toxin.

11   Q.      Right.  But in most cases of cancer, you would

12   agree that the genetic mutations that have led to that

13   cancer are not necessarily caused by environmental

14   factors; right?

15          MR. ROJAS:  Object to form.

16          THE WITNESS:  Well, every cancer is a little

17   different.  For example, I think the pathway for colon

18   cancer that was worked out by Vogelstein at Johns

19   Hopkins, you know, along the way there are probably

20   environmental exposures that affect your pathway from

21   normal colon tissue, to polyp, to carcinoma, to more

22   extensive carcinoma.  So I think gene-environmental

23   interactions are also possible along the way.

24          That's -- I think that's true in lymphoma.  For

25   example, if we say that hep. C is a risk factor for

1   splenic lymphoma villus lymphocytes, there might be

2   antecedent somatic gene mutations that make it more

3   likely because not everybody who has hep. C gets splenic

4   lymphoma, and a lot of people have hep. C.

5          So I think it's not quite so black and white.

6   BY MR. KERSCHNER:

7   Q.     I understand it's not black and white, but my

8   question is simply that you would agree that there are

9   cancers that -- strike that.

10          There are individuals who will develop cancer

11   due to gene mutation that have nothing to do with

12   environmental factors; right?

13   A.     I think that statement is the true, but as

14   humans we're always exposed to environmental factors.

15   Q.     And you can't necessarily definitively say

16   whether or not a cancer was caused by only an

17   environmental factor, genetic mutation and an

18   environmental factor, or only a genetic mutation; right?

19          MR. ROJAS:  Object to the form.

20          THE WITNESS:  Yeah.  What I've said here is that

21   it's my opinion that, more likely than not, Roundup was

22   a substantial cause in this patient's non-Hodgkin's

23   lymphoma.

24   BY MR. KERSCHNER:

25   Q.     But in this case, you can't rule out

1    definitively that Ms. Salas's cancer was caused just

2    simply by random genetic mutation in her body that had

3    nothing to do with environmental factor; right?

4    A.      So I think I read in one of the expert reports

5    for defense by Dr. Matthias, or his name was an M, and

6    he's a physician at Sloan-Kettering, and specifically he

7    said that he thought this lymphoma was only caused by

8    random genetic mutations, which differed from my opinion

9    and I disagree with his opinion there.

10   Q.      You can't say to a reasonable degree of medical

11   certainty, based on any test that you've done, that

12   Ms. Salas's non-Hodgkin's lymphoma was not solely caused

13   by a random genetic mutation; right?

14   A.      What I'm saying, it's my opinion that, more

15   likely than not, Roundup was the substantial factor in

16   causing this patient's non-Hodgkin's lymphoma.

17   Q.      That's not my question.

18           To a reasonable degree of medical certainty, you

19   can't rule out definitively that Ms. Salas's

20   non-Hodgkin's lymphoma was only caused by a random

21   genetic mutation that didn't have to do with an

22   environmental factor; right?

23           MR. ROJAS:  Object to the form.

24           THE WITNESS:  Yeah.

25           I apologize if I'm seeming evasive because I'm

1    so interested in Bayesian analysis and multiple aspects

2    of causality and probability, and I think it's possible

3    that her cancer was caused by genetic mutations but I

4    think that Roundup was a substantial factor in the

5    causing of her non-Hodgkin's lymphoma.

6    BY MR. KERSCHNER:

7    Q.      And what's your basis for saying that it wasn't

8    just a random mutation or --

9    A.      So I --

10   Q.      -- versus being an environmental factor?

11   A.      Right.

12           We have discussed that I am sort of relying on

13   general causation expert about Roundup and the

14   development of non-Hodgkin's lymphoma, the epidemiologic

15   literature, and that this patient had a substantial

16   exposure to Roundup in her life.

17           If she had never touched Roundup or maybe she

18   only saw it once in a grocery store and didn't actually

19   use it, then I'd be more inclined to say that her

20   non-Hodgkin's lymphoma was caused by purely genetic

21   mutations, but because she had a substantial exposure to

22   Roundup, I think my opinion remains that, more likely

23   than not, Roundup was a substantial exposure in causing

24   her lymphoma.

25   Q.      So any patient who has non-Hodgkin's lymphoma

1  who was exposed to Roundup, Roundup would be a

2  substantial contributing factor to their non-Hodgkin's

3  lymphoma.  Is that your testimony?

4          MR. ROJAS:  Object to the form.

5          THE WITNESS:  I think I would look at how much

6  Roundup they had, what the temporal relationship was,

7  what sort of level of exposure they had, you know,

8  whether they used protection, all sorts of things,

9  before I'd render that opinion on any one case.

10         So I think --

11         MR. KERSCHNER:  But --

12         THE WITNESS:  -- I would need to look at the

13  specific details regarding their case.

14         And in many cases, such as this one, I would

15  rely on a toxicological expert.  If the toxicological

16  expert said, oh, no, they didn't have enough Roundup to

17  make it a substantial factor, then I would change my

18  mind.

19  BY MR. KERSCHNER:

20  Q.     There's nothing specific about Ms. Salas's

21  cancer that indicates that Roundup had anything to do

22  with it; right?

23         MR. ROJAS:  Object to the form.

24         THE WITNESS:  I don't know how that differs from

25  what I've said, that I think it was a substantial factor

1    in the causing of her non-Hodgkin's lymphoma.

2         If you're making an analogy like patients who

3    develop HIV are much more likely to get a diffuse

4    large-cell lymphoma than patients who don't develop HIV,

5    you know, the HIV might trigger those genetic mutations

6    and make it more probable but -- I'm sorry.  Can you say

7    that question again?  I want to -- I want to give you --

8    BY MR. KERSCHNER:

9    Q.       There's no test that you could run on

10   Ms. Salas's non -- Ms. Salas's, you know, pathology

11   slides, on her imaging studies that shows you that

12   Roundup had anything to do with her cancer; right?

13   A.       I don't think that there's --

14         MR. ROJAS:  Object to form.

15         THE WITNESS:  Yeah.  I don't think there's a

16   definitive test I could -- I could do.

17         I think, you know, there were some animal

18   studies showing that there were chromosome changes

19   specific to certain chromosomes, and I would have to

20   review that literature related to chromosome 14.  And

21   she had a t(11) -- no, she was negative for t(11;14).

22         So I guess the way you're asking that, I can't

23   definitively -- I guess I'd have to answer that

24   question, no, I can't, as you say, definitively it would

25   be that.

1   BY MR. KERSCHNER:

2   Q.      And you would agree, then, that by looking at

3   Ms. Salas's cancer, there's nothing, no marker or

4   anything, about her tumor specifically that tells you

5   that Roundup was a specific contributing factor to her

6   cancer; correct?

7   A.      No.  I'm basing my opinion on general causation

8   experts and my review of the literature and my

9   differential diagnosis.

10  Q.      And there's nothing specific about Ms. Salas's

11  cancer, no marker or on her tumor specifically, that

12  tells you that genetic mutation wasn't the sole cause of

13  Ms. Salas's cancer.

14  A.      Nothing I could tease out from the medical

15  records that would contradict that.  I think I'm just

16  giving a different opinion than the experts you've

17  retained in that regard.

18  Q.      You mentioned a Dr. Vogelstein at Johns Hopkins;

19  right?

20  A.      That's -- I'm sorry.  That's a very obtuse

21  reference.  It's just having to do with the biology of

22  carcinogenesis being a multi-step process.  I don't

23  think -- I don't think he does anything with lymphoma;

24  he's just a very bright scientist who I admire.

25  Q.      Have you read any of his work?

1    A.      Yeah.  Not for a long time.  But he's -- he's

2    somebody who many people thought always should get a

3    Nobel Prize.

4    Q.      And do you know of a Dr. Cristian Tomasetti as

5    well?

6    A.      E-D-D-Y?

7    Q.      I'm sorry?

8    A.      Is it E-D-D-Y, Eddy?

9    Q.      No.  Cristian Tomasetti, E --

10   A.      Oh, Tomasetti.

11   Q.      E-T-T-I.

12   A.      Oh.  You know, I've come across that name in the

13   context of this litigation but I don't remember which

14   papers he wrote or what they said per se.

15   Q.      And you understand that he's actually written

16   papers with Dr. Vogelstein; right?

17   A.      I have not enough knowledge about Vogelstein's

18   co-authors to say that or not.  I was just -- by

19   invoking him, I was making a point that the pathway from

20   normal tissue to malignant carcinoma is not solely due

21   to genetic factors, that I think environment --

22   Q.      But the large majority of cancers are caused by

23   genetic factors, having nothing to do with environmental

24   factors; right?

25   A.      I'm not sure I completely agree with that.

1          I think it's very hard to tease out the role of

2    the environment in carcinogenesis.  So I'm not --

3    without reviewing more articles there, I'm not sure I

4    would completely agree with that statement.

5    Q.      You haven't studied that specifically.

6    A.      No.  I -- you know, I -- the last thing I read

7    by Vogelstein was probably 1996 or 1997 because people

8    were very excited that he had worked out some genetic

9    pathways for colon cancer but --

10          MR. KERSCHNER:  I'm going to mark an article by

11    Vogelstein as the next exhibit to your deposition.  I

12    think we're up to 7.

13          (Exhibit Knopf-7 was marked for identification.)

14    BY MR. KERSCHNER:

15    Q.      It's an article titled "Stem cell divisions,

16    somatic mutations, cancer etiology, and cancer

17    prevention."

18          You see, looking at the article, it's written by

19    Dr. Tomasetti, Lu Li, and Mr. -- and Dr. Vogelstein?

20    A.      Yeah.

21    Q.      Okay.  And I want to take a look at the

22    abstract.  I think we can scroll down.

23          And if you look at the middle of the abstract,

24    it says, "The major role of R mutations," which they

25    refer to as replication errors --

```
 1              Are you with me?

 2    A.        Uh-huh.

 3    Q.        Do you see where I am?

 4    A.        Yeah.  Yeah.

 5    Q.        "The major role of R mutations in cancer

 6    etiology was supported by an independent approach, based

 7    solely on cancer genome sequencing and epidemiological

 8    data, which suggested that R" -- again, random errors --

 9    "are responsible for two-thirds of the mutations in

10    human cancers."

11              Do you see that?

12    A.        Yeah.

13    Q.        You don't have any reason to disagree with that,

14    do you?

15    A.        I'm not sure I would agree with that without

16    reading the whole study at length and reading their

17    references and forming an opinion.  I -- you know, I

18    don't -- I don't disagree with that that is written on

19    the abstract you're showing me.

20    Q.        But as part of your education and your medical,

21    you know, background, you have no specific reason,

22    sitting here, to disagree with that statement.

23    A.        I think in reviewing records for this case,

24    there were some pretty eloquent disagreements with this

25    paper.  I think it may have been in the deposition of
```

```
 1   Dr. Boyd, where he disagreed with this, and I thought
 2   what he said also made a lot of sense, so --
 3   Q.      So -- and you -- so you're relying on Dr. Boyd.
 4   You haven't done any independent analysis about that
 5   statement.
 6   A.      I haven't done any independent analysis either
 7   way.
 8   Q.      I want to just take a look a little further into
 9   the paper.
10   A.      Yeah.
11   Q.      Well, actually, strike that.
12   A.      I don't think all -- I don't think all cancer
13   biologists and epidemiologists agree with what's being
14   said here, by the way.
15   Q.      But you don't specifically, other than your
16   reliance on Dr. Boyd, have a reason to disagree.
17   A.      Well, I haven't had time to read the whole
18   paper.  I mean, if we want to take a break, it takes me
19   about an hour or so to read a paper, and then I'd have
20   to read the references.
21           I don't think that -- I mean, off the top of my
22   head, I'm not sure I completely agree with this
23   statement, no.
24   Q.      After you saw it in Dr. Boyd's deposition, you
25   didn't take the time to read it?
```

1    A.      No; because I was retained as a specific

2    causation expert, not a general causation expert.

3    Q.      Let's take a look at Page 4 of this on the

4    bottom.  And it says, "We calculated," that last

5    paragraph, "We next calculated the proportion of driver

6    gene mutations caused by E," which is environmental

7    factors, "H," which is hereditary, "in 32 cancer types,"

8    and then it references the supplemental materials.

9            Do you see that?

10   A.      Uh-huh.  Yes.

11   Q.      And it says, We considered those mutations not

12   attributable to E, environmental, or H, hereditary, to

13   be due to random mutation -- random error.  Excuse me.

14           Do you see that?

15   A.      Yes.  But how did he consider that it was not

16   attributable to environmental toxicities?

17   Q.      After reviewing Dr. Boyd's deposition, did you

18   look into that?

19   A.      No.  But this looks like a very interesting

20   paper.  I mean, I would --

21   Q.      Let's --

22   A.      You know --

23   Q.      Let's take a look at that supplemental table

24   that's referenced there.

25           You see it says, "tables S5 and S6"?

1    A.      Yes.

2    Q.      Okay.  So this is a large document.  It's the

3    supplemental materials for that same article.

4            Do you see that?

5    A.      Yes.

6            MR. KERSCHNER:  And we'll mark this as the next

7    exhibit to your deposition, which I believe is 9.

8            THE COURT REPORTER:  I believe that's 8.

9            MR. KERSCHNER:  Eight?

10           THE COURT REPORTER:  I believe that's 8.

11           MR. KERSCHNER:  Thank you.

12           We'll mark this as Exhibit 8 to the deposition.

13   BY MR. KERSCHNER:

14   Q.      And if we go --

15           (Exhibit Knopf-8 was marked for identification.)

16           MR. ROJAS:  It's 7, by my count, but, Rosemary,

17   I'm sure you've got a better count than me.  So maybe

18   later, if I have to introduce any exhibits, I'll need a

19   clarification about where we are.  So I'll take your

20   word for it that my count is off by one, I think.

21           MR. KERSCHNER:  We're also uploading them to the

22   exhibit share, so we can figure it all out at the end.

23   But that -- yeah, I think it is 8, but we'll figure it

24   out.

25

1    BY MR. KERSCHNER:

2    Q.      If you go to the last page, you'll see Table S6.

3    And if you go down about a little more than halfway

4    under "cancer type," you'll see non-Hodgkin's lymphoma.

5    A.      Uh-huh.

6    Q.      And then at the top there are a series of

7    different columns indicating the -- whether -- what

8    would have been the reason for the cancer.

9            So you see female environmental, female

10   hereditary, female R, right, which we've already said is

11   replication error?

12           Do you see that?

13   A.      Uh-huh.

14   Q.      And if you go towards the end, they do -- on the

15   far right, they do a both sexes.

16           Do you see that?

17   A.      Uh-huh.

18   Q.      So that's a combination of male and female?

19   A.      Yeah.

20   Q.      And if you look for non-Hodgkin's lymphoma --

21   A.      Uh-huh.

22   Q.      -- for both sexes under replication error, they

23   found that close to 96 percent of cancers were due to

24   the driver mutation caused by random mutations, random

25   error.

1          Do you see that?

2     A.     Yes.

3     Q.     And do you have any reason, sitting here today,

4     to disagree with that, 96 percent of cancers, of

5     non-Hodgkin's lymphoma, are basically due to random

6     mutation error?

7          MR. ROJAS:  I'm going to let him answer but I

8     just want to lodge a general objection to, you know,

9     asking him about a study that he hasn't reviewed about

10    general causation.

11         Doctor, if you can answer these questions,

12    please go ahead.

13         But it's not within the scope of his, as he

14    testified, of his expert opinion in this case, and we're

15    just jumping around from page to page in a study he

16    hasn't read.

17         MR. KERSCHNER:  Well, I'll just for the record

18    note that the doctor has said that he's relying on other

19    experts and relying on deposition testimony,

20    specifically he mentioned Dr. Boyd, that he read about

21    this study.  I'm going to ask him about it.  You know,

22    we can deal with those objections later.

23    BY MR. KERSCHNER:

24    Q.     So, Doctor, do you have any reason to disagree

25    that the random mutations or bad-luck mutations are

1    responsible for about 96 percent of non-Hodgkin's

2    lymphoma, according to Dr. Vogelstein and Tomasetti?

3    A.      Yes, I have reasons to disagree with that.

4    Q.      And what's your specific basis for disagreeing

5    with that statement?

6    A.      So I would really need to read this article for

7    hours and look at how they came up with that estimate

8    and then read the articles that they came up that

9    estimate with to see how they interpreted the

10   epidemiological literature.

11          I think I've had a conversation with a friend

12   who's a good friend of Vogelstein who has reviewed a lot

13   of the literature on pesticides and lymphoma who might

14   disagree with that point estimate.  He might call

15   Vogelstein and say, "How did you come up with that?"  It

16   might be a very interesting scientific endeavor.

17          I don't know -- you know, I don't know

18   Dr. Tomasetti.  I think I've seen several other expert

19   reports discounting this article and discounting this

20   theory.

21          I'd certainly, you know, in my interest as an

22   oncologist love to know more about why they think it's

23   such a high proportion of random genetic mutations.  And

24   I would like to know how many of the studies there had

25   patients who were exposed to Roundup, what year the

1    studies were.  Were they before 1996, when Roundup

2    wasn't used so much, or after 1996?

3          And then I think, you know, I'd be a little

4    skeptical because a lot of the studies on Roundup and

5    lymphoma did not pass Dr. Zhang's test, so are they only

6    relying on the six studies that she had?

7          I mean, it's just too complicated for me to give

8    you an answer sitting here without taking more time to

9    read it, but --

10   Q.     And you didn't do --

11   A.     -- I've not --

12   Q.     -- any of the things you've just said after

13   reading about this in Dr. Boyd's testimony; right?

14   A.     What's that?

15   Q.     After reading about this study in Dr. Boyd's

16   testimony, all the things you just mentioned that you'd

17   want to do, you didn't do any of that; right?

18   A.     As I said, I'm here as a specific causation

19   expert so I'm, in part, relying on the general causation

20   experts who felt that Roundup was a substantial cause in

21   non-Hodgkin's lymphoma.

22          I certainly am curious, and I wouldn't want to

23   say something I didn't believe in, so if Mr. Rojas feels

24   it's important for me to understand this aspect of

25   general causation in order to give his client a fair

1   trial, I might take the time to read it, but --

2   Q.      Right.  But it's just --

3   A.      -- sitting here today, I don't think I'm

4   prepared --

5   Q.      My question is simple.

6           After having seen, reviewed about this article

7   in Dr. Boyd's testimony, which you reviewed as part of,

8   you know, your basis for this case and your

9   understanding of general causation, did you do any of

10  the analysis you said you'd want to do about this study?

11  A.      I have not yet had the --

12          MR. ROJAS:  Object to the form.

13          THE WITNESS:  -- time to do any analysis about

14  this study because it's the first time I'm seeing it.

15  BY MR. KERSCHNER:

16  Q.      But you had read about it in Dr. Boyd's

17  testimony; right?

18  A.      You know, I think I read several expert

19  testimonies that discounted Dr. Tomasetti's studies.

20  Whether it was this one or other ones, I didn't read the

21  references because I did not spend the time to educate

22  myself to that degree of general causation in this case.

23  I was a specific causation expert only.

24          It's interesting, you brought it up.  It does

25  not change my substantive opinion that, more likely than

1   not, Roundup was a substantial factor in the causation

2   of this patient's non-Hodgkin's lymphoma.

3   Q.      You agree, then, that random mutations may have

4   been the sole cause of Ms. Salas's non-Hodgkin's

5   lymphoma?

6           MR. ROJAS:  Object to the form.

7           THE WITNESS:  I guess I would disagree, yeah.

8           I mean, I said, more likely than not, Roundup

9   was a substantial factor in causing her lymphoma, so if

10  I -- if I said it was the only cause, random genetic

11  mutations, I would be disagreeing with what I stated as

12  my opinion and I --

13  BY MR. KERSCHNER:

14  Q.      Well, it may have been.  I'm saying, you have no

15  reason to say it wasn't definitely; right?

16          MR. ROJAS:  I thought, David, you said the sole.

17          MR. KERSCHNER:  No.  I said it may have been the

18  sole, correct.

19          THE WITNESS:  This may be above my understanding

20  of legalese.

21          You know, I'm just going to say I thought, more

22  likely than not, Roundup was a substantial factor in

23  causing her non-Hodgkin's lymphoma, but the sole cause

24  of it could have been something I have no idea about.  I

25  mean, I don't think I'm really capable of speculating

1    that much.

2    BY MR. KERSCHNER:

3    Q.      You're not capable of speculating as to whether

4    or not it was due just to random mutation error.

5    A.      My opinion is that, more likely than not,

6    Roundup was a substantial cause in her non-Hodgkin's

7    lymphoma.

8          If she had never been exposed to Roundup, I'd be

9    more likely to say that it was a random genetic error.

10   But she was exposed, so in her case I can't necessarily

11   apply this or other levels of evidence to it.

12         I mean, if she wasn't exposed to Roundup with a

13   substantial amount of time and years, then might --

14   somebody might say, oh, it was just bad luck or

15   random -- you know, random mutations, assuming she

16   didn't have any other risk factors for lymphoma.

17   Q.      It's possible, though, that someone can have a

18   risk factor for non-Hodgkin's lymphoma that didn't

19   actually end up causing their lymphoma; correct?

20   A.      I mean, the way I think about causality is much

21   more Bayesian than pure cause and effect, and I don't

22   know how to distinguish each different factor.

23         I mean, some people say, oh, you can compare the

24   relative risks of each thing.  I'm intrigued by this

25   article and such, but I don't know that it can change my

1  opinion substantively about this particular case.

2  Q.     And we can pull the article down.  I didn't mean

3  to focus only on the article.

4         I'm just asking you, as part of your

5  case-specific opinion, there are risk factors for

6  certain types of non-Hodgkin's lymphoma, that a person

7  can have those risk factors, but that risk factor

8  necessarily wasn't the cause of their lymphoma; correct?

9  A.     But the way you're saying that, I can't ever in

10 life say that this was the sole cause unless for like in

11 Newtonian mechanics, because there's always some

12 randomness to multifactorial causality.

13        So it's hard for me to say that this was the

14 sole cause or it was purely genetic mutations in this

15 case.  All I'm saying is that I thought Roundup was a

16 substantial factor in causing her non-Hodgkin's

17 lymphoma.

18 Q.     So is it fair to say that for any individual

19 patient or plaintiff whose case you're reviewing, if

20 they have what you consider to be enough exposure to

21 Roundup, you would then consider Roundup as the

22 substantial cause of their non-Hodgkin's lymphoma?

23        MR. ROJAS:  Object to the form.

24        THE WITNESS:  Well, I think I looked at other

25 risk factors.  If no other risk factors are associated

1    with that person's non-Hodgkin's lymphoma -- I mean, if

2    somebody had a virus that was strongly linked to

3    non-Hodgkin's lymphoma, I might say, oh, it could be

4    this virus more likely than the Roundup.

5           If somebody had no risk factors at all that I

6    know of, then I'd be more inclined to say it was a

7    purely random genetic event.

8    BY MR. KERSCHNER:

9    Q.      But if someone was exposed to Roundup,

10   sufficient exposure to Roundup, as part of your

11   analysis, you would never rule out Roundup as the cause

12   of their -- as the substantial contributing factor to

13   their non-Hodgkin's lymphoma; correct?

14          MR. ROJAS:  Object to the form.

15          THE WITNESS:  I'm not sure I would say never.

16   I'm just talking about this specific case right now.

17          But I think if somebody had a substantial

18   exposure to Roundup, that it is a substantial risk

19   factor for causation of that person's non-Hodgkin's

20   lymphoma, assuming they had no other risk factors.

21          MR. KERSCHNER:  We can -- can we take a break

22   now?

23          Let's go off the record.  I need to figure out

24   timing.

25          VIDEO OPERATOR:  Time is 11:04 a.m.

 1          We are off the record.

 2          (Luncheon recess, 11:04-11:54 a.m.)

 3                    AFTERNOON SESSION

 4          VIDEO OPERATOR:  Time now is 11:54 a.m.

 5          We are back on the record.

 6    BY MR. KERSCHNER:

 7    Q.     Dr. Knopf, I'm going to go to your report.

 8          Do you have a copy of it with you or do you want

 9    us to --

10    A.     Yes, I do.

11    Q.     -- share?  Okay.

12          So then because we're going to reference the

13    report and maybe some other documents, this way, you can

14    keep the report.

15          So I want you to turn to what is on Page 8 of

16    your report.

17    A.     Okay.  I'm there.

18    Q.     And you have a discussion on the bottom half of

19    Page 8 regarding IARC.

20          Do you see that, "A landmark event"?  Do you see

21    that?

22    A.     Yes.

23    Q.     And then below that you talk about the

24    difference between IARC and the EPA study.

25          Do you see that?

1   A.       Yes.

2   Q.       When you say "EPA study," what are you referring

3   to?

4   A.       I think the EPA came up with a separate

5   conclusion that they were less impressed with Roundup as

6   a cause of non-Hodgkin's lymphoma than the IARC report.

7   I don't --

8   Q.       Is there a specific document, though?  When you

9   say "the study," EPA has come out with several documents

10  on this.  Is there a specific one you're referring to or

11  simply just the EPA's body of evidence on it?

12  A.       I think the EPA's body of evidence.  I -- there

13  may be a specific document the EPA put out, like a

14  monograph, but I'm not aware of it at this point in

15  time.

16  Q.       Have you reviewed any documents from the EPA

17  specifically regarding their view on Roundup and

18  non-Hodgkin's lymphoma?

19  A.       No, I've not.

20  Q.       So when you discuss on Page 8 the difference

21  between the conclusion of the IARC study and EPA, you

22  are doing that by relying on someone else to form that

23  opinion?

24  A.       At that point, yes.  This is a specific expert

25  report I'm preparing, and so at that point I'm relying

1   on general expert opinion.

2           As I said, I read the Benbrook study after I

3   wrote this report that discusses the differences between

4   the EPA and the IARC, so if I was writing another

5   version of that report, I would put that article in and

6   I might highlight some of that because I think he did a

7   good job of explaining why they reached different

8   conclusions.

9   Q.      But when you wrote your report, what was the

10  basis for your discussion on this paragraph here on the

11  bottom of Page 8 and then going into Page 9 regarding

12  the differences between IARC and EPA?

13  A.      I think rather than read the formal EPA study, I

14  probably read things on the Internet regarding the

15  Roundup case that I did not think I had the authority to

16  quote.  But I'm relying, in part, on some of the general

17  expert reports that I was reviewing at that time.

18  Q.      And which -- so there are two things.  You said

19  things you found on the Internet that you didn't have

20  authority to quote.

21          What are those things?

22  A.      I wouldn't recall at this point in time, but I

23  can try and do a search and reconstruct them.

24  Q.      You don't need to do that now, but it's

25  something you can do if needed?

1    A.       Yeah.  I think it's in -- it's in some of the

2    other articles that I may have quoted that discussion,

3    the difference between the IARC report and the EPA

4    report, and it may have been in some of the other expert

5    reports I reviewed, and I can see what they reference

6    there.  But --

7    Q.       And is the difference between the IARC study and

8    the EPA's analysis important to your case-specific

9    discussion regarding Ms. Salas?

10   A.       So my case-specific discussion here is that I'm

11   saying, more likely than not, Roundup was a substantial

12   causative factor in her non-Hodgkin's lymphoma.

13          And at this point, I didn't know how much of the

14   general causation I needed to know.  It's -- it's -- I

15   think that I can rely on other general causation

16   experts, and I agree with them and don't disagree with

17   them, and the IARC report was convincing to me and, so

18   far, I have no reason to disbelieve the IARC reports.

19   No, I don't think I can -- I'm not sure.  Can you repeat

20   the question?

21   Q.       I was just asking if in part of your analysis

22   the IARC's conclusions and the difference between IARC

23   and EPA, as you discuss in your report, is part of your

24   opinion as you've dictated it in this report.

25   A.       So I think the IARC -- IARC report was, you

1    know, when a lot of people found out about Roundup and

2    lymphoma because it was a very public event.  And so I'm

3    relying on that and their level of causality as one of

4    the general elements of causality between Roundup and

5    non-Hodgkin's lymphoma.

6         The EPA report some might say has a different

7    conclusion, and so I just -- I think I wanted to

8    acknowledge that I'm not believing that -- you know, if

9    I believed the EPA report was right and the IARC report

10   was wrong, I would not have taken the case.  So I think

11   that's all I'm trying to say there.

12   Q.     And you specifically yourself haven't actually

13   read all of the EPA reports; right?

14   A.     I haven't read all the EPA report thoroughly, I

15   haven't read the IARC report as thoroughly as I would

16   like, no.

17   Q.     And you rely on a different general causation

18   expert to point out the differences between IARC and

19   EPA, as you've articulated in these two paragraphs;

20   right?

21   A.     Yeah, I am relying on --

22   Q.     And --

23   A.     -- expert --

24   Q.     And who are those experts?

25   A.     As I -- when I -- when I was writing this, I

1    think I had the opportunity to review Chadi Nabhan's

2    expert report, Dr. Al Neugut's expert report, an expert

3    report by a different oncologist named Andreadis who's

4    here in San Francisco.

5         I don't know if I had read Weisenburger's

6    general expert report at that time but I had definitely

7    read his 2021 article from a cancer, leukemia, lymphoma,

8    myeloma journal, and I think there he might have said

9    that the EPA report was not evidential compared to the

10   IARC report, but I wouldn't know unless I pull up the

11   article and read it, sir.

12   Q.    And looking at this paragraph here, in that

13   first sentence you say one of the key differences is

14   that the EPA study evaluated pure glyphosate and not a

15   formulation via the diet in the general population,

16   whereas Roundup is a formulated version of glyphosate

17   which could markedly enhance the toxicity of exposure

18   via surfactants that facilitate the movement of

19   glyphosate through the epidermis and ultimately through

20   cell membranes.

21        Did I read that correctly?

22   A.    Yes.

23   Q.    And where do you base your opinion that the EPA

24   study only evaluated pure glyphosate, as opposed to its

25   formulation?

```
 1   A.      You know, I should have referenced the Benbrook

 2   article.  So I think that's where I got that concept

 3   from, and so I should have put the Benbrook article in

 4   the references and referenced it there.

 5   Q.      But to be clear, you hadn't read the Benbrook

 6   article at the time you wrote this report; right?

 7   A.      Think I may have.  I think that's the conclusion

 8   I came away from reading his article, so I may have read

 9   it at the time of this report and forgot to put it in

10   the reference list.

11   Q.      So I want to -- are you aware that EPA has

12   reviewed epidemiologic studies that looked at the use of

13   formulated Roundup products?

14   A.      I believe they have, yes.

15   Q.      So is it still your opinion that EPA did not

16   consider formulated Roundup in determining that Roundup

17   does not cause NHL in humans?

18   A.      I don't know exactly which case-control and

19   cohort studies the EPA reviewed, right, but I think

20   their animal studies did not use -- I think their animal

21   studies measured pure Roundup.

22           And I wish I could remember all the details.

23   You know, I think their conclusions were more like

24   Roundup that they found in humans like you and me,

25   rather than people who are using Roundup in farms, in
```

1    occupational situations, to say that, you know, the

2    levels of Roundup that you and I have are considered

3    safe in terms of not being linked to non-Hodgkin's

4    lymphoma.

5           So I'm not exactly sure what epidemiologic

6    studies they reviewed.  If you pull up the EPA report, I

7    can try and give an estimate now, but I'd have to really

8    read it pretty closely to understand that.

9    Q.     Let's break it down a little bit.

10          Just to be clear, you talked about the Roundup

11   that you and I would use versus, I think you said

12   occupational situations.

13   A.     Well, no, not that --

14   Q.     Ms. Salas -- and I know you haven't used

15   Roundup.

16   A.     Yeah.

17   Q.     So let me be clear.

18          I think you're referring to residential use

19   versus agricultural use; is that right?

20   A.     I think -- and I -- I think they're talking

21   about Roundup levels in people, in general, rather than

22   Roundup levels in people who are using the product, so

23   like the general safety of Roundup in the general

24   population versus the specific population who's using

25   it, because we all have some exposure to Roundup by the

 1    foods we eat.

 2         So if they measured the Roundup level in me and

 3    you, presumably, it would be a lower exposure over our

 4    lifetime versus somebody who was actively using the

 5    product.  I think that's what I mean to say.

 6         MR. KERSCHNER:  Let's go ahead, and I want to

 7    mark the EPA's December 2017 OPP report.  And that will

 8    become our Exhibit 9.

 9         (Exhibit Knopf-9 was marked for identification.)

10    BY MR. KERSCHNER:

11    Q.    Have you seen this document before?

12    A.    No, I don't think I've seen this document

13    before.

14    Q.    I'm going to take you to Page -- and it's rather

15    long so I will try and keep this quick -- Page 138.

16         And, again, if you look on -- this is

17    Section 6.6; right?

18    A.    Yeah, I see 6.6.

19    Q.    And if you -- and that is titled "Evaluation of

20    Cancer Classification per the 2005 EPA Guidelines for

21    Carcinogen Risk Assessment"?

22    A.    Yes.

23    Q.    And this is basically talking about what the EPA

24    did to determine the carcinogen risk assessment?

25    A.    Yes.

1  Q.      And if you look at Page 139 now, which is still

2  part of that section.

3  A.      Where it says, "five classification."

4  Q.      No.  The next page.  Sorry.

5  A.      Yes.

6  Q.      I just wanted to orient us.

7          And you see they talk about the epidemiologic

8  studies; right?

9  A.      Yes.

10  Q.      And you have no reason to disagree that they

11  reviewed epidemiologic data; right?

12  A.      Well, I'm taking their word on it that they

13  reviewed epidemiologic study, yeah.

14  Q.      But you haven't -- you don't know one way or the

15  other because you've never reviewed what they have done;

16  right?

17  A.      Well, they say in epidemiologic studies there

18  was no evidence of association between solid tumors,

19  leukemia, or Hodgkin's disease.

20          I actually think that's probably true, with the

21  exception of hairy cell leukemia in one of those

22  studies, and there is a study that does link it to

23  multiple myeloma.  So I'm not sure I agree with those

24  statements per se.

25  Q.      And then they continue regarding non-Hodgkin's

 1    lymphoma; right?

 2    A.      Right.

 3    Q.      And -- but you would agree that EPA did actually

 4    review studies relating to the formulated Roundup

 5    product; correct?

 6            MR. ROJAS:  Object to form.

 7            THE WITNESS:  In the epidemiologic studies in

 8    human, presumably, yes.

 9    BY MR. KERSCHNER:

10    Q.      So your statement in your report that EPA only

11    reviewed the technical glyphosate and not the formulated

12    product is not correct; right?

13    A.      And then --

14            MR. ROJAS:  Sorry.  I had a -- sorry.  I had a

15    form objection that -- to the one -- not to that

16    question but the one prior.  Just want to note it for

17    the record.

18            Sorry.  Go ahead.

19            THE WITNESS:  I think I was referring to the

20    animal studies that they reviewed.  That's where I saw

21    the discrepancy being highlighted by Mr. Benbrook in his

22    report.

23            MR. KERSCHNER:  Let's take a look, then, at the

24    next exhibit we'll mark, which will be the 2016 response

25    from PRD to comments on glyphosate proposed interim

1    decision.  This is another EPA document written in 2020.

2           (Exhibit Knopf-10 was marked for

3    identification.)

4    BY MR. KERSCHNER:

5    Q.     Again, you've not seen this; correct?

6    A.     No, I've not --

7    Q.     I think we -- hang on a second.  I want to make

8    sure we're on the right document here.

9           No.  I think we want the 2020.  Hang on.  I'll

10   pull it up.

11          Right.  Okay.  Sorry about that.

12          So have you seen this document before?

13   A.     No, I have not seen this document before.

14   Q.     Okay.  And this is titled "Response from the

15   Pesticide Re-evaluation Division (PRD) to Comments on

16   Glyphosate Proposed Interim Decision."

17          Do you see that?

18   A.     Yes.

19   Q.     And if you look at the first paragraph, this is

20   based on EPA's assessment after a public comment period

21   regarding its decisions on glyphosate and non-Hodgkin's

22   lymphoma?

23   A.     I see that paragraph, yes.

24   Q.     So if you take a look on Page 6 of the document,

25   the Letter G, it says [as read], "Comments about

1    toxicity of different formulations, including technical

2    grade, active ingredient, toxicity of inert compounds

3    and surfactants."

4         Do you see that?

5    A.    Yes.  The intro paragraph.  Yes.

6    Q.    And you understand, then, that the active

7    ingredient, inert ingredients, surfactants would make up

8    what is in Roundup; right?

9         MR. ROJAS:  Object to the form.

10        THE WITNESS:  I think that glyphosate is

11   attached to a surfactant in Roundup preparation, yes.

12        MR. KERSCHNER:  Right.

13   BY MR. KERSCHNER:

14   Q.    But other than what's mentioned here, you don't

15   know about any other ingredients in Roundup; right?

16        There's the active, there's the inert, and then

17   there's the surfactant; right?

18   A.    I think the surfactant is attached to the

19   glyphosate molecule, if I'm reading Benbrook's report

20   right.  I assume there are inert substances to the liver

21   and other things.  Yeah, I will take your word for that.

22   Q.    And then there is water.

23   A.    Yes.

24   Q.    Don't want to forget water.

25   A.    Yes.

1  Q.      Can't forget the water.

2          So if you look at the comments, it says [as

3  read], "Several commentators expressed that glyphosate

4  formulations are more toxic than glyphosate alone and

5  questioned toxicity -- and questioned the toxicity,"

6  excuse me, "of inert ingredients and the lack of

7  transparency for inert ingredients and other

8  contaminants in pesticide products."

9          Do you see that?

10  A.      Yes.

11  Q.      And the EPA responded to that; right?

12  A.      Yes.  Paragraph ii.

13  Q.      And if you look at what I think is the second

14  sentence, they say, "The agency has evaluated the hazard

15  potential (i.e., toxicity) of glyphosate and any inert

16  ingredients with a battery of toxicity data from a

17  multitude of studies throughout the risk assessment

18  process."

19          Did I read that correctly?

20  A.      Yes.

21  Q.      And then they continue [as read], "For detailed

22  responses to comments regarding EPA's evaluation of

23  glyphosate technical grade active ingredient and the

24  toxicity of inert compounds including surfactants, see,"

25  and they provide a document that you can review for more

 1   information; right?

 2   A.      Right.

 3   Q.      So you understand that EPA actually did review

 4   the formulated product for Roundup in toxicity studies;

 5   correct?

 6   A.      So I -- I would have to read the article by

 7   Benbrook right after reading this and see, because he

 8   seems to be disagreeing with Paragraph ii.

 9   Q.      Right.  But he -- but -- so then you have no

10   basis to support your opinion other than one article by

11   Benbrook; correct?

12   A.      Well, again, I'm asked on a specific causation

13   here, not general causation.

14           For me to give an answer to why this differs

15   from Benbrook, I would probably read this whole document

16   closely, read the Benbrook document, send an email to

17   Benbrook saying, "how come you're saying something

18   different than this paragraph here," and try and get at

19   the truth that way.  But --

20   Q.      But you didn't do any of that before writing it

21   in your expert report; right?

22   A.      No.  I relied on the general experts' opinions

23   regarding this matter.

24   Q.      You also say that, if you continue, that EPA --

25   sorry.

 1          If you go on the next paragraph [as read], "IARC
 2   considered a greater adversity of routes of exposure
 3   including published studies that reflect applicator
 4   exposure to formulated GBHs."
 5          Do you see that?
 6   A.     Yes.
 7   Q.     And where do you base your opinion that EPA --
 8   excuse me -- that IARC considered a greater diversity of
 9   routes of exposure?
10   A.     Largely, I think from the Benbrook article and
11   from my knowledge of the IARC report.
12   Q.     And which specific routes of exposure did IARC,
13   to you, consider that EPA did not?
14   A.     I'm not sure of the answer to that right now.  I
15   would be happy to look it up for you.
16   Q.     Well, what routes of exposure do you think
17   exist?
18   A.     Well, I think there's the exposure that people
19   who are using it a lot have, dermal routes and
20   inhalational routes with the active ingredient as well
21   as a surfactant.  Those would be the main routes of
22   exposure, I think.
23   Q.     And so --
24   A.     I'm not --
25   Q.     Is it your testimony that EPA did not consider

1   dermal or inhalation risk?

2   A.      I'm not sure why Benbrook said that, and I would

3   have to read his article again to give you a really

4   better answer.

5   Q.      Right.  But I'm just focused on what you wrote

6   in your report and your opinions here, not Benbrook.

7           So when you wrote that IARC considered greater

8   diversity of routes of exposure, you didn't know which

9   routes of exposure IARC considered versus the EPA;

10  correct?

11  A.      I'm assuming they considered, for sure, dermal

12  and inhalational exposure by people who are working in

13  the field.

14          I don't know the nuances.  I thought what was

15  being referred to in the other expert opinions was that

16  the EPA was looking more at how much Roundup people end

17  up with in their body rather than how much Roundup

18  people on the farm are exposed to, and that might have

19  been a difference.

20  Q.      Well, would you agree that the amount of Roundup

21  that gets absorbed into your body is more relevant to a

22  question of whether or not it causes cancer than just

23  the amount of Roundup that you spray and doesn't get

24  into your body?

25          MR. ROJAS:  Object to the form.

```
 1          THE WITNESS:  No.  I mean, I think in this case,
 2   you know, somebody, Dr. Lawlor, took an occupational
 3   exposure history to see how much Roundup she was using.
 4   And she's exposed to a lot more Roundup by using it and
 5   spraying it in her lifetime than I am, eating the food
 6   that comes from the farm that somebody else spilled --
 7   you know, exposed to.
 8          MR. KERSCHNER:  All right.
 9   BY MR. KERSCHNER:
10   Q.     So it's your testimony that EPA's assessment is
11   relevant, then, just to dietary exposure, as opposed
12   to using it.
13          MR. ROJAS:  Object to the form.
14          THE WITNESS:  I'm not sure I can say that
15   definitively here without reviewing the studies more
16   closely.
17   BY MR. KERSCHNER:
18   Q.     Well, that's what you wrote in the next
19   sentence.
20   A.     Yeah.  I think in that, I am relying on what
21   Mr. Benbrook said in his article.  And I think
22   epidemiology is complicated.
23          And if I was going to give you a definitive
24   answer there -- and, again, I'm not a general causation
25   expert, I'm a specific causation expert in this case --
```

 1    I would take the time to read his article and email him

 2    and say, "What basis do you have for this."

 3            So I think deposing him would probably give you

 4    a better explanation of all of that than deposing me at

 5    this point.

 6    Q.      He has been deposed.

 7            Have you read any of Dr. Benbrook's deposition?

 8    A.      I think I read it, but not as closely as I would

 9    like.

10    Q.      And so you actually have no basis for your

11    statement that EPA's assessment is relevant to dietary

12    exposure, whereas, IARC's assessment encompasses

13    exposure to glyphosate application?  Is that fair?

14    A.      I think it's fair to say that when I wrote that

15    in my specific causation report, I'm relying on the

16    opinions of other experts who have studied that element

17    of the epidemiology closer than me.

18    Q.      Right.  But as part of your methodology, you

19    can't tell me anything about what the EPA reviewed and

20    what assessment they looked at versus IARC; right?

21    You're just simply working -- you're just simply relying

22    on what someone else said.

23    A.      So my understanding is that the EPA was more

24    involved in looking at the amount of exposure people

25    have to glyphosate in their body, people like you and me

1    who are not spraying it.

2         Now, if I'm wrong about that, that may change

3    things a little. But if I'm right about that and the

4    IARC looked more closely at the studies where patients

5    had direct exposure to glyphosate in farming

6    communities, then I would say the IARC study is more

7    relevant to this particular case than that study, but I

8    would want to verify for sure that the EPA didn't look

9    at the exact same exposure patterns as the IARC.

10   Q.   And you said if you were wrong about that, that

11   may change things.

12        How would it change things?

13   A.   I would take the time to contact Dr. Benbrook

14   and say, "Why do you say these studies are different?"

15   And then I'd want to convince myself that, you know, the

16   two studies are substantially different.

17        I think Weisenburger's article that I read in

18   2021 may have referenced this. I would read that again.

19   I would, you know, read Dr. Benbrook's deposition again

20   and see how he answered that question and I would try

21   and get, you know, a better answer for you to the

22   question you just asked.

23   Q.   And you keep talking about farming communities.

24        Was Ms. Salas part of a farming community?

25   A.   No. But I think one of the, you know, elements

 1    of causality is dose-response.  And I think that a

 2    farmer who uses glyphosate all the time, every year,

 3    with a large body of crops, all other things being

 4    equal, would have a higher probabilistic development of

 5    lymphoma related to Roundup than Ms. Salas, who was

 6    using it in a more residential section.

 7            But, again, relying on Dr. Lawlor's report, she

 8    had a substantial use of Roundup, certainly a lot more

 9    than I ever have.

10    Q.      I'm sorry.  Whose report?

11    A.      I think it's Dr. Lawlor who was the toxicologist

12    here.

13            THE WITNESS:  Is that right, Mr. Rojas?

14            MR. KERSCHNER:  Unfortunately, the way this

15    works is I'm just asking you the questions.

16    BY MR. KERSCHNER:

17    Q.      Could you spell the name?  Sorry.  There have

18    been several reports.  I just want to make sure I

19    understand the right person.

20    A.      I reviewed a toxicologist's report for this

21    study.  I reviewed an Excel spreadsheet.  I incorporated

22    some of those numbers in my study.

23            And although she's not having the exposure level

24    of somebody who ran a farm for 30 years and used Roundup

25    a hundred days a year, she had a substantial enough

 1  Roundup exposure that my conclusion still stands.

 2  Q.      And what is a substantial enough exposure to

 3  Roundup for your conclusion to still stand?

 4  A.      So I don't think there's any threshold dose to a

 5  potential carcinogen.  I think, you know, obviously, the

 6  lower the dose, the lower the probability that it would

 7  be a substantial cause in causing lymphoma.

 8          I think in the Zhang study, which did some work

 9  about dose-response in the meta-analysis, that using it

10  more than twice a year was one definition of substantial

11  exposure.  And I think Ms. Salas used it more than twice

12  a year.

13  Q.      Let's go back to the EPA report.  And this is, I

14  think this is Exhibit 9, the 2017 report.  Go to

15  Page 15.  Give me one second to get there.  Okay.

16          And if you'd take a look, this is Section 1.4,

17  "Summary of Exposure Profile in the United States."

18          Do you see that?

19  A.      Yeah.

20  Q.      And if you go to the third paragraph.

21  A.      Yes.

22  Q.      Do you see that?

23  A.      Yeah.

24  Q.      Second sentence begins [as read], "Since there

25  are registered uses of glyphosate that may be used in

1    residential settings, residential handlers may be

2    exposed to glyphosate during application.  Exposure may

3    also occur from entering non-occupational areas that

4    have been previously treated with glyphosate.

5    Occupational/commercial workers may be exposed to

6    glyphosate while handling pesticides prior to

7    application (mixing it and/or unloading) during

8    application, or when entering treated sites.  The agency

9    considers all of the anticipated exposure pathways as

10   part of their evaluation for human health."

11          Did I read that correctly?

12   A.     Yeah, you did a great job reading that

13   paragraph.

14   Q.     Thank you.

15          So does that change your opinion that EPA did

16   not consider all potential exposure pathways?

17   A.     I think to answer that question I'd really have

18   to read the report closely and see what they meant by

19   how well they considered all those opinions, what

20   studies they included and what studies they didn't

21   include, and compare and contrast it to the IARC report,

22   make sure they all included the same studies, they

23   interpreted them the same way.

24          So, yes, they are saying they did that but I

25   don't know that they did the exact same analysis as the

1    IARC and I don't know why they reached different

2    conclusions.

3    Q.     Well, you say EPA's assessment is relevant to

4    dietary exposure.

5           They just told you that they look at more than

6    just dietary exposure; correct?

7    A.     They do; but I'm only reading one paragraph of

8    this here so I'm not looking at how they did their whole

9    analysis.

10   Q.     Right.  But your conclusion that it was only

11   relevant to dietary exposure is based simply on your --

12   your -- on what, I guess?

13          If you can't say that they didn't do it by

14   looking at the report, how can you say that they only

15   looked at dietary exposure?  It just doesn't make sense

16   to me.

17          MR. ROJAS:  Object to the form.

18          I don't think that's what the report says.

19          THE WITNESS:  I think I'm going to have to rely

20   on the other experts or read the report more closely and

21   get back to you.

22   BY MR. KERSCHNER:

23   Q.     So if they've got it wrong, then you've got it

24   wrong, basically.

25          MR. ROJAS:  Object to the form.

 1          THE WITNESS:  I didn't say that.

 2   BY MR. KERSCHNER:

 3   Q.     Well, you're relying on the other experts.  So

 4   if what they're saying isn't accurate, then, by

 5   definition, what you've said here wouldn't be accurate

 6   either.

 7          MR. ROJAS:  Object to the form.

 8          THE WITNESS:  In order -- in order to give you a

 9   full answer, I would have to read this whole report and

10   give you a better answer than I'm able to give without

11   reading this whole report.

12          MR. KERSCHNER:  Right.

13   BY MR. KERSCHNER:

14   Q.     And you analyzed the EPA report in your report

15   without actually reading it; right?

16   A.     I am relying in my report on general causation

17   experts because I was asked to write a specific report.

18          What you have shown me yet has not changed my

19   opinion that I thought it was a substantial element in

20   causing this patient's non-Hodgkin's lymphoma because I

21   had the ability to rely on expert reports.

22          I cannot produce to you all of the elements of

23   that looking at this one paragraph.  I don't -- you

24   know, they've said this in one paragraph but I read

25   medical articles and journal articles where they say

1  this and then you read a little bit later and you have

2  to see, well, how did they actually do this methodology

3  for it, you know.

4       I think one thing that I remember Benbrook

5  saying was that some of the animal studies were with

6  pure glyphosate rather than glyphosate surfactant and

7  that that may have changed the animal studies'

8  interpretability because the surfactant enables the

9  substance to get into the cells where the cancer is and

10  that may have biased the conclusions there.

11  Q.      And you're just taking Benbrook's word for it;

12  right?

13  A.      I think I'm also taking the word of the other

14  expert reports that I reviewed in formulating this

15  report.

16  Q.      Did you look at any of the expert reports for

17  the defense on this topic?

18  A.      No.  I didn't have those until more recently.

19  Q.      So you only looked at one side of the story to

20  write your report; right?

21       MR. ROJAS:  Object to the form.

22       THE WITNESS:  No.  I think the expert reports I

23  read all looked at the total body of evidence and all

24  had, for some reason, discounted the EPA report compared

25  to the IARC report.  They had also brought up problems

1   with the AHS study.

2          I wish I understood it a lot, lot better so I

3   could give you a very eloquent answer, but I am relying

4   on the general experts in causation who said that they

5   felt the IARC report was a better scientific analysis

6   than the EPA report.

7   BY MR. KERSCHNER:

8   Q.     Where in your expert report do you say that

9   you're relying on the general causation experts and cite

10  to their report?

11  A.     I don't know that I'm saying that per se.

12         I discussed it with the attorneys as I was

13  preparing the report and they clarified that I was a

14  general expert -- not a general expert but a specific

15  causation expert.

16         MR. ROJAS:  And, again, Dr. Knopf, I -- you can

17  answer Mr. Kerschner but be mindful not to talk about

18  substantive conversations.

19         THE WITNESS:  Yeah.

20         I don't know in my report that I wrote

21  specifically that I am, in part, relying on other expert

22  opinions in formulating my general causation statements

23  in my report.

24  BY MR. KERSCHNER:

25  Q.     Instead, you just recaptured what those experts

1  said in your report as part of your opinion; right?

2  A.     No, I didn't say that.  I read these studies to

3  some extent and convinced myself that what they were

4  saying was true.

5  Q.     Well, you just -- you have two paragraphs on the

6  EPA and you didn't read the EPA, so that information

7  came from somewhere; right?  It came from the expert

8  reports that you didn't cite; right?

9  A.     And it probably came from the Benbrook article,

10  which I'm sorry I didn't cite.

11  Q.     Right.

12  A.     I'll certainly add it to --

13  Q.     So what you did is you just took what you read

14  in the Benbrook article and you put it into your report;

15  right?

16  A.     No.  I read the IARC report.  I didn't read the

17  EPA report fully, I read about the EPA report.  I read

18  other general experts' opinions that the EPA report did

19  not trump the IARC report.  And that's what I wrote in

20  my article.

21  Q.     Right.  You took what the other experts said

22  about the EPA, the other litigation experts, right, the

23  other -- and you took what they said about the EPA and

24  you put it into your report; right?

25  A.     I think I'm putting in what's in the Benbrook

1  article, which I didn't quote in my bibliography there

2  rather than --

3  Q.      Right.

4  A.      You know, so I'm sorry I --

5  Q.      And Benbrook is a paid expert in this

6  litigation; right?

7  A.      He could be a paid expert in this litigation.  I

8  don't think that discredits my belief that what he's

9  writing is accurate.

10  Q.      I'm just asking, I'm just trying to figure out

11  what you did here.  It sounds like you took

12  information -- you keep talking about reports, then

13  Benbrook; right?

14          So you have information about the EPA in your

15  expert report which is the basis of your opinions.  You

16  didn't read the EPA, so it came from somewhere.

17          So you took the information from Benbrook's

18  article and you put it into your expert report; right?

19  A.      I have read many of the reports in here, not all

20  of them to the same extent.

21          I read Benbrook's article, which was discussing

22  why the EPA report was different than the IARC report.

23  I read several general causation experts which differed

24  from the -- which discussed why the IARC report was

25  different from the EPA report.

1       I did not take the time to read the full EPA

2   report and the full IARC report at the time of this

3   article to make a better set of paragraphs there.

4       I was not asked to be a general causation expert

5   in this case so I did not write a long, long, long

6   general causation expert with all the pros and cons of

7   each study.

8   Q.    I'm not -- I'm not saying that that's what

9   should happen.  I just need to understand, because you

10  said Benbrook and a number of experts.  I just want to

11  make sure the record is clear.

12      You took information from the Benbrook article

13  and other experts for the plaintiff in this litigation,

14  what they discussed about the EPA, and that's what you

15  put in your report as the basis of these two paragraphs

16  on Pages 8 and 9; right?

17  A.    I would say that when you write a scientific

18  article or any article and you read somebody else's full

19  review article with their references and you've read

20  three different full articles with their references,

21  that sometimes you will write a paragraph that says what

22  they have said.

23      And I'm sorry I didn't read through -- reference

24  their exact references on this account, but this is more

25  opinion rather than references because I don't know that

1    all the expert reports took the time to write an article

2    comparing and contrasting the EPA report to the IARC

3    report.

4          I think that some of the articles that I quote

5    which I read, such as the Zhang meta-analysis, or some

6    of the commentaries on the case controls did that but I

7    did not cite specific references in this.

8    Q.    Right.  I understand what you're saying, that

9    you took their -- that you're relying on their opinions,

10   but I just need to understand exactly who that is.

11         It's Benbrook and other plaintiff experts in

12   this case.  Those are the opinions that you relied on to

13   make paragraph -- these last two paragraphs on Pages 8

14   and 9; right?

15   A.    Yes, they are plaintiff experts in this case.

16   Q.    Thank you.

17         And are you aware that the EPA has reviewed over

18   63 epidemiologic studies, 14 carcinogenicity studies,

19   and nearly 90 genotoxicity studies on glyphosate?  Did

20   you know that?

21   A.    I don't know those exact numbers but I -- I

22   believe you when you say that, yes.

23   Q.    And that's certainly more than you reviewed;

24   right?

25   A.    Yes.

1  Q.      You would agree that the EPA has reviewed more

2  information on Roundup and glyphosate than you have;

3  right?

4  A.      Yes.  How many studies did the IARC review?

5  Q.      I'm just asking you about EPA.  We can -- we can

6  easily --

7  A.      Yes.

8  Q.      -- get into that comparison, if you'd like, but

9  I'm just asking you --

10 A.      The EPA --

11 Q.      -- about the EPA.

12 A.      The EPA committee who was studying the general

13 nature of Roundup and it's related to non-Hodgkin's

14 lymphoma committee, which was made of many people, which

15 had a very long amount of time to review this, reviewed

16 more studies than I did, yes, that is true.

17 Q.      And you disagree with the EPA's ultimate

18 conclusion, correct, that Roundup -- that the available

19 data does not support carcinogenic process for

20 glyphosate; right?

21 A.      I am disagreeing with that opinion, yes.

22 Q.      And you understand that that opinion is shared

23 by several regulatory agencies around the world?

24 A.      Which other regulatory agencies?

25 Q.      I -- did you know that Health Canada has said

1   that glyphosate is not genotoxic and is unlikely to pose

2   a human cancer risk?

3   A.      Well, I think agencies and epidemiologists are

4   entitled to differences of opinions.  That does not

5   change my opinion that it was a substantial factor in

6   causing this patient's non-Hodgkin's lymphoma.

7   Q.      I didn't ask you to change your opinion; I just

8   asked you if you were aware of Health Canada's

9   conclusion on the issue.

10  A.      I am not sure if I was aware of Health Canada's

11  conclusion on the issue.

12  Q.      Did you review any information or any

13  publications from Health Canada on this topic?

14  A.      No, I did not review anything from Health Canada

15  on this topic.

16  Q.      And it's fair to say that you disagree with the

17  conclusion of Health Canada that glyphosate is not

18  genotoxic and is unlikely to pose a human cancer risk.

19  A.      In general.  I think, you know, if I'm being

20  asked questions about general causation and I really

21  want to have a firm answer, that I would take the Canada

22  study and read it, because it's not just the conclusion

23  that matters but it's how they did the methodological

24  analysis, what studies they included, did they make any

25  mistakes in their analysis or things that I think are

1    mistakes, was there any bias in the study, committee --

2    was anybody on the committee conflicted in any way.

3         I think to answer your question honestly I would

4    really need to read the whole Canada study report.  But

5    since I haven't read it, it does not change my opinion

6    in this regard, no.

7    Q.    And when it comes to IARC, did you look at their

8    methodology, methodological analysis, the studies they

9    included, whether they made any mistakes, and if there

10   are any biases and if any of the committee members were

11   conflicted in any way?

12   A.    I looked at that somewhat but probably not to

13   much -- not enough to be an expert on general causation.

14   Q.    Right.

15        And did you look into whether or not any of the

16   IARC members were working with or discussing these

17   issues about glyphosate and Roundup while they were

18   consulting with IARC?  And strike that.  I don't -- I

19   don't think I -- that's not a question.  Let me try

20   again.

21        Did you look into whether or not any of the

22   members of IARC were working with or discussing the

23   issues about glyphosate and cancer with plaintiffs'

24   lawyers at the time that they were consulting with IARC

25   back in 2015?

1  A.      No, I did not look into that.

2  Q.      Something you would want to know, though, if

3  they were?

4  A.      I'd be interested to know about that and if they

5  excluded themselves from certain part of the analyses

6  and -- I would be interested in knowing that, yes.

7  Q.      And if they were involved and didn't exclude

8  themselves or didn't disclose that, it could call into

9  question the integrity of the committee's decision;

10  right?

11  A.      It might.  But I would also need to know the

12  same thing for the EPA.

13          I mean, in American government regulatory

14  agencies there are conflicts of interest.  You know, I

15  follow the FDA closer than the EPA, but somebody from

16  the FDA just left the FDA last week to join Philip

17  Morris, so some people might say that they don't want to

18  say anything too hard against a future employer.  So --

19  Q.      Right.

20  A.      -- if we're going to talk about biases based on

21  working for a plaintiff or a defense or -- I would

22  actually probably need to take the time to look at the

23  Canadian study, the EPA study, the IARC study and really

24  investigate that thoroughly.  But --

25  Q.      And you didn't do that for any of the studies;

1  right?

2  A.      I did not do that for the studies, no.

3  Q.      And you didn't look into whether or not anyone

4  from IARC left IARC after the monograph was published

5  and started working as a plaintiff expert in this

6  litigation?

7  A.      No, I have not looked at that.

8  Q.      Okay.  Let's move --

9          MR. KERSCHNER:  We can actually pull the

10 document down.  You can stop the screen share.

11         I think -- well, we can keep going with it up.

12 That's fine.

13 BY MR. KERSCHNER:

14 Q.      Are you aware that the European Food Safety

15 Authority has determined that glyphosate is unlikely to

16 pose a carcinogenic hazard to humans and the evidence

17 does not support classification with regard to

18 carcinogenic potential?

19 A.      Now, are they saying that based on the amount of

20 glyphosate that you and I have by going to France and

21 eating the food or are they saying that based on the

22 exposure to people who are actively exposed to

23 glyphosate?

24 Q.      Did you look into that question about what the

25 European regulatory agencies concluded about glyphosate

1   when you did your analysis?

2   A.      No.  And I don't want to keep saying the same

3   thing, but I was retained as a general -- not retained

4   as a general causation expert, I was retained as a

5   specific causation expert, and I am relying on general

6   causation experts in forming my opinion.

7   Q.      Well, you cited the IARC in your report.

8   A.      Yes.

9   Q.      Why did you cite IARC and not, for example, the

10  European Chemical Health Agency?

11  A.      I think if I was retained as a general causation

12  expert back in 2017 or 2016, I would have taken the time

13  to read a lot more articles and consider all the other

14  viewpoints and read the Canadian study, the European

15  study you're referring to.

16          I think there's a difference between saying

17  glyphosate is safe in the terms of the food we eat as

18  being almost ubiquitously exposed to it.  That's a

19  different thing, I think, than people who are exposed to

20  glyphosate by using it extensively --

21  Q.      All right.

22  A.      -- in occupational settings.

23          So I would really want to tease that out myself

24  if I was writing a general expert report.

25  Q.      And you didn't do that as part of your report

1   today.

2   A.      No, I did not do that as part of my report.

3   Q.      Are you aware that the European Chemicals Agency

4   has concluded that there's a -- no hazard classification

5   for carcinogenicity is warranted for glyphosate?

6   A.      Is that related to exposure people have in their

7   foods or to the --

8   Q.      I'm --

9   A.      -- compound as people --

10  Q.      I'm just asking if you're aware of their

11  conclusion, the European Chemical Agency's conclusion.

12  A.      No, I'm not aware of that.

13  Q.      Are you aware that the New Zealand EPA has

14  concluded that glyphosate is unlikely to be genotoxic or

15  carcinogenic to humans?

16  A.      No.  But, again, the methodology of how they

17  reached that conclusion is also important.  But no, I'm

18  not aware of what happens in New Zealand.

19  Q.      And you didn't look into their methodology

20  either.

21  A.      I did not look into the New Zealand methodology.

22  Q.      Are you aware that the Australian Pesticide,

23  Veterinary Medicines Authority has concluded that

24  glyphosate is not carcinogenic to humans?

25  A.      I'm not aware of what happened in Australia, no.

1         Any other countries?

2   Q.    I think I nailed them for now.  I think we'll

3   move on to a different topic.

4         Actually, just to be clear, though, of the --

5   all the regulatory agencies we just discussed -- I

6   believe there were six, all concluding that glyphosate

7   is not carcinogenic -- you have not reviewed any of

8   their materials; correct?

9   A.    I've reviewed the IARC materials somewhat.

10         Again, if I was a general causation expert, I

11   would think it's important to review all those

12   materials, understand the methodology.

13         I'm, from where I'm sitting here today,

14   wondering when somebody says something is not a

15   carcinogen, are they referring to the amount that we

16   have from eating food or are they referring to the

17   amount that people are exposed to who are applicators.

18   And that might be an important thing to differentiate,

19   and I would want to look at that in all six studies.

20   Q.    And you didn't do that.

21   A.    And then you have to look at the individual

22   articles they quote because the Zhang meta-analysis,

23   when they did their search of the literature, narrowed

24   it down to like six studies.

25         So why would that person discount all of these

1  studies that may be in the New Zealand article and are

2  those studies going to bias the New Zealand article the

3  wrong way?

4       So I think it would be a fair amount of

5  interesting work and interesting epidemiology to review

6  all six different studies and compare and contrast them

7  but I, as you point out, I have not done that.

8  Q.     You just relied on IARC instead.

9  A.     No.  I relied on the expert opinion that I read,

10  and they reviewed some of those other studies.  I don't

11  know if they reviewed Australia and New Zealand.

12      But I'm relying on people who I think are very

13  strong epidemiologists, and they considered the pros and

14  cons of governmental agency reports in their reports,

15  and I don't have any obvious reason to disagree with

16  them.

17  Q.     Who are those strong epidemiologists that you're

18  relying on?

19  A.     Well, I think Al Neugut is a very strong

20  epidemiologist.  I think Weisenburger, although not

21  formally an epidemiologist, I'm impressed by the quality

22  of his work and his body of literature on this.

23      As we discussed, Chadi Nabhan I think is a very

24  smart guy who's always been objective in things that he

25  writes.  And I read a report by Dr. Andreadis, who I

 1    think did a little bit more discrediting this report or

 2    that report.  I'm not sure he mentioned Australia and

 3    New Zealand.  I think he's a very bright lymphoma guy.

 4    And he spent a lot more time in his report reviewing

 5    some of the genotoxicity and animal toxicity studies.

 6    Q.      You mentioned the Zhang meta-analysis before.

 7            Did you review the EPA's analysis of the Zhang

 8    meta-analysis?

 9    A.      I didn't.  But, you know, last week or this

10    week, and I was trying to like prepare more for this

11    deposition, Zhang had a response letter, and I don't

12    know if it was to the EPA or if it was to other authors,

13    why other meta-analyses found different answers than

14    their meta-analysis.

15            And they actually ran the same numbers with

16    their techniques and they found still a significant odds

17    ratio when running their techniques and I think

18    discussed why some studies were left out of their

19    meta-analysis versus others.

20            And then you can go back to the original Zhang

21    study and look at their criteria for their studies so --

22    Q.      Doctor, I just asked --

23    A.      But no, I have not read --

24    Q.      -- if you read the EPA's analysis.  That's it.

25    A.      I have not read the EPA's response to the Zhang

1    meta-analysis.

2    Q.     Thank you.  Okay.

3           Let's move on.  In your report on Page 9, you

4    say there are -- on the bottom, "There have been six

5    case-control study of NHL and glyphosate exposure..."

6           Do you see that?

7    A.     Yes.

8    Q.     And what are those six case-control studies?

9    A.     Well, there have been more than six case-control

10   studies so that's not really a fair statement.  But

11   those were the six case-control studies that I found

12   when I was writing that part of the general report and I

13   think -- I think at least five of them are in the Zhang

14   report, the Zhang meta-analysis.

15   Q.     So let's go through what you've said in your

16   report.

17          So I see reference to McDuffie, Eriksson, and

18   Hardell in this section; right?

19   A.     Yes.

20   Q.     What are the other three?

21          And I'm sorry.  Orsi in the first paragraph.

22          What are the other two?

23   A.     Hardell, Eriksson, McDuffie, Orsi, four.  I

24   think there was also -- I don't know if there was one by

25   Pahwa that was a case-control study.

1   Q.      I understand.

2           You've actually cited that, I think, later on as

3   a --

4   A.      Yeah.  Again --

5   Q.      -- different section.

6   A.      -- I felt I had to write --

7   Q.      But what were the other two case-control

8   studies?

9   A.      Right.

10          I felt I had to write some of the general

11  evidence for this report rather than just the specific

12  case because I thought that was what was expected of me,

13  but I think that the general causation element here is

14  not as good as I would do if I was asked to opine on

15  general causation here.

16  Q.      Sorry.  So am I -- is your report then only

17  based on four case-control studies instead of six?

18  A.      I don't know if I -- did I -- well, I said

19  DeRoos here; right?  So that's one other case-control

20  study.

21  Q.      Which DeRoos?

22  A.      Did I put it in the references?

23  Q.      So you cite one DeRoos in the meta-analysis

24  section of your report, which I assume is 2005.

25  A.      And then the DeRoos, Blair, Rusiecki, 2995,

1    Environmental Health Perspectives, I think that's a

2    case-control study.

3    Q.      Okay.  So that's five.

4            What was the sixth?

5    A.      I think I may have been referring to one that

6    looked at hairy cell leukemia, and I don't think I

7    included it here because I -- I -- for brevity's sake or

8    something.  I don't know.

9    Q.      So as far as your opinion is concerned, you're

10   basing your opinion here, as written in your report, on

11   only five case-control studies, not six.

12   A.      Well, I don't want to sound like a broken record

13   but I'm also relying on the expert reports I reviewed

14   and I -- when I reviewed them, I didn't want to take

15   every single case-control study that they had reviewed

16   and put it in my report or did I want to print out every

17   case-control study that they had reviewed and read them

18   all for the reason that I wasn't asked to give a

19   specific opinion in this court.

20           So there are, I'm sure, more than six

21   case-control studies, and in this general causation

22   part, because I am relying on other general causation

23   experts, I did not list all the case-control studies of

24   Roundup and non-Hodgkin's lymphoma.

25   Q.      Again, you didn't cite to any expert reports in

1   this section; right?

2   A.     I think I -- well, I think I'm citing to

3   Weisenburger, who -- whose bibliography contains a lot

4   of the case-control reports.

5          I may not have cited it at the right point but I

6   definitely put it in the reference list because reading

7   his article I think allowed me to look at the evidence,

8   and there are -- there are more than six case-control

9   reports in his study, I believe.

10  Q.     So you're -- so are there more studies than you

11  talked about in your report?

12         I just need to understand where your opinions

13  are.

14  A.     Oh.

15  Q.     Or are you just incorporating what Weisenburger

16  wrote in his study?

17  A.     What I'm writing here are the main studies that

18  I think Zhang put in her meta-analysis.  There are more

19  case-control studies here than I have cited or reviewed

20  for this general causation expert.

21         I am incorporating what Weisenburger wrote in

22  his 2021 piece where he's referring to more case-control

23  studies, but because I didn't want to make this a

24  lengthy, lengthy term paper, because I'm not here as a

25  general causation expert, I did not put every

 1  case-control study in the reference nor did I read them

 2  all and compare and contrast them.

 3  Q.     Okay.  So let's look at what you did write in

 4  your report.

 5         At the end of this section you say, "Several" --

 6  second-to-last paragraph of this section, and you write

 7  [as read], "Several of these prior case-control studies

 8  adjusted for other pesticides as potential confounding

 9  factors."

10  A.     Yes.

11  Q.     And then in parentheses you write, "as the

12  persons in a case-control studies are in occupations

13  where they can be exposed to multiple pesticides,"

14  closed parenthesis, "statistical adjustment being a

15  widely accepted way to minimize the effect of potential

16  confounders."

17         Did I read that right?

18  A.     Yes.

19  Q.     And why does it matter that study participants

20  were exposed to other pesticides?

21  A.     Well, I think there's been -- you know, before I

22  got involved in anything with Roundup, you know, reading

23  the literature on lymphoma, we always saw that there was

24  a higher risk of lymphoma in people who worked on farms,

25  Nebraska, for example.  And these other pesticides, I

1  think there's epidemiologic data linking them to the

2  risk of non-Hodgkin's lymphoma and perhaps some

3  leukemias.

4        So if somebody is a farmworker, they may be

5  exposed to multiple pesticides in the course of their

6  work.  And there is probably epidemiologic literature

7  from before Roundup was introduced, from before it

8  became in great common usage in 1996, 1997 with the

9  introduction of, what was it, Monsanto Roundup-resistant

10 crops.

11       So I think there's older epidemiologic data

12 there on other pesticides and their link for lymphoma

13 and I think epidemiology is -- it's not Newtonian

14 mechanics, it's not completely deterministic, so I think

15 it's important to look at other potential confounders

16 whenever you do an epidemiologic study.

17       If you were studying a group of farmers, it's

18 important to think about what other pesticides they're

19 exposed to because those things might also cause

20 non-Hodgkin's lymphoma substantively.  So that's why --

21 Q.      And --

22 A.      -- I put that paragraph in.

23 Q.      And if you can control for confounders, that

24 would make the results of a study more accurate; right?

25 A.      Yeah.  It's very hard to do, I think, which is

 1   why I put some of the epidemiologic general articles

 2   there, but you do try and control for confounding in a

 3   study.

 4   Q.     And --

 5   A.     It's very, very --

 6   Q.     And adjusted data that controls for confounding

 7   factors would be more accurate than unadjusted data that

 8   doesn't control for confounding pesticides and

 9   herbicides and exposures; right?

10   A.     That would totally depend on the methodology and

11   whether it was good methodology or not, but it would be

12   part of the set of information.  You know, look at how

13   they've tried to control for it.

14          That's why we try and do randomized, controlled

15   studies in clinical medicine, because you can't figure

16   out what all the unmeasured confounders are.

17          And I think in this case, you know, it's very

18   hard for people who are exposed to multiple pesticides

19   to say, you know, I spent this much time with this

20   pesticide and this much time with this pesticide and

21   this much time with this pesticide.

22          It's easier if somebody is only using one

23   product in their garden or their farm but -- and then

24   there's temporality of when, you know, these different

25   pesticides were used and introduced.

```
 1          So I think trying to adjust for confounders is
 2   something good epidemiologists do in their studies, yes.
 3   Q.     But if in the same study there was both adjusted
 4   and unadjusted data for confounders, you would want to
 5   rely on the data that adjusts for other pesticides
 6   versus the data that doesn't; right?
 7   A.     So --
 8          MR. ROJAS:  Object to form.
 9          THE WITNESS:  Object to form?  Do I answer, or
10   you're just objecting to form?
11          MR. ROJAS:  Yes.
12          THE WITNESS:  So I am really relying on some of
13   the studies, such as the Weisenburger study and the
14   Zhang meta-analysis, that included what they thought
15   were the best case-control studies, including ones that
16   adjusted for potential confounders.
17          And so those studies, to me, have more weight in
18   my determination of agreeing with the general causation
19   experts about the causality of Roundup to lymphoma, but
20   I certainly would want to read, if I was asked as a
21   general causation expert, studies that adjust for
22   confounders.
23          I think subsequent to writing this, I did read
24   one once or twice and it was a very complicated study,
25   but --
```

1    BY MR. KERSCHNER:

2    Q.      I'm not asking you about what you've read.  I'm

3    just saying, if you have a study --

4    A.      Yeah.

5    Q.      -- and the data in the study is presented in

6    both adjusted and unadjusted numbers, you would want to

7    look at and rely on the adjusted numbers more so than

8    the unadjusted numbers.

9            Is that a concept which you agree with?  Yes or

10   no?

11   A.      It depends on how well the adjustment was done,

12   and I think that causality is not just adjusted and

13   unadjusted odds ratios, it's a lot of other things.

14           I think I would -- I think what I disagree with

15   is your statement "rely on only the adjusted odds

16   ratio."  I think my answer is, it depends.

17   Q.      Right.  But you would agree, then, that if there

18   is a study that adjusts for confounders and also does

19   not, you wouldn't want to ignore the adjusted data;

20   right?

21   A.      No, I wouldn't ignore it, but I have seen some

22   studies where when they adjust for confounders, they do

23   it wrong and then the adjusted ratio has less veracity

24   to it than the unadjusted one.

25   Q.      So let's look -- so you cited -- you mentioned

1  the Orsi study, and I think you mention it in the first

2  paragraph; right?  You say, "One of the six studies with

3  limited statistical power..."

4        Do you see that?

5  A.     Hold on.

6        Yes.

7  Q.     And then you reference the Orsi study; right?

8  A.     Yes.

9  Q.     And do you know how many cases and controls

10  there were in the Orsi study?

11  A.     You know, I've put it in my reference list, I

12  have printed out the study and I probably have it at

13  home.  I don't know how many cases and controls there

14  were, sitting here today.

15  Q.     So I am happy to show you the study.  We can

16  quickly pull it up and look at Table 3.

17        (Exhibit Knopf-11 was marked for

18  identification.)

19  BY MR. KERSCHNER:

20  Q.     And if you see next to "Glyphosate," the case is

21  controlled, it's 12 and 24.

22        Can you see that?

23  A.     Yes.

24  Q.     And that means that it's a pretty small study;

25  right?

1   A.      Yes.

2   Q.      And that's why it has a limited statistical --

3   limited statistical power; correct?

4   A.      Yeah, that seems like a small number compared to

5   the top numbers there.

6           MR. KERSCHNER:  You can go ahead and pull that

7   down.

8   BY MR. KERSCHNER:

9   Q.      And so, by converse, a larger study with more

10  cases and more controls would have a larger -- would

11  have more statistical power; right?

12  A.      The definition of -- yeah, according to the

13  definition of statistical power.

14          But I actually referenced earlier that sometimes

15  smaller studies generate very important hypotheses if

16  the odds ratio is very high, so I don't totally

17  discount, myself, studies with low power but, again --

18  Q.      Right.  But when you say odds ratios are very

19  high, you're talking maybe -- over 4; right?

20  A.      You know, in 2, 1.5.  I think, you know, a 40

21  percent increase in the risk of cancer is a significant

22  clinical risk factor so --

23  Q.      But if it's only based on, you know, 12 cases

24  and 24 controls, it calls into question the finding and

25  the statistical power of the study; right?

1    A.      Yeah.  What I find there is usually the authors

2    will under discussion, you know, say limitations, there

3    are limitations of this study including small sample

4    size, further studies are needed, but if the study

5    generates a very interesting set of data, I wouldn't

6    totally discount it and it doesn't, you know -- yeah.

7    Q.      And so if --

8    A.      Yes.

9    Q.      -- you had a study that had thousands of cases

10   and thousands of controls, that would have a stronger

11   statistical power; right?

12   A.      Yeah.  And I think that they -- they weight

13   studies that way in meta-analyses to try and do that.

14   Q.      The bigger studies usually have a higher weight

15   because they have more statistical power; right?

16   A.      Yes.

17   Q.      The next study I guess towards the bottom of

18   this list is the Hardell study where you referenced in

19   your report?

20   A.      Yes, sir.

21   Q.      And you say this is a study with 515 cases and

22   1,141 controls, right, just on that first sentence?

23   A.      I think we have McDuffie next so --

24   Q.      Yeah.  I'm sorry.  I skipped that.  I think it's

25   because I tried to do it alphabetically and screwed up.

```
 1   A.      Yeah.

 2   Q.      I think it's two paragraphs down.

 3   A.      The Hardell study, yes.

 4   Q.      Yeah.  And you say 515 cases and 1,141 controls;

 5   right?

 6   A.      Right.

 7   Q.      And then you don't mention that this one has a

 8   limited statistical power because it's a larger study;

 9   right?

10   A.      Well, I would say it has -- I did not say it has

11   a limited statistical power because the numbers are

12   larger, yes.

13   Q.      Did you look at how many of those cases and how

14   many of those controls were actually used -- exposed to

15   glyphosate?

16   A.      I have.  I don't know the exact number off the

17   top of my head.

18   Q.      That would matter, though, for your opinion;

19   correct?

20   A.      Right.  But I think I -- I had said this study

21   had a very low exposure frequency, which markedly limits

22   inferences from the study regarding glyphosate and NHL

23   causation.

24   Q.      Right.  So if you have a low number of folks who

25   are exposed to glyphosate in the study, that also limits
```

1   what you can pull away from the study; right?

2   A.      Yes, I'd agree with that.

3   Q.      And then you mentioned that there was both a

4   significant association with NHL --

5   A.      Yes.

6   Q.      -- for an unadjusted number and then the

7   adjusted number is not significant; right?

8   A.      Yeah.  But that confidence interval to me is

9   intriguing because, although it's less than 1, it's

10  going up to 6.2.  So that --

11  Q.      Right.  But you can't -- in the adjusted

12  findings you can't rule out chance and confounding as

13  part of that finding; right?

14  A.      I could not rule those things out completely,

15  but when I see an odds ratio like that with a confidence

16  interval that's well above 1, so most of the samples are

17  above 1, I would say something like, gee, we should do

18  another study with a larger sample size to see.

19  Q.      And can --

20  A.      Yeah.

21  Q.      Can you cite any publications that support that

22  position that even if it's not statistically

23  significant, if you have a high confidence interval on

24  one side, it supports your finding?

25  A.      If you give me time, I could do a lit search,

Kevin B. Knopf, M.D., M.P.H., Volume I

 1   but I remember in second-term epidemiology at Hopkins

 2   the professors going up there and saying that you should

 3   not discount a study just because the confidence

 4   interval crosses 1 if the odds ratio is high.  And maybe

 5   they alluded it a little bit to Bayesian inference then,

 6   but not enough.

 7         So I agree it's below 1 in the adjusted but it

 8   would -- you know, if it was 0.55 to 1.97, that is a

 9   little bit less concerning to me than when it goes up to

10   6.2.

11         So I'd have to pull the study and see why the

12   confidence interval is wide because it's, I think -- and

13   I'm talking from epidemiology that I wish I understood a

14   lot better, but there's something with the bias-variance

15   problem where if the sample size is too low, you might

16   have a wider variance, but it doesn't mean it should be

17   totally discounted.

18         But there is a difference between the unadjusted

19   and the adjusted odds ratio in the Hardell study and the

20   adjusted odds ratio confidence interval crosses 1.

21   Q.    Doctor, I just asked if, sitting here today, you

22   can cite a particular publication that supports the

23   position that something that's not statistically

24   significant, if you have a high confidence interval, it

25   can support your findings.

1        And am I right, sitting here today, you don't

2   have any publication that you're referring to?

3   A.      No; but I'd like to caveat that.

4        The way I do my day-to-day job in oncology when

5   I take care of patients is if I don't know the exact

6   answer, I'm pretty quick to go on the Internet and try

7   and find a study to support or refute what I'm thinking.

8        So I'm not somebody who memorizes every single

9   epidemiologic study, but I could certainly try and find

10  some studies for you and then we could have a subsequent

11  discussion about the bias-variance problem.  But --

12  Q.      But none of the studies on your materials

13  considered list that you're using to support your

14  opinions today stand for that position; right?

15  A.      Well, so I did try to include some studies there

16  about the cost of dichotomizing continuous variables and

17  I think I included -- did I not put Goodman's?  Damn, I

18  didn't put Goodman's articles in here.

19        But I think you lose something when you

20  dichotomize exposure.  So that might support it, but to

21  your specific question, no, sitting here today, I can't

22  cite any studies off the top of my head.

23  Q.      And would the fact that this study had only

24  eight cases and eight controls be the reason you have

25  such a wide confidence interval?

1  A.      Probably, yes.

2  Q.      Right.  And that calls into question the

3  veracity of the data; right?

4  A.      It does, except the other expert reports and

5  other people seem to put some credence in this study.

6       I -- you know, hairy cell leukemia is such a

7  rare cancer, it wouldn't be one I would design a study

8  to do myself, but the unadjusted odds ratio was positive

9  so I think that's why people are quoting this study

10  with, you know, an odds ratio of 3.04.

11  Q.      But you put it in your report, and that's kind

12  of what I want to focus on.

13  A.      Yeah.

14  Q.      But you would agree, you know, it's not a very

15  strong study because of the small numbers and the fact

16  that it's not statistically significant in the adjusted

17  finding, it calls into question the veracity of the

18  findings.

19  A.      Sure.  I'll agree with that.

20  Q.      So then I think you corrected me that I

21  skipped a study.  So let's go back.  I'm sorry.

22       And do you recall if this study, Hardell, says

23  anything specific about mantle cell lymphoma?

24  A.      I don't recall that, but I would totally be

25  unsurprised because mantle cell lymphoma is a rare

 1    subtype of lymphoma, so I think it's going to be hard

 2    to, unless you specifically did a case-control study of

 3    mantle cell lymphoma patients with exposure to

 4    glyphosate.

 5    Q.      Right.  But if it talked about mantle cell

 6    lymphoma, considering that you're doing a case-specific

 7    analysis, you would have written that in your report;

 8    right?

 9            MR. ROJAS:  If I may just interject, I'm going

10    to instruct Dr. Knopf not to answer.

11            I mean, we've gone a while on this.  Any sort of

12    general causation questions, I think his testimony has

13    been clear that he's a specific causation expert.

14            I know that this is the sort of this background

15    section of the report, and that was in error.  We can

16    sort of amend to focus on the specific causation, which

17    is what he's retained to do, what he's testified that

18    he's been retained to do, and the only -- we're not

19    going to offer him as a general causation expert.  I

20    think he's been clear that he's not been retained as

21    one.  He will not offer an opinion at trial about

22    general causation.

23            So, you know, you're, of course, welcome, David,

24    to ask any questions about sort of the specific

25    causation aspects of the methodology and his opinions

```
1    but moving forward after this kind of lengthy

2    discussion, I'm just going to instruct him not to answer

3    on the general causation.

4         MR. KERSCHNER:  I'm sorry.  So you are

5    instructing him not to answer questions about any of the

6    general causation-related issues in his report?

7         MR. ROJAS:  Right.  It's not his opinion --

8         MR. KERSCHNER:  Are you going to retract -- are

9    you going to retract those opinions?  Because I think

10   it's the first 12 pages of -- you know, 10 or so pages

11   of his report.

12        MR. ROJAS:  Yeah.  It's background.

13        And if you want, we can have an off-the-record

14   conversation or on the record, if you want, about

15   retracting that.  It was sort of background information,

16   but I'm -- as he's testified, and I'll say it again now,

17   he is not retained as the general causation expert and

18   those are not opinions that he will be offering in this

19   matter.

20        His opinion in this matter is limited only to

21   specific causation.  So to the extent that that stuff is

22   in the report as sort of bibliographical background and

23   stuff like that, that will not be part of the opinions

24   that he's offering in this case.

25        MR. KERSCHNER:  So you are going to retract
```

```
 1   everything in his report -- and I just want to be clear

 2   because, if not, we're going to have to go through it.

 3           And maybe we could do -- we could do this off --

 4   we could have a -- why don't we have a discussion off

 5   the record and then we can go back onto the record if

 6   you're going to refuse to have him answer questions on

 7   any of the epidemiology that's in his report.

 8           Is that -- is that -- is that what you're

 9   saying, he's not going to answer questions about the

10   epidemiology that's in his report?

11           MR. ROJAS:  General causation.  I don't know

12   what the distinction that you're drawing between

13   epidemiology.

14           If you want to continue having a conversation

15   off the record, we can sort of --

16           MR. KERSCHNER:  Sure.

17           MR. ROJAS:  -- clarify the landscape.

18           Up to you.  I mean, it can be on the record too.

19   I'm not --

20           MR. KERSCHNER:  Yeah.  Well, let's have a

21   discussion off the record and then we can go back on the

22   record if we've reached common ground or we've figured

23   out what to do.

24           Sorry, Dr. Knopf.  This is the annoying part of

25   our job, but we will, hopefully, be back soon.
```

```
1            VIDEO OPERATOR:  It is 1:05 p.m.

2            We are off the record.

3            (Recess, 1:05-1:27 p.m.)

4            VIDEO OPERATOR:  Time is 1:27 p.m.

5            We are back on the record.

6            MR. ROJAS:  Okay.  So I guess this is as good a

7     time as any to briefly revisit on the record the

8     conversation we were having before we just went off.

9            I am instructing Dr. Knopf not to answer any

10    further questions about general causation because that

11    is not what his testimony is in this case and it's not

12    the testimony that is going to be offered in this case.

13           His -- the only opinion that we're offering for

14    him is specific causation and, if necessary, I'll repeat

15    that instruction if there are further questions on

16    general causation issues.

17           MR. KERSCHNER:  And I'll just make the record

18    clear that we have been asking questions about

19    information and materials in Dr. Knopf's report, which

20    we are entitled to, and I will continue to ask those

21    questions.

22           To the extent counsel refuses to allow me to ask

23    questions about the materials that are in Dr. Knopf's

24    report that form the basis of his opinion, you know,

25    we'll reserve the right to have another deposition and
```

1    to take the issue to the judge and all other relief,

2    including the exclusion of Dr. Knopf as an expert in

3    this case.

4           So I will continue with my questioning, if

5    that's okay.

6           MR. ROJAS:  Yes, all right to reserve.  I think

7    it's an agree-to-disagree type of situation and for the

8    abundance of caution and clarity and avoidance of any

9    confusion, from our point of view, you're free to ask

10   any specific causation questions, of course, of

11   Dr. Knopf.

12          MR. KERSCHNER:  Okay.

13   BY MR. KERSCHNER:

14   Q.     Dr. Knopf, can you go back to your report,

15   please.

16   A.     Yes.  Which page, sir?

17   Q.     Let's start on Page -- your reference list,

18   which is on Page -- begins on 13.

19   A.     Okay.

20   Q.     And these are the studies and information that

21   make up your case-specific opinion for Ms. Salas;

22   correct?

23   A.     Yes.

24   Q.     And then if you look on Page 12 under your

25   conclusion -- do you see that?

1    A.      Yes.

2    Q.      You write, "It is my medical and epidemiologic

3    conclusion that Ms. Salas' exposure to Roundup was not

4    only sufficient but exceeds the risk of exposure that is

5    reported to either cause and/or significantly increase

6    one's risk of developing NHL."

7            Did I read that correctly?

8    A.      You read that statement correctly.

9    Q.      And then your report at the end of this is

10   signed by you; correct?

11   A.      Yes.

12   Q.      And it represents your opinions that you intend

13   to give in this case; correct?

14           MR. ROJAS:  Object to the form.

15           THE WITNESS:  The form objection means I answer

16   or --

17           MR. ROJAS:  Yes.

18           MR. KERSCHNER:  Yes.

19           MR. ROJAS:  Unless I tell you not to answer, you

20   go ahead and answer.  Correct.

21           THE WITNESS:  Well, I -- that last sentence,

22   yes, that would be what I would intend to say in this

23   case, yes.

24   BY MR. KERSCHNER:

25   Q.      And when you say "it is my medical and

1    epidemiologic conclusion," that is based on both

2    Ms. Salas's medical records and your review of the

3    epidemiology in this case; right?

4         MR. ROJAS:  Object to the form.

5         THE WITNESS:  So any time I read somebody a

6    medical history, I'm using some of the framework of

7    epidemiology to answer but, as I said before, I'm not

8    intending to give general causation but the epidemiology

9    of lymphoma and specific causation, yes, I think that's

10   a true statement.

11   BY MR. KERSCHNER:

12   Q.     And when you say that her exposure to Roundup

13   was not only sufficient but exceeds the risk of exposure

14   that is reported to either cause or significantly

15   increase, are you talking about what has been reported

16   in the studies cited in your report?

17   A.     Yes, I would think so.  Yes.

18   Q.     Okay.  So I'm going to continue asking you about

19   those studies.

20          I think we left off talking about -- well, I

21   think we were moving -- we were moving on to the

22   McDuffie study that's cited on Page 8 of your report.

23          Do you see that?

24   A.     I'm not seeing it on Page 8.  On Page 10?

25   Q.     I'm sorry.  Page 10.  I'm sorry.  I had my

1    numbers off.

2    A.      Yes.

3    Q.      Top of Page 10.

4    A.      Yeah, I'm there.

5    Q.      Okay.  And that's where you reference a study

6    published by McDuffie, et al., in 2020 -- 2001?

7    A.      I think that's the date, yes.

8    Q.      And that, just to be clear, is the study that,

9    if you look at your materials considered list on

10   Page 14, is the sixth study down; right?

11   A.      I hope -- I didn't put the year there.  I hope

12   that's the 2001 study.

13   Q.      Do you know of another McDuffie study that

14   you're relying on in this case?

15   A.      Wait.  Wait.  McDuffie is not the sixth one

16   down.  It's on the second page.

17           MR. ROJAS:  Sixth one down on that page, I

18   think.

19           THE WITNESS:  Oh, yeah.

20           It looks like --

21           MR. KERSCHNER:  I'm just talking about the year.

22           THE WITNESS:  I mean, I hope that's the correct

23   reference.  I don't think there's a different McDuffie

24   study I'm relying on.

25           MR. KERSCHNER:  Okay.

1    BY MR. KERSCHNER:

2    Q.      And you've said that this is a study conducted

3    in Canada; correct?

4            MR. ROJAS:  At this point, I mean -- so I think

5    this is where my instruction kicks in.

6            I mean, I think your question is about, is this

7    the right -- did I read that correctly, stuff like that,

8    no problem, but getting into the details of this --

9    these general causation studies, I'm going to instruct

10   him not to answer.

11           MR. KERSCHNER:  So just to be clear, are you

12   instructing the witness not to answer the question I've

13   just asked about the McDuffie study?

14           MR. ROJAS:  No.  No.  I mean, the ones that he

15   has asked -- you asked and he answered, the -- that

16   instruction is inapplicable.  But the one you just asked

17   and if you kind of continue along the lines that you've

18   done with the prior studies, that's where the

19   instruction kicks in.

20           MR. KERSCHNER:  So I'm going to ask the

21   question, and if you're going to instruct him not to

22   answer, that's fine, and then -- but we need to do

23   that --

24           MR. ROJAS:  Sure.

25           MR. KERSCHNER:  -- little exercise.

1          MR. ROJAS:  Sure.

2    BY MR. KERSCHNER:

3    Q.     Doctor, you wrote that this is a study conducted

4    in Canada and it examined 517 cases and 100 -- 1,506

5    controls; correct?

6          MR. ROJAS:  I have no problem, Doctor, with

7    these sort of basic questions about what the words on

8    the page.  So --

9          THE WITNESS:  Okay.

10          Yes, I wrote that there.

11    BY MR. KERSCHNER:

12    Q.     And that study helped form the basis of your

13    case-specific opinions in this case; correct?

14          MR. ROJAS:  I'm going to instruct not to answer.

15    BY MR. KERSCHNER:

16    Q.     And are you going to listen to your counsel's

17    instructions not to answer whether or not this study

18    helped form the basis of your case-specific opinions in

19    this case?

20    A.     Well, as I said, I'm relying on other general

21    causation experts and I'm a specific expert here, so I'm

22    following the advice of my counsel.

23    Q.     Okay.  I'm going to continue.

24          Were you aware of how many of those cases and

25    controls that you've cited were actually -- actually,

1    strike that.

2         Do you know if all of the cases and controls

3    cited in your report were individuals who had used

4    Roundup?

5         MR. ROJAS:  Instruct not to answer.

6    BY MR. KERSCHNER:

7    Q.    Are you going to follow your counsel's

8    instructions not to answer that question as well?

9    A.    Yes, I am.

10        MR. KERSCHNER:  Are you going to -- is it fair

11   to say if I answer -- ask any additional questions about

12   the McDuffie study other than asking whether or not the

13   words specifically on the page in his report I read

14   correctly, you will instruct him not to answer?

15        MR. ROJAS:  The way I would characterize it --

16   and we can go through them, as you just suggested you

17   wanted to -- is any effort to elicit expert testimony

18   that he does not intend to offer in this case for which

19   he was not retained about general causation

20   epidemiological issues, there will be an instruction not

21   to answer.

22        MR. KERSCHNER:  I'm asking about the basis of

23   his opinions, which is the McDuffie study.

24        So I -- Counsel, at this point, I'm not going to

25   go through my entire line of questions just to read them

 1   to you and have you know what they are and instruct him

 2   no to answer.  So I need some clarity here.

 3         You're sort of playing this game of, oh, I'm not

 4   going to let him answer questions about what he wasn't

 5   retained for, but he's retained to provide opinions in

 6   this case, they're in the report.  So just be clear with

 7   me.

 8         MR. ROJAS:  I'm not playing games --

 9         MR. KERSCHNER:  Are you going to instruct him

10   not to answer questions about the studies referenced in

11   the report?

12         MR. ROJAS:  If you'll allow me to respond,

13   please.

14         I am not playing any games.  I have been

15   abundantly clear with you about what our position is.

16         When I spoke with you both on and off the

17   record, we agreed -- your preference was to go through

18   each of the questions and have me give the instruction.

19         If that is not your preference, then I would

20   just refer you to what our position is.  I don't -- I

21   don't -- I don't know what more I can tell you.

22         I know that you're trying to pin me down on a

23   different position than the one I have.  I've been clear

24   with you.  And maybe with this one if you'd like as an

25   experiment to go question by question to get some

 1  clarity on it, we can do it that way.  I'm doing the

 2  best that I can to explain to you what our position is.

 3          MR. KERSCHNER:  I never offered to go question

 4  by question.  I simply said I would explore the

 5  questions and see what your position is, and it sounds

 6  pretty clear.

 7          But I will continue with this study and then we

 8  can move on or you can shut down the deposition if

 9  you're going to continue to ask him not to answer.

10  BY MR. KERSCHNER:

11  Q.      So you were not aware --

12          MR. ROJAS:  No.  Just to be clear, the

13  deposition can proceed, as I've said several times

14  before, on the topic of specific causation, which in his

15  disclosure and throughout today's deposition we have

16  been clear that is the opinion that he's going to offer

17  in this case.

18          So I have no interest in shutting down the

19  deposition, particularly if you have any intention to

20  ask questions about specific causation.

21          Sorry.  Go ahead.

22  BY MR. KERSCHNER:

23  Q.      Dr. Knopf, are you out of the country or

24  unavailable in the next three or four weeks for an

25  additional deposition?

1    A.        There are certain days that it's much harder for

2    me to be available than others because I have clinic and

3    inpatient responsibilities, but I'm not out of the

4    country.

5    Q.        And you can make yourself available for an

6    additional deposition, if need be, within the next three

7    weeks?

8    A.        It's hard, but yes.

9              And that would be another deposition or shorter

10   time period or --

11   Q.        That will be up to whatever rulings from the

12   Court.

13             But just in terms of, I wanted to make sure you

14   weren't, you know, leaving on a three-week vacation or

15   something like that.

16   A.        I'm staying here.  Yes.

17   Q.        Okay.  Thank you.

18             To continue with the McDuffie study, as you

19   considered this study for your case-specific opinions,

20   did you consider how many patients -- excuse me -- how

21   many of the 517 cases and 1,506 controls you mentioned

22   in your report actually used Roundup?

23             MR. ROJAS:  I'm going to instruct him not to

24   answer.

25

```
 1   BY MR. KERSCHNER:

 2   Q.      And are you going to follow counsel's advice on

 3   that?

 4   A.      Yes.

 5   Q.      And you state in your report that glyphosate

 6   showed a dose-response relationship with an odds ratio

 7   of 2.12, confidence interval 1.2 to 3.73, for use two or

 8   more days a year.

 9           Do you see that?

10   A.      I see where I wrote that, yes.

11   Q.      And did you use that finding as part of the

12   basis for your opinions in this case?

13           MR. ROJAS:  I'm going to instruct him not to

14   answer.

15   BY MR. KERSCHNER:

16   Q.      Are you going to listen to your counsel's advice

17   on that?

18   A.      Yes, I am.

19   Q.      And did you pull those findings from Table 8 in

20   the McDuffie study?

21           MR. ROJAS:  I'm going to instruct him not to

22   answer.

23   BY MR. KERSCHNER:

24   Q.      Are you going to follow counsel's advice?

25   A.      Yeah.
```

1          If I knew that there was going to be this line

2    of questioning, I would bring all the studies with me

3    and spend a lot of time reading them and looking at all

4    the tables so that I'd be better prepared to give you

5    full answers to your questions.  So I'm going to follow

6    my counsel's advice.

7    Q.     Did you do that, look at all the studies and

8    analyze all the tables, before writing this report?

9          MR. ROJAS:  I'm going to instruct him not to

10   answer to the extent it's about these general causation

11   studies.

12   BY MR. KERSCHNER:

13   Q.     Are you going to follow counsel's advice on

14   that?

15   A.     Yeah, for the remainder of the deposition I'm

16   going to follow counsel's advice.

17   Q.     I sort of have to ask you.

18   A.     Okay.

19   Q.     And you mentioned in your report that this

20   related to use for more than two days a year?

21          Do you see that?

22   A.     I see that.

23   Q.     And did you use that two-day-a-year cutoff as

24   part of your discussion -- excuse me -- as part of

25   forming your opinion of Ms. Salas and whether or not

```
 1   Roundup was a substantial contributing factor to her

 2   non-Hodgkin's lymphoma?

 3        MR. ROJAS:  I'm going to instruct him not to

 4   answer.

 5   BY MR. KERSCHNER:

 6   Q.     And I assume you're going to follow counsel's

 7   advice on that?

 8   A.     Yes, I am.

 9   Q.     Do you know where this two-day cutoff in the

10   McDuffie study that you cite in your report came from?

11        MR. ROJAS:  Instruct not to answer.

12   BY MR. KERSCHNER:

13   Q.     Are you going to follow counsel's advice to not

14   answer?

15   A.     Yes.

16   Q.     As far as I'm concerned, at this point, is it

17   fair to say that you're going to follow your counsel's

18   instruction not to answer any question you're instructed

19   not to answer?

20   A.     Yes.

21   Q.     The next study you cite is the Eriksson study.

22        Do you see that?

23   A.     Yes, I do.

24   Q.     And you write that this was a case-controlled

25   study with a large sample size.
```

1          Do you see that?

2     A.     Yes.

3     Q.     And did you write it was large because there was

4     9,100 cases?

5          MR. ROJAS:  I'm going to instruct not to answer.

6     BY MR. KERSCHNER:

7     Q.     Are you going to refuse -- not answer?

8     A.     I'm going to follow counsel's advice.

9     Q.     When you were evaluating Ms. Salas's case, did

10    you take into consideration the sum sample size of the

11    Eriksson study in evaluating whether or not non --

12    glyphosate led to Ms. Salas's non-Hodgkin's lymphoma?

13         MR. ROJAS:  Instruct not to answer.

14    BY MR. KERSCHNER:

15    Q.     Are you going to follow counsel's advice?

16    A.     I'm going to follow counsel's advice.

17    Q.     You reported several other findings from the

18    Eriksson study in your report.

19         Do you see that?

20    A.     Yes, I do.

21    Q.     And did you rely on those studies in forming

22    your case-specific opinions for Ms. Salas in this case?

23         MR. ROJAS:  Instruct not to answer.

24    BY MR. KERSCHNER:

25    Q.     Sorry.  I think I asked the question a little

1    incorrectly.

2           Did you rely on those findings that you reported

3    in your report in forming your case-specific opinions

4    for Ms. Salas in this case?

5           MR. ROJAS:  I'm going to instruct him not to

6    answer.

7    BY MR. KERSCHNER:

8    Q.      And are you going to follow that instruction?

9    A.      Yes, I am.

10   Q.      I believe that -- am I correct that that is the

11   universe of case-controlled studies you've cited,

12   McDuffie, Eriksson, Hardell, and Orsi?

13   A.      I think I talk in this paragraph about the

14   DeRoos study.

15   Q.      Okay.  And that -- is that the DeRoos 2003

16   study?

17   A.      I believe it's 2003.

18   Q.      And that was a pooled analysis; is that correct?

19          MR. ROJAS:  I'm going to instruct not to answer.

20   BY MR. KERSCHNER:

21   Q.      Did the DeRoos study that you cited in this

22   section of your report on Page 10 form the basis of your

23   case-specific opinions for Ms. Salas's case?

24          MR. ROJAS:  Instruct not to answer.

25

 1   BY MR. KERSCHNER:

 2   Q.      Are you going to follow counsel's advice and not

 3   answer?

 4   A.      Yes, I am.

 5   Q.      Page 10 begins your discussion of meta-analyses.

 6           Do you see that?

 7   A.      Yes, I do.

 8   Q.      And there you cite a study by Schinasi, a study

 9   by Zhang, and a study by Pahwa, and then, finally,

10   another study by DeRoos; correct?

11   A.      Yes.

12   Q.      And do those four studies inform the basis of

13   your opinions as they pertain to Ms. Salas in this case?

14           MR. ROJAS:  I'm going to instruct not to answer.

15   BY MR. KERSCHNER:

16   Q.      Are you going to follow your counsel's

17   instructions on not answering those questions?

18   A.      Yes, I am.

19   Q.      There are on Page 9 -- sorry to go back up.

20   There is a section entitled "Cell and mouse studies."

21           Do you see that?

22   A.      Yes, I do.

23   Q.      There are then two studies referenced there,

24   Aris and Leblanc, and then Santovito.

25           Do you see that?

 1  A.      Yes, I do.

 2  Q.      And did you review those studies in forming your

 3  opinions in this case?

 4          MR. ROJAS:  I'm going to instruct not to answer.

 5  BY MR. KERSCHNER:

 6  Q.      Are you going to follow your counsel's

 7  instructions not to answer whether you reviewed those

 8  studies?

 9  A.      Yes, I am.

10  Q.      But you cited them in your report; correct?

11  A.      Yes, they're cited in my report.

12  Q.      And do they form the basis of your opinions as

13  they pertain to Ms. Salas's case?

14          MR. ROJAS:  Instruct not to answer.

15  BY MR. KERSCHNER:

16  Q.      Are you going to follow counsel's opinions on

17  this?

18  A.      Yes, I am.

19  Q.      And the cohort studies, you cite Bolognesi,

20  2009, and DeRoos, 2005.

21          Do you see that?

22  A.      Yes, I do.

23  Q.      Did you review those studies before citing them

24  in your report?

25  A.      I have reviewed --

```
 1              MR. ROJAS:  Instruct him not to answer.

 2              Sorry.

 3              THE WITNESS:  I'm going to follow his advice.

 4    BY MR. KERSCHNER:

 5    Q.      And do the Bolognesi study and the DeRoos study

 6    cited in that section of your report form the basis of

 7    your opinions for Ms. Salas in this case?

 8              MR. ROJAS:  Instruct not to answer.

 9    BY MR. KERSCHNER:

10    Q.      And are you going to follow counsel's

11    instruction not to answer questions on that?

12    A.      Yes, I am.

13    Q.      There are a few other epidemiologic studies

14    cited in your materials considered list, and I'll just

15    use some as an example.

16              On Page 14 do you see reference to a study by

17    Leon?

18    A.      Yes.

19    Q.      And you didn't specifically discuss that study

20    in your report, but did it form the basis of your

21    opinions for Ms. Salas in this case?

22              MR. ROJAS:  I'm muted.  Thank you for bearing

23    with me.

24              I instruct you not to answer.

25
```

```
 1   BY MR. KERSCHNER:

 2   Q.      Are you going to follow counsel's advice?

 3   A.      Yes, I'm going to follow counsel's advice.

 4           MR. KERSCHNER:  And if I asked about any other

 5   studies in this section and whether they formed the

 6   basis of your opinions in your case-specific opinions

 7   for Ms. Salas in this case, Counsel, are you going to

 8   instruct him not to answer?

 9           MR. ROJAS:  Yes, I am.

10           MR. KERSCHNER:  Can we take a short recess?  I

11   just need to look at something and then we can get on.

12   I just need two minutes.

13           MR. ROJAS:  Yep.

14           VIDEO OPERATOR:  Time is 1:47 p.m.

15           We are off the record.

16           (Recess, 1:47-1:55 p.m.)

17           VIDEO OPERATOR:  Time now is 1:55 p.m.

18           We are back on the record.

19           MR. KERSCHNER:  Thank you.

20   BY MR. KERSCHNER:

21   Q.      Doctor, if you take a look on your report at

22   Page 7.

23   A.      One sec.  Sorry.

24   Q.      That's okay.

25   A.      Yes.
```

1   Q.      And you see that's where you list some potential

2   risk factors for the development of non-Hodgkin's

3   lymphoma?

4   A.      Yes.

5   Q.      And as part of your differential diagnosis for

6   Ms. Salas, did you go through these risk factors as it

7   pertains to her case-specific -- as it pertains to her

8   case in specific -- strike that.  Let me rephrase.

9           As part of your differential diagnosis for

10  Ms. Salas, did you go through these risk factors as part

11  of your case-specific analysis?

12  A.      Yes, I did.

13  Q.      And the -- I'll go through some of them.

14          Let's start with, you say on Number 10 [as

15  read], "While smoking is considered a risk factor for

16  several malignancies (most notably lung, as well as

17  bladder, head, neck cancer), there is not convincing

18  evidence that smoking increases the risk of

19  non-Hodgkin's Lymphoma."

20          Did I read that correctly?

21  A.      Yes.

22  Q.      And what is the basis for that statement?

23  A.      Well, I've read that in several textbooks of

24  hematology or oncology, and I read a -- I think I put

25  two articles here that reference that.  Although I

1  didn't reference that here, right here, I can find them

2  for you.  And then subsequently --

3  Q.      Do you agree -- I'm sorry.  You cut off there.

4  I thought you were finished.  Sorry.

5  A.      There's the article by Schollkopf in the back

6  about smoking and I think there's a second one I

7  referenced here by Morton, L.M., et al.  So two articles

8  there.

9          And then subsequent to this report, I've read

10  general epidemiology of non-Hodgkin's lymphoma to verify

11  what I said before was accurate, and there are several

12  parts in that where they say that smoking is not a

13  substantive risk factor for non-Hodgkin's lymphoma.

14  Q.      And are those studies cited in your report?

15  A.      At the time of the report I cited the two

16  studies that are in the report.

17  Q.      And would you agree that smoking is a potential

18  risk factor for the development of non-Hodgkin's

19  lymphoma?

20  A.      I think the epidemiological literature for

21  smoking and non-Hodgkin's lymphoma is not particularly

22  robust.

23  Q.      If someone said that smoking was a potential

24  risk factor for non-Hodgkin's lymphoma, they would be

25  wrong?

1    A.    I would say, based on what I've read, I'm not so

2    sure I believe that.

3    Q.    So that person would be wrong?  Is that fair?

4    A.    I wouldn't say things are right and wrong.  I

5    would say, based on what I've read, I don't think the

6    epidemiologic literature supports a particularly strong

7    association between smoking and non-Hodgkin's lymphoma.

8          MR. KERSCHNER:  I'm going to mark what I have

9    here as the -- hang on -- expert report of Dr. Knopf in

10   the Ronald Kapolnek case.

11         Joe, can you pull that up, please.

12         THE WITNESS:  An expert report by me?

13         MR. KERSCHNER:  We're about to find out.

14         THE WITNESS:  All right.

15         (Exhibit Knopf-12 was marked for

16   identification.)

17   BY MR. KERSCHNER:

18   Q.    Doctor, do you recall writing a report in the

19   Ronald Kapolnek case relating to Roundup?

20   A.    That looks like my writing.

21   Q.    And let's just go to Page 12.

22         Is that your signature there?

23   A.    Yes.

24   Q.    Dated January 23rd, 2020; right?

25   A.    Yes.

```
 1   Q.      And do you have any recollection of writing this

 2   report?

 3   A.      Was that for Ken Lumb?

 4   Q.      I'm not aware of who it was for, but do you have

 5   any recollection of writing this report?

 6   A.      Yeah.

 7   Q.      Okay.  So when you said earlier that this is the

 8   first Roundup litigation you have written a report for,

 9   that was incorrect.

10   A.      No.  I think I may have written -- I think this

11   may be for Ken Lumb.  So, obviously, this was not a very

12   long report.  There's only one article -- one referenced

13   article there.

14           MR. KERSCHNER:  Well, let's go -- well, it's

15   a -- let's go to what is on Page 5 of the report.

16           And -- sorry -- just go up a little bit, just --

17   BY MR. KERSCHNER:

18   Q.      And you see it says, "Risk Factors For Non

19   Hodgkin's Lymphoma"?

20   A.      Yes.

21   Q.      And you say in your report that you signed [as

22   read], "There are several purported potential risk

23   factors have been identified for NHL - including

24   smoking..."

25   A.      Yes.
```

1  Q.     Was that a correct statement at the time you

2  wrote it?

3  A.     I don't know.  I think I didn't do a thorough

4  literature review of the relation between smoking and

5  non-Hodgkin's lymphoma when I wrote this because I don't

6  put the same articles in the appendix about smoking and

7  non-Hodgkin's lymphoma.

8  Q.     So when you signed this report at the time, you

9  hadn't done enough research to support your opinions in

10  the report.

11          MR. ROJAS:  Object to the form.

12          THE WITNESS:  I think there are some published

13  epidemiological articles that say smoking is a risk

14  factor for non-Hodgkin's lymphoma, and I don't think

15  this report represents as much time and effort as this

16  current report does.

17          Since then, I've pulled specific epidemiologic

18  articles, two of which I referenced in this report,

19  which do not really say smoking causes non-Hodgkin's

20  lymphoma.

21          Subsequent to this report in 2022, I read

22  another review article on epidemiology, and the first

23  line says something like smoking is not represented as a

24  risk factor for non-Hodgkin's lymphoma for the

25  interlinked group, one study links it to diffuse

1   large-cell lymphoma, and then I didn't pull that article

2   and read it and see what the quality of the epidemiology

3   is there.  So I would say that what I wrote in this

4   report is what I believe to be more true than what I

5   wrote in 2020.

6          MR. KERSCHNER:  Okay.

7          And you could pull that -- go ahead and pull

8   that down.

9   BY MR. KERSCHNER:

10  Q.     When -- you ruled out smoking as a risk factor

11  for Ms. Salas's non-Hodgkin's lymphoma; correct?

12  A.     Well, I -- again, I would say that risk is

13  multifactorial, causality is multifactorial.

14         My opinion is that, more likely than not,

15  Roundup was a substantial factor in causing her

16  non-Hodgkin's lymphoma.  I in this report and believe

17  that smoking was not a substantive factor in the causing

18  of her non-Hodgkin's lymphoma.

19  Q.     And you know that Ms. Salas has smoked

20  substantially in her past; right?

21  A.     Yes.

22         MR. ROJAS:  Object to the form.

23         THE WITNESS:  Well, there was some social

24  history in the medical record that she had smoked, yes.

25

1   BY MR. KERSCHNER:

2   Q.      And then the report we just showed you where you

3   said smoking was a risk factor, that individual didn't

4   smoke; right?

5   A.      I didn't get to read the whole report again.

6   Q.      Well, if you -- you don't recall whether or not

7   in the case that you evaluated the individual was a

8   smoker?

9   A.      I may have that report on my laptop or I may ask

10  it from you.  I don't remember the exact medical

11  records.  I think that person was not a smoker.

12  Q.      And in that case you said smoking was a

13  potential risk factor; right?

14  A.      Yes.  But sitting here today, I would say I

15  should not have said that.  I've read further studies,

16  and I don't really feel that smoking is a significant

17  risk factor for non-Hodgkin's lymphoma.

18          MR. ROJAS:  Can I ask for a brief pause, David?

19          When you have a chance, can you give me a quick,

20  off-the-record call?  It will be three minutes.  If you

21  don't mind going off the record.

22          MR. KERSCHNER:  Sure.

23          I mean, do you want me to keep asking questions

24  or is it about -- let's go off the record quickly.

25          VIDEO OPERATOR:  Time is 2:04 p.m.

```
 1           We are off the record.

 2           (Recess, 2:04-2:08 p.m.)

 3           VIDEO OPERATOR:  Time now is 2:08 p.m.

 4           We are back on the record.

 5  BY MR. KERSCHNER:

 6  Q.      Doctor, one of the other risk factors you

 7  mentioned is family history.

 8           Do you see that?

 9  A.      Yes.

10  Q.      And you say, "NHL do not strongly run along

11  family history as there are not felt to be significant

12  associations with germline mutations..."

13           Did I read that right?

14  A.      Yeah.

15  Q.      And one of the studies that you cite later in

16  your report is the McDuffie study from 2001; correct?

17  A.      Yes.

18  Q.      On Page 10.

19           And did you look at the McDuffie study that you

20  cited on Page 10 of your report to determine what that

21  study said relating to family history?

22           MR. ROJAS:  I'm going to instruct him not to

23  answer.

24  BY MR. KERSCHNER:

25  Q.      Are you going to follow counsel's advice on
```

1    that?

2    A.      Yes, I am.

3    Q.      And did you consider family history as part of

4    your case-specific analysis for Ms. Salas's case?

5    A.      Yes, I did.

6            MR. KERSCHNER:  Counsel, at this point you're

7    going to instruct him not to answer questions about the

8    McDuffie study as it pertains -- if I continue to ask

9    those questions; right?

10           MR. ROJAS:  Right.  Sorry.  I think even with

11   your headphone, but I think I can hear what your

12   question is, yeah, any details about these

13   epidemiological studies, correct.  That's -- that's --

14           MR. KERSCHNER:  Okay.

15           At this point, these studies clearly form the

16   basis of his case-specific opinions, both specific to

17   Ms. Salas and the risk factors he's ruled in and ruled

18   out.

19           If you're going to instruct him to not even

20   answer the questions about whether or not they, specific

21   parts of them, form the basis of the opinions or the

22   details of those studies as they impact his opinions, I

23   can't ask the case -- any questions further.

24           Anything even, you know, remotely further would

25   be impossible due to the fact that I can't ask about the

1   basis for his opinions.

2           So at this point if counsel is going to continue

3   to instruct him not to ask -- answer questions, I can't

4   continue, and we'll have to reserve this for a ruling

5   from the judge, unless counsel wants to change his

6   position.

7           MR. ROJAS:  No.  I think -- I think, as

8   articulated before, agree to disagree.

9           I understand where you say that leaves you as

10  far as further questions.  We have a difference of

11  opinion about that.  But I understand that at least for

12  immediate purposes, I mean, you're telling me you're

13  done with the questions?

14          MR. KERSCHNER:  No.  I have many more questions,

15  but I can't ask them because I can't form the basis of

16  Dr. Knopf's opinions because you won't allow me to --

17  sorry -- you won't allow him to answer the questions

18  about what studies form the basis of his opinions so

19  I -- it is impossible for me to continue.

20          MR. ROJAS:  Yeah.  Understood.

21          And I didn't mean to put words in your mouth.  I

22  think we're speaking almost the same language, which is

23  you have further questions but, in light of my

24  instruction, with which you may disagree, you have no

25  further questions that seem viable, in light of that

 1    instruction; correct?  I mean, you're not --

 2          MR. KERSCHNER:  Yeah.  I mean, you know, I

 3    can't -- I cannot continue, based on those instructions.

 4    I can't -- if I don't know the basis of his opinions, if

 5    I am unable to compare how he ruled in certain risk

 6    factors for Ms. Salas versus what is in those studies

 7    versus what they say about his ruling in of Roundup,

 8    there's no way I could ask questions in this deposition

 9    specific to Ms. Salas.

10          MR. ROJAS:  Okay.  And the only reason I'm

11    asking is, obviously, we can sort of have the

12    disagreement that we've had but I -- I wanted to know

13    whether I could ask a few questions of the doctor with

14    no objection from you.

15          I didn't want to interrupt your flow and, of

16    course, you may have some potential further questions

17    afterwards.

18          MR. KERSCHNER:  Yeah.  I'm not passing the

19    witness.  As far as I'm concerned, the deposition is

20    still open.  So I guess I don't know if that -- I mean,

21    we could go off the record and talk about that, but, no,

22    I'm not passing the witness.

23          I consider this deposition still open.  In terms

24    of also the rules that would apply to confidentiality,

25    that Dr. Knopf's discussions with counsel, that he's not

1  to talk about his testimony, would still apply because,

2  as far as I'm concerned, this deposition is certainly

3  not over.

4          MR. ROJAS:  No.

5          MR. KERSCHNER:  I have no ability to continue

6  answering [sic] my questions.  I don't know that I could

7  stop you from doing it if you wanted to but, you know, I

8  will object to those questions.

9          MR. ROJAS:  Okay.  If you want to speak off the

10  record, that's fine.

11          MR. KERSCHNER:  Yeah.

12          MR. ROJAS:  If you'll allow me to ask my

13  questions -- why don't we speak off the record.  That

14  might be easier.

15          MR. KERSCHNER:  Sure.

16          MR. ROJAS:  Give us a minute or two.

17          VIDEO OPERATOR:  Time is 2:12 p.m.

18          We are off the record.

19          (Recess, 2:12-2:19 p.m.)

20          VIDEO OPERATOR:  Time now is 2:19 p.m.

21          We are back on the record.

22          MR. KERSCHNER:  As I've stated before, due to

23  the instruction from counsel not to ask -- not to --

24  strike that.  I'll start again.  Sorry.

25          As I've stated before, due to counsel's

```
 1    instruction to the witness not to answer questions about

 2    information that forms the basis of his case-specific

 3    opinions, I'm unable to continue to ask any questions as

 4    they pertain to Ms. Salas.

 5          My position is this deposition is still open.

 6    We will go to the Court for a ruling on those questions

 7    because without that ruling, it is -- I'm unable to

 8    continue.

 9          It is my position that because the deposition is

10    still open, Dr. Knopf cannot discuss the contents of the

11    deposition, his report, or his opinions in this case

12    with counsel.  Those communications would -- are not

13    permissible during the deposition, which is still going

14    on, and that the witness has not been passed, and if

15    questioned by counsel for Dr. Knopf, I will object to

16    and ask to be stricken from the record due to the fact

17    that they are improper.  And it is my --

18          MR. ROJAS:  Okay.

19          MR. KERSCHNER:  And then I -- you know, I would

20    say that this deposition transcript should be closed

21    now.

22          MR. ROJAS:  I do, notwithstanding those

23    objections and understanding them, have a few questions

24    for Dr. Knopf.

25          And to be clear, from our point of view, it's
```

1   entirely without prejudice, of course, to counsel for

2   Monsanto or Home Depot continuing to ask questions,

3   should they want, of Dr. Knopf.

4                         EXAMINATION

5   BY MR. ROJAS:

6   Q.      Doctor, has it been part of your work in this

7   case to develop or offer a general causation opinion?

8           MR. KERSCHNER:  And I just have a --

9           THE WITNESS:  No.

10          MR. KERSCHNER:  -- standing objection to all of

11  these questions, that they are improper and should be

12  stricken from the record.

13          Can we agree to standing objections so I don't

14  have to interrupt on that basis?

15          MR. ROJAS:  Agreed to the standing objection.

16          THE WITNESS:  No, it is not.

17  BY MR. ROJAS:

18  Q.      And do you intend, sitting here today, to at

19  some point during this matter offer an opinion about

20  general causation?

21  A.      No, I do not.

22  Q.      Has it been part of your work in this case to

23  develop an expert opinion about the merits or lack

24  thereof of let's say the EPA study versus the IARC study

25  or IARC studies?

```
 1              MR. KERSCHNER:  Objection.  Form.

 2              MR. ROJAS:  Well, let me withdraw that question

 3    because the form objection is well taken.

 4    BY MR. ROJAS:

 5    Q.        You remember several hours ago a colloquy with

 6    Mr. Kerschner about an IARC monograph and the work that

 7    the EPA, an analysis that EPA has undertaken of

 8    glyphosate?  Do you remember that?

 9    A.        Yes, I recall that.

10    Q.        Okay.  And is it part of your work in this case

11    to develop a professional opinion, an expert opinion,

12    about the merits of the general causation analysis

13    undertaken by any regulatory agency of any country?

14              MR. KERSCHNER:  Objection.

15              THE WITNESS:  No.

16              MR. KERSCHNER:  Form.

17              THE WITNESS:  No, it is not.

18              MR. ROJAS:  Okay.

19    BY MR. ROJAS:

20    Q.        Do you intend going forward in this matter to

21    offer any opinion about the merits or methodology of the

22    general causation analysis of glyphosate or Roundup or

23    any other herbicide by any governmental regulatory

24    authority?

25              Is that part of what -- the opinion that you
```

1   intend to offer in this case?

2          MR. KERSCHNER:  Objection.  Form.

3          THE WITNESS:  No, it's not.

4   BY MR. ROJAS:

5   Q.     Dr. Knopf, what is your understanding of the

6   scope of the expert opinion that you're going to offer

7   in this case?

8   A.     My understanding was that I was retained as a

9   specific expert for this case and not a general expert

10  regarding causation and epidemiologic review of the

11  literature but, rather, a specific expert for causality

12  of lymphoma in this particular case.

13  Q.     So is it fair to say that you have not been

14  asked to offer any opinion except on issues of specific

15  causation in this case?

16  A.     That's correct, yes.

17  Q.     Okay.  And you otherwise don't have any

18  intention -- obviously, it kind of goes without saying,

19  but you otherwise have no intention to offer an expert

20  opinion in this case on any other subject matter other

21  than specific causation.

22  A.     No, I do not.

23  Q.     Is that correct?

24  A.     That's correct.

25          MR. ROJAS:  Okay.  That's it for me.

1        I don't know if other counsel has anything else.

2        MR. KERSCHNER:  All right.  I think at this

3   point the deposition is not over, so whether they do or

4   don't, those questions can be asked at the conclusion of

5   the defendant's questions, is Monsanto's position on

6   this.  So I would ask that the transcript be kept open.

7        And, Dr. Knopf, you understand that you can't

8   discuss the content of your opinions or this deposition

9   with counsel while the deposition is still open?

10        THE WITNESS:  I understand.

11        MR. KERSCHNER:  And you'll abide by that?

12        THE WITNESS:  Yes.

13        MR. KERSCHNER:  Okay.

14        Well, at this point, as I said before, I'm

15   unable to continue answering [sic] my questions so we

16   can suspend for the time being.

17        MR. ROJAS:  Great.

18        I think my position has been made clear as well.

19   We've all heard each other out, so I have nothing

20   further, so I guess thank you all, and have a good

21   afternoon.

22        VIDEO OPERATOR:  Time is 2:23 p.m.

23        We are off the record.

24        (Whereupon the deposition adjourned at 2:23

25   p.m.)

```
 1                    TESTIMONY ADJOURNED

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   STATE OF CALIFORNIA           )

 2   COUNTY OF LOS ANGELES         )

 3            I, ROSEMARY LOCKLEAR, a Certified Shorthand

 4   Reporter of the State of California, duly authorized to

 5   administer oaths pursuant to Section 2025 of the

 6   California Code of Civil Procedure, do hereby certify

 7   that

 8            KEVIN B. KNOPF, M.D., M.P.H., the witness in

 9   the foregoing deposition, was by me duly remotely sworn

10   to testify the truth, the whole truth and nothing but

11   the truth in the within-entitled cause; that said

12   testimony of said witness was stenographically reported

13   by me, a disinterested person, and was thereafter

14   transcribed under my direction into typewriting and is a

15   true and correct transcription of said proceedings, to

16   the best of my ability.

17            I DO FURTHER CERTIFY that I am neither a

18   relative nor employee nor attorney nor counsel of any of

19   the parties to this action, and that I am neither a

20   relative nor employee of such attorney or counsel, and

21   that I am not financially interested in the action.

22

23   _Rosemary Locklear_

24   ROSEMARY LOCKLEAR, RPR, CRR, CSR 13969

25
```

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully and

 5   make any necessary corrections.  You should state the

 6   reason in the appropriate space on the Errata Sheet for

 7   any corrections that are made.

 8          After doing so, please sign the Errata Sheet

 9   and date it.

10          You are signing same subject to the changes

11   you have noted on the Errata Sheet, which will be

12   attached to your deposition.

13          It is imperative that you return the original

14   Errata Sheet to the deposing attorney within thirty (30)

15   days of receipt of the deposition transcript by you.  If

16   you fail to do so, the deposition transcript may be

17   deemed to be accurate and may be used in court.

18

19

20

21

22

23

24

25
```

```
 1                        E R R A T A

 2                        - - - - - -

 3

 4    PAGE  LINE  CHANGE

 5    ____  ____  _____

 6    REASON:_____

 7

 8    PAGE  LINE  CHANGE

 9    ____  ____  _____

10    REASON:_____

11

12    PAGE  LINE  CHANGE

13    ____  ____  _____

14    REASON:_____

15

16    PAGE  LINE  CHANGE

17    ____  ____  _____

18    REASON:_____

19

20    PAGE  LINE  CHANGE

21    ____  ____  _____

22    REASON:_____

23

24

25
```

```
 1                 ACKNOWLEDGEMENT OF DEPONENT

 2

 3

 4         I, _____, do hereby certify

 5    that I have read the foregoing pages, and that the same

 6    is a correct transcription of the answers given by me to

 7    the questions therein propounded, except for the

 8    corrections or changes in form or substance, if any,

 9    noted in the attached Errata Sheet.

10

11

12

13    _____

14    KEVIN B. KNOPF, M.D., M.P.H.            DATE

15

16    Subscribed and sworn
      to before me this
17    _____ day of _____, 20____.

18

      My commission expires:_____
19

20    _____
      Notary Public
21

22

23

24

25
```

```
 1                    LAWYER'S NOTES

 2   PAGE LINE

 3   _____   _____  _____

 4   _____   _____  _____

 5   _____   _____  _____

 6   _____   _____  _____

 7   _____   _____  _____

 8   _____   _____  _____

 9   _____   _____  _____

10   _____   _____  _____

11   _____   _____  _____

12   _____   _____  _____

13   _____   _____  _____

14   _____   _____  _____

15   _____   _____  _____

16   _____   _____  _____

17   _____   _____  _____

18   _____   _____  _____

19   _____   _____  _____

20   _____   _____  _____

21   _____   _____  _____

22   _____   _____  _____

23   _____   _____  _____

24   _____   _____  _____

25   _____   _____  _____
```