Exhibit "5"

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4

5

6    IN RE:  ROUNDUP PRODUCTS      ) MDL NO. 2741
     LIABILITY LITIGATION          )
7    _____ ) MDL Case No. 3:16-
     This Document Relates To:     ) MD-02741-VC
8                                  )
     Nancy Salas v.                )
9    Monsanto Company              )
     Case No. 3:20-CV-06173-VC     )
10   _____ )

11

12                    PAGES 245 - 408

13

14                       - - -

15                   JANUARY 20, 2023

16                       - - -

17         Remote videotaped deposition of KEVIN B.

18   KNOPF, M.D., M.P.H., VOLUME II, conducted at the

19   location of the witness in Oakland, California,

20   commencing at 10:07 A.M. EST, on the above date

21   before Pamela Cotten, CSR, RDR, Certified Realtime

22   Reporter, Certificate No. 4497.

23                       - - -

24              GOLKOW TECHNOLOGIES, INC.
         877.370.3377 ph | 917.591.5672 fax
25                  deps@golkow.com

```
 1   A P P E A R A N C E S:

 2

 3   For the Plaintiff:

 4           PODHURST ORSEK, P.A.
             BY:  PABLO ROJAS, ESQ.
 5           One Southeast 3rd Avenue, Suite 2300
             Miami, Florida  33131
 6           305.358.2300
             projas@podhurst.com
 7

 8
     For the Defendant Monsanto Company:
 9
             ARNOLD & PORTER KAYE SCHOLER, L.L.P.
10           BY:  DAVID A. KERSCHNER, ESQ.
                  JOSEPH KLEMME, ESQ.
11           250 West 55th Street
             New York, New York  10019-9710
12           212.836.8000
             Fax - 212.836.8689
13           david.kerschner@arnoldporter.com
             joseph.klemme@arnoldporter.com
14

15   For the Defendant Home Depot:

16           MORRIS MANNING & MARTIN, LLP
             BY:  CAROLINE W. SUYDAM, ESQ.
17           Atlanta Financial Center
             3343 Peachtree Road, N.D., Suite 1600
18           Atlanta, Georgia  30326
             404.495.8485
19           Fax - 404.365.9532
             csuydam@mmmlaw.com
20

21   ALSO PRESENT:

22           KEVIN JOHNSON, Videographer

23

24

25
```

1                    I N D E X

2

3    Witness:  KEVIN B. KNOPF, M.D. - VOLUME II

4    Examination:                                        Page

5      BY MR. KERSCHNER   ----------------------  250

6      BY MS. SUYDAM      ----------------------  399

7      BY MR. ROJAS       ----------------------  401

8

9

10

11

12                  E X H I B I T S

13   Deposition            Description            Page

14   Exhibit 13     National Cancer Institute,    255
                    Cancer Prevention Overview
15                  (PDQ) - Patient Version

16   Exhibit 14     January 14, 2023, Invoice     265
                    Corey Swanson
17
     Exhibit 15     Article Titled "Genes,        289
18                  Environment, and Bad Luck"
                    by Martin A. Nowak, et al.,
19                  Three Pages

20   Exhibit 16     Article Titled "Shining a     304
                    Light on Glyphosate-Based
21                  Herbicide Hazard, Exposures
                    and Risk:  Role of
22                  Non-Hodgkin Lymphoma
                    Litigation in the USA" by
23                  Charles Benbrook

24

25

```
 1                    E X H I B I T S
                         (Continued)
 2

 3    Deposition            Description              Page

 4  Exhibit 17      Memorial Healthcare System        349
                    Record
 5                  Bates No. Confidential-
                    NSalas-MemorialHS-MD-000289
 6
    Exhibit 18      Memorial Healthcare System        357
 7                  Laboratory Systems Records
                    Bates Nos. Confidential-
 8                  NSalas- MemorialHW-PD-
                    000008 - 000009
 9
    Exhibit 19      PowerPoint Presentation           375
10                  Titled "Overview of Lymphoma
                    Hodgkin's
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          OAKLAND, CALIFORNIA - FRIDAY, JANUARY 20, 2023

 2                         10:07 A.M. EST

 3

 4          VIDEO OPERATOR JOHNSON:  We are now on the

 5     record.  My name is Kevin Johnson.  I'm the

 6     videographer for Golkow Litigation Services.

 7              Today's date is January 20th, 2023, and the

 8     time is 10:07 a.m. Eastern time.

 9              This remote video deposition is being held

10     as a matter of Nancy Salas versus Monsanto Company.

11              The deponent is Kevin B. Knopf, M.D.

12              All parties to this deposition are

13     appearing remotely and have agreed to the witness

14     being sworn in remotely.

15              Due to the nature of remote reporting,

16     please pause briefly before speaking to ensure all

17     parties can be heard completely.

18              Counsel's appearance will be noted on the

19     stenographic record, and our court reporter today is

20     Pamela Cotten.

21              You can now swear in the witness.

22                  KEVIN B. KNOPF, M.D.,

23     called as a witness, and having been first duly

24     sworn in remotely by the Certified Shorthand

25     Reporter, was examined and testified as follows:
```

```
 1                    EXAMINATION
 2   BY MR. KERSCHNER:
 3       Q    Good morning, Dr. Knopf, and thank you
 4   again for being with us.  My name is David
 5   Kerschner.  I'll be taking your deposition today.
 6            You understand this is a continued
 7   deposition from when you were deposed back on, I
 8   believe, August 5th?
 9       A    Yes.  I do.
10       Q    And this -- the instructions about how to
11   answer questions and what to do in a deposition
12   remain the same.  So I'll just say if you have
13   answered a question, I'll assume you understood it.
14            Does that make sense?
15       A    Yes.
16       Q    Okay.  Have you had a chance to review the
17   transcript from the first portion of this deposition
18   that was back in August?
19       A    Briefly, yes.
20       Q    And you didn't make any changes through an
21   errata change, correct?
22       A    I did not make any changes on the errata
23   sheet, no.
24       Q    Was there anything in that deposition
25   transcript after reading it that you wanted to
```

1    change?

2        A    Well, I think the way I answered some

3    questions could have been better, but I don't know

4    that I can actually change that in an errata sheet.

5        Q    What questions that you answered -- strike

6    that.

7             Are there any questions that you answered

8    that you are now saying are incorrect?

9        A    I mean, some of them -- for example, you

10   asked did I have any references to show my

11   impression about Bayesian statistics and evidence

12   level, and I have some references if you ask that

13   question again.

14       Q    So other than additional materials, and I

15   think we got a list of materials, is there anything

16   from that initial deposition that you wanted -- that

17   you read and you felt was incorrect?

18       A    I don't believe so, no.

19       Q    Did you do anything to prepare for this

20   deposition today?

21       A    I have not talked to Mr. Rojas between last

22   time and this time except to be informed that

23   there's a deposition today.

24       Q    Did you do anything else to prepare for

25   today's portion of the deposition?

```
 1        A    I reviewed some of the material briefly

 2   before this deposition, and I've -- since this

 3   deposition, I've read additional material, yes.

 4        Q    And what did you review -- what materials

 5   did you review for today's deposition?

 6        A    Some of the general expert reports.

 7        Q    And which reports are those?

 8        A    Particularly the one by Portier.

 9        Q    Any others?

10        A    I think a little bit by Weisenburger.  I've

11   also reread some of the trials, the epidemiologic

12   studies.

13        Q    When you say trials, what do you mean by

14   trials?

15        A    Epidemiologic studies I mean.  They are not

16   clinical trials.

17        Q    Do you recall which studies you reviewed to

18   prepare for today's deposition?

19        A    I mean, at the last deposition you asked me

20   a lot of questions regarding general causation, so I

21   think I reviewed some of the case-control studies,

22   some commentary about the cohort study.  I think I

23   read the Zhang meta-analysis again, one of their

24   responses again.

25             There was an additional study, which I
```

1    provided to you a couple studies regarding the

2    nature of causality and statistics.

3           I think I have read to some extent again

4    the IARC report and the EPA report which you asked

5    me about last time.

6    Q    What do you mean to some extent?

7    A    Well, again, as I'm not an expert on

8    general causation, I didn't sit down and read them

9    for five hours extensively.  I read them at a

10   shorter pace to try to get the gist of what was

11   going on.

12   Q    And just to be clear, the scope of your

13   opinions are still only specific causation and not

14   general causation in this case, correct?

15   A    Well, I'm retained as a specific expert for

16   this case, but at our last deposition you asked me

17   mostly questions related to general causation.  So I

18   wanted to have a little bit of background so that I

19   can try and answer those questions to the best of my

20   ability.

21   Q    I understand.  But in terms of your

22   retention and the opinions you have been asked to

23   give in this case, the scope has not changed since

24   the last deposition, correct?

25   A    No.  The scope has not changed.

1      Q    Are you familiar with the National Cancer

2    Institute?

3      A    A little bit, yes.

4      Q    Is it a reputable institution?

5      A    For the most part, yes.

6      Q    Do you rely on information from the

7    National Cancer Institute in your practice?

8      A    I would say that any information that is

9    produced by any organization, whether it is the

10   National Cancer Institute or Johns Hopkins or

11   Harvard, is something that needs to be assessed

12   independently to its veracity whether it applies

13   because nothing is 100 percent true or 100 percent

14   false.

15     Q    You understand that the NCI publishes

16   information for patients regarding causes and

17   prevention and treatment and statistics regarding

18   lymphoma and other cancers?

19     A    Yes.

20     Q    Do you ever tell your patients to look at

21   things like the NCI?

22     A    My patient population here is a little less

23   well educated, so I don't always suggest that they

24   read up everything about their disease.  If they --

25   if a patient goes to the internet and reads

1    information that's misinformed, I might say make

2    sure you read something from PDQ to get a general

3    sense of things, which is what the NCI puts out.  I

4    might look at this source, I might look at that

5    source.  If I had a patient who was very, very well

6    educated, I might point them to specific papers and

7    things like that.

8              (The document referenced below

9         was marked Deposition Exhibit 13 for

10        identification and is appended

11        hereto.)

12   BY MR. KERSCHNER:

13        Q    I'm going to mark something from the

14   National Cancer Institute.  I think you mentioned

15   PDQ.  Do you know what that stands for?

16        A    Patient data query, I think.

17        Q    Yeah.

18             MR. KERSCHNER:  Joe, I think that's Number

19   22.  In just a moment we are going to pull it up as

20        a share and then in the chat.

21             Doctor, are you able to see?

22             THE WITNESS:  Yeah, I'm clicking on the

23   link right now.

24   BY MR. KERSCHNER:

25        Q    It is also in the share on the chat --

1    sorry, it is on the screen and shared for the depo.

2    Can you see it there?  Either one is fine.

3         A    Yes.  I can see the first paragraph, yes.

4         Q    Okay.  This is the NCI Cancer Prevention

5    Overview PDQ that you were talking about, right?

6         A    Right.

7         Q    Is this the kind of thing you might point

8    one of your patients to?

9         A    I think we alluded to this last time.  You

10   know, once I see a patient who is diagnosed with a

11   cancer, the discussion regarding prevention is not

12   as germane because the goal there is to heal them of

13   their specific cancer unless they specifically ask

14   questions about how did I get this cancer and things

15   such as this.  So I think the prevention statement

16   of the PDQ is more for people who do not have

17   cancer, at least to prevent getting cancer.

18        Q    Yeah.  But for folks who are asking about

19   what, as you said, may have led to their cancer or

20   are curious about things of prevention, is this the

21   kind of website you would point them to?

22        A    To be honest, in the past four years, I

23   have not pointed anybody to PDQ, no.

24        Q    Let's just take a look at the -- what is

25   the second page of the document.

```
1              I'm sorry, can you still hear me?  I think
2     I lost my audio for a second.
3         A     Yes, I can hear you.
4         Q     Okay.  Wonderful.
5              There's a section on risk factors.  Do you
6     see that?
7         A     Yes.
8         Q     Do you agree with the NCI about this list
9     of risk factors here for increase -- that increase
10    the risk of cancer?
11        A     Is this for all cancers, this particular
12    PDQ?
13        Q     If you want -- I think we can probably show
14    the beginning of the section.  Yeah, if we go there.
15        A     So this would apply to every single cancer.
16        Q     Correct.  And you could agree here with
17    what the NCI as put forth as the risk factors?
18        A     Could you raise it a little bit?
19        Q     I think it went the other way.
20        A     Just to where it says risk factors.
21             I don't think that that's a complete or
22    totally accurate list, but some of those things are
23    associated with an increased risk of cancer.
24        Q     And what's missing?
25        A     Well, there's a lot missing.  For example,
```

1    pancreatic cancer is associated with chronic

2    pancreatitis.  That's not on this list.

3           Lung cancer can be associated with uranium.

4    That's not on this list.  Unless it's under

5    radiation.

6           Sarcoma could be associated with chronic

7    lymphedema.  That's not on this list for sarcoma.

8           Environmental risk factors, I guess, is

9    very broad.

10          I don't think it is a complete and totally

11   accurate list, but I would have to take ten minutes

12   to think about it by going through each histology

13   and thinking about which causes which cancers.

14   Q    In the first paragraph on the top of the

15   page, do you see that, begins with "Changes"?

16   A    Changes in mutations --

17   Q    Do you see that?

18   A    Yeah, I see that.  I see that paragraph.

19   Yes, I see the paragraph.

20   Q    And it says:

21          "Changes from mutations in genes

22          can cause normal controls in cells to

23          break down.  When this happens, cells

24          do not die when they should and new

25          cells are produced when the body does

1      not need them.  The buildup of extra

2      cells may cause a mass (tumor) to

3      form."

4           Do you agree with that statement?

5      A    Yeah, I think it may be a simplification,

6   but it is not a wrong statement per se.

7      Q    And you mentioned the environmental

8   factors.  Do you recall that as one of the risk

9   factors listed here?

10     A    It says factors that may affect the risk of

11  cancer, environmental risk factors, yes.

12     Q    And if we scroll down, it then sort of

13  explains, goes through the risk factors there.

14  There's a section on environmental.

15          And if the text is too small, we can try

16  and make it bigger.

17          Do see the section entitled Environmental

18  Risk Factors?

19     A    Yes.

20     Q    Do you see the last two sentences there?

21     A    The drinking water or the studies?

22     Q    No, below that, it begins with "Studies."

23          Do you see that?

24     A    Yes.

25     Q    It says:

```
 1                "Studies have been done to see if
 2           pesticides or other pollutants
 3           increase the risk of cancer.  The
 4           results of those studies have been
 5           unclear because other factors can
 6           change the results of the studies."
 7           Do you see this statement?
 8      A    I do see that statement, yes.
 9      Q    Do you agree with what the NCI has said
10   here?
11      A    I think it's a vast oversimplification.
12      Q    How so?
13      A    Well, as we talked about earlier in the
14   deposition, I think that Roundup is associated with
15   a dramatically increased risk of non-Hodgkin's
16   lymphoma based on data I've read and other expert
17   opinions.  So I don't think it is quite a strong
18   enough statement when it says unclear.  I think it
19   is, to me, more clear than not.
20      Q    You said dramatically increased risk.  What
21   is the increased risk?
22      A    Some of the relative risks and odds ratios
23   in these studies are above two.
24      Q    I'm asking, sorry, your opinion to a
25   reasonable degree of medical certainty, what is the
```

1    relative risk or the increased risk that someone who

2    uses Roundup faces in developing non-Hodgkin's

3    lymphoma?

4       A    I think from the Zhang meta-analysis it

5    increases the risk by 41 percent in their main

6    analysis.  I would have to look it up because they

7    altered the analysis when they took out some of the

8    studies and it changed a little bit higher.

9       Q    We will talk a little bit about Zhang, but

10   you're -- so when it comes to determining the

11   relative risk for Roundup and non-Hodgkin's

12   lymphoma, you are relying on the Zhang data?

13      A    No.  I'm relying on all the papers I've

14   provided you that are informing my opinion as well

15   as all the expert opinions that I've provided to you

16   and -- I mean, I think I provided most of those

17   studies to you that I've read, but I've not read

18   every single study.  But the expert opinions,

19   Weisenburger and Portier, and Al Neugut went through

20   a lot of studies that linked Roundup to increased

21   risk of non-Hodgkin's lymphoma.

22           I would also say that PDQ is written at a

23   very basic level so as to increase, you know,

24   people's understanding.  I think it is supposed to

25   be written at a seventh-grade level or such.  But

1    the nuances regarding what we are talking here today

2    about Roundup and non-Hodgkin's lymphoma are, I

3    think, much above a seventh grade level when you

4    start to read epidemiologic studies.

5         MR. KERSCHNER:  We could pull this down.

6    BY MR. KERSCHNER:

7    Q    Have you ever used data from here in your

8    research or in your practice?

9    A    Mostly in research.  It is usually -- you

10   know, if I'm reading a review article or a chapter

11   on a cancer they may put some SEER data, but in my

12   CV I've done several database searches with SEER.

13   Q    SEER provides data on incidences of cancer

14   in the United States, right?

15   A    Right.

16   Q    And that includes incidents of

17   non-Hodgkin's lymphoma in the United States, right?

18   A    Correct.

19   Q    Is SEER the best source we can use to find

20   data on incident rates of cancer in the United

21   States that you're aware of?

22   A    I'm not sure.

23   Q    Is there another source that you would use?

24   A    I mean I think SEER samples from 13 sites,

25   so it is partly accurate and it relies on, I think,

1    reporting from individual cancer registries.  So I

2    think it is a source, I don't know if it is totally

3    definitive.

4         Q    Is there a better source that you would use

5    in your research?

6         A    Well, the research I've done was mostly

7    trying to look at patterns and quality of care, and

8    the SEER Medicare database is useful because it is

9    in the public domain and there are also some

10   proprietary-linked databases.

11        Q    I don't think you have answered the

12   question.  Is there -- are you aware of, to

13   determine the incident rate of cancer rates in the

14   United States, of a better source to use than SEER?

15        A    I'm not 100 percent sure.  I think SEER is

16   a valid source of information.

17        Q    So SEER is a valid source of incidence

18   rates on cancer in the United States, correct?

19        A    Yes.

20        Q    Since the last time you were deposed, how

21   much time did you spend on Ms. Salas' case?

22        A    Not a lot on her case in specific, you

23   know.  I've written the report about her lymphoma.

24   The time I've spent since the prior part of this

25   deposition, I think I spent more time on reading

1    more about general causation.

2         Q    How many hours to date have you spent so

3    far in the Roundup litigation?

4         A    I don't think I have an accurate total of

5    how many total hours I've spent on it.

6         Q    I think in August you said you had spent

7    roughly 100 hours.  Do you recall that?

8         A    From the transcription, yes.

9         Q    As of August, that was correct?

10        A    I must admit, I haven't taken totally

11   accurate records.  I have to go back and sort of

12   total up the records for each case that I've done

13   and make an accurate estimate of how many hours I've

14   read the different articles, and I think, as I told

15   you last time, Mr. Kerschner, even though I may have

16   spent 100 hours reading the articles, I wasn't

17   necessarily going to bill for all that time.

18        Q    Have you submitted any invoices in the

19   Roundup litigation?

20        A    I submitted one invoice earlier this week.

21        Q    And how much is that invoice for?

22        A    I can look it up real quick if you -- I

23   think it is around $30,000, or I can look up the

24   exact amount.

25        Q    Does 30,100 sound right?  You can look it

1    up if you want.

2         A    If it is important to you, I'll search --

3         Q    You know, I think I can grab it.  Let me --

4    let's do that.  Why don't we pull up your --

5         A    For the Corey Swanson case.

6         Q    From January 14th.

7         A    Okay.

8              MR. KERSCHNER:  Do we have that?

9              MR. KLEMME:  I'm sorry, I thought you were

10   grabbing it.

11             (The document referenced below

12        was marked Deposition Exhibit 14 for

13        identification and is appended

14        hereto.)

15   BY MR. KERSCHNER:

16        Q    We see at the bottom, if you scroll down,

17   it is for $30,100, the total invoice?

18        A    Right.  Minus the $5,000 retainer.

19        Q    So it is actually -- the total billings in

20   that case is then 35,100 for that specific case?

21        A    To date, yes.

22        Q    You spent for this case, it says reading

23   articles 32 hours.

24        A    Correct.

25        Q    And other general reports by experts for

1    plaintiff, six hours?

2         A    Correct.

3         Q    So that's roughly 38 hours on that case,

4    right?

5         A    Correct.

6         Q    Is that a rough estimate of the time you

7    would have spent on your other Roundup cases, about

8    38 hours per case?

9         A    In reading the articles and general

10   reports, that's a rough estimate.

11           The way I was counseled to bill was that if

12   I had three cases with a firm, I should only bill

13   for that part once.

14        Q    Right.

15        A    So in this case this is only one case, so

16   it has been billed for there.

17        Q    So -- and you have how many Roundup cases

18   right now that you are working on?

19        A    It's about 12.  I think I've stopped taking

20   new cases for the time being, and I may divulge

21   myself of one or two of those cases.

22        Q    Why, may I ask?

23        A    I want to make sure I do an accurate job

24   for each case, and this is not my full-time job.

25        Q    So you spend roughly $30,000 on a case, is

1    that about what you spent on each of the 12 cases

2    would you say -- sorry.  That doesn't make sense.

3    Let's try it again.

4           Roughly 38 hours on a case for those 12

5    cases; is that about right?

6       A    Well, so that 38 hours, I think, relates to

7    forming a general opinion, and for some of those

8    cases, in addition to reading the articles I

9    provided a written report, which has a lot of review

10   of the general literature there, even though I'm

11   retained as an expert on specific causation.  And

12   then for each report there's the part above that

13   that says 20.2 hours and 15.2 hours.  So each case

14   is going to have a different amount of time

15   preparing for the case, reading the specific case

16   literature.  So the 38 hours will be for the first

17   time I do a case for a firm, at least.  There

18   probably will be additional hours if I've written a

19   general report for them and edited it or reedited

20   it.

21      Q    So some cases it is going to be more than

22   38?

23      A    Yes.

24      Q    So is a rough estimate of about, for the 12

25   cases, roughly 50 hours per case?

```
1        A    What's the total hours here, 48.2 hours?
2        Q    Yeah.
3        A    Yeah.  Sure.  That's a rough estimate per
4    case.
5        Q    And you bill at $500 an hour, right?
6        A    That is correct.
7        Q    So for 12 cases that you spent roughly
8    about -- you say you have spent about 600 hours on
9    the Roundup litigation?
10        A    So not all cases.  I mean, there's only
11    been three -- three cases where I've been deposed.
12    The rest I haven't maybe written a report for yet or
13    there hasn't been as much work done.  So to date I
14    would multiply this number by about three.
15        Q    That's 150 hours in the three cases in
16    which you have been deposed; is that fair?
17        A    Roughly.  I mean in this case I interviewed
18    the client and -- roughly.  I mean, that's a rough
19    average estimate, yeah, sure.
20        Q    Then in the other nine cases, how much time
21    do you think you have spent on average in those
22    cases?
23        A    A lot of them are in further waves.  So I
24    haven't written many reports yet or even received
25    the medical records or reviewed them.
```

1    Q    Of those nine cases, in that total group, I

2    realize it might vary between cases, what is the

3    total amount you think you have spent on those nine

4    cases?

5    A    Well, the way I was instructed was a fair

6    way to bill is if I have to do the general reading

7    of the general articles, I would bill for that once

8    per firm that's engaged me.

9         There's one case where I've spent some time

10   reading the specific medical records for that case,

11   and I have to write up a report.  That would be the

12   fourth case.

13        The fifth through tenth case, the only time

14   I've spent to date pretty much has been speaking

15   with the attorneys about why the case is of

16   interest.  So not a lot of time for those cases.

17   Q    And that fourth case where you had to read

18   the materials, how many hours?

19   A    Somewhere between 5 and 10, I think.  I

20   haven't even totaled it up.

21   Q    And then those other 5 to 10 cases, how

22   many hours do you think per case?

23   A    Those other cases, maybe a total of 10

24   because the reports are not due until later in 2023.

25   Q    You spent somewhere on the Roundup

1    litigation -- is roughly about 200 hours of your

2    time so far in the Roundup litigation, does that

3    sound right?

4         A    So I want to clarify.  If I'm billing 38

5    hours for reading reports, I'm not doing it 38 hours

6    each time.  Right?  So if you are calculating that

7    correctly, yes.

8         Q    So just to be clear, you spent roughly 200

9    hours of your time in the Roundup litigation?

10        A    You know, I'm not totally sure I'm

11   following your math.  So if I spend 38 hours

12   reviewing the general articles once, and I bill that

13   three times, that's 90 hours, but I didn't actually

14   spend 90 hours reading those articles, I'm just

15   billing each person for the fact that I read them.

16        Q    Okay.  So we will do it in two ways.  Let's

17   start with -- just so I understand because I

18   appreciate that.  I want to get it accurate how much

19   time you spent reviewing.

20             So when you -- let's just talk about hours

21   billed.  So you have billed roughly -- or accrued

22   time that you will bill, if you haven't billed it

23   yet, roughly 200 hours of billable time in the

24   Roundup litigation.  Is that fair?

25        A    That seems more or less fair, yes.

1       Q    And that's at $500 an hour?

2       A    Yeah.  It is always going to be 500 an hour

3    for now.

4       Q    So to date you have earned, whether you

5    have actually billed or been paid or just earned,

6    roughly $200,000 in the Roundup litigation; is that

7    correct?

8       A    Well, 200 hours times $500 an hour would be

9    $100,000.

10      Q    Oh.  Sorry.  That's why I'm a lawyer.

11      A    That would bring my rate to $1,000 an hour.

12      Q    That's why I'm a lawyer, Doctor.

13           Wait.  It is 200 hours times 500, yeah.

14    See?  That's why I -- you went to med. school and I

15    went to law school.  I can't do math.

16           Let me ask it again.

17           To date you have billed roughly $100,000 in

18    the Roundup litigation, correct?

19      A    No.  That's not accurate.  I haven't billed

20    anything, but this --

21      Q    Sorry.  Let me rephrase.

22           To date you have accrued, whether billed or

23    will bill, $100,000 in the Roundup litigation.

24      A    I think that's more or less accurate, yes.

25      Q    And to date, how many hours do you think

1    you have actually spent working in the Roundup

2    litigation?

3        A    Well, again, I'm counting this reviewing

4    the general literature more than once, and on this

5    invoice I didn't bill for writing the written report

6    because I didn't provide a written report for this

7    invoice.  But it would be fair to say I've spent

8    about 200 hours to date on this case.  If you

9    double-count the --

10       Q    Let's not double-count.  In other words,

11   the actual time that you have spent without double

12   counting, how many hours have you spent in the

13   Roundup litigation?

14       A    I mean, it has got to be at least 100 hours

15   because I've talked to these attorneys and I've

16   spent time writing the general report and editing

17   and revising it, and this is my third deposition I

18   need to bill for the deposition time.  So it is more

19   than 100 hours at this point.

20       Q    More than 110 hours?

21       A    I don't know if I can be that accurate

22   until I actually produce the invoices, and then I'll

23   get you an accurate figure, sir.

24       Q    But a fair estimate is you have spent 100

25   hours of time?

1      A    At least 100 hours, yes.

2           MR. KERSCHNER:  Let's pull this down.

3  BY MR. KERSCHNER:

4      Q    Last time you had your -- your CV hadn't

5  been updated and you recently updated your CV,

6  correct?

7      A    There may be some things added to my CV.  I

8  can email you or review it now if you would like.

9      Q    Counsel sent us a new CV this morning

10  that's the 2022 version of your CV.  When was the

11  last time you updated your CV?

12     A    It might even have been after that one I

13  provided to counsel.  There may have been another

14  publication or two.  I can actually tell you.  Hold

15  on a second.

16     Q    When did you provide the CV to counsel?

17     A    Oh, I think I provided it within the past

18  week or two, so it is probably accurate and up to

19  date, yes.

20     Q    And from my quick review, it looks like you

21  have added three papers that were published in 2022,

22  numbers 59, 60, and 61 on your CV?

23     A    I guess that's true.

24     Q    If you want, we can pull it up, if you need

25  to take a look.

```
 1              Do any of those -- one of them is "Maximum

 2    Accuracy Machine Learning Statistical Analysis - A

 3    Novel Approach"?

 4         A    That's true.

 5         Q    And then there's two editorial comments in

 6    Urology?

 7         A    Right.  That's true.

 8         Q    Do any of those papers have to do with

 9    Roundup?

10         A    No, they do not.

11         Q    Do any of those papers have to do with

12    causes or risk factors of non-Hodgkin's lymphoma?

13         A    No.  They are not related to non-Hodgkin's

14    lymphoma.

15         Q    Then there are three nonpeer-reviewed

16    studies.  One about -- that's cost savings through

17    the use of oncology biosimilars in the United

18    States.  That was in 2020.

19              Another one, Curious Dr. George blog.

20              And then the third is, "How I Would Treat

21    My Own Hodgkin's Disease" in 2022.

22         A    True.

23         Q    Do any of those papers have to do with

24    Roundup or glyphosate?

25         A    No.  They do not.
```

1    Q    Do any of them have to do with the causes

2    or risk factors of non-Hodgkin's lymphoma?

3    A    No.  Particularly not the ones about

4    bladder cancer.

5    Q    What is Curious Dr. George blog?

6    A    Dr. George is a very prominent academic

7    physician.  His name is George Lundberg.  He was the

8    former head of the Journal of American Medical

9    Association in the 20th century and one of the

10   pioneers in the medical internet and asked different

11   oncologists to write blog pieces for his readership

12   interest.

13   Q    So you wrote blogs for -- strike that.

14   A    Yeah.

15   Q    So you --

16   A    Read editorials for Dr. George, yes.

17   Q    Understood.  Thank you.

18        Have you -- you are still practicing in

19   California, correct?

20   A    Yes.  Correct.

21   Q    Have you ever practiced in another state?

22   A    Yes, I have.

23   Q    What states have you been licensed to

24   practice in?

25   A    I was licensed to practice in Maryland.

```
 1        Q     Any others?

 2        A     And I was licensed to practice in Illinois.

 3        Q     Other than California, Maryland, and

 4   Illinois, you are not licensed to practice medicine

 5   in any other states, correct?

 6        A     Correct.

 7        Q     Other than the Roundup litigation, have you

 8   ever testified as an expert regarding the causation

 9   of cancer?

10        A     Give me a second to think if any of them

11   were specific about causation.

12              No, I don't think I've testified about the

13   cause of cancer apart from these Roundup

14   litigations.

15        Q     Sitting here today, do you know for certain

16   if any of your non-Hodgkin's lymphoma patients have

17   ever used Roundup?

18        A     I don't know for certain.  I think it is

19   highly likely given that I practice in Northern

20   California, and I've seen a fair amount of farm

21   workers, but I have not taken a poll how many of

22   them use Roundup so I couldn't be 100 percent

23   certain.

24        Q     Do you know what mechanism or mechanisms

25   cause non-Hodgkin's lymphoma?
```

```
 1        A    I have an idea about what mechanisms cause
 2    non-Hodgkin's lymphoma.
 3        Q    To a reasonable degree of medical
 4    certainty, can you tell us what mechanism or
 5    mechanisms cause non-Hodgkin's lymphoma?
 6        A    Well, there are many mechanisms that are
 7    associated with an increased risk of non-Hodgkin's
 8    lymphoma.  I don't think it is just one mechanism.
 9        Q    So what -- to a reasonable degree of
10    certainty, what are the mechanisms that cause
11    non-Hodgkin's lymphoma?
12        A    So carcinomic genesis of cancer is a
13    multifactorial step of many mutations along the way
14    in many different pathways, including alterations in
15    oncogenes, changes in apoptotic function, and
16    causation is a very complicated thing.  I don't
17    think that it is like one thing causes one cancer.
18    And different non-Hodgkin's lymphomas are associated
19    with some particular risks and other are associated
20    with other risks.
21        Q    All right.  Which mechanism can you say to
22    a reasonable degree of medical certainty that
23    glyphosate caused non-Hodgkin's lymphoma?
24        A    By which mechanism?
25        Q    Yeah.
```

1          A     There's a big literature, which I alluded

2     to in my report, about some of the molecular biology

3     changes associated with Roundup and increased risk

4     of non-Hodgkin's lymphoma.  There's a lot of animal

5     data that was looked at by IARC, and I might refer

6     you to some of those papers.

7          Q     Again, I just want to understand your

8     opinion did you use to rule in Roundup as a

9     potential cause of non-Hodgkin's lymphoma.

10               In your opinion, to a reasonable degree of

11    medical certainty, what is the mechanism by which

12    Roundup or glyphosate causes the development of

13    non-Hodgkin's lymphoma?

14         A     Broadly, I would say it would induce

15    changes in the DNA of precursor cells, lymphoma

16    cells -- precursor cells to lymphoma that increases

17    the probability of them developing into

18    non-Hodgkin's lymphoma, and I would have to refer to

19    all the animal studies for sort of a description of

20    that as well as some of the other studies that I've

21    cited to give you a great answer.

22         Q     Is it fair to say, then, you are not an

23    expert on the mechanism by which Roundup or

24    glyphosate can cause non-Hodgkin's lymphoma?

25               MR. ROJAS:  Object to the form.

1          Go ahead, Doctor.

2          THE WITNESS:  So I can give you my thoughts

3     about how glyphosate causes non-Hodgkin's lymphoma,

4     not from memory, but I would certainly refer you to

5     some of the papers and we can discuss, you know,

6     oxidative stress, we can discuss changes to the

7     nucleus.  We could even get into some of the

8     specific molecular mechanisms.  But I think the

9     general causation experts have done a really good

10    job of writing that in their general reports, so if

11    you wanted my opinion, I might say I'm in agreement

12    with what they have written there.  But, as I've

13    said, I'm not retained here as a general causation

14    expert.

15    BY MR. KERSCHNER:

16    Q    I understand that.  I just want to make

17    sure I -- because I want -- I don't want to waste

18    time if I don't need to waste time on tons of

19    questions.

20          So are you putting yourself forward as an

21    expert in the mechanism by which Roundup can cause

22    non-Hodgkin's lymphoma, or are you just referring to

23    others but you are not an expert to a reasonable

24    degree of medical certainty in that question?

25    A    So I think I have some background in

```
 1    epidemiology, and I think when I read some of the
 2    animal studies and some of the reports and some of
 3    the general reports, I could understand the
 4    molecular mechanisms of how Roundup can cause
 5    non-Hodgkin's lymphoma.  There are some of those
 6    reports listed in my general report to you, but I'm
 7    not putting myself forward as a general expert on
 8    causation.
 9        Q    Right.  So my question is a little more
10    nuanced.  Are you saying that you are an expert in
11    the mechanism by which Roundup causes non-Hodgkin's
12    lymphoma?
13        A    No, I'm not an expert in the mechanism by
14    which Roundup causes non-Hodgkin's lymphoma.
15        Q    You talked about multi-faceted causes
16    earlier.  Do you -- strike that.  Let me start over.
17             Would you agree you can't state to a
18    reasonable degree of medical certainty that one
19    factor caused any individual's non-Hodgkin's
20    lymphoma?
21        A    There's a really great analogy from a paper
22    that I think I provided to you about a person who is
23    hit on the head and has some balance problems and
24    then later in life there's a day where it is windy
25    and there's a slick puddle on the ground and he
```

1    falls and break his hip.  So causation in that is

2    multifactorial, and it could be if the wind was very

3    strong that might be enough for him to fall, but all

4    those things were involved in the causal pathway.

5           So the way I think about Roundup and

6    non-Hodgkin's lymphoma is that it dramatically

7    increases the risk of developing non-Hodgkin's

8    lymphoma in somebody who is not exposed to it.  I

9    think I'm confident in the epidemiologic and animal

10   study data that shows that, and I'm of the opinion

11   that non-Hodgkin's lymphoma significantly increases

12   the risk of causing non- -- Roundup increases the

13   risk of causing non-Hodgkin's lymphoma.

14          But I would not put myself forward as an

15   expert in interpreting the animal studies.  I think

16   I have better understanding than many people about

17   the epidemiologic study and the veracity of them

18   only because I have some background in epidemiology,

19   but I'm not putting myself forward as a general

20   expert in causation in this case.

21   Q    I'm sorry.  I think we got way outside my

22   question.  It is a much simpler question.

23          Would you agree that you can't say to a

24   reasonable degree of medical certainty that one

25   factor caused any individual's non-Hodgkin's

1    lymphoma?

2        A    Even when you have smoking, you know, it's

3    a -- not a totally sufficient cause because many

4    people who smoke don't get lung cancer.  But there

5    are some non-Hodgkin's lymphomas that are strongly

6    associated with viruses.  So if somebody has endemic

7    Epstein-Barr virus in Africa -- Epstein -- Burkitt's

8    lymphoma in Africa, you almost always see

9    Epstein-Barr there.

10       Q    And you see that in the pathology, correct?

11       A    If you look for Epstein-Barr virus.  It is

12   not going to be in the pathology report.

13       Q    Sorry.  You would see that in the slide,

14   though, the path slide?

15       A    You wouldn't see in the pathology -- on the

16   path slide you would see Burkitt's lymphoma --

17       Q    Right.

18       A    -- but you have to check separately for

19   Epstein-Barr virus in that sort of case.

20       Q    So other than cases of viral -- viruses

21   inducing non-Hodgkin's lymphoma, is it fair to say

22   that to a reasonable degree of medical certainty

23   that you can't say that one factor caused an

24   individual person's non-Hodgkin's lymphoma?

25            MR. ROJAS:  Object to the form.

1          THE WITNESS:  The way I think I've written

2    it is that Roundup was a significant --

3    BY MR. KERSCHNER:

4        Q    I'm not asking you about Roundup.

5        A    Okay.

6        Q    I said in general.

7        A    General.

8        Q    Sorry.  I'm just trying to get a general

9    question.

10          Other than in particular cases where

11   viruses have led to a development of non-Hodgkin's

12   lymphoma, you can't say to a reasonable degree of

13   medical certainty that one factor caused a person's

14   non-Hodgkin's lymphoma, correct?

15          MR. ROJAS:  Object to the form.

16          THE WITNESS:  I'm not exactly sure how to

17   answer that, but I think cancer is multifactorial,

18   and I think there's more than one thing that would

19   increase risk of cancer.  So I wouldn't point it

20   down to one thing only.

21   BY MR. KERSCHNER:

22       Q    So I am correct, then, you can't, to a

23   reasonable degree of medical certainty, say for any

24   individual that one factor was the cause of their

25   non-Hodgkin's lymphoma?

```
1              MR. ROJAS:  Object to the form.

2              THE WITNESS:  I think I'm going to have to

3     stand by what I wrote in this report as to how I

4     feel about causation in this case.

5     BY MR. KERSCHNER:

6        Q   I'm talking about non-Hodgkin's lymphoma,

7     not specific to Roundup.  So just -- it is a simple

8     question.  Either it is a yes or it's a no.  Can you

9     say to a reasonable degree of medical certainty in a

10    case of non-Hodgkin's lymphoma that is not induced

11    by a virus, that one factor caused a person's

12    non-Hodgkin's lymphoma?

13             MR. ROJAS:  Object to the form.

14             THE WITNESS:  I have a little trepidation

15    answering that when the attorney objects to the form

16    as if it is an awkward question or something.

17             MR. ROJAS:  No, you can go ahead and

18    answer.  I'm objecting only to the form, so.

19             THE WITNESS:  No, I don't think I can say

20    for sure that one factor alone causes somebody's

21    non-Hodgkin's lymphoma.

22    BY MR. KERSCHNER:

23       Q   We talked last deposition about an article

24    by Dr. Tomasetti and Dr. Vogelstein from 2017.

25             Do you recall that?
```

```
 1        A    Yes.

 2        Q    And at that point you had not yet reviewed

 3   that article, right?

 4        A    Right.

 5        Q    And I think it is on the new list of

 6   documents that I received.  Is that correct?

 7        A    Yeah.  I've read it since then.

 8             MR. KERSCHNER:  Actually, let me just -- I

 9   just want to note for the record.  We received a

10   list of several articles this morning that had been

11   requested back in August and again back at a letter

12   to counsel on January 5th, we asked that they be

13   turned over last Friday.  They were received this

14   morning.

15             I haven't had an opportunity to review the

16   articles on that and would reserve the opportunity

17   to continue this deposition with Dr. Knopf after the

18   time to review that.  I just want to put that on the

19   record.

20             MR. ROJAS:  Sure.  We obviously don't

21   agree, but that's fine for the record.

22   BY MR. KERSCHNER:

23        Q    And, Dr. Knopf, just for that, let me ask

24   you, within the next month, do you have any travel

25   plans where you will be unavailable or out of town?
```

1      A    I don't have any travel plans, but I try

2   and do depositions on Mondays and Fridays so as to

3   interfere less with patient care, and I don't -- I

4   do have some other commitments on those dates.  But

5   I'm not fleeing to Venezuela during the next month,

6   no.

7      Q    Do you have any dates in the next two

8   months where you can't be deposed?  And we don't --

9   check that during the break, and we will get back.

10     A    I mean, I provided those documents earlier

11  in the week, and if they were sent to you this

12  morning, I'm not sure.  If you say that justifies

13  continuing the deposition a third time, who am I to

14  disagree.

15     Q    That was just for a statement on the

16  record.  I appreciate your thoughts.

17          So let's --

18     A    Yeah.  There's an article I'm going to try

19  and get the name for you because it really disputes

20  the Tomasetti article nicely.

21     Q    We'll get to that.  I just want to figure

22  out the timing.

23          So you have since reviewed Dr. Tomasetti's

24  2017 paper, right?

25     A    Right.  The first time I saw that paper is

1    when you showed it to me.  So following that, I

2    reviewed it.

3       Q    And we had talked about Dr. Tomasetti's

4    conclusions that DNA replication errors are -- and

5    I'll rephrase that.

6            Your first deposition, am I correct you

7    weren't able to either agree or disagree with the

8    conclusion of the paper that DNA replication errors

9    are responsible for 96 percent of non-Hodgkin's

10   lymphoma; is that right?

11      A    Well, I think I did disagree with that at

12   the time, and I would certainly disagree with it

13   now.

14      Q    You said you need to read the paper for

15   hours, look at how they come up with that estimate,

16   and then read the articles that they came up with

17   the estimate -- strike that.  Let me rephrase.

18           I asked you about your basis for

19   disagreeing with that statement.  You said:

20           "I would really need to read this

21       article for hours and look at how they

22       came up with that estimate and then

23       read the articles that they came up

24       that estimate with to see how they

25       interpreted the epidemiologic

```
 1          literature."
 2              Do you remember saying something to that
 3      effect as to what you would need to do?
 4      A    Yeah.  I mean, I disagree with their whole
 5      making up a mathematical model and then inferring
 6      from that that -- their conclusions.  I think
 7      that -- well.
 8      Q    I'm sorry, just -- my question is do you
 9      recall testifying about what you would have to do to
10      properly analyze their conclusion?
11      A    If that's what you -- you are probably
12      reading what I wrote in the transcript fairly
13      accurately.
14      Q    Did you spend hours reading the article and
15      look up how they came to that estimate and read the
16      articles that they cited in their paper since the
17      last deposition?
18      A    So I read the article at least once,
19      probably twice, and I was provided another article
20      that sort of poked holes in their article.  And I
21      think it is a vast oversimplification to say that --
22      what they said, and I disagree with the Tomasetti
23      article.
24      Q    What article were you provided?
25      A    If you give me a minute, I'm going to see
```

1    if it is on my list of articles here or if it is

2    only in my email.

3         If I can take a two-minute break, maybe I

4    can find it in my email because it's a really nice

5    recitation of the Tomasetti article.

6         MR. KERSCHNER:  Sure.  Why don't we go off

7    the record.  It has been almost an hour, so why

8    don't we do that.

9         VIDEO OPERATOR JOHNSON:  We are going off

10   the record.  It is 11:01.

11        (Recess taken.)

12        VIDEO OPERATOR JOHNSON:  We are back on the

13   record.  It is 11:12 a.m.

14        (The document referenced below

15        was subsequently marked Deposition

16        Exhibit 15 for identification and is

17        appended hereto.)

18   BY MR. KERSCHNER:

19   Q    Dr. Knopf, you just provided us an article

20   titled "Genes, Environment, and Bad Luck," by Martin

21   Nowak and Bartlomiej Waclaw.  I think I said the

22   first name wrong, but is that the article that you

23   referenced before that was provided to you regarding

24   Dr. Tomasetti's 2017 paper?

25   A    Yeah.  And I thought I provided it to

```
 1     Mr. Rojas in advance of this deposition.
 2         Q    And who provided you this paper?
 3         A    I think John Restaino, an attorney in
 4     Florida.
 5         Q    What firm is Mr. Restaino at?
 6         A    I would have to look it up for you.  Hold
 7     on.
 8              The firm is called Rueb Stoller Daniel.
 9         Q    Is that one of the firms that you were
10     working with in the Roundup litigation?
11         A    Yes.
12         Q    This article was provided to you by counsel
13     for one of the plaintiffs in the Roundup litigation?
14         A    Yes.  Although Dr. Restaino --
15         Q    I don't need to get into the content of the
16     communication, and I want to be clear.  So just --
17     if you can answer that yes or no probably, it is
18     probably easiest.
19         A    Yes.  And -- yes.
20              MR. ROJAS:  No objection to the past couple
21     of questions, but -- and even though I don't work
22     with this other lawyer and he doesn't represent
23     Ms. Salas and only our firm does, et cetera,
24     obviously, Dr. Knopf, just take a pause when we are
25     on these topics before because I may have some
```

1    concerns about, you know, attorney-client privilege

2    and that kind of thing, so.

3           MR. KERSCHNER:  I saw you jump there,

4    Pablo.  That's why I made sure -- yeah.

5    BY MR. KERSCHNER:

6    Q    Go ahead, Dr. Knopf.  You know, I don't

7    have any other questions --

8    A    Nothing was revealed about this case or

9    anything that would violate attorney-client

10   privilege.

11          Dr. Restaino is a colleague of mine.  We

12   are on a research group.  And either he or maybe

13   another attorney provided this article for me

14   because I said I was really stunned by this, one,

15   approximation and I didn't believe it, and they said

16   well, this is a better explanation, so.

17   Q    Other than that article you provided, have

18   you done any research or reviewed any other article

19   relating to Dr. Tomasetti's 2017 paper we talked

20   about last time?

21   A    Not specifically related to his paper, but

22   in the deposition before, there was a part where you

23   asked me how can I talk about nonfrequent

24   statistics, and I read some additional articles

25   there.  And I reviewed Goodman's articles there,

1    which I think I provided and listed it to Mr. Rojas.

2        Q    Yeah.  I've seen those.  I just want to get

3    specific to Dr. -- the question about whether DNA

4    replication errors are responsible for 95 percent of

5    non-Hodgkin's lymphoma cases and your -- in the

6    review you have done specific to that question.  Is

7    it right that it was reading Dr. Tomasetti's paper

8    and also the paper you just sent, Genes,

9    Environment, and Bad Luck?

10       A    Right.

11       Q    What percent of non-Hodgkin's lymphoma is

12   caused by naturally occurring mutations or DNA

13   replication errors?

14       A    I'm not sure of the answer to that.

15       Q    Based on your review of Dr. Tomasetti's

16   article and the article you sent, you can't answer

17   that question?

18       A    Well, I'm saying I would disagree with

19   Tomasetti's article.  I think it is a mathematical

20   model that was invented that's not validated, and I

21   think this article -- there's some nice sentences

22   here that I would refer you to.

23       Q    I just want -- I just want -- I don't want

24   to get too far afield.  So can you tell me what

25   percent of non-Hodgkin's lymphoma cases are caused

1    by environmental factors?

2        A    It's more complicated than one agent

3    causing it.  It is a multifactorial process, and I

4    think that intrinsic environmental factors play a

5    much higher percentage of causation of lymphoma than

6    Tomasetti implied in his article.

7        Q    So can you tell us to a reasonable degree

8    of medical certainty sitting here today what percent

9    of non-Hodgkin's lymphoma cases are caused by

10   environmental factors?

11       A    There may be a percentage number in this

12   article which I like.  Let's see.

13           "One cannot use this relationship

14       to differentiate between contributions

15       from replication, hereditary, and

16       environmental factors to cancer risk.

17       Importantly, Tomasetti and Vogelstein

18       never claimed such a possibility in

19       their earlier or current studies.  Wu,

20       et al., provided a simple argument why

21       this is not possible."

22       Q    Are you reading --

23       A    Yeah.

24       Q    -- from the Genes, Environment and Bad Luck

25   article?

```
 1        A     Yes, yes.

 2        Q     So just so that's clear for the transcript,

 3   I wanted to make that clear that you were reading

 4   from the article there.

 5        A     Yeah.

 6        Q     So can you just answer my question, what is

 7   your opinion as to the percentages of non-Hodgkin's

 8   lymphoma cases that are caused by environmental

 9   factors.

10        A     I'm not sure.

11        Q     Okay.  What percent of non-Hodgkin's

12   lymphoma cases would you say are caused by a

13   combination of environmental factors and naturally

14   occurring DNA mutations or DNA replication errors?

15        A     I'm not sure I can give an exact

16   percentage, but I think that the probability of

17   developing non-Hodgkin's lymphoma is multifactorial

18   and environmental factors can be a substantial

19   contributing cause of the development of

20   non-Hodgkin's lymphoma, including viruses, as we

21   alluded to earlier in the deposition.

22        Q     I'm sorry, I don't know that I caught the

23   beginning.

24              Am I correct that you can't tell us, to a

25   reasonable degree of medical certainty, what
```

1    percentages of non-Hodgkin's lymphoma cases are

2    caused by a combination of environmental factors and

3    naturally occurring mutations or DNA replication

4    errors?

5        A    Well, in a sense 100 percent because all

6    lymphomas are caused by a combination of naturally

7    occurring mutations and mutations that are triggered

8    by environmental factors.

9        Q    So is it your testimony to a reasonable

10   degree of medical certainty that there are no

11   non-Hodgkin's lymphoma cases that are caused solely

12   by naturally occurring mutation and DNA replication

13   error?

14       A    I didn't say that.

15       Q    Well, if it is 100 percent a combination --

16   ahh, that's I think where we are -- as I asked the

17   question, I realized my wording was wrong.  So let

18   me rephrase.

19            When I said combination, I don't mean

20   either/or, so let me rephrase.

21            Can you tell us to a reasonable degree of

22   medical certainty what percent of non-Hodgkin's

23   lymphoma are caused by both at the same time

24   environmental factors and naturally occurring

25   mutations or DNA replication error?

1        A    You are asking a hard question.  Can you

2    say that again?

3        Q    Sure.

4             Can you tell me the percentages of

5    non-Hodgkin's lymphoma cases that are caused by both

6    environmental factors impacting the patient as well

7    as naturally occurring mutations or DNA replication

8    errors also impacting that patient?

9        A    I don't think anybody could give you an

10   exact answer to that because in a large population

11   of 1,000 lymphoma patients, it would be very hard to

12   tease out what percent were purely endogenous

13   mutations and what percent were environmental

14   because I don't think that those sorts of studies

15   can be done or that knowledge of evidence exists,

16   you know.

17            For example, non-Hodgkin's lymphomas

18   increase as people age, and there might be antigenic

19   stimulation by a lifetime of encountering bacteria

20   and viruses.  So that -- it is multifactorial, and

21   as I alluded to with the paper by -- shoot.

22   Everything is multifactorial.  So 100 percent of

23   lymphomas are either caused by some random mutations

24   or external environmental factors, and it is a

25   multifactorial process including initiation,

1    promotion, downstream mutations.  So I don't think

2    anybody can say with any one cancer that this was

3    caused solely by this or solely by that, even among

4    people who have Epstein-Barr virus in Africa, not

5    all of them are going to get Burkitt's lymphoma.

6        Q    You can't -- strike that.

7            Have you done any research on whether

8    Roundup specifically or glyphosate specifically can

9    cause any DNA replication errors?

10       A    I have not done my own research myself.  I

11   don't have an animal lab or things, but I've read

12   some of those articles.  I've read the IARC report

13   reviewing those articles.  I've read the Zhang

14   report which reviews some of those articles.  I've

15   read Weisenburger's report.  So in that sense, yes,

16   I've done some research on it.

17       Q    Other than reviewing articles written by

18   other people and studies conducted by others, have

19   you done any research on whether or not glyphosate

20   can cause DNA replication errors?

21       A    You mean my own independent research, like

22   my own lab?

23       Q    Yeah.

24       A    No, I have not.

25       Q    Can you point me to any peer-reviewed

1    published article, other than one that would have

2    been written by one of the experts for the

3    plaintiff, that claims that Roundup causes

4    non-Hodgkin's lymphoma?

5        A    I don't know who is retained by the

6    plaintiff or not.  In all the articles I've sent

7    you, I don't know who was retained by plaintiff.

8        Q    Fair.

9             Do you know any articles that say that

10   Roundup causes non-Hodgkin's lymphoma?

11       A    I know many articles that say Roundup is

12   associated with an increased risk of non-Hodgkin's

13   lymphoma or more likely than not was a substantive

14   cause of non-Hodgkin's lymphoma.  A lot of them are

15   listed in my reference list and a lot of them are

16   listed in the expert reports.  Plenty of them.  And

17   I don't know who among those people was retained as

18   an expert by plaintiff or not.

19       Q    So of the articles you are relying on in

20   that reference list, you just don't know which ones

21   were written by folks who were retained by plaintiff

22   versus not?

23       A    And I don't know which ones written by

24   folks who were retained by your -- you know,

25   Monsanto or not.

1        Q    Right.  So you don't know one way or

2    another whether or not the articles that you

3    reviewed were authored by either someone retained in

4    this litigation or not?

5        A    Well, at the last deposition I said that I

6    read Weisenburger's review article from Clinical

7    Lymphoma, Leukemia & Myeloma and you asked if I was

8    aware that he was retained by plaintiff and I said I

9    was not and you said he was, so.  That guy was

10   retained by plaintiff.  But, you know --

11       Q    Sorry.  I just want -- you are not

12   answering my question.  I think because -- I think I

13   was just a little confused and I think I'm going to

14   short-circuit it.

15            The materials that you reviewed, you are

16   just not aware of whether or not the authors of any

17   of those papers are retained by any of the parties

18   in the Roundup litigation.

19       A    Well, I think the people in the IARC review

20   were not retained by -- as plaintiffs in the Roundup

21   litigation.  I think they were an independent

22   committee for sure.

23            I don't know specifically with each

24   epidemiologic study if each author was retained by

25   plaintiff or not.  No, I don't know for sure.

1      Q   We talked a lot about epidemiology during
2   our last deposition, and I don't intend to go back
3   through all the studies and things that we talked
4   about, but I just want to kind of clear up some
5   questions I had.
6          We talked a lot about statistical power.
7   Is statistical power what you use to measure whether
8   a study is likely to properly test the true effect
9   of the compound or subject, if there is one?
10     A   So I tried to explain a little bit about
11  phasing analysis and pretest probabilities and
12  post-test probabilities.  And this time I provided
13  some of the articles that explain that a little bit
14  more, Goodman's articles to start with.  So
15  statistical power and frequented statistics is a
16  method to test statistical association, but it is
17  not the only method to test causality.  So we talked
18  about, you know, consistency across studies, dose
19  response.  That's not related to statistical power,
20  for example.
21     Q   Right.  I'm just trying to understand what
22  statistical power is, so let me try to make it
23  simple.
24          Is it fair that if a study has more
25  statistical power, that would then make the study

1    more reliable?

2        A    Not always, no.

3        Q    Why wouldn't it?

4        A    Well, I'm not an expert in statistical

5    inference, but, for example, if there is a

6    confidence interval, if there's an odds ratio of

7    2.63 and a confidence interval of .75 to 8.3 and it

8    is crossing P less than 0.05, it is still really

9    interesting because most of the -- most of the

10   relative risk is well above 1.  And so there's a

11   bias variance problem there that relates to sample

12   size and statistical power.

13       Q    I think we are talking about a statistical

14   significance.  I'm talking about just the power of

15   the study.  So a larger study would have more

16   statistical power behind it, right?

17       A    All other things being equal, perhaps

18   that's a true statement.

19       Q    And having more statistical power is a

20   measure of the reliability of the study itself,

21   right?

22       A    No.  I would disagree with that.  I mean,

23   in clinical literature, in my field, if you get

24   enough sample size, you can show something to be

25   true that may not actually be true.

1      Q     So let me rephrase.

2            Is statistical power one variable in which

3      we use to measure the -- whether or not a study is

4      likely to show the true effect of a subject?

5      A     It is one element that we use in

6      interpreting studies.

7      Q     And interpreting whether or not they are

8      likely to give us a truer result?

9      A     Right.  I think people would say a study is

10     underpowered or overpowered.

11     Q     Underpowered would be less likely to tell

12     you an accurate result, right?

13     A     Well, these are only telling you

14     statistical significance.  They are not really

15     telling you causality per se.

16     Q     Correct.  But if it is underpowered -- the

17     study is statistically underpowered, it is less

18     likely to tell you an accurate result, correct?

19     A     I'm not sure I would say that exactly.

20     First of all, I don't put myself forward as an

21     expert in statistics.  But a study could be

22     underpowered but have a very significant odds ratio,

23     which might make it very interesting, even though it

24     is not statistically powered.  And I think that some

25     meta-analyses are trying to get around that issue by

1    combining studies.

2         Q    And they would combine the studies so they

3    have more subjects and would have a larger

4    statistical power, right?

5         A    Yeah.  And they try to correct for

6    heterogeneity and random effects models --

7         Q    Right.

8         A    -- and all things I knew better a couple

9    years ago when I was studying statistics.

10        Q    Other than the documents you emailed me and

11   the documents on the new list we got, you didn't

12   bring any other materials with you for this

13   deposition, correct?

14        A    I have a list of the references from my --

15   so the report I gave you had some references, and I

16   brought a list of all the references that I've

17   included to date, but, you know.

18        Q    Is that a list that you sent to your

19   counsel?

20        A    I believe I tried to send them what

21   references were new, yes.

22        Q    One of the articles was -- on the new list

23   was by Dr. Benbrook, "Shining a Light on the

24   Glyphosate-Based Herbicide Hazard Exposures and

25   Risk:  Role of Non-Hodgkin's Lymphoma Litigation in

1    the U.S.A."

2          Do you recall that article?

3      A    Yeah.  You specifically asked me for the

4    Benbrook references.  I think --

5      Q    And that's one of the articles from

6    Dr. Benbrook that you rely on in your -- forming

7    your opinions, right?

8      A    Yeah.  I think that what he says has a lot

9    of validity.

10     Q    You understand that Dr. Benbrook --

11   actually, let's do it easily.  Why don't we mark

12   that quickly.

13          MR. KERSCHNER:  Joe, can you pull it up.

14   This is going to be the next exhibit, which is, I

15   think, 15, right?

16          THE REPORTER:  Correct.  We did not mark

17   the Genes, Environment --

18          MR. KERSCHNER:  Oh, let's mark that.

19   Sorry.  Let's mark the Genes and Environment

20   article -- that would be 15.

21          THE REPORTER:  Correct.

22          MR. KERSCHNER:  So 16 will be

23   Dr. Benbrook's article.

24          (The document referenced below

25          was marked Deposition Exhibit 16 for

1       identification and is appended

2       hereto.)

3   BY MR. KERSCHNER:

4       Q    I want to -- sorry, Doctor, can you see

5   that article?

6       A    Yes.

7       Q    Can we scroll -- you see next to

8   Dr. Benbrook's name there's a little star?

9       A    Yes.

10      Q    And that usually goes to show you that

11  there's information about the author, right?

12      A    About the what?  I'm sorry, I missed the

13  word.

14      Q    About the author, about Dr. Benbrook?

15      A    I guess so, yes.

16      Q    So that paragraph we are looking at that

17  begins with "Project coordinator," that's

18  information about the author, Dr. Benbrook, right?

19      A    Yogi Hendin and -- yeah, sure.

20      Q    Did you review this paragraph when you

21  reviewed the paper?

22      A    I'm sure I looked at the paragraph at some

23  point, yeah.

24      Q    Do you know what the Heartland Study is?

25      A    The Heartland Study.

1     Q    It is right at the beginning.  The first

2     three words after "Project Coordinator."

3     A    No, I don't know what the Heartland Study

4     is.

5     Q    Then if you continue down four lines where

6     it says "this paper expands upon."

7          Do you see that?

8     A    Yeah.

9     Q    Sorry.  Then the following line, the next

10    sentence, "I appreciate the help."

11         Do you see that?

12    A    Yes.

13    Q    It says:

14         "I appreciate the help of Rachel

15    Benbrook with the figures and

16    references cited herein."

17         Do you know who that is?

18    A    Well, she has the same last name as Charles

19    Benbrook, so perhaps they are related.

20    Q    You don't know Rachel Benbrook?

21    A    No.

22    Q    And then it says:

23         "I've worked as expert witness

24    for plaintiff in the U.S. litigation

25    involving Roundup and non-Hodgkin

1          lymphoma."

2                 Do you see that?

3          A     Yes.

4          Q     And you were aware of that when you read

5      this paper, right?

6          A     Yeah.  He is an intelligent guy with an

7      intelligent science opinion.  If he wants to be an

8      expert for the plaintiff, that's his choice.  That

9      doesn't mean what he is saying is incorrect.

10         Q     I'm just asking if you were aware of it.

11         A     Yes.

12         Q     Okay.  And then it continues, "This

13     assignment" -- so he is referring to his work for

14     the plaintiffs in the U.S. litigation, right?

15         A     Yes.

16         Q     -- "provided me with access to a

17             substantial number of Monsanto emails,

18             studies, and other documents not

19             otherwise available, as well as the

20             funding required to carry out detailed

21             analysis of the basis of IARC and U.S.

22             EPA's classification of the glyphosate

23             oncogenicity."

24                 Do you see that?

25         A     I can see that sentence, yes.

1    Q    So were you aware that the money

2    Dr. Benbrook has received from plaintiffs in the

3    United States Roundup litigation went into funding

4    this study?

5    A    I don't know that I can imply that from

6    that sentence.  But if you say that, I have no

7    reason to disagree with you.

8    Q    When it says "the assignment provided me"

9    and concludes with "the funding required to carry

10   out detailed analysis" and then explaining what his

11   analysis is, you don't interpret that to mean that

12   the U.S. litigation helped fund this analysis?

13   A    Sure.  That's --

14   Q    You're now aware --

15        THE REPORTER:  Excuse me.  You spoke over

16   each other.

17        THE WITNESS:  He wrote this paper.  I don't

18   know how much of the funding was involved in writing

19   a paper.  I didn't ask him.

20   BY MR. KERSCHNER:

21   Q    So is it something you would like to know

22   whether or not this paper was funded by money from

23   plaintiff's counsel in the Roundup litigation?

24   A    You know, I read reports by plaintiff

25   experts, and I'm not an expert in general causation,

1    as we have alluded to.  I read reports by experts

2    from Monsanto who were paid by Monsanto and I'm

3    evaluating the evidence based on what I feel is the

4    correct scientific interpretation of the data.

5         Q    Doctor, this isn't a report.  This is a

6    paper that is published.

7         A    Yeah.

8         Q    So I'm just asking for a published paper,

9    not an expert report in litigation, would you want

10   to know to the extent at which the funding for the

11   research into the published paper came from

12   plaintiff in the United States Roundup litigation?

13        A    Would I want to know that?

14        Q    Yes.

15        A    For what reason would I want to know that?

16        Q    I'm asking if you have any interest to

17   know.

18        A    I mean, I guess I would want to know if

19   there's a potential for bias by somebody being paid

20   by plaintiff or by Monsanto, but it is not the --

21        Q    If an author was being paid by funds from a

22   plaintiff lawyer or a law firm, you would think that

23   would at least call into question the bias of the

24   article, right?

25             MR. ROJAS:  Object to the form.

```
1                  THE WITNESS:  No.  I'm being paid by
2        plaintiff, and I think that my statements and
3        opinions are based on scientific truth, not the fact
4        that I'm being paid.
5        BY MR. KERSCHNER:
6            Q    And, again, that's in litigation.  I'm
7        talking about a published article.
8                  If an article is funded by plaintiffs'
9        counsel in a litigation, do you think that that
10       calls into question any of the credibility of the
11       article?
12                 MR. ROJAS:  Object to the form.
13                 And, David, I don't know that Benbrook says
14       anywhere that the paper is being funded by
15       plaintiffs' counsel.
16                 MR. KERSCHNER:  I'm not -- we can pull the
17       exhibit down.  We are done with -- I'm talking about
18       general here.  Let me reask the question.
19       BY MR. KERSCHNER:
20           Q    If you found out that an article had been
21       written that was funded by plaintiffs' counsel and
22       the article dealt with Roundup and non-Hodgkin's
23       lymphoma, would that, for you, call into question
24       the conclusion for the article itself?
25           A    Let me say it this way.  I know Tomasetti
```

```
 1     is an expert for Monsanto, from a Wall Street
 2     Journal article, I think.  And I read his paper to
 3     figure out whether I thought it was scientifically
 4     accurate, and I did not think it was scientifically
 5     accurate, but I did not think it was not
 6     scientifically accurate because he is a
 7     plaintiff [sic] for Monsanto.  I just evaluated it
 8     on the basis of my impression of science and
 9     creating a mathematical model and then inferring
10     from a mathematical model that something is true.
11          Q    So to be clear, you don't know if Tomasetti
12     was being paid as an expert in litigation when he
13     wrote that paper, do you?
14          A    I don't know when he became an expert for
15     Monsanto.
16          Q    So let me ask my question, because I don't
17     think you answered my question.
18               If you found out that an article had been
19     written and published and that the funding for that
20     article came from plaintiffs' counsel in the Roundup
21     litigation and the article dealt with Roundup and
22     non-Hodgkin's lymphoma, would that, to you, at least
23     call into question the credibility of the article?
24               MR. ROJAS:  Object to the form.  This has
25     been asked and answered.  You don't have to like the
```

 1    answer, but I don't know how many times the question

 2    has been asked.

 3         MR. KERSCHNER:  He didn't answer my

 4    question.

 5    BY MR. KERSCHNER:

 6    Q    Go ahead, Doctor.

 7    A    I mean, there are studies that have been

 8    funded by Monsanto, and think it would be fair if

 9    you read them on the veracity of their studies alone

10    before deciding that it is a study that is only

11    bought and paid for.  I mean --

12    Q    If the study was sponsored by Monsanto,

13    that doesn't call into question the credibility of

14    the study either?

15    A    So I think it is one factor that you should

16    know when reading the study that it was funded by an

17    organization that has an interest in a certain

18    outcome.  I mean, I think other people have -- in

19    fact, I think Benbrook has brought into question

20    about the animal studies that were done -- yeah.

21    Q    But fair in assessing the credibility of a

22    study, you would want to know whether or not any of

23    the funding or research for it came from plaintiffs'

24    counsel in this litigation; correct?

25    A    I think I would want to know it, but I'm

```
 1     thinking I'm scientific enough to read it and decide

 2     on the veracity of the article whether or not I knew

 3     that.

 4          Q    In your prior deposition, you mentioned an

 5     individual named Dr. Lawlor.  Who is that?

 6          A    I need a 30-second pause to answer this.

 7          Q    Sure.

 8               MR. KERSCHNER:  Let's take -- let's go off

 9     the record and take a minute, take a few minutes.

10               VIDEO OPERATOR JOHNSON:  We are going off

11     the record.  The time is 11:41.

12               (Recess taken.)

13               VIDEO OPERATOR JOHNSON:  We are back on the

14     record.  It is 11:54 a.m.

15     BY MR. KERSCHNER:

16          Q    All right, Doctor.  Do you consider

17     yourself an expert in all the causes of

18     non-Hodgkin's lymphoma?

19          A    What do you mean by expert?

20          Q    Do you hold yourself out to colleagues in

21     the medical community as an expert on the causes of

22     non-Hodgkin's lymphoma?

23          A    Relative to somebody who spends their

24     research career studying all the causes of

25     non-Hodgkin's lymphoma in a lab or devotes their
```

1    epidemiologic career and studies all to causes of

2    non-Hodgkin's lymphoma in datasets, no, but compared

3    to other people, I do lecture on the causes of

4    non-Hodgkin's lymphoma compared to an internist and

5    emergency room physician.

6        Q    When you give a talk at a medical

7    conference, you wouldn't hold yourself out as an

8    expert in the cause of non-Hodgkin's lymphoma,

9    correct?

10       A    If I was speaking to a general audience of

11   internists, I think I have more expertise in the

12   causes of non-Hodgkin's lymphoma than them.  If I

13   was speaking at a lymphoma conference, no.

14       Q    So if you were speaking to a lymphoma

15   conference, it would be with oncologists, other

16   medical professionals in your field, you wouldn't

17   hold yourself out as an expert in the causes of

18   non-Hodgkin's lymphoma, correct?

19       A    I think I know a little bit more

20   epidemiology than some of the non-Hodgkin's lymphoma

21   experts who are mostly clinical trialists, but I

22   don't know that I would say that my career has been

23   focused on being an expert for causation of

24   non-Hodgkin's lymphoma.

25       Q    What's the difference between a cause and a

1     risk factor?

2         A     I think there might be some situations

3     where something definitely causes something.  For

4     example, I don't think you are going to come down

5     with AIDS unless you contract the HIV virus.  So I

6     think cause and effect there is pretty simple.

7             In carcinogenesis, causation is never

8     simple where one factor alone can be the cause.  You

9     can have things that are very, very highly

10    associated, like smoking and lung cancer, but it is

11    not sufficient because not everybody who smokes will

12    get lung cancer.

13        Q     So is Roundup a cause of non-Hodgkin's

14    lymphoma or a risk factor?

15        A     I think in the sense of multifocal

16    causality, I would call it a causative agent or a

17    substantial contributing causative agent to some

18    subcategories of non-Hodgkin's lymphoma.

19        Q     So does that make it a risk factor or a

20    known cause?

21        A     This may be too much of a semantic argument

22    for me to totally understand.

23        Q     Can you confirm any paper that you cite,

24    other than an expert report from any of the

25    plaintiff experts, so a published article that says

```
 1     Roundup is a cause of non-Hodgkin's lymphoma?

 2          A    I wouldn't say it is the sole cause of

 3     non-Hodgkin's lymphoma.

 4          Q    I didn't ask for being the sole cause out

 5     there of non-Hodgkin's lymphoma.  I'm asking can you

 6     say one peer-reviewed, published study that says

 7     Roundup is a cause of non-Hodgkin's lymphoma.

 8          A    I don't think they word those, in -- for

 9     example, the five very good case-control studies,

10     they say it is a substantial risk factor or maybe a

11     substantial causative agent, but they don't say it

12     is the sole cause.

13          Q    Again, I'm not saying it is the only thing

14     out there that can cause non-Hodgkin lymphoma.  So

15     you would agree, then, that based on the studies you

16     have reviewed, Roundup is in the category of risk

17     factors as opposed to causes of non-Hodgkin's

18     lymphoma, correct?

19          A    How did I word it in my Salas report, more

20     likely than not it was a substantial cause of her

21     lymphoma, or did I say it was a substantial risk

22     factor?

23          Q    Well, I'm asking you, just in general, your

24     opinions about Roundup.  Is it either -- so back it

25     up.
```

```
 1              There are things you said, for example, the
 2     HIV virus causes AIDS, correct?
 3         A    Yeah.  I think, you know, infectious
 4     diseases it is a little bit easier to say --
 5         Q    Right.
 6         A    -- this causes that.
 7         Q    Whereas eating fatty foods is a risk factor
 8     for heart disease, right?
 9         A    Right.
10         Q    So with the general understanding of the
11     difference between a cause and a risk factor, am I
12     correct that you would put Roundup in the category
13     of risk factors for non-Hodgkin's lymphoma versus a
14     known cause of non-Hodgkin's lymphoma?
15         A    On an individual patient, maybe risk
16     factor, but on a population level, I think it is
17     causative.  I think, you know --
18         Q    So can you give me one study, peer-reviewed
19     literature, that says that Roundup causes
20     non-Hodgkin's lymphoma?
21         A    You know, I really like the Weisenburger
22     review from Cancer, Lymphoma, Leukemia, so whatever
23     language he uses there to describe whether it is a
24     causative agent or risk factor, I would refer to
25     that probably.
```

 1      Q    And that's the Weisenburger -- which

 2   article is that?

 3      A    Like 2021, Cancer -- yeah, "A Review and

 4   Update with Perspective of Evidence that the

 5   Herbicide Glyphosate (Roundup) is a Cause of

 6   Non-Hodgkin's Lymphoma," so I agree with what he is

 7   saying there.

 8      Q    So other than literature published by

 9   Dr. Weisenburger and other individuals who are part

10   of the Roundup litigation, can you name a single

11   peer-reviewed published paper that says Roundup is a

12   cause of non-Hodgkin's lymphoma?

13      A    Well, I don't know which of these authors

14   are --

15      Q    You said Dr. Weisenburger.

16      A    Yeah.

17      Q    We know he is involved in the litigation.

18      A    Right.

19      Q    Is there any other paper that you can cite

20   to that say Roundup is a cause of non-Hodgkin's

21   lymphoma?

22      A    Well, of all the articles that I've cited

23   in my bibliography, updated, are all of them

24   plaintiff experts for -- against Monsanto?

25      Q    I'm asking you -- we will figure that out.

```
 1              Are there any peer-reviewed papers, other
 2      than the Weisenburger article that you mentioned,
 3      which we can look at in a moment, that say that
 4      Roundup was a cause of non-Hodgkin's lymphoma?
 5      A    I think all the papers I cited are
 6      basically saying that, and I don't know who is
 7      retained by plaintiff and who is not.
 8      Q    Some of them say an increased risk, some of
 9      them say association is what you told me before.
10      Now it is your testimony that the papers that you
11      cited say that Roundup is a cause of non-Hodgkin's
12      lymphoma.  Do I understand your testimony correct?
13      A    I don't know if I can give you a totally
14      accurate answer unless I read all the articles and
15      see if they use the word cause or risk factor.
16      Q    So sitting here right now --
17      A    A lot of them --
18      Q    -- you can't tell me --
19              MR. ROJAS:  Hold on, David.  David, you got
20      to let him answer.
21              MR. KERSCHNER:  Oh, I thought he was done,
22      I'm sorry.  I thought that was a finished answer.
23      BY MR. KERSCHNER:
24      Q    Go ahead, Doctor.
25      A    A lot of them are saying risk factor in the
```

1    title, but I would have to read each article to see

2    if the word "cause" is there and then you can tell

3    me if they are retained experts or not.

4        Q    So before your next deposition, I would

5    like you to do that so we can get an answer -- an

6    updated answer.

7            But sitting here today, so -- give us your

8    opinions in Ms. Salas' case, you can't tell me that

9    any of the articles you rely on specifically say

10   that Roundup causes non-Hodgkin's lymphoma other

11   than potentially the Weisenburger paper which we

12   know was written by a plaintiff expert.  Is that

13   correct?

14           MR. ROJAS:  Object to the form.

15           THE WITNESS:  I think I was careful in my

16   wording of saying what I thought the relationship of

17   Roundup was to her non-Hodgkin's lymphoma.  Most of

18   these are saying risk factor, and then I think the

19   IARC commentary is saying probable cause.  I mean,

20   whatever language they use there, I would agree

21   with.

22   BY MR. KERSCHNER:

23       Q    They say probable carcinogen.

24       A    Yes.

25       Q    So my question to you, it sounds like the

1    article says risk factor.  So am I correct, then,

2    that Roundup -- it is your opinion that Roundup is a

3    risk factor for non-Hodgkin's lymphoma, not a known

4    cause of non-Hodgkin's lymphoma?

5          MR. ROJAS:  Object to the form.

6          THE WITNESS:  I'm not sure if I'm answering

7    that incorrectly or not.  I think it is a causative

8    agent in some proportion of non-Hodgkin's lymphomas.

9    BY MR. KERSCHNER:

10         Q    What proportion?

11         A    Well, again, I'm defining cause as

12   multifactorial.  So a substantial portion of

13   patients who are exposed to Roundup, I think it is a

14   causative agent or more likely than not that it was

15   a substantial causative agent in their individual

16   lymphoma.  Somebody who was never exposed --

17         Q    You can say that without having reviewed

18   all the medical records for those patients?

19         A    I haven't reviewed all the medical records

20   for every patient.

21         Q    Right.  But it is still your testimony that

22   a substantial portion of those patients that are

23   exposed to Roundup, Roundup is a causative agent of

24   their non-Hodgkin's lymphoma, correct?

25         A    I'm not sure I can give a yes or no answer

1    to that when causation is multifactorial.

2         Q    Right.  But, in other words, if someone is

3    exposed to Roundup, it is your testimony that

4    Roundup would be a substantial causative agent to

5    the development of their non-Hodgkin's lymphoma?

6              MR. ROJAS:  Object to the form.

7              THE WITNESS:  I'm not sure what the proper

8    answer to that question is.

9    BY MR. KERSCHNER:

10        Q    Well, it is your opinion.  So that's what

11   I'm trying to understand.

12        A    How did I write it in my report for

13   Ms. Salas?

14        Q    So I'm asking about generality about how

15   you view Roundup.  And you are welcome to reference

16   your report, but I'm not asking you only about

17   Ms. Salas.  I'm asking you about how you view

18   Roundup in forming your opinion in this case.

19              So let me ask this question.  If someone is

20   exposed to Roundup, is it your testimony that

21   Roundup would be a substantial causative agent in

22   the development of their non-Hodgkin's lymphoma?

23        A    If they have substantial exposure to it,

24   and they don't have any other real causative agent

25   for it, then I would say that more likely than not

1    Roundup was a substantial causative agent in that

2    person's non-Hodgkin's lymphoma.

3        Q    And what are the other causative agents?

4        A    Well, I went through multiple risk factors

5    for non-Hodgkin's lymphoma.

6        Q    You just said risk factor versus causative

7    agent.

8        A    Yeah.  I would say AIDS is a risk factor,

9    but not a causative agent.  It is not an external

10   toxin.

11       Q    So what -- when you said that if they had

12   substantial exposure to Roundup but not any other

13   causative agent, you would say that Roundup was a

14   substantial contributing factor to a non-Hodgkin's

15   lymphoma, what were those causative agents that you

16   were specifically referring to?

17       A    Well, I think HTLV-III is a substantial --

18   a substantial risk factor and also a substantial

19   causative agent to adult T cell leukemia lymphoma.

20   Hepatitis C is a substantial risk factor, and

21   perhaps a causative agent in some cases, of splenic

22   lymphoma with villous lymphocytes.

23           I'm having trouble -- I guess I'm having

24   trouble stating what's a cause or what's a risk

25   factor.  I don't think that age causes non-Hodgkin's

1    lymphoma.  That's more a risk factor.  But if a

2    patient had no risk factors and substantial exposure

3    to Roundup, I think the literature supports that

4    more likely than not it was a substantial causative

5    agent in that person's non-Hodgkin's lymphoma.

6         Q    And if they were exposed to Roundup --

7         A    Well, I mean significant exposure, not like

8    they walked by it once in a store or anything,

9    but...

10        Q    Does it matter how much of the Roundup or

11   glyphosate was actually absorbed into their skin?

12        A    I think there's a dose response for

13   causation, yeah.  I think somebody who used it one

14   time only and covered their skin completely is much

15   less likely to get lymphoma than somebody who used

16   it for ten years and had substantial dermal

17   exposure.

18        Q    Right.  But in terms of assessing if

19   there's enough exposure to say it is a causative

20   agent, you would rather know how much Roundup was

21   absorbed into their body versus just necessarily how

22   many days they used the product, right?

23             MR. ROJAS:  Object to the form.

24             THE WITNESS:  I think I might make a

25   quantitative and qualitative difference between

1    somebody who used Roundup once and somebody who used

2    it for 20 years with a substantial chance of dermal

3    absorption over the 20 years.

4    BY MR. KERSCHNER:

5        Q    Right.  But if you had data on an

6    individual that was just how many days they used the

7    product and you also had data about actually how

8    much glyphosate was absorbed into that person's

9    body, you certainly would rather understand how much

10   glyphosate was absorbed into their body to determine

11   whether or not it is a substantial contributing

12   factor versus just the number of days, right?

13       A    If I could quantify all that, I think

14   there's probably a link between total dose and the

15   probability of developing non-Hodgkin's lymphoma

16   here.

17   BY MR. KERSCHNER:

18       Q    But if you use Roundup, you know, weekly,

19   but you have never had any actual exposure to the

20   product getting into your body, you can't say it is

21   a causative agent, right?

22       A    I don't know how you would completely

23   protect yourself from it.

24       Q    I'm -- hypothetically, right?  If you are

25   able to not have any exposure to the product, it

Kevin B. Knopf, M.D., M.P.H./Volume II

```
 1    doesn't matter how many days you used it, right?
 2            MR. ROJAS:  Object to the form.
 3            THE WITNESS:  You mean hypothetically if
 4    somebody wore a gas mask and a level 4 suit like
 5    they wear in the CDC and used Roundup that they have
 6    less -- I think they have less of a chance of
 7    absorbing it if they are really taking that much
 8    protection.
 9    BY MR. KERSCHNER:
10       Q    So you would rather understand the internal
11    absorbed level of glyphosate versus just the number
12    of days they used, right?
13            MR. ROJAS:  Object to the form.
14            THE WITNESS:  I would like to know both.  I
15    mean, you and I probably have glyphosate in us from
16    the food we've eaten, right.
17    BY MR. KERSCHNER:
18       Q    So if you had the internal absorption of
19    glyphosate, that's information you would want to
20    rely on in forming your opinions, right?
21       A    I would like to know how much -- how much
22    an individual was exposed to Roundup, not just
23    glyphosate, because I think, as we have alluded to,
24    that the surfactant makes it more likely to enter
25    into the cells and into the dermis.
```

1        Q    So I'll rephrase.

2        A    The total lifetime exposure and what's

3    their protection they use to try and estimate how

4    likely it was a contributing factor to their

5    developing non-Hodgkin's lymphoma.

6        Q    So I'm correct, if you had the amount of

7    Roundup that was absorbed into the skin, you would

8    want to review that and determine if Roundup was a

9    substantial contributing factor for someone's

10    non-Hodgkin's lymphoma, right?

11            MR. ROJAS:  Object to the form.

12            THE WITNESS:  I think it was probably a

13    dose-response form.  I'm not sure there's an

14    absolute minimum threshold, but I think, you know,

15    probabilistically the more you are exposed to a

16    toxin, the higher the chance you will develop that

17    particular malignancy.  Just like smoking one pack

18    when you are 18 is not nearly as bad as three packs

19    a day for 30 years in terms of your probability of

20    developing lung cancer.

21    BY MR. KERSCHNER:

22        Q    Doctor, I'm just asking if you want to look

23    at the data.  If you have the data that shows how

24    much Roundup was absorbed into someone's skin, is

25    that data you would want to review to determine

1    whether or not Roundup was a substantial

2    contributing factor to their non-Hodgkin's lymphoma?

3        A    Yeah.  I would like to know what their

4    exposure to Roundup was, yes.

5        Q    Internally?

6        A    Well, I don't know that you can always get

7    that.  There's no sensors that are put into these

8    people.  You have to estimate it.

9        Q    Right.  And if you could get that

10   estimation, would you want to review it to determine

11   your opinion as to whether or not Roundup was a

12   substantial contributing factor to non-Hodgkin's

13   lymphoma?

14       A    Yeah.  I think that's a fair statement.

15       Q    Did you speak with Ms. Salas for your

16   opinions in this case?

17       A    No, I did not interview Ms. Salas.

18       Q    Did you speak to any of her doctors?

19       A    No, I did not speak directly to any of her

20   physicians.

21       Q    Did you review her medical records?

22       A    Yes, I did.

23       Q    Did you review any depositions in

24   Ms. Salas' case?

25       A    If Mr. Rojas provided them to me, I

1    reviewed them, yes.

2        Q    You don't recall reviewing any depositions

3    in Ms. Salas' case as you sit here today?

4        A    I believe I did, but I did not re-review

5    them prior to this continuation of the deposition.

6        Q    Did you speak with any of Ms. Salas' family

7    members to form your opinions in this case?

8        A    No, I did not.

9        Q    You never provided any care and treatment

10   to Ms. Salas, correct?

11       A    No, I have not served as her physician.

12       Q    When you considered Roundup in this case,

13   what was the extent of Ms. Salas' exposure that you

14   considered made it a causative agent in her

15   developing non-Hodgkin's lymphoma?

16       A    Can I refer to my report?  I think I tried

17   to quantify her exposure in my report.

18       Q    Sure.  I think it is on page 12.

19       A    Can you put it up on the screen or I can

20   try --

21       Q    Yeah.  While he is pulling that up, is what

22   you wrote in your report an accurate recitation of

23   the exposure analysis which you conducted for

24   Ms. Salas in this case?

25       A    I believe it is an accurate representation

1    of my opinion about her exposure.  I'm not sure I

2    was the one conducting the individual analysis for

3    her.

4         Q    How did you learn about that exposure?

5         A    So I did not re-review all of her records

6    prior to continuation, and I'm not remembering if

7    Mr. Rojas provided me with somebody else's estimate

8    for that.

9         Q    So you don't recall where you got that

10   from?

11        A    Hold on.  Page 12?

12        Q    I believe so, yeah.

13        A    So there are numbers there that show

14   substantive days of exposure to Roundup.  If

15   somebody went to, say, a midpoint of 140.3 days,

16   likely or not, Mr. Rojas' firm had somebody come up

17   with that estimate.

18        Q    So you are relying on the estimate that you

19   received from Mr. Rojas?

20        A    Yes.  I did not interview Ms. Salas about

21   her total days of exposure.

22        Q    And that estimate has nothing to do with

23   the amount of Roundup that actually got absorbed

24   into Ms. Salas' skin, right?

25             MR. ROJAS:  Object to the form.

1    BY MR. KERSCHNER:

2        Q    Or body.

3        A    I wouldn't say it has nothing to do with

4    it, no.

5        Q    So you don't have a calculation in your

6    report or your opinions about how much Roundup was

7    actually absorbed by Ms. Salas in her body, correct?

8        A    She had 73.5 exposure days -- between 73.5

9    and 200 exposure days.  I don't know for sure how

10   much she internally absorbed of that.

11       Q    If you were able to get an estimate of the

12   internal absorption that an individual had, that's

13   information you would review in forming your

14   opinion?

15       A    How would one know what the internal

16   absorption was without --

17       Q    Right.  I'm saying if we were able to

18   provide you with an estimated internal absorption

19   for Roundup for an individual, is that information

20   you would review in forming your opinion about

21   whether or not Roundup was a causative agent for

22   that individual?

23       A    If you had an estimate of that number,

24   sure.

25       Q    And it could potentially impact your

1    opinions, right?

2        A    Yeah.  Sure.

3        Q    How many times each day did Ms. Salas spray

4    Roundup?

5        A    I don't have that information off the top

6    of my head.

7        Q    Were you provided that information?

8        A    I believe so, but I did not re-review it

9    prior to the continuation of this.

10       Q    And how were you provided that?

11       A    From Mr. Rojas' firm.

12       Q    Were you provided notes from Mr. Rojas'

13   firm that you used to put together this two

14   paragraphs about Ms. Salas' exposure?

15           MR. ROJAS:  I want to be mindful.  I mean,

16   I don't want to instruct not to answer beyond, but,

17   Doctor, please be mindful not to share the content

18   of any communications, verbal or otherwise, with our

19   firm.  I think stuff like notes or data is fair game

20   for Mr. Kerschner to ask you about, but please tread

21   carefully not to --

22           THE WITNESS:  Right.  I can't breach

23   attorney-client privilege or confidential

24   information shared with me.

25   ///

1    BY MR. KERSCHNER:

2       Q    Well, if you are relying on the information

3    to form your opinions in this case, that's not

4    protected by attorney-client privilege.  And so I

5    just need to know, is there information that

6    Mr. Rojas' firm provided you about Ms. Salas that

7    you are using to calculate the two paragraphs in

8    which you wrote here?

9            MR. ROJAS:  And, Doctor, just to be clear

10   about my earlier instruction, you can answer

11   regarding data relied upon that we or anybody else

12   may have provided you so you can testify truthfully

13   to that.  The privilege concerns communications and

14   stuff like that, but I think Mr. Kerschner and I are

15   on the same page, and we are drawing the line in the

16   appropriate way, so you can go ahead and answer if

17   you know.

18           THE WITNESS:  The numbers of 140.3

19   estimated exposure days, I did not derive myself.

20   BY MR. KERSCHNER:

21      Q    And did anyone provide you information

22   about during each day how much Roundup Ms. Salas was

23   actually using?

24      A    I'm not sure.  I would have to review.

25      Q    What would you review?

1        A     I guess I would have to review all my email

2     correspondences and all the files related to this

3     case.

4              MR. KERSCHNER:  So there -- so to the

5     extent -- I call for the production of any emails or

6     files sent to Dr. Knopf that would impact or were

7     used to form his opinions.

8              Dr. Knopf, I would ask you to go through.

9     To the extent any of those emails relate to the

10    exposure numbers that you are talking about here or

11    any of those documents, I ask you to provide those

12    to counsel to be produced so we can know where you

13    are getting the basis of your opinion.

14             MR. ROJAS:  And if I may, this is Pablo, we

15    will respond to any, obviously, proper request for

16    production, so that's not an issue.

17             THE WITNESS:  Okay.  I want to make sure I

18    don't do anything wrong with the requests.

19    BY MR. KERSCHNER:

20        Q     So in forming your opinion -- actually

21    strike that.

22             Do you know what Ms. Salas was -- strike

23    that.  Let me start over.

24             In forming your opinions, were you aware of

25    the clothing or any protective equipment that

1    Ms. Salas was wearing while she sprayed Roundup?

2        A    I believe that was in her deposition, but

3    as I sit here today, I don't recall exactly.  I

4    probably have a general sense that she was not

5    completely covering her skin and wearing goggles at

6    all times that she used it.

7        Q    So just to be clear, in forming your

8    opinion, you weren't sure one way or another about

9    the extent of the clothing or protective equipment

10   that Ms. Salas was wearing when she applied Roundup,

11   right?

12            MR. ROJAS:  Object to the form.

13            THE WITNESS:  Let me put it this way.  If

14   somebody asked me to look at a case and the person

15   wore gloves and a body suit and a face mask and gas

16   mask and, you know, contamination suit that they

17   would wear as if they were studying Ebola virus, I

18   might say, gee, I don't think much was absorbed to

19   this person, do you really have a case.

20   BY MR. KERSCHNER:

21       Q    That's not my question, Doctor.

22            I move to strike as nonresponsive.

23            In forming your opinions, specifically to

24   Ms. Salas, which are included in your report, you

25   did take into consideration the clothing she was

1    wearing or any personal protective equipment,

2    correct?

3              MR. ROJAS:  Object to the form.

4              THE WITNESS:  Yeah, I'm not sure.  I think

5    I had convinced myself that she had substantial

6    terminal exposure to Roundup.

7    BY MR. KERSCHNER:

8         Q    That's not my question, Doctor.  Your

9    report here, which has your opinions --

10        A    Right.

11        Q    -- I want to focus on what you did to form

12   those opinions.  You didn't include any discussion

13   in forming your opinions for Ms. Salas as to what

14   personal protective equipment or clothing she was

15   wearing when she applied Roundup, right?

16        A    I may have had those opinions but not

17   included them in this report.

18        Q    And this report contains your opinions in

19   this case, right?

20        A    Yeah, but I don't think it contains all my

21   opinions.  I'm not somebody who writes 50-page

22   reports.

23        Q    And sitting here today, you can't tell me

24   what type of clothing or personal protective

25   equipment she was wearing when she sprayed Roundup,

1    right?

2        A    I don't have that in my memory today, no.

3        Q    Do you know what type of Roundup Ms. Salas

4    was using?

5        A    I don't know which flavor of Roundup she

6    used, no.  Not as I sit here today.  I imagine I

7    could obtain that information.

8        Q    Did you obtain it when forming your

9    opinions in this case?

10       A    I reviewed whatever materials were provided

11   to me in order to form my opinions.

12       Q    And if the clothing or type of Roundup that

13   Ms. Salas wore and used is not in the materials

14   which we asked for and will formally request, then

15   it is fair to say you did not have that information

16   when you formed your opinions in this case, right?

17       A    I only form my opinion based on what

18   material I could obtain.  I did not interview the

19   client herself.

20       Q    Did you review -- did you read Ms. Salas'

21   deposition --

22       A    Yes.

23       Q    -- prior to forming your opinion in this

24   case?

25       A    Yes.

```
 1       Q    Do you know if Ms. Salas did a spot spray

 2   or a continuous spray?

 3       A    I don't remember right now what spray she

 4   used.

 5       Q    Did you consider the type of spray she used

 6   in forming your opinions in this case?

 7       A    Yeah.  I think I formed my opinion based on

 8   that she had substantial exposure to Roundup.

 9       Q    In determining whether or not she had

10   substantial exposure to Roundup, did you look at or

11   consider the way in which she actually sprayed

12   Roundup?

13       A    I believe I did, but I would have to go

14   back and -- I would have to go back.

15       Q    And how -- and what method of spray would

16   make her have more exposure to Roundup versus not?

17       A    The greater the quantity of Roundup that

18   was in the air that she was exposed to, she has more

19   total Roundup exposure.

20       Q    And how do you -- in what way did you spray

21   Roundup that would make you have more Roundup in the

22   air?

23       A    I would need to go back and read her

24   deposition again.

25       Q    I'm not asking about what she did.  I'm
```

Kevin E. Knopf, M.D., M.P.H./Volume II

1    asking about what types of ways of spraying Roundup

2    would make it so, in your opinion, there's more

3    Roundup in the air.

4        A    I think a pump might provide more Roundup

5    than just a hand-held sprayer.  A hose might provide

6    a greater volume of Roundup exposure than a

7    hand-held sprayer.

8        Q    And in 73 days -- sorry, 73.5 days of

9    exposure, using a hand-held pump, how much Roundup

10   is someone exposed to?

11       A    I don't know the exact answer to that.  I'm

12   not a toxicologist.

13       Q    And if someone uses a hand sprayer for one

14   hour a day, during that one hour can you tell me how

15   much Roundup they are exposed to?

16       A    I'm not sure I can give you an exact answer

17   to that.  I'm not a toxicologist.

18       Q    Can you give me any answer to that?

19       A    Based on the epidemiologic studies, using

20   it more than ten hours a year, using it for more

21   than -- using it more than two days in some studies

22   and using it for more than ten years was a

23   substantial risk factor for --

24       Q    That's not my question about risk factor.

25   I'm talking about actual exposure which you would

1    consider for Ms. Salas.  If you are using a

2    hand-held Roundup sprayer for one hour, how much

3    Roundup would somebody be exposed to in that one

4    hour?

5        A    You know, as I sit here today I can't give

6    you an exact answer to that, but I could certainly

7    look it up and provide you an answer for that.

8        Q    Have you ever done any research into

9    answering that question?

10       A    My own research into answering that

11   question about dose response?

12       Q    I'm not asking you about dose response.

13   I'm asking you about if you are using a Roundup

14   spray, hand-held sprayer for one hour, how much

15   Roundup is a person exposed to in that one hour?

16       A    I've read others' reports about exposure

17   amounts and exposure types, but I can't recall that

18   right now off the top of my head.

19       Q    And whose reports have you read that answer

20   that question?

21       A    I'm not sure of the names of those reports

22   right now.

23       Q    What type of Roundup would Ms. Salas use?

24       A    I'm not sure I know the answer to that.

25            MR. ROJAS:  Object to the form.

```
 1              Go ahead.
 2    BY MR. KERSCHNER:
 3         Q    What percent of glyphosate was in the
 4    Roundup that Ms. Salas used?
 5         A    I can't recall exactly which flavor of
 6    Roundup she used or what the percentage of
 7    glyphosate it was, but I think --
 8         Q    You keep saying flavor.
 9         A    Well, there's more than one brand of
10    Roundup.  They have different names.  I don't know
11    what the concentration of Roundup is in each one of
12    them.
13              And you are saying glyphosate, and I think
14    we did talk about that it is attached to a
15    surfactant which makes it more absorbable.
16         Q    Do you know the surfactants in any type of
17    Roundup?
18         A    Off the top of my head?
19         Q    As part of your opinions in this case.
20         A    I've read them.  They are long, complicated
21    chemical names.  I have not memorized them for this
22    deposition today.
23         Q    And for Ms. Salas do you know the names of
24    any surfactants she may have been exposed to as part
25    of her using Roundup?
```

```
 1      A    I think I could look up what type of
 2   Roundup she used and try to determine which
 3   surfactants were in that particular brand of
 4   Roundup.
 5      Q    Where would you look that up?
 6      A    I would ask Mr. Rojas' firm to contact her
 7   and find that out.
 8      Q    No, but in forming your opinions, as of
 9   today, you haven't done that, right?
10      A    I reviewed whatever was provided to me
11   before when I wrote this report, and I have not
12   re-reviewed the types of Roundup she used or the
13   percentage of surfactant in those Roundup for
14   preparation of this deposition today, no.
15      Q    In forming your opinions in this case, were
16   you informed specifically about the type of Roundup
17   Ms. Salas used?
18      A    I don't remember for sure.
19      Q    In forming your opinions in this case, were
20   you informed of how many hours a day Ms. Salas used
21   Roundup?
22      A    I have here that 73.5 exposure days, 207
23   exposure days, I don't know if I wrote down the
24   hours there or not because I didn't know it.
25      Q    In forming your opinions in this case, yes
```

1    or no, were you informed about how many hours a day

2    Ms. Salas was using Roundup?

3         A    I don't remember.

4         Q    In forming your opinions in this case, were

5    you informed about the type of surfactants in the

6    Roundup Ms. Salas was using?

7              MR. ROJAS:  Object to the form.

8              THE WITNESS:  In forming my opinions, I was

9    struck by the difference between the EPA report and

10   the IARC report and some of the expert reports I

11   witnessed that surfactant made it more absorbable

12   and that Roundup is not pure glyphosate.  It is

13   attached to a surfactant.  And I believe that's true

14   for all Roundup varieties, that it is attached to a

15   surfactant, which makes it more absorbable and

16   dermal.

17             MR. KERSCHNER:  Objection.  Nonresponsive.

18   BY MR. KERSCHNER:

19        Q    I'm going to ask the question about this

20   case and then I want an answer to my question.

21             In forming your opinions in this case, were

22   you informed about the type of surfactant in the

23   Roundup Ms. Salas was using?

24        A    I don't recall for sure.

25        Q    You agree that Ms. Salas was diagnosed with

1    mantle cell lymphoma on July 6, 2020?

2        A    I believe that's the date, yes.

3        Q    And my understanding, that it is a cyclin

4    D1 negative mantle cell lymphoma, correct?

5        A    I would have to go up and read above.

6        Q    Sure.  Why don't we -- good idea.  If you

7    want to scroll up, we can do that.

8        A    I need to enlarge that.

9             So that's just discussion of mantle cell

10   lymphoma.  Probably the space where I discussed her

11   pathology report.

12       Q    Let me ask you, what does it mean to be

13   cyclin D1 negative?

14       A    Most mantle cell lymphomas, I think, are

15   cyclin D1 positive, which is an oncogene, but there

16   are some cyclin D1 negative mantel cell lymphomas.

17       Q    And if it's a cyclin D1 negative, does that

18   tell you anything about the mantle cell lymphoma?

19       A    It may behave differently biologically.

20       Q    And does Roundup increase cyclin D1?

21       A    I don't know if I can answer that as a

22   direct question.  I would say that Roundup increases

23   the probability of developing non-Hodgkin's

24   lymphoma.  Multiple B-cell lymphomas, I think, have

25   been linked to Roundup and some T-cell lymphomas,

1    apparently.  I don't know that I would say it

2    particularly affects the cyclin D1 oncogene.

3        Q    To be clear, you don't know to a reasonable

4    degree of medical certainty whether or not Roundup

5    has any impact on the cyclin D1 oncogene, correct?

6        A    I think you are simplifying.  So

7    lymphomagenesis is a multi-step process, and cyclin

8    D1 expression may be included in mantle cell

9    lymphoma.  And if her cancer was cyclin D1 negative,

10   that does not mean to me that Roundup did not play a

11   substantial role in causing her lymphoma.

12       Q    That's not my question.  I'm asking if you

13   know one way or another whether or not Roundup can

14   increase cyclin D1 expression.

15       A    I'm not sure.

16       Q    Have you seen any studies or evidence that

17   specifically Roundup can increase the expression of

18   cyclin D1?

19       A    Not that I can recall right now, no.

20       Q    Do you recall that Ms. Salas was treated

21   with R-DHAOx?  And I'm not even going to try to

22   pronounce some of the actual terms of chemotherapy,

23   but I'm sure you are aware of what they are.

24       A    Yeah.  Yes.

25       Q    And that was a three-week cycle, right?

```
 1      A    I need to read that part of the report, but
 2   I can maybe pull up my report and see what the
 3   regimen was.
 4           I believe that's a three-week regimen, yes.
 5      Q    Have you treated patients with the same
 6   course of chemotherapy that Ms. Salas was treated
 7   with?
 8      A    I've definitely used all those drugs.  I
 9   don't know if I've used them all together.
10      Q    Have you used those drugs to treat patients
11   who -- strike that.
12           Have you treated patients with those three
13   products, the chemotherapy, who have not been
14   exposed to Roundup?
15      A    I imagine so, yeah.
16      Q    And so the specific treatment that
17   Ms. Salas had has nothing to do with whether or not
18   Roundup was a substantial cause of her lymphoma,
19   correct?
20      A    I believe that's a correct statement, yes.
21      Q    Are you offering any opinions about the
22   appropriateness of Ms. Salas' cancer treatment?
23      A    No, I'm not.
24      Q    Would you agree that she tolerated each
25   cycle of chemotherapy fairly well?
```

1      A    She made it through.  I don't think these

2    are easy drugs to take, and I don't think an

3    autologous stem cell transplant is an easy thing to

4    go through.

5      Q    Let's just talk about chemotherapy.  So she

6    had four cycles, right?

7      A    Yeah.

8      Q    The first beginning in August 2020?

9      A    Right.

10     Q    And --

11     A    Four cycles of this regimen, yes.

12     Q    And that first cycle in August 2020, she

13   tolerated well without any adverse reaction,

14   correct?

15     A    I don't think she was admitted to the

16   hospital with intervening sepsis, but these regimens

17   all cause fatigue, nausea.  It depends on your

18   definition of well tolerated.

19     Q    You had no reason to disagree with her

20   medical records that she tolerated chemotherapy well

21   without any adverse reaction, right?

22     A    I have no reason to --

23          MR. ROJAS:  Object to the form.

24          THE WITNESS:  I have no reason to disagree

25   that that statement was written in the medical

1    record.  I can tell you that sometimes oncologists

2    overestimate how well patients tolerate regimens.

3    BY MR. KERSCHNER:

4       Q    And you have no information specifically in

5    Ms. Salas' case that you could disagree with the

6    fact that she, as it states in her medical records,

7    tolerated chemotherapy well without any adverse

8    reaction, right?

9            MR. ROJAS:  Object to the form.

10            THE WITNESS:  I can say that was written in

11    the medical records, yes.

12    BY MR. KERSCHNER:

13       Q    And but you don't have any specific

14    information about Ms. Salas or her treatment to

15    disagree with what her medical records indicate,

16    that she tolerated chemotherapy well without any

17    adverse reaction, right?

18       A    To give a totally accurate answer to that,

19    I would probably have to interview her myself and

20    say how did you tolerate chemotherapy.

21       Q    I'm talking about what you have done to

22    form your opinions in this case.  We understand that

23    in forming your opinions you have not spoken to

24    Ms. Salas.

25            So am I correct that in forming your

1    opinions in this case, the opinions that you are

2    going to give in this case, you have no information

3    to disagree with the medical records which indicate

4    that Ms. Salas tolerated her chemotherapy well

5    without any adverse reaction, right?

6        A    I don't have any confirmation of that from

7    her medical records, but I can say given these

8    regimens that everybody has some adverse reactions.

9    It is not a cakewalk.

10       Q    I'm not asking about some people and

11   others, I'm asking specifically about Ms. Salas.

12           MR. KERSCHNER:  And, Joe, we can pull up

13   records, tab 54, 91, 92, and 57.  Let's do this very

14   quickly, and we will bang through all of them

15   very -- all the records.

16           (The document referenced below

17       was marked Deposition Exhibit 17 for

18       identification and is appended

19       hereto.)

20   BY MR. KERSCHNER:

21       Q    Okay.  This is from August 4th, 2020,

22   admission record.

23           Do you see that on the top there?

24       A    Yes.

25       Q    Okay.  And then if you go down to where it

1    says IVA -- Joe, are you with me?

2       A    It says without any adverse reactions, yes.

3       Q    Okay.  So that was her -- you agree that

4    her first cycle of chemotherapy she treated well

5    with no major complication?

6       A    Maybe this is totally irrelevant to this

7    lawsuit, but oncologists --

8       Q    If it is irrelevant, I don't want to go

9    into it.  We don't have the time.

10      A    That's what it is there, yes.

11      Q    Okay.  So you agree that her first of her

12   four cycles she treated well, she fared well with no

13   major complications, right?

14      A    I agree that's written there, yes.

15      Q    But you have no reason to disagree with

16   that statement for Ms. Salas specifically, right?

17      A    Well, I just -- my clinical opinion is that

18   keeping a regimen like this, everybody has some sort

19   of adverse reaction.  Tiredness, nausea, acute

20   neuropathic symptoms are not uncommon.  Discomfort.

21      Q    I understand what you think may be common,

22   but I'm asking about Ms. Salas.  What we know is in

23   her medical records, none of those complications are

24   listed there, right?

25      A    They are not listed there, that's correct.

1        Q    Okay.  You would agree that according to

2    her doctors, who were the ones treating her, that

3    she tolerated her chemotherapy well without major

4    complication, right?

5        A    Yes.

6        Q    And you would agree -- do you see anything

7    in the medical records for any of her other cycles

8    that indicated that's not the case for any of the

9    four cycles of chemotherapy?

10       A    I would agree with that.

11       Q    Sorry, you would agree --

12       A    I agree with your statement, sir.

13       Q    So you would agree that of the four cycles

14   of chemotherapy, you haven't seen anything to

15   indicate that she didn't tolerate it well?

16       A    That's correct.

17            MR. KERSCHNER:  Okay.  You can take that

18   down.

19            THE REPORTER:  That's Exhibit 17, Counsel?

20            MR. KERSCHNER:  Yes.

21   BY MR. KERSCHNER:

22       Q    You would agree that by October 28, 2020,

23   Ms. Salas was in complete remission, right?

24       A    I agree with that, yes.

25       Q    And that's under four months from her date

1    of diagnosis?

2        A    Does that include the autologous transplant

3    time?

4        Q    I believe the stem cell was afterwards.

5        A    Okay.

6        Q    So am I right that by October 28, 2020,

7    Ms. Salas was in complete remission and that was

8    under four months from her date of diagnosis?

9        A    So my impression of lymphoma is that the

10   stem cell consolidates your remission and that while

11   you may be in complete clinical remission, it is not

12   that you still have some residual lymphoma at that

13   point and that's why you would do a stem cell

14   transplant to intensify chemotherapy.

15       Q    And that was performed in November of 2020?

16       A    Correct.

17       Q    And that was by Dr. Sandoval-Sus at Moffitt

18   Center?

19       A    Correct.

20       Q    Do you know Dr. Sandoval-Sus?

21       A    I don't know him personally, no.

22       Q    But you have heard of the Moffitt Cancer

23   Center?

24       A    Yes, I've heard of the Moffitt Cancer

25   Center.

1    Q    It is a very reputable cancer center,

2    right?

3    A    Yes, it is a reputable cancer center.

4    Q    Do you perform stem cell treatments in your

5    practice?

6    A    I do not.

7    Q    And nothing about this treatment course is

8    unique to people who have used Roundup, right?

9    A    That's correct.

10    Q    So stem cell transplants and the

11    chemotherapy Ms. Salas received is given to patients

12    who do not use Roundup, right?

13    A    That is correct.

14    Q    You have no reason to disagree with

15    Dr. Sandoval-Sus that Ms. Salas is still in clinical

16    remission as of when he was deposed in May of 2022,

17    right?

18    A    I have no reason to disagree with that, no.

19    Q    Do you have any reason to disagree with

20    Dr. Sandoval-Sus when he explained that while mantle

21    cell lymphoma is not curable, nowadays it is

22    something that we can control very well and patients

23    can live for many years?

24    A    Many years sounds optimistic, but if that's

25    what he said, that's what he said.

1        Q    Do you have any reason to disagree with the

2    statement that now, although mantle cell lymphoma is

3    not curable, we are able to control the disease in a

4    way that patients can live for many years?

5        A    I'm not sure what he means by many.

6        Q    How many years would you say, based on our

7    science that we have today, that someone who is in

8    clinical remission with mantle cell lymphoma is

9    likely to continue living, obviously other accident

10   or issues aside?

11       A    Well, the median survival used to be three

12   years.  I think it is longer now with ibrutinib and

13   some of the newer medicines, but I don't know that

14   it is 20 or 25 years.

15       Q    Do you know what the survival -- median

16   survival range for somebody in clinical remission

17   from mantle cell lymphoma is?

18       A    I'm not 100 percent sure.  I'd like to look

19   up an exact statistic based on the most recent

20   clinical trials.

21       Q    Can you estimate, based on your practice?

22       A    Mantle cell lymphoma is relatively rare.  I

23   would say five years would be a good long-term

24   remission, ten years would be fantastic.

25       Q    Do you have any reason to disagree with

```
 1        Dr. Sandoval-Sus that Ms. Salas tolerated her

 2        immunotherapy treatment well?

 3               MR. ROJAS:  Object to the form.

 4               THE WITNESS:  I don't have any reason to

 5        disagree with his statement there.

 6        BY MR. KERSCHNER:

 7        Q    Are you familiar with the mantle cell

 8        lymphoma international prognostic index?

 9        A    Yes.

10        Q    Called the MIPI?

11        A    Yes.

12        Q    The index considers numbers of factors to

13        determine someone's prognosis with mantle cell

14        lymphoma?

15        A    Yes.  That's the way prognostic indices

16        work.

17        Q    Did you calculate Ms. Salas' MIPI scores as

18        part of your opinions in this case?

19        A    No, I did not.

20        Q    In your report you do note that Ms. Salas

21        has a higher Ki67, right?

22        A    Correct.

23        Q    And you say that that would lower her

24        overall survival rate?

25        A    Probabilistically, yes.
```

1    Q    A Ki67 is just one of the factors in the

2    MIPI, right?

3    A    Correct.

4    Q    And a Ki67 alone does not establish that

5    she will have actually a worse outcome, correct?

6    A    No.  It is a risk factor for a worse

7    outcome.

8    Q    So Ki67 alone is an indicator that she will

9    certainly have a worse outcome with her mantle cell

10   lymphoma; is that your testimony?

11   A    I don't think anything is certain or

12   uncertain.  I prefer to have a lower Ki67 if I have

13   mantle cell lymphoma.

14   Q    And what Ki67 is considered high?

15   A    I think anything over 60 percent or

16   70 percent.

17   Q    And you can have a range of Ki67, right?

18   A    Right.  It is usually reported from zero to

19   100 percent.

20   Q    And what was Ms. Salas'?

21   A    I would have to look up either my report or

22   pathology report to get you an exact number.

23   Q    And if it is a wide range, what does that

24   mean?

25   A    Well, usually when you measure it it is

1    just one value for the person at that time, but it

2    is reported as zero to 100 percent overall.

3        Q    Right.  But, for example, if you have a

4    report that is very narrow -- right? -- that maybe

5    it, you know, is 60 to 70 percent versus a report

6    that says something like 10 to 20 or 60 to 70, does

7    that tell you anything different about the Ki67 for

8    a patient?

9        A    Well, usually they don't give a range.

10   Usually they say 60 percent, 70 percent, but the

11   lower the Ki67, the less rapidly the cancer is

12   dividing.

13           MR. KERSCHNER:  Let's go to tab 92, Joe.

14   And page 8 through 9.  Stop right there.  Go up.

15           (The document referenced below

16           was marked Deposition Exhibit 18 for

17           identification and is appended

18           hereto.)

19   BY MR. KERSCHNER:

20       Q    Okay.  You see right before the end of the

21   last -- the last paragraph, it talks about her Ki67

22   performed on blocks A3 and A7?

23       A    Yes.

24       Q    It says they range from 10 to 20 percent to

25   60 to 70 percent?

1      A     Right.

2      Q     What does that mean?

3      A     Well, they must be looking at different

4   parts of the tumor block, and in some parts it is

5   the lower proliferative rate and some places it is

6   the higher proliferative rate.

7      Q     Did you indicate in your report that she

8   had a lower rate in certain blocks, right?

9      A     Yes.

10     Q     What does that tell you about her Ki67 that

11  she actually had a lower rate in some blocks and a

12  higher rate in others?

13     A     The way I think about it is that any cancer

14  is heterogeneous and certain cells are dividing --

15  certain parts of the tumor may be dividing more

16  rapidly than other parts.  Often it is the highest

17  dividing part, highest Ki67 that gives you the most

18  trouble or the soonest trouble.

19     Q     What's your basis for that statement?

20     A     It is in the textbooks of oncology.

21     Q     Which textbook?

22     A     I'm sure it is in the DeVita textbook.  It

23  might be in, you know, the major hematologic

24  textbooks, pathology textbooks.  It is just what

25  Ki67 is.

```
 1        Q    And on page 20 of your report, if you have
 2   it in front of you, you listed risk factors for
 3   Ms. Salas.  Just give me a moment.
 4             Ahh, page 12.  It says:
 5             "Exclusion of other potential
 6        causative factors for cancer for
 7        plaintiff, analysis of Ms. Salas' risk
 8        factors for developing NHL."
 9             Do you see that?
10        A    Yes.
11        Q    Then you list a series of Ms. Salas'
12   medical conditions and say she has no factors known
13   to increase the chance of developing mantle cell
14   NHL, right?
15        A    Correct.
16        Q    And then you list a number of potential
17   risk factors that she did not have, right?
18        A    That is correct.
19        Q    But then you say she had a history of
20   smoking, correct?
21        A    That is correct.
22        Q    And then you say the relationship between
23   smoking and NHL is not well established, right?
24        A    Right.  That is correct.
25        Q    You have put other -- signed other expert
```

1    reports in the Roundup litigation where you have

2    indicated smoking is a risk factor for NHL, correct?

3        A    Yeah.  I think those were earlier reports,

4    and I had not read the epidemiology that well at

5    that time.  So I have revised my opinion.

6        Q    And what's -- and what studies have you

7    reviewed to revise your opinion?

8        A    I think I provided it to you.  Study by

9    Schollkopf, Smedby, Hjalgrim, et al. from Cancer

10   Epidemiology Biomarkers Prevention 2005.

11       Q    Right.  That study was available when you

12   formed your opinion that smoking was a risk factor

13   for non-Hodgkin's lymphoma, correct?

14       A    Yeah.  Over time, as I've been involved in

15   this litigation, I've had a chance to read more and

16   more articles, and I'm constantly deciding whether I

17   should revise my opinion one way or the other.

18       Q    So it is possible your opinion about

19   Roundup may change, right?

20       A    I don't think so unless --

21       Q    But your opinion --

22       A    -- unless a new article comes out that

23   really discredits everything else that's been

24   written before.

25       Q    There is no new article about smoking,

1    right?  That was an old article.

2        A    No, but I think at the time I was pressed

3    for time.  I didn't really understand the whole

4    nature of the litigation, and I may have

5    shortchanged myself in not reading enough about

6    cigarette smoking and lymphoma.  I don't think I

7    usually consider it a risk factor for lymphoma, but

8    I may have put it in the report and that's probably

9    an error.

10       Q    Ms. Salas was also obese, right?

11       A    Yes.

12       Q    And do you consider obesity a risk factor

13   for NHL?

14       A    Well, I'm not sure it is a causative risk

15   factor.  There seems to be a mild association

16   between obesity and NHL, but I don't think it is a

17   very strong risk factor.

18       Q    So how are you able to rule out obesity as

19   a risk factor for Ms. Salas' non-Hodgkin's lymphoma?

20       A    My understanding is the relationship

21   between obesity and the risk of developing

22   non-Hodgkin's lymphoma is a fairly weak one.  I

23   don't even know --

24       Q    What's the risk ratio between obesity and

25   non-Hodgkin's lymphoma?

```
 1         A    I don't know that off the top of my head
 2    right now.  I've seen patients who are very thin
 3    getting non-Hodgkin's lymphoma, and it is much
 4    stronger, I think, data between obesity and the
 5    development of colon cancer than non-Hodgkin's
 6    lymphoma.
 7         Q    And has that always been your opinion about
 8    obesity and non-Hodgkin's lymphoma?
 9         A    I think in my head I've not really
10    considered obesity a huge risk factor for
11    non-Hodgkin's lymphoma.
12         Q    Does -- I guess I just want to make sure I
13    understand it.  Does obesity -- is obesity a risk
14    factor associated with non-Hodgkin's lymphoma or is
15    it not?
16         A    I'm just going to answer this text real
17    quick.
18         Q    Do you want to go off the record for a
19    moment?
20         A    No.  It is going to take me two seconds.
21         Q    Does the text have anything to do about
22    this case?
23         A    No.  It has to do with a 13-year-old
24    patient with a low platelet count.
25         Q    I understand.  If you need to take a break,
```

1    we can do that.

2         A    It takes ten seconds to answer the text.

3         Q    Okay.  Is obesity a risk factor for

4    non-Hodgkin's lymphoma -- sorry.  Is obesity a risk

5    factor that has an association with non-Hodgkin's

6    lymphoma?

7         A    I think there's some association between

8    obesity and non-Hodgkin's lymphoma.  I don't think

9    it is a particularly strong one.

10        Q    And what is the basis and what papers have

11   you relied on to rule out obesity as a risk factor

12   for Ms. Salas?

13        A    I think there's a general paper on

14   epidemiology and non-Hodgkin's lymphoma.  I relied

15   on Thandra KC, Barsouk A, Saginala, et al., Med

16   Science 2021, and I don't remember what that paper

17   said about obesity and non-Hodgkin's lymphoma, but

18   that may be one I relied on in forming this opinion.

19        Q    Is it your -- so what is the basis for your

20   opinion that both smoking and obesity, to a

21   reasonable degree of medical certainty, are not a

22   basis for Ms. Salas' non-Hodgkin's lymphoma?

23        A    Those two studies I just referenced, and

24   probably textbook chapters in DeVita, for example.

25        Q    And if Ms. Salas was not exposed to

1    Roundup, would you say that obesity and smoking

2    would be risk factors for her non-Hodgkin's

3    lymphoma?

4        A    Well, again, I tried to talk about

5    causality being multifactorial and that there's a

6    difference between sufficient and necessary and that

7    any one risk factor may or may not play a role in

8    the development of something.  I myself, in general

9    clinical practice, do not consider obesity or

10   smoking substantial risk factors for non-Hodgkin's

11   lymphoma.  In this case, I thought, more likely than

12   not, the Roundup exposure was a substantial risk

13   factor for her developing non-Hodgkin's lymphoma to

14   a much greater extent than obesity or smoking.

15       Q    And if you had a patient that was identical

16   to Ms. Salas but she did not have Roundup exposure,

17   would you say that smoking and obesity were

18   substantial contributing factors to the development

19   of that patient's non-Hodgkin's lymphoma?

20       A    Likely not.

21       Q    And what would you say, then, was the

22   contributing factor to that patient's non-Hodgkin's

23   lymphoma?

24       A    I would likely say unknown.

25       Q    And is unknown the same as genetic

1    mutation?

2        A    Well, all cancer is due to genetic

3    mutations, but that doesn't mean they are not

4    related to environmental factors.  So I would just

5    say unknown.

6        Q    So if it is unknown, does that mean that it

7    would be caused by naturally occurring genetic

8    mutations?

9        A    No.  That means it might be caused by

10   environmental factors that I'm not able to ascertain

11   or quantify.

12       Q    And you understand that in your prior

13   expert report you said that obesity was a risk

14   factor for non-Hodgkin's lymphoma, right?

15       A    That was the one for Mr. Lumb?

16       Q    I couldn't tell you.

17       A    Yeah.  Well, I think at that time I did not

18   spend as much time as I would have liked reviewing

19   the epidemiological literature because I was under

20   the gun to get a report, and I have since revised my

21   opinion based on a more careful review of the

22   literature.

23       Q    And what review of the literature has led

24   you to change your opinions for Ms. Salas' case

25   about obesity?

```
 1        A    The articles I cited, textbook chapters on

 2   lymphoma.

 3        Q    And you haven't reviewed any of those

 4   articles or textbook chapters at any point in your

 5   practice before you wrote this report for Ms. Salas?

 6        A    Those specific articles, no.  I try and

 7   ready DeVita whenever I can.  I read other articles

 8   about non-Hodgkin's lymphoma, you know.  They may

 9   touch briefly on risk factors, but usually they are

10   more clinical.  None of them particularly said

11   obesity is a huge risk factor or smoking is a huge

12   risk factor for non-Hodgkin's lymphoma.  I spent

13   time at the NCI taking courses in cancer prevention

14   and control.  I mean, there's many sources of

15   information.  I've never really talked to anybody

16   where they said, oh, yeah, lymphoma is caused by

17   smoking or obesity.  I think the link there is not

18   very strong.  I think that I'm entitled to change my

19   opinion based on further reading and further

20   reflection compared to my original reports.  If I

21   had a chance, I would revise those original reports.

22        Q    And you said you spent time at NCI taking

23   courses in cancer prevention and control that don't

24   mention obesity and smoking.  Do those courses

25   mention glyphosate or Roundup?
```

1      A    So that would have been 1996.  For sure --

2    for sure when we took courses on lymphoma, we

3    understood that it was related to people who worked

4    on farms and herbicides.  I don't think at that time

5    they specifically mentioned Roundup.  That would

6    have been --

7      Q    The report you did prior was way after

8    1996.  So that is not what changed your opinion on

9    smoking and obesity?

10     A    No.  I think more attention to the exact

11   risk factors for lymphoma that was engendered by

12   writing this report and one or two others.

13     Q    And in that prior report, the individual

14   was not obese and did not smoke, right?

15     A    I haven't reviewed that report recently.

16   You probably reviewed it more recently than me,

17   Mr. Kerschner.

18     Q    You don't remember one way or the other?

19     A    I don't.  I haven't reviewed that report in

20   preparation for today's deposition.

21     Q    Is -- have you seen studies that show

22   alcohol has a protective effect for non-Hodgkin's

23   lymphoma?

24     A    I don't think I've seen a specific study

25   saying alcohol protects from non-Hodgkin's lymphoma.

```
 1        Q    If someone was smoking and they're -- let's
 2   just assume for a second that smoking can cause
 3   non-Hodgkin's lymphoma and alcohol has its
 4   protective effect.  Can someone who smokes and drink
 5   have the alcohol cancel out the effect of smoking
 6   when it comes to causing non-Hodgkin's lymphoma?
 7        A    I can't answer that without reviewing those
 8   studies more carefully.
 9        Q    Does that concept where if you have someone
10   who smokes and then they drink, the alcohol can
11   cancel out the effect of non-Hodgkin's lymphoma,
12   does that make sense to you?
13        A    At face value, no, it doesn't make sense to
14   me.
15             You would have to have -- you would have to
16   have an interaction between the two rather than them
17   being independent risk factors or protective
18   factors, as you say.  So you would probably have to
19   study a population of people who were both smokers
20   and drinkers and see what their incidence of
21   lymphomas were over time.
22        Q    You understand that smoking has been
23   associated with certain subtypes of non-Hodgkin's
24   lymphoma, right?
25        A    So I read one article about cigarette
```

1    smoking and non-Hodgkin's lymphoma.  I've -- I'm not

2    really aware, and I appreciate you telling me which

3    articles show that smoking is associated with

4    certain subtypes of non-Hodgkin's lymphoma.

5        Q    You have never seen any data that smoking

6    is associated with follicular lymphoma?

7        A    I haven't seen any studies linking smoking

8    with follicular non-Hodgkin's lymphoma in

9    particular, no.

10        Q    If there were studies that showed a

11    statistically significant elevated risk of smoking

12    and follicular lymphoma, would that change your

13    opinion on smoking as a risk factor for

14    non-Hodgkin's lymphoma?

15        A    It totally depends on how well the studies

16    were done, how many studies there are, consistency

17    of cross studies, dose response, the usual things

18    that I look for in causality.

19        Q    And are those things that you looked in for

20    Roundup as well?

21        A    Yes.  I am curious.  I wrote down, you

22    know, I'm going to do a quick lit search and see

23    about smoking in follicular non-Hodgkin's lymphoma.

24        Q    So to be clear, though, for your --

25    actually, did you -- we will move on.  Strike that.

```
 1              You agree that smoking tobacco can
 2     inversely impact immunity, right?
 3        A     To some extent, yes.
 4        Q     Did you ever advise Ms. Salas to stop
 5     smoking?
 6        A     I've never met Ms. Salas.
 7        Q     Fair.
 8              In your report you state that Ms. Salas is
 9     below the median age at the time of her diagnosis?
10        A     I believe so, yes.
11        Q     What is the median age for a diagnosis of
12     non-Hodgkin's lymphoma?
13        A     Different subtypes of non-Hodgkin's
14     lymphoma have different median ages, I think.
15        Q     Do you know what the median age for
16     diagnosis of non-Hodgkin's lymphoma is overall?
17        A     I would guess it is probably in the 60s.
18        Q     And the American Cancer Society, any reason
19     to disagree with it that they say 65?
20        A     60, 65, sounds close enough.
21        Q     You understand Ms. Salas was 66 when she
22     was diagnosed?
23        A     If that's the case, then that's higher than
24     65.
25        Q     So you agree that Ms. Salas was above the
```

1    median age for diagnosis, correct?

2        A    Yes.  I would have to correct my statement,

3    then.

4        Q    So is it fair that you can't rule out age

5    as a risk factor for Ms. Salas' development of

6    non-Hodgkin's lymphoma?

7        A    I think of age as more of an association

8    rather than a risk factor because we see lymphoma

9    more as people get older.

10       Q    And as you get older, you accumulate more

11   genetic mutation, right?

12       A    Either that or you're exposed to more -- I

13   mean, one form of lymphoma genesis is you are

14   exposed to more viruses and bacteria that change

15   your immune system in some way that you might cede

16   to a lymphoma.

17       Q    So are you able to rule out -- strike that.

18            So were you able to rule out to a

19   reasonable degree of medical certainty that normal

20   aging was the causative agent for Ms. Salas'

21   non-Hodgkin's lymphoma?

22       A    I don't think that's the way I stated it.

23   I stated that I thought Roundup was a substantial

24   contributing risk factor to her non-Hodgkin's

25   lymphoma.  I don't think I would say that age was a

1    causative agent for -- cause for her risk for

2    non-Hodgkin's lymphoma.

3        Q    And for it to be Roundup as a substantial

4    causative agent, did you rule out age, normal aging,

5    as also being a substantial causative agent of her

6    non-Hodgkin's lymphoma?

7        A    Well, how did I phrase it?  Did I say age

8    was not a risk factor for her developing it?

9        Q    I -- you can take a look at your report,

10   but you didn't say age was a risk factor for her.

11   In fact, you said she was below the median age.

12       A    Probably the correct thing to say would be

13   that age -- there's an association between greater

14   age and the risk of developing non-Hodgkin's

15   lymphoma, but then I would still stand by my

16   statement about Roundup for her case.

17       Q    So how can you rule out to a reasonable

18   degree of medical certainty that Ms. Salas' age was

19   not that substantial causative agent for the

20   development of her non-Hodgkin's lymphoma?

21           MR. ROJAS:  Object to the form.

22           THE WITNESS:  Because age does not cause

23   non-Hodgkin's lymphoma.  It is an association.  It

24   is not a causative thing.

25   ///

1    BY MR. KERSCHNER:

2         Q    All right.  And we understand that age --

3    so strike that.

4              You understand that that people above the

5    age of 60 get non-Hodgkin's lymphoma without being

6    exposed to Roundup, right?

7         A    That's true.

8         Q    And if Ms. Salas wasn't exposed to Roundup,

9    would you associate normal aging as the reason in

10   which she developed non-Hodgkin's lymphoma?

11        A    No.

12        Q    And what would be your basis for that

13   statement?

14        A    I mean, if a patient asked me and I would

15   say, well -- why did I get this, I would say, well,

16   we tend to get this more as we age, but I don't know

17   that that's the reason you got it per se.

18             MR. KERSCHNER:  All right.  Let's take a

19   couple-minute break.  I want to go back through some

20   of my notes.

21             THE WITNESS:  Sure.

22             VIDEO OPERATOR JOHNSON:  We are going off

23   the record.  The time is 1:08 p.m.

24             (Recess taken.)

25             VIDEO OPERATOR JOHNSON:  Back on the

1    record.  It is 12:00 p.m.

2    BY MR. KERSCHNER:

3        Q    You have given presentations to residents

4    as part of board review, right?

5        A    Not really board review, just to sort of

6    teach them about lymphoma.

7        Q    What is board review?

8        A    So if you are an internal medicine

9    resident, you are with us for three years.  My main

10   concern in teaching is that they know how to

11   recognize, diagnose, and take care of patients with

12   lymphoma to the extent that they are going to be

13   hospitalists or a primary care physician.  Board

14   review is that they have to take a board exam at the

15   end of their three-year internal medicine residency

16   to qualify as an internist, and there are going to

17   be questions on the board exam about lymphoma.  So

18   it has a dual purpose.

19       Q    And my understanding is you made a

20   PowerPoint presentation that was used for board

21   review on non-Hodgkin's lymphoma, right?

22       A    Again, it is primarily to educate, but they

23   can also use it for board review, yes.

24       Q    Got it.

25            So I'm going to mark what was provided to

1    counsel as a presentation from Dr. Knopf.

2         MR. KERSCHNER:  Joe, can we pull up the

3    deck, and then we will mark it.

4         MR. KLEMME:  One second.

5         MR. KERSCHNER:  I just have a couple

6    questions, Doctor, just to understand what this is,

7    so.

8         THE REPORTER:  Okay.  That will be Exhibit

9    19 because the last document was 18, but I don't

10   believe we put that on the record.

11        MR. KERSCHNER:  Yeah, I think that was the

12   medical records.  I'll mark those as exhibits as

13   well.  I thought when we loaded them to the chat

14   that we were marking them, but I would like to mark

15   those as well.  So this would be 20.

16        THE REPORTER:  I believe this is 19.

17        (The document referenced below

18    was marked Deposition Exhibit 19 for

19    identification and is appended

20    hereto.)

21   BY MR. KERSCHNER:

22        Q    Doctor, are you familiar with this

23   presentation?

24        A    Sure.

25        Q    And this is a deck that you prepared,

1    right?

2        A    Yes.

3        Q    And is this a deck that you would give to

4    residents as part of board review?

5        A    Well, it is not all board review, as I

6    said, it is just to educate them because they

7    don't -- they need to learn a little bit of

8    non-Hodgkin's lymphoma.  And I either use a deck --

9    more often than not, I write the talk on a white

10    board, but -- yeah.

11        Q    Do you have any other versions of this live

12    deck or is this the only one you have?

13        A    No, I haven't updated it.

14        Q    And so you use this live deck to discuss

15    non-Hodgkin's lymphoma with residents who are

16    working in your hospital?

17        A    I have, but I gave a talk on non-Hodgkin's

18    lymphoma two days ago on a white board without this

19    live deck.

20        Q    When was the last time you think you would

21    have used the deck?

22        A    Three years ago.

23            MR. KERSCHNER:  You can pull it down.

24    BY MR. KERSCHNER:

25        Q    So is there a separate deck that you would

1    use as a part of board review, because I know you

2    testified about doing presentations for board

3    review.

4         A    No, it is the same thing.  They need to

5    learn it for -- you know, there are going to be

6    questions on their boards about it, so it is board

7    review, but my primary concern in giving that talk

8    is that they understand lymphoma, not that they pass

9    their boards.

10        Q    Okay.  Got it.  I think we are on the same

11   page now.  Sorry.

12             So you use the deck to present to your

13   residents as part of their education to become

14   doctors.  Part of that includes passing the board?

15        A    Right.  They usually get a talk on

16   melanoma.  They usually get a talk on colon cancer.

17   This is something I used to talk about lymphoma.

18        Q    Do you agree that higher erythrocyte

19   sedimentation rate, or an ESR, is an indication of

20   inflammation?

21        A    Sure.

22        Q    And do you ever run any ESR tests on your

23   patients?

24        A    Yeah, I run ESR tests on my patients.  Yes.

25        Q    Why?

```
 1      A     It may not be -- when it might be
 2   clinically relevant, I sometimes order that test.
 3      Q     And is it clinically relevant to the
 4   development of cancer?
 5      A     I'm not sure.  Remember my practice is
 6   usually people after they develop cancer.  I think
 7   it is more popularly used in cardiology than
 8   oncology, to be honest.
 9      Q     Right.  And is chronic inflammation a risk
10   factor for the development of non-Hodgkin's
11   lymphoma?
12      A     So it -- I don't know.  It might be.  It
13   has to be sort of chronic inflammation of precursors
14   to lymphocytes to be a risk factor.  And ESR is a
15   broad measure of inflammation.
16      Q     Were you able to rule out -- sorry.
17            Do you take into consideration Ms. Salas'
18   high erythrocyte sedimentation rate in this case?
19      A     I did not, no.
20      Q     So you weren't -- were you able to rule out
21   to a reasonable degree of medical certainty chronic
22   inflammation as a risk factor for Ms. Salas'
23   non-Hodgkin's lymphoma?
24      A     So I think as we decided before, that as
25   you age you are exposed -- this is my understanding
```

1    of lymphomagenesis.  You are exposed to more viruses

2    and bacteria, and so your lymphoproliferative system

3    is dividing more to form mature cells and fight

4    those off, but I'm not sure the relationship between

5    inflammation in general, because ESR is a very

6    nonspecific marker for inflammation, and how much

7    that would correspond with, you know, lymphoma risk.

8    That, I'd have to review.

9        Q    Do you know what C-reactive protein is?

10       A    Yeah.  I mean, that, I think, is used

11   primarily in cardiology.

12       Q    It is an indicator of inflammation, right?

13       A    A broad indicator of inflammation, yes.

14       Q    And did you consider Ms. Salas had a high

15   C-reactive protein level?

16       A    On what parts of her medical history did

17   she have a high sed rate and a high CRP?

18       Q    I'm asking if you were aware of it when you

19   formed your opinion.

20       A    No.

21       Q    Is that something you would consider?

22       A    No, I don't think I would consider that.

23       Q    Did you rule out as a reasonable degree of

24   medical certainty naturally occurring mutations or

25   DNA replication error as a cause of Ms. Salas' NHL?

1       A    No.  I don't think that's the way I phrased

2    it.  I think I phrased it that we went through all

3    the associations between conditions in NHL and I

4    said that I thought Roundup was more likely than not

5    a substantial cause of her non-Hodgkin's lymphoma.

6       Q    Right.

7       A    And I think -- I'm not explaining it well,

8    but causation is not just one thing or the other.  I

9    mean, again, the example of somebody who falls and

10   breaks their hip, you know, maybe one thing was not

11   necessary or maybe it was, but each thing might have

12   had a causative role in each person's development of

13   the disease process.

14      Q    Can something that's protective for the

15   development of cancer or -- undo a mutation from

16   something that would cause mutation in DNA?

17      A    Yeah, I mean, I don't think I've seen great

18   research on things that are protective of cancer per

19   se.  I mean, there was some data about aspirin

20   protecting in colon cancer by decreasing

21   inflammation of the colon.  Vitamin E failed,

22   selenium failed.  I'm trying to think what actually

23   we would tell patients to take to decrease

24   inflammation to cause cancer, and nothing is really

25   coming to my mind right away.

1    Q   I'm not even talking specifically

2  inflammation.  I'm just saying to the extent you

3  have something that is protective, does it make

4  sense that what is protective would undo any

5  mutations that were occurred -- occurred in that

6  person that may have led to their lymphoma?

7    A   I don't know that I could say that.  I'd

8  have to read more about what you are talking about.

9  For example, birth control pills may be protective

10  against ovarian cancer by decreasing follicular

11  stimulation, but that's not reversing mutations.

12  That is just decreasing the chance of mutation

13  developing.

14    Q   In other words, the concept of being

15  protective, you know, undoing or reversing

16  mutations, that's not something you have heard of in

17  your practice, right?

18    A   No.  I mean, I've heard of it, a lot of

19  people are studying it, but I don't -- in my taking

20  care of lymphoma patients or talking to lymphoma

21  experts, nobody has said, gee, everybody should take

22  turmeric to reverse mutations and prevent them from

23  getting lymphoma.

24    Q   Have you heard that alcohol can reverse

25  mutations?

1      A      From you.  You know, alcohol is

2    carcinogenic, so I don't think we usually recommend

3    that people drink alcohol.  Definitely associated

4    with a lot of other cancers, esophageal, head and

5    neck.  So, you know, I wrote it down.  During the

6    break I looked about smoking and lymphoma.  One

7    study was positive and one study was negative that I

8    found.  I'd have to look up alcohol protecting for

9    lymphoma, but...

10      Q      We don't need to take the time to do it

11    today.

12      A      No, no.  Not right now, but, you know, now

13    I'm curious.

14      Q      You have seen a study that's positive for

15    smoking and negative for smoking.  Can you not rule

16    out smoking to a reasonable degree of medical

17    certainty?

18      A      Well, you like to see consistency across

19    multiple studies.  So if you have one positive and

20    one negative, it sort of cancels each other out.

21      Q      In the Roundup literature, there are some

22    that are positive and some that are negative as

23    well, right?

24      A      Yeah, but I think there's enough that are

25    positive and there's enough consistency.  And what I

1      find interesting is that Roundup wasn't associated

2      with breast cancer or colon cancer or lung cancer,

3      it is only associated with lymphoma.  So in

4      epidemiologic literature, that's sort of very

5      noteworthy when you see one particular cancer type

6      associated with one environmental toxin.

7         Q    But you haven't done the level of research

8      on the association between smoking and non-Hodgkin's

9      lymphoma as you have with Roundup in a hospital,

10     correct?

11        A    I've read enough since the prior statements

12     where I said it was a risk factor, to reverse my

13     opinion there.  I looked at two articles during our

14     break.  One had an increased odds ratio and one had

15     a decreased odds ratio.  Next step would be to look

16     at a review article or do a further literature

17     search.  I don't think cigarette smoking is major

18     risk factor, except for follicular lymphoma which

19     this patient did not have.  And I don't know how big

20     a risk factor it is for follicular lymphoma either,

21     and I don't know if there's confounding or

22     interaction.  And, you know, why would it only

23     affect one type of lymphoma and not the other.

24        Q    Let me get back to ruling out naturally

25     occurring mutations.  What is your basis for ruling

1    out, to a reasonable degree of medical certainty,

2    that Ms. Salas' lymphoma was due to naturally

3    occurring mutations or DNA replication errors?

4         A    I may not be doing a good job of explaining

5    the multiple nature of causality.  All I'm saying is

6    I thought Roundup was a substantial cause in

7    increasing her chance of developing non-Hodgkin's

8    lymphoma.  If she hadn't done any Roundup, and then

9    I might say I don't know what caused her lymphoma.

10   I don't see any substantial risk factors here.  I

11   see an association with age.  I'm not convinced that

12   smoking increases the risk of mantle cell lymphoma.

13        Q    So is it a fair understanding of that

14   because you think it is Roundup, she was exposed to

15   Roundup and Roundup is a substantial contributing

16   factor to her non-Hodgkin's lymphoma, then that is

17   how you are ruling out that it was simply caused by

18   naturally occurring mutations or DNA replication

19   error?

20             MR. ROJAS:  Object to the form.

21             THE WITNESS:  Yeah, I think that's the most

22   substantial causative risk factor here.

23   BY MR. KERSCHNER:

24        Q    I'm sorry, was that statement I just said

25   correct?  In other words, that --

1      A    If you can read the statement again, it

2   would make --

3      Q    Sure.  Because I may have missed it.

4           Am I correct that you -- strike that.

5           Is it a fair understanding of your opinion

6   that because you think Ms. Salas was exposed to

7   Roundup and Roundup is a substantial contributing

8   factor to her non-Hodgkin's lymphoma, then that's

9   how you are ruling out that her lymphoma was due to

10  naturally occurring mutations or DNA replication

11  errors?

12     A    So mutations and DNA replication errors can

13  happen spontaneously, they can happen by immune

14  stimulation, and they can also happen by an

15  environmental toxin, in this case Roundup.  So I

16  don't know which chain of mutational things in her

17  DNA initiation, promotion, subsequent changes were

18  due to Roundup or were due to random mutational

19  changes.

20          I don't think you can just dichotomize the

21  two and say random mutational changes only or

22  Roundup only.  Just because for the same reason if

23  you had -- if you were a smoker and you have a much

24  higher chance of developing lung cancer because you

25  smoke, I can't say for sure that smoking was

1   definitively causing of that.  I just can say it is
2   a very strong association because people who don't
3   smoke also get lung cancer and people who aren't
4   exposed to Roundup also get lymphoma.  But it is
5   not -- I don't think it is a simple dichotomy the
6   way you are stating it, sir.
7       Q    You have 100 patients exactly like
8   Ms. Salas, and how many of them would you say that
9   Roundup caused their non-Hodgkin's lymphoma versus
10  Roundup not being a causative agent for her
11  non-Hodgkin's lymphoma?
12      A    I'm not saying it is a direct cause.  I'm
13  saying it increases the chance of developing
14  lymphoma.  The odds ratio, let's say the Zhang
15  meta-analysis was 1.41.  So 41 percent more likely
16  to develop lymphoma if you have a substantial
17  exposure to Roundup than not.
18      Q    So of those 100 patients just like
19  Ms. Salas, you would say 41 of them, their
20  non-Hodgkin's lymphoma would be due to Roundup
21  whereas the others would not?
22          MR. ROJAS:  Object to the form.
23          THE WITNESS:  I don't think in a straight
24  frequentis opinion like that.  I think in terms of
25  more of Bayesian opinion.  I think that it is a

1    substantial enough risk factor, it is increasing the

2    risk by 41 percent, that those patients would

3    certainly have been better off if they had not been

4    exposed to Roundup and that some of the lymphomas

5    would not have happened if they had not been exposed

6    to Roundup, but I don't think I could say 41 out of

7    100 like that.

8    BY MR. KERSCHNER:

9        Q    So what portion out of a hundred?

10       A    I can't give you the exact number.

11       Q    Did you conduct any testing in Ms. Salas'

12   home or -- strike that.

13            You didn't conduct any testing to determine

14   any exposures Ms. Salas may have had to any other

15   environmental compound?

16       A    No.  I have not visited Mrs. Salas' home.

17       Q    You agree that there's no medical record

18   that says glyphosate or Roundup caused Ms. Salas'

19   lymphoma?

20       A    There's no medical record saying that

21   glyphosate caused her -- I don't think it is written

22   in any of her medical records that Roundup caused

23   her non-Hodgkin's lymphoma.  No, I didn't see that

24   in review of her medical records.

25       Q    And there's no test of any type that shows

1    glyphosate present in Ms. Salas that you've seen,

2    correct?

3        A    I don't think they tested for it.  There

4    was an interesting study which I added to my list

5    about looking at mutations --

6        Q    I'm just asking about Ms. Salas.

7        A    No, I don't think anybody checked for her

8    Roundup exposure biologically at the time she was

9    diagnosed with her lymphoma.

10       Q    And none of Ms. Salas' pathology, either in

11   images or report, shows the presence of glyphosate,

12   right?

13       A    No, that's correct.

14       Q    And there's no biomarker in anything you

15   have seen from Ms. Salas that shows that glyphosate

16   or Roundup was the cause of her non-Hodgkin's

17   lymphoma, correct?

18       A    I don't see any biological tests purporting

19   to say that, no.

20       Q    You can't say that Ms. Salas would never

21   have developed non-Hodgkin's lymphoma but for her

22   Roundup exposure, right?

23       A    I think I'm saying it was a substantial

24   causative risk factor in her non-Hodgkin's lymphoma,

25   but I guess I couldn't say she would never develop

1    lymphoma had she not been exposed to Roundup, no.

2        Q    In a patient with Ms. Salas' exact same

3    medical history but with no exposure to Roundup,

4    they would still have been diagnosed with

5    non-Hodgkin's lymphoma, correct?

6        A    Yes, that's correct.

7        Q    And even without being exposed to Roundup

8    or glyphosate, Ms. Salas would still have been

9    diagnosed with non-Hodgkin's lymphoma?

10       A    Well, my understanding is that all of us

11   are exposed to glyphosate at this point, that, you

12   know, all of us on this call have been exposed to

13   glyphosate.  Maybe not all of us have been exposed

14   to Roundup, but we have all been exposed to

15   glyphosate.  80 percent of us maybe.

16       Q    I didn't get an answer to my question.  Do

17   you agree that if Ms. Salas had never been exposed

18   to Roundup, she still may have been diagnosed with

19   non-Hodgkin's lymphoma?

20       A    Yes, but I don't know what the effect of

21   glyphosate in the food is on the risk of developing

22   non-Hodgkin's lymphoma, so.  She might have still

23   developed it as a result of glyphosate even had she

24   not been exposed to the Roundup product.

25       Q    Do you have any information to say that

1    Ms. Salas' non-Hodgkin's lymphoma was caused by

2    glyphosate that was part of her diet?  Let me strike

3    that.  Let me rephrase that.

4         Do you have any information to note

5    specifically for Ms. Salas that her non-Hodgkin's

6    lymphoma was the result of any glyphosate that she

7    came into contact with foods she ate?

8    A    No.  I think in her case I'm more concerned

9    about her exposure to Roundup directly.

10   Q    And without that direct exposure to

11   Roundup, you agree that Ms. Salas would still have

12   developed non-Hodgkin's lymphoma?

13   A    I don't know that that's true.

14   Q    What part of your methodology rules out the

15   possibility that someone -- that she still could

16   have developed non-Hodgkin's lymphoma without the

17   Roundup exposure?

18        MR. ROJAS:  Object to the form.

19        THE WITNESS:  Yeah, I may not be doing a

20   good job talking about multifocal causality, and I

21   might refer you to one of the papers that does a

22   better job explaining that.  I think in her case it

23   was a substantial contributing factor to her risk in

24   developing non-Hodgkin's lymphoma, but the converse

25   statement, I'm not sure I can answer as easily.

```
 1    BY MR. KERSCHNER:

 2        Q    Why not?

 3        A    Because she was exposed to Roundup and she

 4    developed non-Hodgkin's lymphoma.  You are asking a

 5    very hypothetical question that I don't think

 6    anybody can answer.

 7        Q    You understand that tobacco has increased

 8    the numbers of lung cancer in the United States,

 9    right?

10        A    Yes.

11        Q    And that's because -- because of smoking

12    causes lung cancer, right?

13        A    Yeah, but as I said, it is not sufficient

14    because people who don't smoke also get lung cancer.

15        Q    Correct.  But as we have seen an increase

16    in the usage of tobacco, we also saw an increase in

17    the numbers of lung cancers, right?

18        A    Yeah, although I think that trend is

19    reversing itself somewhat.

20        Q    And as is the trend in tobacco use, right?

21        A    Yes.

22        Q    And if tobacco all of a sudden increased

23    dramatically, you would expect to see an increase in

24    lung cancer cases as well, right?

25        A    Probably, yes.
```

1    Q    But if there is an increased use, for

2    example, in glyphosate, you wouldn't expect to see

3    an increase in the number of lung cancers because

4    glyphosate is not associated with lung cancer,

5    correct?

6    A    Correct.

7    Q    If Roundup is associated with non-Hodgkin's

8    lymphoma, you would expect to see that an increase

9    in the use of glyphosate would also increase the

10    usage of -- strike that.  I screwed that up.

11         Under your theory that Roundup is

12    associated with non-Hodgkin's lymphoma, you would

13    expect to see that an increase in glyphosate and

14    Roundup usage would correlate to an increase in the

15    incidence of non-Hodgkin's lymphoma, right?

16    A    It might.

17    Q    But you would expect to see that, right?

18    A    I'm not sure if I would expect to see it or

19    not because there's many causes of non-Hodgkin's

20    lymphoma.

21    Q    But if Roundup was one of the causes and

22    there was a dramatic increase in the amount of

23    Roundup use, you would expect to see at least an

24    increase in the numbers of non-Hodgkin's lymphoma

25    cases under your theory that Roundup is associated

```
 1    with the development of non-Hodgkin's lymphoma,
 2    right?
 3              MR. ROJAS:  Object to the form.
 4              THE WITNESS:  Yeah.  It is a little bit
 5    more complicated.  For example, we saw a big jump in
 6    the number of cases of non-Hodgkin's lymphoma when
 7    AIDS came out, and then when we developed parts and
 8    we could control AIDS, we saw a decrease in the
 9    number of non-Hodgkin's lymphoma, and non-Hodgkin's
10    lymphoma is 50 diseases whereas lung cancer is, you
11    know, one disease with five flavors and --
12    BY MR. KERSCHNER:
13        Q    But it is your opinion that Roundup is
14    associated with all the --
15              MR. ROJAS:  David, David, David.  You got
16    to let him finish.
17              MR. KERSCHNER:  I thought he was done, and
18    he is not going to answer the question.
19              MR. ROJAS:  Well, you can answer again, we
20    can deal with that.  But when he answers, please let
21    him finish.
22    BY MR. KERSCHNER:
23        Q    So let me ask my question.
24              Is there certain subtypes that you would
25    agree that Roundup is not associated with the
```

```
 1      development of that subtype of non-Hodgkin's

 2      lymphoma?

 3           A    No, I think that's much harder to say

 4      because the case control studies, and even the

 5      cohort studies, are showing an overall increased

 6      risk of B-cell non-Hodgkin's lymphomas and in some

 7      cases I think the diffuse large cell lymphoma and

 8      one case of hairy cell leukemia, which is very rare.

 9      But because there's 30 to 50 different subtypes of

10      non-Hodgkin's lymphoma, it is very hard to show the

11      relationship of Roundup to one subtype of

12      non-Hodgkin's lymphoma.  I think that is pretty good

13      on showing an increase to all non-Hodgkin's

14      lymphomas, particularly B cell non-Hodgkin's

15      lymphomas.  But there's -- I mean, mantle cell

16      lymphoma is a smaller subset.

17              So I think overall there's a strong

18      association between Roundup and the development of

19      all non-Hodgkin's lymphomas.  But it is going to be

20      harder to show specific subtypes because there's

21      more than one subtype whereas lung cancers there's,

22      you know, small cell and nonsmall cell.  Even there

23      we know, like, if you are a nonsmoker, you are more

24      likely to have an adenocarcinoma than any other type

25      of lung cancer, assuming you haven't had secondhand
```

1    smoke exposure.

2        Q    So, again, let me get back to what we were

3    talking about.

4        A    Sure.

5        Q    And try to focus on my question because you

6    are going off, and we're going to just get more time

7    if that keeps happening.

8            So under your theory that Roundup is

9    associated with development of non-Hodgkin's

10   lymphoma, if there was an increase in the amount of

11   Roundup used in the United States, you would expect

12   to see a similar increase in the numbers of

13   non-Hodgkin's lymphoma cases in the United States,

14   correct?

15           MR. ROJAS:  Objection.  Asked and answered.

16   You don't have to like the answer, but he has given

17   his answer more than once.

18           You can go ahead and try again to answer,

19   Doctor, but I'm objecting for the record.

20           MR. KERSCHNER:  I'm going -- speaking

21   objections are not permitted.

22           He has not answered that question.  He has

23   talked about a number of different types of cancers,

24   but I'm asking about non-Hodgkin's lymphoma and

25   Roundup.

```
 1              THE WITNESS:  I apologize.  You are asking

 2      a very complicated epidemiologic question.  I'm

 3      trying to answer it.  But consider this, only a

 4      subpopulation of the U.S. is exposed to Roundup.

 5      Right?  Farmers, people who use it.  The majority of

 6      people that have lymphoma are probably not exposed

 7      to Roundup except for glyphosate in the diet, and

 8      I'm not as firmly convinced that glyphosate in the

 9      diet is associated with non-Hodgkin's lymphoma as I

10      am direct use of Roundup over multiple years and

11      multiple exposures.

12              So you have a mixed picture there where you

13      might see a decrease in lymphomas because, for

14      example, we have got AIDS under control, but there

15      might be an increase among the population that's

16      using Roundup.

17      BY MR. KERSCHNER:

18      Q    So it is your testimony that an increase in

19      Roundup usage in the United States would not lead to

20      an increase in the numbers of non-Hodgkin's lymphoma

21      cases in the United States?

22              MR. ROJAS:  Object to the form.

23              THE WITNESS:  I think if you could isolate

24      everybody who has used Roundup in the United States,

25      that they might have an increased incidence of
```

1    non-Hodgkin's lymphoma.

2    BY MR. KERSCHNER:

3        Q    And if you saw a dramatic increase in the

4    numbers of amount of glyphosate, would you think

5    that would have any impact on the numbers -- the

6    amount of non-Hodgkin's lymphoma cases in the United

7    States?

8        A    I would have to isolate those people who

9    have used Roundup substantially and see what their

10   non-Hodgkin's lymphoma incidence is over time.

11           MR. KERSCHNER:  Let's just go off the

12   record.  I think I'm probably done.

13           VIDEO OPERATOR JOHNSON:  We are going off

14   the record.  The time is 1:49 p.m.

15           (Off-the-record discussion.)

16           VIDEO OPERATOR JOHNSON:  We are back on the

17   record.  It is 1:51 p.m.

18   BY MR. KERSCHNER:

19       Q    You mentioned someone by the name of

20   Dr. Andreadis, A-n-d-r-e-a-d-i-s --

21       A    Yes.

22       Q    -- at the last deposition.  Who is that?

23       A    He is a lymphoma expert at University of

24   California San Francisco.

25       Q    And you have relied on him in forming your

1    opinions in this case?

2      A    No.  I think I should say when I was first

3    introduced to this, I read a report of his and I

4    know him to be a very honest guy and a very smart

5    guy, as well as Chadi Nabhan.  And so it, I think,

6    got me thinking more that there's something here to

7    investigate more, you know.

8      Q    And do you have that report still?

9      A    I don't have that report.  I'm sure he

10   submitted it to Monsanto.  I could try and find it

11   for you.

12     Q    How are you able to read it?

13     A    It may have been given to me by Mr. Lumb.

14     Q    It is not on your materials considered

15   list, so I would ask you to turn over a copy of that

16   so we can take a look at it.

17     A    Okay.

18     Q    Dr. Lawlor, you also reviewed one of his

19   reports, right?

20     A    That name -- do you have his first name?

21     Q    You testified Dr. Lawlor.  L-a-w-l-o-r is

22   how I spelled it.

23     A    Right.  I just want to make sure.

24          Christopher Lawlor.  I think I may have

25   reviewed one of his reports.  Yes.

```
 1        Q    Do you still have that report?

 2        A    I don't think I have them, but if they came

 3    from Attorney Lumb, I'll email him and see if he

 4    still has them because he had to submit them.

 5             MR. KERSCHNER:  Thanks, Doctor.  As we

 6    mentioned, we haven't had a chance to go over all

 7    the articles you submitted, so I would reserve some

 8    time to depose Dr. Knopf about that material.  I

 9    understand -- and I put that on the record.  But

10    subject to that I will pass the witness to either --

11    to Caroline, I believe, has questions.

12             And, Doctor, thank you very much for your

13    time.

14             MR. ROJAS:  I'll just reiterate our

15    objection to that suggestion of further deposition

16    testimony, but we can handle that at a later time.

17             Caroline, I think it is your turn probably.

18             MS. SUYDAM:  All right.

19

20                      EXAMINATION

21    BY MS. SUYDAM:

22        Q    Hello, Dr. Knopf.  I'm Caroline Suydam.  I

23    represent Home Depot.

24             Just a couple questions for you real quick.

25             Are you aware that Ms. Salas has named Home
```

1    Depot as a defendant in this case?

2         A    Not off the top of my head, but if you say

3    so, I believe you.

4         Q    Okay.  And did you have any communications

5    with Ms. Salas or her counsel regarding where the

6    Roundup products she was exposed to were purchased?

7         A    No.

8              MR. ROJAS:  I'm going to instruct him not

9    to answer any questions about communications with

10   counsel.

11             THE WITNESS:  Okay.  Yeah, I have to do

12   what my attorney says here.

13   BY MS. SUYDAM:

14        Q    Did you have any communications with

15   Ms. Salas regarding her purchase --

16        A    I didn't talk to Ms. Salas about where she

17   purchased it, no.

18        Q    Just allow me to finish my question, if you

19   don't mind.  Thank you.

20             And have you taken any other steps to

21   determine where the Roundup products Ms. Salas was

22   exposed to were purchased?

23        A    No, I have not.

24        Q    And have you taken any steps to quantify

25   Ms. Salas' exposure to Roundup products that were

1    purchased from a Home Depot as opposed to somewhere

2    else?

3        A    No, I don't believe I have.

4        Q    Okay.  And have you performed any analysis

5    regarding Ms. Salas' exposure to Roundup products

6    that were purchased solely from Home Depot?

7        A    No, I don't believe I have stratified by

8    place of purchase.

9        Q    Okay.  And have you performed any opinions

10   that are specific to Home Depot?

11       A    Not for this case, no.

12       Q    Okay.  And have you been asked to form any

13   such opinions?

14       A    No, I have not been asked to form any

15   opinions regarding Home Depot.

16            MS. SUYDAM:  Okay.  That's all I have.

17

18                        EXAMINATION

19   BY MR. ROJAS:

20       Q    Okay.  Doctor, just a few, I guess,

21   clarifying questions from me.

22            There was in colloquy a couple hours ago

23   with Mr. Kerschner regarding the medical records in

24   this case referring to Ms. Salas tolerating,

25   quote-unquote, "well" her chemotherapy regimen.

1          Do you recall that colloquy into the

2     medical records?

3          A    Yes.

4          Q    In your clinical experience, and based on

5     your review of the medical records, and I know you

6     also testified that you read Ms. Salas' deposition

7     testimony, based on your clinical experience and

8     your review of the materials in this case, do you

9     take that notation of tolerating well to mean that

10    she had a total absence of side effects from her

11    chemotherapy regimen?

12         A    No.

13              MR. KERSCHNER:  Objection.  Form.

14              THE WITNESS:  No, I don't.  I mean, I think

15    oncologists frequently write "well tolerated," but

16    if you really asked the patient how they tolerated

17    the treatment, they all have side effects to

18    treatment.  I mean, that is not a particularly easy

19    regimen that everybody tolerates well.  Even our

20    easiest chemotherapy regimens have some side

21    effects.  So I -- "well tolerated" is sort of a

22    hackneyed phrase in oncology that probably reflects

23    that we are not really asking the patients enough

24    about their symptoms from chemotherapy.

25    ///

1    BY MR. ROJAS:

2        Q    All right.  And then there was a discussion

3    a few moments ago as well about a hypothetical

4    involving 100 patients with a similar or identical

5    profile to Ms. Salas and perhaps some questions

6    directed to you about what percentage you would

7    attribute out of those 100 patients if they had NHL,

8    what percentage you would attribute to glyphosate.

9            Do you remember that?

10       A    Yes.

11       Q    There was a discussion also, I think, of

12   the odds ratio relative risk of, you know, I think

13   being 41, as part of that discussion.

14           Do you remember that?

15       A    Yes.

16       Q    Is it your understanding that, you know,

17   that discussion from -- I think it was from the

18   Zhang meta-analysis means that 41 percent of a

19   certain, you know, subset of patients, cancer is

20   attributable to glyphosate or Roundup?  Is that what

21   that number means, the 41?

22           MR. KERSCHNER:  Objection.  Form.  And

23   improper hypothetical.

24           THE WITNESS:  I think when I see an odds

25   ratio, it means that that increases the pretest

1    probability of somebody developing that particular

2    thing as a result of an exposure.  But I don't take

3    it literally to mean that if you have 100 patients

4    exposed to Roundup, 41 of them are going to develop

5    lymphoma that wouldn't otherwise.  It is not the way

6    probability and causation really works in medicine.

7         And that 41 percent was just a number that

8    I could remember because I think I read the Zhang

9    meta-analysis again, but other odds ratios were

10   different and some were higher than that as well.

11        MR. ROJAS:  I think those are all the

12   questions I had.  Thank you.

13        Okay.  If nothing further, I think we can

14   go off.

15        VIDEO OPERATOR JOHNSON:  This concludes

16   today's deposition.  We are going off the record.

17   It is 1:58 p.m.

18        MR. ROJAS:  All right.  We are going to

19   read and if I can order a PDF copy of the

20   transcript.

21        MR. KERSCHNER:  Pam, I would like as much

22   of a rush as you can possibly please give.  And I'll

23   take a rough.

24      (The proceeding adjourned at 1:58 P.M. EST.)

25                    --ooOoo--

1

2                    CERTIFICATE

3                         OF

4          CERTIFIED SHORTHAND REPORTER

5

6          The undersigned Certified Shorthand
    Reporter of the State of California does hereby
7    certify:
            That the foregoing remote oral proceeding
8    was taken before me at the time therein set forth,
    at which time the witness was duly remotely sworn in
9    by me;
            That the testimony of the witness and all
10   objections made at the time of the examination were
    recorded stenographically by me and were thereafter
11   transcribed, said transcript being a true and
    correct copy of my shorthand notes thereof;
12          That the dismantling of the original
    transcript will void the reporter's certificate.

13

14

15

16

17

18   _____

19                    PAMELA COTTEN, CSR, RDR
                     Certificate No. 4497
20                    Certified Realtime Reporter

21

22          (The foregoing certification of
    this transcript does not apply to any
    reproduction of the same by any means,
23   unless under the direct control and/or
    supervision of the certifying
24   reporter.)

25

```
 1                  INSTRUCTIONS TO WITNESS

 2

 3          Please read your deposition over carefully

 4     and make any necessary corrections.  You should

 5     state the reason in the appropriate space on the

 6     errata sheet for any corrections that are made.

 7          After doing so, please sign the errata

 8     sheet and date it.

 9          You are signing same subject to the changes

10     you have noted on the errata sheet, which will be

11     attached to your deposition.

12          It is imperative that you return the

13     original transcript with errata sheet per the

14     instructions given to you.  If you fail to do so,

15     the deposition transcript may be deemed to be

16     accurate and may be used in court.

17

18

19

20

21

22

23

24

25
```

```
 1                      - - - - - -

 2                    E R R A T A

 3                      - - - - - -

 4     PAGE  LINE    CHANGE

 5    _____ _____   _____

 6        REASON:   _____

 7    _____ _____   _____

 8        REASON:   _____

 9    _____ _____   _____

10        REASON:   _____

11    _____ _____   _____

12        REASON:   _____

13    _____ _____   _____

14        REASON:   _____

15    _____ _____   _____

16        REASON:   _____

17    _____ _____   _____

18        REASON:   _____

19    _____ _____   _____

20        REASON:   _____

21    _____ _____   _____

22        REASON:   _____

23    _____ _____   _____

24        REASON:   _____

25
```

```
 1

 2

 3

 4              DECLARATION UNDER PENALTY OF PERJURY

 5

 6              I hereby declare under penalty of perjury

 7       that the foregoing is my deposition under oath; are

 8       the questions asked of me and my answers thereto;

 9       that I have read same and have made the necessary

10       corrections, additions, or changes to my answers

11       that I deem necessary.

12              In witness thereof, I hereby subscribe my

13       name this _____day of _____, _____.

14

15

16

17

18                    _____

19                    KEVIN B. KNOPF, M.D., VOLUME II

20

21

22

23

24

25
```