**WILKINSON STEKLOFF LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonstekloff.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonstekloff.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel:  202-847-4030
Fax:  202-847-4005

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel:  202-898-5843
Fax:  202-682-1639

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel:  202-662-6000

**BRYAN CAVE LEIGHTON PAISNER LLP**
K. Lee Marshall (CA Bar No. 277092)
(klmarshall@bclplaw.com)
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Tel:  415-675-3400
Fax:  415-675-3434

Jed P. White (CA Bar No. 232339)
(jed.white@bclplaw.com)
120 Broadway, Suite 300
Santa Monica, CA 90401
Tel:  310-576-2100
Fax:  310-576-2200

*Attorneys for Defendant Monsanto Company*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE:  ROUNDUP PRODUCTS LIABILITY LITIGATION, | MDL No. 2741 |
| | Case No.:  3:16-md-02741-VC |
| *Salas v. Monsanto Company, et al.*, 3:21-cv-06173-VC | **DEFENDANT MONSANTO COMPANY'S REPLY IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY OF DR. KEVIN KNOPF** |
| | Hearing:<br>Date:    July 27, 2023<br>Time:   10:00 a.m.<br>Place:  San Francisco Courthouse,<br>            Courtroom 4 – 17th Floor |

## INTRODUCTION

Dr. Knopf did not reliably perform a differential diagnosis to form his opinion that Roundup specifically caused Ms. Salas's mantel cell lymphoma ("MCL"), a subtype of Non-Hodgkin's lymphoma ("NHL"). Plaintiff's Opposition to Monsanto's Motion merely highlights the flaws in his methodology. Accordingly, his testimony should be excluded.

## ARGUMENT

### I. DR. KNOPF FAILS TO RELIABLY RULE IN ROUNDUP.

Plaintiff acknowledges the correct methodology for performing a differential diagnosis under federal law. An expert applying a differential diagnosis must first rule in potential causes of a disease, and, second, rule out less likely causes until the expert arrives at the most likely cause. But the parties disagree on whether Dr. Knopf *reliably applied* this methodology to the facts of this case.

First, Plaintiff somewhat bafflingly argues—without citation to any authority—that, despite this well-settled definition of a differential diagnosis, Dr. Knopf did not have to independently rule in Roundup. Plaintiff contends that the cases Monsanto cites to explain this first step of a differential diagnosis are related to general causation and are therefore inapposite, but that is simply not true. Each case cited discusses the requirements for ruling in potential causes *as part of a differential diagnosis conducted by specific-causation experts.* For example, *Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387, 1412–13 (D. Or. 1996) considers the testimony of an expert who had been disclosed to "testify, on the basis of differential diagnosis, that [the plaintiff] suffers from systemic sclerosis sine scleroderma, manifested by her pulmonary fibrosis, as a result of having silicone gel breast implants," an opinion not unlike Dr. Knopf's here. Likewise, *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1052–53 (9th Cir. 2003) dealt with the reliability of a differential diagnosis conducted by a marine biologist who opined on the cause of the death of oysters on an oyster farm in Oregon, an opinion that goes to the specific cause of the plaintiff's claimed injury. The "primary" dispute in *Clausen* was related to the reliability of the specific-cause expert's ruling-in analysis. *Id.* at 1059–61. Finally, *Glasseter v. Novartis Pharmaceuticals Corp.*, 252 F.3d 986, 989 (8th Cir. 2001) discusses the differential diagnoses of several specific-causation experts, who concluded that a specific drug caused the plaintiff's condition. While not each case's main focus, all three cases require reliable application

of *both steps* of the differential diagnosis, with no distinction between general- or specific-causation opinions. Dr. Knopf—whether disclosed as a specific cause expert or not—claims he performed a differential diagnosis, which, to be reliable in whole, requires the expert to reliably complete both steps of the analysis. Plaintiff cannot avoid this well-settled rule by pointing out that Dr. Knopf is disclosed on specific causation only.

Plaintiff's citation to this Court's decision in *In re Roundup Prod. Liab. Litig.*, 358 F. Supp. 3d 956, 958 (N.D. Cal. 2019) also does not help her here. Nothing in that ruling stands for the proposition that specific-cause experts are exempt from the first step of the differential diagnosis simply by virtue of the fact that general causation experts have been disclosed in the case. In fact, the Court in that case describes the differential diagnosis as requiring two steps: ruling in *and* ruling out. *Id.* And the Court noted that, at the ruling-in stage, specific cause experts must consider "whether a risk factor is a potential cause" of the plaintiff's condition. *Id.* Contrary to Plaintiff's assertions and regardless of whether he is disclosed on specific causation, general causation, or both, Dr. Knopf still must have a reliable basis for ruling in Roundup, and he has provided none.

Plaintiff then argues that Dr. Knopf nevertheless engaged in his own review of epidemiological studies and the general causation materials to arrive at his own independent conclusion that Roundup should be "ruled in" as a cause of Ms. Salas's MCL. However, Dr. Knopf's deposition testimony shows that any review he may have done of the general cause experts, published epidemiology, or other available general-causation materials was surface level at best. When asked about his review of the general causation experts, Dr. Knopf testified that he relied on Drs. Nabhan, Neugut, and Portier (as well as others he "may have" reviewed, but could not specifically recall), but that he had not reviewed their reports "in depth." Opp. Ex. 4 at 77:9–20. Dr. Knopf also several times mentioned reviewing a report of Dr. Lawlor, an expert who has not been disclosed in this case. *Id.* at 77:13–14, 161:7–12. Dr. Knopf also testified multiple times that he did not read anything from the EPA or the full IARC report on glyphosate. *Id.* at 103:12–14, 142:16–143:23 (testifying that he did not review "any documents" from the EPA its view on NHL and Roundup, and that "rather than read[ing] the formal EPA study, [he] probably read things on the Internet regarding the Roundup case"), 168:13–20 ("I didn't read the EPA report fully, I read about the EPA report."), 170:1–3 ("I did not take the time to read the full EPA

report and the full IARC report at the time of this article . . . ."), 174:7–13 (agreeing that he looked at IARC's methodology, analysis, and potential biases "somewhat but probably not to [*sic*] much"), 181:6-14 (testifying that he did not read the EPA's analysis of one epidemiology study upon which he relied). This cursory review cannot form the basis for reliably ruling in Roundup as the cause of Plaintiff's MCL.

Plaintiff next attempts to address the issue that Dr. Knopf failed to consider Plaintiff's absorbed dose of glyphosate by again simply stating that the contrary is true without citation to authority. Contrary to Plaintiff's assertions, Monsanto is not faulting Dr. Knopf for relying on Plaintiff's own testimony about whether she used Roundup. The issue arises from Dr. Knopf's failure to make any attempt to *quantify* that exposure and his reliance on an "estimate" from Plaintiff's counsel, which lead him to "convince[]" himself that Ms. Salas "had a substantial terminal exposure to Roundup." Motion Ex. 3 at 330:18–21, 336:4–6. Despite agreeing that knowing the absorbed dose would be helpful, Dr. Knopf still relied on "estimates" instead of engaging in any analysis to calculate a specific dose, or relying on any other expert's dose calculation. Plaintiff claims glyphosate is different, but she cites no authority exempting glyphosate from this accepted rule nor any persuasive reasoning as to why this would be the case. Instead, she suggests that because the epidemiological literature relies on exposure days rather than absorbed dose, Dr. Knopf was correct to consider exposure days rather than dose in his differential diagnosis. This argument, however, ignores the premise of Monsanto's argument—that dose matters and must be considered for purposes of specific causation. Exposure days does not move the needle on dose (the amount of Roundup absorbed through the skin) or exposure (the amount of Roundup that comes into contact with the skin). Using time spent spraying Roundup as a proxy for exposure, which is itself a proxy for dose, is an unreliable methodology for ruling in Roundup as a potential cause of Plaintiff's cancer. And while epidemiology studies rely on time spent spraying Roundup, they were not assessing dose and therefore are answering a different question than Dr. Knopf or the general-causation experts upon which he relies. Moreover, Dr. Knopf makes no attempt to show that Plaintiff's actual exposure to Roundup (which, again, he did not independently asses) was comparable in intensity or otherwise to the exposure of the participants in the epidemiological studies, most of whom were professional applicators and farmers.

The fact remains that assessing the amount of a substance actually absorbed into the body is critical to a specific-causation analysis. *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1242 (11th Cir. 2005) ("Dose is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect."); *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671 (6th Cir. 2011) (excluding an expert for failing to reliably rule in benzene exposure as a possible cause because the expert "formulated his opinion on dose without any exposure data, only having been told that [Pluck] had been 'heavily' exposed to benzene in her water"); *Borg-Warner Corp. v. Flores*, 232 S.W.3d 765, 770–73 (Tex. 2007) (discussing importance of dose on causation inquiry and reversing judgment in Plaintiff's favor following jury trial where Plaintiff did not establish sufficient dose to cause alleged injuries). Dr. Knopf's failure to do so dooms his differential diagnosis at the first step.

## II.   DR. KNOPF FAILED TO SERIOUSLY CONSIDER ANY ALTERNATIVE CAUSES.

Dr. Knopf's analysis also fails to seriously consider alternative causes of Ms. Salas's MCL. As Dr. Knopf explained, he merely "went through all the associations between" Ms. Salas's other risk factors and simply concluded that he "thought" Roundup was more likely than not the substantial cause from the full list of possibilities. Motion Ex. 3 at 379:23–380:13. According to Dr. Knopf, one cannot identify a single cause of a patient's cancer, so instead he looked at the full scope of potential causes and selected the one that, according to him, had the strongest association. *Id.* This is, quite simply, not a differential diagnosis. Without serious consideration of competing causes—including, in this case, smoking and obesity in addition to random genetic mutations and idiopathic causes—Dr. Knopf's results-oriented "differential diagnosis" cannot be admitted.

Plaintiff contends that Dr. Knopf was required "only to rule out other potential risk factors as the *sole* cause of Ms. Salas's NHL," Opp. at 9, but this misstates the rule and, by extension, Monsanto's argument. While it may be true that Dr. Knopf was not required to rule out all potential alternative causes, that does not change the fact that, to "provide a reliable basis for an opinion on causation," his differential diagnosis must "take *serious account of other potential causes*." *Clausen*, 339 F.3d at 1058 (emphasis added). Moreover, "[w]hen an expert rules out a potential cause in the course of a differential diagnosis, the expert must provide reasons for rejecting alternative hypotheses using scientific methods and procedures and the elimination of those hypotheses must be founded on more

1  than subjective beliefs or unsupported speculation." *Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1198 (9th Cir. 2014) (internal quotation marks omitted).  And while Dr. Knopf did give surface-level consideration of some risk factors, including smoking and obesity, he gave speculative, subjective reasons for ruling them out.  For example, and as discussed in Monsanto's motion, Dr. Knopf's reason for ruling out obesity was that he "in [his] head" had not "really considered obesity a huge risk factor for [NHL]."  *Id.* at 361:18–362:11.  This is not an objective, serious consideration of an alternative cause of Ms. Salas's cancer; it is wholly speculative "say so."

Moreover, Plaintiff fails to grapple with a primary flaw in Dr. Knopf's differential diagnosis: his dismissive approach to random genetic mutations and idiopathic causes.  Plaintiff's Opposition is equally dismissive, saying random mutations are "of course" not a risk factor, citing no testimony or authority to support that contention.  Opp. at 9.  But Plaintiff's own expert testified to the contrary, agreeing that random genetic mutations can lead to replication errors, which cause cancer.  Motion Ex. 2 at 117:15–25, 119:3–10.  Despite Dr. Knopf's acknowledging this to be true, he never seriously considered random mutations or idiopathic causes as potential causes of Ms. Salas's cancer, and gives no explanation for his dismissal of accepted science.  This "fatal error" renders his opinions inadmissible.  *Hall v. Conoco Inc.*, 886 F.3d 1308, 1314 (10th Cir. 2018) (affirming exclusion of expert's differential diagnosis due to the expert's "failure to rule out idiopathic causes," a "fatal error tainting the differential diagnosis"); *see also G v. Fay Sch., Inc.*, 282 F. Supp. 3d 381, 391 (D. Mass. 2017) (excluding expert opinions on causation because, among other reasons, the expert "neglect[ed] to account for the possibility of an idiopathic etiology"); *Pritchard v. Dow Agro Sciences*, 705 F. Supp. 2d 471, 492 (W.D. Pa. 2010) (excluding specific causation opinion because "the presence of a known risk factor" for NHL was an insufficient basis "for ruling out idiopathic origin"), *aff'd*, 430 Fed. App'x 102 (3rd Cir. 2011).

Further underscoring the conclusory nature of Dr. Knopf's differential diagnosis, Plaintiff points out that Dr. Knopf "considered the amount of time Ms. Salas had been using Roundup and found the duration and latency indication of her NHL" before concluding that Roundup more likely than not caused Plaintiff's MCL.  Opp. at 4.  But simply saying that Roundup caused Ms. Salas's MCL because she used Roundup at a certain point before she contracted MCL with no other analysis—particularly

in the absence of a dose calculation—does nothing more than illustrate the flaws in Dr. Knopf's always-Roundup approach to this analysis.

At bottom, Dr. Knopf engaged in an analysis that began with the conclusion that the fact of Ms. Salas's Roundup use meant that it had to have caused her cancer, rather than "explaining what led [him] to believe that it was a substantial contributing factor as compared to other possible causes." *In re Lipitor Mktg., Sales Practices & Prods. Liab. Litig.*, 892 F.3d 624, 644–45 (4th Cir. 2018) (affirming exclusion of specific causation expert who "appeared to simply conclude that 'so long as the patient took Lipitor and developed diabetes, then Lipitor was a substantial contributing factor'"). This is not a reliable differential diagnosis and his opinions should be excluded.

## CONCLUSION

For the reasons set forth above the Court should grant Monsanto's Motion to Exclude the Testimony of Dr. Kevin Knopf.

Dated: July 7, 2023                             Respectfully submitted,

/s/ *Jed P. White*
Jed P. White
Attorneys for Defendant Monsanto Company

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 7th day of July, 2023, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

/s/ *Jed P. White*
Jed P. White
Attorneys for Defendant Monsanto Company