**WILKINSON STEKLOFF LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonstekloff.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonstekloff.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel:  202-847-4030
Fax: 202-847-4005

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel:  202-898-5843
Fax: 202-682-1639

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel:  202-662-6000

**BRYAN CAVE LEIGHTON PAISNER LLP**
K. Lee Marshall (CA Bar No. 277092)
(klmarshall@bclplaw.com)
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Tel:  415-675-3400
Fax: 415-675-3434

Jed P. White (CA Bar No. 232339)
(jed.white@bclplaw.com)
120 Broadway, Suite 300
Santa Monica, CA 90401
Tel:  310-576-2100
Fax: 310-576-2200

*Attorneys for Defendant Monsanto Company*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741<br><br>Case No.: 3:16-md-02741-VC |
| *Estate of Kenzie Elizabeth Murdock, et al. v. Monsanto Co.*,<br>3:20-cv-01363-VC<br><br>*Michele Glavanovits v. Monsanto, Co.*,<br>3:20-cv-01016-VC | **DEFENDANT MONSANTO COMPANY'S NOTICE OF MOTION AND MOTION TO EXCLUDE TESTIMONY OF DR. RON SCHIFF**<br><br>Hearing:<br>Date:   August 24, 2023<br>Time:   10:00 a.m.<br>Place:  San Francisco Courthouse,<br>            Courtroom 4 – 17th Floor |

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** beginning on August 24, 2023 at 10:00 a.m., in Courtroom 4 of the United States District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, or as ordered by the Court, Defendant Monsanto Company ("Monsanto") will present its Motion to Exclude Testimony of Dr. Ron Schiff. Monsanto seeks an order excluding opinions of this witness under Federal Rule of Evidence 702.

Dated:  July 10, 2023

Respectfully submitted,

**BRYAN CAVE LEIGHTON PAISNER LLP**

*/s/ Jed P. White*
Jed P. White
Attorneys for Defendant Monsanto Company

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..............................................................................................................1

II. BACKGROUND ................................................................................................................1

III. LEGAL STANDARD .........................................................................................................2

IV. ARGUMENT ......................................................................................................................2

    A. Dr. Schiff's Specific-Causation Opinions Should be Excluded Because He Did Not Reliably Rule In Glyphosate as a Possible Cause of Plaintiffs' NHL. ............3

    B. Dr. Schiff's Specific-Causation Opinions Should be Excluded Because He Did Not Rule Out Potential Alternative Causes. .........................................................5

V. CONCLUSION ...................................................................................................................8

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Borg-Warner Corp. v. Flores*,
    232 S.W.3d 765 (Tex. 2007) ................................................................................................. 4

*Clausen v. M/V NEW CARISSA*,
    339 F.3d 1049 (9th Cir. 2003) ................................................................................. 2, 3, 5, 7

*Cooper v. Brown*,
    510 F.3d 870 (9th Cir. 2007) ................................................................................................ 2

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) ......................................................................................................... 2, 5

*Hardeman v. Monsanto Company*,
    997 F.3d 941 (9th Cir. 2021) ................................................................................................ 7

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig. (No. II) MDL 2502*,
    892 F.3d 624 (4th Cir. 2018) ................................................................................................ 5

*McClain v. Metabolife Int'l, Inc.*,
    401 F.3d 1233 (11th Cir. 2005) ............................................................................................ 3

*Pluck v. BP Oil Pipeline Co.*,
    640 F.3d 671 (6th Cir. 2011) ................................................................................................ 3

*Westberry v. Gislaved Gummi AB*,
    178 F.3d 257 (4th Cir. 1999) ................................................................................................ 5

*White v. Ford Motor Co.*,
    312 F.3d 998 (9th Cir. 2002) ................................................................................................ 2

**Rules**

Fed. R. Evid. 702 ........................................................................................................................... 2

## I. INTRODUCTION

Plaintiffs in two of the Wave 5 cases (Murdock and Glavanovits) have designated Dr. Schiff—a clinical oncologist who retired eight years ago and has not published in peer-reviewed literature in the last three decades—to opine that exposure to Roundup caused their NHL. But Dr. Schiff's specific-causation opinions should be excluded in both cases because he failed to complete the two required steps of his claimed "differential etiology" methodology. Courts that accept this methodology have held that a differential etiology methodology requires, at minimum, (1) creating a list of all potential causes of the Plaintiff's NHL, and (2) ruling out plausible alternative causes until arriving at a conclusion that exposure to Roundup specifically caused the Plaintiff's NHL. Dr. Schiff failed to adequately perform the first step of this methodology (*i.e.*, ruling in risk factors), and he has expressly disclaimed as unnecessary the need to perform the second required step (*i.e.*, ruling out potential alternative causes). Although Dr. Schiff has been involved in state-court Roundup cases, this is the first time his opinions have been challenged in the MDL. The Court should exclude Dr. Schiff's methodology as unreliable.

## II. BACKGROUND

Dr. Schiff is an oncologist who left clinical practice in 2015. Ex. A, Dr. Schiff Curriculum Vitae, 1-4. He is now a professional litigation witness. Since leaving the practice of medicine, Dr. Schiff's sole source of earned income has been working as an expert witness. Ex. B, Schiff (*Rehak*) Dep. at 109:18-22. Dr. Schiff has not published any peer-reviewed literature since 1990. Ex. A, Dr. Schiff Curriculum Vitae, 6-9. Nor has he published articles on Roundup, glyphosate, or any other herbicide. Ex. C, Schiff (*Wade*) Dep. at 54:17-24. At least over the last 18 months, all of Dr. Schiff's legal consulting work has been providing expert opinions solely for plaintiffs in products liability cases. Ex. D, Schiff (*Murdock*) Dep. at 21:6-23:24.

Dr. Schiff has never told a patient that Roundup caused his or her cancer. Ex. D, Schiff (*Murdock*) Dep. at 48:13-49:9. Dr. Schiff has admitted that 80% "of the patients [he] treated with non-Hodgkin lymphoma did not have a known cause of their non-Hodgkin lymphoma." Ex. E, Schiff (*Harris*) Dep. at 88:2-90:6; *see also* Ex. F, Schiff (*Cervantes*) Dep. at 38:3-7. Yet,

in the Roundup cases in which Dr. Schiff serves as an expert witness, Dr. Schiff regularly concludes that Roundup is a substantial cause of each plaintiff's NHL. Ex. G, Schiff (*Schafer*) Dep. at 29:12-30:1 (admitting that, in the 17 cases he reviewed as of February 26, 2021, he concluded in "all of them" that "Roundup was a substantial contributing factor in causing or contributing to cause."). In fact, Dr. Schiff has never seen a plaintiff that he did not characterize as having "extensive" exposure to Roundup. Ex. F, Schiff (*Cervantes*) Dep. at 126:7-16.

### III. LEGAL STANDARD

A proposed expert witness must possess "knowledge, skill, experience, training, or education" sufficient to qualify him as an expert on the subject to which his testimony relates. Fed. R. Evid. 702. When an expert's field of expertise is not related to the subject on which he seeks to offer testimony, such testimony is inadmissible. *See White v. Ford Motor Co.*, 312 F.3d 998, 1008-09 (9th Cir. 2002). Apart from qualifications, expert testimony must be (1) based upon sufficient facts or data, (2) the product of reliable principles and methods, and (3) the result of applying those principles and methods reliably to the facts of the case. Fed. R. Evid. 702. The trial judge is charged with the responsibility of acting as a gatekeeper to "ensure that any and all scientific testimony … is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). The proponent of the expert bears the burden of proving that the expert's proffered testimony is admissible. *See, e.g.*, *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007).

### IV. ARGUMENT

Dr. Schiff purports to reach his specific-causation opinion—that exposure to Roundup caused each Plaintiff's NHL—by applying a differential etiology (sometimes called a "differential diagnosis") methodology. Ex. H, Schiff *Murdock* Report at 3; Ex. I, Schiff *Glavanovits* Report at 3. The Ninth Circuit recognizes two steps to this methodology, each of which must be performed reliably to render the expert's opinion admissible. *See Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1057 (9th Cir. 2003). First, the expert must "compile a comprehensive list" of causes that are "generally capable of causing the patient's symptoms or mortality." *Id.* at 1058. An opinion is not reliable when the expert rules-in a potential cause

1   that is not capable of causing the observed injury, or fails to consider an alternative hypothesis
2   that could also explain the injury.  *Id.*  Second, after ruling-in all potential causes, the expert
3   must reliably eliminate all hypotheses that cannot explain the plaintiff's injury, until the expert
4   arrives at the specific cause.  *Id.*  When undergoing this process of elimination, the expert must
5   "provide reasons for rejecting alternative hypotheses using scientific methods and procedures
6   and the elimination of those hypotheses must be founded on more than subjective beliefs or
7   unsupported speculation."  *Id.* (quotations omitted).
8   Dr. Schiff does not reliably engage in either of these steps for either Plaintiff.  The Court
9   should therefore exclude his opinions.

> **A.    Dr. Schiff's Specific-Causation Opinions Should be Excluded Because He Did Not Reliably Rule In Glyphosate as a Possible Cause of Plaintiffs' NHL.**

12  Dr. Schiff cannot reliably rule in glyphosate as a cause of Plaintiffs' NHL because he
13  has no quantitative understanding of their *absorbed dose* of glyphosate—*i.e.*, the amount of
14  glyphosate to which they were exposed that was actually absorbed into their skin.  Nor has he
15  offered any other reliable basis to conclude that either Plaintiff's alleged Roundup exposure
16  caused her NHL.
17  As Murdock's other expert, Dr. Sawyer, acknowledges, assessing the amount of a
18  substance that is actually *absorbed* into the body—not just the amount to which a person is
19  exposed—is critical to assessing whether someone's exposure to a substance can be considered
20  a possible cause of an illness or injury.  *See* Ex. H, Sawyer *Murdock* Report at 27 (describing
21  difference between "exposure doses" and "systemic doses").  Courts from around the country
22  have ruled that assessing the amount of a substance actually absorbed into the body is critical
23  when performing a specific causation analysis.  *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d
24  1233, 1242 (11th Cir. 2005) ("Dose is the single most important factor to consider in evaluating
25  whether an alleged exposure caused a specific adverse effect."); *Pluck v. BP Oil Pipeline Co.*,
26  640 F.3d 671 (6th Cir. 2011) (excluding an expert for failing to reliably rule in benzene exposure
27  as a possible cause because the expert "formulated his opinion on dose without any exposure
28  data, only having been told that [Pluck] had been 'heavily' exposed to benzene in her water");

*Borg-Warner Corp. v. Flores*, 232 S.W.3d 765, 770-73 (Tex. 2007) (discussing importance of dose on causation inquiry and reversing judgment in Plaintiff's favor following jury trial where Plaintiff did not establish sufficient dose to cause alleged injuries).

Dr. Schiff himself has previously admitted that assessing dose is important to ruling in a chemical as a risk factor of a patient's injury. *See* Ex. J, Schiff (*Moore*) Dep. at 121:20-24 ("Q Okay. So you agree that dose is important to whether you have had sufficient exposure for a risk factor to be included on the list; correct? A Yes."), 122:13-24 ("Q . . . So you said that dose is important to determine whether something is a risk factor; correct? You have to have sufficient exposure? A Yes. If you want to analyze the epidemiologic studies individually or as a group is important. IARC did not make that distinction in its classification of Glyphosate as a probable human carcinogen."). But here, Dr. Schiff specifically disclaimed (1) needing to rely on Dr. Sawyer's assessment of Murdock's absorbed dose (Ex. D, Schiff (*Murdock*) Dep. at 105:2-14); or (2) needing to quantify Glavanovits' absorbed dose of glyphosate (Ex. K, Schiff (*Glavanovits*) Dep. at 103:15-105:19).[1] Dr. Schiff instead relies only on a purported finding that each Plaintiff was exposed to some glyphosate amount for a sufficient number of days throughout her lifetime. Ex. H, Schiff (*Murdock*) Report at 84-85; Ex. K, Schiff (*Glavanovits*) Dep. at 103:15-104:25. But again, that analysis says nothing about the amount of glyphosate actually absorbed into Plaintiffs' skin.

Dr. Schiff has offered no other reliable basis to conclude that Plaintiffs' alleged Roundup exposure caused their NHL. Instead of an individualized analysis of their Roundup use and absorbed glyphosate dose, Dr. Schiff's analysis for ruling in glyphosate exposure rests on (1) his conclusion that each Plaintiff used a lot of Roundup and (2) his selective plucking of data from cherry-picked studies—primarily Eriksson 2008 and Zhang 2019—purporting to show an increased risk of NHL among individuals exposed to glyphosate more than two days per year or more than 10 days in their lifetime. Ex. H, Schiff (*Murdock*) Report at 83-84; Ex. I, Schiff (*Glavanovits*) Report at 26-27. His use of these selectively-chosen studies is unreliable. *First*,

---

[1] Glavanovits did not disclose any exposure expert. *See* Ex. L, Glavanovits Rule 26(a)(2) Expert Disclosures, dated November 1, 2022.

they do not properly adjust for confounding variables. *See* Ex. C, Schiff (*Wade*) Dep. at 271:1-14 (agreeing on the importance of adjusting for confounders). *Second*, data plucked from these studies did not consider subtypes of NHL.[2]

In all, the Court should exclude Dr. Schiff's specific-causation opinions because he failed to adequately rule in glyphosate as a cause of either Plaintiff's NHL as required by a differential etiology methodology.

### B. Dr. Schiff's Specific-Causation Opinions Should be Excluded Because He Did Not Rule Out Potential Alternative Causes.

Dr. Schiff also did not complete the necessary second step of the differential etiology methodology: even if Dr. Schiff had properly "ruled in" glyphosate exposure as a cause of each Plaintiff's NHL, he did not attempt to rule out—or even consider—potential alternative causes. *See Clausen*, 339 F.3d at 1057. This failure renders his opinions unreliable. *See id.*; *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig. (No. II) MDL 2502*, 892 F.3d 624, 645 (4th Cir. 2018) ("*Daubert* requires more" than an export "dismiss[ing] other possible causes in favor of [the product at issue] in a cursory fashion."); *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265 (4th Cir. 1999) ("A differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation.").

Dr. Schiff in fact dismisses the very concept of ruling out alternative causes, claiming that NHL has what he calls "multifactorial causation of disease." Ex. D, Schiff (*Murdock*) Dep. at 147:11-148:2; Ex. K, Schiff (*Glavanovits*) Dep. at 131:14-132:11. According to Dr. Schiff,

---

[2] Dr. Schiff testified that he is generally unbothered by a lack studies showing any association between glyphosate and development of a plaintiff's specific subtype of NHL. *See, e.g.*, Ex. D, Schiff (*Murdock*) Dep. at 127:25-128:18. Any such lack of documented evidence does not shake his opinion that glyphosate exposure caused a plaintiff's injury. *Id.* But when it comes to determining whether some other external risk factor is a possible alternative cause of a plaintiff's injury, Dr. Schiff refuses to include that alternative risk factor unless there exist conclusive scientific studies showing a clear association between the potential risk factor and the plaintiff's specific NHL subtype. *Id.* at 127:11-24. This selective inclusion of glyphosate as a potential cause and selective exclusion of potential alternative risk factors underscores that Dr. Schiff is providing results-oriented opinions that are not subject to a principled, reliable methodology.

a "finding of other things that, you know, could or would or should have played a role in [Ms. Murdock's] development of lymphoma . . . do not diminish the known effect of extensive glyphosate or Roundup exposure on increasing the risk of developing [NHL]."  Ex. D, Schiff (*Murdock*) Dep. at 147:11-148:2.  In other words, Dr. Schiff believes that if someone has NHL and has been exposed to Roundup, then Roundup caused or contributed to cause that NHL *every time*.  This Court has never before been faced with an expert who so brazenly disregards the need to rule out alternative causes of a plaintiff's NHL.

Dr. Schiff's insistence that he need not engage in the second step of his purported methodology was highlighted at his depositions in these cases.  For instance, he repeatedly acknowledged that Ms. Murdock was exposed to multiple known risk factors for developing NHL, but insisted that (contrary to Ninth Circuit law) he did not need to reliably rule out those risk factors because of his "always glyphosate" theory of causation.  *See* Ex. D, Schiff (*Murdock*) Dep. at 124:1-15 (conceding he "can't rule . . . out" exposure to benzene through secondhand smoke as a contributing factor, but any such exposure "doesn't negate the contributory role of her glyphosate and Roundup exposure"); *id.* at 127:11-128:18 (conceding a documented connection between Ms. Murdock's body mass index and development of lymphomas, but testifying he is "not bothered with that" because that risk factor "would not take away from her extensive herbicide exposure"); *id.* at 131:4-134:5 (conceding he is not aware of Ms. Murdock's exposure to wood smoke or whether there is a documented connection between wood smoke and development of NHL, but testifying that even if prevalent in her records and a documented risk factor, wood smoke "would not take away from her exposure to glyphosate and Roundup"); *id.* at 134:20-135:15 (testifying that Ms. Murdock's exposure to benzene through diesel exhaust, a known risk factor for NHL, is irrelevant because it "would not mitigate her extensive glyphosate and Roundup exposure); *id.* at 137:1-6 (same for exposure to benzene through gasoline exhaust); *see also id.* at 138:1-15 (Dr. Schiff acknowledging that IARC has noted a connection between NHL and benzene exposure).  For Glavanovits, Dr. Schiff testified that he did not *even attempt* to "determine the other candidate exposures" Glavanovits had that could have caused her NHL, because "even a determination of any *would not be relevant or affect*

[his] opinions." Ex. K, Schiff (*Glavanovits*) Dep. at 131:4-21 (emphasis added).  In other words, Dr. Schiff believes that the requirements for expert admissibility in the Ninth Circuit do not apply to his opinions here.

Dr. Schiff's refusal to engage in the second step of the differential etiology methodology means that he nowhere grapples with—and rules out—the possibility that natural random genetic mutations caused either Plaintiff's cancer.[3]  This is so even though Dr. Schiff himself has testified in another Roundup case that approximately 80% of cancers are caused by random cell replication errors, rather than replication errors resulting from external, environmental factors.  Ex. F, Schiff (*Cervantes*) Dep. at 37:24-38:7.  Moreover, Dr. Schiff has acknowledged that he has no way "to identify random mutations versus inherited mutations or environmentally caused mutations." *Id.* at 41:19-42:8; *see also id.* at 42:16-43:3 ("[W]hen we study the acquired mutations we do not know how they were acquired, what caused them, were they random in DNA replication . . . or were they due to an environmental cause.").  This is likely why, when Dr. Schiff was actually practicing medicine, he never told a patient that his or her NHL was caused by exposure to Roundup.  *See* Ex. D, Schiff (*Murdock*) Dep. at 48:13-49:9.

In all, because he does not reliably apply the last step of the methodology he purports to use—ruling out each possible cause until only the most likely cause remains—Dr. Schiff simply guesses when he says Roundup contributed to each Plaintiff's NHL.  Dr. Schiff's application gets the differential etiology methodology exactly backwards.  The methodology does not ask whether the expert can rule out *the subject cause* (here, Roundup) from the list of potential causative factors (as he apparently believes).  Rather, it asks whether the expert can rule out **other** *potential causes* in order to conclude that the subject cause indeed is the most likely cause of the patient's injuries. *See Clausen*, 339 F.3d at 1057.  Dr. Schiff disclaims any need to perform

---

[3]  Random genetic mutations are not equivalent to so-called idiopathic—or unknown—causes, which the Ninth Circuit has said can be accounted for in a differential etiology with an opinion that the observed substance is a "substantial cause." *See Hardeman v. Monsanto Company*, 997 F.3d 941, 966 (9th Cir. 2021).  Random genetic mutations are instead a scientifically-proven explanation for how and why NHL develops apart from any environmental or genetic factors, as Dr. Schiff himself has acknowledged.  Ex. F, Schiff (*Cervantes*) Dep. at 37:24-38:7.

this step, which the Ninth Circuit holds is required for a reliable etiology. Faithful application of Dr. Schiff's rule instead means that literally *any* potential cause of NHL would constitute a legal cause of a patient's disease. The Court should exclude Dr. Schiff's specific-causation opinions because he failed to perform the crucial second step of his purported methodology: ruling out alternative causes of Plaintiffs' NHL.

## V.   CONCLUSION

Monsanto Company respectfully requests that the Court exclude Dr. Schiff's specific-causation opinions.

Dated:  July 10, 2023　　　　　　　　　　　Respectfully submitted,

**BRYAN CAVE LEIGHTON PAISNER LLP**

*/s/ Jed P. White*
Jed P. White
Attorneys for Defendant Monsanto Company

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 10th day of July 2023, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system, which sent notice of the filing to all appearing parties of record.

*/s/ Jed P. White*
Jed P. White