# EXHIBIT F

Ron D. Schiff, M.D., Ph.D.

```
 1                UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
 2

    IN RE: ROUNDUP PRODUCTS        Case No. 3:16-md-02741-VC
 3  LIABILITY LITIGATION
                                   MDL 2741
 4

 5  This document relates to:
 6  Gerard Cervantes v.
    Monsanto Company
 7  Case No. 3:19-cv-03015
 8
                              - - -
 9
                         MARCH 5, 2021
10
                              - - -
11
             Videotaped remote deposition of
12      RON D. SCHIFF, MD, PhD, held at the location of the
        witness in Tampa, Florida, commencing at 10:01 a.m.,
13      on the above date, before Joan L. Pitt, Registered
        Merit Reporter, Certified Realtime Reporter, and
14      Florida Professional Reporter.
15                            - - -
16              GOLKOW LITIGATION SERVICES
             877.370.3377 ph | 917.591.5672 fax
17                     deps@golkow.com
18
19
20
21
22
23
24
25
```

```
 1             APPEARANCES VIA VIDEOCONFERENCE
 2
 3   Counsel for Plaintiff:
 4       REBECCA FREDONA, ESQUIRE
         Moll Law Group
 5       22 West Washington Street, 15th Floor
         Chicago, Illinois 60602
 6       312.462.0427
         rfredona@molllawgroup.com
 7
 8   Counsel for Defendant:
 9       MICHELLE M. FUJIMOTO, ESQUIRE
         Shook, Hardy & Bacon LLP
10       Jamboree Center
         5 Park Plaza, Suite 1600
11       Irvine, California 92614
         949.475.1500
12       mfujimoto@shb.com
13       JOSEPH D. PIORKOWSKI JR.
         The Piorkowski Law Firm, PC
14       1800 K Street, NW, Suite 1000
         Washington, DC 20006
15       202.257.7662
         jpiorkowski@lawdoc1.com
16
17
     ALSO PRESENT:
18
         Sarah Howard, Videographer
19
20
21
22
23
24
25
```

 1          My responses in that whole sequence from the
 2  bottom of page 152 through most of page 153 are
 3  unchanged.  I also pointed out how -- that there is sort
 4  of an academic zeitgeist about genetic versus
 5  environmental cancer causations.  Zeitgeist is
 6  z-e-i-t-g-e-i-s-t.  And I pointed out that when I was in
 7  training I was taught that 85 percent of cancers were
 8  environmentally caused.  And that has changed primarily
 9  as a result of the Human Genome Project.
10          I would also point out that at the top of page
11  152, which you directed me to, I also pointed out, as I
12  did today repeatedly, that advanced age, it's probably
13  safest to say that it has not been defined as a causal
14  risk factor.  So that goes back to the same point.
15          But here what you have asked me about is what
16  percentage of mutations are random, whereas what I
17  testified about in 2019 in Harris is what percentage of
18  cancers are caused by mutations.
19     Q.   Okay.  Doctor, I'm going to move to strike as
20  nonresponsive.
21          So then let me ask you here -- we will -- we
22  will -- we have the transcripts on the record and
23  attached as exhibits.
24          So setting aside your prior testimony, as you
25  sit here today, what percentage of cancers, in your

1   assessment, are considered random, as a result of random
2   mutations?
3       A.   I would still say that about 80 percent of
4   cancers, according to current thinking, are caused by
5   mutations.  I am not speculating on what percentage of
6   those mutations are as defined in the Tomasetti article,
7   random versus inherited versus environmentally caused.
8       Q.   Okay.  And at the time I deposed you in Harris,
9   we talked about the Tomasetti paper, but you had not
10  read it yet; correct?
11      A.   That's correct.
12      Q.   And you -- according to your testimony in the
13  Carmen case, you've since read it; is that right?
14      A.   No.  I've looked at it, but, again, I don't see
15  the relevance to it, and I pointed out four critiques,
16  which were applicable in Carmen and are equally
17  applicable today.
18      Q.   And in Carmen you said that you considered the
19  Tomasetti paper to be an exercise in theoretical
20  computational biology; right?
21      A.   Yes.
22      Q.   And you said you didn't think it was relevant
23  or applicable; correct?
24      A.   Also correct.
25      Q.   Okay.  Do you know whether others in the

```
 1                MS. FREDONA:  Objection.  Form.
 2      A.    All right.  There are two things here.  First,
 3   I would indicate to you as part of a continuation of my
 4   previous answer -- and I get that you move to strike as
 5   nonresponsive any answer that I give you that you don't
 6   like or disagree with, but the bottom line is, what is
 7   the impact -- I would suggest that the impact factor of
 8   the Tomasetti article in studies that deal with any of
 9   the scientific issues involved in the Roundup litigation
10   is zero or pretty close to it.  And, you know, I'm going
11   to --
12      Q.    Doctor --
13      A.    I'm sorry?
14      Q.    Did you hear my question?
15      A.    Yes, and I responded in part to the previous
16   question because I didn't finish with my answer to that.
17   If you'd care to restate the current question, I will
18   focus now on that.
19      Q.    Thank you.  Am I correct that you have
20   acknowledged or it's your opinion that there is no
21   methodology available for determining whether a
22   particular patient like Mr. Cervantes falls within the
23   80 percent of cancers that are caused by random
24   mutations?
25                MS. FREDONA:  Objection.  Form.
```

 1   A.   Again, I don't know about how to identify
 2   random mutations versus inherited mutations or
 3   environmentally caused mutations, which, you know, with
 4   regard to that, if you want to figure out inherited
 5   versus random, you would have to be able to find the
 6   same mutation in a parent that you found in the
 7   individual who developed, in this case, non-Hodgkin
 8   lymphoma.
 9        So among all mutations, you know, we're still
10   back at the 80 percent number, and unless you identify a
11   mutation, you won't know if the mutation is playing an
12   active pathogenetic role, and unless you can identify
13   the mutation in a parent or other close relative, you
14   won't know whether the mutation is inherited or
15   acquired.
16   Q.   Am I also correct, Dr. Schiff, that there is no
17   methodology that you're aware of for us to know what
18   percentage of gene mutations that lead to non-Hodgkin
19   lymphoma are sporadic versus attributable to a specific
20   exposure?
21        MS. FREDONA:  Objection.  Form.
22   A.   I would say that that's correct, because when
23   we study the acquired mutations we do not know how they
24   were acquired, what caused them, were they random in DNA
25   replication, as the Tomasetti article emphasizes, or

```
 1   were they due to an environmental cause.  Tomasetti
 2   chooses to answer that question by talking about
 3   probabilities.
 4      Q.   Right.  Okay.  And following that thinking
 5   through then, so if you have a particular plaintiff like
 6   Mr. Cervantes, who has more than one risk factor for a
 7   disease like non-Hodgkin lymphoma, there's no method by
 8   which you or anyone else can weigh or quantify those
 9   risk factors to compare them; is that right?
10           MS. FREDONA:  Objection.  Incomplete
11      hypothetical.  Form.
12      A.   Are you talking specifically about the role of
13   mutations in the development of his non-Hodgkin
14   lymphoma?
15      Q.   I'm talking about risk factors.
16           Let me try this again.  Am I correct that if
17   you have a plaintiff like Mr. Cervantes, who has more
18   than one risk factor, that there is no methodology by
19   which you can quantify or weigh those risk factors to
20   compare them to one another to determine a cause?
21           MS. FREDONA:  Same objection.
22   BY MS. FUJIMOTO:
23      Q.   You can't do it; right?
24      A.   I am very interested in that question and have
25   thought about answering that based on considerations of
```

1  year when the weather was not too cold, that's
2  extensive.
3         I cannot bracket when extensive goes down to
4  moderate and moderate goes down to minimal.  I can't do
5  that, but I haven't had to, because every one of these
6  plaintiffs has had extensive exposure.
7     Q.   That was the question.  That's all I needed to
8  know.  So you've never seen a plaintiff, a Roundup
9  plaintiff, where you have not quantified their exposure
10 as extensive; right?
11        MS. FREDONA:  Objection.  Form.
12    A.   I'm going to give you a parallel to that to
13 answer it.
14    Q.   Could you say yes or no first and then give me
15 the parallel?
16    A.   That is correct.
17    Q.   Okay.
18    A.   I am not being -- I am not being given cases to
19 review where Roundup exposure is limited to someone who
20 eats a bowl of Cheerios once or twice a week.  It's the
21 exact same principle that IARC has not investigated
22 water or oxygen for possible carcinogenicity.  It's
23 exactly the same thing.  That would be absurd.  The only
24 cases that I'm being presented with have had extensive
25 exposure in excess of the cut points and by any

```
 1                    C E R T I F I C A T E

 2           I, Joan L. Pitt, Registered Merit Reporter,

 3   Certified Realtime Reporter, and Florida Professional

 4   Reporter, do hereby certify that, pursuant to notice,

 5   the deposition of RON SCHIFF, MD, PhD, was duly taken on

 6   March 5, 2021, at 10:01 a.m. remotely before me.

 7           The said RON SCHIFF, MD, PhD, was duly sworn by

 8   me according to law to tell the truth, the whole truth

 9   and nothing but the truth and thereupon did testify as

10   set forth in the above transcript of testimony.  The

11   testimony was taken down stenographically by me.  I do

12   further certify that the above deposition is full,

13   complete, and a true record of all the testimony given

14   by the said witness, and that a review of the transcript

15   was not requested.

16
                        [signature: Joan L. Pitt]
17   _____                              _____

18    Joan L. Pitt, RMR, CRR, FPR

19   (The foregoing certification of this transcript does not

20   apply to any reproduction of the same by any means,

21   unless under the direct control and/or supervision of

22   the certifying reporter.)

23

24

25
```