**WILKINSON STEKLOFF LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonstekloff.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonstekloff.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel: 202-847-4030
Fax: 202-847-4005

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843
Fax: 202-682-1639

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

**BRYAN CAVE LEIGHTON PAISNER LLP**
K. Lee Marshall (CA Bar No. 277092)
(klmarshall@bclplaw.com)
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Tel: 415-675-3400
Fax: 415-675-3434

Jed P. White (CA Bar No. 232339)
(jed.white@bclplaw.com)
120 Broadway, Suite 300
Santa Monica, CA 90401
Tel: 310-576-2100
Fax: 310-576-2200

*Attorneys for Defendant Monsanto Company*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION, | MDL No. 2741<br><br>Case No.: 3:16-md-02741-VC |
| *Delorme-Barton v. Monsanto Company*, 3:18-cv-01427-VC | **DEFENDANT MONSANTO COMPANY'S OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF DR. ROBERT TARONE, PH.D.**<br><br>Hearing:<br>Date: July 27, 2023<br>Time: 10:00 a.m.<br>Place: San Francisco Courthouse, Courtroom 4 – 17th Floor |

MONSANTO'S OPPOSITION TO MOTION TO EXCLUDE TESTIMONY OF ROBERT TARONE, PH.D.

# **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................2

     A.    Dr. Tarone's Background and Qualifications. ...............................................2

     B.    Dr. Tarone's Status as a Non-Retained Expert. ............................................3

     C.    Dr. Tarone's Opinions Regarding IARC Monograph 112. ...........................5

ARGUMENT .........................................................................................................................7

     A.    Dr. Tarone is a Non-Retained Expert. ..........................................................8

     B.    Monsanto's Disclosure of Dr. Tarone Satisfied Rule 26(a)(2). ..................11

     C.    Monsanto, Not Plaintiff, Would Be Prejudiced By the Court's Exclusion of Dr. Tarone's Testimony. ..............................................................................12

CONCLUSION ....................................................................................................................14

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Application of Republic of Ecuador*,
  280 F.R.D. 506 (N.D. Cal. 2012) .................................................................................................10

*Copart, Inc. v. Sparta Consulting, Inc.*,
  No. 2:14-cv-00046-KJM-CKD, 2017 WL 85824 (E.D. Cal. Jan. 9, 2017) ....................................11

*Doe 1 v. Manhattan Beach Unified Sch. Dist.*,
  No. CV 19-06962-DDP, 2020 WL 7931596 (C.D. Cal. Dec. 22, 2020) .......................................10

*F.D.I.C. v. Anderson*,
  No. 2:11-cv-01061-GEB-EFB (E.D. Cal. Aug. 27, 2012) .............................................................13

*Hellmann- Blumberg v. University of the Pacific*,
  No. 2:12-cv-0286 TLN DAD, 2013 WL 4407267 (E.D. Cal. Aug. 15, 2013) ................................9

*Rent Info. Tech., Inc. v. Home Depot U.S.A., Inc.*,
  268 F. App'x 555 (9th Cir. 2008) ....................................................................................................9

*TriMed v. Stryker Corp.*,
  No. CV 06-1918-SVW-SHx, 2010 WL 11002258 (C.D. Cal. Oct. 21, 2010) ..............................12

*Witman v. Knight Trans., Inc.*,
  No. 3:15-cv-01102-H-NLS, 2016 WL 8715668 (S.D. Cal. Nov. 21, 2016) ............................11, 12

**Other Authorities**

Fed. Rule of Civ. Proc. 26(a)(2) ....................................................................................... 7, 8, 11, 12

Fed. Rule of Evid. 702 .........................................................................................................................7

Fed. Rule of Evid. 703 .........................................................................................................................7

**INTRODUCTION**

As this Court knows, a central pillar of Plaintiff's case is the 2015 finding of an International Agency for Research on Cancer ("IARC") working group—a non-regulatory panel that significantly diverged from the widely accepted regulatory and scientific consensus by classifying glyphosate as a "probable" human carcinogen. Plaintiff's Motion to Exclude the Opinions and Testimony of Monsanto Company's Proposed Non-Retained Expert, Robert Tarone, Ph.D. (the "Motion") attempts to insulate IARC's classification from important scientific criticism by excluding any testimony of non-retained expert Dr. Robert Tarone.

Dr. Tarone, who holds a Ph.D. in mathematics and statistics and has a career history of analyzing animal carcinogenicity studies, explains the significant flaws in IARC's scientific analysis of animal data—flaws that are particularly striking because unlike human studies, which IARC deemed to provide only "limited evidence" of carcinogenicity, IARC concluded that animal studies provided "sufficient evidence" of carcinogenicity. Thus, IARC could not have reached its overall conclusion on glyphosate without its flawed analysis of animal data. But Dr. Tarone is not just an expert in the exact area that IARC most critically based its opinions; his testimony also is particularly probative because he is one of the few experts from whom the jury is likely to hear that has not been hired or paid by one side or the other in this litigation. Plaintiff's Motion attempts to muddy the waters on this point to cast doubt on Dr. Tarone's status as a non-retained expert in this litigation. But Monsanto has never paid Dr. Tarone a single dollar, and Monsanto did nothing to instigate Dr. Tarone's publication of the two peer-reviewed articles that form the basis of his expert testimony in this case.

Courts overseeing Roundup litigation have consistently and unanimously rejected plaintiffs' arguments seeking to shield Dr. Tarone's testimony from the jury. *See, e.g.*, Ex. A, 8/21/22 *Alesi* Order at 4 (denying plaintiffs' request to exclude Dr. Tarone's testimony and finding that "Dr. Tarone is a non-retained witness who is neither an employee of Monsanto or a paid witness"); Ex. B, 4/20/23 *Gordon* Order Concerning the Parties Motions in *Limine*, at 6 ("Plaintiff's Motion *in Limine* No. 13 to Exclude Evidence, Testimony from Dr. Robert Tarone About the International Agency for the Research of Cancer ("IARC") is **DENIED**."); Ex. C, 1/24/20 Order on Pretrial Matters in *Caballero v. Monsanto*, Case No. MSC19-01821 (Cal. Sup. Ct.) at 35 (denying motion to exclude Dr. Tarone and finding that

"Dr. Tarone is a non-retained expert witness" who "was not paid for [his] work and has not been paid or retained by Monsanto.").[1] Plaintiff's Motion should similarly be denied here. Dr. Tarone is a non-retained expert and his testimony is admissible.

## BACKGROUND

**A. Dr. Tarone's Background and Qualifications.**

Dr. Tarone, Ph.D., is a statistician with decades of "extensive experience in almost every area of cancer research." Ex. D, 12/17/19 Tarone Dep. at 188:16-18. He holds a bachelor's, master's, and Ph.D. in mathematics from the University of California Davis. *See id.* at 25:7-30:16. Between receiving his master's and Ph.D., Dr. Tarone served in the U.S. Army as a medic for two years, including a one-year deployment to Vietnam. *See id.* at 27:18-29:8. After obtaining his Ph.D. in 1974, he worked for the National Cancer Institute ("NCI") as a mathematical statistician from 1974 to 2002. *See id.* at 30:15-32:10. For the first part of his career at NCI, Dr. Tarone performed carcinogenicity studies on mice and rats, "where rodents were fed different chemicals and followed for two years to see if they developed cancer." *Id.* at 34:6-13. Thereafter, he transferred to the National Toxicology Program and gained significant experience analyzing and assessing animal studies. *See id.* at 34:16-37:3. Dr. Tarone's body of work during this period led IARC to ask him to co-author Volume 79, "Statistical Methods in Cancer Research—The Design and Analysis of Long-Term Animal Experiments," in its scientific monograph series. *See id.* at 39:20-40:1.

Dr. Tarone spent his last fifteen years at NCI in the Cancer Epidemiology Division. *See* Ex. D, 12/17/19 Tarone Dep. at 41:5-12. In this position, Dr. Tarone was involved in "some of the really important large studies" at NCI, most notably the Agricultural Health Study involving a cohort study of 55,000 farmers analyzing the association between pesticide exposure and cancer risk. *See id.* at 41:13-42:18. From 2002 until June 2016, Dr. Tarone worked as Biostatistics Director of the International Epidemiology Institute ("IEI"). *See id.* at 49:1-21. While at IEI, he designed and provided statistical input on several studies, including the Southern Community Cohort Study. *See id.* at 49:18-51:13. Though Dr. Tarone retired in 2016, he remains active in his work with the scientific

---

[1] The exhibits cited in this brief are attached to the Declaration of Jed P. White, filed contemporaneously herewith.

- 2 -
MONSANTO'S OPPOSITION TO MOTION TO EXCLUDE TESTIMONY OF ROBERT TARONE, PH.D.

community, specifically related to glyphosate and his published critiques of IARC's Monograph Program.

**B. Dr. Tarone's Status as a Non-Retained Expert.**

Dr. Tarone has been deposed twice, on three separate days, in the Roundup litigation. Years prior to his first deposition (which occurred on December 17, 2019) and in the wake of IARC's 2015 classification of glyphosate as a "probable" carcinogen, Monsanto's attorney contacted Dr. Tarone's employer, IEI, and requested a meeting to discuss IARC and its policies and procedures, generally. Ex. E, 3/10/23 Tarone Dep. at 47:8-48:11. IEI had been involved in a "pretty lengthy published exchange with the IARC Working Group about some of [its] policies and procedures" for several years by the time IARC published its glyphosate classification. *Id.*; *see also* Ex. D, 12/17/19 Tarone Dep. at 52:19-53:20 (describing IEI's years-long debate with IARC prior to 2015).

Given IEI's clear expertise in IARC policies and procedures, Monsanto's counsel reached out to IEI to better understand "how it [was] possible that when every other agency around the world has evaluated glyphosate, [and] has concluded that it's not a carcinogen, how [was] it possible that IARC would come to a different conclusion." Ex. D, 12/17/19 Tarone Dep. at 52:19-53:20. IEI's then-CEO and statistician Bill Blot and Dr. Tarone met with Monsanto's attorney for three hours in September 2015 to discuss "procedures at IARC, how they chose members for the working groups that evaluated these [chosen chemicals], what were their criteria for membership, [and] what were their criteria for determining whether an agent is a carcinogen." *Id.*; Ex. E, 3/10/23 Tarone Dep. at 47:22-48:11. At that meeting, "there was no discussion of anything strictly related to glyphosate"; instead, the discussion focused exclusively on IARC policies and principles, generally. Ex. E, 3/10/23 Tarone Dep. at 47:22-48:11.

Monsanto paid IEI a very modest $1,500 fee for Dr. Tarone's and Bill Blott's participation in the meeting. Ex. D, 12/17/19 Tarone Dep. at 53:21-54:17. Dr. Tarone, as an employed, salaried worker, did not receive any portion of this fee or any bonus for his participation in the meeting. *See id.*[2] Shortly thereafter, Dr. Tarone gave a short, two-hour statistics seminar to Monsanto's attorneys.

---

[2] Even so, he has disclosed the $750 fee paid for his involvement in both of his publications on this subject. *See id.* at 209:10-16.

Ex. E, 3/10/23 Tarone Dep. at 59:14-24. Dr. Tarone did not accept any compensation for his participation in this meeting either.

These meetings piqued Dr. Tarone's personal and professional interest in IARC's recent classifications, so he decided to read Monograph 112 "to find out [him]self how they came to [the] conclusion they did." Ex. E, 3/10/23 Tarone Dep. at 49:22-50:6. Critically, Dr. Tarone did not read Monograph 112 at Monsanto's direction. *Id.* After reading Monograph 112, it became "very clear to [Dr. Tarone] that there was some funny business going on in how [IARC was] handling the rodent data." *Id.* at 60:5-9. Because the Monograph cited a review paper by Dr. David Saltmiras (a Monsanto employee) and noted that "this paper had supplementary tables showing the tumor data," Dr. Tarone emailed Dr. Saltmiras to ask for a copy of those supplementary tables. *Id.* at 60:10-15. Before Dr. Saltmiras responded, however, Dr. Tarone found a copy of the supplementary tables himself, so Dr. Saltmiras did not provide Dr. Tarone with anything. Ex. F, 3/16/23 Tarone Dep. at 514:1-18. Dr. Tarone then prepared and published his two peer-reviewed papers highlighting the serious errors that IARC committed in its evaluation of glyphosate. Ex. D, 12/17/19 Tarone Dep. at 17:2-19. Again, despite plaintiffs' counsel's claims to the contrary, Dr. Tarone confirmed at his most recent deposition that it is "totally untrue" that he wrote these papers at Monsanto's direction or for the purposes of this litigation. Ex. E, 3/10/23 Tarone Dep. at 88:24-89:2.

Over the past several years, Dr. Tarone has had sporadic conversations with Monsanto and Monsanto's counsel regarding his work and his depositions, but he has never accepted any money from Monsanto, even as reimbursement for his expenses. Ex. F, 3/16/23 Tarone Dep. at 512:6-9. Indeed, Dr. Tarone explicitly declined a request by Dr. Saltmiras to speak on behalf of Monsanto at meetings in Europe to discuss glyphosate. Ex. E, 3/10/23 Tarone Dep. at 62:6-63:11. Dr. Tarone has "scrupulously avoided" taking *anything of value* from any party to this litigation in connection with his work evaluating IARC's decision on glyphosate. Ex. F, 3/16/23 Tarone Dep. at 515:13-20.

As it has done in numerous other cases in this litigation, Monsanto designated Dr. Tarone as a non-retained expert in this case, specifically disclosing that Dr. Tarone will provide testimony on the following topics:

    1. The IARC Monographs Program, including its purposes and procedures;

    2. The IARC Working Group 112 deliberations and analysis and the resulting IARC

Monograph 112;

3. The relevant scientific evidence with respect to glyphosate;

4. The Agricultural Health Study's data and findings, including unpublished, updated data from 2013 regarding glyphosate and non-Hodgkin's lymphoma;

5. Animal toxicology, including his analysis of the glyphosate rodent bioassay data; and

6. Biostatistics.

Ex. G, Monsanto Company's Rule 26 Designation and Disclosure of General Causation Expert Testimony at 14. The vast majority of Dr. Tarone's testimony in this litigation focuses on his two published papers critiquing IARC's glyphosate classification in Monograph 112. Ex. E, 3/10/23 Tarone Dep. at 72:24-73:5 ("I was deposed to defend my papers.").

### C. Dr. Tarone's Opinions Regarding IARC Monograph 112.

Dr. Tarone began raising concerns about IARC's Monograph Program, specifically about "how it elevates agents for their carcinogenic potential," in approximately 2008. Ex. D, 12/17/19 Tarone Dep. at 17:20-18:6. After the 2015 publication of IARC's Monograph 112 regarding glyphosate, Dr. Tarone worked to analyze the data relied upon by IARC to reach its conclusions. Due to the "serious scientific errors" he discovered, Dr. Tarone published two peer-reviewed papers regarding IARC's Monograph 112, one published in the European Journal of Cancer Prevention and the other in Regulatory Toxicology and Pharmacology. *See id.* at 17:2-19. He was prompted to write these two papers "by what [he] perceived to be an **amazingly bad** deliberation by the [IARC] working group that evaluated glyphosate." *Id.* (emphasis added); *see also* Ex. E, 3/10/23 Tarone Dep. at 131:8-10 ("My papers evaluate the deliberations that [IARC] made and show that they were **horribly erroneous**.") (emphasis added).

During his depositions, Dr. Tarone recounted the substance of his published papers and provided his opinion as to why the data considered by IARC does not support IARC's finding that glyphosate is a probable human carcinogen. For example, he explained that IARC ignored material exculpatory evidence that would have eliminated any basis for IARC to conclude glyphosate is a probable human carcinogen. *See* Ex. D, 12/17/19 Tarone Dep. at 102:20-130:1; Ex. E, 3/10/23 Tarone Dep. at 304:21-309:3. Dr. Tarone outlined several key matters the IARC Working Group inexplicably ignored in reaching its conclusion on glyphosate:

- 5 -
MONSANTO'S OPPOSITION TO MOTION TO EXCLUDE TESTIMONY OF ROBERT TARONE, PH.D.

- **First,** even though the first CD-1 mouse study relied upon by IARC (Study 10) showed a moderate increase in kidney tumors in male mice, IARC failed to report that the second CD-1 mouse study it considered (Study 11) showed an inverse association between glyphosate use and kidney tumor development. *See* Ex. D, 12/17/19 Tarone Dep. at 132:20-134:17 (describing this as "the most basic kind of error"). In other words, the results from Study 11 showed that the more glyphosate the mice consumed, the fewer tumors appeared. *See id.* at 133:7-8. Since Study 11 replicated the testing conditions of Study 10, the results of Study 11 removed any basis to conclude from the two mouse studies together that glyphosate can cause kidney tumors. *See id.* at 98:20-101:3 ("[N]o competent statistician could possibly combine those two results, a small increase in the first study and a small decrease in the second study, and conclude that glyphosate caused kidney tumors in mice, but that's what the working group did."); *see also* Ex. F, 3/16/23 Tarone Dep. at 558:18-566:7 ("I know of no way of combining those two results for reasonable statistical tests that would lead to a significant result.").

- **Second,** Dr. Tarone explained that no female mice in Study 10 or Study 11 experienced any increase in kidney tumors. *See* Ex. D, 12/17/19 Tarone Dep..at 101:18-104:19. Despite relying on an increase in kidney tumors in male mice in Study 10, IARC ignored whether any female mice in Study 10 experienced any increase in kidney tumors. *See id.* at 87:1-88:8. Strikingly, IARC failed to report either result, claiming incorrectly that data for female mice in Study 10 were not provided. *See id.* at 87:19-88:2; *see also* Ex. E, 3/10/23 Tarone Dep. at 294:2-299:7 (testifying that it is "basic science" that IARC should have considered results in both sexes); Ex. F, 3/16/23 Tarone Dep. at 555:12-558:17 (testifying that it is "astound[ing] that IARC simply ignored the exculpatory data in female mice).

- **Third,** even though the second CD-1 mouse study relied upon by IARC (Study 11) showed a statistically significant increase in haemangiosarcomas in male mice, IARC failed to report that the first CD-1 mouse study it considered (Study 10) showed no significant increase in combined hemangiomas and haemangiosarcomas. *See* Ex. D, 12/17/19 Tarone Dep. at 102:1-103:10. This information was particularly significant since the mice in group 4 of Study 10 received a dose of glyphosate that was 5 times stronger than the dose received by the group 4 mice in Study 11. *See id.* IARC, however, completely failed to report this Study 10 information in its Monograph 112. *See id.*

Dr. Tarone then highlighted that, in addition to ignoring key data undercutting any basis to conclude that glyphosate causes cancer in animals, IARC also engaged in other scientifically unsound practices to reach its desired outcome. In particular, during the Working Group meeting, IARC—aided by a frequent Roundup plaintiffs' expert Dr. Portier—changed the Study 10 P value reading for kidney tumors in male mice from .065 to .034. *See* Ex. D, 12/17/19 Tarone Dep. at 88:9-92:2; Ex. F, 3/16/23 Tarone Dep. at 554:23-555:11. IARC did this by replacing the exact P value reading (.065) with an estimated P value reading (.034). *See* Ex. D, 12/17/19 Tarone Dep. at 88:9-92:2. By making this change, IARC could claim that there were two separate statistically significant findings (*i.e.*, P value readings below .05), which is a precondition under the IARC Preamble to conclude there is sufficient evidence of animal carcinogenicity. *See id.* at 140:13-142:15. Tying everything together, Dr. Tarone explained that had IARC used the exact P value reading for kidney tumors experienced by male mice in Study 10 (.065) (as also expressed in EPA reports), IARC would have been left with a single

statistically significant P value reading in the animal studies (that pertaining to haemangiosarcomas in male mice in Study 11) and thus would have been unable to conclude under the IARC Preamble that the animal studies provided sufficient evidence of carcinogenicity.  *See id.*

These scientific errors and omissions are highly significant since IARC concluded that the available human epidemiology studies provided only "limited" evidence of carcinogenicity.  *See* Ex. D, 12/17/19 Tarone Dep. at 23:4-14.  Under the IARC rules expressed in the Preamble, if both the animal and epidemiology studies showed only "limited" evidence of carcinogenicity (which, according to Dr. Tarone, are the conclusions IARC should have reached with respect to glyphosate under its own rules), IARC could not have labeled glyphosate a Group 2A "probable" carcinogen.  *See id.* at 82:8-83:10.  At most, it could have labeled glyphosate a Group 2B "possible" carcinogen.  *See id.*  Thus, even setting aside IARC's inexcusable decision to ignore material exculpatory evidence in Studies 10 and 11, had IARC simply applied the exact P value reading of .065, as previously calculated by the EPA and as confirmed by Dr. Tarone using StatExact, IARC still could not have labeled glyphosate as a Group 2A "probable" carcinogen under its own rules.  *See id.* at 130:2-132:19; Ex. F, 3/16/23 Tarone Dep. at 587:5-14 (agreeing that there is "no way IARC should have concluded that glyphosate was a probable human carcinogen . . . based on their own criteria.").

## ARGUMENT

Federal Rule of Civil Procedure 26(a)(2) sets forth the disclosure requirements for expert witnesses and specifically distinguishes between retained experts—expert witnesses who have been "retained or specially employed to provide expert testimony in the case or [whose] duties as the parties' employee regularly involve giving expert testimony"—and nonretained experts.  For retained experts, Rule 26(a)(2)(B) requires that the expert prepare a detailed report.  For nonretained experts, however, Rule 26(a)(2)(C) does not require an expert report and instead merely requires the proponent to prepare a disclosure that states "(i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify."

There is no dispute that Dr. Tarone is not an "employee" of either party "regularly involve[d in] giving expert testimony," so Plaintiff's Motion turns on whether Dr. Tarone has been "retained or

specially employed to provide expert testimony in the case." Rule 26(a)(2). As discussed below, the answer to that question is clearly no, so the Court should find that Monsanto properly classified Dr. Tarone as a non-retained expert (as it has done in numerous cases in this litigation). Moreover, the Court should deny Plaintiff's Motion because Monsanto's disclosure of Dr. Tarone's opinions satisfied Rule 26(a)(2), and Plaintiff has not been prejudiced in any way by these disclosures. To the contrary, it would be Monsanto who would be severely prejudiced if the Court precludes the jury from hearing Dr. Tarone's testimony, which provides critical context regarding Plaintiff's central piece of evidence in this litigation—IARC's Monograph 112.

### A. Dr. Tarone is a Non-Retained Expert.

Plaintiff contends that the Court should ignore Monsanto's classification of Dr. Tarone as a non-retained expert because it paid his employer (not him) a one-time fee of $1,500 and because Monsanto and its attorneys have engaged in sporadic communications with Dr. Tarone over the past several years. *See* Motion at 8. Plaintiff also alleges that Monsanto "enlisted Dr. Tarone's participation in its public defense of glyphosate" and that Monsanto and Dr. Tarone "jointly agreed with Dr. Tarone to subpoena his deposition testimony to make Tarone's opinions available to state and federal juries." *Id.* These assertions range from overblown to intentionally misleading and ignore the actual circumstances of Monsanto's relationship with Dr. Tarone.

Monsanto has never "retained or specially employed" Dr. Tarone "to provide expert testimony in the case." Rule 26(a)(2). Indeed, Monsanto has never paid Dr. Tarone any sum of money. Though Monsanto paid Dr. Tarone's employer a one-time, modest fee of $1,500 for a 3-hour meeting to discuss IARC's policies and procedures, Dr. Tarone never received a penny of that money. Moreover, "there was no discussion of anything strictly related to glyphosate" at that meeting. Ex. E, 3/10/23 Tarone Dep. at 47:22-48:11. Instead, Monsanto simply sought a more generalized discussion about IARC's approach to hazard identification, which resulted in a cancer classification for glyphosate that runs contrary to every regulatory conclusion the world over. As Dr. Tarone himself has stated, he does not "have a dog in the fight with regard to these glyphosate lawsuits." Ex. D, 12/17/19 Tarone Dep. at 55:21-56:4. Rather, his "argument is with [IARC]." *Id.*

Likewise, despite plaintiffs' counsel's repeated insinuations to the contrary at Dr. Tarone's

second deposition and in the Motion, Monsanto did not direct Dr. Tarone to review the IARC Monograph or to write and publish two peer-reviewed articles criticizing IARC's findings on glyphosate. Ex. E, 3/10/23 Tarone Dep. at 88:24-89:2 (testifying that it is "totally untrue" that he wrote his papers at Monsanto's direction or for the purposes of this litigation). Rather, Dr. Tarone independently decided to review the IARC monograph and—because he personally perceived IARC's evaluation of glyphosate to be "amazingly bad" and "horribly erroneous"—he did what any responsible scientist would do under the circumstances: he engaged in the bedrock scientific principle of peer review and published two articles in scientific journals describing his criticisms. Ex. D, 12/17/19 Tarone Dep. at 17:2-19; Ex. E, 3/10/23 Tarone Dep. at 131:8-10. The bulk of Dr. Tarone's deposition testimony, which is the ultimate subject of Plaintiff's Motion, centers on the substance of these two peer-reviewed publications. Accordingly, because Dr. Tarone's opinions in this case were not prepared in anticipation of litigation or at the direction of Monsanto's counsel (and, instead, are the product of the well-recognized scientific practice of peer review), Monsanto properly classified him as a non-retained expert. *See, e.g., Rent Info. Tech., Inc. v. Home Depot U.S.A., Inc.*, 268 F. App'x 555, 559 (9th Cir. 2008) (holding district court abused its discretion by striking four experts who failed to serve expert report "because none of those witnesses were retained or specially employed to provide expert testimony in this case"); *Hellmann-Blumberg v. University of the Pacific*, No. 2:12-cv-0286 TLN DAD, 2013 WL 4407267, at *1 (E.D. Cal. Aug. 15, 2013) (denying motion to compel production of expert report for witness who was "not specially employed to provide expert testimony" even where witness was a "complete stranger to the underlying facts and [drew] her opinions from facts supplied by [defendant]'s counsel").

Plaintiff contends that Dr. Tarone does not qualify as a non-retained expert because he "had no interaction or communication with Working Group 112" and is thus not a percipient witness to any of the "circumstances underlying the litigation." Motion at 9-10 (quoting *In re Application of Republic of Ecuador*, 280 F.R.D. 506, 511 (N.D. Cal. 2012)). But the scientific debate sparked by IARC's classification of glyphosate as a probable carcinogen, including Dr. Tarone's peer-reviewed publications criticizing that classification, is as much a part of the "circumstances underlying the litigation" as the Monograph itself. The fact that Dr. Tarone was not a member of the Working Group

behind IARC Monograph 112 is beside the point. Though he may not be a percipient witness to what happened behind closed doors in Lyon, France in 2015 when IARC reached its conclusion on glyphosate, he is a percipient witness to the scientific debate sparked by that decision (of which he was a direct participant). *See, e.g., Doe 1 v. Manhattan Beach Unified Sch. Dist.*, No. CV 19-06962-DDP (RAOx), 2020 WL 7931596, at *3-4 (C.D. Cal. Dec. 22, 2020) (holding that witness in sexual assault case had "percipient knowledge regarding the allegations of this case" and thus was properly classified as a non-retained expert witness even though witness did not have personal knowledge of the alleged assault itself because "[t]his case is not just about the alleged sexual assault of Plaintiff, but also about [defendant]'s response to that assault").[3]

The cases Plaintiff cites in her Motion do not support exclusion of Dr. Tarone's opinions. Unlike Dr. Tarone, the purported "non-retained" experts in *Trulove v. D'Amico*, for instance, formed their opinions "'solely for the purposes' of the litigation." No. 16-CV-050-YGR, 2018 WL 1090248, at *3 (N.D .Cal. Feb. 27, 2018). Likewise, the purported "non-retained" expert witness in *Funai Elec. Co. v. Daewood Electronics Corp.*, was an employee who "provide[d] technical evaluations of evidence reviewed solely in preparation for trial." No. C 04-1830 CRB (JL), 2007 WL 1089702, at *5 (N.D. Cal. Apr. 11, 2007). The same is true of the purported "non-retained" expert witness in *In re Application of Republic of Ecuador*, 280 F.R.D. 506, 511 (N.D. Cal. 2012) ("Dr. Kelsh falls into the latter category [of retained expert witness]—his expert reports were prepared for trial and in anticipation of litigation."). Unlike the expert materials at issue in each of those cases, Dr. Tarone's published articles, which form the basis of his testimony in this case, were not prepared or published for the purposes of litigation or for trial. Rather, Dr. Tarone published those articles long before Monsanto even considered taking his deposition in this case for the purpose of legitimate scientific debate. *See* Ex. F, 3/16/23 Tarone Dep. at 678:5-9 ("I just think it's important that regulatory decisions be made on the strongest possible science. And so I keep up with the literature and if I see something

---

[3] Dr. Tarone not only personally reviewed IARC's analysis of the mouse and rate studies on which IARC explicitly founded its conclusions (*see* Ex. D, 12/17/19 Tarone Dep. at 66:15-21; 124:21-126:12), but he also obtained the underlying data for those same mouse and rat studies—data that IARC apparently did not consider and which, according to Dr. Tarone, should have changed IARC's overall conclusion about the scientific data on glyphosate. Ex. F, 3/16/23 Tarone Dep. at 468:3-9; 517:4-11; 586:12–587:10.

1  I think is wrong, then I'll submit something to be published."). That scientific debate is central to
2  Monsanto's defense in this case, and Dr. Tarone's well-reasoned and unrefuted critiques of the IARC
3  Monograph—Plaintiff's central piece of evidence in this case—should not be shielded from the jury.

### B. Monsanto's Disclosure of Dr. Tarone Satisfied Rule 26(a)(2).

As discussed above, because Dr. Tarone is a non-retained expert, Rule 26(a)(2)(C) required Monsanto to disclose: "(i) the subject matter on which the witness is expected to present evidence . . . and (ii) a summary of the facts and opinions to which the witness is expected to testify." As the Advisory Committee Notes to the 2010 Amendments to Rule 26 make clear, the disclosures required for non-retained experts are intended to be "considerably less extensive than the report required by Rule 26(a)(2)(B)." The Notes continue by instructing that "[c]ourts must take care against requiring undue detail, keeping in mind that these witnesses have not been specially retained and may not be as responsive to counsel as those who have." *Id.* The purpose of this requirement is to "put [the opposing party] on notice as to the substance of any testimony" these non-retained experts may offer. *Witman v. Knight Trans., Inc.*, No. 3:15-cv-01102-H-NLS, 2016 WL 8715668, at *3 (S.D. Cal. Nov. 21, 2016). Courts have held that where a party's disclosure includes "the identify of [the non-retained experts]" and a "brief summary" of the subject matter and facts and opinions to which the witness is expected to testify, Rule 26(a)(2)(C)'s requirements are met. *See, e.g., Copart, Inc. v. Sparta Consulting, Inc.*, No. 2:14-cv-00046-KJM-CKD, 2017 WL 85824, at *3 (E.D. Cal. Jan. 9, 2017).

Monsanto's disclosure of Dr. Tarone's testimony meets Rule 26(a)(2)(C)'s requirements. And Dr. Tarone's opinions were no mystery to Plaintiff prior to Dr. Tarone's second deposition. His opinions were set out in detail in two peer-reviewed and published articles and were extensively explored in a 2019 deposition. Plaintiff had access to all of these materials prior to Dr. Tarone's second deposition. In addition, Monsanto disclosed that it "may elicit testimony from Dr. Tarone regarding the facts and opinions testified to previously in the Roundup® litigation." Ex. G, Monsanto Company's Rule 26 Designation and Disclosure of General Causation Expert Testimony at 14. Monsanto then disclosed six specific categories of facts and opinions that Dr. Tarone was expected to offer, including:

> (i) the IARC Monographs Program, including its purposes and procedures; (ii) the IARC Working Group 112 deliberations and analysis and the resulting IARC Monograph 112; (iii) the relevant scientific evidence with respect to glyphosate; (iv) the Agricultural Health Study's data and findings, including unpublished, updated data from 2013

regarding glyphosate and non-Hodgkin's lymphoma; (v) animal toxicology, including his analysis of the glyphosate rodent bioassay data; and (vi) biostatistics.

*Id.* Indeed, plaintiffs' counsel questioned Dr. Tarone for several hours and hundreds of pages of transcript pursuant to these disclosures. Monsanto complied with Rule 26(a)(2), and the Court should not preclude it from using this transcript at trial, which is central to its defense. *See, e.g., Witman*, 2016 WL 8715668, at *3 (denying plaintiff's motion to exclude testimony of non-retained expert treating physicians where party had access to other documents (in that case, medical records) that permitted it to "ascertain the treating physicians' possible testimony" and had the opportunity to depose the treating physicians).

### C. Monsanto, Not Plaintiff, Would Be Prejudiced By the Court's Exclusion of Dr. Tarone's Testimony.

Plaintiff finally argues that "Monsanto's gamesmanship" before and during Dr. Tarone's most recent deposition has caused her prejudice warranting exclusion of Dr. Tarone's opinions. Motion at 12. To support this argument, Plaintiff selectively cites only portions of Dr. Tarone's most recent testimony to suggest that Dr. Tarone offered (1) new, (2) unfounded, and (3) changed opinions during his most recent deposition. By focusing only on cherry-picked subparts of Dr. Tarone's most recent deposition, however, Plaintiff's Motion obscures the fact that the ***vast majority*** of Dr. Tarone's testimony in this litigation centers on his ***published*** critiques of IARC's glyphosate classification. Thus, Plaintiff cannot seriously dispute that she had ample notice of (and therefore was not prejudiced, surprised, or harmed by) the lion's share of Dr. Tarone's testimony. Indeed, plaintiffs' counsel spent a significant amount of time at Dr. Tarone's most recent deposition carefully combing through Dr. Tarone's published papers. *See, e.g.,* Ex. E, 3/10/23 Tarone Dep. at 131:8-10 ("My papers evaluate the deliberations that were made and show that they were horribly erroneous."); 170-264 (discussing, in detail, his critiques of IARC Monograph, which he detailed in his two peer-reviewed papers); 294-349 (same).

Accordingly, even if Monsanto's expert disclosures for Dr. Tarone did not technically comply with Rule 26(a)(2)'s requirements (which they did, as discussed above), Plaintiff still would not be entitled to relief because Plaintiff was not harmed by any alleged noncompliance. *See, e.g., TriMed v.*

*Stryker Corp.*, No. CV 06-1918-SVW-SHx, 2010 WL 11002258, at *1 (C.D. Cal. Oct. 21, 2010) (finding technical noncompliance with Rule 26(a)(2)'s requirements harmless, where proponent disclosed name of non-retained expert before the close of discovery, expert's opinions were presented in additional documents beyond the disclosure itself, and the opposing party had "ample opportunity" to depose expert and examine his opinions); *F.D.I.C. v. Anderson*, No. 2:11-cv-01061-GEB-EFB, 2012 WL 3728160 at *3-4 (E.D. Cal. Aug. 27, 2012) (finding incomplete disclosure of non-retained expert "harmless" where the opposing party was not prejudiced or surprised by the incomplete disclosure).[4]

Monsanto (not Plaintiff) is the party who will actually be unfairly prejudiced if the Court grants Plaintiff's Motion. As described above, Dr. Tarone is extraordinarily qualified in statistical analysis of animal carcinogenicity studies and in IARC's monograph process. He has a Ph.D. in mathematics, with a heavy emphasis on statistics. Upon graduation, he went to work for the NCI, where he joined the mathematical statistics and applied mathematics section. Ex. D, 12/17/19 Tarone Dep. at 32:7-33:1. During his nearly 30-year career at the NCI, Dr. Tarone performed mathematical research and developed statistical models that were used to assist in cancer research. *See id.* Throughout his career, he participated in dozens of investigations of various chemicals for carcinogenicity involving analysis of rodent studies, and he has published hundreds of papers in scientific journals. *Id.* at 34:3-35:9. Eventually, Dr. Tarone was promoted to the head position of the Statistical Research and Application Section in the Biostatistics branch of the NCI. *See id.* at 33:11-34:2. Based on his extensive body of work, IARC itself selected Dr. Tarone to co-author an IARC-sponsored text entitled "Statistical Methods in Cancer Research, Volume III, The Design and Analysis of Long-Term Animal

---

[4] Moreover, Plaintiff's specific criticisms of cherry-picked portions of Dr. Tarone's most recent deposition testimony also are meritless and misleading. For instance, Plaintiff asserts that Dr. Tarone changed his opinion on whether IARC ignored exculpatory data when analyzing the glyphosate animal studies. Motion at 13-14. But this is simply not true. Dr. Tarone testified consistently during both depositions that IARC "excluded entirely data that would have argued against carcinogenicity." Ex. E, 3/10/23 Tarone Dep. at 187:5-14; *see also* Ex. D, 12/17/19 Tarone Dep. at 87:19-88:2; Ex. E, 3/10/23 Tarone Dep. at 294:2-299:7; Ex. F, 3/16/23 Tarone Dep. at 555:12-558:17 (testifying consistently across depositions that IARC ignored exculpatory data that should have been available to it). Similarly, though Dr. Tarone did offer a handful of opinions at his second deposition that he did not offer during his first, *see, e.g.,* Motion at 12, the bulk of his testimony during the second deposition was entirely consistent with the testimony he offered during the first deposition. To the extent that Plaintiff has additional specific concerns about the admissibility of small sections of Dr. Tarone's deposition testimony, those concerns can (and should) be addressed at trial through the deposition designation process, not through outright exclusion of Dr. Tarone's testimony in its entirety.

Experiments," which explored the methods for analyzing animal carcinogen bioassays. *See id.* at 35:19-38:21. Dr. Tarone clearly possess both the education and expertise to provide testimony regarding the reasons why the data considered by IARC does not support its findings that glyphosate is a probable human carcinogen. *See, e.g.,* Ex. D, 12/17/19 Tarone Dep. at 188:16-189:7. In fact, "not a single one of the scientific points" made in Dr. Tarone's publications has been refuted, not even by IARC. *Id.* at 24:6-9; Ex. F, 3/16/23 Tarone Dep. at 464:22-465:22; 660:2-23.

It is a virtual certainty that Plaintiff will introduce IARC to the jury, reference its conclusions at length, and rely on those conclusions directly (by argument, testimony, cross-examination, or evidence) and indirectly (by having their experts consider and endorse it). Plaintiff cannot hold up IARC's conclusion as the gold standard while at the same time shielding the jury from qualified and unbiased testimony drawing those conclusions into question. Such a result would be fundamentally unfair and would severely prejudice Monsanto. Courts around the country have rejected Plaintiff's attempts to preclude the jury from hearing this important defense testimony. This Court should reach the same conclusion.

## CONCLUSION

For all these reasons, the Court should deny Plaintiff's Motion to Exclude the Opinions and Testimony of Monsanto Company's Proposed Non-Retained Expert Dr. Robert Tarone, Ph.D.

Dated:  July 13, 2023                     Respectfully submitted,

/s/ *Jed P. White*
Jed P. White
Attorneys for Defendant Monsanto Company

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 13th day of July, 2023, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

/s/ *Jed P. White*
Jed P. White