# EXHIBIT D

CONFIDENTIAL

Page 1

```
 1        SUPERIOR COURT OF THE STATE OF CALIFORNIA
                 COUNTY OF CONTRA COSTA
 2      KATHLEEN CABALLERO,              *
                                         *
 3           Plaintiff,                  *
                                         *
 4        vs.                            * CASE NO.:
                                         * MSC 19-01821
 5      MONSANTO COMPANY, et al.,        *
                                         *
 6           Defendants.                 *
                           - - - - - - - - -
 7        SUPERIOR COURT OF THE STATE OF CALIFORNIA
                 COUNTY OF RIVERSIDE
 8      TRESSA COTTON,                   *
                                         *
 9           Plaintiff,                  *
                                         *
10        vs.                            *  CASE NO.
                                         *  RJI1903180
11      MONSANTO COMPANY, FOSTER-        *
        GARDNER, INC. AND DOES 1-50,     *
12                                       *
             Defendants.                 *
13                         - - - - - - - - -
14                   **CONFIDENTIAL**
15           Deposition of ROBERT TARONE, Ph.D.,
16      taken with simultaneous videotape recording on
17      Tuesday, December 17, 2019, beginning at 10:03
18      a.m., at the offices of Veritext Legal Solutions,
19      2301 Research Boulevard, Suite 200, Rockville,
20      Maryland, before Ilana E. Johnston, Notary Public.
21      Reported by:  Ilana E. Johnston
```

**Exhibit D Page 1**

CONFIDENTIAL

Page 2

```
 1      APPEARANCES:

 2

 3      On behalf of Plaintiff Kathleen Caballero (via

 4      telephone):

 5                  STEVEN J. BRADY, ESQUIRE

 6                  Brady Law Group

 7                  1015 Irwin Street

 8                  San Rafael, California 94901

 9                  415-459-7300 (voice)

10                  415-459-7303 (fax)

11                  steve@bradylawgroup.com

12                        and

13                  CURTIS HOKE, ESQUIRE

14                  The Miller Firm, LLC

15                  The Sherman Building

16                  108 Railroad Avenue

17                  Orange, Virginia 22960

18                  540-672-4224 (voice)

19                  540-672-3055 (fax)

20                  choke@millerfirmllc.com

21
```

CONFIDENTIAL

Page 3

1       APPEARANCES:

2       On behalf of Plaintiff Treesa Cotton (via

3       telephone):

4                   JENNIE LEE ANDERSON, ESQUIRE

5                   Andrus Anderson, LLP

6                   155 Montgomery Street, Suite 900

7                   San Francisco, California 94104

8                   415-986-1400 (voice)

9                   415-986-1474 (fax)

10                  jennie@andrusanderson.com

11      On behalf of Defendants Monsanto Company,

12      Wilbur-Ellis Co., LLC and Wilbur-Ellis Feed, LLC:

13                  JOHN R. VALES, ESQUIRE

14                  STEPHEN M. TURNER, ESQUIRE

15                  Dentons US, LLP

16                  101 JFK Parkway

17                  Short Hills, New Jersey 07078-2708

18                  973-912-7100 (voice)

19                  973-912-7199 (fax)

20                  john.vales@dentons.com

21                  stephen.turner@dentons.com

**Exhibit D Page 3**

CONFIDENTIAL

Page 4

1          APPEARANCES:  (Continued)

2

3      On behalf of Defendants Monsanto Company,

4      Wilbur-Ellis Co., LLC and Wilbur-Ellis Feed, LLC:

5                    ERIC G. LASKER, ESQUIRE

6                    Hollingsworth, LLP

7                    1350 I Street, N.W.

8                    Washington, DC 20005

9                    202-898-5843 (voice)

10                   202-682-1639 (fax)

11                   elasker@hollingsworthllp.com

12                        and (via telephone)

13                   JAIME R. SIMON, ESQUIRE

14                   Winston & Strawn, LLP

15                   35 West Wacker Drive

16                   Chicago, Illinois 60601-9703

17                   312-558-5600 (voice)

18                   312-558-5700 (fax)

19                   jrsimon@winston.com

20        ALSO PRESENT:

21                   Gene Aronov, Videographer

**Exhibit D Page 4**

CONFIDENTIAL

Page 5

1          I N D E X   O F   W I T N E S S E S

2

3      Witness                                    Page

4      ROBERT TARONE, Ph.D.

5      BY MR. VALES                                  13

6      BY MR. BRADY                                 152

7      BY MR. VALES                                 237

8      BY MR. BRADY                                 245

9

10              I N D E X   O F   E X H I B I T S

11

12     Tarone

13     Exhibits                                    Page

14     Exhibit T-1  Affidavit of Process Server   15

15              in Caballero case with

16              attachments

17     Exhibit T-2  Affidavit of Process Server   15

18              in Cotton case with

19              attachments

20

21

CONFIDENTIAL

1      Exhibit T-3   Article titled On the     18

2                  International Agency for

3                  Research on Cancer

4                  classification of

5                  glyphosate as a probable

6                  human carcinogen

7      Exhibit T-4   Article titled Conflicts of   18

8                  interest, bias, and the

9                  IARC Monographs Program

10     Exhibit T-5   Curriculum vitae        26

11     Exhibit T-6   Bibliography           26

12     Exhibit T-7   Statistical Methods in     38

13                  Cancer Research, Volume

14                  III, The design and

15                  analysis of long-term

16                  animal experiments

17     Exhibit T-8   Evaluation of carcinogenic  65

18                  potential of the herbicide

19                  glyphosate, drawing on

20                  tumor incidence data from

21                  fourteen chronic/

1                    carcinogenicity rodent

2                    studies

3        Exhibit T-9  H. Greim supplement            65

4        Exhibit T-10 Pages 77-119 of Hearing        69

5                    Before the Committee on

6                    Science, Space, and

7                    Technology dated 2/6/18

8        Exhibit T-11 IARC Monographs on the         74

9                    Evaluation of Carcinogenic

10                   Risks to Humans

11       Exhibit T-12 Glyphosate Monograph 112       84

12       Exhibit T-13 Glyphosate Use and Cancer     147

13                   Incidence in the

14                   Agricultural Health Study

15       Exhibit T-14 E-mail string                 223

16       Exhibit T-15 E-mail string                 225

17       Exhibit T-16 E-mail string                 225

18       Exhibit T-17 IARC Monographs:  40 Years    225

19                   of Evaluating Carcinogenic

20                   Hazards to Humans

21

CONFIDENTIAL

Page 8

1        Exhibit T-18 IARC response to Reuters        227

2                     article of 6/14/17

3        Exhibit T-19 Report of the Advisory          228

4                     Group to Recommend

5                     Priorities for the IARC

6                     Monographs during 2020-2024

7        Exhibit T-20 French version of Week-end      241

8                     a Prix Fous!

9        Exhibit T-21 English version of Week-end     241

10                    a Prix Fous!

11                    ---------------------

12

13

14

15

16

17

18

19

20

21

CONFIDENTIAL

Page 9

```
 1          T H E   P R O C E E D I N G S

 2          - - - - - - - - - - - - - -

 3          THE VIDEOGRAPHER:  Good morning.  We are

 4     going on the record at 10:03 a.m. on December 17th,

 5     2019.  Please note that the microphones are

 6     sensitive and may pick up whispering, private

 7     conversations and cellular interference.  Please

 8     turn off cell phones or place them away from the

 9     microphone as they can interfere with the

10     deposition audio.

11          Audio and video recording will continue

12     to take place unless all parties agree to go off

13     the record.  This is media unit 1 of the video

14     recorded deposition of Robert Tarone taken by

15     counsel for the plaintiff --

16          MR. VALES:  Incorrect.

17          THE VIDEOGRAPHER:  -- in the matter

18     of --

19          MR. VALES:  Counsel for defendant.

20          THE VIDEOGRAPHER:  Defendant.  Okay.

21     Tressa Cotton versus Monsanto Company, et al., Case
```

CONFIDENTIAL

Page 10

1     No. RIC --

2                     MR. HOKE:  Excuse me.  It was noticed in

3     Caballero versus Monsanto.

4                     MR. VALES:  Both cases.

5                     MR. HOKE:  Okay.  If you can add that as

6     well.

7                     MR. LASKER:  It was noticed in Cotton

8     versus Monsanto and also in Caballero versus

9     Monsanto.

10                    THE VIDEOGRAPHER:  Can I proceed?

11                    MR. LASKER:  Huh?

12                    THE VIDEOGRAPHER:  Can I proceed?

13                    MR. LASKER:  Yes.

14                    THE VIDEOGRAPHER:  In the matter of

15    Tressa Cotton versus Monsanto Company, et al., Case

16    No. RIC1903180 and Kathleen Caballero versus

17    Monsanto Company, et al., Case No. MSC 19-01821,

18    filed in the Superior Court of the State of

19    California.

20                    This deposition is being held at

21    Veritext, Rockville located at 2301 Research

CONFIDENTIAL

Page 11

1     Boulevard, suite 200, Rockville, Maryland.  My name

2     is Gene Aronov from the firm Veritext Legal

3     Solutions, and I'm the videographer.  The court

4     reporter is Ilana Johnston from the firm Veritext

5     Legal Solutions.  I'm not authorized to administer

6     an oath.  I am not related to any party in this

7     action, nor am I financially interested in the

8     outcome.

9               Counsel and all present in the room and

10    everyone attending remotely will now state their

11    appearances and affiliations for the record.  If

12    there are any objections to proceeding, please

13    state them at the time of your appearance,

14    beginning with the noticing attorney.

15              MR. VALES:  Good morning.  Jack Vales

16    with the firm of Dentons US, LLP, here on behalf of

17    defendant Monsanto Company.

18              MR. HOKE:  Good morning.  Curtis Hoke

19    with The Miller Firm on behalf of the plaintiff,

20    Kathleen Caballero.

21              MR. BRADY:  Good morning.  Steve Brady

CONFIDENTIAL

Page 12

1    on behalf of Kathleen Caballero from the Brady Law

2    Group.

3                MS. ANDERSON:  Good morning.  This is

4    Jennie Lee Anderson on behalf of Tressa Cotton,

5    plaintiff, from Andrus Anderson.

6                MS. SIMON:  Good morning.  This is Jaime

7    Simon from Winston & Strawn on behalf of Monsanto

8    Company.

9                MR. LASKER:  Eric Lasker from

10    Hollingsworth, LLP on behalf of Monsanto.

11                MR. TURNER:  Stephen Turner from Dentons

12    US, LLP on behalf of Monsanto.

13                THE VIDEOGRAPHER:  Is that everyone?

14                MR. VALES:  Yes.

15                THE VIDEOGRAPHER:  Will the court

16    reporter please swear in the witness?

17                    ROBERT TARONE, Ph.D.,

18    being first duly sworn to tell the truth, the whole

19    truth, and nothing but the truth, testified as

20    follows:

21                THE VIDEOGRAPHER:  Thank you.  You may

CONFIDENTIAL

Page 13

1   proceed.

2                     EXAMINATION BY MR. VALES:

3          Q.    Good morning, Dr. Tarone.  My name is

4   Jack Vales.  As I just indicated, I'm a lawyer for

5   the defendant in this case, and we're here to take

6   your deposition.  Have you ever given a deposition

7   before, sir?

8          A.    I've been involved in two depositions

9   previously.

10         Q.    Okay.  Are you familiar, sir, with the

11   ground rules of a deposition?

12         A.    Generally.  I'm not a veteran but --

13         Q.    Okay.  Just to quickly review, it's

14   important that only one person speak at a time so

15   that everything that's spoken is taken down by the

16   reporter.  So I would ask that you wait until my

17   question is finished until you provide a response.

18   Is that fair?

19         A.    Fair.  Understood.

20         Q.    Likewise, it's important that you

21   verbalize any responses that you provide today

1    because nods of the head won't be picked up by the

2    reporter or by the folks who are participating

3    remotely.  Do you understand?

4        A.    Understood.

5        Q.    Okay.  Thank you.  If you ever need to

6    take a break today, please let me know.  We'll,

7    we'll take breaks periodically, maybe on the hour

8    or -- but if you need to take a break, just let me

9    know, and unless it's in the middle of a question,

10   certainly we'll accommodate that.  Okay?

11       A.    Okay.

12       Q.    If I ask a question, ensure to -- that

13   you understand.  If you do not understand it for

14   any reason, please ask me to rephrase.  Okay?

15       A.    Okay.  Fine.

16       Q.    Okay?  Is there anything that would

17   prevent you from testifying truthfully today?

18       A.    No.

19       Q.    Okay.  Now, did you receive a subpoena

20   to appear at this deposition today?

21       A.    I did.

CONFIDENTIAL

Page 15

1              (Whereupon, Deposition Exhibit T-1,

2      Affidavit of Process Server in Caballero case with

3      attachments, marked.)

4              (Whereupon, Deposition Exhibit T-2,

5      Affidavit of Process Server in Cotton case with

6      attachments, marked.)

7        Q.   Okay.  I'd like to have marked and

8      introduced into the record a copy of the subpoenas

9      for the testimony of Dr. Tarone in the Caballero

10     and Cotton matters.  They have been marked

11     respectively as Exhibits T-1 and T-2.

12              Sir, I've handed you Exhibits T-1 and

13     T-2.  Do those appear to be subpoenas that you

14     received in connection with this deposition today?

15        A.   Yes, yes, they are.

16        Q.   Okay.  Are you receiving any

17     compensation to appear here today?

18        A.   No.

19        Q.   Have you requested any compensation to

20     appear here today?

21        A.   No.

CONFIDENTIAL

Page 16

1          Q.    Have you previously spoken to me?

2          A.    Yes, I have.

3          Q.    Describe any such conversations that

4     you've had.

5          A.    We had one meeting in person a few weeks

6     ago, maybe a month ago and then a couple of phone

7     calls.

8          Q.    How long was the meeting in person?

9          A.    A couple of hours.

10          Q.    Okay.  Did you receive any compensation

11     for any of your meetings with myself?

12          A.    No, none whatsoever.

13          Q.    Did you request any compensation?

14          A.    No, I did not.

15          Q.    Okay.  Now, are you aware of why your

16     deposition is being sought in this case?

17          A.    I believe so, yes.  It's to describe a

18     couple of my published papers and peer reviewed

19     journals and to defend them against any criticism.

20          Q.    Okay.  What have you published papers

21     and peer reviewed journals on that you just

CONFIDENTIAL

Page 17

1    referenced?

2        A.   There was a paper that was published in

3    the European Journal of Cancer Prevention.  It was

4    about problems with the IARC, International Agency

5    for Research on Cancer, deliberations with regard

6    to glyphosate.  And there was a second paper

7    published in Regulatory Toxicology and Pharmacology

8    with a similar, similar topic.

9            MR. BRADY:  I'm sorry.  Regulatory what?

10           THE WITNESS:  Regulatory Toxicology and

11   Pharmacology.

12       Q.   What was the thesis, if you will, of

13   those two articles?

14       A.   Well, both papers were prompted by what

15   I perceived to be an amazingly bad deliberation by

16   the International Agency for Research on Cancer

17   working group that evaluated glyphosate.  They made

18   serious scientific errors, which I was very

19   concerned about.

20           And I should point out I've been

21   involved in an exchange of views with the IARC

CONFIDENTIAL

1      Monographs Program for a number of years starting

2      around 2008 with various people early on and near

3      the end simply myself, raising questions about

4      problems we perceive with the IARC Monographs

5      Program and how it evaluates agents for their

6      carcinogenic potential.

7                  MR. VALES:  Okay.  We'll get to that,

8      but first I want to show you a couple -- the two

9      articles you referenced.  Can I have these marked

10     as Exhibit 3 and 4 please?

11                 (Whereupon, Deposition Exhibit T-3,

12     article titled On the International Agency for

13     Research on Cancer classification of glyphosate as

14     a probable human carcinogen, marked.)

15                 (Whereupon, Deposition Exhibit T-4,

16     article titled Conflicts of interest, bias, and the

17     IARC Monographs Program, marked.)

18                 MR. BRADY:  Counsel, you marked the

19     subpoena as 1 and the notice as 2?

20                 MR. VALES:  I marked as 1 and 2 the

21     subpoenas respectively in the Caballero and Cotton

Page 19

1    cases.  It's a packaged document, which we've

2    e-mailed out, I believe.  It includes the Affidavit

3    of Service.

4          Q.   Okay.  I'm now handing you Exhibits T-3

5    and T-4.

6          A.   Yeah, these are the two papers.  I would

7    note that the first paper in the European Journal

8    of Cancer Prevention, even though it says -- has a

9    2018 publication date, it was actually published

10   online in August of 2017 and available for anybody

11   in the scientific community to download the PDF and

12   read it.

13         Q.   Okay.  And how about the second article?

14         A.   The second article in Regulatory

15   Toxicology and Pharmacology was written well after

16   the first one actually and in response to a paper

17   in another journal that falsely claimed that

18   Monsanto had paid me to write the first paper.

19         Q.   Okay.  Did anyone pay you to write

20   papers 1 -- paper -- either of those two papers --

21         A.   No.

1          Q.    -- Exhibits T-3 and T-4?

2          A.    There was no compensation whatsoever for

3     either paper.

4          Q.    Why did you write them then?

5          A.    Just because of my concern about faulty

6     science being used in regulatory processes,

7     particularly at IARC.

8          Q.    Okay.

9          A.    No one asked me to write them either, by

10    the way, and it was entirely my own decision.

11         Q.    Okay.  Did IARC, its Monograph Program,

12    reach a determination as to whether or not the

13    agent glyphosate is a carcinogen?

14         A.    They determ -- their conclusion was that

15    it was a probable human carcinogen.

16         Q.    Okay.  Was that expressed in their

17    Monograph 112?

18         A.     It was and also in -- they routinely

19    publish a short paper in a British journal Lancet

20    Oncology, which summarizes the results of the

21    monograph, and they published a short paper.  It

CONFIDENTIAL

Page 21

1    was published online in Lancet Oncology in March,

2    the same month that the meeting took place,

3    evaluating glyphosate, and then it was published in

4    print in May.

5         Q.   Do you agree with the determination of

6    IARC?

7         A.   No, not at all.

8         Q.   Okay.  Could you summarize why you

9    disagree?

10        A.   Yes.  And I want to make it clear that a

11   lot of questions have been raised about the IARC

12   glyphosate classification that I consider to be

13   incidental.  I evaluated their deliberations on

14   their own terms.  I assumed that they were

15   evaluating hazard, not risk.  That's a question

16   that's often raised.

17             I agreed that they -- the studies they

18   relied upon were sufficient to make a determination

19   of whether glyphosate was a carcinogen or not.  And

20   I evaluated using their own criteria.  And their

21   deliberations were totally faulty.

Page 22

```
 1              If they had done a complete synthesis of
 2      all the studies that they relied upon, they could
 3      not have concluded that glyphosate is an animal
 4      carcinogen.  And without that conclusion, they
 5      could not have classified glyphosate as a probable
 6      human carcinogen.
 7          Q.   Now, you expressed your view to --
 8              MR. BRADY:  I believe that --
 9              MR. VALES:  Go ahead.  Sorry.
10              MR. BRADY:  I'm sorry.  You said that it
11      considered that glyphosate was a probable animal
12      carcinogen?  Could you say the last part of that
13      again please?
14              THE WITNESS:  Yeah.  They evaluate both
15      animal data and human data, and they give a, they
16      give a rating to each of those, you know, either a
17      sufficient evidence, limited evidence or no
18      evidence.  And then once they have evaluated the
19      animal and human data, they -- by their criteria
20      that immediately tells them how they have to
21      classify this as -- in terms of whether it's a
```

CONFIDENTIAL

Page 23

1    known carcinogen, a probable carcinogen, a possible

2    carcinogen, questionable as to carcinogenicity or

3    unlikely to be a carcinogen.

4             And because they, like every other

5    agency that's evaluated glyphosate around the

6    world, concluded that the human data was limited,

7    if, if they -- without, without concluding that

8    there was sufficient evidence of animal

9    carcinogenicity, they could not have classified, by

10   their own criteria, they could not have classified

11   glyphosate as a probable human carcinogen.  They

12   relied entirely on their determination that there

13   was sufficient evidence that glyphosate caused

14   tumors in rodents.

15        Q.   Sir, since you have pap -- since you

16   have published these two papers, are you aware of

17   any critique that has discredited the central

18   analysis of your papers?

19        A.   No.  The International Agency for

20   Research on Cancer submitted a letter to the

21   European Journal of Cancer Prevention in December

Page 24

1    of 2016, and the letter was entirely dealing with

2    issues, sort of technical issues of whether it met

3    -- my paper met the standards for a research paper.

4    They raised a conflict of interest, wanted to know

5    who paid for it, even though the paper declared

6    that there was no conflict of interest.  And they

7    refuted not a single one of the scientific points I

8    made about the exclusion of exculpatory rodent

9    tumor data.

10          Q.   Now, these two journals that you

11   published in Exhibits T-3 and T-4, are those

12   scientific journals?

13          A.   Yes, they are, and they're both --

14          Q.   Again, what were those two journals?

15          A.   European Journal of Cancer Prevention

16   and Regulatory Toxicology and Pharmacology.

17          Q.   Okay.  Are those peer reviewed journals?

18          A.   Both peer reviewed journals.

19          Q.   What does that mean?

20          A.   That means that the papers are evaluated

21   by editors and referees and -- as to their

1    scientific merit.  And typically you'll get

2    comments from referees raising questions and

3    issues, and you'll modify the paper until it's

4    acceptable to the editorial staff.

5         Q.    Okay.  Why don't you state, sir, what is

6    your professional occupation.

7         A.    I was a mathematical statistician, and I

8    got my bachelor of science degree in mathematics in

9    1968 from the University of California, Davis, a

10   master of science in mathematics in 1979.  And

11   immediately after that I was drafted and spent two

12   years in the Army, including a year in Vietnam.

13        Q.    Let me just stop, let me just stop --

14        A.    Okay.

15        Q.    Let me just stop you right there.

16        A.    Yeah.

17        Q.    In fact, prior to this deposition you

18   provided me a copy of your CV; is that correct?

19        A.    Right, that's right.

20        Q.    You also provided me a copy of your

21   bibliography, correct?

CONFIDENTIAL

Page 26

1          A.    That's part of the CV, yes.

2                MR. VALES:  Okay.  Let's have those

3     marked.

4                (Whereupon, Deposition Exhibit T-5,

5     curriculum vitae, marked.)

6                (Whereupon, Deposition Exhibit T-6,

7     bibliography, marked.)

8          Q.    Sir, I've handed you what's been marked

9     as Exhibits T-5 and T-6 for identification.  Do you

10    recognize these documents?

11         A.    Yes.

12         Q.    Please describe what they are.

13         A.    The first page is my CV, and then the

14    next several pages are my bibliography, papers on

15    chapters, books I've written, part of my career.

16         Q.    Did you prepare these documents

17    yourself?

18         A.    I did.

19         Q.    I see the CV is dated November 12th,

20    2019?

21         A.    Correct.

CONFIDENTIAL

Page 27

1          Q.   I'd like to go through this.  It says

2      that you were born in Modesto, California.  Is that

3      correct?

4          A.   That is correct.  I grew up in farm

5      country in central California, a little town of

6      Escalon the few first years and then Modesto.

7          Q.   Okay.  Where did you attend high school?

8          A.   Thomas Downey High School in Modesto.

9          Q.   Okay.  And you graduated with highest

10     honors in 1968 from University of California,

11     Davis?

12         A.   That's correct.

13         Q.   And then you immediately got a master's

14     from Davis?

15         A.   Correct.

16         Q.   In mathematics?

17         A.   Both in mathematics.

18         Q.   Okay.  And then it looks like you then

19     enlisted in the United States Army?

20         A.   Well, I was drafted.  It wasn't

21     enlistment.

CONFIDENTIAL

Page 28

1          Q.   Okay.  During what time period were you

2     in the United States Army, sir?

3          A.   From August of 1969 to August of 1971.

4          Q.   Thank you for your service.  During that

5     time period, what position did you hold?

6          A.   I was a medic.

7          Q.   A medic?

8          A.   A medic, right.  Did my medic training

9     at San Antonio, Fort Sam Houston.

10         Q.   Okay.  And did you deploy overseas?

11         A.   I did.  I was in Vietnam for, basically

12     for 1970.

13         Q.   Okay.  And did you see any combat in

14     Vietnam?

15         A.   I was with an engineer battalion, so we

16     took some fire, but we -- I don't want to make

17     myself out to be some kind of a great combat

18     veteran.  We didn't go out looking for trouble, but

19     just because we were generally working on roads,

20     bridges, things like that, we were stationed there,

21     and we took occasional sniper fire.

CONFIDENTIAL

Page 29

1          Q.    You did occasionally take fire?

2          A.    Yeah.  And I was involved in one fire

3     fight when we were, we were convoying and were

4     ambushed, but that was a relatively short fire

5     fight, so I did not see heavy combat.

6          Q.    Did you ever administer to injured

7     service members?

8          A.    I did.

9          Q.    Thank you again for your service, sir.

10               What happened in the United States Army

11    after you returned to the continental United

12    States?

13         A.    It was almost more interesting than

14    Vietnam.  I, I ended up running the sexually

15    transmitted disease clinic at Fort Dix, New Jersey.

16         Q.    How did you get selected for that role?

17         A.    The civilian who had done it for 25

18    years was retiring, and they needed someone to fill

19    in until they could hire another civilian.  And the

20    Colonel in charge of epidemiology saw that I had a

21    master's degree and said we got a job for you.  And

1    so that's what I did for my last seven months, a

2    one man clinic.

3         Q.   Interesting.  And did you achieve the

4    rank of a noncommissioned officer?

5         A.   I was an E-5 when I separated from the

6    Army.

7         Q.   Okay.  And was that your first exposure

8    to epidemiology?

9         A.   It was, yeah, yeah.  It actually changed

10   my career path.  That's when I decided that I

11   wanted to specialize in statistics rather than a

12   more theoretical area of mathematics.

13        Q.   Okay.  So what happened after you were

14   discharged from the United States Army?

15        A.   I went back to Davis, and in 1974 I got

16   a Ph.D. in mathematics.  They did not offer a Ph.D.

17   in statistics at that time, but I took all of the

18   statistics and probability courses that they did

19   offer.  And shortly after my degree, I was hired by

20   the National Cancer Institute in Bethesda, Maryland

21   as a mathematical statistician.

CONFIDENTIAL

Page 31

1       Q.    Did you serve as an adjunct professor

2   while you were earning your Ph.D.?

3       A.    I, I had a, I had a job just to meet

4   expenses.  I actually worked with the veterinary

5   school.  The veterinary school had a program, a

6   master's degree in preventive veterinary medicine,

7   and they needed someone to run the statistics labs.

8   And I did that for the entire time I was there in

9   graduate school.

10      Q.    So I see your CV references employment

11  as an associate in biostatistics.

12      A.    Yes.

13      Q.    Is that what you're referring to?

14      A.    That's what it was called.  But it was

15  basically just a -- running the stat labs for the

16  professors that taught the course.

17      Q.    And did you provide a thesis in

18  connection with your Ph.D.?

19      A.    I did.

20      Q.    What was the subject matter?

21      A.    It was -- I must say like most theses

CONFIDENTIAL

Page 32

1       it's -- it was not exactly a world champion, but it

2       was asymptotic properties of maximum likelihood

3       estimators and some results in nonlinear

4       regression.

5               Q.    That's identified in your CV too.

6               A.    That's identified on the CV.

7               Q.    Okay.  So I think you mentioned that you

8       went to work for the National Cancer Institute

9       after you earned your Ph.D.

10              A.    That's right, almost immediately after.

11              Q.    Okay.

12              A.    Started in July of 1974.

13              Q.    What did that work entail, sir?

14              A.    Well, I was assigned to the mathematical

15      statistics and applied mathematics section.  And

16      we -- our job was twofold.  One was to do

17      mathematical research, develop statistical methods

18      that were useful in cancer research.  But equally

19      important we were to consult with researchers all

20      around, in any laboratory, whatever setting.

21      Anybody at the Cancer Institute that needed help

CONFIDENTIAL

Page 33

1    with statistics we were there to help them out.

2         Q.   And National Cancer Institute, is that a

3    governmental organization?

4         A.   Right.  It's part of the National

5    Institutes of Health.

6         Q.   Okay.  And where is it located?

7         A.   Bethesda, Maryland.

8         Q.   Okay.  And over what time period did you

9    remain employed with the National Cancer Institute?

10        A.   Until 2002.

11        Q.   Okay.  And did your position change at

12   all from the time you started in 1974 until 2002?

13        A.   Well, the first two years I was not in a

14   permanent position.  It was like a postdoc

15   position.  So then when I got out on the GS,

16   that's, you know, the lowest level, and then I

17   worked my way up, and eventually the last eight

18   years I was the -- I was a section head.

19        Q.   A section head of what?

20        A.   At that -- the name had changed.  It was

21   now the statistical research and application

1    section in the biostatistics branch of the Cancer

2    Institute.

3         Q.   Okay.  Why don't you describe generally

4    the type of work that you performed for the

5    National Cancer Institute.

6         A.   Well, it was a variety of things.  Of

7    particular relevance to the glyphosate papers, the

8    first three years I was there my -- one of my first

9    assignments was to work with the division that was

10   responsible for doing the mouse and rat studies,

11   carcinogenicity studies, where rodents were fed

12   different chemicals and followed for two years to

13   see if they developed cancer.

14        And at that time the National Cancer

15   Institute still had the responsibility for doing

16   that.  About four years later that was transferred

17   down to the National Toxicology Program.  But in

18   that regard, I mean, I participated in the

19   evaluation of dozens of chemicals and writing the

20   technical reports reporting the results of the, of

21   the carcinogen assays.

CONFIDENTIAL

Page 35

1          And we would meet twice a week, sit

2     around a table.  Everybody who might remotely have

3     some contribution, there were toxicologists,

4     veterinarians, exposure experts, and we would go

5     through the numerous tables that were generated,

6     data tables, generated by each study.  And we would

7     come to a consensus as to whether or not the

8     chemical caused cancer or not, and we'd write the

9     technical reports.

10          Q.   Okay.  And were those technical reports

11     then published?

12          A.   They were, they were published.  I mean,

13     they're available as government documents with blue

14     cardboard covers.  I mean, I think you can probably

15     find some still at -- in certain libraries that --

16     if such libraries exist.  I know the library at NIH

17     is basically all computer now.  But no, they were,

18     they were documents that were published.

19          Q.   In the course of that work did you

20     become familiar with analyzing and assessing animal

21     studies?

Page 36

1          A.    Oh, absolutely.  I mean, it was hands-on
2     looking at, as I said, there's numerous tables for
3     every study, looking at, you know, the amount of
4     food consumed by each animal, weight gain, survival
5     and the pathology.  When they died, every organ was
6     looked at to see if there was evidence of cancer.
7     So I got a lot of hands-on experience.
8               I also at this time was, during the
9     whole period, writing statistical papers,
10    developing methods for analyzing rodent carcinogen
11    assays.  And, in fact, because of my experience and
12    my papers, the International Agency for Research on
13    Cancer asked me to co-author their text on how to
14    analyze animal carcinogen bioassays.  So I'm a
15    co-author.
16              I should point out that there's -- IARC
17    is a -- is part of the World Health Organization.
18    And their goal -- their purpose is to promote and
19    conduct research into the causes of cancer.  They
20    have several programs.  The one of greatest
21    interest to glyphosate is the IARC Monographs

CONFIDENTIAL

Page 37

1      Program that publishes monographs reporting on how

2      they classify different agents as to their

3      carcinogenic potential.

4              But they also have a separate scientific

5      monograph series.  And I co-authored Volume 79 in

6      that scientific monograph series on how to analyze

7      rodent carcinogenicity assays.  So I know how to

8      analyze them, and I have extensive experience

9      actually doing it.

10          Q.   If you look at your bibliography,

11     Exhibit T-6 --

12          A.   Uh-huh.

13          Q.   -- do you see in there the publication

14     that you authored for IARC?

15          A.   I'll find it.  It was in 1986.  Yes,

16     it's reference No. 74 in my bibliography.  John

17     Gart was the first author, Statistical Methods in

18     Cancer Research, Volume III, The Design and

19     Analysis of Long-term Animal Experiments.

20          Q.   Okay.  And do you know how it was that

21     IARC came to select you for that role?

Page 38

1          A.   No.  I mean, everybody -- there were

2      four other co-authors, and all of us had extensive

3      experience in terms of actually analyzing these

4      rodent studies.  As you might expect from IARC,

5      they were from all around the world, Canada,

6      England, Germany and the United States.

7                    MR. VALES:  I'll have that marked.

8                    (Whereupon, Deposition Exhibit T-7,

9      Statistical Methods in Cancer Research, Volume III,

10     The design and analysis of long-term animal

11     experiments, marked.)

12          Q.   Sir, I've just handed you Exhibit T-7

13     for identification, a document titled Statistical

14     Methods in Cancer Research, Volume III, The design

15     and analysis of long-term animal experiments from

16     the International Agency for Research on Cancer.

17          A.   Yes, that's, that's Volume 79.  That's

18     the text I co-authored.

19          Q.   Okay.  And you recognize this as a copy

20     of that document --

21          A.   Yes.

CONFIDENTIAL

Page 39

1          Q.   -- a true and accurate copy of that

2     document?

3          A.   Yes.

4          Q.   It's fairly lengthy, I see.

5          A.   Right.  We -- there's a lot of the

6     different aspects of these studies to consider, and

7     different people are experts in different areas.

8     It's not the textbook I would have ended up with,

9     but you have to make concessions when you got four

10    co-authors.

11         Q.   Got it.  And so also -- looking again at

12    your bibliography, Exhibit T-6 for identification,

13    I see on there that you did -- that there are

14    articles predating the IARC publication involving

15    the analysis of animal studies like --

16         A.   Right.

17         Q.   -- for example, item 12 on your

18    bibliography?

19         A.   Yeah, right.  Item 8.  I mean, there's

20    several.  In other words, it was my whole body of

21    work that I'm sure led IARC to ask me to co-author

1    the Volume 79 in their scientific monograph series.

2         Q.   Okay.  And if we went through your --

3    how many articles are referenced in your

4    bibliography, sir?

5         A.   I think it's 322.

6         Q.   And if we went through there, if we went

7    through each item, you could identify all of the

8    articles --

9         A.   Right.

10         Q.   -- which address your work in connection

11    with animal studies.

12         A.   Yeah.  There would, there would be

13    probably 20 or more various aspects.

14         Q.   Okay.  Have you also any experience

15    working on human epidemiology, epidemiological

16    studies?

17         A.   Yes.  In fact, I mean, I had a

18    fascinating career at NCI.  After the animal

19    studies moved down to the National Toxicology

20    Program, for the next seven or eight years I

21    primarily -- my consulting was with laboratory

Page 41

1   scientists on all areas, DNA repair mutation,

2   immunology, almost everything you could imagine.

3   It was fascinating.  I learned a lot of biology in

4   that time.

5            And then for the last 15 years the

6   division had changed names to the Division of

7   Cancer Epidemiology.  And so almost everything I

8   did from that point on was related to epidemiologic

9   studies.  And I was, in fact, involved in the

10  design, analysis, writing papers for some of the

11  really important large studies that the National

12  Cancer Institute did.

13           For example, the case-control study of

14  childhood leukemia and magnetic fields from power

15  transmissions lines, the case-control study of cell

16  phones and brain cancer, the ALTS trial, which

17  looked at human papilloma virus testing and how it

18  could be useful in diagnosing cervical cancer.

19  That ended up to be a very influential study.  And

20  then the last large study I worked on was the

21  Agricultural Health Study.

CONFIDENTIAL

Page 42

1        Q.   What is the Agricultural Health Study?

2        A.   It's a cohort study of 55,000 or so

3    farmers in Iowa and North Carolina, and the prime

4    goal was to study whether pesticides might be

5    associated with cancer risk.  So these farmers were

6    recruited when they went in to take the exams or

7    courses on -- to be licensed to be pesticide

8    applicators, which assured that most of the people

9    in our farmer cohort actually used pesticides

10   and --

11       Q.   Where were the farmers located?

12       A.   Iowa and North Carolina.

13       Q.   And what was your role in connection

14   with the Agricultural Health Study?

15       A.   Just a statistician.  I was involved in

16   designing the study.  I was involved in -- I

17   actually co-authored a couple of the earliest

18   papers based on the Agricultural Health Study

19   and --

20       Q.   Was that so -- are those identified in

21   your bibliography?

CONFIDENTIAL

Page 43

1          A.    Yeah, yeah, they would be.

2          Q.    So if you look at your bibliography, do

3     you see any in here that reference your work in

4     connection with the Agricultural Health Study?

5          A.    Yeah.  Actually, the first one would

6     probably be 220, which I believe was maybe the

7     second study actually published on this, and that

8     was looking at the reliability of reporting.

9          Q.    How about item 160?

10         A.    160.  Oh, yeah, that's the study that

11    was the second one.  That was looking at the

12    reliability of the, of the people who returned

13    questionnaires by mail.

14         Q.    Okay.

15         A.    There were so many pesticides they

16    wanted to ask about that they could only ask about

17    a certain number in the first enrollment

18    questionnaire.  So then they sent home

19    questionnaires asking people to mail them back in

20    that asked for the additional pesticides.  And

21    that -- this particular paper looked to see if

Page 44

1        there were any major differences in those people

2        that returned the questionnaires compared to those

3        that did not.

4                Q.    Okay.  How about item 230?

5                A.    Yes, that was -- actually, I was working

6        on this paper when I left NCI, and this was the

7        first paper that actually published on a specific

8        cancer and associations with every individual

9        pesticide for which questions were asked on the

10       questionnaire.  And this was prostate cancer, as

11       you might expect, because it's primarily an older

12       male population.  And it was published in the

13       American Journal of Epidemiology.

14               Q.    I see that you had several co-authors on

15       that publication.  Do you see that?

16               A.    Yes, I do.

17               Q.    One of them I see is Aaron Blair.

18               A.    Yes.

19               Q.    Who is Mr. Blair?

20               A.    Aaron Blair was at that time, he was the

21       head of the occupational epidemiology branch in the

CONFIDENTIAL

Page 45

1    same division I was in, the Division of Cancer

2    Epidemiology.  He had a long-term interest in -- I

3    mean, he grew up in Kansas.  He had a long-term

4    interest in studying pesticides and cancer risk.

5         Q.    Okay.  And was Dr. Blair involved with

6    the IARC Monograph Program for glyphosate to

7    knowledge?

8         A.    Yes.  He chaired the working group that

9    evaluated glyphosate.

10        Q.    Okay.  I'll take a step back.  Have you,

11   have you reviewed anything in preparation for your

12   deposition today, any documents or anything of that

13   nature?

14        A.    No, I really -- I mean, I know my papers

15   inside out, and so since that's the purpose for my

16   being here, you know, that's -- basically I've done

17   very little review.  I don't know how I could

18   possibly review but --

19        Q.    And in the preparation of your papers,

20   did you study the IARC monograph on glyphosate?

21        A.    Oh, yes, yeah, although not when it

1      first came out.  I mean, I really -- glyphosate

2      itself was never of any particular interest to me.

3      But in September of 2016 was the first time that I

4      looked at it.  And very very quickly it occurred to

5      me there was some serious problems with the

6      deliberations they did, particularly with regard to

7      rodent studies.

8            Q.   And so since that time, have you

9      reviewed any of the testimony in the various

10     litigations that have been brought?

11           A.   I've read two depositions, one by -- one

12     of Christopher Portier, I think it was in September

13     of 2017, and one of Aaron Blair.

14           Q.   Do you know -- how did you go about

15     getting those transcripts?

16           A.   They were available online.  One was --

17     I think I got Christopher Portier's from the

18     anti-pesticide, anti-GMO lobby group U.S. Right to

19     Know.  They posted it.

20           Q.   Okay.  Okay.  Turning back to your work

21     in connection with the Agricultural Health Study,

CONFIDENTIAL

1    over what time period did you work on that?

2           A.    Hold on.  It would have started a couple

3    years before that first paper that you mentioned.

4    Was that 160 or 130?

5           Q.    I believe I referenced 160.

6           A.    Yeah.  So it would have been around

7    1995, and up until I left NCI in 2002 I was heavily

8    involved in various aspects of the study.

9           Q.    Okay.  Did you publish a paper

10   pertaining to the Agricultural Health Study after

11   you left NCI?  And I'm referring to item 250.

12          A.    I was co-author on, I think, maybe two

13   papers after the fact.  They were papers that we

14   started work on before I left NCI, but they were

15   then published after I left.  And they were kind

16   enough to include me as a co-author because I

17   contributed scientifically to the papers.

18          Q.    Again, I see on item 250 that Dr. Blair

19   is a co-author.

20          A.    Yes, Dr. Blair.  And Dr. Blair and

21   Dr. Alavanja would have been co-authors on almost

1      every paper because they were the principal

2      investigators.  They were the NCI people sort of in

3      charge of the study.

4               Q.   Dr. Blair was a principal investigator

5      of the Agricultural Health Study?

6               A.   Yes, yes, he was.

7               Q.   Okay.  And likewise, Alavanja as well?

8               A.   Michael Alavanja, yes.

9               Q.   Okay.  Okay.  So certainly they would

10     be, they would be aware of the results of the

11     Agricultural Health Study?

12               A.   Yes, as much as anybody.

13               Q.   Okay.  What caused you to leave the NCI?

14               A.    It just felt like it was time.  I was

15     growing a little bit unhappy with the work ethic of

16     a lot of the people at NIH.  People tend to get,

17     you know, sort of lazy if they don't have to do

18     work.  So I just thought it was time.  Plus I

19     wanted to see what it was like to work in a small,

20     small business.

21               Q.   So where did you go?

CONFIDENTIAL

1        A.   I went to a company called the

2     International Epidemiology Institute, which was

3     founded by Bill Blot, who is the CEO, and he was my

4     branch chief and my supervisor before he left to

5     start this company, and Joe McLaughlin, who was an

6     epidemiologist, very well-known around the world.

7     And Bill, Bill Blot is a statistician, but he's as

8     much an epidemiologist as he is a statistician.  So

9     they founded the company, and they asked me if I

10    would be interested in coming to work for them, and

11    I said yeah, let's give it a shot.

12        Q.   And over what time period did you work

13    with the IEI?

14        A.   From 2002 to June 30th of 2016.

15        Q.   Okay.  And could you describe the work

16    that you performed with International Epidemiology

17    Institute?

18        A.   Right.  My, my title was Biostatistics

19    Director, and I was involved in almost, or I can't

20    say almost every, but many of the large projects

21    that they worked on.  The largest project and by

Page 50

1          far the biggest in terms of time and money was the

2          Southern Community Cohort Study, which is a cohort

3          study of 85,000 largely poor people living in the

4          south, and two-thirds of the cohort is

5          African-American.

6                    And this is a grant from the National

7          Cancer Institute, and I'm sure the reason it was

8          approved is that this, this is a very understudied

9          population, especially at the time that this study

10         went into effect.

11                   And again, I was involved in giving

12         advice, writing papers, designing studies within

13         the Southern Community Cohort Study.  And we did

14         other studies as well.  We did studies -- for

15         example, I was directly involved in a study for the

16         Air Force of the radar facility on Cape Cod.

17                   A whistle blower had convinced several

18         people in the community that this radar facility

19         was causing disease in their community.  So along

20         with John Boyce, who is one of the world's experts

21         in radiation epidemiology, we did a study to see if

Page 51

1    there was any evidence that this radar facility was

2    causing cancer and other diseases.

3            And we also did work for corporations,

4    did work for Lockheed, a cohort study of their

5    workers, General Electric, the silicone companies

6    that manufactured wafers, silicone wafers for

7    computers.  So it was, it was very interesting to

8    me because a lot of the studies involved things

9    other than cancer, and I had been working in cancer

10   my whole life.  But as a biostatistics director I

11   was primarily involved in statistical analysis and

12   people asking questions about -- related to

13   statistics.

14           Q.   During this time period, did you also

15   have an appointment at Vanderbilt University?

16           A.   Yes, yeah.  I was a professor of

17   medicine at Vanderbilt, but this was strictly for

18   Vanderbilt's benefit.  They, they could count my

19   papers as -- on their bibliography.  They didn't

20   pay me any money.  I only gave a couple lectures

21   down at Vanderbilt.  I mean, I wasn't really a

Page 52

1        teaching professor, but that's how that worked out.

2               Q.   Okay.  And during your time period with

3        IEI were you always an employee?

4               A.   Yes, always an employee on salary.

5               Q.   Okay.  Did, to your knowledge -- strike

6        that.

7               Was your experience with IEI your sole

8        private employment since graduating from --

9               A.   Yes.

10              Q.   -- with your Ph.D.?

11              A.   Yes.

12              Q.   Okay.  And during your employment with

13       IEI, did you, did you or the company do any work

14       with Bayer?

15              A.   No.

16              Q.   Okay.  During that time period, did you

17       or the company do any work with Monsanto?

18              A.   No, we did not.

19              Q.   Okay.  During that time period, did you

20       ever have a meeting with anyone from Monsanto?

21              A.   I met with a lawyer in September of 2016

CONFIDENTIAL

Page 53

1      related to -- it was related to IARC, and I'm sure

2      that it was because we had had this debate for

3      years with IARC, and the concern of the lawyer who

4      represented Monsanto was, you know, how is it

5      possible that when every other agency around the

6      world has evaluated glyphosate, has concluded that

7      it's not a carcinogen, how is it possible that IARC

8      would come to a different conclusion.

9              So the discussion was about aspects of

10     the IARC Monograph Program that might explain this.

11     One, for example, is their evaluation of hazard

12     rather than risk, at least at that time.  I believe

13     they have changed it now, so the title of their

14     monographs now says risk instead of hazard.

15             It was -- the discussion was entirely

16     about procedures at IARC, how they chose members

17     for the working groups that evaluated these, what

18     were their criteria for membership, what were their

19     criteria for determining whether an agent is a

20     carcinogen.

21             Q.   Okay.  Did you -- was there any

Page 54

1    compensation provided for that meeting?

2         A.   The company I worked for, IEI, was paid

3    $750 for my -- it was a three-hour meeting roughly,

4    and they were paid $750.

5         Q.   Did you personally receive any

6    compensation for that meeting?

7         A.   No.  As I said, I was on salary, and by

8    that time I wasn't receiving a bonus at the end of

9    the year.  So I received no compensation at all

10   from the meeting.

11        Q.   To your knowledge, was there any other

12   compensation provided beyond that $750?

13        A.   Bill Blot, the CEO, participated in the

14   same meeting, so he also received $750, which went

15   to IEI.

16        Q.   Okay.  So total payments to IEI were?

17        A.   $1,500.

18        Q.   Okay.  Okay.  Do you know whether IEI

19   ever was paid additional amounts from Monsanto?

20        A.   No.  I asked our, I asked our

21   administrator about both Bayer and Monsanto.  I was

1        actually -- I thought we might have done work for

2        Bayer because one of the main topics when I first

3        got to IEI had to do with over the counter

4        analgesics and in particular acetaminophen, but

5        also aspirin, NSAIDs, whether they caused disease.

6        So I thought, you know, I was sure that somewhere

7        in there Bayer might have been involved, but she

8        looked, and we never received anything from Bayer.

9             Q.    Have you ever received a dollar of

10       personal compensation for any work that you've

11       performed relative to glyphosate or IARC?

12            A.    Not at all.  Since I retired in June of

13       2016, I have not received any compensation for any

14       of my scientific efforts, nor do I intend to in the

15       future.

16            Q.    Why is that?

17            A.    Because as soon as I receive money, for

18       example, from Monsanto, my scientific efforts

19       become tarred.  He's got a conflict of interest.

20       Of course, he's writing this or that.  And since

21       my -- I really don't have a dog in the fight with

1       regard to these glyphosate lawsuits.  My argument

2       is with the International Agency for Research on

3       Cancer.  And I need to win that battle in the

4       scientific literature.  And to do that I've got to

5       be, you know, clean.  I can't accept any money from

6       industry.

7              Q.   Okay.

8              A.   IARC is very good at casting aspersions

9       on people that disagree with them by claiming they

10      have a conflict of interest.

11                  MR. VALES:  Okay.  Why don't we take a

12      break there.

13                  MR. BRADY:  Are you about done, John?

14                  MR. VALES:  No, I'm not about done.

15      It's a break.

16                  THE VIDEOGRAPHER:  We are going off the

17      record.  The is the end of media unit No. 1.  The

18      time is 10:51 a.m.

19                       (Recess.)

20                  THE VIDEOGRAPHER:  We are back on the

21      record.  This is the beginning of media unit No. 2.

Page 57

1    The time is 11:10 a.m.

2         Q.   Dr. Tarone, before the break you

3    described a meeting that you attended for which the

4    Institute of Epidemiology received a payment of

5    $1,500.  Do you recall that meeting?

6         A.   That's correct.

7         Q.   In that meeting you met for about three

8    hours with the lawyer or lawyers from Monsanto?

9         A.   A lawyer, yeah.

10        Q.   Okay.  You said you did not receive any

11   compensation personally for that meeting.

12        A.   No.

13        Q.   And you have not received any

14   compensation since that meeting.

15        A.   No.

16        Q.   Okay.  Did you ever meet subsequently

17   with any Monsanto lawyers after that meeting?

18        A.   Yeah.  There was about a two-hour

19   meeting a few weeks later in our office, the same

20   lawyer and two younger lawyers, and it was

21   basically a statistics seminar.  And I did not

Page 58

1        invoice for it.  It was just -- I mean, I love

2        teaching statistics.  For me it was a pleasure to

3        talk about various aspects of statistical analysis,

4        particularly as they applied to the glyphosate

5        study, things like exact tests versus continuous

6        tests, one-sided p-values versus two-sided

7        p-values, multiple comparisons and the problems of

8        handling the fact that in these animal studies for

9        males and females each 20 different organs are

10        looked at and you're bound to have a few false

11        positives pop up from time to time.  The difficult

12        thing is to determine what's a likely false

13        positive and what may be a true effect of the

14        chemical agent.

15            Q.    Is that a common issue that you see in

16        animal studies --

17            A.    Yes.

18            Q.    -- are false positives?

19            A.    Yeah.  And not just animal studies.

20        It's also common in epidemiology, some of the

21        agricultural health studies where you're looking at

Page 59

1    50 pesticides and one cancer or sometimes you look

2    at one pesticide and, you know, 30 different types

3    of cancer.  So there are multiple statistical

4    analyses.  Almost always there's one or two that

5    pop up as looking interesting, and you have to

6    decide are they likely false positives or are they

7    true effects.

8         Q.   How do you decide that?

9         A.   It's difficult.  It's a case by case

10   situation.  And the ideal situation, of course,

11   when you have a questionable effect is to have a

12   replicant experiment.

13        Q.   What's a replicant experiment?

14        A.   It's an experiment that essentially as

15   close as possible tries to replicate the study that

16   you have this, you know, marginal result.

17        Q.   Okay.  Is having replicant experiments

18   of value to you as a mathematical statistician?

19        A.   It's of great value.  It's the gold

20   standard in science.  If you have, if you have a

21   finding that's marginal and you don't know how to

Page 60

```
 1        interpret it, you can argue forever about the

 2        strength of the evidence, the p-value and whatnot.

 3        The way to solve it, the way to answer it is to

 4        have a replicant study and see if this marginal

 5        result replicates or if it goes away.  And more

 6        often than not it goes away.

 7              Q.   What happens if it goes away?  Then what

 8        do you conclude?

 9              A.   Then you conclude that the original

10        result was probably a false positive.  John

11        Ioannidis at Stanford published a famous paper back

12        in 2005 on why most published research findings are

13        false.  That was the title of the paper.

14                   And, in fact, that's true.  Most

15        published research findings are false.  Most of the

16        headlines you see in the paper are, in fact, false.

17        And it's very difficult sometimes to tease out true

18        positives from false positives.

19              Q.   Okay.  Did you ever have any

20        communications with anyone employed by Monsanto

21        separate and apart from the meetings you just
```

Page 61

1          described?

2               A.   Yes.   I had contact with a scientist.

3          I'm not sure exactly what type of scientist he was.

4          His name is David Saltmiras, I believe is how you

5          pronounce it.  When I read the IARC glyphosate

6          chapter and discovered what I saw were serious

7          problems, I noticed that they -- IARC cited in the

8          reference list a paper by Greim, G-r-e-i-m, and two

9          co-authors.  Saltmiras was one of the co-authors.

10               And it said it was a review study of all

11         the rodent studies on glyphosate.  And since I

12         wanted to see what the tumor rates were for

13         these -- there were several that were excluded from

14         the glyphosate monograph.  And so I bought this

15         paper from Critical Reviews in Toxicology where it

16         was published.

17               And reading it I saw that there were

18         supplemental tables that contained the tumor rates,

19         the summary tumor rates for all of the studies they

20         looked at.  And this, of course, is exactly what I

21         wanted.  A lot of the tables that were in the paper

CONFIDENTIAL

Page 62

1     did not contain the information I was looking for,

2     but the supplementary material I wanted.

3             So I tried to download it from the site,

4     the journal site, where I had bought the paper, and

5     I was unsuccessful.  So I sent an e-mail to

6     Saltmiras.  Since he's a co-author I figured he

7     could just send me a PDF of the tables, the

8     supplementary material.  And before he could reply,

9     I figured out how to download them from the journal

10    site.

11         Q.   You figured out how to download the

12    supplementary tables?

13         A.   The supplementary tables, right.

14         Q.   So did you end up communicating with

15    Mr. Saltmiras?

16         A.    I did because as I was reviewing these

17    tumor tables from the two mouse studies, I noticed

18    that for one of the tumors of interest, which was

19    hemangiosarcomas, that the other study, the other

20    mouse study reported hemangiomas and

21    hemangioendotheliomas as opposed to hemangiomas and

Page 63

1       hemangiosarcomas.

2                   And not being a pathologist I wondered

3       about this, so I contacted Saltmiras and asked him

4       if he could put me in touch with a pathologist who

5       could answer my question because I was doing a

6       review, a summary review, and I wanted to know if

7       there was a difference.  And he gave me the name of

8       a pathologist.  I think his last name was Thake,

9       T-h-a-k-e.

10                  And I called him and he said well, some

11      pathologists consider them to be different,

12      consider the hemangioendotheliomas to be less

13      malignant than hemangiosarcomas, but he said for

14      your purpose you can consider them to be the same

15      thing.

16                  So I did, although I did note in the

17      paper that the hemangiosarcomas, I was using

18      hemangioendotheliomas in the other mouse study,

19      calling them hemangiosarcomas.

20           Q.   And we'll get to that in a little bit

21      here.

Page 64

1      A.   Right.  And then there was one later

2   phone call from, from him, and I think he was

3   feeling me out, if I would be interested in going

4   to, of all places, Helsinki, Finland to defend

5   glyphosate.  At that time Europe was having

6   meetings all across Europe, people wanting to ban

7   glyphosate, and he was curious if I would go

8   defend, and I said no.

9      Q.   Why not?

10     A.   I'm not going to take any money from any

11  company.

12     Q.   Was he offering to pay you?

13     A.   Oh, I would hope so.  I mean, I don't

14  think he would expect me to pay my way to Helsinki.

15  I didn't ask him.  I didn't ask what, you know,

16  what's the, what's the remuneration.  I just said

17  no.

18     Q.   So even if it was just reimbursement of

19  your travel expenses, you wouldn't have accepted

20  that?

21     A.   No, no.

1          Q.    Okay.   You referenced the Greim paper

2       and a data supplement.

3          A.    Yes.

4               MR. VALES:   I want to show those to you

5       now.   Please mark the paper and the supplement.

6               (Whereupon, Deposition Exhibit T-8,

7       Evaluation of carcinogenic potential of the

8       herbicide glyphosate, drawing on tumor incidence

9       data from fourteen chronic/carcinogenicity rodent

10      studies, marked.)

11              (Whereupon, Deposition Exhibit T-9, H.

12      Greim supplement, marked.)

13         Q.    So, sir, I've handed you what's been

14      marked for identification as T-8 and T-9.   T-8, do

15      you recognize what that is, sir?

16         A.    Yes.   That is the Critical Reviews in

17      Toxicology review paper that was referenced in the

18      IARC monograph and that I purchased from, from the

19      journal.

20         Q.    And who are the authors of that paper,

21      sir?

CONFIDENTIAL

Page 66

1          A.    Helmut Greim, David Saltmiras, Volker

2     Mostert and Christian Strupp.

3          Q.    Okay.  And does this paper indicate a

4     history of when it was received by the journal?

5          A.    Yeah, I'm sure it does.  They routinely

6     do.  It was received 6 November 2014, and it was

7     revised 19 December 2014, accepted 28 December and

8     was published in February of 2015.

9          Q.    Okay.  And then turning to T-9, the data

10    supplement, I referenced that there is a table of

11    contents on top of this document that was prepared

12    by Ms. Anderson's law firm.  It has 14 tabs

13    referring to 14 studies.  Do you see that, sir?

14         A.    Yes.

15         Q.    And does this appear to be the Greim

16    data supplement you referenced earlier?

17         A.    This is.  Now, I didn't print out all of

18    these.  I only printed out the ones that were

19    relevant to the evaluation of the glyphosate

20    chapter in Monograph 112, the two mouse studies and

21    three rat studies.

Page 67

1          Q.   Okay.  And looking at Exhibit tab 10,

2     and tab 11, do those appear to be true and correct

3     copies of the two mouse studies that you

4     considered?

5          A.   As near as I can tell.  Of course, I

6     mean, as I said, the tables that these studies

7     generate are enormous, but it certainly looks to be

8     the two, the two studies.

9          Q.   Okay.  And then getting back to

10     Mr. Saltmiras, is that someone you've remained in

11     contact with over the years?

12          A.   No.  I believe the last time I talked to

13     him was with regard to the Helsinki, Finland trip.

14     I can't say for certain that I didn't get another

15     call or an e-mail maybe, but I certainly don't

16     remember it.  And it would have been related to

17     science, not related to any company business.

18          Q.   Did Mr. Saltmiras ever invite you to

19     speak at a conference in Washington, D.C.?

20          A.   Yes, he did.  The crop -- I think it's

21     the CropLife America.  It's an association that's

1      affiliated with, you know, agribusiness and asked

2      me if I would be interested in talking to them

3      about the IARC Monograph Program because all of

4      these companies would likely have problems similar

5      to the one with glyphosate in the future.

6              And he wanted me to speak before their

7      Risk Assessment Committee, scientists from the

8      various companies that dealt in human and animal

9      risk assessment so -- and I agreed to do it.  And I

10     took the subway down, was paid nothing, paid my own

11     way, bought my own coffee, gave my one hour talk

12     and left.

13         Q.   Okay.  Sir, have you also testified

14     before the United States Congress?

15         A.   Yes.

16         Q.   Describe for us when that occurred and

17     what that involved.

18         A.   I was asked to testify before the House

19     Science, Space and Technology Committee regarding

20     IARC.  This was at a time when the House was

21     considering withholding funding because of problems

1    they perceived with the IARC Monographs Program,

2    including the glyphosate but not specifically to

3    glyphosate.

4              And so I was asked to testify, along

5    with, I think, five other people.  A representative

6    of the US EPA was there.  There was a -- I don't

7    remember all the names of the other witnesses, but

8    next to me was Jennifer Sass, who's an

9    environmental activist, so she was definitely the

10   democrat's person on the committee.  But it was an

11   interesting experience.

12        Q.   Were you there on behalf of a particular

13   committee or interest?

14        A.   No, no.  They contacted me because of my

15   papers.

16              MR. VALES:  Okay.  If we could -- I'd

17   like to have this marked please.

18              (Whereupon, Deposition Exhibit T-10,

19   pages 77-119 of Hearing Before the Committee on

20   Science, Space, and Technology dated 2/6/18,

21   marked.)

Page 70

1          Q.    Sir, I've handed you what's been marked

2     as Exhibit T-10 for identification.  It is a record

3     of testimony before the United States Congress on

4     February 6th, 2018.  It includes pages 77 through

5     104, pardon me, 77 through 119, 77 through 119 of

6     that record.  And it appears to include your

7     written remarks, your testimony and question and

8     answer with congressional members --

9          A.    Uh-huh.

10         Q.    -- and some follow-up information you

11    provided.  Is that correct?

12         A.    That's what it appears to be.  I must

13    say I've never seen this.  I didn't bother to

14    download it after I had my appearance.

15         Q.    Okay.

16         A.    I knew what I had said so --

17         Q.    On the front page it says it's available

18    via the worldwide web?

19         A.    Right.  I'm sure Congress has to make

20    all such things available.

21         Q.    Okay.  If we turn to page 77 --

CONFIDENTIAL

Page 71

1          A.    Uh-huh.

2          Q.    -- we see that's your, your testimony

3     that you provided?

4          A.    Right.

5          Q.    And turn to page 79.  There's a paper

6     there titled Comments on the IARC classification of

7     glyphosate as a probable human carcinogen before

8     the Committee on Science, Space and Technology,

9     February 6th, 2018, Robert E. Tarone, Ph.D.

10          A.    Right.  The longer document was

11     submitted prior to the meeting.  There's a very

12     strict time limit at these committees, and once

13     your time is up, you got to be quiet.  So that's

14     why the actual testimony is much shorter.

15          Q.    Okay.  And did you prepare this written

16     paper that appears --

17          A.    Yes.

18          Q.    -- at 79 through 84?

19          A.    Entirely.  It was, it was all my work.

20          Q.    Okay.  Then I see you've included a

21     biographical sketch at page 85 through --

1           A.    That's required.

2           Q.    -- 88.  Okay.  And further testimony

3      starting at page 89.

4           A.    Right.

5           Q.    And then at page 116 --

6           A.    Uh-huh.

7           Q.    -- do you see there information you

8      provided in response to congressional inquiries?

9           A.    Correct.

10          Q.    Did you prepare that yourself?

11          A.    I did indeed.

12          Q.    Were you compensated in any regard for

13     your testimony and submission of written materials

14     to Congress?

15          A.    Not at all.

16          Q.    Were you asked by anyone to, at Bayer or

17     Monsanto, to testify?

18          A.    No.

19          Q.    Did you receive their approval or

20     permission?

21          A.    I didn't need approval or permission

CONFIDENTIAL

Page 73

1        from anybody.  I guess at this time I was still --

2        no, this was after I had retired, so I didn't need

3        to ask anyone's permission.

4                Q.    Okay.

5                A.    I took the subway down, testified and

6        took the subway back.

7                Q.    All right.  I want to shift gears a

8        little bit and talk about IARC again.  And again,

9        what does IARC stand for?

10               A.    International Agency for Research on

11       Cancer.

12               Q.    And how did IARC come about, do you

13       know?

14               A.    No, I really don't know the entire

15       history.  I know it's been around for probably

16       close to 50 years.

17               Q.    And what's its purpose?

18               A.    It's to promote and actually conduct

19       research into the causes of cancer around the

20       world.

21               Q.    And you earlier testified, in fact, that

1       you provided a -- you co-authored a written paper

2       for IARC.

3              A.    A book, a textbook, yes.

4              Q.    We have that marked in the record.  And

5       does IARC have a preamble?

6              A.    Yes, they do.  The Monographs Program

7       does.

8              Q.    And describe what that is.

9              A.    The Monographs Program, the preamble

10      sets down the various criteria for selection of

11      working group members, criteria for how they

12      evaluate animal, human data.  And the criteria for

13      how you combine the various conclusions to come up

14      with an overall classification of an agent is

15      whether it's carcinogenic, probably carcinogenic,

16      possibly carcinogenic, undetermined as to

17      carcinogenicity or unlikely to be a carcinogen.

18                   MR. VALES:  Let's have this marked.

19                   (Whereupon, Deposition Exhibit T-11,

20      IARC Monographs on the Evaluation of Carcinogenic

21      Risks to Humans, marked.)

1          Q.   Sir, I've handed you what's been marked

2     as Exhibit T-11, a copy of the preamble from the

3     IARC Monographs Program.  It's also been previously

4     marked in the case as Exhibit 15-8 during the

5     deposition of Dr. Christopher Portier of

6     September 5th, 2017.  Does this, sir, look to be

7     the preamble to you?

8          A.   Yes, it does.

9          Q.   Did you have any involvement yourself in

10     the preparation of the preamble?

11          A.   No, aside from co-authoring that

12     scientific monograph No. 79, which involved two

13     trips to Lyon to meet with the other co-authors,

14     one at the beginning and one at the ending, I've

15     had no experience with IARC whatsoever.

16          Q.   Okay.  You've described a process

17     whereby IARC considers animal studies and also

18     human studies and then identifies whether or not

19     those studies provide sufficient evidence or

20     limited evidence of carcinogenicity --

21          A.   Right.

1       Q.    -- or no evidence.

2       A.    Right.

3       Q.    Right?  Is that outlined in the preamble

4    to your knowledge?

5       A.    I'm sure it is.  I mean, I'm not sure

6    that I've read this most recent one, but I've read

7    several of the -- they update these every few

8    years.

9       Q.    So I'll refer you to page 19.

10       A.    19.  Right, right.  They start out by

11    giving the criteria for humans, sufficient,

12    limited, inadequate and then evidence suggesting

13    lack of carcinogenicity, and then that's followed

14    up with a similar for animals.

15       Q.    What do you mean a similar for animals?

16       A.    A similar description of their criteria,

17    how you're supposed to evaluate animal experiments.

18       Q.    And the criteria are again?

19       A.    Again, sufficient evidence, limited

20    evidence, inadequate evidence or evidence

21    suggesting lack of carcinogenicity.

1          Q.   Do you think those categories are

2     appropriate as just a general principle having

3     those four categories?

4          A.   I, I, I guess.  I mean, I have problems

5     with the last category both for these and for, in

6     particular, for the overall classification.

7          Q.   So you're referring to the category

8     evidence suggesting lack of carcinogenicity?

9          A.   Yeah.  It's very hard to get evidence of

10    lack of carcinogenicity.  In their overall, when

11    they make the final evaluation, their lowest

12    category is unlikely to cause cancer, and that

13    basically replies you -- requires you to have, you

14    know, nothing that even suggests an increase in

15    animals or humans.

16              And that's why there's only one agent

17    that's put in that lowest category, which

18    interestingly Joe McLaughlin and I wrote a paper in

19    Cancer Epidemiology, Biomarkers & Prevention, even

20    that one chemical shouldn't be in the bottom

21    category.  But it's almost impossible to prove that

CONFIDENTIAL

Page 78

1   something doesn't cause cancer.  Proving a negative

2   in science is, you know, just very difficult, if

3   not impossible.

4           Q.   So in your opinion, in almost all cases,

5   a chemical should fall within one of the first

6   three categories; is that correct?

7           A.   Yes, or else call your bottom category

8   something different.  I don't know what it would

9   be.

10          Q.   The first three categories, sufficient

11  evidence of carcinogenicity, 1, 2, limited evidence

12  of carcinogenicity, and 3, inadequate evidence of

13  carcinogenicity.

14          A.   Right.

15          Q.   If there was a fourth category, a bottom

16  category, you said you would come up with a

17  different title.

18          A.   Yeah.  I mean, I don't know what it

19  would be, but it would be something that's a little

20  less specific.  For example, the overall

21  classification, it says probably not carcinogenic

1    to humans.  And, you know, it's very difficult to

2    reach that conclusion.

3         Q.   Okay.  Now, do you know whether or not

4    the IARC Monograph Program requires a finding in

5    either the animal studies or the human studies in

6    one of these categories in order to support a

7    carcinogenicity?

8         A.   Right, yeah.  Generally they require

9    findings in both categories, but certainly if you

10   have sufficient evidence in human studies, then

11   that will almost always lead to a conclusion that

12   it's carcinogenic in humans.  But if you have

13   limited or weak evidence in human studies, but you

14   have sufficient evidence in the animal studies,

15   then they will conclude that it's probably

16   carcinogenic and maybe even carcinogenic.  So they

17   weight the two in a, in a specified way in the

18   preamble to come to the overall conclusion.

19        Q.   Okay.  And if we turn to page 22 of the

20   preamble, you see there that it provides the

21   identification of the group designations used by

Page 80

1          the IARC Monograph Program?

2                    A.    Right.

3                    Q.    Describe what those groups are.

4                    A.    Agent is carcinogenic to humans.

5                    Q.    That's Group 1.

6                    A.    That's Group 1.

7                    Q.    Group 2?

8                    A.    Group 2 is -- oh, it includes two.

9          There's 2A and 2B.  2A is probably carcinogenic to

10         humans.  2B is possibly carcinogenic to humans.

11         Group 3 is agent is not classifiable as to

12         carcinogenicity to humans.  And Group 4 is the

13         agent is probably not carcinogenic to humans.

14                   Q.    And again, I'll ask you, do you think

15         those categories are an appropriate way to

16         categorize and classify chemicals?

17                   A.    It's a way to do it.  The one I object

18         to is the last one because in my opinion there's

19         only one agent that should be in that last

20         category, and that's coffee because coffee has an

21         incredibly large number of epidemiological studies

Page 81

1        that actually show lower cancer risk in humans

2        to -- for coffee consumption compared to

3        nonconsumers, and yet it's not in Group 4.

4              Q.   Group 4 again is the agent is probably

5        not --

6              A.   Probably not carcinogenic, which is very

7        difficult to prove.

8              Q.   Okay.

9              A.   There's almost always -- especially if

10       something has been studied often enough, you're

11       almost always going to find a few studies where

12       there are some elevated risk estimates just by

13       chance alone.  So it's virtually impossible to get

14       into that final category.

15             Q.   Where's coffee currently reside?

16             A.   I think it -- when we wrote this paper,

17       Joe McLaughlin and I wrote a commentary in Cancer

18       Epidemiology, Biomarkers & Prevention, it was

19       either possibly carcinogenic or probably

20       carcinogenic.  And it subsequently has been dropped

21       to nonclassifiable as to its carcinogenicity to

CONFIDENTIAL

Page 82

1      humans.

2             Q.    That's Group 3.

3             A.    That's Group 3.

4             Q.    Okay.  Now, I'd like to turn your

5      attention to the IARC Monograph 112 itself.

6             A.    Could I add one thing about --

7             Q.    Go ahead.

8             A.    Yeah.  Underneath each of the -- you

9      said -- the last questions were about these

10     categories, Group 1, Group 2, Group 2A, Group 2B.

11     And if you read the first sentence under Group 2A,

12     agent is probably carcinogenic to humans, it says

13     this category is used when there is limited

14     evidence in humans and sufficient evidence in

15     experimental animals.

16            Q.    Of carcinogenicity?

17            A.    Yes.  And that's exactly what they

18     concluded with regard to glyphosate, limited

19     evidence in humans and sufficient evidence in

20     rodents.  And once they made those two decisions,

21     they had to classify it as probably carcinogenic to

Page 83

1    humans.  That's their criteria.

2         Q.   So under this criteria, after concluding

3    that there was only limited evidence of

4    carcinogenicity in humans, did indeed IARC have,

5    the working group, have to conclude there was

6    sufficient evidence of carcinogenicity in

7    experimental animals in order to justify a Group 2A

8    finding that the agent is probably carcinogenic?

9         A.   Yes, they had to do that once they said

10   the human evidence is limited.

11        Q.   What if IARC concluded that the -- there

12   was only limited evidence of carcinogenicity in

13   animals?

14        A.   It might have been 2B.

15        Q.   What's 2B?

16        A.   Possibly carcinogenic.  I mean, again, I

17   don't -- I haven't memorized the criteria, but my

18   guess is it would be 2B.  Category 2B is limited

19   evidence in humans and less than sufficient in

20   animals.  So yeah, it would have probably ended

21   up -- they probably would have classified it

Page 84

1    possibly carcinogenic.  I think there's no evidence

2    in animals, so I mean, I wouldn't even agree with

3    that classification, but that's, that's what my

4    papers are about.

5        Q.   So you wouldn't -- we'll go into it, but

6    you would not agree with classifying glyphosate in

7    either Group 2A or Group 2B.

8        A.   No.

9        Q.   Where would you put it on this -- based

10    on this analysis?

11        A.   I guess you'd have to, you've have to

12    put it in as inadequate evidence by their criteria

13    because you certainly couldn't say that there's

14    evidence that it's unlikely to be a carcinogen.

15    Such evidence almost never exists, especially for

16    glyphosate.  It's been studied in so many different

17    studies, human and rodent.

18            MR. VALES:  Okay.  Let's mark the

19    monograph.

20            (Whereupon, Deposition Exhibit T-12,

21    Glyphosate Monograph 112, marked.)

1          Q.   Sir, I've handed you what's been, I've

2     handed you what's been marked as Exhibit T-12.

3     It's a copy of the IARC Monograph 112 for

4     glyphosate.  Do you see that, sir?

5          A.   Yes, I do.

6          Q.   Have you ever reviewed this document

7     before?

8          A.   Yes, I have.

9          Q.    In what context?

10          A.    In, in the context of -- after it was

11     brought to my attention.  As I said, early on I was

12     not really concerned about glyphosate, but once I

13     started reading in the, in the press and realized

14     there was such a controversy and realizing that

15     every other agency around the world that had

16     classified glyphosate and said it's not a

17     carcinogen, I decided I better read it to see, to

18     see exactly what the evidence was that they were

19     presenting.

20          Q.   Did it take you long upon reading this

21     to have any concerns?

CONFIDENTIAL

Page 86

1          A.    No.   It was almost immediate.   I didn't

2    read the early -- the early pages of every

3    monograph deal with uses of the agent and, you

4    know, how people are exposed to it, what levels

5    they might be -- it's basically exposure

6    information.   So I started reading, I started

7    reading the rodent section.

8          Q.    Where is that?   What page does that

9    start on?

10          A.    It's around 30, page 30.

11          Q.    Okay.   So if you could, please identify

12    exactly where you started reading on page 30.

13          A.    Mouse, Cancer in Experimental Animals,

14    Mouse.

15          Q.    Is that Section 3?

16          A.    It's Section 3, and Table 3.1 is the

17    table with the data for mice.

18          Q.    Okay.   That's on page 31?

19          A.    30.   The table, yeah, the table is 31.

20          Q.    Okay.   What about the text raised

21    immediate concern for you?

CONFIDENTIAL

Page 87

1          A.   Well, the first, the first thing was the

2     sentence at the bottom of page 30, no data on

3     tumors of the kidney were provided for female mice.

4          Q.   Why was that concerning?

5          A.   Just from experience of going through

6     these studies, so many -- for so many chemicals

7     when I was at NCI, they're trying to -- what they

8     reported right before that is a very small increase

9     in renal adenomas, not even a malignant tumor,

10    benign tumors.

11          And to follow that up and say oh, no

12    data on tumors of the kidney were provided for

13    female mice so we don't know what happened, any

14    scientist on this working group should have

15    demanded to see the female data in this same study

16    because, as I said, replication is key when you've

17    got a very small increase, which they do have for

18    males.

19          And the first place you look is well,

20    did this agent given at the same high doses cause

21    the same tumors in females?  And to see a statement

1      just saying oh, well, these weren't provided to us,

2      that was the first red flag that went up.

3              And I might add that they -- the next

4      sentence says no other tumor sites were identified.

5      So even they say this small increase in renal

6      tumors in male mice is the only thing that was

7      remotely interesting in terms of possible risk for

8      glyphosate.

9          Q.   And then anything of -- were there any

10     other instances that you saw as you were reading

11     through this monograph that appeared to be missing

12     data?

13         A.   Well, the first thing that occurred to

14     me is to realize that the first results that they

15     report, which was from the original study, renal

16     adenomas, it actually really should be considered

17     as preliminary data.  So I don't know why they gave

18     it the weight they did.

19              Because the United States EPA was

20     concerned enough probably about the three renal

21     tumors and the renal adenomas in the high dose

Page 89

1       group that they convened an environmental working

2       group.  They redid the pathology.  They reevaluated

3       the slides that were cut in kidneys from the

4       original study, and they actually did their own

5       cutting of slides, did a thorough look at the

6       kidneys in these male mice, and they found one more

7       adenoma, which was -- happened to be in a control

8       group, the unexposed group, and they upgraded two

9       of -- three of the four adenomas in the original

10      study to carcinoma.

11              So now the real final data then was

12      their results were carcinoma, which was 0, 0, 1, 2,

13      going from control group to high dose group, and

14      then the combined adenoma and carcinoma, which was

15      1, 0, 1, 3.  And the first thing I did is I

16      calculated -- I went to a computer program I have

17      that calculates exact statistical tests.  The

18      conventional test for this is called the

19      Cochran-Armitage trend test.  It looks for an

20      increase in tumor rates with increasing exposure

21      level.

1           And with these small numbers you can

2       easily calculate exact p-values.  And I did not get

3       the p-values that were reported in, in this

4       chapter.  They report p-values of .037 and .034,

5       and I got p-values of .063 and .065, bigger.  And

6       just to make clear, a p-value is a measure of the

7       strength of whatever association you're looking at.

8       So in this case, it's the strength of the

9       association that glyphosate actually really did --

10      might have caused these renal tumors.

11          Q.   And is there a -- when it comes to

12      talking about p-values, is there sort of a

13      benchmark number above or below which is

14      statistically significant?

15          A.   That's a matter of great debate amongst

16      statisticians right now, whether you should use a

17      cutoff point, but, in fact, there is and has been

18      conventionally .05 has been the cutoff level.  If a

19      p-value is less than .05, then there's concern that

20      it might be a real effect and if it's greater than

21      .05 that, that there's no such concern.

Page 91

1          So when I saw that they had converted

2      p-values greater than .06 to p-values less than.04,

3      if nothing else, it's an indication that, you know,

4      they were really working really hard to try to

5      provide evidence that glyphosate caused these

6      tumors.  And it turns out this program I used to

7      calculate the exact p-values also calculates

8      approximate p-values based on the standard normal

9      distribution, which is a nice bell-shaped curve

10     that everybody is used to seeing.

11          Well, the exact distribution for these

12     trend tests, because of the very high doses at the

13     highest exposure level, are far from nice and

14     symmetric, and it's guaranteed that if you

15     calculate the continuous approximation you're going

16     to get a smaller p-value when you have a tumor

17     increase.

18          So it suggests to me that there were

19     people on the working group that were concerned

20     about concluding that glyphosate caused these

21     tumors if they couldn't get the p-values less than

Page 92

1    .05.  So they figured out a way to get them less

2    than .05.

3         Q.   Okay.  So now let me stop right there.

4    You've talked about p-values and the reporting of

5    p-values on a table on page 31 of the monograph.

6    You were specifically talking about the first study

7    reflected there, which we'll refer to as study 10

8    in the Greim supplement, right?

9         A.   Right.

10        Q.   That's study 10 of Exhibit T-9.

11        A.   Right.

12        Q.   Right?

13        A.   Yes.  That came from the original

14   laboratory that did the studies.  That was before

15   the working group evaluation.

16        Q.   And you noted that that study here, this

17   table, they report on findings for kidney tumors

18   for male mice but not female mice.

19        A.   In, in the IARC monograph, yes.

20        Q.   Right.

21        A.   The supplemental tables in Greim

Page 93

1    reported both.  And, in fact, there were no kidney

2    tumors in female mice.  They were fed the same

3    extremely high dose levels of glyphosate, and none

4    of them developed kidney tumors.

5         Q.   So you're saying that the Greim

6    supplement tables reported results for both male

7    and female mice.

8         A.   Yeah.  These technical reports that the

9    original laboratories produce have multiple tables

10   because every organ is looked at when an animal

11   dies and is sectioned and looked at by pathologists

12   for signs of cancer.  So there are multiple.  But

13   it's always the same in males and females except

14   for things likes breast and prostate, of course.

15   But for the major organs they're looked at in both

16   males and females.

17        Q.   Okay.  And these tables, do you know

18   whether or not these supplemental tables were

19   available to IARC?  Can you tell that?

20        A.   They apparently were because the IARC

21   monograph cites the Greim paper as a reference and

Page 94

```
 1        discusses it in a section on reviews immediately
 2        after they discussed the two mouse studies that
 3        they relied on.
 4              Q.    So are you referring to page 34?
 5              A.    34, Review articles, yes.  They cite
 6        Greim, et al. right off the top, and moreover --
 7              Q.    So it says, and I'm referring here to
 8        page 3 point -- pardon me, page 34, section 3.13,
 9        Review articles, you're referring, sir, to the
10        beginning of that starting Greim, et al.?
11              A.    Right.
12              Q.    What does it say?  Can you read that
13        first sentence?
14              A.    Greim, et al. have published a review
15        article containing information on five long-term
16        bioassay feeding studies in mice.  Of these
17        studies, one had been submitted for review to EPA
18        and one to JMPR.  And these are the two studies
19        that were discussed earlier in the chapter on
20        glyphosate.
21              Q.    Continue on, if you could.
```

**Exhibit D Page 94**

Page 95

1          A.    The review article reported on an

2     additional three long-term bioassay studies in mice

3     that had not been previously available.  And

4     there's more of the same, but the important thing

5     is they then go on to say the review article

6     provided a brief summary of each study and referred

7     to an online data supplement containing the

8     original data on tumor incidence from study

9     reports.

10              So they knew that they had the original

11     tumor data that supposedly wasn't provided to them

12     on female mice in that first study.  They had the

13     data available.

14          Q.    Okay.  Is the Greim paper and supplement

15     referred to elsewhere in the IARC monograph to your

16     knowledge?

17          A.    It may be referred to in the rat.  I

18     mean, I just --

19          Q.    So, for example, on page 35, the top

20     full paragraph on the left, the last sentence, do

21     you see that, beginning the working group was

CONFIDENTIAL

Page 96

1    unable to evaluate this study?

2         A.   Right, because of limited experimental

3    data provided in the review article.  So I guess

4    they're referring to the Greim review article and

5    supplemental information.

6         Q.   And do you see that sentence again, it

7    appears at the end of the paragraph immediately

8    before Section 3.2?

9         A.   Yes.

10        Q.   It says again the working group was

11   unable to evaluate the study because of limited

12   experimental data provided in the review article

13   and supplemental information.

14        A.   Yes.  They were trying -- they were

15   justifying the fact that they only relied on two of

16   the studies, mouse studies, in the Greim paper and

17   were explaining that they didn't use the other

18   studies in the Greim paper, mouse studies, because

19   they did not consider the data to be sufficient.

20        Q.   And does the IARC monograph include a

21   reference section at the end?

Page 97

```
 1              A.    Yes.

 2              Q.    And does it make reference to your

 3       knowledge to the Greim paper?

 4              A.    Yeah, it's referenced.

 5              Q.    Okay.  Is that on page --

 6              A.    That's where I, that's where I first

 7       discovered it.

 8              Q.    Is that on page 84 of the monograph?

 9              A.    Yes.

10              Q.    Now, turning back to page 30 of the IARC

11       monograph, referring to the second study, second

12       CD-1 mouse study identified here, did that -- did

13       you have any concerns reading the results reported

14       there?

15              A.    Very much so because the entire previous

16       page has been devoted to discussing this very small

17       increase in renal tumors in male mice in the first

18       mouse study with nothing given for female mice.

19                    This second study, which was of exactly

20       the same strain of mice, it's exactly what you

21       would want.  It's a replicant study, a second, a
```

Page 98

1    second study that had the same number of exposure

2    levels, slightly lower exposure, but nonetheless it

3    was the same exposure to glyphosate, and shockingly

4    the paragraph does not even mention the kidney.

5              Again, there were 17 members of the

6    working group that were actually at this meeting

7    and also Chris Portier, who was a scientific

8    expert.  They should have demanded -- I mean, they

9    should have been wanting, I want to see what this

10   second study shows for renal tumors.  And the fact

11   that they were -- didn't even discuss kidney is

12   just -- I mean, it's shocking.

13        Q.   Was the data available on kidney tumors,

14   whether or not there was any kidney tumors in the

15   study?

16        A.   They were available in the Greim

17   supplement.

18        Q.   At tab 11 --

19        A.   Yes.

20        Q.   -- study 11?

21             Okay.  And did you review what the

CONFIDENTIAL

Page 99

1    results were?

2            A.   Of course, I did.

3            Q.   And what did you find?

4            A.   Stunningly I found that, in fact, there

5    was a significant decrease in tumor rates with

6    increasing glyphosate in the second mouse study

7    that is not even mentioned in this chapter.  They

8    found two --

9            Q.   Go ahead.

10           A.   They found an adenoma and a carcinoma in

11   the control group, an adenoma and carcinoma in the

12   lowest dose group and no tumors in the next highest

13   and the highest group.

14           Q.   So you're saying the more glyphosate

15   that the mouse consumed, the mice consumed, the

16   less there was an incidence of --

17           A.   Exactly.

18           Q.   -- tumors.

19           A.   It's probably chance.  I mean, I'm not

20   going to claim that glyphosate cures kidney tumors.

21   But it's almost certainly chance, just as the

Page 100

1     finding in the first mouse study is almost

2     certainly chance.  This finding in the second study

3     completely refutes the finding in the first study.

4     The p-value for this one, if you use the one-sided

5     test that IARC likes, I disagree with that, but if

6     you do, it's .042.  It's smaller than the .06 for

7     the supposed increase in the first study.

8          Q.   It's .0 --

9          A.   I consider those equivalent.  But they

10    certainly cancel each other out.

11         Q.   .042 for an inverse association.

12         A.   Inverse association.

13         Q.   What does that mean, inverse

14    association?

15         A.   It means the tumor rates decreased with

16    increasing glyphosate level.

17         Q.   And that was for kidney tumors in the

18    second study.

19         A.   That's right.  And no competent

20    statistician could possibly combine those two

21    results, a small increase in the first study and a

Page 101

1      small decrease in the second study, and conclude

2      that glyphosate causes kidney tumors in mice, but

3      that's what the working group did.

4            Q.    And -- I see that the second study

5      reported in the monograph also referred to

6      hemangiosarcomas.  What's happening there?

7            A.    This is really the only significant

8      finding in all of the mouse and rat studies for

9      malignant tumors.  This is a truly significant

10     result.  They found four hemangiosarcomas, all of

11     which were in the high dose group.

12                  It's still a small number of tumors, but

13     it suggests the possibility that if you give

14     glyphosate at a high enough level there may be a

15     few mice that are susceptible to these blood

16     vessel -- these are blood vessel tumors, malignant

17     blood vessel tumors.

18            Q.    This was in male or female mice?

19            A.    Surprisingly somehow they found the

20     female data for this, for this study, and the

21     female data did not support the finding at all.

Page 102

1          Q.   But the data did have a statistically

2     significant finding for male mice.

3          A.   It was statistically significant, but

4     here again, what you want is a replicant study,

5     which they had.  In fact, they had exactly what you

6     might design in this case.  The first mouse study

7     also looked for hemangiosarcomas, and the high dose

8     group in the first mouse study was five times

9     higher than the high dose group in this second

10    mouse study.

11              So if there really truly was a high dose

12    effect where a few mice were susceptible to

13    hemangiosarcomas, you would expect to see it in the

14    second study.  Of course, when they discuss the

15    first study, they don't even mention

16    hemangiosarcomas.  So again, I had to go to the

17    Greim tables, and it turns out there was only one

18    hemangiosarcoma in male mice, and it was in the

19    second highest group.

20              That highest group, which was 3 percent

21    of the diet that they ate was glyphosate, it's

CONFIDENTIAL

Page 103

1    extraordinary to have a dose level that high in one

2    of these rodent studies, and there was not a single

3    hemangiosarcoma.  So that argues against the high

4    dose effect, which is suggested in the, in the

5    second study.  But what's important is that they

6    totally excluded the exculpatory evidence for both

7    of these tumors.  They excluded the exculpatory

8    evidence for kidney tumors in the second study and

9    the exculpatory data for hemangiosarcomas in the

10   first study.  Again, it's shocking.

11        Q.   Did they also exclude the exculpatory

12   data relative to kidney tumors in the first study

13   for females?

14        A.   Yes.

15        Q.   Okay.  Taken together, do these two

16   studies support a finding of animal carcinogenicity

17   for glyphosate?

18        A.   No.

19        Q.   Why do you say that?

20        A.   Well, I definitely say absolutely

21   there's not a chance that glyphosate can be

Page 104

1    associated with increased kidney tumor rates

2    because these two studies, which are the two

3    studies that IARC relied upon, they considered

4    these to be the best studies and worth looking at,

5    they have results that cancel each other out.

6              There's no evidence, none at all, that

7    glyphosate causes kidney tumors in male mice and

8    certainly not in female mice.  There were no tumors

9    seen in either study in female mice.  The

10   hemangiosarcoma -- if you do a combined test, it

11   would probably still be significant because it's so

12   significant in this one study, but again, the type

13   of effect it suggested is a high dose effect maybe

14   limited to a few susceptible mice, and there's no

15   evidence of that at all in the first study at which

16   the high dose was five times higher than the high

17   dose in the second study.  So I would, I would say

18   that there's no evidence, no sufficient evidence

19   that glyphosate causes tumors in mice.

20        Q.   Okay.  I want to, just so we follow you

21   correctly, refer to the Greim supplement.  That's

Page 105

1      T-9.  You can help us understand where you're

2      finding the data.  Is this what you considered?

3      It's the binder, sir.

4           A.    Oh, the binder?

5           Q.    Yeah, the binder.

6           A.    Which tab is it?

7           Q.    Tab 10.  If you could keep the binder

8      open and also keep the monograph open as well on

9      your desk, sir.  Sir, if you could also have the

10     monograph, the -- yeah, just have that open --

11          A.    To the table?

12          Q.    -- to page 31, yes, so we can follow

13     along.

14          A.    Okay.  All right.

15          Q.    So table 17-1 is located -- 17-C here is

16     located at tab 10.  Is that, is that the first

17     study that was considered in the monograph?

18          A.    Yes.  I was able to match up the -- the

19     numbering in the Greim paper was different, but I

20     was able to match up from the few tumor rates that

21     were reported --

Page 106

1          Q.    And if you, actually, if you look at, if

2     you look at the Greim paper, I'm sorry to move

3     around like this, but that is Exhibit T-8 --

4          A.    Okay.

5          Q.    -- Exhibit T-8, you'll see there's a

6     list there of the studies considered.

7          A.    Right.

8          Q.    And do you see study 10?

9          A.    I do.  And by the way, where I went to

10    see if study 10, you know, to verify that it was

11    the first study was to the kidney.  And you see the

12    0, 0, 1, 3 that was reported in -- for the adenomas

13    in the glyphosate chapter.  So that told me that

14    this mouse study 10 corresponded to the first CD-1

15    mouse study in the glyphosate chapter.

16         Q.    Let's, let's just take it slowly.

17         A.    Okay.

18         Q.    Looking at study 10 in Exhibit P-9, T-9

19    rather, can you find where information is reported

20    on kidney tumors?

21         A.    Yes, it's on page 8 for males.  Renal

CONFIDENTIAL

Page 107

1       tubule adenoma, 0, 0, 1, 3.

2           Q.   Okay.  I just want to stop there.  So

3       we're at page 8 stamped 0162?

4           A.   Right.

5           Q.   So there's a line item for kidneys?

6           A.   Right.

7           Q.   And there's an item below.  It says

8       renal tubule, t-u-b-u-l-e, adenoma.

9           A.   Adenomas.

10          Q.   Adenoma?

11          A.   Adenoma.  It's a benign -- it's not a

12      malignant tumor.  It's a benign tumor.

13          Q.   What's a malignant tumor?

14          A.   Malignant means it's advanced and

15      capable of killing the animal, metastasizing.

16          Q.   Okay.  So it reports some numbers there

17      to the right.  Could you explain what those numbers

18      are?

19          A.   Yeah.  The first line gives the number

20      of animals for which the kidney was sliced and

21      looked at pathologically.  Sometimes that differs

1      from organ to organ.  There are some cases where

2      they're not able to take a sample from some organs.

3      For example, you'll see in the colon there are

4      fewer animals that were examined, but for the

5      kidneys 49 animals were examined in the control and

6      low dose group and all 50 in the two highest

7      groups.

8           Q.   So there's four groups that are

9      considered.

10          A.   Right.

11          Q.   Each group has increasingly amounts of

12     glyphosate?

13          A.   The control group, Group 1, is

14     unexposed, no glyphosate.  And then there's

15     increasing exposure to glyphosate in the other

16     three groups.

17          Q.   Okay.  And then below that it reports

18     numbers.  What are those numbers?

19          A.   Those are the number of renal tubule

20     adenomas that were observed.

21          Q.   So if you could, and I'll have my

Page 109

1      colleague to write down the numbers, what numbers

2      do you see there for Group 1?

3              A.    0, 0, 1, 3.

4              Q.    So 0, 0, 1, 3.

5              A.    Uh-huh.

6              Q.    And what does that mean again?

7              A.    That there was one adenoma found in the

8      second highest group and three in the highest

9      group.

10             Q.    Okay.  Out of -- 3 out of 50.

11             A.    3 out of 50.

12             Q.    Okay.  And you earlier testified that

13     this preliminary data was later reviewed by the

14     pathology working group of the EPA.

15             A.    Right.

16             Q.    Is that also referenced in the table of

17     the monograph, Table 3.1 of the monograph?

18             A.    I believe it is, yeah.  Everything in --

19     everything for this study is kidney, and the first

20     is the original data, again, same for females, no

21     data provided.  And then they do the analyses

Page 110

1       following the report of the pathology working

2       group, that's what PWG stands for, of the

3       Environmental Protection Agency.

4              Q.   And that's where the analysis changed?

5              A.   Yes.  In fact, they do say

6       Cochran-Armitage trend test.  That's why I was

7       stunned when I computed the exact p-values for that

8       exact same test and came up with p-values greater

9       than .06.

10             Q.   So what did -- what were the new

11      combined findings after the pathology working group

12      of the EPA looked at this data?

13             A.   There was one control animal with a

14      renal tumor, 0 in the Group 2, 1 in the -- and then

15      3 again in the high dose group.

16             Q.   Okay.  So the numbers were the same

17      except for the control -- the control group went

18      from 0 to 1.

19             A.   That's right.

20             Q.   That means that now one of the original

21      mice before --

Page 111

1          A.    Right.

2          Q.    -- consuming glyphosate had --

3          A.    Right.

4          Q.    -- a tumor.

5          A.    Yeah.  And I should have said earlier

6     one of the reasons that they give in this chapter

7     for paying such close attention and giving such

8     significance to the renal tumors is they say the

9     renal tumors are exceptionally rare in these mice,

10     and therefore even this small increase is worth

11     looking at.

12               Well, the second study refuted that as

13     well because two of the control animals had renal

14     tumors.  So the second study not only refuted that

15     there was an increasing risk of tumors with

16     increasing exposure level, it refuted the fact that

17     these are extremely rare tumors.

18          Q.    You said two.  You meant one mouse in

19     the control study had a renal tumor.

20          A.    One in the first, but two in that second

21     study.  There were two animals, yes.

Page 112

1          Q.   In study 11.

2          A.   Yeah, study 11.

3          Q.   Okay.  We're not there yet --

4          A.   No.

5          Q.   -- so I don't want to get ahead.

6               And so did you do a p-value calculation

7     of the final results incorporating the pathology

8     working group's analysis?

9          A.   Yes, I did.

10         Q.   And what was that calculation, if you

11    can recall?

12         A.   .065.

13         Q.   Okay.  Is that significant or not

14    significant?

15         A.   Well, if you take a .05 cutoff, that

16    would not be significant.  Again, I'm on the side

17    that says you probably shouldn't use a cutoff, but

18    IARC has in the past and continues to, so that,

19    that would be important to a working group member.

20         Q.   So .065 is higher than what's reported

21    in IARC of .034?

Page 113

1          A.    That's right, which is less than .05.

2          Q.    Okay.  Now, let's also look to see, is

3     there the female data?  Is that contained in here?

4          A.    Yeah.  It's -- those tables are totally

5     separately, so you have to, you have to go near the

6     end here and see where kidneys are.  Kidney is on

7     page, page 8 of the female, which is 207 in the

8     corner of the -- and there you see 50 animals were

9     examined in each of the four groups, and there were

10    no renal tubule tumors found.  They're all 0's.

11         Q.    So 0's for, for the female mice, four

12    0's were recorded --

13         A.    That's right.

14         Q.    -- in this Greim study.

15         A.    Given the same high dose that the males

16    got.  The highest dose was 3 percent of the diet

17    for females as well, and no tumors appeared.

18         Q.    Okay.  That, obviously, shows no

19    association between dosage --

20         A.    Well, it doesn't support the finding in

21    males is the important thing.

Page 114

1        Q.    How so?

2        A.    Because the males you had a small

3    increase, and if glyphosate causes these kidney

4    tumors, you would expect to see some effect in

5    females.  They're given the same high doses, and

6    they did not.

7        Q.    And that data wasn't reported in the

8    IARC monograph.

9        A.    No.  They said it wasn't supplied to

10   them.

11       Q.    Let's also look at study 11 in the Greim

12   supplement.  There was no data reported in the

13   monograph for kidney tumors in the study, correct?

14       A.    That's right.

15       Q.    Can you find that though reported here?

16       A.    Yeah.  It's a little easier here because

17   they include males and females in the, data in the

18   same table.  So we just have to leaf through until

19   we see kidney.

20            There it is, kidneys, tubule adenomas.

21   So it's on page 73 and 72.  72 has carcinomas, and

Page 115

1      you can see 1 in the control, 1 in the low dose, 0,

2      0 and, of course, 0's across the board for females.

3      And then on page 73, the top line is adenomas, 1 in

4      the control, 1 in the low dose and 0's in the two

5      high and, of course, 0's again for females.

6           Q.    Okay.  So in study 11, they looked to

7      see whether or not there was kidney tumors.  And

8      there was findings both for tubule carcinomas and

9      tubule adenomas.

10          A.    Adenomas.

11          Q.    Adenomas.

12          A.    Uh-huh.

13          Q.    And the findings, both, both, both, both

14     findings showed for males 1 and 1 in the first two

15     groups.

16          A.    Yeah, for adenomas and for carcinomas.

17     So it's 2 and 2 when you put them together.

18          Q.    And 0 and 0 --

19          A.    0, 0, exactly what I report in my

20     papers.

21          Q.    Is that significant or not significant?

Page 116

1          A.    It's actually slightly significant.  If

2     you want to use a .05 cut point it's -- but it's

3     for an inverse association.  Decreases in tumors

4     with increasing glyphosate exposures.

5          Q.    Okay.  And that was not reported in the

6     monograph?

7          A.    Didn't even mention kidney, just

8     absolutely shocking.

9          Q.    How about for females again, if we

10    can --

11         A.    Yeah, the females are right next door,

12    and they're all 0's.

13         Q.    So for both adenomas --

14         A.    Both adenomas and carcinomas.

15         Q.    -- and carcinomas --

16         A.    Yeah.

17         Q.    -- 0 across the board?

18         A.    Right, the same thing that was found in

19    the first study.

20         Q.    So it's not significant?

21         A.    No.  I mean, it's -- there's nothing --

Page 117

1         p-value would be 1.  There's no evidence of a trend

2         at all.

3              Q.   Okay.  Sticking with this study 11, do

4         you see in here reporting on hemangiosarcomas?

5              A.   Yeah.  That's a little harder to find

6         because they don't, they don't have a single line

7         for hemangiosarcomas.  You have to go through and

8         find the organ.

9              Q.   If you look, sir, at the last page of

10        the study --

11             A.   Last page.

12             Q.   -- does that help?  Again, referring to

13        study 11.

14             A.   What page is that?

15             Q.   Page 97.

16             A.   97.  All right.  Yeah, this is the

17        result reported, 0, 0, 0, 4.

18             Q.   Okay.  It's 0, 0, 0, 4 for male mice?

19             A.   For male mice only.  If you look at the

20        females, there's no evidence of a trend.

21             Q.   What's the finding for female mice?

Page 118

1         A.    0, 2, 0, 1.  So definitely no evidence

2    that the tumor rate is increasing with increasing

3    exposure.

4         Q.    So on the first 0, 0, 0, 4, you would

5    say that's statistically significant.

6         A.    That one is worth looking at.  I mean,

7    that would be something that you would look at and

8    try to find confirmation elsewhere.

9         Q.    But for female mice not statistically

10   significant.

11        A.    No.  And to their credit, at least in

12   the glyphosate chapter they do mention the female

13   data didn't support the male result.  So while they

14   couldn't find female data in the first study, they

15   apparently found some at least in the second study.

16        Q.    Okay.  And then turning back to study

17   10, did that also report or contain data on

18   hemangiosarcomas?

19        A.    Yeah, this is, this is the study where

20   it's hard to find because you have to go organ by

21   organ.  They don't have a nice summary like they

CONFIDENTIAL

Page 119

1       had for study --

2               Q.    11?

3               A.    I believe the, I believe the

4       hemangioendothelioma, which is apparently what

5       their pathologist called hemangiosarcomas, I

6       believe it was in the spleen.  So if we can find

7       spleen --

8               Q.    So turning to study 10 --

9               A.    Yes.

10              Q.    -- again in the Greim supplement, you

11      looked at several different organs to see reporting

12      on hemangioendothelioma results, correct?

13              A.    Right.

14              Q.    You looked at liver on page 0157?

15              A.    Now, is this for females or males?

16              Q.    I'm looking at males.

17              A.    Okay.  Yeah, I'm still --

18              Q.    Page 0157.

19              A.    01 -- okay.  Here we go, 0157.  Yeah.

20              Q.    And do you see findings there for

21      hemangioendothelioma?

CONFIDENTIAL

Page 120

1          A.    Yeah.   There were no

2     hemangioendotheliomas.

3          Q.    0's across the board?

4          A.    Right.

5          Q.    How about in the next -- for spleen, did

6     you see anything for spleen?

7          A.    Yeah, I'm looking for spleen too because

8     I think that's where the hemangio --

9          Q.    Page 0160.

10         A.    160.  Yes, there it is,

11    hemangioendothelioma, 0, 0, 1, 0.

12         Q.    And --

13         A.    There was one hemangioma found, which is

14    a benign blood vessel tumor, and I think it was in

15    the mesentery, the lining of the chest.

16         Q.    If you turn to page 0167.

17         A.    Yeah.   Yeah, there it is, mesentery,

18    hemangiosarcoma, 0, 1, 0, 0.   It was in the lowest

19    dose group.

20         Q.    So would it be correct to say the

21    findings for male mice hemangiosarcoma would be 0,

CONFIDENTIAL

Page 121

1    1, 1, 0?

2        A.   Well, that -- if you combine hemangioma

3    and hemangiosarcoma.  The important thing is that

4    the high dose group was fed glyphosate at 3 percent

5    of the diet, and there were neither hemangiomas or

6    hemangiosarcomas.

7        Q.   This was at a concentration five times

8    greater than in study 11.

9        A.   That's right.

10        Q.   Okay.  And is that result statistically

11    significant for male mice for hemangiosarcoma in

12    study 10?

13        A.   No, no, it wouldn't.  With just two

14    tumors there's no way you could get significance,

15    no matter where they were.

16        Q.   Now let's look at female mice and do

17    this same exercise.  Starting on page 0202, do you

18    see results reported for liver?

19        A.   0202.  Yes.  There's one

20    hemangioendothelioma in the second highest group.

21        Q.   Okay.  How about for spleen?

CONFIDENTIAL

Page 122

1          A.    Did that come before liver?  I think it

2      does.

3          Q.    It's after page 0205.

4          A.    0205.  One hemangioma in the second

5      highest group and for the hemangioendotheliomas 1

6      in the control, 0 in the low dose, 2 in the mid

7      dose and 1 in the highest dose, again, no obvious

8      trend.

9          Q.    Okay.  So if you combine those results

10     across, do you know what you come up with?

11         A.    If I did that at one point in time, it

12     should be in one of the papers.  I know it wasn't

13     statistically significant.

14         Q.    Okay.  If we turn to your paper, Exhibit

15     T --

16         A.    The first one?

17         Q.    -- Exhibit T3?

18         A.    T3.  Yeah, it wouldn't have been in the

19     second paper.  If it's anywhere, it's in this

20     paper.

21         Q.    And looking at page 84 --

CONFIDENTIAL

Page 123

1          A.    Yes.

2          Q.    -- the first paragraph, do you see

3    reported findings there for hemangiosarcomas?

4          A.    I do.  For hemangiomas and

5    hemangiosarcomas combined, the p-value is .3, and

6    for hemangiosarcoma the p-value is .13.

7          Q.    Both of those are above .05.

8          A.    Yes.  And the hemangiomas and

9    hemangiosarcomas were in organs where -- these are

10   not unusual in rodents, and they were in the

11   expected organs where you usually see them.

12         Q.    So the findings, the readings were for

13   hemangiosarcomas 1, 1, 6, 4; is that correct?

14         A.    That's combined.

15         Q.    Combined?

16         A.    Hemangiosarcomas is 1, 0, 5, 4.

17         Q.    Okay.  Combined was, hemangiomas and

18   hemangiosarcomas, and combined results were 1, 1,

19   6, 4.

20         A.    That's right.

21         Q.    And that's not significant.

CONFIDENTIAL

Page 124

1       A.   No.

2       Q.   And was that disclosed in the IARC

3   monograph?

4       A.   This was the first study.  They did not

5   discuss these tumors at all.

6       Q.   Was that significant to you?

7       A.   Well, again, they excluded the

8   exculpatory evidence in males.  The male evidence

9   was to me extremely exculpatory because they were

10  fed at such a high dose and not a single hemangioma

11  or hemangiosarcoma developed.

12              MR. VALES:  Let's take a break.  We've

13  been going for a while.

14              THE VIDEOGRAPHER:  We are going off the

15  record.  This is the end of media unit no. 2.  The

16  time is 12:20 p.m.

17                   (Luncheon recess.)

18              THE VIDEOGRAPHER:  We are back on the

19  record.  This is the beginning of media unit No. 3.

20  The time is 1:09 p.m.

21      Q.   Good afternoon, Dr. Tarone.  Before we

CONFIDENTIAL

Page 125

1    broke for lunch, we were discussing the animal

2    studies, specifically the mouse studies that were

3    considered in the IARC Monograph 112.  Do you

4    recall that testimony?

5         A.   Yes.

6         Q.   And is it correct that there were two

7    mouse studies considered by the IARC working group?

8         A.   Yes.

9         Q.   Those were studies 10 and 11 in the

10   Greim supplement.

11        A.   That's correct.

12        Q.   Did the, under your reading of the

13   monograph, did the working group consider any other

14   mouse studies?

15        A.   They considered one initiation promotion

16   study.  It's a type of study where if you, you

17   can't show that a particular agent causes cancer by

18   itself, you then use it in conjunction with other

19   exposures and see if you can induce tumors with

20   multiple exposure levels.

21             And although -- I mean, I was a little

CONFIDENTIAL

Page 126

1      bit surprised.  I think I said earlier that IARC

2      publishes a Lancet Oncology paper summarizing

3      their -- the findings in each monograph, and in

4      that paper they said that their animal decision was

5      made on the basis of renal and hemangiosarcomas in

6      male mice and pancreatic islet cell adenomas in

7      male rats.  They went on to mention that initiation

8      promotion study, but if you read the last paragraph

9      of their discussion, of the working group

10     discussion, they say the study was an extremely

11     poor study and cannot be relied upon to make a

12     determination regarding glyphosate carcinogenicity.

13          Q.   So if you look at page 31 of the

14     monograph --

15          A.   Uh-huh.

16          Q.   -- do you see there's a Table 3.1?

17          A.   Yes.

18          Q.   And do you see that it goes over onto

19     page 32?

20          A.   Uh-huh.

21          Q.   And so on page 31 the table lists two

1      studies?  Do you see that?

2              A.    That's right.

3              Q.    That's study 10 and 11 --

4              A.    That's right.

5              Q.    -- from the Greim supplement?

6              A.    That's correct.

7              Q.    And then on page 32 the table references

8      an additional study.  Do you see that?

9              A.    That's right.

10             Q.    Is that the study you were just talking

11     about?

12             A.    That's what I was just talking about.

13     The working group itself said this study cannot be

14     used, but the IARC people still put it in the

15     Lancet Oncology paper, which is surprising.

16             Q.    So the Lancet Oncology paper is what

17     IARC puts out immediately after the meeting; is

18     that correct?

19             A.    Exactly.  They summarize the findings

20     for every agent considered in the, in the

21     monograph, whatever one has just been decided upon.

Page 128

1          Q.    And then the monograph itself, this

2     didn't come out until in around July of that year;

3     is that right?

4          A.    You know, I don't know when -- I got the

5     glyphosate thing online.  I mean, it came out much

6     earlier.  You could get certain chapters online.

7     I'm not -- it might have even been later than that.

8     I don't know when the monograph itself was actually

9     published in print.

10         Q.    Okay.

11         A.    I think it was a couple years after

12    maybe.

13         Q.    Referring again to Table 3.1, the third

14    study you just referenced, does it, does it say in

15    the comments section of the table the working group

16    concluded this was an inadequate study for the

17    evaluation of glyphosate?

18         A.    Right.

19         Q.    So that means the working group did not

20    rely upon this third study.

21         A.    No.  Even though it was in that Lancet

CONFIDENTIAL

1      Oncology article, the working group itself said no,

2      this is a poor study.  It can't be relied upon.

3           Q.   So referring to the mouse studies

4      considered by IARC, they considered just the first

5      two studies --

6           A.   That's right.

7           Q.   -- listed on Table 3.1?

8           A.   That's it exactly.

9           Q.   Okay.  And summarize for us the -- your

10     critique of information omitted from those two

11     studies reported in IARC.

12          A.   In both of the two examples that IARC

13     relied upon for eventually saying it was

14     sufficiently carcinogenic, the renal tumors in the

15     first study and the hemangiosarcomas in the second

16     study, the working group excluded completely

17     exculpatory evidence in -- for renal tumors in the

18     second study and hemangiosarcomas in the first.  So

19     they were selectively reporting results that

20     supported their conclusion that it causes tumors in

21     mice while excluding equally strong exculpatory

Page 130

1    data.

2         Q.   Okay.  And then so as it relates to

3    kidney tumors in study 10, they only reported it on

4    male mice; is that correct?

5         A.   That's right.  There was nothing in

6    female mice, no tumors at all.

7         Q.   As regards to the male mice, they

8    reported a p-value that was changed from the exact

9    calculation.

10        A.   Right.

11        Q.   You have the ability to calculate the

12   exact calculation.

13        A.   Exactly.

14        Q.   You used that software called what?

15        A.   It's called StatXact.  It was produced

16   by Harvard.  And the exact same, exact same

17   p-values that I report were reported in the EPA

18   document.  It's actually cited in the monograph

19   chapter as EPA 1983.  They report the same two

20   p-values as I do for the renal tumor data after the

21   pathology working group.

Page 131

1      Q.    And that p-value was .065 --

2      A.    Right.

3      Q.    -- which is above the --

4      A.    That's right.

5      Q.    -- above .05.

6      A.    And it appears certain that those

7    p-values were -- the exact p-values were in the

8    original draft of the chapter and that they were

9    changed during the monograph meeting because

10   Portier's, Christopher Portier's deposition, he

11   says that he was called in by the animal group to

12   recalculate the Knezevich and Hogan p-values, and

13   that's, that's the study.

14     Q.    Study 10.

15     A.    That's the study, the EPA 1983 study.

16     Q.    But if that recalculation didn't occur,

17   would the p-value of the male mice kidney tumor

18   reading for study 10 by itself support a finding of

19   sufficient carcinogenicity?

20     A.    No.  In my opinion, even the

21   recalculated p-values don't because, again, this

CONFIDENTIAL

Page 132

1    study was not done to show that glyphosate causes

2    kidney cancer.  There was no a priori reason to

3    believe that glyphosate caused any particular

4    cancer at all.

5          So what they did is they picked the most

6    extreme value, and they admit this, they have a

7    sentence saying nothing else was seen, the most

8    extreme result from about 40 comparisons that were

9    made in male and female mice, marginally

10    significant, and no good statistician would come to

11    a conclusion that that's sufficient evidence on the

12    basis of one study alone.  That's even before you

13    realize that they excluded the exculpatory data

14    from the second study.

15    Q.   And they excluded the female mice data

16    from the first study too.

17    A.   From both, yeah.  That's less important.

18    I mean, they were, they were 0's.  It definitely

19    didn't support carcinogenicity of glyphosate.

20    Q.   And in the second study, study 11 for

21    kidney tumors, there was -- what was reported --

Page 133

1      what was not -- actually it was not reported in the

2      IARC monograph; is that correct?

3              A.    That was not reported in the IARC

4      monograph.

5              Q.    But what did the data actually show in

6      the Greim supplement?

7              A.    It showed a decreasing trend in renal

8      tumors with increasing glyphosate level.

9              Q.    So it was an inverse association.

10             A.    Inversion association.

11             Q.    Okay.  And then study 11 did report on

12     hemangiosarcomas, correct?

13             A.    Correct.

14             Q.    But that same data wasn't reported as

15     for study 10.

16             A.    It was not reported for study 10.

17             Q.    Is that significant to you?

18             A.    Because it didn't support the finding in

19     study, you know, the first -- the second study.

20             Q.    Do you think it's a scientifically valid

21     approach to exclude data?

Page 134

1          A.   It's the most basic kind of error.   I

2     mean, if you assigned a student an assignment to

3     synthesize summarized data and they excluded some

4     studies all in the same direction, while including

5     results they liked, they would flunk.  I mean,

6     again, it's just shocking to me that this happened

7     at IARC.

8          Q.   Is there any good reason to exclude

9     data?

10          A.   No.

11          Q.   Have you ever heard of cherry picking of

12     data?

13          A.   Yes.

14          Q.   What is that?

15          A.   This is cherry picking of the first

16     order.  It's where you pick only the results that

17     support your conclusion, confirmation bias.

18          Q.   Okay.  Now, did the IARC monograph also

19     consider any other animal studies other than the

20     two mouse studies we looked at?

21          A.   Right.  They considered several rat

Page 135

1          studies.  And of particular importance again, based

2          on the Lancet Oncology summary, were pancreatic

3          islet cell adenomas in male rats.  Again,

4          everything that they picked out was in males.

5          There's no evidence in females of either mice or

6          rats that there's a problem.  But they, they --

7               Q.   Do they limit their findings, their

8          reported findings of carcinogenicity to males only?

9               A.   Well, that's all they found in either

10         the mice or rats.  They found -- things that they

11         found of interest were all in males.  In fact, the

12         pancreatic islet cell adenoma discussion is

13         embarrassingly nonscientific because they admit

14         that there was no dose response, and they admit

15         that there was no evidence of conversion from

16         adenomas to malignant tumors.

17               But what they did is they found in two

18         of the Sprague -- there were three two-year Sprague

19         Dawley rat studies.  And in two of them the lowest

20         dose group was statistically significant barely

21         compared to the control group.  Nothing else going

CONFIDENTIAL

Page 136

1      on, and they admit there's no dose response.

2      Again, the third two-year Sprague Dawley rat study,

3      they don't give the data.

4           Q.   So you're saying that the monograph

5      reported on the data for two of the three --

6           A.   Two of the three two-year studies.

7           Q.   -- two-year studies of rats.

8           A.   Right.  And I guess -- I'm still

9      surprised, but maybe I shouldn't have been, in

10     fact, when I looked up the data for the third rat

11     study, there was, in fact, a statistically

12     significant decreasing trend of pancreatic islet

13     cell adenomas with increasing glyphosate levels.

14          Q.   So this was like another inverse

15     association?

16          A.   Another example of excluding an

17     exculpatory inverse association while trying to

18     make a lot out of a couple of pairwise comparisons.

19     And again, you don't have to take my word for it.

20     The Lancet Oncology paper says that the decision on

21     animal carcinogenicity was based on renal tumors in

CONFIDENTIAL

Page 137

1    male mice, hemangiosarcomas in male mice and

2    pancreatic islet cell adenomas in male rats so --

3    and in each of those three cases they excluded

4    exculpatory data.

5         Q.   And where did you find the data for

6    rats?

7         A.   Again -- well, actually, I already had

8    it.  As it turns out, the World Health Organization

9    had pub -- they published a -- it's much smaller

10   than the IARC monograph, but they, they also

11   evaluate chemicals, and they had previously

12   evaluated glyphosate, and they had the tumor rates

13   for that study.  But the Greim --

14        Q.   Supplement?

15        A.   -- supplementary material also had the

16   rates, and they're the same.

17        Q.   So IARC would have had the data for all

18   three studies available to them.

19        A.   That's right.  They should have had,

20   they should have had access to the rates for the

21   rats that they did not report.

CONFIDENTIAL

Page 138

1        Q.    Okay.  Did, did the data for rats in any

2    way support a finding that glyphosate is a

3    carcinogen?

4        A.    No.  It was totally, it was totally

5    weak.

6        Q.    Why?

7        A.    At least in the mouse study they had

8    that one significant result based on a small number

9    of hemangiosarcomas.  The rat studies were

10   remarkably negative.  Again, even they admit there

11   was no sign of increase in malignant tumors.  There

12   were no trends in adenomas.  And there was no sign

13   of conversion from adenoma to malignant tumor.  So

14   the rat, the rat data is just totally negative.

15       Q.    So between the rat data and the mice

16   data, was there any statistically significant

17   findings that would support any inference of

18   carcinogen?

19       A.    Just the hemangiosarcoma in the second

20   mouse study.

21       Q.    Just a single one.

CONFIDENTIAL

Page 139

1           A.    Just a single one.

2           Q.    And that was not replicated in the

3      first -- in study 10.

4           A.    No.  And again, it's one significant

5      result in multiple comparisons when you consider

6      all the mouse and rat studies together.

7           Q.    Okay.  Earlier we looked at the

8      preamble.  If you'd look at that again, T-11.

9           A.    Geez.  Here we go.

10          Q.    This is the IARC preamble, T-11.  And we

11     looked at -- if you look at -- turn to page 20,

12     sir.

13          A.    Uh-huh.

14          Q.    There's a section addressing

15     Carcinogenicity in experimental animals.

16          A.    Uh-huh.

17          Q.    And there's a -- at line 34 it begins

18     sufficient evidence of carcinogenicity description.

19     Do you see that?

20          A.    Uh-huh.

21          Q.    And that precedes descriptions of

CONFIDENTIAL

Page 140

1     limited evidence of carcinogenicity, inadequate

2     evidence of carcinogenicity and evidence suggesting

3     lack of carcinogenicity.

4         A.   Right.

5         Q.   So we're looking at sufficient -- the

6     category sufficient evidence of carcinogenicity,

7     correct?

8         A.   Uh-huh.

9         Q.   And do you see there that it describes

10    the criteria for finding of sufficient evidence of

11    carcinogenicity?

12        A.   Right.

13        Q.   And do you see that it refers to a need

14    for two or more species or animals or two or more

15    independent studies?

16        A.   In one species.

17        Q.   Maybe you could read that sentence to us

18    and explain what it means.

19        A.   The working group considers that a

20    causal relationship has been established between

21    the agent and an increase incidence of malignant

Page 141

1    neoplasms or of an appropriate combination of

2    benign and malignant neoplasms if (a), two or more

3    species of animals you have an effect or (b), two

4    or more independent studies in one species carried

5    out at different times or in different laboratories

6    or under different protocols.

7         Q.   So what does that mean to you?

8         A.   Well, to me, with glyphosate this was

9    not met.

10        Q.   Why wasn't it met for glyphosate?

11        A.   There was at most one significant

12    finding, and that was the hemangiosarcoma in male

13    mice.  The findings they reported for adenoma --

14    and that's why they tried to make the big deal

15    about a few adenomas in rats.  They wanted to get

16    two species.  But that false short of sufficient

17    evidence.

18         And again, I even find that the

19    hemangiosarcoma finding in the second study is

20    essentially refuted in the first study because the

21    high dose group, that's such a high dose of

Page 142

1     glyphosate and you had no hemangiosarcomas.  But

2     you certainly couldn't say that you've proven that

3     it's, that it's causation in, you know, two

4     species --

5            Q.   Or two studies.

6            A.   -- or two studies, right.

7            Q.   Okay.  So even accepting the data at

8     face value reported by IARC, you could not support

9     a finding of sufficient evidence of

10    carcinogenicity?

11           A.   Right.  And if you took, if you took --

12    if you called the renal tumors in the male mice

13    only based on study one a significant finding, then

14    you can at least have two findings in mice, but

15    that was totally refuted by the second study.

16           Q.   Plus you would have to change the

17    p-value --

18           A.   Yes.

19           Q.   -- of the first renal tumor finding,

20    right?

21           A.   Right.

CONFIDENTIAL

Page 143

1          Q.   And again, what's the significance of

2      the lack of replication of the results for kidney

3      tumors and for hemangiosarcoma?

4          A.   It's crucial.  It's crucial.  Because

5      the points I made about p-values and whatnot, those

6      are of secondary importance.  The gold standard is

7      replication, and they had the opportunity to look

8      for replication, and they ignored it.

9          Q.   So in your, in your opinion, sir, do the

10     animal studies considered by IARC support a finding

11     that there's sufficient evidence of

12     carcinogenicity?

13         A.    No.  And I've concluded in both papers

14     it would even be difficult to say that there's

15     limited evidence, but there's certainly not

16     sufficient evidence.

17         Q.   Now, did IARC consider any

18     epidemiological studies, the Monograph Program, did

19     they consider any epidemiological studies in

20     addition to animal studies?

21         A.   Oh, yes, yeah.

Page 144

1           MR. BRADY:  Mr. Vales, you've asked him

2      these same questions now about six times and he's

3      answered them six times.  Are we coming to a close

4      with your part of this deposition?

5           MR. VALES:  We're nearing the end,

6      counsel, and we're --

7           MR. BRADY:  We have the same answers to

8      the same questions over and over and over again.

9           MR. VALES:  Okay.  Well, we're shifting

10     gears here to the epi studies, and we haven't spent

11     very much time on that, and that's where we're

12     going next.

13          Q.   So shifting gears to the epi studies,

14     what specifically did IARC consider relative to the

15     epi studies?

16          A.   They, as they always do, considered

17     several case-control studies and one cohort study,

18     the cohort study being the Agricultural Health

19     Study that I was involved in designing, starting

20     out.

21          Q.   And what did, what did IARC conclude

Page 145

1    relative to those studies?

2         A.   They concluded there was limited

3    evidence from the human studies, largely, I think,

4    because the Agricultural Health Study, the only

5    cohort study, showed absolutely no evidence of an

6    increased risk.  And that was based on an early,

7    fairly early paper.

8              They published on NHL and pesticides a

9    few months before the IARC working group meeting,

10   and for some reason for the first time ever they

11   left out herbicides.  They've always published in

12   the past on all four classes of pesticides,

13   insecticides, herbicides, fungicides and fumigants.

14   But they left out the data for herbicides,

15   including glyphosate, in the 2014 paper.

16        Q.   You're referring to the paper describing

17   the Agricultural Health Study.

18        A.   That's right.

19        Q.   So the Monograph Program in looking at

20   the epi data was looking at older data from the

21   Agricultural Health Study.

CONFIDENTIAL

Page 146

1        A.    Yeah, and even with that they concluded

2    there was only limited evidence.

3        Q.    Okay.  Do you know whether or not the

4    new data relative to glyphosate has ever been

5    published from the Agricultural Health Study?

6        A.    Yes, it was published finally in 2018.

7        Q.    And what -- have you reviewed that data?

8        A.    Yes.  I make it a practice of looking at

9    all the papers that come out of the Agricultural

10   Health Study just because I was involved in it so

11   early.

12       Q.    And what does the data show?

13       A.    Remarkably negative.  It's perhaps the

14   most negative study I've ever seen for any

15   pesticide.  They -- in the baseline analysis, which

16   included all cancers diagnosed since the people

17   entered the cohort, there was not a single

18   significant result even though they looked at, I

19   don't know, they looked at over 20 different

20   cancers because they looked at every possible

21   subgroup of leukemias and lymphomas, in addition to

Page 147

1     all solid cancers.  And there was not a single

2     significant result.

3          Q.   No association between glyphosate use

4     and cancer?

5          A.   That's right.

6               MR. VALES:  I want to have this marked

7     please.

8               (Whereupon, Deposition Exhibit T-13,

9     Glyphosate Use and Cancer Incidence in the

10    Agricultural Health Study, marked.)

11         Q.   Sir, I've handed you Exhibit T-13, an

12    article titled Glyphosate Use and Cancer Incidence

13    in the Agricultural Health Study published in the

14    Journal of National Cancer Institute 2018, first

15    published online November 9th, 2017.

16              Do you recognize this article, sir?

17         A.   I do.

18         Q.   You've read this before?

19         A.   I have.

20         Q.   And, and I just want to direct your

21    attention, sir, to the discussion page, 513.

CONFIDENTIAL

Page 148

1          A.   513.  Okay.  Uh-huh.

2          Q.   Do you see at the top of this it says in

3     this updated evaluation of glyphosate use and

4     cancer risk in a large prospective study of

5     pesticide applicators, we observed no associations

6     between glyphosate use and overall cancer risk or

7     with total lymphohematopoietic cancers, including

8     NHL and multiple myeloma?

9          A.   Right.

10         Q.   Is that your understanding of what --

11         A.   That is my understanding.  Then they

12    went on to try to make a case and say well, we did

13    see a couple things for acute myeloid leukemia but

14    that given the multiple testing it's really hard to

15    support that as being likely to be a real effect.

16              And that was only found because they

17    did, for each of the types of leukemia and

18    lymphoma, they actually did five different

19    analyses.  People know that cancer doesn't start

20    immediately after you are exposed to something.

21    There's, there's what's called a latency period.

CONFIDENTIAL

Page 149

1    Usually it takes time for multiple mutations to

2    occur before you get a full-blown cancer.

3            So to take, take account of this, what

4    they did here is they did one analysis.  The main

5    analysis assumed no latency, zero.  All cancers

6    were counted.  Then they did an analysis assuming a

7    five-year latency, another one assuming a ten-year

8    latency, another assuming 15 and another assuming

9    20.

10           So that gave them every opportunity they

11   could to try to produce something in leukemia or

12   lymphoma that they could hang their hat on.  And,

13   in fact, a couple of the lagged analyses were

14   marginally significant for acute myeloid leukemia.

15       Q.    Okay.  But this study did not show any

16   association between glyphosate use and --

17       A.    Lymphoma.

18       Q.    -- lymphoma?

19       A.    Or any lymphoma subtype.

20       Q.    Okay.  And this is the same Agricultural

21   Health Study that you were involved with at its

CONFIDENTIAL

Page 150

1      inception, correct?

2           A.    Correct.

3           Q.    And Dr. Blair?

4           A.    And Dr. Blair.

5           Q.    And do you believe Dr. Blair would have

6      had access to these results on herbicides when he

7      met with the IARC working group in 2015?

8           A.    I do.  In fact, a Reuters science

9      writer, Kate Kelland, sent me, for an article she

10     wrote in Reuters, she sent me two draft papers from

11     the spring of 2013 that were essentially

12     predecessors to this paper.  The only difference is

13     they included herbicides.

14              And in the second of the draft papers,

15     in fact, they focused in their main tables on the

16     16 pesticides that they considered to have the

17     highest a priori evidence of causing NHL, and ten

18     of those 16 were herbicides.  So for some reason

19     they went from focusing on herbicides in the spring

20     of 2013 to totally excluding them in the fall of

21     2014.  It's inexplicable.  I mean, I can't even

Page 151

1      guess their motives.

2             Q.   Was Dr. Blair involved in that paper

3      that you just referenced?

4             A.   He was involved in the 2013 paper, and

5      he was -- I'm pretty sure he was a co-author of the

6      2014 paper.  He was not a co-author of the most

7      recent paper in JNCI.

8             Q.   And he was chair of the IARC working

9      group?

10            A.   He was chair of the IARC working group.

11     He certainly would have known that there was data

12     much more extensive than the one published paper

13     that they had to rely on.

14            MR. VALES:  Okay.  All right.  I just

15     want to take a quick five-minute break.  I may be

16     done, but I want to take a quick five-minute break.

17            THE VIDEOGRAPHER:  We are going off the

18     record.  The time is 1:34 p.m.

19                  (Recess.)

20            THE VIDEOGRAPHER:  We are back on the

21     record.  The time is 1:46 p.m.

CONFIDENTIAL

Page 152

1           MR. VALES:  Dr. Tarone, that concludes

2     my examination.  Thank you for your time.

3           THE WITNESS:  You're welcome.

4           EXAMINATION BY MR. BRADY:

5      Q.   Dr. Tarone, good morning or good

6     afternoon.  My name is Steve Brady, and I represent

7     Kathy Caballero in her action against Monsanto.

8           Can you and I agree, Mr. Tarone, that a

9     working group of 17 experts from 11 countries met

10    at the International Agency for Research on Cancer

11    on March 3rd to March 10th of 2015 to review

12    published scientific evidence about five

13    organophosphate insecticides, including glyphosate,

14    diazinon, malathion, parathion and

15    tetrachlorvinphos?

16     A.   That is the agenda for the Monograph 112

17    meeting, yes.

18     Q.   Okay.  And can we agree that you were

19    not a part of the IARC working group on that

20    monograph, which they have numbered Monograph 112?

21     A.   No, I've never taken part in any of

Page 153

1          their monograph working groups.

2                    Q.    Okay.   You were never asked to take part

3          in that IARC working group, correct?

4                    A.    No, I was not.

5                    Q.    And your former boss for many years at

6          the National Institute of Health, Aaron Blair, was

7          actually the chair of that IARC working group of 17

8          international scientists and experts that were

9          looking at the carcinogenicity of these five

10         organophosphate insecticides, correct?

11                   A.    He chaired the meeting.   He was never my

12         boss.   He was in the occupational epidemiology

13         branch, and I was in the biostatistics branch.

14                   Q.    Okay.   But you two knew each other over

15         your long career at the --

16                   A.    Yes.

17                   Q.    -- National Institute --

18                   A.    We definitely knew each other.

19                   Q.    -- of Health, correct?

20                   A.    Yes, we did.

21                   Q.    Were you friends?

Page 154

1          A.    No, not, not personal friends.

2          Q.    Did you respect Dr. Blair as an

3    accomplished and well published scientist?

4          A.    Oh, he's definitely a well published

5    occupational epidemiologist.

6          Q.    What was your opinion of Dr. Blair that

7    you fostered after 14 years of working with him at

8    the National Institute of Health?

9          A.    Yeah, I try not to judge my co-workers,

10   I mean, especially people in other branches.  If he

11   came to me for help, I worked with him.  You know,

12   while most of the time I knew him at NCI, I thought

13   he was a fine epidemiologist.

14         Q.    Most of the time.  Was there a time when

15   you stopped believing that he was a fine

16   epidemiologist while you were both working at NIH?

17         A.    Yes, I actually started having doubts

18   about, not just him, but people in that group with

19   regard to the last paper that I, that I published

20   before I left NCI, and that was the Agricultural

21   Health Study paper on prostate cancer.

Page 155

```
 1              And when I read the first draft, I saw
 2      some serious deficiencies in, in that draft, and I
 3      relayed them to Dr. Blair, the younger woman, who
 4      was the first author, and Michael Alavanja.  And I
 5      assumed these deficiencies would be taken care of
 6      after I left NCI, but it turned out when the paper
 7      was finally published the deficiencies were all
 8      still there.  One in particular that --
 9          Q.   So your --
10              MR. VALES:  He's still speaking.
11          A.   One in particular that stands out is
12      often when you start one of these papers, the first
13      thing you do is look to see well, is there
14      increased risk in farmers.  And so that was how
15      they started out.  And I'm reading along this
16      paper, and it said that there was an increased risk
17      in white farmers, and it gave a standard,
18      standardized incidence ratio of something like 1.2,
19      indicating a 20 percent increase.
20              And then it said the number of prostate
21      cancers in African-Americans was too small to
```

Page 156

1         calculate a standardized mortality ratio.  Well,
2         the number was 19, which no one would consider to
3         be too small.  And because of this I contacted --
4         the way things work at NCI is the people at NCI
5         design the studies.  A company called Westat does
6         most of the fieldwork on the studies, then another
7         company, usually IMS, does the statistical
8         analysis.
9              So I called the person who did the
10        statistical analysis for this paper because when I
11        saw -- I assumed, when I saw this, I said well, I
12        guess there's no increased risk among
13        African-American farmers, which has always been one
14        of the popular hypotheses of the occupational
15        epidemiology branch, that the reason African-
16        Americans in the south had high rates of prostate
17        cancer was because they worked in farming.
18              And the man at IMS confirmed to me that,
19        in fact, the standardized mortality ratio is, I
20        think, .96, a decrease.  It wasn't even elevated.
21        And there were other things that were also

CONFIDENTIAL

Page 157

1    troublesome.  And the fact that they didn't make

2    the changes that they had promised to me, that was

3    the first sign to me that maybe something wasn't

4    all on the up and up.

5        Q.   What do you -- you made some specific

6    recommendations of changes to the first AHS

7    published study to Dr. Blair?

8        A.   Yes.

9        Q.   And the younger woman you're talking

10   about, was that Betsy Daruse?

11       A.   No, no.  She, she was the first author

12   on the paper.  Did you give me that paper?  I can

13   look in my, I can look in my CV.  Anna -- I don't

14   know.  I better not guess.  It would have been

15   2003, so I can find it very quickly for you.

16            I suppose she had the ultimate

17   responsibility for making the change, but Dr. Blair

18   and Dr. Alavanja were her superiors, and I would

19   have hoped that they would have -- let's see here.

20   2003.  Oh, actually Michael Alavanja was the first

21   author and Claudia Samanic, Samanic, I don't know

CONFIDENTIAL

Page 158

1      how you pronounce her name, she was relatively new,

2      was the second author.  Aaron Blair was the last

3      author, usually called the senior author.  And I

4      had made my --

5              Q.   Okay.  So --

6              A.   Go ahead.

7              Q.   No, go ahead.  You made your --

8              A.    I had made my displeasure known to all

9      three of them.

10              Q.   Okay.  So am I correct then that back as

11     early as 2003 while you were working at the

12     National Cancer Institute you had some serious

13     concerns about the scientific integrity of

14     Dr. Aaron Blair, correct?

15              A.   I left NCI --

16              MR. VALES:  Just object to the question

17     to the extent it applies an incorrect time period

18     that Dr. Tarone worked at NCI.  You may answer.

19              A.   Yeah, I left in 2002.  And I wouldn't

20     say it was serious.  It was just the first sort of

21     hints, first doubts that, that they would, that

Page 159

1    they would do such a thing.

2           Q.   Well, when was the -- when did you give

3    these changes that you recommended to the first AHS

4    study to Drs. Alavanja, Samanic and Blair?

5           A.   It would have been in 2002 in the month

6    or two before I left.

7           Q.   Okay.  And the study, the first AHS

8    study, was published 2003, correct?

9           A.   It's not the first AHS study.  It's the

10   first study that looked at one cancer and all

11   pesticides.  Since there have been multiple such

12   studies.  So it was the first really important

13   study that looked at a specific cancer.

14          Q.   And when you saw that study came out --

15   that study was published in 2003, correct?

16          A.   That's correct.

17          Q.   And after you reviewed it, it became

18   immediately clear to you that all three of the

19   principal authors on the study had disregarded your

20   recommendations for changes to the paper, correct?

21          A.   I can't tell you how they interacted in

Page 160

1          terms of making their decisions and whose decision
2          it was, but the errors that I had pointed out were
3          still in the, in the paper.  Again, it wasn't
4          serious doubts because some stuff happens when
5          you're busy writing so many papers, and things can
6          slip through the cracks.  It was deeply
7          disappointing.  Let's just put it that way.  My,
8          my -- as a statistician --
9                  Q.   Did you have any --
10                 A.   As a statistician my name was now, my
11         name was now on a paper that said you couldn't
12         compute a standardized mortality ratio based on 19
13         deaths, which is an absurd statement.
14                 Q.   So would it be fair to say that you were
15         deeply disappointed with Dr. Blair when you saw the
16         published study we're discussing in 2003?
17                 A.   I was disappointed with regard to this
18         one paper, definitely.
19                 Q.   Okay.  Did you have any other
20         interactions with Dr. Blair from 2002 or
21         thereabouts when you left to go to IEI up until the

Page 161

1    time that you were first contacted by Monsanto's

2    attorneys about IARC's Monograph 112?

3         A.   No, no scientific interactions that I

4    remember.  I probably was a co-author on a couple

5    of papers with him, but I would have just been sent

6    those papers, would have made my changes and sent

7    them back to the author.  I did see him at a couple

8    of funerals.  But in terms of scientific

9    interaction, I don't believe that I had any serious

10   scientific interaction after I left NCI.

11        Q.   Okay.  So would it be fair to say --

12   well, strike that.

13             You told us earlier you never studied

14   glyphosate until you were contacted by one of

15   Monsanto's lawyers in September of 2015, correct?

16        A.   Not really study.  I mean, it was one of

17   the 50 pesticides about which the Agricultural

18   Health Study collected information.  So I was on

19   papers that reported results for glyphosate, but I

20   did never do a specific study of glyphosate.

21        Q.   And you never did any bioassays on rats

Page 162

1      or mice of glyphosate, correct?

2           A.   No, I don't believe so.  We did a lot of

3      insecticides, but in those early years -- in fact,

4      I know I didn't.  Glyphosate wasn't even on the

5      market yet.

6           Q.   Okay.  So you and I just agreed that

7      between March 3rd and March 10th of 2015 17

8      international experts from 11 countries met for the

9      forum that they do for IARC's Monograph 112 on

10     these five organophosphate insecticides, correct?

11          A.   Yes.

12          Q.   Were you aware that that IARC monograph

13     group was meeting during that time?

14          A.   No.

15          Q.   You weren't invited to attend that

16     forum?

17          A.   No.  The way it works is they put out a

18     call for experts.  People around the world submit

19     their names to be on the working group.  I assume

20     maybe they choose some that don't even send in a

21     request.  In my career I never sent in a request to

Page 163

1    serve on any of the monograph working groups for

2    any agent.

3         Q.   And no one that you know of ever

4    suggested that you serve on one of the IARC working

5    groups for any agent, correct?

6         A.   No one that I know of.

7         Q.   Okay.  Those are open forums, meaning

8    that even though there are scientists chosen by the

9    IARC community to work on the various subgroups of

10   the working group, those hearings are open to the

11   public, correct?

12        A.   You can put in to be an observer, but if

13   you're an observer, you have limited ability to do

14   anything.  You're basically muzzled.  But I think

15   you have to submit a request to be an observer.  I

16   don't think anybody can just walk in.

17        Q.   Monsanto had observers at the Monograph

18   112 forum that went on or working groups that went

19   on during that week of March 3rd to March 10th of

20   to 2015, correct?

21        A.    It wouldn't surprise me.  I don't, I

Page 164

1   don't remember the full list of observers, but it

2   wouldn't surprise me at all.

3       Q.   And after they finished that work group

4   the week of March 3rd to March 10th of 2015, on

5   March 20th of 2015 IARC, the International Agency

6   for Research on Cancer, published the findings or

7   determinations on the five organophosphate

8   insecticides and herbicides that that work group

9   evaluated, correct?

10      A.   Correct.  There's one minor, one minor

11  correction of what you just said.  Even though,

12  even though IARC titled the monograph exactly as

13  you indicated, glyphosate is not an

14  organophosphate.  That's another example of sloppy

15  science at IARC.

16           And, in fact, there's a blogger in

17  Belgium named David Zaruk.  He's a professor of

18  science communication.  And in his blog he has

19  looked extensively into the process that IARC went

20  through in this glyphosate monograph, which I

21  haven't really concerned -- I've been more

Page 165

1    concerned about the science.

2           But in July of 2000 -- by the way, in

3    March of 2014 glyphosate for the first time was

4    added as a priority agent for future consideration

5    by a committee that was chaired by Chris Portier.

6    In July of 2014 they published online -- they

7    publish these notices of upcoming meetings, and

8    they had the upcoming meeting for Monograph 112,

9    and it only included organophosphate insecticides.

10          October of 2014, when they posted

11   another upcoming meeting about the monograph,

12   glyphosate had been added.  So they didn't even

13   follow their own rules in this because the call for

14   experts ended at the end of July.  I mean, I'm not

15   sure when glyphosate was added to the roster, but

16   it certainly -- I know what you're implying in

17   terms of all these scientists, how could they make

18   a mistake.

19          But this was a full agenda even with

20   just the four insecticides.  And if you have a

21   fifth agent added later, I can see how accidents

Page 166

1     could happen.  You've got a bunch of people that

2     are very busy evaluating all the animal

3     epidemiology and laboratory data for five different

4     chemicals.  So I can see how mistakes could happen.

5         Q.   You say it was actually sloppy science

6     that happened, and they made mistakes, this working

7     group, that you wouldn't even expect your students

8     to make, correct?

9         A.   That's right.  And it's not just the

10    working group, by the way.  IARC is responsible for

11    providing the working group with, with all of the

12    data they need to make a rational decision.  And

13    the fact that they could say with regard to that

14    first mouse study that no data were provided for

15    female mice, I mean, that's just remarkable.

16              They have been doing this for 40 years.

17    I assume that they would have the laboratory

18    reports for every study they relied upon.  And I

19    don't know what they had for that first study, if

20    all, if all they had were the male mouse results.

21    It's just, it's just bizarre.  So it's not just the

CONFIDENTIAL

Page 167

1     working group.  I think IARC fell down on this a

2     little bit.

3          Q.   So IARC just -- you think the whole

4     organization blew it.

5          A.   I think that with glyphosate they

6     definitely blew it.  I mean, there's no explanation

7     for the systematic exclusion of exculpatory data.

8     There's none.  But it's possible that IARC just

9     simply didn't provide all the information that the

10    working group needed to make a rational decision.

11         Q.   The 17 scientists, the international

12    scientists and experts who got together to evaluate

13    the carcinogenicity of glyphosate, they all voted

14    unanimously that glyphosate was a probable human

15    carcinogen, correct?

16         A.   That's correct.  That doesn't, that

17    doesn't, that doesn't account for the errors they

18    made.

19         Q.   Okay.  And to reach their conclusions,

20    IARC reviewed or IARC reviewed about a thousand

21    studies and made those available to the 17

Page 168

1     international experts who participated in the

2     working group, correct?

3          A.   No.   Unfortunately, there's a

4     considerable doubt about what they made available

5     because, as I said, for that first mouse study they

6     should have provided them with the technical report

7     that the laboratory that did the study produced.

8     They should have had all the tumor data for males

9     and females and sites other than kidney.

10               So it's not, it's not clear to me that

11    they provided the working group with everything

12    they needed.   And again, if glyphosate was added

13    late to the agenda, that would explain why it was

14    particularly sloppy for glyphosate.

15          Q.   Well, the IARC working group found that

16    three of the five insecticides that they were

17    studying, glyphosate, malathion and diazinon, were

18    all probable carcinogens in humans, correct?

19          A.   That's correct.

20               MR. VALES:   Objection to the

21    characterization of glyphosate as an insecticide.

1        Q.   Well, that's how it's referred to in the

2    literature, isn't that right, Doctor?

3        A.   No.  It's a herbicide.  And as I said,

4    it's not an organophosphate herbicide contrary to

5    the title of the --

6        Q.   Doctor, that wasn't, that wasn't my

7    question.

8        A.   Yeah, I know.  It's a herbicide, not an

9    insecticide.

10       Q.   Right.  And isn't it true that the IARC

11   working group chaired by Dr. Aaron Blair voted

12   unanimously that not only was glyphosate a probable

13   human carcinogen, but that malathion and diazinon

14   were also probable human carcinogens?

15       A.   Yes, I believe that's right.

16       Q.   And they also voted unanimously that

17   parathion and tetrachlorvinphos, that's

18   t-e-t-r-a-c-h-l-o-r-v-i-n-p-h-o-s, that they were

19   not likely human carcinogens correct?

20       A.   That's correct.

21       Q.   And again, those were all by unanimous

Page 170

1     vote of these 17 well-respected international

2     scientists.

3              MR. VALES:  Objection to the use of

4     well-respected.

5          A.   Yeah, I don't know how well-respected

6     they are if they can make the mistakes they made in

7     the glyphosate chapter.  Those are clear mistakes.

8     They're not -- they haven't been disputed by

9     anybody, even IARC.  And they knew about my paper

10    by December of 2016 at the latest.  They probably

11    knew before that.  They haven't disputed a single

12    one.

13         Q.   Okay.  Well, we can talk about that, and

14    we will in a few minutes because I think, as you

15    know, IARC did, in fact, dispute your paper to the

16    same outfit that you published it in, the European

17    Journal of Cancer Prevention, but apparently they

18    have chosen not to publish IARC's response.  You're

19    aware of that, right, Doctor?

20         A.   That's a very interesting story, and by

21    the way, I can tell you that story.  As I said

CONFIDENTIAL

Page 171

1    earlier, they submitted a letter in December of

2    2016 to the journal editor.  He sent it to me.  He

3    said he was inclined to publish it and as is

4    typical in these cases gave me the opportunity to

5    respond.  Their letter did not refute a single

6    scientific issue in my paper.  Their letter was

7    very legalistic, talked about my paper didn't meet

8    the standards of a research paper.

9         They raised questions about conflict of

10   interest even though my paper stated explicitly

11   there was no conflict of interest.  They wanted to

12   know who paid for it, what role did they play in

13   writing it, editing it, the usual kind of thing

14   that IARC does when they can't deal with science.

15   They smear the critic.

16        And they also, interestingly enough,

17   criticized me for relying on Greim's paper because

18   they said the working group considered the Greim

19   paper and considered it inadequate.  Well, I could

20   see that if I had --

21        Q.   They considered it, excuse me, excuse

Page 172

1      me, the working group considered it to be an

2      industry paper that was not peer reviewed because

3      Greims wrote that paper with an employee of

4      Monsanto who you actually had a relationship, David

5      Saltmiras, correct?

6                   MR. VALES:  I object to --

7            A.    I didn't have a relationship with him.

8                   MR. VALES:  I object to the use of the

9      term relationship, but I also ask, counsel, you let

10     the witness finish his response.  You interrupted

11     his prior response.  Go ahead.

12           A.    Okay.  You're -- what you say about the

13     Greim paper would make sense if I relied upon that

14     paper for their conclusions about the animal

15     studies, which, obviously, I did not.  I used that

16     paper only as a source for the tumor rates.  It was

17     strictly to get the data.  It has nothing to do

18     with any biases you might think the authors have

19     unless you think they changed the data in the tumor

20     tables.

21                   And with that, with that in mind, I

CONFIDENTIAL

Page 173

1    might add that Chris Portier in comments he

2    submitted to the US EPA Scientific Advisory Panel

3    in October of 2016, he was doing statistical -- EPA

4    considered many more rodent studies than IARC.  And

5    what -- the reason he submitted these comments was

6    he submitted his statistical analysis of all the

7    rodent data, including the ones IARC used, but also

8    those that the EPA used in addition.

9           And in his tables for kidney cancer and

10   for hemangiosarcoma, he included exactly the tumor

11   rates that I report as being excluded from the IARC

12   monograph.  That's an admission that those should

13   have been considered by IARC, and it's also -- it

14   also says those tumor rates were accurate, at least

15   as far as Chris Portier and I could determine.

16          Q.   So do you agree that Chris Portier, in

17   fact, is a well-respected and honest toxicologist?

18          A.   Chris and I started out about the same

19   time.  He's not a toxicologist.  I think his degree

20   is in mathematical statistics, just as mine is.

21   And, in fact, that's how I met him.  When, when the

Page 174

1    animal studies were transferred from the National

2    Cancer Institute down to the National Toxicology

3    Program, the statistical group at NIEHS, which is

4    the National Institute for Environmental Health

5    Sciences, took over the statistical work on these

6    animal studies and I made a couple of trips down to

7    Research Triangle Park in North Carolina to meet

8    with that statistical group and discuss the issues

9    just so we could -- they could understand how we

10   dealt with the issues.  And that was basically --

11   after that I had very little to do directly with

12   evaluating the animal studies.  But he was a

13   statistician just like me and --

14        Q.    Okay.  Would you agree that, would you

15   agree that he's respected by you and that you think

16   he's an honest statistician in how he approaches

17   his work?

18        A.    No, not, not now.  I mean, at that time

19   I had no problem with Chris.  He was just an up and

20   coming statistician like me.  He, obviously, had a

21   little more -- wanted to go higher because he ended

Page 175

1        up going into administration and actually being the

2        head of a couple of agencies, whereas I was happy

3        to just be a consultant statistician.

4              But no, from what happened with -- from

5        what he did with regard to the Monograph 112, I

6        have my doubts now.  The fact that he would, he

7        would sign a contract with a law firm a few days

8        after declaring glyphosate to be a probable

9        carcinogen is very suspicious.

10       Q.   So you don't have any respect for Chris

11       Portier, and you think that statements that he's

12       made are somehow inaccurate or disputable?

13       A.   I think he has a real conflict of

14       interest when it comes to anything related to

15       glyphosate.  And I might add when he submitted

16       comments to the EPA in October of 2014, I went

17       through his tables, and he, he had done exactly

18       what the working group did.

19              He had excluded exculpatory data.  Just

20       the tables were empty for certain studies.  And

21       when I looked them up, it was exculpatory data, so

CONFIDENTIAL

Page 176

1     I just, I just think he has a vested interest in

2     the glyphosate lawsuits, and I think that colors

3     his actions.

4           Q.   Doctor, do you have any evidence at all

5     that Dr. Portier had worked for any law firms or

6     had any involvement in any litigation ever in his

7     career prior to the publication of the IARC

8     Monograph 112?

9           A.   No, I don't, I don't follow people's

10    lives and who they work for.  This blogger in

11    Belgium claimed that he had previously signed a

12    contract with a law firm for a different agent,

13    apparently mobile phones and brain cancer.  But no,

14    I have no personal knowledge at all, just what I've

15    read.

16          Q.   So you have no evidence at all that

17    Dr. Portier has any conflict of interest whatsoever

18    in connection with the work that he did as a member

19    of the working group for Monograph 112,

20    specifically the evaluation of glyphosate.

21               MR. VALES:  I object to the

Exhibit D Page 176

Page 177

1   characterization of that testimony by the witness.

2   You can answer.

3        A.   Okay.  I, I don't like to make guesses

4   about why people do things.  I think it is very

5   peculiar that he played a role in changing the

6   p-values for that mouse study from being greater

7   than .05 to being less than .05.  I know I've

8   read -- people say well, he was only the scientific

9   expert.  He couldn't have had any influence on the

10  deliberations.  That's totally untrue.

11            He can't vote.  He couldn't vote.  But

12  he could greatly influence.  He could take part in

13  all of the discussions.  So all I can say is

14  there's circumstantial evidence that he does not

15  play straight when it comes to analyzing glyphosate

16  studies.

17            MR. BRADY:  Could you read back my last

18  question please, Miss Reporter?  And try to answer

19  my question this time, Dr. Tarone.  And I'll have

20  your answer stand, counsel, so we can get a

21  straight answer from the witness.

Page 178

1          MR. VALES:  I am sorry.  I didn't catch

2     what you just said.  What did you say?

3          THE WITNESS:  He think I didn't answer

4     his question.

5          MR. BRADY:  I'll stipulate, I'll

6     stipulate that your objection stands so when the

7     court reporter reads the question to the witness he

8     can keep it in mind and give us an answer.

9          MR. VALES:  Okay.  I also disagree that

10    the witness did not answer the question.

11         MR. BRADY:  Well, the record will speak

12    for itself.  Let's try again.

13              (The record was read by the reporter.)

14         A.   And I would say I have no direct

15    evidence, but there is circumstantial evidence.

16         Q.   Okay.  And can you and I agree, Doctor,

17    that pesticides can cause cancer?

18         A.   Yes.

19         Q.   And which pesticides would you agree can

20    cause cancer?

21         A.   Oh, I've never done a total summary of

CONFIDENTIAL

Page 179

1      all of the data on pesticides.  I think what I

2      would say though is that from my experience with

3      the Agricultural Health Study very few pesticides

4      cause cancer.  Because they've published on

5      multiple cancers, multiple pesticides, and usually

6      what they see is one or two significant results

7      that they can say well, this is interesting and

8      should be followed up, but confirmed cases where

9      you can say absolutely that a pesticide causes

10     cancer, there may be a couple, but I'm not aware of

11     them personally.

12          Q.   Doctor, can you and I both agree that

13     Monsanto never did a long-term animal study on the

14     formulated Roundup product?

15          A.   I don't know.  I don't know, I don't

16     know who did, I don't know who did or funded the

17     various rodent studies that have been considered by

18     the EPA or IARC.

19          Q.   Doctor, can you and I agree that the

20     surfactant used in the formulated Roundup product

21     has been banned in many countries as a known

CONFIDENTIAL

Page 180

1    carcinogen?

2          A.    Again, I don't know about that.  I just

3    haven't followed that literature.

4          Q.    Okay.  You tell me that you have

5    followed the IARC literature and the additional

6    information that has come out concerning

7    glyphosate, correct?

8          A.    Yeah.  That's my interest.  As I said,

9    in both of these papers, even though I used

10   glyphosate as an example, it's because it's the

11   most egregious case I've seen.  But both papers end

12   with criticisms of the monograph -- IARC's

13   Monographs Program procedures and my suggestions

14   for how they should be improved.  Again, as I said

15   earlier, my fight is with IARC.

16         Q.    So you have general disagreement with

17   the entire IARC process --

18         A.    The Monograph Program.

19         Q.    -- not just, the Monograph Program, not

20   just the findings of the -- unanimous finding and

21   vote of the 17 international scientists who made

Page 181

1      the determination of the insecticides and

2      herbicides in Monograph 112, correct?

3          A.   My arguments are with the IARC

4      Monographs Program, but with respect to glyphosate,

5      the deliberations were so faulty, so bad, that it's

6      an example of -- that there is something seriously

7      wrong with, with their procedures.

8          Q.   Did you attend or observe any of the

9      deliberations from the working group on Monograph

10     112?

11         A.   As I've told you before, I've made two

12     visits to Lyon, and both were with regard to the

13     scientific monograph I co-authored.

14         Q.   That was back in the '80s, correct?

15         A.   Yes.

16         Q.   You haven't had any direct work or

17     involvement with IARC since back in the '80s when

18     you were involved in the scientific procedural

19     group, correct?

20         A.    No, none at all.  I've worked with a

21     couple of scientists, co-authored papers with a

Page 182

1      couple of scientists at IARC, but those were really

2      unrelated to IARC's studies per se.

3           Q.   Would you agree that one of the tenets

4      of the IARC Monograph Program is that they do

5      periodically review the findings from their

6      monographs to see whether or not their findings or

7      their determinations need to be updated or changed?

8           A.   Yes, they do.

9           Q.   And can you and I both agree that, let's

10     see where it was, in April of this year the

11     advisory group, an IARC advisory group, met to

12     recommend priorities for the IARC monographs from

13     2020 to 2024 and reviewed a number of the recent

14     monograph findings, including those of Monograph

15     112?

16          A.   Yeah, I'm not aware of that meeting.

17          Q.   Okay.  On April 18th of 2019 the

18     advisory group made recommendations on priorities

19     for the IARC monographs and then published those or

20     made them available online on November 7th, 2024,

21     correct?

Page 183

1          A.   I haven't seen that.  I mean, I did see

2     the previous meeting, which was chaired by Chris

3     Portier in 2014, and I printed that off because it

4     dealt with IARC and the glyphosate decision.

5          Q.   Okay.  So you're not aware that on

6     November 7th of this year, just last month, the

7     IARC advisory group met, I'm sorry, printed out and

8     disseminated online the report of their April 2019

9     meeting where they specifically reviewed their

10    findings regarding IARC, I mean regarding

11    glyphosate.  Excuse me.

12         A.    I'm not aware of that, but it doesn't

13    make any difference.  The errors that I said

14    occurred occurred.  If IARC could refute them, they

15    would have.  And with those errors they came to an

16    incorrect conclusion.

17         Q.   All right.  Beginning at page 103 of,

18    I'm sorry, yeah, page 103 of the, of a report which

19    was published by IARC last month, they specifically

20    readdressed the carcinogenicity findings of

21    glyphosate for their CAS No. 1071-83-6.  You've

Page 184

1    have not read that, Doctor?

2         A.    I have not.

3         Q.    Okay.  And for the record, they looked

4    at the exposure data.  They looked at the findings

5    regarding cancer in humans and in experimental

6    animals, the mechanistic evidence, and the advisory

7    group determined that there was no need to change

8    or reevaluate the finding.

9              In fact, they concluded there was

10   sufficient evidence of carcinogenicity in

11   experimental animals and that since then additional

12   cancer bio data have become available and

13   specifically cited the Zhang paper from 2019.  Are

14   you familiar with that meta-analysis study?

15        A.    I'm very familiar, I'm very familiar

16   with the Zhang study.  It's one of the most biased

17   tendentious meta-analyses that I've ever seen

18   performed.  It was a classic case of cherry picking

19   the highest risk that it could get from every study

20   to come up with a significant finding.

21        Q.    Okay.  So you have the same exact

CONFIDENTIAL

Page 185

1    criticism of the Zhang study that you do of

2    Monograph 112; is that right?

3         A.    The Zhang study also cherry picked data.

4    In this case, they only picked the largest relative

5    risk estimate that was available from each study.

6    Most importantly was the estimate they chose from

7    the Agricultural Health Study, which even they

8    admit is more powerful than all of the case-control

9    studies combined.  They gave a weight of 54 percent

10   to the Agricultural Health Study.

11          The interesting thing is that, as I

12   said, as I said earlier, the NCI group did five

13   separate analyses for NHL, and only one of those

14   five estimates gave a relative risk estimate

15   greater than 1 for the highest exposure level.  The

16   others were around .86, .87, .9.

17          And Zhang, et al. chose the 1.12, the

18   only one greater than 1, to include in their

19   meta-analysis, which was, by the way, a 20-year

20   lag, which I don't think anybody believes that

21   there's a 20-year lag for non-Hodgkin's lymphoma.

Page 186

1        In fact, lymphomas are known to occur a few years

2     after some exposures, such as immunosuppression.

3            Q.    The Zhang paper found a compelling link

4     between glyphosate use and non-Hodgkin's lymphoma.

5            A.    I disagree with that --

6            Q.    And in it --

7            A.    I disagree with that conclusion.

8            Q.    That was Zhang's -- that was the finding

9     of the Zhang --

10           A.    Right.

11           Q.    -- paper, correct?

12           A.    It may have been what they wrote.

13           Q.    They also looked at the new -- excuse

14    me.  I'm not finished with my question.  The Zhang

15    authors also looked at the updated data from the

16    study that, I guess, you participated in early on

17    from the NHA, correct?

18           A.    Yes.  As I just said, they cherry picked

19    the only estimate greater than 1 to include in

20    their meta-analysis, the only one of five

21    estimates.

Page 187

1          Q.    So you think the Zhang paper is also

2      junk science; is that right?

3          A.    It's tendentious.  They have a point of

4      view.  The three -- three of the co-authors were on

5      the EPA scientific advisory panel, and it's pretty

6      clear they were dissidents, and this was, this was

7      their effort to support their case that glyphosate

8      causes NHL.  By the way, an epidemiologist named

9      Geoffrey Kabat in New York City has written a very

10     good review of that Zhang, et al. paper.

11         Q.    Isn't it true that the dissident

12     scientists, including Dr. Zhang that you referred

13     to, had originally voted in favor of the EPA

14     finding that glyphosate was not a likely human

15     carcinogen?

16         A.    I agreed with most of what the EPA

17     concluded, but I also remember that they left open

18     the possibility that glyphosate caused NHL, which

19     is very convenient.  And that's what this

20     meta-analysis was apparently attempting to show.

21         Q.    Can you and I both agree that -- well,

Page 188

1     you told me before you're not a toxicologist.

2     You're a medical statistician.  Correct?

3          A.   Correct.  I'm definitely not a

4     toxicologist.

5          Q.   And you're not a cell biologist,

6     correct?

7          A.   No.

8          Q.   Is that correct?

9          A.   That's correct.  I've worked with both

10    as a consulting statistician but --

11         Q.   We can both -- okay.  We can both agree

12    you're not a weed scientist, correct?

13         A.   Correct.

14         Q.   And we can both agree you're not trained

15    in oncology.  You're not an oncologist.

16         A.   Well, I have extensive experience in

17    almost every area of cancer research, but I'm not a

18    medical oncologist, no.

19         Q.   You don't have any type of certification

20    as an oncologist, correct?

21         A.   No.

Page 189

1          Q.    Is that correct?

2          A.    That's correct.

3          Q.    And you don't have any type of

4    certification as a medical hematologist or any

5    other hematologist, correct?

6          A.    No, I don't, but I know how to analyze

7    data.

8          Q.    And you don't have any certification as

9    a pathologist, correct?

10          A.    That's correct.

11          Q.    And --

12          A.    That's why I've never made opinions

13    about any of those in any of my papers.  My papers

14    refer only to statistical errors.

15          MR. BRADY:  I move to strike everything

16    after no.

17          Q.    Can you explain to us again when --

18    well, I'm looking at some e-mails that I will ask

19    for Mr. Hoke to provide to the reporter, but before

20    I do that, give me one moment here please.

21          Doctor, do you know a Dr. Tamika Sims,

CONFIDENTIAL

Page 190

1      S-i-m-s, who works for CropLife America?

2           A.   I believe I communicated with her about

3      that one talk I gave.  The name is vaguely

4      familiar.

5           Q.   Okay.  The one talk you gave was

6      actually for CropLife.

7           A.   It was, it was at the --

8           Q.   That was the --

9           A.   Right.  I assume she worked for CropLife

10     because I seem to remember an e-mail from someone

11     with that name about the time that I gave that

12     talk.

13          Q.   You gave a talk actually to the CropLife

14     America Human Health Risk Assessment Committee.

15          A.   Correct.

16          Q.   Is that right?

17          A.   That's correct.

18          Q.   Okay.  What is CropLife?

19          A.   I just know it's a lobbyist for, you

20     know, agribusiness companies.

21          Q.   They're a lobbying group that has done

CONFIDENTIAL

Page 191

1    work and continues to do work for Monsanto,

2    correct?

3         A.   I don't know.  I mean, like I say, they

4    represent, they represent several agribusiness

5    companies.  Monsanto is, obviously, one of them

6    since David Saltmiras is the one who was -- he was

7    on that committee, and he's the one that got the

8    invitation to give me -- for me to give the talk.

9         Q.   He was the vice chair of that CropLife

10   America Human Health Risk Committee --

11        A.   Okay.  I didn't know that.

12        Q.   -- that you spoke in front of.

13        A.   Yeah, I didn't know that.

14        Q.   And David Saltmiras, David Saltmiras,

15   you knew, was a product lead at Monsanto, a high

16   level Monsanto employee, correct?

17        A.   I don't know what that means, product

18   lead.

19        Q.   Well, he sent you a bunch of e-mails,

20   and we can go through them in a moment, but he

21   indicates on his e-mails that he is a Science

CONFIDENTIAL

Page 192

1        Fellow who is the Novel Chemistry and Microbials

2        Product Lead in their Toxicology & Nutrition Center

3        of Monsanto, correct?

4             A.   Yeah, I don't know what that means.  I

5        knew he was a scientist who worked for Monsanto.

6             Q.   Okay.  And tell me again how you came in

7        contact with Mr. Saltmiras.

8             A.   It was when I first purchased the Greim,

9        et al. paper from the Critical Reviews of

10       Toxicology.  I was having trouble downloading the

11       supplementary material, so I contacted him to see

12       if I could get them directly from one of the

13       co-authors.  He was a co-author of that paper.  And

14       as I said, I was able to down -- go ahead.

15            Q.   Well, you said you were able to download

16       it --

17            A.   Yes, I was able --

18            Q.   You had a number of conversations both

19       by e-mail and by telephone and in person with David

20       Saltmiras --

21            A.   I would not say --

CONFIDENTIAL

Page 193

1      Q.    -- a Monsanto employee.

2      A.    I would not say a number, and I never

3   met him in person.  He was on the phone for my talk

4   at CLA.  Never met him in person.

5      Q.    Your talk for -- okay.  CLA, that's

6   CropLife America?

7      A.    Exactly.

8      Q.    That's what you call them?

9      A.    Well, I think that's what it is.  I

10   just -- CLA, I know it's a lobbyist for

11   agribusiness.  That's all I know.

12      Q.    So you told us before that back when the

13   glyphosate or the Monsanto working -- strike that.

14            You told us earlier that when the IARC

15   working group for Monograph 112 that studied

16   glyphosate met between March 3rd and March 10th in

17   Lyon, France you had no idea that that meeting was

18   going on, correct?

19      A.    No, no, I did not.

20      Q.    You hadn't -- it was publicly announced,

21   but you just weren't aware of it at that point --

Page 194

1          A.    No, I don't, I don't --

2          Q.    -- because you had no interest in

3     glyphosate.

4          A.    No, I don't follow regularly which

5     monograph working groups meet and what they're

6     going to evaluate.  I mean, it's not something I

7     do.

8          Q.    And you had no interest in glyphosate

9     back in March of 2015 --

10          A.    No.

11          Q.    -- at the time that that working group

12    was meeting, correct?

13          A.    No, aside from it being one of the --

14          Q.    Is that correct?

15          A.    Yeah, I did not aside from it being one

16    of the 50 pesticides we asked about on the

17    Agricultural Health Study.

18          Q.    Okay.  But you had no direct interest or

19    involvement with glyphosate --

20          A.    No.

21          Q.    -- back when the working group was

Page 195

1    meeting in March of 2015, correct?

2          A.    No.

3          Q.    Is that correct?

4          A.    That's correct.

5          Q.    And on March 20th when IARC published

6    the unanimous findings of that work group, when all

7    17 of the international scientists voted to

8    classify glyphosate as a probable human carcinogen,

9    you weren't paying any attention to that at the

10   time, correct?

11         A.    No.

12         Q.    Is that correct?

13         A.    No, that's correct.  I did not read the

14   glyphosate chapter until September of 2016.

15         Q.    So you're telling us that about six

16   months later you were personally contacted by a

17   lawyer from Monsanto who set up a three-hour

18   meeting with you and the CEO of International

19   Epidemiology; is that right?

20         A.    That's correct.  And by the way, to

21   correct my last answer, it was September of 2015

Page 196

1       that I first read the glyphosate chapter.  And

2       that's absolutely correct, and that's -- it's

3       actually perfectly understandable because since

4       2008 I have been involved originally with several

5       authors.  A number of authors dropped off, and

6       eventually it was Joe McLaughlin and I.  And when

7       Joe died, it's been primarily me since.

8               We've been involved in, since 2008, in

9       exchanges with IARC about their procedures and what

10      we consider to be deficits.  So the reason that the

11      lawyer would contact us, and he did not contact me,

12      he contacted our CEO, Bill Blot, is because he

13      was -- wanted to know what it was about IARC that

14      they could come to a different decision as any

15      other regulatory body and knew that we had been

16      involved in this exchange, sometimes very

17      contentious exchange.  And, in fact, the director,

18      Chris Wild, was involved in two of the responses to

19      our commentaries.

20              Q.   So one of Monsanto's attorneys contacted

21      your boss at IEI; is that right?

CONFIDENTIAL

Page 197

1          A.    That's right.

2          Q.    And IEI provides, it says on your

3     website, biomedical research to, I guess, industry

4     and the -- and government?  Is that what you claim

5     you do there?

6          A.    That's what, that's what's been -- yeah,

7     it does private -- it's a private company that does

8     medical research studies.

9          Q.    And the overwhelming majority of the

10    work that you do at IEI is funded by industry,

11    correct?

12         A.    That's totally untrue.  As I, as I

13    stated earlier, by far the biggest work product for

14    both money and time is running the Southern

15    Community Cohort Study, which is, which is funded

16    by an NCI grant.  And that is, that is jointly done

17    with Vanderbilt University and Meharry University.

18         Q.    You're not truly a professor at any

19    university.  You receive some kind of a, I guess --

20    what's the word when they make you sort of an

21    honorary professor at Vanderbilt?  Is that right?

Page 198

1          A.   Yeah, I don't know.  It's not even an

2      adjunct.  It's basically, it's basically a way for

3      Vanderbilt to pad the bibliography of their

4      epidemiology program.

5          Q.   Okay.  You're not really a professor

6      there, correct?

7          A.   No.  I gave a couple of lectures.

8          Q.   You've never been a professor at any

9      university of higher learning.

10          A.   No, I have not.

11          Q.   Correct?

12          A.   No.  The only one at IEI, the only one

13      at IEI who was actually a professor at Vanderbilt

14      was Bill Blot.

15             MR. BRADY:  And again, I'm looking at a

16      series of e-mails, which -- a couple of series of

17      e-mails here.  It looks like the first one I

18      have -- Curtis, would you please give the court

19      reporter the series of e-mails that we have

20      beginning with Mr. Tarone's --

21             MR. VALES:  Hey, Steve.

CONFIDENTIAL

Page 199

1              MR. BRADY:  -- e-mail to David

2        Saltmiras --

3              MR. VALES:  Hey, Steve.

4              MR. BRADY:  -- dated -- yes.

5              MR. VALES:  The videographer is advising

6        he only has five minutes left on his disk, so maybe

7        you want to take a quick break and do that marking.

8              MR. BRADY:  Just give me a minute here.

9        Let me just, let me just get through this short

10       line of questioning, and we'll switch and take a

11       break.

12             MR. VALES:  Okay.

13       Q.   Mr. Tarone, I have an e-mail from you to

14       David Saltmiras dated September 9th that says just

15       saw your question about the epidemiology.  The

16       epidemiologic evidence is very weak.  And then you

17       go on to talk about the glyphosate rodent review.

18             Had you had -- do you know when you

19       first made contact with David Saltmiras?

20       A.   I'm going through this.  I told you the

21       first time I had was when I tried to download the

Page 200

1       supplementary tables so --

2               Q.   Is that before or after the lawyers from

3       Monsanto contacted you?

4               A.   It was around the same time because

5       that's when I first said well, I better take a look

6       at the glyphosate chapter in Monograph 112, and

7       that's where I saw the Greim, et al. paper cited.

8       So it would have been, it would have been possibly

9       in preparation for that meeting.  I'm not sure.

10      But it would have been just about exactly the same

11      time because the meeting took place early September

12      of 2015.

13              Q.   Okay.  But the lawyers contacted you

14      first, and that is what caused you -- Monsanto

15      lawyers are who caused you to take a look at

16      Monograph 112 and begin your interest in that

17      working group's findings concerning glyphosate,

18      correct?

19              A.   Yeah, I'm pretty sure I read that

20      chapter in preparation for the meeting because I

21      knew even though we weren't going to discuss

Page 201

1        glyphosate per se that that was, obviously, what

2        precipitated the contact, because of our long-term

3        debate with IARC Monographs Program.

4                Q.   Okay.  So one of the lawyers from

5        Monsanto called you --

6                A.   Called Bill Blot.

7                Q.   -- and told you that they wanted to meet

8        with you to discuss the IARC finding regarding

9        glyphosate, correct?

10               A.   No.  He said he wanted to discuss the

11       IARC Monographs Program.  And I think -- again, he

12       called the CEO, so exactly what words he said -- he

13       must have said it's in relation to the fact that

14       we're trying to understand why IARC alone has

15       declared glyphosate to be a carcinogen.

16               Q.   Okay.  So he contacted your boss at IEI.

17               A.   Yeah.

18               Q.   And then your boss, did he bring you in

19       to listen to that phone conversation or --

20               A.   No.  He came to me --

21               Q.   -- did he tell you right afterwards?

CONFIDENTIAL

Page 202

1          A.   He came afterwards because Bill Blot was

2     on the first couple of papers in this exchange with

3     IARC, but after that I was on every single one.  So

4     he wanted me to attend the meeting as well since I

5     had been involved for a longer time period.

6          Q.   And after you had that meeting with Bill

7     Blot, you then attempted or you then for the first

8     time read Monograph 112, looked at the findings

9     specifically, the unanimous findings specifically

10    regarding glyphosate, and that's when you say you

11    first contacted David Saltmiras at Monsanto to try

12    to get some of the supplemental data concerning the

13    article that he published with Mr. Greim.  Is that

14    right?

15         A.   That's correct.  And I only downloaded

16    the glyphosate chapter.  At that time, at that

17    time --

18         Q.   So you knew when -- I'm sorry?

19         A.   At that time the whole monograph was not

20    available, but they did have PDFs of the glyphosate

21    chapter, so that's what I downloaded.

CONFIDENTIAL

Page 203

1        Q.    You knew as soon as you, you knew as
2      soon as your boss called you in and said that
3      Monsanto lawyers wanted to meet with you that
4      glyphosate really was their only concern since that
5      was their biggest product, correct?
6        A.    Well, that was their concern because
7      they couldn't understand why IARC alone called it a
8      carcinogen.  It's a reasonable question.
9        Q.    But you knew Roundup was Monsanto's
10     biggest product though, and you knew that's what
11     you were going to be looking at and talking about,
12     correct?
13            MR. VALES:  Objection, lack of
14     foundation.  You can answer.
15       A.    No, I didn't know that Roundup was their
16     major product, but I did, I did realize that
17     this -- the questions about the IARC Monograph
18     Program were related to the glyphosate
19     classification done by the Monographs Program.
20       Q.    You knew that Monsanto and their lawyers
21     weren't concerned with the IARC classifications of

1         any of the other four insecticides and

2         herbicides --

3              A.   I have no idea.

4              Q.   -- that --

5              A.   I have idea.

6              Q.   -- Monograph 112 -- you need to let me

7         finish.  I'm sorry.  You knew that the Monsanto

8         lawyers weren't concerned about the IARC working

9         group's unanimous conclusions about any of the

10        other four insecticides or herbicides that they

11        studied, correct?

12             A.   I have no way of knowing that or not

13        knowing that.  That's, that's -- I just knew that

14        it had to do with --

15             Q.   Did you -- it had to do with what?

16             A.   I knew that it had to do with the fact

17        that IARC alone in the entire world had called

18        glyphosate a carcinogen and the lawyer was trying

19        to understand what it was about the program that

20        could explain this.

21             Q.   Did you know whether IARC and IARC

CONFIDENTIAL

Page 205

1       alone, as you said, had made similar findings about

2       any of the other insecticides or herbicides,

3       malathion, diazinon or tetrachlorvinphos or

4       parathion that had been studied by the same IARC

5       working group?

6             A.   Yeah, I downloaded the Guyton, et al. in

7       Lancet Oncology, so I knew the decisions that had

8       been made.

9             Q.   Did you agree with IARC, the IARC

10      working group's decision, that malathion was a

11      probable carcinogen in humans?

12            A.   No, I have a problem with malathion.

13      That's, that's the only other one in that monograph

14      I have a serious problem with.  And my problem

15      there is something that's, my problem there is

16      something that's going to become more and more of a

17      problem because they're relying more and more on

18      mechanistic evidence when they have weak animal and

19      epidemiologic evidence.  That was the case with

20      malathion.

21            Q.   So you think their finding regarding

1      malathion was also junk science.

2           A.   I just don't think it's -- I don't think

3      it should be classified as a probable human

4      carcinogen.  I didn't call it junk science.  That's

5      not as bad as glyphosate because that will probably

6      come down to a difference of opinion, whereas the

7      glyphosate decision is based on just plain faulty

8      science, horribly faulty science.

9           MR. BRADY:  Okay.  Why don't we take a

10     break here and he can change media.  Ten minutes,

11     guys.  Thank you.

12          THE VIDEOGRAPHER:  We are going off the

13     record.  This is the end of media unit No. 3.  The

14     time is 2:49 p.m.

15               (Recess.)

16     (Jamie Simon left the deposition during the break.)

17          THE VIDEOGRAPHER:  We are back on the

18     record.  This is the beginning of media unit No. 4.

19     The time is 3:02 p.m.

20          Q.   Okay.  Dr. Tarone, you told us a few

21     minutes ago that the Monsanto lawyers told you that

CONFIDENTIAL

Page 207

1      they were surprised that IARC had determined that

2      glyphosate was a probable human carcinogen,

3      correct?

4          A.   I don't -- they might have told Bill

5      Blot that because once the -- once we had the

6      meeting, it was all about IARC procedures and

7      really not about glyphosate.  But he must, he must

8      have told Bill Blot that that was what was causing

9      this meeting because that's what Bill related to

10     me.

11         Q.   Okay.  Bill told you they were surprised

12     by that, right?

13         A.   He said it was related to the glyphosate

14     classification and the fact that no one else agreed

15     with IARC.

16         Q.   Okay.  Were you aware that Monsanto had

17     put together an extensive perception management

18     response to the IARC finding of glyphosate being a

19     probable human carcinogen before the working group

20     voted?

21         A.   No.  I wasn't aware of any such thing

CONFIDENTIAL

Page 208

1    going on at any time.

2            Q.    Okay.   You haven't been shown by counsel

3    any of the documents about the attack plan that

4    Monsanto had in place before the IARC committee

5    even met to decide whether or not --

6            A.    That's irrelevant.

7            Q.    -- glyphosate was a --

8            A.    That's irrelevant to my concerns, which

9    are, again, the IARC Monographs Program's problems

10   with their deliberations and specifically how they

11   could come to such a horrible decision on

12   glyphosate.

13           Q.    Your first piece, which I think we

14   marked as Exhibit 3, the piece you wrote for the

15   European Journal of Cancer Prevention, that was on

16   the International Agency for Research on Cancer

17   classification as glyphosate -- glyphosate as a

18   probable human carcinogen, that was published on

19   May 20th of 2016, more than 14 months after the

20   IARC decision, correct?

21           A.    It was actually accepted then, but it

Page 209

1    was published online in August 2016.  So no one

2    would have had access to that paper until August of

3    2016.

4         Q.   Okay.  But you didn't even submit it

5    until May 20th of 2016, about --

6         A.   Correct.

7         Q.   -- 14 months after the vote by the

8    working committee, correct?

9         A.   Correct.

10         Q.   And in that paper you disclose that you

11    had been paid $750 following a meeting or by a

12    Monsanto lawyer in the conflict of interest section

13    at the end of that article, correct?

14         A.   No, that's untrue.  It says the

15    International Epidemiology Institute was paid $750

16    for this consultation.

17         Q.   Okay.  But you told us today that they

18    were actually -- the International Epidemiology

19    Institute was actually paid $1,500.  They paid $750

20    to you and $750 to your boss, the CEO of the

21    institute, right?

Page 210

```
 1              MR. VALES:  Objection.  That

 2       mischaracterizes his testimony.

 3         Q.   No, I think that's exactly what your

 4       testimony is, wasn't it, Doctor?

 5              MR. VALES:  No, it's not.  Go ahead.

 6         A.   It's correct that --

 7         Q.   Didn't they pay you $750 and --

 8         A.   It's correct that --

 9         Q.   -- $750?

10         A.   It's correct that Bill Blot also took

11       part and that IEI was paid $750 for his

12       participation.

13         Q.   So IEI was paid $1,500 for your

14       participation and your boss, the CEO of IEI's

15       participation in this three-hour meeting with

16       Monsanto's lawyer, correct?

17         A.   Yes, that's correct.  And since Bill had

18       nothing whatsoever to do with my paper, it's why I

19       restricted this to my participation.

20         Q.   Okay.  But now today you tell us that

21       you really didn't get that money; that money was
```

Page 211

1    paid to IEI, right?

2         A.   That's true, just as the acknowledgment

3    states.

4         Q.   Okay.  But at the time when you met with

5    Monsanto's lawyers, you met with them in the

6    regular course and scope of your employment as a, I

7    guess, a staff biostatistician at IEI, correct?

8         A.   Correct.  And I'm on salary.  So, I

9    mean, I get, I get my salary regardless of who I

10   meet with.

11        Q.   You do, but this was regular work that

12   you were doing for IEI for which IEI was ultimately

13   paid $1,500 for the three-hour meeting that you and

14   your boss, the IEI CEO, had with the Monsanto

15   lawyer, correct?

16        A.   That's correct.  I don't know what the

17   point is, but that's correct.  With regard to this

18   paper, it's irrelevant in terms of the conflict of

19   interest for writing this paper.

20        Q.   Okay.  After IARC sent the letter to the

21   European Journal of Cancer Prevention disputing

**Exhibit D Page 211**

Page 212

1      your claims in your article of May 20th, that you

2      submitted on May 20th of 2016, the European Journal

3      of Cancer Prevention downgraded your article from a

4      scientific article to an opinion piece, correct?

5           A.   Actually, actually, I'm glad you came

6      back to that because you asked me this previously,

7      and I wasn't able to complete my response.  The

8      letter from IARC, which was, which was authored by

9      Dana Loomis, Kate Guyton and the head of the IARC

10     Monographs Program, Kurt Straif, and as I said

11     earlier, it dealt with none of the scientific

12     issues.  They disputed none of the science in my

13     paper.

14          They -- it was a very legalistic paper

15     or letter complaining about the fact that it didn't

16     follow the known standards for a research paper and

17     similar sort of legalistic things.  And as I also

18     said --

19          Q.   Okay.

20          A.   And I, I told the editor that he should

21     publish that letter and my response.  The editor

1     agreed.  The editor accepted both letters.  And the

2     editor sent them to the publisher to be processed

3     and published in the journal.  And sometimes it

4     seems to me people are implying, IARC has implied,

5     that something nefarious went on between the editor

6     of the journal and me to, to keep their letter from

7     being published, but both the editor and I wanted

8     both letters published, and the publisher refused

9     to publish them, I think because he said it was --

10    the exchange was too contentious and maybe for the

11    first time he realized that he was dealing with a

12    very controversial issue.  But it was the publisher

13    that made the decision not to publish those two

14    letters.

15         Q.   And the publisher then made the decision

16    to recharacterize your article, not as a scientific

17    paper, but as an opinion paper, correct?

18         A.   Well, that, that was a very long process

19    actually.  What happened is that Dana Loomis for

20    IARC apparently opened a COPE investigation.  COPE

21    is Committee on Publication Ethics.  And I didn't

1   know anything about this for months, but eventually

2   I was cc'd on a couple of e-mails from someone at

3   this committee, and that investigation, which was

4   really more of a problem for the editor of the

5   journal than me, because he had to deal with the

6   back and forth with this committee about whether

7   there was any conflict of interest and anything

8   that was unethical about my paper.

9           And finally the editor and I agreed that

10   we would make three changes in that paper in order

11   to get it published in print.  And one of them was

12   to change it from a research article to an opinion

13   paper, which really doesn't bother me.

14           Q.   So you agreed, you agreed to change the

15   article from being characterized as a research

16   paper to being characterized publicly as an opinion

17   paper, correct?

18           A.   Exactly.

19           Q.   Okay.  And the second -- that's Exhibit

20   3.  Exhibit 4, the piece that you wrote for the

21   Regulatory Toxicology and Pharmacology Journal,

Page 215

1       that was characterized, from the get-go, that was

2       an editorial, so by its very nature was simply an

3       opinion piece.  That wasn't any kind of a research

4       article, correct?

5            A.   I would beg to differ.  The points I

6       make about the deliberations and the errors made by

7       the working group are not opinion at all.  They're

8       fact.  They're fact, and it has not --

9            Q.   That's your opinion.

10           A.    No, it has not been disputed by anybody,

11      including IARC.  Those data were excluded, and they

12      were excluded incorrectly, and no one has said that

13      I'm wrong about that.  So every, actually, every

14      research paper usually ends in a discussion with

15      opinion.  And there's a little bit of opinion in

16      most papers.  But I have no problem labeling either

17      of these papers opinion papers because what's

18      important to me is the scientific issues I deal

19      with, again, that have not been refuted.

20           Q.   I get it.  Doctor, Doctor, stop.  You've

21      more than answered my question, please.  I know you

Page 216

1     could go on about this all day.  But the piece that

2     you had sent to and was published in the Regulatory

3     Toxicology and Pharmacology Journal was titled

4     editorial, correct?

5          A.   Yes.

6          Q.   And that piece was not peer reviewed,

7     correct?

8          A.    Oh, it was heavily peer reviewed.  It

9     was peer reviewed more than the first paper.  I got

10    two referee reports, and they both were rather

11    extensive.  And one actually -- the changes made

12    greatly improved it.  This was, obviously, someone

13    that knew a lot about analyzing animal studies

14    because he made some changes that greatly improved

15    the presentation.  But no, it was refereed by two

16    referees and also the editor, obviously, plays a

17    role.

18         Q.   Okay.  And nowhere in that editorial for

19    the Regulatory Toxicology and Pharmacology Journal

20    did you disclose the fact that you and your boss,

21    the CEO at IEI, received $1,500 from the Monsanto

Page 217

1      lawyers, correct?

2              A.   I acknowledged, I acknowledged the $750

3      I was paid for in the last paragraph of the

4      acknowledgment.  And I go to acknowledge that

5      neither the company nor I has ever done any other

6      work for Monsanto and we've never done any work for

7      Bayer, nor any work on insecticides, herbicides or

8      other pesticides.

9              Q.   Again, you failed to note that your boss

10     and the CEO of IEI was also paid $750 by the

11     Monsanto lawyer for being involved in this issue,

12     correct?

13             A.   Again, it's irrelevant to my writing

14     this paper.  That's why I didn't acknowledge it.

15     He -- Bill Blot had nothing to do with this paper,

16     either paper.

17             Q.   You wrote this paper, you wrote this

18     paper in the regular course and scope of your work

19     at IEI.

20             A.   No, I didn't.

21             MR. VALES:  Objection.  Objection.

Page 218

1   Mischaracterizes the evidence in the case.

2          A.    It's also totally incorrect.  The

3   Regulatory Toxicology and Pharmacology paper was

4   written two years after I retired.

5          Q.    Okay.

6          A.    And most of the first paper was

7   written --

8          Q.    And in that paper -- I'm sorry.  In the

9   Regulatory Toxicology and Pharmacology paper you

10   rehashed all of the same arguments that you made in

11   the paper that you submitted to the European

12   Journal -- the opinion piece that you submitted to

13   the European Journal of Cancer Prevention, correct?

14              MR. VALES:  Objection.

15          A.    No, I actually --

16              MR. VALES:  Objection.

17              THE WITNESS:  Go ahead.

18              MR. VALES:  I object to the

19   characterization of the question.  It

20   mischaracterizes the two articles.

21          A.    The latter paper I was able to put in a

Page 219

1    lot more -- see, I didn't put a lot in terms of

2    statistical tests and p-values in the first paper

3    because I actually thought it was sufficient just

4    to point out that exculpatory data had been

5    excluded.  I included additional p-values in this,

6    in this paper to show that the exculpatory data

7    excluded was actually significant in the inversed

8    trend direction.

9            So there are, there are -- there is

10    overlap in both papers, obviously.  It's dealing

11    with the same topic.  But they're not identical.

12    And I don't deal with the epidemiology in this

13    Regulatory Tox.  I made some questions about

14    epidemiology in the first paper because I found it

15    very strange that herbicides were excluded from the

16    2014 paper.

17        Q.   And you reiterated the same criticisms

18    that you had of the IARC methodology that you've

19    been publicly making since 2008, correct?

20        A.   Pretty much.  I mean, 2008 started it,

21    but it sort of mushroomed.  In fact, when I gave

CONFIDENTIAL

Page 220

1       the talk at CLA, that was how I structured the talk

2       because I wanted to figure it out, how exactly it

3       came to be that we got into this contentious

4       exchange with IARC because that was never our

5       intent.  But we published a 2008 commentary in JNCI

6       on false positives in cancer epidemiology studies.

7       We were surprised after about a year to get a very

8       defensive letter from a couple of IARC scientists

9       about our paper, and things just went from there.

10                  Our response to that letter led to other

11      responses, and, you know, it moved from journal to

12      journal, but it's been going on since around 2009

13      based on that 2008 paper we published.  And we

14      didn't intend to --

15              Q.   IARC has been pub --

16              A.   We didn't intend to criticize IARC with

17      that paper.  In fact, the first author worked at

18      IARC at the time we published that paper.

19              Q.   Okay.  Doctor, IARC has been publishing

20      monographs for about 50 years, correct?

21              A.   It's over 40, I know, between 40 and 50,

Page 221

1    probably more than 45 at least.

2         Q.   IARC's examined more than 100 chemicals

3    that routinely come into contact with humans to see

4    whether or not they were carcinogens, correct?

5         A.   More than that.  I think it's over 500

6    now.

7         Q.   Okay.  And over half of the compounds

8    that -- chemicals that it's looked at were found

9    not to be carcinogens to human beings, correct?

10         A.   Well, it depends how you interpret that

11    Group 3, which is unclassifiable.  It's not a clean

12    bill of health.  The only clean bill of health is

13    their last category, which has only one chemical.

14         Q.   Doctor, do you know Dr. Haseman,

15    H-a-s-e-m-a-n?

16         A.   I do know Joe Haseman.  As I said, when

17    I first met Chris Portier, it was because the

18    animal carcinogenicity studies had been transferred

19    from NCI to NTP.  And I think Joe Haseman was the

20    head of the statistical group that Chris Portier

21    worked in.  But yeah, he was a statistician down at

Page 222

1    NIEHS, and he was one of those who took over the

2    analysis of the rodent carcinogenicity studies done

3    in the United States.

4        Q.   Do you have any issues with Dr. Joe

5    Haseman?

6        A.   I've always found Joe to be a great guy.

7    I mean, I actually talked -- he called me last week

8    because he's written a paper that he's having

9    trouble getting published and wanted to know any

10   ideas of what journal he should send it to.  So no,

11   I've always been on good terms with Joe.  I think

12   he's a fine guy.

13       Q.   Is Joe involved with Monsanto?

14       A.   I don't know.  I did see that he

15   presented -- I did not go to the open meeting, the

16   EPA Scientific Advisory Panel on glyphosate, but I

17   did see the agenda, and I noticed that he gave

18   public comment.  So I don't know who he was

19   representing at the time because I wasn't at the

20   meeting.

21       Q.   He's been retained by the Monsanto

CONFIDENTIAL

Page 223

1      Exchange Administrative Group, correct?

2             A.   I have no idea.   I know nothing about

3      that group.

4             MR. BRADY:   Okay.   All right.

5      Ms. Reporter, could you please attach as next in

6      order the group of e-mails that begin with the

7      e-mail from -- let's see the date here.   I think

8      it's from, it's from Bob Tarone to David Saltmiras

9      dated September 9th, 2015.

10            (Whereupon, Deposition Exhibit T-14,

11     e-mail string, marked.)

12            MR. BRADY:   And can we mark as next in

13     order please the group of e-mails that begin with

14     an e-mail from David Saltmiras to Bob Tarone dated

15     September 21st, 2015?   Can we mark next in order

16     please --

17            MR. HOKE:   Can you hold on?

18            MR. LASKER:   Can you hold on a second?

19     Curtis is scrambling here.

20            MR. BRADY:   Sure.

21            MR. HOKE:   Are you talking about the one

CONFIDENTIAL

Page 224

1       with Tamika Sims on the front?

2                   MR. BRADY:  Yes.

3                   MR. HOKE:  Okay.  That's the one you

4       want next.

5                   MR. BRADY:  Correct.

6                   MR. HOKE:  And for reference, the first

7       one you were starting with is the one --

8                   MR. BRADY:  And then after, and after,

9       after that -- no, the one I want -- did you get

10      the -- I wanted the first one that starts with the

11      e-mail from Bob Tarone dated September 9th.

12                  MR. HOKE:  Okay.

13                  THE WITNESS:  That's now T-14, I think.

14                  MR. BRADY:  That's got Tamika Sims at

15      the top, but that's, that's -- I'm sorry.  That's

16      the one I want next.

17                  THE WITNESS:  Okay.  That's now Exhibit

18      T-14.  I guess this is --

19                  MR. BRADY:  Then after that I'd like the

20      e-mails beginning with the one from Tamika Sims on

21      top as 15.

Page 225

1                    (Whereupon, Deposition Exhibit T-15,

2          e-mail string, marked.)

3                    MR. BRADY:  And 16 I would like the

4          e-mails from John Rebman, R-e-b-m-a-n, to everyone

5          in the Monsanto Exchange Administrative Group dated

6          November 29th, 2016.

7                    (Whereupon, Deposition Exhibit T-16,

8          e-mail string, marked.)

9                    MR. BRADY:  Next I would like the e-mail

10         from Bob Tarone to Mr. Knott, K-n-o-t-t, dated

11         October 27th, 2016.  Actually, you know what,

12         Curtis?

13                   MR. HOKE:  We haven't marked it yet.

14                   MR. BRADY:  Curtis.

15                   MR. HOKE:  Okay.

16                   MR. BRADY:  No, I don't want that one

17         next.  Sorry.  What I'd like next is the commentary

18         on IARC Monographs:  40 Years of Evaluating

19         Carcinogenic Hazards to Humans, that article

20         signed -- authored by 100 international scientists.

21                   (Whereupon, Deposition Exhibit T-17,

1      IARC Monographs:  40 Years of Evaluating

2      Carcinogenic Hazards to Humans, marked.)

3                  MR. BRADY:  That's 17?

4                  THE REPORTER:  Yes.

5                  MR. BRADY:  Next I'd like the e-mail

6      beginning at the top with the one from Donna Farmer

7      to John Rebman.  Do you see that, regarding the

8      interesting exchanges with Bob Tarone?

9                  MR. HOKE:  What's the date on that?

10                 MR. BRADY:  The date on the first at the

11     top is from Donna Farmer dated 9/11/15.  She sent

12     it to the -- John Rebman and the Exchange

13     Administrative Group again.  She's forwarding a

14     Saltmiras e-mail from Bob Tarone, a couple of them

15     actually.

16                 MR. HOKE:  That's not one we already

17     marked?

18                 MR. BRADY:  I don't think we marked that

19     one.

20                 MR. HOKE:  Oh, okay.  One moment.

21                 MR. BRADY:  Oh, no.  Is that the, I'm

Page 227

1      sorry, is that the first one --

2                    MR. HOKE:  That was the first one.

3                    MR. BRADY:  -- you marked, Curtis?

4                    MR. HOKE:  Yes.

5                    MR. BRADY:  Okay.  Never mind.  Okay.

6      So let's mark as next in order, sorry, let's mark

7      next in order the -- IARC's response to the Reuters

8      article of June 14th of 2017.  Do you have that,

9      Curtis?

10                    MR. HOKE:  Yeah.  One second.

11                    (Whereupon, Deposition Exhibit T-18,

12     IARC response to Reuters article of 6/14/17,

13     marked.)

14            Q.   Mr. Tarone, you've spoken numerous times

15     with Kate Kelland, that's K-a-t-e, Kelland,

16     K-e-l-l-a-n-d, a reporter at Reuters, and given her

17     your opinions about the problems with IARC, and

18     she's quoted you on that extensively, correct?

19            A.   I haven't spoken to her several times.

20     I think it was probably three phone calls and three

21     or four e-mails.  But she has asked me my opinion.

CONFIDENTIAL

Page 228

1    She asked me my opinion on -- she quotes me in two

2    of her articles.  One was on animal studies, and

3    one was on the epidemiology studies about Aaron

4    Blair.

5         Q.   And you pretty much trashed IARC and the

6    determinations that they made in both of those

7    quotes, didn't you?

8         A.   I don't know about trashed.  She

9    contacted, she contacted me because she had read my

10   European Journal of Cancer Prevention paper.  I was

11   critical of IARC, yes, indeed.

12        Q.   And of Dr. Blair.

13        A.   I don't remember that.  I don't remember

14   being critical of Dr. Blair at all.

15             MR. BRADY:   Okay.  And then next,

16   Curtis, I would like to have her mark -- I would

17   like you to mark the IARC report for monographs '20

18   to '24 that we spoke of earlier concerning the IARC

19   rereview of the glyphosate finding.

20             (Whereupon, Deposition Exhibit T-19,

21   Report of the Advisory Group to Recommend

Page 229

1    Priorities for the IARC Monographs during

2    2020-2024, marked.)

3            MR. BRADY:  Okay.  Just give me a

4    minute.  I think we're about done, Doctor.

5        Q.   Doctor, you told us at the beginning

6    that you spent two hours, I'm sorry, you told us

7    that you spent three hours meeting with Monsanto's

8    lawyer with your boss, the CEO at IEI, in September

9    of 2019, correct?

10           A.   September of 2015.

11           Q.   '15.  Correct?

12           A.   Correct.

13           Q.   And then you told us you spent a couple

14   of hours meeting with four more Monsanto lawyers

15   shortly after that but that you didn't charge them

16   anything for that because you like lecturing on

17   statistics; is that right?

18           A.   That's correct.  It was three, three

19   lawyers.  It was about statistical, entirely

20   about --

21           Q.   I'm sorry.  Do you remember who any of

Page 230

1       those lawyers were?

2            A.   Eric Lasker was the first lawyer, and he

3       was at the second meeting as well.  It was a young

4       man and a young woman that were with him in the

5       second stay, second meeting.

6            Q.   And you gave them a free lecture on

7       biostatistics.  That's your testimony, right?

8            A.   That is -- that's exactly what happened.

9            Q.   And were these the biostatistics

10      regarding why it was that you believed that

11      glyphosate should not have been labeled a probable

12      carcinogen in humans by the IARC working group?

13           A.   Not really.  It dealt mainly with

14      issues, like, as I said before, one-sided versus

15      two-sided tests, how to calculate exact p-values,

16      approximations of exact p-values.

17                My main objections to the glyphosate

18      classification and deliberations was the exclusion

19      of exculpatory, clearly exculpatory data, and that

20      was not a topic we discussed.

21           Q.   Okay.

Page 231

1          A.    It was all statistical methods.

2          Q.    Do you know why three Monsanto lawyers

3     flew out to Maryland to meet with you?

4          A.    To learn statistics presumably, to be

5     able to deal with statistics that were in the IARC

6     report.

7                MR. LASKER:  For the record, I'm based

8     in Washington, D.C., so I didn't fly.  This is Eric

9     Lasker.

10         Q.    Did they talk to you about acting as an

11    expert witness on behalf of Monsanto in any of the

12    lawsuits that the company was facing claiming that

13    individuals got cancer from exposure to Roundup?

14         A.    Not at all.  I mean, I made it clear to

15    anybody I talked to that I wasn't interested in

16    getting paid for any work.

17         Q.    Okay.  And then you did some more free

18    work before the deposition today, spending a couple

19    of hours meeting at no cost to Monsanto with their

20    lawyer who's seated next to you, Mr. Vales,

21    correct?

CONFIDENTIAL

Page 232

1        A.    Yes.

2        Q.    Why did you agree to meet with Mr. Vales

3    for free for a couple of hours today?  Did you want

4    to teach him statistics also?

5        A.    No.  It was, as I pointed out often, I'm

6    concerned about what's going on at IARC, and IARC

7    is directly -- it's indirectly related to these

8    court cases, but as I said earlier, I have no dog

9    in the fight.  My fight is with IARC Monographs

10   Program.  But their decision is obviously --

11       Q.    So because you have a fight --

12             MR. VALES:  Hold on.  Let him finish the

13   response.

14       A.    The IARC decision on glyphosate has

15   obvious legal implications in the United States, so

16   there is that relationship.

17       Q.    So, so because of that, you have agreed

18   to give free time to Monsanto's lawyers in

19   defending their claims against or by my client

20   Kathy Caballero and the claim of the lawyers

21   representing Ms. Cotton; is that right?

CONFIDENTIAL

Page 233

1          A.   No, I'm here to defend my papers and the

2     science in my papers.

3          Q.   But you understand that you're also here

4     helping Monsanto, and they listed you as a

5     nonretained expert in this case.  Did you know

6     that?

7          A.   I do, and to the extent that the faulty

8     IARC classification impacts upon the trials, I

9     think that's important, and I want my papers to be

10    taken into account.

11         Q.   How much free time are you willing to

12    give Monsanto to help air these complaints that you

13    have with IARC?

14         A.   Hopefully nothing after this deposition.

15         Q.   Have you agreed to come testify at

16    either of the next trials --

17         A.   No.  In fact, I've said I --

18         Q.   -- the Caballero trial on January,

19    please let me finish, the Caballero trial on

20    January 17th of 2020 or the Cotton trial on

21    January 24th of 2020?

Page 234

1          A.   No.   I explicitly ruled that out from

2     the very first discussion.

3          Q.   But you did agree to this deposition

4     today.  You agreed to make yourself available again

5     at no charge to Monsanto.

6               MR. VALES:   Objection.   The witness was

7     subpoenaed for this deposition.

8          Q.   You agreed to, you told us, waive any

9     witness fees that you may have been entitled to for

10    your deposition today, correct?

11         A.   I have said I want to be paid nothing.

12    I need to win this battle in the scientific

13    literature.  And as soon as I accept money from

14    Monsanto or any other company, it immediately opens

15    me up to criticism that there's a conflict of

16    interest, and it's used to tarnish my science, no

17    matter how right I am about the science.

18         Q.   You've already accepted money from

19    Monsanto though.

20              MR. VALES:   Objection to form.   That's

21    mischaracterizing the witness' testimony.   He's

Page 235

1      never testified to that.

2                    MR. BRADY:  I don't think so, counsel,

3      at all.  Yes, he did.

4                    MR. VALES:  No, he didn't.  He said IEI

5      accepted compensation of $750 for his time at a

6      three-hour meeting.

7                    MR. BRADY:  Counsel, I'm not here for

8      your testimony.  You can answer the question,

9      Dr. Tarone, please.

10             A.    Yeah, I didn't --

11             Q.    You already accepted compensation

12     through your work at IEI, correct?

13             A.    I didn't accept, I did not accept

14     compensation, but IEI got compensation for the one

15     three-hour meeting.

16             Q.    And they, IEI, your employer at the

17     time, who was paying you a salary, accepted

18     compensation from Monsanto, correct?

19             A.    That's correct, for a very small amount

20     of money compared to the overall budget of IEI.

21             Q.    And you didn't spend any time at all

Page 236

1      today preparing for your deposition; is that right?

2             A.   I did not.

3             Q.   How far -- where do you live?  What's

4      your home address?

5             A.   14 Chantilly Court.  I'm an hour and a

6      half away from this building.  Not an hour and a

7      half, a mile and a half away from his building.

8             Q.   1410 Tilly, T-i-l-l-y, Court?

9             A.   C-h-a-n-t-i-l-l-y Court.

10            Q.   I'm sorry.  Say it again slower please.

11            A.   Are you familiar with the song Chantilly

12     Lace and a Pretty Face?  That's how you spell

13     Chantilly, C-h-a-n-t-i-l-l-y.

14            Q.   That's in Baltimore, Maryland?

15            A.   No, that's in Rockville, Maryland.

16            Q.   And the zip code there?

17            A.   20850.

18            MR. BRADY:  Let's go off the record for

19     just a moment.  I don't think I have anything

20     further.

21            THE VIDEOGRAPHER:  We are going off the

Page 237

```
 1      record.  The time is 3:37 p.m.

 2                      (Recess.)

 3              THE VIDEOGRAPHER:  We are back on the

 4      record.  The time is 3:38 p.m.

 5              MR. HOKE:  Okay.  Steve, we're back on

 6      the record.  Steve.

 7              MR. BRADY:  Yes, I'm here.

 8              MR. LASKER:  If you have no further

 9      questions, you have to say that on the record.

10              MR. BRADY:  I'm sorry.  Jack, do you

11      have any more questions?

12              MR. VALES:  Do you have any further

13      questions first before I go?

14              MR. BRADY:  Not unless you raise some

15      issue that I feel I need to clarify or ask further

16      questions about with the witness, counsel.

17              MR. VALES:  Thank you.

18              EXAMINATION BY MR. VALES:

19          Q.  Dr. Tarone, a number of documents were

20      marked but not shown to you, including T-14, T-15,

21      T-16, T-17, T-18 and T-19.  Do you see those, sir?
```

Page 238

1        A.    I do.

2        Q.    And T-19 is Report of the Advisory Group

3   to Recommended -- to Recommend Priorities for the

4   IARC Monographs During 2020 to 2024.  Do you see

5   that?

6        A.    I do.

7        Q.    Do you have any comments on that, sir?

8        A.    Yes, I do, because it's been pointed out

9   that this has been used apparently to contradict me

10  by saying that this group met and affirmed the

11  original glyphosate classification.

12            So I looked at the glyphosate section,

13  and it cites neither of my papers.  So the people

14  that were reviewing this would have been unaware of

15  the serious errors made in the deliberations by the

16  working group.  So it's not surprising --

17            MR. BRADY:  Objection.  This calls for

18  complete speculation on the witness' part.

19        A.    It's certainly true that they don't cite

20  either of my papers.

21            MR. BRADY:  This witness has no idea

CONFIDENTIAL

Page 239

1      what they -- he has no idea what they read or

2      considered.  This is just rank speculation.

3              A.   That's what the reference --

4              MR. BRADY:  Rank speculation.

5              A.   That's what the reference list is for.

6              Q.   Sir, is there a reference list in this

7      publication?

8              A.   It's very lengthy.

9              Q.   Is your name -- is any material authored

10     by you in the reference list?

11             A.   Well, those two papers, none the first

12     author.

13             Q.   Okay.  That's fine.  During -- no, no,

14     I'm still --

15             MR. BRADY:  The witness knows --

16             MR. LASKER:  Steve.

17             MR. BRADY:  -- they don't consider

18     opinion papers as --

19             MR. LASKER:  Steve.

20             MR. VALES:  It's not your, it's not --

21     this is my portion of the examination.  Okay?

CONFIDENTIAL

Page 240

1              MR. BRADY:  Go ahead.

2          Q.   Okay.  And there was also a, a paper

3      here that was marked T-17, IARC Monographs:  40

4      Years of Evaluating Carcinogistic Hazards to Humans

5      signed by a number of scientists.  Do you see that?

6          A.   Yes.

7          Q.   Does that point out any errors

8      substantively in your analysis that you made in

9      your papers?

10          A.   No, it does not.  This is essentially,

11      among other things, a response to a commentary that

12      Joe McLaughlin and I wrote in Cancer Epidemiology,

13      Biomarkers & Prevention.  And as IARC typically

14      does, they respond in great numbers to intimidate,

15      and they reference that paper once but for, you

16      know, not for the reason that the paper was

17      actually written.

18              But no, I'm very well aware of this

19      paper.  This is what -- the head of the EFSA refers

20      to this as Facebook science because you know only

21      one or two of these people wrote it, and then they

Page 241

1        circulate it and people like it by adding their

2        name as co-authors.  It's just, it's just an

3        opinion piece that's praising IARC to the highest

4        level and saying that there's nothing wrong with

5        the IARC Monographs Program.

6              Q.   Do you know whether this opinion

7        expressed in T-17 is shared by all scientists

8        around the world?

9              A.   No, not by all.  You know, they have a,

10        they have a very large group of scientific

11        supporters, the IARC Monographs Program does.

12                  MR. VALES:  I want to show you something

13        that's been marked -- I'll have this marked.  It's

14        an article published in a French publication this

15        past summer.  I'm going to include a translation

16        with it.  I'll have the French publication and the

17        translation marked as two exhibits.

18                  (Whereupon, Deposition Exhibit T-20,

19        French version of Week-end a Prix Fous!, marked.)

20                  (Whereupon, Deposition Exhibit T-21,

21        English version of Week-end a Prix Fous!, marked.)

Page 242

1          Q.   I've handed you the French publication,

2     T-20, and the translation, T-21, published

3     July 14th, 2019.  It's an article in a French

4     journal signed by a number of scientists

5     addressing, among other subjects, glyphosate.  Have

6     you ever seen this before, sir?

7          A.   I have not.  I have never heard of this

8     journal, so this is not something I would have

9     picked up.

10         Q.   And do you, if you turn to the fourth

11    page into this, do you see that the article writes

12    there are indeed scientific consensuses on subjects

13    as diverse as, it includes health, agricultural and

14    climate change?  Do you see that?

15         A.   I don't.  It's the fourth text page

16    or --

17         Q.   Yes.

18         A.   -- including the title?

19         Q.   Including the title.

20         A.   One, two, three, four.  I don't see

21    that.

CONFIDENTIAL

Page 243

1          Q.    (Indicating.)

2          A.    Oh, okay.  All right.  Okay.

3          Q.    And do you see there's comments?  On

4    agricultural it states at current professional and

5    nutritional exhibitions, the various agencies

6    responsible for evaluating the risks associated

7    with using glyphosate considered it unlikely that

8    it presents a carcinogenic risk for humans.  Do you

9    see that?

10         A.    Right.

11         Q.    You haven't seen this before though.

12         A.    I have not seen it before, but that

13   certainly is the opinion of most of the, in fact,

14   almost all but one of the agencies that have

15   evaluated glyphosate.

16         Q.    And you see on the next page it says

17   these are not mere opinions?  These are the

18   conclusions drawn from scientific literature --

19              MR. BRADY:  Counsel, there --

20         Q.    -- and supported by reliable scientific

21   institutions such as the WHO, the European Academy

Page 244

1      of Sciences, the National Academy of Medicine, the

2      Academy of Agriculture and the IPCC.  Do you see

3      that?

4           A.   Yes.

5           Q.   That's what it says?

6                MR. BRADY:  You can say it louder, but

7      we still object.  There's no foundation for this

8      document.  Getting this witness to try to rubber

9      stamp it without a proper foundation is improper.

10          Q.   Counsel, during the examination of

11     Mr. Brady that occurred over the past two hours --

12     do you recall that?

13          A.   Yes.

14          Q.   Did Mr. Brady question you substantively

15     on any of your analysis contained in your papers?

16          A.   No.

17          Q.   Does that surprise you?

18          A.   No.

19               MR. VALES:  Thank you, sir.  That

20     concludes my questions.

21               THE VIDEOGRAPHER:  Are we finished?

Page 245

1          MR. HOKE:  Anything further?

2          MR. BRADY:  No.

3          THE VIDEOGRAPHER:  Please stand by.

4          MR. BRADY:  Just one last question.

5          EXAMINATION BY MR. BRADY:

6     Q.   The paper that counsel just showed you,

7     the last one from the French organization, you've

8     never read or considered that paper and it didn't

9     form the basis for any opinions that you expressed

10    here today or in either of the two papers that

11    we've discussed, correct?

12         A.   No, no.  I didn't -- in fact, just

13    looking at it, this looks to be another example of

14    Facebook science.  So, I mean, I tend to -- I mean,

15    it's certainly true that the agencies that have

16    evaluated glyphosate around the world all but one

17    has said that it's safe as used.  But no, I --

18         Q.   That's not my question.  You did not

19    read or consider this, correct?

20         A.   No, I did not.

21         Q.   It didn't form the basis for any of the

Page 246

1     opinions you gave here today or in any of the two

2     pieces that we've discussed that you had published,

3     correct?

4          A.   No, it did not.  It would not add

5     anything, it would not add anything to the papers

6     that I've already read and relied upon.

7               MR. BRADY:  Thank you.  Nothing further.

8               THE VIDEOGRAPHER:  We are off the record

9     at 3:47 p.m.  This concludes today's testimony

10    given by Robert Tarone.  The total number of media

11    units used was four and will be retained by

12    Veritext Legal Solutions.

13              MR. VALES:  We request that the

14    deposition transcript be designated confidential in

15    accordance with the protective order in light of

16    the fact that it cites to exhibits that have been

17    marked as confidential.  We'd also like the witness

18    to have the opportunity to review the record

19    transcript and sign.

20              (Examination concluded -- 3:47 p.m.)

21              ---------------------

CONFIDENTIAL

Page 247

1    STATE OF MARYLAND SS:

2          I, ILANA E. JOHNSTON, a Notary Public of

3    the State of Maryland, do hereby certify that the

4    within named, personally appeared before me at the

5    time and place herein set out, and after having

6    been duly sworn by me, was interrogated by counsel.

7          I further certify that the examination was

8    recorded stenographically by me and reviewed

9    against the audiotape, and this transcript is a

10   true record of the proceedings.  I further certify

11   that the stipulations contained herein were entered

12   into by counsel in my presence.

13         I further certify that I am not of counsel

14   to any of the parties nor an employee of counsel

15   nor related to any of the parties nor in any way

16   interested in the outcome of this action.

17         As witness my hand and notarial seal this

18   19th day of December,      *Ilana Johnston*

19   My commission expires

20   December 16, 2020          Notary Public

21

CONFIDENTIAL

Page 248

1   John Vales, Esq.

2   john.vales@dentons.com

3                    December 19, 2019

4   RE: Cotton, Treesa  v. Monsanto Company, Et Al.

5       12/17/2019, Robert Tarone , Ph.D. (#3787848)

6       The above-referenced transcript is available for

7   review.

8       Within the applicable timeframe, the witness should

9   read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   Erratas-cs@veritext.com.

16   Return completed errata within 30 days from

17   receipt of testimony.

18     If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20                    Yours,

21                    Veritext Legal Solutions

CONFIDENTIAL

Page 249

1    Cotton, Treesa  v. Monsanto Company, Et Al.

2    Robert Tarone , Ph.D. (#3787848)

3                  E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10    PAGE_____ LINE_____ CHANGE_____

11     _____

12     REASON_____

13     PAGE_____ LINE_____ CHANGE_____

14     _____

15     REASON_____

16     PAGE_____ LINE_____ CHANGE_____

17     _____

18

19     _____    _____

20     Robert Tarone , Ph.D.                    Date

21

CONFIDENTIAL

Page 250

1   Cotton, Treesa  v. Monsanto Company, Et Al.

2   Robert Tarone , Ph.D. (#3787848)

3                    ACKNOWLEDGEMENT OF DEPONENT

4       I, Robert Tarone , Ph.D., do hereby declare that I

5   have read the foregoing transcript, I have made any

6   corrections, additions, or changes I deemed necessary as

7   noted above to be appended hereto, and that the same is

8   a true, correct and complete transcript of the testimony

9   given by me.

10

11   _____     _____

12   Robert Tarone , Ph.D.                         Date

13   *If notary is required

14                          SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                          _____ DAY OF _____, 20____.

16

17

18                          _____

19                          NOTARY PUBLIC

20

21

California Code of Civil Procedure

Article 5. Transcript or Recording

Section 2025.520

(a) If the deposition testimony is
stenographically recorded, the deposition officer
shall send written notice to the deponent and to
all parties attending the deposition when the
Original transcript of the testimony for each
session of the deposition is available for reading,
correcting, and signing, unless the deponent and
the attending parties agree on the record that the
reading, correcting, and signing of the transcript
of the testimony will be waived or that the
reading, correcting, and signing of a transcript of
the testimony will take place after the entire
deposition has been concluded or at some other
specific time.

(b) For 30 days following each notice under
subdivision (a), unless the attending parties and
the deponent agree on the record or otherwise in
writing to a longer or shorter time period, the
deponent may change the form or the substance of
the answer to a question, and may either approve
the transcript of the deposition by signing it, or

refuse to approve the transcript by not signing it.

(c) Alternatively, within this same period, the deponent may change the form or the substance of the answer to any question and may approve or refuse to approve the transcript by means of a letter to the deposition officer signed by the deponent which is mailed by certified or registered mail with return receipt requested. A copy of that letter shall be sent by first-class mail to all parties attending the deposition.

(d) For good cause shown, the court may shorten the 30-day period for making changes, approving, or refusing to approve the transcript.

(e) The deposition officer shall indicate on the original of the transcript, if the deponent has not already done so at the office of the deposition officer, any action taken by the deponent and indicate on the original of the transcript, the deponent's approval of, or failure or refusal to approve, the transcript. The deposition officer shall also notify in writing the parties attending the deposition of any changes which the deponent timely made in person.

(f) If the deponent fails or refuses to approve the transcript within the allotted period, the

deposition shall be given the same effect as though it had been approved, subject to any changes timely made by the deponent.

(g) Notwithstanding subdivision (f), on a seasonable motion to suppress the deposition, accompanied by a meet and confer declaration under Section 2016.040, the court may determine that the reasons given for the failure or refusal to approve the transcript require rejection of the deposition in whole or in part.

(h) The court shall impose a monetary sanction under Chapter 7 (commencing with Section 2023.010) against any party, person, or attorney who unsuccessfully makes or opposes a motion to suppress a deposition under this section, unless the court finds that the one subject to the sanction acted with substantial justification or that other circumstances make the imposition of the sanction unjust.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.