# EXHIBIT E

1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                      CIVIL DIVISION

4    ------------------------------X  MDL No. 2741

5    IN RE:  ROUNDUP PRODUCTS          Case No.

6    LIABILITY LITIGATION              16-md-02741-VC

7    ------------------------------X

8         IN THE CIRCUIT COURT OF ST. LOUIS COUNTY

9                    STATE OF MISSOURI

10   --------------------------

11   JAMES ADAMS JR, et al.,

12            Plaintiffs,

13   V.                    Case No. 17SL-CC02721

14   MONSANTO COMPANY,

15            Defendant.

16   --------------------------

17      VIDEOTAPED DEPOSITION OF ROBERT TARONE, PHD

18

19            FRIDAY, MARCH 10, 2023

20                 9:24 a.m. EST

21

22   Stenographically Reported by:

23   Denise Dobner Vickery, CRR, RMR

24

Robert Tarone, Ph.D.

1

2

3

4

5

6

7

8                    Friday, March 10, 2023

9                    9:24 a.m. EST

10

11          Deposition of ROBERT TARONE, PHD,

12  held at the offices of:

13

14          MOTLEY RICE LLC

15          401 9th Street NW

16          Suite 630

17          Washington, DC 20004

18

19

20          Pursuant to notice, before Denise

21  Dobner Vickery, Certified Realtime Reporter,

22  Registered Merit Reporter, and Notary Public in

23  and for the District of Columbia.

24

Robert Tarone, Ph.D.

```
 1   APPEARANCES:

 2

 3   Representing the Plaintiff SHARLEAN GORDON:

 4        WAGSTAFF LAW FIRM

 5        BY:  AIMEE WAGSTAFF, ESQ.

 6        940 N. Lincoln Street

 7        Denver, CO 80203

 8        303.376.6360

 9        Awagstaff@wagstafflawfirm.com

10

11

12   Representing the Defendant MONSANTO COMPANY:

13        BARTLITBECK LLP

14        BY:  LINDLEY J. BRENZA, ESQ.

15        1801 Wewatta Street, Suite 1200

16        Denver, CO 80202

17        303.592.3130

18        lindley.brenza@bartlitbeck.com

19

20

21   ALSO PRESENT:

22        VINCE ROSICA, Videographer/Trial Tech

23        KEVIN ROWE, Paralegal, Wagstaff Law Firm

24
```

**Exhibit E Page 3**

Robert Tarone, Ph.D.

```
1   APPEARANCES:  (Continued)

2

3   ALSO PRESENT VIA VIDEOCONFERENCE:

4           TARA KING, Esq., Wagstaff Law Firm

5           JEFF SELDOMRIDGE, ESQ., Miller Firm LLC

6           CHELSEA L. MONROE, ESQ., Motley Rice LLC

7           LAURA HOLCOMB, Paralegal, Motley Rice LLC

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

**Exhibit E Page 4**

```
1                     INDEX
2   EXAMINATION OF ROBERT TARONE, PHD          PAGE
3   BY MS. WAGSTAFF                              16
4   AFTERNOON SESSION                           234
5
6              TARONE DEPOSITION EXHIBITS
7   NUMBER       DESCRIPTION                    PAGE
8   Exhibit 1    Subpoena                        36
9   Exhibit 2    Robert Ernest Tarone Curriculum 36
10               Vitae February 22, 2023
11  Exhibit 3    2022 Tarone Letter to the Editor: 74
12               Response to "A Review and Update
13               with Perspective of Evidence that
14               the Herbicide Glyphosate (Roundup)
15               is a Cause of Non-Hodgkin Lymphoma"
16  Exhibit 4    E-mail Tuesday, October 26, 2021  86
17               Vales to Tarone
18  Exhibit 5    Ms. Wagstaff's Chart entitled     86
19               "Dr. Tarone & Monsanto"
20  Exhibit 6    E-mail Monday, November 1, 2021   87
21               Tarone to Vales
22  Exhibit 7    Opinion in NRDC v. USEPA         138
23               June 17, 2022
24
```

Robert Tarone, Ph.D.

```
 1   NUMBER       DESCRIPTION                    PAGE

 2   Exhibit 8    IARC Monographs on the Evaluation 150

 3                Of Carcinogenic Risks to Humans

 4                Volume 112, Lyon, France

 5                3-10 March 2015

 6   Exhibit 9    IARC Monographs on the Evaluation 162

 7                of Carcinogenic Risks to Humans

 8                PREAMBLE, Lyon, France, 2006

 9   Exhibit 10   2018 Tarone Editorial          162

10                Conflicts of interest, bias, and

11                the IARC Monographs Program

12   Exhibit 11   E-mail Monday, May 4, 2020     194

13                Tarone to Weed

14   Exhibit 12   Ms. Wagstaff's Chart           201

15                "IARC 112 Findings"

16   Exhibit 13   Ms. Wagstaff's Chart           228

17                "Ways to Become 2A"

18   Exhibit 14   IARC Monograph on Glyphosate   232

19   Exhibit 15   Ms. Wagstaff's Chart           245

20                "Animal studies = Sufficient"

21

22

23

24
```

Robert Tarone, Ph.D.

| 1 | NUMBER | DESCRIPTION | PAGE |
|---|---|---|---|
| 2 | Exhibit 16 | USEPA February 26, 1985 Memo | 265 |
| 3 | | Subject: Use of historical data | |
| 4 | | in determining the weight of | |
| 5 | | evidence from kidney tumor | |
| 6 | | incidence in the Glyphosate two-year | |
| 7 | | feeding study; and some remarks on | |
| 8 | | false positives | |
| 9 | | MONGLY00235393 - MONGLY00235537 | |
| 10 | Exhibit 17 | USEPA March 4, 1985 Memo | 267 |
| 11 | | Subject: Consensus Review of | |
| 12 | | Glyphosate, Caswell No. 661A | |
| 13 | Exhibit 18 | Monsanto February 22, 1985 Memo | 268 |
| 14 | | Gingerich to Armonstrong, etc. | |
| 15 | | Re: Meeting February 21, 1985 | |
| 16 | | MONGLY04269072 - MONGLY04269075 | |
| 17 | Exhibit 19 | Monsanto April 3, 1985 Memo | 278 |
| 18 | | Levinskas to T.F. Evans | |
| 19 | | MONGLY04277789 | |
| 20 | Exhibit 20 | Biodynamics April 3, 1985 Letter | |
| 21 | | To Kushner from Knezevich | |
| 22 | | MONGLY04269049 - MONGLY04269050 | |
| 23 | Exhibit 21 | Folders of Documents brought to | 315 |
| 24 | | Deposition by Dr. Tarone | |

| | NUMBER | DESCRIPTION | PAGE |
|---|---|---|---|
| 1 | | | |
| 2 | Exhibit 22 | "Rejected without comment by | 317 |
| 3 | | Editors of Environmental Health on | |
| 4 | | February 8, 2023" | |
| 5 | | "On conducting evaluations of | |
| 6 | | evidence" by Robert E. Tarone | |
| 7 | Exhibit 23 | Ms. Wagstaff's Chart | 349 |
| 8 | | In boxes "Mice" and "Rat" | |
| 9 | Exhibit 24 | "Glyphosate Use and Cancer | 353 |
| 10 | | Incidence in the Agricultural | |
| 11 | | Health Study" Andreotti et al 2017 | |
| 12 | Exhibit 25 | July 22, 1997 Memo to the | 355 |
| 13 | | Communications Subcommittee from | |
| 14 | | John Acquavella | |
| 15 | | MONGLY00885870 - MONGLY00885874 | |
| 16 | Exhibit 26 | E-mail(s) 6/1/1999 Klevorn to | 368 |
| 17 | | Farmer Subject: Re[5]: Questions | |
| 18 | | about Glyphosate | |
| 19 | | MONGLY00877463 - MONGLY00877468 | |
| 20 | Exhibit 27 | E-mail 5/11/2015 Heydens to | 374 |
| 21 | | Koch etc. Subject: Post-IARC | |
| 22 | | Activities to Support Glyphosate, | |
| 23 | | Attachment, MONGLY01228576 | |
| 24 | | | |

Robert Tarone, Ph.D.

```
 1   NUMBER        DESCRIPTION                      PAGE

 2   Exhibit 28   Tarone Opinion Paper: "On the     399

 3                International Agency for Research on

 4                Cancer classification of glyphosate

 5                as a probably human carcinogen" 2018

 6   Exhibit 29   "Response to comments prepared    400

 7                by Christopher Portier (dated

 8                October 4, 2016) for the glyphosate

 9                EPA SAP meeting," Robert E. Tarone

10                MONGLY14537158 - MONGLY14537160

11   Exhibit 30   Screenshots of Text Messages      404

12                from Mr. Tarone's iPhone

13   Exhibit 31   "Glyphosate Exposure and Urinary  407

14                Oxidative Stress Biomarkers in the

15                Agricultural Health Study"

16                Chang et al, 2023

17   Exhibit 32   E-mail(s) Saturday, May 09, 2020  411

18                Kabat to Tarone Subject: Re: Some

19                more changes and questions from Bill

20   Exhibit 33   "On recent meta-analyses of       413

21                exposure to glyphosate and risk of

22                non-Hodgkin's lymphoma in humans,"

23                Kabat, Price, Tarone, 2021

24
```

**Exhibit E Page 9**

Robert Tarone, Ph.D.

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 34 | WHO "IARC responds to Reuters article of 14 June 2017" 16 June 2017 | 418 |
| Exhibit 35 | "IARC response to criticisms of the Monographs and the glyphosate evaluation, Prepared by the IARC Director, January 2018" | 423 |
| Exhibit 36 | WHO "IARC Monographs on the Identification of Carcinogenic Hazards to Humans Report of the Advisory Group to Recommend Priorities for the IARC Monographs during 2020-2024 | 433 |

**Exhibit E Page 10**

Robert Tarone, Ph.D.

```
 1              P R O C E E D I N G S

 2                    - - -

 3              MR. BRENZA:  We're about to

 4    begin the deposition of Dr. Tarone in the

 5    MDL and selected other cases that have

 6    been noticed.

 7              This is Lin Brenza.  I'm

 8    representing Monsanto.

 9              Before we begin today I just

10    want to put on the record a few facts

11    that occurred before we came here to this

12    room today.

13              We asked that plaintiffs'

14    leadership counsel agree that

15    Dr. Tarone's prior deposition be deemed

16    as taken in the MDL rather than him

17    having to repeat, for the most part, his

18    testimony that's already been taken in a

19    deposition in another case and which

20    deposition has been permitted to be used

21    in numerous trials.

22              They -- they refuse to make

23    that agreement.  They understood that

24    that would mean we would have to take a
```

Robert Tarone, Ph.D.

1    second day of Dr. Tarone's time to

2    recreate that deposition, in addition to

3    other issues that may come up today in a

4    second day.

5              Our position is today

6    plaintiffs can ask whatever they want.

7    This is their day.  That the second day

8    will be the defense day, and that we will

9    begin the day and that we will consume

10   most of the day, and that that will be

11   the conclusion of Dr. Tarone's deposition

12   in the MDL and these other selected

13   cases.

14             Dr. Tarone is an independent

15   witness.  He's not being paid for his

16   time.  It's unfair that he should have to

17   come back for a second day at all, but if

18   he does, it needs to wind up in that

19   second day.

20             We also received a message

21   last night or two nights ago from one of

22   the leadership counsel saying they

23   couldn't be here today and they were

24   going to reserve their questions for the

Robert Tarone, Ph.D.

1    defendant's day.

2              That's unacceptable.  We're

3    going to object to that.  They can

4    cross-examine, I guess, if they have

5    questions about what Dr. Tarone says in

6    the second day in an appropriate scope

7    and time frame.

8              But in terms of the second

9    day, it's our position that we will begin

10   that day and we will take Dr. Tarone's

11   deposition that the plaintiffs have

12   necessitated us having to do.

13             If any of that is

14   unacceptable -- and I understand

15   plaintiffs' counsel doesn't agree -- we

16   will -- we will ask the court for

17   direction.  But we've -- we've agreed

18   today to see how it goes.  Maybe -- maybe

19   the plaintiffs can finish what they need

20   to do today.

21             I urge them to communicating

22   amongst themselves to do what they need

23   to do today -- they're going to have the

24   whole day -- and not try to invade the

**Exhibit E Page 13**

1    second day with further questioning.

2              That's it.

3              MS. WAGSTAFF:  So Aimee

4    Wagstaff on behalf of plaintiffs.

5              Dr. Tarone was not a

6    percipient fact witness at IARC 112.  He

7    has taken upon himself to inject himself

8    into the litigation and the scientific

9    controversy surrounding the Monograph

10   112.  He has written criticisms of the

11   Monograph 112.  He has written criticisms

12   of the plaintiffs' experts in Monograph

13   112 and whether or not he is being paid

14   is irrelevant.

15             He has injected himself into

16   this litigation, and as the documents

17   will show later today, he is not an

18   independent witness.

19             Plaintiffs have noticed this

20   deposition.  It has been cross-noticed in

21   several state courts, including courts

22   that do not have time limits, and

23   plaintiffs will take as much time as they

24   need to complete this deposition.

**Exhibit E Page 14**

Robert Tarone, Ph.D.

1          As is in any deposition, when

2     we pass the witness, we are more than

3     willing and -- and appreciative that

4     Monsanto can take as much time as they

5     want with their witness when it's their

6     turn.

7          We are not agreeing that day 1

8     is plaintiffs and day 2 is Monsanto.  It

9     may very well may end up that way, but as

10    we start the deposition, we are not even

11    sure that I'll need all day and Monsanto

12    may need to start today.

13         So I think this is a premature

14    argument.  It was brought up before this

15    deposition started.  I offered to call

16    the MDL judge and any state court judge

17    yesterday in the middle of the day.  No

18    Monsanto lawyer took me up on it.

19         So now as we sit here at

20    9 a.m. starting the deposition, it's

21    little disingenuous these threats.

22         That's it.

23         THE VIDEOGRAPHER:  We are now

24    on the record.  My name is a Vince

Robert Tarone, Ph.D.

```
 1           Rosica.  I'm a videographer for Golkow

 2       Litigation Services.

 3                   Today's date is March 10, 2023

 4       and the time is 9:24 a.m.

 5                   This video deposition is being

 6       held in Washington, DC in the matter of

 7       Roundup Products Liability Litigation MDL

 8       No. 2741.

 9                   The deponent is Robert Tarone.

10                   Counsel's appearances will be

11       noted on the stenographic record.

12                   The court reporter is Denise

13       Vickery and will now swear in the

14       witness.

15                           - - -

16                   ROBERT TARONE, PHD

17   called for examination, and, after having been

18   duly sworn, was examined and testified as

19   follows:

20                           - - -

21                   EXAMINATION

22                           - - -

23   BY MS. WAGSTAFF:

24       Q.     Good morning.  Could you please
```

Robert Tarone, Ph.D.

```
 1    state your name for the record?

 2         A.        Robert Tarone.

 3         Q.        All right.  And are you a doctor?

 4         A.        I am.

 5         Q.        Okay.  Dr. Tarone, what is your

 6    current address?

 7         A.        14 Chantilly Court, Rockville,

 8    Maryland.

 9         Q.        All right.  And, Dr. Tarone, my name

10    is Aimee Wagstaff, and I'm a lawyer in the Roundup

11    litigation who represents several plaintiffs who

12    have alleged that exposure to Roundup caused them

13    to develop non-Hodgkin's lymphoma.

14                   Do you understand that?

15         A.        Yes.

16         Q.        Okay.  And who is your current

17    employer?

18         A.        I have no employer.

19         Q.        Okay.

20         A.        I retired July is 1, 2016.

21         Q.        And so how have you been making

22    money since July 1, 2016?

23         A.        Social Security, retirement.

24         Q.        Okay.  So you saved enough money
```

Robert Tarone, Ph.D.

1  that you -- through your -- through your previous

2  work that you no longer need to work?

3       A.      Right.  I was employed by the

4  National Cancer Institute for 28 years.

5       Q.      Okay.

6       A.      I took advantage of their thrift

7  program and have federal retirement, which is more

8  than generous.

9       Q.      All right.  And how much do you

10  receive each month from your federal retirement?

11       A.      About $6,000.

12       Q.      Okay.  And you were a mathematical

13  stat -- you were a mathematical statistician,

14  right?

15       A.      I still am.  (Laugh).  But that was

16  my official title.

17       Q.      Okay.

18       A.      Research mathematical statistician

19  was the official title.

20       Q.      So you said you still are.

21              So are you still working as a

22  mathematical statistician?

23       A.      Well, I mean, that's my training.  I

24  will be a mathematical statistician until I die.

Robert Tarone, Ph.D.

```
 1   That's what I do.  And I do stay current with the
 2   literature, just keep my brain active.
 3        Q.      Okay.  So are you still working as a
 4   mathematical statistician?
 5        A.      Not working.  I mean, I do go
 6   online.  If I see a paper that I'm interested in,
 7   I print it, read it.  And if I find something that
 8   I disagree with or a paper that's lied about me, I
 9   send letters or write papers.
10        Q.      And there are papers online that
11   have lied about you?
12        A.      Oh yes.  Absolutely.
13        Q.      And you received your -- your
14   Bachelor of Science and your master's of science
15   and your PhD in -- in math from UC Davis --
16        A.      Right.
17        Q.      -- is that right?
18        A.      Cal Aggie.
19        Q.      All right.  And when you graduated
20   from UC Davis, you entered a job with the National
21   Cancer Institute; is that right?
22        A.      That's correct.
23        Q.      And you were with -- the NCI is what
24   it's called; is that right?
```

**Exhibit E Page 19**

```
 1        A.        (Nods head).

 2        Q.        You were with NCI from 1974 to 2002;

 3  is that right?

 4        A.        Correct.

 5        Q.        Okay.  And then in 2002, you left

 6  government work and you went into private practice

 7  for about 16 years with Bill Blot to the

 8  International Epidemiology Institute; is that

 9  right?

10        A.        Yeah.  14 years, yeah.

11        Q.        14 years?

12        A.        Yes.

13        Q.        So your last 14 years of working was

14  in the private sector as a consultant, right?

15        A.        Not -- I wouldn't say a consultant.

16  I was an employee.  So I did whatever was

17  required.  Most of what IEI did during the time

18  that I was there was actually running the Southern

19  Community Cohort Study.  We did the day-to-day

20  operation.  This was a federal grant with

21  Vanderbilt University and Meharry University.  A

22  study of 80,000 people, residents of the South,

23  primarily low SES and two-thirds African American.

24        Q.        All right.  I'll move to strike that
```

Robert Tarone, Ph.D.

1    as nonresponsive.

2              So were you doing consulting at IEI?

3         A.    I don't know what you mean by "doing

4    consulting."  I was an employee on salary and I

5    did whatever the CEO or the president asked me to

6    do.

7         Q.    All right.  Do you know what it

8    means to be a consultant?

9         A.    How do you define it?

10        Q.    How do you define it?  You're the

11   deponent.

12        A.    (Laugh).

13        Q.    How do you define consultant?

14        A.    I -- I don't know.

15        Q.    You can't define what it means to be

16   a consultant?

17        A.    Well, as -- as a paid, hired

18   employee on a salary, I don't know if there's a

19   distinction.  But I do whatever I'm told and that,

20   you know, sometimes that's working with the

21   government, sometimes it's working with companies,

22   and we did a wide variety of work.  The most of

23   which was related to the federal grant.

24              So would you say I'm a consultant to

Robert Tarone, Ph.D.

1   the federal government?  I wouldn't say that.

2          Q.      Did you -- can you tell me what it

3   means to be a consultant?  Can you define what

4   that means?

5          A.      To me -- well, in fact, everything I

6   did at NCI was consulting in the sense that I was

7   a statistician, and much of what I did I was not

8   really familiar with the underlying biology or

9   anatomy, whatever.  I'm consulting with people

10  doing research to help them do the best

11  statistical analysis.  So that's how I define a

12  consultant.

13         Q.      Okay.  So you were doing consulting

14  work when you were at ICI?

15         A.      NCI.  I was primarily, yes.

16         Q.      No, ICI.  I'm talking about your --

17  your private sector job.  At IEI.  Sorry.

18         A.      When I was doing work on the

19  Southern Community Cohort Study, was that

20  consultant work?  I wouldn't consider it that.

21         Q.      Is that the only thing you did when

22  you were at IEI?

23         A.      It was a lot of what I did, but, no,

24  it was not.  As I said, we did work for companies.

**Exhibit E Page 22**

Robert Parone, Ph.D.

1    We did work for governments, other than the United

2    States.  We did a wide variety of work, and they

3    were usually just to do specific studies.  And if

4    I was assigned to take part in a given study, I

5    did.

6          Q.      All right.  So since you can't

7    define consulting for me, let me ask another

8    question.

9                  Would private companies hire IEI for

10   advice?

11         A.      Yes.

12         Q.      Okay.  Is that consulting?

13         A.      The company is consulting with the

14   company?  I would say that.  IEI was --

15         Q.      Okay.

16         A.      -- was hired as consult to consult

17   the company.

18         Q.      And as an employee, you were

19   receiving a salary, right?

20         A.      I was receiving a salary.

21         Q.      Okay.  And you were doing what they

22   told you, right?

23         A.      Yes.

24         Q.      Okay.  So you were consulting with

Robert Farone, Ph.D.

1    the private companies that hired IEI, right?

2                      MR. BRENZA:  Object to form.

3                      THE WITNESS:   Indirectly.  I

4         guess I would agree with that.  Yeah.

5    BY MS. WAGSTAFF:

6         Q.      Okay.  And if you sat in on meetings

7    with a company that hired IEI for consulting, you

8    were consulting with that company, right?

9         A.      Yeah.

10                     MR. BRENZA:  Object to form.

11        Vague.

12                     THE WITNESS:   I don't -- that

13        didn't happen very often because my role

14        was primarily, again, as a statistician.

15        So I was more involved in analysis and

16        just working within the company, not with

17        --

18   BY MS. WAGSTAFF:

19        Q.      And --

20        A.      -- not with people in other

21   companies.

22        Q.      And I understand it didn't happen

23   very often, but it happened, right?

24        A.      I assume it did.

**Exhibit E Page 24**

Robert Tarone, Ph.D.

```
1        Q.       You can't think of one time that a
2   private company paid IEI --
3        A.       No, no, no.
4        Q.       -- money?
5        A.       I said that I met with people from
6   that company.  That was usually done by the
7   company president or the CEO.
8        Q.       Sure.
9        A.       And I would rather work.
10       Q.       But that would be consulting?
11       A.       Uh?
12       Q.       And that would be consulting.  We
13  just -- we just defined that.
14       A.       For the company, yes.
15       Q.       Yes.  Okay.  All right.
16                And have you -- you've -- you've
17  provided a deposition before in this litigation,
18  right?
19       A.       (Nods head).
20       Q.       And that was in December of 2019?
21       A.       That's right.
22       Q.       All right.  And at that deposition,
23  you testified that you had given two previous
24  depositions --
```

Robert Tarone, Ph.D.

1        A.        Correct.

2        Q.        -- which means that you've given at

3   least three depositions, right?

4        A.        I've given three depositions.

5        Q.        Okay.  So I'm going to go over the

6   rules of a deposition in a minute, but I want to

7   know.  I've read your December 2019 deposition.

8              What were your other two depositions

9   about?

10        A.        I inherited the case that led to

11   those depositions.  Because when I -- when I went

12   to work for IEI, one of the things I told the

13   president and CEO is I didn't want to do any legal

14   work.  And they were fine with that.

15              But I think it was in 2014, Alcoa

16   contacted the company president and asked him to

17   take a case, a workers' compensation case, a

18   kidney cancer case for a man who had worked on a

19   production line and was asserting that his kidney

20   cancer was due to the exposures on the -- on the

21   line.  Primarily solvent exposures.

22        Q.        Okay.  So what role did you play in

23   that?

24        A.        Well, initially my role was -- the

Robert Tarone, Ph.D.

```
1   company president very often used me to go into
2   the literature, read papers, and write summaries
3   for him that might be relevant to any project,
4   including this one.  So I was just advising the
5   company president, and he was working with Alcoa
6   putting together whatever testimony he was going
7   to give.
8        Q.      So why were you deposed?
9        A.      Well, Joe McLaughlin, who was the
10  company president, got very ill and had to have a
11  very serious operation and, unfortunately, he's
12  just -- he could not continue on the case.  And,
13  doubly unfortunately, I was asked to take it over
14  right before the first deposition, which was an
15  interesting experience since I had never been
16  deposed before.
17       Q.      So I guess I'm just a little
18  confused.
19               Were you an expert witness?
20       A.      Yes, I think that would be how you
21  define it.  Yeah.
22       Q.      Okay.  So -- so someone came to you
23  with an issue which you researched, and then you
24  provided a deposition of your opinion; is that
```

Robert Tarone, Ph.D.

```
1   right?

2        A.      Right.

3        Q.      Okay.  And that made you an expert

4   witness?

5        A.      I assume so, yes.  Yeah.

6        Q.      Okay.  And you said there were two

7   depositions.

8                They were both in that case?

9        A.      They were.  The first deposition was

10  -- I can't remember the exact time.  I think it

11  was August of 2014, maybe July/September, and for

12  some reason there had to be a second deposition.

13  I do remember that date, unfortunately.  That was

14  December 10th of 2014, and it was similar -- it

15  was similar to the first deposition.

16               It was basically me being accused of

17  all kinds of things for the entire deposition

18  because the science was not really on the side of

19  the -- of the plaintiff.  But it was sort of the

20  -- the two depositions were very similar in terms

21  of content.

22               And when I returned to the office at

23  the end of that deposition, the company office

24  administrator came up to me and informed me that
```

1    Joe, the president, had died the previous night.

2    So that's why I remember the date very well, which

3    was unexpected.  Even though he had been sick, it

4    was very unexpected.

5              And I went into my offices.  I was

6    just sitting there for about a half hour, and I

7    got a phone call from the Alcoa lawyer telling me

8    that the case had been dropped.  So that -- that

9    ended there in December.

10        Q.    All right.  Move to strike the last

11   part as nonresponsive, and I'm very sorry for your

12   loss.  Obviously it's --

13        A.    Nonresponsive.

14        Q.    Yeah.

15              MR. BRENZA:  Just so you know,

16         when she says that, it doesn't mean

17         anything.  Just -- you don't need to

18         respond to it.

19              MS. WAGSTAFF:  Oh, it means

20         something.

21   BY MS. WAGSTAFF:

22        Q.    All right.  So let's go through the

23   rules of a deposition.  A few rules to keep in

24   mind.  This is your -- have you had any other

Robert Farone, Ph.D.

1    depositions other than those three?

2         A.      (Shakes head.)

3         Q.      So this is your fourth deposition?

4         A.      This is number four.

5         Q.      All right.  So the main one is:  You

6    let me finish and I'll let you finish.

7         A.      (Nods head).

8         Q.      And sometimes that's hard for me,

9    and I don't know if it's hard for you, but I will

10   endeavor to do my best to wait until you are

11   completely done.  And I ask that you do the same.

12        A.      (Nods head).

13        Q.      I haven't seen so far that you have

14   a problem with verbal answers, but a lot of times

15   deponents, you know, in the normal conversation

16   when we're sitting at a dinner talking to people

17   nod their head, shake their head.  We need an

18   actual verbal answer.  So if that would be great.

19             Now, it doesn't look like you're

20   represented by any lawyer here?

21        A.      No.

22        Q.      And why did you choose not to have a

23   lawyer represent you?

24        A.      (Laugh).  I don't know.  I just

1    didn't think I needed one.

2        Q.      And you've been -- you've been

3    speaking with Monsanto's lawyers since the last

4    deposition, right?

5                    MR. BRENZA:  Object to form.

6                    THE WITNESS:  Yes.

7    BY MS. WAGSTAFF:

8        Q.      Okay.  And after you got

9    subpoenaed -- and we'll go into more detail -- but

10   after you got he subpoenaed by my office to show

11   up today, you spoke to Monsanto's lawyers on

12   numerous occasions, right?

13       A.      Not numerous actually, but I

14   immediately texted Mr. Vales and told him that I

15   had received a subpoena.  He asked me to e-mail it

16   to him, which I did, and it was a few days and

17   then -- because I asked him.  I mean, I didn't

18   really understand -- I'm sure you will tell me --

19   why I should be forced to testify.

20       Q.      Yeah.

21       A.      But he said, you know, it's just the

22   way it was.  And I think the date was -- didn't

23   work.  The original date was the 2nd, which

24   apparently didn't work for -- for him or for

Robert Farone, Ph.D.

1    Monsanto.  Actually, I thought it was Bayer but --

2    and so he must have contacted you or somebody and

3    gotten it moved to the 10th.

4         Q.      So do you have your phone with you?

5         A.      I do.

6         Q.      Can I see your text messages with

7    Mr. Vales, please?

8         A.      Yeah.  I don't mind.

9         Q.      You text with him a lot?

10        A.      Not a lot.  A few times.  There's

11   one -- there's one sort of a lengthy --

12        Q.      Okay.

13        A.      -- a more lengthy text thread.

14        Q.      And do you text message with any

15   other Monsanto lawyers?

16        A.      No.

17        Q.      Any other Monsanto employees?

18        A.      No.

19        Q.      All right.  I'd like to -- if we

20   could get screenshots or something of his text

21   messages, that would be --

22        A.      Okay.  Starts at the top.

23        Q.      I'm just going to scroll through the

24   whole thing.  You hold.

**Exhibit E Page 32**

Robert Parone, Ph.D.

```
 1          A.        Okay.  I'm just telling to let you
 2   know where the specific one about the subpoena.
 3   The first is when I sent him a publication that I
 4   had in --
 5          Q.        Yeah.
 6          A.        -- Issues in Science and Technology.
 7          Q.        I just want to get a flavor of how
 8   often you text message with Monsanto's lawyers.
 9          A.        No, I don't very often, and
10   Mr. Vales is the only one that I had any contact
11   with before today.  It's the first time I've
12   met --
13          Q.        Okay.  If you can just take --
14          A.        -- Mr. Brenza.
15          Q.        Do you mind if he takes pictures of
16   all that?
17          A.        No, not at all.
18          Q.        Okay.
19          A.        If I knew how to print it out, I
20   would have printed it.  I just don't know how to
21   print out --
22          Q.        Yeah, that's a little tricky.
23          A.        -- text threads.
24          Q.        So Monsanto's lawyer is here and
```

Robert Farone, Ph.D.

```
 1  they may make objections from time to time, and I

 2  may make move to strike from time to time.

 3            I guess there's no one to instruct

 4  you not to answer.  But as -- as Lin just said, we

 5  are preserving the record with our objections and

 6  our move to strike and things of that nature.  So

 7  you need to answer every single question.

 8       A.    Uh-huh.

 9       Q.    Okay?

10       A.    Oh, did it fall?

11       Q.    Looks like your microphone.

12            Tell me when you're ready.

13            Okay.  So you understand that even

14  though we're in a conference room in Washington --

15  Washington, DC, you are under the oath to the tell

16  truth today, right?

17       A.    I do.

18       Q.    It's the same oath as if you were in

19  a courtroom before a judge and a jury.

20            Do you understand that?

21       A.    I understand completely.

22       Q.    Okay.  And you understand that a

23  judge and maybe even a jury probably will see this

24  testimony at some point, right?
```

**Exhibit E Page 34**

Robert Farone, Ph.D.

```
 1        A.      I do.

 2        Q.      Okay.  And what does it mean to you

 3   to tell the truth?

 4        A.      (Laugh).  To tell the truth.  To be

 5   honest.  Completely honest.

 6        Q.      The whole truth, right?

 7        A.      Yeah.  Absolutely.

 8        Q.      All right.  And as we discussed

 9   before we went on the record, my intention today

10   is to work through up until lunch, noon, around

11   noontime, but I think every hour, hour and a half

12   we should get up and stretch our legs, take a

13   bathroom break, get something to drink.

14                If you need a break before that,

15   please just ask me, and I will finish my question,

16   and we can stop and take a break.

17                Is that fair?

18        A.      It's fair.

19        Q.      Is there any reason why I can't get

20   your best testimony today?

21        A.      I wouldn't think so.

22        Q.      Now --

23        A.      I apologize for my voice, but the

24   forsythia and the plants are out and the flowers
```

**Exhibit E Page 35**

1    are out, and I have bad hay fever.

2         Q.      Okay.  And I'm going to do my best

3    to ask questions that are not confusing and -- and

4    questions that you can understand, but if for some

5    reason you can't understand something I ask, will

6    you ask me to rephrase?

7         A.      Certainly.

8         Q.      Will you ask me to state it another

9    way, and if you do not ask me, is it fair to

10   assume you understood my question?

11        A.      Yes.

12                MS. WAGSTAFF:  Okay.  So

13           before we get involved into the substance

14           of your opinions -- and I'll mark as

15           Exhibit 2 his CV.

16                (Document marked for

17           identification as Tarone Exhibit 2.)

18                MS. WAGSTAFF:  And as

19           Exhibit 1 the notice of deposition.

20           Okay?

21                (Document marked for

22           identification as Tarone Exhibit 1.)

23   BY MS. WAGSTAFF:

24        Q.      And you were served with this notice

Robert Parone, Ph.D.

```
 1   of deposition.

 2               I don't need it on.

 3        A.     I already have a copy.

 4        Q.     Oh, that's mine?

 5               You were served with your notice of

 6   deposition by my office, right, which is --

 7        A.     Your name is on it.

 8        Q.     Yeah.

 9        A.     So I don't know who served it but --

10               MR. BRENZA:  Do you have a

11      copy for me?

12               MS. WAGSTAFF:  I thought I

13      gave you one.

14               MR. BRENZA:  Oh, I'm sorry.

15      Yeah, you did give me one.

16               THE WITNESS:  Yeah.  Yeah.

17   BY MS. WAGSTAFF:

18        Q.     All right.  So my name is on it.

19   That's my signature right there.

20               And when you got this subpoena, you

21   didn't call me, right?

22        A.     No, I did not.

23        Q.     No.

24               You texted Monsanto's lawyer, right?
```

**Exhibit E Page 37**

Robert Tarone, Ph.D.

```
1              A.       Correct.
2              Q.       All right.  And this required you to
3      appear at a deposition, which is what you're doing
4      today, right?
5              A.       Correct.
6              Q.       And my office a couple days after
7      they served you realized that the statute required
8      that we pay you a witness fee --
9              A.       (Laugh).
10             Q.       -- of like $60 or something, and so
11     my office, realizing they had made a mistake by
12     not complying with the law, sent you a check.
13                      Did you get that check?
14             A.       Well, I got a second deposition with
15     a check, yes.
16             Q.       Yes.
17             A.       Young man showed up at the front
18     door.
19             Q.       We didn't want you not to show up
20     because we had not paid you your statutory fee.
21             A.       (Shakes head.) (Laugh).
22             Q.       So my office sent you that fee.
23                      So you see here that there's a
24     document request, which is 11 things, 11 items.
```

**Exhibit E Page 38**

Robert Tarone, Ph.D.

1                     You see that?

2          A.        Yes.

3          Q.        Okay.  And you didn't produce --

4   you -- you came to the office with -- you showed

5   up at the deposition this morning with about four

6   inches of documents in a couple of different

7   binders, which are being copied right now; is that

8   correct?

9          A.        Correct.

10         Q.        And those are how you -- those are

11  the documents that you believe were in response to

12  this?

13         A.        To the best possible, I mean.

14         Q.        Okay.

15         A.        Given --

16         Q.        So --

17         A.        Given that the deposition just said

18  "Roundup Products Liability Litigation," I wasn't

19  sure, and many of these don't apply to me.  They

20  talk about the last five years.

21         Q.        Okay.

22         A.        Depositions, money received, etc.

23         Q.        Okay.  So once we get those

24  documents back, because they are being copied, I'm

Robert Tarone, Ph.D.

1   going to come back to this.

2        A.      Okay.

3        Q.      I just wanted to make sure.  So

4   we'll put this aside for now --

5        A.      That's fine.

6        Q.      -- and I'll come back to that and

7   we'll figure out what you brought and how you

8   collected it and etc., etc.  Okay?

9                Is that fair?

10       A.      Yes.

11               MS. WAGSTAFF:  All right.  And

12          I'm going to mark as Exhibit 2 his CV,

13          but I'm not going to -- I think I've

14          already covered as much of his CV as I

15          want to cover.  And you have his.

16  BY MS. WAGSTAFF:

17       Q.      One question I will ask is:  This is

18  your most updated CV.  It's titled February 22,

19  2023?

20       A.      If it ends with the -- yes, it ends

21  with the clinical lymphoma, myeloma, leukemia.

22  It's most up-to-date.

23       Q.      And I can rely on this for accuracy

24  and you have verified that it's correct?

Robert Tarone, Ph.D.

1        A.      Yep.

2        Q.      Okay.  And you produced that today

3   as part of your production.

4        A.      (Nods head).

5        Q.      All right.

6                MR. BRENZA:  I'd also let the

7        record reflect that there's a

8        bibliography attached to the CV.

9   BY MS. WAGSTAFF:

10       Q.      Okay.  So before we get into the

11  substance of your opinions, I want to talk about

12  how you became involved in this debate.

13              Fair?

14       A.      Fair.

15       Q.      Okay.  So you are not now nor have

16  you ever been a member of any IARC Working Group;

17  is that right?

18       A.      No.  My only association with IARC

19  is, I went there to IARC twice because I

20  coauthored their scientific monograph on how to

21  analyze rodent studies.

22       Q.      All right.  Move to strike as

23  nonresponsive.

24              You are not now currently or ever

Robert Tarone, Ph.D.

```
1   have been a member of any IARC Working Group, have
2   you?
3        A.     No.
4        Q.     Okay.  You are not -- so -- so you
5   have never been a member of any IARC Working Group
6   that ever analyzed glyphosate, right?
7        A.     No.  Anything.
8        Q.     You've never been an invited
9   specialist to IARC; is that right?
10       A.     No.
11       Q.     You've never been an observer at any
12  IARC meeting; is that right?
13       A.     No.
14       Q.     Is that right?
15       A.     That's correct.
16       Q.     Okay.  (Laugh).  Just -- I'm just
17  saying the record needs to reflect I asked you a
18  question and you said no, and I said is that
19  right.  You said no, but your answer was that's
20  right.
21       A.     (Laugh).
22       Q.     Well, reading -- reading the
23  transcript later.
24       A.     Got you.  I got you.  (Laugh).
```

**Exhibit E Page 42**

Robert Tarone, Ph.D.

```
1           Q.       You understand what I'm saying?

2           A.       Yes.

3           Q.       Okay.  So you have never been an

4    observer at IARC, correct?

5           A.       No, I have not.

6           Q.       Okay.  In fact, you've never even

7    tried to become a member, an invited specialist,

8    or an observer of IARC Working Group that --

9    that -- correct?

10          A.       No.

11          Q.       And that would include any IARC

12   analysis of glyphosate; is that correct?

13          A.       That's correct.

14          Q.       All right.  And over the past 35

15   years, other than the one paper you wrote in 1986,

16   you've had no involvement in developing or

17   implementing any of IARC's policies or procedures,

18   correct?

19          A.       What -- what is the 1986?

20          Q.       The paper you wrote in 1986 about

21   rodent bioassays.

22          A.       Oh, that's a book.

23          Q.       Okay.  A book.

24          A.       It's in their Monograph series.
```

**Exhibit E Page 43**

1    That's correct.

2         Q.      Okay.  So let me -- let me rephrase

3    the question then.

4         A.      No, that's correct.

5         Q.      Over the past 35 years, other than

6    the book chapter you wrote in 1986, you've had no

7    involvement in developing or implementing any of

8    IARC's policies or procedures, correct?

9         A.      That would be correct.

10        Q.      Okay.

11        A.      I've had a lot of interactions with

12   them discussing their policies and procedures, but

13   they're all in the open literature for all to

14   read.

15        Q.      All right.  And you would agree that

16   you were not present for any of the Working

17   Group's discussions about glyphosate?

18        A.      I was not.

19        Q.      You were not consulted by any member

20   of the Working Group while they were assessing

21   glyphosate?

22        A.      No, I was not.

23        Q.      And you did not personally

24   contribute any data, studies, or any information

1    to Working Group 112 before they met in March

2    2015, correct?

3         A.        That is correct.  I was basically

4    ignorant of glyphosate scientific literature at

5    the time that meeting took place.

6         Q.        Okay.  And at the time of that

7    meeting, you didn't speak to anyone while they

8    were there, correct?

9         A.        No, I did not.

10        Q.        Okay.  And since that meeting, in

11   fact, you have not spoken to any of the voting

12   members, invited specialists, or observers that

13   were part of Monograph 112; is that correct?

14        A.        I think.  Yeah, that would be

15   correct.  There weren't many of them that I knew

16   but I -- and I haven't spoken to any of them.

17        Q.        And so it was not until September of

18   2015 when Monsanto attorneys reached out to your

19   company for advice that you first learned of

20   Monograph 112?

21        A.        Well, I knew about Monograph 112,

22   but these monographs come out on a regular basis,

23   and I don't read them all in-depth.  And I did

24   read the summary of the Monograph 112, but aside

1  from that, no.

2       Q.      So let me -- let me rephrase it

3  because I don't think -- I'm asking "correct"

4  questions and you're answering with a yes or no.

5       A.      Okay.

6       Q.      So we're kind of using different

7  language.  (Laugh).

8       A.      I'll try to keep that in mind.

9       Q.      Or I'll try to keep that in mind

10  when I ask my questions that you like yes or no.

11       A.      No, that's all right.

12       Q.      It was not until September 2015 when

13  Monsanto lawyers came to your office and hired

14  your company for advice that you first reviewed

15  Monograph 112, right?

16       A.      Well, even at that time, I didn't

17  review it.  I reviewed it immediately after that

18  meeting.

19       Q.      Okay.

20       A.      And by -- how did you rephrase the

21  question again?

22              MS. WAGSTAFF:  Can you reread.

23              (The reporter read the record

24       on page 46 lines 12-15.)

**Exhibit E Page 46**

Robert Tarone, Ph.D.

```
 1                    THE WITNESS:   I just want to

 2           clarify a little bit.  Because we were

 3           not hired for any period.  This was one

 4           -- it was one lawyer, by the way.  I

 5           believe his name was Mr. Lasker.

 6  BY MS. WAGSTAFF:

 7       Q.      Uh-huh.

 8       A.      And he called the company CEO and,

 9  again, as I said, we -- we -- meaning some people

10  in the company, including the CEO, the company

11  president, and other couple of other people around

12  the world -- had been in a pretty lengthy

13  published exchange with the IARC Working Group

14  about some of their policies and procedures.

15               And so I assume that's why the

16  lawyer contacted the CEO, but he asked for a

17  meeting and we held a three-hour meeting.

18       Q.      Yeah and move to strike the

19  speculation of why Monsanto's lawyers called you.

20               But my question is -- is different,

21  and I know that you want to answer that.

22               But my question is:  Until

23  Monsanto's lawyers came to your office in

24  September of 2015 and paid your company money for
```

1  your advice as to Monograph 112, you had not

2  reviewed or analyzed Monograph 112?

3      A.     I had not.  And the advice was for

4  the IARC Monograph Program, their policies and

5  procedure, not Monograph 112.

6             And there was no discussion of

7  anything strictly related to glyphosate.

8  Glyphosate was obviously the reason he was there

9  because he was trying -- they were trying to

10 understand why only IARC in the entire world had

11 declared glyphosate to be carcinogenic.

12     Q.     Well, move to strike.  That's --

13 that's --

14            So -- so you're testifying here

15 today under oath --

16     A.     Yes.

17     Q.     -- that that meeting that you had

18 with Mr. Lasker in September of 2015 you did not

19 discuss IARC 112?

20     A.     Not the details of the glyphosate

21 chapter per se.  It was about the product.  I

22 mean, it was about -- they were trying to

23 understand what IARC does when they make a

24 decision about carcinogenicity of any compound.

Robert Tarone, Ph.D.

1      Q.      So --

2      A.      The discussion was about policies,

3  procedures, criteria that IARC used.

4              And glyphosate -- I mean, it was

5  clear to the CEO that glyphosate was a reason he

6  was there, but I don't remember discussing any

7  specific.  In fact, I was not familiar with any

8  specifics of the chapter on glyphosate in

9  Monograph 112.

10     Q.      So it was clear to you also that he

11 was there because of glyphosate, right?

12     A.      He was there trying to understand

13 how it was they came to their opinion.

14     Q.      And it was clear to you at the

15 meeting that he was there because of the

16 glyphosate opinion, right?

17     A.      Yes.

18     Q.      Okay.  And that's why after the

19 meeting, you went and reviewed Monograph 112,

20 right?

21     A.      That is correct.

22     Q.      You reviewed Monograph 112 because

23 Monsanto's lawyers came to your office where you

24 worked and paid your company money for your

Robert Tarone, Ph.D.

1   opinion; is that right?

2       A.      Well, that -- that's true but --

3       Q.      Okay.

4       A.      -- that was not the reason I read

5   it.  I read it because I wanted to find out myself

6   how they came to conclusion they did.

7       Q.      All right.  And so your opinions

8   that you are proffering on IARC -- on IARC 112

9   specifically, right?

10              You understand that you're here

11  today and you gave a deposition in 2019 about your

12  opinions on IARC 112 Monograph?

13      A.      Uh-huh.

14      Q.      You understand that?

15      A.      Right.

16      Q.      Okay.  And so your opinions on IARC

17  112 -- on Monograph 112 are not -- are not

18  percipient fact witnesses.  Meaning they are not

19  based on anything that you experienced?

20              MR. BRENZA:  Object to form.

21         Calls for a legal conclusion.

22              THE WITNESS:   I'm not quite

23         sure what that means.

24              Like when I referee a paper, I

**Exhibit E Page 50**

Robert Tarone, Ph.D.

1          evaluate the science in that paper, even

2          if I've never had any experience with the

3          subject matter before.

4     BY MS. WAGSTAFF:

5          Q.      Right.

6          A.      And that's what I did with the IARC

7     Monograph.  I reviewed the chapter, and it became

8     very clear in reading the mouse section of the

9     rodent.  Each chapter is divided into exposure

10    rodent or epidemiology rodent and then mechanisms.

11    And it was just reading three -- the first three

12    pages of the mouse section, it was clear that it

13    was -- there were mistakes that had been made.  It

14    was very, very clear.  Red flags.

15         Q.      All right.  And I'll give you all

16    the opportunity you want to discuss those, and

17    we'll discuss those in detail.  I promise you,

18    Dr. Tarone, but let me rephrase my question so

19    it's not a legal question per se.

20              Your opinion on IARC 112 is not

21    based on personal knowledge.  It's based on your

22    review of what happened.  It's not based on you

23    participating in what happened?

24              MR. BRENZA:  Object to form.

Robert Tarone, Ph.D.

```
1                    THE WITNESS:  Well, my

2          personal knowledge goes into everything I

3          review.

4    BY MS. WAGSTAFF:

5          Q.      Now, that's your personal --

6          A.      I had spent three or four years at

7    National Cancer Institute.  When I first came

8    there, NCI had the rodent program.  And every week

9    I would be at a meeting with going through

10   these -- these types of studies, going through

11   table after table and writing summary reports.  It

12   wasn't just me.  There would be like 10 people

13   around the table.  Veterinarians, toxicologists,

14   chemists, and we would evaluate and write these

15   reports.

16                 So that experience was why I was

17   able to read in the Monograph 112 on glyphosate.

18   I had done this for so many chemicals before for

19   so many years, and that experience was the reason

20   that all of a sudden red flags started popping up

21   as I read this chapter and said that this is --

22   this is not right.

23         Q.      I understand that.

24                 You're talking about your
```

1    qualifications, and we'll get to that later.  What

2    you're saying, "I was qualified to review that."

3                 What I'm saying is:  Your opinions

4    about Monograph 112 are after the fact.  Meaning

5    like you are coming to opinions about Monograph

6    112 after it had been published?

7         A.      Yes.

8         Q.      Okay.  You did not participate in

9    that?

10        A.      In the Monograph 112?

11        Q.      Right.

12        A.      Absolutely not.

13        Q.      In any way?

14        A.      I'm glad, yes.

15        Q.      In no way?

16        A.      No way.

17        Q.      Okay.  And let's talk just a little

18   bit a few more questions.

19                In the 40 years before meeting with

20   Monsanto's lawyers in September of 2015, you had

21   never personally performed any animal test with

22   glyphosate?

23        A.      No, that was not one of the

24   chemicals.  In fact, when I came to NCI, it

1    probably wouldn't even have been on the radar

2    because it had only been in use for about one or

3    two years.  So it wasn't one of the chemicals that

4    I actually sat down --

5          Q.      Okay.

6          A.      -- and evaluated.

7          Q.      And so you had never performed any

8    test with glyphosate?

9          A.      No.  As I said, I was basically

10   ignorant of the toxicological literature of

11   glyphosate before I read that chapter.

12         Q.      And in the 40 years before meeting

13   with Monsanto's lawyers in September of '15, had

14   you ever personally written any peer-reviewed

15   article or paper about glyphosate?

16         A.      Well, obviously, I had where

17   glyphosate was one of several other things that

18   were studied.

19                 I mean, I helped design the

20   Agricultural Health Study cohort study at NCI.

21   There were 15 pesticides that we asked questions

22   about.  Glyphosate was one of them.  So every

23   paper that I did at NCI -- and there weren't many

24   because I left shortly after the first really big

Robert Tarone, Ph.D.

1    study, which was prostate cancer.  But that study,

2    for example, it reported results for glyphosate.

3           Q.       All right.  So we're going to talk a

4    lot about the Agricultural Health Study.  Okay?

5    We're going to talk about that later this

6    afternoon, but that's not responsive to my

7    question.

8                    So you're saying -- the Agricultural

9    Health Study, as I appreciate it, is a data set

10   and it's a collection of data of which people draw

11   data and write papers about?

12          A.       Correct.

13          Q.       Okay.  So you're saying you have

14   actually written a peer-reviewed paper about

15   glyphosate?

16          A.       No.  The glyphosate paper from the

17   Agricultural Health Study was written after I left

18   NCI.  So, no.

19          Q.       Okay.  So you have never written.

20          A.       I have never written a paper

21   exclusively before reading the Monograph.

22          Q.       Before Monsanto's lawyers came, you

23   had never?

24          A.       Before reading the Monograph, I had

Robert Tarone, Ph.D.

1   never written a paper specifically about

2   glyphosate.

3        Q.      Okay.  So let me just get a clean

4   record because I think I'm doing a really bad job

5   of not talking over you.  So I apologize.

6                But before Monsanto's lawyers came

7   to your office in September of 2015, you had never

8   written a paper about glyphosate?

9                     MR. BRENZA:  Asked and

10            answered.

11                    THE WITNESS:  Before I read

12            the Monograph, I had never before written

13            a paper about glyphosate.

14   BY MS. WAGSTAFF:

15        Q.      Okay.  And you didn't read the

16   Monograph until after the lawyers came to your

17   office?

18        A.      After the meeting with the lawyers.

19        Q.      All right.

20                All right.  And let's talk a little

21   bit about what happened after that.

22                So I'm going to turn on this ELMO,

23   if you don't mind.  Bear with me while I --

24                Can you see this?

**Exhibit E Page 56**

Robert Tarone, Ph.D.

```
1          A.      (Nods head).

2          Q.      All right.  So I want to talk a

3    little bit about --

4                  Is this all going to be on the

5    screen?  Okay.  Let me get a different one.

6    That's too low.

7          A.      Oop.

8          Q.      I took it off.

9          A.      (Laugh).

10         Q.      Okay.  So I have labeled this

11   "Dr. Tarone and Monsanto."

12                 Do you see that?

13         A.      Uh-huh.

14                 MS. WAGSTAFF:  Okay.  Did I

15         spell Monsanto wrong?  God.  You know, I

16         did that in the -- the -- I actually have

17         a problem with spelling.  Monsanto should

18         be a pretty easy way.

19                 MR. BRENZA:  You and me both.

20                 MS. WAGSTAFF:  Uh?  No, I

21         mean, I really, really do.  (Laugh).

22         Q.      Okay.  It's labeled "Dr. Tarone and

23   Monsanto."

24                 Did I spell your name right?
```

Robert Tarone, Ph.D.

```
1          A.      Yes.

2          Q.      I spell Monsanto right?

3          A.      Looks like it, yeah.

4          Q.      Okay.  Good.

5                  All right.  So we just talked about

6   how you had an in-person meeting with Monsanto

7   lawyers, right?

8          A.      Correct.

9          Q.      And this was in September --

10         A.      One lawyer.

11         Q.      Let me get a pen that works.

12                 With -- with one lawyer?

13         A.      Yeah.

14                 It was the company CEO, Bill Blot,

15  the lawyer, and me.

16         Q.      Okay.  So, and that was -- you

17  testified earlier it was around three hours?

18         A.      Three hours.

19         Q.      And you were -- your company was

20  paid for that, right?

21         A.      They were paid for that.

22         Q.      And I'll highlight that you were

23  paid for that.

24                 All right.  And then you testified
```

1  that you had another meeting a few weeks later,

2  right?

3          A.      (Nods head).

4                  MR. BRENZA:  I'm sorry, but

5          I'm going to have to object to that.  The

6          company.  He said the company was paid.

7                  THE WITNESS:   The company was

8          paid.

9                  MS. WAGSTAFF:  Okay.

10                 MR. BRENZA:  But you've got it

11         under "Dr. Tarone."

12  BY MS. WAGSTAFF:

13         Q.      All right.  The company was paid.

14                 So you had another in-person meeting

15  with Monsanto lawyers, right?

16         A.      Yes.

17         Q.      And this time Mr. Lasker brought a

18  couple of his colleagues, right?

19         A.      A couple younger colleagues.  One

20  male, one female.

21         Q.      And you testified that was a couple

22  hours, too, two to three hours?

23         A.      Yeah, probably closer to two.  It

24  was just basically a statistics seminar.

1        Q.       Okay.  And then you began -- you

2    testified earlier or last time that you began

3    e-mailing with Monsanto employee, David Saltmiras.

4                 Do you remember that?

5        A.       I did.  Very -- that was very near

6    the time of that meeting, and it was after I read

7    the chapter.  And as I said, it became very clear

8    to me that there was some funny business going on

9    in how they were handling the rodent data.

10                And reading the Monograph, they

11   cited a review paper on which Mr. Salt -- was it

12   Saltmiras?  Is that how you pronounce it?  He was

13   the coauthor and -- and it said that this paper

14   had supplementary tables showing the tumor data,

15   which is exactly what I was looking for.

16                So I contacted Mr. -- Dr. Saltmiras

17   by mail, by e-mail.

18       Q.       All right.  I'm actually going to

19   stop you right here.

20                Because my question was:  Did you

21   e-mail with Dr. Saltmiras?

22       A.       I did.

23       Q.       I never asked you what you e-mailed

24   about.

Robert Tarone, Ph.D.

1             I asked you:  Did you e-mail with

2     them?

3        A.       Yes, I did.

4        Q.       All right.  How do you spell it?

5     Saltmiras.  M-i-r-a-s, I assume.

6                 And, in fact, you also testified at

7     your last deposition that Dr. Saltmiras

8     recommended -- is he a doctor or is he Mr.?  Is

9     he --

10       A.       I think he's a doctor.  He's a

11    scientist.

12       Q.       Okay.  You also testified that he

13    recommended a toxicologist to help you interpret

14    the data?

15       A.       I asked him for the name of a -- of

16    an animal toxicologist.  It was related to the two

17    different mouse studies use different words --

18       Q.       Right.

19       A.       -- to define some of the blood

20    vessel tumors.  One used hemangiosarcoma, one used

21    hemangioendothelioma, and I was not able just by

22    Googling or going -- reading whatever books I

23    could to determine if those were the same or if

24    there was actually two different entities.  And I

Robert Farone, Ph.D.

1    wanted to make sure before I summarized my views

2    on the paper, and he advised me that they were

3    probably the same.

4        Q.      All right.  And so he advised of a

5    toxicologist.

6              And the then next, in fact, you

7    testified that Dr. Saltmiras invited you to

8    Helsinki?

9        A.      (Nods head).

10       Q.      You should have taken him up on

11   that.

12       A.      No thanks.  I don't want to be paid

13   by anybody.

14       Q.      And he was inviting you on behalf of

15   Monsanto to defend glyphosate, right?

16       A.      Yeah.  There was some kind of a

17   European meeting in Helsinki.  They were holding

18   meetings all over the continent because they were

19   debating whether to re-licence glyphosate for use

20   in Europe.

21       Q.      Right.  And I think -- I think you

22   testified earlier that Dr. Saltmiras was extending

23   that invitation on behalf of Monsanto?

24       A.      That was my impression, yes.

Robert Tarone, Ph.D.

```
 1          Q.      So, and you declined?

 2          A.      I declined.

 3          Q.      Okay.  So Monsanto invites

 4    Dr. Tarone to Finland, right?  Isn't that where

 5    Helsinki is?

 6          A.      Uh-huh.

 7          Q.      To defend glyphosate; is that fair?

 8          A.      Yes.

 9          Q.      Declined.

10                  You declined, right?

11          A.      I did.

12          Q.      All right.

13          A.      By the way, this was after my

14    European Journal of Cancer paper was published

15    online, which is the reason, I assume, that they

16    invited me.

17          Q.      Okay.  And then next you testified

18    that you maybe had some more e-mails and phone

19    calls with Dr. Saltmiras, but you couldn't

20    remember?

21          A.      Yeah, I've checked.  I don't -- I

22    think after the Finland call, it was the last time

23    you talked to him but --

24          Q.      Okay.  Well, then I'll leave that
```

Robert Tarone, Ph.D.

```
 1   off.

 2        A.        -- my memory is not perfect.

 3        Q.        Actually, after the Finland call,

 4   Dr. Saltmiras actually asked you to come down to

 5   present to CropLife America, right?

 6        A.        Oh.  Oh.  I didn't know that was

 7   him.  I did -- I did make a presentation to

 8   CropLife.

 9        Q.        Okay.  And Dr. Saltmiras was asking

10   you on behalf of Monsanto?

11        A.        Yeah, I don't know about that.  He

12   asked me to make a presentation.

13        Q.        Well, do you think he was asking you

14   in his personal capacity?

15        A.        I don't know, but I didn't -- by the

16   way, the presentation was not on glyphosate

17   specifically.  Again, it was on the IARC

18   Monographs Program and how they evaluate

19   compounds.  Because I assume most of the people at

20   that meeting had nothing to do with Monsanto or

21   glyphosate.

22        Q.        All right.  Well, you don't know

23   that.

24        A.        So I just gave a general talk.
```

**Exhibit E Page 64**

Robert Farone, Ph.D.

```
1        Q.      You don't know that, right?

2        A.      I don't know what?

3        Q.      I don't want you to assume anything

4   in your deposition today.

5                You just said --

6        A.      I mean, I know some weren't because

7   I had people come up to me after my talk who

8   wanted me to get involved with different

9   pesticides that had nothing to do with Monsanto,

10  and I told everybody no.

11       Q.      Okay.  So Monsanto's lawyers come

12  down to your office.  They pay your company money

13  for advice.  They come back down a few weeks

14  later.  One of their employees invites you to

15  Finland to defend glyphosate.

16               And then they next offer you to come

17  down to CropLife America, which is a trade

18  organization defending pesticide companies, right?

19       A.      Yes.

20       Q.      Okay.  So you don't have -- you

21  don't think at all that that chain of events leads

22  you to believe that -- that Dr. Saltmiras is

23  inviting you as a Monsanto employee?

24       A.      Oh, absolutely not.  I mean --
```

Robert Farone, Ph.D.

1      Q.      I mean --

2      A.      -- I made it clear --

3      Q.      I'm sorry.

4      A.      -- that I want nothing to do with

5  Monsanto.

6      Q.      My -- my question was clear in my

7  head, but not clear coming out of my mouth.

8  (Laugh).

9              You don't think that it was Monsanto

10 inviting you to CropLife America?

11     A.      No, I don't think so.  I mean, I

12 know that Dr. Saltmiras was part of this group.

13 This was a -- this was -- this was a group that

14 was sort of like they would get together and talk

15 about risk assessment  from all various

16 countries -- companies involved in pesticide

17 production.

18     Q.      All right.  So -- so --

19     A.      So, no, I think it might have been

20 just him as part of this group.

21     Q.      So you don't think that it was

22 Monsanto inviting you.

23     A.      No.

24     Q.      You think it was David Saltmiras in

Robert Tarone, Ph.D.

1    his individual --

2         A.      No, I don't know why Monsanto would

3    invite me but --

4         Q.      All right.  You got to let me finish

5    my question, please.

6                 Okay.  And you understand that --

7    that Mr. -- that Dr. Saltmiras was a pretty

8    high-level employee at Monsanto?

9         A.      I did not know that.  I just knew

10   him from being a coauthor on the scientific paper.

11        Q.      Okay.  And you understand he was an

12   employee at Monsanto?

13        A.      I did.

14        Q.      And you understand that Monsanto was

15   a member of CropLife America?

16        A.      I assume that since he was part of

17   this --

18        Q.      Okay.

19        A.      -- risk assessment group.

20        Q.      All right.  So you're not sure if it

21   was Monsanto inviting you to come talk or if it

22   was David Saltmiras?  Under oath you --

23        A.      I'm not sure, but I actually believe

24   it was probably just Dr. Saltmiras --

Robert Farone, Ph.D.

1          Q.       All right.

2          A.       -- because he was part of this group

3    and was aware of my work.

4          Q.       Monsanto employee invites you to

5    speak and present, right?

6          A.       Yes.

7          Q.       At CropLife America.

8                   And tell me what you understand

9    CropLife America to be.

10         A.       Well, I knew it was a lobbyist

11   group.

12         Q.       For who?

13         A.       For pesticide producers apparently

14   because that's what everybody talked about when

15   they came up after my talk.

16         Q.       What sort of things were they

17   saying?

18         A.       They wanted me to get involved with

19   their specific insecticide or herbicide.

20         Q.       All right.  And then you testified

21   before the House Senate Space and Technology

22   Committee to defend your papers; is that correct?

23         A.       Correct.

24         Q.       So is that fair to say you testified

Robert Tarone, Ph.D.

```
 1   before Congress?

 2        A.      I did.

 3        Q.      And how would you summarize -- I

 4   just -- those were my words that you testified.

 5        A.      I don't know why it's going under

 6   this column.

 7        Q.      Because I'm making the Monsanto.

 8        A.      What's the heading on the column?

 9        Q.      It's just -- I'm going to fill this

10   one in, too.

11        A.      Oh.  I mean, it has nothing to do

12   with Monsanto, but go ahead.

13        Q.      Okay.  So you testified before the

14   House --

15        A.      It was the Senate Science, Space,

16   and Technology.  I may have space and science

17   backwards.  SST.

18        Q.      Science, Space, and Technology

19   Committee?

20        A.      Uh-huh.

21        Q.      And that was to defend your opinions

22   on Monograph 112, right?

23        A.      I'm sure it was because of my

24   published paper.  Yes.
```

Robert Tarone, Ph.D.

```
 1      Q.      Which are your opinions on Monograph

 2  112.  So --

 3      A.      No, just on the glyphosate chapter

 4  of Monograph 112.

 5      Q.      To defend your glyphosate

 6  opinions --

 7      A.      Correct.

 8      Q.      -- is that right?

 9      A.      Correct.

10      Q.      And I have the -- I'm not going to

11  walk you through your testimony, but I have that

12  here, and it looks like the date that you did that

13  was February 6, 2018.

14              Does that sound --

15      A.      Oh, I'm sure it's right.

16      Q.      -- familiar?

17      A.      (Laugh).

18      Q.      Okay.

19      A.      I would not remember the exact date.

20      Q.      Okay.

21      A.      But that's probably right.  It's on

22  it.

23      Q.      Okay.  So it's February 6, 2018.

24              So you were defending the opinions
```

1   that you had created after you first met with the

2   lawyer back in September 2015; is that right?

3         A.       I was defending my opinions as

4   written, published in peer-reviewed journals, yes.

5         Q.       Okay.  That started after this

6   meeting in September of 2015, correct?

7         A.       Yes, they did.

8                  I know you like to keep saying

9   Monsanto and lawyers.

10        Q.       I don't -- I don't think I actually

11  just said Monsanto; is that correct?

12        A.       No, but that's what your inference

13  is.

14                 And this work was taken up on my

15  own, not even requested by anybody.

16        Q.       I understand.

17        A.       Just because I realized how poor --

18        Q.       Doctor --

19        A.       -- that chapter was.

20        Q.       -- just please answer my questions.

21                 I'm saying that you started forming

22  these opinions in September of 2015.

23                 All of these chain of events

24  happened and you end up speaking before Congress?

Robert Tarone, Ph.D.

```
1            A.       Correct.

2            Q.       Correct?

3                     Okay.  And we just -- we just

4    decided that that occurred in February of '18.

5                     So it must have been quite an honor.

6    I've never testified before Congress.

7                     Was it quite an honor?

8            A.       It was somewhat sobering, I must

9    say.  I don't know if it was an honor, but it was

10   interesting.  It was a very interesting

11   experience.  I'm not sure I'd do it again because

12   it was clear that each member just wanted to get

13   some video time for their local news.  They really

14   didn't seem to be paying too much attention to the

15   arguments back and forth.

16           Q.       So you didn't think it was an honor

17   to testify before Congress?

18                       MR. BRENZA:  Asked and

19            answered.

20                       THE WITNESS:  No.  No.

21   BY MS. WAGSTAFF:

22           Q.       Okay.  So then it's --

23           A.       I thought it was a duty, actually.

24           Q.       Okay.  So then at some point,
```

**Exhibit E Page 72**

Robert Tarone, Ph.D.

1   Monsanto decides to -- to take your deposition,

2   which is how you ended up being deposed in 2019;

3   is that right?

4        A.     Yes, I was deposed to defend my

5   papers.

6        Q.     Okay.  So, in fact -- just one

7   second, I have a document I just want to show you.

8               If you look at number 20 -- Exhibit

9   -- it's going to be Exhibit 3, but document 22.

10              This is one of the -- your papers

11  that you wrote, right?

12              And you wrote -- you wrote this

13  Letter to the Editor?

14       A.     It's a Letter to the Editor, not a

15  paper, and that's one was in response to someone

16  lying about me.

17       Q.     Okay.  Hang on.  I'm just -- I'm

18  just.  Please just answer my question.

19              Did you write this paper?

20       A.     Yes.

21       Q.     And it's -- you're right.  It's not

22  a paper.  It's a letter to an editor and the date

23  of it is 2022, and this is going to be Exhibit 3.

24              (Document marked for

**Exhibit E Page 73**

1              identification as Tarone Exhibit 3.)

2                     MS. WAGSTAFF:  If you want to

3         just pass it to Lin.

4                     MR. BRENZA:  The date of it is

5         not -- okay.  Sorry.  Wrong one.

6                     MS. WAGSTAFF:  Am I wrong?  Am

7         I wrong.

8                     MR. BRENZA:  No, no.  I

9         thought you were asking about a different

10        one.

11   BY MS. WAGSTAFF:

12        Q.      Okay.  And the only -- we'll come

13   back to this Letter to the Editor later, but I

14   just wanted to -- just wanted to highlight.

15              And you wrote this, right?

16        A.      I did.

17        Q.      Okay.  And so in your disclosure,

18   you note that you were deposed in December of 2019

19   as an unpaid fact witness in the Roundup

20   litigation, and that the purpose of the deposition

21   was to defend his published papers on the IARC

22   glyphosate classification.

23              So that's -- that's your disclosure,

24   right?

Robert Tarone, Ph.D.

1           A.       That is.

2           Q.       So you believe that your December

3    2019 deposition, the purpose of that was to defend

4    your papers?

5           A.       That's why I was there.

6           Q.       Okay.  And you believe that you were

7    a fact witness even though you -- you didn't

8    participate in any of the activities?

9                    MR. BRENZA:  Calls for legal

10           conclusion.

11                    THE WITNESS:  You don't have

12           to be have participated in Monograph 112

13           Working Group to be able to tell -- say

14           that what they did was wrong.

15   BY MS. WAGSTAFF:

16          Q.       Sure, but wouldn't that be an expert

17   opinion like a post hoc expert opinion?

18                    MR. BRENZA:  Calls for a legal

19           conclusion.

20                    THE WITNESS:  No, I don't -- I

21           don't -- I don't know.  I would never

22           call it that.  It was a published paper

23           reporting what I found when I evaluated

24           the chapter on glyphosate.

1    BY MS. WAGSTAFF:

2         Q.    All right.  And so your -- just to

3    be clear, your -- what you're telling the world

4    when you -- when you write this is that the

5    purpose of your 2019 deposition was to defend your

6    public -- published papers on the IARC glyphosate

7    classification.

8              So how did that dep -- that 2019

9    deposition come about?  Did you call Monsanto and

10   say, hey, I need to defend my papers?

11        A.    No.

12        Q.    Okay.  So then did Monsanto call you

13   and say, hey, do you want me to depose you so you

14   can defend your papers?

15             Because you're not a party to this

16   litigation.  So if the purpose was to defend your

17   papers, how did that come about?

18        A.    Well, I'm sure it came about with a

19   discussion with Mr. Vales, but I don't remember

20   exactly.  It was -- it was just that I was curious

21   because my papers were not playing a role, didn't

22   seem to be playing a role in the litigation, and I

23   guess it was suggested to me that -- because I

24   would not and I did not want to be paid to be a

Robert Tarone, Ph.D.

1    witness.

2              So that was what was proposed is to

3    be deposed and then maybe, you know, the papers

4    can come into the -- into the court cases.

5       Q.      Okay.  So you just talked about

6    Mr. Vales.

7              Who is Mr. Vales?

8       A.      Mr. Vales was the lawyer who I first

9    met at the first deposition.

10      Q.      So you met him at the first

11   deposition?

12      A.      That's correct.

13      Q.      But you just said that you just --

14      A.      Yeah, I don't know.

15      Q.      You had testified earlier --

16      A.      I --

17      Q.      -- that you met with him?

18      A.      Yeah, I don't know.  I don't really

19   remember.  There must have been a phone call or

20   something before that.  I don't remember exactly.

21   I'm sure it was with him because there was no one

22   else that I communicated with.

23      Q.      All right.  So you testified in your

24   2019 transcript, which I can pull up -- I have

Robert Tarone, Ph.D.

```
 1    right here --
 2         A.      Uh-huh.
 3         Q.      -- that you met with Mr. -- is it
 4    Vales or "Vales"?
 5         A.      I think it's Vales.
 6         Q.      Vales.
 7                 You testified that you met with
 8    Mr. Vales for a couple of hours before the
 9    deposition, not -- not the day before, but a few
10    weeks before you met with --
11         A.      Okay.  I don't remember that.
12         Q.      -- Mr. Vales.
13         A.      I honestly don't remember that.
14         Q.      All right.  Well, do you want me to
15    show you that?
16         A.      I can't say -- no, I can't tell you
17    it's a lie.  I just don't remember.
18         Q.      Well, I know, but I --
19                 Do you have a clean copy of this?
20                 All right.
21         A.      That was three years ago.  So I'm
22    sure my memory was better then.
23         Q.      Yeah.
24         A.      I don't remember that meeting.
```

Robert Farone, Ph.D.

1          Q.      All right.  Well, we're going to

2   just look real quick because I just want --

3          A.      Oh, I know.  If I said it happened,

4   it happened.

5          Q.      I know.  I just -- I don't want

6   there to be any doubt.

7                  All right.  Number -- page 6 -- I'm

8   not going to mark this as a -- as an exhibit.

9                      MR. BRENZA:  What's this?

10                     MS. WAGSTAFF:  The deposition.

11                     MR. BRENZA:  The transcript?

12                     MS. WAGSTAFF:  Uh-huh.  I'm

13        just going to read from it.

14                     MR. BRENZA:  (Nods head).

15   BY MS. WAGSTAFF:

16         Q.      And maybe this will refresh your

17   recollection.

18         A.      Maybe.

19         Q.      All right.

20         A.      Of course, at the time of the

21   deposition, that would have been a meeting that

22   occurred shortly before.

23         Q.      All right.  So if you want to let me

24   refresh your recollection since you can't

Robert Tarone, Ph.D.

1  remember, this is Dr. Vales asking you questions.

2  He says.

3            "Have you presently spoken to me?"

4            "Yes, I have."

5            "Describe any conversations that

6  you've had."

7            "We had one meeting in person a few

8  weeks ago, maybe a month ago, and a couple of

9  phone calls."

10           And he said:

11           "How long was the meeting in

12  person?"

13           "A couple of hours."

14           So does that refresh your

15  recollection?

16      A.     Yeah.  My memory would have been

17  fresh then.  So that --

18      Q.     Okay.  So there's no reason to think

19  that this isn't accurate what you said?

20      A.     No.

21      Q.     So you had one conver- -- you had

22  one meeting in person for a couple -- with -- with

23  Mr. Vales for a couple of hours, and then you had

24  a couple of phone calls after; is that right?

Robert Tarone, Ph.D.

```
1           A.      Correct.

2           Q.      And how did you get connected with

3   Mr. Vales?  Because he is not in the same law firm

4   as Eric Lasker.

5                   Did you understand that?

6           A.      I did know that.  I assumed -- in

7   fact, I always see -- I thought he was a Bayer

8   lawyer rather than Monsanto lawyer.

9                   I don't -- I have no idea how he

10  first contacted me.  I wouldn't have contacted

11  him.  I didn't know him until this.

12          Q.      So you had an in-person meeting with

13  Monsanto lawyer for a couple of hours.  We just

14  went over that.

15                  And then you testified back then

16  that you had a couple of phone calls afterwards,

17  right?

18          A.      (Nods head).

19          Q.      And then you can't remember how you

20  got in touch with Mr. Vales, but it's your

21  recollection he must have called you?

22          A.      Well, he must -- he had to call me

23  because I wouldn't --

24          Q.      Because you wouldn't have known to
```

**Exhibit E Page 81**

Robert Tarone, Ph.D.

1    call him.

2         A.        I wouldn't have known to call him.

3         Q.        Okay.  And then you get deposed,

4    right?

5         A.        Correct.

6         Q.        And so you are deposed by Monsanto.

7                   And that is to -- and in that

8    deposition, it's Monsanto's lawyers asking you

9    questions first?

10        A.        Correct.

11        Q.        And you guys walk through your

12   opinions.

13                  And you believe the purpose of that

14   was so that your opinions could be used in court?

15        A.        Correct.

16        Q.        And you -- and you met with -- and

17   when you met with Mr. Vales before, do you think

18   that you talked about the scope of your deposition

19   and what he would ask you?

20        A.        I really can't remember that

21   meeting, but I imagine -- it was based on the

22   papers I published.  So I imagine there was some

23   discussion of those papers.

24        Q.        All right.  So you discussed the

Robert Farone, Ph.D.

1   papers in your in-person meeting and you discussed

2   sort of the scope of your -- your deposition and

3   what he would ask you.  And then you are deposed

4   and then the world shuts down for a couple of

5   years.

6                   And then you -- you showed us this

7   morning your text messages with Monsanto's lawyer,

8   and they began shortly after this deposition in

9   2020.

10                  I looked at it real quickly, but I

11  believe the first text message that we were

12  produced was --

13                  What was the date of the first text

14  message?

15                  January 8, 2020.  And you said you

16  were texting with him as recently as this week,

17  which is 2023.

18                  So you have been --

19      A.      When I received the subpoena.

20      Q.      When you received the subpoena.

21                  So began text messaging Monsanto

22  lawyer.

23                  And what other communications have

24  you had with Monsanto's lawyers since this last

Robert Farone, Ph.D.

1    deposition?

2         A.      I have sent Mr. Vales copies of

3    anything that I published, and there have been

4    what, three or four since the deposition.

5         Q.      Okay.  So --

6         A.      It's basically been just keeping him

7    informed of my work.

8         Q.      Okay.  You produced this morning and

9    we'll go over in more detail later, but you

10   produced this morning some e-mail communication

11   you've had with Mr. Vales.

12        A.      Vales.

13        Q.      Vales.  Sorry.  I've never met him

14   in person or else.

15        A.      (Laugh).

16        Q.      It takes that for me to butcher

17   someone's name usually.

18               This is a document you produced this

19   morning.

20               I was impressed with the fact that

21   my law firm has seven lawyers and he has 12,000

22   lawyers.  That's a lot of lawyers.  He's got

23   20,000 people and 200 locations in his -- in his

24   -- in his law firm.

Robert Farone, Ph.D.

```
 1                  That's a pretty impressive size,
 2    isn't it?
 3                       MR. BRENZA:  Relevance.
 4         Objection.
 5    BY MS. WAGSTAFF:
 6         Q.     It's pretty impressive, uh?
 7                       MR. BRENZA:  Calls for
 8         speculation.
 9                       THE WITNESS:   Seems -- seems
10         too big to handle but, yeah, that's
11         impressive.
12    BY MS. WAGSTAFF:
13         Q.     Yeah.  And -- and he represents
14    Monsanto, right?  Monsanto and/or Bayer?
15         A.     I assume Bayer.
16         Q.     Okay.  And you wrote to him in
17    October of 26, 2021.  You said:
18                  "Good speaking with you today."
19                  So you spoke with him.  So you've
20    been speaking with a Mr. Vales as well as
21    e-mailing and texting him?
22         A.     There -- there have been short phone
23    calls.  Usually just cordial.
24         Q.     Okay.
```

Robert Tarone, Ph.D.

```
 1                    MR. BRENZA:  Are you going to

 2        mark this?

 3                    MS. WAGSTAFF:  I'm going to

 4        mark this.  I don't have another copy

 5        because these were just produced today.

 6        Oh, yeah, we do.

 7                    This will be Exhibit 4.

 8                    (Document marked for

 9        identification as Tarone Exhibit 4.)

10                    MS. WAGSTAFF:  And I'm going

11        to mark my chart as Exhibit 5 before I

12        lose all my space.

13                    (Document marked for

14        identification as Tarone Exhibit 5.)

15   BY MS. WAGSTAFF:

16        Q.      So there have been phone calls over

17   the years as well --

18        A.      Yes.

19        Q.      -- right?

20                And what do you guys talk about?

21        A.      Usually just cordial.  How are you

22   doing that?  Sort of thing.

23        Q.      Do you have any business with

24   Mr. Vales, other than your -- your joint interest
```

Robert Tarone, Ph.D.

```
1    in Monograph 112?

2         A.      Not that I know of.

3         Q.      Do you do any other work with

4    Mr. Vales, other than Monograph 112?

5         A.      No.

6         Q.      Do you have any personal --

7         A.      It's all on glyphosate.

8         Q.      Okay.  So everything you talk to

9    Mr. Vales about is related to glyphosate?

10        A.      Well, not every phone call but --

11        Q.      What else do you talk about?

12        A.      Just a cordial hi, how is it going?

13   I mean, that does happen.

14        Q.      Okay.  Well --

15        A.      But I -- but I do send him my papers

16   and I occasionally send him papers written by

17   others that I find of interest.

18                    MS. WAGSTAFF:  All right.  And

19             this is -- and this is an example of

20             something.  Again, this was a document

21             that was produced today.  I'll mark this

22             as Exhibit 6.

23                    (Document marked for

24             identification as Tarone Exhibit 6.)
```

```
 1                    MS. WAGSTAFF:  If you want to

 2          pass them out, Kevin.

 3   BY MS. WAGSTAFF:

 4        Q.      This is something you sent to him.

 5   Your comments submitted to EFSA.

 6                    And EFSA stands for?

 7        A.      This one I think I know.

 8                    European Food Safety Association

 9   or -- yeah, probably that.

10        Q.      And what you're asking him is, "Why

11   is Bayer ignoring my papers?"

12        A.      Yeah, I was a little bit surprised

13   about that.

14        Q.      Did that bother you?

15        A.      Well, more than Bayer.  I mean, it

16   bothers me that other people have largely ignored

17   my papers.  But this EFSA and there was another

18   one, EcHA, was part of some European evaluation of

19   the science about glyphosate, and they had, you

20   know, places where you could submit comments.

21                    And the main reason I sent comments

22   was just to bring my papers to their attention.

23   So that's why and, you know, it did bother me.

24        Q.      Yeah, it bothers you because you
```

1    wrote these papers to be used in the litigation.

2        A.      No, that's totally untrue.

3        Q.      Okay.  But you gave a deposition so

4    that your papers --

5        A.      Those papers were written well

6    before the deposition.  The deposition was based

7    on the papers.  The papers were just an expression

8    of my surprise at how poor the deliberations were

9    that led to the classification of glyphosate as a

10   problem carcinogen.

11       Q.      Okay.  And then as recently as

12   November of 2021, you were annoyed that Bayer was

13   ignoring your papers, and so you asked Bayer's

14   attorney and Monsanto.

15               Let me ask you this.

16               What's the relationship between

17   Bayer and Monsanto?

18       A.      Bayer bought Monsanto I thought.

19       Q.      Okay.  So it's the parent company?

20       A.      (Nods head).

21       Q.      Okay.  So you're annoyed that Bayer

22   is ignoring your papers.  So you write to their

23   attorney.  "Why are they ignoring my papers?"  And

24   what does he say?

Robert Tarone, Ph.D.

```
1          A.        Nothing.  (Laugh).

2          Q.        He ignores you.

3          A.        Well, he said he'd look into it, but

4    I never heard from him since.

5          Q.        Okay.

6          A.        And by the way, the reason this

7    comes about is this review was based on a document

8    that was produced by an organization.  I can't

9    remember the name of it, but it stated that the

10   document that was being reviewed was primarily the

11   result of submissions by -- I think they called it

12   "the funder," which would have been Bayer.  So I

13   assume that that's -- that's why that's -- that's

14   why I made that statement.

15                   MS. WAGSTAFF:  Okay.  So this

16          actually has a second page to it.

17                   Kevin, I don't know if you --

18                   THE WITNESS:  That's what I

19          sent.

20                   MS. WAGSTAFF:  Right.  Just

21          for exhibit purposes, did you get it?

22                   Yeah, mine is not stapled.  So

23          if you want to staple that?  Yeah.

24   BY MS. WAGSTAFF:
```

**Exhibit E Page 90**

Robert Tarone, Ph.D.

1      Q.      All right.  So back to my chart.

2             So we just showed that you have

3   been -- oh, that's not right -- text messaging

4   Monsanto lawyers.

5             And you continued to e-mail and call

6   Monsanto lawyers from 2019 to 2023; is that fair?

7      A.      Yes.

8      Q.      Okay.  So then any other

9   communication that you can remember you had

10  between your last deposition and when you were

11  subpoenaed, which I think your subpoena was in

12  February last month?

13     A.      (Nods head).

14     Q.      Okay.  So you were -- so I -- my

15  client subpoenaed you, right?

16     A.      Yes.

17     Q.      So plaintiffs subpoenaed you.

18            All right.  And so what you

19  testified earlier that when you got subpoenaed,

20  first person you called was Monsanto; is that

21  right?

22                  MR. BRENZA:  Object to form.

23  BY MS. WAGSTAFF:

24     Q.      You texted.

Robert Tarone, Ph.D.

1          A.        Texted.

2          Q.        You actually said you texted

3    Monsanto.

4                    So you texted Monsanto.

5          A.        You should have that from the copies

6    that were made.

7          Q.        Okay.  And then what else happened?

8          A.        Oh, I mean, eventually I was -- I

9    was told that it was changed to the 10th.

10         Q.        Well, did you talk to -- have you

11   ever talked to -- did you -- it sounds like

12   Mr. Vales was your point of contact.

13         A.        (Nods head).

14         Q.        So you texted Mr. Vales when you got

15   the subpoena --

16         A.        I did.

17         Q.        -- who is Monsanto's lawyer.

18         A.        (Nods head).

19         Q.        Did you then call him?

20         A.        Yes, I did call him --

21         Q.        Okay.

22         A.        -- because --

23         Q.        And what did you say?

24         A.        Nothing.  I wanted to know what was

**Exhibit E Page 92**

Robert Parone, Ph.D.

1    going on in terms of the subpoena.

2         Q.      So why didn't you call me since I

3    subpoenaed you and ask me what's going on?

4         A.      I wouldn't have even thought to call

5    you.

6         Q.      Why not?  My name is on the

7    subpoena.  My phone number is right there.  My

8    e-mail is right there.

9         A.      I'm not a lawyer.  I mean I --

10   (laugh).  So, no, I wouldn't have thought to call

11   you.

12        Q.      So why did you think to call

13   Monsanto when I'm the one that subpoenaed you?

14        A.      Because I just -- I wanted to know

15   -- I did -- I was curious why I was subpoenaed,

16   and I'm not sure I ever got a clear answer.  But

17   in any event, I would have not -- not thought to

18   call you.

19        Q.      It didn't cross your mind to call

20   the person that subpoenaed you to say, Why are you

21   subpoenaing me?

22        A.      No.

23                  MR. BRENZA:  Asked and

24        answered.

Robert Parone, Ph.D.

1    BY MS. WAGSTAFF:

2        Q.      Okay.  So you texted Monsanto's

3    lawyer, you called Monsanto's lawyer, and you

4    said, Why am I being subpoenaed?  And what did he

5    say?

6        A.      Not much really, except to say that

7    the date would not work and it would have to be

8    changed.

9        Q.      Okay.  I don't --

10       A.      I think there was then an additional

11   phone call to tell me when it was going to happen

12   on the 10th.

13       Q.      All right.  You're telling me under

14   oath today that you had no discussion with

15   Mr. Vales, other than logistics on setting the

16   date?  You didn't talk about the substance of the

17   deposition today?

18       A.      Well, I asked him and it was

19   uncertain.  I mean, he didn't know what the

20   substance was.

21       Q.      Did you have any -- you didn't have

22   any idea that he --

23       A.      Oh, no.  I told him I thought it was

24   just pure harassment, and I still think that.

**Exhibit E Page 94**

Robert Tarone, Ph.D.

1      Q.      Okay.

2      A.      And he agreed.

3      Q.      Okay.

4      A.      But that was -- that was about it.

5      Q.      Why do you think it's harassment?

6      A.      To me, it's harassment.  I'm a

7   scientist.  I wrote everything I wanted to write

8   about the IARC glyphosate classification in

9   published papers.  They're peer-reviewed.  Anybody

10  can read them.  Anybody can use them in court.

11  Anybody.

12              I mean, that -- they weren't written

13  for that purpose, but that's how I assumed the

14  system used to work.  People publish their

15  scientific opinions, and they don't have to get

16  paid for those scientific opinions to make it into

17  court cases.  It's out there for anybody to make

18  -- make use of.

19      Q.      And that's great.  I understand that

20  and I commend you for -- for saying that you don't

21  want to receive money.

22              But whether or not you receive

23  money, Dr. Tarone, look at all this communication.

24              We're going to go through the

Robert Tarone, Ph.D.

1   communication you've had with plaintiffs' lawyers

2   next, okay, and we're going to see what sort of

3   independence you have, and we'll let the jury

4   decide.

5            But you provided a deposition to

6   defend your papers on glyphosate.

7       A.      (Nods head).

8       Q.      You could have said:  No, Monsanto,

9   I don't want to inject myself into the litigation.

10           But you chose to inject yourself

11   into the litigation, which is why you are sitting

12   here today.

13                  MR. BRENZA:  Argumentative.

14                  THE WITNESS:   I do realize

15       that now, but I did not -- I did not --

16                  MR. BRENZA:  There's no

17       question pending.

18                  THE WITNESS:   But I did not

19       realize that at the time of the first

20       deposition.

21   BY MS. WAGSTAFF:

22       Q.      Okay.  So after you were subpoenaed,

23   you texted Monsanto's lawyer, you called

24   Monsanto's lawyer, and you discussed the substance

Robert Farone, Ph.D.

1   of the depo?

2        A.      Very briefly.

3               MR. BRENZA:  And I'm just

4        going to put on the record.  I'm going to

5        move to strike counsel's colloquy.

6   BY MS. WAGSTAFF:

7        Q.      Okay.  And then what did you do?

8        A.      Basically went through my e-mails,

9   my folders.  I don't have a lot of e-mails left,

10  but I have folders, and tried to accumulate

11  everything that was responsive to the request for

12  documents.  And that's basically what I've been

13  doing since I got the deposition.

14       Q.      Okay.  And so how many times on the

15  phone do you think you talked to Mr. Vales?

16       A.      After I got the deposition?

17       Q.      Yes.

18       A.      Three.

19       Q.      Three times.  Okay.

20       A.      The third time was because he said

21  he was not going to be here.

22       Q.      Okay.  So that was recently?

23       A.      It was probably last week, I guess.

24  I don't know.  Yeah.

 1          Q.        Okay.  And how many times have you

 2    texted with Monsanto's lawyer about the deposition

 3    today?

 4          A.        Since I initially texted, I don't --

 5    I don't believe -- I guess I have to check my

 6    phone.  You have copies of whatever was there.

 7          Q.        Two or three times?

 8          A.        I don't recall texting at all after

 9    that.

10          Q.        Okay.

11          A.        After I -- but let me check.

12          Q.        Okay.

13          A.        Won't take -- won't take long.

14                    Ah.  I did text him when I got the

15    second serving with the check for $61 and change.

16          Q.        Okay.

17          A.        To which he responded "Okay."  So

18    that's -- that's it.

19          Q.        Okay.

20          A.        Let me see the date of that.

21          Q.        And did you speak with any of -- you

22    can -- you can put your phone down, Dr. Tarone.

23          A.        I just wanted to tell you.  That was

24    February 22nd.

Robert Tarone, Ph.D.

1        Q.       Okay.

2        A.       When I got served the second time.

3        Q.       Okay.  Did you speak with any of

4    Mr. Vales' colleagues?

5        A.       No.

6        Q.       His paralegal?

7        A.       No.

8        Q.       Anyone?

9        A.       No.

10       Q.       Okay.  Have you ever spoken with

11   Monsanto's lawyers who's here today before?

12       A.       I got a phone call in which

13   Mr. Vales introduced me to --

14                    MR. BRENZA:  Mr. Brenza.

15                    THE WITNESS:  -- Mr. Brenza.

16   BY MS. WAGSTAFF:

17       Q.       Okay.  And when was that?

18       A.       That would have been last week

19   sometime.

20       Q.       So that was one of the three?

21       A.       Probably earlier this week.  Earlier

22   this week.

23       Q.       So that was a fourth phone call?

24       A.       That's right.  Yes.

Robert Tarone, Ph.D.

1    Q.    Okay.  And what did you and

2  Mr. Brenza and Mr. Vales talk about?

3    A.    Just general things.  It was the

4  same thing about what might -- what might be

5  expected and just that.

6    Q.    Okay.  And so Mr. Vales was telling

7  you, hey, I'm not going to be at the deposition,

8  but Mr. Brezna is and so here's what he thinks is

9  going on?

10   A.    Right, which was not -- he had not a

11 great idea either.  Nobody really knew entirely

12 what was going on.

13              MR. BRENZA:  And just -- just

14       to get it right.  It's Brenza.

15              MS. WAGSTAFF:  Brenza.  Sorry.

16 BY MS. WAGSTAFF:

17   Q.    So he introduced you to new Monsanto

18 lawyer.

19              And how long was that phone

20 conversation?

21   A.    Not long.

22   Q.    How long?

23   A.    Maybe five minutes.

24   Q.    All right.  And then that was last

**Exhibit E Page 100**

Robert Tarone, Ph.D.

```
1    Friday?

2         A.      No.  It was sometime earlier this

3    week --

4         Q.      Okay.

5         A.      -- when I first -- he first

6    introduced me on the phone.

7         Q.      And why do you think that that

8    introduction happened?

9         A.      I suppose just so that I wouldn't

10   see him or hear him.  This is the first time I've

11   seen him.  So it wouldn't be the first time I

12   heard him.

13        Q.      Why?  Why does that matter?

14        A.      It matters.

15        Q.      Why?

16        A.      (Laugh).

17        Q.      He represents Monsanto.

18        A.      I know.

19        Q.      So why does it matter if you show up

20   at the deposition and it's the first time you've

21   seen him?

22        A.      It's just nice to talk to someone

23   before you see him for the first time.

24        Q.      You didn't reach out to me.
```

**Exhibit E Page 101**

Robert Tarone, Ph.D.

1          Is that important to you to meet the

2    lawyers before the deposition?

3          A.      I don't understand, but no.

4          Q.      You just wanted to meet Monsanto's

5    lawyers before the deposition?

6                  MR. BRENZA:  Argumentative.

7                  THE WITNESS:   Mr. Vales

8           wanted me to be introduced to him before

9           the deposition.

10   BY MS. WAGSTAFF:

11         Q.      Okay.  And have you talked to anyone

12   else besides Mr. Brenza, Mr. Vales, that

13   represents Monsanto, to your knowledge?

14         A.      No.

15         Q.      And are you continuing to

16   communicate with Mr. Saltmiras?

17         A.      I have not.  I think the last

18   communication I had was when he called about

19   Finland.

20         Q.      Well, we just -- we discussed later

21   that he actually talked to you about --

22         A.      Oh, no.

23         Q.      -- CropLife.

24         A.      The CropLife.

Robert Tarone, Ph.D.

1          Q.       Okay.  So what did you do to prepare

2    for the deposition today?

3                   And we'll talk about -- just because

4    we don't have the luxury of having -- we don't

5    have the documents yet, do we?

6                   Okay.  So we'll take a break after

7    we finish this section, and when we come back,

8    we'll talk about how we -- about how -- how we --

9    how you -- how you got your -- gathered your

10   documents.

11                  But just to sort of summarize this,

12   which I've marked as Exhibit 5.

13                       MS. WAGSTAFF:  And,

14        unfortunately, I don't have a copy for

15        you.  But, Lin, we can copy this if you

16        want at a break.

17                       MR. BRENZA:  I mean, I do want

18        a copy.

19                       MS. WAGSTAFF:  Yeah, I'll copy

20        at a break or something.

21   BY MS. WAGSTAFF:

22         Q.       But just to sum it up, I've created

23   this chart with you.  You have agreed that these

24   were sort of your interactions with Monsanto.

Robert Tarone, Ph.D.

1            You -- first time you began -- the

2    first -- first meeting occurred in September of

3    2015 when Monsanto lawyers came to your office and

4    paid your employer to educate them about IARC 112,

5    which you knew at that -- or about the IARC

6    process, which you and your employer knew at that

7    time.

8                    MR. BRENZA:  Counsel, you

9            don't -- you don't need -- you don't need

10           to testify about all the points you made.

11                    MS. WAGSTAFF:  Thank you.

12           This is my deposition.  I can.

13                    MR. BRENZA:  Yeah.  All right.

14           I'm just going to move to strike

15           everything you're testifying about.

16                    MS. WAGSTAFF:  Great.  You can

17           move to strike everything I'm testifying

18           about.  It's my deposition.  And if you

19           have questions later, you can certainly

20           ask questions later.

21                    MR. BRENZA:  These are not

22           questions.

23    BY MS. WAGSTAFF:

24        Q.    So let me just start again so

**Exhibit E Page 104**

Robert Tarone, Ph.D.

1    there's a clear record.

2              So your involvement with glyphosate

3    began in September of 2015 with an in-person

4    meeting with Monsanto lawyers?

5        A.      Correct.

6        Q.      Okay.  And that was a three-hour

7    in-person meeting in which Monsanto paid your

8    company money for opinions about the IARC process?

9        A.      Correct.

10       Q.      Which both you and your employer

11   knew related to the glyphosate 112 because they

12   were Monsanto lawyers, correct?

13       A.      Correct.

14       Q.      All right.  Then you had another

15   second in-person meeting a couple weeks later with

16   three Monsanto lawyers, correct?

17       A.      Correct.

18       Q.      All right.  And then you began an

19   e-mail --

20       A.      For which -- for which no pay was

21   received.

22       Q.      Okay.  And we can stipulate you have

23   not been paid since that.  Okay?

24              Is that fair?

Robert Tarone, Ph.D.

1         A.       It's fair.

2         Q.       Okay.  And the second in-person

3    meeting was with Monsanto lawyers two to three --

4    which was two to three hours and a few weeks

5    later, right?

6         A.       Yes.

7         Q.       And then you began e-mailing with

8    Monsanto employee, David Saltmiras, who later

9    recommended a toxicologist to help you interpret

10   data; is that correct?

11        A.       Correct.

12        Q.       All right.  And then, in fact,

13   Dr. Saltmiras invited you to Finland to defend

14   glyphosate, which you politely declined?

15        A.       Correct.

16        Q.       And then Monsanto invited you to

17   speak at CropLife America, which is a lobbyist

18   group defending companies like Monsanto, and you

19   accepted and, in fact, did present, correct?

20        A.       And received no money, even --

21        Q.       And you received no money?

22        A.       Even expenses.

23        Q.       All right.  And then you eventually

24   testified before the House Science, Space, and

Robert Tarone, Ph.D.

1    Technology Committee in February of '18 to defend

2    your glyphosate opinions, right?

3         A.     Correct.

4         Q.     At some point shortly thereafter,

5    Mr. Vales gets a hold of you some way or another,

6    and you two start communicating.

7                And you guys decide collectively

8    that a deposition needs to happen to defend your

9    papers on your glyphosate opinions, correct?

10        A.     Correct.

11        Q.     And then you have an in-person with

12   Mr. Vales for a couple of hours where you discuss

13   the scope of your deposition and a couple of other

14   phone calls after, correct?

15        A.     Correct.

16        Q.     And then, finally, you're deposed by

17   Monsanto so that your opinions could be used in

18   court cases, correct?

19        A.     Correct.

20        Q.     All right.  And then you began text

21   messaging Monsanto lawyers shortly thereafter, and

22   they started in 2020 and they continued until last

23   week or until this week, which is 2023, right?

24        A.     Correct.

Robert Tarone, Ph.D.

1      Q.      All right.  And you continued to

2  e-mail and call Monsanto lawyers from 2019 to 2023

3  this entire time, correct?

4      A.      Correct.  One lawyer.

5      Q.      One lawyer.

6              And we've gone through a couple of

7  those e-mails where you were annoyed that Monsanto

8  or that Bayer was not using your papers, right?

9      A.      Well, in this European opinion.

10     Q.      Right.  You were annoyed that Bayer

11 was not using your papers in a European opinion,

12 right?

13     A.      That's correct.

14     Q.      All right.  And then when plaintiffs

15 subpoenaed you -- my office specifically --

16 instead of calling me, you texted Monsanto

17 lawyers.  You called Monsanto lawyers, had three

18 phone calls with them.

19             You discussed the substance of your

20 deposition, and a new introduction was made to you

21 of a new Monsanto's lawyer who would be here on

22 behalf of Monsanto; is that correct?

23     A.      That's correct.

24     Q.      All right.  Let's take a break and

Robert Tarone, Ph.D.

```
1    then we can talk about -- we can continue on.  Is
2    a break good?
3            A.      Fine.
4                    MS. WAGSTAFF:  Okay.
5                    THE VIDEOGRAPHER:  The time is
6        10:44 a.m.  We're off the record.
7                    (Recess.)
8                    THE VIDEOGRAPHER:  The time is
9        10:52 a.m.  We are back on the record.
10   BY MS. WAGSTAFF:
11           Q.      All right, Doctor.  We just took a
12   break for about 10 minutes.
13                   What did you do during your break?
14           A.      Went to the men's room.
15           Q.      All right.  Did you speak with
16   Monsanto's lawyer?
17           A.      Just to basically say hi.  Didn't
18   talk anything about the deposition.
19           Q.      Okay.  Did you check your e-mails or
20   anything --
21           A.      No.
22           Q.      -- else?
23                   Send them text messages or anything?
24           A.      No.
```

Robert Tarone, Ph.D.

1          Q.          Okay.  So back to Exhibit 4, which

2     was a document that you brought to me -- to us

3     today.

4          A.          Uh-huh.

5          Q.          And we had talked a little bit

6     about, but I noticed here when I was just reading

7     over the break that Mr. Vales -- Vales, sorry --

8     who we've decided is, you know, in a very large

9     law firm and is representing Monsanto and/or

10    Bayer, right?

11         A.          (Nods head).

12                    MR. BRENZA:  Object to form.

13          Acknowledges prejudice.

14    BY MS. WAGSTAFF:

15         Q.          And he's writing to you:

16                    "I would be grateful if you sent me

17    a copy of your comments to EFSA and EcHA."

18                    Do you see that?

19         A.          Yes.

20         Q.          Later you did send your comments

21    to --

22         A.          I did.

23         Q.          -- EFSA and EcHA, right?

24                    And you testified earlier that you

Robert Tarone, Ph.D.

1    in fact, over the years have sent Mr. Vales

2    comments or scientific literature or whatever,

3    right?

4         A.    Mainly -- mainly scientific

5    literature, yes.

6         Q.    Okay.  So you had been -- and here

7    at least as recently as October 26, 2021,

8    Mr. Vales is asking you to provide him

9    information, right?

10        A.    Correct.

11        Q.    Okay.  And then had he asked you to

12   send him literature that you find relevant, or is

13   that something you've done on your own?

14        A.    No.  It's a very small group of

15   people that I send.  Whenever I publish something,

16   I send it to them.  I know they've been following

17   my work from the beginning, and I just send them

18   out.  A couple of people I worked with, including

19   Bill Blot, the CEO.  Even though he's retired and

20   down in Florida I still send him.

21             A young epidemiologist, who had an

22   office next to me, who's very interested in the

23   word.  Jeffrey Kabat, an epidemiologist in New

24   York City.  He's now retired.  David Zaruk, a

Robert Tarone, Ph.D.

1    blogger in Belgium.  He's a Canadian, but he

2    bloggers in Belgium as the Risk-Monger.

3              These are people who have been

4    interested in my work from the very beginning.  So

5    I will send them mainly copies of my stuff and

6    occasionally other papers and I -- essentially I

7    added Mr. Vales to that list after the deposition.

8    So he's now among the people that I just send to.

9         Q.     Okay.  But you just send but, I

10   mean, as recently as October of 2021, he's

11   actually asking you for information, right?

12        A.     Yeah.  I hadn't sent them to him

13   because basically it's just summarizing what's in

14   my paper.

15        Q.     Sure.  But my point is, is that

16   Mr. Vales is asking you for information as

17   recently as 2021.

18              And from what you described as

19   post-deposition until as recently as 2021, you

20   guys were sharing scientific information.

21        A.     Well --

22        Q.     You would request it or you would

23   send it, whatever way.

24        A.     In terms of sharing, I was sending

Robert Tarone, Ph.D.

1    stuff to him.

2         Q.      You were sending to him.

3         A.      (Laugh).  Yeah.

4         Q.      He wasn't sending to you.  Okay?

5         A.      He didn't have any scientific

6    information to share with me.

7         Q.      Well, he's -- to be fair, he's a

8    lawyer?

9         A.      Yeah.

10        Q.      So you're the scientist.

11               So as a scientist, you were sending

12   information to him that you thought would be

13   relevant, and he is asking you for information

14   that he finds that he might think is relevant?

15        A.      Correct.

16        Q.      Okay.  And this is Monsanto's

17   lawyer?

18        A.      Bayer.

19        Q.      Bayer's lawyer?

20        A.      Yeah.

21               MS. WAGSTAFF:  Okay.  Do we

22        have the documents yet?

23               MR. ROWE:  They're almost

24        ready.

Robert Tarone, Ph.D.

1                    MS. WAGSTAFF:  No.

2    BY MS. WAGSTAFF:

3         Q.        Okay.  So what did you do to prepare

4    for today?

5         A.        There wasn't much to do to prepare,

6    except to try to pull together everything I could

7    that was relevant to the request for documents.  I

8    mean, I know the science.  I can't prepare any

9    more on that.  And, of course, I have no idea

10   where you're going to go with your questions.

11                  So really nothing except to pull the

12   documents together.

13        Q.        Okay.  And, unfortunately, because

14   of the size of the documents, we can't kind of

15   go -- I can't walk you through yet how you found

16   those.  So we're going to have to still put a pin

17   in that, but I just want to know.

18                  You testified that to prepare for

19   today you spoke with Monsanto's lawyers at least

20   four times.  You texted, you text messaged with

21   them and e-mailed them.

22                  Did you read -- did you -- other

23   than gathering documents, which we'll go over

24   later, did you read anything?

**Exhibit E Page 114**

Robert Tarone, Ph.D.

```
 1          A.        I'm not sure what you mean.

 2                    MR. BRENZA:  Object to form.

 3                    THE WITNESS:  Read in what

 4        sense?

 5                    MR. BRENZA:  Mischaracterizes

 6        testimony.

 7                    THE WITNESS:   Read anything

 8        new?  I mean, no.  I mean I --

 9   BY MS. WAGSTAFF:

10          Q.     No.  Review anything.

11                    Did you think, oh, I have a

12   deposition so I need to review my paper or I need

13   to review -- well, I don't want to put words in

14   your mouth.

15                    Did you review anything?

16          A.     I know my papers backwards and

17   forwards.

18          Q.     Okay.

19          A.     There was no need to reread any of

20   my papers.

21          Q.     So you testified at your last

22   deposition that you had read Aaron Blair's

23   deposition transcript.

24          A.     Not -- not entirely.  I read a few
```

**Exhibit E Page 115**

Robert Tarone, Ph.D.

1    pages of it.

2         Q.      Okay.  Before you had said I think

3    you read the whole thing, but you're saying you

4    had read a few pages?

5         A.      No, I don't believe I've read any

6    entire deposition.  I can't do that.  I have

7    trouble reading my own.

8              I read parts of his.  I read parts

9    of Chris Portier's deposition.

10        Q.      Okay.

11        A.      And I think that's -- that's it in

12   terms of depositions in the glyphosate matter.

13        Q.      Okay.  So before I talk about that,

14   did you reread them before this deposition?

15        A.      No.

16        Q.      Okay.  So the last time you reviewed

17   Aaron Blair -- portions of Aaron Blair's

18   deposition and portions of Chris Portier's

19   deposition was in 2019?

20        A.      Would have been before that.  I

21   mean, I didn't read those for the deposition.

22        Q.      Okay.

23        A.      I had read them previously.

24        Q.      Okay.  And you understand that Chris

Robert Tarone, Ph.D.

1    Portier has provided multiple versions of an

2    expert report in the Roundup litigation.

3                    Did you know that?

4         A.        What kind of an expert report?

5         Q.        Where he has taken his opinions and

6    put them into a report.

7         A.        Published or for the lawyers?

8         Q.        For the lawyers.

9         A.        Okay.  No, I didn't know that.

10        Q.        Okay.

11        A.        I haven't seen any of that.

12        Q.        And any -- it has been amended,

13   updated, whatever verb you want to use, multiple

14   times.

15                   You have not seen his expert report?

16        A.        No.  I have not followed any of the

17   trials --

18        Q.        Okay.

19        A.        -- closely.

20        Q.        Okay.  And then you understand that

21   Chris Portier has provided -- I don't know the

22   exact number, but somewhere at least more than

23   five, probably less than 10, depositions in the

24   Roundup litigation?

**Exhibit E Page 117**

Robert Tarone, Ph.D.

```
 1          A.       I did not know that.  I only saw the
 2     one.
 3          Q.       Okay.  And you understand that Chris
 4     has testified in at least three trials?
 5          A.       I would not know that.
 6          Q.       No?  Okay.
 7                   So you haven't read any of his trial
 8     testimony?
 9          A.       (Shakes head.)
10          Q.       You haven't read any of his expert
11     reports.  You haven't read any of his depositions?
12          A.       Right.
13          Q.       Other than one deposition you read
14     pieces of?
15          A.       Yeah, pieces of.
16          Q.       Okay.
17          A.       I knew what I wanted to look for.
18          Q.       Okay.  But you understand that
19     there's a lot that Chris has said in this
20     litigation that you haven't seen?
21          A.       Oh, absolutely.
22          Q.       Okay.  And Aaron Blair you read just
23     pieces of that one as well?
24          A.       (Nods head).
```

**Exhibit E Page 118**

Robert Tarone, Ph.D.

1          Q.        Your main criticism from what I can

2    tell of IARC 112 appears to relate to the animal

3    study analyses; is that right?

4          A.        Definitely.

5          Q.        Okay.

6          A.        I do have criticism of -- in the

7    first paper, I did express some concerns about the

8    epidemiology, and those are greater now than they

9    were then.

10         Q.        Okay.  I understand that.

11                   But your main concern seems to be

12   the animal study?

13         A.        Definitely.  It's definitely the

14   rodent study.

15         Q.        So who was the sub-chair of the

16   animal studies group of IARC 112?

17         A.        Oh, I don't know him, but it was I

18   think Matthew Ross?

19         Q.        Okay.  Matthew Ross was the head of

20   the mechanistic study.

21                   Would it surprise you that Bill

22   Jameson?

23         A.        Okay.  Jameson.  No.  I know the

24   names, but I don't know.  I don't know the man

Robert Tarone, Ph.D.

1    personally the man personally.

2        Q.      Okay.

3        A.      But, yeah, Jameson is.

4        Q.      So Bill Jameson has sat in the chair

5    that you're sitting in right now and given

6    deposition testimony under oath.  Under oath.

7        A.      Right.

8        Q.      Multiple times.

9        A.      Right.

10       Q.      Probably 15 times.

11       A.      Right.

12       Q.      In this Roundup litigation.

13               Why haven't you asked to see those

14   transcripts?

15               MR. BRENZA:  Object to form.

16               THE WITNESS:   Because I'm not

17          that interested in the trials.  I'm

18          interested in my papers.

19               And by the way, in all those

20          depositions, what did he say were errors

21          in my papers?

22   BY MS. WAGSTAFF:

23       Q.      Well, why don't you read the

24   depositions?  I mean --

Robert Tarone, Ph.D.

1        A.        Because I'm not heavily involved in

2   these -- in the litigation.

3        Q.        Okay.

4        A.        You're making it seem like I'm much

5   more involved than I am.

6        Q.        Doctor --

7        A.        I would not even think to read the

8   depositions.  I know my papers.  My papers have

9   not been refuted.  The facts I present, not one

10  has been disputed.

11       Q.        Doctor, you presented an editorial

12  and an opinion piece, with all due respect.

13       A.        What -- what are you talking about?

14       Q.        Your paper.  Your -- your articles

15  are an editorial and an opinion piece.

16       A.        Well, there is some opinion in both

17  but --

18       Q.        It says --

19       A.        No, no.

20       Q.        -- opinion pieces.  (Laugh).

21       A.        No, I don't care what it says.  What

22  is in the paper about what the Working Group

23  did --

24       Q.        Okay.

**Exhibit E Page 121**

Robert Tarone, Ph.D.

1        A.        -- with the rodent studies is not

2   opinion.

3        Q.        Okay.  So --

4        A.        It's fact.  I proved and I

5   documented and anybody can go to those references

6   I give.  The Working Group excluded entirely

7   exculpatory rodent tumor evidence.

8        Q.        Okay.  And we're going to get to

9   that.  Trust me.  We're going to get to that.  I

10   have a whole section on that.

11                 But you injected yourself in this

12   litigation by deciding that you wanted to give a

13   deposition in 2019 so that your opinions could be

14   used in court.

15                 We already went over that, right?

16        A.        Right.

17                 MR. BRENZA:  Object to form.

18   BY MS. WAGSTAFF:

19        Q.        Okay.  And are you telling me that

20   your opinion in December of 2019 is somehow less

21   credible because it's related to litigation?

22                 MR. BRENZA:  Object to form.

23         Vague.

24                 THE WITNESS:   I'm not sure

Robert Tarone, Ph.D.

```
 1          what you mean.  I mean, basically --
 2    BY MS. WAGSTAFF:
 3          Q.      You're discrediting Dr. Jameson's
 4    deposition transcript --
 5          A.      I'm not discrediting anybody.
 6          Q.      -- because --
 7          A.      I testified about my scientific
 8    papers.  That's -- and -- and that's the basis for
 9    everything in fact.  That's the reason I gave that
10    deposition.  I'm not discrediting anybody else who
11    goes through depositions.
12          Q.      Well, you said that you didn't read
13    Dr. Jameson's depositions or his expert report,
14    which relate to his factual experience at
15    Monograph 112.
16          A.      And I'm asking you again --
17          Q.      Hang on.  Can I finish my question?
18                  And your response was that you don't
19    get involved in the litigation (indicates).
20          A.      That's right.  I don't.
21          Q.      But you do get involved in the
22    litigation.
23          A.      Well, I didn't realize the extent I
24    was when I agreed to the deposition.  I will say
```

1    that.

2         Q.      Okay.

3         A.      I will say that.

4                 But I'm going to ask you again since

5    you keep bringing Jameson's expert opinions.  What

6    has he pointed out did I make a factual error in

7    what I presented in those papers about the

8    mistakes that the Working Group made in evaluating

9    rodent studies?

10        Q.      Doctor, I'm going to move to strike

11   because this is not your deposition.  I ask the

12   questions in this deposition.

13                You can laugh all you want.  This

14   isn't really funny.

15                And if you actually want to know

16   what Dr. Jameson says about you and if you

17   actually want to know what he says under oath, ask

18   Monsanto's lawyers for the transcripts.  Do your

19   diligence.

20                    MR. BRENZA:  Move to strike.

21   BY MS. WAGSTAFF:

22        Q.      I'm not here as a lawyer --

23                    MR. BRENZA:  You're just

24        arguing.

Robert Tarone, Ph.D.

1    BY MS. WAGSTAFF:

2         Q.        -- to tell you what he says.

3                   MR. BRENZA:  You're just

4         arguing with the witness now.  Ask your

5         question.

6    BY MS. WAGSTAFF:

7         Q.        Okay.

8         A.        I would like science to be done the

9    way it's supposed to be done.  Dr. Jameson should

10   write a letter to the journals that I published in

11   and show where my papers are wrong.  That's how

12   science should be done.  Not through court, not

13   through depositions.

14        Q.        So say --

15        A.        Not through litigation.

16        Q.        So say you, who injected yourself

17   into the litigation so your opinions could be used

18   in court.  That seems a very disingenuous

19   position, Dr. Tarone, but we can move on.

20        A.        I'm not sure where you're coming

21   from on that.

22        Q.        All right.  So Dr. Ross, who you

23   mentioned, has also been deposed in this

24   litigation.

**Exhibit E Page 125**

Robert Tarone, Ph.D.

1               And I assume you likewise have not

2    read that deposition?

3        A.      No.

4        Q.      All right.  All right.  Let's move

5    -- anything else you did to prepare for your

6    deposition?  You didn't read any documents?

7        A.      No.

8        Q.      Okay.  You just gathered documents,

9    which we'll go over later, right?

10       A.      Correct.

11       Q.      Okay.  So I want to just talk a

12   little bit about -- we're going to move topics.

13               I think that we could probably --

14   first of all, what's the difference between a

15   pesticide and an herbicide?

16       A.      Well, a pesticide is a -- it's a

17   broader group.  For example, in the Agricultural

18   Health Study, we looked at four classes of

19   pesticides: herbicides, insecticides, fungicides,

20   and fumigants.  Pesticides would include any one

21   of those.

22       Q.      Okay.  So Roundup is a -- is a --

23       A.      It's an herbicide.

24       Q.      An herbicide.  Okay.

**Exhibit E Page 126**

Robert Tarone, Ph.D.

1          A.       It's also a pesticide.

2          Q.       Right because it's the umbrella

3    term.

4          A.       (Nods head).

5          Q.       You can agree with me -- let's talk

6    about things we can agree on.

7                   You can agree with me that Roundup

8    and glyphosate are not the same thing?

9          A.       Correct.

10         Q.       You can agree with me that IARC made

11   a determination on glyphosate?

12         A.       Correct.

13         Q.       You can agree with me that IARC did

14   not make a determination on Roundup?

15         A.       Correct.

16         Q.       And can you also agree with me that

17   when you -- that no regulatory body in the world

18   has made a determination on Roundup?

19         A.       That I'm not sure of.

20         Q.       Do you know of any regulatory body

21   that has made a determination on Roundup?

22         A.       I -- I don't know exactly how they

23   word it.  They probably are basing it on

24   glyphosate, but there may -- I don't know.  Some

Robert Tarone, Ph.D.

1    of them must have looked at Roundup products.  I

2    don't know.

3         Q.      Well, I'm not asking you to guess.

4    I'm asking you that --

5         A.      I don't know.  I don't know.

6         Q.      -- as you sit here today, do you

7    know of any?

8         A.      I don't know.

9         Q.      Okay.  And we can agree that the

10   EPA -- the Environmental Protection Agency, right?

11        A.      (Nods head).

12        Q.      Has never made a determination on

13   Roundup?

14        A.      Well, their Scientific Advisory

15   Panel definitely just said glyphosate.

16        Q.      Right.  So do you know of any EPA

17   body -- or let me -- let me strike that.

18               Do you know of any -- you know EPA

19   has a bunch of different divisions?

20        A.      Probably like any government agency.

21   I'm not really that familiar with EPA per se.

22        Q.      Okay.  Do you know of any EPA

23   division that has made a determination on Roundup?

24        A.      I would not know.

**Exhibit E Page 128**

Robert Tarone, Ph.D.

1          Q.        So the answer is no?

2          A.        I would not know.  I mean, I don't

3     know what EPA has done in terms of herbicide

4     decisions.  I really don't.  I don't follow that.

5     I know that their big Scientific Advisory Panel

6     was exclusively said glyphosate, did not say

7     Roundup.

8          Q.        Okay.  So you -- so as you sit here

9     today, you know of no --

10         A.        I know of no other.

11         Q.        Okay.  I'm going to need the ELMO

12    on.

13                   And so as you sit here today, you're

14    not providing any opinion with respect to the

15    safety of Roundup?

16         A.        No.  My papers are on glyphosate --

17         Q.        Okay.

18         A.        -- because they're based -- they're

19    based on IARC, which evaluated glyphosate.

20         Q.        Right.  So your papers are based on

21    IARC's evaluation of glyphosate?

22         A.        That's correct.

23         Q.        Your papers have nothing to do with

24    Roundup?

Robert Tarone, Ph.D.

```
 1                    MR. BRENZA:  Object to form.

 2                    THE WITNESS:   Except it's a

 3        product in Roundup.

 4   BY MS. WAGSTAFF:

 5        Q.     You mean it's an ingredient?

 6        A.     It's the active ingredient.

 7        Q.     Okay.  Other than it being the

 8   active ingredient, we already -- we already agree

 9   that glyphosate and Roundup are different, right?

10                    MR. BRENZA:  Object to form.

11                    THE WITNESS:  Well, there's

12        different kinds of herbicides that use

13        glyphosate.  Roundup has other things in

14        it other than glyphosate.

15   BY MS. WAGSTAFF:

16        Q.     Right.  And so you are not here

17   today to give an opinion on whether or not Roundup

18   can cause cancer, right?

19        A.     It's glyphosate.  Just like the

20   first deposition, it's based on my papers.

21        Q.     Okay.

22        A.     My papers very clearly --

23        Q.     I just --

24        A.     -- deal only with glyphosate.
```

**Exhibit E Page 130**

Robert Tarone, Ph.D.

```
1        Q.       And they only deal with the IARC's
2   analysis of glyphosate?
3        A.       That's correct.
4        Q.       So it's even more narrow than --
5   than is glyphosate a carcinogen.
6                 Your paper deals with how IARC
7   analyzed glyphosate, right?
8        A.       My papers evaluate the deliberations
9   that were made and show that they were horribly
10  erroneous.
11       Q.       Okay.  So your opinion relates to
12  IARC's analysis in 2015 based on the science in
13  2015, their deliberation analysis of one
14  ingredient in Roundup, glyphosate, right?
15       A.       That's correct.
16       Q.       Okay.  Nothing else?
17       A.       That's correct.
18       Q.       All right.  And so just to be
19  crystal clear, you're providing no opinions as to
20  the formulated Roundup product?
21       A.       Yeah.  I know -- I don't even know
22  what else is in Roundup.
23       Q.       All right.
24                MR. BRENZA:  And just to be
```

**Exhibit E Page 131**

Robert Tarone, Ph.D.

1           clear, his -- I mean, he'll ask questions

2           that -- he answers questions that you ask

3           him.  I mean, what opinions he gives

4           depends on what you ask him.  He's not a

5           predesignated expert.

6                     MS. WAGSTAFF:  I'm not

7           treating him like a predesignated expert.

8           I'm asking trying to figure out what his

9           opinions are.  If Monsanto wants to

10          object on his behalf, by all means.

11     BY MS. WAGSTAFF:

12          Q.     So are you familiar with the Ninth

13     Circuit opinion that just came out?

14          A.     No.

15          Q.     Came out last summer?

16          A.     No, I'm not.

17          Q.     You know what the Ninth Circuit is?

18          A.     I know that there are several

19     circuit courts, yeah.

20          Q.     All right.  The Ninth Circuit.

21          A.     Uh-huh.

22          Q.     This was an opinion that came out.

23                 And the Court of Appeals is one step

24     below the United States Supreme Court; isn't that

Robert Tarone, Ph.D.

1    right?

2                    MR. BRENZA:  Calls --

3                    THE WITNESS:   Sounds right.

4    BY MS. WAGSTAFF:

5        Q.     All right.

6                    MR. BRENZA:  Calls for a legal

7         opinion.

8                    MS. WAGSTAFF:  You want to

9         just give it to him?

10                   THE WITNESS:  I believe I've

11        seen a news report on this.

12   BY MS. WAGSTAFF:

13       Q.     What do you know about it?

14       A.     Well, I think that they said EPA

15   should go back and reevaluate glyphosate.

16       Q.     Yeah.  Why did they say -- so you --

17   so you have an understanding about what this

18   document says?

19       A.     Yeah.  To the extent that a Wall

20   Street Journal article was accurate, yes.

21       Q.     Okay.  And so what your

22   understanding is that the Ninth Circuit is telling

23   EPA to go back and reanalyze glyphosate?

24       A.     (Nods head).

**Exhibit E Page 133**

Robert Tarone, Ph.D.

1      Q.      Why?

2      A.      I don't know that the paper was that

3   detailed in why.  I know some of it had nothing to

4   do with cancer.  I think it was because they

5   didn't feel that they followed certain of their

6   regulations to the letter of the regulation.

7   That -- that was my opinion.

8                    MR. BRENZA:  This is -- this

9           is all hearsay and speculation.

10  BY MS. WAGSTAFF:

11     Q.      Okay.  And you had -- you had an

12  understanding of this before you came into this

13  deposition today, right?

14     A.      Well, I read that news article.

15     Q.      Yeah.  And so you had an

16  understanding that EPA had done this.  Like that

17  is something that you knew before you walked into

18  this deposition.

19                   MR. BRENZA:  Hearsay.

20          Speculation.

21                   THE WITNESS:   The EPA had

22          done what?

23  BY MS. WAGSTAFF:

24     Q.      What you just said.  Said -- I'm

Robert Tarone, Ph.D.

```
 1    sorry.

 2              That the Ninth Circuit had told the

 3    EPA to reevaluate glyphosate?

 4         A.     They did.

 5                   MR. BRENZA:  Speculation.

 6                   THE WITNESS:  Yes, they did.

 7    BY MS. WAGSTAFF:

 8         Q.     Okay.  So this was something that

 9    was in there.  I just wanted to show you that:

10              "Despite EPA's repeated invocation

11    of its cancer guidelines the interim decision

12    fails to abide by those guidelines.  Inconsistent

13    reasoning and absent explanation is the hallmark

14    of arbitrary action."

15              So exactly what you understood?

16         A.     I mean, I have no idea of what that

17    means entirely, but they clearly --

18         Q.     Yeah.

19         A.     -- didn't think that they followed

20    their regs.

21         Q.     Right.  And then it says that based

22    on that:

23              "On these considerations we" --

24    being the Ninth Circuit -- "vacate the human
```

Robert Tarone, Ph.D.

```
 1   health portions of EPA's interim decision and

 2   remand for further analysis."

 3                    MR. BRENZA:  Calls --

 4   BY MS. WAGSTAFF:

 5        Q.    So exactly what you understood

 6   before you came in, right?

 7                    MR. BRENZA:  Calls for a legal

 8        conclusion.  Hearsay.  Speculation.

 9   BY MS. WAGSTAFF:

10        Q.    Okay.

11        A.    That was my -- close to my

12   understanding.  Again, it came from a Wall Street

13   Journal article.

14        Q.    Okay.  The Ninth Circuit one that

15   you just -- we just handed you, we need to put a

16   sticker on that.

17                    MR. BRENZA:  I'm not sure you

18        gave it to the witness.  You gave it to

19        me.

20                    THE WITNESS:   I only have 1

21        and 2.

22                    MR. BRENZA:  He only has 1 and

23        2.

24                    MS. WAGSTAFF:  Okay.  Is this
```

**Exhibit E Page 136**

Robert Tarone, Ph.D.

1   number 7, I think?  Sorry.

2          MR. BRENZA:  Is that what

3   you're marking it as?

4          MS. WAGSTAFF:  I mean, do you

5   have a 6?

6          MR. BRENZA:  No, not that I

7   can see.

8          MS. WAGSTAFF:  I put 6 on

9   something because the 6 sticker is

10  missing.

11         THE WITNESS:  Is that your --

12  is that your graph?

13         MR. BRENZA:  It might be

14  your --

15         MS. WAGSTAFF:  No, my graph is

16  5.

17         THE WITNESS:  Oh.

18         MS. WAGSTAFF:  6 is --

19         MR. BRENZA:  5 is --

20         MS. WAGSTAFF:  I know what 6

21  is.

22         MR. BRENZA:  5 is --

23         THE WITNESS:  Was it my --

24         MS. WAGSTAFF:  No.  I know

Robert Tarone, Ph.D.

1          what 6 is.

2                    THE WITNESS:  -- clinical

3          lymphoma paper?

4     BY MS. WAGSTAFF:

5          Q.      No.  6.  You guys want to keep

6     guessing?  6 is this e-mail --

7          A.      Okay.

8          Q.      -- that says "Why Bayer ignored my

9     papers."

10                   MR. BRENZA:  I had it as 5,

11         but, okay, that's actually 6.

12                   MS. WAGSTAFF:  5 is my graph.

13         Okay?  This is right.  5 is my graph.

14                   MR. BRENZA:  So this is 7.

15                   (Document marked for

16         identification as Tarone Exhibit 7.)

17                   MS. WAGSTAFF:  All right.  Can

18         I have document number 18, please, and

19         3 -- and get 3, 4, 2 and 32 ready all

20         these.

21    BY MS. WAGSTAFF:

22         Q.      All right.  One of -- one of the --

23    I want to kind of get into the substance of your

24    criticisms now.

Robert Tarone, Ph.D.

1          And one of the criticisms that I

2   noticed -- well, let's talk a little bit more

3   about what we could agree on before we get on what

4   we might disagree on.

5          We can agree that the studies that

6   IARC actually relied on were sufficient to make

7   the determination of whether or not glyphosate was

8   a carcinogen.  It was just --

9      A.    That's actually in the abstract of

10   my first paper I say that.

11     Q.    So we can agree?

12     A.    I acknowledge.

13     Q.    Okay.

14     A.    We definitely agree.

15     Q.    Okay.

16     A.    But it's in my published paper.

17     Q.    Yes.  So we can agree -- just

18   because I don't think I got my question out

19   because you knew where I'm going.  But even if you

20   know where I'm going, for the record, you need to

21   let me finish my question.

22          We can agree that the actual studies

23   that IARC relied upon were sufficient to make the

24   determination of whether or not glyphosate was a

Robert Tarone, Ph.D.

```
1    carcinogen, right?

2         A.      As stated in the abstract of my

3    paper.

4         Q.      Okay.  And we can agree that IARC

5    has four subcategories?

6         A.      (Nods head).

7         Q.      What are those four subcategories?

8         A.      The first is something to do with

9    dose exposure, the second is epidemiology, the

10   third is rodent studies, and the fourth is

11   mechanisms.

12        Q.      Okay.  And you don't have any

13   criticism of the exposure group or the mechanism

14   group?

15        A.      I rarely even read the exposure.

16   It's -- it's just trying to document what the

17   level of human exposure is.

18        Q.      Okay.  So you don't have any

19   criticism of the exposure subgroup?

20        A.      No.

21        Q.      And you don't have any criticism of

22   the mechanism subgroup?

23        A.      I think they overstated the

24   mechanisms, but I'm not a toxicologist.  So I'm
```

Robert Tarone, Ph.D.

```
1   not an expert and that's why I've never put it in
2   my papers.
3          Q.      Okay.  So you're not offering any
4   criticisms of the mechanism subgroup?
5          A.      I'm not a toxicologist.  I think
6   people who say it's a strong mutagen I've done
7   work with people who do mutagenesis, and I've seen
8   no evidence that would support that.  But that's
9   just -- that's an opinion --
10         Q.      Okay.  So you're --
11         A.      -- by a non-toxicologist.
12         Q.      You're not offering an expert
13  opinion --
14         A.      No, I'm not.
15         Q.      -- on anything criticizing the
16  mechanism group?
17         A.      I'm not.
18         Q.      And the mechanism group, to be
19  clear, found that there was strong evidence,
20  right?
21         A.      Right.
22         Q.      Okay.  So -- so we don't have to
23  talk about that one because you're not offering
24  any opinions on that mechanism group.  All right.
```

Robert Tarone, Ph.D.

1          A.       Not an informed opinion.  (Laugh).

2          Q.       Well, that's all we really actually

3     want.

4                   And so the two -- the two categories

5     that we're going to talk about are your criticisms

6     of the animal studies and your opinions of the

7     epidemiology as related --

8          A.       That's fine.

9          Q.       -- to IARC.  Okay?

10                  And then I believe I saw in there in

11    one of your papers some discussion on the actual

12    participants at IARC.

13                  I just -- and maybe I'm wrong.

14    Maybe I was reading too much into it, but I just

15    want to --

16         A.       I don't think I've ever criticized

17    the participants.

18         Q.       Okay.

19         A.       I pointed out in one of the papers

20    that several of them are working as plaintiffs'

21    experts.

22         Q.       Okay.

23         A.       If you think that's criticism, I

24    didn't --

Robert Tarone, Ph.D.

1      Q.      No.

2      A.      -- intend it as criticism.  I just

3   find it's interesting --

4      Q.      Well --

5      A.      -- what's considered a conflict of

6   interest by IARC and what isn't.

7      Q.      Okay.  So we can talk about that

8   real quick, and that's why I wanted to bring this

9   up.

10             But this is, if you'll see, Volume

11   112 of the IARC, right?

12     A.      Uh-huh.

13     Q.      And that's the one we've been

14   talking about, right?

15     A.      Yes.

16     Q.      And this is -- it happened in Lyon,

17   France from March 3rd to 10th of '15; is that

18   right?

19     A.      Yes.

20     Q.      Okay.  And glyphosate.  So here we

21   are on the same page.  This is to sort of orient

22   us.

23     A.      (Nods head).

24     Q.      Okay.  There are groups of people

**Exhibit E Page 143**

Robert Tarone, Ph.D.

1    that were there.  We have members, right?

2          A.      (Nods head).

3          Q.      We have invited specialists?

4          A.      Correct.

5          Q.      We have representatives of -- excuse

6    me -- national and international health

7    agencies --

8          A.      Correct.

9          Q.      -- right?

10               We have observers?

11         A.      Correct.

12         Q.      And then we have IARC secretariat,

13   which I'm guessing are sort of the staff of IARC.

14               Is that the way you understand it,

15   too?

16         A.      Looks like it, yeah.

17         Q.      Okay.

18         A.      Kathryn Guyton.  She's definitely

19   staff.  Yeah, they're all staff.

20         Q.      Okay.  So -- so the people that

21   change every time are really sort of above, right?

22         A.      Above?

23         Q.      Strike that question.  That's sort

24   of irrelevant.

Robert Tarone, Ph.D.

1                     Let's go back to the first page.

2                     We're looking at the members, okay?

3                     I counted these up.  There were 18,

4     except for it said that this person -- did you see

5     it says "unable to attend"?

6          A.     Uh-huh.

7          Q.     So no offense to Ms. Rodriguez, but

8     I'm going to scratch her out because she wasn't

9     voting.

10         A.     And Peter P. Egeghy "unable to

11    attend."

12         Q.     Okay.

13         A.     You know that the IARC people

14    publish in Lancet Oncology a summary of each

15    monogram.

16         Q.     Uh-huh.

17         A.     I think they referred to 17, which

18    they may have been including Chris Portier with

19    the actual members.  I'm not sure, but I think

20    they say 17 international experts.

21         Q.     Okay.  So you would agree with me

22    that only these people vote?

23         A.     Yes.

24         Q.     Okay.  So no one else votes other

**Exhibit E Page 145**

Robert Tarone, Ph.D.

1   than these people?

2       A.      Those are the people that vote.

3       Q.      And they voted unanimously that

4   glyphosate was a class 2A?

5       A.      They did.

6       Q.      Category 2A?

7       A.      Amazingly, yeah.

8       Q.      Okay.  Is there -- do you know any

9   of these people personally?

10      A.      Of course, I know Aaron Blair.  I

11  worked closely with him --

12      Q.      Okay.

13      A.      -- at NCI.  He was a principal

14  investigator in the Agricultural Health Study.  I

15  don't personally know any of the others.

16      Q.      Okay.  So do you have any reason to

17  believe that any of these people, the voting

18  members who are the only people who cast a vote,

19  do you have any reason to believe that any of them

20  were biased against Monsanto?

21      A.      I would have no idea.

22      Q.      Okay.  So you have no reason to

23  believe that?

24      A.      I have no idea.  I'm sure some

Robert Tarone, Ph.D.

1    probably were.  Seems to be a very hated company,

2    but I would have no idea.  I don't know these

3    people.

4         Q.      Why is Monsanto a very hated

5    company?

6         A.      I don't know.  Just read the

7    newspapers.  Read.  (Laugh).

8         Q.      Well, you're under oath.

9         A.      Read.

10        Q.      Why do you think people hate

11   Monsanto?

12                    MR. BRENZA:  Calls for

13        speculation.

14                    THE WITNESS:   I don't know.

15   BY MS. WAGSTAFF:

16        Q.      You brought it up.  You said it's a

17   hated company.

18                You have no opinion on why people

19   might hate Monsanto?

20        A.      I don't.  I mean, some of the

21   products that they produced have been very helpful

22   for human health.  Every company.  I don't know.

23   I'm just telling you that they seem to have --

24        Q.      Do you think it's because they put

Robert Tarone, Ph.D.

1    Agent Orange out in the world?

2                    MR. BRENZA:  Move to strike.

3          Relevance.

4                    THE WITNESS:  No.  I don't

5          know.

6                    MR. BRENZA:  Prejudice.

7                    THE WITNESS:  I really don't

8          know.

9    BY MS. WAGSTAFF:

10        Q.      Well, you just said -- and, counsel,

11   I understand -- but like you just said that it's

12   possible that people on this panel were biased

13   because everyone or you said a lot of people --

14        A.      Oh, no one -- no one --

15        Q.      -- hate Monsanto.

16        A.      Yes.

17        Q.      I'm asking:  Why do people hate

18   Monsanto?  I think that's a fair followup.

19        A.      I can't answer that question.

20   That's why.

21        Q.      So you've --

22        A.      I've been told that that's one of

23   the reason that people sort of leave my -- my

24   results alone.  Two reasons.  People don't want to

Robert Tarone, Ph.D.

1  be seen criticizing IARC, which has its way of

2  getting its way, and people don't want to be seen

3  as defending Monsanto.  I've had two or three

4  people tell me that.

5      Q.    And have you ever asked why?

6      A.    No.

7      Q.    And -- and in your --

8      A.    It's clear from reading.

9      Q.    -- 40 some years of being a

10 scientist, you can sit here under oath and make a

11 comment that -- that perhaps these world-renowned

12 scientists may be biased because people

13 (indicates) don't like Monsanto, but you have

14 nothing to back that up?

15     A.    I have no idea.

16     Q.    Okay.

17     A.    But these -- these world-renowned

18 scientists made serious errors.

19     Q.    Okay.  I understand that's your --

20 your belief, but that's not --

21     A.    It's fact.

22     Q.    -- what we're talking about right

23 now.  Okay, Dr. Tarone?

24            We're talking about you have no

Robert Tarone, Ph.D.

```
 1   evidence --

 2        A.      No, none whatsoever.

 3        Q.      -- that any of these people --

 4        A.      No.

 5        Q.      -- have any bias against Monsanto?

 6        A.      I don't know anything about any of

 7   them except Aaron.

 8        Q.      Okay.  And you have no evidence that

 9   Aaron has any bias against Monsanto?

10        A.      I have never heard him express it.

11        Q.      Okay.  And these were the only

12   voting members?

13        A.      Yes.

14                MS. WAGSTAFF:  Okay.  All

15           right.  Let's talk about -- did I mark

16           that as an exhibit?

17                MR. BRENZA:  No.

18                MS. WAGSTAFF:  I'm going to if

19           I didn't, and I'm going to mark the copy

20           that I wrote on.

21                MR. BRENZA:  I'm waiting to

22           put a number on that.

23                MS. WAGSTAFF:  8.

24                (Document marked for
```

**Exhibit E Page 150**

Robert Tarone, Ph.D.

1           identification as Tarone Exhibit 8.)

2    BY MS. WAGSTAFF:

3           Q.      All right.  And I have heard you,

4    Dr. Tarone, criticize Dr. Portier before.

5                  But what I want to think we both can

6    agree on is that Dr. Portier was not a voting

7    member at IARC?

8           A.      He was not a voting member.

9                  And by the way, I would be curious.

10   I don't think I've ever criticized Portier.  I

11   have pointed out certain things, such as that he

12   signed a contract immediately after IARC declared

13   glyphosate to be a carcinogen, but I don't think

14   I've ever criticized Chris.

15          Q.      Okay.  And --

16          A.      In a published paper.  I've

17   criticized some of his opinions like when he

18   presented to the EPA --

19          Q.      Okay.

20          A.      -- glyphosate SAP.

21          Q.      And immediately after you say that

22   he -- what did you say?  He did what?

23          A.      He signed a contract with law firms

24   suing Monsanto.

**Exhibit E Page 151**

Robert Tarone, Ph.D.

1        Q.      Okay.  Immediately after?

2        A.      Within two weeks.

3        Q.      Okay.  And you had mentioned that

4    other people may be plaintiffs' lawyers or

5    plaintiffs -- consulting with plaintiffs' experts

6    in this litigation.  Oh, strike that.

7                You mentioned that other IARC

8    members may be consulting with plaintiffs' lawyers

9    in the Roundup litigation as well, right?

10       A.      I did.

11       Q.      Okay.

12       A.      The point of that was and consistent

13   with my long-time criticism of the Monograph

14   Program and their one-sided view of what

15   constitutes a --

16       Q.      Okay.

17       A.      -- conflict of interest.

18       Q.      And during this time when this

19   happened, were any of the panelists that you know

20   of retained by plaintiffs' lawyers?

21       A.      None.

22       Q.      Okay.

23       A.      I wouldn't know, but the only one --

24   and I'm not sure how it came out -- was Chris

1    Portier.

2            Q.        Okay.  And that was after?

3            A.        After.

4            Q.        Okay.  So as far as you can tell,

5    none of these people were -- were contact -- were

6    retained by -- by -- by plaintiffs' lawyers during

7    this?

8            A.        Not regarding glyphosate.

9            Q.        Okay.

10           A.        The bloggers, Eric in Belgium says

11   that Portier was working with a law firm, one of

12   the law firms on another matter.

13           Q.        Okay.  So this is Dr. Jameson right

14   here.

15           A.        Uh-huh.

16           Q.        And that's who we talked about

17   earlier, right, who was sub-chair of the animal

18   studies group?

19           A.        Correct.

20           Q.        And he has been retained as a

21   consultant expert for plaintiffs' lawyers in this

22   litigation.

23           A.        (Nods head).

24           Q.        Would it surprise you that Monsanto

Robert Tarone, Ph.D.

1    had also asked him to be a consultant?

2                        MR. BRENZA:  Calls for

3          speculation.  Assumes --

4                        THE WITNESS:   I would have no

5          idea.

6                        MR. BRENZA:  Assumes facts not

7          in evidence.

8                        THE WITNESS:  Would it --

9          would it surprise me?  Not particularly.

10   BY MS. WAGSTAFF:

11        Q.      And why wouldn't it surprise you?

12        A.      I would assume that anybody on this

13   list is going to be thought about, you know, can

14   they help us in court.

15        Q.      Right.  So why is it so strange that

16   somebody would -- that plaintiffs' lawyers or

17   Monsanto, why is it so strange that one of the

18   parties would reach out to these people?

19             They seem to be experts, subject

20   matter experts.

21        A.      Doesn't seem strange.  Have any of

22   the people on this panel agreed to be an expert

23   for Bayer?  Why not?

24        Q.      Well, have you agreed to be an

Robert Tarone, Ph.D.

1    expert for plaintiff?

2        A.      No, but I'm asking.  You only want

3    to see things one way like IARC.  I'm just

4    saying --

5        Q.      No.

6        A.      -- it doesn't -- wouldn't surprise

7    me one way or the other.  These people were

8    involved.

9        Q.      I don't know if any of these people

10   are retained experts for Monsanto or not.  I have

11   no idea.

12       A.      Then good.  We're on the same --

13   same page.

14       Q.      I have no idea.

15               But sometimes if somebody calls you

16   up and says, will you be an expert for me, and you

17   fundamentally don't believe in their position,

18   wouldn't you think someone would say no?

19               I mean, would you ever -- would you

20   ever be an expert for the other side?

21       A.      I wouldn't be an expert for anybody.

22       Q.      Okay.  All right.  So just merely

23   signing a contract with a law firm after this is

24   over does not create a conflict of interest?

Robert Tarone, Ph.D.

```
1          A.        To me, it does.  I mean, I think it

2    does.  It's funny that IARC only sees conflicts of

3    interest when they're in one direction, in other

4    words, that they're industry associated.  So, I

5    mean, I made.  I cited I think three -- maybe

6    three or four of these people.

7                    And by the way, the information came

8    in in a legal briefing that you filed with a

9    couple of coworkers.  You may not even know this,

10   but I've assumed you've looked at my papers.

11         Q.        Yeah, I was impressed.  I'm cited in

12   your paper.

13         A.        Yeah, I cite you.

14         Q.        I actually wrote "Wagstaff cited."

15   (Laugh).

16         A.        Yeah, you were cited.  Now,

17   however --

18         Q.        Let's talk about that.

19         A.        And this more -- this is more

20   evidence of how clever IARC is, by the way.

21                   But I would point out that in that

22   document, you have a clear lie about me

23   personally.  In this legal document, there's a

24   clear lie about me.  When you reference me once in
```

Robert Tarone, Ph.D.

1    that document, you refer to me as, quote, an

2    undisclosed consultant to Monsanto.

3              That's how you refer to me, and

4    that's based on a very clever IARC posting, which

5    you're clearly aware of because it was cited in

6    the footnote to document that I was an undisclosed

7    Monsanto consultant.

8              But if you read that IARC -- I mean,

9    it's very clever.  That's clearly what they

10   intended you to believe with the way they wrote

11   this.

12             But the first thing they state about

13   me is that I acknowledge the meeting with Monsanto

14   lawyer in my published paper, but then they go on

15   to do all this clever wording.  I'd be glad to

16   read it to you.

17        Q.    No, it's okay.

18             You're talking about this paper

19   right here.  I see "cite Wagstaff."  See, I put

20   that.

21        A.    I know.

22        Q.    You got my attention right there.

23        A.    You're there.

24        Q.    I'm rarely cited.

Robert Tarone, Ph.D.

1                    And you're talking about this

2   cite --

3        A.      I am.

4        Q.      -- which --

5        A.      It still is available.

6        Q.      Well, hang on.  I know.  I know what

7   it is.  It's an interesting cherry-picking of

8   legal documents.

9                    But it's 2017 was the day we filed

10  that, right?

11       A.      Right.

12       Q.      Where --

13       A.      As I said, it was based on --

14       Q.      I mean, by 2017, you had met in

15  person.  They had paid you.  You had met a second

16  meeting.  You had begun e-mailing with them.  They

17  had given you a toxicologist.  You had been

18  invited to Finland.  You had gone to CropLife.

19                   All that happened before 2017.

20       A.      And, again, that statement is false.

21  I was not undisclosed.  Even if you --

22       Q.      Okay.

23       A.      You clearly -- you clearly are

24  categorizing me as a Monsanto consultant, which I

Robert Tarone, Ph.D.

1    never thought of myself as.  But I see where

2    you're going.

3          Q.       Well, hang on.

4          A.       But it was clear even from the IARC

5    document you cited that I was not undisclosed.

6          Q.       Okay.  So if that's -- if that's

7    the -- if that's the -- the gripe that you're

8    undisclosed?

9          A.       Well, that's a major point.

10         Q.       Well --

11         A.       That's been IARC's main purpose.

12         Q.       Well, hang on.

13         A.       They're very clever to try to get

14   me.

15         Q.       You're reading a legal document --

16         A.       Yes.

17         Q.       -- Dr. Tarone.

18         A.       Yes.

19         Q.       And a legal document has legal

20   import.  You disclose experts.  That is a word

21   that has legal importance.

22                  MR. BRENZA:  This is just

23          arguing with the witness again, and

24          you're laughing at the witness.

Robert Tarone, Ph.D.

```
1    BY MS. WAGSTAFF:
2         Q.     This is -- that is a word that has
3    legal importance, meaning they have never
4    disclosed you in a case.
5         A.     You cited the IARC post.
6         Q.     No.  What you don't understand --
7    and then we can move on because he's right.  This
8    is ridiculous.
9         A.     No, I do understand.
10        Q.     No.
11                 MR. BRENZA:  You're just
12          testifying, counsel.  This is the point.
13                 THE WITNESS:  I do understand.
14                 MS. WAGSTAFF:  No.  He's
15          accusing me and I am allowed to say what
16          I want to say.  It's my deposition.  You
17          can move to strike it later.
18                 MR. BRENZA:  I move to strike
19          it.
20    BY MS. WAGSTAFF:
21        Q.     But what I'm saying is that you
22    don't even understand the word "disclose" has a
23    legal importance, meaning that they filed you in a
24    court case and, quote, disclosed you.
```

**Exhibit E Page 160**

Robert Tarone, Ph.D.

1              Doesn't mean they have hid you from

2    the world.  That means disclosed you.

3              You don't know what that means, and

4    so I know.  I appreciate that you're trying to

5    attack me and say all of that, but you're wrong.

6    (Laugh).

7         A.     Well, I appreciate, though, that you

8    cited the IARC document.

9         Q.     Okay.

10         A.     You didn't cite any legal

11    implications.  And what the IARC --

12         Q.     You can't prove a negative.

13         A.     What the IARC --

14         Q.     All right.  Let's --

15         A.     Oh, you read that IARC document.

16    Read that IARC document.

17         Q.     All right.

18         A.     I mean, I see -- I see how you got

19    the wording or where the wording came from.

20         Q.     All right.  Well, Dr. Tarone.

21         A.     It was very misleading by IARC.

22         Q.     Well --

23              MR. BRENZA:  Move to strike

24         all of counsel's testimony.

Robert Tarone, Ph.D.

```
 1              MS. WAGSTAFF:  All right.

 2   Well, why don't you move Dr. Tarone's

 3   testimony?

 4              MR. BRENZA:  Because he's here

 5   to give testimony.

 6              MS. WAGSTAFF:  Okay.

 7              MR. BRENZA:  You're supposed

 8   to be asking questions.

 9              MS. WAGSTAFF:  Okay.  Well,

10   I'll just let the record stand for

11   itself.

12              All right.  Let's move on to

13   the Preamble.

14              All right.  We're going to

15   mark the IARC Preamble as Exhibit 9.

16              (Document marked for

17   identification as Tarone Exhibit 9.)

18              MS. WAGSTAFF:  So I can give

19   you this.  I've got -- oh, yeah.  We'll

20   mark that as on 10.

21              If you want to give them a

22   copy.

23              (Document marked for

24   identification as Tarone Exhibit 10.)
```

**Exhibit E Page 162**

1    BY MS. WAGSTAFF:

2         Q.      So we're marking your editorial from

3    2018 as 10 just because we spoke about it.  That

4    little out of order.

5                     MR. BRENZA:  Oh.

6                     MS. WAGSTAFF:  Okay?

7                     MR. BRENZA:  Yeah.

8                     MS. WAGSTAFF:  And we'll mark

9         the Preamble as 9, and I'll give you this

10        one -- well, no, I'll keep it.

11                    Do you have a Preamble?

12                    MR. BRENZA:  I do.

13   BY MS. WAGSTAFF:

14        Q.      Doctor, do you have one?

15        A.      I don't need one.  I'm familiar with

16   the Preamble.

17        Q.      Okay.  All right.  What's the

18   purpose of the Preamble?

19        A.      Just to tell people the general

20   philosophy, I guess, and talk about the

21   procedures, processes.

22        Q.      You had testified --

23        A.      I think it includes criteria that

24   they use.

Robert Tarone, Ph.D.

1              Yeah.  Criteria they use to decide

2    whether something is -- there's sufficient

3    evidence or limited evidence.

4         Q.      Okay.  And it's an important part of

5    the IARC process, right?

6         A.      It's included in every one of the

7    monographs.

8         Q.      Okay.  And it's recently been

9    updated, right?

10        A.      I'm not sure.  I don't keep track of

11   it, but I know they've updated it two or three

12   times in the last 10 or 15 years.

13        Q.      But you don't keep up with?

14        A.      No.

15        Q.      But it sets forth the criteria.

16        A.      Yeah, but all I care about is what

17   they did in the Working Group deliberations.

18              And in my -- again, it's in the

19   abstract of my paper.  I -- I took them on on

20   their own terms.  I said, fine, we're evaluating

21   hazardous, not risk.  So it has nothing to do with

22   risk versus hazard.

23              I said we're going to accept their

24   criteria as specified in the Preamble at that time

Robert Tarone, Ph.D.

1    as being good for determining hazard.  And I

2    accepted that the paper -- the studies they relied

3    upon were sufficient to come to the conclusion --

4         Q.      Yeah.

5         A.      -- entirely on their own terms, as

6    stated in the Preamble.

7         Q.      Okay.  But, Doctor, you -- it's your

8    opinion that IARC should not have classified the

9    animal studies as sufficient evidence.

10        A.      Well, definitely.  Based on --

11        Q.      Okay.

12        A.      Based on the studies that they

13   relied upon, no.

14        Q.      And that definition of what makes

15   something sufficient is in the Preamble.

16        A.      Yeah, it's just -- I said that.

17        Q.      Okay.  And you -- you your opinion

18   is that they had to find sufficient in animal

19   studies to classify it as a 2A?

20        A.      Yeah, based on --

21        Q.      Okay.

22        A.      -- what they've always done before.

23        Q.      Okay.

24        A.      Because they found limited evidence

Robert Tarone, Ph.D.

1    for epidemiology.

2         Q.     Okay.  So those are actually both in

3    the Preamble.

4               So the Preamble and its updates are

5    actually very important to the deliberation

6    process?

7         A.     Yeah, and I accepted them, as I

8    said.

9         Q.     Okay.  But you don't keep up with

10   it.  You are an IARC --

11        A.     I've only --

12        Q.     -- scholar, but you don't keep up --

13        A.     I'm not an IARC --

14        Q.     -- with the definition.

15        A.     I'm not an IARC scholar.

16        Q.     You're not an IARC scholar.  Okay.

17        A.     Again, my work has focused on

18   glyphosate and on only Monograph 112.  So it's

19   only the Preamble as existed then, and I accepted

20   that.  I accepted their criteria, and I showed

21   that if you didn't exclude the studies, the tumor

22   rates they did, there's way no one can conclude

23   that it was a rodent carcinogen.

24        Q.     Okay.  So --

Robert Tarone, Ph.D.

1        A.      No -- no good scientist.

2        Q.      So you're not IARC expert?

3        A.      No, I'm not an IARC expert.

4        Q.      Okay.  And you've never really

5   analyzed any monograph but for 112?

6        A.      No, I've looked at other ones.  I

7   mean, I've read other ones when I'm interested in

8   a classification.

9        Q.      Okay.  And you're not an expert in

10  the IARC process?

11                  MR. BRENZA:  Calls for a legal

12       conclusion.

13                  THE WITNESS:  Well, I have

14       criticized the IARC.  So, I mean, I am

15       aware of certain things that I think are

16       wrong with it.

17                  As I said, starting in about

18       2008 and going up until, I guess, even

19       continuing, some of us have been

20       criticizing some of the things that the

21       Monographs Program does that we think are

22       not good for unbiased deliberations.

23                  These -- these discussions

24       started in NCI.  We published a

1                commentary in 2008 on false positives in

2                Cancer Epidemiology, and we got --

3                unexpectedly we got a -- we got a letter

4                from a couple of IARC scientists that

5                were critical and that started a long --

6                by the way, the first author of this

7                paper worked at IARC, but these other two

8                people nonetheless criticized it.  And

9                that started an exchange which went on

10               for several years, and it moved from

11               journal to journal.

12                      So I am aware of some of the

13               things in the IARC process that I think

14               could be improved.  Let's put it that

15               way.

16        BY MS. WAGSTAFF:

17            Q.      Okay.  And this is the IARC

18        Monograph, which I have marked as Exhibit 9,

19        right?

20                      I'm sorry.

21            A.      Preamble.

22            Q.      The Preamble, yeah.

23            A.      It's the Preamble.

24            Q.      And this is 2006.

Robert Tarone, Ph.D.

1        A.       Okay.

2        Q.       Is that the version that was in

3   place during --

4        A.       2000?  It might -- it might have

5   actually changed, but I know it's changed more

6   than once.  But it would probably be close.

7        Q.       I mean, if I represent to you that

8   this is the Preamble in place when Monograph 112

9   was analyzed, would you have any reason to doubt

10  that?

11       A.       I wouldn't.

12       Q.       Okay.  And like you said, that the

13  Preamble, I think you said, sort of sets forth the

14  criteria on how you classify within then subgroups

15  and then how you put the subgroups' evaluations

16  together to get an overall classification --

17       A.       Right.

18       Q.       -- Is that fair?

19       A.       Yeah.  The latter is not crystal

20  clear, but the earlier parts are.

21       Q.       Well it has --

22       A.       One stipulates sufficient, limited,

23  or no evidence.

24       Q.       Okay.  And so let's -- let's just

Robert Tarone, Ph.D.

1    look at what sort of happened during 112.  Okay?

2                   And I want to look at page 19.

3    Okay.

4                   So I want to look at -- is this?

5    Epi.  Page 19.  Okay.

6                   Okay.  This is the -- if you look

7    just to orient yourself.  Okay?  This is

8    carcinogenicity.  This is page -- oh, it's up

9    here -- 19?

10        A.      Uh-huh.

11        Q.      Okay.  And this is carcinogenicity

12   in humans.

13        A.      Uh-huh.

14        Q.      You see that?

15        A.      Yeah.

16        Q.      This is epidemiology, right?

17        A.      Yep.

18        Q.      And that is one of the subgroups,

19   right?

20        A.      (Nods head).

21        Q.      And they -- and what did the IARC

22   find with respect to the epidemiology subgroup?

23        A.      They found limited evidence.

24        Q.      Okay.  So they found limited

Robert Tarone, Ph.D.

1    evidence.

2              Okay.  And I'm just going to just

3    quickly -- (marks document).

4              So remind me of the four subgroups

5    again.  It's epidemiology?

6       A.     Exposure is first.

7       Q.     Well --

8       A.     Exposure.

9       Q.     -- I'm putting epidemiology.

10             Is it okay if I put that first since

11   I already started?  (Laugh).

12                  MR. BRENZA:  Object since we

13        don't what -- why you're putting it

14        first.

15   BY MS. WAGSTAFF:

16      Q.     Okay.  I'll start all over.

17             I was putting it first so I wouldn't

18   have to start over.

19      A.     (Laugh).

20      Q.     First one?

21      A.     Exposure, which plays very little

22   role in --

23      Q.     Second one?

24      A.     -- classifying a hazard.

Robert Tarone, Ph.D.

1      Q.      And I'd like to go through --

2      A.      Epidemiology.

3      Q.      Well, I'd like to because you don't

4   have -- and I'm only using these to list.  There's

5   no real significance, but since you don't have a

6   problem with the mechanism group, I'd like to put

7   that second.

8      A.      Fine.

9      Q.      You're not -- you're not opining on

10  it.

11     A.      Fine.

12     Q.      And the next one is?

13     A.      Epidemiology.

14     Q.      And then the fourth one is?

15     A.      Animals.  Rodent.  I don't know if

16  it says specifically rodent or just animal.

17     Q.      I'm going to put --

18     A.      Probably the second.

19     Q.      -- animal studies.

20             Is that okay?

21     A.      I think it's animal.

22     Q.      Well, rodent and animal studies.

23     A.      Well, most of them are done in

24  rodents, but there are occasionally.

Robert Tarone, Ph.D.

1      Q.      Okay.  And so --

2      A.      Yeah, animals.

3      Q.      You just said that epidemiology was

4   limited, right?

5      A.      The Working Group found it to be

6   limited.

7      Q.      Okay.  So let's look at what that

8   actually means, orienting you back to the

9   Preamble.

10             Limited.  So this is in the

11   epidemiology group, limited evidence of

12   carcinogenicity.

13             It means a positive association has

14   been observed, right?  So there has been an

15   association of evidence?

16     A.      In at least one study.

17     Q.      Okay.  Between exposure to the agent

18   and cancer.  So that means if you put that to 112,

19   that means that a positive association -- that the

20   panel members found a positive association between

21   glyphosate and cancer.

22             Turn to the next page.

23             And that it was credible, right?  A

24   credible association was found, right?  But chance

Robert Tarone, Ph.D.

1    bias, or confounding could not be ruled out with

2    reasonable confidence, right?

3         A.      Right.

4         Q.      That's what limited means.

5                 So it means that a --

6                 So the Working Group 112 found that

7    the human studies found that a credible positive

8    association had been observed, but they could not

9    rule out bias, chance, and confounding, right?

10        A.      Correct.

11        Q.      Okay.

12        A.      All that's important in terms of

13   their criteria is the classification is limited.

14        Q.      Right.  But I just --

15        A.      No, that's fine.  I know what you're

16   doing.

17        Q.      -- wanted the jury to understand --

18        A.      I can see why you did it and what

19   you do.

20        Q.      -- what -- what -- what that means.

21   Okay?

22                And next is -- the next one is

23   carcinogenicity in experimenting animals, but

24   let's do mechanism first, which is -- hang on,

**Exhibit E Page 174**

1    where's my Preamble? -- on page 21.

2                This is mechanism group, right?

3                Is that right?

4    A.      Yes.

5    Q.      Okay.  And it talks about how the

6    strength -- the second paragraph.  It says --

7    well, the first paragraph it says:

8                "Mechanistic and other evidence

9    judged to be relevant to an evaluation of

10   carcinogenicity and of sufficient importance to

11   affect the overall evaluation is highlighted."

12               Right?

13   A.      Yes, whatever that means.

14   Q.      So you don't know what that means?

15   A.      Well, it's the jargon.  I don't

16   know.  I mean, I know they use mechanistic

17   evidence but --

18   Q.      Well, you're offering an opinion on

19   IARC --

20   A.      I told you --

21   Q.      -- and you don't know what that

22   means?

23   A.      -- I'm not a toxicologist and I'm

24   not --

Robert Tarone, Ph.D.

1      Q.      Okay.

2      A.      Mechanistic judged to be relevant to

3  -- and sufficient importance.  Okay.

4      Q.      Do you understand that sentence?

5      A.      Yes.

6      Q.      You don't look like you do.

7      A.      Well, I'm not sure how it's

8  applying, the "and" part.  How do you determine.

9  That's opinion.

10     Q.      Okay.

11     A.      Of course it applies --

12     Q.      Then it talks about all the things

13  it may include.

14             This may include data on

15  preneoplastic lesions, tumor pathology, genetic

16  and related effects, structure, activity, and

17  relationships, metabolism and toxicokinetics,

18  physiochemical parameters, and analogous

19  biological agents.

20             You see that?

21             And then the mechanistic categories

22  is evaluated using terms as weak, moderate, or

23  strong, correct?

24     A.      Uh-huh.

Robert Tarone, Ph.D.

1        Q.      And what did -- and it says:

2                "The Working Group then assesses

3    whether the particular mechanism is likely to be

4    operative in humans."

5                Do you see that?

6        A.      Yes, I do.

7        Q.      Okay.  Likely to be operative in

8    humans.

9                Okay.  What did Working Group 112

10   find?  What was their evaluation on the mechanism

11   group?

12       A.      I know it was stronger than I had

13   thought was.  I don't know the exact category.

14       Q.      Well, it's either weak, moderate, or

15   strong.

16       A.      Well, what was it?  You know.

17       Q.      You don't know?

18       A.      I don't pay attention that much to

19   mechanism, except that I think that they're

20   starting to put too much weight on mechanisms to

21   make up for weak animal and epidemiology data.

22       Q.      Okay.  So you don't know, as you sit

23   here today opining on Monograph 112, what --

24       A.      I'm opining on the animal studies.

Robert Tarone, Ph.D.

1          Q.        Okay.  Well, we'll get to that in a

2     minute.

3          A.        Yeah.  Well, that's -- that's

4     important.

5          Q.        So should I put question mark next

6     to it, or do you not know?

7          A.        Mechanism is basically -- no, you

8     know but --

9          Q.        I'm not opining.  You're the expert

10    here, sir.

11         A.        No, I don't remember what they said

12    for that.

13         Q.        Okay.  So do not remember.

14         A.        I only know what they said for

15    epidemiology and animal studies.

16         Q.        Okay.  Do not remember.

17                   Okay.  And then it says that "the

18    strongest indications that a particular mechanism

19    operates in humans derived from data on humans or

20    biological specimens obtained from the exposed

21    humans."

22                   That's cell data, right?  Is that

23    what that kind of means?  Tissues?

24         A.        Well...

Robert Tarone, Ph.D.

```
1          Q.        Specimens derived from humans?

2          A.        Yeah, probably drawing blood from

3     people who have been exposed.  Probably mainly

4     blood samples, but yeah.

5          Q.        Maybe cellular data also, or no?

6          A.        It could be biological specimens.

7     Maybe they take scrapes.  I don't know.

8          Q.        Okay.  Do you have any idea what

9     mechanism Monograph 112 found?

10         A.        I've heard members say that they

11    found strong evidence of genotoxicity, which,

12    again, as someone who knows a little bit about

13    genotoxicity, I find that an overstatement.

14         Q.        Okay.  Any other -- I'm sorry.

15         A.        Yeah.  I think they also mention

16    oxidative stress, which is sort of an indirect

17    mechanistic thing.

18         Q.        Okay.  And do -- does genotoxicity

19    occur in the human body?

20         A.        Oh, it definitely does.  Some things

21    are highly genotoxic.

22         Q.        Does oxidative stress happen in the

23    human body?

24         A.        It does.
```

**Exhibit E Page 179**

Robert Tarone, Ph.D.

1      Q.      Okay.  So the mechanism group found

2   mechanisms that occur in the human body?

3      A.      I'm assuming so.

4      Q.      Okay.  And do you remember what the

5   -- let's look at the A, B, C.  The exposure.  Let

6   me -- let me find the exposure really quick.

7              Okay.  The ex -- do you need to take

8   a break?

9      A.      No.  I just want to find this

10  because I want to answer your question.

11             This is the Lancet Oncology

12  article --

13     Q.      Okay.

14     A.      -- that was written.  So for

15  mechanistic glyphosate --

16     Q.      So --

17     A.      -- they just say genotoxicity and

18  oxidative stress.

19     Q.      Okay.  So you needed to refer to

20  something to remember --

21     A.      Yeah.

22     Q.      -- that category?

23     A.      I mean, I knew that they referred to

24  it.  They don't categorize it as strong or

Robert Tarone, Ph.D.

1    otherwise.  They just say that that's the --

2    that's the mechanistic evidence.

3         Q.      Okay.  So it's your opinion that the

4    mechanistic data was not cat -- the subgroup did

5    not come up with a category of strong, medium --

6    strong --

7         A.      Well...

8         Q.      -- moderate or weak?  Weak,

9    moderate, or strong?

10        A.      I did not find it to be extremely

11   strong, no.

12        Q.      I'm not asking you what you found it

13   because we already decided.  You already testified

14   earlier you're not opining as to mechanistic

15   group.

16        A.      Well...

17        Q.      I'm asking you what -- what 112 and

18   it will become relevant why later.  I'm asking you

19   what 112 found.

20                MR. BRENZA:  Object to form.

21                THE WITNESS:  (Reviews

22          document.)

23   BY MS. WAGSTAFF:

24        Q.      Okay.  So then looking at the

Robert Tarone, Ph.D.

1  exposure data, it says that it's summarized as

2  "appropriate on the basis of elements, such as

3  production use, occurrence, and exposure levels in

4  the workplace environment, measurements in human

5  tissue and the bodily fluids."

6            Do you remember what, if anything,

7  IARC found, the IARC mechanistic group found?

8       A.     Well, that would have been in the

9  exposure group, not the mechanistic group.

10      Q.     I'm sorry.  I'm sorry.  Strike that

11  question.

12            Do you remember what, if anything,

13  the exposure group in IARC --

14      A.     No, I don't.  I don't typically read

15  the exposure section of any --

16      Q.     Okay.

17      A.     -- chapter.

18      Q.     So you didn't read it?

19      A.     No.

20      Q.     Okay.

21      A.     It would be more important for risk

22  assessment.

23      Q.     Okay.

24      A.     Since they're evaluating hazard.

Robert Tarone, Ph.D.

1        Q.       Okay.  So you didn't read that?

2        A.       It doesn't -- it doesn't really play

3    a big role.

4        Q.       So now let's talk about the animal

5    studies.

6                 And I know you don't agree with it,

7    but I'm saying what did IARC find?

8        A.       They found sufficient evidence.

9        Q.       Sufficient.

10                Okay.  Sufficient.  All right.

11                So let's look at what that means.

12                All right.  So on page 20.

13   "Carcinogenicity in experimental animals."  Okay.

14                That's the animal studies subgroup,

15   right?

16       A.       Yep.

17       Q.       And this was the subgroup that

18   Dr. Jameson was co-chair of?

19       A.       (Nods head).

20       Q.       Is that the name?  Co-chair?

21   Sub-chair?

22       A.       No.

23       Q.       What is it called?  Do you know?

24       A.       I'll tell you real fast.

Robert Tarone, Ph.D.

```
 1                    Jameson.  Subgroup chair.

 2          Q.        Subgroup chair.

 3                    That means that he was in charge of

 4    overseeing --

 5          A.        Correct.

 6          Q.        -- the animal studies.

 7                    And you haven't read his

 8    depositions?

 9          A.        I have not.

10          Q.        And you have not read his expert

11    reports?

12          A.        I have not.

13          Q.        And you have not reached out to

14    Dr. Jameson?

15          A.        (Shakes head.)

16          Q.        Have you tried to reach out to

17    Dr. Jameson?

18          A.        Dr. Jameson should reach out to me.

19    He should reach out to the journals in which I

20    published in and refute or rebut the points I

21    made.

22          Q.        I understand that's your opinion.

23                    I'm just asking you if you have

24    reached out to Dr. Jameson in any way.
```

**Exhibit E Page 184**

Robert Tarone, Ph.D.

1        A.      No.  There would be no reason to.

2        Q.      Okay.

3        A.      I haven't reached out to any of the

4   members.

5        Q.      So --

6        A.      Including Aaron Blair.

7        Q.      So is it your opinion -- I know that

8   in your papers you reference several times the

9   supplemental tables by Grime.

10       A.      Correct.

11       Q.      Is it your opinion that the subgroup

12  had those supplemental tables available and chose

13  not to use them, or is it your opinion that they

14  didn't have them available?  Or do you not know?

15       A.      I can't tell you their intent, but

16  the Grime paper is referenced on multiple occasion

17  in the chapter itself.  And every time it's

18  mentioned, they also say with supplemental tables

19  including two marines.

20       Q.      I understand that.

21       A.      So they did have them.

22       Q.      Well --

23       A.      I can't tell you why they didn't use

24  them.  Don't ask me.

**Exhibit E Page 185**

1          Q.        Okay.

2          A.        That's for them to answer, not me.

3          Q.        Okay.  So in your first deposition,

4    you stated that -- that you couldn't access them.

5    So you reached out to Dr. Saltmiras.

6          A.        That's -- well --

7          Q.        Okay.

8          A.        It's probably my mistake.  I had to

9    buy that.

10          Q.        Okay.  But you testified to that?

11          A.        Yeah.

12          Q.        And then within a day or two, you

13    were writing to Dr. Saltmiras of your opinion of

14    the -- of the supplemental tables.

15          A.        (Nods head).

16          Q.        You had, as you sit here today --

17          A.        And by the way, I did manage to get

18    them myself.

19          Q.        Okay.  As you sit here today in 2023

20    --

21          A.        Uh-huh.

22          Q.        -- you have no idea if IARC 112

23    animal group had access to the supplemental tables

24    and didn't use them, or if they had -- or if they

Robert Tarone, Ph.D.

1   did not have access to the supplemental tables.

2   You have no idea, right?

3       A.      No.

4       Q.      You have no idea?

5       A.      They should have had them, but, no,

6   I don't.  Maybe the IARC -- the IARC staff should

7   have provided them to the Working Group.  I do not

8   know.

9               I've never said, by the way, that

10  this was on purpose.  What I've said is that they

11  did exclude -- and there's no question about it --

12  from those supplementary tables, they excluded

13  entirely data that would have argued against

14  carcinogenicity.

15      Q.      I understand that's your opinion,

16  Doctor.  I'm asking a different question.

17      A.      It's not an opinion.  It's a fact.

18  My paper showed it.

19      Q.      It's -- it's not a fact.

20      A.      It is a fact.

21      Q.      But I understand that you are dug in

22  on that and that is fine.

23      A.      Well --

24      Q.      But I'm asking -- the question I'm

**Exhibit E Page 187**

Robert Tarone, Ph.D.

1    asking you on the table --

2                    MR. BRENZA:  Let her state it.

3    BY MS. WAGSTAFF:

4         Q.      -- is:  You have no idea if they had

5    access to that information?

6         A.      I don't know if they had access, but

7    what I do know is they should have.

8         Q.      Okay.

9         A.      That's the job --

10        Q.      That's a different --

11        A.      That's the job of IARC staff.

12        Q.      Well, you don't know if they did or

13   not because you've never bothered to ask

14   Dr. Jameson, right?

15        A.      Again, it's not -- they should

16   respond to my paper.  I shouldn't have to search

17   for it.

18        Q.      Of course.  Everybody should come to

19   you, right?

20        A.      No, that's the way science works.

21        Q.      Okay.

22        A.      I made a claim.  I made a claim that

23   IARC should have immediately wanted to rebut and

24   say, no, he's wrong.  Or an alternative say, all

Robert Tarone, Ph.D.

1    right, cool, we did make a mistake.  But even if

2    we include that data, here's why we think our

3    opinion still stands.

4                    They did neither.

5        Q.        Well, are you mad that people are,

6    you know, ignoring you?

7        A.        Mad?  I mean, I'm mad.  I'm upset

8    and surprised that a group of scientists do what

9    they did.

10       Q.        Ever --

11       A.        I mean, they have -- they make a

12   page and a half on the first mouse study all about

13   kidney tumors.  It's all about kidney tumors.

14   Both the initial study and then after there was a

15   pathology review.

16                   And the amazing sentence in the --

17   in that section, by the way -- and this is from

18   someone who did this for a few years.  Right after

19   they give the male kidney tumor results, they

20   say -- it's amazing sentence.  You probably

21   wouldn't appreciate it as much as someone who

22   spent hours going through these tables.

23                   They say "The data on females were

24   not provided to us."  They should have demanded --

Robert Tarone, Ph.D.

1      Q.       Well, listen, we'll talk--

2      A.       -- the table on it.

3      Q.       -- about the significance.

4               MR. BRENZA:   He's not done.

5       Let me him answer.

6               THE WITNESS:   Well, no.   This

7       is important.

8               And then they come to the

9       second --

10 BY MS. WAGSTAFF:

11     Q.       Well, there's no question on the

12 table.

13     A.       Then they come to the second

14 study --

15     Q.       It's not responsive.   So I move to

16 strike.

17     A.       They come to the second study where

18 they don't even mention kidney.

19     Q.       I've read your papers, Doctor.

20 We're going to get to them.   We're going to walk

21 through each one.

22              We're going to walk through the

23 significance of male and female sexes.   We're

24 going to talk about the significance of

Robert Tarone, Ph.D.

1   hemangiosarcomas versus kidney tumors.  We're

2   going to get the opportunity to do all that.

3               But I, you know, I get the sense,

4   you know, we've already seen an e-mail where Bayer

5   is ignoring you.  Now you're telling me IARC is

6   ignoring you.

7               I just got another e-mail this

8   morning from you where you're talking about --

9   you're writing to Douglas Weed.

10              Who is Douglas Weed?

11     A.       I met him at NCI.

12              MR. BRENZA:  Object to form.

13              THE WITNESS:  He's --

14              MS. WAGSTAFF:  How do you

15        object to me asking who Douglas Weed is?

16              MR. BRENZA:  No, that's fine.

17              THE WITNESS:  The tone of your

18        voice was a little different.

19              MR. BRENZA:  But all the

20        preface stuff is.

21   BY MS. WAGSTAFF:

22     Q.       Okay.

23     A.       Well, he's an epidemiologist.  He

24   was in charge of a program at NCI that gave

Robert Tarone, Ph.D.

1    master's degrees to people who came in.

2         Q.      Okay.  You just --

3         A.      Cancer prevention I think.

4         Q.      All right.  You just talked about

5    how you're mad that IARC is not -- is not

6    responding to you.

7                 Didn't we read an e-mail earlier

8    today about how Bayer wasn't responding to you?

9         A.      No, no.  I was just surprised that

10   they ignored the papers when they --

11        Q.      Okay.

12        A.      If, in fact, it's as I read it.

13        Q.      Right.  We --

14        A.      The document that was reviewed came

15   from material that was supplied by -- I forget the

16   word they use.  But it was a person who was

17   supplying.  It would have been Bayer in this case.

18   And my papers weren't cited.  That did surprise

19   me.

20        Q.      Right.  So Bayer is ignoring you, as

21   you put here.

22                You're asking Mr. Vales --

23        A.      Yeah.

24        Q.      -- "Why is Bayer ignoring me?"

Robert Tarone, Ph.D.

1              You're writing to Douglas Weed

2    saying:

3              "Ordinarily I would not bug you, but

4    I can't tell you how many times in the past 5

5    years I have sent my IARC/glyphosate papers to

6    people requesting them.  They have responded

7    initially with interest, and then I never hear

8    from them again."

9         A.      That's right.

10        Q.      "I am beginning to get paranoid."

11        A.      Well...

12        Q.      And then IARC is ignoring you.

13        A.      Well, that is -- that is

14   indefensible.  An organization like that, if

15   someone criticizes with very clear specifics a

16   decision they've made, they're obligated to reply.

17   The only -- the only public statement they made

18   about that paper was in that one page.

19        Q.      It's an editorial, Doctor.

20              Why do they need to respond to an

21   editorial?

22        A.      The facts in that paper are not

23   opinion.

24        Q.      No one is taking your article

Robert Tarone, Ph.D.

1    seriously and it's pissing you off.

2                         MR. BRENZA:  Argumentative.

3                         THE WITNESS:  Well, I don't

4          understand it.

5    BY MS. WAGSTAFF:

6          Q.      You don't understand why no one is

7    taking your article seriously?

8          A.      Well, not no one.  There are people

9    that have appreciated the full significance.

10                        (Document marked for

11          identification as Tarone Exhibit 11.)

12   BY MS. WAGSTAFF:

13         Q.      All right.  So let's look back at

14   this.

15                        This is what IARC found, right?

16                        So it says this is -- this is what

17   you told me they found -- sufficient evidence of

18   carcinogenicity, right?

19         A.      (Nods head).

20         Q.      Okay.  So let's just break that down

21   because this is really the crux of your criticism,

22   right?

23         A.      Correct.

24         Q.      Okay.  So let's spend a few minutes

Robert Tarone, Ph.D.

1    on this.

2              "The Working Group considers that a

3    causal relationship has been established between

4    the agent and an increased incidence of malignant

5    neoplasm, or of an appropriate combination of

6    benign and malignant neoplasm, if" -- right?

7    There's two ways, right? -- "two or more species

8    of an animal or two or more independent studies in

9    one species carried out at different times or in

10   different laboratories or under different

11   protocols."

12             Right?

13   A.        Correct.

14   Q.        So you need two studies.

15   A.        (Nods head).

16   Q.        Two studies, right?

17   A.        That's correct.

18   Q.        All right.  Then it says an

19   increased.  So you need -- so it says two, two.

20             And then it says:

21             "An increased incident of tumors in

22   both sexes of a single species in a well-conducted

23   study under Good Laboratory Practices can also

24   provide sufficient evidence."

**Exhibit E Page 195**

Robert Tarone, Ph.D.

```
 1                   Meaning the male and female can
 2    provide the two studies?
 3         A.       That's correct.
 4         Q.       Okay.  So the male is one study and
 5    the female is the second study?
 6         A.       Absolutely.
 7         Q.       And it is -- it is absolutely
 8    scientifically the standard today that a male
 9    study and a female study are considered two
10    independent studies?
11         A.       That's correct.
12         Q.       Okay.  So male study.
13                   Oh, shoot I wish I had done this.
14                   Male study.
15                   That's male, right?  Isn't that
16    male?
17         A.       I don't know what it is today.
18         Q.       Female?  What?
19                   Well, isn't that at some point that
20    was male and female?
21         A.       I don't know what it is today.
22    Things have changed.
23         Q.       Two separate studies, right?
24         A.       Right.
```

Robert Tarone, Ph.D.

1      Q.      Okay.  Just wanted to make sure.

2              And then a single study.  It goes on

3   to say "a single study in one species and sex."

4              So just one study.  Just one study

5   here it says.

6              "Might be considered to prove

7   sufficient evidence when malignant neoplasm occur

8   to an unusual degree."

9              Meaning rare occurrence, right?

10  Isn't that what "unusual degree" means?

11     A.      Correct.

12     Q.      Unusual degree means rare

13  occurrence, right?

14              "With regard to incident --

15  incidence -- sorry -- site, type of tumor or age

16  at onset, or when there are strong findings of

17  tumors at multiple sites."

18              So it goes on to say, here, are the

19  two -- here are the two categories.  So there's

20  really like four ways something can become

21  sufficient evidence.

22              It can be two or more species of an

23  animal, two or more independent studies in one

24  species carried out at different times or in

Robert Tarone, Ph.D.

```
 1    different laboratories under different protocols,

 2    or the same tests with a male and a female if it's

 3    under GLP can also provide it.

 4              And then, finally, it says one

 5    single study can be so dang strong if it provides

 6    evidence of a rare occurrence with respect to

 7    incident, site, type of tumor, or age at onset,

 8    right?

 9         A.    Correct.

10                   MR. BRENZA:  Object to form.

11                   MS. WAGSTAFF:  Okay.  So let's

12         take a break and it's noon.

13                   Do you guys want to take lunch

14         break now or do you want to --

15                   THE VIDEOGRAPHER:  Go off the

16         record?

17                   MS. WAGSTAFF:  Oh, yeah.

18                   THE VIDEOGRAPHER:  The time is

19         12:03 p.m.  We're off the record.

20                   (Recess.)

21                   THE VIDEOGRAPHER:  The time is

22         12:21 p.m.  We are back on the record.

23    BY MS. WAGSTAFF:

24         Q.    All right, Dr. Tarone.  Are you able
```

Robert Tarone, Ph.D.

1    to continue?

2        A.      Yeah.

3        Q.      All right.  And what did you do

4    during the break?

5        A.      Sat here.

6        Q.      All right.  And did you talk to

7    Monsanto's lawyer outside of my presence?

8        A.      Did not.

9        Q.      All right.  And so just to reorient

10   where we were before we broke, we were discussing

11   the determinations from IARC 112 of the four

12   subcategories, right?

13       A.      Correct.

14       Q.      Together we made this chart.

15               You identified the four

16   subcategories as exposure, mechanism,

17   epidemiology, and animal studies, correct?

18       A.      Correct.

19       Q.      And we went through your

20   understanding of the subgroups.

21               Just to summarize, you did not read

22   the exposure subgroup, right?

23       A.      Correct.

24       Q.      You do not remember the finding or

Robert Tarone, Ph.D.

1   the determination of IARC 112 of the mechanism

2   group, right?

3       A.      Just that it was genotoxicity and

4   oxidative stress.

5       Q.      Right.  You remembered that the

6   mechanisms were actually genotoxic -- genotoxicity

7   and oxidative stress.

8               And I believe you testified that

9   both those mechanisms occur in the human body?

10      A.      Yes.

11      Q.      And they're very prevalent in the

12  human body, right?

13      A.      That I don't know.

14      Q.      Okay.  But you couldn't recall

15  whether IARC 112 mechanism group made a

16  determination of weak, moderate, or strong, right?

17      A.      I've seen -- I've seen some say

18  strong in press.  So.

19      Q.      But you couldn't remember?

20      A.      No, I could not.

21      Q.      Okay.  And then epi -- epidemiology

22  was limited and animal studies was sufficient,

23  right?

24      A.      Correct.

**Exhibit E Page 200**

Robert Tarone, Ph.D.

1          Q.      So this is an accurate

2     representation of our conversation?

3          A.      Yes, that's what the IARC Working

4     Group determined.

5          Q.      Okay.  And this chart is an accurate

6     representation of our conversation?

7          A.      Yes.

8                  MS. WAGSTAFF:  Okay.  And so

9          I'm going to mark this chart as

10         Exhibit 12.

11                 (Document marked for

12         identification as Tarone Exhibit 12.)

13    BY MS. WAGSTAFF:

14         Q.      So let's talk now -- I just want to

15    talk a little bit more about the animal -- the

16    studies of cancer in experimental animals since

17    that is sort of the crux of your opinion, right?

18                 So what IARC is saying is that:

19                 "All known human carcinogens that

20    have been studied adequately for carcinogenicity

21    in experimental animals have produced positive

22    results in one or more animal species."

23                 Right?

24                 MR. BRENZA:  Can I just ask

Robert Tarone, Ph.D.

```
 1           where we are?

 2                   MS. WAGSTAFF:  Oh, I'm sorry.

 3           We're on page 12 paragraph 3.

 4                   MR. BRENZA:  Page 12 paragraph

 5           3 of exhibit?

 6                   MS. WAGSTAFF:  Of the

 7           Preamble.

 8                   MR. BRENZA:  Of Exhibit 9.

 9                   MS. WAGSTAFF:  Whatever the

10           Preamble is.  Is that 9?

11                   MR. BRENZA:  That's what I

12           have.

13                   MS. WAGSTAFF:  Yeah.

14                   MR. BRENZA:  Okay.

15                   MS. WAGSTAFF:  Do you find

16           this?  First sentence.

17                   MR. BRENZA:  Page 12 paragraph

18           3.  Yes.

19   BY MS. WAGSTAFF:

20       Q.     All right.  So just to sort of get a

21   clean record, I'm just going to rephrase that.

22   Okay?

23       A.     (Nods head).

24       Q.     So here we are.  We're in the IARC's
```

1    Preamble, correct?

2               This is the IARC Monograph Preamble?

3        A.      Yes.

4        Q.      Okay.  And this is a section on the

5    studies of cancer in experimental animals, right?

6        A.      Correct.

7        Q.      All right.  And so what IARC

8    Preamble says is that:

9               "All known human carcinogens that

10   have been studied adequately for carcinogenicity

11   in experimental animals have produced positive

12   results in one or more animal species."

13              Do you see that?

14       A.      I do.

15       Q.      All right.  And so that just means

16   that all human carcinogens have had a positive

17   result in at least one animal study, right?

18       A.      I think that's generally true.

19       Q.      Okay.  And then it says -- it

20   says "For several agents" and then it cites a

21   couple of studies for that proposition, right?

22       A.      Uh-huh.

23       Q.      And then it says:

24              "For several agents" -- and then it

Robert Tarone, Ph.D.

1    lists some agents -- "carcinogenicity in

2    experimental animals was established or highly

3    suspected before epidemiological studies confirmed

4    their carcinogenicity in humans."

5               You see that?

6    A.        Yes.

7    Q.        Did I read that correctly?

8    A.        Yes.

9    Q.        So what that's saying is that for

10   several agents IARC -- actually, maybe it's not

11   IARC.  I don't know, but the -- the -- for several

12   -- so let me start all over.

13              What this is saying is that for

14   several agents, carcinogenicity was established or

15   highly suspected before there was human data to

16   support it, right?

17   A.        That's true for some.

18   Q.        And you agree with that?

19   A.        Yeah, for some.  Absolutely.

20   Q.        Okay.  And then it says:

21              "Although this association cannot

22   establish that all agents that cause cancer in

23   experimental animals also cause cancer in humans,

24   it is biologically plausible that agents for which

```
1    there is sufficient evidence of carcinogenicity in

2    experimental animals also present a carcinogistic

3    -- carcinogenic hazard to humans."

4              Do you see that?

5    A.       Yeah.

6    Q.       Did I read that correctly?

7    A.       Yeah.

8    Q.       And you agree with that, don't you,

9    Doctor?

10   A.       I do.

11   Q.       Okay.  "Accordingly."  Goes on to

12   say.

13             "Accordingly, in the absence of

14   additional scientific information, these agents

15   are considered to pose a carcinogenic risk

16   hazard" -- I'm sorry -- "hazard to humans."

17             Do you see that?

18   A.       Yes.

19   Q.       And do you agree with that, Doctor?

20   A.       Hazard.  The way they define hazard,

21   yes.

22              MS. WAGSTAFF:  All right.  All

23        right.  So then let's go and see how

24        something is defined as a 2A.
```

Robert Tarone, Ph.D.

 1                    And let me back up a little.

 2          Let me just -- going to page 6, Lin.

 3     BY MS. WAGSTAFF:

 4          Q.      This is -- we're still in the -- in

 5     the Preamble.  Okay?  So we're still talking about

 6     the criteria and sort of the framework of which

 7     Monsanto or IARC evaluates agents, right?

 8          A.      Correct.

 9          Q.      Okay.  So we're in on page 6 under

10     section B scientific -- Scientific Review.

11                    Okay.  So what an IARC Monograph

12     includes.

13                    These are the four subgroups that

14     we've discussed, right?

15          A.      Yes.

16          Q.      And then it includes a summary; is

17     that right?

18          A.      Correct.

19          Q.      And then it includes an evaluation

20     and rationale; is that right?

21          A.      Correct.

22          Q.      Which is basically the conclusion,

23     right?

24          A.      (Nods head).

Robert Tarone, Ph.D.

1          Q.        That's IARC's --

2          A.        It's the overall categorization.

3          Q.        Okay.  And what was the overall

4     categorization of glyphosate from monarch -- from

5     Monograph 112?

6          A.        Monograph 112?  It was 2A.

7          Q.        Okay.  2A.

8          A.        Probable carcinogen.

9          Q.        Okay.  And the -- is it your

10    understanding that the IARC Monograph panel

11    members consider all of this data?

12         A.        Yeah, I assume they do.

13         Q.        In coming to --

14         A.        Yeah.

15         Q.        That's your understanding?

16         A.        It is my understanding.

17         Q.        Okay.

18         A.        They put precedence on the

19    epidemiology, but also animal studies.

20         Q.        They put weight on certain things --

21         A.        Yeah.

22         Q.        -- but they consider all of the

23    data, right?

24         A.        Consider all of it.

**Exhibit E Page 207**

Robert Tarone, Ph.D.

1      Q.      And there's no -- there's no doubt

2   in your mind that the IARC panel members consider

3   all of the data from all subgroups when they make

4   their ultimate conclusion, right?

5      A.      They're supposed to, yeah.

6   Absolutely.

7      Q.      Okay.  And do you have any reason to

8   think that IARC 112 didn't consider all four

9   categories?

10     A.      No.

11     Q.      Okay.  Now, you didn't consider all

12  four categories because you didn't read -- you

13  didn't read the exposure group, right?

14     A.      Well, basically animals and

15  epidemiology are the most important two, and if

16  there's not sufficient evidence --

17     Q.      We're going to get to how you get to

18  2A in a minute.

19     A.      Yeah, but, I mean --

20              MR. BRENZA:  Wait.  He wasn't

21       done with his answer.

22              THE WITNESS:  -- the exposure

23       almost never comes into play in making

24       the final determination.  That's just --

Robert Tarone, Ph.D.

1           that's just to inform people who is

2           exposed, what occupations are exposed, to

3           what levels they're exposed.  It's just a

4           general descriptive.

5    BY MS. WAGSTAFF:

6           Q.      Okay.  And --

7           A.      So I really don't think it plays a

8    role at all.

9           Q.      Okay.  Well, it's information that

10   the panel members considered, right?

11          A.      It is.

12          Q.      Okay.  So if you turn to page --

13   we're still in the Preamble, and if you turn to

14   page to page 22.  This is page 22.

15                  Talking about the overall

16   evaluation, right?

17          A.      Uh-huh.

18          Q.      And this is kind of what you just

19   testified to.  It says:

20                  "The body of evidence is considered

21   as a whole."

22                  And that's what you just testified

23   to, right?

24          A.      Correct.

Robert Tarone, Ph.D.

1          Q.        And you would -- you would agree it

2    says:

3                    "The body of the evidence is

4    considered as a whole, in order -- in order to

5    reach an overall evaluation of the carcinogenicity

6    of agent to humans."

7                    Right?

8          A.        Correct.

9          Q.        That means, in other words, that the

10   panel members are instructed not to piecemeal

11   information but to consider the evidence as a

12   whole, right?

13         A.        Correct.

14         Q.        And you believe that IARC 112 did

15   that?

16         A.        Based on their determinations, they

17   would -- they would come out with a 2A.

18         Q.        Okay.  So --

19         A.        And by the way, you can see here.

20   This is not all that important, but in the

21   description of Group 1?

22         Q.        Uh-huh.

23         A.        Exposure doesn't come in.  It's

24   primarily humans and animals.

**Exhibit E Page 210**

Robert Tarone, Ph.D.

1        Q.        Okay.  But it's a subcategory that's

2    included in the evaluation.

3        A.        It's a subcategory you look at.

4        Q.        So.

5        A.        But I've never seen it play a role

6    in making the final.  I'm just saying, I've never

7    seen it play a role making the final conclusion.

8        Q.        Okay.  But it's data that's

9    important enough to be in the IARC program, right?

10        A.        Yeah, they want people to know where

11    the exposures come from.

12        Q.        Right.

13        A.        What jobs they have that are

14    exposed.

15        Q.        I mean, you're certainly not saying

16    that exposure data is not relevant, are you?

17        A.        It -- well, no, I'm not saying that.

18    I'm just saying it doesn't play a role in what

19    IARC does --

20        Q.        Okay.

21        A.        -- which defines hazard.  If they

22    were doing a risk assessment, it would play a

23    bigger role.

24        Q.        Okay.  But -- but the point is --

Robert Tarone, Ph.D.

```
 1   and we can quibble over whether it's important or
 2   not -- you didn't read it and it's a subcategory.
 3              We can agree on those two?
 4   A.       Correct.
 5   Q.       Okay.  So then I'm going to -- I'm
 6   just going to highlight these groups really quick,
 7   and then I'll come back to them.  Okay?  So I'm
 8   going to go really quickly.
 9              It looks like for the overall
10   evaluation when you look at the evidence as a
11   whole, Group 1 is the agent is carcinogenic to
12   humans, right?
13   A.       Correct.
14   Q.       And then within Group 2, there's a
15   2A --
16   A.       Uh-huh.
17   Q.       -- which means probably carcinogenic
18   to humans?
19   A.       Correct.
20   Q.       Then there's a Group 2B, which means
21   possibly carcinogenic to humans, right?
22              And then there is a Group 3, which
23   means that the agent is not classifiable as a --
24   as to its carcinogenicity to humans.
```

Robert Tarone, Ph.D.

1                    And then there's a Group 4, right?

2        A.        No.

3        Q.        Which is --

4        A.        No longer.  They've done away with

5    Group 4.

6        Q.        Okay.  So this is, though, the --

7        A.        Yeah, that's their general group.

8        Q.        This is what they had to deal with

9    when they were determining Monograph 112.

10                   What you're telling me is that

11   since --

12       A.        Some time --

13       Q.        -- that time --

14       A.        -- I can't tell exactly when --

15   Group 4 has been done away with.

16       Q.        Okay.  So Group 4 no longer exists.

17                   But at the time that Monograph 112

18   was being determined?

19       A.        Probably it was still there.

20       Q.        This is the actual Preamble that

21   they were dealing with?

22       A.        Okay.

23       Q.        So it was still there.  Okay?

24                   So those were the options.

1                    Monograph 112 panel members had the

2      option to look at the evidence as a whole and put

3      it in category 1, category 2A, 2B, 3, or 4, right?

4           A.       Correct.

5           Q.       Okay.  And they chose to put it in

6      2A?

7           A.       Uh-huh.

8           Q.       Okay.  So let's look at what that

9      means.

10                   Okay.  "This category is used when

11     there is limited evidence of carcinogenicity."

12                   Right?

13                   Did I read that correctly?

14          A.       Yep.  "And sufficient evidence in

15     animals."

16          Q.       Okay.  Hang on.  And -- I was

17     looking at my notes.

18                   So this category is used when there

19     is limited evidence of carcinogenicity in animals

20     and sufficient --

21          A.       In humans.

22          Q.       I'm sorry.  In humans.

23                   Let me read that so I have a clear

24     record because I mixed my sentences.

Robert Tarone, Ph.D.

1                    "This category is used when there is

2      limited evidence of carcinogenicity in humans and

3      sufficient evidence of carcinogenicity in --

4          A.       Correct.

5          Q.       -- experimental."

6                   And that's what --

7          A.       That's how Working Group 112 came --

8          Q.       Okay.  Yep.

9          A.       -- to their conclusions.

10         Q.       Well, that's one of the ways.

11     That's 112 Working Group.  Okay.

12                  "In some cases" -- so here's another

13     way it can get into, right?

14         A.       Uh-huh.

15         Q.       This is -- now we're talking about

16     another way it can get into 2A.  Okay?

17         A.       Yeah.

18         Q.       "In some cases, an agent may be

19     classified in this category when there is

20     inadequate evidence of carcinogenicity in humans

21     and sufficient carcinogenicity in experimental

22     animals and strong evidence that carcinogenesis is

23     mediated by a mechanism that also operates in

24     humans."

Robert Tarone, Ph.D.

1                Which is another thing that happened

2    here, right?

3        A.      Correct.

4        Q.      So this is another way that it got

5    in, right?

6                You said that genotoxicity and

7    oxidative stress, right?

8        A.      (Nods head).

9        Q.      Didn't you say that happens in

10   humans?

11       A.      Well, all of the mechanisms happen

12   in humans that they consider.

13       Q.      Okay.  And then it says:

14               Exceptionally" -- so this is a third

15   way -- "an agent may be classified in this

16   category solely on the basis of limited evidence

17   of carcinogenicity in humans."

18               Okay?  So this is -- so this is one

19   way.  This is two ways.

20               This is three ways, which means that

21   in some cases, something can go into 2A only on

22   limited evidence of carcinogenicity in humans,

23   which is what they had in 112, right?

24       A.      That's -- that is right, but it has

Robert Tarone, Ph.D.

1    to be -- there have to be very clearly associated

2    mechanisms specifically for that agent.

3         Q.     Okay.  And the mechanism group, you

4    don't know what they determined.

5              But this third way to get into 2A

6    says that "An agent may be classified in this

7    category solely" -- meaning only.

8              Doesn't "solely" mean "only"?

9         A.     Yeah.

10        Q.     Okay.

11        A.     But that's not -- that's not what --

12   that's not the rationale they used.

13        Q.     Okay.  But your criticisms have

14   said -- have been towards the animal studies, but

15   here what it says here is despite the animal

16   studies, even if the animal studies came back

17   inconclusive or not in favor of it, it could still

18   have been a 2A based solely on limited evidence of

19   carcinogenicity in humans, right?  Which is what

20   IARC 112 found, right?

21              MR. BRENZA:  Object to form.

22        Calls for a legal conclusion.

23              THE WITNESS:  You know, I've

24        never seen an agent classified that way

Robert Tarone, Ph.D.

```
 1          and I'm not sure.  That wording is

 2          peculiar.  If -- if in that case it also

 3          has to satisfy the next sentence.

 4   BY MS. WAGSTAFF:

 5      Q.      Okay.  Well, it says "category

 6   solely" meaning only on the basis of limited --

 7   okay.  Let me -- let's back up.

 8              IARC 112 found limited evidence of

 9   carcinogenicity in humans, right?

10      A.      Yes.

11      Q.      Okay.  This sentence "Exceptionally

12   an agent may be classified in this category" --

13   meaning 2A?

14      A.      That's right.

15      Q.      "Solely" meaning only.

16              So let me repeat that.

17              "An agent may be classified in this

18   category 2A only on the basis of limited evidence

19   of carcinogenicity in humans."

20      A.      That would take specific arguments

21   and, I mean, I may be wrong.  I don't think that's

22   the basis for their determination.

23              Is that what they said in the final

24   summary?
```

**Exhibit E Page 218**

Robert Tarone, Ph.D.

1       Q.      Well, what I'm telling you is --

2       A.      We're classifying this solely on the

3    basis of limited evidence in epidemiology?

4       Q.      Well, so far it looks like there are

5    three ways to get into 2A, and the evidence has

6    been -- and the determinations have been found in

7    all three ways.

8               And let's -- let's go on to the

9    fourth way.

10              "An agent may be assigned to this

11   category if it clearly belongs, based on

12   mechanistic considerations, to a class of agents

13   for which one or more members have been classified

14   in Group 1 or Group 2A."

15              Does glyphosate fall within that

16   category?

17      A.      No.

18      Q.      How do you know?  Have you

19   researched that?

20      A.      Yes.  I mean, I know about that

21   category of herbicides.  They're very nontoxic.

22   And the mechanistic evidence is not -- I mean,

23   there are cases where the mechanistic evidence is

24   really overwhelming, particularly for mutagenesis.

Robert Tarone, Ph.D.

1        Q.        All right.  But you're not offering

2    an opinion here on the mechanistic data.  So you

3    don't know.

4        A.        I know that they did not use that

5    fourth category when they assigned their 2A.

6        Q.        Okay.  So that -- that is fine.

7    That's not what I'm asking you.

8                  These are categories available.

9    Perhaps they read these and they said, oh, it

10   satisfies number 1.  So they didn't have to look

11   at 2, 3 or 4.

12                 But you would agree with me that --

13   let's see here.  Let me just kind of make this

14   simple.

15                 Okay.  "Ways to Become 2A."  All

16   right?  Make that a capital B.

17                 1.  Limited in -- limited in epi,

18   right?

19                 And strong animal studies?

20       A.        Sufficient.

21       Q.        Or sufficient, right?

22       A.        Sufficient in animal.

23       Q.        2.  How would you summarize 2?

24                 Inadequate epi sufficient

Robert Tarone, Ph.D.

1    carcinogenicity?

2         A.      Sufficient in animals and strong

3    evidence that the carcinogenesis is mediated by a

4    mechanism.

5         Q.      In humans, right?

6         A.      Uh-huh.

7         Q.      Sufficient animals plus mechanism in

8    humans?

9         A.      Correct.

10        Q.      Okay.  And the third way is limited

11   epi.

12                And the fourth way is if it clearly

13   belongs based on mechanistic -- mechanistic

14   considerations, right?

15                Do you want me to add anything to

16   this?

17        A.      Yeah.  It has to be a class of

18   agents that have other agents that have been

19   classified 1 or 2A.

20        Q.      Okay.  So what word should I add to

21   this?

22        A.      Well, I don't know.  What do you

23   have written?

24        Q.      I have:  If it clearly belongs

Robert Tarone, Ph.D.

1    based --

2         A.       If it clearly belongs based.

3         Q.       -- on mechanistic considerations.

4         A.       To class for which one or more

5    members have been classified 1 or 2A.

6         Q.       Okay.  Oh, man.  That was a lot more

7    to write on the last one than I thought.  (Laugh).

8              All right.  Here's how you become a

9    2A.

10             And so glyphosate checks off that

11   box, right?

12        A.       That's what they used to classify

13   it.

14        Q.       Okay.  Glyphosate checks off second

15   box, right?

16        A.       No.  The epi is inadequate.

17        Q.       But it's more than inadequate.  You

18   think that it wouldn't -- you think that if -- if

19   there was actually limited epi, which is a

20   stronger association, that it would mean that you

21   didn't get in there?

22        A.       I'm just saying that was not what's

23   used for.

24        Q.       Okay.  So you don't think that you

Robert Tarone, Ph.D.

1    could use this definition, like these criteria to

2    classify it?  You think that it has to be bad epi

3    with sufficient animals?

4         A.      If it was inadequate epi?  Yeah, you

5    definitely could not.

6         Q.      I understand that.

7                 I'm saying the current

8    determinations, though, there was limited epi,

9    which is means a more causal effect than

10   inadequate epi.

11                You have more -- you have more epi

12   in inadequate in Monograph 112, right?

13        A.      Yeah.

14        Q.      Do you --

15        A.      Limited and sufficient is what made

16   this one come, and that's all I'm saying.

17        Q.      Okay.  But what I'm saying is that

18   inadequate epi is a -- is a lower causal

19   relationship than limited epi, right?

20        A.      Yes.

21        Q.      Okay.  And so there was limited epi

22   in 112, right?

23        A.      Yes.

24        Q.      Okay.  And there was sufficient

Robert Tarone, Ph.D.

1    animals in 112, right?

2         A.      Right.

3         Q.      And the mechanism happened in

4    humans, right?

5         A.      Yes.

6         Q.      Okay.  So they could have used that

7    one?

8         A.      Actually -- actually, since they

9    found limited evidence, no.  I mean, they -- they

10   have their --

11        Q.      Okay.  So they found a higher

12   causal --

13        A.      They have their very specific

14   categories.

15        Q.      Okay.  So you think that because

16   they found a higher -- a higher connection that it

17   wouldn't classify as a 2A?

18        A.      I don't know what you're saying.

19        Q.      Basically --

20        A.      If it was limited epi and sufficient

21   animals, it already is classified.  It's already.

22        Q.      Well, I understand.

23                I'm saying but that -- but we also

24   have the mechanism in humans in this case.

Robert Tarone, Ph.D.

1        A.       I don't know.

2        Q.       And then the third way is that it

3   can become a 2A through a limit -- through a

4   limited epi, right?

5        A.       Yes.  I guess.  I know of no such

6   case.

7        Q.       But it can, right?

8        A.       By their definition, yes.

9        Q.       By their definition, right?

10                All right.  And then it can also

11  become 2A "If it clearly belongs" based on

12  mechanistic considerations to a class of agents

13  for which one or two members have been classified

14  Group 1 or Group 2A.

15                And you told -- you told us earlier

16  that you weren't opining on any of the mechanistic

17  data.  So you don't know if it can -- if that --

18  if glyphosate's analyses satisfies --

19       A.       Well, I know glyphosate is the only

20  agent I know of in that chemical class.

21       Q.       You -- you testified earlier you

22  weren't offering any category on the mechanistic

23  subgroup.

24                So you -- you have no opinion on

Robert Tarone, Ph.D.

1    that, on whether or not glyphosate would become a

2    2A through subsection 4; is that right?

3         A.      No, I know of no.

4         Q.      Okay.

5         A.      I mean, aromatic amines probably

6    fall in that category.

7         Q.      Well, I'm not --

8         A.      There are --

9         Q.      I'm not asking you about that.

10        A.      Well, I'm saying there are cases

11   where there's extremely strong case against

12   certain members of a class.  So you're going to

13   call it probable on the basis of the fact that it

14   has similar mechanistic.  I can understand that.

15        Q.      Okay.  Well, an hour ago you told me

16   you weren't offering any opinion on the

17   mechanistic subgroup.  So I'm going to hold you to

18   your prior testimony.

19        A.      I'm just saying glyphosate is alone

20   in its subgroup.

21        Q.      Okay.

22        A.      (Laugh).

23        Q.      Is there like a spot right here?

24        A.      It's not on the -- on your paper

Robert Tarone, Ph.D.

1    because the paper moved and the spot didn't.

2                        MS. WAGSTAFF:  Okay.  So is it

3            going to be on the video, though?

4                        THE VIDEOGRAPHER:  It is.

5                        MS. WAGSTAFF:  So how do we

6            get it off?  Is it up here?

7                        THE VIDEOGRAPHER:  I think it

8            might be on the camera if you zoom in.  I

9            think it is.

10                       MS. WAGSTAFF:  Do you want me

11           to do that?

12                       THE VIDEOGRAPHER:  You can

13           try.

14                       MS. WAGSTAFF:  Hmm.  Okay.

15           Okay.

16   BY MS. WAGSTAFF:

17       Q.       All right.  So what we can agree on,

18   Dr. Tarone, is that there are four ways to become

19   classified as category 2A according to the

20   Preamble --

21       A.       Yes.

22       Q.       -- as it existed when Monograph

23   112 --

24       A.       Yes.

Robert Tarone, Ph.D.

```
1        Q.        -- deliberated.

2                  Okay.  Is that a yes?

3        A.        Yes.

4                  MS. WAGSTAFF:  Okay.  I'm

5         going to mark my chart as Exhibit 13.

6                  (Document marked for

7         identification as Tarone Exhibit 13.)

8   BY MS. WAGSTAFF:

9        Q.        All right.  Let's now turn to the

10  actual IARC Monograph.  You can give.

11                 I don't know where mine is.  I had

12  one out if I can find it.

13                 Just one second.  I got to find.

14                 You can acquaint yourself with the

15  Monograph if you will while we wait.

16                 MR. BRENZA:  He doesn't have a

17         copy of it.

18                 MS. WAGSTAFF:  Oh.

19                 THE WITNESS:   That's all

20         right.  I don't need one.  I do have one

21         in my --

22  BY MS. WAGSTAFF:

23       Q.        I just have to find my copy.

24  There's a lot of papers flying around.  Sorry.
```

Robert Tarone, Ph.D.

1                    Found it.

2                    All right.  I want to give you time

3    to look at it.

4                    When is the last time you reviewed

5    that Monograph?

6         A.    A while back, but I know this page

7    very well.

8         Q.    How long is a while back?

9         A.    I don't know.

10        Q.    Well, guess.

11        A.    I couldn't say last time I actually

12   read this part.

13        Q.    Okay.  A year ago?

14        A.    But I know it says very clearly why

15   it was determined to be in 2A, and it was based on

16   humans and experimental animals.

17        Q.    Okay.  So the last time you read it

18   was what, like a year ago?

19        A.    Probably.  Maybe more.

20        Q.    More than a year ago?

21        A.    Yeah.

22        Q.    Have you read it since your last

23   deposition?

24        A.    No.

Robert Tarone, Ph.D.

1      Q.      Okay.  Have you ever read it?

2      A.      I mean, there's no -- there's no

3   need to read it.  I think I've read -- once you've

4   read it once and once you realize how they came to

5   the conclusion, that's sufficient.

6      Q.      Okay.  So you haven't read this

7   Monograph 112 since at least 2019?

8      A.      It hasn't changed.

9      Q.      I understand that.  That wasn't my

10  question.

11              Have you read this since 2019?

12     A.      Maybe sections.  Maybe sections, but

13  not the whole thing.

14     Q.      Okay.  And I don't, you know, when I

15  say have you -- have you read it, I'm just, you

16  know, obviously I am just talking about the

17  portion that I've pulled out that relates to

18  glyphosate.

19              Monograph 112 related to other

20  chemicals, didn't it, as well?

21     A.      It what?

22     Q.      Monograph 112 evaluated other

23  chemicals, right?

24     A.      Yeah.  It evaluated four

Robert Tarone, Ph.D.

1    organophosphate insecticides.

2         Q.       Okay.  And every time I've said

3    Monograph 112, you understand it's evaluation of

4    glyphosate, right?

5         A.       Obviously.

6         Q.       Okay.  Obviously.

7                  And so that's what I've handed you

8    is the section that just relates to glyphosate?

9         A.       Correct.

10        Q.       And you said you haven't read this

11   for a while, and when pushed, you said maybe

12   you've read sections --

13        A.       Yeah.

14        Q.       -- since 2019?

15        A.       I may have gone back to -- to read

16   the rodent section to make.  The last time I

17   actually did was to -- was in writing.

18                 So it was -- it was when I was

19   writing the "Clinical Lymphoma, Leukemia, and

20   Myeloma."  I wanted to make sure that I remembered

21   what was said in this chapter about the Grime

22   paper.

23        Q.       Okay.  Great.

24                 And so you didn't read it in

Robert Tarone, Ph.D.

1    preparation for today?

2        A.      No.

3        Q.      And you didn't read the Preamble in

4    preparation for today, right?

5        A.      No.

6        Q.      Okay.  So let's look at -- let's

7    look at page 30, which talks about the

8    experimental animals.

9              Can you turn to page 30?

10             MS. WAGSTAFF:  Oh, before we

11        get into this, the food is here.  Why

12        don't we take a 20-minute break.  Because

13        the mice part will take about 45 minutes

14        or something.

15             MR. BRENZA:  Have you -- have

16        you --

17             MS. WAGSTAFF:  Does that sound

18        good?

19             MR. BRENZA:  Yeah.  Did you

20        mark this?

21             MS. WAGSTAFF:  I'm going to

22        mark the IARC Monograph as 14.

23             (Document marked for

24        identification as Tarone Exhibit 14.)

Robert Tarone, Ph.D.

```
 1                    MR. BRENZA:  Okay.

 2                    MS. WAGSTAFF:  Off the record.

 3                    THE VIDEOGRAPHER:  The time is

 4     12:53 p.m.  We're off the record.

 5                    (Whereupon, at 12:53 p.m., a

 6     luncheon recess was taken.)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

**Exhibit E Page 233**

Robert Tarone, Ph.D.

```
 1                    AFTERNOON SESSION

 2                              (1:18 p.m.)

 3                    ROBERT TARONE, PHD

 4    called for continued examination and, having been

 5    previously duly sworn, was examined and testified

 6    further as follows:

 7                    EXAMINATION (CONTINUED)

 8                    THE VIDEOGRAPHER:  The time is

 9        1:18 p.m.  We're back on the record.

10   BY MS. WAGSTAFF:

11        Q.     All right, Dr. Tarone.  You had an

12   opportunity to review the IARC Monograph?

13        A.     Yes.

14        Q.     Okay.  And are you ready to

15   continue --

16        A.     Yes.

17        Q.     -- your deposition?

18               All right.  And during your break,

19   did you make any phone calls or send any text

20   messages?

21        A.     No, I didn't.

22        Q.     Okay.  And did you otherwise talk to

23   anybody about the testimony that you're giving

24   today?
```

**Exhibit E Page 234**

```
 1          A.       Talked to nobody.

 2          Q.       Okay.

 3          A.       About anything.

 4          Q.       So we had discussed going on page

 5   30, I believe it was, of the IARC Monograph is

 6   where the animal data starts, right?

 7          A.       I thought we were on 78.

 8          Q.       78?

 9          A.       Page 78, yeah.  We were in the final

10   evaluation.  That's where I thought we were.

11          Q.       I hadn't gone to page 78.

12          A.       Okay.  30?

13          Q.       I was going to page 30, yeah.

14          A.       Okay.

15          Q.       That's where I had guided you --

16          A.       All right.

17          Q.       -- before our break.

18          A.       Good enough.

19          Q.       "Cancer in Experimental Animals,"

20   right?

21          A.       Uh-huh.  That's right.  Yeah.

22          Q.       And you mentioned page 78.

23                   This Monograph is actually 92 pages,

24   right?
```

Robert Tarone, Ph.D.

1          A.      Yeah.

2          Q.      Okay.  92 double-columned typed

3     pages.  It's a lot of -- lot of information,

4     right?

5                  It's a lot of information, right?

6          A.      Yes.

7          Q.      Okay.  So we're looking here and

8     this is where really the crux of your criticism

9     comes in, right?

10         A.      Correct.

11         Q.      Is with the experimental animals.

12                 And there's two types of

13    experimental animals, right?  There's mouse and

14    there's rat.

15         A.      For glyphosate, yes.

16         Q.      Okay.  And we're only talking about

17    glyphosate.

18                 So my questions for the rest of the

19    afternoon, you can assume that I'm just talking

20    about glyphosate unless I say otherwise.

21                 Is that fair?

22         A.      Fair.

23         Q.      And I can assume that your responses

24    are just about glyphosate unless you respond

Robert Tarone, Ph.D.

1    otherwise.

2                Fair?

3        A.        Absolutely.

4        Q.        Okay.  So --

5        A.        Go ahead.

6        Q.        Okay.  So with respect to the mouse,

7    it says "See Table 3.1," right?

8        A.        Yes.

9        Q.        So let's see Table 3.1, which

10   happens to be the next page.

11               Do you see that?

12       A.        Yep.

13       Q.        Okay.  All right.  So Table 3.1

14   actually is on page 31, right?

15       A.        Yes.

16       Q.        And it continues on to page 32.

17       A.        Yes.

18       Q.        Right?

19               Okay.  Let's -- let's look at page

20   31 first.  Okay?

21               So taking a step back, looking at

22   sort of the Preamble that we had already

23   discussed, they had found -- just sorry.  I'm

24   going to put this back up.

1            This is sort of -- this is what IARC

2    found, which is sufficient carcinogenicity in

3    rodents, right?

4        A.      Correct.

5        Q.      Using this criteria.

6            And what -- just so that I can kind

7    of orient us a little bit, I'm going to create a

8    chart, but I'd like you to keep your Preamble.

9    I'm on page 20.

10           Can you make sure you're on page 20?

11           Tell me when you're there.

12       A.      Yes.

13       Q.      Okay.  Let's walk through together

14   and come with a collective understanding of what

15   it means of -- of the -- of -- of the criteria.

16           Because you said the Preamble is a

17   criteria, right?

18           So let's come up with a collective

19   understanding of what it means to be sufficient in

20   animal studies.  Okay?

21           Are you ready to do that with me,

22   Doctor?

23       A.      Yep.

24       Q.      Okay.  Do you need to read --

Robert Tarone, Ph.D.

```
1            A.      No.

2            Q.      -- the category again?

3                    Okay.  So sufficient is that a

4    causal relationship has been established.

5                    Would you agree with that?

6            A.      Where are you reading from?

7            Q.      The Working Group considers that --

8    so when something is sufficient --

9            A.      Oh.

10           Q.      -- it means that the Working Group

11   has determined a causal relationship --

12           A.      Yep.

13           Q.      -- between the agent and the tumors.

14                   Is that fair?

15           A.      Uh-huh.

16           Q.      I don't want to put words in your

17   mouth.

18                   So do you agree with me that's

19   that -- is that --

20           A.      Well, that particular part is

21   malignant neoplasms.

22           Q.      Okay.  And so that's a tumor, right?

23           A.      Yes.

24           Q.      Okay.  So --
```

**Exhibit E Page 239**

Robert Tarone, Ph.D.

1          A.       Well, there are benign tumors.

2          Q.       Okay.  Well, it says benign and

3     malignant.

4          A.       That's the second part, or an

5     appropriate combination of benign and malignant.

6          Q.       Okay.  So it's fair -- is it fair to

7     say that when something has been determined that

8     it is sufficient evidence of carcinogenicity in

9     animal studies, that the Working Group has found

10    that a causal relationship has been established

11    between the agent and the tumor incidents?

12               Is that fair?

13         A.       Correct.

14         Q.       Okay.  So causal relationship -- I

15    want to get the right word -- established.

16               And in our case, it's glyphosate.

17               So can I put "glyphosate" instead of

18    the word "agent"?

19         A.       It's fine.

20         Q.       Between glyphosate and the tumors,

21    right?

22         A.       Yes.

23         Q.       Okay.

24               Okay.  So that's what they found.

Robert Tarone, Ph.D.

1                      And they did that by -- these are

2    the ways that you can do it.  Okay?

3                      One is two or more species of

4    animals, right?

5         A.      (Nods head).

6         Q.      The second way is two or more

7    independent studies in one species, right?

8                      At different times, different

9    laboratories, under different protocols, right?

10                     So I'll put different.  What is it?

11   Time, laboratories, and protocols; is that right?

12                     I want to make sure --

13        A.      It sounds right.

14        Q.      -- I'm capturing this correctly.

15                     Well, it sounds right.  Read it.  It

16   says:

17                     "Two or more independent studies in

18   one species carried out at different times or in

19   different laboratories or under different

20   protocols."

21                     So did I capture that correctly?

22        A.      Shorthand but, yeah, I mean I

23   understand it.  I can read it.

24        Q.      Okay.  And then it says a third way

Robert Tarone, Ph.D.

1    to do it is that an increased incident in tumors

2    in both sexes of a single species in a well -- in

3    a well-conducted study ideally under GLP, which is

4    Good Laboratory Practices.

5               So you can do one study with -- or

6    I'm sorry.

7               You can do increased tumors, right?

8               In both sexes of a single species

9    conducted -- let's just call it -- under GLP,

10   right?

11   A.        (Nods head).

12   Q.        Is that fine?

13   A.        Yeah, it's fine.

14   Q.        And then the fourth way you can do

15   it is one study, right?

16               And sex in one.  One study in one

17   species -- a single study in one species and sex.

18   So one study, right?

19   A.        (Nods head).

20   Q.        When the tumors are rare occurrences

21   is what you said earlier, right?

22   A.        (Nods head).

23   Q.        Are rare as to.  As to what?  As to

24   incidents, right?  Site, type, type of tumor or

**Exhibit E Page 242**

Robert Tarone, Ph.D.

1    age at onset.  I'll put age at -- age at onset or

2    when there are strong findings of tumors at

3    multiple sites.

4                 So there are four ways, right?

5        A.      Yes.

6        Q.      Did I capture that correctly?

7        A.      Yep.

8        Q.      All right.  So this summarizes our

9    conversation and it summarizes your understanding

10   of the Preamble's requirements for animal studies,

11   right?

12       A.      Right.  I just say, just point out,

13   there's a great deal of subjectivity in some of

14   these.

15       Q.      Okay.  But this is --

16       A.      Determining -- determining what's a

17   rare occurrence and what are strong findings, but

18   these are exactly specified in the Preamble.

19       Q.      Okay.  So this is -- so I have -- so

20   this captures, correct?

21       A.      The Preamble, yes.  Correct.

22       Q.      Okay.  And your understanding of it?

23       A.      Yeah.

24       Q.      And then we also discussed that a

Robert Tarone, Ph.D.

1    female and a male study, or female and male

2    results in the same study are two independent

3    studies, right?

4          A.      Correct.

5          Q.      And same study equals two

6    independent studies, right?

7          A.      Correct.

8          Q.      Okay.  And that's industry standard,

9    correct?

10         A.      Oh, I don't know about industry

11   standard, but yeah, I mean, they're different.

12         Q.      Okay.  They're different.

13         A.      That's why when you see something

14   occurring in the males, the first thing you should

15   do is look at females at the same site.

16         Q.      Yeah.  And I under --

17         A.      And that's what they didn't do with

18   kidney.

19         Q.      So I understand that's your opinion,

20   but I just want to --

21         A.      No, it's not an opinion.  That's how

22   science is done.

23         Q.      Okay.  I understand that's your

24   opinion and I just want to -- I just -- I just

Robert Tarone, Ph.D.

1   want to make sure we understand that when there's

2   male and female in the same study, they're

3   considered two independent studies, right?

4              Well, I've asked you that four or

5   five times.

6              So I'm going to mark this exhibit as

7   15.

8              (Document marked for

9        identification as Tarone Exhibit 15.)

10  BY MS. WAGSTAFF:

11      Q.     All right.  Now, let's go to -- now

12  that we have kind of worked out how you do that,

13  let's go to -- back to chart.  This one.  All

14  right.

15             So, and when we were talking about

16  two or more studies where it says two or more

17  species or it says two or more independent

18  studies, those are studies with positive findings,

19  right?

20      A.     Correct.

21      Q.     Okay.  That's -- that's what that

22  means, that PLOS?

23      A.     And traditionally -- traditionally

24  IARC has interpreted that to be something

Robert Tarone, Ph.D.

1   significant with a P-value less than .05.

2        Q.      Okay.  So you have testified before

3   that you see nothing magical about a P-value of

4   .05?

5        A.      That's true.

6        Q.      Okay.

7        A.      I'm just saying IARC traditionally

8   has.

9        Q.      Okay.

10       A.      There's a debate about that, and I'm

11  on the side of not having strict --

12       Q.      Yeah.  You've testified before --

13       A.      -- significance level.

14       Q.      -- there's no scientific magic about

15  that threshold.

16       A.      (Nods head).

17       Q.      I've read your testimony to that.

18               And you stand by that today, right?

19       A.      Absolutely.

20       Q.      Okay.  So looking in here, this

21  first group, this first case is mouse.  It's in

22  gray.

23               Do you see it?

24       A.      Uh-huh.

Robert Tarone, Ph.D.

1    Q.    And I'm going to try to zoom in on

2   this, but just the nature of the horizontal, I

3   don't think it's going to actually work, but you

4   have this right in front of you, right?

5         And so this first one was a study

6   called Knezevich and Hogan, right?

7    A.    Correct.

8    Q.    All right.  The jury by now will

9   have heard a lot about the Knezevich and Hogan

10  study and so I just want to reorient the jury

11  as -- as to that.

12   A.    Just to specify, Knezevich and Hogan

13  refers to the analysis after the EPA did their

14  pathology Working Group.

15   Q.    Right.

16   A.    It's the lower part.  There's two.

17   Q.    Right.

18   A.    It's the lower part.

19   Q.    Right.  And so -- so the first group

20  right here --

21   A.    Uh-huh.

22   Q.    -- was this is a mouse group and

23  this is -- I'm just talking about the group in

24  gray.  I mean, the study in gray.  Okay?  This

Robert Tarone, Ph.D.

1    first.

2                 You see how there's two studies on

3    this chart on this page?

4         A.       There's two studies in gray.

5         Q.       No, there's this study.

6         A.       I know, but in the top one, what I'm

7    telling you is the first few lines refer to --

8    it's essentially preliminary data as reported

9    initially by the laboratory.

10        Q.       Well, then it says report from the

11   PWG of the EPA, right?

12        A.       That's -- that's what the final data

13   is.

14        Q.       Okay.  And then -- and then there is

15   the -- the -- there is -- and we're going to talk

16   about that pathology group, and we're going to

17   talk about Knezevich and Hogan.  I'm sure you've

18   seen internal documents and know sort of about

19   that.

20        A.       Not -- in fact, I haven't been able

21   to get my hands on the original total Knezevich

22   and Hogan, but I have a summary of Knezevich and

23   Hogan results that the EPA put together for the

24   glyphosate SAP.

**Exhibit E Page 248**

Robert Tarone, Ph.D.

1      Q.      Okay.  And so this first mouse study

2   show -- it found the renal tubule adenoma, right,

3   at 0 -- so when -- so when you look at these

4   numbers, just so we're orienting on the same page.

5      A.      Uh-huh.

6      Q.      Right here where it says 0 out of

7   49, 0 out of 49 --

8      A.      That's preliminary.  That's where

9   they --

10     Q.      Okay.  I'm not asking you that.

11  That's not my question.  So you need to please

12  wait for me to finish my question.

13     A.      Uh-huh.

14     Q.      This says 0, 1000, 5000, 30000 parts

15  per million, right?

16     A.      Uh-huh.

17     Q.      This relates to the 0 group, this is

18  the 1000 group, this is the 5000 group, and this

19  is the 30000 group, right?

20     A.      Yes.

21     Q.      Okay.  Well, just because the jury

22  may not have the same scientific knowledge of you,

23  I want -- I want to make sure that we're

24  understanding that.

Robert Tarone, Ph.D.

1                   And so when I say 0, 0, 1, 3, right?

2     When I say that, that means those are the tumors

3     they found at the 0, 1000, 5000, 30000, right?

4          A.      Correct.

5          Q.      Okay.  And so you understand that

6     this is a significant finding?

7                   Whether or not you believe that

8     that's preliminary data --

9          A.      It is preliminary.

10         Q.      -- or not, you understand -- you

11    would agree with me --

12         A.      Yes.

13         Q.      -- that that is a significant

14    finding?

15                   MR. BRENZA:  Object to form.

16    BY MS. WAGSTAFF:

17         Q.      Correct?

18         A.      Yes.

19         Q.      Okay.  And you would agree with me

20    that this is statistically significant?

21         A.      It is.

22         Q.      Okay.  And you would agree with me

23    that even when data is not statistically

24    significant, even when it is -- falls just below

Robert Tarone, Ph.D.

1  statistically significant, you shouldn't ignore

2  data, right?

3       A.       Yeah.   Absolutely.

4       Q.       Okay.   All right.   And then you have

5  a complaint about the P-values included here,

6  right?

7       A.       I do.

8       Q.       Okay.   And you understand that those

9  were P-values that were submitted by the EPA as

10 well?

11      A.       No, they were not.

12      Q.       Okay.

13      A.       They were recalculated during the

14 Working Group meeting, and that's -- that was the

15 only reason I looked at Chris Portier's

16 deposition.   And he -- he was in the mechanistic

17 -- mechanisms group, but he said he was asked by

18 the animal group to help recalculate these

19 P-values.

20      Q.       Okay.

21      A.       So these are P-values that were

22 calculated at the time of the Working Group, and

23 they're not the same as the exact P-values that

24 are .065 and .067.

**Exhibit E Page 251**

Robert Tarone, Ph.D.

1          Q.       Okay.  And so it's your testimony

2    here under oath that those P-values of .037 and

3    .034 were never reported by the EPA in their

4    initial evaluation?

5          A.       I don't think so.  They weren't --

6    they weren't the primary P-values.

7          Q.       Okay.

8          A.       Knezevich and Hogan.  Those were

9    based on the exact test.  These are based on an

10   approximate test.

11         Q.       Okay.  So --

12         A.       And as I said, in Chris Portier's

13   deposition, he said that he was called over to

14   change the P-values for these two specific

15   comparisons.

16         Q.       Okay.  I don't really think that

17   that's what his testimony said.  So I'll move to

18   strike that.

19                  And you have --

20         A.       It's absolutely right.  He even says

21   Knezevich and Hogan.

22         Q.       You have not read but a sliver of

23   the testimony provided by Chris Portier in this.

24   You didn't even read the entire deposition that

**Exhibit E Page 252**

Robert Tarone, Ph.D.

1   you had access to.

2        A.      So was he lying when he said that he

3   helped recalculate the P-values for Knezevich and

4   Hogan?  Because he said that clearly.

5        Q.      I'm not -- I'm not -- I'm not here

6   to talk about Chris Portier's deposition.  I'm

7   just moving to strike that as -- as inaccurate.

8              But my question on the table --

9        A.      But I know the --

10              MR. BRENZA:  We'll oppose that

11       motion, but you can go ahead.

12   BY MS. WAGSTAFF:

13       Q.      My motion -- Monsanto has always got

14   your back.  Don't worry.  My --

15              MR. BRENZA:  Let's move on.

16   BY MS. WAGSTAFF:

17       Q.      My question is -- and I think you've

18   answered, but there's just been so much

19   back-and-forth I want to make sure.

20              Your testimony is that .037 and .03

21   P-values, if those were reported by the EPA, then

22   the EPA was wrong?

23       A.      No.  I mean, I don't know what

24   different P-values were reported.  I know in

Robert Tarone, Ph.D.

1    Knezevich and Hogan, the original P-values were

2    reported were .065 and .067.  And having seen that

3    these were recalculated during the Working Group

4    meeting, it was probably because someone felt

5    uncomfortable declaring a carcinogenic effect

6    without a P-value less than .05.

7         Q.      Okay.  And so --

8         A.      And these are approximate because

9    I've run these analyses both approximately and

10   exactly, and the approximate P-values are too low.

11        Q.      Okay.  And so -- so your testimony

12   is that someone was -- was trying to get the

13   P-value under .05 so that they could identify it

14   as a carcinogen?

15        A.      That's the only reason I can come up

16   with.

17        Q.      Okay.  And so if I represent to you

18   that those P-values were actually in the EPA's

19   initial evaluation, is it your opinion that the

20   EPA was also trying --

21        A.      Knezevich and Hogan?

22        Q.      I am testifying --

23        A.      No.  You said EPA.  There's a lot of

24   EPA documents.

**Exhibit E Page 254**

Robert Tarone, Ph.D.

1          Q.      Okay.  So I'm asking you.  If the

2     EPA has -- and I'm not here to tell you

3     information.  You're the expert.  So I want to

4     know what research you've done and what -- what

5     diligence you've done.

6                So this is about what you know,

7     sitting here today, and you chose not to review

8     anything to prep for this.  So that's on you.

9                And I'm asking you:  If those

10    numbers, if the P-values right here of .037 and

11    .034 were included in an EPA evaluation --

12         A.      Still makes them wrong.

13         Q.      -- iS it your opinion that the EPA

14    was bending over backwards to try to get the

15    P-value --

16         A.      Oh, I have no idea.  I'm just

17    saying.

18         Q.      Can I finish my sentence?

19                I know -- I know it bothers you that

20    I'm asking you questions --

21         A.      No, it doesn't bother me at all.

22         Q.      -- challenging your opinions, but

23    just let me ask questions.

24                     MR. BRENZA:  Move to strike.

Robert Tarone, Ph.D.

1          Move to strike.  Arguing with the

2          witness.

3    BY MS. WAGSTAFF:

4          Q.      Please.

5                  So is it your opinion that if the

6    .037 and .034 P-values were included in an EPA

7    evaluation, that the EPA was bending over

8    backwards to try to get the P-value below .05?

9          A.      I would not say that.

10                      MR. BRENZA:  Assumes

11          matters --

12                      THE WITNESS:  What I would

13          say --

14                      MR. BRENZA:  Assumes matters

15          not in evidence.  Go ahead.

16                      THE WITNESS:   What I would

17          say is, if they did include these two

18          P-values, they were wrong.  They're the

19          wrong P-values.

20    BY MS. WAGSTAFF:

21          Q.      Okay.  So the EPA is wrong?

22          A.      Everybody knows.  They would be.

23          Q.      IARC is wrong and Dr. Tarone is

24    right?

**Exhibit E Page 256**

Robert Tarone, Ph.D.

 1          A.        No.   The EPA document authored by

 2    Knezevich and Hogan has the .065 and .067 --

 3          Q.        Okay.

 4          A.        -- calculated correctly using the

 5    exact test.

 6          Q.        So to date, you've never produced

 7    any of your calculations on how you got .67

 8    whatever you got.

 9                    Would you be willing to give me

10    those, e-mail me those?

11          A.        Anybody can.   Anybody can produce

12    them.

13          Q.        Well, I'd like -- I'd like you to

14    produce them and you have my e-mail address, and I

15    would request that you send them to me after.

16    They -- they should have been produced as part of

17    this production.

18          A.        They're in my paper.

19          Q.        Okay.

20          A.        And I say how I -- how I calculated

21    them.   Anybody -- anybody who refereed it would

22    calculate them or could calculate them to see if

23    they're correct.

24                         MR. BRENZA:   Yeah.

**Exhibit E Page 257**

Robert Tarone, Ph.D.

```
 1   BY MS. WAGSTAFF:

 2        Q.      Okay.

 3                    MR. BRENZA:  And I don't think

 4        it's proper for you to ask the doctor to

 5        do additional work.  If it's existing

 6        document --

 7                    THE WITNESS:   I can send them

 8        to her.

 9   BY MS. WAGSTAFF:

10        Q.      Yeah.  I mean, it wouldn't be hard

11   to send it.

12        A.      It's a computer -- it's a computer

13   program --

14        Q.      Easy.

15        A.      -- called StatXact out of Harvard.

16        Q.      Yeah.  So I would like you to.

17        A.      And you'll see both.

18        Q.      Yeah, send it to me.

19        A.      The exact P-value and also the

20   approximate P-value.  They calculate one-sided and

21   two-sided for both.

22        Q.      Yeah.  Please send it to me.  You

23   have e-mail --

24        A.      I will.  You said I have your
```

Robert Tarone, Ph.D.

1    e-mail.  Where is it?

2         Q.      Well, you have Kevin.  Kevin

3    e-mailed you the amended notice.  So if you could

4    just e-mail it to Kevin Rowe.

5         A.      Kevin.

6         Q.      Yes.

7         A.      I remember the name.

8         Q.      That would be great.

9              And I'd appreciate if you could do

10   that before the second day.  So if we have to ask

11   you questions, we don't need to re-notice your

12   deposition.

13        A.      It won't take long.

14        Q.      Okay.  All right.  And so what do

15   you know about the Knezevich and Hogan study?

16        A.      I just know that it was a study

17   based on the evaluation of the renal tumors after

18   the pathology Working Group.

19        Q.      And why was there a pathology

20   Working Group?

21        A.      I guess there was enough concern

22   over the results in the first study.  They were

23   just concerned.

24        Q.      Who was concerned?

**Exhibit E Page 259**

Robert Tarone, Ph.D.

1          A.      I don't -- I don't know who

2    evaluates it at EPA, but somebody saw that it was

3    significant.

4          Q.      That what was significant?

5          A.      The highest dose.

6          Q.      Okay.

7          A.      So they probably said, we need to

8    take a closer look at this.

9          Q.      So you don't actually know?

10         A.      Well, I don't think anybody has ever

11   said, but for some reason they did hold up

12   pathology Working Group.

13         Q.      Well, a lot of people have said.

14   I'm just wondering.

15                 You have never bothered to look,

16   right?

17         A.      No.

18         Q.      Is it normal that that happens?

19         A.      What?

20         Q.      That a pathology Working Group comes

21   into play?

22         A.      I don't -- I don't know why, but

23   IARC considered it important because that's what

24   they present as a final result.

Robert Tarone, Ph.D.

1          Q.       All right.  And these were talking

2    about -- in this first study, we're talking about

3    renal tubule adenomas, right?

4          A.       Correct.

5          Q.       Okay.  And this is -- can you do 56?

6                   This is an EPA document titled

7    "February 26, 1985."

8                   Do you see that?

9          A.       Uh-huh.

10         Q.       And this is talking about the study

11   we just said we were just looking at.

12                  If you look at the study it's 0,

13   1000, 5000, 30000.

14         A.       Yep.

15         Q.       It says:

16                  "The Glyphosate feeding study on

17   Charles River CD-1 mice generated renal tubular

18   adenomas in male mice at 5000 and 30000 parts per

19   million."

20                  Right?

21         A.       Correct.

22         Q.       Which is the -- right here?

23         A.       Yep.

24         Q.       Okay.  So we're talking about the

**Exhibit E Page 261**

Robert Tarone, Ph.D.

1    same study, right?

2         A.       (Nods head).

3         Q.       In this one, it talks about false

4    positives, and I just have one question on this.

5              It says -- well, it talks about how

6    the registrant, Monsanto -- it's kind of hard to

7    read because it's from 1985.

8         A.       I see.  I can read it fine.

9         Q.       "The registrant (Monsanto) claims

10   that such tumors are 'unrelated to treatment.'"

11             You see that?

12        A.       Yep.

13        Q.       Okay.  And then it talks about how

14   Monsanto is asking the EPA to make the following

15   assumptions.

16             Do you see that?

17             Monsanto's argument -- and that

18   argument is the one that I just read, right, that

19   the tumors are unrelated?

20        A.       Uh-huh.

21        Q.       Asks the EPA to make the following

22   assumptions that.

23             "A mouse may develop 20 distinct and

24   independent types of tumors.

Robert Tarone, Ph.D.

1                    "The probability of each tumor type

2        in a typical mouse is .05."

3                    And then those two things, right?

4        A.        Yeah, I've seen that argument.  It's

5        common.

6        Q.        And then Monsanto in this says

7        "proposes to avoid the problem of false positives"

8        and then it gets cut off.

9                    But what the EPA says is that they

10       disagree with Monsanto's position, right?

11       A.        Uh-huh.

12       Q.        Then it says that the two --

13                    "The two assumptions needed to

14       support the Monsanto argument are themselves in

15       need of support."

16                    So it doesn't buy anything Monsanto

17       is saying, right?

18       A.        Yeah.  I mean, I wouldn't either.

19       Q.        And then it says:

20                    "False positives results are less

21       likely to occur with rare tumors.

22                    And the tumors in question are rare?

23       A.        I disagree with that, and that's why

24       the second mouse study was so important.  Because

Robert Tarone, Ph.D.

1   in that study, the tumors only occurred in the two

2   lowest doses.

3        Q.      Okay.  So you disagree with the EPA

4   that these are rare?

5        A.      I do.  Exceedingly rare.  That

6   statement is true for tumors that almost never are

7   seen.

8        Q.      And the tumors in question are rare?

9        A.      Yes.

10       Q.      Dr. Tarone disagrees?

11       A.      I do.  Exceedingly rare.  I don't

12   think they're -- and the second study proves it.

13   The one that was not evaluated by IARC.

14       Q.      Okay.  So you disagree with the EPA.

15   All right.

16       A.      Yeah.  That's not the first time, by

17   the way.

18                   MS. WAGSTAFF:  I'm going to

19           mark this one -- did you give me a clean

20           copy? -- as 16.

21                   MR. BRENZA:  Which one are you

22           marking?

23                   MS. WAGSTAFF:  The one I just

24           went over.

**Exhibit E Page 264**

Robert Tarone, Ph.D.

```
 1                    MR. BRENZA:  The EPA?

 2                    MS. WAGSTAFF:  Uh-huh.

 3                    (Document marked for

 4          identification as Tarone Exhibit 16.)

 5                    MR. BRENZA:  As 16?

 6                    MS. WAGSTAFF:  Yeah.

 7                    THE WITNESS:   Just to be

 8          clear, I do agree that for lower tumor

 9          rates, the probability of a false

10          positive is less common.  I just think to

11          call these renal tumors in this strain of

12          mice exceedingly rare is wrong, as the

13          second study showed.

14    BY MS. WAGSTAFF:

15          Q.      Okay.

16          A.      Make sure I send this.

17          Q.      All right.  And then you'll see that

18    on March 4th -- and if you want to give them 54.

19                    On March 4, 1985.  You see this

20    date?

21          A.      Yes.

22          Q.      It says that:

23                    "On February 11, 1985, a group of

24    Toxicology Branch personnel met to evaluate and
```

Robert Tarone, Ph.D.

1   discuss the database on Glyphosate, and in

2   particular" they discussed "the potential

3   oncogenic response of Glyphosate."

4                   Right?

5                   So, in particular, they were looking

6   at if glyphosate can have a cancer response,

7   right?

8        A.      Correct.

9        Q.      Okay.  Oncogenic means cancer?

10       A.      Yep.

11       Q.      Okay.

12                   MR. BRENZA:  Do you have one

13        for us?

14                   MS. WAGSTAFF:  Yeah.

15                   Kevin, 54.

16   BY MS. WAGSTAFF:

17       Q.      And the results of this meeting was

18   that:

19                   "In accordance with EPA proposed

20   guidelines, the panel has classified Glyphosate as

21   a Category C oncogen."

22                   So in 1985, it was categorized as an

23   agent that can cause cancer; is that right?

24                   MR. BRENZA:  Object to form.

Robert Tarone, Ph.D.

```
 1                    THE WITNESS:   That's what

 2         they say.

 3                    MR. BRENZA:  Calls for

 4         speculation.

 5                    THE WITNESS:   I don't know

 6         what they mean by "Category C," but

 7         they're saying that.  You read it exactly

 8         accurately.

 9                    MS. WAGSTAFF:  Okay.  I'm

10         going to mark this as Exhibit 17.

11                    (Document marked for

12         identification as Tarone Exhibit 17.)

13    BY MS. WAGSTAFF:

14         Q.      And that was on March 4, 1985,

15    right?

16         A.      I didn't see a basis for that.  I'm

17    just curious.  Did I miss something?  You think it

18    was just on the basis of the renal tumors?

19         Q.      That's what it says.

20         A.      Oh, I didn't see renal tumor.

21    That's what I'm asking.  I might have missed it.

22    Which one is this?  March 4th.

23         Q.      I'm looking back right here.

24         A.      Oh, I didn't see that table.
```

Robert Tarone, Ph.D.

1          Q.      I didn't show it to you but it

2    was --

3          A.      Oh, okay.  Fine.  Fine.  That's

4    fine.

5                  And they're saying it's rare.  Okay.

6          Q.      "In the chronic mouse study carried

7    out by Biodynamics."

8          A.      Uh-huh.  This is the original study.

9          Q.      Yep.  In males.  Got it?

10         A.      Yeah.

11         Q.      Are we on the same page?

12         A.      Yeah, and that's the only thing they

13   mentioned, and then they concluded it was

14   oncogenic.

15         Q.      Uh-huh.

16         A.      Okay.

17                 MS. WAGSTAFF:  And that's 17.

18                 And then can I have number 52,

19          58, and just get out the 50s.  And then

20          I'm going to 55.  I'm going to -- or not

21          55.  18.  You can give them one.  It's

22          55.

23                 (Document marked for

24          identification as Tarone Exhibit 18.)

Robert Tarone, Ph.D.

```
 1   BY MS. WAGSTAFF:

 2        Q.      This is a Monsanto document, right?

 3                Am I right?

 4        A.      Yep.

 5        Q.      All right.  And it is a meeting

 6   between the OPP Toxicology Branch.

 7                Do you know -- do you understand

 8   that to be part of the EPA?

 9        A.      No, I don't know about their

10   different branches, but it must be.  It's right

11   there.

12        Q.      Okay.  Office of?  What does OPP

13   stand for?

14        A.      I have no idea.

15        Q.      Okay.  You've never visited OPP?

16        A.      But it's clearly an office in the

17   EPA.  (Laugh).

18        Q.      Okay.  And it says that the meeting

19   was relaxed.

20                "The meeting mood was relaxed,

21   informal and open.  The Toxicology Branch had

22   decided on a course of action on February 11,"

23   which we had just read about, right?

24                In the previous e-mail -- in the
```

**Exhibit E Page 269**

Robert Tarone, Ph.D.

1    previous letter says on February 11th a group of

2    personnel met, right?

3         A.      Uh-huh.

4         Q.      So this is sort of a followup to

5    that meeting where they had decided to make it a

6    Category C.

7                 Are you -- are you following me?

8         A.      Yes.

9         Q.      Okay.  And it -- it notes and if you

10   need to take -- any document I give you if you

11   need to take time to read, Dr. Tarone.

12        A.      That's fine.

13        Q.      And it talked about concerns of the

14   Toxicology Branch.

15                And it says that the meeting was

16   opened by "reciting the conclusions of the

17   Toxicology Branch" and the conclusion we just

18   talked about was that "Oncogenic in mouse, IARC

19   ranking 'C'?"

20                Do you see that?

21        A.      I do.

22        Q.      Okay.  Is this you?

23        A.      Must be.

24        Q.      Okay.  "Statistically significant at

Robert Tarone, Ph.D.

1    .05 level."

2                Do you understand you were -- were

3    you at NTP at that point?

4        A.      Never.

5        Q.      Okay.  So maybe it's not you.

6        A.      Well, it says "Tyrone."  So I don't

7    know.

8        Q.      Maybe.  If you weren't at NTP, maybe

9    it's not.  I was just --

10       A.      Well, just a second.  Where's my CV?

11       Q.      And this is in 19 --

12       A.      1979 paper.

13       Q.      No.  '85?

14       A.      No, no.  The paper, though, that

15   they're citing says 1979.  I can't imagine what

16   they're citing, but let me look.

17               1979.  1979.  1979.  Okay.  Here

18   starts that.

19               Yeah, I don't know.  There's no

20   paper where I'm the first author in 1979.

21       Q.      Okay.  So a different Tarone.

22       A.      I have no idea what they're

23   referring to.

24       Q.      A different Tarone.  That's it.  I

Robert Tarone, Ph.D.

1    just -- I just had a question about it.

2              But it says that "Dr. Farber

3    indicated that."

4              So at this point the EPA has decided

5    that glyphosate is an oncogen based on the

6    Knezevich and Hogan study, right?

7                   MR. BRENZA:  Object to form.

8         Calls for speculation.

9    BY MS. WAGSTAFF:

10        Q.     Do we need to go back to the -- to

11   the previous letter so you can see that?

12        A.     No, I actually found the citation.

13   I don't know why it's being cited here.

14              The paper is number -- 957 -- 22.

15        Q.     On your bibliography?

16        A.     Yeah.

17        Q.     Okay.

18        A.     So this was a paper that I was the

19   third author.  Gart, Chu, and Tarone.  It did deal

20   with "Statistical issues in the interpretation of

21   chronic bioassay tests," but I don't know why it

22   would be cited here.

23        Q.     So someone at Monsanto during this

24   Knezevich and Hogan thing is citing your paper?

Robert Tarone, Ph.D.

1        A.        Did that come from them or did this

2   come from EPA?  I don't know.

3        Q.        Okay.  These documents were produced

4   by Monsanto.

5        A.        Well, I don't know who wrote those

6   in, though.

7        Q.        Confidential.

8                  Okay.  So I'm not asking you who

9   write that but someone --

10       A.        No.  Those are written in in ink.

11  That could have been somebody.

12       Q.        Somebody wrote in your name.

13       A.        Someone wrote it in.

14       Q.        Okay.  So Dr. Farber indicated -- so

15  at this point in time --

16                 Just to orient you and to orient the

17  jury, at this point in time, the EPA had analyzed

18  the Knezevich and Hogan study and found that --

19  that glyphosate was a Category C oncogen?

20       A.        I don't think --

21                 MR. BRENZA:  Objection to

22        form.  Speculation.

23                 THE WITNESS:   I don't think

24        this.  The early study is not Knezevich

Robert Tarone, Ph.D.

1          and Hogan.

2     BY MS. WAGSTAFF:

3          Q.     Okay.  Then this --

4          A.     It's the laboratory.

5          Q.     Okay.

6          A.     I don't know.  The laboratory.  They

7     did the study.

8          Q.     Okay.  But they had found at this

9     point in time there was a Category C

10    determination, right?

11         A.     Yeah, whatever that means.

12         Q.     Okay.

13         A.     They classify it that does.

14         Q.     Okay.  And it says Dr. Farber -- and

15    this is a Monsanto memo discussing a meeting with

16    the EPA after that determination.

17                It says:

18                "Dr. Farber indicated that a

19    substantial re-look at tissues may cause the EPA

20    pathologist to change his position.  If no

21    carcinomas are found the second time, our

22    arguments about 'only benign' tumors would be

23    stronger.  I read this to mean that the EPA

24    pathologist" -- I guess that name is Kasza -- is

Robert Tarone, Ph.D.

1    "open to persuasion."

2              Do you read that?

3         A.       Yeah.

4         Q.       So Monsanto is suggesting that they

5    re-look at it, right?

6                   MR. BRENZA:  Calls for

7         speculation.  Foundation.

8    BY MS. WAGSTAFF:

9         Q.       Then it talks about:

10              "FJ asked about Tyrone's report from

11   NTP."

12              Which we just realized is actually

13   your report, right?

14        A.       And it's not from NTP.  So I don't

15   know what the hell is going on here.

16        Q.       Okay.  But the cite, they're talking

17   about your paper?

18        A.       Yeah.  They seem to be, yeah.

19        Q.       Okay.  So back in 1985, Monsanto is

20   already looking to you and it says:

21              "FJ asked about Tyrone's report from

22   NTP."

23              Which you just found on your

24   bibliography.

Robert Tarone, Ph.D.

1                    And it says:

2                    "The question of using .05%

3    statistical confidence with zero in the controls

4    can be pursued."

5                    So whatever you had written in your

6    paper, they were going to pursue that, right?

7    That looks like?

8         A.        Apparently.

9                        MR. BRENZA:  Calls for

10          speculation.

11                      THE WITNESS:   Apparently.

12   BY MS. WAGSTAFF:

13        Q.        Okay.

14        A.        But Monsanto -- obviously I was at

15   NCI.

16        Q.        Okay.

17        A.        There's no association.  And why

18   they cited it here, I'm really not quite certain.

19        Q.        Okay.  Well, neither am I, but they

20   did.

21                    So, and then in the next page, we're

22   talking about this looks like comments at that,

23   you know, and it says that:

24                    "FJ asked, 'Short of a new study or

1    finding tumors in the control groups, what can we

2    do to get this thing off group 'C'?'"

3                Do you see that?  It's highlighted.

4        A.      Yep.

5        Q.      Okay.  So FJ, who I take to mean

6    Fred Johannsen, who is a Monsanto employee, was

7    asking the group at the meeting:  How can we get

8    this off Category C "short of a new study or

9    finding tumors in the control group," right?

10       A.      Uh-huh.

11       Q.      And later they find tumors in the

12   control group, don't they?

13       A.      They did or EPA?  I don't think

14   Monsanto did the pathology.

15       Q.      Well, let's look at this.

16               The person who found it was Dr.

17   Kuschner, right?

18       A.      I don't know.

19               MS. WAGSTAFF:  All right.  It

20          will be a miracle if I don't get these

21          really mixed up.

22               Can you give them 57 and 58?

23               Okay.  So here we go and this

24          is going to be Number 19.

Robert Tarone, Ph.D.

```
 1                  (Document marked for

 2          identification as Tarone Exhibit 19.)

 3   BY MS. WAGSTAFF:

 4       Q.      So this is about -- this is in the

 5   time frame.  Now we're to April 3, 1985.

 6               Do you see that?

 7       A.      Yes.

 8       Q.      Okay.  And this is a Monsanto

 9   document, right?

10       A.      Uh-huh.

11       Q.      And the meeting that classified --

12   the meeting where the determination was made by

13   the Category C was on February 11th of that year,

14   right?

15       A.      I'll take your word for it.

16       Q.      No, don't take my word for it.

17       A.      I haven't been following all of it.

18       Q.      Okay.  Here just -- here, I'll put

19   it up on the screen.

20               On February 11, a group of

21   Toxicology Branch personnel met.

22       A.      Okay.

23       Q.      Okay?  So February 11th?

24       A.      Okay.
```

**Exhibit E Page 278**

Robert Tarone, Ph.D.

```
 1          Q.      Right before Valentine's Day.

 2                  And this is the same year.  So here

 3    we are about six weeks later.  Seven weeks later,

 4    right?

 5          A.      Uh-huh.

 6          Q.      And we are just after -- and we are

 7    about six weeks after the one we just looked at,

 8    the document we just looked at where Monsanto is

 9    citing your paper and where Monsanto is saying.

10                  "Short of a new study or finding

11    tumors in the control group."

12                  You see that?

13          A.      Uh-huh.

14          Q.      About six weeks later.

15                  Okay.  So now here we are April 3rd,

16    and it says:

17                  "Senior management at EPA is

18    reviewing a proposal to classify glyphosate as a

19    Category C possible human carcinogen."

20                  So now we know what Category C

21    means, right?

22          A.      Possible.  Okay.

23          Q.      Because of kidney adenomas in male

24    mice, right?
```

**Exhibit E Page 279**

1           A.       Yeah.

2           Q.       This is tracking with what we just

3     saw.

4                    "Dr. Marvin Kuschner will review

5     kidney sections and present his evaluation of them

6     to EPA in an effort to persuade the agency that

7     that the observed tumors are not related to

8     glyphosate."

9                    Right?

10          A.       What it says.

11          Q.       All right.  So Dr. Marvin Kuschner,

12    right?

13                   And so to -- to know this for,

14    Dr. Marvin -- first of all, do you know anything

15    about Marvin Kuschner?

16          A.       No.

17          Q.       Okay.  For Dr. Marvin Kuschner --

18    for Monsanto to know that Dr. Marvin Kuschner is

19    going to persuade the agency in their favor,

20    right, that the observed tumors are not related to

21    glyphosate, wouldn't you think that Dr. Kuschner

22    has already reported the findings to Monsanto?

23                        MR. BRENZA:  Calls for

24          speculation.

Robert Tarone, Ph.D.

```
 1                    THE WITNESS:   That's

 2        definitely speculation.   I have no idea.

 3   BY MS. WAGSTAFF:

 4        Q.     Okay.  So -- do -- is it?

 5        A.     Where -- by the way, where is

 6   Kuschner?

 7        Q.     We'll get to that in a minute.

 8        A.     No, no.  I'm just curious because it

 9   makes a difference.

10        Q.     Where in the country?

11        A.     In Monsanto?  Was he a Monsanto

12   employee?

13        Q.     No.  He's an independent person.

14        A.     Okay.

15        Q.     All right.  So Dr. -- or George

16   Levinskas.

17        A.     Yeah.

18        Q.     Levinskas.

19               How would you pronounce that last

20   name?

21        A.     Levinskas.

22        Q.     Levinskas.

23               George Levinskas is telling T.F.

24   Evans that Marvin Kuschner is going to review the
```

Robert Tarone, Ph.D.

1   kidney sections, present his evaluation, and

2   persuade the agency that the observed tumors are

3   not related to glyphosate.

4            And that would be a pretty bold

5   statement if --

6        A.      Well, I don't know.  It's not worded

7   the way a scientist should word it.  You're

8   absolutely right about that.

9        Q.      I mean, what if the results actually

10  showed an oncogenic effect?  I mean, how -- how

11  can Monsanto already know what --

12       A.      Well, it is interesting if, you

13  know, I think you're implying that this guy was

14  biased in favor of Monsanto.

15       Q.      Okay.  Well, let's just --

16       A.      But he also found upgraded three

17  tumors to car- -- to malignant tumors and they

18  were in the -- two in the highest and one in the

19  -- in the, you know, second highest.  So --

20       Q.      Well --

21       A.      -- that's not consistent.  But no,

22  this, I don't like the wording.  A scientist

23  shouldn't use that wording.

24       Q.      What I'm suggesting is, this was on

**Exhibit E Page 282**

1    April 3rd.

2         A.      Yeah.

3         Q.      They already know that Dr. Kuschner

4    is going to persuade the agency that the observed

5    tumors are not related to glyphosate.

6         A.      No.  He's going to attempt to

7    persuade them, yes.

8         Q.      Yes.  I don't -- where do you see

9    "attempt"?

10        A.      "In an effort."  An effort is an

11   attempt.  It's not that he's going to persuade

12   them.

13        Q.      Okay.  Yeah, but, I mean, he's --

14   he's not going to review his data and decide if he

15   should try to persuade them or not.  He's going to

16   persuade -- try to persuade the EPA.

17        A.      Going try to persuade, yeah.

18        Q.      Okay.

19        A.      Like I said, it's very poor --

20        Q.      Before he even --

21        A.      -- wording for a scientist.

22        Q.      This is a letter the same day from

23   Biodynamics, which is the one we learned already

24   did the study, right?

Robert Tarone, Ph.D.

1          A.        (Nods head).

2          Q.        This is a letter the same day to

3     Dr. Kuschner, same Dr. Kuschner.

4                    "The enclosed shipment is being sent

5     to you at the request of Tim Long of Monsanto."

6                    So Monsanto is sending the slides to

7     him to redo the analyses.

8                    "It contains slides of kidney

9     sections from all animals on the referenced

10    study."

11                   You see that?

12         A.        Yeah.

13         Q.        And Dr. Kuschner signs for it,

14    receipt nine days later, 11 days later.

15                   So at the time that Monsanto is

16    internally telling people that Dr. Kuschner is

17    going to go persuade the EPA that they're

18    unrelated, Dr. Kuschner hadn't even received the

19    slides yet.

20                   I mean, you believe in conspiracies,

21    don't you?

22                        MR. BRENZA:  Calls for

23         speculation.

24                        THE WITNESS:  No, I try not

Robert Tarone, Ph.D.

1         to, actually.

2    BY MS. WAGSTAFF:

3         Q.       You don't believe in conspiracies.

4    Okay.

5                      MR. BRENZA:  Calls for

6          speculation.

7                      THE WITNESS:   So this guy I

8          think -- you're saying this guy was

9          actually a pathologist, it appears, at

10         the laboratory that did the original

11         study.  So he --

12   BY MS. WAGSTAFF:

13        Q.       No.  The original study was --

14        A.       I thought you said it was

15   Biodynamics.

16        Q.       Biodynamics is sending them.

17        A.       No, no, no.  But the original study

18   I thought you said.

19        Q.       Yeah.  Was sending this to

20   Dr. Kuschner.  I'm not sure where Dr. Kuschner

21   worked.  They were sending these.

22                 Dr. Kuschner was a pathologist and

23   they were sending them to Dr. Kuschner, who

24   received the slides on April 14th, which is 11

Robert Tarone, Ph.D.

1    days after Monsanto had declared that he was going

2    to take his results and persuade the agency.

3                     And you understand that

4    Dr. Kuschner, in fact, did find the tumor in the

5    control group?

6         A.        But, again, I don't -- I don't see

7    what the timing means.  The fact that they said he

8    was going to try to do it and when he gets the

9    slides, it's going to be later.  So I don't know.

10        Q.        Well, why would it be later?

11                  You would think that Monsanto --

12        A.        Well, you were just saying -- you

13   were just assuming that he had already knew what

14   the results were going to be.

15        Q.        Well, sure, because --

16        A.        How could he do that if they were

17   sent 14 days later?  11 days later?

18        Q.        That's what I'm saying.

19                  George Levinskas is assuming, it's a

20   predetermined -- it's a -- it's predetermined that

21   he is going to use his F -- his findings to

22   persuade the agency.

23        A.        He's going to attempt to.

24        Q.        Okay.  Well, if he -- if he finds

Robert Tarone, Ph.D.

1    nothing in the control group, how can he persuade

2    it?  It was sort of a, you know, foregone

3    conclusion that he was going to find a tumor in

4    the control group.

5         A.     That's an assumption.  I'm not sure

6    that's true.

7         Q.     All right.  Does that cast any doubt

8    at all?

9         A.     Well, yeah, as I told you, just --

10   just the phrasing of that sentence --

11        Q.     Okay.

12        A.     -- casts some doubt.

13        Q.     Okay.

14        A.     A scientist doesn't talk that way.

15        Q.     All right.  So let's go back to --

16   let's go back to the IARC chart.

17               So those results that -- let's talk

18   about this first test that's in this first study

19   that's in gray.  Okay?  Compared to the second

20   study that's in white.  Okay?

21               Is this second study the George

22   study?  Or no?

23               No, that's the third study.

24               So the study on the following page

Robert Tarone, Ph.D.

```
1    IARC did not consider, right?

2        A.      That's correct.

3        Q.      Okay.  So IARC considered just these

4    two.

5                So you would agree with me that the

6    dose of 0, 100, 300, 1000 is a lot less than the

7    dose of the first group?

8        A.      It is.

9        Q.      Okay.  In fact, the highest dose in

10   study 2 is equal to the lowest dose --

11       A.      Yeah.  No, it's still very high --

12       Q.      -- in study 1?

13       A.      -- for a rodent study.

14       Q.      But you would agree with me that,

15   right?

16       A.      Oh, absolutely.  It was higher in

17   the first study.  That's very important.

18       Q.      And you would agree with me that

19   these studies are done at different laboratories?

20       A.      Yes.

21       Q.      These studies are done at different

22   times?

23       A.      Yes.

24       Q.      These studies are done with
```

Robert Tarone, Ph.D.

1  different strains of CD mice -- CD-1 mice?

2  Different sources?

3       A.      Different sources maybe.  They're

4  the same strain.

5       Q.      Okay.  And you would agree with me

6  that these studies have much different doses?

7       A.      Yeah, they're lower doses.

8       Q.      Okay.  And what other differences in

9  the protocol of the studies do you see?

10      A.      I don't know.

11      Q.      Well, is one 24 month and one 104

12 weeks?

13      A.      They're both two years, right?

14      Q.      Is that what 104 weeks is?

15              Yeah, it is.  52 plus 52.

16              Well, one --

17      A.      Yeah, they're both --

18      Q.      One is described in weeks and one is

19 described in years.  (Laugh).

20      A.      They're both two-year studies.  As I

21 say in my papers, they're both two-year studies

22 with same strain of mice.

23      Q.      Okay.  Different sources, different

24 doses, different locations, different

**Exhibit E Page 289**

Robert Tarone, Ph.D.

1    laboratories, different years.

2              What else is different about these?

3        A.    Both have 50 animals per group.

4              The second one doesn't report renal

5    tumors, which is just unbelievable given what the

6    first study found.

7        Q.    Okay.  So you would agree with me

8    that just based on those differences that I cited,

9    these are not -- study 2 is not a replicant study

10   of study 1?

11       A.    No.  It's as close as you get

12   basically in rodent studies.  They're both diet

13   studies.  They're both two years.  Same strain of

14   mice.  No two studies are ever identical.

15       Q.    But it would -- using definitions

16   that you have cited before, this would not be --

17   just on the dose alone, this would not be a

18   replicant study?

19       A.    Actually, in terms -- it would be a

20   replicant study just with different doses.  It's

21   actually very important in interpreting

22   hemangiosarcomas, quite frankly, more so than the

23   kidney.

24       Q.    All right.  So --

Robert Tarone, Ph.D.

1        A.        And -- and what's more important is

2   the kidney tumors they found in this study, which

3   was at lower doses, were all found in the control

4   group and the lowest dose group.  And that lowest

5   dose group was so low, given how high you can give

6   glyphosate, it was basically like two control

7   groups.

8        Q.        Well --

9        A.        So all the tumors were in the low

10  doses.

11       Q.        Right.  And so let's -- let's focus

12  now, though.

13                 You're telling me that this --

14  you're telling me that despite this being 5 --

15  one-fifth of the dose, a different source of the

16  mouse, a different time, a different laboratory,

17  different conditions, that your opinion based on

18  your -- your opinion outside of the litigation

19  that you're involved in right now is that this is

20  a replicant study?

21       A.        This is a replicant study with

22  different doses.

23       Q.        Okay.  And so focusing on the first

24  study, this is a positive finding, right?

**Exhibit E Page 291**

Robert Tarone, Ph.D.

1        A.       Uh-huh.

2        Q.       So we can call it a positive

3   finding, right?

4        A.       Again, preliminary.

5        Q.       And this is a positive -- is there

6   positive finding in here?

7        A.       Well, not if you use point -- not if

8   you use the exact P-values.

9        Q.       Okay.  Well, again, there's -- so

10  you just --

11       A.       The Working Group concluded that was

12  a positive study.

13       Q.       So there's a positive finding,

14  right?

15       A.       Uh-huh.

16       Q.       So there's two positive findings in

17  this first group, right?

18       A.       One.  I mean, you can't count -- oh,

19  you mean in terms of the -- yeah, in terms of both

20  the carcinoma and adenoma and carcinoma combined.

21       Q.       Uh-huh.  So there's -- okay.  Two

22  positive findings.

23       A.       And I got to say, the fact that -- I

24  was unaware of this possible background stuff with

1    the pathologist, but the fact that he found -- he

2    upgraded the diagnosis in the highest dose group

3    and second highest dose group definitely does not

4    suggest that he was doing something to bias it.

5        Q.      Okay.  All right.  And then there is

6    no requirement that when you have male tumor data

7    that you look at the female tumor dater -- data?

8        A.      There is a requirement that you look

9    at it.  I'm sorry.  Absolutely.  They should

10   have --

11       Q.      Okay.  Did they cite it different --

12       A.      They should have -- they should have

13   demanded because that's the only thing in some --

14   in some studies.  In fact, most of the studies I

15   was involved in, which is probably why I'm a

16   little bit sensitive to it.  At NCI, it was

17   basically almost always the first time that a

18   particular agent had ever been looked at.

19              So when you saw a finding like this,

20   the only replication -- the only replication you

21   could look for was in the female.  The fact that

22   they just said, oh, the female data wasn't

23   provided, I mean, it just --

24       Q.      Well --

Robert Tarone, Ph.D.

1       A.       It blows me away.

2       Q.       You just told me.  We just

3   established earlier that the female and male are

4   two -- two independent studies.  Okay?

5       A.       They are.  And if you have --

6       Q.       Okay.  Hang on.

7       A.       If you have a real carcinogen,

8   therefore, you should see increases in both.

9   They're independent, but they're replicants.  I

10  mean, they're really replicants because they use

11  the same dose.

12      Q.       So they're two independent studies?

13      A.       Correct.

14      Q.       And there is no requirement in

15  IARC --

16      A.       No.

17      Q.       -- that you have to consider the

18  female or the male counterpart, right?  We can

19  agree on that?

20      A.       Not at all.

21      Q.       Okay.  And can you cite to me any

22  reference -- this is one of your main criticisms.

23  So I would think that you would have this at the

24  tip of your tongue.

Robert Tarone, Ph.D.

1                    Can you cite to me any reference at

2    all -- because I haven't seen it in any of your

3    papers -- that requires that even says it's a

4    scientifically sound method that if you look at

5    the male, you have to look at the female?

6         A.      Yeah.  I mean, that's just science.

7    I'm sorry.

8         Q.      Can you cite anything to me?

9         A.      No one should even need a citation

10   for that.

11        Q.      Well --

12        A.      That's -- that's basic science.

13        Q.      There's a lot of scientists that

14   don't agree with you.

15                So your --

16        A.      Oh, you mean you got a lot of

17   scientists that say if you have a carcinogen, that

18   it shouldn't affect both sexes?

19        Q.      People have said that.

20        A.      (Laugh).

21        Q.      So you have nothing to cite to me

22   that says that it is more of a carcinogen because

23   it affects both sexes.  You have nothing to cite

24   to me?

**Exhibit E Page 295**

Robert Tarone, Ph.D.

1       A.      No.  I would say that's -- that's

2   why you look at both sexes.  There is -- there is

3   greater evidence if you see it in both sexes.

4   That's why it blows my mind --

5       Q.      Well --

6       A.      -- that they didn't mind that they

7   weren't even given the female data.

8       Q.      Well, there's greater evidence

9   because there's two independent studies.

10          But I'm asking you:  This has been

11  something that you have -- that you have blasted

12  around the country, around the world.  This is

13  your big gripe, and you have not one paper or

14  anything to cite to it?

15      A.      By the way, that -- that was not --

16  I do object to that, but that was not a key point

17  in my decision.  That -- that was the first red

18  flag and so obvious that no one has bothered to

19  cite it.

20      Q.      Okay.

21      A.      If you see a result in the males

22  with a -- with a certain chemical and you don't

23  look at the females to see if you also see it

24  there, then that's just not good science period.

Robert Tarone, Ph.D.

```
 1          Q.      Okay.

 2          A.      Anybody would know that.

 3          Q.      So it's not a requirement of IARC

 4   that you look at the counterpart.  We've agreed

 5   with that.

 6                  And you can't cite to me one --

 7          A.      It's not a requirement, and as I

 8   said, it doesn't play any role in my -- what my --

 9          Q.      Okay.

10          A.      -- eventual because when I finally

11   found the data, there were no kidney tumors --

12          Q.      Okay.

13          A.      -- in either study --

14          Q.      So --

15          A.      -- in females.

16          Q.      I understand that.

17                  But you are -- you are claiming

18   that -- that you have made claims that the IARC

19   panelists somehow were acting inappropriate

20   because they didn't look at the opposite -- at the

21   female data.

22                  And I'm telling I'm asking you

23   because this is the only --

24          A.      It's not --
```

Robert Tarone, Ph.D.

1          Q.       Hang on.  Can I finish my question,

2     please?

3                   I'm asking you because this is the

4     only time I get to talk to you about this.

5                   We've agreed that there's no

6     recommendation -- that there's no requirement that

7     in IARC that if you look at female, you have to

8     look at male and if you look at male.  We've

9     agreed there's no requirement on that.

10                  I'm asking you --

11         A.       Oh, I don't --

12         Q.       Do you want to look through the

13     entire Preamble and let me know?  Because I have.

14         A.       You don't put down -- you don't --

15     you don't put into print things that are obvious.

16         Q.       Okay.  So you're --

17         A.       It's obvious that if you see an

18     effect in either the male or female in a study

19     with a certain chemical agent, that you're going

20     to look at the other sex to see if that's

21     replicated.  You're going to look at it because if

22     it is replicated, voila, that's stronger evidence.

23                  And the fact that they could say,

24     oh, it wasn't provided to us, I mean, I just

Robert Tarone, Ph.D.

```
 1   pointed that out because that the was the first
 2   red flag.  Man, this is not right.
 3        Q.      All right.  So just so I understand
 4   this.
 5                Your only response to me is, it's so
 6   obviously no one has written it down?
 7        A.      Basically, yes.
 8        Q.      Okay.  All right.  Now, let's talk
 9   more next about this second study, right?  This
10   one in the white.
11        A.      Yep.
12        Q.      You have agreed that this is a --
13   this hemangiosarcoma, right?  0004.
14        A.      Uh-huh.
15        Q.      You agree that that is a positive
16   finding?
17        A.      Yeah, it's definitely a positive
18   finding.  And in all the mouse and rat studies
19   that they looked at, it's the only positive
20   finding for glyphosate in a malignant tumor.
21        Q.      Okay.  Positive finding.
22                And that's a significant finding,
23   right?
24        A.      Oh, yes.
```

Robert Tarone, Ph.D.

1          Q.       Okay.  So in the mice, there have

2     been three positive findings, right?

3          A.       Well, as -- as IARC has said.

4          Q.       Even without looking at the female

5     data --

6          A.       Not -- not in here.  NO.

7          Q.       -- there's three positive findings?

8          A.       I do not consider the male renal

9     cell tumors to be a positive finding.

10          Q.       Okay.  But even without looking at

11     the female data, which is not required, there are

12     three positive findings reported?

13          A.       Reported.

14          Q.       Okay.

15          A.       And -- well, let me say something

16     before you leave for the hemangiosarcomas.

17     Because as I pointed out and you just pointed out,

18     if there's an effect in this study, it's at the

19     highest dose, which says that it's a possibility

20     that there may be a few male mice that have a

21     propensity to develop these hemangiosarcomas if

22     they're exposed to very high levels.

23                    And as you pointed out, by far the

24     highest level was in the previous study, and there

Robert Tarone, Ph.D.

1   were no hemangiosarcoma in that highest dose

2   group.

3        Q.      Well, I mean, there's -- there's

4   reasons for that.

5        A.      That can't be, And they ignored it.

6        Q.      There's reasons for that.

7        A.      Now, I don't know mind if they had

8   reported it and said, well, we put these two

9   together and still conclude.  I mean, but they

10  didn't even do that.  The fact --

11       Q.      But that's not what you do.

12       A.      -- that they ignore data.

13       Q.      You don't -- you don't -- you don't

14  combine data.

15       A.      Yes, you do.

16       Q.      You don't combine data.

17       A.      Well, yes, you do.

18       Q.      Where does it say that?

19       A.      You have to.

20       Q.      Tell me where you take data from

21  different laboratories, different sources,

22  different everything and come out.  Tell me.  Cite

23  to me.

24       A.      It's done all the time.

**Exhibit E Page 301**

Robert Tarone, Ph.D.

1        Q.      Let me guess.

2        A.      Chris Portier does.

3        Q.      It's so obvious, no one writes it

4    down?

5        A.      No, it's done all the time.

6        Q.      Okay.

7        A.      You got the same strain of mice.  In

8    fact, Chris did it for all strains of mice,

9    combining them all.  But definitely when you got

10   the same.

11       Q.      Chris isn't in this case right now.

12       A.      What?

13       Q.      Chris is not an expert in this case

14   right now.  Chris is --

15       A.      Well, but he -- I'm just saying.

16   You're saying that nobody does it and I'm saying

17   that, yes, a lot of people do it.

18       Q.      All right.  So it was a different

19   study and they found -- they found -- they looked

20   at a different site.

21               And your problem is that you think

22   that they should have reported and combined.

23   That's your --

24       A.      They absolutely should have

Robert Tarone, Ph.D.

1   reported.

2          Q.      Okay.

3          A.      And in the renal -- in the renal

4   kidney tumor case, they should have combined.

5          Q.      Okay.  And so you're -- you

6   understand -- and I don't actually think you do

7   because I asked you earlier and you didn't have

8   any appreciation of this, but that Dr. Jameson has

9   testified -- and remember Dr. Jameson was the --

10         A.      I don't know who Dr. Jameson.  I

11  don't.

12         Q.      You don't know who he is?

13         A.      No.  I just --

14                 MR. BRENZA:  He's one of the

15          plaintiffs' litigation experts.

16                 THE WITNESS:   First time I

17          saw his name was in the --

18                 MS. WAGSTAFF:  Move to strike.

19          Doctor -- you're not testifying.

20                 MR. BRENZA:  Yeah.  I'm

21          just -- he didn't know.

22                 MS. WAGSTAFF:  I know, but

23          you're not testifying.

24                 MR. BRENZA:  Yeah, I'm not.

Robert Tarone, Ph.D.

```
 1                    MS. WAGSTAFF:  If he doesn't
 2          know who he is, he doesn't know who he
 3          is.
 4                    MR. BRENZA:  You're misleading
 5          the witness.
 6                    MS. WAGSTAFF:  Dr. Jameson
 7          is --
 8                    MR. BRENZA:  You're making out
 9          Dr. Jameson is like some objective source
10          and he's not.
11                    MS. WAGSTAFF:  Okay.
12                    MR. BRENZA:  He's your paid
13          expert.
14                    MS. WAGSTAFF:  Okay.  Move to
15          strike and please, I mean, I can put you
16          under oath if you want.
17    BY MS. WAGSTAFF:
18          Q.      So Dr. Jameson, he was the chair --
19    sub-chair of the animal studies, wasn't he?
20          A.      He was.
21          Q.      Okay.  And he has testified that
22    they did not have access to the supplemental data?
23          A.      If that's the case, then the IARC
24    staff did not do their job.
```

Robert Tarone, Ph.D.

```
1        Q.       Okay.  He has testified that they
2   tried to download the information.  He's testified
3   in deposition that they tried to download the
4   information, just like you originally tried to
5   download the information and weren't able to, and
6   that they were not able to.
7                And that they found that the
8   information here was more than enough to put it in
9   sufficient, anyway.
10       A.       Well, I disagree with that.
11       Q.       Okay.
12       A.       And I would also say that whether
13  they had it or not, they became aware of it when I
14  published my papers.  And they -- the fact that
15  they have ignored it -- and I would have been fine
16  if they said, yeah, okay, but here's -- here's how
17  we evaluate this.  And that's what I suggested in
18  my first paper.  They should revise it.
19       Q.       So you just want --
20       A.       And they would not even revise it.
21  They should have reported.  They should have
22  acknowledged, yeah, we left out some data.  In
23  fact, for the renal tumor, the significant -- the
24  P-value for the decrease in the second was smaller
```

Robert Tarone, Ph.D.

1    than the P-value for the increase in the first.

2         Q.     Yeah.

3         A.     So, I mean, the fact that they

4    should have acknowledged it and they could have

5    said, well, we still stand by our result because

6    of A, B, and C.  That's what I would have

7    expected.

8         Q.     Yeah.

9         A.     Quite frankly.

10        Q.     Now we're just back to people

11   ignoring you.

12        A.     No.  That's -- it's how you do

13   science.  The fact that they -- the fact that they

14   know that they excluded data and don't go back and

15   revise their assessment, I mean, it just blows my

16   mind.  It's not I'm ignored or not, it's just bad

17   science.

18        Q.     Well, not only have they not gone

19   back and revised, they don't agree with your

20   analyses.

21                  MR. BRENZA:  Assumes matters

22        not in evidence.

23                  THE WITNESS:  Where is that?

24        I haven't seen that.  Why haven't they --

Robert Tarone, Ph.D.

```
 1            why haven't they submitted a paper then

 2            to the journal where I published and

 3            pointed out what's wrong with my

 4            analysis?

 5  BY MS. WAGSTAFF:

 6       Q.      Do you think they just don't take

 7  you seriously?

 8       A.      I think that they're wrong if they

 9  don't like -- if they object to my analysis.  What

10  do they object to in my analysis?

11       Q.      I don't know.  I haven't talked to

12  IARC.

13            I'm just wondering.  Do you think

14  they don't take you seriously?

15       A.      No, you said IARC.  He didn't say

16  IARC.  I thought you said Jameson.

17       Q.      Do you think --

18       A.      You said Jameson disagreed with my

19  analysis.

20       Q.      I don't think I said that, but if I

21  did, I'm just wondering.  You've said they should

22  report.

23            So I'm wondering:  Do you think that

24  the IARC takes you seriously?
```

Robert Tarone, Ph.D.

1        A.        Obviously not.

2        Q.        Okay.

3        A.        Or at least they found out that if

4    they ignore me, it works for them.

5        Q.        Okay.  And then this study was a

6    third --

7        A.        Yeah.

8        Q.        -- mouse study that we can both

9    agree, at least for purposes of IARC, this was an

10   inadequate study for the evaluation of glyphosate,

11   right?

12       A.        That's what they concluded, but, of

13   course, in the Lancet Oncology paper they included

14   that as providing evidence which --

15       Q.        Okay.  So --

16       A.        And they're supposed to be

17   summarizing this report.

18       Q.        Okay.  So -- so did you look at any

19   of the mice studies?  Have you looked at any mice

20   studies outside of those two studies?

21       A.        Not really.  Not in detail.

22       Q.        Okay.

23       A.        I've seen papers where they're

24   reviewed.

Robert Tarone, Ph.D.

```
 1        Q.      Okay.

 2        A.      But I have not done the analysis

 3   myself.

 4        Q.      All right.  So you are not here to

 5   give any sort of opinion on whether or not

 6   glyphosate -- the road -- the totality of the

 7   animal studies that aren't included in here prove

 8   that glyphosate can cause tumors, right?

 9        A.      I haven't analyzed it myself.  I

10   think the strongest paper in that regard is the

11   paper that Crump is coauthor on with three -- or

12   three -- first author with three coauthors.

13        Q.      Okay.  But you haven't done it

14   yourself?

15        A.      No, I haven't done the analysis

16   myself.

17        Q.      And you can't give any opinion on

18   that and you're not trying to?

19        A.      I have been restricted.  My focus is

20   on the original IARC with the studies that they

21   relied on and that's -- that's been --

22        Q.      Okay.

23        A.      -- that's been the focus.

24        Q.      And so you're not.  So outside
```

Robert Tarone, Ph.D.

1    studies or if there are more studies, I mean, if

2    there's a chart of studies, you haven't looked at

3    those, right?

4           A.      No.

5           Q.      And you're not in any way opining on

6    them?

7           A.      Actually, I think that that study is

8    the strongest study, and they found essentially

9    the number of significant decreases you'd expect

10   by chance given the number of tests.

11          Q.      Okay.

12          A.      And they also found slightly more

13   decreases in tumor rates with increasing

14   glyphosate level than increases.

15          Q.      Okay.

16          A.      That you would not expect to see if

17   you got a carcinogen.

18          Q.      Okay.  But you're not --

19          A.      I think that's strongest paper, but

20   I haven't -- I haven't done the analysis myself.

21          Q.      You haven't done that yourself.

22   You're not an expert on those cases.

23          A.      Well, I mean, I can read a paper.

24          Q.      Okay.

**Exhibit E Page 310**

Robert Tarone, Ph.D.

1        A.        I would have accepted the paper if I

2   had sent it to review.  It was very well done.

3   The people involved were highly qualified.

4        Q.        Okay.  And then moving on to -- is

5   there any other -- I think I've covered all of

6   your issues with the mice studies?

7        A.        That's it.

8        Q.        Okay.  That's it?

9        A.        Yep.

10        Q.        Okay.  And then if we move on to the

11   rat studies, which is next, right?

12        A.        Uh-huh.

13        Q.        So if you just turn the page to 35.

14   Okay?  It says 3 -- this is still in the IARC

15   panel.  It goes -- turn the page to 35, which is

16   Table 3.2.

17        A.        Uh-huh.

18        Q.        And 3.2 is on page 37, 38, and 39.

19                  And can we take a two-minute break

20   and let the doctor review the tables since he

21   hasn't looked at it in a while?

22        A.        No, I'm fairly familiar with these.

23        Q.        Can we go off the record?

24        A.        I looked at these when I wrote my

Robert Tarone, Ph.D.

1    table.

2         Q.       Yes.  Just off the record for two

3    minutes.

4         A.       That's fine.

5                  THE VIDEOGRAPHER:  The time is

6         2:27 p.m.  We're off the record.

7                  (Recess.)

8                  THE VIDEOGRAPHER:  The time is

9         2:29 p.m.  We're back on the record.

10                 THE WITNESS:  Oh, here they

11        come.  (Laugh).

12   BY MS. WAGSTAFF:

13        Q.       All right.  Doctor, you were just

14   saying something off the record.  If you could

15   repeat yourself on the record?

16        A.       Since we're going to the rat study,

17   I was just saying that in one of the folders,

18   there's a recent Letter to the Editor I submitted

19   to Environmental Health.  It's not going to be

20   published, but it deals with the question

21   involving the rat.

22        Q.       Okay.  Maybe you could find that at

23   the next break for me?

24                 MS. WAGSTAFF:  Or could you

Robert Tarone, Ph.D.

1          hand him his original documents, please?

2                    THE WITNESS:  I can give it to

3          you right now if you give me the folder.

4          Hopefully, they're in the same folders.

5          (Laugh).

6                    Well, I'll probably say it in

7          terms of your questions.

8    BY MS. WAGSTAFF:

9          Q.      Okay.  I just want to orient the

10   jury and you so -- but I'll wait for you to find

11   that document.

12                   MS. WAGSTAFF:  And if you --

13         did you get copies of them?  Well, I'd

14         like to mark a set for the -- okay.  Can

15         you -- can you get -- can you receive

16         like a scanned copy for an exhibit or do

17         you need a hard copy?

18                   THE REPORTER:  Scan is fine.

19                   MS. WAGSTAFF:  Like he has

20         these documents and we have them scanned.

21         Can we e-mail that to you and say like we

22         want to mark that as exhibit whatever?

23                   THE REPORTER:  Yes.

24                   MS. WAGSTAFF:  Instead of

Robert Tarone, Ph.D.

1   printing you out hard copy right now?

2              THE REPORTER:  Yes.

3              MS. WAGSTAFF:  We can?  Okay.

4              THE WITNESS:   You can keep

5   this.

6              MS. WAGSTAFF:  Are you okay

7   with me doing that?

8              THE WITNESS:   You can keep

9   this.

10             MS. WAGSTAFF:  Are you okay

11  with me doing that, Lin?

12             MR. BRENZA:  What are we going

13  to use during the deposition?  I mean.

14             MS. WAGSTAFF:  I mean, I will

15  use particular copies.  I'm just saying

16  like I want to mark what he brought as an

17  exhibit.

18             MR. BRENZA:  That's fine.

19             MS. WAGSTAFF:  Okay.

20             MR. BRENZA:  Yeah.

21             MS. WAGSTAFF:  All right.

22             MR. BRENZA:  I'm just if

23  you're going to use it --

24             MS. WAGSTAFF:  Yeah, yeah.

Robert Tarone, Ph.D.

1           MR. BRENZA:  -- we kind of

2     need to be able to follow along.

3           MS. WAGSTAFF:  We will.  We

4     have copies.  Yeah.  I haven't really

5     looked at them.  So I don't even know

6     what I would use.

7           So I'm going to mark as

8     Exhibit 21 the set of documents that

9     Tarone brought -- Dr. Tarone brought with

10    him in response to the subpoena.

11          (Document marked for

12    identification as Tarone Exhibit 21.)

13          MS. WAGSTAFF:  So you can give

14    those to Lin and then -- and then Kevin

15    will e-mail you a copy of that that you

16    can include with the record.

17          MR. BRENZA:  So you've handed

18    me the copy set?

19          MS. WAGSTAFF:  We've handed

20    you the copy set.

21          MR. BRENZA:  And you want me

22    to give this?

23          MS. WAGSTAFF:  No.

24          MR. BRENZA:  What do you want

Robert Tarone, Ph.D.

1          me to do with it?

2                    MS. WAGSTAFF:  Just keep it.

3          If we use a document, I'll pull it out

4          one by one.  Just keep it.  That's -- you

5          said you wanted a hard copy to take home

6          with you to Denver.

7                    MR. BRENZA:  Yeah, yeah.  How

8          do you have one if this is the only set?

9                    MS. WAGSTAFF:  There's another

10         one being made.  Just keep it.

11                   You're having another one

12         being made, right?  Okay.

13                   So I don't know what you want

14         me to with 21?  Should I just destroy it?

15         Okay.

16  BY MS. WAGSTAFF:

17      Q.      All right.  So you handed me a

18  document, Dr. Tarone, which is you said rejected.

19  It says on the top --

20      A.      Yes.

21      Q.      -- "Rejected without comment by

22  editors of Environmental Health on February 8,

23  2023," which was about a month ago?

24      A.      Yeah.

**Exhibit E Page 316**

Robert Tarone, Ph.D.

1        Q.        "On conducting evaluations of

2    evidence."

3                  Okay.  I haven't had time to review

4    this because it was just handed to me.  So.

5        A.        Yeah.  I just wanted you to know

6    that in that I discuss the rat.

7        Q.        And you said I could have this?

8        A.        You can have it, yeah.

9        Q.        So I'll mark it as 22.

10       A.        I can print another copy.

11                 MS. WAGSTAFF:  Okay.  I'll

12            mark that as 22, which you should have a

13            copy in there at some point.

14                 (Document marked for

15            identification as Tarone Exhibit 22.)

16                 MS. WAGSTAFF:  All right.

17                 MR. BRENZA:  Somewhere.

18                 MS. WAGSTAFF:  Sorry about

19            that.  That was like the one -- the only

20            way that could happen where I didn't.

21   BY MS. WAGSTAFF:

22       Q.        All right.  Now I'm going to walk

23   through with you the rat studies.

24                 So the rat studies start on page 37,

**Exhibit E Page 317**

Robert Tarone, Ph.D.

1    right?  And they go -- there's one on 38, right?

2         A.       Uh-huh.

3         Q.       And then there's one on 39, right?

4         A.       Yep.

5         Q.       Okay.  So let's start on page 37.

6                  So on page 37, there is -- this one

7    says over here:

8                  "The Working Group concluded this

9    was an inadequate study for the evaluation of

10   glyphosate."

11                 Right?

12        A.       Correct.

13        Q.       And this is the Seralini study,

14   right?  If you look to your left?

15        A.       Yeah.

16        Q.       Okay.  And do you know -- what do

17   you know about the Seralini study?

18        A.       Not much.  I just looked at the

19   three studies they relied upon for their

20   determination on pancreatic islet cell adenomas.

21        Q.       All right.

22        A.       So I didn't look at that one.

23        Q.       So --

24        A.       Especially since they didn't rely on

Robert Tarone, Ph.D.

1    it.

2         Q.      Okay.  So you have no opinion on the

3    Seralini study?

4         A.      No, I don't.

5         Q.      Okay.  All right.  So the second

6    study right here, they found no -- no tumors.

7                 The rest -- basically all the

8    studies on this first page were not used in their

9    evaluation, right?

10        A.      Right.

11        Q.      Okay.  So we can just move to the

12   next.

13        A.      Well, they didn't find anything.

14   So, yeah.

15        Q.      Yeah.  So we can just move to the

16   next page?

17        A.      You can.

18        Q.      Okay.

19        A.      But we want to come back to one on

20   that page.

21        Q.      Okay.  We can start.

22                What is it that you want to come

23   back to?

24        A.      Well, the second from the bottom.

Robert Tarone, Ph.D.

1        Q.        Okay.

2        A.        Which is -- which is the same strain

3    of rat that they talk about in the next two

4    tables.

5        Q.        Okay.

6        A.        Sprague-Dawley two-year study.

7        Q.        Uh-huh.  Yep.

8        A.        How many doses?  1, 2, 3, 4.  So

9    it's one of their four-dose studies.

10       Q.        Uh-huh.

11       A.        And they did not report any tumor

12   rates from the study in Monograph 112.

13       Q.        Okay.

14       A.        There was a significant decrease in

15   pancreatic islet cell adenomas with increasing

16   glyphosate reported in this study.

17                 And, interestingly, there -- I don't

18   know why they did this -- the World Health

19   Organization has a small book -- they're small --

20   smaller books than most, but each one evaluates a

21   different chemical and they -- that's where I

22   found the rates for this one, even before I got

23   the -- found the tables from the other study.

24       Q.        So you have a fundamental -- well,

Robert Tarone, Ph.D.

1    let me -- let me strike that.

2            You understand there is no

3    requirement in IARC to report negative data?

4        A.      That's not science.

5        Q.      That -- answer my question.

6                Do you understand that?

7        A.      No, I don't understand it.

8        Q.      Okay.

9        A.      And if that's the case, if they have

10   ever stated that officially, which I don't think

11   they would do because that's not science --

12       Q.      Okay.

13       A.      -- you have to look at both.  I

14   mean, if you only report positive data, then

15   you're going to have a whole lot of false

16   positives.  Because occasionally there are random

17   decreases in tumor rates.  It happens.

18       Q.      So journals, do they produce or do

19   they publish studies that have negative findings?

20       A.      I would hope so.  If they --

21       Q.      They do?

22       A.      They're probably not observed as

23   often as positive findings, but, yeah.

24       Q.      Okay.  So I think that your -- one

Robert Tarone, Ph.D.

```
1    of your -- all right.  Well, we'll just -- I'll

2    strike that.

3               So let's talk about --

4          A.      I just think as a scientist you have

5    to evaluate all relevant data to a certain

6    question.

7               In this case, is there an increase

8    in pancreatic islet cell adenomas in

9    Sprague-Dawley rats with the glyphosate in the

10   feed?  These are exactly the same kind of study.

11         Q.      Okay.

12         A.      The first study was in drinking

13   water, which they found insufficient.

14         Q.      Okay.  So this is a study.  It's got

15   a lot of information.  I'm just -- we're just

16   going to walk through it here with you together.

17   Okay?

18         A.      Okay.

19         Q.      So what we've got is, we've got --

20   it's a four-group study.  It's 0, 2000, 8000, and

21   20000 parts per million, right?

22         A.      Uh-huh.

23         Q.      And it's two years, right?

24         A.      Yep.
```

**Exhibit E Page 322**

Robert Tarone, Ph.D.

1          Q.      And it's got -- it's got a bunch of

2    different categories of -- a bunch of different

3    sort of studies or findings, I should say, in it.

4                  There's this one, 1, 2.  I'm just

5    going to do these and you can tell me if I'm wrong

6    or not.  4, 5, 6, 7, 8, 9, 10.

7                  Okay.  10.  There's -- there's sort

8    of 10 different categories --

9          A.      Uh-huh.

10         Q.      -- of information?  Am I -- did I do

11   that right?

12         A.      Yep.

13         Q.      Okay.  And so you would agree that

14   when you're talking that -- that an adenoma is

15   benign and a carcinoma is malignant, right?

16         A.      Correct.

17         Q.      Which means malignant means bad,

18   right?  I mean, it means -- it means opposite of

19   benign.

20                  So when you're looking at this just

21   kind of walking down this middle row, right, which

22   I've circled, let's kind of go through them one by

23   one.

24                  You would agree with me that there

Robert Tarone, Ph.D.

```
 1    is a statistically significant increase at the low

 2    dose, right?

 3              Now, whether or not you think that

 4    that's what should be reported, you would agree

 5    that there is a statistically --

 6         A.    Yes.

 7         Q.    -- significant increase at low dose?

 8         A.    I deal with that in what I just sent

 9    you, but, yes.

10         Q.    Okay.  And that is a positive

11    finding, right?

12         A.    (Nods head).

13         Q.    So that is a positive finding.  I'm

14    just going to put statistically significant

15    instead of spelling it all out because whatever at

16    low dose.

17              Okay.  So we'll highlight that.

18              And then there's not much -- this

19    number 2 is not a positive finding, right?  When

20    it goes 1, 0, 0?

21         A.    No.

22         Q.    What?

23         A.    No.

24         Q.    Okay.  And they report it.
```

**Exhibit E Page 324**

Robert Tarone, Ph.D.

1            Number 3 is not a positive finding,

2   right?

3        A.      Uh-huh.

4        Q.      They report that.

5            Number 4 is an increase in trend.

6   The higher the dose, the more tumors, right?

7        A.      Uh-huh.

8        Q.      Which is a dose-response.

9            That's a positive finding, right?

10       A.      Yep.

11       Q.      Okay.  And then moving down,

12   number 5, that is not a positive finding, right?

13       A.      Correct.  And, interestingly, they

14   didn't do the combined analysis of adenomas and

15   carcinomas because it would not have been

16   significant.

17       Q.      Okay.  And then the next one, the

18   islet cell --

19       A.      Islet cell.

20       Q.      Islet cell.  Sorry.

21       A.      Yeah, that's all right.

22       Q.      The next.  So 6, 7, and 8 are not

23   positive, right?

24       A.      Right.  Very not positive.

Robert Tarone, Ph.D.

1          Q.          But then, again, you come down to

2    the C cell adenoma and it's 2, 2, 6, 6.

3                      That is a positive finding and it's

4    dose-response, right?

5          A.          Yes.

6          Q.          Okay.  So that's three positive

7    findings on that.

8                      And then number 10 it's not; is that

9    correct?

10         A.          Correct.

11         Q.          Okay.  So before we get to your

12   other criticisms of this, there were three

13   positive findings in this test, right?

14                      MR. BRENZA:  Object to form.

15   BY MS. WAGSTAFF:

16         Q.          Am I right?

17         A.          Yep.

18         Q.          Okay.  There was dose-response and

19   there was a statistically significant at low dose.

20                      And you should not ignore positive

21   findings, right?

22         A.          No.

23         Q.          Okay.

24         A.          But you should -- you should -- you

Robert Tarone, Ph.D.

1  should view them in context of all the studies of

2  a similar nature.

3        Q.      Okay.  And you have criticized that

4  there was in -- you have criticized multiple times

5  in multiple of your papers that there was no

6  apparent progression to carcinoma?

7        A.      Right.

8        Q.      Why do you feel that that's

9  significant?

10       A.      Well, because -- well, it's

11 something.  If they're progressing to carcinomas,

12 it's obviously stronger evidence of a carcinogenic

13 effect.

14       Q.      Well, it may be stronger evidence

15 under some circumstances, but this is still an

16 indication of -- of an oncogenic effect even if

17 they're benign, right?

18              I mean, you're not -- you're not

19 here to testify that, you know, if something

20 causes a benign tumor that that means that should

21 be ignored?

22       A.      No.  I'm just -- I'm just saying

23 that you can't just look at one study.  And in my

24 first paper, I did look at these, other -- other

Robert Tarone, Ph.D.

```
 1   than the pancreatic islet cell adenomas, which are

 2   the ones that they relied upon.

 3             That's all they relied upon in terms

 4   of declaring sufficient evidence.  For good

 5   reason.  Because there wasn't consistency in the

 6   others.

 7       Q.     Okay.  So they had -- they did the

 8   P-value for these, if you look at the screen.

 9             They had .016 and .031, right?

10       A.     Uh-huh.

11       Q.     Okay.  And so -- so your only issue

12   with whether or not it goes -- your -- let me

13   strike that.

14             When you put in your complaint

15   section that one of the problems was that there

16   was -- that IARC noted there was no apparent

17   progression to carcinoma, something --

18       A.     I just noted that.  I mean, it

19   was -- it should be noted.

20       Q.     Okay.  So that's not a criticism?

21       A.     That and the fact that there was no

22   dose-response.

23       Q.     Okay.  But we just found out that

24   there were actually two dose responses?
```

Robert Tarone, Ph.D.

1          A.       But not for the one that they

2     focused on, pancreatic islet cell adenomas.  There

3     was no consistency in the other.  They did it

4     because they saw --

5          Q.       Okay.

6          A.       -- low-dose finding in the next

7     study.  That's why that's they -- why they relied

8     upon this.

9          Q.       Okay.  So there were three positive

10    findings from this study, dose-response and

11    statistically significant at low dose.

12               We just went over that, right?

13         A.       The one at low dose is the one they

14    relied upon.

15         Q.       Okay.  And then moving -- moving to

16    -- and have I captured all of your criticism --

17    have I discussed all of your criticisms with

18    respect to this study?

19         A.       Well, what my major criticism is

20    that they didn't take the third study into account

21    because it didn't show any kind of an increase.

22         Q.       Okay.  That's your major criticism?

23         A.       Absolutely it's the major.

24         Q.       Okay.

Robert Tarone, Ph.D.

1          A.        But I do discuss -- that's why I

2     gave you that letter that was rejected because I

3     do discuss pairwise comparisons, for example, low

4     dose to control at versus trend.  So --

5          Q.        Okay.

6          A.        -- that is an issue.

7          Q.        Okay.  So -- all right.

8                    So now we're on the next study

9     that's a rat study.

10         A.        Uh-huh.

11         Q.        And looking at this, it looks like

12    it's 0, 30, 100, and 300; is that right?

13         A.        Yep.

14         Q.        Okay.  And then they had 1, 2, 3, 4,

15    5, 6 sort of data reportings in here?

16         A.        Uh-huh.

17         Q.        And this first one, the islet cell

18    adenoma in males was 0, 5, 2, 2, right?  And that

19    is statistically significant at low dose, right?

20         A.        Yep.

21         Q.        Okay.  And that's a positive

22    finding, right?

23         A.        Positive finding and it's the same

24    one they found in the previous study for males.

Robert Tarone, Ph.D.

1        Q.        Okay.

2        A.        Low dose only.

3        Q.        Okay.  And then the rest of the data

4    was not positive, right?

5        A.        Correct.

6        Q.        No positive findings.  Okay.

7                  Is that right?

8        A.        And it's interesting.  They don't

9    present rates for these other positives that you

10   found in the previous study because they were not

11   significant increases.

12                      MS. WAGSTAFF:  Kevin.

13   BY MS. WAGSTAFF:

14       Q.        Sorry.

15                 Okay.  I'm sorry.  I didn't mean to

16   cut you off.

17       A.        That's all right.  (Laugh).

18                 I'm just saying that the only tumor

19   type they looked at here in this last table are

20   the pancreatic islet cell tumors.

21       Q.        Okay.

22       A.        They did not report -- you pointed

23   out some significant findings for other things

24   like liver, and they don't even report them here

**Exhibit E Page 331**

Robert Tarone, Ph.D.

1   because they're not significant.  I deal with that

2   in my first paper.

3        Q.      Okay.  So we've just kind of gone

4   through all these.  So I just want to sum it up.

5   Okay?

6        A.      Well, can we talk about the third

7   rat study where they didn't present the rates?

8        Q.      Sure.

9        A.      Which is the second from the bottom

10  on page 37.

11       Q.      And I suppose that it's your opinion

12  that there was some sort of collusion or

13  purposeful omission of data on this?

14       A.      I'm saying --

15                  MR. BRENZA:  Objection.  Form.

16          Objection.  Form.

17                  THE WITNESS:  Well, I'm saying

18          -- I'm saying any scientist, given the

19          reported rates in the other two studies

20          for pancreatic islet cell adenomas and

21          given that on the basis of two low-dose

22          findings, they base their evidence --

23          that's part of their basis for sufficient

24          evidence of animal carcinogenicity.

Robert Tarone, Ph.D.

```
 1                  They should have at least

 2          reported the rates.  And the fact is the

 3          rates for that study, it's a decreasing

 4          trend with increasing glyphosate level

 5          that's significant.

 6   BY MS. WAGSTAFF:

 7          Q.      Well, sir.

 8          A.      Has a P-value of .02.  That's not

 9   good science.  You got to report all the data.

10          Q.      So, sir, based on the IARC criteria,

11   which is what you're here to talk about, right?  I

12   understand your point, but based on the IARC

13   criteria, you would agree with me that having

14   another data that was not -- that didn't have

15   positive findings doesn't affect the overall

16   outcome?

17          A.      Oh, it absolutely does.

18          Q.      Okay.

19          A.      It absolutely does.

20          Q.      Well, then -- then we'll talk about

21   that and I'll throw in the --

22          A.      No.  If IARC has anywhere put in

23   that if you have multiple studies with the same

24   strain that you can ignore results in one study if
```

1   it doesn't fit with the result of another study,

2   then, I'm sorry, that's just wrong.

3         Q.      Well, that's -- that's not what IARC

4   says and we can -- we can -- I will add your

5   hypothetical data to this.

6         A.      Does IARC data ignore?

7         Q.      You tell me.

8         A.      No.

9         Q.      I'm not the expert here.

10        A.      I mean, no scientist would put that

11  in writing that you should ignore --

12        Q.      Nobody is --

13        A.      -- decreases in tumors rates with

14  increasing exposure level.

15        Q.      I guess what I'm saying is that

16  let's -- we can assume when you get -- we can

17  assume when we get to the rat studies that there

18  was tumor tables in there, and we'll say if it

19  makes a difference in the 2A classification.

20  Okay?

21        A.      I don't understand.

22        Q.      You just stay with me and we'll --

23  we'll walk through it all.  Okay?

24                      MR. BRENZA:  Object to form.

Robert Tarone, Ph.D.

1  BY MS. WAGSTAFF:

2      Q.      Okay?  All right.  Let's go back to

3  3.1 and let's see what we talked about that we

4  found.

5              Okay.  This is the -- this is the

6  mice study.  Okay?  You see this?

7      A.      Yeah.

8      Q.      So we had two different.  This is CD

9  -- CD-1, CD-1, right?

10     A.      Yeah.

11     Q.      Okay.  So do CD-1, CD-1.

12             And we agreed that as reported, it

13 was positive, positive, positive?

14     A.      Not -- not according to my

15 interpretation.

16     Q.      Okay.  So this was positive finding.

17 This is actually two positive findings, and this

18 is was one positive finding.  Okay?

19             MR. BRENZA:  Yeah.  He just

20        said "not according to my

21        interpretation."

22             THE WITNESS:  Yeah, a

23        misinterpretation of the data --

24 BY MS. WAGSTAFF:

Robert Tarone, Ph.D.

1      Q.      Okay.

2      A.      -- but that's your interpretation.

3      Q.      Okay.

4      A.      Fine.

5      Q.      And then if we move to the rats,

6  there was also two, right?

7              And if you want to put -- there's

8  also two, right?

9              And this was a Sprague-Dawley rat,

10 right?

11     A.      It's your interpretation.  You can

12 put whatever you want there.  I don't agree with

13 it.

14     Q.      Okay.  Okay.

15             Well, Sprague-Dawley.  You don't

16 agree that this first one was a Sprague-Dawley?

17     A.      No, I agree with that.  I just don't

18 agree that there was an increased -- a

19 demonstrated increased in pancreatic islet cell

20 adenomas.

21     Q.      Okay.

22     A.      You do.

23     Q.      Well, no.  Actually, the record will

24 show that you and I just walked through this, and

Robert Tarone, Ph.D.

1    you said there was a positive finding and you said

2    there was two positive dose-response findings.

3         A.      For an individual study.

4         Q.      Right.

5         A.      I'm saying that overall, I disagree

6    that there's a positive finding for pancreatic

7    islet cell adenoma, and there's clearly not.  Any

8    way you combine all three studies, you're not

9    going to get a significant result.

10        Q.      Okay.  And we walked through this

11   study together?

12        A.      Yeah, and you gave your

13   interpretation.

14        Q.      Okay.  The record will reflect and

15   the jury will see that now that we're actually

16   putting pen to paper you got to backtrack.

17               You said there was a positive

18   finding.  I asked you that.  You said, yes,

19   absolutely positive.  I said positive finding

20   dose-response?  You said yes.  Positive finding

21   dose-response?  You said yes.

22        A.      For individual studies and

23   individual sites --

24        Q.      Okay.

Robert Tarone, Ph.D.

1        A.        -- but that's not how you evaluate

2    overall carcinogenicity.

3        Q.        Okay.  Well --

4        A.        You got to look at all the studies.

5        Q.        Okay.  Well, we -- we walked through

6    these studies and there was -- you agreed with me

7    at the time we were walking through them that

8    there was three positive findings.

9                  Now, we're --

10       A.        I agreed with your

11   misinterpretation.  Yes, I did.

12       Q.        Well, you shouldn't have done that

13   if you didn't -- if you didn't agree with it.

14       A.        Well, you're going to keep saying it

15   so I might as well agree.  There were P-value less

16   than .05, but they're very peculiar.  Only in low

17   dose not replicated in other studies.

18       Q.        Okay.  Well, the jury will hear what

19   you said, and I guess the jury will just have to

20   make a determination.

21                 And you had told me that there was a

22   statistically significant low dose positive

23   finding in this case as well?

24       A.        There are for individual studies --

Robert Tarone, Ph.D.

1       Q.      All right.

2       A.      -- but that's not how you evaluate

3    carcinogenicity.

4       Q.      Okay.

5       A.      You evaluate the entirety of the

6    evidence.

7       Q.      Okay.  Right.

8               And so we go back here and we talk

9    about how you get to sufficient, and you get to

10   sufficient with two or more species with positive

11   findings, which you told me earlier that's what

12   that meant.

13      A.      Well, it means positive for a single

14   study, but not positive for this overall

15   determination.  My interpretation, there's only

16   one positive finding in the mouse and rat studies

17   and that's hemangiosarcomas.

18      Q.      Well, I understand that because you

19   believe that --

20      A.      And the only reason they didn't

21   conclude that is they excluded exculpatory data.

22      Q.      So that, you know, and I think -- I

23   think that you are misunderstanding how IARC is

24   run, and that we have agreed that there are --

Robert Tarone, Ph.D.

1    that male and female are different studies, and

2    that if you have actually male or female of the

3    same sex that that's all you need.  Two tumors in

4    both?

5         A.      You keep -- I'm sorry, but you keep

6    bringing up female results.  The female data play

7    no role in what I wrote or in what IARC decided.

8         Q.      Okay.  So you -- so you have --

9         A.      Everything they saw was in males.

10        Q.      Well, I understand that but I

11   understood --

12        A.      I understand they should have

13   presented the female data.

14        Q.      Okay.  I thought one of your

15   complaints was that they didn't present the female

16   data?

17        A.      My complaint was that they accepted

18   without arguing that the female data were not

19   presented to them.  I mean, it's clear in my

20   paper.  That's what I said.

21        Q.      Okay.  So what I'm --

22        A.      I didn't --

23        Q.      What I'm saying is they didn't --

24   they -- they could come to a conclusion.  Pursuant

Robert Tarone, Ph.D.

```
1    to the Preamble, the panel members could come to a

2    conclusion without looking at the female data?

3         A.      That's true.

4         Q.      Okay.  And that's, in fact, what

5    they did?

6         A.      By excluding data for the males.

7         Q.      Well, they didn't -- they didn't --

8         A.      They did.  Oh, they did exclude

9    data.

10        Q.      For the males?

11        A.      The renal tumor miles is not even

12   close to significant if you include the second

13   study that had a significant decrease in tumors.

14        Q.      Okay.

15        A.      And the rat study for pancreatic

16   islet cell adenomas is not significant if you

17   include the data from the third study that they

18   didn't even report.

19        Q.      Okay.

20        A.      The hemangiosarcoma result holds.

21        Q.      Okay.  So if you look back at this,

22   there are two or more species.  There is a mice

23   and a rat that have positive findings?

24        A.      Your interpretation.
```

Robert Tarone, Ph.D.

1          Q.       Then there are more --

2          A.       Saying -- saying there are positive

3    findings when you're talking about just a pairwise

4    comparison that's not replicated in any of the

5    other studies, that's not a positive finding.

6    It's not, not as these people would interpret it.

7          Q.       Okay.

8          A.       They mean overall.

9          Q.       Well, actually, that's exactly how

10   they interpreted it.

11                  And then two or more independent

12   studies in one species.  We have that as well?

13         A.       How do you -- how do you know that's

14   how they interpreted?  If you read -- if you read

15   the Monograph, it was based on significant finding

16   for renal tumors based on one study in males.

17   They ignored the second study that had a decrease.

18                  Any way you pull that data, that

19   does not count as a positive.  They did count it

20   as a positive.

21         Q.       Right.

22         A.       I'm saying it's not a positive.

23         Q.       That was the first study they found

24   it as a positive.  The second study they found

Robert Tarone, Ph.D.

1    hemangiosarcomas as a positive.

2         A.      Yeah, that's like apples and

3    oranges.  They should have.  And they didn't

4    report the hemangiosarcomas in the first study

5    where there was no evidence.

6         Q.      But you understand that that's not

7    requirement.  You don't have to.

8         A.      Oh, it should be.  Absolutely.

9         Q.      But it's not?

10        A.      Oh, I don't know that it's not.

11        Q.      I understand that Dr. Tarone sits

12   here and thinks if you look at -- if you look at

13   renal adenomas in one study, you must look at

14   renal adenomas in all studies, but you

15   understand --

16        A.      Absolutely.

17        Q.      -- that's not a requirement.

18        A.      It better be a requirement.

19        Q.      Look in the Preamble and tell me

20   where it's a requirement.

21        A.      Oh, I don't see them saying you can

22   ignore results in another study from the same

23   organ.

24        Q.      I think you should -- I think tell

1   me where -- tell me -- your gripe is that IARC

2   didn't follow its own protocol basically, and I

3   want to know where in there it says.  You've

4   already backed off of the gender thing.  So tell

5   me where it says.

6          A.      No, I didn't back off, but I just

7   said the female results, which they should have

8   looked at, but they play no --

9          Q.      They don't -- they don't --

10         A.      They play no role in anything IARC

11  did or anything I did.

12         Q.      Okay.

13         A.      Except that they should have at

14  looked at them for them to say, ah, it wasn't

15  provided to us, that's not --

16         Q.      They didn't need to get them.

17         A.      The scientists are not -- don't act

18  that way.

19         Q.      Well, they didn't need them because

20  they had enough data to satisfy --

21         A.      They didn't need them.  As we -- the

22  reason you look at females in the first study is

23  because you're going -- you're trying to

24  strengthen --

Robert Tarone, Ph.D.

1          Q.        Okay.

2          A.        -- your claim that they cause it.

3    You hope to see an increase in the females as

4    well.

5          Q.        Okay.  So two or more independent

6    studies in one species.

7                    You would at least agree with me

8    that these are independent studies in one species?

9                    Are CD -- this is the same species,

10   CD-1 mouse?

11         A.        Yeah, and they had the opposite

12   result.  They cancel out.

13         Q.        Okay.  I'm not asking you that.  I

14   said -- listen to my question.

15                   You would agree that these are

16   independent studies in one species?

17         A.        Yeah, it looks good to me.

18         Q.        Okay.  And you would agree that

19   these are independent studies in one species?

20         A.        Yes.

21         Q.        Okay.  It doesn't say that they have

22   to have the same tumor site anywhere in the

23   Preamble, does it?

24         A.        It better.

Robert Tarone, Ph.D.

1        Q.      Well, does it?  Go back and look.

2        A.      The fact that something is not

3    explicitly stated.  No scientist would put that in

4    there.  And saying you can ignore the second

5    study.

6        Q.      (Laugh).

7        A.      I'm serious.  No scientist would say

8    you can ignore the second study because we found a

9    positive effect in the first study that we like.

10       Q.      Nobody is saying that.

11       A.      Yes, they are.

12       Q.      You -- your -- your scientific

13   basis --

14       A.      You're saying that --

15       Q.      -- again is it's so obvious, it's

16   not stated.  Is that the Dr. Tarone reason?

17       A.      There -- there -- no, it's not the

18   Dr. Tarone.  There are certain principles of

19   science where you look before you make an

20   inference based on a single study, which very

21   often is a false positive.  You look for

22   confirmation.  First you look in the opposite sex

23   of the same study --

24       Q.      Uh-huh.

Robert Tarone, Ph.D.

1       A.       -- and then you look at both in the

2   other study.

3       Q.       Okay.

4       A.       Which they didn't do.

5       Q.       Okay.

6       A.       I'm just saying, that is not good

7   science.

8       Q.       Okay.  All right.  So I know you

9   don't agree that these were positives, but we can

10  agree that there were independent studies in one

11  species.  Two of them.

12               We do not have that one, and then

13  there are rare occurrence in type of tumor.

14               And you don't agree with the EPA

15  that the renal tubular or the IARC was rare?

16      A.       The second study proves that they're

17  not rare.

18      Q.       Okay.

19      A.       Rare -- rare in this case means

20  exceedingly rare, in other words.

21      Q.       Really?

22      A.       Yes, it does because --

23      Q.       So how would we know that when it

24  just says "rare"?

Robert Tarone, Ph.D.

1        A.        Well, because.  What they're arguing

2  is, if you almost never see a tumor in the control

3  group, then you're not going to see a negative

4  effect.

5        Q.        Is that another thing that's so

6  obvious, they didn't bother to put it in the

7  paper?

8        A.        I don't know if it's obvious.  That

9  is in on some of our papers that we wrote at the

10 time.

11       Q.        Okay.  So you don't agree with the

12 EPA or with IARC that the renal adenoma is rare?

13       A.        Not exceedingly rare.

14       Q.        Okay.

15       A.        And the second study that IARC

16 relied upon had four renal tumors, and they were

17 two in the control group and two in the low dose.

18       Q.        Okay.

19       A.        And one of each of those was a

20 carcinoma.

21       Q.        Okay.

22       A.        So even carcinomas aren't

23 exceedingly rare if you can see them in two groups

24 of 50.

**Exhibit E Page 348**

Robert Tarone, Ph.D.

1      Q.      Okay.  So you -- so Dr. Tarone does

2   not agree with the EPA or IARC with respect to

3   that?  Understood.

4      A.      That is right.  I do not.

5      Q.      All right.  Anything else about rats

6   that we haven't discussed?

7      A.      No.  The rats are discussed more in

8   my first paper.

9                  MS. WAGSTAFF:  Okay.  All

10          right.  And then going back to the

11          Preamble a little bit, which is Exhibit

12          9.  Excuse me.

13                  Turning to page 22 --

14          actually, hang on.  I don't need that.

15                  All right.  And I think that I

16          have marked -- I think I have marked --

17          I'm going to mark this as Exhibit 23.

18                  (Document marked for

19          identification as Tarone Exhibit 23.)

20                  MS. WAGSTAFF:  Kevin, can you

21          start these at 26?

22   BY MS. WAGSTAFF:

23      Q.      Okay.  So let's move off of animal

24   studies and go on to the AHS study.

**Exhibit E Page 349**

Robert Tarone, Ph.D.

1                    AHS study stands for what?

2        A.        Agricultural Health Study.

3        Q.        Okay.  And you testified before that

4    you were involved in the design of the AHS; is

5    that right?

6        A.        I was.

7        Q.        Okay.

8        A.        (Nods head).

9        Q.        And tell me exactly what you did to

10   design the AHS.

11       A.        I was involved in the statistical

12   issues that are involved in design.

13       Q.        Okay.  And what does that mean?

14       A.        You have to based on the number of

15   people that you're going to enroll, what would the

16   power be to find certain effects.

17       Q.        Okay.  And so you were involved in

18   this when?

19       A.        Well, I actually don't know when it

20   first started, but I wrote one of the first papers

21   based on it, and it will probably be a couple

22   years before that.

23                 Let me see if I can find that.

24       Q.        And just to orient the jury a

Robert Tarone, Ph.D.

1    little, would you agree with me that the AHS is a

2    cohort study?

3         A.       It is a cohort study.

4         Q.       Which they will have learned about

5    by now.

6                  And it is -- the AHS is -- is

7    essentially a body of data that scientists can

8    pull data from and write papers, and there -- and

9    there have been dozens of papers written -- been

10   written from AHS data; is that right?

11        A.       There have been.

12        Q.       Okay.  How many --

13        A.       I was coauthor on some of the first,

14   but I left NCI in 2002, which was the year that

15   the first major paper was published looking at a

16   single disease and all pesticides, and that was

17   prostate cancer.

18        Q.       Okay.  And so it's fair to say that

19   -- it's fair to say that there are AHS papers that

20   have been written that have nothing to do with

21   glyphosate?

22        A.       Well, yeah, there are.  That would

23   be rare, but there are -- there are -- there are

24   papers because a lot of the papers look at a

Robert Tarone, Ph.D.

```
1    single cancer and all pesticides.

2         Q.       Okay.

3         A.       So glyphosate will be included.

4    There are others that look at a single pesticide

5    and all cancers.

6         Q.       Yeah.

7         A.       Now, obviously, there would only be

8    one for glyphosate.

9         Q.       Right.

10                 And so how many papers -- okay.

11                 So were you involved in the drafting

12   of the questionnaire?

13        A.       I was not.

14        Q.       Okay.

15        A.       I'm not a questionnaire expert.

16        Q.       You're not a questionnaire expert.

17                 Okay.  And the -- and when was the

18   -- and I can refresh your recollection because I

19   don't need this to be like a memory.

20                 MS. WAGSTAFF:  Can you hand me

21        49?

22   BY MS. WAGSTAFF:

23        Q.       When was the initial -- the way that

24   I understand the AHS is the -- you can give it to
```

Robert Tarone, Ph.D.

1    them, too -- the enrollment period occurred over

2    about four years; is that right?

3         A.      Correct.

4         Q.      Okay.  And do you remember what

5    years?

6         A.      I don't.

7         Q.      Okay.  So let me just reorient you.

8                 This is -- this is -- what you've

9    just been handed is a 2018 article that came out.

10        A.      Okay.  Andreotti.

11        Q.      Yeah, the Andreotti.  Okay?

12        A.      I know it.

13        Q.      Okay.  And so this is -- I'm only

14   showing you this to sort of reorient you.

15                   MR. BRENZA:  Mark that 24?

16                   MS. WAGSTAFF:  I marked it

17          whatever.  Yeah.

18                   (Document marked for

19          identification as Tarone Exhibit 24.)

20   BY MS. WAGSTAFF:

21        Q.      Okay.  So it says right here

22   "Briefly 57,000" -- hang on.

23                 Can you read this?

24        A.      Yes.

Robert Tarone, Ph.D.

```
1        Q.       It says:

2                 "57,000 individuals seeking licenses

3    to apply restricted-use pesticides were enrolled

4    between 1993 and 1997."

5        A.       Uh-huh.

6        Q.       Does that refresh your recollection

7    of when the AHS started?

8        A.       Yes.

9        Q.       Okay.  So that means that -- that

10   when people came to get their restricted-use --

11       A.       Licenses.

12       Q.       -- pesticide license, they filled

13   out an application or an enrollment form or

14   something of that sort --

15       A.       That's correct.

16       Q.       -- between '93 and '97?

17       A.       Yes.

18       Q.       Right?

19       A.       And they were given a second

20   questionnaire to take home to get more detailed

21   information --

22       Q.       Yeah.

23       A.       -- on a subset of the pesticides.

24       Q.       But by '97, the enrollment was over?
```

Robert Tarone, Ph.D.

```
 1        A.       It was over.

 2        Q.       Okay.

 3        A.       Yes.

 4        Q.       And so let's take a look at what

 5    Monsanto was saying.

 6                 Can I have 33, 34, and 82?

 7                 Let's take a look at what Monsanto

 8    is saying about -- about the Agricultural Health

 9    Study.  And I know of three papers that have come

10    out from the Agricultural Health Study relating to

11    glyphosate.  One in 2005?

12        A.       Yes.

13        Q.       De Roos.

14                 One in '18, which I just showed you

15    and then one a couple months ago.

16        A.       (Nods head).

17        Q.       Do you know of any other papers?

18        A.       Specifically about glyphosate?  I

19    don't.

20        Q.       Okay.  If any come to your mind,

21    will you let me know?

22                 MS. WAGSTAFF:  Okay.  So this

23        is going to be marked 25.

24                 (Document marked for
```

**Exhibit E Page 355**

Robert Tarone, Ph.D.

```
 1          identification as Tarone Exhibit 25.)

 2   BY MS. WAGSTAFF:

 3        Q.      So the AHS study is an epidemiology

 4   study, right?

 5        A.      Yes.

 6        Q.      Okay.  And do you know who John

 7   Acquavella is?

 8        A.      I do.

 9        Q.      Who's John Acquavella?

10        A.      He's an epidemiologist.  I know him

11   because he was a friend of our company president.

12   So I actually met him a couple times.

13        Q.      Okay.  And he worked for Monsanto,

14   right?

15        A.      He did at the time I first met him.

16        Q.      Okay.  And he did in July 22 of

17   1997, right?

18        A.      Uh-huh.  Well, clearly, yes.

19        Q.      Okay.  And so this is -- we just

20   established -- this is right around the time when

21   the enrollment is ending.

22        A.      Uh-huh.

23        Q.      So the enrollment has been going on

24   for about four years at this point.
```

Robert Tarone, Ph.D.

1              Does this look fuzzy to you, or are

2   my eyes just starting?

3       A.      I can read it fine.

4       Q.      Hold it down?  Okay.

5              Okay.  "To the Communications

6   Subcommittee."

7              "At your last meeting, I was asked

8   to provide some background thoughts on

9   Epidemiology and the Agricultural Health Study

10  that could -- that you could use to build positive

11  message -- messages."

12      A.      Uh-huh.

13      Q.      Did I read that right?

14      A.      Yes.

15      Q.      "Please find some preliminary

16  thoughts attached."

17              Okay.  So John Acquavella has -- has

18  or that Monsanto has testified that John

19  Acquavella was actually the only epidemiologist at

20  Monsanto at this time.

21              Do you have any reason to discount

22  that?

23      A.      No, I wouldn't -- no, I wouldn't

24  know.

Robert Tarone, Ph.D.

1          Q.        Okay.  So these are John

2   Acquavella's thoughts on the Agricultural Health

3   Study in 1997 just after enrollment is --

4          A.        Uh-huh.

5          Q.        -- coming to a conclusion.  Okay?

6                    And so he talks about -- he talks

7   about "The ideal study," right?  And he says:

8                    "The limitations of the Agricultural

9   Health Study" -- that's what AHS is, right?

10         A.        Uh-huh.

11         Q.        "By comparison with the hypothetical

12   ideal study.  The ideal study would have the

13   following characteristics."

14                   Right?

15                   "Experienced investigators, well

16   reasoned hypotheses defined before the study, well

17   defined study population, comparable exposed and

18   comparison groups, accurate exposure assessment,

19   accurate disease classification."

20                   Do you see that?

21         A.        Yes.

22         Q.        And you agree -- oh, let me finish

23   this.

24                   "Comprehensive data analyses, no

**Exhibit E Page 358**

Robert Tarone, Ph.D.

1   systematic bias and no confounding, good

2   documentation, and accurate/fair write-up."

3                   Do you see all that?

4        A.        I see that.

5        Q.        And you agree that that's an ideal

6   study?

7        A.        The ideal.

8        Q.        Okay.

9        A.        Not possible, but that's the ideal.

10       Q.        Okay.  So "how the AHS compares."

11   Then it talks about the key NCI investigators are

12   experienced in agricultural research and highly

13   regarded in the epidemiologic -- epidemiologic

14   community.

15                   And then it goes on and says "but

16   she and the entire team are inexperienced in

17   agricultural epidemiology."

18       A.        That's -- that's the NIEHS portion.

19       Q.        Okay.

20       A.        Not the Cancer Institute.

21       Q.        Okay.  So that's one.

22                   And then it talks about the

23   hypotheses.  Okay?  And then it says:

24                   "Most of the diseases to be studied

**Exhibit E Page 359**

Robert Tarone, Ph.D.

1   in AHS have scant reasoning to link them to

2   pesticide exposure.  Thus, much of the research

3   can be termed 'exploratory.'  While that's not

4   unusual in epidemiology, it is unusual on this big

5   a scale."

6        A.      I can guarantee you that was not the

7   opinion of the people in the occupational

8   epidemiology branch.  Otherwise, the study would

9   have never been funded.

10       Q.      I'm talking about Monsanto's

11  opinion.

12       A.      Well, that's fine.  I'm just telling

13  you that that wasn't the opinion of the NCI

14  researchers.

15       Q.      Okay.  But this is what Monsanto is

16  saying --

17       A.      That's fine.

18       Q.      -- in 1997.

19               "The downside for industry and

20  agriculture in this approach is that exploratory

21  research tends to yield uncertain findings."

22               Do you see that?

23       A.      Yes.

24       Q.      Uncertain findings.

Robert Tarone, Ph.D.

1                     Do you agree that exploratory

2     research yields uncertain findings?

3          A.       Strictly exploratory.  Absolutely.

4          Q.       Okay.  "Uncertain findings, at the

5     least, can cast doubt on the safety of our

6     products."

7                     And you agree with that, right?

8          A.       I suppose.

9          Q.       "This energizes pesticide opponents,

10    may cause the public to dictate a market change,

11    and typically makes the manufacturer adopt a

12    defensive stance."

13         A.       (Laugh).

14         Q.       Why are you laughing?

15         A.       I find it amusing.

16         Q.       Why is this amusing?

17         A.       It's not scientific, but that's all

18    right.

19         Q.       All right.  This is Monsanto's

20    opinion of the AHS.

21         A.       That's fine, and I find it amusing.

22         Q.       Okay.  "It would have been

23    preferable if the AHS had a limited scope and

24    focused more detail on a few worthy questions."

Robert Tarone, Ph.D.

```
1              A.      Well, if he thought --

2              Q.      Do you agree with that?

3              A.      No, but if he thought that, he

4    should have said, well, what are those --

5              Q.      Okay.

6              A.      -- worthy questions?  Should we have

7    limited the number of pesticides?

8                      The advantage of a cohort study is

9    you can look at every disease.

10             Q.      Okay.

11             A.      And NIEHS was there to look at like

12   Parkinson's disease, noncancer outcomes.

13             Q.      Okay.  So Monsanto goes on to say

14   that:

15                     "The AHS has a well defined study

16   population.  The problem with the study

17   population, from the researchers' perspective, is

18   that they have a limited -- they have limited

19   contact with pesticides (farmers report about 12

20   days/year of use for all pesticides).  A

21   researcher would prefer to study people with

22   constant or daily exposure."

23             A.      I'm not sure where you're going to

24   find that.
```

Robert Tarone, Ph.D.

1        Q.        Okay.

2        A.        Certainly, the Agricultural Health

3   Study compared to the case-control studies, I

4   think it had about 80 percent of the NHL cases and

5   the most recent paper had exposure to glyphosate.

6        Q.        Okay.

7        A.        So you've got a high prevalence of

8   exposure.  Most case-control studies, it's like 5

9   to 10 percent at most.

10        Q.        All right.  Next it says "Exposure

11   assessment."

12        A.        Uh-huh.

13        Q.        This it says:

14                  "The exposure assessment in the AHS

15   will be inaccurate."

16                  Do you agree with that?

17        A.        No.  I don't know how he could know

18   that.

19        Q.        Okay.

20        A.        If farmers can't report their own

21   exposure, then nobody can.

22        Q.        So --

23        A.        It means that all the case-control

24   studies are worthless, too.

Robert Tarone, Ph.D.

1      Q.      It says:

2              "There are two problems with this

3      approach:  Usage does not necessarily mean

4      exposure" and "recall can be faulty or biased,

5      especially when historical usage information is

6      collected."

7              And do you agree with that?

8      A.      No.  Neither.

9      Q.      Okay.

10     A.      In fact, I mean, he's right, but

11     that's why we also collected information in the

12     questionnaire on whether the farmers wore

13     protective equipment.  We had questions to look at

14     what might reduce the exposure.

15             And the recall, the advantage of --

16     the advantage of a cohort study is that exposure

17     is before.  It's not recall.  Recall is important

18     in case-control studies.  So I don't even know

19     what he's getting at with regard to cohort study.

20     Q.      Okay.  And this is Monsanto's

21     opinion --

22     A.      Fine.

23     Q.      -- before the results came out.

24     A.      Means nothing to me.

**Exhibit E Page 364**

Robert Tarone, Ph.D.

1          Q.     And then it says -- and then

2    Monsanto's epidemiologist says:

3                 "Inaccurate exposure classification

4    can produce spurious results."

5                 That means bad results, right?

6          A.     Well, that's -- that's certainly

7    true of any study.  Case control or cohort.

8          Q.     And then it says:

9                 "In a study of this size, there will

10   be some, perhaps many, spurious exposure-disease

11   findings due to exposure misclassification."

12                And do you agree that there was --

13   that AHS is subject to exposure misclassification?

14         A.     Not more than case -- not more than

15   other studies.  Probably less susceptible than

16   case-control studies, for example.

17         Q.     Okay.  And then it says:

18                "We also have to keep in mind that

19   even the most sophisticated statistical analysis

20   can't correct for aspects of the study that are

21   less than optimal (i.e. exposure

22   misclassification)."

23                You see that?

24         A.     That's not completely true.  There

Robert Tarone, Ph.D.

1    are ways and they have used those in the

2    Agricultural Health Study.  There are ways to try

3    to adjust for exposures misclassification.  None

4    of them are perfect.

5                  And I might add.  In that very

6    paper, if you go -- if you actually read through

7    the results, they're -- they're concerned and they

8    look at various sensitivity analyses for different

9    classes of exposure.  I mean, I thought they were

10   very careful about what they analyzed.

11        Q.      Okay.  And then it talks about --

12   and this is, again, in 1997 --

13        A.      Uh-huh.

14        Q.      -- before any of the results are

15   out -- documentation.  And it says:

16                  "However, there is a major gap in

17   the AHS documentation: they are lacking study

18   protocols for their specific sub-studies.  There

19   is an overall AHS protocol which lays out, in

20   general, the rationale and methods for the study."

21                  Did I read that right?

22        A.      You read it right.

23        Q.      "But, there are no protocols for the

24   initial sub-studies."

Robert Tarone, Ph.D.

```
1          A.      I don't even know what he could be
2   referring to in sub-studies.
3          Q.      "A number of these sub-studies are
4   almost completed including."
5                  And then he states a few.
6                  "The AHS investigators are
7   conducting these studies 'on the fly.'  In the
8   past, they have promised us protocols for these
9   studies, but they have never materialized."
10                 So Monsanto is sitting here saying
11  that the investigators are conducting studies on
12  the fly without protocols.
13                 "This circumvents some of the
14  scrutiny they might get and gives them flexibility
15  in their research since they won't have to worry
16  about deviating from the protocol."
17                 If true, that doesn't seem very
18  scientific, does it?
19         A.      Well, I don't know.  I'm not
20  familiar with any of the so-called sub-studies
21  that he mentioned.
22         Q.      Okay.  So this was written in
23  realtime in 1997.
24         A.      Uh-huh.
```

Robert Tarone, Ph.D.

1        Q.      And if this is true that the AHS

2    investigators are operating on the fly, doesn't

3    seem very scientific, does it?

4        A.      Again, I don't know what he's

5    talking about, quite frankly.

6        Q.      Well, I'm asking you a different

7    question.

8                I'm asking you:  If this is true and

9    the AHS investigators are operating on the fly, it

10   doesn't seem very scientific, does it?

11       A.      Well, it wouldn't be scientific.

12               MR. BRENZA:  Objection.  Calls

13           for speculation.

14               MS. WAGSTAFF:  Okay.  Let's

15           see what one other.  That was labeled 25

16           I think.  Was it 25?

17               MR. BRENZA:  That's what I put

18           down.

19               MS. WAGSTAFF:  Okay.  And then

20           let's look at one other one.  This is

21           going to be 26.

22               (Document marked for

23           identification as Tarone Exhibit 26.)

24   BY MS. WAGSTAFF:

**Exhibit E Page 368**

Robert Tarone, Ph.D.

1      Q.      This is Donna Farmer.  This is

2  another Monsanto employee, and she was a

3  toxicologist.

4              Do you know who Donna Farmer is?

5      A.      Do not.

6      Q.      Okay.  She's one of Monsanto's

7  current spokespeople in this litigation.  So I

8  thought maybe you would know who she was.

9      A.      No.  Saltmiras is the only Monsanto

10 scientist that I ever talked to or met.

11     Q.      Okay.  So it looks like she wrote

12 this e-mail about two years -- almost two years

13 after the one we just saw.

14     A.      Uh-huh.

15     Q.      Okay?  Which is in '99, again,

16 before any of the results are known, right?

17             And she says -- she's talking about

18 an epidemiology study, Hardell.

19             You've seen -- you know about

20 Hardell, right.

21     A.      Yes, I certainly do.

22     Q.      And she says:

23             "Hardell is just the tip of the

24 iceberg for these type of 'association epi' --

Robert Tarone, Ph.D.

1    meaning epidemiology -- "studies."

2                   Right?

3        A.       Yes, and I do agree.  I do agree

4    with that assessment of Hardell.

5        Q.       Okay.  And then she says:

6                   "What is of greater concern however

7    is an American initiative called the AHS."

8                   All right.  You see that?

9        A.       Yeah.

10       Q.       Okay.

11       A.       Interesting.

12       Q.       And it says:

13                  "Yes, it's interesting now that they

14   embrace it so much that the results are out."

15       A.       Well, no, but it's just very

16   interesting.  These are people who are scared to

17   death that it's going to show something they don't

18   like.  (Laugh).

19       Q.       Right.  And so --

20       A.       So they're throwing as much mud on

21   the wall as they can.

22       Q.       And then once the results come out

23   and it's in their favor, they embrace it, uh?

24       A.       Well, not all the results have been

Robert Tarone, Ph.D.

1    in the favor of companies.

2         Q.      Well, for Monsanto it has.

3         A.      But that's typical of any company.

4    Is that their only pesticide?

5         Q.      And so I'm talking about for

6    glyphosate.

7         A.      Well, for glyphosate.

8         Q.      It's this is these articles.

9                 Hardell relates to Roundup and

10   glyphosate, right?

11        A.      Yes.

12        Q.      And this is talking about --

13        A.      And as he's done in everything he

14   studied, he reports the largest odds ratio.

15        Q.      Okay.  So -- so put Hardell aside

16   for a second.

17        A.      Yes.

18        Q.      But the AHS, they are trashing the

19   AHS, and they are saying you'll see here, many

20   groups --

21        A.      Does Aaron Blair agree with this?

22        Q.      I haven't talked to Aaron Blair

23   about this.

24        A.      Well, he's the one that should look

Robert Tarone, Ph.D.

```
1   at that because he was --

2        Q.      I'm asking you.

3        A.      He would know.

4                Well, I'm just saying, I don't know

5   about sub-studies.  He would.

6        Q.      Okay.

7        A.      He's the principal investigator.

8        Q.      So I'm asking you.

9                "Many groups have been highly

10  critical of the study as being a flawed study, in

11  fact some people have gone so far to call it junk

12  science."

13       A.      Some people.

14       Q.      Junk science.

15       A.      Well, some people.

16       Q.      "It is small in scope and the

17  retrospective questioneer on pesticide usage and

18  self-reported diagnoses from the questioneer is

19  thought to be so unreliable -- or thought to be

20  unreliable... but the bottom line is scary."

21               You see that?

22       A.      Yeah.

23       Q.      All right.

24       A.      It's very amusing.
```

**Exhibit E Page 372**

Robert Tarone, Ph.D.

1                    And by the way, what she -- what she

2    says about exposure assessment, calling it

3    retrospective, it's retrospective in one sense in

4    that they were asked to say how long they had been

5    applying and given pesticide, how many acres, etc.

6                    But that's nothing compared to

7    case-control studies which is retrospective in

8    terms of the occurrence of disease.  That has much

9    greater bias for any study.

10                    So, yeah, no study is perfect, but

11    this is absurd.  They're just scared what it's

12    going to show.

13                    MS. WAGSTAFF:  Right.  And

14              then I'm going to mark -- can you give

15              him this one as 27?  34.  I think the

16              Roundup.

17    BY MS. WAGSTAFF:

18         Q.        And so now here fast-forward a bunch

19    of years --

20         A.        (Laugh).

21         Q.        -- and we're now into May of '15.

22    So fast-forward 18 or 19 years.

23                    Fast-forward all these years.

24         A.        Uh-huh.

```
 1                    MR. BRENZA:  So what number is

 2         this?

 3                    MS. WAGSTAFF:  Sorry.  It's

 4         26.  27.  27.

 5                    (Document marked for

 6         identification as Tarone Exhibit 27.)

 7  BY MS. WAGSTAFF:

 8         Q.     And the IARC Lancet article has just

 9  come out, right?

10         A.     Which IARC Lancet?

11         Q.     The article about glyphosate.

12         A.     Oh.  This is a summary of Monograph

13  112.  Okay.

14         Q.     Uh-huh.  And it says this is from

15  Bill Heydens, who's a Monsanto employee, which

16  says:

17                "See attached, which reflects the

18  results of conversations Donna" -- being Donna

19  Farmer -- "and I had with various stakeholders

20  (Law, CE, RPSA."

21                You see that?

22         A.     Uh-huh.

23         Q.     All right.  And then this -- this is

24  a -- this is a PowerPoint that was a "Proposal for
```

Robert Tarone, Ph.D.

```
 1    Post-IARC Meeting, Scientific Projects," right?

 2         A.      Yep.

 3         Q.      All right.  And if you go to the

 4    third page.

 5                 So this was before the final IARC --

 6    on May -- on May -- you can see this is dated May

 7    11th?

 8         A.      Uh-huh.

 9         Q.      So this was in between the summary

10    paper and the main paper coming out?

11         A.      It was a long time before the actual

12    volume came out.

13         Q.      Yeah.  I mean, I've got the actual

14    volume here and it is -- I don't know when it's

15    dated but --

16         A.      But it's all right.  You can still

17    get everything online.

18         Q.      I believe that it was dated in July

19    of '15.

20         A.      Oh, I didn't think -- not the hard

21    copy.

22         Q.      Okay.  Well, it was --

23         A.      But, anyway, go ahead.

24         Q.      It was after the summary, right?
```

Robert Tarone, Ph.D.

1      A.      Yeah.

2      Q.      And before?

3      A.      Yeah.

4      Q.      And so this is a PowerPoint that's

5   being circulated around Monsanto, and it says.

6              "Counter IARC's selective use of

7   data and flawed analyses/conclusions on

8   Epidemiology, Animal Bioassays and Genotoxicity

9   (Mode of Action) Prevent future adverse outcomes."

10             And genotoxicity is the mechanism

11  data, right?

12     A.      Uh-huh.

13     Q.      That we talked about?

14     A.      Yep.

15     Q.      And so these are possible ways that

16  Monsanto is thinking about countering IARC's

17  eventual 112 determination, right?

18     A.      Uh-huh.

19     Q.      Okay.  And one of them is to publish

20  an updated AHS paper.

21             You see that?

22     A.      Uh-huh.

23     Q.      And they had just added publication

24  on animal data cited by that.  See, these are all

Robert Tarone, Ph.D.

```
 1   things they were going to do to counter IARC's

 2   determination.

 3              And so, in fact, at this point,

 4   there had only been one study from the AHS data or

 5   one paper from the AHS data, and that was 2005

 6   De Roos, right?

 7        A.       Right.

 8        Q.       Okay.  And so, in fact, Monsanto was

 9   able to succeed in doing this by getting the --

10   after 13 years of no paper, coincidentally the AHS

11   Andreotti study comes out, right?

12                  MR. BRENZA:  Object to form.

13        Argumentative.

14   BY MS. WAGSTAFF:

15        Q.       You can put that down and move back

16   to 24.

17              Do you have -- you can -- you can

18   put that exhibit down.  The one in your hands.

19   I'm not going to ask you any more questions on it.

20   Unless you want to read it?

21        A.       No.  I just -- I don't believe that

22   -- there's no way that Monsanto could convince

23   Aaron Blair to publish a paper.  So if you're

24   implying that Monsanto somehow got this paper
```

1    published, I just -- I can't believe it.

2        Q.    Okay.  Well, Aaron Blair is not on

3    this, is he?

4        A.    Which paper was this?  JNCI?

5        Q.    This is the 2018.

6        A.    Yeah, he might have left, but he was

7    still important in the group.

8              Is Michael Alavanja?  Yeah, Michael

9    Alavanja had taken over.

10       Q.    Okay.

11       A.    I can't believe Michael would have

12   done it.

13       Q.    Okay.

14       A.    Michael is as straight an arrow as

15   you can find.

16       Q.    Okay.  And so what we talked about

17   before, we're going to -- if you want to find the

18   article or you can look on my screen, either one,

19   but I'm not going to ask any more questions about

20   that PowerPoint.  I'm going to go to the AHS study

21   for a few minutes.

22             So if you want to kind of just look

23   at the bottom of this, you can some see that this

24   was received in August 22nd of '17, right?

1        A.        Yes.

2        Q.        Okay.  So just after in time the

3   IARC Monograph came out, right?  112?

4        A.        I'm not sure when it came out but --

5        Q.        Okay.

6        A.        -- I don't think that's relevant to

7   when this paper was published.

8        Q.        Well, I'm not asking you your

9   opinion on relevance.  I'm asking a question if

10  this came out just after the IARC Monograph came

11  out.

12                 IARC Monograph came out in 2015, and

13  this is being accepted in 2017, right?

14       A.        I don't know.  Well, when I think of

15  the Monograph, I think of the hard copy book, and

16  that didn't come out in 2015.  But --

17       Q.        When did it come out?

18       A.        -- you could still -- it didn't

19  matter.  You could still get every chapter online.

20       Q.        Okay.

21       A.        They just hadn't print -- print --

22  printed the book.

23       Q.        Okay.  But this paper, you will

24  agree --

Robert Tarone, Ph.D.

1        A.        Chapters were available before this,

2    well before this.

3        Q.        Okay.  So this paper was received by

4    the -- by the journal on August 22, 2017, right?

5        A.        Yeah.

6        Q.        And it takes -- how long does it

7    take to draft a paper like this and get it -- get

8    it to -- to the -- to the journal?

9        A.        I'm not sure.  It's pretty

10   boilerplate for these people.  They've been

11   publishing studies like this forever.

12       Q.        Well, what's your opinion?  You

13   don't have an opinion?

14                 MR. BRENZA:  Calls for

15       speculation.  Foundation.

16                 THE WITNESS:  Well, I was --

17   BY MS. WAGSTAFF:

18       Q.        You don't have --

19       A.        I was involved in the very first

20   study, which would have not been very quick

21   because it was the first time we published on

22   anything, and that was prostate cancer looking at

23   all pesticides.  And the work started before I

24   left NCI, and we were still revising it while I

Robert Tarone, Ph.D.

1   was at NCI.  So I would take it was -- I would say

2   it was four months.

3        Q.      Okay.  So if you look at the bottom

4   here, it says:

5              "With the introduction of

6   genetically engineered glyphosate-tolerant crops."

7              That's GMO, right?

8        A.      Uh-huh.

9        Q.      "Glyphosate use increased

10  dramatically in the late '90s and 2000s."

11             Right?

12       A.      Uh-huh.

13       Q.      And you would agree with that?

14       A.      Yes.

15       Q.      You would agree that before the late

16  1990s, there wasn't a lot of glyphosate use?

17       A.      (Nods head).

18       Q.      I need a yes or a no.

19       A.      Yes.

20       Q.      The nodding.  Sorry.  The nodding.

21  I know --

22       A.      I mean, it built slowly.  I think it

23  started in the '90s.

24       Q.      Yeah.  Okay.

Robert Tarone, Ph.D.

1          And then if you go back to what we

2   talked about earlier that the -- that the

3   registration was in '93 to '97.

4          The spike in glyphosate really

5   started after the registration?

6      A.       Probably, yeah.  It was probably the

7   mid-'90s when it started really taking off.

8      Q.       Okay.  So there are a lot of people

9   that probably enrolled and didn't use glyphosate,

10  but ended up being a glyphosate user because it

11  (indicates) took off.

12     A.       Yeah.

13     Q.       Right?

14     A.       Yeah.

15     Q.       I mean, it wasn't just like a little

16  increase.  When GMOs was added to the market, the

17  farming community, it was a massive increase.

18     A.       That's an issue.  It's an issue with

19  any cohort study.  And as I said, they tried to

20  deal with it in their results.

21     Q.       Well, no, no.  Hang on.  I'm not --

22  I'm just -- I'm asking you if that's true.

23     A.       What's that?

24     Q.       When GMOs were introduced to the

Robert Tarone, Ph.D.

```
1    farming community in the late '90s, glyphosate use

2    skyrocketed?

3         A.      Yeah.

4         Q.      Not just a gradual increase in

5    market share.  It was a -- it was a vertical

6    skyrocket, right?

7         A.      Right.

8         Q.      Okay.  And so one of the issues with

9    this paper, you would agree with me that 63 -- you

10   had talked about a followup phone interview after

11   the '93 to '97 issue?

12        A.      That's right.

13        Q.      And only 63 percent of the people

14   completed a phone interview later, which was still

15   in 1995 to 2005, right?

16        A.      Yep.

17        Q.      So the skyrocketing of glyphosate

18   was just mid skyrocket in the 19 --

19        A.      Uh-huh.

20        Q.      -- in '99 to 2005.

21               And so for the 37 percent of people

22   who didn't respond, these researchers just imputed

23   information?

24        A.      Yeah, they did.
```

**Exhibit E Page 383**

Robert Tarone, Ph.D.

1          Q.        And they just said, well, whatever

2    you were doing in '93, '4 or '5, we're going to

3    assume you're doing in 2001, '2, and '3.

4          A.        Right.

5          Q.        And while that may be fine for some

6    pesticides, that was really improper for

7    glyphosate, which was skyrocketing, right?

8          A.        They still had 80 percent of their

9    pop -- of their cases were exposed and controlled.

10   So they still picked up a lot of glyphosate

11   exposure and that, the exposure assessment is

12   always a problem.

13               But as I said, they did their best

14   to do sensitivity analysis looking to see if there

15   was any effect from the imputation.  They looked

16   at several different ways of trying to see if they

17   were advised.  That's all you can do.

18         Q.        Listen, I'm not saying they didn't

19   do their best.

20               But sometimes doing your best isn't

21   good enough, right?

22                    MR. BRENZA:  Object to form.

23                    THE WITNESS:  Well, it's not

24        perfect.  It's better than any

Robert Tarone, Ph.D.

1           case-control study still.

2    BY MS. WAGSTAFF:

3           Q.      But you would -- you would agree

4    with me that prior to enrollment, glyphosate

5    hadn't spiked?

6           A.      No, it hadn't spiked.

7           Q.      And then it spikes off the charts

8    right after that?

9           A.      Right.  Right.

10          Q.      And 20 to 37 percent of the people,

11   almost 40 percent of the people don't respond, and

12   the investigators just make up data for them.

13                  I mean, it's the best guesstimate,

14   but they say, well, they weren't using it in '93.

15   So we're going to assume they aren't using it in

16   2003.

17                  And that's not just not true for

18   glyphosate.  You can't do that.

19                      MR. BRENZA:  Object to form.

20            Mischaracterizes the study.

21   BY MS. WAGSTAFF:

22          Q.      I mean, how can you possibly do that

23   when there is a dramatic spike like that?

24                      MR. BRENZA:  Same objections.

**Exhibit E Page 385**

Robert Tarone, Ph.D.

```
 1                    THE WITNESS:   They do the

 2         best they can.   That's true of any study.

 3   BY MS. WAGSTAFF:

 4         Q.      Well, sure.

 5         A.      I'm saying it's still better

 6   exposure assessment than case-control studies.

 7         Q.      Okay.   And so they made up

 8   information for 37 percent of the people, and that

 9   doesn't bother you?

10                    MR. BRENZA:  Object to form.

11         Mischaracterizes the study.

12                    THE WITNESS:  No.  I mean,

13         they did the best they could.

14                    MR. BRENZA:  And there's no

15         made-up data.

16                    THE WITNESS:   That's what you

17         do.  I'm actually surprised maybe that it

18         was 63 percent where they got the data.

19                    These farmers are not the

20         easiest to get to fill out

21         questionnaires.  They're busy.  They have

22         other stuff to do.  They don't want to

23         deal with it.

24   BY MS. WAGSTAFF:
```

1        Q.        Okay.  And, again, that doesn't

2    bother you that -- that doesn't bother you that --

3        A.        Well, I wish it was perfect.  It's

4    not perfect.

5        Q.        I'm not talk -- I mean --

6        A.        You're still picking up people that

7    were exposed to glyphosate more than other people.

8        Q.        So -- so you have -- you have --

9        A.        You're talking like they missed it

10   all.

11       Q.        You would agree with me --

12       A.        Like they had like 80 percent of the

13   people used glyphosate.

14       Q.        You would agree with me that if the

15   spike in glyphosate hadn't happened just after

16   enrollment or if it was a different pesticide,

17   right?  If you were looking at paraquat or if you

18   were looking at malathion or I don't -- whatever.

19       A.        Uh-huh.

20       Q.        It would be easier and more reliable

21   to impute so much data.  But if you're imputing

22   data --

23       A.        Well, you wouldn't have as much data

24   to impute, actually.  That's the advantage.

Robert Tarone, Ph.D.

1       Q.      37 -- why?

2       A.      Because it does -- other pesticides

3   you mentioned have been used for a longer period

4   of time.  They didn't spike after enrollment.

5   They were already.

6       Q.      Well, we're -- we're --

7       A.      Malathion is used everywhere.

8       Q.      I know, but we're imputing that.

9   Those researchers are imputing that data because

10  people didn't return their questionnaires, or they

11  didn't answer the phone.

12      A.      And I'm saying that it would still

13  be better for a longer-used pesticide than for

14  glyphosate.

15      Q.      That's what -- we're saying the same

16  thing.

17      A.      (Laugh).

18      Q.      I'm just saying the imputation is

19  not the issue.  It's the imputation with

20  glyphosate that has a spike post-enrollment,

21  right?

22      A.      Imputation has its limits, but it's

23  better than not trying and not getting more

24  extensive exposure data.

Robert Tarone, Ph.D.

1      Q.      Okay.  And the AHS study from 2020

2   or from 2018 actually finds that glyphosate has a

3   protective effect, right?

4      A.      No.

5      Q.      No, it doesn't?

6      A.      Do you see -- do you see significant

7   decreases?  It's rare.  There are a lot -- there

8   are a lot of relative risks less than 1, but that

9   doesn't mean.  I mean, how many trends?  I don't

10  see any significant trends at all.

11     Q.      So -- so my understanding -- and I

12  could --

13     A.      Look at the P-value for trend in

14  their primary analysis, Table 2.

15     Q.      I could be wrong, but here we go.

16  This is what this litigation --

17     A.      The smallest one is .07 for

18  testicular.

19     Q.      Well, hang on a second.  Let's --

20  let's --

21             On page 513 talking about B-cell

22  lymphoma, which is what a lot of this litigation

23  is about --

24     A.      Uh-huh.

Robert Tarone, Ph.D.

1       Q.      -- or non-hodgkin's lymphoma, if

2   something is below 1. -- in the relative risk, RR?

3       A.      You got to look at the confidence

4   interval.

5       Q.      Okay.

6       A.      None of those are significant for

7   trend.  Look at those trend P-values .95, .94,

8   .86.  That's -- that's saying that it's basically

9   flat.

10      Q.      Okay.  So basically flat, but what

11  I'm saying is that if it's below 1, is your -- is

12  your -- is your testimony that that does not mean

13  it's a protective effect?

14      A.      It's not a protective effect --

15      Q.      Okay.

16      A.      -- unless it's significant.

17      Q.      Okay.  Anything about the AHS study

18  that you think I should know?

19              MR. BRENZA:  Object to form.

20  BY MS. WAGSTAFF:

21      Q.      That we haven't covered.

22      A.      Not -- not this one.

23      Q.      Which one?

24      A.      Well, I have questions.  Well, you

Robert Tarone, Ph.D.

```
1    say you've read my papers.

2         Q.      Uh-huh.

3         A.      I have serious questions about the

4    paper they published in PLoS ONE.

5         Q.      In what?

6         A.      P-L-o-S.  It's Public Library of

7    Science.  They've got several.  One -- I think

8    maybe the first one.  It's just called PLoS ONE,

9    o-n-e, and it was a study of NHL.

10        Q.      Uh-huh.

11        A.      Updated.  You can read it.  Update

12   everything.

13               And for some reason, as I point out

14   in my paper -- and never -- they never done this

15   before, and this is right before the Monograph 112

16   meeting -- they excluded herbicides.  It's even in

17   the title.  It says "Insecticides, Fungicides, and

18   Fumigants."

19        Q.      So AHS is purposefully keeping out

20   herbicides.

21        A.      I can't --

22        Q.      IARC is bending over backwards.

23        A.      No, wait.  No.

24        Q.      Okay.
```

**Exhibit E Page 391**

1      A.      What I can tell you is they did

2  leave it out.  I called Mike Alavanja, and I

3  assumed -- see, they've always had -- they've

4  actually always sort of favored the hypothesis

5  that herbicides increased NHL, that group.

6              I mean, it's been one of their pet

7  ideas, and to see it excluded from it -- I

8  actually assumed when I saw it they must be

9  publishing a separate paper just for herbicides.

10  They must have had some really interesting

11  results.

12              I called Mike Alavanja.  He said,

13  no, we -- we just -- the paper is getting too long

14  and we just -- we'll do the herbicides later.  By

15  the way, they've never done the herbicides, and

16  the journal is an online journal.  There's no

17  limit on pages, tables, figures, data.  It's just

18  very peculiar.

19      Q.      So you think he was lying to you,

20  the guy you just said is a straight shooter?

21      A.      Oh, I do.

22      Q.      You think he was lying to you?

23      A.      I think -- I can't tell you why they

24  excluded herbicides.  I wouldn't even hazard a

Robert Tarone, Ph.D.

```
 1   guess.  But saying that it was because the paper
 2   was getting too long, that just doesn't make
 3   sense.
 4        Q.      Well, so you think it's like a
 5   conspiracy?  You think people are out to get,
 6   like, glyphosate?
 7                    MR. BRENZA:  Object to form.
 8                    THE WITNESS:   I have no idea,
 9            and that's why I've never hypothesized a
10            reason.  I just said, this is funny and
11            it should be explained.
12   BY MS. WAGSTAFF:
13        Q.      Okay.  So you have this theory that
14   AHS purposefully --
15        A.      No.
16        Q.      Okay.  So why are you bringing it
17   up?
18        A.      I don't know.
19                Because it's peculiar just that it
20   was left out.
21        Q.      Okay.
22        A.      They've never done that before.
23        Q.      Okay.  We are going to -- let's
24   take a --
```

Robert Tarone, Ph.D.

```
1          A.       And by the way, I'll just add this.
2   Because I was actually sent a couple of draft
3   papers by a Reuters reporter and asked to, you
4   know, summarize it.
5          Q.       Uh-huh.
6          A.       And it was drafts of the NHL paper.
7          Q.       Uh-huh.
8          A.       But it included herbicides.  It was
9   from 2013.
10         Q.       So why was -- why did a reporter
11  send you something to edit?
12         A.       Because they were aware of my paper.
13  It was the same reporter that IARC --
14         Q.       Kate Keyland?
15         A.       Yes, that IARC was --
16         Q.       She had a copy of the draft before
17  it was published and asked you to edit it?
18         A.       No, it wasn't published.  This was
19  -- I'm assuming.
20         Q.       That's bizarre.
21         A.       It is bizarre.  I didn't even think
22  about it much, but after the fact, I think it must
23  have come out in a deposition or something.
24         Q.       Uh-huh.  I don't know.  I don't have
```

Robert Tarone, Ph.D.

1    any idea what you're talking about.

2                    I think it's bizarre that a reporter

3    had a draft manuscript and asked you to draft it.

4         A.        Oh, you can find the report.  It's

5    still -- it's still available online.

6         Q.        Okay.

7         A.        But they had herbicides in this.

8    And in fact, in the table, it was obviously aimed

9    not for PLoS ONE or any online journal because it

10   had a limitation.  So they had a select number of

11   pesticides they looked at, and then the rest were

12   reported in an online supplement.

13        Q.        Uh-huh.

14        A.        And they had a table where they had

15   25 -- well, they had 16 pesticides that were

16   chosen because they had the greatest apriority

17   feeling that they would be associated with NHL.

18   10 of the 16 were herbicides, and this is

19   consistent with my conversations over the years I

20   was there.  They were very interested in

21   herbicides.

22                    So I can't tell you why a year and a

23   half later when this -- they actually published it

24   herbicides aren't there.  I mean, it's just --

**Exhibit E Page 395**

Robert Tarone, Ph.D.

1        Q.       And are you mad that your friend

2    lied to you?

3        A.       I'm not pleased.

4        Q.       Okay.  You still think he's an

5    upstanding guy, even though he's lying to you?

6        A.       Well, he's about as straight an

7    arrow as you can go.

8        Q.       Well --

9        A.       I don't -- I don't even know if

10   he knew.

11       Q.       -- I wouldn't consider people who

12   are straight as an arrow to be liars.

13       A.       I'm just saying he was -- the way he

14   lived his life, I thought it was

15   exemplary compared to --

16       Q.       Okay.

17       A.       -- compared to some.

18                MS. WAGSTAFF:  Let's take just

19         a 10-minute break, and then we'll come

20         back and I'm hoping to be done by 5:00.

21                MR. BRENZA:  Do you want to

22         quit then or do you want me to --

23                MS. WAGSTAFF:  Quit what?

24                THE VIDEOGRAPHER:  Go off the

Robert Tarone, Ph.D.

1        record?

2                    MS. WAGSTAFF:  Go off the

3        record.

4                    THE VIDEOGRAPHER:  The time is

5        the time is 3:42 p.m.  We're off the

6        record.

7                    (Recess.)

8                    THE VIDEOGRAPHER:  The time is

9        4:07 p.m.  We're back on the record.

10   BY MS. WAGSTAFF:

11       Q.      All right.  I just want to do a

12   little bit of housekeeping before we sort of jump

13   into our last line of testimony, if that's okay

14   with you.

15               So we had previously marked as

16   Exhibit 3 this Letter to the Editor that you've

17   written.

18       A.      (Nods head).

19       Q.      Remember that?

20       A.      Yes.

21       Q.      Okay.  That's one, one article.

22               Then we had also marked as

23   Exhibit -- you know what exhibit it was, one of

24   his articles? -- as Exhibit 10 the editorial that

Robert Tarone, Ph.D.

1    you wrote.

2              You remember that?

3         A.      Uh-huh.  Yes, I do.

4         Q.      Okay.  So you have also written an

5    opinion paper, right?  Which was written in May of

6    2018, right?

7         A.      No.

8         Q.      Or was received in May of '16.

9    Sorry.

10        A.      No.  There were two.  This is a very

11   -- this was the most peculiar publishing

12   experience I ever had.  This paper was --

13        Q.      28.

14        A.      -- actually published online in

15   August of 2016.  And then I couldn't figure out

16   what was going on because it went months and

17   months, and the paper had not appeared in print.

18   It was still online.

19              And it turned out that -- that the

20   IARC Monographs Program had initiated what's

21   called a COPE investigation -- COPE stands for

22   Committee on Publication Ethics -- on the basis of

23   this paper.

24              My guess is the hope was they could

Robert Tarone, Ph.D.

1    keep it from ever appearing in print.  But the

2    poor editor of the journal had to go through over

3    a year of back and forth with this COPE

4    organization.

5                    So this is the version that was

6    actually published in print, and it's a little bit

7    different than the original in very minor ways.

8    So this -- these dates occurred to the final

9    version that was published in January 2018.

10        Q.        January of 2018?

11        A.        Yeah.

12        Q.        Okay.

13        A.        That's when it actually appeared in

14   print.

15        Q.        Okay.  And we've covered your

16   opinions set forth in this paper today, right?

17        A.        (Nods head).

18        Q.        And we've covered your opinions set

19   forth in Exhibit 10 as well, right?

20        A.        Yes.

21                    MS. WAGSTAFF:  Okay.  And so

22            I'm marking your paper you were just

23            discussing as Exhibit 28.

24                    (Document marked for

1          identification as Tarone Exhibit 28.)

2    BY MS. WAGSTAFF:

3          Q.      Your -- you also have written --

4          A.      Which is 28?

5          Q.      The one we just we're talking about.

6                  MR. BRENZA:  This one.

7                  THE WITNESS:   Oh, okay.

8    BY MS. WAGSTAFF:

9          Q.      And then you wrote "Response to

10   comments prepared by Christopher Portier"?

11         A.      Yes.

12         Q.      Did you -- other than these three,

13   which I'm going to mark as Exhibit 29, just for

14   completeness of the record.

15                 (Document marked for

16          identification as Tarone Exhibit 29.)

17   BY MS. WAGSTAFF:

18         Q.      Did you write anything about the

19   Roundup or the non-Hodgkin -- about the Roundup --

20   I mean -- sorry -- about the IARC glyphosate

21   Monograph 112 in published journals other than

22   these three articles?

23         A.      Which were these three?

24         Q.      This is your --

Robert Tarone, Ph.D.

1        A.        You don't have the Issues in Science

2   and Technology.

3        Q.        And when was that published?

4        A.        Oh.

5        Q.        Roughly.

6        A.        Well, let me think.  2020 or 2021.

7        Q.        Okay.

8        A.        No, it must have been 2020.  It was

9   shortly after the deposition.

10        Q.        Okay.  And --

11        A.        It was a very short piece.  It was

12   -- it was a comment.  (Indicates).  This -- this

13   journal publishes quarterly --

14        Q.        Uh-huh.

15        A.        -- and they have an interesting

16   style.  They publish commentaries, and then in the

17   next quarter they have what they call their forum

18   and people publish reactions.  So this was just a

19   short forum piece.

20        Q.        Okay.

21        A.        But it is a peer-reviewed published

22   journal.

23        Q.        And I'll let the record reflect your

24   hands are showing it's what, like one page or

1    something?

2         A.      Oh, yeah, it's one.

3         Q.      On one side?

4         A.      Less than one.  Less than one page.

5         Q.      On one side -- one column?

6         A.      I included it.

7         Q.      Okay.  So that -- you're suggesting

8    that that article is a less than one page

9    published in 2020, and the opinions that you

10   express in that piece have we covered today?

11        A.      Yeah.

12        Q.      Okay.  So is there -- are there any

13   -- is there -- so is there any other thing you've

14   published about that we --

15        A.      No.

16        Q.      Other than those four?

17        A.      No.

18        Q.      Four?  Okay.

19        A.      If I could, I'd like to make a

20   couple comments.

21               You showed Chris Portier's comments

22   to the SAP, and what -- what's interesting about

23   that is, first of all, he did a combined analysis

24   and he does exactly what I said should be done.

1   Like for kidney, he does a pooled analysis of all

2   the studies.

3                 And interestingly, for kidney

4   cancer, he has a table for kidney cancer, and it

5   includes both the rates from the first and second

6   CD-1 mouse study.

7                 Now, that's a tacit agreement by him

8   that it should have been included in IARC.

9   Because he included it in the larger comments he

10  had, and he did a pooled analysis.  It's the idea

11  that pooled analyses are bad or not good science.

12  In fact --

13      Q.     I didn't -- I didn't say they were

14  bad or not good science.

15                I said that they were -- I was

16  asking you if they were required and, you know,

17  you -- you didn't know.

18                And you didn't know when you wrote

19  those articles whether or not the Monograph 112

20  panel members have the data and ignored it or

21  didn't have the data.

22      A.     Right.

23      Q.     And I -- and for -- for you to in

24  some way, shape or form, you know, infer intent

1    when you have no idea.

2         A.        I never inferred intent on anything

3    I wrote.

4         Q.        Okay.

5         A.        But I did say given these

6    observations, this should be revised.

7         Q.        Okay.  So I'm going to mark as

8    Exhibit 30 your text messages --

9         A.        Uh-huh.

10        Q.        -- which I don't know if you've had

11   a chance to review them.

12                       (Document marked for

13            identification as Tarone Exhibit 30.)

14   BY MS. WAGSTAFF:

15        Q.        But you handed me your phone --

16        A.        Yeah.

17        Q.        -- earlier today.

18        A.        Uh-huh.

19        Q.        And this is -- this is an accurate

20   reflection of your text messages with Monsanto's

21   lawyers?

22        A.        Well, that's what on my texts.  I

23   didn't delete any.  Those are them.

24        Q.        Okay.  So that's going to be

Robert Tarone, Ph.D.

1    Exhibit 30, and I believe I've given you a copy at

2    some point.

3                        MR. BRENZA:  We don't have 29.

4                        MS. WAGSTAFF:  29 is the -- is

5         the response to the comments.

6                        MR. BRENZA:  So it's in the

7         stack.

8                        MS. WAGSTAFF:  Uh-huh.

9                        THE WITNESS:   That was the

10        EPA.

11                       MS. WAGSTAFF:  29 is "Response

12        to comments by Chris Portier (dated

13        October 4, 2016) for the glyphosate EPA

14        SAP meeting.  Robert E. Tarone."  Okay?

15   BY MS. WAGSTAFF:

16        Q.     All right.  So you testified earlier

17   that you keep up with studies as they relate to

18   the Agricultural Health Study, right?

19        A.     Right.  Not as regularly as I used

20   to, but every couple of months or so I'll go on

21   PubMed see if there's anything.

22        Q.     Okay.  Are you familiar with the

23   latest study on glyphosate as it relates to the

24   Agricultural Health Study?

Robert Tarone, Ph.D.

1         A.        Probably not.

2                   MS. WAGSTAFF:  Okay.  Can you

3         hand the doctor a copy of that, please?

4                   Did you give me a copy?

5                   THE WITNESS:  So this is

6         within the Agricultural Health Study.

7    BY MS. WAGSTAFF:

8         Q.        If you want to just take a second to

9    familiarize yourself with it.

10        A.        Title.  Let me look at the tables.

11        Q.        All right.  Tell me when you're

12   ready.

13        A.        Okay.

14                  (Reviews document.)

15                  So they're adding to the mechanistic

16   evidence.

17        Q.        So let me just tell -- are you

18   ready?  Tell me when you're ready to go.

19        A.        Go ahead.

20        Q.        Okay.  I don't want to rush you.

21        A.        No, no.

22        Q.        Okay.  So this was published in

23   2023, right?  You can see at the bottom if you

24   look at the screen.

Robert Tarone, Ph.D.

1        A.        Online, yeah.  So it will come in

2   print, too.  Okay.

3                     MS. WAGSTAFF:  I'm going to

4            mark this as Exhibit 31.

5                     (Document marked for

6            identification as Tarone Exhibit 31.)

7   BY MS. WAGSTAFF:

8        Q.        But you see where it says "2023"?

9        A.        Uh-huh.

10       Q.        All right.  And you see at the top

11  it says:

12                   "Glyphosate Exposure and Urinary

13  Oxidative Stress Biomarkers in the Agricultural

14  Health Study."

15                   Do you see that?

16       A.        Yeah, I don't look -- it looks like

17  it's JNC -- oh, yeah, there it is.  JNCI Advanced.

18  Okay.

19       Q.        Okay.  Are you with me?

20       A.        Yes.

21       Q.        So this is a study based off the

22  Agricultural Health Study data.

23       A.        Uh-huh.

24       Q.        And you see the second author right

Robert Tarone, Ph.D.

1    there, Gabriella Andreotti, right?

2        A.      Don't know her, but I definitely

3    have seen the name.

4        Q.      Okay.  And that's the same author of

5    the 2018 studies, right?

6        A.      I would guess.

7        Q.      Well, do you want to compare it?

8        A.      I don't think there's two

9    Andreottis.  Well, quite clearly, almost certainly

10   is.

11              Yes.

12       Q.      Okay.  So it's Gabriella Andreotti,

13   who did the 2018 AHS study.  She's back at it five

14   years later and she's -- she's provided this

15   study, right?

16       A.      Uh-huh.

17       Q.      All right.  And you see the

18   conclusion on the next page?

19       A.      Uh-huh.

20       Q.      "Our findings contribute to the

21   weight of the evidence supporting an association

22   between glyphosate exposure and oxidative stress

23   in humans and may inform evaluations of the

24   carcinogenic potential of this herbicide."

**Exhibit E Page 408**

Robert Tarone, Ph.D.

```
 1          A.      That's very --

 2          Q.      Do you see that?

 3          A.      That's a very carefully worded

 4    sentence.

 5          Q.      Okay.  So what she's suggesting --

 6    and this is the 2018 author of the -- this is the

 7    author of the 2018 AHS study.

 8                  She is now saying five years later

 9    that the weight of the evidence supports an

10    association between glyphosate exposure and

11    oxidative stress, right?

12                       MR. BRENZA:  Mischaracterizes

13          the document.

14                       THE WITNESS:   The mechanism.

15          She's not saying -- she's not applying it

16          to carcinogenesis.

17    BY MS. WAGSTAFF:

18          Q.      Well, what she's saying is that it

19    may inform evaluations of the carcinogenic

20    potential of the herbicide.

21          A.      Sure.  It will be included in the

22    next --

23          Q.      Yeah.

24          A.      -- whatever summary is done.
```

Robert Tarone, Ph.D.

1      Q.      This is a mechanistic study.

2      A.      Mechanistic.

3      Q.      She's saying that the weight of the

4   evidence supporting an association between

5   glyphosate exposure and oxidative stress, which is

6   what IARC 112 found, right?

7      A.      Uh-huh.

8      Q.      Okay.

9      A.      I guess you don't have problems with

10   the exposure assessment being 4 in this paper?

11      Q.      If you do, you tell me, Doctor.

12      A.      It's the same exposure.  That's all

13   I'm saying.

14      Q.      You --

15      A.      It's the same exposure assessment as

16   good as you can do.

17      Q.      All right.  So that's marked as

18   Exhibit 31.

19      A.      Thank you.  I wouldn't have found

20   this for probably a month or so.

21      Q.      You're welcome.

22              MR. BRENZA:  I need to have

23      it.

24              THE WITNESS:  Oh, you want

Robert Tarone, Ph.D.

1          it?  Yeah, you can have it.  Go ahead.

2                    MR. BRENZA:  I can send you a

3          copy of it.

4                    THE WITNESS:  Yeah.

5                    MS. WAGSTAFF:  All right.

6          Let's can you give them a copy?

7                    We'll mark this one as 32.

8                    (Document marked for

9          identification as Tarone Exhibit 32.)

10   BY MS. WAGSTAFF:

11        Q.     This is just a little out of time,

12   but this is one of the documents you brought

13   today.

14        A.     Uh-huh.

15        Q.     So we just -- I just saw it.

16        A.     No, that's fine.

17        Q.     Here's another copy.

18        A.     Thank you.

19        Q.     So e-mails are best started at the

20   back.

21                 Who is Geoffrey Kabat?

22        A.     I mentioned him earlier.  He is a

23   retired epidemiologist.  He was at Albert Einstein

24   Medical School in New York City.  Written two of

Robert Tarone, Ph.D.

1    the best books that I've seen on epidemiology and

2    how to interpret it, and really the only person

3    who I really collaborate with at all to any extent

4    now.

5         Q.    Okay.  And so in May of 2020, you

6    and him were exchanging thoughts, some more

7    changes in questions from Bill.

8              And if you look at what Geoffrey

9    wrote you?

10        A.    Don't you have this paper, the paper

11   that this is discussing?  It was published in

12   Cancer Causes and Control.  If you don't, I can

13   give it to you.

14        Q.    I mean, is that your latest one that

15   you --

16        A.    No.  I mean, I can give it to you.

17   I can obviously print another one.

18             But this discussion was about a

19   paper that was submitted to Cancer Causes and

20   Control.  It wasn't --

21        Q.    Who is -- who is Bill?

22        A.    Bill is Bill Price.  I had never

23   worked with him before.  He's at the University of

24   Idaho.

Robert Tarone, Ph.D.

1        Q.      Okay.  I'll submit that this --

2   sorry.  I don't have another copy, but you should

3   have one in there.

4                   MR. BRENZA:  I just need it

5           for a second.

6                   MS. WAGSTAFF:  It's Kabat.

7                   THE WITNESS:   Kabat.

8           (Laugh).

9                   MS. WAGSTAFF:  Kabat.

10                  MR. BRENZA:  Okay.  There's

11          another article that Dr. Tarone authored.

12    BY MS. WAGSTAFF:

13       Q.      Okay.

14       A.      This was prompted that by the

15   meta-analysis that was published in Mutation

16   Research that showed a --

17       Q.      Okay.

18       A.      -- 43 percent increase in risk.

19                  MS. WAGSTAFF:  Okay.  So this

20          I'm going to mark as Exhibit 33.

21                  (Document marked for

22          identification as Tarone Exhibit 33.)

23                  MS. WAGSTAFF:  All right.

24                  MR. BRENZA:  33?  Oh, yes, 33.

Robert Tarone, Ph.D.

```
 1                     MS. WAGSTAFF:  I don't know
 2          what 32 is.
 3                     MR. BRENZA:  Yeah.  It's this
 4          cover.  It's the thing that causes to
 5          look for that.
 6   BY MS. WAGSTAFF:
 7          Q.      Okay.  And so you guys are editing
 8   this paper, right?  So it looks like you're doing?
 9          A.      Yeah.
10          Q.      All right.  And then if you look
11   back, you're still talking about because the three
12   -- these are -- Bill is William Price?
13          A.      Yes.
14          Q.      Who's the second author.
15                  And then it talks about -- it
16   says -- you say on Sunday, May 9th.
17                  I'm sorry.  Geoff, Geoffrey says.
18                  "Look forward to going through your
19   changes.  We'll take this slow.  I wasted more
20   than an hour fixing my log-in to CCC."
21          A.      Cancer Causes and Control.
22          Q.      "But I finally got that straightened
23   out."
24                  "Let me know your opinion on what 3
```

Robert Tarone, Ph.D.

```
1    reviewers we should list."

2              "Last time round, I gave John

3    Acquavella" who's now at the University of -- what

4    university is that?

5         A.        Aarhus.

6         Q.        Where is that?

7         A.        It's in Denmark.

8         Q.        Okay.  So John Acquavella has left

9    Monsanto and he's now at the university?

10        A.        Oh, I didn't know that, but, yeah,

11   he's been there for a couple years.

12        Q.        Well, I'm guessing if he's at

13   university, or do you think he's still with

14   Monsanto if he's at --

15        A.        No, no.  He's at the university.

16        Q.        Okay.  You said:

17             "Last time round, I gave John

18   Acquavella (now at University of Aarhus), José

19   Tarazona of EFSA, and Gary Williams."

20        A.        That was Geoffrey saying that.

21        Q.        Yep.

22        A.        He handled the medical submission.

23        Q.        Yep.  At New York Medical College.

24             And this is an article about, you
```

**Exhibit E Page 415**

Robert Tarone, Ph.D.

```
 1    know --

 2         A.      It's a meta-analysis -- it's

 3    evaluating the different meta-analyses of the

 4    epidemiology studies of glyphosate.

 5         Q.      Okay.  So Gary Williams used to be a

 6    Monsanto employee?

 7         A.      I didn't know that.

 8         Q.      Okay.  You didn't know that?

 9         A.      No.

10         Q.      Okay.  So can you think of --

11         A.      I don't know Gary Williams.

12         Q.      Okay.  "Can you think of anyone who

13    is both knowledgeable and sane on this topic?  I

14    would consider -- I think I hesitate to give Kenny

15    Crump."

16                 And you respond:

17                 "Might have to reconsider Acquavella

18    and Williams.  They are paid Monsanto whores."

19         A.      "Channeling my Carey Gilliam."  My

20    joke.  I think they were both involved.  Monsanto

21    put together this mock IARC where they had.  I

22    think it was a Canadian company they paid to do

23    it, and they wrote four papers in critical review.

24    I think he was involved in that.
```

Robert Tarone, Ph.D.

1        Q.        Uh-huh.  Okay.  And --

2        A.        I don't -- I don't remember who they

3    used, who he suggested.  Neither Acquavella or

4    Williams.

5        Q.        Okay.

6        A.        I mean, you should have known it was

7    a joke when I said "channeling my Carey Gilliam."

8                  Do you have this one?

9                      MR. BRENZA:  Yeah.  That's

10           yours.

11                     THE WITNESS:   Oh, okay.

12                     MR. BRENZA:  That's this one.

13                     THE WITNESS:   What is this

14           one?  Oh, yeah.  Okay.

15                     MR. BRENZA:  That's just a

16           different.

17    BY MS. WAGSTAFF:

18        Q.        Okay.  So I'd like to now talk about

19    some of the reactions to some of the criticism on

20    the Monograph 112.

21                  Okay.  So do you remember this

22    study?  I'd like to mark it.  I mean, this letter

23    from June 16.

24        A.        Absolutely.

**Exhibit E Page 417**

Robert Tarone, Ph.D.

1      Q.      It's 25.

2      A.      We talked about it earlier.

3              (Document marked for

4       identification as Tarone Exhibit 34.)

5  BY MS. WAGSTAFF:

6      Q.      June 16, 2017?

7      A.      Yeah.  That's the only public

8  response that they've had to my paper in European

9  Journal of Cancer Prevention.

10     Q.      Okay.  So it's actually not

11 responding to your article.  It's responding to a

12 Reuters article.

13     A.      It responds to both, as you can see.

14     Q.      And so what it says -- and this is

15 an official letter from IARC, right?

16 International Agency for Research on Cancer is

17 IARC, right?

18     A.      Yes.  It's posted on their website.

19 I don't know if you call it a letter.

20     Q.      Okay.  And this is when an

21 accusation came out about the AHS, right?

22     A.      She wrote an article about the AHS,

23 yes.  I guess -- yeah, it's appears to be it.

24     Q.      And then it says that you wrote a

1    journal article referenced.  So she's -- so --

2         A.        That's what I said.  She discusses

3    me, too, or IARC discusses me, too.

4         Q.        Yeah, I mean, they're responding to

5    her letter, her article.

6         A.        They're responding to her article.

7         Q.        In which she mentioned you?

8         A.        They're criticizing both of us.

9         Q.        And it says that:

10                   "IARC scientists took note of the

11   article and submitted a Letter to the Editor of

12   that journal in December 2016.  To date, this

13   letter has not been published.  However, the

14   journal's editors have indicated, most recently...

15   that the article by Tarone will be corrected to

16   report the author's paid consultation with

17   Monsanto as a conflict of interest."

18                   Is that right?

19        A.        Yes.  That's the sentences I thought

20   resulted in what you said in that legal brief.

21   Because, see, it's very tricky.  They've been --

22   they've been honest in the first sentence.  If

23   they had stopped there, it would be fine.

24                   The journal article referenced in

Robert Tarone, Ph.D.

```
 1    Reuters acknowledges the author consulted

 2    representing Monsanto and that payment was

 3    received.

 4              So they start off by saying, yeah,

 5    we know about this because he acknowledges --

 6    acknowledged it in his paper.  But then the

 7    sentence you just read -- I'm sure it was

 8    intentional.  That's what they want people to

 9    think and people have thought this.

10              The way they wrote it, it looks like

11    he didn't -- he didn't report a conflict of

12    interest, which is totally untrue.  I mean, it's

13    just --

14        Q.    Okay.

15        A.    They're good at this.  They're very

16    good at this.

17        Q.    And then it says:

18              "IARC can re-evaluate substances

19    when a significant body of new scientific data is

20    published in the openly available scientific

21    literature."

22              You see that?

23        A.    I see that.

24        Q.    So IARC can reevaluate a substance,
```

Robert Tarone, Ph.D.

1  right?

2       A.       And by the way, they did -- what's

3  the date?  In 2000.  Every five years they have a

4  committee meet that sets the priorities for agents

5  to be considered --

6       Q.       Yeah.

7       A.       -- in the next five years.

8       Q.       We're going to get to that.

9       A.       Oh, but I'm just going to point out.

10  The last time they did it, which was 2019, they

11  also evaluated -- they had the committee evaluate

12  past -- it was from a number of years, but it

13  included glyphosate, and they included the list of

14  papers that they gave to the committee to -- to do

15  the evaluation.

16       Q.       Uh-huh.

17       A.       They didn't include my papers, but

18  they included the mutation research meta-analysis,

19  which was published much later, that showed the

20  result they wanted.  So.

21       Q.       It just seems like a lot of people

22  are ignoring you.

23       A.       It is true.

24       Q.       Yeah.

Robert Tarone, Ph.D.

```
 1    A.       I mean, it is.

 2    Q.       It must be frustrating.

 3    A.       Yeah.  It's life.

 4             MS. WAGSTAFF:  So this is

 5    number 34, Lin.  34.

 6             MR. BRENZA:  33.

 7             MS. WAGSTAFF:  34.

 8             THE WITNESS:   (Laugh).

 9    Here's 33.

10             MS. WAGSTAFF:  33 is his

11    paper.

12             THE WITNESS:  Oh, no, that's

13    what he's got.

14             MS. WAGSTAFF:  33 is his paper

15    that he just handed me out of his stack.

16             MR. BRENZA:  Oh, okay.  I'm

17    off by one then.

18             THE WITNESS:  Do you have

19    that paper?

20             MS. WAGSTAFF:  Do you have a

21    staple?  Can you staple that?

22             MR. BRENZA:  I have one

23    somewhere but not --

24             MS. WAGSTAFF:  Just write on
```

**Exhibit E Page 422**

Robert Tarone, Ph.D.

1          34 that 33 is.

2                    MR. BRENZA:  Yeah.

3                    MS. WAGSTAFF:  All right.  And

4          35 is going to be this "IARC response to

5          criticisms of the Monographs and the

6          glyphosate evaluation."

7                    (Document marked for

8          identification as Tarone Exhibit 35.)

9    BY MS. WAGSTAFF:

10        Q.      "Prepared by IARC Director" in June

11   of '18.

12        A.      Uh-huh.

13        Q.      Do you see that?

14        A.      Yep.

15        Q.      All right.  And this is prepared by

16   the IARC director, who's -- do you know what his

17   name is?  I thought it would be in here.

18        A.      It was -- no.  It was -- at that

19   time it was, Kurt Straif I believe.

20        Q.      Okay.  So --

21        A.      What year was it?

22        Q.      January 2018.

23        A.      It might be have been Chris Wild.

24        Q.      I think it was Christopher Wild.

Robert Tarone, Ph.D.

1            So what he says is:

2            "Since the evaluation of the

3    glyphosate -- of glyphosate by the IARC Monographs

4    Program in March 2015, the Agency has been subject

5    to unprecedented, coordinated efforts to undermine

6    the evaluation, the program and the organization."

7            You see that?

8    A.      I see it.

9    Q.      "These efforts have deliberately and

10   repeatedly misrepresented by the Agency's -- the

11   Agency's work.  The attacks have largely

12   oriented -- originated from the agro-chemical

13   industry and associated media outlets."

14           You see that?

15   A.      Yeah.

16   Q.      "In response to the

17   misrepresentations, the Agency has sought to

18   provide a clear account of its actions, including

19   keeping its governing bodies informed of

20   developments.  Many of the recent -- of the

21   relevant documents have been posted in the public

22   domain on the IARC Governance website and on

23   dedicated glyphosate websites."

24           And it says:

Robert Tarone, Ph.D.

```
 1                   "A number of quite specific and

 2   other more general criticisms have been aimed

 3   repeatedly at the glyphosate evaluation and the

 4   wider Monographs program.  Many criticisms in the

 5   media originate from one Reuters journalist;

 6   another source is a March '15 article that Forbes

 7   since removed from their website."

 8                   And that Reuters journalist is Kate

 9   Keyland, I assume?

10        A.        Kate Kelland.

11        Q.        Kelland.

12                   Ending -- and Forbes ended "their

13   relationship with the author amid revelations in

14   the New York Times that the article was

15   ghostwritten by Monsanto."

16        A.        I had read a news article.  I think

17   it was Henry Miller was the Forbes columnist.

18        Q.        Right.

19                   "A number of these criticisms were

20   included subsequently in two letters to the IARC

21   Director from the U.S. House of Representatives

22   Committee on Science, Space and Technology."

23                   Right?

24        A.        Uh-huh.  Yep.
```

Robert Tarone, Ph.D.

1      Q.      And that is the -- that is the

2  Congressional division that you spoke in front of

3  you, right?

4      A.      That's the committee I spoke in

5  front of.

6      Q.      Okay.  And then it goes on to talk

7  about:

8              "IARC did not edit parts of the

9  Glyphosate Monograph to achieve a particular

10  outcome."

11      A.      Of course they're going to say that.

12      Q.      "For all Monograph evaluations, the

13  drafts prepared over the months prior to a meeting

14  form the basis of an open and detailed scientific

15  debate during the eight-day evaluation meeting in

16  Lyon and are modified by the Working Group as a

17  result.

18              "Changes made to the draft documents

19  are the result of deliberation between Working

20  Group members and are not attributable to any

21  particular scientist."

22              Then it goes on to talk about the

23  AHS and how they considered it, and then it talks

24  about:

1                "IARC Monograph evaluations are

2    transparent and open to scrutiny."

3                You see that?

4        A.      I see it.  They're defending

5    themselves.  They do that very well, also.

6                     MR. BRENZA:  Do you guys have

7            one of those for me?

8                     MS. WAGSTAFF:  Yeah.  It

9            was -- I don't remember what number this

10           was.  11.

11                    MR. BRENZA:  Oh.

12                    MS. WAGSTAFF:  No, no, no.

13           I'm talking to him.

14   BY MS. WAGSTAFF:

15       Q.      And then it says:

16               "IARC evaluates only agents that

17   have some evidence of carcinogenicity."

18               Right?

19       A.      That's their constant defense.

20       Q.      And then it talks --

21       A.      This is like boilerplate.  I mean,

22   they do this with almost any -- any controversy.

23       Q.      Have you ever seen an article -- a

24   letter like this --

1          A.       Yeah.

2          Q.       -- written before?

3          A.       It's common from IARC.

4                   By the way, one thing you don't see

5    there, which is interesting, they take on -- they

6    take on the Reuters columnist.  They don't mention

7    me.

8          Q.       Once again, you're being ignored.

9          A.       They don't -- well, no, they don't

10   want people to know about my papers.  I mean, I

11   think -- I think that is intentional not to

12   mention me.  They're willing to mention other

13   people.  I just think it's very peculiar.

14         Q.       It must make you mad that everyone

15   is ignoring you.

16         A.       Yeah.  It's life.  I mean, I'm very

17   happy with my career at NCI and after.  It's -- I

18   don't understand it.  I would like -- I would like

19   to understand it, actually.  It's not worth

20   getting angry about.

21         Q.       All right.  Well --

22         A.       Is this -- I want to see this.

23         Q.       -- you provided a deposition in 2019

24   so that you could be injected in the litigation.

1    So at least --

2        A.      Be injected.

3        Q.      -- you're now with us in the

4    litigation.  So.

5        A.      Where -- where is the --

6        Q.      I'm looking at page 7.

7                    MR. BRENZA:  Move to strike

8         counsel's comments.

9    BY MS. WAGSTAFF:

10       Q.      Dr. Tarone, can you tell me when

11   you're at page 7?

12       A.      Yeah.  I was looking for something

13   else that I thought was in this particular.

14               Go ahead.

15       Q.      All right.

16               "Monograph evaluations take account

17   of 'real-world' exposures by evaluation of

18   epidemiological studies."

19               You see that?

20       A.      Uh-huh.

21       Q.      All right.  So it says:

22               "When considering scientific

23   evidence of carcinogenicity including biological

24   mechanisms, the Working Group places special

Robert Tarone, Ph.D.

1    emphasis on whether the observations are relevant

2    to humans.

3                    "In light of occurring ('real

4    world') exposure -- human exposures, Working

5    Groups synthesize evidence in humans, animals and

6    other model systems in reaching overall

7    conclusions."

8                    Do you see that?

9         A.       Yeah, it's boilerplate.  Could come

10   right out of the Preamble.  They're defending

11   themselves.  They defend themselves very well.

12        Q.       As a -- and then it says:

13                    "As a science-driven process, the

14   Monographs program has a responsibility to

15   re-evaluate an agent when a significant additional

16   body of evidence becomes available."

17                    You see that?

18        A.       Yeah.

19        Q.       All right.  Then it says:

20                    "IARC evaluations" -- I'm on page 9

21   -- "make use of the latest scientific data and

22   methodologies."

23                    Do you see that?

24        A.       Yeah.

Robert Tarone, Ph.D.

1          Q.          Okay.  "The IARC Monograph pioneered

2     and continue -- Monographs pioneered and continue

3     to be a leader worldwide in objective, systematic

4     cancer hazard evaluations."

5               Do you see that?

6          A.          Yeah.

7          Q.          And it says:

8               "Authoritative reviews, including by

9     the National Research Council of the United States

10    have heralded IARC's review and evaluation

11    methodology -- methodology, citing it as exemplary

12    and recommending it as one of the potential model

13    for -- as one potential model for adoption by U.S.

14    national risk assessment groups."

15              Do you see that?

16         A.          Yep.

17         Q.          "The Monographs Program has received

18    funding from the NCI/NIH USA for over thirty

19    years."

20              You see that?

21         A.          I do.

22         Q.          "The Monographs program undergoes

23    scientific review by a Review Panel, most recently

24    receiving the highest possible ranking for

Robert Tarone, Ph.D.

1    performance and fit with the Agency's mission."

2                    They got an outstanding performance

3    rating?

4        A.      From the panel that they set up.  I

5    mean -- I mean, come on.  This is great.  I mean,

6    they are very --

7        Q.      And external experts?

8        A.      Uh?

9        Q.      And external experts?

10       A.      Like the 17 that made the mistakes

11   in Monograph 112.

12       Q.      Yeah.

13                   "A subsequent IARC Monographs

14   Advisory Group concurred with the Scientific

15   Review Panel in supporting the current system of

16   selection and use of experts for the cancer hazard

17   evaluations, accompanied by strict management

18   conflict of interests."

19                   You see that?

20       A.      Uh-huh.

21       Q.      All right.  And that letter was

22   January 2018 where it discussed the unprecedented

23   and coordinated effort to undermine the

24   evaluation, program, and organization.

Robert Tarone, Ph.D.

1                    Do you see that?  That's on page 1.

2        A.       I do.

3        Q.       Okay.

4        A.       I just -- this says that Dr. Kurt

5   Straif was the director of monographs at this

6   time.

7        Q.       Okay.  That could be true.

8        A.       Oh, but this -- this was from the

9   director of the entire IARC.  Yeah.

10       Q.       Uh-huh.

11       A.       So that was Wild.

12                    MS. WAGSTAFF:  Okay.  All

13           right.  And then I'd like to show you --

14           are you aware of what this document is?

15                    If I can -- if you can -- it's

16           number 8.  Could you give them number 8,

17           which I'll mark as --

18                    THE WITNESS:  Oh, that's --

19           that's the advisory meeting in 2019 I

20           spoke about --

21                    MS. WAGSTAFF:  Yeah.

22                    THE WITNESS:  -- where they

23           evaluated all the agents supposedly.

24                    (Document marked for

**Exhibit E Page 433**

Robert Tarone, Ph.D.

```
 1        identification as Tarone Exhibit 36.)

 2   BY MS. WAGSTAFF:

 3        Q.      So what they do is, they go back and

 4   see if -- we just looked at a few documents where

 5   it says that IARC if new material comes out that

 6   they can reevaluate and if they should reevaluate,

 7   right?

 8        A.      This was more than that.  I mean,

 9   this was like a -- I've never seen them do this

10   before.

11        Q.      Okay.

12        A.      They did -- it was not on the basis

13   of new material.  They just decided to have them

14   review a boatload of past cases, including

15   glyphosate, and not much new had come out.  That's

16   another -- that's an example.  But it was a huge,

17   huge list of studies.

18        Q.      Well, the AHS study had come out.

19   The 2018 AHS study had come out.

20        A.      Yeah.  I don't think it was even

21   cited here.  But as I said --

22        Q.      Well --

23        A.      -- the mutation research

24   meta-analysis was.  It was a selected choice.
```

Robert Tarone, Ph.D.

```
 1          Q.      So the IARC monographs was in 2015.

 2          A.      Uh-huh.

 3          Q.      And this is in 2019.

 4          A.      (Nods head).

 5          Q.      So I just -- it was a very thick

 6   document, as you said.

 7          A.      Yes, it was.

 8          Q.      And I just printed out the first

 9   page so you could see what it was.

10          A.      Yeah.

11          Q.      And then I printed out the section

12   on glyphosate.

13                  And it talks about -- this is

14   glyphosate, right?  And this is the section on

15   glyphosate, and it talks about how it was

16   evaluated in Volume 112 and is classified as a

17   Group 2A.

18                  Do you see that?

19          A.      Uh-huh.

20          Q.      And then it talks about the exposure

21   data, the cancer data.  Then it talks about the

22   cancer -- in the next page, on page 104, it talks

23   about the cancer in animals.  Talks about the

24   mechanistic data, and then it recommends no
```

Robert Tarone, Ph.D.

1    reevaluation.

2               You see that?

3        A.      I saw it.  I was well aware of it.

4    Begin.

5        Q.      It says --

6        A.      It did not have a balance in terms

7    of papers that were given.

8        Q.      It says "In summary."  So this is

9    sort of, you know, they talk the most about the

10   epidemiology.  Just -- just so you can see this.

11   "Cancer in Humans."

12               That's epidemiology, right?

13       A.      Yeah, and they cite -- they do cite

14   Andreotti.

15       Q.      Yeah, and this is -- this is

16   epidemiology, right?

17       A.      Yeah.

18       Q.      Okay.  So this is the IARC going

19   back and saying, okay, Andreotti 2018 has been

20   published now, and they talk about results from an

21   earlier followup, which were already reviewed in

22   112, and they consider that.

23               They talk about the Leon paper in

24   2019.

Robert Tarone, Ph.D.

```
1        A.        Uh-huh.

2        Q.        You're probably familiar with that?

3        A.        Yes, I am.

4        Q.        So they cite that, and then their

5   overall conclusion about whether or not because

6   we've just looked at paper where they can

7   reevaluate.  It says:

8                  "In summary, the Advisory Group

9   reviewed the evidence published since IARC

10  Monographs 112 and concluded that the evidence on

11  cancer in humans appears to remain limited.  In

12  addition, no change is anticipated in the

13  conclusions regarding cancer in experimental

14  animals or mechanistic evidence.  Therefore, a

15  re-evaluation would not be warranted within the

16  next 5 years."

17                 And that was in 2018, right?

18       A.        That's their opinion.

19       Q.        And that means that they do not

20  believe that it should be reevaluated in 2024; is

21  that right?

22       A.        That's what they believe.

23       Q.        All right.

24       A.        I think they should revise it.
```

Robert Tarone, Ph.D.

1      Q.      Well, those -- that -- that --

2      A.      With all of the rodent studies.

3      Q.      So that recommendation that not to

4   revise it was after -- I mean, you had already

5   published your articles or your --

6      A.      But this advisory panel was not --

7   my papers were not included in what -- they had a

8   log.  You think this is -- part of the thickness

9   was the log bibliography of papers that they could

10  use to review.

11     Q.      Okay.  But your -- your paper was

12  published and actually cited in an article -- in a

13  letter in 2017.  2017.

14     A.      Yeah.

15     Q.      The journal article by Tarone.

16     A.      Yeah, that was just a post on their

17  website.

18     Q.      IARC knew about your article.

19     A.      Yeah.

20     Q.      And they've chosen?

21     A.      (Laugh).  To ignore it.

22     Q.      Not to ignore it.

23     A.      Yes.  No, that's what they have

24  chosen.

1          Q.        They -- they -- I mean, there's a

2    difference between ignoring it, Dr. Tarone, and,

3    you know, not considering that it is persuasive.

4    Don't you think?

5          A.        No.  They have to --

6          Q.        You think that everyone --

7          A.        They have to know that they --

8          Q.        -- needs to look at your article?

9          A.        They have to know that they excluded

10   data.  Chris Portier proved it in his EPA

11   comments.  And I don't see how anyone cannot say,

12   okay.  I mean, I would have expected --

13         Q.        It's not --

14         A.        -- they'd be saying, okay, we're

15   going to now -- we're now going to include this

16   data, but we still think that our classification

17   holds.

18         Q.        Well, you understand that they --

19         A.        I could have lived with that.

20         Q.        -- they didn't have the supplemental

21   data during --

22         A.        I'm not sure that's true.

23         Q.        Okay.  Well, if you read the -- if

24   you read the testimony of the subgroup chair under

Robert Tarone, Ph.D.

1   oath --

2        A.      I'm just saying.

3        Q.      -- it will say that.  So if --

4        A.      I'm just saying that if that -- that

5   that is true, then the IARC staff really fell down

6   on their job.

7        Q.      Okay.  So let's look at the

8   documents that you produced here.  I have copied

9   them.

10               I don't need this on anymore.

11               I have copied them right here.  If

12  you could just tell me sort of what you did to

13  collect these documents --

14       A.      I just --

15       Q.      -- I would really appreciate it.

16       A.      I have -- I'm a folder person.  So I

17  just went through and looked for everything that I

18  thought you would want to see.  In particular,

19  everything that related to communications with

20  Saltmiras.  I knew you'd want to see that.

21  Mr. Vales, and that's all I can tell you.

22               Everything that I thought would be

23  relevant to your evaluation, your deposition, as

24  near as I could figure out what your intent was.

**Exhibit E Page 440**

Robert Tarone, Ph.D.

1      Q.      Okay.  And so there's different

2  categories here.

3              What are those for?

4      A.      Well, one cat- -- one of the -- one

5  of the folders was only rodent stuff.  One was

6  only epi- -- the big one was only epidemiology.

7      Q.      Okay.

8      A.      One was e-mails that I had found.

9              And was there a fourth?

10     Q.      There's four folders.  There's four

11 folders.

12     A.      Yeah.  Well, let me just look.

13             Oh, the other was my CV and all my

14 papers.

15     Q.      Okay.

16     A.      All my papers related to glyphosate,

17 including a couple of unpublished.  Including, by

18 the way, one of the documents -- actually, it's

19 this document.

20             Including my referee report of this

21 letter that they referred to in this, in which I

22 recommended that it be accepted with my response.

23 And apparently the journal editor wanted to

24 publish them both, and that -- that would have

Robert Tarone, Ph.D.

1    been ideal.  I mean, that would.

2              And one thing IARC and I would

3    definitely agree on is that their letter and my

4    response should have been published, and

5    apparently the publisher didn't like them.  Didn't

6    like the letters.  He thought they weren't

7    science-based enough.  He probably didn't like the

8    fact that there was clearly a controversy.

9              For whatever reason, they weren't

10   published.

11        Q.    Okay.

12        A.    And I did referee and my referee

13   report is included in with my papers.

14        Q.    Okay.  It would take me a long time

15   to read all of these documents that were just

16   brought to me.

17        A.    (Laugh).

18        Q.    We had asked that they be sent

19   prior.  I understand why they weren't.  In the

20   subpoena, I think it says to produce them, you

21   know, a couple days before.

22              I understand you don't have any

23   clerical help, and I'm not casting aspersions on

24   you for bringing them here today.

Robert Tarone, Ph.D.

1                    I'm just saying that one option is

2    for us to go off the record and let me read all of

3    these, and on the off-chance I have questions, we

4    ask them.

5                    Another option is that I take these

6    home with me and there will most, undoubtedly, be

7    redirect.  And to the extent there is redirect or

8    recross, or however you want to call it, I can ask

9    questions of those at that time over Monsanto's

10   objection or not.

11                   But that's the proposed -- that's

12   the method I propose, instead of me sitting here

13   and reading through all of these.

14        A.      Okay.

15                   MR. BRENZA:  I'd rather you

16        take a run at doing -- doing what you can

17        now.  We have a little time.

18                   MS. WAGSTAFF:  Well, I have

19        looked at them before and I'm saying

20        that, you know, these articles, I

21        don't -- I don't think I will have

22        questions on them.

23                   But I'm not going to sit here

24        and read through six inches of documents

Robert Tarone, Ph.D.

1   and be told that this is my one and only

2   chance to do it.

3              THE WITNESS:   I know.

4   There's no -- there's no -- not nearly

5   time.

6              MS. WAGSTAFF:   While you are

7   given a week to do it.

8              But if you want to take your

9   chance, if you want to read them through

10  all real quick and start your direct and

11  do your direct on these documents and

12  then be told you can't ask anymore

13  questions on them, you are free to do

14  that.

15             MR. BRENZA:   I mean, I don't

16  know if I would have any questions on

17  those or --

18             MS. WAGSTAFF:   I don't either.

19             MR. BRENZA:   And we're not

20  going to do that at the beginning of a

21  new direct.  I mean, I want to start my

22  direct fresh --

23             MS. WAGSTAFF:   Fair.

24             MR. BRENZA:   -- on the very

1          next day.

2               THE WITNESS:   I have to point

3          out something about this Christopher Wild

4          post.

5     BY MS. WAGSTAFF:

6          Q.      Sure.

7          A.      You highlighted the part about IARC

8     did not edit parts.  In other words, I think the

9     claim -- the claim was that -- the objection was

10    that it was -- the original draft was edited

11    during the Working Group, which would not be

12    surprising.

13               However, what I wanted to point out.

14    This is the strangest thing that I found in this.

15               It said:

16               "The Reuters journalist obtained a

17    draft -- a draft parts of a glyphosate Monograph

18    from Monsanto and compared the draft with the

19    final published journal.  On the basis -- on this

20    basis, the journalist claimed IARC had selectively

21    edited the text to favor an evaluation of

22    glyphosate as probably carcinogenic to humans."

23               Now, this is the important part.

24               "The majority of the highlighted

Robert Tarone, Ph.D.

1   differences" -- and that means things that were in

2   the original draft that was prepared before the

3   meeting -- "related to a review article coauthored

4   by the Monsanto scientist."  That's Grime.  That's

5   the paper that had the supplement with the data.

6              So the IARC staff was definitely

7   aware well before the Monograph that there was

8   this paper out there that had supplementary table

9   with tumors.

10       Q.      How do you know that?

11       A.      Because that's what -- that's what

12   she's saying -- they're saying here.

13       Q.      What page are you on?

14       A.      It's on page 2 under "IARC did not

15   edit parts of the Glyphosate Monograph."

16              They're claiming here that the

17   changes were made to text that was in the original

18   draft that was based on Grime.  So they used Grime

19   apparently -- I mean, I still find that amazing

20   given it was sponsored by Monsanto -- to write

21   parts of the Monograph, and they're saying that's

22   where most of the changes that Kelland pointed out

23   came from.

24       Q.      So which --

1      A.      So it's probably the -- I --

2      Q.      Which bullet point are you talking

3   about?

4      A.      Hmm?

5      Q.      Which bullet point are you talking

6   about?

7      A.      The first one.

8              "The majority of the highlighted

9   differences were related to a review article

10  coauthored by a Monsanto scientist."

11     Q.      So --

12     A.      That's Grime.

13     Q.      So if you bothered to read

14  Dr. Jameson's deposition, that bullet point would

15  make more sense to you.  And I -- I think you

16  should take the time to do that.

17     A.      Why would it make more sense?

18              I'm saying that the IARC staff had

19  that paper and knew that there was

20  supplementary -- supplementary tables well before

21  the meeting.

22              I'm not -- I'm not blaming Jameson.

23  I think it's probably the staff.  They could have

24  and they should have.  By the way, they could have

Robert Tarone, Ph.D.

1    also gotten the female data that was quote

2    (indicates) not provided.  It was all in those

3    tables.

4         Q.      All right.

5         A.      I mean, I'm just amazed.  I can't

6    believe that IARC would use Monsanto-sponsored

7    paper as an important.

8         Q.      Why not?

9         A.      Well, because they're so

10   anti-industry.  They don't want any industry at

11   all.

12        Q.      So that's -- that's the problem you

13   have is they're anti-industry?

14        A.      No.  They are in terms of who they

15   --

16        Q.      Okay.

17        A.      -- who they exclude.  Since about

18   2005, they exclude almost anyone from their

19   Working Group, too, besides the industry.

20        Q.      Do you know that there were Monsanto

21   people at IARC 112, right?

22        A.      There are what?

23        Q.      Monsanto people at IARC 112.

24        A.      As observers.  They're not going to

1    make it on the Working Group.

2        Q.    Well --

3        A.    And observers can't intervene in a

4    discussion.  They can't -- they can't -- basically

5    they can't play any role except to watch.

6        Q.    And the EPA was at Monograph 112,

7    too.

8        A.    I'm sure.

9        Q.    Okay.

10       A.    I had friends at NCI.  NCI did the

11   primary funding when we were doing the animal

12   studies.

13       Q.    Yeah.

14       A.    And they loved it because they would

15   go out.  They would get to go to Lyon for every

16   IARC Monograph meeting and be observers.

17       Q.    All right.  Great.

18             Was I respectful of you and your

19   time today?

20       A.    Uh, reasonably.  I mean, I

21   understand your role and what you're trying to do.

22       Q.    Great.

23       A.    I hope -- I hope I didn't get too

24   angry.  I did my best.

Robert Tarone, Ph.D.

1        Q.      I have no further questions right

2   now, Doctor, and I'll pass the witness to

3   Monsanto.  And I will work with counsel and with

4   you to find us another day that Monsanto can ask

5   you questions.

6                    MR. BRENZA:  We're going to

7           hold our questions until we have that day

8           so we can do it in one kind of coherent

9           session.

10                   MS. WAGSTAFF:  Okay.

11                   MR. BRENZA:  You should let

12          Robin Greenwald know that we're going to

13          object to new lines of questioning that

14          should have been raised today.  We still

15          have time left.  She could have been here

16          and done it or somebody could have been

17          here and done it.

18                   So, I mean, I know that's a

19          different lawyer different case, but

20          that's going to be our position.

21                   MS. WAGSTAFF:  Okay.

22                   MR. BRENZA:  And we,

23          hopefully, can find a time that works

24          soon.  I think Dr. Tarone has expressed a

Robert Tarone, Ph.D.

1   desire to finish this chapter.

2              THE WITNESS:   I love this.

3              MR. BRENZA:  (Laugh).

4              MS. WAGSTAFF:  Sure.  Yeah.  I

5   mean, I intend to go home and meet with

6   my team and see if anyone can accommodate

7   your 15th date, and if not, come back

8   with other dates.  That's my plan.

9              MR. BRENZA:  Very well.

10             THE WITNESS:   Okay.  But I'll

11  send you that analysis.

12             MS. WAGSTAFF:  Thanks.

13             THE VIDEOGRAPHER:  The time is

14  4:56 p.m.  We're off the record.

15

16     (Deposition concluded at 4:56 p.m.)

17

18                  *     *     *

19

20

21

22

23

24

**Exhibit E Page 451**

1                      ERRATA SHEET

2

3    Page No._____Line No._____Change to:_____

4    _____

5    Page No._____Line No._____Change to:_____

6    _____

7    Page No._____Line No._____Change to:_____

8    _____

9    Page No._____Line No._____Change to:_____

10   _____

11   Page No._____Line No._____Change to:_____

12   _____

13   Page No._____Line No._____Change to:_____

14   _____

15   Page No._____Line No._____Change to:_____

16   _____

17   Page No._____Line No._____Change to:_____

18   _____

19   Page No._____Line No._____Change to:_____

20   _____

21   Page No._____Line No._____Change to:_____

22   _____

23   Page No._____Line No._____Change to:_____

24   _____

```
 1           DECLARATION UNDER PENALTY OF PERJURY

 2

 3

 4                    I declare under penalty of

 5   perjury that I have read the entire transcript of

 6   my Deposition taken in the captioned matter

 7   or the same has been read to me, and

 8   the same is true and accurate, save and

 9   except for changes and/or corrections, if

10   any, as indicated by me on the DEPOSITION

11   ERRATA SHEET hereof, with the understanding

12   that I offer these changes as if still under

13   oath.

14

15              Signed on the _____ day of

16   _____, 2023.

17

18   _____

19            ROBERT TARONE, PHD

20

21

22

23

24
```

Robert Tarone, Ph.D.

```
 1                   CERTIFICATE OF REPORTER

 2   DISTRICT OF COLUMBIA        )

 3                   I, DENISE DOBNER VICKERY,

 4   Certified Realtime Reporter, Registered Merit

 5   Reporter and Notary Public, do hereby certify

 6   that ROBERT TARONE, PHD was first remotely duly

 7   sworn by me to testify to the truth, the whole

 8   truth, and nothing but the truth.

 9                   I DO FURTHER CERTIFY that the

10   foregoing is a verbatim transcript of the

11   testimony as taken stenographically by me at the

12   time, place and on the date herein set forth, to

13   the best of my ability.

14                   I DO FURTHER CERTIFY that I am

15   neither a relative nor employee nor attorney nor

16   counsel of any of the parties to this action, and

17   that I am neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21

22                   Denise Dobner Vickery, CRR/RMR
                     Notary Public in and for the
23                   District of Columbia

24   My Commission expires:  March 14, 2028
```