# EXHIBIT F

1         IN THE UNITED STATES DISTRICT COURT

        FOR THE NORTHERN DISTRICT OF CALIFORNIA

2                  CIVIL DIVISION

3    IN RE:  ROUNDUP PRODUCTS      MDL No. 2741

     LIABILITY LITIGATION

4                               Case No.

                                16-md-02741-VC

5

6         IN THE CIRCUIT COURT ST. LOUIS COUNTY

                 STATE OF MISSOURI

7    JAMES ADAMS, JR., et al.,

8            Plaintiffs,

     vs.

9

10     MONSANTO COMPANY,          Case No. 17SL-CC02721

                Defendant.

11

     _____

12

          CONTINUATION OF THE DEPOSITION OF:

13            ROBERT TARONE, Ph.D.

                  VOLUME II

14   _____

15

16   The videotaped deposition of Robert Tarone, Ph.D.

17   was taken before Sherry L. Brooks, Stenographic

18   Court Reporter and Notary Public, at Motley Rice,

19   LLC, 401 9th Street NW, Suite 630 Washington, DC on

20   Thursday, March 16th at the approximate hour of 9:20

21   a.m.Said deposition was taken for the purpose of

22   discovery, for use at trial or for such other

23   purposes as permitted under the Rules of Civil

24   Procedure

25

```
 1    APPEARANCES:
 2

      AIMEE WAGSTAFF, ESQUIRE
 3    WAGSTAFF LAW FIRM
      940 North Lincoln Street
 4    Denver, Colorado 80203
      awagstaff@wagstafflawfirm.com
 5

      APPEARING ON BEHALF OF THE PLAINTIFFS
 6

 7    LINDLEY BRENZA, ESQUIRE
      BARTLIT BECK LLP
 8    1801 Wewatta Street, Suite 1200
      Denver, Colorado 80202
 9    lindley.brenza@bartlitbeck.com
      kat.hacker@bartlitbeck.com
10

      APPEARING ON BEHALF OF THE DEFENDANT
11

12    ALSO APPEARING:
13    CHRIS NELSON, VIDEOGRAPHER
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    INDEX
 2   WITNESS:  ROBERT TARONE, Ph.D.                PAGE
 3   CROSS EXAMINATION
        By Mr. Brenza.........................    460
 4
     REDIRECT EXAMINATION
 5      By Ms. Wagstaff.......................    679
 6   RECROSS EXAMINATION
        By Mr. Brenza.........................    759
 7
 8    REPORTER'S CERTIFICATE (Read & Sign).....  772-774
 9                 E X H I B I T S
10   DEFENDANT'S                      FOR IDENTIFICATION
11   Exhibit No. 37  Dr. Tarone's Subpoena        468
                     to Testify
12
     Exhibit No. 38  Defendant's Cross-Notice     471
13                   of Videotaped Deposition
                     of Dr. Tarone
14
     Exhibit No. 39  Plaintiff's Cross-Notice     472
15                   of Videotaped Deposition
                     of Dr. Tarone
16
     Exhibit No. 40  Dr. Tarone's 12/17/19        473
17                   Deposition Transcript
18   Exhibit No. 41  Statistical Methods in       497
                     Cancer Research - Vol. III
19                   The Design and Analysis of
                     Long-Term Animal Experiments
20
     Exhibit No. 42  Critical Reviews in Toxicology  515
21                   Article
22   Exhibit No. 43  Kathleen Cabballero vs.      516
                     Monsanto Company, et al.
23                   H. Greim Supplement
24
25
```

**Exhibit F Page 3**

Robert Tarone, Ph.D.

```
 1                    EXHIBITS CONTINUED
 2      Exhibit No. 44   Hearing Before the Committee    524
                         on Science, Space and Technology
 3                       February 6, 2018
 4      Exhibit No. 45   Ways to Become 2A               551
 5      Exhibit No. 46   Opinion Paper                   552
                         On the International Agency
 6                       For Research on Cancer
                         Classification of Glyphosate
 7                       as a Probable Human Carcinogen
 8      Exhibit No. 47   Regulatory Toxicology and       552
                         Pharmacology Article
 9
        Exhibit No. 48   Glyphosate Exposure Data        552
10
        Exhibit No. 49   June 16, 2017 International      606
11                       Agency for Research on Cancer
12      Exhibit No. 50   Permutation Test                614
13      Exhibit No. 51   Pathology Working Group         620
                         Report on Glyphosate
14                       in CD-1 Mice
15      Exhibit No. 52   Non-Hodgkin Lymphoma Risk       629
                         and Insecticide, Fungicide
16                       and Fumigant Use in the
                         Agricultural Health Study
17
        Exhibit No. 53   11/09/17 Glyphosate Use         633
18                       and Cancer Incidence in
                         the Agricultural Health Study
19
        Exhibit No. 54   Mutation Research -             641
20                       Reviews in Mutation Research
21      Exhibit No. 55   Cancer Causes and Control       643
                         on Recent Meta-Analyses of
22                       Exposure to Glyphosate and
                         Risk of NHL in Humans
23
24
25
```

**Exhibit F Page 4**

```
 1                        EXHIBITS CONTINUED
 2      Exhibit No. 56   Review - Accounting for        651
                         Accounting for Multiple
 3                       Comparisons in Statistical
                         Analysis of the Extensive
 4                       Bioassay Data on Glyphosate
 5      Exhibit No. 57   12/28/17 Jaak Janssens Email   658
 6      Exhibit No. 58   International Agency on         661
                         Research for Cancer - IARC
 7                       Monographs on the Identification
                         of Carcinogenic Hazards to Humans
 8
        Exhibit No. 59   Dr. Tarone's                   670
 9                       Letter to the Editor
10      PLAINTIFFS'                    FOR IDENTIFICATION
11      Exhibit No. 60   International Agency on         759
                         Research for Cancer - IARC
12                       Monographs on the Identification
                         of Carcinogenic Hazards to Humans
13                       Volume 112 - Call for Experts
14      Exhibit No. 61   02/22/19 GMWatch               759
                         Forbes Article
15
        Exhibit No. 62   Letters - Bias and             759
16                       Meta-analysis an Exchange
17
18
19
20
21
22
23
24
25
```

**Exhibit F Page 5**

Robert Tarone, Ph.D.

```
 1                  THE VIDEOGRAPHER:  We are now on the

 2          record.  My name is Chris Nelson.  I am a

 3          videographer for Golkow Litigation Services.

 4          Today's date is March 16th, 2023, and the

 5          time is 9:20.

 6                  The video deposition is being held in

 7          Rockville, Maryland in the matter of James

 8          Adams, Jr., et al. v. Monsanto Company.

 9                  The deponent is Dr. Robert Tarone, and

10          the counsels' appearances will be noted on

11          the stenographic record.

12                  Will the court reporter please swear in

13          the witness.

14                  THE COURT REPORTER:  Would you please

15          raise your right hand.  Do you solemnly swear

16          or affirm and declare under the penalties of

17          perjury that the testimony you are about to

18          give in this matter today will be the truth,

19          nothing but the truth?

20                  THE WITNESS:  I do.

21                  THE COURT REPORTER:  Thank you.

22

23

24

25
```

**Exhibit F Page 6**

```
  1                  ROBERT TARONE, Ph.D.,

  2     the witness, after being first duly sworn, was

  3     examined and testified as follows:

  4                  CROSS EXAMINATION

  5     BY MR. BRENZA:

  6          Q.    Good morning, Dr. Tarone.

  7          A.    Good morning.

  8          Q.    My name is Lin Brenza.  I represent

  9     Monsanto, and thank you for coming and answering

 10     some questions for us this morning.

 11                  You understand that this is a

 12     continuation of the deposition that the Plaintiffs

 13     began of you about a week ago?

 14          A.    I do.

 15          Q.    Okay.  And so we're going to use some

 16     of the same exhibits that they used and some new

 17     ones as well.  So if you have a question about

 18     whether something has been previously used, just

 19     feel free to ask, and we'll try to clarify that

 20     for you.

 21          A.    Okay.  That's fine.

 22                  MR. BRENZA:  Can we go off the record

 23          for a moment?

 24                  THE VIDEOGRAPHER:  We are going off the

 25          record.  The time is 9:21.
```

1          (Thereupon a break was taken.)

2          THE VIDEOGRAPHER:  And going back on

3     the record the time is 9:25.

4          MR. BRENZA:  Sorry for that

5     interruption, Doctor.

6  BY MR. BRENZA:

7     Q.    As we proceed, would you give the jury

8  a -- a quick overview of your expertise and

9  background.  And we're going to get into your

10 résumé in detail, but just so they have a sense

11 right off the bat, what are your -- what's your

12 expertise?  What's your profession?

13    A.    I am a mathematical statistician.  I --

14 I have a Bachelor's of Science, Master's of

15 Science and Ph.D. in mathematics.  I got those

16 degrees from the University of California, Davis.

17 They did not have a statistics department but --

18 so the degree is in mathematics, but I took every

19 statistics and probability course.

20    Q.    All right.

21    A.    I could because I knew I wanted to go

22 into statistics.

23    Q.    And as I said, we're going to unpack

24 your résumé in detail, but I just want the jury to

25 get a sense going in.

**Exhibit F Page 8**

Robert Tarone, Ph.D.

```
 1                    Have you had extensive experience in

 2        your life analyzing and interpreting animal

 3        studies for cancer?

 4                    MS. WAGSTAFF:  Object to form.

 5             A.    Yes, I have.  My first job was with the

 6        National Cancer Institute in 1974, and at that

 7        time the Cancer Institute was still responsible

 8        for reporting the results of the rodent

 9        carcinogenicity studies.

10                    And my first assignment was to help the

11        division that was reporting those experiment

12        studies to write their technical reports reporting

13        on the results of the studies.

14                    So we would meet once or twice a week

15        sitting around a table with pathologists,

16        toxicologists.  I was a statistician,

17        veterinarians, various disciplines and go over the

18        many tables that accompanied every such study, and

19        would just talk about how to evaluate the results

20        of the studies.

21             Q.    Are you retired now?

22             A.    I am retired.

23             Q.    Do you know what glyphosate is?

24             A.    I do.

25             Q.    What do you -- what do you understand
```

**Exhibit F Page 9**

Robert Tarone, Ph.D.

1     it to be?

2          A.     It's an ingredient in -- in herbicides.

3          Q.     And have you had occasion in -- in your

4     time, toward the end of your career and since

5     you've been retired, to evaluate the analysis

6     that's been done of glyphosate?

7          A.     Yes, I have.

8                 MS. WAGSTAFF:  Object to form.

9          Q.     Are you familiar with an organization

10    called IARC?

11         A.     Yes.  International Agency for Research

12    on Cancer.

13         Q.     Okay.  And IARC analyzed some animal

14    studies involving glyphosate?

15         A.     Correct.

16         Q.     To your understanding, was the -- were

17    the animal studies that IARC analyzed critical to

18    its determination that glyphosate was a probable

19    carcinogen?

20                MS. WAGSTAFF:  Objection, leading.

21         A.     Yes, they were.

22         Q.     Do you agree with IARC's conclusions?

23         A.     Overall conclusion, no.  And it's

24    primarily because of their deliberations on the

25    rodent studies.

Robert Tarone, Ph.D.

1      Q.    Did you publish papers about that?

2      A.    I did.

3      Q.    And we'll get into those also today.

4  But what -- in those papers did you set out,

5  scientifically, proof that IARC had made a

6  mistake?

7            MS. WAGSTAFF:  Object to form.

8      A.    I did.  I -- I critiqued their

9  deliberations and pointed out weaknesses in what

10  they did.  In particular their exclusion of data

11  that was relevant to the tumor types that they

12  made their classification based on which were

13  mouse renal cell tumors, mouse hemangiosarcomas,

14  both of those only in males.  And rat pancreatic

15  islet cell carcin -- or adenomas.

16            Again, those, were the three tumors

17  that they specified as the result of their overall

18  conclusion that glyph -- there was sufficient

19  evidence that glyphosate was an animal carcinogen.

20      Q.    And you disagree with their conclusions

21  that that's specifically --

22      A.    I disagree with the final conclusions.

23      Q.    Okay.  And we're going to -- we'll get

24  into the details of that as well.

25            But let me just ask you:  In the papers

Robert Tarone, Ph.D.

```
 1    that you've written about your disagreement with

 2    how IARC did its work, did Monsanto ask you to

 3    write those papers?

 4         A.    No, they did not.

 5         Q.    Did Monsanto contribute to the writing

 6    of those papers?

 7         A.    Not at all.

 8               MS. WAGSTAFF:  Object to form.

 9         Q.    Have you -- did Monsanto pay for those

10    papers?

11         A.    No.

12         Q.    Did you write those papers -- well, why

13    did you write those papers?

14         A.    Basically it was peculiar in a way

15    because it actually -- the reason I got involved

16    in the scientific analysis started with a legal

17    situation in that the CEO of the company I worked

18    for -- I was a salaried employee at the

19    International Epidemiology Institute, a private

20    medical research firm -- and he received a call

21    from a lawyer representing Monsanto requesting a

22    short meeting, and then he called me and asked me

23    to attend the meeting.  And the meeting was about

24    IARC Monograph program procedures and -- and the

25    reason for the meeting was that IARC had declared
```

**Exhibit F Page 12**

Robert Tarone, Ph.D.

1    that glyphosate was a probable human carcinogen,

2    and no other agency -- it surprised many other

3    people.  No other agency national, international

4    or otherwise who had evaluated glyphosate had come

5    to that conclusion.

6              So this meeting was held so that this

7    lawyer could understand the processes by which

8    IARC reaches their decision trying to understand

9    why they stood alone in making this conclusion.

10       Q.   And when you say that "IARC stood alone

11   in making that conclusion," what do you mean by

12   that?

13       A.   I mean it -- there were several other

14   national, international groups that evaluated

15   glyphosate at that time, and no one else had

16   concluded that it was a carcinogenic risk or

17   hazard.

18              Now, the -- it's been evaluated by

19   several more since and the results have also been

20   the same including the United States EPA.  So no

21   one else agrees with the conclusion of IARC.

22       Q.   And as you sit here today, is it your

23   opinion that the reason IARC disagrees with

24   everybody else in the world is that IARC --

25              MS. WAGSTAFF:  Object to form.

Robert Tarone, Ph.D.

```
 1          Q.    -- made a mistake?
 2                MS. WAGSTAFF:  Object to form.
 3          A.    Not -- yes, I do.  But what I would
 4    like to see is IARC re-evaluate.  They definitely
 5    excluded some tumor rates that were relevant to
 6    the exact tumor sites on which they base their
 7    conclusion about animal carcinogenicity, so I
 8    would like to see a re-evaluation with all the
 9    data included.
10                (DEFENDANT'S EXHIBIT 37 WAS MARKED.)
11    BY MR. BRENZA:
12          Q.    Okay.  All right.  Let's -- let's
13    back up now and do some housekeeping.  Do you see
14    in front of you the exhibit that I've marked as
15    37?
16          A.    Yes.
17          Q.    That is a deposition notice for your
18    deposition issued by the Plaintiffs' lawyers in --
19    in something called the MDL, the multidistrict
20    litigation.  Do you see that?
21          A.    Yes.
22          Q.    Is that the subpoena that you received
23    that caused you to appear for a deposition last
24    week?
25          A.    It is.
```

Robert Tarone, Ph.D.

```
 1            Q.    Did the counsel for -- for the

 2     Plaintiffs in the multidistrict litigation spend a

 3     day with you asking you questions about your

 4     opinions?

 5            A.    No.

 6            Q.    What -- what happened at your

 7     deposition last week?

 8            A.    What happened at the deposition?

 9            Q.    Well, you said "no," so something else

10     must have -- I must have described it wrong.

11            A.    Yeah, you did.

12            Q.    Well, how would you describe it?

13            A.    I'm not sure what -- actually I'm not

14     sure about -- I thought you meant before the

15     deposition.

16            Q.    No, not before the deposition.

17            A.    No, no, no.  Friday -- Friday the

18     entire day was spent answering questions from the

19     Plaintiff counsel.

20            Q.    Okay.  And you answered all those

21     questions that the Plaintiffs' counsel asked you

22     to best of their ability -- your ability, right?

23            A.    To the best of my ability.

24            Q.    Okay.  And in fact you -- you took on a

25     homework assignment for them, right?
```

**Exhibit F Page 15**

Robert Tarone, Ph.D.

```
 1          A.    I did.

 2          Q.    They asked you to compute a --

 3    something called a P-value, right?

 4          A.    They asked for the output from a

 5    statistical analysis of some of the tumor rates

 6    that were relevant to the glyphosate decision.

 7                MS. WAGSTAFF:  To be fair, we didn't

 8          ask him to do any work.  We asked him to

 9          produce documents that should have been

10          produced pursuant to the subpoena.  So all we

11          did was ask him for data that he had already

12          done to send us stuff because he -- he

13          inappropriately withheld them from us.  They

14          should have been served -- or brought to the

15          deposition.

16    BY MR. BRENZA:

17          Q.    In any event, you -- you had to

18    recalculate those numbers and you did that for

19    them and you sent it to them over the weekend?

20          A.    I did.

21          Q.    Okay.

22          A.    They are reported in my published

23    peer-reviewed papers --

24          Q.    Okay.

25          A.    -- but the request was for the actual
```

**Exhibit F Page 16**

Robert Farone, Ph.D.

```
1     output.

2          Q.    Okay.  And you -- and you did that?

3          A.    Which I did not -- I have not thought

4     that that was necessary to provide because the

5     information, relevant information from that

6     output, is in my published peer-reviewed papers.

7          Q.    In any event, you were willing to do

8     that --

9          A.    I did.

10         Q.    -- and you did that for them, right?

11         A.    Uh-huh (affirmative).

12         Q.    Okay.

13         A.    Yes, I did.

14         Q.    And the deposition we're here today is

15    -- is a -- is the next day of that deposition,

16    right?

17         A.    As I understand it, yes.

18              (DEFENDANT'S EXHIBIT 38 WAS MARKED.)

19    BY MR. BRENZA:

20         Q.    Okay.  You'll see that I've also marked

21    another -- some other notices that I know if

22    you've received or -- or were aware of but other

23    cases have joined this deposition.  Do you see

24    that the next one that I've marked as 38 is a case

25    called Adams --
```

Robert Farone, Ph.D.

```
 1            A.    Uh-huh (affirmative), yes.

 2            Q.    -- vs. Monsanto?

 3            A.    Yes.

 4            Q.    Okay.  And that's -- that's another

 5      deposition notice that -- were you served with

 6      this or -- or not?

 7            A.    Yes, by email.

 8                  (DEFENDANT'S EXHIBIT 39 WAS MARKED.)

 9      BY MR. BRENZA:

10            Q.    Okay.  And then there's another one

11      after that marked 39.  It's the Mendoza deposition

12      notice.  Do you see that?

13            A.    I do.

14            Q.    Okay.  And you were served with that

15      once again before your deposition that happened --

16            A.    Is this also -- is this similar -- I

17      only received one.

18            Q.    Okay.

19            A.    Oh, yeah, this is a cross-notice I

20      didn't understand what that meant --

21            Q.    Cross-notice?

22            A.    -- but I did receive that by email.

23            Q.    Yeah.  And that -- and that was for a

24      deposition in the Mendoza case noticed for the

25      same day that you gave your deposition last week.
```

**Exhibit F Page 18**

```
  1            A.    Right.  I still don't know what it

  2      means, but I did receive it by email.

  3            Q.    Okay.

  4                  MS. WAGSTAFF:  And I'll just let the

  5            record, so we have a clear record, show the

  6            Mendoza counsel has withdrawn this

  7            cross-notice as of a few days ago.

  8                  MR. BRENZA:  Yeah, and we don't agree

  9            with that.  That's why I want it on the

 10            record that --

 11                  MS. WAGSTAFF:  I just wanted the record

 12            to show --

 13                  MR. BRENZA:  -- that they noticed it

 14            for the day that it happened.

 15            A.    Well, I think that's all I received was

 16      with the withdrawal notice.

 17            Q.    Okay.

 18            A.    Yeah.

 19                  (DEFENDANT'S EXHIBIT 40 WAS MARKED.)

 20      BY MR. BRENZA:

 21            Q.    The next document is -- it's a

 22      transcript, so this is going to require a little

 23      background.

 24                  Do you recall in 2019 you -- you gave a

 25      deposition?
```

**Exhibit F Page 19**

Robert Tarone, Ph.D.

```
 1          A.    Yes, December 2019.

 2          Q.    And at that deposition it was in a

 3   different case, right?

 4          A.    Yes.

 5          Q.    And you were asked questions by counsel

 6   for Monsanto and counsel for the plaintiff in that

 7   case, and you answered all those questions to the

 8   best of your ability, right?

 9          A.    Correct.

10          Q.    Do you -- do you understand by the

11   testimony that you gave in that transcript?

12          A.    Well, I do.  I actually have not seen

13   the transcript before, but clearly I answered

14   every question to the best of my ability.

15          Q.    Okay.  So you don't -- as you sit here

16   today, you don't have anything in mind that you

17   would like to take back or correct or change --

18          A.    No.

19          Q.    -- about the answers that you gave?

20          A.    No.

21          Q.    Okay.

22                MS. WAGSTAFF:  You know, we -- we would

23          object to some sort of incorporation of this

24          deposition that was not noticed in the MDL

25          even though it could have been, and it was
```

**Exhibit F Page 20**

Robert Tarone, Ph.D.

```
 1          not noticed in Ms. Gordon's case.  We would

 2          object any sort of incorporation via

 3          attaching it as an exhibit.

 4               MR. BRENZA:  All right.  Well, we can

 5          -- we can take that up at a future date, but

 6          the record is that the transcript from that

 7          deposition is now an exhibit and the doctor

 8          stands by it, right, Doctor?

 9               THE WITNESS:  Correct.

10     BY MR. BRENZA:

11          Q.   Okay.  Now, the next dep -- the next

12     exhibit, and you don't have this in front of you,

13     and I'm not sure I have one for you, but it's been

14     previously marked at your deposition last week in

15     2023 as Exhibit 2.  And it's your -- your CV and

16     your bibliography.  Are you familiar with those

17     documents?

18          A.   Yes, I am.

19          Q.   And so I want to -- I want to walk

20     through your background in a little more detail

21     and -- and learn your -- your experience in life

22     if -- if you don't mind.

23          A.   Fine.

24          Q.   Where were you born?

25          A.   Modesto -- well, Modesto, California.
```

Robert Farone, Ph.D.

```
1          Q.    And did you grow up there?

2          A.    I did.  Except for the first -- the

3    first two years of my life, we lived in Escalon,

4    which is small, next to Modesto where my father

5    was an instructor in agriculture at the high

6    school, but we moved to Modesto from the time when

7    I was three years old, and that's where I grew up.

8          Q.    When did you leave Modesto?

9          A.    I left Modesto when I went to the

10   University of California, Davis.

11         Q.    And why did you go to the University of

12   California, Davis?

13         A.    Well, one reason is my father went

14   there but just -- they had the majors I was

15   interested in.  I did the first two years of

16   college at Modesto Junior College, and then I

17   transferred to Davis my junior year.

18         Q.    What did you study there?

19         A.    At Davis it was almost exclusively

20   mathematics.  At the Junior College I got a lot of

21   the requirements out of the way, so almost

22   entirely math at Davis.

23         Q.    Did you receive a degree?

24         A.    Yes, I did a Bachelor's in Science.

25         Q.    What did you do next?
```

**Exhibit F Page 22**

Robert Tarone, Ph.D.

```
 1          A.    I got a draft notice from President
 2     Nixon, so I was in the Army for a couple years.
 3          Q.    Well, so let me -- let me back up.  Did
 4     you -- did you also complete a Master's?
 5          A.    I did.  I got a one-year deferment to
 6     complete a Master's degree because I had already
 7     been accepted to graduate school when I graduated.
 8          Q.    Okay.
 9          A.    And after getting the Master's degree,
10     I went into the Army.
11          Q.    Okay.  So -- so before you went into
12     the Army you had a Bachelor's of Science and a
13     Master's of --
14          A.    Of Science.
15          Q.    -- of Science in mathematics --
16          A.    That's correct.
17          Q.    -- from -- from UC, Davis?
18          A.    Correct.
19          Q.    And then you served?
20          A.    Yes.
21          Q.    What did you do in the military?
22          A.    Well, I was trained as a medic and
23     essentially spent the entire 1970 in Vietnam.
24     And after returning from Vietnam I was sent to
25     Fort Dix where in a very interesting job I was the
```

**Exhibit F Page 23**

Robert Tarone, Ph.D.

```
 1     one-man sexually transmitted disease clinic.
 2          Q.    Okay.  Well, we'll get to the -- to the
 3     Fort Dix experience, but let's -- let's talk a
 4     little more about Vietnam.  What did you do when
 5     you were serving in Vietnam?  And by the way --
 6          A.    I was a medic --
 7          Q.    And by the way, Doctor, thank you for
 8     your service.
 9          A.    Yes.
10          Q.    I always say that.
11          A.    I was a medic with an engineer, combat
12     engineer company, battalion.
13          Q.    Say that again?
14          A.    With the combat engineer battalion.
15          Q.    Combat engineer.  And what did that
16     involve?
17          A.    That involved -- I spent most of my
18     year in the field with a -- with one of the line
19     companies, and we just did engineering projects
20     that were needed, repair of bridge, roads,
21     anything that was needed.
22          Q.    Did you at times come under fire while
23     you were serving?
24          A.    Occasionally but we didn't go out and
25     look for trouble.  We were just engineers.  We
```

**Exhibit F Page 24**

Robert Farone, Ph.D.

```
 1    took occasional sniper fire, and there was one
 2    short firefight but I'm no, you know, deep combat
 3    veteran, don't claim to be.
 4          Q.    Sure.  But -- but you -- you were there
 5    and you served.  How long did you stay in Vietnam?
 6          A.    From January of 1970 to December of
 7    1970, a little over 11 months.
 8          Q.    And then what?
 9          A.    Then I was sent to Fort Dix.
10          Q.    Okay.  And Fort Dix is in the United
11    States?
12          A.    It's in New York, New Jersey.
13          Q.    Actually, I think my father may have
14    done basic training there, but...
15          A.    Oh, yeah.
16          Q.    What did you do at Fort Dix?
17          A.    Well, the man who had been running
18    their sexually transmitted disease clinic for 20
19    or more years had just retired, and they needed
20    someone to take over, and the Colonel Park, the
21    man in charge of the epidemiology program, saw
22    that I had a Master's degree and said, well, this
23    is what you're going to do for us, so...
24                I had about a week of training with the
25    man who was retiring, and then I ran that clinic
```

**Exhibit F Page 25**

1    for about -- my last seven months.

2        Q.    And what was involved in running the

3    clinic?

4        A.    People came in with a potential

5    sexually transmitted disease, and I did the tests,

6    the gram stain tests if it was possibly gonorrhea

7    and a dark field microscope examination if it was

8    possibly syphilis.

9             And then I made a diagnosis but of

10   course I couldn't treat because I'm not an M.D.,

11   so I would send them to the proper place to be

12   treated.

13       Q.    Okay.  Did you learn anything as a

14   result of working at Fort Dix in their clinic?

15       A.    Well, it got me interested --

16            MS. WAGSTAFF:  Object to form.

17       A.    -- actually in epidemiology, which I

18   had not previously been interested in.  So I think

19   it did change what I did in graduate school.

20   Rather than getting a purely theoretical degree, I

21   decided -- I decided to concentrate on statistics,

22   a more applied field.

23       Q.    How long did you serve at Fort Dix?

24       A.    Seven months, the last seven months I

25   was in the Army.

**Exhibit F Page 26**

```
1          Q.     What happened next?

2          A.     I separated in August and returned to

3     graduate school at Davis.

4          Q.     So back at Davis what -- what did you

5     study -- you were studying now for Ph.D., right?

6          A.     Right.

7          Q.     And -- and you -- had you decided you

8     wanted to go for a Ph.D. as a -- as a result of

9     your service at Fort Dix?

10         A.     No.  I think it was my goal originally

11    is just to -- I probably would have been in a more

12    theoretical area.

13         Q.     Okay.  What did you study at UC, Davis

14    in connection with the Ph.D.?

15         A.     Just a lot of different courses on

16    analysis.  And as I said, I took every course

17    possible in statistics and probability, but it was

18    a wide range of things even things like topology

19    that I wasn't particularly interested, but just to

20    fill out the requirements for a Ph.D.

21         Q.     Okay.  And did you complete the

22    requirements for a Ph.D.?

23         A.     I did.

24         Q.     Was there a -- did you provide a

25    thesis?
```

**Exhibit F Page 27**

Robert Farone, Ph.D.

```
1            A.    I did.

2            Q.    That's part of getting a Ph.D., right?

3            A.    I did.

4            Q.    Was you thesis -- what was your thesis

5       about?

6            A.    It was about asymptotic -- asymptotic

7       properties of certain estimators.  Asymtotic means

8       that as a sample gets very large, the distribution

9       of the -- of the various estimates.

10           Q.    So -- so is that a statistical

11      analysis?

12           A.    Yeah, they are statis -- estimates,

13      statistical estimates.

14           Q.    Okay.  When you're talking about

15      estimates, you're talking about --

16           A.    Theorizing different statistical

17      problems.

18           Q.    Okay.  When did you receive your Ph.D.?

19           A.    In 1974, June or July.

20           Q.    What happened next?

21           A.    I took a job at the National Cancer

22      Institute.

23           Q.    What's the National Cancer Institute?

24           A.    It's the institute within the National

25      Institutes of Health that focuses on cancer
```

**Exhibit F Page 28**

Robert Farone, Ph.D.

```
1     research.
2          Q.    And -- and to back up even more, what's
3     the National Institutes of Health?
4          A.    It's the umbrella that contains a lot
5     of different institutes, heart, lung and blood,
6     allergy and infectious diseases.  It's just -- I
7     don't know how many there are now.  More -- more
8     than when I was there first.
9          Q.    It's -- it's connected with the -- with
10    the Government, right, the US Government?
11         A.    Absolutely.  It's Federal Government.
12         Q.    Federal Government?
13         A.    Correct.
14         Q.    And it's funded by the Government,
15    right?
16         A.    Correct.
17              MS. WAGSTAFF:  Leading.
18         Q.    So you were a -- were you a Government
19    employee at that time?
20         A.    Yeah.  The first two years I was on
21    what -- essentially a fellowship.  I was a staff
22    fellow.  It's not a permanent position.  It's just
23    sort of -- they can take a look and see if they
24    want to keep you.
25              But after that I became a permanent
```

**Exhibit F Page 29**

Robert Tarone, Ph.D.

1    Federal employee.  Research mathematical

2    statistician was my title.

3         Q.    And -- and I should have asked this

4    earlier.  You said the NIH was an umbrella

5    institution of various health things.  The

6    National Cancer Institute is it fair to say that

7    that was a -- the part of NIH that focused on

8    cancer?

9         A.    Yes, exactly.

10        Q.    Okay.  And that's the part you were

11   working on, right?

12             MS. WAGSTAFF:  Objection, leading.

13        A.    Correct.

14        Q.    And you said you were a math --

15   research mathematical statistician?

16        A.    Correct.

17        Q.    What is that?  What were you doing

18   there?

19        A.    I was doing a variety of things but

20   most of my time was spent helping researchers in

21   various areas with the statistical analysis of

22   their experiments.

23        Q.    Why -- why did they need help with

24   that?

25        A.    Well, nobody -- nobody is trained in --

Robert Tarone, Ph.D.

```
 1    very few people who are doing research in the lab

 2    are well trained in doing statistical methods, so

 3    they would ask me to help them just to make sure

 4    they are doing their analyses correctly.

 5              And for the first 10 or 11 years it was

 6    mainly I was working with either people in the

 7    labs or for the first three or four years with the

 8    -- the group doing the rodent studies.

 9    Q.    Why is -- why do these researchers

10    needs statistical analysis?

11              MS. WAGSTAFF:  Object to the form.

12    A.    Just to make sure that they are

13    rigorously reporting their results, not coming to

14    conclusions that aren't justified based on the

15    data.

16    Q.    How does statistical analysis achieve

17    that?

18    A.    Oh, it's just a basic -- I mean, you

19    have data and usually there's -- or often there's

20    a control set and then there's -- there's data

21    that comes from various exposures and you're going

22    to see some differences just by chance, and you

23    want to know -- if you see a difference you want

24    to know is this by chance or is this actually due

25    to the thing I'm studying?  And that's what
```

**Exhibit F Page 31**

```
 1    statistical methods allow you to infer.

 2        Q.    What happens if you don't use

 3    statistics in that kind of a situation?

 4        A.    Well, I mean, there are obviously --

 5    there's probably some studies where the results

 6    are so striking, you don't need statistics.  But

 7    in many cases the results -- the differences are

 8    not that large, so you just want to use statistics

 9    to make sure that you're not just making an

10    inference based on a random chance occurrence.

11        Q.    Okay.  And there's -- your job was to

12    make sure they were doing that right, correct?

13            MS. WAGSTAFF:  Object to form.

14        A.    Correct.

15        Q.    Okay.  Is it possible that people who

16    are not -- is it possible that the people -- even

17    smart people make mistakes when applying

18    statistics?

19            MS. WAGSTAFF:  Object to form.

20        A.    Yeah, they are difficulties that arise.

21    Knowing -- knowing exactly which method to apply

22    to the data one of the --

23            THE COURT REPORTER:  Excuse me.  Excuse

24        me.  Oh, my ear.

25            MS. WAGSTAFF:  Oh, sorry.
```

```
 1                 THE COURT REPORTER:  Please repeat your
 2         answer.
 3                 MS. WAGSTAFF:  Sorry.
 4                 THE WITNESS:  What was the question?
 5                 THE COURT REPORTER:  Knowing exactly
 6         which method to apply.  Go ahead.
 7         A.    Yeah, I was just saying that one of the
 8   -- one of the things were quite -- one of the
 9   reasons questions arise is people don't often know
10   which particular statistical method to apply.
11   There are many statistical methods.  Some are
12   applicable to a given problem, some are not.
13         Q.    Okay.  So you -- you spent some years
14   as a research mathematician -- math -- math
15   statistician?
16         A.    Statistical, yes.
17         Q.    What happened after that?  What -- what
18   was your next --
19         A.    Well, my entire period there I was --
20   essentially that was my job title.  But at some
21   point later in my career, I think around 1992, I
22   became a head of a section, a section that I had
23   been in previously, but I was always just a
24   research mathematical statistician.  That was my
25   job title throughout.
```

Robert Tarone, Ph.D.

```
1            Q.    So that was -- you said in 1992 you
2     became head of your section?
3            A.    Well, I'd have to look at my CV.  I
4     think it was around 1992.
5            Q.    And -- and what was your section that
6     you're referring to?
7            A.    Well, it changed names several times.
8     Originally it was the mathematical statistics and
9     applied mathematics section, and I think by the
10    time I became the head, it was the statistical
11    research and application section.  It seems to be
12    a thing in government where divisions, branches
13    and sections change names.
14           Q.    Were your duties similar over the
15    course of that time?
16           A.    They were.  A combination of providing
17    consultations to researchers in the lab and also
18    occasionally writing statistical methods papers
19    for statistical journals.
20           Q.    And those papers are they recorded in
21    the --
22           A.    Every paper I did was in my CV, yes.
23               THE COURT REPORTER:  Excuse me.
24          Doctor, excuse me.  Could you please wait for
25          him to finish his question?
```

```
 1                  THE WITNESS:  Okay.  Sorry.

 2                  THE COURT REPORTER:  Please repeat your

 3        question.

 4   BY MR. BRENZA:

 5        Q.    Are those papers included in your

 6   bibliography?

 7        A.    They are.

 8        Q.    Okay.  And -- and your bibliography as

 9   of February of 2023 it looks like you have --

10   well, how many -- how many papers have you

11   published?

12        A.    I think maybe 326.  Is that what it is?

13   I know I --

14        Q.    I've got 325.

15        A.    Okay.  325.

16        Q.    That's close.

17        A.    Okay.

18        Q.    325 over the course of your lifetime

19   roughly?

20        A.    Right.  And most of those are actually

21   published in peer-reviewed journals.  So if you go

22   on PubMed, which is a way of ascertaining papers

23   published in a select group of publi --

24   publications that they index, I think 290, or a

25   little bit more than that, are on PubMed.
```

**Exhibit F Page 35**

Robert Tarone, Ph.D.

```
 1            Q.     Is -- is there a way of generalizing
 2      the subject matter of most of those papers?
 3            A.     No, not really because as I said, many
 4      of them were as a consulting statistician in
 5      laboratory research that was quite varied.
 6            Q.     Okay.  What happened next at the
 7      National Cancer Institute?
 8            A.     Well, I retired in 2002.
 9            Q.     Okay.  So before you retired at the
10      National Cancer Institute, did you have occasion
11      to analyze animal carcinogenicity studies?
12            A.     That was in the initial portion of may
13      career.  Then in the middle portion it is was
14      mainly laboratory studies and experiments, but
15      then for the last 12 to 15 years it was primarily
16      with epidemiologists.
17            Q.     Okay.  I want to direct you back to the
18      time when you were working with animals and -- and
19      carcinogenicity tests, okay?  What was the nature
20      of the test that you were participating in?
21            A.     Well, they were rodent studies very
22      much like the ones that are relied upon in the
23      Monograph 112 for glyphosate.  The studies
24      included a strain of mice and a strain of rats,
25      males and females, so there were essentially four
```

Robert Tarone, Ph.D.

```
 1    different experiments, a male and female mouse and

 2    male and female rat.

 3              And they were lifetime feeding

 4    experiments for the most part where the animals

 5    were exposed to agents for their lifetime and

 6    followed for two years to see if they developed

 7    tumors.

 8       Q.    Is two years a lifetime for a mouse or

 9    a rat?

10       A.    I think it's pretty much considered

11    that.  I think they start -- when they get beyond

12    two years, they get sort of old like I am.

13              (Laughter.)

14       Q.    So you were participating in feeding

15    studies?

16       A.    Right.

17       Q.    So how did that work?  What -- what

18    was --

19       A.    Well, I was only -- I was only involved

20    in the end product.

21       Q.    Right.

22       A.    These studies were done under contract

23    from the National Cancer Institute, and then they

24    would send files -- folders with a huge number of

25    tables that are generated in such tables.  And as
```

```
 1      I said, we would sit around the table, a group of

 2      people, and go through all the tables, try to make

 3      sense of it, come to a conclusion as to whether we

 4      thought the chemical was a carcinogen or not and

 5      then write a technical report.

 6          Q.    And I'm trying to get back to

 7      something -- about how these studies are designed.

 8      Do they give begin with feeding groups of rodents

 9      different amounts --

10          A.    Yes.

11          Q.    -- of a compound?

12          A.    Yes.  Typically for the Cancer

13      Institute studies there would be a control group

14      and two exposed groups, one at a medium dose and

15      then one at a high dose.

16          Q.    And -- and there's more than one mouse

17      or rat in each of those --

18          A.    Usually 50 rats, occasionally more, but

19      usually 50 rats or mice.

20          Q.    In each group?

21          A.    Male and female, 50 of each, yes.

22          Q.    Okay.  And -- and you feed them dose --

23      certain doses over their lifetime?

24          A.    Correct.

25          Q.    And then you see at the end of their
```

**Exhibit F Page 38**

```
1    lives if they got cancer?
2         A.    Correct.  Occasionally it's
3    administered in water and rarely for the studies
4    that I was involved in, inhalation.  So it was
5    mainly feeding studies.
6         Q.    And did you observe that even rodents
7    who hadn't been given any compound still got
8    cancer on occasion?
9              MS. WAGSTAFF:  Object to form.
10        A.    Yes, I did.  And that was for the --
11   for the mouse training that we're involved in,
12   most of the experiments I was -- that I was
13   involved in analyzing it was called the B6C3F1
14   mouse, and they had fairly high spontaneous high
15   tumor rates.
16        Q.    So is that -- is that the control
17   group?  The group that didn't get --
18        A.    The control group even if they weren't
19   exposed to anything.
20             THE COURT REPORTER:  Excuse me.  Please
21        repeat your question.
22        Q.    Is the control group the group that
23   doesn't get any -- they are not fed any of
24   compound?
25        A.    That's correct.
```

Robert Tarone, Ph.D.

```
 1          Q.    They are just normal mice?

 2          A.    They are treated exactly the same

 3    except they don't have whatever agent you're

 4    examining, it's not in their feed.

 5          Q.    And some of those mice, the control

 6    mice, still get cancer?

 7          A.    Sure, yes.

 8                MS. WAGSTAFF:  Objection, leading.

 9          Q.    Why -- why do you have that control

10    group?

11          A.    Well, you need to know what the

12    baseline rate is so you can evaluate whether what

13    you observed in the treated groups has actually

14    elevated.  If you didn't have a control group,

15    there would be no way to know that.  You'd just

16    have two exposed groups.

17          Q.    And how does that -- how is that

18    important -- well, strike that.

19                What kind of analysis do you do once

20    you have the results of a lifetime feeding study

21    to determine whether the compound had any effect

22    on the mice?

23          A.    Well, the method can vary.  But

24    assuming -- assuming there's no toxicity so that

25    you're not killing some of the animals that you
```

**Exhibit F Page 40**

Robert Tarone, Ph.D.

```
 1    expose to the higher doses, there are methods for

 2    analyzing just the raw tumor rates, the number of

 3    animals that developed a tumor divided by the

 4    number of animals in that group.

 5              And in that case, there are actually

 6    Exact statistical methods.  There's something

 7    called the Fisher Exact Test to compare one group

 8    to another, just a pairwise comparison.  And then

 9    there's a Cochran-Armitage Trend Test where you

10    look for a dose-response whether there's a

11    dose-response increasing tumor rates with

12    increasing exposure levels.

13        Q.   And -- and those tests, the

14    Cochran-Armitage and the Fisher, those are --

15    those are statistical tests?

16        A.   Statistical tests.  They are very well

17    widely recognized for applied statisticians.

18        Q.   And they -- and they tell you whether

19    what you're seeing is evidence of a real effect or

20    just due to chance?

21        A.   That's right.  You're trying to

22    determine if what you observed might -- even

23    though it might look like it's an effect, you want

24    to know if it could possibly be due to chance.

25        Q.   All right.  About how many compounds
```

**Exhibit F Page 41**

Robert Tarone, Ph.D.

```
 1    did you and your colleagues at the National Cancer

 2    Institute analyze over the course of your time

 3    there?

 4         A.   Well, I don't know --

 5              MS. WAGSTAFF:  Object to form.

 6         A.   Yeah, I couldn't -- I couldn't tell you

 7    exactly how many, but I was doing it for, you

 8    know, two to three years.  It was scores, you

 9    know.

10         Q.   Scores meaning 20s, right?

11         A.   Probably more than 50.

12         Q.   More than 50?

13         A.   But not 300.

14         Q.   Okay.  But -- but quite a few?

15         A.   Yes.

16         Q.   And that was you said at the earlier

17    part of you're career --

18         A.   Right.

19         Q.   -- at the National Cancer Institute

20    then you moved to --

21         A.   Shortly after -- shortly after -- maybe

22    four or five years after I got there, the

23    responsibility for these rodent studies was

24    transferred to the National Toxicology program

25    with the National Institute for Environmental
```

**Exhibit F Page 42**

1    Health Statistics' statisticians being involved in

2    the analysis.

3         Q.    Okay.  And then so you -- your job

4    changed a little then and then you -- you started

5    analyzing more laboratory-related results?

6         A.    Right, right.  But after it moved

7    actually, I mean, I still wrote a few

8    methodological papers.  And because of my

9    experience, I was asked by IARC to write their

10   scientific monogram on how to analyze animal

11   studies.

12              MS. WAGSTAFF:  Objection, speculation.

13              MR. BRENZA:  All right.  I'm going to

14        -- that's been previously marked in your

15        deposition as -- your December 2019

16        deposition as Exhibit 7.  I'll mark it again

17        here just for clarity as 41.

18              (DEFENDANT'S EXHIBIT 41 WAS MARKED.)

19              THE COURT REPORTER:  I'm sorry, was

20        there a 40?

21              MS. WAGSTAFF:  Yeah, 40 was the --

22              MR. BRENZA:  40 was the transcript.

23              MS. WAGSTAFF:  -- transcript.

24   BY MR. BRENZA:

25         Q.    So, Doctor, I'm handing you 41.  Is

**Exhibit F Page 43**

1     this the chapter of the -- of the IARC manual?

2          A.     It's not actually a chapter.  This is a

3     text.

4          Q.     But what's the --

5          A.     But in addition -- in addition to

6     their -- the Monograph's program, series of

7     monographs, IARC also has a scientific monograph

8     series, which is -- this book was in that series.

9     They just produced text based on different things,

10    you know, involved in -- in research, cancer

11    research.

12               There were -- there were two, actually

13    two books, on statistical methods and

14    epidemiology.  They are actually very -- very

15    excellent books.  They are done by Norman Breslow

16    and Nick Day -- Nick Day.

17         Q.     Are those two books -- I'm not sure

18    what you're saying.  Are they connected to IARC?

19         A.     Yeah, they're -- they're in the same

20    scientific monograph series of IARC.

21         Q.     Okay.

22         A.     They're not -- they're not -- all the

23    books in that series are not statistics.  Anything

24    -- anything related to cancer research they would

25    produce monographs if they thought it was needed.

```
 1            Q.    In any event, they -- they asked you to

 2      -- to write one for them?

 3            A.    Be a co-author, yes.

 4            Q.    And -- and you did that?

 5            A.    I did.

 6            Q.    And it was published?

 7            A.    Published.  It appeared in print in

 8      1986.

 9                  THE COURT REPORTER:  I'm sorry, could

10            you repeat that?

11            A.    It appeared in print in 1986.

12            Q.    Okay.

13            A.    And that was just about the last really

14      active research that I did in animal studies

15      because I had now primarily had been working with

16      laboratory workers.

17            Q.    Do you know why IARC asked you to write

18      that chapter on animal research?

19            A.    I don't know.  I assume it was because

20      of my experience at NCI analyzing and possibly my

21      methodological papers.

22            Q.    Okay.  Have you been made aware of

23      people using your -- your publication on how to

24      analyze animal studies statistically?

25            A.    I mean, I've seen it cited.
```

```
 1              MS. WAGSTAFF:  Objection.

 2         A.    It's cited in the preamble that occurs

 3    with every IARC Monograph's program publication.

 4         Q.    All right.  Let's get back to finishing

 5    your career history.  You left the Government

 6    around 1993, is that right?

 7         A.    I did.

 8         Q.    And what did you do next?

 9         A.     I joined a private company called the

10    International Epidemiology Institute.  In the last

11    15 years at NCI I had been involved in designing,

12    analyzing and writing papers on -- on a number of

13    large studies, case control study of power lines

14    and childhood leukemia, case control study of

15    cellphones and brain cancer.  The ALTS trial which

16    was a trial comparing HPV testing with cytological

17    examination for the diagnosis of cervical cancer.

18              That -- that study eventually went on

19    to NCI getting involved in developing a vaccine

20    for HPV.

21              And in the final large project I was

22    involved in was the design and -- I published a

23    few of the early papers based on the Agricultural

24    Health Study, a study of farmers in North Carolina

25    and Iowa.
```

**Exhibit F Page 46**

Robert Tarone, Ph.D.

1          Q.    And you said -- you said that you

2     published some of the early papers.  What were --

3     what were the early papers that you published on

4     the Agricultural Health Study?

5          A.    The first two were just sort of

6     method -- methodology papers.  It was before we

7     had any data on actual cancer rates because the

8     follow-ups start and you have to -- you have to go

9     a few years before you accrue enough cases to do

10    analyses of actual outcomes.  But right before I

11    left NCI, I was involved in the first large study

12    of a -- of a given disease, and it was since these

13    farmers are largely men, obviously it was prostate

14    cancer, so I was involved in writing that paper

15    which was published in 2003 in the American

16    Journal of Epidemiology.

17         Q.    Okay.  And you said at IEI, the

18    International Epidemiological Institute, you

19    worked on some large programs involving power

20    lines and leukemia?

21         A.    No, on, that was at the NCI.

22         Q.    Oh, this was NCI?

23         A.    Yeah, these were NCI studies.

24         Q.    Okay.  And I just want to unpack those

25    a little bit.  Said some of the bigger studies you

**Exhibit F Page 47**

Robert Tarone, Ph.D.

```
1    worked at on at NCI you said one was power lines
2    and childhood leukemia?
3         A.    Yes, it was a case control study.
4         Q.    And what was that -- what was the
5    question there?
6         A.    Well, there was a fear that living near
7    electrical power lines might increase the risk of
8    childhood leukemia.  So I think NCI was actually
9    tasked by Congress to study the relationship and,
10   so a case control study was done.  It was similar
11   with cellphones and brain cancer.
12        Q.    Okay.  That was another big project
13   that you worked on?
14        A.    It was a case control study.  And once
15   again, I think Congress sort of had urged NCI to
16   study this because there was so much concern.
17        Q.    And the same with the HPV study?
18        A.    Yeah.  I think -- I'm not sure that was
19   obviously an important question that had arisen
20   fairly soon before we did that study was how could
21   you use HPV testing?  I mean, for a long time no
22   one thought that cervical cancer was due to any
23   sort of an infectious agent.
24             But by that time it was clear that HPV
25   was the primary cause.  So it was just a study to
```

Robert Tarone, Ph.D.

```
 1    look to see if maybe it was better to do HPV

 2    testing rather than cytological testing, the Pap

 3    smear that had been done for decades.

 4        Q.    Uh-huh (affirmative).  Okay.  And then

 5    -- and then you said just before you left you did

 6    a couple of the early studies on the agricultural

 7    study --

 8        A.    Right.

 9        Q.    -- involving the methodology by which

10    that program would be studied?

11        A.    Yeah, there was one comparison of --

12    the people in the cohort were enrolled when they

13    arrived at state centers to get licensed to apply

14    pesticides.  And they had a rather large

15    questionnaire that they were asked to fill out at

16    that time, and then they had a take-home

17    questionnaire that was sent home, and they were

18    asked to fill it in and answer it.

19              Of course as with any questionnaire,

20    not everybody returned the second questionnaire.

21    So one of the -- one of the early papers was to

22    compare the demographic characteristics of the

23    people that returned the questionnaire with those

24    that didn't.  And we had the demographic --

25    demographic information on all of them because of
```

**Exhibit F Page 49**

1    the initial enrollment questionnaire.

2         Q.    Did you make any conclusions about

3    whether the study could be valid, if not every

4    single person return their questionnaire?

5         A.    No.  We couldn't do -- we did show that

6    demographically they were similar, but of course

7    you can never know -- answer the question you

8    asked because you can only analyze the demographic

9    characteristics that you asked about on the first

10   exam.

11        Q.    Okay.  So -- so does that finish your

12   work at NCI before you have left?

13        A.    Basically, yes.  After I left NCI, I

14   was co-author on a couple of more papers based on

15   Agricultural Health Study just because of my

16   long-time involvement, but that was my last active

17   work at NCI was with the Agricultural Health

18   Study.

19        Q.    The -- the next thing you did was you

20   went to work for a company, right?

21        A.    Company, right, a small business.

22        Q.    And that was what you said before the

23   International Epidemiological Institute?

24        A.    Yes.

25        Q.    What kind of work did you do at --

Robert Tarone, Ph.D.

1    we'll just call it IEI since it's kind of a

2    mouthful if that's okay with you?

3          A.     Right.  That's fine.

4          Q.     What kind of work did you do at IEI?

5          A.     Pretty much the same thing that I did

6    at the Cancer Institute except IEI was involved in

7    many more diseases than cancer, but they

8    specialized essentially in doing cohort studies.

9          Q.     What's a cohort study?

10         A.     Well, there's two types of cohort

11   studies.  The Agricultural Health Study is a

12   perspective cohort study, and there you enroll

13   subjects, get information at the baseline on their

14   exposures and then follow them over time and

15   ascertain the disease outcomes and see if you can

16   find associations between exposures and eventual

17   disease occurrence.

18              But there are also retrospective cohort

19   studies in which you have a well-defined group of

20   people, but you're trying to look after the fact.

21   You -- many of these are done with industrial

22   cohorts, and you try to ascertain their lifetime

23   exposure history from company records, but you're

24   -- you're looking backwards and then you get their

25   disease -- any disease status -- sometimes it's

Robert Parone, Ph.D.

```
 1    difficult.  Sometimes you can do cancer if there's
 2    a cancer registry near where the -- whatever the
 3    industrial cohort works, but you can always get
 4    mortality data from Federal records.
 5              But -- but it's retrospective in terms
 6    of everything has already happened.  You're just
 7    trying to make sense of it.  But it's in a
 8    well-defined group of people, and that's why it's
 9    considered a cohort study.
10         Q.   Okay.  And -- and did you do both of
11    those types of studies at IEI?
12         A.   I did.  The main -- the time I was
13    there, the main job both in terms of money and
14    time was a very large prospective cohort study of
15    residents of southern states.  It's called the
16    Southern Community Cohort Study.  It's over 80,000
17    residents of southern states.
18              A couple of reasons it was done most of
19    the cohorts that people had been publishing on for
20    years -- like there are three at Harvard.  Most of
21    them involved fairly high SES people and
22    predominantly white.
23              This cohort in the Southern Community
24    Cohort Study were two-thirds African Americans and
25    almost all the participants were lower
```

**Exhibit F Page 52**

Robert Tarone, Ph.D.

```
 1     socioeconomic status.  They were recruited out of

 2     the community health centers where they went to

 3     get their -- their healthcare.

 4          Q.    What was the purpose of developing a

 5     database of these other -- these people who hadn't

 6     previously been --

 7          A.    Well, as for most prospective cohort

 8     studies, you can look at almost any outcome and

 9     any exposure or demographic characteristic that

10     you ask about on the baseline questionnaire.

11               So there was no one specific reason.

12     It was just to provide a database.  And it was --

13     it was very useful not only for IEI, but other --

14     anybody around the United States who was

15     interested in doing research could submit a

16     request to use the data which included biological

17     samples because there was -- there were actually a

18     number of very relatively high percentage of

19     subjects for which we had biological samples

20     because they were recruited at these health

21     centers, so it was easy to draw blood, get urine,

22     take a buccal swab, a scrape of the inside of the

23     mouth for DNA.

24               But there was no one specific reason it

25     was done.  It was just done to study.  Now one of
```

**Exhibit F Page 53**

Robert Tarone, Ph.D.

```
 1    the reasons was -- the justifications was to

 2    examine differences between African Americans and

 3    whites in terms of cancer risk.  That was -- that

 4    was obviously one of the important reasons for

 5    doing it.  There had been disparities that had

 6    been reported on for same.

 7         Q.    And -- and this study was part of an

 8    effort to address those discrepancies?

 9         A.    Right.  No, the study was joint with

10    Vanderbilt University and Meharry University, so

11    all three IEI, Vanderbilt and Meharry were on the

12    -- the Government grant.

13         Q.    And when you say the Government grant,

14    are we talking about the National Cancer Institute

15    grant?

16         A.    It was funded by the NIH, right.

17         Q.    NIH.  Was that the bulk of the work you

18    did at IEI?

19         A.    Yes, for everybody in the company

20    predominantly, but I was also involved in other

21    studies.

22         Q.    What other studies were you involved?

23         A.    We did some industrial cohort studies,

24    one of Lockheed Martin workers in an airplane

25    production plant in California.  We looked at
```

**Exhibit F Page 54**

Robert Tarone, Ph.D.

```
 1    silicone wafer workers that produced the silicone
 2    wafers, the chips for computers and other things.
 3              We did a study on Cape Cod in Maryland
 4    -- in Massachusetts rather, because there was a
 5    concern that a radar facility on the Cape was
 6    causing increased disease rates, and that was a
 7    study done for the Air Force.
 8              So there were -- there were a variety
 9    of different things that we studied.  It was
10    different diseases, not entirely cancer.
11         Q.    And did you finish your career working
12    at IEI?
13         A.    I did.
14         Q.    When did you retire?
15         A.    I retired in June -- at the end of June
16    in 2016.  IEI essentially ceased to exist as a
17    private entity at that point.  It became part of
18    the Vanderbilt College of Medicine.  It's now
19    called the International Epidemiology Institute
20    Field Station of the Vanderbilt University College
21    of Medicine.  Because most of what's -- in fact
22    almost everything that's done is running this
23    large cohort.
24         Q.    While you were at IEI, was Monsanto a
25    client?
```

Robert Farone, Ph.D.

```
1        A.    No.  Monsanto was not a client.  And in

2   fact IEI did no research whatsoever on pesticides

3   at all.

4        Q.    Was -- was Bayer a client of IEI?

5        A.    Bayer was not.  There were

6   pharmaceutical companies that were clients but --

7   in fact I checked on that when I -- when Bayer

8   bought Monsanto, I asked the -- the woman who is

9   sort of our -- in charge of the whole company if

10  any research had ever been done with Bayer.

11  Because we did look at studies with analgesics,

12  acetaminophen, Advil, to look at possible adverse

13  risks.  But, no, no research was ever done at IEI

14  for Bayer.

15       Q.    Okay.  Now, we're going to -- you did

16  have a three-hour meeting that you alluded to

17  earlier with -- with Monsanto, right?

18       A.    Exactly.

19       Q.    Toward the end of your time at IEI?

20       A.    Yes, it was in September of 2015.

21       Q.    You said December 12th.  Okay, 2015.

22  Other than that three hours, did you do anything

23  for Monsanto while you were at IEI?

24       A.    I did have another meeting with the

25  same lawyer and two younger lawyers just like a
```

**Exhibit F Page 56**

Robert Tarone, Ph.D.

```
 1    seminar on statistical methods that were relevant

 2    to animal studies, and there was no pay received

 3    for that.  It was just a -- it was just a meeting

 4    so that they could understand the various terms

 5    and techniques that were involved in animal

 6    studies.

 7         Q.    Okay.  Let's backup to the previous

 8    one.

 9         A.    Right.

10         Q.    That one Monsanto did pay something

11    for, right?

12         A.    Yes, they did.  IEI received $750 for

13    my participation and $750 for the CEO's

14    participation.

15         Q.    Okay.  So the two of you the CEO --

16         A.    Correct.

17         Q.    -- and you met with Monsanto with three

18    hours?

19         A.    Correct.

20         Q.    And the company that you worked for

21    that -- that was paid $750 for the time of each of

22    you?

23         A.    That's correct.

24         Q.    Okay.  Other than that one $750 payment

25    to the company that you worked for, has Monsanto
```

**Exhibit F Page 57**

Robert Tarone, Ph.D.

```
1    ever given you any money for anything you have
2    done in your research or work?
3         A.    No.
4               MS. WAGSTAFF:  Object to form,
5         misstates the record.
6         A.    No.  There's been no payment at all
7    further from Monsanto.  And since I retired, no
8    payment received from anybody for my scientific
9    endeavors.
10        Q.    Have you been -- have you had other
11   contacts with Monsanto besides -- while you
12   working at IEI?
13        A.    Yes.
14        Q.    What were those?
15        A.    Well, during this meeting -- I should
16   say that when I went to this meeting, before --
17   before this meeting, I was totally ignorant of the
18   -- what was in the IARC Monograph 112 about
19   glyphosate.  I hadn't read it.  I hadn't really
20   paid much attention to it.
21               In preparing right before the meeting,
22   I did give it a quick reading, at least the
23   sections on epidemiology and rodent tumors, and
24   there was some things in the quick read of the
25   rodent tumors that disturbed me, sort of red flags
```

Robert Tarone, Ph.D.

1      that something peculiar was going on.

2                But aside from that, at the time of the

3      meeting, I did not know details of the glyphosate

4      deliberations.  But in reading -- in reading the

5      rodent section because questions arose, I was

6      interested in seeing the actual tumor rates from

7      all of these studies, and the Monograph itself

8      cites a review paper by Greim, et al.  It was

9      sponsored by -- it was paid for by Monsanto.

10               And the monograph states that with this

11     paper there was also accompanying supplement that

12     contained all of the tumor rates.  And I wanted to

13     see those, so I contacted one of the co-authors

14     David -- I think his name is pronounced Saltmirus

15     or Saltmiras, but he was one of the co-authors.

16               Because when I bought the paper, I was

17     having trouble downloading the -- the

18     supplementary tables of tumors, and it turned out

19     that I had actually found out how to get them

20     downloaded before he replied to me, but I had

21     contacted him to ask him if he could provide those

22     supplementary tumor data.

23          Q.    So you -- you called a person that

24     worked at Monsanto?

25          A.    Sent an email.

Robert Farone, Ph.D.

```
 1          Q.    Sent an email.  Dr. Saltmiras

 2    who was -- he was an author on -- on --

 3          A.    On the Greim, et al. paper.

 4          Q.    -- on the paper, right?

 5                And you asked him if he could provide

 6    you with the base -- the underlying data --

 7          A.    I did.

 8          Q.    -- about --

 9          A.    Before he responded, I had figured how

10    to download them from the Journal website.

11          Q.    All right.  So -- so Dr. Saltmiras

12    never actually provided to you the tables because

13    you didn't need them?

14          A.    No, I didn't need to get them from him.

15          Q.    Okay.  And you were able to get the

16    tables without -- without going through

17    Dr. Saltmiras ultimately?

18          A.    Right, yeah.

19          Q.    During that course -- during the course

20    of dealing with Dr. Saltmiras and asking him for

21    the data, was there any compensation or any

22    discussion about how you --

23          A.    No compensation.  There was a brief

24    back and forth via email, and those emails were

25    provided at the deposition on Friday, copies of
```

**Exhibit F Page 60**

1    them.

2         Q.   Okay.  Have you -- do you have a

3    philosophy about whether you're willing to accept

4    compensation from Plaintiffs or Monsanto or any

5    party that's involved in this dispute about

6    glyphosate?

7         A.   About anything.  I will not take

8    payment from any company.  Because once you take

9    payment from the company, your research is viewed

10   in a different light as if you're maybe doing

11   something for them instead of just doing an

12   objective analysis.

13        Q.   Have you scrupulously avoided taking

14   anything of value in connection with your work

15   evaluating IARC's decision on glyphosate?

16        A.   Yes.

17             MS. WAGSTAFF:  Object to form.

18        A.   That and anything else.  I've taken --

19   I've received no compensation from anybody since I

20   retired.

21             (DEFENDANT'S EXHIBIT 42 WAS MARKED.)

22   BY MR. BRENZA:

23        Q.   Your paper you referred to we are going

24   to talk more about it, so I'm going to mark it.

25   It was Exhibit 8 at your 2019 deposition and I'm

1    going to mark it now as 42 and hand you a copy.

2         A.    This isn't my paper.  This is the Greim

3    paper.

4         Q.    Yes.  And I'm also going to hand you a

5    copy of the supplement previously marked at your

6    December deposition as Exhibit 9.  I'm going to

7    mark it now as 43.

8              (DEFENDANT'S EXHIBIT 43 WAS MARKED.)

9    BY MR. BRENZA:

10        Q.    Is the paper we've marked as 42 the --

11   the Greim paper that you referenced earlier?

12        A.    Yeah, that's the -- that's the paper

13   cited in Monograph 112 in the glyphosate chapter.

14        Q.    Okay.  And -- and David Saltmiras is

15   listed as one of the authors.  He's the second

16   author, right?

17        A.    Correct.

18        Q.    And it says right at the bottom that

19   David Saltmiras' address is at Monsanto, right?

20        A.    Correct.

21        Q.    So it's not -- it's not a secret that

22   he was a Monsanto employee on this --

23        A.    And that's where I got his email

24   address because it is at the bottom.

25        Q.    The -- the other authors were not

Robert Tarone, Ph.D.

1    Monsanto employees, right?

2         A.    I never actually looked to see who they

3    were with.

4         Q.    Okay.  In any event, you weren't so

5    much interested in their paper as the underlying

6    data, right?

7         A.    Exactly.  And in fact in my papers I

8    don't cite this paper for its conclusions about

9    animal carcinogenicity.  I just cite this paper as

10   the source of the tumor rates that my analyses are

11   based on.

12        Q.    And -- and it's the nature of the Greim

13   paper that it collects the data from a number of

14   different mouse and rat studies that had been

15   done?

16        A.    Well, they were evaluating the evidence

17   presented in several different mouse and rat

18   studies for which they provided the supplementary

19   data.

20        Q.    The supplementary data is provided in

21   the document we've marked in Exhibit No. 43, is

22   that right?

23        A.    Correct.

24        Q.    And -- and you were able get that and

25   analyze it to see what -- what the actual numbers

Robert Tarone, Ph.D.

```
1    were for various rat and mouse studies?

2         A.    Right.  It took a little work to figure

3    out because these studies are just kind of given a

4    number in the paper, but I determined which papers

5    were referred to in the Monograph 112 chapter.

6         Q.    Okay.  Let me -- we're going to get

7    into this in a little more, but I want to just

8    finish what we were doing earlier which is your

9    discussions with Monsanto.

10              You -- you asked Dr. Saltmiras for the

11   tables.  You were able to get them otherwise.  Did

12   you have any other discussions with Dr. Saltmiras?

13        A.    I did.  At -- at one point when I

14   finally got the tumor data and was able to look at

15   it, I was just a little bit concerned because in

16   the two mouse studies one of the studies they

17   referred to hemangiosarcomas, which are malignant

18   tumors of the blood vessel.

19              But the other study referred to -- and

20   they also referred to hemangiomas which are a

21   benign version, by it also -- the other -- the

22   other study referred to hemangiomas, but they used

23   hemangioepithelioma (sic), not hemangiosarcoma.

24              And when -- I read what I could read,

25   and I could not come to a conclusion whether they
```

Exhibit F Page 64

Robert Parone, Ph.D.

```
 1    were definitely referring to the same lesion.  So
 2    I asked Dr. Saltmiras for the name of a rodent
 3    pathologist.  This I'm pretty sure was a telephone
 4    call.  And he gave me the -- the telephone number
 5    of a -- of a rodent pathologist I think in
 6    Illinois.  And I did call that man, and he -- said
 7    well some people make a distinction but he thought
 8    I could refer to them both as hemangiosarcoma,
 9    which I did in my papers.
10         Q.    Okay.  So you needed a little bit of
11    information about --
12         A.    Correct.
13         Q.    -- how to compare the cancers, and you
14    -- and you were referred by Monsanto to an expert
15    who gave you that information?
16         A.    Correct.
17         Q.    And you relied on that information?
18         A.    I did.
19         Q.    Okay.  Any other conversations that you
20    had with Dr. Saltmiras?
21         A.    Yes, there was one other.  He called me
22    and was sort of asking if I might be interested in
23    going to Helsinki, Finland because there was a
24    meeting -- Europe went through a very long process
25    where they had meetings all around the continent
```

**Exhibit F Page 65**

Robert Farone, Ph.D.

1    trying to decide if they were going to renew the

2    license for glyphosate, and one of these meetings

3    was going to be in Helsinki, and he was, you know,

4    asking if I would be interested in attending.  Of

5    course I said no.

6         Q.   You said "of course you said no," why

7    -- why did you say no?

8         A.   Again, that would be taking money from

9    Monsanto.

10        Q.   Okay.  So you might have wanted to go

11   to Helsinki but you didn't want to do it enough to

12   take Monsanto's money?

13             MS. WAGSTAFF:  Objection, leading.

14        A.   Yeah, I did not want to take any money

15   from Monsanto.

16        Q.   Okay.  Any other conversations with

17   Dr. Saltmiras?

18        A.   Yes.  Actually I had forgotten this,

19   but it came up at the last -- at Friday's

20   deposition.  He asked me to make a presentation

21   for Crop Life Association, which is a lobby group

22   for farming, I think pesticide manufacturers, and

23   I agreed to do it.  And they -- their office is in

24   Washington, DC.  Again, I took no money.  I took

25   the subway down, gave my talk, which was not about

**Exhibit F Page 66**

Robert Tarone, Ph.D.

```
 1    the glyphosate monograph, you know, problem.  It

 2    was -- it was mainly about how I had gotten

 3    involved and what turned out to be an exchange,

 4    email exchange and exchange in papers with the

 5    IARC Monograph Program on some -- some

 6    disagreements we had with some of what they did

 7    not IARC Monograph Program.

 8              So I gave my talk and then took the

 9    subway back home.  Again, received nothing, not

10    even expenses.

11         Q.   Was that the last communication that

12    you can recall with Dr. Saltmiras?

13         A.   It was.

14         Q.   Were there any other communications

15    that you recall with Monsanto besides those with

16    Dr. Saltmiras?

17         A.   Not -- not with active employees.

18         Q.   At least none that had anything to do

19    with glyphosate?

20         A.   No, not related to Monsanto.

21         Q.   Okay.

22              MS. WAGSTAFF:  Objection, misstates the

23              evidence.

24         Q.   I should ask you the same questions

25    about Bayer.  Are you aware of having any
```

**Exhibit F Page 67**

```
 1      communications with anyone at Bayer?

 2           A.     Not at Bayer except for the -- the

 3      lawyer that was at the first deposition and --

 4      then you --

 5           Q.     Right.

 6           A.     -- at the second deposition.

 7           Q.     Okay.  And the lawyer at the first

 8      deposition was at -- was that Mr. Vales?

 9           A.     Mr. Vales, yes.

10           Q.     You were asked some questions at your

11      deposition last week about -- by Plaintiffs'

12      counsel about why you didn't call Plaintiffs'

13      counsel with any questions you had about the

14      subpoena that you received.  Do you remember

15      those?

16           A.     Yes.

17           Q.     Was there a reason why you looked for

18      guidance or otherwise reached out to Mr. Vales?

19           A.     I guess it's -- the question was asked

20      why I didn't contact Plaintiff counsel, and I

21      guess it's just naivety about legal matters.  I

22      wouldn't have even -- you know, I wouldn't have

23      even thought about it.  I never heard from her

24      before.  You know, so the only person I thought to

25      send it to was Mr. Vales.
```

**Exhibit F Page 68**

Robert Tarone, Ph.D.

```
 1         Q.    Okay.  And you appeared for your
 2    deposition last week as -- as the notice required,
 3    right?
 4         A.    Yes.
 5         Q.    And you didn't have a lawyer to help
 6    you with that, right?
 7         A.    No.
 8         Q.    All right.  Have we -- have we
 9    completed your -- your résumé?
10         A.    Yes, I think so.
11         Q.    Now, we're going to get to the articles
12    you wrote which is important, but -- but I want to
13    make sure we've got the background sufficiently
14    covered.  I think we -- I think we do.
15              THE COURT REPORTER:  Excuse me.  Do you
16         want to take a break?
17              MS. WAGSTAFF:  Did you just say take a
18         break?
19              MR. BRENZA:  Take a break?  Okay.
20         We'll go off the record.
21              THE VIDEOGRAPHER:  Okay.  Going off the
22         record.  The time is 10:34.
23              (Thereupon, a break was taken.)
24              THE VIDEOGRAPHER:  Going back on the
25         record.  The time is 10:49.
```

**Exhibit F Page 69**

Robert Tarone, Ph.D.

```
 1                    (DEFENDANT'S EXHIBIT 44 WAS MARKED.)

 2    BY MR. BRENZA:

 3         Q.    Doctor, I've marked during the break

 4    Exhibit 44.  One more thing that we needed to just

 5    touch on with your career.  Were you asked to

 6    speak about glyphosate and the mistakes IARC made

 7    before Congress?

 8                    MS. WAGSTAFF:  Object to form, leading.

 9         A.    I was asked to appear before the Senate

10    Space Science and Technology Committee.  It was

11    more about the general IARC Monograph's Program,

12    but I did -- I did speak about glyphosate.

13                    They were trying to determine, you

14    know, if they should continue to fund IARC at

15    least the Monograph's Program.

16         Q.    And you said it was more about the

17    Monograph's Program.  Is there a -- do you have

18    some concerns about the overall program?

19         A.    Well, I have concerns about some of

20    their procedures.  And as I said we -- we had been

21    in a long-time sort of in-journal discussion with

22    people at IARC Monograph Program about some of

23    their procedures.  By "we" I meant the company

24    present and company CEO of IEI and a couple of

25    other researchers around -- around the world
```

**Exhibit F Page 70**

Robert Tarone, Ph.D.

```
 1    including one that worked at IARC when we first
 2    started these discussions.
 3         Q.   What was the -- what was the substance
 4    of your testimony before the Senate Committee on
 5    Science, Space and Technology?
 6         A.   Well, I can't remember exactly, but I'm
 7    sure I pointed out my problems were specifically
 8    with the glyphosate deliberations as an example of
 9    some of the problems that they might be having
10    there.
11         Q.   Okay.
12         A.   I must say if I remember correctly, I
13    did not make a statement about whether I thought
14    they should be funded or not.  But I did -- one of
15    the last things I did say is that if they were
16    going to continue to be funded, then there should
17    be some accountability, and there didn't seem to
18    be any accountability.
19         Q.   Okay.
20         A.   You know, IARC is under the umbrella of
21    the World Health Organization.  But it really
22    seems like they're pretty much on their own, do
23    what they want.
24         Q.   I am going to hand you now what was
25    previously marked at your deposition last week
```

**Exhibit F Page 71**

Robert Tarone, Ph.D.

```
 1     Plaintiffs' Exhibit 8.  This is a -- a three-page

 2     -- three pages that represent the invitees to the

 3     Monograph Program that generated Monograph 112,

 4     okay?

 5               MS. WAGSTAFF:  I don't suppose you have

 6          copy for me?

 7               MR. BRENZA:  It was previously marked.

 8          I just assumed you had the --

 9               MS. WAGSTAFF:  Okay.

10               MR. BRENZA:  -- the ones from the last

11          time.  I only have one set.

12     BY MR. BRENZA:

13          Q.   So, Doctor, do you see -- do you see

14     there where the Plaintiffs' lawyer marked up that

15     document to show who the voting members were --

16          A.   Correct.

17          Q.   -- of -- of the invitees to 112?  Do

18     you see that?

19          A.   I do.

20          Q.   And 112, just to be clear, was the --

21     the volume that IARC used to publish its

22     criticisms of glyphosate?

23          A.   That's correct.

24          Q.   And do you see that at the bottom

25     there's an invited specialist?
```

Robert Farone, Ph.D.

```
 1          A.     Yes.

 2          Q.     And his name is Christopher Portier?

 3          A.     Correct.

 4          Q.     Do you know that Christopher Portier is

 5     a hired and paid litigation witness for Plaintiffs

 6     in this case?

 7                 MS. WAGSTAFF:  Objection, leading.

 8          A.     I have read that.

 9          Q.     Have you read materials where

10     Dr. Portier testifies about the money he's been

11     paid to testify for Plaintiffs in this matter?

12                 MS. WAGSTAFF:  Objection, leading.

13          A.     I did see one deposition where he

14     acknowledged how much money he had received.  It

15     may have been his first deposition.  I'm not sure.

16          Q.     And -- and are you aware that he's been

17     paid hundreds of thousands of dollars over the

18     course of this litigation?

19          A.     I would have no way of knowing that.

20          Q.     But in any event, Plaintiffs told you

21     that he wasn't allowed to vote, right?

22                 MS. WAGSTAFF:  Objection to form.

23          A.     It's true.  Invited specialists do not

24     vote on the final decision in any case.

25          Q.     Does that mean they have no influence?
```

Robert Tarone, Ph.D.

```
1              A.    No, they can --

2                    MS. WAGSTAFF:  Objection, speculation.

3              A.    They can contribute fully to the

4       discussions that go on at the working group

5       meetings.  And, for example, in that one

6       deposition -- the reason I looked at that

7       deposition is I was curious about P-values that

8       were reported in the IARC Monograph for the renal

9       tubule adenomas and carcinomas in the first CD-1

10      mouse study that they discuss in great detail.

11                   And so I looked at that deposition, and

12      although Chris Portier -- by the way, I know Chris

13      Portier.  We started about the same time at

14      statisticians, but he was down at NIHS, and I was

15      at NCI.

16                   And when the transfer of the rodent

17      studies occurred, we went down to NIHS and met

18      with the statistical group that he was a part of

19      talking about, you know, what was involved in

20      analyzing the studies.

21                   But he -- and, in fact, he was in the

22      mechanism subgroup, which surprised me a bit.  I

23      thought he would have been in the animal subgroup,

24      but he did admit in that deposition that he

25      contributed to the changing of P-values for that
```

**Exhibit F Page 74**

Robert Tarone, Ph.D.

```
1     study, for the mouse renal tumor adenomas and --

2     adenomas and carcinomas combined.

3              MS. WAGSTAFF:  Objection, misstates the

4         record

5     Q.    Was -- was the contribution, as you put

6     it, of Dr. Portier of P-values to the IARC

7     analysis, was that correct?

8              MS. WAGSTAFF:  Objection, speculation.

9     A.    I don't -- the P-values actually

10    reported in the monograph are incorrect.  They are

11    based on a normal approximation to the

12    Cochran-Armitage's Exact test, and that

13    approximation is known to produce P-values that

14    are too small.

15    Q.    So Dr. Portier provided the working

16    group with the wrong P-value so --

17    A.    I can't say exactly what he

18    contributed, but he did admit that they called him

19    and asked him for advice in recalculating

20    P-values.

21    Q.    And that P-value based on -- not based

22    on the exact estimate but based on an

23    approximation, that P-value was part of the basis

24    on which IARC reached its conclusions about

25    glyphosate, right?
```

**Exhibit F Page 75**

```
 1                MS. WAGSTAFF:  Objection, speculation.

 2        A.     It played a role.

 3        Q.     It wasn't a stray bit of data.  It was

 4    -- it was central to their analysis, wasn't it?

 5        A.     Well, it played a role.

 6    Historically --

 7                MS. WAGSTAFF:  Objection, speculation.

 8        A.     Historically the IARC program has taken

 9    a result to be significant when the P-value is

10    calculated as less than .05.  And the P-values

11    that are reported in the actual monograph are

12    actually .037 and .034, so they are less than .05.

13    Whereas the Exact P-values are .063 and .065.

14        Q.     Okay.  So let me stop you there because

15    I don't know that anyone would understand the

16    importance of the -- of the numbers you just said.

17                The numbers that Dr. Portier gave that

18    were below .05, I think you they said they were

19    .03 something?

20        A.     Correct.

21                MS. WAGSTAFF:  Object to the form.

22        Q.     That would --

23        A.     I didn't say -- I didn't say

24    Dr. Portier gave them.  He contributed --

25        Q.     Okay.
```

**Exhibit F Page 76**

Robert Tarone, Ph.D.

```
 1          A.     -- to whatever was involved in changing

 2     the numbers.

 3          Q.     However, they did it Dr. Portier

 4     contributed to that?

 5          A.     He contributed.  He was asked to help

 6     them out because people know he's a statistician.

 7          Q.     And the -- and the -- and the P-values

 8     that Dr. Portier contributed to, were low enough

 9     that the IARC committee could construe that as --

10          A.     A statistical --

11          Q.     -- proving a real statistical

12     connection between glyphosate and cancer?

13          A.     Yes, yes.

14               MS. WAGSTAFF:  Objection, speculation

15          misstates the evidence.

16          A.     A statistically significant result.

17               THE COURT REPORTER:  Excuse me.  You

18          guys are speaking all at the same time.

19               THE WITNESS:  Okay.  Sorry.

20               THE COURT REPORTER:  What's your

21          objection?

22               MS. WAGSTAFF:  Objection, speculation,

23          misstates the record.

24               THE COURT REPORTER:  Your answer?  Your

25          answer
```

**Exhibit F Page 77**

Robert Tarone, Ph.D.

```
 1      BY MR. BRENZA:

 2          Q.    Go ahead, Doctor, you can answer.

 3          A.    I'm not -- how does it misstate the

 4      record?

 5          Q.    Don't -- don't talk --

 6          A.    Oh, okay.  Well, I don't know how it

 7      misstates the record.

 8          Q.    You know you can just answer.

 9          A.    The fact is --

10          Q.    She's making her objection.

11          A.    No.  The fact that the P-values are

12      less than .05 allowed them to conclude that there

13      was significant evidence of an increase in renal

14      tubule cell carcinomas and renal tubule cell

15      adenomas and carcinomas combined.

16          Q.    And if they had done it right and used

17      the Exact P-value, like the one that we're going

18      to talk about that you calculated, they wouldn't

19      have been able to do that, right?

20              MS. WAGSTAFF:  Object to form,

21          misstates the record.

22          A.    No, those P-values are greater than

23      .05.

24              THE COURT REPORTER:  Excuse me, what's

25          your answer?
```

**Exhibit F Page 78**

Robert Tarone, Ph.D.

```
 1         Q.    You got to say -- counsel spoke over
 2    you again.
 3         A.    No.  Those P-values are greater than
 4    .05, so by the historical way that IARC has
 5    treated significance levels, they would not be
 6    significant.
 7         Q.    And when you say they would not be
 8    significant, that's a way of saying they are not
 9    evidence of glyphosate causing cancer?
10              MS. WAGSTAFF:  Objection.
11         A.    What it -- what it means is that they
12    could well be due to chance.
13         Q.    Okay.
14              MS. WAGSTAFF:  So can I ask you just to
15         pause before you answer so I can object?
16              THE WITNESS:  Oh, I'm sorry.  I'm
17         sorry.  Okay.
18              MS. WAGSTAFF:  Just to kind of help
19         with the flow because I don't want to speak
20         over you, but I need to make a record.
21    BY MR. BRENZA:
22         Q.    So -- so just to wrap it up,
23    Dr. Portier contributed to IARC's reliance on a
24    P-value that was lower than it should have been
25    and that allowed IARC to conclude there was real
```

**Exhibit F Page 79**

Robert Tarone, Ph.D.

1    evidence that glyphosate caused cancer?

2         A.    Correct.

3              MS. WAGSTAFF:  Object to form,

4         misstates the record.

5         Q.    Dr. Portier became a -- signed a

6    contract to become a paid litigation consultant

7    for the Plaintiffs not that long after IARC met,

8    right?

9              MS. WAGSTAFF:  Objection, speculation.

10        A.    I have read that.

11             THE COURT REPORTER:  Excuse me.  What

12        was your answer, Doctor?  What was your

13        answer?

14        A.    I have read that in news articles.

15        Q.    In any event, you know that he has now

16   spent years being an expert, a paid expert, and

17   made hundreds of thousands of dollars working for

18   the Plaintiffs?

19             MS. WAGSTAFF:  Objection, speculation.

20        He just stated he didn't know how much money

21        he had made.

22        A.    Yeah, I know he's been -- I know he's

23   been active in -- in defending the IARC glyphosate

24   deliberations, but I would have no idea how much

25   money he's made.

1          Q.    Have you seen anything that predates

2    his involvement with IARC or -- or corresponds

3    with his time at IARC where he discloses that he

4    is thinking about being a paid litigation expert

5    after the IARC ruling?

6               MS. WAGSTAFF:  Objection.

7          A.    No, I have not seen anything like that.

8          Q.    Would you look now at the voting

9    members on what was previously marked as

10   Exhibit 8?  Do you see that we talked -- we talked

11   last time or you were asked last time about

12   Dr. Jameson, right, do you see that?

13         A.    Correct.

14         Q.    And Plaintiffs' lawyer has said that

15   you should have talked to Dr. Jameson to learn

16   about how IARC did their analysis, right?

17              MS. WAGSTAFF:  Object to form.

18         A.    I don't believe she said that.  But she

19   did seem surprised that I hadn't read any of his

20   depositions.

21         Q.    Do you know that Dr. Jameson is also a

22   paid litigation consultant and testifier for

23   Plaintiffs for these cases?

24         A.    I knew that.

25         Q.    And he's also made hundreds of

1    thousands of dollars testifying to support

2    Plaintiffs' claims in these cases?

3              MS. WAGSTAFF:  Object to form.

4        A.    I would have no way to know how much

5    money he's made.

6              MS. WAGSTAFF:  Counsel is testifying.

7        A.    But I do cite a legal -- a legal

8    document in my second paper, the one in Regulatory

9    Toxicology and Pharmacology where I cite that he

10   is a paid expert, but I would have absolutely no

11   way knowing what he's paid.

12       Q.    Well, are you aware of anything

13   predating this IARC or IARC 112, or

14   contemporaneous with it, where Dr. Jameson tells

15   anybody in the world that he's thinking about

16   being a litigation consultant for the Plaintiffs?

17       A.    No.

18             MS. WAGSTAFF:  Objection, assumes facts

19        not in the record that he was actually

20        considering that.

21       A.    No.  I had know -- I didn't even know

22   of Dr. Jameson before this Monograph 112.

23       Q.    All right.  Let's -- let's look now at

24   what's previously been marked at your deposition

25   last week.  I'm not sure what the number of it

Robert Tarone, Ph.D.

```
 1    was.

 2                    MS. WAGSTAFF:  I think was 32.

 3                    MR. BRENZA:  The preamble?

 4                    MS. WAGSTAFF:  Yes.

 5                    MR. BRENZA:  Okay.  We'll go with 32.

 6         I'm just going to write it on...

 7                    MS. WAGSTAFF:  Yeah, and I'll just make

 8         a -- sort of a standing objection with

 9         respect to this document and any medical

10         journals that you used that he did not draft.

11         And if this deposition being used in a

12         jurisdiction where they do not -- there's no

13         hearsay objection as to this document and/or

14         medical journals, and I'm thinking of

15         California in particular, then I would object

16         on hearsay to the use of these documents as

17         exhibits.  I know it's not the norm, but

18         there are jurisdictions that do not have that

19         hearsay objection -- or hearsay exception.

20                    MR. BRENZA:  And are you talking about

21         the preamble?

22                    MS. WAGSTAFF:  Yeah, preamble and

23         medical literature.

24                    MR. BRENZA:  Okay.  I have the full --

25         we don't agree but duly noted.
```

```
 1            MS. WAGSTAFF:  Well, to the extent

 2        Monsanto would agree to let it in, we would

 3        -- I would withdraw my objection.  But I was

 4        just in a California case where Monsanto's

 5        lawyers were objecting to the use of any

 6        medical literature, so...

 7            MR. BRENZA:  I'm not going to attempt

 8        to -- to respond to every possible argument

 9        pro or con.

10            MS. WAGSTAFF:  Okay.  Understood.

11            MR. BRENZA:  I'm just going to use

12        these and let the -- the chips will fall

13        where they may.

14            MS. WAGSTAFF:  Absolutely.

15    BY MR. BRENZA:

16        Q.   Doctor, I handed you what we discussed

17    last time.  And when I say "we," I mean

18    Plaintiffs' lawyer and you, the preamble for IARC

19    112.  Do you see that?

20        A.   Right, I do.

21        Q.   And just to set the table, the preamble

22    is part of the IARC report that comes before their

23    analysis.

24            MS. WAGSTAFF:  Objection, leading.

25        A.   Correct.  It's included in every IARC's
```

**Exhibit F Page 84**

Robert Tarone, Ph.D.

```
1      Monograph's Program monograph.

2           Q.    What's generally contained in the

3      preamble?

4           A.    It's just a description of the methods

5      that IARC uses, criteria they use to come to

6      various decisions about carcinogenicity of the

7      compound that they're studying.

8           Q.    Does it include standards and

9      definitions that IARC then uses in its analysis?

10          A.    In making its inferences, yes.

11          Q.    One of the areas that we -- that you

12     addressed last time was the -- the standards for

13     evaluating carcinogenicity in experimental animals

14     on --

15          A.    Right.

16          Q.    -- Page 20.  Do you see that?

17          A.    Right.

18          Q.    And one of the questions that's

19     addressed by this is what constitutes sufficient

20     evidence of carcinogenicity.  Do you see that?

21          A.    Correct.

22          Q.    And it's -- reading from that tagline

23     it says, "The working group considers that a

24     causal relationship has been established between

25     the agent and an increased incidence of malignant
```

**Exhibit F Page 85**

Robert Tarone, Ph.D.

```
1    neoplasms or of an appropriate combination of

2    benign and malignant neoplasms," and then it goes

3    on from there.  Do you see that?

4         A.    Right.

5         Q.    What's the significance of that?

6         A.    The significance of this is that if

7    you're going to come to a conclusion that there is

8    sufficient evidence of rodent carcinogenicity,

9    then it has to be based on the analysis of either

10   malignant neoplasms or a combination of, as I say

11   appropriate combination, of benign and malignant

12   neoplasms.

13        Q.    Does that have any -- does that play

14   any role in your concerns about what IARC did with

15   respect to glyphosate?

16        A.    It -- it does.  I mean, they weren't --

17   in the papers I published, so I was primarily

18   interested in just how I would analyze data.  So I

19   don't believe I made a big issue of this.  But

20   this does mean that if you do an analysis based

21   only on benign tumors, then you can't use that to

22   justify a conclusion that there's sufficient

23   evidence of carcinogenicity.

24              So, for example, in the mouse study,

25   the analyses based only on adenomas.  They can
```

**Exhibit F Page 86**

1    provide evidence -- maybe you can conclude that

2    there's limited evidence of carcinogenicity, but

3    they don't contribute it to deciding that there's

4    sufficient evidence.

5         Q.    And when you're talking about "the

6    mouse study," you're talking about the mouse study

7    that IARC relied on?

8         A.    The first CD mouse -- CD-1 mouse study,

9    right.  There were two.  They were the same design

10   and the same strain of mouse, but this is the

11   first one that they spent most of the time in

12   monograph describing.

13        Q.    And the problem there was that the

14   tumors were something called an adenoma?

15        A.    In the original pathology -- it's

16   peculiar.  I don't know that I've ever seen this

17   before, but they actually presented results for

18   the original pathology down at the lab that did

19   the study.  And then after a pathology review

20   group, they had slightly different numbers because

21   a pathologist reviewed the slides and --

22        Q.    Well, we'll get to that.

23        A.    Yeah.

24        Q.    Yeah.  We'll get to that.

25        A.    Yeah.  I mean, so there's two.  But the

**Exhibit F Page 87**

Robert Tarone, Ph.D.

```
 1    first study, the first -- the original pathology,

 2    that was only adenomas.

 3         Q.    Okay.

 4         A.    And that -- that is statistically

 5    significant even if you use the correct, Exact

 6    P-value.  They report a P-value of .016 which is

 7    too small, but even the Exact P-value is .039, so

 8    that would be a significant -- definitely a

 9    significant finding.

10            But since it's based only on benign

11    tumors, that would really be of no value in coming

12    to the conclusion that they did come to.

13         Q.    All right.  I'm going to -- I want to

14    direct you to another part of the preamble the

15    part that deals with the criteria to be

16    classified -- for a compound to be classified as

17    Group 2A it appears on Page 22 --

18         A.    Okay.

19         Q.    -- of the preamble.

20            I want to -- what I want to do is go

21    through a demonstrative that Plaintiffs' counsel

22    created with you last time and just make some

23    corrections if you would.  So I'm going to hand

24    this to you.  It's been previously marked as

25    Exhibit 13.
```

**Exhibit F Page 88**

Robert Tarone, Ph.D.

```
 1              MS. WAGSTAFF:  Objection, counsel is
 2         testifying regarding corrections, leading the
 3         witness.
 4         Q.    So what I want to do, Doctor, is do a
 5    comparison between the section that -- that
 6    discusses the criteria for Group 2A in the
 7    preamble and the demonstrative that Plaintiffs'
 8    counsel wrote, okay?
 9         A.    Okay.
10         Q.    So the first -- and 2A, just to be
11    clear, is the category that IARC assigned to
12    glyphosate, right?
13         A.    Probably carcinogenic.
14         Q.    And the question we've all been
15    wondering about is can you get Category 2A if you
16    don't have sufficient animal evidence, right?
17         A.    And limited epidemiological evidence
18    which is what the working group itself concluded.
19         Q.    Right.
20         A.    That's there's limited evidence --
21         Q.    Right.
22         A.    -- based on the human study.
23         Q.    The epidemiology or epidemiological
24    evidence that's evidence in human beings, right?
25         A.    That's correct.
```

**Exhibit F Page 89**

Robert Farone, Ph.D.

```
1              Q.    And IARC agreed there wasn't sufficient
2        evidence in human beings?
3              A.    It was limited.
4              Q.    It was limited.  Which means you can't
5        exclude confounding bias --
6              A.    These are some evidence but there are
7        -- there are issues that might explain why -- why
8        the evidence exists.  It's unclear that it's
9        definitive.
10             Q.    Some evidence other than that the
11       compound caused whatever you observed?
12             A.    Right.
13                   MS. WAGSTAFF:  Object to form.
14             Q.    So there's limited evidence in humans,
15       so IARC put a lot of weight on animal evidence,
16       right?
17                   MS. WAGSTAFF:  Object to form,
18             speculation.
19             A.    Yes.  By my reading of the preamble, if
20       you have limited epi, you pretty much need to have
21       sufficient animal evidence.
22                   THE COURT REPORTER:  I'm sorry, Doctor,
23             if you have limited what?
24                   THE WITNESS:  Limited epidemiology.
25             Q.    Okay.  So -- so the first category in
```

**Exhibit F Page 90**

```
 1    2A it says, "This category is used when there is

 2    limited evidence of carcinogenicity in humans," so

 3    that's the situation we have.  "And sufficient

 4    evidence of carcinogenicity in experimental

 5    animals."  Right?  So you need limited evidence in

 6    epi and sufficient animal evidence.

 7         A.    Correct.

 8         Q.    The next -- so -- so Category 1 on --

 9    on the Plaintiffs' demonstrative encapsulates

10    that, right?

11         A.    Correct.

12         Q.    In some cases -- then going back to the

13    IARC Monograph, it says, "In some cases an agent

14    may be classified in this category when there is

15    inadequate evidence of carcinogenicity in humans

16    and sufficient evidence of carcinogenicity in

17    experimental animals and strong evidence that the

18    carcinogenesis is mediated by a mechanism that

19    also operates in humans."

20         A.    Correct.

21         Q.    So that's Bullet Point 2 of the

22    Plaintiffs' Exhibit, right?

23         A.    Correct.

24         Q.    So you need -- that one also requires

25    sufficient evidence in animals, right?
```

**Exhibit F Page 91**

Robert Tarone, Ph.D.

```
1            A.    Correct.

2            Q.    Then a there's third category beginning

3      with the word "exceptionally," right?

4            A.    Correct.

5            Q.    And it says, "An agent may be

6      classified in this category solely on the basis of

7      limited evidence of carcinogenicity in humans.  An

8      agent may be assigned to this category if it

9      clearly belongs based on the mechanistic

10     considerations to a class of agents for which one

11     or more members have been classified in Group 1 or

12     Group 2A."  Do you see that?

13           A.    Correct.

14           Q.    Now, this is where I think Exhibit 13

15     is wrong.  Do you see that --

16                 MS. WAGSTAFF:  Object to counsel

17           testifying.

18           Q.    Well, do you see that Plaintiffs'

19     lawyer wrote that one of the ways you can

20     categorize something as 2A is just if you have

21     limited epi.  That's their third point, right?

22           A.    Correct.

23           Q.    And that just omits the whole rest of

24     the test, right?

25           A.    Yeah.  I've always assumed that those
```

**Exhibit F Page 92**

Robert Tarone, Ph.D.

1    two sentences are tied together.  If you have

2    limited evidence but it is assigned -- but it

3    clearly belongs based on mechanistic

4    considerations.

5          Q.    So --

6                MS. WAGSTAFF:  Objection, misstates the

7          record.

8          Q.    If it were sufficient to just have

9    limited epi and nothing else, why would you even

10   have any of the other categories, right?

11         A.    I don't know about that.

12               MS. WAGSTAFF:  Objection, leading.

13         A.    But the point is that they did not make

14   the decision in Monograph 112 based on limited epi

15   only.

16         Q.    All right.  Well, what I want to say --

17         A.    And if they want to re-evaluate it,

18   that's fine.  If in fact it turns out that there's

19   not sufficient evidence.  So, again, I would just

20   like to see it re-evaluated including all of the

21   data.

22         Q.    Well, what I want to do is just get

23   this last category straight.

24         A.    Okay.

25         Q.    Okay.  Because I think it's wrong on

Robert Tarone, Ph.D.

```
 1      this exhibit.
 2              MS. WAGSTAFF:   Object to counsel
 3          testifying.
 4      Q.    Exhibit -- Bullet Points 3 and 4 that
 5   Plaintiffs wrote on their exhibit, that's -- those
 6   are together one of the ways --
 7      A.    That's how I've interpreted it.
 8      Q.    Not -- not independently one of the
 9   ways.
10      A.    That's how I've interpreted it.
11      Q.    So if you'll give me that back, I want
12   to just make correction on it.  What this really
13   is there is no 4 there's only 3.  And 3 is this
14   whole thing, not just a piece of it.
15              MS. WAGSTAFF:   Objection to counsel
16          testifying.
17      Q.    Is that correct?  The exhibit to
18   reflect your understanding --
19      A.    This -- this has been my understanding
20   that they -- those two sentences are linked
21   together.
22      Q.    Now, the -- so in Category 3 now which
23   is -- encompasses both 3 and 4 of the Plaintiffs'
24   Exhibit, you need to -- you need to have, in order
25   to assign 2A, evidence that the compound is a
```

Robert Tarone, Ph.D.

```
1    member of a class of agents where there's been

2    proof that it's probably carcinogenic, right?

3         A.    Correct.

4         Q.    And that's not true for glyphosate, is

5    it?

6               MS. WAGSTAFF:  Objection, leading.

7         A.    Well, I don't -- glyphosate does not

8    belong to any large class.  There are -- there are

9    cases -- for example, aromatic amines are very

10   strong bladder carcinogens in almost everyone

11   tested it seems.  So limited epi would

12   definitely -- because there's other closely

13   related compounds that would cause cancer, then

14   that would be sufficient I'm sure

15        Q.    Okay.  But aromatic amines aren't

16   glyphosate.  That's not glyphosate, right?

17        A.    Right.  I know of no agent that's

18   closely related to glyphosate that is classified

19   1A, or 1 or 2A.  I have to say that that assumes,

20   as I think is true, it's peculiar that they titled

21   this monograph some organophosphate insecticides

22   and herbicides because glyphosate is not an

23   organophosphate compound.  It's closely related

24   but it's a phosphonate.  And there are known --

25   there are certain characteristics of
```

**Exhibit F Page 95**

1    organophosphate chemicals that are known to exist

2    in all such chemicals that are not present in

3    glyphosate.

4        Q.    Well, you --

5        A.    So this -- I'm saying there may be some

6    organophosphates insecticides that have been

7    classified in Group 1 or 2A but that still would

8    not apply to glyphosate.

9        Q.    Okay.  So the bottom line is with --

10   with -- with the exhibit corrected, there's no way

11   that you can classify an agent as to 2A with

12   limited epi unless you have sufficient animal

13   evidence?

14           MS. WAGSTAFF:  Objection, leading.

15       A.    That's -- that's my interpretation of

16   this.  Obviously IARC needs -- and, in fact, they

17   have actually redone this preamble.  It would be

18   interesting to look and see if they sort of made

19   what they mean in those two sentences clear.  But

20   that's -- that's been the way I've always

21   interpreted this.

22       Q.    All right.

23           MS. WAGSTAFF:  Do you want to mark that

24       as an exhibit since you drew on it?

25           MR. BRENZA:  Yeah, I should.  Why don't

Robert Tarone, Ph.D.

```
1              you hand that back to me, Doctor, and I'll

2              put a sticker on it.  Thank you.

3                   MS. WAGSTAFF:  I think it would be 45?

4                   MR. BRENZA:  Yes.

5                   (DEFENDANT'S EXHIBIT 45 WAS MARKED.)

6    BY MR. BRENZA:

7         Q.    All right.  So now I want to talk to

8    you, Doctor, about whether there was sufficient

9    evidence -- sufficient animal evidence for IARC to

10   assign glyphosate into Category 2A, okay?  And I'm

11   going to -- I'm going to --

12        A.    So you're asking if there was

13   sufficient evidence by the criteria sufficient

14   evidence of carcinogenicity?

15        Q.    Correct.  And that's -- that's the --

16   been the -- the subject of a number of your

17   papers, right?

18        A.    Correct.

19        Q.    And I'm going to hand you the first

20   one.  I think this is the one in the European

21   Journal.

22        A.    European Journal of Cancer Prevention.

23                   MR. BRENZA:  I'm going to put 46 on it.

24        And then I'm going to hand you your article

25        in regulatory toxicology and pharmacology and
```

**Exhibit F Page 97**

Robert Tarone, Ph.D.

1           put 47 on that one.

2                 MS. WAGSTAFF:  Objection to the term

3           "article."  This is an editorial.

4                 MR. BRENZA:  And I'm going to -- I'm

5           going to hand you the Monograph 112 as

6           Exhibit 48.

7         (DEFENDANT'S EXHIBITS 46, 47 & 48 WERE MARKED.)

8                 MR. BRENZA:  Do you have -- do you have

9           your own copy of the Monograph?

10                MS. WAGSTAFF:  Yeah, I've got one, yes.

11                MR. BRENZA:  So let's sort of -- well,

12          actually I do have one for you.  Do you want

13          one or no?

14                MS. WAGSTAFF:  No, I've got it.

15                MR. BRENZA:  Okay.

16                Doctor, can you hand me back -- I just

17          wanted to make sure I didn't hand you my

18          copy.  I don't think so.  Okay.  That's good.

19          There it is.  That's why I didn't have one

20          for you.

21        BY MR. BRENZA:

22          Q.   All right.  So let's begin with the

23        monograph, doctor.  Did -- did your understanding

24        of the monograph indicate that the IARC Working

25        Group 112 relied on two mouse studies to support

Robert Tarone, Ph.D.

```
 1    its conclusion that animal -- there was animal

 2    evidence that glyphosate should be categorized as

 3    Category 2A?

 4              MS. WAGSTAFF:  Objection, leading.

 5         A.    They did.  They -- they actually had

 6    three studies that they deemed originally were

 7    good enough to be considered by their working

 8    group, but the third one was an initiation

 9    promotion study where you apply one compound that

10    you think is going to cause like DNA damage, and

11    then you apply a second compound to see if it --

12    if it increases the tumor production over just the

13    first compound alone.  That's what initiation

14    promotion is.

15         Q.    So --

16         A.    But the working group decided that that

17    study was not -- not good enough to make a

18    determination of human carcinogenicity.

19         Q.    So that's -- that's the George study,

20    isn't it?

21              THE COURT REPORTER:  I'm sorry, what?

22         I'm sorry.

23              THE WITNESS:  Human carcinogenicity.

24              MS. WAGSTAFF:  Object to form.

25         Q.    That's the George -- I think it's
```

**Exhibit F Page 99**

Robert Tarone, Ph.D.

```
 1    called the George study.  Anyway, they concluded

 2    that it was a bad study and they weren't going to

 3    rely on it?

 4              MS. WAGSTAFF:  Object to the form.

 5         A.   They said the working group concluded

 6    that this was an inadequate study for the

 7    evaluation of glyphosate.

 8         Q.   And so they didn't use it?

 9         A.   They didn't use that, but they did use

10    the first two.

11         Q.   Okay.  And we're looking at Table 3.1

12    now --

13         A.   Okay.

14         Q.   -- on Page 31 of the monograph we've

15    marked as -- what did I mark it as?  48.

16         A.   Correct.

17         Q.   And you see that there are two mouse

18    studies on that table?

19         A.   Correct.

20         Q.   Are those the two mouse studies that

21    they -- that the IARC working group relied on?

22         A.   Yes.

23         Q.   What did they do wrong?

24         A.   Well, the main thing they did wrong is

25    use -- well, I don't know what main.  They did --
```

```
 1    they did a couple of things wrong, and I just have
 2    to say on Page 30 -- and this -- and this was like
 3    I said.  I read -- I read this the day before I
 4    met with the lawyer or we met with the lawyer.
 5    And -- and it was this section on Page 30 "Dietary
 6    Administration" that the red flag started going
 7    up.  They report a positive trend P equals .016 in
 8    the incidence of renal tubule adenoma.  That
 9    P-value is based on the approximate test.  But
10    even with the Exact test the P-value would be
11    .039, so it would be significant.
12              What really -- I mean, the first red
13    flag was the sentence that starts at the bottom of
14    that.  They said, "No tumors of kidney were
15    provided for female mice."  And I was just
16    astounded by that because they should want to know
17    -- if they're going to make an evaluation of
18    whether glyphosate causes these tumors, they
19    should want to know what was showing up in the
20    female mice.  It may be, for example, that there
21    was a small increase.  Which even if it's not
22    significant, would support that they found in
23    males.
24              The fact that they were essentially
25    disinterested -- oh, well, they weren't provided
```

Robert Tarone, Ph.D.

1    to us, that was the first red flag that went up

2    that this is not -- something was funny.

3        Q.    And when you say "something was funny,"

4    what -- what are you saying?

5        A.    I'm saying that you would think that a

6    group of scientists like this there would be at

7    least some that would say, "No, wait a minute.  We

8    need to see the female data for this study."

9        Q.    So let me ask you about interpreting

10   rodent studies in this context.  Why is it

11   important to look at the female counterparts if --

12   if you think that the male mice have shown you

13   something that's significant?

14       A.    Well, replication is a key aspect of

15   the scientific method.  As I said, even if they

16   saw a small increase that was not significant,

17   that would be evidence that what they saw in the

18   males was due to compound administration.  And I

19   mean, the fact that they were not interested is

20   just -- I mean, I was amazed.

21            MS. WAGSTAFF:  Objection, speculation.

22       Q.    What's the -- what's the importance of

23   a replication study?

24       A.    Well, especially in a case like this

25   where even though it's significant, it's based on

Robert Tarone, Ph.D.

```
1      a small number of tumors, you want to see

2      additional evidence.

3           Q.    What's -- why do you want to see that

4      additional evidence?

5           A.    Because it strengthens your inference

6      that what you saw in the males is actually due to

7      the compound.

8           Q.    Does it also have the ability to --

9                 (Knock at the door.)

10                MR. BRENZA:  Let's go off the record.

11                THE VIDEOGRAPHER:  Going off the

12          record.  The time is 11:28.

13                (Thereupon, a break was taken.)

14                THE VIDEOGRAPHER:  Going on the record.

15          The time is 11:35.

16     BY MR. BRENZA:

17          Q.    Dr. Tarone, before we went off you were

18     saying that a replication study, depending on how

19     it comes out, can confirm the results of your

20     initial study?

21          A.    It can confirm or refute but either way

22     you should look.  You should want to know what it

23     shows.

24          Q.    And what's the importance of a -- of a

25     replication study that refutes the original
```

```
1    conclusion?
2         A.    It just tells you that the first one
3    might have been due to chance.  More or less or
4    more important than a replication study that in
5    fact confirms it.
6         Q.    Okay.  Now, you said that the first --
7    I don't know if you consider this to be a
8    replication study, but the first source of testing
9    data that IARC could have looked to was the
10   results in the female mice --
11        A.    Correct.
12        Q.    -- of the first study, right?
13        A.    Correct.
14        Q.    And they didn't do that.
15        A.    They didn't even report it and seemed
16   disinterested.  They just said it wasn't -- it
17   wasn't provided to us.
18        Q.    Did -- did -- were there other mistakes
19   made by IARC in connection with interpreting that
20   first mouse study?
21        A.    Well, in addition to -- in addition to
22   the reporting of P-values that are too small, the
23   more amazing thing is that they had a second study
24   in the same strain of mice.  And when you read the
25   paragraph in which they discuss that second study,
```

Robert Tarone, Ph.D.

1    you don't see the word "kidney."

2              And, again, given that you've reported

3    a very small increase in renal tubule tumors in

4    the first study, you should want to see the

5    results of that second study to either confirm or

6    refute what you saw in the first study.  And the

7    fact that they just don't report, again, was just

8    astounding.

9         Q.    All right.  So let me unpack the

10   terminology a little bit.  When you're talking

11   about renal tubular adenomas, that's part of the

12   kidney, right?

13        A.    Correct.

14        Q.    So -- so the comparable data from the

15   second mouse study is the kidney tumor?

16        A.    Kidney tumors, right.

17        Q.    And IARC thought they saw a -- a weak

18   relationship of -- with glyphosate with respect to

19   kidney tumors in the first female mice, right?

20        A.    Well, they thought -- they thought it

21   was a significant.  I wouldn't say weak.  It's

22   based on a small number of tumors, but the

23   analysis of adenomas is significant even if you

24   use the Exact test, adenomas alone.

25        Q.    So what's the importance of the second

**Exhibit F Page 105**

Robert Tarone, Ph.D.

```
1    test that, the second mice study with respect to

2    kidney tumors?

3         A.    Well, they should have demanded to see

4    it, to see if it either affirmed or refuted what

5    they saw in the first study.  It could have done

6    either.

7         Q.    Did you do that?

8         A.    I -- when I got the tumor rates

9    associated with the Greim paper, yes, I did.

10        Q.    What did you conclude?

11        A.    Well, amazingly they found four -- in

12   the first study they found four adenomas in the

13   first pathology and five in the -- or tumors, they

14   were all adenomas in the first, and they found

15   five tumors in the second pathology, three of

16   which were carcinomas and two adenomas.

17             In this study which they didn't report,

18   they found four renal tubule tumors, two in the

19   control group, one of which was adenoma and one a

20   carcinoma, and two in the lowest dose group, one

21   adenoma, one carcinoma.

22             In other words, the data that they

23   didn't look at showed a decreasing trend.  And in

24   fact the P-value for the combination of carcinomas

25   and adenomas is .042, the Exact P-value.  So it's
```

Robert Tarone, Ph.D.

1    very similar.

2              I mean, essentially it's a similar

3    magnitude to what they report for adenomas --

4    adenomas and carcinomas in the second -- in the

5    first study.  So when you combine those two

6    together, they cancel out.  In any sort of

7    reasonable combined analysis there would be no

8    evidence of a relationship between glyphosate and

9    the renal tubule tumors.

10       Q.    And just to be clear in the second

11   mouse study that IARC used, the data that they

12   didn't report but that you went and found showed

13   there were two tumors in the control group?

14       A.    Correct.

15       Q.    And in the low dose group?

16       A.    Correct.

17       Q.    And there were zero tumors in the high

18   dose -- higher dose groups?

19       A.    That's correct.

20       Q.    So what does that tend to show about

21   whether glyphosate causes those tumors?

22       A.    Well, as I said, it shows that you

23   actually get a significant decrease in tumors

24   using the Exact test.

25       Q.    So interpreting that information in

**Exhibit F Page 107**

Robert Tarone, Ph.D.

```
 1    connection with the results of the first mouse

 2    study, what does that lead -- what does that lead

 3    you to conclude?

 4         A.    They cancel each other out.  It's a

 5    wash.  And equally important in a way for the

 6    results in the second study, the reason they gave

 7    so much weight to the small numbers of tumors in

 8    the first study, was that they said it's a very

 9    rare tumor, but then they found two of these

10    tumors in the control group in the second study.

11         Q.    How comparable --

12               MS. WAGSTAFF:  Objection, speculation.

13         Q.    -- are these two studies?

14         A.    Excuse me?

15               THE COURT REPORTER:  Could you repeat

16    the question?

17         Q.    How comparable are the two mouse

18    studies that IARC relied on?

19         A.    They're the same general design.  They

20    got three -- three exposure levels in both.  The

21    first study had higher glyphosate levels in the

22    exposed group, but I mean they're totally

23    comparable in terms of design.  Two-year studies

24    in which glyphosate was administered in feed.

25         Q.    Is there any excuse for not looking at
```

**Exhibit F Page 108**

1    the second study after concluding that there's --

2    something is being shown by the first study?

3              MS. WAGSTAFF:  Objection, speculation.

4         A.    I don't see -- I don't see any excuse.

5    I mean, if you're a scientist, it just says you

6    wanted, you should have wanted to see the female

7    data.  In the first study you should have wanted

8    to see both the male and female data in the second

9    study.  You should evaluate all the evidence

10   related to any given association.

11        Q.    Now, you said -- you're aware that the

12   renal tumor data was revised, right, in the first

13   study?

14        A.    In the first study.

15        Q.    So the testimony you just gave is based

16   on the unrevised data, right?

17        A.    Both.

18        Q.    Both?

19        A.    Both.  If you use the Exact P-value.

20   Because if you use the correct Exact P-value for

21   the revised pathology, then the P-values are

22   greater than .05, both of them.

23        Q.    And, again, to put that in words, if

24   it's greater than .05, that means it's not

25   distinguishable from chance?

Robert Tarone, Ph.D.

```
 1          A.    Well, it's -- it's historically that's

 2     -- the .05 significant nominal level has been used

 3     by IARC over the years, and it's determining it's

 4     significant if it's less than .05 and

 5     non-significant if it's greater than .05.  That

 6     doesn't mean that there's no effect.  It just

 7     means that it's -- it's not so rarely -- it's not

 8     so rare in terms of a chance occurrence that you

 9     can make a strong conclusion about

10     carcinogenicity.

11          Q.    Okay.  But in any event when you

12     consider both studies --

13          A.    In any event they should have

14     considered that -- that a decreasing trend in the

15     second study.

16          Q.    And if they had done that what -- what

17     would they have concluded in that --

18          A.    There would be no evidence.

19          MS. WAGSTAFF:  Objection, speculation.

20          Q.    Let me ask the question.

21          A.    Okay.

22          Q.    If they had considered the second

23     study, what would they -- what should they have

24     concluded about whether there was sufficient

25     animal evidence that glyphosate was producing an
```

**Exhibit F Page 110**

Robert Tarone, Ph.D.

1    effect?

2              MS. WAGSTAFF:  Objection, speculation.

3         A.    I know of no way of combining those two

4    results for reasonable statistical tests that

5    would lead to a significant result.

6              But the point I have always made is

7    they should have included both, and they should

8    re-evaluate it, get their experts together,

9    re-evaluate it, include all the data and see if

10   they still come to the same conclusion.  They

11   might.  I don't know.

12        Q.    That's -- and that's the point you made

13   in your -- in the paper that we've marked as 46,

14   right?

15        A.    Correct.

16        Q.    And -- and the editorial that we've

17   marked as 47?

18        A.    Correct.

19        Q.    And these were peer-reviewed, right?

20        A.    Peer-reviewed.

21        Q.    And they were published, right?

22        A.    Yes.

23        Q.    We'll talk more about them later, but

24   did you set out your -- your analysis that you

25   just described to me in these papers?

Robert Tarone, Ph.D.

```
 1          A.    I did.  And although the one is marked

 2     editorial, the analysis of the tumor rates and the

 3     exclusion of the data, everything in there is

 4     factual.  It's as factual as any research paper.

 5               There is commentary in the editorial

 6     but not with regard to what they actually did with

 7     their deliberations.

 8          Q.    Okay.  Now, did IARC make other

 9     mistakes with respect to the mouse study -- mouse

10     studies?  Were there other tumors that they --

11     that they made a mistake on?

12          A.    I don't think so.  I mean, those are

13     the two major things.  Reporting P-values too

14     small.  But more importantly excluding evidence

15     that contradicted the conclusion they made based

16     on the first study.

17          Q.    With respect to the second mouse study,

18     they -- they suggested there was some connection

19     between glyphosate and something called

20     hemangiosarcoma?

21          A.    Correct.  And -- and there is in

22     fact -- in all of the mouse and rat studies that

23     they considered in their review, that is the only

24     analysis based on a malignant tumor that is

25     significant.  No matter how you look at it, Exact,
```

Robert Tarone, Ph.D.

```
 1      Approximate, it is significant.
 2              And I think it's interesting --
 3      although I didn't agree with what they said.  It's
 4      interesting in this case they were able to find
 5      the female data because they thought it actually
 6      supported what they found in the males.  I don't
 7      see that at all.  What I see in their female data
 8      is basically flat.
 9              MS. WAGSTAFF:  Objection, speculation.
10          Q.   And when you say "flat," you mean
11      evidence of no effect?
12          A.   Right.  They had zero percent in the
13      control group, four percent in the lowest dose
14      group, zero percent in the mid dose group and two
15      percent in the high dose group.  Those are
16      basically indistinguishable rates.  The highest
17      rate was observed in the -- in the lowest exposed
18      group.
19          Q.   So what --
20          A.   But they found it and they reported it
21      at least, and that's what they should have done
22      with kidney tumors in first --
23              MS. WAGSTAFF:  Do you mean to be saying
24          percent?
25          A.   Yes.
```

**Exhibit F Page 113**

Robert Tarone, Ph.D.

```
 1                    MS. WAGSTAFF:  Okay.

 2           A.    Zero percent.  In terms of tumors it's

 3     zero to zero one, but percentage-wise it's zero

 4     percent, four percent, zero percent, two percent.

 5                    THE COURT REPORTER:  I'm sorry, Doctor.

 6           I've lost you.  Say that again?

 7           A.    Okay.  In terms of it numbers of

 8     tumors, it's zero, two, zero, one.  But in terms

 9     of percent it's zero percent, four percent, zero

10     percent, two percent.

11           Q.    So that --

12           A.    That's going from control group to

13     increase in exposure level.

14           Q.    If you take into account both the male

15     and the female data in the mouse -- the second

16     mouse study, what should IARC have concluded?

17                    MS. WAGSTAFF:  Objection, speculation.

18           A.    What they did.  I mean, they have a

19     significant effect in males.  It doesn't go away

20     because of what they found in the second study.

21           Q.    What about with taking into account the

22     first study?

23           A.    Well, they ignored -- again, they

24     didn't report the results for hemangiosarcoma or

25     hemangioma in -- in the first study.
```

**Exhibit F Page 114**

Robert Tarone, Ph.D.

1          Q.    And you went and found those results?

2          A.    I did.  By the way, the P-value here

3     again, they report the P-value for

4     hemangiosarcomas as P less than .001 and the Exact

5     P-value is .004, so it's still quite significant,

6     but it's not quite as small, once again, as they

7     report.

8          Q.    With respect to the first study, you

9     went and found the information that IARC didn't

10    report.

11         A.    Right.  It was in the supplementary

12    tables with the Greim paper.

13         Q.    And that's the document we've marked as

14    Exhibit 43, right?

15         A.    Correct.

16         Q.    And if -- and if I asked you to, you

17    could go through Exhibit 43 and you could find the

18    unreported --

19         A.    Right.

20         Q.    -- kidney tumor data --

21         A.    It might take a while --

22         Q.    -- and the unreported --

23         A.    -- because some of these tables are

24    difficult to --

25         Q.    -- the unreported --

Robert Tarone, Ph.D.

```
 1          A.     -- dig through.

 2          Q.     The unreported hemangiosarcoma that

 3     IARC didn't -- didn't include.

 4          A.     Right.  And I've got to point out that

 5     the numbers that I report have never been

 6     contested.  And in fact when Chris Portier

 7     submitted comments to the Environmental Protection

 8     Agency, SAP that was evaluating, he submitted

 9     comments that were an analysis of all studies,

10     including these studies, and he reports exactly

11     the same P-values that I report as being excluded

12     from the experiment -- from the studies where they

13     were excluded.

14                So that's a task in acknowledgment that

15     those -- those tumor rates should have been

16     included in this evaluation as well.

17                MS. WAGSTAFF:  Objection, speculation.

18          Q.     If -- what -- what did you conclude

19     when you found the data that IARC didn't report

20     about hemangiosarcomas in the the first mouse

21     study?

22          A.     In the first mouse study there was one

23     and it was found in the second -- second from the

24     top.  It wasn't the highest dose.  And that's --

25     it should have been taken into consideration.
```

**Exhibit F Page 116**

Robert Tarone, Ph.D.

1    Because what is -- what is suggested in the second

2    study is that at very high glyphosate levels,

3    there may be a small number of animals that are

4    susceptible to hemangiosarcomas.

5            Well, the high dose in the first mouse

6    study is as high as any dose I've ever seen.

7    Three percent of them died in that study was

8    glyphosate, and they saw no hemangiosarcomas.  And

9    that should have at least been considered in the

10    deliberations.

11        Q.   So the high dose in the -- in the study

12    that IARC didn't report for hemangiosarcomas

13    was -- was five times what the dose -- the high

14    dose was --

15        A.   Right.

16        Q.   -- on the -- on the dose that they were

17    saying caused cancer?

18        A.   Yeah, caused hemangiosarcomas in the

19    second study.

20        Q.   And yet in the first study it didn't

21    produce any cancers?

22        A.   No.  But they should -- I mean, they

23    should have reported it.  I think -- I think if

24    you even combined those two, you might still

25    conclude that hemangiosarcoma, the increase is

**Exhibit F Page 117**

Robert Tarone, Ph.D.

1    significant, but the point is they should have

2    considered that.  That should have been involved

3    in their deliberations.

4         Q.    Is it fair to say -- well, let's --

5    let's move onto the rat studies.

6              Did -- did IARC consider certain rat

7    studies in trying to justify its position that the

8    animal data provided evidence that glyphosate was

9    a Category 2?

10        A.    They did.

11             MS. WAGSTAFF:  Object to the form.

12        A.    They -- they included three studies,

13   lifetime feeding studies, again two-year,

14   approximately two-year, with glyphosate

15   administered in the feed, and they were deemed to

16   be acceptable to IARC for consideration of an

17   effect of glyphosate.

18        Q.    And are we looking now at Table 3.2 of

19   the monograph?

20        A.    Yes.

21        Q.    That's Page 37?

22        A.    37, 38 and 39.

23        Q.    Okay.  Did -- in your opinion, did IARC

24   make a mistake in the way that they analyzed the

25   rat data?

Robert Tarone, Ph.D.

1        A.    Well, the first rat data -- rat study

2    by the way is the second from the bottom on Page

3    37.  It's called -- JMPR 2006 is how it's

4    identified.  And you can see that they present no

5    tumor data for that study.

6             Going onto the next two, they declared

7    that there was evidence -- that glyphosate was

8    causing tumors on the basis of two comparisons of

9    the low dose tumor rate to the control group.

10            Because you can see in the pancreatic

11   islet cell adenomas, they indicate significance

12   between the 2 percent in the control group and the

13   14 percent in the low dose group.

14            So in spite of the fact that it's a

15   low-dose response, they found that to be a

16   significant effect which they took into

17   consideration.

18            And in the next study there was a

19   similar thing.  They had a -- they declared --

20   they found a significant result 0 out of 50

21   adenomas, again pancreatic islet cells, the same

22   type of tumor, 0 out of 50 in the control group

23   and 5 out of 49 --

24            THE COURT REPORTER:  I'm sorry, what?

25        A.    5 out of 49 in the low-dose group.

1             And on the basis of these two findings

2     they concluded that there was evidence that

3     glyphosate caused these pancreatic islet cell

4     adenomas in spite of an absence of a dose-response

5     in either of these studies.

6         Q.    Well, and -- and so when you say

7     there's an absence of a dose-response I want to

8     address that in a minute, but you didn't read the

9     rest of the data that -- for adenomas let's just

10    pick this last study.  It's zero in the control,

11    five in the low, two in the mid and two in high --

12        A.    Correct.

13        Q.    -- right?

14             So there's less in the dose -- in

15    the --

16        A.    In the two higher dose groups.

17        Q.    -- in the two highest dose groups than

18    there is in the low dose group.

19             MS. WAGSTAFF:  Which study are you

20        looking at?

21        A.    That's why there is no --

22             MR. BRENZA:  It's on Page 39.

23        A.    That's why there is no dose-response.

24        Q.    And so that's what dose-response means,

25    right?  Is what are --

```
1          A.    It's an increase or a decrease in tumor

2    rates as the exposure level increases.

3          Q.    And if it increases with dose, then

4    that is a dose-response, right?

5          A.    Yes.  And if it decreases --

6          Q.    If it decreases -- well, yes, I guess

7    it could be a protected --

8                THE COURT REPORTER:  You guys are

9          speaking at the same time.

10               THE WITNESS:  Sorry.

11         Q.    If it decreases, that could be a

12   dose-response in terms of a protective effect?

13         A.    I wouldn't necessarily say protective

14   effect.  But, yes, it shows that the tumor rates

15   go down with increase in exposure to the compound.

16         Q.    Okay.  And -- and if it it's all over

17   the place, then that's the only time you wouldn't

18   have any dose-response?

19         A.    It's not a dose-response, correct.

20         Q.    So it's going up and down.

21         A.    And the same thing -- the same thing

22   was observed in both studies.  The low-dose group

23   had the highest tumor rate, but there was no

24   increase -- there was no evidence that there was

25   actually a monotone dose-response, consistently
```

**Exhibit F Page 121**

Robert Tarone, Ph.D.

1      increase in dose-response.

2          Q.   So why is dose-response a touchstone

3      for interpreting animal data of carcinogenicity?

4          A.   Well, that's what you want to see

5      ideally.  Assuming you have no toxicity, which is

6      almost never seen in glyphosate studies because

7      it's not toxic to the rodents, you want to see the

8      increase as the dose increases as evidence of an

9      effect.

10              Sometimes pairwise comparisons like the

11     two that they pointed out can be evidence of

12     carcinogenicity, for example, if they are observed

13     in the highest dose.  Or if there's toxicity in

14     the two highest doses, so you're killing the

15     animals before they can develop tumors.

16              So there are cases where pairwise

17     comparisons make sense.

18              THE COURT REPORTER:  Excuse me.  There

19          are tumors what?  I didn't hear you.

20         A.   Okay.  Let me go back.

21         Q.   I think you were saying there are cases

22     where pairwise --

23         A.   Yeah, pairwise comparisons make sense

24     when you have toxicity so that you're killing

25     animals in the two highest dose levels before they

**Exhibit F Page 122**

Robert Tarone, Ph.D.

1    can develop tumors.  Then a low dose to a control

2    comparison might make sense.  But in the absence

3    of toxicity, it would make more sense if you

4    wanted to claim there was an effect if the

5    difference was between the highest dose and the

6    control group, but that's not what they saw in

7    either of these studies.

8        Q.    So what's your conclusion about IARC's

9    analysis of the rat data?

10       A.    Well, even if you only base it on these

11   two studies, even though I don't like their

12   analysis, let's assume that they're right, and

13   that there are two significant low-dose

14   comparisons that they conclude cause -- are caused

15   by glyphosate, these are benign tumors, so they

16   can't contribute to a conclusion that there is

17   sufficient evidence of carcinogenicity.  They can

18   only contribute to there might be limited

19   evidence.

20       Q.    And --

21       A.    There's another factor to consider --

22   again, I'm assuming there that they were right to

23   base their analysis only on these two experiments.

24   But the other study, the one that's JMPR 2006 for

25   which they present no data, again I went to the

Robert Tarone, Ph.D.

```
 1    supplementary data from Greim, found the data.

 2    And in fact there's a significant decrease in

 3    these pancreatic islet cell adenomas as the

 4    glyphosate exposure level increases.  The P-value

 5    is .021.

 6         Q.    So that's, I guess, in your parlance --

 7         A.    I'm sorry, the P-value is .027, the

 8    Exact P-value.

 9         Q.    In your parlance that's a refuting

10    study or --

11         A.    Yes, it would refute that there's an

12    increase in these tumors as you feed them more

13    glyphosate.

14         Q.    And -- and you're not saying that

15    glyphosate has a protective effect?

16         A.    No, I'm not.

17         Q.    Just effects like that --

18         A.    Random chance events happen.  I think

19    they happen more often than most people think.

20         Q.    And those -- the way you detect those

21    if an event is chance is by doing these other

22    studies, by do some more studies?

23         A.    Combining -- yeah, the analysis of the

24    -- of the three studies.

25         Q.    And IARC didn't do that?
```

**Exhibit F Page 124**

Robert Tarone, Ph.D.

```
1        A.    No.  Well, they didn't even report the

2   tumor rates in the one study.

3        Q.    Now, it might be excusable if IARC

4   didn't have the data, right?

5        A.    Correct.

6        Q.    But we know that they did have Greim?

7        A.    Well, they had access to it.

8              MS. WAGSTAFF:  Objection, misstates the

9        record.

10        A.    They had access to it because even in

11   the monograph they admit that there's

12   supplementary tumor rates that were accompanying

13   the Greim paper.  I don't know if -- it may be

14   that no one actually looked at the supplementary

15   data.  I can't say.

16        Q.    But you'll --

17        A.    And in fact in my letter, recent

18   letter, I admitted -- what I said was either these

19   excluded data were ignored by the working group,

20   or they were not provided to the working group by

21   IARC staff.  In either case, something went wrong.

22        Q.    If you'll look at the monograph that

23   we've marked as 48, you'll see at the back there's

24   a bibliography.  Do you see that?

25        A.    I do.
```

**Exhibit F Page 125**

```
1          Q.     And if you look at Page 84, do you see
2    -- do you see that they cite to the Greim study?
3          A.     They do cite the Greim study.
4          Q.     Any reason to think they -- having
5    known about the Greim study, they couldn't have
6    gotten the tables just like you did?
7          A.     Hey, I can't know what went on at IARC.
8    I wasn't there.
9          Q.     But --
10         A.     That's why I say it could be one of two
11   things.  I have no evidence one way or the other.
12   I just observed something that struck me as wrong.
13         Q.     Well, do you know of any reason why --
14   why an international group of scientists couldn't
15   have gotten the data tables that you were able to
16   get all by yourself?
17         A.     Again, I don't know what happened --
18                MS. WAGSTAFF:  Objection, speculation.
19         A.     I don't know what happened at IARC.
20                By the way, here's how they refer to
21   Greim.  It's referred to in both the mouse and the
22   rat sections under Review Articles, and they say,
23   "Greim, et al. had published a review article
24   containing information on five long-term bioassay
25   feeding studies in mice."  Let me see.  There's
```

**Exhibit F Page 126**

Robert Tarone, Ph.D.

```
 1    another --
 2         Q.    Where -- where are you reading from,
 3    Doctor, what page?
 4         A.    This is on Page 34.
 5               In here they say that "This review
 6    article provided a brief summary of each study and
 7    referred to an online data supplement containing
 8    the original data on tumor incidence from the
 9    study reports."
10               So it acknowledges that there were
11    supplementary data, but I have no idea of knowing
12    if they had access to it or maybe -- you know, I
13    really don't know.  I have no idea what happened.
14         Q.    Well, in any event, you were able to
15    get it when you tried to --
16         A.    Yeah, this is why I bought the Greim
17    paper.  We didn't subscribe to it, and I wasn't
18    even able to get it from the Vanderbilt University
19    digital library, so I had to buy the paper.
20         Q.    All right.  I'd like to direct your
21    attention to your article that we've marked as 46.
22         A.    The first paper.
23         Q.    Yes.  Was this the paper where you
24    first set out your concerns about what IARC had
25    done or not done --
```

Robert Tarone, Ph.D.

```
1          A.    Yes.

2          Q.    -- and the data that they had omitted?

3          A.    Yes.

4                MS. WAGSTAFF:  Objection, leading.

5          Q.    Did you set out your concerns about how

6     they analyzed the mouse data and omitted mouse

7     data in -- on Page 1 and 2 of your -- of your

8     article?

9          A.    Yes.

10                MS. WAGSTAFF:  Objection, leading.

11          Q.    What was the -- what was the thrust of

12     your critique?

13          A.    I was just pointing out that relevant

14     tumor data was excluded from the deliberations.

15                And in this one I don't even think I --

16     oh, I did calculate some.  But it was more the

17     exclusion of data and not an issue of P-values.

18                I should point out in the abstract, I

19     was evaluating IARC on their own terms.  A lot of

20     people sometimes say, well, the reason they differ

21     from other groups is because they're evaluating

22     hazard, and the other groups are all evaluating

23     dose.

24                THE COURT REPORTER:  Excuse me, dose?

25                THE WITNESS:  Hazard as opposed to
```

**Exhibit F Page 128**

1          dose, D-O-S-E.

2          A.    But I indicate in the abstract that I'm

3     assuming that we're evaluating hazard.  I'm

4     assuming that the IARC criteria for hazard are

5     good, they are reasonable, and I'm assuming that

6     the studies they evaluated were sufficient to make

7     a conclusion about carcinogenicity of glyphosate.

8     So I'm evaluating them entirely on their own

9     terms.

10          Q.    And your conclusion with respect to

11     hemangiosarcoma is that given at the bottom of the

12     first paragraph on Page 2 -- Page 3, sorry.

13          A.    Page 3?  No, I think it is Page 4 -- or

14     Page 2 rather.

15          Q.    Well, they are double-sided so I'm --

16     it's --

17          A.    82 -- or 83 rather, Page 83 in the

18     Journal.

19          Q.    Well, the sentence I'm looking at is --

20     is the -- the last one of the first paragraph on

21     84, Page 84 of the European Journal.

22          A.    Oh, okay.

23          Q.    In there it says, "The evaluation of

24     the both mouse studies together does not provide

25     credible evidence that glyphosate causes blood

1    vessel tumors in CD-1 mice."

2         A.    That's my conclusion based on all of

3    the data, but that does not remove the

4    significance of the finding in first mouse study.

5         Q.    And with respect to the mouse study

6    kidney data, your conclusion is on -- on Page 83,

7    right?

8              MS. WAGSTAFF:  Objection, leading.

9         A.    Yes.

10        Q.    And you've written:  "It is apparent

11   that these two studies together provide no

12   evidence whatsoever to support the hypothesis that

13   glyphosate causes renal tubule tumors in male CD-1

14   mice."

15             MS. WAGSTAFF:  Where are you reading

16        from?

17             MR. BRENZA:  It's the last sentence of

18        the first full paragraph of the second column

19        on page --

20             MS. WAGSTAFF:  On the right?

21             MR. BRENZA:  -- on Page 83.  Yeah.

22        Q.    Was that your opinion?

23        A.    That's correct.

24        Q.    And is that still your opinion?

25        A.    Yes, that's correct.  That's because

**Exhibit F Page 130**

```
 1    the increasing dose-response in the first study is
 2    just cancelled by the decreasing dose-response in
 3    the second study.
 4         Q.    And with respect to the rat study --
 5    studies, some of which weren't reported in the
 6    IARC, your conclusion in the second -- the bottom
 7    of the first paragraph at the second column on
 8    Page 84, right?
 9         A.    Correct.
10         Q.    It says, "A synthesis of the data from
11    all three rat studies does not support the
12    conclusion that glyphosate is associated with
13    increased pancreatic islet cell adenoma rates --
14         A.    That's correct.
15         Q.    -- in males Sprague-Dawley rats."
16         A.    That's correct.  That was my
17    conclusion.
18              THE COURT REPORTER:  I'm sorry, in male
19         what, sir?
20              MR. BRENZA:  Sprague, S-P --
21              THE WITNESS:  Sprague-Dawley,
22         S-P-R-A-G-U-E, hyphen, D-A-W-L-E-Y.
23              THE COURT REPORTER:  What was your
24         question?
25              MR. BRENZA:  I'll just read it again.
```

**Exhibit F Page 131**

Robert Tarone, Ph.D.

```
 1    BY MR. BRENZA:

 2        Q.    A synthesis -- it says, "A synthesis of

 3    the data from all three rat studies does not

 4    support the conclusion that glyphosate is

 5    associated with increased pancreatic islet cell

 6    adenomas -- adenoma rates in male Sprague-Dawley

 7    rats."

 8        A.    Correct.

 9        Q.    And that was your opinion then?

10        A.    That -- that is my opinion.

11        Q.    And it is your opinion now?

12        A.    I didn't state, but I could have, that

13    even if your buy their interpretation, the

14    analysis is based on benign tumors only, so it

15    can't lead to a conclusion that there is

16    sufficient evidence of carcinogenicity.

17        Q.    So -- so taking all that together, and

18    going back to, you know, the preamble and the test

19    for being a 2A, was there sufficient animal

20    evidence that glyphosate should have been

21    categorized as 2A?

22              MS. WAGSTAFF:  Objection, speculation.

23        A.    I do not think that the data if they --

24    if they had included all of the excluded tumor

25    rates would support -- as I said in the paper, it
```

Robert Tarone, Ph.D.

```
 1    does not -- I don't think it would support a

 2    conclusion that there is sufficient evidence of

 3    carcinogenicity.  I said -- and I even said it

 4    would be hard even to justify limited evidence.

 5         Q.    And without sufficient evidence in rats

 6    and potentially not even limited evidence in rats

 7    and mice, there's no way IARC should have

 8    concluded that glyphosate was a probable human

 9    carcinogen?

10         A.    No, not based on their own criteria.

11         Q.    Do you know why IARC nevertheless

12    omitted all this data and found glyphosate?

13         A.    I can't possibly -- I can't possibly

14    know the reason.

15         Q.    Has anyone -- nobody has ever told you?

16         A.    No.  No one has -- no one has refuted a

17    single claim made in my two papers.

18               MS. WAGSTAFF:  Objection.

19         Q.    Well, that's a separated line of

20    questioning, but let's get into that.

21               You think having published this paper

22    IARC would have come back to you and said:

23    Dr. Tarone, you've just got it all wrong.  This is

24    why we did what we did.

25         A.    I fully expected that.  I mean I'll
```

**Exhibit F Page 133**

1     willing to have a back and forth to debate the

2     topic.

3          Q.   And -- and if there was a good answer,

4     that probably would have happened, right?

5               MS. WAGSTAFF:  Objection, speculation.

6          A.   That is speculation, but I certainly --

7     if I was IARC, I would want to respond.

8          Q.   And you didn't just stop with -- with

9     this one paper, right?  You -- you -- you have a

10    second paper that we have marked as Exhibit 47?

11         A.   Right.

12         Q.   And -- and you made some similar points

13    in that paper as well, right?

14         A.   Right.  I mean, that -- I had no plans

15    to write that paper, and the main reason that was

16    written is because a paper in the American Journal

17    of Industrial Medicine claimed that Monsanto paid

18    me to do the first study in the European Journal

19    of Cancer Prevention.

20              I submitted a letter to the American

21    Journal of Industrial Medicine complaining about

22    this and saying I was not paid anything, and the

23    letter was rejected.  They didn't publish it.  So

24    I went ahead and published this because I won't be

25    lied about in the published literature without

Robert Tarone, Ph.D.

1    responding.

2         Q.    And when you "this," you're talking

3    about the document we've marked as Exhibit 47?

4         A.    Regulatory Toxicology and Pharmacology.

5              THE COURT REPORTER:  Excuse me, could

6         you repeat?

7              THE WITNESS:  Regulatory Toxicology

8         and Pharmacology.  It's the name of the

9         journal.

10        Q.    And it's marked as an editorial, but

11   you said earlier that you thought it went beyond

12   just being an editorial?

13        A.    No.  It's the facts about what was

14   excluded in the tumor rates I present have never

15   been disputed.

16             MS. WAGSTAFF:  Object to form.

17        Misstates the record.

18                  (Knock at door.)

19             MR. BRENZA:  All right let's go off the

20        record.

21             THE VIDEOGRAPHER:  We're going off the

22        record.  The time is 12:12.

23             (Thereupon, a break was taken.)

24             THE VIDEOGRAPHER:  Going on the record.

25        The time is 12:55.

Robert Tarone, Ph.D.

```
 1    BY MR. BRENZA:

 2         Q.    Dr. Tarone, we were talking about your

 3    editorial that was published in Regulatory

 4    Toxicology and Pharmacology.  Do you remember

 5    that?

 6         A.    Yes.

 7         Q.    And I was asking you whether you

 8    regarded this as an editorial or a scientific

 9    paper.

10         A.    It's an editorial but the facts -- the

11    factual presentation related to tumor rates that

12    were excluded from the deliberations, that's not

13    opinion.

14         Q.    Was -- was this publication

15    peer-reviewed?

16         A.    Yes.

17         Q.    And what does that mean?

18         A.    It was reviewed by two referees, and in

19    fact this case the referees greatly improved the

20    paper.  Sometimes it's the opposite.  But it was a

21    -- it was a nice experience in terms of peer

22    review.

23         Q.    And when you talk about referees, are

24    they other scientists in the field?

25         A.    Other scientists in the related fields.
```

**Exhibit F Page 136**

Robert Tarone, Ph.D.

1          Q.    Do you recall offhand what suggestions

2    they made and what you changed in response?

3          A.    Yeah.  I mean, the company president at

4    IEI used complain about my writing.  He said I

5    used too few words.  I assume too much that people

6    are going to understand.

7               And one of the things that really

8    improved it is he asked a logical question, you

9    know, you're using Exact tests based on just the

10   proportions.  You know, what -- what if there's a

11   difference in survival among the groups?  So I put

12   in there that there is no difference in survival.

13         Q.    Well, and that's an important point?

14         A.    It is.

15         Q.    The -- the mouse studies and the rat

16   studies that IARC relied on didn't show that the

17   mice that were given a lot of glyphosate had

18   shorter life spans.

19         A.    Yeah.

20               MS. WAGSTAFF:  Object to form, attorney

21         testifying.

22         A.    It's pretty much been known for a long

23   time glyphosate is nontoxic.

24         Q.    So -- so they couldn't scientifically

25   evaluate the results based on rats prematurely

**Exhibit F Page 137**

Robert Tarone, Ph.D.

```
 1     dying because all the rats lived to the end of the

 2     experiment?

 3          A.    The groups had very similar survival.

 4          Q.    Okay.  What other changes do you recall

 5     or were suggested to you?

 6          A.    I can't really remember.

 7          Q.    Okay.

 8          A.    I haven't looked at it recently.

 9          Q.    Did you make similar points in the

10     Regulatory Toxicology and Pharmacology editorial

11     that you did to your -- in your -- in your

12     previous paper in the European Journal of Cancer

13     Prevention regarding mistakes that IARC made in

14     how they analyzed --

15          A.    Very similar.

16          Q.    -- the animal data?

17          A.    Very similar.  I think I included more

18     P-values from statistical analyses in Reg Tox

19     paper or Regulatory Toxicology.

20               THE COURT REPORTER:  I'm sorry, the

21          what paper?

22               THE WITNESS:  The Regulatory Toxicology

23          and Pharmacology paper.

24          Q.    And on Page 2 did you describe the --

25     the errors that IARC made with respect to how they
```

**Exhibit F Page 138**

Robert Tarone, Ph.D.

1    analyzed kidney -- kidney pathology?

2              MS. WAGSTAFF:  Object to the form of

3         the question.

4         A.    The arguments with regard to the

5    glyphosate working group deliberations were very

6    similar in the two papers, almost exactly the

7    same.  Maybe just a few more P-values from

8    statistical analyses.

9         Q.    And -- and what was your analysis of

10   the -- in the second paper regarding what IARC had

11   done with respect -- done wrong with respect to

12   the -- the kidney --

13        A.    Primarily the exclusion of data --

14             MS. WAGSTAFF:  Object to the form.

15             THE COURT REPORTER:  Excuse me.  You

16        guys are speaking on top of each other.  Can

17        you repeat your answer?

18        A.    Primarily the exclusion of data from

19   the second study.

20        Q.    Okay.  And same thing with respect to

21   the hemangiosarcomas?

22        A.    Correct.  Similar arguments as in the

23   first paper.

24        Q.    And just, again, to rereview what those

25   arguments were, what did you -- what did you set

**Exhibit F Page 139**

Robert Tarone, Ph.D.

1        forth in the exhibit?

2            A.    Well, just that there's no question

3        hemangiosarcomas were significantly elevated in

4        the first -- in the second study, but the working

5        group should have considered the first study as

6        well in their deliberations.  They might have come

7        to the same conclusion, I don't know, but they

8        should have included that data.

9            Q.    Okay.  And with respect to the rat

10       data, what did you set out in Exhibit 47?

11           A.    Very similar.  Again, that -- that they

12       should have considered the data from the one rat

13       study that they excluded.

14           Q.    How would you evaluate IARC in terms of

15       -- of their scientific analysis of the -- of the

16       and animal data in Monograph 112?

17               MS. WAGSTAFF:  Object to the form of

18           the question.

19           A.    Well, I can only comment on the

20       glyphosate.  I mean, all I can say is what I've

21       said, and that is that there are some errors that

22       are hard to explain.

23           Q.    Did you -- in your first paper that we

24       marked 46, did you discuss sources of bias?

25           A.    Probably but I'm not sure what -- to

**Exhibit F Page 140**

Robert Tarone, Ph.D.

1    what you're referring.

2         Q.    Well, let me -- let me direct your

3    attention to the bottom of the first paragraph of

4    the second column on Page 85.  Sorry.  It's --

5    sorry, that --

6         A.    First paragraph, second column?

7         Q.    Correct.  It's titled 'IARC Working

8    Group --

9         A.    Right.

10        Q.    Composition and Deliberative --

11   Deliberative Process'.

12        A.    Right.

13        Q.    And there you talked about some of the

14   -- some of the flaws that exist in IARC's

15   procedures, right?

16        A.    Well, there's some opinions that I have

17   about how they do their business, but I -- I don't

18   know.  Like the first sentence you talked about, I

19   just -- there -- there was a paper with 124

20   co-authors praising IARC Monograph Program to the

21   heavens and essentially saying it can't improved.

22   And my point would be that anything can be

23   improved.

24             And, you know, that was -- a lot of the

25   discussion we had starting again in 2008 with

Robert Tarone, Ph.D.

```
 1    IARC's staff was just things that we thought that
 2    could be improved.  I'm not going to say that I'm
 3    necessarily correct on it, but it's just something
 4    that I think they should have considered in regard
 5    to how they put together their working groups.
 6         Q.    Well, and at the very end of that
 7    paragraph you talk about types of conflicts of
 8    interest, right?
 9         A.    Correct.
10         Q.    And -- and we're going to talk about
11    the claims that have been made about your
12    financial conflicts of interest, but -- but there
13    are other conflicts of interest as well, right?
14         A.    Right.
15         Q.    And you -- you -- what -- what do you
16    identify as possible conflicts of interest that
17    might have effected IARC?
18         A.    I -- I can't tell you that.  I mean, I
19    don't know what motivates people.
20         Q.    Well, did you reference as possible
21    conflicts of interest pursuit of professional
22    advancement?
23         A.    That's always a possibly, but I can't
24    know about any of the people.  I don't know any of
25    the people on there except Aaron Blair.
```

**Exhibit F Page 142**

Robert Tarone, Ph.D.

```
 1            Q.    Future -- another possible conflict of

 2     interest is concern about future of funding

 3     sources, right?

 4            A.    Correct, that's a possibility.

 5            Q.    Personal recognition is a source of

 6     possible conflict?

 7            A.    Right.

 8            Q.    People want to be known as the

 9     discoverer of this or that.

10            A.    Yep.

11                  MS. WAGSTAFF:  Objection to the

12            attorney testifying.

13            Q.    Future funding opportunities, is that a

14     conflict of interest you identified?

15            A.    Yeah.  It's possible.  I don't know

16     that it existed for any of the people on the

17     monograph.

18            Q.    Personal recognition, that's -- is that

19     a conflict of interest you identified?

20            A.    It plays a role sometime.

21            Q.    Public policy activism?

22            A.    Yes, indeed.

23            Q.    Advocacy?

24            A.    Yep.  And, you know, I'm always careful

25     to report non-financial conflicts.  For example,
```

Robert Tarone, Ph.D.

```
 1    in the paper with Geoffrey Kabat and Bill Price,

 2    which was an evaluation of different meta-analyses

 3    that had been done on glyphosate, we gave

 4    preference to the agricultural health study.

 5              So I reported at the bottom that I had

 6    helped design the study and co-authored some of

 7    the papers.  Just to point out that, you know, I

 8    may be biased in favor of this study.

 9              Rarely are such non-financial conflicts

10    reported unfortunately.

11        Q.    And of course if members of the IARC

12    voting members and special -- invited specialists

13    were expecting to become litigation consultants,

14    that could just be a straight up financial

15    conflict, right?

16              MS. WAGSTAFF:  Objection, assumes facts

17         not in record.

18        A.    Yeah, it could be but it's -- you know,

19    I have no evidence of that.

20        Q.    Now, if you look at the acknowledgment

21    -- acknowledgments of your conflicts of interest

22    when you wrote that paper, do you see at the very

23    end that there's a section called

24    "Acknowledgments"?

25        A.    Right.
```

**Exhibit F Page 144**

```
 1           Q.    And did you put out -- put out there,

 2      for whatever it's worth, that you got paid -- that

 3      your company got paid $750 at one point?

 4           A.    I did.  And that's how IARC knew about

 5      that meeting, and they actually made a post on

 6      their website trying to turn it into something

 7      that was essentially some kind of a conflict.

 8           Q.    What -- do you remember exactly what

 9      the post said?

10           A.    No, I can't remember the exact words.

11           Q.    But the impression that they tried to

12      leave is that you were a Monsanto paid consultant?

13           A.    That I did something ethically

14      incorrect in terms of reporting a conflict of

15      interest.

16           Q.    Well, and this -- you know, that raises

17      an interesting point.  This article that we've

18      marked as 46 the one published in the European

19      January Journal of Cancer Prevention --

20           A.    Right.

21           Q.    -- it was -- it was -- let me try to

22      get the dates of this right.  Is this the one that

23      there was a -- yeah.  So it says at the bottom of

24      the header, "Received May 20th, 2016.  Accepted

25      May 31st 2016."  But it's only copyrighted in
```

**Exhibit F Page 145**

Robert Tarone, Ph.D.

1    2018, so that's almost two years later.

2        A.    It was actually published online in

3    August 2016.

4        Q.    Okay.

5        A.    So it was readily available --

6        Q.    Readily --

7        A.    -- online.

8        Q.    Okay.  So -- so since August of 2016 if

9    IARC or any member of IARC had wanted to see this

10   article they could have.

11       A.    Anybody could have.

12             MS. WAGSTAFF:  Object to the form.

13       A.    In fact, I submitted it to the EPA's

14   SAG.  It was a -- I must say that was a very open

15   way they did business.  Anybody could contact them

16   and submit comments or a document, and they would

17   post it on their website.

18             So I submitted this version of the

19   paper, the one that was published online, to the

20   EPA.

21       Q.    But then somebody did something to

22   prevent the paper from being physically published,

23   right?

24             MS. WAGSTAFF:  Objection, leading.

25       A.    Well, they delayed it.  Unbeknownst to

**Exhibit F Page 146**

1    me, I just knew that it was taking forever for the

2    paper to appear in print, and eventually I found

3    out much much later that a COPE investigation,

4    COPE is Committee on Publication Ethics, had been

5    opened, had been initiated regarding this paper.

6           And eventually I was cc'd, I don't

7    know, by someone on the -- on the COPE committee

8    and the ethics complaint was initiated by a member

9    of the IARC Monographs Program, Dana Loomis.

10      Q.    And when Dr. Dana Loomis initiated this

11   complaint against your article, did he say I'm

12   part of IARC or did he -- did he --

13      A.    I have no idea.

14      Q.    -- try to just pretend it was just

15   himself?

16      A.    Yeah, I have no idea what he might have

17   told the committee.  I was only cc'd on a thread

18   that showed that he initially was the one who

19   initiated it.

20      Q.    What did Dr. Loomis say that caused

21   your paper to get put on hold for so long?

22      A.    Well, I don't know.  He again was

23   alleging conflicts of interest.

24           In -- in the documents I submitted at

25   the previous deposition, I included my response to

Robert Tarone, Ph.D.

```
1     a letter to the editor that had been submitted to

2     this journal, a letter that I wanted -- I advised

3     the editor that he should publish that along with

4     my response, and he initially agreed.

5               Well, that response -- what was raised

6     in that letter are very similar to what he based

7     the COPE investigation on.

8        Q.   Was the -- was the result of Dr. Loomis

9     complaining about your article that it didn't get

10    published for over a year?

11              MS. WAGSTAFF:  Objection, speculation.

12       A.   Yeah, it may -- it may well -- I

13    suppose that the -- the editor was the one having

14    to deal with the -- with the committee.  I'm not

15    sure what COPE does, but this back and forth

16    between the editor and the committee had been

17    going on a long time before I even realized

18    anything was going on.

19       Q.   And just to be clear, this back and

20    forth, that's between Dr. Loomis -- or between the

21    editor and -- and COPE?

22       A.   COPE.

23       Q.   Trying to resolve Dr. Loomis'

24    accusations?

25       A.   Exactly.  Exactly.
```

Robert Tarone, Ph.D.

1          Q.    Did Dr. Loomis ever step up and talk to
2     you directly about anything?
3          A.    No.  There would be no reason I guess
4     to do that.
5          Q.    If you would you pull out the list of
6     the IARC working group for 112 that we looked at
7     earlier I think it's been marked as -- it was
8     marked previously as Exhibit 8?
9          A.    Yes.
10          Q.    And turn to the very last page of it.
11     You see that it lists some staff that worked at
12     IARC there?
13          A.    Right.
14          Q.    And do you see Dr. Loomis there?
15          A.    Yes.
16          Q.    So --
17          A.    And I realize that Dr. Loomis worked at
18     IARC because the letter that was submitted in
19     December of 2016 in response to my paper published
20     online in August of 2016, it was written by
21     Dr. Loomis, Dr. Guyton and Dr. Straif, and I knew
22     all three of them are employees IARC.
23          Q.    So you wrote a letter --
24          A.    I was well aware of it.
25          Q.    You wrote a letter explaining that IARC

Robert Tarone, Ph.D.

```
 1    got it wrong, and instead of responding to your

 2    science, they make an ethical complaint about your

 3    article?

 4         A.   Right.  And -- and the letter that they

 5    submitted in December was also primarily making

 6    ethical claims.  It wasn't refuting or disputing

 7    any scientific fact in my paper.

 8         Q.   And -- and the ethical claims were

 9    false, right?

10         A.   Yes.

11              MS. WAGSTAFF:  Object to the form.

12         Q.   They were claiming that you were a

13    Monsanto paid -- paid consultant?

14         A.   Well, they were claiming I had a

15    conflict of interest.

16              THE COURT REPORTER:  Excuse me, could

17         you repeat your question?

18         Q.   They were --

19         A.   Sorry.

20         Q.   Doctor Loomis was -- was complaining

21    that you were a Monsanto consultant?

22         A.   Well, I'm not sure he mentioned

23    Monsanto in the complaint, but he was saying that

24    there was a conflict of interest that had been

25    improperly reported.
```

**Exhibit F Page 150**

```
 1            Q.    And -- and first of all, you're not a

 2     Monsanto consultant, right?

 3            A.    No.

 4            Q.    And secondly you disclosed this one

 5     meeting you had for three hours in the article?

 6            A.    That's correct.  That's why IARC knew

 7     about it.

 8            Q.    So Dr. Loomis managed to jam-up your

 9     article for over a year over false accusations?

10            MS. WAGSTAFF:  Object to form.

11            A.    It probably is the reason it was

12     published so much later than it was actually put

13     online.

14            Q.    Do you know of any reason why

15     Dr. Loomis or anyone else at IARC would decide

16     that rather than respond to your science,

17     criticizing how they did their work, they instead

18     chose to attack you personally?

19            MS. WAGSTAFF:  Objection, calls for

20            speculation.

21            A.    Yeah, I can't make any judgment on a

22     person's motives.

23            Q.    As you sit here today, so now we're --

24     so this was published in 2018, it's 2023 now, has

25     IARC ever responded to your scientific criticisms
```

1    of their work?

2         A.    No one has re -- no one has refuted or

3    disputed any of the facts in my two papers.  And,

4    again, IARC did respond in December with a letter

5    to the editor that I thought should be published

6    along with my response.  And the editor also

7    thought they should be published, but apparently

8    the -- someone at the publisher did not want to

9    see them published.  Perhaps because it was, you

10   know, so obvious that there was a disagreement.  I

11   don't know.  I can't say why.

12        Q.    Well, IARC did do a -- in 2017 this was

13   -- this was previously marked, but I'm not sure

14   what the previous exhibit was.  I'll give it

15   another sticker now, 49.

16             (DEFENDANT'S EXHIBIT 49 WAS MARKED.)

17             MS. WAGSTAFF:  Do you have a copy for

18        me?  If not I can --

19             MR. BRENZA:  I'm going to be short one

20        copy, but you can -- if you --

21             THE WITNESS:  I don't need one.  I

22        think I know the document.

23             MR. BRENZA:  Well, I want you to have

24        it.

25             MS. WAGSTAFF:  If you take it, I've to

```
1          to look at it.

2               MR. BRENZA:  You can look at it first.

3               MS. WAGSTAFF:  If you tell me what it

4          is --

5               MR. BRENZA:  You might be able to

6          identify it.

7               MS. WAGSTAFF:  -- I've got them all on

8          here on a --

9               MR. BRENZA:  I'm sorry, I lost my copy.

10              MS. WAGSTAFF:  You know what, it's the

11         2017 response to Reuters' article.

12              THE WITNESS:  Yes.

13              MS. WAGSTAFF:  Do you know what number

14         it is?  Well, I can pull it up here.

15              THE COURT REPORTER:  What was the

16         article?

17              MS. WAGSTAFF:  It's the 2017 IARC

18         response to Reuters' article of 14, June

19         2017.  I think it's 34.  I got it.

20              THE COURT REPORTER:  How do you spell

21         Reuters?

22              THE WITNESS:  R-E-U-T-E-R-S.

23              MR. BRENZA:  Actually I think I found

24         my copy.

25              MS. WAGSTAFF:  It's 34.
```

Robert Tarone, Ph.D.

```
 1                    MR. BRENZA:  If you need it, I can
 2          still...
 3                    MS. WAGSTAFF:  No.
 4     BY MR. BRENZA:
 5          Q.    So in -- in June of 2017, so that was
 6     roughly a year after your article appeared online,
 7     right?
 8          A.    Right.
 9          Q.    IARC mentions you in a press release.
10                    MS. WAGSTAFF:  Object to the
11          characterization of this document as a press
12          release.
13          A.    It's just a post on their website.  I'm
14     not sure that it was a press release.  But it --
15     it's really the only public response they've had
16     to my paper.
17          Q.    And it's -- it's responding really to a
18     newspaper article, a Reuters' article, right?
19          A.    Correct.
20          Q.    But it says in the -- you see the
21     paragraph beginning four -- four lines -- four
22     paragraphs down, the journal article?
23          A.    Yes.
24          Q.    It says, "The journal article by Tarone
25     referenced in the Reuters' article acknowledges
```

**Exhibit F Page 154**

Robert Tarone, Ph.D.

1    that the author consulted with the lawyer

2    representing Monsanto and that payment was

3    received for that consultation.  IARC scientists

4    took note of the article and submitted a letter to

5    the editor in that journal in December 2016."

6         A.    Correct.

7         Q.    "To date that letter has not been

8    published."

9         A.    That's the letter that I was talking

10   about.

11        Q.    Okay.

12        A.    And if they had just stopped with that

13   first sentence, that would have been fine because

14   that's factual.  I would have preferred they said

15   the payment was received by the company.  It makes

16   it seem like it was received by me, but still I

17   could have lived with that.

18             But it's later on they write this

19   sentence that's very peculiar but it's worded as

20   if I did something wrong.  Because he says, "The

21   general editors have indicated that the article by

22   Tarone will be corrected to report the author's

23   paid consultation with Monsanto as a conflict of

24   interest."

25        Q.    And that wasn't done, was it?

**Exhibit F Page 155**

Robert Tarone, Ph.D.

```
 1          A.    What's that?

 2          Q.    Nothing about the article needed to be

 3     corrected because you had already --

 4          A.    No.  They did make that change.  The

 5     editor decided that it would be best.  If you'll

 6     notice, originally the acknowledgment appeared

 7     first, and afterwards there was a statement of no

 8     conflict of the interest.  But the editor said

 9     let's get it into print.  We'll put the conflict

10     of interest under acknowledgement.  And I agreed

11     to that just to get the paper in print.

12          Q.    Okay.  Did -- did your meeting with

13     Monsanto in which your company was paid $750

14     affect your judgment in any way?

15          A.    No, it did not.

16          Q.    Has -- have you ever been contacted by

17     members of the working group of IARC to

18     substantively discuss your problems with what they

19     did?

20          A.    I've had no contact with any of the

21     members of the working group since the March 2015

22     meeting there.  There was only two of them I ever

23     met Aaron Blair, who I worked with quite a bit,

24     and Chris Portier who I met when the animal

25     program was transferred to the south from NCI.
```

**Exhibit F Page 156**

Robert Tarone, Ph.D.

```
 1              Q.    And they -- neither one of them have --
 2              A.    No.
 3              Q.    -- ever reached out to you to discuss
 4        your -- your scientific criticisms?
 5              A.    No.  And I -- I didn't know any of the
 6        other members, so there would probably be no
 7        reason for that to happen.
 8              Q.    You do know that IARC is aware of your
 9        article, right?
10              A.    Well, they wrote that post on their
11        website.
12              Q.    Yeah.
13              A.    So clearly they were aware of it.
14              Q.    And somebody, Dr. Loomis --
15              A.    Plus I know they submitted the letter
16        to the editor in December of 2016 so they
17        obviously were aware of it.
18              Q.    And -- and Dr. Loomis at least was
19        aware of it enough to prevent -- try to prevent
20        you from going into print for a period of time?
21                    MS. WAGSTAFF:  Object to form.
22              A.    Well, I can't say why he initiated the
23        COPE investigation.  So, again, I -- I don't ever
24        try to impute motives on somebody.
25              Q.    Well, has anyone ever said to you that
```

Robert Tarone, Ph.D.

1      IARC is embarrassed by the mistakes that you've

2      flagged that they made?

3           A.    No.

4           Q.    IARC says it has an obligation to

5      correct its work as -- as is appropriate, right?

6           A.    Every scientific organization or

7      scientist does.

8           Q.    To your knowledge, has IARC done

9      anything to correct the mistakes that you have

10     identified in how it decided glyphosate was a

11     Category 2A probable carcinogen?

12          A.    Well, they haven't --

13               MS. WAGSTAFF:  Object to form.

14          A.    They haven't even acknowledged that

15     they are mistakes, so there would be no reason for

16     them to go further.

17          Q.    Well, that's the first step I guess of

18     --

19          A.    Right.

20          Q.    Correction is -- is acceptance, right?

21               Doctor --

22               THE COURT REPORTER:  What's your

23     answer?

24          A.    Yes.  I'm sorry.

25          Q.    You -- you did some calculations after

**Exhibit F Page 158**

1    -- you were asked to do calculations and you did

2    them after your deposition last week for -- for

3    the Plaintiffs' lawyer?

4         A.    Correct, correct.

5              MS. WAGSTAFF:  Just for the record I'm

6         going to say we did not ask him to do

7         calculations.  We asked him for backup data

8         which he said he could send us in one click

9         of a button.  We did not ask him to do any

10        calculations.

11        A.    Well, it didn't take long.  This was

12   not a major effort.

13             MR. BRENZA:  Well, the record will

14        reflect whatever it reflects.

15             MS. WAGSTAFF:  Okay.

16             MR. BRENZA:  I -- my understanding was

17        he was -- he was asked to do these.  Maybe he

18        was also asked to produce them in advance.  I

19        don't know.

20   BY MR. BRENZA:

21        Q.    But any event, I want to just ask --

22   you did send -- you did some calculations --

23        A.    Yes, I did.

24        Q.    -- and you did send them, right?

25             MR. BRENZA:  And I'm going to mark what

```
 1          I -- I understand you did and tell, you know,

 2          this is going to be subject to your

 3          confirming it, as 50.

 4               MS. WAGSTAFF:   Thank you.

 5               (DEFENDANT'S EXHIBIT 50 WAS MARKED.)

 6  BY MR. BRENZA:

 7       Q.   Is Exhibit 50, the three pages, the

 8  calculations that you performed after last week's

 9  deposition --

10       A.   They are.

11       Q.   -- that were sent to opposing counsel

12  on -- I think it was on Saturday and then they

13  were forwarded on to me?

14       A.   These are the calculations.  These are

15  the printer -- the computer output.

16       Q.   Can you explain what they are?

17       A.   Right.  Well, this is just -- what I

18  like about this program, which is called StatXact,

19  that's S-T-A-T-X-A-C-T, it was a Harvard

20  statistician that did this, is you can see on each

21  of these pages, right one on top of the other,

22  both the approximate P-value that the IARC

23  monograph reported and the Exact P-value that I

24  reported.

25               So on the first page the monograph
```

Robert Tarone, Ph.D.

1    reported .034 and I reported .065.

2              The second page the monograph

3    reported --

4         Q.    Well, wait, let me -- let me stop you

5    on the first page.

6         A.    Okay.

7         Q.    Can you help us see where you are?

8         A.    It's under one-sided these are

9    one-sided P-values.  It says "Inference."  That's

10   how the table is headed.

11        Q.    Okay.  So it's -- it's the fourth

12   column from the left?

13        A.    Correct.

14        Q.    And what's the significance of those

15   P-values that you've calculated?

16        A.    Those are just the two P-values

17   approximate reported in the monograph and the

18   Exact reported in my paper.

19        Q.    And these are P-values you've written

20   at the top for the first CD-1 mouse study that was

21   relied on in the IARC -- in the IARC Monograph?

22        A.    Yes, for renal -- this analysis is for

23   renal tumors adenomas and carcinomas combined.

24              The second page is the same study but

25   just carcinomas.  And there again, you see the

Robert Tarone, Ph.D.

```
 1    P-value is one on top of the other, .03 -- .037

 2    reported in the monograph and .063 reported in my

 3    papers.

 4         Q.    And just to be clear, the importance of

 5    those numbers is that anything less than .05 would

 6    be considered significant?

 7         A.    Historically by IARC, yes, that's what

 8    they've used.

 9         Q.    And anything over .65 would be

10    considered not significant?

11         A.    05, .05.

12         Q.    .05.  And -- and these numbers actually

13    one is significant and one isn't significant,

14    right?

15         A.    One is less than .05 and the other is

16    greater, yes.

17         Q.    So, I mean, it's not -- these aren't

18    just random numbers.  They -- they -- they're

19    right on the line.  That's important.

20         A.    They're calculated based on the Exact

21    test statistic.

22         Q.    And am I understanding correctly that

23    the Exact test that you suggest should have been

24    used shows that the -- which has a P-value of

25    greater than .05, shows that those results are not
```

**Exhibit F Page 162**

Robert Tarone, Ph.D.

1    significant?

2         A.    It could be considered non-significant

3    using the .05 level that IARC has traditionally

4    used.

5         Q.    The same thing is true for the next

6    page.

7         A.    The next page is the second study, so

8    this is the negative trend.

9         Q.    Okay.

10        A.    So there is no P-value reported in the

11   monograph.  If it had been, that's what would have

12   been reported, and there's the Exact P-value,

13   which .042.

14             Now, it's interesting in this case the

15   approximate P-value is greater than the Exact, but

16   that's because the trend is negative.  That's just

17   the way it works.

18        Q.    Okay.

19        A.    If it's a positive trend, the

20   approximate P-value will be too small.  If it's a

21   negative trend, it will be too large.

22        Q.    And the neg -- when you say "a negative

23   trend," you're saying there's less cancer with

24   greater doses of glyphosate?

25        A.    Tumor rates decrease as the glyphosate

**Exhibit F Page 163**

1    level increases.

2         Q.    Okay.

3         A.    And the reason for this difference is

4    you're trying to approximate the P-value in the --

5    in the Approximate test by a very symmetric

6    normal -- sort of the bell-shaped curve you're

7    used to seeing, but the curve for the Exact

8    statistic is very asymmetric.  It has a very heavy

9    tail out on the end, so that's why there's a

10   difference in the Approximate and the Exact

11   P-value.

12        Q.    And, once again, these are right on the

13   line that's important, right?  They are on that

14   .05 that IARC says --

15        A.    Yeah, they are all somewhere around

16   .05, yeah.

17             THE COURT REPORTER:  Excuse me, can you

18        please repeat your answer?

19             THE WITNESS:  Sorry.

20        Q.    They're right around -- I'll ask the --

21        A.    They are right around .05 is what I

22   said.

23        Q.    Well, one is above and one is below

24   which is --

25        A.    Yeah, occasionally above, occasionally

**Exhibit F Page 164**

Robert Tarone, Ph.D.

```
 1    below but they all tend to be around .05.

 2         Q.   Okay.  What's -- what's on the last

 3    page of your --

 4         A.   I thought we just talked about that.

 5    That's the -- that's the -- that's the study that

 6    IARC did not report, but it shows the exact

 7    P-value of .042 that I report in my papers.

 8         Q.   Okay.  Doctor, was -- you're aware that

 9    there was a -- a modification of the results --

10    initial results in the first mouse study that IARC

11    relied on, right?

12         A.   You're referring to the pathology

13    review?

14         Q.   Yes.

15         A.   Yes.  There was a pathology review, so

16    a second set of rates was created in addition to

17    the original rates that were based on adenomas

18    only.

19         Q.   And -- and I believe during your

20    questioning there was an implication somehow that

21    Monsanto had done something to manufacture a -- a

22    new tumor in the control group of the -- of the

23    animals?

24         A.   Well, there was clear implication from

25    the papers that I was shown that were Monsanto
```

**Exhibit F Page 165**

```
 1    papers that the pathologist who did the review may

 2    have been doing Monsanto's bidding.  That was

 3    clearly an implication.

 4        Q.    And -- and -- but it's not an

 5    implication that you accepted, right?

 6        A.    Well, I have no way of knowing.

 7        Q.    Yeah.  I mean, you know that --

 8        A.    I don't know any pathologist and

 9    certainly not that pathologist.

10        Q.    Sure.

11        A.    I wouldn't dare to guess what his

12    motives were.

13        Q.    So I'm going to hand you a Monsanto

14    document that deals with those revised pathology

15    results.  And did I -- I did put a sticker on that

16    one, sir?

17        A.    No, I don't have a sticker.

18        Q.    No?  Let me -- let me do that.

19              THE COURT REPORTER:  What number is it?

20              MR. BRENZA:  51.

21              (DEFENDANT'S EXHIBIT 51 WAS MARKED.)

22    BY MR. BRENZA:

23        Q.    You see here what I've handed you is a

24    document that's been produced by Monsanto in this

25    litigation and it's entitled 'The Pathology
```

**Exhibit F Page 166**

Robert Tarone, Ph.D.

1     Working Group Report on Glyphosate in CD-1 Mice'.

2     Do you see that?

3          A.    Uh-huh (affirmative).  Yes, I do.

4          Q.    And if you turn to the third page, do

5     you see that there's a list of the members of the

6     Pathology Working Group?

7          A.    Let me see.  Yes, I see five names.

8          Q.    All right.  And you see under reviewing

9     pathologist, Dr. Kuschner, do you see that?

10         A.    Yes, I do.

11         Q.    And he was a -- he's listed as -- he's

12    not a Monsanto employee, right?

13         A.    I have no idea.

14         Q.    Well, according to this document --

15         A.    It says School of Medicine State

16    University of New York.

17              THE COURT REPORTER:  Excuse me, it says

18         what?

19         A.    Excuse me.  It says School of Medicine

20    State University of New York, so he appears to be

21    a university pathologist.

22         Q.    Okay.  In any event, his work was

23    reviewed by five other pathologists?

24         A.    Correct.

25              MS. WAGSTAFF:  Object to form.

**Exhibit F Page 167**

Robert Tarone, Ph.D.

1          Q.    And do you see their signatures at the

2     bottom of that page?

3          A.    I do.  And surprisingly I know one of

4     them.  Jerrold Ward worked at NCI for years.

5          Q.    Okay.

6          A.    I actually did some work with him.

7          Q.    If you'll turn to page -- it's the page

8     that's numbered 3.  It's not -- it's not the third

9     page but it's got 3 at the bottom.  For the

10    results of their rereview of the pathology.

11         A.    Which page is noted on the bottom?

12         Q.    Three?

13         A.    Three.

14         Q.    Table 1.

15         A.    Okay.

16         Q.    Do you see there they reported the

17    incidence of tubular-cell adenomas and carcinomas?

18         A.    Correct.

19         Q.    And the final conclusion is it's one in

20    the control group, none in the low dose, one in

21    the medium dose and three in the high dose?

22         A.    Oh, that's at the bottom, okay.

23    Combined.

24         Q.    Yes.  Do you see that?

25         A.    Yes.

Robert Tarone, Ph.D.

```
1              Q.     And it goes on to say:  This PWG,

2        that's Pathology Working Group, firmly believes

3        and unanimously concurs with the original

4        pathologist and reviewing pathologist that the

5        incidence -- incidences of renal tubular cell

6        neoplasms in the study are not compound related.

7              A.     Yes, I see that.

8              Q.     Is that consistent with the revised

9        data that you saw IARC was reporting in Table 3.1

10       of Monograph 112?

11             A.     It's not.  But even empirically looking

12       at this, it's sort of a mixed bag for Monsanto

13       because, yes, they were helped by finding a tumor

14       in the control group, but they were not helped by

15       finding three of the four tumors in the two

16       highest doses, carcinomas instead of adenomas.

17             Q.     So that tends to tells you --

18             A.     It's kind of a mixed bag.

19             Q.     So that kind of tells you that these

20       guys were not in Monsanto's pocket?

21                    MS. WAGSTAFF:  Object to speculation.

22             A.     Yeah.  I can't -- I can't say that but

23       definitely I would not have expected that if the

24       goal was to just help out Monsanto.

25             Q.     Does it make a difference with respect
```

**Exhibit F Page 169**

Robert Tarone, Ph.D.

```
 1     to evaluating what IARC did if you accept that the

 2     Pathology Working Group that I've just handed to

 3     you is correct?

 4          A.    Not really because it doesn't matter

 5     which -- I think we argued this -- or talked about

 6     this earlier.  It doesn't matter which pathology

 7     you base it on.  If you base it on the original,

 8     which was statistically significant, it's based

 9     only on benign tumors.  So it can't reach the

10     conclusion that the working group reached.

11               And if you base it on this, neither the

12     carcinomas nor the adenomas and carcinomas

13     combined have a P-value less than .05 for the

14     Exact test.

15          Q.    So they are not statistically

16     significant?

17          A.    Right.

18          Q.    So either way IARC got it wrong?

19               MS. WAGSTAFF:  Object to form.

20               MR. BRENZA:  All right.  I'll withdraw

21          that question.

22     BY MR. BRENZA:

23          Q.    Doctor, you talked a little bit about

24     the Agricultural Health Study and that you had a

25     small role in designing it in the early stages, is
```

Robert Tarone, Ph.D.

```
 1    that right?

 2         A.    Yes.

 3         Q.    Did you -- have you followed --

 4    followed the Agricultural Health Study as it's

 5    proceeded over the years?

 6         A.    Yes, I have actually because of --

 7    because of my interest.  I haven't done it in the

 8    recent years, but the whole time I was working at

 9    IEI, I would make a copy of every paper that was

10    published based on it just to follow and see what

11    they were finding.

12         Q.    What are the strengths of a study like

13    the Agricultural Health Study compared to case

14    control studies?

15         A.    Well, the main strength --

16               MS. WAGSTAFF:  Objection, incomplete

17          hypothetical.

18         A.    The main strength of a cohort study --

19    and this is a prospective cohort study, is that

20    you obtain the exposure information, not only the

21    current exposure but past exposure, before you

22    follow the patient, the subjects over time.

23               Whereas in a case control study, you're

24    asking them after the events have occurred.  So

25    you're asking say a cancer patient about their
```

Robert Tarone, Ph.D.

```
1    exposure, and it's likely to be very different

2    than asking a controller who has never been

3    seriously ill about their exposures.

4           People with a disease tend to be a

5    little bit -- you know, they tend to report more

6    stuff because they think really harder about what

7    their exposures were in the past.

8           And another advantage of a cohort study

9    is you can't -- you don't have to restrict

10   yourself to say only cancer.  You can look at any

11   disease outcome.

12        Q.   Is the -- are there strengths of the

13   Agricultural Health Study that go beyond simply

14   the fact that it's a perspective cohort study?

15        A.   Well, a major strength compared to the

16   case control studies is because the cohort study

17   is among farmers, you have a much higher

18   prevalence of exposure to any given pesticide than

19   you would get in a -- most of -- in fact, all of

20   the case control studies are population-based.

21   The people aren't selected because they're

22   farmers.  They're just -- you're asking the

23   general population and asking them well, did you

24   use glyphosate, and some people who use it in

25   their yards will say, yes.  And there will be some
```

Robert Tarone, Ph.D.

```
1    farmers, but it's a very mixed bag in terms of who

2    is reporting exposure.  For glyphosate in the --

3    in the Agricultural Health Study 80 percent of the

4    subjects had used glyphosate.

5         Q.   Why is that a benefit?

6         A.   Because you're getting much more stable

7    estimates.  In the case control studies, you

8    rarely get above 10 percent of the people

9    reporting use of glyphosate.

10              MS. WAGSTAFF:  Object to form.

11        A.   So you're working with smaller numbers,

12   and it just means your analysis is not as stable.

13   Small changes in how things are categorized can

14   make a big difference in the estimates of risk.

15              THE COURT REPORTER:  Did you object?

16              MS. WAGSTAFF:  Yes.

17        Q.   Was there -- strike that.

18              Have there been papers relying on the

19   data collected in the Agricultural Health Study

20   over the years?

21        A.   Yes, several.

22        Q.   The agricultural health study is --

23   it's a dataset that people can access and do

24   whatever they want with it, right?

25        A.   Right.  I didn't realize that until I
```

**Exhibit F Page 173**

Robert Tarone, Ph.D.

```
 1     actually asked for some data for the paper with

 2     Kabat, et al.

 3                THE COURT REPORTER:  Excuse me, what?

 4                THE WITNESS:  K-A-B-A-T.  He's an

 5          epidemiologist.

 6          A.   And I was refused the data

 7     surprisingly.  But in the process, they have --

 8     they have a system similar to one we had in the

 9     Southern Community Cohort Study that you can apply

10     to them for access to datasets.

11                So, yes, it is available.  You have to

12     go through their official process.

13          Q.   Was there a paper published in 2014?

14          A.   Yes, there was.

15                MS. WAGSTAFF:  Object to form.

16          A.   Based on the Agricultural Health Study,

17     probably more than one.  But there was one that

18     was on non-Hodgkin's lymphoma.

19          Q.   And that -- is that the -- the paper by

20     a Alavanja or Alvanja?

21                THE COURT REPORTER:  Excuse me?

22          A.   Can you show me the paper.

23          Q.   Yes.  Let me see if I can give you the

24     copy that came from your production.

25          A.   He was the primary author on a number
```

**Exhibit F Page 174**

Robert Tarone, Ph.D.

1    of papers.  He was one of the co-principal

2    investigators.

3              MS. WAGSTAFF:  If you have a copy for

4         me, that would be great.

5              MR. BRENZA:  Yeah, I do.

6              THE WITNESS:  What's the title?

7              MR. BRENZA:  I'm going to give you --

8         I'm going to give you the paper.  I found it.

9              MS. WAGSTAFF:  Did they copy it with

10        your --

11             MR. BRENZA:  They did.  With -- with --

12        not with mine.

13             MS. WAGSTAFF:  Oh.  You can do it

14        sideways.

15             MR. BRENZA:  I guess that's probably

16        what I have to do.

17             MS. WAGSTAFF:  Thanks.

18             THE WITNESS:  Okay.

19             THE COURT REPORTER:  Are you marking

20        this?

21             MR. BRENZA:  Yeah, I just marked it as

22        50...

23             MS. WAGSTAFF:  2.

24             MR. BRENZA:  52.

25             (DEFENDANT'S EXHIBIT 52 WAS MARKED.)

**Exhibit F Page 175**

1      BY MR. BRENZA:

2          Q.    So, Doctor, this is a paper you

3      actually brought to the deposition last week?

4          A.    Yeah, it's got my marking all over it.

5          Q.    Yeah.

6          A.    I tend to write on papers.

7          Q.    And -- and I'm sorry your handwriting

8      didn't copy very well, but it did copy somewhat.

9      But that's your -- just to be clear, that's your

10     handwriting, that's not mine.

11         A.    Yeah, that's notes to myself.

12         Q.    And this was a paper that you had in

13     your files when --

14         A.    Yes.

15         Q.    -- when your deposition was noticed.

16               What's the nature of this paper?

17         A.    This is -- there were two generally --

18     general types of papers that were written based on

19     the Agricultural Health Study.

20               One, they would look at a single

21     pesticide and then look at how cancer rates vary

22     at different doses of that one pesticide.  And

23     then were papers like this that looked at one

24     disease.  The other ones would look at all cancers

25     but a single pesticide.  This one looks at a

```
 1      single disease endpoint but multiple pesticides.
 2           Q.    And it was published, it shows on the
 3      front, October of 2014?
 4           A.    That's correct.
 5           Q.    So that was six months or so before
 6      IARC was going to meet on glyphosate?
 7           A.    That's correct.  Five or six months
 8      prior.
 9           Q.    And you see Aaron Blair's name as one
10      of the authors --
11           A.    Yes.
12           Q.    -- on Exhibit 52?
13           A.    Yes.
14           Q.    Was there something about this article
15      that disappointed you when you -- when you saw it?
16           A.    Well, not disappointed as much as
17      surprised me.  And we -- we had done -- I say we
18      because I was on one of them.  There had been 11
19      or 12 similar papers with different types of
20      cancer published prior to this, and they had
21      already included all four classes of pesticides.
22                In other words, this title says,
23      "Lymphoma Risk and Insecticide, Fungicide and
24      Fumigant Use."
25           Q.    So those are --
```

Robert Tarone, Ph.D.

```
1              A.     All of the previous --

2              Q.     Those are -- just to stop you, those

3     are three different types of chemicals?

4              A.     Yeah, three different classes of

5     pesticides.

6              Q.     Insecticides, fungicides and fumigants?

7              A.     Right.

8              Q.     Okay.  Go ahead.

9              A.     But all the previous papers had also

10    included herbicides.  So that -- definitely that

11    surprised me that they excluded herbicides.

12                    And I couldn't figure out a reason for

13    it particularly since the previous papers had all

14    been published in print journals.  Print journals

15    I think all have limitations on how long the paper

16    can be, how much data you can put in, how many

17    tables, how many figures.  Because it's a print

18    edition, they can't give you a whole bunch of

19    pages for a paper.  But this was published in an

20    online journal.  They have no limitation.

21                    And I saw some -- a couple of people in

22    media reports say that -- you know, that this was

23    -- this was done because the paper was getting too

24    long, which just didn't make any sense to me.  So

25    I was surprised that they excluded herbicides from
```

**Exhibit F Page 178**

Robert Tarone, Ph.D.

1    this paper.

2        Q.    If they had included herbicides

3    presumably they would have included glyphosate,

4    right?

5        A.    Yeah, it was one of the I think 18,

6    maybe 20 herbicides that we asked questions about.

7        Q.    And the article from the Agricultural

8    Health Study on glyphosate, that didn't get

9    published until 2018?

10       A.    2018.

11       Q.    That was the Andreotti study, right?

12       A.    Right Andreotti was the first author.

13       Q.    I'm going to hand that to you also.

14   Just give me a minute here.

15            THE COURT REPORTER:  Is it 53?

16            MR. BRENZA:  Yes.

17            (DEFENDANT'S EXHIBIT 53 WAS MARKED.)

18   BY MR. BRENZA:

19       Q.    What did the Andreotti study find about

20   whether glyphosate causes cancer?

21            MS. WAGSTAFF:  Object to form.

22       A.    There were no -- in their basic

23   analysis -- they did multiple analyses on this --

24   what would be considering data dredging.  But

25   their primary analysis included all of the cases

**Exhibit F Page 179**

1    that have been diagnosed.  So in other words,

2    there was no lag.  Lags are sometimes introduced

3    into analyses to take account of the fact that

4    cancer usually doesn't immediately appear when

5    you're exposed for something.  There's usually a

6    latency period and then cancer starts developing.

7            So in their primary analysis there was

8    no lag and there was not a single significant

9    result for any type of cancer, blood cancer, solid

10   cancer, and that was in spite of the fact that

11   they really sliced and diced and looked at all

12   different types of lymphoma, all different types

13   of leukemia.  I mean, they looked at almost every

14   possible cross-classification of tumor types, and

15   they found no significant results in the primary

16   analysis.

17       Q.   Now, if -- if the results of the

18   Andreotti study had been published in 2014 as part

19   of the article we've marked as Exhibit 52, IARC

20   would have been able to see those results, right?

21            MS. WAGSTAFF:  Object to form, calls

22       for speculation.

23       A.   They would have been able to use them.

24   IARC will not include a paper that's not

25   published.  So they would have been able to use

Robert Tarone, Ph.D.

1    the data and included it in their evaluation.

2         Q.    But because IARC didn't have the the

3    2018 data, and it wasn't published in the 2014

4    paper, IARC was using out-of-date information from

5    the Agricultural Health Study?

6         A.    Yeah, I think it's --

7              MS. WAGSTAFF:  Object to form.

8              THE COURT REPORTER:  Excuse me, from

9         the what?

10             MR. BRENZA:  From the Agricultural

11        Health Study.

12             MS. WAGSTAFF:  Object to form,

13        misstates evidence.

14        A.    Yeah, I think the previous paper was

15   published in 2005, so it had a far smaller number

16   of lymphoma cases.

17        Q.    Now, you mentioned you knew Aaron

18   Blair, right?

19        A.    Yes.

20        Q.    And Aaron Blair was an author on the

21   2014 Agricultural Health Study paper?

22        A.    Correct.

23        Q.    He was -- and he was a prominent

24   individual in the Agricultural Health Study,

25   right?

**Exhibit F Page 181**

Robert Tarone, Ph.D.

```
 1          A.    Yes.  He was one of the principal
 2    investigators.
 3          Q.    And had been for years?
 4          A.    Yes.
 5          Q.    And then he was chairman of the IARC
 6    group that evaluated glyphosate?
 7          A.    Monograph 112 Working Group he was the
 8    chair, overall chair.
 9          Q.    So although it hadn't been published,
10    somebody on IARC did know about the Agricultural
11    Health Study data?
12          A.    Yes, but --
13                MS. WAGSTAFF:  Object to form.
14          A.    -- IARC has a strict -- a very strict
15    rule that you cannot include anything in their
16    evaluations that hasn't been published.  They're
17    very strict about that.
18                I would also add in this Andreotti
19    paper, probably -- I don't know why but there's
20    actually supplemental tables that are not included
21    in this.  In the paper they report lags of -- I
22    said they did many analyses and data dredging.
23    They use lags of 5 and 20 years, and in the
24    supplemental data they also used lags of 10 and 15
25    years.
```

**Exhibit F Page 182**

Robert Tarone, Ph.D.

```
1              So they actually did five different

2    statistical analyses and still in a couple of

3    those I think myeloid leukemia was modestly

4    elevated, but none of the lymphomas were

5    significantly elevated.

6         Q.    And you -- you said this a couple of

7    times now.  I'm not sure what it means.  You

8    talked about "data dredging."  What is -- what is

9    that?

10        A.    Data dredging is when you just keep

11   doing multiple analyses trying to see if you can

12   come up with a -- with an effect.

13        Q.    Is that a --

14        A.    At least a lot of false-positive

15   findings.

16        Q.    So that's a known risk to somebody like

17   you who knows statistics, right?  That somebody

18   made --

19        A.    Yes, even most epidemiologists realize

20   that.

21        Q.    You can generate false-positives just

22   by slicing and dicing your data?

23        A.    If you do enough analyses just by

24   chance, you're going to see -- you're likely to

25   see more positive results.
```

**Exhibit F Page 183**

```
1          Q.    But even having done that, the
2    Agricultural Health Study still didn't find any --
3          A.    It was remarkably negative for solid
4    cancers and for lymphomas.
5          Q.    Was the size of the Agricultural Health
6    Study of importance to your -- the weight you give
7    it?
8          A.    It is important.  I mean, more so it's
9    -- it's the size of the number of people exposed
10    to pesticides.  That's even more important.
11          Q.    And in the Agricultural Health Study
12    they had 45,000 exposed -- exposed applicators,
13    right?
14          A.    Oh, I have to add it up.  It had 80
15    percent.
16          Q.    Well, I'm looking at the front page of
17    it.  In my very simplistic view of it it says,
18    "Among 54,251 applicators 44,932 used glyphosate."
19          A.    Yeah.  As I said it's around 80 percent
20    for the entire cohort.  Most of them -- definitely
21    most of them used glyphosate.
22          Q.    This might be something that your --
23    that you haven't thought enough about.  And if it
24    is, just say so.
25                Are you familiar with the imputation
```

Robert Tarone, Ph.D.

1    method that the --

2         A.    I know about imputation methods, yes.

3         Q.    Opposing counsel characterized

4    imputation as making up data.  Is that -- is that

5    how --

6         A.    Well, it's not making up data.  I mean,

7    the methods for imputation has been peer-reviewed

8    and published in journals, but you're -- it's not

9    as good as having firsthand, yes I did use it or

10   no I didn't.

11               But what they try to do is take other

12   characteristics of farmers for which they know

13   they've reported glyphosate use.  For example,

14   what crops they grow, and there maybe demographic

15   factors.

16               And based on these other things, they

17   try to impute whether the person was likely to use

18   a given pesticide, but it's not as good as actual

19   data where they've answered, oh, yes I've used

20   that.

21        Q.    Not as good as actual data but --

22        A.    No.

23        Q.    -- but a huge difference --

24        A.    It's in a different --

25        Q.    A huge amount better than making up

Robert Tarone, Ph.D.

1    data, right?

2         A.    No.  It's not making up data, and it's

3    an accepted procedure, but you have to be careful.

4    And, in fact, these investigators did a number of

5    sensitivity analyses where they excluded people

6    with imputed data to see if it made any difference

7    in their results.

8              So, I mean, they did do a number of

9    sensitivity analyses which in some sense makes up

10   for the fact that I think they did a bit of data

11   dredging.

12        Q.    Speaking of data dredging, are you

13   familiar with a paper by through Luoping Zhang or

14   Zhang?

15        A.    Or Zhang.

16        Q.    Published in 2019?

17        A.    Mutation research?

18        Q.    Yes, mutation.

19             THE COURT REPORTER:  Excuse me?

20   Mutation.

21             THE WITNESS:  Mutation,

22   M-U-T-A-T-I-O-N, Research.

23        A.    Yes, I am.

24        Q.    I'm going to hand it to you.

25             MR. BRENZA:  Marked as 54.

**Exhibit F Page 186**

Robert Tarone, Ph.D.

```
 1              MS. WAGSTAFF:   Thanks.
 2              (DEFENDANT'S EXHIBIT 54 WAS MARKED.)
 3    BY MR. BRENZA:
 4         Q.   What -- what was your first occasion to
 5    analyze the Zhang paper from 2019 that we've
 6    marked as 54?
 7         A.   Well, I first became aware of it from a
 8    newspaper article in the Guardian newspaper, and
 9    they described this meta-analysis, and I then went
10    online and downloaded it from the Vanderbilt
11    digital library.
12              And my first impression was you almost
13    could not choose the estimators from the different
14    studies that were you -- a meta-analyses combines
15    a number of different studies.  In this case the
16    epidemiologic studies is the analysis that was
17    used.
18         Q.   Okay.  So let me stop you there.  Zhang
19    and her coauthors they went out and gathered
20    results from other epidemiological studies and
21    attempted to combine them in a -- in a single
22    analysis?
23         A.   Right.  They looked at the available
24    epidemiologic studies, mainly case control
25    studies, but then also the Agricultural Health
```

```
 1     Study, and they tried to come up with a summary

 2     estimate, in their words, of the various

 3     estimates.

 4          Q.   And continue on with what you're --

 5          A.   Well, all I can say when you first --

 6     when I first read this, I said, man, they're just

 7     about picking the largest estimate that they could

 8     pick from each paper, and it just seems like it

 9     was, in fact, the worst kind of data dredging.

10               But then I read closely the methods,

11     and they actually -- they provided a justification

12     for it.  They said that they were based -- they

13     were going to pick the estimator with the longest

14     latency period in the analysis, which from the

15     Agricultural Health Study would be 20 years, and

16     they were going to pick the estimate to them that

17     came from the highest exposure level on each

18     paper, so --

19          Q.   Was it -- was it a problem in your mind

20     that the exposure levels in all of the papers were

21     different or --

22          A.   No, not really.

23          Q.   -- or in some cases it was not even

24     known?

25          A.   What they were doing was picking the
```

Robert Tarone, Ph.D.

```
 1     one that they thought corresponded to the highest
 2     -- I mean, it was the reasonable thing to do if
 3     you believe that there are underlying assumptions.
 4               And the reason that Geoffrey Kabat,
 5     Bill Price and I wrote the paper in Cancer Causes
 6     and Control, was to examine the underlying
 7     assumptions about, well, is it really longest
 8     latency and highest dose level, is there empirical
 9     support for either of those for lymphoma?
10          Q.   Okay.  So I'm going to hand you your
11     paper with is it Mr. -- is it Professor Kabat or
12     Dr. Kabat?
13          A.   He's retired but, yeah, he was
14     professor.
15          Q.   Professor?
16          A.   Albert Einstein College of Medicine.
17     And Bill Price is at the University of Idaho.  I
18     had never worked with Bill before.  It was -- it
19     was a pleasure actually.
20               (DEFENDANT'S EXHIBIT 55 WAS MARKED.)
21     BY MR. BRENZA:
22          Q.   So did you -- so I've handed you a
23     document entitled 'On Recent Meta-analyses of
24     Exposure to Glyphosate and risk of non-Hodgkin's
25     lymphoma in humans by Geoffrey Kabat, William
```

**Exhibit F Page 189**

Robert Tarone, Ph.D.

```
1     Price and Robert Tarone'.

2          A.     Correct.

3          Q.     Which is you, right?

4          A.     Yes.

5          Q.     Is this your -- your most recent

6     publication?

7          A.     Yeah, an actual paper.

8          Q.     Actual paper.

9          A.     A letter to the editor on Clinical

10    Lymphoma, Myeloma and Leukemia.

11               THE COURT REPORTER:  Clinical

12          Lymphoma --

13               THE WITNESS:  Clinical myeloma,

14          M-Y-E-L-O-M-A, leukemia.  Clinical, Lymphoma,

15          Myeloma and Leukemia.  CML -- okay.

16         A.     Yes.  This is -- this is the last sort

17    of full-length article that I've written.

18         Q.     And was the purpose of this article

19    that you wrote with Drs. Kabat and Price to

20    respond to the Zhang article?

21         A.     Not specifically.  It was motivated by

22    the article, but it was just to examine all

23    meta-analyses that had been done.

24         Q.     Okay.

25         A.     Including that one but particularly to
```

**Exhibit F Page 190**

Robert Tarone, Ph.D.

```
 1     look at evidence for the assumptions they made in
 2     choosing their estimates.
 3         Q.    What -- under the discussion you --
 4     you -- you and your co-authors talk about a
 5     sensitivity analysis of the Zhang article
 6     specifically, right?
 7         A.    Correct.
 8         Q.    And what was your conclusion about the
 9     Zhang article?
10         A.    The conclusion in general is to get a
11     significant result, it relied heavily on assuming
12     that there was a long latency period for
13     non-Hodgkin's lymphoma.
14              In other words, you had to do analyses
15     with a 15 or 20 year lag period to -- to arrive at
16     a significant overall meta-estimate.  And we went
17     into literature, and the literature simply does
18     not support long latency for lymphoma.
19              For leukemia and lymphoma the latency
20     period estimates tend to be lower, more like 10
21     years than 20.  Solid tumors tend to have long
22     latency periods, but not leukemias and lymphomas
23     necessarily.  Some do obviously.
24              When you say latency period, it's
25     usually like sort of an average.  But there may be
```

Robert Tarone, Ph.D.

1    some with longer or shorter.

2        Q.    Okay.  But -- but getting back to your

3    critique of Zhang, that study depends on the

4    assumption that there are 15- or 20-year lag

5    periods for lymphomas or non-solid tumors?

6        A.    On -- on -- yeah.  In order to get a

7    significantly elevated meta-estimate, you have to

8    take one of the two estimates from the

9    Agricultural Health Study to have 15- or 20-year

10   latency periods.

11       Q.    And --

12       A.    And we didn't say that's wrong by the

13   way.  The sensitivity analysis is just looking,

14   all right, here's -- here's what's required to

15   make this significant.  And then we looked at

16   evidence for -- that supported it.

17             And by the way, even the -- even their

18   assumption that risk would be higher at the

19   highest exposure level is not supported by the

20   Agricultural Health Study at 20 years latency.

21             The highest risk estimate for the

22   20-year latency analysis is at the lowest exposure

23   level.  The second highest is at the second lowest

24   and then comes the highest.

25             So there really was no empirical

1    support for either of the assumptions.

2         Q.    Either of the assumptions that -- that

3    Zhang made.

4         A.    That Zhang, et al. used in their

5    meta-analysis.

6              But as we say, I mean, our final

7    conclusion was every meta-analysis, including

8    ours, needs to be taken with a grain of salt.  But

9    we just looked at, you know, what it took to get a

10   significant estimate from a meta-analysis of the

11   glyphosate data.

12             THE COURT REPORTER:  Is this a good

13        time for a break?

14             MR. BRENZA:  Yeah, let's go off the

15        record.

16             THE VIDEOGRAPHER:  Going off the

17        record.  The time is 2:02.

18             (Thereupon, a break was taken.)

19             THE VIDEOGRAPHER:  Going on the record.

20        The time is 2:31.

21   BY MR. BRENZA:

22        Q.    Doctor, we've talked about some of your

23   articles and publications.  Now that we've gotten

24   through those, have -- have any of those been paid

25   projects for anybody?

**Exhibit F Page 193**

Robert Tarone, Ph.D.

```
 1        A.    No.  And nobody has suggested --

 2   anything I've written, I've written on my own.

 3        Q.    Did Monsanto pay you anything for any

 4   of those articles -- to publish any of

 5   those articles?

 6        A.    No.  As I said before, no one has paid

 7   me anything for any of my work since I retired.

 8   And all the articles were after I retired.

 9        Q.    And you've had no compensation from

10   Monsanto in connection with your deposition --

11        A.    No.

12        Q.    -- your depositions in these cases?

13        A.    No.

14        Q.    With respect to the opinions that

15   you've -- and scientific calculations that you've

16   put forth drawing into question what IARC did, why

17   -- why did you do that?

18        A.    Well, just -- just because I couldn't

19   believe that they would -- would exclude relevant

20   data from their deliberations, and I couldn't

21   believe that members of a -- supposedly

22   international experts would say something like,

23   well, data on female mice weren't provided to us.

24   I mean, it just seemed so unscientific.  They

25   should have wanted to see that data that they
```

```
 1    excluded.  It might have made their inference
 2    stronger.  They don't know if they didn't see it.
 3         Q.    What are the consequences of allowing
 4    decisions like the one IARC made to be based on
 5    bad science?
 6              MS. WAGSTAFF:  Objection, calls for
 7         speculation, overly broad.
 8         A.    Well, I would just say it's bad for
 9    regulatory -- anything regulatory.  Once you start
10    making decisions on the basis of incomplete
11    information, it's eventually going to cause people
12    to look askance at regulatory decisions.
13         Q.    Did -- did you receive any editorial
14    assistance or other kind of help from Monsanto in
15    connection with any of your articles?
16         A.    Not from anybody.  The only person who
17    edits anything that I've written since I retired
18    is Geoffrey Kabat.  We kind of use each other as
19    editors.  He's a much better editor than I am.
20         Q.    Are you familiar with the term
21    "cherry-picking" when it comes to statistical --
22         A.    Yes.
23         Q.    -- analysis?
24              MS. WAGSTAFF:  Object to form.
25         Q.    What is -- what is cherry-picking?
```

Robert Tarone, Ph.D.

```
 1          A.    Cherry-picking refers to choosing the

 2     data that you think supports your wanted

 3     conclusion and ignoring other data.

 4          Q.    So cherry-picking sounds like a good

 5     thing in -- in the abstract, but in science that's

 6     not a good thing, is it?

 7          A.    Well, I don't know.

 8                MS. WAGSTAFF:  Object to the form of

 9          the question.

10          A.    I hated picking cherries as a kid.  It

11     takes a long time to fill a bucket, but, yeah, I

12     know what you're saying.

13          Q.    All right.  Well, putting aside what it

14     might be in the real world, for statisticians it's

15     a problem, right?

16          A.    It's a problem.

17          Q.    What's the -- what's the consequence of

18     cherry-picking data?

19          A.    Well, you would just result in -- it

20     results in false, incorrect inferences.

21          Q.    Are you familiar with an article

22     written by Kenny Crump and -- and a group of other

23     authors?

24          A.    Yes, I am.

25          Q.    Are you familiar with Kenny Crump
```

Robert Tarone, Ph.D.

```
 1    personally, who he is?

 2         A.    I've never met him.  I'm very familiar

 3    with him.  I mean, I looked on PubMed.  We started

 4    publishing I think one year difference.  He

 5    started maybe a year before I did, and we

 6    published on very similar topics.  So I was aware

 7    of his writing, but I don't remember -- I can't

 8    say that I didn't briefly bump into him at a

 9    carcinogenesis conference or something, but I

10    don't remember ever meeting him personally.

11         Q.    And do you know what position he held?

12         A.    You know, I don't know who he was

13    working for early on.  I think he's a private

14    consultant now.

15         Q.    Okay.  I'm going to hand you an article

16    written by Kenny Crump and -- and other authors.

17    I'm marking it as 56.

18              (DEFENDANT'S EXHIBIT 56 WAS MARKED.)

19              MS. WAGSTAFF:  Thanks.

20    BY MR. BRENZA:

21         Q.    Have you seen the -- the article by

22    Crump and others that we've marked as Exhibit 56?

23    Have you seen this article before?

24         A.    Yes, I have.

25         Q.    What -- in what context?
```

**Exhibit F Page 197**

Robert Tarone, Ph.D.

```
1          A.    Well, obviously I read it because I was

2     interested in anything that talks about

3     glyphosate, and I actually included it in the

4     documents I provided Friday.

5          Q.    And -- and just to -- for the record

6     it's -- the title of it is:  'Accounting for

7     Multiple Comparisons in Statistical Analysis of

8     the Extensive Bioassay Data on Glyphosate'.  Do

9     you see that?

10          A.    That's correct.

11          Q.    And if you would, I want to unpack that

12     title a little bit.  Bioassay data, that's --

13     that's another way of saying animal studies,

14     right?

15          A.    That's -- that was -- in fact, when I

16     first started looking at the rodent tumor data,

17     they were called -- you know, carcinogen bioassay

18     studies was one way they were referred to.

19          Q.    And multiple comparisons, what's --

20     what's that?

21          A.    Multiple comparisons, we've actually

22     talked about it before.  If you do enough

23     statistical analyses, you're going to see positive

24     results.  And in these rodent studies, typically

25     you have both males and females, 50 animals per
```

Robert Tarone, Ph.D.

```
1    group, and you look at maybe a dozen different

2    organs or tissue types for cancer in both males

3    and females.  So you're doing, you know, basically

4    20 to 30 statistical analyses, and some of the

5    results that are significant are going to be

6    significant by chance.

7         Q.    And that's -- that's called a multiple

8    comparison --

9         A.    That's a false -- that would be a false

10   positive due to multiple comparisons.

11        Q.    Okay.  Getting at the words "multiple

12   comparison," that just refers to the fact that if

13   you do enough comparisons, some of them will be --

14        A.    If you do enough statistical --

15        Q.    -- positive?

16        A.    -- analyses, yes.

17        Q.    Some of them will be positive by --

18        A.    Right.

19        Q.    -- chance?

20             THE COURT REPORTER:  Excuse me.  You're

21        talking over each other.

22             THE WITNESS:  I'm sorry, I talked over

23        him.

24             THE COURT REPORTER:  If you do

25        enough --
```

**Exhibit F Page 199**

Robert Tarone, Ph.D.

```
 1              MR. BRENZA:  Comparisons.

 2              THE WITNESS:  Statistical analyses.

 3      BY MR. BRENZA:

 4          Q.    Did -- did you understand the article

 5      that Mr. Crump wrote to be an accounting of more

 6      than just the -- the two mouse studies and the rat

 7      studies that IARC considered?

 8          A.    Oh, yeah, many more.

 9          Q.    There have been other studies on

10      animals and glyphosate?

11          A.    Glyphosate -- glyphosate has been

12      studied more than most chemicals by far.  There

13      may be other -- there may be other pesticides,

14      like maybe 2,4-D, that have been studied more in

15      rodents, but glyphosate is right up there.

16          Q.    What was -- what was the goal of the

17      paper, as you understood it when you read it, in

18      terms of interpreting all the rodent studies with

19      respect to glyphosate?

20          A.    Well, it was assessing whether the

21      number of positive findings and negative findings

22      -- one thing I liked about this paper is it looked

23      at increases and decreases, and it was trying to

24      determine if the number that were observed was

25      actually more than you would expect by chance
```

**Exhibit F Page 200**

1    alone.

2         Q.    What did they conclude?

3         A.    Oh, they found that it was -- it could

4    be explained by chance alone, that the number of

5    positives -- in fact, it was amazing, about what

6    you'd expect.

7               And for me, one of the things I've been

8    arguing with IARC about has been one-sided versus

9    two-sided tests.  And so I really liked that this

10   paper looked at both increases and decreases and

11   they found a similar number of both.  Because

12   that's what you'd expect, and that's why you would

13   use two-sided tests.

14        Q.    And when you say "that's what you would

15   expect," that's what you would expect from what?

16        A.    Under the null hypothesis.

17        Q.    That's what you would expect if there

18   is no relationship --

19        A.    If there's no relationship --

20        Q.    -- between glyphosate --

21        A.    -- between glyphosate and tumors.

22              THE COURT REPORTER:  Please repeat your

23         question.

24              MR. BRENZA:  Excuse me?

25              THE COURT REPORTER:  Could you repeat

Robert Tarone, Ph.D.

```
 1        your question.

 2    BY MR. BRENZA:

 3        Q.    That's what you would expect if there

 4    is no relationship between glyphosate and cancer?

 5        A.    Correct.

 6        Q.    And that's what they found?

 7        A.    That's what they found.

 8        Q.    Looking at Table 4, you were referring

 9    to positive and negative findings.  Is that where

10    they report --

11        A.    Yes.

12        Q.    -- report that?

13              And in Table 4, they talk about

14    positive dose-related trends in tumor occurrence.

15    Do you see that?

16        A.    Correct.

17        Q.    And they find of all -- all these

18    samples that they did -- you tell me.  I think it

19    says 24, is that right?

20        A.    Right.  24 at the .05 level that we've

21    talked about before and 7 at the .01 level which

22    is sometimes used.  And it's based -- I mean,

23    there's no difference.  There's 26 decreases in

24    the next table below.

25        Q.    So Table 5 lists the decreases?
```

Robert Tarone, Ph.D.

```
1          A.    Decreases.  In there it's 26 and 10

2    compared to 24 and 7.  There's no difference.

3          Q.    And -- and, once again, you're not

4    saying that glyphosate protects against cancer,

5    right?

6          A.    No.

7          Q.    That just tells you that you're seeing

8    random results.

9          A.    Exactly.

10          Q.    Okay.  Is it fair to view Mr. Crump's

11   paper as sort of a -- in some sense a

12   generalization of the -- of the approach that you

13   think IARC should have used?

14          MS. WAGSTAFF:  Objection, leading.

15   Object to form.

16          A.    It's a very different question they're

17   looking at.

18          Q.    Okay.

19          A.    So, yeah, it's not really comparable.

20   Because they're doing an overall assessment from

21   all studies, and I'm just concerned about the few

22   studies that --

23          Q.    Right.

24          A.    -- they relied on.

25          Q.    That's why I said in generalization.
```

**Exhibit F Page 203**

Robert Tarone, Ph.D.

```
1          A.    Yeah.

2          Q.    Mr. Crump takes what you did and

3     applies it to all the studies.

4          A.    Well, I was just looking at the three

5     tumors types.  They look at all of them.

6          Q.    Okay.

7          A.    Everything.

8          Q.    In any event, he found no -- no effect

9     that wasn't explained by chance.

10         A.    That's right.  Well, there were a

11    couple but they were in benign tumors.

12         Q.    I'm going to -- I'm going to hand you

13    -- we talked a little bit about this, but I just

14    want to make sure I understood exactly how it came

15    out.  I'm going to mark this as -- I think it

16    should already be an exhibit to your exhibit (sic)

17    if all the things you brought last time were

18    marked as exhibits.

19         A.    Uh-huh (affirmative).

20         Q.    So this is one of the things that

21    you -- you had in your files.  We'll mark it as

22    57.

23              (DEFENDANT'S EXHIBIT 57 WAS MARKED.)

24    BY MR. BRENZA:

25         Q.    This is just the email string from the
```

**Exhibit F Page 204**

Robert Tarone, Ph.D.

```
 1    challenge that Mr. Loomis made to publication of
 2    your paper, your first paper.
 3             And do you see -- does this refresh
 4    your memory on exactly how the correspondence went
 5    over Mr. Loomis' --
 6        A.   Right.  I mean, this came out of the
 7    blue to me.  I was totally unaware of what was
 8    going on behind the scenes, but I had complained,
 9    you know, why isn't my paper being published in
10    print?
11        Q.   And you say in the second paragraph,
12    "In view of the fact that Loomis has continued to
13    raise questions with COPE and others about an
14    alleged industry role in the writing of my paper,
15    I hope you will include a statement of the fact
16    that no payment was received for writing the paper
17    when you add the correction about the opinion
18    paper heading in one of the next issues."  Do you
19    see that?
20        A.   Yes.
21        Q.   And that's -- that's a true statement,
22    right?
23        A.   Yes.
24        Q.   You didn't receive any payment for
25    writing a paper?
```

**Exhibit F Page 205**

```
1              A.     That's correct.

2              Q.     You go on to say:  IARC continues to

3       attack me and a Reuters reporter with basis claims

4       -- claim that we have ties to Monsanto even though

5       IARC folks have not been able to refute a single

6       scientific question raised about the deliberations

7       that led to the classification of glyphosate as a

8       probable human carcinogen.

9              A.     Yeah, I wrote that.

10             Q.     That's a true statement, right?

11             A.     Yeah.

12             Q.     And as you sit here today, I know I've

13      asked you this before, IARC still has not grappled

14      with the criticisms you've made of what they did,

15      right?

16                    THE COURT REPORTER:  I'm sorry, please

17             repeat that.

18                    MR. BRENZA:  IARC still has not

19             grappled with the criticisms that Dr. Tarone

20             has made of what they did.

21                    MS. WAGSTAFF:  Objection, speculation.

22             A.     They have not refuted or disputed

23      publicly any of the claims in my papers.

24             Q.     They -- they published something --

25      periodically IARC publishes a -- a -- I don't know
```

Robert Tarone, Ph.D.

```
 1    what you would call it, a report that sets out its

 2    priorities for the next five years, right?

 3         A.    Every five years.

 4         Q.    And part of the way they evaluate what

 5    their priorities are is if there's anything new

 6    that makes them think they might have made a

 7    mistake, right?

 8         A.    I don't know how they do it.  They get

 9    -- they get a committee of people together and

10    they try to prioritize agents that they think IARC

11    should consider including in monographs for the

12    next five years.

13              (DEFENDANT'S EXHIBIT 58 WAS MARKED.)

14    BY MR. BRENZA:

15         Q.    I'm going to hand you I've marked as

16    Exhibit 58.  Is this -- is this the report --

17         A.    Which one is this?  2019 meeting.

18         Q.    Was that 2000...

19         A.    It was -- the meeting was in 2019.

20         Q.    Okay.

21         A.    They're setting priorities for 2020 to

22    2024.

23         Q.    And this is -- so this is -- this is

24    the report where they're setting their priorities,

25    right?
```

**Exhibit F Page 207**

1          A.     Correct.

2          Q.     And you'll notice at the back there's a

3    bibliography, right?

4          A.     Correct.

5          Q.     And these are all the materials that

6    they consider in evaluating how important it is

7    that they review what they've already done.

8          A.     No.  Actually this is unusual.  I had

9    never seen this done before.  What they -- they

10   sometimes ask this committee to take on another

11   role, and what they asked them to do was to

12   consider a large number of past classifications

13   that they had made and just say:  Do you agree or

14   disagree?  And glyphosate on Page 103 was one of

15   those.

16          And the bibliography refers to papers

17   that they sent them in order to make these

18   evaluations of past IARC classifications.  And

19   for -- for example, they did not include either

20   one of my papers in the bibliography.  They did

21   include the Zhang, et al. meta-analysis that was

22   written after my papers.

23          So -- but this is what was given to the

24   advisory committee to make use of in evaluating

25   the past decisions.  And as I said, I haven't seen

1    them do this before.

2        Q.    Do you --

3        A.    They --

4        Q.    I'm sorry.  Are you done?

5        A.    No.  But they do sometimes have this

6    committee do other tasks for them.

7        Q.    Did you ever receive an explanation for

8    why -- when IARC prepared exhibit -- report --

9    what did we mark it as?  50 --

10       A.    This, the thick one?

11       Q.    50 -- 58?

12       A.    58.

13       Q.    Did you ever receive an explanation for

14   why IARC, when it was preparing the report that

15   we've marked as Exhibit 58, continued to ignore

16   your papers?

17       A.    No, I didn't even realize it.  I -- it

18   was a long time before I realized that this

19   particular panel had done this evaluation.  Really

20   a large number of past evaluations they had done.

21   I mean, it's -- was a huge job.  Probably too

22   huge, but...

23       Q.    Well, a huge job, but they didn't find

24   your papers.

25       A.    Well, I can't -- I can't explain why

Robert Tarone, Ph.D.

1    that is a fact, but...

2         Q.    Well, is it --

3         A.    They do what they do.

4         Q.    Do you have any reason to believe that

5    they didn't intentionally omit them again?

6         A.    I have no idea whether it was

7    intentional, but I think it should have been

8    included.  If you're going to include a

9    meta-analysis that was done after my two papers,

10   they should have included at least one.

11             MR. BRENZA:  I'm going to -- I only

12        have one copy of this so I don't know -- I

13        think opposing counsel should have -- this is

14        one from last time?

15             MS. WAGSTAFF:  Yeah.

16   BY MR. BRENZA:

17        Q.    Doctor, do you -- do you recognize this

18   from your last deposition?  It's a --

19        A.    Yeah, I do.  I wasn't -- I honestly

20   didn't follow everything but, yes, I do.

21        Q.    I'll just ask an open-ended question.

22   Is there anything that -- on -- on this exhibit

23   that -- well, first of all, do you understand what

24   was written here?  We've -- it was previously

25   marked as Plaintiffs' Exhibit 23.

Robert Tarone, Ph.D.

```
 1          A.    Right.

 2          Q.    And -- and I just don't know if --

 3          A.    I had some trouble --

 4          Q.    It may not even --

 5          A.    -- following it, but I think the pluses

 6    indicated significant results, P-values less than

 7    .05 that were reported in Monograph 112.  And you

 8    correct me if I get any of this wrong.

 9          Q.    Well, ultimately that's -- that's --

10    that's not the way it works.  This has to be

11    consistent with your understanding.

12          A.    Yeah.  Well, my understanding is that,

13    for example, the two red pluses --

14          Q.    So I'm going to hand you --

15          A.    Oh, okay.

16          Q.    If you need to correct this to make it

17    right, I want you to --

18          A.    All right.  Well --

19          Q.    We'll mark -- we'll mark this as a new

20    copy and we'll -- we'll do that.  But, yes, that's

21    what I'm concerned about is I want -- I want to

22    make sure that you -- that it reflects what you

23    thought you were saying.

24          A.    Yeah.  What I thought that I was saying

25    is that this one plus here for the CD-1 mouse
```

Robert Tarone, Ph.D.

1    referred to the original analysis of the pathology

2    based on the adenomas, and that the two pluses

3    here depended on -- they were the two analyses,

4    one for carcinomas alone and one for carcinomas

5    and adenomas with the pathology review, okay?

6              So if I changed anything on this, these

7    two I would say were not significant because they

8    were based on incorrect test.

9         Q.   All right.  So we are changing this.

10   So why don't you -- why don't you cross out the

11   ones that shouldn't be there.

12        A.   This is if I'm interpreting this

13   correctly.  In this one, even though it's a

14   positive -- and it definitely is a positive --

15   maybe I would make it pink instead of red because

16   it -- you cannot use it to conclude that there is

17   sufficient evidence of animal carcinogenicity

18   because it's based on benign tumors.

19        Q.   Okay.  Then would you cross that one

20   out too, please.  It's wrong as it is, so...

21        A.   It's wrong in terms of concluding that

22   there's sufficient evidence.

23        Q.   Yes.  For that purpose --

24        A.   It is -- it is a significant result.

25        Q.   For that purpose, though, let's cross

**Exhibit F Page 212**

Robert Tarone, Ph.D.

1    it out and -- and, you know, counsel can create a

2    new version if she wants to.

3         A.    Now, I'm not sure why there are three

4    pluses, but there probably were -- this is the

5    significant result for the low dose compared to

6    control in the pancreatic islet cell adenomas.

7    And one of these three is the significant result

8    for the same tumors in the second study.

9         Q.    And these are the pairwise --

10        A.    Pairwise comparisons.  And there were

11   other pairwise comparisons in this study for other

12   tumors other than the ones that the IARC working

13   group relied upon to make their decision.  So that

14   -- that's what I assume.

15             But, once again, the first two then

16   would be not applicable to a conclusion that

17   there's sufficient evidence of animal

18   carcinogenicity because they're based on benign

19   tumors only.

20        Q.    All right.  Would you cross those out

21   then, please.

22        A.    And I don't remember the other two, so

23   I don't know what to do with them, whether they

24   were --

25        Q.    Just put a question mark on them I

Robert Tarone, Ph.D.

1    guess.

2        A.    Yeah.  But there were several Ps less

3    than .05 for that study for different individual

4    types of tumors.

5        Q.    And -- and with respect to the -- the

6    rats, there was a lot of -- there was -- there was

7    no what's call a trend, right?  There was --

8        A.    Not a --

9        Q.    None of the studies showed a trend.

10       A.    Not a positive trend.  There was a

11   negative trend in the study that they did not

12   report.

13       Q.    Okay.  So that -- that would tend to

14   prove that glyphosate is protecting against -- at

15   the very least it neutralizes --

16       A.    No.  It says there's nothing going on.

17       Q.    Yeah, it shows there's nothing --

18       A.    When you look at --

19            THE COURT REPORTER:  Excuse me.  Could

20       you repeat your question?

21       Q.    A negative trend would tend to suggest

22   that there's nothing going on.  That glyphosate --

23       A.    In conjunction with the results of the

24   other two studies which did not have any strong

25   evidence.  They had no evidence of a positive

**Exhibit F Page 214**

Robert Tarone, Ph.D.

1    trend.

2            MS. WAGSTAFF:   Object to leading.

3        A.    All three studies together provide no

4    evidence of a positive trend.

5        Q.    And -- and none of them -- without a --

6    without a positive trend, what's the significance

7    of a pairwise comparison?

8        A.    Well, as I indicated earlier, it can be

9    depending on characteristics of the experiment.

10   Their pairwise comparisons for the adenomas of the

11   pancreatic islet cell were based on the lowest

12   dose.  That can be meaningful if you've got

13   toxicity, so you're killing the animals in the two

14   higher doses.

15       Q.    Right.

16       A.    Because then those are -- they're not

17   -- they're not able to develop --

18       Q.    Well, so --

19       A.    -- tumors.

20       Q.    So the pairwise is sort of a special

21   case.

22       A.    You have --

23       Q.    You can't do a trend analysis.

24       A.    Pairwise depends on care -- I mean, if

25   it's in the highest dose, then it means more to me

 1    than if it's in the lowest dose.  It just has to

 2    be interpreted with care, but it can be

 3    meaningful.

 4        Q.    Okay.

 5        A.    All pairwise comparisons aren't

 6    useless.

 7        Q.    All right.  I'm going to hand you now

 8    -- this -- this may be the most recent thing

 9    you've published.  It's -- it's a letter to the

10    editor.  Oh, wait.  Let me -- let me put a sticker

11    on there.

12            MS. WAGSTAFF:  Can I have a copy,

13        please.

14            MR. BRENZA:  Yes.

15            MS. WAGSTAFF:  I see your manila folder

16        is dwindling down.

17            MR. BRENZA:  It is.

18            MS. WAGSTAFF:  That's a positive.

19            MR. BRENZA:  Reason for encouragement.

20            (DEFENDANT'S EXHIBIT 59 WAS MARKED.)

21    BY MR. BRENZA:

22        Q.    So this is a letter to the editor

23    entitled 'Response to a Review and Update with

24    Perspective of Evidence that the Herbicide

25    Glyphosate (Roundup) is a Cause of Non-Hodgkin's

1    Lymphoma' by Robert E. Tarone.

2         A.    Correct.

3         Q.    And it was published in 2022?

4         A.    December of 2022 it actually appeared

5    in print.

6         Q.    And it begins with the sentence:  "A

7    recent perspective by Weisenburger falsely claims

8    that my paper criticizing the International Agency

9    for Research on Cancer, IARC, classification of

10   glyphosate as a probable human carcinogen was,

11   quote, unquote, industry sponsored."

12        A.    Correct.

13        Q.    And then it goes on -- you go on to

14   say, "Claims that I have an industry conflict of

15   interest with regard to this paper or any

16   publication on the IARC glyphosate classification

17   have previously been rebutted in detail.  The

18   paper was written without consultation with or pay

19   from any entity associated with industry and

20   demonstrated that the glyphosate classification

21   was erroneous because of the seriously flawed

22   summary of rodent tumor data."

23        A.    Correct.

24        Q.    Is all that true still?

25        A.    Yeah.

Robert Tarone, Ph.D.

```
 1          Q.    Yeah.

 2          A.    I wrote it because I don't like people

 3     lying about me.

 4          Q.    And do you know anything about

 5     Dr. Weisenburger?

 6          A.    I've never met him.  I don't know much

 7     about him at all.

 8          Q.    Would it -- would it surprise you to --

 9     if I told you that he's also been paid hundreds of

10     thousands of dollars to testify for the

11     plaintiffs?

12               MS. WAGSTAFF:  Objection.  Calls for --

13          A.    I would have no way of knowing that.

14               MS. WAGSTAFF:  -- for facts not in

15          evidence.

16          Q.    Did you see Exhibit 59 is yet another

17     attempt to attack you personally rather than

18     respond to your science?

19          A.    Well, it was definitely an attack on me

20     personally.

21          Q.    And, once again, is there -- can you --

22     do you know of any reason why somebody wouldn't

23     respond to your science and decide to attack you

24     personally if there was a good answer to your

25     science?
```

**Exhibit F Page 218**

Robert Tarone, Ph.D.

```
1                MS. WAGSTAFF:  Objection, calls for
2         speculation.
3         A.    I have no way of knowing anybody's
4    motives.
5         Q.    Well, I'm asking you if you know any
6    reason why somebody would do such a thing.
7         A.    I don't.
8         Q.    Okay.
9         A.    That's getting to motive, and I -- I
10   don't know why people do what they do.  I can only
11   worry about my own motives.
12        Q.    Well, I understand.  That's -- that's
13   commendable, Doctor, and I appreciate your giving
14   everyone the benefit of the doubt.  But wouldn't
15   you have thought by now, you know, years later
16   after your repeated publications and -- and
17   testimony in these cases that if there was any
18   data or any argument scientifically that you had
19   made a mistake and you were wrong that you would
20   have heard it by now?
21               MS. WAGSTAFF:  Objection, calls for
22        speculation.
23        A.    I would have actually hoped that
24   someone contested my results.  I mean, that's all
25   I want is an open debate.  And if they contest it,
```

Robert Tarone, Ph.D.

1    then I can answer and say, oh, well, I see what

2    you're doing.  You're right.  I was wrong.

3         Q.    That assumes that there's a way --

4    there is a way to test your results, right?

5         A.    Yes.

6         Q.    There might not be.  You might be

7    right.

8         A.    Well, the data that I present is

9    correct, and that's been shown.  As I said, Chris

10   Portier used the same tumor rates in the analyses

11   he submitted to the EPA, exactly the ones that I

12   presented as being excluded, so...

13        Q.    That puts people who want to disagree

14   with you at a big disadvantage, doesn't it?

15        A.    Apparently not.  Apparently ignoring me

16   works.

17        Q.    All right.  This is one that was part

18   of your deposition last time.  It was previously

19   marked as -- as -- last week as Exhibit 11.  I'm

20   not sure I have copies of it.

21             MS. WAGSTAFF:  What is it, Exhibit 11?

22             MR. BRENZA:  It was Exhibit 11.  I

23        might have one copy.  I hope I have one copy.

24             MS. WAGSTAFF:  I've got it.  I don't

25        need a copy.

**Exhibit F Page 220**

```
 1              MR. BRENZA:  All right.  Well, I'd like
 2         to give one to the doctor if I can.  Good.
 3         I've got one.
 4    BY MR. BRENZA:
 5         Q.    I'm just going to hand you the one that
 6    counsel marked up at your deposition last week.
 7    So the -- for the record, the highlighting and the
 8    -- and the underlining is from counsel,
 9    Plaintiffs' counsel.  Well, I'll just hand it to
10    and we can -- we can --
11         A.    Okay.
12         Q.    -- mark another copy if we need a clean
13    copy.
14              MS. WAGSTAFF:  I actually can't pull it
15         up, so do you mind if I just look over your
16         shoulder?
17              THE WITNESS:  No, not a problem.  You
18         can look at --
19              MS. WAGSTAFF:  No, you need to read --
20              THE WITNESS:  Right in the middle.
21         That's all right.
22         A.    It was from me so I guess I -- okay.
23         Q.    So this is an email that you sent to it
24    looks like Douglas L. Weed?
25         A.    Doug Weed.
```

Robert Tarone, Ph.D.

```
 1            Q.    And is he -- who is he?

 2            A.    Doug Weed I met at NCI.  He's an

 3     epidemiologist.  And when I was at NCI, he was

 4     running a master's degree program for

 5     non-epidemiologists to give them a degree in

 6     epidemiology, cancer epidemiology.

 7            Q.    And you sent him your -- your papers?

 8            A.    I did.

 9            Q.    And he didn't respond immediately,

10     right?

11            A.    Yeah.  Not surprising.

12            Q.    Then you go on -- if you look in the

13     middle of the paragraph that you wrote --

14            A.    Yes.

15            Q.    -- it says, "I'm beginning to get

16     paranoid.  I have been told by numerous colleagues

17     that IARC and its defenders have been sliming me

18     to anyone who will listen.

19                  "GO Gori" -- I don't know who that

20     is -- "told me (only half jokingly) that they

21     would kill me if they could."

22                  And I understand that's a joke, right?

23            A.    Yes.

24            Q.    Yeah.  But still had you heard things

25     that IARC was unhappy with you?
```

```
 1          A.     Yes, I had.

 2          Q.     And what exactly did people tell you

 3    their --

 4          A.     No great details.

 5          Q.     Okay.  Anything that goes beyond the

 6    documents we've looked at --

 7          A.     No.

 8          Q.     -- here today where they try to

 9    make you out as a -- as a consultant for

10    Monsanto?

11          A.     No, I don't have --

12                 GO, by the way, was an older guy when I

13    first arrived at NCI, and I don't think I even met

14    him when I was there.  But he -- he had a lot of

15    large projects.  The one that I remember is he was

16    trying to design a safer cigarette.

17          Q.     As you sit here today, you're retired,

18    right?

19          A.     Yes, I am.

20          Q.     But you obviously are still concerned

21    that science do the right thing, right?

22          A.     Exactly.

23          Q.     Why -- why are you -- why are you here

24    today -- other than the fact that you're required

25    to by Plaintiffs' subpoena, but why --
```

Robert Tarone, Ph.D.

```
1          A.    I just --

2          Q.    -- why do you continue this effort to

3    -- to expose IARC?

4          A.    I just -- it's not really to expose

5    IARC.  I just think it's important that regulatory

6    decisions be made on the strongest possible

7    science.  And so I keep up with the literature and

8    if I see something I think is wrong, then I'll

9    submit something to be published.

10         Q.    Do you have any financial interest in

11   Monsanto, glyphosate?

12         A.    No.

13         Q.    Any of the litigation that's pending?

14         A.    Nope.

15         Q.    Is your interest in testifying here

16   today purely scientific and truthful?

17         A.    Purely scientific and, again, to defend

18   what I've done.

19               MR. BRENZA:  All right.  Let's go off

20         the record.

21               THE VIDEOGRAPHER:  Going off the

22         record.  The time is 3:05.

23               (Thereupon, a break was taken.)

24               THE VIDEOGRAPHER:  Okay.  Going on the

25         record.  The time is 3:24.
```

**Exhibit F Page 224**

Robert Tarone, Ph.D.

```
 1                    REDIRECT EXAMINATION

 2    BY MS. WAGSTAFF:

 3         Q.    Dr. Tarone, are you able to continue

 4    your deposition?

 5         A.    Yes.

 6         Q.    All right.  So I have an opportunity to

 7    follow up on some things that Monsanto's lawyer

 8    discussed with you, so my questions to you may

 9    jump around a little bit as I took notes while he

10    was going.

11               This deposition started last Friday,

12    and today is -- it's almost a week later.  And

13    when you left the deposition last Friday, I think

14    it concluded like 5:00 -- 4:00 or 5:00 in the

15    afternoon or something like that, right?

16         A.    Correct.

17         Q.    Have you spoken with any Monsanto

18    lawyers since you left that conference room on

19    Friday?  Before today.  Between when you --

20         A.    Does that include texts?

21         Q.    Yes.

22         A.    Yeah.  Saturday afternoon I received a

23    text from Mr. Vales saying that Wednesday wouldn't

24    work and could Thursday work.

25         Q.    Meaning --
```

**Exhibit F Page 225**

Robert Tarone, Ph.D.

1           A.    Because we had talked about -- my

2      preference was to have the continuation yesterday.

3      So he said that won't work for the Plaintiff

4      lawyers.  How about Thursday?  And I said yes.

5      And then nothing on Sunday.

6                Monday -- well, I can look.  Monday I

7      think there was another contact related to the

8      timing of the continuation.  Mr. Vales.  No.  It

9      was Tuesday.  And he said:  As of now, we are

10     confirmed for Thursday at 9:00 a.m. at the

11     Rockville Hilton.

12               So that was it until -- yesterday

13     evening at 5:00 there was a phonecall just to let

14     me know what to expect, with Mr. Vales, and --

15     gee, I'm blocking on you -- Mr. Brenza.

16          Q.    Okay.  And how long did -- so -- so the

17     night before this continuation you had a telephone

18     call with Monsanto's lawyers to tell you what to

19     expect?

20          A.    Yeah.

21          Q.    Okay.  How long did that conversation

22     last?

23          A.    40, 45 minutes.

24          Q.    Wow!  What did you guys discuss?

25          A.    Just basically what to expect.

**Exhibit F Page 226**

Robert Tarone, Ph.D.

```
1              Q.    And what did they say?

2              A.    Oh, I can't remember specifics.  In

3      fact, it was not exactly -- I don't -- I don't

4      know what -- how to explain it, but it was -- I

5      couldn't remember exactly how the 2019 deposition

6      went.  So I really did not have any idea what to

7      expect.  And there weren't details.  It was just

8      -- it was going to be a continuation of what was

9      done in 2019.

10             Q.    Okay.  Well, what you just summarized

11     took about 45 seconds and you guys spoke for

12     45 minutes.

13             A.    Well, I can't remember everything we

14     talked about.

15             Q.    Well, tell me -- tell me anything you

16     can remember.  You're under oath so I'm just

17     asking you to tell me anything you can remember.

18             A.    Well, I don't know what I can tell you.

19     Let's see.  We talked -- what did we talk about?

20     There weren't any details.  It was just sort of

21     that we were going to look at my papers and what I

22     said in my papers about the glyphosate

23     deliberations at IARC and, you know, I don't know

24     what else because it wasn't any detailed, look,

25     I'm going to show this exhibit and you're going to
```

**Exhibit F Page 227**

Robert Tarone, Ph.D.

1    say this.  It was just sort of general -- I think

2    they were just trying to put me at ease, but it

3    wasn't -- it wasn't any details about scripting

4    responses.

5        Q.    So did you discuss your papers last

6    night on the telephone with Monsanto's lawyers?

7        A.    No.  I didn't really have to.  I mean,

8    the -- what I -- what I've said about my papers

9    is -- it's out there and consentent for everyone

10   to see.

11       Q.    Well, 45 minutes is a long time, and

12   I'm entitled to know what you and Monsanto had a

13   private conversation about.  So I'd a like to --

14   you're not giving me any information about what

15   you guys spoke about.

16       A.    Well, I don't remember specifically

17   except I can tell you there was nothing scripted

18   about we're going to show this and you're going to

19   say that.  It was just a general sort of

20   conversation what might come up.

21       Q.    So did they talk about any of the

22   documents that I created last week?

23       A.    Did they talk -- no, I don't think so.

24       Q.    So for 45 minutes you and two of

25   Monsanto's lawyers had a private conversation on

Robert Tarone, Ph.D.

1    the telephone the night before this deposition.

2        A.    Yes.

3        Q.    And you're telling me that the only

4    thing they said is we're going to talk about your

5    papers?

6        A.    No.  I just can't remember everything

7    they said, but it was similar things about what

8    might -- what might come up.

9        Q.    You've had an impeccable memory

10   throughout this entire deposition, and now you

11   can't remember what was said last night to you?

12       A.    No, I wasn't actually in a place where

13   I could concentrate very well last night, quite

14   frankly.

15       Q.    But you spent 45 minutes on the phone.

16       A.    Yes.  I don't remember every --

17       Q.    And you can't remember anything?

18       A.    I don't remember every detail of the

19   conversation.

20       Q.    I'm not asking for every detail of the

21   conversation.  I'm asking for what topics you

22   discussed.  And all you're telling me is that

23   Monsanto's lawyers called you the night before

24   your deposition to prepare you and they only told

25   you we're going to talk about your papers and that

Robert Tarone, Ph.D.

```
 1    that took 45 minutes?

 2        A.    I can't remember what else they talked

 3    about.  All I can tell you for certain is it

 4    wasn't a detailed explanation of what exhibits I

 5    was going to be shown and how I should respond to

 6    them.

 7        Q.    Well, I'm not suggesting that.  But

 8    what I'm saying is that 45 minutes is a really

 9    long time.

10        A.    Right.

11              MR. BRENZA:  Objection, testimony.

12        Q.    Isn't it?

13        A.    It's a long time for me on a phone.

14        Q.    Do you normally spend 45 minutes on a

15    phonecall?

16        A.    No.

17        Q.    So this was an exceptionally long

18    phonecall for you.

19        A.    Yes.

20        Q.    Okay.  And you can't remember -- the

21    only thing you could remember is that they

22    mentioned your papers would be discussed.

23        A.    Well, they talked about other things

24    too that had come up in previous -- mainly in the

25    2019 deposition.  I mainly wanted to know if it
```

**Exhibit F Page 230**

1    was going to be similar to what happened in 2019.

2         Q.    Okay.  So what are the other things

3    they talked about from the 2019 deposition that

4    came up?

5         A.    Again, I just simply can't remember.

6         Q.    Okay.  Did you ask for this phonecall?

7         A.    I did.  I suggested it might be nice to

8    touch base just so I know what to expect.

9         Q.    Okay.  And what -- and before I was

10   deposing you, you didn't call me to ask what to

11   expect, right?

12        A.    No.

13        Q.    Why not?

14        A.    Well, I wouldn't even think of it.

15        Q.    But --

16        A.    It's like -- it's like when you asking

17   me why didn't you call me about the deposition?  I

18   mean, maybe I'm naive about legal things, but I

19   wouldn't have even thought to contact you.

20        Q.    Well, when -- I -- you knew that I was

21   going to be the one asking the questions last

22   Friday, right?

23        A.    I did not.

24        Q.    Or you knew that --

25        A.    I know you signed --

**Exhibit F Page 231**

```
1          Q.    -- Plaintiffs' counsel would be.

2          A.    -- the deposition.

3          Q.    You knew Plaintiffs' counsel would be?

4          A.    That Plaintiff counsel --

5          Q.    And my name was on there?

6          A.    Yes.

7          Q.    And my phone number was on there?

8          A.    Yes.

9          Q.    And my email was on there?

10         A.    Yes.

11         Q.    And you could have reached out to me,

12    just like you reached out to Monsanto's employee,

13    David Saltmiras, when you saw his email?

14         A.    I -- I wouldn't have thought of

15    reaching out to you.

16         Q.    Okay.  But before Monsanto's lawyer

17    questioned you --

18         A.    And I didn't reach out to David

19    Saltmiras because of any email.  I reached out to

20    him because I needed assistance getting some tumor

21    rates.

22         Q.    Yeah.  And I thought you had testified

23    earlier that you saw his email on the article and

24    you said, oh, that's how I got his email.

25         A.    Yeah, it was on the page.
```

1          Q.    Yeah.  And so I'm saying you similarly

2    had my email.

3          A.    No, I know how to deal with scientists.

4          Q.    Okay.

5          A.    If I have a question about science, I

6    know to contact one of the authors of the

7    scientific paper.

8          Q.    Okay.  So --

9          A.    Legal things --

10         Q.    -- your --

11         A.    -- are foreign to me.

12         Q.    Your independence (sic) is that the

13   night before Monsanto's lawyers are going to

14   question you, you request a private phonecall with

15   them so that they can tell you what to expect,

16   right?

17         A.    Yes.

18         Q.    Okay.  You mentioned early -- early in

19   your testimony today that several international

20   and national groups have made decisions on

21   glyphosate, right?

22         A.    Correct.

23         Q.    All right.  Which international groups

24   have made decisions on glyphosate?

25         A.    Several companies had.  There's an

Robert Tarone, Ph.D.

```
 1     infographic floating around that has all of them,

 2     France, Germany, EFSA, an organization in Europe,

 3     Canada, the US EPA.  I mean, a number of

 4     countries.  I haven't memorized it, but there's

 5     probably like 15 or 16.

 6          Q.   And are you -- do you have any idea on

 7     how those decisions are made in other countries?

 8          A.   No, but it's probably similar to what

 9     the EPA did.  They put together committees of

10     experts, presented data and then come to a

11     conclusion about what the data mean.

12          Q.   Well, you said "probably," but you

13     don't know, right?

14          A.   Canada actually did two such things

15     because there was such an out -- outwar when they

16     said that it likely didn't cause cancer.

17               And this -- the first Canadian meeting

18     was after IARC's decision, but still there was an

19     outpouring and complaint that -- you know, that

20     the committee had been bought out.  So they set up

21     an entirely independent second committee, no

22     common members, and they came to the same

23     decision.  And I'm -- I'm assuming they used an

24     approach similar to EPA.

25          Q.   Okay.  You're assuming, but you don't
```

**Exhibit F Page 234**

Robert Tarone, Ph.D.

1    know.

2         A.    No.

3         Q.    Okay.  And I should have asked you this

4    before, but between when you left the conference

5    room on Friday and when you showed up this

6    morning, other than having -- text messaging

7    Monsanto's lawyers over the weekend and having a

8    private meeting with them last night, did you do

9    anything else to prepare?

10        A.    Well, I mean, I reread some of the --

11   some of my papers and I reread the preamble, IARC

12   preamble.  But really there was not much I could

13   do to prepare.

14        Q.    Okay.  Did you reread your 2019

15   deposition transcript?

16        A.    No.  I've never seen that deposition

17   transcript.

18        Q.    But you -- you stated earlier that you

19   stand by it even though you haven't read it?

20        A.    Well, and I said that at the time, that

21   I -- I answered as honestly as I could.  And from

22   that point of view, that means I stand by it.

23        Q.    And you know that the EPA -- we

24   discussed this on Friday.  But you know that the

25   EPA has vacated -- I'm sorry.  You know that --

Robert Tarone, Ph.D.

```
 1    strike that.

 2              You know that the Ninth Circuit has

 3    vacated the EPA's --

 4         A.   Yes.

 5         Q.   -- decision.  Okay.

 6              So when did you start working at NCI,

 7    what year?

 8         A.   1974.

 9         Q.   Okay.  And so when you -- you said --

10    you testified that you worked on animal

11    carcinogenicity tests at the --

12         A.   Yes.

13         Q.   -- beginning of your time at NCI.

14         A.   Correct.

15         Q.   So that means that you -- and -- and

16    you also stated that you had worked on it for

17    about two to three years, right?

18         A.   Yeah.  Whenever it moved to NTP.  I

19    think it was about three years.

20         Q.   Okay.  So when you were working on the

21    animal carcinogenicity tests that -- which is the

22    bulk of your experience with -- with animal

23    studies, it was in the '70s?

24         A.   '70s, definitely in the '70s.

25         Q.   Okay.  And you weren't involved in
```

**Exhibit F Page 236**

1    designing any of those studies, right?  I think --

2        A.    No.  These -- these studies had been

3    done at various laboratories under contract around

4    the country, and our goal was just to evaluate the

5    evidence presented in their tables.

6        Q.    Okay.  And then you talked about some

7    epidemiology studies that you worked on at NCI.  I

8    believe that you had said there was a power line

9    childhood leukemia study?

10       A.    Yes.

11       Q.    There was an HPV study?

12       A.    Yes.

13       Q.    You talked about a cellphone brain

14   cancer study?

15       A.    Yes.

16       Q.    Those are the only -- those are what I

17   wrote down.  Were there any others?

18       A.    And the Agricultural Health Study.

19       Q.    And the Agricultural --

20            THE COURT REPORTER:  Excuse me.  And

21        the what?

22       A.    The Agricultural Health.

23       Q.    So let's leave the Agricultural Health

24   Study out and talk about those other four.  What

25   did you, Dr. Tarone, actually do with respect to

Robert Tarone, Ph.D.

```
1    those studies?
2         A.    Well, I was involved in the design of
3    every one of those when -- when they were
4    preparing the study, providing statistical input,
5    things like power calculations which are required
6    for -- to get the study approved.
7              So I was involved in the design.  I
8    went to many committee meetings.  I was involved
9    in statistical analysis and definitely editing
10   several papers in all of those -- for all of those
11   studies.
12        Q.    Okay.  And then you talked about -- I'm
13   -- I'm looking back at your testimony.  So you
14   testified that you had written on AHS.  And
15   specifically what you had written on was whether
16   or not -- looking at whether or not there was a
17   difference between the people who had returned
18   their questionnaires and not --
19        A.    That's correct.
20        Q.    -- returned their questionnaires?  Is
21   that what the subject --
22        A.    Demographic.  Using information we
23   obtained from the --
24        Q.    And then --
25        A.    -- original questionnaire.
```

**Exhibit F Page 238**

Robert Tarone, Ph.D.

1        Q.    Okay.  And then counsel said:  Did you

2    make any conclusions about whether the study could

3    be valid if not every single person returned their

4    questionnaire?  And you said no.

5             And so just -- just to make clear,

6    you've never analyzed whether or not the AHS data

7    was valid because people didn't return their

8    questionnaires?

9        A.    No, I don't know how you would do that.

10       Q.    Okay.

11       A.    We could only make use of the

12   information we collected on the baseline

13   questionnaire.

14       Q.    Okay.  You testified that -- and we

15   talked at length before about your communications

16   with Monsanto and Monsanto's lawyers.  You

17   testified today that before you met with them back

18   in 2015 that you did a quick read of 112, of

19   Monograph 112.  Do you remember testifying about

20   that?

21       A.    The epidemiology and rodent study

22   sections.

23       Q.    And you did that because you knew that

24   those lawyers were there to meet with you about

25   IARC 112, not just the IARC process in general,

Robert Tarone, Ph.D.

```
 1    right?

 2         A.    That's why this -- that's why -- that's

 3    what the CAO -- CEO said.  They were interested in

 4    the IARC process, but he said it was motivated by

 5    the glyphosate decision.

 6         Q.    Okay.

 7               THE COURT REPORTER:  By the what?

 8               THE WITNESS:  Glyphosate decision.

 9    BY MS. WAGSTAFF:

10         Q.    You testified earlier that you -- so --

11    so Mr. -- Mr. Brenza walked you through in great

12    detail your communications with Mr. Saltmiras.  Do

13    you remember that?

14         A.    Yes.

15         Q.    And we talked about each one of them.

16    But he did not walk you through your

17    communications with Mr. Vales, right?

18         A.    No.

19         Q.    He did not mention the private meeting

20    that you guys had last night, did he?

21         A.    No.

22         Q.    So I'd like to look at your testimony

23    that you gave which is Exhibit 44.

24         A.    Okay.

25         Q.    I believe this is your test -- you --
```

**Exhibit F Page 240**

Robert Tarone, Ph.D.

1    you testified that this is your testimony that you

2    gave --

3         A.    To the Senate --

4         Q.    -- to the Senate --

5         A.    -- Senate Committee, Space Science --

6         Q.    Okay.

7         A.    -- and Technology.

8         Q.    And this is -- well, tell me when

9    you're ready.

10        A.    Okay.  Got it.

11        Q.    Okay.  So turn to what the top of the

12   -- it's the third page, but it says 77 at the top

13   of the page.

14        A.    Yes.

15        Q.    Okay.  What is that -- or what is this?

16        A.    I don't -- these are the -- each of the

17   member -- each of the people testifying made an

18   open -- a presentation.

19        Q.    So this is a transcript of your

20   presentation?

21        A.    It might be based on the presentation

22   itself because we had to present a presentation --

23   a written copy of what we were going to present,

24   but -- I assume it is.

25        Q.    Well, take a minute -- take a minute --

Robert Tarone, Ph.D.

```
 1          A.    Well, I can't remember what I said

 2    versus what I wrote.

 3          Q.    Okay.  But -- but I guess my point is

 4    these are your words.

 5          A.    Yes.

 6          Q.    You either wrote them or you said them.

 7          A.    Yep.

 8          Q.    Because it's -- it's in the first

 9    person as Dr. Tarone, right?

10          A.    Yes.

11          Q.    It says "I" meaning you.  It says "my"

12    meaning you, right?

13          A.    That's correct.

14          Q.    Okay.  So you wrote this or -- or you

15    said it and you -- and this was -- you said this

16    to the United States Senate, right?

17          A.    I did.

18          Q.    Okay.  And so you took time to make

19    sure that it was accurate, right?

20          A.    As accurate as I could, yes.

21          Q.    Okay.  And then -- so let's look at the

22    end.  Turn to the next page --

23          A.    Uh-huh (affirmative).

24          Q.    -- Page 78.  In the last sentence,

25    actually it says, "The prepared statement of
```

**Exhibit F Page 242**

Robert Tarone, Ph.D.

1    Dr. Tarone follows:"  So we'll talk about that in

2    a minute.

3            But the last senate you said -- the

4    last sentence you said to the senate on Page 78

5    is, "And reports since my paper was published and

6    depositions of key working group members related

7    to lawsuits filed against Monsanto have fully

8    substantiated the facts presented and questions

9    raised in my paper."

10           A.    I don't remember saying that.

11           Q.    Well, you testified earlier that you

12   have only read Dr. Blair's testimony and that you

13   have not read any other members'.

14           A.    Yes.  No, I said --

15           Q.    So this is --

16           A.    I said I --

17           Q.    -- this is lie?

18           A.    I said I have read Chris Portier's

19   first deposition.

20           Q.    Okay.  He's not a working group member.

21           A.    Well, he was on the working group.

22           Q.    So you haven't read Jameson's --

23           A.    No.

24           Q.    -- deposition.  You haven't read

25   Matthew Ross' depositions.

Robert Tarone, Ph.D.

```
 1          A.    No.

 2          Q.    So this is not fully accurate what

 3   you're telling the Senate?

 4          A.    I don't remember saying this.

 5          Q.    Okay.

 6          A.    I really don't.  I can't believe that I

 7   would say anything of that type.

 8          Q.    Okay.

 9          A.    Is it in my prepared -- no, the

10   prepared one is the one that I spent the most time

11   on.

12          Q.    Okay.  Well, we just went over the fact

13   that these were your thoughts and you either said

14   them or wrote them.

15          A.    Well, there's nothing like that in my

16   written comments, which are immediately after

17   this -- which is supposedly a transcript of my

18   statements.

19          Q.    All right.  And we talked -- well, you

20   and Monsanto's lawyer talked a lot about

21   Dr. Portier earlier today.  Do you remember that?

22          A.    A lot?  I don't remember.  I mean, his

23   name certainly came up.

24          Q.    All right.  And you don't know what

25   Dr. Portier's contribution was in terms of the
```

**Exhibit F Page 244**

Robert Tarone, Ph.D.

```
 1    IARC Monograph's overall conclusion, right,

 2    because you weren't there?

 3         A.    Only what I read in that deposition,

 4    that he was in the mechanisms subgroup and that he

 5    helped change some P-values for kidney tumors.

 6         Q.    But you don't know what influence

 7    Dr. Portier had --

 8         A.    No.

 9         Q.    -- over the voting members, do you?

10         A.    I have no way of knowing that.

11         Q.    And any testimony you provide that

12    relates to any influence that Dr. Portier had is

13    pure speculation, right?

14         A.    I don't think I've made such statements

15    but, yeah, it would be if I did.

16         Q.    Okay.

17         A.    Because I don't know what anybody

18    did --

19         Q.    Right.

20         A.    -- at the internal meetings.

21         Q.    And you understand that Dr. Portier was

22    not a Plaintiffs' expert on this litigation at the

23    time of the IARC 112.

24         A.    Oh, no.  Yeah, it was after.

25         Q.    Right.  And same with Dr. Jameson,
```

**Exhibit F Page 245**

```
 1    right?

 2         A.    Yes, as far as I know.

 3         Q.    Okay.  So if you turn to the preamble,

 4    which I don't know if you marked it as an exhibit

 5    or if we just talked about it.

 6               MR. BRENZA:  We marked it as 32.

 7               MS. WAGSTAFF:  That was from the last

 8         deposition, so --

 9               THE WITNESS:  All right.  I've got it.

10               MS. WAGSTAFF:  Okay.

11               Because you started at 40 today.  I

12         think you said what number was it, and then

13         you...

14               MR. BRENZA:  Okay.

15               MS. WAGSTAFF:  Yeah, I used it last

16         Friday and marked it as 32.

17               MR. BRENZA:  Okay.

18    BY MS. WAGSTAFF:

19         Q.    If you turn to the -- if you turn to

20    Page 20 of the monograph --

21         A.    Yes.

22         Q.    -- okay, where we're talking about

23    sufficient evidence of carcinogenicity?

24         A.    Correct.

25         Q.    Mr. Brenza was asking you today about
```

Robert Tarone, Ph.D.

1    that first sentence.

2        A.    Correct.

3        Q.    Specifically with an increased

4    incidence of malignant neoplasms or of an

5    appropriate combination of benign and malignant

6    neoplasms.

7        A.    Correct.

8        Q.    Do you see that?

9        A.    Yes.

10       Q.    And I believe that you said that you

11   had not written on that before.  You did not

12   include that -- that criticism in your papers.

13       A.    No.  My -- my papers were based solely

14   on the way that the working group deliberated, not

15   what they based their conclusion on.

16       Q.    Okay.  So any criticism you have of

17   that now of -- of -- related to that sentence that

18   you said earlier is -- was not in your published

19   papers and it's a new opinion that you've

20   generated for this deposition.

21       A.    Well, it points out a fact that you

22   have to make an analysis based on -- it's not an

23   opinion.  It's right here in black and white.  If

24   you're going to make a conclusion of sufficient

25   evidence, you have to base it on an analysis that

Robert Tarone, Ph.D.

```
 1    includes malignant tumors.
 2         Q.    But it -- but it --
 3         A.    And it's clear.
 4         Q.    Well, it says or --
 5         A.    It's not an opinion.
 6         Q.    -- an appropriate combination.
 7         A.    But that's malignant tumors as well.
 8               THE COURT REPORTER:  Excuse me.  Excuse
 9         me.  I didn't get your question.
10         A.    There have to be malignant tumors
11    include --
12               THE COURT REPORTER:  Excuse me.  I
13         didn't get your question.
14               MS. WAGSTAFF:  I'll start over.
15         Q.    You did not include this as a criticism
16    in either of your published papers, right?
17         A.    No, I did not.
18         Q.    Okay.  If you pull your papers, which I
19    believe are 46 and 47...
20         A.    Okay.
21         Q.    Okay.  So one of the things that you
22    spoke -- a criticism you spoke about with respect
23    to the animal data in Monograph 112 is that you
24    stated if you combine the kidney data -- one of
25    the specific criticisms was that if you combine
```

**Exhibit F Page 248**

Robert Tarone, Ph.D.

1     the kidney data from the first study and the

2     second study, that it cancels each other out?

3          A.    Right.

4          Q.    Okay.  Is that like -- is that -- is

5     another way to say that pooling the data?

6          A.    No.  You don't even have to do a pooled

7     analysis.  You have -- you have a non-significant

8     result to start with in the first study.  So if

9     you combined it now with a decreasing trend in the

10    opposite direction of the trend, it's going to

11    increase that P-value.  Any reasonable way of

12    combining that data.

13         Q.    So what's the difference between

14    combining data and pooling data?

15         A.    Combining data is that you're -- you

16    particular -- you're looking at the data from one

17    and the analysis from one study and a second study

18    and then combining the test statistics.

19               Pooling of data would be like if you

20    said, oh, these two studies are all one study.

21    And if you put the controls, pool it, so you now

22    have 100 people at the control group, and then if

23    you use the doses, even though they're in

24    different studies, you align the other rates by

25    the doses interspersed in the -- in the two

Robert Tarone, Ph.D.

```
 1    studies.
 2              So instead of having two different
 3    statistical analyses that you combine, you now
 4    have created one table that instead of two
 5    two-by-three tables, you now have a two-by-six
 6    table.
 7         Q.    Okay.  And they -- they will yield
 8    different results?
 9         A.    Oh, yes, yeah.
10         Q.    Okay.
11         A.    And I -- and I don't know -- it would
12    be hard to justify the pooling in this case
13    because there's -- there are always small
14    differences in the way that the studies are
15    conducted.  You're assuming that the doses can be
16    ordered in the same way as if they were all done
17    at the same time.
18         Q.    Okay.
19         A.    And I might say the preamble -- I was
20    -- I did reread the preamble, and they do advocate
21    -- where is that?  They advocate -- advocate
22    combining data.  It's on Page 15.  Although
23    meta-analyses and combined analyses are conducted
24    less frequently for animal experiments than for
25    epidemiologic studies due to differences in animal
```

**Exhibit F Page 250**

Robert Tarone, Ph.D.

```
 1    strains.  They can useful aids in interpreting

 2    animal data when the experimental protocols are

 3    sufficiently similar.

 4              And I considered that two CD-1 mouse

 5    studies, they're both in the same strain of animal

 6    and their protocols are sufficiently similar.

 7         Q.   Okay.  And next we -- if you'll look --

 8    I'm just going through the exhibits in order.

 9    Next if you'll look at 52.

10         A.   52.  Which is?

11         Q.   The Alavanja article.

12         A.   Okay.  All right.  Michael, Michael,

13    Michael.

14         Q.   And you can also pull up 59 which is

15    your -- I believe the last Exhibit.

16         A.   Okay.  Here's Alavanja.  The last one,

17    was that the clinic -- clinical lymphoma?

18         Q.   No.  Oh -- no, the letter to the

19    editor.  I'm going to use them together.

20         A.   Which letter do you have?  Oh, yeah,

21    that's clinical lymphoma leukemia, myeloma

22    leukemia.

23         Q.   Yeah.

24         A.   All right.  Let me find that.  Yeah,

25    here it is.  All right.  I got it.
```

Robert Tarone, Ph.D.

```
1              Q.      All right.  So if you look at your
2      letter to the editor --
3              A.      Uh-huh (affirmative).
4              Q.      -- on the -- on the right, the last
5      sentence of your article --
6              A.      Yes.
7              Q.      -- it says, "It appears that expediting
8      the evaluation of glyphosate as soon as possible
9      after it was proposed in March 2014 as a medium
10     priority agent for IARC consideration took
11     precedence over scientific accuracy."  Do you see
12     that?
13             A.      Correct.
14             Q.      So as of March 2014, glyphosate had not
15     been listed yet on the --
16             A.      This is -- this is the every five year.
17             Q.      Uh-huh (affirmative).
18             A.      That's what that's referring to.
19             Q.      Okay.
20             A.      It was proposed in March of 2014 --
21     2014 that glyphosate be a medium priority agent to
22     be considered by --
23             Q.      Okay.
24             A.      -- IARC.
25             Q.      And I'm handing you a document that was
```

**Exhibit F Page 252**

Robert Tarone, Ph.D.

```
1    pulled -- it's not stapled, but it's two pages.  I

2    highlighted what I'm going to ask you about, so I

3    will represent that the highlights on Exhibit 60

4    are -- are my highlights.

5              If you look at the first highlight, it

6    talks about -- well, actually above the first

7    highlight it talks about Volume 112.

8         A.   Uh-huh (affirmative).

9         Q.   That's what we've been talking about.

10   It says Leon, France and it shows that glyphosate

11   is going to be on it, right?

12        A.   Yes.

13        Q.   Okay.  And it says that it's going to

14   happen March 3rd to 10th in 2015.  Do you see

15   that?

16        A.   Yes.

17        Q.   And this is a call for experts.  And

18   this is -- this is IARC telling the scientific

19   community to apply to be an expert, right?

20        A.   Yes, it is.

21        Q.   And the deadline to be -- for

22   applications is actually July -- July 30th, 2014,

23   right?

24        A.   That's what it says.

25        Q.   Which means self-nominations -- if you
```

**Exhibit F Page 253**

Robert Tarone, Ph.D.

```
1     kind of scroll down to what I haven't highlighted

2     it says, "Self-nominations are encouraged."  Do

3     you see that?

4          A.    Yes.

5          Q.    "Each nomination should include" and

6     then it gives --

7          A.    Right.

8          Q.    -- things -- and then if you -- gives

9     the criteria.  And then if you go to the next

10    page, it shows that this was posted on March 12th

11    of 2014, right?

12         A.    Okay.  And this is something -- this is

13    something I was looking for and requested.

14         Q.    Okay.  So -- so in -- in March it was

15    announced that glyphosate -- on March 12th it was

16    announced --

17         A.    Right.

18         Q.    -- of 2014 it was announced that

19    glyphosate --

20         A.    Boy, that's quick, yeah.

21         Q.    -- was going to be on -- on Monograph

22    112, and then they gave about three to four months

23    for scientists to apply, right?

24         A.    Correct.

25         Q.    So as of this date, no -- it was --
```

Robert Tarone, Ph.D.

 1    nobody knew who the panel members of IARC 112

 2    were --

 3         A.    No.

 4         Q.    -- going to be, right?

 5               And, in fact, it was just learned in

 6    March of 2014 that glyphosate would even be on

 7    Monograph 112, right?

 8         A.    Well, it was only proposed to be on a

 9    future monograph in March of 2014.

10         Q.    Right.  Now let's go -- now let's look

11    at Exhibit 52.  This was published in October of

12    2014, right?

13         A.    What is -- yes.

14         Q.    Okay.  But let's look to when it was

15    received.  If you look in the box -- I'm just

16    going to show you, just look at my finger.  It's

17    right around there (indicating).

18         A.    Right.

19         Q.    When was it received?

20         A.    March of 2014.

21         Q.    What date?

22         A.    March 10th, 2014.

23         Q.    All right.  And what was the date that

24    glyphosate was announced?  If you could look back

25    to here on the exhibit we just looked at.

Robert Tarone, Ph.D.

```
 1          A.     March of 2014.

 2          Q.     What date?

 3          A.     March 12th, 2014.

 4          Q.     Okay.  So this paper was actually

 5   received before glyphosate was even announced --

 6          A.     Right.

 7          Q.     -- to be on Monograph 112?

 8          A.     Right.

 9          Q.     Okay.  And -- and it was -- this paper

10   was received by the Journal before glyphosate was

11   announced to be on 112 and certainly before

12   Dr. Blair knew he would be involved in

13   Monograph 112.

14          A.     That, I don't know.  If they were

15   already announcing -- yeah, probably.  I mean, I

16   would --

17          Q.     Well, glyphosate hadn't been announced

18   that it was going to be on 112.

19          A.     What's that?

20          Q.     It hadn't been announced that

21   glyphosate would be on 112.

22          A.     Right.

23          Q.     Until after the Journal --

24          A.     Okay.

25          Q.     -- received this paper that didn't
```

Robert Tarone, Ph.D.

```
1    include herbicides, right?

2         A.    Right.

3         Q.    Okay.  All right.  In your paper, you

4    discussed -- and I just I want to make sure we're

5    really clear.  In Exhibit 46, which is one of your

6    -- which is your opinion paper.

7         A.    Which journal?

8         Q.    European Journal of Cancer Prevention.

9         A.    Okay.

10        Q.    All right.  You have a -- counsel

11   walked you through -- if you look at Page 85,

12   counsel walked you through potential conflicts of

13   interest, right?

14        A.    Yes.

15        Q.    And just to be very clear, you're just

16   listing potential conflicts of interest.  You have

17   no actual knowledge that any of these apply to any

18   IARC 112 panel members, right?

19        A.    No.  This was not specific to

20   glyphosate.  These were -- these were -- these

21   were things we had been discussing for years.

22   This applies in general to any working group.

23   Just that they -- they put a precedence on

24   financial conflict of interest and not on

25   nonfinancial conflicts of interest, and we had
```

Robert Tarone, Ph.D.

```
1    been arguing for years that they should consider

2    both.

3         Q.   Okay.  And -- and -- and just to sort

4    of put a finer point on it, so these are sort of

5    hypothetical conflicts.  There's -- there's --

6    you're not -- your opinion is not that any IARC

7    112 member actually had any of these --

8         A.   Oh, no.

9         Q.   Okay.

10         A.   We're not even implying that.

11         Q.   Okay.  And then we talked at length

12    about how this -- how this article took a while to

13    get published.  Do you remember that --

14         A.   Yes.

15         Q.   -- testimony?

16              Okay.  And then we talked about the

17    IARC letter that came out in June of 2017 where --

18         A.   The post, the post on their website.

19         Q.   Yep.  Do you want to pull that up?

20         A.   Yep.

21         Q.   All right.

22         A.   I don't know where it is.  Okay.

23         Q.   Does it have a number on it?  I'm

24    trying to figure out what exhibit --

25         A.   49?
```

Robert Tarone, Ph.D.

```
 1          Q.    -- it was last week.

 2          A.    Oh, I don't know.

 3          Q.    Oh, I got it.  That was 30 -- were you

 4    asking what 34 was?  That's from last week.

 5                All right.  So do you have this exhibit

 6    in front of you?

 7          A.    Yes.

 8          Q.    Okay.  So it talks about -- we talked

 9    about -- it says, "However, the journal's editors

10    have indicated most recently in correspondence

11    dated 17 May 2017 that the article by Tarone will

12    be corrected to report the author's paid

13    consultation with Monsanto as a conflict of

14    interest."  Do you see that?

15          A.    Correct.

16          Q.    All right.  And Monsanto's counsel

17    questioned you about this.  And if you look to

18    Page 86 of your article, I think what you said was

19    that originally you did not list your paid

20    consultation with -- through IEI as a conflict of

21    interest, right?

22          A.    It was an acknowledgment.

23          Q.    Originally you had said no conflict of

24    interest, right?

25          A.    Correct.
```

Robert Tarone, Ph.D.

```
1              Q.    And the journal made you come back and
2       report it.
3              A.    The journal editor agreed with my
4       characterization that the acknowledgment was not a
5       conflict of interest, but he said we'll put it
6       under -- we'll put conflicts of interest under
7       acknowledgments so we can get the paper in print.
8              Q.    All right.  So he --
9              A.    It was a concession we made.
10             Q.    So he wouldn't print the paper unless
11      it was listed as a conflict of interest.
12             A.    He felt he had to make this in order to
13      publish the paper in print.
14             Q.    Right.  So he -- so the --
15             A.    But he agreed with me that that meeting
16      did not constitute a conflict of interest.  That's
17      what the debate is about, whether it's a conflict
18      of interest.
19             Q.    Well, whether or not he agreed with you
20      is irrelevant because that's hearsay what he told
21      you.  What we know as a fact is that he made you
22      list it as a conflict of interest.
23                   MR. BRENZA:  Asked and answered.
24             A.    I don't know, to say he made me.  We
25      agreed that, all right, let's do what -- let's do
```

Robert Tarone, Ph.D.

1    what they're requesting just to get the paper in

2    print.

3         Q.    Okay.  So he didn't go to bat for you

4    and say, no, that's not a conflict of interest,

5    we'll print it under -- as an acknowledgment?

6         A.    I have no idea what went on between him

7    and the publisher, but -- on COPE.

8         Q.    Okay.

9         A.    But this was something we -- I did

10   agree.  I said, okay, let's just get it in print.

11        Q.    Okay.  So what we can agree on is that

12   you did not include your paid consultation with

13   Monsanto as a conflict of interest, and the editor

14   of the journal required you to list it as a

15   conflict of interest as a -- as a condition of

16   publishing.

17        A.    Again, it was a concession we made.  He

18   agreed with me that it did not constitute a

19   conflict of interest because I did not write that

20   paper because of the meeting with the lawyer.

21        Q.    I understand that that's what you're

22   saying.  Please -- please answer my question.  And

23   I'll read it back again.

24              You did not include your paid

25   consultation with Monsanto as a conflict of

Robert Tarone, Ph.D.

```
 1    interest, and the editor of the journal required

 2    you to list it as a conflict of interest as a

 3    condition of publishing.

 4         A.   I guess I disagree with the "required

 5    you."  It was a concession that we made equally.

 6    We agreed that it would be best to list it, as

 7    it's seen here --

 8         Q.   Okay.

 9         A.   -- and get the paper published in

10    print.

11         Q.   Are you an expert in the latency for

12    NHL?

13         A.   No.  I'm not an expert, but I know how

14    to read the literature.  And we cite the papers

15    upon which our opinion was based on for latency.

16              The original paper it cited a very old

17    paper that didn't even base their latency estimate

18    on lymphoma.  They were extending something that

19    was considered to be latency at that time for

20    benzene and leukemia and say -- and assuming that

21    it would be similar for a chemical and lymphoma.

22              MS. WAGSTAFF:  All right.  I'm going to

23         move to strike anything after "No.  I'm not

24         an expert."

25         Q.   My question was:  Are you an expert in
```

Robert Tarone, Ph.D.

1    latency for NHL?

2              MR. BRENZA:  Asked and answered.

3        Q.    I don't need you to repeat it.  I was

4    just saying that was my question.

5        A.    One does not have to be an expert to be

6    able to read the literature and to summarize what

7    other people, who are experts, have said about

8    latency.  That includes a man at CDC.

9              THE COURT REPORTER:  Excuse me.

10              MS. WAGSTAFF:  All right.  Move to

11         strike.

12              THE COURT REPORTER:  That includes

13         what, "a man"?

14              THE WITNESS:  That includes.  That

15         includes a man who was at the CDC.

16    BY MS. WAGSTAFF:

17        Q.    If you could pull up No. 56 which is

18    the Kenny Crump article.

19        A.    Crump.  Okay.  Got it.

20        Q.    All right.  So if you go to the

21    declaration of conflicting interest --

22        A.    Correct.

23        Q.    -- it says, "Dr. Kenny Crump and

24    Dr. Zelterman served on the EPA Federal

25    Insecticide Fungicide and Rodenticide Act Science

**Exhibit F Page 263**

Robert Tarone, Ph.D.

```
1        Advisory Panel which met to review an EPA document

2        on glyphosate on December 13th to 16th."  Do you

3        see that?

4            A.    Correct, yes.

5            Q.    2016.

6            A.    Uh-huh (affirmative).

7            Q.    Then it says, "Dr. Haseman --

8            A.    Haseman.

9            Q.    Haseman.

10                 -- testified before this panel on

11       behalf of Monsanto and had a one-year consulting

12       agreement with Monsanto that extended from

13       November 14th, 2016 to November 13th, 2017."  Do

14       you see that?

15           A.    Correct.

16           Q.    It says, "However, this agreement" --

17       meaning the consulting agreement, right?

18           A.    Yes.

19           Q.    -- "was limited explicitly to his work

20       related to the SAP."  Do you see that?

21           A.    Yes.

22           Q.    Which means that Monsanto hired

23       Dr. Haseman to defend glyphosate to a panel that

24       Dr. Crump and Dr. Zettleman were sitting on, is

25       that right?
```

Robert Tarone, Ph.D.

```
1           A.     Zelterman.  Yes.

2           Q.     Zelterman.

3           A.     Correct.

4           Q.     So Monsanto paid Haseman for his work.

5           A.     For that year, yes, and for the SAP

6    presentation.

7           Q.     Okay.

8           A.     I didn't realize until I read this

9    paper but, yeah, that's what -- that's what

10   happened.

11          Q.     Okay.  And then this paper talks

12   about -- is the same subject matter as what

13   Monsanto paid him for, right?

14          A.     I don't know --

15                 MR. BRENZA:  Object to form.

16          A.     -- what he testified before the SAP.

17          Q.     Okay.  But the --

18          A.     I really don't know.

19          Q.     -- SAP was talking about glyphosate.

20          A.     Yes.  But I don't know what aspect that

21   he testified.

22          Q.     All right.

23          A.     I really can't say.  And I assume that

24   if Crump and Zelterman were on the SAP, they had

25   to pass a conflict of interest procedure to be on
```

Robert Tarone, Ph.D.

```
 1    that SAP.
 2         Q.    Okay.  And then let's talk about the --
 3    your article which is No. 55.
 4         A.    55.
 5         Q.    So by my count --
 6         A.    Which article are you on?
 7         Q.    It's the Kabat.
 8         A.    Oh, Kabat, okay.
 9         Q.    Kabat?
10         A.    Yeah.
11         Q.    So by my count --
12         A.    Let me find it.
13         Q.    -- Dr. Tarone --
14         A.    Okay.
15         Q.    -- you have written four articles --
16    I'm sorry, strike that.
17              By my count you have written four
18    pieces about glyphosate and non-Hodgkin's
19    lymphoma, and they are all sitting in front of me.
20    And one of them is an opinion piece in the
21    European Journal of Cancer Prevention?
22         A.    Correct.
23         Q.    Followed by an editorial in the
24    Regulatory Toxicology and Pharmacology, right?
25         A.    Yes.
```

1          Q.    And that Regulatory Toxicology and

2     Pharmacology editorial was, I think you testified

3     earlier, in defense of somebody saying that you

4     were a paid consultant?

5          A.    Well, it was.  Four authors in a paper

6     in the American Journal of Industrial Medicine.

7          Q.    Okay.  So this Regulatory Toxicology

8     and Pharmacology paper was basically your response

9     to somebody saying that --

10         A.    Exactly.

11         Q.    And it parroted a lot of your opinions

12    from the opinion paper you wrote a year or two --

13         A.    More importantly -- you want to use the

14    word "parroted."  It parroted the scientific facts

15    I pointed out about data that was excluded from

16    the --

17         Q.    Okay.

18         A.    -- glyphosate deliberations.

19         Q.    Okay.  But -- that's fine.

20         A.    But there is -- there is an overlap in

21    opinion as well because it's saying things about

22    -- in general about the IARC Monograph's Program.

23         Q.    Okay.  So your opinion paper and your

24    editorial are very similar substantively.

25         A.    They are very similar.

**Exhibit F Page 267**

```
 1            Q.    Okay.  Substantively.

 2            A.    Yes.

 3            Q.    Okay.

 4            A.    I wouldn't have written it if the man

 5      -- the men hadn't lied about me.

 6            Q.    Okay.  And so you wouldn't have

 7      written the -- you wouldn't have written the

 8      editorial if --

 9            A.    There would have been no reason to.  It

10      was because they lied about me --

11            Q.    Okay.

12            A.    -- saying Monsanto paid for my paper.

13            Q.    And then -- then you wrote a letter to

14      the editor pretty much for the same reason, to

15      defend things --

16            A.    Yeah, it's much shorter, but yeah.

17            Q.    Okay.

18                  THE COURT REPORTER:  Excuse me, what

19            was your answer?

20                  MS. WAGSTAFF:  He said it's much

21            shorter.

22                  THE WITNESS:  It's much shorter than

23            the two previous.

24      BY MS. WAGSTAFF:

25            Q.    So this third article that you wrote,
```

**Exhibit F Page 268**

Robert Tarone, Ph.D.

1    this letter to the editor, is again someone had

2    accused you of working for the industry and so you

3    wrote a letter to the editor and had it published

4    defending yourself.

5         A.    Yeah.  It also misstated the Greim

6    Study.  So there are actually two reasons it was

7    written.

8         Q.    Okay.

9         A.    But I wouldn't have written it if he

10   hadn't lied about me.

11        Q.    Okay.  But substantively this letter to

12   the editor doesn't add any new --

13        A.    No.

14        Q.    -- substance, right?

15        A.    No.

16        Q.    Okay.  And then the last thing I have

17   you writing is an article with Dr. Kabat --

18        A.    Kabat.

19        Q.    -- and William Price that came out

20   online January 15th, 2021, is that right?

21        A.    That's what it says, published online.

22        Q.    Okay.  And am I missing any other

23   articles?

24        A.    No.

25        Q.    Okay.  And so this is called a brief

**Exhibit F Page 269**

Robert Tarone, Ph.D.

```
1    report, is that right?

2         A.    Right.

3         Q.    So you have a letter to the editor, an

4    editorial opinion piece, and now you have a brief

5    report, right?

6         A.    Right.

7         Q.    Okay.  And I think you testified

8    earlier that Dr. Kabat and you edit each other's

9    papers.  I think you said --

10        A.    Correct.

11        Q.    -- he edits --

12        A.    Yeah, correct.

13        Q.    -- I don't know if you used the word

14   "everything," but you said --

15        A.    No.

16        Q.    -- a lot.

17        A.    He -- if I -- if I think I need a paper

18   edited, I'll send it to him and he's very honest

19   with his opinion.

20        Q.    Okay.  Did Dr. Kabat edit any of your

21   prior three papers?

22        A.    He definitely wouldn't have edited

23   the -- the first two.  He -- he probably saw the

24   letter to the editor, but I -- I don't think I

25   needed any editing on that.  I just sent it to him
```

1    for his information.

2         Q.    Okay.  So how did you -- how did this

3    article -- I'm talking -- by "this article" I'm

4    talking about the article No. 55 that's --

5         A.    Uh-huh (affirmative).

6         Q.    -- your brief report --

7         A.    Yes.

8         Q.    -- on recent meta-analyses of exposure

9    to glyphosate and risk of non-Hodgkin's lymphoma

10   in humans.  How did you select Dr. Kabat as your

11   co-author?

12        A.    Well, actually it's interesting.  When

13   I first read the paper, my first response was to

14   the senior editor who is --

15        Q.    Read what paper?

16        A.    The paper -- the mutation research

17   paper by Zhang.

18        Q.    Uh-huh (affirmative).

19        A.    I sent an email to the editor who had

20   accepted it -- and I'm sure I included that in the

21   emails that I presented to you last week -- saying

22   why I thought the paper should be modified before

23   it was published in print.  And I never received a

24   response from him, but I had laid out my criticism

25   of the paper.  And at the same time, unbeknownst

1    to me, Geoffrey Kabat had submitted a commentary

2    to the Genetic Literacy Project and he made many

3    of the same points that I made in my letter to the

4    mutation research.

5         So we decided, you know, what could we

6    do that would further the science, and we decided

7    that we would do a meta-analysis.  And Bill Price

8    had the same software for meta-analyses that the

9    authors of the mutation research paper used, so we

10   asked him if he would be interested in, you know

11   collaborating, and he said yes.  So that's why

12   this paper resulted.

13        Q.   So who did the actual meta-analysis --

14   meta-analysis in this paper?

15        A.   Bill Price ran the statistical

16   programs, but everybody involved -- like there

17   were several sensitivity analyses.  And there was

18   sort of a general agreement on which sensitivity

19   analyses to do.  Once you know which estimates to

20   take from each study, it's just a matter of

21   putting it in the computer program, which Bill

22   would do and then he would send us the output.

23        So it was a mutual decision to decide

24   exactly which sensitivity analysis to do.

25        Q.   Okay.  And, you know, if you look

1    through this paper, just sort of flipping through,

2    there are different sections, right?

3        A.    Yes.

4        Q.    Okay.  Did you guys assign somebody to

5    be in charge of a particular section?

6        A.    No, not particularly.  It was really a

7    joint effort.

8             And you said before about there's --

9    there's arguments in here about latency.  That was

10   me just because I'm the one that went out and got

11   all the papers that were -- had been published.

12   So that -- that paragraph on latency was virtually

13   me.

14       Q.    Okay.  So other than the paragraph

15   on latency, was there any part of this paper,

16   this paper we're talking about that you did with

17   Kabat --

18       A.    Uh-huh (affirmative).

19       Q.    -- was there any part that Dr. Tarone

20   (sic) was in charge of?

21       A.    In charge of?  No.  It was a very

22   collegial joint effort, I must say.

23       Q.    Okay.

24       A.    It was a very pleasant collaboration.

25       Q.    Okay.  And who actually put pen to

1     paper and wrote it?

2         A.    I don't know who wrote the first draft.

3     It might have been Geoffrey, but everybody then

4     contributed modifications, revisions.

5         Q.    Okay.

6         A.    And as I said, the latency, I -- I

7     drafted the first part of that.

8         Q.    Okay.  Did you draft the first part of

9     anything else?

10        A.    I -- you know, I can't recall.

11        Q.    But you can recall that?

12        A.    This -- this -- I recall that because

13    it was -- it was a bit of an effort.  I had to go

14    back into the literature and find experts who had

15    opined as to what the latency should be for

16    lymphoma.

17        Q.    All right.  And you talk -- if you turn

18    to the second page -- they're not numbered, sorry.

19        A.    That's all right.

20        Q.    But the left side under selection of

21    estimates from the different studies --

22        A.    Uh-huh (affirmative).

23        Q.    -- it states maybe four or five lines

24    up from the bottom, "We were unsuccessful in

25    attempts to obtain the ever exposure RRs from the

Robert Tarone, Ph.D.

```
 1      AHS investigators."
 2           A.    Yes.
 3           Q.    What's RR stand for here?
 4           A.    Relative risk.
 5           Q.    Okay.  And was that -- that wasn't a
 6      problem for you that you couldn't get information?
 7           A.    Well, it was very disappointing.  And
 8      the EPA, I believe we cite their summary of
 9      epidemiology.
10           Q.    Do you think --
11           A.    Yes, it's reference 15.  They also did
12      not have the ever exposure relative risk, and so
13      they had to estimate what it would be.  And they
14      actually made a mistake in terms of giving it too
15      much precision.
16           Q.    So --
17           A.    So we -- we tried to estimate it but
18      in such a way that it would not overweight the
19      Agricultural Health Study.
20           Q.    Okay.  So is that a flaw in your study,
21      that you couldn't get that information?
22           A.    It's very unfortunate.  Obviously it
23      would have been better to have the actual estimate
24      from the Agricultural Health Study.  And it was
25      very disappointing, since I worked with a lot of
```

**Exhibit F Page 275**

```
 1    those people, that they were unwilling to provide

 2    it.

 3         Q.    So is that a flaw in your study that

 4    you don't have that information?

 5              MR. BRENZA:  Object to the form.

 6         A.    No, it's not flaw.

 7         Q.    Okay.

 8         A.    In fact, if we had the information, it

 9    would have given greater weight to the

10    Agricultural Health Study and it had a low

11    estimate.  So if anything, it caused us to

12    overestimate the meta-estimate.

13              THE COURT REPORTER:  Excuse me,

14         "Overestimate the meta-estimate"?

15              THE WITNESS:  The meta, M-E-T-A,

16         hyphen, estimate as a result of the

17         meta-analysis.

18    BY MS. WAGSTAFF:

19         Q.    Do think that the AHS studies should be

20    combined with case controls in a meta-analysis?

21         A.    I think it's very problematic.  I also

22    don't think that the AHS study should have been

23    combined with the two European cohort studies that

24    IARC essentially wrote.  Because the exposure

25    assessment in the two European studies was based
```

**Exhibit F Page 276**

Robert Tarone, Ph.D.

1    on indirect -- they knew what crops people grew,

2    and so they had what they call a crop exposure

3    matrix, and they assigned herbicides that they

4    thought would be used for that crop.  It was not

5    direct.

6              In the Agricultural Health Study we

7    directly asked people what they applied.  So I --

8    that's a problem that we pointed out here.  The

9    problem with a meta-analysis is very often -- very

10   often you're combining studies that have very

11   different quality, and that's always a problem.

12       Q.   All right.  If you'll turn to your --

13   the -- the last page of the actual study where you

14   -- where it talks about acknowledgments and

15   compliance with ethical standards, do you see

16   that?  Before you get to references?

17       A.   Yes.

18       Q.   Okay.  In acknowledgments it says,

19   "Dr. Tarone was deposed in December of 2019 as an

20   unpaid fact witness in two January 2020 California

21   trials involving Roundup."  Do you see that?

22       A.   Yes.

23       Q.   "The purpose of the deposition was to

24   defend his published papers on the IARC glyphosate

25   classification."  Do you see that?

Robert Tarone, Ph.D.

```
 1          A.    I do.

 2          Q.    And then it says, "Dr. Tarone helped

 3     design the Agricultural Health Study and

 4     co-authored some early papers based on that

 5     study," correct?

 6          A.    Correct.

 7          Q.    So in nowhere do you mention that --

 8     that your company that you were consulting with

 9     was paid by Monsanto.

10          A.    Again, if I did, as I did in prior

11     studies, and I've done it in three or four, I

12     would consider that an acknowledgment, not a

13     conflict of interest.

14          Q.    Okay.  Well, you didn't include it in

15     the acknowledgement.

16          A.    Well, but it's in the -- it's in the

17     papers that are cited in the reference list.

18          Q.    You --

19          A.    I don't think you have to keep --

20          Q.    You have to -- you want your readers --

21     when I'm reading a paper and I want to know about

22     acknowledgments and conflicts of interest, I look

23     to the acknowledgment and conflicts of interest

24     section.  So you're telling me now that you expect

25     your readers to dig through all of your references
```

```
 1    and read those conflicts of interest?

 2         A.    It -- again, I do not consider it to be

 3    a conflict of interest for -- even for the

 4    original papers, but definitely not for this one.

 5         Q.    Okay.  But -- but you should have put

 6    it in the acknowledgment section, right?

 7               MR. BRENZA:  Object to form.

 8         A.    I don't know.  I guess I could have,

 9    but it's been in the previous publications.

10    That's the reason I didn't.  It wasn't any effort

11    to hide something.

12         Q.    Okay.  And then it says, "For conflict

13    of interest," right?  Do you see that?

14         A.    Yes.

15         Q.    "All authors declared no potential

16    conflicts of interest."

17         A.    Correct.

18         Q.    "No funding was sought or received for

19    the statistical analyses or for writing the

20    paper," right?

21         A.    Correct.

22         Q.    And so that means -- "All authors

23    declared no potential conflicts of interest."

24    That means that Dr. Kabat declared no conflict,

25    Dr. Price declared no conflict, and Dr. Tarone
```

**Exhibit F Page 279**

1    declared no conflict, right?

2        A.    Regarding this paper.

3        Q.    Regarding that paper, yep.

4              How well do you know Dr. Kabat?

5        A.    I just -- he's an email friend.

6        Q.    Okay.  So how did you meet him?

7        A.    Probably because of a common interest

8    in something he wrote a column about.  He, for

9    years, wrote columns on different scientific

10   matters for Forbes online.  And now he writes

11   primarily for the Genetic Literacy Project.  So it

12   was probably a column he wrote on Forbes.

13       Q.    And is Forbes considered a credible

14   news source?

15       A.    It's not -- I mean, it's better than

16   some.  I mean, it's -- it's a -- I haven't had a

17   problem with most of what they do.

18       Q.    Okay.

19       A.    And there's been some things they've

20   published that I disagree with.

21       Q.    So how -- how long have you known

22   Dr. Kabat roughly?

23       A.    That's a good question, when I first

24   met him.  Probably around 2018, I would guess.  I

25   don't know.

**Exhibit F Page 280**

Robert Tarone, Ph.D.

```
1           Q.    Okay.  So you met Dr. Kabat after you
2      got involved in the IARC 112 --
3           A.    Yes.
4           Q.    -- controversy.  Yes?
5           A.    Yes.
6           Q.    And is that how you met him, through
7      the IARC 112 controversy?
8           A.    No, I don't -- well, I can't -- I can't
9      tell you exactly which column, but I'm sure it
10     came about because of a column that he published
11     in Forbes.
12          Q.    Okay.  And have you ever met him in
13     person?
14          A.    I don't believe so.
15          Q.    Okay.  Are you aware of his ties to the
16     tobacco industry?
17          A.    Yeah.  Well, that's indirect --
18                MR. BRENZA:  Objection, relevance.
19          A.    He has no ties with the tobacco
20     industry.
21          Q.    He has what?
22          A.    He has no ties.  This was a paper that
23     he wrote with a -- I know about that because I at
24     one time was very interested in studies of
25     environmental tobacco smoke.  And he did a paper
```

**Exhibit F Page 281**

Robert Tarone, Ph.D.

```
1     with a UCLA professor, okay, where they analyze

2     environmental tobacco smoke and lung cancer in a

3     large cohort study.

4               And apparently, as I understand it, the

5     UCLA professor needed additional funding to finish

6     some analyses of the -- in the paper, and he did

7     get some money from some group affiliated with the

8     tobacco industry.  But nobody ever raised a

9     scientific objection.

10              And the paper was published in the

11    British Medical Journal, which is widely read, and

12    no one ever found anything wrong in their

13    analysis.

14       Q.    All right.  And is that a picture of

15    Dr. Kabat right there (indicating) on --

16       A.    It is.

17       Q.    Okay.  So this article was published

18    February 22nd, 2019.  Do you see that right above

19    his photo?

20       A.    Yes.

21       Q.    Okay.  And it's -- it's entitled,

22    'Forbes Retracts Attack on Paper Showing Link

23    between Glyphosate and Cancer'.  Do you see that?

24       A.    Yes.

25       Q.    All right.
```

Robert Tarone, Ph.D.

```
 1          A.      That was not a Kabat column.

 2          Q.      Okay.  Well, let's read the article.

 3      It says, "Tobacco industry-linked author failed to

 4      disclose Monsanto connections."  Do you see that?

 5      Right -- I'm on the first page still, right

 6      underneath his photo.

 7          A.      This is from GMWatch.

 8          Q.      Okay.

 9          A.      They're anti-pesticide, anti-GMO.  I

10      know of no connection between Monsanto --

11          Q.      Okay.

12          A.      -- and Kabat.

13          Q.      Okay.

14          MR. BRENZA:  And this is utterly

15          irrelevant.  This is not even about

16          Dr. Tarone.  It's about somebody else and it

17          has nothing to do with glyphosate.

18      BY MS. WAGSTAFF:

19          Q.      Okay.  So do you see where it says

20      underneath his photo -- let's -- you can -- you

21      can read it if you'd like.

22          A.      That's all right.  I can read what you

23      want me --

24          Q.      I'm going to walk you through it.  But,

25      Dr. Tarone, if you need to take time to read it,
```

**Exhibit F Page 283**

Robert Tarone, Ph.D.

```
 1    please do it.  I'm not --

 2        A.    No, that's all right.

 3        Q.    Okay.  Well, if we're -- if I'm going

 4    to ask you questions, I want you to be looking at

 5    the page I'm looking at, so --

 6        A.    You got me.

 7        Q.    -- you can read it or walk -- I can ask

 8    my questions.  Which would you prefer?

 9        A.    That's fine.  Go ahead.

10        Q.    Okay.  So do you see underneath the

11    photo it says, "Tobacco industry-linked author

12    failed to disclose Monsanto connections"?

13        A.    I see that.

14        Q.    Okay.

15              MR. BRENZA:  Objection.  Move to

16        strike.

17        A.    But I don't know that it's true,

18    especially from this source.

19        Q.    Okay.  And then do you see how it says:

20    Forbes has pulled an article by Geoffrey Kabat

21    attacking the new meta-analysis confirming a link

22    between glyphosate and a type of cancer called NH

23    -- called non-Hodgkin's lymphoma?

24        A.    Yes.

25        Q.    Do you see that?
```

Robert Tarone, Ph.D.

```
 1          A.    Yes.

 2          Q.    "The American business magazine, most

 3    famous for its Forbes 400 rich list, has long been

 4    the platform of choice for defending Monsanto's

 5    products and attacking the company's critics."  Do

 6    you see that?

 7          A.    Yes.

 8                MR. BRENZA:  Objection, hearsay.

 9          Q.    And then it talks about -- the article

10    goes on to talk about how Forbes was -- had

11    article after article attacking Dr. Séralini's

12    study.  Do you see that?

13                MR. BRENZA:  Objection --

14          A.    I see that.

15                MR. BRENZA:  -- relevance, hearsay.

16          Q.    All right.  And then if you go down to

17    where it says, "Conflicted out, Monsanto and big

18    tobacco," do you see that?

19          A.    Yes.

20          Q.    It says, "But Geoffrey Kabat, a retired

21    cancer epidemiologist, claims to be different.  A

22    disclosure at the bottom of his attack on the new

23    meta-analysis told Forbes readers, quote, I have

24    no financial involvement with Monsanto, Bayer or

25    any other conflict of interest relating to this
```

**Exhibit F Page 285**

Robert Tarone, Ph.D.

```
1    topic."

2         A.    Yes.

3         Q.    Similar to the -- similar to the

4    conflict of interest he put in your paper, right?

5         A.    Right.

6               MR. BRENZA:  Objection, relevance.

7         Q.    Okay.

8               MR. BRENZA:  Hearsay.

9         Q.    It says, "However, that isn't true.

10   Kabat is on the board of advisers of the American

11   Council on Science and Health, ACHS."  Do you see

12   that?

13        A.    Yes.

14        Q.    "A corporate front group funded my

15   Monsanto."

16              MR. BRENZA:  Hearsay, relevance.

17        Q.    Do you see that?

18        A.    Yeah.  I'm aware of ACHS.  I don't know

19   that I'd call it a corporate front group.

20        Q.    Funded by Monsanto.

21        A.    Not funded entirely.  They -- I don't

22   know.  I -- if --

23              MR. BRENZA:  Hearsay, relevance.

24        A.    I'm not even sure if it's true.  But if

25   it is, it means Monsanto gives them some money.
```

**Exhibit F Page 286**

Robert Tarone, Ph.D.

```
 1              Q.    Okay.  Which --

 2              A.    But it's not --

 3              Q.    -- should be disclosed.

 4              A.    I'm sure it's not primarily --

 5                    THE COURT REPORTER:  One at a time,

 6         please.

 7              A.    I have no idea to what extent Monsanto

 8         funds it.

 9              Q.    And he is also a board member of the

10         Genetic Lit -- Literacy Project.

11              A.    Literacy Project.

12              Q.    Which is --

13              A.    That's where he still writes.

14              Q.    Which is what you were talking about is

15         where he mainly writes now.

16              A.    Yes, now.

17              Q.    And that was named in a court filing as

18         receiving funds from Monsanto, right?

19                    MR. BRENZA:  Relevance.

20              A.    That's what it says.  I don't know that

21         it's true, but...

22              Q.    So if that were true --

23                    MR. BRENZA:  Hearsay.

24              Q.    If either of those were true, shouldn't

25         that have been disclosed in your conflict of
```

```
 1    interest?

 2              MR. BRENZA:  Relevance.

 3       A.    It's indirect so I'm not sure.  I mean,

 4    the fact that he's on a board of directors.  I

 5    mean, he wasn't getting paid to be on the board of

 6    directors, so I don't know.

 7       Q.    All right.  If you go --

 8       A.    I really don't know that it has to be

 9    -- first of all, I don't know that it's true.  And

10    I don't know that that would require saying he has

11    a conflict of interest because he's not received

12    any funding.

13       Q.    You don't know that, though.  You're

14    just speculating, right?  You don't know if

15    Dr. Kabat has received money from Monsanto.

16       A.    He said that he hasn't.  He's told me

17    he hasn't.

18       Q.    All right.  And then, you know, you

19    just I think testified that he -- he doesn't have

20    ties to tobacco, but this next paragraph says, "A

21    search for Kabat in the tobacco industry documents

22    archive brings up more than 800 hits."

23              MR. BRENZA:  Relevance, hearsay, move

24         to strike.

25       A.    Probably a lot of them come from
```

Robert Tarone, Ph.D.

```
1    GMWatch.  There's no question that
2    environmentalists hated that paper.
3         Q.    Well, the paper you're talking about on
4    the next page when it says, "Perhaps most
5    notorious is Kabat's publication of a paper
6    concluding that secondhand tobacco smoke does not
7    have a causal relation with increased mortality
8    from lung cancer"?
9         A.    That's exactly --
10             MR. BRENZA:  Relevance, hearsay.
11        A.    -- the paper I'm talking about.  It was
12   published in the British Medical Journal, a highly
13   respected journal, peer-reviewed.  And nothing in
14   it in terms of the way they analyzed the data has
15   been refuted.
16        Q.    And, in fact, a judge it says used that
17   article in a United States racketeering lawsuit --
18   his article claiming that secondhand smoke had no
19   causal relationship to lung cancer was cited by a
20   judge as a prime example of how tobacco companies
21   engaged in criminal racketeering and fraud to hide
22   the dangers of tobacco smoke.  And Kabat's paper
23   also led to calls for better disclosure of
24   conflicts of interest, right?
25             MR. BRENZA:  Relevance, hearsay, move
```

**Exhibit F Page 289**

Robert Tarone, Ph.D.

```
 1          to strike.

 2     Q.    Is that what it says?

 3     A.    That's his opinion.

 4     Q.    All right.

 5     A.    I know the paper.  And I know that the

 6   paper -- nothing was found incorrect in the paper.

 7   The fact that one study shows something that

 8   people don't like, gives them ground to attack

 9   him, and especially GMWatch.  I don't trust

10   anything in GMWatch.

11     Q.    All right.  And then if you turn to the

12   next page it talks about smearing the WHO's cancer

13   agency.  And it says, "Kabat is equally dishonest

14   about the World Health Organization's cancer

15   agency, IARC --

16          MR. BRENZA:  Move to strike, relevance

17          and hearsay.

18     Q.    -- which concluded that glyphosate is a

19   probable carcinogen."  Do you see that?

20          MR. BRENZA:  Hearsay.

21     A.    Yes.

22          MR. BRENZA:  Move to strike.

23     Q.    According to Kabat --

24          THE COURT REPORTER:  Excuse me.  Which

25          concluded that glyphosate was what?
```

**Exhibit F Page 290**

```
 1                 THE WITNESS:  Is a probable carcinogen.

 2                 THE COURT REPORTER:  The question,

 3         which concluded that glyphosate --

 4                 MS. WAGSTAFF:  Glyphosate is a probable

 5         carcinogen.

 6                 MR. BRENZA:  Hearsay, move to strike.

 7                 THE COURT REPORTER:  Your answer?

 8    BY MS. WAGSTAFF:

 9         Q.    Did you see that?

10         A.    Yes.

11         Q.    Okay.  He writes:  "Of the more than

12    500 agents that have been classified by IARC with

13    respect to carcinogenicity, only one was judged by

14    the agent to be probably not carcinogenic."

15         A.    That's a statement of fact.  Although

16    they now have done away with that category.

17         Q.    But again, this is seriously misleading

18    it states.

19         A.    Why is it misleading?

20         Q.    It says that "IARC has directly

21    rebutted the suggestion it concludes just about

22    everything causes cancer.  It points out that it

23    only evaluates substances where there are already

24    grounds for suspecting that they cause cancer."

25         A.    Right.
```

Robert Tarone, Ph.D.

```
 1                    MR. BRENZA:  Hearsay.

 2          Q.    Do you see that?

 3          A.    Yes.

 4                    MR. BRENZA:  Move to strike, relevance.

 5          A.    This argument has been going on for

 6    years.

 7                    MR. BRENZA:  And I'm going to move to

 8          strike every question that has to do with

 9          this --

10                    MS. WAGSTAFF:  You can have a standing

11          objection --

12                    MR. BRENZA:  Yeah.

13                    MS. WAGSTAFF:  -- to this document.

14          That's fine with me.

15                    MR. BRENZA:  It's unreliable source and

16          it's not proper questioning.

17                    MS. WAGSTAFF:  That's the most activity

18          I've gotten from you all day, though.

19                    MR. BRENZA:  I'll try not to take that

20          personally.

21                    THE COURT REPORTER:  Are we at a good

22          breaking point?

23                    MS. WAGSTAFF:  Sure.  Just to take a

24          little break?  Sure.

25                    THE VIDEOGRAPHER:  Okay.  Going off the
```

**Exhibit F Page 292**

Robert Tarone, Ph.D.

```
 1           record.  The time is 4:32.

 2                   (Thereupon, a break was taken.

 3                   THE VIDEOGRAPHER:  Going on the record.

 4           The time is 4:44.

 5      BY MS. WAGSTAFF:

 6           Q.    All right.  Dr. Tarone, I just have a

 7      few more questions for you.

 8                   I've handed you a letter.  It looks

 9      like to the editor of Significance magazine.

10           A.    Correct.

11           Q.    All right.  And this -- if you will

12      look down this was printed in February of 2021,

13      right?

14           A.    Uh-huh (affirmative).  Yes.

15           Q.    And it is a letter -- or it's actually

16      a -- this is not written by Professor Sheppard

17      from the University of Washington but the article

18      includes her comments, right?

19           A.    The -- the letter, the first letter,

20      "We received the following response from professor

21      Lianne Sheppard."

22           Q.    Yeah?

23           A.    So the first part of that is from

24      Sheppard.

25           Q.    Right.
```

1        A.    And then Geoffrey Kabat's response

2    starts near the -- a little bit below the middle

3    of the third column.

4        Q.    Right.  So it says bias and meta -- the

5    article is called Bias Meta-analysis and Exchange.

6        A.    Correct.

7        Q.    And it says -- starts by saying:

8    In June 2020 Significance published an article by

9    Geoffrey Kabat -- The same Geoffrey Kabat we've

10   been talking about?

11       A.    Yes.

12       Q.    -- titled the two faces of

13   meta-analyses.  We received the following response

14   -- edited response from professor Lianne Sheppard

15   of the University of Washington a co-author of a

16   study cited by Kabat in his article.  Do you see

17   that?

18       A.    Yes.  I guess that means the editor of

19   the journal somehow edited her response.  I don't

20   know.  That seems -- I've never seen that kind of

21   strange consistency.

22       Q.    Well, if you look over on the right it

23   says, "Kabat's response is also edited."

24       A.    No.  I mean, I'm surprised but editors

25   do sometimes --

Robert Tarone, Ph.D.

```
 1              MR. BRENZA:  This is -- this hearsay

 2         within hearsay.

 3         A.    It's actually good.  At least they

 4    indicated that they edited it, so that's fine.

 5         Q.    All right.  And it starts off by

 6    saying this is -- this is Professor Sheppard's

 7    article.  It says, "Geoffrey Kabat's article

 8    displays deplorable bias in its attempt to

 9    discredit our meta-analysis of observational

10    studies of the effect of the herbicide

11    glyphosate on non-Hodgkin's lymphoma."  Do you

12    see that?

13         A.    Uh-huh (affirmative).

14              MR. BRENZA:  Relevance, hearsay.

15         Q.    Then it talks about sort of what --

16    what Monsanto's lawyer was asking you earlier

17    about different -- different -- about how they

18    focused on the highest exposure groups, right?

19         A.    Right.

20         Q.    Okay.  And if you -- you look a little

21    ways down, still in the left-hand column with the

22    sentence that says, "We focused," do you see that?

23         A.    Yes.

24         Q.    "We focused on this hypothesis because

25    NHL development suggests that workers with higher
```

Robert Tarone, Ph.D.

1    exposures including longer exposure duration,

2    higher intensity and longer latency will show

3    increased cancer risk if indeed glyphosate causes

4    NHL."  Do you see that?

5         A.    I see that.

6         Q.    And you testified earlier that that was

7    appropriate.

8         A.    That was what?

9         Q.    Appropriate.

10        A.    I said at least a -- I said when I

11   first read it, I thought they had just clearly

12   gone through and picked the highest estimate.  But

13   after reading their, methods they had a rationale.

14        Q.    It was appropriate rationale.

15        A.    Well, it's a rationale.

16        Q.    Okay.

17        A.    We -- we -- whether it's appropriate or

18   not is why we wrote the Cancer Causes and Control

19   paper.  We wanted to investigate what evidence is

20   there for their assumption.

21        Q.    Okay.  And then it says, "The only

22   attention to our scholarship in Kabat's article

23   was to contrast it with the US Environmental

24   Protection Agency's most recent meta-analysis

25   finding which addressed a different scientific

**Exhibit F Page 296**

Robert Tarone, Ph.D.

1    question.  Namely, whether there is an increased

2    risk among ever exposed workers, a group which

3    would include many whose exposure would be too

4    small to induce risks no matter what the true

5    effect of glyphosate."

6              And that was the information that you

7    could not get from the AHS, the "ever exposed"

8    right?

9         A.    Yes, I did not get --

10        Q.    All right.

11        A.    We had to estimate that just as the EPA

12   had to estimate it.

13        Q.    Well, it doesn't say there that the EPA

14   had to estimate it.

15        A.    But they did.  If you read the EPA's,

16   you can see that they estimated it -- they wanted

17   ever exposure.  So they took -- what the paper

18   from the Agricultural Study did do was report the

19   unexposed group and then four levels of exposure.

20   They reported relative risks.  Those relative

21   risks were relatively similar.

22              What the EPA did is they did a weighted

23   average of those to estimate ever exposure, which

24   is -- you know, it's reasonable.  But they

25   underestimated the variance, which gave -- gave

Robert Tarone, Ph.D.

```
 1    the estimate -- they assumed those were

 2    independent, but they are not statistically

 3    independent because they all depend on the value

 4    of the unexposed group.

 5         Q.    Okay.

 6         A.    Okay?  But they did have to estimate

 7    it.

 8         Q.    And then it says in the middle column,

 9    the first -- the big block paragraph, "Sheppard

10    follows this up by pointing to a March 2019 report

11    published by a website called US Right to Know

12    which refers to Kabat's involvement with two

13    groups.  The science literacy project the, the

14    parent group of the genetic literacy project and

15    the American Council on Science and Health."

16    Those are the two groups we just talked about --

17         A.    Exactly.

18         Q.    -- right?

19         A.    And US Right to Know like GMWatch is

20    very anti-pesticide, anti-GMO they are very

21    biased.

22         Q.    Okay.  Well --

23         A.    This is their opinion.

24               MR. BRENZA:  Objection, hearsay.

25         Q.    It goes on to -- to cite a document.
```

Robert Tarone, Ph.D.

```
 1     It says one cited document if kind of -- I'll show

 2     you my page.  I'm like right there in the the

 3     middle column.

 4          A.    One cited document.

 5          Q.    One cited document dated February 2015

 6     mentions -- and this is talking about documents --

 7     if you go up a paragraph, it says, "Documents that

 8     were released as part of a litigation, the

 9     litigation that you've injected yourself in,

10     concerning the weed killer Roundup."

11               It says:  One cited document dated

12     February 2015 mentions the genetic literacy

13     project as one of the number of industry partners

14     Monsanto planned to engage as part of it's PR

15     effort to -- to -- public relations' effort to

16     protect the reputation of Roundup by communicating

17     the safety of glyphosate.  Do you see that?

18          A.    I see it.

19               MR. BRENZA:  Relevance and hearsay,

20          move to strike.

21          Q.    All right.

22          A.    I have no idea if it's true, especially

23     from that source.

24          Q.    Another cited document also dated

25     February 2015, and that's also before the
```

**Exhibit F Page 299**

Robert Tarone, Ph.D.

1    monograph came out, right?

2         A.    February 2015 was before the working

3    group.  The working group met in March of 2015.

4         Q.    Right.  "Another cited document also

5    dated February 2015 contains the text of an email

6    exchange between ACSH and Monsanto personnel in

7    which glyphosate is discussed as is a request,

8    quote, to secure Monsanto's renewed and continued

9    funding of ACSH's ongoing work to provide a

10   rational voice of scientific reason to the

11   public."  Do you see that?

12        A.    I do.

13              MR. BRENZA:  Same objections.

14        Q.    All right.  So if those were true, if

15   those documents -- if what she's writing is true,

16   does it seem like Monsanto is -- is -- has an

17   industry tie to both the GLP and to ACSH?

18        A.    I don't know about the Genetic Literacy

19   Project, but if that latter thing is true, that

20   would show that there's a Monsanto AC -- that's

21   sort of saying we won't fund you unless you do

22   what we want.  That's definitely not good.

23        Q.    Okay.

24        A.    I don't know if it's true but if it

25   happens, that's definitely not good.

Robert Tarone, Ph.D.

1          Q.    Okay.  And then the last thing I just

2    want to point to is if you you'll turn to

3    Exhibit 58 which is this big document that

4    Mr. Brenza gave you.

5          A.    Oh, it's all of the tumor rates.

6          Q.    No, no.

7          A.    No.

8          Q.    It's the 2020 --

9          A.    Oh, okay.  The advisory panel.

10               MR. BRENZA:  The advisory panel.

11         Q.    Yeah.

12         A.    Yep.  I got it.

13         Q.    And so this came out -- and I think you

14   testified that this was done in '19?

15         A.    I think it was March of 2019, but I'm

16   not sure about the actual month.  But, yeah, it

17   happens every -- the previous one was in 2014.

18   That was the one that recommended glyphosate, so

19   it's every five years, so this occurred in 2019.

20         Q.    Okay.  So, regardless, it had to have

21   occurred before 2020?

22         A.    Yes.

23         Q.    Okay.

24         A.    Yeah.

25         Q.    Since it was recommending 2020 reviews?

Robert Tarone, Ph.D.

```
 1          A.     Exactly.

 2          Q.     Okay.  And so at that point when this

 3     came out, the only articles that you had published

 4     were your editorial and your opinion piece?

 5          A.     The two most relevant papers on the

 6     subject.

 7          Q.     An editorial and an opinion piece,

 8     right?

 9          A.     Yes.

10          Q.     Okay.

11          A.     But they have factual --

12          Q.     Okay.

13          A.     -- information.  They're not -- just

14     because they are labeled "editorial and opinion

15     piece" does not mean that the facts I state in

16     there are incorrect, and none have been refuted or

17     disputed.

18          Q.     Okay.  But they are -- another fact

19     that you can't refute or dispute is that this is

20     an editorial, and this is an opinion piece.  It's

21     got many facts.

22          A.     Yeah, that contain many facts.

23                 MR. BRENZA:  Opinion paper, by the way.

24                 THE COURT REPORTER:  Excuse me what is

25          your objection?
```

**Exhibit F Page 302**

```
 1              MR. BRENZA:  It's an opinion paper.

 2     BY MS. WAGSTAFF:

 3          Q.    Okay.  An opinion paper and an

 4     editorial.  I understand they contain facts as you

 5     wrote them, as you believe them to be, but --

 6          A.    As are true and as have been confirmed

 7     by others.

 8          Q.    Okay.  But another fact that you have

 9     to admit, sir, is that this is an opinion paper --

10          A.    Yes.

11          Q.    -- and this is an editorial.

12          A.    And that doesn't lessen the importance.

13          Q.    Okay.  Listen to my question.  You have

14     to admit this is an opinion paper --

15          A.    Yes.

16          Q.    -- and this is an editorial.  And so if

17     you look at the back, are there any other -- are

18     there any editorials or opinion papers listed in

19     here?

20          A.    I would not know because it's such a

21     long list.

22          Q.    Okay.  Would you be surprised to know

23     that there are not?

24          A.    I -- I don't know.

25          Q.    So could that be a reason why IARC
```

Robert Tarone, Ph.D.

```
 1    didn't include your papers, your opinion paper and

 2    your editorial in their --

 3         A.    If you're true -- if you're right,

 4    it may be, but it doesn't change the fact that

 5    they should deal with the facts in these two

 6    papers.

 7         Q.    Okay.  But you and Mr. Brenza were

 8    spending time wondering --

 9              MS. WAGSTAFF:  Are you okay?

10              THE WITNESS:  There's a bug.

11              MS. WAGSTAFF:  Oh, I thought you just

12         had like a small seizure or something.

13              THE WITNESS:  No.

14                   (Laughter.)

15    BY MS. WAGSTAFF:

16         Q.    So you and Mr. Brenza were -- were

17    discussing why your papers weren't included in --

18    in the bibliography of -- of this, and that could

19    be a reason, right?

20         A.    Right.

21         Q.    Okay.

22              MS. WAGSTAFF:  No further questions.

23         Do you want to switch?

24              MR. BRENZA:  Yeah.  Let's go off the

25         record.
```

**Exhibit F Page 304**

Robert Tarone, Ph.D.

```
 1              THE VIDEOGRAPHER:  Going off the
 2        record.  The time is 4:55.
 3              (Thereupon, a break was taken.)
 4              THE VIDEOGRAPHER:  Going on the record.
 5        The time is 4:58.
 6              MS. WAGSTAFF:  So I pass the witness
 7        but I forgot to mark a few exhibits so I just
 8        wanted to -- the WHO document that we talked
 9        about that related to announcing glyphosate
10        being on the monograph and the closing date
11        for expert applications is Exhibit 60.
12              The article about the retraction of
13        Dr. Kabat's article in Forbes is 61, and the
14        letter that we just discussed in Significance
15        magazine, the letter about -- with Professor
16        Sheppard's criticism of Kabat's article is
17        Exhibit 62.
18        (PLAINTIFFS' EXHIBITS 60, 61 & 62 WERE MARKED.)
19                    RECROSS EXAMINATION
20        BY MR. BRENZA:
21        Q.    Dr. Tarone, just a few -- a few small
22        things to clear up and then I think we'll be done,
23        or very close.
24              I want you to direct your attention to
25        Exhibit 56.  This is the Crump article that you
```

**Exhibit F Page 305**

Robert Tarone, Ph.D.

```
 1     were asked a few questions about.

 2           A.    Okay.  Luckily it's near the top.

 3     Okay.

 4           Q.    Yeah.  And what I want to do -- so

 5     there's a number of authors, right?  There's --

 6           A.    Yes.

 7           Q.    -- one, two, three, four, five authors.

 8     Kenny Crump is just the first one, and then you

 9     were asked some questions about the disclosure,

10     the declaration and conflict of interest.  And --

11     and the question that came up was about

12     Dr. Haseman and that he worked on something called

13     the SAP for a year for Monsanto.

14           A.    Correct.

15           Q.    And he disclosed that, right?

16           A.    Yes.

17           Q.    Not a secret?

18           A.    That's the first time I heard about

19     it.

20           Q.    And -- and when somebody represents --

21     presents for a company at an SAP, it's known that

22     they are representing --

23           A.    Well, it's a public presentation.

24           Q.    Yeah, and it's known who they

25     represent.
```

**Exhibit F Page 306**

Robert Tarone, Ph.D.

```
 1          A.    Yes.

 2          Q.    And then it says -- and this was the

 3    part that counsel didn't read.  He has received --

 4    "He had no contact with or received any

 5    compensation, advice or data from Monsanto related

 6    to this paper."

 7          A.    Correct.

 8          Q.    Any reason to think that's not

 9    completely true?

10          A.    No.  I mean, I don't -- I don't know.

11    But, no, if he stated that then I assume it's

12    true.

13          Q.    Okay.  And -- and that's just

14    Mr. Haseman.  You know that the other members of

15    this -- if the declaration of conflict of interest

16    is correct, they -- they didn't have any conflicts

17    with Monsanto?

18          A.    Correct.

19          Q.    And -- and Mr. Crump goes back a long

20    way with -- with --

21          A.    He does.

22          Q.    -- the Government and the National

23    Institute of Health, right?

24          A.    Yeah, I'm not sure who he worked for in

25    the past.  I just know that we were working on
```

**Exhibit F Page 307**

Robert Tarone, Ph.D.

```
1     very similar topics.

2          Q.    Okay.  Okay.  But you knew he published

3     in your area --

4          A.    Oh, yeah, absolutely.

5          Q.    -- and was an expert in the field.

6          A.    Right.

7          Q.    And there's nothing about him, or any

8     of the other authors, even having an interaction

9     with Monsanto in the past.

10         A.    No.  And they're -- one is -- one is

11    associated with the Yale School of Public Health

12    and another the Department of Medicine at Mount

13    Sinai.  I mean, these are --

14         Q.    Okay.

15         A.    These are well-respected people.

16         Q.    You were asked a number of questions

17    about an article that appeared in GMWatch.

18         A.    Right.

19         Q.    What do you know about GMWatch?

20         A.    It's anti-pesticide, anti-GMO.

21         Q.    So it's an advocacy group?

22         A.    Yes, very much so.

23         Q.    And did you think it was strange that

24    you were asked questions about what GMWatch said

25    rather than any sort of scientific articles or
```

**Exhibit F Page 308**

Robert Tarone, Ph.D.

1    anything that would actually have any relevance to

2    the opinions you expressed today?

3         A.    I don't know about strange.  I sort of

4    expected it, but what can I say.  I -- I don't

5    ever go there to read something if I want to have

6    facts.  I'm actually surprised that they haven't

7    written something like that about me.

8         Q.    Well, you never know.

9         A.    Yeah.  Well, I think they would have

10   found it if they had.

11        Q.    The next article you were asked about

12   was something that appeared in a magazine called

13   Significance.

14        A.    Yes.

15        Q.    Do you -- what do you know about

16   that?

17        A.    It's -- it's -- it's not a widely read

18   journal, but I think it's -- I think it's a good

19   journal.

20        Q.    All right.  The but they're reporting

21   on a web -- a website from US Right to Know,

22   right?

23        A.    Yes, which is like GMWatch.

24        Q.    Okay.  It's also an advocacy group?

25        A.    Very much so.

```
1          Q.    And, again, this is not a -- Exhibit 62

2    doesn't have any scientific analysis in it at all,

3    right?

4          A.    No.

5          Q.    It's basically just ad hominem attacks?

6          A.    Yes.

7                THE COURT REPORTER:  I'm sorry, a what?

8                MR. BRENZA:  Ad hominem attacks.  It's

9          Latin.

10         A.    And US Right to Know writers have

11   written stuff about me.

12         Q.    And -- but -- but -- but they are also

13   -- they have a point of view?

14         A.    Yes, absolutely.

15         Q.    Okay.

16         A.    In fact, Carey Gillam who has written

17   some of the things about me is -- is mentioned at

18   the end of the GMWatch article.

19         Q.    Okay.  Do you consider, you know,

20   reports about GMWatch's website to be an accurate

21   or reliable source of facts?

22         A.    I have -- I have no idea.  I tend not

23   to trust them because of their point of view, but

24   I can't actually attest to the accuracy or

25   inaccuracy.
```

Robert Tarone, Ph.D.

1           Q.    Okay.  I now want to ask you just a few

2      more questions about the -- the COPE

3      investigation.

4           A.    Okay.

5           Q.    If you'll pull out the document I

6      marked as 57.

7           A.    Which is that?

8           Q.    57?

9           A.    What is it though?  Describe it.

10          Q.    It's your email with -- with Jaak

11     Janssens.

12          A.    Oh, it's the long email.

13          Q.    I believe he's the editor of the --

14          A.    Okay.

15          Q.    -- European journal.

16          A.    Yes, I guess that's Jaak Janssens.

17          Q.    Jaak?  Is that how it's pronounced?

18     Okay.  Very well.

19          A.    I don't know.  I've never -- I've never

20     actually talked to him.

21          Q.    That's possible.

22               So anyway, I wanted to just cover --

23     because I think there was some discussion about

24     whether there was any disagreement between you and

25     the -- and the person who is asserting that there

```
 1     should be some additional conflict of interest.

 2              And -- and just to be clear, the work

 3     you had done for Monsanto was disclosed in the

 4     beginning of your draft, right?

 5        A.    Yeah, the first paper they got.  And

 6     actually they took out -- after I had the

 7     acknowledgment --

 8        Q.    Yeah.

 9        A.    -- I said -- I said that no money was

10     received for writing this paper.  And they

11     actually removed that.  I think because they

12     considered a statement, which is like a

13     boilerplate statement, the author has no conflict

14     of interest.  They considered that to cover what I

15     had written just saying no money was received for

16     this.

17        Q.    Okay.

18        A.    So my acknowledgment actually contained

19     more detail than what was actually published.

20        Q.    And -- and your acknowledgment -- so it

21     was really a dispute about whether something that

22     you already had in the acknowledgment should be

23     moved to a place in the article that said conflict

24     of interest.

25        A.    That's right.
```

```
 1           Q.    It wasn't a question about whether you
 2     had had adequately disclosed anything.
 3           A.    No, the disclosure was not an issue.
 4     It was how it should be labeled.
 5           Q.    I just want read what Dr. Janssens or
 6     Jaak Janssens -- I don't know if he's a doctor,
 7     but --
 8           A.    Yeah, he's a doctor.
 9           Q.    -- he's the editor of the journal.
10           A.    A real doctor.
11           Q.    Right, I assume he is.
12                 He's -- do you see at the bottom,
13     beginning at the bottom of the first page he
14     responds back to Ms. Puebla?
15           A.    Yes.  She -- she was like the executive
16     secretary of this committee, COPE.
17           Q.    And Ms. Puebla is, you know,
18     transmitting the challenges that Dr. Loomis
19     made --
20           A.    Exactly.
21           Q.    -- about that you were -- you were in
22     Monsanto's pocket basically and she wants you
23     to -- wants Dr. Janssens to investigate that?
24           A.    Correct.
25           Q.    And Dr. Janssens writes back and
```

Robert Tarone, Ph.D.

```
1    says, "First, I'd like you to know that this
2    discussion is now going on for almost year
3    without any scientific argument to reconsider
4    publication."  Do you see that?
5         A.    Yes.
6         Q.    Was that -- was that a true statement
7    as far as you know?
8         A.    I think it's very true.
9         Q.    So -- so it went on for a year
10   without -- without ever even attempting to
11   challenge the truth of what you had stated
12   factually?
13        A.    And without me even knowing it was
14   going on.
15              In fact, I probably overstepped
16   when I actually sent COPE an email.  I said,
17   look, you're investigating me.  You haven't
18   asked me for my opinion, and then I told them
19   exactly what was involved in the meeting with
20   the lawyer and the fact that I was not paid for
21   anything.
22        Q.    And what did they say?
23        A.    They didn't respond.
24        Q.    Okay.
25        A.    They probably -- I probably wasn't
```

**Exhibit F Page 314**

1      suppose to do that.

2          Q.    It seemed like they weren't

3      interested --

4          A.    I think it's supposed to -- I think

5      it's supposed to --

6              THE COURT REPORTER:  Excuse me, one at

7          a time.

8          A.    I think it's supposed to be between

9      this committee and the editor.

10         Q.    Yeah.  All right.  Well, then if

11     you turn to the second page, and there Jaak

12     answers her questions more specifically.  Do

13     you see that?

14         A.    Right.

15         Q.    In 1 he says, "We changed the conflict

16     of interest statements of Dr. Tarone now in the

17     right location in the paper."

18         A.    Correct.

19         Q.    That just means he moved your

20     statement.

21         A.    It does, yes.

22         Q.    He didn't change it really.  He just

23     moved it.

24         A.    Exactly.

25         Q.    And then critically with respect to the

```
 1    science, he says, "We did not change the wordings.

 2    Although Dr. Tarone provided more insight for the

 3    absence of a conflict of interest to the editorial

 4    staff," right?  That's not the part --

 5         A.    Correct.

 6         Q.    That's not the part about the science.

 7               But then it goes onto say under 2, the

 8    second sentence, "Dr. Tarone stated clearly 'no

 9    payment was received for writing the paper'."  Do

10    you see that?

11         A.    I do.

12         Q.    And that's something you -- is that a

13    true statement?

14         A.    It is true and it was on -- that

15    statement was on my original submission.

16         Q.    And -- and nothing about your science

17    was -- was ever questioned?

18         A.    He's true.

19         Q.    They were just questioning you?

20         A.    Exactly.

21               MR. BRENZA:  I'll pass.

22               MS. WAGSTAFF:  I don't have any further

23         questions.

24               THE VIDEOGRAPHER:  Okay.  If that's

25         everything then that concludes today's
```

Robert Tarone, Ph.D.

```
1        deposition, and we'll go off the record.  The

2        time is 5:08.

3

4

5                 (Thereupon, the deposition

6                  concluded at 5:08 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Exhibit F Page 317**

Robert Tarone, Ph.D.

1             I, JANINE N. LEROUX, Court Reporter and

2       Notary Public, certify that the facts stated in

3       the caption hereto are true.

4             I further certify that after the witness

5       was duly sworn he was examined by counsel for the

6       parties; and that said testimony was taken in

7       stenotype and later reduced to computer-aided

8       transcription; and that the foregoing is a true

9       record of the testimony given by said witness.

10            The foregoing deposition has been

11      submitted to the witness for reading and signing.

12

13

14

15          ELECTRONICALLY SIGNED: Janine Leroux

16

17          ELECTRONICALLY SIGNED: Sherry L. Brooks

18

19

20

21

22

23

24

25

**Exhibit F Page 318**

Robert Tarone, Ph.D.

```
1        I, _____, state that I have

2    read the foregoing deposition and that it is a

3    true and complete transcript of the testimony

4    given by me on March 16, 2023 together with

5    corrections, if any, on the attached errata

6    sheet.

7

8        _____

9        Robert Tarone, Ph.D.

10

11   STATE OF _____

12   COUNTY OF _____

13

14

15   Signed before me on this the _____ day of

16   _____, 2023

17   My commission expires:

18

19   _____

20   NOTARY PUBLIC

21

22

23

24

25
```

Robert Tarone, Ph.D.

```
 1                      ERRATA SHEET

 2              WITNESS:  DR. ROBERT TARONE

 3

 4       Page/Line                          Correction

 5       _____

 6       _____

 7       _____

 8       _____

 9       _____

10       _____

11       _____

12       _____

13       _____

14       _____

15       _____

16       _____

17       _____

18       _____

19       _____

20       _____

21       _____

22       _____

23       _____

24

25
```

**Exhibit F Page 320**