# EXHIBIT 2

**Expert Report of William G. Johnson, Ph.D., M.S.**
**Professor and Extension Weed Scientist**
**Department of Botany and Plant Pathology**
**Purdue University**

## I. Background

I am currently a Professor of Weed Science in the Department of Botany and Plant Pathology at Purdue University. My primary responsibility is to lead a weed science research and extension education effort in agronomic crops by maintaining and enhancing the close working relationships between the University and farmers, extension educators and the crop protection industry. My research and extension program objectives are the following:

> Develop weed management systems that are safe, economically and environmentally sound, integrate cultural practices with judicious herbicide use, improve efficiency of production, and minimize selection pressure for herbicide-resistant weeds.

> Promote grower acceptance of these weed management systems through education efforts targeting growers, crop consultants, input suppliers, industry representatives and extension educators in Indiana and surrounding states.

The major agronomic crops produced in Indiana that I have expertise in weed management include corn, soybean, small grains, forages, and pastures. These crops account for billions of dollars per year of the total Indiana farm receipts and tens of millions of dollars per year in weed management expenditures. I am a member of a number of advisory boards, including an appointment by the Governor to the Indiana Pesticide Review Board.

In addition to my research and extension responsibilities, I teach two on-campus courses, Botany 490, Botany Seminar, and Botany 505, Advanced Weed Science. Botany 490 is a course designed to improve students' ability to communicate science to the general public and develop professional skills such as resume development and interviewing. Botany 505 is a study of the biological characteristics of weeds and their impact on crop yields and other human activities. In addition to my formal responsibility for these courses, I have guest lectured in a number of other courses on various methods (chemical and non-chemical) of weed control for agronomic crops, proper herbicide use, herbicide resistance, and interactions between weeds and other plant pests.

In addition to faculty responsibilities, I have served in a number of administrative roles during my career as well. I served as the Extension Coordinator for the Department of Botany and Plant Pathology from 2006 until 2013 and as the Chair of the Graduate Studies Committee for the Botany and Plant Pathology Department from 2013 until 2019.  For my primary professional society, the North Central Weed Science Society (NCWSS), I was the Communications and Newsletter Editor from 2001 until 2005, Chairman of the Extension Special Interest Group, Program Chair, Awards Chair, and served a 4 year term in the Presidential Rotation from 2006 until 2009. I am also a member of the Weed Science Society of America. I was elected as a Fellow of the NCWSS in 2011, which is the highest honor bestowed by the society.

Exhibit 2 Page 1

I grew up on a livestock and grain farm in Northwest Illinois, and obtained a B.S. degree in Agricultural Science with an emphasis in Agronomy from Western Illinois University (1987), an M.S in Agronomy (Weed Science) (1989), and a Ph.D in Agronomy (Pesticide Environmental Fate) (1994) from the University of Arkansas.  While I was an undergraduate, I was employed by Western Illinois University and by VanDerSchaaf Agricultural Research during the summers.  In both of these positions as an undergraduate, my primary responsibility was to assist the faculty member or research leader with duties involved in testing the efficacy of herbicides and insecticides at field research sites and in the greenhouse. My specific duties included preparation of spraying equipment, measuring, mixing, and application of chemicals to be applied, preparing land area to apply the treatments, recording data on the efficacy of various active ingredients, and harvest of the field and greenhouse trials.

I received an M.S. Degree from the University of Arkansas in December 1989.  My M.S. thesis research project was an evaluation of herbicides for control of johnsongrass in soybeans, cotton, and corn.  I conducted field trials at multiple locations in northwest and southeast Arkansas to evaluate numerous herbicides, which included many acetyl coenzyme A carboxylase inhibitors, such as sethoxydim, fluazifop, and quizalofop, and glyphosate. I was also highly involved in the University of Arkansas down state herbicide evaluation team. My activities with this team involved conducting herbicide efficacy field trials at multiple locations through southern, southeast, and northeast Arkansas to evaluate herbicide and herbicide plus adjuvant performance on key weeds in cotton, soybean, corn, grain sorghum, and peanuts. For my M.S. thesis project, in addition to the field studies, I also conducted greenhouse and lab studies on the effect of group 1 herbicides on total non-structural carbohydrates in johnsongrass. From the research conducted during my M.S. degree, I published 3 peer reviewed manuscripts on control methods, herbicide efficacy, and the effect of herbicides on johnsongrass regrowth and johnsongrass rhizome total nonstructural carbohydrates.

I received a Ph.D. in Agronomy (Pesticide Environmental Fate) at the University of Arkansas in 1994. My Ph.D. dissertation research project involved an assessment of the environmental fate of selected herbicides, fungicides, and insecticides used in rice production. I conducted field and lab studies to assess the persistence of 2,4-D, triclopyr, molinate, thiobencarb, benomyl, and carbofuran in the soil and water used in rice production.  During my Ph.D. program, I was also a full-time employee of the University where I ran the University of Arkansas Herbicide Residue Program.  My responsibilities included sample processing, chemical analysis, troubleshooting, and customer support for the clientele that submitted soil samples for herbicide residue testing to our lab. From the research conducted during my Ph.D. degree, I published 5 peer reviewed manuscripts on the environmental fate of herbicides, insecticides, and fungicides in soil and water, and the stability of these compounds on extraction media.

My professional career began in March of 1994 as a Research Scientist for two growing seasons with Cenex/Land O'Lakes at their research farm in Fort Dodge, Iowa. One of my roles within this company was to support our seed division by conducting glyphosate screening of prospective soybean varieties to ensure the varieties we would bring to market met tolerance standards.  This work involved both lab and field work to test the sensitivity of varieties to high rates of glyphosate to ensure they varieties would exhibit commercially acceptable tolerance to

2

Exhibit 2 Page 2

labeled rates of glyphosate when grown in a production setting.  In November of 1995, I joined the University of Missouri as an Assistant Professor and Extension Weed Scientist and remained there until 2002. In 2002, I joined Purdue University in a faculty position, and was promoted to Professor in 2009. In each of these post graduate positions, I was responsible for herbicide testing, adjuvant testing, documenting and evaluating herbicide resistant weeds, studying herbicide resistance mechanisms, developing environmentally sound weed management practices for agronomic crops, training farmers and custom applicators about proper pesticide use so they can obtain or maintain a pesticide applicator license, and teaching on and off campus courses on weed control, herbicide management, and herbicide environmental fate.  I worked extensively with glyphosate, and it was at the forefront of many of my research endeavors.

Over the course of my post graduate career, I have conducted research and published numerous peer reviewed manuscripts on using glyphosate in no-till and conventional till soybean and corn production systems, it's impact on crop growth and development, it's efficacy on many different weed species including glyphosate resistant biotypes, and the impact of glyphosate-resistant cropping systems on weed population shifts in Midwest U.S.A. production systems.  I published a review article in the European Journal of Agronomy on the impact of glyphosate on weed population shifts which has been cited over 100 times.  I conduct over 25 field and greenhouse experiments each year on the impact of adjuvants and additional herbicides on the efficacy of glyphosate on key weed species and herbicide-resistant weeds. Overall, I have authored or co-authored over 170 peer reviewed manuscripts for refereed scientific journals and over 400 technical reports and abstracts.  I have trained over 20 M.S. students and 10 Ph.D. students. My graduate students have won numerous awards in paper and poster contests at NCWSS meetings and at the summer NCWSS Weed Science Contests.   A copy of my curriculum vitae and list of publications with further details of my experience and background is attached hereto as Attachment A.

The opinions I plan to offer in this case include the opinions detailed in this report, opinions that could be asked of me in explaining or discussing these areas and/or responding to the testimony of plaintiffs' experts, and any opinions formed based on additional literature review. My opinions are based on my education, training, experience and research; my review of the relevant scientific literature; materials specifically related to this case, including reports of plaintiffs' experts, deposition testimony and statements of the plaintiff; and any inspection(s) of the locations where plaintiff(s) used glyphosate-based herbicides. All the opinions expressed by me in this report are held to a reasonable degree of scientific certainty, unless stated otherwise. I reserve the right to supplement or modify this report if additional information is provided to me or comes to my attention, and to respond to the testimony of plaintiffs' experts at deposition or trial. A list of materials I have reviewed and considered in forming my opinions in this case is attached hereto as Attachment B.

I have testified four times as an expert in the past four years. In 2019, I provided an expert report and testified at trial in *New Century FS v. Hoksbergen*, No.LALA002310, Iowa District Court, Poweshiek County. In 2020, I provided an expert report and was deposed in *Wiedrin v. Landus Coop.*, No.LACV051479, Iowa District Court, Story County. In 2020, I also provided an expert report and was deposed in *Hoffman, et al. v. Syngenta Crop Protection et al.*, No. 17-L-517, Illinois District Court, St. Clair County. In 2021, I provided an expert report and was deposed in

Exhibit 2 Page 3

*Cris Adkins v. James Timmons, and TD Hunter, LLC, d/b/a/ Green County Agronomy Services*, No.LACV083149, Iowa District Court, Guthrie County.

I am being compensated at a rate of $350 per hour to produce an expert report and examine other pertinent material, at a rate of $450 per hour for deposition and court testimony, and at a rate of $150 per hour for travel associated with my services.

**Exhibit 2 Page 4**

## II. Background Information on Weeds

**What is a Weed?** A weed is a plant out of place, a plant interfering with the intended and beneficial use of the land, and a plant with no use or value to humans, livestock, or property. Essentially, a weed is a plant that interferes with human, agricultural, or animal activities. Weeds are undesirable plants that invade an area and compete with desirable plants like turf, ornamental plants, and garden plants for nutrients, water and space.  Competition with desirable plants can lead to uneven and unattractive lawns, inhibited and abnormal growth of ornamental plants like shrubs and roses, and lower fruit and vegetable yield on garden plants. Weeds can also have a negative impact on human and animal health by triggering allergic reactions and skin irritation.

**Weeds have been the number one pest problem faced by man since the beginning of time.** Weeds have plagued man and have been a major roadblock to developing societies for thousands of years. People have battled against weeds since the beginning of time as we have attempted to make beneficial use of the land for our survival and enjoyment. Weeds are so problematic because they are persistent and appear year after year in virtually every site where people are present; they are relentless in their desire and ability to survive.  They are naturally strong competitors and will dominate an area if not controlled.  In addition, weeds have the ability to adapt to, and survive many control measures. Weeds can adapt to non-chemical control measures by altering their emergence or growth characteristics to avoid exposure to tillage, mowing, or burning. Weeds can also adapt to chemical measures because some individuals in the population of weeds contain genes that allow the weeds to survive a chemical application. This is called herbicide resistance. Over time, the susceptible weeds are killed off and the plants containing the resistance genes repopulate the area.

There are many times in a weed's lifecycle where it will have traits that allow it to survive control measures.  Weeds are extremely difficult, if not impossible, to eradicate because they possess the following seed-related characteristics. First, they easily reproduce and spread throughout an area because they produce large number of seeds, up to tens of thousands per plant. Second, they produce seeds and reproduce under even adverse conditions that other plants could not survive; weeds can produce viable seed even under conditions of poor fertility, low water supply, cool temperatures, short growing season, and after mowing. Third, seeds of many weeds undergo periods of dormancy, and thus survive even where weeds may appear to be eliminated from an area. Seed dormancy is a condition in which seeds fail to germinate when air, temperature, and oxygen conditions are not viable for growth, but are able to germinate later when conditions improve.  Weed control would be greatly simplified if all seeds of a weed species were to germinate at one time, but due to the innate characteristics of weeds, this is not possible. Fourth, weed seeds buried in the soil remain viable for years. Weed seeds are able to survive adversity. Seeds are natural resting bodies with relatively low moisture content, and frequently well protected by a seed coat that is resistant to breakdown for passage of water or oxygen, and they resist freezing. Fifth, weed seeds may be difficult to detect or remove from crop seed. Many weed seeds are small and inconspicuous. Some weed seeds can mimic the crop plant seeds and are not removed in mechanical harvesting operations. Finally, many weed seeds and fruits have adaptations that aid in dispersal. Hooks and spines can adhere to feathers, hair and clothing; feathery hairs, parachutes, and wings aid dispersal by wind; and corky or inflated structures increase buoyancy in water. Even seeds without special adaptations can be easily

**Exhibit 2 Page 5**

moved by farm machinery, automobiles, airplanes, ships, farm equipment, and forest products. Moving water such as floodwater or irrigation systems can spread weed seeds as well.

Many of the most troublesome and persistent weeds have vegetative reproductive structures that serve as major food storage organs and possess numerous buds capable of generating new plants. Such structures found on perennial weeds are rhizomes, tubers, bulbs, stolons, and creeping roots. These structures contribute in many ways to the overall success of perennial weeds. The movement and storage of food materials into these organs in the late summer and early fall permits the production of vigorous new shoots the following spring. In addition, buds of some of these vegetative structures can harden off and become dormant, providing an effective means of surviving adverse conditions in a manner similar to seeds. Reproductive structures permit the plant to have another means of propagation in addition to seeds. All reproductive vegetative structures can produce new shoots, including creeping roots that form adventitious shoots, and the number of new shoots can be substantial. Vegetative structures also allow the plant to extend itself to new sites for water nutrients.

### III. Weeds and Their Devastating Impact on Humans and Society

No matter what definition is used, weeds' undesirable qualities cause devastating impacts on humans and society. Weeds substantially reduce the beauty and aesthetics of residential and urban areas, lower property values, interfere with the enjoyment of residences and recreational areas. Weeds cause human discomfort through rashes and allergies. Weeds can result in loss of human life by ingestion of poisonous plants. Weeds cause accidents when weeds obstruct the view of signs, intersections, and when vehicles encounter wildlife crossing roads. Weeds can result in property damage and loss by creating fire hazards, growing in cracks in roads and sidewalks, causing power outages, and creating refuge for insect pests, snakes, and rodents. The energy needed for weed control has been the major limitation to providing food for human populations since the beginning of time and will continue to plague humans and society for the rest of time people inhabit earth.

**Weeds and Their Negative Impact on Agricultural Systems.** There are approximately 8,000 species of plants that are categorized as weeds. The annual estimated cost of weeds varies depending on the site infested and the source of information referenced. The estimated average annual crop loss due to weeds ranges from $6 to $43 billion dollars annually (Bridges 1994, WSSA 2016).  Weeds compete with crops for every single element a plant needs to survive. The economic consequences of just crop losses are staggering, with 10% to 15% of the total value of farm and forest products in the United States lost to weed competition with crops (Ross and Lembi 1999, citing Shaw 1979). The impact of this crop loss is devastating, especially when one considers the need to feed a population which will grow by over 20% in the next 30 years. Weeds are so problematic that there are federal and state laws in place to reduce the spread and impact of weeds on human activities and agriculture (discussed later in this report).

As impressive as weed control losses are when expressed in terms of crop yield loss, there are other ways in which weeds can have an impact on crops and agricultural systems:

**Exhibit 2 Page 6**

1) Weeds cause loss of crop quality. Weeds have a detrimental effect on crop quality as well as quantity, particularly in crops where the presence of weed contaminants can result in monetary loss due to market price dockage. This can result from weed contaminated crops because of odors such as wild garlic or onion in wheat, wild mustards in milk, staining of crop seeds by nightshade berries in soybeans or dried beans, and toxicity of the crop by the presence of jimsonweed in the harvested portion of soybeans. Crop spoilage can occur from excess moisture of contaminating weed parts such as sunflower heads causing spoilage in harvested wheat. Competition from weeds can also reduce the size and shape of root vegetables such as carrots and potatoes, which further reduces the yield and value of the crop (Williams and Boydston, 2017; Arnold et al. 1997). In addition, wild onion and wild garlic will cause off flavor to be imparted on grains such as wheat and result in lower market prices received for the grain at the elevator if the concentrations are above the threshold.

2) Weeds limit the choices of crop rotation sequences and other cultural practice options. Some weeds are very similar genetically to the crop they infest. Examples include Johnsongrass and sorghum, red rice and rice, and annual ryegrass and wheat. When these weeds infest a genetically similar crop, it is difficult to find control measures (chemical or non-chemical) because herbicides work on physiological process in plants that have similar characteristics in both weedy and non-weedy plants of the same species. In addition, the growth habits between weedy and non-weedy relatives are similar, so they cannot be exploited with non-chemical control measures. These characteristics may force one to grow a different crop on that land so alternative control measures can be used to reduce the infestation of the weed.

3) Weeds interfere with crop harvest.  Weeds in vegetable crops directly interfere with hand and mechanical harvesting.  It requires mechanical and hand labor to clean crops of soil and weed debris after harvest.  Grassy weeds and vines can become wrapped around the rollers for cylinders of mechanical harvesters, necessitating stops and cleaning of the equipment. Harvesting of weeds along with the crop adds to the wear on expensive machinery. Desiccants often have to be used to dry weeds prior to harvest so they will not interfere with harvest, and this adds to the cost of weed control.

4) Weeds can serve as hosts for insects, pathogens, and nematodes that can harm crops. A nematode is a multicellular insect with a smooth, unsegmented body. They feed on plants, but they are tiny, so a microscope is needed to see them. Nematodes can carry viruses and bacterial diseases and inject them into plants.  Black cutworm moths fly into the Midwest from Texas in the early spring and lay eggs in no-till fields, particularly in fields that have chickweed.  When the chickweed is killed with herbicides in the spring in no-till corn production, the cutworm will move from the dying chickweed to a newly emerging corn seedling. For decades, crop advisors have recommended that farmers control weeds such as chickweed at least two weeks before planting corn to reduce the chance of black cutworm larvae moving from chickweed to corn in the same field. Other weeds commonly found in no-till corn, soybean and cotton fields such as henbit, and purple deadnettle can serve as alternative hosts for soybean cyst nematode (Creech et al. 2007; Mock et al., 2009). Volunteer corn can serve as a host for western corn rootworm (Marquardt et al., 2012). Weeds such as Italian ryegrass and cover crops such as annual ryegrass can serve as a host for the plant disease organism that causes Goss's wilt in corn (Ikley et al. 2015; Ikley et al. 2016).

**Exhibit 2 Page 7**

5) Weeds increase the time and resources needed to harvest crops.  Weeds and weed seeds in harvested crops necessitate extra cleaning and processing procedures. This is particularly true when the weed part or propagule is similar in size and shape of to-be harvested crops. Wheat harvested with wild garlic as a contaminant must be dried before the garlic bulbs can be removed from the grain. Some of the garlic odor can be retained by the wheat and must be blended with non-infested lots to eliminate the odor. Special techniques must be used to remove dodder seed from small-seeded legume crops such as red clover and alfalfa. Weeds lead to increased transportation costs when the weed seeds are transported along with the crop seed and have no economic value to the end-user.

6)  Weeds adversely affect livestock production by competing with desirable species and crowding out the more nutritious crop species needed by grazing animals. Unlike most grain or fiber crops from which weeds are separated at harvest, weeds are often harvested along with forage crops which are consumed by livestock.  This reduces the quality of the feed for these animals. In the case of pasture, weeds remain in the field where they continue to interfere with desirable forage. Reductions in quality often take the form of lower protein content, feed digestibility, or even reduced intake by the animals.

7) Weeds can poison livestock. Grazing animals can consume poisonous weeds and become sick or die. Weeds such as white snakeroot, poison hemlock, buttercup, black cherry, jimsonweed, milkweed, nightshades, and mustards can crowd out nutritious forage species and cause depression, vomiting, diarrhea, convulsions, weakness, paralysis, and death if consumed in high quantities.  White snakeroot can pass through the animal in the milk and cause "milk sickness" in humans, which was the cause of death of Abraham Lincoln's mother.  I have had a number of experiences with cattle feeding on poison hemlock and dying or becoming very thirsty and depressed.  Occasionally a deceased animal will be brought to the Purdue Large Diagnostic Lab for an autopsy.  I have been asked to identify some of the plants that some of the animals have ingested and have observed a few instances of animals dying from ingestion of poison hemlock. Weeds such as wild garlic and wild onion can cause off flavor to be imparted to milk and other dairy products when eaten by livestock.

8) Animal hides can be physically damaged by weeds such as cocklebur, multiflora rose, locust trees, and thistles. When the damage to the hide results in a wound to the animal, infection can set in and lead to lower rates of gain. Wounds can also serve as areas for flies to lay eggs and cause myiasis, which is the presence of maggots in the animal wounds. This condition can weaken the animal and lead to more complications.

**Weeds and Their Negative Impact in Residential Settings.** Weeds in residential settings are extremely problematic. Weeds invade landscapes and harbor diseases, pests and insects that can damage landscape plants. Weeds can be toxic and cause allergies. Weeds can also increase water usage as they compete with desired plants.  Weeds also have a detrimental impact on property values. Many areas have homeowner associations that require weeds to be controlled, as do city or county ordinances.  Weeds can affect values of the property that they are present on, along with adjacent properties.

**Exhibit 2 Page 8**

Controlling weeds in residential areas mitigates possible damage to landscaping and infrastructure like hardscapes, sidewalks, parks and athletic facilities. Controlling weeds in residential spaces also can help reduce allergens, undesirable insects, and rodents.  Also, weeds near homes have the potential to increase the risk of fires.

Other negative impacts include:

1) Weeds reduce land and property values and the taxes collected on property values.  Weeds can reduce aesthetic values around homes, schools, office buildings, gardens, athletic turf fields, nursery plantings, public parks and roadsides. In the South, a house that received an excellent rating from a local landscaping professional could expect a sales price 4 to 5% higher than equivalent houses with only good landscaping (Henry 1994).  Conversely, homes with landscaping appeal far below neighboring homes can expect a sales price 8-10% below equivalent homes with good landscaping appeal. In Washington state, the aquatic weed Eurasion milfoil reduces the value of lake front properties by 19% (Olden and Tamayo 2014). Many homeowner associations in subdivisions require lawn and landscape maintenance to meet established standards to maintain property values. The expense to control weeds in lawns and landscaped areas is an added cost to living in areas with higher property values and taxes.

2) In addition to a reduction in aesthetic and property values in residential areas, weeds cause allergies and rashes, and ingestion of some plants can be lethal. Ragweed pollen can cause hay fever or seasonal rhinitis, and rashes to people who are allergic to it. Various trees that pollinate in the spring, and grass pollen in the early summer can cause allergic reactions in sensitive individuals. Poison ivy, poison oak, poison sumac, wood and stinging nettles are commonly found weed plants that can cause skin irritation. Baby's breath when dried can irritate eyes, nose, sinuses, and skin and cause asthma in people who touch it frequently. Giant hogweed can cause serious skin and eye irritation, blistering, scarring and even blindness if the sap gets in the eye. Weeds such as nightshade, pokeweed, jimsonweed, and poison hemlock can be lethal if ingested or inhaled via smoke from burning.

3) Weeds invade sports turf and increase potential for athlete injury.  Weeds can invade voids in sports turf because they are aggressive, opportunistic, and can thrive in less than ideal soil conditions. When weeds invade these voids, they reduce the turf density needed for safe footing for athletes, which could lead to injuries.  In addition, weedy sports turf is not desirable for playing or viewing of high profile fields used by colleges or professional sports teams.

4) Weeds create fire hazards around houses and rural properties where flammable products such as firewood, lumber and oil products are stored, and around electrical substations, where lightning or electrical sources can ignite dead vegetation. For example, in the western U.S., grasses are the most problematic, especially in valleys and foothills. Annual grasses are wildfire fuel because they provide a relatively uniform, continuous fuel supply over the landscape, and they can carry low-temperature fire. In contrast, perennial grasses that grow in bunches are less effective at spreading fire because there is nonflammable space between bunches, so flames need to be longer and hotter to continue spreading. In the foothills and forest, fire fuels include perennial plants like shrubs and trees. Like bunchgrasses, shrubs can catch fire, but shrubs must be fairly close together to carry a fire across the landscape, or there needs to be other material

**Exhibit 2 Page 9**

(such as dry grass) to carry flame between shrubs. Woody plants tend to burn slower and hotter than grasses, so fires in woody areas can be more severe and longer lasting. The Congressional Research Service estimates that since 2000, an annual average of 7.0 million acres are burned each year.[1]

5) Weeds interfere with gardening activities and food grown in gardens. Gardening is also an important leisure activity for many and can benefit human mental and physical health – weeds interfere with this activity, can reduce the aesthetic beauty, and can be dangerous for gardeners if the weeds cause rashes, trigger allergies, or are poisonous or toxic.

**Weeds and Their Negative Impact on Other Non-Crop Areas.**

In addition to their negative impact in agricultural and residential settings, weeds have a devastating impact in other non-cop areas.  These negative impacts include:

1) Weeds replace native plants in natural areas leading to degradation and decreased value of rangelands, and threatening endangered species. Many invasive plant-infested areas have experienced drastic changes in vegetative structure and function, including plant community composition and forage quantity and quality. Plant invasion can reduce biological diversity, threaten rare and endangered species, reduce wildlife habitat and forage, alter fire frequency, increase erosion, and deplete soil moisture and nutrient levels (DiTomaso 2000). In various quantitative assessments, invasive plants have been estimated to decrease range productivity by 23% to 75% (Eviner et al. 2010), native plant diversity by 44%, and abundance of animal species by 18% (Vilà et al. 2010). In addition, weeds have increased fire frequency and intensity and the amount of area burned, as well as the prevalence of other invasive species (Mack et al. 2000).

2) Weeds can damage federal, state, county and city infrastructure, such as right-of-way sites, water systems, power systems, transportation systems and building systems. These impacts cause increased costs to the agencies managing the infrastructure, as state and local governments, utilities and railroads all must control unwanted vegetation within their right of ways. As discussed, uncontrolled vegetation in these areas can block views of other motorists, signs, wildlife, and construction operations. Water and snow can build up on the roads if undesirable vegetation prohibits snow removal and water drainage. Excessive vegetation can also be a fire hazard (Eck and McGee 2007; Green et al., 1996). For train operators, vegetation on railroad right of ways must be managed to maintain proper visibility at railway crossings for approaching motorists. Unwanted vegetation can block visual and electronic monitoring of the railway, and reduce braking efficiency of the train when vegetation covers that track and is crushed between the train wheels and track (Progressive Railroading 2008). For utility right of ways, fire hazards associated with dried vegetation pose a threat to utility reliability. Utilities also need access to equipment and lines, which requires vegetation control.

3) Weeds can cause safety and transportation problems by interfering with the view of signs at intersections and railroad crossings, and by growing through cracks in asphalt and concrete in road pavement, degrading roads and creating safety hazards by causing water to pool. Weeds

---

[1] https://fas.org/sgp/crs/misc/IF10244.pdf

**Exhibit 2 Page 10**

growing near roads can also serve as cover for wildlife which can cause accidents when the animals cross the road. Highwaysafety.org estimates that more than 1.5 million traffic crashes are caused each year by deer.[2] These crashes produce at least $1.1 billion in vehicle damage and cause 150 human fatalities annually. In addition to increased traffic and deer herd numbers, weeds growing along roadsides reduce visibility and can contribute to the high number of accidents.

4) Weeds can obstruct power lines and prevent access for repairs and cost power outages. Trees, shrubs, and other vegetation can cause safety hazards and power outages if they grow into or near power lines.  For utilities in the United States, vegetation management is the largest preventative maintenance expense. August 14, 2003 represented the worst blackout on record for the U.S. and Canadian utility industries. According to the U.S. – Canada Power System Outage Task Force Final Blackout Report, the outage that occurred that day affected an area with an estimated 50 million people and 61,800 megawatts (MW) of electric load in eight states and the Canadian province of Ontario. The total cost estimates in the U.S. ranged between $4 billion and $10 billion dollars.[3] In the Final Blackout Report, the U.S. – Canada Power System Outage Task Force identified inadequate tree-trimming as one of the four major outage root causes.

Some specific examples of impacts that were discussed in the Invasive Species Impacts on Federal Infrastructure report[4] include the following:

> a) Increased operation and maintenance costs to federal agencies, excessive wear and tear on the equipment from over use and strain, consumer losses, costs due to lost man-hours, cost of repairs to damaged equipment, lost production and reduced reliability of asset operational readiness.
> b) Highways require herbicide treatments to maintain visibility for safety, to reduce collisions, and to reduce snow drifting on the roadway.
> c) Roads and power transmission are being impacted by increased wildfires that are melting pavement and burning wood poles supporting power lines. Roads and power line rights-of-way are becoming overgrown and hindering access for safety and maintenance.
> d) Watershed health is being impacted by excessive erosion, fires fueled by invasive vegetation, the choking out of waterways, and reduced water movement from invasive aquatic plants. Agriculture is experiencing failures in crops due to irrigation systems not being able to supply a consistent and reliable source of water because of invasive mussels and plants.
> e) Endangered species are being impacted by the inability to manage water levels in national fish hatcheries.

5) Weeds invade public parks, reducing aesthetics and threatening biodiversity conservation. Weeds compete with native plants for resources such as moisture, light and nutrients, contributing to reductions in the populations of native species and, in some cases, increasing the risk of species extinctions (Groves et al. 2005; Vila et al. 2011; Foxcroft et al. 2013; Csurhes and

---

[2] https://www.defenders.org/sites/default/files/publications/methods_to_reduce_traffic_crashes_involving_deer.pdf
[3] https://electricenergyonline.com/energy/magazine/274/article/Utility-Vegetation-Management-The-Key-Driver-of-System-Reliability.htm
[4] https://www.doi.gov/sites/doi.gov/files/uploads/invasive_species_impacts_on_federal_infrastructure.pdf

**Exhibit 2 Page 11**

Edwards 1998). Weeds also have major economic impacts, including reducing the quality of ecosystem services provided by national parks, while increasing management costs (Groves et al. 2012; Csurhes and Edwards 1998; Sinden et al. 2004; Williams and West, 2000). Controlling weeds in parks and other natural areas is expensive.  In Australia, for example, the cost of controlling environmental weeds was estimated at over $20 million AU for the 2001–2002 financial year (Sinden et al. 2004). Hydrilla infestations in two Florida lakes has cost an estimated $10 million per year in lost recreation income for the lakes (Center et al. 1997)

The establishment of protected areas, such as national parks, is not only the major mechanism for the conservation of biodiversity, but many are also important destinations for tourism and recreation (Chiesura 2003; Florgard and Florgard 2006; Arnberger and Brandenburg 2007; Tzoulas et al. 2007). Visiting parks contributes to people's quality of life by providing a diversity of physical, psychological and social benefits (Chiesura 2004; Tzoulas et al. 2007). Unfortunately, there are negative environmental impacts from park visitation, including an increased diversity and abundance of weeds (Liddle 2007; Newsome et al. 2013; Pickering and Hill 2007). Partly, this is because weeds benefit from disturbance, including that associated with the construction, maintenance and use of different types of visitor infrastructure (Timmins et al. 1991; Hill and Pickering 2006; Ngugi et al. 2014; Nielsen et al. 2014) As a result, weeds dominate the edges of roads, tracks and car parks in many national parks (Foxcroft et al. 2013; Hill and Pickering 2006; Ngugi et al. 2014; Mount and Pickering 2009; Pickering and Hill 2007). Visitors also can unintentionally introduce and spread new weeds, with a wide diversity of weed seeds found on vehicles and clothing (Ngugi et al. 2014; Pickering and Hill 2007; Lonsdale and Lane 1994; Pickering and Mount 2010; Pickering et al. 2011). For instance, seeds from 626 species of plants have been collected from cars, nearly all of which (96%) are considered weeds (Arnsong and Pickering 2013). Seeds from 449 species have been found on clothing, of which 87% are considered weeds (Arnsong and Pickering 2014). Animals used for recreation in parks can also spread weed seeds, with seeds from 249 species (99% weeds) able to germinate from horse dung (Arnsong and Pickering 2013).

**Weeds have a Negative Impact on Aquatic Areas.** City ponds, tanks and reservoirs can get infested with floating and submerged weeds, which results in reduced water storage and irrigation capacity. Aquatic plants can cause loss of water from water bodies like lakes and dams through evapotranspiration. Aquatic weeds can even damage irrigation and drainage systems, dams, pumps and turbines in different types of power stations, siphons, valves, and bridge piers. They can negatively influence power generation and increase the cost of maintenance of power stations. The decomposition of huge amounts of biological mass creates condition where $CO_2$ and carbon monoxide are produced which can reduce fish production and complicate fish harvesting. Dense growth of aquatic weeds may provide an ideal habitat for the development of mosquitoes, causing malaria, and encephality filarasis. Dense mats of floating or deep-rooted submerged weeds prevent the movement of boats (e.g., Water hyacinth, Alligator weed) and at times even large ships.

According to the Invasive Species Impacts on Federal Infrastructure Report,[5] aquatic weeds make it almost impossible to open miter gates affecting navigation lock facilities on major rivers transporting commerce. Gates have to open and close multiple times to remove water hyacinth

---

[5] https://www.doi.gov/sites/doi.gov/files/uploads/invasive_species_impacts_on_federal_infrastructure.pdf

**Exhibit 2 Page 12**

from behind them. The gates have to be in the recess fully or the boats cannot get out of the lock chamber. The lock is not designed to accommodate large amounts of vegetation as well as the barges. The tow company struggles to get their tows back together because of the copious amounts of water hyacinth tangled between the barges. When there are no tows to lock through, the operators lock only water hyacinth; they will leave the lock gates open to let the vegetation drift in, then lock it down and let it drift out and start all over again. This causes unnecessary strain on equipment; opening and closing lock gates to move debris is not the intended purpose of these locks.

A secondary impact from this is the loss of time and revenues from increased blockages to the barge industry. Excessive mats of aquatic vegetation create friction below the surface and slow the flow of water in flood control, water supply impoundments and navigation systems. This creates a situation where more power is required to move the water. When dead, the vegetation detaches and floats to the surface, creating large mats. These mats clog critical components of the water conveyance system, including pumping plants, turnouts, and various critical flow meters and other structures and equipment. These mats also reduce flow capacity within licensed agricultural irrigation intake structures.

As shown above, weeds have a significant, daily impact on human health and safety, food production and security, and recreational activities. This report will now outline the history of how weeds were controlled and the evolution of weed control tactics leading up to the current strategies being used in both residential and agricultural settings.

## IV. The History of Humans' Attempts to Control Weeds

Throughout the history of mankind, we have struggled to control and eradicate weeds and thus have continuously searched for improved management methods. Weeds' detrimental impacts are so extensive and harmful to humans that society has sought any means possible to try to eradicate and manage them: from simple mechanical means to extreme methods like fire, electricity, and poisonous chemicals like sulphuric acid. Weed control methods generally fall within one of three categories: mechanical, cultural, or chemical.  Herbicides, including glyphosate, are the most efficient, effective, and safe weed control method because of their selectivity, application timing flexibility, lack of crop injury, and cost.

The energy needed for weed control has been the major limitation to providing food for human populations and development of technology since the beginning of time. Before 10,000 B.C., weeds were removed by hand. The effort of one person could hardly feed themselves, and starvation was common (Monaco et al. 2002). Later, farmers substituted wooden tools to dislodge weeds to save wear on human limbs.  By 1000 B.C., crude hoes dragged by an animal through a crop field helped reduce the human labor inputs. In 1731, Jethro Tull proposed planting crops in rows to permit the use of horses or oxen to pull tillage equipment to kill weeds. With this advancement, energy efficiency improved, and one person could now feed 4 people. By 1920, tractors started to replace horses and oxen, and one farmer could now feed 8 people. Collectively, humans could now use their hands, hand tools, horses and tractors to control weeds, but these means still relied on brute force and required a great deal of energy. With the introduction of herbicides in the 1940's, one person could now feed 16 people (Monaco et al.

**Exhibit 2 Page 13**

2002). The change to using herbicides shifted the use of mechanical energy to the use of chemical energy for the control of weeds. By 1990, one farmer could now feed 75 people. This meant that that high number of people who previously worked on farms mainly hoeing weeds were able to pursue other jobs and provide inputs into goods and services that have increased the standard of living for many people. With advances in chemical control tactics, and implementation of biotechnology-based products, one farmer can now feed nearly 170 people.[6] With the world population at 7.7 billion and expected to grow to 9 billion over the next 15-20 years, it is imperative to understand that the battle with weeds is not over and we will still need to have tools available to reduce these issues to manageable levels.

**Mechanical Weed Control Practices.** Mechanical weed control methods range in complexity from hand hoeing and pulling to mowing to large-scale tillage operations with multi-component attachments. Hand hoeing and pulling is the most primitive method of weed control. Hand removal is more time consuming and expensive than all other methods of weed control.

One common type of mechanical weed control is tillage. Tillage destroys weeds by breaking them apart, cutting or tearing them loose from the soil, causing them to dry out, or depleting food reserves in seeds or vegetative proper fuels. Cutting, breaking or tearing the weeds apart or loose from soil frequently results in desication and death. Repeated tillage events, however, are not an effective or desirable method of weed control given the long-term damage that can occur to soil structure, soil organic matter and soil health.  Tillage can bring up new weed seeds from deeper within the soil profile to be exposed to germination conditions. Tillage loosens the soil and makes it more prone to erosion, permanently damaging an area for cultivation of crops, drying out soil in areas with limited precipitation (as mentioned below in the discussion about the Dust Bowl), damaging crop roots by tillage equipment, and requiring more fossil fuel consumption compared to chemical methods of weed control. Tillage also breaks up organic matter and causes organic matter contents to decrease over time. This reduces the ability of the soil to provide nutrients to crop plants and support microbial activity to fix nitrogen and prevent nutrients such as nitrogen and phosphorus moving off site into surface waters, causing algae blooms and hypoxia conditions. Finally, tillage requires multiple trips across the field with heavy, fuel thirsty equipment, which increases $CO_2$ emission and can cause soil compaction in addition to increase potential for erosion and organic matter decomposition.  Tillage also contributes up to 18.5% greater $CO_2$ emissions compared to no-tillage production practices, contributing to global warming (West and Marland, 2002).

The most profound example of the detrimental aspects of mechanical weed control is the environmental catastrophe that occurred during the Dust Bowl in the 1930s. At the start of the 1900s, cheap public land attracted farmers to the prairie regions of the United States. During World War I, a profitable new wheat market opened up in the Plains states. Advances in gas powered farm machinery made wheat production easy for farmers and millions of acres of these grass lands in the plains were plowed up and converted into wheat fields. In 1930, with the great depression under way, wheat prices collapsed. Rather than following the government recommendation to cut back on production, desperate farmers tilled up more land in an attempt to harvest more wheat to make up their losses. Tillage eroded the fields and depleted them of the soil moisture needed to be productive agricultural fields. These exposed fields were vulnerable to

---

[6] https://www.fb.org/newsroom/fast-facts

**Exhibit 2 Page 14**

drought which hit in 1932. Once the winds began picking up dust from open dry fields, they grew into dust storms. Each year the storms grew more frequent, sweeping up millions of tons of loose soil, which covered farms and homes across the plains with sand, and spreading dust across the country. Children often developed fatal dust pneumonia, business owners were unable to cope with the financial ruin, and thousands of desperate Americans were displaced from their homes and forced to move in an exodus unlike anything the United States has ever seen (Worster, 1979). This environmental catastrophe provided much incentive to reduce the use of tillage for weed control and helped to spur the development of herbicide discovery efforts which will be discussed later in this report.

Mowing is another type of mechanical weed control that can temporarily cut down weeds but cannot effectively eliminate them. Mowing controls weeds by removing the tops prior to seed formation, depleting underground food reserves stored in the root systems, and favoring the growth habits of competitive crops. Mowing is relatively ineffective on species that can grow and produce seed below the normal height of cutting. Mowing is one of the more temporary methods of weed control as the plants always grow back after cutting. This causes the need to repeat the process and results in high usage of fuel, labor costs, and wear on equipment. Mowing is also limited in that it cannot be used on areas where it is difficult to operate the equipment, such as crops grown in narrow rows, steep hill sides, and tight spaces. Mowing also selects for shorter weeds, which can avoid future mowing yet still deprive desirable plants of soil nutrients via competition. Further, mowing spreads weed seeds, is fairly labor intensive, and needs to be repeated often.

Another form of mechanical weed control is mulching. Mulching controls weeds by excluding light, thereby preventing or hindering weed growth. Mulches can consist of straw, sawdust, wood chips, bark chips, grass clippings, plastic, or paper. Mulches can only be used in limited areas such as on small acreage sites and relatively high value crops, and mulches are limited to emerged, established, or transplanted crops. Other disadvantages to mulches include the cost of the material and the cost to haul and apply. Perennial weeds with vigorous underground reproductive systems are not controlled well with mulches. The use of mulch can limit the use of other tactics such as mowing and tillage. Also, mulch must be applied with a level of precision; laying mulch too thick or deep around trees can result in damage to the bark on the base of the tree and provide an entryway for disease organisms. Many mulches also contain insect pests and termites that can be spread on to new uninfected property.

**Cultural Weed Control**. Cultural weed control is the manipulation of cropping practices to suppress weed growth and includes non-chemical crop management practices ranging from crop rotation, livestock management, use of cover crops, and land preparation to harvest and postharvest weed seed management. Cultural weed control alone cannot provide adequate weed control, especially when weeds are well established; long term weed control effectiveness through cultural practices alone is minimal. Cultural practices need to be part of an integrated weed management program that involves integration of cultural practices with mechanical, chemical and biological methods to be effective. Cultural practices tend to shift weed populations to species that are better adapted to surviving or avoiding the chosen cultural practices.

15

**Exhibit 2 Page 15**

The primary form of cultural control practice is crop rotation. This method of weed control involves manipulating the type and sequence of crops grown, and management tactics within specific crops, to favor growth of the crop over the weeds. The key aspects of this tactic of weed control are to continually implement new crops and management tactics within the crop. This strategy is limited and cannot provide long-term, cost effective and comprehensive weed control alone since markets for some of the crops grown in the rotation may be limited or nonexistent. In addition, each crop requires a unique set of production and marketing skills which the grower may or may not have in his toolbox.

Livestock management also plays a significant role in cultural weed management, but has limited ability ultimately to control weeds. Purchasing feed, feed ingredients, or hay that does not contain weed seeds plays a large role in avoiding spread of weeds. Rotational grazing practices, in which animals are moved to new grazing areas frequently, limits overgrazing and weed establishment in over grazed areas. In pastures or rangeland that is grazed by livestock, allowing animals to overgraze areas results in less coverage of the soil by the desirable species (forages) and greater opportunities for weeds to become established and soil erosion to occur. Also, many animals will graze on plants that are considered weeds. Moving these animals to new grazing areas where these weeds are not established can result in moving weed seed in the digestive tract of these animals to new areas. In addition, a challenge with livestock management is having access to enough fields where animals can be rotated between grazing paddocks. In many areas of the United States, the cost of establishing fences and water sources in additional paddocks is high and limits the use of this weed control tactic in grazing livestock production.

Cover crops are another form of cultural weed control. A cover crop is plant that is used primarily to slow soil erosion during periods of the growing season where the cash or food crop is not growing or covering the soil adequately to slow soil erosion from rainfall events. Cover crops have been a part of farming in North America since the Native Americans used plant species modern agriculture refers to as weeds, as a cover crop. However, use of cover crops on large acreages is not efficient and the utility of cover crops is limited since they are like weeds and compete with crop plants for the same resources needed for growth. Thick cover crop stands often compete well with weeds during the cover crop growth period. However, there are many challenges with cover crops as a weed control tactic. First, the cover crop seed has to be purchased and seeded in a manner that allows it to become established when the desired crop is not in the field. This means there is the cost of the seed, the cost of the equipment to plant the seed, and there is no economic return for that cost unless the cover crop is grazed by livestock, since the cover crop is not sold in most cases. Second, to ensure the cover crop is not competing for nutrients, water, and space with the desired crop, the cover crop must be terminated prior to seeding the desired crop. That means there is a cost of termination whether it is from using herbicides, tillage, or crimping (using a large roller to flatten the cover crop). Third, many cover crops are like weeds and can serve as hosts for other disease and insect pests that can infest the summer desired crop.

**Extreme Methods of Weed Control.** The search for a successful means to eliminate weeds has also led to use of other extreme methods, including (1) flooding, (2) fire or heat; (3) electricity; and (4) biological control. None of these methods, however, are successful beyond some very limited applications.

**Exhibit 2 Page 16**

Flooding is a mechanical technique used to control weeds in rice and sometimes for control of creeping perennial weeds. For example, in rice production, the crop is able to grow in flooded conditions while many common weeds cannot. This method, however, only works on a select few crops, and cannot be used as a weed control method at all outside agriculture, including residentially.  Even in the limited settings where this method can be used, disadvantages include the high cost of pumping water if a readily available supply is not available, and the cost of leveling and putting water levees in the field where water will be used. Flooding has a relatively high financial and environmental cost. The high financial cost is due to the fuel and horsepower requirements to level the land, build levies to contain water, and pump the water to the field. The environmental costs are that aggressive tillage is needed to move soil that would increase the potential for erosion if the water containment levies were damaged by storms or poor water management.

Humans are so desperate to control weeds that they occasionally use flame throwing devices to set fire to their own land and literally scorch the earth to eliminate them. Although some insect and disease control can be achieved with fire, flaming is nonselective and can damage or kill any plant that it touches. Other disadvantages of flaming include the fact that it is a fire hazard on muck soils, dry grasslands, and to fence and telephone poles, and flaming cannot be used in residential areas. Flaming also has a relatively high energy requirement in that energy is needed to propel the equipment across the field and fossil fuels are burned to create the flame. Flaming is also hazardous in areas where there is drought and grasslands that could be easily ignited by the flame. Flaming also is hazardous to the operator because of the nature of igniting a compressed fuel source and operating it. Flaming can also lead to unintended fires and smoke, thus detrimentally affecting the health of humans and animals.

The concept of using electricity to kill weeds was developed in the late 1800s.  In order for this technique to be successful, the electricity cannot come into contact with desired plants, so electrical control can only be used in settings where there is space between the weeds and desirable plants. In a crop setting, this means that the weeds must be taller than the crop. By the time the weeds are large enough to work with electrical weed control devices, crop yield loss due to weed competition has already occurred.  In addition, the energy required to run these machines is excessive, and the electrical current produced by these machines can injure and kill humans and animals. In highly dense populations of weeds, generator failure is common and a costly and time-consuming repair to incorporate into the weed control operation of a farm.

Biological weed control is broadly defined as the use of a living organism or biological processes to bring about weed suppression. Examples of biological control agents include insects and mites, plant pathogens like fungi, bacteria, viruses, and nematodes, fish, birds, and other animals like goats. Common problems with biological control agents are that they are very specific for controlling a limited number of weeds, may attack other plant species once the weed is controlled, and they have very strict regulatory procedures in the U.S.  Other issues have included the concern that biological control agents could mutate and evolve to attack other plant species.[7]

---

[7] https://link.springer.com/article/10.1007/s10526-018-9888-2

**Exhibit 2 Page 17**

The above mentioned weed control tactics, though effective in limited instances, are ultimately not the most safe, environmentally sound, or cost-effective means to control weeds. All of the methods listed above have high labor, training, and management requirements. In addition, these methods are very dependent on the availability of cheap fuel. Finally, all of these methods have the potential to bring in additional plant pests to a field that had not been previously infested, and there are safety risks associated with each of these methods.

**Other Non-Chemical Weed Control Tactics.** Preventative weed control refers to any control method that aims to prevent weeds from being established in a cultivated crop, pasture, or greenhouse. It aims to prevent weed spread by seeds or vegetative propagules. Examples of preventative weed control are using certified weed free seed, only transporting hay that is weed free, making sure farm equipment is cleaned before moving from one location to another, and screening irrigation water to prevent weed seeds from traveling along irrigation ditches.

The problems weeds cause are so serious – and the need for preventative weed control so great – that the U.S. Congress established the Federal Noxious Weed Act to prevent entry of weeds of foreign origin.  The Act provides for inspection at ports of entry and establishing and enforcing quarantines. Seed laws were put in place to ensure the purity of crop seed used for planting to prevent the spread of weed seeds, and all states have seed laws designed to regulate the quality of agricultural seeds for planting that are sold within their borders. These laws generally conform with federal seed laws, but vary from state to state as far as specific weed species are concerned. Weed laws are enacted to compel local officials and property owners to carry out weed sanitation measures on lands under their jurisdiction. These lands include farms, roadsides, railroad tracks, waste areas, rights-of-way, and ditch banks. Although some states impose fines on landowners who allow certain weeds to set seed, weed laws have been relatively ineffective in stopping the spread of noxious weeds.  Seed laws have been more effective at reducing the spread of weed seeds. However, seed laws are not uniform across states, and will have no impact on controlling weeds that have already infested fields.

Weed eradication occurs after weeds have infested an area. Eradication involves removing the weed, weed seed, and other weed reproductive propagules from an area so the infestation is terminated. Eradication methods have a few success stories which mostly involves the control of invasive weeds from large acreages on ground that is not managed intensively. Weed eradication methods, however, are only successful when a large group of individuals within the affected area are unified in their approach to controlling and destroying the weeds whenever it is physically possible to do so. Weed eradication requires a large investment in time, labor and fuel to be successful. When the problem weed is removed, however, this opens a niche for another invasive weed to reinfest the area. So, it is important to fill the open niche with a desirable plant species that can be managed and has positive value for the use of the property. Otherwise, weeds are so pervasive that they are able to fill any niche that does not contain natural enemies or control strategies and all the effort to eradicate one species may lead to infestation of another weed problem.

**Integrated Weed Management.** Integrated Weed Management (IWM) is an approach to managing weeds using multiple control tactics, which can include a mix of all of the strategies mentioned previously such as prevention, eradication, cultural practices, and the use of various

**Exhibit 2 Page 18**

herbicides. For example, the use of multiple herbicide modes of action is part of an IWM approach. Herbicides are the backbone of any IWM program because herbicides are so effective, environmentally safe, and economical; IWM without herbicides would be ineffective in controlling weeds.

**Chemical Weed Control.** During the late 1800's, the need to solve the vexing problem of weeds was so strong and the realities of the high labor needs and detrimental environmental effects of mechanical weed control tactics so severe, that farmers and scientists began to look at any chemical that could have the potential to kill weeds.

At first, salt, ashes, smelter wastes, and other industrial byproducts were applied to control vegetation near the factories at which such byproducts were produced. However, this practice was not effective.  First, it was not efficient or economical because of the high cost of transporting the material to fields, especially fields that are not located close to the source of the byproduct. Second, some of the byproducts reduced the productivity of the soil by creating pH imbalances or high levels of cations such as calcium or aluminum, which reduced the crops' ability to take up other nutrients from the soil.

Based on various reports, an organized effort for herbicide development began in the late 19th and early 20th century. The first herbicides were inorganic salts such as sodium chloride, sodium chlorate, arsenic salts, and carbon bisulfite as a fumigant. Use of these compounds was not a viable long term solution for a number of reasons.  For one, use of high rates of sodium-based herbicides can result in development of saline soils, which is basically another term for soils that have high sodium contents. Salinity affects almost all aspects of plant development, including germination, vegetative growth and reproductive development. Soil salinity imposes ion toxicity, osmotic stress, nutrient (N, Ca, K, P, Fe, Zn) deficiency and oxidative stress on plants, and thus limits water uptake from soil. Soil salinity significantly reduces plant phosphorus (P) uptake because phosphate ions precipitate with Ca ions ([Bano and Fatima, 2009](#)). Some elements, such as sodium, chlorine, and boron, have specific toxic effects on plants. Excessive accumulation of sodium in cell walls can rapidly lead to osmotic stress and cell death ([Munns, 2002](#)). Increased salinity in water and soil can also have serious negative impacts on agriculture and food security as well as human health since land productivity is negatively impacted. So, the use of sodium-based compounds was not a sustainable weed control strategy because of the negative impacts on soil health and productivity. Second, these compounds also had severe human health concerns.

The use of inorganic salts had limited long-term effectiveness because they were toxic to humans and animals, reduced land productivity, and had high transportation costs because of the amount needed per acre to be effective. In addition to the organic salts, various oils, acids such as sulfuric acid, and solvents were used as herbicides during this era at extremely high rates and posed similar dangers to human health and soil productivity and thus were not sustainable long-term solutions for controlling weeds.

A major developmental effort occurred between 1900 and 1915 in France, Germany, and the United States to control weeds in cereal crops. It was the discovery of the fungicidal properties of the Bordeaux mixture that led to the first serious attempt at chemical weed control, which

**Exhibit 2 Page 19**

controlled some broadleaf weeds in cereal crops. Between 1919 and 1940, a few other herbicides were introduced which included compounds such as arsenicals, chlorate, and borate as long residual herbicides; copper sulfur made for the control of aquatic plants; selective and nonselective herbicide oils; and the dinitrophenoles. But the challenge with these systems was the lack of adequate spraying equipment, the vast number of large acreages to be covered, and low efficacy of inorganic salt products in low humidity conditions. These products and methods also could be highly toxic to humans and animals, contaminate drinking water sources, and cause reduction in soil health from buildup of heavy metals in the soil. As a result, the main methods of weed control in this era were still mechanical, primarily tillage. At the start of World War II, about a dozen chemicals of somewhat limited utility were available.

In the early 1940s, the discovery of the herbicidal properties of 2,4-D triggered development of modern herbicide technology. Evaluation of the compound for insecticidal and fungicidal properties were not successful. Concurrent investigations of the role of auxin hormones and synthetic compounds on growth regulating effects lead to the discovery of the herbicidal properties of 2,4-D.  The compound proved to be easy and safe to handle and apply, large areas could be sprayed quickly at normal use rates, and long-term herbicide residues were not a problem. 2,4-D was and still is used extensively. The success of 2,4-D provided the incentive for further development of organic compounds for weed control.

Following World War II, the use of herbicides gained in popularity because of their ability to increase agricultural productivity through more cost-effective weed management, all of which continued to spur the herbicide discovery and development industry. The next main family of herbicides, the triazines, were introduced in the 1950s and became widely used in many crops across the world but posed problems with contaminating surface and groundwater sources.

By the late 1960s, there were over 100 modern herbicides on the market for use on farms, industrial settings, landscapes, and elsewhere. During the period from 1960 until 1972, Monsanto tested over 51,000 compounds for herbicidal activity.  These compounds were tested extensively for efficacy and safety using the approved methods set forth by the Environmental Protection Agency ("EPA"). Of these 51,000 compounds, less than 50 advanced to the product development stage and only 3 became herbicide products. One of these was glyphosate (Franz et al). Glyphosate's discovery was of great impact because it was found to be a highly effective and commercially acceptable systemic herbicide with low mammalian toxicity and environmental impact.  The innovation of glyphosate revolutionized the way in which humans manage and control weeds.

Glyphosate was introduced in 1974 for non-selective weed control, and glyphosate-resistant crops were commercialized in the late 1990s. Glyphosate is currently labeled for use in over 130 countries. It is a broad spectrum, safe, very effective herbicide. The current label lists over 100 annual weed species and over 60 perennial weed species controlled by glyphosate. Because of its unique properties, glyphosate was initially utilized to control perennial weeds on ditch banks, rights of ways, and fallow fields. Due to its effectiveness on both annual and perennial weed species, and the fact that it does not injure crops in the soil, no till production practices began to evolve to use glyphosate to control weeds prior to planting row crops and to substitute chemical weed control for pre-plant tillage. This practice resulted in huge gains in fuel savings, protecting

**Exhibit 2 Page 20**

soil from erosion, and better water infiltration into soil. No till crop production practices grew exponentially after the introduction of glyphosate and continued to grow with the introduction of glyphosate resistant crops.

During the 1980s, a number of herbicides were commercialized that were active on weeds at low use rates which were capable of controlling weeds at ounces of active ingredient per acre rather than pounds of active ingredient per acre for previously introduced herbicides. However, the utility of many of these compounds was short lived because weed populations quickly developed resistance to ACCase and ALS inhibitor herbicides. Meanwhile the use of no-till production practices continued to grow during the 1980s, glyphosate was used extensively for weed control prior to planting, and no resistant weed populations were documented during this time. Monsanto began the process of developing glyphosate resistant crops during the 1980s.

As the foregoing demonstrates, glyphosate herbicides permit control of weeds where cultivation is not possible, and the use of glyphosate reduced the number of tillage operations as well as a critical timing needed for such operations for weed control. Less tillage results in less soil erosion and environmental contamination. Glyphosate reduced the amount of human labor needed for hand weeding. Glyphosate controlled weeds effectively and at a relatively low cost. Because it does not persist in the soil and cause herbicide carryover problems, glyphosate permitted greater flexibility in choice of crop rotations and management systems.

## V. How Do Herbicides Work in Plants?

When a herbicide comes in contact with a plant, its action is influenced by the morphology and anatomy of the plant as well as numerous physiological and biochemical processes that occur within the plants and the environment. These processes include absorption, translocation, molecular fate of the herbicide in the plant, and effect of the herbicide on plant metabolism. The interaction of all these factors with the herbicide determines the effect of a specific herbicide on a given plant species (Monaco 2002). This section will describe the general structure of plants and their important tissues and the characteristics of glyphosate herbicides, as well as some of the terms that are used when discussing herbicide activity.

Absorption of herbicides can occur through root and/or shoot tissue, and site of uptake is dependent on the chemical and physical properties of each herbicide (see Figures 1, 2, and 3). For herbicides that can be taken up by plant roots, after preemergence herbicide application to soil, herbicide absorption is primarily through root tissue but can also occur through shoot tissue as it comes into contact with treated soil. Herbicides must then move into living plant parts called the symplast so they can move to target sites to stop plant metabolic processes and kill the weed.  Herbicides applied postemergence (like glyphosate) must move through the leaf surface into the symplast of plant cells. Leaves are the most important absorption site for postemergence herbicides, but absorption can occur through any above ground plant part where the herbicide is present.

Glyphosate does not have soil activity and is a herbicide designed to be applied to living plants, where it enters the plant through the leaf surface.  When a herbicide is applied to a leaf surface, the first barrier it must penetrate is the leaf cuticle. The composition of the cuticle on a leaf

**Exhibit 2 Page 21**

consists of cutin, epicuticular wax, embedded wax, and pectin (see Figure 1 below). The cuticle has both water loving (hydrophilic) and wax loving (lipophilic) characteristics.  The lipophilic and hydrophilic properties of herbicides are important in understanding how they absorb across plant cuticles. Lipophilic herbicides are able to move through the cuticle barrier by diffusion by association with the waxy components of the cuticle. Water soluble herbicide formulations (like glyphosate) are also able to enter the plant through the cuticle by diffusion. However, because of its low relative rate of transport through the cuticle, surfactants are used with glyphosate to spread out the spray droplets on the surface of the leaf and help it to move through the cuticle to reach the transport systems in the plant, which will be discussed below.



Figure 1. The chemical composition of the cuticle of a plant leaf which shows the relative position of where post emergence herbicides like glyphosate is applied, the epicuticular wax, embedded wax, cutin and pectin located above the cell wall. (Monaco, et al. 2002, p.104).

Most of the important weedy plants that glyphosate is designed to control contain transport tissues called xylem and phloem, so they are classified as "vascular" plants.  Vascular plants consist of three systems of tissues: 1) dermal, 2) vascular, and 3) fundamental or ground.  See Figure 2 below, taken from Kremer et al., for a generalized description of a plant and its three systems of tissues. The dermal system in plants provides the outer covering of the plant (which includes the cuticle described above) and is represented in the young plant by the epidermis.  The vascular system includes the two main conducting systems, the xylem and the phloem. The vascular system allows movement of water, mineral nutrients, photosynthate, and other chemical constituents within the plant.  The fundamental system or ground system, included the remaining tissues, such as apical meristems and reproductive cells that determine the overall form and function of the plant (Aldrich and Kremer et al., 1997).

**Exhibit 2 Page 22**



Figure 2. This diagram shows the route of herbicide absorption through root or shoot tissue and the three systems of plant tissues that herbicides must move through to reach their sites of action. (Kremer et al., 1997, p. 276).



Figure 3. This diagram shows more detail of herbicide uptake from leaves and movement to xylem and phloem tissue where the herbicide can be translocated to sites of action. (Kremer et al., 1997, p. 277).

**Exhibit 2 Page 23**

Even though the three tissue systems are discrete and fairly easy to identify, the systems are dependent on one another for plants to live, and herbicides commonly interact with all 3 systems as shown in Figure 3. Once a herbicide has been applied to a plant, five things can happen to the herbicide molecule (see Figure 4 below).

1) The herbicide can volatilize and be lost to the atmosphere or washed off the leaf by rain. Glyphosate has a low vapor pressure and it does not volatilize.

2) It can remain on the outer surface in a liquid or crystalline form.

3) It can penetrate the cuticle, but remain absorbed in the wax components of the cuticle.

4) It can penetrate the cuticle, enter the cell walls, and then translocate prior to entering the symplast. This is called apoplastic translocation which involves movement in the xylem.

5) It can penetrate the cuticle, enter the cell walls, then move into the internal cellular system (called the plasmalemma) for symplastic translocation, which includes movement in the phloem. Postemergence herbicides which are mobile in the phloem, like glyphosate, are taken up by plants in this manner.



Figure 4. Diagram of the five fates of a herbicide after it has been applied to a plant. (Monaco, et al. 2002, p.102).

A surfactant is a chemical additive to a spray solution that reduces the surface tension of the liquid. Reducing the surface tension reduces the number of droplets that bounce off the leaf and helps the spray solution stick to the leaf surface. This allows the herbicide solution to sit on the leaf surface long enough to be absorbed by the weed and greatly increases the herbicide effectiveness on the desired species and reduces the chance of the herbicide running off and killing desirable vegetation.

**Exhibit 2 Page 24**

The major prerequisites for effective herbicide use are that the herbicide will come into contact with the plant surface, remain at the plant surface long enough to penetrate or be absorbed into the plant, and reach a living cellular site where it can disrupt the vital process. Once the herbicidal function is complete, degradation of the compound to simple or nontoxic components occurs either in the plant or in the soil. Below are some of the known characteristics of herbicides that vary between products.

**Selective versus non-selective herbicide** – A selective herbicide only controls certain weed species and thus does not injure other plants in the vicinity of the application. A non-selective herbicide will injure most if not all of the plant species that are exposed to the herbicide. However, non-selective herbicides are useful and can be applied in many settings, including residential areas, if the spray application can be applied in a manner that does not injure desirable plants.  Herbicide selectivity can be accomplished through molecular fate and metabolism, placement of the herbicide in time and space, differences in crop and weed susceptibility at different stages of growth, localized application of adsorbents, use of safeners to protect the crop, molecular configuration of the herbicide, concentration of the herbicide, and formulation of the herbicide. Selective herbicides can be used to control weeds in an agronomic crop like corn or soybeans, food crops like tomatoes, or in a lawn or homeowner setting. The desirable "crop" or landscape plants will not be harmed by the herbicide, but only weeds that the herbicide is selective for will be controlled. Nonselective herbicides are used in areas where the desire is to control all species present to plant an agronomic crop, or in residential settings to control all vegetation and renovate an area with new desirable species, and to control weeds under fences, around buildings and sidewalks, and in landscaped areas between desirable shrubs, flowers, and trees. Glyphosate is a non-selective herbicide when it is used to control weeds before planting in no-till production, control weeds along fences, sidewalks, or flower beds in a residential or landscaped area or when used to control all vegetation during a site remediation.  Glyphosate is a selective herbicide when used postemergence in a Roundup Ready crop that has been developed to tolerate glyphosate or when applied in a manner that avoids contact with desirable plant species as it is used in a residential setting.

**Foliar versus soil applied** - To be effective, herbicides must come into contact with plants, be absorbed by plants, move within the plants to the site of action without being deactivated, and reach toxic levels at the site of action.  Herbicides can enter a plant through roots, shoots, stems, foliage, or buds. The primary site of entry is specific for each herbicide and may be influenced by the method of application.  Foliar herbicide applications are made directly to the leaves or foliage of plants. Soil applications are made to the soil rather than to vegetation. Foliar herbicides are designed to be very active on the above ground portions of the plant, with some translocation to underground parts if the herbicide is a systemic herbicide. Soil applied herbicides are designed to be very active on weed seeds that have germinated but not emerged yet from the soil. Glyphosate is a foliar absorbed herbicide. It is bound tightly to soil particles so it cannot be taken up by plant roots.

**Herbicide uptake from soil applied herbicides**. Most herbicides applied to the soil move readily into the plant with the soil water solution. Plant structures that take up herbicides generally are those that are actively imbibing or absorbing water. Absorption by the germinated

**Exhibit 2 Page 25**

weed seedling is primarily through root tissue but can also occur through shoot tissue as it comes into contact with treated soil. Soil applied herbicides do not affect non-germinating seeds. However, in order for a soil applied herbicide to be taken up by a plant, it must be soluble in the water solution in the soil and the plant species must be actively growing and transpiring water, so it is taking up water from the soil. If the plant is not taking up water, it won't adsorb soil applied herbicides that are dissolved in the soil water solution. Glyphosate cannot be taken up by the soil because it is bound tightly to soil particles and not available for uptake from the soil solution.

**Herbicide uptake from foliar applied herbicides**. It is much more difficult for a herbicide to enter a plant through the shoot than through the root. The major barrier to uptake in the shoot is the cuticle, which is composed of three distinct materials, wax, cutin, and pectin (see Figure 1 above). The presence of waxes at the exterior of the cuticle results in an extremely lipophilic layer that constitutes a barrier to water soluble compounds. Movement of a herbicide into and through the cuticle is related to its solubility in water. The more water-soluble the herbicide is, the less likely it is to penetrate the cuticle. The more oil soluble a herbicide is, the more likely it is to penetrate the cuticle. Two important factors affecting movement of foliar applied herbicides into leaves are its degree of retention on the plant surface, and its ability to move through the cuticle. If the retention time is too short, or an insufficient amount of herbicide is intercepted by the plant, penetration to the cuticle and eventual control of the weed will be unsatisfactory. The type of herbicide formulation and adjuvant used, the amount of spray volume, the amount of shoot growth, and the probability of rainfall after application all have an impact on retention and plant coverage. As mentioned earlier, glyphosate is applied with surfactants that are designed to help with decreasing surface tension of spray droplets, and retention on leaf surfaces which provides sufficient time for movement of this hydrophilic herbicide through the cuticle to the transport systems in the plant.

**Contact versus systemic herbicides**. These terms refer almost exclusively to postemergence, foliar applied herbicides. Contact herbicides kill only the part of the plant on which they're sprayed. The root system is not killed, and the weed may grow back from the roots. Systemic herbicides are absorbed by the plant and can move in the apoplast, the symplast, or both, and typically will have some activity in the root system as well. Glyphosate is a systemic herbicide that is translocated in the symplast. It is translocated to the actively growing areas on the plant where it interferes with essential metabolic processes that result in plant death.  It is more effective at killing plants because of its ability to translocate to actively growing regions. It is particularly more effective in killing perennial plants, especially perennial grassy weed plants like johnsongrass and bermudagrass.

**Application timing in relation to crop and weed development**. Preplant herbicides are applied to the soil surface or existing weeds before seeding or transplanting a crop or desired plant like tree, shrub, or other landscape plant. Pre-emergent herbicides are applied prior to emergence of either the crop or a specific weed, but not necessarily both. When referring to the crop, pre-emergence generally means after planting and prior to crop and weed emergence. In established crops such as turf or orchards, pre-emergence usually means prior to weed emergence since the turf grass or orchard trees are already established. Post emergent herbicides are applied after the crop and specific weed has emerged. Glyphosate can be applied preplant to control existing weeds before crop emergence or to control weeds before reseeding a lawn or turf field. It can be

**Exhibit 2 Page 26**

applied postemergence between the rows of trees in orchards or directly over the top of the crop and weeds in Roundup Ready crops like soybeans, corn, and cotton.

**Herbicide movement in plants - Transport systems in plants**. Once a herbicide has entered the plant, whether it was soil or foliar applied, it must reach a specific susceptible site. In some cases, little herbicide movement is required to kill the plant. In other cases the herbicide must move in the plant, particularly to underground portions. The three major groups of herbicides according to kind of movement are the following: 1) contact or limited movement herbicides that show limited or no movement in the plant, 2) apoplastically, xylem-only translocated herbicides, and 3) symplastically, phloem-translocated herbicides, which can also move apoplastically.

**Contact or limited movement herbicides**. Foliar herbicides in this class often kill the tissue they encounter immediately after penetration. These herbicides cause burning and necrosis of leaf and stem issues often within hours. Thorough coverage of the plant is required for shoot kill. Some types of these herbicides also show limited movement in plants. These herbicides are most effective when used on small seedling plants or broadleaf plants right after emergence from the soil. These herbicides generally do not work as effectively as systemic herbicides on large weeds or perennial weeds where translocation of the herbicide is needed for the most effective control. Two of the alternatives to glyphosate, glufosinate and paraquat, would fall in this category of contact or limited movement herbicides.

**Apoplastically, xylem-only translocated herbicides**. The apoplast is the major pathway for movement of water and nutrients (see Figure 2 above). The apoplast accounts for movement of materials from the soil upward in the plants and into the leaves. The apoplast is more or less a continuous system of cell walls, intercellular spaces, and interconnecting cells of xylem tissue. The specific pathway for apoplastic transport begins with the movement of water and nutrients into the root via the root hairs. Unlike shoot, which is covered with a water repellent cuticle, root hairs have little to no cuticle and water and nutrients can penetrate easily into the root. Once inside, substances can move with the water stream through the cell walls and intracellular spaces or can cross the plasma membrane and move from one cell to another through plasmodesmata. Herbicides in this category, when applied to the soil, are taken up by the roots and move into the leaves that are actively transpiring water. When foliar applied, these compounds cannot move downward since the flow of water and nutrients in the apoplast is into rather than away from the leaves. The compounds that are active when foliar applied often work in much the same way as contact herbicides by causing injury to new plant tissue.

**Symplastically, phloem-translocated herbicides**. Herbicides in this category move in the symplast with the products of photosynthesis (sometimes called sugars) produced in the leaves (see Figure 3 above). The symplast is the major pathway for sugars and accounts for sugar movement from the site of production, which is typically the leaves, to a site of storage for utilization, such as underground plant structures or developing shoot tips. The symplast is the pathway by which substances applied to the foliage of plants move to underground structures. Herbicides applied postemergence must move through the leaves' surface to living parts or symplast of plant cells. Although the leaves are the most important absorption site, absorption can occur through any aboveground plant part where the herbicide is present. When applied to the foliage and at the right stage in the lifecycle, the herbicide becomes distributed throughout

**Exhibit 2 Page 27**

the plant because it moves to points of active growth or food storage accumulation. When applied to the soil, some symplastically translocated herbicides flow through the cells of the root to the steele where they can move in both the symplast and apoplast. Glyphosate is translocated in the symplast and it accumulates in underground tissues, immature leaves, and meristems (actively growing regions of the plant) (Shaner, 2014). Some glyphosate movement in the apoplast has been observed, but most results suggest little to no apoplastic movement (Shaner, 2014).

**Herbicide Mode of Action and Mechanism of Action** - Historically, the term "mode of action" referred to the entire sequence of events from introduction of a herbicide into the environment to death of the plants. More recently, weed scientists have been using this term to describe the symptoms observed in the plant species affected by the herbicide. The term "mechanism of action" used to refer to the primary biochemical or biophysical processes that are inhibited which lead to death of the plant. More recently, weed scientists use the term "site of action" to describe the specific enzyme or enzyme target that is inhibited by the herbicide, which leads to plant death.

**Herbicide site of action** – Herbicides are developed to target molecular processes in plants that are not present in higher animals such as man. Most herbicides target a specific enzyme or enzyme complex in the chloroplast of a plant that are called sites of action. Chloroplasts are the structures in plant cells that intercept light and turn light energy into chemical energy in the form of sugars/carbohydrates, the building blocks for other structures in the plant. Higher animals and humans consume food rather than intercepting sunlight to obtain sugars and carbohydrates. Higher animals and humans do not have chloroplasts. The Weed Science Society of America (WSSA) groups herbicides into 30 site of action families. Glyphosate targets the key enzyme of the shikimate pathway, 5-enolpyruvylshikimate-3-phosphate synthase (EPSPS - WSSA group 9) which synthesizes three essential aromatic amino acids (phenylalanine, tyrosine and tryptophan) in plants. This pathway is present in plants and some bacteria, but not present in humans. This pathway will be described in more detail later in the report.

**Environmental fate of herbicides**. Environmental fate refers to the processes that result in movement of the herbicide from the site of application and decomposition of the parent herbicide molecule to metabolites that are not active on plants. The term persistence refers to the property of a herbicide to remain in its parent state which is active on target weed species. Persistent herbicides remain active in the soil for long periods of time, and kill weeds or harm susceptible crops planted in a rotation after the treated crop is harvested. In non-crop situations, regrowth of native vegetation in non-crop sites will be prevented over long periods of times by persistent herbicides. Herbicides that are not persistent are broken down quickly by soil microbes, or chemical processes, to nontoxic metabolites, and eventually the metabolites are broken down to $CO_2$ and water. In some cases, herbicides can move from the site of application before they are decomposed. Herbicides can move offsite by leaching (movement down through the soil profile with water), surface runoff (lateral movement with water as it runs off the site of application), movement on soil particles with wind, and volatilization. Volatilization refers to movement of the herbicide in the gaseous phase. This happens when one of the chemical properties of a herbicide, the vapor pressure, is high enough that it goes through a phase change from a liquid to a gas. The herbicide in a gas phase is much lower in density than the liquid phase and the

**Exhibit 2 Page 28**

herbicide will move off site as a gas. Herbicides with high vapor pressure characteristics potentially can move offsite. Glyphosate has a low vapor pressure and will not move offsite via volatility.  It is rapidly and tightly adsorbed to soil and has shown low mobility on most soils because of high adsorption.  In fact, because it is so tightly adsorbed to soil, all crops or plants can be planted or transplanted immediately after application.

**Toxicity and Bioaccumulation of Herbicides**. Toxicity and bioaccumulation of herbicides are two key criteria in chemical risk assessment of crop protection products like herbicides. A common way to document and discuss toxicity is to review oral $LD_{50}$ values. $LD_{50}$ is the amount of chemical required to provide a "lethal dose" to 50% of the test population. $LD_{50}$ is measured in mg of chemical administered per kg of body weight. Therefore, an oral $LD_{50}$ of 500 means that 500 mg of chemical was needed to obtain lethality in a 1 kg subject (such as a rabbit). The lower the $LD_{50}$ value, the less chemical that is required to reach lethality. A chemical with an $LD_{50}$ of 10 mg/kg is more acutely toxic than one with an $LD_{50}$ of 100 mg/kg.

Bioaccumulation is the gradual accumulation of substances, such as pesticides or other chemicals, in an organism. Bioaccumulation occurs when an organism absorbs a substance at a rate faster than that at which the substance is lost or eliminated by catabolism and excretion.

These herbicidal properties explain why herbicides are so effective on plant species but not equally harmful to humans. As discussed, herbicides target highly specific biological or biochemical processes within plants, such as photosynthesis and production of branch-chain amino acids. However, mammals (e.g. humans) do not have the organs to photosynthesize (use sunlight to fix carbon and produce energy) or produce the branch-chain amino acids leucine, isoleucine or valine. These amino acids are needed by humans and must be obtained from food.

**Formulations and Adjuvants**. Before they are made available to consumers, herbicides are typically mixed with other ingredients into a formulated product.  These other ingredients make the herbicide safer to store, transport, and handle and increase the efficacy of the herbicide.

Herbicide adjuvants can be added either to the formulated product at the factory or added to the spray tank by the applicator.  Herbicide adjuvants are used with many postemergence herbicides to help overcome the barriers that reduce movement of the herbicide from the leaf surface to the target site in the interior of a plant cell. The primary types of adjuvants used to enhance glyphosate performance are surfactants and ammonium fertilizers.

The term "surfactant" is derived from the term *sur*face *ac*tive ag*ent*, and describes the ability of these compounds to function at the interface between compounds with different water and oil solubilities.  Surfactant molecules have two distinct components, one is hydrophilic (water soluble) whereas the other is lipophilic (oil soluble).  The lipophilic portion of the molecule typically is a long carbon containing chain, which is lipophilic.  The two portions of the surfactant molecule allow it to associate with liquds having wide-ranging solubilities in water and oil.  Most products used with postemergence herbicides are classified as nonionic because they have a neutral charge.

29

**Exhibit 2 Page 29**

The effect of surfactants on the surface tension of spray droplets is well documented.  The epicuticular, lipohilic wax on the surface of leaves repels water, resulting in beading of spray droplets.  Surfactants reduce the surface tension of spray droplets, increasing spray retention, and allowing the spray droplets to spread over a larger area (Figure 5).

Figure 2.  Effect of Surfactants on Surface Tension and Herbicide Activity

| | Surfactant concentration | Weed Control |
|---|---|---|
| | 0% | 45% |
| | 0.12% | 60% |
| | 0.25% | 85% |
| | 0.50% | 98% |

Figure 5. Image which shows the effect of a surfactant on the spray droplet on a leaf surface. Taken from (https://crops.extension.iastate.edu/encyclopedia/role-spray-adjuvants-postemergence-herbicides)

Surfactants are used with glyphosate-based herbicides to improve the delivery of the product to the target weed species so excessive rates of glyphosate are not required to maximize efficacy.

Another common spray additive used with glyphosate in agricultural settings is ammonium fertilizer solutions. Ammonium containing fertilizer solutions are also used to enhance glyphosate performance.  Weed control efficacy of weak acid herbicides like glyphosate can be reduced when water sources contain hard water cations like calcium ($Ca^{+2}$), iron ($Fe^{+3}$), magnesium ($Mg^{+2}$), and sodium ($Na^+$).  The hard water cations, which have a positive charge, will bind to the negatively charged herbicide molecule and reduce the herbicide's ability to be absorbed into the plant.  Sometimes we call this process chelating and it is well known that glyphosate can chelate $Ca^{2+}$ ions, and that calcium can tie up multiple glyphosate molecules (Figure 6).



Glyphosate is bound by hard water cations which is less likely to be absorbed into plant tissue.

Figure 1. Glyphosate molecules in hard water.

**Exhibit 2 Page 30**

Figure 6. Glyphosate molecules in hard water (source: Johnson, Young, and Zimmer - No-Till Farmer - https://www.no-tillfarmer.com/articles/8726-using-ams-to-combat-hard-water-antagonism-of-postemergence-herbicides).

To correct this problem, when you add AMS $(NH_4)^2SO_4$ to the tank, the ammonium $(NH^{4+})$ disassociates from the sulfate $(SO_4^{-2})$ and the sulfate preferentially binds to the positively charged hard water cations.  The sulfate essentially sequesters the hard water cations and prevents them from binding to the herbicide (Figure 7).



Figure 2. Glyphosate molecules in hard water plus Ammonium Sulfate (AMS).

Figure 7. Glyphosate molecules in hard water after ammonium sulfate has been added. (source: Johnson, Young, and Zimmer - No-Till Farmer - https://www.no-tillfarmer.com/articles/8726-using-ams-to-combat-hard-water-antagonism-of-postemergence-herbicides)

Additionally, after antagonistic minerals are neutralized by the sulfate, the ammonium can bind with the herbicide to form the ammonium herbicide salt, which can more effectively pass through the plant cuticle resulting in greater herbicide absorption, in some cases increased herbicide translocation, and overall greater herbicide efficacy.

## VI. Glyphosate-Based Herbicides

Glyphosate-based herbicides are the safest, most effective, and most environmentally friendly herbicides in use and have allowed humans to finally gain an edge in our battle against weeds. Glyphosate is an environmentally benign herbicide. It is not volatile, binds tightly to soil with very little movement in soil and groundwater, and has a relatively short environmental half-life due to microbial degradation. Glyphosate has little or no effect on non-target organisms other than some fungi.

**Exhibit 2 Page 31**

**Toxicological Properties of Glyphosate-Based Herbicides**. Glyphosate targets the key enzyme of the shikimate pathway (Figure 8), 5-enolpyruvylshikimate-3-phosphate synthase (EPSPS ‐ WSSA group 9) which synthesizes three essential aromatic amino acids (phenylalanine, tyrosine and tryptophan) in plants that are needed for auxin, phytoalexins, folic acid, lignin, plastoquinones and other secondary products. Over 30% of the carbon fixed by plants passes through this pathway. Inhibition of this pathway by glyphosate leads to accumulation of shikimate and shikimate-3-phosphate.  Glyphosate binds to the site that normally binds PEP. There are two forms of EPSPS found in nature. EPSPS I, which is found in plants, fungi, and most bacteria, is sensitive to glyphosate. EPSPS II, which is found in glyphosate resistant bacteria, is not inhibited by glyphosate. The gene for EPSPS II is the gene that has been placed in some crops to engineer glyphosate resistance in crops.



Figure 8. Shikimate pathway in plants and some bacteria. This diagram shows the structure of the components of the pathway and the location where glyphosate inhibits the aromatic amino acids tryptophan, tyrosine, and phenylalanine. Image taken from https://www.researchgate.net/figure/Chemical-structures-of-glyphosate-and-phosphoenolpyruvate-and-overview-of-the-shikimate_fig4_317552846.

Glyphosate is extremely safe for human use and is one of the least toxic pesticides to humans and mammals. As discussed above, the $LD_{50}$ value for each compound can be used to compare the toxicity of various herbicides.  The higher the $LD_{50}$ value, the less acutely toxic the substance. All substances have an $LD_{50}$ value, including common household items like table salt, ammonia, caffeine and nicotine (Table 1). Glyphosate, with an $LD_{50}$ value of nearly 5000 mg per kg, has a higher $LD_{50}$ value, and is therefore less toxic, than many of these commonly used household products. For example, it is less acutely toxic than common chemicals such as table salt and aspirin.

Table 1. Oral $LD_{50}$ of selected herbicides and consumer goods.

| Compound | Oral $LD_{50}$ (mg/kg) |
| --- | --- |
| Glyphosate | 4900 |
| Atrazine | 3090 |
| 2,4-D | 666 |

Exhibit 2 Page 32

| Paraquat | 100 |
|---|---|
| Glufosinate | 2170 |
| Table salt | 3000 |
| Household ammonia (10%) | 350 |
| Aspirin | 200 |
| Tylenol | 338 |
| Caffeine | 192 |
| Nicotine | 9 |

Glyphosate is also less acutely toxic than other herbicides.  The acute oral $LD_{50}$ for glyphosate is 4900 mg/kg, while the acute oral $LD_{50}$ for glufosinate is 2170 mg/kg, and 100 mg/kg for paraquat. Because of its high oral $LD_{50}$ and negligible inhalation toxicity, toxicology data support the fact that glyphosate is the safest of three comparable herbicides (glufosinate and parquat are the other two) that would be used for non-selective weed control in many different settings (Herbicide Handbook 2014). In fact, the toxicity risk is so high with paraquat that it is classified as a restricted use pesticide, which means additional training and licensure is needed to purchase and use paraquat. This additional training and licensure is not required for glyphosate since it is safer to use.

Glyphosate and glyphosate-based herbicides are backed by one of the most extensive worldwide human health and safety databases ever compiled for a pesticide. EPA approved registration of glyphosate in 1974 and again in 1993 when glyphosate was reregistered for sale in the U.S.  EPA initiated another registration review for glyphosate in 2009.  In 2020, EPA released the glyphosate proposed final decision that concluded that there are no unreasonable human health risk concerns when glyphosate is used according to the label, it is not likely to be carcinogenic to humans, and no further data are needed to evaluate the risks to humans (EPA 2020).  EPA reached the same conclusion in previous reviews of glyphosate (EPA 2017).  These findings on human health risk are congruent with reviews by other countries and other regulatory agencies.  Glyphosate recently was found to be low risk to humans and the environment in an extensive evaluation of 659 pesticides by various environmental groups (Jepson et al. 2020).

**Environmental Properties of Glyphosate Based Herbicides.**  Glyphosate is a revolutionary herbicide because of its low toxicity to humans and animals, and efficacy on a broad-spectrum of weeds. Glyphosate is rapidly and tightly adsorbed to soil and does not leach into groundwater. Crops, vegetables, and landscape plants can be seeded or transplanted immediately after application. After application, glyphosate is degraded in soil by soil microorganisms and up to 70% is degraded over a growing season or less (Herbicide Handbook 2014).

The physicochemical properties of glyphosate indicate a favorable environmental profile. The vapor pressure of glyphosate is $2.50 \times 10^{-5}$ Pa at 25 C. Volatile herbicides are those that have vapor pressures in the $10^{-4}$ or higher, and include herbicides such as clomazone and EPTC. Glyphosate is considered a non-volatile herbicide, and its low volatility make it less likely to drift off-target and injure sensitive vegetation or drift onto applicators when applying glyphosate.

Glyphosate does not persist in the environment, leach into groundwater, or move off site by volatility or leaching. Glyphosate is used as a postemergence, foliar applied herbicide, and the

**Exhibit 2 Page 33**

potential for root uptake of glyphosate from soils is negligible because of its rapid microbial degradation and strong soil binding properties. Chemical decomposition does not contribute to the degradation of glyphosate in the environment because glyphosate is stable to hydrolytic degradations in most relevant pH ranges.  Glyphosate is not susceptible to degradation by light (photodegradation) in sterile water and soil.  However, photodegradation can occur in water under certain limited conditions. Glyphosate is readily degraded by microorganisms in the soil, nonsterile water, and water sediment systems. Indigenous microflora degrade glyphosate under both aerobic and anaerobic conditions. The principal metabolite is aminomethylphosphonic acid ("AMPA"). AMPA is further degraded by soil microorganisms, although at a slower rate than glyphosate.

Studies demonstrate that in soil 79% to 86% of glyphosate is degraded to carbon dioxide during a six month period (Franz et al., 1997). The results of over 90 field trials conducted in Europe, Canada, and the US show that glyphosate dissipates in all cases within less than one year, and typically less than 38 days (Giesy et al., 2000). Laboratory and field studies also demonstrate that dissipation times are not affected by the rate of application and that glyphosate and its metabolite AMPA do not accumulate following multiple applications, either during the same year or over tens of years (Giesy et al., 2000). In all cases, the results demonstrate the biodegradation of glyphosate to AMPA and carbon dioxide, and the subsequent biodegradation of AMPA to carbon dioxide. Batch equilibrium studies, which demonstrate the ability of substances to be absorbed into soil, have shown Koc values for glyphosate ranging from 1600 to 60,000 (Saltmiras et al., 2015). This indicates that glyphosate is strongly absorbed into soil, especially when compared to other herbicides such as atrazine and metolachlor which each have average Koc values of 100 and 200, respectively (Herbicide Handbook, 2014). Additional studies have been done to investigate the uptake of radiolabeled glyphosate into rotational crops following soil applications to a primary crop. The maximum uptake into plants grown and soil treated with glyphosate was in all cases less than 1% of the total applied (Saltmiras et al., 2015). These results demonstrate that glyphosate entry into plants via the root system as a result of applications of glyphosate to the soil is negligible.

## VII.  Benefits of Glyphosate Based Herbicides

**Agricultural Benefits**. Controlling weeds to protect crop yields has been the world's greatest challenge in providing a safe and abundant supply of food since the beginning of time. Glyphosate use as a preplant, burndown herbicide in the 1980s and early 1990s allowed for rapid expansion of no-till crop production practices because of its high efficacy in controlling winter and summer annual weeds and perennial weeds commonly found in farm fields prior to planting the summer crop.

Glyphosate quickly became the foundation for no tillage and minimum tillage agriculture. Conservation tillage systems were developed to reduce tillage and preserve soil. Glyphosate is the herbicide of choice for these systems because it is nonselective and kills a broader spectrum of species and larger plants than other nonselective herbicides.  Glyphosate is more effective on perennial weeds that often increase under no tillage systems.

**Exhibit 2 Page 34**

The advantages of conservation tillage crop production practices are abundant.  No and conservation tillage results in increased soil moisture, which produces higher yields where moisture is limiting.  Further, the reduced number of passes with heavy, fuel thirsty tillage equipment over the field saves fuel, labor and soil compaction.  Runoff and erosion by water and wind are reduced when compared to traditional till practices. This reduced erosion improves water and air quality, and decreases dust storms, which can result in catastrophic consequences. $CO_2$ and greenhouse gas emissions are less because of the retention of crop residues and reduced fossil fuel use.  These reductions are extremely significant because they are factors in reducing the negative impacts of climate change. Because glyphosate provides the most effective weed control compared to other herbicides that can be used in this manner, it would not be possible to maintain the environmental gains that have resulted from the expansion of conservation tillage without it. Without glyphosate, growers would need to use less effective herbicides and make more applications of these less effective herbicides, which would increase the environmental and economic costs of weed control.

**Glyphosate use in Herbicide Resistant Crop Farming.** The introduction of Round-up Ready crops in the 1990s revolutionized agriculture and led to a substantial and rapid reduction of tillage in farming. The use of glyphosate in glyphosate resistant crops allowed improved, simpler, and more flexible weed control because time of herbicide application was no longer as critical as it is with other herbicides.  Further, since glyphosate is nonselective, no other herbicides are needed in these systems and growers simply respray the field if weeds are not controlled with the first application.  Previously, there were few options to control late emerging weeds without crop damage, but glyphosate can be applied early in the season and again later in the season to control weeds later as well.  This flexibility in application also provides a longer window of time if environmental and/or weather conditions prevent access to the field. Glyphosate provides better season-long weed control of many species that growers were struggling to control, such as waterhemp, cocklebur, sunflower, and ragweeds because it can be applied more than once if necessary, which results in higher crop yields in fields with these species that had evolved resistance to ALS herbicides.  Growers no longer needed to consider herbicide residues from late season alternative herbicides (primarily ALS and PPO inhibitors) that might injure the next crop in the rotation.  Also, glyphosate reduces worker exposure to herbicides with higher toxicity while at the same time reducing the environmental impact of these herbicides.

Rapid expansion of reduced tillage operations for corn, soybeans, and cotton occurred in the 1990s with greater utilization of glyphosate-based herbicides to control weeds before planting, and commercial release of Roundup Ready crops.  An analysis of the relationship between conservation tillage and glyphosate-resistant soybean adoption found a direct positive relationship with a 1% increase in glyphosate resistant soybean adoption, leading to a 0.21% increase in conservation tillage (Fernandez-Cornejo et al., 2012). A 2012 USDA agricultural resource management survey found that approximately 97% of soybeans grown in the U.S. were herbicide resistant and 70% of U.S. soybean growers practiced conservation tillage (USDA-NASS, 2014). A 2004 report from the Conservation Technology Information Center (CTIC, Fawcett and Towery, 2004) examined the early years of glyphosate-resistant soybean adoption. From 1996 to 2000, CTIC found that no till practices increased in soybeans from 20.2 to 25.5 million acres and conservation tillage increased in soybeans from 26.9 to 32.2 million acres

**Exhibit 2 Page 35**

during this period. By 2000, 75% of no-till soybean acres, 64% of conservation tillage soybean acres and 52.9% of conventional tillage soybean acres were planted with glyphosate resistant soybeans. CTIC concluded that the availability of glyphosate-tolerant crops enabled both no-till and conservation tillage

There is further evidence that the benefits of glyphosate go beyond just its favorable environmental and toxicity profile. USDA research showed that adoption of herbicide-resistant soybeans was associated with increased off-farm household income, a finding the authors attributed to reduced labor requirements associated with glyphosate resistant soybeans (Fernandez-Cornejo et al., 2007). Gardner et al. (2009) demonstrated the reality of this relationship by examining USDA Agricultural Resource Management Survey data and found that the average soybean farmer with 517 acres reduced labor requirements 14.5% by adopting herbicide resistant soybeans. This reduction resulted in a total requirement of 94.5 hours of labor per growing season, allowing the extra time to be devoted elsewhere, including off-farm employment. In addition, Brooks and Barfoot (2020) estimated that reductions in tillage and herbicide resistant crop use worldwide resulted in a cumulative permanent reduction in fuel use of 34,172 million kg of carbon dioxide, arising from reduced fuel use of 12,799 million liters. In terms of car equivalents, this is equal to taking 22.65 million cars off the road for a year.

With regard to the adoption of each Roundup Ready crop, early adoption rates of herbicide tolerant crops from 1996 to 2015 were driven primarily by the use of the glyphosate resistance trait since it was the main trait sold by most seed companies.  Based on USDA survey data, the percent of domestic soybean acres planted with herbicide tolerance rose from 17 percent in 1997 to 68 percent in 2001, before plateauing at 94 percent in 2014 (Figure 9). Herbicide tolerant cotton acreage expanded from approximately 10 percent in 1997 to 56 percent in 2001, and reached a high of 95 percent in 2019. Adoption rates for herbicide tolerant corn grew relatively slowly immediately following the commercialization. However, adoption rates increased following the turn of the century. Currently, approximately 89 percent of domestic corn acres are produced with herbicide tolerant seeds.



Figure 9. Herbicide tolerant seed use in the United States.

**Exhibit 2 Page 36**

**Roundup Ready Soybeans (1996).** USDA ERS data indicate that herbicide-tolerant soybean acres plateaued at 94% in 2014 and have remained fairly steady since then (Figure 9). The rapid adoption of this technology between its introduction and 2002 was due to the simplicity and flexibility of a weed control program that provides control of a wide spectrum of annual, biennial and perennial weeds with a single herbicide that can be applied over the top of the crop without causing injury to the crop. Prior to the use of glyphosate in Roundup Ready crops, at least 2 postemergence herbicides were required (one for grasses and one for broadleaves). This would either require 2 trips over the field (one for each herbicide), or if the grass and broadleaf herbicides were tankmixed, higher rates of the grass herbicide were needed to avoid antagonism. In addition, rapid expansion of the number of acres infested with ALS resistant cocklebur, sunflower, giant ragweed, and waterhemp necessitated a change in herbicide use to protect crop yields and was the primary driver for rapid adoption.

**Roundup Ready Corn (1996).** Adoption of herbicide tolerant corn was slower than soybeans and cotton (Figure 9) because growers can still use atrazine, a low cost herbicide that controls grass and broadleaf weeds, dicamba for broadleaf weed control, and effective postemergence grass herbicides like nicosulfuron, rimsulfuron, primisulfuron, and foramsulfuron were available. However, as ALS-resistant grass weeds (foxtail and shattercane) became more prevalent in corn production, adoption of glyphosate-resistant hybrids grew rapidly from 2006 to 2010.

**Roundup Ready Cotton (1996).** Adoption of herbicide tolerant cotton was rapid from 1996 until 2001 (roughly 58% of the acres), and proceeded more slowly from 2001 until it plateaued in 2014 at about 90% (Figure 9). Adoption was driven by the favorable efficacy on grass weeds like barnyardgrass, foxtail, crabgrass and the perennial grass johnsongrass, the fact that no-till practices could now be utilized for this crop, and less need for cultivation and post-directed sprays for broadleaf weeds like cocklebur, morningglories, prickly sida, and spurred anoda, which are time consuming and costly.

**Roundup Ready Alfalfa (2005).** Slower adoption of this crop is due to it being a perennial crop and less than 20% of the acreage is newly seeded each year. Only 13% of the alfalfa were planted using HT varieties in 2013 (Figure 10). Adoption is being driven by the high efficacy on winter annual weeds like henbit, chickweed, field penny cress and annual bluegrass, summer annual broadleaf weeds like pigweeds and cocklebur, and perennial weeds like dandelion and curly dock, which were much more difficult to control in alfalfa that was not Roundup Ready.

**Exhibit 2 Page 37**



Figure 10. Adoption of herbicide tolerant alfalfa. Taken from https://www.ers.usda.gov/webdocs/publications/81176/eib-163.pdf?v=0.

**Roundup Ready Canola (1998).** Approximately 95 percent of U.S. canola acres harvested in 2013 were planted with seeds containing herbicide tolerant traits (Figure 11). Though HT canola seeds are more expensive than conventional seeds, most U.S. canola farmers use herbicide tolerant-based production systems. Johnson, Grillo, and Strom (2008) report that HT canola reduced pesticide use in the United States by 600,000 pounds in 2006, a cost savings of $9.5 million. Brookes and Barfoot (2014) report that average yields increased by about 6 percent in the early years of genetically engineered herbicide tolerant ("GE HT") crop adoption. The premium paid for glyphosate tolerant varieties ranges between $5 and $13 per acre (Brookes and Barfoot, 2014). Cost savings (before inclusion of the technology costs) are an estimated $12-$32 per acre for glyphosate-tolerant canola. Glyphosate tolerant canola-based production system increased gross margins between $11 and $25 per acre, presumably due to better control of weeds like kochia, wild buckwheat, and the perennial weeds dandelion and Canada thistle. Brookes and Barfoot estimate that at the national level the total farm income benefit from GE HT canola was $26.8 million in 2012, with a cumulative benefit from 1999 to 2012 exceeding $268 million.

**Exhibit 2 Page 38**



Figure 11. Adoption of herbicide tolerant canola. Taken from
https://www.ers.usda.gov/webdocs/publications/81176/eib-163.pdf?v=0.

**Roundup Ready Sugarbeets (2005).** Over 99 percent of sugarbeet acres harvested in 2013 were
planted with GE seeds containing HT traits
(https://www.ers.usda.gov/webdocs/publications/81176/eib-163.pdf?v=0). Initially, demand for
herbicide tolerant sugarbeet was low, but demonstrations of the effectiveness in several states
resulted in rapid adoption from 2008 to 2010, which topped out at over 98% adoption by 2013
(Figure 12). Glyphosate provided better control of lambsquarters, pigweeds, grass weeds, and
most perennial weeds than the herbicides that were labelled prior to commercial use of Roundup
Ready sugarbeets. Herbicide tolerant sugarbeets have been reported to have 4 to 18 percent
higher root yields and lower herbicide and labor costs with a net impact of $96 to $224 per acre
benefit (Kniss 2010; Lee 2014)



Figure 12. Adoption of herbicide tolerant sugarbeet. Taken from
https://www.ers.usda.gov/webdocs/publications/81176/eib-163.pdf?v=0.

Glyphosate is the most commonly used herbicide in the United States, in terms of total area
treated. It is the most broad-spectrum herbicide available to growers that controls annual,

**Exhibit 2 Page 39**

biennial and perennial weeds, and broadleaf, sedge, and grass weeds with no toxicity to Roundup Ready crops.

**Glyphosate use in Orchards, Vineyards and Nurseries**. Weeds compete with orchard, vineyard, and nursery crops for water and reduce the yield and quality of fruit.  More water is needed to maintain tree and vine health and yield when weeds are present.  Weeds also interfere with irrigation systems by blocking the spray nozzles, which changes the amount of water distributed, leading to over- and under-watering within the site. Further, weeds provide cover and habitat for rodents and pests that can damage tree trunks. Tillage and mowing were the only weed control tools available before herbicides were introduced. Trees were grown on wide centers, to better allow cross-cultivation for weed control. The development of herbicides for orchard use in the 1950s allowed the development of sprinkler irrigation and grass cover crops. Trees could be planted closer, increasing yields and increasing the efficiency of labor. Glyphosate saves growers time and money compared to other weed control options in these areas.

Glyphosate is used in these areas to create a clean field before tree or vine establishment and does not have a replanting restriction, unlike many other herbicides. Glyphosate is especially useful because many of the weed species in these crops are perennial and not effectively controlled by practices such as mowing, which is the major mechanical weed control option for these types of crops.  Glyphosate can be applied at low rates to reduce the growth of grasses that are being maintained between the tree or vine rows.  Glyphosate is safe to use in these areas because it does not volatilize and move off-target like many other herbicides do.  Glyphosate is more effective than the contact herbicides glufosinate and paraquat, which are used in orchards, because glyphosate translocates and kills perennial weeds such as bindweed that is often a problem in orchards.  Glyphosate is less acutely toxic than paraquat and is safer to apply. Glyphosate has a very short pre-harvest interval for tree fruit, and thus can be applied late in the season for weed control.

In modern orchard crops, herbicide programs are highly dependent on glyphosate as part of a tank mix applied with preemergence herbicides and for postemergence weed control at multiple times during the year. The average orchard is treated two to three times each year with glyphosate and potentially more often if preemergence herbicides are not used as part of the year-round weed control program. Glyphosate provides significant benefits by reducing the need for tillage in orchards.

In wineries (grape production for wine), most growers prefer to manage weeds for up to two years with herbicides to prevent damage to the vines. Weed control during this time involves tillage and hoeing several times during the season. In addition, mulches can be used as well to prevent germination and growth of weeds. When the vines are a few years old, a residual, preemergence herbicide can be used in an area 3 to 6 feet wide around each vine and glyphosate is used around mature vines. The use of glyphosate allows the grower to control emerged weeds if the preemergence herbicide fails or the grower is not able to apply a preemergence herbicide.

Nurseries will typically have a wide variety of ornamental plants growing in them. Glyphosate is routinely used for spot-spraying and maintaining weed control throughout the growing season.

**Exhibit 2 Page 40**

Some nurseries use glyphosate exclusively to periodically remove weed infestations and forego using any preemergent herbicides.  Weeds reduce the growth of nursery crops, which are often sold on size.  When size is reduced, the price paid for nursery tree seedlings is also diminished. The seedlings may have to be left in the field for longer, sometimes up to another year before harvest, thus increasing costs of producing nursery crops. Further, the presence of weeds in nurseries may reduce the price that wholesalers are willing to pay. Glyphosate is used in ornamental nursery crops for general nonselective weed control but is especially important for control of perennial species.

**Non Agricultural Benefits.** Glyphosate is also beneficial in a variety of other settings, including in residential areas, aquatic areas, rights of ways, and recreational areas as well.  Federal and state laws require weed control along transportation rights of ways and mandate specific practices for the control of noxious and invasive weeds. Glyphosate is a highly valuable herbicide to address these requirements because it is much less expensive and more effective than mowing or alternative herbicides. Because glyphosate can be used to control noxious and invasive weeds, national and city parks use glyphosate to eliminate noxious vegetation and restore natural habitats.  In lakes and ponds, glyphosate is used to control aquatic weeds to allow boat traffic and maintain fish and wildlife habitat. In turfgrass environments such as golf courses and athletic fields, glyphosate can be used during the dormant season to control undesirable weeds and renovate golf course fairways. In residential settings, glyphosate is easy to use, effective, and safe for use by homeowners and landscapers alike.

Residential areas. Glyphosate use in residential areas is beneficial to homeowners because it is easy to use, it controls a broad spectrum of weeds, and it is safe for humans and animals. With glyphosate, residential users are able to use one low toxicity herbicide to control all weeds instead of using several herbicides with limited selectivity that most likely have less favorable $LD_{50}$ values. It can be used in landscape beds, fence lines, around the foundation of buildings, in between the rows of fruit and vegetable plants in gardens, and a host of other locations as well. Most glyphosate formulations for residential use are ready to use (RTU) and simple to apply so users do not have to mix the concentrated product or add any adjuvants to spray.  Applicators do not have to wear PPE when applying these RTU products because of its low toxicity, and the minimal likelihood of getting it on skin or clothing when properly applied.  Glyphosate has lower toxicity than many other frequently used landscape herbicides including herbicides certified as organic. Glyphosate is less expensive than other products typically used on residential property and less expensive than labor for practices like hand weeding and electrical or gas powered trimmers.

Glyphosate is not persistent in the soil and allows grass and other landscape plants to be planted soon after an area is treated.  Because it controls a broad spectrum of weeds, users do not have to take time to learn how to identify specific weeds and sort through other herbicide options. Homeowners often do not have the skills to identify specific weed species.  Therefore, glyphosate - a systemic, nonselective herbicide - is especially valuable because it controls a wide range of species.  Because glyphosate is not selective, only one product is needed to control multiple species and types of weeds, which reduces the amount of chemicals applied to areas to control weeds.  Glyphosate is nonselective so is not used on lawns but is used to kill weeds that occur in other areas of landscaping.  Glyphosate will not kill desirable landscape plants as long

**Exhibit 2 Page 41**

as it is applied correctly.  Because glyphosate only kills plants that it contacts, homeowners can be assured that their desirable plants will not be injured or killed.  Glyphosate does not require repeated applications as do non-translocated, contact herbicides so it can be used less often during a season and only at the times in a season when weeds have emerged.  In most landscape situations, glyphosate is sprayed on limited areas, which results in less overall use because it is not applied as a broadcast treatment.  Glyphosate has an advantage over other herbicides used in urban areas because it does not have an offensive odor.

Glyphosate saves homeowners time and can be used by those who may not be physically able to remove weeds by other more physically-intensive methods such as pulling, hoeing, or mowing. In addition, glyphosate is beneficial for homeowners who do not have the resources to hire professionals to maintain their landscape. Glyphosate also provides an option to control weeds like poison ivy, which can cause rashes, and other poisonous plants which should not be handled directly. These plants can be treated with glyphosate when they are growing in close proximity to desirable species if the spray can be kept off of the desirable species.

Ultimately, the low toxicity, ease of use, efficacy and low cost make glyphosate an easy and ideal option for homeowners. It allows for control of weeds for those not able to employ mechanical methods and only needs to be used a few times per year to achieve desired weed control. No other herbicide provides the combination of benefits for residential landscapes as glyphosate.

Aquatic Areas. Control options for aquatic weeds include both mechanical and herbicide options, but herbicide options are much less expensive and time consuming. Glyphosate use in aquatic systems is important because it controls a broad spectrum of annual and perennial weeds, trees and floating plants, which can serve as breeding grounds for mosquitoes that act as disease vectors (Getsinger et al., 2014).  Glyphosate controls emerged aquatic weeds like reed canarygrass, purple loosestrife, phragmites, water hyacinth, and water lettuce. Glyphosate is often the herbicide of choice for emerged aquatic weed control because of its low cost and low toxicity to other aquatic organisms. Unlike herbicides like triclopyr and imazapyr, which are persistent in the water and can injure vegetation through irrigation water, water use restrictions for glyphosate do not exist.

Highway, railroad and utility rights of ways. Because glyphosate is a broad-spectrum, non-selective herbicide, it can be used in areas where all vegetation requires control or used as a spot treatment to control individual plants or stands of weedy vegetation. Because much of the unwanted vegetation in these areas include woody, perennial species, glyphosate is the preferred herbicide to use because it is a systemic herbicide which can control the roots of plants unlike the contact herbicide alternatives like paraquat or glufosinate.  Further, glyphosate can be mixed with many other herbicides so it can be combined with a soil residual herbicide that provides extended weed control to limit the number of applications needed to these areas.  The combinations allows for control of weeds that are emerged as well as those that have not emerged.  Glyphosate can also be applied after a pre-emergence herbicide to control weeds that escape its control.  Glyphosate's unique flexibility in providing for weed control on these sites is especially valuable because of its ability to kill grasses and broadleaf and its effectiveness on perennial species.  Glyphosate can be used at low rates to reduce the growth, referred to as

**Exhibit 2 Page 42**

chemical mowing, but not kill grass species; this provides the option to keep desirable ground cover while controlling undesirable weeds.

Recreational Settings. Recreational areas such as picnic grounds, county and state fair grounds, sports fields, golf courses, lake and pond shorelines and other areas that include managed landscapes rely on weed control methods to maintain function and aesthetics. Use of glyphosate to control annual, biennial and perennial weeds, makes it valuable in these settings to support their intended use. Because it does not persist in the soil, the use of glyphosate for vegetation control in these areas allows new vegetation to be seeded or planted shortly after application. Its low cost, high efficacy, and low toxicity compared to other alternatives makes it a desirable option for renovating existing vegetation. An important use for glyphosate is in the renovation of turf grass stands on golf courses. Yelverton (2004) noted that glyphosate can be applied to dormant turf in fairways to eliminate undesirable species, thus maintaining the desired turf quality without the high cost of replacement. Glyphosate's lack of residual activity makes it a strong choice compared to alternative herbicides that can control grasses. Additionally, when existing grass needs to be removed, new turf can be seeded within days of application. Glyphosate products can also be used to spot treat weeds in sand bunkers, native, and no-mow areas.

## VIII. Pesticide Registration through EPA

The process of registering a pesticide is a scientific, legal, and administrative process where EPA examines the ingredients of the pesticide, the site or crop where it is to be used, the amount, frequency, and timing of use, and storage and disposal practices. The U.S. EPA assesses a wide variety of human health and environmental effects associated with the use of the pesticide. A company that wants to produce and sell a pesticide must provide data from experiments that meet EPA testing guidelines.  Through evaluation of the data package submitted, EPA will develop risk assessments that evaluate a pesticide's potential for harm to humans, wildlife, fish, and plants, including endangered species and non-target organisms.  Human risks evaluated by EPA range from short term toxicity to long term effects such as cancer and reproductive system disorders. EPA also develops risk assessments for environmental contamination of surface and ground water from leaching, runoff and spray drift.

Weed control practitioners, scientists and citizens who use herbicides to control weeds look to the EPA for guidance on how to safely use pesticides in accordance with the label. EPA has exclusive regulatory authority over pesticides and the EPA approved label is the law which governs the use of that specific product. Weed control researchers and practitioners such as myself look to the EPA and their guidance about the possible risks and benefits of using a specific herbicide.

EPA regulates pesticides under broad authority granted in two major statutes, the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") and the Federal Food, Drug, and Cosmetic Act ("FFDCA"). These laws have been amended by the Food Quality Protection Act ("FQPA") and the Pesticide Registration Improvement Act ("PRIA"), all of which are described below.

Exhibit 2 Page 43

FIFRA requires all pesticides sold or distributed in the United States (including imported pesticides) to be registered by EPA. Registration is based on evaluation of scientific data and assessment of risks and benefits of a product's use. The approved label directions control how products are used, and not following the label instructions is a violation of federal law.

The FFDCA requires EPA to set pesticide tolerances for all pesticides used in or on food or in a manner that will result in a residue in or on food or animal feed. A tolerance is the maximum permissible level for pesticide residues allowed in or on human food and animal feed. The FFDCA includes strong provisions for protecting infants and children, as well as other sensitive subpopulations.

Under the Food Quality Protection Act of 1996 (FQPA), which amended both FIFRA and FFDCA, EPA must find that a pesticide poses a "reasonable certainty of no harm" before it can be registered for use on food or feed. EPA must review each pesticide registration at least once every 15 years. Several factors must be addressed before a tolerance can be established, including: the aggregate, non-occupational exposure from the pesticide (exposure through diet and drinking water and from using pesticides in and around the home); the cumulative effects from exposure to pesticides that have a common mechanism of toxicity, that is, two or more pesticide chemicals or other substances that cause a common toxic effect(s) by the same, or essentially the same, sequence of major biochemical events (i.e., interpreted as mode of action); whether there is increased susceptibility to infants and children, or other sensitive subpopulations, from exposure to the pesticide; and whether the pesticide produces an effect in humans similar to an effect produced by a naturally-occurring estrogen or produces other endocrine-disruption effects.

There are a number of federal regulations implementing each of these statutes.

As mentioned earlier, the registration of a pesticide is a scientific, legal, and administrative process. EPA assesses a comprehensive and a wide variety of potential human health and environmental effects associated with use of the product, considering the particular site or crop on which it is to be used, the amount, frequency, and timing of use, and the recommended storage and container disposal practices. EPA evaluates scientific studies concerning these issues; these studies must be conducted according to standardized good laboratory practices (GLPs). Results of these tests determine whether a pesticide has potential to cause adverse effects on humans, wildlife, fish, or plants, including endangered species and non-target organisms, as well as possible contamination of surface water or groundwater from leaching, runoff, and spray drift. The potential for human risk is evaluated and includes short-term toxicity and long-term effects such as cancer and disorders of the reproductive system. EPA approves a pesticide's registration only if EPA determines that it can be used to perform its intended function without unreasonable adverse effects on humans or the environment. EPA must also approve specific language that appears on each pesticide label, and the product only can be legally used according to label directions.

## IX. Glyphosate Labeling by the U.S. EPA

**Exhibit 2 Page 44**

As mentioned above, the U.S. EPA has the exclusive regulatory responsibility to approve the herbicide label.  Herbicide labels provide important information about the product, its appropriate use, and the precautions needed to avoid off-target movement, to protect environmental quality, and to protect the user. EPA evaluates the data submitted for registration and ensures that the label translates the results of those evaluations into a set of conditions, directions, and precautions that define who may use a pesticide, as well as where, how, how much, and how often it may be used.

FIFRA Section 3(g) mandates that the EPA periodically re-review the registration of all pesticides to ensure that they do not pose unreasonable adverse effects to human health and the environment. This periodic review is necessary in light of scientific advancements, changes in policy, and changes in use patterns that may alter the conditions underpinning previous registration decisions. In determining whether effects are unreasonable, FIFRA requires that the Environmental Protection Agency consider the risks and benefits of any use of the pesticide.

There are many different formulations of glyphosate and there are several sections on a glyphosate herbicide label to outline safe use practices. Even though there are many formulations of glyphosate, there are generally 2 main types of labels for glyphosate products, the label for glyphosate packaged as a concentrated product and the label for ready to use (RTU) formulations of glyphosate. There are differences in the content of each of these labels. Below is a brief discussion of the main components of the labels that outline safe use practices.

**Signal Word.** The signal word – Danger, Warning or Caution – is found on all pesticide labels, and indicates the acute level of toxicity if the product is swallowed, spilled on skin, splashed in eyes, or inhaled. Danger, Poison with a Skull and Crossbones appears on the most toxic pesticides. Glyphosate has a signal word "Caution," which indicates that EPA determined it has the lowest level of signal word and a lower acute toxicity than the herbicides that have a "Danger" or "Warning" signal word.

**Restricted Use Pesticide.** Restricted Use Pesticides are available only to certified applicators or persons under their direct supervision in some states. Restricted use pesticides cannot be used by the residential market, require more extensive PPE, and often are products that can pose serious risk of harm like cancer. In addition, special attention is needed while using the restricted products because they can move off-site or can be injurious or toxic to non-target species. Glyphosate is not a restricted use pesticide, which indicates that it does not pose a high risk of offsite movement or injury or toxicity to nontarget species and applicators.

**Precautionary Statement.** The precautionary statement sections of the label contain the signal word and specifically outline the required PPE that must be worn to limit exposure of the mixer or applicator to a product like glyphosate.  The label for the use of a glyphosate concentrate product, such as Roundup Pro, requires long-sleeved shirt and long pants, shoes plus socks to be worn as personal protective equipment. The label for the RTU formulations typically do not specify that the applicator needs to wear any personal protective equipment. This indicates that the RTU formulations that are typically used in residential settings do not pose health risks to applicators.

**Exhibit 2 Page 45**

**Instructions on Where, When, and How to Apply**. The instructions on where, when, and how to apply glyphosate RTU products for minimizing the exposure of the mixer and applicator of glyphosate are clear, simple and designed to minimize any chance of exposure of humans to glyphosate-based herbicides.

*Where to apply* - The RTU products can be applied to a number of differential residential sites which include flower beds and vegetable gardens, around shrubs and trees, on patios, walkways, sidewalks, gravel or mulch beds, around fences and foundations, and near edging around foundations and retaining walls.

*When to apply* – Both concentrate and RTU products should be applied when weeds are actively growing, during warm sunny weather above 60 degrees F, when the wind is calm to prevent drift. Glyphosate can be applied when temperatures are cooler (down to 45 degrees F), but it will work more slowly to kill the weed since they are not growing as fast in cool temperatures.

*How to apply* - The RTU products are premixed with water in a sealed container. RTU products do not require the applicator to mix concentrated product with water, which reduces the chances of exposure. Most RTU products are applied from the sealed container through a wand that can be extended and held away from the applicator's body with the spray stream targeted at the weed the applicator is trying to control.  Glyphosate is absorbed by the undesirable plant's leaves. After application to the undesirable plant, glyphosate moves from the leaves to the root. Any product not absorbed by the plant breaks down without moving in or onto soil to untreated plants.

The signal word, restricted use pesticide statement, and precautionary statements provide clear directions from the EPA that glyphosate is safe to use in residential settings. In summary, the instructions for minimizing the exposure of the mixer and applicator of glyphosate are clear, simple and designed to minimize any chance of exposure of humans to glyphosate-based herbicides.


## X.      Glyphosate Application Methods

This section will focus on the different ways glyphosate-based herbicides are applied. Each of these methods is designed to ensure that the herbicide reaches its intended target and only its intended target, and thus minimizes the potential for human contact.

Glyphosate based herbicides can be applied as broadcast sprays, with aerial spray equipment such as airplanes or helicopters, with ground application equipment and with selective hand-held applicators. Ground application equipment used for broadcast sprays include boom sprayers, which can be pulled with tractors, ATV's, or trucks, or the sprayers can be self-propelled units that are driven by an operator. Glyphosate based herbicides can also be applied with more selective application methods such as shielded and hooded sprayers, rope wick or wiper (sponge) applications, or through injection systems. Finally, hand-held selective applications can be accomplished with controlled droplet applicators and handheld or backpack sprayers.

**Exhibit 2 Page 46**

**Aerial Application.** Aerial application involves spraying crops with crop protection products from a highly specialized agricultural aircraft such as an airplane or a helicopter (Figure 13). Aerial glyphosate application in agricultural crops can be an important tool where large fields, topography, and wet soil conditions prevent the use of ground driven application equipment.



Figure 13. Aerial application of pesticides from an airplane (photo on left) and a helicopter (photo on right). Image source – https://inthefurrow.com/2020/05/06/aerial-herbicide-applications/ (image on left) and https://cdn2.creativecirclemedia.com/ptleader/original/20190813-142411-HeliSpray.jpg (image on right).

**Ground Application.** Ground application of glyphosate can be done with broadcast boom sprayers of various types, shielded and hooded sprayers, rope wick/wiper (sponge) applicators, sponge bars, and controlled droplet applicators. Ground application equipment also includes backpack and handheld sprayers and other spot spraying equipment mounted on tractors or all-terrain vehicles (ATVs). There are very similar safeguards in place for each piece of equipment to minimize pesticide exposure to the applicator or other unintended targets, which are mentioned below.

Boom Sprayer Applications - A ground-driven boom sprayer consists of a spray boom with several spray nozzles mounted in a row. Boom sprayers can be self-propelled or used on tractors (Figures 14 and 15), ATVs (Figure 16), or trucks. Broadcast spray applications with a spray boom consist of applying a spray solution uniformly over the entire treated area. The spray boom can be mounted on either the front or the back of the equipment. These applications are most successful and minimize off target movement when herbicides are applied according to label directions and the equipment is operated properly.

**Exhibit 2 Page 47**



Figure 14. Large ground sprayer applicators used in agricultural crop production. A pull type boom sprayer on the left and a self propelled boom sprayer on the right. Image source https://www.wyliesprayers.com/v/product-line/Agriculture/3m/ (image on left) and https://www.deere.com/en/sprayers/hagie-sts/hagie-sts16-self-propelled-sprayer/ (image on right).



Figure 15. Medium sized ground sprayer mounted on a tractor. Image source https://cropcareequipment.com/3pt-sprayers/



Figure 16. Small ground sprayer applicators that are either pulled by an ATV. Image source https://www.topairequip.com/atv-sprayer/.

**Exhibit 2 Page 48**

Shielded or Hooded Sprayer Application - These applications are very similar to the spray boom application and consist of applying a spray solution over an entire treated area. The difference between shielded or hooded applications and open boom applications is the use of shields or hoods over the spray nozzle. (Figure 17).



Figure 17. Hooded sprayer applicator used in a turf or lawn setting.  The hoods prevent wind from moving the spray solution onto vegetation which can be damaged by the herbicide. Image source https://www.grasshoppermower.com/implements/shielded-sprayer/

With all of the ground application methods mentioned above, there are a number of safeguards required by the glyphosate label to minimize off site movement of the herbicide applied by the sprayer

These safeguards include the following:

1) The nozzles, carrier volume and pressure should be set so large spray droplets are produced that provide adequate coverage and control of the weeds, and minimize small droplets that are prone to move before they are deposited on the intended target.

2) When spraying near sensitive areas, apply only when the potential drift is minimal with the wind blowing away from the sensitive vegetation.
3) Keep the spray boom height as close to the intended target as allowed by the nozzle spacing and spray angle. Information on lowest spray distance can be found from the nozzle manufacturers literature.

Controlled Droplet Applicators. Most conventional boom sprayers use a hydraulic nozzle which involves breaking up spray liquid into smaller particles by squirting it under pressure through a hole. Controlled droplet applicators produce a specific size of spray droplet by utilizing a spinning disc atomizer which breaks up spray droplets more evenly. Controlled droplet applicators enable the use of low and ultra low carrier volumes since they can produce a smaller range of spray droplet sizes. This type of application reduces waste and production of spray particles that are not effective. The use of this type of sprayer provides the flexibility to mix up smaller spray volumes as well (Figure 18).

**Exhibit 2 Page 49**



Figure 1. ATV-mounted controlled droplet applicator (CDA) sprayer applying post-emergence herbicide under the trellis at Fox Run Vineyards, Yates County (above). A close-up of the CDA sprayer and mounting system (left).

Figure 18. Controlled droplet applicator. Image source Eastern NY Commercial Horticulture Program Newsletter, Vol. 3, Issue 3, June 9, 2016

<u>Handheld or Backpack Sprayers.</u> Backpack and handheld sprayers are utilized to treat smaller areas such as those found in a residential setting. One type of backpack or handheld sprayer involves mixing up a spray solution in a small (usually 3 gallons or less) container, employing some type of power, either mechanical or battery, to propel the spray solution out of a handheld spray wand that directs the spray onto the target vegetation and away from the applicator (Figure 19). The use of this type of sprayer provides the flexibility to mix up smaller volumes, and selectively treat smaller areas with a handheld wand that is held away from the body which like other application methods minimizes any contact with the spray solution and the applicator and other unintended targets. Applying glyphosate with handheld or backpack sprayers is thus one of the most selective application methods since it provides a great deal of control where the application is applied to target vegetation.

**Exhibit 2 Page 50**



Figure 19. Handheld (left) and backpack (right) sprayers. Image source
https://www.amazon.com/Chapin-1749-Industrial-Fertilizer-Herbicides/dp/B0009KM2P2 (left)
and pwmall.com/p-212290-BPS-REV401-
revolt_rechargeable_lithium_ion_4_gallon_backpack_sprayer_1_gpm_40_psi (right)

Another type of handheld sprayer is the use of ready to use (or RTU) glyphosate products that
are premixed in a closed container with its own applicator. These types of products are
commonly available in stores that carry herbicides designed for use in residential areas. The use
of these ready to use glyphosate products is designed to prevent the applicator from having to
mix glyphosate with water since that is done before the package is closed at the factory.  Like
backpack and other handheld sprayers, RTU formulations typically come with a hose and wand,
which allows targeted spraying away from the applicator.  This further reduces the potential for
contact of the applicator to glyphosate. In addition, following label directions when using
backpack or other handheld sprayers helps further minimize contact of the applicator and other
unintended targets with the spray solution.



Figure 20. Ready to use Roundup herbicide applicator. Roundup herbicide is premixed with
water in the closed container and the application wand is attached to the container just prior to

51

**Exhibit 2 Page 51**

use. Image source https://www.amazon.com/RoundUp-5200210-Ready-Grass-Killer/dp/B00FN3N0A6

In summary, glyphosate application methods intended for agricultural and residential use are designed to place the herbicide on the desired target species and minimize contact with the person who mixes, loads, or applies glyphosate. In particular, for the types of applications that would be done around a home or in a residential setting, the use of handheld sprayers, backpack sprayers, and RTU sprayers provides the flexibility to mix up smaller volumes, or not mix at all with a RTU sprayer.  In addition, with these application methods the applicator is selectively treating smaller areas with a handheld wand that is held away from the body to minimize exposure to the applicator and other unintended targets.

## XI. Conclusion

Glyphosate, introduced commercially in 1974, and reregistered in 1993, is a highly effective, broadspectrum herbicide for use in agricultural, non-agricultural, and residential settings. It is environmentally benign, does not pose a risk for ground or surface water contamination, and allows planting of succeeding crops, turf, orchards, vineyards, and landscape plants immediately after use.  It also has a safe toxicology profile. In multiple separate reviews, EPA reached the conclusion that there are no unreasonable human health risk concerns when glyphosate is used according to the label, and it is not likely to be carcinogenic to humans.  For these reasons, glyphosate is a revolutionary herbicide and has become the dominant herbicide in the U.S. and around the world.

Exhibit 2 Page 52

## Case Specific Opinions for Karen Delorme-Barton

### I.      Introduction

The following is a summary of my case specific expert opinions in this case. These opinions are based on my review of materials relating to plaintiff Karen Delorme-Barton as set forth in my materials considered list, as well as my education, training, and experience which is set forth in my curriculum vitae.

### II.      Alleged Use of Roundup

Ms. Karen Delorme-Barton "KDB" alleges use of glyphosate in residential settings from 1976 to 1986 at her parent's property in Palos Heights, IL; from 1988 to 2003 at her personal property in Roswell, GA; from 1987 to 2010, and in 2014 on her mother's property in Marietta, GA; and from 2010 to 2012 on her personal property in Savannah, GA (Second Amended PFS pg 8 and KDB Dep. Exhibit 2).

Palos Heights, IL 1976-1986

From 1976 to 1986 at her parent's property in Palos Heights, IL, KDB claims she used glyphosate concentrate in a pump sprayer or hose sprayer, and sprayed glyphosate once or twice a week for 1 to 2 hours each time from April through October (6-7 months) (KDB Dep. at 157 and exhibit 2).

Based on property records I reviewed, the property size was 10,500 square feet (roughly 1/4 of acre). See figure 1 for a Google Earth overhead image dated June 2016 and figure 2 for a Google Earth image dated October of 2019 of the front of the property. KDB testified she used glyphosate to treat an easement area or hill, 13 "beds", 1 vegetable garden (KDB Dep. at 10, 113 and Exh. 2), a hedge (KDP Dep. at 11) on both sides and back of her parent's house, and underneath three blue spruce trees (KDB Dep. at 112). She also mentions spraying in front of the house on the property across the street (KDB Dep. at 113). When asked how many times she would have to refill the 2 gallon pump up sprayer each time she sprayed, she stated that she had to mix up a new batch 4 to 6 times each time she sprayed (KDB Dep. at 154-55).  She stated that she would hold the spray wand low and close to the ground where the weeds were located, but sometimes she would hold the wand higher if she wanted to spray something further away from where she was standing (KDB Dep. at 155-56). She described the spray pattern as a stream (KDB Dep. at 155-56).  She stated that she occasionally sprayed on windy days (KDB Dep. at 163, 165). She claimed she sprayed 2 times per week for 1 to 2 hours each time at this site (KDB Dep. Exhibit 2). She would spot spray so as not to kill desirable vegetation and was pretty careful to only hit the weed she wanted to get rid of (KDB Dep. at 168). KDB described herself as "surgical", "precise", and "pretty accurate" in her application (KDB Dep. at 168-69).

She claimed that she never purchased glyphosate for use on this property, but that her father made the purchases (KDB Dep. at 99, 103, 106, 107, 117).

**Exhibit 2 Page 53**

When applying glyphosate, KDB wore a 2-piece bathing suit, shorts, flip flops or tennis shoes, and no gloves (at 158).  She claimed that her hands, arms, wrist, feet, legs, knees, face, shoulders, and stomach got wet from Roundup when spraying (KDB Dep. Exh. 2). She would shower before she went to bed (KDB Dep. Exh. 2). Clothes were thrown in the laundry, but she did not wash her flip flops (KDB Dep. Exh. 2).

Figure 1. Overhead image of the property at Palos Heights, IL that KDB claimed she treated with glyphosate.



Figure 2. Front view of the Palos Heights, IL property.



**Exhibit 2 Page 54**

Roswell, GA and Marietta, GA

KDB also claims to have sprayed glyphosate from 1988 to 2003 at her personal property in Roswell, GA, and from 1987 or 1988 to 2010 on her mother's property in Marietta, GA (KDB Dep. Exhibit 2). She allegedly used glyphosate concentrate and premixed glyphosate in a Scott's pump sprayer or Ortho Dial-N-Spray applicator.  See figures 3 and 4 for Google Earth images of the Roswell, GA residence, and figures 5 and 6 for Google Earth images of her mother's property at Marietta, GA.

Based on property records I reviewed, the Roswell property was 0.5327 acres. KDB claims to have treated 10 "beds", a fence, 2-3 hills, and some areas that were gravel. At the Marietta, GA address (her mother's residence), the area sprayed included 11 "beds", and a hill, and the property size was 1/4 to 1/5 of an acre. She claimed she would use the Dial N Spray applicator on the hills on these properties and the spray pattern from this applicator was spread out more than the pump-up sprayer (KDB Dep. at 174). The Dial N Spray applicator held 32 ounces of concentrate and she would fill it four to five times each time she sprayed the hills at the Roswell site (KDB Dep. at 177-78). She also claimed she would fill the pump-up sprayer four to six times when spraying these sites (KDB Dep. at 179).  KDB stated that she could spray out an entire 32 oz of concentrate in 3-4 minutes with the Dial N Spray applicator (KDB Dep. at 120). KDB used the Dial N Spray applicator on the hills and the pump-up sprayer elsewhere (at 120). She claims to have used more than 32 oz of concentrate on each hill (KDB Dep. at 123).

KDB claims that this was the first site where she or her ex-husband (KDB Dep. at 12) purchased glyphosate, and that the purchases with cash were made at Home Depot, Pike's Nursery, Shemin's Nursery, and Lowe's (KDB Dep. at 104-06). She would buy 8 or 10 bottles of glyphosate each time, and that supply would not last an entire season (KDB Dep. at 118, 123). She could not remember how many times she would make this bulk purchase of glyphosate each year (KDB Dep. at 124). She claims that the small container sizes were 32 ounces and the larger size containers were twice as big (KDB Dep. at 119). She claims the small containers cost approximately $20 each and the large containers were $40 each (KDB Dep. at 124). When asked about her annual budget for purchasing glyphosate, she could not recall specific details on the amount spent each year or month (KDB Dep. at 125-29). KDB claims she was pretty accurate with her applications at these locations (KDB Dep. at 179) and was careful not to kill desirable vegetation.

At the Roswell, GA site, she claims she sprayed glyphosate 2-4 times per week for 1-2 hours each time from March through November (9 months). At her mother's home in Marietta, GA, the lot size was approximately 0.2 acre, and she claims she used glyphosate 3-4 times per week for 1-2 hours each time from March through November (KDB Dep. at 132).

When applying glyphosate at these sites, she wore a sleeveless t-shirt, shorts, flip flops or tennis shoes (KDB Dep. at 171). She claims that the same parts of her body were contacted by glyphosate as mentioned for the Palos Heights, IL site, except that she wore sleeveless T-shirts (KDB Dep. at 173).

**Exhibit 2 Page 55**

Figure 3. Overhead image of the property in Roswell, GA.



**Exhibit 2 Page 56**

Figure 4. Front views of the property in Roswell, GA.





57

**Exhibit 2 Page 57**

Figure 5. Overhead images of the property in Marietta, GA





Figure 6. Front views of the property in Marietta, GA.



58

**Exhibit 2 Page 58**





Savannah, GA

KDB claims to have used glyphosate from 2010 to 2012 on her personal property at 411 Southbridge Boulevard, Savannah, GA, which is described as a "villa" (at 54, 135) or a multi-residence complex like townhouse or apartment (see figure 7). The treatable area of this property was small. She claims she treated an open-air patio, and a strip 4 to 5 feet wide and 50 feet deep between the sod and the wetland near the property (KDB Dep. at 136 and Exhibit 2).

She claims she used glyphosate in a premixed formulation (KDB Dep. at 145, 181), 1-2 times per week for 30 minutes each time from March through November (9 months) (KDB Dep. at 136).

She claims she wore "more clothes" when applying glyphosate at this site during this time interval because she was concerned about skin cancer, but she did not specify what additional clothes she would wear (KDB Dep. at 181).

**Exhibit 2 Page 59**

Figure 7. Overhead images of the Savannah, GA property.



Marietta, GA on her deceased mother's property

KDB also claims to have used glyphosate again on her deceased mother's property in Marietta, GA, in 2014, only after she passed away (figure 5).  She claims she used glyphosate concentrate and a premixed glyphosate formulation (KDB Dep. Exhibit 2), 1-2 times per week from February through May (4 months), and also that she treated the yard (KDB Dep. at 141).

Other details regarding KDB's alleged glyphosate use

All told, KDB claims that she sprayed glyphosate for over 34 years, and for 6-9 months per year. She also claims that she sprayed the property of 2 homes for 15 years, 5-8 times per week, for 1-2 hours each time (KDB Dep. Exhibit 2).

KDB claims that she used glyphosate concentrate in a 2 gallon pump up sprayer for 2/3rds of the applications and the "Ortho Dial N Spray" applicator for 1/3 of the applications (KDB Dep. Exhibit 2). She also claims that she used a pre-mixed Roundup formulation (KDB Dep. Exhibit 2). She mostly used glyphosate concentrate over the years (KDB Dep. at 145).  KDB referred to the type of spray pattern as a "jet" for the pump-up sprayer and as  a "jet", "stream", or "wide" for the Ortho Dial N Spray. When she mixed glyphosate concentrate with water, the quantity of glyphosate added to each gallon of spray solution was 6 oz/gallon (KDB Dep. Exhibit 2 and KDB Dep. at 41). Her recollection of how long the spray solution would last during each application was 1 gallon/5 minutes for the pump-up sprayer and 1 gallon/30 seconds for the Ortho Dial N Spray (KDB Dep. Exhibit 2).  KDB stated that she used the wand applicator to direct the spray away from her body when applying glyphosate (KDB Dep. at 138, 155, 156), and she held the wand low or below her waist (KDB Dep. at 155, 161). KDB stated that she

**Exhibit 2 Page 60**

wiped off her hands when they came into contact with glyphosate during mixing (KDB Dep. at 161, 185), but didn't wash her hands after glyphosate contact (KDB Dep. at 162, 173).

KDB claims that a 10 inch by 12 inch container of glyphosate premix would last several months (KDB Dep. at 146). KDB was not able to recall the percentage of glyphosate in the purchased product once it was diluted (KDB Dep. at 147).

KDB claims that she read a glyphosate label sometime around 1993 or earlier for either glyphosate concentrate or a premixed formulation of glyphosate (KDB Dep. at 32-5). She claimed that glyphosate was purchased at other stores such as Home Depot, Pike's Nursery, Shemin's Nursery, and Lowe's and purchases were made with cash (KDB Dep. at 12), but no glyphosate purchase records were provided. Only one herbicide purchasing record was provided from 5/21/14 (see figure 8), and that was for Ortho GroundClear (active ingredient is imazapyr and pelargonic acid), which is not a glyphosate product. She indicates that this product was purchased because it was cheaper, and she was helping her brother document costs for her mother's estate.



Figure 8. Purchase receipt from Home Depot on 5/21/14 for Ortho GroundClear.

William F. Barton ("WFB") testified that he became aware of KDB using glyphosate in 2005 (WFB Dep. at 19). From 2005-2010 he testified that he would buy glyphosate for KDB from Home Depot or Pikes with his mother in law's cash (WFB Dep. at 19-20).

### III.    My Opinions

*KDB's claimed applications far exceed what would have been necessary to control weeds on these properties.*

Spraying multiple times per week, every week, for multiple years, far exceeds what would be needed to control weeds on these properties and is not consistent with my experience regarding the frequency at which weeds regrow from glyphosate treated areas in residential properties. Glyphosate efficacy on weeds requires up to 14-21 days to completely kill the weed, and weed regrowth would be minimal during this interval right after spraying. It could take several more weeks for any new weeds to reach a treatable size.  There is simply no scenario in which an

**Exhibit 2 Page 61**

individual would need to spray multiple times per week for as long as KDB claims to have sprayed to control weeds on her property.

There is no indication in this case that the properties that KDB sprayed had never been treated for weed control prior to when she began to spray. If the properties had previously been treated prior to KDB's activities on the properties, they would have only needed 2-4 applications per year. Even if these properties, however, were completely unmanaged before KDB began treating for weeds, glyphosate still would only need to be sprayed once or at most twice a month during the growing season in the climates in which she applied. After weeds are controlled in specific areas for the first couple of months in each of the first couple of years after treatment started, weed regrowth from these areas would be reduced as the weed seedbank is depleted and rootstocks of biennial and perennial weeds are killed off.  Treatment frequency should go down to about once every 2 months during subsequent years (after year 2 or 3), and could be even less during years when rainfall is limited.

Moreover, the number of times needed to spray would also decline both during each growing season and over the years. Weed emergence and growth is more vigorous in the spring (April and May) when weed seeds have broken dormancy after the winter months, and soil temperatures and moisture are well suited to promote germination and growth.  Most common weed species will show a period of rapid germination and growth in the spring when soil temperatures and moisture levels are optimal for growth, which results in a dense "flush" of weeds emerging in April and May.  As this flush is killed off with glyphosate, the weed seedbank of the germinable fraction of seed is depleted. Subsequent "flushes" of weed germination and growth are spaced out farther in time, and weed density in these "flushes" is reduced. By mid-summer, very few weeds are emerging. As a result, after the initial flushes of weeds are controlled with glyphosate, the area needing treatment and the number of weeds that require treatment declines, and thus the frequency and time spent spraying would decline when there is less to spray. It is therefore unlikely that consistent applications as frequently as the plaintiff claimed throughout the growing season would have been needed to control weeds.  This also means that fewer and fewer weeds emerge year after year as the weed problem comes under control. For these reasons, the frequency and time it would take to control for weeds on these properties would decrease both within a given season and over years of application on the same properties.

In addition, based on my experience as a weed scientist and my review of documents and Google Earth images of the properties (see figures 1-7), KDB would not have needed to spray for as long as she claims to control weeds on these properties. Based on the size of these properties and the amount of landscaping, fences, hedges, and mulch area at each house, I would estimate the time spent spraying these properties that include a house, concrete driveway, and a small yard to be about 30 minutes for the Palos Heights, IL property (0.25 acre lot), about 30 minutes for the Roswell, GA site (0.5 acre lot), 15-20 minutes for the Marietta, GA site (lot size estimated at 0.2 acre from Google Earth), and 10-15 minutes for the Savannah, GA site (lot size estimated at 0.6 acre from Google Earth). At all of these sites, most of the time would have been spent searching for weeds, as opposed to spraying.

**Exhibit 2 Page 62**

*The volume of glyphosate KDB claims to have used exceeds what would have been necessary to control weeds on the properties.*

The volume of glyphosate KDB claims to have used also exceeds what would have been necessary to control weeds on the properties. KDB testified that she would spray large volumes relative to the amount of property that was being treated. For example, she claims to have refilled a 2-gallon sprayer 4 to 6 times at her parent's property at Palos Heights, IL. She also claims to have sprayed in excess of 8-10 bottles of glyphosate concentrate per year and over 32 ounces of glyphosate concentrate on a single hill during a single application at the properties in Roswell and Marietta. These volumes far exceed what would have been needed to control weeds on these residential properties.  In my opinion, a couple of containers of glyphosate *premix* could be used, and would not be unusual, for use on one of these properties during the initial year of treatment, but several containers of glyphosate *concentrate* would not be needed based on the size of these properties. When glyphosate is used in row crop production, such as in corn or soybean, one trip over an entire acre of land with a broadcast application of a diluted glyphosate solution that treats the entire area, would only require 1 quart of glyphosate concentrate mixed with 12-20 gallons of water. These residential properties were small, 0.2 to 0.6 of an acre, and the entire footprint of the property was not treated since the properties have a residence, a lawn, and driveway which would not need to be treated. In reality, there was at most, a couple of hundred square feet treated on each of these properties.  If we consider the fact that a quart (32 oz) of glyphosate concentrate can be used to treat 43,560 feet (square feet in an acre), this equates to 0.0007 oz/square foot.  If we compare this volume to the volume needed on a residential lot of 0.25 acre, and the entire area of a 0.25 acre residential property was treated, it would take at most 0.0007 oz X 10,890 sq. ft. = 7.6 oz each time it was treated.  Since KDB did not treat the entire lot, and more likely treated less than 1/10[th] of each lot, the amount of glyphosate concentrate needed to treat the areas mentioned would be at least 100 times less than what KDB claims she used.

Using such quantities of glyphosate would also mean that KDB was potentially spending more than $10,000 per year on glyphosate products. At the Roswell property alone, KDB claims that she sprayed 2-4 times per week for 9 months each year, and she sprayed at the site from 1988 to 2003 (15 years). Assuming an average of 3 applications per week, this would mean 108 applications per year and 1,620 applications over the 15 years she lived at this residence.

The Dial N Spray applicator held 32 ounces of glyphosate concentrate and she would fill it four to five times each time she sprayed the hills at the Roswell site (KDB Dep. at 177-78). That means KDB was using a minimum of 128 oz of glyphosate concentrate each time she sprayed the hills at this site, which is unnecessary to control weeds at this location.

On top of that, when she sprayed with the pump up sprayer, she would mix 6 oz of glyphosate concentrate per gallon into the 2 gallon container for a total of 12 oz. She claimed she would fill the pump-up sprayer 4 to 6 times when spraying this site. This means that she would have been applying a minimum of 12 oz X 4 times = 48 oz of glyphosate concentrate each time she sprayed, which again far exceeds what is needed to control weeds.

On each day she sprayed, she would use 128 oz + 48 oz = 176 oz of glyphosate concentrate. Assuming 3 applications per week, this would amount to 176 x 3 = 528 oz per week, 2112 oz per

**Exhibit 2 Page 63**

month, 19,008 oz or 148.5 gallons of glyphosate concentrate per year. If each gallon of glyphosate concentrate costs $80/gallon, the annual cost of treating for weeds at this site would be $11,880 and the total cost would be $178,200 for the 15 years she lived at this residence.

In my estimation, KDB's claims about the amount of glyphosate used are over 100 times more than would be needed to control weeds at these properties.

*Ms. Delorme-Barton likely had minimal contact with glyphosate*

KDB likely had minimal contact with glyphosate.  Although KDB testified that she often wore minimal clothing  when spraying Roundup, the Roundup labels for the products she likely used, which were approved by the EPA, do not require personal protective equipment.  Further, although she did not avoid spraying on windy days, as recommended on many labels, she held the spray wand close to the ground when she was targeting weeds. In addition, the small pump-up sprayer that she was using does not generate significant pressure, and it delivers large, coarse droplets to the target, both of which minimize spray drift. Moreover, KDB testified that she was careful while mixing the product (KDB Dep. at 153), and had to be careful while spraying to not kill desirable vegetation (KDB Dep. at 155). For example, KDB says she had to apply very carefully around the hedges at her parent's house to not kill them. Further, when spraying the hills with the Ortho Dial N Spray, she was very careful not to kill grass or the Leyland Cypress trees, indicating no significant drift occurred (KDB Dep. at 176). KDB also testified that she was "pretty accurate" when spraying with the pump sprayer in Roswell and Marietta (*id.* at 179). KDB described applying in a "surgical" and "precise" manner, indicating she was accurate with her applications and there was no off-target movement. It is therefore unlikely that there was any significant spray drift during application. Moreover, glyphosate is practically non- volatile, meaning that she was unlikely to have come into contact with glyphosate vapor drift. Glyphosate based herbicides also dry quickly, limiting potential for contact with spray residues.

KDB also testified she got glyphosate on her hands while mixing because of the small mouth of on the loading opening of the spray equipment. However, spray equipment is typically designed with openings large enough to facilitate loading and mixing. KDB also testified that she tightened the spray container lids tight so they could maintain pressures which indicates it did not leak and likely did not result in glyphosate contact from this source.

*Dr. Conry's opinions are based on claims that exceed what would be needed to control weeds on these properties.*

Dr. Conry's opinions are based on claims that exceed what would be needed to control weeds on these properties. Dr. Conry states that KDB used glyphosate twice weekly at her parent's house in Palos Heights, IL, 3-4 times weekly at her home in Roswell, GA, 2-4 times weekly at her mother's home in Marietta, GA, 1-2 times weekly at her home in Savannah, GA, and another 1-2 times weekly in 2014 at her mother's home in Marietta, GA. Based on these claims, Dr. Conry concludes that KDB had over 3000 application sessions. Dr. Conry also states that many of these application sessions lasted over an hour and that KDB had considerable exposure. As discussed above, these claims regarding frequency and length of application far exceed what would be necessary to control weeds on these properties. In addition, based on physical and chemical

**Exhibit 2 Page 64**

properties of glyphosate and the equipment used to apply it, it is my opinion that KDB would have had minimal contact with glyphosate.

Date: March 28, 2023

William G. Johnson, Ph.D., M.S.

**Exhibit 2 Page 65**

# ATTACHMENT A

**Exhibit 2 Page 66**

**a. Academic appointments**

2009-present  Professor of Weed Science, Department of Botany and Plant Pathology, Purdue University (70% extension/30% research)

2005-2009    Associate Professor of Weed Science, Department of Botany and Plant Pathology, Purdue University (70% extension/30% research)

2002-2005    Assistant Professor of Weed Science, Department of Botany and Plant Pathology, Purdue University (70% extension/30% research)

1998-2002    Assistant Professor of Agronomy, Univ. of Missouri (80% extension/20% research)

1995-1998    Extension Assistant Professor of Agronomy, Univ. of Missouri (100% extension)

**b. Industrial, business and government positions**

1994-1995    Research Agronomist, Cenex/Land O' Lakes, Fort Dodge, IA

**c. Awards and honors:**

2023 – WIU School of Agriculture Distinguished Alumni – presented by Western Illinois School of Agriculture

2022 – Corrinne Alexander Spirit of the Land Grant Mission Award – presented by Purdue University College of Agriculture

2022 - Seed For Success Research Award (for a grant exceeding $1,000,000) – presented by Purdue University

2020 - Seed For Success Research Award (for a grant exceeding $1,000,000) – presented by Purdue University

2018 - Weed Science Society of America – Outstanding Paper in *Weed Technology*

2018 - Purdue College of Agriculture Team Award – Indiana Dicamba Response Team

2018 - Purdue University Cooperative Extension Specialists Association (PUCESA) Team Award – CCA Conference Planning Committee

2018 Seed For Success Research Award (for a grant exceeding $1,000,000) – presented by Purdue University

2017 Advisor – NCWSS Outstanding Graduate Student (Joe Ikley) – presented by NCWSS

2016 Advisor – NCWSS Outstanding Graduate Student (Travis Legleiter) – presented by NCWSS

2016 Advisor – Dept of Botany and Plant Pathology Outstanding Ph.D. Student (Pratap Devkota).

2015 Coach – 1st Place Graduate Team – 2015 National Weed Science Contest – presented by WSSA

2015 Coach - 1st Place Graduate Team – 2015 Weed Science Contest – presented by NCWSS

2014 Advisor – NCWSS Outstanding Graduate Student (Jessica Schafer) – presented by NCWSS

2014 Coach – 1st Place Graduate Team – 2014 Weed Science Contest – presented by NCWSS

2014 Outstanding Graduate Educator Award – presented by the Purdue University College of Agriculture

2013 Seed For Success Research Award (for a grant exceeding $1,000,000) – presented by Purdue University

2013 Outstanding Graduate Educator Award – presented by the Department of Botany and Plant Pathology

2014 Advisor – NCWSS Outstanding Graduate Student (Paul Marquardt) – presented by NCWSS

2012 Outstanding Graduate Educator Award – presented by the Department of Botany and Plant Pathology

2011 Advisor – NCWSS Outstanding Graduate Student (Chad Brabham) – presented by NCWSS

2011 NCWSS Fellow – presented by North Central Weed Science Society.

**Exhibit 2 Page 67**

2010  Outstanding Graduate Educator Award – presented by the Department of Botany and Plant Pathology

2010  Eric G. Sharvell Distinguished Extension Specialist Award – Presented by Purdue University Cooperative Extension

2010  Outstanding Extension Award – presented by the Weed Science Society of America

2010  Advisor of WSSA Outstanding Ph.D. Student – presented by the Weed Science Society of America.

2009  Outstanding Graduate Educator Award – presented by the Department of Botany and Plant Pathology

2009  Educator of the Year – presented by the Mid America CropLife Association

2008  Outstanding Graduate Educator Award – presented by the Department of Botany and Plant Pathology

2008  Purdue Agriculture Team Award – presented by Purdue University College of Agriculture

2007  PUCESA Special Award (Purdue University Cooperative Extension Specialists Association) for development of a regional series of Extension publications on glyphosate stewardship and biology and management of glyphosate-tolerant weeds– presented by Purdue University Cooperative Extension Specialists Association

2007  Entomology Educational Project Award for the Corn and Soybean Field Guide – presented by the Entomological Society of America

2006  Outstanding Graduate Educator Award – presented by the Department of Botany and Plant Pathology

2005 Outstanding Paper in Weed Technology - presented by Weed Science Society of America

Received Extension Publication or Video Certificates of Excellence from American Society of Agronomy in 1999, 2001, 2002, 2004, 2005, 2006, and 2007 (14 awards total).

2001  Excellence in Education Award – presented by University of Missouri Student Affairs Division

2000  Distinguished Achievement Award, Young Scientist - presented by North Central Weed Science Society

1998  Outstanding Ag Alumni – presented by Black Hawk Community College

1994  Outstanding Ph.D. student – presented by Dept. of Agronomy, University of Arkansas


**d. Memberships in academic, professional and scholarly societies:**

American Society of Agronomy (up until 2008)

Gamma Sigma Delta (Agriculture Honorary)

International Weed Science Society

North Central Weed Science Society

Weed Science Society of America

**Exhibit 2 Page 68**

1. **Current research interests:**

Dr. Johnson conducts an applied research program in support of his Extension responsibilities and defined by his Extension priorities. Research is conducted at Purdue University Agricultural Centers and in grower fields.  Each experiment must be conducted in two to four environments (site-years) to allow for appropriate interpretation of results. Emphasis is placed on cooperative projects with scientists at Purdue University and other universities, and graduate student research.

**Published work:**

The majority of Dr. Johnson's peer reviewed publications are published in two of the three Weed Science Society of America Journals. The Weed Science Society of America publishes original research and scholarship in the form of three international journals.  *Weed Science* is focused on understanding "why" phenomena occur in agricultural crops. It focuses on fundamental research directly related to all aspects of weed science in agricultural systems.  *Weed Technology* focuses on understanding "how" weeds are managed. It focuses on more applied aspects of management of weeds in agricultural systems. *Weed Science* and *Weed Technology* are considered tier 1 journals for weed scientists all over the world. Both journals are ranked in the top 10 of approximately 40 international journals that publish peer reviewed research on agricultural crop production. Dr. Johnson has published a limited number of manuscripts in *Crop Management* and *Crop Protection*, which are considered tier 2 journals.

Dr. Johnson has published 1 review article titled "Role of winter annual weeds as alternative hosts for soybean cyst nematode" and written an invited review article titled "Influence of glyphosate-resistant cropping systems on weed species shifts and glyphosate-resistant weed populations".  He has co-authored an addition review article titled "Spray water quality and herbicide performance: A review".

i)  **Refereed articles published (\* denotes corresponding author)**

**182)** A.M. Conrad, **W.G. Johnson**, C.D. Cruz, D.E.P. Telenko\*. 2023. Integration of Sclerotinia sclerotiorum targeted biofungicides Coniothyrium minitans and Bacillus amyloliquefaciens into season-long soybean pest management practices in Indiana**.**  22 Jan 2023 https://doi.org/10.1094/PHYTOFR-08-22-0082-R

**181)** Kouame, K.B.-J., Butts\*, T.R., Werle, R. and **Johnson, W.G.** 2023. Impact of volatility reduction agents on dicamba and glyphosate spray solution pH, droplet dynamics, and weed control. Pest Manag Sci, 79: 857-869. https://doi.org/10.1002/ps.7258

**180)** Daramola, O., **Johnson, W.,** Jordan, D., Chahal, G., & Devkota\*, P. 2022. Spray water quality and herbicide performance: A review. Weed Techn. 36:758-767. doi:10.1017/wet.2022.97

**179)** Arana, J., Meyers\*, S., Guan, W., & **Johnson, W** 2022. Interference of morningglories (Ipomoea spp.) with 'Fascination' triploid watermelon. Weed Sci. 70:488-494. doi:10.1017/wsc.2022.35

**178)** J. Arana, S.L. Meyers\*, **W.G. Johnson**, W. Guan. 2022. Dose response of two Jack O'Lantern pumpkin cultivars to fomesafen applied preemergence. Weed Technol. 36:537-543.

**Exhibit 2 Page 69**

**177)** Hodgskiss, C.L., Legleiter, T.R., Young, B.G. and **Johnson*, W.G.** 2022. Effects of herbicide management practices on the weed density and richness in 2,4-D-resistant cropping systems in Indiana. Weed Technol. 36:130-136.

**176)** Hodgskiss, C.L., Young, B.G., Armstrong, S.D. and **Johnson*, W.G.** 2022. Utilizing cover crops for weed suppression within buffer areas in 2,4-D-resistant soybean. Weed Technol. 36:118-129.

**175)** J.A. Haarmann*, B.G. Young, **W.G. Johnson**. 2021. Control of waterhemp (Amaranthus tuberculatus) regrowth after failed applications of glufosinate or fomesafen. Weed Technol. 35:464-470.

**174)** Hodgskiss, C.L., Young, B.G., Armstrong, S.D. and **Johnson*, W.G.**, 2021. Evaluating cereal rye and crimson clover for weed suppression within buffer areas in dicamba-resistant soybean. Weed Technol. 35:404-411.

**173)** Hodgskiss, C.L., Legleiter, T.R., Young, B.G. and **Johnson*, W.G.**, 2022. Effects of herbicide management practices on the weed density and richness in dicamba-resistant cropping systems in Indiana. Weed Sci. 69:88-94.

**172)** J.A. Haarmann*, B.G. Young, **W.G. Johnson**. 2020. Control of waterhemp (Amaranthus tuberculatus) regrowth after failed applications of glufosinate or fomesafen. Weed Technol. 34:1-7.

**171)** S. A. Desimini, K.D. Gibson, S.D. Armstrong, M. Zimmer, L.O.R. Maia, **W.G. Johnson***. 2020. Effect of cereal rye and canola on winter and summer annual weed emergence in corn. Weed Technol. 34:21-27

**170)** P. Devkota*, **W. G. Johnson**. 2020. Efficacy of dicamba and glyphosate as influenced by carrier water pH and hardness. Weed Technol. 34:101-106.

**169)** M. Zimmer*, B. G. Young, **W. G. Johnson**. 2019. Halauxifen-methyl preplant intervals and environmental conditions in soybean. Weed Technol. 33:680-685.

**168)** P. Devkota*, **W. G. Johnson**. 2019. Influence of carrier water pH, foliar fertilizer, and ammonium sulfate on 2, 4-D and 2, 4-D plus glyphosate efficacy. Weed Technol. 33:562-568.

**167)** T. M. Campbell, J. T. Ikley, **W. G. Johnson**, K. A. Wise*. 2019. Impact of Inoculum Concentration on Goss's Wilt Development in Corn and Alternative Hosts. Plant Health Progress 20:155-159.

**166)** D. J. Spaunhorst*, H. Nie, J. R. Todd, J. M. Young, B. G. Young, **W. G. Johnson**. 2019. Confirmation of herbicide resistance mutations Trp574Leu, ΔG210, and EPSPS gene amplification and control of multiple herbicide-resistant Palmer amaranth (*Amaranthus palmeri*) with chlorimuron-ethyl, fomesafen, and glyphosate. PloS one 14.

**165)** M. Zimmer*, B. G. Young, **W. G. Johnson**. 2018. Herbicide Programs Utilizing Halauxifen-Methyl for Glyphosate-Resistant Horseweed (*Conyza canadensis*) Control in Soybean. Weed Technol. 32:659-664.

**Exhibit 2 Page 70**

**164)** C. L. McCauley, **W. G. Johnson**, B. G. Young*. 2018. Efficacy of Halauxifen-Methyl on Glyphosate-Resistant Horseweed (*Erigeron canadensis*). Weed Sci. 66:758-763.

**163)** M. Zimmer*, B. G. Young, **W. G. Johnson**. 2018. Weed Control with Halauxifen-Methyl Applied Alone and in Mixtures with 2, 4-D, Dicamba, and Glyphosate. Weed Technol. 32:597-602.

**162)** Nicholas E. Korres, Jason K. Norsworthy*, Bryan G. Young, Daniel B. Reynolds, **William G. Johnson**, Shawn P. Conley, Reid J. Smeda, Thomas C. Mueller, Douglas J. Spaunhorst, Karla L. Gage, Mark Loux, Greg R. Kruger, Muthukumar V. Bagavathiannan. 2018. Seedbank Persistence of Palmer Amaranth (*Amaranthus palmeri*) and Waterhemp (*Amaranthus tuberculatus*) across Diverse Geographical Regions in the United States. Weed Sci. 66:446-456.

**161)** Douglas J. Spaunhorst*, Pratap Devkota, **William G. Johnson**, Reid J. Smeda, Christopher J. Meyer, Jason K. Norsworthy. 2018. Phenology of Five Palmer amaranth (*Amaranthus palmeri*) Populations Grown in Northern Indiana and Arkansas. Weed Sci. 66:457-469.

**160)** Christopher R. Van Horn, Marcelo L. Moretti*, Renae R. Robertson, Kabelo Segobye, Stephen C. Weller, Bryan G. Young, **William G. Johnson**, Burkhard Schulz, Amanda C. Green, Taylor Jeffery, Mackenzie A. Lespérance, François J. Tardif, Peter H. Sikkema, J. Christopher Hall, Michael D. McLean, Mark B. Lawton, R. Douglas Sammons, Dafu Wang, Philip Westra, Todd A. Gaines. 2018. Glyphosate resistance in *Ambrosia trifida*: Part 1. Novel rapid cell death response to glyphosate. Pest Mgt. Sci. 74:1071-1078.

**159)** Marcelo L. Moretti*, Christopher R. Van Horn, Renae Robertson, Kabelo Segobye, Stephen C. Weller, Bryan G. Young, **William G. Johnson**, R. Douglas Sammons, Dafu Wang, Xia Ge, André d'Avignon, Todd A. Gaines, Philip Westra, Amanda C. Green, Taylor Jeffery, Mackenzie A. Lespérance, François J. Tardif, Peter H. Sikkema, J. Christopher Hall, Michael D. McLean, Mark B. Lawton, Burkhard Schulz. 2018. Glyphosate resistance in *Ambrosia trifida:* Part 2. Rapid response physiology and non-target-site resistance. Pest Mgt. Sci. 74:1079-1088.

**158)** Y. R. Kandel, D. S. Mueller, T. Legleiter, **W. G. Johnson**, B. G. Young, K. A. Wise. 2018. Impact of fluopyram fungicide and preemergence herbicides on soybean injury, population, sudden death syndrome, and yield. Crop Prot. 106:103-109.

**157)** T. R. Legleiter*, B. G. Young, **W. G. Johnson**. 2018. Influence of Broadcast Spray Nozzle on the Deposition, Absorption, and Efficacy of Dicamba plus Glyphosate on Four Glyphosate-Resistant Dicot Weed Species. Weed Technol. 32:174-181.

**156)** T. R. Legleiter*, B. G. Young, **W. G. Johnson**. 2018. Glyphosate plus 2, 4-D Deposition, Absorption, and Efficacy on Glyphosate-Resistant Weed Species as Influenced by Broadcast Spray Nozzle. Weed Technol. 32:141-149.

**155)** N. T. Harre*, H. Nie, R. R. Robertson, **W. G. Johnson**, S. C. Weller, B. G. Young. 2017. Distribution of Herbicide-Resistant Giant Ragweed (*Ambrosia trifida*) in Indiana and Characterization of Distinct Glyphosate-Resistant Biotypes. Weed Sci. 65:699-709.

**Exhibit 2 Page 71**

**154)** D. J. Spaunhorst*, **W. G. Johnson**. 2017. Variable Tolerance among Palmer Amaranth (*Amaranthus palmeri*) Biotypes to Glyphosate, 2,4-D Amine, and Premix Formulation of Glyphosate plus 2,4-D Choline (Enlist Duo®) Herbicide. Weed Sci. 65:787-797.

**153)** M.M. Loux*, A.F. Dobbels, K.W. Bradley, **W. G. Johnson**, B.G. Young, D.J. Spaunhorst, J.K. Norsworthy, M. Palhano, L.E. Steckel. 2017. Influence of Cover Crops on Management of Amaranthus Species in Glyphosate- and Glufosinate-Resistant Soybean. Weed Technol. 31:487-495.

**152)** J. M. Heneghan, **W. G. Johnson***. 2017. The Growth and Development of Five Waterhemp (*Amaranthus tuberculatus*) Populations in a Common Garden. Weed Sci. 65:247-255.

**151)** J.A. Farmer, K.W. Bradley, B.G. Young, L.E. Steckel, **W.G. Johnson**, J.K. Norsworthy, V.M. Davis, M.M. Loux. 2017. Influence of Tillage Method on Management of *Amaranthus* Species in Soybean. Weed Technol. 31:10-20.

**150)** P. Devkota*, **W. G. Johnson**. 2016. Glufosinate efficacy as influenced by carrier water pH, hardness, foliar fertilizer, and ammonium sulfate. Weed Technol. 30:848-859.

**149)** P. Devkota*, **W. G. Johnson**. 2016. Effect of Carrier Water Hardness and Ammonium Sulfate on Efficacy of 2, 4-D Choline and Premixed 2, 4-D Choline Plus Glyphosate. Weed Technol. 30:878-887.

**148)** P. Devkota*, D. J. Spaunhorst, **W. G. Johnson**. 2016. Influence of carrier water pH, hardness, foliar fertilizer, and ammonium sulfate on mesotrione efficacy. Weed Technol. 30:617-628.

**147)** T. R. Legleiter*, **W. G. Johnson**. 2016. Herbicide coverage in narrow row soybean as influenced by spray nozzle design and carrier volume. Crop Prot. 83:1-8.

**146)** D. J. Spaunhorst*, **W. G. Johnson**. 2016. Palmer amaranth (Amaranthus palmeri) control with preplant herbicide programs containing dicamba, isoxaflutole, and 2, 4-D. Crop, Forage & Turfgrass Management 2.

**145)** E. E. Regnier*, S. K. Harrison, M.M. Loux, C. Holloman, R. Venkatesh, F. Diekmann, R.Taylor, R.A. Ford, D.E. Stoltenberg, R.G. Hartzler, A.S. Davis, B.J. Schutte, J. Cardina, K.J. Mahoney, **W.G. Johnson**. 2016. Certified Crop Advisors' Perceptions of Giant Ragweed (Ambrosia trifida) Distribution, Herbicide Resistance, and Management in the Corn Belt. Weed Sci. 64:361-377.

**144)** P. Devkota*, F. Whitford, **W. G. Johnson**. 2016. Influence of Spray-Solution Temperature and Holding Duration on Weed Control with Premixed Glyphosate and Dicamba Formulation. Weed Technol. 30:116-122.

**143)** C.J. Meyer, J.K. Norsworthy*, B.G. Young, L.E. Steckel, K.W. Bradley, **W.G. Johnson**, M.M. Loux, V.M. Davis, G.R. Kruger, M.T. Bararpour, J.T. Ikley, D.J. Spaunhorst, T.R. Butts. 2016. Early-Season Palmer Amaranth and Waterhemp Control from Preemergence Programs Utilizing 4-Hydroxyphenylpyruvate Dioxygenase-Inhibiting and Auxinic Herbicides in Soybean. Weed Technol. 30:67-75.

**Exhibit 2 Page 72**

**142)** J. Ikley*, **W. Johnson**, K. Wise. 2016. Defining the alternative host range and the effect of herbicides on pathogenicity of Clavibacter michiganensis subsp nebraskensis, causal agent of Goss's wilt of corn. PHYTOPATHOLOGY 106:S4-S4.

**141)** G. F. Hollandbeck, **W. G. Johnson**, K. A. Wise*. 2016. Effect of volunteer corn density on deoxynivalenol production by Fusarium graminearum. PHYTOPATHOLOGY 106:S3-S4.

**140)** R. J. Wuerffel*, J. M. Young, J. L. Matthews, V. M. Davis, **W. G. Johnson**, B. G. Young. 2015. Timing of Soil-Residual Herbicide Applications for Control of Giant Ragweed (Ambrosia trifida). Weed Technol. 29:771-781.

**139)** J.T. Ikley*, K.A. Wise, **W.G. Johnson**. 2015. Annual Ryegrass (*Lolium multiflorum*), Johnsongrass (*Sorghum halepense*), and Large Crabgrass (*Digitaria sanguinalis*) are Alternative Hosts for *Clavibacter michiganensis* subsp. *nebraskensis*, Causal Agent of Goss's Wilt of Corn. 2015. Weed Sci. 63:901-909.

**138)** C.J. Meyer, J.K. Norsworthy*, B.G. Young, L.E. Steckel, K.W. Bradley, **W.G. Johnson**, M.M. Loux, V.M. Davis, G.R. Kruger, M.T. Bararpour, J.T. Ikley, D.J. Spaunhorst, T.R. Butts. 2015. Herbicide Program Approaches for Managing Glyphosate-Resistant Palmer Amaranth (*Amaranthus palmeri*) and Waterhemp (*Amaranthus tuberculatus* and *Amaranthus rudis*) in Future Soybean-Trait Technologies. Weed Technol. DOI: https://doi.org/10.1614/WT-D-15-00045.1

**137)** Patton*, A.J., D. V. Weisenberger, **W. G. Johnson**. 2015. Divalent Cations in Spray Water Influence 2, 4-D Efficacy on Dandelion (Taraxacum officinale) and Broadleaf Plantain (Plantago major). Weed Technol. 30:431-440. DOI: https://doi.org/10.1614/WT-D-15-00120.1

**136)** Robinson, A. P., D. M. Simpson, and **W. G. Johnson***. 2015. Response of Aryloxyalkanoate Dioxygenase-12 Transformed Soybean Yield Components to Postemergence 2,4-D. Weed Sci. 63:242-247.

**135)** Robinson, A. P., D. M. Simpson, K. Yau, S. Canada, and **W. G. Johnson***. 2015. Aryloxyalkanoate dioxygenase-12 soybean protein expression. Weed Sci. 63:229-234.

**134)** G. F. Hollandbeck, **W. G. Johnson**, K. A. Wise*. 2014. Effect of volunteer corn density on mycotoxin production by Gibberella zeae. PHYTOPATHOLOGY 104:170-171.

**133)** Marquardt*, P. T., C. Krupke, J. Camberato, and **W. G. Johnson**. 2014. The Effect of Nitrogen Rate on Transgenic Corn Cry3Bb1 Protein Expression. Pest Mgt. Sci. 70:763-770. DOI: 10.1002/ps.3611

**132)** Schafer*, J. R., S. G. Hallett, and **W. G. Johnson**. *2014*. Rhizosphere Microbial Community Dynamics in Glyphosate-Treated Susceptible and Resistant Biotypes of Giant Ragweed (*Ambrosia trifida*). Weed Sci. 62:370-381.

**131)** Butler, R.A., S.M. Brouder, **W.G. Johnson**, and Kevin D. Gibson*. 2013. Response of Four Summer Annual Weed Species to Mowing Frequency and Height. Weed Technol. 27:798-802.

**Exhibit 2 Page 73**

130) Brenner*, D. M., **W. G. Johnson**, C. L. Sprague, P. J. Tranel, and B. G. Young. 2013. Crop-weed hybrids are more frequent for the grain amaranth 'Plainsman' than for 'D 136–1. Genetic Resources and Crop Evolution. DOI 10.1007/s10722-013-0043-8.

129) Marquardt*, P.T.; Terry, R.M.; **Johnson, W.G.** 2013. The Impact of Volunteer Corn on Crop Yields and Insect Resistance Management Strategies. *Agronomy* 2013: 488-496.

128) P. T. Marquardt and **W. G. Johnson***. 2013. Influence of Clethodim Application Timing on Control of Volunteer Corn in Soybean. Weed Technol. 27:645-648.

127) Robinson, A. P., V. M. Davis, D. M. Simpson, and **W. G. Johnson***. 2013. Response of glyphosate-tolerant soybean yield components to dicamba. Weed Sci. 61:526-536.

126) Roskamp, J. M., and **W. G. Johnson***. 2013. The Influence of Adjusting Spray Solution pH on the Efficacy of Saflufenacil. Weed Technol. 27:445-447.

125) Roskamp, J. M., R. F. Turco, M. Bischoff, and **W. G. Johnson***. 2013. The Influence of Carrier Water pH and Hardness on Saflufenacil Efficacy and Solubility. Weed Technol. 27:527-533.

124) J. M. Roskamp, G. S. Chahal, **W. G. Johnson**. 2013. Saflufenacil's efficacy as influenced by water hardness and co-applied herbicides. Crops & Soils 46:37-40.

123) Schafer*, J. R., S. G. Hallett, and **W. G. Johnson**. 2013. Soil microbial root colonization of glyphosate-treated giant ragweed (*Ambrosia trifida*), horseweed (*Conyza canadensis*), and common lambsquarters (*Chenopodium album*) biotypes. Weed Sci. 61:289-296.

122) Robinson, A. P., V. M. Davis, D. M. Simpson, and **W. G. Johnson***. 2013 Response of soybean yield components to 2,4-D. Weed Sci. 61:68-76.

121) Roskamp, J. M., G. S. Chahal, and **W. G. Johnson***. 2013. The Effect of Cations and Ammonium Sulfate on the Efficacy of Dicamba and 2,4-D. Weed Technol. 27:72-77.

120) Yerka, M. K. A. T. Wiersma, R. B. Lindenmayer, P. Westra, **W. G. Johnson**, N. D. Leon, and D. E. Stoltenberg*. 2013. Reduced translocation is associated with common lambsquarter (chenopodium album L.) tolerance to glyphosate. Weed Sci. 61:353-360.

119) Roskamp, J. M., Chahal, G. S., and **Johnson, W. G***. 2012. Influence of water hardness and co-applied herbicides on saflufenacil efficacy. Online. Crop Management doi:10.1094/CM-2012-1213-01-RS.

118) R. M. Terry, P. T. Marquardt, J. J. Camberato, **W. G. Johnson***. 2012. Effect of Plant Nitrogen Concentration on the Response of Glyphosate-Resistant Corn Hybrids and Their Progeny to Clethodim and Glufosinate. Weed Sci. 60:121-125.

117) Marquardt, P. T., R. Terry, and **W.G. Johnson***. 2012. Competitive effects of volunteer corn on hybrid corn growth and yield. Weed Sci. 60:537-541.

**Exhibit 2 Page 74**

116) Mock, V. A., J. E. Creech, V. R. Ferris, J. Faghihi, A. Westphal, J. B. Santini, and **W. G. Johnson***. 2012. Influence of winter annual weed management and crop rotation on soybean cyst nematode (*Heterodera glycines*) and winter annual weeds: years four and five. Weed Sci. 60:634-640.

115) Schafer*, J. R., S. G. Hallett, **W. G. Johnson**. 2012. Response of giant ragweed (*Ambrosia trifida*), horseweed (*Conyza canadensis*), and common lambsquarters (*Chenopodium album*) biotypes to glyphosate in the presence and absence of soil microorganisms. Weed Sci. 60:641-650.

114) Chahal*, G. S., and **W. G. Johnson**. 2012. Influence of glyphosate or glufosinate combinations with growth regulator herbicides and other agrochemicals in controlling glyphosate-resistant weeds. Weed Technol. 26:638-643.

113) Johnson*, W. G., **G. S. Chahal,** and D. L. Regehr. 2012. Efficacy of various corn (*Zea mays*) herbicides applied preplant incorporated and preemergence. Weed Technol. 26:220-229.

112) Robinson, A. P., D. M. Simpson, and **W. G. Johnson***. 2012. Summer annual weed control with 2,4-D and glyphosate. Weed Technol. 26:657-660.

111) Chahal*, G. S., Davis, V., and **Johnson, W. G.** 2012. Influence of spring herbicide applications on winter weed emergence in corn and soybean production systems. Online. Crop Management doi:10.1094/CM-2012-0413-01-RS.

110) Vencill*, W. K, R. L. Nichols, T. M. Webster, J. Soteres, C. Mallory-Smith, N. Burgos, **W. G. Johnson,** and M. R. McClelland. 2012. Herbicide resistance: Toward and understanding of resistance development and the impact of herbicide-resistant crops. Weed Sci. 60:2-24.

109) Terry, R. M, T. Dobbels, M. M. Loux, P. R. Thomison, and **W. G. Johnson***. 2012. Corn replant situations: Herbicide options and the effect of replanting into partial corn stands. Weed Technol. 26:432-437.

108) **Kruger***, G. R., W. G. Johnson, D. J. Doohan, and S. C. Weller. 2012. Dose response of glyphosate and dicamba on tomato (*Lycopersicon esculentum* Mill.). Weed Technol. 26:256-260.

107) Terry, R. M., P. T. Marquardt, J. J. Camberato, and **W. G. Johnson***. 2012. Influence of nitrogen application timing and rate on volunteer corn interference in hybrid corn. Weed Sci. 60:510-515.

106) Marquardt, P., C. Krupke, and **W. G. Johnson*.** 2012. Competition of transgenic volunteer corn with soybean and the effect on western corn rootworm emergence Weed Sci. 60:193-198.

105) Robert G. Wilson, Bryan G. Young, Joseph L. Matthews, Stephen C. Weller, **William G Johnson**, David L. Jordan, Micheal D. K. Owen, Philip M. Dixon, David R. Shaw. 2011. Benchmark study on glyphosate-resistant cropping systems in the United States. Part 4: Weed management practices and effects on weed populations and soil seedbanks. Pest Mgt. Sci. 67:771-780.

104) Henry, R. S., Wise, K. A., and **Johnson*, W. G**. 2011. Glyphosate's effect upon mineral accumulation in soybean. Online. Crop Management doi:10.1094/CM-2011-1024-01-RS.

**Exhibit 2 Page 75**

103) Brabham, C.B., C. K. Gerber, and **W. G. Johnson***. 2011. Fitness of glyphosate-resistant giant ragweed (Ambrosia trifida L.) in the presence and absence of glyphosate. Weed Sci. 59:506-511.

102) Henry, R.S. **Johnson, W.G**., and Wise, K.A**.** 2011. The impact of a fungicide and insecticide on soybean growth, yield, and profitability. Crop Prot. 30:1629-1634.

101) Mithila, J., J. C. Hall, **W. G. Johnson**, K. B. Kelly, and D. E. Riechers*. 2011. Evolution of Resistance to Auxinic Herbicides:  Historical Perspectives, Mechanisms of Resistance, and Implications for Broadleaf Weed Management in Agronomic Crops. Weed Sci. 59:445-457.

100) Zheng, D., G. R. Kruger, S. Singh, V. M. Davis, P. J. Tranel, S. C. Weller, and **W. G. Johnson***. 2011.  Cross Resistance of Horseweed (*Conyza canadensis*) Populations with Three Different ALS Mutations. Pest Mgt. Sci. DOI 10.1002/ps.2190

99) Brabham, C., M. Loux, A. Dobbels, and **B. Johnson***. 2011. Control of Glyphosate-Resistant and Glyphosate-Sensitive Giant Ragweed in Soybean with Adjuvant, Fomesafen and Glyphosate Tank Mixtures. Online. Crop Management doi.10.1094/CM-2011-042-02-RS

98) Loux*, M. M., A. F. Dobbels, **W. G. Johnson**, B. G. Young. 2011. Effect of Residual Herbicide and Postemergence Application Timing on Weed Control and Yield in Glyphosate-resistant Corn. Weed Technol. 25:19-24.

97) Brabham, C., and **B. Johnson***. 2010. Efficacy of Ignite and Flexstar Tank Mixtures on Giant Ragweed and Common Lambsquarters. Online. Crop Management doi:1094/CM-2010-1227-01.RS. (Brabham is Johnson's M.S. student)

96) Book Chapter – Weller*, S. C., M. D. K. Owen, and **W. G. Johnson**. 2010. Managing glyphosate-resistant weeds and population shifts in Midwestern U.S. cropping systems. Chapter 12 (pages 213-233) in Glyphosate Resistance in Crops and Weeds – History, Development and Management. V. K. Nandula, ed. John Wiley and Sons, Inc. Hoboken, NJ.

95) **Johnson*, B.,** B. Young, J. Matthews, P. Marquardt, C. Slack, K. Bradley, A. York, S. Culpepper, A. Hager, K. Al-Khatib, L. Steckel, M. Moechnig, M. Loux, M. Bernards, and R. Smeda. 2010. Weed control in dicamba-resistant soybeans. Online. Crop Management doi:10.1094/CM-2010-0920-01-RS.

94) Kruger, G. R., V. M. Davis, S. C. Weller, and **W. G. Johnson***. 2010. Growth and seed production of horseweed (*Conyza canadensis*) after exposure to 2,4-D. Weed Sci. 58:413-419.

93) Kruger, G. R., V. M. Davis, S. C. Weller, and **W. G. Johnson***. 2010. Control of horseweed (*Conyza canadensis*) with growth regulator herbicides. Weed Technol. 24:425-429.

92) Mock, V.A., J. E. Creech, S. E. Hallett, and **W. G. Johnson***. 2010. Influence of Winter Annual Weed Removal Timings on Soybean Cyst Nematode Population Density and Plant Biomass. Weed Sci. 58:381-386

91) Davis, V. M., G. R. Kruger, B. G. Young, and **W. G. Johnson***. 2010. Fall and spring preplant herbicide applications influence spring emergence of glyphosate-resistant horseweed (*Conyza canadensis*). Weed Technol. 24:11-19.

**Exhibit 2 Page 76**

**90)** Davis, V.M., G. R. Kruger, S. G. Hallett, P. J. Tranel, and **W. G. Johnson**\*. 2010. Heritability of glyphosate resistance in Indiana horseweed (*Conyza canadensis*) populations. Weed Sci. 58:30-38.

**89)** Kruger, G. K., V. M. Davis, S. C. Weller, J. M. Stachler, M. M. Loux, and **W. G. Johnson**\*. 2009. Frequency, distribution, and characterization of horseweed biotypes with resistance to glyphosate and ALS-inhibiting herbicides. Weed Sci. 57:652-659.

**88)** Davis, V. M., G. R. Kruger, J. M. Stachler, M. M. Loux, and **W. G. Johnson**\*. 2009. Growth and seed production of horseweed (Conyza Canadensis) populations resistant to glyphosate, ALS-inhibiting, and multiple (glyphosate + ALS inhibiting) herbicides. Weed Sci. 57:494-504.

**87)** Mock, V. A., J. E. Creech, V. M. Davis, and **W. G. Johnson**\*. 2009. Plant growth and soybean cyst nematode response to purple deadnettle (Lamium purpuream), annual ryegrass, and soybean combinations. Weed Sci. 57:489-493.

**86)** Davis, V. M., K. D. Gibson, T. T. Bauman, S. C. Weller, and **W. G. Johnson**\*. 2009. Influence of weed management practices and crop rotation on glyphosate-resistant horseweed population dynamics and crop yield – years III and IV. Weed Sci. 57:417-426.

**85)** **Johnson, W. G.**, M. D. K. Owen\*, G. R. Kruger, B. G. Young, D. R. Shaw, R. G. Wilson, J. W. Wilcut, D. L. Jordan. and S. C. Weller. 2009. Farmer awareness of glyphosate resistant weeds and resistance management strategies. Weed Technol. 23:308-312.

**84)** Invited Review Paper - **Johnson\*, W. G.**, V. M. Davis, G. R. Kruger, and S. C. Weller. 2009. Influence of glyphosate-resistant cropping systems on weed species shifts and glyphosate-resistant weed populations. European J. of Agronomy. 31:162-172. DOI information: 10.1016/j.eja.2009.03.008

**83)** Krupke\*, C., P. Marquardt, **W. Johnson**, S. Weller, and S. P. Conley. 2009. Volunteer corn presents new challenges for insect resistance management. Agron. J. 101:797-799.

**82)** Davis, V. M., K. D. Gibson, V. A. Mock, and **W. G. Johnson**\*. 2009. In-field and soil-related factors that affect the presence and prediction of glyphosate-resistant horseweed (*Conyza canadensis*) populations collected from Indiana soybean fields. Weed Sci. 57:281-289.

**81)** V.A. Mock, **W. G. Johnson**\*, J. E. Creech, V. M. Davis. 2009. Influence of henbit and purple deadnettle density on plant biomass and soybean cyst nematode reproduction. Weed Science 57:489-493.

**80)** Brown\*, L. R., D. E. Robinson, B. G. Young, M. M. Loux, **W. G. Johnson**, R. E. Nurse, C. J. Swanton, and P. H. Sikkema. 2009. Response of corn to simulated glyphosate drift followed by in-crop herbicides. Weed Technol. 23:11-16.

**79)** Shaw\*, D. R., W. A. Givens, L. A. Farno, P. D. Gerard, D. Jordan, **W. G. Johnson,** S. C. Weller, B. G. Young, R.G. Wilson, and M. D. K. Owen. 2009. Using a grower survey to assess the benefits and challenges of glyphosate-resistant cropping systems for weed management in U.S. corn, cotton, and soybean. Weed Technol. 23:134-149.

**Exhibit 2 Page 77**

78) Givens*, W. A., D. R. Shaw, G. R. Kruger, **W. G. Johnson**, S. C. Weller, B.G. Young, R.G. Wilson, M. D. K. Owen, and D. Jordan. 2009. Survey of tillage trends following the adoption of glyphosate resistant crops. Weed Technol. 23:150-155.

77) Givens*, W. A., D. R. Shaw, **W. G. Johnson**, S. C. Weller, B. G. Young, R. G. Wilson, M. D. K. Owen, and D. Jordan. 2009. A grower survey of herbicide use patterns in glyphosate-resistant cropping systems. Weed Technol. 23:156-161.

76) Kruger, G. K., **W. G. Johnson\***, S. C. Weller, M. D. K. Owen, D. R. Shaw, J. W. Wilcut, D. L. Jordan, R. G. Wilson, M. L Bernards, and B. G. Young. 2009. U.S. grower views on problematic weeds and changes in weed pressure in glyphosate-resistant corn, cotton, and soybean cropping systems. Weed Technol. 23:162-166.

75) Westhoven, A. M., J. M. Stachler, M. M. Loux, and **W. G. Johnson\***. 2008. Management of glyphosate-tolerant common lambsquarters (*Chenopodium album*) in glyphosate-resistant soybean (*Glycine max*). Weed Technol. 22:628-634.

74) Westhoven, A. M., V. M. Davis, K. D. Gibson, S. C. Weller, and **W. G. Johnson\***. 2008. Field presence of glyphosate-resistant horseweed (*Conyza canadensis*) and common lambsquarters (*Chenopodium album*) and giant ragweed (*Ambrosia trifida*) biotypes with elevated tolerance to glyphosate. Weed Technol. 22:544-548.

73) Kruger, G. K., V. M. Davis, S. C. Weller, and **W. G. Johnson\***. 2008. Response and survival of rosette-stage horseweed (*Conyza canadensis*) after exposure to 2,4-D. Weed Sci. 56:748-752.

72) Westhoven, A. M., G. R. Kruger, C. K. Gerber, J. M. Stachler, M. M. Loux, and **W. G. Johnson\***. 2008. Characterization of selected common lambsquarters (*Chenopodium album*) biotypes with tolerance to glyphosate. Weed Sci. 56:685-691.

71) Davis*, V. M., P. T. Marquardt, and **W. G. Johnson**. 2008. Volunteer corn in northern Indiana soybean fields is correlated to glyphosate-resistant corn adoption. Crop Management doi:10.1094/CM-2008-0721-01-BR.

70) Davis, V. M., K. D. Gibson, T. T. Bauman, S. C. Weller, and **W. G. Johnson\***. 2008. A field survey to determine the distribution and frequency of glyphosate-resistant horseweed (*Conyza canadensis*) in Indiana. Weed Technol. 22:331-338.

69) Review Paper – **Johnson\*, W. G.**, J. E. Creech, and V. A. Mock. 2008. Role of winter annual weeds as alternative hosts for soybean cyst nematode. Online. Crop Management doi:10.1094/CM-2008-0701-01-RV.

68) Nice*, G., F. Whitford, **B. Johnson,** and C. Janssen. 2008. Assessing the impact of educating growers about proper use of atrazine in pesticide applicator recertification programs. Weed Technol. 22:326-330.

67) Davis, V. M., and **W. G. Johnson\***. 2008. Glyphosate-resistant horseweed emergence, survival, and fecundity in no-till soybean. Weed Sci. 56:231-236.

**Exhibit 2 Page 78**

66) Creech, J. E., A. Westphal, V. R. Ferris, J. Faghihi, T. J. Vyn, J. B. Santini, and **W. G. Johnson***. 2008. Influence of winter annual weed management and crop rotation on soybean cyst nematode (*Heterodera glycines*) and winter annual weeds. Weed Sci. 56:103-111

65) Creech, J. E., J. S. Webb, B.G. Young, J. P. Bond, S. K. Harrison, V. R. Ferris, J. Faghihi, A. Westphal, and **W. G. Johnson***. 2007. Development of soybean cyst nematode (*Heterodera glycines*) on henbit (*Lamium amplexicaule*) and purple deadnettle (*Lamium purpureum*). Weed Technol 21:1064-1070.

64) Creech, J. E., J. B. Santini, S. P. Conley, A.Westphal, and **W. G. Johnson***. 2007. Purple deadnettle (*Lamium purpureum*) and soybean cyst nematode (*Heterodera glycines*) response to cold temperature regimes. Weed Sci. 55:592-598.

63) Creech, J. E., J. Faghihi, V. R. Ferris, A. Westphal, and **W.G. Johnson***. 2007. Influence of intraspecific henbit (*Lamium amplexicaule*) and purple deadnettle (*Lamium purpureum*) competition on soybean cyst nematode (*Heterodera glycines*) reproduction. Weed Sci. 55:665-670.

62) **Johnson***, **W. G.**, E. J. Ott, K. D. Gibson, R. L. Nielsen, and T. T. Bauman. 2007. Influence of nitrogen application timing on low density giant ragweed (*Ambrosia trifida* L.) interference in corn (*Zea mays* L.). Weed Technol. 21:763-767.

61) Davis, V. M., K. D. Gibson, T. T. Bauman, S. C. Weller, and **W. G. Johnson***. 2007. Influence of weed management practices and crop rotation on glyphosate-resistant horseweed population dynamics and crop yield. Weed Sci. 55:508-516.

60) Creech*, J. E., J. Faghihi, V. R. Ferris, and **W. G. Johnson**. 2007. Survey of Indiana producers and crop advisors: A perspective on winter annual weeds and soybean cyst nematode (*Heterodera glycines*). Weed Technol. 21:532-536.

59) Ott, E. J. C. K. Gerber, D. B. Harder, C. L. Sprague, and **W. G. Johnson***. 2007. Prevalence and influence of stalk boring insects on glyphosate activity on Indiana and Michigan giant ragweed (*Ambrosia trifida*). Weed Technol. 21:526-531.

58) **Johnson***, **W. G.**, K. D. Gibson, and S.P. Conley. 2007. Does weed size really matter? An Indiana grower perspective about weed control timing. Weed Technol. 21:542-546.

57) Harder, D. B., C. L. Sprague*, C. D. Difonzo, K. A. Renner, E. J. Ott, and **W. G. Johnson**. 2007. Influence of stem boring insects on common lambsquarters (*Chenopodium album*) control in soybean with glyphosate. Weed Technol. 21:241-248.

56) Knezevic*, S., **W. G. Johnson**, and C. L. Sprague.  2007. WeedSOFT: Effects of corn row spacing for predicting herbicide efficacy on selected weed species. Weed Technol. 21:219-224.

55) Nelson*, K. A., **W. G. Johnson**, J. D. Wait, and R. S. Smoot. 2006. Winter annual weed management in corn (*Zea mays*) and soybean (*Glycine max*) and the impact on soybean cyst nematode (*Heterodera glycines*) egg population densities. Weed Technol. 20:965-970.

54) Creech*, J. E. and **W. G. Johnson**. 2006. Survey of broadleaf winter weeds in Indiana production fields infested with soybean cyst nematode. Weed Technol. 20:1066-1075.

**Exhibit 2 Page 79**

53) Gibson*, K. D., and **W. G. Johnson.** 2006. Crop rotation affects farmer perceptions of weed problems in corn and soybean weeds in Indiana. Weed Technol. 20:751-755.

52) **Johnson*, W. G.** and K. D. Gibson. 2006. Glyphosate resistant weeds and resistance management strategies: An Indiana grower perspective. Weed Technol. 20:768-772.

51) Creech*, J.E., **W. G. Johnson**, J. Faghihi, V. Ferris, and A. Westphal. 2005. First report of soybean cyst nematode reproduction on purple deadnettle under field conditions. Online. Crop Management doi:10.1094/CM-2005-0715-01-BR.

50) Schmidt, A. A.,  **W. G. Johnson*,** D. A. Mortensen, A. R. Martin, A. Dille, D. E. Peterson, C. Guza, J. J. Kells, R. D. Lins, C. M. Boerboom, C. L. Sprague, S. Z. Knezevic, F. W. Roeth, C. R. Medlin, and T. T. Bauman. 2005. Evaluation of corn (*Zea mays* L.) yield loss estimations by WeedSOFT® in the North Central region. Weed Technol. 19:1056-1064.

49) Gibson*, K.D., **W.G. Johnson,** and D. Hilger. 2005. Farmer perceptions of problematic corn and soybean weeds in Indiana. Weed Technol. 19:1065-1070.

48) Li*, J., R. J. Smeda, B. A. Sellers, and **W. G. Johnson.** 2005. Influence of formulation and glyphosate salt on absorption and translocation on three annual weeds. Weed Sci. 53:153-159

47) Sellers*, B. A., Cordes, J. C., Smeda, R. J., and **W. G. Johnson**. 2004. Waterhemp control in transgenic and conventional corn varieties. Online. Crop Management doi:10.1094/CM-2004-1208-01-RS.

46) **Johnson*, B.,** J. Barnes, K. Gibson, and S. Weller. 2004. Late season weed escapes in Indiana soybean fields. Online. Crop Management doi:10.1094/CM-2004-0923-01-BR.

45) Barnes, J., **B. Johnson***, K. Gibson, and S. Weller. 2004. Crop rotation and tillage system influence late-season incidence of giant ragweed and horseweed in Indiana soybean. Online. Crop Management doi:10.1094/CM-2004-0923-02-BR.

44) Donald*, W. W., D. Archer, **W. G. Johnson**, and K. A. Nelson. 2004. Zone herbicide application controls weeds and reduces residual herbicide use in corn. Weed Sci. 52:821-833.

43) Cordes, J. C., **W. G. Johnson*,** R. J. Smeda, and P. C. Scharf. 2004. Late-emerging common waterhemp (*Amaranthus rudis* Sauer) interference in conventional-tillage corn (*Zea mays* L.). Weed Technol. 18:999-1005.

42) W. W. Donald, **W. G. Johnson**, K. Nelson. 2004. In-Row and Between-Row Interference by Corn Modifies Preemergence Residual Herbicide Phytotoxicity. Weed Sci. 44:252.

41) Donald*, W. W., **W. G. Johnson**, and K. A. Nelson. 2004. In-row and between-row interference by corn (*Zea mays*) modifies annual weed control by preemergence residual herbicide. Weed Technol. 18:497-504.

40) Tharp, B. E., J. J. Kells*, T. T. Bauman, R. G. Harvey, **W. G. Johnson**, M. M. Loux, A. R. Martin, D. J. Maxwell, M. D. K. Owen, D. L. Regehr, J. E. Warnke, R. G. Wilson, L. J. Wrage, B. G. Young, C.

**Exhibit 2 Page 80**

D. Dalley. 2004. Assessment of weed control strategies in the North-Central United States. Weed Technol. 18:203-210.

**39)** Schmidt, A. A., and **W. G. Johnson***. 2004. Influence of early-season yield loss predictions from WeedSOFT® and soybean row spacing on weed seed production from a mixed weed community. Weed Technol. 18:412-418.

**38)** C. H. Lin*, R. N. Lerch, H. E. Garrett, **W. G. Johnson**, D. Jordan, M. F. George. 2003. Bioremediation and biodegradation. J. Environ. Qual 32:1992-2000.

**37)** Dewell*, R. A., **W. G. Johnson**, K. A. Nelson, J. D. Wait and J. Li. 2003. Weed removal timings in no till, double-crop, glyphosate-resistant soybean grown on claypan soils. Online. Crop Management doi:10.1094 / CM-2003-1205-01-RS.

**36)** Sellers*, B. A., R. J. Smeda, and **W. G. Johnson**. 2003. Atrazine may overcome the time-of-day effect on Liberty efficacy. Online. Crop Management doi:10.1094/CM-2003-1111-01-RS.

**35)** Sellers*, B. A., R. J. Smeda, **W. G. Johnson,** J. A. Kendig and M. R. Ellersieck. 2003. Comparative growth of six Amaranthus species in Missouri. Weed Sci. 51:329-333.

**34) Johnson*, W. G.**, J. Li and J. D. Wait. 2003. Johnsongrass control, regrowth, and total non-structural carbohydrates in rhizomes following postemergence herbicides used in herbicide-resistant corn. Weed Technol. 17:36-41.

**33)** Hellwig, K. B., **W. G. Johnson*** and R. E. Massey. 2003. Weed management in no-tillage herbicide resistant corn (*Zea mays* L.). Weed Technol. 17:239-248.

**32)** Sellers*, B. A., R. J. Smeda and **W. G. Johnson**. 2003. Influence of leaf angle on glufosinate efficacy on velvetleaf (*Abutilon theophrasti*). Weed Technol. 17:302-306.

**31)** Donald*, W. W. and **W. G. Johnson**. 2003. Interference effects of weed infested bands in or between crop rows on corn yield. Weed Technol. 17:755-763.

**30)** Gower, S. A. , M. M. Loux*, J. Cardina, S. K. Harrison, P.L. Sprankle, N.J. Probst, T.T. Bauman, W. Bugg, W. S. Curran, R. S. Currie, R.G. Harvey, **W.G. Johnson,** J. J. Kells, M.D.K. Owen, D. L. Regehr, C. H. Slack, M. Spaur, C.L. Sprague, M. VanGessel, and B.G. Young. 2003. Effect of postemergence glyphosate application timing on weed control and grain yield in glyphosate-resistant corn: Results of a 2-year multistate study. Weed Technol*.* 17:821-828.

**29)** Lin*, C. H., R. N. Lerch, H. E. Garrett, **W. G. Johnson**, D. Jordan, and M. F. George. 2003. The effect of five forage species on transport and transformation of atrazine and isoxaflutole in lysimeter leachate. J. Environ. Qual. 32:1992-2000.

**28)** Hans, S. R., and **W. G. Johnson***. 2002. Influence of shattercane (*Sorghum bicolor*) interference on corn (*Zea mays*) yield and nitrogen accumulation. Weed Technol. 16:787-791.

**27)** Hellwig, K. B., **W. G. Johnson***, and P. C. Scharf. 2002. Grass weed interference and nitrogen accumulation in no-tillage corn (*Zea mays* L.). Weed Sci. 50:757-762.

**Exhibit 2 Page 81**

**26)** Beyers, J. T., R. J. Smeda*, and **W. G. Johnson**. 2002. Weed management programs in glufosinate-resistant soybean (*Glycine max*). Weed Technol. 16:267-273.

**25)** Li, J., **W. G. Johnson***, and R. J. Smeda. 2002. Interactions between glyphosate and imazethapyr on four annual weeds. J. Crop. Prot. 21:1087-1092.

**24)** Allen, J. R., **W. G. Johnson***, R. J. Smeda, W. J. Wiebold, and R. E. Massey. 2001. Management ALS-resistant common sunflower (*Helianthus annuus*) in soybean (*Glycine max*). Weed Technol. 15:571-575.

**23)** Wiesbrook, M. L., **W. G. Johnson***, S. E. Hart, L. M. Wax, and P. R. Bradley. 2001. Comparison of weed management programs in glyphosate and glufosinate resistant soybean (*Glycine max*). Weed Technol. 15:122-128.

**22)** Niekamp, J. W. and **W. G. Johnson***. 2001.Weed control programs with sulfentrazone and flumioxazin in no-tillage soyabean (*Glycine max*). J. Crop Prot. 20:215-220.

**21)** Dirks, J. T., **W. G. Johnson***, R. J. Smeda, W. J. Wiebold, R. E. Massey. 2000. Reduced rates of soil-applied herbicides and glyphosate in no-till, narrow-row, glyphosate-resistant soybean (*Glycine max* L.). Weed Sci. 48:618-627.

**20)** Dirks, J. T., **W. G. Johnson***, R. J. Smeda, W. J. Wiebold, R. E. Massey. 2000. Utilization of preplant sulfentrazone in no-till, narrow-row, glyphosate-resistant soybean (*Glycine max* L.). Weed Sci. 48:628-639.

**19)** Bradley, P. R., **W. G. Johnson***, S. E. Hart, M. L. Beusinger, and R. E. Massey. 2000.Efficacy and economics of weed management in glufosinate resistant corn (*Zea mays* L.). Weed Technol. 14:495-501.

**18)** Allen, J. R., **W. G. Johnson***, R. J. Smeda, W. J. Wiebold, and R. J. Kremer. 2000. ALS-resistant *Helianthus annuus* interference in *Glycine max*. Weed Sci. 48:461-466.

**17) Johnson***, W. G., P. R. Bradley, S. E. Hart, M. L. Beusinger, and R. E. Massey. 2000. Efficacy and economics of weed management in glyphosate-resistant corn (*Zea mays*). Weed Technol. 14:57-65.

**16)** Bradley, P. R., **W. G. Johnson***, and R. J. Smeda. 2000. Response of sorghum (*Sorghum bicolor*) to atrazine, ammonium sulfate, and glyphosate. Weed Technol. 14:15-18.

**15)** Wait, J. D., **W. G. Johnson***, and R. E. Massey. 1999. Weed management with reduced rates of glyphosate in no-till, narrow row, glyphosate-resistant soybean (*Glycine max*). Weed Technol. 13:478-483.

**14)** Niekamp, J. W., **W. G. Johnson***, and R. J. Smeda. 1999. Broadleaf weed control with sulfentrazone and flumioxazin in no-tillage soybean (*Glycine max*). Weed Technol. 13:233-238.

**13) Johnson***, W. G., J. S. Dilbeck, M. S. DeFelice, and J. A. Kendig. 1998. Weed control with reduced rates of chlorimuron + metribuzin and imazethapyr in no-till narrow-row soybean (*Glycine max*). Weed Technol. 12:32-36.

**Exhibit 2 Page 82**

**12) Johnson\*, W. G.,** J. S. Dilbeck, M. S. DeFelice, and J. A. Kendig. 1998. Weed control with reduced rates of imazaquin and imazethapyr in no-till narrow-row soybean (*Glycine max*). Weed Sci. 46:105-110.

**11) Johnson\*, W. G.,** J. A. Kendig, R. E. Massey, M. S. DeFelice, and C. D. Becker. 1997. Weed control and economic returns with reduced rates of postemergence herbicides in narrow-row soybeans (*Glycine max*). Weed Technol. 11:453-459.

**10) Johnson\*, W. G.,** M. S. DeFelice, and C. S. Holman. 1997. Application timing affects weed control with metolachlor plus atrazine in no-till corn (*Zea mays*). Weed Technol. 11:207-211.

**9) Johnson\*, W. G.,** T. L. Lavy, and E. E. Gbur. 1995. Sorption, mobility and degradation of triclopyr and 2,4-D on four soils. Weed Sci. 43:678-684.

**8) Johnson\*, W. G.,** T. L. Lavy, and E. E. Gbur. 1995. Persistence of triclopyr and 2,4-D in flooded and non-flooded soils. J. Environ. Qual. 24:493-497.

**7) Johnson\*, W. G.,** and T. L. Lavy. 1995. Persistence of carbofuran and molinate in flooded rice culture. J. Environ. Qual. 24:487-493.

**6) Johnson\*, W. G.,** T. L. Lavy, and S. A. Senseman. 1994. Stability of selected pesticides on solid-phase extraction disks. J. Environ. Qual. 23:1027-1031.

**5) Johnson\*, W. G.,** and T. L. Lavy. 1994. In-situ dissipation of benomyl, carbofuran, thiobencarb, and triclopyr at three soil depths. J. Environ. Qual. 23:556-562.

**4)** Johnson\*, D. H., D. L. Jordan, **W. G. Johnson**, R. E. Talbert, and R. E. Frans. 1993. Nicosulfuron, primisulfuron, imazethapyr, and DPX-PE350 injury to succeeding crops. Weed Technol. 7:641-644.

**3)** Jordan\*, D. L., D. H. Johnson, **W. G. Johnson,** J. A. Kendig, R. E. Frans, and R. E. Talbert. 1993. Carryover of DPX-PE350 to grain sorghum (*Sorghum bicolor*) and soybean (*Glycine max*) on two Arkansas soils. Weed Technol. 7:645-649.

**2) Johnson\*, W. G.,** R. E. Frans and L. D. Parsch. 1991. Economics of johnsongrass (*Sorghum halepense*) control in soybeans (*Glycine max*). Weed Technol. 5:765-770.

**1) Johnson\*, W. G.,** and R. E. Frans. 1991. Johnsongrass (*Sorghum halepense*) control in soybeans (*Glycine max*) with postemergence herbicides. Weed Technol. 5:87-91.

**Exhibit 2 Page 83**

# ATTACHMENT B

**Exhibit 2 Page 84**

**Dr. William Johnson's Materials Considered List (*Delorme-Barton v. Monsanto Co.*)**

1. Aldrich, R.J. & R.J. Kremer, *Principles in Weed Management* (Iowa State University Press, 2nd ed. 1997).

2. American Farm Bureau Federation, *Fast Facts About Agriculture & Food*, available at https://www.fb.org/newsroom/fast-facts.

3. American Soybean Association (ASA), *ASA Study Confirms Environmental Benefits of Biotech Soybeans* (Nov. 12, 2001).

4. Ansong, M. & C. Pickering, *A Global Review of Weeds That Can Germinate from Horse Dung*, 14 Ecological Mgmt. & Restoration 216 (2013).

5. Ansong, M. & C. Pickering, *Are Weeds Hitchhiking a Ride on Your Car? A Systematic Review of Seed Dispersal on Cars*, 8(11) PLoS One e80275 (2013).

6. Ansong, M. & C. Pickering, *Weed Seeds on Clothing: A Global Review*, 144 J. Env't Mgmt. 203 (2014).

7. Arnberger, A. & C. Brandenburg, *Past On-Site Experience, Crowding Perceptions, and Use Displacement of Visitor Groups to a Peri-Urban National Park*, 40 Env't Mgmt. 34 (2007).

8. Bano, A. & M. Fatima, *Salt Tolerance in Zea Mays (L.) Following Inoculation with Rhizobium and Preudomonas*, 45 Biology & Fertility of Soils 405 (2009).

9. Bayer CropScience, *Benefits and Safety of Glyphosate*, available at https://www.bayer.com/sites/default/files/Glyphosate%20Benefits%20and%20Safety%20booklet.pdf (last accessed Oct. 21, 2021).

10. Beck, K.G., *How Do Weeds Affect Us All?*, 1994 Leafy Spurge Symposium, Bozeman, MT, USA (1994), available at https://library.ndsu.edu/ir/bitstream/handle/10365/4099/11BECK94.PDF?sequence=1.

11. Bell, C., *A Historical View of Weed Control Technology*, UC Weed Science (May 1, 2015), available at https://ucanr.edu/blogs/blogcore/postdetail.cfm?postnum=17593.

12. Borgaard, O. & A. Gimsing, *Fate of Glyphosate in Soil and the Possibility of Leaching to Ground and Surface Waters: A Review*, 64 Pest Mgmt. Sci. 441 (2008).

13. Bridges, D., *Crop Losses Due to Weeds in the United States*, Weed Science Society of America (1992).

14. Bridges, D., *Impact of Weeds on Human Endeavors*, 8 Weed Technology 392 (1994).

15. Brookes, G. & P. Barfoot, *Environmental Impacts of Genetically Modified (GM) Crop Use 1996-2018: Impacts on Pesticide Use and Carbon Emissions*, 11 GM Crops & Food 215 (2020).

16. Brookes, G. & P. Barfoot, *GM Crops: Global Socio-Economic and Environmental Impacts 1996-2012*, PG Economics Ltd., Dorchester, United Kingdom (2014).

17. Center, T.D. et al., *Biological Control* in Strangers in Paradise: Impact and Management of Nonindigenous Species in Florida (D. Simberloff et al. eds., 1997).

**Exhibit 2 Page 85**

18. Chiesura, A., *The Role of Urban Parks for the Sustainable City*, 68 Landscape & Urban Planning 129 (2003).

19. Complaint and Demand for Jury Trial, *Delorme-Barton v. Monsanto Co.*, No. 3:18-cv-01427 (N.D. Ill. Feb. 16, 2018), ECF No. 1.

20. Creech, J.E. et al., *Development of Soybean Cyst Nematode on Henbit (Lamium amplexicaule) and purple deadnettle (Lamium purpureum)*, 21 Weed Sci. 1064 (2007).

21. Csurhes, S. & R. Edwards, *Potential Environmental Weeds in Australia: Candidate Species for Preventative Control*, Environment Australia (Jan. 1998), available at https://weeds.org.au/wp-content/uploads/2020/04/potential.pdf.

22. Deposition of Karen Delorme-Barton, *Delorme-Barton v. Monsanto Co.*, No. 3:18-cv-01427 (N.D. Cal. Jan. 14, 2020) (with exhibits).

23. Deposition of William Barton, *Delorme-Barton v. Monsanto Co.*, No. 3:18-cv-01427 (N.D. Cal. Jan. 14, 2020) (with exhibits).

24. Derpsch, R. et al., *Current Status of Adoption of No-Till Farming in the World and Some of Its Main Benefits*, 3(1) Int'l J. Agriculture & Biological Engineering 1 (2010).

25. Derpsch, R., *History of Crop Production, With and Without Tillage*, 3 Leading Edge 150 (2004).

26. Dill, G., *Glyphosate-Resistant Crops: History, Status and Future*, 61 Pest Mgmt. Sci. 219 (2005).

27. DiTomaso, J., *Invasive Weeds in Rangelands: Species, Impacts and Management*, 48 Weed Sci. 255 (2000).

28. Duke, S. & S. Powles, *Glyphosate-Resistant Crops and Weeds: Now and in the Future*, 12(3&4) J. Agrobiotechnology Mgmt. & Econ. 346 (2009).

29. Duke, S. & S. Powles, *Mini-Review, Glyphosate: A Once-in-a-Century Herbicide*, 64 Pest Mgmt. Sci. 319 (2008).

30. Eck, R.W. & H.W. McGee, *Vegetation Control for Safety, A Guide to Local Highway and Street Maintenance Personnel*, U.S. Dep't of Transp., Fed. Highway Admin. (2007).

31. EPA (Environmental Protection Agency), Office of Pesticide Programs, *Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* (Dec. 12, 2017).

32. EPA, *About Pesticide Registration*, available at https://www.epa.gov/pesticide-registration/about-pesticide-registration (last accessed Oct. 26, 2021).

33. EPA, *Glyphosate – Interim Registration Review Decision Case Number 0178* (Jan. 2020).

34. EPA, Memorandum from Caleb Hawkins, Biologist, Biological Analysis Branch on *Glyphosate: Response to Comments, Usage, and Benefits (PC Codes: 103601, 103604, 103607, 103608, 103613, 417300)*, to Khue Nguyen, Chemical Review Manager, Risk Management and Implementation Branch 1, Pesticide Re-Evaluation Division (7508P) (Apr. 18, 2019).

**Exhibit 2 Page 86**

35. EPA, Office of Chemical Safety and Pollution Prevention, Letter from Michael L. Goodis, Director of Registration Division, EPA Office of Chemical Safety and Pollution Prevention, on Labeling Requirements for Products that Contain Glyphosate to Registrant (Aug. 7, 2019).

36. EPA, Office of Chemical Safety and Pollution Prevention, Letter from Michael Freedhoff, Ph.D., Assistant Administrator, EPA Office of Chemical Safety and Pollution Prevention on OEHHA Proposition 65 Language to Dr. Lauren Zeise, Director, Office of Environmental Health Hazard Assessment, California Environmental Protection Agency (Apr. 8, 2022).

37. Eviner, V. et al., *Ecosystem Impacts of Exotic Plants Can Feed Back to Increase Invasion in Western U.S. Rangelands*, 31 Rangelands 21 (2010).

38. Expert Report of Dr. Robert Conry, MD, *Delorme-Barton v. Monsanto Co.*, No. 3:18-cv-01427 (N.D. Cal. Feb. 27, 2023).

39. FAO (Food & Agriculture Organization of the United Nations), *The Future of Food and Agriculture – Trends and Challenges* (2017).

40. FAO, *The future of Food and Agriculture – Alternative Pathways to 2050* (2018).

41. Fernandez-Cornejo, J. et al., *The Adoption of Genetically Engineered Alfalfa, Canola, and Sugarbeets in the United States*, United States Department of Agriculture, Economic Research Service, Economic Information Bulletin No. 163 (Nov. 2016).

42. Florgard, C. & O. Florgard, *Residents' Use of Remnant Natural Vegetation in the Residential Area of Jarvafaltet, Stockholm*, 5 Urban Forestry & Urban Greening 83 (2006).

43. Foxcroft, L. et al., *Plant Invasions in Protected Areas: Patterns, Problems and Challenges*, Springer (2013).

44. Franz, J. et al., *Glyphosate: A Unique Global Herbicide ACS Monograph 189*, American Chemical Society (1997).

45. Gardner, J. et al, *Genetically Modified Crops and Household Labor Savings in U.S. Crops Production*, 12 AgBioForum 303 (2009).

46. Getsinger, K. et al., *Benefits of Controlling Nuisance Aquatic Plants and Algae in the United States*, CAST Commentary (July 2014).

47. Gianessi, L & A. Williams, *The Importance of Herbicides for Natural Resource Conservation in the USA*, in *Convergence of Food Security, Energy Security and Sustainable Agriculture* 333 (D. Songstad et al. eds., 2014).

48. Giesy, J. et al., *Ecotoxicological Risk Assessment for Roundup® Herbicide*, 167 Revs. Of Envtl. Contamination & Toxicology 35 (2000).

49. Google Earth images of 12706 South Austin Avenue Palos Heights, IL 60463.

50. Google Earth images of 1855 Azalea Springs Trail Roswell, GA 30075.

51. Google Earth images of 411 Southbridge Boulevard Savannah, GA 31405.

52. Google Earth images of 4644 Villa Ridge Road Marietta, GA 30068.

53. Government Technology, *Dead Weeds on the Side of the Road* (Aug. 12, 2010), available at https://weeds.org.au/wp-content/uploads/2020/04/potential.pdf.

**Exhibit 2 Page 87**

54. Green, J.D. et al., *Training Manual for Right-of-Way Vegetation Management*, University of Kentucky Cooperative Extension (1996).

55. Groves, R. et al., *Jumping the Garden Fence: Invasive Garden Plants in Australia and Their Environmental and Agricultural Impacts*, CSIRO Report for WWF-Australia, Sydney, Australia (2005), available at https://wildlife.lowecol.com.au/wp-content/uploads/sites/25/Jumping-The-Garden-Fence.pdf.

56. Hanson, B. et al., *Herbicide-Resistant Weeds Challenge Some Signature Cropping Systems*, 68 California Agriculture 142 (2014).

57. Hartzler, B., *Role of Spray Adjuvants with Postemergence Herbicides*, Iowa State University, available at https://crops.extension.iastate.edu/encyclopedia/role-spray-adjuvants-postemergence-herbicides.

58. Hedlund, J. et al., *Methods to Reduce Traffic Crashes Involving Deer: What Works and What Does Not*, Insurance Institute for Highway Safety (Oct. 2003), available at https://www.defenders.org/sites/default/files/publications/methods_to_reduce_traffic_crashes_involving_deer.pdf.

59. Henry, M., *The Contribution of Landscaping to the Price of Single Family Houses: A Study of Home Sales in Greenville, South Carolina*, 12(2) J. Envtl. Horticulture 65 (1994).

60. Hill, W. & C.M. Pickering, *Vegetation Associated with Different Walking Track Types in the Kosciuszko Alpine Area, Australia*, 78 J. Env't Mgmt. 24 (2006).

61. Hollenbaugh, R. & B. Champagne, *Utility Vegetation Management – The Key Driver of System Reliability*, Electric Energy Online (2006), available at https://electricenergyonline.com/energy/magazine/274/article/Utility-Vegetation-Management-The-Key-Driver-of-System-Reliability.htm.

62. Hoover, K. & L. Hanson, *Wildfire Statistics*, Congressional Research Service (Mar. 1, 2023), available at https://sgp.fas.org/crs/misc/IF10244.pdf.

63. Hunter, M. & D. Brown, *Spatial Contagion: Gardening Along the Street in Residential Neighborhoods*, 105 Landscape & Urban Planning 407 (2012).

64. Hurley, T. & H. Sun, *Softening Shock and Awe Pest Management in Corn and Soybean Production with IPM Principals*, 10 J. Integrated Pest Mgmt. 7 (2019).

65. IARC (International Agency for Research on Cancer), *IARC Monograph Vol. 112 on the Evaluation of Carcinogenic Risks to Humans, Some Organophosphate Insecticides and Herbicides: Diazinon, Glyphosate, Malathion, Parathion, and Tetrachlorvinphos* (2015).

66. Ikley, J.T. et al., *Annual Ryegrass (lolium multiflorum), Johnsongrass (Sorghum halepense), and Large Crabgrass (Digitaria Sanguinalis) are Alternative Hosts for Clavibacter Michiganensis Subsp Nebraskensis, Causal Agent of Goss's Wilt of Corn*, 63 Weed Sci. 901 (2015).

**Exhibit 2 Page 88**

67. Ikley, J.T. et al., *Defining the Alternative Host Range and the Effect of Herbicides on Pathogenicity of Clavibacter Michiganensis Subsp Nebraskensis, Causal Agent of Goss's Wilt of Corn*, Phytopathology (2016).

68. Jepson, P. et al., *Selection of Pesticides to Reduce Human and Environmental Health Risks: A Global Guideline and Minimum Pesticides List*, 4 Lancet Planet Health e56 (2020) with supplementary materials.

69. Johnson, B. et al., *Using AMS To Combat Hard Water Antagonism of Postemergence Herbicides*, Purdue University Extension (Apr. 25, 2019).

70. Johnson, S. et al., *Quantification of the Impacts on US Agriculture of Biotechnology-Derived Crops Planted in 2006*, National Center for Food and Agricultural Policy (Feb. 2007).

71. Kemper, B. & R. Derpsch, *Results of Studies Made in 1978 and 1979 to Control Erosion by Cover Crops and No-Tillage Techniques in Parana, Brazil*, 1 Soil & Tillage Rsch. 253 (1981).

72. Kniss, A., *Comparison of Conventional and Glyphosate-Resistant Sugarbeet the Year of Commercial Introduction in Wyoming*, 47 J. Sugarbeet Rsch. 127 (2010).

73. Kroeck, S., *Crop Rotation and Cover Cropping; Soil Resiliency and Health on the Organic Farm*, Chelsea Green Publications, White River Junction, UK (2011).

74. Lee, B. et al., *Profitability Comparison for Glyphosate Resistant and Conventional Sugarbeet Production Systems*, 51 J. Sugarbeet Rsch. 2 (2014).

75. Liddle, M., *Recreation Ecology: The Ecological Impact of Outdoor Recreation* (Chapman & Hall, 1997).

76. Liebman, M. & E. Gallandt, *Many Little Hammers: Ecological Management of Crop Weed Interactions* in Ecology in Agriculture (L. Jackson ed., 1997).

77. Lonsdale, W. & A. Lane, *Tourist Vehicles as Vectors of Weed Seeds in Kakadu National Park, Northern Australia*, 69 Biological Conservation 277 (1994).

78. Mack, R. et al., *Biotic Invasions: Causes, Epidemiology, Global Consequences, and Control*, 3 Ecological Applications 689 (2000).

79. Marquadt, P. et al., *Competition of Transgenic Volunteer Corn with Soybean and the Effect on Western Corn Rootworm Emergence*, 60 Weed Sci. 193 (2012).

80. McWhorter, C. & M. Gebhardt, *Methods of Applying Herbicides*, WSSA Monograph 4 (1987).

81. Mensink, J. et al., *Environmental Health Criteria for Glyphosate*, World Health Organization (1994).

82. Mock, V. et al., *Influence of Henbit and Purple Deadnettle Density on Plant Biomass and Soybean Cyst Nematode Reproduction*, 57 Weed Sci. 489 (2009).

83. Monaco, T.J. et al., *Weed Science Principles and Practice* (Wiley & Sons, 4th ed., 2002).

**Exhibit 2 Page 89**

84. Monsanto Company, Label for Roundup® Concentrate Poison Ivy & Tough Brush Killer (2002).

85. Monsanto Company, Label for Roundup® Concentrate Weed & Grass Killer (1993) [MONGLY15556339– MONGLY15556341].

86. Monsanto Company, Label for Roundup® Herbicide by Monsanto (1985) [MONGLY15269062].

87. Monsanto Company, Label for Roundup® Herbicide by Monsanto (1988) [MONGLY15269069].

88. Monsanto Company, Label for Roundup® L&G Ready-To-Use Grass & Weed Killer (1988) [MONGLY15555337].

89. Monsanto Company, Label for Roundup® Max Control 365 (2013) [MONGLY11771137-MONGLY11771141].

90. Monsanto Company, Label for Roundup® Original (1998) [MONGLY15271890-MONGLY15271988].

91. Monsanto Company, Label for Roundup® Original Herbicide (2001) [MONGLY15269923-MONGLY15269973].

92. Monsanto Company, Label for Roundup® Original Herbicide (2003) [MONGLY15269664].

93. Monsanto Company, Label for Roundup® Ready-To-Use Weed & Grass Killer (1999) [MONGLY10529812].

94. Monsanto Company, Label for Roundup® Ready-To-Use Weed & Grass Killer III (2012).

95. Monsanto Company, Label for Roundup® Ready-To-Use Weed & Grass Killer (1994) [MONGLY10529810– MONGLY10529811].

96. Monsanto Company, Label for Roundup® Weed & Grass Killer Concentrate Plus (2009) [MONGLY10529152-MONGLY10529157].

97. Monsanto Company, Label for Roundup® Weed & Grass Killer Concentrate (2001) [MONGLY10529518-MONGLY10529520].

98. Monsanto Company, Label for Roundup® Weed & Grass Killer Concentrate (2003) [MONGLY10529502-MONGLY10529504].

99. Monsanto Company, Label for Roundup® Weed & Grass Killer Concentrate (1993) [MONGLY15556339-MONGLY15556341].

100. Monsanto Company, Label for Roundup® Weed & Grass Killer Concentrate Plus (2015).

101. Monsanto Company, Label for Roundup® Weed & Grass Killer III (2015) [MONGLY10528908-MONGLY10528910].

102. Monsanto Company, Label for Roundup® Weed & Grass Killer Plus Weed Preventer (2015).

**Exhibit 2 Page 90**

103. Monsanto Company, Label for Roundup® Weed & Grass Killer₁ Concentrate (1996) [MONGLY10529771-MONGLY10529774].

104. Monsanto Company, Label for Roundup® Weed & Grass Killer₁ Concentrate (1999) [MONGLY10529777-MONGLY10529779].

105. Mount, A. & C. Pickering, *Testing the Capacity of Clothing to Act as a Vector for Non-Native Seed in Protected Areas*, 91 J. Evn't Mgmt. 168 (2009).

106. Munns, R., *Comparative Physiology of Salt and Water Stress*, 25 Plant Cell Env't 239 (2002).

107. Nandula, V. et al., *Glyphosate-Resistant Weeds: Current Status and Future Outlook*, 16 Outlooks on Pest Mgmt. 183 (2005).

108. Nandula, V., *Glyphosate Resistance in Crops and Weeds: History, Development, and Management* (Wiley & Sons, 2010).

109. Neill, S.P. & D.R. Lee, *Explaining the Adoption and Disadoption of Sustainable Agriculture: The Case of Cover Crops in Northern Honduras*, 49 Economic Dev. & Cultural Change 793 (2001).

110. Newsome, D. et al., *Natural Area Tourism: Ecology, Impacts and Management* (Channel View Publications, 2nd ed. 2013).

111. Ngugi, M. et al., *Non-native Plant Species Richness Adjacent to a Horse Trial Network in Seven National Parks in Southeast Queensland, Australia*, 21 Austl. J. Env't Mgmt. 413 (2014).

112. Nice, G., *Guide to Toxic Plants in Forages*, Purdue Extension (2008), available at https://www.extension.purdue.edu/extmedia/ws/ws_37_toxicplants08.pdf.

113. Nielsen, A. et al., *Species Richness in Urban Parks and Its Drivers: A Review of Empirical Evidence*, 17 Urban Ecosystems 305 (2014).

114. Oerke, E., *Centenary Review - Crop Losses to Pests*, 144 J. Agricultural Sci. 31 (2006).

115. Olden, J. & M. Tamayo, *Incentivizing the Public to Support Invasive Species Management: Eurasian Milfoil Reduces Lakefront Property Values*, 10 PLoS One 1371 (2014).

116. Ozkan, H. & H. Zhu, *Effect of Major Variables on Drift Distances of Spray Droplets*, The Ohio State University (Apr. 4, 2016).

117. Pesticide Environmental Stewardship, *Safety Information on the Pesticide Label*, available at https://pesticidestewardship.org/national-pesticide-safety-education-month/safety-information-on-the-pesticide-label/.

118. Pickering, C.M. & A. Mount, *Do Tourists Disperse Weed Seed? A Global Review of Unintentional Human-Mediated Terrestrial Seed Dispersal on Clothing, Vehicles and Horses*, 18 J. Sustainable Tourism 239 (2010).

119. Pickering, C.M. & W. Hill, *Impacts of Recreation and Tourism on Plant Biodiversity and Vegetation in Protected Areas in Australia*, 85 J. Env't Mgmt. 791 (2007).

**Exhibit 2 Page 91**

120. Pickering, C.M. & W. Hill, *Roadside Weeds of the Snowy Mountains, Australia*, 27 Mountain Rsch. & Dev. 359 (2007).

121. Pickering, C.M. et al., *Estimating Human-Mediated Dispersal of Seeds Within an Australian Protected Area*, 13 Biological Invasions 1869 (2011).

122. Plaintiff Fact Sheet re Karen Delorme-Barton (original and amended).

123. Plaintiff Karen Delorme Barton's Objections and Responses to Defendant Monsanto Company's First Set of Interrogatories, *Delorme-Barton v. Monsanto Co.*, No. 3:18-cv-01427 (N.D. Cal. Sept. 12, 2022).

124. Plaintiff Karen Delorme-Barton's Objections and Responses to Defendant Monsanto Company's Requests for Production, *Delorme-Barton v. Monsanto Co.*, No. 3:18-cv-01427 (N.D. Cal. Sept. 12, 2022).

125. Plaintiff Karen Delorme-Barton's Objections and Responses to Defendant Monsanto Company's Second Requests to Permit Entry Upon Land or Other Property, *Delorme-Barton v. Monsanto Co.*, No. 3:18-cv-01427 (N.D. Cal. Sept. 12, 2022).

126. Plaintiff Karen Delorme-Barton's Objections and Responses to Defendant Monsanto Company's Second Requests for Inspection of Tangible Goods, *Delorme-Barton v. Monsanto Co.*, No. 3:18-cv-01427 (N.D. Cal. Sept. 12, 2022).

127. Progressive Railroading, *Vegetation Management Railroads Are Pulling Out All The Stops* (2008), available at https://www.progressiverailroading.com/mow/article/Vegetation-management-Railroads-are-pulling-out-all-the-stops--15029.

128. Property Records re 12706 South Austin Avenue Palos Heights, IL 60463.

129. Property Records re 1855 Azalea Springs Trail Roswell, GA 30075.

130. Property Records re 4644 Villa Ridge Road Marietta, GA 30068.

131. Rosegrant, M. et al., *Food Security in a World of Natural Resource Scarcity – The Role of Agricultural Technologies*, International Food Policy Research Institute (2014).

132. Ross, M.A. & C.A. :Lembi, *Applied Weed Science* (Prentice Hall, 1999).

133. Saltmiras, D. et al., *Glyphosate: The Fate and Toxicology of a Herbicidal Amino Acid Derivative* in Amino Acids in Higher Plants (J. D'Mello ed., 2015).

134. Schwarzlander, M. et al., *Constraints in Weed Biological Control: Contrasting Responses by Implementing Nations*, 63 BioControl 313 (2018).

135. Shaner, D.L, *Herbicide Handbook*, Weed Science Society of America (10th ed., 2014).

136. Sinden, J. et al., *The Economic Impact of Weeds in Australia*, CRC for Australian Weed Management, Technical Series No. 8 (2004).

137. Strauch, I., *Poison Ivy, Poison Oak, and 7 Other Plants That Can Give You a Rash*, Everyday Health (Oct. 21, 2022), available at https://www.everydayhealth.com/poison-ivy/rashes-caused-by-poisonous-plants/.

**Exhibit 2 Page 92**

138. Timmins, S.M. & P. Williams, *Weed Numbers in New Zealand's Forest and Scrub Reserves*, 15 New Zealand J. Ecology 153 (1991).

139. Timmons, F.L., *A History of Weed Control in the United States and Canada*, 18 Weed Sci. 294 (2017).

140. Tzoulas, K. et al., *Promoting Ecosystem and Human Health in Urban Areas Using Green Infrastructure: A Literature Review*, 81 Landscape & Urban Planning 167 (2007).

141. USDA, *Agricultural Resource Management Survey – U.S. Soybean Industry*, National Agricultural Statistics Service (NASS) Report No. 2014-1 (2014).

142. Vila, M. et al., *Ecological Impacts of Invasive Alien Plants: A Meta-Analysis of Their Effects on Species, Communities and Ecosystems*, 14 Ecology Letters 702 (2011).

143. Vila, M. et al., *How Well Do We Understand the Impacts of Alien Species on Ecosystem Services? A Pan-European, Cross-Taxa Assessment*, 8 Frontiers in Ecology & Env't 135 (2010).

144. Vissichelli, M., *Invasive Species: Impacts on Federal Infrastructure*, Report for the National Invasive Species Council Secretariat (Nov. 2018), available at https://www.doi.gov/sites/doi.gov/files/uploads/invasive_species_impacts_on_federal_infra structure.pdf.

145. Weather Spark, *Climate and Average Weather Year Round in Marietta, Georgia*, https://weatherspark.com/y/15643/Average-Weather-in-Marietta-Georgia-United-States-Year-Round.

146. Weather Spark, *Climate and Average Weather Year Round in Palos Heights, Illinois*, https://weatherspark.com/y/14157/Average-Weather-in-Palos-Heights-Illinois-United-States-Year-Round.

147. Weather Spark, *Climate and Average Weather Year Round in Roswell, Georgia*, https://weatherspark.com/y/15698/Average-Weather-in-Roswell-Georgia-United-States-Year-Round.

148. Weather Spark, *Climate and Average Weather Year Round in Savannah, Georgia*, https://weatherspark.com/y/17828/Average-Weather-in-Savannah-Georgia-United-States-Year-Round.

149. Weed Science Society of America (WSSA), *WSSA Calculates Billions in Potential Economic Losses from Uncontrolled Weeds* (May 4, 2016), available at https://wssa.net/2016/05/wssa-calculates-billions-in-potential-economic-losses-from-uncontrolled-weeds/.

150. Weiser, C., *Economic Effects on Invasive Weeds on Land Values (from an Agricultural Banker's Standpoint)*, available at https://www.nrs.fs.usda.gov/pubs/jrnl/1998/1998_exotic-pests-papers/weiser_1998-exoticpests.pdf (last accessed Oct. 29, 2021).

151. West, T. & G. Marland, *A Synthesis of Carbon Sequestration, Carbon Emissions, and Net Carbon Flux in Agriculture: Comparing Tillage Practices in the United States*, 91 Agric., Ecosystems & Env't 217 (2002).

**Exhibit 2 Page 93**

152. Williams, J.A. & C.J. West, *Environmental Weeds in Australia and New Zealand: Issues and Approaches to Management*, 25 Austral Ecology 425 (2000).

153. Williams, M. & R. Boydston, *Volunteer Potato Interference in Carrot*, 54 Weed Sci. 94 (2006).

154. WOCATpedia, *Water Related Weeds*, available at https://wocatpedia.net/wiki/Water_related_weeds (last accessed Oct. 29, 2021).

155. Worster, D., *Dust Bowl: The Southern Plains in the 1930's* (Oxford University Press, 1979).

156. Yelverton, F., *Winter Glyphosate Applications to Bermudagrass*, NC State Extension (Feb. 13, 2020), available at https://turfpathology.ces.ncsu.edu/2020/02/winter-glyphosate-applications-to-bermudagrass/.

157. Zimdahl, R., *The Etymology of Herbicide*, 17 Weed Sci. 137 (1969).

**Exhibit 2 Page 94**