# EXHIBIT 3

```
 1                UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3   IN RE: ROUNDUP PRODUCTS        )  MDL No. 2741
                                    )
 4    LIABILITY LITIGATION          )  Case No. MDL No.
                                    )  3:16-md-02741-VC
 5   --------------------------     )
                                    )
 6    This document relates to:     )
                                    )
 7                                  )
     Karen Delorme-Barton v.        )
 8   Monsanto Company               )
                                    )
 9   Case No. 3:18-cv-01427-VC      )

10                        - - -

11           WILLIAM G. JOHNSON, PH.D., M.S.

12                 Monday, May 22, 2023

13                        - - -

14

15         Remote videotaped deposition of

16   WILLIAM G. JOHNSON, PH.D., M.S., held remotely at the

17   location of the witness, commencing at 10:04 a.m., on

18   the above date, before Juliana F. Zajicek, Registered

19   Professional Reporter, Certified Shorthand Reporter

20   and Certified Realtime Reporter.

21

22                        - - -

23              GOLKOW LITIGATION SERVICES
            877.370.3377 ph | 917.591.5672 fax
24                   Deps@golkow.com
```

**Exhibit 3 Page 1**

```
 1                A P P E A R A N C E S :
               (ALL PARTIES APPEARED REMOTELY)
 2


 3   ON BEHALF OF THE PLAINTIFF:


 4        WEITZ & LUXENBERG P.C.
          Fisher Building
 5        3011 West Grand Boulevard, 24th Floor
          Detroit, Michigan 48202
 6        313-800-4170
          BY:  GREGORY STAMATOPOULOS, ESQ.
 7             gstamatopoulos@weitzlux.com


 8
          WEITZ & LUXENBERG P.C.
 9        700 Broadway
          New York, New York 10003
10        212-558-550
          BY:  CHANTAL KHALIL, ESQ.
11             ckhalil@weitzlux.com


12
     ON BEHALF OF DEFENDANT MONSANTO COMPANY:
13
          HOLLINGSWORTH LLP
14        1350 I Street, N.W.
          Washington, DC 20005
15        202-898-5800
          BY:  DAVID I. SCHIFRIN, ESQ.
16             dschifrin@hollingsworthllp.com;
               NEIL S. BROMBERG, ESQ.
17             nbromberg@hollingsworthllp.com


18
     ALSO PRESENT:
19
          HANNA NOVAK, Paralegal
20        Weitz & Luxenberg P.C.


21


22   THE VIDEOGRAPHER:


23        CAROLIN DE LA ROSA,
          Golkow Litigation Services
24
```

Exhibit 3 Page 2

 1   of Botany and Plant Pathology at Purdue University in

 2   West Lafayette, Indiana, correct?

 3        A.    Yes, that's correct.

 4        Q.    And your primary research focus is on weed

 5   science with an emphasis on agronomic crops, correct?

 6        A.    Yes, that's correct.  I also have

 7   extension responsibilities and some minor teaching

 8   responsibilities as well.

 9        Q.    What do you mean by "extension

10   responsibilities"?

11        A.    The way I would characterize extension

12   responsibilities is that's the adult -- that's the

13   education of the adult learners that our -- our

14   clientele farmers, custom applicators, ag retail

15   employees, certified crop advisers, the people that

16   serve the -- the crop protection industry, the farmers

17   and the other folks that serve the crop protection

18   industry.

19        Q.    So kind of walk me through what a day in

20   Dr. Johnson's -- a day at Purdue.

21              Are you in a classroom teaching students

22   or are you mostly working with farmers?

23        MR. SCHIFRIN:  Objection to the form, narrative,

24   vague.

**Exhibit 3 Page 3**

```
 1   of studies.
 2        Q.    Have you ever conducted any research on
 3   any human health effects of pesticide or herbicide
 4   use?
 5        A.    No, I am not a causation toxicology cancer
 6   researcher, no.  I -- I can offer some testimony on --
 7   on contact with herbicides with various application
 8   practices, but in terms of causation of cancer or
 9   toxicity or those sorts of things, I am not an expert
10   in those areas.
11        Q.    You are not a hematologist, are you?
12        A.    No.
13        Q.    You are not qualified to interpret any
14   hematological studies; is that fair to say?
15        A.    I'm not a toxicologist or a hematologist
16   or a causation expert.  I do have some expertise in --
17   in assessing the potential for contact with a
18   herbicide based on whether or not label directions
19   were followed and -- and environmental conditions, but
20   in terms of the toxicology -- toxic -- toxicity,
21   causation, hematology or anything like that, that's
22   not an area that I'm qualified to testify in.
23        Q.    And, again, Dr. Johnson, I'm going to move
24   to strike the nonresponsive portion of your answer.  I
```

Exhibit 3 Page 4

Golkow Litigation Services                                Page 202

 1   excuse me -- that she was pretty accurate, surgical

 2   and precise with these spray applications just

 3   indicates that -- that contact was unlikely.

 4   BY MR. STAMATOPOULOS:

 5        Q.   Did she ever testify that -- that she had

 6   minimal contact with Roundup during her deposition?

 7        A.   So I made this -- I developed this opinion

 8   based on reading the documents and my knowledge of the

 9   spray equipment and the fact that the glyphosate as a

10   herbicide is -- is nonvolatile, so it doesn't turn

11   into a gas, the spray application equipment, the

12   pump-up sprayer has a wand that you hold away from the

13   body, it's -- it applies a spray solution under low

14   pressure which produces large droplets.  And, again, I

15   am going back to her testimony about indicating that

16   she did not get spray on desirable vegetate --

17   vegetation and that she was pretty accurate, surgical

18   and precise with these applications.

19        Q.   Did you read Ms. Delorme-Barton's

20   husband's deposition?

21        A.   Yes.

22        Q.   Okay.  And do you recall that he testified

23   under oath that he saw that her legs were wet from

24   Roundup usage?

Exhibit 3 Page 5

Golkow Litigation Services                                Page 273

1    A.   My testimony is -- is that the amount of

2  glyphosate and the frequency at which she sprayed was

3  in excess of what we -- what would have been -- what

4  was needed on these modest size residential

5  properties.

6    Q.   So you accept her testimony at face value

7  that she sprayed as much as she testified that she

8  sprayed, correct?

9    MR. SCHIFRIN:  Objection to form and to the

10  extent it mischaracterizes his testimony.

11  BY THE WITNESS:

12    A.   Yeah, and I've answered this question

13  earlier.  Again, my -- I'm not calling into question

14  what she stated in her deposition testimony.  I'm just

15  stating that based on my professional experience, my

16  personal experience and with a reasonable degree of

17  scientific certainty that the amount claimed that --

18  the number of times and the amount that she claimed

19  that she used was in excess of what would have been

20  needed.

21  BY MR. STAMATOPOULOS:

22    Q.   Do you believe Ms. Delorme-Barton?

23    MR. SCHIFRIN:  Objection to form, asked and

24  answered many times at this point.

William G. Johnson, Ph.D., M.S.

```
 1        THE VIDEOGRAPHER:  The time -- the time is
 2   6:04 p.m.  Off the record.
 3             (WHEREUPON, a recess was had
 4              from 6:04 to 6:05 p.m.)
 5        THE VIDEOGRAPHER:  The time is 6:05 p.m., back
 6   on the record.
 7                    FURTHER EXAMINATION
 8   BY MR. STAMATOPOULOS:
 9        Q.   Dr. Johnson, counsel for Monsanto just
10   asked you a few follow-up questions from the
11   deposition earlier, and I believe you testified that
12   herbicide resistance did not apply for residential
13   users.
14             Do you recall that testimony?
15        A.   The statement I made was herbicide
16   resistance is not a major problem for -- for the --
17   the residential users of glyphosate.
18        Q.   And what is the basis for your belief that
19   herbicide resistance is not a major problem for
20   herbicide users?
21        A.   We had a herbicide resistance testing
22   program a few years ago.  We -- we received no samples
23   whatsoever to test from the residential market.  They
24   all come from agronomic crops.  And we simply do not
```

Exhibit 3 Page 7

Golkow Litigation Services                                    Page 297

```
 1   get questions from home -- homeowners about

 2   herbicide-resistant weeds in -- in residential

 3   settings.  All of the questions come from agronomic

 4   crops.

 5       Q.   So is it my understanding that you have no

 6   data or information with respect to herbicide

 7   resistance for residential users?

 8       MR. SCHIFRIN:  Objection; mischaracterizes his

 9   testimony.

10   BY THE WITNESS:

11       A.   My testimony was it hasn't been a problem

12   expressed by the clientele that I serve.  And what

13   that -- what that implies then, when we don't get

14   samples sent in for testing, we don't get phone calls

15   or things like that, that it isn't a problem for that

16   audience because if that audience had a problem, they

17   are -- they are an audience that's not bashful about

18   calling County-Level Extension.

19   BY MR. STAMATOPOULOS:

20       Q.   So that -- is that the sole basis for your

21   conclusion that herbicide resistance is not a major

22   problem for residential users is because you didn't

23   receive any calls to the hotline?

24       A.   Well, we -- we don't have what we call a
```

Exhibit 3 Page 8

Golkow Litigation Services                               Page 298

```
 1  hotline.  We have County-Level Extension, we have

 2  extension offices in over 70 of our 92 counties, we

 3  had a herbicide resistance testing program through our

 4  Plant Pest Diagnostic Lab that's housed in our

 5  department a few years ago, and we didn't get any

 6  residential samples sent in to the PPDL, and I stay in

 7  contact with our county offices and we've never had a

 8  herbicide resistance call come in from a -- from a

 9  consumer in the state of Indiana regarding a herbicide

10  resistant weed in a residential setting.

11       Q.   Have you ever received any calls from

12  consumers in Georgia with respect to herbicide

13  resistance?

14       A.   We -- well, our -- our county offices

15  serve the State of Indiana.  Our PPDL serves Indiana

16  and many other states.  So when we did our herbicide

17  resistance testing program through the Plant Pest

18  Diagnostic Lab, we received samples from probably 15

19  different states, and I don't recall which ones they

20  were, but they would be ones east of the Mississippi

21  River.

22       Q.   Is it your claim that not a single

23  residential user has encountered herbicide resistance

24  to an herbicide?
```

Exhibit 3 Page 9

```
 1       MR. SCHIFRIN:  Objection; mischaracterizes his

 2   testimony.

 3   BY THE WITNESS:

 4       A.   No.  My -- my answer to the question about

 5   herbicide resistance in residential areas was based on

 6   the fact that we did not have samples sent in to our

 7   PPDL and our -- we have never had a

 8   herbicide-resistant weed problem in a residential site

 9   reported to one of our county offices.

10   BY MR. STAMATOPOULOS:

11       Q.   Just because it wasn't reported does it

12   mean that it is not a problem?

13       MR. SCHIFRIN:  Objection; argumentative.

14   BY THE WITNESS:

15       A.   So if it were a problem, our County

16   Extension ag and natural resource educators do a great

17   job of keeping their fingers on the pulse of their

18   communities, and the information would have filtered

19   back to our group as the Weed Science group at Purdue

20   if it were a major problem that required us to address

21   it with educational efforts.

22   BY MR. STAMATOPOULOS:

23       Q.   Earlier David had asked you about LD50.

24            Do you recall that?
```

Exhibit 3 Page 10

Golkow Litigation Services                                    Page 300

```
 1                    REPORTER'S CERTIFICATE

 2

 3            I, JULIANA F. ZAJICEK, a Registered

 4    Professional Reporter and Certified Shorthand

 5    Reporter, do hereby certify that prior to the

 6    commencement of the examination of the witness herein,

 7    the witness was duly remotely sworn by me to testify

 8    to the truth, the whole truth and nothing but the

 9    truth.

10            I DO FURTHER CERTIFY that the foregoing is

11    a verbatim transcript of the testimony as taken

12    stenographically by me at the time, place and on the

13    date hereinbefore set forth, to the best of my

14    availability.

15            I DO FURTHER CERTIFY that I am neither a

16    relative nor employee nor attorney nor counsel of any

17    of the parties to this action, and that I am neither a

18    relative nor employee of such attorney or counsel, and

19    that I am not interested directly or indirectly in the

20    outcome of this action.

21

22

23           [signature: Juliana F. Zajicek]

24           JULIANA F. ZAJICEK, Certified Reporter
```

Exhibit 3 Page 11