**WILKINSON STEKLOFF LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonstekloff.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonstekloff.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel:  202-847-4030
Fax: 202-847-4005

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel:  202-898-5843
Fax: 202-682-1639

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel:  202-662-6000

**BRYAN CAVE LEIGHTON PAISNER LLP**
K. Lee Marshall (CA Bar No. 277092)
(klmarshall@bclplaw.com)
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Tel:  415-675-3400
Fax: 415-675-3434

Jed P. White (CA Bar No. 232339)
(jed.white@bclplaw.com)
120 Broadway, Suite 300
Santa Monica, CA 90401
Tel:  310-576-2100
Fax: 310-576-2200

*Attorneys for Defendant Monsanto Company*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION, | MDL No. 2741<br><br>Case No.: 3:16-md-02741-VC |
| *Delorme-Barton v. Monsanto Company*, 3:18-cv-01427-VC | **DEFENDANT MONSANTO COMPANY'S OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE TESTIMONY OF JOHN MURPHY, PH.D.**<br><br>Hearing:<br>Date:   July 27, 2023<br>Time:   10:00 a.m.<br>Place:  San Francisco Courthouse,<br>            Courtroom 4 – 17th Floor |

**TABLE OF CONTENTS**

Page

I.   Plaintiffs fail to raise any valid objection to admitting Dr. Murphy's opinions. ...................... 1

II.  Dr. Murphy is a highly qualified occupational hygienist and epidemiologist. ........................ 1

III. The majority of Dr. Murphy's opinions are unchallenged and should not be excluded. ................................................................................................................................ 2

IV.  Dr. Murphy's opinion that Ms. Delorme-Barton's use of the Dial N' Sprayer did not produce "driftable droplets" is reliable. ........................................................................ 4

V.   Dr. Murphy reasonably relied on Google Earth images of Ms. Delorme-Barton's property to calculate the square foot area she sprayed with Roundup. .................................... 6

VI.  Dr. Murphy may comment on the discrepancy between the volume of Roundup Ms. Delorme-Barton recalled using and the volume he estimated based on photographs of the property. ............................................................................................... 8

VII. Dr. Murphy's opinions should not be excluded. ...................................................... 11

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*California v. Kinder Morgan Energy Partners, LP*,
   613 F. App'x 561 (9th Cir. 2015) .............................................................................................. 7

*City of Pomona v. SQM N. Am. Corp.*,
   750 F.3d 1036 (9th Cir. 2014) .................................................................................................. 5

*Elosu v. Middlefork Ranch Inc.*,
   26 F.4th 1017 (9th Cir. 2022) ................................................................................................... 7

*Haynes ex rel. Haynes v. Nat'l R.R. Passenger Corp.*,
   319 F. App'x 541 (9th Cir. 2009) ............................................................................................. 5

*Nash-Perry v. City of Bakersfield*,
   2022 WL 3357516 (E.D. Cal. Aug. 15, 2022) ....................................................................... 10

*Rodriguez v. Gen. Dynamics Armament & Tech. Prod., Inc.*,
   696 F. Supp. 2d 1163 (D. Haw. 2010) ..................................................................................... 4

*Thompson v. Whirlpool Corp.*,
   2008 WL 2063549 (W.D. Wash. May 13, 2008) ..................................................................... 5

*U.S. v. Binder*,
   769 F.2d 595 (9th Cir. 1985) .................................................................................................. 10

*United States v. Lizarraga-Tirado*,
   789 F.3d 1107 (9th Cir. 2015) .................................................................................................. 8

*United States v. Morales*,
   108 F.3d 1031 (9th Cir. 1997) ................................................................................................ 10

*Walker v. S.G.B.C., L.L.C.*,
   290 So. 3d 700 (La. App. 3 Cir. 2020) ..................................................................................... 8

**Other Authorities**

Federal Rule of Evidence 703 ........................................................................................................ 8

**I.     Plaintiffs fail to raise any valid objection to admitting Dr. Murphy's opinions.**

Dr. Murphy estimated Ms. Delorme-Barton's daily and cumulative lifetime doses of glyphosate and concludes that her exposure is a small fraction of the regulatory limits for exposure set by California and the U.S. EPA. Plaintiffs do not challenge his methodology. Instead, Plaintiffs argue that he lacks support for two parts of his opinion. Plaintiffs first attack Dr. Murphy's opinion that Ms. Delorme-Barton's occasional use of a Dial N' Spray hose attachment would not have caused inhalation exposure because that attachment did not produce "driftable droplets." Plaintiffs argue only that Dr. Murphy could have performed a better test of the Dial N' Spray hose attachment. But Dr. Murphy also relied on his understanding of the physics of droplet production and Plaintiffs offer no reason why his observational test was unreliable. Moreover, Plaintiffs criticism is immaterial: Dr. Murphy's opinion about the Dial N' Spray merely provides a reason why his calculations overstate Ms. Delorme-Barton's exposure, and Plaintiffs' argument would, at best, go to the weight of his testimony.

Plaintiffs also attack Dr. Murphy's estimate of the volume of Roundup that Ms. Delorme-Barton used because he used Google Earth Pro images to calculate the square feet she would have sprayed. This argument fails because the images comport with Ms. Delorme-Barton's description of the properties. Plaintiffs also ignore that Dr. Murphy calculated Ms. Delorme-Barton's daily dose of glyphosate based on *both* his estimate of square footage *and* the volume Ms. Delorme-Barton recalled using. Even using Ms. Delorme-Barton's higher estimate, her daily and lifetime doses were small relatively to the relevant regulatory limits.

**II.     Dr. Murphy is a highly qualified occupational hygienist and epidemiologist.**

Dr. Murphy is a professional occupational hygienist, health and safety consultant, and epidemiologist. He holds a doctorate in Health Policy, Management and Evaluation from the University of Toronto's School of Public Health. He is a Certified Industrial Hygienist, American Board of Industrial Hygiene, a Registered Occupational Hygienist, Canadian Registration Board of Occupational Hygienists, and a Member of the American College of Epidemiology. Declaration of Jed P. White ¶ 1 & Ex. 1 (Dr. John Murphy's Expert Report ("Murphy Rep.") at 7); *Id*. at Ex. A (CV). Dr. Murphy has conducted thousands of exposure assessments and dozens of epidemiological field

investigations. He is also a farmer who applies Roundup to his 127-acre fruit, vegetable, and seed crop farm. White Decl., Ex. 1 (Murphy Rep.), at 7–8.

### III. The majority of Dr. Murphy's opinions are unchallenged and should not be excluded.

Dr. Murphy's report discloses his mandate to:

- Describe the group of products marketed in the United States under the brand name Roundup®.

- Describe what is known regarding the routes of human exposure to glyphosate during use of glyphosate-based herbicides, and its subsequent absorption, distribution, metabolism and excretion.

- Explain the methods for measuring human exposure and dose in studies involving application of Roundup® to soils and plants.

- Explain whether any limits or thresholds on acceptable human doses or exposures of glyphosate have been set by regulatory or public health agencies around the world.

- Discuss the appropriateness of using epidemiological evidence for glyphosate human health risk assessment.

- Comment on the exposure/doses of glyphosate potentially experienced by the Plaintiff and compare same to the limits/thresholds mentioned above.

White Decl., Ex. 1 (Murphy Rep.), at 4.

Although Plaintiffs move to exclude Dr. Murphy's testimony entirely, they ignore most of his opinions. For example, Dr. Murphy opines on glyphosate's limited "Routes of human exposure":

> Glyphosate has a slow rate of transport across the skin and into the bloodstream. In practice, a portion of the glyphosate deposited onto skin is removed by wiping, washing, and sweating, reducing the absorbed dose. Glyphosate that is absorbed through the skin is not metabolized by the human body, and is eliminated primarily by urinary excretion. The half-life for urinary elimination has been found to be approximately $5 \pm 2$ hours, meaning that within 100 hours the residual amount of glyphosate in the body is generally less than 0.0001% of the original absorbed dose. It does not accumulate in the human body.

White Decl., Ex. 1 (Murphy Rep.), at 5.

Dr. Murphy also disclosed opinions on governmental and public health organizations' recommended lifetime daily dose limits for glyphosate in different contexts, which range from 1.1 milligrams per day to 21 milligrams per day over a natural lifetime for a 70 kg adult. White Decl., Ex.

1 (Murphy Rep.), at 5. He also will testify that "the glyphosate doses associated with residential, commercial and agricultural application of GBHs [glyphosate-based herbicides] are extremely low in relation to all current recommended human dose limits." *Id.*

Finally, Dr. Murphy will opine that Ms. Delorme-Barton's exposure to glyphosate is a tiny fraction of the lowest health-based limits set by California or the U.S. EPA. Specifically, he will opine that her likely daily exposure was 0.4–4.7% of the California No Significant Risk Level ("NSRL") limit, and 0.1–0.7% of the U.S. EPA Reference Dose ("RfD") limit. *Id.* at 6. Further, he will opine that Ms. Delorme-Barton's cumulative lifetime glyphosate dose is approximately 2.5 mg/kg, which is 0.67% of the allowable California NSRL limit and 0.11% of the U.S. EPA RfD limit. *Id.*

Dr. Murphy calculated Ms. Delorme-Barton's daily exposure using the following equation:

**Predicted Dose = Exposure Factor x Mass of Glyphosate Acid Equivalent (GAE)**

Plaintiffs do not dispute this methodology. Plaintiffs also do not dispute that the Exposure Factor value is 0.00312 µg/kg/gm GAE. White Decl., Ex. 1 (Murphy Rep.), at 64. The Exposure Factor was determined in two published papers. *Id.* at 61–64 (citing Pierce, 2020 and Kougias, 2020).

Dr. Murphy further opines that 0.00312 overstates the Exposure Factor because it combines skin exposure and inhalation, while Ms. Delorme-Barton would not have inhaled any "driftable droplets" of Roundup for the portion of spraying she did with her Ortho Dial N' Spray hose attachment. *Id.* at 70–71. Plaintiffs' motion argues Dr. Murphy lacks foundation for opining that the Dial N' Spray hose attachment does not produce "driftable droplets," even though he uses the conservative 0.00312 value in his report.

The second variable in Dr. Murphy's equation is the mass of GAE used during a daily session. The mass of GAE is the product of the volume of dilute solution used multiplied by its concentration. White Decl., Ex. 1 (Murphy Rep.), at 64–65.

**Mass of GAE = Volume x Concentration**

Ms. Delorme-Barton did not recall the concentration of the Roundup products she used. White Decl., Ex. 2 (Barton Dep.), at 101:4–6. Plaintiffs do not dispute Dr. Murphy's estimate that the concentration equals 25.26 grams. White Decl., Ex. 1 (Murphy Rep.), at 64 n. 96.

1    Ms. Delorme-Barton also did not recall the volume of Roundup solution she used. For the Palos
2    Heights and Roswell properties, she testified the volume varied, but she probably refilled her 2-gallon
3    tank four to six times. White Decl., Ex. 2 (Barton Dep.), at 155:11–12, 179:12–14; White Decl., Ex. 1
4    (Murphy Rep.), at 65. Dr. Murphy estimated the volume by multiplying the area sprayed (in square
5    feet) by the coverage rate (300 square feet/gallon):

**Volume = Area x Coverage Rate**

White Decl., Ex. 1 (Murphy Rep.), at 65–67. Plaintiffs do not dispute that methodology or the coverage rate. Plaintiffs only dispute Dr. Murphy's estimate of the area.

Far from challenging Dr. Murphy's opinions in their entirety, Plaintiffs raise two cavils: (1) that Dr. Murphy lacks foundation to opine that a portion of Ms. Delorme-Barton's Roundup use—when she used the Dial N' Spray hose attachment—would not have exposed her to inhaling driftable droplets, and (2) that Dr. Murphy's reliance on Google Earth images of Plaintiff's properties might understate how much Roundup Ms. Delorme-Barton actually used. Neither of those criticisms are valid, let alone sufficient to prevent the jury from hearing Dr. Murphy's testimony.

**IV.   Dr. Murphy's opinion that Ms. Delorme-Barton's use of the Dial N' Sprayer did not produce "driftable droplets" is reliable.**

Dr. Murphy opines that neither the direct stream nor fountain discharge from the Dial N' Spray hose attachment would produce driftable droplets. White Decl., Ex. 1 (Murphy Rep.), at 70–71. His opinion rests on "observation as well as my understanding of the physics of how those droplets are produced and the relationship between droplet production and the characteristics of the orifice and the nozzle." White Decl., Ex. 3 (Murphy Dep.), at 107:15–21. He described his observation as "like watching water come out of a hose. It's fairly obvious that it doesn't produce driftable droplets." White Decl., Ex. 3 (Murphy Dep.), at 107:25–108:2. He acknowledged that it would also be possible to perform a controlled study of the Dial N' Spray hose attachment using fluorescent dye in a lab setting, but he did not "think it would alter the conclusion in this case." *Id.* 108:3–109:18.

Plaintiffs argue that his opinion should be excluded because he could have performed a better test. Courts, however, consistently reject arguments that the perfect must be the enemy of the good. *See, e.g.*, *Rodriguez v. Gen. Dynamics Armament & Tech. Prod., Inc.*, 696 F. Supp. 2d 1163, 1175 (D.

Haw. 2010) (denying motion to exclude testimony of munitions expert about cause of mortar shell explosion based on theoretical possibilities and on previous experience with similar ammunition); *Thompson v. Whirlpool Corp.*, 2008 WL 2063549, at *5 (W.D. Wash. May 13, 2008) (denying motion to exclude testimony of expert on cause of house fire who did not perform three possible tests because the omission of those tests "are more properly considered by the jury in weighing his testimony").

In fact, the potential for Dr. Murphy's observation to be further tested favors its admissibility. "In order for a scientific technique to be reliable, there must be evidence in the record indicating the methodology 'can be or has been tested.'" *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1046 (9th Cir. 2014) (quoting *Cooper v. Brown*, 510 F.3d 870, 880–81 (9th Cir.2007)). "[T]he failure to test does not automatically render expert testimony . . . inadmissible." *Thompson*, 2008 WL 2063549, at *5. Because Dr. Murphy's observational test can be "challenged in some objective sense," then it is sufficiently reliable to go to the jury. *City of Pomona*, 750 F.3d at 1046.

In contrast, Plaintiffs find no support in *Haynes ex rel. Haynes v. Nat'l R.R. Passenger Corp.*, 319 F. App'x 541 (9th Cir. 2009), which affirmed exclusion of an expert on the foreseeability of deep vein thrombosis (DVT) from long-distance train travel. The Ninth Circuit held the expert was not qualified and that his reliance on a Google search and CNN.com report were insufficient to render an opinion on the foreseeability of long-distance train travel causing DVT. That case did not involve the purported expert conducting any tests.

Plaintiffs also ignore that Dr. Murphy relied on "the physics of how those droplets are produced." White Decl., Ex. 3 (Murphy Dep.), at 107:15–21. Dr. Murphy's observational test only confirms what he knew about how different shaped nozzles disperse herbicide solutions.

Finally, even if Dr. Murphy's opinion about the Dial N' Spray hose were invalid—and Plaintiffs offer no evidence that it does produce driftable droplets—it would not significantly affect his testimony. Dr. Murphy used an Exposure Factor value of 0.00312 to calculate Ms. Delorme-Barton's daily and lifetime exposure to glyphosate. White Decl., Ex. 1 (Murphy Rep.), at 73 (Table 8); 76 (Table 10). To be clear, that Exposure Factor value combines exposure through skin *and inhalation*. Dr. Murphy explained: "if [the Dial N' Spray hose attachment] does produce driftable droplets, I did do an analysis in my report, which immediately follows this outlining what the exposure and dose would be

if it, in fact, produced the droplet spectrum that was comparable to the two-gallon sprayer." White Decl., Ex. 3 (Murphy Dep.), at 112:8–13. Even making this assumption in Ms. Delorme-Barton's favor, her daily doses were single-digit percentages of the California NSRL and fractions of a percent of the EPA RfD limit. White Decl., Ex. 1 (Murphy Rep.), at 73 (Table 8).[1]

### V. Dr. Murphy reasonably relied on Google Earth images of Ms. Delorme-Barton's property to calculate the square foot area she sprayed with Roundup.

To determine Ms. Delorme-Barton's daily dose of glyphosate, given that she was uncertain about the volume of solution she used, Dr. Murphy estimated the square foot area based on Ms. Delorme-Barton's testimony and Dr. Murphy's analysis of "photos from the exhibit set, from Google Earth Pro and from publicly available real estate sites that show the property." White Decl., Ex. 3 (Murphy Dep.), at 41:10–12. His estimates are consistent with Ms. Delorme-Barton's testimony for the Marietta, GA and Savanna, GA properties, but vary from her recollected testimony for the Palos Heights, IL and Rosewell, GA properties. White Decl., Ex. 1 (Murphy Rep.), at 65–66. For those properties, he compared the images to Ms. Delorme-Barton's deposition testimony and marked the areas that "correspond to the areas that she identified in her deposition testimony. White Decl., Ex. 3 (Murphy Dep.), at 51:15–17; *accord* 44:2–3. At the Palos Heights property, for example, the "Google Earth image contained features that were similar to those that she described in her testimony. *Id.* at 69: 11–13. He detailed the square feet of those areas in a series of figures in his report. White Decl., Ex. 1 (Murphy Rep.), at 41–60.

Plaintiffs argue only that the landscaping on some of the properties might have been different when Ms. Delorme-Barton was at those locations, but offer no evidence that this was the case, and no facts to suggest that different landscaping would substantially affect Dr. Murphy's analysis. Plaintiffs'

---

[1] Dr. Murphy testified at deposition that Table 8 overstates Barton's exposure at the Palos Heights property by approximately 30% because he included "Feet Soaking" and "Spill on Hand" values related to use of the Dial N' Spray hose attachment, despite Barton testifying she did not use the Dial N' Spray at that property. White Decl., Ex. 3 (Murphy Dep.), at 116:13–25 ("now that you mentioned it, it occurs to me I also included the feet soaking and the spill on the hand in the Palos Heights, Illinois analysis, which I should not have done because she didn't use it there. So that would actually reduce her Palos Heights total dose. But it wouldn't affect the Roswell and Marietta. So that's -- that's a correction I would need to make in table 8 actually. The feet soaking and the spill on the hand would have to go, I think. Which would reduce that dose by 30 percent, approximately. Yeah, about 30 percent, so it would be lower than I indicate.").

motion also does not provide an alternative basis to estimate the volume of Round-up used by Ms. Delorme-Barton at her different properties. There are, however, only two possible estimates: (1) Dr. Murphy's estimate based on the square feet of the area Ms. Delorme-Barton described; and (2) Ms. Delorme-Barton's estimate of refilling her 2-gallon sprayer four to six times at each property. White Decl., Ex. 2 (Barton Dep.), at 155:11–12 (Palos Heights); 179:12–14 (Roswell).

Dr. Murphy estimated she sprayed 1,937 square feet for Palos Heights and 835 square feet for Roswell. *Id.* Ms. Delorme-Barton's estimate of four to six 2-gallon tanks would be sufficient to spray 2,400–3,600 square feet. White Decl., Ex. 1 (Murphy Rep.), at 65–66. Dr. Murphy performed calculations for both estimates. He presented his estimate of the square feet sprayed in Table 6 of his report. White Decl., Ex. 1 (Murphy Rep.), at 67. In addition, his report states: "If the Plaintiff discharged 8 to 12 gallons on each occasion of spraying, the associated systemic dose would be 24% to 86% higher at Palos Heights, and 300% to 400% higher at Roswell, than indicated in Table 6. These higher systemic doses would still be very low in relation to the California NSRL and US EPA RfD values." *Id.* at 66. And the difference would not have been material in Dr. Murphy's calculation of Ms. Delorme-Barton's lifetime systemic dose. White Decl., Ex. 3 (Murphy Dep.), at 81:3–20.

Moreover, the likelihood that different landscaping would substantially change the square feet estimate is implausible given Ms. Delorme-Barton's testimony that she spot sprayed, instead of broadcast spraying. White Decl., Ex. 3 (Murphy Dep.), at 57:14–18 ("But she said she did spot spray. So my -- my assumption would overstate, you know, it should overstate, in fact, the quantity that she used because she claimed to do targeted spot spraying, not broadcast spraying."); White Decl., Ex. 2 (Barton Dep.), at 155:13–18; 156:2–12.

Plaintiffs' argument that Dr. Murphy underestimated the volume of Roundup used by Ms. Delorme-Barton goes to the weight of his testimony, not its admissibility. *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) ("[T]he judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable.") (*quoting Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013)). Assumptions about the historical conditions of property, specifically, goes to weight and not admissibility. *California v. Kinder*

*Morgan Energy Partners, LP*, 613 F. App'x 561, 564 (9th Cir. 2015) (reversing exclusion of expert because assumption about the pre-contamination condition of City property went to weight.).

Plaintiffs' citation to cases excluding Google search results misses the point. Dr. Murphy relied on satellite images of Ms. Delorme-Barton's property obtained from Google Earth Pro and real estate websites—not random sites obtained from a Google search. Plaintiffs do no dispute that the photographs depict the correct properties, only that the landscaping might have changed. Courts routinely admit Google Earth images. *See, e.g.*, *United States v. Lizarraga-Tirado*, 789 F.3d 1107, 1109 (9th Cir. 2015) (affirming admission of Google Earth photograph over hearsay objection); *Walker v. S.G.B.C., L.L.C.*, 290 So. 3d 700, 705 (La. App. 3 Cir. 2020) (affirming admission of Google Earth photographs). And Plaintiffs never argue that Dr. Murphy's reliance on Google Earth Pro photographs fails to satisfy the requirements of Federal Rule of Evidence 703.

**VI.     Dr. Murphy may comment on the discrepancy between the volume of Roundup Ms. Delorme-Barton recalled using and the volume he estimated based on photographs of the property.**

Contrary to Plaintiffs' motion, Dr. Murphy did not attack Ms. Delorme-Barton's credibility generally. Yet Plaintiffs seek to exclude Dr. Murphy's opinions entirely, apparently because his estimate of the volume of Roundup necessary to spray the Palos Heights and Roswell properties is lower than Ms. Delorme-Barton's estimate. In his report, Dr. Murphy states only: "I cannot reconcile the discrepancy." White Decl., Ex. 1 (Murphy Rep.), at 66. Dr. Murphy's report does not comment on Ms. Delorme-Barton's credibility, nor did he volunteer any opinions on her credibility at his deposition.

Instead, Plaintiffs' counsel repetitively invited him to comment on Ms. Delorme-Barton's credibility by asking a series of loaded questions, questions that Dr. Murphy quite reasonably answered:

> Q. Right. But if you're taking -- if you're not questioning the creditability of her testimony, then -- then her -- then the amount of Roundup that she sprayed is clear, right, she said she filled up the two gallon - -
>
> MR. MURNER: You have to let me make my objection. Objection, form.
>
> A. I'm not questioning her creditability. I do know that people sometimes have difficulty recalling precisely how much they used. I use Roundup myself, and if you ask me, you know, what was the typical volume that I used last summer when I was spraying, I couldn't tell you. And I see this all the time. So, you know, I -- I did an analysis based upon the square footage.

> But I do say in the report that if – if the volume that she stipulates is accurate, and, again, it's not -- it's not up to disparage her. I'm not suggesting she was untruthful, simply that recalling these types of particulars is not that easy necessarily.

White Decl., Ex. 3 (Murphy Dep.), at 57:19–58:14.

> In reviewing the -- in reviewing Ms. Delorame-Barton's deposition testimony and the 2013 Google Earth image, you determined that it was plausible that she sprayed the amount of Roundup that she reported spraying over the area that you blocked off in the Google Earth image; is that right?
>
> A. That's not what I say in the report.

*Id.* 72:16–24.

> Q. Okay. And you would agree that Ms. Delorame-Barton is in a better position than you personally to know how much Roundup she sprayed at the Palos Heights address between 1976 and 1986; isn't that right?
>
> A. I don't know that I would agree with that, no.
>
> Q. You don't agree with that? You think that you personally are in a better position to determine how much Roundup Ms. Delorame-Barton sprayed on each session of spraying at the Palos Heights address?
>
> MR. MURNER: Objection, form. Asked and answered.
>
> A. Oh, no. I simply said I didn't agree with your characterization. And I don't agree with the way you recharacterized it.
>
> Q. Okay. So upon what basis do you believe that you personally are in a better position than Ms. Delorame-Barton to determine how much Roundup she sprayed at the Palos Heights address between 1976 and 1986?
>
> MR. MURNER: Objection, form.
>
> A. I didn't say I was in a better position. I just didn't agree that she was in a better position. I think we're both in a position of having uncertainties with respect to that information.

*Id*. at 83:11–84:12.

> Q. And of course, Ms. Delorame-Barton would be in a better position than you to know how much Roundup she sprayed at the Palos Heights address between 1976 and 1986. You would agree with that?
>
> MR. MURNER: Objection, form.
>
> A. No, you've asked me that before, and I said I did not agree that that was necessarily the case.

> Q. What is the basis of your disagreement with that statement?
>
> A. Well, as a starting point, in research involving individuals' recollections of their past uses of products and their exposures, the abundance of the literature indicates that people's recollections are very, very poor, and they tend to overstate their exposures. Particularly when they are ill with a condition that they attribute to their exposure. So that's the starting point as a foundational idea.
>
> The second is that having been deposed in two prior cases and reviewing case materials to see that recollection of past use is often very uncertain, full of gaps. I think there's lots of evidence in her transcript that she was uncertain about certain particulars.
>
> So, you know, like I said, I'm not asserting that I -- that she has better knowledge of it or that I have better knowledge of it. The reality is there are uncertainties.

*Id*. 87:16–88:19.

There is no reason to exclude Dr. Murphy's estimate of the square foot area that Ms. Delorme-Barton sprayed just because it does not comport with Ms. Delorme-Barton's memory, especially given her vague recollection. If, however, Plaintiffs open the door by asking Dr. Murphy to explain why his estimate is different from Ms. Delorme-Barton's, they cannot then object to him answering that people's estimate of how much pesticide they used decades ago is usually uncertain and commonly overstated. His opinions are not arbitrary; they are grounded in Ms. Delorme-Barton's own uncertainty expressed in her deposition, on his personal experience in prior cases, and research on the accuracy of self-reported data of pesticide use. White Decl., Ex. 3 (Murphy Dep.), at 87:16–88:19. For that reason, his opinions are both helpful and require specialized knowledge. *See U.S. v. Binder*, 769 F.2d 595, 602 (9th Cir. 1985) (cited by Plaintiffs; holding that while testimony about professional research or experience about a class of people may be admissible, testimony about the credibility of particular witnesses was not); *United States v. Morales*, 108 F.3d 1031, 1039 (9th Cir. 1997) (affirming admission of expert testimony on defendant's poor familiarity with bookkeeping principles).

Dr. Murphy's invited comments are far different than the credibility attack excluded in the case cited by Plaintiffs. In *Nash-Perry v. City of Bakersfield*, 2022 WL 3357516, at *13 (E.D. Cal. Aug. 15, 2022), a police shooting case, the court excluded an expert from opining that the decedent was unable to hear the police officer's commands, was unaware the person at his door was a police officer, and

approached the door with a BB gun to dissuade the person from entering. In forming these opinions, which all concerned the decedent's mental state, the expert relied only on three deposition transcripts. The court found the opinions lacked any basis and were improper. Here, however, Dr. Murphy offers no opinion concerning Ms. Delorme-Barton's subjective intent; his opinion presents Ms. Delorme-Barton's self-reported estimate and his estimate of the volume based on the area she describes spraying.

**VII.   Dr. Murphy's opinions should not be excluded.**

Plaintiffs' motion to exclude Dr. Murphy's opinions should be denied because Plaintiffs' two criticisms are properly issues for cross-examination, not exclusion. Plaintiffs raise no issue with his methodology. They can question him about the basis for his assertion that the Dial N' Spray hose attachment did not cause Ms. Delorme-Barton to inhale driftable droplets and his estimate of the volume of Roundup based on the area he determined Ms. Delorme-Barton sprayed. As discussed above, there is no merit to these lines of attack, nor do they threaten Dr. Murphy's conclusions—even were Plaintiffs correct on both points, Ms. Delorme-Barton's cumulative lifetime dose of glyphosate would still only be a fraction of a percent of the California NSRL limit and the EPA RfD limit.

Dated:  July 14, 2023                              Respectfully submitted,

/s/ *Jed P. White*_____
Jed P. White
Attorneys for Defendant Monsanto Company

**CERTIFICATE OF SERVICE**

 I HEREBY CERTIFY that on this 14th day of July, 2023, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

          */s/ Jed P. White*
          Jed P. White