# EXHIBIT 3

```
 1              UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF CALIFORNIA
 2
                           MDL No. 2741
 3
                           Case No. 3:16-md-02741-VC
 4

 5
    IN RE: ROUNDUP PRODUCE LIABILITY
 6  LITIGATION

 7  ---------------------------------

 8  Karen Delorme-Barton

 9  v.

10  Monsanto Company

11  Case No. 3:18-cv-01427-VC

12  ---------------------------------

13

14

15

16        ZOOM DEPOSITION OF JOHN MURPHY, PH.D

17           April 24, 2023 at 10:01 a.m.

18                  Virtual Room

19

20

21

22
      ----------Jennifer A. Doherty, CSR--------------
23           Certified Court Stenographer

24

25
```

**Exhibit 2 Page 1**

```
 1    APPEARANCES:

 2         WEITZ & LUXENBERG, P.C.
           BY: Benjamin Goldman, Esq.
 3         220 Lake Drive East, Suite 210
           Cherry Hill, New Jersey 08002
 4         bgoldman@weitzlux.com
           For the Plaintiff.
 5

 6

 7         HOLLINGSWORTH, LLP
           BY: Daniel Murner, Esq.
 8         1350 I Street, NW
           Washington, DC 20005
 9         dmurner@hollingsworthllp.com
           For the Defendant.
10

11

12
      ALSO PRESENT:  Ranjit Dhindsa, Esq., Abigail Reecer,
13    Esq., Chantel Khali, Esq. and Alex Jandrow,
      Videographer
14

15

16

17

18

19

20

21

22

23

24

25
```

Exhibit 2 Page 2

Golkow Litigation Services                                Page 2

John Murphy, Ph.D.

```
 1          A.    I provide no opinion on that matter.

 2          Q.    Okay.  And then your analysis of the

 3   exposure levels for Ms. Delorame-Barton, you

 4   reviewed her deposition testimony; is that right?

 5          A.    Yes.

 6          Q.    Okay.  And in your report you also use a

 7   series of photographs from Google Earth and I

 8   believe also realty company websites; is that

 9   right?

10          A.    I used photos from the exhibit set, from

11   Google Earth Pro and from publicly available real

12   estate sites that show the property.

13          Q.    Okay.  And in reviewing and using the

14   testimony of Ms. Delorame-Barton in conducting your

15   analysis, did you question the accuracy of

16   Ms. Delorame-Barton's testimony?

17                MR. MURNER:  Objection, form.

18          A.    When I read through the testimony, I did

19   not question its accuracy.

20          Q.    Okay.  So would it be accurate -- would it

21   be -- would it be accurate to say with regards --

22   with regards to your use of the deposition

23   testimony, you accepted everything that she said as

24   true and accurate in the -- in using it for your

25   analysis?
```

**Exhibit 2 Page 3**

1          So there's no discrepancy on that point.

2     I -- I base my analysis specifically upon the

3     locations that she describes spraying.

4          Q.   Right.  I mean, so let me -- let me make

5     sure that I'm -- that we're -- it seems like we're

6     getting close to the same page.  She said that she

7     sprayed at 1855 Azalea Springs, Roswell, Georgia.

8     That's your understanding; is that right?

9          A.   That's what she states, and my analysis

10    reflects that, yes.

11         Q.   Okay.  But within that property she said

12    that she sprayed a certain volume of Roundup over a

13    certain area of ground; is that right?

14         A.   She does, yes.

15         Q.   Okay.  And did you find a discrepancy

16    between the amount of Roundup that she said she

17    sprayed in the area of ground that you determined

18    she would have sprayed?

19         A.   To provide some context.

20         Q.   Please.

21         A.   I think -- I think in the testimony she

22    does not actually offer in relation to that

23    property -- proactively, she does not offer a

24    specific volume.  The deposing attorney suggests a

25    volume that she agrees to.  And the volume that she

**Exhibit 2 Page 4**
Golkow Litigation Services                        Page 44

1        A.    State that question again.

2        Q.    Yeah, sure.  Okay.  So here, page 41, you

3    have figure 7, which is the Palos Heights property;

4    is that right?

5        A.    Yes.

6        Q.    Okay.  Then figures 8 and 9 are -- have

7    yellow blocked off areas within the Palos Heights

8    property; is that right?

9        A.    Yellow blocked off areas, yes, correct.

10       Q.    And you blocked off the yellow areas in

11   figure 8 and figure 9 because these were areas that

12   you believe correspond to the areas that she

13   described spraying in her deposition testimony; is

14   that right?

15       A.    I believe those areas correspond to the

16   areas that she identified in her deposition

17   testimony.

18       Q.    Right.  Okay.  And so it's -- that would

19   be figure 8 would be an area that you -- an area in

20   the Google Earth image you believe she describes

21   spraying in her deposition testimony; is that

22   right?

23       A.    Yes, uh-huh.

24       Q.    Okay.  And just bear with me, I'm going to

25   run through them.  Figure 9 is a blocked off -- the

**Exhibit 2 Page 5**

Golkow Litigation Services                        Page 51

1    application?

2         A.    No.

3         Q.    Okay.  Where did you get the rate of

4    application?

5         A.    The rate of application is -- is an

6    advertised rate that is provided by the

7    manufacturer, and it's -- it's generally -- it's an

8    application rate that is generally used in the

9    industry.  It's not -- it's not a function of the

10   sprayer.  It's a function of how much is necessary

11   to do broadcast spraying of the -- of the indicated

12   surface area.

13        Q.    Okay.

14        A.    But she said she did spot spray.  So my --

15   my assumption would overstate, you know, it should

16   overstate, in fact, the quantity that she used

17   because she claimed to do targeted spot spraying,

18   not broadcast spraying.

19        Q.    Right.  But if you're taking -- if you're

20   not questioning the creditability of her testimony,

21   then -- then her -- then the amount of Roundup that

22   she sprayed is clear, right, she said she filled up

23   the two gallon --

24              MR. MURNER:  You have to let me make

25   my objection.  Objection, form.

Exhibit 2 Page 6
Golkow Litigation Services                          Page 57

John Murphy, Ph.D.

```
1         A.    I'm not questioning her creditability.   I
2    do know that people sometimes have difficulty
3    recalling precisely how much they used.   I use
4    Roundup myself, and if you ask me, you know, what
5    was the typical volume that I used last summer when
6    I was spraying, I couldn't tell you.   And I see this
7    all the time.   So, you know, I -- I did an analysis
8    based upon the square footage.
9         But I do say in the report that if -- if
10   the volume that she stipulates is accurate, and,
11   again, it's not -- it's not up to disparage her.
12   I'm not suggesting she was untruthful, simply that
13   recalling these types of particulars is not that
14   easy necessarily.
15        And as I said before as well, she really
16   didn't offer it in relation to the other properties.
17   So I think there was, you know, it's possible that
18   the volumes were different.   But if they were as
19   reported, that's fine.   I indicate the consequence
20   for the dose estimate based on that assumption.   If
21   her volumes are accurate, I indicate in my report
22   what the consequences are for the dose.
23             MR. GOLDMAN:   Move to strike as
24   nonresponsive all testimony regarding the witness's
25   personal usage of Roundup.
```

**Exhibit 2 Page 7**

1    your report and the time that she actually -- that

2    Ms. Delorame-Barton actually resided at the Palos

3    Heights address; is that right?

4              MR. MURNER:  Objection, form.

5        A.   Based on the time of her reported

6    occupancy that would be correct.

7        Q.   Okay.  And you've testified that the 2013

8    Google Earth image seemed consistent to you with her

9    deposition testimony; is that right?

10             MR. MURNER:  Objection, form.

11       A.   The Google Earth image contained features

12   that were similar to those that she described in her

13   testimony.

14       Q.   Okay.  But would you agree that the Google

15   Earth image is one that you really don't know

16   whether it fairly and accurately represents the

17   landscaping at the Palos Heights address 27 to 37

18   years earlier?

19             MR. MURNER:  Objection, form.

20   Scope.

21       A.   All I can say is that the features she

22   described appear in the photo, and that was the

23   basis for the measurements.

24       Q.   Okay.  So would you agree that based on

25   the 2013 Google Earth image, you can't tell the

**Exhibit 2 Page 8**

John Murphy, Ph.D.

```
 1                    MR. MURNER:  Objection, form.

 2        A.   The --

 3                    THE COURT REPORTER:  He's frozen.

 4        A.   -- application rate per label is probably

 5   the more precise way of describing it.

 6                    THE COURT REPORTER:  He has to

 7   repeat.

 8   BY MR. GOLDMAN:

 9        Q.   I know.  I have to stop you, Doctor.  You

10   froze again.

11        A.   Okay.

12        Q.   So -- yeah, if you could -- if you could

13   repeat that answer, that would be helpful.  If you'd

14   like me to repeat the question, I'd be happy to.

15        A.   Please repeat the question.

16        Q.   Okay.  In reviewing the -- in reviewing

17   Ms. Delorame-Barton's deposition testimony and the

18   2013 Google Earth image, you determined that it was

19   plausible that she sprayed the amount of Roundup

20   that she reported spraying over the area that you

21   blocked off in the Google Earth image; is that

22   right?

23                    MR. MURNER:  Objection, form.

24        A.   That's not what I say in the report.  I

25   provide a dose estimate based on the areas that I
```

**Exhibit 2 Page 9**

Golkow Litigation Services                              Page 72

John Murphy, Ph.D.

```
 1        A.    For the lifetime dose you mean?

 2        Q.    Yes.  Yes.

 3        A.    No, I did not because it wouldn't actually

 4   have materially altered it.  It wouldn't even have

 5   been a decimal place difference in the overall

 6   amount.

 7        Q.    Well, but -- okay.  So --

 8        A.    It would be a rounding error,

 9   essentially.

10        Q.    Your -- but you never did the calculation;

11   is that right?

12        A.    Well, I did it for her occasion use, but I

13   didn't do it for the lifetime.

14        Q.    Okay.  But your understanding of the

15   mathematical model suggests to you that if you had

16   done her lifetime exposure, including her

17   recollection of the volume that she used at Palos

18   Heights and Roswell, that would not materially alter

19   your -- the final dose in your report?

20        A.    That's a fair characterization, yes.

21        Q.    Okay.  But let's back up.  You certainly

22   have no reason to doubt that Ms. Delorame-Barton was

23   present at Palos Heights between 1976 and 1986,

24   right?

25                   MR. MURNER:  Objection, form.
```

**Exhibit 2 Page 10**

John Murphy, Ph.D.

1    public.

2    BY MR. GOLDMAN:

3         Q.   So what you're describing -- tell me if

4    this is fair.  You're describing having undertaken a

5    hypothetical analysis assuming that -- that

6    Ms. Delorame-Barton's testimony is true?

7                   MR. MURNER:  Objection, form.

8         A.   I did an analysis based upon the

9    information she provided in her transcript or that

10   appears in the transcript.

11        Q.   Okay.  And you would agree that

12   Ms. Delorame-Barton is in a better position than you

13   personally to know how much Roundup she sprayed at

14   the Palos Heights address between 1976 and 1986;

15   isn't that right?

16        A.   I don't know that I would agree with that,

17   no.

18        Q.   You don't agree with that?  You think that

19   you personally are in a better position to determine

20   how much Roundup Ms. Delorame-Barton sprayed on each

21   session of spraying at the Palos Heights address?

22                   MR. MURNER:  Objection, form.  Asked

23   and answered.

24        A.   Oh, no.  I simply said I didn't agree with

25   your characterization.  And I don't agree with the

**Exhibit 2 Page 11**

1    way you recharacterized it.

2        Q.   Okay.  So upon what basis do you believe

3    that you personally are in a better position than

4    Ms. Delorame-Barton to determine how much Roundup

5    she sprayed at the Palos Heights address between

6    1976 and 1986?

7                    MR. MURNER:  Objection, form.

8        A.   I didn't say I was in a better position.

9    I just didn't agree that she was in a better

10   position.  I think we're both in a position of

11   having uncertainties with respect to that

12   information.

13       Q.   You would agree that she was physically

14   present at that address between 1976 and 1986?

15                   MR. MURNER:  Objection, form.

16       A.   I agree that she testified that having

17   lived there during that period.

18       Q.   Okay.  So for the purpose of -- of your

19   analysis you accept as true that Ms. Delorame-Barton

20   sprayed Roundup at the Palos Heights address between

21   1976 and 1986; is that right?

22       A.   No, I don't accept that as true that it

23   occurred.  I simply used the assertion that it

24   occurred as the basis for my analysis.

25       Q.   Okay.  So let me -- let me repeat the

**Exhibit 2 Page 12**

1  truthfulness or untruthfulness.  I have no basis for

2  questioning the plaintiff in any way, shape, or form

3  as an individual or character.  I simply take the

4  information presented to me, and I do the

5  calculations.

6      Q.   Okay.

7      A.   That's it.

8      Q.   Okay.  And part of the information that

9  you're using for basis for your analysis is

10  Ms. Delorame-Barton's testimony that she filled up a

11  two-gallon sprayer with Roundup between four and six

12  times when she was spraying the Palos Heights

13  address; is that right?

14      A.   I acknowledged that she states that.  Yes,

15  that's correct.

16      Q.   And of course, Ms. Delorame-Barton would

17  be in a better position than you to know how much

18  Roundup she sprayed at the Palos Heights address

19  between 1976 and 1986.  You would agree with that?

20           MR. MURNER:   Objection, form.

21      A.   No, you've asked me that before, and I

22  said I did not agree that that was necessarily the

23  case.

24      Q.   What is the basis of your disagreement

25  with that statement?

**Exhibit 2 Page 13**

John Murphy, Ph.D.

1        A.    Well, as a starting point, in research

2   involving individuals' recollections of their past

3   uses of products and their exposures, the abundance

4   of the literature indicates that people's

5   recollections are very, very poor, and they tend to

6   overstate their exposures.  Particularly when they

7   are ill with a condition that they attribute to

8   their exposure.  So that's the starting point as a

9   foundational idea.

10            The second is that having been deposed in

11   two prior cases and reviewing case materials to see

12   that recollection of past use is often very

13   uncertain, full of gaps.  I think there's lots of

14   evidence in her transcript that she was uncertain

15   about certain particulars.

16            So, you know, like I said, I'm not

17   asserting that I -- that she has better knowledge of

18   it or that I have better knowledge of it.  The

19   reality is there are uncertainties.

20            But it's ultimately immaterial because my

21   analysis with respect to her dose at Palos Heights

22   and at Roswell recognizes that there's a discrepancy

23   between the volumes that I arrive at through my

24   methodology and her stated usage volumes.  And I

25   also state the incremental effect that that would

**Exhibit 2 Page 14**

John Murphy, Ph.D.

1      Q.   Okay.  When you tested it, did you record

2  the results of this test?

3      A.   Visually only.

4      Q.   Okay.  Did you test -- did you purchase

5  the -- this sprayer and test it in order to produce

6  the report in this matter?

7      A.   Yes, I did.

8      Q.   Okay.  Do you still have that Dial N'

9  Spray?

10      A.   Yes, I do.

11      Q.   Okay.  And your basis for saying that

12  neither of these modes would produce a driftable

13  droplet is based on your own personal observation;

14  is that right?

15      A.   It's based on observation as well as my

16  understanding of the physics of how those droplets

17  are produced and the relationship between droplet

18  production and the characteristics of the orifice

19  and the nozzle.  So, yeah, so it's based on my -- my

20  understanding as an expert of that aspect of aerosol

21  physics.

22      Q.   Okay.  You didn't take any measurements

23  associated with this informal test you undertook of

24  the Dial N' Spray nozzle, did you?

25      A.   No.  It's like -- it's like watching water

**Exhibit 2 Page 15**

Golkow Litigation Services                        Page 107

John Murphy, Ph.D.

1    come out of a hose.   It's fairly obvious that it

2    doesn't produce driftable droplets.

3         Q.    Is the question of whether or not a nozzle

4    produces driftable droplets something that is

5    amenable to being tested with any kind of technology

6    that would sense whether or not driftable droplets

7    are actually produced?

8         A.    Yes, it can be tested.

9         Q.    Okay.  How would that -- how would that

10   work?

11        A.    Well, with this particular device,

12   probably the best way to do it would be to add a

13   fluorescent dye to the liquid and then discharge.

14   And determine whether, in fact, driftable droplets

15   are detected as a result of the discharge.

16             So you'd basically design a little

17   experiment, and you'd shoot out the liquid and you

18   would -- you would shroud the discharge area.   And

19   then you would determine afterward by way of

20   ultraviolet light whether you're actually getting --

21   ultraviolet light and a microscope as to whether

22   you're actually getting driftable droplets.

23        Q.    Okay.  And I assume you can do that in a

24   controlled environment in a -- in a lab; is that

25   right?

**Exhibit 2 Page 16**

Golkow Litigation Services                      Page 108

John Murphy, Ph.D.

1    A.    You could, yes.

2    Q.    Yeah.  And I'm sure that the lab could

3  also reproduce different wind conditions that might

4  affect the drift of a -- of a spray nozzle?

5    A.    Presumably, it could be done.

6    Q.    Yeah.  Okay.  And that type of experiment

7  would give you a -- you know, a more accurate answer

8  as to whether or not the nozzle actually produces

9  driftable droplets; is that right?

10                MR. MURNER:  Objection, form.

11    A.    It would -- it would be a more

12  quantitative answer.

13    Q.    Okay.  Is it desirable to have a more

14  quantitative answer in a -- from a scientific

15  perspective?

16    A.    More information is always better.  I

17  don't think it would alter the conclusion in this

18  case.

19    Q.    Okay.  But you certainly didn't use

20  ultraviolet light to determine whether or not

21  driftable droplets were produced by the Dial N'

22  Spray sprayer; is that right?

23    A.    No, I didn't have time to do it.

24    Q.    And you didn't have -- and then you didn't

25  use a microscope to determine whether or not

**Exhibit 2 Page 17**

1    but the -- as I explain in the footnote, this was

2    something that I found on Amazon or Ebay, I can't

3    remember which one it was.

4            But there have been many models of this

5    device.  So I was not familiar with it, and felt it

6    was necessary to get it to -- to determine, you

7    know, what -- what its characteristics were.

8            Now, having said that, if it does produce

9    driftable droplets, I did do an analysis in my

10   report, which immediately follows this outlining

11   what the exposure and dose would be if it, in fact,

12   produced the droplet spectrum that was comparable to

13   the two-gallon sprayer.

14           So -- but, again, if that analysis -- if

15   that is the case, and I don't believe it is, it

16   shows once again that the contribution to the

17   overall dose is not that high.  In my mind, the more

18   significant issue regarding this device is the

19   potential for the plaintiff to have had her feet

20   wet, because that's what she describes.

21           She describes using this to do broadcast

22   discharge on these hills, and then she walks through

23   it with her flip flops and her feet get wet.  So to

24   me, that was a more significant aspect that

25   warranted consideration in the dose estimate because

**Exhibit 2 Page 18**

John Murphy, Ph.D.

1    transdermal absorbed dose.

2            So it's not a question of having assigned

3    zero.  It's a question of having used the completely

4    different dose model for that -- that device.

5        Q.    Okay.  So when she was use -- so the model

6    that you use when she was using -- to analyze her

7    use of the Dial N' Spray sprayer, did that factor in

8    any respiratory exposure to Roundup?

9            MR. MURNER:  Objection, form.

10       A.    If she was also using the two-gallon, than

11   it would have been factored in through that.  But if

12   she wasn't using the two-gallon, then it would not.

13           However, now that you mentioned it, it

14   occurs to me I also included the feet soaking and

15   the spill on the hand in the Palos Heights, Illinois

16   analysis, which I should not have done because she

17   didn't use it there.  So that would actually reduce

18   her Palos Heights total dose.  But it wouldn't

19   affect the Roswell and Marietta.

20           So that's -- that's a correction I would

21   need to make in table 8 actually.  The feet soaking

22   and the spill on the hand would have to go, I think.

23   Which would reduce that dose by 30 percent,

24   approximately.  Yeah, about 30 percent, so it would

25   be lower than I indicate.

**Exhibit 2 Page 19**

Golkow Litigation Services                           Page 116

John Murphy, Ph.D.

```
 1                C E R T I F I C A T E

 2   COMMONWEALTH OF MASSACHUSETTS
     Worcester, ss.
 3

 4                I, Jennifer A. Doherty, Certified

 5   Shorthand Reporter and Notary Public duly

 6   commissioned and qualified in and for the

 7   Commonwealth of Massachusetts, do hereby certify

 8   that the witness came before me on the 24th day of

 9   April, 2023, who was by me duly sworn to testify to

10   the truth of their knowledge concerning the matters

11   in controversy in this cause; and that the

12   deposition is a true record of the testimony given

13   by the deponent.

14                I further certify that I am not

15   related to or employed by any of the parties to the

16   action, and further that I am not a relative or

17   employee or financially interested in this action.

18

19                IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY

20   HAND AND SEAL THIS 26TH DAY OF APRIL, 2023.

21

22

23                          Notary Public
                            My Commission Expires:
24                          October 19, 2023
                            CSR No. 1398F95
25
```

**Exhibit 2 Page 20**

John Murphy, Ph.D.

1   WITNESS:  John Murphy, Ph.D

2   DATE:  April 24, 2023

3   CASE:  Karen Delorme-Barton v Monsanto

4

5

6   DISTRIBUTION TO COUNSEL:  The original signature

7   page/errata sheet was sent to Daniel Murner, Esq. to

8   obtain signature for the deponent.  When signed,

9   please forward same to Benjamin Goldman, Esq. for

10  inclusion with the original of the deposition

11  transcript.

12

13  WITNESS INSTRUCTIONS:  After reading the transcript

14  of your deposition, please note any change or

15  correction and the reason for it on the errata

16  sheet.  DO NOT make any notations on the transcript

17  itself.  Use additional sheets if necessary.

18

19  SIGN AND DATE THE ERRATA SHEET and return it, along

20  with the transcript, to your counsel.

21

22

23

24

25

Exhibit 2 Page 21

Golkow Litigation Services                          Page 167