**WILKINSON STEKLOFF LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonstekloff.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonstekloff.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel:  202-847-4030
Fax: 202-847-4005

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel:  202-898-5843
Fax: 202-682-1639

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel:  202-662-6000

**BRYAN CAVE LEIGHTON PAISNER LLP**
K. Lee Marshall (CA Bar No. 277092)
(klmarshall@bclplaw.com)
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Tel:  415-675-3400
Fax: 415-675-3434

Jed P. White (CA Bar No. 232339)
(jed.white@bclplaw.com)
120 Broadway, Suite 300
Santa Monica, CA 90401
Tel:  310-576-2100
Fax: 310-576-2200

*Attorneys for Defendant Monsanto Company*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION, | MDL No. 2741 |
| | Case No.: 3:16-md-02741-VC |
| *Delorme-Barton v. Monsanto Company*, 3:18-cv-01427-VC | **DEFENDANT MONSANTO COMPANY'S RESPONSE IN OPPOSITION TO PLAINTIFF'S *DAUBERT* MOTION TO PRECLUDE TESTIMONY FROM MONSANTO'S EXPERT DR. CRISTIAN TOMASETTI, Ph.D.** |

**TABLE OF CONTENTS**

Page

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................3

LEGAL STANDARD ............................................................................................................4

ARGUMENT .........................................................................................................................4

    I.     Dr. Tomasetti is Qualified to Testify about What Causes Cancer. ............................4

         A.     Dr. Tomasetti's Career Has Focused on the Study of Cancer and Its Causes. ...................................................................................................4

         B.     It Does Not Matter that Dr. Tomasetti is Not a Medical Doctor. .....................6

    II.    Dr. Tomasetti's Opinions Are Generally Accepted. ....................................................6

    III.   Plaintiff's Other Criticisms of Dr. Tomasetti's Opinions are Meritless. .....................9

         A.     Dr. Tomasetti is a General Causation—Not a Specific Causation—Expert. ....................................................................................................9

         B.     Plaintiff Mischaracterizes Dr. Tomasetti's Work. .........................................11

         C.     Plaintiff Misstates the Record. ......................................................................13

CONCLUSION ...................................................................................................................15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*,
  9 F.4th 768 (8th Cir. 2021) .................................................................................................. 9

*Chapple v. Ganger*,
  851 F. Supp. 1481 (E.D. Wash. 1994) ................................................................................. 8

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) .......................................................................................................... 8, 9

*In re Hanford Nuclear Reservation Lit.*,
  292 F.3d 1124 (9th Cir. 2002) ........................................................................................... 10

*Hangarter v. Provident Life and Accident Ins. Co.*,
  373 F.3d 998 (9th Cir. 2004) ............................................................................................. 13

*Holley v. Pambianco*,
  270 Va. 180 (2005) ............................................................................................................ 11

*Lust by and Through Lust v. Merrell Dow Pharms., Inc.*,
  89 F.3d 594 (9th Cir. 1996) ................................................................................................. 8

*In re Methl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
  643 F. Supp. 2d 482 (S.D.N.Y. 2009) ............................................................................... 13

*Milward v. Acuity Specialty Prods. Grp., Inc.*,
  639 F.3d 11 (1st Cir. 2011) .................................................................................................. 9

*Monroe v. Zimmer U.S. Inc.*,
  766 F. Supp. 2d 1012 (E.D. Cal. 2011) ............................................................................... 6

*In re Neurontin Marketing, Sales, Practices, and Prods. Liab. Litig.*,
  612 F. Supp. 2d 116 (D. Mass. 2009) .................................................................................. 6

*In re Silicone Gel Breast Implants Prods. Liab. Litig.*,
  318 F. Supp. 2d 879 (C.D. Cal. 2004) ............................................................................... 10

*In re: TFT-LCD (Flat Panel) Antitrust Litig.*,
  Nos. 07-1827, 10-1064, 2013 WL 124347 (N.D. Cal. Jan. 8, 2013) ................................. 13

*Timblin v. Ken Gen. Hosp.*,
  640 A.2d 1021 (Del. 1994) ................................................................................................ 11

*Wendell v. GlaxoSmithKline LLC*,
  858 F.3d 1227 (9th Cir. 2017) ............................................................................................. 4

*Woodard v. Stryker Corp.*,
   No. 11-cv-36, 2012 WL 3475079 (D. Wyo. July 16, 2012) ........................................................ 6

**Other Authorities**

C. Tomasetti, L. Li, and B. Vogelstein, *Stem cell divisions, somatic mutations, cancer etiology, and cancer prevention*, 355 SCIENCE 6331, Mar. 24, 2017 ......................................... 3

Fed. R. Evid. 702 ............................................................................................................................ 4

Fed. R. Evid. 703 .......................................................................................................................... 13

M. Song, B. Vogelstein, E. L. Giovannucci, W. C. Willet, and C. Tomasetti, *Cancer prevention: Molecular and epidemiologic consensus*, 361 SCIENCE 6409, Sep. 28, 2018 ......................................................................................................................................... 8

Y. A. Fouad and C. Aanei, *Revisiting the hallmarks of cancer*, AM. J. CANCER. RES. 2017;7(5) at 1028 ................................................................................................................... 8

**INTRODUCTION**

Dr. Cristian Tomasetti has spent his professional career focused on answering one question which happens to be central to this case: what causes cancer? His work on this question has advanced humanity's understanding of cancer's causes. Dr. Tomasetti's opinions in this case are based on peer-reviewed research papers, many of which he personally co-authored, in the world's leading scientific journals, including *Science*, *Nature*, the *New England Journal of Medicine*, and the *Proceedings of the National Academy of Sciences*.

Recognizing Dr. Tomasetti's qualifications and the reliability of his methodology, courts across the country have uniformly rejected similar motions to exclude Dr. Tomasetti's opinions in other Roundup litigation cases. Indeed, Dr. Tomasetti has been allowed to testify without restriction in every single court where his opinions have been offered at trial. *See*, *e.g., Ferro v. Monsanto Co.*, No. 20SL-CC03678 (Mo. Cir. Ct.); *see also Alesi v. Monsanto Co.*, No. 19SL-CC03617 (Mo. Cir. Ct.); *Stephens v. Monsanto*, No. CIVSB104801 (Cal. Super. Ct.), *L. Johnson v. Monsanto Co.*, No. 21CV10291 (Or. Cir. Ct.); *Gordon v. Monsanto Co.*, No. 17SL-CC02721 (Mo. Cir. Ct.).[1]

In this case, Dr. Tomasetti will offer general causation opinions on the following topics that are within the core of his expertise: (1) the role of random mutations, and the interaction between naturally-occurring mutations, environmental factors, and hereditary factors, in the development of cancer; (2) the significance of mutation load and mutation signature on determining causes of cancer, including in his own research and as it relates to Roundup and NHL; (3) whether glyphosate and/or glyphosate-based formulations have been shown to cause NHL in humans, including as it relates to his analysis of the epidemiological data and the impact of publication bias and multiple comparisons on glyphosate-based formulated products; and (4) animal and genotoxicity studies and their relevance to the question of whether glyphosate and/or glyphosate-based formulated products cause NHL.

Despite the obvious relevance of his opinions to the issues in this case, Plaintiff has nonetheless moved under *Daubert* to exclude Dr. Tomasetti from testifying at trial, raising a hodgepodge of supposed deficiencies in his qualifications and methodologies. But at very best, Plaintiff has merely

---

[1] A motion to exclude Dr. Tomasetti was also denied by the Massachusetts Superior Court in *Constantine v. Monsanto Co.*, No. 1972CV00277 (Mass. Sup. Ct.).

identified subjects for cross-examination at trial, not bases to exclude Dr. Tomasetti.

Plaintiff attacks Dr. Tomasetti's qualifications by describing him as a "mathematician and economist" and criticizes the fact that he is not a licensed physician. But Dr. Tomasetti is an oncological biostatistician. He is currently the Director of the Center for Cancer Prevention and Early Detection at City of Hope Cancer Center, which eminently qualifies him to opine on cancer causation. And contrary to Plaintiff's assertions, biostatisticians like Dr. Tomasetti regularly testify about general causation, even if they are not licensed medical doctors.

Plaintiff also attacks Dr. Tomasetti because his discovery that naturally-occurring cell mutations cause cancer was groundbreaking. Plaintiff argues that Dr. Tomasetti's work is not generally accepted because the medical and scientific community reacted strongly to the groundbreaking nature of Dr. Tomasetti's discovery in the months immediately after it was published. Plaintiff is wrong. Dr. Tomasetti's research was peer-reviewed and published in one of the world's leading scientific journals. And Plaintiff's own experts agree with Dr. Tomasetti's core opinion, even if they sometimes disagree on the margins.

Plaintiff also argues Dr. Tomasetti's opinions are irrelevant because he will not testify about what caused *Plaintiff*'s non-Hodgkin's lymphoma (NHL) specifically. But Dr. Tomasetti is a general causation expert, not a specific causation expert. He has never purported to diagnose Plaintiff, just like Plaintiff's general causation experts do not purport to diagnose Plaintiff.

And Plaintiff's specific attacks on Dr. Tomasetti's methodology are meritless. For example, Plaintiff asserts that Dr. Tomasetti's opinions about mutations causing cancer are based on "the rate of cell division for the wrong cell" and "the wrong rate of mutation." But Plaintiff is wrong on the science: the cells Dr. Tomasetti analyzed are the *only* place where the mutations causing cancer *originate*, even if the cancer is later *observed* in a different type of cell. And, contrary to Plaintiff's assertions, Dr. Tomasetti's work is based on analyzing two types of mutations in cells: point mutations and translocations.

Dr. Tomasetti is qualified. His opinions are relevant and his methodology is reliable. His testimony will aid and inform the jury. This Court should deny the motion to exclude his testimony, as every other court to consider similar motions has done.

# BACKGROUND

Dr. Tomasetti's research with Dr. Bert Vogelstein into cancer risk and causation was groundbreaking: it showed for the first time why certain human tissues are more susceptible to cancers than other human tissue. *See* Ex. 1, Cristian Tomasetti & Bert Vogelstein, *Variation in cancer risk among tissues can be explained by the number of stem cell divisions*, 347 (6217) SCIENCE 78, Jan. 2, 2015 ("Tomasetti 2015"). Drs. Tomasetti and Vogelstein hypothesized that human tissues that experience more stem cell divisions over the course of a lifetime are more likely to develop cancer than human tissues that experience fewer stem cell divisions. *Id.* To confirm this hypothesis, Drs. Tomasetti and Vogelstein conducted an extensive search of published scientific literature and identified thirty-one tissue types where the number of stem cells has been quantified, including bone, brain, lung, small intestine, skin, and hematopoietic stem cells. *Id.* They then compared the number of lifetime stem cell divisions in those tissues to the lifetime cancer risk for each tissue utilizing the Surveillance, Epidemiology, and End Results ("SEER") database—the most comprehensive database of cancer diagnoses in the United States population. *Id.* They found a strong positive correlation: as the lifetime number of stem cell divisions within tissue types increased, the incidence of cancer in those tissue types increased linearly. *Id.*

Drs. Tomasetti and Vogelstein next determined the percentage of mutations caused by naturally-occurring copy errors, exposure to environmental factors, or hereditary disposition for a variety of cancer types. *See* Ex. 2, C. Tomasetti, L. Li, and B. Vogelstein, *Stem cell divisions, somatic mutations, cancer etiology, and cancer prevention*, 355 SCIENCE 6331, Mar. 24, 2017 ("Tomasetti 2017"); *see also* Ex. 3, *Alesi* Aug. 29, 2022 Trial Tr. at 4348:15-4349:10; Ex. 4, *Stephens* Oct. 26, 2021 Trial Tr. 2 at 14:8-14; Ex. 5, *L. Johnson* June 10, 2022 Trial Tr. at 50:1-51:9; 70:22-71:9. Examining publicly-available data from Cancer Research UK, they determined that naturally occurring random mutations account for about two-thirds of mutations in cancers across all human tissue types, as opposed to environmental or hereditary factors, which together account for about one-third of mutations. Ex. 1, Tomasetti 2015. When performing the same analysis for NHL, Dr. Tomasetti found that more than 95% of NHL mutations are caused by random copy errors. Ex. 6, *Alesi* Aug. 30, 2022 Trial Tr. at 4388:16-4389:7; Ex. 4, *Stephens* Oct. 26, 2021 Trial Tr. 2 at 19:10-12.

Dr. Tomasetti's research formed the basis of his opinions in this case. In this case, he will testify about the role that naturally-occurring mutations due to copy errors play in the development of cancers generally and NHL specifically. This is critical context for the jury to have in evaluating whether Plaintiff's exposure to glyphosate or Roundup caused Plaintiff's NHL. However, Dr. Tomasetti will not testify about what caused Plaintiff's NHL, specifically.

## LEGAL STANDARD

Federal Rule of Evidence 702 provides that expert opinion evidence is admissible if: (1) the witness is sufficiently qualified as an expert by knowledge, skill, experience, training, or education; (2) the scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (3) the testimony is based on sufficient facts or data; (4) the testimony is the product of reliable principles and methods; and (5) the expert has reliably applied the relevant principles and methods to the facts of the case. Fed. R. Evid. 702. This inquiry "is 'flexible,' and … should be applied with a 'liberal thrust' favoring admission." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (citations omitted). Ultimately, "the interests of justice favor leaving difficult issues in the hands of the jury and relying on the safeguards of the adversary system . . . to attack shaky but admissible evidence." *Wendell*, 858 F.3d at 1237 (cleaned up).

## ARGUMENT

### I.  Dr. Tomasetti is Qualified to Testify about What Causes Cancer.

A recurrent theme of Plaintiff's Motion is that Dr. Tomasetti is supposedly unqualified to testify about a central issue in this case: what causes cancer. Plaintiff is incorrect. Dr. Tomasetti's opinions about the role naturally occurring mutations play in causing cancer have been published in some of the best scientific journals in the world, and he has conducted his research at some of the best cancer hospitals in the world. And, contrary to Plaintiff's assertion, it does not matter that Dr. Tomasetti is not a medical doctor.

#### A.  Dr. Tomasetti's Career Has Focused on the Study of Cancer and Its Causes.

Dr. Tomasetti has spent nearly his entire career studying what causes cancer. His research primarily focuses on cancer causation, diagnosis, and early detection. Ex. 3, *Alesi* Aug. 29, 2022 Trial Tr. at 4302:20-4303:11 Ex. 7, *Ferro* Nov. 3, 2022 Trial Tr. at 2385-88; Ex. 8, Tomasetti CV at 1. His

Ph.D. dissertation in Applied Mathematics with an emphasis on biostatistics "was in cancer research." Ex. 7, *Ferro* Nov. 3, 2022 Trial Tr. at 2381; Ex. 8, Tomasetti CV at 2. His research on DNA gene sequencing data and cancer mutations has been published in some of the world's most prestigious scientific and medical journals, and he conducted most of that research "way before" he offered any opinions in any Roundup litigation. Ex. 8, Tomasetti CV at 2-6 (listing recent publications); *see also* Ex. 6, *Alesi* Aug. 30, 2022 Trial Tr. at 4390:15-4391:7 (explaining that most of his underlying research was conducted or published in "2015 and 2016" which was "way before" he was hired by Monsanto in November 2019). Dr. Tomasetti unquestionably is qualified to offer causation opinions based on cancer mutation research he performed himself.

And Dr. Tomasetti has spent nearly his entire career working at some of the most prestigious cancer centers in the world. After obtaining his Ph.D., he spent two and a half years as a postdoctoral fellow at the Harvard School of Public Health and the Dana-Farber Cancer Institute, which a recent global survey of medical professionals ranked as the fourth-best cancer hospital on the planet. Ex. 8, Tomasetti CV at 1; News Release, Newsweek Names Dana-Farber #4 in the World for Cancer (Sept. 15, 2022), *available at* https://bit.ly/3FV7QpE. Until recently, he was an associate professor in the Department of Oncology at the Johns Hopkins University School of Medicine. Ex. 8, Tomasetti CV at 1. In that role, Dr. Tomasetti worked closely with the clinical oncology faculty at Johns Hopkins, and with collaborators around the world, to diagnose and determine appropriate treatment for a wide variety of cancer patients. Ex. 9, *Neal v. Monsanto Co.,* No. 1722-CC10773 (Mo. Cir. Ct.) Jan. 4, 2022 Tomasetti Dep. at 7:6-9:8; 11:6-13:9. In early 2022, Dr. Tomasetti became the Director of the Center for Cancer Evolution and Early Detection at City of Hope, one of the world's largest cancer centers. Ex. 8, Tomasetti CV, at 1. Dr. Tomasetti also directs the Division of Integrated Cancer Genomics at City of Hope. *Id.*

Plaintiff's motion mentions none of this. Instead, Plaintiff waves away Dr. Tomasetti's extensive credentials and experience by describing him as a "mathematician and economist." Pl. Mot. 3. But Dr. Tomasetti's entire career in biostatistics has focused on cancer's causes—and some of the best hospitals and research universities in the world have employed him for that purpose.

**B.     It Does Not Matter that Dr. Tomasetti is Not a Medical Doctor.**

In addition to belittling Dr. Tomasetti as a mere "mathematician and economist," Plaintiff argues that Dr. Tomasetti is not qualified to testify because "does not hold any degrees or licenses in medicine, toxicology, or epidemiology." Pl. Mot. 6; *see also* Pl. Mot. 3 (stating that Dr. Tomasetti should not be permitted to testify because he "not a medical doctor, pathologist, geneticist, epidemiologist, or toxicologist").  But biostatisticians like Dr. Tomasetti are regularly permitted to testify about general causation. *See, e.g.*, *Monroe v. Zimmer U.S. Inc*., 766 F. Supp. 2d 1012, 1023-24 (E.D. Cal. 2011) (holding that a biostatistician was "capable of understanding the data reported in studies conducted by medical professionals" and was qualified to testify about whether a medical device can cause a particular illness; rejecting the argument that the biostatistician was unqualified because he was not a medical doctor or an epidemiologist); *Woodard v. Stryker Corp*., No. 11-cv-36, 2012 WL 3475079 at *11 (D. Wyo. July 16, 2012) (biostatistician was permitted to testify about whether a medical device was capable of causing a particular injury); *In re Neurontin Marketing, Sales, Practices, and Prods. Liab. Litig*., 612 F. Supp. 2d 116, 137-39 (D. Mass. 2009) (biostatistician testified at *Daubert* hearing regarding whether particular drugs increased the risk of suicide in users).  That Dr. Tomasetti is not a medical doctor does not disqualify him from testifying here.

**II.    Dr. Tomasetti's Opinions Are Generally Accepted.**

Plaintiff spends significant time arguing that Dr. Tomasetti's opinions should be excluded because they are supposedly not generally accepted by his peers in the scientific community. Pl. Mot. 4-6; *id*. at Ex. G (collecting articles supposedly critical of Dr. Tomasetti's opinions).  Plaintiff is incorrect, factually and legally.

Dr. Tomasetti's core opinion—that naturally-occurring cell mutations cause cancer—has been published and refined in premier peer-reviewed journals and co-authored by top scientists.  *See supra*, pp. 4-5; *see also, e.g.*, Ex. 2, Tomasetti 2017; Ex. 3, *Alesi* Aug. 29, 2022 Trial Tr. at 4348:15-4349:10 (Dr. Tomasetti testified that he has personally published in peer-reviewed scientific journals his analyses of the number of mutations caused by random copy errors in different tissue types); Ex. 6, *Alesi* Aug. 30, 2022 Trial Tr. at 4395:14-19 (Dr. Tomasetti testified that all of his opinions come from articles that were published or will be published in peer-reviewed scientific journals); Ex. 10, *Stephens*

Oct. 26, 2021 Trial Tr. 1 at 44:1-45:11 (Dr. Tomasetti testified that he has published dozens of peer-reviewed articles, including in *Science*, *Nature*, and the *New England Journal of Medicine*, and his work has been cited by other researchers and scientists in peer-reviewed literature).

*Plaintiff's own experts in this case agree with Dr. Tomasetti*'s core opinion.  Dr. Robert Conry, Plainitff's specific causation expert, testified at his deposition in this case that he found "plausible" Dr. Tomasetti's theory that "spontaneous mutations from replication errors can result in cancers" even "in the absence of exposure to environmental risk factors." Ex. 11, *Delorme-Barton v. Monsanto,* No. 3:18-cv-01427 (N.D. Cal.) Apr. 14, 2023 Conry Dep. at 149:10-15.  In a different Roundup case, *Jacobs v. Monsanto Co*., No. 19-013244 (Fla. Cir. Ct.), Dr. Conroy called Dr. Tomasetti's core theory "correct." Ex. 12, Apr. 25, 2023 Conry Dep. at 53:11-21 ("I would say on the topic of random DNA replication errors, that has been studied and, you know, reported on by Dr. Tomasetti among others as something that just happens in the natural course of being human, which is correct.  That as our DNA replicates over and over during our lifetimes, there can be and generally are replication errors that occur that can make a contribution to our future development of cancer.").

Plaintiff's other expert, Dr. Dennis Weisenburger,[2] also agrees with Dr. Tomasetti that naturally-occurring mutations can be responsible for causing cancer.  In a prior Roundup case, *Bailey v. Monsanto*, No. 19-cv-06071 (N.D. Cal.), Dr. Weisenburger agreed there is an "emerging understanding that random genetic mutation accounts for a lot of non-Hodgkin's lymphoma without any external cause."  Ex. 13, Aug. 3, 2021 Weisenburger Dep. at 70:18-72:7.  In a different prior Roundup case, *Stephens*, Dr. Weisenburger agreed that "cancer can develop rather spontaneously … through accumulated random mutations over time." Ex. 14, May 17, 2021 Weisenburger Dep. at 52:10-15.  In yet another prior Roundup case, *Russo v. Monsanto Co*., No. 16-cv-06024 (N.D. Cal.), Dr. Weisenburger agreed it is "generally-accepted" that "as our cells replicate on a minute, hourly, and daily basis … there are random mutations that occur." Ex. 15, Nov. 4, 2019 Weisenburger Dep. at 71:1-6.

---

[2] In her February 27, 2023 expert disclosure in this case, Plaintiff "incorporat[ed] by reference the general causation and other expert reports served by lead counsel in Waves 1-5 and reserve[ed] the right to call the author of any such report as an expert witness at trial." Ex. 16 at 3. Dr. Weisenburger is one such expert. Ex. 17, Jan. 23, 2023 Wave V disclosure at 6.

That Plaintiff found articles supposedly critical of Dr. Tomasetti's work is insufficient to show that Dr. Tomasetti's work is not widely accepted within the scientific community. Drs. Tomasetti and Vogelstein first published their discoveries about naturally occurring mutations causing cancers in the journal *Science* in 2015; they published their follow-up research in *Science* in 2017. *Supra*, p. 3. Those discoveries were groundbreaking, so it is unsurprising that the scientific community reacted strongly in the months immediately following those publications. Indeed, the overwhelming majority of the debate over Drs. Tomasetti's and Vogelstein's discoveries occurred during the 2015-2017 timeframe, as Plaintiff's own evidence confirms: of the 54 articles Plaintiff identifies as supposedly critical of Dr. Tomasetti, *46—or 85%—of them* were published between 2015 and 2017 when the scientific community was first digesting the nature and impact of Dr. Tomasetti's findings. *See* Pl. Mot. Ex. G.

Since then, however, any initial criticisms of Dr. Tomasetti's opinions have largely subsided. Indeed, now the "consensus" view among experts in cancer causation is that naturally occurring mutations play a major role, as Dr. Tomasetti's research has shown. Ex. 18, M. Song, B. Vogelstein, E. L. Giovannucci, W. C. Willet, and C. Tomasetti, *Cancer prevention: Molecular and epidemiologic consensus*, 361 SCIENCE 6409, Sep. 28, 2018. That is how science works—it "takes time for new and innovative theories to become 'generally accepted.'" *Chapple v. Ganger*, 851 F. Supp. 1481, 1496 n.14 (E.D. Wash. 1994). And even during the 2015-2017 timeframe, when most of the academic debate over Dr. Tomasetti's theories occurred, the majority of the commentary agreed with Dr. Tomsetti's findings, contrary to Plaintiff's handpicked list of articles. For example, a 2017 article published in the *American Journal of Cancer Research* described Drs. Tomasetti's and Vogelstein's 2015 study as "one of the most critically acclaimed cancer papers of modern times." Ex. 19, Y. A. Fouad and C. Aanei, *Revisiting the hallmarks of cancer*, AM. J. CANCER. RES. 2017;7(5) at 1028.

Finally, even if there were, in 2023, serious debate in the scientific community about the validity of Dr. Tomasetti's opinion, that would not be a good enough reason to shield his testimony from the jury. Under *Daubert*, "general acceptance is not a necessary condition to admissibility"—it is simply one factor among several for courts to consider. *Lust by and Through Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 597 (9th Cir. 1996); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993) ("[A] rigid 'general acceptance' requirement would be at odds with the 'liberal thrust' of the Federal

Rules." (citation omitted)).  Indeed, federal circuit courts have reversed district court opinions that place undue weight on the general acceptance prong of the *Daubert* analysis.  *See, e.g.*, *In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*, 9 F.4th 768, 793 (8th Cir. 2021); *Milward v. Acuity Specialty Prods. Grp., Inc.*, 639 F.3d 11, 22 (1st Cir. 2011).

Dr. Tomasetti's opinions are generally accepted in the scientific community.  His research has been peer-reviewed, and even Plaintiff's own experts agree that his opinions are correct, even if they may disagree around the margins.  Plaintiff is, of course, free to confront Dr. Tomasetti on cross-examination with the criticisms from the articles she cites, as prior Roundup plaintiffs have attempted.  But the fact that some scientists may disagree with Dr. Tomasetti's groundbreaking findings is not a good enough reason to exclude his testimony.

**III.     Plaintiff's Other Criticisms of Dr. Tomasetti's Opinions are Meritless.**

**A.     Dr. Tomasetti is a General Causation—Not a Specific Causation—Expert.**

Plaintiff repeatedly argues that Dr. Tomasetti's opinions are irrelevant in this case because he does not say whether naturally occurring mutations caused *Plaintiff's* cancer, specifically.  *See, e.g.*, Pl. Mot. 4 (criticizing Dr. Tomasetti's theory because it cannot determine the cause of "a particular person's" cancer); *id*. at 12 (arguing that Dr. Tomasetti's "opinions regarding population-based mutational rates are irrelevant to the causation issues presented in this case"); 13-15 (arguing, *inter alia*, that Dr. Tomasetti should not be permitted to testify because his opinions "pertain to cancer generally" and "do not relate to the specific cause of an individual's cancer").  Plaintiff's argument thus appears to be that general causation testimony is altogether irrelevant in this case because it does not purport to answer what caused *Plaintiff*'s NHL—an odd position, considering that Plaintiff has also retained general causation experts who do not purport to answer what caused her NHL.

A general causation expert offers opinions about whether a substance in the environment is "*capable* of causing the injury in question."  3 David Faigman, *et al*., Modern Scientific Evidence § 28:3 (2022-2023 ed.) (emphasis added).  A specific causation expert offers opinions about whether "the substance caused the injury to *this particular individual*."  *Id*. (emphasis added).

Dr. Tomasetti's role in this case is as a general causation expert.  Perhaps obviously, Dr. Tomasetti's opinions bear directly on whether Roundup is "capable of causing" cancer generally.  His

- 9 -

testimony will address whether environmental, hereditary, or genetic factors are "capable," "of causing the injury in question," namely NHL in general. 3 Faigman, *et al.*, § 28:3. His opinions do not attempt to definitively answer whether glyphosate or Roundup "caused the injury to [any] particular individual." *Id*. Dr. Tomasetti did not diagnose Plaintiff, has never purported to have diagnosed Plaintiff, and will not testify at trial as to the particular cause of her NHL—just as Plaintiff's own general causation experts have not diagnosed Plaintiff and will not testify as to what, specifically, caused her NHL. *See* Ex. 17 at 4-5 (stating that Plaintiffs' general causation experts, Drs. Ritz and Portier, will testify about whether exposure to Roundup "can cause cancer" generally, not whether it caused Plaintiff's cancer, specifically).

Plaintiff similarly argues that Dr. Tomasetti should not be permitted to testify because his opinions are based on analyses of "the prevalence of sporadic mutations in the general population." Pl. Mot. 13. But that is just another way of saying that Dr. Tomasetti should not be allowed to testify because his opinions bear on the general causation, and not the specific causation, inquiry. Whether a substance is "capable," in general "of causing the injury in question, 3 Faigman, *et al.*, § 28:3, necessarily requires examining data about populations of people. Indeed, the Ninth Circuit's definition of "general causation" is "whether exposure to a substance …. is capable of causing a particular injury or condition *in the general population*." *In re Hanford Nuclear Reservation Lit*., 292 F.3d 1124, 1133 (9th Cir. 2002). If Plaintiff were correct that population-level expert opinions are irrelevant in this case because they do not themselves conclusively establish what caused Plaintiff's cancer, then Plaintiff's own epidemiologists—Drs. Ritz and Portier—should be precluded from testifying as well. After all, epidemiology is "probative of general causation" precisely because it "is concerned with the incidence of disease *in populations*"; "specific causation is beyond the domain of the science of epidemiology." *In re Silicone Gel Breast Implants Prods. Liab. Litig*., 318 F. Supp. 2d 879, 892 (C.D. Cal. 2004) (emphasis added, citation omitted).[3]

---

[3] Plaintiff asserts that "state Supreme Courts around the country had routinely upheld the wholesale exclusion of …improper attempts to extrapolate general, population-level statistical opinions to individual cases." Pl. Mot. 12. Not so. Each of the two cases Plaintiff cites addresses whether statistical analysis was relevant to determining the appropriate standard a breach of the standard of care had occurred in a medical malpractice case—an entirely different inquiry than the jury's here. *Timblin v. Ken Gen. Hosp.*, 640 A.2d 1021, 1024 (Del. 1994) (statistical evidence "cannot be used to show"

Regardless, the relevance of Dr. Tomasetti's general causation opinions to the jury's specific causation inquiry is obvious. In this case, as in all Roundup cases, the jury's ultimate task will be to determine whether it is more likely than not that exposure to Roundup caused Plaintiff's NHL. Dr. Tomasetti's general causation opinion—that naturally-occurring mutations can cause cancer—is a potential alternative explanation for any particular person's NHL, because there is a very high likelihood that a particular person's NHL was simply the result of the same naturally-occurring processes that account for most NHL in the world. Although not dispositive of what caused Plaintiff's NHL, Dr. Tomasetti's general causation opinions are plainly relevant to the jury's overall task of determining causation. Indeed, one of the state Supreme Court cases Plaintiff cites for the proposition that statistical evidence is never relevant to specific causation supports Dr. Tomasetti testifying in this way: "Statistical evidence may be relevant in appropriate circumstances to rebut the nexus between the defendant's conduct and the plaintiff's injury *by showing that the injury was likely to occur regardless*" of the defendant's conduct. *Timblin*, 640 A.2d at 1024 (emphasis added). That is precisely why Dr. Tomasetti's general causation opinion is relevant here.

Plaintiff is, of course, free at trial to ask Dr. Tomasetti whether he is able to attribute Plaintiff's NHL, specifically, to naturally occurring mutations. He will confirm for the jury that he is not. But that is in an insufficient basis under *Daubert* to exclude his testimony.

**B.     Plaintiff Mischaracterizes Dr. Tomasetti's Work.**

Plaintiff repeatedly mischaracterizes Dr. Tomasetti's work in an effort to make it sound unreliable.

The most glaring example is Plaintiff's claim that Dr. Tomaetti's "calculations are based on (a) the rate of cell division for the wrong cell; and (b) the wrong rate of mutation." Pl. Mot. 9; *see also id*. at 10-11. *First*, Plaintiffs incorrectly state that Dr. Tomasetti's calculations based on hematopoietic stem cells are irrelevant to cancers that develop in mature B-cells. *See* Pl. Mot. at 9-10. In fact, mature B-lymphocytes are ultimately daughter cells of hematopoietic stem cells and thus carry with them all

---

whether the defendant hospital "acted in conformity with the applicable standard of care); *Holley v. Pambianco*, 270 Va. 180, 185 (2005) (same). And, as noted below, *Timblin* actually explains why Dr. Tomastti's testimony *is* relevant here.

of the genetic changes that occur in the earlier cells. Ex. 5, *L. Johnson* June 10, 2022 Trial Tr. at 51:7-23 (Dr. Tomasetti testifying that hematopoietic stem cells are the origin of all blood cells, which include mature B-lymphocytes). As Dr. Tomasetti will explain, driver mutations must originate in stem cells because stem cells—cells capable of creating identical copies of themselves—are the *only* cells that can carry the mutations for long enough for cancer to develop. Although some literature might describe certain types of NHL, like diffuse large B-cell lymphoma, as "originating" in mature B cells, that is a slight misnomer—B-cells are simply where the cancer is *observed*. The mutations that cause the cancer, by necessity, *had* to originally come from the hematopoietic stem cells from which all lymphocytes derive. As Dr. Tomasetti will testify, it is the accumulation of damage to a cell's DNA that leads to cancer—*i.e.*, cancer rarely, if ever, develops from a single genetic change at a single point in the cell's development. Plaintiffs' insistence that Dr. Tomasetti's research using the division rates of hematopoietic stem cells is irrelevant to cancers that develop in mature differentiated B-cells is simply false.

*Second*, Plaintiffs' claims that Dr. Tomasetti's opinions somehow do not encompass translocation mutations are also wrong. *See* Pl. Mot. 9-11. Plaintiffs misunderstand that Dr. Tomasetti's calculations and opinions encompass both point mutations and translocations. Point mutations and translocations are simply different types genetic mutations that can occur due to naturally occurring processes in lymphocytes. Dr. Tomasetti's research on how mutations lead to cancer development does not differentiate between these two types of mutations. *See* Ex. 1, Tomasetti 2015 at 80 (referring to "somatic mutations" as the "stochastic factor underlying the importance of stem cell divisions.").[4] Plaintiffs' insistence that this irrelevant distinction, which they do not show Dr. Tomasetti's opinion actually makes, is an insufficient basis upon which to exclude Dr. Tomasetti's testimony.

As another example of Plaintiff's mischaracterization of Dr. Tomasetti's work, Plaintiff states that Dr. Tomasetti has never "provided his underlying calculations or formula—including the numbers he used—in support of his conclusion," making his opinions "conclusory *ipse dixit*." Pl Mot 8. That

---

[4] Somatic mutations are simply mutations that occur after fertilization (*i.e.*, are not inherited).

is false. The Cancer Research UK data on which Dr. Tomasetti relied is publicly available and can be accessed via the following URLs: https://www.cancerresearchuk.org/health-professional/cancer-statistics/risk/preventable-cancers (Cancer Research UK Statistics on preventable cancers) and https://www.cancerresearchuk.org/health-professional/cancer-statistics/statistics-by-cancer-type/non-hodgkin-lymphoma#heading-Six (Cancer Research UK Statistics on NHL). Amazingly, Plaintiff asserts that Dr. Tomasetti is hiding this data, even though Plaintiff's motion itself contains a citation to a URL from Cancer Research UK. Pl. Mot. 7 n.11. As for Dr. Tomasetti's calculations: they are in his published articles as well as in the expert report he filed in this litigation. *See* Ex. 20, Tomasetti Rpt.. Dr. Tomasetti has hidden nothing. His data is publicly available and he has shown his work in his publications. Plaintiff's misrepresentations to the contrary is nothing more than an attempt to mislead the Court. If Plaintiff wishes to argue that Dr. Tomasetti's underlying data is incorrect or outdated, she are free to do so on cross examination. But this is not grounds for exclusion.[5]

### C. Plaintiff Misstates the Record.

Plaintiffs repeatedly misstate the record to make it sound like Monsanto's witnesses said things they did not say.

One easily-debunked example: Plaintiff asserts that Dr. Tomasetti "by his own admission … is not an expert in NHL." Pl. Mot. 6. Plaintiff misleadingly cites to Dr. Tomasetti's testimony in a prior roundup trial. This portion of Dr. Tomasetti's testimony comes from a redirect examination in which

---

[5] The same is true for many of Plaintiffs' other criticisms of Dr. Tomasetti's opinions. For example, Plaintiff faults Dr. Tomasetti for not considering as many environmental factors as Plaintiff would prefer—and then accuses him of assuming his own conclusion for not doing do. Pl. Mot. 8. But that is not actually a criticism of Dr. Tomasetti's opinions or methodology—it is a criticism of the underlying data on which he relied, Cancer Research UK. Notably, though, despite implicitly criticizing them, Plaintiff *never* argues that the Cancer Research UK data is the type of data that an expert in Dr. Tomasetti's field would not "reasonably rely on." Fed. R. Evid. 703. And in any case, critiques about what Cancer Research UK did or did not include in its definition of "environmental factors" is a subject for cross-examination, not a basis for exclusion. *See, e.g., Hangarter v. Provident Life and Accident Ins. Co.,* 373 F.3d 998, 1017 n.14 (9th Cir. 2004) ("The factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." (citation and alteration omitted)); *In re Methl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.,* 643 F. Supp. 2d 482, 499 (S.D.N.Y. 2009) ("[C]oncerns about the adequacy of data underpinning an expert opinion are best addressed via cross-examination."); *In re: TFT-LCD (Flat Panel) Antitrust Litig.,* Nos. 07-1827, 10-1064, 2013 WL 124347 at *1 (N.D. Cal. Jan. 8, 2013) ("The Court finds that the experts' decisions about what data to use can be the subject of cross-examination, but it does not render the experts' models unreliable.").

Dr. Tomasetti simply clarified that he is providing general causation testimony and is not testifying regarding the plaintiff's specific subtype of NHL. *See*, Ex. 5, *L. Johnson* June 10, 2022 Trial Tr. at 215:12-216:6 (Q. Okay. So you were asked a series of questions about non-Hodgkin's lymphoma subtypes. Are you an expert in non-Hodgkin's lymphoma? A. No. As I said, I remember like three or four of them, which I think I mentioned, and then I'm aware that there is a long list, and I thought he was just reading that long list and that's why I kept saying yes. Q. Did we -- did we call you here to testify about Mr. Johnson's cancer? A. No. Q. Did we tell you anything for Mr. Johnson. A. No. Q. Did we tell you what kind of cancer subtype he had? A. No. Q. Did we talk about his exposure to Roundup with you? A. No."). Plaintiff uses this testimony out of context to attempt to mislead the Court regarding Dr. Tomasetti's qualifications.

Another example is Plaintiff's repeated misuse of the prior testimony of Monsanto's expert Dr. David Grinblatt. Initially, Dr. Grinblatt is not an expert in this case, so it is unclear why anything he has said in the past is relevant here. Regardless, Plaintiff's grossly misstate his testimony to make it sound like he disagrees with Dr. Tomasetti's theory. He does not.

For example, Plaintiff cites testimony from Dr. Grinblatt in *Griswold*, a prior Roundup case in state court in St. Louis, Missouri. Plaintiff asserts that Dr. Grinblatt testified that Dr. Tomasetti's work is "not the best" work on lymphomas and what causes them. Pl. Mot. 9 (citing *id*. at Ex. M at 206). But further context makes clear that Dr. Grinblatt was not saying that Dr. Tomasetti's work is wrong or inaccurate—he was merely stating that Dr. Tomasetti's work is not about lymphomas specifically and exclusively, but about what causes *all* cancers, *including* lymphomas. In the very same testimony Plaintiff cites, Dr. Grinblatt explained that Dr. Tomasetti's work deals with "different cancers, including lymphoma, but not only lymphoma" and then immediately clarified: "*I don't want to say [Dr. Tomasetti's work is] not the best. It's not a specific paper on lymphomagenesis*." Pl. Mot. Ex. M at 206:21-23. Of course, Plaintiff omits this language entirely in her mischaracterization.

As for Plainitff's assertion that Dr. Grinblatt thinks that "random genetic mutations" do not "relate to non-Hodgkin's lymphoma at all," again Plaintiff omits critical context. Pl. Mot. 6, 11, 13 (citing *id*. at Ex. M at 225). Context makes clear that Dr. Grinblatt took issue with the word "random" and not with Dr. Tomasetti's theory that naturally-occurring processes can cause cancers, including

lymphomas.  In the same testimony Plaintiff cites, Dr. Grinblatt explained that he was drawing a distinction between point mutations and translocations.  His point was that translocations are what cause lymphoma, and not "random" point mutations.  Dr. Grinblatt explained, in testimony Plaintiff omits, that "random somatic mutations" are different from the "specific translocations" that cause lymphomas.  Pl. Mot. Ex. M. at 225:6-12.  Lest there be any doubt about whether Dr. Grinblatt thinks that Dr. Tomasetti's opinions to not relate to non-Hodgkin's lymphoma, he clarified in subsequent testimony that they do.  Dr. Grinblatt explained:

> *Non-Hodgkin's lymphoma is basically due to mutations, genetic mutations that occur due to replicative errors of lymphocytes*, so basically over time the cells are dividing and specific translocations occur because lymphocytes have to divide. They have to respond to a variety of kind of antigens, a variety of things that are a part of our immune system so they have to respond to anything that is kind of invading our, you know, kind of foreign to our body. And so they are kind of programmed to constantly have their DNA rearranged in order to recognize different antigens. *And during that process things go wrong and what is known as replicative errors. So that's the cause that we would expect as the cause of ... lymphoma.*

Ex. 21, *Armstrong v. Monsanto Co.,* No. 2021-005190 (Fla. Cir. Ct.) Apr. 25, 2023 Grinblatt Dep. at 71:25-72:14.  This testimony is entirely consistent with Dr. Tomasetti's opinion.  Once again, if Plaintiff wishes at trial to confront Dr. Tomasetti on cross-examination with testimony from Monanto's others experts, she is free to do so (subject, of course, to the Rules of Evidence).  But nothing about Dr. Grinblatt's testimony warrants exclusion.

## CONCLUSION

For the reasons set forth above, the Court should deny Plaintiff's motion to preclude Dr. Tomasetti's testimony, just as every other court to consider the issue has done.

Dated:  July 14, 2023                                    Respectfully submitted,

/s/ *Jed P. White*
Jed P. White
Attorneys for Defendant Monsanto Company

- 15 -
MONSANTO'S OPPOSITION TO PLAINTIFF'S MOTION
TO PRECLUDE TESTIMONY FROM DR. CRISTIAN TOMASETTI

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of July, 2023, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

*/s/ Jed P. White*
Jed P. White