# EXHIBIT 5




IN THE CIRCUIT COURT OF THE STATE OF
OREGON FOR JACKSON COUNTY

LARRY JOHNSON and GAYLE JOHNSON,

    Plaintiffs,

v.

MONSANTO COMPANY, a corporation; EAGLE POINT HARDWARE, LLC, a corporation,

    Defendants.
_____

**TRANSCRIPT OF**

**JURY TRIAL - DAY THIRTEEN**

**HELD ON**
**FRIDAY, JUNE 10, 2022**
**9:36 A.M.**

**BEFORE**
**THE HONORABLE CHARLES KOCHLACS**

JACKSON COUNTY CIRCUIT COURTHOUSE
100 SOUTH OAKDALE AVENUE
MEDFORD, OREGON 97501

**Exhibit 5 Page 1**

```
 1  APPEARANCES
 2
 3  For the Plaintiffs:
 4  James Orr, Esquire
 5  HEYGOOD ORR & PEARSON
 6  6363 North State Highway 161, Suite 450
 7  Irving, TX 75038
 8  (214) 237-9001
 9  (214) 237-9002 Fax
10  jim@hop-law.com
11
12  David Linthorst
13  ANDERSEN MORSE & LINTHORST
14  1730 East McAndrews, Suite A
15  Medford, OR 97504
16  (541) 773-7000
17  (541) 608-0535 Fax
18  david@andersenlaw.com
19
20
21
22
23
24
25
```

**APPEARANCES CONTINUED**

Kimberly Loutey, Esquire
**KIRKENDALL DWYER**
4343 Sigma Road, Suite 200
Dallas, TX 75244
(877) 503-1595

**For the Defendants:**
Frederic Norris, Esquire
Jennifer Lee, Esquire
**HUSCH BLACKWELL, LLP**
1999 Harrison Street, Suite 700
Oakland, CA 94612
(510) 768-0650
(510) 768-0651 Fax
rick.norris@huschblackwell.com
jennifer.lee@huschblackwell.com

```
 1                    APPEARANCES CONTINUED
 2
 3  Kurt Mathas, Esquire
 4  George Lombardi, Esquire
 5  WINSTON & STRAWN, LLP
 6  35 West Wacker Drive
 7  Chicago, IL 60601
 8  (312) 558-5600
 9  (312) 558-5700 Fax
10  kmathas@winston.com
11
12  Dominic Campanella, Esquire
13  BROPHY SCHMOR, LLP
14  201 West Main Street, 5th Floor
15  Medford, OR 97501
16  (541) 772-7123
17  (541) 772-7249 Fax
18  dcampanella@brophylegal.com
19
20
21
22
23
24
25
```

```
 1                 APPEARANCES CONTINUED
 2
 3  Alex Whitworth, Esqiuire
 4  BRYAN CAVE
 5  120 Broadway, Suite 300
 6  Santa Monica, CA 90401
 7  (310) 576-2100
 8  (310) 576-2200 Fax
 9  alex.whitworth@bryancave.com
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1    Q.   And what has your research shown about
2 which of the factors cause most of the mutations
3 that result in cancer?
4    A.   Yes.  What is very important to understand
5 is that until certain work in 2015, if you asked to
6 the field what was causing mutations, the idea is
7 that because this naturally occurring -- as I showed
8 you before, the probabilities are so small, that
9 doctors thought that they were essentially not very
10 probable.
11         And in a series of papers, I, with some
12 colleagues, were able to show that, actually, they
13 count for a lot of the mutations that we observe in
14 patients.  In fact, we estimate a majority of them.
15    Q.   And have you put together a slide that
16 sets forth the percentages attributable to each, for
17 cancer generally?
18    A.   Yes.
19    Q.   Okay.  And can you explain to the jury
20 what that breakdown is?
21    A.   Yes.  So what was -- the finding was that
22 when you look at all cancers, so whether it's lung
23 cancer, blood cancer, you know, colon cancer, when
24 you put them all together -- and with the frequency
25 that you observe in the population, so lung cancer

```
 1  happens a lot, for example, because of smoking.
 2  When you put them all together and you estimate how
 3  many of the mutations were due to hereditary factors
 4  or could be attributed to hereditary factors, to the
 5  environment, and to this naturally occurring, you
 6  know, mutations, then about 5 percent were due to
 7  hereditary factors, about 29 -- you know, 30 percent
 8  due to the environment, and two-thirds were
 9  attributable to natural copying errors.
10       Q.   Okay.  And we're going to talk about how
11  you came to that determination shortly.  But you
12  said before this research, scientists attributed
13  cancer to environmental or hereditary factors; is
14  that right?
15       A.   That's correct.
16       Q.   Did they think that environmental and
17  hereditary factors accounted for all cancers?
18       A.   No.  But there was a major fraction that
19  was considered unknown.  And --
20       Q.   So you had -- this is before your
21  research.  You had environmental, hereditary, and
22  then a big unknown; is that right?
23       A.   Correct.
24       Q.   All right.  Now, let's -- let's talk a
25  little bit about your research and how we know that
```

1   A.   Well, several.  But a major one in 2017.
2   Q.   And was that an article in Science, again?
3   A.   Yes.
4        MR. LOMBARDI:  Brad, can we put up 8892,
5   please?
6   Q.   (BY MR. LOMBARDI)  And what are we looking
7   at here, Dr. Tomasetti?
8   A.   Yeah.  That is that article, the title of
9   that article.  Again, in the section on causes of
10  cancer, which is cancer etiology.
11  Q.   Okay.  It says stem cell divisions, which
12  we've talked about, what does it mean when it says
13  "somatic mutations"?
14  A.   So mutations are classified as either
15  germline or somatic.  If they are germline, that
16  means they are inherited, so we receive them from
17  parents.  If they are somatic, it's because we
18  acquired them throughout our life, during our life.
19  Q.   And in this paper, do you study, among
20  other things, NHL specifically?
21  A.   Yeah.
22  Q.   And what were you looking at in this
23  study, generally speaking?
24  A.   In this study, we looked at two things,
25  but I think the one that you're -- the one that

1  you're referring to is the part where we assess the
2  proportion of mutations that you could attribute to
3  heredity, environmental factors, and naturally
4  occurring replication errors.
5       Q.   Okay.  And just to be clear, this paper
6  was published before you were ever contacted about
7  this litigation; is that right?
8       A.   Oh, yeah.  More than two years.  Probably
9  three.
10      Q.   All right.  Let's talk about the data that
11 you used for your work in this paper that you
12 published in this paper.  What were the sources of
13 information you used?
14      A.   Genomic sequencing data.  So in the United
15 States, we have a database that's called TCGA, which
16 are the four letters for DNA.  But it also means The
17 Cancer -- sorry -- Cancer Genome Atlas.  And so it's
18 tens of thousands of patients that the National
19 Institutes of Health has paid so that the cancers of
20 these patients could be sequenced so that we could
21 learn from all of this incredible amount of
22 sequencing data.  So imagine 3 billion letters from
23 each patient, tens of thousands of patients.
24      Q.   And these are patients that have all kinds
25 of cancers, right?

1  said, obviously, I believe he's a man and he cannot
2  be pregnant, but I said science believes in parallel
3  universes and we could very well be in one of those.
4  And in fact, it's a very strong theory currently in
5  physics.  And we could be in this reality like a
6  matrix where I think I'm a man, but maybe I'm a
7  woman.  And I have no way to scientifically prove
8  that if we are talking about 100 percent for sure.
9  Obviously, I don't think to be a woman.  And I
10 function normally.  It was just to make a point that
11 there is no such a thing as 100 percent for sure.
12     **Q.   Okay.  So you were asked a series of**
13 **questions about non-Hodgkin's lymphoma subtypes.**
14 **Are you an expert in non-Hodgkin's lymphoma?**
15     A.   No.  As I said, I remember like three or
16 four of them, which I think I mentioned, and then
17 I'm aware that there is a long list, and I thought
18 he was just reading that long list and that's why I
19 kept saying yes.
20     **Q.   Did we -- did we call you here to testify**
21 **about Mr. Johnson's cancer?**
22     A.   No.
23     **Q.   Did we tell you anything about Mr.**
24 **Johnson?**
25     A.   No.

```
 1        Q.   Did we tell you what kind of cancer
 2   subtype he had?
 3        A.   No.
 4        Q.   Did we talk about his exposure to Roundup
 5   with you?
 6        A.   No.
 7        Q.   Let's put up one of your exhibits, DTX
 8   8892, please. One of your articles, I should say.
 9   And we'll look at the front page first.  This is
10   your 2017 article, correct?
11        A.   Yes.
12        Q.   And counsel went through this article and
13   asked you a series of questions.  Do you remember
14   that?
15        A.   Yes.
16        Q.   And at one point, he read you a sentence
17   from a middle of -- the middle of a paragraph.  Do
18   you remember that?
19        A.   Yes.
20        Q.   And you wanted to read the rest of the
21   paragraph.
22        A.   I think that would be good.
23        Q.   Okay.  Let's go to page 4.  And it's in
24   the second column.  Last full paragraph in that
25   column.  If we can just blow that up.  Let's read
```

```
 1                    REPORTER CERTIFICATION

 2             I, PHOEBE S. MOORHEAD, Registered Professional

 3   Reporter, do hereby certify:

 4             That the foregoing proceedings were taken before me

 5   at the time and place set forth herein and were taken down by

 6   me in shorthand and thereafter transcribed into typewriting

 7   under my direction and supervision;

 8             That the foregoing pages contain a true and

 9   correct transcription of my said shorthand notes so taken.

10             I FURTHER CERTIFY that I am neither counsel for nor

11   related to any party to said action nor in anywise interested

12   in the outcome thereof.

13             Certified and dated this 10th day of June, 2022.

14

15

16
                           _____
17
                           PHOEBE S. MOORHEAD, RPR, CRR
18                         Certified Shorthand Reporter
                           for the State of Utah
19

20

21

22

23

24

25
```

**Exhibit 5 Page 12**