1  **SCHLESINGER LAW OFFICES, P.A.**
   Jeffrey L. Haberman
2  Sarah J. Schultz
3  1212 Southeast Third Avenue
   Fort Lauderdale, FL 33316
4  Telephone: (954) 467-8800
   Facsimile: (954) 320-9509
5  jhaberman@schlesingerlaw.com
   sarah@schlesingerlaw.com
6
7  *Attorneys for Plaintiff, Peter Engilis*

8                    **UNITED STATES DISTRICT COURT**
9                    **NORTHERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No: 2741 |
| | Case No.: 3:19-cv-07859-VC |
| Peter Engilis, Jr., *et al*., | **PLAINTIFFS' MOTION FOR RECONSIDERATION OF THE COURT'S DAUBERT ORDER EXCLUDING THE TESTIMONY AND OPINIONS OF ANDREW SCHNEIDER, M.D.** |
| Plaintiff, | |
| vs. | |
| Monsanto Company, | |
| Defendant. | **Daubert Hearing date: September 11, 2023** |
| | **Time: 10:00 a.m.** |
| Individual Case No.: 3:19-cv-07859-VC | |

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** beginning on September 11, 2023, at 10:00am, in Courtroom 4 of the United States District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, or as ordered by the Court, Plaintiffs will move this Court for an order seeking reconsideration of its prior order respecting Plaintiff's expert, Dr. Andrew Schneider.

Dated: July 21, 2023                    Respectfully submitted,

                                        */s/ Jeffrey L. Haberman* _____
                                        JEFFREY L. HABERMAN (*pro hac vice*)
                                        **SCHLESINGER LAW OFFICES, P.A**

1
PLAINTIFFS' MOTION FOR RECONSIDERATION OF THE COURT'S DAUBER ORDER
EXCLUDING THE TESTIMONY AND OPINIONS OF ANDREW SCHNEIDER, M.D.

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... 2
INTRODUCTION ..................................................................................................................... 3
FACTUAL BACKGROUND .................................................................................................... 5
STANDARD OF LAW .............................................................................................................. 7
ARGUMENT ............................................................................................................................. 7
    I.    The Court Should Vacate Its June 1, 2023 Order with Respect to Dr. Schneider and, at the Very Least, Permit Dr. Schneider to Testify at the *Daubert* Hearing. ....................................................................................................... 7
    A.    The Court's June 1, 2023 Order Departs from the Liberal *Daubert* Standard Adopted by the Ninth Circuit. .................................................................................. 7
    B.    Monsanto's Google-argument is unsupported by the cases is relies on. .................. 8
    C.    Unlike *Ferro v. Monsanto*, Dr. Schneider Has Provided a Detailed and Comprehensive Expert Report in This Case. ........................................................... 11
    II.    In the Alternative, the Court Should Permit Dr. Schneider to Testify at the *Daubert* Hearing on Specific Causation. ............................................................... 13
CONCLUSION ....................................................................................................................... 19

## INTRODUCTION

The Court should reconsider its order excluding Dr. Schneider's opinions. Reconsideration is appropriate because the Court's ruling departed from Ninth Circuit precedent applying *Daubert*; worse, the Court departed from its own application of *Daubert* in this very litigation. The Court held *Daubert* hearings on virtually every other expert's general and, if applicable, case specific causation opinions to examine the reliability of the expert's methodology. Not so with Dr. Schneider. The Court did not reduce to a writing any analysis of the parties' arguments on the admissibility of Dr. Schneider's testimony. The Court did not comment on Dr. Schneider's Rule 26 expert report which: stated that he relied on the general causation testimony of other experts (independent of his own research and analysis); detailed Plaintiff's extensive exposure to Roundup; chronicled Plaintiff's medical history; assessed the potential risk factors – or the lack thereof – for NHL; and explained why Roundup was a substantial factor in causing Plaintiff's NHL.

Instead, the Court granted Monsanto's motion by seemingly adopting, wholesale, the holding of another court in another Roundup case stating:

> Dr. Schneider cannot base his opinions "on results he found on Google and what Plaintiffs' lawyers gave to him" because that "is not a reliable method upon which to form an opinion" (Doc. 45, citing *Ferro v. Monsanto*, Case No. 20SL-CC03678, *Order Regarding Parties' Motions to Exclude Experts*, at 6-7 (Mo. Cir. Ct. Oct. 13, 2022) ("the *Ferro* Order")).

But Dr. Schneider used Google to search, he did not use it for substance. The method underpinning his general causation opinion consisted of gathering, reviewing, and applying the relevant medical literature: the same set of articles all the experts have analyzed and applied in Roundup litigation. Precluding an expert's testimony because he used a universal search engine instead of a targeted one is contrary to the Ninth Circuit's admonition that a district court should conduct its *Daubert* analysis "with a 'liberal thrust' favoring admission." *In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d 1102, 1112 (N.D. Cal. 2018) ("the General Causation Order").

Reconsideration is further warranted because this Court embraced another court's holding that *misapplied* this Court's General Causation Order of July 10, 2018, to hold that Dr. Schneider could not give general or specific causation testimony. That order dealt only with general causation. Yet the Missouri court improperly extended this Court's holding on Dr. Nabhan's general causation opinion to Dr. Schneider's case specific causation opinion. *See* the *Ferro* Order at 6. This Court cannot accept an erroneous application of its own ruling.

Even if the Court excludes Dr. Schneider's general causation opinion, as it did with Dr. Nabhan, the Court should reconsider its holding on case specific causation. *See In re Roundup Prod. Liab. Litig.*, 358 F. Supp. 3d 956, 960 (N.D. Cal. 2019) ("the Specific Causation Order) (denying Monsanto's motion to exclude case specific causation testimony following a *Daubert* hearing). Here, the Court did not address the differences between this case and the *Ferro* case. Most significantly Dr. Schneider authored a comprehensive report in this case that accounts for Plaintiff's Roundup use and exposure and provides a robust differential diagnosis. Without conducting its own inquiry into Dr. Schneider's methodology, and more specifically, Dr. Schneider's case specific causation opinion, the Court did not heed the great weight of precedent that emphasizes the goal to admit testimony rather than preclude it.

Accordingly, pursuant to Local Civil Rule 7-9,[1] Plaintiffs respectfully move for reconsideration of this Court's decision dated June 1, 2023, granting Defendant's Motion to Exclude the Testimony of Andrew Schneider, M.D.—Plaintiffs' case-specific oncology expert (hereinafter referred to as the "June 1, 2023 Order").

Following the June 1, 2023 Order, the Court set in-person *Daubert* hearing for September 11-12, 2023 to hear argument and testimony from Plaintiffs' other expert witnesses, Dr. Ambrose Charles

---

[1] The Court's June 8, 2023 Minute Entry provides leave for Plaintiffs to file a Motion for Reconsideration by July 21, 2023. (Doc. 48).

4

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE
THE TESTIMONY OF ANDREW SCHNEIDER, M.D.

and Dr. Joel Gagnier. (Doc. 48). Plaintiffs therefore request that this Court reconsider its June 1, 2023 Order and, at the very least, permit Plaintiffs to present argument and testimony from Dr. Schneider at the September 2023 *Daubert* hearing as such relief is necessary to prevent manifest injustice.

**FACTUAL BACKGROUND**

The Court is familiar with the facts of this case from the Parties' *Daubert* briefings and incorporates herein such prior briefing by reference. However, for ease of reference, Plaintiffs have outlined the pertinent facts with respect to Dr. Schneider's qualifications and methodology.

*Qualifications.* Dr. Schneider has been a practicing physician since 1987 and is triple board-certified in internal medicine, oncology, and hospice/palliative care. *See* Curriculum Vitae of Andrew Schneider, M.D. (Doc. 32-1). Dr. Schneider completed a fellowship in medical oncology from the esteemed Memorial Sloan Kettering Cancer Center in New York in 1989 and his work has been published in peer-reviewed medical journals such as the Cancer Research, Cancer, Current Problems Cancer and the Journal of the American Chemical Society. *Id.*

Dr. Schneider is a clinical oncologist; he practices at South Florida Oncology and Hematology Consultants. (Doc. 32-2, at 72:19–23). He treats patients with cancer every day. *Id.* Over the course of his career, Dr. Schneider has treated hundreds of patients who have Non-Hodgkin's Lymphoma. *Id.* at 77–78. Based on his training and experience, Dr. Schneider is an expert in Chronic Lymphocytic Leukemia ma—the sub-type of NHL that is at issue in Mr. Engilis's case. *Id.* Dr. Schneider even specialized in the treatment of lymphoma while he was at Sloan Kettering. *Id.* at 85:25–86:1.

Dr. Schneider has stayed atop of the oncology literature since he finished his training, including cancer etiology. *Id.* at 87:3–11. He has been trained to read, review and critique the very types of medical literature at issue here that predominantly deal with epidemiological evidence,

5

which he has continued to do for the past 33 years. *Id.,* at. 134:4–10. Dr. Schneider knows and understands the various terms required to evaluate the epidemiological evidence on which he relies. *Id.* at 163–168.

*Methodology.* Plaintiffs disclosed Dr. Schneider as an expert on general and specific causation. To reach his general causation opinion, Dr. Schneider researched the association between glyphosate/Roundup and NHL. His internet search generated the relevant studies on which nearly all the experts named in Roundup litigation have reviewed and considered in their respective general causation opinions. His search resulted in a comprehensive Material Considered List that included the pertinent epidemiological studies, animal studies, and mechanistic studies—the pillars of causation evidence that various courts have found sufficient for opining on general causation in Roundup litigation. (Doc. 32-3). This, coupled with Dr. Schneider's training and extensive experience, makes Dr. Schneider's opinion that exposure to Roundup can cause NHL in general, including CLL, consistent with his expert report. (Doc. 32-4).

In assessing the specific cases of Plaintiff Peter Engilis, Dr. Schneider reviewed his medical records, fact sheet, and deposition testimony. This information contained the Plaintiff's respective medical history and Roundup exposure. Dr. Schneider's case specific opinions are based on a differential diagnosis. *See id.* Dr. Schneider identified each of the risk factors that are generally known to be associated with NHL. Dr. Schneider determined that Mr. Engilis did not present with these risk factors. Based on his review of the medical literature on Roundup and NHL, including case-controlled studies, cohort studies, meta-analysis, and the pooled analysis; determining the intensity of the Plaintiff's respective Roundup exposures; and the fact that they did not have any of the other risk factors mentioned here, Dr. Schneider determined that Roundup caused his CLL. *Id.*

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE
THE TESTIMONY OF ANDREW SCHNEIDER, M.D.

**STANDARD OF LAW**

"District courts . . . have inherent authority to entertain motions for reconsideration of interlocutory orders." *See Amarel v. Connell*, 102 F.3d 1494, 1515 (9th Cir. 1996) ("[I]nterlocutory orders . . . are subject to modification by the district judge at any time prior to final judgment." (quotation omitted))). A district court may reconsider its decision for any reason it deems sufficient. *City of Los Angeles v. Santa Monica Baykeeper*, 254 F.3d 882 (9th Cir. 2001). Generally, a motion for reconsideration "is appropriate if the district court . . . committed clear error or the initial decision was manifestly unjust." *School Dist. No. 1J, Multnomah Cnty v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993).

**ARGUMENT**

I. **The Court Should Vacate Its June 1, 2023 Order with Respect to Dr. Schneider and, at the Very Least, Permit Dr. Schneider to Testify at the *Daubert* Hearing.**

   A. **The Court's June 1, 2023 Order Departs from the Liberal *Daubert* Standard Adopted by the Ninth Circuit.**

The Ninth Circuit has repeatedly stated that the better approach to *Daubert* is to permit contested expert testimony and allow vigorous cross-examination, presentation of contrary evidence and careful weighing of the burden of proof to test shaky but admissible evidence. *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (quoting *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579 (1993)). The Ninth Circuit has emphasized that the district court's gatekeeping function is meant to "screen the jury from unreliable nonsense opinions, but not to exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*, 738 F.3d 960, 969 (9th Cir. 2013).

Accentuating these principles, this Court—in its Roundup MDL *Daubert* Order—has explained that "[t]he Ninth Circuit has placed great emphasis on *Daubert*'s admonition that a district court should conduct this analysis *with a liberal thrust favoring admission*." *In re Roundup Products Liability Litigation*, 390 F. Supp. 3d 1102, 1112 (N.D. Cal. 2018) (Chhabria, J.) (internal citations

7

omitted) (emphasis added). Indeed, this Court recognized that "[t]his emphasis has resulted in slightly more room for deference to experts in close cases than might be appropriate in some other Circuits" and that "[t]his is a difference that could matter in close cases." *Id.* at 1113.

Addressing the reliability prong of *Daubert* in particular, this Court explained that expert opinion and testimony "is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Id.* at 1112 (quoting *City of Pomona v. SQM North Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014)). Significantly, this Court recognized that an expert's testimony must have "**a reliable basis, like peer-reviewed studies** or a reputable source showing that the expert followed the scientific method, as it is practiced by (at least) a recognized minority in their field." *Id.* at 1112 (emphasis added).

In this case, the Court departed from its own application of the *Daubert* principles and the principles established by the Ninth Circuit. Instead of reviewing Dr. Schneider's opinions and testimony with a liberal thrust favoring admission, the Court erred by focusing solely on the choice of search engine used by Dr. Schneider in obtaining reputable, peer-reviewed literature. That is a red-herring. No case holds that an expert cannot use Google to simply search for literature. The inquiry the Court should be focused on is whether the underlying peer-reviewed literature itself provides "a reliable basis" for Dr. Schneider's opinions. *Id.* This Court has already found it does. Thus, because the peer-reviewed studies (which followed the scientific method) provide a reliable basis to support Dr. Schneider's opinions, his methodology is sound. After all, Dr. Schneider's opinions are based upon the same universe of literature and peer-reviewed articles which have been relied upon by every single expert witness in the Roundup litigation.

**B. Monsanto's Google-argument is unsupported by the cases is relies on.**

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE
THE TESTIMONY OF ANDREW SCHNEIDER, M.D.

The relevant case law cited by Monsanto all stands for the proposition that an expert should not rely on Google for the substance of the expert's opinion—not that an expert can't employ Google as a means of obtaining the relevant literature that supports the opinion.

For example, Monsanto pointed to *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 289 (4th Cir. 2021) as authority which supports Dr. Schneider's exclusion. But the facts of *Sardis* are entirely distinguishable. In that case, the plaintiff brought product liability claims against a manufacturer of a garage door hood who the plaintiff claimed negligently designed the garage door hood's shipping container (hereinafter "container"). *Id.* at 275. The issue involved on appeal was whether the district court reversibly erred in admitting the expert testimony of Dr. Singh, Plaintiff's design standards expert, under Rule 702. *Id.* at 279. At trial, Dr. Singh's opined that the container breached the design standards set forth in the ASTM D6039 and that the defendant breached industry standards that required the defendant to test the container design prior to placing the container into the stream of commerce. *Id.* at 286. When asked what testing standards the ASTM generally required, Dr. Singh stated that the testing standards were "[i]n the ASTM book. I don't remember that standard number off the top of my head . . . You can search it on Google." *Id.* at 287.

The Fourth Circuit explained that Dr. Singh's testimony was unreliable because he "never explained what th[e] testing standards are or if they even exist" and instead "simply pointed the district court and the jury to 'Google' for standards he could not identify." *Id.* at 289. The Fourth Circuit further explained that "[t]he expert must be able to identify and explain those industry testing standards and why the product in question met or failed that test." *Id.* (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.") (citing *Daubert*, 509 U.S. at 590) ("'[K]nowledge' connotes more than subjective belief or unsupported speculation."); (citing Fed. R. Evid. 702 advisory committee's note

to 2000 amendments) ("The trial court's gatekeeping function requires more than simply taking the expert's word for it.").

Unlike *Sardis*, Dr. Schneider does not rely on Google to opine that Roundup causes NHL nor does he answer substantive questions on causation with "I don't know, Google it!" To the contrary, the Google search merely generated the medical literature that Dr. Schneider (and every other expert) reviewed, criticized, relies on to support his opinions in this case. Thus, unlike the cases relied upon and cited by the *Sardis* court, Dr. Schneider's opinions are tethered to peer-reviewing existing data, not merely Dr. Schneider's subject belief or *ipse dixit*. *See Joiner*, 522 U.S. at 146; *Daubert*, 509 U.S. at 590.

*Madison v. Courtney*, No. 4:18-cv-00671, 2019 WL 8263428, at *3 (N.D. Tex. Jan. 26, 2019) is similarly unavailing. In *Madison*, the plaintiff brought 42 U.S.C. § 1981 discrimination claims against an airline and individual flight attendant who allegedly spit mucus into the plaintiff's in-flight beverage. The plaintiff moved to exclude defendant's expert under *Daubert*, one of which was Dr. Gannaway, the defendant's dental expert offered to provide testimony on the characteristics of saliva, mucus, phlegm, and sputum so that a jury can understand the differences between the terms. *Id.* at *3. In his motion to exclude, the plaintiff argued that Dr. Gannaway's opinions were unreliable because he "provides absolutely no testing or other methodology for his identification" of the "different types of 'spit'" and instead "relies on a citation to Wikipedia." *Id.*

The *Madison* court, however, explained that Dr. Gannaway's expert report "provides a series of definitions gathered from Wikipedia" as support for his opinions. *Id.* In fact, the court correctly emphasized that "Dr. Gannaway, ***instead of turning to medical or dental publications, merely ran a Google search for the terms 'saliva' and 'mucus' [and] pasted the results*** into his expert report". *Id.* (emphasis added). Further, the court noted that Dr. Gannaway provided "no explanation of how his special knowledge or training assisted him in reaching an expert conclusion" and "did not even

attempt to explain how his conclusion was guided by his expertise." *Id.* "It would be unduly prejudicial to allow [d]efendants to enlist a dentist to report the content of a Wikipedia page, thereby cloaking generally available information with the veneer of medical expertise." *Id.*

*Madison* demonstrates the stark difference between what courts have found to be unreliable and what Dr. Schneider actually did in this case. Unlike *Madison*, Dr. Schneider did not merely copy and paste definitions or conclusions from a Google service page or a Wikipedia page into his expert report and call it a "conclusion." Dr. Schneider did precisely what the Madison court deemed would have been acceptable and reliable—he "turn[ed] to medical or [scientific] publications." *See id.* Moreover, Dr. Schneider further explained that he has stayed atop of the oncology literature since he finished his training, including cancer etiology. (Doc. 32-2, at 87:3–11). He further testified that he has been trained to read, review and critique the very types of medical literature at issue here that predominantly deal with epidemiological evidence, which he has continued to do for the past 33 years. *Id.* at. 134:4–10. Consequently, instead of supporting exclusion of Dr. Schneider's opinions as unreliable, the *Madison* case establishes the admissibility of Dr. Schneider's opinions and the reliability of the basis for his general causation opinions.

The federal *Daubert* standard for reliability of an expert's opinion mandates the existence of sufficient and relevant facts and scientific literature which support the expert's opinion. Put simply, the Court's focus should be on whether the materials which underlie the expert's opinion are sufficiently reliable to support that opinion. Because Dr. Schneider relies upon peer-reviewed, scientific literature which have been found to be a reliable bases for plaintiffs' experts in every Roundup trial that has been tried to date, his opinions are reliable.

### C. Unlike *Ferro v. Monsanto*, Dr. Schneider Has Provided a Detailed and Comprehensive Expert Report in This Case.

The Court's order adopting the Missouri state court opinion in *Ferro v. Monsanto* does not consider the differences between this case and the *Ferro* case. For example, in this case Dr. Schneider

11
PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE
THE TESTIMONY OF ANDREW SCHNEIDER, M.D.

authored an extensive and detailed expert report in this case outlining his methodology, whereas in *Ferro* no expert report was submitted by Dr. Schneider.

Unlike Federal Courts, which require experts to provide a full report of their opinions and methodology, Missouri state courts (like many other state courts) only require that a party provide an expert disclosure simply disclosing the names of the potential expert witnesses and a brief statement of the general substance of each expert's proposed testimony. Missouri state courts, like the *Ferro* court, do not even require that the expert write a report at all. Because Missouri state courts engage in only a limited foundational analysis in reviewing most expert testimony, any conclusion reached by a Missouri state court would be of little use in Federal Court. As a result, this Court is far better suited to resolve any *Daubert* challenges to Plaintiffs' experts on the merits presented to this Court and not simply adopting the same analysis and reasoning as the *Ferro* Missouri court.

Indeed, unlike *Ferro*—and consistent with Federal Rule of Civil Procedure 26—Dr. Schneider provided a comprehensive expert report in this case. (Doc. 32-5). Dr. Schneider's expert report discusses his qualifications, provides a detailed and lengthy timeline of Plaintiff's medical history, provides a summary of Plaintiff's Roundup use, explains his methodology, discusses the basis of his general causation opinions, and discusses his specific causation opinions and differential etiology. In his report, Dr. Schneider specifically lays out his methodology as follows:

> **Methodology**
> The methodology used below to determine whether a causal relationship exists between exposure to an environmental agent and a disease, condition, or illness are generally accepted scientific methods in my field and have been subject to the peer-review process in numerous reputable medical and scientific journals. In reaching my case-specific opinions, I considered the relevant exposure and have reviewed and relied upon general causation opinions of other experts in this litigation. Based on my review of the literature and the materials considered in this case, I also opine that Roundup can cause or substantially contribute to causing NHL, including CLL. I performed a differential diagnosis, considering and ultimately ruling out alternative or competing causes of CLL.

. (Doc. 32-5, at 7–8).

In addition, Dr. Schneider's expert report highlighted aspects of each peer-reviewed article he relied upon "which would be of interest to clinicians, and particularly medical oncologists, caring for patients with NHL." *Id.* at 6. In doing so, Dr. Schneider analyzed various peer-reviewed articles which "showed a statistically significant increase in the development of NHL." *Id.* at 8. Dr. Schneider further explained in his expert report why he discredited studies that did not show a correlation between Roundup use and NHL, such as the Agricultural Health Study. *Id.* ("The Agricultural Health Study (AHS) had 37% applicators failing to complete follow up survey[s], leading to misclassification bias.").

Based on the above, Dr. Schneider's expert report demonstrates how his knowledge, training, and experience combine with his review of the medical and scientific literature to form a reliable basis for his general causation opinions in this case. What's more, Dr. Schneider provided this Court much more material to consider and judge the reliability of his methodology – this cannot be lightly brushed aside under Ninth Circuit precedent.

**II.  In the Alternative, the Court Should Permit Dr. Schneider to Testify at the *Daubert* Hearing on Specific Causation.**

The Court's June 1, 2023 Order did not comment on Dr. Schneider's specific causation opinions with any detail. (Doc. 45). The *Ferro* order failed to meaningfully address the parties' arguments on specific causation. Instead, its holding on Dr. Schneider's case specific opinion misapplied this Court's opinion on general causation. Grouping both general and specific causation together, the *Ferro* court stated: "The multidistrict ("MDL") court that previously handled Roundup-related cases excluded an expert whose 'primay focus is on clinical work.'" *Ferro* Order at 6 (Doc. 29-4), citations omitted. That holding applied to Dr. Nabhan's general causation opinion – it had nothing to do with specific causation. As the Court well knows, it wrote separately to address that issue. The Court cannot accept the *Ferro* court's misapplication of this Court's prior order. Instead, the Court should analyze Dr. Schneider's case specific opinions much in the same way it for Plaintiffs

13

Hardeman, Gebeyehou, and Stevick. *See* the Specific Causation Order, 358 F. Supp. 3d at 957-960. There the Court held that case-specific experts may rely on the general causation opinions of others. And the relevant question was whether the experts adequately assessed the potential causes of the plaintiffs' NHL, and properly ruled out factors other than glyphosate, while at the same time declining to rule out glyphosate. In the Specific Causation Order, the Court noted the Ninth Circuit's instruction that "doctors enjoy wide latitude in how they practice their art when offering causation opinions." *Id.*, citation omitted. The Court admitted case specific causation opinions where the expert relied on plaintiffs' exposure levels, noted their extensive Roundup usage, reviewed the medical records, and relied on the general causation evidence.

Examining Dr. Schneider's opinion through this prism merits a different result. Reconsideration or a hearing on Dr. Schneider's case specific methodology is warranted. Dr. Schneider stated: "In reaching my case-specific causation opinions, I considered the relevant exposure and have reviewed and relied upon the general causation opinions of other experts in this litigation. Baased on my review of the literature and the materials considered in this case…I performed a differential diagnosis, considering and ultimately ruling out alternative or competing causes of CLL.." (Doc. 32-5). The Court's Specific Causation Opinion held that this methodology was consistent with Ninth Circuit caselaw and found the experts' case specific opinions were admissible. The same should follow here.

Dr. Schneider's specific causation opinion is based on a robust differential diagnosis. (Doc. 32-8, at 29:16–20) ("Q. And so you conducted what is known as a differential etiology in reaching your opinion that Mr. Engilis's Roundup use caused or contributed to his CLL; correct? A. Correct."). The Ninth Circuit (and many others) have held that the "[d]ifferential diagnosis is a common scientific technique, and federal courts, generally speaking, have recognized that a properly conducted differential diagnosis is admissible under *Daubert*." *Clausen v. M/V New Carissa*, 339 F.3d 1049,

14
PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE
THE TESTIMONY OF ANDREW SCHNEIDER, M.D.

1057 (9th Cir. 2003). *Accord Bland v. Verizon Wireless L.L.C.*, 538 F.3d 893, 897 (8th Cir. 2008); *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 262–66 (4th Cir. 1999); *Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 154–55 (3d Cir. 1999); *Baker v. Dalkon Shield Claimants Trust,* 156 F.3d 248, 252–53 (1st Cir. 1998); *Zuchowicz v. United States,* 140 F.3d 381, 387 (2d Cir. 1998); *Ambrosini v. Labarraque,* 101 F.3d 129, 140–41 (D.C. Cir. 1996).

Dr. Schenider's report explains in detail his differential etiology, including ruling out recognized risk factors for the development of NHL and other environmental exposures. (Doc. 32-5, at 10–11):

> Risk Factors & Differential Etiology
> Recognized risk factors for the development of NHL include aging, male gender, white ethnicity, geographic location, inherited or acquired immunodeficiency, certain autoimmune disorders, specific types of infection, previous treatment for Hodgkin's lymphoma, certain drugs, occupational and environment exposures, and a family history of malignancies of the blood or bone marrow. Implicated occupational and environmental exposures include herbicides, organic solvents, other organic chemicals, hair dyes, and smoking . . . .
>
> Mr. Engilis is, of course, a white male, who was 62 years old at the time of diagnosis of his NHL. Other than Roundup exposure, no risk factors for the development of lymphoma, such as predisposing medical conditions (including immunodeficiency states, autoimmune disorders, immunosuppressive medications, and specific infections), a family history of malignancies of the blood or bone marrow, or other candidate carcinogenic exposures, are identified in Mr. Engilis's medical records or deposition testimony.
>
> Per Mr. Engilis's Plaintiff Fact Sheet, he is negative for the following medical conditions: autoimmune diseases (including but not limited to Crohn's disease, Ulcerative Colitis, HIV), Celiac disease, Diabetes, Eczema, Epstein-Barr virus, Hepatitis B or C, Immunosuppressive Medications, Lupus, Obesity, Organ transplant/stem cells, Psoriasis, Rheumatoid Arthritis, Thyroiditis/Hashimoto's, Ulcers. Any of the above medical conditions or medications, therefore, are not suggested as related to or as causative factors to the onset of different types of cancers in Mr. Engilis's case.
>
> Mr. Engilis's deposition testimony also indicates that his pertinent environmental exposures are limited to Roundup . . . He denies any exposures to chemicals working as a car/auto mechanic, or using antifreeze or change oil, as a painter or woodworker, or as applying rodenticides, or fungicides. He was never exposed to asbestos, benzene, diesel fumes, metal lead, or radiation, except the diagnostic x-rays.

It is therefore my conclusion that, to a reasonable degree of scientific and medical certainty, exposure to Roundup can cause NHL in general, and caused or was a substantial factor in causing or contributing to Mr. Engilis's NHL.

Despite this, Monsanto contends that Dr. Schneider's deposition testimony failed to rule out the following other factors: Mr. Engilis's "self-reported history of sunburns [as] a primary risk factor for melanoma," random genetic mutations, and whether Mr. Engilis's melanoma and bladder cancer preceded his CLL diagnosis. (Doc. 29, at 13). Yet, Dr. Schneider did explain his differential etiology as to each of these. (Doc. 32-8, at 55:17–21 ("A… And ATM mutations are not big causes of bladder cancer, melanoma, and CLL. I have seen ATM mutations of prostate cancer, for example, breast cancer, I believe. I don't think they're big ones for those two diseases."); *see also id.* at 57:17–58:24:

> Q. I'm sorry. Can you rule out that Mr. Engilis had a genetic mutation that caused or contributed to any or all of his cancers without doing genetic testing? . . .
> A. So I have knowledge of mutations. I get requests all the time as part of my work at Century Health, and I also do reviews for Maximum where they ask me to approve just what you're asking. They're asking me to approve requests for mutational analysis . . . And I know what diseases warrant that and what don't, okay, because that's my job. And patients with melanoma, for example, we don't do routine mutational analysis. Patients with CLL, we look at things like heavy chain mutations for TP53 mutations. We don't look at ATM mutations . . . because it's not indicated.

*See also id.* at 107:20–108:9 ("Q. But my question is: When you were conducting your differential etiology, did you consider as a potential risk factor a history of primary cancer that preceded the CLL? A. So … we know patients with bladder cancer, for example, don't get CLL. That's not a factor of CLL. We already discussed that CLL causes secondary malignancies. And it's well described in the literature that melanoma and we discussed the TCC of the bladder. . . . My opinion is that they occurred at the same time."); *See also id.* at 124:23–126:15 (explaining why ruled out Mr. Engilis's self-reported history of sunburns as a cause of his melanoma).

Notwithstanding, even if this Court finds that Dr. Schneider's differential diagnosis failed to rule every possible explanation, this is not grounds for exclusion according to Ninth Circuit law. *See Clausen*, 339 F.3d at 1058–59. Significantly, *Daubert* does not require an expert to eliminate every

16
PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE
THE TESTIMONY OF ANDREW SCHNEIDER, M.D.

possible potential cause. *See Stambolian v. Novartis Pharma. Corp.*, 2013 WL 6345566, at *5 (C.D. Cal. Dec. 6, 2013) ("***A medical expert's opinion based upon differential diagnosis normally should not be excluded because the expert has failed to rule out every possible alternative cause of a plaintiff's illness.*** Generally, an expert need not rule out every potential cause in order to satisfy *Daubert*, as long as the expert's testimony addresses obvious alternative causes and provides a reasonable explanation for dismissing specific alternate factors . . . .") (emphasis added); *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 693 (8th Cir. 2001) ("[T]his requirement cannot be carried to a quixotic extreme . . . an expert's causation conclusion should not be excluded because he or she failed to rule out *every* possible alternative cause."); *see also In re Trasylol Prod. Liab. Litig.*, 2010 WL 8354665, at *11 (S.D. Fla. Dec. 10, 2010) ("[D]octors need not rule out every conceivable cause in order for their differential-diagnosis-based opinions to be admissible."); *Farm Bureau Prop. & Cas. Ins. Co. v. CHN Industrial Am. LLC*, 2018 WL 2077727, *7 (N.D. Iowa Feb. 5, 2018) ("There is no rule requiring an expert to eliminate all other explanations before the expert is permitted to explain his or her opinions to the jury. The Eighth Circuit has rejected such a rule."); *Edwards v. Ethicon, Inc.*, 2014 WL 336923, *7 (S.D. W. Va. July 8, 2014) ("[A] physician need not conduct every possible test to rule out all possible causes of a patient's illness, so long as he or she employed sufficient diagnostic techniques to have good grounds for his or her conclusion.").

For example, in *Stambolian v. Novartis Pharma. Corp.*, the Court found plaintiff's expert, Dr. Kraut, performed a sufficiently reliable differential diagnosis because he "engaged in a process of eliminating hypotheses until he reached the most likely conclusion." 2013 WL 6345566, at *5. Specifically, "Dr. Kraut looked to prevailing literature, his own research, personal experience with patients . . . [and] his review of Plaintiff's medical records" when he "ruled out chemotherapy and corticosteroids." *Id.* Like Monsanto's argument, the defendant in *Stambolian* argued Dr. Kraut's methodology was flawed "because Dr. Kraut failed to rule out osteomyelitis and periodontitis as

17
PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE
THE TESTIMONY OF ANDREW SCHNEIDER, M.D.

potential causes of her jaw problem." *Id.* However, the *Stambolian* court noted that a differential diagnosis is not unreliable or inadmissible simply "because the expert has failed to rule out every possible alternative cause of a plaintiff's illness." *Id.* Ultimately, the *Stambolian* court concluded by noting "Defendant's arguments require credibility determinations that go to the weight and not the admissibility of his opinions." *Id.* The same is true in this case.

Here, Dr. Schneider reviewed the relevant literature, the animal studies and the mechanistic or genotoxic studies; he reviewed Mr. Engilis's medical records, which contained their medical history; and he reviewed their deposition testimony and fact sheets which described the Plaintiff's respective exposure history. Dr. Schneider identified each of the risk factors that are generally known to be associated with NHL—including a history of rheumatoid arthritis; medication that suppresses the immune system; long-term steroidal use; post organ transplant; and lymphoproliferative disorders—and determined that Mr. Engilis presented with none of these risk factors. (Doc. 32-5, at 10–11). Dr. Reshef even agrees. Dr. Reshef identified the following risk factors of NHL: chronic infection; immune dysregulation or immunodeficiency; solid organ or bone marrow transplant or patients on immune-suppressive medications, and age. (Doc. 32-6, at 75:3–19). Other than age, Mr. Engilis did not present with any of these risk factors. *Id.* at 103:5–104:15.

Dr. Schneider is in good company. Dr. Reshef employed the same methodology: "look through the relevant literature, including both in vitro, animal and human studies, identify the associations and in which context they were discovered, look at the weight of the evidence and the hierarchy of the evidence…" as well as consider a person's medical records, evaluate that person's medical history and exposure history. *Id.* at 150:2–152:5. Dr. Reshef just comes out on the other side.

Dr. Schneider, after completing his differential diagnosis, concluded that Roundup was the probably etiology cause of Mr. Engilis's CLL. (Doc. 32-8, at 29:5–11) ("so I went through all of the

18

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE
THE TESTIMONY OF ANDREW SCHNEIDER, M.D.

possible etiologic agents for CLL and ruled them out to a large degree. And then, in my mind, a reasonable degree of medical certainty is left, Roundup, the 24-year exposure, as the most probable etiologic agent for the development of CLL to a reasonable degree of medical probability and certainty."). That is all that *Daubert* requires.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant Plaintiffs' Motion for Reconsideration, and grant such other and further relief this Court deems just and proper.

DATED: July 21, 2023          Respectfully submitted,

                                           */s/ Jeffrey L. Haberman*
                                           JEFFREY L. HABERMAN (*pro hac vice*)
                                           **SCHLESINGER LAW OFFICES, P.A.**

                                           *Attorneys for Plaintiff, Peter Engilis*

# CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2023, I served a copy of the foregoing on the Clerk of Court by CM/ECF, which will provide automatic notification to all parties and counsel of record.

By: */s/ Jeffrey L. Haberman*
Jeffrey L. Haberman