**Garmer & Prather, PLLC**
Jerome P. Prather, Esq. (*pro hac vice*)
141 North Broadway
Lexington, Kentucky 40507
Telephone: (859) 254-9351
Facsimile: (859) 233-9769
Email: jprather@garmerprather.com

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
***ELECTRONICALLY FILED***

IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION

This document relates to:

*Estate of Kenzie Elizabeth Murdock, Kyle A. Murdock, Adm'r, Kyle A. Murdock, individually, and Mandi L. Murdock v. Monsanto Co.,*
Case No. 3:20-cv-01363-VC

MDL NO. 2741

Case No. 3:16-md-02741-VC

**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO EXCLUDE TESTIMONY OF DR. RON SCHIFF**

COME the Plaintiffs, the Estate of Kenzie Elizabeth Murdock, Kyle A. Murdock, Administrator; and Kyle A. Murdock, individually, by counsel, and for their response to Defendant's motion to exclude the opinions and testimony of Dr. Ron Schiff, hereby state as follows.

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................3

BACKGROUND ....................................................................................................3-4

ARGUMENT ....................................................................................................4-15

I. Legal Standard ....................................................................................................4-6

II. This Court has repeatedly denied motions by Defendant to exclude Dr. Schiff's testimony on similar grounds and should do the same here. ....................................6-7

III. Dr. Schiff's opinions in this case are founded upon his knowledge, experience, training, skill, education, and his thorough review of the facts of this case. ....................7

IV. Dr. Schiff properly assessed glyphosate as a possible cause of Kenzie Murdock's NHL. ....................................................................................................8-11

A. Dr. Schiff appropriately relied on Kenzie's cumulative exposure to Roundup to form his opinions, in conformity with peer-reviewed scientific literature ....................8-10

B. Dr. Schiff's reliance on peer-reviewed medical and scientific literature is proper and reliable. ....................................................................................................10-11

C. Dr. Schiff adequately "ruled in" glyphosate as a cause of Kenzie's NHL ....................12

V. Dr. Schiff properly ruled out other possible alternative causes of Kenzie's NHL. ....................................................................................................12-15

CONCLUSION ....................................................................................................15

## TABLE OF AUTHORITIES

City of Pomona v. SQM N.A. Corp., 750 F.3d 1036 (9th Cir. 2014)....................................5-6

Clausen v. M/V New Carissa, 339 F.3d 1049 (9th Cir. 2003)....................................6, 8, 15

Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993)....................................4, 5, 6

Fed. R. Evid. 702 ....................................................................................................4, 11

Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999) ....................................4, 5

Messick v. Novartis Pharm. Corp., 747 F.3d 1193 (9th Cir. 2014)....................................5, 6, 15

United States v. Downing, 753 F.3d 1224 (3d Cir. 1985) ....................................5

Wendell v. GlaxoSmithKline LLC, 858 F.3d 1227 (9th Cir. 2017) ....................................5, 6

Plaintiffs' Response to Defendant's Motion to Exclude Testimony of Dr. Ron Schiff
MDL No. 3:16-Md-02741 and Case No. 3:20-Cv-01363-VC

Page 2 of 16

## INTRODUCTION

Dr. Schiff is an eminently qualified oncologist and hematologist whose opinions have previously been accepted in this MDL. The opinions he offers in this case comply with all requirements of Fed. R. Evid. 702 and Daubert. Monsanto's motion misconstrues Dr. Schiff's well-reasoned and reliable opinions and testimony. Dr. Schiff's methodology comports with Ninth Circuit requirements. Monsanto attempts to exclude his testimony for failing to "rule in" all factors of Kenzie Murdock's NHL or "rule out" all other possible alternative causes of her NHL. But Dr. Schiff's testimony and report, viewed as a whole, comply with the Ninth Circuit's requirements by sufficiently considering potential causes of her NHL and arriving at his well-founded opinion that, more likely than not, Kenzie's lifelong exposure to Roundup caused her NHL.

## BACKGROUND

Kenzie Murdock was diagnosed with T-cell non-Hodgkin's lymphoblastic lymphoma shortly before her eighteenth birthday. Despite receiving rigorous courses of treatment at Saint Jude Children's Research Hospital, she died ten months after her initial diagnoses, on July 28, 2019. She had been exposed to glyphosate her entire life on her family's farmland near Murray, Kentucky. From the time she was a toddler, she played in and around the fields where RoundUp products were regularly applied. She rode with her father—and even applied RoundUp products herself—while seated on ATVs around the farm's and residence's non-crop areas.

Plaintiffs disclosed Ron D. Schiff, M.D., Ph.D., as a specific causation expert. Dr. Schiff is an oncologist and hematologist and offered opinions based upon his expertise. Dr. Schiff opined that, more likely than not, Kenzie Murdock's exposure to RoundUp was a substantial factor in causing her to later develop non-Hodgkin's lymphoma. In forming his opinions, Dr.

Plaintiffs' Response to Defendant's Motion to Exclude Testimony of Dr. Ron Schiff
MDL No. 3:16-Md-02741 and Case No. 3:20-Cv-01363-VC

Page 3 of 16

Schiff relied on a series of widely accepted, peer-reviewed medical and scientific studies, coupled with his education, training, skill, knowledge, and nearly 30 years of clinical experience. In addition, Dr. Schiff obtained details of Kenzie's exposure both from Plaintiffs' toxicology expert, William Sawyer, Ph.D., and in interviews with Kenzie's father, Kyle Murdock.

## ARGUMENT

### I. Legal standard

Admissibility of expert testimony is governed by Fed. R. Evid. 702. That rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 (emphasis added).

In Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), the United States Supreme Court established a framework for interpreting and applying Rule 702.[1] Most notably, the Court held that all scientific testimony or evidence admitted must be relevant and reliable.[2] Id. at 589. The Court extended this holding to testimony based on technical and other specialized

---

[1] Fed. R. Evid. 702 was amended effective December 2011, but those amendments were only stylistic changes and were not intended to alter the substance of the rule. *See* Advisory Notes to 2011 Amendments ("These changes are intended to be stylistic only. There is no intent to change any result in any ruling on evidence admissibility.") Thus, the analysis contained in Daubert is still applicable.

[2] The relevance prong of the Daubert decision is simply a specific application of Rule 402 of the Federal Rules of Evidence which states, "[e]vidence which is not relevant is not admissible." Fed. R. Evid. 402.

Plaintiffs' Response to Defendant's Motion to Exclude Testimony of Dr. Ron Schiff
MDL No. 3:16-Md-02741 and Case No. 3:20-Cv-01363-VC

Page 4 of 16

knowledge in Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999). In Daubert, the Court determined that the condition in Rule 702 requiring the evidence or testimony to "assist the trier of fact" is primarily related to relevance and inextricably linked to the third requirement found in Rule 702—that "the witness has applied the principles and methods reliably to the facts of the case." 509 U.S. at 591. The Court held that relevance is determined by evaluating "whether expert testimony proffered in the case is sufficiently tied to the facts of the case," id. (citing United States v. Downing, 753 F.2d 1224, 1242 (3d Cir. 1985)), which involves "a preliminary assessment of whether the reasoning or methodology … properly can be applied to the facts in issue," id. at 592. Put another way, the objective of Daubert "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire, 526 U.S. at 152.

The Ninth Circuit has interpreted Rule 702 and Daubert and has held that "the interests of justice favor leaving difficult issues in the hands of the jury and relying on the safeguards of the adversary system . . . to 'attack[] shaky but admissible evidence." Wendell v. GlaxoSmithKline LLC, 858 F.3d 1227, 1237 (9th. Cir. 2017) (quoting Daubert, 509 U.S. at 596). Put another way, "Rule 702 should be applied with a 'liberal thrust' favoring admission." Id. at 1232 (quoting Messick v. Novartis Pharm. Corp., 747 F.3d 1193, 1196 (9th Cir. 2014)).

Expert testimony is admissible under Rule 702 when it includes a reliable differential diagnosis, which considers the "pertinence of all potential causes, then rules out the ones as to which there is no plausible evidence of causation, and then determines the most likely cause among those that cannot be excluded." Id. at 1234. The Ninth Circuit has also recognized the "difficulties in establishing certainty in the medical sciences." Id. at 1197-98. In making its

Plaintiffs' Response to Defendant's Motion to Exclude Testimony of Dr. Ron Schiff
MDL No. 3:16-Md-02741 and Case No. 3:20-Cv-01363-VC

Page 5 of 16

determination as to the admissibility of Dr. Schiff's opinions, the Court "is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." City of Pomona v. SQM N.A. Corp., 750 F.3d 1036, 1044 (9th Cir. 2014) (internal citation omitted). An expert need not "be able to identify the sole cause of a medical condition in order for his or her testimony to be reliable. It is enough that medical condition be a substantive causative factor. Messick, 747 F.3d at 1199. "While 'precise information concerning the exposure necessary to case specific harm [is] beneficial, such evidence is not always available, or necessary, to demonstrate that a substance is toxic . . . and need not invariably provide the basis for an expert's opinion on causation.'" Clausen v. M/V New Carissa, 339 F.3d 1049, 1060 (9th Cir. 2003). "The focus . . . must be solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 594.

## II. This Court has repeatedly denied motions by Defendant to exclude Dr. Schiff's testimony on similar grounds and should do the same here.

Dr. Schiff's specific causation testimony has been allowed by this Court in another case in this MDL (*Schaffner*) and in state court cases against Monsanto (*E.g.*, *Walker et al. v. Monsanto Co. et al.*, Case No. 1122-CC09621-01 (St. Louis City Cir. Ct. 2016)). No component of his testimony and opinions here warrants departing from the Court's previous ruling that Dr. Schiff's testimony is admissible. In Pretrial Order No. 262, the Court denied Defendant's motion to exclude Dr. Schiff's testimony for the same reasons stated in the Court's earlier Pretrial Order No. 85. In PTO 262, the Court reasoned that Dr. Schiff's testimony was admissible and any challenges were better suited to cross-examination instead of by exclusion. In that Order, the Court ruled that a qualified expert's "reliance on his clinical experience, review of plaintiffs' medical records, and evaluation of the general causation evidence, to conclude that an 'obvious

Plaintiffs' Response to Defendant's Motion to Exclude Testimony of Dr. Ron Schiff
MDL No. 3:16-Md-02741 and Case No. 3:20-Cv-01363-VC

Page 6 of 16

and known risk factor' is the cause of that plaintiff's disease" renders him qualified to testify as an expert. PTO 85, at 5 (quoting Wendell v. GlaxoSmithKline LLC, 858 F.3d 1227,1235 (9th Cir. 2017). That is precisely what Dr. Schiff has done in this case; he relied on his clinical experience, reviewed Kenzie's medical records, and evaluated the causation evidence, recognized that glyphosate is an "obvious and known factor" and has concluded that glyphosate was specifically the cause of Kenzie's NHL. Therefore, this Court's prior ruling should apply here too.

Moreover, the Court has repeatedly instructed Monsanto not to relitigate issues previously ruled upon by the Court. Because this Court has previously ruled for plaintiffs several times on a Daubert motion to exclude Dr. Schiff, the Court should deny the motion here as well.

## III. Dr. Schiff's opinions in this case are founded upon his knowledge, experience, training, skill, education, and his thorough review of the facts of this case.

Dr. Schiff is an eminently qualified oncologist and hematologist. He received both an M.D. and a Ph.D. with a concentration in molecular and cellular biology. Exh. A, Schiff Report at 1. He is board certified in internal medicine, medical oncology, and hematology. Id. at 2. He completed a fellowship in molecular and cellular biology, Id. at 1, and a subspecialty fellowship in medical oncology and hematology at Memorial Sloan-Kettering Cancer Center. Id. In addition to his academic work, Dr. Schiff was a clinician in private practice for 29 years. Id. at 2. He chaired the Cancer Committee at University Community Hospital for nearly 20 years. Id.

Dr. Schiff's education, training, skill, knowledge, and experience qualifies him to render oncological and hematological opinions in this case. For this case, Dr. Schiff thoroughly reviewed Kenzie's relevant medical history. He reviewed 1,060 pages of records from four hospitals. Id. at 3. In addition, Dr. Schiff reviewed the First Amended Complaint, Plaintiff's Fact

Plaintiffs' Response to Defendant's Motion to Exclude Testimony of Dr. Ron Schiff
MDL No. 3:16-Md-02741 and Case No. 3:20-Cv-01363-VC

Page 7 of 16

Sheet, report of William Sawyer, Ph.D.; and a list of herbicides, pesticides, surfactants, and other chemicals used on the Murdocks' property. Id. Drawing on his knowledge, education, skill, training, and experience, Dr. Schiff reliably applied principles and methods to the facts of this case based on his review of the above-mentioned case specific evidence.

## IV. Dr. Schiff properly assessed glyphosate as a possible cause of Kenzie Murdock's NHL.

Defendant's argument mischaracterizes the opinions Dr. Schiff reached that Kenzie's extensive, prolonged exposure to Roundup was a substantial factor in the development of her NHL and death. Dr. Schiff's report explains the methodology he employed to reach his opinions. Exh. A, Schiff Report at 3. To determine whether a causal connection exists "between exposure to an environmental agent and a disease, condition, or illness," Dr. Schiff applies "generally accepted scientific methods utilized by regulatory agencies and reported in peer-reviewed medical and scientific journals. Id. For his specific causation opinions, such as his opinions in this case, Dr. Schiff "consider[s] the relevant exposure, or 'dose,' of the chemical agent, and whether or not that dose has been associated with the disease in the medical and scientific literature." Id. In direct contradiction to Defendant's assertion that Dr. Schiff failed to follow the two-prong process in Clausen v. M/V New Carissa, 339 F.3d 1049 (9th Cir. 2003), Dr. Schiff indicated that he performed an "differential etiological analysis, considering evidence for alternative or competing causes." Id.

### A. Dr. Schiff appropriately relied on Kenzie's cumulative exposure to Roundup to form his opinions, in conformity with peer-reviewed scientific literature.

Dr. Schiff relied on Kenzie's extensive exposure to Roundup and other glyphosate products for nearly the entirety of her life to form his specific causation opinions. Monsanto gives much attention to the opinions of William Sawyer, Plaintiff's toxicology expert, about

Plaintiffs' Response to Defendant's Motion to Exclude Testimony of Dr. Ron Schiff
MDL No. 3:16-Md-02741 and Case No. 3:20-Cv-01363-VC

Page 8 of 16

calculating Kenzie's absorbed dose. Mot. at 3. While calculating specific absorption or systemic doses may require precise calculations for Dr. Sawyer's toxicology opinions, Dr. Schiff testified that, for his oncological and hematological opinions, a person's cumulative exposure is more important. Exh. B, Schiff Depo. at 105.

> Q. Are you relying on Dr. Sawyer's calculation of [Kenzie] Murdock's systemic dose in this case?
>
> A. I am aware of that calculation and, you know, I am happy to discuss that with you. But that is not how the exposure thresholds associated with an increased risk of developing non-Hodgkin's lymphoma are—are addressed in the published literature. You know, those things look at, again, cumulative exposure, duration of exposure, frequency of exposure, and so forth.

Id. Whether courts in other jurisdictions have required specific dose calculations to be performed is irrelevant to Dr. Schiff's opinions here. His opinions apply reliable methods and principles from peer-reviewed literature to the facts of this case.

In this case, Dr. Schiff reviewed Kenzie's "lifelong exposure to Roundup." Exh. A, Schiff Report at 80. He gathered some of this information from Dr. Sawyer's toxicology report, but independently verified Kenzie's complete exposure to Roundup in a telephone interview of Kenzie's father, Plaintiff Kyle Murdock. Exh. B, Schiff Depo. at 15. Dr. Schiff noted that Kenzie grew up on her family's large farming operation, on which "Roundup was applied frequently and in large quantities." Exh. A, Schiff Report at 80. Kenzie's exposure to Roundup was in many forms: as a child, she played in the fields where Roundup had been sprayed by large boom sprayers; she rode with her father in tractor cabs while he applied Roundup in the farm fields; as she grew, she rode ATVs with mounted spray tanks and even participated in spraying the Roundup from wands attached to the ATVs herself; she often cleaned the tractors and ATVs, which required pressure washing the sprayers and booms; and Roundup was also applied in the

Plaintiffs' Response to Defendant's Motion to Exclude Testimony of Dr. Ron Schiff
MDL No. 3:16-Md-02741 and Case No. 3:20-Cv-01363-VC

Page 9 of 16

non-crop areas around the home and outbuildings where she lived. Id. at 81-82. Kenzie's direct exposure to Roundup began from the time she was approximately three years old and continued until she became ill. Id. at 81. She began spraying Roundup herself from the time she was about seven years old. Id. She rode with her father while spraying as many as 15 to 20 times per year and was exposed to Roundup while on open-air ATVs for approximately two hours ten to twelve times per year for approximately twelve years. Id. Dr. Schiff's analysis of Kenzie's exposure from his conversation with Kyle Murdock establishes that Kenzie's cumulative exposure to Roundup was frequent and for extended durations. This conforms with the thresholds of the published literature—as Dr. Shiff testified—which, in turn, satisfies the requirements of Daubert and Fed. R. Evid. 702. Therefore, Dr. Schiff's reliance on Kenzie's cumulative exposure is a sufficient basis to render his opinions in this case.

**B. Dr. Schiff's reliance on peer-reviewed medical and scientific literature is proper and reliable.**

Dr. Schiff relied on methodologies accepted in peer-reviewed medical and scientific literature and applied those principles and methodologies to the facts of Kenzie's exposure to form his opinions that Roundup was a substantial factor in causing Kenzie's NHL. Defendant's suggestion that Dr. Schiff's "selective plucking of data from cherry-picked sources," Mot. at 4, unfairly mischaracterizes the scientific nature of Dr. Schiff's opinions, which are based upon sound principles and methods. The evidence establishes that Kenzie Murdock's exposure to Roundup from the time she was three until she died at age 18 was "well above the threshold levels reported in the literature to be associated with an increased risk of developing non-Hodgkin lymphoma. Exh. A, Schiff Report at 94. And according to the peer-reviewed literature upon which Dr. Schiff relies, that is sufficient to draw a causal connection to the development of

Plaintiffs' Response to Defendant's Motion to Exclude Testimony of Dr. Ron Schiff
MDL No. 3:16-Md-02741 and Case No. 3:20-Cv-01363-VC

Page 10 of 16

Kenzie's NHL. *See* id. at 83-84.

Furthermore, Monsanto's argument that Dr. Schiff's citation of these studies is unreliable because the studies do not contemplate the various subtypes of NHL is not persuasive and is misplaced. Dr. Schiff specifically addressed this issue in his report and deposition. Dr. Schiff testified that the IARC's monograph on glyphosate carcinogenicity was not specific to any particular subtype of NHL. Exh. B, Schiff Depo. at 52.

> But I will also point out that the IARC did not condition their designation of [g]lyphosate as a group to a probable carcinogen on non-Hodgkin's lymphoma subtype. . . . I'm quite confident that they took into account the existing data on subtype and did not feel that that should influence their classification of Roundup carcinogenicity.

Id. Moreover, Dr. Schiff noted that data is not available for some subtypes of NHL, including T-cell lymphoblastic NHL, Kenzie's diagnosis. In his report, Dr. Schiff stated that although some studies have sought to examine more closely specific associations between glyphosate and subtypes, but "less common non-Hodgkin lymphoma subtypes may not occur with sufficient frequency to permit detection of a statistically significant association with glyphosate exposure **even if such an association exists**." Exh. A, Schiff Report at 83 (emphasis added); *see also* Exh. B, Schiff Depo. at 47 ("There might not be so much specific data about rare subtypes like T-lymphoblastic lymphoma because of their very rarity.").

Merely because these studies—specifically Zhang (2019) and Eriksson (2008)—reach a different conclusion than studies relied upon by Defendant's experts, does not mean that Dr. Schiff's reliance on them was improper, as Defendant suggests. Mot. at 4. These studies contain sound principles and methods, and Dr. Schiff's application of the sound principles and methods to the facts of this case is reliable and relevant. *See* Fed. R. Evid. 702.

**C. Dr. Schiff adequately 'ruled in' glyphosate as a cause of Kenzie's NHL.**

Dr. Schiff's comprehensive review of the medical literature and facts related to Kenzie's lifelong exposure to Roundup were a sufficient assessment of Roundup, and more specifically, glyphosate, as a substantial factor in causing the development of Kenzie's NHL and her death.

**V. Dr. Schiff properly ruled out other possible alternative causes of Kenzie's NHL.**

Dr. Schiff performed a differential etiological analysis, which considered evidence "for alternative or competing causes" of Kenzie's NHL. Exh. A, Schiff Report at 3. For Defendant to suggest that Dr. Schiff failed to "rule out" potential alternative causes completely ignores Section 9 of his report, *see* id. at 85-89, and misconstrues his deposition testimony. Dr. Schiff never "dismisse[d] the very concept of ruling out alternative causes," as Defendant suggests. Mot. at 5. Dr. Schiff did just the opposite: he considered several possible alternative causes of Kenzie's NHL and concluded, after reviewing all of them, that Kenzie's exposure to glyphosate was a substantial factor in causing her to develop NHL.

In Dr. Schiff's report, he thoroughly evaluated and excluded several possible alternative causes of NHL which did not apply in the development of Kenzie's NHL. Kenzie had no medical conditions that would predispose her to develop NHL (such as immunodeficiency states, autoimmune disorders, or specific infections). Id. at 85. There was no documentation in the medical records of any family histories of malignancies of the blood or bone marrow. Id. Dr. Schiff conducted a genetic counseling consultation to determine family history of lymphomas or any predisposition to cancer. Id. This "family tree" found no "hematologic malignancies (including leukemia, lymphoma, and multiple myeloma) or pediatric cancers among [Kenzie] Murdock's relatives. Id. This inquiry effectively ruled out genetic predisposition as a possible alternative cause.

Plaintiffs' Response to Defendant's Motion to Exclude Testimony of Dr. Ron Schiff
MDL No. 3:16-Md-02741 and Case No. 3:20-Cv-01363-VC

Page 12 of 16

Dr. Schiff ruled out any occupational etiological alternatives because Kenzie was a high school student and had no occupational exposures. Id. Dr. Schiff ruled out smoking because Kenzie never smoked. Id. Dr. Schiff testified about the effects of secondhand smoke. Even if Kenzie had been exposed to secondhand smoke, that did not "negate the contributory role of her [g]lyphosate and Roundup exposure, which is very extensive." Exh. B, Schiff Depo. at 124. That is to say that, even if Kenzie had been exposed to secondhand smoke, any possible causative effect was minuscule compared to Kenzie's extensive Roundup exposure, and, thus, could be dismissed as a possible alternative cause. When asked about Kenzie's inhalation of wood smoke during his deposition, Dr. Schiff ruled this out as a possible cause as well.

> Q. So I asked you whether you would agree that you cannot rule out [Kenzie] Murdock's exposure to wood smoke as a contributing factor to her lymphoma, and you said you'd be speculating about that. What do you mean by that?
>
> A. That's correct. Yes. **I doubt very much that would have been a contributing factor.** But even if it was, it does not mitigate the lymphomagenic consequences of her [g]lyphosate and Roundup exposure.
>
> Q. So is it true then that you cannot rule out her exposure to wood smoke as a contributing factor to her lymphoma?
>
> A. Again, I would have to speculate about that because I don't know what exposure she may have had or how extensive it was. **But I'm also not aware of an etiologic link between wood smoke and lymphoma.** If you have evidence to the contrary, I'm happy to look at the study.
>
> Q. Well, if you don't know whether she was exposed to wood smoke, how can you rule that out as a factor in her lymphoma?
>
> A. **Because I don't think that wood smoke is a lymphomagenic**.

Id. at 133-34 (emphasis added).

Dr. Schiff also considered the list of chemicals applied on the Murdocks' farms to identify any possible alternative causes of Kenzie's NHL. There were none. Kenzie was exposed

Plaintiffs' Response to Defendant's Motion to Exclude Testimony of Dr. Ron Schiff
MDL No. 3:16-Md-02741 and Case No. 3:20-Cv-01363-VC

Page 13 of 16

to two IARC Group 1 carcinogens (crystalline silica and petroleum distillates), but "[n]either of these carcinogens has been implicated in the development of non-Hodgkin lymphoma." Exh. A, Schiff Report at 86. Kenzie was not exposed to any IARC Group 2A probable carcinogens other than glyphosate. Id. The chemical lactofen was used on the Murdocks' farms, but "this chemical is not listed by IARC and has not been associated with the development of non-Hodgkin lymphoma." Id. The chemical list Dr. Schiff reviewed included several IARC Group 2B possible carcinogens (cumene (isopropylbenzene), naphthalene, 2,4-dichlorophenoxyacetic acid (2,4-D), ethylbenzene, attapulgite, talc (for perineal use), and titanium dioxide). Id. Only 2,4-D has been associated with an increased risk of developing NHL, but Dr. Schiff's review of the supporting studies reveals that the "results have been inconsistent and inconclusive" and "reflects inadequate epidemiological evidence of carcinogenicity to humans[.]" Id. Dr. Schiff also reviewed other chemicals which have been classified as IARC Group 3, or not classifiable to human carcinogenicity. Id. His thorough review ruled out any of these other chemicals that Kenzie may have been exposed to were "capable of causing or contributing to cause non-Hodgkin lymphoma." Id.

Dr. Schiff also considered—and ruled out—any of Kenzie's prior medical history or pharmaceutical interventions. Kenzie's childhood pneumonia and cellulitis are not risk factors for developing NHL. Id. at 87. Kenzie's eczema was not a risk factor for the t-cell lymphoblastic lymphoma that Kenzie was diagnosed with. Id. Kenzie's herpes simplex virus type 1 infections have never been identified as a cause or associated with an increased risk of developing NHL. Id. Kenzie's exercise-induced asthma diagnosis is not a risk factor for the subtype of NHL that Kenzie had. Id. Kenzie's prior diagnosis of non-acute Epstein-Barr virus infections have never been associated with the development of Kenzie's subtype of NHL. Id. at 88. Neither has

Plaintiffs' Response to Defendant's Motion to Exclude Testimony of Dr. Ron Schiff
MDL No. 3:16-Md-02741 and Case No. 3:20-Cv-01363-VC

Page 14 of 16

Kenzie's history of non-acute cytomegalovirus infections or varicella-zoster virus ever been associated with an increased risk of developing NHL. Id.

Dr. Schiff also included Kenzie's weight and BMI in his differential etiological analysis. Kenzie was "never obese according to the standard definitions." Id. Dr. Schiff noted that published literature identifies obesity as a risk factor for NHL, but explained confusion among the studies caused by "varying definitions of obesity" and a tendency to focus on B-cell (and not T-cell) lymphomas. Id. He also noted that there has never been a reported association between obesity or elevated BMI range and T-cell lymphoblastic lymphoma. Id. Dr. Schiff ruled out Kenzie's weight or BMI as an alternative cause for her NHL. Id.; *see also* Exh. B, Schiff Depo. at 128 ("So the answer to that is, no, I don't think her weight or BMI is connected.").

Dr. Schiff considered several noted possible alternative causes of Kenzie's NHL and, for each of them, concluded that they did not apply or were insignificant compared to her prolonged cumulative exposure to Roundup. This analysis precisely follows Ninth Circuit law interpreting Rule 702 as it relates to experts' differential diagnoses. *See* Messick v. Novartis Pharm. Corp., 747 F.3d 1193, 1199 (9th Cir. 2014); *see also* Clausen v. M/V New Carissa, 339 F.3d 1049, 1060 (9th Cir. 2003). Therefore, Dr. Schiff's testimony and opinions are reliable, relevant, consistent with Ninth Circuit law, and should be admissible in this case. Furthermore, as stated above, any of Defendant's criticisms of Dr. Schiff's opinions go to the weight and not the admissibility, and would be best addressed by cross-examination instead of exclusion.

## CONCLUSION

For all of the reasons stated herein, Defendant's motion to exclude the testimony of Dr. Schiff should be denied.

Plaintiffs' Response to Defendant's Motion to Exclude Testimony of Dr. Ron Schiff
MDL No. 3:16-Md-02741 and Case No. 3:20-Cv-01363-VC

Page 15 of 16

Respectfully submitted,

ATTORNEYS FOR PLAINTIFF

BY: /s/ Jerome P. Prather

Jerome P. Prather, Esq. (*pro hac vice*)
141 North Broadway
Lexington, Kentucky 40507
Telephone: (859) 254-9352
Facsimile: (859) 233-9769
Email: jprather@garmerprather.com

Plaintiffs' Response to Defendant's Motion to Exclude Testimony of Dr. Ron Schiff
MDL No. 3:16-Md-02741 and Case No. 3:20-Cv-01363-VC

Page 16 of 16