# EXHIBIT F

**Expert Report of William G. Johnson, Ph.D., M.S.**
**Professor and Extension Weed Scientist**
**Department of Botany and Plant Pathology**
**Purdue University**

### I. Background

I am currently a Professor of Weed Science in the Department of Botany and Plant Pathology at Purdue University. My primary responsibility is to lead a weed science research and extension education effort in agronomic crops by maintaining and enhancing the close working relationships between the University and farmers, extension educators and the crop protection industry. My research and extension program objectives are the following:

> Develop weed management systems that are safe, economically and environmentally sound, integrate cultural practices with judicious herbicide use, improve efficiency of production, and minimize selection pressure for herbicide-resistant weeds.

> Promote grower acceptance of these weed management systems through education efforts targeting growers, crop consultants, input suppliers, industry representatives and extension educators in Indiana and surrounding states.

The major agronomic crops produced in Indiana that I have expertise in weed management include corn, soybean, small grains, forages, and pastures. These crops account for billions of dollars per year of the total Indiana farm receipts and tens of millions of dollars per year in weed management expenditures. I am a member of a number of advisory boards, including an appointment by the Governor to the Indiana Pesticide Review Board.

In addition to my research and extension responsibilities, I teach two on-campus courses, Botany 490, Botany Seminar, and Botany 505, Advanced Weed Science. Botany 490 is a course designed to improve students' ability to communicate science to the general public and develop professional skills such as resume development and interviewing. Botany 505 is a study of the biological characteristics of weeds and their impact on crop yields and other human activities. In addition to my formal responsibility for these courses, I have guest lectured in a number of other courses on various methods (chemical and non-chemical) of weed control for agronomic crops, proper herbicide use, herbicide resistance, and interactions between weeds and other plant pests.

In addition to faculty responsibilities, I have served in a number of administrative roles during my career as well. I served as the Extension Coordinator for the Department of Botany and Plant Pathology from 2006 until 2013 and as the Chair of the Graduate Studies Committee for the Botany and Plant Pathology Department from 2013 until 2019. For my primary professional society, the North Central Weed Science Society (NCWSS), I was the Communications and Newsletter Editor from 2001 until 2005, Chairman of the Extension Special Interest Group, Program Chair, Awards Chair, and served a 4 year term in the Presidential Rotation from 2006 until 2009. I am also a member of the Weed Science Society of America. I was elected as a Fellow of the NCWSS in 2011, which is the highest honor bestowed by the society.

**Case Specific Opinions for Karen Delorme-Barton**

I.    Introduction

The following is a summary of my case specific expert opinions in this case. These opinions are based on my review of materials relating to plaintiff Karen Delorme-Barton as set forth in my materials considered list, as well as my education, training, and experience which is set forth in my curriculum vitae.

II.   Alleged Use of Roundup

Ms. Karen Delorme-Barton "KDB" alleges use of glyphosate in residential settings from 1976 to 1986 at her parent's property in Palos Heights, IL; from 1988 to 2003 at her personal property in Roswell, GA; from 1987 to 2010, and in 2014 on her mother's property in Marietta, GA; and from 2010 to 2012 on her personal property in Savannah, GA (Second Amended PFS pg 8 and KDB Dep. Exhibit 2).

Palos Heights, IL 1976-1986

From 1976 to 1986 at her parent's property in Palos Heights, IL, KDB claims she used glyphosate concentrate in a pump sprayer or hose sprayer, and sprayed glyphosate once or twice a week for 1 to 2 hours each time from April through October (6-7 months) (KDB Dep. at 157 and exhibit 2).

Based on property records I reviewed, the property size was 10,500 square feet (roughly 1/4 of acre). See figure 1 for a Google Earth overhead image dated June 2016 and figure 2 for a Google Earth image dated October of 2019 of the front of the property. KDB testified she used glyphosate to treat an easement area or hill, 13 "beds", 1 vegetable garden (KDB Dep. at 10, 113 and Exh. 2), a hedge (KDP Dep. at 11) on both sides and back of her parent's house, and underneath three blue spruce trees (KDB Dep. at 112). She also mentions spraying in front of the house on the property across the street (KDB Dep. at 113). When asked how many times she would have to refill the 2 gallon pump up sprayer each time she sprayed, she stated that she had to mix up a new batch 4 to 6 times each time she sprayed (KDB Dep. at 154-55).  She stated that she would hold the spray wand low and close to the ground where the weeds were located, but sometimes she would hold the wand higher if she wanted to spray something further away from where she was standing (KDB Dep. at 155-56). She described the spray pattern as a stream (KDB Dep. at 155-56).  She stated that she occasionally sprayed on windy days (KDB Dep. at 163, 165). She claimed she sprayed 2 times per week for 1 to 2 hours each time at this site (KDB Dep. Exhibit 2). She would spot spray so as not to kill desirable vegetation and was pretty careful to only hit the weed she wanted to get rid of (KDB Dep. at 168). KDB described herself as "surgical", "precise", and "pretty accurate" in her application (KDB Dep. at 168-69).

She claimed that she never purchased glyphosate for use on this property, but that her father made the purchases (KDB Dep. at 99, 103, 106, 107, 117).

When applying glyphosate, KDB wore a 2-piece bathing suit, shorts, flip flops or tennis shoes, and no gloves (at 158). She claimed that her hands, arms, wrist, feet, legs, knees, face, shoulders, and stomach got wet from Roundup when spraying (KDB Dep. Exh. 2). She would shower before she went to bed (KDB Dep. Exh. 2). Clothes were thrown in the laundry, but she did not wash her flip flops (KDB Dep. Exh. 2).

Figure 1. Overhead image of the property at Palos Heights, IL that KDB claimed she treated with glyphosate.



Figure 2. Front view of the Palos Heights, IL property.



Roswell, GA and Marietta, GA

KDB also claims to have sprayed glyphosate from 1988 to 2003 at her personal property in Roswell, GA, and from 1987 or 1988 to 2010 on her mother's property in Marietta, GA (KDB Dep. Exhibit 2). She allegedly used glyphosate concentrate and premixed glyphosate in a Scott's pump sprayer or Ortho Dial-N-Spray applicator. See figures 3 and 4 for Google Earth images of the Roswell, GA residence, and figures 5 and 6 for Google Earth images of her mother's property at Marietta, GA.

Based on property records I reviewed, the Roswell property was 0.5327 acres. KDB claims to have treated 10 "beds", a fence, 2-3 hills, and some areas that were gravel. At the Marietta, GA address (her mother's residence), the area sprayed included 11 "beds", and a hill, and the property size was 1/4 to 1/5 of an acre. She claimed she would use the Dial N Spray applicator on the hills on these properties and the spray pattern from this applicator was spread out more than the pump-up sprayer (KDB Dep. at 174). The Dial N Spray applicator held 32 ounces of concentrate and she would fill it four to five times each time she sprayed the hills at the Roswell site (KDB Dep. at 177-78). She also claimed she would fill the pump-up sprayer four to six times when spraying these sites (KDB Dep. at 179). KDB stated that she could spray out an entire 32 oz of concentrate in 3-4 minutes with the Dial N Spray applicator (KDB Dep. at 120). KDB used the Dial N Spray applicator on the hills and the pump-up sprayer elsewhere (at 120). She claims to have used more than 32 oz of concentrate on each hill (KDB Dep. at 123).

KDB claims that this was the first site where she or her ex-husband (KDB Dep. at 12) purchased glyphosate, and that the purchases with cash were made at Home Depot, Pike's Nursery, Shemin's Nursery, and Lowe's (KDB Dep. at 104-06). She would buy 8 or 10 bottles of glyphosate each time, and that supply would not last an entire season (KDB Dep. at 118, 123). She could not remember how many times she would make this bulk purchase of glyphosate each year (KDB Dep. at 124). She claims that the small container sizes were 32 ounces and the larger size containers were twice as big (KDB Dep. at 119). She claims the small containers cost approximately $20 each and the large containers were $40 each (KDB Dep. at 124). When asked about her annual budget for purchasing glyphosate, she could not recall specific details on the amount spent each year or month (KDB Dep. at 125-29). KDB claims she was pretty accurate with her applications at these locations (KDB Dep. at 179) and was careful not to kill desirable vegetation.

At the Roswell, GA site, she claims she sprayed glyphosate 2-4 times per week for 1-2 hours each time from March through November (9 months). At her mother's home in Marietta, GA, the lot size was approximately 0.2 acre, and she claims she used glyphosate 3-4 times per week for 1-2 hours each time from March through November (KDB Dep. at 132).

When applying glyphosate at these sites, she wore a sleeveless t-shirt, shorts, flip flops or tennis shoes (KDB Dep. at 171). She claims that the same parts of her body were contacted by glyphosate as mentioned for the Palos Heights, IL site, except that she wore sleeveless T-shirts (KDB Dep. at 173).

55

Figure 3. Overhead image of the property in Roswell, GA.

56

Figure 4. Front views of the property in Roswell, GA.





Figure 5. Overhead images of the property in Marietta, GA





Figure 6. Front views of the property in Marietta, GA.







Savannah, GA

KDB claims to have used glyphosate from 2010 to 2012 on her personal property at 411 Southbridge Boulevard, Savannah, GA, which is described as a "villa" (at 54, 135) or a multi-residence complex like townhouse or apartment (see figure 7). The treatable area of this property was small. She claims she treated an open-air patio, and a strip 4 to 5 feet wide and 50 feet deep between the sod and the wetland near the property (KDB Dep. at 136 and Exhibit 2).

She claims she used glyphosate in a premixed formulation (KDB Dep. at 145, 181), 1-2 times per week for 30 minutes each time from March through November (9 months) (KDB Dep. at 136).

She claims she wore "more clothes" when applying glyphosate at this site during this time interval because she was concerned about skin cancer, but she did not specify what additional clothes she would wear (KDB Dep. at 181).

59

Figure 7. Overhead images of the Savannah, GA property.



Marietta, GA on her deceased mother's property

KDB also claims to have used glyphosate again on her deceased mother's property in Marietta, GA, in 2014, only after she passed away (figure 5). She claims she used glyphosate concentrate and a premixed glyphosate formulation (KDB Dep. Exhibit 2), 1-2 times per week from February through May (4 months), and also that she treated the yard (KDB Dep. at 141).

Other details regarding KDB's alleged glyphosate use

All told, KDB claims that she sprayed glyphosate for over 34 years, and for 6-9 months per year. She also claims that she sprayed the property of 2 homes for 15 years, 5-8 times per week, for 1-2 hours each time (KDB Dep. Exhibit 2).

KDB claims that she used glyphosate concentrate in a 2 gallon pump up sprayer for 2/3rds of the applications and the "Ortho Dial N Spray" applicator for 1/3 of the applications (KDB Dep. Exhibit 2). She also claims that she used a pre-mixed Roundup formulation (KDB Dep. Exhibit 2). She mostly used glyphosate concentrate over the years (KDB Dep. at 145). KDB referred to the type of spray pattern as a "jet" for the pump-up sprayer and as a "jet", "stream", or "wide" for the Ortho Dial N Spray. When she mixed glyphosate concentrate with water, the quantity of glyphosate added to each gallon of spray solution was 6 oz/gallon (KDB Dep. Exhibit 2 and KDB Dep. at 41). Her recollection of how long the spray solution would last during each application was 1 gallon/5 minutes for the pump-up sprayer and 1 gallon/30 seconds for the Ortho Dial N Spray (KDB Dep. Exhibit 2). KDB stated that she used the wand applicator to direct the spray away from her body when applying glyphosate (KDB Dep. at 138, 155, 156), and she held the wand low or below her waist (KDB Dep. at 155, 161). KDB stated that she

month, 19,008 oz or 148.5 gallons of glyphosate concentrate per year. If each gallon of glyphosate concentrate costs $80/gallon, the annual cost of treating for weeds at this site would be $11,880 and the total cost would be $178,200 for the 15 years she lived at this residence.

In my estimation, KDB's claims about the amount of glyphosate used are over 100 times more than would be needed to control weeds at these properties.

*Ms. Delorme-Barton likely had minimal contact with glyphosate*

KDB likely had minimal contact with glyphosate. Although KDB testified that she often wore minimal clothing when spraying Roundup, the Roundup labels for the products she likely used, which were approved by the EPA, do not require personal protective equipment. Further, although she did not avoid spraying on windy days, as recommended on many labels, she held the spray wand close to the ground when she was targeting weeds. In addition, the small pump-up sprayer that she was using does not generate significant pressure, and it delivers large, coarse droplets to the target, both of which minimize spray drift. Moreover, KDB testified that she was careful while mixing the product (KDB Dep. at 153), and had to be careful while spraying to not kill desirable vegetation (KDB Dep. at 155). For example, KDB says she had to apply very carefully around the hedges at her parent's house to not kill them. Further, when spraying the hills with the Ortho Dial N Spray, she was very careful not to kill grass or the Leyland Cypress trees, indicating no significant drift occurred (KDB Dep. at 176). KDB also testified that she was "pretty accurate" when spraying with the pump sprayer in Roswell and Marietta (*id.* at 179). KDB described applying in a "surgical" and "precise" manner, indicating she was accurate with her applications and there was no off-target movement. It is therefore unlikely that there was any significant spray drift during application. Moreover, glyphosate is practically non-volatile, meaning that she was unlikely to have come into contact with glyphosate vapor drift. Glyphosate based herbicides also dry quickly, limiting potential for contact with spray residues.

KDB also testified she got glyphosate on her hands while mixing because of the small mouth of on the loading opening of the spray equipment. However, spray equipment is typically designed with openings large enough to facilitate loading and mixing. KDB also testified that she tightened the spray container lids tight so they could maintain pressures which indicates it did not leak and likely did not result in glyphosate contact from this source.

*Dr. Conry's opinions are based on claims that exceed what would be needed to control weeds on these properties.*

Dr. Conry's opinions are based on claims that exceed what would be needed to control weeds on these properties. Dr. Conry states that KDB used glyphosate twice weekly at her parent's house in Palos Heights, IL, 3-4 times weekly at her home in Roswell, GA, 2-4 times weekly at her mother's home in Marietta, GA, 1-2 times weekly at her home in Savannah, GA, and another 1-2 times weekly in 2014 at her mother's home in Marietta, GA. Based on these claims, Dr. Conry concludes that KDB had over 3000 application sessions. Dr. Conry also states that many of these application sessions lasted over an hour and that KDB had considerable exposure. As discussed above, these claims regarding frequency and length of application far exceed what would be necessary to control weeds on these properties. In addition, based on physical and chemical

64