# EXHIBIT G

William G. Johnson, Ph.D., M.S.

```
 1                 UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF CALIFORNIA

 3   IN RE: ROUNDUP PRODUCTS        )   MDL No. 2741
                                    )
 4    LIABILITY LITIGATION          )   Case No. MDL No.
                                    )   3:16-md-02741-VC
 5   ------------------------       )
                                    )
 6    This document relates to:     )
                                    )
 7                                  )
     Karen Delorme-Barton v.        )
 8   Monsanto Company               )
                                    )
 9   Case No. 3:18-cv-01427-VC      )

10                            - - -

11              WILLIAM G. JOHNSON, PH.D., M.S.

12                  Monday, May 22, 2023

13                            - - -

14

15              Remote videotaped deposition of

16   WILLIAM G. JOHNSON, PH.D., M.S., held remotely at the

17   location of the witness, commencing at 10:04 a.m., on

18   the above date, before Juliana F. Zajicek, Registered

19   Professional Reporter, Certified Shorthand Reporter

20   and Certified Realtime Reporter.

21

22                            - - -

23              GOLKOW LITIGATION SERVICES
            877.370.3377 ph | 917.591.5672 fax
24                 Deps@golkow.com
```

**Exhibit G Page 1**

```
 1              A P P E A R A N C E S :
               (ALL PARTIES APPEARED REMOTELY)
 2


 3   ON BEHALF OF THE PLAINTIFF:


 4        WEITZ & LUXENBERG P.C.
          Fisher Building
 5        3011 West Grand Boulevard, 24th Floor
          Detroit, Michigan 48202
 6        313-800-4170
          BY:  GREGORY STAMATOPOULOS, ESQ.
 7             gstamatopoulos@weitzlux.com


 8
          WEITZ & LUXENBERG P.C.
 9        700 Broadway
          New York, New York 10003
10        212-558-550
          BY:  CHANTAL KHALIL, ESQ.
11             ckhalil@weitzlux.com


12
     ON BEHALF OF DEFENDANT MONSANTO COMPANY:
13
          HOLLINGSWORTH LLP
14        1350 I Street, N.W.
          Washington, DC 20005
15        202-898-5800
          BY:  DAVID I. SCHIFRIN, ESQ.
16             dschifrin@hollingsworthllp.com;
               NEIL S. BROMBERG, ESQ.
17             nbromberg@hollingsworthllp.com


18
     ALSO PRESENT:
19
          HANNA NOVAK, Paralegal
20        Weitz & Luxenberg P.C.


21


22   THE VIDEOGRAPHER:


23        CAROLIN DE LA ROSA,
          Golkow Litigation Services
24
```

William G. Johnson, Ph.D., M.S.

```
 1                    I N D E X

 2   WITNESS:                              PAGE:

 3    WILLIAM G. JOHNSON, PH.D., M.S.

 4        EXAM BY MR. STAMATOPOULOS...........    5

 5        EXAM BY MR. SCHIFRIN................  293

 6        FURTHER EXAM BY MR. STAMATOPOULOS....  297

 7

 8                    *****

 9                 E X H I B I T S

10   DR. WILLIAM JOHNSON EXHIBIT          MARKED FOR ID

11     No. 1     Dr. William Johnson's Supplemental    38
                 Materials Considered List
12
       No. 2     Document titled "Dimensions of        59
13               Discovery, Sponsored Program
                 Awards, May 2010"
14
       No. 3     Combination of documents titled       72
15               "Dimensions of Discovery,
                 Sponsored Program Awards," from
16               May 2010 to September 2020

17     No. 4     Spreadsheet titled "Sponsored        138
                 Program Awards Given to Professor
18               William G. Johnson at the
                 Department of Botany and Plant
19               Pathology at Purdue University"

20     No. 5     Roundup Ready Xtend Crop System      154
                 Channel YouTube video by Extension
21               Weed Scientist Dr. William Johnson
                 at Purdue University (Retained by
22               Counsel Stamatopoulos)

23     No. 6     Curriculum Vitae, Attachment A to    166
                 Dr. Johnson's report
24
```

```
 1                    E X H I B I T S

 2   DR. WILLIAM JOHNSON EXHIBIT              MARKED FOR ID

 3    No. 7     Purdue Extension, Weed Science       172
                article titled "Glyphosate -
 4              Manganese Interactions and Impacts
                on Crop Production: The
 5              Controversy," by Camberato, wise
                and Johnson
 6
      No. 8     Article titled "Glyphosate          233
 7              resistance threatens Roundup
                hegemony"
 8
      No. 9     Expert Report of William G.         257
 9              Johnson, Ph.D., M.S. Professor and
                Extension Weed Scientist,
10              Department of Botany and Plant
                Pathology, Purdue University
11
      No. 10    Defendant Monsanto Company's        289
12              Responses and Objections to
                Plaintiff's Notice to Take Oral
13              and Videotaped Deposition of
                William Johnson, Ph.D.
14

15

16

17

18

19

20

21

22

23

24
```

1   would want to know?

2         MR. SCHIFRIN:  Objection; assumes facts not in

3   evidence, beyond the scope, incomplete hypothetical.

4   BY THE WITNESS:

5         A.    Yeah, that's -- I don't -- I don't have

6   expertise in the toxicology area and -- and what

7   happens with inside a company is not something I -- I

8   would have any knowledge of.

9   BY MR. STAMATOPOULOS:

10        Q.    Do you know what a POEA stands for?

11        A.    It is an abbreviation for the -- the

12  tallow amine components that are used as a -- as part

13  of the Roundup -- some of the Roundup formulations.

14        Q.    Are you aware of whether the POEA has been

15  banned in the European Union?

16        MR. SCHIFRIN:  Objection; assumes facts not in

17  evidence, beyond the scope.

18  BY THE WITNESS:

19        A.    Yeah, I'm -- I'm not aware if that's true,

20  but it is an area outside my area of expertise.

21  BY MR. STAMATOPOULOS:

22        Q.    If it has been banned, the POEA in the

23  European Union, do you have any idea why?

24        MR. SCHIFRIN:  Objection; assumes facts not in

William G. Johnson, Ph.D., M.S.

1    medical opinion, about whether glyphosate or

2    glyphosate-based formulations are capable of causing

3    cancer?

4         A.    I am not a -- a cancer or toxicity expert,

5    so I will not offer opinions on whether or not

6    glyphosate causes cancer.

7              The opinions I would offer --

8         Q.    Is there a -- go ahead.

9         A.    The opinions I would offer is that the

10   USEPA is the regulatory agency that I rely on to

11   analyze the data and make that assessment and the

12   USEPA has determined that glyphosate is safe and

13   non-carcinogenic.

14        MR. STAMATOPOULOS:  I'm going to move to strike

15   the nonresponsive portion again.

16   BY MR. STAMATOPOULOS:

17        Q.    Sitting here today, you have no opinion

18   one way or another as to what caused or didn't cause

19   the plaintiff Karen Delorme-Barton's cancer, correct?

20        A.    I am not a cancer expert, so I'm not going

21   to comment on what caused her cancer.

22        Q.    Are you aware of the various routes of

23   exposure to herbicides, such as Roundup, in a human

24   being?

William G. Johnson, Ph.D., M.S.

1      MR. SCHIFRIN:  Objection; beyond the scope.

2  BY THE WITNESS:

3      A.    So I'm -- I'm aware that there are points

4  of potential contact, but in terms of being an

5  exposure expert, that's -- that's an area outside my

6  area of expertise.

7  BY MR. STAMATOPOULOS:

8      Q.    One route of exposure would be dermal

9  through the skin, correct?

10      MR. SCHIFRIN:  Objection; beyond the scope,

11  form.

12  BY THE WITNESS:

13      A.    Could you restate --

14      MR. SCHIFRIN:  Incomplete hypothetical.

15          Sorry.  You can go ahead.

16  BY THE WITNESS:

17      A.    Could you restate the question?

18  BY MR. STAMATOPOULOS:

19      Q.    Sure.

20          One route of exposure would be dermal

21  through the skin, correct?

22      MR. SCHIFRIN:  Same objection.

23  BY THE WITNESS:

24      A.    One route of -- of contact would be

William G. Johnson, Ph.D., M.S.

```
 1   BY THE WITNESS:

 2        A.    Yeah, so, again, my expertise comes in

 3   interpreting the words that are on the label and what

 4   they mean.  As far as how that impacts behavior,

 5   that's for someone that is -- is a behavioral expert.

 6   That's outside my area of expertise in terms of the

 7   behavioral response.

 8   BY MR. STAMATOPOULOS:

 9        Q.    Have you written any article on warning

10   labels?

11        MR. SCHIFRIN:  Objection; form.

12   BY THE WITNESS:

13        A.    I have not written any newsletter articles

14   on that topic.

15   BY MR. STAMATOPOULOS:

16        Q.    Does the word "warning" or the word

17   "label" appear anywhere in your CV?

18        A.    I have no idea.  I'd -- I'd have to do a

19   word search and see if it's in there.

20        Q.    Have you ever contributed to any textbook

21   or handbook of warnings?

22        MR. SCHIFRIN:  Object to form, vague.

23   BY THE WITNESS:

24        A.    I have not contributed any content in a
```

William G. Johnson, Ph.D., M.S.

1   body, that she was pretty accurate when making the

2   applications, she was very careful not to kill grass

3   or Leyland Cypress trees, indicating no spray drift

4   occurred, which means wind wasn't blowing the spray

5   around.  She was very careful not to kill desirable

6   vegetation.

7            And so, given the -- the care that she

8   takes -- that she took in making these spray

9   applications, it is just unlikely that she was ever in

10  a situation where she had contact with glyphosate.

11       Q.   And you read Ms. Barton's --

12  Delorme-Barton's deposition testimony, correct?

13       A.   Yes.

14       Q.   And do you recall her testimony in her

15  deposition stating that she was wet as a result of

16  spraying Roundup and that it was all over her legs,

17  arms, stomach, feet, clothes and shoes?

18       MR. SCHIFRIN:  Object to form.

19  BY THE WITNESS:

20       A.   So, yes, she indicated that those parts of

21  her body were wet, but the definition of "wet" can

22  mean different things to different people.  Wet could

23  be a couple of spray drops, all right.

24            Again, she was utilizing sprayer -- spray

William G. Johnson, Ph.D., M.S.

 1          THE VIDEOGRAPHER:  The time -- the time is

 2   6:04 p.m.  Off the record.

 3                   (WHEREUPON, a recess was had

 4                    from 6:04 to 6:05 p.m.)

 5          THE VIDEOGRAPHER:  The time is 6:05 p.m., back

 6   on the record.

 7                   FURTHER EXAMINATION

 8   BY MR. STAMATOPOULOS:

 9      Q.    Dr. Johnson, counsel for Monsanto just

10   asked you a few follow-up questions from the

11   deposition earlier, and I believe you testified that

12   herbicide resistance did not apply for residential

13   users.

14          Do you recall that testimony?

15      A.    The statement I made was herbicide

16   resistance is not a major problem for -- for the --

17   the residential users of glyphosate.

18      Q.    And what is the basis for your belief that

19   herbicide resistance is not a major problem for

20   herbicide users?

21      A.    We had a herbicide resistance testing

22   program a few years ago.  We -- we received no samples

23   whatsoever to test from the residential market.  They

24   all come from agronomic crops.  And we simply do not

**Exhibit G Page 10**

1   get questions from home -- homeowners about

2   herbicide-resistant weeds in -- in residential

3   settings.  All of the questions come from agronomic

4   crops.

5       Q.    So is it my understanding that you have no

6   data or information with respect to herbicide

7   resistance for residential users?

8       MR. SCHIFRIN:  Objection; mischaracterizes his

9   testimony.

10  BY THE WITNESS:

11      A.    My testimony was it hasn't been a problem

12  expressed by the clientele that I serve.  And what

13  that -- what that implies then, when we don't get

14  samples sent in for testing, we don't get phone calls

15  or things like that, that it isn't a problem for that

16  audience because if that audience had a problem, they

17  are -- they are an audience that's not bashful about

18  calling County-Level Extension.

19  BY MR. STAMATOPOULOS:

20      Q.    So that -- is that the sole basis for your

21  conclusion that herbicide resistance is not a major

22  problem for residential users is because you didn't

23  receive any calls to the hotline?

24      A.    Well, we -- we don't have what we call a

 1  hotline.  We have County-Level Extension, we have

 2  extension offices in over 70 of our 92 counties, we

 3  had a herbicide resistance testing program through our

 4  Plant Pest Diagnostic Lab that's housed in our

 5  department a few years ago, and we didn't get any

 6  residential samples sent in to the PPDL, and I stay in

 7  contact with our county offices and we've never had a

 8  herbicide resistance call come in from a -- from a

 9  consumer in the state of Indiana regarding a herbicide

10  resistant weed in a residential setting.

11       Q.    Have you ever received any calls from

12  consumers in Georgia with respect to herbicide

13  resistance?

14       A.    We -- well, our -- our county offices

15  serve the State of Indiana.  Our PPDL serves Indiana

16  and many other states.  So when we did our herbicide

17  resistance testing program through the Plant Pest

18  Diagnostic Lab, we received samples from probably 15

19  different states, and I don't recall which ones they

20  were, but they would be ones east of the Mississippi

21  River.

22       Q.    Is it your claim that not a single

23  residential user has encountered herbicide resistance

24  to an herbicide?

1      MR. SCHIFRIN:  Objection; mischaracterizes his

2   testimony.

3   BY THE WITNESS:

4      A.    No.  My -- my answer to the question about

5   herbicide resistance in residential areas was based on

6   the fact that we did not have samples sent in to our

7   PPDL and our -- we have never had a

8   herbicide-resistant weed problem in a residential site

9   reported to one of our county offices.

10  BY MR. STAMATOPOULOS:

11     Q.    Just because it wasn't reported does it

12  mean that it is not a problem?

13     MR. SCHIFRIN:  Objection; argumentative.

14  BY THE WITNESS:

15     A.    So if it were a problem, our County

16  Extension ag and natural resource educators do a great

17  job of keeping their fingers on the pulse of their

18  communities, and the information would have filtered

19  back to our group as the Weed Science group at Purdue

20  if it were a major problem that required us to address

21  it with educational efforts.

22  BY MR. STAMATOPOULOS:

23     Q.    Earlier David had asked you about LD50.

24         Do you recall that?

William G. Johnson, Ph.D., M.S.

```
 1                    REPORTER'S CERTIFICATE

 2

 3              I, JULIANA F. ZAJICEK, a Registered

 4    Professional Reporter and Certified Shorthand

 5    Reporter, do hereby certify that prior to the

 6    commencement of the examination of the witness herein,

 7    the witness was duly remotely sworn by me to testify

 8    to the truth, the whole truth and nothing but the

 9    truth.

10              I DO FURTHER CERTIFY that the foregoing is

11    a verbatim transcript of the testimony as taken

12    stenographically by me at the time, place and on the

13    date hereinbefore set forth, to the best of my

14    availability.

15              I DO FURTHER CERTIFY that I am neither a

16    relative nor employee nor attorney nor counsel of any

17    of the parties to this action, and that I am neither a

18    relative nor employee of such attorney or counsel, and

19    that I am not interested directly or indirectly in the

20    outcome of this action.

21

22

23              Juliana F. Zajicek

24              JULIANA F. ZAJICEK, Certified Reporter
```

**Exhibit G Page 14**