Robin Greenwald (*Pro Hac Vice*)
**WEITZ & LUXENBERG, P.C.**
700 Broadway, Fifth Floor
New York, NY 10003
Telephone: (212) 558-5802
Facsimile: (212) 344-5461
rgreenwald@weitzlux.com

*Attorney for Plaintiff*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741<br><br>Case No. 3:16-md-02741-VC |
| This document relates to:<br><br>*Karen Delorme-Barton v. Monsanto,*<br>3:18-cv-01427-VC | **PLAINTIFF'S REPLY IN SUPPORT OF *DAUBERT* MOTION TO PRECLUDE THE OPINIONS AND TESTIMONY OF MONSANTO COMPANY'S PROPOSED EXPERT DR. GRAHAM SLACK, M.D.** |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that, on a date and time set by the above-captioned court, or as otherwise ordered by District Judge Vince Chhabria, Plaintiff will and hereby moves to preclude the Opinions and Testimony of Monsanto Company's Proposed Expert Dr. Graham Slack, M.D.

This reply in support of Plaintiff's motion to exclude the testimony of Dr. Graham Slack, M.D. is based on this supporting memorandum, all pleadings and papers on file in this matter, and such further oral and documentary evidence and papers as the Court may consider at the time of the hearing.

Dated July 28, 2023                                            Respectfully submitted,

                                                    By:    */s/ Robin L. Greenwald*
                                                           Robin L. Greenwald (*Pro Hac Vice*)
                                                           **WEITZ & LUXENBERG, P.C.**

700 Broadway, Fifth Floor
New York, NY 10003
Telephone: 212-558-5802
Facsimile: (212) 344-5461
rgreenwald@weitzlux.com

*Attorney for Plaintiff*

PLAINTIFF'S REPLY IN SUPPORT OF DAUBERT MOTION TO PRECLUDE THE OPINIONS AND
TESTIMONY OF MONSANTO COMPANY'S PROPOSED EXPERT DR. GRAHAM SLACK, M.D.

**INTRODUCTION**

Plaintiff Karen Delorme-Barton ("Plaintiff") respectfully submits this reply in support of her motion for an Order precluding the testimony of Defendant Monsanto Company's ("Defendant" or "Monsanto") causation expert Dr. Graham Slack, ECF No. 27 ("Motion" or "Mtn"). For the reasons set forth below, Plaintiff seeks to preclude Dr. Slack from offering opinions that Plaintiff's NHL was caused by "bad luck" and/or random genetic mutations, rather than environmental factors, as well as his opinion that glyphosate use and NHL incident rates are inversely correlated.

**ARGUMENT**

I.  **In Addition to Dr. Slack's Lack of Qualifications to Offer Opinions Based upon the Controversial and Novel "Bad Luck" Causation Theory, Dr. Slack's Opinions Arising from the "Bad Luck" Theory Are Based Upon Unreliable, Speculative, and Unsound Methodologies that Are Not Generally Accepted in the Scientific Community.**

Defendant Monsanto's claim that Dr. Slack is qualified to provide an expert opinion on the "bad luck" theory because he is a pathologist is not persuasive in the context of the novel and controversial opinions he intends to offer in this case. "Defendant's argument boils down to the logically flawed premise that because Dr. [Slack] is trained as a scientist, []he is therefore qualified to review lab reports in any field of science, regardless of whether []he is familiar with the particular subject and methodologies used therein." *Gunaratna v. Dennis Gross Cosmetology LLC*, No. 20-2311, 2023 WL 2628620, at *9 (C.D. Cal. Mar. 15, 2023). Defendant's contention is belied by Ninth Circuit principles: "Courts regularly find that an expert's qualifications in one field do not automatically translate to qualification to opine in a separate field, even if those fields are related in some general sense." *Id.* at *10 (citing and quoting *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 841 (9th Cir. 2001) ("[A] very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have

conducted independent of the litigation"). The "bad luck" theory as it relates to cancer causation is a novel and, simply stated, controversial opinion. Dr. Slack has no expertise related to genetics that would allow him to interpret a controversial theory, like Dr. Tomasetti's theory, and attribute it to the Plaintiff for the purposes of specific causation; *i.e.*, that bad luck is the cause of her NHL. Due to his lack of qualifications to reach that specific causation opinion, this Court should not now allow him to offer such novel and controversial opinions based in genetics. Permitting Dr. Slack to do so at trial will only confuse and mislead the jury.

Setting Dr. Slack's lack of qualifications aside, his opinion, based upon Dr. Tomasetti's theory is not generally accepted. In support of this argument, Plaintiff adopts and incorporates the papers filed in support of Plaintiff's motion to preclude Dr. Tomasetti's opinions.

Monsanto's attempt to conflate the plaintiffs' experts' testimony in other Roundup litigation with Dr. Tomasetti's theories is fatally flawed. The medical experts for plaintiffs in other Roundup cases attribute NHL to exposure to glyphosate-based Roundup, and do not rely upon – let alone endorse – the controversial "bad luck" theory. The plaintiffs' medical experts consider a litany of evidence based in toxicology and epidemiology, amongst other medical and scientific evidence, to form their opinions. The fact that one plaintiff's expert answered questions from the defense recognizing that some cancers may be caused by random mutations is highly distinct from Dr. Tomasetti's theory that over 95 percent of NHL cases are caused exclusively by bad luck, and certainly does not convert Dr. Tomasetti's theory into a generally accepted scientific principle. Indeed, to counsel's knowledge, not a single plaintiff's expert has given credence to Dr. Tomasetti's controversial theory.

Even if there were general acceptance of Dr. Tomasetti's theory, it would not end the inquiry – as there is no evidence that Dr. Slack can point to that would independently and medically

link Plaintiff's NHL to Tomasetti's "bad luck" theory. Most notably, Defendant fails to address the well-established rule within the Ninth Circuit that a medical causation expert "cannot blindly rely on the statistician's reports in forming his medical causation opinion." *In re Incretin-Based Therapies Prod. Liab. Litig.*, 524 F. Supp. 3d 1007, 1043 (S.D. Cal. 2021), *aff'd*, No. 21-55342, 2022 WL 898595 (9th Cir. Mar. 28, 2022). An expert may rely upon the opinions of others "only if 'the record demonstrates that the expert conducted an independent evaluation of that evidence.'" *Gunaratna*, 2023 WL 2628620, at *10 (quoting *In re Conagra Foods, Inc.*, 302 F.R.D. 537, 556 (C.D. Cal. 2014)). Dr. Slack cannot, through any medical evidence, link Ms. Delorme-Barton's NHL to Tomasetti's "bad luck" theory. Specifically, Dr. Slack testified that he cannot point to any evidence in any of Ms. Delorme-Barton's medical records, other than the fact that she had a t(14;18) chromosomal translocation (which he does not know the cause of) that affirmatively supported his opinion that her NHL was specifically caused by "bad luck." Greenwald Decl. in support of Motion, Exhibit A, ECF No. 27-2, at 154:20-166:14. Plaintiff's specific translocation is characteristic of NHL as it is present in 70-90 percent of follicular lymphoma cases and, thus, is to be expected. Greenwald Decl., Exhibit O, ECF No. 27-16, at 2, Chiu, B.C., *et al.,* (2008) *The utility of t(14;18) in understanding risk factors for non-Hodgkin lymphoma*, J. Natl. Cancer Inst. Monogr., (39):69-73. It is noteworthy that Dr. Slack highlighted Plaintiff's t(14;18) translocation, as there is a body of evidence indicating that the "presence of the t(14;18) is not sufficient for the development of NHL because it occurs in healthy individuals at a frequency of 10-50%" and findings "suggest that pesticides contribute to the development of NHL through pathways involving the t(14;18)." *Id*. at 5. When asked whether there was anything in Plaintiff's diagnostic images (x-rays, CT scans, MRIs) that affirmatively proves that random replicative errors caused her NHL, Dr. Slack testified:

> Q: What words actually affirmatively prove? I want you to give me a sentence, a line, any words that you believe affirmatively prove your opinion that Karen Delorme-Barton's follicular lymphoma was caused by random replicative errors. Go ahead. . . .
>
> A: There will be no words.

Greenwald Decl., Exhibit A, at 163:12-21. As it relates to whether Ms. Delorme-Barton's medical records could affirmatively prove that "bad luck" caused her NHL, he testified: "I'm trying to prove a negative here so there's not going to be much to point to." *Id.* at 165:22-166:14.

Accordingly, Dr. Slack's opinions boil down to reliance on an inadmissible opinion by another Monsanto expert, Dr. Tomasetti. Furthermore, Dr. Slack has not, from a medical causation perspective, independently analyzed the data from the Tomasetti articles: "A: I have not reviewed that raw data, no." *Id.* at 152:12-15. At its core, Dr. Slack's specific causation opinions are not his own but rather parrot the opinions of Monsanto's general causation expert. As stated above, Dr. Tomasetti's opinions are, *inter alia*, unreliable, speculative, and incapable of being tested. Those same grounds preclude Dr. Slack from relying on those opinions. Moreover, expert testimony that simply parrots another individual's testimony without independent evaluation is inadmissible. *See, e.g.*, *Gunaratna*, 2023 WL 2628620, at *9-10 (an expert may rely upon the opinions of others "only if 'the record demonstrates that the expert conducted an independent evaluation of that evidence.'" (quoting *In re Conagra Foods, Inc.*, 302 F.R.D. 537, 556 (C.D. Cal. 2014))) (collecting cases); *Santa Clarita Valley Water Agency v. Whittaker Corp.*, No. 18-06825, 2021 WL 4338973, at *7 (C.D. Cal. Aug. 13, 2021) ("Such impermissible parroting is not immunized by a cursory statement that the conclusions reflected Dawson's own experience in the field."); *Guidroz-Brault v. Missouri Pac. R. Co.*, 254 F.3d 825, 830 (9th Cir. 2001) (affirming exclusion of portions of expert's opinion based on an "assumption [that] finds no support in the physical facts as described by the reports and other evidence in the record").

Additionally, any specific causation opinions reliant upon Dr. Tomasetti's "bad luck" theory are clearly unreliable because Dr. Tomasetti's theory is based upon the stem cell division rates, which, according to Dr. Slack's opinions, are not applicable to Plaintiff's NHL. This argument, raised in Plaintiff's original motion papers to exclude Dr. Slack, has also gone unaddressed by Monsanto in its opposition papers. Moreover, Dr. Slack has opined that Plaintiff had a chromosomal translocation t(14;18) that was a "necessary but not sufficient abnormality to develop what we call classic follicular lymphoma." Greenwald Decl., Exhibit A, at 123:7-17, 124:18-125:1. He does not know what caused that translocation: "Q: Do you have any evidence of what would have caused the translocation? A: Do I have evidence of what would have caused that translocation in Ms. Delorme-Barton, no." *Id*. at 125:2-5. In the matter of *Griswold v. Monsanto*, Monsanto's own medical expert, Dr. David Grinblatt, stated that Dr. Tomasetti's "bad luck" theory is not related in any way to the development of NHL. Greenwald Decl., Exhibit M, ECF No. 27-14, at 125:3-12, 205:15-206:23, 48:20-23, 71:10-12, 225:13-16.

Monsanto's other expert in this matter, Dr. Navarro, likewise admits that follicular lymphoma does not originate with the stem cell division rate that underpins Dr. Tomasetti's "bad luck" theory: "Q: So let me ask you with regard to follicular lymphoma, do you believe follicular lymphomas originate with stem cells? A: I don't think so because the follicular lymphomas are farther along in the development pathway for B cell development, so not, they're not stem cell like, no." Greenwald Decl., Exhibit D, ECF No. 26-5, at 76:11-16. Dr. Navarro further testified that he could not state that Ms. Delorme-Barton's chromosomal translocation was related to stem cell divisions. Specifically, he testified:

> "[W]ell, it's a translocation 8 between chromosomes, so it, directly related to stem cell division, I, I don't know that we can say, but it's certainly that in the course of that cell's life that was the first cell to develop this mutation, there was a switch in chromosomal material between the two chromosomes that the IgH and the BCL2 chromosomes . . . .

*Id.* at 77:7-14. Yet Dr. Tomasetti's theory is based on the division rate of hematopoietic stem cells, which divide and replicate frequently. Thus, pursuant to Dr. Slack's opinions related to the chromosomal translocation, along with other Monsanto medical experts' opinions, the estimated rate of division in hematopoietic stem cells is irrelevant here.

Additionally, Dr. Tomasetti's mutation rate is based on how often *point mutations* occur in these hematopoietic stem cells, which is a different type of mutation than the *chromosomal translocation* that Dr. Slack believes caused and/or was a marker of Ms. Delorme-Barton's NHL. *See* Greenwald Decl., Exhibit A, at 124:14-125:5. Point mutations involve substitutions or changes that occur at a single location along a chromosome; by contrast, chromosomal translocations involve a situation where fragments of chromosomes break off and reattach to different chromosomes. While Dr. Slack "can rely on the published research of others to support [his] findings," in such scenarios, district courts are permitted to "plumb the depths of the precise relationship between the materials cited and the conclusions drawn." *Cloud v. Pfizer, Inc.,* 198 F. Supp. 2d 1118, 1132 (D. Ariz. 2001) (excluding expert psychiatrist's testimony) (internal citations omitted). In this instance, the relationship between Dr. Tomasetti's study and Dr. Slack's conclusions is simply too tenuous. Because Slack's reliance on Tomasetti's study is in direct conflict with his own statements regarding the development and etiology of Plaintiff's cancer, *i.e.*, chromosomal translocations, the Court should exclude his testimony. *See Davis v. McKesson Corp.,* No. 18-1157, 2019 WL 3532179, at *17 (D. Ariz. Aug. 2, 2019) (excluding plaintiff's experts because "[p]laintiff's experts cite some studies without acknowledging that the studies' results or the authors conclusions are inconsistent with the expert's opinions."); *Jones v. U.S.*, 933 F. Supp. 894, 898 (N.D. Cal. 1996) (excluding experts who relied on studies that yielded inapposite conclusions to what the experts were proposing) ("This tactic does not qualify as good science.").

Based upon the foregoing, the Court should grant Plaintiff's motion to preclude Dr. Slack's opinions that "bad luck" and/or "random" genetic mutations caused the Plaintiff's NHL.

## II.     Dr. Slack Cannot Not Discuss "Risk Factors" Of Plaintiff's NHL.

Finally, Monsanto argues that Dr. Slack should not be precluded from offering testimony concerning other potential risk factors because the absence of other risk factors is part of his specific causation opinion. *See* Defendant Monsanto Company's Response in Opposition to Plaintiff's Motion to Exclude Dr. Graham Slack's Testimony, ECF No. 38 ("Opp.") at 9-11. This argument is specious. If Dr. Slack is permitted by the Court to offer a specific causation opinion that "bad luck" caused the Plaintiff's NHL (which he should not be), Monsanto can simply elicit testimony by Dr. Slack that he ruled out any other potential risk factors as causative of Plaintiff's NHL in forming those opinions without disclosing the potential non-causative specific risk factors he considered. But at its core, Dr. Slack does not attribute any external or exogenous risk factor to causing any of the Plaintiff's NHL; it is Dr. Slack's opinion that "bad luck" is the sole cause of the Plaintiff's NHL. Any potential or possible non-causative risk factors related to the Plaintiff's NHL would be pure speculation, irrelevant to Dr. Slack's specific causation opinions or Monsanto's defense, confusing, misleading, and unduly prejudicial.

## III.    Dr. Slack Must Be Precluded from Testifying that Glyphosate Use and NHL Incident Rates Are Inversely Correlated.

Monsanto's opposition brief on the issue of comparing the rates of glyphosate usage versus the incident rate of NHL raises more questions than provides answers as Monsanto admits that Dr. Slack does not rely upon this information to claim that glyphosate did not cause Plaintiff's NHL. *See* Opp. at 12 ("It is important to recognize that nowhere in Dr. Slack's expert report does he state that due to evidence of the increasing trend in glyphosate usage and the decreasing trend of NHL in the United States, Roundup does not cause cancer, despite Plaintiff's inferences suggesting

otherwise."). If Dr. Slack is not relying upon that data for the purposes of his causation opinions, what purpose could the data serve other than to confuse and deceive the jury? In light of its admitted lack of probative value according to defense counsel and its ability to prejudice Plaintiff, this testimony must be precluded.

Setting aside Defendant's misguided effort to obscure the fatal flaws in Dr. Slack's comparison,[1] Monsanto has failed to address the crux of the Plaintiff's argument that the data sets underpinning Dr. Slack's claim that the NHL incident rate has not followed the increased usage of glyphosate is like comparing "apples to oranges." When conducting his comparison, Dr. Slack did not ascertain the geographic scope of either of the two data sets he compared – information, notably, that is publicly available.[2] Instead, Dr. Slack baselessly assumed that both data sets cover the same scope geographies and populations "until proven otherwise." Greenwald Decl., Exhibit A, 194:23-198:12 ("I would assume it's representative until proven otherwise" and "I'm making the assumption that the data is representative so I'm comparing apples to apples until proven otherwise."). As a result, at his deposition, Dr. Slack could not identify the population he was relying upon as support for the claim that there was an increase in glyphosate usage, nor could he identify which states served as the raw data for the NHL incident rates. *Id.* Thus, neither Monsanto nor Dr. Slack can show that both rates are comparable and/or "representative of the population in question," as Dr. Slack incorrectly assumed. Greenwald Decl., Exhibit A, 192:21-198:12.

---

[1] Defendant's opposition mischaracterizes Plaintiff's argument, couching it as an issue with the underlying SEER data's reliability. Opp. at 12-13. To the contrary, Plaintiff takes no issue with the reliability of the SEER data. Rather, it is Dr. Slack's misunderstanding and misrepresenting the actual scope of the SEER data that renders his testimony inadmissible.

[2] *See* About the SEER Registries, National Cancer Institute, https://seer.cancer.gov/registries/; Map of Estimated Agricultural Use for Glyphosate, 2014, U.S. Geological Survey, https://water.usgs.gov/nawqa/pnsp/usage/maps/show_map.php?year=2014&map=GLYPHOSATE&hilo=L&disp=Glyphosate.

Critically, the states with the highest glyphosate usage nationwide do not participate in the SEER program. *Compare* Greenwald Decl., Exhibit Q, ECF No. 27-18, Map of Estimated Agricultural Use for Glyphosate, 2014, U.S. Geological Survey, *with* Exhibit P, ECF No. 27-17, Map of States Contributing to SEER. Moreover, the glyphosate usage data was collected from multiple sources that captured different time periods and were integrated together. Monsanto does not dispute these facts in its opposition. Because the data sources do not in fact represent the entire U.S. population, as Dr. Slack admittedly assumed, but instead compares populations that do not broadly overlap, Dr. Slack's comparison is unfounded and unreliable.

Given the admitted lack of foundation, absence of probative value, and the likelihood of prejudice to Plaintiff of such testimony, Dr. Slack must be precluded from testifying that glyphosate use and NHL incident rates are inversely correlated.

## CONCLUSION

For the reasons set forth in Plaintiff's moving papers and above, the Court should grant Plaintiff's Motion to preclude Dr. Slack from offering opinions that Plaintiff's NHL was caused by "bad luck" and/or random genetic mutations, rather than environmental factors, as well as his opinion that glyphosate use and NHL incident rates are inversely correlated.

Dated July 28, 2023                                             Respectfully submitted,

                                                    By:   */s/ Robin L. Greenwald*
                                                          Robin L. Greenwald
                                                          **WEITZ & LUXENBERG, P.C.**
                                                          700 Broadway, Fifth Floor
                                                          New York, NY 10003
                                                          Telephone: 212-558-5802
                                                          Facsimile: (212) 344-5461
                                                          rgreenwald@weitzlux.com

                                                          *Attorney for Plaintiff*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 28th day of July 2023, a copy of the foregoing was filed with the Clerk of the Court through CM/ECF system which sent notice of the filing to all appearing parties of record.

*/s/ Robin Greenwald*

*Attorney for Plaintiff*