# EXHIBIT A

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                 NORTHERN DISTRICT OF CALIFORNIA

 3                        MDL NO: 2741

 4   *********************************

 5   IN RE: ROUNDUP PRODUCTS
     LIABILITY LITIGATION
 6

 7   This document relates to:

 8   Peter Engilis v. Monsanto Co.
     Case No. 3:19-cv07859-vc
 9

10   *********************************

11

12

13

14

15

16             The remote video deposition of ANDREW

17          SCHNEIDER, M.D., held via Zoom webconference

18          on August 9, 2022, commencing at

19          approximately 2:02 p.m. ET.

20

21

22

23

24

25   REPORTER: Alan Peacock, RDR, CRR, CCR
```

```
  1                    A P P E A R A N C E S

  2    ON BEHALF OF THE PLAINTIFF:

  3         SCHLESINGER LAW OFFICES, PA
            1212 Southeast Third Avenue
  4         Ft. Lauderdale, Florida 33316
            954-467-8800
  5
            BY: JEFFREY LOUIS HABERMAN, ESQ
  6              jhaberman@schlesingerlaw.com

  7    ON BEHALF OF THE DEFENDANT:

  8         HOLLINGSWORTH LLP
            1350 I Street, N.W.
  9         Washington, D.C. 20005
            202-898-5800
 10
            BY: JOHN M. KALAS, ESQ
 11              jkalas@hollingsworthllp.com

 12         BY: LOUIS M. RUSSO, ESQ.
                 lrusso@hollingsworthllp.com
 13

 14    COURT REPORTER:

 15         L. ALAN PEACOCK, FAPR, CRC, CCR, RDR
            Realtime Systems Administrator
 16         Golkow Litigation Services

 17    VIDEOGRAPHER:

 18         JOHN FISLER

 19

 20

 21                            - - -

 22

 23

 24

 25
```

Andrew Schneider, M.D

1    documents, now this -- where it's called internal

2    documents here, what do you mean by calling these

3    internal documents?  What's that mean?

4         A.   I didn't label them internal documents.  But

5    basically, these are, I think, requests for production

6    to Monsanto or other makers of glyphosate where there

7    was some emails and discussions.

8         Q.   Okay.  You said you didn't label them

9    internal documents.  Did you not create this list?

10        A.   I endorsed this list but I did not type this

11   list, no.

12        Q.   Okay.  Did counsel type this list?

13        A.   I don't know who typed the list, but I didn't

14   type it.

15        Q.   How did you receive the list?

16        A.   This list?  By email.

17        Q.   Okay.  From whom did you receive the list?

18        A.   Either Mr. Haberman or his paralegal.

19        Q.   Okay.  Do you intend to offer opinions

20   regarding any of the documents listed as internal

21   documents in the Engilis case?

22             MR. HABERMAN:  I object to the form of the

23        question.

24   BY MR. KALAS:

25        Q.   Dr. Schneider, you can answer the question

1    report about the association of CLL and melanoma; so I

2    think there was no reference to what I was saying, so I

3    think I just gave you two references.

4        Q.   Got it.  Okay.  Perfect.  Thank you.

5        A.   Sure.

6        Q.   Okay.  Going to Exhibit 3 -- well, actually

7    going back to Exhibit 2, Exhibit 2 says you're going to

8    offer opinions on both general causation and specific

9    causation; right?

10       A.   Yes.

11       Q.   So going to Exhibit 3 -- and feel free to

12   refer to Exhibit 3 as much or as little as you need

13   to -- can you walk me through your methodology, first,

14   in reaching your general causation opinion in the

15   Engilis matter that Roundup is capable of causing CLL?

16       A.   Sure.  So I reviewed all of the available

17   pertinent literature including animal data,

18   epidemiologic data; I reviewed meta-analysis, case

19   control studies, cohort studies; and I formed an

20   opinion based upon the epidemiologic and animal data

21   whether Roundup causes NHL and specifically CLL.

22       Q.   Okay.  And you said NHL and specifically CLL.

23   Do you hold the opinion that Roundup causes NHL

24   generally?

25       A.   I believe to a reasonable degree of medical

1    certainty that, yes, Roundup is an etiologic agent that

2    causes NHL.

3          Q.    Okay.  And likewise, do you hold the opinion

4    that Roundup causes the specific NHL subtype CLL?

5          A.    I do.

6          Q.    And the methodology that you employ to

7    determine whether Roundup causes NHL generally, can you

8    just explain that to me and then we will go to the CLL

9    after.

10         A.    Sure.  Well, as I'm sure you're aware --

11               MR. HABERMAN:  Asked and answered.  Go ahead.

12               THE WITNESS:  I did answer, but I will do it

13         again.

14               MR. HABERMAN:  That's fine.

15               THE WITNESS:  So I'm sure you're aware that

16         the studies -- some look at NHL in general, some

17         break it down by subtype, some by exposure.

18               So I have reviewed, first, animal data and

19         then epidemiologic data.  You can see from my

20         report I reviewed -- I think it's six or seven

21         main studies, and then I reviewed multiple

22         meta-analysis or pool studies to reach my opinion

23         to a reasonable degree of medical certainty that

24         Roundup is an etiologic agent that causes NHL and

25         then, based upon reviewing some of these studies,

```
 1              So let my ask my question, and you can
 2    object.  So my question is:  Do veterinary pathologists
 3    classify malignant lymphoma the same way human
 4    oncologists classify non-Hodgkin's lymphoma?
 5              MR. HABERMAN:  Objection to the scope.
 6              THE WITNESS:  There's no way I can tell what
 7         a veterinary pathologist does.  I'm not a
 8         veterinary pathologist nor do I deal with them.  I
 9         am, however, able to read the literature, which
10         clearly states that the CB1 mouse exposed to
11         glyphosate develops NHL.
12    BY MR. KALAS:
13         Q.   We will look at some of that literature in a
14    bit.  But thank you.  Let's keep going.
15              Let's go to your methodology for your
16    specific causation opinions.  Can you walk me through
17    your methodology in reaching your conclusions on
18    specific causation in the case of Mr. Engilis?
19         A.   Sure.  I looked at all of the etiologic
20    factors that cause CLL.  And I think they're in my
21    report.  There are autoimmune diseases.  There are
22    viral exposures.  There are occupational exposures.
23    There are immunosuppressive drugs.  So I look through
24    all of the possible causes of CLL.
25              Let me go through my report one second.
```

```
 1              So I say that having acquired

 2    immunodeficiency syndrome, autoimmune diseases,

 3    infection, previous lymphoma, certain drugs,

 4    occupational/environmental exposures, family history of

 5    malignancies -- so I went through all of the possible

 6    etiologic agents for CLL and ruled them out to a large

 7    degree.  And then, in my mind, a reasonable degree of

 8    medical certainty is left, Roundup, the 24-year

 9    exposure, as the most probable etiologic agent for the

10    development of CLL to a reasonable degree of medical

11    probability and certainty.

12         Q.   So we will get into that a little more detail

13    in a bit.  Are all of those things you just outlined

14    listed here on page 10 that I have up on the screen?

15         A.   I believe so, yes.

16         Q.   And so you conducted what is known as a

17    differential etiology in reaching your opinion that

18    Mr. Engilis's Roundup use caused or contributed to his

19    CLL; correct?

20         A.   Correct.

21         Q.   Okay.  Now, in the text of the report, and

22    again on the amended reliance list, which is Exhibit 5,

23    you talk about the fact that you have relied upon --

24    I'm going up here to page 1 -- and incorporated by

25    reference the expert report for Christopher Portier,
```

```
 1    Dennis Weisenburger and Ron Schiff.  Do you see that?
 2         A.   I do.
 3         Q.   Before we get into that and who they are and
 4    what have you, what do you mean by "incorporate by
 5    reference"?
 6         A.   Just that I reviewed those reports, looked up
 7    what they said, and then reached my own conclusions.
 8         Q.   So when you say "incorporate by reference,"
 9    you don't mean that you have adopted every single
10    opinion they have, and you're going to tell the jury
11    those objections.
12              MR. HABERMAN:  Objection.
13              THE WITNESS:  Yes.  That is correct.
14    BY MR. KALAS:
15         Q.   Are there any portions of Dr. Portier --
16    well, we will take them in turn so that we have clean
17    questions here.  Are there any portions of
18    Dr. Portier's report that you are not relying on here?
19              MR. HABERMAN:  Objection.
20              THE WITNESS:  Again, I don't have them
21         memorized.  We would have to pull them up and look
22         at them to answer that question.
23    BY MR. KALAS:
24         Q.   Same question for Dr. Weisenburger and Dr.
25    Schiff?
```

1      A.   Yes.  They're lengthy reports.  I don't have

2  them memorized.  If you have a specific question, I can

3  call up the report.

4      Q.   Are you aware that portions of Dr. Portier's

5  opinions on the animal data were excluded by the same

6  court that you're offering opinions in here?

7      A.   I don't know which opinion you're talking

8  about; and, no, I don't know anything about illegal

9  maneuvers.  But, again, you haven't even asked me what

10  I'm relying on from Portier's report, because you

11  haven't shown it to me yet.  What I am relying on is

12  data from the CB1 mouse that shows glyphosate causes

13  NHL.

14      Q.   So you're relying on -- that's one thing

15  you're relying on, Dr. Portier's report, data from CB1

16  mice that shows, in your opinion, glyphosate causes

17  NHL.  What -- are you relying on his entire animal

18  section?  Only portions of that?

19      A.   Again, to be fair, if you're going to talk

20  about the report, you have to show it to me.

21      Q.   Well, let me ask you this -- well, strike

22  that.  I'll come back to that.

23           Now, Dr. Shiff, Dr. Weisberger, and

24  Dr. Portier, they're all experts for plaintiffs in

25  Roundup litigation; right?

1   who to ask for.

2        Q.   And you did not review the report, for

3   instance, of Celeste Feldman at USF Moffitt Cancer

4   Center on glyphosate; correct?

5        A.   That is correct.

6        Q.   Now, why did you care, when reaching your

7   opinions, what other experts for plaintiffs had to say

8   but not what experts for Monsanto had to say?

9             MR. HABERMAN:  Objection.  Argumentative.

10            But you can answer.

11            THE WITNESS:  So the answer is I read the

12        reports just to read the reports.  It pointed me

13        to the literature.  I went to the epidemiologic

14        literature and read extensively to give my own

15        opinions.  I'm not adopting the opinions of any of

16        these three doctors.

17            So my opinions are based upon my

18        understanding of CLL, its epidemiology, and

19        reading in detail the literature, which I'm sure

20        we're going to talk about in detail.  So plaintiff

21        and defense opinions really don't influence my

22        decisions and my opinions.

23            I come here today to give you my opinions as

24        Dr. Andrew Schneider, medical oncologist, what I

25        believe to a reasonable degree of medical

Andrew Schneider, M.D

1        certainty, and it's not in any way predicated on

2        an opinion of Dr. Portier, Dr. Weisenburger, or

3        Dr. Schiff.

4   BY MR. KALAS:

5        Q.   Well, you said Dr. Portier, Dr. Weisberger

6   and Dr. Schiff pointed you to the literature.  You

7   mentioned that in your last answer.  Do you recall that

8   when you were deposed by Ms. Ross last time she pointed

9   you to some literature that you had not considered?

10             MR. HABERMAN:  Objection to the form of the

11        question.

12             THE WITNESS:  What she pointed to, my

13        recollection, was other countries' regulatory

14        agencies' reports on the association of glyphosate

15        and NHL.  I don't recall these being epidemiologic

16        studies, or if they were, they probably referenced

17        the same epidemiologic studies that I referenced

18        because there are only a certain number of studies

19        out there.  So that's my answer.

20   BY MR. KALAS:

21        Q.   You cite the meta-analysis by Dr. Zhang from

22   2019 on your reliance list; right?

23        A.   Correct.

24        Q.   You do not cite the meta-analysis from

25   Dr. Kabat from 2020 on your reliance list, do you?

Andrew Schneider, M.D.

```
 1        A.    No.

 2        Q.    You do not cite the meta-analysis from

 3   Dr. Donato from 2020 on your materials from your

 4   reliance list, do you?

 5        A.    Well, that's not fair.  I'm familiar with

 6   Donato and his meta-analysis.  And I thought he was

 7   also part of -- I think 2020 there was another author

 8   there.  Who is the other author?

 9        Q.    So Boffetta 2020?

10        A.    Right.  Boffetta.

11        Q.    Well, he is not listed actually as an author,

12   Befetta.  We're looking at that right now.  But just to

13   go back to my original question, you don't cite on your

14   reliance list Donato 2020; correct?

15        A.    I don't.  But again, I think he may be

16   associated with Boffetta.

17        Q.    The reason I ask you this question is -- are

18   you aware that Dr. Portier and Dr. Schiff and

19   Dr. Weisenburger also don't cite to those studies?

20        A.    Like I said, I'm not relying on everything

21   they say.  I do my own research.  You know, I got a way

22   to start, I think, by looking at the six or seven main

23   epidemiologic studies.  And then from there, I went to

24   the meta-analysis and the pooled studies.

25        Q.    But you didn't go to the Kabat meta-analysis;
```

```
 1   correct?

 2       A.   I may have seen that one.  I actually have

 3   seen that one.  Is that the January 6, 2021?

 4       Q.   I don't believe it would have an actual date

 5   like that on it.  It's a published article in

 6   peer-reviewed literature, sir.

 7       A.   Okay.  I think I have seen it.  But I agree,

 8   if it's not on my list, it's not on my list.

 9       Q.   Right.  Have you ever spoken to any of the

10   experts for plaintiffs in Roundup litigation regarding

11   Roundup?

12       A.   No.

13       Q.   Have you ever spoken to Mr. Engilis?

14       A.   No.

15       Q.   Okay.  Turning to Mr. Engilis here for a

16   minute -- and we will take a break soon --

17       A.   I don't need to break, by the way, unless you

18   do.

19       Q.   No.  I know.  I just usually do them one an

20   hour.  If you want to keep going and --

21       A.   We've only been going 45 minutes.  It's up to

22   you.

23       Q.   I don't need it yet.  But anyway, we will

24   keep going until you tell me you need a break.  How

25   does that work?
```

Andrew Schneider, M.D

```
 1       A.   Yeah.  I think we should go another 45

 2  minutes at least.

 3       Q.   Okay.  Cool.

 4            MR. HABERMAN:  We will break on the hour.  I

 5       have to use the restroom.

 6            THE WITNESS:  I mean, you guys only have

 7       three hours; so --

 8  BY MR. KALAS:

 9       Q.   All right.  So Mr. Engilis's cancer -- and I

10  say cancer collectively here.  Mr. Engilis actually had

11  three cancers manifest in 2014; correct?

12       A.   Correct.

13       Q.   Okay.  First, he was diagnosed with bladder

14  cancer in the middle part of that year; correct?

15       A.   Correct.

16       Q.   And then near the end of the year, he was

17  diagnosed with melanoma.  And then during the course of

18  his melanoma treatment was diagnosed with CLL; correct?

19       A.   Correct.

20       Q.   Okay.  Are you offering an expert opinion

21  regarding the cause of Mr. Engilis's bladder cancer?

22       A.   I'm going to make the opinion that patients

23  with CLL have immunodysfunction and are at risk for

24  second malignancies.

25       Q.   That wasn't my question, though.  I
```

1  understand that's an opinion you offer.  But I asked

2  about the cause of his bladder cancer.

3          Are you going to offer an opinion -- let me

4  ask a more specific question.  Are you going to opine

5  that Mr. Engilis's CLL caused his bladder cancer?

6      A.   I think I said that in my report.  I think I

7  say decreased immunity and B-cell dysfunction of CLL

8  probably, more likely than not, accounts for this

9  emergence of second malignancy such as TCC of the

10  bladder.

11     Q.   Where do you say that in your report, sir?

12     A.   Look at the last page.  It's under Line

13  Association.  Right there.

14     Q.   Probably more likely than not.  Okay.

15          So let me ask you -- let's get our timelines

16  right here.  When did the genetic damage that caused

17  Mr. Engilis's bladder cancer first occur?

18     A.   I can't give you a date.  But basically he

19  had 24 years of Roundup exposure which, in my opinion,

20  was the etiologic agent which eventually caused his

21  CLL.  And because he had CLL, he had immune B-cell

22  dysfunction and was at risk for secondary malignancies

23  including TCC of the bladder and melanoma.

24     Q.   When did the genetic damage that led to

25  Mr. Engilis's malignant melanoma first occur?

1        A.    I can't give you an exact date.  I think it

2   was probably years before he was diagnosed.  Again, he

3   had 24 years of Roundup exposure, but I can't tell you

4   an exact date when the immune dysfunction occurred.

5        Q.    When did the genetic damage that led to

6   Mr. Engilis's CLL first occur?

7        A.    Again, I think sometime years before

8   diagnosis, but I can't be any more precise than that.

9        Q.    Explain to me -- well, let me ask you this:

10  Do you have an opinion to a reasonable degree of

11  scientific certainty that the genetic damage that led

12  to Mr. Engilis's CLL preceded the genetic damage that

13  led to his bladder cancer?  We will start with that.

14       A.    Well, I'm not sure I understand your

15  question, but let me try to answer it; and if I don't

16  answer it correctly, it's because I don't understand

17  it.

18            So as you said to me before, they all kind of

19  occurred in a similar time frame, right, within 12

20  months of each other, 14, 15 -- so it's my opinion, to

21  a reasonable degree of medical certainty, that the 24

22  years of glyphosate exposure caused him to have CLL and

23  subsequently immune dysfunction which led to his other

24  problems of TCC of the bladder and melanoma.

25            Now, as you may or may not know, bladder

1   damage that caused his bladder cancer or malignant

2   melanoma?

3        A.   What I think happened, he had 24 years of

4   glyphosate exposure and that is the etiologic agent --

5   why he has CLL.  Then by having CLL, he has immune

6   dysfunction and B-cell dysfunction.  And it's a

7   well-known description in the medical literature that

8   patients with CLL have secondary malignancies.  So it's

9   my opinion that the CLL caused by the glyphosate is the

10  reason to develop two other malignancies, that being

11  melanoma and TCC to the bladder, to a reasonable degree

12  of medical certainty.

13       Q.   Here is what I don't understand about your

14  opinion.  How do you know the bladder cancer is

15  secondary to the CLL and that the CLL is not secondary

16  to the bladder cancer?  That's what I'm getting at.

17       A.   Sure.  Because bladder cancer doesn't

18  predispose you to CLL.  Melanoma can predispose you to

19  CLL but probably not to a statistically significant

20  effect.

21            So the way things happened here, and it's

22  known in the literature, is that glyphosate is known,

23  in my opinion, to be an etiologic agent for CLL; and

24  patients with CLL absolutely have immune dysfunction

25  and get secondary malignancies.

```
 1       A.    Yeah.   Was I answering the question or you
 2  asking the question?
 3       Q.    No.   If Mr. Peacock can just read back that
 4  last answer to me, please.
 5             (THE REPORTER READ BACK THE REQUESTED
 6              TESTIMONY.)
 7  BY MR. KALAS:
 8       Q.    What is the mechanism by which glyphosate
 9  causes every single type of NHL?
10       A.    So there are different mechanisms of action.
11  It's genotoxic, meaning it affects DNA.   It's -- it
12  causes oxidative stress, free radicals.   Those are the
13  two main ways.
14       Q.    And via genotoxicity and oxidative stress, it
15  causes every single type of NHL; right?   That's your
16  opinion?
17             MR. HABERMAN:   Object to the form.
18             THE WITNESS:   My opinion is that genotoxicity
19       and oxidative stress allows glyphosate to cause
20       NHL.   That is my opinion, correct.
21  BY MR. KALAS:
22       Q.    Okay.   And genotoxicity and oxidative stress
23  is a mechanism by which it causes CLL in your opinion
24  as well; right?
25       A.    Correct.
```

1       A.    Sure.

2       Q.    Do you discuss as a mechanism of action

3   anywhere in your report that glyphosate is immunotoxic?

4       A.    I use the word genotox -- well, not in my

5   report.  Maybe it is.  Let me read my report again.

6             But I think that it's genotoxic and oxidative

7   stress.  Those are the two main mechanisms of action of

8   glyphosate.

9       Q.    Have you reviewed the studies that have been

10  done on the potential immunotoxicity of glyphosate by

11  Monsanto and by other researchers?

12      A.    If it's on my reliance list, yes.  Otherwise,

13  no, I have to go back and look at that.  I don't have

14  this memorized.

15      Q.    Okay.  Is there a test one can do to

16  determine that somebody's solid tumor is related to

17  immunotoxicity caused by a previous cancer?

18      A.    So I'm a clinical oncologist.  That would be

19  out of my scope of expertise.

20      Q.    Okay.  Is there a test someone could do to

21  determine whether or not someone's malignant melanoma

22  is related to immunotoxicity from a previous cancer?

23      A.    You're asking me as a clinical oncologist?

24      Q.    I heard -- I know you're a clinical

25  oncologist.  I'm asking you if you know of a test.

1    proceeding CLL as CLL preceding melanoma.  Am I right?

2         A.   Yes.

3              MR. KALAS:  I'm going to mark as Exhibit -- I

4         think I'm at 12 -- a study entitled "The

5         Association Between Melanoma, Lymphoma and Other

6         Primary Neoplasms."

7              (DEPOSITION EXHIBIT 12 WAS MARKED FOR

8               IDENTIFICATION.)

9    BY MR. KALAS:

10        Q.   I'll get it up on the screen for you.

11             This is a study I did not see on your

12   materials considered list.  Is this the study you have

13   seen?

14        A.   I have to read it.  I've never seen it.

15        Q.   How did you search for studies -- before you

16   read it, how did you search for studies on melanoma and

17   CLL?  Tell me about the process you went through.

18        A.   I did a Google search, and I said look for

19   the association of CLL and melanoma.

20        Q.   And did you refer to the association between

21   lymphoma and melanoma?

22        A.   No.  I was -- our patient has CLL, so that's

23   much more specific and, really, if I can get that data,

24   that's the better data so --

25        Q.   This is an article -- and again I'm not going

1               C E R T I F I C A T E

2    STATE OF ALABAMA   )

3    MOBILE COUNTY      )

4

5             I do hereby certify that the foregoing

6    proceedings were taken down by me and transcribed using

7    computer-aided transcription and that the foregoing is

8    a true and correct transcript of said proceedings.

9             I further certify that I am neither of

10   counsel nor of kin to any of the parties, nor am I in

11   anywise interested in the result of said cause.

12            I further certify that I am duly licensed by

13   the Alabama Board of Court Reporting as a Certified

14   Court Reporter.

15

16

17   _____

     L. ALAN PEACOCK, FAPR, CCR, RDR, CRC
18   NCRA REALTIME SYSTEMS ADMINISTRATOR
     ALABAMA ACCR No. 13, Expires 9/30/22
19   LOUISIANA -  CCR #2015013, Expires 12/31/22
     COURT REPORTER, NOTARY PUBLIC
20   STATE OF ALABAMA AT LARGE

21   My Notary Commission Expires: 10/28/2023

22

23

24

25