# EXHIBIT 11

STATE OF NEW YORK SUPREME COURT
COUNTY OF ERIE
_____

ROSS M. CELLINO, JR.,

                          Petitioner,           **REFEREE'S DECISION**
                                               **RE SOLICITATION OF**
      - v -                                **<u>MASS TORT CASES</u>**

                                               Index No.: 806178/2017

CELLINO & BARNES, P.C. and
STEPHEN E. BARNES,

                            Respondents.
_____

        To summarize this dispute, Mr. Barnes alleges that attorneys intending to join Mr. Cellino's new law firm improperly solicited certain mass tort cases listed on Exhibit Y ("Ex. Y Cases" or "Ex. Y Clients") of the confidential settlement agreement (the "Agreement" or "SA"), and presented this dispute to the Referee for resolution. Mr. Cellino not only denies the allegations, but counters that an attorney who works for Mr. Barnes sent a misleading and unethical letter to the same Ex. Y Clients. Both Parties admit that the Agreement implicitly contemplated that the lead attorney on the Ex. Y Cases would join Mr. Barnes' new firm, but ultimately chose to join Mr. Cellino's new firm. It is therefore necessary to look beyond the terms of the Agreement governing the Ex. Y Cases to resolve this dispute. Based on the Agreement, read as a whole, the evidence and testimony presented by the parties, and the briefing by counsel, the relief requested by Mr. Barnes and Mr. Cellino is granted and denied in part as stated below.

## I.    Procedural History

        Mr. Barnes sought the Referee's involvement based on a letter signed by Brian Goldstein, Esq., dated July 3, 2020, intended for the Ex. Y Clients concerning his intention to transition their cases to Cellino Law following the dissolution of Cellino & Barnes, P.C. ("C&B"). Mr. Barnes alleged that Mr. Cellino previously agreed the Ex. Y Clients would not be solicited by any attorneys joining his New Firm,[1] Cellino Law. In response, Mr. Cellino informed the Referee that he directed Mr. Goldstein not to send the letter or any new Cellino Law retainer agreements to the Ex. Y Clients. To preserve the status quo, the Referee directed Mr. Cellino to advise Mr. Goldstein and any C&B

_____

[1] Capitalized terms not defined herein are defined in the Agreement.

attorneys and staff who were joining Cellino Law to refrain from taking similar actions pending resolution of this dispute.  Referee email, 7/2/2020 5:58 p.m.

Following the Referee's temporary restraining order, counsel to Mr. Barnes and Mr. Cellino (together, the "Parties") thoroughly briefed this dispute. Berloth email, 7/2/20, 9:36 a.m.; Berloth email, 7/2/20, 4:13 p.m.; Doyle email, 7/2/2020 5:25 p.m.; Doyle email, 7/6/2020 5:13 p.m. (with exhibit); Berloth letter, 7/9/2020 (with exhibits); Doyle e-mail, 7/10/2020 11:11 a.m.; Mahler email, 7/10/2020 3:53 p.m.; Berloth email, 7/14/2020 12:45 p.m. (with exhibits); Berloth email, 7/14/2020 3:25 p.m. (with exhibit); Doyle e-mail, 7/14/2020 4:07 p.m. (with exhibit); Doyle letter, 7/20/2020 (with exhibits); Berloth letter, 7/20/2020; Doyle e-mail, 7/29/2020 10:17 a.m.; Berloth e-mail, 7/30/2020 1:07 p.m.; Doyle e-mail, 8/3/2020 3:22 p.m.; Berloth email, 8/3/2020 4:09 p.m.; Doyle letter, 8/20/2020; Berloth letter, 8/20/2020.

The Parties also sought testimony, which was taken remotely before the Referee, from Mr. Goldstein, Alexander Greco, Esq., and Michael Williams, Esq., on July 21, 2020, and Mr. Barnes, Mr. Cellino, Joe Vazquez, Esq., and Christian Oliver, Esq., on July 29, 2020.  Counsel for the Parties had a full opportunity to examine the witnesses.

Following the testimony, the Parties submitted additional evidence, without objection.  Doyle email, 7/28/2020 3:32 p.m. (Takushi voicemail for Mr. Greco); Doyle email, 7/29/2020 9:39 a.m. (Mr. Greco's "mark-off" phone call list); Berloth email, 7/30/2020 9:57 a.m. (consent to change attorney ("CTCA") case list; CTCA forms); Doyle email, 8/3/2020 4:27 p.m. (excerpt from Mr. Goldstein's employment agreement re non-solicitation of Mass Tort Cases); Doyle email, 8/4/2020 4:31 p.m. (Goldstein affirmation, dated August 3, 2020, with exhibits); Berloth e-mail, 8/10/2020 9:03 a.m. (Vazquez affirmation, dated August 9, 2020, with exhibits).

The Parties submitted final briefs on August 20, 2020.  Doyle letter, 8/20/2020; Berloth letter, 8/20/2020.

## II.     The Agreement's treatment of the Ex. Y Clients

The Parties entered into the Agreement, effective June 16, 2020, to dissolve and wind-up C&B.  Among other things, the Agreement provides a mechanism for transitioning C&B's case inventory to the Parties' respective New Firms, while recognizing that clients have the final say.

### A.     The Agreement authorizes the Parties to establish New Firms.

Mr. Cellino and Mr. Barnes are "entitled to establish their new respective firms; Cellino will establish his new firm [Cellino Law] and Barnes will establish his new firm (the 'Barnes Firm') (collectively, the 'New Firms')."  SA § 1(c), at 6.  "The term

establish as used [in the Agreement, however, does] not require either [Mr. Cellino or Mr. Barnes] to form a new firm, and shall provide both Parties the freedom to start their respective new firm, including creating a new entity or joining an existing entity." *Id.*

**B.      Cases are deemed to follow attorneys, except the Ex. Y Cases, which are deemed to follow the Barnes Firm.**

Cases defined as C&B Legacy Cases under the Agreement are "deemed to follow lawyers to the respective New Firm, as indicated in the C&B case management system known as the ATO . . . ." SA § 1(g).  The key exception is that the Ex. Y Cases—which were originally retained by The Barnes Firm, L.C., and thereafter handled by C&B—are "deemed cases that will follow the Barnes Firm." SA § 1(d), at 9.

**C.      Non-solicitation**

In addition to the Agreement's general prohibition against the New Firms soliciting cases deemed to follow the other New Firm, SA § 1(e), at 12-13, the Agreement specifically provides that Mr. Cellino, Cellino Law, "as well any other attorney, agent, or representative joining or affiliated with [Cellino Law] . . . shall be prohibited from soliciting the [Ex. Y] Cases." *Id.* § 1(d), at 9.

**D.      Mr. Barnes may ethically transition the Ex. Y Cases to the Barnes Firm after the Cross Charge Payment Date.**

The Agreement generally prohibits the New Firms from "engag[ing] in any prospective or actual client intake during the Interim Period." *Id.* § 1(c), at 7.  With respect to the Ex. Y Cases, however:

> immediately upon the Cross Charge Payment Date, the Barnes Firm shall be entitled to take all steps necessary to ensure the ethical transition of the [Ex. Y] Cases to being handled by the Barnes Firm, including, but not limited to, being permitted to send letters on Barnes Firm letterhead to the [Ex. Y Clients].

*Id.* § 1(d), at 9.  Note that under the Agreement, the Barnes Firm is defined and distinct from "The Barnes Firm, L.C. f/k/a/ Cellino & Barnes, L.C. (the 'CA Firm')," *id.*, the California law firm owned by Mr. Barnes.

**E.      After the Cross Charge Payment Date, the Barnes Firm alone is entitled to attorneys' fees from the Ex. Y Cases it handles; No Attorney Proportionate Share is to be paid for Unselected Legacy Cases.**

Distribution of attorneys' fees earned on the Ex. Y Cases being handled by the Barnes Firm are subject to a different formula than the remaining Legacy Cases:

> Solely with respect to attorney's fees that result from the resolution of the [Ex. Y] Cases being handled by the Barnes Firm (as set forth in Section 1(d) above), Cellino and Barnes agree that (a) C&B will waive any lien on such [Ex. Y] Cases, effective as of the Cross Charge Payment Date, and (b) the waterfall provisions set forth in this Section 1(j) shall not apply.

*Id.* § 1(j), at 19.  Distribution of attorneys' fees resulting from the remaining Legacy Cases (other than the Ex. Y Cases being handled by the Barnes Firm) are governed by the Agreement's general waterfall provisions.  *Id.* § 1(j), at 19-21.  The waterfall provisions include, *inter alia*, payment of the Attorney Proportionate Share, *id.* § 1(j)(v), followed by a Quantum Meruit Calculation determining the amount payable to the New Firm that finished the case.  *Id.* § 1(j)(vi).

### 1.      Unselected Legacy Cases

The Agreement recognizes that "despite the non-solicitation agreement" some clients may choose to follow a Non-Deemed Firm.  *Id.* § 1(j), at 21.  Those cases are "Unselected Legacy Cases" and are subject to modified waterfall provisions.  *Id.*  The Attorney Proportionate Share is eliminated for all Unselected Legacy Cases, and the Quantum Meruit Calculation is eliminated for all Unselected Legacy Cases that follow a Non-Deemed Firm within six months after the Closing Date.  *Id.*  Those amounts are instead to be paid to directly C&B.  *Id.*  Elimination of the Attorney Proportionate Share and Quantum Meruit Calculation for these cases is expressly "[t]o further support the non-solicitation agreement . . . ."  *Id.*

## III.    The Ex. Y Cases

The 287 Ex. Y Cases were originally retained by The Barnes Firm L.C., and during the Litigation were represented to be handled by C&B.  *Id.* § 1(c), at 9.  Testimony was more specific than the Agreement:  the Ex. Y Cases were transferred to C&B in December 2017, pursuant to Mr. Barnes' instructions, to resolve an issue raised in the Litigation.  Barnes Tr., at 12:18-20, 22:20-22; Goldstein Tr., at 8:11-14.

The Ex. Y Cases are a subset of the 1,200 mass tort cases currently handled by C&B.  Goldstein Tr., at 8:11-22.  Mr. Goldstein was a counsel of record for the Ex. Y Cases, at least through June 2020.  Williams Tr., at 14:3-8 ("[the Ex. Y Cases] were filed under my name . . . . and Brian Goldstein would have been added on as additional counsel of record"); Vazquez Tr., at 39:18-21 ("Q. So right now . . . who's counsel of record?  A. Right now Mike Williams and Brian Goldstein are on the ECF").

Until approximately the last week of June 2020, Mr. Greco and Mr. Williams handled the day-to-day litigation work on the Ex. Y Cases, while Mr. Goldstein oversaw the full inventory of 1,200 mass tort cases handled by C&B, including the Ex. Y Cases.  Goldstein Tr., at 8:14, 9:2, 15:20-21; Cellino Tr., at 29:9-18; Barnes Tr., at 11:22-12:1, 12:10-15, 23:7-8; Williams Tr., at 10:21-23; Greco Tr., at 4:16-19, 9:6, 15:13.  Telephone calls from Ex. Y Clients were primarily handled by legal assistants, and then by Mr. Greco or Mr. Williams, if a legal assistant was unavailable or insufficient.  Williams Tr., at 9:4-11; Greco Tr., at 13:10-14.

On March 6, 2020, during the Litigation, Mr. Barnes sent an email to C&B attorneys, including Mr. Goldstein:  "I would encourage all of you to contact your clients to reassure them that YOU will continue to represent them . . . ."  Goldstein Tr. Ex. A, at 4; Barnes Tr., at 29:21-30:13.  In casual conversations, he also told Mr. Goldstein to reassure mass tort clients that Mr. Goldstein would stay their attorney after the dissolution.  Barnes Tr., at 34:15-20.

Following Mr. Barnes' instructions, Mr. Goldstein sent a letter, dated March 10, 2020, to all 1,200 mass tort clients (including the Ex. Y Clients) "reassur[ing] [them] that [he] would continue to manage their case[s] and that each case would continue to move forward without interruption."  Goldstein Tr. Ex. A, at 1; Greco Tr., at 11:5-12:8.  Mr. Goldstein sent another letter, dated May 19, 2020, to approximately 600 talcum powder MDL clients (a subset of the 1,200 mass tort case inventory) that included a similar message about post-dissolution representation.  Goldstein Tr., at 35:14-19, 36:2-7; Goldstein Tr. Ex. A, at 8; Greco Tr., at 11:13-12:8.

In response to these two letters, approximately 200 of the 1,200 mass tort clients called C&B.  Greco Tr., at 16:17.  Mr. Greco and legal assistants fielded the calls.  *Id.* at 13:10-14.  Most of the clients inquired about the dissolution.  *Id.* at 17:4.

Approximately 40 asked to be updated when Mr. Goldstein and/or Mr. Greco decided which New Firm to join.  *Id.* at 21:5.

On June 11, 2020, Mr. Goldstein and Mr. Greco downloaded the contact information for the Ex. Y Clients from ATO and created a contact list therefrom.  Greco Tr., at 41:6-11, 46:6-12; Vazquez Tr., at 25:5-17, 27:4-5.  Mr. Goldstein also directed that

Mr. Greco and staff prepare CTCA forms for all 1,200 mass tort cases, including the Ex. Y Cases.  Goldstein Tr., at 28:10-29:9.  The CTCA forms were not sent.  *Id.* at 29:5-9.

On June 22, 2020, during the Buffalo Location Solicitation Period, Mr. Cellino informed Mr. Goldstein that even if he joined Cellino Law, "we would not be involved in the [Ex. Y Cases] because those were deemed to be Steve Barnes' cases . . . ." Cellino Tr., at 5:6-11.  Mr. Cellino explained, "if you . . . join me, you have to understand that [the Ex. Y Cases are] not part of the deal."  *Id.*  Mr. Cellino told Mr. Goldstein he could not solicit those clients, and Mr. Goldstein's employment agreement with Cellino Law prohibits him from doing so.  *Id.* 5:6-7:3; Doyle email, 8/3/2020 4:27 p.m.

On June 25, 2020 Mr. Goldstein, Mr. Williams, and Mr. Greco elected to join Cellino Law.  Goldstein Tr., at 9:6-8; Greco Tr., at 6:23.  Mr. Barnes and Mr. Cellino were surprised by Mr. Goldstein's choice.  Barnes Tr., at 3:17-19; Cellino Tr., at 4:13-14, 5:4-5.

Immediately after choosing Cellino Law, Mr. Goldstein and Mr. Greco began calling all 287 Ex. Y Clients.  Goldstein Tr., at 11:6-18; 27:9-28:9; Greco Tr., at 29:3-5.  Mr. Goldstein asked Mr. Greco to call half of the Ex. Y Clients, while he would call the other half.  Goldstein Tr., at 11:7-8.

Mr. Goldstein testified that on these calls he and Mr. Greco informed the Ex. Y Clients that Mr. Goldstein would be joining Cellino Law.  Goldstein Tr., at 13:5-7. They then told clients they had three options.  The first option was to follow them to Cellino Law.  Goldstein Tr., at 13:7-8; Greco Tr., at 18:5-6.  Otherwise, clients could choose the Barnes Firm or any other firm.  Mr. Goldstein and Mr. Greco testified that they said nothing else on these calls, except to answer follow up questions, such as confirming Mr. Goldstein handled the "cases from day one."  Goldstein Tr., at 13:10-22.

While he and Mr. Goldstein were making these calls, Mr. Greco kept a "mark-off" list of all 1,200 mass tort clients on which he applied color-coded notations to memorialize clients' post-dissolution preferences.  Greco Tr., at 19:19-20, 20:22, 20:15-16; Doyle e-mail, 7/29/2020 9:39 a.m. (explaining color code).  According to Mr. Greco's mark-off list, their outreach efforts resulted in approximately 80 clients designated as "California" or "CA" choosing to follow them to Cellino Law.  Doyle email, 7/29/2020 9:39 a.m. (Mr. Greco's "mark-off" list).

In or about late June or early July 2020, however, shortly after Mr. Goldstein, Mr. Greco, and Mr. Williams elected to join Cellino Law, Mr. Barnes relieved them of responsibility for the Ex. Y Cases, and terminated their access to the Ex. Y Case files on ATO.  Goldstein Tr., at 15:20-21 ("we don't have access to those files anymore"); Williams Tr., at 10:21-23 ("all of the cases from California have been removed from my access on the database").  Mr. Barnes appointed Joe Vazquez and Brett Manske "to

assume and take over the handling of [the Ex. Y Cases] on behalf of C&B." Berloth letter, 8/20/2020, at 7.

Mr. Barnes also involved Christian Oliver, Managing Attorney of The Barnes Firm L.C., in "securing the [Mass Tort Cases]" for the Barnes Firm L.C. and  P.C., which would be operating "together" "under an umbrella." Barnes Tr., at 6:7-20. "[They] envisioned that Christian [Oliver] would send a letter [to the Ex. Y Clients]." *Id.* 7:4-5.  On July 8, 2020, Mr. Oliver sent the letter to all Ex. Y Clients (the "Oliver Letter"). Goldstein Tr. Ex. G; Oliver Tr., at 13:20-23, 14:16-17. Mr. Oliver testified that before sending the letter, he "ran it by Steve Barnes." *Id.* 14:20-22; Barnes Tr., at 7:6-8 (same). The body of the Oliver Letter reads:

> I trust this letter finds you and your family safe and well during these challenging times.  While many of our communities are living through various restrictions to combat the global pandemic, I'm pleased to report that our team has been fully operational and hard at work prosecuting your case.
>
> We are also excited to announce the expansion of our firm, with new offices opening this fall across the east coast including New York City.  To clear up any past confusion, as you will recall, you retained our firm Cellino & Barnes, LC which is now known as The Barnes Firm, LC.  This name change took place in September 2017.  Thus, there will be no separation since we are the same firm operating under a different name.  So you may be assured that your case will continue without any interruption and requires no action by you to continue your case.  **Please note our new phone number is 1-800-800-0000**.  Please do not call our old phone number 1-800-888-8888 because it will soon be out of service.
>
> We will continue to update you with any developments from the court.  In the meantime, please feel free to contact me if you have any questions or concerns.

Goldstein Tr. Ex. G.  The Oliver Letter was on The Barnes Firm, L.C. letterhead, but prior to the last week of June 2020, attorneys at that firm had not handled the Ex. Y Cases after they were transferred to C&B in December 2017.  Oliver Tr., at 10:10-22, 17:20-22.  The "new phone number" for The Barnes Firm, L.C. had been advertised and provided to clients since September 2017.  Oliver Tr., at 7:9-10, 7:20-21.

## IV.     The Dispute

Mr. Barnes alleges that in violation of the Agreement, multiple attorneys who elected to join the Cellino Law Firm, including Mr. Goldstein and Mr. Greco, contacted numerous Ex. Y Clients, solicited those clients, and planned to send letters, new retainer agreements, and CTCA forms for those clients to retain Cellino Law. *E.g.* Berloth email, 7/2/2020 9:36 a.m.; Berloth email, 7/2/2020 4:13 p.m.

It is undisputed that:

- Mr. Goldstein and other attorneys who elected to join Cellino Law are bound by the non-solicitation provisions of the SA. Doyle email, 7/10/2020 11:11 p.m.

- Mr. Goldstein and Mr. Greco endeavored to speak with all 287 Ex. Y Clients immediately after selecting Cellino Law. Goldstein Tr., at 27:9-17; 28:1-8; Greco Tr., at 46:7-9.

But Mr. Cellino and Mr. Goldstein contest that these conversations amounted to solicitation, and deny that any CTCA forms, engagement letters, or solicitation letters were sent.  Doyle email, 7/6/2020 5:13 p.m.

To remedy the alleged violations, Mr. Barnes requests that the Referee issue a directive ordering:

(1) Mr. Cellino, Cellino Law, Mr. Goldstein, Mr. Greco, and any person who voted to join Cellino Law or is otherwise employed by Cellino Law, to cease and desist from any and all forms of outreach to [Ex. Y] clients;

(2) any calls or communications to C&B from [Ex. Y Clients] be directed to Joe Vazquez and Brett Manske, who have taken over responsibility of the [Ex. Y] Cases during their remaining tenure with C&B and through their transition to [the Barnes Firm];

(3) Brian Goldstein, Alex Greco, and Mike Williams withdraw as counsel of record on the [Ex. Y] Cases no later than September 1, 2020;

(4) Brian Goldstein, Alex Greco, and any other member of the Cellino Team [to] immediately provide [the Barnes Firm mass torts team] access to any systems, documents, and

information related thereto, in advance of September 2, 2020,
bellwether case deadlines, including, but not limited to (i)
turning over and disgorging any and all mail and
correspondence relating to [Ex. Y] Cases still in their
possession and/or which they have wrongfully withheld to
date and (ii) providing access to C&B's MDL Centrality
account necessary to comply with the September 2
bellwether filing deadlines; and

(5) The imposition of a financial penalty upon Cellino Law,
pursuant to Section 1(j) of the Settlement Agreement, such
that, in the event an [Ex. Y client] opts to proceed with
Cellino Law after the Closing Date, Cellino Law be forced to
disgorge any fee for the [Ex. Y] Case(s) it handles to [the
Barnes Firm].

Berloth letter, 8/20/2020, at 10.

Mr. Cellino counters that Mr. Barnes breached the Agreement
because the Oliver Letter contains false representations, and confuses and
misleads the Ex. Y Clients.  Doyle letter, 8/20/20, at 7.  To remedy the allegedly
misleading information in the Oliver Letter, Mr. Cellino submitted a proposed
corrective letter for the Referee send to the Ex. Y Clients.  *Id.* Appendix A.

Mr. Barnes disagrees and contends that the Oliver letter is
"expressly permitted under the Settlement Agreement and contained no
misrepresentations or inaccuracies."  Berloth letter, 8/20/2020, at 5.  He argues,
among other things, that Mr. Oliver's statement "our team has been fully
operational and hard at work prosecuting your case" is accurate because "the
Cellino Team's access to the [Ex. Y] Cases was eliminated in the last week of
June" and "[the Barnes Firm] team began handling the [Ex. Y] Cases *immediately*
thereafter."  *Id.* (emphasis in original).  He contends that "the transitioning of the
[Ex. Y] Case work to (a) [C&B] attorneys joining [the Barnes Firm] and (b) The
Barnes Firm, L.C. itself is expressly permitted by the [Agreement] . . . ."  *Id.*

To "remed[y] any purported flaws in the [Oliver Letter]," however,
Mr. Barnes states that The Barnes Firm is willing to send a new letter to the Ex. Y
Clients.  *Id.* at 7; Berloth email, 7/30/2020.

## V.     Analysis

### A.     Solicitation

In *Cohen v. Lord, Day & Lord*, the New York Court of Appeals noted the longstanding restrictions against solicitation of clients:  "Efforts, direct or indirect, in any way to encroach upon the business of another lawyer, are unworthy of those who should be brethren at the Bar."  75 N.Y.2d 95, 98 (1989) (quotation marks omitted).  In those days, "[a] former employee of . . . a law firm [such as Mr. Goldstein and Mr. Greco] would . . . refrain from any effort to secure the work of clients of his former employer."  *Id.*  While the general prohibition on solicitation is now more nuanced, Mr. Cellino and Mr. Barnes mutually revived the complete ban and included it in the Agreement with respect to all Legacy Cases, SA § 1(e), at 12-13, and specifically the Ex. Y Cases.  *Id.* § 1(d), at 9.

Solicitation as "any effort to secure the work of clients," *Cohen*, 75 N.Y.2d at 98, has been fleshed out by more recent cases and ethical rules.  The New York Rules of Professional Conduct define solicitation as:

> any advertisement initiated by or on behalf of a lawyer or
> law firm that is directed to, or targeted at, a specific recipient
> or group of recipients, or their family members or legal
> representatives, the primary purpose of which is the
> retention of the lawyer or law firm, and a significant motive
> for which is pecuniary gain.

N.Y. Rules of Prof. Conduct ("Rule") 7.3(b).  Advertisement is defined as "any public or private communication made by or on behalf of a lawyer or law firm about that lawyer or law firm's services, the primary purpose of which is the retention of the lawyer or law firm,' *other than communications to existing clients* or other lawyers."  Rule 1.0 (emphasis added); NYSBA Eth. Op. 937 (2012).  While attempts to develop business from existing clients are generally not solicitations, that does not apply under circumstances such as those that exist here—when lawyers are leaving a law firm and forming new firms.  *E.g.*, *Matter of Silberry*, 81 A.D.2d 640, 641 (2d Dep't 1981) (prior to dissolution, partners owe fiduciary duty not to solicit existing clients for their own benefit).

The New York Court of Appeals defined solicitation as "to move to action, to endeavor to obtain by asking, and impl[ying] personal petition to a particular individual to do a particular thing . . . ."  *Koffler v. Joint Bar Ass'n*, 51 N.Y.2d 140, 146 (1980) (emphasis added) (relying on definitions in "Webster's Third New International Dictionary, p. 2169" and "Black's Law Dictionary (5th ed), pp. 1248-1249").  More recently, in the financial services context, the Court of Appeals defined solicitation to

include "taking affirmative steps to directly communicate with . . . or mak[ing] individualized telephone calls to . . . former customers informing them of . . . new business ventures." *Bessemer Tr. Co., N.A. v. Branin*, 16 N.Y.3d 549, 557-58 (2011). The court's emphasis on affirmative steps, however, does not mean that a party bound to non-solicitation is "free to tout his new business venture simply because a former client has fortuitously communicated with him first." *Id.* at 558.

While the Agreement here bars solicitation, which in general includes "individualized telephone calls to . . . former customers informing them of . . . new business ventures," *Bessemer*, 16 N.Y.3d at 557-58, the legal profession imposes other obligations to communicate with clients. For instance, a lawyer must "promptly comply with a client's reasonable requests for information." Rule 1.4(a)(4). Further, "[a] lawyer should promptly respond to or acknowledge client communications, or arrange for an appropriate person who works with the lawyer to do so." Comment [4] to Rule 1.4. "As a matter of ethics, departing partners have been permitted to inform firm clients with whom they have a prior professional relationship about their impending withdrawal and new practice, and to remind the client of its freedom to retain counsel of its choice." *Graubard Mollen Dannett & Horowitz v. Moskovitz*, N.Y.2d 112, 120 (1995).

The duty to provide information, however, cannot be used to camouflage efforts to lure clients to a new law firm. In *Graubard*, the Court of Appeals held that "presignation surreptitious 'solicitation' of firm clients for . . . personal gain" is a breach of fiduciary duty and "exceeds what is necessary to protect the important value of client freedom of choice in legal representation, and thoroughly undermines another important value—the loyalty owed partners . . . ." 86 N.Y.2d at 119-20. "[S]ecretly attempting to lure firm clients (even those the partner has . . . personally represented)" to a new firm is improper. *Id.* at 120. If a lawyer contacts firm clients to inform them of his departure, it should be done only "on notice to the firm and not surreptitiously." 1 *Simon's N.Y. Rules of Prof. Conduct* § 5.6:6 Duties of departing attorneys (2019) (citing *Graubard*, 86 N.Y.2d 112).

It is undisputed that Mr. Goldstein and Mr. Greco endeavored to speak with all 287 Ex. Y Clients immediately after selecting Cellino Law, without telling Mr. Barnes about it. Goldstein Tr., at 27:9-17; 28:1-8; Greco Tr., at 46:7-9. The purpose of these calls was clearly not simply to *respond* to client requests for information. Only approximately 40 out of 1,200 mass tort clients requested to be kept apprised of Mr. Goldstein's and Mr. Greco's decision about a New Firm. Greco Tr., at 21:5. While Mr. Goldstein testified that "hundreds" of mass tort clients made this request, Goldstein Tr., at 10:8-11:3; 12:16-13:4, Mr. Greco testified that he and the legal assistants fielded the calls and the number was only about 40. Greco Tr., at 13:10-14, 21:5; *see also* Williams Tr., at 9:4-11 (in the normal course of practice, Mr. Williams and Mr. Greco fielded client calls, if legal assistants could not answer the question).

- 11 -

Further undermining the contention that the outreach effort to all Ex. Y Clients was merely in response to prior client requests for information, Mr. Greco and Mr. Goldstein never demonstrated that any of the 40 who wanted to be informed were Ex. Y Clients.  Mr. Greco testified that his mark-off list identified the 40 clients, but upon submission of the list into evidence it became apparent that it instead identified (a) approximately 80 mass tort clients who intended to retain Cellino Law, and (b) 27 clients who called in response to the Oliver Letter.  Greco Tr., at 19:19-20, 20:22, 20:15-16; Doyle e-mail, 7/29/2020 9:39 a.m. (explaining color code).

Although some Ex. Y Clients may have been among the 40 mass tort clients who requested information about Mr. Goldstein's choice of a New Firm, Mr. Goldstein must have had a different motivation for quickly attempting to call all 287 Ex. Y Clients.  The totality of his conduct points to the conclusion that the motive was competition. Although Mr. Goldstein knew the Agreement prohibited solicitation of the Ex. Y Clients, and knew they "were deemed to be Steve Barnes' cases . . . ," Cellino Tr., at 5:6-7:3, he did not notify Mr. Barnes of his outreach campaign. *Graubard*, 86 N.Y.2d at 119-20.  Mr. Goldstein admits he never told these clients his employers intended to have the cases follow the Barnes Firm (subject to client approval).  Goldstein Tr., at 13:10-22. Nor did he offer to introduce these clients to the future Barnes Firm attorneys assigned to their cases, or otherwise constructively help facilitate the transition.  *Id.*  Instead, by contacting the Ex. Y Clients without first notifying Mr. Barnes of the plan, or affording him time to transition the clients to the Barnes Firm, or even mentioning that they were deemed to follow the Barnes Firm, Mr. Goldstein teed it up to increase the chances Ex. Y Clients would follow him to Cellino Law.  Goldstein Tr., at 13:7-22.

Mr. Goldstein competed with the Barnes Firm by "taking affirmative steps to directly communicate with [and] . . . mak[ing] individualized telephone calls to" the Ex. Y Clients, *Bessemer*, 16 N.Y.3d at 557-58, attempted to "move [the Ex. Y Clients] to action" by offering Cellino Law's services, *Koffler*, 51 N.Y.2d at 146, and according to Mr. Greco's mark-off list, succeeded in attracting approximately 80 clients to Cellino Law.  Doyle email, 7/29/2020 9:39 a.m. (Mr. Greco's "mark-off" list).  The primary purpose was to retain the Ex. Y Clients, and a significant purpose was pecuniary gain, so it was solicitation, even if subtle.  Rule 7.3(b).

The Referee disagrees with Mr. Barnes, however, that the appropriate remedy is for Cellino Law to disgorge and pay to the Barnes Firm any attorneys' fees resulting from Ex. Y Cases.  The Agreement does not provide for disgorgement, but the modified waterfall for Unselected Legacy Cases operates similar to a liquidated damages provision and applies when, as alleged here, a client chooses a Non-Deemed Firm.  SA § 1(j), at 21.  Because the Ex. Y Cases were deemed to follow the Barnes Firm, any Ex. Y client that retains Cellino Law will be an Unselected Legacy Case, and no Attorney Proportionate Share is to be paid to Mr. Goldstein or other attorneys who

handle the case. *Id.* Further, if an Ex. Y client engages Cellino Law within six months of the Closing Date, no quantum meruit amount is to be paid to Cellino Law. *Id.* Instead, those amounts are to be paid directly to C&B. *Id.* While the Barnes Firm is entitled to the full attorneys' fee for Ex. Y Cases "handled by the Barnes Firm," *id.* § 1(j), at 19, Ex. Y Cases that are "handled by" Cellino Law more naturally fall within the Unselected Legacy Case provisions, which the Parties adopted to expressly discourage solicitation of each New Firm's deemed cases. *Id.* § 1(j), at 21.

The Referee does not see how a breach of the non-solicitation provision could result in nullification or rescission of the Agreement, because the Agreement itself contains the Parties' chosen remedy for solicitation, *i.e.*, forfeiture of the Attorney Proportionate Share and potential forfeiture of the quantum meruit amount. *Id.*

### B.   Cellino Law representation of Ex. Y Clients

During his testimony, Mr. Barnes stated that Mr. Goldstein and other attorneys that elected to join Cellino Law should decline to represent any Ex. Y Clients. Barnes Tr., at 28:14-21. That raises for resolution the question whether Cellino Law can represent Ex. Y Clients if those clients request the representation. The answer is yes.

Mr. Barnes correctly recognizes that "nothing in the Settlement Agreement impinges on the clients' right to choose their counsel." Berloth letter, 7/9/2020, at 2. He acknowledges that "[w]hile clients have the ultimate say, the crux of the agreement is that the Barnes Firm has the ability to attempt to transition the [Ex. Y Clients] without interference or solicitation from Cellino Law or Mr. Goldstein acting on Cellino's behalf." Berloth letter, 7/9/2020, at 2. "Thus, the prohibition against solicitation does not eliminate the clients' rights, it solely enforces a contractual obligation not to solicit clients whose cases have been allocated in the agreed fashion." Berloth letter, 7/9/2020, at 2.

It is well-settled that a party may "accept the patronage" of clients it is barred from soliciting, if such clients voluntarily choose the services. *Mohawk Maintenance Co., Inc. v. Kessler*, 52 N.Y.2d 276, 284 (1981); *Bessemer*, 16 N.Y.3d at 557. This is particularly true in the legal profession, where the client's ability to freely choose counsel is well-protected. Rule 5.6; *see also Cohen,* 75 N.Y.2d at 108.

Here, however, there can be no doubt that any Ex. Y Cases represented by Cellino Law will be Unselected Legacy Cases and subject to the forfeiture provisions. SA § 1(j), at 21. Those provisions apply not just when a client goes to a Non-Deemed Firm because of improper solicitation, but also when the client freely chooses. *Id.* Because the Unselected Legacy Case forfeiture provisions apply regardless of whether solicitation occurred, they apply to Ex. Y Clients who (a) voluntarily chose Cellino Law, (b) determined to follow Mr. Goldstein before the Effective Date without further

solicitation, and (c) would apply even if Mr. Goldstein's post-June 25 outreach effort consisted solely of providing requested information.

The Unselected Legacy Case forfeiture provisions are distinguishable in multiple ways from the forfeiture-for-competition clause struck down in *Cohen*, which was expressly limited to its facts.  75 N.Y.2d at 99, 102.  For instance, the Unselected Legacy Case forfeiture provisions appear in a settlement agreement, not the C&B partnership agreement.  After *Cohen*, the Court of Appeals held that such provisions in settlement agreements are enforceable, because the stronger public policy in favor of voluntary settlements takes precedence.  *Denburg v. Parker Chapin Flattau & Klimpl*, 82 N.Y.2d 375, 386 (1993) ("[U]nlike outright prohibitions on the practice of law, agreements involving financial disincentives are not per se illegal but depend on the particular terms and circumstances."); *see also  Hackett v. Milbank, Tweed, Hadley & McCloy*, 86 N.Y.2d 146, 157 (1995) (public policy in favor of arbitration outweighs policy against forfeiture-for-competition clauses).

**C.    The Oliver Letter**

Pursuant to the Agreement, Mr. Barnes is authorized "to take all steps necessary to ensure the ethical transition of the [Ex. Y] Cases to being handled by the Barnes Firm, including, but not limited to, being permitted to send letters on Barnes Firm letterhead to the [Ex. Y ] clients."  SA § 1(d), at 9.

Even though the Agreement states that "Barnes will establish his new firm (the 'Barnes Firm')," it does not "require" Mr. Barnes to form a new firm.  SA § 1(c), at 6.  Instead, it grants Mr. Barnes "the freedom to start [a] new firm, including creating a new entity or *joining an existing entity*."  *Id.* (emphasis added).  Nonetheless, the Agreement does not address, in this context, the fact that Mr. Barnes *remains with* an existing entity—he is not *joining* the "CA Firm," as The Barnes Firm, L.C. is defined under the Settlement Agreement, and he is already the owner thereof.

The Oliver Letter is misleading and should be clarified.  First, although the L.C. originally retained the Ex. Y Cases, these cases were transferred to C&B in 2017 and were handled since by C&B through C&B's attorneys—Mr. Goldstein, Mr. Greco, and Mr. Williams.  There is no evidence that The Barnes Firm, L.C. or any of its counsel worked on the Ex. Y Cases after December 2017, except for the minimal time Mr. Oliver devoted to them in the few days before he sent his letter.  Oliver Tr., at 10:10-22, 17:20-22.  Consequently, the statement: "our team has been . . . hard at work prosecuting your case," is misleading.

Second, in communicating with clients, lawyers owe an ethical obligation to avoid making statements that will cause the clients to erroneously believe they will continue to be represented by the attorney who was formerly representing them.  NYCLA Formal Op. No. 728 (1999) ("there may be circumstances in which a failure to notify certain clients of a particular partner's withdrawal from the firm could be misleading to the clients, in particular in circumstances in which specific clients believe that the client's legal matters at the firm are being handled by the former partner"); ABA Formal Op. No. 99-414 (Sept. 8, 1999) ("The departing lawyer and responsible members of the law firm who remain have an ethical obligation to assure that prompt notice is given to clients on whose active matters she currently is working.").  Hence, the following statement is also misleading:

> To clear up any past confusion, as you will recall, you retained our firm Cellino & Barnes, LC which is now known as The Barnes Firm, LC.  This name change took place in September 2017.  Thus, there will be no separation since we are the same firm operating under a different name.  So you may be assured that your case will continue without any interruption and requires no action by you to continue your case.

Goldstein Tr. Ex. G.  This statement fails to clarify that even though the clients signed a retainer with Cellino & Barnes, LC, which is now The Barnes Firm, LC, their cases were transferred to C&B and were handled by Mr. Goldstein and team for the past three years, but (presumably with client consent) will be returned to The Barnes Firm, L.C. to be handled by attorneys of The Barnes Firm L.C., who are separate from the attorneys of C&B who handled the cases previously.

Third, stating that The Barnes Firm L.C.'s old phone number is 1-800-888-8888 and that it will soon be out of service is misleading.  That number is Call Eight LLC's and will be active for at least 18 months after the Closing Date.  SA § 1(m).  And the Barnes Firm's "new phone number" had been advertised and provided to clients since September 2017.  Oliver Tr., at 7:9-10, 7:20-21.

Because the Oliver Letter is misleading, a corrective letter should be sent to the Ex. Y Clients.  It would be unnecessarily disruptive and even more confusing for such a letter to come from the Referee.  It is more appropriate for the letter to come from Mr. Barnes, because the Agreement authorizes him to take all steps necessary to transition the Ex. Y cases.

## CONCLUSION

Based on the foregoing, Mr. Barnes' and Mr. Cellino's requests for relief are granted in part and denied in part. Accordingly, it is hereby ordered and determined that:

Mr. Cellino, Cellino Law, Mr. Goldstein, Mr. Greco, and any person expected to be employed by Cellino Law, must (a) cease and desist from any and all forms of outreach to Ex. Y Clients, and (b) withdraw as counsel of record as soon as practicable (neither sub-a nor sub-b of this paragraph shall apply to Ex. Y Clients who Cellino Law can demonstrate have voluntarily chosen to retain Cellino Law (and thereby become Unselected Legacy Cases)); and

Any and all calls or communications to C&B from Ex. Y Clients are to be directed to Mr. Vazquez and Mr. Manske, with the exception of calls or communications from Ex. Y Clients who Cellino Law can demonstrate have voluntarily chosen to retain Cellino Law (and thereby become Unselected Legacy Cases); and

Mr. Goldstein, Mr. Greco, and any other member of the Cellino Team shall immediately provide Mr. Barnes, Mr. Vazquez, and Mr. Manske access to (a) copies of any and all documents and information related to the Ex. Y Cases, and (b) C&B's MDL Centrality account (neither sub-a nor sub-b of this paragraph shall apply to Ex. Y Clients who Cellino Law can demonstrate have voluntarily chosen to retain Cellino Law (and thereby become Unselected Legacy Cases)); and

Any Ex. Y Case in which Cellino Law is retained or becomes counsel of record is an Unselected Legacy Case subject to the modified waterfall provisions, SA § 1(j), at 21; and

Mr. Barnes may send a corrective letter to the Ex. Y Clients on the Barnes Firm letterhead (not The Barnes Firm, L.C. letterhead), in a form substantially similar to the version attached hereto as Appendix A; and

A conference with the Referee and the parties shall be held on **Thursday, September 3, 2020 at 11:00 a.m.** to discuss any concerns with Appendix A; and

Any relief not expressly granted is denied.

Dated:  September 2, 2020                                         /s/ *John G. Schmidt Jr.*

                                                                    JOHN G. SCHMIDT JR.
                                                                    Referee

Doc #8794462

- 16 -

**APPENDIX A**

Dear [Ex. Y Client]:

I hope you and your family are doing well in these difficult times. I am writing in follow-up to prior communications you may have received from the lawyers handling your matter, and to provide some clarity on your representation going forward.

As you may know, there currently exists The Barnes Firm, L.C. (formerly Cellino & Barnes, L.C.) in California, and Cellino & Barnes, P.C. in New York. On October 9, 2020, Cellino & Barnes, P.C. will be separating into two independent firms. Ross Cellino and I agreed that your case would be deemed to follow The Barnes Firm, subject to your approval. I am the sole owner of The Barnes Firm, L.C., and will also be opening The Barnes Firm, P.C. in New York. I intend for The Barnes Firm, P.C. to act as one firm with The Barnes Firm, L.C., which as you know has already existed in California for many years. The splitting of the New York firm will have no effect on the operations of The Barnes Firm, L.C. I hope that the combination of these two firms into one "The Barnes Firm" will create a nationwide law firm that we believe will provide an unparalleled benefit to our clients.

My intention is to handle your case pursuant to the terms in the written retainer agreement you entered into with The Barnes Firm, L.C. (at that time named Cellino & Barnes, L.C.), except that we will honor the reduction of the contingency fee from 40% to 33.33% from when your case was being handled by Cellino & Barnes, P.C. I want to assure you that there will be no delay whatsoever in any of the aspects of our handling your claim for damages. We have already put measures in place to ensure that your interests are being represented and your case being prosecuted. That being said, you have the right to select counsel of your choosing. I hope you choose The Barnes Firm. As you may recall, Brian Goldstein, Esq. was the lead attorney on your matter. But Mr. Goldstein is joining a different law firm that agreed not to solicit you to follow him. If you require us to transfer your matter to another firm, please let us know as soon as possible. Otherwise, no action is required by you at this time, we will prosecute your case to its fullest, and will be in touch with you in the near future concerning any forms to be filed with the Court.

Thank you for your confidence in our firm. We will keep you closely advised on the status of your case. Please feel free to contact me should you have any questions.