# EXHIBIT E

STATE OF NEW YORK
SUPREME COURT : COUNTY OF ERIE

_____

**ROSS M. CELLINO, JR.,**                    |

                                 Petitioner,    |

                                               |    **VERIFIED ANSWER AND**
- v -                                          |    **OBJECTIONS IN POINT OF LAW**

                                               |
**CELLINO & BARNES, P.C.** and                 |    Index No.: 806178/2017
**STEPHEN E. BARNES,**                         |

                                               |
                                 Respondents.   |
_____

Respondents Cellino & Barnes, P.C. ("C&B" or the "PC") and Stephen E. Barnes ("Barnes") (collectively "Respondents"), by and through their attorneys, Duke Holzman Photiadis & Gresens LLP, as and for their Answer and Objections in Point of Law to Petitioner Ross M. Cellino, Jr.'s ("Cellino" or "Petitioner") Verified Amended Petition (the "Petition"), hereby answers as follows:

**1.**    <u>Deny.</u> Cellino was suspended and unlicensed for a total of nineteen (19) months, from 2005 to 2007, as a result of "engaging in illegal conduct that adversely reflects on his honesty, trustworthiness or fitness as a lawyer" as well as "conduct involving dishonesty, fraud, deceit or misrepresentation." <u>Matter of Cellino</u>, 21 A.D.3d 229, 234 (4th Dept. 2005).

Since returning from his suspension in 2007, Cellino voluntarily withdrew from the management of C&B and relied on Barnes to continue the day-to-day business of the firm. Cellino did not object to the management and/or operation of C&B for almost ten (10) years and in no way involved himself in the same. Upon information and belief, Cellino was completely satisfied with the firm's growth, success, and management. He was more-than-happy to collect his profits and

allow Barnes to manage and grow C&B. Cellino did not raise any of the "issues" or "disagreements" until, upon information and belief, he began planning to dissolve C&B.

Upon information and belief, it was only after Cellino decided he wanted to appropriate C&B for his own ends and to the detriment of his fellow stockholder, Barnes, that Cellino began manufacturing issues regarding C&B's management and operation that he allegedly "disagreed with." Cellino now attempts to bootstrap a legal basis of self-imposed, newly-found dissension after not objecting to, and indeed consenting to, C&B's practices, operations, and management under Barnes' tutelage for almost ten (10) years.

2.   Admit.

3.   Admit.

4.   Admit.

5.   Admit.

6.   Admit.

7.   Admit.

8.   Admit.

9.   Admit.

10.   Admit.

11.   Respondents hereby admit that Barnes is the President and Treasurer of C&B and that Cellino is the Vice President and Secretary. Respondents otherwise deny that no other officers exist as Daryl Ciambella is C&B's Chief Operations Officer.

12.   Deny. The distinctions between the officers of C&B and the duties thereof are set forth in C&B's By-Laws (the "By-Laws"). For example, the role of the President of C&B is explained to be:

- 2 -

shall have the general powers and duties of supervision and management of the corporation which usually pertain to his or her office, and shall perform all such other duties as are properly required of him or her by the board of directors.

The Vice-President's obligations are limited to acting on behalf of the President "in the absence or disability of the President, or at his request[.]" Id. A copy of the By-Laws is attached to the Petition as Exhibit B.

13.    Deny. Barnes has not excluded Cellino from the practice of C&B. Rather, Cellino voluntarily withdrew from the practice after returning from his suspension from the practice of law in 2007. Barnes has also taken no action to divert funds or opportunities from C&B—his conduct has always been to further C&B and help the firm grow and succeed.

Cellino has voluntarily absented himself from C&B's practice to a large degree. He has spent the last several years pursuing personal ambitions such as developing and running a golf course, building a mansion in Hamburg, New York, operating a heavy equipment company, and operating a tree farm.

Funds and opportunities have not been diverted from C&B to the California LC (the "LC"). The LC has made cross-charges to the PC. Cellino has never provided any counter-accounting to dispute the amount of the cross-charges. Moreover, Cellino willfully blinds himself to the fact that the PC has greatly benefitted from the investment that Barnes alone has made in furthering C&B's brand.

14.    Respondents lack information or knowledge sufficient to form an assertion of truth as to Cellino's subjective belief(s). Respondents hereby deny the remaining allegations in paragraph 14. Upon information and belief, Cellino's allegation of lack of trust is a pretense to manufacture claims of dissension and deadlock to support an otherwise meritless petition for dissolution.

- 3 -

15.    Deny. Cellino has not attempted to obtain votes necessary to, nor even express his opinion that he desired to, change most of C&B's management policies/practices. Indeed, most of C&B's management is conducted by a management team—including managing attorneys for the various offices—and to which Cellino has not objected. Upon information and belief, Petitioner's allegations are pretextual, false, and are designed to manufacture claims of dissension and deadlock in an effort to support an otherwise meritless petition for dissolution.

16.    Deny. The alleged "dissension" or "divide" is not irreconcilable as Cellino himself has acknowledged that he is willing to "work things out" if dissolution is not granted. Annexed hereto as **Exhibit 1** is a copy of correspondence sent from Cellino demonstrating his willingness to "work things out" if dissolution is not granted.

Since the instant action was commenced on May 10, 2017, the firm has continued to move forward and grow on all metrics—for instance, C&B has received at least two (2) favorable jury verdicts, hired three (3) attorneys on consensus, agreed to charitable contributions, seen an increase in attorney compensation, and experienced continued growth of profits. Upon information and belief, the allegations of "complete breakdown of trust" and "diametrically opposed philosophies of practice" are false and are manufactured in an effort to obtain bases for the instant Petition.

17.    Deny. Dissolution is not beneficial to C&B's shareholders. Rather, dissolution would catastrophically harm the shareholders of C&B. Cellino has admitted in both the Petition (see V. Am. Pet. ¶242) and in e-mail correspondence that it would be "financial suicide" for the shareholders if C&B is dissolved. Annexed hereto as **Exhibit 2** is a copy of the affidavit of Brett L. Manske, sworn to June 21, 2017, setting forth Cellino's admission that dissolution would cause "financial suicide."

- 4 -

**18.** <u>Deny</u>. C&B is not a partnership but a professional corporation subject to New York corporate law. Petitioner's repeated references to C&B as a partnership is misleading and flatly contradicted by Petitioner's own allegations (<u>see</u> V. Am. Pet. ¶¶ 3-5) and the documentary evidence, <u>id.</u> at Ex. A.

**19.** <u>Deny</u>. Dissolution would not be beneficial to, and indeed would cause significant harm to, C&B's shareholders, clients, and the community—including C&B's employees and their families. Moreover, Respondents have formally set forth a viable alternative to dissolution: in the alternative to dismissing the Petition, the Court appoint an independent third director to resolve any alleged dissension or deadlock—to the extent it exists, which Respondents utterly refute and deny.

**20.** Respondents lack information or knowledge sufficient to form an assertion of the truth as to the allegations in paragraph 20.

**21.** Respondents lack information or knowledge sufficient to form an assertion of the truth as to the allegations in paragraph 21.

**22.** Respondents lack information or knowledge sufficient to form an assertion of the truth as to the allegations in paragraph 22.

**23.** Respondents lack information or knowledge sufficient to form an assertion of the truth as to the allegations in paragraph 23.

**24.** Respondents lack information or knowledge sufficient to form an assertion of the truth as to the allegations in paragraph 24.

**25.** Respondents lack information or knowledge sufficient to form an assertion of the truth as to Cellino's subjective belief(s).

26.    Respondents lack information or knowledge sufficient to form an assertion of the truth as to Cellino's subjective belief(s).

27.    Respondents lack information or knowledge sufficient to form an assertion of the truth as to the allegations in paragraph 27.

28.    Admit.

29.    The allegations in paragraph 29 are vague such that Respondents cannot form an assertion of the truth as to the same.

30.    Admit. In making the decision to incorporate in 1998, C&B embarked upon a program and policy of substantial investment in the promotion of the brand "Cellino & Barnes." Barnes relied upon the protections afforded by the corporate form—specifically the high barriers to dissolution—in deciding to invest substantial funds in the promotion and growth of the "Cellino & Barnes" brand. Absent the protections of the corporate form, and if Messrs. Cellino and Barnes had continued as a partnership, Barnes would not have agreed to invest substantial funds in the promotion of a brand. The brand depended on the personas of Messrs. Cellino and Barnes and Barnes would not have invested such substantial amounts in the brand were Cellino able to dissolve the firm and destroy the brand at will.

31.    Admit.

32.    Admit.

33.    Respondents lack information or knowledge sufficient to form an assertion of the truth as to Cellino's subjective belief(s).

34.    Admit. By the time C&B expanded to Long Island in 2008, Cellino had returned from his nineteen (19) month suspension and disengaged himself from the firm's overall practice and was only minimally involved in C&B's operations.

- 6 -

**35.** Deny. Both Cellino and Barnes began discussing expanding C&B to California in or around 2010, three (3) years before the expansion occurred. Cellino and Barnes planned to be 50-50 shareholders in the expansion to Los Angeles. Cellino was involved in planning the expansion and never opposed it. Indeed, Cellino and Barnes met with John Sheehan, Esq.—one of C&B's attorneys—to discuss Mr. Sheehan being the managing attorney for the LA office. It was not until approximately two months before Mr. Sheehan was scheduled to move to LA that Cellino approached Barnes and advised him that Cellino would not participate in the LA expansion.

Even though he decided last minute that he did not want to be a part of the expansion to California, Cellino expressed his continued support of Barnes' going forward with the expansion, including the use of the 800 number in California. Barnes realized that he had greater risk and had to invest double the amount to go forward with the expansion without Cellino's involvement; however, Barnes accepted the additional risk because Cellino agreed that the LC could use the C&B brand, the 800 number, and the facilities and resources of the PC. As such they agreed that the LC would reimburse the PC for use of the PC's resources through annual cross-charges.

**36.** Deny. Cellino was intimately involved in the expansion to California for three (3) years before backing out of the expansion a month before it was scheduled to occur.

**37.** Deny. Cellino was intimately involved in the expansion discussions at the outset, including meeting with John Sheehan, the attorney intended to manage the Los Angeles office. Barnes and Mr. Ciambella did not engage in expansion planning to the exclusion of Cellino or without his knowledge and consent.

**38.** Respondents admit that Cellino ultimately declined to become a 50% owner of the California L.C. after years of being interested and invested in expanding to the same. Respondents otherwise lack information or knowledge sufficient to form an assertion of the truth as to Cellino's

7 of 48

subjective belief(s) in his decision to limit himself to becoming a minority owner with a minimal interest (.1%) in the California L.C. Cellino never opposed the expansion.

**39.** <u>Deny</u>. Cellino remained a supportive partner in C&B's expansion to California. Cellino expressly agreed that the LC could utilize C&B's resources—including call centers, telephone number, attorneys and staff, IT systems, etc. In fact, one of the key considerations for both Cellino and Barnes in deciding to expand in every expansion effort—including California— was the fact that each office could use the centralized resources of C&B's main office in Buffalo, New York, lowering the effective cost to the PC.

Messrs. Cellino and Barnes did agree that the LC would reimburse the PC through annual cross-charges, which the LC has and continues to make to the PC. Respondents otherwise lack information or knowledge sufficient to form an assertion of the truth as to Cellino's subjective belief(s).

**40.** Respondents <u>admit</u> that the LC is a distinct entity from, but affiliated with, C&B— originally owned by Barnes (99.9%) and Cellino (.1%). Since commencing these proceedings, Cellino has withdrawn his minimal interest in the LC. The issues and allegations that Cellino raises in relation to the LC are therefore rectified and no longer relevant to the PC and the dissolution action.

Nonetheless, Respondents hereby <u>deny</u> the remaining allegations to the extent they imply that Barnes in any way favored the LC over the PC or in any way attempted to divert funds or profits rightly owed to the PC to himself through the LC to the exclusion of Cellino. Indeed, Barnes has not, to date, gained any profits through the LC. The only profits Barnes has made are through the PC.

**41.** <u>Admit</u>.

- 8 -

42.    Deny. Barnes has always emphasized C&B and its brand as a whole. He has attempted to grow all of its offices—be they in New York or California—to promote the "Cellino & Barnes" brand. Barnes has never diverted any funds, resources, or opportunities from the PC to the LC.

43.    Deny.

44.    Deny. C&B and Cellino have benefited from the LC and the large investment Barnes unilaterally made in furthering and growing the C&B brand with no contribution from Cellino whatsoever. C&B's ongoing success irrefutably belies the allegations in paragraph 44.

45.    Deny. Most of C&B's management has been done on consensus of both Barnes and Cellino—to the extent Cellino had not voluntarily withdrawn from those areas of practice. C&B has grown in prominence nationally, locally, and in the local legal community under Barnes management—none of which was at the exclusion of Cellino or his alleged "philosophy".

46.    Deny.

47.    Deny. Cellino has largely withdrawn from C&B's practice and is not sufficiently involved in C&B so as to cause a divide in the firm's management. Indeed, C&B's Management Team—including Barnes, Head Managing Attorney Robert Schreck, Esq., Chief Operating Officer Daryl Ciambella, and the Managing Attorney for C&B's downstate offices Dylan Brennan, Esq.— have all attempted to engage Cellino in C&B's practice and the management of the firm. Cellino has declined or ignored these efforts by the management team and instead focused on his personal ventures.

48.    Deny. The allegation of "pervasive internal dissension" is manufactured to create an illusion of deadlock and to bolster Petitioner's otherwise meritless petition for dissolution.

- 9 -

**49.** <u>Deny</u>. C&B has continued to be enormously successful despite the alleged dissension and deadlock, and indeed despite the negative publicity that has arisen from the instant proceedings. C&B has grown into, and remains, a multi-million dollar professional law corporation. Indeed, C&B has continued to function since the filing of these proceedings such that the firm has increased client intake by almost 9% in the eleven weeks since the original petition was filed compared to the eleven weeks prior. Furthermore, C&B has achieved an increase in settlements of approximately 7% so far in 2017 compared to the same time period in 2016.

**50.** The allegations in paragraph 50 constitute a legal conclusion to which no response is necessary.

**51.** <u>Deny</u>.

**52.** <u>Deny</u>. Upon information and belief, Cellino has refused to engage in good faith settlement negotiations, but rather, before and during said negotiations engaged in acts of bad faith, including, but not limited to, soliciting C&B's employees and attorneys to leave C&B and attempting to terminate C&B's relationship with its bank. Upon information and belief, Cellino has engaged in said conduct to destroy C&B for the purpose of creating a legacy firm for his family—specifically for the five of his six children, all of whom are or soon will be attorneys.

**53.** Respondents lack information or knowledge sufficient to form an assertion of the truth as to Cellino's subjective belief(s). Respondents otherwise <u>deny</u> the allegations in paragraph 53 to the extent they imply that a divide exists such that the functioning of C&B is in anyway limited or harmed.

**54.** Respondents lack information or knowledge sufficient to form an assertion of the truth as to Cellino's subjective belief(s). Barnes has been and remains willing to resolve any

alleged differences Cellino has alleged or may allege. Barnes welcomes the opportunity to work with Cellino once again to advance the interests of C&B, its employees, and its clients.

**55.** <u>Deny</u>.

**56.** <u>Deny</u>.

**57.** <u>Deny</u>. Barnes has always remained and remains willing to discuss any and all issues with Cellino, including resolution of the same.

**58.** <u>Deny</u>. Barnes and Mr. Ciambella did not conduct "secret meetings," nor did they ever exclude or conspire to exclude Cellino from said meetings or the firm's practice. Cellino was at all times welcome to participate in said meetings and involve himself in the firm's management. He chose to withdraw and absent from both.

**59.** <u>Deny</u>. Barnes never attempted or contemplated gaining sole control of C&B. Indeed, Barnes never complained about, or attempted to avoid, paying Cellino every dime he was owed as 50% shareholder—even though Cellino had largely withdrawn from C&B's practice after returning from his suspension in 2007.

**60.** Respondents <u>admit</u> that Barnes formed The Barnes Firm, LLC, a New York limited liability company, as a payroll company on December 13, 2016. Respondents otherwise <u>deny</u> the remaining allegations contained in paragraph 60 to the extent they are inconsistent with the foregoing.

**61.** Respondents lack information or knowledge sufficient to form an assertion of the truth as to Cellino's subjective belief(s) or knowledge. Respondents <u>admit</u> that the de minimus filing fee for creation of The Barnes Firm, LLC was initially paid through the accounting department of C&B. This was purely an oversight and neither Mr. Ciambella nor Barnes had asked the accounting department to pay the filing fee from the firm's account. When the error was

discovered, the charge was immediately reversed and the PC was reimbursed. Administrative errors such as this are unfortunately relatively common for a corporation the size of C&B, but whenever discovered Respondents have always rectified such errors. It is noteworthy that similar errors have been made in reverse—such that the LC was charged for PC expenses—and reimbursement subsequently made upon discovery.

**62.** Respondents refer to the referenced document for its complete and exact contents, meaning, and legal effect.

**63.** <u>Admit</u>. As previously stated, the utilization of C&B funds was incidental, de minimus, and subsequently rectified.

**64.** Respondents refer to the referenced document for its complete and exact contents, meaning, and legal effect.

**65.** <u>Admit</u>.

**66.** <u>Deny</u>. Respondents hereby refer to their response to paragraph 61.

**67.** <u>Deny</u>. Creation of The Barnes Firm, LLC had and has nothing to do with Cellino, and was created as a payroll company.

**68.** <u>Deny</u>. Barnes never used any funds other than his personal funds to fund The Barnes Firm, LLC. As such, Barnes had no obligation to inform Cellino of the creation of said company. Upon information and belief, Cellino has paid one or more C&B employees from personal or business accounts owned by Cellino for work performed by those employees relating to Cellino's golf course or other businesses. The instant circumstances are little, if any, different.

**69.** <u>Admit</u>. Cellino has no legal right to know, nor does Barnes of have any duty to disclose the transactions of The Barnes Firm, LLC. Notwithstanding, Respondents hereby offer to disclose all transactions of The Barnes Firm, LLC to demonstrate that the instant allegations have

no relevance to the issues at hand, and are no more than a continuation of Cellino's manufacturing issues to support his baseless Petition.

70.    Deny.

71.    Deny. The Barnes Firm, LLC has never had a website, nor have any efforts been made to create a website for The Barnes Firm, LLC.

72.    Admit. The Barnes Firm, LLC—through the use of Barnes' personal funds— purchased a telephone number, in June 2017, as a result of Cellino's threats to interfere with the LC's use of the 800 number in California. Cellino has subsequently followed up on those threats and improperly attempted to terminate the valid agreement between the PC and LC.

73.    Admit.

74.    Deny. The instant allegation is no more than an improper inference that The Barnes Firm, LLC is attempting to compete with C&B and demonstrates Cellino's efforts to manufacture non-existent issues to support his otherwise baseless petition for dissolution.

75.    Deny. A limited liability company cannot even practice law in New York State— only a professional limited liability company may practice law. There was no attempt or contemplation to transition any portion of C&B, its assets, attorneys, or infrastructure, to The Barnes Firm, LLC. Petitioner's allegations and implications are erroneous, malicious, and defamatory.

76.    Deny. Upon information and belief, Cellino has and continues to take steps toward creating a new law firm, including approaching C&B's in-house director of SEO and website development to work on creating Cellino's "new firm website."

77.    Respondents lack information or knowledge sufficient to form an assertion of the truth as to the allegation in paragraph 77. Respondents otherwise deny the allegations in paragraph

- 13 -

77 as there is no basis for Cellino to "no longer trust" Barnes because Barnes engaged in no wrongful conduct.

**78.** Deny. In addition to denying breach of trust, Respondents again point out that C&B is not a partnership.

**79.** Deny.

**80.** Deny. Cellino's wrongful conduct speaks for itself.

**81.** Deny.

**82.** Deny.

**83.** Deny. As previously mentioned, Cellino has acknowledged that he and Barnes can "work things out" if the Petition is dismissed and dissolution denied. Moreover, C&B continues to function and grow despite these proceedings and Petitioner's erroneous allegations.

**84.** Deny. In addition to the allegations in paragraph 84 being defamatory, they are conclusory and speculative as to what will happen in the future and rely on erroneous and baseless allegations. Barnes has never attempted to exclude or otherwise conspire to remove Cellino from C&B, nor has Barnes ever had any desire to "transition away" from the PC. These allegations are expressly refuted by numerous factual affidavits submitted in these proceedings.

**85.** Deny.

**86.** Deny. While C&B was still a partnership, Cellino and Barnes had joint decision-making authority. However, upon incorporating in 1998, the relationship between the shareholders, directors, and officers were governed by the By-Laws. Barnes is C&B's President and his responsibilities are articulated by the By-Laws. That being said, on the vast majority of large issues that have occurred in the firm, the shareholders have historically operated on consensus.

- 14 -

**87.** <u>Deny</u>. The allegations in paragraph 87 contradict Cellino's prior allegations—he simultaneously contends that he was excluded from C&B and plays an active role in C&B. Neither are true. Cellino voluntarily withdrew from C&B's practice and management and is not sufficiently engaged with the firm. This is confirmed by the affidavits of C&B's management team—Barnes, Robert Schreck, Dylan Brennan, and Daryl Ciambella—as well as of numerous C&B attorneys. In regards to the allegation that Cellino tried a case within the past three (3) years, the case at issue should never have been tried and ultimately was a waste of firm resources. To contrast Cellino's claim that he tried one case, Barnes has been involved in every substantial case the firm has ever resolved, and has given settlement and trial strategies on all types of cases, both large and small. Barnes is also lead counsel for many large cases, including a large products liability case pending in New York Supreme Court that will likely be tried later this year.

**88.** <u>Deny</u>.

**89.** <u>Deny</u>. C&B has continued to function extremely successfully and profitably despite the alleged dissension and deadlock. The management of C&B is largely controlled by managing attorneys for the various offices and has not been affected by the alleged "malfunction."

**90.** <u>Deny</u>. The allegations contained in the Petition are manufactured to create an illusion of dissension, deadlock, and malfunction where none otherwise exists. Moreover, the allegations in paragraph 90 are speculative and conclusory with no factual support.

**91.** <u>Deny</u>. Even if true at the time the original Petition was filed—which Respondents utterly deny—any issues raised by the LC have been remedied by the fact that Cellino withdrew his interest and the LC is in the process of transitioning away from C&B and utilization of its resources. Notwithstanding the aforementioned transition, Respondents deny that such transition

- 15 -

is necessary or required, and contend that valid agreements provide that the LC is entitled to the continued use of C&B's resources.

**92.** <u>Deny</u>. Cellino agreed and consented to the agreement between the LC and C&B for the use of C&B's resources, and the LC adequately compensates C&B for said resources.

**93.** <u>Deny</u>.

**94.** <u>Deny</u>. The LC pays a royalty for use of the 800 number pursuant to an agreement between the LC and C&B, to which Cellino consented. Barnes detrimentally relied on Cellino's agreement that the LC could use the 800 number by in unilaterally investing tens of millions of dollars to further promoting the C&B brand and 800 number in California.

**95.** <u>Deny</u>. Cellino has never provided Barnes or the LC with a counter-accounting for a value he contends is reasonable. Barnes remains open and willing to examining any counter-accounting Cellino proffers. However, Cellino's allegations in light of his failure to produce any such accounting raises issues of the genuine nature of the allegations and his credibility.

**96.** <u>Deny</u>. Payment for C&B employees was included in the cross-charge accountings to which Cellino did not object prior to these proceedings and in response to which Cellino still has not submitted a counter-accounting.

**97.** <u>Deny</u>.

**98.** Respondents lack information or knowledge sufficient to form an assertion of the truth as to the allegations in paragraph 98.

**99.** Respondents lack information or knowledge sufficient to form an assertion of the truth as to the allegations in paragraph 99. Respondents otherwise <u>deny</u> the allegations in paragraph 99.

**100.** Deny. Cellino has never provided an accounting to support his baseless assertions for the value owed to C&B. Moreover, his allegations do not demonstrate irreconcilable differences, but rather at most a dispute over value which can easily be resolved by accountings and/or by third-party dispute resolution.

**101.** Deny. See response to the allegations in paragraph 100.

**102.** Deny. Barnes is and has been willing to adjust the amount of compensation the LC makes to C&B if Cellino would offer an actual counter-accounting to that submitted by the LC.

**103.** Respondents admit that the LC paid a cross-charge of $927,000.00 for 2016. Respondents otherwise deny the allegations in paragraph 103. The compensation made by the LC to the PC was pursuant to the agreement entered into between the entities such that the LC provide fair value to C&B for resources used and by no means a recognition of any unfair utilization of resources.

**104.** Deny.

**105.** Deny. Barnes and the LC provided Cellino with an accounting for the 2016 cross-charges. Cellino cannot say the same for the values he contends are applicable.

**106.** Deny.

**107.** Deny. The LC adequately compensated C&B for the resources used. In regards to Cellino's attempted "revocation" of the LC's utilization of the 800 number, Cellino lacks the authority to take such unilateral action. Moreover, Cellino lacks the authority to engage in such self-help absent petitioning to the Court for leave to do so. As a precaution, and without expressly or impliedly acknowledging any validity to Cellino's unilateral and improper actions, the LC has begun transitioning away from utilization of the PC's resources despite the existing agreement permitting said use.

**108.** Deny.

**109.** Respondents admit that the 800 number is owned by Call Eight, LLC, a Delaware limited liability company, of which C&B is the sole member, and of which Cellino and Barnes are the sole managers. Respondents deny the remaining allegations, including any implication that Cellino has any authority to refuse to grant the LC continued permission to use the 800 number.

**110.** Deny.

**111.** Deny.

**112.** Deny.

**113.** Deny. The attorney in question, Christian Oliver, Esq. (who happens to be Cellino's nephew), approached Barnes about the possibility of running the San Diego office. Mr. Oliver had discussions with Barnes from approximately early 2016 through the date of his hire in February 2017, regarding the position of managing attorney for the San Diego office. Cellino was aware of these discussions and Mr. Oliver's desire to manage the office.

**114.** Deny.

**115.** Deny. In 2016, the LC engaged in a national advertising campaign for mass tort cases through Sirius Radio and other media sources. In 2016, Barnes advised Cellino that any mass tort cases that were gathered by either the LC or PC in New York or Northern New Jersey would be signed to PC retainer agreements irrespective of whether these cases were retained through advertisements funded by the LC. In other words, the PC obtained cases through the investment of Barnes and the LC. In September 2016, Barnes sent an e-mail to Cellino and invited Cellino's discussion and input pertaining to this matter, but Cellino never responded or sought to communicate with Barnes about the issue. The amount the PC spent advertising for mass tort cases in 2016 was less than it had been in 2015, and yet, the PC's client intake for mass tort cases

- 18 -

substantially increased. This major benefit occurred simultaneously with the time period that the LC funded the national mass torts advertising campaign.

Importantly, to the extent Cellino's allegations are deemed colorable, which is utterly denied, the fact remains that none of the mass tort cases at issue have settled to date. As such, neither the PC nor LC have made any money from these cases and resolution of said "issue" is as easy as transferring/allocating the cases from one entity or the other. As such, even if true, this is not an irreconcilable issue or demonstrative of dissension or deadlock.

116.    Deny.

117.    Deny. Cellino was the one who considered C&B removing its mass tort practice and referring said cases to outside counsel. Barnes and the head of C&B's mass torts division, Brian Goldstein, Esq., explained that it was not a good idea and Cellino ultimately agreed.

118.    Deny. The LC conducted minimal national advertising for mesothelioma cases in 2017. The PC has never done any national advertising for mesothelioma cases, nor has Cellino ever raised this issue. In fact, the PC has benefitted from the national advertising conducted by the LC because the PC has retained two cases from Michigan as a result, whereas the LC has not retained any cases from areas Cellino contends are "competitive areas" between the PC and LC. Further, neither the PC nor LC has made any money off of any mesothelioma case retained, and as such, similar to the mass torts cases, the allocation of these cases can be easily rectified if Cellino's allegations are deemed colorable.

119.    Deny.

120.    Deny. New York State cases are handled by the PC and not the LC—the LC primarily handles cases local to California and the Mass Torts cases. Barnes has never made any effort to favor the LC over the PC.

- 19 -

**121.** <u>Deny</u>. Respondents hereby <u>admit</u> that California law permits plaintiff's lawyers to charge whatever percentage a lawyer chooses regarding personal injury cases. However, there is no "conflict" between the PC and LC regarding personal injury cases. The percentage set forth in the LC retainer agreements has nothing to do with any alleged issue pertaining to East Coast clients. Respondents <u>deny</u> that any cases were ever allocated to the LC as a result of any higher percentage of attorney's fees available in California, and further <u>deny</u> that any practices by the LC ever had any detrimental effect on the PC.

**122.** <u>Deny</u>. The LC has never been given a case that should have been handled by an attorney employed by the PC.

**123.** <u>Deny</u>.

**124.** <u>Deny</u>.

**125.** <u>Deny</u>.

**126.** Respondents lack information or knowledge sufficient to form an assertion of the truth as to Cellino's subjective belief(s) and/or reasoning for his conduct. Respondent otherwise <u>admits</u> the allegations in paragraph 126. Mr. Ciambella has been a crucial employee to C&B's success, and, along with Robert Schreck, Esq. and Dylan Brennan, Esq., has been a member of C&B's Management Team that is largely responsible for C&B's growth and success. Cellino never provided any reasoning for Mr. Ciambella's termination and Barnes was and is of the opinion that terminating Mr. Ciambella would be a terrible business decision for C&B.

**127.** <u>Admit</u>. Cellino is not a signatory on the bank accounts at issue—he refused to be a signatory on the accounts after returning from his suspension in 2007. As such, the bank made the decision that Cellino did not have the authority to restrict the firm's longstanding practices

pertaining to banking policies. Moreover, Cellino's unilateral action violated the Court's status quo order.

**128.** <u>Deny</u>. While Respondents <u>admit</u> that Mr. Ciambella's access to C&B's bank accounts has not been revoked or restricted, Respondents <u>deny</u> that Petitioner's claim(s) constitute deadlock or otherwise prevents the effective functioning of C&B. Mr. Ciambella has been an authorized user with access to the bank accounts for almost a decade. He has in no way interfered with the successful implementation of corporate policies as evidence by C&B's tremendous growth and success during that time.

**129.** <u>Deny</u>. Cellino has not even attempted to conduct any meeting—shareholder, board of directors, or otherwise—to alter C&B management or policies.

**130.** <u>Deny</u>. The allegations in paragraph 130 is utterly refuted by documentary evidence.

**131.** <u>Deny</u>. Barnes has not favored the LC over the PC. Moreover, C&B is not a partnership, but a professional corporation.

**132.** <u>Deny</u>. The only harm to C&B has been a result of Cellino's bad faith conduct since filing the Petition.

**133.** Respondents <u>admit</u> that C&B is "highly profitable," that it faces "marketplace competition from other law firms that are attempting to replicate the firm's marketing strategy," and that it is "well-positioned to overcome these challenges." Respondents otherwise <u>deny</u> the allegations in paragraph 133. The firm's leadership, including C&B's Management Team, remain focused on the continued success of C&B. Barnes hopes that Cellino will return to being an active participant in the firm's management and practice.

**134.** Respondents lack information or knowledge sufficient to form an assertion of the truth as to Cellino's subjective belief(s). Respondents otherwise <u>deny</u> the allegations in paragraph 134.

**135.** <u>Deny</u>. C&B has at all times been and continues to be an orderly functioning law firm—one that is incorporated as a professional law corporation, not a partnership.

**136.** <u>Deny</u>.

**137.** <u>Admit</u>.

**138.** <u>Deny</u>. With the exception of Barnes' termination of Maureen Napoli after she accompanied and aided Cellino on his raid of C&B's employees on May 10, 2017—whom Barnes agreed to rehire—Barnes has never hired or fired a C&B employee without the consent of Cellino. Ultimately, Barnes agreed to rehire Ms. Napoli.

**139.** <u>Deny</u>.

**140.** <u>Deny</u>.

**141.** <u>Deny</u>. The instance in question involved an employee that began demonstrating an attitude unbecoming of a professional and improper for C&B's environment over time. C&B attorneys complained about the employee's conduct on multiple occasions. Ultimately C&B decided that a change was needed—a decision which was made on a Friday. C&B's head managing attorney, Robert Schreck, Esq., suggested that, as a long-time employee, she deserved a face-to-face meeting outside the view of other employees. Mr. Schreck volunteered to go to her house to speak with her. Everyone, including Cellino, was aware that he was going to do so. Barnes did not order anyone to go to the employee's home—Cellino knows this to be true despite the allegations herein. Cellino consented to the employee's termination and made no objection after the decision has been made.

142.   <u>Deny</u>.

143.   <u>Deny</u>. As discussed above, Cellino agreed and consented to the decision to terminate the employee.

144.   <u>Deny</u>. Cellino did not raise any objection to the employee's firing at the time, nor in the five years since prior to the Petition.

145.   <u>Deny</u>. Cellino was aware that Mr. Schreck chose to go to the employee's home and the reasons therefor. He did not object to Mr. Schreck's decision to do so. Cellino even called Mr. Schreck after the termination to see how it went.

146.   <u>Deny</u>.

147.   <u>Deny</u>. There was only one occasion where Barnes refused to pay more money to an employee of C&B where Cellino appeared to acquiesce to the request. In that instance, the employee stated that he had an offer to join a corporation for $100,000 more than C&B was paying him. After refusing to pay the employee, Cellino approached Barnes and acknowledged that the employee's story was a ruse to get a raise and told Barnes he was correct to refuse the raise.

148.   <u>Deny</u>. Cellino has never raised this issue prior to filing the Petition. C&B's policy regarding attorney compensation for cases brought in through the attorneys' "friends and family" is set forth in C&B's Employment Agreement and has never been challenged by Cellino prior to the institution of these proceedings.

149.   Respondents lack information or knowledge sufficient to form an assertion of the truth as to Cellino's subjective belief(s). Respondents <u>deny</u> that Cellino ever indicated his belief relating to the allegations in paragraph 149 to Barnes.

**150.** <u>Deny</u>. Barnes, in his capacity as President of the firm and supervisor has, on occasion, expressed dissatisfaction with the way certain tasks are performed. However, Barnes denies that he "berates" employees.

**151.** <u>Deny</u>.

**152.** <u>Deny</u>.

**153.** <u>Deny</u>.

**154.** <u>Deny</u>.

**155.** <u>Deny</u>. C&B is not a partnership.

**156.** Respondents hereby <u>admit</u> that Barnes initially declined to hire Cellino's daughter. Respondents <u>deny</u> the allegations in paragraph 156 to the extent they imply that Barnes has continued to decline to hire Cellino's daughter.

**157.** Respondents lack information or knowledge sufficient to form an assertion of the truth as to Cellino's subjective belief(s). Upon information and belief, the allegations in paragraph 157 are false. Cellino's conduct since filing the Petition undercuts his allegations herein. In the meetings where Cellino illicitly solicited C&B attorneys and employees, he focused significant portions of those meetings on discussions about his family, his hiring of his family members to his new firm, his family's compensation, and his creation of a "legacy" firm.

**158.** Respondents lack information or knowledge sufficient to form an assertion of the truth as to Cellino's subjective belief(s).

**159.** Respondents <u>admit</u> that Cellino discussed hiring his daughter with Barnes in 2012. Respondents <u>deny</u> that Cellino ever offered to pay his daughter out of his share of C&B's profits. Moreover, Barnes sought assurances that Cellino sought only to hire his one daughter, not his four

other children who either are or soon will be attorneys. Cellino refused. Nonetheless, Barnes did offer to hire Cellino's eldest daughter.

**160.** <u>Deny</u>.

**161.** <u>Deny</u>.

**162.** <u>Deny</u>. Cellino did in fact agree to Richard Barnes, Esq.'s compensation, but was by no means under duress when he did so. This is demonstrated by the Cellino's allegations themselves: Cellino alleges he agreed "under duress" in 2007 and did not "raise[] an objection" until 2015. There were strategic, firm-protecting reasons for Cellino and Barnes agreeing to increase Richard Barnes' salary.

**163.** <u>Deny</u>. Barnes engaged in discussions with Cellino in which he acknowledged that Richard Barnes' salary may need to be adjusted.

**164.** <u>Deny</u>.

**165.** <u>Deny</u>. Again, C&B is not a partnership.

**166.** <u>Deny</u>.

**167.** <u>Deny</u>. The attorneys at C&B have a great deal of autonomy. Barnes has a great working relationship with C&B's attorneys as demonstrated by the various affidavits submitted in opposition to dissolution. Barnes provides a "second set of eyes" to settlements beyond certain amounts and provides trial strategies and settlement techniques to C&B's attorneys.

**168.** Respondents lack information or knowledge sufficient to form an assertion of the truth as to Cellino's subjective belief(s). Respondents <u>deny</u> that Cellino ever indicated his belief relating to the allegations in paragraph 168 to Barnes. In every interview that the firm has ever had with an attorney-candidate—for which Cellino has always been present—C&B's policy that Barnes approve settlements over $20,000 is brought up with the candidate. Cellino has never taken

- 25 -

the initiative either during or after an interview to bring up his alleged objection to this longstanding policy.

**169.** Deny.

**170.** Respondents admit that there are cases where, due to circumstances of a case, the proceeds resulting from the client's lawsuit are less than the attorneys' fees owed to the firm. In many instances, the firm will agree to waive or reduce its fee.

**171.** Deny. C&B adjusts and reduces client fees regularly. C&B does not have a policy in place for such reduction, but instead analyzes each matter on a case by case basis to determine the fair fee owed—including the amount of work and resources the C&B attorney(s) allocated to the case prior to resolution. Cellino has never raise this issue or objected to C&B's handling of these types of cases prior to the instant proceedings.

**172.** Deny. As mentioned above, C&B and Barnes reduce client fees when appropriate.

**173.** Respondents lack information or knowledge sufficient to form an assertion of the truth as to the allegations contained in paragraph 173.

**174.** Deny. C&B is not a partnership, nor has the working relationship between the shareholders and directors deteriorated so as to impede the successful functioning of the firm.

**175.** Deny. It is not uncommon for clients represented by other counsel to call the firm because they are unhappy with their current representation. The policy of the firm is to handle these inquiries on a case-by-case basis. Often times, C&B's attorneys (not Barnes or the Management Team) will decide to sign a case where the client wishes to discharge prior counsel. C&B attorneys have also advised prospective clients that it was in their best interest to remain with their counsel.

For all new cases, C&B attorneys prepare a preliminary evaluation memorandum ("PEM") and e-mail a copy to C&B's Management Team and Cellino. If a client was previously represented by prior counsel, it will be detailed in the first sentence of the PEM. Cellino has never responded to such PEMs with any objection to the case having come into C&B where a prior attorney was involved, nor has he ever refused to accept the profits generate from said cases. Indeed, one of the largest cases the firm has ever handled was a case which Cellino accepted despite prior counsel's involvement. Cellino personally wrote the discharge letter to prior counsel in that case.

**176.** Respondents lack information or knowledge sufficient to form an assertion of the truth as to Cellino's subjective belief(s). Respondents hereby deny that Cellino ever attempted to institute a policy of calling the prospective client's attorney and determining where the relationship can be salvaged before C&B would agree to take the case. Cellino has never mentioned that he supports such a policy.

**177.** Respondents lack information or knowledge sufficient to form an assertion of the truth as to Cellino's subjective belief(s). Respondents deny that Cellino ever indicated his belief relating to the allegations in paragraph 177 to Barnes and that Barnes unilaterally imposes his own aggressive approach to soliciting cases from other attorneys.

**178.** Deny.

**179.** Deny. Cellino has never objected to the manner by which C&B resolves fee disputes. C&B attorneys Dylan Brennan and Gregory Pajak handle C&B's downstate and upstate fee disputes respectively. Cellino has also never objected to their work on these issues.

**180.** Respondents lack information or knowledge sufficient to form an assertion of the truth as to Cellino's subjective belief(s). Respondents admit that Cellino proposed that he exclusively manage the attorneys in one of C&B's offices and that Barnes refused to permit

- 27 -

27 of 48

exclusive control over any office to either Cellino or Barnes. Barnes offered other tasks that Cellino could take on to be of benefit to C&B. Cellino flatly refused and demanded exclusive control. No one individual has exclusive control over any of C&B's offices. C&B has managing attorneys for the various offices, a head managing attorney, Mr. Schreck, for C&B as a whole, and Barnes as President of C&B. Together these individuals, along with C&B's Chief Operations Officer, Daryl Ciambella, make up the C&B Management Team. C&B has prospered greatly under the tutelage of the Management Team.

**181.** <u>Deny</u>. Cellino has the authority to manage any and all cases he so desires. He voluntarily has chosen not to do so and withdrawn from C&B's practice. Barnes has never told Cellino he could not involve himself in case management duties and welcomes further involvement from Cellino.

**182.** <u>Deny</u>. Neither Barnes nor any other member of the Management Team has ever refused "to permit Cellino to exercise control over the firm." It has never been up to Barnes to "give" Cellino things to do. Rather, Cellino is a 50% shareholder of a multi-million dollar law firm; it is up to Cellino to take initiative and involve himself in C&B's practice. He has refused and failed to do so.

**183.** <u>Deny</u>.

**184.** <u>Deny</u>.

**185.** <u>Deny</u>. C&B has a valid buy-sell agreement in place that both Cellino and Barnes executed and agreed to. Barnes has indicated his willingness to alter the succession plan if Cellino desires. However, Cellino's "succession plan" is an attempt to transfer all of his ownership in C&B to his children and create a "legacy firm." Cellino approached Barnes and Mr. Ciambella to attempt

to determine whether he could transfer his shares in C&B to his children. C&B's corporate documents prevent such action.

**186.** <u>Deny</u>. Barnes has discussed this issue with Cellino on multiple occasions.

**187.** <u>Deny</u>.

**188.** <u>Deny</u>. The very definition of a succession plan is a device to determine the path of the firm after one or more shareholder retires or is deceased. As such, the succession plan cannot harm that shareholder. If Cellino receives the benefit of the succession plan he will be permitted to do as he will with C&B as he will be sole owner. If Barnes receives the benefit of the succession plan, Cellino as a shareholder will not be harmed because he will no longer have any interest in the firm. The succession plan cannot be deemed as detrimental to the shareholders.

**189.** <u>Deny</u>. All marketing and advertising campaigns have been done on consensus of both Cellino and Barnes.

**190.** <u>Deny</u>.

**191.** Respondents <u>admit</u> that the firm's competitors have always been attempting to "gain ground in the New York markets." There is nothing new about this. Respondents otherwise <u>deny</u> the allegations contained in paragraph 191. Moreover, Cellino suggested an "attack campaign" against local competition. Barnes advised Cellino that he thought such a campaign could have adverse ethical implications and could result in disciplinary action. Cellino ultimately agreed that C&B should not run the attack campaign.

**192.** <u>Deny</u>. C&B only used the coast-to-coast theme for a single set of advertisements. Cellino agreed to the national marketing campaign because he and Barnes both believed that emphasizing the firm's national presence would have a significant impact on growing C&B. The

national coast-to-coast campaign was just one of the many marketing strategies that C&B conducted upon consent of both Cellino and Barnes.

    **193.**   <u>Deny</u>.

    **194.**   <u>Admit</u>.

    **195.**   Respondents hereby <u>admit</u> that the needs of each community have always been a priority of C&B. Respondents otherwise lack information or knowledge sufficient to form an assertion of the truth as to Cellino's subjective belief(s). Respondents <u>deny</u> that Cellino ever indicated his belief relating to the allegations in paragraph 195 to Barnes.

    **196.**   <u>Deny</u>. Barnes has always been committed to the advancement of C&B, both as a whole and for its individual offices. Barnes' commitment to the PC has never wavered due to his involvement with the LC.

    **197.**   <u>Deny</u>. Barnes has always emphasized the C&B Brand.

    **198.**   <u>Deny</u>. C&B has continued to be successful locally despite, and indeed because of, the national marketing. C&B's national image creates more and easier access to the firm's brand for prospective clients. For instance, Google categorizes C&B as a national brand and not just a location-specific firm. The national brand classification by Google's algorithms gives each of C&B's local offices a distinct advantage with both SEO rankings and pay-per-click performance—meaning easier and more economical access to C&B's brand.

    **199.**   <u>Deny</u>. Cellino took the position that C&B should refer/outsource its mass tort cases to other firms. C&B has never been a "referring mill" and all cases the firm has received have been handled by a C&B attorney. Cellino was advised against creating such a "referring mill" by both Barnes and C&B's head of the mass torts division, Brian Goldstein, Esq. The allegation of creating "co-counsel relationships" is equivocal and false.

- 30 -

**200.** Respondents lack information or knowledge sufficient to form an assertion of the truth as to Cellino's subjective belief(s). Respondents deny that Cellino ever indicated his belief relating to the allegations in paragraph 200 to Barnes. Respondents further deny that referring mass tort cases to outside firms would in any way benefit C&B.

**201.** Deny. Cellino discussed his proposal that C&B outsource the mass tort cases with Barnes and C&B's head of the mass torts division, Brian Goldstein, Esq., separately and together. Both Barnes and Mr. Goldstein explained that C&B would lose significant profits because C&B's mass torts division is extremely successful and efficient in its handling of the cases. After discussing the issue Cellino agreed that the mass torts cases should not be outsourced and never raised the issue again.

**202.** Deny. C&B has attained more than $140 million in mass tort settlements. It clearly optimizes the firm's resources and effectiveness.

**203.** Respondents lack information or knowledge sufficient to form an assertion of the truth as to Cellino's subjective belief(s). Respondents otherwise deny the allegations in paragraph 203.

**204.** Deny.

**205.** Deny.

**206.** Deny.

**207.** Deny. Cellino has recognized that he is able to work things out if dissolution is not ordered. Barnes remains willing to work out the alleged issues with Cellino. The issues at hand do not relate to the firm's functionality at any rate.

**208.**    Respondents lack information or knowledge sufficient to form an assertion of the truth as to Cellino's subjective belief(s). Respondents otherwise <u>deny</u> that Barnes engaged in any wrongful conduct that would cause Cellino to lose trust in him.

**209.**    <u>Deny</u>.

**210.**    <u>Deny</u>. Barnes remains open and willing to resolve the issues Petitioner alleges.

**211.**    The allegations in the first sentence of paragraph 211 constitute hypothetical legal conclusions to which no response is required. Respondents otherwise <u>deny</u> the allegations in paragraph 211. Moreover, the allegations in paragraph 211 demonstrate an admission by Petitioner that Cellino has not engaged any affirmative conduct necessary for dissolution proceedings pursuant to BCL § 1104.

**212.**    <u>Deny</u>.

**213.**    <u>Deny</u>.

**214.**    <u>Deny</u>.

**215.**    <u>Deny</u>.

**216.**    <u>Deny</u>.

**217.**    Respondents lack information or knowledge sufficient to form an assertion of the truth as to Cellino's subjective belief(s). Respondents otherwise <u>deny</u> the allegations in paragraph 217. Dissolution is not the best and only remedy for a company producing over $20 million in profits annually and only continuing to grow.

**218.**    Respondents hereby <u>deny</u> the allegations in paragraph 217 to the extent they imply that Barnes terminated Cellino's access to C&B's computer network and e-mail systems as a result of the Petition. Respondents <u>admit</u> that Barnes terminated said access as a result of Cellino using that access to engage in a campaign of illicitly soliciting C&B attorneys and employees in an

attempt to pillage and pirate said attorneys and employees from C&B to Cellino's "new Cellino firm."

**219.** Respondents lack information or knowledge sufficient to form an assertion of the truth as to Cellino's knowledge or lack thereof. Respondents other deny the allegations in paragraph 219.

**220.** Respondents hereby admit that Barnes terminated a long-time employee as a result of said employee engaging and aiding in Cellino's campaign of illicitly soliciting C&B attorneys and employees. Respondent otherwise deny the allegations in paragraph 220.

**221.** Respondents admit that Barnes did not consult with Cellino to terminate an employee who was engaging in illicit conduct and improper solicitation of C&B employees alongside Cellino. Respondents otherwise deny the remaining allegations in paragraph 221.

**222.** Deny. The allegations in paragraph 222 are a misrepresentation of the circumstances leading to the employee's reinstatement. The parties jointly agreed to a stipulated order—including all terms therein—which the Court subsequently granted.

**223.** Respondents hereby admit that Cellino opposed C&B giving a mid-year bonus to Daryl Ciambella. Respondents otherwise deny the allegations contained in paragraph 223.

**224.** Deny. Cellino is the individual who went office-to-office soliciting C&B attorneys and employees to leave C&B, not Barnes.

**225.** Respondents refer to the referenced document for its complete and exact contents, meaning, and legal effect.

**226.** Deny.

**227.** Respondents hereby deny the allegations in paragraph 227 to the extent they imply that Barnes in any way mistreated and/or mistreats C&B employees.

**228.** Respondents hereby <u>admit</u> that C&B attorneys provided affidavits as to their sworn statements of the circumstances at C&B. Respondents otherwise <u>deny</u> the allegations in paragraph 228. The affidavits of C&B's attorneys and Management Team speak for themselves.

**229.** <u>Deny</u>.

**230.** <u>Deny</u>. Cellino's rights are less effective because he refused to take any affirmative action. Cellino bears the burden of demonstrating actual dissension and deadlock, not hypothetical deadlock or unexpressed opinion.

**231.** <u>Deny</u>.

**232.** Respondents lack information or knowledge sufficient to form an assertion of the truth as to the allegations in paragraph 232 regarding conversations between various attorneys and Petitioner. Respondents otherwise <u>deny</u> the remaining allegations contained in paragraph 232 to the extent they imply that Barnes engaged in adverse employment action or fired employees he personally disliked.

**233.** <u>Deny</u>. The fact that C&B's attorneys are willing to swear under oath about Cellino's lack of involvement in C&B's practice does not demonstrate any pressure by Barnes, but rather the voluntary withdrawal of Cellino. Cellino's baseless allegations of "pressure" being exerted on C&B attorneys is patently false and does not alter the truth contained in their affidavits.

**234.** The allegations in paragraph 234 constitute a legal conclusion to which no response is required. Barnes otherwise states that Respondents' attorneys' fees have been paid by Barnes' personal funds.

**235.** <u>Deny</u>.

**236.** <u>Deny</u>.

**237.** <u>Deny</u>. C&B continues to function and prosper, and indeed, has continued its trend of growth and prosperity throughout and despite the instant proceedings and allegations therein and the harm caused therefrom.

**238.** <u>Deny</u>. Cellino has repeatedly violated the status quo order through courses of conduct that had and have the potential to cause substantial irreparable harm to the firm.

**239.** <u>Deny</u>. The issues requiring counsel participation have been manufactured by Petitioner to manufacture and illusion of deadlock and dissension to support the otherwise baseless Petition.

**240.** <u>Deny</u>. Petitioner's allegations of "looming financial loss" and "emotional well-being" are speculative and conclusory with no supporting basis in fact. Indeed, Petitioner has not and cannot refute the fact that C&B has continued extremely profitably and resulted in Barnes and Cellino both receiving over $3 million since these proceedings began. That utterly belies any claim of "looming financial loss."

**241.** <u>Deny</u>.

**242.** <u>Deny</u>. Again, Petitioner submits no more than conclusory and baseless allegations of "brighter emotional future as well as greater financial security in what will be a more stable, functional, and profitable law firm." Such meritless allegations are insufficient to be awarded dissolution, factual support is required and yet entirely absent.

**243.** <u>Deny</u>.

**244.** <u>Deny</u>. Dissolution will not result in any preservation of C&B or its brand—it will result in the destruction of both. The allegations in paragraph 244 are entirely disingenuous, speculative, conclusory, and unsupported.

**245.** <u>Deny</u>.

- 35 -

35 of 48

**246.** Deny.

**247.** Deny. It is Barnes' intent to maintain and protect C&B as it currently exists and continue to provide its attorneys, employees, and clients the firm they first chose to build their careers and for their representation respectively.

**248.** Deny. Petitioner submits another speculative and conclusory allegation. There is no evidence that C&B's clients will be benefited by dissolution. Indeed, C&B's clients will be substantially harmed if dissolution is granted.

**249.** Deny.

**250.** Respondents repeat, refer to, and reallege all prior responses.

**251.** No response required.

**252.** Deny.

**253.** Deny.

**254.** Respondents lack information or knowledge sufficient to form an assertion of the truth as to Cellino's subjective belief(s). Respondents otherwise deny the allegations in paragraph 254.

**255.** The allegations in paragraph 255 constitute a legal conclusion to which no response is required. Respondents otherwise deny the allegations in paragraph 255.

**256.** The allegations in paragraph 256 constitute a legal conclusion to which no response is required. Respondents otherwise deny the allegations in paragraph 256.

**257.** The allegations in paragraph 257 constitute a legal conclusion to which no response is required. Respondents otherwise deny the allegations in paragraph 257.

**258.** Deny.

**259.** Deny.

**260.**    Deny.

**261.**    The allegations in paragraph 261 constitute a legal conclusion to which no response is required. Respondents otherwise deny the allegations in paragraph 261.

**262.**    Deny.

**263.**    The allegations in paragraph 263 constitute a legal conclusion to which no response is required. Respondents otherwise deny the allegations in paragraph 263.

**264.**    Respondents lack information or knowledge sufficient to form an assertion of the truth as to the allegations in paragraph 264.

**265.**    Respondents repeat, refer to, and reallege all prior responses.

**266.**    The allegations in paragraph 266 constitute a legal conclusion to which no response is required.

**267.**    The allegations in paragraph 267 constitute a legal conclusion to which no response is required.

## FIRST OBJECTION IN POINT OF LAW

**268.**    Petitioner's claims are barred because of Cellino's bad-faith conduct.

**269.**    Cellino breached his fiduciary duties to C&B by planning and attempting a raid on C&B's attorneys, employees, and clients.

**270.**    Cellino attempted to manufacture dissension for the purpose of misappropriating C&B's infrastructure, personnel, and goodwill for a future "Cellino legacy firm."

**271.**    Within minutes of filing the Petition, Cellino began illicitly soliciting C&B employees to join his new "Cellino firm" despite the fact that C&B was still an existing and operating professional corporation for which Cellino remained a director, officer, and shareholder.

**272.** On May 10, 2017, around the same time he filed the Petition, Cellino sent three (3) e-mails to C&B personnel within a seven (7) minute span. One of the e-mails was sent to every attorney at C&B, titled "Vision for your Future", and contained the express purpose of explaining "Why you should join my new firm".

**273.** The e-mails disparaged Barnes, C&B, and certain C&B employees, and were for the express intent of convincing C&B employees to join his new firm rather than stay employed by C&B/Barnes.

**274.** Immediately after sending the e-mails, Cellino visited numerous C&B offices in New York State to illicitly solicit C&B attorneys in person. This included having a private jet chartered to take Cellino to New York City to visit C&B's downstate offices.

**275.** As a result of Cellino's conduct, on May 15, 2017, this Court set forth its Status Quo Directive. The directive was for the purpose of maintaining C&B as it currently functions and included the express prohibition of either party, or their agents and representatives, soliciting C&B personnel to leave the firm.

**276.** Notwithstanding the Status Quo Directive, I was informed that Cellino and individuals acting on Cellino's behalf visited C&B's downstate offices on or around July 27 and 28, 2017, and were attempting to solicit C&B attorneys and employees.

**277.** The "pitch" being made to C&B's personnel included statements such as: (a) "You will be better off if C&B is dissolved"; (b) "We are on Cellino's team"; and (c) "Cellino will have the Melville office and you can work there". Another statement that Cellino made to the attorneys and employees during his pitch was that the "Cellino" name was "better" than the "Barnes" name—analogizing our firm to Harley-Davidson and telling people "no one ever calls their

motorcycle a Davidson." Such a pitch is clearly intended to recruit C&B attorneys and employees to Cellino's new "Cellino & ??" firm.

**278.** Cellino also has engaged in disparaging and damaging conduct ever since filing the Petition, including, but not limited to, engaging in an interview on June 26, 2017, during which he publicly advised clients to leave C&B and that it would "be best . . . to just move forward."

**279.** Based on Cellino's conduct, it is clear that his sole basis for petitioning for dissolution is to pillage C&B and obtain the benefits of the firm built up over the years by the joint efforts of both he and Barnes.

**280.** Cellino has also attempted to interfere with C&B's banking relationship.

**281.** On June 6, 2017, Cellino attempted to revoke C&B's Chief Operations Officer's (Daryl Ciambella) authority to wire or transfer any funds absent joint authorization from Cellino and myself. This could have caused C&B to be unable to make payroll and pay C&B's employees.

**282.** Cellino does not have the authority to make such a demand or revocation as a 50% percent shareholder nor in any of his roles as an officer or director of C&B. Indeed, the representative of the bank responded to Cellino stating:

> The accounts Cellino & Barnes, PC maintain at the Bank are governed by various documents previously entered into by the parties, which include Resolutions/Signature Cards naming authorized signers on each of the Accounts. . . . After review, the Bank has determined it cannot accommodate [Cellino's] request for several reasons. Primarily, the Bank does not have the ability to monitor and enforce such limits to the authority of an authorized individual such as Mr. Ciambella. The account documentation must continue to govern the Accounts unless and until the parties agree to supplement, amend or replace that documentation.

**283.** Having been unsuccessful in his attempt, Cellino attempted a new tactic, responding:

> I hereby revoke my personal guarantees for the two line [sic] of credit accounts for Cellino & Barnes, PC. . . . [o]ur current balance in our attorney account is

$5,131,230.31. According to the latest [] Bank statement, the outstanding balance on the disbursement line of credit is $4,589,365.28. The bank has the legal authority to set off from the cash bank balances and pay off this indebtedness.

**284.** Cellino is aware of the importance of C&B's use of the disbursement credit line because he was involved in the decision to take out the disbursement line and the business reasons therefor, and indeed he spearheaded the initial discussions to alter the firm's disbursement-paying practices in the first place. Cellino also indisputably consented to taking out the disbursement line—seeing as he is a personal guarantor on the line.

**285.** Cellino is aware that C&B's current business functionality will be severely harmed if the disbursement line of credit is made immediately due.

**286.** Cellino's bad-faith conduct utterly and absolutely bars him from obtaining dissolution.

## SECOND OBJECTION IN POINT OF LAW

**287.** Petitioner's claims are barred by Respondents' good-faith conduct.

**288.** Specifically, Petitioner's claims, including, but not limited to, the claims that (a) Barnes limited Cellino's access to C&B's computer network and e-mail systems and (b) fired an employee for "supporting Cellino" are barred by Cellino's bad-faith conduct—as set forth in the First objection above—as well as Barnes' good-faith attempt to protect C&B and its continuing business interests.

**289.** Cellino's access to C&B's e-mail and computer networks was removed to protect C&B from the raid Cellino was attempting from the moment he filed the Petition. It was Cellino's reprehensible conduct that necessitated the removal of access.

**290.** Similarly, the employee in question was terminated because she aided Cellino and participated in the raid of C&B attorneys and employees, not because she "supported Cellino."

- 40 -

**291.** At all times, Barnes engaged in conduct solely for the purpose of bettering and protecting the business of C&B and its interests.

## THIRD OBJECTION IN POINT OF LAW

**292.** Petitioner's claims are barred by Cellino's failure to exhaust and/or attempt to engage in remedies other than, and as a condition precedent to, the ultimate remedy of dissolution—which is to be applied "as a last resort." Matter of Klein Law Grp., P.C., 134 A.D.3d 450, 450 (1st Dept. 2015).

**293.** Cellino has failed to make any allegations that: (a) C&B ever held a shareholder and/or Board of Directors meeting; (b) C&B and/or Barnes refused to conduct a shareholder and/or Board of Directors meeting; and/or (c) Cellino ever even requested that a shareholder and/or Board of Directors meeting take place.

**294.** The reason behind Cellino's failure to make such an allegation is plain: C&B never held such meetings and Cellino never remotely discussed, let alone requested, that such meetings take place.

**295.** Petitioner's claims are barred because "there can be no deadlock where, as here, the contending factions have not even attempted" the actions for which deadlock is claimed. In re Parveen, 259 A.D.2d 389, 391 (1st Dept. 1999).

## FOURTH OBJECTION IN POINT OF LAW

**296.** This action is frivolous and has no good faith basis in law or fact.

**297.** Upon information and belief, every one of Cellino's allegations of "deadlock" and "disagreements" of the management of C&B have been manufactured by Cellino in support of his goal to dissolve C&B and create a new legacy firm.

- 41 -

**298.** In 2005, Cellino was suspended from the practice of law—the suspension ultimately lasted for nineteen (19) months. When Cellino returned from his suspension he voluntarily withdrew from C&B's management and refused to be involved with the day-to-day operations of the firm. Barnes was forced to step up and run C&B for the past ten (10) years.

**299.** In 2014, Ross approached Barnes and Daryl Ciambella to discuss the potential of hiring Cellino's daughter at C&B. He also discussed transferring his shares in C&B to his children. Initially Barnes refused to hire Cellino's daughter.

**300.** Upon information and belief, approximately two years ago, as a result of Barnes' refusal to hire Cellino's daughter, Cellino began planning a way to dissolve C&B so that he would be able to create a new firm so that he could hire his children and create a "legacy" firm for his family.

**301.** Upon information and belief, as a result of his plan to create a new firm, Cellino began attempting to create and manufacture dissension and deadlock, which he now attempts to use as a basis for dissolution.

**302.** Tellingly, Cellino did not raise any of the "issues" or "disagreements" he now claims are his basis for deadlock **for almost ten (10) years**. Cellino had never previously raised the issues at hand and, upon information and belief, was content with the management and operation of C&B under Barnes' tutelage.

**303.** Despite voluntarily withdrawing from the firm upon reinstatement to the bar, Cellino has only recently attempted to become more involved in C&B's management, upon information and belief, because he is seeking to disrupt C&B's practice, gain support for his bad-faith petition for dissolution, and create a legacy firm for his family.

**304.** Cellino's petition ignores that fact that he is harming Barnes' interest as a shareholder and fails to even address the destruction of C&B's brand. Cellino's recent allegations—which are utterly meritless, lack factual support, and most of which are alleged merely upon information and belief—are disingenuous and lack credibility when viewed with his long-standing consent and lack of objection to C&B's practices prior to determining that he wanted to dissolve C&B.

**305.** Petitioner's claims are barred by Cellino's manufacturing of the alleged dissension and/or deadlock to the extent such is deemed to exist.

**306.** As discussed above, Cellino planned to file the Petition in furtherance of his goal to raid C&B for his own personal desires to create a new legacy firm.

**307.** Petitioner's allegations contradict themselves and create inconsistencies further demonstrating Cellino's manufacturing of dissension for his own personal desires.

**308.** The Petition is riddled with false allegations that Barnes unilaterally usurped control of C&B and kept Cellino from involving himself with C&B. However, Cellino simultaneously contends in paragraph 87 that he "plays an active role in Cellino & Barnes, P.C., working from the various firm offices on a day-to-day basis[.]"

**309.** Furthermore, Cellino's allegations of irreconcilable differences and deadlock are flatly contradicted by his correspondence demonstrating that he is able and willing to "work things out" if dissolution is not granted. Ex. 4.

**310.** In further contradiction to the allegations in the Petition—specifically that dissolution would be in the best interest of the shareholders—Cellino sent correspondence acknowledging and admitting that dissolving C&B would be "**financial suicide**." Specifically,

Cellino stated: "I truly understand and appreciate that it will be financial suicide for me to abandon the brand."

**311.** Cellino is aware that the firm is extremely successful and functions efficiently. His allegations that the alleged dissension and deadlock prevent C&B from functioning are directly contradicted by C&B's statistics and growth patterns.

**312.** In the eleven weeks since Cellino filed the Petition C&B has seen an 8.8% **increase** in client intake over the eleven weeks prior to the filing. Similarly, the amount of proceeds from C&B's settlement of cases for the months of January to July 2017 has increased by 7% from the same time period in 2016. C&B's growth, prosperity, and functionality continues to increase **despite the filing of the Petition and the alleged dissension, deadlock, and impact on functionality**.

**313.** Cellino's various correspondences, the firm's success, and Cellino's failure to object to his alleged "disagreements" over C&B's management for almost ten (10) years directly contradict his allegations and demonstrate Cellino's lack of a good-faith basis in law and fact for bringing the instant Petition.

## FIFTH OBJECTION IN POINT OF LAW

**314.** Petitioner's claims are barred due to the enormous disruption and harm dissolution will cause C&B, its more-than two hundred thirty (230) employees and their families, and its more-than 12,000 clients—all of whom chose C&B as their first choice for employment/representation.

**315.** Petitioner's claims are also barred due to the destruction of C&B's brand that dissolution will cause. Both Cellino and Barnes have each invested tens of millions of dollars in building the C&B brand—indeed, Barnes has invested millions more than Cellino due to his investments for the California LC and the national C&B brand. Barnes would not have invested

- 44 -

scores of millions of dollars into the brand—which is based on the personas of both Cellino and Barnes—if Cellino was able to exit the business at will and render Barnes' investment worthless. The investments were made, in part, because of and in reliance of the protections New York Corporate law provide to corporations from at-will dissolution.

## SIXTH OBJECTION IN POINT OF LAW

**316.** Petitioner's claims are barred due to documentary evidence.

**317.** For instance, Cellino makes erroneous allegations that C&B is a 50-50 partnership and a "marriage" throughout the Petition. C&B is, and at all relevant times has been, a professional corporation duly organized under and subject to New York Corporations Law, not New York Partnership Law.

**318.** C&B's corporate documents irrefutably demonstrate that C&B was incorporated— which Petitioner admits in his Petition—and as such bars any arguments or claims that C&B is a partnership or marriage.

## SEVENTH OBJECTION IN POINT OF LAW

**319.** Petitioner's claims of dissension and deadlock are barred by Cellino's baseless claims of his "belief" and/or "opinion" absent any factual proof or assertions that he expressed the same to Barnes.

**320.** Actual and express disagreements have not arisen because Cellino has not expressed his opinions or belief as to most of the allegations contained in the Petition, but rather asserts them as though his mere having of an unexpressed opinion creates deadlock.

**321.** In fact, Petitioner admits in paragraphs 211-13, and 230 that he has taken no affirmative action such that actual deadlock exists.

## EIGHTH OBJECTION IN POINT OF LAW

**322.**    Petitioner's claims are barred by his conclusory allegations made "upon information and belief." The Petition is riddled with allegations made "upon information and belief" even when the allegation, if true, would be within Cellino's personal knowledge.

**323.**    Allegations made upon information and belief are insufficient for dissolution to be granted summarily, but rather must be rooted in a prima facie showing of entitlement to judgement as a matter of law. Yattassaye v. City of N.Y., 2017 N.Y. Misc. LEXIS 2190 at 9-10 (Sup. Ct. N.Y. Cnty. 2017); see, e.g., Onondaga Soil Testing, Inc. v. Barton, Brown, Clyde & Loguidice, P.C., 69 A.D.2d 984 (4th Dept. 1979).

## NINTH OBJECTION IN POINT OF LAW

**324.**    The Petition fails to state a claim upon which relief may be granted.

## TENTH OBJECTION IN POINT OF LAW

**325.**    Petitioner's claims are barred by the doctrines of laches, estoppel, and/or unclean hands.

## ELEVENTH OBJECTION IN POINT OF LAW

**326.**    Petitioner's claims are barred by the doctrines of waiver, acquiescence, consent, release, and/or ratification.

## TWELFTH OBJECTION IN POINT OF LAW

**327.**    Respondents reserve the right to assert, and will rely upon, any and all additional objections, defenses and/or claims associated therewith, which become available or appear during

discovery proceedings, and hereby specifically reserve the right to amend their pleadings for the

purpose of assertion such additional defenses and/or claims.

**WHEREFORE,** Respondents Cellino & Barnes, P.C. and Stephen E. Barnes respectfully

request that this Court dismiss and deny the Verified Petition in its entirety.

Dated: Buffalo, New York
     August 15, 2017

**DUKE HOLZMAN PHOTIADIS & GRESENS LLP**

By:    /s/ *Gregory Photiadis*

        Gregory P. Photiadis
        Robert L. Bencini
        Christopher M. Berloth
        *Attorneys for Respondents Cellino &*
        *Barnes, P.C. and Stephen E. Barnes*
        701 Seneca Street, Suite 750
        Buffalo, New York 14210
        (716) 855-1111
        gpp@dhpglaw.com
        rbencini@dhpglaw.com
        cberloth@dhpglaw.com

        **LIPSITZ GREEN SCIME CAMBRIA LLP**
        Paul Cambria
        *Co-Counsel for Respondents Cellino &*
        *Barnes, P.C. and Stephen E. Barnes*
        42 Delaware Avenue, Suite 120
        Buffalo, New York 14202
        (716) 849-1333
        pcambria@lglaw.com

- 47 -
