Volume 1

Pages 1 - 176

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE VINCE CHHABRIA, JUDGE

IN RE ROUNDUP PRODUCTS LIABILITY      )
LITIGATION.                            ) NO. 16-md-02741-VC
_____)


PETER ENGILIS, JR., et al.,           )
                                       )
            Plaintiffs,                )
                                       )
  VS.                                  ) NO. 19-cv-07859-VC
                                       )
MONSANTO COMPANY,                     )
                                       )
            Defendant.                 )
_____)
                                        San Francisco, California
                                        Monday, September 11, 2023

**<u>TRANSCRIPT OF EVIDENTIARY HEARING PROCEEDINGS</u>**


**<u>APPEARANCES</u>**:

For Plaintiffs:
                        SCHLESINGER LAW OFFICES, P.A.
                        1212 Southeast Third Avenue
                        Fort Lauderdale, Florida  33316
                   BY:  **JEFFREY L. HABERMAN, ESQ.**

For Defendant:
                        WILKINSON STEKLOFF, LLP
                        2001 M Street NW
                        Tenth Floor
                        Washington, D.C.  20036
                   BY:  **BRIAN L. STEKLOFF, ESQ.**
                        **SARAH NEUMAN, ESQ.**


Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
              Official Reporter, U.S. District Court

| | |
|---|---|
| 1 | **Monday, September 11, 2023**                    **10:00 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | **THE CLERK:**  Now calling Civil Cases 16-2741, In Re |
| 4 | Roundup Products liability litigation, and 19-7859, Engilis, |
| 5 | Jr., et al. versus Monsanto Company. |
| 6 | Will counsel please state your appearances for the record, |
| 7 | starting with the plaintiff. |
| 8 | **MR. HABERMAN:**  Good morning, Your Honor.  Jeffrey |
| 9 | Haberman on behalf of Schlesinger Law Offices, on behalf of |
| 10 | plaintiff. |
| 11 | **THE COURT:**  Good morning. |
| 12 | **MR. STEKLOFF:**  Good morning, Your Honor.  Very nice to |
| 13 | see you in person again.  Brian Stekloff on behalf of Monsanto. |
| 14 | Along with me is my colleague, Sarah Neuman, also on behalf of |
| 15 | Monsanto. |
| 16 | **THE COURT:**  Good morning.  Nice to see you again, too. |
| 17 | So, where is -- is that Dr. Charles, I assume? |
| 18 | **MR. HABERMAN:**  Yes. |
| 19 | **THE COURT:**  Hi. |
| 20 | **THE WITNESS:**  Hi. |
| 21 | **THE COURT:**  Okay.  I have a preliminary question or |
| 22 | two. |
| 23 | First, what are we -- Bhavna, are we doing Zoom audio? |
| 24 | **THE COURTROOM DEPUTY:**  Yes. |
| 25 | **THE COURT:**  Okay.  This is something I should have |

**PROCEEDINGS**

1   thought of before.  But, you know, when we did that, you know,

2   those weeks of *Daubert* hearings back in the day we video

3   recorded those pursuant to the cameras in the courtroom pilot

4   project, which still somehow exists.

5        I don't know if it's too late to sort of be able to

6   video-record it.  I mean, at a minimum, if everybody agrees, I

7   think we should audio record it.

8        **MR. STEKLOFF:**  (Nods head)

9        **THE COURT:**  And make the recording, you know,

10  available on the record so that in future cases, people can

11  listen to this testimony.

12       Does anybody -- so maybe first I should ask Bhavna.  It's

13  probably too late to set this up so that we can do --

14  video-record it?

15       Is that right?

16       **THE COURTROOM DEPUTY:**  I can do it for all of them

17  (Indicating).  I just need to figure out how to do the witness

18  stand (Indicating).

19       **THE COURT:**  Well, I think maybe what we should do is

20  just audio-record it.

21       **THE COURTROOM DEPUTY:**  Okay.

22       **THE COURT:**  And to the extent there are visuals, I

23  don't know how much -- how many visual aids there are.  But, to

24  the extent there are visuals, that will make it a little harder

25  to follow, but it would probably still be useful to folks.

**PROCEEDINGS**

1  So does anybody object to audio-recording it and making it

2  a part of the record?

3       **MR. HABERMAN:**  No, Your Honor.

4       **MR. STEKLOFF:**  No, Your Honor.

5       **THE COURT:**  Okay.  So we will do that.  And then,

6  Mr. Haberman, I can't remember, do you -- do you have other

7  experts than Dr. Charles who are live in this case?

8       Did you disclose -- I know you disclosed one -- there was

9  one expert that Monsanto moved to exclude.  And I granted the

10 motion.  I think it was Schneider.  And you filed a motion for

11 reconsideration?

12      **MR. HABERMAN:**  That's correct.

13      **THE COURT:**  So there's that expert that's still sort

14 of in play, right?  And then there's Dr. Charles.

15      Are there any other experts that you offered up in this

16 individual case that were not excluded?

17      **MR. HABERMAN:**  Just the general causation experts that

18 the Court has previously ruled on in the Roundup litigation, we

19 had designated those in this case, as well.

20      **THE COURT:**  Oh, you have.

21      **MR. HABERMAN:**  Yes.

22      **THE COURT:**  Okay.  So, like Portier and --

23      **MR. HABERMAN:**  (Nods head)

24      **THE COURT:**  What was the name of -- Doctor --

25      **MR. HABERMAN:**  Dr. Weisen- --

1          **THE COURT:**  There's Ritz, Portier and --

2          **MR. STEKLOFF:**  Weisenberger on general causation.  And

3     then I think Dr. Jameson may have also been disclosed.

4          **THE COURT:**  So you have those and both sides agree

5     that those general causation experts are teed up in this

6     particular occasion, the Engilis case?

7          **MR. STEKLOFF:**  Yes, Your Honor.

8          **MR. HABERMAN:**  Yes, Your Honor.

9          **MR. STEKLOFF:**  I believe that they have been teed up

10    in every -- I don't want to overstate it.  They have been teed

11    up in this case.

12         They may have been teed up in every case in the MDL, as

13    sort of a matter of course, is typically how it's been

14    happening.

15         **THE COURT:**  Okay, so assuming that's correct, then

16    even if I were to conclude that Dr. Charles is not qualified to

17    offer an opinion on general causation, or if I were to conclude

18    that the opinion he offered on general causation is inadequate,

19    I could still assess -- would still need to assess

20    Dr. Charles's opinion on specific causation because he could

21    get up and testify -- I mean at trial, in the Engilis trial,

22    Portier or whoever could get up and testify on general

23    causation, and then Charles, if he -- if he offered an

24    admissible specific causation opinion and if he were qualified

25    to give one, he could get up and say: I'm assuming that Roundup

1   is a risk factor, based on what Portier said, and I've

2   conducted my differential diagnosis based on that assumption.

3        So my opinion on specific causation is only as good as

4   Portier's opinion on general causation.  But assuming you agree

5   with Portier on general causation, my opinion is that this is

6   the risk factor, Roundup is a risk factor that caused

7   Mr. Engilis's cancer.

8        Does everybody agree with that?

9            MR. HABERMAN:  For the plaintiff, Your Honor, yes.

10           MR. STEKLOFF:  I think we need to hear a little bit

11   from Dr. Charles on that question.  Clearly, Your Honor has

12   allowed other experts, say, Dr. Nabhan.

13           THE COURT:  Yeah.

14           MR. STEKLOFF:  My recollection is Dr. Nabhan was

15   excluded on general causation largely because he made his

16   general causation opinions, he based exclusively or almost

17   exclusively on IARC, didn't do his own sort of own adequate

18   investigation from a methodological standpoint of general

19   causation.  You allowed him to go forward on specific causation

20   under the reasoning that you just articulated.  So I -- I

21   understand where we are on that, and have no dispute with it.

22       I think with Dr. Charles, it feels a little bit different,

23   because Dr. Charles, unlike -- and my recollection is, could be

24   off but Dr. Nabhan and others did review Dr. Portier's expert

25   report, Dr. Portier's expert testimony, Dr. Ritz's expert

 1   report, et cetera.  And had a little bit more of a foundation

 2   to be able to say that his -- or, in Dr. Nabhan's case, his

 3   opinion, he was deferring to them and he understood what their

 4   conclusions were and the basis on how they reached them, even

 5   though you excluded, sort of, then, his own attempt to have an

 6   independent basis to offer a general causation opinion.

 7        Dr. Charles, I believe, has never read any of the other

 8   experts' testimony.  And I think if you look at his report, his

 9   opinions are very intertwined.  So his sort of -- I'm not even

10   sure it is a differential diagnosis, but his -- his methodology

11   that might be -- we'll learn more today, I think, whether it's

12   a differential diagnosis or not, is intertwined with the way

13   that he formed opinions about Roundup on a general causation

14   basis.

15        And so I do feel like this is different, I guess is what I

16   would say, than where we were sort of before *Hardeman* with some

17   of the specific causation *Daubert* issues that the Court was

18   addressing.

19        And I guess we could say now, well, oh, you know, you

20   didn't do any of this but the lawyer -- you know, Mr. Haberman

21   is making a decision that you should just get up on the stand

22   and say: I'm relying on others.  It just feels different when

23   you look at the totality of his report and the totality of his

24   opinions.

25        **THE COURT:**  Well, I mean, but, but if I remember the

1   *Hardeman* trial correctly, the only thing I allowed people like

2   Nabhan to say -- and I can't remember, did Nabhan ultimately

3   testify?

4          **MR. STEKLOFF:**  No, ultimately what happened in

5   *Hardeman* is that Dr. Weisenberger offered both the general

6   causation opinion and then also was plaintiff's specific

7   causation expert.  Dr. Nabhan, I think, came in phase two to

8   testify about compensatory damages but he -- ultimately, we

9   didn't reach the point where I think you would have allowed

10  Dr. Nabhan to testify in phase one to his differential

11  diagnosis.

12         **THE COURT:**  Now I think what I said is you have to

13  make clear that you are not offering an opinion on whether

14  Roundup is a risk factor, you are relying on the general

15  causation experts on that.  You can say -- I think I said, you

16  know, you can say I agree with it, you know, if you want.  But

17  you can't go beyond that.  You have to make clear that you are

18  not -- that that's not the opinion you are offering.

19         You're not offering an opinion that Roundup is a risk

20  factor.  You are assuming, for purposes of argument, that

21  Roundup is a risk factor and you are saying if Roundup is a

22  risk factor, that is, doing my different -- assuming that it's

23  a risk factor, doing my differential diagnosis, I conclude that

24  Roundup is the risk factor that caused the cancer.

25         **MR. STEKLOFF:**  I agree.  I think --

1          THE COURT:  So why would it be different in this

2    context?

3          MR. STEKLOFF:  Because I don't think Dr. Charles used

4    the same methodology to -- even -- even if he just said: I

5    assume Roundup is a risk factor, I don't think he performed a

6    differential diagnosis.

7          THE COURT:  Right.  But --

8          MR. STEKLOFF:  Using that methodology.

9          THE COURT:  So you are taking an issue with his

10   specific causation analysis, right?  With his differential

11   diagnosis.

12       But why wouldn't I say the same thing -- if I concluded

13   that Dr. Charles was not qualified to opine on general

14   causation, not qualified to conclude that Roundup is a risk

15   factor, and/or that the opinion he offered that Roundup is a

16   risk factor is -- is junk science, but if I -- why couldn't I

17   still entertain an argument that he should be allowed to offer

18   a specific causation?  And then at that point, the only

19   question would be:  Has he offered a specific causation opinion

20   like Dr. Nabhan -- like I concluded that Dr. Nabhan barely did?

21         MR. STEKLOFF:  I think that's fair.  I think what I'm

22   suggesting is when you hear from his testimony, it will be hard

23   to -- I think that what he did on general causation is, on some

24   level, inextricably intertwined with what he did on specific

25   causation, because I think his methodology was slightly

1    different than what we have seen in the past.

2        But I guess I agree, if you think that he properly

3    performed a differential diagnosis, it is hard for me to argue

4    that he couldn't just come in and say: I'm not offering any

5    opinions about general causation, but here is my differential

6    diagnosis.

7        **THE COURT:**  Isn't this really about whether he is

8    qualified to do a differential diagnosis, and whether he

9    properly did one?  Or I should say more broadly, about whether

10   he's qualified to offer a specific causation opinion and

11   whether he has offered an adequate specific causation opinion.

12   Isn't that really what this is about?

13       **MR. STEKLOFF:**  Yes.

14       **THE COURT:**  Because it seems -- I mean, seems unlikely

15   that he is going to be allowed to offer a general causation

16   opinion.

17       **MR. STEKLOFF:**  I would agree with that, Your Honor.  I

18   think we are probably narrowing the issue to what we are

19   focused on.  I would agree with that.

20       **THE COURT:**  Okay.  So I guess -- I guess we'll see how

21   this goes.  You can -- you know, you can put Dr. Charles on the

22   stand and we can see how it goes.

23       But I may, at some point -- if you spend too long on

24   general causation, I'm probably going to cut you off and tell

25   you to get to specific causation, just to let you know.

1          Okay?

2               **MR. HABERMAN:**  Yes.

3               **THE COURT:**  So do you want to go and call Dr. Charles?

4               **MR. HABERMAN:**  Yes, Your Honor.  May it please the

5      Court, plaintiffs call Dr. Ambrose Charles.

6          Your Honor, may I ask if Dr. Charles can take some notes

7      up with him on the stand?

8               **THE COURT:**  Um, sure.

9               **THE COURTROOM DEPUTY:**  Please raise your right hand.

10              **AMBROSE CHARLES, Ph.D., PLAINTIFFS' WITNESS, SWORN**

11              **THE WITNESS:**  I do.

12              **THE COURTROOM DEPUTY:**  Please be seated, and state and

13     spell your full name for the record.

14              **THE WITNESS:**  Thank you.

15          **MR. STEKLOFF:**  And Your Honor, I obviously have no

16     objection to Dr. Charles having notes, but maybe at the

17     appropriate break we can just see what they are, or have them

18     explained, if he's relying on them to support his testimony.  I

19     don't want to slow things down now.

20              **THE COURT:**  Yeah, it's totally appropriate for you to

21     see what he's brought up on the stand, take a look at what he's

22     brought up on the stand.

23              **MR. STEKLOFF:**  Thank you, Your Honor.

24              **MR. HABERMAN:**  Your Honor, I had prepared a

25     PowerPoint, but my connection is not working.  We printed out

 1    the copies.  If I could use the ELMO and put up a slide?

 2              **THE COURT:**  Yeah, that's fine.

 3              **MR. HABERMAN:**  Thank you.

 4              **THE COURT:**  Do you have an extra copy set for us, or a

 5    couple extra copy sets for us?

 6              **MR. HABERMAN:**  So I emailed a copy to Courtroom

 7    Deputy, and -- did you get the --

 8              **MR. STEKLOFF:**  I'm not sure, but probably, yeah.

 9         I think we might have it by email, Your Honor.

10              **THE COURT:**  Okay.  I'll just have her circulate it to

11    me and the law clerks.

12         (Reporter clarification)

13              **THE WITNESS:**  Ambrose Charles, C-H-A-R-L-E-S.

14              **THE REPORTER:**  Thank you.

15              **MR. HABERMAN:**  May it please the Court?

16              **THE COURT:**  Go ahead.

17                          <u>**DIRECT EXAMINATION**</u>

18    **BY MR. HABERMAN**

19    **Q**    Good morning, Dr. Charles.

20    **A**    Good morning.

21    **Q**    Can you introduce yourself to the Court, please?

22    **A**    I'm Ambrose Charles.  I'm a toxicologist, by training.

23    **Q**    Are you a Ph.D.-trained scientist and toxicologist?

24    **A**    I'm a Ph.D.; I have a Ph.D. in medical biochemistry.  That

25    is a medical subject.  And then I took toxicology training

1    after my Ph.D. for an additional two years, under NIEHS

2    program.

3    **Q**    Okay.  Are you a poison expert?

4    **A**    Poison expert is in all the definition of toxicologists.

5    Toxicologists should have a better understanding of multi --

6    multidisciplinary science, you know, like medical science,

7    biochemistry, biology, statistics, physiology.  And so, many

8    different subjects, you know.

9         And they look at the adverse effects of chemicals, of

10   substances or situations on human health.  So it's much broader

11   than just poison.

12   **Q**    And is that something that you have been doing for -- how

13   many years now?

14   **A**    Maybe 50-plus.

15   **Q**    Fifty-plus years?  Are you here to talk to the Court today

16   about whether Roundup causes non-Hodgkin's lymphoma?

17   **A**    Yes.

18   **Q**    And are you here today to talk about the exposure that

19   Mr. Engilis had to Roundup over a long period of time?

20   **A**    The information support that.

21   **Q**    Are you here to talk today about whether Roundup caused or

22   substantially contributed to causing Mr. Engilis's

23   Non-Hodgkin's lymphoma?

24   **A**    The information support that.

25   **Q**    So the answer is yes?

1    **A**    Yes.

2    **Q**    Okay.  And is it your understanding that that's why we

3    brought you here today?

4    **A**    I believe so, yes.

5    **Q**    Do you have opinions on the topics that you are prepared

6    to talk to the Court about today?

7    **A**    I have nuclear (Phonetic) opinion, and my opinion on this

8    particular case that I have already expressed in my opinion

9    conclusions that, you know, all the facts point out that

10   Mr. Engilis's lymphoma or small lymphocytic leukemia probably

11   is as a result of his exposure.  That's a factor.

12   **Q**    And when you said "small lymphocytic leukemia," is that

13   interchangeable also with CLL, chronic lymphocytic leukemia?

14   **A**    Yes.  Not interchangeable.  SSL, or small lymphocytic

15   leukemia, was an old classification.  And then when they

16   reclassified, they included SSL with the CLL, that chronic

17   lymphocytic leukemia, and brought it to a single class.  In

18   many literature you can see SSL/CLL.

19   **Q**    Okay.  And is it your understanding that Mr. Engilis was

20   diagnosed with CLL?

21          **MR. STEKLOFF:**  Objection, leading, Your Honor.

22          **THE COURT:**  Yeah, I'm not going to allow leading

23   questions in this direct examination.  I want to hear what the

24   expert has to say, not what the lawyer has to say.

25          **MR. HABERMAN:**  Yes, Your Honor.

1    BY MR. HABERMAN

2    Q    Dr. Charles, what type of non-Hodgkin's lymphoma was

3    Mr. Engilis diagnosed with?

4    A    A CLL type.  Can I add, first he was diagnosed with NHL,

5    that is non-Hodgkin's lymphoma.  And then they went further

6    investigation on that, and sub-typed into what type of CLL.

7    Q    When did you obtain your Ph.D.?

8    A    That was in 1974.

9    Q    And what is your Ph.D in?

10   A    It is in medical biochemistry, but the subject area of my

11   studies were snake venom poisoning on human death.  You know,

12   there is a lot of mortality in that part of the region,

13   tropical country from snakebite.

14        So I was trying to isolate the most toxic component of the

15   snake venom that is Indian cobra, and biochemically isolate it

16   and then try to find out its mechanism, pharmacology, and

17   physiology mechanism of its action in causing that.

18   Q    And so did you have an occasion to determine whether or

19   not the exposure to that toxin or poison would cause death or

20   could cause death?

21   A    Yes.

22   Q    And did you have occasion to determine whether or not the

23   exposure did actually cause death in real people?

24   A    Yes.

25   Q    And, explain that to the Court.  How did you do that?

1   **A**    Say that customary phrase, please?

2   **Q**    So, walk us through.  You talked about going back to 1974

3   when you got your Ph.D., and you talked about the specialty

4   that your Ph.D. was in.  And it related back then to

5   determining whether or not something caused something else.

6   **A**    Yes.

7   **Q**    And so tell the Court, please, how would you make that

8   determination whether the exposure to a toxin caused a

9   reaction, in that case, death.  How did you make that

10  determination as a scientist?

11  **A**    In most cases -- in many cases, you know, after the -- the

12  victim of a snakebite is showing signs of toxicity.  That is,

13  paralysis and unconsciousness, and he is taken to the hospital.

14  And at that point, they try to find out what particular

15  incident has caused this.  So they may find out it is due to a

16  snakebite, that somebody has seen a snake, or in the night, you

17  know, he felt it, that it was a snakebite.  And from there, you

18  know, the clinical doctors and their emergency take care of and

19  they give the anti-serum for a snakebite.  You can see them

20  bloom, and then retrospectively look at if it is a cobra bite,

21  or is it a viper bite or -- because there are different types

22  of symptoms.  From symptoms, you go back and decide that

23  particular exposure or a bite caused this affect.

24  **Q**    Over the course of your career, have you had other

25  occasions to determine whether the exposure to a toxin or a

1    drug caused, specifically, an adverse reaction or a reaction in

2    a human?

3    **A**     In many ca- -- I had -- in my work at the Texas Department

4    of Agriculture, specifically as a toxicologist and director of

5    the Risk Assessment and Toxicology Program, I have reviewed and

6    made opinions, about 200-plus opinions on chemical exposure,

7    especially in farmworker community, which is a big thing in the

8    state of Texas.

9         Through aerial application or reentering into the applied

10   field before the reentry interval, many farmworkers get exposed

11   to different types of pesticides.  They're commonly used in the

12   southern part of Texas.  So every time there is an exposure,

13   that person is taken to the hospital.  And there is a medical

14   record there.

15        And it is state law, if it is a human exposure that's

16   being investigated, all of the records shall be sent to the

17   enforcement division, the legal division.  They're reviewed,

18   and they're sent then to the toxicologist for their review of

19   the records.  And come up with an opinion, whether it is an

20   insecticide type of thing or a herbicide type of thing.  You

21   know, there are specific symptoms that you can attribute to

22   different classes of pesticides, generally.

23        And then the field investigator -- we call them

24   "inspectors" -- they go out in the field and they collect

25   information as part of the case investigation.  So we have that

1  specific information to review and look at, and make

2  comparisons and conclusions.

3  Q    And how long were you at the Texas Department of

4  Agriculture?

5  A    I worked for 22 years.

6  Q    How many?

7  A    Twenty-one, 22.  Twenty-three.

8  Q    Okay.  What were your various roles in the Texas

9  Department of Agriculture?

10 A    For 15 years I was directly responsible as the director of

11 the Risk Assessment Program.  Environmental risk, human health,

12 endangered species, water quality.  Pesticides are a big

13 contaminant of ground water, as well as surface water, that is

14 drinking water, all over the state.  And, and we cooperate with

15 different other agencies, environmental agencies, Department of

16 Health experts to investigate and review these cases.

17 Q    Okay.  And did your job have -- in your job, did you make

18 risk assessment determinations on pesticides?

19 A    Yes.

20 Q    Did you do environmental assessments --

21 A    Yes.

22 Q    -- on pesticides?

23 A    Yeah.  Sorry.

24 Q    And you mentioned something on human health.  What would

25 you do on human health in connection with pesticides?

1  **A**    Can you be a little more specific on that?  It's a general

2  question.

3  **Q**    So I asked you what your responsibilities were, and you

4  ticked off a number of things, beginning with risk assessments

5  and environmental assessments.  And then the third bullet point

6  was human health.

7  **A**    Yes.

8  **Q**    What, what were your job duties with respect to human

9  health, or making determinations regarding human health, in

10  connection with pesticides?

11  **A**    The first aspect I already explained, you know.  The human

12  health, acute short-term exposures in the field of human

13  health.  That's a part of the human health assessment.

14       And the second part is related to the pesticide

15  registration in the state.  There are three types of

16  registrations for pesticides.  There is -- Type 2 registration

17  is what the EPA has already registered.  State law allows to

18  accept those registration, and register in the State of Texas.

19  And according to FIFRA -- that is pesticide laws -- there is a

20  section called Section 18, for which the State has to apply for

21  registration.  That is called the special local need

22  registration.  Particular pesticide we need to use in special

23  area in the state, in certain counties in the state, because of

24  some pest problem.

25       So the State has to gather information and review the

1    data, and come out with the -- follow the assessment process of

2    EPA.  That is the paradigm that EPA uses, like a hazard

3    identification, a dose response, exposure assessment -- a

4    probable and possible exposure assessment, and characterization

5    of the risk.  All those things that we have to write as a

6    document and submit to EPA.  That is part of the assessment.

7         And there is another registration called 24(c)

8    registration under FIFRA and under pesticide laws.  Federal

9    pesticide laws.  That is for, you know, arguing for level

10   changes.  Additional changes in the already existing or

11   approved EPA labels State had to apply for, stating reasons why

12   the change of levels will not cause an adverse -- added adverse

13   effects on humans, animals or the environment.

14   Q    As we work our way through this --

15        THE COURT:  Can I just ask, can I just interrupt and

16   ask, sir, the summary question?

17        THE WITNESS:  Yes, sir.

18        THE COURT:  This assessment that you are conducting,

19   human beings get exposed to pesticides.  And you are conducting

20   an assessment.  And the assessment you are conducting is

21   basically to determine whether the exposure to the pesticides

22   will result in increased risk for the people who were exposed

23   to it?

24        THE WITNESS:  That is the kind of assessment that the

25   EPA does.

1          THE COURT:  Okay.

2          THE WITNESS:  Okay?  We do not have that amount of

3   data to look at and evaluate at the state level.

4          THE COURT:  Okay.

5          THE WITNESS:  So we accept the EPA's risk level.  And

6   that risk level says, for example, one in ten will qualify.

7   That is 10,000 people, or in a million people, that is their

8   calculations.

9          THE COURT:  One in a million people, what?

10         THE WITNESS:  Of people will have -- that is a normal

11  background data in the population.  If there will -- there will

12  be an excess of that risk, that population, by adding a

13  particular additional use of the chemical in the state.  That's

14  okay.

15         THE COURT:  You are conducting the assessment of

16  whether there will be an additional risk --

17         THE WITNESS:  Yeah.

18         THE COURT:  -- to the population?

19         THE WITNESS:  Exactly.

20         THE COURT:  Or you're reporting to the EPA --

21         THE WITNESS:  We are reporting to the EPA.

22         THE COURT:  What are you reporting to the EPA?

23         THE WITNESS:  We are submitting an application to the

24  EPA with all this data and their arguments.

25         THE COURT:  Okay.  And the data -- what are the -- the

1  argument is that the addition of this pesticide, the addition

2  of this exposure is not going to result in increased risk to

3  people?

4          THE WITNESS:  Yes, Judge.  Because the number of

5  vehicles that will be additionally used and the amount of

6  pesticide that could be probably used in these counties will

7  not significantly increase the already existing risk.

8          THE COURT:  Will not significantly increase the

9  already existing risk?

10          THE WITNESS:  Yeah.

11          THE COURT:  Okay.  And you're basing that on an

12  estimate of how much of the pesticide people will be exposed

13  to?

14          THE WITNESS:  Yeah.

15          THE COURT:  And, what else?  Other than estimating the

16  amount of pesticide people will be exposed to.

17          THE WITNESS:  The exposure amount, yes.

18          THE COURT:  What else are you using?

19          THE WITNESS:  Um, we already know the hazardous nature

20  of that pesticide.  What we need additionally is to know how

21  much more exposure that we are adding to the population, that

22  particular additional use.  And probably we are looking at how

23  much of the material is going to be used, as far as human

24  health is concerned.

25          So these three determinations that we make, and we make

1  our arguments, and send it to EPA.  They review it.  And they

2  can disagree with us, or they can recalculate or whatever they

3  think, or they can agree with us.  And in 85, 90 percent of the

4  time, we never had any problem.  They accepted our...

5          THE COURT:  Okay.  So it's the State of Texas applying

6  to the EPA for permission to expose people to additional

7  pesticides?

8          THE WITNESS:  It is not to expose people.  That is not

9  what the request is.

10          THE COURT:  To engage in an activity that might expose

11  people to additional pesticides?

12          THE WITNESS:  That is an additional use of this

13  pesticide in the state, other than that EPA has already

14  approved in their registration and labeling stage.

15          THE COURT:  So you are conducting an analysis that

16  says:  We have analyzed the proposed use of -- proposed

17  additional use of these pesticides.  And we have concluded that

18  it will not result in a significant increased risk for the

19  population that might be exposed to these pesticides.  And so

20  we're seeking your approval for this pesticide use.

21          THE WITNESS:  Yes, Judge.

22          THE COURT:  Is that accurate?

23          THE WITNESS:  Yes.

24          THE COURT:  Okay.  Thank you.

25

CHARLES - DIRECT / HABERMAN

1  BY MR. HABERMAN

2  **Q**    You know, you mentioned --

3           **MR. HABERMAN:**   Thank you, Your Honor.

4  BY MR. HABERMAN

5  **Q**    You mentioned that you had occasions to look at medical

6  records while you -- of individuals, of people, while you were

7  working at the Texas Agriculture Department.   True?

8  **A**    True.

9  **Q**    And tell the Court, in what context would you do that?

10 Why would you be looking at medical records of anyone?

11 **A**    That is part of the case investigation.   The inspectors go

12 to the hospitals where they are treated, and collect the copies

13 of the record.   And it is part of the enforcement cases, so it

14 has to be part of the records.

15 **Q**    And would you, yourself, look at people's medical records?

16 **A**    I have looked at many, when I was doing that.

17 **Q**    And what -- expand more, please, on what a case

18 investigation is.

19 **A**    Oh, a case investigation is a different component of that.

20 An incident happened.   Incident is reported to the

21 headquarters; that's the department.   And the department

22 communicate immediately to the regional office.

23        Regional office will assign an inspector in the local

24 region to go to the site and investigate all the usage,

25 spraying, exposure; take interviews with people; and collect

1   all the information.  And then they go to the hospital, talk to

2   the doctor who treated him, and then collect the medical

3   records, if he's hospitalized for two days, three days.

4        And then those records -- everything comes back to

5   headquarters, and then that is reviewed there.  And after

6   reviewing, it goes to the enforcement attorneys.  They review

7   it.  And then the medical records -- and the whole file,

8   actually, they send it to me:  Please give your medical and

9   toxicology -- toxicity opinion on this case.

10  **Q**   You're kind of speaking a little bit fast.  So if you can

11  just slow down a little bit, so I can --

12  **A**   Sorry.

13  **Q**   -- remember, or try to remember everything that you say.

14       You had a lot of components in what goes into an

15  investigation.  And I want to break that down for the Court, to

16  see if the same kind of components that you would do in a case

17  investigation for the Texas Department of Agriculture is

18  something that you applied in this case.

19       So can you list off the different elements that you

20  mentioned before?  You gave a long-winded answer there, so I

21  just wanted to get some of that down.

22  **A**   Pertaining to this particular case?

23  **Q**   Not this particular case; we'll get into that.  But I

24  asked you broadly what a case investigation is.  And I liked

25  your answer.

 1   **A**    Yeah.

 2   **Q**    You listed off a number of different things.  Something

 3   would happen, and then you would have to go and investigate.

 4   And in that investigation, much data was collected.  Right?

 5   **A**    Yeah.

 6   **Q**    Okay.  And you listed off the types of data that was

 7   collected.  So can you just, again, slowly list that off?

 8       I think you mentioned something about exposure, and

 9   duration.

10   **A**    Okay.  We are coming to that particular point, when the

11   inspector is there, if a sample -- for example, a leafy

12   material or grass, or where there is complaints of exposure, or

13   a person was wearing a shirt or a hat or something like that,

14   you know, he will collect a sample of that.  And then send it

15   to a pesticide analytic lab of the State.  And they look for

16   the pesticide residues.  So they will identify the residue;

17   they will quantify or quantitate the residues.

18       All those things will be part of that case records.

19   **Q**    Would it also be -- okay.  So that would be collecting

20   physical evidence.

21   **A**    Yes.

22   **Q**    What about finding out how much of that pesticide was

23   used?  Is that something that would be done?

24   **A**    That can be -- that interview will be held with the

25   applicators.  If it was a non-applicator, a farmer who did that

1  appli- -- so we can -- they can go and interview them, get the

2  label.  That label of the material, how much was used.  That

3  interview process also will be part of the case file.

4  **Q**    Okay.  So the pesticide applicator would be interviewed as

5  to what he used, and how much he used.

6  **A**    Yes, sir.

7  **Q**    Anything else?

8  **A**    I told you if samples are available, you know, they will

9  take samples.  In many cases, some cases, they go home, they

10  take a shower, they throw away the clothes.  So we do not have

11  a sample to collect other than their words, their opinions

12  about how they were sprayed.  And it was all, you know:  My

13  skin was irritating and I was feeling suffocated.  So I

14  immediately went to a shower; I threw away the clothes.

15      So we don't have any evidence to collect for the

16  inspector.

17  **Q**    Okay.  And what other types of data would be collected

18  after the interview?

19  **A**    Uh --

20  **Q**    Or along with the interview?

21  **A**    I told you medical records already.

22  **Q**    Okay.

23  **A**    Personal interview records.  Whatever that particular

24  affected person recollects in his memory.  And if there were

25  any eyewitnesses to that, inspector will check with them.

**CHARLES - DIRECT / HABERMAN**

1  **Q**    So you mentioned an inspector does an investigation,

2  medical records are collected, a bunch of information is

3  collected.  And then what would your role be?

4  **A**    My role will be to determine if this particular chemical

5  that is identified at this exposure level, if the exposure

6  level is not available, these are the symptoms that are in the

7  medical records, you know, recorded.  All these symptoms can be

8  caused by any of these chemicals that is identified.  Or from

9  the label, or from the lab.

10 **Q**    So how would you make an opinion, as a scientist and a

11 toxicologist, that the exposure to a contaminant caused an

12 adverse outcome?

13 **A**    Because there are scientific literature and findings --

14 **Q**    I'm sorry; say that again?

15 **A**    Symptoms correlated with the exposure of particular

16 chemicals.  For example, I would say, a carbon monoxide

17 exposure.  There are already symptoms, you know, health

18 symptoms that can be measured or observed of carbon monoxide.

19      So if we have the symptoms of that, and people --

20 medically-trained people in toxicology, yeah, that's because of

21 the CO exposure, carbon monoxide exposure.

22 **Q**    As a toxicologist, did you have occasion to sometimes have

23 to do research into whether or not the exposure to something

24 could cause an adverse event?

25 **A**    Yes.

1    Q    And in other words, is that something that you just did in

2    this case when you were asked to look at the case?

3    A    Yeah.  That is all toxicologist work.  And it's not only

4    that, they also go back to the literature.  Other medical

5    sciences.  There are books for symptoms and exposure -- there

6    are cookbooks for that, you know, published by EPA.  You know,

7    there are several references that we look at in order to

8    evaluate and conclude something.

9    Q    But going back to your -- are you retired now, Doctor?

10   A    No.

11   Q    You are not.

12   A    No, I'm not tired.

13   Q    Are you working for the Texas Department of Health

14   anymore?

15   A    I'm not working; I'm retired.

16   Q    That's what --

17   A    Oh, I'm sorry.  I didn't hear that part.

18   Q    I asked:  Are you retired now?

19   A    I'm fully retired.

20   Q    Okay.  Over the course of your career, though, as a

21   toxicologist, did you research sometimes peer-reviewed medical

22   literature, epidemiological data, and apply that in our

23   everyday work?

24   A    Not everyday work.  But whenever that is necessary, we

25   look at the human exposure.  Chronic human exposure, long-term

1   human exposure data is not readily available, you know.  So we

2   had to look for epidemiological type of data, see whether that

3   is available; we read it.

4   **Q**   And, in other words, what I'm trying to ask is:  Did you

5   have experience reading, reviewing, relying, applying

6   epidemiological data in your job?

7   **A**   Reading, relying, understanding, and the inputting, the

8   inputting to the -- in our occasion that I'm looking at that

9   data for.  We have that kind of understanding, I have that kind

10  of understanding.

11  **Q**   And can you give the Court some examples?  Apart from this

12  case, in your work as a toxicologist, can you give the Court

13  examples of occasions where you had to do that, where you had

14  to read and interpret epidemiological data to come up with a

15  causation opinion, in, let's say, a case that you were

16  reviewing?  If any come to mind?

17  **A**   In another case that I had reviewed, a different case that

18  I have reviewed?  Or --

19  **Q**   Not a Roundup case.  But a case -- before you were ever

20  retained in Roundup litigation, a case that you did while

21  working at a toxicologist.

22  **A**   Yes.  Understood.

23  **Q**   Okay.

24  **A**   Um, there were many occasions, you know.  An example that

25  comes to my mind is there was a case in Texas where

 1  schoolchildren were exposed from a golf course or something

 2  like that.  So several years later, they had developed some

 3  kind of diseases.

 4       And then I was asked by a friend of mine to see if -- that

 5  is after I retired.  He would like to see that case.  I said:

 6  I'm retired.

 7       Said:  Well, you know, why don't you take a look at the

 8  data?

 9       So in that particular situation, I had to go back and then

10  look at some of the chronic epidemiological data on those

11  chemicals.  You know, they were mostly insecticides and

12  herbicides used in golf courses, you know.  Those were the

13  exposures.

14           **THE COURT:**  Used in what?

15           **THE WITNESS:**  Herbicide, H-E- --

16           **THE COURT:**  Yeah, but used in what, did you say?  Gulf

17  Coast?

18           **THE WITNESS:**  Golf courses, yes.

19           **THE COURT:**  What?

20           **THE WITNESS:**  Golf courses.

21           **THE COURT:**  Golf courses.  Okay.

22           **THE WITNESS:**  Yeah.  So I have reviewed such papers,

23  yes.

24  **BY MR. HABERMAN**

25  **Q**    Okay.  Were there times in your professional career

1  working for the Department of Agriculture, for the Texas

2  Department of Agriculture -- and we haven't talked yet, maybe

3  we'll touch on it a little bit, but for the New York State

4  Department of Health, in that capacity, where you -- where you

5  reviewed and interpreted and applied epidemiological data to

6  the work that you were doing at hand?

7  **A**    Not for the Department of Health at New York.  There, the

8  situation was New York State was going through a big issue of

9  Superfund site cleanup.

10  **Q**    Okay.

11  **A**    At the time, in the western part of the state.  So there

12  were a lot of chemical analysis in that particular area.  I

13  don't want to say the name of the area or the company.  But

14  Superfund sites, you know.

15      So looking at the number of things I identified, mostly

16  petroleum and pesticides, chemicals identified in those sites,

17  we had to develop exposure assessment to the residents there,

18  as well as characterize the risk -- the risk assessment.

19  Epidemiology was not very much used there, but the risk

20  assessment process was done many times.  And --

21  **Q**    Okay.  So, what about, though, for the Texas Department of

22  Agriculture?  Did you use epidemiological data in your work?

23  **A**    On a daily routine basis, you know, you don't have to.  We

24  mostly do subchronic or acute exposures in Department of

25  Agriculture.

1   Q    So not on a daily work, but there -- were there times that

2   you did use it?

3   A    I -- I read reviewed scientific papers, spent time in the

4   library, yes.

5   Q    Okay.  So in terms of the -- when you were -- and we have

6   on the screen here some of the appointments that you've had in

7   your career.

8        You also have a master's degree in biochemistry, is that

9   right?

10  A    Master's degree in biochemistry, yes.

11  Q    And a Ph.D. in, just so we're clear, medical biochemistry?

12  A    Yes.

13  Q    Well, how does medical biochemistry differ from

14  biochemistry?

15  A    Biochemistry can be several -- a few other brands or so,

16  biochemistry.  It can be plant biochemistry; it can be

17  mutational biochemistry.  Or it can be medical biochemistry.

18       Since working at the medical hospital and the medical

19  biochemistry department in the medical school, prior to my

20  master's degree, I was interested to go to a program that

21  covers medical biochemistry subjects, area.  So that's how I

22  got my master's degree in biochemistry there.

23       But they don't say "medical biochemistry," because it is

24  issued by the faculty of science, that degree.  But my Ph.D.

25  degree was in the faculty of medicine.  So there, a

1    biochemistry degree they award, that is a medical biochemistry

2    Ph.D.

3    Q    Going back to the case investigations that you would do in

4    the Department of Agriculture, did you have to consider -- in

5    making a causation opinion, did you have to consider what else

6    that person who had an adverse event was exposed to or doing,

7    and rule that out?

8    A    Yes.

9    Q    Do you understand what I'm asking?

10   A    Yes.

11           MR. STEKLOFF:  Objection, leading.

12           THE COURT:  Sustained.

13   BY MR. HABERMAN

14   Q    Um, when you were working for the Department of

15   Agriculture, I just -- I would like you to elaborate more on

16   how you would come to a causation opinion.

17        How would you know that the pesticide caused an adverse

18   event, rather than something else?

19   A    In the inspector training, we --

20   Q    In what?

21   A    Training inspectors.

22   Q    In training inspectors.

23   A    Training inspectors, the Department does a training

24   program for their investigators, right?

25   Q    (Nods head.)

1   **A**      Part of that training, you know, we toxicologists -- I

2   have other staff also in my department, in my section.  We go

3   out there and tell them, you know, in the interview process of

4   the victim or the person affected, we ask several other

5   questions of other factors.  About their smoking.  Other

6   habits.  You know, other medications that he take.  Whether he

7   has some other diseases that caused it, you know.  Those kind

8   of information also is collected as part of the investigation.

9       So to rule out those things, that information will be part

10  of the case file.

11  **Q**      Okay.  Going back to the work that you did in the New York

12  State Department of Health, you did -- you mentioned you did

13  exposure assessments?

14  **A**      Yes.

15  **Q**      And did you also do risk assessments?

16  **A**      Yes.

17  **Q**      And were you concerned that -- or, I guess, to ask it in a

18  different way, why did you do those things?

19      Why were you tasked with, or what was the purpose of being

20  tasked with doing exposure assessments and risk assessments in

21  Superfund sites?

22  **A**      In the particular area of Superfund sites, you know, there

23  were so many different developments happened later on.

24  Apartments were built, houses were built, people were living

25  there, and then they started falling sick.  There were, you

1  know, preliminary investigations showed that, you know, their

2  tap water was contaminated, their shower water was

3  contaminated.  And their soil samples were contaminated.

4      So when you have this multiple exposure possible from

5  these test results, you know, toxicologists, you know, I mean,

6  we get that data and then we are asked to determine the extent

7  of their exposure from these multiple routes of exposure.

8  These are real people, communities living in the west Texas,

9  you know, area, so we had do that.  That was the purpose of

10  doing the exposure assessment.

11  **Q**    And how about risk assessments?

12  **A**    Risk assessment is part of the characterization of the

13  exposure, and the dose response.

14      (Reporter clarification)

15          **THE WITNESS:**  D-O-S-E, dose response.

16  **BY MR. HABERMAN**

17  **Q**    Okay.  So that was the first time that that term was

18  mentioned today.  And tell us your exper- -- tell us -- just

19  define it, please, quickly, and then tell us what your

20  experience is in measuring dose response or determining dose

21  response.

22  **A**    Dose is the amount of a chemical that enters, you know,

23  when we talk about medically or physiologically, that enters

24  the body.  Amount of the chemical.

25      And then the amount of the chemical can be related to the

1  body weight.  Okay?  Ten milligrams of a substance taken by a

2  30-kilogram body weight person, as opposed to 150-kilogram body

3  weight person, their dose will be different because the amount

4  will be divided by their body weight.

5      So it is specifically mentioned as the amount of the

6  substance per unit weight.  That is what this dose is all

7  about.  Simple.

8  **Q**   And then the response?

9  **A**   Response is if you give 5 milligrams of a substance, you

10 expect a certain response.  If you increase the dose to

11 10 milligrams, 15, 20, we look at if the response is

12 increasing.

13     First, when I go out and do this dose response, as a

14 simple example, injecting mice with snake venom, diluted,

15 different dilutions of snake venom, so certain amount of venom

16 that we inject to the -- so I'm trying to look at the death

17 rate of mice.  We increase the dose, we can see the number of

18 deaths happening in 24 hours.

19     So, that is a simple demonstration of the dose response.

20 **Q**   And when you were working at the New York State Department

21 of Health as a toxicologist, doing hazard assessment, risk

22 assessment, dose response, did you have occasion to determine

23 whether or not the people living in the neighboring areas were

24 getting sick as a result of their exposure?

25 **A**   Yes.

Q    Okay.  And what went into that?  How did you make that
determination?

A    There were -- they were falling sick.

Q    Right.  My question is, you just mentioned that you had
occasion to determine that the people in -- neighboring the
Superfund sites were getting sick as a result of their
proximity to Superfund sites.  Right?

A    Yes.

Q    How did you do that?

A    Because they went to the hospital.

Q    And -- but, anything beyond them just going to the
hospital?

A    They went to the hospital; they were sick.  And then that
report came back to the Department of Health, and just
simplifying it.

     Department of Health was interested, what causes the
number of -- the frequency of sickness was going up.  Number of
people were getting sick.  But there were -- certain types of
symptom was generalized in that area.  So investigation started
by different groups.  Medical -- medical professionals, health
professionals, everybody went there, started asking questions,
trying to find out, sampling.  All those things happened
before.

Q    Did you have to apply your background in toxicology, in
medical biochemistry and toxicology to the case at hand, to

1    determine that the people living in proximity to the Superfund

2    sites were getting sick as a result of their proximity?

3    **A**    Yes.  Also, other -- other sciences, like pharmacology.

4    **Q**    And would you work with --

5    **A**    Physiology.

6    **Q**    Would you work with pharmacologists and physiologists?

7    Or --

8    **A**    Part of my Ph.D. program was pharmacology.  Pharmacology

9    and physiological effects of snake venoms.

10   **Q**    So you applied your -- did you apply -- or, how did you

11   apply your knowledge in pharmacology and physiology to those

12   cases?

13   **A**    Pharmacology and physiology, as well as biochemistry or

14   toxicology, they all have same types of principles of kinetics.

15   Kinetics is a rate of a substance to be absorbed.  That

16   kinetics, it can be applied to any enzyme reaction or a

17   chemical reaction, anything, that kind of math is applied.

18        Here, in pharmacology and toxicology, we look at chemical

19   absorption.  Absorption to distribution in that particular

20   organism, or the system.  And then, whatever is distributed to

21   the system is partly metabolized, and then circulated.

22        And then whatever is metabolized is eliminated through the

23   body, and some other substances are accumulated in the system

24   in various organ cell preferential uptake.  Quality of uptake

25   in certain chemicals in certain way.  For example, kidney

 1   versus liver.

 2   **Q**    Kidney versus --

 3   **A**    Liver.  Liver.  Liver.

 4   **Q**    Okay.

 5   **A**    It's okay.  Certain chemicals are absorbed more in liver.

 6   Some go to the kidney.  So there are specificities that -- that

 7   -- so those kind of picture is pharmakinetics (Phonetic).  That

 8   principally is used in pharmacology, physiology, as toxicology.

 9   And biochemistry.

10   **Q**    Was it enough for you to determine causation, based on the

11   fact that somebody got sick?

12        Or, did you have to apply your background, your

13   environmental exposure and the risk assessment, and -- all of

14   the things that we just talked about, would you apply that to

15   the cases that you were reviewing to determine whether or not

16   someone was sick just by happenstance, or someone was sick as a

17   result of an exposure?

18   **A**    Oh, I apply all those things.

19   **Q**    So I, you know, I just want to ask you about the first

20   bullet point on this slide.  You had a NIEHS Environmental

21   Toxicology National Research Award?

22   **A**    Yeah.

23   **Q**    Tell the Court, please, what that was about.

24   **A**    That was a two-year NIEHS fellowship award given to me, to

25   be trained as a toxicologist.  I was doing -- I finished my

1  post-doctoral research in this country, after I came from

2  India, at University of Maryland Medical School --

3  **Q**    University of?

4  **A**    Maryland.

5  **Q**    Maryland.

6  **A**    It was in Baltimore.  After I finished that thing, you

7  know, I actually was offered an assistant professorship

8  position in the department of dermatology.  But during my stay

9  there, I was also having more reading and, you know, knowledge

10  about the developing toxicology field at that time.

11       Toxicology was a three-lecture -- three-hour lecture in

12  pharmacology for medical students.  That's what the toxicology

13  that was taught.

14  **Q**    And it's developed since then?

15  **A**    Three hours of toxicological principles.  Blood toxicity.

16  That's what basically was taught at the time.  Toxicology as a

17  field of science was developing only at that time.

18  **Q**    So --

19  **A**    And then, that interested me.  Then I applied for a

20  fellowship in training.  So they gave me a two-year fellowship.

21  That is financial assistance, a grant, so I can get trained.

22       A requirement of the training was after I finished two

23  years training, I had to teach toxicology in a university

24  system.  Which, also, I did.  I did more than that.  I taught

25  for four years, not six months.

1          These two years, I had to really go through a complete

2    curriculum of toxicology graduate program, which includes

3    biochemical toxicology, pathology, pharmacology.  You know,

4    various other, you know, basic biomedical sciences are part of

5    that toxicology.

6          So I had to sit through all this course work, but I didn't

7    have to take the exam.  They exempted me, because of I already

8    have a doctorate degree.  But graduate students were attending

9    seriously that program.  But I was also teaching the graduate

10   program at that time in biochemical toxicology.

11         That is what that national research award pertains to.

12   Q    Okay.  You were also a member of numerous state and

13   federal committees for regulatory policy and technical

14   decision-making for chemicals; is that right?

15   A    Yes, a part of my job.

16   Q    And, just give us an overview of that, please.

17   A    When you are a -- in a state department, especially

18   dealing with pesticides, you know, for about 15 years I was the

19   director of toxicology and risk assessment, as I said.  After

20   that, I was assistant commi- -- deputy assistant commissioner,

21   running the program --

22   Q    Deputy assistant commissioner --

23   A    Assistant commissioner.

24   Q    Let's just slow down a little bit, okay?  Because the

25   court reporter is taking down everything that we're both

1    saying, and it's --

2  **A**    Sorry about that.

3  **Q**    -- tough.

4  **A**    Commissioner for pesticides program in the department.  I

5   am -- I had to be part of various state and federal committees,

6   including FDA committees, and EPA committees, and some other

7   minor committees in the USDA.  Because Department of

8   Agriculture has to be a part of that committee.  And I am

9   assigned to take care of that.  So, also the state committees.

10 **Q**    Did you -- do you have more than 50 years' experience in

11  toxicology and risk assessment?

12           **THE COURT:**  Let's go ahead and -- let's go ahead and

13  get to the opinions.

14           **MR. HABERMAN:**  Sure.

15           **THE COURT:**  I've read his report, and I've read the

16  papers.

17           **MR. HABERMAN:**  Okay.  Just one more question, if I

18  may.

19 **BY MR. HABERMAN**

20 **Q**    Did you contribute to the medical journal, to

21  peer-reviewed medical literature on your -- well, did you

22  contribute to the field of toxicology?

23       Did you write peer-reviewed medical articles?

24 **A**    Yes, I have.  In fact --

25           **THE COURT:**  I don't think they're challenging his, you

1    know, contributions to the field of toxicology.  So why don't

2    we just get the opinions.

3              **MR. HABERMAN:**  Yes, Your Honor.

4         (Document taken off display)

5    **BY MR. HABERMAN**

6    **Q**    So what -- share with the Court, please, what opinions do

7    you have in this case, generally?

8    **A**    Can you be a little more specific?  "What opinion I have

9    on this case" means on what?

10   **Q**    So did you determine, to a reasonable degree of scientific

11   certainty, on whether or not Roundup can, in general, cause

12   non-Hodgkin's lymphoma?

13   **A**    Yeah, the lit- -- literature support that.

14   **Q**    Okay.  Just to be clear, do you have an opinion, to a

15   reasonable degree of medical certainty, that Roundup can cause

16   non-Hodgkin's lymphoma?

17   **A**    Yes, it can cause NHL.

18   **Q**    Okay.  Do you have an opinion, to a reasonable degree of

19   medical certainty, that Roundup can cause CLL?

20   **A**    SLL?

21   **Q**    CLL.

22   **A**    CLL.  Yes, the medical literature support that.

23   **Q**    So, just to be clear, do you have that opinion, that

24   Roundup can cause CLL?

25   **A**    Yes, I do.

1  **Q**    And is that an opinion that you hold to a reasonable

2  degree of medical certainty?

3  **A**    Yes.

4  **Q**    Do you also have an opinion -- were you able to come up

5  with an opinion on whether or not Mr. Engilis's exposure to

6  Roundup caused or contributed substantially to causing his

7  non-Hodgkin's lymphoma?

8  **A**    Reviewing all the data, I come to the conclusion that,

9  eliminating all of the confounding or other factors, this is

10  the factor.  That is, Roundup is the one, that extra factor

11  that is standing out that may have contributed.

12  **Q**    Okay.  But, is it your opinion, to a reasonable degree of

13  medical cert- --

14         **THE COURT:**  Well, you keep asking these leading

15  questions.  He just gave his opinion.  So I don't -- I don't

16  think you should feed language to him when you are trying to

17  solicit his opinion from him.  I think you should let him give

18  his opinion.

19         **MR. HABERMAN:**  Yes, Your Honor.

20  **BY MR. HABERMAN**

21  **Q**    What is your opinion on whether or not Roundup

22  specifically caused Mr. Engilis's non-Hodgkin's lymphoma?

23         **MR. STEKLOFF:**  Objection.  He just offered -- he just

24  explained his opinion on that, Your Honor.

25         **THE COURT:**  Well, why don't you move on.  You can

1  circle back to it later, if you need to ask it again.  But...

2      And I want to reiterate I'm not going to allow questions

3  like that again, so don't even try to ask them.

4      Okay?

5          MR. HABERMAN:  Okay.

6          THE COURT:  You are basically feeding him an opinion

7  that you want him to give, and you are asking him to say yes.

8  And that's not an appropriate way to conduct a direct

9  examination of an expert in a case like this.  So don't even

10  try to ask that question again.  Okay?

11          MR. HABERMAN:  Yes, Your Honor.

12  BY MR. HABERMAN

13  Q    Dr. Charles, taking -- going to -- answering the question

14  of general causation, what did you do to determine whether or

15  not Roundup can cause NHL?

16  A    First I look at the review of literature.

17      Secondly, I look at what the literary and national and

18  international agencies who have reviewed this chemical, and

19  what their review says and what their conclusions are, what

20  their comments are.

21      And thirdly, I look at the individual research papers.

22  And -- not individually.  So many of different types of

23  toxicological studies.  For example, mechanistic studies.

24  Genotoxic studies.  Mutagenicity comes under genotoxicity.

25  Metabolism.  Kinetics.  As I said, absorption/distribution type

**CHARLES - DIRECT / HABERMAN**

1  of thing.

2  **Q**    Did you do all that in this case?

3  **A**    Yeah.  I reviewed data on that.

4  **Q**    What -- how did you synthesize the data to determine that

5  Roundup can cause non-Hodgkin's lymphoma?

6  **A**    That was -- that is emphasizing, in my mind, is the

7  information, my knowledge, and my inferences from the facts, as

8  a trained scientist.

9  **Q**    Okay.  When you reviewed the literature, what literature

10  stood out, if any, in your mind -- does any literature stand

11  out in your mind that supports your opinion that Roundup causes

12  non-Hodgkin's lymphoma?

13  **A**    Most of the information that come from chronic toxicity --

14  chronic toxicity, chronic exposure to Roundup, in the

15  population studies.

16       And secondly, the possibility of contribution of genetic

17  damage that can cause cancer.  Glyphosate that can cause

18  genetic expression of proteins, which are characteristics.

19  Glyphosate can cause oxidative stress.

20       And then, correlation of oxidative stress biomarkers with

21  causing cancer.

22       All these different steps and factors one has to weigh in,

23  to look at whether it can cause cancer or not.

24  **Q**    And, did you do that in this case?

25  **A**    I did.

**CHARLES - DIRECT / HABERMAN**

1  Q    You mentioned population studies.  You know, what -- do

2  you recall the names of the population-based studies that you

3  reviewed and relied on?

4  A    I must have collected about ten, 20 epidemiological

5  studies, you know.  I referenced the five or six studies in my

6  report.  Particularly because that EPA, in their assessment,

7  they have included those studies.  So I took those studies

8  particularly in my report, also.  Those are the epidemiological

9  studies.

10  Q    And how did those studies -- what did you make of those

11  studies, in general?

12  A    Two or three studies stood out.  That is, McDuffie and

13  Pahwa, et al., studies that stood out, that lower exposure days

14  have the potential -- or if not statistically significant,

15  there is a doubling effect of excessive risk in their

16  assessment.

17      (Reporter clarification)

18          THE WITNESS:  Excessive.  Excessive.

19  BY MR. HABERMAN

20  Q    I think you also mentioned doubling?

21  A    Yeah.  It can be doubling.  Or, more than one.

22  Q    And where did you see that?  And why is that significant?

23  A    Because the basic risk of -- I don't have the data to

24  pinpoint, but I can tell you generally.  The basic risk is 1,

25  and the exposure risk group goes up to 2, that's a doubling of

1  more than one risk.

2  **Q**    Did you review and rely on the McDuffie study, 2001?

3       (Document displayed)

4       **THE COURT:**  Well, why don't you take that down for a

5  second.

6       (Document taken off display)

7       **THE COURT:**  And let me just ask Dr. Charles.

8       What -- can you explain how you reached this conclusion

9  about the doubling of the risk?  Where did it come from?  And

10 explain why, explain why you reached this conclusion.

11      **THE WITNESS:**  I had to go through the McDuffie study

12 that -- for a -- can I look at my notes, and tell?

13      **THE COURT:**  Uh, sure.  But I'm just -- I mean, this is

14 a pretty basic point.  Right?

15      **THE WITNESS:**  Yeah.

16      **THE COURT:**  There's a doubling of the risk.

17      **THE WITNESS:**  Yeah.

18      **THE COURT:**  So can you explain to me why you reached

19 that conclusion?

20      **THE WITNESS:**  How -- how they assessed in this case,

21 by case control studies, they look at the odd ratios.  Odd

22 ratios of exposed and non-exposed.  They also compare for

23 glyphosate group, exposed group.  They also look at group who

24 have CLL.

25      And they do the all ratio assessment, and then look at the

1  difference between the ratios.  Do a logical regression

2  analysis or statistical analysis.  Come out with whatever it

3  is, showing a tendency or statistically significant because of

4  the P value also less than .05.  Or it shows significance, but

5  not reach the level of --

6      THE COURT:  And the doubling of the risk, what causes

7  the risk of NHL to double?  What are you saying doubles the

8  risk?

9      THE WITNESS:  Doubles the risk case, the -- check out

10  if glyphosate exposure can cause the doubling of the odd ratio.

11    (Reporter clarification)

12      THE COURT:  Any glyphosate exposure?

13      THE WITNESS:  Yeah.

14      THE COURT:  You're saying any glyphosate exposure

15  doubles the risk of any --

16      THE WITNESS:  No.  Glyphosate exposure.

17      THE COURT:  Right.  How much glyphosate exposure?  Any

18  glyphosate exposure doubles the risk?  Is that what you're

19  saying?

20      THE WITNESS:  They are saying that duration of

21  exposure is the measure.  Two days, more than two days, things

22  like that.

23      THE COURT:  More than two days, what?  If you --

24      THE WITNESS:  Of exposure, working or handling

25  glyphosate.

1          **THE COURT:**  So you are saying that if -- if you are

2    exposed to glyphosate for more than two days, you double the

3    risk of NHL?

4          **THE WITNESS:**  Yes.

5          **THE COURT:**  Okay.  What else?  Anything else?

6          **THE WITNESS:**  Also, CLL, the specific type of cancer.

7          **THE COURT:**  Okay.  So that's -- so your opinion is

8    that if you are exposed to two days -- if you experience two

9    days-worth of glyphosate exposure, you are doubling your risk

10   of NHL.

11         **THE WITNESS:**  I agree with their opinions.

12         **THE COURT:**  You agree with their opinions.  Okay.  And

13   who is "they"?

14         **THE WITNESS:**  Um, there are Eriksson, et al.,

15   McDuffie, et al., Pahwa, et al., two, three papers that did

16   case control studies.

17         **THE COURT:**  Okay.  And what's a case control study?

18         **THE WITNESS:**  They have separate groups, of people

19   exposed, and -- different groups, you know.  If I -- if I may

20   explain.

21         They go to the population, and look at number of people

22   that used glyphosate, and controls who did not use it.  And

23   then among men exposed, how many had NHL.  And in control, not

24   used, how many of them had NHL.

25         **THE COURT:**  Got it.  Okay.  Thanks.

1          You can continue.

2    BY MR. HABERMAN

3    Q    Okay.  So, Doctor, we were talking about McDuffie, and

4    McDuffie -- I'm sorry, what?

5    A    Nothing.

6    Q    Okay.  You also mentioned other authors.  Eriksson, for

7    example.

8    A    Yeah, Eriksson.

9    Q    Do you recall what Eriksson described, the findings of

10   Eriksson, and why you rely on that?

11          THE WITNESS:  Judge, can I look at my notes?

12          THE COURT:  Sure.

13          THE WITNESS:  All these long papers, and I can't

14   remember my --

15          THE COURT:  Sure, go ahead.

16          THE WITNESS:  -- and findings.

17       (Witness examines document)

18          THE WITNESS:  Eriksson finding, Eriksson, 2008 finding

19   on Page No. 1658, and Table No. 2.  Based on that, all

20   herbicide exposure, odd ratio is 1.72.

21   BY MR. HABERMAN

22   Q    Okay.

23   A    All -- all pesticides.

24   Q    All pesticides, you said, --

25   A    Exposure.

1  **Q**    -- were 1.72?

2  **A**    O2.  And, and then they go further.

3  **Q**    Just, just need to make sure that the numbers are clear

4  for the court reporter.  She's having difficulty hearing.

5  **A**    Yes.

6  **Q**    Okay.  So you're on Table 2 of Eriksson?

7  **A**    Table 2, Page No. 1658.  And explanation or description of

8  Table No. 2, somewhere in that paragraph.

9         **MR. HABERMAN:**  Your Honor, may I publish that table?

10        **THE COURT:**  Go ahead.

11     (Document displayed)

12  **BY MR. HABERMAN**

13  **Q**    Do you see Table No. 2 in the Eriksson paper, Doctor?

14     (Witness examines document)

15  **A**    On the top of the table, besides total.

16  **Q**    Okay.  The top had an odds ratio of 1 --

17  **A**    Is 1.72, with a 95 percent, confidence interval is 1.18 to

18  2.51.

19     (Reporter clarification)

20        **THE WITNESS:**  A confidence interval of 1.18 to 2.51.

21  **BY MR. HABERMAN**

22  **Q**    And does this study also pull out glyphosate?

23  **A**    Yes.  If you go down there --

24        **MR. STEKLOFF:**  Your Honor, I think this is now

25  having -- the problem I think that we're facing is that

 1  Dr. Charles was testifying on what data he's relying on.  He,

 2  looking at his notes, referred to the all-herbicide data.

 3       And now Mr. Haberman has a highlighted copy that would

 4  point him to the relevant glyphosate data, but I'm not sure he

 5  -- I mean, I think he should be just asked what he's relying

 6  upon as opposed to showing him -- this is sort of leading in

 7  its own way, I think, is the problem.

 8            **THE COURT:**  I agree with you.  I agree.  Sustained.

 9       (Document taken off display)

10  **BY MR. HABERMAN**

11  **Q**   Do you have data at hand on what Eriksson said about

12  glyphosate exposure?

13  **A**   Yes.

14  **Q**   And what, what was said there?

15  **A**   In the category of herbicides, the dominating agent was

16  glyphosate, which was reported having an odd ratio as 2.02,

17  with a confidence interval of 1.1 to 3.71.

18  **Q**   Okay.  Was there anything reported there about the amount

19  of exposure that is significant for you?

20  **A**   I am talking about Table No. 2 now.

21  **Q**   Right.

22  **A**   Not in the Table No. 2.

23  **Q**   Right.

24  **A**   If you go further, further in that paper, you may find

25  that information.

1   Q    Do you recall what Eriksson said about the amount of

2   exposure and its correlation?  The amount of exposure to

3   glyphosate and its correlation to NHL, do you recall what

4   Eriksson said there?

5   A    Eriksson did the number of days of exposure.  More than

6   ten days of exposure, having an odd ratio of 2.36.  As opposed

7   to less than ten days, 2.02 in higher -- highest exposed-to

8   groups.

9   Q    And was that important for your opinion in this case?

10  A    More than ten days of exposure.

11  Q    Right.

12  A    Lifetime.

13  Q    So tell us why that's significant to you, if at all.

14  A    Because in the population study, case control study, they

15  had this kind of duration of exposure was -- was the odd ratio

16  significance.

17       The ten days of exposure, more than ten days of exposure,

18  they say it is higher in exposed-to groups and it shows a dose

19  response that is their observation.  So it indicates a dose

20  response, so I pay attention to that, that particular number.

21  Q    How did -- how does Eriksson indicate a dose response?

22  A    He -- oh, can I add a little more to that, just dose?

23       In epidemiological studies, generally you don't see dose.

24  I told you what -- the definition of dose.  Instead of dose --

25  dose is a measurement.

**CHARLES - DIRECT / HABERMAN**

1    Here, we do not have anything to measure, the blood or

2 urine or anything like that, to look at the load or amount of

3 the chemical.  What we are left with is exposure.  Okay?

4 Exposure response, not in a struck response (Phonetic).  In

5 that case, you know, the exposure has to be related to a

6 duration.  A duration of exposure.

7    So in epidemiological observation, instead of classic

8 pharmacological definition of dose response, they actually

9 measure exposure response, and then call it as dose response.

10 **Q**   Did other articles do similar -- treat that data

11 similarly?

12 **A**   Same, same way.

13 **Q**   Same way.  What about the Pahwa article?  Is that article

14 significant to you in your general causation opinion?

15 **A**   Yeah, Pahwa articles also talk about the duration, I

16 believe.

17 **Q**   And so why -- what did you find significant about the

18 Pahwa article?

19 **A**   Pahwa article, statistical significant association of

20 handling glyphosate for more than two days per year with an odd

21 ratio of 1.73.

22 **Q**   And what does that mean?

23 **A**   That means, you know, if you have a two days cutoff point,

24 if you have more than two days exposure in their analysis,

25 there is -- I'm sorry -- statistical significance.  Okay.  That

 1   regression analysis, odd ratio.

 2   **Q**    And is statistical significance always important to you,

 3   Doctor?

 4   **A**    Not always important to me.  For publishing papers,

 5   general publishing, the statistical analysis is important to

 6   show that this finding is very important to look at.  But in

 7   general scientific analysis, as a scientist, there are

 8   significant findings sometimes as outliers of the statistical

 9   95-percent confidence level.  There are cases outside that

10   level.  So I look at that also.  I do not just go for the

11   significance, alone.

12   **Q**    Have you read or -- is it -- is it okay to only focus on

13   statistical significance?

14   **A**    No, there are lots of --

15          **MR. STEKLOFF:**  Oh, objection, Your Honor.

16          **THE COURT:**  Hold on one second.  Hold on one second.

17   There's an objection.

18          **MR. STEKLOFF:**  I -- um, I mean, none of this is

19   disclosed in his report, is the problem I have now.  So we

20   didn't -- so we didn't have any opportunity to examine him on

21   any of this.

22          **THE COURT:**  That objection is overruled.

23       Go ahead.  You can go ahead and answer the question.

24          **THE WITNESS:**  I can answer?

25          **THE COURT:**  I overruled the objection.  So when I --

1    when I sustain an objection, you are not to answer the

2    question.  But when I overrule an objection, you are free to

3    answer the question.

4        So, I just overruled that objection.

5        THE WITNESS:  There were some debate about the

6    statistical significance, and then finding out they actually

7    affect, among scientists, you know, for -- in my recollection,

8    over 10, 15 years, I have read published articles and even

9    journals about that.  I cannot pinpoint the article reference

10   right now.  But, that thought and process consensus is in my

11   mind.

12   BY MR. HABERMAN

13   Q    Is there information or data in the Pahwa article that's

14   significant to you, even though the results might not be

15   significantly significant?

16       THE COURT:  Statistically significant?

17       THE WITNESS:  If there is a tendency --

18       MR. HABERMAN:  Sorry.  What'd I say?

19       THE COURT:  Go ahead.

20       THE WITNESS:  If there is a tendency of increase, we

21   take into consideration that, even if it is not statistically

22   significant.

23   BY MR. HABERMAN

24   Q    And did you see evidence of an association between

25   exposure to Roundup and CLL specifically that was important to

1    you, even though not statistically significant?

2    **A**    Yes.

3    **Q**    And tell the Court about that, please.

4    **A**    When they looked at exposure less than 3.5 days and then

5    exposure more than 3.5 days, they are -- statistically, it was

6    not significant.

7         But when you look at the data of -- of SLL versus less

8    than 3.5 days -- SLL is the common factor -- less than five

9    days and then more than five days is almost the same.  Similar

10   exposure are found.  That means, you know, whether they're

11   exposed or not exposed, there is a possibility of SLL there for

12   3.5 days, the cutoff days.

13        But, statistical analysis, it may not be very important.

14   Because the number they used in their lifetime analysis of SLL,

15   the number of subjects in the less than 3.5 days was -- only

16   number two, two individuals.  More than 3.5 days, there were

17   five individuals.  And they did their statistical significant

18   analysis.  It may not be statistically significant.  Because of

19   the number issue.

20   **Q**    What do you mean, "number issue"?

21   **A**    "Number issue" mean number of subjects enrolled in the

22   study.  But if you look at the odd ratio, less than 3.5 days is

23   1.03, after adjusting all variables.

24   **Q**    And what about more than that time?

25   **A**    And more than 3.5 days, it is 2.19.  So there is a

1    doubling effect right there, but, may not be statistically

2    significant.

3    **Q**    What about whether Pahwa examined the number of years

4    used -- or days per year, handling glyphosate?  Did Pahwa

5    examine that relationship, too?

6    **A**    Pahwa examined the handling of glyphosate.  More than two

7    days per year has excess.  That is DLBCL, not SLL.  Association

8    were elevated, but not statistically significant, even every

9    years or days per use for SLL.

10           **MR. STEKLOFF:**  Your Honor, I have -- now one concern I

11   have is that we're reading from notes that none of us have

12   access to.  I mean, it's one thing for him to sort of refer to

13   notes to remind himself of -- there are a lot of odds ratios;

14   I'm not disputing that.  But, it seems like he's literally

15   reading from notes.

16           **THE COURT:**  I just wrote down on my pad of paper that

17   he's reading his answers from his notes.

18           **MR. STEKLOFF:**  Okay.

19           **THE COURT:**  But other than that, I mean --

20           **MR. STEKLOFF:**  I mean, I don't know.  I don't -- I --

21           **THE COURT:**  That's relevant, but I don't know what you

22   want me to do about that right now.

23           **MR. STEKLOFF:**  Well, I would like the day to be

24   efficient.  I don't know that it has been so far.  But I think

25   at some point, we -- like, if there's a script or something

 1  that's been prepared, we all, including the Court, are entitled

 2  to see it, as opposed to wondering what is in front of him

 3  that's being read.

 4          **THE COURT:**  Yeah.

 5          **MR. STEKLOFF:**  Yeah, I --

 6          **THE COURT:**  Go ahead.

 7          **MR. HABERMAN:**  Thank you, Your Honor.

 8  **BY MR. HABERMAN**

 9  **Q**    Do you know, Doctor, whether or not Pahwa also examined

10  lifetime days of glyphosate use?

11  **A**    Lifetime days?

12  **Q**    (Nods head)

13  **A**    I think I mentioned that thing already.

14          (Reporter clarification)

15          **THE WITNESS:**  Lifetime, lifetime days for SLL.

16  **BY MR. HABERMAN**

17  **Q**    Right.  Did Pahwa examine that as well?

18  **A**    Yes.  That's what I was describing about the numbers.

19  **Q**    I see.

20  **A**    The subject number, two, versus five.

21  **Q**    Oh, okay.  When you say two and five, are you talking

22  about the number of people?

23  **A**    Yes.

24  **Q**    I see.  Okay.  But what -- do you know the number of days,

25  the lifetime days that Pahwa was looking at?

 1           **MR. STEKLOFF:**  Objection, in that.  He's already

 2    discussed this.  He said it was 3.5 days.  That is incorrect.

 3    But I think now we're trying to -- I mean, this is just -- my

 4    objection is that this is covered already, and we've already

 5    heard his opinion, that they were talking about 3.5 days in the

 6    lifetime days.

 7           **MR. HABERMAN:**  But, Your Honor, that had --

 8           **THE COURT:**  Go ahead and ask the question.

 9           **MR. HABERMAN:**  Thank you, Your Honor.

10    BY MR. HABERMAN

11    **Q**    In terms of -- you know, you said that there was a number

12    of two, and then a number of five.  And that referred to the

13    amount of people with SLL, right?

14    **A**    Number of people, yes.

15    **Q**    Do you recall or do you know the number of days that Pahwa

16    was looking at, the number of lifetime days that Pahwa was

17    looking at?  The number of days of -- of exposure to -- the

18    number of lifetime days of exposure to Roundup in its

19    association with NHL or its subtypes, in Pahwa?

20    **A**    I don't have the number of days in my notes, written.  In

21    subtype analysis, measure of lifetime days was significant --

22    statistically significant, suggesting an association.

23    **Q**    Okay.  In addition to these three articles that you just

24    mentioned, Pahwa, McDuffie and Eriksson, did you also look at

25    studies -- did you look at meta analysis studies?

 1   **A**     Yeah.  There are other studies, yes.

 2   **Q**     Right.  Are you familiar with IARC?

 3   **A**     Yes.

 4   **Q**     And tell us, what is IARC, and how is it of any importance

 5   in this case?

 6   **A**     How is IARC important in this case?

 7   **Q**     What about IARC is important in this case, if anything?

 8   **A**     IARC is an international agency who reviewed and made a

 9   report on glyphosate toxicity assessment.  They reviewed many

10   studies, both research articles, as well as available -- I do

11   not know what were the studies available to them -- available

12   toxicological studies.  They came to a conclusion that

13   glyphosate is likely to be a human carcinogen.

14   **Q**     Are you familiar with IARC's classification system?

15   **A**     Yes.

16   **Q**     And did you review IARC's analysis?

17   **A**     I have reviewed their -- their report.

18   **Q**     What about an author by the name of Zhang?  Z-H-A-N-G.

19   Did you review --

20   **A**     Yes.  That's an epidemiological meta analysis, I believe.

21   Recollection, yeah.

22   **Q**     And is that a report that you reviewed and relied on in

23   this case for your general causation opinions?

24   **A**     Yes.

25   **Q**     What stood out to you in that report?  Why was that

1    significant?

2    **A**    Zhang?  EPA found some limitations in that particular

3    study.  Some limitations.  So they decided not to include in

4    their decision-making that thing.

5    **Q**    Do you recall what Zhang said about the relative risk with

6    exposure to glyphosate?

7    **A**    Yes, but I don't have my notes.  I cannot remember all the

8    numbers and opinions in my head, without the appropriate paper

9    in front of me.  I'm too old for -- long papers, and so many

10   epidemiological studies.  I can't recollect and store all this

11   thing in my memory, to tell you what Zhang said or Eriksson

12   said.  So many different findings, I can't.

13   **Q**    Okay.  You also mentioned, in addition to the

14   epidemiological data that you reviewed, that you also reviewed

15   mechanistic data and genotox data --

16        **THE COURT:**  Let me cut you off there.

17        Number one, I think now is a good time to give the court

18   reporter a little break.

19        Number two, I think the way I would like to proceed, in

20   the interest of efficiency, is I would like to give

21   Mr. Stekloff the opportunity to -- or Ms. Neuman, whoever it's

22   going to be, to cross-examine Dr. Charles on the

23   epidemiological stuff, and what he said so far.

24        And I think that the epidemiological stuff is so much more

25   important than the rest of the stuff.  That if Dr. Charles is

 1   either not qualified or -- to offer an opinion on the

 2   epidemiology, or if he -- the opinion that he's -- even if he

 3   is qualified, if the opinion that he's offered on the

 4   epidemiology is inadequate, that's the end of the matter, with

 5   respect to general causation.

 6        So in the interest of efficiency, what I'd like to do is

 7   take a five-minute break, and then we'll begin with

 8   cross-examination on what has been discussed so far.  And then,

 9   I may be able to make a determination at that time whether

10   Dr. Charles is permitted to testify on the issue of general

11   causation.  Okay?

12        So I'm going to also require Dr. Charles to provide all

13   his notes to Mr. Stekloff --

14             THE WITNESS:  Sure.

15             THE COURT:  -- right now, so that Mr. Stekloff can

16   review them before cross-examination.

17        And I'll order you not to discuss with Dr. Charles his

18   testimony or the subject matter of the testimony at all before

19   cross-examination.

20        And we'll resume at ten minutes to 12:00.

21        Mr. Stekloff, do you have a sense of how long this might

22   take?

23             MR. STEKLOFF:  Um --

24             THE COURT:  Rough sense?

25             MR. STEKLOFF:  I think I can do this, Your Honor, in

```
 1    less than an hour, for sure.

 2              THE COURT:  Okay.

 3              MR. STEKLOFF:  Yeah.

 4              THE COURT:  So then we'll break after you're done with

 5    your cross.

 6              MR. STEKLOFF:  Okay.

 7              THE COURT:  Break for lunch, that is.

 8         Okay.   Thank you.

 9              THE COURTROOM DEPUTY:  Court is in recess.

10         (Recess taken from 11:45 a.m. to 11:53 a.m.)

11              THE COURT:  Okay, Dr. Charles, you are free to take

12    the stand again.

13              MR. STEKLOFF:  May I proceed, Your Honor?

14              THE COURT:  Yep.

15                          CROSS-EXAMINATION

16    BY MR. STEKLOFF

17    Q    Good morning, Dr. Charles.

18    A    Good morning.

19    Q    Dr. Charles, I'm going to start where the Court asked us

20    to focus, which is on epidemiology.   Okay?

21    A    Yes, sir.

22    Q    And as part of your review, you looked at data points in a

23    few epidemiology studies, correct?

24    A    Yes.

25    Q    And in your report you had a chart that summarized the
```

1    data points that are important to you, correct?

2    **A**    Yes, some of the studies or other.

3    **Q**    Your report --

4            **MR. STEKLOFF:**   So you know, I've given, Your Honor,

5    Dr. Charles a binder.

6    **BY MR. STEKLOFF**

7    **Q**    And if you look at Tab 113, Dr. Charles, that has your

8    report.

9    **A**    Okay.

10   **Q**    And the summary that you put is on Page 19 of your report.

11   Right?

12   **A**    Yes, sir.  I'm there.

13   **Q**    Okay.  And those were the data points that you believed

14   were important for your general causation opinions.  Correct?

15   **A**    Yeah.  That was.

16   **Q**    Now, you know -- I don't -- I'd prefer not to walk through

17   this whole table.

18       You know, sitting here, having been deposed before, that

19   there are a number of errors in this -- in the numbers here.

20   Right?

21   **A**    Yeah.  I believe so; in the deposition, there was a few

22   discussion about that.

23   **Q**    Yeah.  In other words, you transcribed many of the numbers

24   incorrectly.  Correct?

25   **A**    Yes.

**CHARLES - CROSS / STEKLOFF**

1  Q    And you never have gone back to correct this table or

2  supplement your report.

3  A    I did not do anything that -- I didn't -- I didn't do

4  anything to change my deposition or the report, unless I was

5  asked, you know, to do so.

6  Q    Okay.  One of these numbers you recall even involves

7  multiple myeloma.  It doesn't even involve non-Hodgkin's

8  lymphoma.  Correct?

9  A    Yeah, that's right.

10  Q    Now, let's talk about epidemiology, on a high level.

11  Okay?

12      You agree that when reviewing an epidemiology study, it's

13  important to consider all of the data in a study.  Correct?

14  A    Yes.

15  Q    And specifically with pesticides, you also agree it's

16  important to look at data that is controlled or adjusted for

17  other pesticides.  Right?

18  A    Yes.

19  Q    So when you're looking at Roundup or glyphosate data, you

20  want to look to see if the data has been adjusted for other

21  pesticides.

22  A    Yes.

23  Q    And that's important because other pesticides could be

24  confounders, correct?

25  A    Yes.

1   **Q**    And could minimize the importance of the data if the

2   numbers are unadjusted.  Right?

3   **A**    Yes.

4   **Q**    Now, you explained some of your experience with

5   epidemiology, right?

6   **A**    Yeah.  My experience is reviewing and understanding and

7   self-learning.  I have not taken any epidemiological courses; I

8   never claimed to be an epidemiologist.  My knowledge as a

9   toxicologist, research papers related to human toxicity I had

10  to review, and learn about it, you know.  And that methodology,

11  I understand.

12  **Q**    Okay.  Now, when you were doing your work for this case,

13  and looking at these epidemiology studies, you did not assess

14  the limitations of any of the studies.  Right?

15  **A**    No, no.

16  **Q**    You didn't assess the quality of the studies.  Correct?

17  **A**    Correct.

18  **Q**    You didn't assess the methodology of the study.  Correct?

19  **A**    No, I -- not.

20  **Q**    So you basically, to sum up, looked at data points, and

21  tried to see whether they showed an association, correct?

22  **A**    No, I read the whole paper, mark wherever that is

23  important for me to look at, review, come back and read that

24  thing, look at the odd ratios and their significance.  When

25  they are statistically significant, I look back and see what is

 1   the number, why it is statistically significant, what that

 2   explanation is.  And likewise.  Yeah.

 3   Q    But you didn't, for example, compare the quality of the

 4   case control studies you looked at to the quality of the cohort

 5   study that you looked at, right?

 6   A    Those kind of quality assessment comes before the

 7   publication of the paper.  Not at my level.

 8   Q    Right.  By the peer reviewers.

 9   A    Peer reviewers, yes.

10   Q    So one of the studies you looked at is called the

11   Agricultural Health Study, right?

12   A    Yes, AHS study, yes.

13   Q    And you know that that study found no association between

14   Roundup and non-Hodgkin's lymphoma, correct?

15   A    Yes.

16   Q    And it's one of the studies you put in your table.

17   A    Yes.

18   Q    But you didn't do any assessment of the methodology of the

19   Agricultural Health Study.

20   A    No.

21   Q    And you didn't do any assessment comparing the methodology

22   of the Agricultural Health Study to the other studies you

23   pointed to, correct?

24   A    I do not examine methodology of any other studies, you

25   know.  That comes before that paper is published.

**CHARLES - CROSS / STEKLOFF**

1  Q    Okay.  So let's look at some of the papers.  And -- well,

2  let me ask you this.  You talked about McDuffie and Eriksson,

3  right?

4  A    Yeah.

5  Q    And those are the papers that show -- one paper shows an

6  increased risk with two days per year, right?

7  A    Yeah.

8  Q    And one paper shows an increased risk with ten lifetime

9  days.  Correct?

10 A    Yes.

11 Q    Are those numbers adjusted for other pesticides?  Or not

12 adjusted for other pesticides?

13 A    They're adjusted for other pesticides, I believe.  Yes.

14 Q    You believe they are.

15 A    Yeah.

16 Q    And is that -- were -- if they were not adjusted, how

17 would that affect your opinions?

18 A    Um, I may have to go back and look at the data again, yes.

19 Q    Right.  And, and I don't want to get too far ahead of

20 ourselves, but your specific causation opinion is based on the

21 fact that Mr. Engilis used Roundup more than two days per year.

22 Right?

23 A    Yes.

24 Q    And it's important to you that you believe that two days

25 per year, data is adjusted for other pesticides.  Correct?

**CHARLES - CROSS / STEKLOFF**

1   **A**    For Pahwa, it is adjusted, Pahwa --

2   **Q**    I'm not asking about Pahwa; I'm asking about McDuffie and

3   Eriksson.  You believe that it's adjusted for other pesticides?

4   **A**    Yes.

5   **Q**    And that's important to your specific causation opinion,

6   right?

7   **A**    Because you can eliminate the variables.

8   **Q**    And that's why it's important, right?

9   **A**    Yeah, statistically it is important, yes.

10  **Q**    So let's look at -- well, I think the Court knows whether

11  McDuffie and Eriksson are adjusted so I'm going to move on and

12  let's look at Pahwa, actually, okay.

13       So Pahwa, in your binder, is Tab 107.  Okay?

14       (Reporter clarification)

15          MR. STEKLOFF:  I'm going to put it on the screen to

16  walk through it.  I just have one copy that is highlighted and

17  one that's not, so I'm going to try to use the unhighlighted.

18  **BY MR. STEKLOFF**

19  **Q**    Let me ask you this before we look at Pahwa, Dr. Charles.

20  Do you know if McDuffie is part of Pahwa?

21  **A**    Yeah, I -- I think they published together some papers.

22  **Q**    So explain to me what role, if any, McDuffie plays in

23  Pahwa.

24  **A**    How do I explain?  I see common authors in the paper.

25  **Q**    Ah, so your only understanding of McDuffie and Pahwa is

1  that they have common authors.

2  **A**    Yeah.  In that paper, yes.

3  **Q**    Okay.  You don't have any understanding about whether one

4  incorporates the data from the other.

5  **A**    No.

6  **Q**    Okay.  So you don't have any understanding about, in

7  Pahwa, whether it's a pooled analysis that incorporates

8  McDuffie in part of that pooling.

9  **A**    Pahwa states it is a pooled analysis.  Pooled, pooled

10  analysis, of case-controlled studies, yes.

11  **Q**    But you don't know if McDuffie is one of those studies.

12  **A**    Ah, no.

13  **Q**    Okay.  Let's look at Pahwa.  And let's -- and let's start

14  with the front page, just --

15      (Document displayed)

16  **Q**    So we can see down here, this was published in 2019.

17  Correct?

18  **A**    Correct.  Correct.

19  **Q**    And I only point that out so that the Court is aware that

20  this -- I think His Honor heard about this, a draft of this

21  study during trial, but now this is the final published

22  version.

23      **THE COURT:**  I'm shocked at how much I remember about

24  all this stuff.

25      **MR. STEKLOFF:**  I'm not surprised, Your Honor.

CHARLES - CROSS / STEKLOFF

1    (Document displayed)

2   **BY MR. STEKLOFF**

3   **Q**    Now, in Pahwa, they looked at ever/never use, correct?

4   **A**    Say it again, please.

5   **Q**    Sure.  In Pahwa, they looked at ever/never use of

6   glyphosate.  Correct?

7   **A**    You have a page number?

8   **Q**    Sure.  It's on the screen, but it is Page 604 at the

9   bottom.

10  **A**    604.

11  **Q**    And do you see Table 2, Dr. Charles?

12   Do you see Table 2 on Page 604?

13  **A**    Yes.

14  **Q**    And this says (As read):

15          "Ever/never glyphosate use, and associations

16          with Non-Hodgkin lymphoma overall and

17          histological subtypes in the North American

18          pooled project."

19   Do you see that?

20  **A**    Yes.

21  **Q**    Okay.  And for non-Hodgkin's lymphoma overall, they found

22  an odds ratio of 1.13 that was not statistically significant.

23  Correct?

24    (Document highlighted)

25      **MR. HABERMAN:**  I object, Your Honor.  Again,

1  mischaracterizes the document.

2          **THE COURT:**  Overruled.

3      (Witness examines document)

4          **THE WITNESS:**  It shows odd ratios 1.43, ever use

5  glyphosate.

6  **BY MR. STEKLOFF**

7  **Q**    Right.

8  **A**    And these -- these were adjusted, yesterday.

9  **Q**    I should make that clear.  There's two odds ratios, right?

10  One has a little "a" next to it and one has a little "b" next

11  to it, correct?

12  **A**    Yes.

13  **Q**    And then you can see under the table what was adjusted for

14  little "a" and little "b", right?

15  **A**    Yes.

16  **Q**    And little "a" was adjusted for age, sex, location,

17  first-degree relative, and proxy respondent, and PPE.  Correct?

18  **A**    Yes.

19  **Q**    And then "b" was adjusted for all of those things, plus

20  the use of 2,4-D, dicamba and malathion.  Correct?

21  **A**    "b" was adjusted for age, sex, state, province, lymphatic

22  or hematopoietic cancer or the first degree they relate to you,

23  use of proxy respondent, use of any protective equipment, use

24  of 2,4-D, dicamba, and use of malathion, yes.

25  **Q**    And you understand 2,4-D, dicamba and malathion are other

**CHARLES - CROSS / STEKLOFF**

1  pesticides, yes?

2  **A**    Phenoxy- -- 2,4-D is a phenoxy, yes.  Herbicides.

3  **Q**    Okay, so --

4  **A**    Sorry.  Malathion is an insecticide.

5  **Q**    Okay.  And when we are looking at the data, therefore, we

6  should be looking at the data that was adjusted for other

7  pesticides, right?

8  **A**    Yes.

9  **Q**    So in the ever/never use for NHL overall, if we look at

10 "b," adjusted for other pesticides, the odds ratio was 1.13,

11 and not statistically significant.  Correct?

12 **A**    Yes.

13 **Q**    That's a data point that you should consider in reviewing

14 this study.  Right?

15 **A**    Yes.

16 **Q**    You didn't include that in your expert report, though,

17 right?

18 **A**    Well, if it is not there, I have not included it.

19 **Q**    Okay.

20     (Document taken off display)

21 **Q**    Now let's look at some of the tables that you were asked

22 about on your direct examination.

23     (Document displayed)

24 **Q**    So Table 3 shows duration of glyphosate use.  Correct?

25 And that is just on the next page, Dr. Charles.

**CHARLES - CROSS / STEKLOFF**

1    A    Yes.

2    Q    And duration of use is defined -- do you recall talking

3    about 3.5 days, on direct?

4    A    Yes.

5    Q    If we actually look at the study, duration of use, it says

6    "Number of years of glyphosate use."  Do you see that?

7    A    Yes.

8    Q    And then it has data.  We'll look at NHL overall.  It has

9    data for less than 3.5 years, and over 3.5 years.  Do you see

10   that?

11   A    Yes.

12   Q    And for over 3.5 years, in the adjusted column, "b," the

13   data shows an odds ratio of .94 that was not statistically

14   significant, correct?

15   A    More than 3.5 years, yes.

16   Q    So that means that in Pahwa, after they pooled the data,

17   what they determined was that for users who used glyphosate or

18   Roundup for more than three and a half years, there was no dose

19   response.  Correct?

20   A    Yes.

21   Q    And, this is jumping ahead a little bit.  But,

22   Mr. Engilis, he used Roundup for more than three and a half

23   years.  Right?

24   A    Yes.

25   Q    So this data would suggest that Mr. Engilis was not at an

1   increased risk of developing non-Hodgkin's lymphoma.  Correct?

2   **A**    NHL, yes.

3   **Q**    And he had NHL, right?

4   **A**    Yes.  Not statistically significant.

5   **Q**    Okay.  Right.  This, this data would suggest he was not at

6   an increased risk of developing non-Hodgkin's lymphoma.

7   **A**    This paper, that will not -- will suggest that Engilis do

8   not have -- or have no chance of getting cancer; is that your

9   question?

10  **Q**    I'm asking if this data point (Indicating) about the fact

11  that users in the study who used glyphosate for more than three

12  and a half years, do you agree this data point suggests that

13  users who used for more than three and a half years did not

14  have an increased risk of non-Hodgkin's lymphoma?

15  **A**    Yes, yes.

16  **Q**    And that would apply to Mr. Engilis.  Correct?

17  **A**    May be, may not be.  Because he can be an outlier, you

18  know what I mean?  When you say statistical significance, it

19  goes through a paradigm of regression analysis.  He may not be

20  just outside that code.

21  **Q**    But anyone could be an outlier, right?

22  **A**    Exactly.

23  **Q**    So to you, the epidemiology doesn't even matter.  Is that

24  what you're telling us?  Because anyone could be an outlier.

25  **A**    I'm not saying that, you know.  When you make an absolute

 1  relationship, that absolute relationship may not be existing

 2  for one individual separately, because you are talking -- you

 3  are asking about Engilis.  So that's the reason I made that

 4  comment.

 5  **Q**    Well, this data point (Indicating) does not even show an

 6  increased risk.  Right?  The risk is below 1.

 7  **A**    Yeah.

 8  **Q**    It shows a decreased risk, right?

 9  **A**    Yes, yes.

10  **Q**    Do you agree with me, this data point -- did you even

11  consider this data point in applying --

12  **A**    Yes, I -- I -- I think I -- it is in my notes; I must have

13  seen that.

14  **Q**    Right.  But in your report, did you even explain how this

15  data point -- let me ask it a different way.  In your report,

16  you did not explain how this data point (Indicating) affected

17  your analysis of Mr. Engilis.

18  **A**    I did not go in great details about that, yes.

19          **THE COURT:**  Dr. Charles, I'm going to ask you to let

20  Mr. Stekloff finish his questions before you answer them,

21  because the court reporter is trying to take it down.

22          **THE WITNESS:**  Thank you, Judge.  I'm sorry.

23          **THE COURT:**  That's okay.

24  **BY MR. STEKLOFF**

25  **Q**    And then just for completeness, you mentioned SLL,

1    correct?

2        Is that something you mentioned when Mr. Haberman was

3    questioning you?

4    A    Say --

5    Q    SLL.  Is that something you also discussed this morning?

6    A    Yes.

7    Q    That's different from CLL, correct?

8    A    The same.

9    Q    It's the same.  Okay.  And here, for over three and a half

10   years for SLL, with eight patients, or applicators, it showed

11   1.94 risk.  But that was not statistically significant,

12   correct?

13   A    Correct.

14   Q    That's a wide -- that's not close to statistically

15   significant.  That's a wide confidence interval.  Correct?

16   A    That number indicates that way.  But in their assessment,

17   in their sentence, you know, they said:  After adjusting,

18   similar results we have obtained as before adjusting.  So the

19   adjustment did not have any impact on that.

20   Q    Let's just look at the rest of the data, Dr. Charles.

21       Table 4 talks about frequency of glyphosate handling

22   (Indicating).  Correct?

23   A    Yes.

24   Q    And it looks at the number of days per year of glyphosate

25   use.  Correct?

```
 1          (Document highlighted)

 2   A    Yes.

 3   Q    And again, we should be looking at the 95 -- sorry, the

 4   adjusted column, which is the "b" column, correct?

 5   A    Yes.

 6   Q    Okay.  So let's start with non-Hodgkin's lymphoma overall.

 7   This data point for more than two days shows 1.73 increased

 8   risk.  And that number is statistically significant

 9   (Indicating).  Correct?

10          (Document highlighted)

11   A    NHL overall, yes.

12   Q    At 1.02, it is statistically significant, correct?

13   A    Yes, sir.

14   Q    So in Pahwa, that number in Pahwa arguably would support

15   your theory that there is an increased risk associated with

16   Roundup and non-Hodgkin's lymphoma, right?

17   A    Overall.

18   Q    Yes.

19   A    NHL.  Yeah.

20   Q    That is the data point in Pahwa that --

21   A    Yes, 1.73, yes.

22   Q    Right.  So when you were going into your work, and looking

23   to see whether there was an association between non-Hodgkin's

24   lymphoma and Roundup, in Pahwa, that is the number that

25   supports you.  Right?
```

```
 1   A    Yes.

 2   Q    Okay.  Now, they also looked at five days per year, right?

 3        (Document highlighted)

 4   Q    So they said:  Let's not just look at two days per year.

 5   But they have this ordinal data point that looks at five days

 6   per year.  Right?

 7   A    Yes.

 8   Q    And that number goes down.  The risk for people who used

 9   glyphosate for more than five days compared to less than five

10   days was 1.11, and not statistically significant.  Right?

11        (Document highlighted)

12   A    Correct.

13   Q    And you have no explanation for that, for that outcome,

14   correct?

15   A    I have no explanation for that.

16        On -- funny thing that I heard, I think during deposition,

17   my deposition was, Judge, I was asked whether it is a

18   protective effect of glyphosate, because the ratio went down

19   for five days.  That means for three days of use, the ratio is

20   lower than the ratio, five days, so -- sorry, this should show

21   that it is a protective effect of glyphosate.  And my response

22   was I never heard of anybody taking glyphosate as a medicine to

23   protect from the toxicity of glyphosate.

24        THE COURT:  Yeah, it's a funny phrase, "protective

25   effect."
```

1          THE WITNESS:  Yeah.

2          THE COURT:  It is a phrase that the epidemiologists

3   used with some regularity.  It is very strange.

4          THE WITNESS:  From science, there is not protection

5   like that.

6          THE COURT:  Yeah.

7   BY MR. STEKLOFF

8   Q    And it is not statistically significant, right?

9   A    Yeah, in that case it is not significant.

10  Q    But it would be important to consider what happens for

11  people who used glyphosate more than five days, right?  Per --

12  A    I saw that data point, sir, but I did not take that

13  number, per se, for analysis or interpretation because for my

14  mind, as a health scientist, you know, that protective effect

15  did not go, you know, through my mind as something that I

16  should pay attention to.

17  Q    Well, this isn't even a protective effect, Right?  This is

18  an increased risk of 11 percent.  1.11.  So it's not

19  protective, right?  It's a small increased risk, but it's not

20  statistically significant for users who used more than five

21  days in the Pahwa study.  Right?

22  A    To my mind, that is not a change at all.

23  Q    Okay.  That would apply to Mr. Engilis, correct?  He used

24  more than five days per year, according to you.  Right?

25  A    To anybody.  You know?  It's not Mr. Engilis, you know?

1  Q     Okay.

2  A     Anybody who is using for five days, yeah.

3  Q     Okay.  Let's look quickly at SLL.  For more than two days,

4  the odds ratio was 2.31.

5        (Document highlighted)

6  Q     But not statistically significant, right?

7        I've highlighted it here on the screen, Dr. Charles.

8  A     Yeah.

9  Q     And then similarly, five days, it goes to 1.18, not

10 statistically significant.  Right?

11 A     Yes.  Now, I want to point out one thing, if you don't

12 mind.

13 Q     Go ahead.

14 A     On the same table.

15 Q     Yeah.

16 A     Same table, if you look at the line above that, less than

17 two days, adjusted ratio is 1.27.  Do you see that?

18 Q     Yes.

19 A     And more than two days, it is 3 -- 2.31.

20 Q     Yes.

21 A     Isn't it a doubling effect?

22 Q     You think that that's a valid doubling effect --

23 A     Even if it is not statistically significant?

24 Q     Well, let's hear from you.  Do you think that that -- did

25 you consider that a doubling effect, even though it's not

**CHARLES - CROSS / STEKLOFF**

1  statistically significant?

2  **A**    Yeah.   Excessive -- excess.   More than less than two days.

3  Yeah.

4  **Q**    Okay.   And that, you considered that before today?

5  Because it's not in your report, right?

6  **A**    Yeah.

7  **Q**    And when you say statistical significance, the 95 percent

8  doesn't matter, you have no cutoff for what matters?

9  **A**    Say that question again.

10  **Q**    Sure.   You understand the norm in statistical significance

11  is 95 percent confidence, right?

12  **A**    Yeah.

13  **Q**    And for you, it doesn't matter how far you are from

14  95 percent, right?

15  **A**    In my viewpoint, as a trained health scientist, okay, a

16  disease, a diseased person, he can come out of the statistical

17  significance.

18  **Q**    Okay.   So --

19  **A**    That's the way I see it; always there is outliers, yeah.

20  **Q**    So the confidence interval could be 80 percent, and you

21  would still accept it as a valid data point?

22  **A**    Sir, what I'm trying to think here is, you know,

23  statistical significance.   And this analysis is good for a

24  larger population, a larger population.   You're looking at the

25  incidence rate and their significance and correlations for a

1    larger number of people, so that you can come up with some kind

2    of general conclusions.

3        But that one person that was affected, if they said later

4    that he is showing something like that, you know, I had to pay

5    attention.  That's what I'm saying.

6    **Q**    Okay.  But my question's a little different.  The odds

7    ratio or the -- the -- sorry.  The confidence-interval interval

8    could be 80 percent, and you would still consider the data just

9    as valid.

10   **A**    According to the statistical methodology, 95 percent

11   confidence interval is what is measured.  Okay?  But sometimes

12   you may have to think otherwise in lowering that threshold.

13   **Q**    How low will you go, lowering the threshold?

14   **A**    I cannot tell you that thing right now.

15   **Q**    Would you go to 80 percent?

16   **A**    I have no opinion on that, that kind of --

17   **Q**    Okay.  Would you go to 50 percent?  If the confidence

18   interval were 50 percent, would you treat it the same as if the

19   confidence interval were 95 percent?

20   **A**    No answer for that.

21   **Q**    Okay.  And everything we are talking about with the

22   confidence intervals and your review of all this data, that

23   applied to your assessment about Mr. Engilis specifically,

24   correct?

25   **A**    Yeah.

1  Q    Okay.  Let's just close this out, and look at the last

2  part of Pahwa.

3       (Document displayed)

4  Q    And that is Table 6 -- sorry, Table 5 on Page 606.  Do you

5  see that?

6       (Witness examines document)

7  A    Table 6 --

8  Q    Sorry, Table 5.

9  A    Table 5.

10  Q    I misspoke.

11  A    Table 5, yes.

12  Q    Okay.  So Table 5 on Page 606, do you see that on the

13  screen?

14       (Document highlighted)

15  A    606.  Yes.

16  Q    And this talks about lifetime days of glyphosate use.  Do

17  you see that?

18  A    Yes.

19  Q    And in McDuffie, that's the study that talks about ten

20  lifetime days of glyphosate use.  Correct?  McDuffie -- not

21  Pahwa, but McDuffie talks about ten lifetime days of glyphosate

22  use.

23  A    Yes, yes.

24  Q    Okay.  So this one's looking here, we can see, at seven

25  lifetime days of glyphosate use.  Correct?

1    **A**    Yeah.

2    **Q**    Okay.  So let's look at NHL overall for more than seven

3    days, in Column "b."  And the number was 1.08, not

4    statistically significant.  Correct?

5    **A**    Yes.

6    **Q**    So this would suggest for users who used more than seven

7    days in their lifetime, that there was no increased risk of

8    developing non-Hodgkin's lymphoma.  Correct?

9    **A**    After adjusted, yes.  After adjustment, yeah.

10   **Q**    And let's assume that McDuffie and Eriksson are not

11   adjusted.  This number actually is more -- more important in

12   assessing Mr. Engilis's increased risk. (Indicating).  Right?

13   **A**    That is an interesting question.  I may think a little

14   different, okay?

15       Pahwa is a pooled study.  Pooled study of three different

16   epidemiological studies, I believe.  So there are a number of

17   subjects, you know, the N increases.  One of the problems with

18   statistical methodology, I'm looking at significance.  When the

19   N number goes up and up, you are losing some other significance

20   of the smaller-case controlled type of studies, when you pool

21   everything together.  Small studies with the 28 people and 31

22   people, making that kind of comparisons, that goes away when

23   you take those numbers in the thousands and, you know, several

24   hundreds of people, making a pool analysis.  Some of the

25   significance may go away, you know.  That is -- that is true.

1  **Q**   But aren't you aware, Dr. Charles, that the reason why you

2  do a pooling is because the small datasets are so small that

3  they may not be reliable?  Aren't you aware of that?

4  **A**   Yeah, this kind of pooling, pooling, and the next study

5  will come with a formal -- for pooled studies.  It's about more

6  and more publications, without giving much information for me.

7  **Q**   Okay.  Well, you certainly chose to rely on Pahwa.  Right?

8  **A**   Yes.

9  **Q**   And you knew that it was a pooled study, correct?

10 **A**   Yes.

11 **Q**   And the same authors pooled McDuffie.  They chose to say:

12 McDuffie was too small; we're going to pool with others so we

13 can see the results.  Correct?

14 **A**   They looked at, you know, if we just pooled all the data,

15 and then how would that look like.

16 **Q**   Yes.  And here what it showed was for users who used more

17 than seven days, there was no increased risk (Indicating).

18 Correct?

19 **A**   That's what the table shows, sir.

20 **Q**   Okay.  And then, just to close out, for SLL, more than

21 seven days, it showed a 2.19 increased risk, but not

22 statistically significant.  Correct?

23     (Witness examines document)

24 **A**   Yes.

25 **Q**   Okay.  And when you were talking earlier about the two,

1   the two and the five participants, this is actually where you

2   were finding that data, correct?

3   **A**    Yes.  Yes.  Yes.

4        (Document taken off display)

5   **A**    Not statistically -- statistically significant.

6   **Q**    Correct.  Now, you did -- in addition to not assessing the

7   limitations or methodology of these studies, you also did not

8   do a Bradford Hill analysis, correct?

9   **A**    Say it again?

10  **Q**    You did not do a Bradford Hill analysis?

11  **A**    Bradford Hill analysis, I would not do an analysis, per se

12  using a program.  But I looked at what the criteria, and then

13  making my determination where I agree with them or not, or

14  agreeing these studies are agreeing to that, you know.  Many

15  papers say this according to the Brad Hill, you know, criteria.

16  **Q**    Dr. Charles, in your report, you cited seven studies.

17  Right?

18  **A**    Yes.

19  **Q**    One was Agricultural Health Study.  That shows no

20  association.  Correct?

21  **A**    Yes.

22  **Q**    One was Pahwa, right?

23  **A**    Yes.

24  **Q**    Almost all of the data points in Pahwa show no association

25  that is statistically significant.  Correct?

1    **A**    If you look at Pahwa study as a full study, yes.

2    **Q**    Okay.  And in two of the studies, at least, McDuffie and

3    Eriksson, were not adjusted for other pesticides.  Right?

4    **A**    Yes.

5    **Q**    Okay.  So, and then you Zhang, which you said because EPA

6    did not accept its methodology, you really didn't rely on Zhang

7    as well.  Correct?

8    **A**    "Jong"?

9    **Q**    I think it was pronounced "Jang" but having been in trial

10   with Dr. Zhang, I know she pronounces it "Dr. Shong," that meta

11   analysis, you really didn't consider that because of the EPA's

12   views of it, right?

13   **A**    You mean Zhang at all --

14   **Q**    Yeah, Zhang, sure.

15   **A**    Z-A-N-G, right?

16   **Q**    Z-H-A-N-G, yes.

17   **A**    Zhang.  Yeah, Zhang, no.

18   **Q**    So you didn't really count that one either, right?

19   **A**    Ah, no.  Yeah, I did not count, because of some

20   limitations of the study.  But I reviewed it.

21   **Q**    Okay.  So that leaves us -- so we've talked about

22   Eriksson, McDuffie, Andreotti, Zhuang, and Pahwa, which left

23   two more, Buffetta and Leon.  Right?

24   **A**    Yeah.

25   **Q**    Okay.

1          MR. STEKLOFF:  And unless the Court needs me to, I

2     will spare going through those specific studies.

3          THE COURT:  I don't need you to.

4          MR. STEKLOFF:  Okay.

5     BY MR. STEKLOFF

6     Q    And then I just wanted to close out the general causation

7     cross-examination, and then I'm done.

8          There were two other parts that you briefly discussed.

9     One was animal studies, right?

10    A    Okay.

11    Q    Correct?

12    A    Okay.

13    Q    You didn't review a single animal study.  Right?  The

14    underlying study.  Correct?

15    A    You mean toxicological studies done according to the GLP

16    standards?

17    Q    Let me ask it a different way.  You looked at what ATSDR

18    did, right?

19    A    I mainly did, at ATSDR.  I also read the EPA summary, and

20    also some studies were referenced, and some in IARC, also.

21    Q    So you looked at other agencies that summarized studies,

22    right?

23    A    Reliable agencies like ADSD are part of the CDC.  They

24    review, make a profile of this chemical, because of some

25    interest in the public.

**CHARLES - CROSS / STEKLOFF**

1  **Q**    Understood.  But you relied on their assessment, correct?

2  **A**    Yes.

3  **Q**    You did not, yourself, go to any of the underlying

4  studies, correct?

5  **A**    I did not plan to reinvent the wheel.  It has already been

6  evaluated, our internal agencies, the scientists that we pay

7  their salaries, they review all these things, and summarized.

8  That's good reports for us to look at.

9  **Q**    Right.

10  **A**    I had no reason.

11  **Q**    Well, you -- you know EPA's concluded about those studies,

12  right?

13  **A**    The EPA.  Yeah, I read those studies.

14  **Q**    Okay.  But you didn't -- I just have two simple questions.

15  With respect to the animal studies, you didn't look at any of

16  the underlying studies.  Right?

17  **A**    The original studies, developed by the -- or prepared by

18  the industry.  Usually submitting for registration.

19  **Q**    You didn't look at any of those.

20  **A**    I did not look at those.  Each study is about two feet

21  high, paperwork.

22  **Q**    And you also didn't look at any published papers about

23  those studies, correct?

24  **A**    I looked at all the summarized version.

25  **Q**    Yeah.  But if the underlying original research was

1   published --

2   **A**    Some other papers like George, et al. and things like

3   that, I had already.

4   **Q**    Yeah, I'll stay away --

5   **A**    -- those papers.

6   **Q**    Well, George actually only looked at the IARC summary as

7   well, right?

8   **A**    I read the original paper, I am saying, since you asked

9   would I have read any of the general paper.

10  **Q**    Just for George.

11  **A**    No, there are some other papers, also.

12  **Q**    Dr. Charles, I could pull this up for you.  But in your

13  deposition, you were asked -- and I'm just going to read you

14  the answer, the question and answer.  And you -- you are being

15  asked about the animal questions.  And you said:

16          "Each of these reports is often several

17          thousand pages long, right?

18          **ANSWER:**  That's right."

19      And the question was:

20          "I am correct that you did not review the

21          study reports for the long-term animal

22          studies."

23      And your answer was:

24          "I did not."

25      Correct?

**CHARLES - CROSS / STEKLOFF**

1   **A**    Yeah.

2   **Q**    And then you were asked (As read):

3              "For your conclusions that glyphosate causes

4              cancer in animals, you are relying on ATSDR's

5              2009 report and IARC's 2015 report.

6              Correct?"

7        And your answer was:

8              "That's correct."

9        Right?  And that is correct.  Right?

10  **A**    Yeah, that is correct.  I also did the EPA summaries, but

11  perhaps I did not mention that.

12  **Q**    Okay.

13  **A**    In my answer.

14  **Q**    And then the same is true for cell studies or genotoxicity

15  studies.  You did not review any original studies.  Right?

16  **A**    No.  I had not reviewed any original studies of a number

17  of genotoxicity.  About 30 or so, 30-plus, I believe, studies

18  were mentioned in the ATSDR report.  I did not look at 30-plus

19  genotoxicity studies.  No.

20  **Q**    You relied on ATSDR to review those.

21  **A**    Yeah.  And then they have reviewed and summarized what

22  their findings were.  They have not made any revelatory

23  assessments on that.  They are just profiled.  That just means

24  summarizing the data that is in the published literature.  Or,

25  in the private.

1   Q    So is it fair to say that in offering your opinion -- I

2   think this is where the Court was -- in offering your opinion

3   that glyphosate is capable of causing cancer, you relied most

4   heavily on the epidemiology.

5   A    Yes.

6   Q    And is it fair to say that that assessment of the

7   epidemiology then informed everything you did in assessing

8   Mr. Engilis?

9   A    Yes.

10         MR. STEKLOFF:  No further questions.

11         THE COURT:  Okay.  Do you want to -- if you want -- do

12  you have any redirect that you want to do?  I'll give you ten

13  minutes, if you want to do any redirect, on the general

14  causation stuff only.

15         MR. HABERMAN:  Yes, Your Honor.

16         THE COURT:  You have ten minutes.

17         MR. HABERMAN:  Okay.

18         THE COURT:  I'll remind you, no leading questions.  No

19  feeding answers.

20                    **<u>REDIRECT EXAMINATION</u>**

21  BY MR. HABERMAN

22  Q    Doctor, you were asked questions about the -- you were

23  shown a lot of data in the Pahwa articles.  You were shown the

24  tables.  Do you recall questions about the tables that you had

25  seen?

**CHARLES - REDIRECT / HABERMAN**

1    **A**    Yes.

2    **Q**    And you were asked questions about statistical

3    significance.  Do you recall that?

4    **A**    Asked questions about what?

5    **Q**    Statistical significance.

6    **A**    Yes.

7    **Q**    And whether or not results were statistically significant.

8    Right?

9    **A**    Yes.

10        **MR. HABERMAN:**  Your Honor, may I publish the table

11   that was just shown to the Doctor?

12        **THE COURT:**  Sure.

13        **MR. HABERMAN:**  Thank you.

14    (Document displayed)

15   **BY MR. HABERMAN**

16   **Q**    Dr. Charles, can you see what's here on Table 5?  Can

17   you --

18   **A**    Table 5.

19   **Q**    Is that clear to you?

20   **A**    Yes.

21   **Q**    Are you able to see that?  And here, it's the number of

22   years -- actually, up here it says "Lifetime-days of glyphosate

23   use and associations with non-Hodgkin lymphoma."  Do you see

24   that?

25   **A**    Yes.

1   Q    And you were asked about non-Hodgkin's, overall.  Do you

2   recall questions about that?

3   A    Yes.

4   Q    And then you were asked questions about small lymphocytic

5   lymphoma.  Right?

6   A    Yes.

7   Q    And can you tell us what you read here (Indicating),

8   please?  The "greater than 7."  What the -- the odds ratio is

9   for both adjusted and unadjusted for other pesticides; do you

10  see that?

11  A    Yes.

12  Q    And is there a meaningful difference to you between

13  whether or not the -- there's a -- the odds ratio is adjusted

14  or not for small lymphocytic leukemia?  Is there a difference

15  there that's meaningful?

16  A    For seven days they are looking?

17  Q    Right.

18       (Witness examines document)

19  A    Not much difference.

20  Q    Okay.

21  A    You mean --

22  Q    Right.

23  A    The 2. -- 2.13.

24  Q    Right.

25  A    Versus 2.19.

1  **Q**    Right.

2  **A**    Whether it is adjusted or not, it remains the same.

3       (Reporter clarification)

4          **THE WITNESS:**  It remains the same.

5  **BY MR. HABERMAN**

6  **Q**    You were asked questions about confidence intervals.  And

7  you were asked if it's 80 percent or if it goes down to

8  50 percent.

9       My question to you is:  Does the population size have any

10 bearing on the confidence interval?

11 **A**    Yes.

12 **Q**    And explain how that works.

13 **A**    When the population level, the number increases, you know,

14 there is a tendency for the significance to come down.  The

15 number of people you include in the population.

16      But if you do the same study in a small population, that

17 may be very significant.

18 **Q**    And what do these studies, like McDuffie and Eriksson,

19 were those smaller-based studies?  Or were those

20 large-population studies?

21 **A**    Small study.

22 **Q**    And do those studies, those -- are those studies

23 significant for your opinion in this case?

24 **A**    Yeah.  We have indicated those things before.

25      (Reporter clarification)

PROCEEDINGS

 1           THE WITNESS:  We have indicated those things before.

 2    BY MR. HABERMAN

 3    Q    You were asked questions on whether or not those results

 4    showing ten or more lifetime days of usage in the Eriksson

 5    study or two or more days per year in the McDuffie study,

 6    whether those were adjusted or unadjusted.  Do you recall that

 7    question?

 8    A    Yes.

 9    Q    And to you, for your opinion in this case, are you relying

10    on the results of those studies?

11    A    Yes.

12    Q    Okay.  Whether they are adjusted or unadjusted?

13    A    Yes.

14           MR. HABERMAN:  Thank you, Your Honor.

15           THE COURT:  Thank you.

16    Before we break for lunch, I will just say that I am

17    excluding Dr. Charles's opinion on general causation.  I'll

18    issue a ruling on that.  So there does not need to be any more

19    questioning on general causation.

20    You can do a direct examination on specific causation.

21    And you can cross-examine him on that.

22    Regarding the other expert, the motion to reconsider, was

23    it Schneider?

24           MR. HABERMAN:  Yes, Your Honor.

25           THE COURT:  Okay.  Mr. Stekloff, why shouldn't I grant

**PROCEEDINGS**

1   the motion to reconsider with respect to Schneider?

2       It seems to me that I -- well, number one, I think my

3   ruling was -- excluding Schneider was too flip.  I should have

4   done a better job of explaining myself.

5       But number two, more importantly, you know, my focus was

6   on general causation, and not on specific causation.  I would

7   not reconsider my decision to exclude his general causation

8   opinion.

9       Seems quite clear that for many of the same reasons that

10  Dr. Charles is neither qualified -- is not qualified to provide

11  a general causation opinion, and the opinion offered was -- is

12  inadequate, is junk science, the same is true of Schneider.

13  But on -- on specific causation, I didn't really focus on it.

14      And I think it's -- strikes me, now that I've spent more

15  time focusing on it, strikes me that specific causation for

16  Schneider is a closer question than general causation.

17      So why shouldn't I grant the motion for reconsideration as

18  to specific causation, and give Schneider a chance to testify?

19      Presumably he could come tomorrow; you would make him

20  available tomorrow?

21          **MR. HABERMAN:**  I don't have that available,

22  Your Honor.

23          **THE COURT:**  But I thought you asked -- I thought you

24  -- in your motion for reconsideration, you said:  If you grant

25  it, I'll make him available.

PROCEEDINGS

1           **MR. HABERMAN:**  I thought I would have had more notice

2   for that.  I -- I -- I did not -- I don't have Dr. Schneider

3   ready to go on specific causation tomorrow.  I -- I --

4           **THE COURT:**  I thought the whole point was we were

5   going to do these hearings, and you were going to have those

6   two witnesses available.  And if I granted the motion for

7   reconsideration as to Schneider, then Schneider would come

8   testify as well.

9           **MR. HABERMAN:**  I can make him available as soon as

10  possible.  That was a misunderstanding, then, on my part.

11          **THE COURT:**  Okay.

12          **MR. HABERMAN:**  I'm sorry.  I --

13          **THE COURT:**  Or maybe I didn't communicate it properly.

14      So, anyway, any reason why I shouldn't give Schneider a

15  chance to testify?

16          **MR. STEKLOFF:**  I mean, obviously we believe,

17  Your Honor, that he should be excluded on specific causation.

18  But I can't -- I mean, obviously, you know what you were

19  thinking at the time.  But you ruled also, your ruling was

20  focused on general causation.  So I'm not -- it would be odd of

21  me to tell you that you were thinking about specific causation

22  when you weren't, so I'm not going to do that, Your Honor.  So

23  I think --

24          **THE COURT:**  Okay.  Yeah.

25          **MR. STEKLOFF:**  I think we're going to be in a similar

**PROCEEDINGS**

 1  situation that we're seeing today, which is I think that the --

 2  both experts' analyses are more interwoven than maybe they were

 3  in prior -- in other cases.  But I'm not disagreeing with Your

 4  Honor.

 5          **THE COURT:**  Okay.  So I'll grant the motion for

 6  reconsideration as to specific causation.  I will also issue a

 7  ruling as -- after Schneider testifies, I will issue a ruling

 8  both as to general and specific.  And I'll do a better job of

 9  explaining why I do not believe Schneider can testify on

10  general causation.  But I'll give -- but I -- I think it would

11  be appropriate to hear his testimony on specific causation.

12          **MR. HABERMAN:**  I appreciate that.  Thank you,

13  Your Honor.  And I'm sorry for the --

14          **THE COURT:**  No, no.

15          **MR. HABERMAN:**  -- mix-up.

16          **THE COURT:**  At least as great chance that it was my

17  failure to communicate it properly, as it was your failure to

18  understand it.

19          **MR. HABERMAN:**  I did -- I just want to make clear.  I

20  did represent in the papers that we could do it in one shot.

21  But I just -- I guess I would have thought that we would have

22  had some notice beforehand that said: Yeah, bring him in one

23  shot.

24          **THE COURT:**  Yeah.  It's okay.  Don't --

25          **MR. HABERMAN:**  I'm so sorry about that.

PROCEEDINGS

```
 1          THE COURT:  Not a problem.  Don't worry about it.  But
 2   maybe at the lunch break you can find out how soon you can get
 3   Schneider here, because I want to do this while it's -- while
 4   -- you know, I dove back into these materials.  And I would
 5   like to do it while it is fresh in my mind, if at all possible.
 6          MR. HABERMAN:  Yes.
 7          THE COURT:  So if you can, some time -- if you can get
 8   Schneider sometime this week or next week, I would greatly
 9   appreciate it.  If there's -- by some miracle, if you can get
10   him tomorrow, that would be great, because I set aside the day
11   for it.  So, if you could call him at the lunch break, and find
12   out when you can get him here.
13          MR. HABERMAN:  Okay.
14          THE COURT:  Okay.  All right.  So let's take a break,
15   and why don't we plan on resuming at 1:15.  Is that okay?
16      All right.  Thank you.
17          MR. STEKLOFF:  Thank you, Your Honor.
18          THE COURTROOM DEPUTY:  Court is in recess.
19      (Recess taken from 12:41 p.m. to 1:20 p.m.)
20          THE COURT:  Okay, Mr. Haberman, you can continue your
21   direct.
22          MR. STEKLOFF:  And Your Honor, just from a logistics
23   standpoint, I think Mr. Haberman wants exhibits to be
24   introduced into the record.
25      So I'll introduce Pahwa -- which I think is really the
```

1    only exhibit that's been used -- as Hearing Exhibit 1, if

2    that's appropriate.

3        THE COURT:  Admitted.

4        (Evidentiary Hearing Exhibit 1 received in evidence.)

5        MR. HABERMAN:  And Your Honor, we would introduce

6    Plaintiff's 5, which is the Eriksson article, and Plaintiff's

7    7, which is the McDuffie article.

8        MR. STEKLOFF:  No objection, Your Honor.

9        THE COURT:  Admitted.

10       (Evidentiary Hearing Exhibits 5 and 7 received in

11   evidence.)

12       THE COURT:  And the notes, did you want the notes

13   admitted?

14       MR. STEKLOFF:  Yes.  I think those should be admitted.

15   And then, I've asked that Mr. Haberman provide us with a full

16   copy after the hearing.  I have been able to review them, and

17   he has agreed to do so.

18       THE COURT:  Okay.  Any objection to the notes being

19   admitted?

20       MR. HABERMAN:  No objection.

21       THE COURT:  Okay, those are admitted as well.

22       (Evidentiary Hearing Exhibit 12 received in evidence.)

23       THE COURT:  Okay.  Go ahead, Mr. Haberman.

24       MR. HABERMAN:  Okay.  Thank you, Your Honor.

25       May I proceed?

 1          THE COURT:  Go ahead.

 2                  REDIRECT EXAMINATION, RESUMED

 3   BY MR. HABERMAN

 4   Q    Good afternoon, Dr. Charles.

 5   A    Good afternoon.

 6   Q    Did you have a good lunch?

 7   A    Yes.

 8   Q    Okay.  I want to turn your attention to talking about

 9   Mr. Engilis and the opinion that you have with respect to --

10   specifically to whether or not Roundup caused Mr. Engilis's

11   non-Hodgkin's lymphoma.  Okay?

12   A    Okay.

13   Q    All right.  Can you tell us, overall, the methodology you

14   employed to reach the opinion that Roundup caused Mr. Engilis's

15   non-Hodgkin's lymphoma?

16   A    Overall opinion?

17   Q    The methodology --

18   A    Oh, the methodology.

19   Q    -- for the case-specific opinion.

20   A    The methodology is, in a case like this, in order, I

21   review all the case like this come to me.  First I apply the

22   EPA's methodology for risk assessment.

23          THE COURT:  EPA's methodology for what?

24          THE WITNESS:  Risk assessment.

25          THE COURT:  Risk assessment, okay.

1            **THE WITNESS:**  Risk assessment, and then coupled with

2    the review of the documents.  Okay?  That includes everything

3    that the counsel gave to me.  May not be everything included,

4    but, but what I can recall is the deposition of Mr. Engilis and

5    his statements, his medical records.  All the investigations in

6    the hospital.  All the descriptions and everything that you

7    provide me, I read.

8         And then while I'm reading this, I'm also comparing the

9    medical literature.  And scientific literature.  Scientific

10    papers, information, textbooks that correlates with the

11    information that I need to make a decision.  Means, you know, I

12    am listing what -- my findings.

13         And then I'm looking for:  Is that -- if it can be caused

14    by glyphosate or not?  Is there any literature on that, to

15    support or not support?

16         I'm going to be very neutral in my evaluation.  And I

17    apply methodology looking at the weight of evidence at every

18    step that I go, in favor or not in favor of my opinions.

19    **BY MR. HABERMAN**

20    **Q**    Okay.  Did you consider Mr. Engilis's history of Roundup

21    use?

22    **A**    Yes.

23    **Q**    Did you consider the mode in which he applied Roundup?

24    **A**    Yes.

25    **Q**    Did you consider the frequency and duration of use?

1   **A**      Yes.

2   **Q**      Did you consider the potential routes of exposure?

3   **A**      Yes.

4   **Q**      Did you consider what type of clothing he wore while

5   spraying Roundup?

6          **MR. STEKLOFF:**  Your Honor, objection to leading, to

7   all of this.

8          **THE COURT:**  Overruled.

9   **BY MR. HABERMAN**

10  **Q**      Did you consider the type of clothing he wore while

11  spraying Roundup?

12  **A**      Yes.

13  **Q**      Did you consider whether he wore any PPE?  Personal

14  protection equipment?

15  **A**      Yes.

16  **Q**      Did you come up with numbers as to how much Roundup he was

17  exposed to over the course of the time he used it?

18  **A**      Estimates.

19  **Q**      Did you consider other potential confounding or causative

20  factors of non-Hodgkin's lymphoma?

21  **A**      Yes, I looked at various factors available in the

22  literature.

23  **Q**      Did you consider other potential chemicals exposure?

24  **A**      Yes.

25  **Q**      Did you consider Mr. Engilis's medical history and other

1  potential medical conditions?

2  **A**    Yes, I looked at those.

3  **Q**    And based on reviewing all of that, did you then come to

4  an opinion in this case?

5  **A**    Yes.

6  **Q**    And what is your opinion to a reasonable degree of medical

7  -- scientific certainty?

8  **A**    That glyphosate can cause cancer.

9  **Q**    With respect to Mr. Engilis, after reviewing all of the

10  things that we just talked about, just focusing on Mr. Engilis,

11  did you come to an opinion in this case, specifically?

12  **A**    It was a significant factor that caused his cancer.

13  **Q**    What was a significant factor?

14  **A**    Glyphosate.

15  **Q**    And when you say "Glyphosate," what are you saying?

16  **A**    Using glyphosate, yes.

17  **Q**    Okay.

18  **A**    Glyphosate exposure, I mean.

19  **Q**    Okay.  So where did you find out information about

20  Mr. Engilis's Roundup use, and history of his Roundup use?

21  **A**    History of his Roundup use come mainly from his affidavit.

22  And there is a factsheet, I believe.

23  **Q**    (Nods head)

24  **A**    And then, deposition.

25  **Q**    And you considered all of those things?

```
 1   A     Yes.

 2          MR. HABERMAN:  Your Honor, I would like to admit

 3   Plaintiff's 4, which is Mr. Engilis's affidavit.

 4          MR. STEKLOFF:  No objection.

 5          THE COURT:  Admitted.

 6       (Evidentiary Hearing Exhibit 4 received in evidence.)

 7          MR. HABERMAN:  May I publish, Your Honor?

 8          THE COURT:  Go ahead.

 9       (Document displayed)

10   BY MR. HABERMAN

11   Q     Is this the -- what is this, Doctor?

12   A     This is the affidavit of Peter Engilis.

13   Q     Does this describe to you or tell you where he was using

14   Roundup, and how often he was using Roundup?

15   A     It reads that he was using in his house at DeBary,

16   Florida.  And his residence not -- residence at Summerfield,

17   Florida.  And his residence at Fort Lauderdale, Florida.

18   Q     Okay.  And there's no mention of the time in which he used

19   Roundup at these locations.  Were you able to read deposition

20   testimony or factsheet to find that out?

21          MR. STEKLOFF:  Object.

22          THE WITNESS:  Are you asking me the period of his use?

23   Or --

24          MR. STEKLOFF:  No --

25
```

1   BY MR. HABERMAN

2   **Q**    Not the period of his use, I guess; the frequency in which

3   he used it.

4   **A**    May --

5   **Q**    Or actually -- sorry -- the length of time per frequency

6   of use.

7   **A**    I depended on his deposition.

8   **Q**    Okay.  We have a demonstrative that I would like to

9   publish that shows --

10        **THE COURT:**  Instead of feeding him all these answers,

11  I mean, these are basic questions that I assume he should know

12  the answer to.  Right?

13        **MR. HABERMAN:**  Right.

14        **THE COURT:**  I mean, he's here to testify about his

15  opinion as to why Roundup caused Mr. Engilis's NHL.

16    (Document taken off display)

17        **MR. HABERMAN:**  Right.

18        **THE COURT:**  And these are some very basic fundamental

19  facts that go into his opinion.  Instead of feeding him this

20  stuff, would it be fair for me to ask you just to ask him about

21  it?

22    I mean, I know that there is sometimes details in the

23  studies, like when you were going through the Pahwa study, for

24  example, that table, there were a lot of different numbers, and

25  an expert sometimes needs to refer to his notes or refer to the

1    study.

2        But what you just put in front of him was very basic,

3    right?  And he would have to be familiar with that in order to

4    offer an opinion on whether Roundup caused the plaintiff's

5    cancer.  Right?

6            **MR. HABERMAN:**  I'm just saying --

7            **THE COURT:**  Is there a reason why you are feeding this

8    to him on the screen?

9            **MR. HABERMAN:**  No, Your Honor; I'm not suggesting

10   that, by showing him the affidavit, he does not know the answer

11   to these questions.

12           **THE COURT:**  Okay.

13           **MR. HABERMAN:**  So I'll --

14           **THE COURT:**  That's sort of starting to become the

15   implication.  I mean, you are asking him a very basic question,

16   and then you show him the answer on the screen, and then he

17   answers the question.  I mean, that's basically been the

18   entirety of the direct so far.  Not just on specific causation,

19   but on general causation, too.

20       It might be in your interest and your client's interest to

21   conduct the direct examination in a way that allows the expert

22   to establish that he actually knows something on his own about

23   this case.

24           **MR. HABERMAN:**  You are right, of course.  Point noted.

25   So let's continue with that.  Okay?

CHARLES - REDIRECT / HABERMAN

1    BY MR. HABERMAN

2    Q    So Doctor, do you know, or where did -- where did

3    Mr. Engilis apply Roundup?

4    A    At his residences, his homes, at three different

5    locations, I believe.

6    Q    And what were those locations?

7    A    DeBary, Florida.  That is his current residence that I

8    recall.  And then there was a rental property I believe he

9    owned at Summerfield, Florida.  And then there was another

10   property I believe he bought from his parents, in Fort

11   Lauderdale.  That is a condominium, I believe.

12   Q    Okay.  And what do you recall about the length of time in

13   which Mr. Engilis used Roundup?

14   A    Mr. Engilis used Roundup in his primary residence, that is

15   the current residence at DeBary, Florida, from 1990 through

16   2015, according to the affidavit.

17   Q    And how often would he use Roundup at that property?

18   A    He mentioned in his deposition about 30 minutes biweekly.

19   That is twice a month.  Every two weeks, he used this once.

20   That means two times a month.

21   Q    Okay.  Two times a month for 30 minutes at DeBary.

22   A    Yeah.  That's what the deposition reads.

23   Q    Okay.  So about how long -- how many minutes is that, a

24   month?

25   A    That's about one hour per month.

**CHARLES - REDIRECT / HABERMAN**

1   **Q**    Okay.  And how about in Summerfield?

2   **A**    Deposition reads it is 20 minutes.

3   **Q**    And do you recall the period of time he was using Roundup

4   for 20 minutes at the Summerfield property?

5   **A**    Yes.

6   **Q**    And what did Mr. Engilis say about that?

7   **A**    Ask again, please?

8   **Q**    What did Mr. Engilis say or attest to about his usage of

9   Roundup at the Summerfield property?

10  **A**    Yes.  He used 20 minutes, per spray.  And for 2008 through

11  2013, I believe.

12       (Reporter clarification)

13           **THE WITNESS:**  Summerfield is 20 minutes.

14  **BY MR. HABERMAN**

15  **Q**    And then in the Fort Lauderdale residence or property,

16  what was the yearly period of time that he was using Roundup in

17  that time?

18  **A**    From 1990 through -- trying to remember -- 2002, if I'm

19  not wrong.

20  **Q**    Okay.  And for about how long would he use it at that

21  property, each time he was using it?

22  **A**    The person reads as 15 minutes per incident.

23  **Q**    Okay.

24  **A**    Yeah.

25  **Q**    And did you calculate this total usage over the time of

1    these properties, over the length in time in which he used it?

2    **A**    Yes.

3    **Q**    And what was your conclusion?  What did you -- how much

4    was he using?  How much was he exposed to in this period of

5    time?

6    **A**    I had to look at the community, that is, different

7    exposure scenarios, and added the time for three properties.

8    And then come up with the number of days probably he used, per

9    year.  That's about -- about two days per year.

10   **Q**    What about lifetime days?  Did you do a calculation of

11   lifetime days?

12   **A**    That is 26 years of usage.

13   **Q**    From 1990 to 2015?

14   **A**    Yes.

15   **Q**    Twenty-six years of usage.  But in that time, about how

16   many lifetime days in that 26-year span did he use Roundup?

17   **A**    More than ten -- ten years, lifetime.

18        I don't understand the question.

19   **Q**    So we looked at different things in the literature.  We

20   looked at days per year, and we looked at overall lifetime

21   days.

22   **A**    Yes.

23   **Q**    If you add it all up.

24   **A**    Yeah.

25   **Q**    And then divide by days.  So how many lifetime days do you

1    recall?

2    **A**    Total number of days?

3    **Q**    Total number of lifetime days.  Or, to your best

4    recollection, what was the number of lifetime days?

5    **A**    I don't remember that calculation, to exactly say the

6    number.

7    **Q**    Okay.  So let's break it down.  If he's using it at the

8    DeBary property for 26 years, do you recall how many months

9    that is?

10   **A**    That's about 312 months.

11   **Q**    Right.  Okay.  And then, how many times is he using it in

12   that period of time, if he's using it --

13   **A**    600 -- 624 times.

14   **Q**    And how -- per use, what's his -- how many -- how much is

15   he using, per use?  Or how -- how long is he using it, per use?

16   **A**    Thirty minutes per use.

17   **Q**    So using it at 30 minutes per use twice a month for 312

18   months, how many hours is he using it at the DeBary property?

19   **A**    312 hours.

20   **Q**    And at the Summerfield property, he's using it, you

21   testified from -- you can testify to it again.

22   **A**    2008 through 2013.

23   **Q**    So how many months does that total?

24   **A**    Seventy-two months.

25   **Q**    And how often is he using it per month at the Summerfield

**CHARLES - REDIRECT / HABERMAN**

1    property?

2    **A**    Twenty minutes.

3    **Q**    How many times a month?

4    **A**    Seventy-two times.

5    **Q**    Okay.

6    **A**    Once a month.

7    **Q**    Right.  How many hours total spray at the Summerfield

8    property?

9    **A**    Twenty-four.

10   **Q**    Then at the Fort Lauderdale property, how many years is he

11   using it?

12   **A**    From 1996 through 2002, I think it is 84 months.

13   **Q**    Okay.  And how much is he using -- how many minutes,

14   sorry, per time spraying does he --

15   **A**    He says 15 minutes per spray.

16   **Q**    So how long is that?  How many hours?

17   **A**    Twenty-one hours.

18   **Q**    Is there testimony, do you know, of additional time use at

19   the Fort Lauderdale residence?

20   **A**    The deposition, he also adds, responding to the questions

21   from the counsel, that he bought his property in 1996 from his

22   parents.  But prior to his purchase of the property, he started

23   using in that property from 1990, through -- I can't remember

24   the -- through -- through 2013.  Yes.  No.  1990 through 1995.

25   **Q**    Right.

1   **A**     Yeah.  '96 is when he bought the property, yes.

2   **Q**     So from 1990 to 1995, how many months is he using Roundup

3   at that property?

4   **A**     Seventy-two months, again.

5   **Q**     And how many minutes per use is he using it there?

6   **A**     There is not a real specific time.  But I take it as 15

7   minutes, as he used to do before.

8   **Q**     Okay.  And so how many hours is that over the 1990-1995

9   period?

10  **A**     Eighteen hours.

11  **Q**     Eighteen hours.  So if you add up all those hours, the 312

12  at the DeBary, the 24 at Summerfield, the 21 in Fort Lauderdale

13  from 1996 to 2022, and then another 18 from 1990 to 1995, what

14  is the total amount of hours he's using?

15  **A**     375 hours.

16          **MR. STEKLOFF:**  Your Honor, can I interject?

17      Can I put on the record that unless Dr. Charles is

18  extremely fast at math, I think he is just reading from a chart

19  that he has in those notes that have been admitted as an

20  exhibit.

21          **THE COURT:**  Okay.

22      You can continue.

23  **BY MR. HABERMAN**

24  **Q**     And so how do you calculate the total hours to find out

25  how many lifetime days he's used Roundup?

**CHARLES - REDIRECT / HABERMAN**

1    **A**    You have to convert that into days.

2    **Q**    And so how do you do that?

3    **A**    Divide by 8, it comes to days.

4    **Q**    Why do you divide by 8?

5    **A**    Eight is normal work hours, from 8:00 to 5:00, that kind

6    of work hours.  That is a standard time that is used normally

7    for a day.

8    **Q**    Okay.  And when you divide that 375 by 8, about how many

9    lifetime days does he have?

10   **A**    I get 46.8.  That is 47 days.

11   **Q**    Okay.  And was that important to determine for your

12   opinions in this case?

13   **A**    That is lifetime days.

14   **Q**    Right.  And is that significant for your opinion here?

15   **A**    Yes, it is nearly four times than Eriksson's ten days per

16   year.

17   **Q**    And -- okay.  And we talked about -- have you heard of the

18   term "risk factor"?

19   **A**    "Risk factor"?

20   **Q**    Yes.

21   **A**    Yes.

22   **Q**    What is a risk factor?

23   **A**    Risk factor is factors or agents or situations, or a

24   disease or a virus or anything that can increase the risk of a

25   particular disease.

**CHARLES - REDIRECT / HABERMAN**

1  **Q**    Is using Roundup 47 lifetime days, does that put you at

2  risk for getting non-Hodgkin's lymphoma?

3  **A**    Yes, it can, compared to the data -- literature.

4  **Q**    Okay.  What other factors did you consider in

5  Mr. Engilis's history when you were coming up with your

6  case-specific opinion in this case?

7  **A**    There were several of them.  I'll start from one; it is

8  medical conditions.  Are there any other medical conditions in

9  the literature?  Those are considered as risk factors.  I

10  checked several of them.  There are now 15 of the medical

11  conditions that are associated with NHL.

12  **Q**    What are some of those conditions that are associated with

13  NHL in the medical literature that you checked?

14  **A**    So virus, HIV virus, Burkitt virus, diabetics I believe is

15  one of those.  There is a long list in my report.  Autoimmune

16  diseases.  Ulcerative colitis, celiac disease, diabetes, as I

17  mentioned.  Eczema, Epstein-Barr virus, Hepatitis C or B,

18  taking immunosuppressive medications, lupus, obesity, organ

19  transplant, psoriasis, rheumatoid arthritis, thyroiditis or

20  Hashimoto's disease, and various other.  Ulcers.

21  **Q**    Tell the Court, where did you -- how did you come to know

22  that these other medical conditions may be associated with

23  non-Hodgkin's lymphoma?

24  **A**    It's in the literature, American Cancer Society

25  literature.  There are various other medical literature talking

1  about associated factors through -- causing NHL.

2  **Q**    And from your review of Mr. Engilis's medical records, did

3  he have any of these other medical conditions?

4  **A**    No.

5  **Q**    And is that significant in your opinion here?

6  **A**    Yes.  Eliminating those factors.

7  **Q**    Why is that significant to eliminate those factors?

8  **A**    Because they can contribute to this disease.  If he

9  doesn't have any of those factors associated with these medical

10  history or medical conditions, you know, I'm excluding those

11  factors.

12  **Q**    You're excluding those factors.  Okay.  What about other

13  -- were there other risk factors, or were there other things

14  that played into your differential of what you considered,

15  other than -- we talked about his duration of use, and now we

16  talked about his other -- or potential other medical

17  conditions.  Were there other things that you considered?

18  **A**    Family history.

19  **Q**    Okay.  And did -- did Mr. Engilis have a family history of

20  non-Hodgkin's lymphoma?

21  **A**    Not that I read.  No.

22  **Q**    What else did you consider?

23  **A**    His alcohol consumption.

24  **Q**    Okay.  And was he a heavy drinker?

25  **A**    Um, he is a never-drinker, and then probably had three or

1    four beers, all years.  That -- that is not considered as a

2    heavy drinker.

3    Q    What else did you consider?

4    A    Smoking history.

5    Q    And did he have a past history of smoking?

6    A    Yes: "I never smoked tobacco products or any other --

7    taken any other illegal drugs."

8    Q    You mentioned HIV, AIDS.  Was Mr. Engilis ever diagnosed

9    with that?

10   A    No.

11   Q    What else played into your --

12   A    Any other exposures to radiation at any time in his life.

13   Q    And did he have any?

14   A    No.  And --

15   Q    What else?

16   A    Looked at whether he lived near a Superfund site, like I

17   mentioned before.

18   Q    Did he ever live near or adjacent to a Superfund site?

19   A    No.  And, any other unusual or chronic gasoline exposures,

20   exposure to petroleum products or petroleum.

21   Q    And did he have any unusual or chronic gasoline exposures?

22   A    No history I found in the documents.

23   Q    Did you have -- did you come to check out whether he had

24   other occupational or industrial exposures?

25   A    He -- there was nothing that I noticed in his deposition

1    or any other documents.

2    **Q**    So in this case, were you able to -- you excluded other

3    medical conditions.  We talked about that.  The other things

4    that were negative, did you exclude those as well?

5    **A**    I excluded all risk factors, risk factors that -- that --

6    also other questions on what his usage of other pesticides or

7    other chemicals in the state, chemicals.  All those things were

8    excluded as possible causes.

9    **Q**    And so when you excluded all those other things -- and

10   let's just make a full record.  What other things are you

11   talking about that you excluded?  What other types of

12   occupational or industrial exposures?  You just mentioned

13   pesticide use, but what other things were there that you

14   considered?

15   **A**    The medical conditions, family history.  We listed all

16   those.

17   **Q**    Do you have your report in front of you?

18   **A**    Yes.

19   **Q**    Can you turn to Page 15 of your report.

20        **MR. HABERMAN:**  Your Honor, do you have this before

21   you?  It's Plaintiff's --

22        **THE COURT:**  I can pull it up real quick.

23        **MR. HABERMAN:**  Plaintiff's 2.

24        **THE COURT:**  No, I got it.

25        **MR. HABERMAN:**  Okay.

1   BY MR. HABERMAN

2   Q    So there are various things that are listed in your report

3   as other occupational or industrial exposures.  Do you see

4   that, Doctor?

5   A    Yes, that's occupational.

6         MR. HABERMAN:  And Your Honor, I offer Plaintiff's

7   Exhibit 2 into evidence for this hearing.

8         THE COURT:  You mean the report?

9         MR. HABERMAN:  Yes.

10        THE COURT:  Sure.

11        MR. HABERMAN:  Thank you.

12     (Evidentiary Hearing Exhibit 2 received in evidence.)

13  BY MR. HABERMAN

14  Q    I don't know if we need to go through one by one, but

15  other than some other pesticide use, did he have any other

16  occupational or industrial exposure to any of the other things

17  that you mentioned?

18  A    All of those items listed are negative answer.

19  Q    Okay.  And is that important for you?  That all these

20  other things were negative?

21  A    Yes.

22  Q    And why is that important?

23  A    Because all these factors are some -- in some literature,

24  if you look at this, associated with NHL.

25  Q    And so if you eliminate all of them, what's left standing?

1    A    We look for other factors, what caused it.

2    Q    And you did that.  We went through all of that.  Right?

3    A    Yeah.

4    Q    So when you eliminated the occupational exposures and the

5    family history, and the other medical conditions, what's left

6    standing?

7    A    Glyphosate exposure.

8    Q    And did glyphosate or Roundup cause or contribute

9    substantially to causing Mr. Engilis's non-Hodgkin's lymphoma

10   or CLL?

11   A    Yes.

12   Q    And is that an opinion you hold to a reasonable degree of

13   medical and scientific certainty?

14   A    I do.

15           MR. HABERMAN:  Thank you, Your Honor.

16           THE COURT:  Okay.  Any cross-examination?

17           MR. STEKLOFF:  Yes, Your Honor.

18                      <u>RECROSS-EXAMINATION</u>

19   BY MR. STEKLOFF

20   Q    Good afternoon, Dr. Charles.

21   A    Good afternoon.

22   Q    Just to start with a little bit of your background, which

23   we heard about this morning, you are not a medical doctor.

24   Correct?

25   A    I am not a medical doctor but I taught medical students,

**CHARLES - RECROSS / STEKLOFF**

1  MDs, for four years?

2  **Q**    But you have never diagnosed non-Hodgkin's lymphoma,

3  correct?

4  **A**    I don't diagnose and treat patients.

5       (Reporter clarification)

6          **THE WITNESS:**  I don't make diagnosis and treat

7  patients.

8  **BY MR. STEKLOFF**

9  **Q**    So you have never diagnosed a patient with non-Hodgkin's

10  lymphoma, correct?

11  **A**    No, no.

12  **Q**    You have never treated a patient with non-Hodgkin's

13  lymphoma, correct?

14  **A**    I don't have a medical practice and license, so...

15  **Q**    And that would apply to all of the medical risk factors

16  you just discussed, Epstein-Barr, hepatitis, HIV, all of those,

17  the same is true?

18  **A**    All those things are cited in the literature.

19  **Q**    But that's not my question.  My question is you have never

20  diagnosed or treated any of those conditions.  Right?

21  **A**    No.

22  **Q**    And if you had a plaintiff in litigation who had one of

23  those conditions, you wouldn't be qualified to compare the

24  impact of, say, a plaintiff who also had Hepatitis C with

25  someone who was exposed to glyphosate.  That would be beyond

1   your qualifications, correct?

2   **A**   Yes.

3   **Q**   Now you talked about your important work for the State of

4   Texas this morning, correct?

5   **A**   Yes.

6   **Q**   And one of the things that you talked about was what the

7   inspectors did if there was an incident on behalf of the State,

8   correct?

9   **A**   Yes.

10  **Q**   And do you recall stating that one of the things they did

11  was they would speak to eyewitnesses?

12  **A**   Yes.

13  **Q**   And that was because the inspectors on behalf of Texas

14  were looking to verify any information that they were receiving

15  about the incident.  Correct?

16  **A**   If there were -- eyewitnesses.

17  **Q**   Right.  So if there was a concern that someone was exposed

18  to too much carbon monoxide, the inspectors in the field would

19  go to see whether or not there were eyewitnesses to the

20  incident, right?

21  **A**   Yes, if the person says Tom was with me or George was with

22  me when this thing happened, then interview George, what

23  happened.

24  **Q**   Right.  It is important when doing any assessment of this

25  toxicology type to verify the information that you are given.

1    Correct?

2    **A**    If it's available, sir.

3    **Q**    If it's available it is important to verify, right?

4    **A**    Yeah.

5    **Q**    Okay.  Now, here, you did not verify any of the

6    information that Mr. Engilis presented in his deposition or in

7    the factsheet that we saw.  Correct?

8    **A**    I had not verified --

9            **MR. HABERMAN:**  (Inaudible)

10           **THE WITNESS:**  I relied on the facts.

11           **THE COURT:**  Hold on a second; there is an objection.

12   Sorry, what is the objection?

13           **MR. HABERMAN:**  I object to the form of the question.

14           **THE COURT:**  Overruled.

15       Go ahead.

16   **BY MR. STEKLOFF**

17   **Q**    Do you understand my question?

18   **A**    Repeat, sir.

19   **Q**    Sure.  You did not do anything to verify the information

20   provided by Mr. Engilis in his testimony or the factsheet.

21   Correct?

22   **A**    My understanding that if I verified the statements in the

23   deposition correct or wrong?  Is that the verification that you

24   are asking?

25   **Q**    I'm just asking if you did anything beyond reading the

**CHARLES - RECROSS / STEKLOFF**

1  testimony.

2  **A**    Oh, no, no.

3  **Q**    You didn't do anything else to verify it, correct?

4  **A**    No, no.

5  **Q**    You didn't look at pictures of the properties.  Correct?

6  **A**    Um, no.

7  **Q**    You didn't go to the properties.  Correct?

8  **A**    No.

9  **Q**    You didn't interview Mr. Engilis.  Correct?

10 **A**    No.

11 **Q**    You didn't speak to him to see if you found his statements

12 about his use of glyphosate to be reasonable.  Correct?

13 **A**    Yes.  I already made the statement that -- the documents I

14 relied on.

15 **Q**    Right.  And my question is:  You didn't speak to him to

16 test that information, correct?

17 **A**    I don't do that, in my profession.

18 **Q**    Right.  And you didn't do anything to understand how often

19 Roundup would have needed to have been used at his properties.

20 Correct?

21 **A**    How often?

22 **Q**    Yes.

23 **A**    I did not verify that.

24 **Q**    Right.  Do you have any understanding of how long Roundup

25 kills weeds for, on a property?

**CHARLES - RECROSS / STEKLOFF**

1  **A**   About two weeks to a month.

2  **Q**   You're not a weed scientist, right?

3  **A**   I have used Roundup.

4  **Q**   It's your understanding, personally, that if you use spray

5  Roundup and kill weeds, in two weeks the weeds will be back?

6  **A**   Yeah; sometimes yes.  It's a very serious -- poison ivy,

7  like, creepers may die fast.  But, you know, some grass, like

8  Johnson grass, at least in Texas, you know, don't behave that

9  way.

10  **Q**   Okay.  So that's based on just your personal experience.

11  Not your expertise.

12  **A**   No.

13  **Q**   It's based on what you've done in Texas?

14      Your understanding of how often Roundup works for, is that

15  based on your personal experience in Texas?

16  **A**   Yeah.  I used a couple of times.

17  **Q**   Okay.  Are you sure you're using it properly?

18  **A**   Yes.

19  **Q**   Okay.  Now, I want to talk through this -- first, this

20  timing.  This exposure, the number of days calculations.  Do

21  you recall doing a calculation about the number of days?

22  **A**   Yes.

23  **Q**   Now, you also did that in your report.  Correct?

24  **A**   Yes.

25  **Q**   So let's look at your report.  I think today you told us

**CHARLES - RECROSS / STEKLOFF**

1   your conclusion, to a reasonable degree of medical certainty,

2   is that Mr. Engilis sprayed for 375 hours over his lifetime.

3   **A**    Yes.

4   **Q**    Is that right?

5   **A**    Yes, yes.

6   **Q**    Okay.

7   **A**    May I add a statement?

8   **Q**    Well, I'm going to ask you questions, and then, you

9   understand Mr. Haberman can ask you questions after that.

10  Okay?

11       So I'm going to pull up Page 11 of your report.

12       (Document displayed)

13  **Q**    And do you see that on the screen or on your binder?

14  **A**    Yes.

15  **Q**    And on Page 11, this is what you wrote under Frequency &

16  Duration?

17  **A**    Yes.

18  **Q**    (As read)

19             "From the data so far known, an attempt is

20             made to extrapolate the number of average

21             possible work hours or days per year for

22             comparison with an occupational time-weighted

23             average.  If Mr. Engilis had spent 24 hours

24             in a year (1 hour twice a month) applying

25             Roundup, he would have spent 1,272 hours, at

**CHARLES - RECROSS / STEKLOFF**

```
1                        a minimum, in 53 years on the property
2                        locations mentioned above."
3            Do you see that?
4    A    Um, I admitted in my -- I'm reading it correctly, you are
5    reading it correct, yes.
6    Q    Yes.
7    A    But that 53 was a wrong number.
8    Q    Okay.  So basically in your report, when you did your
9    analysis, it was -- it was vastly overstated.  Is that right?
10   A    Yeah.
11   Q    So today you're relying on the new data that you walked
12   through --
13   A    Yes.
14   Q    -- for the first time today with Mr. Haberman.
15   A    Yes.
16   Q    Okay.
17   A    I recalculated after that.
18        (Document taken off display)
19   Q    Ah.  And then, this is the first time you informed the
20   Court --
21   A    Yes.
22   Q    -- of your new calculation.
23   A    Yes.
24   Q    Okay.
25            THE COURT:  How did you make this mistake?
```

1          **THE WITNESS:**  That 24 hours, initially when I was

2     reading the deposition, he said the 30 minutes.  Okay, 30

3     minutes at a time.  Then when he's asked more:  So you used for

4     30 minutes?

5          No, more than that, sometimes.

6          How more than that?

7          I have a lot of property.  I frequently use that thing.

8     It is not -- you know, sometimes more.

9          These kind of vague statements, you know, fall into the

10     picture of my time guessing, you know, how much time actually

11     he used.

12          Then when I also was looking at -- sorry, the description

13     of the property, 20,000 square feet or so in the case of

14     DeBary, Florida, property, and then he said about the bottle --

15     buffer area towards a golf course in his backyard.  And on his

16     side, there are tree lines.  And then he was spraying all of

17     those area.  And because describing all those things, he said

18     it is more than that.  But these are the property.

19          So I had to guess, maximum, one hour.  That one hour is

20     the one that I use in this for 30 minutes.  So that reflected

21     in the calculation, like 24 hours per year.  That is how I put

22     that thing.  Worst case, that's what he used.  Maximum.

23          **THE COURT:**  And then, why, why did you reduce that?

24          **THE WITNESS:**  I reduce that because if you -- in the

25     deposition, my deposition, he pointed out, he said 30 minutes.

**CHARLES - RECROSS / STEKLOFF**

1   I said that is what he said.  But if you read more into the

2   deposition, that statement goes all over, from 30 minutes to an

3   hour.

4       So in order to make it to 30 minutes, I exactly calculated

5   his statements, 30 minutes at DeBary, 20 minutes at Summerfield

6   and 15 minutes exactly, according to him, that is about two

7   days.

8           **THE COURT:**  But I guess I'm asking why did you change?

9           **THE WITNESS:**  I didn't change the report.  I

10  recalculate because --

11          **THE COURT:**  Right, but you changed from what you said

12  in your report to what you're saying now.

13          **THE WITNESS:**  Yes.

14          **THE COURT:**  And I'm asking, why did you decide to make

15  that change?

16          **THE WITNESS:**  I decided to change because I stuck with

17  the statement alone, then.  His numbers statement, "I used for

18  30 minutes," take that number, alone.

19          **THE COURT:**  But, why?

20          **THE WITNESS:**  Because that is the statement he made.

21  Number.  If you follow the numbers --

22          **THE COURT:**  Right.  But why didn't you do that in your

23  report, then?

24          **THE WITNESS:**  I did not do because I was reading other

25  statements, you know, continuing the deposition of Mr. Engilis.

 1   And he qualifies this as 30 minutes.

 2        **THE COURT:**  Right.  But I guess what I'm asking is it

 3   seems like you decided to take one approach in your report, and

 4   then you've decided to take another approach here.

 5        **THE WITNESS:**  Because I was told at the -- my

 6   deposition that I was exaggerating, that that is not true.  So

 7   then I said, well, let me go and then look at what exactly

 8   exaggerated.

 9        **THE COURT:**  Okay.

10        **THE WITNESS:**  Okay.  That's the reason I was making

11   this calculation, to see how far it is.

12        **THE COURT:**  Okay.

13        (Document displayed)

14   **BY MR. STEKLOFF**

15   **Q**   Dr. Charles, just to follow up on that, you say that the

16   reason was because of some testimony he gave where you

17   calculated an hour instead of 30 minutes.  But.

18        Right here, in what we read, you calculated in his -- in

19   your report, you calculated that he sprayed for a minimum of 53

20   years.

21        (Document highlighted)

22   **Q**   Right?

23   **A**   That 53 years is a typo.  That should be 43.

24   **Q**   Well, it really should be 26, because he sprayed, we saw

25   in his affidavit --

1    A    Yeah.

2         (Document displayed)

3    Q    -- between -- and this has already been admitted, it was

4    Plaintiff's Exhibit 4 -- he began using Roundup in 1990 and

5    continued using Roundup until 2015, which is 26 years.  Right?

6         (Document highlighted)

7    A    Yes.

8    Q    So the real reason that your calculations were off in your

9    report is because you used 53 years when, in fact, he sprayed

10   for 26 years.  Right?

11        (Documents displayed)

12   A    The calculations show like that, but there was a reasoning

13   for my to do that way.  It is not 53; it is 43.  Okay.

14   Q    I'm sorry, could you repeat that?

15   A    It was 43.  I told you that is a typo.  Or 53 is a typo.

16   I admitted that thing in my deposition.

17        (Document displayed)

18   Q    Okay.  So now you're saying --

19   A    Then I calculated -- used that 53 for the calculation.

20   Should be 43.  That 43 comes from I used an approach -- there

21   are two ways to approach this.  One is accumulate each incident

22   happening separately, in separate properties, in separate

23   places.  So I had taken these three different incidents as

24   cumulative application.

25   Q    Okay.

1   A     Okay?  That is where the 26 years.  Then, what is that?

2   Q     Okay.  So let me break this down.

3   A     Yeah.  That's what added to 43.

4   Q     I understand.

5   A     But in effect, when you divide it with the number of

6   years, it comes to per year.

7   Q     Okay.

8         (Reporter clarification)

9         **THE WITNESS:**  Divided with the number of years of

10  usage, it comes, per-year use, whether it is 26 years or 43

11  years.

12  **BY MR. STEKLOFF**

13  Q     Okay.

14  A     When you exaggerate that number by 43 years, you divide by

15  the larger number, 43, comes -- bring down the days.  But if

16  you are using an aggregate or added-to approach, you are adding

17  all the exposures within the time frame of 26 years.

18        And when you divide that result by 26 years, then you also

19  get the per-year exposure.

20  Q     Okay.

21  A     So two different approaches.  First I thought about the

22  first approach.  That's what I dealt with.

23  Q     Okay.  Let me just try to break this down a little bit.

24        You agree that Mr. Engilis, according to him, sprayed for

25  26 years.  Right?  I'm not asking about how you calculated it,

1  but there was a 26-year period when he sprayed.

2  A    Yes.

3  Q    Right?

4  A    Yes.

5  Q    There is no dispute about that, correct?

6  A    No.

7  Q    In your report, you mistakenly said he sprayed for 53

8  years.  Correct?

9  A    Yes.

10  Q    Now you are saying there is an approach under which you

11  can calculate 43 years.  Right?

12  A    Yes.

13  Q    That is not anywhere in your report, correct?  The 43

14  years is not anywhere in your report.  Right?

15  A    I have not corrected it, never had a chance, to 43.

16  Q    Okay.  And you didn't talk about the 43 years with

17  Mr. Haberman.  Correct?

18  A    No.

19  Q    Okay.  And what you're staying is, and I think we can look

20  right here, he sprayed at one property from 1990 to 2015.

21  That's 26 years.  Right?

22  A    Yes.

23  Q    Then he sprayed at another property from 2008 to 2013.  So

24  that's another six years.  So we are at 32, right?

25  A    Yeah.

1   Q     And then he sprayed at another property from 1996 to 2002,

2   which is seven years.

3   A     Yes.

4   Q     So that's --

5   A     Yeah.

6   Q     -- 39, right?

7   A     Yeah.

8   Q     So I don't -- so 43, 39.  This is my question.

9         (Document taken off display)

10  A     Yeah.

11  Q     Where in the epidemiology that you rely upon do they ever

12  talk about this aggregate approach of looking at years?

13        Did they do that in McDuffie, Eriksson, Pahwa, or any

14  other study?

15  A     This is a toxicity -- a toxicologist.  We like this, and

16  we always calculate it this way.

17  Q     Okay.  But you were then cross-referencing that data to

18  the epidemiology, right?

19  A     Yeah, I had to come up with some kind of exposure days.

20  Exposure assessment is a part of the toxicological assessment,

21  sir.

22  Q     Okay.

23  A     So I had to come up with a number, in the chronology, come

24  up with the number of days of exposure associated with NHL or a

25  specific NHL, okay?  That is the human data that I have.

1  Q    Okay.

2  A    And then I have Engilis and, I have some vague exposure

3  information.  And I'm calculating, and finally the number of

4  days, and making an aggregate number of hours, bring down to

5  number of days that he probably had exposed per year.  So then

6  I can make a direct comparison with his exposure with the

7  already-published literature.  That is what I was doing.

8  Q    And you agree with me that the way you are calculating the

9  number of hours is different than the way the epidemiologists

10 in the studies calculated the hours.

11 A    Yes.  Probably, yes.

12 Q    Completely different.

13 A    Yeah.

14 Q    Okay.  Now, you also, as a toxicologist, calculated the

15 worst-case scenario.  Right?

16 A    Yes.

17 Q    So there's two options there, too, right?  You could take

18 a conservative approach and say: What is the minimum number of

19 hours that Mr. Engilis sprayed?  Or you could say: What's the

20 worst-case scenario?  What's the most that he sprayed?

21 Correct?

22 A    Yes.

23 Q    And you chose the worst case.

24 A    Yes.

25 Q    You didn't choose the conservative case.

1   **A**    At that time, I did not calculate this aggregate

2   conservative thing, because his statements of spreaded use, and

3   flexible hours, you know, I took the worst-case scenario.

4   **Q**    Right.  I've seen your notes.  That aggregate calculation,

5   that is brand-new.  Never been produced to us, or the Court,

6   before today.  Right?

7   **A**    Yeah, I brought my notes, yes, to the...

8   **Q**    Okay.  And even -- I don't even believe His Honor has even

9   seen your notes yet.  So, so this aggregate, this is the first

10  time we are talking about this aggregate approach, right?

11  **A**    Yeah, I'm -- even my report, I did not say what approach I

12  took.  That was accumulated type of approach.

13  **Q**    But then looking at, going back to your report -- just

14  trying to find the right page.  I apologize.

15       Well, I think we just saw that in your report you had

16  1,272 hours.  Right?

17  **A**    Yeah.

18  **Q**    Today you have 375 hours.  Correct?

19       Isn't that where we ended up, 375 hours?

20  **A**    Oh, that is according to the -- that new timings.

21  **Q**    Yes.  Is that -- is that according to that?  Is 375 hours?

22  **A**    If you go through the other methodologies, 43 years, 43

23  times, that number will be different.  That number will come to

24  1,032 hours.

25  **Q**    Okay.

**CHARLES - RECROSS / STEKLOFF**

1   A     See, see what number you have in my report is 53.   Belongs

2   to 53 years.   If it is 43, it would be 1,032 hours.

3   Q     Okay.  So --

4   A     If you have my sheet and --

5   Q     So now to, just to step back, there are different

6   calculations.  We have the calculation in your report that was

7   1,272 hours.  We have a calculation that brought with you today

8   that's a little over 1,000.  And then we have the calculation

9   you did with Mr. Haberman, which was 375.  Is that right?

10  A     Yes.

11  Q     And all of those are different.

12  A     Yes.

13  Q     And all of those are based on a different methodology.

14  A     All accepted methodology in toxicology.

15  Q     Right.  And all different than the method --

16  A     Most were different.  That is where we came to a different

17  number, okay.

18  Q     And all of them are based on a methodology that is

19  different than the epidemiology.

20  A     Yes.

21  Q     And then you rely on the epidemiology to say whether

22  someone sprayed for more than two days a year?

23  A     Yes.

24  Q     Using an adjusted -- a number, a data point that is

25  unadjusted for other pesticides.

1   **A**     For, in toxicology, this is the way we do the exposure

2   assessment for the risk assessment.

3   **Q**     Okay.  One thing I wanted to ask you about, at the

4   beginning of your testimony you said that you followed the EPA

5   risk process.  Is that right?

6   **A**     Yes.

7   **Q**     And you know for Roundup, the EPA has determined that

8   glyphosate is not likely to be a carcinogen.  Correct?

9   **A**     EPA's determination, yes.

10  **Q**     Okay.  And you are not saying that EPA is wrong, right?

11  **A**     That is EPA's determination.

12  **Q**     Right.  And you have no reason to disagree with it.

13  Correct?

14  **A**     I -- I can have a different opinion.  That is a scientific

15  conclusion.  I am a scientist.  I can conclude differently from

16  the facts I have.

17  **Q**     But you did not calculate an internal dose for

18  Mr. Engilis, correct?

19  **A**     There were no measurements for internal dose measurements.

20  **Q**     Right.  And that is what toxicologists do, correct?  They

21  try to determine an internal dose.  Right?

22  **A**     If that is available.  Or, internal doses are usually done

23  by experimental approach.

24  **Q**     And you were unable to do that here.  Correct?

25  **A**     Correct.

**CHARLES - RECROSS / STEKLOFF**

1  **Q**    So you do not know, sitting here, how much Roundup entered

2  Mr. Engilis's body.  Correct?

3  **A**    Yes.

4  **Q**    That -- yes, in other words --

5  **A**    Yeah.  No, I don't know.

6  **Q**    Okay.  And ultimately what you did after you came up with

7  the hours, whether it's --

8  **A**    Uh-huh.

9  **Q**    -- 375, 1,000, 1,200, is you divided them by 8, right?

10 **A**    Yeah.

11 **Q**    And then you said:  Is it more than two days per year?

12 Correct?

13 **A**    Yeah.

14 **Q**    And in doing that, you ignored several of the data points

15 that we discussed this morning in the Pahwa study.  Correct?

16         **MR. HABERMAN:**  Objection.

17         **THE WITNESS:**  Well, did I ignore -- in this

18 calculation?

19 **BY MR. STEKLOFF**

20 **Q**    Sure.  Well, Mr. Engilis used -- used Roundup for more

21 than three and a half years.  Correct?

22 **A**    Yes.

23 **Q**    And that data point in Pahwa suggests that there's no

24 association with non-Hodgkin's lymphoma, right?

25 **A**    Pahwa, yes, yes, yeah.

**CHARLES - RECROSS / STEKLOFF**

1  Q    Same with the Pahwa data point that talks about more than

2  seven days per year, correct?

3  A    Yes.

4  Q    That data point is actually updated from the ten days per

5  year in McDuffie that is unadjusted, correct?

6  A    Yet.

7  Q    In Pahwa, they were able to take McDuffie, pool it with

8  other data and adjust it for other pesticides, correct?

9  A    But Pahwa also says with more than two days of exposure.

10  I believe I'm correct.

11  Q    Right.  And I won't revisit all of this, but you chose one

12  data point in Pahwa that supported your hypothesis that Roundup

13  caused Mr. Engilis's cancer and then ignored all the other data

14  points that contradicted it?

15  A    I did not ignore.  I evaluated all of the data points.

16  Q    Okay.  So tell me why the over seven days doesn't apply

17  to -- data doesn't apply to Mr. Engilis.

18  A    Mr. Engilis, if somebody else used more than two days, it

19  doesn't matter seven days or ten days, the probability of

20  causing cancer is high.  That's all it says.  The minimum

21  number is two, and more than two days.

22  Q    So once you have that number, that's the only number you

23  need.

24  A    Yeah.  I mean, if you are exposed for seven days or eight

25  days, 20 days, I read it, look at.  But that is the minimum

1    requirement --

2    **Q**    Okay.

3    **A**    -- in the data, they say.

4    **Q**    Okay.  So let's talk about the other factors that you say

5    you considered.  I think there were two sets.  One was -- one

6    related to other medical conditions, correct?

7    **A**    Yes.

8    **Q**    And you -- do you agree with me that you obtained that --

9    I think you said you obtained that list of medical conditions

10   from the American Cancer Society?  Is that right?

11   **A**    That was a part of -- and there are other medical

12   literature -- I mean medical papers on NHL that I read.  I made

13   a list of all possible risk factors.

14   **Q**    Okay.  And then the other chemicals, you pulled that from

15   the plaintiff factsheet.  Right?

16   **A**    Yes.

17   **Q**    So you basically looked at the plaintiff factsheet that

18   the lawyers had prepared, and then, and then used that list.

19   Right?

20   **A**    Yeah.  That was asked and answered.

21   **Q**    Okay.  Now, I want to look at another part of your report,

22   which is on Page 26 of Exhibit 4.

23       (Document displayed)

24   **Q**    And at this part of your report you had a section that

25   discussed CLL risk factors.  Right?

**CHARLES - RECROSS / STEKLOFF**

1   **A**      Yes.

2   **Q**      And you described the risk factors that you found, and

3   then you can see here that there's a Footnote 39 (Indicating).

4   Right?

5   **A**      Yes.  I see it.

6   **Q**      So that's a cite to where you obtained the information

7   about other risk factors?

8   **A**      Yes.  The reference is correct, that is, yes.

9   **Q**      Okay.  Now, I will tell you I think it's supposed to be

10  37.

11          (Document displayed)

12  **A**      Yes.

13  **Q**      Because if you look here, 37 cites --

14  **A**      That's correct.

15  **Q**      -- what I think is supposed to be the Mayo Clinic.  38 has

16  a different article about prostate cancer.  Do you see that?

17  **A**      Should be the Mayo Clinic.

18  **Q**      Right.  It should be 37?

19  **A**      Seven.

20          (Document taken off display)

21  **Q**      So basically, what you did to discover what other risk

22  factors there are for CLL is you did a Google search and found

23  the Mayo Clinic website.  Correct?

24  **A**      I went to Mayo Clinic website, as well as then I verified

25  with some other publications, too.

**CHARLES - RECROSS / STEKLOFF**

1  **Q**    Okay.  And you didn't cite a single one of those other

2  publications in your report?

3  **A**    I have not cited there.

4  **Q**    Okay.  So the Court, myself as counsel, our experts, none

5  of us can figure out where you found those.  Correct?

6  **A**    Correct.

7  **Q**    Okay.  You basically did what you would do as a

8  non-medical expert.  You just did a Google search and found a

9  website.  Right?

10  **A**    Yes.

11        **THE COURT:**  Could I ask a question about that?

12        **MR. STEKLOFF:**  Yes, of course, Your Honor.

13        **THE COURT:**  That Mayo Clinic list, did that include

14  glyphosate?

15        **THE WITNESS:**  They don't mention chemicals, they --

16  they may say some chemicals may be causing to.  They don't

17  specifically highlight American Chemical -- Cancer Society or

18  Mayo Clinic or, you know, MD Anderson, they have all the script

19  here about NHL and their subtypes, and all, but nobody will say

20  any particular name, glyphosate or anything, that causes.

21      They say chemicals are at (Inaudible) causative agents.

22  There are many chemicals that are causative.  That, you have to

23  go the --

24        **THE COURT:**  So you won't -- you can't get a list of

25  chemicals that are potential causes of NHL?

1              THE WITNESS:  I did not list them.  Those were all in

2      the papers.  The epidemiological papers list all those

3      chemicals they tested and found positive.

4              THE COURT:  And did they include glyphosate?

5              THE WITNESS:  Yes.

6              THE COURT:  Okay.  All right.

7      BY MR. STEKLOFF

8      Q    Well, to be clear, you're talking about the plaintiff

9      factsheet, right?

10     A    Which one?

11     Q    You are talking about the legal paper, the plaintiff

12     factsheet?  When you're saying the list of chemicals, you're

13     talking about the -- the document that Mr. Engilis filled out,

14     the plaintiff factsheet, right?

15     A    No.  I am talking about the list here is the chemicals

16     that -- the epidemiological studies that we discussed, you

17     know, phenoxy herbicides, malathion --

18     Q    Oh, and the --

19     A    -- glyphosate, all those chemicals they tested and then

20     found positive association.

21     Q    And --

22     A    One of them is glyphosate.

23             THE COURT:  But I guess I was confused because you

24     said you went to this Mayo Clinic --

25             THE WITNESS:  Yeah.

CHARLES - RECROSS / STEKLOFF

1          THE COURT:  -- list --

2          THE WITNESS:  Yeah.

3          THE COURT:  -- to find a list of other things cause

4    NHL.  Right?

5          THE WITNESS:  Not all are listed in Mayo Clinic.

6          THE COURT:  Okay.

7          THE WITNESS:  Only some of them are really related to

8    the medical diagnosis.  Sickness, diseases.

9          THE COURT:  Okay.

10          THE WITNESS:  Family history, for example.  Those

11   things.

12          THE COURT:  Okay.  So where else did you go to find --

13   to get a full comprehensive list of things that cause NHL?

14          THE WITNESS:  There are -- there are no lists like

15   that anywhere, a comprehensive list.  You have to search

16   various documents and various sites to find out several risk

17   factors put together like that.

18          THE COURT:  So you put your own -- together your own

19   list of --

20          THE WITNESS:  I -- I keep writing.  When I find a new

21   risk factor, I put a note in my notebook.

22          THE COURT:  And those risk factors, those are in your

23   report.

24          THE WITNESS:  No.

25          THE COURT:  The list.

CHARLES - RECROSS / STEKLOFF

1          THE WITNESS:  No.

2          THE COURT:  Of risk factors?

3          THE WITNESS:  Yeah.  I did not individually list all

4   the individual chemicals reported.  See, that particular aspect

5   is covered, that he has not used any other pesticides, any

6   other chemicals.  There is no -- then the answer is no.  Then

7   there's no need of listing all those array of chemicals and

8   then saying no, no, no, no.  So I -- I didn't do that.

9          THE COURT:  Okay.

10  BY MR. STEKLOFF

11  Q    Just a few more questions, Dr. Charles.

12  A    Yes, sir.

13  Q    So let's just take a step back.  You were retained to

14  determine whether Roundup caused Mr. Engilis's non-Hodgkin's

15  lymphoma.  Correct?

16  A    I was retained to review the data and all the documents,

17  come out with the toxicological and scientific opinion as to

18  what I -- my opinions are.

19  Q    Correct.  And then you -- we talked about what you looked

20  at in terms of ATSDR, IARC and the epidemiology, but in the

21  epidemiology, you looked for data points to see whether they

22  supported the -- supported an association, or disproved or were

23  against an association.  Correct?

24  A    If this particular chemical that this particular person

25  has used, if there is a positive association somewhere, they

1    can -- I can relate this exposure to the positive association.

2    There is no need of bringing in negative association with this

3    person's positive finding or positive diagnosis.

4    **Q**    So the overall data, if there was -- well, let me just

5    make sure I got that right.  If there's a positive association

6    anywhere in the data, then you can associate the cancer with

7    that, with glyphosate.  That's what you said, right?

8    **A**    Many factors.  That is not the only one.  You look at the

9    other studies, you know, biochemical studies.  Cancer studies.

10   Molecular biological studies.  You know, cellular studies.  I

11   mean, gene expression.

12   **Q**    But you didn't --

13   **A**    Oxidative --

14   **Q**    But you didn't --

15   **A**    All those things will be pointing out to my conclusions.

16   **Q**    But you didn't look at those things, right?  You relied on

17   what ATSDR and IARC and EPA said about that.  Correct?

18   **A**    I have read a couple of reviews on that, you know, on

19   this.

20   **Q**    Yes.  And then in the epidemiology, you found very few

21   data points that was a positive association.  Correct?

22              **MR. HABERMAN:**  Objection.  Asked and answered.

23              **THE COURT:**  Overruled.

24   **BY MR. STEKLOFF**

25   **Q**    Correct?

 1   **A**    I have seen several positive association, like glyphosate

 2   has either associate or excess risk or a significant risk,

 3   something like that.  It differs from one paper to the other.

 4   **Q**    You found almost no associations that were both positive

 5   for an association between glyphosate and non-Hodgkin's

 6   lymphoma and statistically significant and adjusted for other

 7   pesticides.  Correct?

 8         **MR. HABERMAN:**  Asked and answered.

 9         **THE COURT:**  Overruled.

10   **BY MR. STEKLOFF**

11   **Q**    Correct?

12   **A**    You have to ask me that question again.

13   **Q**    Sure.  There were -- there were less than five data points

14   in all of the data you looked at that were adjusted for other

15   pesticides, showed a positive association, and statistically

16   significant.  Correct?

17   **A**    Yeah.

18   **Q**    But the fact that there were a handful, one or two or

19   three, that was enough for you to say:  If he was exposed to

20   glyphosate, then I can say the cancer was because of

21   glyphosate.

22         **MR. HABERMAN:**  (Inaudible)

23         **THE WITNESS:**  Because on the three points, along with

24   other supporting documents.

25

1    BY MR. STEKLOFF

2    Q    Okay.  And that was --

3         MR. HABERMAN:  Your Honor, if I could just throw in an

4    objection.  I was late on the last question; the conversation

5    was moving fast.  But, this is out of scope.

6         THE COURT:  Overruled.

7    BY MR. STEKLOFF

8    Q    And that was your methodology in determining the cause of

9    Mr. Engilis's cancer.  Correct?

10   A    I follow a weight of evidence pattern.  Okay?  Weight of

11   evidence of the different data I evaluate.  Epidemiological

12   studies support data or positive association is only one of

13   those that tells me probably yes, this is associated.

14   Q    Okay.  But everything we just discussed, that was the

15   methodology that you used to determine what you believe is the

16   cause of Mr. Engilis's cancer.  Correct?

17   A    I rely on the human data available, yes.

18        MR. STEKLOFF:  No further questions, Your Honor.

19        THE COURT:  Okay.  Any redirect?

20        MR. HABERMAN:  Yes, Your Honor.

21                    REDIRECT EXAMINATION

22   BY MR. HABERMAN

23   Q    You were asked questions about whether you -- sorry, go

24   ahead.

25        MR. HABERMAN:  Sorry, Your Honor.  May I proceed?

CHARLES - FURTHER REDIRECT / HABERMAN

1          Okay.

2     BY MR. HABERMAN

3     Q     You were asked questions earlier on in the cross about

4     whether you verified this or you verified that.  Did you rely

5     on sworn testimony?

6     A     Yes.

7     Q     The affidavit, the deposition, was that sworn to?

8     A     Yes.

9     Q     If you called Peter Engilis on the phone, would he have to

10    take an oath before talking to you?

11         MR. STEKLOFF:  Objection, Your Honor.  I'll stipulate,

12    he wouldn't have had to take an oath.

13         THE COURT:  Overruled.

14         MR. STEKLOFF:  Yeah.

15    BY MR. HABERMAN

16    Q     Did you think it was important to review his sworn

17    testimony, the sworn fact sheet, the sworn affidavit, in coming

18    up with the way in which he used Roundup for the length of time

19    in which he used Roundup?

20    A     Yes.

21         MR. STEKLOFF:  Your Honor, this is all leading, so if

22    he wants to ask why he did certain things, I think that's more

23    appropriate than --

24         THE COURT:  Sustained.

25         MR. STEKLOFF:  Yeah.

CHARLES - FURTHER REDIRECT / HABERMAN

1   BY MR. HABERMAN

2   Q    Well, I'll just ask it, then:  Why did you feel -- why

3   didn't you call Peter on the phone and ask him about his

4   Roundup use?

5   A    I did not verify his statements.  That is -- that brings

6   a biased -- a different opinion that is not sworn.  And it is a

7   personal communication with me that I cannot include in my

8   evaluation.

9   Q    We spent some time on the methodology you used to

10  calculate the amount of Roundup that Mr. Engilis was exposed to

11  over a period of time in which he was using Roundup.  Do you

12  recall that?

13  A    Yes.

14  Q    Do you have your report in front of you?

15  A    Yes.

16  Q    Can you turn to Page 10 of your report.

17  A    Yes.

18  Q    And I'll just put it up on the ELMO.

19       (Document displayed)

20  Q    Just in the first paragraph of Page 10 of your report, do

21  you note where -- or do you note the bookends of time in which

22  Peter was using Roundup?

23  A    Which line are you referring to, sir?

24  Q    I'm looking on Page 10, the first paragraph.  The overall

25  bookends of when he was using Roundup.  Do you note that in

1    your report?

2    **A**    Starting with the "Mr. Engilis started using..."?

3    **Q**    Uh-huh.

4    **A**    Yeah, okay.

5    **Q**    So does your report accurately state when he started using

6    Roundup and when he stopped using Roundup?

7    **A**    That is a statement from the deposition and on the fact

8    sheet.

9    **Q**    Right.  In other words, you got the years, the beginning

10   and end years right.

11   **A**    Yeah.

12   **Q**    Okay.  And then, you know, we talked about the methodology

13   in which you -- you used, and you said that it was point --

14   that there was a typo.  And let's just -- let me back up.

15       If you would take a look at Page 11 of your report.

16   **A**    Yes.

17   **Q**    It says that he used it a minimum of 53 years.

18   **A**    Yes.

19   **Q**    And you said that that is a typo?

20   **A**    Yes.

21   **Q**    And what you were doing here was to get the frequency

22   here, you took a 24 --

23       **THE COURT:**  Why don't you ask him what he was doing,

24   instead of telling him what he was doing.

25       **MR. HABERMAN:**  Okay.  Thank you, Your Honor.

CHARLES - FURTHER REDIRECT / HABERMAN

1   BY MR. HABERMAN

2   **Q**   How did you -- I think -- did you have a discussion with

3   the Court about how you were -- how you read into the

4   deposition how many hours he was using a month?

5       I just want to lay a foundation here so I can ask my next

6   question, which is --

7   **A**   Is it based on what is on Page 11?

8   **Q**   Right.  On Page 11, the Court asked --

9   **A**   Yeah.

10  **Q**   Do you recall having a conversation with the Court about

11  how you got that number?

12  **A**   Yeah.

13  **Q**   Okay.

14  **A**   On our approximate one hour per use, 24 times, maximum, to

15  24 hours per year.

16  **Q**   Okay.  And then, if you multiply that -- the 24 hours a

17  year applying Roundup, you say in -- in your report that he

18  would have spent 1,272 hours, at a minimum, in 53 years on the

19  property.  Do you see that?

20  **A**   Yeah, that's the number on that page.  But if you multiply

21  that by 43, as I corrected, you will get a different number.

22  **Q**   I see.  Okay.

23      Okay.  And the -- the numbers that you went over today, is

24  that a more conservative approach?

25      **MR. STEKLOFF:**  Objection, Your Honor.

1          THE WITNESS:  That is on --

2          THE COURT:  Overruled.

3          THE WITNESS:  Which number -- sorry.

4    BY MR. HABERMAN

5    Q    The numbers that we discussed today on your direct

6    examination, where it was 375 hours, is that a more

7    conservative approach?

8    A    Very conservative.

9    Q    And you were asked if this methodology was any different

10   than the methodology in the epidemiological studies.  Do you

11   recall that?

12   A    Yes.

13   Q    How is it in those epidemiological studies, how were --

14   was the exposure and the duration of exposure, how was that

15   measured?  Do you recall?

16   A    Duration of measure, his exposure from the questionnaire.

17   Q    The questionnaire?

18   A    Yeah, the survey that people are -- self-written

19   questionnaire they collect from controls and exposed people,

20   according from some cancer registry or something like that.

21        And then they compute that information.  Number of years

22   that each one is -- that is how they get that duration of

23   exposure from general population survey.

24   Q    And did Mister -- did you -- and how did Mr. Engilis

25   report his Roundup use here?

1    **A**    How did he report?  In the deposition.  That is the only

2    place, you know, that number, 30 minutes, 20 minutes, 15

3    minutes, is recorded.

4    **Q**    Was he asked questions about his Roundup use?

5    **A**    Yes.

6          **MR. HABERMAN:**  Thank you.

7          **THE COURT:**  Could I ask a followup question about

8    that?

9          **MR. HABERMAN:**  Yes.

10         **THE COURT:**  How is it -- you said that Mr. Engilis

11   reported his Roundup use in the deposition.  And you said the

12   epidemiologists collect questionnaires from people who describe

13   their Roundup use in the questionnaires.  But I think you said

14   that they're different methodologies.  And, did I misunderstand

15   that?

16       Or if, if they are different -- if the epidemiologists are

17   using a different methodology for calculating hours of Roundup

18   exposure than the methodology that you're using, I don't

19   understand what the difference is.

20         **THE WITNESS:**  The difference is the duration of the

21   exposure the epidemiologists calculate is they identify the

22   population first.  And then they gave a questionnaire to the

23   population.  When you --

24         **THE COURT:**  They give a what?

25         **THE WITNESS:**  Questionnaire.

CHARLES - FURTHER REDIRECT / HABERMAN

 1          **THE COURT:**  Yes.

 2          **THE WITNESS:**  And then that questionnaire will have a

 3  starting date, how many years did he use, when did he stop, and

 4  all those different questions will be there for their usage

 5  information.  And the people fill those information by

 6  themselves, and then hand over to the researcher.

 7       They take all those numbers.  They don't verify with

 8  everybody, every individual that these numbers are correct; are

 9  you sure about these numbers?  They compute these numbers, then

10  come out with an average duration of exposure.

11       And then they -- that exposure is taken as the dose.  That

12  is the duration of exposure.  That is the time the person was

13  exposed.  We do not know -- we do not know the amount.  We do

14  not know the amount.

15       And then they correlate with the effects.  That is -- and

16  they also correlate all statistical probability calculation.

17          **THE COURT:**  But in terms of -- so Mr. Stekloff was

18  asking you some questions about how you -- he asked you, you

19  used a different methodology for calculating Engilis's exposure

20  hours, --

21          **THE WITNESS:**  Yeah.

22          **THE COURT:**  -- compared to what the epidemiologists

23  do.  And I just didn't understand that.  I still don't

24  understand what it -- and you said:  Yes, I use a different

25  methodology.

**CHARLES - FURTHER REDIRECT / HABERMAN**

1     But I still don't understand what the difference is

2   between what you did, how you calculated Engilis's hours, and

3   how epidemiologists calculate hours in the study.

4     I understand that the epidemiologists ask the people in

5   the study to fill out questionnaires.  I understand that.  But

6   what's the -- what's the difference in the methodology of

7   asking them those questions, compared to the way you did it?

8       THE WITNESS:  What -- what Mr. Engilis was doing and

9   in the sworn testimony, he was asked question about how long

10  did he use.  And there was followup questions about the same

11  usage, time, everything, for three, four pages of his

12  testimony, confirming that 30 minutes is his use.

13     That is the difference between the questionnaire answer

14  and then confirming that 30 minutes.  So that 30 minutes or 20

15  minutes or 10 minutes is actual data that I believe, on the

16  testimony.

17     So methodology is -- one is a statistical approach.  But

18  exposure assessment in EPA, what we use, we use a different

19  approach.  We add up the -- we have to know the dose in order

20  to calculate the risk assessment.  The amount of the chemical,

21  duration of his exposure, the weight of the person.  You know,

22  how many times a week he is exposed.  All those data has to be

23  there in EPA's exposure assessment.  If one of the data is

24  lacking, we cannot complete that equation.

25     So that is a different methodology than computation and

1  regression analysis of data through epidemiological --

2          THE COURT:  Okay.  And just to see if I can make sure

3  I understand the difference between the methodology you are

4  using now, today in court --

5          THE WITNESS:  Yeah.

6          THE COURT:  -- and the methodology you used in your

7  report, can you try to explain that to me one more time?

8          THE WITNESS:  In the report, there are two different

9  approaches, you know, that you can take when you read a report.

10 He used in Property No. 1, so many years.  This period to this

11 period.  Property No. 2, from this year to this year.  That is

12 the second.  Third property, this year to this year.

13         You can consider those three different treatments and

14 three different time.  So you can calculate them separately and

15 then pull and add at the last minute.  And then you have

16 aggregate number of -- or the cumulative number of years, you

17 have the cumulative number of exposure a month.  And then you

18 divide, you get per-year exposure.  So you come down to per

19 year.  Number of days per year.

20         This method, he is using only 26 years.  And in between,

21 he has two other --

22         THE COURT:  Okay.

23         THE WITNESS:  -- treatments.

24         THE COURT:  And can you -- why are you excluding the

25 two other treatments today?

 1          THE WITNESS:  I did not exclude.  Summerfield and

 2   Fort Lauderdale also is included in this 26-year period.  Two

 3   other -- there are three different treatments during that

 4   period.

 5          THE COURT:  Okay.

 6          THE WITNESS:  So that second approach is aggregating

 7   within 26 hours -- the 26 years.

 8          THE COURT:  Okay.

 9          THE WITNESS:  That is an aggregate or added approach.

10   You can add each one, then come up with how many hours per

11   month.

12       Calculation-wise, it may look different.  But the

13   result-wise, it will be close.

14          THE COURT:  But I -- I apologize, I'm having trouble

15   understanding.

16       So in the first approach, the approach that you took in

17   your report, you used the 26-year period?

18          THE WITNESS:  Twenty-six-year period at one property.

19   Another six-year period, another property.  Another six-year

20   period, another property.  Three properties.

21          THE COURT:  Okay.

22          THE WITNESS:  Okay?

23          THE COURT:  And then --

24          THE WITNESS:  And then --

25          THE COURT:  And that added up to 38?

1          THE WITNESS:  Thirty-eight.  Then there is another

2     five years that he used in Fort Lauderdale before he bought

3     that property.  So I added that five years more.  38 plus 5,

4     43.  That's why I came up with that number.

5          THE COURT:  And then there was a typo, and that said

6     53?

7          THE WITNESS:  Yeah, 53.  I do everything myself.  I

8     don't have any other help or secretaries, so --

9          THE COURT:  But I -- and so your -- but in this

10    methodology that you're presenting today, you're only -- you're

11    not putting the three properties together?

12         THE WITNESS:  Yes, it is.

13         THE COURT:  You are.

14         THE WITNESS:  It is.

15         THE COURT:  Okay.  So what's the difference, then?

16    What's the difference in the methodology you're using today and

17    the methodology you used in your report?

18         THE WITNESS:  I took a 26-year period, that's --

19    period.  And then include, stack other treatment, and add them

20    together.  That's an additive approach.

21         THE COURT:  But, I guess, why would you do that?  I

22    don't understand.  I mean, he says that he was exposed for 26

23    years to Roundup.  Right?

24         THE WITNESS:  Yes.  Yeah.

25         THE COURT:  So I just don't understand the methodology

**CHARLES - FURTHER REDIRECT / HABERMAN**

 1   that would assume 43 years' worth of exposure to Roundup.  I

 2   just don't understand it.  I'm --

 3          **THE WITNESS:**  I told you, Judge, you know, that 43

 4   years, how it came from.  There, I considered as three

 5   different segments of usage, three different property, isolated

 6   properties, separately.  So the first treatment was among

 7   properties, second --

 8      (Reporter clarification)

 9          **THE COURT:**  The first treatment was in the -- I

10   animate a little bit, that's why.  The first treatment was one

11   property.  Second treatment was another property.  It was all

12   number of property, the number of years, and period from start

13   to finish is different in different properties.

14      So I consider, when I read first:  Oh, it looks like there

15   are different incidents.  So I just kept them separate.  And --

16          **THE COURT:**  So, I -- can I -- yeah.  I'm -- I'm -- I

17   apologize; I'm having trouble understanding.

18          **THE WITNESS:**  Okay.

19          **THE COURT:**  Are you saying that you just made a

20   mistake in your report?  That you -- you thought that he was

21   exposed to Roundup for many more years than he actually was?

22          **THE WITNESS:**  No.  If -- that period, period for 26

23   years on property, if you take it as a separate incident, you

24   are adding six more years of another exposure.

25      If you add this way, Judge, you get a total number of

 1   hours anyway.  And you are dividing it with the number of

 2   years.  In one case, I'll do it by 43.  Second case I'm

 3   dividing by 26, number of hours.  So, the result will be close,

 4   because unified unit.  Number of days per year, that's what

 5   finally you get.

 6           THE COURT:  Okay.  And then can you explain to me

 7   again, you said something about how previously you were

 8   assuming more than half an hour, more than 30 minutes --

 9           THE WITNESS:  Yes.

10           THE COURT:  -- because of other things he was saying

11   in his deposition?

12           THE WITNESS:  Yeah.  Other things he was saying about,

13   you know, sometimes extended use more than --

14           THE COURT:  And so that was -- that was part of your

15   methodology that you described in your report?

16           THE WITNESS:  Yes.

17           THE COURT:  But the methodology that you are

18   presenting today sticks with the 30 minutes.

19           THE WITNESS:  Yes.

20           THE COURT:  And you're not making any assumptions

21   about additional exposure that --

22           THE WITNESS:  Exactly.

23           THE COURT:  -- he may have had.

24       Okay.  Anything further?

25           MR. HABERMAN:  No, Your Honor.

1          THE COURT:  Okay.  Anything -- any -- recross?

2          MR. STEKLOFF:  Just very briefly.

3          THE COURT:  Okay.

4                 **FURTHER RECROSS-EXAMINATION**

5    **BY MR. STEKLOFF**

6    **Q**    Dr. Charles.

7    **A**    Yes, sir.

8    **Q**    In your report, you said he sprayed for 53 years.  Right?

9    **A**    Yeah.

10   **Q**    That was just wrong.  Correct?  That was a typo.

11   **A**    Yeah.

12   **Q**    And so when you did your calculations in your report, no

13   matter which -- no matter whether you used this aggregate

14   version or the 26 years, none of it adds up to 53 years.

15   Correct?

16   **A**    No.  53 was a typo.  That is admitted, and it can be

17   corrected.

18   **Q**    Right.  So when His Honor asks you why your report number

19   was different, the reason is because you used the wrong number,

20   53 years.  Correct?

21   **A**    Yeah.  And -- yes.  I said actually should be 43, and I

22   also explained to Judge, you know, how that 43 came about.

23   **Q**    Okay.  And the 43 is using this aggregate where you treat

24   each property differently.

25   **A**    Yes, yes.

**CHARLES - FURTHER RECROSS / STEKLOFF**

1   **Q**   And you're saying that's what toxicologists do.

2   **A**   Yeah.

3   **Q**   None of this has to do with whether he sprayed 30 minutes

4   or 20 minutes or an hour.  It's all about which years you use.

5   Correct?

6   **A**   Yeah.

7   **Q**   Okay.  Now, let me ask one other thing.

8   **A**   And also, a standard treatment period.  This -- I

9   calculate, you know, that number, Page 11.  One hour, 24

10  times, maximum 24 hour per year.  That is a standard.  Instead

11  of 15 minutes, 20 minutes, 30, I took just one number for every

12  incident of spraying.

13  **Q**   Exactly.

14  **A**   Yes.

15  **Q**   And that's where you used the worst-case scenario.  Right?

16  **A**   Yes.

17  **Q**   So if he said "I sprayed for maybe 20 minutes, maybe 30,"

18  you used an hour.  Correct?

19  **A**   Yeah.

20  **Q**   Because you were using the worst-case scenario to

21  standardize things.  Correct?

22  **A**   Yes, yes.

23  **Q**   So your numbers, part of the reason your numbers are high

24  is because you didn't take a conservative approach about, say,

25  20 minutes; you used an hour.  Right?

**PROCEEDINGS**

1  **A**    Yes.  I -- I did the worst-case scenario, yes.

2  **Q**    Because that's what toxicologists do.  Correct?

3  **A**    Yes.

4          **MR. STEKLOFF:**  No further questions.

5          **THE COURT:**  Okay.  All right.  Thank you.  You can

6  step down.

7          **THE WITNESS:**  Thank you.

8      (Witness excused)

9          **THE COURT:**  Hope you had a nice time.

10     All right.  So did you get in touch with Schneider?

11         **MR. HABERMAN:**  I was unable to, Your Honor.  I tried.

12         **THE COURT:**  Okay.  My ideal scenario, of course, would

13  be for him to come tomorrow.  Where is -- where is Schneider

14  physically located?

15         **MR. HABERMAN:**  In Fort Lauderdale.

16         **THE COURT:**  Okay.

17         **MR. HABERMAN:**  Or in Broward County.  I don't know if

18  he's exactly in Fort Lauderdale, but --

19         **THE COURT:**  What are some other possible days, do you

20  think?

21         **MR. HABERMAN:**  So as soon as I get ahold of him, I'll

22  be able to know exactly when he's available.  He is a

23  clinician.

24     I'm thinking that -- that maybe we can come back and -- on

25  -- you know, my daughter is undergoing a procedure on the 22nd.

**PROCEEDINGS**

 1   I was going to say Wednesday, or Thursday.

 2       Can we do it on the 27th or 28th?

 3           **THE COURT:**  No.  I'm not going to be available then.

 4           **MR. HABERMAN:**  Is there a day of the week that works

 5   better for the Court than --

 6           **THE COURT:**  Well, I mean, is it possible to do, like,

 7   the 18th or 19th?

 8           **MR. HABERMAN:**  So I can't fly on the 17th --

 9           **THE COURT:**  Okay.

10           **MR. HABERMAN:**  -- to California, because it's the

11   second day of Rosh Hashanah.

12           **THE COURT:**  Oh, yeah, uh-huh.

13           **MR. HABERMAN:**  So, I observe all of these holidays

14   that are -- that kick off with Rosh Hashanah pretty strictly,

15   so I -- and I can't do it on the 25th, because that's

16   Yom Kippur.

17           **THE COURT:**  That's fine.  So does that mean you

18   wouldn't be able to do the 19th?

19           **MR. HABERMAN:**  Oh, the 19th.  Um, I -- I don't -- I

20   cannot do the 19th.  I'm sorry.

21           **THE COURT:**  Okay.  All right.  Well --

22           **MR. HABERMAN:**  I might be able to do the 20th, though.

23   Did I ask the Court already about that, and you said no?

24           **THE COURT:**  I'm guessing that the 20th is busy, but

25   let me just take a quick glance.

PROCEEDINGS

 1          **MR. HABERMAN:**  But again, I do have to check with the

 2   doctor, and I'm sorry about --

 3          **THE COURT:**  No, I understand, and it is -- he's

 4   actually a practicing clinical oncologist, right?

 5          **MR. HABERMAN:**  He is.  I don't know how the Court

 6   feels about Zoom?

 7          **THE COURT:**  Yeah, that's something to think about.  I

 8   mean, I'm -- you know, in-person is certainly preferable.  But

 9   I also -- You are free to step down if you want.

10          **THE WITNESS:**  Oh, thank you.

11          **THE COURT:**  You're welcome to hang out if you want,

12   also.

13      The 20th is a quiet day, so the 20th is certainly a

14   possibility.  I mean, I do think that in-person is far

15   preferable to Zoom.

16      I'm also -- you know, I have a desire to do while the

17   stuff, materials are still fresh in my mind.

18      So why don't you just get back to us as soon as you can.

19   Email Bhavna, telling us how soon you can make Schneider

20   available.

21          **MR. HABERMAN:**  Okay.  And what about the -- what

22   about, just so I can -- what about the week of October 2nd?  Is

23   that too far in -- is that -- any of those days work for the

24   Court?

25      Monday would not work for me, but, you know --

**PROCEEDINGS**

1          **THE COURT:**  Yeah, I'm really hoping to do it before

2     then if we -- if at all possible.

3          **MR. HABERMAN:**  Okay.

4          **THE COURT:**  But I understand your restrictions as

5     well.  And so just let us know when you can make it happen.

6          **MR. HABERMAN:**  Okay.

7          **MR. STEKLOFF:**  And, Your Honor, I am far from

8     essential from all this.  But it may -- just depending on the

9     timing, it may be -- we will work with whatever day he picks.

10     It may be that another attorney appears on behalf of Monsanto.

11     So I just wanted to give the Court notice of that.

12          **THE COURT:**  That's fine.  I think I can handle that.

13          **MR. STEKLOFF:**  Me, too.

14          **THE COURT:**  Would you like -- I think, given the

15     testimony that occurred today, I think it probably would be

16     fair to give -- give you all an opportunity to file, like, a

17     five-page supplemental brief on Dr. Charles, limited to the

18     issue of specific causation.  I've already made clear he's

19     excluded on general causation.

20          So, why don't you -- when -- let's see here.  Why don't

21     you file by this Friday, the 15th, a -- I'll tell -- why don't

22     you file by the 14th, a five-page supplemental brief.  Monsanto

23     can file a five-page supplemental brief by the 14th.  And the

24     plaintiff can file a five-page supplemental brief by the 15th

25     at 4:00 p.m.

PROCEEDINGS

1      No?

2           MR. HABERMAN:  Given the holidays, it's just tough for

3    me because I'm traveling to family on Thursday, the 14th.

4           THE COURT:  Oh, you are?

5           MR. HABERMAN:  The 15th is just like a --

6           THE COURT:  You're traveling on the 14th?

7           MR. HABERMAN:  Yeah.  At night on the 14th.  And

8    then...

9           THE COURT:  Okay.  What if we said that Monsanto's is

10   due on the 15th, and the plaintiff's is due on the 20th?  Is

11   that okay?

12          MR. HABERMAN:  Yes, Your Honor.  Thank you.

13          THE COURT:  A five-page supplemental brief on specific

14   causation.

15          MR. STEKLOFF:  And out of total clarification, for

16   others who will ask, I assume double --

17          THE COURT:  Double space.  The usual form, brief

18   format.

19          MR. STEKLOFF:  Yes, okay.

20          THE COURT:  Yeah.

21          MR. STEKLOFF:  Thank you.

22          THE COURT:  And it's just to, you know, make your

23   basic points and quickly make any new point you want to flag.

24          MR. STEKLOFF:  I could make them now, but I'm happy to

25   put it in writing, Your Honor.

PROCEEDINGS

1          **THE COURT:**  Yeah, just put it in writing.

2     All right.   Thank you.

3          **MR. HABERMAN:**  Thank you, Your Honor.

4          **MR. STEKLOFF:**  Nice to see you.   Thank you,

5     Your Honor.

6          **THE COURTROOM DEPUTY:**  Court is adjourned.

7       (Proceedings concluded)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## <u>I N D E X</u>

Monday, September 11, 2023 - Volume 1

| <u>PLAINTIFF'S WITNESSES</u> | <u>PAGE</u> | <u>VOL.</u> |
|---|---|---|
| **<u>CHARLES, PH.D., AMBROSE</u>** | | |
| (SWORN) | 11 | 1 |
| Direct Examination by Mr. Haberman | 12 | 1 |
| Cross-Examination by Mr. Stekloff | 66 | 1 |
| Redirect Examination by Mr. Haberman | 96 | 1 |
| Recross-Examination by Mr. Stekloff | 125 | 1 |
| Further Redirect Examination by Mr. Haberman | 154 | 1 |
| Further Recross-Examination by Mr. Stekloff | 168 | 1 |

## <u>E X H I B I T S</u>

| <u>EXHIBITS</u> | <u>IDEN</u> | <u>EVID</u> | <u>VOL.</u> |
|---|---|---|---|
| 1 | | 105 | 1 |
| 2 | | 124 | 1 |
| 4 | | 110 | 1 |
| 5 | | 105 | 1 |
| 7 | | 105 | 1 |
| 12 | | 105 | 1 |

CERTIFICATE OF REPORTER

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____/s/ Belle Ball_____

Belle Ball, CSR 8785, CRR, RDR

Tuesday, September 12, 2023