**WILKINSON STEKLOFF LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonstekloff.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonstekloff.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel:     202-847-4030
Fax:    202-847-4005

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel: (202) 898-5843
Fax: (202) 682-1639

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (pro hac vice)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

**BRYAN CAVE LEIGHTON PAISNER LLP**
K. Lee Marshall (CA Bar No. 277092)
(klmarshall@bclplaw.com)
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Tel: 415-675-3400
Fax: 415-675-3434

Jed P. White (CA Bar No. 232339)
(jed.white@bclplaw.com)
120 Broadway, Suite 300
Santa Monica, CA 90401
Tel: 310-576-2100
Fax: 310 -576-2200

*Attorneys for Defendant Monsanto Company*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | ) ) ) ) MDL No. 2741 <br><br> Case No. 3:16-md-02741-VC |
| *Engilis v. Monsanto Company,* 3:19-cv-07859-VC | ) ) ) ) ) ) ) ) ) ) ) ) **DEFENDANT MONSANTO COMPANY'S POST-DAUBERT HEARING BRIEF REGARDING AMBROSE K. CHARLES, PH.D.** |

## INTRODUCTION

Following a *Daubert* hearing on September 11, 2023, the Court granted Defendant Monsanto's motion to exclude Dr. Ambrose K. Charles's general causation opinions, but reserved judgment on Dr. Charles's specific causation opinion that "Roundup is the one, that extra factor that is standing out that **may have contributed**" to Plaintiff Peter Engilis's NHL.  Hr'g Tr. at 45:10–11 (emphasis added).  Dr. Charles's *Daubert* testimony confirmed that he is unqualified to opine on whether glyphosate exposure caused Mr. Engilis's NHL.  The testimony also made clear that Dr. Charles's specific causation opinion is inextricably intertwined with his flawed review of the epidemiology and is not based on a reliable methodology.  It is fundamental to any *Daubert* analysis to assess whether an expert's methodology and opinions are reliable and would aid the jury.  After hours of testimony, it is unclear what methodology Dr. Charles even utilized and thus his opinion is neither reliable nor helpful to a jury.  Dr. Charles should be precluded from offering any specific causation opinions in this matter.[1]

## ARGUMENT

### I.  Dr. Charles Is Not Qualified To Interpret Epidemiological Data.

Dr. Charles is unqualified to opine on whether Roundup caused Mr. Engilis's NHL, or to evaluate epidemiological data.  Dr. Charles is not a medical doctor, and he has never diagnosed or treated NHL—or any medical risk factor for NHL—in the real world. Id. at 125:22–126:21.  Dr. Charles also is not an epidemiologist.  *Id.* at 69:4–11.  He has no formal epidemiological training; indeed, he has not taken a single course on epidemiology.  *Id.*  And when pressed by Plaintiff's counsel, Dr. Charles could not identify any instance in his professional career where he had reviewed epidemiological data or papers.  Instead, he pointed to a time during retirement when a friend informally asked him to comment on schoolchildren's chemical exposure on a golf course "or something like that." *Id.* at 30:24–31:13; *see also id.* at 31:25–32:9 (never reviewed epidemiological data while working for New York State); *id.* at 32:21–33:4 (did not use epidemiological data on a

---

[1] The applicable legal standard is set out in Monsanto's original Motion to Exclude, ECF No. 15888 at 4–5 (11/30/2022).  Monsanto incorporates by reference the specific causation arguments set forth in that motion.

"daily routine basis" while working for Texas State but "spent time in the library").  For all these reasons, it is unsurprising that Dr. Charles was unable to and did not assess the methodology, quality, or limitations of any of the epidemiological studies on which he purports to rely.  *Id.* at 69:12–19.

## II.  Dr. Charles's Specific Causation Opinion Is Based On His Superficial And Incomplete Assessment Of Epidemiological Data.

Dr. Charles nevertheless conceded that his "assessment of the epidemiology [studies] informed everything [he] did in assessing Mr. Engilis." *Id.* at 96:6–9.  That assessment does not come close to satisfying Rule 702 because it is riddled with errors, demonstrates Dr. Charles's unfamiliarity with the studies he purports to assess, and fails to grapple with contrary data that does not support the conclusion he sought to reach on specific causation.

### A.  Dr. Charles misunderstands the epidemiological data that undergirds his specific causation opinion.

Dr. Charles's methodology was to conduct a toxicological examination allegedly consistent with those he made while working for state regulatory agencies and also, according to him, consistent with the EPA's approach to toxicological assessments.  *Id.* at 28:22–29:8; 106:13–25.  It remains entirely unclear how he conducted such an examination, but in a generous attempt to summarize his approach, at the outset, it appears he attempted to count the number of 8-hour days that Mr. Engilis used Roundup and compare those exposure days to exposure thresholds set forth in two epidemiological studies:  McDuffie and Eriksson.  *See id.* at 71:1–10; *id.* at 71:19–23 (specific causation opinion based on two-day threshold from McDuffie).  During the hearing, Dr. Charles insisted (incorrectly) that the McDuffie and Eriksson data is adjusted for other pesticide use.  *Id.* at 71:11–15.  He readily agreed that the data would be less reliable and less informative for his assessment of Mr. Engilis if that data were unadjusted (as it is).  *Id.* at 68:15–18 (agreeing that "it's important to look at data that is controlled or adjusted for other pesticides"); *id.* at 69:1–3 (agreeing that McDuffie's and Eriksson's import would be "minimize[d]" if not adjusted); *id.* at 72:2–9 (acknowledging that his opinion that McDuffie and Eriksson are adjusted is "important to [his] specific causation opinion").  That Dr. Charles is unaware of the basic limitations of McDuffie and Eriksson renders him unable to defend his reliance on those benchmarks.  And Dr. Charles's

MONSANTO COMPANY'S POST-DAUBERT HEARING BRIEF REGARDING AMBROSE K. CHARLES, PH.D.

confusion is not limited to the issue of pesticide adjustment.  *See, e.g.*, *id.* at 73:9–12 (Dr. Charles

saying he is unaware whether Pahwa, a pooled analysis, incorporates data from McDuffie (it does));

*id.* at 58:24–59:19 (confusing the thresholds from Pahwa); *id.* 62:15–22 (unable to answer Plaintiff's

counsel's questions about a study because "I don't have the number of days in my notes [on the stand],

written").  His incorrect and superficial understanding of basic epidemiological points means that any

testimony he offers on the studies is likely to confuse the jury.[2]

### B.       Dr. Charles ignores contradictory data.

Dr. Charles agreed—in the abstract—"that it's important to consider all of the data in a[n

epidemiological] study."  *Id.* at 68:10–14.  But when confronted with inconsistencies between the

epidemiological studies on which he relies and his specific causation opinion, Dr. Charles shared his

view that *any* positive association in the epidemiological literature means he can ignore all datapoints

showing no association or no statistically significant association between glyphosate use and NHL.

*Id.* at 151:19–152:3; 153:13–24.  Consequently, Dr. Charles does not account for data showing, for

example, no increased risk of developing NHL for people like Mr. Engilis who use glyphosate for

more than 3.5 years.  *Id.* at 77:12–79:18; *see also id.* at 82:8–14 ("no explanation" for Pahwa data

showing no statistically significant risk associated with 5 or more days of use per year).  The same is

true for data within Pahwa that shows no statistically increased risk associated with users who sprayed

Roundup for more than 7 lifetime days.  *Id.* at 89:16–19; 144:23–146:1.  Dr. Charles's blinders to any

data that undermines his preordained view—even when contained within a study upon which he relies

and that is adjusted for other pesticides (Pahwa)— renders his opinion unreliable and inadequate for

presentation to the jury.  *See Claar v. Burlington N. R.R.*, 29 F.3d 499, 502–03 (9th Cir. 1994)

("Coming to a firm conclusion first and then doing research to support it is the antithesis of [the

scientific] method."); *In re Zoloft Prods. Liab. Litig.*, 858 F.3d 787, 796–800 (3d Cir. 2017)

---

[2] Nor should Dr. Charles be permitted to offer the scientifically unsound opinion—first disclosed during the hearing—that using Roundup doubles a person's risk of developing NHL.  *See* Pretrial Order No. 85 in *In re Roundup Prods., Liab. Lit.*, 3:16-md-02741-VC, ECF No. 2799 at 7 (N.D. Cal. Feb. 24, 2019) ("Dr. Nabhan may not testify that the McDuffie and Eriksson studies stand for the proposition that if someone uses Roundup more than two days per year or more than ten days in their lifetime, their risk of developing NHL doubles.").

(excluding "inconsistent" and "conclusion-driven" analysis).

## III.   Dr. Charles's Exposure Arithmetic Is Unreliable And Would Not Assist The Jury.

Dr. Charles admitted during the hearing that the exposure-day calculation in his report relies on erroneous and worst-case-scenario inputs.  *See* Hr'g Tr. at 135:15–23; 140:14–24; 169:3–22. Beyond that, Dr. Charles's testimony made clear that he is incapable of coherently explaining how he went about calculating Mr. Engilis's exposure days.  During the course of the hearing, Dr. Charles offered three wildly different lifetime exposure hours calculations:  **<u>1,272 hours</u>** (*id.* at 131:18– 132:10), **<u>1,032 hours</u>** (*id.* at 141:21–24), and **<u>375 hours</u>** (*id.* at 118:11–15).  *See also id.* at 142:13– 20 (different exposure hours figures based on different methodologies, none of which is used by epidemiologists).  Dr. Charles admitted that the 1,272-hour estimate was improperly inflated because he had multiplied Dr. Charles's alleged annual usage by the incorrect number of years (53 years).  *Id.* at 168:12–22.  Though, when asked by the Court why this number was inflated, he could not accurately explain why.  As for the other two exposure-hour figures, Dr. Charles was unwilling to say which is more reliable or accurate, instead just calling them two different approaches.  Nor was he able to coherently explain how his methodology differed from standard epidemiological methodologies, *id.* at 160:10–163:1, or how the methodology he presented for the first time during the hearing differed from the methodology used in his report, *id.* at 163:2–167:22, except that it was an "additive" approach, *id.* at 165:18–20.  These exchanges demonstrate that Dr. Charles has no reliable framework for calculating Mr. Engilis's exposure days and that any effort to explain his calculations to the jury would be impossible to follow.

## IV.   Dr. Charles Employed Unscientific Research Methods That Courts Routinely Reject.

Dr. Charles did not utilize reliable methods or sources for the alleged elimination of other risk factors on which his specific causation opinion is based.  Two examples illustrate the point.  First, to identify potential risk factors for NHL, Dr. Charles did not rely on any medical training or background (he has none), or on medical textbooks or literature.  Instead, he "basically did what [he] would do as a non-medical expert" and "just did a Google search and found a website [the Mayo Clinic]."  *Id.* at 148:7–10.  This is precisely the type of "research" that even *Plaintiff* has recognized as warranting exclusion of an expert's opinions.  *See* Plaintiff's Motion for Reconsideration of the Court's Daubert

Order Excluding the Testimony of Andrew Schneider, M.D., ECF No. 17018 at 9 (7/21/2023) ("The relevant case law cited by Monsanto all stands for the proposition that an expert should not rely on Google for the substance of the expert's opinion.").

And second, in purporting to evaluate whether Mr. Engilis had any other potential chemical exposures that could have contributed to his NHL, Dr. Charles simply lifted the list of chemicals identified in the Plaintiff Fact Sheet, a litigation document.  Hr'g Tr. at 146:14–20.  Copying and pasting litigation materials plainly is not a reliable methodology for determining what other exposures could have contributed to Mr. Engilis's NHL.

## **CONCLUSION**

For the foregoing reasons and those set out in Defendant's Motion to Exclude, ECF No. 15888, the Court should exclude the specific causation opinions of Dr. Charles and preclude Dr. Charles from testifying in this matter.

Dated: September 15, 2023                         Respectfully submitted,

                                                  */s/ Brian L. Stekloff*_____
                                                  Brian L. Stekloff
                                                  *Attorneys for Defendant Monsanto Company*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 15th day of September 2023, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

*/s/ Brian L. Stekloff*
Brian L. Stekloff

MONSANTO COMPANY'S POST-DAUBERT HEARING BRIEF REGARDING AMBROSE K. CHARLES, PH.D.