**SCHLESINGER LAW OFFICES, P.A.**
Jeffrey L. Haberman
Sarah J. Schultz
1212 Southeast Third Avenue
Fort Lauderdale, FL 33316
Telephone: (954) 467-8800
Facsimile: (954) 320-9509
jhaberman@schlesingerlaw.com
sarah@schlesingerlaw.com

*Attorneys for Plaintiff, Peter Engilis*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No: 2741 |
| | Case No.: 3:16-md-02741-VC |
| Peter Engilis, Jr., *et al.*, | PLAINTIFFS' POST-DAUBERT HEARING BRIEF REGARDING AMBROSE K. CHARLES, PH.D. |
| Plaintiff, | |
| vs. | |
| Monsanto Company, | |
| Defendant. | |
| Individual Case No.: 3:19-cv-07859-VC | |

Dr. Charles's specific causation opinions are based on a sound methodology. He went through the risk factors of NHL and methodically explained why Mr. Engilis's Roundup exposure was the most likely cause. Dr. Charles did what this Court has found acceptable in other cases.

At the *Daubert* hearing which took place on September 11, 2023, the Court excluded Dr. Ambrose Charles's general causation opinions. *See* 9/11/2023 Evidentiary Hrg. Tr., at 100:16–19 (Doc. 56). Dr. Charles was then examined on his specific causation opinions and methodology. At the end of the hearing, the Court permitted the parties to each file "a five-page supplemental brief on Dr. Charles, *limited to the issue of specific causation*." *Id.* at 173:16–18 (emphasis added). Monsanto's motion goes beyond the narrow issue the Court is focused on. Monsanto's supplemental briefing largely rehashes its arguments on Dr. Charles's general causation opinions because, in Monsanto's opinion, "Dr. Charles's specific causation opinion is inextricably intertwined with his flawed review of the epidemiology" in reaching his general causation opinions. (Doc. 58, at 2). But that's not right. Roundup is a risk factor because the Court has concluded Plaintiff's other general causation experts may say it is. And the Court should reject Monsanto's attempt to blend the issues.

At the *Daubert* hearing, Dr. Charles solidified his qualifications. He testified to his 50+ years of experience in medical toxicology. He went through how much Roundup Mr. Engilis was exposed to, and then systemically ruled out all other potential causes, including any past family history of NHL, other related medical condition, and exposure to other potential chemicals and toxins. After ruling out all other potential causes, Dr. Charles concluded that glyphosate exposure was Mr. Engilis's only risk factor and was, therefore, a cause or substantially contributed to causing Mr. Engilis's NHL. This testimony would certainly assist a jury. Because this is all that is required to withstand *Daubert*, Dr. Charles's specific causation opinion cannot be excluded.

**I.    Dr. Charles Is Sufficiently Qualified to Conduct a Differential Diagnosis and Offer His Specific Causation Opinions.**

Monsanto first argues in its supplemental briefing that Dr. Charles is not qualified to interpret or "evaluate epidemiological data." (Doc. 58, at 2). But this argument improperly shifts the focus back to Dr. Charles's general causation opinions. With respect to Dr. Charles's specific causation opinions, what matters is whether Dr. Charles possesses the requisite "knowledge, skill, experience,

training, or education" to conduct a differential diagnosis in the manner that he did in this case. Fed. R. Evid. 702.

As Dr. Charles testified, he holds a master's degree in biochemistry and a Ph.D. in medical biochemistry. (Doc. 56, Evidentiary Hrg. Tr., 33:8–12). He worked as a toxicologist for the Texas Department of Agriculture for more than twenty (20) years, where he was directly responsible for evaluating exposures to pesticides and the risk associated with said exposure. *Id.* at 18:3–16; 19:25–20:6. Dr. Charles testified that he also conducted case investigations in which his department would evaluate reported incidents by going out to the site where the exposure occurred, investigating usage/ spraying/exposure, interviewing exposed individuals, and even collecting the medical records of exposed individuals who were hospitalized. *Id.* at 24:5–25:3. Once this information was collected, Dr. Charles himself would review the investigations, interviews, and medical records and "give [his] medical and toxicolog[ic] opinion on th[e] case." *Id.* at 25:4–9.

That is precisely what Dr. Charles has done here in reaching his specific causation opinions. Accordingly, Dr. Charles is well-qualified—through his knowledge, experience, and training—to conduct a toxicologic differential diagnosis and give his opinion as to the most likely cause of Mr. Engilis's NHL.[1]

## II. Dr. Charles's Specific Causation Opinions are Based Upon the Well-Accepted Differential Diagnosis Methodology.

The Ninth Circuit (and many others) have held that the "[d]ifferential diagnosis is a common scientific technique, and federal courts, generally speaking, have recognized that a properly conducted differential diagnosis is admissible under *Daubert*." *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1057 (9th Cir. 2003). That is exact methodology Dr. Charles employed in this case.

To begin, Dr. Charles considered Mr. Engilis's history of Roundup use, including the mode in which he applied Roundup, the frequency and duration of use, the potential routes of exposure, the type of clothing he wore while spraying Roundup, and whether he wore any personal protective

---

[1] Monsanto ignores all of this pertinent knowledge, experience, and training, and focuses solely on Dr. Charles's review of the epidemiology. In doing so, Monsanto argues that, at the *Daubert* hearing, "Dr. Charles could not identify any instance in his professional career where he had reviewed epidemiological data or papers," and instead, could point only "to a time during retirement when a friend informally asked him to comment on schoolchildren's chemical exposure on a golf course." (Doc. 58, at 2). It is worth noting that this is patently incorrect. Dr. Charles testified that although he did not have to review epidemiological data on a daily basis while working at the Texas Department of Agriculture, he did read and "review scientific papers." (Doc. 56, Evidentiary Hrg. Tr., at 32:21–33:4).

2
PLAINTIFFS' POST-DAUBERT HEARING BRIEF REGARDING AMBROSE CHARLES, PH.D.

equipment in "ruling-in" Roundup as a potential cause of Mr. Engilis's NHL.  (Doc. 56, Evidentiary Hrg. Tr., at 107:20–108:15).  Using this information—which was all gleaned from sworn testimony provided by Mr. Engilis—Dr. Charles calculated how much Roundup Mr. Engilis was exposed to over the course of time he used Roundup.  *Id.* at 108:16–18; 109:19–110:1.

First, Dr. Charles calculated the total number of hours Mr. Engilis sprayed Roundup at his three (3) residences—the DeBary, FL residence, the Fort Lauderdale residence, and the Summerfield, FL residence. *Id.* at 110:13–17.  To calculate the total number of hours Mr. Engilis sprayed Roundup, Dr. Charles added together all of the minutes and/or hours Mr. Engilis sprayed Roundup at his three residences, which amounted to a total of 375 hours of Roundup usage.  *Id.* at 116:19–118:15.  With this, Dr. Charles was able to calculate the amount of "lifetime days" Mr. Engilis sprayed Roundup. *Id.* at 118:24–119:7 (explaining that lifetime days are calculated by multiplying the total hours by eight).  Through Dr. Charles's conversion from total hours to lifetime days—i.e., 375 divided by 8— he concluded that Mr. Engilis had sprayed Roundup for a total of 47 lifetime days.  *Id.* at 119:8–10.  As Dr. Charles's testified, 47 lifetime days is nearly four (4) times the statistically significant lifetime days recorded in the *Eriksson* study.  *Id.* at 119:11–16.  As a result, Dr. Charles was able to rule in Roundup (or glyphosate exposure) as a potential cause of Mr. Engilis's NHL. *See id.* at 120:1–3 ("Q. [U]sing Roundup 47 lifetime days, does that put you at risk for getting [NHL]?  A. Yes, it can, compared to the data – literature.").  Monsanto takes no issue with the accuracy of these numbers, which is the most conservative approach.

After ruling in glyphosate as a potential cause of Mr. Engilis's NHL, Dr. Charles then considered other potential confounding or causative factors that could cause or contribute to causing NHL, including other potential chemical or toxic exposures, Mr. Engilis's family and medical history, and other medical conditions associated with NHL. *Id.* at 108:19–109:5; 120:4–121:4.  Because Mr. Engilis had no family history of NHL, no other medical conditions related to or associated with NHL, and no other potential chemical or toxic exposures, Dr. Charles was able to rule out every other contributor or potential cause of Mr. Engilis's NHL. *Id.* at 121:2–123:16; 124:14–24. Consequently, all that remained as a potential cause was Mr. Engilis's Roundup use. *Id.* at 125:4–14.  This is the classic differential diagnosis methodology hat has been held reliable time and again.

Indeed, this Court has previously accepted virtually identical testimony from prior specific causation experts offered by plaintiffs in the Roundup litigation. For example, in 2019, Roundup MDL plaintiffs offered Dr. Andrei Shustov to opine only on specific causation. *In re Roundup Prods. Liab. Litig.*, No. 3:16-md-02741-VC, Doc. 2635 (N.D. Cal. Feb. 1, 2019) (Transcript of *Daubert* Proceedings held on January 28, 2019). At the *Daubert* hearing, Dr. Shustov testified that, after ruling in Roundup exposure, he was able to rule out various other risk factors, including the plaintiff's family history of NHL, other potential medical conditions or diseases, and other industrial toxicins/pesticides/known carcinogens—the same risk factors considered and ruled out by Dr. Charles. (Doc. 2635, Shustov Hearing Tr., at 122:5–126:15). Following the *Daubert* hearing of Dr. Shustov, this Court denied Monsanto's motion to exclude Dr. Shustov's specific causation opinions. *In re Roundup Prods. Liab. Litig.*, No. 3:16-cv-06046-VC, Doc. 146 (N.D. Cal. Jan. 22, 2020) (Pretrial Order No. 203: Order Denying Motion to Exclude Dr. Shustov in Wave 1 Cases).

### III. **Defendant's Criticisms of Dr. Charles Affect the Weight to be Afforded by a Jury, Not Admissibility.**

Defendant's primary argument as to Dr. Charles's methodology is that his specific causation opinions should be excluded because they necessarily build upon his excluded general causation opinions. (Doc. 58, at 3–4). The Court has rejected this kind of argument. In prior rulings the Court has explained: "[t]he plaintiffs' specific causation experts use a "differential diagnosis" as the basis for their opinion that exposure to glyphosate caused these plaintiffs' NHL. . . The Ninth Circuit has repeatedly approved the use of a differential diagnosis under *Daubert*, provided, of course, that it is applied reliably." *In re Roundup Prods. Liab. Litig.*, 358 F. Supp. 3d 956, 957 (N.D. Cal. 2019) *Id.* at 957–58. When "ruling-in" a cause that is generally capable of causing the disease, this Court held:

> As this Court has previously ruled, the specific causation experts are permitted to build from the plaintiffs' admissible general causation opinions. And the admissible general causation opinions grappled with the full body of evidence. ***Thus, it does not matter that the specific causation experts mentioned only a subset of the epidemiological studies in their reports; at trial, their basis for ruling in glyphosate will be the general causation opinions***.

*Id.* at 958 (emphasis added); *see also id.* at 959 ("The specific causation experts cite De Roos as well, but, again, the important point is that these experts will not be repeating the analysis of the general causation experts, but rather relying on them to rule in glyphosate.").

Monsanto further complains that "Dr. Charles ignores contradictory data." (Doc. 58, at 4). However, "the decision to rely on certain studies rather than others" goes to the weight, not admissibility. *Gloser v. Thompson Medical Co., Inc.,* 32 F.3d 969, 975 (6th Cir. 1994); *BC Technical, Inc. v. Ensil Intern. Corp.*, 464 Fed. Appx. 689, 704 (10th Cir. 2012) (affirming admission of expert testimony and explaining that the proper course is for the opposing party to exploit the expert's omission of data in his analysis "by presenting evidence contrary to [the expert's] assumptions and through cross examination."); *Raytheon Aircraft Co. v. United States*, 2008 WL 627488, at *2 (D. Kan. Mar. 4, 2008) (declining to exclude expert testimony based on allegations of cherry-picking data and finding that "discounting of that evidence does not affect the admissibility of [the] testimony.").

Monsanto also takes issue with the list of chemicals identified by Dr. Charles in his report, arguing that he "simply lifted" it from the Plaintiff Fact Sheet ("PFS") that was required to be completed by all plaintiffs in the MDL. (Doc. 58, at 5). This argument makes little, if any, sense. If the list of chemicals identified on the PFS was not relevant or reasonably connected to causing NHL, why was it required to be completed by plaintiffs? Surely, had Mr. Engilis been exposed to any number of the chemicals identified in the PFS, Monsanto would argue that Mr. Engilis's exposure to that chemical (rather than glyphosate) caused or contributed to causing his development of NHL.

Lastly, Monsanto attempts to couch Dr. Charles's methodology as a mere "Google search" in an effort to lure the Court into categorically excluding Dr. Charles's opinions simply because the Court has already made a similar ruling in this case. (Doc. 58, at 4). But Dr. Charles made clear that he did not simply perform a "Google search" and copy/paste the potential risk factors for NHL from Google. To the contrary, Dr. Charles testified that he compiled the list of potential risk facts from the Mayo Clinic website and the MD Anderson Cancer Center website—both of which are leading cancer hospitals in the United States. (Doc. 56, Hrg. Tr., at 147:24–25; 148:15–20). Dr. Charles further explained that he "verified [the list of potential risk factors] with some other publications" and from the American Cancer Society. *Id.* at 120:21–121:1 ("Q... [H]ow did you come to know that these other medical conditions may be associated with [NHL]? A. It's in the literature, American Cancer Society literature."). Thus, Monsanto's "Google search" argument is nothing more than a red herring.

For the foregoing reasons, the Court should deny Monsanto's motion, and permit the specific causation opinions of Dr. Charles to proceed to a jury.

DATED:  September 20, 2023

Respectfully submitted,

/s/ Jeffrey L. Haberman
JEFFREY L. HABERMAN (*pro hac vice*)
**SCHLESINGER LAW OFFICES, P.A.**

*Attorneys for Plaintiff, Peter Engilis*

## CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2023, I served a copy of the foregoing on the Clerk of Court by CM/ECF, which will provide automatic notification to all parties and counsel of record.

By: /s/ Jeffrey L. Haberman
Jeffrey L. Haberman