Pages 1 - 80

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE VINCE CHHABRIA, JUDGE

IN RE ROUNDUP PRODUCTS LIABILITY       )
LITIGATION.                            ) NO. 16-md-02741-VC
_____)
                                       )
PETER ENGILIS, JR., et al.,            )
                                       )
            Plaintiffs,                )
   VS.                                 ) NO. 19-cv-07859-VC
                                       )
MONSANTO COMPANY,                      )
                                       )
            Defendant.                 )
_____)
                                        San Francisco, California
                                        Wednesday, September 20, 2023

### TRANSCRIPT OF EVIDENTIARY HEARING PROCEEDINGS

**APPEARANCES**:

For Plaintiffs:
                    SCHLESINGER LAW OFFICES, P.A.
                    1212 Southeast Third Avenue
                    Fort Lauderdale, Florida  33316
              BY:   **JEFFREY L. HABERMAN, ESQ.**

For Defendant:
                    ARNOLD & PORTER KAYE SCHOLER LLP
                    250 West 55th Street
                    New York, New York  10019-9710
              BY:   **JULIE B. duPONT, ESQ.**

                    ARNOLD & PORTER KAYE SCHOLER LLP
                    777 South Figueroa Street
                    44th Floor
                    Los Angeles, California  90017
              BY:   **KATHRYN M. PODSIADLO, ESQ.**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
                    Official Reporter, U.S. District Court

PROCEEDINGS

1    **Wednesday, September 20, 2023**                    **9:09 a.m.**

2                    P R O C E E D I N G S

3         **THE COURTROOM DEPUTY:**  Now calling Civil Case

4    16-MD-2741, In Re Roundup Product Liability Litigation, and

5    19-7859, Engilis, Jr., et al. versus Monsanto Company.

6         Counsel, come forward and state your appearances, starting

7    with plaintiff.

8         **MR. HABERMAN:**  Good morning, Your Honor.  Jeffrey

9    Haberman from Schlesinger Law Offices on behalf of plaintiffs.

10        **THE COURT:**  Good morning.

11        **MS. duPONT:**  Julie duPont from Arnold & Porter, and

12   joined by Katherine Podsiadlo, for Monsanto.

13        **THE COURT:**  Hi.  All right.  So we are here for a

14   *Daubert* hearing regarding Dr. Schneider.

15        A couple quick things.  First of all, as you can see, we

16   have the Zoom cameras on.  And we're proposing to record the --

17   have a video recording of the hearing so that people can use it

18   in the future.  Everybody okay with that?

19        **MR. HABERMAN:**  Yes, Your Honor.

20        **MS. duPONT:**  Yes, Your Honor.

21        **THE COURT:**  Okay.  Second of all, before Dr. Schneider

22   takes the stand, I want to reiterate that I'm granting the

23   motion for reconsideration, but only to the extent that you are

24   seeking to offer an opinion on specific causation.

25        I will say, Dr. Schneider, to you, the ruling that I

1   issued previously excluding your testimony was not -- I did not

2   give -- I did not give you fair treatment, and I apologize for

3   that.

4            THE WITNESS:  Thank you.

5            THE COURT:  And I will be vacating that ruling and

6   issuing a new ruling, explaining why I'm excluding your opinion

7   on general causation in a more -- you know, in a more careful

8   way.  And then I'll also rule on whether you can offer your

9   opinion on specific causation.

10       But, I do apologize for giving your opinion short shrift

11   in that ruling.

12            THE WITNESS:  No problem.  Thank you, sir.

13            THE COURT:  But I assume we're clear that it's -- you

14   know, we're not going to hear a bunch of testimony about

15   general causation today, because I've firmly decided that the

16   opinion on general causation is excluded.

17            MR. HABERMAN:  That's right.

18            THE COURT:  Okay.  So it we can -- unless the lawyers

19   have anything else, we can -- we can proceed.

20            MS. duPONT:  Nothing further here.

21            THE COURT:  Okay.

22            MR. HABERMAN:  Your Honor, may Dr. Schneider take a

23   binder up with him?

24            THE COURT:  Absolutely.

25            MR. HABERMAN:  Okay.

1          **MS. duPONT:**  And Your Honor, I will also have a

2     binder.  Do you want him to just take both up now, or do you

3     want me to wait?

4          **THE COURT:**  Sure.

5        (Binder tendered to the Witness)

6          **THE WITNESS:**  Thank you.

7          **DR. ANDREW SCHNEIDER, PLAINTIFF'S WITNESS, SWORN**

8          **THE WITNESS:**  I do.

9          **THE COURTROOM DEPUTY:**  Thank you.  Please be seated,

10    and state and spell your full name for the record.

11         **THE WITNESS:**  Sure.  My name is Andrew Schneider.

12    S-C-H-N-E-I-D-E-R.

13         **MR. HABERMAN:**  May I proceed?

14         **THE COURT:**  Go ahead.

15                     **DIRECT EXAMINATION**

16    BY MR. HABERMAN

17    **Q**    Good morning, Dr. Schneider.  How are you today?

18    **A**    I'm well, thank you.

19    **Q**    Please introduce yourself to the Court.

20    **A**    Sure.  My name is Dr. Andy Schneider, or Andrew Schneider;

21    I'm a board-certified medical oncologist.  I have been

22    practicing in the same practice in south Florida for 34 years.

23    I'm also board-certified in internal medicine and hospice and

24    palliative care.

25    **Q**    Are you a clinician?

**SCHNEIDER - DIRECT / HABERMAN**

1    **A**    I am a clinician for the past 34 years, yes.

2    **Q**    And just describe, generally, please, your practice.

3    **A**    We have a hematology oncology practice.  It's about

4    65 percent oncology, which includes diseases like lymphoma and

5    about 35 percent basic hematology.

6         We see lymphoma patients with many different diseases.

7    Common diseases occur commonly, so we see lung cancer, breast

8    cancer, colon cancer and lymphomas.

9         Lymphoma, as you know, is not one disease, but it's many

10   diseases.  And we see all types of lymphoma.

11   **Q**    Can you give us a sense of how many patients you treat, a

12   week?

13   **A**    Sure.  I would say maybe a hundred.

14   **Q**    And do you treat patients with NHL, for their NHL?

15   **A**    Absolutely.  It's a common problem that we see all the

16   time.

17   **Q**    And are you an expert, do you consider yourself to be an

18   expert in treating Non-Hodgkin lymphoma?

19   **A**    Absolutely, yes.

20   **Q**    And what about CLL?  Are you an expert in treating or

21   diagnosing CLL?

22   **A**    Yeah.  CLL is a type of NHL.  It's actually a very common

23   type.  And I am, indeed, an expert in treating it.  And I see

24   it all the time.

25   **Q**    I think you mentioned this before, but how many years have

**SCHNEIDER - DIRECT / HABERMAN**

1    you been in practice?

2    **A**    Thirty-four years.

3    **Q**    And in your three-plus decades of treating Non-Hodgkin's

4    lymphoma and CLL, can you give the Court a sense of how many

5    CLL cases, patients, you've treated over this span of time?

6    **A**    I'm sure -- including my training at Memorial Sloan

7    Kettering Cancer Center, I'm sure I've seen a thousand CLL

8    patients.

9    **Q**    Are there certain risk factors that are associated with

10   Non-Hodgkin lymphoma?

11   **A**    Absolutely yes.

12   **Q**    And are there certain risk factors that are associated

13   with CLL?

14   **A**    Yes.

15   **Q**    Before your involvement in Roundup litigation, were you

16   knowledgeable and an expert in knowing the risk factors that

17   are associated with non-Hodgkin's lymphoma and CLL?

18   **A**    Oh, yes; as part of my board certification, it includes

19   epidemiology, so I did have an understanding of what causes

20   lymphoma.  When I started assisting in the Roundup lawsuits, I

21   learned more.

22   **Q**    And you heard the Court's instruction with regard to

23   general causation, specific causation.  So only focusing on

24   specific causation, what was your task in this case?

25   **A**    My task was to give an opinion, to a reasonable degree of

1    medical certainty, whether the plaintiff's CLL was caused by

2    Roundup.

3        In order to do that, I reviewed his medical records,

4    years' worth of records.  I reviewed deposition testimony of

5    him and his wife.  I reviewed the epidemiologic literature.  I

6    reviewed your general causation expert's opinions, via some

7    published articles.

8        And then I was able to do a differential diagnosis;

9    decide, based upon his specific history, what risk factors he

10   had for the development of CLL; and then give an opinion.

11   **Q**    And Doctor, after doing all that, were you able to come to

12   an opinion within a reasonable degree of medical certainty of

13   -- well, let me just ask.

14       Were you able to come to an opinion within a reasonable

15   degree of medical certainty?

16   **A**    I was.  Do you want me to tell you why, or wait?

17   **Q**    Yeah, and -- so you were able to.  And, what is that

18   opinion?

19   **A**    It's my opinion to a reasonable degree of medical

20   certainty that his 24-year or 25-year exposure to Roundup was

21   an etiologic reason why he developed CLL.

22       I did that by looking at his medical history; ruling out

23   other causes of CLL, such as autoimmune diseases,

24   immunosuppressive diseases or drugs, other occupational

25   exposures to things like benzene, toluene or hair dye,

1   cigarette smoking, which, he was not a cigarette smoker.  A

2   history of Hodgkin's disease, which he didn't have.  A family

3   history of lymphoma, which he didn't have.

4        So, I looked at all the known etiologic risk factors for

5   CLL.  And what I was left with is that he had a significant

6   exposure to Roundup.  And relying, after reviewing the

7   articles, at least six of them -- which I can quote if you

8   want -- I looked at the data.  And to the best of my ability,

9   agreed, and I adopt the opinions of the general causation

10  experts that Roundup causes NHL, and specifically in this case,

11  CLL.

12  **Q**    Okay.  So that was a pretty good synopsis of where I

13  wanted to go, but I want to break that down a little bit to

14  make sure that I cover my bases here.

15  **A**    Sure.

16  **Q**    You mentioned a differential diagnosis.  Just -- I know

17  the Court knows this, too, but just for the record, what is a

18  differential diagnosis?

19  **A**    So you look at possible causes for a specific illness or a

20  specific problem.  There can be more than one in some

21  circumstances.  So we go through, in medicine, a list of what

22  could have contributed to either a disease or differential of

23  diseases, itself, and form an educated opinion as to what

24  happened.

25  **Q**    Have you been doing differential diagnoses for the last

**SCHNEIDER - DIRECT / HABERMAN**

1    30-some-odd years?

2    **A**    Of course.   That's generic and germane to my job as a

3    doctor.

4    **Q**    And did you do that here?

5    **A**    Of course.

6    **Q**    Did you apply the same kind of rigor in this case as you

7    do in your everyday job as a treating clinical oncologist?

8    **A**    Absolutely.   I take all my jobs seriously.

9    **Q**    Okay.   Okay.   So you mentioned risk factors.   Can you tell

10   us, please, what the risk factors are that are associated with

11   NHL and CLL?

12   **A**    Sure.   As I said before, so, people who have autoimmune

13   diseases like Crohn's disease, for example, or --

14   **Q**    Before I ask that, in this case, did you -- were you able

15   to get a history, a family history or a social history of

16   Mr. Engilis?

17   **A**    Yes.   The record did have that information.   And there was

18   no family history of lymphoma.

19   **Q**    Okay.   How did you go about, in this case, collecting a

20   family history or social history of Mr. Engilis?

21        What materials did you review to come to that?

22   **A**    It's well-documented in multiple H&Ps.   As part of any

23   original -- initial H&P, all doctors do a family history, a

24   social history, a review of system, so there is a standard way

25   of writing.   And I reviewed those documents.

**SCHNEIDER - DIRECT / HABERMAN**

1  **Q**    Did you get that from the medical records?

2  **A**    Yes.

3  **Q**    How about his deposition testimony?

4  **A**    Absolutely.  We also heard in his deposition testimony,

5  correct.

6  **Q**    Okay.  So going back now to risk factors, you just

7  mentioned autoimmune diseases.  What autoimmune diseases are

8  associated with NHL or CLL?

9  **A**    So we're talking about Crohn's disease, and ulcerative

10 colitis.  We're talking about thyroid disease.  Some people

11 might say diabetes.

12 **Q**    Based on your review of the records, did Mr. Engilis have

13 any of those autoimmune diseases?

14 **A**    No, he had no autoimmune disease.

15 **Q**    And what is the mechanism by which autoimmune diseases are

16 associated with NHL or CLL?

17 **A**    I think autoimmune diseases can suppress the immune

18 system.  And when you have a suppressed immune system, you are

19 more predisposed to get diseases such as NHL and CLL.

20        **THE COURT:**  Dr. Schneider, could I ask a question

21 about that, his records?

22        **THE WITNESS:**  Of course.

23        **THE COURT:**  I noticed in your report that the

24 plaintiff had bladder cancer at some point.

25        **THE WITNESS:**  Yes.

 1         **THE COURT:**  Is cancer a -- a risk factor?  You know,

 2  some other cancer, is that a risk factor for NHL?

 3         **THE WITNESS:**  Sure.  So, I don't think a non-NHL-type

 4  cancer is a risk factor for NHL.  Clearly, if you have, for

 5  example, Hodgkin's disease, you may be at risk for

 6  non-Hodgkin's lymphoma.  But I know with certainty that, for

 7  example, having a lung cancer or a bladder cancer does not

 8  predispose you to NHL.  But, the reverse is true.  Having a NHL

 9  because of the immune dysfunction predisposes you to getting a

10  solid tumor.

11         **THE COURT:**  Okay.  And what's the -- temporally, what

12  is the relationship between the bladder cancer and the NHL for

13  this plaintiff?

14         **THE WITNESS:**  Sure.  So they were all diagnosed at a

15  similar time.  He had his bladder cancer diagnosed or

16  symptomatic with hematuria in July, 2014.  In October, 2014, he

17  had his melanoma.

18         And then what happened is when you have a melanoma, they

19  do a biopsy -- it's called a "sentinel biopsy" -- under the

20  arm.  His melanoma was on the arm, and the regional node would

21  be the axilla.  They biopsy that node for staging.

22         And lo and behold, by accident, they found that he had

23  small lymphocytic lymphoma, which is the same disease as CLL.

24         So in my opinion, the diagnoses were separated by months.

25  So really, it doesn't matter who saw -- which doctor first.

 1   They were diagnosed at the same time.

 2        But my opinion, when asked, is when the CLL originated was

 3   years before.  But for melanoma, as you can imagine, people die

 4   of melanoma.  They don't routinely die of CLL, but they can.

 5   If you have a melanoma that's left untreated for years, you're

 6   going to die.

 7        So, I believe all three diseases were found at the same

 8   time.  But, I believe the CLL came first, for reasons which

 9   I'll tell you when asked.

10        **THE COURT:**  Okay.  Did -- for his melanoma and/or

11   bladder cancer, did the plaintiff have chemo?

12        **THE WITNESS:**  He luckily never had chemo for any of

13   his cancers.  He did not req- -- he had a Stage 1 melanoma.

14   The treatment for that is surgery.  He has a Stage 1 CLL.

15   Observation.

16        And he had a noninvasive bladder cancer that was actually

17   of such low malignant potential that it was observed.  So the

18   plaintiff never had any chemotherapy.

19        **THE COURT:**  Thank you.

20        **THE WITNESS:**  Sure.

21   **BY MR. HABERMAN**

22   **Q**   And why would that be important?

23   **A**   Well, chemotherapy, in itself, can suppress the immune

24   system.  So, clearly, that's not a factor here.  The plaintiff

25   never had any immunosuppressive or any chemotherapy.

1   **Q**    Okay.  And that's the next, I guess, risk factor.

2   Immunosuppressive agents.  Right?

3   **A**    Yes.

4   **Q**    Did you consider whether Mr. Engilis had any exposure to

5   or -- yeah, exposure to immunosuppressive agents?

6   **A**    I think the record is clear he did not.

7   **Q**    Tell the Court, what are you thinking in terms of

8   immunosuppressive agents?

9        What is one, and what is the mechanism by which that would

10  cause or contribute to causing Non-Hodgkin's lymphoma that you

11  can rule out?

12  **A**    Right.  So for example, you see on TV the commercials I

13  think for psoriatic arthritis, and then they have this long

14  disclaimer, and they say, you know, this drug can cause

15  8 million things, including lymphoma.

16       So, I think some -- some of the biologics that are used

17  for rheumatological issues can cause immunosuppression and

18  cause lymphoma, but that is not the case for Mr. Engilis.  He

19  had no disease that required any immunosuppressive agents.

20  **Q**    Did Mister -- are there certain infections that are

21  associated with Non-Hodgkin's lymphoma?

22  **A**    Of course.  You probably -- EBV, Epstein-Barr viruses.

23  And not CLL, but there is an HTL1 virus which causes a T-cell

24  lymphoma.

25       But he had -- no evidence that he had EBV.  And I don't

1   think EBV was a -- is a reason why he had CLL.

2   **Q**    Did Mr. Engilis have any other malignancies of the bone or

3   blood?

4   **A**    So as we discussed before, he had these three malignancies

5   which occurred in the late middle 2014 time frame.  But other

6   than those three malignancies which really came all at the same

7   time, he had no previous history of a malignancy.

8   **Q**    Okay.  We talked about a family history, a social history.

9   What was Mr. Engilis's family history or social history, and

10  how did that figure into your differential?

11  **A**    My recollection was I think he had a terminal someone who

12  had esophageal cancer, which has no bearing on his NHL.  But

13  other than that, I don't think he had a family history of

14  cancer.  And in particular, he didn't have a family history of

15  Hodgkin's disease or Non-Hodgkin's lymphoma.

16  **Q**    And why is that important for your --

17  **A**    As we said before, that's one of the risk factors to

18  develop NHL, is a previous history of lymphoma or a Hodgkin's

19  disease.

20  **Q**    Did you consider whether Mr. Engilis was exposed to

21  certain toxins?

22  **A**    Yes.  I mean, he was not.  We know that certain organic

23  solvents can cause NHL:  Benzene, toluene, hair dyes.  But he

24  was not exposed to those things, no.

25  **Q**    Okay.  Did you consider Mr. Engilis's Roundup exposure?

1  **A**    Of course.

2  **Q**    And what do you know about Mr. Engilis's Roundup

3  exposures?

4  **A**    He had exposure in three different locations.  The first

5  one was the DeBary residence.  There, he sprayed Roundup about

6  two times per month for about 30 minutes.  And, from about 1990

7  to 2015.

8       The second was the Summerfield residence.  I believe he

9  bought it from his father in 1996, but he says that he was

10  working there before and spraying before.  There, he sprayed

11  about one time a month for about 20 minutes.

12       And lastly, he had a condo in Fort Lauderdale.  And there,

13  he sprayed once a month for about 15 minutes.

14  **Q**    Okay.  And in considering Mr. Engilis's exposure and use

15  of Roundup, how, how did that figure into your differential?

16       How did you decide that that was enough to put into your

17  differential?

18  **A**    So I relied on the epidemiologic data and the general

19  causation opinions that, for example, in McDuffie, spraying for

20  two days per year led to a significant incidence of NHL.  And

21  in Eriksson, spraying for greater than ten days per year led to

22  an increased incidence of even CLL.  So Mister -- the plaintiff

23  met the minimal threshold for Roundup exposure, per those two

24  articles.

25       So relying on the general causation experts, and knowing,

**SCHNEIDER - DIRECT / HABERMAN**

1   in my opinion, by reading those opinions and looking at the

2   literature that in many articles, meta analysis, there is a

3   statistic of increased incidence of NHL from Roundup, I

4   concluded that was the only risk factor that I can find to

5   cause his CLL.

6   **Q**    And is that an opinion you hold to a reasonable degree of

7   medical certainty?

8   **A**    Yes, I do.

9   **Q**    And you mentioned McDuffie and two days per year, and then

10  you also mentioned ten days.  Do you know if that is ten

11  lifetime days or ten days per year?

12  **A**    Right.  So I believe it's ten lifetime days.

13  **Q**    Okay.  And did you also review the Pahwa article?

14  **A**    I did.  So Pahwa, on Table 5 again looks at lifetime

15  incidence of exposure to Roundup.  And he does an ordinal --

16  O-R-D-I-N-A-L -- statistical analysis, and shows that for CLL,

17  there's an increased risk -- a statistically increased risk of

18  CLL from Roundup.

19  **Q**    You were asked questions in your deposition about

20  Mr. Engilis's weight.  Do you recall that?

21  **A**    I do.

22  **Q**    Do you have an opinion one way or the other about whether

23  weight is a significant risk factor that also may have

24  contributed to Mr. Engilis's CLL?

25  **A**    Sure.  So I believe there is controversy in the literature

1  about whether weight -- and specifically, BMI -- is a risk

2  factor for NHL.  I've seen articles that say yes; I've seen

3  articles that say no.

4      To me, we know, for example, that being male and being

5  over 65 or 70, there's a higher incidence of CLL.  But I don't

6  consider those risk factors.  I consider those associated

7  events.

8      And I feel weight is the same thing.  The problem with

9  weight is it's sometimes asked in a questionnaire.  People may

10  lie about their weight; people might overestimate or

11  underestimate their weight.

12      In my opinion, having practiced oncology for 34 years, I

13  see no association between weight and CLL.  I see fat people

14  get CLL; I see skinny people get CLL.  In my mind, the medical

15  databases does not really have a strong opinion that weight is

16  a risk factor for CLL.

17  **Q**    And what did you see, if anything, in Mr. Engilis's

18  record, medical record or deposition testimony, about his

19  physical activity before he was diagnosed with any cancer?

20  **A**    He was active.  I know he rode a bike, so I do know he was

21  active.

22      And again, you know, BMI doesn't really tell you about

23  distribution of the fat.  You know, a guy who lifts weights and

24  is muscular may have a high BMI, but he's not fat, he's

25  healthy.  So I think there is an error in just looking at BMI.

1   **Q**    And you mentioned your experience.  How does your

2   experience bear on your opinion of whether or not you consider

3   or give much weight to BMI and age?

4   **A**    Sure.  I mean, again, common things work commonly.  So

5   most people with CLL are elderly.  It's more common in males.

6   Again, 34 years of seeing people, my experience tells me that

7   BMI is not a risk factor for CLL.

8   **Q**    You mentioned that you've treated over a thousand patients

9   of CLL for their CLL, right?

10  **A**    Yes.

11  **Q**    What would you expect to see if weight was a causative

12  factor of CLL?

13  **A**    Right.  So let's take a quick example, if I could, of

14  squamous-cell cancer of the lung.  Or small-cell carcinoma of

15  the lung.  There, we are going to see they're all cigarette

16  smokers, because that's what happens.

17      I can tell you, in my practice, that I've not noticed any

18  association of having a high BMI and any development of CLL.

19  **Q**    Other than Roundup, did Mr. Engilis have exposure to

20  industrial agents at all?

21  **A**    Yeah; I think we said before, no.

22  **Q**    Okay.  And why is that important?

23  **A**    Because as I mentioned before, benzene, toluene, hair dyes

24  have been linked to the development of NHL, but he was not

25  exposed to those agents.

**SCHNEIDER - DIRECT / HABERMAN**

1  **Q**    So just to be sure the record is clear, in your opinion,

2  within a reasonable degree of medical certainty, what was a

3  cause or a substantial contributing cause of Mr. Engilis's CLL?

4  **A**    Sure.  Based upon the general causation opinions, it's my

5  opinion to a reasonable degree of medical certainty that his

6  exposure to Roundup was a substantial contributory factory to

7  the development of CLL.

8  **Q**    Okay.  I want to turn to your opinions with respect to

9  whether or not his CLL caused or contributed to other cancers.

10  **A**    Okay.

11  **Q**    Do you hold to a reasonable degree of medical certainty

12  that Mr. Engilis's CLL did cause or contribute to causing

13  secondary cancers?

14  **A**    Absolutely yes.

15  **Q**    And what are your opinions?

16  **A**    First, it's known in the medical literature that patients

17  with CLL have immune dysfunction, and are at risk for secondary

18  malignancies.  And probably the most common one would be

19  melanoma.

20  **Q**    And what do you base that off of?

21  **A**    That's based on my understanding of medical literature.

22  And my experience seeing just that event in my patients, over

23  34 years.

24  **Q**    And what is the mechanism by which CLL leads to secondary

25  cancer like melanoma?

SCHNEIDER - DIRECT / HABERMAN

1  **A**    So again, it causes immune dysfunction.  The body's not

2  able to survey, if you will, to take care of these cancer

3  cells.  And, for example, melanoma develops.  It grows

4  unchecked, and it rears its ugly head.

5  **Q**    Did you see in the records whether or not Mr. Engilis had

6  a mole?

7  **A**    Yes.  So the record shows that he had this mole for about

8  five years.  But the record also shows that over the last

9  probably year before, it started to change.  So it was probably

10  a benign mole for four of those years, and then the last year

11  there was change.

12  **Q**    Okay.  Did you consider whether Mr. Engilis had

13  significant sun exposure?

14  **A**    So the record says that he did have some sunburns.  I was

15  not able to distinguish how many, how severe.  Again, I think

16  if you asked everybody, they would say they've had a sunburn.

17  So yes, he had a sunburn.  That's really the extent of what I

18  know about the sunburn.

19  **Q**    Did Mr. Engilis have a family history of melanoma?

20  **A**    He did not.

21  **Q**    How do you know that his CLL predated his melanoma, such

22  that it could even cause the melanoma or contribute to causing

23  the melanoma?

24  **A**    Sure.  This is going to be a little long, so bear with me,

25  and I'll try to make it understandable.

1    So we know that from the literature that the development

2    of CLL to melanoma can be bi-directional.  Meaning you can go

3    from CLL to melanoma, and you can go from melanoma to CLL.

4        Now, the literature, including literature supplied last

5    night to me by defense counsel, talks about those two very

6    instances.  And what's interesting is you find that patients

7    who have melanoma and then they get CLL, it's a short time

8    frame, just as it was with Mr. Engilis.  Mr. Engilis really was

9    a month or two at the same time.  In the article supplied by

10   defense counsel, the median time to get the CLL once you have

11   the melanoma was nine months.

12       Now, contrast that to when you have CLL, and then you get

13   melanoma.  That takes a long time, where the median time is

14   about 68 months.

15       So what does this tell you?

16       The literature tells you that a lot of CLL is found by

17   chance.  In fact, a great majority of CLL is found by chance.

18   **Q**    What do you mean by that?

19   **A**    So you feel fine, you go to the doctor, he does a CBC.

20   Your white count is 15,000, it's elevated.  And you have

21   80 percent lymphocytes.  They do a test called flow cytometry;

22   they diagnose you have CLL.  You're stage zero.  You're fine.

23   You never knew about it, but now you know about it.  Okay?

24       If you didn't have the melanoma, perhaps you wouldn't have

25   gone to the doctor, or you wouldn't have had to have the CBC

1    before your lymph node dissection.  You would have never known.

2    You would have found out about the CLL years later.

3         We know that, as opposed to melanoma where, again, if you

4    don't do something, in a year, year and a half something bad is

5    going to happen to the patient, we know that it takes about

6    seven and a half years to develop CLL.

7         So I think what the literature tells you because of the

8    short time frame from the melanoma to the CLL is really the CLL

9    was always there, but just was recently found.

10        So it's my opinion, to a reasonable degree of medical

11   certainty, that just as with Mr. Engilis, you have the CLL

12   first.  It causes immune dysfunction, but it's really not known

13   to the patient or to anybody.  He seeks medical attention for

14   his melanoma.  They find his CLL a few months later, the same

15   time.  So the CLL and the immune dysfunction is causing the

16   melanoma.

17   **Q**    Could it be the case that Mr. Engilis had the melanoma

18   five years before?

19   **A**    No.  Because you don't walk around with superficial

20   spreading melanoma, and have a thin lesion.  He was a Stage 1,

21   okay?  So he had a thin lesion.  If he had a five-year history

22   of melanoma, it would be thick.  And more likely than that, it

23   would be metastatic.

24        So, no.  He couldn't have had melanoma for five years.

25   But, he absolutely and did have undiagnosed CLL.  It didn't

**SCHNEIDER - DIRECT / HABERMAN**

1   happen overnight, that CLL.  He had it for years.  But it just

2   came to medical attention.

3   **Q**   How do you know that he had had it for years?  What do you

4   base that on?

5   **A**   The CLL?

6   **Q**   Correct.

7   **A**   The natural history of CLL.  As I told you before, it

8   takes about seven and a half years for it to become noticeable.

9   It's a slow-moving, indolent disease.  Even now, he's being

10  observed.  But, melanoma had to have surgery, had to be

11  operated on.  If you left the melanoma alone, he'd have

12  problems.  But the CLL, you can leave alone.

13  **Q**   So just for the record, what was a cause or substantial

14  contributing cause of Mr. Engilis's melanoma?

15  **A**   So the literature is clear that having CLL predisposes you

16  to second malignancies.  And melanoma probably is the most

17  common malignancy seen.  I've seen it in my own practice; I

18  know it in the literature.  It's a known fact.

19  **Q**   Now let's talk about bladder cancer.

20      Do you have any opinions whether Mr. Engilis's CLL caused

21  or contributed substantially to causing Mr. Engilis's bladder

22  cancer?

23  **A**   I do.

24  **Q**   And what is your opinion?

25  **A**   So let's talk a few seconds about bladder cancer and risk

1  factors for bladder cancer.

2      So smoking is the main risk factor for bladder cancer.  He

3  was a nonsmoker.  Exposure to things like analine dyes, but he

4  also wasn't exposed to analine dyes.

5      So, again, it is known that the immune dysfunction of CLL

6  causes second malignancies, including solid tumors, you know.

7  So it's my opinion, based upon that and his lack of other

8  reasonable risk factors, that his immune dysfunction from CLL

9  caused his bladder cancer.

10      And I do note with honesty that the literature -- it's

11  hard to find that.  I can't point to a specific study that says

12  that.  But knowing about solid tumors and the immune

13  dysfunction from CLL and no other risk factors when I do my

14  differential, I can say it's my opinion to a reasonable degree

15  of medical certainty that, indeed, his CLL caused his secondary

16  low-risk bladder cancer.

17  **Q**    Did Mr. Engilis have any family history of bladder cancer?

18  **A**    He did not.

19  **Q**    And are all the opinions that you expressed in the last

20  few minutes, since I started examining you, are those held to a

21  reasonable degree of medical certainty?

22  **A**    Absolutely, yes.

23          **MR. HABERMAN:**  Your Honor, I -- if the Court doesn't

24  have any questions, I'll pass the witness.

25          **THE COURT:**  Okay.  I have maybe one question.

1          **MR. HABERMAN:**  Sure.

2          **THE COURT:**  Maybe some followups.

3      But, it's a little bit of a weird question.  So you are --

4  you're an oncologist.  You treat people for NHL and other

5  cancers.

6          **THE WITNESS:**  I do.

7          **THE COURT:**  That is different from figuring out what

8  caused their cancer.

9          **THE WITNESS:**  That is a different exercise.  But both

10  exercises are under my board certification.

11          **THE COURT:**  Tell me more about that.

12          **THE WITNESS:**  Sure.  So to be a board-certified

13  medical oncologist by the American Board of Internal Medicine,

14  I have to be held to a certain standard.  And that standard

15  requires the following.

16      First, as you probably may or may not know, I do a

17  three-year internal medicine residency.  And I must take a

18  multiple-choice test by the American Board of Internal

19  Medicine, where I answered the questions, and I passed.

20      I then go to Memorial Sloan Kettering Cancer Center, which

21  I'm sure you know is one of the tertiary centers,

22  world-renowned centers, and I learned to be an oncologist.

23      And then after my fellowship, two years, I'm allowed to

24  take a second board, the American Board of Internal Board

25  Specialty in Medical Oncology.  And that has a lot of subsets.

 1   They ask -- you know, it has epidemiology.  It has cancer

 2   chemotherapy.  It has immunology.

 3        So in the eyes of the American Board of Internal Medicine,

 4   and in the eyes of me, I know about risk factors for certain

 5   diseases.  I see it all day.  I may not ask every patient about

 6   the risk factor; I may not chart it.  But I know it.

 7        And again, when I'm practicing medicine, I don't have to

 8   use it every day, but in a situation here where I'm asked

 9   questions, I'm able to say: Look, the American Board of

10   Internal Medicine and Medical Oncology says that I'm an expert

11   in the epidemiology of cancer.

12        **THE COURT:**  Uh-huh.  So, you know, obviously I've --

13   I've -- here's what I'm trying to get at with my question.

14        I've excluded your opinion on general causation.  Okay?

15   So I'm sort of putting that aside, for the moment and trying to

16   understand what expertise is needed do the differential

17   diagnosis.

18        Right?

19        **THE WITNESS:**  Sure.

20        **THE COURT:**  And, you know, "differential diagnosis" is

21   sort of a misnomer, right?  It's differential etiology.  And,

22   you know, "diagnosis" implies that you're diagnosing a patient

23   with a disease, and that's not what we are talking about here.

24   Right?  I understand the expertise that one would need to

25   diagnose a patient with a disease.

1        So I guess my question is this:  How much difference is

2   there between you and me in offering an opinion on differential

3   etiology?

4        I can go to the -- I could go read the medical literature,

5   right, and identify different causes of NHL.  Right?  I could

6   do a study of the plaintiff's history to figure out which risk

7   factors he has been exposed to.  And if he's been exposed to

8   only one risk factor, I could presumably conclude, as you have,

9   that that one risk factor contributed to his NHL.  And so

10  that's what it seems like, on the surface, to me.

11            THE WITNESS:  Sure.

12            THE COURT:  When you take out the general causation

13  part of it.  Right?

14            THE WITNESS:  Uh-huh.

15            THE COURT:  On the surface, it seems like a fairly

16  simple analysis to conduct.  And I'm wondering if you could let

17  me know if you sort of agree or disagree with that.

18        And if you disagree with that, if you could kind of

19  explain to me why you are more qualified than me to provide the

20  analysis.

21            THE WITNESS:  Sure.  I think that is a great question.

22  I appreciate it.  And I'm going to give you a little bit of an

23  analogy to it also.

24        With all due respect, I think I'm a lawyer.  I have been

25  in divorce.  I have written my own briefs.  I've researched the

1  case law.  I'm not a lawyer.  And I have a basic understanding.

2  I think I know it, but I don't.

3      Same thing, the reverse.  With all due respect, you're a

4  lawyer; you're a judge.  But you are not well-versed in the

5  medical literature.  You may not know how to interpret it.  You

6  may not know what a relative risk means.  You may not know what

7  a statistical significance means.

8      So, I've devoted --

9          **THE COURT:**  But on the issue of statistical

10 significance, right, I mean we're not -- I don't think that the

11 specific causation analysis that you are offering depends on an

12 understanding of statistical significance.

13         **THE WITNESS:**  It doesn't, but we have to also rule out

14 that something may be happening by chance.  So statistical

15 significance may help you to realize that it is not by chance.

16     Getting back to your question, so, I've spent 40 years

17 studying these topics.  You know, with all due respect, you

18 know, you will spend a few hours.  I know how to read the

19 literature; I know how to interpret the literature.  I see

20 patients all day.  I know what may or may not cause their

21 diseases.  So I have expertise endorsed by the American Board

22 of Internal Medicine in medical oncology to do epidemiologic

23 investigations.

24     And your point is also well taken.  It really is not a

25 differential diagnosis, but it is a differential of what agents

1   might have caused the CLL.  And I'm truly qualified to do that,

2   by my board certification and my 40 years of experience.

3   Really, there's no one better.  I practiced; I see the

4   patients.

5       You don't need to be an epidemiologist to figure out

6   whether a history of Epstein-Barr virus causes lymphoma.

7   That's something I've studied.  It's something I know.  I don't

8   need to look that up.  I've known that for years.

9       So, I hope that answers your question.

10      **THE COURT:**  Is part of it, too, the ability to sift

11  through medical records?  I mean, that's maybe one area where a

12  regular person might not be capable of doing it, and sort of

13  deciphering what's in those medical records.

14      **THE WITNESS:**  Well, I think they may have problems

15  understanding abbreviations, or the thought process of the

16  treating physician who is writing it.

17      But again, you know, just as I think an intelligent man

18  can read case law and come up with an opinion, I think an

19  intelligent lawyer can look at medical literature and come to

20  an opinion.

21      But, as you can understand, I'm not a lawyer, and you are

22  not a doctor.  And my opinions won't be as good as your

23  opinions about the law.  And hopefully you will think that my

24  opinions, as a 40-year practitioner, board-certified in three

25  specialties, is better than yours.

 1          THE COURT:  But to press you on that a little bit,

 2    what is it about -- and I shouldn't have compared you to me,

 3    because that puts you in sort of a bad position.

 4          THE WITNESS:  No, not at all.  I could -- it's okay.

 5          THE COURT:  Okay.  Give me an example of an aspect of

 6    your specific causation analysis that I would not be able to

 7    do.

 8          THE WITNESS:  Okay.  Well, again, unless -- I don't

 9    know what your fund of knowledge is.

10          THE COURT:  That is why I said -- I shouldn't have

11    said --

12          THE WITNESS:  All right.

13          THE COURT:  Just a generic lawyer.

14          THE WITNESS:  Okay.  I would think the generic lawyer

15    doesn't know off the top of his head what viral illnesses cause

16    lymphoma.  He may have to look that up, Google it.  Something

17    that --

18          THE COURT:  But what is -- what would prevent a

19    generic lawyer from identifying the relevant medical

20    literature, and using that literature to identify all of the

21    risk factors?

22          THE WITNESS:  I think it's hard to do that.  You know,

23    I think sometimes you look -- you look at an internet search,

24    and you get misled.  I think sometimes they tell you things

25    that are wrong.

1          And I don't think the general lawyer or the general

2     Mr. Smith in our society is going to know how to interpret

3     everything.  They are going to come to some erroneous

4     conclusions.  At least for me --

5               **THE COURT:**  So you have to know where to look, is what

6     you're saying.

7               **THE WITNESS:**  You have to know where to look.  And

8     then, like, I'm sure all the time you look up, you Google, you

9     know:  I have a chest pain or something.  And it will tell you

10    you's are having a massive dissecting aneurysm, which you know

11    you're not having.  So, Google makes people crazy.

12         So I think -- look.  We're in a court here.  We're giving

13    evidence-based opinions.  I have the training, expertise, and

14    board certification to give opinions not only about what kind

15    of chemo to give my cancer patient, which I do all day, but I

16    can give an opinion, a specific causation opinion, of what

17    things can lead to NHL and CLL.  I can go through what can do

18    it and can't do it.

19         And at least -- my opinion could be scrutinized, but I'm

20    certainly respected and allowed by my qualifications to give

21    that opinion.

22              **THE COURT:**  Okay.

23         Followup questions?

24              **MR. HABERMAN:**  Yes, Your Honor, if I could ask some

25    followups.

1  BY MR. HABERMAN

2  **Q**    Putting aside Roundup use and Non-Hodgkin's lymphoma, have

3  you had opportunities to look at whether other agents might be

4  an etiological agent, to do a differential etiology in other

5  circumstances?

6  **A**    Well, if you're asking again, you know, things we do all

7  the time, we know that asbestos causes mesothelioma.  We know

8  that cigarette smoke causes squamous-cell carcinoma of the

9  lung.  We know that radon causes maybe adenocarcinoma of the

10  lung.  We know about certain mutations in adenocarcinoma.

11  We're learning new things all the time.  Things are rapidly

12  changing.

13      But again, I really believe that it's me, the oncologist,

14  with my board certification and years of experience, who could

15  analyze literature and give evidence-based opinions.

16      And one thing that I never do is -- you know, I can come

17  to court and say:  This is what I think.  But I like to come to

18  court and say:  This is what I think, and here's why.  I have

19  literature to back up what I'm saying.

20      Because, what's not evidence-based is me giving an

21  anecdotal opinion about what I think.  You know, you can get

22  five different oncologists and get five different anecdotal

23  opinions.  We want the jury and the law to at least hear what

24  the body of knowledge states.  And I think it's me, the

25  oncologist, who can do that, and not the average lawyer or Joe

1   Smith of society.

2   **Q**   Do have to know something about chemistry and biology and

3   medicine and mechanisms of action, and how these other risk

4   factors actually -- why they're even associated with a disease

5   to begin with, that you would know that I wouldn't know?

6   **A**   Sure.  Yeah.  And that's a great question.  The answer is,

7   again, it's hard to extricate.  I have 40 years of experience,

8   right?  So I can't tease out when I knew this one fact or how I

9   learned it.  But I can go to literature to show you that I'm

10   right.

11         But, clearly, I've been studying and training for 40

12   years, you know.  That's different than the guy who does a

13   one-hour Google search, and thinks like I think I'm a lawyer,

14   but I'm not.

15             **THE COURT:**  I'm sure you'd be an excellent lawyer.

16             **THE WITNESS:**  I was pretty -- a really good

17   (inaudible), I thought.  I tried, anyway.

18   **BY MR. HABERMAN**

19   **Q**   Have you done other expert witness work where you've

20   determined, for example, whether exposure to, like,

21   firefighting foam or something like that causes or does not

22   cause disease?

23   **A**   Thank you.  That's a good point to bring up.  So I've done

24   this kind of work before.  That's a very good point.

25         So, I have been involved in firefighter litigation.  And,

1  again, when I take a case, I take it because I believe in it.

2  It doesn't matter who calls me.  In this situation, I was

3  looking at firefighters who were alleging that they got their

4  -- think of something -- thyroid cancer or chronic myelogenous

5  leukemia from the years as a firefighter.

6      And there, I guess I did some general causation work

7  because I reviewed the literature, found out what the relative

8  risks were, and offered opinions about -- just like here.  I

9  went through their history, I went through the epidemiologic

10  data, and then I came to a conclusion to my reasonable degree

11  of medical certainty, whether their occupation as a firefighter

12  caused their cancer.

13      So I've done it obviously in other instances, and

14  obviously I've done it for lung cancer.  I mean, that seems

15  intuitive.  But, you know, smokers who have lung cancer.  I've

16  done that.  I've done people exposed to asbestos who have had

17  lung cancer, and I've done that.

18          **MR. HABERMAN:**  If nothing else, Your Honor, then I'll

19  pass the witness.

20          **THE COURT:**  Okay.  Sounds good.

21          **MS. duPONT:**  Can you just give us a couple minutes to

22  get the technical stuff?

23          **THE COURT:**  Sure.  Why don't we take a five-minute

24  break.  We'll come back at five minutes after the hour.

25          **THE WITNESS:**  Step down?

```
 1          THE COURT:  Step down, yes.

 2      (Recess taken from 10:00 a.m. to 10:08 a.m.)

 3          THE COURTROOM DEPUTY:  Remain seated, come to order.

 4  Court is back in session.

 5          THE COURT:  Okay.

 6          THE WITNESS:  Before we start --

 7          THE COURT:  Yeah.

 8          THE WITNESS:  One more comment to the previous

 9  question?  I thought of something important.

10          THE COURT:  Sure.

11          THE WITNESS:  So you or Mr. Smith, as the layperson,

12  probably doesn't know that CLL and small lymphocytic lymphoma

13  are the same diseases.  And they probably don't understand when

14  they read about NHL, it's not one disease; it's 20 different

15  diseases.  So, they don't have the expertise to analyze it

16  because they don't understand the nuances, and I do.

17          THE COURT:  Okay.  Thanks.

18          THE WITNESS:  Thank you.

19          MS. duPONT:  Can I proceed, Your Honor?

20          THE COURT:  Please.

21                      CROSS-EXAMINATION

22  BY MS. duPONT

23  Q    Good morning, Dr. Schneider.

24  A    Good morning.

25  Q    My name is Julie duPont.  I represent Monsanto.  And I
```

SCHNEIDER - CROSS / duPONT

1   want to ask you some questions today about your opinions in

2   Mr. Engilis's case.   Okay?

3   **A**    Sure.

4   **Q**    You were contacted for this first time to serve as an

5   expert for plaintiffs in the Roundup litigation in April of

6   2022, is that correct?

7   **A**    Sounds about right, yes.

8   **Q**    And prior to April, 2022, before you became an expert in

9   the Roundup litigation, you had no opinion whether or not

10  Roundup causes NHL.   Correct?

11  **A**    Correct.

12  **Q**    And before you were retained in the Roundup litigation,

13  you had not reviewed the published literature on Roundup and

14  NHL, right?

15  **A**    Correct.

16  **Q**    And outside of litigation, you had never researched

17  Roundup in any context.   Correct?

18  **A**    That is correct.

19  **Q**    So between when you were contacted in April of 2022 and

20  when you signed your report in this case in June of 2022, you

21  formed an opinion that Roundup causes NHL, and the subtype of

22  NHL Mr. Engilis had, CLL.   Right?

23  **A**    Correct.

24  **Q**    And before the Roundup litigation, you had never testified

25  as to the cause of someone's non-Hodgkin's lymphoma, correct?

1    **A**    I can't say with certainty the way I may have been asked

2    in my 25 years of expertise, but I don't remember.  It's

3    possibly -- I don't have an independent recollection.

4    **Q**    Dr. Schneider, you gave a deposition in June of 2022, in a

5    case called *Farro versus Monsanto*.  Do you recall that?

6    **A**    Yes.

7    **Q**    And that occurred -- well, at that time, you took an oath

8    to tell the truth.  Correct?

9    **A**    Correct.

10   **Q**    And you told the truth at that deposition.  Correct?

11   **A**    I always tell the truth, correct.

12   **Q**    Okay.  And I'm going to direct you to Defendant's Exhibit

13   101.

14        (Document displayed)

15   **Q**    And specifically to Page 16, Line 3.  And you were asked

16   the question (As read):

17             **"QUESTION:**  Before this case, have you ever

18             testified as to the cause of someone's

19             non-Hodgkin's lymphoma?"

20        And your answer was:

21             "No."

22   **A**    Okay.

23   **Q**    So just to move on, Dr. Schneider, you've been a witness

24   in over 200 cases in the course of your career?

25   **A**    Yes.

1  Q    And in your clinical practice, you do not typically

2  evaluate the cause of an individual person's lymphoma.  Right?

3  A    Typically, no.

4  Q    In your clinical practice, you don't ask patients what

5  risk factors they have for CLL.  Correct?

6  A    I don't specifically ask, correct.

7  Q    You don't ask your patients about their exposure history

8  when they come to you with NHL.  Correct?

9  A    Correct, because as pointed out by the judge previously, I

10 have two different jobs.  One job is to treat my cancer

11 patients.  But today that's not my job.  My job is to use my

12 board certification and talk about the risk factors for NHL.

13 Q    But in treating your clinical patients, you don't ask them

14 about their exposure history when they come to you with NHL.

15 Correct?

16 A    That was correct.  I now will ask them, going forward.

17 But it really will have no bearing on my therapeutic

18 decision-making, but it does have bearing in my opinions as a

19 specific causation expert.

20 Q    Outside of the Roundup litigation, you have never

21 evaluated the number of days a patient was exposed to a

22 chemical.  Correct?

23 A    Correct.

24 Q    And outside of litigation, you've never determined

25 whether, on the basis of the number of days of exposure, a

1  particular chemical caused a person's cancer.  Right?

2  **A**    That is correct.  That's why I'm using the general

3  causation opinions here.

4  **Q**    And you've never told a patient that Roundup caused their

5  cancer.  Correct?

6  **A**    I have never had a patient, to my knowledge, where I've

7  told them that.  Correct.

8  **Q**    Now, you talked with Mr. Haberman earlier about the fact

9  that you are doing a differential diagnosis or etiology to

10  reach your opinion that Mr. Engilis's Roundup use caused or

11  contributed to his CLL.  Right?

12  **A**    I'm sorry --

13  **Q**    Sorry if I cut out.  I'll say it again.

14  **A**    Yes.  Yes.  CLL, correct.

15  **Q**    Okay.  When you're doing your differential etiology for an

16  association between glyphosate and Mr. Engilis's CLL, you

17  relied on multiple epidemiology studies.  Right?

18  **A**    Yes.  Including, though, the general causation opinion of

19  plaintiff's experts, yes.

20  **Q**    And I understand, to be fair, that you reviewed the expert

21  reports -- you wrote this in your report -- of Drs. Portier,

22  Weisenburger and Schiff.  Right?

23  **A**    Correct.

24  **Q**    And when you were deposed, though, in August of 2022, you

25  testified that those expert reports were not the basis of your

1   opinions.  Correct?

2   **A**    I think what I said or what I'm trying to say is that I

3   didn't blindly just adopt their opinions, but I looked at their

4   opinions, tried to do my own research, and then agreed to the

5   best of my ability as a non-epidemiologist statistician, and

6   then adopted their opinions.  But, I wanted you to know that I

7   didn't just take it without at least using a little thought on

8   my part.

9   **Q**    But to be clear, when you were deposed, your opinion that

10  Roundup causes NHL and caused Mr. Engilis's cancer was not in

11  any way predicated on the opinions of Drs. Portier,

12  Weisenburger and Schiff.  That's what you said, right?

13  **A**    I don't think that's what I said.  I think what I said was

14  I read those reports, and then I looked at the reports, I tried

15  to understand what they said.  And then I adopted their reports

16  as the general causation opinions.

17      But, I didn't want you to think I just didn't read them,

18  didn't try to understand them, and just accepted them.  I at

19  least tried to understand them, and then adopted them for my

20  specific causation opinions.

21  **Q**    Dr. Schneider, you gave a deposition in August of 2022, in

22  this case, Engilis versus Monsanto, correct?

23  **A**    Okay, yes.

24  **Q**    And you took an oath at that time to tell the truth,

25  correct?

SCHNEIDER - CROSS / duPONT

```
 1   A     Correct.

 2   Q     And you did tell the truth at that deposition, correct?

 3   A     Correct.

 4   Q     And I'm going to direct you to your deposition in that

 5   case -- or in this case -- to Page 34, Line 6.

 6         (Document displayed)

 7   Q     And you were asked (As read):

 8               "QUESTION:  Now, why do you care when

 9               reaching your opinions what other experts for

10               plaintiffs had to say, but not what experts

11               for Monsanto had to say?"

12         And there was an objection.  And then the answer that you

13   gave was (As read):

14               "So the answer is I read the reports just to

15               read the reports.  It pointed me to the

16               literature.  I went to the epidemiological

17               literature and read extensively to give my

18               own opinions.  I'm not adopting the opinions

19               of any of these three doctors.  So my

20               opinions are based upon my understanding of

21               CLL, its epidemiology, and reading in detail

22               the literature, which I'm sure we're going to

23               talk about in detail.  So plaintiff and

24               defense opinions really don't influence my

25               decisions and my opinions.  I come here today
```

1              to give you my opinions as Dr. Andrew

2              Schneider, medical oncologist, what I believe

3              to be a reasonable degree of medical

4              certainty.  And it's not in any way

5              predicated on an opinion of Drs. Portier,

6              Weisenburger, or Dr. Schiff."

7  **A**    I think what that means is it's not blindly adopted, but I

8  don't think it says that I didn't give their opinions credence.

9  It's well known that I'm not an epidemiologist.  I can't

10 possibly be able to do that test, test, and I'm not allowed to

11 be a general causation expert.  So, I am a specific causation

12 expert.  I read their reports.  I thought about their reports.

13         And what I want you and the judge and what I tried to say

14 here is that I at least thought about things, and then take

15 their opinions to be my opinions.  But obviously, I don't have

16 the training as they do, to do the studies, to come up with the

17 relative risks, et cetera.

18 **Q**    But your opinion about Mr. Engilis's CLL is based on your

19 understanding of CLL, its epidemiology, and your reading of the

20 literature.  Fair?

21 **A**    That's -- my specific causation opinion is based on the

22 following.  Number one, after reviewing the literature, I've

23 adopted the general causation opinions of experts.

24         Again, I could have -- why didn't I adopt the defense

25 expert opinions?  I had to look at everything, and come up with

1   an opinion to the best I can.  But, again, I'm not the general

2   causation expert.

3        But I adopt their opinions, and say that yes, Roundup

4   causes NHL.  And then I go and look at the specific case of

5   Mr. Engilis, and apply that to see if he had Roundup as a major

6   etiologic agent that causes his NHL.

7   **Q**    When you looked at those articles on your reliance list to

8   support your opinion about Mr. Engilis, you found some of those

9   articles, yourself, and some of them were provided to you by

10  plaintiffs' counsel.  Correct?

11  **A**    Correct.

12  **Q**    And to the extent you looked for literature, yourself, you

13  did that through a regular Google search.  Right?

14  **A**    So a Google search is just an engine.  It doesn't get me

15  to the article.  Or it leads me to an article, but whether I

16  search in Google or PubMed or UpToDate, what really matters is

17  the peer-reviewed article.  Search engine doesn't matter.

18  **Q**    But you didn't conduct a Google Scholar search.  Correct?

19  **A**    I did not, because I don't need to.  I need to find

20  peer-reviewed literature to look at and evaluate.  And how I

21  come to that, what engine I use doesn't matter.  What matters

22  is the actual peer-reviewed article that I find, and then we

23  critique that article.

24  **Q**    But you didn't do a PubMed search, either, to be clear.

25  Correct?

1  **A**    To be clear, I did a Google search which led me sometimes

2  to PubMed.  So I went from Google to PubMed.  I did an extra

3  step, but I still got to PubMed.

4         **THE COURT:**  Could I ask a followup question about

5  that?

6         **THE WITNESS:**  Sure.

7         **THE COURT:**  Are you saying that you just used Google

8  to find particular articles that you had already identified and

9  were looking for?

10        **THE WITNESS:**  So what I did was I have a fund of

11 knowledge.  And like I said before, when I come to court, I

12 like to have some authoritative literature to support my

13 opinion.  So I often will do a search in Google.  It may lead

14 me to PubMed, it may lead me to NCI, it may lead me to a number

15 of places.

16    I then find an article.  I evaluate the article, see if

17 it's peer-reviewed, if it makes sense to me, if it's respected.

18 If it's well done.  And then use it to bolster an opinion that

19 I may already have.  But, whether I search in Google or PubMed

20 makes no difference, you go to the same place.

21 **BY MS. duPONT**

22 **Q**    I'm going to move into a different area.

23 **A**    Sure.

24 **Q**    You testified earlier that to give your opinion in this

25 case, you looked at Mr. Engilis's medical records, his

**SCHNEIDER - CROSS / duPONT**

1    deposition testimony, his wife Cathy's deposition testimony,

2    and his plaintiff fact sheet.  Correct?

3    **A**    Correct.

4    **Q**    And you never spoke to Mr. Engilis, correct?

5    **A**    That is true.

6    **Q**    And we heard earlier that Mr. Engilis was diagnosed with

7    three types of cancer in 2014.  Correct?

8    **A**    Correct.

9    **Q**    The first type of cancer he was diagnosed with was bladder

10   cancer.  Right?

11   **A**    Yes.

12   **Q**    The second type of cancer he was diagnosed with was

13   melanoma.  Correct?

14   **A**    Correct.

15   **Q**    And the third type was CLL.  Correct?

16   **A**    Correct.

17   **Q**    And you said CLL is a relatively common form of NHL.

18   Right?

19   **A**    Yes.

20   **Q**    And you are relying on the deposition testimony of

21   Mr. Engilis and his wife Cathy for your opinion that he was

22   exposed to Roundup.  Right?

23   **A**    Yes.

24   **Q**    And you note in your report that he sprayed it at three

25   separate residences over the course of approximately 24 to 25

SCHNEIDER - CROSS / duPONT

1   years.  Right?

2   **A**    Yes.

3   **Q**    But you didn't specifically calculate the lifetime days of

4   exposure Mr. Engilis had, in your report, did you?

5   **A**    I didn't specifically do it, but I know that it was more

6   than two days, per McDuffie, and more than ten days, per

7   Eriksson.

8   **Q**    But you specifically didn't calculate the lifetime days of

9   exposure.  Correct?

10  **A**    I didn't have to, because I knew it was greater than those

11  numbers.

12  **Q**    In your review, as you just mentioned, anyone who uses

13  Roundup for more than two days per year has an increased risk

14  of NHL.  Right?

15  **A**    That is per McDuffie, correct.

16  **Q**    And in your expert opinion, anyone who uses Roundup for

17  more than ten lifetime days has an increased risk of NHL,

18  correct?

19  **A**    Well, yes and no.  I'm not here to give a general -- those

20  are general causation opinions, I think.  I'm adopting the

21  beliefs of the epidemiologist statisticians, and going from

22  there to give a specific causation opinion.

23  **Q**    So does anyone who uses Roundup for more than ten lifetime

24  days, including Mr. Engilis, have an increased risk of

25  non-Hodgkin's lymphoma, in your expert opinion?

**SCHNEIDER - CROSS / duPONT**

1  **A**    If I'm allowed to give that opinion -- and I thought I was

2  not allowed to give that opinion -- the answer would be yes.

3  **Q**    We established that Mr. Engilis has CLL, chronic

4  lymphocytic leukemia, correct?

5  **A**    Correct.

6  **Q**    And you mentioned that there are different subtypes of

7  NHL.  For example, CLL which Mr. Engilis had and DLBCL are two

8  different subtypes.

9  **A**    Absolutely, yes.

10 **Q**    And in order to understand the cause of a particular

11 subtype of NHL, you need to look at the data specific to that

12 subtype.  Is that fair?

13        **MR. HABERMAN:**  Objection to the scope, Your Honor.

14        **THE WITNESS:**  Yeah.  Not always --

15        **THE COURT:**  Overruled.

16    Remember, when you hear an objection, give me a chance to

17 rule on it.  But the objection is overruled, so you can answer

18 the question.

19        **THE WITNESS:**  So I can answer it properly, can you say

20 it one more time for me?

21 **BY MS. duPONT**

22 **Q**    Sorry, let me ask the question again.

23    In order to understand the cause of a particular subtype

24 of NHL -- here, CLL for Mr. Engilis -- you need to look at the

25 data specific to that subtype, if those data are available.

1   Correct?

2   **A**    You made an important point.  If the data is available,

3   yes.  It's always better to use the best data you can use, but

4   sometimes you don't have the best data.

5   **Q**    So you, here, looked at whether there was a reliable

6   association in studies between glyphosate or Roundup exposure

7   and CLL, to reach your specific cause opinion for Mr. Engilis.

8   Correct?

9   **A**    Well, no.  I think what I did was I adopted the opinions

10  of the general causation experts, and then went and looked at

11  the other possible etiologies of why Mr. Engilis could have

12  CLL.

13  **Q**    You spoke about -- in your examination with Mr. Haberman,

14  you talked about the Eriksson study.  Do you recall that

15  testimony?

16  **A**    I do.  I do.

17  **Q**    And that's a study you're familiar with?

18  **A**    Yes.

19  **Q**    Let's take a look at Defendants Exhibit 104.  It's in your

20  binder, as well, in front of you, if you want to look at the

21  full document.

22  **A**    Which number?  104?

23  **Q**    104.

24  **A**    Thank you.

25  **Q**    Excuse me, 107.  I just read it wrong.

SCHNEIDER - CROSS / duPONT

1    **A**    No problem.   Thank you.

2    **Q**    And you've read this medical literature before, correct?

3         This is the article by Eriksson.   Correct?

4    **A**    Correct.

5    **Q**    And if we can go to Page 1659, to Table 3.

6         (Document displayed)

7    **Q**    And the name of that table is "EXPOSURE TO VARIOUS

8    HERBICIDES DIVIDED ACCORDING TO DIFFERENT LYMPHOMA ENTITIES."

9         Do you see where I'm reading?

10   **A**    I do.

11   **Q**    And this table reports on different subtypes of lymphoma.

12   Correct?

13   **A**    Correct.

14   **Q**    And one of those subtypes is CLL.   Correct?

15   **A**    Yes, yes.

16        (Document highlighted)

17   **Q**    In the left-hand column, we can see that.   Do you see

18   where I've highlighted?

19   **A**    I see it.   You're correct.

20   **Q**    And if we go over to the second-to-last column, there's an

21   odds ratio reported for glyphosate.   Do you see that?

22   **A**    I do.

23   **Q**    And that's the odds ratio you mentioned in your report.

24   Correct?

25   **A**    Correct.

**SCHNEIDER - CROSS / duPONT**

1   **Q**    And to be fair, that odds ratio is statistically

2   significant.  Correct?

3   **A**    Correct.

4   **Q**    And you told the Court earlier, statistical significance

5   allows you to rule something out, and that it happened by

6   chance.  Correct?

7   **A**    Correct.

8   **Q**    However, if we look at the bottom of the table, you see

9   that it says (As read):

10           "Adjustment was made for age, sex and year of

11           diagnosis or enrolment."

12       Right?

13   **A**    Yes.

14   **Q**    It does not say adjustment was made for the use of other

15   pesticides.  Correct?

16   **A**    That table does not say that, correct.

17   **Q**    Okay.  And how did you determine that -- or how were you

18   able to rule in Roundup as a cause of Mr. Engilis's CLL, if

19   this odds ratio was not adjusted for other pesticides?

20   **A**    So to be fair, again I'm a specific causation expert, not

21   a general causation expert.  I'm not allowed to give that

22   testimony.

23       My job is to review the general causation expert's

24   opinion, which I did.  I read the articles, which I did.  And

25   to the best of my ability, I saw that it made sense to me, and

SCHNEIDER - CROSS / duPONT

1   I support and adopt the general causation opinions that Roundup

2   is an etiologic agent in CLL.

3        And then taking those to the next step, look and see what

4   else possibly could have caused the CLL, and give my opinions

5   to a reasonable degree of medical certainty, based upon my 40

6   years of training, my board certification which allows me to

7   expose -- sorry -- to expand on the epidemiologic causes of

8   NHL.

9   Q   Do you know whether Dr. Weisenburger's opinion or report

10  that you reviewed discussed CLL, and whether there was an

11  association with Roundup?

12  A   I don't have an independent recollection of whether he

13  mentioned it or not.  I guess if you showed me, I could look at

14  it.  But, indeed, he certainly said NHL.

15       And a lot of the studies don't distinguish NHL and CLL.

16  That's a drawback.  But, still, as I said before, I have to use

17  the best data I can find.  And, you know, this is a study where

18  it shows that CLL was caused or may be caused by Roundup.

19  Other studies, like McDuffie, for example, weren't able to

20  break it down, so I just had to use NHL.

21  Q   You mentioned Pahwa in your questions with Mr. Haberman

22  earlier.  Are you relying on that study?

23  A   Again, I'm not the one to rely on the study.  I am the

24  specific causation witness.  I'm not allowed to be a general

25  causation witness.  Therefore, I looked at the Pahwa study.

1   And I saw in Table 5 that for CLL, that the ordinal lifetime

2   exposure of ten days was significant.

3       (Document displayed)

4   **A**    But again, I'm not a statistician or an epidemiologist.  I

5   don't fully understand what "ordinal" means.  But, I base my

6   specific causation opinions on the general causation opinions.

7           **THE COURT:**  And let me just jump in here, maybe just

8   to sort of -- in the interest of saving some time.

9           Dr. Schneider's right, right, that if I rule that he's

10  permitted to offer a specific causation opinion, I would not

11  permit him -- the stuff that you're asking him about now would

12  be outside the scope of that opinion.

13          **MS. duPONT:**  (Nods head)

14          **THE COURT:**  And so I don't think we need to hear too

15  much more about it today.

16          **MS. duPONT:**  Okay.

17          **THE COURT:**  What I will say -- and I'll make this

18  clear in my ruling if I do conclude that he's allowed to

19  testify on specific causation -- is that when he -- you know,

20  just like we did with Dr. Nabhan, right, he can -- he can state

21  that he is -- you know, that his opinion assumes the

22  correctness of the analysis of the general causation experts.

23  But that he's not here to offer a general causation opinion,

24  himself.  So in a way, his specific causation opinion is only

25  as good as the general causation opinions that came before it.

1        I think it would be permissible to allow the plaintiffs to

2    ask him if he agrees with those general causation opinions, and

3    he can say yes, but then that's it, on direct.  I mean, that's

4    what we did with Nabhan.

5        Now, of course, you are free on cross-examination to ask

6    him anything you want.  And if you want to impeach him with

7    things that he said about general causation, that's perfectly

8    appropriate.  But at that point, you've opened the door to him

9    giving an opinion on general causation.

10        And I'm pretty sure that's what we said with respect to

11    Nabhan.  And Monsanto chose, in that case, I believe, not to

12    impeach him on stuff that he had said on general causation, if

13    I remember correctly.  I think it was Nabhan.

14        But anyway, if I do allow the specific causation opinion,

15    which I've not made a decision on yet, those would be the

16    ground rules.

17        **MS. duPONT:**  Understood.

18        **THE COURT:**  Right?  The stuff that you're asking him

19    about now would be outside the scope of his opinion.  And if

20    you -- but if you choose to ask him about it, then he has

21    freedom to answer in whatever way he believes would be sort of

22    appropriate to explain the impeachment material to the jury.

23    And that, I think, inevitably will include giving his own

24    opinion on these studies and on general causation.

25        But for purposes of this hearing, I don't think it's

1    necessary for you to start cross-examining him on his general

2    causation opinion, because I'm not allowing that testimony.

3         MS. duPONT:  Understood.  And I think that my

4    confusion lies with the fact that at his deposition, when he

5    was discussing CLL, he was specifically using epidemiology to

6    offer an opinion specific to Mr. Engilis's CLL.

7         THE COURT:  Right.  Which is understandable, because

8    that's how it is normally done.  Right?

9         MS. duPONT:  Right.

10        THE COURT:  That's how a specific causation expert

11   would normally give their opinion.  But I believe that if --

12   you know, if one -- you know, if a general causation -- if an

13   expert is not qualified to give a general causation opinion, or

14   if maybe he is qualified but he just hasn't offered a general

15   causation opinion that is admissible in a particular case, and

16   if a plaintiff has another qualified general causation opinion,

17   it's appropriate for the specific causation expert to piggyback

18   off of that.

19        And so I agree that in the normal situation -- and that's

20   where Dr. Schneider was previously, right, when he was having

21   his deposition taken, --

22        MS. duPONT:  Right.

23        THE COURT:  -- he's incorporating his assessment of

24   the epidemiology into his opinion.  But I've sort of said that

25   he can't do that.  Because he didn't offer an adequate general

 1   causation opinion on -- on the relationship between glyphosate

 2   and NHL.

 3          MS. duPONT:  Understood.  And just so you are aware, I

 4   know he's relying on Dr. Weisenburger's opinion, but that

 5   opinion, that report does not discuss CLL specifically, which

 6   is why I was asking him these questions here.  But, I'll move

 7   on.

 8          THE COURT:  And what about Portier?

 9          MS. duPONT:  Portier does not discuss that, either.

10   He's focused on NHL.

11          THE COURT:  Okay.  There was a third general causation

12   expert?

13          MS. duPONT:  It was Dr. Schiff, who was actually not

14   disclosed in this case.

15          THE COURT:  Okay.

16          MR. HABERMAN:  Just to be clear, though, Your Honor,

17   the plaintiffs did designate all of the general causation

18   experts in this matter.

19          THE COURT:  Meaning Portier, Weisenburger, and Schiff?

20          MR. HABERMAN:  Dr. Schneider's report mentions

21   Dr. Portier, Weisenburger and Schiff, but the overall expert

22   disclosure discloses all of the general causation experts that

23   the Court's permitted.

24          THE COURT:  And that is Portier, Weisenburger, and

25   Ritz?

1          **MR. HABERMAN:**  Ritz.

2          **THE COURT:**  Three, right?

3          **MR. HABERMAN:**  I can't recall if the Court also made

4    rulings on Jameson.

5          **THE COURT:**  I think I excluded Jameson, if I remember

6    correctly.  I'm not positive about that, but I think I did.

7          **MR. HABERMAN:**  Okay.  So --

8          **THE COURT:**  If I recall correctly, Jameson just sort

9    of adopted the IARC analysis, and didn't go further than that,

10   and so I excluded him.  I may be misremembering.

11         **MR. HABERMAN:**  I don't have a recollection, one way or

12   the other.  But I just know that he -- from my memory, he was

13   one of the experts that the plaintiffs put up for general

14   causation.  I don't recall how the Court ruled.

15      But, the point that I'm trying to make is in the

16   plaintiff's general expert disclosures in this matter, we

17   disclosed the -- the general experts that the plaintiff's

18   leadership in the MDL put forward.

19         **THE COURT:**  Okay.

20         **MR. HABERMAN:**  Thank you.

21         **MS. duPONT:**  But, to be fair, he only reviewed the

22   reports of Portier and Weisenburger.

23         **THE COURT:**  And --

24         **THE WITNESS:**  And --

25         **MS. duPONT:**  And Schiff, who is not disclosed in this

 1    case.

 2          **THE COURT:**  Okay.

 3    **BY MS. duPONT**

 4    **Q**    So let me talk a little bit more about your differential

 5    diagnosis or etiology.  Doctor, in your expert report, you do

 6    not discuss literature reporting an association between obesity

 7    and NHL or CLL.  Correct?

 8    **A**    Correct, for the reasons I've told you before.

 9    **Q**    And you have, in fact, reviewed literature, though, on

10    obesity that's associated with NHL.  Right?

11    **A**    Correct.

12    **Q**    So you know that the literature, in fact, reports an

13    association between obesity and the development of NHL.  Right?

14    **A**    Some does; some doesn't.

15    **Q**    But you're aware of some literature that reports an

16    association between obesity and the development of NHL.

17    Correct?

18    **A**    Again, very few studies.

19    **Q**    And we just were speaking about Dr. Weisenburger.  Do you

20    recall that?

21    **A**    I do.

22    **Q**    And Dr. Weisenburger actually published on the association

23    between NHL and obesity.  And I will refer you to Defendant's

24    Exhibit 113, which we can pull up on the screen.

25          (Document displayed)

**SCHNEIDER - CROSS / duPONT**

1   **Q**    Is this one of the articles you reviewed on obesity and

2   NHL?

3   **A**    Last night I got it for the first time, yes.

4   **Q**    So you reviewed it last night?

5   **A**    I did.  I have many comments on it, if you'd like me to

6   make them.

7          **THE COURT:**  Could you slow down a little bit?

8          **THE WITNESS:**  I'm sorry.  I'm from New York.

9   **BY MS. duPONT**

10  **Q**    Doctor, this articles discusses odds ratios for various

11  subtypes of NHL, according to BMI.  Right?

12  **A**    Yes.

13  **Q**    And if we go to Table 4, Page 683.

14         (Document displayed)

15         **MS. duPONT:**  Thanks, Katherine.

16  **BY MS. duPONT**

17  **Q**    This Table 4 contains adjusted odds ratios for subtypes of

18  NHL according to body mass index, by age.  Correct?

19  **A**    Correct, yes.

20  **Q**    And the fourth column over is entitled "Chronic

21  Lymphocytic Leukemia, Small lymphocytic Lymphoma," correct?

22  **A**    Yes.

23  **Q**    And CLL, that's the type of NHL Mr. Engilis had?

24  **A**    They are the same disease.

25  **Q**    And that's what he had?

**SCHNEIDER - CROSS / duPONT**

1  **A**    Correct.  He had CLL, or small lymphocytic lymphoma.  They

2  are the same disease.

3  **Q**    And this table reports a statistically significant odds

4  ratio of 4.5 with a confidence interval of 1.5 to 13.3 for the

5  development of CLL based on a BMI of over 30 when someone is in

6  their forties.  Correct?

7  **A**    Correct.

8  **Q**    And this odds ratio is much larger than the literature

9  that you have seen reporting on glyphosate in CLL, correct?

10  **A**    I don't remember a 13.3, but again, I'm not a

11  statistician.

12  **Q**    So in your expert report, you discuss Mr. Engilis's

13  clinical history, but you didn't note his weight or BMI in your

14  report.  Correct?

15  **A**    Well, again, maybe we can go to the discussion where I can

16  show you all of the pitfalls of the study.  I don't think it's

17  a good study.

18  **Q**    I'm not asking you about the study, to be fair.

19       **THE COURT:**  Yeah; you have to answer the question that

20  she's asking.

21       **THE WITNESS:**  I apologize.  What is the question?

22  **BY MS. duPONT**

23  **Q**    In your expert report you discuss Mr. Engilis's clinical

24  history, but you do not note his weight or BMI, do you?

25  **A**    Because I don't think it's important, correct.

1    Q    And in your expert report you actually wrote that

2    Mr. Engilis is, quote-unquote, negative for obesity, based on

3    his plaintiff fact sheet.  Right?

4    A    Yes.  It's -- who's saying he's obese?  Maybe he filled

5    out the fact sheet; maybe he didn't think he was obese.

6    Q    And that's what you wrote in your report, is that he was

7    negative for obesity.  Right?

8    A    That's what I think.  As I said before, I don't think BMI

9    tells you the whole story about --

10        THE COURT:  Did you write that he was negative for

11   obesity?

12        THE WITNESS:  She says I did; I'm sure I did.  I'm

13   just --

14   **BY MS. duPONT**

15   Q    I'm happy to pull it out for you.

16   A    I'm sure I did, if I said that, yeah.

17   Q    You also reviewed Mr. Engilis's medical records, as you

18   told us, to form your opinions in this case, right?

19   A    Correct.

20   Q    Did you go to the medical records to confirm the

21   information in Mr. Engilis's plaintiff fact sheet, that he was

22   in fact not obese, or negative for obesity?

23   A    I don't think the records said either way.  I don't

24   remember him being called obese by any practitioner.

25   Q    Well, let's take a look at some of his medical records.

**SCHNEIDER - CROSS / duPONT**

1      Let's pull up Defense Exhibit 114.

2      (Document displayed)

3  **Q**    And this is a medical record from his primary care doctor,

4  Frank Mari, which you can see at the bottom of the page, if you

5  look at the Bates stamp number.  And if we scroll back up to

6  the top, do you see that this is a medical record from December

7  of 2000?

8  **A**    I do.

9  **Q**    And you are aware that Mr. Engilis was born December 25,

10  1951?

11  **A**    Yes.

12  **Q**    So he would have been 48 years old in December -- on

13  December 4th, 2000.  Correct?

14  **A**    Okay.

15  **Q**    And this medical record says Mr. Engilis was 204 pounds on

16  December 4th.  Right?

17  **A**    Yes.

18  **Q**    And you are aware that Mr. Engilis is five foot, six

19  inches tall.  Correct?

20  **A**    Yes.

21  **Q**    And so would you agree with me, Doctor, that Mr. Engilis's

22  BMI is over 30?  In fact, it's approximately, if we calculate

23  it, 32.9?

24  **A**    I would agree with you, sure.

25  **Q**    And so Mr. Engilis was, in fact, obese in his forties,

1    correct?

2    **A**    I can't say that.  I don't know how his weight was

3    distributed.  I know he rode his bike.  Maybe he had very

4    thick, muscular legs.  I have not seen a picture.  So he was

5    not called obese there, and I certainly can't say whether he's

6    obese or not.

7    **Q**    But you understand that a BMI of over 30 qualifies as

8    obese.  Correct?

9    **A**    By definition, yes.  But really what matters is how it's

10   distributed on a person.

11   **Q**    Now, Mr. Engilis was diagnosed with CLL in November of

12   2014.  Correct?

13   **A**    Yes.

14   **Q**    And are you aware that there are medical records that

15   establish that he was obese right before his CLL diagnosis?

16   **A**    You may want to show me.  I don't remember the word

17   "obese."

18   **Q**    Are you aware that there are medical records that show he

19   has a BMI of 33, right before his diagnosis?

20   **A**    I agree with you that the BMI was 33, but I don't remember

21   him being called obese.

22   **Q**    So you didn't consider the fact that Mr. Engilis had a BMI

23   of greater than 30 for the 14 years prior to, leading up to his

24   diagnosis.  Correct?

25   **A**    I did consider it, but rejected it.  And even the article

SCHNEIDER - CROSS / duPONT

```
 1   that you supplied, for example, there's contradictory

 2   information.

 3        If you look at the discussion of that article, it says,

 4   for example, patients with CLL had a statistically significant

 5   chance of getting -- patients who were obese and had CLL, the

 6   obesity was a factor.  But then they caught a small lymphocytic

 7   lymphoma, and that was not significant.  So it doesn't make

 8   much sense.  They're the same disease.  So I think there's

 9   problems with the study.

10   Q    And Mr. Haberman -- Mr. Haberman can ask you questions

11   about that in a bit.

12        I just want to understand.  You wrote in your report that

13   you considered Mr. Engilis to be negative for obesity.

14   Correct?

15   A    Again, you haven't shown me anywhere where it says

16   "obese."  It talks about BMI, but not the word "obese."

17   Q    Okay.  Assume if someone has a BMI greater than 30, they

18   are considered medically obese.  Okay?

19   A    Is that a fact?  Or I can respond to that?

20   Q    Just assume that, for me.

21   A    Okay.

22   Q    Mr. Engilis had a BMI of greater than 30, 14 years prior

23   to his diagnosis.  Correct?

24   A    Yes.

25   Q    And he also had a BMI of over 30 at the time of his
```

1    diagnosis.

2    **A**    Yes.

3    **Q**    And that is nowhere in your expert report.  Correct?

4    **A**    I don't think, as I said before, that BMI is a risk

5    factor, for the reasons I've told you before.  It depends how

6    it's distributed.

7    **Q**    I'm going to change topics.

8         **THE COURT:**  Before you change topics, could I just get

9    an understanding?

10        **MS. duPONT:**  Yeah.

11        **THE COURT:**  So there's this Weisenburger study.  What

12   are the other studies or papers, or whatever you want to call

13   them, what are the other papers on the link -- on whether there

14   is a link between NHL and obesity?

15        **THE WITNESS:**  So I researched last night.  And there's

16   an article in a journal called *Oncology*.

17        **THE COURT:**  I want to make sure I understand.  So

18   you're saying when you prepared your report and when you were

19   in your deposition, you hadn't read any of the studies on

20   whether there's a link between obesity and NHL.

21        **THE WITNESS:**  No.

22        **THE COURT:**  Okay.  You read them last night for the

23   first time?

24        **THE WITNESS:**  That's not what I'm saying, no.

25        **THE COURT:**  Okay.

1          **THE WITNESS:**  What I'm saying is that in my 35 or

2    40 years, I've seen articles on that topic.  I form my own

3    opinions based upon my training, 40 years, board certification.

4          And I think just like being 65 and male are risk factors,

5    I think obesity is the same kind of risk factor.  It's not a

6    risk factor because so many of the population is 65, male and

7    obese.

8          So I have that fund of knowledge, and I have seen

9    literature before.  And when I wrote my report, that was my

10   opinion, and it still stands.

11         But last night, for the first time, I get this article to

12   look at.  So in preparation for today's hearing, I did a Google

13   search.  And I went to the peer-reviewed journal called

14   *Oncology*.  And in that -- it's 2010, by the way, *Oncology*, 2010

15   was the year.

16         And there's a very nice table of about 40 studies, looking

17   at this very issue.  And of the 40 studies, I think only three

18   showed an association.  The other ones were either silent on

19   the topic, or negative.

20         So to me that supports my opinion, as Andy Schneider, that

21   obesity is not a specific risk factor for NHL, as being male is

22   not, and being 65 is not.  Just more common.  But, again, most

23   of the population, unfortunately, is either obese or, slash,

24   have a high BMI.

25         **THE COURT:**  Did you read those three studies that --

```
 1              THE WITNESS:  I did read those three studies.  I
 2   pulled -- one of them was this study (Indicating).  And the
 3   other -- there were two other ones.  One showed, like, in black
 4   and white men, it was significant.  And --
 5              THE COURT:  Obesity was significant?
 6              THE WITNESS:  Yes.  So out of the -- I'm guessing --
 7   it was about 40 studies.  It was a whole lot of studies.  It
 8   was three -- a three-page table.  And only three studies showed
 9   an association.
10       And I did -- I went to the article, I was able to click on
11   the reference, and I did look at those studies.
12              THE COURT:  Okay.
13              MS. duPONT:  Respectfully, Your Honor, he just
14   testified he pulled this up last night.  I've had no
15   opportunity to see exactly what he's talking about.
16              THE WITNESS:  With respect, you only gave it to me
17   last night.  I got the article from you last night.
18              MS. duPONT:  My point, Your Honor, is that I haven't
19   had an opportunity to see what studies he's talking about.
20   He's just saying he's found 20 studies, and three of them are
21   positive.
22       And so I would request that this is an undisclosed
23   opinion, and he not be able to testify further about what he
24   did last night.
25              THE COURT:  Well, the question is whether I -- I will
```

 1   consider what he did last night.

 2          MS. duPONT:  (Nods head)

 3          THE COURT:  I'm happy to hear his testimony about

 4   anything, and I'll decide what's appropriate to consider and

 5   what is not.

 6          MS. duPONT:  Understood.  Thank you.

 7   BY MS. duPONT

 8   Q   I want to switch gears a little bit.

 9   A   Sure.

10          THE COURT:  One other question.  And I guess -- this

11   is probably for you, Ms. DuPont.

12      You implied or stated a number of times that he said that

13   Engilis was negative for obesity in his report.

14          MS. duPONT:  Correct.

15          THE COURT:  I was just looking for that.  I couldn't

16   find that, so I was wondering if you could show that to me.

17          MS. duPONT:  Sure.

18      (Document displayed)

19          MS. duPONT:  If we pull up -- I think its' Defendants

20   Exhibit 104.

21      And if we go to -- hold on one second.

22          MS. PODSIADLO:  I have it on the screen.

23          MS. duPONT:  Yes.

24      So he has here:

25          "Per Mr. Engilis's plaintiff fact sheet, he

```
 1              is negative for the following medical

 2              conditions"

 3      And then if you scroll down, one of those conditions is

 4   obesity.

 5      (Document highlighted)

 6              THE COURT:  Got it.  Thank you.

 7              MS. duPONT:  Okay.

 8      Can I switch to the next topic, Your Honor?

 9              THE COURT:  Go ahead.

10   BY MS. duPONT

11   Q    Okay.  Cells in our body divide and replicate, right,

12   Doctor?

13   A    Yes.

14   Q    And our cells contain our DNA, right?

15   A    Yes.

16   Q    And that DNA contains thousands of genes, right?

17   A    Yes.

18   Q    And the process of cell division is called mitosis,

19   correct?

20   A    Yes.

21   Q    And cell division happens billions of times in our

22   lifetime, right?

23   A    I assume so, yes.

24   Q    And depending on the tissue, some cells divide a lot,

25   others not so much.  Right?
```

**SCHNEIDER - CROSS / duPONT**

1   **A**     Yes.

2   **Q**     Just like other tissues, haematopoietic stem cells divide

3   throughout our lives.  Right?

4   **A**     Yes.

5   **Q**     And while the body is almost perfect in this copying

6   process, some errors are made.  Right?

7   **A**     Yes.

8   **Q**     In other words, sometimes DNA doesn't get copied

9   correctly.  Right?

10  **A**     Yes.

11  **Q**     When DNA doesn't get copied correctly, that results in a

12  cell that has a mutation.  Right?

13  **A**     Yes.

14  **Q**     And a mutation is the -- an abnormality in the DNA.

15  Right?

16  **A**     Yes.

17  **Q**     And mutations can occur in any type of cell in our body,

18  including lymphocytes.  Correct?

19  **A**     Correct.

20  **Q**     And cells do not have to be exposed to anything external

21  to the cell to have a mutation happen.  Correct?

22  **A**     True.

23  **Q**     And as we age, there are more chances for mutations to

24  occur.  Correct?

25  **A**     Correct.

1   Q    And we know Mr. Engilis was 62 when he was diagnosed with

2   CLL.   Correct?

3   A    Yes.

4   Q    And you agree that certain mutations, when they occur and

5   are not repaired, can cause a cell to divide, and never stop or

6   die, meaning it causes cancer.   Right?

7   A    Doesn't have to be, but it can happen, yes.

8   Q    And in performing your differential etiology in

9   Mr. Engilis's case, you didn't consider whether mutations

10  internal to Mr. Engilis's body were the cause of his CLL, did

11  you?

12  A    I did.   So, as you said, we all can get mutations, but

13  your body can take care of mutations.   Not every mutation is

14  going to lead to a malignancy.   And sometimes if there's an

15  external factor and there's a mutation, that may promote or

16  exacerbate or potentiate a chance of getting a malignancy.

17  Q    Explain to me exactly how you ruled out that a

18  naturally-occurring mutation internal to Mr. Engilis's body

19  wasn't the cause of his CLL.   I didn't understand your

20  response.

21  A    Yeah.   So as a clinical medical oncologist, for CLL,

22  there's no known mutation, other than maybe TP53, or

23  heavy-chain mutations.   But those, by itself, don't cause CLL.

24  They're byproducts of getting the CLL.

25       So it's my opinion as a clinical oncologist that it's --

SCHNEIDER - CROSS / duPONT

1   when you have the CLL, you can get genetic mutations.  But I

2   know of no data, no evidence where a mutation by itself, that

3   we can isolate and name, is the etiology of CLL.

4   Q    When you were deposed in June of 2022, you said you had no

5   basis to disagree that research has shown that, on average, CLL

6   will have somewhere between five and 20 mutations.  Correct?

7   A    And I still agree with that.  You can have mutations.  But

8   your question was:  Did the mutation cause the CLL?  And that's

9   what I'm disagreeing with you.

10        It's known that patients with CLL do have mutations, as I

11  just told you.  They have TP53; they have heavy-chain

12  mutations.  But it's not these mutations that are causing CLL.

13  It's the CLL that makes these mutations.

14        And you can prognosticate the CLL, based upon these

15  mutations.  It is used for prognostic information.  It's not a

16  way to diagnose, and it's not the etiology of the CLL.  There's

17  a difference.

18  Q    You told us that Mr. Engilis was diagnosed with three

19  different types of cancer.  Right?

20  A    Yes.

21  Q    The first was the bladder cancer.  Correct?

22  A    Correct.

23  Q    The second was the melanoma.  Correct?

24  A    Yes.

25  Q    And that was on his forearm, right?

**SCHNEIDER - CROSS / duPONT**

1  **A**    Correct.

2  **Q**    And the third cancer that was diagnosed was CLL.  Right?

3  **A**    Yes.

4  **Q**    And as I understand it, you are not offering the opinion

5  that Mr. Engilis's CLL was -- sorry.  Strike that.

6       You're not offering the opinion that Roundup directly

7  caused the bladder cancer.  Correct?

8  **A**    Correct.  I believe it's a secondary malignancy from the

9  CLL.

10  **Q**    And you're not offering the opinion that Mr. Engilis's

11  melanoma was caused by Roundup.  Correct?

12  **A**    Correct.  Both are known secondary malignancies of

13  patients who have CLL.

14  **Q**    And your basis for that opinion is that in your view,

15  patients with CLL have more immune dysfunction than those with

16  NHL have.  Right?

17  **A**    Absolutely, yes.

18  **Q**    But you're not citing any medical literature for your

19  opinion that patients with CLL have more immune dysfunction

20  than patients with NHL, generally.  Right?

21  **A**    Well, I didn't give you literature, but I can give you

22  reasons.  So, again --

23  **Q**    I'm asking about literature, though.  You didn't cite any

24  literature.  Correct?

25  **A**    So every statement I make, I don't have a literature cite

**SCHNEIDER - CROSS / duPONT**

1    to.  Only ones that I think need them.

2         To me, this is a basic tenet of oncology that patients

3    with CLL have hypogammaglobulinemia, and are pre-exposed (sic)

4    to infections with encapsulated organisms.  It's the CLL

5    patients more than any other NHL patient who was at risk for

6    infections, and the sequelae of those infections.

7         And that's why, for example, we use IV gamma globulin for

8    those patients who have recurrent infections in CLL.

9    **Q**    But my question was very specific.

10        You didn't cite any medical literature for your opinion

11   that patients with CLL have immune dysfunction more than

12   patients with NHL, generally.  Correct?

13        You didn't cite any medical literature.

14   **A**    So if I'm correct, I was asked in my depo, and I wouldn't

15   have had time to cite it because you just asked me in my depo.

16   Obviously I didn't know what questions you were going to ask

17   me, but I can always give you the literature.

18        But more importantly, it's very known to all oncologists

19   that patients with CLL are the ones who have infection

20   problems.  And again, you asked me that in my depo.  That's why

21   there was no literature to support.

22   **Q**    You said there's no literature to support it.  Correct?

23   **A**    No, I said I couldn't give you at the time, because you

24   asked me during my depo.  So this was a question you asked me,

25   so I didn't have any time to give literature support, because I

1    was answering your questions at deposition.

2    **Q**    And you don't have any literature to support it today,

3    either.   Correct?

4    **A**    Oh, I do.   I do.   You can go to DeVita textbook of

5    medicine, oncology, and read the CLL chapter.   It'll tell you

6    that they have problems with encapsulated organisms,

7    hypergammaglobulinemia.   DeVita Journal of Cancer, yes.

8    **Q**    And that is an opinion that you are offering for the first

9    time today.   Correct?

10            **MR. HABERMAN:**   Objection --

11            **THE WITNESS:**   I mean, you asked the question --

12            **THE COURT:**   Hold on a sec.   There's an objection.

13       The objection is overruled.

14       Okay, go ahead.

15            **THE WITNESS:**   So answer the question?

16            **THE COURT:**   Yeah.

17            **THE WITNESS:**   I'm only answering your questions today.

18    I can only give opinions and answer questions that you ask me.

19    **BY MS. duPONT**

20    **Q**    You're not relying on a specific study that shows a

21    statistically significant increased risk of bladder cancer in

22    patients who have a preceding CLL, correct?

23    **A**    That is correct.   I'm relying on the fact that it is well

24    known that patients with CLL have secondary solid tumor

25    malignancies.

**SCHNEIDER - CROSS / duPONT**

1   Q    Now, Doctor, in your report -- and I'm just focused on

2   your report -- you didn't describe whether or not Mr. Engilis

3   had any alternative risk factors, or lay out in your report

4   what those alternative risk factors might be, and then rule

5   those out for Mr. Engilis.  Fair?

6   A    Which disease?  You didn't tell me.

7   Q    For bladder cancer.  Sorry.

8   A    If I didn't -- I don't know if I did or I didn't, but I

9   said in my deposition and I said today that smoking and analine

10  dyes are the risk factors.

11  Q    But you didn't discuss that anywhere in your report.

12  Correct?

13  A    If I didn't, then I didn't.

14  Q    And you, at the time you offered an opinion and were

15  deposed in August of 2022, didn't explain what alternative risk

16  factors there were for the development of melanoma.  Correct?

17  A    I think you guys asked me about the sunburn eventually,

18  and we talked about that.

19          **THE COURT:**  Try and slow down a little bit.

20          **THE WITNESS:**  Sorry.

21          **THE COURT:**  You've gotten a lot faster on

22  cross-examination.

23          **THE WITNESS:**  I'm sorry.

24  **BY MS. duPONT**

25  Q    But you didn't discuss whether or not Mr. Engilis had

1    sunburn, or whether he had a predisposition based on his family

2    history, whether he had moles.  You didn't discuss any of that

3    in your report.  Correct?

4    **A**    In my report?  Or my deposition?

5    **Q**    In your report.

6    **A**    In my report, I don't think I did, although I obviously

7    said he had no family history of cancer.

8    **Q**    And you acknowledge that exposure to the sun is a risk

9    factor for melanoma.  Right?

10   **A**    I agree.

11   **Q**    And you mentioned that there's a medical record that said

12   that the patient, being Mr. Engilis, reported sunburns.

13   Correct?

14   **A**    Yes.

15   **Q**    But when you submitted your expert opinion in this case,

16   you didn't even know how many sunburns Mr. Engilis had, did

17   you?

18   **A**    I still don't know.  I don't think it said in the record.

19          **MS. duPONT:**  I don't have any further questions at

20   this time, Your Honor.

21          **THE COURT:**  Okay.  Thank you.  Any redirect?

22          **MR. HABERMAN:**  No, Your Honor.

23          **THE COURT:**  Okay.  Very good.  You can step down.

24          **THE WITNESS:**  I appreciate the time.  Thank you very

25   much.

PROCEEDINGS

```
1        (Witness excused)

2            THE COURT:  So I gather that you all would like to

3    submit a post-hearing brief.  Can you submit a brief in seven

4    days?  Is that --

5            MS. duPONT:  Seven days.

6            THE COURT:  Is that unreasonable?

7            MS. duPONT:  That is not unreasonable.

8            THE COURT:  So Monsanto will file a post-hearing

9    briefing regarding Dr. Schneider within seven days.

10       And then, perhaps the plaintiff can file a response

11   14 days from today?

12           MR. HABERMAN:  Yes, Your Honor.

13           THE COURT:  Okay.  Very good.  And I'll issue a ruling

14   after that.

15       Anything else for us to discuss right now?  Oh, what

16   about, who's the -- this isn't your case.  There's a motion to

17   exclude one of your witnesses in a different case.

18           MS. duPONT:  Do you know what case?

19           THE COURT:  I can look it up real quick.

20           MS. duPONT:  Is it Dr. Tomasetti?

21           THE COURT:  Yeah.  That is not this case, right?

22           MS. duPONT:  That's not this case.

23           THE COURT:  Okay, so I'll get back to you on that

24   shortly.

25           MS. duPONT:  Okay.  Just one housekeeping matter.  I
```

**PROCEEDINGS**

1  just referred to several exhibits during my examination of

2  Dr. Schneider.  Can I just make sure that those are all

3  admitted by --

4      **THE COURT:**  I assume everybody agrees that all of the

5  exhibits that were used in the hearing today can be admitted as

6  part of the record for the hearing?

7      **MR. HABERMAN:**  That's fine.

8      **MS. duPONT:**  Is that okay with you?

9      **MR. HABERMAN:**  Yes, Your Honor.

10      **THE COURT:**  Okay.

11      **MR. HABERMAN:**  I didn't identify the Pahwa article.

12      **MS. duPONT:**  I can just --

13      **MR. HABERMAN:**  Or --

14      **THE COURT:**  Can I make it -- maybe I could make it

15  easier on you?  Do you want to just say that all the exhibits

16  in both binders are part of the hearing record?

17      **MS. duPONT:**  That's fine with me.

18      **MR. HABERMAN:**  Um, I don't.  I do object to that.  I

19  think there are a lot of prints and reliance lists and things

20  like that that --

21      **THE COURT:**  Okay.  Well, why don't you all work

22  together to identify -- maybe you could do that right now.

23      **MR. HABERMAN:**  Sure.

24      **THE COURT:**  Work together to identify the list of

25  exhibits that will -- that will be admitted as part of this

1  hearing, and the ones that -- any of them that were referenced

2  in the testimony.  And you can give those to Bhavna, and they

3  will be admitted.

4          **MR. HABERMAN:**  Thank you.

5          **MS. duPONT:**  Thank you.

6          **THE COURT:**  Okay?  Thank you.

7          **MR. HABERMAN:**  Thank you, Your Honor.

8      (Proceedings concluded)

9      (Evidentiary Hearing Exhibits 101, 103, 104, 107, 113,

10  114, and 115 received in evidence.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## <u>I N D E X</u>

Wednesday, September 20, 2023 - Volume 1

| **<u>PLAINTIFFS' WITNESSES</u>** | **<u>PAGE</u>** | **<u>VOL.</u>** |
|---|---|---|
| **<u>SCHNEIDER, DR. ANDREW</u>** | | |
| (SWORN) | 4 | 1 |
| Direct Examination by Mr. Haberman | 4 | 1 |
| Cross-Examination by Ms. duPont | 35 | 1 |

## **<u>E X H I B I T S</u>**

| **<u>EXHIBITS</u>** | **<u>IDEN</u>** | **<u>EVID</u>** | **<u>VOL.</u>** |
|---|---|---|---|
| 101 | | 79 | 1 |
| 103 | | 79 | 1 |
| 104 | | 79 | 1 |
| 107 | | 79 | 1 |
| 113 | | 79 | 1 |
| 114 | | 79 | 1 |
| 115 | | 79 | 1 |

CERTIFICATE OF REPORTER

I, BELLE BALL, Official Reporter for the United States

Court, Northern District of California, hereby certify that the

foregoing is a correct transcript from the record of

proceedings in the above-entitled matter.


___/s/ Belle Ball___

Belle Ball, CSR 8785, CRR, RDR

Wednesday, September 20, 2023