# Exhibit AA

Robert L. Lieff (SBN 037568)
Elizabeth J. Cabraser (SBN 083151)
Steven E. Fineman (SBN 140335)
Kevin R. Budner (SBN 287271)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California  94111-3339
Telephone: 415.956.1000
ecabraser@lchb.com

William M. Audet (SBN 117456)
Ling Y. Kuang (SBN 296873)
AUDET & PARTNERS, LLP
711 Van Ness, Suite 500
San Francisco, CA 94102-3229
Telephone: 415.568.2555

James R. Dugan, II
TerriAnne Benedetto
David S. Scalia
THE DUGAN LAW FIRM, APLC
One Canal Place
365 Canal Street, Suite 1000
New Orleans, LA  70130
Telephone: 504.648.0180

Samuel Issacharoff
40 Washington Square South
Suite 411J
New York, NY 10012
Telephone: 212.998.6580

*Counsel for Plaintiffs and the Proposed Class*
*(additional counsel listed below)*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL NO. 2741 |
| _____ | Case No. 3:16-md-02741-VC |
| THIS DOCUMENT RELATES TO: | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| *Ramirez, et al. v. Monsanto Co.*, Case No. 3:19-cv-02224 | **JURY DEMAND** |

- 1 -

Plaintiffs, ROBERT RAMIREZ, JERRY AGTARAP, DEXTER OWENS, and JOHN ELKO, individually and on behalf of all others similarly situated, by and through undersigned class counsel, allege as follows as to Defendant Monsanto Company ("Monsanto"), based upon counsel's investigation:

## I.   **INTRODUCTION**

1.      This proposed class action arises from the scientific evidence which has linked exposure to Defendant's Roundup® herbicide—including its active ingredient, glyphosate, alone and/or in combination with other Roundup® ingredients—to Non-Hodgkin's Lymphoma ("NHL").

2.      For decades, class members, including agricultural workers, landscapers and home gardeners have used Roundup®, unaware that this exposure was increasing their risk of contracting NHL.

3.      Defendant knew or should have known that Roundup® is carcinogenic and associated with an increased risk of developing NHL.

4.      Yet, Defendant failed to appropriately and adequately inform and warn of the serious risks associated with the use of and exposure to glyphosate-based formulations and/or Roundup®.

5.      Instead, Defendant has made and continues to make representations suggesting that Roundup® was, and is, safer than ordinary household items, such as table salt.

6.      Upon information and belief, these statements and representations have been made with the intent of inducing the purchase and use of  Roundup® for Defendant's pecuniary gain, and with disregard for and reckless indifference to the safety of those exposed to Roundup®.

7.      Many individual personal injury actions have been filed on behalf of those who know they have been exposed to and alleged they have been harmed by Roundup®.  This class action picks up where those cases leave off.  Through it, Plaintiffs seek to represent those who

have been exposed to Roundup® but have not commenced a personal injury claim or hired a lawyer to do so.[1]

## II.   JURISDICTION

8.      This Court has jurisdiction over this matter pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(a)(1) and (d), because the named Plaintiffs and many Class members are citizens of a different state than Defendant, there are more than 100 members of the Class, and the value of the relief sought exceeds $5,000,000.00, exclusive of interest and costs.

9.      Pursuant to 28 U.S.C. § 1391(b), venue is proper in this District because a substantial part of the events giving rise to the claims occurred in this District.  The Judicial Panel on Multidistrict Litigation already has transferred and consolidated in this District numerous other complaints alleging personal injuries related to Roundup®, and this Court is intimately familiar with the matter.

## III.   PARTIES

10.      Plaintiff ROBERT RAMIREZ (for the purpose of this paragraph, "Plaintiff") is a natural person currently residing in Soledad, California.  Plaintiff worked for Roto-Rooter in Salinas, California from 1999 to 2013 where he utilized a concentrated mix of Roundup® in the maintenance yard.  In 2018, Plaintiff was diagnosed with Double Expressor Large B-Cell Non-Hodgkin's Lymphoma at the Salinas Valley Memorial Hospital in Salinas and underwent chemotherapy treatment at Stanford University Hospital.  Plaintiff was found to be in remission in 2018, but continues to require a colostomy bag and routine cancer screening.  Plaintiff became aware that his injuries were caused by Roundup® within the applicable limitations period of filing his initial complaint.  Plaintiff is a member of and seeks to represent the proposed Class and Subclass 1, as defined herein.

---

[1] The precise Class and Subclasses that Plaintiffs seek to represent—subject to modification as necessary and appropriate—are identified in ¶¶ 99-100, below.

2002216.2

11.     Plaintiff JERRY AGTARAP (for the purpose of this paragraph, "Plaintiff") is a natural person currently residing in Everett, Washington.  Plaintiff is a certified landscaper who has used Roundup® daily for more than 20 years.  Plaintiff does not have access to medical care due to his financial situation.  As of the filing of this Complaint, he has not been diagnosed with NHL, but has an increased risk for future development of NHL due to his exposure to Roundup®.  Plaintiff is a member of and seeks to represent the proposed Class and Subclass 2, as defined herein.

12.     Plaintiff DEXTER OWENS (for the purpose of this paragraph, "Plaintiff") is a natural person currently residing in Fresno, California.  Plaintiff worked for the Fresno Unified School District in Fresno, California where he sprayed Roundup® around the school grounds.  In 2017, after a month of spraying, Plaintiff developed a rash on his left hand.  Plaintiff sought treatment and was prescribed an ointment for the rash.  Plaintiff has not been diagnosed with NHL as of this filing, but he has an increased risk  of future development of NHL due to his exposure to Roundup®. Plaintiff is a member of and seeks to represent the proposed Class and Subclass 2, as defined herein.

13.     Plaintiff JOHN ELKO (for the purpose of this paragraph, "Plaintiff") is a natural person currently residing in North Myrtle Beach, South Carolina.  Plaintiff worked for ten years, from March 2004 to May 2014, at Possum Trot Golf Club in North Myrtle Beach, where he sprayed Roundup® on a daily basis.  Plaintiff was diagnosed with Parkinson's Disease in 2014.  As of the date of this filing, he has not been diagnosed with NHL, but he has an increased risk of future development of NHL due to his exposure to Roundup®.  Plaintiff is a member of and seeks to represent the proposed Class and Subclass 2, as defined herein.

14.     Defendant Monsanto Company ("Monsanto") is a Delaware corporation, with its headquarters and principal place of business in St. Louis, Missouri.  At all times relevant to this Complaint, Monsanto was the entity that discovered and promoted the herbicidal properties of glyphosate and is engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup®.  Monsanto advertises and

- 4 -

sells goods, specifically Roundup®, in this District.  Monsanto transacted and conducted business within this District that relates to the allegations in this Complaint.

15.     "Roundup®" refers to all formulations of Defendant's Roundup® products, including, but not limited to, Roundup® Concentrate Poison Ivy and Tough Brush Killer 1, Roundup® Custom Herbicide, Roundup® D-Pak Herbicide, Roundup® Dry Concentrate, Roundup® Export Herbicide, Roundup® Fence & Hard Edger 1, Roundup® Garden Foam Weed & Grass Killer, Roundup® Grass and Weed Killer, Roundup® Herbicide, Roundup® Original 2k Herbicide, Roundup® Original II Herbicide, Roundup® Pro Concentrate, Roundup® Prodry Herbicide, Roundup® Promax, Roundup® Quik Stik Grass and Weed Killer, Roundup® Quikpro Herbicide, Roundup® Rainfast Concentrate Weed & Grass Killer, Roundup® Rainfast Super Concentrate Weed & Grass Killer, Roundup® Ready- to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup® Ready- to-Use Weed & Grass Killer, Roundup® Ready-to-Use Weed and Grass Killer 2, Roundup® Ultra Dry, Roundup® Ultra Herbicide, Roundup® Ultramax, Roundup® VM Herbicide, Roundup® Weed & Grass Killer Concentrate, Roundup® Weed & Grass Killer Concentrate Plus, Roundup® Weed & Grass Killer Ready-to-Use Plus, Roundup® Weed & Grass Killer Super Concentrate, Roundup® Weed & Grass Killer 1 Ready-to-Use, Roundup® WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

16.     Defendant derived substantial revenue from goods and products used in this District and nationwide.  Defendant expected or should have expected their acts to have consequences within this District, as well as nationwide, and derived substantial revenue from interstate commerce.  Upon information and belief, Defendant did design, sell, advertise, manufacture and/or distribute Roundup®, with full knowledge of its dangerous and defective nature.

- 5 -

IV.    **FACTS**

    A.    **Background on Glyphosate-Based Formulations, Roundup® and Roundup Ready® Seeds**

    17.    Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

    18.    Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

    19.    Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

    20.    Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

    21.    Each year, approximately 250 million pounds of glyphosate-based products are sprayed on crops, commercial nurseries, lawns, parks, and golf courses.  This usage has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

    22.    At all relevant times, Defendant was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or acquire responsibility for the commercial herbicide Roundup®, in which the active ingredient is glyphosate.

    23.    Defendant discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate-based "Roundup®" as a broad-spectrum herbicide.

    24.    The original Roundup®, containing a glyphosate-based formulation, was introduced in 1974.  Today, products incorporating glyphosate-based formulations are among the world's most widely used herbicides.

25.     For more than 40 years, consumers, farmers, and the public have used Roundup®, unaware of its carcinogenic properties.

26.     Defendant is also intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup®, i.e., "Roundup Ready®."

27.     As of 2009, Defendant Monsanto was the world's leading producer of seeds designed to be Roundup Ready®.  In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready® seeds.

28.     Defendant was able to secure their dominant market position in the glyphosate and herbicide market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of the Roundup® herbicide.

        **B.      Registration of Herbicides Under Federal Law**

29.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136, et seq.  FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. § 136a(a).

30.     The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.  Registration by the EPA, however, is not an assurance or finding of safety.  The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment."  7 U.S.C. § 136a(c)(5)(D).

31.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, considering the economic, social, and

environmental costs and benefits of the use of any pesticide."  7 U.S.C. § 136(bb).  FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

32.     FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products.  The data produced by the registrant must be submitted to the EPA for review and evaluation.  The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

33.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered.  The data necessary for registration of a pesticide have changed over time.  The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration."  7 U.S.C. § 136a1.  In order to re-evaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

34.     In the case of glyphosate and Roundup®, the EPA had planned on releasing its preliminary risk assessment—in relation to the registration process—no later than July 2015.  On March 24, 2015, however, the World Health Organization's International Agency for Research on Cancer identified glyphosate as a "probable carcinogen," as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.  The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's finding.  On January 30, 2020, the EPA released its re-registration decision on glyphosate, which concluded that "there are no risks to human health from the current registered uses of glyphosate and that glyphosate is not likely to be carcinogenic to humans."

**C.     Evidence of Carcinogenicity in Roundup®**

35.     As early as the 1980s, Monsanto was aware of glyphosate's carcinogenic properties, alone and/or in combination with other ingredients.

- 8 -

36.     By way of example only, studies and scientific statements reflecting the

carcinogenicity of glyphosate-based formulations include:

a.      On March 4, 1985, researchers from the EPA's Toxicology Branch

published a memorandum classifying glyphosate as a Category C oncogene.  Category C

oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

b.      In 1986, the EPA issued a Registration Standard for glyphosate (NTIS

PB87-103214).  The Registration standard required additional phytotoxicity, environmental fate,

toxicology, product chemistry, and residue chemistry studies.  All the data required were

submitted and reviewed and/or waived.

c.      In October 1991, the EPA published a memorandum entitled "Second Peer

Review of Glyphosate."  The memorandum changed glyphosate's classification to Group E

(evidence of non-carcinogenicity for humans).  Two peer review committee members did not

concur with the conclusions of the committee, and one member refused to sign.

d.      A 2006 study examining DNA damage in human subjects exposed to

glyphosate produced evidence of chromosomal damage in blood cells.  Subject blood cells

showed significantly greater damage after exposure to glyphosate than before in the same

individuals, suggesting that the glyphosate formulation used during aerial spraying had a

genotoxic effect on exposed individuals.

37.     Glyphosate and Roundup® have long been associated with carcinogenicity and the

development of NHL.

38.     Numerous human and animal studies have evidenced the carcinogenicity of

glyphosate and/or Roundup®, including but not limited to:

a.      In 1985, the EPA studied the effects of glyphosate in mice, finding a dose-

related response in male mice linked to renal tubal adenomas, a rare tumor.  The study concluded

the glyphosate was oncogenic.

b.      In 2003, scientists published the results of two case-controlled studies on

pesticides as a risk factor for NHL and hairy cell leukemia.  The studies concluded that

- 9 -

glyphosate had the most significant relationship to NHL among all herbicides, with an increased odds ratio of 3:11.

        c.     A 2003 study examined pesticides and herbicides as risk factors for NHL based on the pooled data of mid-western farmers.  Even controlling for confounders, the study found a relationship between glyphosate and increased incidence of NHL.

        d.     A 2008 population-based case-control study of exposure to various pesticides as a risk factor for NHL strengthened previous associations between glyphosate and NHL.

39.     In addition to evidencing the toxicity of the active molecule, many studies support the hypothesis that glyphosate-based formulations found in Defendant's Roundup® products are more dangerous and toxic than glyphosate alone.

40.     As early as 1991, evidence existed demonstrating that glyphosate-based formulations were significantly more toxic than glyphosate alone.

41.     A 2005 study showed that Roundup®'s effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.  This finding could be attributable to other chemicals in Roundup®, namely the surfactant polyoxyethylene amine ("POEA"), or alternatively, due to the possible synergy between glyphosate and Roundup® formulation products.

42.     A 2009 study examined the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells, and concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone.  The study confirmed that the adjuvants in Roundup® are not inert, and that Roundup® is always more toxic than its active ingredient glyphosate acting alone.

43.     The results of these studies were confirmed in recently published peer-reviewed studies and were always available and/or known to Defendant.

44.     Defendant knew or should have known that Roundup® is more toxic than glyphosate alone, and that safety studies on Roundup®, Roundup®'s adjuvants and "inert"

- 10 -

ingredients, and/or the surfactant POEA, were necessary to protect Plaintiffs and members of the Class from Roundup®.

45.     Defendant knew or should have known that tests limited to Roundup®'s active ingredient, glyphosate, were insufficient to prove the safety of Roundup®.

46.     Defendant failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiffs and the Class from Roundup®.

47.     Rather than performing appropriate tests, Defendant relied upon flawed industry-supported studies.

48.     Moreover, despite knowledge that Roundup® was considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup® as safe.

**D.     IARC Classification of Glyphosate**

49.     The World Health Organization ("WHO") of the United Nations International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency tasked with conducting and coordinating research into the causes of cancer.

50.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014.  Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

51.     IARC set glyphosate for review in 2015–2016.  IARC uses five criteria for determining priority in reviewing chemicals: the substance must have a potential for direct impact on public health; scientific literature must support suspicion of carcinogenicity; evidence of significant human exposure must exist; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern must be present; and related agents

- 11 -

similar to one given high priority by the above considerations must exist.  The IARC seeks to source the data it reviews from publicly accessible, peer-reviewed data.

52.     On March 24, 2015, after a year-long, cumulative review of human, animal, and DNA studies—many of which have been in Defendant Monsanto's possession since as early as 1985—the IARC's Working Group published its conclusion that the glyphosate contained in Roundup® herbicide is a Group 2A, "Probable Human Carcinogen," as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

53.     The IARC's full Monograph was published on July 29, 2015, and established glyphosate as a Group 2A probable carcinogen to humans.  According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

54.     The IARC Working Group found an increased risk between exposure to glyphosate and NHL, as well as several subtypes of NHL, and found that the increased risk continued after adjustment for other pesticides.

55.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

### E.     Scientific Fraud Underlying the Safety Determinations of Roundup® and Glyphosate-Based Formulations

56.     After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Monsanto exerted pressure on the EPA to change its classification.

57.     This culminated in the EPA's reclassification of glyphosate to Group E, which was purportedly based upon evidence of non-carcinogenicity in humans.

58.     In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

59.     On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed scientific fraud.

60.     In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®.  IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including eleven of the nineteen chronic toxicology studies needed to register Roundup® with the EPA.

61.     In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to toxicological impacts of glyphosate.  The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup® were invalid.  An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from *male* rabbits."

62.     Three top executives of IBT were convicted of fraud for their role in the falsified studies in 1983.

63.     In the second incident, Monsanto hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup®.

64.     In March of 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides."

65.     The investigation led to the indictments of the laboratory owner and a handful of employees.

**F.     Monsanto's False Representations Regarding the Safety of Roundup®**

66.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products.  Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to

- 13 -

mammals, birds, and fish.  The representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® include, but are not limited to:

       a.     "Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences."

       b.     "And remember that Roundup® is biodegradable and won't build up in the soil.  That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problem."

       c.     "Roundup® biodegrades into naturally occurring elements."

       d.     "Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

       e.     "This non-residual herbicide will not wash or leach in the soil.  It ... stays where you apply it."

       f.     "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

       g.     "Glyphosate's safety margin is much greater than required.  It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

       h.     "You can feel good about using herbicides by Monsanto.  They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

       i.     "Roundup® can be used where kids and pets will play and breaks down into natural material."  This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup®.

    67.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from

- 14 -

publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

        a.    its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless, or free from risk;

        b.    its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed, or sold by Monsanto are biodegradable;

        c.    its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

        d.    its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics";

        e.    its glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and

        f.    its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

68.    Monsanto did not alter its advertising in the same manner in any state other than New York and, on information and belief, still has not done so today.

69.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

70.    In spite of its knowledge, Defendant continued to issue broad and sweeping statements suggesting that Roundup® was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and despite the evidence to the contrary.

71.    Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiffs and members of the Class to purchase and increase

- 15 -

the use of Defendant's Roundup® for Defendant's pecuniary gain, and in fact did induce Plaintiffs and members of the Class to use Roundup®.

72.    Defendant made these statements with disregard for and reckless indifference to the safety of Plaintiffs and members of the Class.

73.    Notwithstanding Defendant's representations, certain scientific evidence has established a clear association between Roundup®—including glyphosate alone and/or in combination with other Roundup® ingredients—and genotoxicity, inflammation, and an increased risk of NHL.

74.    Defendant knew or should have known that Roundup®—including glyphosate alone and/or in combination with other Roundup® ingredients—is associated with an increased risk of developing NHL.

75.    Defendant failed to appropriately and adequately inform and warn Plaintiffs and members of the Class of the serious risks associated with the use of and exposure to glyphosate-based formulations and/or Roundup®, including the risk of developing NHL.

76.    Despite the IARC's classification of glyphosate as a Group 2A probable carcinogen, Defendant continue to maintain that glyphosate-based formulations and/or Roundup® are safe, non-carcinogenic, non-genotoxic, and falsely to warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate or Roundup®.

77.    Defendant has claimed and continues to claim that Roundup® is safe, non-carcinogenic, and non-genotoxic.

78.    Defendant claims on its website that "regulatory authorities around the world have comprehensively and routinely reviewed glyphosate and glyphosate-based herbicides for more than 40 years and their conclusions consistently support the safety of glyphosate and glyphosate-based herbicides when used as directed."

- 16 -

79.     However, glyphosate-based formulations and Defendant's Roundup® products have long been associated with serious side effects, and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

80.     Despite Defendant's knowledge that Roundup® was associated with an elevated risk of developing NHL, Defendant's promotional campaigns focused on Roundup®'s purported "safety profile."

81.     Defendant's statements proclaiming the safety of Roundup® and disregarding its dangers misled Plaintiffs and the Class.

82.     Defendant's failure to adequately warn resulted in (a) Plaintiffs and members of the Class using and being exposed to Roundup® instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (b) scientists and physicians failing to warn and instruct consumers about the risk of NHL associated with Roundup®.

83.     Defendant failed to seek modification of the labeling of Roundup® to include relevant information regarding the risks and dangers associated with Roundup® exposure.

84.     Defendant's failure to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

85.     Defendant's failure to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

86.     Defendant's failure to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

**G.**     **California Office of Environmental Health Hazard Assessment's Recent View of Glyphosate**

87.     Since July of 2017, the California Office of Environmental Health Hazard Assessment has listed glyphosate as a carcinogen.

88.     Glyphosate was added as an ingredient subject to California's Proposition 65, which requires businesses to warn customers about chemicals known to cause cancer.

- 17 -

89.     However, in August of 2019, the EPA told Defendant that the EPA would no longer approve labels abiding by California's requirements to warn customers that glyphosate in Monsanto's Roundup® has been linked to NHL.

### H.     The EPA's Position Contradicts Other More Credible Scientific Authority

90.     As detailed above, the EPA's current position— "that there are no risks of concern to human health when glyphosate is used according to the label and that it is not a carcinogen"—is contradicted by numerous, credible public health authorities and scientists.

91.     One scholar has attempted to explain how the EPA and the IARC could have reached such diametrically opposed conclusions as to the genotoxicity of glyphosate-based herbicides, based upon the available data.  He concluded that the agencies emphasized and relied more heavily upon very different types of data, noting that "[t]he IARC's evaluation relied heavily on studies capable of shedding light on the distribution of real-world exposures and genotoxicity risk in exposed human populations, while EPA's evaluation placed little or no weight on such evidence."  Charles M. Benbrook, *How Did the US EPA and the IARC Reach Diametrically Opposed Conclusions on the Genotoxicity of Glyphosate Herbicides?*, Environ. Sci. Eur. 31:2, at 14 (2019).

92.     In a similar vein, as discussed above, concerns have been raised regarding the independence and integrity of the scientific and medical research and publication relating to Roundup®.

## V.     EQUITABLE TOLLING OF APPLICABLE STATUTES OF LIMITATIONS

93.     The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment.  Defendant, through its affirmative misrepresentations and omissions, actively concealed from Plaintiffs and Class members the true risks associated with Roundup® and glyphosate.

94.     At all relevant times, Defendant has maintained that Roundup® is safe, non-toxic, and non-carcinogenic.

2002216.2

95.    Indeed, even as of July 2016, Defendant continued to represent to the public that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is *no evidence* that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic" (emphasis added).

96.    As a result of Defendant's actions, Plaintiffs were unaware, and could not reasonably know or have learned through reasonable diligence, that contact with Roundup® and/or glyphosate exposed Plaintiffs to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

97.    Because of their fraudulent concealment of the true character, quality, and nature of Roundup®, Defendant is estopped from relying on any statute of limitations.  Defendant was under a duty to disclose the true character, quality, and nature of Roundup® because this was non-public information over which Defendant had and continues to have exclusive control, and because Defendant knew that this information was not available to Plaintiffs or to distributors of Roundup®.  In addition, Defendant is estopped from relying on any statute of limitations because of its intentional concealment of these facts.

98.    Plaintiffs had no knowledge that Defendant was engaged in the wrongdoing alleged herein.  Because of the fraudulent acts of concealment of wrongdoing by Defendant, Plaintiffs could not have reasonably discovered the wrongdoing at any time prior.  Additionally, the economics of this fraud should be considered.  Defendant had the ability to and did spend enormous amounts of money in furtherance of its purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably knowable risks. Plaintiffs and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendant's representations.  Accordingly, Defendant is precluded by

- 19 -

the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

## VI.   CLASS ALLEGATIONS

99.   Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and/or 23(c)(4) on behalf of themselves and all others similarly situated as members of the following "Class": "(i) those individuals who are either citizens or Residents of the United States as of June 24, 2020 or who claim exposure to Roundup Products through the application of Roundup Products in the United States and who both (1) have been exposed to Roundup Products through the application of Roundup Products prior to June 24, 2020 and (2) have not commenced a lawsuit or otherwise retained counsel with respect to any individual personal injury claims relating to such exposure prior to June 24, 2020; and (ii) 'Derivative Claimants,' defined as all spouses, parents, children who are dependents, or any other persons who properly under applicable state law assert the right to sue based on the facts asserted in this Complaint independently or derivatively by reason of their relationship with a Class Member, including a deceased Class Member."

100.   The Class defined above is comprised of two subclasses, defined below:

a.    "Subclass 1" consists of Class members who have been diagnosed with NHL as of June 24, 2020, and their Derivative Claimants.

b.    "Subclass 2" consists of Class members who have not been diagnosed with NHL as of June 24, 2020, and their Derivative Claimants.

101.   Additionally and specifically excluded from the proposed Class and Subclasses are Defendant, any of their past, present or future officers, directors, trustees, agents, representatives, employees, principals, trusts, partners, joint ventures or controlled entities; any successors, assigns, heirs or other persons or entities related to or affiliated with Defendant; the judicial officers, appointees, and designees assigned to this action; and any member of their immediate families.

- 20 -

102.    **Numerosity/Impracticality of Joinder**.  The members of the Class are so numerous as to render their individual joinder impracticable.  Although the precise number of Class members is unknown, based upon information and belief, Plaintiffs allege that the Class contains millions of members

103.    Class and Subclass members may be notified of the pendency, certification, and/or other important steps in this action under Fed. R. Civ. P. 23(c),(d), and/or (e), as appropriate, through a Court-approved combination of direct and indirect methods, including print, broadcast, social media, posting, and other physical and electronic means.

104.    **Significant Common Question**.  Plaintiffs' claims raise a significant common question—that is, a question with an answer not dependent upon the particular circumstances of class members, the answer to which is the same for everyone in the Class:  whether Roundup® can cause NHL in humans, and at what level of exposure.

105.    This common question—whether Roundup can cause NHL in humans, and at what level of exposure, sometimes referred to as "generic" or "general" causation—is an inquiry salient to all claims.  Resolving it on a classwide basis would itself significantly advance the resolution and determination of all Class members' claims and save millions of dollars for the Class members and thousands of hours of judicial time and resources.

106.    **Typicality**.  Plaintiffs' claims are typical of those held by the other members of the Class in that each of them was exposed to Roundup® and none has commenced an individual personal injury lawsuit against Defendant or retained counsel with the intention of filing an individual personal injury action against Defendant related to the facts alleged in this Complaint. Plaintiff Ramirez's claims are typical of those held by other members of Subclass 1, in that he has been diagnosed with NHL.  The claims of Plaintiffs Agtarap, Owens, and Elko are typical of those held by other members of Subclass 2, in that they have not been diagnosed with NHL.

107.    **Adequacy of Representation**.  Plaintiffs and other class representatives will fairly and adequately protect the interests of the Class.  Plaintiffs have retained trial counsel highly experienced in complex litigation, including complex class action litigation involving

- 21 -

toxic exposures, and Plaintiffs intend to vigorously prosecute this action.  Plaintiffs have no interests in this action that are adverse or antagonistic to the interests of the Class.

108.    **Superiority**.  Under these circumstances, class action litigation is superior to all other available means for the fair and efficient adjudication of the common question of general causation within the meaning of Rule 23(b)(3) because this common question is key to the advancement of the litigation by Class members.

109.    Further, individualized litigation would create the danger of inconsistent or contradictory results arising from an identical factual predicate.

110.    By contrast, litigation of the general causation question as a class action in a single, unitary proceeding will materially advance the disposition of the litigation, and is consistent with the purposes and goals of multidistrict litigation under 28 U.S.C. § 1407, because it will provide substantial economies of scale, allow comprehensive supervision of this issue raised herein by a single court, and presents no unusual management difficulties under the circumstances presented here.

111.    Under Fed. R. Civ. P. 23(c)(4), an action may be brought or maintained as a class action with respect to a particular issue.  Rule 23(c)(4) precisely fits this case.  Each Class member would benefit from a determination as to whether Roundup® exposure can cause NHL in humans, and at what level of exposure.  Resolving that one general causation issue before a single trier of fact, or by classwide resolution, would significantly reduce the burden and expense that would be entailed by prosecution of individual personal injury and wrongful death claims.

## VII.    CLAIMS FOR RELIEF

### COUNT I
### Strict Liability—Design Defect
### (On Behalf of Residents of the United States and its Territories)

112.    Plaintiffs and the Class incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

113.     Plaintiffs and the Class bring this strict liability claim against Defendant for defective design.

114.     At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs and the Class, thereby placing Roundup® products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendant.  At all times relevant to this litigation, Defendant designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products that the Class was exposed to.

115.     At all times relevant to this litigation, Defendant's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Plaintiffs and the Class.

116.     At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout the United States, including Plaintiffs, without the substantial change in the condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

117.     Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of the Defendant's manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

118.     Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of Defendant's

- 23 -

manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

119.    At all times relevant to this action, Defendant knew or had reason to know that its Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendant.

120.    Therefore, at all times relevant to this litigation, Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendant were defective in design and formulation, in one or more of the following ways:

a.    When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b.    When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of NHL when used in a reasonably anticipated manner.

c.    When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

121.    Defendant did not sufficiently test, investigate, or study their Roundup® products and, specifically, the active ingredient glyphosate alone and/or in combination with other Roundup® ingredients.

122.    Exposure to Roundup® presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

123.    Defendant knew or should have known at the time of marketing their Roundup® products that exposure to Roundup® could cause NHL.

124.    Defendant did not conduct adequate post-marketing surveillance of its Roundup® products.

- 24 -

125.    Defendant could have employed safer alternative designs and formulations.

126.    Plaintiffs and the Class were exposed to Defendant's Roundup® products without knowledge of their dangerous characteristics.

127.    At all times relevant to this litigation, Plaintiffs and the Class were exposed to Defendant's Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

128.    Plaintiffs and the Class could not have reasonably discovered the defects and risks associated with Roundup® before or at the time of exposure.

129.    The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Roundup® products were and are more dangerous than alternative products and Defendant could have designed Roundup® products to make them less dangerous.  Indeed, at the time that Defendant designed Roundup® the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

130.    At the time Roundup® products left Defendant's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's herbicides.

131.    Therefore, as a result of the unreasonably dangerous condition of Roundup® products, Defendant is strictly liable to Plaintiffs and the Class.

132.    The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiffs and the Class NHL, and, but for Defendant's misconduct and omissions, Plaintiffs and the Class would not have sustained their injuries.

133.    As a direct and proximate result of Defendant placing defective Roundup® products into the stream of commerce, Plaintiffs and the Class have suffered and will continue to suffer damages, injury in fact, and/or ascertainable loss in amounts to be determined. Plaintiffs

- 25 -

and the Class therefore seek declaratory, injunctive, and equitable relief, as well as all relief available under law and equity.

134.     Additionally, Defendant's conduct, as described above, was oppressive, fraudulent, malicious, and conducted with willful and conscious disregard for the health and safety of users of the Roundup® products, including the Plaintiffs and the Class herein. Defendant had knowledge of the safety problems associated with Roundup®, and suppressed this knowledge from the general public.  Defendant also made conscious decisions not to modify or alter the Roundup® products.  Defendant's conduct warrants an award of punitive damages.

135.     The determination of the general causation question on a class-wide basis will advance the resolution of this claim for individual Class Members.

<u>COUNT II</u>
<u>Strict Liability—Failure to Warn</u>
<u>(On Behalf of Residents of the United States and its Territories)</u>

136.     Plaintiffs and the Class incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

137.     Plaintiffs and the Class bring this strict liability claim against Defendant for failure to warn.

138.     At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, promoting and applying Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

139.     Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiffs and the Class, and persons

- 26 -

responsible for consumers (such as employers), and therefore had a duty to warn of the risks associated with the use of Roundup®.

140.   At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn the Plaintiffs and the Class of the dangers associated with Roundup® use and exposure.  Defendant, as a manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of experts in the field.

141.   At the time of manufacture, Defendant could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

142.   At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of this product and to those who would foreseeably use or be harmed by Roundup, including Plaintiffs and the Class.

143.   Despite the fact that Defendant knew or should have known that Roundup® posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure.  The dangerous propensities of Roundup® products and the carcinogenic characteristics of glyphosate when used with the other chemicals in Roundup®, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time they distributed, supplied or sold the product, and not known to end users and consumers, such as Plaintiffs and the Class.

144.   Defendant knew or should have known that these products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to Roundup® products.

- 27 -

Defendant has wrongfully concealed information concerning the dangerous nature of Roundup®, and further made false and/or misleading statements concerning the safety of Roundup®.

145.    At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in California and throughout the United States, including Plaintiffs and the Class, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, marketed and sprayed/applied by Defendant.

146.    At all times relevant to this litigation, Plaintiffs and the Class were exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

147.    Plaintiffs and the Class could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of the exposure of Plaintiffs and the Class.  Plaintiffs and the Class relied upon the skill, superior knowledge, and judgment of Defendant.

148.    Defendant knew or should have known that the minimal warnings disseminated with or accompanying the application of Roundup® products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

149.    The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled those exposed such as Plaintiffs and the Class to utilize the products safely and with adequate protection.  Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to promote the efficacy of its products, even after they knew or should have known of the unreasonable risks

- 28 -

from use or exposure; and concealed, downplayed, or otherwise suppressed, through marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

150.    To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiffs' and the Class's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable human carcinogen.

151.    As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were sold or distributed by Defendant, were applied by Defendant, and when Plaintiffs and the Class used or became exposed to them.

152.    Defendant is liable to Plaintiffs and the Class for injuries caused by negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its products and the risks associated with the use of or exposure to Roundup® and glyphosate.

153.    The defects in these Roundup® products were substantial and contributing factors in causing Plaintiffs' and the Class's injuries, and, but for Defendant's misconduct and omissions, Plaintiffs and the Class would not have sustained their injuries.

154.    Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products and application, Plaintiffs and the Class could have avoided the risk of developing injuries as alleged herein and Class members and/or the individuals or entities that employed Class members could have obtained alternative herbicides.

155.    As a direct and proximate result of Defendant's placing defective Roundup® products into the stream of commerce and exposing Plaintiffs and the Class to them, these Class members have suffered and will continue to suffer damages, injury in fact and/or ascertainable loss in an amount to be determined.  Plaintiffs therefore seek declaratory, injunctive, and equitable relief, as well as all relief available under law and equity.

- 29 -

156.    Additionally, Defendant's conduct, as described above, was oppressive, fraudulent, malicious, and conducted with willful and conscious disregard for the health and safety of users of the Roundup® products, including the Plaintiffs and the Class herein. Defendant had knowledge of the safety problems associated with Roundup®, and made conscious decisions not to warn or inform the public of the risks of Roundup® products. Defendant's conduct warrants an award of punitive damages.

157.    The determination of the general causation question on a class-wide basis will advance the resolution of this claim for individual Class Members.

## COUNT III
### Negligence/Negligent Misrepresentation
### (On Behalf of Residents of the United States and its Territories)

158.    Plaintiffs and the Class re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Class Action Complaint, as though set forth fully herein.

159.    Defendant owed Plaintiffs and Class members a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup®, including a duty to assure that the product would not cause users an increased risk of suffering unreasonable, dangerous side effects.

160.    Defendant breached that duty.  Defendant manufactured, marketed, advertised, and sold, Roundup® as a 'weed killer.' However, Defendant failed to disclose to users material information regarding the link between exposure to relevant doses and the likelihood of NHL after minimal usages and exposure per year, despite the fact that Defendant knew or should have known about Roundup's propensity to cause NHL.

161.    Defendant also failed to disclose, concealed, suppressed, and omitted material information concerning Roundup® and the truth regarding the various studies that Roundup® would cite to support their false claim that Roundup® did not cause NHL.

- 30 -

162.     Defendant intended that Plaintiffs and the Class rely upon their material misrepresentations and omissions.

163.     Defendant's negligent conduct, as alleged in this complaint, exposed Plaintiffs to an increased risk of NHL from Roundup, rendering Defendant responsible for preventing or mitigating that risk of harm through payment for a program providing medical diagnosis or other programmatic remedies, according to proof and as approved by the Court.

164.     Defendant's breach proximately caused Plaintiffs and the Class to suffer damages, injury in fact and/or ascertainable loss in amounts to be determined.

165.     The determination of the general causation question on a class-wide basis will advance the resolution of this claim for individual Class Members.

<u>COUNT IV</u>
**Breach of Express Warranty**
**<u>(On Behalf of Residents of the United States and its Territories)</u>**

166.     Plaintiffs and the Class re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Class Action Complaint, as though set forth fully herein.

167.     Defendant made several express warranties regarding Roundup®.

168.     These representations and promises became part of the basis of the bargain between the parties and created a collective "express warranty" that Roundup® would conform to Defendant's affirmations and promises.

169.     Defendant knew or should have known that Roundup® was susceptible to causing NHL for those exposed to Roundup®.

170.     Defendant has breached the express warranty.

171.     Defendant's conduct described in this Complaint constitutes a breach of express warranties under the following state statutes:

      a.      Ala. Code § 7-2-313, et seq.;

      b.      Alaska Stat. § 45.02.313, et seq.;

- 31 -

| | |
|---|---|
| c. | Ariz. Rev. Stat. § 47-2313, et seq.; |
| d. | Ark. Code § 4-2-313, et seq.; |
| e. | Cal. Com. Code § 2313, et seq.; |
| f. | Colo. Rev. Stat. § 4-2-313, et seq.; |
| g. | Conn. Gen. Stat. § 42a-2-313, et seq.; |
| h. | 6 Del. C. § 2-313, et seq.; |
| i. | D.C. Code § 28:2-313, et seq.; |
| j. | Fla. Code § 672.313, et seq.; |
| k. | O.C.G.A. § 11-2-313, et seq.; |
| l. | Haw. Rev. Stat. § 490:2-313, et seq.; |
| m. | Idaho Code § 28-2-313, et seq.; |
| n. | 810 Ill. Comp. Stat. 5/2-313, et seq.; |
| o. | Ind. Code § 26-1-2-313, et seq.; |
| p. | Iowa Code § 554.2313, et seq.; |
| q. | Kan. Stat. § 84-2-313, et seq.; |
| r. | Ky. Rev. Stat. § 355.2-313, et seq.; |
| s. | La. Rev. Stat § 9:2800.53(6) , et seq.; |
| t. | 11 M.R.S.A. § 2-313, et seq.; |
| u. | Md. Code Ann., Com. Law § 2-313, et seq.; |
| v. | Mass. Code 106, § 2-313, et seq.; |
| w. | Mich. Comp. Laws 440.2313, et seq.; |
| x. | Minn. Stat. § 336.2-313, et seq.; |
| y. | Miss. Code § 75-2-313, et seq.; |
| z. | Mo. Rev. Stat. § 400.2-313, et seq.; |
| aa. | Mont. Code § 30-2-313, et seq.; |
| bb. | Neb. U.C.C. § 2-313, et seq.; |
| cc. | Nev. Rev. Stat. § 104.2313, et seq.; |

dd.     N.H. Rev. Stat. § 382-A:2-313, et seq.;

ee.     N.J. Stat. § 12A:2-313, et seq.;

ff.     N.M. Stat. § 55-2-313, et seq.;

gg.     N.Y. U.C.C. § 2-313, et seq.;

hh.     N.C. Gen. Stat. § 25-2-313, et seq.;

ii.     N.D. Cent. Code § 41-02-30, et seq.;

jj.     Ohio Rev. Code § 1302.26, et seq.;

kk.     Okla. Stat. Tit. 12A, § 2-313, et seq.;

ll.     Or. Rev. Stat. § 72.3130, et seq.;

mm.     13 Pa. Cons. Stat. § 2313, et seq.;

nn.     R.I. Gen. Laws § 6A-2-313, et seq.;

oo.     S.C. Code § 36-2-313, et seq.;

pp.     S.D. Codified Laws § 57A-2-313, et seq.;

qq.     Tenn. Code § 47-2-313, et seq.;

rr.     V.T.C.A., Bus. & C. § 2.313, et seq.;

ss.     Utah Code § 70A-2-313, et seq.;

tt.     Vt. Stat. Tit. 9A, § 2-313, et seq.;

uu.     Va. Code § 8.2-313, et seq.;

vv.     Wash. Rev. Code § 62A.2-313, et seq.;

ww.     W. Va. Code § 46-2-313, et seq.;

xx.     Wis. Stat. § 402.313, et seq.; and

yy.     Wyo. Stat. § 34.1-2-313, et seq.

172.    Plaintiffs and the Class have complied with the warranty terms, including application instructions and maintaining residence in their homes.

173.    As a direct and proximate result of the breach of the express warranty, Plaintiffs and the Class suffered damages, injury in fact, and/or ascertainable loss in amounts to be determined.

- 33 -

174.    The determination of the general causation question on a class-wide basis will advance the resolution of this claim for individual Class Members.

<u>**COUNT V**</u>
<u>**Breach of Implied Warranty (Non-Privity)**</u>
<u>**(On Behalf of Residents of the Following States: Alaska; Arkansas; California; Colorado;**</u>
<u>**Connecticut; Delaware; District of Columbia; Florida; Hawaii; Indiana; Kansas;**</u>
<u>**Louisiana; Maine; Maryland; Massachusetts; Michigan; Minnesota; Mississippi; Missouri;**</u>
<u>**Montana; Nebraska; Nevada; New Hampshire; New Jersey; New Mexico; North Dakota;**</u>
<u>**Ohio; Oklahoma; Pennsylvania; Rhode Island; South Carolina; South Dakota; Texas;**</u>
<u>**Utah; Vermont; Virginia; Washington; West Virginia; and Wyoming)**</u>

175.    Plaintiffs and the Class re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Class Action Complaint, as though set forth fully herein.

176.    Defendant is in the business of manufacturing, designing, supplying, marketing, advertising, warranting, and selling Roundup®. Defendant impliedly warranted to Plaintiffs and the Class that Roundup® was of a certain quality, was free from defects, was fit for its ordinary purpose of killing 'weeds' and was fit for use without causing material harm to the Class.

177.    Roundup® was unfit for its ordinary use and was not of merchantable quality, as warranted by Defendant, because it was defective and had caused NHL.  Prior to purchase, Plaintiffs and the Class could not have readily discovered that the product was not fit for its ordinary purpose.

178.    Roundup® was similarly unfit for its particular purpose, and was unfit at the point of sale because it had the propensity to cause NHL.

179.    Defendant has failed to provide adequate remedies under its written express warranty, which has caused the express warranty to fail its essential purpose, thereby permitting remedies under implied warranties.

180.    Defendant has not sufficiently disclaimed the implied warranty of merchantability (specifically and conspicuously) or the implied warranty of fitness (in writing and

- 34 -

conspiciously).  Defendant knew or should have known that Roundup® increases the risk of NHL in those exposed to the product.

181.   Defendant's conduct described in this Complaint constitutes a breach of implied warranties under the following state statutes:

a.   Alaska Stat. §§ 45.02.314 and 45.02.315, et seq.;

b.   Ark. Code Ann. §§ 4-2-314 and 4-2-315, et seq.;

c.   Cal. Com. Code §§ 2314-2315, et seq., and Cal. Civ. Code § 1790, et seq.;

d.   Colo. Rev. Stat. Ann. §§ 4-2-314 and 4-2-315, et seq.;

e.   Conn. Gen. Stat. §§ 42a-2-314 and 42a-2-315, et seq.;

f.   Del. Code Ann. Tit. 6, §§ 2-314 and 2-315, et seq.;

g.   D.C. Code §§ 28:2-314 and 28:2-315, et seq.;

h.   Fla. Stat. Ann. §§ 672.314 and 672.315, et seq.;

i.   Haw. Rev. Stat. §§ 490:2-314 and 490:2-315, et seq.;

j.   Ind. Code §§ 26-1-2-314 and 26-1-315, et seq.;

k.   Kan. Stat. Ann. §§ 84-2-314 and 84-2-315, et seq.;

l.   La. Civ. Code Ann. Art. 2520, et seq.;

m.   Me. Rev. Stat. Ann. Tit. 11, §§ 2-314 and 2-315, et seq.;

n.   Md. Code Ann., Com. Law §§ 2-314 and 2-315, et seq.;

o.   Mass. Gen. Laws ch. 106, §§ 2-314 and 2-315, et seq.;

p.   Mich. Comp. Laws Ann. §§ 440.2314 and 440.2315, et seq.;

q.   Minn. Stat. §§ 336.2-314 and 336.2-315, et seq.;

r.   Miss. Code Ann. §§ 75-2-314 and 75-2-315, et seq.;

s.   Mo. Rev. Stat. §§ 400.2-314 and 400.2-315, et seq.;

t.   Mont. Code Ann. §§ 30-2-314 and 30-2-315, et seq.;

u.   Neb. Rev. Stat. Ann. §§ 2-314 and 2-315, et seq.;

v.   Nev. Rev. Stat. §§ 104.2314 and 104.2315, et seq.;

w.   N.H. Rev. Stat. Ann. §§ 382-A:2-314 and 382-A:2-315, et seq.;

- 35 -

    x.     N.J. Stat. Ann. §§ 12A:2-314 and 12A-315, et seq.;

    y.     N.M. Stat. Ann. §§ 55-2-314 and 55-2-315, et seq.;

    z.     N.D. Cent. Code §§ 41-02-31 and 41-02-32, et seq.;

    aa.    Ohio Rev. Code Ann. §§ 1302.27 and 1302.28, et seq.;

    bb.    Okla. Stat. Tit. 12A, §§ 2-314 and 2-315, et seq.;

    cc.    13 Pa. Stat. Ann. §§ 2314 and 2315, et seq.;

    dd.    R.I. Gen. Laws §§ 6A-2-314 and 6A-2-315, et seq.;

    ee.    S.C. Code Ann. §§ 36-2-314 and 36-2-315, et seq.;

    ff.     S.D. Codified Laws §§ 57A-2-314 and 57A-2-315, et seq.;

    gg.    Tex. Bus. & Com. Code Ann. §§ 2.314 and 2.315, et seq.;

    hh.    Utah Code Ann. §§ 70A-2-314 and 70A-2-315, et seq.;

    ii.     Vt. Stat. Ann. Tit. 9A, §§ 2-314 and 2-315, et seq.;

    jj.     Va. Code Ann. §§ 8.2-314 and 8.2-315, et seq.;

    kk.    Wash. Rev. Code §§ 62A.2-314 and 62A.2-315, et seq.;

    ll.     W. Va. Code §§ 46-2-314 and 46-2-315, et seq.; and

    mm.  Wyo. Stat. Ann. §§ 34.1-2-314 and 34.1-2-315, et seq.

182.    Constructive notice was duly given to Defendant of the breaches of these warranties, and Defendant has failed to cure.

183.    As a direct and proximate result of the breaches of these warranties, Plaintiffs and the Class suffered damages, injury in fact, and/or ascertainable loss in amounts to be determined.

184.    The determination of the general causation question on a class-wide basis will advance the resolution of this claim for individual Class Members.

## COUNT VI
## Breach of Implied Warranty (Privity)
## (On Behalf of Residents of the Following States: Alabama; Arizona; Georgia; Idaho; Illinois; Iowa; Kentucky; New York; North Carolina; Oregon; Tennessee; and Wisconsin)

185.    Plaintiffs and the Class re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Class Action Complaint, as though set forth fully herein.

186.    Defendant is in the business of manufacturing, designing, supplying, marketing, advertising, warranting, and selling Roundup, which has been used as a weed killer.  Defendant impliedly warranted to Plaintiffs (and to Plaintiffs' agents) that Roundup® was of a certain quality, was free from defects, and was fit for its ordinary purpose.

187.    Roundup® was unfit for its ordinary use and was not of merchantable quality, as warranted by Defendant, because it was defective and studies show that it increases the risk of NHL.  Prior to purchase, Plaintiffs could not have readily discovered that the product was not fit for its ordinary purpose and would potentially cause NHL.

188.    Roundup® was similarly unfit for its particular purpose.

189.    Defendant has not sufficiently disclaimed the implied warranty of merchantability (specifically and conspicuously) or the implied warranty of fitness (in writing and conspicuously).  Further, the purported limitations in the warranty, including limiting the "exclusive remedy" to a refund or replacement, are procedurally and substantively unconscionable.

190.    Defendant was and is in privity with each Class member by law and/or by fact. First, Plaintiffs and the Class members have had sufficient direct dealings with Defendant and/or its authorized dealers, franchisees, representatives, and agents to establish privity of contract. Alternatively, Plaintiffs and Class members are intended third-party beneficiaries of contracts, including express warranties, amongst Defendant and its dealers, franchisees, representatives and agents; Defendant's advertisements were aimed at Plaintiffs and Class members, and Defendant's warranties were expressly written for the benefit of Plaintiffs and Class members as

- 37 -

end users of Roundup.  Defendant's authorized dealers, franchisees, representatives, and agents, on the other hand, were not intended to be the ultimate consumers of Roundup® and have no rights under the warranty agreements provided by Defendant; these intermediary entities made no changes to Defendant's product, nor made any additions to the warranties issued by Defendant. Further, Defendant is estopped from limiting claims for common law and statutory violations based on a defense of lack of privity.

191.    Defendant's conduct described in this Complaint constitutes a breach of implied warranties under the following state statutes:

      a.     Ala. Code §§ 7-2-314, 7-2-315 and 7-2-318, et seq.;

      b.     Ariz. Rev. Stat. Ann. §§ 47-2314, 47-2315 and 47-2318, et seq.;

      c.     Ga. Code Ann. § § 11-2-314, 11-2-315 and 11-2-318, et seq.;

      d.     Idaho Code Ann. §§ 28:2-314, 28:2-315 and 28:2-318, et seq.;

      e.     810 Ill. Comp. Stat. 5/2-314, 5/2-315 and 5/2-318, et seq.;

      f.     Iowa Code §§ 554.2314, 554.2315 and 554.2318, et seq.;

      g.     Ky. Rev. Stat. Ann. §§ 355.2-314, 355.2-315 and 355.2-318, et seq.;

      h.     N.Y. U.C.C. Law §§ 2-314, 2-315 and 2-318, et seq.;

      i.     N.C. Gen. Stat. §§ 25-2-314, 25-2-315 and 25-2-318, et seq.;

      j.     Ore. Rev. Stat. §§ 72.3140, 72.3150 and 72.3180, et seq.;

      k.     Tenn. Code Ann. §§ 47-2-314, 47-2-315 and 47-2-318, et seq.; and

      l.     Wis. Stat. §§ 402.314, 402.315 and 402.318, et seq.

192.    Actual and/or constructive notice was duly given to Defendant of the breaches of these warranties, and Defendant has failed to cure.

193.    As a direct and proximate result of the breaches of these warranties, Plaintiffs and the Class have suffered damages, injury in fact, and/or ascertainable loss in amounts to be determined.

194.    The determination of the general causation question on a class-wide basis will advance the resolution of this claim for individual Class Members.

- 38 -

**COUNT VII**
**Violation of State Consumer Laws**
**(On Behalf of Residents of the Following States: Alaska; Arizona; Arkansas; California;**
**Colorado; Connecticut; Delaware; District of Columbia; Florida; Hawaii; Idaho; Illinois;**
**Indiana; Iowa; Kansas; Maine; Maryland; Massachusetts; Michigan; Minnesota;**
**Missouri; Nebraska; Nevada; New Hampshire; New Jersey; New Mexico; New York;**
**North Carolina; North Dakota; Ohio; Oklahoma; Oregon; Pennsylvania; Rhode Island;**
**South Dakota; Texas; Utah; Vermont; Virginia; Washington; West Virginia; Wisconsin;**
**and Wyoming)**

195.     Plaintiffs and the Class re-allege and incorporate by reference the allegations

contained in all preceding paragraphs of this Class Action Complaint, as though set forth fully

herein.

196.     Defendant market and sell goods, including Roundup®, to consumers throughout

the United States and its Territories, including to Plaintiffs and the Class.  Defendant's acts and

omissions regarding Roundup® affect trade and commerce across all the United States and its

Territories.

197.     Plaintiffs and statewide Class members are consumers who purchased and used

Roundup® primarily for personal, family and/or household purposes.

198.     Defendant has violated state consumer protection laws by engaging in unfair

methods of competition and unfair, deceptive, fraudulent, unconscionable and/or unlawful acts or

practices, including without limitation, by defective design and manufacture of Roundup® as

well as misleading marketing, advertising, selling, and warranting of Roundup® to consumers.

In connection with these sales, Defendant omitted material information about Roundup® that it

was legally obligated to disclose.  Defendant never informed Plaintiffs or Class members, at the

point of sale or otherwise, that Roundup® was linked to NHL, and failed to disclose this

information in a timely manner.

199.     Among other things, Defendant made numerous deceptive statements regarding

Roundup.

200.    Through its conduct, Defendant has violated the following state consumer laws prohibiting unfair methods of competition and unfair, deceptive, unconscionable, fraudulent and/or unlawful acts or practices:

a.    The Alaska Unfair Trade Practices and Consumer Protection Act, Alaska Stat. §§ 45.50.471 through 45.50.561, et seq.;

b.    The Arizona Consumer Fraud Act, A.R.S. § 44-1522, et seq.;

c.    The Arkansas Deceptive Trade Practices Act, Ark. Code Ann. §§ 4-88-107(a)(1)(10) and 4-88-108(1)(2), et seq.;

d.    The California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code, § 17200, et seq.;

e.    The Colorado Consumer Protection Act, Col. Rev. Stat. Ann. §§ 6-1-105(1)(b), (c), (e) and (g), et seq.;

f.    The Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110(b), et seq.;

g.    The Delaware Consumer Fraud Act, Del. Code Ann. Title 6 § 2513, et seq.;

h.    The District of Columbia Consumer Protection Act, D.C. Code §§ 28-3904(a), (d), (e), (f) and (r), et seq.;

i.    The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.204(1), et seq.;

j.    The Hawaii Deceptive Trade Practices Act, Haw. Rev. Stat. Ann. §§ 481A¬3(a)(5), (7) and (12), et seq., and the Hawaii Consumer Protection Act, Haw. Rev. Stat. Ann. § 480-2(a), et seq.;

k.    The Idaho Consumer Protection Act, Idaho Code §§ 48-603(5), (7), (17) and (18), et seq., and Idaho Code § 48-603C, et seq.;

- 40 -

l.      The Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 Ill. Stat. § 505/2, et seq., and the Illinois Uniform Deceptive Trades Practices Act, 815 Ill. Stat. § 510/2(a)(5), (7) and (12), et seq.;

m.      The Indiana Deceptive Consumer Sales Act, Ind. Code §§ 24-5-0.5-3(a) and (b)(1) and (2), et seq.;

n.      The Iowa Consumer Fraud Act, I.C.A. §§ 714H.3 and 714H.5, et seq.;

o.      The Kansas Consumer Protection Act, Kan. Stat. §§ 50-626(a) and (b)(1)(A)(D) and (b)(3), et seq.;

p.      The Maine Uniform Deceptive Trade Practices Act, 10 M.R. S.A. §§ 1212(1)(E) and (G), et seq., and the Maine Unfair Trade Practices Act, 5 M.R.S.A. § 207, et seq.;

q.      The Maryland Consumer Protection Act, Md. Code Commercial Law, § 13 - 301(1) and (2)(i), and (iv) and (9)(i), et seq.;

r.      The Massachusetts Consumer Protection Act, Ma. Gen. Laws Ann. Ch. 93A § 2(a), et seq.;

s.      The Michigan Consumer Protection Act, M.C.P.L.A. § 445.903(1)(c)(e), (s) and (cc), et seq.;

t.      The Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.44, subd. 1(5), (7) and (13), et seq., the Minnesota Consumer Fraud Act, Minn. Stat. § 325F.69, subd. 1, and Minn. Stat. § 8.3 1, subd. 3(a), et seq.;

u.      The Missouri Merchandising Practices Act, Mo. Ann. Stat. § 407.020(1), et seq.;

v.      The Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1602, and the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87- 302(a)(5) and (7), et seq.;

w.      The Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. Ann. § 598.0915(5) and (7), et seq.;

- 41 -

         x.      The New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. § 358- A:2(v) and (vii), et seq.;

         y.      The New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-2, et seq.;

         z.      The New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-2(D)(5)(7) and (14) and 57-12-3, et seq.;

         aa.     New York Business Law, N.Y. Gen. Bus. Law § 349(a), et seq.;

         bb.     The North Carolina Unfair Trade Practices Act, N.C.G.S.A. § 75-1.1(a), et seq.;

         cc.     The North Dakota Unlawful Sales or Advertising Practices Act, N.D. Cent. Code § 51-15-02, et seq.;

         dd.     The Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.02(A), (B)(1) and (2), et seq.[2];

         ee.     The Oklahoma Consumer Protection Act, 15 Okl. Stat. Ann. § 753(5), (7) and (20), et seq.;

         ff.     The Oregon Unfair Trade Practices Act, Or. Rev. Stat. §§ 646.608(1)(e)(g) and (u), et seq.;

         gg.     The Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-2(4)(v)(vii) and (xxi), and 201-3, et seq.;

         hh.     The Rhode Island Deceptive Trade Practices Act, R.I. Gen. Laws § 6-13.1-1(6)(v), (vii), (xii), (xiii) and (xiv), et seq.;

------

[2] Pursuant to Ohio Rev. Code Ann. § 1345.09(B), Defendant's alleged acts must have been previously declared to be deceptive or unconscionable under Ohio Rev. Code Ann. §§ 1345.02 or 1345.03.  Defendant systematically made misrepresentations and material omissions regarding Roundup®.  Ohio courts have previously declared such actions to be deceptive or unconscionable. *See, e.g.*, *Arales v. Furs by Weiss, Inc.*, No. 81603, 2003 WL 21469131, at *1-4 (Ohio Ct. App. June 26, 2003) (retailer's omission to consumer was unfair or deceptive); *Lump v. Best Door & Window, Inc.*, Nos. 8- 01-09, 8-01-10, 2002 WL 462863, at *4-5 (Ohio Ct. App. Mar. 27, 2002) (failure to perform obligations to consumers in a timely and competent manner is a deceptive and unconscionable)

ii.     The South Dakota Deceptive Trade Practices Act and Consumer Protection Act, S.D. Codified Laws § 37-24-6(1), et seq.;

jj.     The Texas Deceptive Trade Practices- Consumer Protection Act, V.T.C.A., Bus. & C. § 17.46(a), (b)(5) and (7), et seq.;

kk.     The Utah Consumer Sales Practices Act, Utah Code Ann. §§ 13-11-4(1) and (2)(a) and (b);

ll.     The Vermont Consumer Fraud Act, 9 V.S.A. § 2453(a), et seq.;

mm.    The Virginia Consumer Protection Act, Va. Code Ann. § 59.1-200(A)(5)(6) and (14), et seq.;

nn.     The Washington Consumer Protection Act, Wash. Rev. Code § 19.86.020, et seq.;

oo.     The West Virginia Consumer Credit and Protection Act, W.V.A. Code § 46A-6-104, et seq.;

pp.     The Wisconsin Deceptive Trade Practices Act, W.S.A. §100.20(1), et seq.; and

qq.     The Wyoming Consumer Protection Act, Wyo. Stat. Ann. § 40-12-105(a), (i), (iii) and (xv), et seq.

201.    Plaintiffs and the Class bring this action on behalf of themselves and all similarly situated persons for the equitable, declaratory, and injunctive relief requested; to promote the public interests in the provision of truthful, non-deceptive information to allow consumers to make informed purchasing decisions; and to protect Plaintiffs, the Class, and the public from Defendant's unfair methods of competition and unfair, deceptive, fraudulent, unconscionable and/or unlawful practices.  Defendant's wrongful conduct has had widespread impact on the public at large and caused serious injuries to the Class members.

202.    Defendant has long had notice of the underlying allegations, claims and demands, including from internal audits, field testing, online complaints, and direct complaints regarding Roundup.

203.    As a direct and proximate result of Defendant's unfair methods of competition and unfair, deceptive, fraudulent, unconscionable, and/or unlawful acts or practices, Plaintiffs and the Class have suffered ascertainable losses and injuries in amounts to be determined.

204.    The determination of the general causation question on a class-wide basis will advance the resolution of this claim for individual Class Members.

<u>COUNT VIII</u>
<u>Violation of State False Advertising Laws</u>
<u>(On Behalf of Residents of the those States and Territories with False Advertising Law Claims)</u>

205.    Plaintiffs and the Class re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Class Action Complaint, as though set forth fully herein. Plaintiffs have standing to pursue this cause of action on behalf of the Class.

206.    Plaintiffs and the Class bring this claim pursuant to applicable False Advertising Laws which prohibit deceptive, misleading, and/or false advertising.

207.    Defendant violated False Advertising Laws by advertising and representing—on product labels, advertisements, and warranties—that Roundup® was dependable and reliable when in fact it was not.  As alleged, these representations were false, misleading, and likely to deceive Plaintiffs, members of the Class, those who employed Plaintiffs and Class members and who purchased Roundup®, and other reasonable consumers.

208.    In connection with these sales, Defendant also omitted material information about Roundup® that it was legally obligated to disclose.  Defendant never informed Plaintiffs or the Class, at the point of sale or otherwise, that Roundup® would and could cause NHL if exposed to the active ingredient.

209.    At the time of sale, Defendant knew, or by the exercise of reasonable care should have known—given internal data—that its representations and omissions were false and misleading.

- 44 -

210.    Defendant made these representations and omissions for the purpose of inducing, and did induce, Plaintiffs and members of the Class, and/or the individuals or entities that employed Plaintiffs and members of the Class, and/or other consumers to purchase Roundup®.

211.    Plaintiffs and the Class reviewed and reasonably relied on Defendant's representations and omissions regarding Roundup® and incurred damages as a direct and proximate result.

212.    As a direct and proximate result of Defendant's violation of False Advertising Laws, Plaintiffs and the Class have suffered ascertainable losses and injuries in amounts to be determined.

213.    The determination of the general causation question on a class-wide basis will advance the resolution of this claim for individual Class Members.

**COUNT IX**
**Fraudulent Concealment**
**(On Behalf of Residents of the United States and its Territories)**

214.    Plaintiffs and the Class re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Class Action Complaint, as though set forth fully herein.

215.    Defendant knowingly and intentionally concealed material facts regarding Roundup®.

216.    Defendant knew they were omitting material facts at the time they sold Roundup® to Plaintiffs and at a time they had a duty to disclose these facts.

217.    In omitting these facts, Defendant intended to defraud the Class and/or the individuals/entities that employed Plaintiffs and the Class and intended for Plaintiffs and the Class and/or the individuals/entities that employed Plaintiffs and the Class to rely upon Defendant's omissions to purchase more Roundup®.

218.    Plaintiffs reviewed and reasonably relied on Defendant's representations and omissions regarding Roundup® and incurred damages as a direct and proximate result, in

- 45 -

amounts to be determined.  Any limitation on economic loss is precluded by Defendant's fraudulent misrepresentations.

219.   Plaintiffs, in reasonable reliance of those statements made by Defendant, incurred out of pocket costs.

220.   Plaintiffs have suffered ascertainable losses and injuries in amounts to be determined.

221.   The determination of the general causation question on a class-wide basis will advance the resolution of this claim for individual Class Members.

<u>COUNT X</u>
<u>Claim For Declaratory Relief</u>
<u>(On Behalf of Residents of the United States and its Territories)</u>

222.   Plaintiffs repeat and reallege the foregoing allegations on behalf of themselves and the Class as if fully set forth herein.  This claim serves as an independent claim for relief or, alternatively, as further explanation of the declaratory relief sought under the other claims pled herein.

223.   Defendant has acted and refused to act with respect to its misrepresentations and omissions concerning the safety of Roundup® in a manner that has affected all Class members, and the declaratory, injunctive and equitable relief sought herein under Fed. R. Civ. P. 23(b)(2), 23(b)(3), and/or 23(c)(4) will provide relief to all members of the Class.

224.   An actual case and controversy exists as between Plaintiffs and Defendant as to:

a.      Whether Roundup® is unfit for its ordinary purpose;

b.      Whether Defendant marketed Roundup®, but omitted material health information regarding its use;

c.      Whether Defendant's marketing of Roundup® was false, deceptive, and/or misleading;

d.      Whether Roundup is carcinogenic, genotoxic and/or linked to NHL;

e.      Whether and when Defendant discovered that Roundup® was carcinogenic, genotoxic and/or linked to NHL;

- 46 -

f.    Whether Defendant had an obligation to disclose the fact that Roundup®
was carcinogenic, genotoxic and/or linked to NHL;

g.    Whether Defendant engaged in fraudulent, unfair, or deceptive practices;
and

h.    Whether Defendant is financially responsible for providing corrective
notice the Class regarding Roundup.

225.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, the Court may "declare
the rights and legal relations of any interested party seeking such declaration, whether or not
further relief is or could be sought."  The declaratory relief sought here does not fall within any
of the exemptions set forth under the Act.

226.    The requested declaratory relief set forth herein will produce an answer to the
common question that will resolve a controversy that lies at the heart of this litigation and will
allow Plaintiffs and the Class to obtain relief that directly redresses the injuries suffered.

**COUNT XI**
**Claim for Medical Monitoring**
**(On Behalf of Residents of the United States and its Territories)**

227.    Plaintiffs and the Class re-allege and incorporate by reference the allegations
contained in all preceding paragraphs of this Class Action Complaint, as though set forth fully
herein.

228.    Defendant's conduct, as alleged herein, placed Plaintiffs and the Class at
increased risk of contracting NHL, through exposure to Roundup®.  Under principles of common
law tort and as a matter of equity, Defendant should pay for the costs of medical screening,
diagnostic and/or surveillance programs and services to be provided to Plaintiffs and the Class,
to prevent or mitigate the injury otherwise resulting from Roundup® exposure, as appropriate and
according to proof, under Court decree and supervision.

229.    The determination of the general causation question on a class-wide basis will
advance the resolution of this claim for individual Class Members.

- 47 -

## VIII.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, request the Court to enter judgment against the Defendant, as follows:

a.      An order certifying an appropriate Class and Subclasses pursuant to Fed. R. Civ. P. 23(b)(2), 23(b)(3), and/or 23(c)(4) for the determination of the common question whether Roundup® can cause NHL in humans, and at what level of exposure, and designating Plaintiffs and their undersigned counsel as Class and Subclass Representatives and counsel as appropriate;

b.      Awards to named Plaintiffs of their compensatory damages, and, exemplary, punitive, and statutory penalties and damages as allowed by law, including interest, in amounts to be proven;

c.      Appropriate declaratory, equitable, medical monitoring, and/ or injunctive relief according to proof;

d.      An award of reasonable attorneys' fees and costs incurred in this action; and

e.      Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all matters so properly triable.

- 48 -

Dated: June 24, 2020                    Respectfully submitted,

                                        */s/ Elizabeth J. Cabraser*
                                        Robert L. Lieff (of counsel) (SBN 037568)
                                        Elizabeth J. Cabraser (SBN 083151)
                                        Kevin R. Budner (SBN 287271)
                                        LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                        275 Battery Street, 29th Floor
                                        San Francisco, California 94111-3339
                                        Telephone: 415.956.1000
                                        Facsimile: 415.956.1008
                                        rlieff@lchb.com
                                        ecabraser@lchb.com
                                        kbudner@lchb.com

                                        Steven E.  Fineman (SBN 140335)
                                        Wendy R. Fleishman
                                        Rhea Ghosh
                                        LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                        250 Hudson Street, 8th Floor
                                        New York, NY 10013
                                        Telephone: 212.355.9500
                                        sfineman@lchb.com
                                        wfleishman@lchb.com
                                        rghosh@lchb.com

                                        Andrew R. Kaufman
                                        LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                        222 2nd Avenue South, Suite 1640
                                        Nashville, TN 37201
                                        Telephone: 615.313.9000
                                        akaufman@lchb.com

                                        James R. Dugan, II
                                        TerriAnne Benedetto
                                          *Proposed Subclass Two Counsel*
                                        David S. Scalia
                                        THE DUGAN LAW FIRM, APLC
                                        One Canal Place
                                        365 Canal Street, Suite 1000
                                        New Orleans, LA 70130
                                        Telephone: 504.648.0180
                                        jdugan@dugan-lawfirm.com
                                        tbenedetto@dugan-lawfirm.com
                                        dscalia@dugan-lawfirm.com

William M. Audet (SBN 117456)
*Proposed Subclass One Counsel*
Ling Y. Kuang (SBN 296873)
AUDET & PARTNERS, LLP
711 Van Ness, Suite 500
San Francisco, CA 94102-3229
Telephone: 415.568.2555
waudet@audetlaw.com
lkuang@audetlaw.com

Samuel Issacharoff
40 Washington Square South
Suite 411J
New York, NY 10012
Telephone: 212.998.6580
si13@nyu.edu

*Counsel for Plaintiffs and the Proposed Class*

2002216.2

## **CERTIFICATE OF SERVICE**

I hereby certify that, on June 24, 2020, service of this document was accomplished pursuant to the Court's electronic filing procedures by filing this document through the ECF system.

/s/ *Elizabeth J. Cabraser*
Elizabeth J. Cabraser

2002216.2