# EXHIBIT B

1            UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4

5    IN RE:  ROUNDUP PRODUCTS LIABILITY    )
     LITIGATION                           )
6                                         ) MDL NO. 2741
     This document relates to:            ) Case No. MDL No.
7                                         ) 3:16-MD-02741-VC
                                          )
8    ANGELO BULONE VS. MONSANTO COMPANY   )
     CASE NO. 3:20-cv-03719-VC            )
9                                         )
     _____)
10

11

12

13         DEPOSITION OF JAMES J.J. CLARK, PhD

14              CONDUCTED REMOTELY

15           Monday, October 30, 2023

16            9:02 a.m. Pacific Time

17

18

19

20

21

22

23    Stenographically Reported By:

24    Lorie Rhyne, CSR, RPR, CRR

25

Exhibit B Page - 1

1              REMOTE VIDEOTAPED DEPOSITION OF JAMES J.J. CLARK,

2    PhD, taken before Lorie Rhyne, CRR, RPR, CSR No. 12905,

3    a Certified Shorthand Reporter for the State of

4    California, commencing on Monday, October 30,

5    2023, 9:02 a.m. Pacific Time.

6     (All Appearances via Videoconference)

7

8         APPEARANCES OF COUNSEL:

9         For Plaintiff:

10             ERIN WOOD, ESQ.

11             Nachawati Law Group

12             5489 Blair Road

13             Dallas, Texas 75231

14             (214) 890-0711

15             ewood@ntrial.com

16

17        For Defendant:

18             MARINA BATALIAS, ESQ.

19             Nelson Mullins Riley & Scarborough

20             901 East Byrd Street, Suite 1650

21             Richmond, Virginia 23219

22             (804) 533-4614

23             Marina.Batalias@nelsonmullins.com

24        Videographer:

25             KAREN KEEBLER

09:07:08    1        please.

            2              Q.   Please do.

            3              A.   It looks like my report.

            4              Q.   Great.  Is this the most recent copy of

09:07:56    5        your report dated October 21st, 2023?

            6              A.   Yes, it is.

            7              Q.   And this is an amended report; is that

            8        correct?

            9              A.   That is correct.

09:08:07   10              Q.   Do you recall what sort of revisions you

           11        made between your initial report in this case and

           12        this amended report?

           13              A.   Yes.  Do you want me to list those?

           14              Q.   Yes, please.

09:08:19   15              A.   Okay.  So for this report, I simplified

           16        it by focusing only on the exposure days that

           17        Mr. Bulone had to the Roundup products because

           18        that's primarily what the specific causation folks

           19        are focusing on.  So I eliminated the discussions

09:08:44   20        about dermal absorption and systemic doses.

           21              Q.   Okay.

           22              A.   And to that end, on the exposure days,

           23        what I did was also account for days that

           24        meteorologically there would have been a rain

09:09:09   25        event going on and reducing the number of exposure

09:09:11   1    days to account for that because Mr. Bulone had

2    testified he didn't spray on days when it was

3    raining.

4           And to that end, what it is, is a very

09:09:21   5    conservative assumption that if there was any rain

6    on any part of that day, Mr. Bulone wouldn't have

7    sprayed.  So if -- he could have sprayed in the

8    morning, but it rained in the afternoon, I assumed

9    he didn't spray at all.

09:09:37  10       Q.   Okay.  And those were essentially the

11    substantive changes you made between the two

12    reports?

13       A.   Correct.

14           MS. BATALIAS:  Okay.  I'll go ahead and

09:09:46  15    mark the report as Exhibit 2.

16           (Exhibit 2 was marked for identification.)

17    BY MS. BATALIAS:

18       Q.   And I'm throwing a third document into

19    that folder.

09:10:08  20           Do you see the document marked -- nope,

21    sorry.  I messed myself up -- Materials Considered

22    List?

23       A.   I do.  I'm going through that right now.

24       Q.   Great.

09:10:25  25       A.   Yes.

09:27:46    1           A.   Medical records, his -- the exhibits

            2      from his deposition and his deposition.

            3           Q.   And I believe you also interviewed

            4      Mr. Bulone via telephone on September 21st, 2023?

09:28:06    5           A.   Correct.

            6           Q.   Okay.  And that's where you would have

            7      generated your interview notes listed here?

            8           A.   That is correct.

            9           Q.   I'm moving a document into the folder

09:28:23   10      called Interview Notes.

           11           Can you see that document?

           12           A.   Let me pull it up.

           13           Yes.

           14           Q.   Okay.  Is this a fair and accurate copy

09:28:34   15      of the notes that you took during your interview

           16      of Mr. Bulone on September 21st, 2023?

           17           A.   Yes, that is.

           18           Q.   Did you take any additional notes

           19      besides what is included in this document?

09:28:50   20           A.   No, ma'am.

           21           Q.   And this was a telephone conversation;

           22      correct?

           23           A.   Correct.

           24           Q.   So it wasn't via Zoom or any other

09:29:00   25      conferencing device like that where you can see

Exhibit B Page - 5

```
09:29:03    1    face-to-face?

            2         A.   No.  It was old-school over -- on a

            3    telephone.

            4         Q.   Okay.  And it was just with Mr. Bulone?

09:29:13    5         A.   That would be correct.

            6         Q.   Okay.  There wasn't anyone else present

            7    on the call?

            8         A.   No.

            9         Q.   Approximately how long did that call

09:29:22   10    last?

           11         A.   I see on the notes, it says about

           12    40 minutes.

           13              MS. BATALIAS:  And I can't remember if I

           14    did this already, but if I haven't, then I'm going

09:29:34   15    to mark the Interview Notes as Exhibit 6, just for

           16    the record.

           17              THE WITNESS:  Okay.

           18              (Exhibit 6 was marked for identification.)

           19    BY MS. BATALIAS:

09:29:43   20         Q.   So apart from this interview, which is

           21    documented in these notes, have you conducted any

           22    other interviews with Mr. Bulone?

           23         A.   No, ma'am.

           24         Q.   Okay.  Did you record this conversation

09:30:02   25    with Mr. Bulone, or are the notes the only
```

09:30:05   1   recollection?

2   A.   The notes are the only thing that I

3   have.  So I take them concurrently with the

4   interview.

09:30:13   5   Q.   Okay.  And is this just a form document

6   that your office produces, or were you provided

7   this document to fill in?

8   A.   This is a form that I generated, and I

9   try to use this in interviews of potential

09:30:26   10   subjects.

11   Q.   And during your phone conversation with

12   Mr. Bulone, was he under oath?

13   A.   No, I didn't put him under oath, so no.

14   Q.   Did you notice any consistencies between

09:30:45   15   what Mr. Bulone told you on the phone and what you

16   read in his deposition?

17   A.   I'm sorry.  Did you say "consistencies"

18   or "inconsistencies"?

19   Q.   "Inconsistencies."  I'm sorry.

09:30:58   20   A.   No, I did not notice any differences in

21   what he had testified to and what he was

22   describing on that day.

23   Q.   Okay.  And you say in your report that

24   you were relying on his testimony in his

09:31:15   25   deposition and on his phone interview with you

09:31:17   1      regarding the frequency of his Roundup usage?

           2           A.   Correct.

           3           Q.   And just to be clear, you have not met

           4      in person or physically examined Mr. Bulone?

09:31:31   5           A.   No, I have not met him in person, and I

           6      wouldn't examine him physically.

           7           Q.   Okay.  I'm going to walk through some of

           8      the interview notes just so I can make sure I

           9      understand your handwriting, if that's okay.

09:31:48  10           A.   Yes.

          11           Q.   I believe the -- correct me if I'm

          12      wrong.  It's -- the first and second page are

          13      reproduced in your report in typed form; is that

          14      correct?

09:32:01  15           A.   Yes, ma'am.

          16           Q.   Apart from that, would you mind

          17      scrolling to page 4 of your interview notes.  So

          18      under --

          19           A.   I see it.

09:32:23  20           Q.   Oh, sorry.

          21           A.   Yeah, I'm there.

          22           Q.   So under Smoking History and pack-year

          23      calculations, would you mind reading what your

          24      handwriting says under the Yes/No column.

09:32:34  25           A.   Sure.

James Clark, PhD

| | | |
|---|---|---|
| 09:33:56 | 1 | mentioned something about tomatoes.  So she would |
| | 2 | do it on a small portion of her garden. |
| | 3 | Q.   Okay.  Thank you very much. |
| | 4 | A.   Okay. |
| 09:34:08 | 5 | Q.   We're going to go back to the report |
| | 6 | which is marked Exhibit 2. |
| | 7 | Okay.  So, Dr. Clark -- |
| | 8 | A.   Yes. |
| | 9 | Q.   -- does this report contain all the |
| 09:34:26 | 10 | opinions you intend to give at trial in this case? |
| | 11 | A.   Yes.  This provides my written opinions. |
| | 12 | Q.   Okay.  And it also provides the basis |
| | 13 | for your opinions thereof? |
| | 14 | A.   Yes, ma'am. |
| 09:34:48 | 15 | Q.   Did you have access to all of the |
| | 16 | information you needed to formulate your opinions |
| | 17 | in this case? |
| | 18 | A.   I had sufficient information to -- to |
| | 19 | formulate my opinions.  That's kind of a broad |
| 09:35:01 | 20 | question.  I -- I had access to his files, and I |
| | 21 | was able to go through them and then verify the |
| | 22 | information with Mr. Bulone over the phone |
| | 23 | interview, yes. |
| | 24 | Q.   Was there anything that you wanted to |
| 09:35:14 | 25 | have access to but were unable to obtain? |

09:41:49    1    record.  The time is 9:41.

            2    BY MS. BATALIAS:

            3        Q.   All right.  So we took a five-minute

            4    break.  So I'll just restart with questioning.

09:42:01    5             Dr. Clark, did you conduct or take a

            6    chemical inventory of Mr. Bulone's case?

            7        A.   No, I did not.

            8        Q.   Did you conduct any sort of site

            9    inspection or visit of the places where Mr. Bulone

09:42:19   10    allegedly sprayed Roundup?

           11        A.   I reviewed the photos that were attached

           12    to his deposition of his residence in Pawleys

           13    Island and the golf course in Georgetown.  I did

           14    not make a site inspection, a physical site

09:42:42   15    inspection.

           16        Q.   Okay.  Did you inspect or investigate

           17    any of the equipment that Mr. Bulone used to apply

           18    Roundup?

           19        A.   No, I did not.

09:42:56   20        Q.   Did you do anything else to prepare for

           21    this deposition besides review the documents that

           22    we've just discussed?

           23        A.   I reviewed the documents.  I reviewed my

           24    reports -- my report, not reports, and that was

09:43:10   25    about it.

James Clark, PhD

09:46:06   1    different outcomes along the way.

  2        Q.    The Zhang 2019 study doesn't report a

  3    specific dose measurement, does it?

  4        A.    No.    It reports a cumulative evaluation,

09:46:19   5    all -- of many studies.

  6        Q.    And you did not assess the underlying

  7    studies to identify what dose falls into the

  8    high-exposure group, did you?

  9        A.    No.    Because the metric that is being

09:46:33   10    used most frequently for specific causation is the

  11    exposure days.    So it is the use of the product

  12    provides an opportunity for the individual to

  13    become exposed to the materials, to have it either

  14    land on their skin or inhale it or have some other

09:46:55   15    kind of incidental exposure.    And the most

  16    commonly reported epidemiological values are

  17    exposure days.

  18        Q.    What is your opinion about what dose of

  19    glyphosate subjects an individual to an increased

09:47:08   20    risk of the NHL?

  21        MS. WOOD:    I'm going to object.    Beyond

  22    the scope of Dr. Clark's opinions in this case and

  23    the opinions contained within his report.    He's

  24    not being proffered as a causation expert.

09:47:26   25    BY MS. BATALIAS:

09:47:27   1          Q.   You can answer if you can.  If not,

           2     we'll move on.

           3          A.   Let's go ahead and move on.

           4          Q.   Okay.  On page 3 of your report -- on

09:47:51   5     page 3 of your report, you list the objectives of

           6     this report; is that correct?

           7          A.   Correct.

           8          Q.   And you state in the first paragraph,

           9     under the heading 2.1 Objectives, that the primary

09:48:13  10     objective of this toxicological assessment is to

          11     arrive at a scientifically reliable exposure

          12     analysis for Mr. Bulone, based on his cumulative

          13     exposure, as expressed in exposure days to

          14     Roundup; is that correct?

09:48:28  15          A.   Correct.

          16          Q.   And this analysis and dose estimation is

          17     based on the objective evidence available to you;

          18     is that right?

          19          A.   That is correct.

09:48:43  20          Q.   And in this case, the available evidence

          21     regarding Mr. Bulone's exposure was obtained from

          22     Mr. Bulone himself, right, his deposition and his

          23     conversation with you?

          24          A.   Yes.  His sworn testimony, under

09:48:57  25     examination from attorneys on your side, plus my

James Clark, PhD

09:49:03   1    interview with him, yes.

2         Q.   Do you have any additional factual

3    information corroborating Mr. Bulone's use of

4    Roundup?

09:49:16   5         A.   I'm relying on the information that was

6    provided in the deposition testimony and the

7    interview.  So beyond that, that's all the

8    information that I needed to come up with my

9    opinions.

09:49:29   10        Q.   So you're not aware of any independent

11   corroboration for Mr. Bulone's use of Roundup.  Is

12   that fair?

13             MS. WOOD:  Objection.  I'm sorry.

14   Object to the form.  Vague and ambiguous.

09:49:37   15             You can answer.

16             THE WITNESS:  I'm relying on the

17   testimony that he's sworn to.  So that's typical

18   of these kind of analyses.

19   BY MS. BATALIAS:

09:49:51   20        Q.   And your analysis is only as good as the

21   information that is provided to you; right?

22        A.   The information -- the opinions are

23   based upon the sworn testimony, yes.

24        Q.   Right.  So if the sworn testimony was

09:50:08   25   wrong, your opinion would be wrong.

James Clark, PhD

| | | |
|---|---|---|
| 09:50:10 | 1 | Is that fair to say? |
| | 2 | A.   I wouldn't characterize it as wrong. |
| | 3 | Like all of these assessments, you take the |
| | 4 | information that you have to come together to -- |
| 09:50:24 | 5 | for a reasonable calculation of dose or exposure |
| | 6 | days. |
| | 7 | Q.   Do you have any direct personal |
| | 8 | knowledge of Mr. Bulone's exposure and his use of |
| | 9 | Roundup? |
| 09:50:39 | 10 | A.   Beyond his testimony and the interview, |
| | 11 | no. |
| | 12 | Q.   In that same paragraph on page 3, you |
| | 13 | mentioned that your toxicological assessment of |
| | 14 | Mr. Bulone also identifies other potential |
| 09:50:55 | 15 | contributing toxicological factors and calculates |
| | 16 | the latency period from initial exposure to the |
| | 17 | time of Mr. Bulone's diagnosis; right? |
| | 18 | A.   Correct. |
| | 19 | Q.   In doing that estimation, you'd be |
| 09:51:08 | 20 | subject to the same limitations we just discussed |
| | 21 | relating to Mr. Bulone's exposure; right? |
| | 22 | A.   Yes.  I'm relying on my review of his |
| | 23 | medical records and his review -- his -- my |
| | 24 | interview with him to assess those confounding |
| 09:51:30 | 25 | factors, which don't affect my dose calculation. |

Exhibit B Page - 14

James Clark, PhD

```
09:51:35   1    I provide that -- it's a typical toxicological

           2    evaluation to go ahead and assess the status of

           3    the individual.  And for somebody who's doing

           4    specific causation, who will be reading my report,

09:51:47   5    I call this out so that they can evaluate that and

           6    see if that affects their opinions one way or the

           7    other.

           8        Q.   In your report, you agree that

           9    Mr. Bulone was diagnosed with NHL?

09:52:19  10        A.   Mr. Bulone was diagnosed with CLL.

          11    That's what I've seen in there.  And that falls

          12    under the larger umbrella of NHL.

          13        Q.   Right.  And you're not making an

          14    independent diagnosis of NHL or CAL [sic]?

09:52:37  15        A.   As I stated in the report, I am not

          16    assessing -- I'm relying on his medical records

          17    and the other experts to fill in that information.

          18    My charge was evaluate how he used the product and

          19    what his number of exposure days are.

09:53:09  20        Q.   In your report, you evaluated some of

          21    his contribute -- potential contributing factors,

          22    such as family medical history and smoking and

          23    that sort of thing; correct?

          24        A.   Correct.  I noted it in the -- Table 3.

09:53:32  25        Q.   Right.  And so, for example, on page --
```

Exhibit B Page - 15

10:00:36    1           Q.   So what is your understanding, based off

            2      of his deposition testimony and your conversation

            3      with him, of how much he got on himself while

            4      spraying Roundup?

10:00:49    5           MS. WOOD:  Objection.  Vague.

            6      Ambiguous.

            7           You can answer.

            8           THE WITNESS:  It's -- my understanding

            9      is that it would -- got on his body.  He wasn't

10:00:59   10      sure of the amounts.  What he was sure of was the

           11      amount of time that he would -- spent spraying.

           12           And, for me, the exposure period starts

           13      with picking up the product and then starting to

           14      apply it.

10:01:14   15      BY MS. BATALIAS:

           16           Q.   So you're unsure of the amount of

           17      Roundup that got on his body or his hands?

           18           A.   That's not something that I was

           19      quantifying in this report.  It was the usage days

10:01:30   20      is what I was quantifying.

           21           Q.   And in your report, you only calculated

           22      exposure days for Mr. Bulone; right?

           23           A.   I calculated total hours, which were

           24      then translated -- or divided into exposure days,

10:01:47   25      yes.

James Clark, PhD

| | | |
|---|---|---|
| 10:03:16 | 1 | the outside of the -- of the sprayer.  Adjusting |
| | 2 | the nozzle along the way is going to provide |
| | 3 | contact.  So in a general sense, you're right, |
| | 4 | exposure ultimately leads to contact. |
| 10:03:30 | 5 | Q.   And you would agree that Roundup |
| | 6 | exposure is not harmful unless it contacts with |
| | 7 | the body and gets into the body; correct? |
| | 8 | A.   Contact is going to occur, yes.  The |
| | 9 | rate of contact may be modified by something, but |
| 10:03:54 | 10 | generally, yes, when the product is released into |
| | 11 | the environment and it comes back and contacts the |
| | 12 | skin, what is inhaled, that's -- that's a |
| | 13 | significant exposure. |
| | 14 | Q.   Right.  So my question was:  You would |
| 10:04:10 | 15 | agree that exposure is not harmful unless this |
| | 16 | contact occurs; correct? |
| | 17 | A.   The assumption is that contact is |
| | 18 | occurring, yes. |
| | 19 | Q.   You're saying that every time you use |
| 10:04:26 | 20 | Roundup the assumption is that contact occurs? |
| | 21 | A.   Yes.  So as you're spraying the mist -- |
| | 22 | as you create this mist -- it's not in a vacuum. |
| | 23 | The materials are going to migrate through the |
| | 24 | environment, and, yes, there will be contact. |
| 10:04:44 | 25 | Q.   But you didn't assess exposure dose in |

Exhibit B Page - 17

| | | |
|---|---|---|
| 10:04:46 | 1 | this case. |
| | 2 | You only assessed exposure days? |
| | 3 | A.   Correct.  I'm keeping it consistent with |
| | 4 | the epidemiological literature, which is used by |
| 10:04:57 | 5 | specific causation analysts to determine the |
| | 6 | relationship between exposure and cancer. |
| | 7 | Q.   Exposure dose would require you to |
| | 8 | assess how much glyphosate actually contacted the |
| | 9 | body; correct? |
| 10:05:14 | 10 | A.   Yes.  That would be a different |
| | 11 | valuation.  That would be looking at a different |
| | 12 | model to simulate the contact rates. |
| | 13 | Q.   So in your report at page 24 to 25, |
| | 14 | which is Table 5 and then it looks like your |
| 10:06:04 | 15 | conclusion from Table 5, you assess Mr. Bulone's |
| | 16 | eight-hour time-weighted Roundup exposure days |
| | 17 | prediagnosis exposure, right? |
| | 18 | A.   That is correct.  So Table 5 summarizes |
| | 19 | the exposures at each of the locations of |
| 10:06:25 | 20 | interest, so the Bonnau, B-o-n-n-a-u, Court |
| | 21 | address on Pawleys Island, P-a-w-l-e-y-s, and the |
| | 22 | Wedgefield Plantation Golf Course.  Either in -- |
| | 23 | in the case of Bonnau Court, there was the first |
| | 24 | two years that he had a significant -- he recalled |
| 10:06:49 | 25 | doing a lot of spraying around the house to kind |

James Clark, PhD

| | | |
|---|---|---|
| 10:06:52 | 1 | of burn down the weeds, and then after that, a -- |
| | 2 | kind of a once-a-month exposure. |
| | 3 | Then for the -- for the golf course, it |
| | 4 | evaluated during the growing season and what I've |
| 10:07:05 | 5 | called the off-season, or I may have referred to |
| | 6 | it as the cold season, the rates at which he |
| | 7 | applied Roundup and along with the number of years |
| | 8 | and the events per year. |
| | 9 | Q.   And for the second row in Table 5, the |
| 10:07:25 | 10 | 62 Bonnau Court, from 1985 to 1993 exposure, you |
| | 11 | don't take into account rain days; is that |
| | 12 | correct? |
| | 13 | A.   Correct, because it was a once-a-month |
| | 14 | evaluation -- or spraying that he referred to.  So |
| 10:07:47 | 15 | I made the assumption that he was not going to |
| | 16 | spray on a rain day.  And because of the -- the |
| | 17 | difference in the -- you know, the long extended |
| | 18 | time period, he could do this in a sunny day. |
| | 19 | Q.   But you took into account rainy days for |
| 10:08:06 | 20 | the one, two, three -- three other rows in that |
| | 21 | table? |
| | 22 | A.   Correct.  And it -- it is back to a |
| | 23 | logical assumption of he recalled spraying once a |
| | 24 | month.  He would have done it on a day that it |
| 10:08:21 | 25 | wasn't raining, and he was pretty solid in that |

Exhibit B Page - 19

```
10:08:25    1    recall.

            2        Q.   And ultimately you concluded with a

            3    range of potential exposure days; is that right?

            4        A.   That is correct.  I provide a minimum

10:08:38    5    value, a midpoint and a maximum value.  And in

            6    this evaluation, as is consistent with what I've

            7    done in other matters, is for the minimum value, I

            8    assume a 50 percent reduction.  The midpoint then

            9    is based upon a -- 50 percent of the lowest value

10:09:03   10    recorded.

           11        So if he said, I sprayed between one

           12    hour and an hour and a half, I automatically

           13    assumed it was an hour as -- as the amount that

           14    was being -- the spraying was actually occurring,

10:09:18   15    and then reduce that by 50 percent to get the

           16    minimum.  For the midpoint, I take the lowest

           17    value reported and report that out.  And then on

           18    the maximum, I assume a 25 percent increase over

           19    that midpoint.

10:09:36   20        Q.   Okay.

           21        A.   And then to account for the rain days, I

           22    go ahead and take the number of possible events

           23    during that time period and subtract out the rain

           24    days.  So now I've eliminated those days, and

10:09:50   25    we've -- we're getting a bare-bones number of
```

10:09:55   1    events that could have occurred.

2          Q.   And where did you come to the numbers

3    that you use in that?  Specifically, the

4    50 percent reduction and 25 percent increase.

10:10:08   5         A.   So I'm basing it upon my professional

6    judgment and experience of 30 years of doing these

7    dose reconstructions.  These are reliable ranges

8    of values that you would be seeing.

9          Q.   This is a method that you developed

10:10:22  10    yourself?

11         A.   This is a method that over time I've

12    seen generally accepted, so I've been working with

13    that.

14         Q.   When you say "generally accepted," what

10:10:36  15    sort of references are you using for that?

16         A.   Well, talking to other professionals,

17    How do you go ahead and calculate this?  So it

18    was -- I come to this conclusion after doing this

19    a long time and talking with other toxicologists.

10:10:53  20         Q.   Okay.  Can you point to any

21    peer-reviewed articles or studies that also use

22    this methodology?

23         A.   Sorry.  My dogs are barking here.

24              No.  The literature is not specific to

10:11:08  25    this, so I can't give you any specific citation.

James Clark, PhD

| | | |
|---|---|---|
| 10:11:14 | 1 | Q.   So going back to Table 5. |
| | 2 | A.   Yes. |
| | 3 | Q.   With the numbers specifically, it looks |
| | 4 | like the total time-weighted average minimum was |
| 10:11:25 | 5 | 42.15 days, the midpoint was 84.33 days and the |
| | 6 | max was 105.41 exposure days; is that correct? |
| | 7 | A.   That's correct.  And the majority of -- |
| | 8 | if we just go to the 42.5, you can see that 39.187 |
| | 9 | is from application on the Wedgefield Golf Course, |
| 10:11:56 | 10 | and it's in the minimum.  And then on the |
| | 11 | midpoint, it's -- 78.375 days are based on the |
| | 12 | Wedgefield Golf Course.  And this is -- this is |
| | 13 | from the time period of 1988 to 1991.  So that's |
| | 14 | that -- that period right there, yes. |
| 10:12:24 | 15 | Sorry.  I got distracted here. |
| | 16 | Q.   You're fine. |
| | 17 | So those numbers break out to -- sorry. |
| | 18 | Let me back up. |
| | 19 | So that 1988 to 1991 time period, that |
| 10:12:47 | 20 | is three years; right? |
| | 21 | A.   Yes. |
| | 22 | Q.   So essentially these numbers divided by |
| | 23 | the three years come out to dozens of exposure |
| | 24 | days per year? |
| 10:13:05 | 25 | A.   At a minimum in 1988, yes.  It would be |

James Clark, PhD

| | | |
|---|---|---|
| 10:14:45 | 1 | A. An event is anytime he pulled the |
| | 2 | product out to spray it. |
| | 3 | Q. So it doesn't necessarily mean he |
| | 4 | actually sprayed the product in that event -- |
| 10:14:52 | 5 | case? |
| | 6 | A. What did you say? |
| | 7 | MS. WOOD: Objection. Misstates |
| | 8 | testimony. |
| | 9 | THE WITNESS: I'm sorry. I couldn't |
| 10:14:59 | 10 | hear that. |
| | 11 | BY MS. BATALIAS: |
| | 12 | Q. I think I said -- |
| | 13 | (The record is read by the stenographer.) |
| | 14 | MS. WOOD: Objection. |
| 10:15:20 | 15 | BY MS. BATALIAS: |
| | 16 | Q. Do you understand the question, |
| | 17 | Dr. Clark? |
| | 18 | A. Yes. |
| | 19 | So the assumption was that when he |
| 10:15:24 | 20 | pulled the product out, he was using it and he was |
| | 21 | going to spray it. |
| | 22 | Q. Okay. Do you know whether Mr. Bulone |
| | 23 | actually got Roundup product on his skin every |
| | 24 | time there was an event? |
| 10:15:43 | 25 | A. The assumption is that he -- when he was |

**Exhibit B Page - 23**

James Clark, PhD

| | | |
|---|---|---|
| 10:15:45 | 1 | using it, yes, it was getting on his skin. |
| | 2 | Q.   But do you know whether that actually -- |
| | 3 | A.   And then -- well, that's -- that's a -- |
| | 4 | in this exposure modeling, you have to make an |
| 10:15:58 | 5 | assumption about contact or no contact.  So, yes, |
| | 6 | the assumption was that he was getting it on his |
| | 7 | skin every time he was using the product, whether |
| | 8 | it would be he'd get -- he'd get it on his skin |
| | 9 | when he picked up the product itself or the |
| 10:16:12 | 10 | sprayer, yes, he was getting -- he was having |
| | 11 | contact with the material. |
| | 12 | Q.   Did Mr. Bulone ever testify that he |
| | 13 | spilled Roundup on himself over the course of |
| | 14 | using the products? |
| 10:16:33 | 15 | A.   I'm not recalling spillage. |
| | 16 | Q.   Do you recall during your phone |
| | 17 | conversation if he mentioned whether or not he |
| | 18 | ever spilled Roundup product on himself? |
| | 19 | A.   I don't recall the spillage, no. |
| 10:16:52 | 20 | Q.   Did Mr. Bulone tell you whether he |
| | 21 | remembers getting Roundup on his skin every time |
| | 22 | he used it? |
| | 23 | A.   I am not recalling him saying "every |
| | 24 | time."  The model assumes that when you are using |
| 10:17:16 | 25 | the product and spraying it that you will get |

| | | |
|---|---|---|
| 10:17:18 | 1 | contact. |
| | 2 | Q.   But Mr. Bulone himself didn't |
| | 3 | specifically tell you that he got Roundup on his |
| | 4 | skin every single time he used the product? |
| 10:17:29 | 5 | MS. WOOD:  Objection.  Asked and |
| | 6 | answered. |
| | 7 | You can answer. |
| | 8 | THE WITNESS:  The -- I don't recall |
| | 9 | Mr. Bulone specifically saying that.  It was in my |
| 10:17:39 | 10 | exposure model I'm assuming contact every time |
| | 11 | he's using it -- |
| | 12 | BY MS. BATALIAS: |
| | 13 | Q.   Now -- |
| | 14 | A.   -- whether that is when he's picking it |
| 10:17:47 | 15 | up or whether he's spraying it or putting it away, |
| | 16 | there -- there's going to be contact. |
| | 17 | Q.   Do you know why Mr. Bulone stopped using |
| | 18 | Roundup? |
| | 19 | A.   I don't recall.  I thought it was |
| 10:18:04 | 20 | because of his health.  I don't specifically |
| | 21 | recall -- recall why he stopped using it.  He |
| | 22 | stopped -- when he stopped working at the -- the |
| | 23 | golf course, there was -- you know, that was |
| | 24 | the -- the biggest chunk of what his exposure was. |
| 10:18:19 | 25 | So he was still using it at his house. |

James Clark, PhD

| | | |
|---|---|---|
| 10:32:25 | 1 | clothing, that sort of thing? |
| | 2 | A.   No.  I didn't delve into that with him. |
| | 3 | His description of it made me feel like it was not |
| | 4 | a frequent product that was being used.  So it |
| 10:32:38 | 5 | would have been, in my mind, a minimal exposure. |
| | 6 | Q.   And I note in your report on page 9, |
| | 7 | Table 2, you went over his dietary habits. |
| | 8 | A.   Yes. |
| | 9 | Q.   Did you ask him about processed meats? |
| 10:33:01 | 10 | A.   I did.  I asked him about whether he ate |
| | 11 | salami or bologna or things of that nature, and I |
| | 12 | think his response was something to the effect, |
| | 13 | I'm an Italian from New York.  Yes, I eat those |
| | 14 | things. |
| 10:33:20 | 15 | Q.   Did you ask about what sort of |
| | 16 | high-temperature cooking he does, any deep fat |
| | 17 | frying or grilled meats? |
| | 18 | A.   He gave me the impression he wasn't |
| | 19 | doing the cooking, so I don't -- when he -- we |
| 10:33:36 | 20 | were talking about diet, kept coming back to he |
| | 21 | eats a lot of pasta.  He eats a lot of Italian |
| | 22 | food that you would normally see from a New |
| | 23 | Yorker. |
| | 24 | Q.   Do you know when the first malignant |
| 10:34:04 | 25 | cell appeared on Mr. Bulone's body? |

Exhibit B Page - 26

```
10:34:07    1              MS. WOOD:  Objection.  Beyond the scope

            2    of Dr. Clark's opinions.  Also lack of foundation.

            3              THE WITNESS:  I can't really answer that

            4    question.

10:34:20    5    BY MS. BATALIAS:

            6         Q.   You're not --

            7         A.   I mean, it's not part -- it's not part

            8    of my charge.  My charge in this case was

            9    calculate the number of exposure days because

10:34:29   10    exposure days is equal to usage.  Usage is equal

           11    to the actual contact with the materials along the

           12    way.  And that's consistent with the

           13    epidemiological literature related to development

           14    of cancers, and exposure days is the metric that

10:34:46   15    is used.

           16         Q.   So you can't say whether there was any

           17    glyphosate in Mr. Bulone's body when his first

           18    cancerous cells appeared?

           19         A.   Again, that is beyond --

10:35:02   20              MS. WOOD:  Objection.  Beyond the scope.

           21    Lack of foundation.

           22              You can answer.

           23              THE WITNESS:  It's beyond the scope of

           24    what I was asked to do.

10:35:08   25    BY MS. BATALIAS:
```

James Clark, PhD

```
 1                  CERTIFICATE OF COURT REPORTER

 2

 3          I, LORIE RHYNE, CSR No. 12905, RPR, CRR, a

 4     Certified Shorthand Reporter, State of California,

 5     the officer before whom the foregoing deposition

 6     was taken, do hereby certify that the foregoing

 7     transcript is a true and correct record of the

 8     testimony given; that said testimony was taken by

 9     me stenographically and thereafter reduced to

10     typewriting under my direction; that reading and

11     signing was not waived; and that I am neither

12     counsel for, related to, nor employed by any of

13     the parties to this case and have no interest,

14     financial or otherwise, in its outcome.

15          Dated this 7th day of November, 2023.

16

17

18     _____

19                LORIE RHYNE

20                CSR No. 12905

21

22

23

24

25
```