# EXHIBIT D

1      IN THE CIRCUIT COURT OF ST. LOUIS COUNTY

2                 STATE OF MISSOURI

3                              Case No. 19SL-CC03421

4     *******************************

5     BARBARA ALLEGREZZA, et al,

6              Plaintiffs,

7          v.

8     MONSANTO COMPANY, et al,

9              Defendants.

10    ***********************************

11

12            Remote Videotaped Deposition of

13    DAVID BARRY BOYD, MD, MS, held at the

14    location of the deponent, commencing at 1:01

15    p.m., on the 14th of April, 2023, before

16    Maureen O'Connor Pollard, Registered

17    Diplomate Reporter, Realtime Systems

18    Administrator, Certified Shorthand Reporter,

19    Notary Public.

20

21                      - - -

22
              GOLKOW LITIGATION SERVICES
23                 877.370.DEPS
                 deps@golkow.com
24

```
 1   REMOTE APPEARANCES:

 2

 3     NACHAWATI LAW GROUP

 4     BY: GIBBS HENDERSON, ESQ.

 5         5489 Blair Road

 6         Dallas, Texas 75231

 7         214-890-0711

 8         ghenderson@ntrial.com

 9         Representing the Plaintiffs

10

11     HOLLINGSWORTH LLP

12     BY: ADAM D. MICHEL, ESQ.

13         1350 I Street, NW

14         Washington, DC 20005

15         202-898-5817

16         amichel@hollingsworthllp.com

17         Representing the Defendants

18

19   Videographer:  Jacob Pettyjohn

20

21

22

23

24
```

1   certainty?

2       A.   I do.

3       Q.   What is your basis for offering
4   that opinion?

5       A.   Based on the longevity and
6   duration, duration, exposure, latency, as
7   well as the total level of exposure over
8   time, coupled with the known potential
9   carcinogenic effect of glyphosate in
10  lymphoma, including large B-cell lymphoma.

11      Q.   The first three things you
12  identified, the longevity, the duration -- I
13  guess three of the first four things you
14  identified, the longevity, the duration, and
15  the total level of exposure over time, are
16  those things you draw from Dr. Clark.

17      A.   Sorry, that's a spam.

18           They're basically -- the
19  longevity and latency are the same.  The
20  duration, the length of time he had been
21  exposed, as well as the total exposure over
22  that time.

23      Q.   Those are all things that you
24  draw from Dr. Clark?

1      A.      Yes.

2      Q.      Is there any other basis

3   besides what you've already identified for

4   your opinion in this case?

5      A.      Predominantly exposure.

6      Q.      Is there any pathologic finding

7   in this case that identifies glyphosate or

8   Roundup as the cause of Mr. McCostlin's

9   diffuse large B-cell lymphoma?

10     A.      No.

11     Q.      Is there any blood test result

12  in this case that identifies glyphosate or

13  Roundup as the cause of Mr. McCostlin's

14  diffuse large B-cell lymphoma?

15     A.      No.

16     Q.      Is there any genomic finding in

17  this case that identifies glyphosate or

18  Roundup as the cause of Mr. McCostlin's

19  diffuse large B-cell lymphoma?

20     A.      No.

21     Q.      Is there anything about the

22  morphology or shape of Mr. McCostlin's cells

23  that evidences the presence of glyphosate or

24  Roundup?

1     their component.

2     Q.     Are you offering any opinions

3     regarding the presence or absence of specific

4     surfactants in those products?

5     A.     No. But the answer is no,

6     because we're dealing with glyphosate, but

7     the toxicity and potential side effects are

8     greater in the products than they are in the

9     glyphosate alone, and nobody has glyphosate

10     alone exposure, as you know. That doesn't

11     exist, except in the laboratory.

12     Q.     But to confirm, you're not

13     offering any opinions regarding the presence

14     or absence of specific surfactants in the

15     products that Mr. McCostlin reports having

16     been exposed to?

17     A.     No.

18     Q.     Are you offering any opinions

19     regarding potential impurities in the Roundup

20     products that Mr. McCostlin was reportedly

21     exposed to?

22     A.     No.

23     Q.     Did you attempt to quantify how

24     much glyphosate Mr. McCostlin was exposed to?

1         A.      Only rely on the toxicology
2    report, and that's predictive of dermal
3    exposures.  He has had calculations of
4    systemic exposure, but the dermal is the one
5    we normally look at, the days, hours of
6    events, and eight-hour exposures over a
7    period of time that he's been exposed,
8    eight-hour exposure days.
9         Q.      And you rely completely on
10   Dr. Clark's opinions for that?
11        A.      Yes.
12        Q.      Is that the same for the amount
13   of glyphosate Mr. McCostlin absorbed into his
14   body, do you rely completely on Dr. Clark for
15   that?
16        A.      Yes.  I don't do those
17   calculations.
18        Q.      Is that the same for the
19   internal dose of glyphosate for
20   Mr. McCostlin?
21        A.      Of course, yes.
22        Q.      What did Mr. McCostlin
23   typically wear when he was reportedly exposed
24   to Roundup?

```
1         A.    They can contribute.  When you
2   add environmental factors they exacerbate the
3   random mutation risk.  That's how they work.
4         Q.    My question is, can you rule it
5   out?
6         A.    I can't rule out that the
7   initiation event might have been random.  I
8   can't fully rule out that the promotion of
9   that might have been exposures.
10              MR. MICHEL:  Are we on
11        Exhibit 16, Madam Court Reporter?
12              COURT STENOGRAPHER:  Yes.
13              MR. MICHEL:  Thank you.
14              (Whereupon, Boyd Exhibit Number
15        16 was marked for identification.)
16   BY MR. MICHEL:
17        Q.    Doctor, I'm sharing with you
18   what will be marked as Exhibit 16 to your
19   deposition today.
20              Are you familiar with this
21   study?
22        A.    Yes.
23        Q.    I gather by now you've seen it
24   twice?
```

```
1        A.    At least twice, if not 100
2    times.
3        Q.    Well, this will really catch
4    you off guard then.
5              I am going to direct your
6    attention to page 9.
7              Just for the record, is this
8    the Andreotti, et al study?
9        A.    Yeah, this is the follow-up
10   cohort study.
11       Q.    Okay.
12       A.    Report.
13       Q.    And on pages 9 and 10 are
14   Supplementary Table 1, correct?
15       A.    Yes.
16       Q.    At the bottom of page 10, the
17   study includes a key that shows how the
18   authors categorized exposure days, correct?
19       A.    Right.
20       Q.    What quartile would
21   Mr. McCostlin fall under here?
22       A.    Probably quartile 4 is my
23   guess, 3 or 4.
24       Q.    What is your basis for saying
```

```
 1    that?
 2         A.    That's based on exposures, I
 3    believe.
 4         Q.    What about the exposures makes
 5    you say that?
 6         A.    Let me just look at that,
 7    because right down there -- and he might be
 8    in quartile 2, but I would have to go back.
 9    I didn't analyze this report relative to his
10    level.
11         Q.    All right.  Do you agree that
12    Dr. Clark says that Mr. McCostlin had between
13    13 and 33 exposure days?
14         A.    Yes.
15         Q.    And would that put
16    Mr. McCostlin somewhere between quartile 1
17    and quartile 2?
18         A.    Yeah, it would probably put him
19    closer to quartile 2 than quartile 1.
20         Q.    Okay.  Let's start with
21    quartile 1.
22               If you look at non-Hodgkin's
23    lymphoma at the top of this page, the
24    relative risk for quartile 1 is 0.76, and the
```

1 confidence interval is 0.57 to 1.01, is that
2 correct?
3     A.    Yes.
4     Q.    Does that mean that for
5 individuals with a similar exposure profile
6 to Mr. McCostlin, the Agricultural Health
7 Study did not find a relationship between
8 their glyphosate exposure and non-Hodgkin's
9 lymphoma?
10     A.    Yes, statistically significant,
11 right.
12     Q.    And then let's look at quartile
13 2. For non-Hodgkin's lymphoma, the relative
14 risk for quartile 2 was 0.87 and the
15 confidence interval is 0.66 to 1.14, is that
16 correct?
17     A.    Yes.
18     Q.    Does that also mean that if
19 Mr. McCostlin were to be put in quartile 2,
20 for individuals with a similar exposure
21 profile to him the Agricultural Health Study
22 did not find a relationship between
23 glyphosate exposure and non-Hodgkin's
24 lymphoma?

1        A.    Yes.

2              Did you look at the DLBCL,

3    quartile 2?

4        Q.    So that's where we were going.

5              Okay.  Let's turn to diffuse

6    large B-cell lymphoma.  Let's start with

7    quartile 1.  The relative risk for this is

8    1.0, and the confidence interval is 0.55 to

9    1.82, is that correct?

10       A.    Correct.

11       Q.    Does that mean that for

12   individuals with this exposure profile, the

13   Agricultural Health Study did not find a

14   relationship between their glyphosate

15   exposure and diffuse large B-cell lymphoma?

16       A.    Yes.  Again, but he was in

17   quartile 2.

18       Q.    Okay.  So let's look at

19   quartile 2.  And the relative risk here is

20   1.24 and the confidence interval is 0.70 to

21   2.2, is that correct?

22             We didn't hear an answer, I'm

23   sorry.

24       A.    Yes, that's correct.

1     Q.    Is that considered a null
2  finding?
3     A.    That's considered not
4  statistically significant.  Again, there are
5  issues with this follow-up study, as you
6  know.
7     Q.    How many years do you maintain
8  Mr. McCostlin was exposed to glyphosate?
9     A.    From 1985 to 2016, 31 years.
10    Q.    And we already agreed, I think,
11 that Dr. Clark estimates Mr. McCostlin's
12 exposure days is between 13 and 33, is that
13 correct?
14    A.    Yes.
15    Q.    So if Mr. McCostlin had at the
16 high end 33 exposure days over 31 years, does
17 that mean that on average he had around one
18 day of exposure per year?
19    A.    Yes.
20    Q.    I'm sharing with you what we
21 marked as Exhibit 17 to your deposition
22 today.
23          (Whereupon, Boyd Exhibit Number
24    17 was marked for identification.)

1   6 -- 36 even.  So if you're simply doing how
2   many exposures per year, he was always well
3   above that.  Not eight-hour exposure days,
4   but the number of days he was exposed per
5   year, which is what that is.
6         Q.    So you disagree with the
7   application of the McDuffie study in its
8   entirety to this case?
9         A.    No, no, no, no, no, no, no, no.
10  I disagree with your interpretation.
11              He had greater than two days
12  per year.  Look at it.  It's not saying
13  eight-hour exposure days, just how many days
14  did he use it.  He used it, as I said, and
15  you can go into the chart, it's right there.
16        Q.    But you agree that there were
17  years where, even according to Dr. Clark,
18  Mr. McCostlin had less than two days of
19  exposure?
20        A.    Yes, but many of them were
21  greater than that.  You know, events per
22  year, it's in the chart, the lowest was six,
23  the highest was 36 events per year.  And
24  that's what you're seeing, how many times per

1  year did he use it.  That's what that chart
2  reflects.
3              Unexposed, less than two days
4  per year or greater than two days per year.
5  That's the chart.  That's what you're asking.
6  He was well above that for most of the time
7  he used it.
8       Q.   So it's your testimony that out
9  of these categories, Mr. McCostlin would be
10 correctly placed in the category that
11 averaged more than two days per year?
12      A.   That's correct.
13      Q.   Now I'm sharing with you what
14 will be marked as Exhibit 18 to your
15 deposition.
16              (Whereupon, Boyd Exhibit Number
17      18 was marked for identification.)
18 BY MR. MICHEL:
19      Q.   This is the Plaintiff's
20 Designation of Expert Witnesses in this case.
21 Have you seen this document before?
22      A.   I can't tell you.  I haven't
23 seen the document, so I can't tell you if
24 I've seen it already.

```
 1                C E R T I F I C A T E

 2
                    I, MAUREEN O'CONNOR POLLARD, LSR
 3   #473, Registered Diplomate Reporter and
     Notary Public in and for the State of
 4   Connecticut, do hereby certify that there
     remotely came before me on the 14th day of
 5   April, 2023, the person hereinbefore named,
     who was duly sworn to testify to the truth of
 6   their knowledge concerning the matters in
     this cause, and their examination reduced to
 7   typewriting under my direction and is a true
     record of the testimony.
 8
                    I further certify that I am
 9   neither attorney for or related or employed
     by any of the parties to the action, and that
10   I am not a relative or employee of any
     attorney or counsel employed by the parties
11   hereto or financially interested in the
     action.
12

13


14              [signature: Maureen O Pollard]

15   _____
     MAUREEN O'CONNOR POLLARD, License #473
16   Registered Diplomate Reporter
     Realtime Systems Administrator
17   Notary Commission Expires:  10/31/2027

18

19

20

21

22

23

24
```