# EXHIBIT B

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

    IN RE: ROUNDUP PRODUCTS     )
4   LIABILITY LITIGATION        )
                                )
5   This document relates to:   )  MDL No. 2741
                                )
6   William C. Turnoff v.       )  Case No. MDL
    Monsanto Company            )  3:16-md-02741-VC
7   Case No. 3:19-cv-03837-VC   )
                                )
8

9                   - - - -

10                   REMOTE

11               VIDEO-RECORDED

12         EXPERT WITNESS TESTIMONY OF

13           SAMUEL BERKMAN, M.D., FACP

14              (Pages 1 - 351)

15      Thursday, November 16, 2023, 8:07 a.m.

16                   - - - -

17

18

19

20

21   REPORTED BY:  ELAINA BULDA-JONES, CSR 11720

22

23

24

25

```
 1                     APPEARANCES

 2

 3   For the Plaintiff:

 4         BY: JOSEPH DONATO, ESQ.
           BY: ROBERT KUNTZ, ESQ.
 5         Rivero Mestre LLP
           2525 Ponce de Leon Boulevard, Suite 1000
 6         Miami, Florida 33134
           305.445.2500
 7         jdonato@riveromestre.com
           rkuntz@riveromestre.com
 8

 9   For the Defendants:

10         BY: NATHAN E. HOFFMAN, ESQ.
           Nelson Mullins
11         1222 Demonbreun Street, Suite 1700
           Nashville, Tennessee 37203
12         615.664.5308
           nathan.hoffman@nelsonmullins.com
13


14
     Also present:
15
           Vincent Rosica, videographer
16

17

18

19

20

21

22

23

24

25
```

```
1         A.    I'm really sorry, it's in the timeframe --
2    it's been since COVID started.  That's all I know,
3    but I don't remember exactly.
4         Q.    Okay.
5         A.    A good way to -- you know, looking at the
6    billing records probably would give an idea, but
7    I -- I really don't know on the top of my head.
8         Q.    Okay.  Do you hold the opinion that
9    Roundup can cause non-Hodgkin's lymphoma?
10        A.    Yes, I think -- well, let me put it this
11   way.  I think there is enough evidence out there
12   that it should be considered a possible cause.  As
13   you know, it's very controversial.
14            But yes, I think it can in some people.
15        Q.    When you say "possible cause," how -- when
16   you say "possible," how certain are you of that
17   possibility?
18        A.    I'm certain.  In other words, I am certain
19   that it can cause lymphoma in some people.  I'm not
20   sure that it causes it in everyone who gets exposed.
21   But it can cause it in some people.
22        Q.    And in your mind, what would be the
23   difference between the some people who get exposed
24   and are diagnosed with non-Hodgkin's lymphoma versus
25   those people who are exposed to Roundup and do not
```

Exhibit B Page - 3

1    issue -- but take, for example, you know, smoking

2    and lung cancer.  Clearly, there's a consensus on --

3    on that issue.  Would you agree?

4         A.   I would agree.  I think that's a good

5    example.  There was a -- there is a consensus, but

6    there's been a consensus for a long time about that.

7    But you didn't see on packages of cigarettes it

8    causes lung cancer.  That came in stages.  It said

9    for a while it might cause lung cancer.

10              So all science is a work in progress.

11   When you're talking about science, you know, you're

12   talking about works in progress.

13        Q.   You mentioned warnings on packages of

14   cigarettes now for decades.

15              Are you aware that even as of today the

16   EPA does not require any warning on a -- on any

17   Roundup product regarding cancer or non-Hodgkin's

18   lymphoma?

19        A.   I thought it says caution.

20        Q.   Caution regarding what?

21        A.   I -- you know, I'm not sure, I just

22   thought I -- it had said something about caution.

23   I -- I don't think it says anything specific about

24   non-Hodgkin's lymphoma.

25        Q.   Okay.  Well, we'll discuss that issue a

1    little bit more later.  Let me move on for now.

2            When did you first form the opinion that

3    Roundup is a possible cause of non-Hodgkin's

4    lymphoma?

5        A.   Well, I have, you know, read the

6    literature extensively.  And I don't see any other

7    causes in this person.  I don't see any other

8    causes.

9            In other words, this form of non-Hodgkin's

10   lymphoma that this man has, a splenic marginal zone

11   lymphoma, is very rare.  It's less than one percent

12   of lymphomas.  It occurs very infrequent.  It's not

13   something that people get all the time.

14           And he had this 20-year exposure to

15   Roundup, which is a chemical that causes chromosomal

16   abnormalities, mutations, and I looked carefully to

17   see if there were any other causes in this person of

18   non-Hodgkin's lymphoma.  I looked carefully at his

19   family history, at exposure to infections, and other

20   risk factors.  And I didn't find any.

21           So I felt that since -- that he had so

22   much exposure to this, he wasn't sure he was wearing

23   gloves, that there was nothing else.  It's a rare

24   tumor.  That's what caused me to come to this

25   conclusion.

1     Q.   Well, when did you form that opinion?

2     A.   I formed that opinion after I was able to

3  review all his past records to see and check

4  carefully to see if he had history of Hepatitis C,

5  if he had Hepatitis B, if he had an autoimmune

6  disease, if he had a family history of lymphoma, if

7  he worked in a place where he could have been

8  exposed to insecticides, herbicides, et cetera.

9  Whether he had -- and I looked carefully through all

10  his records to see if there wasn't some more widely

11  recognized cause of lymphoma.  And, you know, a lot

12  of lymphomas, we don't know what the cause is.

13         But I didn't find anything so I felt that

14  this was the most likely cause in this particular

15  patient.  And that's how I came to my conclusion.  I

16  scoured the records.  I read them through several

17  times.  Looking for Kaposi sarcoma.  I mean, I

18  looked for everything.

19     Q.   Doctor, I appreciate that.  I'm not asking

20  you right now about your process.  We'll -- we'll

21  get to the process or your methodology.

22         I'm simply asking you when in time, at

23  what point, was it a month ago, two months ago,

24  how -- how -- at what point in time did you form the

25  opinion that Roundup is a possible cause of

1   those at the same time.

2        Q.   Do you know whether the lawyers selected

3   what you reviewed or if you had the ability to

4   search and review everything in the medical records?

5        A.   I don't know.  You'd have to ask them

6   whether they -- the stuff they didn't send me.

7            What I received is -- was the deposition,

8   the hospital records, and there was some office

9   records.

10       Q.   Okay.  And when you did your PubMed search

11  searches and then you drafted your report, did you

12  include all of the relevant articles you found from

13  your searches in your expert report?

14       A.   Yeah, that's a good question.  I -- you

15  know, there's a lot in there, I mean, no, I -- I

16  was -- you know, I'm not doing a review article for

17  a medical journal.  I -- I looked at some major

18  articles and I looked at some references from those

19  articles.

20           I looked a lot at Weisenburger's article.

21  I thought that was an excellent article.  And I

22  looked at his article and I got a lot of references

23  from there.  And I found references also that -- you

24  know, that supported the opposite side, too.  So, I

25  mean, I looked at everything.

Samuel A. Berkman, MD, FACP

1      Q.   Have you discussed it with any of your

2  patients or with any of your colleagues?

3      A.   No.

4           MR. DONATO:  Objection.  Asked and

5  answered.

6  BY MR. HOFFMAN:

7      Q.   Other than this case, are there any other

8  Roundup cases that you're currently working on?

9      A.   No.

10     Q.   This is the only one?

11     A.   Yes.

12     Q.   Okay.  Going back, when -- when did you

13  first get involved in litigation consulting,

14  approximately how many years ago was that?

15     A.   1995.

16     Q.   Okay.  So getting close to 30 years -- or

17  28, 28, 29 years ago?

18     A.   Yes.

19     Q.   And in your career, do you know how many

20  times, approximately, you've been disclosed as an

21  expert in a -- in a case?

22     A.   No, I don't know how many times I've been

23  disclosed.

24     Q.   But you mentioned before, I think you said

25  you've testified at least at deposition about 50

Samuel A. Berkman, MD, FACP

```
1        Q.   In other personal injury cases, what
2   percentage of the time have you testified for
3   plaintiffs?
4        A.   I'd say it's been about 50/50 for personal
5   injury.
6        Q.   And what types of other -- have you
7   testified in other cases where there were chemical
8   or environmental exposures?
9        A.   Yes, I have.
10        Q.   What -- what types of exposures were
11   involved in those, those previous cases?
12        A.   Benzene causing aplastic anemia,
13   hexamethyl chromium causing anemia, asbestos causing
14   pulmonary disease.
15        Q.   Any others you can think of?
16        A.   Not offhand.
17        Q.   So those three different exposures that
18   you talked about, in those personal injury cases did
19   you always testify for the -- the plaintiffs or was
20   it mixed?
21        A.   Plaintiffs.
22        Q.   And approximately how many times did you
23   testify in those three different litigations that
24   you mentioned?
25        A.   Just once on each.
```

Samuel A. Berkman, MD, FACP

```
 1        Q.   Oh, okay.  Got it.

 2             But those were all for plaintiffs?

 3        A.   Yes.

 4        Q.   What about -- putting aside chemical

 5   exposure, environmental exposure, have you testified

 6   in any pharmaceutical or medical device cases?

 7        A.   I believe I've testified in an inferior

 8   vena cava filter case.

 9        Q.   And in -- in that series of cases did you

10   testify for the plaintiffs or for the defense?

11        A.   The defense.

12        Q.   Did you testify for both -- for both

13   defendants and for plaintiff?

14        A.   No, defense.

15        Q.   Oh, defense, I'm sorry, I thought you said

16   it depends.  I'm sorry.

17        A.   No, I said defense.

18        Q.   Okay.

19        A.   Sorry, with the IVC filter case.

20        Q.   And approximately how many times did you

21   testify in those cases?

22        A.   Just once.

23        Q.   Okay.  So the other approximately 45 or 46

24   depositions that you've given in your career, can

25   you give me a sense of the -- the types of cases
```

```
 1        A.   Okay.  Yeah.

 2        Q.   It looks like there it's a -- it's a list

 3   of cases you testified in.  It says in the last five

 4   years.

 5             Do you see that?

 6        A.   Okay.  So that's -- that I'm going to have

 7   to get the -- yeah, I -- I gave you a -- yeah, I

 8   gave you a list of cases I've testified in.

 9        Q.   Okay.  So I just want to ask you about

10   those.

11             So the first one, it says, Jessen case in

12   Peoria, Illinois, in 2017.

13        A.   Right.

14        Q.   What -- what was that case about?

15        A.   So that was a case of a patient who had a

16   headache and was on Coumadin.  And they basically --

17   this was a while ago so I don't have all the

18   details.  But this is a patient who died from a

19   cerebral hemorrhage with Coumadin.

20             And basically, they didn't reverse the

21   patient's Coumadin because the INR, the degree of

22   anticoagulation, was not long enough.  But they

23   didn't take into account that the patient was also

24   taking aspirin and Plavix so he was more at risk to

25   bleed.  And so the patient bled.  And they went by
```

1    the fact, well, we went by the guidelines.  But the

2    guidelines weren't for people who were taking

3    additional anticoagulants.  So that's what that case

4    was about.

5         Q.   Okay.  Did you testify for the plaintiff

6    or the defense?

7         A.   Plaintiff.

8         Q.   And then the second case there -- and that

9    was trial testimony?

10        A.   Yes.

11        Q.   Okay.  The second case there, I assume

12   that's also trial testimony, in New Orleans.

13             Do you see that one?

14        A.   Yeah, that's Mr. Bialous, yeah.

15        Q.   And that was also in 2017, correct?

16        A.   Uh-huh, yes.

17        Q.   That's the Calvin Jackson case.  Tell me

18   about that one.  What did that involve?

19        A.   So Calvin Jackson was another one with the

20   same problem.  And what happened was he had a

21   prolonged INR, but the surgeon who tested him for

22   that didn't bother letting his doctor know, who was

23   managing his Coumadin.  He just had his secretary

24   give a call to the other secretary and they didn't

25   get it in time.  And this guy also died of a

Exhibit B Page - 12

1    cerebral hemorrhage.

2         Q.   And did you testify for the plaintiff in

3    that case as well?

4         A.   Yes.

5         Q.   Okay.  And then the four depositions.

6              The first one is Church versus Johnson in

7    2021.

8              Do you see that one?

9         A.   Right.  Church versus Johnson, right,

10   yeah.

11        Q.   What did -- what did that -- what did that

12   case involve?

13        A.   I -- I think I got this straight.  This

14   lady came from Hawaii for plastic surgery in Salt

15   Lake City.  And she flew all night.  She'd had a

16   previous history of a blood clot.  And she -- she

17   flew all night and then she had to drive there.

18             And the guy did the plastic surgery, had

19   her on the table for nine hours but never gave her

20   any prophylactic anticoagulation.  She died of a

21   pulmonary embolism a couple of days later.

22        Q.   And did you testify for the plaintiff or

23   the defense?

24        A.   Plaintiff.

25        Q.   Next case, Jones v. Phoebe Putney Group,

1    January 2022.  What was the nature of that case?

2         A.   That was a sepsis case in a patient who

3    had -- let me see, yeah, he basically was a patient

4    who had sepsis and had disseminated intravascular

5    coagulation.  Went to an emergency room in Alabama

6    and had a temperature -- they -- they said that he

7    had -- he said he had shaking chills, went to the

8    emergency room, and his temperature was only 101 but

9    he'd taken some Tylenol.

10        So they just swabbed his throat and sent

11   him home even though he had drenching chills and had

12   to change his underwear.  And then he came back,

13   yeah, ten hours later, he was fully septic and he

14   died.  And, you know, if they had admitted him the

15   first time, I don't think he would have died.  So

16   I -- he had DIC, which is a hematologic condition,

17   which is why I was asked to testify.

18        Q.   And did you testify for the plaintiff or

19   the defense in that case?

20        A.   Plaintiff.

21        Q.   Next one, Smith versus University of

22   Washington.  Tell me about that case.

23        A.   Smith versus University of Washington

24   was -- let me see.  That was a case where the

25   patient bled out after surgery.  He had a heart

1    valve and he was on aspirin and anticoagulant.  And

2    basically, he -- there was no need for him to have

3    been on aspirin and he had a serious bleed.

4         Q.   Okay.  And did you testify for the

5    plaintiff or the defense?

6         A.   Plaintiff.

7         Q.   And then the last one there, Nicolai

8    versus Abrazo, or Abrazo.  Tell me about that case.

9         A.   You know, I'm sorry, I don't have good

10   recollection of that case.  It hasn't been resolved

11   yet.  And I may -- I'm the plaintiff's expert there

12   also.  But I'd have to look that up.  I'd have to

13   refresh myself.  I just don't have a clear

14   recollection of that case.  This guy has died.  He's

15   died.  And I just -- I'm not coming up with that

16   one.

17        Q.   Okay.  And these -- but these are all

18   med-mal cases you testified?

19        A.   Yeah, they're all med-mal.  I do mostly

20   med-mal.  I don't do much personal injury.

21             But the personal injury I've done has been

22   much more defense oriented.  The med-mal I'm usually

23   a plaintiff's expert.

24        Q.   Okay.  And, Doctor -- you can -- you can

25   put that aside or click out of it.

Exhibit B Page - 15

Samuel A. Berkman, MD, FACP

```
 1   U.S. will be diagnosed with non-Hodgkin's lymphoma

 2   in 2023?

 3        A.   Well, it doesn't surprise me.

 4        Q.   In fact, non-Hodgkin's lymphoma ranks

 5   among the top ten most common cancers diagnosed,

 6   true?

 7             MR. DONATO:  Objection.  Form.

 8             THE WITNESS:  I don't know exactly where

 9   it ranks, but it's a common form of cancer.

10   BY MR. HOFFMAN:

11        Q.   Okay.  A few questions now on Roundup

12   generally as it relates to non-Hodgkin's lymphoma.

13             Do you agree, Doctor, that there are

14   people who develop non-Hodgkin's lymphoma who have

15   never been exposed to Roundup?

16        A.   Absolutely.

17        Q.   And it certainly is not necessary for a

18   person to be exposed to Roundup to develop

19   non-Hodgkin's lymphoma, correct?

20        A.   Correct.

21        Q.   And the flip side of the coin is also

22   true, there are people who have been exposed to

23   Roundup who never develop non-Hodgkin's lymphoma,

24   correct?

25        A.   Yeah, the odds ratio are not a hundred
```

Exhibit B Page - 16

Samuel A. Berkman, MD, FACP

```
 1   percent.  It's just -- yeah, you're right.
 2        Q.   So it's certainly not a 1-to-1
 3   relationship?
 4        A.   Well, I wouldn't go with ratios, but let's
 5   say that not everyone who gets exposed to Roundup
 6   develops non-Hodgkin's lymphoma.
 7        Q.   People were diagnosed with non-Hodgkin's
 8   lymphoma long before Roundup was invented and first
 9   used in the mid-1970s, correct?
10        A.   Yes.
11        Q.   And you agree that there are many people
12   who have been exposed to Roundup who never develop
13   non-Hodgkin's lymphoma, true?
14        A.   I already answered that.  Yes.
15        Q.   Are you familiar with the results of the
16   recent CDC study that found detectable levels of
17   glyphosate in more than 80 percent of urine samples
18   of people in the United States?
19        A.   Yes, I am.
20        Q.   And you certainly would agree that
21   80 percent of Americans are not diagnosed with
22   non-Hodgkin's lymphoma, correct?
23        A.   No, they're not.
24        Q.   In fact, the background rate of
25   non-Hodgkin's lymphoma in the U.S. is around
```

Exhibit B Page - 17

Samuel A. Berkman, MD, FACP

```
 1    2 percent or less, true?

 2         A.    The background rate of the total

 3    population?

 4         Q.    Yes.

 5         A.    Yeah.  Yes.

 6         Q.    Okay.  Let me ask you some general

 7    questions about your board certifications.

 8               Are you -- are you currently board

 9    certified, Doctor?

10         A.    Yes.

11         Q.    In what areas?

12         A.    Internal medicine, hematology, and medical

13    oncology.

14         Q.    It's fair to say that you are not a

15    pathologist?

16         A.    Well, I'm not a pathologist.  I do read

17    bone marrows, though.

18         Q.    I'm sorry, I missed that last part of your

19    answer.

20         A.    I do read bone marrows, but I'm not a

21    pathologist.

22         Q.    Okay.  And you're not a toxicologist?

23         A.    No.

24         Q.    You're not an epidemiologist?

25         A.    No.
```

Exhibit B Page - 18

Samuel A. Berkman, MD, FACP

```
 1          Q.    Not a cancer biologist?

 2          A.    No.

 3          Q.    Not a geneticist?

 4          A.    No.

 5          Q.    Not an immunologist?

 6          A.    No.  I'm not boarded in immunology.  I

 7    certainly deal with immunological problems, that's

 8    for sure, but I am not a board-certified

 9    immunologist.

10          Q.    And you're not an expert in genotoxicity,

11    are you, Doctor?

12          A.    No.

13          Q.    Have you ever designed, conducted, or

14    published a genotoxicity study?

15          A.    No.

16          Q.    And you're not an expert in animal

17    carcinogenicity studies, are you, Doctor?

18          A.    No.

19          Q.    Have you ever designed, conducted, or

20    published an animal carcinogenicity study?

21          A.    Never.

22          Q.    You would agree you're not a regulatory

23    expert or an expert on the EPA?

24          A.    I am not.

25          Q.    Have you ever worked for, consulted for,
```

**Exhibit B Page - 19**

Samuel A. Berkman, MD, FACP

```
 1   or been asked to be on a Scientific Advisory Panel
 2   for the EPA?
 3        A.   No.
 4        Q.   Would you agree you're not an expert in
 5   pesticides?
 6        A.   What's an expert in pesticides?
 7        Q.   Well, pesticides -- when I use the term
 8   "pesticide," I'm using that in the same way that the
 9   EPA would use it, so it's a broad term that would
10   include herbicides, such as Roundup or glyphosate.
11        A.   Would you say it falls under the rubric of
12   toxicology?
13        Q.   No, I mean, what I'm asking you is there
14   are some folks who devote their career to studying
15   pesticides, herbicides, their effects on plants,
16   et cetera.  Their effect on the environment.  Do you
17   believe you're one of those types of experts?
18        A.   No, I'm not -- no.
19        Q.   And you're not an expert in pesticide
20   labeling either, are you?
21        A.   No.
22        Q.   You've never written, submitted, reviewed,
23   or approved any pesticide labeling?
24        A.   Never.
25        Q.   Are you familiar with the discipline
```

Exhibit B Page - 20

Samuel A. Berkman, MD, FACP

1    living.

2        Q.   You mentioned clinical research regarding

3    lymphoma.  Have you ever conducted any of that type

4    of clinical research regarding non-Hodgkin's

5    lymphoma or lymphoma more generally?

6        A.   Okay.  So did I conduct it, no.  But when

7    I was at the NIH in my training, that was the main

8    protocol we used.  We only treated about three

9    different types of patients there, breast cancer,

10   ovarian, and lymphoma.  So all of my patients had

11   lymphoma and they were there on research protocols

12   being conducted by the NIH.  But was I conducting

13   them, no, I was a clinical associate and I was

14   taking care of them.

15       Q.   And what -- what time period was that,

16   Doctor?

17       A.   That was 1976 through '78.

18       Q.   Now, Judge Turnoff was diagnosed with

19   something that is called splenic marginal zone

20   lymphoma; is that right?

21       A.   That's right.

22       Q.   What -- can you just describe for us

23   what -- what that is?  What is splenic marginal zone

24   lymphoma?  Can you give us just your general

25   understanding of that?

Exhibit B Page - 21

1    lymphoma and you just don't see any specific cause

2    for their disease?  How often does that occur?

3         A.   It's -- it's frequent.

4         Q.   When you say "frequent," is that the

5    majority of patients?  Is it a certain percentage?

6    Can you quantify that?

7         A.   I would say 30 to 40 percent.

8         Q.   Do you recall if you've ever told a

9    patient with marginal zone lymphoma what the cause

10   was of their disease?

11        A.   Okay.  So like I said, I've seen only

12   maybe one or two cases.  That was a while back so I

13   don't remember exactly what I -- you know, I've

14   probably seen hundreds of patients with these

15   lymphomas so I can't remember what I told any one

16   given patient about the cause of their disease.  I

17   mean, I just don't recollect those details.

18        Q.   Okay.  But you do agree that frequently it

19   is the case in the clinic that you see a patient,

20   patient is diagnosed with non-Hodgkin's lymphoma and

21   you don't know the cause?

22        A.   That's -- yes.  Yes.

23        Q.   Okay.  Let me -- let me show you

24   something -- I'm going to mark it as Exhibit 6.  I'm

25   going to mark it now.

Exhibit B Page - 22

Samuel A. Berkman, MD, FACP

1        Q.    Page 8.

2        A.    Okay.  Page 8, uh-huh.

3        Q.    Page 8 is entitled, "What causes

4    non-Hodgkin's lymphoma," question mark.

5              Do you see that?

6        A.    Yes.

7        Q.    And then that first paragraph, it says,

8    "Researchers have found that non-Hodgkin's lymphoma,

9    NHL, is linked with a number of risk factors but the

10   cause of most lymphomas is not known."

11             Do you see that?

12       A.    In which paragraph is that?

13       Q.    The first one at the -- at the top.

14       A.    It says scientists -- oh, I'm sorry, now,

15   this is page 8 you said?  Okay.

16             "Researchers have found" -- yeah, "is

17   linked with a number of risk factors but the cause

18   of most lymphomas is not known," yeah.

19       Q.    And do you agree with that generally?

20       A.    Yeah, I do.

21       Q.    Okay.  And just so we have a clear record

22   let me read it again.

23             "Researchers have found that non-Hodgkin's

24   lymphoma, NHL, is linked with a number of risk

25   factors but the cause of most lymphomas is not

 1    known."

 2              And you generally agree with that,

 3    correct?

 4         A.   I don't know about most.  Most implies

 5    more than 50 percent.  I don't know that I agree

 6    with that.  But it's frequent that we don't know

 7    what the cause is in any given individual.  As far

 8    as most, I don't know about that.

 9         Q.   Okay.  And then it says, "This is

10    complicated by the fact that lymphomas are actually

11    a diverse group of cancers."

12              Do you see that?

13         A.   Yes.

14         Q.   Do you have some understanding as to what

15    that means when the American Cancer Society says

16    lymphomas are actually a diverse group of cancers?

17         A.   Well, I know what my understanding is.

18    I'm not sure what they mean, but I know what I would

19    take that as.

20         Q.   Okay.  Fair.

21              So what's -- what is your understanding of

22    that?

23         A.   Well, some of them are very aggressive.

24    Some of them very -- like diffuse lymphomas can be

25    very aggressive.  Others can be very indolent.  So

1    hematology journals I read, like Blood or Seminars

2    in Hematology, so it took a while for me to get to

3    them but, you know, yeah, I would ask, sure.

4         Q.   And did you have any form that you used to

5    guide that discussion that had the word "Roundup" or

6    "glyphosate" on it?

7         A.   No, I didn't.

8         Q.   Did you have any literature that you

9    provided to your patients that warned them about

10   Roundup or glyphosate?

11        A.   No, but -- no, I didn't.

12        Q.   Have you had patients develop

13   non-Hodgkin's lymphoma who were never exposed to

14   Roundup?

15        A.   Of course.

16        Q.   How -- what percentage overall?  Can you

17   give me an idea of what percentage of your patients,

18   your non-Hodgkin's lymphoma patients you believe

19   were never exposed to Roundup?

20        A.   Well, of course, you know, I didn't ask

21   them for 20 -- first 25 years in my practice.  So

22   when you ask me the overall percentage, it's hard to

23   tell you because I'm excluding a tremendous number

24   of people.

25             So basically, your question is, did I ask

Exhibit B Page - 25

Samuel A. Berkman, MD, FACP

```
1    BY MR. HOFFMAN:

2        Q.   Do normal B-cells undergo DNA

3    recombination and rearrangement as part of their

4    normal process?

5        A.   Do they undergo rearrangement and -- could

6    you ask that again, please?

7        Q.   Yeah.

8            Do normal B-cells undergo DNA

9    recombination and rearrangement as part of their

10   normal process?

11       A.   Okay.  I don't know the answer to that

12   question.

13       Q.   Okay.  Now, B-cells also are particularly

14   vulnerable to sporadic replication mutations because

15   B-cells have a high rate of mutation as part of

16   their normal function, true?

17       A.   I don't know that they are high rate.  I

18   mean, everything's relative.  But you certainly can

19   get mutations with B-cells, absolutely.

20       Q.   Okay.  So let's just recap briefly.

21           So NHLs are caused by mutations to

22   B-cells, correct?

23       A.   Yes, that's one cause.

24       Q.   That's one cause of non-Hodgkin's

25   lymphoma, true?
```

Exhibit B Page - 26

Samuel A. Berkman, MD, FACP

1     A.    Yeah.

2     Q.    B-cells are lymphocytes, right?

3     A.    Yes.

4     Q.    In the normal course of B-cells performing

5   their function in the body, the B-cells will

6   replicate or divide, correct?

7     A.    Yes.

8     Q.    And as we discussed, as part of the normal

9   function of B-cells, they actually mutate into

10   different forms to respond to attacks on the body,

11   true?

12     A.    They mutate into different forms to

13   respond to attacks in the body -- B-cells cause the

14   synthesis of immunoglobulin, okay.  Immunoglobulin

15   then goes out and recognizes an antigen and binds to

16   it by the Fab receptor and then the white cell comes

17   along, binds to the Fc receptor and engulfs the

18   antigen.  There's -- it's not rearrangement.  It

19   basically is a synthesis of immunoglobulin.  That's

20   its function.

21     Q.    Okay.  But as a result of -- of the

22   replication, division, and the normal functioning of

23   B-cells, B-cells can have unwanted mutations,

24   correct?

25     A.    Yeah, they can.  But, you know, so can a

Samuel A. Berkman, MD, FACP

```
 1   lot of other cells, but including B-cells, yes.
 2       Q.   And those unwanted mutations in B-cells
 3   can lead to cancer, specifically non-Hodgkin's
 4   lymphoma, correct?
 5       A.   Yes.
 6       Q.   Okay.  Now, science does not know yet many
 7   of the gene mutations that occur that lead to
 8   non-Hodgkin's lymphoma, true?
 9       A.   Well, I gave you a list of some of them,
10   but they don't know all of them.
11       Q.   And so you -- so we are aware of certain
12   driver mutations that can lead to non-Hodgkin's
13   lymphoma, correct?
14       A.   Yes.
15       Q.   And you mentioned some of those in your
16   previous testimony, right?
17       A.   Yes.
18       Q.   And you've mentioned that different driver
19   mutations occur in the different subtypes of
20   non-Hodgkin's lymphoma?
21       A.   Yes.
22       Q.   So I'm not sure which of these you
23   mentioned.  Let me go through a few and see if you
24   recognize these.
25            So --
```

Exhibit B Page - 28

Samuel A. Berkman, MD, FACP

1    A.   I can -- I can do it again for you.

2    Q.   Let me -- let me give you the -- tell me

3    where I'm missing some.  I'll give you my list and

4    then we can compare.

5         So MYC.  MYC is an example of a driver

6    mutation found in some cases of non-Hodgkin's

7    lymphoma, including diffuse large B-cell lymphoma,

8    correct?

9    A.   Right --

10   Q.   And then we have BCL2, is an example of a

11   driver mutation found in some cases of diffuse large

12   B-cell lymphoma, but more frequently, it's found in

13   follicular lymphoma, correct?

14   A.   Yeah, yeah, exactly.  It's a (14;18)

15   translocation.

16   Q.   And then BCL6 is another example of a

17   driver mutation in some cases of diffuse large

18   B-cell lymphoma, correct?

19   A.   Yeah, and when it's combined with BCL2,

20   it's called a double-hit.

21   Q.   And so can you name any others that I

22   haven't covered?  I can't remember the other ones

23   that you may have mentioned.

24   A.   Okay.  There's one -- there's one with

25   Burkitt's that's a translocation.  I just can't

1    think of it right now.  That's why I put a list

2    because I just can't remember all of these, you

3    know.  Burkitt's lymphoma has a translocation.

4           And there's some -- there's some mutations

5    specific to the splenic marginal zone lymphoma also.

6       Q.   Okay.  So tell me about those.  What

7    are -- what are some of the mutations that are

8    specific to marginal zone lymphoma?

9       A.   Well, there's two that I know of.  One's

10   called NOTCH, N-O-T-C-H, and the other is 7q minus.

11      Q.   I'm sorry.  I'm having a real hard time

12   hearing you.

13      A.   Okay, sorry.

14           I said a NOTCH mutation and 7q minus.

15      Q.   Okay.  And are you familiar with any

16   research that has connected Roundup or glyphosate to

17   those mutations specifically?

18      A.   No, I haven't.

19      Q.   Do you know how many driver mutations are

20   needed for a patient to develop non-Hodgkin's

21   lymphoma?

22      A.   Do I know how many?

23      Q.   Yeah.

24      A.   I don't know the answer to that question.

25      Q.   And you cannot identify any driver

Exhibit B Page - 30

1    properly, abnormally growing cells have a greater

2    chance of getting through the defense mechanisms,

3    true?

4        A.   If the immune system isn't functioning

5    normally?

6        Q.   Right.

7        A.   I think that if a person has a problem

8    with their immune system, they are more susceptible

9    to malignancy.

10        Q.   Right.  So that's why it is believed, for

11    example, that immune system disorders like HIV and

12    autoimmune diseases, those types of things may

13    increase the risk for non-Hodgkin's lymphoma,

14    correct?

15        A.   Yes, they -- well, certainly autoimmune

16    diseases.

17        Q.   And the immune system also might not

18    function properly because of drug therapies that

19    chronically suppress immune function, right?

20        A.   Yes.

21        Q.   Or the immune system could just be getting

22    older, fair?

23        A.   Age is a risk factor for most cancers.

24        Q.   Right.  And as we age, our immune system

25    starts to break down and doesn't work as well as it

Samuel A. Berkman, MD, FACP

```
 1   lymphoma?

 2       A.    Well, I certainly -- if I found that the

 3   person had a family history of lymphoma, I wouldn't

 4   call it a random replication error because -- so if

 5   I identify a specific cause, I'm not going to cause

 6   it -- call it a random replication error.

 7             So basically, in patients who we don't

 8   identify a specific cause, you want to call it a

 9   random replication error, okay.  Maybe -- if that's

10   what you want to call it, maybe it is a high number.

11   But I would say that it just shows the fact that

12   scientific information has not gotten to the point

13   where we can identify all of the mechanisms yet.

14       Q.    Right.  Okay.

15             So setting aside what you mentioned, for

16   example, a patient who has a family history of

17   lymphoma, putting aside that patient or, you know, a

18   patient with HIV or some autoimmune disease or

19   something specific, if you put those patients aside,

20   is it -- is it fair to say that it's -- it's really

21   impossible to rule out random -- random replication

22   errors as a cause of a patient's non-Hodgkin's

23   lymphoma?

24       A.    I would say it's impossible to rule it

25   out, yeah, that's one possibility.  But I think that
```

Exhibit B Page - 32

1    if you've got something that's very suspicious or a

2    known cause or a lot of -- I think that I think that

3    I would view that as more likely than the random

4    error.

5         Q.   Okay.  All right.

6              I'm going to shift topics again.  We've

7    been going for a little over an hour.  Why don't we

8    go off the record and take another break.

9              THE VIDEOGRAPHER:  The time is 10:20 a.m.

10   We are off the record.

11             (Whereupon, a brief recess was taken.)

12             THE VIDEOGRAPHER:  The time is 10:34 a.m.

13   We're back on the record.

14   BY MR. HOFFMAN:

15        Q.   Okay.  Doctor, are you ready to proceed?

16        A.   Yes.

17        Q.   Now, you are -- you're trained in

18   oncology, correct?

19        A.   I'm board certified in oncology.

20             (Whereupon, a brief discussion off the

21   record.)

22   BY MR. HOFFMAN:

23        Q.   Doctor, on the subject of oncology,

24   oncology is a branch of medicine focused on the

25   study, diagnosis, treatment, and prevention of

Exhibit B Page - 33

Samuel A. Berkman, MD, FACP

```
 1    cancer, correct?
 2        A.   Well, not so much prevention.  In other
 3    words, people that get referred to an oncologist,
 4    they usually are pre -- already diagnosed as cancer.
 5    So clinical oncologist is not going to be doing
 6    much.  That's more internal medicine, prevention of
 7    cancer, than oncology.
 8        Q.   Well, but efforts to prevent cancer
 9    certainly are very important, true?
10        A.   Of course they're important.  But a
11    medical oncologist, what they do is they treat
12    cancer.  They usually don't diagnose it and they
13    usually don't try to -- they're -- the screening
14    tests for cancer are not usually done by
15    oncologists.  They're done by primary care
16    physicians.
17        Q.   Have you ever diagnosed a patient with a
18    Roundup-induced or a glyphosate-induced
19    non-Hodgkin's lymphoma?
20        A.   Well, I had a few patients that got
21    exposed to that but they also had other risk factors
22    so I couldn't really say it was the glyphosate.  You
23    know, I thought it might be a -- a contributing
24    factor, but I couldn't, you know, pin it on that a
25    hundred percent.
```

Samuel A. Berkman, MD, FACP

1          One of them had -- I don't exactly

2    remember one of them, but one of them had a family

3    history of lymphoma and they had exposure to

4    glyphosate.  So I had to kind of attribute it to the

5    family history.

6          And the other one, I just don't remember

7    whether it was Epstein-Barr or Hepatitis C or

8    something.

9          So I have had people but they had --

10   they -- which I thought it might be a contributing

11   factor, but they had other factors that were more

12   well recognized at the time.

13      Q.   So -- so you didn't determine -- in those

14   two cases that you recall, you didn't determine that

15   Roundup was a cause of their non-Hodgkin's lymphoma?

16      A.   I thought there were other things that

17   were more likely.

18      Q.   So you've never written in any patient's

19   medical record that you believe glyphosate or

20   Roundup was a cause or a substantial contributing

21   factor to their non-Hodgkin's lymphoma?

22      A.   I certainly never wrote in anybody's

23   chart, but I thought about it.

24      Q.   You thought about it but you -- in -- in

25   clinical practice you have not come to a conclusion

Exhibit B Page - 35

Samuel A. Berkman, MD, FACP

1    regarding a specific patient that their

2    non-Hodgkin's lymphoma was caused by Roundup?

3         A.    That's right.

4         Q.    Have you ever published anything related

5    to glyphosate or Roundup?

6         A.    No, I've provided my CV for you.

7         Q.    And you haven't published on any type of

8    pesticide or herbicide?

9         A.    No, sir.

10        Q.    And you certainly -- you haven't published

11   your opinions or concerns about Roundup anywhere,

12   correct?

13        A.    I have not.

14        Q.    Have you ever presented at a medical

15   conference about glyphosate or Roundup?

16        A.    No.

17        Q.    So you haven't shared your opinions or

18   concerns about Roundup with any professional medical

19   association or any other audience, correct?

20        A.    That's right.

21        Q.    So your -- your CV lists 35 publications,

22   correct?

23        A.    35, yes.

24        Q.    And it's true that you haven't researched

25   or published or made any professional presentations

1    regarding Roundup or glyphosate, correct?

2        A.    Right.

3        Q.    Have you ever researched or published or

4    made any professional presentations on non-Hodgkin's

5    lymphoma or marginal zone lymphoma?

6        A.    Well, I've certainly given presentations

7    on non-Hodgkin's lymphoma.  In fact, when I was at

8    the NIH, I gave several of them.  But I -- not on

9    marginal zone lymphoma, on non-Hodgkin's lymphoma

10   with diffuse histiocytic, which we now call diffuse

11   large or B-cell lymphoma.  I gave lectures, but I --

12   but I basically have not published on that area.

13   That's not been my area of published publication.

14       Q.    Have you ever researched or published or

15   made any professional presentations on glyphosate or

16   Roundup exposure and non-Hodgkin's lymphoma?

17       A.    No, sir.

18       Q.    So it's fair to say you haven't shared

19   your opinions or concerns about Roundup outside of

20   the litigation context?

21       A.    That's right.

22       Q.    You currently are a clinical professor of

23   hematology and oncology at UCLA; is that correct?

24       A.    Yes, sir.

25       Q.    What -- what courses do you teach?

Exhibit B Page - 37

1    regulatory authority about your concerns regarding

2    Roundup or glyphosate?

3         A.   I have not.

4         Q.   I want to talk to you about dose as it

5    relates to Roundup or glyphosate.

6              First of all, it's true that for Roundup

7    to have any potential health effect on any plaintiff

8    or patient, that person first must have an absorbed

9    dose from applying Roundup, correct?

10        A.   Yes.

11        Q.   In other words, the active ingredient,

12   glyphosate, must be absorbed into the bloodstream to

13   have any potential health effect, true?

14        A.   True.

15        Q.   So you would agree that counting up hours

16   or days of exposure would be different than

17   calculating an internal dose, fair?

18        A.   But it would probably be related because

19   the more you're exposed the higher the dose you're

20   going to get and the higher the blood level.  So it

21   would be -- there'd certainly be a correlation

22   between the two.

23        Q.   Well, that may or not be true, right,

24   Doctor?  Let me just -- let me see if we can get on

25   the same page.

Samuel A. Berkman, MD, FACP

1    the product with gloves.

2            MR. DONATO:  Objection.  Form.

3    BY MR. HOFFMAN:

4        Q.    And do you know from the literature what

5    is believed in terms of the overall exposure or dose

6    that occurs by inhalation of Roundup or glyphosate?

7        A.    I don't know the dose by inhalation, no.

8    I'm not a toxicologist.  I don't know the

9    information about how much the exact dose is.

10       Q.    And you've heard the term in toxicology

11   that the dose makes the poison, correct?

12       A.    No, I haven't heard that.

13       Q.    You've never heard that, okay.

14       A.    No, I've never heard that.

15       Q.    You are aware that there are dose levels

16   of glyphosate that do not lead to adverse health

17   effects in humans, correct?

18       A.    Well, I know that they are -- you know, if

19   you check like farm workers, et cetera, you're going

20   to get measurable levels.  And people who are just

21   exposed in the environment, you are going to get

22   levels that are not necessarily.  So there's

23   background levels that you can get that don't cause

24   disease.

25              But if you ask me what specific level

Samuel A. Berkman, MD, FACP

1    causes the disease, I think you'd have to ask for a

2    toxicologist.  That's not kind of the work I do.

3        Q.    Are you familiar with dose levels of

4    glyphosate that are set by various state, federal,

5    and international regulators, sometimes referred to

6    as regulatory thresholds?

7        A.    I am not.

8        Q.    In your opinion, what dose of Roundup or

9    glyphosate needs to enter the human body to cause

10   non-Hodgkin's lymphoma?

11       A.    Say that again.

12       Q.    In your opinion, what dose of Roundup or

13   glyphosate needs to enter the body to cause

14   non-Hodgkin's lymphoma in humans?

15       A.    Okay.  So I don't know the exact dose

16   which would do that.  I think that's something you

17   got to ask a toxicologist.

18       Q.    You recall IARC concluded that glyphosate

19   is a probable human carcinogen but not at what dose,

20   correct?

21       A.    Just a second, please.

22             Could you can repeat the question?

23       Q.    Yeah.  You recall IARC concluded that

24   glyphosate is a probable human carcinogen but not at

25   what dose, correct?

Samuel A. Berkman, MD, FACP

1   BY MR. HOFFMAN:

2        Q.   So you don't have an opinion regarding a

3   threshold internal dose of glyphosate that is

4   necessary to cause or contribute to the plaintiff's

5   non-Hodgkin's lymphoma?

6        A.   I can't give you --

7             MR. DONATO:  Objection.  Form.

8             THE WITNESS:  I can't give you exact

9   number.

10  BY MR. HOFFMAN:

11       Q.   Now, in this case, you believe the

12  plaintiff's exposure to Roundup was from 1980 to

13  2000; is that correct?

14       A.   That's what he says in his deposition.

15       Q.   Right.  And then he was diagnosed with

16  marginal zone lymphoma in 2010, correct?

17       A.   Yes.

18       Q.   So he was diagnosed with his non-Hodgkin's

19  lymphoma about ten years or so after he stopped

20  using Roundup, fair?

21       A.   Yes.

22       Q.   And you don't know whether any glyphosate

23  was in the plaintiff's body when the first cancer

24  cells developed in his lymphatic system, do you?

25       A.   Well, I would say since the average

Samuel A. Berkman, MD, FACP

```
 1   latency period is about 20 years, that he would have

 2   had glyphosate in his body when it started, based on

 3   that being the average.

 4        Q.   Right.  And he had a slow-growing or an

 5   indolent form of non-Hodgkin's lymphoma, correct?

 6        A.   Yes.

 7        Q.   So let me get back to my question.

 8             You don't know whether any glyphosate was

 9   in the plaintiff's body when the first cancer cells

10   developed in his system, do you?

11        A.   Well, I --

12             MR. DONATO:  Objection.  Form.

13             THE WITNESS:  I assume that there was

14   glyphosate because if it was 20 years, that would

15   have been 1990 and he would have been taking the

16   drug.  So I would assume that there was glyphosate

17   there.  But, I mean, no one measured it then.  So

18   all I can do is the mathematics.

19   BY MR. HOFFMAN:

20        Q.   Right.  So you're making an assumption

21   based upon that timeline and the latency, the

22   average latency period, that there would have been

23   glyphosate in the plaintiff's system?

24        A.   I wouldn't use the word "assumption."  I'm

25   using a projection, a projection, on basically the
```

Exhibit B Page - 42

Samuel A. Berkman, MD, FACP

```
 1    amount of time he used it, the latency period, and

 2    when he developed the lymphoma.  So I wouldn't call

 3    it an assumption.  I would call it a projection.

 4        Q.   Right.  But you cannot point me to any

 5    test at any time that would confirm that Judge

 6    Turnoff had measurable glyphosate in his body, can

 7    you?

 8        A.   Well, how could I possibly?  Because no

 9    one ever measured it.

10        Q.   Right.  Judge Turnoff never had

11    measurements taken that showed the presence of

12    glyphosate in his blood, urine, or in any body

13    tissue, true?

14        A.   True.

15        Q.   It's possible that Judge Turnoff never had

16    measurable glyphosate in his body, isn't it?

17        A.   Oh, it's very unlikely.

18        Q.   Right.  But it's possible?

19        A.   Even if environmentally exposed people

20    have glyphosate, then this guy who is using it

21    regularly is certainly going to have levels.  So I'd

22    say that is very unlikely.

23        Q.   It's fair to say you didn't point me to

24    any medical record or data that would help us answer

25    that question as to whether Judge Turnoff ever had
```

Exhibit B Page - 43

1          Do you have any opinion that the plaintiff

2    had an average daily dose of glyphosate that put him

3    above any regulatory threshold?

4       A.   I get the feeling he did.  And the reason

5    I say that is because he went out and bought the

6    stuff almost every Friday night, and he got pretty

7    large things.

8          And also, he didn't just go around the --

9    he had a fairly sizable property and he got all the

10   weeds and he even went into areas where there

11   weren't weeds.  There were other things.  So he used

12   quite a bit of it.

13         So I would say that, you know, the fact

14   is, his biggest -- his big outing on Friday night,

15   he said in his deposition, was going to the Home

16   Depot store and getting this glyphosate.  So, I

17   mean, I think he used a lot of it.  It wasn't just

18   an occasional thing.  So I would say he was someone

19   who you would expect would have a significant level.

20      Q.   So have you -- have you ever attempted to

21   calculate the average daily dose of glyphosate for

22   the plaintiff?

23      A.   No, I haven't done that.

24      Q.   Okay.  So you wouldn't be able to tell me

25   in milligrams per kilograms at any point in time

Exhibit B Page - 44

1   what the plaintiff's dose was of glyphosate?

2       A.   Well, it's not measured in milligram per

3   kilograms.  It's measured in microgram per liter,

4   first of all.  And secondly, no, I wouldn't.

5       Q.   So have you -- are you familiar with the

6   EPA, the validated EPA mathematical formulas that

7   can calculate internal doses of glyphosate for an

8   individual in terms of a dose reconstruction?  Have

9   you considered those?

10      A.   Well, what the -- if the EPA says that it

11  doesn't cause the problem so what difference does it

12  make what the dose is?

13      Q.   Are you familiar with the mathematical

14  calculations on the EPA website whereby --

15      A.   I'm not --

16      Q.   -- you can --

17      A.   No, I'm not familiar with that.

18      Q.   Whereby you can calculate the internal

19  dose for an individual in milligrams per kilogram,

20  either an average daily dose or -- or in any other

21  terms.  Are you familiar with that?

22          MR. DONATO:  Objection.  Form.

23          THE WITNESS:  I'm not.  But I was

24  wondering, if the EPA opines that it doesn't cause

25  the problem, why are they going to the trouble of

Exhibit B Page - 45

Samuel A. Berkman, MD, FACP

```
1    applying mathematical formulas because what
2    difference does it make what the dose is if they're
3    saying it doesn't cause the disease?  So why are
4    they going to all this trouble when they've said it
5    doesn't cause the disease?
6    BY MR. HOFFMAN:
7         Q.   Do you know the answer to that question
8    that you just asked?
9         A.   Do I know the answer?
10             MR. DONATO:  Objection.  Form.
11             THE WITNESS:  I don't ask -- no, I'm just
12   saying, you know, I'm -- I'm puzzled why they're
13   doing that if they say, you know, it doesn't cause
14   the disease.  So then why give -- why put people
15   through all that work of going through mathematical
16   calculations.
17             They must think it does possibly cause the
18   disease.  Otherwise, why would they -- why would
19   they give people those calculations if they -- if
20   they think it really doesn't cause the disease.  Why
21   are they putting people through that.  They must
22   think that it is a risk.
23             MR. HOFFMAN:  I'll object.  Move to strike
24   as nonresponsive.
25        Q.   So let me -- let me ask you this.
```

Samuel A. Berkman, MD, FACP

 1    by your company.

 2    BY MR. HOFFMAN:

 3         Q.   Right.  And that's obviously disclosed

 4    right on the face of the article.

 5         A.   Of course it is.  Of course it is.  I'm

 6    not saying that you tried to conceal that at all.

 7    I'm just saying that -- that a reader has to --

 8    can't ignore that.

 9         Q.   The reader can't ignore potential

10    conflicts of interest, fair?

11         A.   Exactly.

12         Q.   Okay.  So let's move on.  You can -- you

13    can click out of that.  You can put that exhibit

14    aside.

15         A.   Okay.

16         Q.   Let me turn our focus to IARC.

17              In your report, you discuss briefly the

18    IARC monograph on glyphosate that was published in

19    2015, correct?

20         A.   Yes, sir.

21         Q.   I'm sorry.  Did -- did you answer?

22         A.   I did.  Yes, I -- I did.

23         Q.   Okay.  When did you -- when did you first

24    hear of IARC?

25         A.   I first heard of IARC when I reviewed all

1    of the stuff.  I didn't know who they were before.

2        Q.    Okay.  So in 2021, 2022, when you were

3    retained by the plaintiffs for your opinions, that

4    was the first time that you reviewed the IARC

5    monograph?

6        A.    Well, it's -- it's a 450-page monograph.

7    I mean, it's not exactly something I would pick up

8    automatically.

9        Q.    Right.  But you -- I take it, then, you

10   have never consulted any IARC publication during

11   your clinical practice, fair?

12       A.    That's right.

13       Q.    Did you review the entire monograph?

14       A.    I did.

15       Q.    Did you review any of the underlying

16   studies or data that IARC was commenting on and

17   reviewing?

18       A.    Yes.

19       Q.    Which -- which of the underlying studies

20   or data did you review?  Are those the specific

21   studies that are cited in your report?

22       A.    Yes, yes, they are.  I -- I don't remember

23   the names.  I reviewed my notes.  But like Eriksson

24   is one.  And McDuffie I think is another one.  And

25   there's about five or six case-controlled studies.

Samuel A. Berkman, MD, FACP

```
1    definition is a positive association has been

2    observed between exposure to the agent and cancer

3    for which a causal interpretation is considered by

4    the working group to be credible but chance, bias,

5    or confounding could not be ruled out with

6    reasonable confidence.

7             Do you recall that?

8        A.   Yeah, but that doesn't mean that you

9    ignore the part about the positive association any

10   more than you ignore the part about the fact that,

11   you know, there may be more -- there may be

12   methodological issues in coming to this.  You don't

13   ignore either of them.

14       Q.   Right.  But the -- but IARC certainly did

15   not conclude that there was sufficient evidence in

16   humans for the carcinogenicity of glyphosate, fair?

17       A.   Right.  But what it says should -- should

18   be taken as it should not be ignored.  This is a

19   possibility.  This is a possibility.  So while it

20   shouldn't be taken as -- you know, as a hundred

21   percent, it should be not ignored, not shoved under

22   the rug.

23       Q.   And do you -- you don't disagree with

24   IARC's conclusions, do you?

25       A.   I don't agree -- I don't disagree with
```

Exhibit B Page - 49

Samuel A. Berkman, MD, FACP

```
 1        A.    That a causal -- so limited evidence says,
 2   has been observed between exposure for which a
 3   causal -- interpretation is considered by the --
 4   wait a second.  I'm sorry.  Let me get this.  It's
 5   the working group to be credible, okay.
 6              So there's a difference between something
 7   that's a sure thing and something is credible.
 8        Q.    Right.  And that's a distinction that
 9   they -- that IARC makes between sufficient evidence
10   and limited evidence.  In order for there to be
11   sufficient evidence, the working group has to
12   conclude that a causal relationship has been
13   established, correct?
14        A.    Yeah, they use a different word here.
15   They use "credible" here, but they use "probable" in
16   the other document.  So I think "probable" is a
17   little stronger of a word.  I'd like to know why
18   they changed the words.
19        Q.    Okay.  Well, just going on with that
20   sentence, then, it says to be credible, but chance,
21   bias, or confounding, could not be ruled out with
22   reasonable confidence.
23              Do you see that?
24        A.    I see that.
25        Q.    So IARC is saying, with respect to the
```

Samuel A. Berkman, MD, FACP

```
1   wrong category.  There additives, too, to these

2   things that -- and also, there's -- when people

3   don't turn in the -- when people don't turn in their

4   questionnaires, you have a lot of missing

5   information that you use imputation for.

6           So, I mean, yeah, all of these studies,

7   both pro and con, have all of these problems.  You

8   don't have any randomized trials, including this --

9   the one -- the component trials that IARC looked at.

10  So this is -- this is characteristic of the entire

11  literature on this whole subject.

12      Q.  Okay.  So you don't disagree with IARC on

13  that?

14      A.  No, I don't disagree with them, but I

15  don't that that changes.  I think that it's true of

16  the studies that show no -- no effect of -- of

17  Roundup.  They have the same limitations as the ones

18  that you just mentioned.

19      Q.  Right.  And so all the studies have some

20  limitations to some degree; is that fair?

21      A.  More than some.

22      Q.  Okay.  Do you agree that of the three

23  categories of evidence that IARC considered, human

24  epidemiological studies are the most important for

25  answering the question of whether Roundup causes
```

Exhibit B Page - 51

1    non-Hodgkin's lymphoma at exposure levels relevant

2    to humans?

3        A.   I think the human studies have got to be

4    given priority over animal studies.

5        Q.   Okay.  Let me ask you just a couple more

6    questions about IARC and then we can break for

7    lunch.  Because after that I'll be moving on to a

8    different topic.

9             Are you aware that IARC conducts what is

10   referred to as hazard assessments?

11       A.   Well, no, not exactly.  Hazard

12   assessment -- no, I don't, but that's --

13       Q.   Do you know the difference between a

14   hazard assessment and a risk assessment?

15       A.   Okay.  So there's a risk ratio and a

16   hazard ratio.  So a risk ratio is done in a specific

17   point of time whereas a hazard ratio is done over a

18   period.  So hazard ratio continues to, like, between

19   one month and one year whereas a risk ratio is six

20   months, period.

21       Q.   Well, so I'm not asking you about hazard

22   ratios and risk ratios.  I'm asking you about

23   assessments, whether -- and you may or may not know.

24            But do you know if there's a difference

25   between when one organization conducts something

Samuel A. Berkman, MD, FACP

```
1   that's called a hazard assessment versus another

2   organization or regulator that conducts something

3   that's called a risk assessment.  Do you know that

4   there's a difference between those two?

5       A.   But that's not correlated with the

6   evidence-based medicine of the difference between a

7   hazard ratio and a risk ratio.  I don't know what

8   that is.

9       Q.   Okay.  All right.

10           Well, let me -- let me show you -- it's in

11  the same document that we were looking at, if you

12  still have that up, the same exhibit, which was

13  Exhibit 8.  There's some other definitions in here.

14      A.   Okay.  What page?

15      Q.   So this is page 2 at the top.

16      A.   Okay.  So this is the last one we were

17  looking at?

18      Q.   Yeah.  It's the same --

19      A.   The IARC monograph?

20      Q.   It's Exhibit 8.  It was the one we were

21  just in looking at the definitions.

22      A.   Okay.  Hold on.  Let me go back.  Hold on.

23  Exhibit 8.  Okay.  This is the IARC monograph,

24  Exhibit 8.

25      Q.   Yeah, it's the -- it's the preamble, yeah.
```

Exhibit B Page - 53

Samuel A. Berkman, MD, FACP

```
 1              It says, "A cancer," quote, "hazard is an
 2   agent that is capable of causing cancer under some
 3   circumstances while a cancer," quote, "risk is an
 4   estimate of the carcinogenic effects expected from
 5   exposure to a cancer hazard.  The monographs are an
 6   exercise in evaluating cancer hazards despite the
 7   historical presence of the word risks in the title.
 8   The distinction between hazard and risk is important
 9   and the monographs identify cancer hazards even when
10   risks are very low at current exposure levels
11   because new uses or unforeseen exposures could
12   engender risks that are significantly higher."
13              Do you see all of that?
14        A.   I do.
15        Q.   So what the -- so do you understand the
16   distinction between hazard and risk that IARC is
17   making here?
18        A.   No, they're saying that a hazard is more
19   directly related to causing cancer under some.
20   Whereas a risk is a more vague estimate of the
21   carcinogenic effects of exposure.
22              So I would say that a hazard is something
23   that's more like a definite cause and a risk is
24   something that may be a cause.
25        Q.   Are you aware that what IARC is defining
```

Exhibit B Page - 54

Samuel A. Berkman, MD, FACP

1    here is that -- what they do is they identify

2    potential cancer hazards, but they do not define

3    what the increased risk is at exposure levels for

4    those hazards?

5         A.   Okay.

6         Q.   Okay.  And you're not familiar with

7    regulatory bodies such as EPA doing risk assessments

8    where they take a hazard and they evaluate the extra

9    chance of getting cancer at a given exposure level

10   or dose?

11        A.   Okay.  So I'm not aware of that, no.

12        Q.   Okay.  And IARC doesn't consider dose or

13   risk, fair?

14        A.   I didn't see that.

15        Q.   Okay.  And, in fact, IARC says that they

16   identify potential cancer hazards even when risks

17   are very low at current exposure levels, correct?

18        A.   Yes.

19        Q.   So IARC can identify a cancer hazard even

20   if the risk in the real world for causing cancer is

21   very low?

22        A.   Okay.  But that means that the issue is

23   not settled and that's still viewed as a hazard.

24   But I see what you're saying.  But that's a little

25   different than saying it's a probable cause.  I

Exhibit B Page - 55

Samuel A. Berkman, MD, FACP

```
 1    So it's really --

 2         Q.   Right.  But, Doctor, you do see where they

 3    say the distinction between hazard and risk is

 4    important and the monographs identify cancer hazards

 5    even when risks are very low at current exposure

 6    levels.

 7              Do you see that?

 8         A.   I do.

 9         Q.   You don't --

10         A.   I see that.

11         Q.   And you don't disagree with that, do you?

12         A.   Well, I don't -- I don't know enough to

13    disagree with it because I don't -- you know, I'm

14    not a toxicologist or someone like that.  This gets

15    into real semantics to me.

16         Q.   Okay.

17         A.   It's like -- this is real semantics, as

18    far as I'm concerned.

19         Q.   All right.  Well, that's fair enough.

20              MR. HOFFMAN:  We can go off the record and

21    take our next break.

22              THE VIDEOGRAPHER:  The time is 11:59 a.m.

23    We are off the record.

24              (Whereupon, a brief recess was taken.)

25              THE VIDEOGRAPHER:  The time is 12:52 p.m.
```

Exhibit B Page - 56

Samuel A. Berkman, MD, FACP

1    We are back on record.

2    BY MR. HOFFMAN:

3         Q.    Good afternoon, Doctor.

4         A.    Good afternoon.

5         Q.    You ready to proceed?

6         A.    Yes, sir.

7         Q.    All right.  I want to start going through

8    the epidemiological studies that you cite in your

9    report, but before we go through the individual

10   studies I want to ask you some general questions

11   about epidemiology.

12            I believe you agreed with me earlier that

13   you are not an epidemiologist, correct?

14        A.    Not an epidemiologist, but I have

15   extensive experience in evidence-based medicine.

16   And if you look at my CV you'll see I've done

17   several articles for the McMaster evidence-based

18   newsletter, which have been edit by Gordon Guyatt

19   who is the person who coined the term evidence-based

20   medicine.

21            So yeah, I'm not an epidemiologist, but I

22   know more than the average hematologist about

23   clinical trials and analyzing them.

24        Q.    Okay.  Would you agree that in the absence

25   of controlled clinical trials, human epidemiological

Samuel A. Berkman, MD, FACP

```
 1    studies are the most important when considering risk
 2    factors to humans?
 3         A.    What do you mean by controlled studies?
 4         Q.    I said in the absence of controlled
 5    clinical trials, would you agree that human
 6    epidemiological studies are the most important when
 7    considering risk factors to humans?
 8         A.    Well, let me put it this way, they are the
 9    next best thing.  I mean -- yeah, they're called --
10    they're called observational trials, is what they're
11    called.  They're not randomized.
12         Q.    Right.  And when you say "the next best
13    thing," you're saying that the observational studies
14    are the next best thing to randomized controlled
15    trials?
16         A.    Yeah, but that doesn't mean like they're
17    almost as good.  That means they're -- they're quite
18    a bit -- there's a difference.
19         Q.    Sure.
20               You would agree that human epidemiological
21    studies, if we're asking the question of what are
22    risk factors to humans, that those human
23    epidemiological studies are more important than
24    animal studies, correct?
25         A.    I would, yes, agree with that, yes.
```

Exhibit B Page - 58

Samuel A. Berkman, MD, FACP

1       Q.   And you would agree that the human
2   epidemiological studies are more important than
3   cellular studies in petri dishes, fair?
4       A.   I would.
5       Q.   And the human epidemiological studies that
6   you reviewed were based on the use of
7   glyphosate-based herbicides in real-world conditions
8   at relevant human exposure levels, fair?
9       A.   Yes.
10      Q.   Now, some types of epidemiological studies
11  are considered higher quality of scientific evidence
12  than other types of epidemiological studies; is that
13  fair?
14      A.   Of course.
15      Q.   For example, case-controlled studies are
16  typically considered lower quality than prospective
17  cohort studies, right?
18      A.   I would say so, yeah.  I would say so.
19  But it depends on the study, of course, but
20  generally, yeah.
21      Q.   And prospective cohort studies are
22  designed in part to answer the hypothesis raised by
23  case-control studies, true?
24      A.   Well, basically, you're looking at an
25  exposed population versus a controlled population.

Exhibit B Page - 59

Samuel A. Berkman, MD, FACP

```
1        Q.   Okay.  And in epidemiological studies, and

2   particularly in case-control studies, it is

3   important to adjust for confounders, isn't it?

4        A.   Yes, it's important to because if you

5   don't do that, you don't know whether you've got a

6   true cause-and-effect relationship if you don't

7   adjust for confounding.

8        Q.   And confounders can be things like other

9   risk factors or other chemicals that affect both the

10  variable of interest and the outcome of interest,

11  correct?

12       A.   Yes, that's right.

13       Q.   And studies should adequately adjust for

14  confounders to provide valid results, true?

15       A.   They should, yes, if they can.

16            One of the problems with the fact that

17  these studies aren't randomized is you've got

18  real -- you can only max them for measurable

19  covariates.  So if you've got nonmeasurable

20  covariates that impact the endpoints it's going to

21  cause bias and you can't do anything about that

22  because they're not measurable.  So that's a real

23  limitation of any kind of nonrandomized trial, like

24  all of these are.

25       Q.   Well, let me ask you about farmers and
```

Exhibit B Page - 60

Samuel A. Berkman, MD, FACP

1    exposures can be confounders in an epidemiological

2    study, correct?

3        A.    Yes, that I agree with it.

4              These studies, you know, are peer-reviewed

5    and they are published.  If you've got that much

6    confounding, why would they publish something like

7    that, and why would IARC say it's a probable cause

8    if there's that much confounding?  I mean, I don't

9    think they would do that.

10       Q.    Well, IARC said -- well, you remember IARC

11   said they could not exclude chance, bias, or

12   confounding in their analysis, right?

13       A.    Yeah, but that's true of any of these

14   trials.

15       Q.    Okay.  Well, let's see if we can focus it

16   a little bit more narrowly.

17             Do you agree that a well-designed and

18   well-executed epidemiological study investigating

19   the potential association between glyphosate-based

20   herbicides and non-Hodgkin's lymphoma should

21   identify and adjust for confounding by other

22   pesticide use?

23       A.    Yes, I think that that would be the

24   optimal.

25       Q.    Do you agree that failure to identify and

Samuel A. Berkman, MD, FACP

```
 1        A.   Oh, multiple use, yeah, yeah.  Multiple
 2   use, yeah.
 3        Q.   And so they show that most farmers used
 4   multiple herbicides, correct?
 5        A.   Yeah.
 6        Q.   Okay.  So now if we go to the results,
 7   results are in -- overall results are in Table 2, so
 8   if you can go back to Table 2, which is on
 9   page 1158.
10        A.   Uh-huh.
11        Q.   You'll -- you see the -- the row there for
12   glyphosate or Roundup?
13        A.   Uh-huh.
14        Q.   And you'll see that the odds ratio in that
15   first column there, 1.26 with a 95 percent
16   confidence interval of .87 through 1.80.
17             Do you see that?
18        A.   Uh-huh.
19        Q.   And that's the unadjusted odds ratio,
20   correct?
21        A.   Yes.
22        Q.   But that -- that unadjusted odds ratio
23   shows no statistical significance, fair?
24        A.   Well, the confidence interval goes across
25   one.
```

Samuel A. Berkman, MD, FACP

1    Q.   Right.  So it's not a statistically

2   significant result, true?

3    A.   Right.

4    Q.   And then you see the next column has an

5   odds ratio that's adjusted.

6        Do you see that?

7    A.   Yes.

8    Q.   And if you look down in the footnotes for

9   that column it says, "ORs adjusted for statistically

10  significant medical variables."

11       And in parens, it says "history of measles

12  mumps, cancer, allergy desensitization shots, and a

13  positive familiar history of cancer in a

14  first-degree relative."  Close parens.

15       And then it says "and with strata for the

16  variables of age and province of residence."

17       Do you see that?

18   A.   Yes.

19   Q.   So the adjusted results did not adjust for

20  other pesticide use in the McDuffie study, correct?

21   A.   Yeah, they adjusted for a lot of other

22  variables, but it doesn't look like they adjusted

23  for the -- for the pesticides in this particular

24  study.  But they did adjust for a lot of other

25  things.

Samuel A. Berkman, MD, FACP

1    one of those overall results was a statistically

2    significant association?

3         A.   Right.  So you've got contradiction

4    between the two tables here.  And, you know, you

5    know, basically you've got a contradiction.  And I

6    think that I would have to read the paper more

7    carefully to determine why that is and what the

8    reason is.  And there may be other covariates or

9    other confounders that are not getting into our

10   discussion here.

11             You know, you need to be able to read --

12   you're just pulling this table out.  I did read the

13   article but it was a while ago so I would need to

14   read the article to be able to see the whole

15   picture, why you're getting this discrepancy here

16   and why they wouldn't do that in the other place.

17        Q.   So you didn't consider that specifically

18   prior to our discussion?

19        A.   Well, I basically saw that -- that it

20   was -- I felt it was a -- a reasonable study.

21             And it's been quoted in several other

22   articles as well, as being a good study.  I think

23   Weisenburger used his -- pointed to this study as

24   well.

25        Q.   Which case-control -- well -- strike that.

Samuel A. Berkman, MD, FACP

```
1    see that.
2         Q.   Okay.  So if we -- then if we look at
3    Table 7, which is on the next page.
4         A.   Uh-huh.
5         Q.   You'll see that for glyphosate, the
6    univariate analysis has an OR, an odds ratio, of
7    2.22 with a confidence interval of 1.1 to 3.71.
8              Do you see that?
9         A.   Uh-huh.
10        Q.   And then when they did their multivariate
11   analysis, that odds ratio for glyphosate drops down
12   to 1.51, correct?
13        A.   Right.
14        Q.   And it loses statistical significance,
15   correct?
16        A.   Yeah.
17        Q.   And when we say "loses statistical
18   significance," what that means is you can't rule out
19   chance as a -- as a reason for the outcome, true?
20        A.   Well, it just -- it's got a wide
21   confidence interval.
22        Q.   Right.  But you cannot rule out a null
23   finding or the null hypothesis if the confidence
24   interval crosses 1, fair?
25        A.   That's right.
```

Exhibit B Page - 65

```
 1        Q.   Okay.  So -- so the odds ratios went down

 2   with the multivariate analysis, correct?

 3        A.   They did.

 4        Q.   And lost statistical significance, as --

 5   as we've said, correct?

 6        A.   The -- with the multivariate analysis,

 7   it's -- yeah, you have it with the univariate, but

 8   you do not with the multivariate.

 9        Q.   And so the significance of confounding is

10   several evidence from Eriksson's analysis, isn't it?

11        A.   What do you mean by that?

12        Q.   Well, it changes the outcome of the study

13   with respect to glyphosate from a statistically

14   significant result at 2.02 to a not statistically

15   significant result at 1.51, right?

16        A.   If you go just by this, yeah.

17        Q.   So when Eriksson controlled for exposure

18   to other pesticides, among other things, the study

19   found no significant association overall, fair?

20        A.   In -- in that table.

21        Q.   Okay.  And then if we go to the other

22   table, which is Table 2, Table 2 is where they have

23   the various exposure metrics.

24             Do you see those?  That's back at 1659.

25        A.   1659.  Hold on.  I don't see -- oh, 1659.
```

Samuel A. Berkman, MD, FACP

```
1        Q.   And not only did the number go down, it --
2   the odds ratio lost statistical significance,
3   correct?
4        A.   Yeah.
5        Q.   And, again, these large confidence
6   intervals are because of the small number of cases
7   in the case-control studies, correct?
8        A.   That's right.
9        Q.   But we do know that the odds ratio went
10  down in the multivariate analysis and it lost
11  statistical significance, true?
12       A.   That's what this data shows.
13       Q.   So like Eriksson and Hohenadel, when
14  Hardell controlled for exposure to other pesticides,
15  the study found no significant association between
16  glyphosate and NHL, correct?
17       A.   That's what this data shows.
18       Q.   Okay.  And so far we -- we still haven't
19  seen a fully adjusted number that's statistically
20  significant for glyphosate and non-Hodgkin's
21  lymphoma, correct?
22       A.   In the studies we've looked at that you've
23  shown me, they've not shown it with multivariate
24  analysis.
25       Q.   Okay.  Now, for this next one, I'm going
```

Exhibit B Page - 67

Samuel A. Berkman, MD, FACP

```
1    studies that you have in your entire report, I'll

2    represent that to you.  There aren't any others.

3         A.   Okay.  But, I mean, there are -- there is

4    very robust literature.  I mean, I wasn't writing a

5    review article here.  I was using some studies that

6    I had reviewed, but I needed a much more wider

7    literature on this subject.  It's just that, you

8    know, I'm not writing a review article.  I'm writing

9    a report for a -- for a case.

10        Q.   But these -- but these are the

11   case-control studies that you found and that you

12   rely upon in your report, correct?

13        A.   I -- well, I mean, I rely on them, but

14   I -- I'm much more, you know, a clinician and look

15   at the -- the patient and the patient's story and

16   that's kind of what my main reliance is.

17             I did put these out there because we're

18   talking about glyphosate.

19             But what I'm relying on is the patient's

20   history, exposures, et cetera.  And that's the big

21   crux of my opinion, is that this is the most likely

22   cause of it.

23             And there's controversy in the literature

24   and there's studies that show things like you've

25   shown me and there's other writers who are much
```

Exhibit B Page - 68

Samuel A. Berkman, MD, FACP

1    stronger about the risk, like Zhang, for example, or

2    Weisenburger, who is very strong about this.  So, I

3    mean, there's mixed opinions about this.  There's a

4    lot of noise about this.

5           And I'm going -- relying less on this

6    stuff than I am on my experience as a clinician and

7    evaluating this patient and all his risk factors and

8    what he doesn't have.

9        Q.   Well, do you agree that if generally

10   causation cannot be reasonably demonstrated then

11   case specific causation also cannot be demonstrated?

12       A.   I think that -- I think that each case,

13   because there's so much controversy on this point,

14   that I think that each case has to be evaluated on

15   its own merits.  And I think that that's how I

16   evaluated this case.  I looked at the literature,

17   but I also looked at the patient's history and

18   everything.

19          So I think you have to take each of these

20   cases on their own merits.  Particularly when

21   there's so much -- there's so much controversy and

22   there's so many -- much room for bias and six or

23   seven different causes.  It's -- it's a challenging

24   literature.  And you can pick out certain statistics

25   to support either point of view.

Exhibit B Page - 69

Samuel A. Berkman, MD, FACP

1      Q.    Well, I -- I just showed you the

2   case-controlled studies in your report, Doctor, I

3   didn't choose them.  You chose them.

4      A.    Okay.  Well, I mean -- I chose -- I chose

5   stuff that I thought was -- basically showed

6   elevated odds ratios and I took those and I think

7   that these cases have been written in other articles

8   by Weisenburger has mentioned these articles.  He's

9   an authority in this.  And he also feels that these

10  articles are significant and substantial.

11         So, I mean, I -- I felt that since they

12  were in his article, and they were quoted by Zhang,

13  that they were worth -- that they were worth putting

14  into my report.

15     Q.    Let me get back to my question a few

16  minutes ago, which is, do you agree that if general

17  causation cannot be reasonably demonstrated, then

18  specific causation also cannot be demonstrated?

19         MR. DONATO:  Objection.  Form.

20         THE WITNESS:  I think that I -- I'm

21  choosing to evaluate this case on its merits, and I

22  think there's enough evidence out there that, as the

23  IARC, it's probable cause.

24         So, I mean, that's a -- they're a

25  reputable organization, and they're saying that it

Samuel A. Berkman, MD, FACP

1    probably causes this.  So that's a general mark of

2    causation, when a major organization states this.

3    And I understand there's opposing views but there is

4    authorities out there like Weisenburger and Zhang,

5    who are not clinicians, but pathologists and

6    occupational laboratory people who feel strongly

7    also.

8            So I think there's enough out there that

9    you can say that there's enough out there that this

10   has to be strongly suspected as a cause.  And I

11   think that with this patient, based on that

12   background, I can say that this patient fits that

13   model.

14   BY MR. HOFFMAN:

15       Q.   Now, you mentioned Weisenburger and Zhang.

16            You're aware that both of those authors

17   are paid plaintiff's experts in the Roundup

18   litigation, correct?

19       A.   They're also academicians.  They are

20   basically academicians.

21       Q.   Can you answer my question first?  I

22   didn't ask about any other credentials.

23            I asked you, are you aware that both Zhang

24   and Weisenburger, who you continually refer to, are

25   both paid plaintiff experts in the Roundup

Exhibit B Page - 71

Samuel A. Berkman, MD, FACP

1    litigation?

2        A.    Okay.  So it doesn't state on their

3    articles that they -- I think maybe -- I think it

4    does state that Weisenburger is a witness, yeah, I

5    think so, I think it showed that.  I don't think it

6    said that about Zhang.  But they are researchers.

7    They're researchers.

8        Q.    Are you aware that Dr. Taioli, who's also

9    an author on the Zhang meta-analysis, is a paid

10   plaintiff's expert in the Roundup litigation?

11       A.    No, I don't know about him.

12       Q.    Okay.  I want to get back into your

13   report.  I -- I -- if we have time at the end to

14   come back to some of the cohort studies and

15   meta-analyses, I'm happy to do that, but I want to

16   make sure I cover your report first.

17            So if we can go back to your report, if

18   you have a hard copy, you can look at that or if --

19       A.    I'll look at that.  Hold on.

20       Q.    If you want to go back to Exhibit 3 in the

21   folder, you can do that.

22       A.    That's okay.  I'll do that.  Hold on.

23   I'll get that.  Okay.  I got the letter up here.

24            Go ahead.

25       Q.    Okay.  So if you look at your report on

Samuel A. Berkman, MD, FACP

1    the first page, under Purpose of Evaluation, you

2    say, "I reviewed the materials I was sent with the

3    following issue in mind.  Was Roundup exposure the

4    most likely because of Judge Turnoff's marginal

5    splenic zone lymphoma," question mark.

6              Do you see that?

7         A.   That should have been "cause," not

8    "because."  It's a typo, "because."

9         Q.   So the question you were considering was

10   Roundup -- was Roundup exposure the most likely

11   cause of Judge Turnoff's marginal zone lymphoma; is

12   that right?

13        A.   Yes, sir.

14        Q.   If we correct that typo, then, you know,

15   that's essentially the question that you were

16   assigned to answer, right?

17        A.   Yes, sir.

18        Q.   How do you determine what is the most

19   likely cause?

20        A.   Okay.  Good question.

21             So first of all, this is a very rare

22   lymphoma.  The incidence is about one per million.

23   So, you know, this is -- this is not something

24   people get all the time.  This is not something you

25   might get from a common mutation or something like

1    that.

2              Also, he has chromosomal abnormalities.

3    He has a -- he had two chromosomal abnormalities in

4    his -- that I found.  One is trisomy 13.  The other

5    is monozygosity 21.  So he's damage to his

6    chromosomes.  Something damaged his chromosomes.

7              So basically, what I do is I take a

8    history and I see, does this guy have a family

9    history of lymphoma?  Does he have a history of

10   Hepatitis C?  Does he have a history of Hepatitis B?

11   Does he have autoimmune disease?  Has he had

12   radiation treatment in the past?  Has he had

13   employment that put him at risk and exposure to

14   toxins?

15             So the answer to all of those questions is

16   no, it doesn't.  So what's there in his, then, that

17   would make it likely?  Well, he's gotten exposed to

18   Roundup.  And he's had Roundup exposure for

19   20 years, which is the average amount of exposure or

20   latency period, and he doesn't remember getting it

21   on -- whether he used gloves or not.  And he

22   basically has had exposure to this.

23             And I think that's -- it -- there's enough

24   here in the literature, there's enough there, like I

25   said, there's not -- it's not like something where

Samuel A. Berkman, MD, FACP

1    there's an obscure article seven years ago in some

2    obscure journal.  There is a lot of stuff going back

3    to 2000.

4              And you are right, there are things that

5    don't support it in the literature.  And there are

6    things that do support it in the literature.

7    There's organizations that support it.  There's

8    organizations that don't support it.

9              But I come down, after I read all of this

10   stuff and I come down with the fact that because of

11   all of this, I think that you cannot ignore -- I'm

12   not saying you can definitely -- that you can't

13   ignore the possibility of Roundup.

14             And in the absence of any other clear risk

15   factor, I am saying that more likely than not, not

16   definitely, but more likely than not, this is the

17   factor that caused this guy's lymphoma.  And that's

18   how basically I come across that opinion.

19        Q.   And how do you -- how do you quantify more

20   likely than not?

21        A.   Well, you know, you're supposed to say

22   greater than 50 percent.  So if I saw that the guy

23   had a family history of lymphoma or he had a history

24   of Hepatitis C, then I wouldn't say this.  I

25   wouldn't have accepted the case.  But I didn't find

**Exhibit B Page - 75**

Samuel A. Berkman, MD, FACP

1    Roundup was the sole cause of his lymphoma?

2        A.    Well, the major cause.

3        Q.    Major cause.  What -- what are the other

4    potential causes?

5        A.    I don't have any other potential causes.

6    I mean, there's stuff you could say if you wanted,

7    like I know your expert talks about diabetes and

8    says he had diabetes before this.  He didn't have

9    diabetes before this.  His diabetes was diagnosed

10   in -- in 2010, when he had his diagnosis.  His blood

11   sugar was 90.  And in 2014 or '13, I can show you

12   the pages, but it was 74.  So if you're going to

13   bring up diabetes, sorry, he didn't have diabetes,

14   despite what your expert says.

15            Your expert also says he had psoriasis,

16   okay.  Well, with respect to psoriasis, he has, in

17   his deposition, no recollection of having psoriasis,

18   but it is in his medical hospital records,

19   psoriasis, diagnosed in 2012 by a Dr. Berke.  And he

20   still sees Dr. Berke regularly and he doesn't get

21   treatment from psoriasis for her.

22            So secondly, psoriasis is an inflammatory

23   disease and this guy has had, every three months,

24   tests for every inflammatory test you can imagine.

25   He's had tests for -- he's had tests for antinuclear

Samuel A. Berkman, MD, FACP

```
 1    antibody, a complement, et cetera.  And he's had

 2    tests, a complement antinuclear antibody.  And

 3    there's a whole bunch of them he has every three

 4    months for inflammation.  And his sed rate is

 5    normal.

 6              So this guy, if he's got psoriasis, and

 7    psoriasis, as your expert says, causes inflammation,

 8    this guy has no inflammation measurable on a whole

 9    constellation of tests.

10              Then they say pipe smoking.  Well, pipe

11    smoking has never been shown to be a cause of

12    non-Hodgkin's lymphoma.  Pipe smoking has been a

13    cause of lip cancer.  And there's a question about

14    lung cancer.  But it's never been a cause of

15    non-Hodgkin's lymphoma.

16              Then there's obesity.  Well, the obesity,

17    yeah, this guy in 19 -- when he was smoking --

18    excuse me -- when he was exposed to this stuff, he

19    said he was under 200 pounds.  He's five seven.  So

20    his BMI would be about 29.8, and if it was like up

21    to 195, it would be 30.1.  And that's just barely

22    obesity.  I mean, just on a -- just barely on the

23    borderline of obesity.

24              So basically -- he has a family history, a

25    family history of cancer.  His brother smoked
```

Exhibit B Page - 77

Samuel A. Berkman, MD, FACP

1    four -- four packs of cigarettes a day and got

2    bladder cancer.  That's a known cause of bladder

3    cancer, is cigarette smoking.  Your expert tends to

4    indicate that it's more likely he has a family

5    history and got this from a family history of some

6    big predisposition to cancer and that his brother's

7    cancer for the bladder, instead of being due to

8    smoking four packs a day, is due to some vague

9    family history.

10              I think one of his relatives had a brain

11    tumor.  That's never been shown to be a cause of

12    non-Hodgkin's lymphoma.

13              So, I mean, we can go through all of these

14    things that your expert brings up.  But the fact is,

15    that none of them really are relevant and none of

16    them occurred prior to this except maybe the

17    psoriasis in his family history.  So if you've got

18    other things you want to bring up, by all means.

19    But the stuff your expert brings up really isn't --

20    he doesn't have Hepatitis C.  Well, I guess your

21    expert didn't go into Hepatitis C or Hepatitis B.

22         Q.   Well, we'll go through -- we'll go through

23    some of that and I'll show you some literature on --

24    on some of those risk factors that I -- you may have

25    considered but I don't see them in your report.  So

Exhibit B Page - 78

Samuel A. Berkman, MD, FACP

```
 1    picking up the -- the Roundup.  So I think it was

 2    more weekends, much more weekends than not.

 3         Q.   Okay.  And he estimated that he sprayed

 4    Roundup for approximately 30 minutes for each use?

 5         A.   I don't remember how long he did, but he

 6    did spray all over his property, the weeds.

 7         Q.   You don't recall him estimating that the

 8    total time he spent was about 30 minutes at each

 9    use?

10         A.   I just don't remember that detail.

11         Q.   Do you also recall that he conceded that

12    the actual time spraying would be substantially less

13    than 30 minutes?

14         A.   No, but that wouldn't surprise me.  I

15    mean, he's got to walk around there looking at what

16    he's going to spray.  So that doesn't surprise me.

17         Q.   Have you quantified in hours, or in days,

18    the total amount of time that the plaintiff sprayed

19    Roundup?

20         A.   I just looked at it like he did it, once

21    about -- well, average -- I did what he averaged,

22    basically, based on his deposition.  He averaged

23    once a week for 20 years.  So I didn't do any math

24    because it wouldn't do me any good because what am I

25    going to do with that number, calculate a level?
```

Exhibit B Page - 79

Samuel A. Berkman, MD, FACP

```
 1              You know, like I said, I'm not a
 2    toxicologist.  I'm not an environmentalist.  And,
 3    frankly, you know, with what I do, my treating him
 4    would have nothing to do with how he got the
 5    lymphoma.  It would just be to tell him to stay away
 6    from it in the future so he didn't get any more
 7    problems.
 8         Q.   Right.  But it is -- it is true, it is
 9    a -- it is fair to say that you haven't quantified
10    in hours or in the number of days the total amount
11    of time that the plaintiff sprayed Roundup?
12         A.   I have not done any math on that.
13         Q.   Okay.  And if you go to the next page in
14    your report, page 4, this is about halfway down.
15              You say, "The amount of time he was
16    exposed to" --
17         A.   Where is it?
18         Q.   About halfway down on page 4.
19         A.   Yeah, I see it.
20         Q.   "The amount of time he was exposed to
21    Roundup is 20 years, which is the average latency
22    period of NHL in persons with long-term exposure to
23    toxic chemicals and solvents."
24              And then you cite Weisenburger for that,
25    right?
```

Exhibit B Page - 80

Samuel A. Berkman, MD, FACP

```
 1        A.    Yeah.

 2        Q.    And then you go on to say, "This appears

 3   to have been sufficient exposure to cause his

 4   problem."

 5              Do you see that?

 6        A.    I do.

 7        Q.    Now, a couple of questions there.

 8              On the issue of the 20-year latency

 9   period, you talked about this earlier, but the

10   plaintiff wasn't diagnosed until 2010, correct?

11        A.    That's right.

12        Q.    And if that 20-year latency period, in

13   fact, is not accurate, what, if any, role would the

14   latency period play in your analysis in terms of his

15   overall exposure?

16        A.    Well, again, you know, I mean, it depends

17   on the dose, too.  You know, if he's got a higher

18   dose, it may be a lesser latency period.  But based

19   on a constant dose -- I mean, I'm not sure I

20   understand your question.

21        Q.    Well, you don't know what his dose was at

22   any point in time, right?

23        A.    Right.  I didn't measure it, no.  I

24   basically -- but I know that he seemed to replace

25   these bottles of the ready-made Roundup pretty
```

Exhibit B Page - 81

1    regularly.

2        Q.    Okay.  But when you say, "This appears to

3    have been sufficient exposure to cause his problem,"

4    how do you define sufficient exposure?

5        A.    20 years.

6        Q.    Okay.  Anything other than that, anything

7    other than 20 years?

8        A.    And also, I didn't put this up, but I

9    don't know whether he had gloves, and I don't think

10   he remembers, either.  That would have pushed -- be

11   a big factor, too.

12       Q.    So if he -- if he did use gardening

13   gloves, that would be a significant factor to you?

14       A.    I think so.  I think it would be a factor.

15       Q.    Okay.  Now, if you go back again to page 3

16   on some of those -- on some of those factors.

17       A.    Page 3?

18       Q.    That same paragraph we were looking at.

19             You say, about halfway down in the first

20   full paragraph of Section 6, you say, "He does not

21   recollect getting it on his hands but is not sure of

22   these details."

23             Do you see that?

24       A.    Yeah -- wait a second.  I'm sorry, I'm not

25   sure where -- you said page 6?

Samuel A. Berkman, MD, FACP

```
 1          Q.    No, no, back on page 3.

 2          A.    Page 3, okay.  Hold on.

 3          Q.    Section 6.

 4          A.    All right.  Section 6.  Right.  Report.

 5    Okay.

 6          Q.    Yeah, first full paragraph, about halfway

 7    down in the paragraph, you say, "He does not

 8    recollect getting it on his hands but is not sure of

 9    these details."

10          Do you see that?

11          A.    Yes.

12          Q.    In fact, in his deposition, plaintiff

13    testified that he did not recall ever getting

14    Roundup on his bare skin, correct?

15          A.    I think he was very unclear about it.  I

16    don't think he remembered, frankly, whether he used

17    gloves or not.  I think that was my impression.  He

18    just didn't remember.

19          Q.    Well, he didn't remember it ever getting

20    on his skin.  He had no recollection of that,

21    correct?

22          A.    Right, he didn't remember.

23          Q.    Okay.  And Judge Turnoff only sprayed a

24    ready-to-use Roundup product, right?

25          A.    Yeah, he didn't mix it.  In other words,
```

Exhibit B Page - 83

Samuel A. Berkman, MD, FACE

1    he got the green bottle which has the handle and the

2    sprayer.

3        Q.   And he -- the plaintiff did testify that

4    he wore gardening gloves when he sprayed Roundup,

5    didn't he?

6        A.   I don't recollect him saying that.  I

7    recollect him saying that he doesn't remember

8    getting it on his hands.  And as far as the gloves,

9    I don't remember him giving a clear answer.  I think

10   maybe he used gloves some of the time.  But I don't

11   think he has a good recollection of how much he used

12   gloves.

13       Q.   Well, he did testify that he tried not to

14   get any of the Roundup on him, right?

15       A.   I -- I believe so.  But I -- I just

16   don't -- the detail with the gloves, which is what I

17   really paid attention to, I don't think he had clear

18   recollection of whether he used gloves or not.

19   That's my recollection.

20       Q.   But he did testify that he tried not to

21   get Roundup on him, right?

22       A.   Okay.  I don't know what that means.

23   Maybe that just means not getting it on his clothes

24   because his wife would yell at him, I don't know.

25       Q.   And you haven't interviewed Judge Turnoff

Exhibit B Page - 84

Samuel A. Berkman, MD, FACP

```
 1   any further to try to clarify any of these points?
 2        A.   No, I haven't interviewed him at all.
 3        Q.   Now, just assume for me that Judge Turnoff
 4   never got Roundup on his hands and he doesn't recall
 5   ever getting it on his skin so just assume that he
 6   never had any dermal exposure to Roundup.
 7             We can agree that if that's the case, then
 8   he would have no absorbed dose, true?
 9        A.   Well, he may have inhaled it.  I don't
10   know.
11        Q.   I'm asking you about dermal exposure.  I
12   know you don't -- you haven't reviewed the
13   literature on inhalation or if that's even possible.
14   I understand that.  So I'm limiting my questions to
15   dermal exposure.
16             If you assume for me that Judge Turnoff
17   never got Roundup on his hands, and he never recalls
18   getting it on any other part of his body, on his
19   exposed skin, if all of that is true, then he may
20   not have had any absorbed dose of Roundup or
21   glyphosate, correct?
22        A.   Well, that's a hypothetical question.  I
23   mean, you know, that's a hypothetical.  And, you
24   know, I'm told -- I know you didn't go through all
25   the admonitions on this deposition, but you told me
```

Exhibit B Page - 85

1    not to guess.  They usually tell you not to guess.

2    So, I mean, I'm not going to guess on a hypothetical

3    something like that.

4            The guy developed lymphoma, used Roundup

5    all the time, he's not sure about whether he used

6    gloves or not.  I mean, you know, that's basically

7    what I took out of this.

8        Q.   But you agree that if the plaintiff never

9    got Roundup on any exposed skin, it's certainly not

10   only possible, it's more than probable that he would

11   not have ever received an absorbed dose from a

12   dermal route of exposure, correct?

13       A.   Well, that's a hypothetical.

14           MR. DONATO:  Objection.  Form.

15           THE WITNESS:  That's a hypothetical.  I

16   really --

17   BY MR. HOFFMAN:

18       Q.   I am asking you a hypothetical.

19           If you assume he never got it on his skin,

20   the plaintiff wouldn't have an absorbed dose, would

21   he?

22       A.   I don't want to respond to a hypothetical.

23   I'm going to go by my interpretation of his

24   deposition.  And my interpretation of his deposition

25   is that he doesn't remember whether he protected his

Exhibit B Page - 86

Samuel A. Berkman, MD, FACP

1    hands or not.  That's my recollection.

2           And, you know, as far as what might have

3    happened in certain circumstances, that's really --

4    I've got to go by in treating somebody what his

5    result is and what his history is.  And I have to

6    assume that if he got this lymphoma, this really

7    rare lymphoma, and he's got no other risk factors,

8    that he absorbed this Roundup and -- and I -- as far

9    as whether he had the gloves or not, I would assume

10   that he got some exposure through his hands,

11   particularly since he doesn't remember.

12          I don't want to get into a hypothetical.

13     Q.   Do you plan on talking to the plaintiff to

14   try to clarify some of these points before you

15   testify at trial?

16     A.    If -- if Mr. Donato would like me to talk

17   to him, Mr. Kuntz would like me to talk to him, then

18   I will talk to him.  I will take my advice from

19   them.  I was told to give my opinion here.  You

20   know, I try not to talk to plaintiffs, if I can,

21   because I don't want to be influenced by them.  I --

22   I want to keep my objectivity.  I -- once I see

23   them -- I'd rather not do that.  But if they want me

24   to do it, I'll do it.

25     Q.   Besides what the plaintiff said in his

Exhibit B Page - 87

1    deposition, was there anything else you reviewed to

2    determine how much Roundup the plaintiff used over

3    time?

4         A.   No, I went by what he gave in his history

5    over the 50-year period.

6         Q.   So you haven't seen any receipts from

7    purchases of Roundup?

8         A.   I don't think he kept the receipts.  I

9    think he -- we went through the deposition and I

10   don't think he kept the receipts.  I think he kept

11   receipts for three years and then he discarded them

12   for everything.  You know, he's a judge, et cetera.

13   So I think his receipts he kept three years and

14   discarded them because he --

15        Q.   So your description in your report of the

16   plaintiff's Roundup use comes from him trying to

17   remember in 2022 how and when he used a weed control

18   product going back decades, correct?

19        A.   Well, I would -- I don't have a better way

20   of knowing it but other than asking him.  It's

21   better than asking someone secondhand.  At least

22   it's a firsthand account.  And since he's making a

23   claim here, he's got this on his mind.  So I'm not

24   asking him to deal with something that he's

25   repressed way out of his mind or et cetera.  This is

1    something that's on his mind that's a priority to

2    him and he's a firsthand witness.  So I don't think

3    it's such a stretch.

4         Q.  Well, you do know that his deposition was

5    taken in 2022, right?

6         A.  It was taken a while ago.

7         Q.  And he was asked to recollect what he did

8    with respect to a weed control product dating back

9    for more than four decades, right?

10        A.  Yes, yes.

11        Q.  Even with the best of intentions, and

12   assuming complete good faith, you would acknowledge

13   that the exercise of trying to remember how much of

14   a lawn care product somebody used in any given

15   weekend 30 or 40 or more years ago carries with it

16   inherent uncertainty, doesn't it?

17        A.  No, this --

18             MR. DONATO:  Objection.  Form.

19             THE WITNESS:  This was a hobby for him.

20   It wasn't just a chore.  It was a hobby.  This is

21   what his weekend recreation was.  So he was really

22   into this.  So this was his way of relaxing and

23   enjoying his weekend.  So it's not something he felt

24   was a chore.  This is something he enjoyed.

25

Exhibit B Page - 89

Samuel A. Berkman, MD, FACP

1    BY MR. HOFFMAN:

2        Q.   Right.   But sitting here today, can you

3    recall what you did 30 or 40 years ago on a given

4    weekend?

5        A.   Well, this wasn't a given weekend.   This

6    is almost every weekend.   This wasn't -- no one's

7    asking him what he did on April 23rd or May 30th

8    whether he used the stuff.   We're talking about over

9    a long period of time.

10           So no, it's not the same thing as asking

11   what someone did on a given specified day.

12       Q.   Do you agree there is inherent uncertainty

13   in someone trying to recollect what they did

14   40 years ago?

15       A.   I think there is inherent uncertainty if

16   you're asking someone to recollect what they did at

17   a specific time.   But over a period of time in doing

18   the same thing every weekend, I don't think -- I

19   think, yeah, if you want to say did you do it at a

20   different order this weekend, yeah.   But, I mean, if

21   he's doing the same thing every weekend and it's

22   re-enforced again and again and again and again and

23   again, no, I don't.

24       Q.   Did you see any contemporaneous

25   documentation of any kind that would support the

Samuel A. Berkman, MD, FACP

```
1    plaintiff's memory of what he did?

2        A.   What do you mean by that?  I don't

3    understand that question.

4        Q.   Any pictures, any journals, any --

5    anything at all that would support how and when he

6    used the product other than his recollection?

7        A.   No, I didn't.  I've seen some pictures

8    from -- of his house, but I don't think he kept

9    them.  I think some -- they've appeared for the

10   trial.  But I haven't checked any journals or

11   diaries or anything like that.  I would doubt that

12   this is the type of thing someone would put in a

13   confidential diary about weed killing.

14       Q.   And there's no picture of him doing this

15   hobby that he did almost every weekend over a

16   20-year period, no -- no photos of that?

17       A.   There may well be, but I haven't seen any.

18       Q.   What, if anything, did you do to

19   investigate whether the Roundup product that the

20   plaintiff claims to have started using in 1980 was

21   even on the market at that time?

22       A.   It was on the market.  It was --

23       Q.   What did you do to investigate whether the

24   Roundup ready-to-use product that the plaintiff

25   claims he used was even on the market in 1980?
```

Exhibit B Page - 91

1      A.   Well, I don't know if the ready-to-use

2  product was -- was there, but it was on the market.

3  There were other ways of doing it.  I think that --

4      Q.   So you investigated that issue and you

5  have determined that the ready-to-use product that

6  Judge Turnoff claims to have used was available on

7  the market to anyone in 1980.  You did an

8  investigation?

9      A.   No, I don't -- I don't know the answer to

10 that question, whether it was or it wasn't.  What I

11 know is that the -- it's been on the market since

12 the '70s.  But I don't know whether the ready-to-use

13 product, when that came.  I have a feeling it was

14 like in the late '80s.  But I don't know.

15     Q.   But we can agree that the plaintiff only

16 claims to have ever used a ready-to-use Roundup

17 product, correct?

18     A.   That's what he says in his deposition, but

19 he also says that he did it for -- started in 1980.

20 So that's the point I need to clear up, you know,

21 what product he used in 1980 until the ready-to-use

22 product was available.  So that's something I should

23 check into.

24          But assuming he used the other products,

25 that's even a greater risk because you got to mix

Samuel A. Berkman, MD, FACP

```
 1    that thing and you could spill it on your hands

 2    mixing it whereas the ready-to-use product you just

 3    squirt it out.  So I think --

 4         Q.   Doctor, the plaintiff has never claimed in

 5    his deposition to ever have used a concentrated

 6    product.  And he was specifically asked about it,

 7    wasn't he?

 8         A.   I don't remember if he was specifically

 9    asked about it, but the impression I got was he

10    strictly used the spray.

11         Q.   Right.  And there's nothing in the

12    deposition testimony that contradicts that, is

13    there?

14         A.   No, but when you bring up, you know, if

15    the spray was available in 1980, that causes -- that

16    calls it into question because if it wasn't

17    available in 1980, he couldn't have used it in 1980.

18         Q.   Right.  That calls his memory into

19    question, doesn't it?

20         A.   Well, I don't know.  I don't know whether

21    it does or it doesn't.

22         Q.   All right.  Well, take a look at

23    Exhibit 19, if you would, please, that I placed in

24    your exhibit folder.

25         A.   Okay.  Just a second.
```

Exhibit B Page - 93

```
 1              (Whereupon, Exhibit 19 was marked for
 2    identification.)
 3              THE WITNESS:  Where is it?
 4    BY MR. HOFFMAN:
 5         Q.   Exhibit 19?
 6         A.   Yeah, it's loading.  As usual it only goes
 7    down to 11 until I mess around with the -- that's
 8    it.  Usually get it to -- here it is.  I got it.
 9    That's a funny thing, this little box here.
10         Q.   All right.  Do you have that?
11         A.   It says, "Roundup."  It says, "Do not
12    apply directly to water or wetlands, swamps, bogs,
13    marshes, or potholes.  Do not contaminate water by
14    cleaning of equipment" --
15         Q.   I'm just asking you, Doctor, if you have
16    the exhibit in front of you?
17         A.   Yeah, I do.
18         Q.   Okay.  Exhibit 19, at the top, it says,
19    "Roundup L&G RTU."
20              Do you see that?
21         A.   I do.
22         Q.   And it was accepted by the EPA in
23    September of 1987.
24              Do you see that stamp?
25         A.   No, I don't see a stamp.
```

```
 1          Q.   About halfway down?

 2          A.   Oh, okay.  Yeah, oh, yeah, accepted, yeah,

 3   okay.

 4          Q.   Okay.  And if you turn to the next page,

 5   at the top it says, "New.  No mixing required."

 6               Do you see that?

 7          A.   Uh-huh.

 8          Q.   And then it says "Ready-To-Use" under

 9   Roundup.

10               Do you see that in the middle?

11          A.   Yes.

12          Q.   And the stamp also says it was accepted by

13   EPA in 1987, correct?

14          A.   Yeah, that's what I thought.

15          Q.   Okay.  And then if, in fact, you go over a

16   couple more pages, there is a mockup of what the

17   Roundup bottle, what the label was going to say.

18               Do you see that?

19          A.   No, which page are we on?

20          Q.   A couple pages over from there.

21          A.   Three -- page 3?  Page 3 says storage or

22   disposal, is what it says.

23          Q.   Yeah, go to the next one, then, where you

24   see the mockup of the -- of the label and what the

25   container was going to show.
```

Exhibit B Page - 95

Samuel A. Berkman, MD, FACP

1       A.   Okay.  Let me see.  It says, "Roundup L&G

2   Ready-To-Use."

3       Q.   Yeah, you see that, where it says, "New.

4   No mixing required"?

5       A.   Yeah.

6       Q.   Roundup Lawn & Garden Ready-To-Use.

7            Do you see that?

8       A.   I do.

9       Q.   That's also accepted in 1987 by the EPA,

10  correct?

11      A.   I -- I think that my recollection is that,

12  from what I read, is that this ready-to-use thing

13  was available in 1987.

14      Q.   Right.  So are you aware of any evidence

15  of any Roundup ready-to-use product on the market

16  before sometime in 1987?

17      A.   I'm not.

18      Q.   And that calls the plaintiff's memory into

19  question, doesn't it?

20      A.   That's one interpretation.

21      Q.   Okay.  And -- okay.

22           And if you didn't start using Roundup

23  until 1987, that wouldn't be 20 years, that would be

24  13 years, right?

25      A.   If he didn't start using it until 1987 and

Exhibit B Page - 96

Samuel A. Berkman, MD, FACP

1   he used it to 2000, that would be 13 years.

2           MR. HOFFMAN:  Okay.  Let's take a quick

3   break.  We can go off the record.

4           THE WITNESS:  Okay.  How long, ten

5   minutes?

6           MR. HOFFMAN:  Yeah, where are we at from a

7   time standpoint just so I know how to finish this

8   up.

9           (Whereupon, a brief discussion off the

10   record.)

11          THE VIDEOGRAPHER:  The time is 3:31 p.m.

12   We are off the record.

13          (Whereupon, a brief recess was taken.)

14          THE VIDEOGRAPHER:  The time is 3:47 p.m.

15   We are back on the record.

16   BY MR. HOFFMAN:

17      Q.   Doctor, you did not conduct any site visit

18   of the plaintiff's property, did you?

19      A.   I did not, sir.

20      Q.   Do you have any experience with Roundup

21   yourself?  Have you personally used it?

22      A.   I have not.

23      Q.   And I take it you didn't investigate the

24   types of weeds that can grow in North Miami Beach

25   where the plaintiff claims to have applied Roundup?

Exhibit B Page - 97

Samuel A. Berkman, MD, FACP

```
1          A.    You guessed right.

2          Q.    You would defer to a weed scientist on

3    that, correct?

4          A.    Yeah, definitely.

5          Q.    You don't know how susceptible any of the

6    weeds on the plaintiff's property may have been to

7    Roundup use, true?

8          A.    I wouldn't know something like that.

9          Q.    Do you agree that you have no professional

10   or personal experience that would inform your

11   judgment regarding whether a particular amount of

12   Roundup use would be reasonable or unreasonable?

13         A.    Since I've never had the occasion to use

14   it, I really wouldn't know.  And when I ask people

15   if they use insecticides or herbicides, I -- I do

16   ask them how they use it.  I do ask them how they

17   use it.  But I don't have any idea how much volume

18   use would be appropriate.

19         Q.    And you obviously have no professional

20   experience with that?

21         A.    No.

22         Q.    Now, as I understand it, you are not

23   offering an opinion regarding the specific mechanism

24   or process by which glyphosate caused the

25   plaintiff's marginal zone lymphoma, correct?
```

Exhibit B Page - 98

```
 1              I would say that when you find mutations,
 2    that has got to be given significant consideration
 3    as being the mechanism of the malignancy.
 4         Q.   What mutation are you testifying Roundup
 5    caused specifically in this plaintiff?  What -- what
 6    was the mutation?
 7         A.   Well, the mutations that were found were
 8    trisomy 13 and monozygosity 21.
 9         Q.   And are you any -- are you aware of any
10    literature that supports the notion that those
11    specific mutations are called by Roundup or
12    glyphosate?
13         A.   No.  No.
14         Q.   And is there anything unique about the
15    plaintiff's marginal zone lymphoma that would help
16    you identify Roundup as the cause?
17         A.   No.
18         Q.   Was there anything about the plaintiff's
19    presentation, clinical presentation, that points to
20    Roundup as the cause of his lymphoma?
21         A.   No.
22         Q.   Was there any clinical sign or symptom
23    that would tell you whether Roundup caused the
24    plaintiff's lymphoma?
25         A.   No, with most -- no matter what the
```

Exhibit B Page - 99

Samuel A. Berkman, MD, FACP

1    causation is there, there's very little sign and

2    symptom of what the cause is.  I mean, so you

3    wouldn't know from going by signs and symptoms what

4    the cause is.  You'd have to go by the history.

5        Q.   Was there any physical examination finding

6    that would help you determine whether Roundup caused

7    the plaintiff's lymphoma?

8        A.   No.  And no with any other form of

9    lymphoma either.

10       Q.   Was there anything about the plaintiff's

11   pathology that points to Roundup as the cause of his

12   lymphoma?

13       A.   No.

14       Q.   Was there anything about the plaintiff's

15   imaging studies that points to Roundup as the cause

16   of his lymphoma?

17       A.   No, like I said, these things don't point

18   to the cause at all.  They -- that's not the purpose

19   of these tests.  They don't point to the cause.

20       Q.   Is there any lab test result that would

21   tell you whether Roundup caused the plaintiff's

22   marginal zone lymphoma?

23       A.   There's no test for that.

24       Q.   None of the plaintiff's test reveal

25   anything about Roundup or glyphosate use, correct?

Exhibit B Page - 100

Samuel A. Berkman, MD, FACP

1      A.   There were no tests done for that purpose.

2   So it's not that they didn't reveal it.  They

3   would -- it wasn't sought after.

4      Q.   Right.  The same results of each and every

5   one of the tests that was performed on the

6   plaintiff, each and every one of those medical tests

7   can be seen in patients with the plaintiff's type of

8   lymphoma who have never been exposed to Roundup,

9   correct?

10      A.   I'm sure.  I'm sure.  And with any other

11   form of lymphoma, too.

12      Q.   And none of the features of the

13   plaintiff's marginal zone lymphoma tell you that it

14   was caused by glyphosate or Roundup, correct?

15      A.   That's right.

16      Q.   There's no biomarker that points to

17   glyphosate as a cause of his cancer?

18      A.   Or any other cause.  No.

19      Q.   There's no pathologic marker or feature

20   that would tell you whether Roundup caused his

21   cancer?

22      A.   No.

23      Q.   There's nothing on any of the pathology

24   slides that would reveal Roundup as a cause?

25      A.   That's not the purpose of these tests, any

1    of them.  That's not the purpose, to find the cause.

2    It's to determine whether you have a lymphoma or not

3    and what the extent of it is.

4        Q.   Well, it remains that -- I hear your

5    explanation, but there's nothing you can look at on

6    a pathology slide that would reveal Roundup as a

7    cause, correct?

8        A.   Or any other cause.

9        Q.   Is there any biopsy or tissue sample that

10   you can look at under a microscope that would tell

11   you whether Roundup caused the plaintiff's cancer?

12       A.   No, that's not the purpose of these tests,

13   any of them.

14       Q.   And you have reviewed the plaintiff's

15   medical records, correct?

16       A.   I have.

17       Q.   Hundreds and hundreds of pages of medical

18   records?

19       A.   I reviewed everything -- yeah, I did, I

20   went through everything.

21       Q.   And there's no medical record that says

22   glyphosate or Roundup caused or contributed to the

23   plaintiff's lymphoma, is there?

24       A.   I didn't see anything in the records that

25   said that.

1      Q.   And none of the plaintiff's treating

2  physicians determined that Roundup caused or

3  contributed to his marginal zone lymphoma, correct?

4      A.   They didn't give opinions on that.

5      Q.   So therefore, you're not aware of any

6  evidence that they reached a determination that

7  Roundup caused or contributed to the plaintiff's

8  marginal zone lymphoma, correct?

9      A.   They -- there's no reason why they would

10  have.

11      Q.   Well, be that as it may, you're not aware

12  of evidence that they did?

13      A.   No.

14      Q.   All right.  Now, we discussed earlier the

15  fact that not all patients who develop non-Hodgkin's

16  lymphoma have known risk factors for the disease,

17  correct?

18      A.   That's right.

19      Q.   As you testified earlier, you've had

20  patients frequently in your career who've developed

21  non-Hodgkin's lymphoma without presenting with any

22  known risk factors, correct?

23      A.   That's true.

24      Q.   And you said that was often the case,

25  right?

Samuel A. Berkman, MD, FACP

```
 1   disease like cancer."
 2         Do you agree generally with that
 3   definition?
 4      A.   I think age can be a risk factor for
 5   cancer, all cancer.
 6      Q.   I'm sorry.  I just -- can you say that
 7   again?  I couldn't hear you.
 8      A.   I said age is a risk factor for cancer,
 9   all cancers.
10      Q.   I'm asking about the sentence.  "A risk
11   factor is anything that increases your chance of
12   getting a disease like cancer."
13         Do you agree with that?
14      A.   Yeah, I agree -- I'll agree with that.
15      Q.   It says, "Some risk factors like smoking
16   can be changed.  Others like a person's age or
17   family history can't."
18         Do you see that?
19      A.   I do.
20      Q.   That's also true, correct?
21      A.   Absolutely.
22      Q.   It goes on to say, "But having a risk
23   factor, or even many risk factors, does not mean
24   that you will get the disease."
25         Do you see that?
```

Exhibit B Page - 104

Samuel A. Berkman, MD, FACP

```
 1        A.   I do.

 2        Q.   Do you agree with that generally?

 3        A.   Yeah, I do.  I -- I think that these

 4   things are often multifactorial so even if you have

 5   a risk factor or a couple, doesn't mean you'll get

 6   the disease.

 7        Q.   "And many people who get the disease may

 8   have few or no known risk factors."

 9             Do you see that?

10        A.   Yes.

11        Q.   And do you agree with that?

12        A.   Yes.

13        Q.   Okay.  Then the first risk factor that's

14   listed is age.

15             Do you see that one?

16        A.   I do.

17        Q.   It says, "Getting older is a strong risk

18   factor for lymphoma overall with most cases

19   occurring in people in their '60s or older."

20             Do you see that?

21        A.   I do.

22        Q.   Do you agree with that statement

23   generally?

24        A.   It hasn't been my experience.  I've seen a

25   lot of lymphoma in younger people.  But I think
```

Exhibit B Page - 105

Samuel A. Berkman, MD, FACP

```
1    there are actual statistical peaks.  There's two

2    peaks.  There's one in young people in their 20s.

3    And then there is a second peak in the '60s.

4        Q.   Okay.  And do you agree that just growing

5    older put the plaintiff at an increased risk for

6    lymphoma?

7        A.   Any form of cancer.

8        Q.   Right.  At age 61, he would have had a

9    higher risk than at age 40 or 50, true?

10       A.   Yeah, but 61 is just -- just barely over

11   60.  I mean, it's not like he's way above this age

12   range.

13       Q.   Right.

14       A.   It's kind of borderline.

15       Q.   Right.  But his age may have contributed

16   to the development of his non-Hodgkin's lymphoma?

17       A.   It's possible.

18       Q.   And then sex is next.  It says, "Overall,

19   the risk of non-Hodgkin's lymphoma is higher in men

20   than in women, but there are certain types of NHL

21   that are more common in women.  The reasons for this

22   are not known."

23            Do you see that?

24       A.   I do.

25       Q.   Do you -- do you agree that being male
```

1    recollect having psoriasis.  The only reason

2    psoriasis comes up at all is because it's in his

3    medical chart.  It was put on there in 2010 by a

4    Dr. Berke, who's a dermatologist, two years after he

5    was diagnosed with lymphoma.  And he still sees

6    Dr. Berke every three months and they don't deal

7    anything with psoriasis.

8            So if he had psoriasis it must have been

9    pretty limited because he doesn't remember it and he

10   has no markers of autoimmune disease.  So he just

11   plain does not have autoimmune disease even if he

12   might have had it --

13       Q.   All right.  So two questions.

14            Number one, do you -- do you agree or

15   disagree that the plaintiff was diagnosed with

16   psoriasis?

17       A.   It's on his record.  He must have been

18   diagnosed by somebody.

19       Q.   Okay.

20       A.   By Dr. Berke, but that was after the time

21   of his diagnosis of lymphoma.

22       Q.   You -- so you believe it was after he was

23   diagnosed?

24       A.   I know it was after.  It's says right in

25   his record, 2012.  That's what -- psoriasis, it's

1    right next to it, is 2012.  In 2010 is when he got

2    diagnosed with his lymphoma, so --

3         Q.   Okay.  We'll check that in a minute.

4              But second question is, do you agree that

5    in the peer-reviewed, published literature psoriasis

6    is a known risk factor for lymphoma?

7         A.   It is in the literature.  It's true.  It's

8    just that it isn't a risk factor in this particular

9    patient.

10        Q.   And that's because you believe he was

11   diagnosed with psoriasis after he was diagnosed with

12   his --

13        A.   That's the -- that's the least of it.  He

14   doesn't have an autoimmune disease.  In other words,

15   the way psoriasis causes lymphoma is through being

16   an autoimmune disease, and he doesn't have --

17        Q.   And you didn't -- and you didn't consider

18   anywhere in your report psoriasis as a risk factor

19   for the plaintiff, did you?

20        A.   I didn't put it in my report because I --

21   I did write in my report and the things that I

22   checked into, any autoimmune diseases.  And that is

23   in my report.  And it states very clearly all the

24   tests he had, which are detailed in my report,

25   repeatedly.

1          So whatever potential autoimmune disease

2   he might have had did not translate into any

3   abnormal blood tests for autoimmune disease.  And

4   psoriasis, you know, is -- is -- real differences in

5   severity of psoriasis.  This guy clearly did not

6   have big-time psoriasis.  Otherwise, he would

7   remember it.

8          It's a disease people remember because it

9   can be very disfiguring and even though it's not

10  life-threatening, it can really affect your

11  appearance, and people are very sensitive about

12  this.  So he doesn't even remember having it.  So I

13  don't think that psoriasis is a big player here.

14     Q.   Okay.  Go ahead and take a look at

15  exhibit -- Exhibit 20 that I marked.  I put it in

16  your exhibit folder.

17     A.   Exhibit 20.  Okay.

18          (Whereupon, Exhibit 20 was marked for

19  identification.)

20  BY MR. HOFFMAN:

21     Q.   Exhibit 20.

22     A.   Hold on.

23     Q.   Do you -- do you have Exhibit 20 in front

24  of you?

25     A.   I'm looking.  It's hard for me to scroll

Samuel A. Berkman, MD, FACP

```
 1        Q.   Doctor, I'm only asking you if you agree
 2   with that statement.  You don't have to agree with
 3   it.  If you disagree with it, just tell me.
 4        Do you --
 5        A.   I think including overweight is a bit
 6   much.
 7        Q.   Okay.  Do you believe that being obese
 8   might increase someone's risk for non-Hodgkin's
 9   lymphoma?
10        A.   I have read articles to that effect.  So I
11   would say that it's possible.
12        Q.   And was the plaintiff at any point in time
13   prior to his diagnosis on the scale of obesity,
14   meaning 30 BMI or above?
15        A.   So -- that's a good question.
16        So the estimate in his deposition, he's
17   5-foot-7 and I think -- five seven and half.  And so
18   his weight, he said before the year 2000 was under
19   200.  So I did a calculation at 195.  And at 195,
20   his BMI was around 29.8.  I did another calculation
21   at 198 -- excuse me, I did the calculation at 190,
22   and it was 29.8.  And then I did another calculation
23   at 195 and it was 30.1.
24        So he was right at the lower limit of
25   obesity, just barely made it into the obesity
```

1    category.

2        Q.   Okay.  And that fact -- can obesity, even

3    if it's borderline, according to the peer-reviewed,

4    published literature, can obesity increase someone's

5    risk for developing non-Hodgkin's lymphoma?

6        A.   Yeah, and about 50 other diseases, yes.

7        Q.   Well, I'm not saying it's good.  I mean,

8    I'm just asking you if there's literature that

9    supports that proposition?

10       A.   Yeah, but these are, you know, very

11   generic things.  Yeah, they might push it, but it's

12   not a real specific type thing like family history

13   or Hepatitis C.

14           This is -- these are risk factors that are

15   not on the level, obesity, of Hepatitis C and -- and

16   radiation history or family history.  It's not like

17   you can say these things are all equivalent risk

18   factors.

19       Q.   Right.  But it is listed by the American

20   Cancer Society as a risk factor?

21       A.   Uh-huh.  I know.  I know.

22       Q.   You don't disagree with that, do you?

23       A.   I -- I think that -- no, but I think the

24   American Cancer Society also says ovarian cancer,

25   lung cancer, colon cancer, pancreatic cancer, breast

Exhibit B Page - 111

Samuel A. Berkman, MD, FACP

1    cancer all --

2         Q.   Right.  But nowhere in your report do you

3    consider the plaintiff's body weight or obesity as a

4    risk factor for him, do you?

5         A.   I don't think that -- I -- I did not

6    consider that to be a significant enough risk factor

7    to outweigh the exposure of Roundup.

8         Q.   But you don't -- you don't analyze that

9    risk factor anywhere in your report, do you?

10        A.   Well, I -- no, I don't.

11        Q.   Okay.  Let me show you the next exhibit.

12   I just marked it.  It should be Exhibit 23.

13             (Whereupon, Exhibit 23 was marked for

14   identification.)

15   BY MR. HOFFMAN:

16        Q.   Yeah, it's Exhibit 23.

17             Let me know when you have that one pulled

18   up.

19        A.   Exhibit 23.  Let's see.  Okay.  Okay.  I

20   got this.  I got it down to Exhibit 21.

21             I got Exhibit 23.  "Obesity and risk of

22   non-Hodgkin's lymphoma."  Okay.

23        Q.   So do you have it in front of you,

24   Exhibit 23?

25        A.   Yeah.

1    repeat the question?

2        Q.    This is not an article or meta-analysis

3    that you reviewed and considered when forming your

4    opinions in this case?

5        A.    Well, what I don't see here is any

6    correction for covariates here mentioned in the

7    abstract.  You know, it's a very common condition,

8    obesity, et cetera.  I mean, did they correct for

9    other things?

10       Q.    Doctor, you didn't review or consider

11   this, right?

12       A.    Pardon?

13       Q.    You didn't review or consider this, did

14   you?

15       A.    No, but, I mean, you know, you're asking

16   me to comment on the results here and I -- you know,

17   you know, when you throw a paper in front of me, I

18   have a -- I have a right to look at it and to ask

19   questions.  And I'm wondering if this thing was

20   corrected for covariates or anything like that or,

21   you know, to interpret this study.  Can you tell me?

22       Q.    They say -- they say at the last sentence,

23   you see their -- their overall conclusion says,

24   "These findings indicate that excess body weight is

25   associated with an increased risk of non-Hodgkin's

Samuel A. Berkman, MD, FACP

1    lymphoma, especially of diffuse large B-cell

2    lymphoma."

3            Do you see that?

4       A.   I do.  I -- I basically -- this is a very,

5    very common condition, obesity.  And I would give

6    more priority in this case to something that was

7    unusual that the person did.  Given that it's a rare

8    type of lymphoma, very rare type of lymphoma.  And I

9    would give more in this particular case.

10           I don't deny that being overweight could

11   increase your risk.  But in this case, given such a

12   rare thing, I think you're looking for something a

13   little unusual, not something like obesity.

14           And overweight is our whole country, I

15   mean, you know, and I asked if there was a

16   correction for covariates.  You didn't answer

17   because you don't have to answer anything I ask.

18   I'm the one who has to answer.

19      Q.   Well, you can't rule out some contribution

20   of the plaintiff's -- either his obesity or being

21   overweight to the development of his non-Hodgkin's

22   lymphoma, can you?

23      A.   I just would give more weight to the

24   Roundup because it's a very rare tumor and Roundup

25   is a more unusual type of thing than obesity.

Samuel A. Berkman, MD, FACP

```
 1              Obesity is so common.  I mean, I can't
 2    tell you.  I've never told a person they got a
 3    lymphoma because of their obesity or something like
 4    that.  I mean, obesity is a cause of every form of
 5    cancer.
 6         Q.   Well, you've also never told a patient
 7    that their Roundup use was a cause of their
 8    non-Hodgkin's lymphoma either?
 9         A.   That's right.  That's right.
10         Q.   Okay.  So any other factors, any other
11    reasons you can think of in your consideration of
12    obesity or being overweight that would allow you to
13    rule out that factor as a contributor to the
14    plaintiff's non-Hodgkin's lymphoma?
15         A.   Only the fact that his obesity is
16    extremely borderline, like it's just -- it's not
17    even up to 31 and it's -- probably was under 30 for
18    a while.  But he still is overweight.
19         Q.   Right.  This meta-analysis -- but this
20    meta-analysis includes overweight individuals and
21    there's a statistically significant increased risk
22    for them as well, right?
23         A.   Yeah, just barely, like -- I think like
24    1.07 or something like that.
25         Q.   Okay.  And you don't cite to or consider
```

Exhibit B Page - 115

Samuel A. Berkman, MD, FACP

1        A.    I looked that up and I just saw basically

2    it was the lip, the mouth, you can get the

3    esophagus, and there's some evidence about lungs,

4    but I didn't see anything about lymphoma.

5        Q.    Okay.  What about the plaintiff's family

6    history of cancer.  You mentioned earlier that his

7    brother died of bladder cancer.  And during his

8    deposition, he also recalled that his mother had

9    cancer in her chest that was treated with radiation.

10           Do you recall that?

11        A.    I recall somebody had a brain tumor.  And

12    so it was some cancer in the chest but he didn't say

13    what kind of cancer.

14           And yeah, his brother had bladder cancer,

15    and his brother smoked four packs of cigarettes a

16    day.

17        Q.    Now, are you familiar with the literature

18    that reports even having one first-degree relative

19    with any type of cancer increases a patient's risk

20    for non-Hodgkin's lymphoma?

21        A.    You see, this is, to me, fishing, you

22    know.  This is a fishing expedition.  Maybe there

23    is, but the point is, this guy, if you're going to

24    try to say that this guy had some big genetic

25    problem that predisposed him to cancer and that's

1   more likely the cause, and then his brother smoking

2   four packs of cigarettes a day, I'm sorry, you've

3   got a definite risk factor there versus some vague

4   factor.

5       Q.   Doctor, I'm just asking you if you've

6   considered the literature that points out there's an

7   increased risk for patients developing non-Hodgkin's

8   lymphoma if they have even one first-degree relative

9   with any type of cancer?

10      A.   Well, I still would not put that as a

11  significant factor up at the top.

12           You know, you used the word "hierarchy"

13  earlier.  There's a hierarchy --

14      Q.   Doctor, I only asked you if you have

15  reviewed the literature.  That's all I'm asking you.

16  It's either a yes-or-no question -- answer.

17      A.   If I've reviewed the literature as far

18  as -- okay.

19      Q.   On the topic of whether someone is at an

20  increased risk for non-Hodgkin's lymphoma if they

21  simply have one first-degree relative with any

22  type --

23      A.   So I have heard that but I did not review

24  the literature.

25      Q.   Okay.  And in your report, you don't

1    analyze that literature in any way, do you?

2         A.    No.

3         Q.    You didn't note that in the McDuffie

4    study, that we've already marked as an exhibit, that

5    McDuffie found a 31 percent increased risk that was

6    statistically significant for anyone who had a

7    first-degree relative with cancer?

8         A.    Okay.  So I didn't process that part of

9    the study.  But I think these are very vague --

10        Q.    Okay.  Let's go back, then, if we can go

11   back to Exhibit 11, I'll show it to you.

12              Let me know when you have Exhibit 11 up.

13        A.    Okay.  Okay.

14        Q.    You have Exhibit 11, the McDuffie study?

15        A.    I got 11 up here.

16        Q.    And, again, this is a study you have

17   reviewed and relied upon?

18        A.    This is a study I looked at.

19        Q.    Yeah, so go over to Table 1, which is on

20   the third page.

21              Do you see Table 1?

22        A.    Yeah.

23        Q.    And then you see the very last row there,

24   it says, "Family history of cancer any first degree

25   relative (yes)."

```
 1              And then it shows an odds ratio of 1.31

 2    for non-Hodgkin's lymphoma that's statistically

 3    significant, correct?

 4         A.   So I'm looking down here.  It says smoking

 5    history, missing data, medical history, previous

 6    cancer, family history, okay.  1.31.  Okay.  I see

 7    that.

 8         Q.   And it's statistically significant,

 9    correct?

10         A.   It is.

11         Q.   And you didn't consider that when forming

12    your opinions about the plaintiff in this case?

13         A.   I considered the fact that he -- his

14    family history, I considered his family history very

15    strongly.  But I had other explanations for all of

16    their cancers.  So that's how I considered the

17    family history.

18         Q.   But you didn't consider this specific

19    finding from the McDuffie study?

20         A.   No, I went by basically the types of

21    cancer that the family had.

22         Q.   Okay.  Let me show you another article

23    real quick.

24              (Whereupon, Exhibit 24 was marked for

25    identification.)
```

Samuel A. Berkman, MD, FACP

1     Q.   Doctor, just try to focus on my question.

2   I don't know how I can make it any clearer.  I'll

3   try. We talked about this issue earlier.

4        And I'm asking you if you're claiming

5   anywhere in your report that you have ruled out DNA

6   mutations due to replication errors as a cause or a

7   substantial contributing factor to the plaintiff's

8   non-Hodgkin's lymphoma?

9     A.   Okay.  So basically, if I see a specific

10  cause that I think is a strong enough specific

11  cause, I'm not going to go to random errors and,

12  et cetera, as the cause.  I'm going to -- if I don't

13  see a specific cause, then I will go to a random

14  replication error.

15    Q.   Right.  So you didn't rule that out, then,

16  did you?

17    A.   I didn't think it was the most likely

18  situation.  I thought that the Roundup was the most

19  likely.

20    Q.   Based on what?  Based on what facts or

21  data did you --

22    A.   I told you.  I told you, basically, that

23  the -- several things.  That he had a long exposure

24  to the Roundup.  That he may have gotten it on his

25  hands.  That he had mutations.  Then that he

Samuel A. Berkman, MD, FACP

```
 1   basically developed a form of cancer.  And that I

 2   ruled out history of -- a family history of

 3   lymphoma, Hepatitis C, Hepatitis B, autoimmune

 4   disease, et cetera.

 5            Now, if you're asking about psoriasis, I

 6   looked into psoriasis, but I ruled it out because

 7   he's got no evidence of autoimmune disease.

 8            As far as obesity, I thought he was very

 9   borderline obese.

10       Q.   Doctor, I'm asking you about random

11   replication errors.  I'm not asking you about any --

12       A.   Yeah, well, I'm telling you I think that

13   basically I would invoke a random replication error

14   where I don't see evidence of a specific factor like

15   the Roundup or something else like Hepatitis C or

16   something like that.  That's when I would invoke a

17   random error.

18       Q.   Is there any -- is there any other reason

19   why you think you can rule out random replication

20   errors?

21       A.   Well, that's a good reason.  I mean, why

22   would you say -- that's like saying the guy's

23   bladder cancer was caused by a random replication

24   error when he smokes four packs a day, you know.

25   Yeah, maybe his bladder cancer was caused by a
```

Samuel A. Berkman, MD, FACP

```
 1                  INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition over carefully

 4    and make any necessary corrections.  You should

 5    state the reason in the appropriate space on the

 6    errata sheet for any corrections that are made.

 7              After doing so, please sign the errata

 8    sheet and date it.

 9              You are signing same subject to the

10    changes you have noted on the errata sheet, which

11    will be attached to your deposition.

12              It is imperative that you return the

13    original errata sheet to the deposing attorney

14    within thirty (30) days of receipt of the deposition

15    transcript by you.  If you fail to do so, the

16    deposition transcript may be deemed to be accurate

17    and may be used in court.

18

19

20

21

22

23

24

25
```

Exhibit B Page - 122

Samuel A. Berkman, MD, FACP

```
 1                         ERRATA SHEET

 2

 3    PAGE    LINE      CHANGE

 4    _____   _____   _____

 5                    REASON:_____

 6    PAGE    LINE      CHANGE

 7    _____   _____   _____

 8                    REASON:_____

 9    PAGE    LINE      CHANGE

10    _____   _____   _____

11                    REASON:_____

12    PAGE    LINE      CHANGE

13    _____   _____   _____

14                    REASON:_____

15    PAGE    LINE      CHANGE

16    _____   _____   _____

17                    REASON:_____

18    PAGE    LINE      CHANGE

19    _____   _____   _____

20                    REASON:_____

21    PAGE    LINE      CHANGE

22    _____   _____   _____

23                    REASON:_____

24

25
```

Exhibit B Page - 123

```
1                ACKNOWLEDGMENT OF DEPONENT

2

3

4

5        I,_____, do hereby certify

6   that I have read the foregoing pages, and that the

7   same is a correct transcription of the answers given

8   by me to the questions therein propounded, except

9   for the corrections or changes in form or substance,

10  if any, noted in the attached Errata Sheet.

11

12

13     _____    _____

14     SAMUEL BERKMAN, M.D.        DATE

15

16

17

18

19

20

21

22

23

24

25
```

Exhibit B Page - 124

Samuel A. Berkman, MD, FACP

```
 1   STATE OF CALIFORNIA  )

 2   COUNTY OF YOLO       )

 3        I, ELAINA BULDA-JONES, a Certified Shorthand

 4   Reporter of the State of California, duly authorized

 5   to administer oaths pursuant to Section 2025 of the

 6   California Code of Civil Procedure, do hereby

 7   certify that

 8              SAMUEL BERKMAN, M.D.,

 9   the witness in the foregoing deposition, was by me

10   duly sworn to testify the truth, the whole truth and

11   nothing but the truth in the within-entitled cause;

12   that said testimony of said witness was reported by

13   me, a disinterested person, and was thereafter

14   transcribed under my direction into typewriting and

15   is a true and correct transcription of said

16   proceedings.

17        I further certify that I am not of counsel or

18   attorney for either or any of the parties in the

19   foregoing deposition and caption named, nor in any

20   way interested in the outcome of the cause named in

21   said deposition dated the 29th day of November, 2023.

22

23

24

25   ELAINA BULDA-JONES, CSR 11720
```

Exhibit B Page - 125