# EXHIBIT A

John Fountaine, M.A., C.R.C., C.C.M.

```
 1              UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3    _____
                                  )
 4    IN RE: ROUNDUP PRODUCTS      ) MDL No. 2741
                                   )
 5    LIABILITY LITIGATION         ) Case No. 3:16-MD-02741-VC
                                   )
 6    _____

 7    RICKY BEAVERS, JR.,          )
                                   )
 8            Plaintiff,           )
      vs.                          )
 9                                 ) Case No. 3:20-cv-08799-VC
      BAYER CO., et al.,           )
10            Defendants.          )
      _____

11

12     VIDEO-RECORDED DEPOSITION UPON ORAL EXAMINATION OF

13          JOHN FOUNTAINE, M.A., C.R.C., C.C.M
      _____

14

15                      9:00 a.m.

16              NOVEMBER 16, 2023

17          Virtual Zoom Deposition

18              Washington State

19

20

21

22

23

24
      REPORTED BY:  ANITA MITCHELL, CSR No. 2586
25
```

```
 1                  A P P E A R A N C E S

 2             (ALL PARTIES APPEARING REMOTELY)

 3

 4
     FOR THE PLAINTIFF
 5
             CHARLES L. MEYER
 6           LAW OFFICES OF CHARLES L. MEYER
             1000 Second Avenue, Suite 3200
 7           Seattle, WA  98104-1046
             (206) 292-0088
 8           (206) 621-6443 Fax
             lawofficesofcharleslmeyer@gmail.com
 9

10

11   FOR THE DEFENDANTS

12           JOHN SHERK
             SHOOK HARDY & BACON L.L.P.
13           2555 Grand Blvd.
             Kansas City, MO
14           (816) 474-6550
             (816) 421-5547 Fax
15           Jsherk@shb.com

16

17

18   Also appearing:  Darren Guastella, Videographer

19

20

21

22

23

24

25
```

Exhibit A Page - 2

```
1      Q.  Okay.  Have you interviewed the plaintiff, Ricky

2   Beavers, Jr. or anyone else in connection with your work

3   on this lawsuit?

4      A.  I have not.

5      Q.  Do you have a work file or anything like that,

6   that you compiled in connection with the preparation of

7   your report?

8      A.  No.  Just my report itself.

9      Q.  Okay.  Have you brought anything with you in the

10  room today, where you're sitting, that relates to your

11  testimony for this deposition?

12     A.  I brought my CV, my rate sheets, and my report.

13     Q.  Do you have a materials considered list, that you

14  compiled in connection with your report in this case?

15     A.  I do not.

16     Q.  Okay.  All right.  I want to shift gears now.

17  We'll take this document down.  Mr. Fountaine, we're

18  going to take a quick peak at your CV.

19     Q.  Let's see.  Mr. Fountaine, I'm showing you what

20  we'll mark as Exhibit 2.

21                         (Exhibit 2 was marked for

22                          identification.)

23     Q.  (By Mr. Sherk) I'll represent to you that this is

24  a copy of the CV that we received from Mr. Meyer.  Do

25  you have this CV in front of you?
```

```
 1      A.  I have my updated CV in front of me, which is

 2   almost identical for that first page, with the addition

 3   of, instead of 'OSC Vocational Systems,' it's 'Fountaine

 4   Consulting Services.'

 5      Q.  You know, I would ask to just get a copy of that

 6   updated CV from you, so that we have the most current

 7   iteration of it.

 8          Let's go with this one for now.  I'll scroll

 9   through this just very quickly since you've got almost

10   the identical one in front of you.  Mr. Fountaine, I'll

11   do a super fast run through your CV.  Is that generally

12   looking like the one you have in front of you?

13      A.  You have two documents there that you combined.

14   You have my CV and then you have my testimony list.

15      Q.  Okay, very good.  Thanks, thanks for that

16   clarification.  Yeah, I stapled them both together.

17      A.  Okay.

18      Q.  So we'll kill two birds with one stone there.

19   All right.  At the very top of Page 1 of Exhibit 2, it

20   lists your name and then 'OSC Vocational Systems Inc.'

21   That was your former employer; is that right?

22      A.  Correct.

23      Q.  During what years were you employed by OSC?

24      A.  Through September of 2023.  I was there for 30

25   years.
```

Exhibit A Page - 4

1    Q.   And what is the name of your present company?

2    A.   Fountaine Consulting Services, LLC.

3    Q.   So what made you make the jump from OSC to

4    opening your own shop?

5    A.   That's a good question.  I think it was time,

6    after 30 years, to branch out a little bit and do some

7    things on my own, so that's what I chose to do at 57 and

8    to hang up my own shingle and maximize my earning

9    capacity, as we say, and see if I can own and operate my

10   own firm.

11   Q.   I can only imagine that there is a lot to that?

12   A.   There has been.

13   Q.   Now, so what is OSC Vocational?

14   A.   OSC Vocational is a firm in the Northwest.  OSC

15   has about 60 employees that do a variety of vocational

16   rehabilitation case management and Life Care Planning

17   services under federal and state contracts, as well as

18   working with personal injury attorneys, both defense and

19   plaintiff's attorneys.

20   Q.   What does vocational rehabilitation consist of?

21   A.   Vocational rehabilitation is a field, and it's

22   the field that I have my Master's degree in.

23        So our focus is really on work, earning capacity,

24   skills, impact of impairments or injuries on

25   individuals' ability to work, how we can help mitigate

1    recommendations, vocationally coordinate care plans.

2       Q.  Were you generally brought in during a settlement

3    phase of the litigation?

4       A.  Oh, I don't -- can't tell you what phase of the

5    litigation that I'm retained in.

6       Q.  Okay, great.  Are you a Certified Public

7    Accountant?

8       A.  I'm not.

9       Q.  Okay.  And what areas of your expertise have you

10   applied to form your opinions in this case?

11      A.  I think providing the information regarding

12   earnings of individuals, based on levels of education.

13   My scope here has been fairly limited.  I haven't

14   interviewed Mr. Beavers or asked to provide any opinions

15   specifically to him.  I've been asked to identify what

16   the average wages are, based on educational attainment

17   and then compare those wages.

18      Q.  All right.  So you are not a medical doctor,

19   correct?

20      A.  I'm not.

21      Q.  You're not a toxicologist?

22      A.  Correct.  No.

23      Q.  You're not an epidemiologist?

24      A.  No.

25      Q.  You're not an industrial hygienist?

1    Q.  Okay.  And I think you already said you didn't,

2  you didn't see the Complaint; is that right?

3    A.  No.  Correct.

4    Q.  All right.  Let's talk a little bit about your

5  deposition history now, Mr. Fountaine.  About how many

6  times have you testified in a deposition as an expert

7  witness over the course of your career?

8    A.  I don't have a number.

9    Q.  Over 20?

10   A.  Yes.

11   Q.  Over 50?

12   A.  Yes.

13   Q.  Over 100?

14   A.  Yeah.

15   Q.  Okay.  I forgot to ask you this, pardon me.  At

16  your new shop, Fountaine Consulting Services, LLC, are

17  you doing essentially the same thing that you did at

18  your prior job?

19   A.  Yes.

20   Q.  Very good.  Thanks.  Just so I cover that.  About

21  how many times have you testified at trial as an expert

22  witness?

23   A.  Approximately 70 or 80 times.

24   Q.  Do you know when you began to testify as -- let

25  me start again, pardon me.

1   expectancy."  Did I read that correctly?

2      A.  That's correct.  Yeah, the only difference is you

3   said 'reliable financial data,' and I haven't reviewed

4   any of Mr. Beavers' financial data.

5      Q.  Well, and if I was a better typer, I would have

6   gotten it right --

7      A.  That's okay.

8      Q.  -- in the little outline here.  Anyway, thank you

9   that clarification.

10     A.  You're welcome.

11     Q.  So I want to cover some things that I don't

12  believe you're going to be testifying to, just for the

13  record, all right?

14     A.  Absolutely.

15     Q.  Is it fair to say, you have not formed any

16  opinions about the amount of medical expenses the

17  plaintiff in this case has incurred?

18     A.  That is correct.

19     Q.  Okay.  Is it also correct that you haven't formed

20  any opinions about the amount of medical expenses

21  plaintiff has paid or may be obligated to pay?

22     A.  I have not.

23     Q.  Have you formed any opinions about the amount of

24  non-medical out-of-pocket expenses incurred by the

25  plaintiff?

1    A.  Medical expenses?

2    Q.  Non-medical out-of-pocket expenses?

3    A.  No.  I'm, I'm strictly looking at, again, the

4  data on average earnings by educational attainment, so

5  no.

6    Q.  And you have not formed any opinions about the

7  present value of plaintiff's future medical care; is

8  that right?

9    A.  I have not.

10    Q.  You have not formed any opinions about hedonomic

11  damages in this case, correct?

12    A.  Hedonic.  I have not.

13    Q.  Okay.  Have you formed any opinions about the

14  life expectancy for the plaintiff in this case?

15    A.  Not life expectancy.  I've estimated a work life

16  expectancy at 65.  It could be -- again, that would be

17  conservative because Social Security retirement age is

18  65-67, so these numbers might be a little light.

19    Q.  You have not formed any opinions about punitive

20  damages in this case; is that right?

21    A.  I have not and will not.

22    Q.  Okay.  You are not going to offer any opinions

23  about general or specific causation relating to Mr.

24  Beavers' diagnosis of cancer; is that right?

25    A.  I am not.

1       A.   You know, I very much teamed up with economic

2    analysis individuals and economists.  Neil specifically

3    was internal with OSC, so I would say 5 or 6 times.  So

4    it's either Neil within our company or an economist,

5    outside of our company, to provide the same

6    calculations.  It's very common, in my work, to rely on

7    economists to, as I say, run these numbers and provide

8    any adjustments necessary for the court.  I, like you, I

9    think from the beginning of the deposition, I'm pretty

10   good at math, just addition, but when it comes to the

11   reduction of present day value and those calculations, I

12   defer to an economist for that or someone who does --

13       Q.   You're talking to a guy who struggles to balance

14   his checkbook, so I'm, I'm with you.

15       A.   You told me that earlier.  It made me smile.

16       Q.   Okay.  Do you know whether Mr. Bennett was ever

17   involved in a Roundup case that you were not a part of?

18       A.   You would have to ask Neil, Mr. Bennett.  I don't

19   know.

20       Q.   Let's -- I'm going to take this down, and we're

21   just going to very briefly look at Mr. Bennett's CV and

22   his, his list of testimonies?

23       Q.   All right.  You're being shown what we'll mark, I

24   believe --

25              MR. SHERK:  Anita, are we at 5?

Exhibit A Page - 10

1    preparation of this report?

2       A.  Um, I'm comfortable providing testimony of what I

3    directed him to do and I'm comfortable confirming the

4    average median wages, because I confirmed those for

5    2020.  The calculations, however, were done by Mr.

6    Bennett and he would have to speak to those calculations

7    and the present day value and any reduction or addition

8    that he made to those numbers, based on his opinions.

9       Q.  And did you personally check any of the work that

10   Mr. Bennett did, in connection with the preparation of

11   this report?

12      A.  Again, at the time, I looked at the annual median

13   average wages based on the census data, which is the

14   data one relies upon in terms of identifying educational

15   attainment and educational attainment earnings, in 2020,

16   and those annual mean averages, based on those

17   educational levels, are correct, based on the data,

18   based on the census data.

19      Q.  And how would you describe the collaboration

20   between you and Mr. Bennett, that resulted in this

21   report?

22      A.  Um, Hi Neil - I'm asking you to perform some

23   specific work for me.  I would like you to take the

24   earning levels for individuals based on certain levels

25   of education, provide calculations, and address the

John Fountaine, M.A., C.R.C., C.D.M.

1  present day value of those calculations.  He did that --

2     Q.  And he did that and has the numbers?

3     A.  He did that.  Yes, he has the numbers.

4     Q.  Do you know whether any kind of computer program,

5  application, or algorithm was used in running the

6  numbers here?

7     A.  I don't know what Neil used to run the numbers,

8  no, Mr. Bennett.

9     Q.  Was the report reviewed by anyone else at OSC,

10  besides you and Mr. Bennett, before it was delivered?

11     A.  I can't imagine it was, not that I'm aware of.  I

12  wouldn't have asked anybody else to review it.  It's

13  available in our computer system, so essentially someone

14  could have.  I don't -- I guess my answer is I don't

15  know.

16     Q.  Very good.  Let's take a look, again, at the

17  first paragraph of this report, and it talks about

18  providing reliable data, defining the earnings of

19  individuals.  Do you see that?

20     A.  I do.

21     Q.  Okay.  Was this report in any way tailored to

22  Ricky Beavers?

23     A.  No, no.  I was asked generally to provide

24  information on what the average high school graduate in

25  the United States earns over a work life expectancy and

1  what the average individual that completes some college,

2  what that average mean wage is annually and over a life

3  expectancy and what a Bachelor's Degree graduate earns

4  on average in the United States, and an annual rate, and

5  what that would be over a work life expectancy.

6      Q.  Did the analysis in this report take into account

7  Mr. Beavers' age?

8      A.  It took into consideration his age, in terms

9  of -- he would be part of the data.  I mean, it would be

10  -- I didn't specifically adjust any of this information

11  based on his age specifically, no.  It's -- individuals

12  of his age would be included in the data, however.

13      Q.  Do you have take to into account his particular

14  educational history in preparing this report?

15      A.  No.

16      Q.  Okay.  Did you have any personal information

17  about Mr. Beavers that you used in preparing this

18  report?

19      A.  No.  This report, again, is based on general data

20  available in the census and average earnings of

21  individuals, based on levels of education, so not

22  specific to Mr. Beavers, no.

23      Q.  Were there any particular assumptions that you

24  and Mr. Bennett made about Mr. Beavers, when you were

25  preparing this expert report?

1    A.  The second paragraph starts, "I obtained a

2   Master's Degree..."

3    Q.  Hang on.  Let's see, the second paragraph of Page

4   2, I'm sorry.

5    A.  Gotcha, yes.

6    Q.  Pardon me.  There we go.  What does that mean in

7   laymen's terms, "economic damage calculations"?

8    A.  I think that's self-explanatory for me.  It's

9   that the damages that are calculated and reduced to

10   present day value, to define what the damages are, based

11   on what calculations have been used.  So in that case,

12   that's more, more language for Neil Bennett, in terms of

13   what he did in his economic damage calculations.

14    Q.  If we move to the next paragraph, it starts out

15   with, "Present cash value..."  Do you see that?

16    A.  Correct.

17    Q.  What does "present cash value" mean?

18    A.  That's a question for Neil Bennett, because

19   that's what he's -- you're looking at the value of money

20   now and how that money is going to be used in the

21   future, and the rate of return and the rate of growth or

22   decline with that money, and I deferred those

23   calculations to Mr. Bennett.

24    Q.  And can you tell me how the present cash value

25   was calculated within the context of this report?

John Fountaine, M.A., C.R.C., C.G.M.

 1    A.  If you look -- I believe if you look at the

 2   10-year average annual growth rate on Page 3, those are

 3   the percentages that I believe Mr. Bennett used when he

 4   did his calculations, but again, that would be a

 5   question for Mr. Bennett.

 6    Q.  Okay.  After the "Present cash value..."

 7   paragraph, the report then dives into the issue of

 8   discount rate.  Do you see that?

 9    A.  Correct.

10    Q.  What is a discount rate?

11    A.  Again, it's the rate that's going to be applied

12   to a number that's below the market discount rate; is a

13   calculation that Mr. Bennett performed in this case.  I

14   believe, again, based on that 10-year average annual

15   growth rate that he provides on Page 3, but that's a

16   question for him specifically.

17    Q.  And so the discount rate was applied in this

18   matter?

19    A.  In his calculations, I believe when you look at,

20   when the calculation -- when calculated to present day

21   value, that is applying a present value discount rate

22   for his bottom line number, but again, I did not run

23   those numbers, so I would defer the calculations and the

24   percentages used to Mr. Bennett.

25    Q.   Let's take a look at the chart entitled 'Ten

Exhibit A Page - 15

1    based on that number.

2         So keep going down.  So that's the number of

3    people that fit in the categories.  And then the 'Mean

4    Earnings,' if you keep going down a little bit farther,

5    it would be 'High School Graduate' here.  You would look

6    'Under 65' for him.  Mr. Bennett has 54, but this has

7    52, and I don't know why that's different, but it's

8    close.

9         Q.  So where -- can you point me specifically to

10   where you're looking, under the 'Mean' --

11        A.  Yeah.  So you're looking right now -- so you go

12   under -- so look under 'Mean Earnings.'

13        Q.  Correct.

14        A.  Then if you go to 'High School' and you look at

15   'Graduate, including GED,' so those are individuals that

16   are graduating from high school or have a GED.  Go

17   'Under 65 years of age' and that $52,000 is the average,

18   $52,187.  I recall -- and again, I'm going to defer this

19   to Mr. Bennett, before we get deeper into it, but the

20   data I looked at, at the time, I had a confirmation that

21   the 2020 data was $54,751, so I don't know why that's

22   $52,000, on average, so I would have to again defer that

23   to Mr. Bennett.

24        Q.  Yeah.  I think maybe --

25             MR. MEYER:  This was 2019 information.

Exhibit A Page - 16

1           MR. SHERK:  Chuck, I was going to say, I

2      don't think I could find the 2020 sheet.

3      A.  So that's, that's what you're seeing, and the

4      2020 data is $54,751 because that is one thing that I

5      confirmed, that I didn't double-check his calculations,

6      because I allowed him to do that, but it's kind of a

7      good -- it's a good benchmark for you, because you will

8      see that 'Under 65' number, that has that 52 -- $52,187,

9      and if we know that in 2020, that 2019 data was

10     increased by a couple-thousand dollars, what you will

11     see ordinarily is a $1,000 to $2,000 increase in those

12     averages per year, but that would be a calculation made

13     by Mr. Bennett, again, but that's my experience in

14     looking at the data.

15     Q.  Perfect.  Thank you.

16     A.  So you would expect data in 2003 to probably be

17     -- oh, I don't know, that $54,000 might be closer to

18     $59,000 now, but again, I would defer that to Mr.

19     Bennett and we would have to pull -- I wasn't asked and

20     I'm not sure that Mr. Bennett was asked to update this

21     information, but typically we see an increase in the

22     average -- for example, if the 'Bachelor's Degree

23     Graduate' which isn't here, was at about $102,000, I

24     believe, now it's going to be about $106,000, $110,000,

25     somewhere in there.

John Fountaine, M.A., C.R.C., C.C.M.

```
1   School Graduate, GED.'  Based on the category you're
2   looking at, it's '43' in this data, as opposed to
3   whatever it was in the other one that I don't remember
4   now, '52.'
5       Q.  Okay.  All right.  That's helpful.  Now Mr.
6   Beavers, he is Black?
7       A.  He is.
8       Q.  So is this particular chart a better one to have
9   used?
10      A.  It's, you know, it's -- in my opinion, if you're
11  looking at capacity, I would not -- gosh I wouldn't
12  endorse discrimination, when you're looking at
13  individuals capacity to work in the labor market.
14          So if you're going to judge someone on this data,
15  based on their race, that could be considered racism,
16  and what we're looking at for full year -- 'Full
17  Year-Round' workers is having the ability of work
18  available and not -- hopefully in the United States of
19  America not discriminating against you because of the
20  color of your skin.
21      Q.  I understand and I appreciate --
22      A.  Again, I will defer that to Mr. Bennett on why he
23  used 'All Races' and not 'Black,' but that's the reason
24  that I would say, I'm not going to discriminate against
25  Mr. Beavers, because of his race.  I would consider that
```

1   to be discrimination.

2      Q.  All right.  Very good.  Thank you.

3      A.  And what's also good about that is if you look at

4   'All Races,' you have a certain percentage of those that

5   would be in the Black category, so it's more of a

6   melting pot, which I believe America is.

7      Q.  Thank you.  All right.  Now, drawing on, you

8   know, your 30 years of experience, are there other

9   factors that go into an individual's earning capacity,

10  besides education?

11     A.  Sure.  Yes, yeah.  Impairments, particularly in

12  the work that I do, I work with a lot of pediatric cases

13  or younger individuals that unfortunately -- when you

14  get injured or you have a disability or impairment or a

15  medical condition that you obtain before adulthood, it

16  really is the impact of that impairment on your ability

17  to complete education and move into the world of work

18  and the success in that.

19        So even when we have, for example, an average

20  'High School Graduate' number, obviously that average

21  number takes people that earned lower wages, that have a

22  high school graduate and that higher wage as a high

23  school graduate.

24        But what we find, all the data that you're going

25  to look at, unfortunately for people with disabilities,

1  in the census, Harris polls, whatever data you look at,

2  individuals that have impairments or disabilities have a

3  tendency to earn less and work less.

4     Q.  Now, does an individual's intelligence factor

5  into his or her earning capacity?

6     A.  I think so, yes.

7     Q.  How about an individual's environment or family

8  situation, would those be factors that would affect an

9  individual's earning capacity?

10    A.  They certainly can be, yes.

11    Q.  Would, would someone's location or geography

12  factor into earning capacity?

13    A.  Can be, yes.

14    Q.  Okay.  How about personality traits like, you

15  know, being -- having a positive attitude or being a

16  hard worker?

17    A.  I think those are all factors in earning

18  capacity, yes.

19    Q.  Now, here, Mr. Beavers, after he had been

20  diagnosed with cancer, was in remission.  He had a

21  pretty serious car wreck and then he got shot.  Would

22  those kinds of injuries have affected his ability to

23  earn a living one way or another?

24    A.  They certainly could.  Um, in our work,

25  ordinarily we would defer to the medical community or a

John Fountaine, M.A., C.R.C., C.D.M.

```
 1   trade, you know, go to community college or a college
 2   and get trained as an auto mechanic, get trained as a
 3   pipe fitter, get trained as a plumber, and you're
 4   probably reading the same things that I'm reading and
 5   that I'm exposed to, that there may be a gap in terms of
 6   having that level of worker available, and those are the
 7   types of jobs that you can obtain.
 8        I work with high school graduates that make much
 9   higher than that mean average wage that we see here, but
10   again, what the data tells you, and again, this is -- I
11   don't know -- over 300 million individuals in 140
12   million households that are being surveyed in this data,
13   and what we're seeing consistently over time is the
14   higher education you have, the more opportunities you
15   have, and the higher level of wages that you earn, and
16   that's -- I believe that that's still true.
17   Q.  I don't think I've got anymore questions.
18             MR. SHERK:  Chuck, anything for you?
19             MR. MEYER:  No.  I think that's good.  I'm,
20   I'm good with that.
21             MR. SHERK:  Wonderful.  Well, I think we can
22   go off the record.
23             THE VIDEOGRAPHER:  Okay.  Well, this
24   concludes the video deposition.  We're now going off the
25   record.  The time is 10:24 a.m.
```

Exhibit A Page - 21

John Fountaine, M.A., C.R.C., C.B.M.

```
 1    (The deposition concluded at 10:24 a.m.)

 2    (Reading and signing was not requested pursuant to FRCP

 3    Rule 30(e).)

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

John Fountaine, M.A., C.R.C., C.D.M.I.

```
 1                    REPORTER'S CERTIFICATE

 2

 3              I, ANITA MITCHELL, the undersigned Certified

 4   Court Reporter, pursuant to RCW 5.28.010, authorized to

 5   administer oaths and affirmations in and for the State

 6   of Washington, do herby certify that the sworn testimony

 7   and/or proceedings, a transcript of which is attached,

 8   was given before me via videoconference; that any and/or

 9   all witness(es) were duly sworn to tell the truth; that

10   the sworn testimony and/or proceedings were by me

11   stenographically recorded and transcribed under my

12   supervision, to the best of my ability; that the

13   foregoing transcript contains a full, true, and accurate

14   record of all the sworn testimony and/or proceedings

15   given and occurring via videoconference; that a review

16   of which was not requested; that I am in no way related

17   to any party to the matter, nor to any counsel, nor do I

18   have any financial interest in the event of the cause.

19

20   WITNESS MY HAND AND DIGITAL SIGNATURE THIS

21   5TH DAY OF DECEMBER, 2023.

22

23

24

25        ANITA MITCHELL, CSR No. 2586
```

Exhibit A Page - 23