**WILKINSON STEKLOFF LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonstekloff.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonstekloff.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel: 202-847-4030 | Fax: 202-847-4005

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843 | Fax: 202-682-1639

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

**BRYAN CAVE LEIGHTON PAISNER LLP**
K. Lee Marshall (CA Bar No. 277092)
(klmarshall@bclplaw.com)
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Tel: 415-675-3400 | Fax: 415-675-3434

Jed P. White (CA Bar No. 232339)
(jed.white@bclplaw.com)
Linda C. Hsu (CA Bar No. 239880)
(linda.hsu@bclplaw.com)
120 Broadway, Suite 300
Santa Monica, CA 90401
Tel: 310-576-2100 | Fax: 310-576-2200

*Attorneys for Defendant Monsanto Company*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION, | MDL No. 2741 <br><br> Case No.: 3:16-md-02741-VC |
| *Ricky Beavers, Jr. v. Monsanto Company*, 3:20-cv-08799-VC | **DEFENDANT MONSANTO COMPANY'S MOTION TO EXCLUDE TESTIMONY OF CLAIRE MURPHY, M.D.** <br><br> Hearing: <br> Date: March 1, 2024 <br> Time: 10:00 a.m. <br> Place: San Francisco Courthouse, Courtroom 4 – 17th Floor |

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on March 1, 2024 at 10:00 a.m., in Courtroom 4 of the United States District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, or as ordered by the Court, Defendant Monsanto Company ("Monsanto") will present its Motion to Exclude Testimony of Claire Murphy, M.D. Monsanto seeks an order excluding opinions of this witness under Federal Rule of Evidence 702.

Dated:  December 14, 2023                Respectfully submitted,

/s/ *Linda C. Hsu*
Linda C. Hsu
Attorneys for Defendant Monsanto Company

**INTRODUCTION**

Plaintiff Ricky Beavers, Jr. alleges that his exposure to glyphosate while using Roundup earlier in his life is the cause of his Large Cell lymphoma, B cell, a form of Non-Hodgkin lymphoma ("NHL"), with which he was diagnosed in June 1997. He has disclosed Dr. Claire Murphy, a hematopathologist, as a testifying medical expert. Dr. Murphy is a practicing doctor whose non-litigation work consists of diagnosing and treating cancers such as lymphomas and leukemia. Dr. Murphy purports to provide specific causation opinions about the source of Mr. Beavers' childhood development of both cancer and mental health issues—that is, medical testimony to establish that a person's chemical exposure was not just a possible, but an actual cause of an injury. But diagnosing a patient with cancer is very different from determining its cause. Dr. Murphy admits that finding the cause of a patient's cancer is not what she does in medical practice. Yet, that is exactly what she seeks to do in this case.

Dr. Murphy's report consists of just a page and a half of text, based on nothing more than a phone call with Mr. Beavers and Dr. Murphy's review of his records, with no actual medical examination. In a single, conclusory paragraph, Dr. Murphy concludes "in my medical opinion, I believe it is more likely than not that the plaintiff's use of and exposure to Roundup contributed to his lymphoma." *Id.* at 2. She adds to that a pediatric assessment that "[s]ince his non-Hodgkin lymphoma occurred at such a young age, his developmental trajectory was significantly altered in a negative way." *Id.* Dr. Murphy also ventures beyond her own medical field of hematopathologist and opines on Mr. Beavers' psychological health, asserting that contracting lymphoma caused him to suffer an array of "mental health issues" from his diagnosis when "14 years old" through "age 39." *Id.* at 1.

The Court should exclude Dr. Murphy's testimony under Fed. R. Evid. 702 and *Daubert*. As explained herein, Dr. Murphy is not qualified to render these opinions. She is not an expert in the health effects of chemical exposure, much less that of glyphosate absorption, and does not in her line of work regularly try to determine what is the cause of her patient's cancers. Further, she purports to render opinions focused on the medical implications of Mr. Beavers' exposure occurring while he was an adolescent, but she admits she is not a pediatrician and lacks expertise in young patients. She has no psychological degree, credential, or other qualification to opine on mental health.

Further, her analysis in reaching these conclusions—that she is not qualified to make—falls far short of what courts hold is required of testifying experts. Courts require that an expert on specific causation perform a differential diagnosis/etiology methodology. This methodology requires two steps be performed: (1) creating a list of all potential causes of the Plaintiff's NHL, and (2) ruling out plausible alternative causes until arriving at a conclusion that exposure to Roundup specifically caused the Plaintiff's NHL. Dr. Murphy did not reliably perform either step, essentially assuming that because Mr. Beavers used Roundup, and because she believes Roundup exposure can cause NHL, glyphosate was what caused Mr. Beavers' cancer, to the exclusion of all other possibilities.

The Court should grant Monsanto's motion and exclude Dr. Murphy's testimony entirely.

## LEGAL STANDARD

A proposed expert witness must possess "knowledge, skill, experience, training, or education" sufficient to qualify her as an expert on the subject to which her testimony relates. Fed. R. Evid. 702. When an expert's field of expertise is not related to the subject on which she seeks to offer testimony, such testimony is inadmissible. *See White v. Ford Motor Co.*, 312 F.3d 998, 1008-09 (9th Cir. 2002). Apart from qualifications, expert testimony must be (1) based upon sufficient facts or data, (2) the product of reliable principles and methods, and (3) the result of applying those principles and methods reliably to the facts of the case. Fed. R. Evid. 702. The trial judge is charged with the responsibility of acting as a gatekeeper to "ensure that any and all scientific testimony … is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). The proponent of the expert bears the burden of proving that the expert's proffered testimony is admissible. *See, e.g., Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007).

## ARGUMENT

Dr. Murphy purports to apply medical expertise as a hematopathologist to reach her proffered specific-causation opinion—that childhood exposure to Roundup caused Mr. Beavers' NHL and mental health issues—but she lacks the qualifications and employs a deficient method to arrive at her conclusions. The Court should exclude her opinions and bar her testimony at trial under Rule 702.

I. **Dr. Murphy Is Unqualified To Opine On The Cause Of Mr. Beavers' Asserted Injuries.**

There are at least three critical deficiencies in Dr. Murphy's medical background that make her unqualified to present the expert testimony she proffers in this case: (1) with no expertise in medical etiology, at most she is qualified to opine on whether Mr. Beavers had NHL, not on what the cause of cancer most likely was; (2) she is not a pediatrician and yet purports to opine on childhood developmental factors pertaining to the health implications of Mr. Beavers' NHL; and (3) she has no background in psychology or psychiatric medicine and yet also purports to opine on mental health conditions that she claims were caused by Mr. Beavers' NHL and, ultimately, from Roundup exposure.

A. **Dr. Murphy Lacks Expertise In Determining The Cause Of Patients' Cancer.**

Dr. Murphy's medical practice consists of determining *whether* a person has certain cancers, including leukomas and lymphomas, and how to treat them, but she does not try to identify their *cause*. Causation is something she is unqualified to determine or opine about to the jury in this case.

Dr. Murphy's deposition testimony confirmed that she is not the type of doctor who, in her medical practice or in her medical research or publications, looks at the causes of lymphomas or other cancers in humans generally. *See* Ex. A, Murphy Dep. Tr. at 22:20-22 ("Have you written anything about the causes of non-Hodgkin's lymphoma in children? A No."), at 62:6-11 ("Q Have you ever presented or spoke about the causes of non-Hodgkin's lymphoma the causes? A No. Q Have you ever presented or spoke about the causes of non-Hodgkin's lymphoma in children? A No."), at 96:19-21 ("Q. Have you talked to any oncologist about the causes of non-Hodgkin's lymphoma? A No."). She is not an expert in what causes NHL in a person, but in how to identify the illness and treat it.

Thus, in her medical practice, Dr. Murphy does not attempt to identify the root cause of her patients' cancer—indeed, she has never tried to make a specific causation determination for a patient:

> Q So as part of your practice in pathology, you don't look to IARC to determine what causes cancer; is -- is that right?
>
> A We -- we focus on cancer diagnosis and accurate diagnoses so we can treat our patients rather than causation per se, although we do understand causation.
>
> Q Outside of this litigation, have you ever attempted to determine the cause of any person or patient''s non-Hodgkin''s lymphoma?
>
> A I have not been -- I have not done that.

*Id.* at 95:6-16.  *See also* at 96:8-12 ("Q. Have you ever determined that a patient or person's non-Hodgkin's lymphoma was caused by anything outside of litigation?  A. I have not spoken to patients about causation personally.").  Dr. Murphy does not determine causation outside litigation, so she is unqualified to do so in litigation.

Nor does Dr. Murphy have any expertise in chemical toxicology or the human health effects of exposure to Roundup and glyphosate:

Q. [H]ave you done any research related to Roundup or glyphosate?

A. No.

Q. Have you ever done any research related to any chemical or pesticide?

A. No.

Q. Have you ever published any article related to glyphosate or Roundup

A. No.

Q. Have you ever published any article related to any pesticide or herbicide?

A. No.

Q. Have you – whether it's published or not, other than your report in this case, have you written anything about glyphosate or Roundup?

A No, not other than the report.

*Id.* at 16:19-17:9.  In other words, her litigation report in this case is the first time Dr. Murphy has ever attempted to draw a causal connection between a person's use of Roundup (or any chemical) and contracting cancer.  This is grounds for disqualifying an expert from giving specific causation testimony.

**B.     Dr. Murphy Is Not Qualified To Opine on Pediatric Medical Issues.**

Plaintiff proffers Dr. Murphy's testimony that "[s]ince [Mr. Beavers'] non-Hodgkin lymphoma occurred at such a young age, his developmental trajectory was significantly altered in a negative way."  Ex. B, Murphy Rpt. at 2.  This is an assertion about pediatric medicine, which is "a branch of medicine dealing with the development, care, and diseases of infants, children, and adolescents." Merriam-Webster.com, www.merriam-webster.com/dictionary/pediatrics.  But Dr. Murphy lacks the expertise to opine on juvenile development or pediatric cancer and its causes.

During her deposition, Dr. Murphy admitted this limitation to her medical specialization: "Q. Are you a specialist in pediatric cancer? A. No." Ex. A, Murphy Dep. Tr. at 35:20-21. *See also id.* at 23:18-20 ("Q. … Have you presented anything on childhood non-Hodgkin's lymphomas? A. No."), at 23:21-23 ("Q. Have you presented anything on childhood cancers? A. No."), at 24:9-11 ("Q. Have you ever published anything on the causes of childhood non-Hodgkin's lymphoma? A. No."). It is a mainstay of *Daubert* doctrine that, even if an expert may be qualified to testify in some technical fields, their testimony must be curtailed such that proffered opinions that lie "beyond the scope of their expertise" are improper and "should not be allowed." *McClellan v. I-Flow Corp.*, 710 F. Supp. 2d 1092, 1127 (D. Or. 2010). *See also Yakima Valley Mem'l Hosp. v. Washington State Dep't of Health*, No. 09-CV-3032-EFS, 2012 WL 12951706, at *3 (E.D. Wash. June 27, 2012) ("while Dr. Leffler's report contains sparing references to medical matters, the Court finds that opinions regarding the specific quality of care or specific patient outcomes at Yakima Valley hospitals are indeed outside of Dr. Leffler's field of expertise, and grants YVMH's motion" to exclude those opinions). Because Dr. Murphy is admittedly unqualified to diagnose or determine the cause of Mr. Beavers' asserted mental health issues, the Court should preclude her from testifying beyond her expertise on this issue.

**C.    Dr. Murphy Is Not Qualified To Stand In As A Neurocognitive Medical Expert.**

Dr. Murphy strays far outside her oncological expertise as a hematopathologist by purporting to opine on matters of psychology and Mr. Beavers' mental well-being. Her report states, among other references to mental health and its purported connection to Mr. Beavers' Roundup exposure:

> [Mr. Beavers'] aggressive lymphoma occurred at a young age, which led to additional issues which has affected him into adulthood. These additional issues were related to his diagnosis and treatment, and included anxiety about treatment, complications, social chaos, and fear of death. At 14 years old, a child/preadolescent require a sense of normalcy, future career development via education, independence, and peer support …. He continues to struggle with consistent employment and mental health issues at age 39.

Ex. B, Murphy Rpt. at 1. These are opinions about the psychological, emotional, and mental effects of Mr. Beavers' medical condition, which Dr. Murphy ultimately opines were caused by Roundup.

Dr. Murphy is not qualified to opine on such psychological or psychiatric issues, either to diagnose mental health illness or to attribute it to some specific cause. Dr. Murphy admits she is not a psychologist, and has no specialization or credential to qualify her to opine on the psychological or

emotional state of patients or the causes of mental health issues. *See* Ex. A, Murphy Dep. Tr. at 65:12-13 ("I don't diagnose psychiatric disorders."), at 66:24-67:1 ("Q. Have you ever published anything on psychological issues related to cancer? A. No."). She further concedes that in her medical practice she does not make diagnoses about the psychological effects of having cancer, and has never done so for any patient, much less an adolescent patient. *See id. at* 54:14-20 ("Are an expert in emotional psychological issues for pediatric cancer patients? A. I understand the implications. I don't make the diagnoses. Q. Have you ever counseled any child about his cancer? A. No."), at 65:14-22. She explained that, for psychological treatment, she refers cancer patients to other specialists.

And in response to a question about the causal factors contributing to Mr. Beavers' "psychosocial challenges," Dr. Murphy admitted that she could only "defer that [question] to Dr. Beaton being a psychiatrist…" *See* Ex. A. Murphy Dep. Tr. at 162:3-9. *See also id.* at 66:10-13 ("Q. So when a patient needs counseling or treatment for psychological issues, you send them to an expert in that area; is that right? A. Correct."). When asked whether she had referred Mr. Beavers to a psychologist or other mental health professional, she conceded that she is unable even to assess his need for one, given that "I only met him over the phone." *Id.* at 65:23. Lacking the qualifications to professionally assess his mental injuries or their causes, and having admitted that she can't even say whether his conditions warranted referral to an expert, Dr. Murphy clearly is not someone who can provide knowledgeable, specialized testimony to the jury with respect to Mr. Beavers' mental injuries, if any, or their causes.

II.     **Dr. Murphy's Opinions Are Methodologically Deficient Because She Did Not Conduct The Requisite Differential Diagnosis.**

The Ninth Circuit recognizes two steps to doing a proper differential diagnosis, each of which must be performed reliably to render the expert's opinion admissible. *See Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1057 (9th Cir. 2003). First, the expert must "compile a comprehensive list" of causes that are "generally capable of causing the patient's symptoms or mortality." *Id.* at 1058. An opinion is not reliable when the expert rules-in a potential cause that is not capable of causing the observed injury, or fails to consider an alternative hypothesis that could also explain the injury. *Id.* Second, after ruling-in all potential causes, the expert must reliably eliminate all hypotheses that cannot explain the plaintiff's injury, until the expert arrives at the specific cause. *Id.* When undergoing this

process of elimination, the expert must "provide reasons for rejecting alternative hypotheses using scientific methods and procedures and the elimination of those hypotheses must be founded on more than subjective beliefs or unsupported speculation." *Id.* (internal quotations omitted).

Dr. Murphy purports to reach her specific-causation opinion—that exposure to Roundup caused Plaintiff's NHL—by applying a differential etiology (sometimes called a "differential diagnosis"). But the only basis for her opinions amounts to nothing more than a short list summarizing a few potential cancer factors raised during Dr. Murphy's telephonic interview with Mr. Beavers:

> Mr. Ricky Beavers, Jr's pertinent medical history related to tumorigenesis was discussed. His father noted that his mother's pregnancy was uneventful and healthy. His home environment was safe per description, without environmental exposures (including secondhand smoke). He did not have significant recurrent childhood infections. He was not exposed to ironizing radiation. His siblings did not have any significant health issues. He does not have a significant family history of immunodeficiency or cancer including lymphoma.

Ex. B, Murphy Rpt. at 1. Dr. Murphy entirely skips over how she "ruled in" Roundup use as a potential cause of Mr. Beavers' NHL, and does not do a systematic analysis "ruling out" alternative causes.

### A.     Dr. Murphy Did Not Reliably Rule In Roundup As A Possible Cause.

Dr. Murphy does no medical or patient-specific analysis to support her stated opinion that Roundup exposure caused Mr. Beavers' NHL, except to state that he was exposed to Roundup and later developed NHL. *See* Ex. B, Murphy Report at 1. She concludes that "Roundup contributed to his lymphoma" because (1) "[t]he [International Agency for Research on Cancer] classified glyphosate (RoundUp) as a probable human carcinogen (category 2A)" in a report that (like all IARC work) she never relied on in practice or cited prior to use in this litigation; (2) her telephonic interview of him indicated that Mr. Beavers "had a consistent and frequent exposure to RoundUp" as a youth; and (3) generally "children are even more uniquely vulnerable to the adverse effects of chemical exposure." *Id.* at 2.

Critically absent from Dr. Murphy's "ruling in" analysis are steps that are necessary to a proper differential diagnosis. For example, Dr. Murphy admits that she has no quantitative understanding of Plaintiff's *absorbed dose* of glyphosate—*i.e.*, the amount of glyphosate to which Plaintiff was exposed that was actually absorbed into his skin, and she has offered no other reliable basis to conclude that his alleged Roundup exposure caused his NHL. Dr. Murphy dismisses this gap in data on the ground that "specific dose or minimum exposure threshold has not been established in humans" and "Mr. Ricky

Beavers, Jr. had a consistent and frequent exposure to RoundUp." Ex. B, Murphy Rpt. at 2. But that rationale implicitly acknowledges that there is no systemic dose of absorbed glyphosate that has been established to be carcinogenic, and so Mr. Beavers' dose may have been harmless however "consistent and frequent" it was. Courts have clearly held, however, that in a toxic exposure case, assessing the plaintiff's systemic dose (i.e., the amount of a substance that is actually absorbed into the body, not just intensity or frequency of exposure—and whether that dose is capable of causing the illness at issue is critical to assessing whether someone's exposure to a substance can be considered a possible cause of an illness or injury. *See*, *e.g.*, *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1242 (11th Cir. 2005) ("Dose is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect."); *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671 (6th Cir. 2011) (excluding an expert for failing to reliably rule in benzene exposure as a possible cause because the expert "formulated his opinion on dose 'without any exposure data, only having been told that [Pluck] had been 'heavily' exposed to benzene in her water'"); *Borg-Warner Corp. v. Flores*, 232 S.W.3d 765, 770-73 (Tex. 2007) (discussing importance of dose on causation inquiry and reversing judgment in plaintiff's favor following jury trial where plaintiff did not establish sufficient dose to cause alleged injuries). With no assessment of Mr. Beavers' absorbed dose or whether it was high enough to cause NHL, Dr. Murphy's differential diagnosis fails at the gate of the "ruling in" step.

Dr. Murphy's "ruling in" analysis also fails for lack of any evidence she found or identified in her research supporting the premise of her opinion—that glyphosate is capable of causing the specific type of NHL Mr. Beavers developed, "diffuse large B cell lymphoma," Ex. A, Murphy Dep. Tr. at 192:25-193:1. She agrees "it would be nice" to have epidemiological studies that show a connection to the actual, specific form of cancer Mr. Beavers had, but resigns herself to rendering a causation opinion without that because the data does not exist—in her words, "your numbers get smaller when you separate out" different forms of NHL, showing no association between glyphosate and large B cell lymphoma. *Id.* at 175:6-10. But this amounts to a concession that she has no epidemiological support for ruling in Roundup as a potential cause of the cancer Mr. Beavers actually developed.

///

///

### B. Dr. Murphy Failed To Adequately Rule Out Potential Alternative Causes.

"[A]t the core of differential diagnosis is a requirement that experts at least consider alternative causes." *Poust v. Huntleigh Healthcare,* 998 F. Supp. 478, 496 (D.N.J. 1998) (citation and quotation omitted). *See also Guinn v. AstraZeneca Pharm. LP*, 602 F.3d 1245, 1253 (11th Cir. 2010) (expert's opinion was properly excluded where differential diagnosis failed to consider alternative causes and this was deemed unreliable). Here, Dr. Murphy's assessment of other potential causes of Mr. Beavers' NHL comes down to a cursory statement that, based on the synopsis of her phone-call interview with him, Mr. Beavers "did not have any specific history of other known related causes of lymphoma" Ex. B, Murphy Rpt. at 2. But "*Daubert* requires more" than "dismiss[ing] other possible causes in favor of [the product at issue] in a cursory fashion." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig. (No. II) MDL 2502*, 892 F.3d 624, 645 (4th Cir. 2018); *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265 (4th Cir. 1999) ("A differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation."). Dr. Murphy's summary dismissal of the short off-hand list of alternative potential causes she does mention falls far short of this bar.

Still worse, Dr. Murphy's purported differential diagnosis fails to even consider a long list of very real alternative causes for Mr. Beavers' illness, without any attempt to explain why or how she concludes that Roundup use is the more likely cause of his NHL than those alternatives. Dr. Murphy acknowledged at her deposition that childhood NHLs "can be caused by errors in replication of cells," Ex. A, Murphy Dep. Tr. at 220:7-9, and that literature in her report states that "many are likely to be the result of random events that sometimes happen inside a cell without having an outside cause," *id.* at 222:7-9. However, when asked whether she had "done any research on what percentage of non-Hodgkin's lymphomas are attributable to replication errors," Dr. Murphy answered, "No." *Id.* at 22:18-21. For all she knows, such events internal to the body may account for 80% of childhood NHLs, and yet without any analysis, she excluded that potential cause. She also acknowledged that the medical literature she relied on indicates "the general viewpoint that *most* childhood cancers, including most non-Hodgkin's lymphomas, are not caused by some environmental exposure," *id.* at 225:7-10 (emphasis added). Despite this, and without any effort to account for whether internal replication errors

are the true cause of Mr. Beavers' NHL, she opines that it is at least 51% likely that Roundup is the actual cause.

In short, Dr. Murphy "rules in" glyphosate as a possible cause of Mr. Beavers' NHL for little reason other than a single IARC report that identified the chemical as a possible carcinogen (among the many internal and external causes of NHL that exist), and then leaps to the conclusion that Roundup exposure is the true cause of Mr. Beavers' NHL without any real analysis to rule out more likely causes. Because this is not a reliable specific causation methodology, Dr. Murphy's opinions must be excluded.

## CONCLUSION

For these reasons, the Court should grant Monsanto's motion to exclude the testimony of Plaintiff's expert witness Dr. Murphy purporting to support Plaintiff's specific causation case.

Dated:  December 14, 2023                              Respectfully submitted,

/s/ *Linda C. Hsu*
Linda C. Hsu
Attorneys for Defendant Monsanto Company

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of December, 2023, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

/s/ *Linda C. Hsu*
Linda C. Hsu