# EXHIBIT A

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

   IN RE:  ROUNDUP PRODUCTS       )
4  LIABILITY LITIGATION           )  MDL No. 2741
   _____  )
5                                 )
   This Document Relates to:      )  Case No. MDL No.
6  Brett Beckfield v. Monsanto    )
   Company                        )  3:16-MD-02741-VC
7                                 )
   Case No. 3:21-cv-05322-VC      )
8

9

10             REMOTE VIDEOTAPED

11          DEPOSITION OF KENT JAYNE

12             December 22, 2022

13

14

15          REMOTE VIDEOTAPED DEPOSITION OF

16  KENT JAYNE, held remotely at the location of

17  the witness, commencing at approximately 9:07 a.m.,

18  on December 22, 2022, before Stephanie J.

19  Cousins, Registered Professional Reporter,

20  Certified Shorthand Reporter and Certified

21  Realtime Reporter.

22

23          GOLKOW LITIGATION SERVICES

24      877.370.3377 ph | 917.591.5672 fax

25             deps@golkow.com

Kent Jayne

```
 1              A P P E A R A N C E S

 2          (ALL PARTIES APPEARED REMOTELY)

 3

 4    ON BEHALF OF THE PLAINTIFF:

 5    JAMES H. COOK, ESQUIRE
      DUTTON LAW FIRM
 6    3151 Brockway Road
      Waterloo, Iowa 50701
 7    (319) 234-4471
      jcook@duttonfirm.com
 8

 9
      ON BEHALF OF DEFENDANT MONSANTO COMPANY:
10
      KIRK MARTY, ESQUIRE
11    SHOOK, HARDY & BACON, LLP
      2555 Grand Boulevard
12    Kansas City, Missouri 64108
      (816) 474-6550
13    kmarty@shb.com

14

15

16
      THE VIDEOGRAPHER:
17
      Daniel Bermudez, Golkow Litigation Services
18

19

20

21

22

23

24

25
```

Kent Jayne

```
 1    deposition?  You mentioned you got some

 2    information.  Was that a verbal discussion?

 3         A.   No.  That was an email as well.

 4         Q.   Okay.  What about any of his family

 5    members?  Have you spoken with or communicated

 6    with any of them to get ready for your

 7    deposition?

 8         A.   No.

 9         Q.   Okay.  Have you spoken with or

10    communicated with any of his treating

11    physicians or former employers to get ready for

12    your deposition?

13         A.   Not spoken with them.  I have not

14    exchanged any emails with them.  I do, of

15    course, have the records.

16         Q.   Okay.  So it sounds like the update

17    that you have -- is it just one email from

18    Mr. Beckfield?

19         A.   Yes, it was.

20         Q.   It was one email?

21         A.   One email, yes.  Yes.

22         Q.   Okay.  And we would ask that that be

23    produced.

24              MR. MARTY:  Is that something

25    that -- Jamie, I don't know if you've got a
```

Exhibit A Page - 3

Kent Jayne

1    sure if there was or not.

2        Q.   Okay.  I guess just -- the question is

3    just whether you responded to him directly.

4        A.   I believe what communications I've had

5    have been with Mr. Cook.

6        Q.   Okay.  Fair enough.

7             What's your understanding of

8    what you've been requested to do as an expert

9    in this case, Mr. Jayne?

10       A.   I was asked to evaluate a couple of

11   different things.  One would be loss of

12   earnings and earning capacity at present value,

13   and also future related life care needs and

14   costs as best we could determine them.

15       Q.   Okay.  Anything else?

16       A.   No.  I think that's my assignment.

17       Q.   Okay.  Other than your wife, has

18   anyone else been working with you on this case?

19       A.   No.

20       Q.   Okay.  And what role has Michelle

21   played in this matter?  You mentioned

22   production and editing -- or typing and

23   research and things like that.  Has she done

24   that in this case?

25       A.   She's done the production.  She's

Kent Jayne

```
 1    BY MR. MARTY:
 2         Q.   And then I'll mark as Exhibit No. 16,
 3    if you can see that there -- this is an
 4    email -- the very top part is from Mr. Cook to
 5    me, but then below that is what's actually
 6    being produced, which is the email from
 7    December 21st, yesterday, that you received
 8    from Mr. Beckfield.  Is that right?
 9         A.   Yes.
10         Q.   Does that look right, Mr. Jayne?
11         A.   Yes.  Can you hear me?
12         Q.   Yeah.  Yeah.  You just cut out just
13    for a second, but I hear you now.
14                   Okay.  And then it had attached
15    to it some medical records; is that right?
16         A.   Yes.
17         Q.   Okay.  And I think we've got copies of
18    those.  So that's going to be Exhibit No. 16
19    for us.
20                   Okay.  All right.  So turning
21    back to your report, then, if you look on the
22    first page right under the title, it says, "An
23    assessment to determine past lost earnings,
24    diminished earning capacity, and partial life
25    care needs as currently understood has been
```

Exhibit A Page - 5

Kent Jayne

```
 1    completed in the case of Brett Beckfield.  All
 2    available documentation has been reviewed, and
 3    an extensive interview and follow-up conducted
 4    with Mr. Beckfield."
 5              Did I read that correctly?
 6        A.   Yes.
 7        Q.   Okay.  And does that accurately
 8    describe what you've done in this case?
 9        A.   Yes.
10        Q.   All right.  And we talked a little bit
11    about this before, but then directly below
12    that, you've got the documentation that you
13    reviewed; correct?
14        A.   Correct.
15        Q.   All right.  And other than what's on
16    the 17 items and what we've already discussed
17    today, any other case-specific items that you
18    relied on in forming your opinions in this
19    case?
20        A.   Only what we've referred to as yield
21    curves and -- well, that's about it, really.
22        Q.   Okay.  You haven't reviewed any expert
23    reports from any other experts in this case,
24    have you?
25        A.   No.
```

Kent Jayne

```
 1          Q.   No.  That's okay.  I think a couple of
 2     these are actually some exhibits -- some of the
 3     handwritten notes and things might be exhibits.
 4          A.   All right.
 5          Q.   But did you rely -- for purposes of
 6     your evaluation and opinions in this case, did
 7     you rely on anything from those two
 8     depositions?
 9          A.   Just background information, dates of
10     birth, and so forth.  That would be it.
11          Q.   Okay.  Okay.  Then categories 5, 6,
12     and 7 are medical records from Penn State,
13     MD Anderson, and a radiology report dated
14     January 25th, 2021.
15               Do I have that right?
16          A.   Yes.
17          Q.   And those are things that you obtained
18     from Plaintiff's Counsel; right?
19          A.   Yes.
20          Q.   Did you review a complete set of these
21     records?
22          A.   I reviewed what I received.
23          Q.   Okay.  Do you have -- those medical
24     records that you have, are they Bates-
25     labeled?
```

Kent Jayne

```
 1          A.   Let me check.  No, they have no Bates

 2     numbers.

 3          Q.   Okay.  Okay.  Do you know,

 4     approximately, how many pages of records you

 5     have from Penn State?  And I'm just -- I'm

 6     thinking just in terms of tens of pages,

 7     hundreds of pages, thousands of pages?

 8          A.   Oh, no.  Maybe 10.  10 to 12 pages.

 9          Q.   Okay.  What about for MD Anderson?

10     How many pages of materials do you have from MD

11     Anderson?

12          A.   About the same.

13          Q.   Okay.  Do you know how it was that

14     those particular pages of medical records were

15     selected for -- to be sent to you?

16          A.   No.

17          Q.   Okay.  Is that -- are those --

18          A.   Excuse me.  Let me make a statement

19     here, because it looks like there's a Bates

20     number, but it's cut off at the bottom -- the

21     copy didn't get all of them.  But it looks like

22     the MD Anderson -- if I can read them

23     properly -- goes from 17-28 to the cutoff --

24     let's see, 17-25, 26, 27, 28, 29, and 17-31, I

25     believe.
```

Exhibit A Page - 8

Kent Gayne

```
 1        A.    Correct.

 2        Q.    And those are what we had marked as

 3   Exhibits -- Exhibit No. 11.  Is that right?

 4        A.    I don't recall what the exhibit number

 5   was.

 6        Q.    Okay.  Fair enough.  Fair enough.

 7              So what was the purpose of

 8   administering these tests?

 9        A.    Well, these are questionnaires to get

10   a better idea, a better understanding of how he

11   has been limited in whatever degree he has in

12   terms of physical tests, and also in terms of

13   his pain levels and how pain affects his daily

14   activities.  That's the Pain Disability

15   Questionnaire.  The first one is a Functional

16   Capacity Checklist.  The second one is the Pain

17   Disability Questionnaire.  So it's to better

18   understand how pain affects his activities of

19   daily living, his independent -- or his

20   instrumental activities of daily living.  And

21   then the Cognitive Symptom Checklists are to

22   better understand how this has affected him

23   cognitively or emotionally.

24        Q.    Okay.  And do you rely on the results

25   of these three tests for purposes of your
```

Kent Gayhe

1    calculations or for the opinions that you

2    express in this case?

3        A.    Yes.

4        Q.    In what way?

5        A.    Well, I take in -- into account to

6    determine whether he has any residual

7    employability and how this would affect his

8    residual employability.  So I look at

9    those and -- all three of those

10   questionnaires -- or, actually, all six -- all

11   five of them -- to determine if he's got any

12   residual capacity at this point.  But, of

13   course, he's got a -- you know, nobody survives

14   this problem of mantle cell lymphoma, as I

15   understand.  And so I take that into account as

16   well.

17       Q.    What do you mean when you say, "nobody

18   survives mantle cell lymphoma"?

19       A.    Well, it's terminal.

20       Q.    Is that your professional opinion?

21       A.    That's my understanding of the

22   disease, yes.

23       Q.    Okay.  What work have you done to --

24   well, let me just make sure I understand.  You

25   said that's your understanding of the disease.

Exhibit A Page - 10

1              My question was, is that your
2      professional opinion?
3          A.   No.  It's my -- it would only be based
4      on what I know from the literature I've seen or
5      from the -- actually, regarding the testimony
6      of Mr. Beckfield and his wife, as well as his
7      indications to me that, you know, he's trying
8      to extend his life as long as he can.
9          Q.   Okay.  So your belief that mantle cell
10     lymphoma is a terminal cancer is based on
11     information that you reviewed from the
12     deposition of Mr. Beckfield, his wife, and then
13     is it also from some of the emails that he sent
14     you?
15         A.   Yes.
16         Q.   Okay.  Is that understanding based at
17     all on any of the medical records you reviewed?
18         A.   I haven't seen anything specific to
19     that, no, in the medical records I've reviewed.
20         Q.   Okay.  Would you defer to
21     Mr. Beckfield's physicians on whether or not
22     mantle cell lymphoma is a terminal cancer?
23         A.   Yes.
24         Q.   Okay.  Okay.  So then on Page 2 of
25     your report, you have a discussion that's

Rene Gayhe

```
 1    remission at this point indicates that he has

 2    some capacity to work.  Is that what you're

 3    saying?

 4        A.   Not any -- it's not changed as far as

 5    I understand from the documentation I have,

 6    including the -- the questionnaires and tests

 7    that we took that we discussed earlier.

 8        Q.   Okay.  I'm just trying to understand

 9    how remission would impact his employability.

10             At some point in the future, do

11    you believe that if he remains in remission,

12    that he'll have some level of employability?

13        A.   That would depend on his symptoms.

14        Q.   Okay.  If at some point in the future,

15    he becomes asymptomatic and it remains in

16    remission, would he have some level of

17    employability at that time?

18        A.   Well, my understanding is that it's an

19    incurable disease.  So I really can't give you

20    an opinion on that.  He may be -- he may be

21    capable of something in the future.  As you

22    know, he's doing a little bit of consulting.

23    Not very much at this point.  But that seems to

24    be all he's capable of doing at this point.  So

25    it would be -- I would defer to his doctors in
```

Kent Gayne

```
 1    terms of, you know, the change in symptoms that
 2    are likely to occur as a result of his
 3    remission.
 4        Q.   Okay.  What about remission status and
 5    providing household services?  Would his
 6    remission status have any impact on his ability
 7    to provide household services?
 8        A.   All I know is what I understand that
 9    he is capable of doing now, and that he's
10    losing a lot of -- what I call -- not just
11    household services, but effi- -- lost
12    efficiency in what I call nonmarket production,
13    which means, you know, things taking twice as
14    long as they used to, then he's lost that
15    amount of time that -- in terms of efficiency,
16    that needs to be made up.
17        Q.   Okay.  And that's all based on his
18    self-reported information about his household
19    services and how long things take him to do?
20        A.   Right.  And also, that's based on the
21    foundation of the American Time Use Survey,
22    which is an average, in this case, of a married
23    male who was employed prior to this diagnosis,
24    and what amount of nonmarket production they
25    produce a week, per week.  That's from the
```

Rene Gayne

```
 1         Q.   I'm sorry.  "Partial remission," those
 2    were his words?
 3         A.   Yeah.  He had just finished his
 4    chemotherapy.  I believe he was not getting
 5    any more infusions at that point.  It was a
 6    very short time frame.  So it was referred to
 7    as partial remission because he had just
 8    recently stopped treatment.
 9         Q.   Okay.  Do you know if he remains in
10    partial remission at this time?
11         A.   He says he's in remission.
12         Q.   Okay.  Do you know if he's in complete
13    remission?
14         A.   I'd have to rely on his physicians for
15    that.
16         Q.   Okay.  So you'd defer to Dr. Wang and
17    Dr. Ehmann for their assessment of his
18    remission status?
19         A.   Yes.
20         Q.   And as of the June 22nd date when you
21    issued your report, it was your understanding
22    that he was still continuing to receive
23    maintenance protocol medication at that time?
24         A.   That's what he indicated, yes.
25         Q.   Okay.  And that's just, again, from
```

Rene Gayne

```
 1    with medication since April of 2022; right?
 2         A.   I believe that's true, yes.
 3         Q.   Okay.  Okay.  All right.  Now, you
 4    also, it sounds like -- well, let me back up
 5    for one second.
 6              You mentioned a couple of times
 7    his cancer being terminal; right?
 8         A.   I believe -- my understanding of MCL
 9    is that it is incurable.
10         Q.   Okay.  And, again, that's based on
11    what Mr. Beckfield told you?
12         A.   Well, I've taken a look at it, and
13    I -- my understanding is that people can be in
14    remission, but eventually it's going to take
15    their life.
16         Q.   Right.  So you equate "incurable" with
17    "terminal"?  Is that what you're saying?
18         A.   Well, "incurable" meaning that it's
19    always going to be there and there's a chance,
20    obviously -- there's gonna be a chance of
21    recurrence or -- at some point in the future,
22    but we just don't know if or when that will
23    occur.
24         Q.   Right.
25         A.   He could remain in remission for some
```

1    time.  I -- I mean, I would defer to his

2    doctors on that.

3        Q.   Okay.  But by "terminal," it doesn't

4    sound like you necessarily mean that his

5    lymphoma will kill him some day, do you?

6        A.   I don't want to assume that, no.

7        Q.   Okay.  So what you're saying is --

8    more precisely, you're saying that his lymphoma

9    is incurable; right?

10       A.   Correct.

11       Q.   Okay.  All right.  Now, you also did a

12   videoconference with him, and you talk about

13   that on Page 2 of your report; right?

14       A.   Yes.

15       Q.   Now, it says that you did the

16   videoconference on March 29th, 2021, but that's

17   not quite right, is it?

18       A.   It was on the 28th or 29th.

19       Q.   But it was 2022 that you did the

20   videoconference; right?

21       A.   20 -- I'm sorry.  That's -- yeah, that

22   was a -- that's a typo.  That should be 2022.

23       Q.   Was there anyone else participating in

24   the interview other than you and Mr. Beckfield?

25       A.   No.

Kent Gayne

```
1    because it's much more detailed.
2         Q.   Okay.  And those questionnaires are
3    all his self-reported issues that he's having?
4         A.   That's right.
5         Q.   Okay.  You've never met with
6    Mr. Beckfield in person, have you?
7         A.   Correct.
8         Q.   And other than the one
9    videoconference, you've never spoken with him;
10   correct?
11        A.   Correct.
12        Q.   The questions that you asked during
13   your interview, have those ever been published
14   in a peer-reviewed journal?
15        A.   The questions --
16        Q.   Correct.
17        A.   -- that I ask?
18             Well, there's standard protocol
19   for -- you know, it follows vocational
20   evaluation protocol which have been published
21   in -- a number of times.  But as far as his
22   specific questions, no, I don't have
23   any -- there's no peer-reviewed literature as
24   far as I'm concerned -- as far as I know.
25        Q.   Okay.  Have you ever done any work to
```

Exhibit A Page - 17

Rene Gayne

```
 1          Q.   Okay.  But you haven't done that in
 2     this case because you didn't believe that that
 3     was relevant to your interview --
 4          A.   No.
 5          Q.   -- with Mr. Beckfield?
 6          A.   That's correct.
 7          Q.   Okay.  Just to make sure I've got it,
 8     you've never had any conversations with any of
 9     his health care providers; right?
10          A.   Correct.
11          Q.   You've never spoken with any member of
12     his family?
13          A.   Correct.
14          Q.   Okay.  And do you have any visits or
15     discussions planned for the future with
16     Mr. Beckfield?
17          A.   It's possible, yes.  If additional
18     information comes to light, obviously, I want
19     to update all my background information or
20     symptoms and so forth prior to trial.  So that
21     might require -- that might require another
22     interview.
23          Q.   Okay.  Now, back on your report on
24     Page 2, you've got a list of these 13 symptoms.
25     Is that right?
```

Exhibit A Page - 18

Kent Gayhe

```
1          A.    Yes.

2          Q.    And those symptoms all came from your

3     interview with him; is that correct?

4          A.    That's right.

5          Q.    How do you -- what bearing do those

6     symptoms have on your analysis?

7          A.    They would -- they -- the bearing they

8     would have would be foundation for and

9     understanding of his residual employability, if

10    any, and his loss of earning capacity.

11         Q.    Okay.  And did you double-check this

12    list of 13 symptoms against any of his medical

13    records?

14         A.    No.  I don't have any other medical

15    records other than what we've spoken about.

16         Q.    Okay.  And do you know if -- since the

17    time you conducted your interview in March of

18    this year, whether any of these symptoms have

19    resolved?

20         A.    Well, that would be a good question

21    for a further follow-up interview.  I don't

22    have any further information.  All I have is

23    what he was experiencing at the time.

24         Q.    Have you made any sort of

25    determination that any of these claimed
```

Kent Gayne

```
 1    symptoms are the result of Mr. Beckfield's

 2    lymphoma or his treatment?

 3        A.    No.  It's just what he's experiencing

 4    at the time.

 5        Q.    Okay.

 6        A.    I have no opinions as to causation.

 7        Q.    Okay.  And so you don't, for

 8    example -- aren't offering the opinion that,

 9    number three, sleeping more, that he is

10    sleeping more because of his lymphoma or

11    because of his treatment; correct?

12        A.    Correct.

13        Q.    And that's the case for all 13 of

14    these symptoms; right?

15        A.    Yes.

16        Q.    Okay.  Do you know if any of

17    Mr. Beckfield's physicians have causally

18    related any of these claimed symptoms to his

19    lymphoma or his treatment?

20        A.    I've seen no reports to that effect.

21        Q.    Then further on Page 2 you note --

22    after the symptoms, you note that he continues

23    to be immunocompromised and he follows up for

24    chemotherapy, including infusion with

25    venetoc- -- I'm not going to be able to
```

Rene Gayne

```
 1         A.   I can't state that, no.

 2         Q.   Okay.  You'd defer to his physicians

 3    on those issues?

 4         A.   That's correct.

 5         Q.   Is the Functional Capacity Checklist a

 6    peer-reviewed instrument?

 7         A.   It has never been peer reviewed as far

 8    as -- well, it has been, but I'm not sure that

 9    it's ever been published anywhere other than an

10    article that I wrote.  Because I -- I use it

11    quite frequently, and I've published an article

12    on chronic pain a couple years ago.  And I

13    referred to this as one of the documents.  But

14    as far as I know, it's never been peer

15    reviewed.  I -- I just don't know.

16         Q.   Okay.  Is this a document that you

17    created yourself?

18         A.   No.

19         Q.   Okay.

20         A.   This is created by a colleague by the

21    name of Everett Dillman, who's an economist and

22    also a vocational economist in El Paso.

23         Q.   You say Everett Dillman?

24         A.   Everett Dillman, D-I-L-L-M-A-N, yes.

25         Q.   Okay.
```

Rene Gayne

```
1                    Okay.  And then we talked about
2    the Pain Disability Questionnaire.  We talked
3    about the functional checklist, and then you
4    also had the Cognitive Systems [sic]
5    Checklists.
6         A.   Cognitive Symptom Checklists.
7         Q.   Yes.  Cognitive Symptoms Checklists --
8    symptom?
9         A.   Yes.
10        Q.   Okay.  So I'm still in Exhibit No. 11.
11   So is this -- are these checklists
12   peer-reviewed instruments?
13        A.   I believe they are.  Because this
14   was -- these were published by Psychological
15   Assessment Resources, Inc.  I am not aware of
16   the -- the citations, but they're published by
17   a well-known psychological assessment resources
18   publisher.
19        Q.   Okay.  And did you undergo any
20   training to be able to administer the Cognitive
21   Symptoms Checklist?
22        A.   No.  There's no training involved in
23   that.
24        Q.   Okay.  And back on -- I should have
25   asked that on the Pain Disability
```

Kent Gayne

1      A.   I use the questionnaires once I

2   receive them to make the statement if that

3   statement is necessary.

4      Q.   Okay.  So just to clarify this, is it

5   your assessment and your opinion that he's

6   unable to perform any duties of an adjunct

7   professor at Penn State University?

8      A.   He actually told me that, I think, as

9   I recall.  I'm not sure if that was his

10  statement.  I know he was unable to continue at

11  Riviana, and that was in 2019.  And then he had

12  some minimal appointment at Penn State as an

13  adjunct, but that dropped off to, essentially,

14  zero in the last year.

15     Q.   Okay.  And I appreciate that.

16     A.   That's all I know.

17     Q.   I appreci- --

18     A.   Sure.

19     Q.   Thank you for that information.

20          I guess what I'm trying to

21  figure out is whether this statement that he's

22  unable to perform any duties as an adjunct

23  professor at Penn State -- is that just based

24  on what he told you, or is that based on your

25  independent assessment of his capabilities?

Rene Gayne

```
1         A.   Both.

2         Q.   Okay.  And so what did he tell you as

3    to why he was unable to perform any duties as

4    an adjunct professor at Penn State University?

5         A.   I don't recall him giving me any

6    information on that because that would be

7    information received on the questionnaires

8    later.

9         Q.   Okay.  So you didn't -- and you hadn't

10   recorded anything in your interview notes about

11   any reason that he gave; correct?

12        A.   Correct.

13        Q.   Okay.  So, in part, this is based on

14   his summary statement that he's unable to

15   perform any duties as an adjunct professor at

16   Penn State University?

17        A.   Correct.  He's been unable, yes.

18   That's correct.

19        Q.   Okay.  And then --

20        A.   Correct.

21        Q.   -- in addition to that, then, you say

22   that based on the questionnaires that you

23   administered, that you've made the professional

24   judgment or opinion that he's unable to perform

25   any duties as an adjunct professor at Penn
```

Kent Jayne

```
 1    don't we go off the record.

 2                    THE VIDEOGRAPHER:  We are off

 3    the record at 2:44 p.m.

 4                    (A recess was taken.)

 5                    THE VIDEOGRAPHER:  We are on the

 6    record at 2:53 p.m.

 7    BY MR. MARTY:

 8        Q.   Mr. Jayne, jumping into the next

 9    section of your report is entitled

10    "Assessment."  I'm over on Page 5.  Are you

11    there with me?

12        A.   Yes.

13        Q.   Okay.  And is it fair to say that this

14    section of your report relates to

15    Mr. Beckfield's capacity to work?

16        A.   Yes.

17        Q.   And what are your conclusions

18    regarding Mr. Beckfield's capacity to work now

19    and in the future?

20        A.   I don't believe he's capable of

21    working now.  The future would depend on a

22    continuation of his remission and any change in

23    his symptoms which would be -- I would rely on

24    his physicians for that.

25        Q.   Okay.  So your belief that he's not
```

Rene Gayne

1    about $16,000 a year.  So if you're below that,

2    you're incapable of substantial gainful

3    activity.

4         Q.   Okay.  So your opinion is that he is

5    incapable of earning more than $16,500 per

6    year?

7         A.   Whatever that would be, yeah.

8    Whatever it is today.

9         Q.   Okay.  And so -- and what about as to

10   his future?  Do you have an opinion as to his

11   ability to be capable of substantial gainful

12   activity at some point in the future?

13        A.   I'd have to rely on his physicians for

14   that.

15        Q.   Okay.  And your basis for your

16   conclusion that he's, essentially, incapable of

17   substantial gainful activity at this present

18   time is based on, then, what is articulated

19   below which comes from your checklists and

20   questionnaires; right?

21        A.   That's right.

22        Q.   Okay.  And the assessment you've done

23   here, does that focus at all on anything other

24   than his employability?  In other words, have

25   you done an assessment of his ability to

Kent Gayne

 1    me that everything takes him about twice as

 2    long to do now.  So this would be an estimate

 3    based on the average for a married male, the

 4    amount contributed to non -- what I call

 5    nonmarket production and the value of that

 6    replacement labor.

 7        Q.   Okay.  Okay.  We'll talk a little bit

 8    more about that in a moment.  Let's just -- a

 9    couple of questions more on the

10    vocational -- or I guess sort of the assessment

11    information.

12               So do you know if any of

13    Mr. Beckfield's physicians have ever placed any

14    limits on his ability to work?

15        A.   If any of his positions -- his career?

16    You mean his -- his --

17        Q.   I'm sorry.  Have any of his

18    physicians, his doctors --

19        A.   Oh, I'm sorry.

20        Q.   -- placed any limits on his ability to

21    work?

22        A.   I haven't -- I don't know.

23        Q.   Did you ever ask him --

24        A.   I don't have those records.

25        Q.   Did you ask him during the interview?

Kent Gayne

```
 1        A.   No.  I don't think -- I don't think I
 2   did, no.
 3        Q.   Okay.  Do you know if Mr. Beckfield's
 4   physicians have ever assigned a performance
 5   status to him?
 6        A.   I haven't seen it.
 7        Q.   Okay.  Are you familiar with the
 8   concept of performance status?
 9        A.   Well, I assume it's his ability to
10   perform up to a level of -- of average daily
11   activity.
12        Q.   Okay.  And is it your -- in your
13   30-plus years working in this area, have you
14   ever run across medical records where a
15   physician has assigned a performance status to
16   a patient?
17        A.   I don't think I've heard it used in
18   those terms.
19        Q.   Okay.  I'm going to mark what I've got
20   as Exhibit --
21        A.   Maybe you can define for me what you
22   mean by that because I haven't heard that term
23   before.
24        Q.   Sure.  Sure.
25             So I'm going to mark this as
```

Rene Gayne

```
 1    Exhibit No. 20, and I'll share my screen here.
 2                 (Exhibit 20 was marked for
 3    identification.)
 4    BY MR. MARTY:
 5        Q.   Are you able to see my screen?
 6        A.   Yeah.  It just came up.
 7        Q.   Okay.  Let me zoom in a little bit so
 8    it's a little easier for everyone to read.
 9                 So this is a discussion of the
10    Karnofsky Performance Scale Index that
11    classifies patients as to their functional
12    impairment.  Is this something you've seen
13    before?
14        A.   No.
15        Q.   Okay.
16        A.   I have not seen this.
17        Q.   Okay.  Based on this, it appears that
18    the performance status is something that ranges
19    from 0 to 100.
20                 Does that look like it's right?
21        A.   It looks like it's rated that way,
22    yes.
23        Q.   Okay.  And zero being the worst,
24    representing death?
25        A.   Yes.
```

Exhibit A Page - 29

Kent Gayhle

```
1        Q.   And 100 is the best including
2   indicating no complaints, no evidence of
3   disease?
4        A.   Right.
5        Q.   Okay.  And it appears that a
6   performance of status of 80 or above indicates
7   that the patient is able to carry on normal
8   activity and to work with no special care
9   needed?
10       A.   This would be in terms of actual
11  physical abilities with regard to his disease,
12  I assume.  This does not include the other
13  factors we've talked about, including loss of
14  efficiency, cognitive symptoms and so forth.  I
15  don't see that here.  So I don't know who fills
16  this out.
17       Q.   Okay.  As you sit here today, you
18  don't have any reason to disagree with any
19  performance status determinations made by any
20  of Mr. Beckfield's physicians, do you?
21       A.    I don't know what it in- -- I don't
22  know what this is inclusive of because I don't
23  know -- I haven't seen any evidence of whether
24  his cognitive symptoms have been taken into
25  account here.  Cognitive as well as efficiency.
```

Rene Gayne

```
 1          Q.   Okay.  And --
 2          A.   These look like -- sorry.
 3          Q.   No, you go ahead.  I was interrupting
 4     you.
 5          A.   I don't know what this refers to.  I'm
 6     not gonna make any specul- -- I'm not gonna
 7     speculate on this.
 8          Q.   Okay.  Fair enough.
 9               I want to jump to our next
10     exhibit.  This is going to be Exhibit No. 21.
11               (Exhibit 21 was marked for
12     identification.)
13     BY MR. MARTY:
14          Q.   And this is a medical record.  I'll
15     zoom in on this.
16               Are you able to see my screen
17     there?
18          A.   Yes.
19          Q.   So does -- this is an outpatient
20     letter from Dr. Ehmann from February 27th,
21     2021 {sic}.  Do you see that?
22          A.   January 27, 2021, yes.
23          Q.   Okay.  And it's Dr. Ehmann over here
24     (indicating)?
25          A.   Yes.
```

Exhibit A Page - 31

Rene Gayne

```
 1          Q.   Okay.  Now, in this first paragraph
 2     here at the very end, he says, "As of
 3     March 30th, 2020, there was no evidence of
 4     disease, and so far that appears to be
 5     remaining the case."
 6               Is that right?
 7          A.   That's what it says, yes.
 8          Q.   Okay.  And so as of March 30th, 2020,
 9     that was when Mr. Beckfield was in remission.
10     Is that true?
11          A.   I believe so.
12          Q.   Okay.  The next paragraph says, "When
13     I saw Mr. Beckfield, he was feeling well, he
14     has no particular complaints or issues."
15               Is that what it says there?
16          A.   Yeah.
17          Q.   Kind of scrolling down, it notes at
18     the last paragraph on this page, "Mr. Beckfield
19     has some upcoming eye surgery, including
20     cataract extraction, left, and the laser
21     treatment of the right eye.  It has been
22     recommended that he interrupt his ibrutinib for
23     the cataract extraction."
24               Do you see that?
25          A.   Yes.
```

Rene Gayne

```
1         Q.   Okay.  And over on the next page,
2    third paragraph down, "When I saw Brett, he was
3    feeling well.  He has no physical complaints."
4              Do you see that?
5         A.   Yes, I do.
6         Q.   Okay.  The next paragraph, at the end
7    of the first sentence -- or end of the first
8    line, "I would assess his performance status at
9    least 90, if not 100 percent."
10             Do you see that?
11        A.   That's what it says.
12        Q.   And then in the last paragraph, the
13   last full paragraph, it says, "My impression is
14   that Brett is doing quite well at the present
15   time."
16             Do you see that?
17        A.   Yes.
18        Q.   Okay.  Do you have any reason to
19   disagree with any of those statements from
20   Dr. Ehmann?
21        A.   Well, I wouldn't disagree with
22   Dr. Ehmann.  He's stating it in terms of
23   whatever he has observed at that time, I
24   assume.  But I would point out that this -- the
25   date of this is 2020, and my understanding was
```

Kent Gayne

1    that Mr. Beckfield was continuing his

2    chemotherapy up to March of 2022.  So --

3        Q.   Right.  This is actually 2021, if

4    you --

5        A.   Okay.  2020 -- January 2021.  Yeah.

6        Q.   Right.

7        A.   So my understanding was he was

8    continuing his chemotherapy up until March of

9    2022.

10       Q.   Okay.  And so Dr. Ehmann's opinion at

11   that time was that his performance status was

12   at least 90 percent.  Is that right?

13       A.   That's what he says, yes.

14       Q.   And under the Karnofsky performance

15   status scale, that would be a sufficiently high

16   number for Mr. Beckfield to be able to work; is

17   that right?

18       A.   I don't know.  As I said, I'm not

19   gonna speculate on that because I don't know

20   what it takes into account.

21       Q.   Okay.  And at least at this --

22       A.   I don't see any psychological

23   evaluation here beyond what he's told me.  And

24   so that might be appropriate as well.

25       Q.   Okay.

Rene Gayle

```
 1                    C E R T I F I C A T E

 2

 3           I, the undersigned, Certified and
       Registered Professional Reporter, duly
 4     appointed commissioner for the purpose of
       administering an oath to this witness, do
 5     hereby certify that I acted as the shorthand
       reporter in the foregoing matter at the time
 6     and place indicated herein; that I took in
       shorthand the proceedings had at said time and
 7     place; that said shorthand notes were reduced
       to print under my supervision and direction by
 8     means of computer-aided transcription, and that
       the foregoing pages are a full and correct
 9     transcript of the shorthand notes so taken;
       that said deposition was submitted to the
10     witness for signature, as requested to do so by
       a party or the witness; that any changes, if
11     any, requested by the witness are attached
       hereto.
12
             I further certify that I am neither
13     attorney nor counsel for, or related to or
       employed by any of the parties in the foregoing
14     matter, and further that I am not a relative or
       employee of any attorney or counsel employed by
15     the parties hereto, or financially interested
       in the action.
16

17

18

19     _____

20     STEPHANIE J. COUSINS, CSR, RPR, RMR, CRR
       NOTARY PUBLIC
21

22

23

24

25
```