**WILKINSON STEKLOFF LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonstekloff.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonstekloff.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel:  202-847-4030 | Fax: 202-847-4005

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel:  202-898-5843 | Fax: 202-682-1639

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel:  202-662-6000

**BRYAN CAVE LEIGHTON PAISNER LLP**
K. Lee Marshall (CA Bar No. 277092)
(klmarshall@bclplaw.com)
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Tel:  415-675-3400 | Fax: 415-675-3434

Jed P. White (CA Bar No. 232339)
(jed.white@bclplaw.com)
Linda C. Hsu (CA Bar No. 239880)
(linda.hsu@bclplaw.com)
120 Broadway, Suite 300
Santa Monica, CA 90401
Tel:  310-576-2100 | Fax: 310-576-2200

*Attorneys for Defendant Monsanto Company*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION, | MDL No. 2741<br><br>Case No. 3:16-md-02741-VC |
| *Brett Beckfield v. Monsanto Company, 3:21-cv-05322-VC* | **MONSANTO COMPANY'S NOTICE OF MOTION AND MOTION TO EXCLUDE THE TESTIMONY OF CHRISTOPH F.A. VOGEL; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**Hearing:**<br>Date:    March 1, 2024<br>Time:    10:00 a.m.<br>Place:    Courtroom 4 |

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** beginning on March 1, 2024 at 10:00 a.m. or a date/time to be determined by the Court, in Courtroom 4 of the United States District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, or as ordered by the Court, Defendant Monsanto Company ("Monsanto") will present its Motion to Exclude Testimony of Christoph Vogel. Monsanto seeks an order excluding the opinions of this witness under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

Dated:  December 14, 2023                                   Respectfully submitted,

                                                            */s/ Linda C. Hsu*
                                                            Linda C. Hsu
                                                            Attorney for Defendant Monsanto Company

MOTION TO EXCLUDE TESTIMONY OF CHRISTOPH VOGEL

TABLE OF CONTENTS

INTRODUCTION ............................................................................................................................. 1

LEGAL STANDARD ...................................................................................................................... 1

ARGUMENT ................................................................................................................................... 2

    I.     Vogel is Not Qualified to Opine or Offer Opinions on Causation. ............................ 2

    II.    Dr. Vogel's methodology for selecting and applying scientific literature is not generally accepted. ........................................................................................................ 4

    III.   Rendering a Specific Causation Opinion in a Toxic Exposure Case Without Calculating Absorbed Dose or Actual Exposure is Not a Generally Accepted Methodology. ............................................................................................................... 6

    IV.   Dr. Vogel Improperly Fails to Rule Out the Possibility that Plaintiff's NHL Occurred Naturally, In Spite of Plaintiff's Documented Risk Factor. ....................... 8

    V.    The Court Should Exclude Dr. Vogel's Opinions on Cancer "Promotion" and on The George Study. ................................................................................................... 10

CONCLUSION ............................................................................................................................. 12

# TABLE OF AUTHORITIES

Page(s)
**Cases**

*Berry v. Armstrong Rubber Co.*,
    989 F.2d 822 (5th Cir. 1993) ................................................................................................ 2

*Borg- Warner Corp. v. Flores*,
    232 S.W.3d 765 (Tex. 2007) ................................................................................................... 8

*Cooper v. Brown*,
    510 F.3d 870 (9th Cir. 2007) ................................................................................................... 2

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ....................................................................................................... *passim*

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*,
    285 F.3d 609 (7th Cir. 2002) ................................................................................................... 3

*Engilis v. Monsanto Co.*,
    No. 3:19-cv-07859-VC ........................................................................................................... 3

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices and Prods. Liab. Litig.*,
    892 F.3d 624 (4th Cir. 2018) ................................................................................................... 8

*McClain v. Metabolife Int'l, Inc.*,
    401 F.3d 1233 (11th Cir. 2005) ............................................................................................... 8

*Parkhill v. Alderman-Cave Milling & Grain Co.*,
    2010-NMCA-110,149 N.M. 140, 148, ¶¶ 37-38, 245 P.3d 585, 593 (N.M. Ct.
    App 2010) ................................................................................................................................ 8

*White v. Ford Motor Co.*,
    312 F.3d 998 (9th Cir. 2002) ................................................................................................... 2

**Other Authorities**

Ex. A, *Vogel Dep.* ............................................................................................................................ 3

Ex. B, Christoph F. Vogel Report Aug. 16, 2022 ("Vogel Report") ............................................. 4

Ex. C, EPA 1/6/2020 Memo ............................................................................................................ 6

Ex. D, George, J., et al., *Studies on glyphosate-induced carcinogenicity in mouse
    skin: A proteomic approach* ................................................................................................ 10

Ex. E, EPA, Office of Pesticide Programs, *Revised Glyphosate Issue Paper:
    Evaluation of Carcinogenic Potential* ................................................................................ 11

Ex. F, IARC, *Glyphosate in Some Organophosphate Insecticides and Herbicides: Diazinon, Glyphosate, Malathion, Parathion, and Tetrachlorvinphos, Monograph Vol. 112 on the Evaluation of Carcinogenic Risks to Humans* (2015) .................................................................................................................... 11

Ex. G, BAuA, Proposal for Harmonized Classification and Labeling: N (phosphonomethyl)glycine; Glyphosate (ISO), CLH Report for Glyphosate (2016) ........................................................................................................................ 11

Ex. H, Heath *Pepperday* Rpt. ............................................................................................ 11

Fed. R. Evid. 702 ................................................................................................................ 2

Federal Rule of Evidence 702 ........................................................................................ 1, 2

*In re Roundup Prods. Liab. Litig.*,
Pretrial Order No. 288: Order Granting Motions to Exclude Experts Charles and Schneider, MDL No. 2741, Case No. 16-md-02741-VC (N.D. Cal. Nov. 15, 2023), .................................................................................................................. 4

Rule 26 ................................................................................................................................ 1

# INTRODUCTION

In the more than four decades since Roundup®-branded products were first introduced, regulators around the world have repeatedly concluded that glyphosate and glyphosate-based herbicides like Roundup do not cause cancer. To counter that consistent conclusion, Plaintiff Brett Beckfield ("Plaintiff") relies on the unreliable testimony of Dr. Christopher Vogel on both general and specific causation, i.e., (1) whether exposure to glyphosate and/or glyphosate-based herbicides ("GBHs") can cause non-Hodgkin's lymphoma ("NHL"), and (2) whether exposure to glyphosate and/or glyphosate-based herbicides ("GBHs") such as Roundup was a cause of Mr. Beckfield's mantle cell lymphoma, a subset of non-Hodgkin's lymphoma ("NHL"). *See* Plaintiff's Rule 26 Specific Causation Expert Disclosures, August 22, 2022 at 4. Dr. Vogel's disclosed testimony is broad. Plaintiff asserts that he "will testify on issues of specific causation and… regarding medical toxicology and environmental risk assessment of Roundup usage, evaluation of the chronicity and amount of Roundup exposure, how personal protective gear affects the amount of exposure, and epidemiological factors." *Id.* Dr. Vogel is new to the Roundup cases and the opinions he seeks to offer have never been subject to scrutiny by this or any court.

Dr. Vogel's testimony is inadmissible and should be excluded under *Daubert* for four reasons: ***first***, Dr. Vogel is not qualified to offer the opinions in his report; ***second***, Dr. Vogel's methodology for selecting and applying scientific literature is not generally accepted; ***third***, Dr. Vogel improperly renders a specific causation opinion without calculating dose, which is not generally accepted; and ***fourth***, Dr. Vogel improperly vails to rule out statistically significant alternative causes for Plaintiff's NHL. For these reasons, Dr. Vogel's testimony should be excluded in its entirety. In the alternative, if the Court admits any portion of Dr. Vogel's testimony, it should exclude any and all testimony on glyphosate as a cancer "promoter."

# LEGAL STANDARD

To be admissible, expert testimony must: (1) come from a witness "qualified as an expert by knowledge, skill, experience, training, or education"; (2) be derived from "scientific, technical, or other specialized knowledge"; and (3) "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.

1

MOTION TO EXCLUDE TESTIMONY OF CHRISTOPH VOGEL

When an expert's field of expertise is not related to the subject on which he seeks to offer testimony, such testimony is inadmissible. *See White v. Ford Motor Co.*, 312 F.3d 998, 1008-09 (9th Cir. 2002). Apart from qualifications, expert testimony must be (1) based upon sufficient facts or data, (2) the product of reliable principles and methods, and (3) the result of applying those principles and methods reliably to the facts of the case. Fed. R. Evid. 702. The trial judge is charged with the responsibility of acting as a gatekeeper to "ensure that any and all scientific testimony … is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). The proponent of the expert bears the burden of proving that the expert's proffered testimony is admissible. *See*, *e.g.*, *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007).

Moreover, an expert's conclusions are not admissible if they are based on an unreliable foundation or methodology. *Daubert,* 509 U.S. at 592-95. Factors to consider in evaluating reliability are (1) whether the expert's opinion is susceptible to testing and has been subjected to testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been generally accepted in the scientific community. *Id.* at 593-94.

## ARGUMENT

### I.   Vogel is Not Qualified to Opine or Offer Opinions on Causation.

By his own admissions, Dr. Vogel lacks the qualifications required to opine on causation. A proposed expert witness must possess "knowledge, skill, experience, training, or education" sufficient to qualify him as an expert on the subject to which his testimony relates. Fed. R. Evid. 702. When an expert's field of expertise is not related to the subject on which he seeks to offer testimony, such testimony is inadmissible. *See White v. Ford Motor Co.*, 312 F.3d 998, 1008-09 (9th Cir. 2002); *see also Berry v. Armstrong Rubber Co.*, 989 F.2d 822, 828 (5th Cir. 1993) (affirming exclusion of experts who "stepped outside of their areas of expertise" into an area in which they had no training); *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 612–14 (7th Cir. 2002) ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist of a different specialty.").

Dr. Vogel is a research professor and toxicologist who has testified that he is not an expert on lymphoma in humans. *See* Ex. A, Christoph F. Vogel June 27, 2023 Dep. ("Vogel Dep.") at 53:2-5. The only papers Dr. Vogel has published on lymphoma relate to the study of rodents and Dr. Vogel has testified that he "[doesn't] think you can really translate" this research to NHL in humans. *Id.* at 47:23-48:2; 49:11-22. According to Vogel, "you would have to ask an MD to—you know, how far can you really translate it into a subtype of NHL in humans." *Id.* at 49:25-50:2. Dr. Vogel is not an oncologist and does not treat or diagnose cancer in humans. *Id.* 40:15-20. Dr. Vogel studies and identifies cancer "[n]ot from human, but from mouse model," *id.* at 40:21-24, and he acknowledges that there are physiological differences between humans and rodents and that certain chemicals can cause cancer in rodents but have not been shown to cause cancer in people, *id.* at 241:11-23.

Dr. Vogel likewise is not an expert in epidemiology. Ex. A, *Vogel Dep.* at 42:10-24, 53:9-11. He is not a pathologist, *id.* at 40:25-41:2, an industrial hygienist or a weed scientist, *id.* at 42:25-43:5. Dr. Vogel is not an expert on EPA regulations, *id.* at 53:6-8, and he has never been asked by any regulatory agency to advise on the carcinogenicity of any substance, *id.* at 46:18-47:9. Although he opines about Plaintiff's dose in his report, he has testified that he does not know the dose of glyphosate a person would need to absorb in order to increase their risk of NHL. *Id.* at 9:9-13.

Dr. Vogel does not possess the necessary qualifications to testify about whether Roundup caused Plaintiff's NHL, or whether Roundup can cause NHL in humans. He has no expertise in lymphoma or any cancer in humans and, by his own admission, he is not qualified to apply data on animal lymphoma to humans. His report is nothing more than a selection of cherry-picked studies that he is not qualified to interpret. As this Court noted recently in ruling on Monsanto's motion to exclude certain causation experts in *Engilis v. Monsanto Co.*, No. 3:19-cv-07859-VC, an expert's "cherry-pick[ing] the findings of the epidemiological studies, reporting only certain odds ratios—those most favorable to his ultimate opinion" disqualifies his testimony. *See In re Roundup Prods. Liab. Litig.*, Pretrial Order No. 288: Order Granting Motions to Exclude Experts Charles and Schneider, MDL No. 2741, Case No. 16-md-02741-VC (N.D. Cal. Nov. 15, 2023), at 3 [Dkt. No.

17504]. Thus, his opinions regarding whether Roundup causes NHL or has caused Plaintiff's NHL are far outside of the scope of his knowledge, skill, and experience.

## II. Dr. Vogel's methodology for selecting and applying scientific literature is not generally accepted.

### A. Dr. Vogel Ignores or Disregards Relevant, Reliable Scientific Literature That Does Not Support His Conclusions.

Dr. Vogel's expert report consists of a summary of studies selected by him which, according to Dr. Vogel, "provide a compelling link between the exposures to glyphosate and an increased risk to develop NHL." *See Ex. B,* Christoph F. Vogel Report Aug. 16, 2022 ("Vogel Report") at 11. Relying on his curated sample of studies, Dr. Vogel likewise concludes that his report "provide[s] the best possible answer to the question of whether or not the exposure of Mr. Beckfield to Roundup may have caused the development of Mantel Cell lymphoma." Based on his review of Mr. Beckfield's history and the studies he selected himself, Dr. Vogel assures the reader that the answer to this question is "yes." Ex. B, Vogel Report at 11-12.

However, the Court cannot—and need not—rely on Dr. Vogel's own assessment of the quality of his analysis. Dr. Vogel's application of the science should only be admitted under *Daubert* if it has been generally accepted in the scientific community. *See generally Daubert,* 509 U.S. at 593-94. The answer to this question is no. Dr. Vogel's report and deposition demonstrate that he did not seriously consider several scientifically valid and relevant sources of data, including studies that he admits to be reliable and relevant. Instead, he started with the conclusion that Roundup can cause NHL and did cause Plaintiff's NHL, and then sought scientific support to justify those conclusions. Dr. Vogel fails to provide a reasonable explanation as to why he chose to include some data and exclude others. Dr. Vogel engages a flawed, results-driven "always Roundup" methodology— precisely the type of unconventional approach that should be excluded under *Daubert*.

Most notably, although he purports to offer "compelling" analysis on general causation and "the best possible answer" to the question of specific causation, Dr. Vogel fails to seriously consider or accurately apply the Agricultural Health Study ("AHS"), which he acknowledges to be the largest epidemiological study looking at the relationship between glyphosate and NHL. Ex. A, Vogel Dep. at 204:1-205:12. Dr. Vogel's only mention of this study is its inclusion at the end of Table 1, where

he indicates that the study found "5[,]779 cancer cases in 44[,]932 applicators." Ex. B, Vogel Report at 5-6. This brief nod to the AHS is incomplete and misleading. In truth, as Dr. Vogel acknowledged in his deposition, the authors of this study found *no relationship* between glyphosate and NHL among the approximately 54,000 applicators they studied, all of whom were engaged in farming and licensed pesticide application. Ex. A, Vogel Dep. at 209:6-13. Dr. Vogel acknowledged that the AHS was "a high quality study," that it used an appropriate study population to determine whether glyphosate causes NHL, and that it was the largest study of its kind as far as he is aware. *Id.* at 203:10-12; 205:13-206:6; 205:11-12. In his report and deposition, Dr. Vogel offers no explanation for his decision to all-but disregard this study, which follows a large group of more than 50,000 individuals similarly situated to Plaintiff (exposed to glyphosate in an agricultural setting). Instead, to reach his conclusion that Plaintiff's use of glyphosate increased his risk of NHL, Dr. Vogel relies primarily on the McDuffie and Eriksson studies, each of which relied on data from approximately 2,000 individuals. *See* Ex. A, Vogel Dep. at 213:22-214:1; Ex. B, Vogel Report at 5. Dr. Vogel cannot justify this decision because it was not based on generally accepted scientific principles; it was based on Dr. Vogel's aim to support his conclusion.[1]

### B. Dr. Vogel Improperly Relies on Flawed Studies That Are Not Generally Accepted.

In addition to disregarding the largest high-quality study on the topic at hand, Dr. Vogel also relies on scientific authority that is not generally accepted, including the Zhang meta-analysis and the George rodent study.

Dr. Vogel repeatedly cites Zhang's 2019 paper, including to support his conclusion that "the link between exposure to glyphosate and NHL is stronger than previously reported." Ex. B, Vogel Report at 4. However, the Zhang paper is not generally accepted and has been extensively criticized. In January 2020, the EPA evaluated Zhang's 2019 meta-analysis and found serious methodological flaws therein. Specifically, EPA found that Dr. Zhang and her co-authors did not use "appropriate

---

[1] In a similar omission, although his report criticizes and dismisses the EPA's analysis and conclusion that glyphosate is not carcinogenic, he has admitted that he has not reviewed or analyzed all of the data that the EPA considered in making its determination, including mechanistic studies that "probably" would have been relevant and helpful in his analysis. Ex. A, Vogel Dep. at 142:18-143:1; 133:12-24.

methods to perform their meta-analyses" because they "did not include an ever/never estimate" and instead only compared patients with higher NHL exposure levels to those with lower NHL exposure levels. *See* Ex. C, EPA 1/6/2020 Memo. at 12-13. The EPA concluded that a properly conducted meta-analysis would have found "lower and non-statistically significant meta-estimates." *Id*. at 12. Therefore, Zhang's 2019 Paper did not change EPA's assessment of glyphosate's carcinogenicity, and EPA maintained its assessment that glyphosate is "not likely to be carcinogenic to humans." *Id*. at 13. In other words, the EPA found that the Zhang 2019 meta-analysis did not support Dr. Vogel's opinion that Roundup can or did cause Plaintiff's NHL. Indeed, this is precisely why it is not generally accepted in the scientific community to make causation determinations based on a limited subset of evidence without conducting a weight of evidence review.

Dr. Vogel likewise cites a mouse study known as the George study. He does so to support his opinion that glyphosate may have "tumor-promoting" effects. Ex. B, Vogel Report at 8. As discussed below, the George study has been widely discredited as inadequate for scientific analysis. Dr. Vogel's reliance on this study is further indication that his application of the science is not generally accepted and his testimony is inadmissible under *Daubert*.

Further, Dr. Vogel relies extensively on studies that assess the toxicity of glyphosate. However, toxicity is not the same as carcinogenicity, the actual issue the jury will be required to weigh and assess. Indeed, Dr. Vogel has conceded that many of the mechanistic studies he relies on show toxicity, and that this inquiry is not relevant to the question of carcinogenicity. Ex. A, Vogel Dep. at 76:17-77:3. Any suggestion that these toxicity studies support findings on carcinogenicity or causation relating to NHL are mere speculation. Dr. Vogel improperly uses these studies to prop his conclusions. Toxicity is not a proxy for carcinogenicity. Dr. Vogel's reliance on this data is further indication that his methodology is not supported or generally accepted by the scientific community.

**III.    Rendering a Specific Causation Opinion in a Toxic Exposure Case Without Calculating Absorbed Dose or Actual Exposure is Not a Generally Accepted Methodology.**

Dr. Vogel has acknowledged that people can be exposed to carcinogens daily without getting cancer because the dose makes the poison. Ex. A, Vogel Dep. at 11:8-12:7. He opines in his report

6
MOTION TO EXCLUDE TESTIMONY OF CHRISTOPH VOGEL

that "it is likely" that Plaintiff was exposed to liquid aerosols from Roundup which were absorbed by his skin, and that Plaintiff's "exposure time" to glyphosate was "clearly above the exposure threshold metric." Ex. B, Vogel Report at 9-10. However, when pressed on this question, Dr. Vogel made it clear that he lacks the knowledge and data necessary to make these statements, which appear to be simple guesswork. For example, although he maintains his opinion that Plaintiff had a dose of glyphosate that increased his risk of NHL, Dr. Vogel admits that he does not know what dose would be necessary to increase the risk of NHL. Ex. A, Vogel Dep. at 10:18-11:4. He likewise concedes that he does not know how much glyphosate (if any) Plaintiff may have absorbed. *Id.* at 12:8-17. He even concedes that glyphosate that reaches the skin would have a very difficult time breaking through and entering the body. *Id.* at 168:6-10.

Rather than assess exposure or dose (*i.e.,* the amounts of Roundup that came into contact with Plaintiff's skin and were eventually absorbed by it), Dr. Vogel focused exclusively on the amount of *time* Plaintiff spent spraying Roundup. Ex. B, Vogel Report at 10-11. Relying on Plaintiff's self-reported exposure intervals, Dr. Vogel determines that Plaintiff "reached a cumulative exposure of 525 days." *Id.* at 10-11. From this exposure-day number, Dr. Vogel takes a series of logical leaps that lead him to his conclusion that "the causal relationship between [Plaintiff's] specific exposure to glyphosate and the development of NHL is evident." *Id.* at 12.

Dr. Vogel thus ignores the critical concepts of exposure and dose entirely and uses "exposure days" as a proxy for exposure, which itself is a proxy for dose. The amount of time a person spends spraying a chemical says nothing about the amount of chemical that came into contact with that person's skin (*i.e.*, exposure), let alone the amount of chemical that the person absorbed through his or her skin (*i.e.,* dose)—both of which are necessary to determine causation in a toxic exposure case. Even if it were generally accepted to calculate and use a person's exposure to a chemical in lieu of an absorbed dose when assessing a person's individual risk of cancer (it is not), Dr. Vogel's exposure-days assessment does not even do that. Instead, Dr. Vogel simply answers the irrelevant question regarding the amount of time Plaintiff spent spraying Roundup, without considering the amount of Roundup, if any, that came into contact with Plaintiff's skin or that was absorbed by it.

MOTION TO EXCLUDE TESTIMONY OF CHRISTOPH VOGEL

Not only is this not a generally accepted methodology, it is not even a proper subject of expert testimony, as the jury is capable of hearing testimony on days of use and conducting simple math.

The Court should reject this methodology because it is not generally accepted that a specific causation opinion in a toxic exposure case can disregard the critical concepts of absorbed dose and actual exposure in favor of a formulaic "exposure days" calculation that, by its very nature, ignores case-specific factors bearing on the plaintiff's exposure.

An assessment of dose is central when assessing causation, as acknowledged by plaintiff's experts in prior Roundup trials and by courts around the country. *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1242 (11th Cir. 2005) ("Dose is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect."); *Borg-Warner Corp. v. Flores*, 232 S.W.3d 765, 770-73 (Tex. 2007) (discussing the importance of dose on causation inquiry and reversing judgment in plaintiff's favor following a jury trial where plaintiff did not establish sufficient dose to cause alleged injuries); *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices and Prods. Liab. Litig.*, 892 F.3d 624, 639 (4th Cir. 2018) ("all chemical agents are intrinsically hazardous," and "whether they cause harm is only a question of dose."); *Parkhill v. Alderman-Cave Milling & Grain Co.*, 2010-NMCA-110,149 N.M. 140, 148, ¶¶ 37-38, 245 P.3d 585, 593 (N.M. Ct. App 2010) (excluding as unreliable causation testimony in a toxic exposure case where the expert "did not attempt to quantify the dose of [the chemical] received by the [plaintiff]"). Because Dr. Vogel's methodology simply ignores this pivotal concept and does not even consider the amounts of Roundup to which Plaintiff was actually exposed, it should be excluded.

### IV. Dr. Vogel Improperly Fails to Rule Out the Possibility that Plaintiff's NHL Occurred Naturally, In Spite of Plaintiff's Documented Risk Factor.

Dr. Vogel's report demonstrates that he did not seriously consider that something other than Roundup could have caused Plaintiff's NHL. Instead, he started with the conclusion that Roundup was the cause, and then sought to justify that conclusion. Dr. Vogel fails to provide a reasonable explanation as to why or how he ruled out alternative causes. Specifically, Dr. Vogel fails to account for his refusal to consider random genetic mutations or a genetic predisposition to NHL.

Notably, Dr. Vogel dismisses the possibility that Plaintiff may be genetically predisposed to NHL because he has a family history of cancers. Dr. Vogel concedes that one of the studies he relies

on most heavily found a 31% increased risk for NHL in those who, like Plaintiff, have a first-degree relative with cancer. Ex. A, Vogel Dep. at 220:17-221:2; 222:1-14. When asked for an explanation for his dismissal of this risk factor, Dr. Vogel struggled to explain himself:

> [Question]: Did you take that into account, this data in the McDuffie study, which you found reliable, in reaching your conclusions regarding excluding Mr. Beckfield's family history of cancer as causing or contributing to his NHL?
>
> [Vogel]: I considered it, but it's still for me clearly overwhelming that the exposure in his case was the dominant factor causing NHL in his case.
>
> [Question]: **Okay. So you have not concluded to a reasonable degree of scientific certainty that Mr. Beckfield's family history of cancer did not cause or contribute to his NHL in some way?**
>
> [Vogel]: *Well, I have no evidence for it.* But, of course, you know, in my opinion, it's -- I considered it, of course, you know. Cancer history is important in families. And it's impossible to compute that. But, you know, the overwhelming data and statements we had from Mr. Beckfield regarding his exposure was convincing me that this was not the reason causing NHL in Mr. Beckfield.

Ex. A, Vogel Dep. at 221:3-23. Dr. Vogel does not just fail to offer support: he admits that he ***has no evidence*** to support his conclusion that Plaintiff's NHL is unrelated to the fact that Plaintiff is 31% more likely than the general population to naturally develop NHL. Dr. Vogel confirmed his failure to rule this out on more than one occasion:

> Question: [C]an you rule out to a reasonable degree of toxicological certainty that a genetic predisposition caused or contributed to his NHL?
>
> [Vogel]: **I cannot rule it out[.]**

*Id.* at 108:20-25. Dr. Vogel likewise acknowledges that he cannot rule out random genetic mutations as the cause of Plaintiff's NHL. His only justification for his dismissal of these causes is the so-called "overwhelming data" on dose—data that is far from overwhelming based on Dr. Vogel's own testimony. *See id.* at 12:8-17 (conceding that he does not know how much glyphosate Plaintiff may have absorbed). Dr. Vogel's failure to rule in and meaningfully consider these statistically significant and highly relevant potential causes of Plaintiff's NHL deviates from any conventional or generally accepted methodology.

**V.      The Court Should Exclude Dr. Vogel's Opinions on Cancer "Promotion" and on The George Study.**

In his expert report, Dr. Vogel telegraphs his intention to opine that Roundup is a cancer "promoter," based on a mouse study known as the George study. Ex. B, Vogel Report at 8 ("In a 2-stage mouse skin carcinogenesis model where mice were exposed topically to glyphosate George et al. (2010) confirmed the tumor-promoting effect of glyphosate."). The George study has been discredited and rejected as inadequate for scientific analysis. Thus, the Court should preclude Dr. Vogel's unsupported and unscientific opinions on this topic.

The George study is a small mouse study in which various combinations of (1) a known carcinogen, (2) a known tumor promoter, (3) Roundup, (4) 2-dimethylbenz[a]anthracene ("DMBA"), and (5) 7, 12-O-tetradecanoyl-phorbol-13-acetate ("TPA") were painted on the skins of the subject animals. Ex. D, George, J., et al., *Studies on glyphosate-induced carcinogenicity in mouse skin: A proteomic approach*, 73 Journal of Proteomics 951 (2010) at 953. It was designed, in relevant part, to determine if glyphosate *initiated* tumors or if it *promoted* tumors generated by a known tumor initiator. It concluded that glyphosate *"failed* to provoke neoplastic development when tested as tumor initiator or complete carcinogen," but did show "carcinogenic potential" as a tumor promoter." Ex. D, George 2010 at 954.

The George study was evaluated by several major national and international agencies, including EPA and IARC, and those agencies have each highlighted the study's significant flaws:

- Ex. E, EPA, Office of Pesticide Programs, *Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* (Dec. 12, 2017) at 70 ("A number of studies were judged to be inadequate in protocol, conduct or reporting and were not considered in the analysis of glyphosate . . . An initiation-promotion study (George et al., 2010) in male Swiss mice that tested a commercial formulation of glyphosate (41%) on the skin. Study deficiencies included small number (20) of animals, tested only males, and lack of histopathological examination.").

- Ex. F, IARC, *Glyphosate in Some Organophosphate Insecticides and Herbicides: Diazinon, Glyphosate, Malathion, Parathion, and Tetrachlorvinphos, Monograph Vol. 112 on the Evaluation of Carcinogenic Risks to Humans* (2015) at 32 ("Short duration of treatment, no solvent controls, and lack of any histopathological evaluation, Age at start, NR (mice weighed 12–15 g bw) The Working Group concluded this was an inadequate study for the evaluation of glyphosate.").

- Ex. G, BAuA, Proposal for Harmonized Classification and Labeling: N (phosphonomethyl)glycine; Glyphosate (ISO), CLH Report for Glyphosate (2016) at 66 ("[George] cannot contribute to a decision on the classification of glyphosate.").[2]

In addition to these agencies, other plaintiff's experts in the Roundup litigation also have refused to rely on the George study, acknowledging its flaws. For example, Dr. Jennifer Heath, the toxicologist disclosed in the *Pepperday* and *Young* cases pending in Pennsylvania state courts concluded that the George study is "inadequate for our purposes" and "too brief to be reliable as an evaluation of the ability to cause cancer." Ex. H, Heath *Pepperday* Rpt. at 52. This consensus view rejecting the George study is ample evidence that a "cancer promoter" opinion based on that study is not generally accepted in the scientific community. Accordingly, the Court should prohibit Dr. Vogel from offering the undisclosed opinion that glyphosate or Roundup is a cancer promoter, based on this discredited study.[3]

---

[2] The BAuA is Germany's Federal Institute for Occupational Safety and Health.
[3] Moreover, Dr. Vogel makes an unsupported speculative leap, inferring from this study of chemicals painted on mouse skin that Roundup can promote cancer in *humans*.

## CONCLUSION

For the foregoing reasons, the Court should grant Monsanto's Motion to Exclude Testimony of Christoph Vogel. In the alternative, if the Court admits any portion of Dr. Vogel's testimony, it should exclude any testimony relating to glyphosate as a cancer "promoter" based on the George study.

Dated: December 14, 2023              Respectfully submitted,

/s/ Linda C. Hsu
Linda C. Hsu
Attorney for Defendant Monsanto Company

## CERTIFICATE OF SERVICE

I hereby certify that on December 14, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing (NEF) to all counsel of record who are CM/ECF participants.

/s/ Linda C. Hsu
Linda C. Hsu