# EXHIBIT H

Report of Jenifer S. Heath, PhD
Pepperday
April 2023

# REPORT OF JENIFER S. HEATH, PH.D.

*Pepperday v. MONSANTO COMPANY*

Case No. 220602425

## Table of Contents

1. EXECUTIVE SUMMARY……………………………………………………………………………………2
2. EDUCATION AND EXPERIENCE AS A TOXICOLOGIST……………………………4
3. ROUNDUP AND GLYPHOSATE……………………………………………………………………6
4. SCIENTIFIC CONTEXT OF THIS CASE……………………………………………………………8
5. CASE-SPECIFIC SUMMARY……………………………………………………………………………11
6. THE SCIENCE……………………………………………………………………………………………………15
   6A. Non-Hodgkin's Lymphoma……………………………………………………………15
   6B. Exposure……………………………………………………………………………………………17
   6C. Absorption, Distribution, Metabolism, Storage and Elimination (ADME)……………25
   6D. Genotoxicity and Mechanisms of Action (MOA)………………………………38
   6E. Carcinogenicity in Experimental Animal Studies……………………………50
   6F. Epidemiology………………………………………………………………………………………59
7. INTERPRETATION……………………………………………………………………………………………..71
8. REFERENCES……………………………………………………………………………………………………..74

Report of Jenifer S. Heath, PhD
Pepperday
April 2023

## 1. EXECUTIVE SUMMARY

I was retained as a professional toxicologist to evaluate the potential for exposure to chemicals in formulations of Roundup and/or glyphosate to cause Non-Hodgkin's lymphoma (NHL).

Specifically, I have studied the case of Mr. Pepperday (Plaintiff) who was exposed to Monsanto's RoundUp products and its active ingredient glyphosate as well as various other components or ingredients of the specific products he used for decades in the course of Maintaining his residential yards and his volunteer service. He now suffers from NHL.

This report was prepared after I considered (1) medical records of Mr. Pepperday (2) the reports of plaintiff's expert(s), (3) the reports of various credible scientific groups related to the potential carcinogenicity of glyphosate, (4) scientific peer reviewed literature and proprietary industry literature (as provided) related to Roundup toxicology, (5) some internal Monsanto communications provided to me, (6) Mr. Pepperday's deposition transcript, Plaintiff fact sheet and responses to interrogatories, and (7) any other documents on my materials considered list. I interviewed Mr. Pepperday by phone to understand the details of his exposure to these products as well as other potentially relevant exposures.

This process involved identifying key information in case-related documents, searching available published literature, incorporating available proprietary data from Monsanto and synthesizing an understanding of the evidence in this case in light of available science.

This report evaluates the potential for Mr. Pepperdays's NHL to have been caused by his exposure to glyphosate/Roundup.

The process I have followed to evaluate the facts of this case, including the general body of scientific literature, is the same process I follow in other cases.

This report is organized as follows:

Section 1.  **Executive Summary**

Section 2. **Education and Experience**

Section 3.  **Introduction to Roundup / Glyphosate**

Section 4.  **Scientific Context**

Section 5. **This Case**: including Table Exposure Pepperday.

Section 6.  **The Science**

    6.a.  **Non-Hodgkin's Lymphoma**

Report of Jenifer S. Heath, PhD
Pepperday
April 2023

      6.b.   **Exposure**, including Biomonitoring versus Direct Measurement (aka Passive Dosimetry), Personal Protective Equipment (PPE), Table [Clothing] 1, Impact of Late Detection Limit Method Development Resulting in Limitations on Biomonitoring Study Conclusions Due to High Detection Limits

      6.c.  **Absorption, Distribution, Metabolism, Excretion and Storage (ADME)**, including Dermal Absorption and Penetration Studies, Dermal Studies in Primates, Surfactants

      6.d.  **Genotoxicity / Mechanisms of Action**, including Structural Alerts, Comet Assay, Comment on Gates

      6.e.  **Carcinogenicity in Experimental Animal Studies**, including Critical Reviews in Toxicology, IARC Evaluation of Experimental Animal Studies Related to Cancer, Jameson 2022, Portier 2020a, case law from the US Court of Appeals 9th Circuit Court

      6.f.  **Epidemiology**, including ATSDR 2020, Interpretation of Mr. Pepperday's Exposure to Roundup, NHANES and Other Population Biomonitoring Data

Section 7.  **Interpretation**

Report of Jenifer S. Heath, PhD
Pepperday
April 2023

## 2.  EDUCATION AND EXPERIENCE AS A TOXICOLOGIST

I am an independent toxicologist, practicing as a sole proprietor, aka Woven Egg Consulting and/or HeathToxicology, located at P.O. Box 371136, Denver, CO, 80237.

By way of educational summary, I received an Associates Degree in Nursing from Ellis Hospital School of Nursing in 2007, a Bachelors of Science in Public Health from the University of Massachusetts at Amherst in 1980, a Masters of Science in Toxicology and Nutrition from North Carolina State University in 1983, a Masters of Arts in Public Policy Studies from Duke University in 1986, and a Doctorate in Environmental Toxicology from Cornell University in 1987.

I am testifying here as a toxicologist with training and experience in epidemiology, chronic animal studies, and mechanisms of action leading to adverse effects.  Toxicology is the study of adverse effects of chemical, biological, and physical agents on living systems, including humans and encompasses data from humans (including epidemiology) and information about how chemicals cause adverse effects at the cellular or subcellular levels.  I have worked as a professional toxicologist for over 35 years.

By way of work experience as a toxicologist, I was first employed as a chemical safety analyst by Mobay, which was owned by Bayer, a global pesticide and chemical manufacturer, in a role focused primarily on herbicide (weed killer) registration and safety.  I was the primary toxicologist tracking toxicology aspects of the registration process for a new herbicide and for responding to agency inquiries about a registered herbicide.  I also helped the other chemical safety analysts with several self-contained projects, and did some work beyond pesticides with food packaging, animal health products, and a division that made pigments and dyes.

I then worked for the State Health Department in North Carolina (where I also had done an internship as part of one of my Master's degrees).  In this role I responded to questions about the toxicity of a wide range of chemicals in homes, schools, drinking water and workplaces.  I evaluated chemical exposure data (usually collected by colleagues) in the context of (1) literature about the toxicity of the chemicals to reach conclusions about whether the exposure would be likely to cause or to have caused an adverse effect(s) in those exposed or (2) about whether the exposure, if not already reduced, needed to be reduced or eliminated.  I worked closely with another toxicologist as well as the state epidemiologist, and with the state childhood lead (Pb) poisoning program.

I have spent the rest of my career as a consultant, both as an employee of large consulting firms and as an independent consultant.  In my role as a consultant, I have consulted to a wide range of clients, including industry, mines, refineries, several Regions of the United States Environmental Protection Agency, other federal entities such as the General Services

Report of Jenifer S. Heath, PhD
Pepperday
April 2023

Administration and Department of Defense, state agencies, and law firms. I have evaluated many workplace exposures to chemicals as well as residential and other exposure situations.

In addition to my training and experience in Toxicology and Risk Assessment (described in Section 2), I have also received explicit education and training in public policy and ethics. In addition to my Master's degree in Public Policy Studies, I have had explicit coursework in Ethics, Policy Making, Development of Occupational and Environmental Health Standards, Principles of Public Health Practice, Principles in Occupational Health, Environmental Policy, Safety Evaluation in Public Health, Dilemmas for Toxicologists, and Regulating the Corporation. Nursing school also included explicit coursework related to ethics. At least twice over the course of my formal education my coursework included case studies about the IBT toxicity testing fraud.

This education, in conjunction with my hands-on experience working for both regulators and the regulated, has prepared me to recognize dilemmas and opine about words and choices made by parties and their potential impact on public health and safety as well as whether those choices seem to promote the production and sale of safe products. Because I myself worked for a pesticide manufacturer (Mobay, then owned by Bayer) in the general timeframe in which much of the Roundup history unfolded, I can compare Monsanto's actions (as represented by their internal communications provided to me) with actions I participated in or observed at Mobay, and I can reach an opinion about whether Monsanto's choices were consistent with industry standards and practices, and my own experiences of what actions a reasonable and conscientious pesticide manufacturer would take to prioritize the safety of both their product and consumers.

### 6.e. Carcinogenicity in Experimental Animal Studies

Based on my experience reviewing registration packages for pesticides, I know that full reports of laboratory studies for cancer (carcinogenicity or even chronic studies) can be hundreds or even over 1,000 pages long. These studies are extremely expensive to run and can take many years to complete. Even after the need for such a study has been realized, it can take months or even years to prepare for the study, including finding the right laboratory that has appropriate space and professionals and access to an appropriate species and getting on their schedule. Dose range finding studies may be needed, although that information also could be available from prior registration-related (or other) studies. Once started, the studies typically use hundreds of animals and run for up to 24 months. When the study has ended, final measurements (like body weight, food ingestion, etc.) must be taken and samples (such as blood) collected, and surviving animals must be humanely sacrificed. That is just the beginning of the task. Animals must be dissected and dozens of organs and tissues must be collected and processed for the various required testing and evaluation (for example, many slides may be prepared from the slices of a single organ to be reviewed by histopathologists). Each step is implemented by highly educated, trained and experienced professionals, and completion can take many months or more. Deeply evaluating the quality of these studies and the implications of their results is very time-consuming. For example, throughout the in-life portion of the study, were blood samples taken as scheduled? Were those samples analyzed for all the clinical values that were requested? Was the proper and full list of organs and tissues collected, properly treated, prepared and stored? If more than one pathologist is reading the slides, were they properly trained and their conclusions validated to ensure consistent readings and interpretations across pathologists?

**Critical Reviews in Toxicology**

In 2016, several glyphosate-related papers were published in a special supplement to the journal Critical Reviews in Toxicology. That section (46(S1)) was titled "An Independent Review of the Carcinogenic Potential of Glyphosate." As is true for most (or possibly all) credible scientific journals, Critical Reviews in Toxicology requests that authors disclose or declare any interests related to the papers. (Critical Reviews in Toxicology, 2016, 48(10):891).

In September 2018 the Editor-in-Chief and Publisher of the journal published an "Expression of Concern" that stated that they had been "… informed of concerns over the completeness of acknowledged contributions to [the supplement] , and in declarations of interest provided by the named contributors…" for 5 articles. As of September 26, 2018 (2 years following publication of the articles), the journal had received corrected information, agreed by all authors, for only 3 of the 5 papers. The editor and publisher go on to say: "We have not received an adequate explanation as to why the necessary level of transparency was not met on first submission. We thank those who brought this to our attention. When reading the articles, we recommend that

Report of Jenifer S. Heath, PhD
Pepperday
April 2023

readers take this context into account. We will continue to work to update these articles and ensure full disclosure of all contributions to them."

In November 2018, according to the Editor-in-Chief and Publisher of Critical Reviews on Toxicology, following an "… investigation into completeness of the original declarations of interest provided by the authors, it was found that these [declarations] did not fully represent the involvement of Monsanto or its employees or contractors in the authorship of the articles." "These corrigenda provide additional disclosure as to contributions to the articles, in some places in contradiction to the statements originally supplied." "We have not received an adequate explanation as to why the necessary level of transparency was not met on first submission and welcome the opportunity to address this. We regret that these corrections were necessary and thank those who brought this matter to our attention." "…we recommend that readers take the additional context the corrected disclosures provide into account when reading the articles." (Critical Reviews in Toxicology, 2018, 48(10):903)).

As a scientist, I find the original omissions and the slow process of providing full information to be very disturbing. I did not read and do not rely on the following articles, which were specifically identified by the Editor-in-Chief and Publisher:

- Williams GM, Aardema M, Acquavella J, Berry C, Brusick D, Burns MM, de Camargo JLV, Garabrant D, Greim HA, Kier LD, et al. 2016. A review of the carcinogenic potential of glyphosate by four independent expert panels and comparison to the IARC assessment. Crit Rev Toxicol. 46(S1):3–20.
- Solomon KR. 2016. Glyphosate in the general population and in applicators: a critical review of studies on exposures. Crit Rev Toxicol. 46(S1):21–27.
- Acquavella J, Garabrant D, Marsh G, Solomon KR, Sorahan T, Weed DL. 2016. Glyphosate epidemiology expert panel review: a weight of evidence systematic review of the relationship between glyphosate exposure and non-Hodgkin's lymphoma or multiple myeloma. Crit Rev Toxicol. 46(S1):28–43.
- Williams GM, Berry C, Burns MM, de Camargo JLV, Greim HA. 2016. Glyphosate rodent carcinogenicity bioassay expert panel review. Crit Rev Toxicol. 46(S1):44–55.
- Brusick D, Aardema M, Kier LD, Kirkland DJ, Williams G. 2016. Genotoxicity Expert Panel review: weight of evidence evaluation of the genotoxicity of glyphosate, glyphosate-based formulations, and aminomethylphosphonic acid. Crit Rev Toxicol. 46(S1):56–74.

In this report, I do cite to other papers or communications by one or more of these authors, sometimes in the context of internal Monsanto memoranda and emails that may provide some background and insight into the broader implications of the intellectual environment in which the Critical Reviews in Toxicology embarrassment took place.

**IARC Evaluation of Experimental Animal studies related to cancer**

Report of Jenifer S. Heath, PhD
Pepperday
April 2023

IARC included in their review 7 studies in various species of rat and 3 studies in mice (2017). The paragraphs below represent information from IARC 2017 Tables 2.1 and 3.2 and, as useful, from other reviews, as well as my own thinking.

**Studies in mice:**

**CD-1 mice, 24 months via diet, male and female, EPA 1985a, 1985b, 1986, 1991a**

Statistically significant P trend (0.016) for renal tubule adenoma in males. Re-evaluation of pathology in males reconfirmed incidence of renal tubule adenoma in males. Statistically significant trend for this tumor persisted. No data on this endpoint was provided for females. IARC 2017,

**CD-1 mouse via diet, male and female, 104 weeks, JMPR 2006**

(JMPR is the (annual) Food and Agriculture Organization (FAO) (of the United Nations)/World Health Organization (WHO) Joint Meeting on Pesticide Residues. These are summaries available from JMPR because the original proprietary data was not available to, and/or not the focus of studies considered credible by IARC. Original reports and data were not reviewed by IARC.)

Significant trend test for hemangiosarcomas in males. (This is the data that OEHHA selected as the basis for California's NSRL for glyphosate. (CalEPA 2021)) Trend tests not significant for females, but the tumor was found in 2 dose groups but not controls. No significant trend for histiocystic sarcoma in lymphoreticular/hematopoetic tissue for males or females, but these were detected in treated groups (but not controls) in both sexes. IARC 2017, CalEPA 2021

**Swiss mice, 32 weeks, males, dermal, George et al 2010**

This study was too brief to be reliable as an evaluation of the ability to cause cancer. In addition, observed skin tumors were labelled as "papillomas" by eye, with no histopathology conducted. Also, no female animals were included. I concur that this study is inadequate for our purposes. IARC 2017

**Studies in rats:**

**Sprague-Dawley rat, drinking water, 24 months, male and female, formulation, Seralini et al 2014**

This study used GBH and a GMO crop, and had small dose group numbers (10). No significant increase in tumors in males. In females, mammary tumors were seen in all groups, and at higher frequency in the glyphosate-treated groups (p<0.05, meaning that this is a statistically significant observation). Pituitary lesions were identified in both controls and treated females at similar levels and were not statistically significant. IARC describes study documentation (specifically histopathology) as inadequate and concluded that this study was not adequate to rely, and I concur. IARC 2017

Report of Jenifer S. Heath, PhD
Pepperday
April 2023

**Wistar rat, drinking water, 24 months, male and female, glyphosate salt, Chruscielska et al 2000**

No significant increase in tumors was reported, but documentation of dosing regimen, histopathological methods and tumor incidence was inadequate. To me, poorly documented studies are not reliable. We now know that in general, formulations containing glyphosate are more toxic and more powerful at causing MOAs than is glyphosate itself. In this study a salt of glyphosate was used, so the relevance of this study to the human experience is unclear. IARC 2017

**Wistar-Alpk:PfSD rat, 1 year, diet, male and female, JMPR 2006**

No significant increase in tumors; small-ish group size; short duration. Again, to me this would be a sub-optimal basis for conclusions. We now know that in general, formulations containing glyphosate are more toxic and more powerful at causing MOAs than glyphosate itself. In this study a glyphosate technical was used, so the relevance of this study to the human experience is unclear. IARC 2917

**Sprague-Dawley rat, 104 weeks, diet, male and female, JMPR 2006**

No significant increase in tumor incidence reported. We now know that in general, formulations containing glyphosate are more toxic and more powerful at causing MOAs than is glyphosate itself. In this study a glyphosate technical was used, so the relevance of this study to the human experience is unclear. IARC 2017

**Wistar-Alpk:PfSD rat, 24 months, diet, male and female, JMPR 2006**

No significant increase in tumor incidence reported. We now know that in general, formulations containing glyphosate are more toxic and more powerful at causing MOAs than is glyphosate itself. In this study a glyphosate technical was used, so the relevance of this study to the human experience is unclear. IARC 2017

**Sprague-Dawley rat, 24 months, male and female, diet, EPA 1991a, b, c, d**

(This study and the next were also proprietary studies with details not available to IARC or not meeting their criteria so they used EPA's summary.)

Statistically significant increased incidence of pancreas islet cell adenoma in males (P<= 0.05). no apparent progression of adenomas to carcinomas. The high dose group incidence of pancreas islet cell adenoma exceeded historical controls from this lab, but other groups did not. EPA re-evaluated the data excluding animals that died early. In female rats, there was a statistically significant trend for thyroid C-cell adenomas, but not for C-cell carcinomas and progression from adenoma to carcinoma was not evident. For me, the numbers in IARC's 3rd and 5th columns did not make sense, with group sizes of up to 60 in column 3 but up to 40-50 in column 5 except for

thyroid.  We now know that in general, formulations containing glyphosate are more toxic and more powerful at causing MOAs than is glyphosate itself.  In this study, only technical glyphosate was used, so the relevance of this study to the human experience is unclear.   IARC 2017

**Sprague-Dawley rat, lifetime, male and female, diet**

This study found a statistically significant increase in pancreas islet cell adenomas in males with no apparent progression to carcinomas, and in that way seems to confirm the study above.  We now know that in general, formulations containing glyphosate are more toxic and more powerful at causing MOAs than is glyphosate itself.  In this study glyphosate was used, so the relevance of this study to the human experience is unclear.  IARC 2017

**Summary of IARC 2017**

Based on the animal studies, IARC 2017 concluded:

> "Glyphosate was tested for carcinogenicity in male and female mice by dietary administration in two studies, and in male and female rats by dietary administration in five studies and in drinking-water in one study. A glyphosate-based formulation was also tested in drinking-water in one study in male and female rats, and by skin application in one initiation–promotion study in male mice.
>
> There was a positive trend in the incidence of renal tubule carcinoma and of renal tubule adenoma or carcinoma (combined) in males in one feeding study in CD-1 mice. Renal tubule carcinoma is a rare tumour in this strain of mice. No significant increase in tumour incidence was seen in female mice in this study. In the second feeding study, there was a significant positive trend in the incidence of haemangiosarcoma in male CD-1 mice. No significant increase in tumour incidence was seen in female mice in this study.
>
> For the five feeding studies in rats, two studies in the Sprague-Dawley strain showed a significant increase in the incidence of pancreatic islet cell adenoma in males – one of these two studies also showed a significant positive trend in the incidences of hepatocellular adenoma in males and of thyroid C-cell adenoma in females. Two studies (one in Sprague-Dawley rats, one in Wistar rats) found no significant increase in tumour incidence at any site. One study in Wistar rats was inadequate for the evaluation because of the short duration of exposure.
>
> In the study in Wistar rats given drinking-water containing glyphosate, there was no significant increase in tumour incidence.
>
> A glyphosate-based formulation was found to be a skin-tumour promoter in the initiation– promotion study in male Swiss mice. The study of a glyphosate-based formulation in drinking-water in Sprague-Dawley rats was inadequate for the evaluation because of the small number of animals per group, and the limited information provided

on tumour histopathology and incidence in individual animals. These studies of a chemical mixture containing glyphosate were considered inadequate to evaluate the carcinogenicity of glyphosate alone." (page 396).

**Further thoughts triggered by IARC 2017**

In the context of California's Proposition 65 (including a product labeling requirement intended to inform the public of products containing chemicals known by the state of California to present cancer or noncancer health risks so people can decide for themselves whether to be exposed/use the product), OEHHA found IARC 2015/2017 to meet their requirements of credibility as a basis for their No Significant Risk Level (NSRL), a labeling-related number for chemicals that can cause cancer.

Other experts in animal studies and carcinogenicity judge the long-term animal studies / animal cancer study data set to provide evidence of glyphosate's (or Roundup's) carcinogenicity. Among these are Jameson and Portier.

**Jameson 2023**

Plaintiff's expert witness Jameson, having very detailed and extended hands-on experience conducting studies in laboratory animals, examined the animal carcinogenicity studies (September 1, 2022). As I often found when I reviewed animal studies at the level of counting animals and tissues collected, Jameson found details that had apparently been overlooked or discounted over the course of many years. He was able to interpret these findings in the context of his extensive and directly relevant career-long experience.

I find Jameson's description of his evaluation process and his findings and interpretations to be similar to my own experience when I used to work hands-on evaluating animal studies for conformance to agency guidelines and as a second eye on interpretations and conclusions reached by study directors and authors. Because I understand his process (and have followed similar steps myself in the past) and because his observations and conclusions represent experiences that I have had in deep dives on animal studies and because of his appropriate and extensive training and experience, I find his findings and conclusions to be credible and insightful.

Jameson reviewed "…five dose feed bioassays of glyphosate in mice" and "…7 dose feed and 2 drinking water bioassays of glyphosate in rats." (page 48 and 49) He summarizes his finding as:

> "To state my findings more concisely, I determined that in CD-1 mice, glyphosate exposure causes kidney tumors in males in two separate studies, hemangiosarcomas in males in two separate studies, malignant lymphoma in males in two separate studies, adenocarcinomas of the lung in males in one study, and hemangiomas in females in one