**WILKINSON STEKLOFF LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonstekloff.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonstekloff.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel:  202-847-4030
Fax: 202-847-4005

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel:  202-898-5843
Fax: 202-682-1639

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel:  202-662-6000

**BRYAN CAVE LEIGHTON PAISNER LLP**
K. Lee Marshall (CA Bar No. 277092)
(klmarshall@bclplaw.com)
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Tel:  415-675-3400 | Fax: 415-675-3434

Jed P. White (CA Bar No. 232339)
(jed.white@bclplaw.com)
Linda C. Hsu (CA Bar No. 239880)
(linda.hsu@bclplaw.com)
120 Broadway, Suite 300
Santa Monica, CA 90401
Tel:  310-576-2100 | Fax: 310-576-2200

*Attorneys for Defendant Monsanto Company*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION, | MDL No. 2741<br><br>Case No. 3:16-md-02741-VC |
| *Benito Ornelas Gonzalez v. Monsanto Company,*<br>*3:20-cv-06198-VC* | **MONSANTO COMPANY'S NOTICE OF MOTION AND MOTION TO EXCLUDE THE TESTIMONY OF OMID HAMID; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**Hearing:**<br>Date:     March 1, 2024<br>Time:    10:00 a.m.<br>Place:   San Francisco Courthouse,<br>            Courtroom 4 – 17th Floor |

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** beginning on March 1, 2024 at 10:00 a.m. or a date/time to be determined by the Court, in Courtroom 4 of the United States District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, or as ordered by the Court, Defendant Monsanto Company ("Monsanto") will present its Motion to Exclude Testimony of Omid Hamid. Monsanto seeks an order excluding the opinions of this witness under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

Dated:  December 14, 2023				Respectfully submitted,

					/s/ Linda C. Hsu					
						Linda C. Hsu
					Attorney for Defendant Monsanto Company

TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................... 1

LEGAL STANDARD ..................................................................................................................... 2

ARGUMENT .................................................................................................................................. 3

    I.    Dr. Hamid is Not Qualified to Opine or Offer Opinions on Causation. ............................. 3

    II.    Dr. Hamid's Opinion is Not Based on Sufficient Facts or Data. ......................................... 4

    III.    Dr. Hamid's Opinion is Not the Product of Reliable Methodology and is Not Generally Accepted. ............................................................................................................................. 6

    IV.    Rendering a Specific Causation Opinion in a Toxic Exposure Case Without Calculating Absorbed Dose or Actual Exposure is Not a Generally Accepted Methodology. ................ 9

    V.    Dr. Hamid Improperly Fails to Rule Out the Possibility that Plaintiff's NHL Occurred Naturally, In Spite of Plaintiff's Documented Risk Factors. ............................................. 11

CONCLUSION ............................................................................................................................. 12

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Berry v. Armstrong Rubber Co.*,
    989 F.2d 822 (5th Cir. 1993) ................................................................................................ 3

*Borg- Warner Corp. v. Flores*,
    232 S.W.3d 765 (Tex. 2007) ............................................................................................... 11

*Cooper v. Brown*,
    510 F.3d 870 (9th Cir. 2007) ................................................................................................ 2

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) .................................................................................................... *passim*

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*,
    285 F.3d 609 (7th Cir. 2002) ................................................................................................ 3

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices and Prods. Liab. Litig.*,
    892 F.3d 624 (4th Cir. 2018) .............................................................................................. 11

*McClain v. Metabolife Int'l, Inc.*,
    401 F.3d 1233 (11th Cir. 2005) .......................................................................................... 11

*Parkhill v. Alderman-Cave Milling & Grain Co.*,
    2010-NMCA-110,149 N.M. 140, 148, ¶¶ 37-38, 245 P.3d 585, 593 (N.M. Ct.
    App 2010) ........................................................................................................................... 11

*White v. Ford Motor Co.*,
    312 F.3d 998 (9th Cir. 2002) ........................................................................................... 2, 3

**Other Authorities**

Ex. A, Omid Hamid Report ........................................................................................... *passim*

Ex. B, Hamid Dep. ......................................................................................................... *passim*

Ex. C, EPA 1/6/2020 ............................................................................................................... 8

Fed. R. Evid. 702 .......................................................................................................... 1, 2, 3

# INTRODUCTION

To support his claim that Roundup caused his non-Hodgkin's lymphoma ("NHL"), Plaintiff Benito Ornelas Gonzalez ("Plaintiff") relies on the scarcely researched testimony of Dr. Omid Hamid.

In a single-paragraph expert report, Dr. Hamid offers vague and conclusory opinions on specific causation, i.e., whether exposure to glyphosate and/or glyphosate-based herbicides ("GBHs") such as Roundup was a cause of Plaintiff's Waldenström's macroglobulinemia ("Waldenström's"), a slow-growing subtype of NHL. *See* Ex. A, Omid Hamid Report Aug. 25, 2023 ("Hamid Report") at 1. Without providing a single citation to any authority, Dr. Hamid asserts the following:

- Plaintiff has had "significant repetitive contact with glycophosphate [sic]."
- "Multiple studies have supported that the findings of an increased NHL risk in individuals with high GHB exposure."
- "GBH is *thought to have* harmful effects on human health."
- "Animal and mechanistic studies *have provided supporting evidence* for the carcinogenic *potential* of GBH."
- This "*association*" finds "*further support*" in studies of malignant lymphoma incidence with pure glyphosate, and in "*potential links*" between GBH exposure and immunosuppression, endocrine disruption, and genetic alterations."
- "In the absence of any other risk factors, the B cell lymphoma with plasmacytic differentiation can be related to Round Up use."

Ex. A, Hamid Report at 1 (emphasis added). Although Dr. Hamid examined Plaintiff's medical records and plans to testify about the cause of Plaintiff's Waldenström's, his report does not discuss the cause of Plaintiff's disease. At no point does Hamid conclude, with a reasonable degree of scientific certainty, that GBHs caused Plaintiff's Waldenström's. Although Hamid's report does discuss the possibility of a relationship between GBHs and NHL, all of the language is tentative: "GBH is thought to have harmful effects"; and "association" finds "support" in "potential links"

between GBH exposure and certain harms; lymphoma "can be related to Round Up use." Ex. A, Hamid Report at 1.

Dr. Hamid's testimony is inadmissible and should be excluded under *Daubert* for four reasons: ***first***, Dr. Hamid is not qualified to opine or offer opinions on causation; ***second,*** Dr. Hamid's opinion disclosed in his report is not based on sufficient facts or data; ***third***, Dr. Hamid's opinion is not the product of reliable methodology and is not generally accepted; ***fourth***, Dr. Hamid improperly renders a specific causation opinion without calculating dose, which is not generally accepted; and ***fifth***, Dr. Hamid improperly fails to rule out statistically significant alternative causes for Plaintiff's NHL. For these reasons, Dr. Hamid's testimony should be excluded in its entirety.

## LEGAL STANDARD

To be admissible, expert testimony must: (1) come from a witness "qualified as an expert by knowledge, skill, experience, training, or education"; (2) be derived from "scientific, technical, or other specialized knowledge"; and (3) "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.

When an expert's field of expertise is not related to the subject on which he seeks to offer testimony, such testimony is inadmissible. *See White v. Ford Motor Co.*, 312 F.3d 998, 1008-09 (9th Cir. 2002). Apart from qualifications, expert testimony must be (1) based upon sufficient facts or data, (2) the product of reliable principles and methods, and (3) the result of applying those principles and methods reliably to the facts of the case. Fed. R. Evid. 702. The trial judge is charged with the responsibility of acting as a gatekeeper to "ensure that any and all scientific testimony … is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). The proponent of the expert bears the burden of proving that the expert's proffered testimony is admissible. *See*, *e.g.*, *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007).

Moreover, an expert's conclusions are not admissible if they are based on an unreliable foundation or methodology. *Daubert,* 509 U.S. at 592-95. Factors to consider in evaluating reliability are (1) whether the expert's opinion is susceptible to testing and has been subjected to testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards

controlling the technique's operation; and (4) whether the theory has been generally accepted in the scientific community. *Id.* at 593-94.

## ARGUMENT

**I.     Dr. Hamid is Not Qualified to Opine or Offer Opinions on Causation.**

By his own admissions, Dr. Hamid lacks the qualifications required to opine on causation. A proposed expert witness must possess "knowledge, skill, experience, training, or education" sufficient to qualify him as an expert on the subject to which his testimony relates. Fed. R. Evid. 702. When an expert's field of expertise is not related to the subject on which he seeks to offer testimony, such testimony is inadmissible. *See White v. Ford Motor Co.*, 312 F.3d 998, 1008-09 (9th Cir. 2002); *see also Berry v. Armstrong Rubber Co.*, 989 F.2d 822, 828 (5th Cir. 1993) (affirming exclusion of experts who "stepped outside of their areas of expertise" into an area in which they had no training); *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 612–14 (7th Cir. 2002) ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist of a different specialty.").

Dr. Hamid has testified that he cannot say with certainty that Roundup exposure caused Plaintiff's Waldenström's NHL, and that his background does not qualify him to make this determination: "I would state to you that no medical oncologist, hematologist, physician in any way can indicate the true cause of cancer in a patient." *See* Ex. B, Hamid Dep. at 86:14-20. Dr. Hamid is not an expert in the field: he has never authored any articles, abstracts or book chapters, or given any lectures or presentations on NHL or Waldenström's. *Id.* at 30:16-31:3. None of his research, lectures, presentations, publications, or abstracts are focused on NHL or Waldenström's. *Id.* at 96:9-99:8.

Perhaps more troubling, Dr. Hamid has admitted that he does not understand the difference between the concepts of "dose" and "exposure." Ex. B, Hamid Dep. at 51:1-23 ("Q: Dr. Hamid, can you tell me what your understanding of the difference between exposure and dose was when you were preparing this report? A. No, I can't tell you that. I did not quantify a dose. It is difficult to do that."). Dr. Hamid also admitted that he does not know the constituent ingredients of Roundup

products, or the differences between various Roundup formulations, and that he did nothing to familiarize himself with these products in preparation for his report. *Id.* at 44:4-13.

Thus, his opinions regarding whether Roundup causes NHL or has caused Plaintiff's NHL are far outside of the scope of his knowledge, skill, and experience.

## II. Dr. Hamid's Opinion is Not Based on Sufficient Facts or Data.

Dr. Hamid submitted a one-paragraph report and has testified that he has no intention of preparing another report or supplementing his current one. Ex. B, Hamid Dep. at 38:14-20. In his single-paragraph report, Dr. Hamid does not cite a single source of any kind to support his conclusions—he simply assures the reader that "multiple studies" support his position. Ex. A, Hamid Report at 1. In fact, Dr. Hamid testified that ***he never even wrote a list of the documents and materials he reviewed*** in relation to his report. Ex. B, Hamid Dep. at 42:21-24. Dr. Hamid has testified that he reviewed six articles[1] to prepare for and draft his report but, when he was asked about these articles during his deposition, he could not name any of them:

> Q. And you also mentioned that you reviewed six articles; is that correct?
>
> A. It's correct.
>
> Q. Now you reviewed those six articles for this deposition. Did you review those articles before you prepared this report?
>
> A. I did. **I would say most of them I had before I prepared the report, yes. I can't tell you which ones or which ones not, but, yes, you know, I would say that the articles are repetitive in what they present and what they discuss.**
>
> Q. Other than those -- other than the deposition transcript and the medical records and the six articles, were there any other documents that you reviewed in order to prepare this report?
>
> A. No, sir, no other documents were made available.
>
> Q. Did you take the initiative to perform any research or review any other documents prior to preparing this report?

---

[1] *See also* Ex. B, Hamid Dep. at 62:3-17 (confirming that references to scientific consensus in his report are all based on these six unnamed studies).

> A. Well, as I said, I went through PubMed and looked at a whole host of publications, but did not move forward with the majority of them as they were not germane.

Ex. B, Hamid Depo. at 41:8-42:6.

In addition to his failure to cite a single source to support his claims about the scientific consensus, Dr. Hamid has confirmed that he cannot offer his testimony to a reasonable degree of scientific certainty. His report describes studies showing the "potential" and supporting an "association" between GBH and various harmful health effects. Ex. A, Hamid Report at 1. However, Dr. Hamid himself has testified that association is not the same as causation:

> Q. What is your understanding of the term association?
>
> A. I mean, there's many things. That they are seen together at times, I would say, they are associated with each other so -- that they come together, these things, that they work together or that they are found in a place together.
>
> Q. Now, Dr. Hamid, have you ever heard of the term "causation"?
>
> A. Yes, I have.
>
> Q. What is your understanding of the term causation?
>
> A. That is a direct route that -- doing A will bring upon B.
>
> Q. Now, Dr. Hamid, is there a difference between association and causation? And I'm talking about in the epidemiologic context.
>
> A. Yes. You can be associated with but not directly cause.
>
> Q. So based on what you have said here, is it reasonable to say that, just because there are -- there is an association between an exposure and an outcome, that that does not necessarily mean that the exposure causes the outcome? Is that reasonable to say?
>
> A. That's reasonable to say with association, yes.

Ex. B, Hamid Dep. at 71:25-73:9.

Dr. Hamid's opinions on Plaintiff's exposure, dose, and condition are likewise based on insufficient facts or data. Dr. Hamid's understanding of Plaintiff's exposure to Roundup is based entirely on the Plaintiff's own words, as found in the transcript of Plaintiff's deposition. Ex. B, Hamid Dep. at 43:19-22. Dr. Hamid has never interviewed, examined, or met Plaintiff. *Id.* at 44:14-23. At his deposition, Dr. Hamid could not recall whether Plaintiff wore any protective clothing

when he used Roundup,[2] and Dr. Hamid did not factor the presence or absence of protective clothing in his analysis of Plaintiff's exposure. *Id.* at 50:3-17. Hamid simply notes that "[Plaintiff] mentions just his normal clothing in his deposition. *Id.* at 50:15-17. Hamid likewise could not "clearly recollect" how Plaintiff typically applied Roundup in his work. *Id.* at 50:18-25

As further indication of the fact that Dr. Hamid's opinions are not based upon sufficient facts or data, Dr. Hamid himself could not express confidence in the accuracy of his report. When he was asked whether his report was complete and accurate, Hamid gave the following response:

> [Q] Are there any corrections or errors to your report that you feel need to be corrected?
>
> A. Allow me to get back to... no, I don't – I believe that this is -- I believe that this is fair. I would say that, you know, if you -- if you -- I would say that, if I look at this and I say -- you say is there anything missing, I think I would say that a patient, a person, like Mr. Gonzalez, who has had many decades of exposure, it would be on causality, on a list of causality for lymphoma, but I believe it's indicated in my note here.

Ex. B, Hamid Depo. at 42:12-20. Between Dr. Hamid's failure to cite **even a single study**, his failure to state any opinions with a reasonable degree of scientific certainty, his exclusive reliance on Plaintiff's own dose estimates, and his inability to verify the accuracy and completeness of his own report, it is clear that Dr. Hamid's opinions and testimony are not based on sufficient facts or data. As such, his testimony and opinion should be excluded in their entirety.

### III.   Dr. Hamid's Opinion is Not the Product of Reliable Methodology and is Not Generally Accepted.

Dr. Hamid's application of the science should only be admitted under *Daubert* if it has been generally accepted in the scientific community. *See generally Daubert,* 509 U.S. at 593-94. However, based on Dr. Hamid's report and testimony, it is impossible to ascertain what his methodology was. As discussed above, he offers no citations in his report and could not recite the six sources he purports to have relied on. *See* Ex. A, Hamid Report at 1; Ex. B, Hamid Dep. at 41:8-42:6. Indeed, Dr. Hamid's methodology is unknowable even to Dr. Hamid, as he failed to write any of his sources down. Ex. B, Hamid Dep. at 42:21-24. During Dr. Hamid's deposition, counsel

---

[2] Later in the deposition, Dr. Hamid revisited Plaintiff's depo transcript to refresh his memory on this. *Id.* at 53:4-14.

showed Dr. Hamid a series of articles and he was able to confirm four of the articles he relied on, in addition to several articles that he did not. Although this incomplete list of verbally confirmed sources is inadequate to describe or justify Dr. Hamid's methodology, it provides further insight into that methodology's flaws.

For example, Dr. Hamid confirmed that he relied on the De Roos study to support his conclusions on the alleged causal relationship between glyphosate and NHL, but he admitted under oath that this study shows no statistically significant relationship between dose response and glyphosate, and that the absence of a dose-response relationship "tends not to support a causal relationship." Ex. B, Hamid Dep. at 111:1-13, 130:1-15, 131:6-10. He likewise confirmed that he relied on a study looking at the impacts of Roundup on "water fleas" (daphnia), but he conceded that this study is not a causation study for NHL or Waldenstrom's in humans. *Id.* at 140:18-142:18, 142:21-24. He also confirmed that he relied on the Weisenberg study in forming his opinion, but confirmed that he was not aware that the study's author was a paid expert witness in this litigation. *Id.* at 132:12-13, 133:1-9.

Dr. Hamid also confirmed that he relied on the 2019 Zhang meta-analysis, a paper that is not generally accepted and has been extensively criticized. *See* Ex. B, Hamid Dep. at 159:5-16. In January 2020, the EPA evaluated Zhang's 2019 meta-analysis and found serious methodological flaws therein. Specifically, EPA found that Dr. Zhang and her co-authors did not use "appropriate methods to perform their meta-analyses" because they "did not include an ever/never estimate" and instead only compared patients with higher NHL exposure levels to those with lower NHL exposure levels. *See* Ex. C, EPA 1/6/2020 Memo. at 12-13. The EPA concluded that a properly conducted meta-analysis would have found "lower and non-statistically significant meta-estimates." *Id*. at 12. Therefore, Zhang's 2019 Paper did not change EPA's assessment of glyphosate's carcinogenicity, and EPA maintained its assessment that glyphosate is "not likely to be carcinogenic to humans." *Id.* at 13. In other words, the EPA found that the Zhang 2019 meta-analysis did not support Dr. Hamid's opinion that Roundup can or did cause Plaintiff's NHL. Indeed, this is precisely why it is not generally accepted in the scientific community to make causation determinations based on a limited subset of evidence without conducting a weight of evidence review.

Dr. Hamid also confirmed that he failed to consider the Agricultural Health Study ("AHS"), and that he was not aware of the existence of this large prospective epidemiological study looking at the relationship between glyphosate and NHL. Ex. B, Hamid Dep. at 91:22-92:9. As Dr. Hamid acknowledged in his deposition, a study of this type is the "gold standard" for establishing causation between exposure and outcome. *Id.* at 91:4-8. Upon review of this study, he conceded that, as far as he was aware, the AHS had the longest follow-up of any human epidemiological study of glyphosate. *Id.* at 148:9-19. He acknowledged that the entities supporting the AHS—including the National Institutes of Health, the National Cancer Institute—are prestigious, reputable institutions. *Id.* at 149:2-22.

When Dr. Hamid examined the findings of the AHS during his deposition, he acknowledged that the authors of this study found *no statistically significant association* between glyphosate and lymphomas of any kind (including NHL) among the approximately 54,000 applicators they studied. Ex. B, Hamid Dep. at 155:18-156:2, 153:3-5. In fact, Dr. Hamid conceded that the study found no statistically significant association between glyphosate and all cancers, no significant exposure-response relationship, and no evidence of an association between glyphosate use and the risk of any solid tumors or lymphoid malignancies, including NHL and its subtypes. *Id.* at 154:9-13, 155:8-14, 157:3-12.

Dr. Hamid offered no justification for his failure to review the well-known AHS study before he formulated his opinions and wrote his report. Although he testified at various points that he was not aware of the study, he also posited the possibility that he "may have read about it and it didn't… help [him] understand the situation" while also thanking Defendant's counsel for bringing the article to his attention. Ex. B, Hamid Dep. at 157:13-20. Once again, Dr. Hamid demonstrates that *even he* is confused about his methodology, displaying an inability to recall or articulate what he has reviewed and how his opinions were formed.

Aside from his confusion and inability to recall or articulate his own methodology, Dr. Hamid cannot justify his methodology because it was not based on generally accepted scientific principles; it was based on Dr. Hamid's aim to support his conclusion. His report and deposition demonstrate that he did not seriously consider several scientifically valid and relevant sources of

data, and that he applied no articulable criteria to the studies he allegedly reviewed and applied. Instead, he started with the conclusion that Roundup can cause NHL and did cause Plaintiff's NHL, and then sought scientific support to justify those conclusions. Dr. Hamid engages a flawed, results-driven "always Roundup" methodology—precisely the type of unconventional approach that should be excluded under *Daubert*.

**IV. Rendering a Specific Causation Opinion in a Toxic Exposure Case Without Calculating Absorbed Dose or Actual Exposure is Not a Generally Accepted Methodology.**

In his single-paragraph report, Dr. Hamid asserts that Plaintiff "has had significant repetitive contact to glyphosate through extensive duration to daily exposure through many decades." Ex. A, Hamid Report at 1. However, when pressed on the issues of dose and exposure, Dr. Hamid made it clear that he lacks the knowledge and data necessary to form this opinion, which appears to be simple guesswork. Dr. Hamid concedes that this conclusion is based entirely on Plaintiff's own representations, which Dr. Hamid read in Plaintiff's deposition transcript. Ex. B, Hamid Dep. at 45:5-46:11. He concedes that he has made no quantitative estimates of Plaintiff's exposure, *id.* at 47:25-48:21, and he makes it clear that he does not understand or does not believe that there is a difference between the amount used and the amount of Plaintiff's exposure:

> Q. Dr. Hamid, there is a difference between the amount of Roundup Mr. Gonzalez may have used in his work versus his exposure to the actual Roundup product, is there not?
>
> A. Can you clarify that?
>
> Q. Well, there is -- is there a difference, Dr. Hamid, between the amount of Roundup that Mr. Gonzalez might use in a day versus his exposure? What is your -- do you have an understanding of whether there is a difference between the amount that he uses and the amount to which he is exposed?
>
> A. I don't believe that there -- I mean, the idea here is that these patients -- these people are utilizing them, and it's around all -- it's around them at every time. **I don't believe that there is quite a difference there between what he uses and what he's exposed to**, as he's the primary person who has been utilizing it.

> Q. **So is it your understanding when you were writing this report that, if Mr. Gonzalez used a gallon of Roundup, he was also exposed to a gallon of Roundup?**
>
> A. **Well, either one that would be laying it.** I would say that there -- there is no clear amount that -- that quantifies risk.

*Id.* at 48:25-49:24.

Rather than assess exposure or dose (*i.e.,* the amounts of Roundup that came into contact with Plaintiff's skin and were eventually absorbed by it), Dr. Hamid focuses on the quantity of Roundup that Plaintiff used over the course of his life. Dr. Hamid thus ignores the critical concepts of exposure and dose entirely and uses Plaintiff's Roundup use as a proxy for exposure, which itself is a proxy for dose. The amount of time a person spends spraying a chemical says nothing about the amount of chemical that came into contact with that person's skin (*i.e.*, exposure), let alone the amount of chemical that the person absorbed through his or her skin (*i.e.,* dose)—both of which are necessary to determine causation in a toxic exposure case. Even if it were generally accepted to calculate and use a person's exposure to a chemical in lieu of an absorbed dose when assessing a person's individual risk of cancer (it is not), Dr. Hamid's assessment does not even do that. Instead, Dr. Hamid simply takes the Plaintiff's estimate of the amount of Roundup that Plaintiff has used in his lifetime and concludes that this constitutes "significant exposure," sufficient to cause his NHL. He does not consider or attempt to estimate the amount of Roundup, if any, that came into contact with Plaintiff's skin or that was absorbed by it. Not only is this not a generally accepted methodology, it is not even a proper subject of expert testimony, as the jury is capable of hearing Plaintiff's estimates, conducting simple math, and determining whether they find this information "significant."

The Court should reject this methodology because it is not generally accepted that a specific causation opinion in a toxic exposure case can disregard the critical concepts of absorbed dose and actual exposure in favor of reliance on Plaintiff's own estimates of the amount of Roundup he used which, by its very nature, ignores case-specific factors bearing on the plaintiff's exposure.

An assessment of dose is central when assessing causation, as acknowledged by plaintiff's experts in prior Roundup trials and by courts around the country. *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1242 (11th Cir. 2005) ("Dose is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect."); *Borg- Warner Corp. v.*

*Flores*, 232 S.W.3d 765, 770-73 (Tex. 2007) (discussing the importance of dose on causation inquiry and reversing judgment in plaintiff's favor following a jury trial where plaintiff did not establish sufficient dose to cause alleged injuries); *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices and Prods. Liab. Litig.*, 892 F.3d 624, 639 (4th Cir. 2018) ("all chemical agents are intrinsically hazardous," and "whether they cause harm is only a question of dose."); *Parkhill v. Alderman-Cave Milling & Grain Co.*, 2010-NMCA-110,149 N.M. 140, 148, ¶¶ 37-38, 245 P.3d 585, 593 (N.M. Ct. App 2010) (excluding as unreliable causation testimony in a toxic exposure case where the expert "did not attempt to quantify the dose of [the chemical] received by the [plaintiff]"). Because Dr. Hamid's methodology simply ignores this pivotal concept and does not even consider the amounts of Roundup to which Plaintiff was actually exposed, it should be excluded.

## V. Dr. Hamid Improperly Fails to Rule Out the Possibility that Plaintiff's NHL Occurred Naturally, In Spite of Plaintiff's Documented Risk Factors.

Dr. Hamid's report fails to acknowledge or address any alternative causes or risk factors. However, he admitted in deposition that, in order to determine whether an association is truly causation, the scientific method requires factoring in confounders. Ex. B, Hamid Dep. at 77:3-8. In that same deposition, Dr. Hamid admitted that he disregarded factors that he acknowledges to be confounders for Plaintiff's disease, including: other chemicals Plaintiff may have been exposed to, *id.* at 78:19-79:11; Plaintiff's older age, *id.* at 79:12-24; Plaintiff's obesity, *id. at* 82:1-8, 207:8-17; and replicative DNA errors, which Dr. Hamid acknowledges to be a major cause of lymphomas in humans, *id.* at 82:12-83:2. On the confounder of replicative DNA errors, Dr. Hamid acknowledged that these errors can occur naturally and are not necessarily the result of chemical exposures, and that these errors can accumulate over the years, making NHL more common among older patients. *Id.* at 83:15-25, 85:1-9. Dr. Hamid testified that, in his clinical practice, he does not overlook confounders like age and gender because they "**can answer causation.**" *Id.* at 80:21-81:9. However, Dr. Hamid fails to provide a reasonable explanation as to why or how he ruled out these alternative causes here.

Dr. Hamid's testimony demonstrates that he did not seriously consider that anything other than Roundup could have caused Plaintiff's NHL. Instead, he started with the conclusion that

Roundup was the cause, and then sought to justify that conclusion. Dr. Hamid's failure to rule in and meaningfully consider these significant and highly relevant potential causes of Plaintiff's NHL deviates from any conventional or generally accepted methodology.

## CONCLUSION

For the foregoing reasons, the Court should grant Monsanto's Motion to Exclude Testimony of Omid Hamid.

Dated:  December 14, 2023              Respectfully submitted,


                                       /s/ Linda C. Hsu
                                       Linda C. Hsu
                                       Attorney for Defendant Monsanto Company

## CERTIFICATE OF SERVICE

I hereby certify that on December 14, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing (NEF) to all counsel of record who are CM/ECF participants.

                                       /s/ Linda C. Hsu
                                       Linda C. Hsu