# EXHIBIT A

1                    UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF CALIFORNIA
2

                              _  _  _
3

4   IN RE:  ROUNDUP PRODUCTS      )  MDL No. 2741
    LIABILITY LITIGATION          )
5                                 )
    This Document Relates to:     )  Case No. MDL No.
6                                 )  3:16-md-02741-VC
    Lois Rolish v. Monsanto       )
7   Company, et al.               )
                                  )
8   Case No. 3:20-cv-01421-VC     )

9

10

11                   TUESDAY, NOVEMBER 21, 2023

12

13

14          Remote Videotaped Deposition of CHRISTOPHER D.

15   ROSENBAUM, M.D., MSc, FACEP, taken pursuant to notice and

16   conducted at the location of the witness, commencing at

17   12:02 p.m., Eastern Standard Time, on the above date, before

18   Jennifer A. Dunn, Registered Merit Reporter, Certified

19   Realtime Reporter, California, Illinois & Texas Certified

20   Shorthand Reporter, and Missouri Certified Court Reporter.

21

                              _  _  _
22

23

24              GOLKOW LITIGATION SERVICES
            P:  877.370.DEPS | F:  917.591.5672
25                   deps@golkow.com

Exhibit A Page - 1

```
 1              R E M O T E   A P P E A R A N C E S

 2

 3     JOSEPH SAVERI LAW FIRM, INC.
            BY:  STEVEN N. WILLIAMS, ESQ.
 4          swilliams@saverilawfirm.com
            601 California Street, Suite 1000
 5          San Francisco, California  94108
            Tel:  (415) 500-6800
 6              Counsel for the Plaintiff

 7

 8     NELSON MULLINS
            BY:  NATHAN E. HOFFMAN, ESQ.
 9          nathan.hoffman@nelsonmullins.com
            123 N. Wacker Drive
10          21st Floor
            Chicago, Illinois  60606
11          Tel:  (615) 664-5308
                Counsel for the Defendant
12

13

14

15   VIDEOGRAPHER:

16   Julie Robinson

17

18

19

20

21

22

23

24

25
```

Exhibit A Page - 2

```
 1                    MR. WILLIAMS:  Objection to form.

 2                    THE WITNESS:  I'm not familiar with the

 3          literature to be able to disagree or agree with that

 4          statement.

 5     BY MR. HOFFMAN:

 6          Q    Are you familiar with the results of the recent

 7     CDC study that found detectable levels of glyphosate in more

 8     than 80 percent of urine samples of people in the United

 9     States?

10          A    I am not.

11          Q    Doctor, are you currently board certified?

12          A    I am.

13          Q    In what areas?

14          A    Emergency medicine and medical toxicology.

15          Q    You are not an oncologist, correct?

16          A    I am not an oncologist, that is correct.

17          Q    You're not a pathologist?

18          A    I am not a pathologist, that is correct.

19          Q    You're not an epidemiologist?

20          A    I am not an epidemiologist, that is correct.

21          Q    You're not a cancer biologist?

22          A    I am not a cancer biologist, that is correct.

23          Q    You're not a geneticist?

24          A    I am not a geneticist, that is correct.

25          Q    And you're not an expert in genotoxicity, correct?
```

Christopher D. Rosenbaum, MD, MSc, #FACEP

```
 1      A    I don't know how you define genotoxicity in order

 2  to best answer that question.  Is it possible for you to ask

 3  that in a different way?

 4      Q    Well, do you have an understanding of what the

 5  term "genotoxicity" means?

 6      A    I do.

 7      Q    What is your understanding?

 8      A    My understanding of genotoxicity relates to damage

 9  that can be caused to nucleic acid entities relative to

10  exposures of different origin.

11      Q    Okay.  So damage to some type of gene or DNA?

12      A    Yes.

13      Q    And does it always have to be from an external

14  exposure or can damage to DNA happen in the normal course of

15  DNA replication errors?

16      A    It can --

17              MR. WILLIAMS:  Objection.  Form.

18              THE WITNESS:  -- DNA damage can happen in

19          the -- can happen.

20              It -- the way you've asked that is in a way

21          that I want to answer precisely.

22              Could you ask that in a different way?

23  BY MR. HOFFMAN:

24      Q    Well, you said it can happen.  What did you mean

25  by saying it can happen?
```

1          MR. WILLIAMS:  Objection to form.

2          THE WITNESS:  DNA damage can happen

3    spontaneously.

4    BY MR. HOFFMAN:

5       Q    Okay.  And on that subject of damage to genes or

6    damage to DNA, do you believe you're an expert in that

7    subject matter?

8       A    I believe that there are people who study and

9    train with formal education through a much greater extent

10   than I have trained in that subject matter.

11      Q    Okay.  Well, have you ever designed, conducted, or

12   published a genotoxicity study?

13      A    I have not.

14      Q    Okay.  Same question with respect to animal

15   carcinogenicity studies.

16          Have you ever designed, conducted, or published

17   any animal carcinogenicity study?

18      A    I don't think so.

19      Q    Do you believe you're a regulatory expert or an

20   expert on the EPA?

21      A    I am not.

22      Q    Have you ever worked for, consulted for, or been

23   asked to be on a scientific advisory panel for EPA?

24      A    I have not.

25      Q    Do you believe you're an expert in pesticides?

```
 1                    MR. WILLIAMS:  Objection to form.

 2                    THE WITNESS:  How would you define an expert

 3          in pesticides in order for me to best answer your

 4          question?

 5     BY MR. HOFFMAN:

 6          Q    Well, when I use the term "pesticides," that's a

 7     broad category, which would include herbicides like

 8     glyphosate in Roundup.

 9               So in that general subject matter, do you believe

10     you're an expert when it comes to pesticides or herbicides?

11                    MR. WILLIAMS:  Objection to form.

12                    THE WITNESS:  I believe there are people who

13          study and work in research to a much greater extent

14          than myself in the subject matter of herbicide and

15          pesticide.

16     BY MR. HOFFMAN:

17          Q    Well, when is the first time you started studying

18     any pesticide or herbicide?

19          A    It's part of my training in medical toxicology

20     that would have begun around 2008.

21          Q    Okay.  Do you believe you're an expert in

22     pesticide labeling?

23          A    I am not.

24          Q    Are you familiar with the discipline that's known

25     as weed science?
```

Christopher D. Rosenbaum, MD, MSc, #FACEP

```
 1       A    I am vaguely familiar with that terminology.  That

 2   is not an area that I have worked in with any great

 3   experience or detail.

 4       Q    So you're not a weed scientist, correct?

 5       A    I do not self-identify as a weed scientist, that

 6   is correct.

 7       Q    And you're not an industrial hygienist?

 8       A    I am not an industrial hygienist.

 9       Q    Hey, don't worry, Doctor, that's the list.  I'm

10   going to move on from that.

11       A    We're going to be here a while.  Most -- most

12   things in the world that I'm not familiar with.  There's --

13   I didn't know how far we would be there, so that's why I'm

14   laughing.  You picked up on it.

15       Q    Sorry.

16       A    I should be allowed to laugh a little bit in life.

17   I know it's a serious subject matter, but we can smile and

18   laugh.

19       Q    Most people aren't intimately familiar with weed

20   science or a weed scientist, so --

21       A    I understand.

22       Q    -- but that's an aside.

23            Let me -- let me shift topics a little bit and ask

24   you about your medical practice, Doctor.

25            You currently, as I understand it, are director of
```

Exhibit A Page - 7

1    new cancer diagnoses and maintenance therapy intervention

2    and complications relative to malignancy with a routine and

3    regular basis.

4              I have no way of estimating that number.  It is

5    not a small number.

6         Q    Okay.  And are you the doctor who actually

7    diagnoses any of those patients with non-Hodgkin's lymphoma?

8         A    Typically not.

9         Q    And is that typically done by an oncologist or a

10   pathologist, or both?

11        A    Yes, correct.  It typically is formally diagnosed

12   by a pathologist or an oncologist, yes.

13        Q    But you may see the patient initially when they

14   present to the emergency room?

15        A    Correct.

16        Q    Okay.  And now you are not a lymphoma specialist,

17   are you?

18        A    That is correct.  I am not a lymphoma specialist.

19        Q    Now, the plaintiff in this case was diagnosed with

20   a B-cell non-Hodgkin's lymphoma; is that right?

21        A    That is my understanding, yes.

22        Q    What is B-cell non-Hodgkin's lymphoma, what is

23   your general understanding of that?

24        A    It references the cell line, the white blood cell

25   line that is the cause of the lymphoma where the malignancy

 1   is isolated.

 2       Q    And I think I already have this clearly, but let

 3   me make sure.

 4            So you've seen patients in the emergency context

 5   who later were diagnosed and/or treated for non-Hodgkin's

 6   lymphoma, but you yourself are not the doctor who is

 7   formally diagnosing or treating those patients; is that

 8   right?

 9       A    I treat patients with non-Hodgkin's lymphoma in

10   the emergency department, both in its initial stages of

11   diagnosis and in its maintenance therapy relative to

12   complications related to chemotherapy, et cetera.

13            So when you say "formally," I don't know that I

14   can agree with your question.

15       Q    Okay.

16       A    I do take care of and treat patients with

17   non-Hodgkin's lymphoma.

18       Q    Okay.  So sometimes you do administer

19   chemotherapy, for example, to non-Hodgkin's lymphoma

20   patients?

21       A    No.  I do not administer chemotherapy to patients

22   with non-Hodgkin's lymphoma.  I take care of patients who

23   are receiving chemotherapy.

24       Q    I see.  Okay.

25            So if I were to ask you whether you formally

1    diagnose non-Hodgkin's lymphoma and/or treat non-Hodgkin's

2    lymphoma with chemotherapy, radiation, that type of thing,

3    would you agree that that's something you do not typically

4    do?

5        A    Correct.  I would agree with that statement.

6        Q    So if the plaintiff in this case were to visit

7    Newton-Wellesley Hospital to be diagnosed for her

8    non-Hodgkin's lymphoma, or to be treated with chemotherapy,

9    you would not be the physician to do that, correct?

10       A    Correct.

11       Q    Have you ever determined the cause of

12   non-Hodgkin's lymphoma in your emergency room or clinical

13   practice?

14       A    No.

15       Q    Have you ever told a patient with non-Hodgkin's

16   lymphoma what the cause was of his or her cancer?

17       A    I don't recall.

18       Q    You don't recall an instance of --

19       A    I don't recall having shared that sort of

20   information in the way you described it with a patient, no.

21       Q    You say -- let me direct you back to your report,

22   this is also on page 3 of your report.  It's up in paragraph

23   6, down near the bottom of paragraph 6.

24            You say:  "Consultations regarding chemical

25   exposures like glyphosate are part of my daily professional

Exhibit A Page - 10

1    responsibilities."

2              Do you see that?

3        A    That's right.

4        Q    Okay.  And what do you mean by that?

5        A    Any exposure, including a pesticide or herbicide,

6    chemical, any exposure presenting to the emergency

7    department would typically generate a phone call to me and

8    consultation regarding toxic considerations from my

9    emergency medicine colleagues.

10       Q    Okay.  And do you recall any instances of -- any

11   cases where a patient was exposed to Roundup or glyphosate

12   and then you were consulted regarding that exposure in your

13   clinical practice?

14       A    I don't recall any specific cases off top of my

15   head, no.

16       Q    So outside of the litigation context, have you

17   determined that Roundup or glyphosate caused anyone's

18   non-Hodgkin's lymphoma?

19       A    No.

20       Q    Are you familiar with the term "idiopathic"?

21       A    I am.

22       Q    That's when a disease happens spontaneously or

23   from an unknown cause, correct?

24       A    Correct.

25       Q    Unlike lung cancer or skin cancer, the cause of

1      Q    Okay.  And it would important for you to tell your

2  patients about your concerns regarding Roundup because they

3  could be exposing themselves and their family members to

4  what you believe is a harmful cancer-causing chemical,

5  right?

6      A    Correct.

7      Q    And you, of course, would want to prevent your

8  patients or their family members from getting cancer if you

9  could, right?

10     A    Yes.

11     Q    Have you ever told any patient about your concerns

12  regarding Roundup?

13     A    I don't recall.

14     Q    You don't recall one way or the other?

15     A    I don't recall one way or the other.

16     Q    Have you ever discouraged your patients or their

17  family members from using Roundup?

18     A    I don't recall.

19     Q    And you've never diagnosed a patient with a

20  Roundup-induced or a glyphosate-induced non-Hodgkin's

21  lymphoma?

22     A    I have not, that is correct.

23     Q    You've never written in any patient's medical

24  record that you believe glyphosate or Roundup was a cause of

25  their non-Hodgkin's lymphoma?

```
 1        A    I don't recall ever having written such item in a

 2   patient chart.

 3        Q    Okay.  Now, your CV that we referred to earlier,

 4   which is Attachment A to your report.

 5        A    Mm-hmm.

 6        Q    I didn't count them all up, but your CV lists

 7   dozens of publications, book chapters, and presentations,

 8   correct?

 9        A    Correct.

10        Q    Have you ever researched, published, or made any

11   professional presentation on glyphosate or Roundup?

12        A    I have not.

13        Q    Have you ever researched, published, or made any

14   professional presentation on non-Hodgkin's lymphoma?

15        A    I have not.

16        Q    Have you ever researched, published, or made any

17   professional presentation on glyphosate or Roundup exposure

18   and non-Hodgkin's lymphoma or any non-Hodgkin's lymphoma

19   subtype?

20        A    I have not.

21        Q    And you haven't published your opinions or

22   concerns about Roundup anywhere, correct?

23        A    Correct.

24        Q    You haven't shared your opinions or concerns about

25   Roundup with any professional medical association or any
```

Exhibit A Page - 13

1    other audience?

2        A    Correct.

3        Q    You haven't shared your opinions or concerns about

4    Roundup outside of the litigation context, true?

5        A    Correct.

6        Q    Now, you currently are the education director at

7    Newton-Wellesley Hospital and an Assistant Clinical

8    Professor, Department of Emergency Medicine, at Tufts

9    University School of Medicine; is that correct?

10       A    Correct.

11       Q    What -- what -- excuse me.  What courses do you

12   teach?

13       A    Emergency medicine.

14       Q    Anything else?

15       A    In that capacity, no.  Those are the courses that

16   I teach.

17       Q    Okay.  And what percentage of your time is devoted

18   to teaching?

19       A    Oh, 100 percent of it is we work with residents

20   and students alike during each shift.  So I'm always working

21   with students and we're always teaching clinically.

22       Q    Have you ever taught your medical students that

23   Roundup causes non-Hodgkin's lymphoma?

24       A    I have not.

25       Q    You're a member of many professional medical

 1    may not be up to date.  I have to look that one up, but ACMT

 2    and ACEP are both yes.

 3         Q    Okay.  Does the American College of Emergency

 4    Physicians claim that glyphosate or Roundup causes

 5    non-Hodgkin's lymphoma?

 6         A    I'm not aware of such a claim.

 7         Q    Have you told them that they should make that

 8    claim?

 9         A    No.

10         Q    Does the American College of Medical Toxicology

11    claim that glyphosate or Roundup causes non-Hodgkin's

12    lymphoma?

13         A    I'm not aware of their position on that issue.  I

14    can't answer that question.

15         Q    Have you told them that they should make that

16    claim?

17         A    I have not.

18         Q    So outside of the courtroom, outside of the

19    litigation context, neither you, nor any of the professional

20    organizations you are associated with, have claimed publicly

21    that Roundup causes non-Hodgkin's lymphoma, correct?

22         A    I can't answer that question.  I can't speak on

23    behalf of those organizations in their totality.

24         Q    Okay.  Are you aware of any medical association

25    website that lists Roundup or glyphosate as a cause of

1      Q    So I take it you haven't contacted the EPA or any

2    other regulatory authority about your concerns regarding

3    Roundup or glyphosate?

4      A    I have not.

5      Q    Now, for Roundup to have any potential health

6    effect on any person, that person first must have an

7    absorbed dose from applying Roundup, true?

8      A    True.

9      Q    In other words, the active ingredient, glyphosate,

10    must be absorbed into the bloodstream to have any potential

11    health effect, correct?

12              MR. WILLIAMS:  Objection to form.

13              THE WITNESS:  It must be incorporated into

14        the body in order to have an outcome measure of

15        clinical significance, yes.

16    BY MR. HOFFMAN:

17      Q    And calculating an internal dose would be referred

18    to as dose reconstruction, right?

19      A    Correct.

20      Q    And you have not done that in this case, you have

21    not performed a dose reconstruction?

22      A    That's correct.

23      Q    In other cases that you've been involved with,

24    have you conducted dose reconstructions?

25      A    No.

Exhibit A Page - 16

```
 1                MR. HOFFMAN:  Yeah, I'll split it up.

 2  BY MR. HOFFMAN:

 3      Q    So use is not necessarily exposure, correct?

 4      A    Correct.

 5      Q    And exposure is not dose?

 6      A    I'm not able to answer that question.  Exposure is

 7  not dose, I can't agree or disagree with that.

 8      Q    Okay.  You've heard the term in toxicology that

 9  it's the dose that makes the poison, correct?

10      A    Yes.

11      Q    You've never heard the term in toxicology it's the

12  exposure that makes the poison, have you?

13      A    I don't know if I've ever heard that term or

14  phrase.

15      Q    You've heard the term it's the use that makes the

16  poison, have you?

17      A    I don't know that I've ever heard that term or

18  phrase.

19      Q    And you're aware that there are dose levels of

20  glyphosate that do not lead to any adverse health effects in

21  humans, correct?

22      A    Yes.

23      Q    Are you familiar with the dose levels of

24  glyphosate for humans that are set by various state,

25  federal, and international regulators, they're sometimes
```

Exhibit A Page - 17

1    referred to as regulatory thresholds?

2        A    I am aware that that exists.  I am not familiar

3    with the numbers off the top of my head, no.

4        Q    Have you seen what is referred to as a reference

5    dose by the U.S. EPA for glyphosate?

6        A    I may have reviewed that over the course of my

7    career.  I'm not familiar with the number or the reference

8    off the top of my head at this time, no.

9        Q    What about ADI, acceptable daily intake.  Have you

10   seen references to that for glyphosate?

11       A    I may have reviewed that over the course of my

12   career, but I'm not familiar with the number off the top of

13   my head at this time, no.

14       Q    Okay.  In your opinion, what dose of Roundup or

15   glyphosate needs to enter the body to cause non-Hodgkin's

16   lymphoma in humans?

17       A    I don't know that anyone knows the answer to that

18   question.

19       Q    So you don't have an opinion on it?

20       A    Can you ask that again?  You don't know if I have

21   an opinion on what?

22       Q    The dose level of Roundup or glyphosate that needs

23   to enter the human body to cause non-Hodgkin's lymphoma.

24       A    I'm not familiar with literature that cites a

25   specific number to that regard, no.

Exhibit A Page - 18

1    exposure was a substantial -- I believe you called it a

2    substantial contributing factor to the plaintiff's

3    development of non-Hodgkin's lymphoma?

4        A    I believe that to be true, yes.

5        Q    Okay.  Do you also hold general causation opinions

6    with respect to whether, in general, the literature at large

7    supports the conclusion that glyphosate or Roundup is -- can

8    cause non-Hodgkin's lymphoma?

9        A    I do believe that there is a link and a possible

10   cause there, yes.  Possible, probable, probably, parsing

11   words that I have to choose more carefully.

12            Yes.  I believe there -- the link has been

13   established between causality relative to glyphosate and

14   non-Hodgkin lymphoma.

15       Q    Do you know whether, as part of your opinions at

16   trial, you will go through and review and analyze the

17   individual epidemiological studies that have been published

18   on glyphosate and non-Hodgkin's lymphoma?

19            MR. WILLIAMS:  Objection to form.

20            THE WITNESS:  Can you ask your question just

21       a little bit more succinctly, please?

22   BY MR. HOFFMAN:

23       Q    Yeah.  So, I mean, in your report, you refer to

24   the Court's order, and you say you looked at that analysis,

25   you also looked at the underlying studies.  You refer to

Exhibit A Page - 19

1    IARC.  You refer to a number of general things.

2          I guess what I'm trying to understand is, do you

3    anticipate that at trial, as part of your opinions, that

4    you're actually going to go through each of the underlying

5    studies that the Court reviewed in its July 10, 2018 order

6    and analyze each of those studies as the Court did?

7          A    Yes, sir.

8          Q    Okay.  Okay.

9          Okay.  Now, I believe you told me earlier that

10   you're not an epidemiologist, correct?

11         A    That is correct.

12         Q    It is true that the human epidemiological studies

13   that you have reviewed were based on the use of

14   glyphosate-based herbicides in real-world conditions at

15   relevant human exposure levels, correct?

16         A    I believe that to be true.

17         Q    Now, some types of epidemiological studies are

18   considered higher quality of scientific evidence than other

19   types of epidemiological studies, correct?

20         A    Are you asking a generic question about

21   epidemiologic studies in general, not specific to this case?

22         Q    Correct.

23         A    That is true.  There are stronger levels of

24   evidence and weaker levels of evidence relative to different

25   epidemiologic studies, that is correct.

```
 1    need me to -- to zoom in or if you want to look at an

 2    additional page of the document or anything like that, but

 3    let's try this.

 4              I'm going to share my screen and move this over

 5    here.

 6              (Rosenbaum Deposition Exhibit 14 marked for

 7              identification.)

 8    BY MR. HOFFMAN:

 9        Q    So what I have put up on my screen is a medical

10    record that has a Bates of IrvineG, I-r-v-i-n-e-G, dash,

11    00007, and it's a medical record from Fang Frank Yu, M.D.

12    Ph.D., it looks like it's dated January 19, 2006.

13              Do you see that?

14        A    Yeah.

15        Q    And you'll see here in the physical examination

16    section, it notes that Mrs. Rolish, at that time, was

17    165 pounds.

18              Do you see that?

19        A    I do, yes.

20        Q    And do you recall how tall she was?

21        A    I don't have it in front of me, no.

22        Q    I'll represent to you that her medical records say

23    she was 5-5.  Does that sound accurate?

24        A    Yep.

25        Q    Okay.  So if she were 165 pounds, 5-5, that would
```

1    give us a BMI of 27.5, correct?

2         A    It sounds right.  I'd have to calculate it before

3    I could agree completely, but that sounds reasonable.

4         Q    Okay.  So, I'm sorry, what exhibit number were we

5    up to, was it 13 or 14?

6         A    This would make 14.  We have 13 on the platform,

7    this additional one is Number 14.

8         Q    Okay.  So, I'm sorry, I don't know if I said I'd

9    like to mark that as an exhibit, but we will mark that

10   medical record as Exhibit 14.

11             Now, Doctor, let me show you one of the studies on

12   the topic of weight and risk of non-Hodgkin's lymphoma.

13                  (Rosenbaum Deposition Exhibit 15 marked for

14                  identification.)

15   BY MR. HOFFMAN:

16        Q    Can you -- can you see what's on my screen now?

17   This would be Exhibit 15.

18        A    I can, yes.

19        Q    Okay.  It's a -- it's an article entitled:

20   "Obesity and risk of non-Hodgkin's lymphoma:  A

21   meta-analyses," by lead author Larsson, L-a-r-s-s-o-n, and

22   it appears to have been published in 2007.

23             Do you see that?

24        A    I do, yes.

25        Q    And do you recall whether you've reviewed or

Exhibit A Page - 22

1   considered this study?

2       A    I don't recall off the top of my head, no.

3       Q    Okay.  Can you see it okay or do you need me to

4   zoom in a little bit more?

5       A    I can see it okay.

6       Q    All right.  Well, as I mentioned, this is a

7   meta-analysis.  If we look in the abstract section, can you

8   see here where I'm pointing?

9       A    I can.

10      Q    It says:  "16 studies, 10 cohorts, and six

11  case-control studies with 21,720 cases met the inclusion

12  criteria."

13           Do you see that?

14      A    I do.

15      Q    Okay.  Then it goes on to say:  "Compared to

16  individuals of normal body weight, BMI less than 25, the

17  summary RRs, or relative risks, of non-Hodgkin's lymphoma

18  were 1.07, 95 percent confidence interval of 1.01 to 1.14.

19  For overweight individuals BMI between 25 and 30."

20           Do you see that?

21      A    I do.

22      Q    And would that be the category that Mrs. Rolish

23  would fall into, the 25 to 30 range?

24                MR. WILLIAMS:  Objection to form.

25                THE WITNESS:  I don't know what range she

1        would fall into in terms of BMI over the course of the

2        time of her life relevant to her risk and exposure, is

3        lymphoma a single time moment with a BMI measured on a

4        day of the week and the moment in time?

5              I don't know how to apply that singular BMI

6        to the data referenced in this meta-analysis.  So I

7        don't know that I can agree that it falls within that

8        range of this study without having time to review this

9        study in its entirety, and, therefore, if we're going

10       to be specific, pull up all 10 cohorts and all six

11       control studies and review all of their contents to see

12       if Ms. Rolish's characteristics fall within the

13       criteria that were included in this meta-analysis.

14   BY MR. HOFFMAN:

15       Q    Okay.  Do you know whether Mrs. Rolish's weight

16   remained relatively stable over the years?

17       A    I don't know the answer to that question.  I would

18   have to review the copious medical literature again to

19   answer that.  I don't know right now off the top of my head.

20       Q    And you haven't done any kind of survey of the

21   medical literature to look specifically at the issue of

22   either overweight or obese individuals and their increased

23   risk for non-Hodgkin's lymphoma?

24       A    I reviewed a lot of literature.  Again, I would

25   reference to my report that cites the different reference

Christopher D. Rosenbaum, MD, MSc, FACEP

```
1        family history of cancer.  I do not recall her

2        mentioning that her father had -- sorry.  I do not

3        recall her mentioning that her father had any

4        malignancy history.  That is not my recollection.

5                MR. HOFFMAN:  Madam Court Reporter, did you

6        get that?

7                COURT REPORTER:  Yes.

8   BY MR. HOFFMAN:

9        Q    And in your report, just backing up, in your

10  report, you didn't consider anywhere the plaintiff's body

11  weight as a risk factor that we, you know, as we just

12  discussed, you didn't consider that in your report anywhere,

13  did you, Doctor?

14       A    I don't believe it's written in the report.

15       Q    Okay.  And family history of cancer is also not

16  something you explicitly considered in your report, correct?

17       A    I don't see it written in the report.

18       Q    Okay.  Have you reviewed the medical literature on

19  positive family history of cancer and its relationship, if

20  any, to an increased risk for non-Hodgkin's lymphoma in an

21  individual?

22       A    The literature that I referenced, I referred to in

23  my report, I would defer to that reference point.

24       Q    Okay.  Again, in your materials considered upon

25  list?
```

```
 1    to 1.8 for men with a family history of non-hematopoietic

 2    cancer."

 3              Do you see that?

 4        A    I see a study that references men.  When we're

 5    talking about a case that is about a woman, yes.

 6        Q    And do you know if from your review of the

 7    literature, your experience, your clinical training and

 8    otherwise, do you know whether men and women are -- or would

 9    be unique in that regard?

10        A    I would have to refer to the literature in order

11    to best answer that question.  I'm not able to answer off

12    the top of my head at this time.

13        Q    Do you know whether the plaintiff's positive

14    family history of cancer was any increased risk for her of

15    developing non-Hodgkin's lymphoma?

16        A    I don't know that it contributed to her risk for

17    non-Hodgkin's lymphoma, no, I don't know that.

18        Q    Did you rule that out in your analysis?

19        A    I neither ruled it in nor ruled it out.  I

20    considered it in my decision-making.

21        Q    I'm sorry.  You said you didn't rule it in or rule

22    it out?

23        A    That's correct.  I'm not able to rule in or rule

24    out --

25        Q    And why --
```

Exhibit A Page - 26

Christopher D. Rosenbaum, MD, MSc, FACEP

```
 1      A     -- family history of cancer as a cause of

 2   non-Hodgkin's lymphoma.  I considered it.

 3      Q    Okay.

 4      A     It appeared that there was no first-degree

 5   relative with a history of hematopoietic cancer listed in

 6   her medical record.  That's what I considered.

 7      Q    Okay.  And so it was on that basis that you did

 8   not include family history of cancer as a risk factor?

 9      A     I didn't say that I didn't include it as a

10   consideration or risk factor.  I'm not able to attribute the

11   risk of cancer in isolation to family history, plus or

12   minus, it is considered as part of the contributing factors

13   when considering what might have led to the increased risk

14   for non-Hodgkin's lymphoma.

15      Q    Maybe it's my -- I'm having a hard time hearing,

16   but I'm not sure I'm understanding what you're saying.

17           Are you understanding that you considered it and

18   didn't include it at all in your analysis, or are you saying

19   you considered it and then you ruled it out?

20      A     I don't understand what "ruled out" means.  If you

21   could be more specific when you say "I ruled it out," what

22   is the "it" and "ruling out" refers to what process?

23      Q    Yeah.  Ruling out family history as a contributing

24   factor or an increased risk of non-Hodgkin's lymphoma for

25   the plaintiff.
```

Exhibit A Page - 27

```
 1                        CERTIFICATE

 2            I, Jennifer A. Dunn, Registered Merit

 3    Reporter, Certified Realtime Reporter, California Certified

 4    Shorthand Reporter #14461, and Certified Shorthand Reporter,

 5    do hereby certify that prior to the commencement of the

 6    examination, CHRISTOPHER ROSENBAUM, M.D., was duly

 7    remotely sworn by me to testify to the truth, the whole

 8    truth and nothing but the truth.

 9            I DO FURTHER CERTIFY that the foregoing is a

10    verbatim transcript of the testimony as taken

11    stenographically by me at the time, place and on the date

12    hereinbefore set forth via remote Zoom technology platform.

13            I DO FURTHER CERTIFY that I am neither a

14    relative nor employee nor attorney nor counsel of any of the

15    parties to this action, and that I am neither a relative nor

16    employee of such attorney or counsel, and that I am not

17    financially interested in the action.

18

19

20

21

22            JENNIFER A. DUNN
              Registered Merit Reporter
23            Certified Realtime Reporter
24            Dated:  November 30, 2023

25
```