# EXHIBIT G

**Expert Report of Cristian Tomasetti, Ph.D.**

## BACKGROUND AND QUALIFICATIONS

I am an Associate Professor of Oncology and Biostatistics at Johns Hopkins University (JHU), in the Division of Biostatistics and Bioinformatics of the Department of Oncology of the School of Medicine, and in the Department of Biostatistics of the Bloomberg School of Public Health.

After a Ph.D. in Applied Mathematics from the University of Maryland, College Park in December 2010, I was a Ruth L. Kirschstein National Research Service Award Postdoctoral Fellow in the Department of Biostatistics of the Harvard School of Public Health and in the Department of Biostatistics and Computational Biology of the Dana-Farber Cancer Institute until June 2013, when I was recruited to become an Assistant Professor at JHU. At the end of 2017 I was promoted to the rank of Associate Professor.

My work is recognized internationally for the paradigm-shift contributions to the current understanding of cancer etiology and tumor evolution. I have published several leading-author papers in Science, Nature, and Proceedings of the National Academies of Sciences. The two Science papers discovering that a large fraction of cancer and many of its mutations are attributable to the normal divisions of our cells, rather than to environmental and inherited factors, were ranked #4 and #15 by Altmetric for the attention they received among any research paper published in any field of any scientific journal for the years 2015 and 2017, respectively. I have been invited to give more than 80 talks on these topics at national and international conferences and seminars, several of which as a keynote speaker.

I also lead the effort to develop classification algorithms for the early detection of cancer, and its risk prediction, using a combination of mathematical modeling and machine learning. In 2018, I published with my collaborators a new blood test methodology called CancerSEEK, for the early detection of eight different cancer types, in the journal Science. The test has been recently successfully evaluated as a cancer screening tool on 10,000 people (Lennon et al. Science 2020).

Since 2014 I have been responsible for the design and teaching of the graduate course in probability theory to JHU Biostatistics PhD students, arguably the most theoretical course in a graduate statistics program.

1

an unbiased assessment of the information, Health Canada selected a group of 20 of its own scientists who were not involved in the 2017 re-evaluation to evaluate the notices of objection. **No pesticide regulatory authority in the world currently considers glyphosate to be a cancer risk to humans at the levels at which humans are currently exposed**."

## MECHANISM, ANIMAL MODELS & GENOTOXICITY

When considering if an exposure may cause cancer in humans, **epidemiological studies in humans are by far the most important ones to consider.** This is true for several reasons.

First, there are **fundamental differences between the biology of rodents and human biology**. While studies in mice and cell lines are extremely valuable in many research endeavors, a recent study I published (Tomasetti PNAS 2019) shows how lab mice will inflate the effect of a carcinogen when compared to humans because cell division does not decelerate with aging in mice. Given the known power law relationship between cell divisions and cancer risk, it follows that the cancer incidence in lab mice will not decelerate but continue to grow like a power law when aging, contrary to humans. This is indeed what has been observed in mice (see reference in my PNAS 2019). In contrast, the decelerating effects in humans have been proven in large epidemiology datasets of many cancer types, among which NHL (see both SEER US and UK Cancer Research data). **This implies that any harmful effect estimated in lab mice should be expected to be significantly smaller in humans as DNA damage is highest at cell division.** Given that, any differences in survival between experimental groups of rodents may, if not properly accounted for, impact results and complicate any potential inference to humans. For example, by properly controlling for age, Crump 2020 "found a statistically significant trend toward more animals surviving to final sacrifice at higher doses in several of the bioassays" they analyzed (see their Table 2). This can be problematic for any analysis attempting to attribute increasing numbers of tumors to increasing glyphosate exposure rather than simply to longer lifespan, and this is compounded given that the rate of cell division does not decrease in rodents as it does in humans (Tomasetti PNAS 2019). Also, not all substances that cause tumors in mice or rats cause tumors in humans, even at similar concentrations; inherent biological differences may in part explain these differences (MacDonald 2004, Anisimov 2005, Dale 2006, Bracken 2009, Newman 2019).

This is also true of mechanism studies such as those examining genotoxicity and oxidative stress: simply because a particular exposure might cause a given effect in a

24

cell line *in vitro* or in an animal at extremely high doses (e.g., by intraperitoneal injection) does not mean that it will cause the same effect in the course of actual, human-relevant exposures at human-relevant doses (EPA 2017). Moreover, we must consider the relevance of a mechanism being considered to the outcome of interest. Some mechanisms that may operate *in vitro*—such as cytotoxicity that results in the release of free oxygen species—may not, in practice, lead to cancer *in vivo*. For an interesting example where this might be at play, see the results of recent NTP studies evaluating glyphosate's ability to induce genotoxicity and oxidative stress (Rice 2018, Rice 2019, Swartz 2019).

Second, in many animal studies the concentrations used are by far higher than what humans get realistically exposed to. Thus, even if there were some potential effect observed at the highest dose levels in rodents - and there does not appear to be any significant one - one would need to, of course, consider how that relates to human exposure (if at all) before concluding it had any relevance whatsoever to humans. In this case, rodents in the high-dose groups were exposed to doses in feed ranging from 5,000 to 50,000 parts per million, or 50 million parts per billion (Greim 2015, EPA 2017). For comparison, in one study of farmers spraying glyphosate as part of their occupation, the average urinary level of glyphosate on day of application was 3.2 parts per billion, and the highest observed level was 233 parts per billion (Acquavella 2004). This indicates **a vast difference in dosage between humans and rodents, making the comparison of the results observed in rodents at those extreme concentrations essentially irrelevant for inferring the actual effect in humans, given the concentrations observed in humans.**

Finally, as I showed already for the human study, **we always need to control for multiple comparisons.** To determine how many positive results we would expect *by chance alone*, we must consider how many tests have been conducted in the animal study and how many comparisons are at play. For example, in the case of glyphosate, more than a dozen long-term rodent carcinogenicity studies have been conducted (Greim 2015, EPA 2017, Crump 2020, Portier 2020). Each of those studies included males and females, along with controls and multiple dosing groups. Typically, dozens of tumor types were evaluated per study, and for each tumor type multiple comparisons (trend tests and pairwise) could be, and in many cases were, made. As a result of the richness of the data set alone, one would expect to see positive results (and negative results, where exposed groups had lower tumor incidences than unexposed controls) *by chance alone*. Thus, the fact that for some tumor types there seemed to be an effect in one sex or the other in a few of the many reported statistical tests performed does not indicate that glyphosate caused rodents to develop tumors. Rather, a proper statistical correction for the multiple comparisons is required, i.e., a more thoughtful approach to

25

assessing causation is needed (see, e.g., BfR 2015, EFSA 2015, Greim 2015, ECHA 2017, EPA 2017, Crump 2020). Crump 2020 performed a detailed analysis of the effect of accounting for multiple comparisons on the results of the 15 bioassay studies examined by the U.S. EPA through Docket EPA-HQ-OPP-2016-0385. Six of these fifteen studies were excluded due to incomplete data or confounding. This is similar to the IARC 2015 report, which was based on some information from ten bioassays (though not the full bioassays themselves) (*see* IARC 2015, Tarone 2018 ("When all relevant data from the rodent carcinogenicity studies of glyphosate relied upon by the Working Group are evaluated together, it is clear that the conclusion that there is sufficient evidence that glyphosate is an animal carcinogen is not supported empirically.")).

Crump 2020 randomly assigned animals to different dose groups to build a null distribution, and then presented three different analyses based on a continuity-corrected poly-3 test, which is a survival-adjusted Cochran-Armitage test. The results, which can be seen in Figure 1 of Crump 2020, clearly show a lack of any convincing evidence for a carcinogenic effect of glyphosate in these animal studies. In fact, between the two options, that figure would rather suggest an anti-carcinogenic effect of glyphosate, given the much larger concentration of p-values that are close to the value of 1. Table 4 also shows how none of the p-values were significant once corrected for multiple comparisons.

Based on my review of the data and the published statistical analyses of the various animal bioassays with glyphosate, and similar to the conclusions reached by various regulatory agencies throughout the world (BfR 2015, EPA 2017, EFSA 2015, ECHA 2017, New Zealand 2016, Australia 2017, Health Canada 2017), the reliable data do not support a carcinogenic effect of glyphosate in animals.

## CONCLUSION

Based on my review of the published data, there is no significant association much less a causal relationship, between glyphosate or formulated glyphosate and NHL. This is not surprising, since based on my own research, the vast majority of mutations in NHL appear to be explained simply by replication errors.

## COMMENTS ON PLAINTIFFS' EXPERT REPORTS

I have reviewed the reports submitted by the plaintiffs in this litigation, including the reports of Drs. Ritz, Portier, and Jameson. I disagree with some of their methodology

All of the opinions expressed in this report are mine and reflect my training, education, and experience as a biostatistician and expert in cancer etiology. I hold them to a reasonable degree of scientific certainty, and I approached the issues discussed in this report using the same rigor and methodology that I employ in my research and regular practice. I reserve the right to supplement my opinions should new evidence become available. I also reserve the right to comment on the opinions or testimony of others. I am compensated for my time at a rate of $500 per hour. A list of cases in which I have provided expert testimony in the last four years is attached.

*[signature: Cristian Tomasetti]*

_____
Cristian Tomasetti, PhD
Associate Professor, Division of Biostatistics & Bioinformatics
Department of Oncology
Johns Hopkins University


February 12, 2021