# EXHIBIT C

```
 1      IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
                   STATE OF MISSOURI
 2


 3   BARBARA ALLEGREZZA, et al.,    )
                                    )
 4               Plaintiffs,        )
                                    )
 5       -vs-                       ) 19SL-CC03421
                                    )
 6   MONSANTO COMPANY, et al.,      )
                                    )
 7               Defendants.        )


 8


 9               ****CONFIDENTIAL****


10

             Videotaped Remote Deposition of
11             RICHARD DeGRANDCHAMP, Ph.D.
                  taken on behalf of
12                  the Defendants
                 on April 28, 2023
13


14                  *  *  *  *  *


15


16


17


18


19


20


21


22


23


24


25
```

Exhibit C Page - 1

```
 1                    INDEX  OF   EXAMINATION

 2

 3   BY MR. KALAS                                              5

 4

 5

 6

 7                         EXHIBITS

 8   Ex #.          Description                            Page

 9   Exhibit 1  Defendant Monsanto Company's Second         34
                Amended Notice of Deposition of
10              Richard DeGrandchamp, Ph.D.

11   Exhibit 2  Plaintiffs' Objections and Responses        11
                to Defendant Monsanto Company's
12              Notice of Taking Deposition of
                Richard DeGrandchamp, Ph.D. and
13              Request for Production

14   Exhibit 3  Invoice                                      24

15   Exhibit 4  Test Report and Monsanto Letter to          33
                EPA, 11/17/80
16
     Exhibit 5  PRN 98-3                                     28
17
     Exhibit 6  Generic Glyphosate Report                   49
18
     Exhibit 7  Email String re: 1,4-Dioxane in             58
19              glyphosate formulations

20   Exhibit 8  TSCA Statute                                 97

21   Exhibit 9  ATSDR toxicological profile 1,4-dioxane    118

22

23

24

25
```

Exhibit C Page - 2

Golkow Litigation Services                                  Page 2

Richard DeGrandchamp, Ph.D.    Confidential

```
 1                   APPEARANCES:


 2

     Gibbs Henderson, Esq.
 3   Nachawahti Law Group
     5489 Blair Road
 4   Dallas, Texas 75231
     ghenderson@ntrial.com
 5
                         On Behalf of the Plaintiffs;
 6


 7   John Kalas, Esq.
     Abigail M. Reecer, Esq.
 8   Hollingsworth, LLP
     1350 I Street NW
 9   Washington, DC 20005
     jkallas@hollingsworthllp.com
10
                         On Behalf of Defendant
11                       Monsanto Company.


12


13   COURT REPORTER:


14   Mary Joy Springer
     Golkow Litigation Services
15


16   VIDEOGRAPHER:


17   Bill Geigert
     Golkow Litigation Services
18


19


20


21


22


23


24


25
```

Exhibit C Page - 3

Richard DeGrandchamp, Ph.D.   Confidential

```
 1   submitted have -- were updated with new information and

 2   documents that I received.  So those documents would have

 3   included more, more information, and I don't know if

 4   they'd fall in the category of significant overlap -- I

 5   continually up- -- these are evergreen documents, so

 6   they're always -- I'm always updating them with new

 7   information, and I can't recall offhand the difference

 8   between the documents that I submitted in Mr. Stewart's

 9   case as opposed to Mr. Henderson.

10        Q   Okay.  Well, let me ask you this because this

11   is really what I'm interested in.  The work you've done

12   that you can recollect on these evergreen reports from

13   the time you served them for Mr. Stewart's case to the

14   time they went to Mr. Henderson for this case, would you

15   bill all of that work to Mr. Henderson?

16        A   Yes.  With each new law firm -- yes, it's a

17   work product, so they would have to replace me with

18   someone else and, you know, fund that research.  But yes,

19   but once it's, once I submit the documents, then it --

20   because I only testify to general causation, I would not

21   be charging any additional funds for any future cases

22   with the exception of the updates, yes.  So that's

23   correct.

24        Q   Okay.  So -- so just so I understand, even

25   though if Mr. Stewart designates you in Peters next
```

Exhibit C Page - 4

 1    And then I started writing that up to update my

 2    supplemental report, and just last Wednesday or Thursday

 3    I was sent a protective order to sign.

 4         Q    Okay.

 5         A    So I sent those in probably last Thursday,

 6    but before then I didn't know I -- those documents were

 7    subject to a protective order.

 8         Q    Okay.  I understand.  So if we keep going

 9    here.  Okay, so you have concluded that ethylene oxide is

10    present in Roundup.  Have you concluded that ethylene

11    oxide disassociates with the Roundup formulation in such

12    a way that it may be absorbed by people?

13         A    That was a long one.  Can you repeat that.

14         Q    Have you reached an expert conclusion that

15    ethylene oxide disassociates from the Roundup formulation

16    in such a manner that it may be absorbed by people

17    exposed to Roundup?

18         A    I haven't expressed an opinion about the

19    ADME.  As we've discussed before, the ADME, you know,

20    basic toxicological aspects of exposure, but, of course,

21    ethylene oxide is highly volatile so it would be inhaled,

22    and certainly because of its -- because it dissolves in

23    the surfactant, it would be absorbed considerably in

24    dermal exposure.

25              But I haven't done those calculations or

Exhibit C Page - 5
Golkow Litigation Services                              Page 30

Richard DeGrandchamp, Ph.D.   Confidential

```
 1   looked at any exposure to them per se because that gets

 2   into the realm of specific causation.

 3        Q    Okay.  So if I understand correctly, the

 4   expert opinion you would offer about ethylene oxide at

 5   trial or at least -- strike that, let me ask a better

 6   question.

 7             If I understand you correctly, part of the

 8   expert opinion you would offer about ethylene oxide at

 9   trial is that it is present in Roundup formulations, it

10   has the potential to disassociate from those formulations

11   and it has the potential for inhalation or dermal

12   absorption; is that fair?

13        A    Yes, that's fair.

14        Q    Okay.  But you will not offer an opinion that

15   the ethylene oxide is actually absorbed via the dermal

16   route or inhalation route in Roundup users because you

17   haven't done that analysis; is that fair?

18        A    Well, I've done an analysis.  I haven't been

19   asked to form an opinion.

20        Q    Okay.

21        A    So as a toxicologist, I would always look

22   at -- I mean, if I were going to introduce ethylene oxide

23   as a key ingredient or an impurity in Roundup, before I

24   would form an opinion on that matter, I would make sure

25   that it's toxicologically significant or exposure could
```

Exhibit C Page - 6

Richard DeGrandchamp, Ph.D.  Confidential

 1   happen.  So I've evaluated that, but I haven't quantified

 2   it or looked at it yet because I haven't been asked.

 3        Q    Okay.  So just so I understand, you've looked

 4   at the potential for ethylene oxide to be inhaled or

 5   dermally absorbed, but you haven't yet reached an expert

 6   opinion that any inhalation or dermal absorption of

 7   ethylene oxide in Roundup users will be toxicologically

 8   significant; is that fair?

 9        A    That's fair, yes.

10        Q    Okay.  All right.  Going down here, you

11   wrote:  Monsanto had previously notified EPA on November

12   17th, 1980 that Roundup contained dioxane as an impurity.

13             Did I read that correctly?

14        A    Yes.

15        Q    Okay.  I wanted to just go through the

16   timeline a little bit there.  If I understand correctly,

17   the reason Monsanto knew 1,4-dioxane was in surfactants

18   that were potentially being used in Roundup formulations

19   is that a surfactant supplier told them; right?

20        A    I don't know how they received that

21   information, but, yes, there was -- there was a report or

22   there was some information given to Monsanto about the

23   dioxane contamination.  I don't know what form that was

24   in, a telephone call or a report.

25        Q    Okay.  Well, as you know, timelines can be

Exhibit C Page - 7

 1   off.

 2        A    Yeah, I was just going to say, since Monsanto

 3   didn't know the concentrations at that point, then their

 4   statement of, you know, their statement with regard to

 5   the hazard that dioxane posed was totally without merit.

 6   I'm sorry.

 7        Q    Well, you say Monsanto --

 8        A    I'm sorry.

 9        Q    You say Monsanto didn't know the

10   concentrations.  But you're basing that on the fact that

11   Monsanto did not send a letter to the agency with the

12   concentrations until February 1981.  You don't know based

13   on the documents you've reviewed, that Monsanto was

14   ignorant of the concentrations before their November

15   letter; true?

16        A    I can't answer that question specifically.

17   And I'm trying to be careful here because now you're

18   nailing down the timeline.  Monsanto did know the

19   impurities in their formulations, and they have tables

20   and they have the actual concentrations that they

21   detected when they actually took measurements, when they

22   analyzed for a variety of impurities, and we can talk

23   about that document as well.

24             I do not know when Monsanto actually made

25   those measurements.  I don't know if it was before 1980,

Exhibit C Page - 8

Golkow Litigation Services                              Page 61

Richard DeGrandchamp, Ph.D. - Confidential

 1    before this TSCA rule was put into place or it was after.

 2    So as far as -- my opinion is Monsanto knew, reasonably

 3    could have known that dioxane was contaminated or one of

 4    the contaminants in the surfactants when they actually

 5    took measurements, because they do report the

 6    concentrations in their impurity document that I cite.

 7    When those analyses were actually performed and when they

 8    have knowledge of the actual levels, I do not know.  But

 9    the -- I regard it as kind of a flippant statement.  You

10    know, if I were Monsanto and someone was interested in an

11    impurity in one my products, I would reflexively have

12    said, yeah, but it doesn't pose any risk because it's at

13    trace concentrations.  Since I don't know -- since I

14    don't know when they actually did those measurements, I

15    don't know if that was a justifiable statement.  But I do

16    know that they did not conduct a risk assessment to

17    support that.

18          Q    Right.  Until after EPA asked them to do it.

19          A    That's correct.

20          Q    Okay.  Now, let me back up to 30,000 feet for

21    a moment before we keep going through your report.  You

22    talked about or we use these terms, trace impurities,

23    de minimis, a lot of times.  And as a toxicologist, are

24    impurities present in many everyday products?

25          A    Yes.  Yes, they are.

Exhibit C Page - 9

Golkow Litigation Services                                    Page 62

1    looking at formaldehyde and NNG.  But because I'm not

2    testifying to -- I'm not testifying to any of those new

3    opinions that I've developed, I'd rather not express any

4    opinions that I have at this point.

5         Q    Okay.  So let's -- let's try to put a pin in

6    it and we'll move off it.  In the Allegrezza matter up to

7    this point, April 2023, you have not reached an opinion

8    to a reasonable degree of toxicological certainty that

9    N-nitrosoglyphosate is a carcinogen; true?

10        A    I have reached an opinion, but I won't be

11   expressing that opinion in this litigation matter, that's

12   correct.

13        Q    Okay.  And you also won't be expressing the

14   opinion in this litigation matter regarding any spec

15   levels for NNG; correct?

16        A    That's correct.

17        Q    Okay.  And same for formaldehyde.

18        A    That's correct.

19        Q    Okay.  Okay.  Can we go to page 30 of Book 6

20   which is pdf page 55, please.

21        A    Okay.

22        Q    And you say here at the bottom sentence, you

23   say, EPA is also very clear that while inerts are

24   protected from disclosure under FIFRA, the agency can

25   supersede that regulation if it believes that it poses a

Exhibit C Page - 10

Richard DeGrandchamp, Ph.D. - Confidential

```
 1          Q     And it has formulation samples and technical

 2    samples, both under the glycine process and the IDA

 3    process.  Do you see that?

 4          A     I do.

 5          Q     Okay.  And do you have any understanding one

 6    way or another about whether Monsanto uses both processes

 7    or just one of those processes to make glyphosate?

 8          A     I do not.

 9          Q     Okay.  And do you have any understanding one

10    way or another if these formulation samples and technical

11    samples included in tab 10 are just Monsanto products,

12    include generic products, or a combination of the two?

13          A     Well, that was a long one.  My understanding

14    of this -- my understanding of this table is there are

15    two different processes that are involved, but my

16    interest in this table was the surfactant levels.

17          Q     Right.  You have the dioxane levels out there

18    in the formulation.

19          A     Right.  Exactly.

20          Q     So my question is:  For the formulation

21    samples, is the data coming from just Monsanto products,

22    just generic products or a combination thereof?

23          A     I see what your question was.  I do not know.

24          Q     Okay.  And so if we go back to Exhibit 2 in

25    your report, and your report which is Book 6 and we look
```

Exhibit C Page - 11

Richard DeGrandchamp, Ph.D. - Confidential

```
 1   at that table, which is right here, you say, Monsanto

 2   reported finding dioxane concentrations in Roundup as

 3   high at 270 parts per million in batches of its Roundup

 4   final formulations.

 5            Do you see that?

 6       A    I do.

 7       Q    Okay.  In fact, Monsanto reported finding

 8   dioxane concentrations in glyphosate formulations as high

 9   as 270 parts per million, but you don't know if that was

10   Roundup or a generic formulation; true?

11       A    I see your question.  Yes, I do not know --

12   well, number one, I don't know if the glycine process or

13   IDA process were Monsanto's Roundup process.  It could

14   mean the generic, but it could mean Roundup.

15       Q    I know you don't have an opinion on it, but

16   I'll just tell you they only use one of the processes,

17   but anyway.

18       A    Yeah, I'm just saying it's unclear.  It's

19   just Monsanto's table --

20       Q    Well, let me -- it's Monsanto's table, but

21   you don't know if it's Monsanto's product; is that fair?

22       A    It could be Monsanto's product.  It might not

23   be Monsanto's product, but those levels that are

24   presented there in the last column are consistent with

25   what Monsanto actually used in their risk assessment.
```

Exhibit C Page - 12

Richard DeGrandchamp, Ph.D. - Confidential

```
 1   Solvay, per se.  My opinion is multifaceted.  It's not

 2   just, you know -- we just went through Monsanto's own

 3   impurity list or impurity tables where they present the

 4   impurity concentration.  This is just one more example

 5   that the concentration is either the spec concentration

 6   or the measured concentration were greater than one part

 7   per million.  But I will not be offering any opinion on

 8   Solvay specifically.

 9        Q    Well, right.  But this example in particular

10   which refers to the Solvay surfactants, you don't know

11   whether or not it's relevant to US formulations.  That's

12   really what I'm getting at.

13        A    Yes.  I don't know if they're relevant.  I

14   don't know if Solvay was used in the United States,

15   that's correct.  I do not know.

16        Q    Okay.  All right.  Give me one more minute

17   and I might get out of your report.  Okay.

18             And the email that you cite to there that we

19   were looking at, the top email is from a Thomas Carl

20   Schneider to an Eric Sellen and it's dated 26 of

21   February 2016; right?

22        A    Yes.

23        Q    Okay.  And when you reviewed that document,

24   was that the top email in the chain you reviewed?  In

25   other words, was there any response following it?
```

Exhibit C Page - 13

```
 1   at what levels.  You know, there are different --

 2         Q    Whatever the levels may be.  Whatever the

 3   levels may be --

 4         A    Yeah.

 5         Q    -- it will capture the effect of those

 6   impurities.

 7         A    If the impurities are in the formulation,

 8   humans will be exposed to the entire formulation, that is

 9   correct.

10         Q    Okay.  Has 1,4-dioxane been associated with

11   cancer in people by any regulatory agency?

12         A    I -- I was not asked to look at that, so I

13   have no opinion.  I haven't looked -- I'm not looking at

14   any epidemiology as far as my --

15         Q    Sure.  My question was about regulatory

16   agencies, though, which was different than epidemiology.

17   Have any regulatory agencies, to your knowledge,

18   classified 1,4-dioxane or concluded that 1,4-dioxane is

19   associated with cancer in people?

20         A    Again, I'm not going to be offering any

21   opinion on epidemiology of any impurity or glyphosate

22   with the exception of the one study that we've talked

23   about.

24         Q    Okay.  So -- so you just don't have an expert

25   opinion one way or another whether a regulatory agency
```

Exhibit C Page - 14

Richard DeGrandchamp, Ph.D. - Confidential

```
 1  has concluded that?

 2       A    I have no opinion.

 3       Q    You're aware IARC has classified 1,4-dioxane

 4  as a 2B; right?

 5       A    2B, yes.

 6       Q    2B or not 2B, right?  That's a joke.  That's

 7  an IARC joke.

 8                 MR. KALAS:  Thanks, Gibbs.

 9       Q    (By Mr. Kalas) 2B means possibly

10  carcinogenic; right?

11       A    That's correct.

12       Q    Okay.  And that means that they found limited

13  evidence in humans, limited evidence in animals; correct?

14       A    Well, yes and no.  Now that they've raised

15  the level of the molecular mechanism to be equal to

16  animals and -- animal studies or bioassays in

17  epidemiology.  Now, you're talking about IARC's

18  framework.

19       Q    Yeah.  That's why I asked in past tense what

20  they found.  Not what they might find today.

21       A    Yeah.  I know that they classified it as a

22  2B.  I don't recall specifically the epidemiology studies

23  that they looked at.  So I really don't have any opinion

24  on that because, again, I'm not testifying to any

25  epidemiology unless there are other experts who are going
```

Exhibit C Page - 15

Richard DeGrandchamp, Ph.D. - Confidential

```
 1   with that.

 2        A    There are other products that have

 3   1,4-dioxane, that's correct.

 4        Q    Right.  Right.  And again, what I'm just

 5   trying to get to is, all those other products, every

 6   single one of them wasn't made by Monsanto; right?

 7        A    Oh, no.  Not every one of them, no.  That's

 8   correct.

 9        Q    Okay.  And you haven't done any calculations

10   in this case, and I don't mean to cast aspersions, you

11   haven't been asked to do any calculations in this case to

12   determine what amount of a Roundup applicator's daily

13   1,4-dioxane intake would come from applying Roundup

14   versus all these other background products; right?

15        A    I have not been asked to do that.  I have not

16   done that, but I would also say I would never just do

17   that.  I would never limit myself to that because I would

18   calculate the risks from glyphosate, the carcinogenic

19   risks from glyphosate, add that to the risk from

20   1,4-dioxane.  Then again, add the ethylene oxide to that,

21   add the formaldehyde to that, to get the cumulative risk,

22   or that's how I would proceed with my risk assessment.

23   It would be a summed risk with comprehensive, with a

24   comprehensive exposure analysis.  So I would never just

25   calculate the 1,4-dioxane risk.
```

Exhibit C Page - 16

```
 1        Q    Right.  And I wasn't really getting at risk

 2   as much as levels.  You haven't done an analysis to

 3   determine what proportion of somebody's levels of

 4   1,4-dioxane come from Roundup use versus somewhere else.

 5        A    Well, I'm relying primarily -- I mean, if you

 6   want to reduce this to what my opinion is about that,

 7   that alone -- I'm relying on Monsanto's own risk

 8   assessment for --

 9        Q    But -- but that's something different from

10   what I'm asking about, Doctor.  I don't mean to cut you

11   off.  But, like, I'm not asking about risk assessments

12   here.  I'm asking about levels, just absolute levels,

13   whatever the risk is.  You haven't done any breakdown to

14   determine how much comes from environmental exposures

15   outside of Roundup versus how much comes from Roundup.

16        A    Oh, I see your question.  No, I have not done

17   that.  That's correct.

18        Q    Okay.  All right.  Give me a moment.  Doctor,

19   I'm marking as Exhibit 7 -- I thought I already marked

20   Exhibit 7.

21             MR. HENDERSON:  You did.

22             MR. KALAS:  Okay.  It's not showing

23        up in there anymore, nor did -- you know, the

24        other one just got deleted too.  There it is.

25        All right.  Sorry.  My computer acted wonky
```

Exhibit C Page - 17

Golkow Litigation Services                                      Page 117

 1    rates.  Buffler, et al. 1978, also found no evidence

 2    1,4-dioxane-induced cancer in an occupational study of

 3    165 workers exposed intermittently to mean concentrations

 4    of 1,4-dioxane between 0.1 and 17 ppm.  Maximums ranged

 5    between 1.5 and 3.2 ppm at least one month during a

 6    21-year period.  However, the study was limited in power

 7    to detect an effect due to small size of cohort, low

 8    levels of exposure and the relatively short exposures.

 9            Did I read that correctly?

10       A    You did.

11       Q    Okay.  I know you don't have an opinion on

12    human evidence.  Are you aware of any other human studies

13    that exist on individuals occupationally exposed to

14    1,4-dioxane beyond those listed here in the ATSDR?

15       A    No.  I've not been asked to look into this

16    issue, no.

17       Q    Okay.  Go to page 101.  3.4.1.3, Dermal

18    Exposure.  Do you see that?

19       A    Yes.

20       Q    It says, Data on the absorption of

21    1,4-dioxane in humans following dermal exposure are not

22    available, but a study with excised human skin reported

23    that 10 times more 1,4-dioxane penetrates the skin under

24    occluded conditions than under unoccluded conditions.

25    And it says 3.2 percent be applied versus 0.3 percent.

Exhibit C Page - 18

```
 1                    REPORTER'S CERTIFICATE

 2

 3              I, MARY JOY SPRINGER, a Certified Court

 4    Reporter within the State of Missouri, do hereby certify

 5    pursuant to stipulation there appeared before me on April

 6    28, 2023, RICHARD DeGRANDCHAMP, Ph.D., who was first duly

 7    sworn by me to testify to the whole truth of all

 8    knowledge touching the matter in controversy aforesaid,

 9    so far as the witness should be interrogated concerning

10    the same; that the witness was examined and said

11    examination was taken down in shorthand by me and

12    afterwards transcribed by computer-aided transcription.

13

14              I FURTHER CERTIFY that I am neither attorney

15    nor counsel for nor related to nor employed by any of the

16    parties to the action in which this  deposition is taken;

17    and further, that I am not a relative or employee of any

18    attorney or counsel employed by the parties hereto, or

19    financially interested in the action.

20

21              I hereunto set my hand and affix my signature.

22

23              ------------------------------------
                MARY JOY SPRINGER
24

25
```

Exhibit C Page - 19

Golkow Litigation Services                                    Page 126