# EXHIBIT E

Richard DeGrandchamp, Ph.D.

```
 1          IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
                COUNTY DEPARTMENT, LAW DIVISION
 2
 3                                    |
      MICHAEL EVARD, SUE              |
 4    WIECHMANN, MICHAEL ORREL,       |
      SONIA MARTIN-AHMED, and         |
 5    RONALD E. BRYAN,                | Case No.  2019-L-011574
                                      |
 6            Plaintiffs,             | (Consolidated with
                                      |  2019 L 010612)
 7    v.                              |
                                      | Honorable Kathy M. Flanagan
 8    MONSANTO COMPANY,               |
                                      |
 9            Defendants.             |
      _____
10
11                        July 8, 2022
      _____
12
13            Remote Oral deposition of RICHARD
14    DEGRANDCHAMP, Ph.D., conducted with all participants
15    appearing via videoconference (Zoom) and the witness
16    appearing in Evergreen, Colorado, commencing at 9:06
17    a.m., on the above date, before Cindy Elliott, RPR, CSR,
18    and Notary Public in and for the State of Colorado.
19
20
21
                      GOLKOW LITIGATION SERVICES
22
              877.370.3377 ph | 917.591.5672 fax
23
                       deps@golkow.com
24
25
```

```
 1                   A P P E A R A N C E S
 2
      For the Plaintiff:
 3
             ALLEN M. STEWART, ESQ.
 4           Allen M. Stewart, P.C.
             1700 Pacific Avenue Suite 2750
 5           Dallas, Texas 75201
             Phone: 214.965.8700
 6           Email: Astewart@allenstewart.com
 7
      For the Defendant:
 8
             JOHN M. KALAS, ESQ.
 9           Hollingsworth LLP
             1350 I Street, NW
10           Washington, D.C. 20005
             Phone: 202.898.5848
11           Email: Jkalas@hollingsworthllp.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1          Q    (By Mr. Kalas)  Can you repeat that

2    answer?  You froze for a sec.

3          A    Oh, I'm sorry.  Yeah, I just want to make

4    sure my Internet is working correctly.

5               I was just going to opine that prior to

6    the Ninth Circuit's opinion being issued, I concluded

7    the same -- the same -- I had come -- I reached the same

8    conclusion, that EPA deviated from their own guidance,

9    and that was -- that's what I was going to testify to.

10         Q    Okay.  Now, Book Four does not contain

11   that conclusion.  That was served on April 8th, that EPA

12   deviated from their own guidance on the rodent studies

13   in the context of glyphosate.  Sitting here today, are

14   there any other opinions you can think of, anything that

15   is not in Book Four that you intend to tell the jury

16   about Roundup?

17              MR. STEWART:  This is beyond the Ninth

18   Circuit opinion?  Is that what you mean, John?

19              MR. KALAS:  Yes, yes, that's what I mean.

20         A    Oh, beyond that, yeah.

21              No, not unless you ask me questions today

22   that require that I answer the question with new

23   knowledge and documents that I did not include in my --

24   in any of the Books One through Four; so if you ask me

25   questions today about certain topics, I will answer them

```
 1              Q    Do you know if any of them have a Ph.D.

 2    in toxicology?

 3              A    I do not.

 4              Q    Do you know if any of them have a Ph.D.

 5    in epidemiology?

 6              A    I do not.

 7              Q    Do you know whether any of them have ever

 8    interpreted EPA regulations before?

 9              A    Same answer.

10              Q    Do you know if any of them have ever --

11    well, strike that.

12                   Do you know anything at all about how the

13    judges came to their conclusion here?

14              A    Same answer.

15              Q    Which is you don't?

16              A    Well, I know what the basis of their

17    conclusion was.  I don't know how they arrived at that

18    and the basis for that decision-making process.  I

19    didn't read any transcripts from the trial.  I read -- I

20    read the ruling.  I was concerned about the

21    scientific -- I was -- not concerned.  I was interested

22    in determining what the underlying theory was from a

23    scientific standpoint, but that's it.  I don't know what

24    their backgrounds were or how they reached that ruling.

25              Q    Do you -- you've testified in many
```

1           Q     Okay.

2                 MR. KALAS:  Mr. Stewart, those documents

3     have not been produced and those references have not

4     been produced.  We request that those be produced.  And

5     that he is relying on.  He just said it.

6           A     Well, I'm sorry, but I want to clarify.

7     I said I would not be discussing those documents

8     unless -- you asked me the question why the Ninth

9     Circuit opinion is important, and so I would only broach

10    that subject if you pressed me on why my opinion

11    parallels the Ninth Circuit opinion, but I wasn't -- I

12    hadn't planned to go into my opinion in detail except to

13    say it parallels the Ninth circuit and my opinion was

14    reached before the Ninth Circuit opinion was issued.

15                MR. KALAS:  To the extent he's going to

16    offer an opinion about the mouse studies and he's

17    reviewed documents on it, we request those be produced

18    and --

19                MR. STEWART:  John, help me with

20    something, because, as you know, I wasn't in the Alesi

21    deposition; so I don't know how that spun itself out.

22    You've attached the Alesi deposition, so I now have it.

23    I didn't have it before.  Let me take a look at what

24    that looks like and I'll get back with you on your

25    request.

1    Roundup.  I have looked at human epidemiology studies

2    with regard to the mechanism of NHL in lymphomas and

3    multiple myelomas.

4          Q    Okay.  Okay.  So let's make sure then

5    that we're crystal clear.  It is my understanding based

6    on that answer, and I want to make sure that it's --

7    it's your understanding as well, that the opinion you

8    intend to offer regarding Roundup at the Evard trial is

9    that the mechanistic data is consistent with glyphosate

10   and glyphosate-based herbicides being capable of causing

11   NHL in people, correct?

12         A    That's part -- yes, that is correct.

13   Again, let me just restate from my standpoint.

14         Q    Okay.

15         A    I looked at the mechanism described for

16   Roundup, the molecular mechanisms, under the key

17   characteristics of NHL that had been established or have

18   been established over many years of research to see if

19   they matched what we know about human lymphomas and

20   myelomas.  So that's -- so I -- I identified the key

21   characteristics of NHL are part of my report.  I

22   identified the key characteristics that have been

23   reported for a variety of lymphomas and myelomas,

24   leukemias, and identified those hallmarks to see if

25   studies conducted on Roundup matched those.  That's what

1    I did.

2            But those human studies, some of them

3    were in vitro studies.  Some were epidemiology studies.

4    So to say that I didn't rely on epidemiology studies, I

5    just wanted to clarify.  I --

6            Q    Now, I --

7            MR. STEWART:  Let him finish and then you

8    can go ahead, John.

9            MR. KALAS:  Yeah.

10           A    I just want to clarify that point.  I

11   have not looked at or relied on the Roundup epidemiology

12   study, because that's not pertinent to my opinion.

13           Q    All right.  So let me march through it.

14   I think I've got it now.  You looked at epidemiology

15   studies of people with lymphoma to identify mechanistic

16   hallmarks of lymphoma within those epidemiology studies,

17   right?

18           A    Some of them, yes.

19           Q    Okay.  And in those epidemiology studies

20   where you identified mechanistic hallmarks of lymphoma,

21   they weren't looking to see if people used Roundup or

22   didn't use Roundup, right?

23           A    Sitting here, I would have to look at my

24   report and some of the supporting documents to see if

25   any of them did look at Roundup, but sitting here now, I

Richard DeGrandchamp, Ph.D.

1   can't recall any of the NHL hallmark, so to speak, the

2   framework I used, that looked at Roundup.  That I

3   believe that's correct.

4           Q    Okay.  And then the next step was then

5   you looked at the mechanistic data on glyphosate and

6   glyphosate-based herbicides and said mechanistically is

7   glyphosate or glyphosate-based herbicides capable of

8   inducing same or similar mechanistic damage to what we

9   saw in the mechanistic hallmarks of NHL in the

10  epidemiology data, right?

11          A    Not totally epidemiology data, because a

12  lot of the human data with in vitro studies --

13          Q    Okay.

14          A    -- where they would isolate lymphocytes

15  or --

16          Q    Or hepatocytes or what have you?

17          MR. STEWART:  Let him finish and then you

18  can ask him another question.  Let him do the testifying

19  there, John.

20          Go ahead, Doctor.

21          A    Thanks.

22          Yeah, so in many studies, they were

23  epidemiology/in vitro studies, where they would have

24  different subcategories of lymphomas, cohorts, and draw

25  blood and see what the key molecular markers were.  So

1    they were epidemiology studies/in vitro studies.  So I

2    don't want you to think they were all epidemiology

3    studies.  They looked at and used the same molecular

4    biological techniques in those in vitro studies in

5    humans as many of the studies that I have identified in

6    Roundup studies.  So the in vitro studies were similar.

7              Q    (By Mr. Kalas)  Okay.  And then after

8    that, you did not then go and look at whether or not

9    individuals exposed to Roundup in the epidemiological

10   data had a higher rate of NHL than individuals not

11   exposed to Roundup.  You left that to a different

12   expert, correct?

13             MR. STEWART:  Object to the form.

14             A    Yes.  I did not and will not be -- I did

15   not look at any -- well, let me back up.  Of course, I

16   always look at the epidemiology studies.  I glance at

17   it.  I read the IARC 2015 monograph, of course.  But I

18   didn't rely on any of that to form my opinion.

19             Q    (By Mr. Kalas)  Okay.  Based on Book Four

20   and the other material you've reviewed, are you going to

21   opine at trial there is any ingredient in

22   glyphosate-based herbicides that cause lymphoma beyond

23   glyphosate?

24             A    I don't believe for this particular case

25   I am.

```
 1                   MR. STEWART:  Object to the form.

 2           A     I don't know if I answered your question.

 3      Yeah.

 4           Q     (By Mr. Kalas)  Let me ask you this:

 5      What is your methodology that you go through to judge

 6      how people think through how they act?

 7                   MR. STEWART:  Object to the form.

 8           A     Well, I think the only way I can answer

 9      it is give you a couple of examples.  If a chemical

10      company, for example, is producing massive amounts of a

11      chemical, and I'm not specifying what chemical, and they

12      don't test those chemicals fully in their usable form

13      with toxicity tests before the public's exposed, I think

14      that's unethical.  I think that's not following the

15      generally accepted practice of food corporate

16      stewardship.  But that's the -- that's the outcome.  So

17      maybe there were monetary decisions that forced that.

18      Maybe they needed to make more money.

19                   I'm not going to -- I can't opine about

20      what led to those decisions.  I can only look at those

21      decisions and opine about whether or not it's consistent

22      with the generally accepted practice in the field or --

23           Q     (By Mr. Kalas)  Got it.  So in the Evard

24      matter, you will not testify, if I understand correctly,

25      as to the thinking that led to the decisions Monsanto
```

```
 1   conclusions, but I'm not getting at that.  I'm getting

 2   at what's internally in their head, Monsanto's intent in

 3   their head, you know, not reading a document.  So let me

 4   make that very clear.  This question is not about

 5   reading a document.  It's about opining about what's in

 6   somebody's head.

 7            A    Yeah, I -- I'm sorry.  I didn't mean to

 8   interrupt you.

 9            Q    So let me ask the question again.  I

10   understand that you will read and interpret documents at

11   trial, or you intend to.  My question is:  Will you tell

12   the jury that you know what somebody was thinking at

13   Monsanto as part of your expert testimony?

14                 MR. STEWART:  Form objection.

15            A    First, I want to get a clarification

16   about what we're talking about in terms of the chemical.

17   Are we talking about PCBs or Roundup?

18            Q    (By Mr. Kalas)  Well, I can start with

19   Roundup.  Are you going to tell the jury you know what

20   Monsanto was thinking or its employees were thinking

21   about Roundup or glyphosate?

22                 MR. STEWART:  Form objection.

23            A    Well, I can't crawl into their heads and

24   know what they were thinking.  I know the decisions that

25   they made and can infer that they knew certain facts and
```

1    they acted contrary to generally accepted practice.  And

2    I'm using the term "generally accepted practice" in

3    terms of what was the industry standard or what was the

4    scientific ethical standard in terms of testing and so

5    forth.  How -- are you asking me if I can envision

6    sitting down in a room and asking how Monsanto came to

7    those decisions?  And in some instances, Monsanto

8    actually tells its employees that it's acting

9    illawfully, it's acting with disregard to public health.

10            Q    (By Mr. Kalas)  I'm not asking you about

11   reading a document and telling the jury what it says.

12   That is objectionable in my opinion for another reason.

13   I'm asking about reading a document and saying to the

14   jury, "I know what this person was thinking when they

15   wrote that document."  Are you going to opine on that?

16            MR. STEWART:  Object to the -- object to

17   the form of the question.

18            A    Yeah, again, this is really troublesome,

19   because I don't know what's behind this question, you

20   know, in terms of practicality.  But am I mind reader?

21   If that's what you're asking me, I am not a mind reader.

22            Q    (By Mr. Kalas)  Great.  Okay.

23            Are you going to opine in the Evard trial

24   that IARC, after reviewing the existent epidemiology

25   animal and mechanistic data, would reach the same

1    conclusion today as to glyphosate?

2              MR. STEWART:  Object to the form.  I

3    don't understand your question.  Maybe I didn't hear it

4    correctly.

5              Q    (By Mr. Kalas)  Are you going to opine in

6    the Evard trial that IARC, if they were to assess

7    glyphosate today with the currently existent

8    epidemiology animal and mechanistic database, would

9    reach the same conclusion as they reached in 2015?

10             MR. STEWART:  Form objection.

11             A    Well, I think their decision would even

12   be stronger, much stronger.  I think -- I believe that

13   the monograph preamble clearly states that they are --

14   that they in '19 -- 2019 have adopted this key

15   characteristic new approach that's currently being

16   adopted by all the other regulatory agencies and health

17   agencies, and if they were to apply a similar protocol

18   that I followed, the evidence would have been very

19   convincing, more so than was available in 2015.

20             And furthermore, in view of the Ninth

21   Circuit decision, perhaps even EPA would, and that would

22   of course then be used by IARC in their classification

23   scheme.  So, yes, I believe, yes, they would.

24             Q    (By Mr. Kalas)  Okay.  Let's go -- I've

25   marked as Exhibit 13 an IARC document.

Exhibit E Page - 13

```
 1   are other groups that I speak to.  I don't -- your

 2   question's a little bit vague.  I don't -- if you could

 3   give me an example or, you know, some concrete -- I

 4   don't understand your question.

 5        Q    Okay.  Have the opinions that you've

 6   reached on the molecular etiology of NHL been subjected

 7   to peer review?

 8        A    And that's what -- you mean peer review

 9   in terms of open peer reviewed scientific literature?

10        Q    Yes, sir.

11        A    Oh, no.

12        Q    Okay.  Given that, would a public health

13   agency like the ones you refer to on page 10 of Book

14   Four consider the report you've presented as Book Four

15   in this litigation?

16             MR. STEWART:  Form objection.

17        A    I guess I don't understand your question.

18        Q    (By Mr. Kalas)  Sure.  Let's say IARC was

19   looking at a lymphoma issue, okay?

20        A    Okay.

21        Q    Would your report be something IARC would

22   consider?

23        A    Oh, absolutely.  Yes.

24        Q    Your report, IARC would consider your

25   report?
```

```
 1              A     Oh, you mean if I submitted to IARC --

 2              Q     Yeah.

 3              A     -- would they consider it?  No, but they

 4    would consider the same studies that I've relied on.

 5    I'm sorry.  The content in my report.  My opinions they

 6    would not consider.

 7              Q     And the reason they would not consider

 8    your opinions is because they have not undergone

 9    transparent, open peer review, correct?

10              MR. STEWART:  Form objection.

11              A     Well, that, and by 2015, they already had

12    strong evidence that Roundup caused -- there was strong

13    evidence of the molecular mechanism; so there's no

14    reason to do any further research, as we've already

15    discussed.

16              Q     (By Mr. Kalas)  But you have done further

17    research, though.  Let's go to it, actually.  This

18    report, you've identified nine key mechanistic hallmarks

19    of NHL, right?

20              A     That's correct.

21              Q     Okay.  What article -- well, strike that.

22    Let me back up.

23              These nine key mechanistic hallmarks of

24    NHL, this list that's right here, is this a list that

25    you, in your extensive research and analysis, put
```

Exhibit E Page - 15

Richard DeGranchamp, Ph.D.

```
1           Q    Okay.  What article in the literature

2   lists out the key mechanistic hallmarks of NHL in a

3   single article?  So not, you know, pulling one from

4   here, one from there.  In a single article.

5           A    Well, it doesn't exist.  I don't

6   understand.

7           Q    Right.  The nine -- that's what I'm

8   getting at.  The nine key mechanistic hallmarks of NHL

9   are something you put together for this report, right?

10               MR. STEWART:  Form objection.

11               Go ahead.

12          A    It's based on the IARC monograph.

13  They've looked at very similar mechanisms.  But again,

14  there is no international organization or scientific

15  organization that has put together a list of

16  NHL-specific molecular mechanisms.  There is no -- it

17  doesn't exist.  Are these identified by organizations

18  that do focus on mechanistic changes involved in

19  lymphomas?  Yes, these are some of those.

20          Q    (By Mr. Kalas)  Are you the first

21  scientist, to your knowledge, to put together a list of

22  the molecular mechanism hallmarks of NHL?

23               MR. STEWART:  Form objection.

24               You can answer.

25          A    These are mechanisms that I have
```

Exhibit E Page - 16

1    described as resulting from various scientific studies.

2    So, for example, I include the references that establish

3    DNA strand breaks as being involved in development of

4    NHL.  Same thing for chromosomal gene translocations.

5    These are well known mechanisms.  I just simply collated

6    them all, put them all in a hierarchy here and with no

7    particular order, and these are reported in the

8    literature.

9              MR. KALAS:  Motion to strike as

10   nonresponsive.

11             Cindy, could you please read back my

12   question?

13             (Record read from page 101

14             line 20 to line 22.)

15        A    And I think my answer was -- I'm sorry,

16   is there a question pending?

17        Q    (By Mr. Kalas)  No.  I just don't --

18             MR. STEWART:  Can you read back the

19   answer?  Since you've read the question, can you read

20   back his answer, please.

21             MR. KALAS:  No, I'll withdraw the

22   question.  I'll ask it a different way.  I'll withdraw

23   the question.

24        Q    Dr. DeGrandchamp, can you point me to a

25   published article with a list of the nine key

Richard DeGrandchamp, Ph.D.

```
 1    mechanistic hallmarks of NHL?

 2                  MR. STEWART:  Form objection.

 3                  You can answer.

 4          A     I can point to many documents that list

 5    these particular mechanisms as being associated with NHL

 6    cancers, leukemias, myelomas and so forth.  Can I point

 7    to one document that lists all of these?  No, because

 8    studies don't look at all of these.

 9          Q     (By Mr. Kalas)  Okay.  Now, you call

10    these mechanistic hallmarks of NHL as opposed to

11    mechanistic characteristics of NHL.  I'm sorry, did you

12    hear me?

13          A     Yes.

14                  MR. STEWART:  I'm sorry for the coughing.

15                  MR. KALAS:  Let me start over.

16          Q     You call these mechanistic hallmarks of

17    NHL as opposed to mechanistic characteristics of NHL; is

18    that correct?

19          A     Those two words are synonymous in my

20    vernacular.

21          Q     Okay.  So there's no intent in calling it

22    a hallmark versus a characteristic in your opinion?

23          A     No, you can call them pathognomonic

24    characteristics.  You can call them, you know, steps in

25    the etiology.  There are many ways to describe it.
```

Exhibit E Page - 18

1    These -- I use the key characteristics that were

2    presented in the 2019 key characteristic section of the

3    upgraded monograph or updated monograph preamble and

4    identified those nine characteristics that are

5    associated with NHL, the molecular mechanisms, and

6    followed the same kind of framework and went -- you

7    know, based on my research over the years.  These are

8    the most frequently described and established

9    characteristics of NHL at the molecular level.  So there

10   was no intent for me to parse any words.  I'm not --

11   there was no intention -- hallmarks and characteristics

12   are synonymous to me.

13        Q    Okay.  Do you agree that hallmarks

14   describe the environment in which a cancer develops?

15             MR. STEWART:  Form objection.

16        A    No, no.  It -- the environment that most

17   of these hallmarks or characteristics are observed is in

18   a Petri dish.  Is that what you're -- that's the

19   environment that they're described.  I don't really -- I

20   don't know how to answer your question.

21        Q    (By Mr. Kalas)  That's fine.

22        A    We'll --

23        Q    That's fine.  If you don't know how to

24   answer it, then it's a bad question.

25             Now, going down in your report to page --

1    to the same page, it says here that you had -- you talk

2    about ten key NHL mechanistic hallmarks.  Do you see

3    that?

4           A    I do.

5           Q    And you had nine above here, right?

6           A    I think that was the nine that I -- that

7    after thinking this through, nine seemed the most

8    appropriate, the most had been published in these areas,

9    yes.

10          Q    Was there a tenth?

11          A    Somewhat, yeah.  Micronuclei.

12          Q    Okay.

13          A    Because when I went into the literature,

14   there were conflicting reports.  So I didn't think the

15   evidence was as strong for that particular mechanism.

16   So....

17          Q    Okay.  Now --

18          A    This was self-limiting, I guess, you

19   might call it.

20          Q    Okay.  So micronuclei, you looked at the

21   literature, and you weren't convinced, at least, that

22   that was a mechanistic pathway to NHL, fair?

23          A    No, that's not correct.  It is associated

24   with NHL.  So you do find micronuclei as an aberrant

25   chromosomal change in NHL patients.  What I was -- when

```
 1    ten mechanistic hallmarks of NHL, including -- I'm not

 2    done yet -- including micronuclei that you had listed in

 3    your report, right?

 4          A    No.  No.  I'm sorry.  It's a bit

 5    confusing.  Because you could put micronuclei up with

 6    chromosomal breaks, because that's, of course, how

 7    micronuclei form.  Micronuclei are just excessive

 8    aberrant strands of nuclei outside the nucleus.  That is

 9    in that category.  So when I put down ten, I -- you

10    know, maybe this is even a typo.  Maybe I should just

11    have cut it down to nine.  I think what happened was I

12    put these together, originally had another category, and

13    just left the ten in.  So that might be a --

14          Q    I just want to make sure I understand

15    this, and then we can move on.  Under oath it's your

16    best recollection that you did not remove micronuclei

17    from the list after discovering the Roundup evidence did

18    not support it?

19          A    No, I didn't --

20          Q    Is that --

21          A    I'm sorry.

22          Q    No, go ahead.  Go ahead.

23          A    Well, if it's not relative to -- if it's

24    not -- if it doesn't relate to NHL and there aren't that

25    many studies that exist, I -- you know, it's not a
```

Exhibit E Page - 21

Richard DeGrandchamp, Ph.D.

```
 1              Q    Okay.  Let me ask you this:  You
 2    talked -- we -- Mr. Stewart and I had some crosstalk
 3    very early in the deposition about reference list versus
 4    documents reviewed, right?
 5              A    Yes.
 6              Q    Okay.  And you talk about -- and we
 7    talked about this already, on pages 10 to 12, that, you
 8    know, you're not relying on any Monsanto internal
 9    studies on glyphosate or Roundup because of this past
10    history with PCBs and what have you, right?
11              A    That's correct.
12              Q    Okay.  Even though you're not relying on
13    them, have you reviewed -- have you even taken a look at
14    internal Monsanto studies on glyphosate or Roundup that
15    are not listed in your reference list?
16              A    I don't -- in my book -- well, let me --
17    let me tell you that as it relates to Book Four, I'm not
18    aware of any mechanistic studies that Monsanto
19    performed, so it wouldn't be relevant to my opinion.
20    The question -- if they -- I have not reviewed those
21    documents, but it was my understanding from reading
22    other documents in IARC, particularly the monograph,
23    2015 Roundup monograph, that the studies that you're
24    referring to relate to animal testing, period.  There
25    was no reference to the mechanistic studies, and had
```

Richard DeGrandchamp, Ph.D.

```
 1              CERTIFICATE OF DEPOSITION OFFICER

 2         I, Cindy Elliott, RPR, CSR, and Notary Public

 3    within and for the State of Colorado, commissioned to

 4    administer oaths, do hereby certify that previous to the

 5    commencement of the examination, the deponent was duly

 6    sworn by me to testify the truth in relation to matters

 7    in controversy between the said parties; that the said

 8    deposition was taken in stenotype by me at the time and

 9    place aforesaid and was thereafter reduced to

10    typewritten form by me; and that the foregoing is a true

11    and correct transcript of my stenotype notes thereof.

12         That I am not an attorney nor counsel nor in any

13    way connected with any attorney or counsel for any of

14    the parties to said action nor otherwise interested in

15    the outcome of this action.

16

      __X__ Reading and Signing was requested.

17

      _____ Reading and Signing was not requested.

18

      _____ Reading and Signing was waived.

19

      _____ Reading and Signing is not required.

20

21                _____

22                Cindy Elliott, RPR, CSR, Notary Public

                  (Notary ID 20034011464)

23                My commission expires:  April 7, 2023.

24

25
```