**WILKINSON STEKLOFF LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonstekloff.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonstekloff.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel: 202-847-4030 | Fax: 202-847-4005

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843 | Fax: 202-682-1639

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

**BRYAN CAVE LEIGHTON PAISNER LLP**
K. Lee Marshall (CA Bar No. 277092)
(klmarshall@bclplaw.com)
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Tel: 415-675-3400 | Fax: 415-675-3434

Jed P. White (CA Bar No. 232339)
(jed.white@bclplaw.com)
Linda C. Hsu (CA Bar No. 239880)
(linda.hsu@bclplaw.com)
120 Broadway, Suite 300
Santa Monica, CA 90401
Tel: 310-576-2100 | Fax: 310-576-2200

*Attorneys for Defendant Monsanto Company*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION, | MDL No. 2741<br><br>Case No.: 3:16-md-02741-VC |
| *Ricky Beavers, Jr. v. Monsanto Company*, 3:20-cv-08799-VC | **DEFENDANT MONSANTO COMPANY'S MOTION TO EXCLUDE TESTIMONY OF RANDAL BEATON**<br><br>Hearing:<br>Date: March 1, 2024<br>Time: 10:00 a.m.<br>Place: San Francisco Courthouse, Courtroom 4 – 17th Floor |

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on March 1, 2024 at 10:00 a.m., in Courtroom 4 of the United States District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, or as ordered by the Court, Defendant Monsanto Company ("Monsanto") will present its Motion to Exclude Testimony of Dr. Randal Beaton. Monsanto seeks an order excluding opinions of this witness under Federal Rule of Evidence 702.

Dated:  December 14, 2023                             Respectfully submitted,

/s/ *Linda C. Hsu*
Linda C. Hsu
Attorneys for Defendant Monsanto Company

# **TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................................................... 1

LEGAL STANDARD ................................................................................................................ 2

BACKGROUND ........................................................................................................................ 2

ARGUMENT .............................................................................................................................. 3

    I.    Dr. Beaton Admits He Is Not Qualified To Opine On The Cause Of Mr. Beavers' NHL ............................................................................................................ 3

    II.    Dr. Beaton's Opinion That Mr. Beavers' NHL Caused Him To Suffer PTSD Is Not Based On Reliable Medical Diagnostic Methodologies ................................... 4

        A.    Dr. Beaton Employed Unvalidated, Improperly Administered Methodologies To "Rule In" NHL As The Cause Of Mr. Beavers' Psychological Conditions ............................................................................... 5

            1.    Post-Traumatic Checklist (PCL-5) ................................................................ 5

            2.    Patient Health Questionnaire-9 (PHQ-9) ...................................................... 6

            3.    Systems Of Stress Test ("SOS") ................................................................... 7

            4.    General Anxiety (GAD-7) Test ..................................................................... 8

            5.    Minnesota Multiphasic Personal Inventory-2 (MMPI-2) ............................. 9

        B.    Dr. Beaton Failed To Consider And Rule Out Plausible Alternative Causes Of Mr. Beavers' Psychological Conditions ........................................ 9

            1.    Dr. Beaton Failed To Consider The Fact That Mr. Beavers Was Assaulted And Shot Three Times As An Alternative Possible Cause Of PTSD ................................................................................. 10

            2.    Dr. Beaton Failed To Consider Other Alternative Causes Of Mr. Beavers' Claimed PTSD, MDD, And GAD .............................. 10

CONCLUSION .......................................................................................................................... 11

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Avila v. Willits Env't Remediation Tr.*,
    633 F.3d 828 (9th Cir. 2011) ................................................................................................ 5

*Cooper v. Brown*,
    510 F.3d 870 (9th Cir. 2007) ................................................................................................ 2

*Daubert. Clausen v. M/V NEW CARISSA*,
    339 F.3d 1049 (9th Cir. 2003) .............................................................................................. 4

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) ...................................................................................................... *passim*

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ...................................................... 4

*Laux v. Mentor Worldwide, LLC*,
    295 F. Supp. 3d 1094 (C.D. Cal. 2017), *aff'd*, 786 F. App'x 84 (9th Cir. 2019) ................. 4

*Morin v. United States*,
    244 F. App'x 142 (9th Cir. 2007) ......................................................................................... 4

*Persian Gulf Inc. v. BP W. Coast Prod. LLC*,
    632 F. Supp. 3d 1108 (S.D. Cal. 2022) ................................................................................ 2

*Stanley v. Novartis Pharm. Corp.*,
    11 F.Supp.3d 987 (C.D. Cal. 2014) ...................................................................................... 4

*Westberry v. Gislaved Gummi AB*,
    178 F.3d 257 (4th Cir. 1999) ................................................................................................ 4

*Wettlaufer v. Mt. Hood R. Co.*,
    77 F.3d 491 (9th Cir. 1996) .................................................................................................. 2

*White v. Ford Motor Co.*,
    312 F.3d 998 (9th Cir. 2002) ................................................................................................ 2

**Other Authorities**

Fed. R. Evid. 702 ................................................................................................................ 1, 2, 7

**INTRODUCTION**

Plaintiff Ricky Beavers, Jr. was diagnosed and treated for non-Hodgkins Lymphoma ("NHL") in 1997, when he was fifteen years old. He alleges that he contracted the disease from using Roundup in the 1990s, and claims damages based on the alleged emotional and psychological impact he suffered. He has disclosed Randal Beaton, Ph.D., a psychologist, as a specific causation expert to testify that Mr. Beavers' alleged psychological injuries were caused by Mr. Beavers' diagnosis and treatment for NHL and thus, ultimately, by Mr. Beavers' exposure to glyphosate when he was young. Dr. Beaton opines in his report that it is "more probable than not" that Mr. Beavers' cancer (in remission for 22 years now) caused him to suffer conditions that include (1) post-traumatic stress disorder ("PTSD"), (2) major depressive disorder ("MDD"), and (3) generalized anxiety disorder ("GAD"), that Dr. Beaton asserts "have now persisted for more than two decades." Ex. A, Beaton Rpt. at 10, 15-17, 19.

This Court should exclude the opinions and testimony of Dr. Beaton from trial under Federal Rule of Evidence 702 and *Daubert*. The law requires that a specific causation expert, like Dr. Beaton, conduct a methodologically valid differential diagnosis—using medically valid standards and methods to "rule in" a plaintiff's alleged cause of harm as a medically likely cause and then to "rule out" other likely alternative causes. Here, Dr. Beaton knows and openly admits that he did not use clinically sound methods in either respect. In his report, Dr. Beaton details five distinct psychological diagnostic methods based on an interview of Mr. Beavers he did in October 2019. But at deposition, Dr. Beaton specifically admitted that the manner in which he administered each diagnostic test was "not validated." One need not dig deep into medical methodology to understand why Dr. Beaton's conclusions are invalid. Put simply, Dr. Beaton *told* Mr. Beavers to consider only his childhood cancer diagnosis and treatment in answering questions about his mental health, and not any other stressful, anxiety-causing, or traumatic events. Those other events include highly psychologically damaging experiences, such as the fact that Mr. Beavers *was assaulted and shot three times* as a younger man.

Whether or not Mr. Beavers suffers emotional and psychological disorders, and whether or not contracting NHL and being treated for it as a child contributed to them, the jury should not be subjected to such a deliberately blind and misleading specific causation assessment as one that willfully ignored such other likely causes. This motion is not intended to make light of the very significant challenges

in Mr. Beavers' life or the legitimate claim that he suffers from mental health ailments. But this Court's gatekeeping function for trial requires that, if the jury should reach a conclusion, it does not do so based on bogus science or unreliable expert medical testimony like Dr. Beaton's.

## LEGAL STANDARD

A proposed expert witness must possess "knowledge, skill, experience, training, or education" sufficient to qualify him as an expert on the subject to which his testimony relates. Fed. R. Evid. 702. When an expert's field of expertise is not related to the subject on which he seeks to offer testimony, such testimony is inadmissible. *See White v. Ford Motor Co.*, 312 F.3d 998, 1008-09 (9th Cir. 2002). Apart from qualifications, expert testimony must be (1) able to "help the trier of fact to understand the evidence or to determine a fact in issue," (2) based upon sufficient facts or data, (2) the product of reliable principles and methods, and (3) the result of applying those principles and methods reliably to the facts of the case. Fed. R. Evid. 702. The trial judge is charged with the responsibility of acting as a gatekeeper to "ensure that any and all scientific testimony … is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). The court must also assess "whether the proffered expert testimony 'fits' the facts of the case" and, if not, exclude it. *Wettlaufer v. Mt. Hood R. Co.*, 77 F.3d 491 (9th Cir. 1996). "[A]n expert's scientific conclusions must be supported by 'good grounds for each step in the analysis,' meaning that 'any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible.'" *Persian Gulf Inc. v. BP W. Coast Prod. LLC*, 632 F. Supp. 3d 1108, 1164–65 (S.D. Cal. 2022) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994)). The proponent of the expert has the burden to prove that the expert's testimony is admissible. *See, e.g., Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007).

## BACKGROUND

Plaintiff Ricky Beavers has endured great hardship in his life. His parents abused alcohol and other substances. Ex. B, Beaton Dep. Tr. 33:12-13. They separated when he was a toddler and Mr. Beavers was raised by a single father, with whom he has what his father called an "unhealthy co-dependent relationship." Ex. A, Beaton Rpt. at 5-6. He was diagnosed with cancer at age 14 (the NHL at issue in this suit) and underwent intensive chemotherapy as a teenager. *Id.* 6-7. He was told that the lower part of his leg might need to be amputated, though it ultimately was not.

He spent time in jail at some point in his life. Ex. B, Beaton Dep. Tr. 33:20-22. Since the age of 19, he has suffered from alcohol and substance use disorders. Ex. A, Beaton Rpt. at 5. In 2009, Mr. Beavers was assaulted on the streets of Seattle by a stranger, who shot him three times, leading to a three-day inpatient hospital stay while Mr. Beavers was treated for his gunshot wounds. *Id.* at 6.

To prepare his litigation report, Dr. Beaton interviewed Mr. Beavers on October 30, 2019. *Id.* at 3. In his report, Dr. Beaton names six distinct psychological evaluations he administered to reach his opinions about Mr. Beavers' mental health: the Life Events Checklist, The Symptoms of Stress ("SOS") inventory, the Patient Health Questionnaire-9 ("PHQ-9"), the Generalized Anxiety Disorder-7 test ("GAD-7"), the Posttraumatic Checklist for DSM-5 ("PCL-5"), and the Minnesota Multiphasic Personal Inventory-2 ("MMPI-2"). For these tests, Dr. Beaton "specifically ask[ed] Mr. Beavers to only consider his NHL cancer diagnosis, risk of amputation, and chemo…." Ex. B, Beaton Dep. Tr. 27:6-7. This is despite the fact that Dr. Beaton agrees "that Mr. Beavers, Jr. did have other life events that would potentially result in PTSD or distress in this life." *Id.* 32:24-33:2. Indeed, in his report and at deposition, Dr. Beaton candidly acknowledged "it is not possible to determine the current causes of Mr. Beavers' PTSD symptomatology, because he has experienced numerous subsequent major traumatic events like the death of his mother, incarceration, assault with a deadly weapon." *Id.* 37:10-14.

## ARGUMENT

The Court should exclude the proffered opinions of Dr. Beaton for two reasons. First, Dr. Beaton is not qualified to opine on whether glyphosate exposure from Roundup caused Mr. Beaver's NHL. Second, Dr. Beaton's opinion that the diagnosis and treatment of Mr. Beavers' NHL caused his psychological injuries is not based on reliable medical diagnostic methodologies.

### I. Dr. Beaton Admits He Is Not Qualified To Opine On The Cause Of Mr. Beavers' NHL

Dr. Beaton is not a medical doctor and is not qualified to opine on whether glyphosate exposure from Roundup caused Mr. Beavers' NHL. Despite this undisputed fact, Dr. Beaton's report purports to include an opinion on what caused Mr. Beavers' cancer:

> Based on a review of the known risk factors identified in the literature for NHL (See Appendix 3) as well as my doctorate in physiology and training in epidemiology, it seems more likely than not that Mr. Ricky Beavers, Jr.'s exposure(s) to the herbicide glyphosate – an ingredient in the weed killer Roundup®-- was a substantial causal factor in the etiology of his NHL.

Despite this seeming attempt to offer a specific causation opinion about the cause of Mr. Beavers' NHL, Dr. Beaton clarified at deposition that he does not, in fact, purport to opine on that topic and instead deferred to Plaintiff's medical specific causation expert, Dr. Clare Murphy: "I would … defer to Dr. Murphy regarding any causal link between Junior [i.e., Mr. Beavers'] exposure to glyphosate as a child [and NHL] and feel that she is much more qualified than I, to offer an opinion in terms of causation." Ex. B, Beaton Dep. Tr. 17:1-5. The Court should hold him to this concession and rule that Dr. Beaton is precluded at trial from purporting to opine about the cause of Mr. Beavers' NHL.

## II. Dr. Beaton's Opinion That Mr. Beavers' NHL Caused Him To Suffer PTSD Is Not Based On Reliable Medical Diagnostic Methodologies

A differential diagnosis is "a patient-specific process of elimination that medical practitioners use to identify the most likely cause of a set of signs and symptoms from a list of possible causes." *Stanley v. Novartis Pharm. Corp.*, 11 F.Supp.3d 987, 1000 (C.D. Cal. 2014) (citations and internal quotations omitted). "The first step in a differential diagnosis is to compile a list of potential causes of the ailment, then the expert must engage in a process of elimination to rule out those potential causes." *Laux v. Mentor Worldwide, LLC*, 295 F. Supp. 3d 1094, 1098 (C.D. Cal. 2017), *aff'd*, 786 F. App'x 84 (9th Cir. 2019). Although courts have found that a differential diagnosis can be "a scientifically valid methodology supporting admissible testimony under *Daubert v. Merrell Dow Pharmaceuticals*, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)," *Morin v. United States*, 244 F. App'x 142, 143 (9th Cir. 2007), "expert testimony that neglects to consider a hypothesis that might explain the clinical findings under consideration may ... be unreliable," and thus, inadmissible under *Daubert*. *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1057 (9th Cir. 2003); *see also Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265 (4th Cir. 1999) (finding that "[a] differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation").

Here, Dr. Beaton's methodologies failed to conduct a valid differential diagnosis. Dr. Beaton admitted at deposition that his proffered opinion that Mr. Beavers' cancer is the cause of his PTSD is not based on any individualized assessment of Mr. Beavers at all, but rather on a general association between childhood cancer and PTSD:

> Q. Okay. Do you agree that you can't claim Mr. Beavers experienced PTSD solely from adolescent cancer if you didn't consider alternative traumatic stressor events?
>
> A. I don't agree with that.
>
> Q. Okay. Why do you not agree with that?
>
> A. Because of the literature, in part, that indicates that adolescent cancer is not invariably, but often associated with Post Traumatic Stress Disorder.

Ex. B, Beaton Dep. Tr. 36:1-9. Even if "the literature" is sufficient to satisfy Dr. Beaton as to the cause of Mr. Beavers' mental health conditions, it is legally insufficient absent an individualized differential diagnosis. *See Avila v. Willits Env't Remediation Tr.*, 633 F.3d 828, 838 (9th Cir. 2011) ("Nor was Levin's report reliable enough to support specific causation, because he simply assumed that causation existed without going through the steps in the differential diagnosis process…."). Dr. Beaton did not do the necessary, individualized assessment of potential causes for Mr. Beavers' asserted mental conditions, either in ruling in his NHL diagnosis and treatment as a cause or ruling out alternative ones.

### A.  Dr. Beaton Employed Unvalidated, Improperly Administered Methodologies To "Rule In" NHL As The Cause Of Mr. Beavers' Psychological Conditions

Dr. Beaton purports to have employed five established psychological evaluation tools in forming his opinions that Mr. Beavers' cancer diagnosis and treatment caused his mental health conditions. But at deposition, counsel walked Dr. Beaton through his methodology for each test and Dr. Beaton candidly admitted that he did not administer any of them correctly, rendering their results, and thus Dr. Beaton's conclusion and specific causation testimony invalid.

#### 1.  Post-Traumatic Checklist (PCL-5)

The PCL-5 is "a standard form with 20 questions," Ex. B, Beaton Dep. Tr. 27:6-7, used as a "measure of post trauma symptomatology," Ex. A, Beaton Rpt. at 8. For purposes of administering this evaluation, Dr. Beaton "specifically ask[ed] Mr. Beavers to only consider his NHL cancer diagnosis, risk of amputation, and chemo when he was filling out his PCL-5." Ex. B, Beaton Dep. Tr. 27:6-8. *See also* 31:20-25 ("Q. Did you ask him to reflect on any other life events that could have been considered when determining whether Mr. Beavers, Jr. was experiencing PTSD? A. I did not."), 36:16-19 ("Q. You agree that you did not have Mr. Beavers, Jr. consider alternative traumatic events when he filled out the PCL-5, right? A. Yes."). Dr. Beaton told Mr. Beavers "to only consider the month of

July, in 1997" and "the prior month back in October of 2019." Ex. B, Beaton Dep. Tr. 27:10-18. He also instructed Mr. Beavers to ignore the rest of his traumatic life story and to "rely[] on historical memories in completion of the PCL-5." *Id*. 28:10-13.

This is not the proper way to administer the PCL-5. The DSM-5 warns practitioners that it is not a reliable assessment tool when depending on memories of long ago: "The PCL-5 is intended to assess patient symptoms in the past month. Versions of the PCL-5 that assess symptoms over a different timeframe, example, past day, past week, past 3 months, have not been validated." *Id.* 30:17-21. Asked if he agreed with this statement, Dr. Beaton answered "Yes." *Id*. 30:22. Furthermore, Dr. Beaton plainly admits that his administration of the PCL-5 was improper: "Q. Is it an acceptable practice in your field to administer the PCL-5 and ask the person you're interviewing to only consider an event that occurred more than 22 years ago? A. No." *Id*. 27:24-28:3. *See also id.* 30:23-31:2 ("Do you agree that your results for Mr. Beavers PCL-5 cannot be validated, given the fact that you have attempted to assess symptoms from more than 22 years ago? A. I, I believe that it's not validated."). The jury should not be misled by hearing Dr. Beaton's causation testimony that rests on this unreliable application of the PCL-5 test as a basis for "ruling in" Mr. Beavers' cancer diagnosis as the cause of PTSD—which he was specifically ***told*** by Dr. Beaton to treat as the one and only cause when completing the form.

**2.   Patient Health Questionnaire-9 (PHQ-9)**

Dr. Beaton bases his opinion that Mr. Beavers suffers from MDD, a clinical depressive disorder, on Mr. Beavers' answers to a clinical "screening measure of depression" known as the "Major Depression Checklist, or PHQ-9," Ex. B, Beaton Dep. Tr. 46:5-17. "Mr. Beavers, Jr. responded to the PHQ-9 for two different timeframes - the standardized last two-week period and the modified first two weeks of July 1997." Ex. A, Beaton Rpt. at 8. Mr. Beavers' score for the prior two weeks "reflected an above average level of distress, but was below the cutoff for a diagnosis of major depressive disorder." *Id.* Only his responses based solely on his recollection of July 1997 scored in the MDD range. *Id.*

The application of the PHQ-9 on which Dr. Beaton bases his opinions—the one relating to July 1997—was, like all the tests Dr. Beaton applied, clinically improper. The PHQ-9 is intended to be used only to assess depression symptoms over the two-week period prior to when it is administered.

Ex. B, Beaton Dep. Tr. 46:17-21 ("The symptoms that are listed in the DSM-5 are all listed, and the individual is to indicate **over the prior two weeks** how often he may have experienced one of these or several of these symptoms." (emphasis added)).  When asked if "you agree that PHQ is intended to be used, to ask about the patient's experience in the last two weeks?" Mr. Beaton answered "Absolutely." *Id*. 47:20-23.  Asked "Would you say it's an acceptable practice to rely on results from the PHQ-9, where you asked a patient to consider a timeframe from years ago?," he answered "I wouldn't describe it as an acceptable practice," because "memories change over time, fade over time, can be inaccurate." *Id*. 47:24-48:8.  See also 48:18-24 ("Q. And you agree that the modif -- the time period modification from the two-week timeframe to 22 years ago is not an accepted methodology in your practice, right? A. That's correct. Q. Is there any literature that you relied upon in your practice that would validate that methodology? A. No.").  It would be improper to expose the jury to Dr. Beaton's results from his clinically invalid PHQ-9 administration relating to July 1997 or his opinion based on it that Mr. Beavers suffered depression as a result of his cancer diagnosis and treatment.

### 3. Systems Of Stress Test ("SOS")

Dr. Beaton also attributes his determination that Mr. Beavers suffers PTSD on Mr. Beaver's score on the SOS test, but again conducted the assessment in a materially deficient manner by asking Mr. Beavers to focus solely on his cancer diagnosis and treatment based on 22-year-old memories.  The SOS is a clinical "measure of an individual's self-reported physical, behavioral, emotional, and cognitive symptomatology **during the prior week**." Ex. A, Beaton Rpt. at 7 (emphasis added).  In his report and at deposition, Dr. Beaton acknowledged that "all of the available published studies and benchmarks for the SOS are based upon the past week timeframe." *Id.*  See also Ex. B, Beaton Dep. Tr. at 54:11-13.  His opinion about PTSD cannot, consistent with Rule 702 and *Daubert*, be based on his improper use of the tool to evaluate Mr. Beavers' mental health far beyond that timeframe—over 22 years, because Dr. Beaton plainly admits it is not a reliable tool for assessing mental health over that expansive period.  See 55:5-11 ("Q. Do you think that results outside of that time period would be -- are reliable? A. I think that it's questionable…. [It's] not the standardized method of administration.").

### 4. General Anxiety (GAD-7) Test

Dr. Beaton based his conclusion that Mr. Beavers suffers clinical anxiety on the GAD-7 test, which is "a checklist of the items on the DSM-5 criteria for generalized anxiety disorder." Id. 56:13-16. Again, this is a test that is designed, intended, and deemed valid only for assessment of a patient's condition and sources of anxiety *in the two weeks prior to administration*. See id. 56:17-20 ("Those are scored over the prior two-week timeframe is the standardized time, and individuals indicate how frequently they were bothered by these symptoms, during that timeframe."). See also id. 56:25-57:3 ("Q. And you agree that the GAD-7 is intended to be used to ask about the patient's experience in the last two weeks? A. Correct."). As with the SOS, Dr. Beaton "asked Mr. Beavers to complete the GAD-7 for early -- for the early July 1997 timeframe and the October 2019 timeframe." Id. 56:21-23. For the 2 weeks before his October 2019 interview, Mr. Beavers scored "slightly below the suggested cutoff for a diagnosis of an anxiety disorder;" for July 1997 he scored above it. Ex. A, Beaton Rpt. at 8.

As with his opinions relating to stress and depression, Dr. Beaton's temporal misapplication of the GAD-7 test renders his causation opinion regarding clinical anxiety invalid and inadmissible. Again, he admits that he is deviating materially from standard clinical procedure and valid medical methods: "Q. Would you agree that it is not an acceptable practice to rely on results from the GAD-7 where you asked a patient to consider a timeframe 22 years ago? A. It's certainly not the standardized timeframe, and I would say it's not generally accepted practice as well." Ex. B, Beaton Dep. Tr. 57:4-9. He admitted that he himself has "concern" in "relying on results reported from a patient who claims to have experienced symptoms 22 years ago," namely because "recall, his present mood state" would be "major factors" influencing his responses. *Id.* 57:10-17. This is precisely the type of unreliable science *Daubert* bars.

Further, Dr. Beaton violated valid methodological requirements for psychological evaluation by failing to assess Mr. Beavers' anxiety level for the requisite 6-month duration. He acknowledged at deposition that "the DSM diagnostic criteria for generalized diagnostic disorder requires a six-month duration of symptoms." Id. 59:5-8. He did not do a 6-month analysis. See id. 59:9-12 (Q. Did you do any other analysis to establish six-month duration of symptoms in order to diagnose generalized anxiety

disorder of Mr. Beavers, Jr.? A. I did not."). For this reason, when asked "because you did not conduct that six-month review of Mr. Beavers, Jr., according to the DSM, you cannot diagnose him with generalized anxiety disorder, right?" Dr. Beaton conceded, "Technically, correct." *Id.* 59:24-60:4. The jury should not hear purported expert testimony that is admittedly based on such invalid methods.

### 5. Minnesota Multiphasic Personal Inventory-2 (MMPI-2)

Finally, Dr. Beaton states in his report that Mr. Beavers completed the MMPI-2, an evaluation of his overall "current psychological status." Ex. A, Beaton Rpt. at 9. Dr. Beaton opines that the results revealed "a major depressive disorder and a generalized anxiety disorder as well as a moderately severe posttraumatic stress disorder" which he assigns Mr. Beavers' childhood cancer as the cause. *Id.*

Again, Dr. Beaton's administration of the clinical diagnostic tool he picks, and his opinions based on the results are not reliable evidence. He concedes that his "report notes that Mr. Beavers, Jr.'s ranges were normal or below expected cutoffs, except for three; is that right? A. Yes, on the validity scale." Ex. B, Beaton Dep. Tr. 61:19-22. The three scores on which Mr. Beavers deviated from normal psychological ranges were those measuring the veracity of his answers on the test: "And FBS is so-called fake, bad scale, which has been -- the name has been changed to 'Symptom Validity' so it assumed to be a measure of overall reliability of an individual's responses." *Id.* 62:12-15. Asked to explain what the three abnormal numbers meant, Dr. Beaton testified that they meant Mr. Beavers was "consciously or unconsciously over-reporting and over-endorsing items on the MMPI-2." *Id.* 62:20-63:1. It would be misleading and inconsistent with this Court's gatekeeping function to permit Dr. Beaton to opine at trial that Mr. Beavers' childhood cancer experience caused clinical-level mental disease, when in fact the MMPI-2 results indicated the opposite with normal score results. It would be even worse to admit his opinions when the only abnormal scores indicated the test's unreliability.

### B. Dr. Beaton Failed To Consider And Rule Out Plausible Alternative Causes Of Mr. Beavers' Psychological Conditions

Dr. Beaton did not do any differential diagnostic "ruling out" of alternative causes of the mental disorders identified in his DSM-5 Diagnostic Impressions (*see* Ex. A, Beaton Rpt. at 10). What he did do is merely "rule out" two disorders—alcohol and marijuana use—as conditions Mr. Beavers currently suffers, id. ("Rule out Alcohol Use Disorder"; "Rule out Cannabis Use Disorder") while acknowledging that Mr. Beavers has suffered these conditions and that they can cause conditions like

PTSD, MDD, or GAD. *See* Ex. B, Beaton Dep. Tr. 65:25-66:10. Despite that concession, Dr. Beaton considered **no other potential causes** other than Mr. Beavers' childhood diagnosis and treatment for NHL. *See* Ex. B, Beaton Dep. Tr. 36:16-19 ("Q. You agree that you did not have Mr. Beavers, Jr. consider alternative traumatic events when he filled out the PCL-5, right? A. Yes."): This failure to do a real differential diagnosis and rule out renders Dr. Beaton's opinions unreliable and unhelpful to the jury.

### 1. Dr. Beaton Failed To Consider The Fact That Mr. Beavers Was Assaulted And Shot Three Times As An Alternative Possible Cause Of PTSD

Mr. Beavers was shot three times. In a case of mistaken identity, a stranger assaulted and shot him on the streets of Seattle. *See* Ex. A, Beaton Rpt. at 5. It does not take a Psychology Ph.D. to know that this would be a traumatic experience for just about anyone, but in case there is any doubt, Dr. Beaton agrees. *See* Ex. B, Beaton Dep. Tr:10-3 ("What about being shot multiple times. I saw you noted that in your report. Is that something that could result in PTSD or distress in Mr. Beavers' life? A. Yes."). Despite being aware of this horrible experience in Mr. Beavers' past, Dr. Beaton consciously disregarded it, and did no analysis to rule it out, in his purported diagnostic assessment of what caused Mr. Beavers' mental health conditions. This choice cannot be squared with *Daubert*'s requirement of doing real science.

### 2. Dr. Beaton Failed To Consider Other Alternative Causes Of Mr. Beavers' Claimed PTSD, MDD, And GAD

There are numerous other alternative potential causes of Mr. Beavers' asserted PTSD, MDD, and GAD that Dr. Beaton acknowledges exist, but did not rule out in reaching his causation conclusion.

With respect to PTSD, Beaton has named factors that may have traumatized Mr. Beavers: his parents' separation, parental substance abuse, going to jail and as noted, being shot in a violent assault. Ex. B, Beaton Dep. Tr. 35:6-36:13. Dr. Beaton made no effort to clinically rule out these potential causes.

Dr. Beaton acknowledged "other factors in his life [that] could have resulted in depression." Ex. B, Beaton Dep. Tr. 52:2. Those include: "use of drugs and alcohol, inability to develop his identity and to fledge the nest, to pursue his education, to develop a career with job skills, um, being shot and

injured, his mother's death." Id. 52:3-7. Dr. Beaton did not rule out any of these as alternative causes to Mr. Beavers' NHL diagnosis and treatment 22 years ago. Instead, he crams them all together and says, "I think his depression was multifactorial." Id. 52:17. But the necessary implication is that he "can't say one way or another which factor would cause depression." Id. 52:21-22.

As to anxiety, Dr. Beaton named as potential alternative causes: "the disappointment of not being able to participate in baseball, his transition from junior high to high school," "academic problems," and "family dynamics." Id. 58:7:59:4. Dr. Beaton disregarded these possibilities, just as he disregarded the fact that "Mr. Beavers, Jr. did not reach the cutoff for anxiety disorder." Id. 60:6-7.

## CONCLUSION

For these reasons, the Court should grant Monsanto's motion to exclude the specific causation testimony of Plaintiff's expert witness Dr. Beaton purporting to support Plaintiff's claim that his experience contracting and being diagnosed and treated for NHL caused his mental health issues.

Dated:  December 14, 2023                    Respectfully submitted,

/s/ *Linda C. Hsu*
Linda C. Hsu
Attorneys for Defendant Monsanto Company

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of December, 2023, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

/s/ *Linda C. Hsu*
Linda C. Hsu

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF RANDAL BEATON, PH.D.