# EXHIBIT B

1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3       _____
                                   )
4       IN RE: ROUNDUP PRODUCTS   ) MDL No. 2741
                                   )
5       LIABILITY LITIGATION       ) Case No. 3:16-MD-02741-VC
                                   )
6       _____

7       RICKY BEAVERS, JR.,        )
                                   )
8               Plaintiff,         )
        vs.                        )
9                                  ) Case No. 3:20-cv-08799-VC
        BAYER CO., et al.,         )
10             Defendants.         )
        _____

11

12         VIDEO-RECORDED DEPOSITION UPON ORAL EXAMINATION OF

13                    RANDAL BEATON, Ph.D
        _____

14

15

                            12:01 p.m.
16

                       NOVEMBER 15, 2023
17

                    Virtual Zoom Deposition
18

                       Washington State
19

20

21

22

23

24
        REPORTED BY:  ANITA MITCHELL, CSR No. 2586
25

Exhibit B Page - 1

```
 1                 A P P E A R A N C E S

 2             (ALL PARTIES APPEARING REMOTELY)

 3


 4


 5   FOR THE PLAINTIFF

 6         CHARLES L. MEYER
           LAW OFFICES OF CHARLES L. MEYER
 7         1000 Second Avenue, Suite 3200
           Seattle, WA  98104-1074
 8         (206) 292-0088
           (206) 621-6443 Fax
 9         lawofficesofcharleslmeyer@gmail.com


10


11
     FOR THE DEFENDANTS
12
           SARAH S. POWELL
13         NELSON MULLINS RILEY & SCARBOROUGH, LLP
           151 Meeting Street, Liberty Center, Suite 600
14         Charleston, SC 29401
           (843) 534-4327
15         sarah.powell@nelsonmullins.com


16


17
     Also appearing:  Maddie Cowell, Videographer
18


19


20


21


22
     Veritext Legal Solutions
23   1200 Sixth Avenue, Suite 610
     Seattle, WA  98101
24   Calendar-pnw@veritext.com
     (800) 831-6973 (national)
25   Litsup-west@veritext.com
```

Exhibit B Page - 2

1    documents of Dr. Murphy, Mr. Bennett, and Mr. Fountaine.

2       Q.  Okay.  You didn't have any communications with

3    those experts in this case, did you?

4       A.  Not pertaining to this case.

5       Q.  Okay.

6       A.  That's correct.

7       Q.  I don't think I saw this in your report, and I

8    may have missed it.  But what is the hourly rate that

9    you charge for preparing the report?

10      A.  $300 per hour.

11      Q.  And is that a steady rate or do you have

12   different rates per deposition time, trial time, things

13   of that matter?

14      A.  Yes.

15      Q.  Okay.  Can you tell me those?

16      A.  Yes.  For deposition testimony, live testimony,

17   it's $450 per hour.

18      Q.  Okay.  And for report preparation it's $300 per

19   hour?

20      A.  Correct.

21      Q.  Okay.  Have you sent an invoice to your counsel

22   for your time spent on this case?

23      A.  Yes, I have.

24      Q.  Okay.

25              MS. POWELL:  Charles, I don't know if you

Randal Beaton, Ph.D.

```
 1      A.  I would also -- at this point, I would also defer
 2   to Dr. Murphy regarding any causal link between Junior's
 3   exposure to glyphosate as a child and feel that she is
 4   much more qualified than I, to offer an opinion in terms
 5   of causation.
 6      Q.  Okay, great.  That was one of the questions that
 7   I was going to ask you later in the deposition, so --
 8              THE VIDEOGRAPHER:  This is the videographer.
 9   Can we go off the record real quick?
10              MS. POWELL:  Sure.
11              THE VIDEOGRAPHER:  The time is 12:19.  We're
12   off the record.
13                          (After a brief break, the
14                          deposition continued.)
15              THE VIDEOGRAPHER:  The time is 12:21.  We're
16   back on the record.
17      Q.  (By Ms. Powell) Okay, Dr. Beaton.  We were just
18   discussing your causation opinion, and you said that
19   you're deferring any causation, as it relates to Ricky
20   Beaver, Jr.'s non-Hodgkin's lymphoma and Roundup
21   exposure to Dr. Murphy and other qualified oncologists;
22   is that correct?
23      A.  Yes.
24      Q.  Okay.  So in your report, on Page 19, right here,
25   we can just scrap this causality sentence, right here?
```

Exhibit B Page - 4

Randall Beaton, Ph.D.

1    questions to be completed, correct?

2        A.  Yes.

3        Q.  In your report you state that, "The index trauma

4    event identified on the PCL-5 in this case was his NHL

5    cancer diagnosis, the risk of amputation, and chemo."

6    Did you specifically ask Mr. Beavers to only consider

7    his NHL cancer diagnosis, risk of amputation, and chemo

8    when he was filling out his PCL-5?

9        A.  Yes.

10       Q.  Okay.  And you specifically asked him to only

11   consider the month of July, in 1997; is that right?

12       A.  It was actually administered on two separate

13   occasions, timeframes.

14       Q.  Right.

15       A.  And so he was also completed it for the prior

16   month.

17       Q.  Right.  So July of 1997 and also the prior month

18   back in October of 2019.  So those two timeframes?

19       A.  Yes.

20       Q.  Okay.

21       A.  I think it would be August.

22       Q.  Yes.  Or September.

23       A.  Yes.

24       Q.  Is it an acceptable practice in your field to

25   administer the PCL-5 and ask the person you're

Exhibit B Page - 5

Randall Beaton, Ph.D.

1   interviewing to only consider an event that occurred

2   more than 22 years ago?

3      A.  No.

4      Q.  Okay.  Is that something you just did for

5   litigation purposes?

6      A.  It's, uh, just using the available tools and

7   being creative and innovative and using a measure of --

8   that lists the symptoms.  It's better than, in my

9   opinion, just historical memories.

10     Q.  Would you agree that Mr. Beavers, Jr. would be

11  relying on historical memories in completion of the

12  PCL-5?

13     A.  He would be, in a more unstructured way -- a more

14  structured way, than just an interview.

15          MS. POWELL:  I'm going to mark this as

16  Exhibit 5.

17                       (Exhibit 5 was marked for

18                        identification.)

19     Q.  (By Ms. Powell) Let me know when you can see this

20  on your screen.  Can you see this document?

21     A.  Yes.

22     Q.  Okay.

23     A.  Yes.

24     Q.  I'll get to the second page here, and I'll

25  zoom-in.  We see that the PTSD Checklist for DSM-5, what

1    A.  That is a structured interview that goes into

2    detail on all of the symptoms that are listed on the

3    PCL-5 and is used extensively in the VA.

4    Q.  Is that something you used with Mr. Beaver's,

5    Jr.?

6    A.  I did not.

7    Q.  Is that something that you would use in practice?

8    A.  I have used it in practice and forensic cases.  I

9    did not in this instance.

10    Q.  Why did you choose not to use the CAPS-5 in this

11    instance?

12    A.  I feel that the PCL-5 addressed the issues based

13    on the literature and what is known about juvenile

14    adolescent cancer.  I did not feel like it was

15    necessary.

16    Q.  Okay.  Now if we scroll a bit, we see the last

17    paragraph.  It says, "The PCL-5 is intended to assess

18    patient symptoms in the past month.  Versions of the

19    PCL-5 that assess symptoms over a different timeframe,

20    example, past day, past week, past 3 months, have not

21    been validated."  Do you agree with that statement?

22    A.  Yes.

23    Q.  Okay.  Do you agree that your results for Mr.

24    Beavers PCL-5 cannot be validated, given the fact that

25    you have attempted to assess symptoms from more than 22

1    years ago?

2      A.  I, I believe that it's not validated.  It's not

3    administered in a standardized fashion.  As I said, I

4    think it was better than just interview recollections,

5    because it was more structured and focussed.

6      Q.  And we discussed that your report says that Mr.

7    Beavers, Jr.'s index trauma was his NHL threat of

8    amputation and chemo.  What is an index trauma?

9      A.  It is the trauma that is referred to, that the

10   individual is asked to recollect, related to the reports

11   on the measure.

12     Q.  Did you do anything to determine whether Mr.

13   Beavers' cancer diagnosis, threat of amputation, and

14   chemo was his index trauma for purposes of this PTSD

15   diagnosis?

16     A.  That was the instruction he was given, so I guess

17   it is the index trauma, per se, because that's what I

18   asked him to reflect on, when he was answering the

19   question.

20     Q.  Did you ask him to reflect on any other life

21   events that could have been considered when determining

22   whether Mr. Beavers, Jr. was experiencing PTSD?

23     A.  I did not.

24     Q.  Did you have Mr. Beavers complete the Life Events

25   Checklist for DSM-5?

1    A.  I did not.

2    Q.  Are you aware of the Life Events Checklist for

3    DSM-5?

4    A.  Yes.

5    Q.  Why did you choose not to have Mr. Beavers, Jr.

6    complete the Life Events Checklist for DSM-5?

7    A.  I do not use that measure in my practice.  I feel

8    that I am able to assess other potentially traumatic

9    events as part of the interview.

10   Q.  What is a Life Events Checklist, in your

11   practice?

12   A.  It is, it is a Checklist that's been around to

13   assess potentially traumatic events, including the death

14   of a family member, serious injury, serious illness, so

15   it's -- has a number of items on it that are potentially

16   traumatic.

17   Q.  Without the completion of the Life Events

18   Checklist, how could you determine Mr. Beavers, Jr.'s

19   index trauma?

20   A.  The index trauma again is, by definition, what is

21   instructed to recollect and focus on, in answering the

22   questions, so it's -- it is the index trauma because

23   that's what I asked him to focus on.

24   Q.  Got it.  And you agree that Mr. Beavers, Jr. did

25   have other life events that would potentially result in

Randall Beaton, Ph.D.

1    PTSD or distress in his life, right?

2       A.  Correct.

3       Q.  Okay.  Would his mother leaving him at a young

4    age potentially result in PTSD or distress in his life?

5       A.  Based on the history presented, his mother didn't

6    leave him.  He left with his father first, when I think

7    he was 3-years-old.  It could have potentially been

8    traumatic, whether he had any recollection of it or had

9    vague recollections of it, but it could have been

10   potentially emotionally distressing at the very least.

11      Q.  And you note in your report that Mr. Beavers, Jr.

12   was around parents that were abusing alcohol and other

13   substances.  Is that something that could result in PTSD

14   for a young child?

15      A.  Yes.

16      Q.  And those are both instances that Mr. Beavers,

17   Jr. experienced prior to his cancer diagnosis?

18      A.  Yes, yes.

19      Q.  Okay.  And in your report, you also note that Mr.

20   Beavers, Jr. also went to jail at some point in his

21   life?

22      A.  After his cancer diagnosis.

23      Q.  Right, right, right.

24      A.  Yes.

25      Q.  He also -- would going to jail potentially result

Randall Beaton, Ph.D.

```
 1    Q.  Okay.  Do you agree that you can't claim Mr.
 2  Beavers experienced PTSD solely from adolescent cancer
 3  if you didn't consider alternative traumatic stressor
 4  events?
 5    A.  I don't agree with that.
 6    Q.  Okay.  Why do you not agree with that?
 7    A.  Because of the literature, in part, that
 8  indicates that adolescent cancer is not invariably, but
 9  often associated with Post Traumatic Stress Disorder.
10        Also in interview and his reports and
11  recollections of events during the timeframe, so I feel
12  like, based on the interview, his answers on the tests,
13  the collateral interview with Senior, on a more probable
14  than not basis, he was -- experienced PTSD as a result
15  of his childhood cancer.
16    Q.  You agree that you did not have Mr. Beavers, Jr.
17  consider alternative traumatic events when he filled out
18  the PCL-5, right?
19    A.  Yes.
20    Q.  So how can you rule those out, if you did not
21  even have him consider those other traumatic stressors,
22  including leaving his mother and not having her in his
23  life and having parents abusing alcohol and other
24  substances at a young age, how can you rule those out?
25    A.  Those are risk factors, and they may have
```

Exhibit B Page - 11

Randall Beaton, Ph.D.

 1   contributed to his score on that test.  But again, he

 2   was asked to refer to his index traumatic event, namely

 3   his NLH (sic) -- yeah, N -- NLH.

 4       Q.  NHL.

 5       A.  Thank you.  Yeah.  And diagnosis and early

 6   treatment, so he focussed on that in answering the

 7   questions.  Could those other events have affected his

 8   response on the PCL-5, yes.

 9       Q.  And I think you note in your report that you

10   agree it is not possible to determine the current causes

11   of Mr. Beavers' PTSD symptomatology, because he has

12   experienced numerous subsequent major traumatic events,

13   like the death of his mother, incarceration, assault

14   with a deadly weapon, right?

15       A.  I do agree with that.

16       Q.  Okay.  In your report, you discuss that non-white

17   race is a risk factor for PTSD and you reference an

18   article by Smith from 2008.  Do you recall that?

19       A.  Yes.

20       Q.  Okay.

21              MS. POWELL:  I'm going to mark this as

22   Exhibit 6.

23                        (Exhibit 6 was marked for

24                         identification.)

25       Q.  (By Ms. Powell) And this is the Smith article

Exhibit B Page - 12

Randall Beaton, Ph.D.

```
 1                        (After a brief break, the

 2                        deposition continued.)

 3             THE VIDEOGRAPHER:  The time is 1:25.  We're

 4   back on the record.

 5      Q.  (By Ms. Powell) Dr. Beaton, it's also your

 6   opinion that Mr. Beavers has experienced major

 7   depressive disorder, by history, and he's in partial

 8   remission, right?

 9      A.  Yes.

10      Q.  Did you reach this opinion through your interview

11   with plaintiff and by his completion of the PHQ-9?

12      A.  Yes.  Also his father's recollections.

13      Q.  Okay.  Anything else?

14      A.  Um, photographs from that certain time era as

15   well.

16      Q.  Okay.  What is the PHQ-9?

17      A.  It's a Major Depression Checklist.  The symptoms

18   that are listed in the DSM-5 are all listed, and the

19   individual is to indicate over the prior two weeks how

20   often he may have experienced one of these or several of

21   these symptoms.

22      Q.  And you used the PHQ-9 to determine whether Mr.

23   Beavers, Jr. experienced depression at two different

24   timeframes, right?

25      A.  Yes.
```

Randall Beaton, Ph.D.

1    Q.  And you administered the PHQ-9 on October 30th,

2    2019 in that same meeting you had with him and his

3    father?

4    A.  Yes.

5    Q.  One of the timeframes you asked him to complete

6    PHQ-9 for, was for July of 1997, the first two weeks of

7    July of 1997?

8    A.  Correct.

9    Q.  Okay.  And then the other was the last two weeks

10   prior to -- the last two weeks prior to your interview

11   and meeting with Mr. Beavers, right?

12   A.  Yes.

13   Q.  Okay.  Let's discuss the July 1997 PHQ first.  So

14   for that timeframe, where you had Mr. Beavers complete

15   the PHQ-9 and focus only on the first two weeks of July

16   of 1997.  You called the timeframe 'modified.'  What do

17   you mean when you claim the timeframe is 'modified'?

18   A.  Well, it's not the standardized -- prior two-week

19   timeframe, so it's modified.

20   Q.  So you agree that PHQ is intended to be used, to

21   ask about the patient's experience in the last two

22   weeks?

23   A.  Absolutely.

24   Q.  Yeah.  Would you say it's an acceptable practice

25   to rely on results from the PHQ-9, where you asked a

Exhibit B Page - 14

Randal Beaton, Ph.D.

1    patient to consider a timeframe from 22 years ago?

2       A.   I wouldn't describe it as an acceptable practice.

3       Q.   Okay.  What concerns would you have as a

4    psychologist, relying on results reported from a patient

5    who claims to have experienced symptoms 22 years ago?

6       A.   I think some of the caveats that I included in my

7    report, that memories change over time, fade over time,

8    can be inaccurate.

9       Q.   Any, any problems with recall memories?

10      A.   Yeah.  As I said, memories can change and can

11   fade and can be altered over time.

12      Q.   Knowing Mr. Beavers, Jr. was coming to see you

13   for this litigation, do you think that would have

14   affected his answers or results for this testing?

15      A.   That's possible.  I'm, I'm not aware of any

16   studies that have specifically looked at that for the

17   PHQ-9.

18      Q.   And you agree that the modif -- the time period

19   modification from the two-week timeframe to 22 years ago

20   is not an accepted methodology in your practice, right?

21      A.   That's correct.

22      Q.   Is there any literature that you relied upon in

23   your practice that would validate that methodology?

24      A.   No.

25      Q.   What kind of adverse life events would affect the

Randal Beaton, Ph.D.

1    Q.  Okay.  From July of 1997 to present, what other

2    factors in his life could have resulted in depression?

3    A.  His use of drugs and alcohol began at age 19;

4    certainly are risk factors.  I think his inability to

5    develop his identity and to fledge the nest, to pursue

6    his education, to develop a career with job skills, um,

7    being shot and injured, his mother's death.

8    Q.  What about his DUI, in your view, would that

9    affect his ability to develop depression?

10   A.  I guess I've include that under his drugs and

11   alcohol use --

12   Q.  Okay.

13   A.  -- yes.

14   Q.  How did those factors affect your opinions in

15   this case, as it relates to a potential depression

16   diagnosis?

17   A.  I think his depression was multifactorial, was

18   related to, I think his cancer diagnosis and impact that

19   it had on his life, as well as the other factors that I

20   just listed.

21   Q.  Understood.  So you can't say one way or another

22   which factor would cause depression.  It's more of a

23   conglomeration of life events.  Is that fair to say?

24   A.  I believe it is a combination of factors, yes.

25   Q.  It's also your opinion that Mr. Beavers, Jr.

Randall Beaton, Ph.D.

1    presented in this testing?

2       A.  That was the timeframe that I asked him to focus

3    on, yes.

4       Q.  Okay.  And in your report, in a footnote, you

5    state, "The modified referent timeframe required Mr.

6    Beavers, Jr. to recall symptoms that he had reportedly

7    experienced more than 22 years ago.  By the passage of

8    time, the vulgarities of human memory across decades and

9    his current psychological orientation/coping style are

10   certainly some limitations/drawbacks to using this

11   remote timeframe.  Also, all of the available published

12   studies and benchmarks for the SOS are based upon the

13   past week timeframe;" is that correct?

14      A.  I couldn't have said it any better.

15      Q.  So you agree that all of the available published

16   studies on SOS testing are based upon the week prior

17   timeframe?

18      A.  Yes.

19      Q.  Okay.  Would you agree that the methodology

20   you're applying for the SOS testing is something you're

21   only doing for litigation purposes?

22      A.  I think I've used it before in clinical practice,

23   but not for litigation.  But in this particular

24   instance, it was used in a litigation purpose.

25      Q.  So in practice, would, would you administer a

Exhibit B Page - 17

```
 1   Symptoms of Stress test to a patient and asked them to
 2   identify and report results on a week outside of the
 3   time period required by the test?
 4       A.  On occasion.
 5       Q.  Do you think that results outside of that time
 6   period would be -- are reliable?
 7       A.  I think that it's questionable in the caveats
 8   that I raised.  I think that I would, you know, say that
 9   there are limitations.  Again, I think it's innovative,
10   creative, but not the standardized method of
11   administration.
12       Q.  And you claim that Mr. Beavers, Jr.'s SOS score
13   was 267 which, "...was indicative of an overwhelming
14   level of stress and distress," right?
15       A.  I didn't claim that.  I actually just added up
16   his replies --
17       Q.  Okay.
18       A.  -- and so it was calculated.  And yes, that's --
19   I use, as a cutoff in clinical practice, scores above
20   150 are generally indicative of overwhelming level of
21   stress and distress, so it was much higher than that.
22   In my clinical practice, using the standardized
23   timeframe, the vast majority of clients score in the 100
24   to 150 level.
25       Q.  Knowing that Mr. Beavers was coming to see you
```

Exhibit B Page - 18

Randall Beaton, Ph.D.

1    for this litigation, do you think that would have

2    affected his answers or results for this test?

3        A.  It's possible, but again, I'm not aware of any

4    studies that have used or studied that, to document

5    that.

6        Q.  Do you think that you can draw valid conclusions

7    from these results, given the fact that the timeframe

8    you used has not been peer-reviewed or studied?

9        A.  I, I don't think it's completely invalid.  I

10   don't think it is the standardized method of

11   administration, so the caveats that I have in the

12   footnotes, I think I would say hold.

13       Q.  And you say you also administered the GAD-7 to

14   Mr. Beavers, on October 30th, 2019.  What is the GAD-7?

15       A.  Yes.  So it's a checklist of the items on the

16   DSM-5 criteria for generalized anxiety disorder.

17           Those are scored over the prior two-week

18   timeframe is the standardized time, and individuals

19   indicate how frequently they were bothered by these

20   symptoms, during that timeframe.

21       Q.  And again, you asked Mr. Beavers to complete the

22   GAD-7 for early -- for the early July 1997 timeframe and

23   the October 2019 timeframe, right?

24       A.  Yes.

25       Q.  And you agree that the GAD-7 is intended to be

Randall Beaton, Ph.D.

1   used to ask about the patient's experience in the last

2   two weeks?

3       A.   Correct.

4       Q.   Would you agree that it is not an acceptable

5   practice to rely on results from the GAD-7 where you

6   asked a patient to consider a timeframe 22 years ago?

7       A.   It's certainly not the standardized timeframe,

8   and I would say it's not generally accepted practice as

9   well.

10      Q.   What concern do you have as a psychologist, for

11  relying on results reported from a patient who claims to

12  have experienced symptoms 22 years ago?

13      A.   Recall, his present mood state.  Those would be

14  the major factors.

15      Q.   Is there any literature that you can point to,

16  that you relied upon in your practice, that validates

17  the methodology you used here?

18      A.   Research over a shorter timeframe suggests that

19  people can remember major life events over a period of

20  at least 4-5 years, which is research that's been done

21  with the schedule of recent experience, but minor ones

22  tend to be forgotten, so there is some evidence that

23  people can remember certain major life events, at least

24  for 4 or 5 years.

25      Q.   Is there any research that people can remember

Randall Beaton, Ph.D.

```
 1   these major life events 22 years ago?  Any that you're
 2   aware of?
 3       A.  No, not that I'm aware of.
 4       Q.  For the July 1997 timeframe, you reported that
 5   Mr. Beavers, Jr. had a score of 19, which indicated a
 6   diagnosis of anxiety disorder, right?
 7       A.  Yes.
 8       Q.  Are there any other factors in Mr. Beavers, Jr.'s
 9   life which could have caused or contributed to his
10   anxiety disorder in the July of 1997 timeframe, outside
11   of his NHL diagnosis and treatment?
12       A.  Well, dealing with the disappointment of not
13   being able to participate in baseball, his transition
14   from junior high to high school, he was having academic
15   problems and difficulties during his first year of high
16   school.  Those would be the major ones in that
17   timeframe.
18       Q.  So him struggling in school prior to July of 1997
19   could cause or contribute to, to any anxiety he may have
20   experienced?
21       A.  Yes.
22       Q.  What about any family dynamics, would his
23   parents' divorce have caused any kind of anxiety?
24       A.  Yeah.  Again, I don't think -- he never brought
25   up the divorce.  I think the separation, um, it was not
```

1  like his parents were having disagreements and fights in

2  front of him.  He was 3 when his father separated from

3  his mother.  It's, it's possible.  It wasn't something

4  that seemed to, seemed to be serviced at that time.

5     Q.  Okay.  Do you agree that the DSM diagnostic

6  criteria for generalized diagnostic disorder requires a

7  six-month duration of symptoms?

8     A.  I think that that's the criteria, yes.

9     Q.  Did you do any other analysis to establish a

10 six-month duration of symptoms in order to diagnose

11 generalized anxiety disorder of Mr. Beavers, Jr.?

12    A.  I did not.

13    Q.  So according to the DSM, you can't appropriately

14 diagnose him with generalized anxiety disorder, right?

15    A.  I think his active treatment lasted for almost a

16 year.  I think his anxiety lasted for longer than just a

17 few weeks during inpatient care.  I think his active

18 treatment continued, and I -- yeah, so I, I would say

19 that he would have met the criteria, but I didn't probe

20 it, specifically for that timeframe.

21    Q.  So if you had conducted a, a six-month review of

22 Mr. Beavers, Jr., you could have diagnosed him with

23 generalized anxiety disorder?

24    A.  Yes.

25    Q.  Okay.  But because you did not conduct that

1    six-month review of Mr. Beavers, Jr., according to the

2    DSM, you cannot diagnose him with generalized anxiety

3    disorder, right?

4        A.   Technically, correct.

5        Q.   Okay.  And then for the October 30th of 2019

6    testing, your report claims that Mr. Beavers, Jr. did

7    not reach the cutoff for anxiety disorder, right?

8        A.   Correct.

9        Q.   Okay.  Let's discuss the Minnesota Multiphasic

10   Personality -- Personal Inventory-2, which is MMPI-2,

11   and that's a test you administered on October 30th,

12   2019, right?

13       A.   Correct.

14       Q.   What does this testing analyze?

15       A.   It's the most widely used personality testing.

16   It analyzes severe psychopathology, so it has scales

17   that measure depression, anxiety, worry, somatic focus,

18   impulse control, schizophrenia, or bizarre ideation.

19   The original scale had masculine and feminine.  I think

20   that that's kind of an embarrassing legacy of the test,

21   which dates back, I think 100 years.

22       Q.   Okay.

23       A.   So it's been updated now.  There's actually the

24   MMPI-3, which I was not using at the time, in my

25   practice.

1          It also has a number of validity scales,

2    measuring the degree to which people are consistent in

3    their replies, maybe endorsing items that seem

4    desirable, but are actually rare, so-called lie scale.

5          Measures of denial, suppression, willingness to

6    admit symptoms, over-endorsing symptoms.  I think

7    there's more validity scales than pathology scales in

8    the MMPI-3, so there is a great effort to see that

9    people are responding in ways that can actually

10   accurately help to diagnose extreme pathology.

11      Q.  So this test analyzes the current psychological

12   status of Mr. Beavers, Jr.?

13      A.  Correct.

14      Q.  Okay.

15      A.  So that's, yeah.  So he's asked to respond to

16   that, um, today --

17      Q.  Okay.

18      A.  -- as of the day that he's taking the test.

19      Q.  Okay.  And your report notes that Mr. Beavers,

20   Jr.'s ranges were normal or below expected cutoffs,

21   except for three; is that right?

22      A.  Yes, on the validity scale.

23      Q.  Yes.  And I think that you said the three were

24   F, FB and FBS.  Does that sound right?

25      A.  Yes.

Randall Beaton, Ph.D.

```
1      Q.  Can you tell me what -- let's start with F.  What
2   is that?
3      A.  That is a measure of distortion.  These are
4   rarely endorsed items in the MMPI.  For example, the
5   only part of the paper that I read is the comics, as an
6   example.  And if you answer 'true' to that, that's a
7   measure of distortion.
8          The FB, that is the F scale -- excuse me -- but
9   it's the back part of the test.  I think it's like from
10  Item Number 200 to 500 or something like that, so it's
11  the back part.
12         And FBS is so-called fake, bad scale, which has
13  been -- the name has been changed to 'Symptom Validity'
14  so it assumed to be a measure of overall reliability of
15  an individual's responses.  It has been criticized, and
16  one of the developers of the MMPI-2, Dr. Butcher, feels
17  that it doesn't meet the criteria for a validity scale
18  and he wouldn't pay any attention to it.  I agree with
19  Dr. Butcher on that.
20     Q.  So to you, what do the three -- the F, the FB,
21  and FBS results for Mr. Beavers, Jr. tell you?
22     A.  I think you can look at them, in some ways, as a
23  cry for help.  So he's endorsing a lot of items that are
24  rarely endorsed, in the direction of those scales.  Or
25  he is consciously or unconsciously over-reporting and
```

**Exhibit B Page - 25**

```
 1      Q.   That's true.  Do you agree that in your report,
 2   you noted that Mr. Beavers, Jr. reported, "...onset and
 3   progression of alcohol and substance use disorders that
 4   began when he was approximately 19-years-old."?
 5      A.   Yes.
 6      Q.   Do you know what substances Mr. Beavers, Jr. was
 7   using?  Did you ask him that?
 8      A.   Yes.
 9      Q.   What are they?
10      A.   (Inaudible) marijuana.
11      Q.   You broke the a little bit.  Could you repeat
12   yourself?
13      A.   Marijuana.
14      Q.   Just marijuana?
15      A.   Yes.
16      Q.   Okay.  You also said on Page 5 of your report
17   that, "Not surprisingly, these problems with drugs and
18   alcohol caused psychosocial and legal problems,
19   including at least two DUIs and some jail time."  My
20   question is, what kind of psychological problems can
21   drug and alcohol use cause?
22      A.   It can cause all kinds of problems: Judgment,
23   decision-making, um, impulse control, problems with the
24   law, incarceration.
25      Q.   Do you think drug and alcohol use or abuse can
```

```
 1                REPORTER'S CERTIFICATE

 2

 3            I, ANITA MITCHELL, the undersigned Certified

 4   Court Reporter, pursuant to RCW 5.28.010, authorized to

 5   administer oaths and affirmations in and for the State

 6   of Washington, do herby certify that the sworn testimony

 7   and/or proceedings, a transcript of which is attached,

 8   was given before me via videoconference; that any and/or

 9   all witness(es) were duly sworn to tell the truth; that

10   the sworn testimony and/or proceedings were by me

11   stenographically recorded and transcribed under my

12   supervision, to the best of my ability; that the

13   foregoing transcript contains a full, true, and accurate

14   record of all the sworn testimony and/or proceedings

15   given and occurring via videoconference; that a review

16   of which was requested; that I am in no way related to

17   any party to the matter, nor to any counsel, nor do I

18   have any financial interest in the event of the cause.

19

20   WITNESS MY HAND AND DIGITAL SIGNATURE THIS

21   30TH DAY OF NOVEMBER, 2023.

22

23

24

25            ANITA MITCHELL, CSR No. 2586
```