**WILKINSON STEKLOFF LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonstekloff.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonstekloff.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel: 202-847-4030 | Fax: 202-847-4005

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843 | Fax: 202-682-1639

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

**BRYAN CAVE LEIGHTON PAISNER LLP**
K. Lee Marshall (CA Bar No. 277092)
(klmarshall@bclplaw.com)
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Tel: 415-675-3400 | Fax: 415-675-3434

Jed P. White (CA Bar No. 232339)
(jed.white@bclplaw.com)
Linda C. Hsu (CA Bar No. 239880)
(linda.hsu@bclplaw.com)
120 Broadway, Suite 300
Santa Monica, CA 90401
Tel: 310-576-2100 | Fax: 310 -576-2200

*Attorneys for Defendant Monsanto Company*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741<br><br>Case No.: 3:16-md-02741-VC |
| *Richard Canning, et al. v. Monsanto Co.,* Case No. 3:19-cv-04230-VC<br><br>*Gerald Nelson, et al. v. Monsanto Co.,* Case No. 3:19-cv-04576-VC<br><br>*Robert Cotter, et al. v. Monsanto Co.,* Case No. 3 :20-cv-03108-VC | **DEFENDANT MONSANTO COMPANY'S MOTION TO EXCLUDE TESTIMONY OF ROBERT F. HERRICK**<br><br>Hearing:<br>Date:    March 1, 2024<br>Time:   10:00 a.m.<br>Place:   San Francisco Courthouse,<br>            Courtroom 4 – 17th Floor |

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

　　　　**PLEASE TAKE NOTICE THAT** on　March 1, 2024, 2024 at 10:00 a.m., in Courtroom 4 of the United States District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, or as ordered by the Court, Defendant Monsanto Company ("Monsanto") will present its Motion to Exclude Testimony of Robert F. Herrick.  Monsanto seeks an order excluding opinions of this witness under Federal Rule of Evidence 702.


Dated:  December 14, 2023                    Respectfully submitted,

                                             **BRYAN CAVE LEIGHTON PAISNER LLP**


                                             */s/ Linda C. Hsu*
                                             Linda C. Hsu
                                             Attorneys for Defendant Monsanto Company

1

## <u>TABLE OF CONTENTS</u>

2

<u>Page</u>

3

INTRODUCTION ........................................................................................................1

4

BACKGROUND .........................................................................................................2

5

LEGAL STANDARD..................................................................................................5

6

ARGUMENT ..............................................................................................................6

7

8

I.      Dr. Herrick Is Not Qualified to Interpret and Apply Epidemiological Studies. ....6

9

II.     Dr. Herrick's Exposure-Days Opinion Is Unreliable and Unhelpful Because It Does Not Account For the Circumstances of Plaintiffs' Spraying Or The Dose of Roundup Plaintiffs Allegedly Absorbed Into Their Bodies.................................7

10

11

A.      Dr. Herrick's Exposure Days Methodology Is Unreliable and Unhelpful Because It Does Not Measure The Actual Amount of Roundup To Which Each Plaintiff Was Exposed...................................................................7

12

13

B.      Dr. Herrick's Methodology is Also Unreliable Because It Ignores Scientifically-Accepted Methods of Calculating Dose...........................13

14

III.    Dr. Herrick's Opinions Are Not Scientific And Are Within the Knowledge of the Common Juror. ...................................................................................14

15

16

CONCLUSION..........................................................................................................15

17

18

19

20

21

22

23

24

25

26

27

28

MOTION TO EXCLUDE TESTIMONY OF DR. ROBERT F. HERRICK

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Barajas v. Mercedes Benz USA, LLC*,
  No. CV 19-0070 DSF (KK), 2020 WL 10431812 (C.D. Cal. Oct. 15, 2020) ......................14

*Borg-Warner Corp. v. Flores*,
  232 S.W.3d 765 (Tex. 2007)...............................................................................................8

*Bryant v. Farmers Ins. Exch.*,
  432 F.3d 1114 (10th Cir. 2005) ........................................................................................14

*Cooper v. Brown*,
  510 F.3d 870 (9th Cir. 2007) ..............................................................................................6

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)............................................................................................................6

*Dura Auto. Sys. Of Ind., Inc. v. CTS Corp.*,
  285 F.3d 609 (7th Cir. 2002) ..............................................................................................7

*Georgia Operators Self-Insurers Fund v. PMA Mgmt. Corp.*,
  143 F. Supp. 3d 1317 (N.D. Ga.), aff'd, 631 F. App'x 730 (11th Cir. 2015) ........................15

*Jones Creek Invs., LLC v. Columbia Cnty., Georgia*,
  No. CV 111-174, 2013 WL 12141348 (S.D. Ga. Dec. 23, 2013)........................................15

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices and Prods. Liab. Litig.*,
  892 F.3d 624 (4th Cir. 2018) ..............................................................................................8

*McClain v. Metabolife Int'l, Inc.*,
  401 F.3d 1233 (11th Cir. 2005) ..........................................................................................8

*Parkhill v. Alderman-Cave Milling & Grain Co.*,
  2010-NMCA-110, 149 N.M. 140, 245 P.3d 585 (N.M. Ct. App 2010) ...............................8

*Ray v. AT&T Mobility LLC*,
  No. 2:17-CV-68, 2020 WL 535787 (E.D. Ky. Feb. 3, 2020) ..............................................15

*In re Roundup Prods., Liab. Lit.*,
  3:16-md-02741-VC (N.D. Cal. Feb. 24, 2019)....................................................................7

*In re Roundup Prods. Liab. Lit.*,
  390 F. Supp. 3d 1102 (N.D. Cal. 2018) .........................................................................6, 12

*Sardis v. Overhead Door Corp.*,
  No. 20-1411, 2021 WL 3699753 (4th Cir. Aug. 20, 2021) ..................................................6

*White v. Ford Motor Co.*,
   312 F.3d 998 (9th Cir. 2002) ................................................................................................5

**Other Authorities**

Fed. R. Evid. 702 ....................................................................................................................5, 6

MOTION TO EXCLUDE TESTIMONY OF DR. ROBERT F. HERRICK

1

**INTRODUCTION**

2      Dr. Robert F. Herrick, an Environmental Health Scientist and Certified Industrial

3 Hygienist, seeks to offer opinions regarding the amount of Roundup exposure sustained by three

4 Plaintiffs, Richard Canning, Robert Cotter, and Gerald Nelson ("Plaintiffs").   Because Dr.

5 Herrick is a newcomer to the Roundup litigation, this Court's analysis of his opinions is critical.

6 The Court should exclude Dr. Herrick's opinions on three primary bases:

7      ***First***, Dr. Herrick, who admits that he is not an epidemiologist, arrives at his "exposure

8 days" methodology through his interpretation of six epidemiological papers.  Notwithstanding

9 the fact that these papers have been criticized for their failure to adjust for confounding factors—

10 including by this Court—Dr. Herrick is not qualified to interpret these studies.  He admits that

11 he is not a toxicologist, epidemiologist, biostatistician, or expert in genotoxicity or oncology,

12 and that he is not an expert in Roundup or glyphosate.  He should be held to these admissions

13 and precluded from interpreting literature from a field (epidemiology) where he admits he is not

14 an expert.

15      ***Second***, Dr. Herrick's "exposure days" analysis is not reliable or helpful because it fails

16 to quantify or even estimate Plaintiffs' dose of Roundup, *i.e.*, how much Roundup was absorbed

17 into Plaintiffs' bodies.   Dr. Herrick disregards dose and purports instead to focus on

18 "exposure"—the amount of Roundup that came into contact with Plaintiffs' skin.   Yet his

19 exposure calculation does not actually assess Plaintiffs' exposure to Roundup at all.  Instead it

20 analyzes Plaintiffs' "days of exposure"—the amount of time Plaintiffs spent spraying Roundup,

21 regardless of actual exposure or dose.[1]  The Court should exclude this opinion because it is not

22 reliable in a toxic exposure case to render a specific causation opinion, due to the fact that it

23 focuses only on time spent using the product, a metric that ignores accepted scientific principles

24 and case-specific factors that impact exposure and dose.  Indeed, Dr. Herrick himself admits

25

26 ───────────────

27 [1] Plaintiffs' specific causation expert then uses Dr. Herrick's exposure calculation to compare it to cherry-picked, unadjusted epidemiological data points purporting to show that a certain number of days of spraying Roundup is sufficient to increase the risk of cancer.  *See* Motion to

28 Exclude Dr. Boyd, filed contemporaneously herewith.

MOTION TO EXCLUDE TESTIMONY OF DR. ROBERT F. HERRICK

that his estimates did not adjust for several factors—like personal protective equipment and method of spraying, among other things—that would reduce a Plaintiff's actual exposure.

*Third*, Dr. Herrick's opinions should be excluded because they are within the knowledge of the common juror and are therefore not helpful to the jury.  He arrives at his opinions by 1) reading Plaintiffs' depositions and Plaintiff Fact Sheets; and 2) based on representations in that testimony, tabulating the total number of days each Plaintiff was exposed to Roundup.  He admits that his calculations use only multiplication, addition, and division.  Such opinions are squarely within the province of the jury, which will hear the testimony of the Plaintiffs and can decide for themselves how many days each Plaintiff was exposed to Roundup.

## BACKGROUND

Plaintiffs Richard Canning, Robert Cotter, and Gerald Nelson ("Plaintiffs") have retained Dr. Robert F. Herrick ("Dr. Herrick"), an Environmental Health Scientist and Certified Industrial Hygienist, to offer an opinion regarding the number of days that Plaintiffs were exposed to Roundup.  Dr. Herrick does not render an opinion regarding causation of any Plaintiff's NHL.  *See* Ex. B, Herrick (*Canning*) Dep. at 47:5-15; 143:21-144:1; Ex. C, Herrick (*Cotter*) Dep. at 22:17-21.  He also does not render an opinion regarding the dose that each Plaintiff received (*see* Ex. B, Herrick (*Canning*) Dep.  at 63:14-64:12; 130:20-22; 174:5-11; Ex. C, Herrick (*Cotter*) Dep. at 48:5-9; 48:13-49:2; 124:1-8; 166:17-21; 167:7-13), or their dermal absorption rate (*see* Ex. B, Herrick (*Canning*) Dep. at 108:21-109:11); Ex. C, Herrick (*Cotter*) Dep. at 90:1-11; 100:4-19; 100:20-101:3, or their inhalation levels (*see* Ex. B, Herrick (*Canning*) Dep. at 130:23-131:18; 174:21-175:1; Ex. C, Herrick (*Cotter*) Dep. at 35:14-21; 155:18-20).

Dr. Herrick acknowledges that he has no objective measurement of dose for any Plaintiff. That is, he did not rely on or measure glyphosate levels in the Plaintiffs' urine or blood.  *See* Ex. B, Herrick (*Canning*) Dep. at 71:8-20; 170:15-171:2; Ex. C, Herrick (*Cotter*) Dep. at 48:5-9.

Instead, to calculate each Plaintiffs' exposure, he purports to interpret six epidemiological studies to derive his exposure days methodology.  *See* Ex. A, Herrick (*Canning*) Report at 6. He claims that four of these studies—McDuffie et al. (2001), Eriksson et al. (2008), Andreotti et al. (2018), and Pahwa et al. (2019)—"used information about the frequency and/or duration

of the use of glyphosate-based herbicides to calculate an exposure metric known as 'exposure days.'" *Id*. at 7.  And he endeavors to perform his own "exposure days" analysis to calculate for each Plaintiff: 1) the total number of days they were exposed to Roundup, regardless of hours of exposure on any particular day (non-time weighted estimate); and 2) the number of 8-hour days that each Plaintiff was exposed to Roundup (time-weighted estimate). *Id*. at 7.

To arrive at these exposure days, Dr. Herrick performed a simple methodology.  First, he read each Plaintiff's deposition and Plaintiff Fact Sheet.  *See* Ex. B, Herrick (*Canning*) Dep. at 72:20-74:7; 167:9-168:7; Ex. C, Herrick (*Cotter*) Dep. at 23:6-16.   He did not interview Plaintiffs Canning or Nelson or ask them any follow-up questions.[2]   *See* Ex. B, Herrick (*Canning*) Dep. at 29:4-30:6; 168:18-169:1.  Second, using the number of hours each Plaintiff claims to have sprayed Roundup, he uses simple addition, multiplication, and division to derive each Plaintiff's "exposure days."  For his non-time weighted estimate, he simply multiplied the number of days each Plaintiff claims to have sprayed Roundup by the number of years each Plaintiff claims to have sprayed Roundup.

> Q.    And so you picked the number of days per year that he provides to you, and then you multiply it by the number of years that he used Roundup, is that correct?
>
> A.    That's it, yes.  That's correct.

*See* Ex. B, Herrick (*Canning*) Dep. at 102:19-104:7 (emphasis added).[3]  *See also id.* at 105:7-16 ("Q. So in order to perform the estimate for non-time-weighted exposure, you just use addition and multiplication, is that correct? A. Yeah… Yes.  It's a matter of just really multiplying the number of seasons by the days used per season, so it's a multiplication.").

For his time-weighted estimate, Dr. Herrick simply added up the total number of hours each Plaintiff claims to have sprayed Roundup, and then divided that number by eight:

---

[2] Dr. Herrick did speak with Mr. Cotter over the phone, and asked him about two points related to his job history at Lawn Rangers: 1) when Mr. Cotter started working with Lawn Rangers; and 2) the estimated number of days that he worked during each season with Lawn Rangers.  *See* Ex. C, Herrick (*Cotter*) Dep. at 23:17-24:20.

[3] Dr. Herrick used the same methodology for Richard Canning (*see* Ex. B, Herrick (*Canning*) Dep. at 173:5-19), and for Robert Cotter (*see* Ex. C, Herrick (*Cotter*) Dep. at 25:2-26:21).

Q.    So essentially you added up all of his hours over a lifetime spraying Roundup and then divided that by an 8-hour day in order to provide an estimate of the total number of days that he was spraying Roundup, is that correct?

A.    Yes, that is correct.

Q.    So for the time-weighted methodology you used addition, multiplication, and then division, is that correct?

A.    That's correct, yep.

*Id*. at 108:9-20.

Using this addition, multiplication, and division, Dr. Herrick concluded that Mr. Canning's total lifetime time-weighted exposure was between 169 to 656.5 eight-hour days with a midpoint value of 331.5 eight-hour days; he concluded that Mr. Canning's total lifetime non-time weighted exposure was 1,352 exposure days.  *See* Ex. A, Herrick (*Canning*) Report at 8-9. He concluded that Mr. Cotter's total lifetime time-weighted exposure was between 485.9 to 3,320.9 eight-hour days, with a midpoint of 1,700.9 eight-hour days; he concluded that Mr. Cotter's total lifetime non-time weighted exposure was 4196.5 exposure days.  *See* Ex. D, Herrick (*Cotter*) Report at 10.  He concluded that Mr. Nelson's total lifetime time-weighted exposure was between 12.6 to 116 eight-hour days, with a midpoint value of 62.7 eight-hour days; he concluded that Mr. Nelson's total lifetime non-weighted exposure was between 1,255 to 1,385 days with a midpoint of 1,320 days.[4]  *See* Ex. E, Herrick (*Nelson*) Report at 9.

Dr. Herrick claims that each Plaintiff was exposed to Roundup through their skin (dermal absorption) and through inhalation.  *See* Ex. B, Herrick (*Canning*) Dep. at 69:2-8.  However, he did not endeavor to calculate dermal absorption for any Plaintiff, or the level of inhalation.  *See* Ex. B, Herrick (*Canning*) Dep. at 108:21-109:11; 130:23-131:18; 174:21-175:1; Ex. C, Herrick (*Cotter*) Dep. at 90:1-11; 100:4-19; 100:20-101:3; 35:14-21; 155:18-20).  And he did not use scientifically-accepted methodology to measure the actual rate of exposure in any Plaintiff, including the ART method, which he has used in prior cases.  Ex. B, Herrick (*Canning*) Dep. at 108:21-109:11; 130:23-131:18; 174:21-175:1.  He admits that using this method would provide

---

[4] Dr. Herrick testified that he provided a range for the exposure numbers of Mr. Nelson because Mr. Nelson's testimony was uncertain.  *See* Ex. B, Herrick (*Canning*) Dep. at 99:22-102:9.

a "more quantitative assessment" of Plaintiffs' exposure.  *See* Ex. B, Herrick (*Canning*) Dep. at 133:20-134:8; Ex. C, Herrick (*Cotter*) Dep. at 37:4-17.

Dr. Herrick admits that in his methodology, he failed to consider several factors that would reduce the actual exposure to Roundup for each Plaintiff.  These include, among other things, the clothing, personal protective equipment, boots, gloves, method of spraying, and type of Roundup used by the Plaintiffs.  In fact, he testified that his exposure assessment would be the same even if a Plaintiff wore a water-repellant Tyvek suit while using Roundup:

> **Q. If Mr. Cotter were wearing a water-repellent Tyvek suit, your answer for exposure days would be the same as opposed to what he actually wore, shorts and a T-shirt, right? The exposure days would be the exposure days?**
>
> **A. That -- that would be true. You just, you know, calculate the days when he reported that he used Roundup.**
>
> Q. And if he were wearing a water-repellent Tyvek suit, as opposed to shorts and T-shirt, the amount of glyphosate that could reach his skin, because it's in a water-based solution, would likely be far lower, right?
>
> **A. I think that's -- that's a reasonable thing to say, yes.**

*See* Ex. C, Herrick (*Cotter*) Dep. at 96:1-17 (emphasis added).

Dr. Herrick himself has described the methodology he uses here as "semi-quantitative." *See* Ex. C, Herrick (*Cotter*) Dep. at 38:9-19.  He admits that his exposure days methodology does not relate to the actual biological level in humans.  *See* Ex. B, Herrick (*Canning*) Dep. at 151:5-156:6; *id*. at 154:20-23 ("So it doesn't really track the exposure day and the biological level.  They can be quite different because the chemical doesn't really persist."); *see also* Ex. C, Herrick (*Cotter*) Dep. at 82:24-83:6 ("So, you know, you might not find that the exposure day metric relates very well to the biological level.").

## LEGAL STANDARD

A proposed expert witness must possess knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates. Fed. R. Evid. 702. When an expert's field of expertise is not related to the subject on which he seeks to offer testimony, such testimony is inadmissible. *See White v. Ford Motor Co.*, 312 F.3d 998, 1008-09 (9th Cir. 2002). Apart from qualifications, expert testimony must be (1) based

1    upon sufficient facts or data, (2) the product of reliable principles and methods, and (3) the result

2    of applying those principles and methods reliably to the facts of the case. Fed. R. Evid. 702. The

3    trial judge is charged with the responsibility of acting as a gatekeeper to "ensure that any and all

4    scientific testimony … is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*,

5    509 U.S. 579, 589 (1993); *see also Sardis v. Overhead Door Corp.*, No. 20-1411, 2021 WL

6    3699753, at *7 (4th Cir. Aug. 20, 2021) (district court in wrongful death suit abused its discretion

7    when it "abandoned its gatekeeping function" by declaring reliability and relevance arguments

8    to be province of jury because they went to weight, not admissibility). Indeed, the Supreme

9    Court instructs that an expert's error-prone application of his or her methodology is inherently

10    unreliable; and reliability is within the charge of the trial court as the gatekeeper. *Daubert*, 509

11    US at 589. The proponent of the expert bears the burden of proving that the expert's proffered

12    testimony is admissible. *See, e.g.*, *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007).

## ARGUMENT

## I.    Dr. Herrick Is Not Qualified to Interpret and Apply Epidemiological Studies.

15    Examining Dr. Herrick's credentials and expert materials, it is clear that he brings no

16    relevant expertise that would bear on any issue relevant to this case.  He is not a toxicologist,

17    epidemiologist, biostatistician, or expert in genotoxicity or oncology.  *See* Ex. B, Herrick

18    (*Canning*) Dep. at 54:1-23; 58:16-59:6.  He is not an expert on glyphosate or Roundup, or their

19    alleged carcinogenicity.  *Id*. at 80:11-81:8.  Instead, Dr. Herrick holds a Sc.D. in Environmental

20    Health Science and is a certified industrial hygienist.

21    Nevertheless, despite the fact that he holds no degree in epidemiology and does not hold

22    himself out to be an epidemiologist (*see* Ex. B, Herrick (*Canning*) Dep. at 54:1-23), he purports

23    to interpret six epidemiological studies—McDuffie et al. (2001), Eriksson et al. (2008),

24    Andreotti et al. (2018), Leon et al. (2019), Zhang et al (2019), and Pahwa et al. (2019)—to

25    calculate the "exposure days" of three Plaintiffs—*Richard Canning*, *Robert Cotter*, and *Gerald

26    Nelson*.  *See, e.g.*, Ex. A, Herrick (*Canning*) Report at 6.

27    This exposure days methodology, including the very epidemiological studies on which

28    Dr. Herrick relies, has been criticized by this Court.  *In re Roundup Prods. Liab. Lit.*, 390 F.

Supp. 3d 1102, 1140 (N.D. Cal. 2018) (precluding plaintiff's experts from offering similar "junk science" testimony in the Roundup MDL and holding "[f]ailing to take account of likely confounders by presenting and relying upon only unadjusted (or minimally adjusted) estimates is a serious methodological concern."). *See also* Ex. F, Pretrial Order No. 85 in *In re Roundup Prods., Liab. Lit.*, 3:16-md-02741-VC (N.D. Cal. Feb. 24, 2019) (precluding plaintiffs' experts from testifying, based on the McDuffie and Eriksson studies, that "glyphosate is a substantial causative factor for anyone who exceeds two days per year or ten lifetime days of Roundup use, because that conclusion is again based on unadjusted data" and holding that "it is not scientifically sound to quantify [a] risk and assign it to a particular plaintiff using the unadjusted numbers from McDuffie and Eriksson").

In any event, Dr. Herrick is not qualified to interpret these—or any other epidemiological study. Dr. Herrick has admitted that he is not an epidemiologist and does not hold himself out as such. *See* Ex. B, Herrick (*Canning*) Dep. at 54:1-23. Accordingly, the Court should not allow Dr. Herrick to opine on topics that exceed his expertise or about which he disclaims any expertise, which includes extracting methodology from studies he is not qualified to evaluate for purposes of conducting his exposure-days assessment. *See, e.g.*, *Dura Auto. Sys. Of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty.").

**II.    Dr. Herrick's Exposure-Days Opinion Is Unreliable and Unhelpful Because It Does Not Account For the Circumstances of Plaintiffs' Spraying Or The Dose of Roundup Plaintiffs Allegedly Absorbed Into Their Bodies.**

> **A.    Dr. Herrick's Exposure Days Methodology Is Unreliable and Unhelpful Because It Does Not Measure The Actual Amount of Roundup To Which Each Plaintiff Was Exposed.**

Dr. Herrick's exposure-days assessment is inherently unreliable and unhelpful to the jury because it fails to account for the circumstances of Plaintiffs' spraying or the amounts of Roundup (if any) that Plaintiffs allegedly absorbed in their bodies—both of which are critical

factors in determining whether a person received a sufficient systemic dose of Roundup to cause his cancer (assuming that Roundup is capable of causing cancer at all).[5]

Dr. Herrick did not actually measure or calculate Plaintiffs' exposure levels.  Nor did he assess the amount of Roundup that Plaintiffs allegedly absorbed through their skin, a toxicological principle known as "dose" that is foundational in evaluation of toxic exposure. *See*, *e.g.*, *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1242 (11th Cir. 2005) ("Dose is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect."); *Borg-Warner Corp. v. Flores*, 232 S.W.3d 765, 770-73 (Tex. 2007) (discussing the importance of dose on causation inquiry and reversing judgment where plaintiff did not establish sufficient dose to cause alleged injuries); *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices and Prods. Liab. Litig.*, 892 F.3d 624, 639 (4th Cir. 2018) ("[A]ll chemical agents are intrinsically hazardous," and "whether they cause harm is only a question of dose."); *Parkhill v. Alderman-Cave Milling & Grain Co.*, 2010-NMCA-110, 149 N.M. 140, 148, ¶¶ 37-38, 245 P.3d 585, 593 (N.M. Ct. App 2010) (excluding as unreliable causation testimony in a toxic exposure case where the expert "did not attempt to quantify the dose of [the chemical] received by the [plaintiff]").

Dr. Herrick offers <u>no</u> opinion on what dose of Roundup is necessary to be capable of causing NHL, *i.e.*, a minimum threshold.  In fact, he has squarely testified that he does not know the answer to this question, because he is not a toxicologist.  *See* Ex. G, Herrick (*Constantine*) Dep. at 7:24-8:24.  He further admits that he does not know—and did not endeavor to calculate—the dose of Roundup (if any) that any Plaintiff actually experienced  (*see* Ex. B, Herrick (*Canning*) Dep. at 63:14-64:12; 130:20-22; 174:5-11); Ex. C, Herrick (*Cotter*) Dep. at 48:5-9; 48:13-49:2; 124:1-8; 166:17-21; 167:7-13).

---

[5] Here, Dr. Herrick does not endeavor to establish causation.  *See* Ex. B, Herrick (*Canning*) Dep. at 47:5-15; 143:21-144:1; Ex. C, Herrick (*Cotter*) Dep. at 22:17-21.  Nor could he—he is not a toxicologist, epidemiologist, or medical doctor. *See* Ex. B, Herrick (*Canning*) Dep. at 54:1-23.  However, Plaintiffs' other specific causation expert, Dr. Boyd, relies entirely on Dr. Herrick's exposure days analysis for his conclusion that Plaintiffs received a sufficient dose of exposure of Roundup to cause their NHL.  *See, e.g.*, Ex. H, Boyd (*Cotter*) Dep. at 105:19-22; 107:8-12.

Instead of assessing dose, Dr. Herrick relies on the concept of "exposure days" as his methodology.  He admits that his exposure days methodology does not relate to the actual biological level in humans.  *See* Ex. B, Herrick (*Canning*) Dep. at 151:5-156:5; *id*. at 154:20-23 ("So it doesn't really track the exposure day and the biological level.  They can be quite different because the chemical doesn't really persist.").  He also acknowledges that exposure is different than dose (*id*. at 61:16-62:24), and that he is not offering an opinion regarding dose.  (*Id*. at 63:15-64:13; 130:20-22; 174:5-11; Ex. C, Herrick (*Cotter*) Dep. at 48:5-9; 48:13-49:2; 124:1-8; 166:17-21; 167:7-13).  Rather than assess exposure and dose (the amount of Roundup that came into contact with Plaintiffs' skin and was absorbed by it), Dr. Herrick focused exclusively on the amount of *time* Plaintiffs spent spraying Roundup.  He read litigation materials for each Plaintiff—including each Plaintiff's deposition and Plaintiff Fact Sheet—to determine the number of hours and "8-Hr Exposure Days" Plaintiffs claim to have sprayed Roundup.  *See* Ex. B, Herrick (*Canning*) Dep. at 72:20-74:7; 167:9-168:7; Ex. C, Herrick (*Cotter*) Dep. at 23:6-16.

Dr. Herrick ignores the concepts of exposure and dose entirely and uses "exposure days" as a proxy for actual exposure, which itself is a proxy for dose.  But whether measured in years, months, weeks, days, minutes, or seconds, the amount of time a person spends spraying a chemical, alone, says nothing about the amount of chemical that came into contact with that person's skin (*i.e.*, exposure), let alone the amount of chemical that the person absorbed through the skin (*i.e.,* dose)—both of which are necessary to evaluate causation in a toxic exposure case.  Simply put, Dr. Herrick's exposure days calculation simply answers the irrelevant question regarding the amount of time each Plaintiff claims he spent spraying Roundup, without quantifying or even estimating the amount of Roundup, if any, that came into contact with Plaintiffs' skin or that was absorbed by it.

Not only is this not a generally accepted methodology, it is not even a proper subject of expert testimony, as the jury is capable of hearing testimony on days of use and conducting simple math.  *See* Section III below.  The Court should reject this specific causation methodology as fundamentally unreliable and unhelpful because it disregards the concepts of

MOTION TO EXCLUDE TESTIMONY OF DR. ROBERT F. HERRICK

absorbed dose and actual exposure in favor of a formulaic "exposure days" calculation that, by definition, ignores case-specific factors bearing on exposure.

Significantly, Dr. Herrick acknowledges several factors that may reduce a person's exposure to Roundup, but admits that he failed to consider them in his analysis.  For example, Dr. Herrick admitted that Mr. Nelson wore a face mask while mixing and spraying Roundup. *See* Ex. B, Herrick (*Canning*) Dep. at 117:23-121:3.  He also admitted that a respirator mask like an N95 mask would reduce inhalational exposure to Roundup (*id*. at 120:4-121:8) and that a surgical mask would also reduce inhalational exposure to Roundup by a smaller extent.  *Id*. at 121:4-24.  However, Dr. Herrick does not know what type of mask Mr. Nelson wore.  *Id*. at 120:4-21.  And he admits that he made no adjustments to his exposure assessment to account for Mr. Nelson wearing a mask—or using other personal protective equipment like the "heavy work clothes" (*id*. at 111:23-113:4), gloves (*id*. at 113:6-23), and waterproof boots (114:21-115:24) that Mr. Nelson testified he used—while mixing and spraying Roundup:

> Q.     Dr. Herrick, did you make any adjustments to your non-time-weighted exposure assessment for Mr. Nelson based on the personal protective equipment that he stated he used while mixing and spraying Roundup?
>
> A.     No, I didn't.
>
> Q.     Dr. Herrick, did you make any adjustments to your time-weighted exposure assessment for Mr. Nelson based on the personal protective equipment that he stated he used while mixing and spraying Roundup?
>
> A.     I didn't, no.

*Id*. at 122:2-14.  The same is true for Dr. Herrick's assessment of Mr. Canning:

> Q.     Did you take -- when you were preparing your exposure estimates for Mr. Richard Canning, did you take into account the protective -- the personal protective equipment or clothing that he described?  Did you take that into account?
>
> A.     No, I didn't.
>
> Q.     And you made no adjustments to your quantitative estimates -- I'm sorry, your numerical estimates based on his personal protective equipment, is that correct?
>
> A.     That is correct, right.

*Id*. at 196:12-24.  And for Mr. Cotter, Dr. Herrick admits that his exposure days assessment would be the same even if Mr. Cotter were wearing a water repellant Tyvek suit while using Roundup, even though wearing such a suit would make his exposure far lower.  *See* Ex. C, Herrick (*Cotter*) Dep. at 96:1-7.  *See also* Background Section, above.

Dr. Herrick also testified that there is a difference between *continuous* broadcast spraying—which covers a wide area—and spot spraying, which is more targeted.  Ex. B, Herrick (*Canning*) Dep. at 182:17-183:22; 203:21-24.  He testified that Mr. Canning used a small hand pump sprayer at times 181:24-182:22; 203:16-20. But Dr. Herrick did not make any adjustments for the fact that Mr. Canning was spot spraying (rather than continuously spraying) in his residential use of Roundup because he "didn't really have that sort of detail to come up with a more refined number." *Id*. at 218:1-20.  And he admits that failure to account for the difference in spot spraying would mean that his exposure estimate could be higher than Mr. Canning's actual exposure:

> Q.   So based on the fact that Mr. Canning wasn't continuously spraying for 1.0 hours per day on his residence, that midpoint exposure estimate of 6.5 days is an overestimate, isn't that reasonable to surmise?
>
> *        *        *
>
> A.   Yeah, I would -- again, I'd have to go back to using the information that Canning provided, so I don't really have a way to quantify how he was spending his time, you know, within that one-hour period per day. So I can't really, you know, come up with a different calculation than what's here.
>
> Q.   But you do agree that his actual spraying time on his residence was actually less than 1.0 hours per day, correct?
>
> A.   Well, I --
>
> *        *        *
>
> A.   I would say it could be, but I can't really quantify how much less than an hour it would be.

*Id*. at 219:24-221:5.

There are numerous examples of similar instances of Dr. Herrick failing to consider various factors that he admits would reduce exposure, and *that Plaintiffs testified were present when they sprayed and/or mixed* Roundup.  For example:

- Dr. Herrick admits that Mr. Nelson testified he does not recall getting Roundup on his skin because of all the precautions he took.  *Id*. at 124:3-14.  However, Dr. Herrick made no adjustments to his exposure assessment of Mr. Nelson based on his testimony that he did not recall getting any Roundup or any herbicide on his skin at any time.  *Id*. at 124:15-125:9.

- Dr. Herrick admits that Mr. Nelson testified he washed his hands after every time he used Roundup.  *Id*. at 127:10-128:19.  However, Dr. Herrick did not make any adjustments to his exposure estimates based on this testimony.  *Id*. at 135:5-14.

- Dr. Herrick admits that Mr. Nelson used premixed Roundup, which he admits could reduce the risk of exposure to Roundup.  *Id*. at 139:20-141:22.  However, Dr. Herrick does not account for the type of Roundup used by Mr. Nelson.

- Dr. Herrick testified that use of a wiper applicator (like that used by Mr. Canning) would reduce inhalation exposure because it does not actually spray Roundup but instead saturates a sponge which is wiped on a weed.  *Id*. at 183:23-186:3.  However, Dr. Herrick did not make any adjustments to his exposure estimates for Mr. Canning for his use of a wiper versus a sprayer.  *Id*. at 188:24-189:4.  He also does not know what percentage of Mr. Canning's Roundup application was spraying versus wiping because Mr. Canning was not asked that question at his deposition.  *Id*. at 189:15-24.

- Dr. Herrick testified that Mr. Cotter wore leather gloves while using Roundup.  *See* Ex. C, Herrick (*Cotter*) Dep. at 92:19-93:6.  He also admitted that leather gloves would reduce dermal exposure, albeit to a small extent.  *Id*. at 94:1-16.  However, Dr. Herrick did not consider this factor, instead testifying that his exposure days assessment would have been the same whether or not Mr. Cotter was wearing leather gloves.  *Id*. at 95:19-24.

Dr. Herrick's failure to take account of confounding variables that he himself admits would reduce his exposure estimates for these Plaintiffs renders his opinions unreliable.  As this Court acknowledged when precluding other plaintiffs' experts from offering similar "junk science" specific causation testimony in the Roundup MDL, "[f]ailing to take account of likely confounders by presenting and relying upon only unadjusted (or minimally adjusted) estimates is a serious methodological concern."  *In re Roundup Prods. Liab. Lit.*, 390 F. Supp. 3d 1102, 1140 (N.D. Cal. 2018).  Dr. Herrick's opinions should be excluded.  *Id.*

**B.** **Dr. Herrick's Methodology is Also Unreliable Because It Ignores Scientifically-Accepted Methods of Calculating Dose.**

There are, in fact, scientifically accepted ways of estimating absorbed dose, even in the absence of available biological samples. Most notably, the EPA has for decades recommended a verified method to calculate dose in the absence of contemporaneous biological sampling. This methodology offers an equation to calculate internal dose to measure the amount of a substance absorbed per kilogram of body weight that provides a basis to compare human exposures with levels of toxicologic significance. *See* Ex. I, Exposure Assessment Tools by Routes – Dermal, EPA; Ex. J, Acquavella (2004). Dr. Herrick is also aware of other methods to evaluate inhalation exposure, including the Advanced Research Tool (ART methodology), which he admits would give a "more quantitative assessment" of a person's exposure. *See* Ex. B, Herrick (*Canning*) Dep. at 131:4-134:8. However, Dr. Herrick summarily dismisses this accepted methodology in favor of his own, which does not even endeavor to calculate dose.

One input in the EPA's calculation is time, or exposure duration. Dr. Herrick offers a methodology that stops there. It does not account for any additional factors, including skin surface area available for contact, body weight, exposure frequency (events/year), or exposure duration (years). *See* Ex. I, Exposure Assessment Tools by Routes – Dermal, EPA. Dr. Herrick opted against using this gold standard, and reliable methodology utilized by the EPA and numerous studies. This is not a reliable methodology on which to base a specific causation opinion in a toxic exposure case. The Court should exclude it.

Dr. Herrick's methodology also ignores relevant factors that are critical to calculating dose, including most notably the concentration of Roundup used by Plaintiff. It strains credulity to believe—as Plaintiffs assert—that the number of days Plaintiffs used glyphosate is a surrogate for actual dose when the calculation does not include the concentration of glyphosate in the herbicide used by Plaintiffs. Dr. Herrick's methodology also ignores other relevant circumstances of Plaintiffs' spraying (*e.g.,* the types of equipment Plaintiffs used, the clothing Plaintiffs wore while Plaintiffs sprayed Roundup). It is common sense to understand that dose – the amount of a substance absorbed through a person's skin – is impacted by the concentration

of the active ingredient in the substance, how much of their skin is exposed while spraying, their method of spraying, and the weather conditions during use. Beyond common sense, studies have shown this: there is a significant reduction in the risk of exposure when specific practices are adhered to, such as the use of rubber gloves. Ex. J, Acquavella (2004). Dr. Herrick's failure to consider these factors renders his opinion unreliable and not helpful to the jury. The jury could apply his methodology with a calculator or a pencil and piece of scratch paper.

**III.     Dr. Herrick's Opinions Are Not Scientific And Are Within the Knowledge of the Common Juror.**

Dr. Herrick's exposure-days methodology simply involves him reviewing the Plaintiffs' testimony (their depositions and Fact Sheets), accepting their recollection of exposure as true, and applying basic math to calculate the total number of days they claimed to have sprayed or been exposed to Roundup. *See* Ex. B, Herrick (*Canning*) Dep. at 72:20-74:7; 167:9-168:7; Ex. C, Herrick (*Cotter*) Dep. at 23:6-16.  He admitted that his analysis for a non-time weighted estimate involved only multiplication and addition, and his analysis for a time-weighted estimate involved only multiplication, addition, and division.  *See* Ex. B, Herrick (*Canning*) Dep. at 102:19-104:7; 105:7-16; 108:9-20.  His analysis and methodology starts and stops there.

But interpreting testimony and applying simple math is well within the knowledge of the common juror, and therefore is neither scientific nor helpful to the jury. To the contrary, Federal courts routinely exclude expert testimony that parrots information provided by other witnesses and applies simple math to reach a conclusion because it is improper and not helpful to a jury. *See, e.g.*, *Barajas v. Mercedes Benz USA, LLC*, No. CV 19-0070 DSF (KK), 2020 WL 10431812, at *6 (C.D. Cal. Oct. 15, 2020) ("The Court agrees with Defendant that Miller's opinions consist of little more than restating the Vehicle's repair history and the number of [d]ays the vehicle was not in use. His testimony appears in large part to be more summary testimony than expert testimony."); *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1124 (10th Cir. 2005) ("Taking a simple average of 103 numbers, though technically a statistical determination, is not so complex a task that litigants need to hire experts in order to deem the evidence trustworthy. A mathematical calculation well within the ability of anyone with a grade-school education is,

14

in our opinion, more aptly characterized as a lay opinion under Fed.R.Evid. 701."); *Ray v. AT&T Mobility LLC*, No. 2:17-CV-68 (WOB-CJS), 2020 WL 535787, at *7 (E.D. Ky. Feb. 3, 2020) ("The lay jury is endowed with the common knowledge necessary to add, divide, and multiply the figures presented by the parties without 'expert' testimony."); *Georgia Operators Self-Insurers Fund v. PMA Mgmt. Corp.*, 143 F. Supp. 3d 1317, 1338 (N.D. Ga.), aff'd, 631 F. App'x 730 (11th Cir. 2015) ("Costner presented simple, grade-school level arithmetic based on the data contained in the actuarial reports . . . Costner simply explained financial business records that were independently admitted into evidence without objection, and testified about the results of simple calculations using that data. None of this was expert testimony."); *Jones Creek Invs., LLC v. Columbia Cnty., Georgia*, No. CV 111-174, 2013 WL 12141348, at *20-21 (S.D. Ga. Dec. 23, 2013) (finding that where expert opined on dredge project cost estimates based on parroted statements of others and "the application of simple math," his estimates fell "far outside the scope of permissible expert testimony and are thus inadmissible").

At trial, the jury can rely upon its own knowledge and common sense to calculate the exposure time of Plaintiffs. In fact, this type of assessment—listening to plaintiff testimony and determining conclusions—is exactly the jury's role. And in most instances, this is a function that is better performed by a jury—unlike Dr. Herrick, who simply accepted Plaintiffs' recollection as true, the jury can evaluate the credibility of the Plaintiffs' testimony to reach its own conclusion regarding the amount of time each Plaintiff sprayed Roundup. For these reasons, Dr. Herrick's testimony is not helpful to the jury and should be excluded.

## **CONCLUSION**

The Court should grant Monsanto's motion to exclude Plaintiff's exposure expert Robert F. Herrick because his opinions are unreliable and inadmissible.

Dated: December 14, 2023

Respectfully submitted,

**BRYAN CAVE LEIGHTON PAISNER LLP**

*/s/ Linda C. Hsu*
Linda C. Hsu
Attorneys for Defendant Monsanto Company

MOTION TO EXCLUDE TESTIMONY OF DR. ROBERT F. HERRICK

1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of December 2023, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system, which sent notice of the filing to all appearing parties of record.

*/s/ Linda C. Hsu*
Linda C. Hsu

MOTION TO EXCLUDE TESTIMONY OF DR. ROBERT F. HERRICK