# EXHIBIT B

```
 1              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
 2
     **************************
 3   IN RE: ROUNDUP PRODUCTS      MDL No.
     LIABILITY LITIGATION         3:16-md-02741-VC
 4
                                  Case No. MDL No.
 5   This document relates to:    3:16-md-02741-VC

 6   Gerald and Lynne Nelson
     v. Monsanto
 7   Case No. 3:19-cv-04576-VC

 8        and

 9   Richard Canning and
     Shirley Canning v.
10   Monsanto Company, et al
     Case No. 3:19-cv-04230-VC
11
     **************************
12

13          Remote Videotaped Deposition of

14   ROBERT F. HERRICK, MS, ScD, CIH, FAIHA, held at

15   the location of the deponent, commencing at

16   10:41 a.m., on the 23rd of October, 2023,

17   before Maureen O'Connor Pollard, Registered

18   Diplomate Reporter, Realtime Systems

19   Administrator, Certified Shorthand Reporter,

20   Notary Public.

21                      - - -

22

23          GOLKOW LITIGATION SERVICES
                 877.370.DEPS
                deps@golkow.com
24
```

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    REMOTE APPEARANCES:

2

     THORNTON LAW FIRM, LLP
3    BY:    DAVID BRICKER, ESQ.
            9595 Wilshire Blvd., Suite 900
4           Beverly Hills, California 90212
            310-282-8676
5           dbricker@tenlaw.com
            Representing the Plaintiffs
6

7    THORNTON LAW FIRM, LLP
     BY:    CHRISTIAN F. UEHLEIN, ESQ.
8           101 Hyalite Ranch Lane
            Bozeman, Montana 59718
9           888-491-9726
            cuehlein@tenlaw.com
10          Representing the Plaintiffs

11

     NELSON MULLINS RILEY & SCARBOROUGH LLP
12   BY:    JAE LEE, ESQ.
            750 B Street, Suite 2200
13          San Diego, California 92101
            619-489-6187
14          jae.lee@nelsonmullins.com
            Representing the Defendants
15

16   Videographer:   Phillip Todd

17

18

19

20

21

22

23

24

Exhibit B Page - 2

1   scientist at Environmental Health &

2   Engineering, Incorporated since 2018, is that

3   correct?

4        A.    Correct, yes.

5        Q.    Since 2018, how much of your

6   professional time has been taken up by your

7   work as a principal scientist for

8   Environmental Health & Engineering,

9   Incorporated?

10       A.    Can I -- in terms of a

11  clarification, as far as professional time,

12  would you include my work on committees and

13  reviewing for scientific journals, things

14  like that?  Is that considered professional

15  time?

16       Q.    Yes.

17       A.    Oh, okay.  I'll say 25 percent

18  over the arc of, you know, the time since I

19  retired.  I would put a number around

20  25 percent working in the litigation support.

21       Q.    Dr. Herrick, what percent --

22  since 2018, what percentage of your

23  professional income has come from your work

24  as principal scientist for Environmental

Robert F. Herrick, MS, ScD, CIH, FAIHA

1        Q.      Dr. Herrick, do you have a

2    degree in epidemiology?

3        A.      No, I don't.

4        Q.      Are you an epidemiology expert?

5        A.      No.  I don't consider myself to

6    be that, no.

7        Q.      Do you have a degree in

8    biostatistics?

9        A.      No, I don't.

10       Q.      Do you consider yourself to be

11   an expert in biostatistics?

12       A.      No, I wouldn't claim that.

13       Q.      Do you have a medical degree,

14   Dr. Herrick?

15       A.      No, I don't.

16       Q.      And you don't consider yourself

17   an expert in clinical medicine, is that

18   correct?

19       A.      That's correct, I'm not an

20   expert in that.

21       Q.      And you don't have expertise in

22   medical oncology, is that correct?

23       A.      That is correct, yes.

24       Q.      Do you recall what

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    teaching and in my research, so I do have

2    some -- I don't know if I'd go so far as to

3    claim I'm exactly an expert, but I have tried

4    to understand them and use them in my own

5    practice, yeah.

6        Q.    Well, that wasn't my question.

7            Do you consider yourself an

8    expert in the Bradford Hill criteria?

9        A.    I would have to say --

10            MR. BRICKER:  Form.

11   BY MR. LEE:

12       Q.    You can answer.

13       A.    No, I don't consider that to be

14   an area of my -- where I would claim to be an

15   expert.

16       Q.    Dr. Herrick, are you a

17   toxicologist?

18       A.    No, I am not.

19       Q.    Do you have board certification

20   in toxicology?

21       A.    No, I don't.

22       Q.    Do you consider yourself an

23   expert in toxicology?

24       A.    I don't, no.

Robert F. Herrick, MS, ScD, CIH, FAIHA

1          Q.      Dr. Herrick, have you ever

2    heard of the term "genotoxicity"?

3          A.      Yes, I have.

4          Q.      Do you consider yourself an

5    expert in genotoxicity?

6          A.      No, I don't.

7          Q.      Have you ever heard of the term

8    "mutagenicity"?

9          A.      Yes, I have.

10         Q.      Do you consider yourself an

11   expert in mutagenicity?

12         A.      No, I am not.

13         Q.      Have you heard of

14   carcinogenicity?

15         A.      Yes, I have.

16         Q.      Do you consider yourself an

17   expert in clinical human carcinogenicity?

18         A.      No, I don't.

19         Q.      Dr. Herrick, have you ever

20   performed any research on chronic lymphocytic

21   leukemia?

22         A.      I'm thinking.

23                 I personally in my own

24   research, I have not.

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    assessment, is that correct?

2        A.    It is, yes.

3        Q.    And you also offer an exposure

4    assessment for Richard Canning, is that

5    correct?

6        A.    It is correct, yes.

7        Q.    Are you providing any -- well,

8    let me ask you this.

9              What is the difference -- do

10   you have an understanding of the difference,

11   Dr. Herrick, between exposure and dose?

12       A.    I do.  I think I understand the

13   difference, yeah.

14       Q.    You think or you do?

15       A.    I do.

16       Q.    What is your understanding of

17   the difference between exposure and dose?

18       A.    Well, my use of the term

19   "exposure" refers to the presence of an

20   agent, usually a chemical but it could be

21   biological or radiation or some form of

22   energy, but the point is that it's the

23   presence of that outside the body, external

24   to the body.  That's what I refer to as the

1    exposure.

2         Q.    So exposure is presence of a

3    chemical outside the body, is that correct?

4         A.    Right.  Or the agent, you know,

5    radiation or something else.  But the point

6    being it's external to the body.

7         Q.    Dr. Herrick, what is your

8    understanding of dose versus exposure?  How

9    is dose different from exposure?

10        A.    Yeah, well, I've always viewed

11   them as related concepts, the connection

12   being that the dose is the portion or the

13   characteristic of exposure that can reach a

14   site in the body and have some effect.

15        Q.    Dr. Herrick, is it reasonable

16   to say that the dose is the amount of a

17   chemical or an agent that is inside the body?

18             MR. BRICKER:  Form.

19             THE WITNESS:  It is inside the

20        body, and, you know, could even go a

21        little further and say it's the

22        characteristic of the exposure that is

23        pharmacologically active.

24             ///

Robert F. Herrick, MS, ScD, CIH, #AIHA

1    BY MR. LEE:

2         Q.    If a chemical impacts

3    lymphocytes, where does the chemical have to

4    be inside the body?  Do you have an

5    understanding of that?

6              MR. BRICKER:  Form.  And it's

7         beyond his designation in this matter.

8    BY MR. LEE:

9         Q.    Is that correct, Dr. Herrick,

10   it's beyond your designation in this matter?

11        A.    It is, and I don't feel like I

12   really can give that a confident answer.  I

13   don't really know the answer to that.

14        Q.    Dr. Herrick, are you going to

15   provide a quantitative estimate of the dose

16   of glyphosate in Mr. Gerald Nelson?

17             MR. BRICKER:  Form.

18             THE WITNESS:  No, I don't

19        really have -- you know, I wasn't

20        planning on, you know, making any

21        comment about his dose.

22   BY MR. LEE:

23        Q.    You weren't planning or you're

24   not going to?

Robert F. Herrick, MS, ScD, CIH, FAIHA

1        A.      I'm not going to.

2        Q.      Are you going to make any

3   quantitative estimate of a glyphosate-based

4   herbicide in the body of Gerald Nelson?

5                MR. BRICKER:  Form.

6                THE WITNESS:  No, I'm not.

7   BY MR. LEE:

8        Q.      Are you going to offer any

9   quantitative estimate of the dose of Roundup

10  in the body of Mr. Gerald Nelson?

11               MR. BRICKER:  Form.

12               THE WITNESS:  No, I'm not.

13  BY MR. LEE:

14       Q.      I have really the same

15  questions for Mr. Richard Canning.  Are you

16  going to be offering any quantitative

17  estimate of dose for Mr. Richard Canning?

18               MR. BRICKER:  Form.

19               THE WITNESS:  No.

20  BY MR. LEE:

21       Q.      I'm sorry, what was your

22  answer, Dr. Herrick?

23       A.      Sorry.  The answer is, no, I'm

24  not.

Exhibit B Page - 10

Robert F. Herrick, MS, ScD, CIH, FAIHA

1       A.      Okay.  I'm there.

2       Q.      You state that when people use

3   Roundup, they can be exposed in two ways, is

4   that correct?

5       A.      That's what I said, yes.

6       Q.      And one is inhale some of the

7   small liquid droplets, is that correct?

8       A.      That is correct, yeah.

9       Q.      And the other is on their skin

10  both from the droplet spray and from leaks

11  and spills when they handle the Roundup

12  solutions.

13          Do you see that?

14      A.      Yes, I do see that.

15      Q.      And you state that in Gerald

16  Nelson's case, he was exposed both ways.

17          Do you see that?

18      A.      Yes, I do.

19      Q.      So is it your opinion that

20  Mr. Nelson was exposed both with the

21  inhalation route and the -- on their skin, is

22  that correct?

23      A.      I believe he was, yes.

24      Q.      So that's inhalation exposure

**Exhibit B Page - 11**

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    mention blood, although the fact that it

2    wound up in the urine, you know, it had to

3    have been in the blood at some point.

4                    But just so the record is

5    right, you know, what I said in that third

6    paragraph had to do with the urinary

7    glyphosate, not the blood levels.

8        Q.    Well, that wasn't really my

9    question, Dr. Herrick.

10                   My question was, did you rely

11   on any glyphosate blood-level measurements in

12   forming your opinions for Mr. Gerald Nelson?

13       A.    No, I did not.

14       Q.    Now, did you measure any urine

15   levels of glyphosate for Mr. Gerald Nelson?

16       A.    No.

17       Q.    In formulating your opinions

18   for Mr. Gerald Nelson, did you rely on any

19   measurements of glyphosate in his urine?

20       A.    No, I didn't.

21       Q.    Now, in the second paragraph of

22   your report marked as Exhibit 3, Dr. Herrick,

23   you state that, in the second sentence,

24   "Mr. Nelson used two types of Roundup

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    sprayers in his commercial landscaping

2    business, and his residences."

3              Do you see that?

4         A.    I do see that, yeah.

5         Q.    What is the source of your

6    information for that statement?

7         A.    Can we go to the next page?

8    Because I think what I tried to do, and I can

9    double-check it here, is when I had that kind

10   of information, I tried to footnote where he

11   mentioned that in the -- in his deposition.

12        Q.    So you reviewed Mr. Nelson's

13   deposition transcript?

14        A.    Right.

15             And so, are we going to

16   continue?  I'm on my page 4 now where he

17   talked about using the 1-gallon ready mix,

18   and then he also used 5-gallon containers of

19   the concentrate.

20        Q.    Well, so one of your sources

21   for your exposure assessment was the

22   deposition testimony of Mr. Gerald Nelson, is

23   that correct, Dr. Herrick?

24        A.    Yes.  That is correct, yeah.

**Exhibit B Page - 13**

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    Q.    What other sources of

2    information did you use for your exposure

3    assessment for Gerald Nelson?

4    A.    Well, he had that Plaintiff

5    Fact Sheet which, you know, I think I have.

6    Yeah, this was -- this table that I have on

7    page 3, that little table there with the two

8    rows in it, that's from his Plaintiff Fact

9    Sheet.

10   Q.    Other than Mr. Nelson's

11   deposition transcript and his Plaintiff Fact

12   Sheet, did you rely on any other source of

13   information in writing his exposure

14   assessment?

15   A.    I don't think so.  I'd have to

16   double-check on Nelson.  On some of these

17   cases, there's also been a form that I've

18   seen that is the Complaint form, and

19   sometimes there's information, you know, in

20   there, but I actually don't remember if I had

21   that for Nelson or not.

22   Q.    So as you sit here today, you

23   don't have any specific recollection of

24   reviewing his legal Complaint, is that

**Exhibit B Page - 14**

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    correct?

2        A.    Well, you know, I don't

3    remember.  I'd have to double-check.  I

4    could -- you know, I could do it, but the

5    information that I've put in here I would say

6    was from his Plaintiff Fact Sheet and his

7    deposition.  Those were the primary sources.

8        Q.    Now, you stated earlier in

9    your -- in this deposition that you did not

10   interview Mr. Gerald Nelson in preparing this

11   exposure assessment for him, is that correct?

12       A.    That is correct, yeah.

13       Q.    And do you still stand by that

14   testimony that you did not interview

15   Mr. Gerald Nelson in preparing his exposure

16   assessment?

17       A.    You know, I don't believe I

18   did.  You know, my recollection could be --

19   could be false if we're, you know, going back

20   a year or so, but I don't have that

21   recollection that I actually spoke to him,

22   no.

23       Q.    Did you ever perform a site

24   visit on any of the properties on which he

**Exhibit B Page - 15**

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    exposed -- I'm sorry, to your knowledge, was

2    Mr. Gerald Nelson exposed to glyphosate or

3    Roundup during his employment at Charles T.

4    Main?

5         A.    I don't believe he was, no.

6         Q.    Next you state that Mr. Nelson

7    started his landscaping business in 1997,

8    which he operated until 2014, is that

9    correct?

10        A.    That's correct, yep.

11        Q.    To your knowledge, did

12   Mr. Gerald Nelson have any occupational

13   exposure to glyphosate or Roundup prior to

14   1997?

15        A.    I don't believe he did, no.

16        Q.    Now, you also state in the

17   chart toward the bottom of page 3 of your

18   exposure assessment that his exposure to

19   Roundup was related to IT&O, which you

20   describe as "Industrial, Turf, and

21   Ornamental."

22             Do you see that?

23        A.    I do, right.

24        Q.    What are you referring to

Robert F. Herrick, MS, ScD, CIH, PAIHA

1    there, "Industrial, Turf, and Ornamental"?

2        A.    Well, this is the terminology

3    that was in the Plaintiff Fact Sheet, and in

4    footnote 1 there, you know, this is their

5    definition of ITO.  It includes using the

6    product in areas such as golf courses,

7    nurseries, roadsides, turf management, or

8    landscaping.

9              So that's their definition.

10       Q.    You're relying on the

11   plaintiff's definition of industrial, turf,

12   and ornamental, is that correct?

13       A.    Well, the fact sheet -- I had

14   the impression, you know, this wasn't

15   something just generated by Nelson.  This is

16   a standard form, apparently, that is being

17   used in these cases, and so this is the

18   definition that they've applied to it.

19       Q.    Do you have any independent

20   expertise in herbicide exposures on

21   industrial, turf, and ornamental

22   environments?

23       A.    Well, I see people using it all

24   the time, you know, landscapers.  You know,

Robert F. Herrick, MS, ScD, CIH, FAIHA

1              Do you see that?

2       A.      Yes, I do see that.  Right.

3       Q.      And let's see.  And you stated

4   that he wasn't initially clear during his

5   deposition regarding whether he stopped using

6   it in 2014 or 2017, is that correct?

7              MR. BRICKER:  Form.

8              THE WITNESS:  I may have --

9         yeah, now that I see this, I don't --

10        I'm not 100 percent sure that I

11        remembered exactly which of the dates

12        were, you know, in question or in

13        dispute.  But I see now that, you

14        know, it apparently was from '97 to

15        2014.

16             And then this may come up

17        later, but I thought I also remembered

18        that when he was in business with --

19        in the landscaping business with

20        somebody else, he used it up until

21        2017.

22   BY MR. LEE:

23        Q.    Well, I've marked another

24   exhibit as Exhibit 5.

**Exhibit B Page - 18**

Robert F. Herrick, MS, ScD, CIH, #ANHA

1          (Whereupon, Exhibit Herrick 5

2     was marked for identification.)

3  BY MR. LEE:

4     Q.     Can you take a look at that,

5  please?  Just let me know when you are able

6  to open it, Dr. Herrick.

7     A.     Yeah, sure.

8          Okay.  I'm in 5.

9     Q.     And do you see again there is

10 this header -- I'm sorry, I've marked this

11 document as Exhibit 5.  It says, Continued

12 Videotaped and Videoconference Deposition of

13 Gerald Nelson.  This time it has a date of

14 April 7th, 2022.

15          Do you see that?

16    A.     I do, yes.  Yes, I have it.

17    Q.     Now, just to be clear,

18 Dr. Herrick, you relied upon the deposition

19 transcripts from both April 6th and

20 April 7th, 2022 in preparing your exposure

21 assessment for Mr. Nelson, is that correct?

22    A.     Right, I did.  And then I

23 thought I remembered there was actually a

24 third one.

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    Q.    Now, if you go down to
2  page 122.  Well, let me take you back to
3  page 121.  My apologies, Dr. Herrick.
4    A.    Okay.  I'm on 121.
5    Q.    Now, do you see on line 17
6  Mr. Gerald Nelson is testifying, and he
7  states, "Another landscaper took over.  I
8  worked for him for a year 2012."
9          Do you see that?
10    A.    Yes, I do see that.
11    Q.    Then there's another question
12  that follows, "So during the year that you
13  worked for the other landscaper to whom you
14  sold your business there was no spraying
15  going on through 2012?"
16          And then Mr. Nelson answers,
17  "Not for me, no."
18          Do you see that?
19    A.    I do see that, yep.
20    Q.    Was it your understanding that
21  Mr. Nelson didn't spray Roundup for a year
22  when someone else purchased that business?
23    A.    That is, I believe, what he was
24  describing in this part of his deposition,

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    yes.

2         Q.     And then in line 24 on

3    page 121, there is mention of -- Mr. Nelson

4    testifies, "In 2012 to 2017 my son had it and

5    I worked with them spraying and helping

6    them."

7              Do you see that?

8         A.     I do see that, yep.

9         Q.     So, and then further down on

10   page 122, on line 10, there's a question,

11   "Yes, you stopped using Roundup in 2014?"

12              And then Mr. Nelson answers,

13   "Well, let's clarify that a little bit if I

14   may.  I slowed down using it but I did

15   continue to use it until 2017."

16              Do you see that?

17        A.     I do see that, yeah.

18        Q.     Does that refresh your

19   recollection about Mr. Nelson's testimony

20   about whether he stopped in 2014 or 2017?

21        A.     Yeah, this is where the

22   discrepancy between 2014 and 2017 came up.

23        Q.     Was it your understanding when

24   you prepared his exposure assessment that

Robert F. Herrick, MS, ScD/CIH, #AIHA

1    answering to the best of his recollection.

2         Q.    Now, Dr. Herrick, you state in

3    your report on page -- I believe it is page 4

4    of your exposure assessment for Mr. Nelson --

5         A.    Okay, hang on.  I'm headed back

6    to it.

7         Q.    That would be great.  Just let

8    me know when you have that open again.

9         A.    Yeah, it's -- hang on.  It's

10   just -- here, page 4.  Okay.

11        Q.    Now, you write in the second

12   paragraph on page 4 of your exposure

13   assessment for Mr. Nelson that, "The

14   frequency of his Roundup use was

15   approximately 15 times a year from 2012 to

16   2017 for about the same time periods as it

17   had been before (could have been as little as

18   five to 10 minutes or as much as 30 to

19   40 minutes)."

20              Do you see that?

21        A.    I do see that.

22        Q.    Can you tell me how you work

23   with that uncertainty about the time periods

24   when you were providing your exposure

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    assessments for Mr. Nelson?

2         A.    Yeah.  If we want to, maybe the

3    best way is just go down into one of the

4    tables here, because that's where he -- you

5    know, he tended to report these things in

6    ranges, you know, when people asked him, and

7    so, you know, his response would be, you

8    know, he used it between five and 40 minutes

9    each time, and so what I tried to do then is

10   say, Okay, well, that's the range of his

11   exposures.

12             And so if we look in the table

13   here -- let's see if I can -- okay.  I'm on

14   page 8.  What I did was I tried to, you know,

15   recognize this range that he was reporting in

16   terms of, say, the hours that he used it per

17   day.

18             So if we look, say, in his --

19   let's just take residential use.  That's that

20   first row in the table.  He said he used

21   these things between five and 40 minutes each

22   time, so that's translated into that column

23   you see there where it says "Hours Used per

24   Day."  That's just converting those minutes

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    to hours.  And then you multiply those

2    together to get his total hours over the

3    course of his lifetime.

4            And so that's presented as a

5    range as well, you know, to try to

6    accommodate the fact that he used it for

7    varying periods of time each day.

8    Q.    All right.  You're using that

9    range also because his recollection was

10   uncertain about how long he may have used it

11   per day?

12           MR. BRICKER:  Argumentative.

13       Form.

14           MR. LEE:  Well, I'm asking him.

15           THE WITNESS:  You know, I mean,

16       I don't -- you know, I think what he

17       was trying to do, you know, was answer

18       the question, you know, honestly.

19           And so, you know, some days he

20       used it, it would have been five

21       minutes.  Other times he used it, it

22       was 40 minutes.  And that was, you

23       know -- he was trying to, you know,

24       capture the variability in the amount

Robert F. Herrick, MS, ScD, CIH, FAIHA

1          of time that he used it.

2   BY MR. LEE:

3          Q.     And again, he was just relying

4   only on his memory, his recollection,

5   correct?

6                 MR. BRICKER:  Form.

7                 THE WITNESS:  Yeah, he was, you

8          know, giving that information to the

9          best of his recollection.

10  BY MR. LEE:

11         Q.     Now, you -- in your assessment,

12  exposure assessment, for Mr. Nelson, you

13  provide a non- -- I'm sorry, a

14  non-time-weighted exposure estimate for

15  Mr. Nelson, is that correct?

16         A.     I have, you know, the time

17  weighted and the non-time weighted, right.

18  I've put them both in there.

19         Q.     Can you explain your

20  methodology for estimating a

21  non-time-weighted exposure for Mr. Nelson?

22  Can you explain your methodology there?

23         A.     Yeah.  It would be a matter of

24  saying, okay, you know, when the person

**Exhibit B Page - 25**

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    reported that they used Roundup or used the

2    glyphosate product, without trying to

3    consider how long they used it, we just

4    counted the number of days per season that

5    they reported any use, and then multiplied

6    that by the number of seasons, and that's

7    what gives you your non-time-weighted

8    exposure days.

9         Q.    So "per season," are you

10   referring to years or...

11        A.    Yes, right, I'm using "season"

12   and "year" synonymously.

13        Q.    So based solely on Mr. Nelson's

14   recollection, he provides you the number of

15   days that he can recall that he used Roundup

16   for over a year, is that correct?

17             MR. BRICKER:  Form.

18             THE WITNESS:  Right.  That was

19        the way, you know, he responded to the

20        question, is, you know, How many days

21        per year or per season did you use it?

22             And like in this one case we're

23        looking at here, his response was,

24        Between five and ten days per season.

Exhibit B Page - 26

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    BY MR. LEE:

2         Q.     And so you picked the number of

3    days per year that he provides to you, and

4    then you multiply it by the number of years

5    that he used Roundup, is that correct?

6         A.     That's it, yes.  That's

7    correct.

8         Q.     And the number of -- under the

9    non-time-weighted methodology, when it came

10   to the number of days that he used Roundup,

11   did it matter whether he used the Roundup for

12   1 minute or 23 hours and the 59 minutes when

13   you were counting the number of days under

14   the non-time-weighted methodology?

15              MR. BRICKER:  Form.

16              THE WITNESS:  Yeah, you're

17         conveying it correctly.  I mean,

18         basically this approach counts any day

19         of exposure as being a day regardless

20         of the duration.

21   BY MR. LEE:

22         Q.     So under the non-time-weighted

23   methodology, a day which Mr. Nelson used

24   Roundup or sprayed Roundup for 1 minute

**Exhibit B Page - 27**

1    counts the same as hypothetically if he was

2    spraying Roundup for 23 hours and 59 minutes?

3    You would just count both as one day, is that

4    correct?

5         A.    That's correct.  Under this

6    approach, a day is a day.

7         Q.    So in order to perform the

8    estimate for non-time-weighted exposure, you

9    just use addition and multiplication, is that

10   correct?

11        A.    Yeah.

12             MR. BRICKER:  Form.

13             THE WITNESS:  Yes.  It's a

14        matter of just really multiplying the

15        number of seasons by the days used per

16        season, so it's a multiplication.

17   BY MR. LEE:

18        Q.    Did you use subtraction for any

19   of your calculations for non-time-weighted

20   exposure estimate?

21        A.    I don't think so.  No, I don't

22   believe I did.

23        Q.    Did you make any other

24   adjustments with respect to non-time-weighted

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    BY MR. LEE:

2        Q.    And a full day in this

3    methodology, your methodology, was defined as

4    an 8-hour day, is that correct?

5        A.    That's right.  And I think

6    that's -- you know, that's pretty

7    conventional in industrial hygiene, you know,

8    a full workday is considered 8 hours.

9        Q.    So essentially you added up all

10   of his hours over a lifetime spraying Roundup

11   and then divided that by an 8-hour day in

12   order to provide an estimate of the total

13   number of days that he was spraying Roundup,

14   is that correct?

15       A.    Yes, that is correct.

16       Q.    So for the time-weighted

17   methodology you used addition,

18   multiplication, and then division, is that

19   correct?

20       A.    That's correct, yep.

21       Q.    Dr. Herrick, did you account at

22   all for dermal absorption rate when

23   calculating non-time-weighted exposure for

24   Mr. Nelson?

Robert F. Herrick, MS, ScD, CIH, FAIHA

1          A.      I didn't, no.

2          Q.      Did you use a dermal absorption

3    rate when you were estimating his

4    time-weighted exposure assessment?

5          A.      I did not, no.

6          Q.      So you did not make any

7    adjustment at all for dermal absorption rate,

8    is that correct?

9               MR. BRICKER:  Form.

10              THE WITNESS:  That's correct.

11        Right.

12   BY MR. LEE:

13        Q.      Dr. Herrick, did you describe

14   in your exposure assessment for Mr. Gerald

15   Nelson any of the personal protective

16   equipment he used while spraying Roundup?

17        A.      I did.  Let's just roll back

18   here.  I'm trying to just kind of scan this

19   document to see where I talked about that,

20   because he was asked about that in the

21   deposition.  Oh, gosh, where are we here?

22        Q.      Let me refer you to -- let's

23   see, it's page 1, 2, 3 -- the fourth page of

24   this document that I've marked as -- I think

1    wore, "heavy work clothes," is that correct?

2           A.     Let me just get up to my --

3    where I talked about that.

4                  Oh, here we are.  "Mr. Nelson

5    recalled that when he mixed Roundup he wore

6    heavy work clothes, a long sleeved shirt,

7    gloves, waterproof work boots, and probably

8    goggles from time to time or most of the

9    time."

10                 Right.

11          Q.     And he stated he used the same

12   precautions when spraying Roundup, is that

13   correct?

14          A.     That's what he said.  Yes, he

15   did.

16          Q.     So he basically wore the same

17   protective equipment when he was mixing

18   Roundup and spraying Roundup, was that your

19   understanding?

20          A.     I believe that's what he was

21   saying, yeah, in that part of his deposition,

22   right.

23          Q.     Now, Dr. Herrick, by wearing

24   "heavy work clothes," did Mr. Nelson

Robert F. Herrick, MS, ScD, CIH, FAIHA

1  potentially reduce his dermal exposure to

2  Roundup?

3      A.      Well, I think it's certainly

4  possible.  It would be -- you know, there

5  would be -- you'd want more detail about, you

6  know, what the nature of the work clothes

7  were.  You know, was it a cotton shirt or was

8  it, you know, like a chemical-resistant suit

9  or something like that?

10          But, you know, I think it's

11  safe to say that in general, you know, if he

12  had some sort of work clothes, that that

13  could have reduced his dermal exposure.

14      Q.      Now, in general, would wearing

15  a, "long sleeved shirt," would that also

16  potentially reduce his dermal exposure to

17  Roundup?

18          MR. BRICKER:  Form.

19          THE WITNESS:  You know, I

20      think, again, you'd want to know a

21      little more about the nature of the

22      fabric, you know, whether it was a

23      chemical-protective clothing or a

24      regular old cotton shirt.

**Exhibit B Page - 32**

Robert F. Herrick, MS, ScD, CIH, FAIHA

1            But, you know, in general you

2       would expect that, you know, having

3       the skin covered by clothing would

4       reduce the dermal contact.

5  BY MR. LEE:

6       Q.    And he also wore gloves.  In

7  general, would gloves reduce Mr. Nelson's --

8  potentially reduce Mr. Nelson's dermal

9  exposure to Roundup?

10           MR. BRICKER:  Form.

11           THE WITNESS:  Again, not to,

12      you know, be -- you know, put too fine

13      a point on it, but you would like to

14      know what the type of gloves were.

15           You know, certain gloves like

16      leather gloves or cotton gloves

17      probably wouldn't make a huge amount

18      of difference against, you know, a

19      liquid that's splashed.  If, on the

20      other hand, they were

21      chemical-resistant gloves, you know,

22      you might expect that there would be

23      greater protection.

24           ///

 1    BY MR. LEE:

 2         Q.    Do you recall what kind of

 3    gloves Mr. Nelson wore when he mixed or used

 4    Roundup?

 5         A.    I don't, you know.  And I was

 6    just, you know, thinking about this in terms

 7    of the way the question was asked in the

 8    deposition, I don't think -- you know, this

 9    was his answer, and I don't think there was

10    any, you know, follow-up, you know, to try

11    to, you know, probe for more information.

12         Q.    Did you -- when you were

13    preparing Mr. Nelson's exposure assessment,

14    did you write -- provide any written

15    questions that were to be asked of

16    Mr. Nelson?

17         A.    No.  This was all -- you know,

18    everything that I had to work with, you know,

19    was done -- was collected, you know, before I

20    started working on the case, so no.

21         Q.    Now, you also note in your

22    report that Mr. Nelson recalled using

23    "waterproof work boots" when mixing or

24    spraying Roundup.

Robert F. Herrick, MS, ScD, CIH, FAIHA

1          Do you see that?

2      A.    Let me just -- are we on the

3  same page here?

4      Q.    Yes.

5      A.    Gosh.  Yeah.  Heavy work

6  clothes, long-sleeved shirt, gloves,

7  waterproof work boots, yep.

8      Q.    Now, would waterproof work

9  boots in general reduce -- potentially reduce

10  Mr. Nelson's dermal exposure to Roundup?

11          MR. BRICKER:  Form.

12          THE WITNESS:  Potentially, I

13      think they could, yes.

14  BY MR. LEE:

15      Q.    Is it important that the work

16  boots be waterproof?

17      A.    Well, yeah, I think that's a

18  useful, you know, bit of additional

19  information, you know, compared to just plain

20  old leather, you know, work boots or

21  something.  The fact that they're waterproof,

22  you know, would, you know, increase the

23  protection compared to just, you know, plain

24  old leather boots.

Robert F. Herrick, MS, ScD, CIH, FAIHA

1            The only caveat I would, you

2       know, include in that is that, you

3       know, in the situations like

4       Mr. Nelson, you know, the Roundup

5       contains glyphosate but also includes

6       other chemicals like surfactants.

7            So, you know, the properties of

8       glyphosate alone aren't going to be,

9       you know, necessarily the only factor

10      in play.

11  BY MR. LEE:

12      Q.    Would a waterproof work boot

13  reduce dermal exposure to a water-based

14  product like Roundup?

15      A.    I think --

16            MR. BRICKER:  Form, and beyond

17      the scope.

18  BY MR. LEE:

19      Q.    You can answer.

20      A.    Sure.

21            Potentially, I think it could,

22  yes.

23      Q.    Now, you also state that

24  Mr. Nelson recalled using goggles from time

Robert F. Herrick, MS, ScD, CIH, #APHA

1    to time when mixing or using -- spraying

2    Roundup, is that correct?

3         A.    Yeah, I do remember him

4    mentioning that.  Probably goggles from time

5    to time or most of the time, right, that's

6    what he said.

7         Q.    Did you have an understanding

8    what kind of goggles he was referring to?

9         A.    You know, I didn't.  And, you

10   know, there was no follow-up to, you know,

11   kind of probe for more information, so I

12   don't really know of any details about the

13   goggles.

14        Q.    For plastic goggles, would that

15   have the potential to reduce Mr. Nelson's

16   dermal exposure to Roundup?

17        A.    Well, I think in general, you

18   know, we find that, you know, the amount of

19   skin surface that goggles actually cover is

20   pretty small, you know, so the goggle was

21   more, you know, an eye protective device, you

22   know, for splashes of the liquid or

23   something.

24              So, you know, there could be

**Exhibit B Page - 37**

1    some, you know, small protection there, but

2    that, I don't think, would be the reason for

3    wearing the goggles.

4         Q.    Now, you also report, "He also

5    stated that he usually wore a mask."

6              Do you see that?

7         A.    I do see that, yep.

8         Q.    Now, what kind of mask -- well,

9    let me ask you this.

10             What was your understanding of

11   the type of mask that was being referred to

12   there?

13        A.    Yeah, again, it was one of

14   those questions that, you know, there wasn't

15   really any follow-up on it.

16             You know, it would be important

17   to know if it were, you know, like a surgical

18   mask as opposed to a real respirator like an

19   N95.  You know, that makes a huge difference

20   in the amount of protection that is provided.

21   You know, it's just one of the sad lessons

22   from COVID, right, that everybody, I think,

23   now understands the difference between a

24   surgical mask and a respirator.

1          But in any case, you know, he

2     didn't really specify, so there isn't any

3     more detail than what we have here.

4          Q.     Now, so was it your

5     understanding that Mr. Nelson was referring

6     to a face mask that covered his nose and

7     mouth?

8          A.     Yeah, I -- you know, I wouldn't

9     want to -- I'd have to be speculating, you

10    know, if -- you know, you may have had this

11    experience.  You can walk down the aisle in a

12    Home Depot and there's all kinds of devices

13    there that are, you know, face masks, some of

14    which, you know, wouldn't be very effective,

15    and then others like an N95, you know,

16    actually are more like real respirators.

17          So, you know, without having

18    any more information from Nelson about, you

19    know, the particular type, I don't really

20    feel like I could give you a good answer to

21    that question.

22          Q.     Would an N95 face mask reduce

23    inhalational exposure to Roundup?

24          A.     I think especially if you were,

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    you know, spraying it from a backpack, the

2    N95 would reduce the inhalation exposure,

3    yes.

4          Q.    Could even a regular surgical

5    mask reduce inhalational exposure to Roundup?

6                MR. BRICKER:  Form.

7                THE WITNESS:  By a much smaller

8          extent.

9                And I think, you know, that's

10         why, you know, I tried to reference it

11         back to what's going on with COVID,

12         that people, you know, are beginning

13         to appreciate that the surgical mask,

14         you know, is actually meant to keep

15         droplets from being released from the

16         exhaled breath of the person who is

17         wearing it, not to filter particles in

18         the air out, which is why it's such a

19         controversy now about whether the

20         surgical mask is good protection from

21         COVID.  And, you know, the data

22         indicates that it really isn't because

23         it's not designed to filter out those

24         particles.

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    BY MR. LEE:

2         Q.    Dr. Herrick, did you make any

3    adjustments to your non-time-weighted

4    exposure assessment for Mr. Nelson based on

5    the personal protective equipment that he

6    stated he used while mixing and spraying

7    Roundup?

8         A.    No, I didn't.

9         Q.    Dr. Herrick, did you make any

10   adjustments to your time-weighted exposure

11   assessment for Mr. Nelson based on the

12   personal protective equipment that he stated

13   he used while mixing and spraying Roundup?

14        A.    I didn't, no.

15        Q.    Let me mark another exhibit for

16   you, Dr. Herrick.

17               (Whereupon, Exhibit Herrick 6

18        was marked for identification.)

19        A.    Is this Number 5?

20   BY MR. LEE:

21        Q.    I'll tell you in a moment.

22               MR. BRICKER:  No.  It will be

23        6.

24               THE WITNESS:  Okay.

**Exhibit B Page - 41**

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    a question on page 135, line 8?

2        A.    I see it.  Right.

3        Q.    Now, the question is, "Do you

4    have any recollection of getting Roundup or

5    any herbicide on your skin at any time?"

6              And then Mr. Nelson answers, "I

7    don't have any recollection of that at all,

8    no."

9              And then the question is,

10    "Okay.  And is that because you took all of

11    the precautions that we just discussed?"

12              And Mr. Nelson answers, "Yes."

13              Do you see that?

14        A.    I do see that, right.

15        Q.    Now, did you make any

16    adjustments to your non-time-weighted

17    exposure assessment for Mr. Nelson based on

18    the fact that he doesn't have any

19    recollection of getting Roundup or any

20    herbicide on his skin at any time?

21              MR. BRICKER:  Form.

22              THE WITNESS:  No, I didn't do

23        any adjustments.

24              ///

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    BY MR. LEE:

2        Q.    Did you make any adjustments to

3    your time-weighted exposure assessment for

4    Mr. Nelson based on his testimony under oath

5    that he did not recall getting any Roundup or

6    any herbicide on his skin at any time?

7                MR. BRICKER:  Form.

8                THE WITNESS:  Again, no, I

9        didn't do an adjustment.

10   BY MR. LEE:

11       Q.    Let me mark another exhibit for

12   you, which I'll mark as Exhibit 7.

13               (Whereupon, Exhibit Herrick 7

14       was marked for identification.)

15   BY MR. LEE:

16       Q.    Just let me know when you get

17   that, Dr. Herrick.

18       A.    Okay.  Another -- this is still

19   deposition?

20       Q.    Yes.  And again, this is

21   another excerpt from the April 7th, 2022

22   transcript.

23               Do you see that?

24       A.    I do, yes.

1    report -- I'm sorry, Exhibit 3, your report

2    for Mr. Nelson, and if you can go back to

3    page 4.

4         A.    Let's see.  Is that my report?

5         Q.    Yes.

6         A.    Hang on.

7               Okay.  Page 4?

8         Q.    Yes, the fourth page of this

9    exhibit.

10              And then you -- in the last

11   paragraph on the fourth page of Exhibit 3,

12   you write, "When asked about instances when

13   he got Roundup on himself, Mr. Nelson stated

14   that he washed his hands after every time he

15   used Roundup regardless of whether he got it

16   on his skin or not."

17              Do you see that?

18        A.    I do, yeah.

19        Q.    Now, with a water-based product

20   like Roundup, is washing hands effective in

21   getting -- reducing dermal exposure to

22   Roundup?

23        A.    You know, I'd have -- you know,

24   I think potentially -- you know, I haven't

1    really tried to look at that specifically,

2    so, you know, I don't feel like I can, you

3    know, give you a real good answer to that.

4          Q.     Now, if Mr. Nelson had any

5    Roundup on his hands, would washing his hands

6    remove whatever Roundup was still on his

7    skin?

8                MR. BRICKER:  Form.

9                THE WITNESS:  You know, again,

10          I don't know that I'm really in a

11          great position to try to give you a

12          good answer to that, I mean, partly

13          because as we, you know, talked about

14          earlier, Roundup has several

15          ingredients, and I don't know that I

16          could really generalize about, you

17          know, how effective handwashing with

18          water would be at removing all of

19          those.

20    BY MR. LEE:

21          Q.     Is that beyond your area of

22    expertise, Mr. Herrick -- I'm sorry,

23    Dr. Herrick?

24                MR. BRICKER:  Certainly beyond

Robert F. Herrick, MS, ScD, CIH, FAIHA

1        A.     No, I didn't.  It was, you

2   know, outside the scope of, you know, the

3   question that I was addressing.

4        Q.     Dr. Herrick, can you summarize

5   the question that you were addressing when

6   you prepared Mr. Nelson's exposure

7   assessment?  What question specifically were

8   you addressing?

9        A.     Oh, well, yeah --

10             MR. BRICKER:  Form.

11             THE WITNESS:  -- it was pretty

12        simple.  It was that they -- you know,

13        the question was could I prepare a

14        lifetime exposure history for Nelson

15        for both the time-weighted and the

16        non-time-weighted days of lifetime

17        exposure, so that was the question I

18        was responding to.

19   BY MR. LEE:

20        Q.     You weren't asked to provide a

21   quantitative dose estimate for Mr. Nelson?

22        A.     I was not, no.

23        Q.     And you mentioned in your

24   report that Mr. Nelson was also exposed to

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    Roundup by the inhalational route, is that

2    correct?

3         A.    That is correct, yes.

4         Q.    Dr. Herrick, are you familiar

5    with a methodology called the advanced

6    research tool, or ART, A-R-T, methodology?

7         A.    I am, yes.

8         Q.    And do you have an

9    understanding whether the ART methodology is

10   a methodology for estimating inhalational

11   exposure to a chemical?

12        A.    Yes, it is.  That's what it's

13   designed for.

14        Q.    Were you asked to provide a

15   quantitative estimate of inhalational

16   exposure for Mr. Nelson using the ART

17   methodology, A-R-T methodology?

18        A.    No, I wasn't.

19        Q.    When you were preparing this

20   exposure assessment for Mr. Nelson, did you

21   have an understanding of the input variables

22   that you would need in order to provide a

23   quantitative assessment using the ART

24   methodology?

Robert F. Herrick, MS, ScD, CIH, #AIHA

1              MR. BRICKER:  Form and scope.

2              THE WITNESS:  The answer is,

3         yes, I've used the ART approach in the

4         past, and so I have an understanding

5         of what the inputs are.

6    BY MR. LEE:

7         Q.    What inputs are there for the

8    ART methodology?

9              MR. BRICKER:  Objection.  Form,

10        beyond the scope.

11             THE WITNESS:  It depends on the

12        particular exposure scenario that, you

13        know, you're trying to develop the

14        estimate for.  The model has inputs

15        for the nature of the material, how

16        it's being handled, if it's being

17        sprayed, you know, what sort of

18        pressure is being used for the

19        spraying.  If it's spraying, is it

20        indoors or outdoors, the ambient

21        temperature.

22             There's probably a couple

23        others that I'm not thinking of right

24        off the top of my head, but those are

1          the kinds of -- oh, the volume that's

2          being sprayed, whether it's, you know,

3          low volume or something of a higher

4          volume in terms of the amount sprayed

5          per minute.

6                    Those are the main inputs that

7          you need to be able to feed to the

8          model.

9     BY MR. LEE:

10         Q.    Did you have that input

11    information available to you for Mr. Nelson

12    when you were preparing his exposure

13    assessment?

14                   MR. BRICKER:  Form, and beyond

15         the scope.

16                   THE WITNESS:  No, I didn't have

17         it.  And, you know, given the question

18         I was responding to, I didn't need it.

19    BY MR. LEE:

20         Q.    If you had all the necessary

21    input information, would the ART methodology

22    have provided a more precise inhalational

23    exposure assessment for Mr. Nelson?

24                   MR. BRICKER:  Form, beyond the

1          scope, argumentative.

2     BY MR. LEE:

3          Q.     You can answer.

4          A.     Sure.

5               I don't think I would use the

6     word "precise," but I think, you know, we

7     could say that the ART model would give you a

8     more quantitative assessment of his exposure.

9          Q.     Have you ever described in the

10    past, in your past testimony in Monsanto

11    litigation, these time-weighted and

12    non-time-weighted exposure day estimates as

13    semi-quantitative?  Have you ever described

14    it that way?

15               MR. BRICKER:  Form, calls for

16          speculation.

17               THE WITNESS:  I was just trying

18          to remember.  The only other time, you

19          know, I used this approach was on

20          Cotter, and, you know, I don't

21          actually remember using the term

22          "semi-quantitative."  I don't think I

23          used that term.

24               We could check Cotter, for

1          sure, but, you know, just as I sit

2          here, I don't remember characterizing

3          him that way.

4     BY MR. LEE:

5          Q.     Dr. Herrick, did you make any

6     adjustments to your non-time-weighted

7     exposure assessment for Mr. Nelson based on

8     his stated habit of washing his hands after

9     every time he used Roundup?

10         A.     No, I didn't.

11              MR. LEE:  I've marked an

12         exhibit which is now Exhibit 8.

13              (Whereupon, Exhibit Herrick 8

14         was marked for identification.)

15    BY MR. LEE:

16         Q.     And just let me know when you

17    see Exhibit 8.

18         A.     Sure.  I'm looking.

19              Okay.  I have it.

20         Q.     And do you see on the first

21    page the title is Zoom Deposition of Gerald

22    Nelson with a date April 8th, 2022?

23         A.     I do.

24         Q.     And the deposition transcript

Robert F. Herrick, MS, ScD/CIH, #ANNA

```
 1    on his skin was a fairly rare event?  Was

 2    that your understanding when you prepared his

 3    exposure assessment?

 4              MR. BRICKER:  Form.

 5              THE WITNESS:  Yeah, he, you

 6         know, referred to it as something that

 7         happened, what did he say here, one

 8         half of a trillionth of a percent, so

 9         I would say that would be rare.

10    BY MR. LEE:

11         Q.    Going back to your report,

12    page 5 of your report marked as Exhibit 3.

13         A.    I'm looking.  Hang on a sec.

14               Okay.  I'm there.

15         Q.    Now, in the last paragraph on

16    page 5 of your report -- now, I'm referring

17    to the page 5 that is at the right lower-hand

18    corner.

19         A.    Yes, got it.

20         Q.    You wrote that, "Mr. Nelson

21    recalled using pre-mixed Roundup at his

22    residence."

23               Do you see that?

24         A.    I do see that, yes.
```

Robert C. F. Herrick, MS, SCD, CIH, #AIHA

1    Q.    What are you referring to

2    there, "pre-mixed"?

3    A.    Oh, if I remember it, this

4    would be when he bought the, what is it, you

5    know, sort of the Windex size -- or, no,

6    actually it may have been the larger size.

7    Let me just see if I can refresh my memory

8    here.  This was the stuff he bought over the

9    counter.

10            I'm sorry, I'm kind of blanking

11    on the size of the container, whether it was

12    the, you know, sort of two-and-a-half gallon

13    size sprayer or if it was the little Windex

14    bottle size.  And actually, it's possible he

15    didn't even mention that.  I just don't

16    remember it.

17            But this is, you know, what he

18    said about buying the premix.

19    Q.    So with premix Roundup,

20    Mr. Nelson didn't have to mix the Roundup

21    with water, is that correct?

22    A.    Yeah, exactly right.  That's

23    correct.

24    Q.    Now, does using a premixed

Exhibit B Page - 53

1  version of Roundup, does that potentially

2  reduce the risk of dermal exposure to

3  Roundup?

4      A.    I think you could say that

5  potentially, yeah, because it doesn't require

6  that you, you know, mix the concentrate with

7  the water and so it's -- you know, there's

8  one less step there involved in the

9  preparation.

10      Q.    And could using a premixed

11  Roundup potentially reduce the risk of

12  inhalational exposure to Roundup?

13      A.    That wouldn't be -- you know, I

14  think we'd have to look at that a little more

15  carefully, because, you know, you are

16  generating the liquid spray, you know, the

17  aerosol, whether you'd mix it up and put it

18  in the backpack or whether you, you know, use

19  the premix.  I think we'd have to, you know,

20  drill down on that a little bit further

21  before we could, you know, draw any real good

22  conclusion about the inhalation.

23      Q.    Now, Dr. Herrick, are you

24  familiar with the term "spot-spraying,"

1        it would, I think, depend a little bit

2        on where the weed was that he wanted

3        to kill.

4              You know, if it were, like, in

5        a flower bed or up against a wall or

6        something, you know, he might take a

7        different approach than if it was, you

8        know, right out there in the middle of

9        his lawn.

10             But, you know, that would be

11       the idea, you were just trying to, you

12       know, apply it to that very restricted

13       area.

14  BY MR. LEE:

15       Q.     Now, Dr. Herrick, on page 6 of

16  your exposure assessment for Mr. Nelson, you

17  have a statement regarding six epidemiologic

18  studies.

19             Do you see that?

20       A.     Yes, I do, right.

21       Q.     As you testified earlier you're

22  not providing any opinions on whether Roundup

23  caused Mr. Nelson's cancer, is that correct?

24       A.     That is correct, I'm not

Robert F. Herrick, MS, ScD, CIH, AIHA

1    providing that kind of opinion.

2         Q.    On page 7 of your exposure

3    assessment, you cite a paper by Eriksson et

4    al.

5              Do you see that?

6         A.    Let me just get down to it

7    here.

8              Yes, I do.

9         Q.    And I believe in the Cotter

10   deposition you mentioned that the Eriksson

11   paper had the basic methodology for the

12   exposure assessment that you used for

13   Mr. Nelson's exposure assessment, is that

14   correct?

15        A.    For the time-weighted estimate,

16   yeah, that's the approach I used, was what

17   Eriksson followed.

18        Q.    Now, if you go to, I believe

19   it's page 8 of your exposure assessment for

20   Mr. Nelson, you have two charts, I believe.

21        A.    Right.

22        Q.    Now, can you -- I believe you

23   touched upon this earlier, but can you

24   explain what you're referring to when you are

1   Deposition of:  Robert F. Herrick, Doctor of

2   Science, and the date September 6, 2022, is

3   that correct?

4        A.    It is.

5        Q.    And you testified or referred

6   to earlier in this deposition about

7   testifying in the Cotter matter, C-O-T-T-E-R,

8   is that correct?

9        A.    It is.

10       Q.    Is this the deposition

11  testimony that you were referring to earlier,

12  Dr. Herrick?

13       A.    Yes, it looks like it.

14       Q.    Okay.  I'll represent to you

15  again, this is an excerpt from that

16  transcript just to facilitate ease of use on

17  this remote platform.

18       A.    Okay.

19       Q.    If you could take a -- go to

20  page 82, and I'm referring to the -- I'm

21  sorry -- yes, page 82, and I'm referring to

22  the lower right-hand corner page number of

23  Exhibit 9.

24       A.    Okay.  I'm on it.

Robert F. Herrick, MS, ScD, CIH, FAIHA

1       Q.      Now, you'd been asked a

2   question, and if you go to line 16, you were

3   answering, "Like, just to take an example,

4   you know, you might use lifetime exposure

5   days to lead because lead tends to accumulate

6   whereas if something is much more short-lived

7   in the body and tends to be excreted quickly,

8   the exposure days, you know, might not be

9   such a meaningful exposure variable."

10              And then -- do you see that?

11      A.      I do, yep.

12      Q.      And then there's a further

13  question, "Okay.  And is glyphosate a

14  compound that's excreted quickly from the

15  body?"

16              And then you answer, "Yeah,

17  that was actually one I was thinking of that

18  it's -- it doesn't really tend to accumulate.

19  So, you know, you might not find that the

20  exposure day metric relates very well to the

21  biological level."

22              Do you see that, Dr. Herrick?

23      A.      I do, yes.

24      Q.      Now, is it still your

1    understanding today that glyphosate is a

2    compound that's excreted quickly from the

3    body?

4             MR. BRICKER:  Form.  It lacks

5         foundation, misstates his testimony.

6             THE WITNESS:  Well, that's my

7         recollection.  And in particular, what

8         I was thinking of when we had that

9         conversation was that study by Pierce

10        where they did consecutive urine

11        samples after exposure and they

12        tracked the elimination of the

13        glyphosate from the body.

14   BY MR. LEE:

15        Q.    And, Dr. Herrick, why do you

16   state in this testimony that for a compound

17   like glyphosate, you might not find that

18   exposure day metric relates very well to the

19   biological level?  Can you explain what

20   you're talking about there?

21            MR. BRICKER:  Well, I'm going

22        to object.  This is a completely

23        improper use of deposition testimony.

24            You've given him an excerpt,

Robert F. Herrick, MS, ScD, CIH, PAIHA

1          you focused him on one thing.  The

2          discussion that was being had in this

3          deposition was on biomonitoring, not

4          on exposure day assessment.

5               So if you want to give him the

6          whole deposition to review in another

7          case, that's fine.  Otherwise, this is

8          entirely improper.

9     BY MR. LEE:

10         Q.    You can answer the question,

11    Dr. Herrick.

12         A.    Okay.  Well, to try to, like,

13    put a little bit of point on it, the way the

14    Pierce study was done, if you were to take a

15    look at the biological level, say, on day 5

16    after exposure, what's left after day 5 might

17    not relate very well to what the exposure was

18    on day 1 because this particular compound

19    tends to be mobilized and leave the body.

20              So it doesn't really track the

21    exposure day and the biological level.  They

22    can be quite different because the chemical

23    doesn't really persist.

24         Q.    And by "biological level," what

1    are you referring to there, Dr. Herrick?

2         A.     Well, like in this case, the

3    biological level --

4               MR. BRICKER:  Bob, I'm sorry,

5         let me just object to form, and that

6         this is beyond the scope of your

7         designation in this case.

8               Go ahead.

9               THE WITNESS:  Okay.

10              Well, in this case what they

11        were looking at was the excretion of

12        the glyphosate in the urine, so that's

13        the biological level that we were

14        talking about, you know, in this

15        deposition.

16   BY MR. LEE:

17        Q.     And was the glyphosate level in

18   the urine, is that a -- was that a proxy for

19   the glyphosate level in the blood?

20        A.     You know, they --

21              MR. BRICKER:  Form.

22              THE WITNESS:  I'm sorry.

23              Yeah, sure.  They didn't try

24        to, you know, directly make that

1          connection, but there is clearly a

2          linkage between the two.  The

3          glyphosate, you know, is in the blood.

4          It winds up getting processed, you

5          know, I'm thinking, through the liver

6          and kidneys and excreted in the urine.

7    BY MR. LEE:

8          Q.    And so when you testified here

9    in the Cotter deposition that, "you might not

10   find that the exposure day metric relates

11   very well to the biological level," you're

12   stating that the exposure day metric may not

13   correlate very well with the level of

14   glyphosate in the urine, is that correct?  Am

15   I understanding that correctly?

16         A.    Yeah, that's what this

17   conversation in this deposition was engaging,

18   and so what you just described, you know,

19   essentially restating the point I was trying

20   to make here.

21         Q.    Dr. Herrick, let me give you

22   another document that I'll mark as

23   Exhibit 10.

24                ///

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    second paragraph.

2        A.    Yes, I see it.  That is what I

3    said.

4        Q.    And when you refer to "exposed

5    both ways," you are talking about dermal

6    exposure and inhalational exposure, is that

7    correct?

8        A.    That's correct, yes.

9        Q.    And what documents did you

10    review in order to prepare your opinions in

11    your report marked as Exhibit 12?

12        A.    This would have been the

13    Canning deposition and the Plaintiff Fact

14    Sheet.  And again, I don't remember if there

15    was a Complaint document that was in the

16    package that I looked at for this one.  If

17    there was, I used that as well.  But those

18    would be the sources of information.

19        Q.    So other than the Richard

20    Canning deposition transcript, the Plaintiff

21    Fact Sheet for Mr. Richard Canning, and

22    possibly the Complaint, did you rely upon any

23    other documents in preparing this exposure

24    assessment for Mr. Canning?

**Exhibit B Page - 63**

1    A.    No.  Just those studies that we

2    had talked about earlier for Nelson, those

3    studies that talked about the methods of

4    calculating the time-weighted and the

5    non-time weighted lifetime exposures, you

6    know, I relied on their methods, but that was

7    all.

8    Q.    Are all the articles and

9    publications that you relied upon to prepare

10   your exposure history for Mr. Canning, are

11   they listed in your report marked as

12   Exhibit 12?

13   A.    Yeah, they are, with, again,

14   the same exception as we talked about

15   earlier.  I also refreshed my memory on that

16   Covle report that's referenced in the

17   Andreotti article.

18   Q.    Did you interview Mr. Richard

19   Canning in order to prepare his exposure

20   history?

21        MR. BRICKER:  Form.

22        THE WITNESS:  I didn't.

23   BY MR. LEE:

24   Q.    You did not?

1    respect to his exposure, correct?

2                MR. BRICKER:  Form.

3                THE WITNESS:  Yes.

4    BY MR. LEE:

5        Q.    Now, in your report for

6    Mr. Richard Canning marked as Exhibit 12, you

7    mention in the third paragraph on page 2

8    blood levels of glyphosate.

9                Do you see that?

10       A.    I'm looking here.  Oh, that

11   first sentence, "Research has shown,"

12   etcetera?

13       Q.    Yes.

14       A.    Yes.

15       Q.    Did you rely on any

16   measurements of blood levels of glyphosate in

17   Mr. Richard Canning to prepare his exposure

18   history?

19       A.    I did not.

20       Q.    Did you rely on any urine

21   levels of glyphosate in preparing

22   Mr. Canning's exposure history?  And I'm

23   talking about measurements of Mr. Canning's

24   urine.

Exhibit B Page - 65

1        A.      Right, I understand.

2                No, I didn't.

3        Q.      You prepared an employment

4    history for Mr. Richard Canning, is that

5    correct?

6        A.      I did, yes.

7        Q.      And this is based on a

8    Plaintiff Fact Sheet for Mr. Richard Canning?

9        A.      Let me take a look.  I think

10   the -- yeah, this table that we're looking at

11   here on page 3, that was reported in his

12   Plaintiff Fact Sheet.

13       Q.      Now, you also relied on

14   Mr. Richard Canning's November 23rd, 2021

15   deposition for his employment history, is

16   that correct?

17       A.      I did.

18       Q.      Did you rely on any other

19   sources of information to compile Mr. Richard

20   Canning's employment history?

21       A.      No, I don't believe I did.  The

22   only thing -- as I mentioned before, I can't

23   remember if there was a Complaint document in

24   this package or not, but what I relied on

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    containers.

2              So I didn't have the feeling

3    that that was a substantial source of

4    exposure.

5         Q.    Dr. Herrick, for Mr. Richard

6    Canning's exposure history, you provided a

7    non-time-weighted exposure estimate, is that

8    correct?

9         A.    That is correct, yeah.

10        Q.    And you also provided a

11   time-weighted estimate of his exposure, is

12   that correct?

13        A.    Yes.

14        Q.    Is the methodology that you

15   used for the exposure assessment for

16   Mr. Richard Canning, is that the same as the

17   methodology that you described for

18   Mr. Nelson's exposure assessment?

19        A.    It is, yes.

20        Q.    Are there any differences

21   between the methodologies that you employed

22   for Mr. Richard Canning's exposure assessment

23   versus Mr. Gerald Nelson's?

24        A.    No, the methods and approach

Robert F. Herrick, MS, ScD, CIH, PAIHA

1    were the same.  There were some differences

2    in, you know, the way they tended to report

3    their patterns of use, but the methods were

4    the same.

5          Q.    Dr. Herrick, for Mr. Richard

6    Canning's exposure assessment, you did not

7    quantitate a dose estimate, is that correct?

8          A.    That's correct, I didn't --

9                MR. BRICKER:  Form.

10               THE WITNESS:  -- quantitate

11         those.

12   BY MR. LEE:

13         Q.    Were you asked to provide a

14   quantitative dose estimate for Mr. Richard

15   Canning?

16         A.    No, I wasn't.

17         Q.    Do you recall our earlier

18   discussion of the ART method for inhalational

19   exposure?

20         A.    I do recall that, yes.

21         Q.    Were you asked to perform a

22   quantitative estimate of inhalational

23   exposure for Mr. Richard Canning using the

24   ART methodology?

1      A.      No, I wasn't asked to do that.

2      Q.      Based on your report marked as

3  Exhibit 12 -- I believe it's 12 -- what

4  employment was -- what part of his employment

5  history was the main exposure to Roundup?

6              MR. BRICKER:  Form.

7              THE WITNESS:  Well, mainly

8          it's, if we go back to that table in,

9          I guess it's page 2, that Scorton

10         Cranberry Company, East Sandwich,

11         Mass, that was his business.  That's

12         what he did as far as

13         cranberry-growing, and that's where he

14         applied the Roundup.

15  BY MR. LEE:

16     Q.      And he started the Scorton

17  Cranberry Company in 1984, is that correct?

18     A.      Yeah, that's what my -- I

19  recall from the deposition, I think it was,

20  or maybe it was the fact sheet, that he

21  bought 15 acres in 1984, and that's how he

22  got started.

23     Q.      To your knowledge, was

24  Mr. Richard Canning exposed to Roundup or

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    know, this to see if I could get a -- you

2    know, kind of get a visual image of what he

3    was using.  I don't remember.  I don't

4    remember it.

5         Q.    As you sit here in the

6    deposition today, are you able to describe

7    the Tomahawk Pro Series sprayer at all?

8         A.    I -- you know, I didn't

9    really -- I don't have a recollection of

10   finding, and truthfully I can't remember if

11   I, you know, tried to Google it and see.

12             I have a -- you know, I have

13   seen gas-powered 5-gallon backpack sprayers.

14   I can't generalize as to, you know, how

15   representative that would be of what the

16   Tomahawk looked like, I'm afraid.

17        Q.    So as you sit here today, you

18   have no specific recollection of reading a

19   description of the Tomahawk Pro Series 5

20   Gallon Gas Power sprayer, is that correct?

21        A.    That's correct.  I don't

22   remember -- if I found it, I don't remember

23   what it said about it.

24        Q.    In the next sentence you write

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    that Mr. Canning used, "a small hand pump

2    sprayer as well."

3                Do you see that?

4        A.      Right.  I do, yep.

5        Q.      Can you describe what you were

6    referring to by "small hand pump sprayer"?

7        A.      Yeah, because he talked about

8    it -- I don't have it in my footnote here,

9    but as I recall, you know, he was asked about

10   the different types of sprayers, and

11   sometimes when he was working in the ditches,

12   you know, he needed something that was

13   smaller and lighter that he could, you know,

14   hold in his -- just in one hand and spray

15   with the other, and so that was what he used

16   the little hand pump sprayer for.

17       Q.      Did you have an understanding

18   when you prepared this report of whether the

19   small hand pump sprayer provided spot

20   spraying or continuous spraying, or both?

21       A.      You know, he didn't -- again,

22   he didn't use the term "spot-spraying," if I

23   remember correctly.  But, you know, just

24   given the size of the little hand pump

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    sprayer, you know, it would be more likely

2    that he used that for more targeted spraying

3    rather than, you know, the more, sort of,

4    broadcast spraying like you would with the

5    Tomahawk power sprayer.  It's a different

6    sort of target area.

7          Q.    So if I understand you

8    correctly, the small hand pump sprayer may be

9    a shot of Roundup rather than a continuous

10   spray of Roundup?

11         A.    Yeah, you know, because I've

12   used these little sprayers myself, and so

13   you, you know, have a handle on the top, and

14   you pump it, you know, 20 times or something

15   and it pressurizes the tank, and so you've

16   got, you know, some period of time or number

17   of times you can spray before you have to

18   stop and pump it up again.

19              So, you know, it isn't really

20   designed for, you know, a wide area of

21   broadcast spraying.  It's more a matter of

22   spraying a particular targeted area.

23         Q.    If you go to page 5 of your

24   report for Mr. Canning, in the first sentence

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    you note, "When he used Roundup in the bog

2    itself, he applied it with a wiper"...

3              Do you see that?

4         A.    I do, yes.

5         Q.    And then you specify, "a Drift

6    Free Red Devil Weed Wiper."

7              Do you see that?

8         A.    I do, yes.

9         Q.    Are you able to describe what a

10   wiper applicator is, or sprayer?

11        A.    Yeah.  Well, this device, he

12   didn't -- maybe he did.

13             Some people refer to it as a

14   hockey stick, and some models do tend to look

15   like a hockey stick in the sense that they

16   have a handle.  And then the area that

17   corresponds to where the blade of the hockey

18   stick would be is kind of a sponge-type

19   device, and the solution that you're applying

20   is in the handle.  It's a hollow-tube handle.

21             And it flows down the handle,

22   it comes out through this sponge, and if

23   you're using it to kill weeds, you wipe the

24   foliage, you know, the leaves and the stems

Robert F. Herrick, MS, ScD, CIH, #AIHA

1    of the weed with the sponge, and it deposits

2    whatever your agent, your chemical you're

3    trying to apply, is on the vegetation, so

4    that's how the wiping is done.

5         Q.    I see.

6               So the wiper doesn't actually

7    spray Roundup, it saturates a sponge with

8    which you can then wipe it on a weed?

9         A.    That's a fair explanation, I

10   think, yeah.

11        Q.    Does the use of such a wiper

12   decrease the potential for inhalational

13   exposure?

14        A.    You know, I think --

15        Q.    With a sprayer.

16             MR. BRICKER:  Let me object to

17        form, and it's beyond the scope of his

18        designation.

19   BY MR. LEE:

20        Q.    You can answer, if you can.

21        A.    Okay.  Well, I've never really

22   seen any data that would directly, you know,

23   answer that question, but I think, you know,

24   it's certainly plausible that because the

Robert F. Herrick, MS, ScD, CIH, FAIHA

```
 1    wiper, you know, isn't generating spray like
 2    a sprayer does, you could definitely have
 3    less inhalation from the use of the wiper.
 4          Q.     Now, you report that, in the
 5    middle of that paragraph on page 5, "When he
 6    sprayed, he did it for two or three hours at
 7    a time."
 8                Do you see that?
 9          A.     I do see that, yeah.
10          Q.     Now, when you write "he did it
11    for two or three hours at a time," could you
12    clarify what you meant?  Did you mean that he
13    was continuously spraying Roundup for two or
14    three hours, or was it -- was he applying
15    Roundup intermittently during a two to
16    three-hour period?  Can you clarify that,
17    please?
18                MR. BRICKER:  Form.
19                THE WITNESS:  You know, maybe
20          we should -- you know, sitting here
21          looking at it, I mean, I did reference
22          the point in his deposition where he
23          made the statement.
24                Is that something we can take a
```

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    excerpt from Richard Canning's November 23rd,

2    2021 deposition transcript which you earlier

3    testified you relied upon, is that correct?

4         A.    That is, yeah.

5         Q.    Then if you go to page 102.

6         A.    Okay.  I'm scrolling down.

7    101.

8               All right.  Yeah, okay.

9         Q.    Does this refresh your memory

10   of what Mr. Canning meant by two to three

11   hours?

12        A.    Yeah, I got the impression --

13   you know, I'm just looking at the sentence

14   here, you know, in line 18 and 19.  He said,

15   you know, "I make sure I spray for two or

16   three hours, and then I'd get bored and do

17   something else and then come back the next

18   day."

19               So I got the feeling from the

20   way he phrased this that that was two or

21   three hours of continuous spraying, and then

22   he'd get bored so he would go do something

23   else.

24        Q.    Dr. Herrick, did you make any

**Exhibit B Page - 76**

1    adjustments to any of your exposure estimates

2    for Mr. Canning for his use of a wiper versus

3    a sprayer?

4         A.    No, I didn't.

5         Q.    On page 5 of your report for

6    Mr. Canning, end of the first paragraph, you

7    write, "Overall, including spraying and

8    wiping with Roundup, Mr. Canning recalled

9    that he used Roundup five times per week for

10   10 weeks per year from 1984 to 2009."

11             Do you see that?

12        A.    Hang on.  I'm just -- page 5?

13        Q.    Yes.

14        A.    Yeah.

15        Q.    Did you have an understanding

16   of what percentage of his Roundup application

17   was spraying versus wiping?

18        A.    I don't.  You know, that's an

19   interesting question.  And he wasn't asked

20   that, so I don't have a good feel for that.

21        Q.    Did you submit any written

22   questions for Mr. Richard Canning in

23   preparing this exposure report for him?

24        A.    No, I didn't.

1          and as we said earlier, you know,

2          Roundup can be a mixture of several

3          ingredients, and so washing like you

4          would conventionally in a shower with

5          water and soap, you know, I don't feel

6          like I could make a good judgment of

7          how well that type of washing

8          procedure would influence or affect

9          the different ingredients that are in

10         Roundup.

11     BY MR. LEE:

12         Q.    Did you take -- when you were

13     preparing your exposure estimates for

14     Mr. Richard Canning, did you take into

15     account the protective -- the personal

16     protective equipment or clothing that he

17     described?  Did you take that into account?

18         A.    No, I didn't.

19         Q.    And you made no adjustments to

20     your quantitative estimates -- I'm sorry,

21     your numerical estimates based on his

22     personal protective equipment, is that

23     correct?

24         A.    That is correct, right.

1    Roundup could potentially reduce both dermal

2    and inhalational exposure, is that correct?

3         A.    I think I remember saying, you

4    know, when we talked about this that it, you

5    know, could certainly reduce the dermal

6    exposure because you're not, you know,

7    pouring things from one container to the

8    other.

9              I wouldn't be quite so sure

10   that it had much effect on the inhalation

11   exposure, because you're still spraying it.

12        Q.    And then if you go to page 186,

13   line 18.

14        A.    Okay.  I'm rolling down.

15             Yep, I have it.

16        Q.    And there's a question, "Were

17   you spot spraying the driveway or were you

18   broadcast spraying the driveway?"

19             Do you see that?

20        A.    I do see that, yes.

21        Q.    Did you have an understanding

22   of the term "broadcast spraying" when you

23   were preparing Mr. Canning's report?

24        A.    I do have an understanding of

**Exhibit B Page - 79**

Robert F. Herrick, MS, ScD, CIH, FAIHA

1          Dr. Herrick, you did not make

2     any adjustments for the fact that Mr. Canning

3     was spot spraying in his residential use

4     versus continuously spraying, isn't that

5     correct?

6               MR. BRICKER:  Form.

7               THE WITNESS:  Yeah, I didn't

8          really, you know, have any real detail

9          as to within that one hour per day

10         that he was out there spraying the

11         driveway, you know, what portion of

12         that time he actually had his hand on

13         the trigger actively, you know,

14         generating spray as opposed to the

15         amount of time he was spending walking

16         between -- you know, from one weed to

17         the other or one side of the driveway

18         to the other.  I didn't really have

19         that sort of detail to come up with a

20         more refined number here.

21    BY MR. LEE:

22         Q.    Would it be reasonable to infer

23    that because Mr. Canning was spot spraying

24    during that one-hour period that the actual

1    hours used per day was less than 1.0?  Isn't

2    that reasonable?

3         A.    I think you could --

4               MR. BRICKER:  Just let me

5         object to form.  It's argumentative.

6    BY MR. LEE:

7         Q.    You can answer.

8         A.    Sure.

9               Well, I think that's the kind

10   of thing, you know, there could be more

11   information, you know, that Canning could

12   provide that would let -- you know, let me

13   refine that estimate a little bit, yeah.

14        Q.    But you didn't use deposition

15   testimony that he was spot spraying on his

16   residence to adjust that 1.0 hours used per

17   day?  You didn't make that adjustment,

18   correct?

19        A.    No, I didn't.

20              MR. BRICKER:  Form.

21              THE WITNESS:  I didn't adjust

22        it.

23   BY MR. LEE:

24        Q.    So based on the fact that

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    Mr. Canning wasn't continuously spraying for

2    1.0 hours per day on his residence, that

3    midpoint exposure estimate of 6.5 days is an

4    overestimate, isn't that reasonable to

5    surmise?

6              MR. BRICKER:  Form.  It's

7         argumentative.

8              THE WITNESS:  Yeah, I would --

9         again, I'd have to go back to using

10        the information that Canning provided,

11        so I don't really have a way to

12        quantify how he was spending his time,

13        you know, within that one-hour period

14        per day.

15             So I can't really, you know,

16        come up with a different calculation

17        than what's here.

18   BY MR. LEE:

19        Q.    But you do agree that his

20   actual spraying time on his residence was

21   actually less than 1.0 hours per day,

22   correct?

23        A.    Well, I --

24             MR. BRICKER:  Foundation,

Robert F. Herrick, MS, ScD, CIH, FAIHA

1        argumentative.

2                THE WITNESS:  I would say it

3        could be, but I can't really quantify

4        how much less than an hour it would

5        be.

6   BY MR. LEE:

7        Q.     And I believe you testified the

8   reason that you don't have a minimum and

9   maximum time-weighted estimate for his

10  residential use is because he was -- you only

11  provided that 1.0 number, is that correct?

12       A.     Yeah.  I mean, that was, you

13  know, the way he answered the question in his

14  deposition.  That's where it came from.

15       Q.     Then you make a -- then you

16  provide minimum, maximum, and midpoint

17  time-weighted exposure estimates for his

18  commercial application of Roundup right below

19  that, isn't that correct?

20       A.     That is correct, yeah.

21       Q.     So the minimum is 162.5 days

22  and the maximum is 650 days, is that correct?

23       A.     That is correct, yeah.

24       Q.     And the midpoint time-weighted

Exhibit B Page - 83

Robert F. Herrick, MS, ScD/CIH, #AIHA

1    COMMONWEALTH OF MASSACHUSETTS   )

2    SUFFOLK, SS.                    )

3            I, MAUREEN O'CONNOR POLLARD,

4    Registered Diplomate Reporter and Notary

5    Public in and for the Commonwealth of

6    Massachusetts, do certify that on the 23rd

7    day of October, 2023, at 10:41, the person

8    above-named was duly remotely sworn to

9    testify to the truth of their knowledge, and

10   examined, and such examination reduced to

11   typewriting under my direction, and is a true

12   record of the testimony given by the witness.

13   I further certify that I am neither attorney,

14   related or employed by any of the parties to

15   this action, and that I am not a relative or

16   employee of any attorney employed by the

17   parties hereto, or financially interested in

18   the action.

19

20

21

22   _____

23   MAUREEN O'CONNOR POLLARD, NOTARY PUBLIC

24   CSR #149108