# EXHIBIT C

```
 1                UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3                     MDL NO. 2741

 4

 5         *********************************
           IN RE:  ROUNDUP PRODUCTS
 6         LIABILITY LITIGATION

 7         THIS DOCUMENTS RELATES TO:

 8         ROBERT AND DARYA COTTER
           V. MONSANTO COMPANY
 9         CASE NO. 3:20-CV-03108-VC

10
           *********************************
11

12

13
                   VIDEOTAPED DEPOSITION OF:
14
                    ROBERT F. HERRICK, SC.D.
15
                        (Taken Remotely)
16
                     7A Skinners Avenue
17
                   Marblehead, Massachusetts
18
              September 6, 2022        10:34 a.m.
19

20

21

22                  Darlene M. Coppola

23                 Registered Merit Reporter

24                Certified Realtime Reporter
```

```
 1      APPEARANCES:

 2      Representing the Plaintiff:

 3           THORNTON LAW FIRM LLP

 4           One Lincoln Street

 5           Boston, MA 02111

 6           BY:  CHRISTIAN F. UEHLEIN, ESQUIRE

 7           T 617.720.1333

 8           E cuehlein@tenlaw.com

 9

10      Representing the Defendants:

11           HOLLINGSWORTH LLP

12           1350 I Street, NW

13           Washington, DC 20005

14           BY:  JOHN M. KALAS, ESQUIRE

15           T 202.898.5800

16           E jkalas@hollingsworthllp.com

17

18

19

20      Also Present:

21      Maddie Cowell, Videographer

22

23

24
```

Exhibit C Page - 2
Golkow Litigation Services                                    Page  2

1          think we could use that as a pretty good

2          benchmark number.

3          BY MR. KALAS:

4               Q.   Okay.  And about how many cases would

5          you say you've worked on up to this point?

6                         MR. UEHLEIN:  Objection.

7               A.   Are we on Roundup now?

8          BY MR. KALAS:

9               Q.   Yes.

10              A.   Oh, okay.  Well, I've done a total of

11         four reports, yeah.

12              Q.   And so a rough estimate, you'd

13         estimate you will have invoiced approximately

14         $60,000 on Roundup cases up to this point?

15              A.   I think that's -- that's a fair

16         estimate, yes.

17              Q.   Turning back to Exhibit 2, your

18         report, what was the scope of issues you were

19         asked to opine upon in this matter?

20              A.   The request was that I prepare an

21         exposure history for Mr. Cotter.

22              Q.   What is an exposure history?

23              A.   Well, specifically in this case, the

24         request was to describe his work history, his

Exhibit C Page - 3

Golkow Litigation Services                        Page 22

Robert F. Herrick, Sc.D.

1      activities, the materials that he reported

2      that he used, and then also to prepare

3      calculations of his time-weighted lifetime

4      exposure and also his nontime-weighted

5      lifetime exposure.

6          Q.   Starting with the first half of that,

7      talking about the materials he used, what he

8      did in his job, what have you, what was your

9      methodology that you employed in evaluating

10     this work history?

11         A.   Well, there were really two primary

12     sources.  One, we had the information that had

13     been supplied on the plaintiff fact sheet, and

14     then I also had Mr. Cotter's deposition.  So

15     those were the starting points for doing the

16     exposure history.

17         Q.   And did you talk to Mr. Cotter as well

18     beyond the deposition, like in an interview?

19         A.   Yeah, I did.  I spoke with him over

20     the phone.

21         Q.   Did you glean any additional

22     information in that phone interview that you

23     weren't able to get out of the deposition?

24         A.   Yeah, there were a couple of things

Exhibit C Page - 4

Golkow Litigation Services                    Page 23

Robert F. Herrick, Sc.D.

```
 1        that weren't totally clear from the

 2        deposition, so I was able to ask him

 3        specifically, and he clarified those points

 4        for me.

 5            Q.   What points were those, if you can

 6        recall?

 7            A.   Yeah.  They both dealt with his

 8        business in the Lawn Rangers, you know, in his

 9        landscaping company.  One of the questions

10        that I wanted to make sure I had the right

11        answer from him was when he actually started

12        working under that company, when he really

13        went into business with the Lawn Rangers, and

14        so he was able to clarify that for me.

15                And then I also wanted to make sure I

16        had a correct number from him as to the

17        estimated number of days that he worked during

18        each season with the Lawn Rangers, and so he

19        was able to give me a good answer for that,

20        too.

21            Q.   Okay.  And so when you were putting

22        together the work history -- well, strike

23        that.

24                Let's go to the second half, which was
```

Exhibit C Page - 5

Robert F. Herrick, Sc.D.

```
 1      the calculation of days.

 2              Can you just explain to me your

 3      methodology in calculating the exposure days

 4      and then the time-weighted exposure days as

 5      well?  And you can -- let me break that up.

 6      I'm going to ask you about both, but let me

 7      start with just exposure days.

 8              What was your methodology in

 9      calculating exposure days?

10      A.    Well, the way the exposure day would

11      accumulate would be counting up the number of

12      days per year that he reported using Roundup

13      and then multiplying that by the number of

14      years.

15      Q.    Okay.

16      A.    And so I did that both for his

17      residential use and also for the two

18      commercial activities that he was involved in.

19      Q.    Okay.  And then how about the

20      time-weighted exposure days?  Can you explain

21      to me your methodology that you utilized in

22      reaching that opinion?

23      A.    Yeah.  In that case, the calculation

24      is the same as I just described except there's
```

Exhibit C Page - 6

1     an additional factor that I used to weight

2     each one of those totals by the reported

3     number of hours per day that he recalled

4     actually spraying Roundup.  So that, in

5     effect, gives you a time-weighted value that's

6     suggested for the duration of spraying time

7     that he did each day.

8         Q.   Okay.  If I read your report correctly

9     and understand it, the time-weighted exposure

10    day figure takes the days times the years, so

11    days in a year times the number of years

12    spraying, and then it calculates or it

13    normalizes that to an eight-hour workday.

14         So the time-weighted figure gives you

15    the number of eight-hour workdays he applied

16    Roundup; is that fair?

17        A.   Yeah, that's a reasonable, fair way to

18    put it.  It's -- I think we're both saying

19    roughly the same thing.  The idea is to weight

20    that number based on the actual number of

21    hours that he spent spraying.

22        Q.   Okay.  Are you relying on the opinions

23    of any other experts for Mr. Cotter in

24    reaching your opinions?

Exhibit C Page - 7

Golkow Litigation Services                          Page 26

Robert F. Herrick, Sc.D.

```
1        know, that we just talked about or the -- you

2        know, that I got from Cotter in terms of the

3        interview and his PFS and his deposition, in

4        terms of the approaches to calculating the

5        cumulative lifetime exposure days, I did refer

6        to the epidemiology studies that I have

7        identified here in my footnotes and

8        specifically the -- let's see.  There's

9        Footnotes, going down here, 33 through 38.

10       And -- I'm sorry.  Go ahead.

11       BY MR. KALAS:

12            Q.   No, no.  I was just nodding.

13            A.   Oh, okay.  So I did look at those epi

14       studies in developing my calculations of the

15       two different lifetime exposure numbers.

16            Q.   Okay.  And how did you get those

17       epidemiology studies?  Did you find them on a

18       PubMed search?  Were they provided to you?

19       How did you come across them?

20            A.   It was probably a mix.  I -- I know

21       the Thornton guys sent me the full text of

22       some of these because there are some that I

23       didn't have access to the full article.  You

24       know, I could just access the abstract myself.
```

Exhibit C Page - 8

Golkow Litigation Services                          Page 29

1          So it was probably a mix of both approaches.

2              Q.   Okay.  And other than the references

3          listed in the footnotes of your report, are

4          you relying on any other materials to support

5          your expert opinion in this matter?

6                       MR. UEHLEIN:  Objection.

7              A.   Well, if we go back away from the

8          epidemiology for just a minute, back at the

9          start of the Cotter report, I laid in just a

10         little bit of background information about the

11         nature of his exposure.

12                  And so I talked about the droplets,

13         you know, and the fact that you can get those

14         on your skin, and you can also inhale those.

15         And some of that was in some ways anchored

16         back to literature that I had reviewed in the

17         Constantine matter.

18         BY MR. KALAS:

19             Q.   Right.  And that's, I think, listed --

20         I put it up on the screen -- listed in

21         Footnotes 4 through 9, right?

22             A.   Yeah.  That's -- that's -- I tried to,

23         you know, give an annotation to those studies

24         that I had reviewed initially when we were

Exhibit C Page - 9

Golkow Litigation Services                          Page 30

1    specifically, you know, what their disease

2    endpoint was.

3         Q.   And the Constantine case, like this

4    one, involved someone who you were asked to

5    evaluate using your exposure assessment

6    expertise, right?

7         A.   In Constantine, yeah, that's right.

8         Q.   And in the Constantine case, like this

9    one, it involved you evaluating things like

10   the plaintiff's deposition, an interview of

11   the plaintiff, et cetera, in order to reach an

12   exposure assessment opinion, correct?

13        A.   It did, yes.

14        Q.   Okay.  Why did you not use the ART

15   model in this case after you used it in the

16   Constantine case?

17        A.   Well, the question that was -- that I

18   was asked to address in this Cotter case

19   really didn't extend to specifically trying to

20   estimate his inhalation exposure.  It was more

21   limited to his exposure history.

22        Q.   Okay.  And so if I understand your

23   answer there correctly, the assessment you

24   were asked to undertake in this case, Cotter,

Exhibit C Page - 10

Golkow Litigation Services                          Page 35

1       needed to use the ART model.

2           Q.   Okay.  My last question was probably

3       unartful.

4               How could the ART model have been

5       helpful in assessing Mr. Cotter's exposure

6       history had you chosen to employ it in this

7       case?

8                   MR. UEHLEIN:  Objection.

9           A.   Well, I could have developed a more

10      quantitative estimate of what the ART model

11      predicted to be his level of inhalation

12      exposure because that's what I calculated in

13      the Constantine case.  And also, as I imagine

14      you recall in the Constantine case, that I was

15      able to discuss how that ART model estimate

16      compared with other published information

17      about inhalation exposure levels.

18      BY MR. KALAS:

19          Q.   You said that the ART model would give

20      information.  I think "quantitative

21      information" was the word you used.  What's

22      "quantitative information"?

23          A.   Well, we could have done a calculation

24      that would have given us an estimate of the

Exhibit C Page - 11

Golkow Litigation Services                          Page 37

```
 1        airborne level of Roundup, or glyphosate, that

 2        Mr. Constantine, or, in this case, Mr. Cotter,

 3        would have been expected to be exposed to, and

 4        we could have had a 50 percent, you know, sort

 5        of a median value and then a range around that

 6        value.  So that's kind of output that, you

 7        know, could have been produced from the ART

 8        modeling.

 9            Q.   And what you've done here in the

10        Cotter case is what's known as a qualitative

11        evaluation of exposure, correct?

12                    MR. UEHLEIN:  Objection.

13            A.   I think I would -- you know, if we're

14        thinking about kind of classifying, this is a

15        little bit more semiquantitative in that it

16        does have a numerical value associated with

17        his lifetime cumulative exposure, but it

18        doesn't have a measure of the actual airborne

19        level of concentration that he was exposed to.

20        BY MR. KALAS:

21            Q.   If someone was trying to determine

22        whether or not an individual were at an

23        increased risk of a disease based upon their

24        exposure, would using the ART model give more
```

Exhibit C Page - 12

Robert F. Herrick, Sc.D.

```
 1                    MR. UEHLEIN:  Objection.

 2          A.   I -- I think that would be a

 3     reasonable statement to make, yes.

 4     BY MR. KALAS:

 5          Q.   Okay.  And in the Cotter matter, you

 6     will not be offering any opinion regarding the

 7     dose of glyphosate that entered Mr. Cotter's

 8     body, true?

 9          A.   That is true.  Right.

10          Q.   And you will not be offering any

11     opinion in the Cotter matter that the dose of

12     glyphosate that entered -- or strike that.

13               In the Cotter matter, you will not

14     offer any opinion that Mr. Cotter was ever

15     exposed to a dose of glyphosate that exceeded

16     any regulatory threshold, true?

17          A.   That would be true.  Right.

18          Q.   And you have no opinion in the Cotter

19     matter regarding the dose of glyphosate

20     necessary to increase the risk of someone

21     getting NHL, right?

22          A.   No, I didn't address that.

23          Q.   And you have no opinion in the Cotter

24     matter whether there's ever been any measured
```

Exhibit C Page - 13

Robert F. Herrick, Sc.D.

```
1        dose in the exposure biomonitoring literature

2        that exceeded any regulatory threshold, true?

3             A.   I -- yeah, I really haven't looked

4        into that.  So I don't really know how to

5        answer that.

6             Q.   Okay.  A few more housekeeping

7        questions, and then I think we'll be at a good

8        spot for a break.

9                  These are just some questions about

10       some law firms, and, you know, if you don't

11       know, that's always an okay answer.

12                 Have you ever been retained as a

13       consulting or testifying expert by the Weitz &

14       Luxenberg law firm?

15            A.   I don't think so.  That doesn't ring a

16       bell.

17            Q.   The Andrus Wagstaff law firm?

18            A.   No, it's not -- that doesn't sound

19       familiar.

20            Q.   The Miller law firm?

21            A.   Again, I'm not -- I'm not recalling

22       that.

23            Q.   The Baum Hedlund law firm?

24            A.   No to that, too.  I don't remember
```

Exhibit C Page - 14

1        know, that's one thing.  You could have a

2        whole family of exposure variables, and that

3        could be one of them that you would include,

4        yeah.

5            Q.   Okay.  And the question wasn't whether

6        you could include it.  I asked would it be

7        typical, in your experience?

8                So is that something typically done in

9        biomonitoring studies, in your experience?

10                   MR. UEHLEIN:  Objection.

11           A.   I would have to kind of caveat the

12        answer by saying it would depend a little bit

13        on the nature of the agent that was being

14        studied, so especially for something that

15        accumulated in the body.

16                Like, just to take an example, you

17        know, you might use lifetime exposure days to

18        lead because lead tends to accumulate whereas

19        if something is much more short-lived in the

20        body and tends to be excreted quickly, the

21        exposure days, you know, might not be such a

22        meaningful exposure variable.

23        BY MR. KALAS:

24           Q.   Okay.  And is glyphosate a compound

Exhibit C Page - 15

Golkow Litigation Services                        Page 82

Robert F. Herrick, Sc.D.

```
1        that's excreted quickly from the body?

2            A.   Yeah, that was actually one I was

3        thinking of that it's -- it doesn't really

4        tend to accumulate.  So, you know, you might

5        not find that the exposure day metric relates

6        very well to the biological level.

7            Q.   Okay.  Is there a passive dosimetry

8        study -- well, let me back up and ask a

9        foundational question.

10               Have you heard of a type of study

11       called passive dosimetry?

12           A.   I have, yes.

13           Q.   What's passive dosimetry?

14           A.   Well, in the sort of exposure

15       assessment world, the family of measurement

16       devices that people use can be characterized

17       either as active or passive, and so the active

18       devices tend to be equipment that have some

19       kind of a sampling pump that, you know, does

20       some kind of air collection, and then that air

21       collection deposits the agent of interest on

22       some sampler, and it's analyzed in the

23       laboratory whereas there are other devices

24       that don't really include that sort of
```

Exhibit C Page - 16

Robert F. Herrick, Sc.D.

```
1            Q.   Right.  And that was -- I said setting

2       aside the episodic.  So the one time on the

3       back or maybe a few times, if it leaked a few

4       times.  But beyond that, do you recall any

5       other locations where he had dermal exposure

6       that he talked about besides his arms, legs,

7       and hands?

8            A.   Oh, okay.

9                 MR. UEHLEIN:  Objection.

10           A.   No, I don't remember, you know, him

11      talking about that.

12      BY MR. KALAS:

13           Q.   And Mr. Cotter bought both refill

14      bottles and then refill powder packets in

15      order to mix and load his Roundup, right?

16           A.   He did, yeah.

17           Q.   And the refill bottles could either be

18      a concentrated mix or a premixed dilution,

19      right?

20           A.   That's true, I think, yes.

21           Q.   And at his deposition, a picture was

22      actually marked of the refill bottles.  I

23      think it was Exhibit 5.  And those were

24      diluted.  But he testified to using
```

Exhibit C Page - 17

1       he used the backpack at least once a month.  I

2       have a recollection of him, you know, kind of

3       putting that amount of detail to it.

4            Q.   And then beyond that, he would use the

5       hand sprayer, right?

6            A.   Well, yeah.  He had the 1- and

7       2-gallon little --

8            Q.   Pump guy.

9            A.   -- pump guy, and then he had the

10      Windex bottles.

11           Q.   Right.  So he had three different

12      application tools.  He had a backpack sprayer

13      for bigger jobs; a pump sprayer, 1 or 2 gallon

14      for a normal day; and then a Windex bottle for

15      real quick sprays; is that -- is that fair? --

16      as a commercial applicator?

17           A.   That -- I think that tracks with the

18      way he described it, yes.

19           Q.   And when he would spray -- and this

20      goes residentially or commercially -- he

21      testified to wearing shorts, T-shirts, leather

22      gloves, and then sometimes goggles or

23      sunglasses.

24                Do you recall that?

Exhibit C Page - 18

Golkow Litigation Services                        Page 92

Robert F. Herrick, Sc.D.

```
 1        A.   Yeah, and then he said as he -- when

 2    he got older, he wore a hat apparently.  So,

 3    yeah, and I'm just scrolling through the

 4    deposition.  He -- shorts and T-shirt, leather

 5    work boots, glasses, leather gloves, and

 6    baseball hats when he got older, yeah.

 7        Q.   Okay.  So when he reported getting

 8    Roundup on his hands when mixing and loading,

 9    do you know one way or another whether or not

10    those hands were gloved with leather gloves

11    when that was occurring?

12        A.   I don't think he was, you know, really

13    asked that.  I mean, I'm just trying to think

14    about, you know, kind of the mixing process,

15    whether he would be likely to wear gloves

16    while he was mixing as opposed to when he was

17    spraying.  I don't think he really -- he might

18    not have been asked that.  I don't remember

19    seeing any information about that.

20        Q.   And did you follow up on that when you

21    were conducting your interview on June 10?

22        A.   Specifically about the leather gloves?

23        Q.   Yes, sir.

24        A.   I didn't ask him about the gloves, no.
```

Exhibit C Page - 19

1          Q.   And the leather gloves would reduce

2     dermal exposure to that Roundup that got on

3     his hands when mixing and loading to some

4     degree, right?  What that degree is, we would

5     have to go to the literature and find out how

6     much glyphosate permeates the leather.  But to

7     some degree, the leather gloves would reduce

8     dermal exposure.  Would you agree with that?

9               MR. UEHLEIN:  Objection.

10         A.   I -- I would think to a pretty small

11    extent since, you know, the glyphosate's in a

12    water solution.  And, you know, I haven't

13    looked into this, but I would be very

14    surprised if the leather provided, you know, a

15    very substantial amount of protection against

16    that.

17    BY MR. KALAS:

18         Q.   Well, what if the leather gloves were

19    lined with cotton?

20         A.   Well, cotton --

21              MR. UEHLEIN:  Objection.

22         A.   You know, I could easily see the

23    water-based liquid going through both the

24    leather and the cotton.

Exhibit C Page - 20

Golkow Litigation Services                        Page 94

Robert F. Herrick, Sc.D.

```
 1        BY MR. KALAS:

 2             Q.   Well, have you actually reviewed the

 3        literature on the permeation through cotton of

 4        glyphosate in a Roundup solution in a paper

 5        called Wester 1996?

 6             A.   I haven't looked into that, no.

 7             Q.   And that's because -- and going back

 8        to not asking him about whether or not he had

 9        the gloves on, whether or not he's wearing

10        leather gloves on his hands when he's mixing

11        and loading is immaterial to an exposure day

12        calculation, true?

13                  MR. UEHLEIN:   Objection.

14             A.   Well, yeah, I really wasn't -- you

15        know, to answer the question that I was

16        working on, I really didn't dig down for that

17        level of information.

18        BY MR. KALAS:

19             Q.   And that's because your answer would

20        be the same as far as exposure days whether or

21        not he was wearing leather gloves, right?

22             A.   That's probably true.  I don't really

23        see that the leather glove would have been,

24        you know, a real major factor.
```

Exhibit C Page - 21

Robert F. Herrick, Sc.D.

```
 1          Q.   If Mr. Cotter were wearing a
 2     water-repellent Tyvek suit, your answer for
 3     exposure days would be the same as opposed to
 4     what he actually wore, shorts and a T-shirt,
 5     right?  The exposure days would be the
 6     exposure days?
 7          A.   That -- that would be true.  You just,
 8     you know, calculate the days when he reported
 9     that he used Roundup.
10          Q.   And if he were wearing a
11     water-repellent Tyvek suit, as opposed to
12     shorts and T-shirt, the amount of glyphosate
13     that could reach his skin, because it's in a
14     water-based solution, would likely be far
15     lower, right?
16          A.   I think that's -- that's a reasonable
17     thing to say, yes.
18          Q.   Now, what Mr. Cotter was wearing, the
19     shorts and the T-shirts and I think you said
20     leather boots, leather gloves was similar to
21     what the applicators were wearing in the
22     dermal arm in Pierce, correct?
23          A.   I would have to go back to Pierce and
24     take a look.  I mean, I -- I think they were
```

Exhibit C Page - 22

Golkow Litigation Services                          Page 96

1          Q.   And that means, in layman's terms, it

2     has an affinity for water, right?

3          A.   Right.

4          Q.   And do you have any opinion one way or

5     another how long it takes for dermal

6     absorption to begin after glyphosate reaches

7     the skin?

8          A.   Oh, I really -- you know, the only --

9     I haven't really looked in the literature in

10    that.  I mean, there is some indication of

11    that if we looked at the data since we're in

12    the Pierce paper.  You know, that's one of the

13    things that Pierce reported was the time

14    course after exposure ended, and, you know,

15    she did a series of urine samples 3, 6, 12, 24

16    hours after application.

17          So there is -- you know, there is an

18    indication there, but I haven't looked beyond

19    that.

20          Q.   Okay.  And in your time-weighted

21    exposure assessment, you did not include a

22    variable for the period of time, however short

23    or long it may be, from which -- from the time

24    from which glyphosate reaches the skin until

Exhibit C Page - 23

Golkow Litigation Services                    Page 100

Robert F. Herrick, Sc.D.

1          absorption starts, right?  You didn't include

2          that sort of variable?

3               A.   No, I didn't.

4               Q.   Okay.  And so in your time-weighted

5          exposure assessment, there could be a portion

6          of time in that where glyphosate has reached

7          the skin but absorption has not yet begun,

8          true?

9                         MR. UEHLEIN:  Objection.

10              A.   Sure.  Yeah.

11         BY MR. KALAS:

12              Q.   Okay.

13                        MR. UEHLEIN:  John, we've been

14         going an hour or so.  I recommend we take a

15         little break.

16                        MR. KALAS:  Absolutely.  That's

17         fine.

18                        THE WITNESS:  Okay.

19                        THE VIDEOGRAPHER:  The time is

20         12:36.  We're off the record.

21

22              (Recess taken from 12:36 p.m.

23              to 12:46 p.m.)

24

Exhibit C Page - 24

Robert F. Herrick, Sc.D.

```
1            Q.   Well, I know you're not familiar with

2       the way that value came from Dr. Sawyer's

3       calculations because, as you told me very

4       early on in this deposition, you're not here

5       to be the dose assessment expert.  That's for

6       the toxicologist, right?

7                      MR. UEHLEIN:  Objection.

8            A.   Right.

9       BY MR. KALAS:

10           Q.   And so Dr. Sawyer, being the

11      toxicologist, calculated a dose, and we just

12      looked at that, right?

13           A.   Okay.  Sure.

14           Q.   And then you would multiply dose in a

15      given day times the number of days you're

16      exposed to get a lifetime dose.  Is that a

17      fair way to do that?

18                      MR. UEHLEIN:  Objection.  That

19      was asked and answered.

20           A.   You know, I -- just looking at it for

21      the first time here, I don't feel like I can

22      give you a really good answer as to how -- you

23      know, how you would go about doing that

24      calculation.  I would really need to --
```

Exhibit C Page - 25

1       the question that I was asked to address was a

2       different question, and you could say it was

3       more limited in scope to -- by comparison with

4       what I was asked to address in the Constantine

5       case, yeah.

6              Q.   In the Constantine case, were you

7       asked to address -- or let me ask you this:

8       In the Constantine case, did you, in fact, do

9       an exposure day calculation?

10             A.   No, I didn't.

11             Q.   In the Constantine case, did you do an

12      inhalation exposure assessment?

13             A.    That's what I did in Constantine,

14      yeah.

15             Q.   In the Cotter case, did you do an

16      exposure day calculation?

17             A.   I did, yes.

18             Q.   In the Cotter case, did you do an

19      inhalation exposure assessment?

20             A.   No, I wasn't asked to do that.

21             Q.   Is it fair to say, then, that rather

22      than characterizing it as more limited, it

23      would be more accurate to say that you did a

24      different assessment in Cotter than you did in

Exhibit C Page - 26

Golkow Litigation Services                                    Page 155

1        thinking in choosing the methodology that you

2        did in this case?

3              A.   Yeah, that was exactly the logic that

4        I employed to do the calculations that are in

5        my report.

6              Q.   And if we start throwing outlandish

7        hypotheticals in there, that would actually

8        potentially change the whole basis for

9        choosing the particular methodology that you

10       choose to employ; fair to say?

11                    MR. KALAS:   Objection.   Form.

12             A.   Yeah, if the underlying circumstances

13       were very different, the approach to the

14       exposure assessment would have to be adjusted

15       to accommodate that.

16       BY MR. UEHLEIN:

17             Q.   I think that the record is very clear

18       in this case that you did not attempt to

19       calculate a dose, a milligram per kilogram of

20       body weight dose for Mr. Cotter, correct?

21             A.   That's correct.

22             Q.   Did you spend any time comparing the

23       results of your exposure day calculations to

24       the results of any other expert in this case's

Exhibit C Page - 27

Golkow Litigation Services                                    Page 166

1      calculations, including Dr. Sawyer?

2                    MR. KALAS:  Objection.  Form.

3          A.   No, I didn't see any of the other

4      experts' work until after I had finished my

5      report.

6      BY MR. UEHLEIN:

7          Q.   Do you hold any opinions in this case

8      comparing the results of your exposure day

9      calculations to the results of any other

10     expert in this case's exposure estimations or

11     dose estimations?

12         A.   No, I haven't tried to make that sort

13     of comparison.

14         Q.   You used a series of six

15     epidemiological studies to guide your method

16     in exposure assessment, correct?

17         A.   That's correct, yeah.

18         Q.   I just want to be clear.  Are you --

19     in this case, are you offering epidemiological

20     opinions based on those studies?

21         A.   No, I'm not.

22         Q.   Okay.  But you utilized the exposure

23     portion of those studies to inform your

24     opinions in those cases, correct?

Exhibit C Page - 28

Golkow Litigation Services                              Page 167

```
 1                    MR. KALAS:  Objection.  Form.

 2                    MR. UEHLEIN:  Yes.  Let me

 3        strike that.

 4        BY MR. UEHLEIN:

 5            Q.   You used the exposure information in

 6        those studies to inform your opinions in this

 7        case, correct?

 8                    MR. KALAS:  Objection.  Form.

 9            A.   Right.  What I used was relied on the

10        methods that they described in their

11        publications to inform my approach.

12        BY MR. UEHLEIN:

13            Q.   There was a line of questioning that

14        you were asked about confounding factors and

15        other pesticide use in Eriksson.

16                 Do you recall that?

17            A.   I do.

18            Q.   Would you characterize that as going

19        to the epidemiological basis for that study,

20        or would you characterize that as being for

21        something relevant to the exposure foundation

22        of that study?

23            A.   Well, if there is confounding going

24        on, it would only show up in the epidemiologic
```

Exhibit C Page - 29

Golkow Litigation Services                     Page 168

```
1      analysis.  It doesn't turn up in the exposure

2      assessment, per se.

3          Q.   So is it fair to say that that is

4      really outside of your either area of

5      expertise and/or your purview in this case?

6                    MR. KALAS:  Objection.  Form.

7          A.   I would agree with that, yeah.

8      BY MR. UEHLEIN:

9          Q.   Okay.  You're -- in this case, you're

10     using Eriksson for the exposure, not for its

11     epidemiological results, correct?

12                    MR. KALAS:  Objection.  Form.

13         A.   Which is true for Eriksson and the

14     other studies as well.

15     BY MR. UEHLEIN:

16         Q.   Okay.  Do you think that that line of

17     questioning about confounding factors would be

18     better posed to an epidemiologist?

19                    MR. KALAS:  Objection.  Form.

20         A.   I think someone who was a specialist

21     in epidemiology would be in a better position

22     to really address that than I am.

23                    MR. UEHLEIN:  Those are all of

24     the questions that I have, Dr. Herrick.  Thank
```

Exhibit C Page - 30

```
 1                    CERTIFICATION

 2           I, DARLENE M. COPPOLA, a Notary Public, do hereby

 3      certify that ROBERT F. HERRICK, SC.D., after having

 4      satisfactorily identifying himself, appeared remotely

 5      on the 6th day of September, 2022 from Marblehead,

 6      Massachusetts, and was by me duly sworn to testify to

 7      the truth and nothing but the truth as to his

 8      knowledge touching and concerning the matters in

 9      controversy in this cause; that he was thereupon

10      examined upon his oath and said examination reduced to

11      writing by me; and that the statement is a true record

12      of the testimony given by the witness, to the best of

13      my knowledge and ability.

14           I further certify that I am not a relative or

15      employee of counsel/attorney for any of the parties,

16      nor a relative or employee of such parties, nor am I

17      financially interested in the outcome of the action.

18           WITNESS MY HAND THIS 19th day of September, 2022.

19

20

21      DARLENE M. COPPOLA          My commission expires:

22      NOTARY PUBLIC               November 11, 2022

23      REGISTERED MERIT REPORTER

24      CERTIFIED REALTIME REPORTER
```

Exhibit C Page - 31

Golkow Litigation Services                          Page 177