# EXHIBIT A

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA
          ---------------------------------X
 3
                      MDL NO. 2741
 4
                      CASE NO. MDL 3:16-MD-02741-VC
 5

 6     IN RE: ROUNDUP LITIGATION PRODUCTS LIABILITY

 7     LITIGATION

 8

 9     This document relates to:

10

11     RICHARD CANNING AND SHIRLEY CANNING V.

12     MONSANTO COMPANY

13                    CASE NO. 3:19-CV-04230-VC

14

15     ---------------------------------X

16

17

18        REMOTE VIDEOTAPED DEPOSITION OF D. BARRY

19     BOYD, M.D., M.S., taken pursuant to Connecticut

20     Statutes, before Helga Christiane Lavan, RPR,

21     Licensed Shorthand Reporter and a Notary Public

22     in and for the State of Connecticut, Shorthand

23     Reporter License No. 540, on October 27, 2023,

24     at 12:02 p.m.

25
```

```
 1                A P P E A R A N C E S

 2

 3       For the Plaintiff:

 4            THORNTON LAW FIRM, LLP
              9595 Wilshire Boulevard
 5            Suite 900
              Beverly Hills, California 90212
 6            (310) 282-8676
              dbricker@tenlaw.com
 7
                   By: DAVID BRICKER, Esquire
 8

 9
         For the Defendant:
10
              NELSON MULLINS RILEY & SCARBOROUGH LLP
11            901 East Byrd Street
              Suite 1650
12            Richmond, Virginia 23219
              (804) 533-2900
13            Marina.Batalias@nelsonmullins.com

14                 By:  MARINA BATALIAS, Esquire

15

16

17

18

19

20

21       ALSO PRESENT:

22       JULIE ROBINSON, Videographer

23       JUSTIN CARTER, Legal Clerk for Thornton Law
         Firm
24

25
```

```
 1                    I N D E X

 2
        D. BARRY BOYD, M.D., M.S.              PAGE
 3

 4   Direct Examination by Ms. Batalias          6
     Cross-Examination by Mr. Bricker           92
 5

 6   Exhibit 1, a Expert Report                 11
     Exhibit 2, a C.V.                          21
 7   Exhibit 3, a Plaintiff Expert              91
     Disclosure
 8

 9

10

11

12

13

14

15                (Exhibits were retained by
                   Attorney Batalias.)
16

17

18

19

20

21

22

23

24

25
```

D. Barry Boyd, MD, MS

```
 1                S T I P U L A T I O N S

 2                          IT IS HEREBY STIPULATED AND

 3      AGREED by and between counsel for the

 4      respective parties hereto that all

 5      technicalities as to proof of the official

 6      character before whom the deposition is to be

 7      taken are waived.

 8

 9                          IT IS FURTHER STIPULATED

10      AND AGREED by and between counsel for the

11      respective parties hereto that the reading and

12      signing of the deposition by the deponent are

13      not waived.

14

15                          IT IS FURTHER STIPULATED

16      AND AGREED by and between counsel for the

17      respective parties hereto that all objections,

18      except as to form, are reserved to the time of

19      trial.

20

21

22                     *    *    *    *    *    *

23

24

25
```

1            THE VIDEOGRAPHER:  We are now on
2       the record.  My name is Julie
3       Robinson.  I'm a videographer for
4       Golkow Litigation Services.
5            Today's date is October 27, 2023,
6       and the time is 12:02 p.m. Eastern
7       Time.
8            This remote video deposition is
9       being held in the matter of Richard
10      Canning versus Monsanto Company et al.
11      The witness is D. Barry Boyd, M.D.,
12      M.S.
13           All parties to this deposition
14      are appearing remotely and have agreed
15      to the witness being sworn in
16      remotely.
17           Due to the nature of remote
18      recording, please pause briefly before
19      speaking to ensure all parties are
20      heard completely.
21           Counsel, please identify
22      yourselves for the video record, after
23      which the court reporter, Helga Lavan,
24      will swear in the witness.
25           MS. BATALIAS:  Marina Batalias

D. Barry Boyd, MD, MS

```
 1                    for Monsanto.
 2                    MR. BRICKER:  David Bricker for
 3               Plaintiff.
 4
 5                    D. BARRY BOYD, M.D., M.S.,
 6          having been first duly sworn, was examined
 7                    and testified as follows:
 8
 9          DIRECT EXAMINATION
10          BY MS. BATALIAS:
11               Q.    Good morning, Dr. Boyd.  How are
12     you doing?
13               A.    Good morning.
14               Q.    So I introduced myself off the
15     record, but I'll do it again for the record.
16     My name is Marina Batalias, and I represent
17     Defendant in this case.
18                    Generally speaking -- you've been
19     deposed before; right?
20               A.    I certainly have.
21               Q.    Great.
22                    In the interest of time, I'm just
23     going to skip over the usual ground rules, but
24     if you need a break, please just let me know,
25     and we'll go off the record as long as, you
```

D. Barry Boyd, MD, MS

1   know, you've answered any questions that we've

2   left hanging.

3                    Does that sound good?

4        A.      Yes.   That's fine.

5        Q.      Great.

6                    Is there any reason that would

7   prevent you today from answering my questions

8   accurately and completely?

9        A.      No.

10       Q.      Wonderful.

11                   All right.   This is my first time

12  using the remote exhibit software, so I ask

13  everyone to sort of bear with me as I get going

14  with this.   But I'm moving the first exhibit

15  into the marked exhibits folder right now.   Let

16  me see if I actually did that correctly.

17                   MR. BRICKER:  So, Barry, before

18             you joined, the videographer indicated

19             that in the chat folder, there's a

20             link which will open up a marked

21             exhibits folder so you can see what

22             counsel is referring to.

23                   THE WITNESS:  I see.  Right.  I

24             got it.  Okay.

25                   MS. BATALIAS:  Let me just get

D. Barry Boyd, MD, MS

```
 1              that.  It looks like I'm missing the
 2              first one I was going to refer to, so
 3              we're off to a great start.
 4                   We're just going to skip that
 5              one.  Thank you.
 6     BY MS. BATALIAS:
 7          Q.    So in preparation for this
 8   deposition, you received a notice of
 9   deposition; is that correct?
10          A.    Yes.
11          Q.    And in that notice we asked for
12   certain documents to bring with you to the
13   deposition?
14          A.    Yes.  And those have all been --
15   David Bricker has those.  Those have been in
16   his possession.
17              MR. BRICKER:  Everything --
18              everything that we have that's
19              responsive has been produced by
20              ShareFile or Dropbox.
21              MS. BATALIAS:  Wonderful.
22              MR. BRICKER:  There's nothing new
23              or additional today.
24              MS. BATALIAS:  Thank you.  You
25              anticipated my next question, which
```

D. Barry Boyd, MD, MS

1              is, you know, going to be anything you

2              didn't bring.

3         BY MS. BATALIAS:

4              Q.    Have you -- do you have any

5    documents with you in person that you're

6    referencing during this deposition?

7              A.    No.

8              Q.    Okay.  And you submitted a report

9    in this case?

10             A.    I did.

11             Q.    Okay.  That one I know I have

12   handy, so let me go ahead and move that into

13   the marked exhibits folder.  Great.

14             MS. BATALIAS:  And can everyone

15        see the report that I just moved into

16        the marked exhibits folder?

17             MR. BRICKER:  Yeah.

18             MS. BATALIAS:  Great.

19        BY MS. BATALIAS:

20             Q.    Dr. Boyd, would you mind

21   scrolling through that and just confirming that

22   that is the report that you submitted in this

23   case?

24             A.    Where would it be?  In the chat?

25             MR. BRICKER:  So in the chat,

1              Barry, there is a link from Julie

2              Robinson.  If you click on that link,

3              it will open up a window that has the

4              exhibits in it.

5                   THE WITNESS:  Got it.  Should I

6              open -- do you want me to open that

7              up, just so I can confirm?

8                   MS. BATALIAS:  Yes.  Thank you.

9                   THE WITNESS:  Yep.  Got it.  I'm

10             going to shrink this down.  Oops.  I

11             shrank it down too much.

12                  Hold tight.  Sorry.

13                  MS. BATALIAS:  We're all

14             learning.  Don't worry.

15                  MR. BRICKER:  Yeah.  I wasn't

16             born with a computer in my hand.  My

17             sons were.

18                  But I see it.  Yes.  Of course.

19        BY MS. BATALIAS:

20             Q.    Great.  And take your time, but

21        if you wouldn't mind just confirming that that

22        is the report that you submitted in this case?

23             A.    Yes, it is.

24             Q.    Wonderful.

25                  I will go ahead and mark this

D. Barry Boyd, MD, MS

1    exhibit as Exhibit 1 for the record.

2                    (Boyd Exhibit 1, a Expert Report,

3             was so marked for identification.)

4      BY MS. BATALIAS:

5             Q.    So this report contains a

6    materials reviewed list listing all of the

7    documents that you relied upon in forming your

8    opinions regarding Mr. Canning.

9                    Do you recall that list?

10            A.    Yes.

11            Q.    Great.

12                    This report also contains a

13   references list, listing all the articles you

14   relied on; is that right?

15            A.    Yes.  Correct.

16            Q.    Great.

17                    And had you discussed this case

18   with anyone besides Mr. Canning's attorneys?

19            A.    No.

20            Q.    Okay.  Have you reviewed any

21   documents beyond the ones that are marked on

22   the two lists I just referred to, in

23   preparation for this deposition?

24            A.    No.

25            Q.    No additional depositions or

D. Barry Boyd, MD, MS

1    medical records or anything like that?

2              A.    No, I have not.

3              Q.    Wonderful.

4                    So it's fair to say that the

5    materials reviewed list and the references list

6    in your report are the complete list of

7    documents and depositions you've relied on in

8    forming your opinion?

9              A.    Yes.

10                   MR. BRICKER:  Marina, I hate to

11              interrupt you, but you, in fact, have

12              the wrong report.

13                   MS. BATALIAS:  Oh, no.  Do I?

14                   MR. BRICKER:  You do.

15                   That report that you're looking

16              at, dated September -- I think

17              September 20th of last year -- yes,

18              September 20, 2022, was the report

19              served with the expert designation.

20                   There was an updated report sent,

21              dated August 5, 2023.  So it's,

22              essentially, the same report, but

23              there are, as I believe -- and, Barry,

24              you can correct me if I'm wrong -- the

25              August 25, 2023, report just addresses

1          some updated epi studies.

2              And if you don't have that,

3          Marina, I can email it to you.

4              MS. BATALIAS:  Yes, just for

5          ease, so I don't have to go searching

6          through my file or anything, could you

7          just shoot me a quick email with it.

8              MR. BRICKER:  Okay.  Hold on one

9          second.

10             All right.  You should have it.

11         It's on its way.

12             MS. BATALIAS:  Thank you.

13     BY MS. BATALIAS:

14         Q.    While we wait on that, it sounds

15     like the only difference is in a couple of

16     articles or studies that are referenced,

17     Mr. Boyd?

18         A.    Dr. Boyd.

19         Q.    I'm so sorry.  Dr. Boyd.

20         A.    That's what my mother called me

21     when I was young, so that's okay.

22             Yeah.  Some additional studies

23     subsequent to that, that bear on this.

24         Q.    Okay.  But the substance of your

25     analysis of this case didn't necessarily change

D. Barry Boyd, MD, MS

1    between the two?

2            A.    Correct.

3            Q.    Thank you.

4                  MS. BATALIAS:  I'm going to go

5             back here, and I'm moving a second one

6             in.  Okay.

7                  Can everyone see the second

8             document that I just moved into the

9             exhibit folder labeled "Boyd CV"?

10                 MR. BRICKER:  Yes.

11                 THE WITNESS:  Yes.

12     BY MS. BATALIAS:

13           Q.    Mr. Boyd -- or, Dr. Boyd -- oh,

14    my gosh.  I'm so sorry.  I don't know why I

15    keep doing that.

16                 Dr. Boyd, would you mind

17    scrolling through that and confirming that that

18    is an updated copy of your curriculum vitae,

19    your CV?

20           A.    Yeah.  I actually have a newer

21    one that's essentially similar, that's -- that

22    was updated to this August -- or this

23    September 2023.  I can get you that, but it's

24    basically the same.

25           Q.    Okay.  And was -- do you know if

D. Barry Boyd, MD, MS

1    a copy of that updated one was produced in this

2    case?

3              A.     I'll make sure that Mr. Bricker

4    gets it so that he can get it to you.

5              Q.     Wonderful.  Thank you.

6              Do you know what the updates

7    would be between this one marked February 25,

8    2020, and the updated one in 2023?

9              A.     When it was -- you mean when was

10   the date of the updated one?

11             Q.     No, I'm sorry.  I mean do you

12   recall the differences between the two?

13             A.     Minimal.  Just few more research

14   studies.  That's all.

15             Q.     Okay.  Thank you.

16             THE COURT REPORTER:  Doctor, if

17              you can move closer to the microphone,

18              please.

19             THE WITNESS:  Oh, yeah.  Of

20              course.  I'm not sure where the mike

21              is.

22             THE COURT REPORTER:  Thank you.

23        BY MS. BATALIAS:

24             Q.     And I'll note on this CV marked

25   February 25, 2020, you don't list any of your

D. Barry Boyd, MD, MS

1    expert work among your professional activities;

2    is that correct?

3             A.    Yeah.  I have not, you know, put

4    that down.  I mean, that's a debatable part of

5    the CV.  I mean, that's discussed whether --

6    you know, whether that's relevant or not.

7             Q.    Okay.  Do you know if you've

8    included your expert work among your

9    professional activities in your updated CV from

10   2023?

11            A.    Again, same issue.  Yeah.  I

12   don't think it's really listed there, but I've

13   discussed that with a lawyer colleague, whether

14   that really goes into that.

15                  So I may add that, even as to

16   David Bricker, what the standard has been for

17   his other experts, in terms of the CV.

18                  MR. BRICKER:  We can talk about

19         that another -- another day.

20                  THE WITNESS:  At another time.

21         Sorry.

22                  MS. BATALIAS:  Maybe off the

23         record.

24   BY MS. BATALIAS:

25            Q.    Now, Dr. Boyd, you currently

D. Barry Boyd, MD, MS

1    actively treat patients; right?

2            A.      Right up until five minutes

3    before the deposition.  The answer is yes.

4            Q.      And when was the last time you

5    treated a patient with any type of NHL?

6            A.      You know, yesterday, I think.

7            Q.      Have you ever told a patient that

8    his or her NHL was caused by glyphosate or

9    Roundup?

10           A.      I have questioned exposures more

11   and more, since I see patients.  I have not

12   told them that, but, you know, I've

13   explained -- and they're very -- they're very

14   conscious of exposures and risk.  And that's

15   beyond lymphoma.  It includes breast cancer,

16   other malignancies.

17                   So that's an ongoing area of

18   research independent of the lymphoma data.  But

19   not just glyphosate, but environmental

20   exposures in general, which is one of my areas

21   of interest at Yale.

22           Q.      To clarify, you haven't ever told

23   a patient or written in a patient's medical

24   record that you thought glyphosate or Roundup

25   was a cause or substantial contributing factor

D. Barry Boyd, MD, MS

1    to their NHL?

2         A.     I have not, but I have seen

3    second-opinion patients from Memorial Sloan

4    Kettering -- you've probably heard of that

5    cancer center -- where the treating oncologist

6    speculated that that might be the cause.  So

7    other physicians and oncologists have stated

8    that.

9         Q.     But you have not?

10        A.     I have not.

11        Q.     Have you ever told a patient that

12   their NHL was caused by any specific factor?

13        A.     I lay out of risk factors without

14   speculating, or at least directly telling them,

15   their cause, with one exception:  Patients who

16   have had HTLV-2, which is a direct

17   lymphotrophic virus that actually causes a

18   subtype of T-cell lymphoma.

19                And I've treated several

20   patients, and I had to tell them that their

21   disease was clearly linked to immunosuppression

22   and the presence of an HTLV virus that was

23   causing the disease.

24                So I have done that.

25        Q.     Okay.  With that one exception,

D. Barry Boyd, MD, MS

1    have you ever told a patient that you -- that

2    their NHL was caused by any specific factor

3    besides the one that you just mentioned?

4             A.     No, but we discussed the

5    various -- the different risk factors.

6             Q.     Do you have a form that patients

7    fill out when they come in to see you for

8    potential diagnosis or treatment of NHL?

9             A.     Say that again.  I'm sorry.

10            Q.     Sorry.

11                   Do you have any sort of form that

12   patients fill out when they come in to see you

13   for potential diagnosis or treatment of NHL?

14            A.     Only after they come in.  They

15   don't fill out a form on paper.  We use Epic,

16   the medical records system at Yale, and we

17   gather all that data.

18                   And even before they see me, one

19   of the other staff may fill in initial

20   information in Epic on their visit.  But it's

21   all in the computer.  It's not on paper.

22            Q.     Okay.  Whether computer or paper,

23   do you recall what sort of risk factors or

24   other questions that are asked about any --

25   actually, strike that.  That was a horribly

D. Barry Boyd, MD, MS

1    worded question.  Let me break that up.

2                    Does this form ask questions

3    regarding risk factors for NHL?

4           A.    Well, you know, some of the most

5    common risk factors that are purported to play

6    a role are simple things like age, which

7    includes date of birth, so that's in there.

8    Male or female, gender, although that's gotten

9    complicated in recent years, but that plays a

10   role.  Family history, and the presence or

11   absence of a history of hemological

12   malignancies.

13                   We don't have in the computer --

14   we do have, obviously, other diseases too, so

15   that there are a number of diseases that are

16   linked, rheumatologic abnormalities, that is

17   immune -- immune-related diseases that are

18   associated with a high risks of lymphoma, as

19   well as -- you know, sometimes issues of recent

20   infection or other illnesses that might play a

21   role in predisposing them.

22                   But other than that, that's

23   really part of the computer system that's

24   filled out.

25           Q.    Okay.  So it's fair to say that

D. Barry Boyd, MD, MS

1    each of those risk factors you just mentioned,

2    you inquire about when a patient comes to see

3    you for treatment or diagnosis of NHL?

4              A.      Yes.  And, you know, beyond NHL,

5    all of my cancer patients, my focus has been on

6    cancer causation.  And people come to me from

7    many -- from distances, to help them sort out

8    why they got their cancer.

9              That's one of the most common

10   questions that patients come, because they want

11   to -- if they can discover what they believe

12   might have caused it, they feel that maybe if

13   they can remove or reverse that, they can

14   improve their outcome.

15             In some cases that may play a

16   role, but in most cases not.  And there's a lot

17   of misinformation that I help patients deal

18   with in terms of cancer causation.

19             Q.    And I hate to deviate for a

20   second, but I can't remember if I moved your CV

21   into evidence.

22             MS. BATALIAS:  So just for the

23        record, I'll mark that as Exhibit 2.

24        Just thought of that.

25             (Boyd Exhibit 2, a C.V., was so

1              marked for identification.)

2       BY MS. BATALIAS:

3              Q.     Okay.  Dr. Boyd, when did you

4    first come to the conclusion that glyphosate or

5    Roundup was a cause of NHL?

6              A.     You mean the date?

7              Q.     Yes, if you can pinpoint it.

8              A.     Well, I've been focused on the

9    data on glyphosate/Roundup, because, you know,

10   there is no glyphosate without Roundup these

11   days, for the most part.

12                     For the last six or seven years,

13   and focusing on the growing body of

14   information, both epidemiologically,

15   mechanistically and in animal studies.  You

16   know, so I would say it's been -- you know,

17   it's been in that period of time.

18                     And, you know, I don't make a

19   determinative decision about any individual

20   until I've reviewed all the data and looked at

21   the extent and duration exposure and the nature

22   of their disease.

23              Q.     So is it fair to say prior to --

24   I think you said six or seven years ago -- you

25   had not come to the conclusion that glyphosate

1      or Roundup was a cause of NHL?

2                    MR. BRICKER:  Form.

3                    THE WITNESS:  It may have been a

4            little longer than that, but the

5            important point is, like the growing

6            use of Roundup and -- in the

7            population, meaning the, literally,

8            exponential rise and exposures to

9            individuals, the data has become

10           strengthened by that information, not

11           just for non-Hodgkin's lymphoma but

12           for other diseases.  So my opinion has

13           been strengthened, not weakened, by

14           that growing information.

15                The early epidemiology included

16           studies where Roundup was not being

17           used very widely.  You know, it's

18           grown enormously since the time of

19           those early provocative studies.  It

20           really reinforced the great concern

21           that the future may be worse than the

22           past, in terms of risk.

23      BY MS. BATALIAS:

24           Q.     But, Dr. Boyd, you have never

25      published your opinion that Roundup is a

D. Barry Boyd, MD, MS

```
1    contributing factor to NHL in any sort of
2    peer-reviewed journal; correct?
3              A.      Not yet.
4              Q.      Is there anything preventing you
5    from doing so?
6              A.      Time.
7              MR. BRICKER:  Form.
8       BY MS. BATALIAS:
9              Q.      You've never subjected this
10   opinion that Roundup can be a contributing
11   factor to NHL to peer review; have you?
12             A.      As I said, I am -- I haven't got
13   it, but I have a manuscript I'm working on that
14   explains the carcinogenicity and cancer risk
15   related to Roundup, in prep, but it's not
16   available yet for your review.
17             Q.      And where is your current place
18   of employment?  Is that still Yale?
19             A.      I'm looking at it now.  It's a
20   Yale cancer center called Yale Smilow Cancer
21   Center, and my office is in Greenwich,
22   Connecticut, just outside of New York City.
23   And we're one of the care centers.
24                     And we're -- I'm actually a
25   faculty member at Yale University, so I'm --
```

D. Barry Boyd, MD, MS

1    that's where I get my paycheck from.

2           Q.     But you also do expert litigation

3    work?

4           A.     I do some, yes.

5           Q.     And approximately how much of

6    your revenue comes from litigation work versus

7    your work at Yale?

8           A.     15 to 20 percent.  Somewhere in

9    that range.  But I would have to -- you know,

10   I'm estimating.  It depends on the year.

11          Q.     What rate do you usually charge

12   for litigation work?

13          A.     Well, the rate I charge -- now,

14   to explain this, it's important to understand

15   that there is a lawyer who has worked with me

16   who gathers the data, puts it together, helps

17   with report.  Doesn't write the report, but

18   he's an organizer who puts together, you know,

19   even my depos.

20                 He's got all of this together.

21   And he bills, and then I get a -- he gets a

22   portion, about 30 percent of that.  So I

23   believe it may be 800 or maybe more, maybe a

24   thousand an hour.  But that's not what I get.

25          Q.     Okay.  But you charge 800 to a

1    thousand an hour, you said?

2           A.     Yes.  Plus time out of the

3    office.  That's time, unfortunately, that I

4    split with him, even though it's my cost.

5    Because when I'm not seeing patients, I'm the

6    one who loses the money.

7                  So, for instance, a half day out

8    of the office is time away from patient care.

9    So in addition to missing seeing patients,

10   which I do, it also is a financial cost to me

11   in terms of my income, because those are hardly

12   used that count toward my salary -- my income.

13   It's not a salary but, you know, my

14   compensation.

15          Q.     Do you recall how much you

16   charged for this deposition today?

17          A.      It may be 6 to 9,000.  It's

18   around -- David Bricker would probably be able

19   to tell you more accurately.

20          Q.     Do you have any reason to

21   disagree if I told you it was $8,600 for this

22   day of deposition?

23          A.     No.  No.  That's -- I said 6 to

24   9,000, so that's the upper end of that range.

25          Q.      And has that amount that you

1   charge per half day or per day of testimony,

2   has that changed over time the longer you've

3   done this litigation work?

4           A.      Well, yeah, it has gone up with

5   inflation.

6           Q.      Do you recall how much it's gone

7   up since you began?

8           A.      No.  I would say it's probably

9   gone up 20 to 30 percent, but that's been in

10  the last two -- three or four years.  That's

11  what's the billing.  That's not what I make.

12          Q.      Right.  As you said before, you

13  make about 70 percent of that bill?

14          A.      Correct.

15          Q.      And in the course of your

16  litigation work, have you ever testified for

17  the defense?

18          A.      For -- for Monsanto?

19          Q.      Yes.  Any defense -- any

20  defendant.

21          A.      Once in -- unrelated to this.  I

22  testified about a cause of cancer in a patient

23  who was using an industrial chemical on the

24  floor.  And the causation was clearly

25  documented related to -- I can't even remember

D. Barry Boyd, MD, MS

1    now, but it was -- but there was clear-cut

2    evidence for an intrinsic risk factor that the

3    patient had that was being ignored by the

4    people suing the chemical company.

5              I said, "It's not the chemical,"

6    you know.

7              And I can't tell you what the

8    case is, but that was for the defense, for the

9    company.  They lost anyway because in a jury,

10   even though it was quite clear -- maybe didn't

11   get across to them -- that sympathy was enough,

12   I guess.

13        Q.    I understand how that works.

14        A.    Right.

15        Q.    So in the course of your

16   litigation involving glyphosate or Roundup

17   products, you've always testified for the

18   plaintiff; is that fair to say?

19        A.    Yes.  I briefly testified -- and

20   I haven't -- I've discontinued my work on the

21   role of Zantac and a chemical called NDMA,

22   which is present in previous Zantac samples

23   that is no longer available.  The FDA banned

24   the use of that, and they've changed it, so

25   it's taken off the market.  And I was involved

D. Barry Boyd, MD, MS

```
 1    in that related to -- particularly, bladder
 2    cancer.
 3                 But I've discontinued my work on
 4    that.  And that's not defense.  That's, you
 5    know, for --
 6          Q.     For plaintiff work?
 7          A.     Yes.
 8          Q.     Have you ever worked with the
 9    Thornton Law Firm before?
10          A.     I think so, yes.
11          Q.     Can you estimate how many times
12    in the past.
13          A.     No, not really.
14          Q.     Is that because --
15          A.     It's because -- I'm not one who
16    remembers the firms as much as the cases.
17          Q.     Fair -- fair enough.
18                 And you mentioned you're
19    currently teaching at Yale?
20          A.     Yeah, I've been doing that for
21    years.
22          Q.     Have you ever taught medical
23    students that glyphosate or Roundup was a cause
24    of NHL?
25          A.     Not specifically, but I do
```

D. Barry Boyd, MD, MS

1   discuss causation in my screen lecture on

2   energy balance, obesity and cancer.  But I have

3   not specifically mentioned glyphosate, but I

4   talk about environmental factors in the

5   causation.

6         Q.    We're going to try to do this

7   again with another exhibit.  Okay.  There

8   should be a third document in that folder.

9   Please let me know if there is not.

10        A.    Expert disclosure?

11        Q.    Yes, sir.

12              And if you wouldn't mind

13   scrolling down to Page 64 of that document.

14        A.    Yes.

15        Q.    Okay.  Do you see what's -- the

16   heading, the subject line, is "Testimony List"?

17        A.    Yes.

18        Q.    Is it fair to say that this is

19   your testimony list as of -- it looks like the

20   date on that email is January 21, 2022?

21        A.    Yes.

22        Q.    Okay.  I'll represent -- sorry.

23        A.    Yeah, we'll add this to that

24   list.

25        Q.    And I'll represent that --

D. Barry Boyd, MD, MS

1        A.      That's it.  Before today, that's

2   it.

3        Q.      Okay.  Have you -- strike that.

4   Sorry.

5                So this list isn't fully updated;

6   correct?

7        A.      Well, that -- I think that's the

8   list to date that I've testified.  Yeah.

9        Q.      You're saying you haven't

10  testified in anything since, it looks like, the

11  Constantine case in 2022?

12       A.      I believe so.  I believe that's

13  correct.

14       Q.      So you did not recently be

15  deposed in August of this year?

16       A.      I remember what that --

17                MR. BRICKER:  Well, we know the

18           Cotter depo was since January of last

19           year, Barry.

20                THE WITNESS:  Yeah.  Okay.  I

21           mean, I just can't keep them all

22           straight.  I tend to keep my patients

23           straight.  It's enough to keep these

24           straight.

25                So, yeah, I did -- well, I had

1                   Cotter, and then I actually testified

2                   in trial on McCostlin in St. Louis.

3          BY MS. BATALIAS:

4                   Q.     And that was September of this

5     past year; is that correct?

6                   A.     I believe so, yeah.

7                   Q.     Okay.  Do you have any reason to

8     dispute if I told you that you've testified in,

9     actually, six depositions and two trials since

10    this list was last updated in January of 2022?

11                  A.     If you'd fill me in, I'd love to

12    know that.  I trust you.  Monsanto certainly

13    knows.

14                  Q.     Yeah.  My list since Constantine,

15    I believe there's Frank, Buttrey, Pyan, Cotter,

16    Allegreeza, McCarthy, Canning and McCostlin.

17                  A.     Yeah.  Well I would -- I'll go

18    back and review that, and maybe we can update

19    this to make sure it's correct.  Assumably,

20    I'm -- I'd be glad to look at that, make sure

21    it's all complete.

22                  Q.     Thank you.

23                         And that last trial that you

24    testified in McCostlin, that was the most

25    recent testimony that you can recall?

D. Barry Boyd, MD, MS

1         A.      Yeah.   That was live.   I had to

2   fly out to St. Louis for that -- for that

3   trial.

4         Q.      Were you privy to the outcome of

5   that trial?

6         A.      I'm actually -- we were just

7   discussing that.   I don't know yet what the

8   outcome was.

9         Q.      Have you done anything to

10  formulate or change your opinions in this case,

11  beyond the work that you did for your most

12  recent testimony in the McCostlin trial?

13        A.      No.

14        Q.      I was going to say, to reword

15  that, because I think that came out kind of

16  confusing.

17              Have you updated your opinions in

18  between the end of that trail and where we sit

19  now today?

20        A.      No, I haven't.   I have not.

21        Q.      Okay.   Going back to the

22  materials reviewed list that you included on

23  your report.   I understand that the articles

24  and studies, there might more in the updated

25  version.

D. Barry Boyd, MD, MS

```
 1              A.      Yes.
 2              Q.      But as far as the documents that
 3    you've reviewed for this specific case, do you
 4    know who selected those documents?
 5              A.      Me.  I choose the documents that
 6    I review.  I look at the research.  I do the
 7    research myself.  So nobody else shows that.
 8    It's just my own review of the literature.
 9                      You know, I think the most recent
10    updated -- if I can tell you that, and I think
11    it should be in there because it's very
12    important -- is the series of Swedish studies
13    and case control studies of Eriksson and
14    Hardell.  The most recent one I think was 2023.
15    So that's one that should be in there, so.
16              Q.      I'm sorry.  I don't think my
17    question was clear.  I meant as far as the
18    case-specific documents that you reviewed, such
19    as depositions or discovery requests.  Do you
20    know who selected those documents for your
21    review?
22              A.      Well, I do, usually.  I review --
23    I determine the appropriate documents based on
24    the case and based on the issues.
25              Q.      So you review the whole case file
```

D. Barry Boyd, MD, MS

1    and then pick out the documents you would like

2    to include in your report?

3           A.     Well, we haven't -- we have a

4    reference file that has been used and given to

5    Monsanto that includes all the studies.

6                 Some of them -- for instance, you

7    know, we have a number of references regarding

8    mantle cell lymphoma.  We have a number of

9    references regarding obesity.  We have a number

10   of references within there linked to risk

11   factors, you know, secondary risk factors that

12   are not specific to Roundup but are part of the

13   entire group of testimonies we've done.

14                So that's a master list of our

15   references.

16          Q.     I understand what you're saying

17   there.  I'm more so talking about specifically

18   to Mr. Canning in this case.

19                Do you know who selected the

20   litigation documents that you reviewed?  So,

21   for example, the deposition?

22          A.     Oh, oh, yeah.  Yeah.  That's

23   different.

24          Q.     Yeah.

25          A.     I -- well, you know, those are --

D. Barry Boyd, MD, MS

1   those are incorporated into a file that I have

2   for each -- each -- I was going to say

3   patient -- each individual, and then I review

4   those documents, whether it's depositions,

5   expert testimony, you know, medical history, of

6   course, the extensive medical history.  So

7   those are placed in that file.

8           Q.     And who places them in the file?

9           A.     That's -- that's one of the

10  things that -- that the lawyer I told you about

11  who does for me, Michael Lavinger.

12          Q.     So he picks out the documents

13  from this specific litigation that you review?

14          A.     Well, he organizes what has been

15  provided to him, that is relevant to the

16  particular individual we're reviewing.

17          Q.     And who provides the documents to

18  him?

19          A.     I think it's through the lawyers

20  in the case.

21          Q.     So the lawyers in this case,

22  Mr. Canning's lawyers, provide documents to

23  your lawyer, and then he provides documents to

24  you for review?

25          A.     Yeah.  He'll put them in the

D. Barry Boyd, MD, MS

1   Dropbox, and then I'll have a chance to review

2   all of that information that is critical for

3   decision-making.  And, you know, that would --

4   he will request additional information or get

5   it if there's new information that comes in

6   prior to deposition, for instance.

7              So that file in Dropbox is often

8   updated with additional -- you know, additional

9   history, for instance.  I mean, we've had

10  one case where there was another six months of

11  history that had been not given because the

12  file was older.  So that keeps getting updated.

13            Q.    But you're not privy to the

14  documents that he selects and puts into the

15  folder, the decision-making process that goes

16  into that?

17            A.    Well, he doesn't -- he doesn't

18  select and deselect.  Everything that he gets

19  goes in there.

20            Q.    Okay.  And you're not privy to

21  the selection process that Mr. Canning's

22  lawyers go through in providing your attorney

23  with these documents?

24            A.    Not what they go through, but we

25  presume that all the relevant documents are

D. Barry Boyd, MD, MS

1    there.  So I have to presume.

2          Q.    Now, before we get into the

3    specifics of your opinions regarding

4    Mr. Canning, I'm just going to go through them

5    at sort of a high level to make sure that I

6    understand.

7                Your generic causation opinion is

8    that Roundup increases the risk that any

9    individual exposed will develop NHL; is that

10   fair?

11         A.    You need to --

12               MR. BRICKER:  Form.

13               THE WITNESS:  You need to restate

14        that.

15     BY MS. BATALIAS:

16         Q.    Your generic causation opinion is

17   that any exposure to Roundup increases the risk

18   of NHL; is that correct?

19         A.    No, it's not correct.

20         Q.    Would you mind explaining your

21   generic causation opinion briefly?

22         A.    Generic causation of any disease

23   is dependent on duration, extent, and what we

24   call latency, the time of origin.  So the

25   exposure duration, prior to diagnosis, plays a

D. Barry Boyd, MD, MS

1    role.

2                    If somebody's exposed to Roundup

3    a year before they get lymphoma, that had

4    nothing to do with their lymphoma.  If somebody

5    gets exposed twice a month, you know, with very

6    minimal amounts of exposure, it's likely that's

7    not.

8                    So it's duration and extent of

9    exposure play a big role.  But that's true not

10   only for Roundup -- and this goes to what's

11   call Bradford Hill criteria for causation.  It

12   has to be coherent, and it has to make sense.

13                   And timing is critical, so there

14   has to be enough latency to explain, because

15   tumors don't arise and immediately after

16   exposure.  Carcinogenesis is a prolonged,

17   extended period prior to the onset of the

18   disease.

19                   So the duration of exposure's

20   important.  The intensity is important because

21   minimal exposure is not going to make sense.

22                   The other portion, Bradford Hill,

23   has been described as -- as the idea of other

24   diseases manifest a similar approach, like

25   smoking.  If you smoke for a week or a month,

D. Barry Boyd, MD, MS

1  you're not going to get lung cancer.  The

2  longer and the greater you smoke over the

3  longer period of time, the risk goes up.  And

4  that's well described by a number of epistudies

5  both in Great Britain and the United States in

6  the '50s and '60s.

7              So causation is more complicated

8  than just being exposed causes it.  I would

9  never do that.  And there are many cases I

10  would turn down because I didn't think the

11  exposure was enough to explain it, for Roundup,

12  specifically.

13        Q.    Is it your opinion that Roundup

14  promotes the development of already-existing

15  NHL?

16              MR. BRICKER:  Form.

17              THE WITNESS:  That may be part of

18        it, but I believe it may play a role

19        in the initiation, as well as the

20        progression of NHL.

21     BY MS. BATALIAS:

22        Q.    In this case specifically,

23  Mr. Canning was allegedly exposed to glyphosate

24  while working at a cranberry bog starting in

25  1984; is that correct?

D. Barry Boyd, MD, MS

```
 1              A.      Yes.
 2              Q.      And it sounds like from the
 3     records, he stopped spraying at either location
 4     in 2009?
 5              A.      Correct.
 6              Q.      And your specific causation
 7     opinion, as I understand it, please correct me
 8     if I'm wrong, is that Mr. Canning's glyphosate
 9     exposure substantially increased his risk of
10     developing NHL; is that right?
11              A.      Yes.
12              Q.      Did it increase his risk of
13     developing any type of NHL?
14              A.      Well, that's -- that's an
15     epidemiology question that we're all focused
16     on.  There's data both for DHL or DLBCL,
17     diffuse large B-cell lymphoma, that he had, and
18     a significant amount of the data favors that
19     that is clearly one of the lymphomas that is at
20     risk with high and long exposure to Roundup.
21     And that data's pretty good.  That's pretty
22     firm data.
23                      One of the earliest studies was
24     in T-cell lymphoma.  So I can't argue that that
25     doesn't.  Leukemia and the -- you know, the
```

D. Barry Boyd, MD, MS

1    agricultural health studies.  So there are a

2    number of different subsets of hemologic

3    malignancies.

4                    But within lymphomas, it's pretty

5    significant that their association with not

6    only diffuse large cell, which is the most

7    common type of B-cell lymphoma, by the way, but

8    also follicular lymphomas and small lymphocytic

9    lymphomas through CLL.  So there's data in all

10   of those.

11                   And I've seen cases of mantle

12   cell, a fourth version of a B-cell lymphoma

13   that also has been associated.

14        Q.    Do you know whether -- whether

15   Mr. Canning's exposure in this case initiated

16   or promoted his cancer?

17        A.    Well, based on the latency, which

18   started in 1984, his exposure, it would be hard

19   to say that it -- that it promoted it alone.

20   But it very clearly, in his case, may have had

21   an initiation effect on this, because of the

22   long duration of exposure.

23                   So that plays a role in how you

24   judge this.  You know, you can initiate a

25   disease from another cause, a spontaneous

D. Barry Boyd, MD, MS

1   mutation, as Thomas Eddy, you know, talk about.

2                   But even within that, there are

3   many factors in the environment that they had

4   been, essentially, critiqued about, that play a

5   role in taking an initiated cell and making it

6   grow faster, acquiring mutations and leading to

7   progress of disease.

8                   And lymphoma is clearly going to

9   be one of those diseases.  He probably had

10  both, a potential for initiation.  And we know

11  the mechanisms in animal data.  We know, as you

12  probably have known through, you know,

13  Monsanto's discussions, the data from the World

14  Health Organization, you know, in terms of

15  their report in 2015, that it has a number of

16  different mechanisms including oxidative

17  stress, immunotoxic effects with high

18  exposures, and is likely linked to lymphoma.

19  And it's a Class B carcinogen, based on that

20  report.

21          Q.    But in this case you cannot say

22  with certainty whether his exposure was an

23  initiator a promoter of his NHL?

24          A.    I wouldn't know --

25                   MR. BRICKER:  Form.

1          THE WITNESS:  I'm sorry, David.

2      Go ahead.

3          MR. BRICKER:  I just objected to

4      form.

5          Go ahead.

6          THE WITNESS:  I would argue that

7      the level exposure that this gentleman

8      had for so long precludes trying to

9      determine which, because it very

10      clearly could have been both, and

11      clearly had, likely, a promoting

12      effect, even if he had a non-Roundup

13      or glyphosate-related initiating

14      event.  It clearly, over those years,

15      would promote progression of lymphoma,

16      if he had a latent population of

17      cells.  So he had a huge exposure.

18          I mean, there are very few

19      patients, people -- I like to talk to

20      these patients like they're patients

21      of mine.  But there are very few

22      individuals that had the extent of

23      exposure that he had.

24  BY MS. BATALIAS:

25      Q.    On that note, just to clarify,

D. Barry Boyd, MD, MS

1    Mr. Canning is not a patient of yours; right?

2              A.      No, he is not.  No.  I just --

3              Q.      You've never examined him?

4              A.      Never examined him.  Never spoken

5    to him.

6              Q.      Okay.  Now, when assessing

7    whether Roundup is a cause or contributing

8    factor to a patient's NHL or a plaintiff's NHL,

9    do you distinguish between Roundup and

10   glyphosate?

11             A.      The data in epi has focused on

12   glyphosate.  In the real world, it's in

13   Roundup.  And, of course, the dilemma is that

14   Roundup contains multiple different

15   formulations, in addition to the glyphosate.

16                     So it's been mostly looking at

17   glyphosate exposure, but nobody sprays

18   glyphosate.  They spray herbicides containing

19   glyphosate, and most of them have been Roundup.

20             Q.      So for purposes of your opinion,

21   does the particular, I guess, sub brand of

22   Roundup used by Mr. Canning make a difference?

23             A.      Not that we know, no.  The

24   difference is how concentrated the exposure is.

25                     So different formulations of

D. Barry Boyd, MD, MS

1    Roundup are concentrated in whether they use

2    that in mixture at high exposures, than if they

3    have a average residential sprayer that they

4    pick up at Home Depot.

5                    So that's not formulation.  That

6    is the concentrate versus the spray,

7    ready-to-use spray.

8            Q.      And in this case, of course, you

9    don't know the specific formula or concentrate

10   of the Roundup that Mr. Canning used; is that

11   right?

12           A.      No, but we know that he used the

13   concentrated mix that you put it into -- you

14   know, into the ditches.  So he was using,

15   likely, commercial formulations that would be

16   used on a farm.

17           Q.      But you don't know for sure?

18           A.      Well, I think the data --

19                   MR. BRICKER:  Form.

20                   THE WITNESS:  -- it has that in

21         there.

22      BY MS. BATALIAS:

23           Q.      Other companies besides Monsanto

24   make products with glyphosate in them; right?

25           A.      Yes.

D. Barry Boyd, MD, MS

1                    MR. BRICKER:  Form.

2          BY MS. BATALIAS:

3                    Q.    Do you know which specific

4     products that Mr. Canning used containing

5     glyphosate?

6                    A.    Not the specific, no.

7                    Q.    And in reviewing the records, you

8     know that Mr. Canning could not specifically

9     remember the bottles he used or the labels on

10    them?

11                   A.    Right.  Correct.

12                   Q.    So you have no way to tell if

13    anything besides glyphosate was in those

14    bottles?

15                   A.    Well, they all contain --

16                   MR. BRICKER:  Form.

17                   THE WITNESS:  -- various

18          formulations.  There's no way to know

19          without knowing which form.

20         BY MS. BATALIAS:

21                   Q.    So you're unable to calculate the

22    amount of exposure that Mr. Canning had to any

23    specific additive?

24                   A.    Beyond glyphosate, no.

25                   Q.    Mr. Canning had a number of

1  medical conditions that didn't have anything to

2  do with his Roundup use; is that correct?

3          A.      Yes.

4          Q.      For example, it looks like he was

5  overweight.  That's noted as far back at 2008;

6  is that right?

7          A.      Yeah.  Yes.

8          Q.      We also have hypertension, gout,

9  dizziness, hearing loss?

10          A.      Musculoskeletal symptoms.  He had

11  low back pain.  He had a variety of injuries.

12  He had a fracture of the foot.

13          Q.      Deep vein thrombosis?

14          A.      Right.  That's correct.

15          Q.      Migraines?

16          A.      He traveled by the way.  So he

17  had clear-cut etiology to that, unrelated to

18  Roundup or lymphoma.

19          Q.      Right.

20                  So let's turn to his initial

21  diagnosis.  It sounds like he first noticed a

22  mass in his left cheek in November of 2014.

23                  Does that sound right?

24          A.      It was October of 2014.

25          Q.      Okay.  And he got that -- sorry.

D. Barry Boyd, MD, MS

1    Go ahead.

2              A.    That was a mass in his left neck.

3              Q.    Okay.  And he got that checked

4    out at Cape Cod medical hospital in December of

5    that same year?

6              A.    Yes.  And as you noted, he had

7    episodes of dizziness.  So he was referred to

8    the same EMT doctor that had seen him

9    previously, Dr. Jones.

10             Q.    And then to simplify the course

11   of events, it sounds like the Cape Cod medical

12   hospital then referred him to Boston Medical

13   Center for further testing?

14             A.    Well, to add to that, Dr. Jones

15   did two fine needle aspirates, which is a

16   standard, in the neck -- of the lymph node.

17   And what he found in the first was negative,

18   and the second one showed, quote, unquote,

19   atypical cells.  He had a subsequent imaging

20   study with an MRI, which also showed extensive

21   adenopathy, both adenopathy and what we call

22   the parapharyngeal, which is back of the

23   throat.

24                   And as an oncologist, one of the

25   first things you think of, although he was not

D. Barry Boyd, MD, MS

1  a smoker, he did have modest alcohol intake, is

2  a head and neck cancer, which increasingly is a

3  virally mediated cancer by HPV.  And so you

4  don't need to be a smoker or drinker to get

5  that.

6             And I think that was his first

7  concern, although, it's not really mentioned.

8  But that, then, he got referred to an

9  otolaryngologist at Boston Medical Center.

10        Q.    And from there he was diagnosed,

11  and it sounds like he had surgery on

12  February 26, 2015, for that mass; correct?

13        A.    Yeah.  And, you know, I think

14  they were concerned about an urgent diagnosis.

15  And I read the notes directly from the

16  hospitalization.  And he had a surgical

17  approach that was rather extensive for simple

18  diagnosis.

19             Instead of having -- and he

20  suffered that -- consequences of the extent of

21  the surgery that he had there.  He was treated

22  like he had head and neck cancer.  He had a

23  left neck dissection, along with removal of the

24  that tumor there.  Left with swallowing

25  difficulties.  Normally, if it's possibly a

D. Barry Boyd, MD, MS

1    lymphoma, you do a lymph node excision.  That's

2    all you need.

3                    So he went through a rather

4    extensive surgery, and I think I didn't see

5    anybody write in there, well, oops, he had just

6    lymphoma.  Because he could have been treated

7    with chemotherapy and radiation without that

8    extensive operation.  I was very surprised by

9    that.

10            Q.     And he would have been about

11   74 years old at that time?

12            A.     Correct.

13            Q.     You said they could have just

14   done chemo, that -- they ended up doing chemo

15   after the surgery; correct?

16            A.     Yeah.  We treat -- we treat --

17   when they finally made the diagnosis, he had

18   T-cell-rich, histiocyte-positive -- well, a

19   T -- a B-cell -- a large B-cell lymphoma,

20   classic B-cell lymphoma.

21                    If you make a diagnosis with a

22   simple lymph node dissection, you use R-CHOP,

23   which he received for six cycles and followed

24   by involved-field radiation.  He wouldn't have

25   needed that big operation.  He could have just

D. Barry Boyd, MD, MS

1    received that after a lymph node biopsy.  It

2    would have been just as effective.

3                    You normally don't treat lymphoma

4    by extensive, big surgery, because it's so

5    exquisitely sensitive to systemic chemotherapy.

6            Q.     And he did have said

7    chemotherapy, it looks like starting in

8    April 2015, and then six cycles of that?

9            A.     Correct.  Yeah.

10           Q.     And do you know exactly when

11   Mr. Canning's NHL started?

12           A.     When it started?

13           Q.     Yes, sir.

14           A.     I can only tell you when it was

15   diagnosed.  I mean, obviously, he had a neck

16   mass in 2014.

17                   Now, I can tell you this.

18   Diffuse large cell lymphoma is an aggressive

19   B-cell malignancy.  It does not have a long

20   latent premalignant period, once it is exploded

21   into a large B-cell lymphoma.  So it may have

22   had a precancer period of a couple of years.

23                   But prior to that, he may have

24   had the early initiating events, before he

25   developed this frank, aggressive B-cell

1    component.

2              Q.      But you agree that it's

3    impossible to determine exactly when

4    Mr. Canning's NHL started?

5              A.      Right.  Correct.  But it was

6    before, not after.

7              Q.      And you mentioned this before,

8    but you agree that the NHL responded favorably

9    to his chemotherapy?

10             A.      Yeah.  He had an excellent

11   response.

12             Q.      Yeah.  No evidence of progression

13   to this date?

14             A.      No.  He's only suffered the

15   consequences of radiation.  He's had bursitis.

16   He's had what we call dysphagia, pain with

17   swallowing.  You know, so he has suffered the

18   consequences, particularly, in the radiation

19   and the surgery, rather than the chemo.

20             Q.      And besides continuing to monitor

21   Mr. Canning, he doesn't need to have any

22   additional treatment at this time for his NHL?

23             A.      Correct.  And he's likely far

24   enough out that -- you know, because we're now

25   talking really seven -- like, eight years,

D. Barry Boyd, MD, MS

1   nine years, that he -- you can't guarantee it

2   can't recur, but it's less likely as you go on

3   with large cell lymphoma.

4           Q.     As far as you can tell, none of

5   Mr. Canning's blood tests showed that Roundup

6   or glyphosate was present in Mr. Canning?

7           A.     There is no blood test for that.

8           Q.     And --

9           A.     All my other depositions, the

10  answer is the same.

11          Q.     There are no biomarkers that can

12  point to glyphosate as the cause of

13  Mr. Canning's cancer?

14          A.     No.  Nor for most carcinogens.

15          Q.     And to that same effect, none of

16  Mr. Canning's pathology reports showed any

17  evidence of Roundup or glyphosate?

18          A.     No, and, again, that's not a way

19  to prove or disprove causation.  You don't

20  identify a carcinogen in pathology.

21          Q.     Right.

22                 And there's no medical test that

23  could show anything pertinent to Roundup or

24  glyphosate?

25          A.     No.  And, again, does not

D. Barry Boyd, MD, MS

1   disprove causation.

2          Q.     None of the imaging tests or

3   studies that you reviewed of Mr. Canning

4   reflect any cause of -- let me strike that.

5   That was a horribly worded question.

6                 Did you review imaging studies

7   for Mr. Canning in this case?

8          A.     As part of it, yes.

9          Q.     And none of those scans reflect

10  that this was a case of Roundup-induced NHL; do

11  they?

12         A.     Again, no.  You don't see -- you

13  can't see Roundup on a scan.  Only the tumor.

14  The same way that for many carcinogens, for

15  instance, with mesothelioma, you can't see

16  asbestos on the scan.

17         Q.     A patient with the exact same

18  medical history as Mr. Canning but who has

19  never used Roundup could still be diagnosed

20  with the exact same type of NHL that he

21  contracted; is that right?

22                MR. BRICKER:  Objection.  Form.

23                THE WITNESS:  Yeah.  Possibly.

24         But they may have other risk factors.

25                This risk factor was really a

1              standout in this patient.  That is

2              associated with this.

3      BY MS. BATALIAS:

4              Q.     But you can't say Mr. Canning

5      would not have been diagnosed with NHL had he

6      never been exposed to Roundup; correct?

7                   MR. BRICKER:  Form.

8                   THE WITNESS:  Only thing I would

9              say the probability of this is a

10             more-likely-than-not associate.

11     BY MS. BATALIAS:

12             Q.     If you conducted a differential

13     diagnosis in this case -- which you did,

14     correct, that differential diagnosis?

15             A.     A differential diagnostic

16     ideology, is that -- that's what you mean;

17     right?

18             Q.     Yes, sir.  That is what I mean.

19             A.     Yes.

20             Q.     In conducting that differential

21     ideology, you couldn't rule out the possibility

22     that Mr. Canning's NHL was caused by a mutation

23     not influenced by a chemical?

24             A.     Again, mutational events are the

25     beginning, not the end, of cancer.  Even a

D. Barry Boyd, MD, MS

1   spontaneous mutation will then predispose to

2   the influence of environmental factors to

3   promote progression of replication, decreased

4   apoptosis, all the things that -- and what we

5   call -- and we know for sure that glyphosate

6   alters promotional factors called methylation

7   that changes how genes are expressed, even

8   after the mutation, to make it more likely that

9   that mutation will then lead to malignancy,

10  even if the mutation was not Roundup.

11          Q.    But if you saw a patient with the

12  same medical history as Mr. Canning, minus the

13  exposure to Roundup, what would you say caused

14  his NHL?

15          A.    You have to look at the

16  individual.  There are many, many things that

17  play a role.  So, you know, that's a

18  hypothetical that is not rational, because each

19  individual has many, many factors in their

20  history.  Do they have autoimmune disease, are

21  they on immunosuppressant therapies, do they

22  have a viral, you know, infection, do they have

23  other exposures that may play a role.

24          Q.    So taking out just the exposure

25  for Mr. Canning's case and using the exact same

1    medical history, you're saying you're unable to

2    say what causes NHL?

3              A.     Well, beyond the Roundup.  I

4    think the Roundup is the most consistent factor

5    in his case.  The exposure was extensive and

6    for a long period.  It meets the latency of the

7    epidemiology studies, greater than 10 years or

8    10 to 20 years.  It matches the duration and

9    extent of exposure, in terms of exposure days,

10   on the data.

11             So glyphosate overwhelms all the

12   other risk factors he might have; even based on

13   his age, based on the fact he's a male, which

14   we know plays a role in lymphoma.  Even beyond

15   that, this risk factor is pretty, pretty

16   substantial for him.

17             Q.     Right.  But my question was

18   taking out the exposure to Roundup as a

19   contributing factor, potential contributing

20   factor, if you saw a patient with the exact

21   same medical history, what would you say caused

22   the Roundup -- NHL?

23                  MR. BRICKER:  Form.  Form.

24                  THE WITNESS:  Well, that's a

25          hypothetical that doesn't exist.

D. Barry Boyd, MD, MS

```
1               You're asking me the same person

2               without Roundup, with all the

3               features.

4                    And that's -- I don't know if you

5               know anything about the human being,

6               but there are very few identical

7               people that remove one factor.  You

8               know, that's a hypothetical that can't

9               really be looked at, because

10              everyone's different.  My patients

11              come to me every day -- even twins,

12              based on their different exposure from

13              the time they were born, may have

14              different risks.

15         BY MS. BATALIAS:

16              Q.    So you if you take out exposure

17      to Roundup in this case, you're unable to say

18      what contributed or caused his NHL?

19                   MR. BRICKER:  Form.

20                   THE WITNESS:  I'm not sure I can

21              answer that, because, again, there is

22              no such person that I'm looking at

23              now, that's identical to him, without

24              Roundup.  There just is none.

25         BY MS. BATALIAS:
```