# EXHIBIT B

```
 1                  UNITED STATES DISTRICT COURT

 2                 NORTHERN DISTRICT OF CALIFORNIA

 3                       MDL NO. 2741

 4

 5        ********************************
          IN RE:  ROUNDUP PRODUCTS
 6        LIABILITY LITIGATION

 7        THIS DOCUMENTS RELATES TO:

 8        ROBERT AND DARYA COTTER
          V. MONSANTO COMPANY
 9        CASE NO. 3:20-CV-03108-VC

10
          ********************************
11

12

13

                    VIDEOTAPED DEPOSITION OF:
14
                     ROBERT F. HERRICK, SC.D.
15
                        (Taken Remotely)
16
                       7A Skinners Avenue
17
                    Marblehead, Massachusetts
18
                September 6, 2022       10:34 a.m.
19

20

21

22                   Darlene M. Coppola

23                 Registered Merit Reporter

24                Certified Realtime Reporter
```

```
1        APPEARANCES:

2        Representing the Plaintiff:

3             THORNTON LAW FIRM LLP

4             One Lincoln Street

5             Boston, MA 02111

6             BY:  CHRISTIAN F. UEHLEIN, ESQUIRE

7             T 617.720.1333

8             E cuehlein@tenlaw.com

9

10       Representing the Defendants:

11            HOLLINGSWORTH LLP

12            1350 I Street, NW

13            Washington, DC 20005

14            BY:  JOHN M. KALAS, ESQUIRE

15            T 202.898.5800

16            E jkalas@hollingsworthllp.com

17

18

19

20       Also Present:

21       Maddie Cowell, Videographer

22

23

24
```

```
 1                      INDEX

 2                   EXAMINATION

 3  Witness Name                                    Page

 4  ROBERT F. HERRICK, SC.D.

 5     Direct By Mr. Kalas ............................. 6

 6     Cross By Mr. Uehlein ........................... 153

 7     Redirect By Mr. Kalas ......................... 170

 8

 9                    EXHIBITS

10  Exhibit        Description                      Page

11  Exhibit 1      Defendant Monsanto               10
                   Company's Notice to
12                 Take Oral and
                   Videotaped Deposition
13                 of Robert F. Herrick
                   SC.D., CIH, FAIHA
14
    Exhibit 2      Roundup Exposure                 12
15                 History, Robert F.
                   Herrick, SC.D., CIH,
16                 FAIHA, June 15, 2022

17  Exhibit 3      Robert F. Herrick,               14
                   M.S., SC.D., CIH, FAIHA
18                 Curriculum Vitae

19  Exhibit 4      Environmental Health &           16
                   Engineering, Inc.
20                 Invoices, April 20,
                   2022 through August 17,
21                 2022

22  Exhibit 5      Depositions and                  20
                   Testimony, Last Five
23                 Years

24
```

Robert F. Herrick, Sc.D.

```
 1                    EXHIBITS

 2    Exhibit         Description                 Page

 3    Exhibit 6       "Pesticide exposure as        54
                      risk factor for
 4                    non-Hodgkin lymphoma
                      including
 5                    histopathological
                      subgroup analysis,"
 6                    Eriksson 2008

 7    Exhibit 7       Audiovisual                    63
                      Videoconference
 8                    Deposition of Robert
                      Cotter
 9
      Exhibit 8       "Glyphosate Use and           70
10                    Cancer Incidence in
                      the Agricultural Health
11                    Study," Andreotti 2018

12    Exhibit 9       "Pilot study evaluating       97
                      inhalation and
13                    dermal/glyphosate
                      exposure resulting from
14                    simulated/heavy
                      residential consumer
15                    application
                      of Roundup," Pierce
16                    2020

17    Exhibit 10      June 23, 2022 Report of      121
                      William R. Sawyer,
18                    Ph.D.

19    Exhibit 11      "Glyphosate                   137
                      Biomonitoring for
20                    Farmers and Their
                      Families:  Results from
21                    the Farm Family
                      Exposure Study,"
22                    Acquavella

23

24
```

Robert F. Herrick, Sc.D.

```
 1                 P R O C E E D I N G

 2

 3              (Commencing at 10:34 a.m.)

 4

 5                 THE VIDEOGRAPHER:  We are now on

 6      the record.  My name is Maddie Cowell.  I'm a

 7      videographer for Golkow Litigation Services.

 8      Today's date is September 6, 2022, and the

 9      time is 10:35 a.m.

10              This remote video deposition is being

11      held in the matter of Roundup.  Robert and

12      Darya Cotter versus Monsanto Company, et al.

13      The deponent is Robert F. Herrick.

14              All parties to this deposition are

15      appearing remotely and have agreed to the

16      witness being sworn in remotely.  Due to the

17      nature of remote reporting, please pause

18      briefly before speaking to ensure all parties

19      are heard completely.  Counsel will be noted

20      on the stenographic record.

21              The court reporter is Darlene Coppola

22      and will now swear in the witness.

23

24
```

Robert F. Herrick, SC.D.

```
 1                    ROBERT F. HERRICK, SC.D.,

 2          a witness called for examination by

 3      counsel for the Defendant Monsanto Company,

 4      having been satisfactorily identified by the

 5      production of his driver's license and being

 6      first duly sworn by the Notary Public, was

 7      examined and testified as follows:

 8

 9                    THE STENOGRAPHER:  Thank you.

10      You may proceed.

11

12                    DIRECT EXAMINATION

13      BY MR. KALAS:

14          Q.   Good morning, Dr. Herrick.  How are

15      you?

16          A.   Hi.  Fine.  Thank you.

17          Q.   Good.  It's good to see you again.

18      This is your second deposition in Roundup

19      litigation, correct?

20          A.   Yeah, that's right.

21          Q.   Okay.  And this is a remote

22      deposition, correct?

23          A.   It is.

24          Q.   Okay.  Where are you right now?
```

Robert F. Herrick, Sc.D.

```
 1              A.   I am at my home in Marblehead,

 2      Massachusetts.

 3              Q.   Okay.  And is anyone in the room with

 4      you?

 5              A.   No.

 6              Q.   Are you on your personal computer?

 7              A.   I am.

 8              Q.   And do you have any programs open on

 9      your computer beyond the Zoom we're on?

10              A.   The only thing -- and I thought I was

11      going to shut this down -- I have my e-mail

12      open.  I can close that.

13              Q.   Okay.  I'm not telling you to close

14      it, but I just wanted to make a record of what

15      you had open.  That's fine.

16              A.   Yes.

17              Q.   Do you have any hard-copy documents

18      with you in front of you right now?

19              A.   Right.  I printed out a copy of my

20      report on the Cotter case.

21              Q.   Okay.  And you may note that I put a

22      link into the chat, and you may remember this

23      from the last time we got together.  That's

24      how I'm going to mark exhibits as we go
```

```
1        through the day.  And right now there should

2        be five exhibits that are premarked that we'll

3        get to in a moment.

4             But if you can just click on that link

5        and have that open that would be helpful, too.

6        A.   (Witness complying.)

7             Okay.  Yeah, there's five exhibits

8        here.  Right.

9        Q.   Okay.  Perfect.  To the extent that

10       you refer to something beyond your hard-copy

11       expert report throughout today -- so you call

12       up a file on your computer or something to

13       take a look at it -- can you just let us know

14       what you're doing for the record so we have a

15       record of that?

16       A.   I will.

17       Q.   Okay.  And if you need a break at any

18       time, can you let us know, please?  And as

19       long as a question's not pending, we'll take a

20       break.

21       A.   Okay.

22       Q.   One thing that I'm noticing, just off

23       the bat, is your audio, when you speak, seems

24       pretty quiet.  I don't know if you're far away
```

Robert F. Herrick, Sc.D.

```
 1        from your microphone.  But if there's a way to

 2        get that louder, that would be helpful.

 3                      THE STENOGRAPHER:  I would agree

 4        with you.  Can we just give it a little test?

 5                      THE WITNESS:  Let me just see

 6        here.

 7        BY MR. KALAS:

 8             Q.   That's better.

 9             A.   Well, maybe I should sit up straight

10        and speak up, then.

11             Q.   Like first grade, right?

12             A.   It is that day.

13             Q.   That's true.  That's true.  Tomorrow

14        for me.  I can't wait, though.

15                  So since the last time you were

16        deposed in the Constantine case, have you

17        been -- have you given any depositions in

18        other matters?

19             A.   No, I haven't.

20             Q.   Do you still -- well, strike that.

21                  Upon reflection on your testimony in

22        the Constantine case, which I realize was many

23        months ago now, was there anything after that

24        deposition that you spoke about that you
```

Robert F. Herrick, Sc.D.

```
 1         thought was taken out of context or you needed

 2         to change?

 3                     MR. UEHLEIN:  Objection.

 4         A.   You're referring to the transcript

 5         of --

 6    BY MR. KALAS:

 7         Q.   Yes, sir.  The testimony --

 8         A.   -- the Constantine --

 9         Q.   Yes, the testimony you gave in that

10         case.

11                     MR. UEHLEIN:  Objection.

12         A.   Let me think for a second.  Just off

13         the top of my head, I -- I can't think of

14         anything.

15    BY MR. KALAS:

16         Q.   Okay.  Now, I've premarked five

17         exhibits, and that is in that link, and we're

18         going to march through them now.

19

20              (Exhibit No. 1 marked for

21         identification.)

22

23    BY MR. KALAS:

24         Q.   The first exhibit, if you can click on
```

Robert F. Herrick, Sc.D.

```
 1         that, Exhibit 1 is your notice of deposition.

 2                       MR. UEHLEIN:  Dr. Herrick, this

 3         is in the chat, by the way.

 4                       THE WITNESS:  Right.  Yeah, I

 5         think I'm there.  I'm just trying to open it.

 6              Yeah, it just opened.

 7         BY MR. KALAS:

 8              Q.   And I'll share my screen, as I have

 9         exhibits up, just to make things a little more

10         efficient.

11              Have you seen Exhibit 1 before, sir?

12              A.   I think I have, yeah.

13              Q.   Do you recall when you saw it?

14              A.   No.  Let's see.  Oh, you know, I

15         actually don't think I have seen this.  I was

16         mistaking it for the document that we talked

17         about in Constantine.

18              Q.   So this is a notice of deposition that

19         was sent over to you -- or to counsel at the

20         Thornton firm, I guess, two weeks ago.  And it

21         asks you to bring some materials to your

22         deposition today, and I'm going to march

23         through at least the documents that were

24         produced, and maybe I'll come back to this.
```

Robert F. Herrick, Sc.D.

```
 1              But as far as you know, this is the
 2      first time you've ever seen this document?
 3          A.   Yeah.  I'm just scrolling down through
 4      it, and that would be correct.  I haven't seen
 5      this before.
 6          Q.   Okay.  Let's go to Exhibit 2.
 7
 8              (Exhibit No. 2 marked for
 9      identification.)
10
11              MR. KALAS:  And, Christian, I'll
12      just note for the record I don't believe we
13      got objections to that notice of deposition.
14      If you -- do you think you guys served them?
15      They didn't make it to me.  So if we want a
16      complete record and want to mark those, if you
17      could just forward those to me, please.
18              MR. UEHLEIN:  Sure, and for the
19      record, we produced responsive records in
20      accordance with the federal rules, and
21      certainly anything beyond the scope of what's
22      required to be produced in expert discovery in
23      the federal rules, we are objecting to.
24              MR. KALAS:  Okay.  And oral
```

Robert F. Herrick, Sc.D.

```
 1      objections noted, but if there's a document,

 2      if you could just send it along, please.

 3      BY MR. KALAS:

 4          Q.   Okay.  Now, Exhibit 2, Dr. Herrick, is

 5      your expert report that was served in the

 6      Cotter case in the MDL, and this is an

 7      eleven-page document.

 8               And I guess I just want to ask you is

 9      this a true and correct copy of your expert

10      report in the Cotter matter?

11          A.   Yeah, I'm just scrolling down through

12      it.  Let me just verify that I -- so far it

13      looks -- it looks very much like the report I

14      submitted.  Let me just roll down a couple

15      more pages here.

16          Q.   Sure.

17          A.   (Witness reviews document.)

18               Yeah, this -- right.  This does look

19      like my report, yes.

20          Q.   And are all the opinions you intend to

21      offer in the Cotter matter contained in your

22      report?

23          A.   Yeah, they -- yes, I would say they

24      are.
```

Robert F. Herrick, Sc.D.

```
 1            Q.   Okay.  Exhibit 3 is the first of the

 2       documents that were -- that were served on us,

 3       on Monsanto, by the Thornton firm in response

 4       to our notice of deposition, and it's your CV.

 5            And if you could, just take a look at

 6       it, please, sir, and let me know if it's a

 7       true and correct copy of your CV as it stands

 8       today.

 9

10            (Exhibit No. 3 marked for

11       identification.)

12

13       A.   Sure.  Let me scroll down here a

14       bit --

15  BY MR. KALAS:

16       Q.   Absolutely.

17       A.   -- see where we are.  Do I have the

18       ability to scroll down, or do you have to do

19       that?

20       Q.   No.  You have the ability to scroll

21       down.  If you click on the exhibit, you can

22       manipulate it on the bar on the right-hand

23       side.

24                 MR. UEHLEIN:  Bob, what may be
```

Robert F. Herrick, Sc.D.

```
1        helpful is if you download from the link, and

2        then you can do whatever you need to do on

3        your computer with the exhibits.

4                      THE WITNESS:  Oh, okay.  Let

5        me...

6              Oh, I see.  I'll just go back.  I'm

7        back on the link here.  Let me just do the

8        "download all files."

9              Is that what you were referring to?

10                     MR. KALAS:  Yes, I think

11       that's -- I think that's what Mr. Uehlein's

12       referring to, and I think that's fine.

13                     MR. UEHLEIN:  And then -- and

14       then you will have a copy of whatever

15       Mr. Kalas is sharing on his screen, but then

16       you can scroll and read at your discretion.

17                     THE WITNESS:  Gotcha.  Okay.

18       Let me just download this to that -- to the

19       folder where I'm keeping the report.

20             Here we are.  Just give me a second.

21                     MR. KALAS:  Sure.

22                     THE WITNESS:  (Witness reviews

23       document.)

24             Wow, okay.  Sorry about that.  Working
```

Robert F. Herrick, Sc.D.

```
 1        on the technology here.

 2                     MR. KALAS:  No worries at all.

 3                     THE WITNESS:  Okay.  So, yeah,

 4        I've got the CV here, and I can scroll down.

 5                I just wanted to check the date.

 6        Yeah, this was updated as of October 2021, so

 7        this would be -- this would be the current

 8        version.

 9        BY MR. KALAS:

10            Q.   Perfect.  Great.

11

12                (Exhibit No. 4 marked for

13        identification.)

14

15        BY MR. KALAS:

16            Q.   Exhibit 4 is a series of five invoices

17        dated from April 20, 2022 through August 17,

18        2022 from a group called Environmental

19        Health & Engineering.  If you can, just open

20        those real quick.

21            A.   Right.  I just opened it up, and I'm

22        scrolling down here.

23            Q.   Okay.  And are these all of the

24        invoices that EH&E has submitted on your
```

Robert F. Herrick, Sc.D.

```
 1        behalf in the Cotter matter?

 2             A.   I believe so.  Let me just roll down

 3        here.

 4                  Right.  It looks like the last one is

 5        for the period ending July 31.

 6             Q.   Right.

 7             A.   And so that would be -- so that would

 8        be up to date because I haven't submitted my

 9        time sheet for August yet.

10             Q.   Okay.  And so through July 31, if my

11        math is correct --

12             A.   Did I just lose you?

13             Q.   No.  I'm doing math in my head.

14             A.   Oh, okay.

15             Q.   Through July 31, if my math is

16        correct, it appears you've invoiced

17        approximately $14,500 on the Cotter matter?

18             A.   Yeah, I'm just kind of scrolling down

19        the page and doing the same thing.

20                  I think that's -- that's in the

21        ballpark.  Yeah, that's reasonable.

22             Q.   Okay.  And since July 31, have you

23        done any additional work on the Cotter matter?

24             A.   Yeah.  In August, I did -- I can't
```

Robert F. Herrick, Sc.D.

```
 1        remember the number of hours.  It might have

 2        been somewhere in the range of eight to ten,

 3        mostly around preparation for this deposition.

 4             Q.   And would you bill at your rate of

 5        $450 for those eight to ten hours of work in

 6        August?

 7             A.   Yeah.  Except I think this rate is

 8        400.

 9             Q.   Okay.  The only reason I said 450 is

10        the -- if you look at the July invoice --

11             A.   Oh.

12             Q.   -- it says your rate's 450.

13             A.   Oh, I see.  You're right.  I hadn't

14        noticed that.  Right.

15             Q.   Inflation, right?

16             A.   I guess so yeah.  I wish they'd told

17        me.

18             Q.   You're not seeing it in your paycheck?

19             A.   Well, I --

20             Q.   It's a joke.  It's a joke.  You don't

21        have to answer it.

22                  Okay.  So eight to ten at $450 an

23        hour, that would be an additional 4,000 or so

24        invoiced?
```

Robert F. Herrick, Sc.D.

```
 1              A.   I think that's -- that's in the

 2        ballpark, yeah.

 3              Q.   Okay.  And then how much will you

 4        invoice for your lost professional time today?

 5                   MR. UEHLEIN:  Objection.

 6              A.   I'm sorry.  Could you repeat that.

 7        BY MR. KALAS:

 8              Q.   How much will you invoice for your

 9        professional time today in deposition?

10                   MR. UEHLEIN:  Objection.

11              A.   Oh, it's -- I do this all at a flat

12        rate.  So it would be at the same 450.

13        BY MR. KALAS:

14              Q.   And so up through today, when we

15        conclude this deposition, assuming we go the

16        full three hours, would it be fair to say

17        you'll invoice -- you have invoiced or will

18        invoice approximately $19,000 on the Cotter

19        matter?

20              A.   I think that's a fair approximation,

21        yeah.

22              Q.   Going back to the exhibits, Exhibit 5

23        is a list of prior testimony, and that one was

24        produced as a Word document, so I'm putting it
```

Robert F. Herrick, Sc.D.

```
 1          in the record as a Word document.  But I'm

 2          not -- I haven't manipulated it, as far as I

 3          know.

 4                    Is this a true and correct copy of

 5          your prior testimony up to -- in the past four

 6          years --

 7          A.    Yeah, I think --

 8          Q.    -- or five years?  Strike that.

 9          A.    I think it's five -- yeah, five years.

10          Let me just scroll down.  I think this is

11          the -- this is the summary that I prepared,

12          yes, so it is the correct -- that's the

13          correct document.

14

15                    (Exhibit No. 5 marked for

16          identification.)

17

18          BY MR. KALAS:

19          Q.    Okay.  Now, going back to Exhibit 4

20          for a moment, this is your billing records for

21          the Cotter matter.

22                    Have you continued to bill on the

23          Constantine matter since you were deposed?

24                              MR. UEHLEIN:  Objection.
```

```
1           A.   I -- I don't think so.  I think that's

2      been sort of dormant since we did the

3      deposition.  I'm just trying to think back.  I

4      don't recall any particular activity on

5      Constantine, no.

6      BY MR. KALAS:

7           Q.   Okay.  And are you working on other

8      Roundup matters beyond Cotter and Constantine?

9                MR. UEHLEIN:  Objection.

10          A.   Yeah, there's a couple other cases

11     that I had prepared reports on, and then it's

12     my understanding that there's another three or

13     four cases, you know, kind of on the horizon

14     that I may be involved with.

15     BY MR. KALAS:

16          Q.   And for the other cases you've

17     prepared reports on, is it typical to bill

18     approximately $15,000 preparing your report in

19     one of these cases?

20                MR. UEHLEIN:  Objection.

21          A.   I think that's probably fair.  I

22     haven't really tried to go back and break it

23     down that way, but the amount of time I spend

24     on these, you know, is -- is similar.  So I
```

Robert F. Herrick, Sc.D.

```
1          think we could use that as a pretty good

2          benchmark number.

3          BY MR. KALAS:

4               Q.   Okay.  And about how many cases would

5          you say you've worked on up to this point?

6                         MR. UEHLEIN:  Objection.

7               A.   Are we on Roundup now?

8          BY MR. KALAS:

9               Q.   Yes.

10              A.   Oh, okay.  Well, I've done a total of

11         four reports, yeah.

12              Q.   And so a rough estimate, you'd

13         estimate you will have invoiced approximately

14         $60,000 on Roundup cases up to this point?

15              A.   I think that's -- that's a fair

16         estimate, yes.

17              Q.   Turning back to Exhibit 2, your

18         report, what was the scope of issues you were

19         asked to opine upon in this matter?

20              A.   The request was that I prepare an

21         exposure history for Mr. Cotter.

22              Q.   What is an exposure history?

23              A.   Well, specifically in this case, the

24         request was to describe his work history, his
```

Robert F. Herrick, Sc.D.

```
1       activities, the materials that he reported

2       that he used, and then also to prepare

3       calculations of his time-weighted lifetime

4       exposure and also his nontime-weighted

5       lifetime exposure.

6            Q.   Starting with the first half of that,

7       talking about the materials he used, what he

8       did in his job, what have you, what was your

9       methodology that you employed in evaluating

10      this work history?

11           A.   Well, there were really two primary

12      sources.  One, we had the information that had

13      been supplied on the plaintiff fact sheet, and

14      then I also had Mr. Cotter's deposition.  So

15      those were the starting points for doing the

16      exposure history.

17           Q.   And did you talk to Mr. Cotter as well

18      beyond the deposition, like in an interview?

19           A.   Yeah, I did.  I spoke with him over

20      the phone.

21           Q.   Did you glean any additional

22      information in that phone interview that you

23      weren't able to get out of the deposition?

24           A.   Yeah, there were a couple of things
```

Robert F. Herrick, Sc.D.

```
 1        that weren't totally clear from the

 2        deposition, so I was able to ask him

 3        specifically, and he clarified those points

 4        for me.

 5             Q.   What points were those, if you can

 6        recall?

 7             A.   Yeah.  They both dealt with his

 8        business in the Lawn Rangers, you know, in his

 9        landscaping company.  One of the questions

10        that I wanted to make sure I had the right

11        answer from him was when he actually started

12        working under that company, when he really

13        went into business with the Lawn Rangers, and

14        so he was able to clarify that for me.

15             And then I also wanted to make sure I

16        had a correct number from him as to the

17        estimated number of days that he worked during

18        each season with the Lawn Rangers, and so he

19        was able to give me a good answer for that,

20        too.

21             Q.   Okay.  And so when you were putting

22        together the work history -- well, strike

23        that.

24             Let's go to the second half, which was
```

1        the calculation of days.

2                Can you just explain to me your

3        methodology in calculating the exposure days

4        and then the time-weighted exposure days as

5        well?  And you can -- let me break that up.

6        I'm going to ask you about both, but let me

7        start with just exposure days.

8                What was your methodology in

9        calculating exposure days?

10       A.   Well, the way the exposure day would

11       accumulate would be counting up the number of

12       days per year that he reported using Roundup

13       and then multiplying that by the number of

14       years.

15       Q.   Okay.

16       A.   And so I did that both for his

17       residential use and also for the two

18       commercial activities that he was involved in.

19       Q.   Okay.  And then how about the

20       time-weighted exposure days?  Can you explain

21       to me your methodology that you utilized in

22       reaching that opinion?

23       A.   Yeah.  In that case, the calculation

24       is the same as I just described except there's

1          an additional factor that I used to weight

2          each one of those totals by the reported

3          number of hours per day that he recalled

4          actually spraying Roundup.  So that, in

5          effect, gives you a time-weighted value that's

6          suggested for the duration of spraying time

7          that he did each day.

8               Q.   Okay.  If I read your report correctly

9          and understand it, the time-weighted exposure

10         day figure takes the days times the years, so

11         days in a year times the number of years

12         spraying, and then it calculates or it

13         normalizes that to an eight-hour workday.

14              So the time-weighted figure gives you

15         the number of eight-hour workdays he applied

16         Roundup; is that fair?

17              A.   Yeah, that's a reasonable, fair way to

18         put it.  It's -- I think we're both saying

19         roughly the same thing.  The idea is to weight

20         that number based on the actual number of

21         hours that he spent spraying.

22              Q.   Okay.  Are you relying on the opinions

23         of any other experts for Mr. Cotter in

24         reaching your opinions?

Robert F. Herrick, Sc.D.

```
 1              A.    No.  I, you know, did this report, you
 2        know, without any input from other experts.
 3              Q.    Have you talked to any of the other
 4        experts for plaintiffs in the Cotter matter.
 5              A.    No, I haven't.
 6              Q.    When you spoke to Mr. Cotter, when was
 7        that conversation?
 8              A.    Gee, I've got it in the footnote here.
 9        Let me just kind of scroll up to it.  Hang on
10        a second.
11                    It was -- it was on June 10.
12              Q.    And did you -- other than the notes
13        you took and included in your report, was
14        there any audio recording of this
15        conversation?
16              A.    No, I don't think so.
17              Q.    Okay.  Was anybody else present during
18        the conversation besides you and Mr. Cotter?
19              A.    Yeah, the call -- Mr. Uehlein was on
20        the call as well.
21              Q.    Did Mr. Uehlein ask any questions
22        during the call?
23              A.    No.
24              Q.    Okay.  Did -- how long was the call?
```

```
 1              A.   Oh, I think, you know, we probably

 2         talked for ten minutes or so.  I asked him,

 3         you know, these things that I was trying to

 4         get clarity on.  And then I also was just

 5         curious about the name of his company, you

 6         know, how he happened to choose the name Lawn

 7         Rangers, and so we talked about that for a

 8         couple of minutes.

 9              Q.   It's a play on Lone Ranger, right?

10              A.   Well, that's what I was thinking.  I

11         was also thinking that maybe it was something

12         that his kids had come up with.  But he said,

13         no, that was -- it was purely his idea.  So

14         he -- he took credit or blame for it.

15              Q.   Well, maybe his kids called him Tonto,

16         too, right?

17              A.   Maybe so, yeah.

18              Q.   So -- okay.  In reaching your expert

19         opinions in this matter, what materials are

20         you relying upon for that opinion?  In other

21         words, what pieces of literature, what

22         materials in the record, that sort of thing?

23                   MR. UEHLEIN:  Objection.

24              A.   Well, other than the information, you
```

```
 1      know, that we just talked about or the -- you

 2      know, that I got from Cotter in terms of the

 3      interview and his PFS and his deposition, in

 4      terms of the approaches to calculating the

 5      cumulative lifetime exposure days, I did refer

 6      to the epidemiology studies that I have

 7      identified here in my footnotes and

 8      specifically the -- let's see.  There's

 9      Footnotes, going down here, 33 through 38.

10      And -- I'm sorry.  Go ahead.

11      BY MR. KALAS:

12           Q.   No, no.  I was just nodding.

13           A.   Oh, okay.  So I did look at those epi

14      studies in developing my calculations of the

15      two different lifetime exposure numbers.

16           Q.   Okay.  And how did you get those

17      epidemiology studies?  Did you find them on a

18      PubMed search?  Were they provided to you?

19      How did you come across them?

20           A.    It was probably a mix.  I -- I know

21      the Thornton guys sent me the full text of

22      some of these because there are some that I

23      didn't have access to the full article.  You

24      know, I could just access the abstract myself.
```

1      So it was probably a mix of both approaches.

2          Q.   Okay.  And other than the references

3      listed in the footnotes of your report, are

4      you relying on any other materials to support

5      your expert opinion in this matter?

6                    MR. UEHLEIN:  Objection.

7          A.   Well, if we go back away from the

8      epidemiology for just a minute, back at the

9      start of the Cotter report, I laid in just a

10     little bit of background information about the

11     nature of his exposure.

12             And so I talked about the droplets,

13     you know, and the fact that you can get those

14     on your skin, and you can also inhale those.

15     And some of that was in some ways anchored

16     back to literature that I had reviewed in the

17     Constantine matter.

18     BY MR. KALAS:

19         Q.   Right.  And that's, I think, listed --

20     I put it up on the screen -- listed in

21     Footnotes 4 through 9, right?

22         A.   Yeah.  That's -- that's -- I tried to,

23     you know, give an annotation to those studies

24     that I had reviewed initially when we were

Robert F. Herrick, Sc.D.

1       working on Constantine.

2             Q.   Okay.  Just going back to the question

3       I asked a few questions ago, other than the

4       materials listed in the footnotes in

5       Exhibit 2, your report, are there any other

6       materials you're relying upon for your opinion

7       in this matter?

8                        MR. UEHLEIN:  Objection.

9             A.   No.  I think that's -- that's a pretty

10      good summary of what I've relied on, yeah.

11      BY MR. KALAS:

12            Q.   Okay.  I'm going to ask you a series

13      of questions now about what you consider your

14      expertise on, and I'm asking more about your

15      credentials and what you consider yourself to

16      be an expert in as opposed to whether or not

17      you were asked to opine on that issue in this

18      matter.  So that's just to tell you kind of

19      where I'm coming from.  And you know --

20      anyway, that's not a question.  You don't need

21      to respond to that.

22                   Do you consider yourself, Dr. Herrick,

23      an expert in epidemiology?

24            A.   No, I don't.  I've worked on a number

Robert F. Herrick, Sc.D.

```
 1      of research projects that involve

 2      epidemiology, but my expertise has been on the

 3      exposure assessment side of that.

 4          Q.   Do you consider yourself an expert in

 5      animal toxicology?

 6          A.   No, I don't.

 7          Q.   Do you consider yourself an expert in

 8      mechanistic toxicology?

 9          A.   No, I don't.

10          Q.   Do you consider yourself an expert in

11      pharmacokinetics?

12          A.   No, I'm not.

13          Q.   Do you consider yourself an expert in

14      risk assessment?

15          A.   No, I don't consider that.

16          Q.   Do you consider yourself an expert in

17      exposure assessment?

18          A.   Yes, I do.

19          Q.   Do you consider yourself an expert in

20      dose assessment?

21          A.   Not to the same extent as exposure.  I

22      would try to distinguish between the exposure

23      and dose assessment, and I don't really have

24      the same level of expertise in dose assessment
```

Robert F. Herrick, Sc.D.

```
1        that I would say I have in exposure

2        assessment.

3             Q.   When I use the term "exposure

4        assessment" and "dose assessment," it sounds

5        like you take them to mean different things.

6        I certainly mean them to mean different

7        things.

8                  How would you define exposure

9        assessment?

10            A.   Well, I think I would link it back to

11       the idea that exposure is a measure or an

12       estimate that's present in the external

13       environment.

14            Q.   And how would you define dose

15       assessment?

16            A.   Yeah, and then to sort of move

17       downstream, you know, my feeling about the

18       difference between exposure and dose is that

19       dose is the pharmacologically significant

20       component of exposure.  And so by definition,

21       then, the dose is something that is internal

22       to a living organism.

23            Q.   And in this matter, you were asked to

24       opine on exposure assessment, correct?
```

```
 1          A.    That is correct, yes.

 2          Q.    In this matter, you were not asked to

 3    opine on dose assessment, correct?

 4          A.    That is correct, right.

 5          Q.    Now, going back to the Constantine

 6    matter for a moment, in the Constantine

 7    matter, you did conduct an inhalation dose

 8    assessment using something called the ART,

 9    A-R-T, model, correct?

10          A.    Well, I would consider that -- and I

11    think the term I actually tried to use was it

12    was an exposure assessment.

13                MR. UEHLEIN:  I'm going to

14    object to the prior question.

15    BY MR. KALAS:

16          Q.    Okay.  So you conducted an inhalation

17    exposure assessment using the ART model,

18    correct?

19          A.    That is correct, yeah.

20          Q.    Okay.  And the Constantine case, like

21    this one, involved someone who applied

22    Roundup, and alleged they got NHL, right?

23          A.    Yeah, I think that's right.  I didn't

24    really, you know, try to drill down on
```

Robert F. Herrick, Sc.D.

1    specifically, you know, what their disease

2    endpoint was.

3        Q.   And the Constantine case, like this

4    one, involved someone who you were asked to

5    evaluate using your exposure assessment

6    expertise, right?

7        A.   In Constantine, yeah, that's right.

8        Q.   And in the Constantine case, like this

9    one, it involved you evaluating things like

10   the plaintiff's deposition, an interview of

11   the plaintiff, et cetera, in order to reach an

12   exposure assessment opinion, correct?

13       A.   It did, yes.

14       Q.   Okay.  Why did you not use the ART

15   model in this case after you used it in the

16   Constantine case?

17       A.   Well, the question that was -- that I

18   was asked to address in this Cotter case

19   really didn't extend to specifically trying to

20   estimate his inhalation exposure.  It was more

21   limited to his exposure history.

22       Q.   Okay.  And so if I understand your

23   answer there correctly, the assessment you

24   were asked to undertake in this case, Cotter,

```
1        was more limited than the assessment you were

2        asked to undertake in Constantine, true?

3                    MR. UEHLEIN:  Objection.

4            A.   I -- I think that's a fair statement,

5        yeah.

6        BY MR. KALAS:

7            Q.   What information relevant to

8        Mr. Cotter's exposure could you have

9        investigated had you used the ART model in

10       this case?

11           A.   Well, let's see.  I would have, you

12       know, I probably would have tried to get more

13       information about the application equipment

14       that he used.  You know, I'm just trying to

15       think of the inputs that you need for the ART

16       model.

17                    I would have wanted more information

18       about the concentration of Roundup that he

19       sprayed because that's something that you

20       need, you know, to really make the ART model

21       work properly.

22                    So there were -- there were some

23       things that I didn't really need in Cotter to

24       do the exposure history that I would have
```

Robert F. Herrick, Sc.D.

1      needed to use the ART model.

2          Q.  Okay.  My last question was probably

3      unartful.

4              How could the ART model have been

5      helpful in assessing Mr. Cotter's exposure

6      history had you chosen to employ it in this

7      case?

8                  MR. UEHLEIN:  Objection.

9          A.  Well, I could have developed a more

10     quantitative estimate of what the ART model

11     predicted to be his level of inhalation

12     exposure because that's what I calculated in

13     the Constantine case.  And also, as I imagine

14     you recall in the Constantine case, that I was

15     able to discuss how that ART model estimate

16     compared with other published information

17     about inhalation exposure levels.

18     BY MR. KALAS:

19         Q.  You said that the ART model would give

20     information.  I think "quantitative

21     information" was the word you used.  What's

22     "quantitative information"?

23         A.  Well, we could have done a calculation

24     that would have given us an estimate of the

1    airborne level of Roundup, or glyphosate, that

2    Mr. Constantine, or, in this case, Mr. Cotter,

3    would have been expected to be exposed to, and

4    we could have had a 50 percent, you know, sort

5    of a median value and then a range around that

6    value.  So that's kind of output that, you

7    know, could have been produced from the ART

8    modeling.

9         Q.   And what you've done here in the

10   Cotter case is what's known as a qualitative

11   evaluation of exposure, correct?

12              MR. UEHLEIN:  Objection.

13        A.   I think I would -- you know, if we're

14   thinking about kind of classifying, this is a

15   little bit more semiquantitative in that it

16   does have a numerical value associated with

17   his lifetime cumulative exposure, but it

18   doesn't have a measure of the actual airborne

19   level of concentration that he was exposed to.

20   BY MR. KALAS:

21        Q.   If someone was trying to determine

22   whether or not an individual were at an

23   increased risk of a disease based upon their

24   exposure, would using the ART model give more

Robert F. Herrick, Sc.D.

```
 1        useful information for risk assessment than

 2        exposure day calculations?

 3                        MR. UEHLEIN:  I'm going to

 4        object to the extent that that's outside the

 5        scope of Dr. Herrick's designation.

 6            A.   Let me --

 7                        MR. KALAS:  You backed away

 8        again.

 9                        THE WITNESS:  Oh, I'm sorry.

10        Let me try to -- here my microphone is

11        wiggling around here.

12                Can you hear me now?

13        BY MR. KALAS:

14            Q.   Yes.

15            A.   Oh, good.  Okay.  You know, I think --

16        let me try to answer it this way.  It would

17        depend a little bit on the nature of the risk

18        assessment because, you know, you can do very

19        quantitative risk assessments that require the

20        use of concentrations of exposure as your

21        inputs.  And in a case like that, you would

22        want to have the quantitative information such

23        as measurements of concentration or something

24        from the ART model or something similar.
```

```
 1                    If you were -- if your goal was to do

 2          a risk assessment that was more qualitative or

 3          semiquantitative in nature, you could use the

 4          inputs such as the lifetime days of exposure.

 5                    So, you know, I think it depends a

 6          little bit on the target that you're trying to

 7          hit in terms of your risk assessment.

 8               Q.   You've worked some on PCB litigation

 9          involving Monsanto, right?

10               A.   I have, yes.

11               Q.   And in those cases, you've done

12          exposure assessments as well, correct?

13               A.   I have.  They weren't -- the short

14          answer is, yeah, I have done exposure

15          assessments.

16               Q.   And when scientists are evaluating in

17          the context of PCBs whether or not exposures

18          create unreasonable risks, do they use

19          quantitative methodologies where they come up

20          with an internal dose, or did they just count

21          exposure days to PCBs?

22                         MR. UEHLEIN:  Objection.

23               A.   Well, they tend to do both.  I've

24          seen -- and I should qualify this by saying
```

Robert F. Herrick, Sc.D.

1          I'm really not, you know, actively involved in

2          PCB research at this point.  So I know there's

3          a lot of interest in work being done around

4          levels of PCBs in serum, for example.  So I

5          think there's -- that's kind of an evolving

6          practice of trying to use serum PCB levels as

7          inputs and in markers in risk assessment.

8                    But in -- in the work that I was

9          involved with, it was more focused strictly on

10         airborne exposures, and those were being used

11         for a comparison with reference values, like

12         EPA's reference values.

13         BY MR. KALAS:

14              Q.   And those airborne exposures, were

15         they measured in a quantitative manner?  In

16         other words, was there a measurement of

17         milligrams per meter cubed of those airborne

18         exposures or parts per billion in the air, or

19         was there just a measurement of the number of

20         days you were around it?

21              A.   In some cases, there were measurements

22         of -- quantitative exposure measurements of

23         micrograms per cubic meter or part per

24         billion, so there were -- there were some of

Robert F. Herrick, Sc.D.

```
1        both.
2             Q.   Okay.  And, in fact, your group EH&E,
3        there's a gentleman by the name of Kevin
4        Coughlin at your group, right?
5             A.   There is, yes.
6             Q.   He works on those PCB cases currently,
7        right?
8             A.   He -- I believe he does, yes.
9             Q.   And the way he evaluates the PCBs in
10       your group is they look at blood serum levels
11       of PCBs and compare people to the literature,
12       right?  They look at the quantitative dose?
13                      MR. UEHLEIN:  Objection.
14            A.   You know, I would have to say I
15       haven't really been keeping up.  I know
16       there's a lot of activity, and Kevin's very
17       prominently involved in it, in PCB litigation,
18       but I haven't really been keeping track of
19       that.
20       BY MR. KALAS:
21            Q.   And I guess the reason I asked about
22       Kevin initially is I was looking at your
23       billing records, and your project manager
24       for -- for these cases, these Roundup cases,
```

Robert F. Herrick, Sc.D.

```
1          is a gentleman by the name of David MacIntosh,

2          right?

3               A.   It is, yes.

4               Q.   And who -- what's David's role in

5          EH&E?  What does the project manager do?

6               A.   Well EH&E has kind of a flat

7          organizational structure, and there's four --

8          let's say three or four, maybe more, very

9          senior-level people, of whom MacIntosh is one,

10         and Kevin Coughlin is another.  But I have to

11         say, you know, in terms of kind of the

12         dynamic, the management dynamic of who's

13         responsible for what, I'm not really privy to

14         that.

15              Q.   Okay.  So when it says "Project

16         Manager, David MacIntosh" on your invoices,

17         you don't know what exactly he's doing on the

18         project?  That's not something you're involved

19         in; is that fair?

20              A.   I -- I think that's fair.  I mean,

21         he's -- you know, he's not involved in

22         hands-on management of the work I'm doing, for

23         example.

24              Q.   Okay.  And the reason I asked about
```

1        him is he's the project manager for Kevin

2        Coughlin on the PCB cases as well.

3               Were you aware of that?

4        A.   No, I wasn't.

5        Q.   And, in fact, Mr. Coughlin has also

6        testified in mixed PCB glyphosate cases --

7        were you aware of that? -- where the people

8        allege exposure to both?

9        A.   No, I wasn't aware of that.

10       Q.   Have you spoken to Mr. Coughlin or

11       Dr. Coughlin -- I'm not sure which.  I

12       apologize -- but have you spoken to him about

13       Roundup or glyphosate?

14       A.   No, I haven't.

15       Q.   Have you discussed the details of your

16       report that you served in this matter or in

17       the Constantine matter with David MacIntosh?

18       A.   No, I haven't.

19       Q.   Did either David Macintosh or Kevin

20       Coughlin contribute to the drafting or editing

21       of your expert reports in either Constantine

22       or this matter?

23       A.   No, they didn't.

24       Q.   Now, just returning back to the ART

1      model for a moment, had you garnered the

2      information about the spray apparatus and what

3      have you in your interview of Mr. Cotter,

4      would you have been capable of conducting an

5      ART model in this matter?

6           A.   I think so.  I'm just trying to think

7      about the inputs that we would need to

8      actually do the ART modeling.  I would want to

9      know some more about the actual formulations

10     of Roundup that he was using, the

11     concentrations that he prepared, but, you

12     know, in a broad sense, I think the

13     information would have been there to do the

14     ART modeling.

15          Q.   Okay.  And when you did the ART

16     modeling in the Constantine case, you did the

17     ART modeling because you believed,

18     Dr. Herrick, that it was the most reliable way

19     to assess his exposure, correct?

20               MR. UEHLEIN:  Objection.

21          A.   Well, in thinking about the

22     information that's available in the published

23     literature and the EPA studies and things like

24     that, I thought that the ART model was a good

Robert F. Herrick, Sc.D.

1    choice to try to fill out the exposure

2    picture, you know, to have the predictions

3    from the model that I could then use

4    comparison to comparison with what's been

5    published.

6    BY MR. KALAS:

7        Q.   And I'm not asking about conversations

8    you had with counsel.  Those are between you

9    and counsel, so I just want to caution you

10   that on this next question.

11           Is there a scientific reason why you

12   chose not to employ the ART model in the

13   Cotter matter?

14       A.   My choice of doing the calculation I

15   did in Cotter was really driven by the nature

16   of the question I was asked to address.

17       Q.   And the nature of the question you

18   were asked to address changed from Constantine

19   to Cotter, fair?

20               MR. UEHLEIN:  Objection.

21       A.   Yeah, I think that's fair.  The

22   questions were different.

23   BY MR. KALAS:

24       Q.   In your expert opinion, if someone is

Robert F. Herrick, Sc.D.

```
 1        trying to assess -- well, strike that.
 2               In your expert opinion, does the ART
 3        model give useful information on exposure that
 4        exposure days are incapable of giving?
 5                    MR. UEHLEIN:  Objection.
 6        A.    Well, I think -- you know, and I would
 7        answer this in general because, as I'm sure
 8        you know, the ART model is used, you know, in
 9        lots of situations, you know, beyond
10        glyphosate.
11               I think, in general, people try to
12        acquire information that's as quantitative as
13        you reasonably can.  And so coming up with
14        quantitative estimates from the ART model does
15        give you a different level of detail than
16        using something like cumulative days of
17        exposure.
18        BY MR. KALAS:
19        Q.    Okay.  Using the ART model would
20        provide more information, or more detailed
21        information I should say, about the amount of
22        glyphosate that potentially entered
23        Mr. Cotter's body as opposed to exposure days,
24        true?
```

Robert F. Herrick, Sc.D.

```
 1                    MR. UEHLEIN:  Objection.

 2          A.   I -- I think that would be a

 3    reasonable statement to make, yes.

 4    BY MR. KALAS:

 5          Q.   Okay.  And in the Cotter matter, you

 6    will not be offering any opinion regarding the

 7    dose of glyphosate that entered Mr. Cotter's

 8    body, true?

 9          A.   That is true.  Right.

10          Q.   And you will not be offering any

11    opinion in the Cotter matter that the dose of

12    glyphosate that entered -- or strike that.

13               In the Cotter matter, you will not

14    offer any opinion that Mr. Cotter was ever

15    exposed to a dose of glyphosate that exceeded

16    any regulatory threshold, true?

17          A.   That would be true.  Right.

18          Q.   And you have no opinion in the Cotter

19    matter regarding the dose of glyphosate

20    necessary to increase the risk of someone

21    getting NHL, right?

22          A.   No, I didn't address that.

23          Q.   And you have no opinion in the Cotter

24    matter whether there's ever been any measured
```

Robert F. Herrick, Sc.D.

```
 1        dose in the exposure biomonitoring literature

 2        that exceeded any regulatory threshold, true?

 3            A.   I -- yeah, I really haven't looked

 4        into that.  So I don't really know how to

 5        answer that.

 6            Q.   Okay.  A few more housekeeping

 7        questions, and then I think we'll be at a good

 8        spot for a break.

 9                 These are just some questions about

10        some law firms, and, you know, if you don't

11        know, that's always an okay answer.

12                 Have you ever been retained as a

13        consulting or testifying expert by the Weitz &

14        Luxenberg law firm?

15            A.   I don't think so.  That doesn't ring a

16        bell.

17            Q.   The Andrus Wagstaff law firm?

18            A.   No, it's not -- that doesn't sound

19        familiar.

20            Q.   The Miller law firm?

21            A.   Again, I'm not -- I'm not recalling

22        that.

23            Q.   The Baum Hedlund law firm?

24            A.   No to that, too.  I don't remember
```

```
1        that.

2              Q.   The Lundy, Lundy law firm?

3              A.   I -- no, I'm not getting a

4        recollection on that.

5              Q.   The Napoli Shkolnik law firm?

6              A.   No, same answer.  I don't recall that.

7              Q.   The Allen Stewart law firm?

8              A.   No, it's not familiar.

9              Q.   Waters and Kraus law firm?

10             A.   I don't believe so.  It's not

11       familiar.

12             Q.   The Williams Hart law firm?

13             A.   I don't recall that, no.

14             Q.   Frazer PLC?

15             A.   No.

16             Q.   Fears Nachawati?

17                  THE STENOGRAPHER:  What was the

18       name?  I'm sorry.

19                  MR. KALAS:  Fears, F-e-a-r-s,

20       Nachawati, N-a-c-h-a-w-a-h-t-i [sic].

21                  THE STENOGRAPHER:  Thank you.

22             A.   It's not familiar to me, no.

23       BY MR. KALAS:

24             Q.   Kirkendall Dwyer?
```

```
 1          A.   Not -- not recalling that, no.

 2          Q.   The Trammell firm?

 3          A.   No, it's not familiar.

 4          Q.   The OnderLaw firm?

 5          A.   No.

 6          Q.   The Schlesinger firm?

 7          A.   I'm not recalling that.

 8          Q.   Terrell Hogan?

 9          A.   No.  Sorry, no.

10          Q.   Cory Watson?

11          A.   Doesn't ring a bell.

12          Q.   Beasley Allen?

13          A.   I don't recall that, no.

14          Q.   Kline & Specter?

15          A.   No.

16          Q.   Heygood, Orr?

17          A.   I don't recall that.

18          Q.   The Gomez firm?

19          A.   Again, no.

20          Q.   All right.  Now we're going to the

21      other side of the V.

22               Arnold &Porter?

23          A.   Doesn't ring a bell.

24          Q.   Hollingsworth LLP?
```

Robert F. Herrick, Sc.D.

```
 1          A.   I don't recall that.

 2          Q.   Shook, Hardy & Bacon?

 3          A.   I don't believe so.

 4          Q.   Nelson Mullins?

 5          A.   I don't have a recollection of that,

 6     no.

 7          Q.   Wilkinson Stekloff?

 8          A.   Again, no.

 9          Q.   McDermott, Will & Emery?

10          A.   Not familiar.

11          Q.   Dentons?

12          A.   No.

13          Q.   Husch Blackwell?

14          A.   I'm not familiar with that.

15          Q.   Bartlit Beck?

16          A.   I don't remember that.

17          Q.   Gold man-ish e-mail?

18          A.   Not familiar.

19          Q.   Covington & Burling?

20          A.   I don't recall that.

21          Q.   The Perkowski law firm?

22          A.   Not -- no, I don't remember that.

23          Q.   Winston & Strawn?

24          A.   No.
```

Robert F. Herrick, Sc.D.

1          Q.   Evans Fears & Schuttert?

2          A.   I am not recalling them, no.

3          Q.   Proskauer Rose?

4          A.   No.

5               MR. KALAS:  All right.  We've

6     been going an hour.  Do you need a break, or

7     shall we continue?

8               THE WITNESS:  Five-minute break

9     would be -- would be great.

10              MR. KALAS:  Okay.  Great.  Let's

11    go off the record.

12              THE VIDEOGRAPHER:  The time is

13    11:29.  We are off the record.

14

15         (Recess taken from 11:29 a.m.

16          to 11:40 a.m.)

17

18              THE VIDEOGRAPHER:  The time is

19    11:40.  We are back on the record.

20    BY MR. KALAS:

21         Q.   Dr. Herrick, of the materials that

22    you've cited in your report, which one gives

23    the methodology for calculating an eight-hour

24    exposure  day?

Robert F. Herrick, Sc.D.

```
 1                  MR. UEHLEIN:  Objection.

 2        A.   Let me just flip to where we are here.

 3             The one that kind of lays that

 4    approach out is -- let me scroll down here,

 5    make sure I give you the right -- is the one

 6    that's my Reference Number 34.  The first

 7    author is Eriksson.

 8    BY MR. KALAS:

 9        Q.   Okay.  Let me get that called up, and

10    we'll get it marked, and then you can show it

11    to me.  Just give me a moment.

12

13             (Exhibit No. 6 marked for

14    identification.)

15

16    BY MR. KALAS:

17        Q.   All right.  Dr. Herrick, I've marked

18    as Exhibit 6 the Eriksson 2008 article.  You

19    may need to refresh the link in order to see

20    it again.

21        A.   Oh, okay.

22        Q.   But then it should be on there.

23        A.   Yes, I see it.

24        Q.   Okay.  So you said the methodology's
```

Robert F. Herrick, Sc.D.

```
1        contained in here.  Can you point me out in

2        the article where the methodology for

3        calculating the eight-hour exposure  day is?

4             A.   Yeah, let me see here.  I'm just going

5        to scroll down.  Just give me a minute here.

6                  So if you go down, I'm in his section

7        on "Methods," and -- I'm assuming it's a him.

8        I don't know, but it doesn't matter -- and

9        there's a subparagraph in that section called

10       "Assessment of Exposure."  And --

11            Q.   Okay.

12            A.   -- so in the first paragraph of

13       "Assessment of Exposure," it talks about the

14       questionnaire, and I can read you the sentence

15       that's relevant.  It says, "For all

16       pesticides, not only numbers of years of

17       exposure, number of years and number of days

18       per year, but also approximate length of

19       exposure per day were questioned."

20                  So that's -- you know, in terms of him

21       or her describing the methods, that's where

22       that comes from.

23            Q.    And is that the same -- is that the

24       same methodology you tried to follow in
```

1        assessing your time-weighted exposure days?

2            A.    That's the same approach, yes.

3            Q.    And how did the authors of Eriksson

4        treat someone who conducted spot spraying as

5        opposed to continuous spraying?  How did they

6        calculate exposure for that person, time of

7        exposure?

8            A.    I would have to go back into the --

9        into this and dig down a little bit.  I -- I

10       don't remember them actually even using the

11       term "spot spraying."

12           Q.    How did you treat spot spraying versus

13       continuous spraying?

14                 So Mr. Cotter, right -- to make this a

15       little more tangible, Mr. Cotter had some

16       testimony where he talked about clearing out

17       mulch beds in order to, you know, plant, and

18       that would involve spraying almost

19       continuously for, like, an hour.

20                 Other testimony talked about the fact

21       that he would spot spray once those mulch beds

22       were cleared out for 10 or 15 minutes.  You

23       know, see a weed, spray a weed.

24                 So with that testimony, how did you

Robert F. Herrick, Sc.D.

```
1          treat that in assessing your exposure time?

2                    MR. UEHLEIN:  Objection.

3          A.   Yeah, and I tried to, you know, kind

4     of get into that in my report.  There were

5     cases, especially around his residential use,

6     where, you know, he would describe that, yeah,

7     he sprayed for an hour, and then later in the

8     season, he would come back and spray for 15

9     minutes.  And so that was exactly the number I

10    was able to put in to do the calculation.

11              In the other situation around his use

12    with the Lawn Rangers, one of the things he

13    was asked about in his deposition was the

14    amount of time he spent spraying as opposed to

15    everything else in the course of a day, and

16    his answer there was that he spent 30 minutes

17    spraying versus the time he spent doing

18    everything else.  So we had that information

19    about, you know, 30 minutes per day.

20              And then he also said when he was

21    mowing, that's when he did -- and I don't even

22    know if he used the term "spot spraying."  I'd

23    have to go back to refresh myself, but that's

24    where he talked about if he saw a weed, he
```

```
1        would shoot it, or spray it, rather.  I don't
2        think he said "shoot."  So if he was on the
3        mower, he had that Windex bottle, that type
4        bottle as he described it, and when he saw a
5        weed, he would spray it.
6             So the way I used that information, I
7        said, Well, okay.  So if he were mowing and
8        he, you know, sprayed for five minutes each
9        time when he was -- over the course of a
10       mowing session, when he spotted these weeds
11       and sprayed them and that was five minutes on
12       each lawn and he did, say, 12 or 15 lawns per
13       day, I added that cumulative number to the 30
14       minutes that he had previously mentioned
15       during his typical day of spraying.
16            And so that's kind of how I came up
17       with that -- what I thought was sort of the
18       best case or the least exposure day, that he
19       had a total spray time of one hour for those
20       days.
21       BY MR. KALAS:
22       Q.   Okay.  And those -- those inputs that
23       you just discussed, as far as, you know, the
24       spraying when he's on the mower, the 30
```

```
 1    minutes while he's -- you know, 30 minutes a

 2    day that he testified to, those sort of

 3    things, where in the Eriksson article does it

 4    talk about assessing exposure in that way?

 5    Where -- what do you -- what literature says

 6    this is an appropriate way to assess exposure?

 7         A.   I would have to go back down.  I don't

 8    remember that, you know, that level of detail

 9    was actually in the Eriksson article.  I mean,

10    they talked about in their methods that they

11    asked about the duration of spraying each day.

12    So, again, not really having access to the

13    questionnaire that he -- he or she used, I

14    don't think I can really give you a, you know,

15    real good, detailed answer as to how Eriksson

16    accumulated that information.

17         Q.   Are you sure that you counted exposure

18    the same way the authors of Eriksson would

19    have?

20              MR. UEHLEIN:  Objection.

21         A.   I think so because, you know, to the

22    extent I can tell, again, from reading

23    Eriksson, you know, and not really knowing

24    exactly what was in the questionnaire and, you
```

1       know, they also mentioned that they

2       supplemented the questionnaire with

3       information that they got over the phone.  So,

4       you know, my sense of it is to try to get to

5       the daily amount of time, you know, the

6       duration of spraying each day, that they would

7       have approached it -- or I would have

8       approached it roughly the same way they did

9       given as much as I know about, you know, the

10      detail of how they did it.

11      BY MR. KALAS:

12          Q.   What are you basing that sense on?  I

13      mean -- and I don't mean that as a -- as a --

14      you know, meant to be rude or anything.  But

15      is there anything written you're basing that

16      sense on that you just referred to?

17          A.   Well, there isn't -- again, it was --

18      what's written in Eriksson isn't really quite

19      that detailed.  But they do, you know, talk

20      about what information they gained from the

21      questionnaire in terms of the amount of time

22      per day and then that they supplemented that

23      with information they got over the phone.

24              So, you know, I can easily see a

Robert F. Herrick, Sc.D.

1       situation where they asked follow-up

2       questions, you know, to come up with some

3       assessment of how much time people actually

4       spent doing that, you know, as we're calling

5       it, spot spraying, although I don't recall

6       that Eriksson actually used that term.

7          Q.   But you would agree, since you don't

8       have the questionnaire, you don't have the

9       supplemental questions from the phone

10      interview, since you don't have that

11      information, you can't say, sitting here

12      today, whether or not the information -- the

13      follow-up questions that you utilized in your

14      methodology matched what the Eriksson authors

15      did; is that fair?

16                  MR. UEHLEIN:  Objection.

17         A.   Yeah, I don't really have that level

18      of detail from what Eriksson published.  So I

19      can't say with a lot of confidence, you know,

20      that I have -- that I can really comment on

21      how his approach or her approach compared to

22      mine.

23      BY MR. KALAS:

24         Q.   Taking it to a tangible example of

```
1          Mr. Cotter, talking about the testimony -- I
2     believe it's at page 92 of his depo, and we
3     can mark it if you need to see it -- where he
4     talked about applying 30 minutes a day.
5          A.   Uh-huh.
6          Q.   And then you talked about the lawn
7     mower spraying -- see a weed, spray a weed --
8     later on, and you added that to the 30 minutes
9     a day to come up with the sort of
10    one-hour-minimum day.
11             Did I understand that correctly?
12         A.   Yeah, that's a fair -- a fair
13    statement of the approach I took, yeah.
14         Q.   Okay.  How did you know, utilizing
15    using the Eriksson methodology, that 30
16    minutes a day did not include that lawn mower
17    spraying?
18         A.   Well, the way the question -- and I
19    don't know.  Maybe we should pull up the
20    deposition.
21         Q.   Let's -- let's mark it just so we have
22    a record.
23         A.   Sure.
24         Q.   And I'll ask the question again.
```

```
 1            A.    Okay.

 2

 3                 (Exhibit No. 7 marked for

 4            identification.)

 5

 6       BY MR. KALAS:

 7            Q.    So I've marked it as Exhibit 7, and it

 8       may be easiest for you to download it once it

 9       loads, and then we can look at it.

10            A.    Just give me a minute here to download

11       this guy.

12                 I think I've got it.

13            Q.    Okay.  So just going to that --

14            A.    I think you said page 92?  Is that --

15            Q.    I believe it's on 92.  I'm opening it

16       up now too.

17            A.    Okay.

18            Q.    This is page 92.  The question is at

19       line 13.  It goes through line 22.  It

20       reads -- let me know when you're there, and

21       then I'll read it.

22            A.    Yeah, I'm here.  I'm here.

23            Q.    Okay.  It says, "Question:  Okay.  I

24       know you said you sprayed weeds as you saw
```

Robert F. Herrick, Sc.D.

```
 1      them.  Can you give -- can you at all give me

 2      a sense of about how much time you spent on an

 3      average day spraying Roundup versus all the

 4      other things you were doing for lawn

 5      maintenance?

 6               "Answer:  Yeah, in the course of the

 7      day, I probably would have spent 30 minutes a

 8      day on spray unless I was doing the whole beds

 9      at somebody's house."

10               Did I read that correctly?

11          A.   Yes, you did.

12          Q.   And so my question is, utilizing the

13      Eriksson methodology and the same methodology

14      they did -- used in assessing exposure, what

15      can you refer me to, if anything, that

16      suggests that Eriksson would include lawn

17      mower spraying time of weeds that they saw in

18      addition to the 30 minutes, as testified to by

19      the plaintiff when calculating a time-weighted

20      exposure day?

21          A.   Yeah.  Again, not really having

22      Eriksson's questionnaire, I think what I would

23      surmise as the approach that they took in

24      those telephone interviews would have been to
```

1        try to drill down, you know, for this

2        particular type of information that you just

3        read from the deposition that Cotter gave, and

4        in the questioning, you would ask these

5        individuals about the sort of blocks of time,

6        you know, the duration of time that they

7        spent, say, continuously spraying.  You know,

8        was it 30 minutes?  Was it 60 minutes?  You

9        know, ask them that, and then also ask them

10       about these more sort of episodic, short-term

11       "spot spraying," I guess is the word that

12       we're going to use.

13              That would be the kind of question you

14       could put to them and get a sense in the

15       course of a typical day how much time did they

16       spend in these blocks of spraying versus these

17       spots of spraying and then add all that up for

18       a single daily duration number.

19       Q.   Okay.  And now turning to your

20       methodology, using your methodology that you

21       employed to calculate time-weighted exposure

22       days, how did you know that the 30 minutes

23       referred to on page 92 did not include the see

24       a weed, spray a weed from riding on the lawn

```
1          mower at other times in the day?

2          A.  Well, I think, you know, in reading

3      the way the question was put to Cotter, you

4      know, they asked him about the time he spent

5      spraying versus all the other things he did.

6              Well, you know, it seems to me that

7      that says to Cotter, Okay.  Spraying is here

8      in one bucket.  Everything else you did,

9      including riding the lawn mower, is in the

10     other bucket.  So you -- you know, you

11     accumulate, add up the sum of those two

12     buckets to get the daily total.

13             I mean, that's the way this question,

14     I think, is what -- and then also thinking

15     about the way he responded to it.  You know,

16     he talked about spraying the whole beds.  You

17     know, I think the message he got was that, you

18     know, the question was looking for the time

19     spent spraying compared to the time doing

20     everything else.

21         Q.  Based on that previous answer, are

22     you -- do you have special expertise in

23     opining on what people are thinking?

24                 MR. UEHLEIN:  Objection.
```

Robert F. Herrick, Sc.D.

```
 1        A.   Well, what I was trying to reflect

 2   back is the way I think this question -- you

 3   know, what -- what kind of response he was

 4   giving, you know, given the way the question

 5   was asked.

 6   BY MR. KALAS:

 7        Q.   I understand what you're trying to do,

 8   and I get it.  But I don't think that answer

 9   was responsive to my question.

10             Do you have special expertise,

11   Dr. Herrick, in what people are thinking?

12                  MR. UEHLEIN:  Objection.  It's

13   argumentative.

14        A.   I wouldn't claim that I have special

15   expertise in trying to infer what people are

16   thinking, no.

17   BY MR. KALAS:

18        Q.   When you spoke to Mr. Cotter in your

19   ten-minute conversation, was this a question

20   you asked for clarification on as to whether

21   he included the lawn mower time or whether he

22   did not?

23        A.   No, I didn't ask him that.

24        Q.   Okay.  And so you were assuming, based
```

Robert F. Herrick, Sc.D.

1        on the context here, that the 30 minutes

2        discussed on page 92 did not include the lawn

3        mower spot spraying time; is that correct?

4                    MR. UEHLEIN:  Objection.

5            A.   That's -- that's the way I interpret

6        this question, yes.

7        BY MR. KALAS:

8            Q.   Okay.  And the basis for that

9        assumption is how you think Mr. Cotter

10       understood the question that we just read on

11       page 92; is that fair?

12           A.   I think it's fair, especially if we

13       look at it in the context of the way he

14       responded.

15           Q.   Okay.  Looking at it in the context of

16       the way he responded, are you applying any

17       scientific expertise in reaching that opinion?

18           A.   I think it's more kind of a question

19       of linguistics than science.  I was, you know,

20       kind of looking at the way he replied.  I

21       don't consider that to really be a matter of

22       science.

23           Q.   Okay.  Now, are there any other

24       articles beyond the Eriksson article that

Robert F. Herrick, Sc.D.

```
 1        you're relying on for your methodology in

 2        calculating an eight-hour exposure  day, or a

 3        time-weighted exposure day?

 4             A.   Within this set of articles that I

 5        included in my footnotes, Eriksson was the

 6        only one who executed, you know, that

 7        particular step and -- and factored in the

 8        duration of time spent per day.

 9             Q.   There's another article, Andreotti,

10        that you looked at, right?

11             A.   Right.

12             Q.   And they calculated something called

13        an intensity-weighted exposure day, right?

14             A.   They did do that, right.

15             Q.   And what's that?

16             A.   Well, they -- they had information.

17        Let me -- can we open it up?

18             Q.   Sure.  I can mark it as Exhibit 8, if

19        you would like me to.

20             A.   Sure, sure.

21             Q.   Give me a moment.

22             A.   Sure.

23

24
```

Robert F. Herrick, Sc.D.

```
 1                    (Exhibit No. 8 marked for

 2           identification.)

 3

 4           A.   I'm getting too many things open at

 5           the same time.  Let me just flip back to that.

 6                    I'm just going down into their methods

 7           here.  I'm trying to remember what it was that

 8           they actually included in that intensity

 9           score.

10                    (Witness reviews document.)

11                    Okay.  I'm in their section on methods

12           in page 510.

13           BY MR. KALAS:

14           Q.   Okay.

15           A.   It's in the right-hand column in that

16           top paragraph.  And they said, "The intensity

17           score was derived from an algorithm based on

18           literature-based measurements and information

19           provided by the applicator, specifically

20           whether the participant mixed or applied

21           pesticides, repaired pesticide-related

22           equipment, used personal protective equipment,

23           and the application method used."

24                    So these were all, you know, factors
```

Robert F. Herrick, Sc.D.

1      that they included in deriving this intensity

2      value, but they didn't seem to actually use

3      the duration the same way that Eriksson did.

4           Q.   Well, I don't know if I agree with

5      that.  If you can look at the sentence before

6      that, it says "intensity-weighted lifetime

7      days," so they multiplied lifetime days times

8      intensity score.

9                Do you see that?

10          A.   I do.

11          Q.   And so they did include days per year,

12     which is one of the two exposure metrics you

13     calculated, and then they multiplied it -- or

14     excuse me -- days lifetime, and then they

15     multiplied it by the intensity score, right?

16          A.   They did but as -- if we put those two

17     sentences together, when they talk about the

18     way the intensity score was derived, they

19     don't mention that they considered the daily

20     duration in, you know, deriving that intensity

21     factor.

22          Q.   Well, right.  That's fair.  So they

23     don't consider daily duration, but they do

24     consider the number of days somebody used, and

Robert F. Herrick, Sc.D.

```
1        they multiply it by the intensity score to get

2        their intensity-weighted lifetime days, true?

3            A.   That's -- that's the approach that

4        they took, yeah.

5            Q.   Okay.  Did you have the information

6        available to you to calculate an intensity

7        score for Mr. Cotter?

8            A.   I don't think the detail that I have

9        on Cotter, you know, would really support

10       trying to calculate intensity, no.

11           Q.   Well, let's -- let's march through the

12       things here, and then -- and then we can talk

13       about it on the back end.

14               Did you have information on whether or

15       not Mr. Cotter mixed or applied pesticides?

16           A.   There was information, you know, of a

17       descriptive nature, you know, that he actually

18       did both.  So, yeah, that information was

19       there.

20           Q.   Okay.  Did you have information as to

21       whether or not he repaired his backpack

22       sprayer or his pump sprayer?

23           A.   I don't remember that he was asked

24       that or that there was any -- you know,
```

Robert F. Herrick, Sc.D.

1      whether that was really mentioned in any of

2      the information I had.  So I don't really know

3      the answer to that.

4          Q.   Do you remember he talked about his

5      backpack sprayer leaking one day?  Do you

6      remember that?

7          A.   I do remember that part, yes.

8          Q.   Do you remember he said he had to fix

9      it because it got all over him?

10         A.   I remember that.

11              MR. UEHLEIN:  Objection.

12         A.   Yeah.

13     BY MR. KALAS:

14         Q.   And so that's information on repairing

15     application equipment, isn't it?

16         A.   Well, it's a one-time --

17              MR. UEHLEIN:  Objection.

18         A.   It was an episodic -- you know, he

19     recalled that had happened.  But I wouldn't

20     consider that that's really the level of

21     detail I would want to somehow, you know,

22     assign an intensity value to the number of

23     times or the nature of the repairs he made.

24     BY MR. KALAS:

Robert F. Herrick, Sc.D.

```
1          Q.   Okay.  Well, we'll come back to that.

2               Did you have information on whether or

3      not he used personal protective equipment?

4          A.   Right.  He described the kind of stuff

5      that he wore, yeah.

6          Q.   Did you have information on whether --

7      or on how he applied pesticides, whether it

8      was a pump spray or a backpack spray or what

9      have you?

10         A.   Yeah, he talked about the different

11     types of sprayers and the backpack, so he did

12     mention that.

13         Q.   Okay.  The citation here is to a

14     Citation 8.

15              Do you see that?

16         A.   I do.

17         Q.   And if you go to Citation 8, it's a

18     paper by Coble, et al., in the index.

19         A.   Uh-huh.

20         Q.   Do you see that?

21         A.   Uh-huh.

22         Q.   Is that a paper you've reviewed?

23         A.   Let me just look down to the reference

24     here.
```

```
 1                  (Witness reviews document.)

 2             I didn't review it in preparing

 3        Cotter, but I do think -- and it did seem

 4        familiar.  I think I've read it in the past.

 5        Q.   For what reason did you read it in the

 6        past?

 7        A.   Oh, well, partly because I know Coble,

 8        but I know Cindy Hines.  I mean, I know these

 9        people.  These are people I worked with at

10        National Cancer Institute.  So back in 2011,

11        you know, I probably read it because I was

12        keeping track of what they were doing.

13        Q.   Who is -- I mean, I know you said you

14        worked with them.  What does Dr. Coble do for

15        a living?  Or Mr. Coble.  I don't know which.

16        A.   I think it's Dr. Coble.  He's an

17        exposure assessment guy at the National Cancer

18        Institute.

19        Q.   Is he good at his job?

20                  MR. UEHLEIN:  Objection.

21        A.   I don't have any reason to think that

22        he isn't.

23        BY MR. KALAS:

24        Q.   How about Dr. Hines or Ms. Hines?
```

1     What does she do?

2         A.   She's an industrial hygienist at

3     NIOSH.  She was actually someone who was in my

4     research group when I was there.

5         Q.   Does -- do you have any opinion on the

6     type of work she does, if it's reliable or

7     not?

8                    MR. UEHLEIN:  Objection.

9         A.   I -- I have no reason to question, you

10    know, the quality of her work.

11    BY MR. KALAS:

12        Q.   Are Dr. Coble and Dr. Hines the type

13    of people you would want to put together an

14    intensity-weighting algorithm for an

15    epidemiology study?

16        A.   Well, they're both very experienced

17    people.  You know, I think they would be the

18    kind of people you could count on, you know,

19    to do something like that, yeah.

20        Q.   Okay.  And you mentioned your work at

21    the National Cancer Institute.  This study,

22    Andreotti, which is in your reliance

23    materials, it's actually a study that appeared

24    in the Journal of the National Cancer

Robert F. Herrick, Sc.D.

```
1        Institute, right?

2            A.   Yeah, it's -- I think so.  Let me just

3        scroll back up to that.

4                 Yes.

5            Q.   And is that the journal that is

6        sponsored by the NCI?

7            A.   I don't know if they would -- I'm not

8        sure how they would characterize it

9        themselves.  I mean, it's -- it is their

10       publication.  I don't know exactly how they

11       would consider their relationship to it.

12           Q.   Okay.  And this is actually an article

13       published by multiple investigators from the

14       NCI, right?

15           A.   It is, yes.

16           Q.   And what is the NCI's role in the

17       federal government?  What are they tasked to

18       do?

19           A.   Well, they're -- they have a very

20       broad-based mandate, you know, but it includes

21       research around cancer and factors that might

22       be associated with causing cancer.  Among

23       other things, they also do lots of research

24       around cancer treatment and things like that.
```

Robert F. Herrick, Sc.D.

```
1        So I guess it's -- I would just say it's a

2        pretty broad-based mandate.

3            Q.   And do you know any of the authors of

4        the Andreotti paper?

5            A.   Well, let's see.  I know Mike

6        Alavanja, and I know Debra Silverman.  I don't

7        know the other people, no.

8            Q.   How do you know Mike Alavanja?

9            A.   He was at NIOSH in the same group I

10       was when I was there.

11           Q.   Is he an epidemiologist?

12           A.   Yeah, he's a physician and a

13       epidemiologist.

14           Q.   And do you have any opinion one way or

15       another as to whether he puts out reliable

16       science?

17                    MR. UEHLEIN:  Objection.

18           A.   I don't have any reason to question

19       the work that he does.

20       BY MR. KALAS:

21           Q.   How about Dr. Silverman?  How do you

22       know her?

23           A.   Just -- that's a little bit more of,

24       you know, just a professional acquaintance.
```

```
1          You know, she is at NCI, and she's someone I

2          knew just in passing.

3              Q.   Okay.  Have you -- when you worked at

4          NCI, did you publish any articles?

5              A.   Can I just correct it?  I actually

6          never worked at NCI.  I worked at NIOSH.

7              Q.   Oh, excuse me.  And there are -- I

8          guess you said you -- I'm trying to see if

9          there's any authors on here from NIOSH.  I

10         don't think there are.  I think it's NIEHS and

11         NCI.

12             Okay.  Let me back up, then, to the

13         Coble article.  I know you said you looked at

14         it a long time ago.  Do you know, based upon

15         the information provided in his deposition

16         regarding that leaking backpack sprayer, how

17         the intensity score in Coble would take that

18         into account?

19             A.   Oh, I would have to go back and

20         refresh myself on Coble.  It's -- it's

21         something I haven't really looked at lately.

22             Q.   Okay.  And without going back to

23         refresh yourself on Coble, do you -- can you

24         state one way or another today whether or not
```

```
1      it would have been possible to calculate an

2      intensity score, intensity-weighted lifetime

3      days for Mr. Cotter?

4              MR. UEHLEIN:  Objection.

5         A.   I think, you know, it would have been

6      a somewhat different approach to try and get

7      some additional information from him, but I

8      think in concept it would have been possible,

9      yeah.

10     BY MR. KALAS:

11        Q.   Do you know why you weren't asked to

12     calculate an intensity-weighting lifetime day

13     score to see where Mr. Cotter fell from an

14     exposure assessment point of view in the

15     Andreotti data?

16        A.   No, I don't.

17        Q.   Is there any bio -- well, let me back

18     up.  I think we maybe defined these in the

19     Constantine depo, but I can't -- I can't

20     recall.

21             Have you heard of a thing called a

22     biomonitoring study?

23        A.   Yes, I have.

24        Q.   What's a biomonitoring study?
```

Robert F. Herrick, Sc.D.

```
 1              A.    Well, in the broadest sense, it would

 2        be research that included collecting and

 3        analyzing some biological material, either for

 4        an agent of interest or some byproduct or

 5        metabolite of that agent.

 6              Q.    Is there a biomonitoring study on

 7        glyphosate or Roundup that you're aware of

 8        that calculates exposure using exposure days?

 9              A.    I -- let me think about this.

10              Not quite in that sense.  In that

11        study that we talked about in Constantine,

12        that one where Pierce is the first author, the

13        approach she took there was to look at urine

14        levels of glyphosate and a metabolite on

15        consecutive days, which are -- you know,

16        that's not quite the same as, I think, the

17        question you just asked.

18              So I guess the short answer would be I

19        don't know of one that has done that

20        directly.

21              Q.    Would it be typical in a biomonitoring

22        study to use exposure days as the quantitative

23        variable that you're assessing?

24              A.    It could be one of the variables.  You
```

Robert F. Herrick, Sc.D.

```
 1        know, that's one thing.  You could have a

 2        whole family of exposure variables, and that

 3        could be one of them that you would include,

 4        yeah.

 5           Q.   Okay.  And the question wasn't whether

 6        you could include it.  I asked would it be

 7        typical, in your experience?

 8                So is that something typically done in

 9        biomonitoring studies, in your experience?

10                    MR. UEHLEIN:  Objection.

11           A.   I would have to kind of caveat the

12        answer by saying it would depend a little bit

13        on the nature of the agent that was being

14        studied, so especially for something that

15        accumulated in the body.

16                Like, just to take an example, you

17        know, you might use lifetime exposure days to

18        lead because lead tends to accumulate whereas

19        if something is much more short-lived in the

20        body and tends to be excreted quickly, the

21        exposure days, you know, might not be such a

22        meaningful exposure variable.

23        BY MR. KALAS:

24           Q.   Okay.  And is glyphosate a compound
```

Robert F. Herrick, Sc.D.

1    that's excreted quickly from the body?

2        A.   Yeah, that was actually one I was

3    thinking of that it's -- it doesn't really

4    tend to accumulate.  So, you know, you might

5    not find that the exposure day metric relates

6    very well to the biological level.

7        Q.   Okay.  Is there a passive dosimetry

8    study -- well, let me back up and ask a

9    foundational question.

10           Have you heard of a type of study

11   called passive dosimetry?

12       A.   I have, yes.

13       Q.   What's passive dosimetry?

14       A.   Well, in the sort of exposure

15   assessment world, the family of measurement

16   devices that people use can be characterized

17   either as active or passive, and so the active

18   devices tend to be equipment that have some

19   kind of a sampling pump that, you know, does

20   some kind of air collection, and then that air

21   collection deposits the agent of interest on

22   some sampler, and it's analyzed in the

23   laboratory whereas there are other devices

24   that don't really include that sort of

```
 1      equipment.  They rely more on a passive

 2      collection of the agent.

 3             For example, these dermal exposure

 4      patches that people refer to, that they put on

 5      the surface of the skin and things like that,

 6      tend to -- you know, that falls more in the

 7      category of a passive dosimetry study.

 8         Q.  Is there a passive dosimetry study

 9      you're aware of that outlines a methodology

10      for calculating an eight-hour time-weighted

11      exposure day?

12         A.  You mean in the same sense that

13      Eriksson did?

14         Q.  Yes, sir.

15         A.  I can't think of one right offhand,

16      no.

17         Q.  The regulators who've evaluated

18      glyphosate, the US EPA, the ATSDR, Health

19      Canada, what have you, are you aware of any

20      regulator who's evaluated glyphosate, who's

21      evaluated exposure to glyphosate using a

22      time-weighted eight-hour exposure day?

23         A.  You know, I really haven't looked at

24      that.  I'm afraid I can't really give you a
```

```
1      good answer to that.

2           Q.   Okay.  Now, Mr. Cotter applied Roundup

3      both commercially and residentially, correct?

4           A.   Yes.

5           Q.   Okay.  And we talked about this

6      earlier.  He owned a company called Lawn

7      Rangers, L-a-w-n, right?

8           A.   Right, uh-huh.

9           Q.   And he owned that company -- well, he

10     applied pesticides while working at that

11     company from around 1995 to 2019, right?

12          A.   That's what he reported, yeah.

13          Q.   And Mr. Cotter was a licensed

14     pesticide applicator, correct?

15          A.   That's what he reported, yes.

16          Q.   What's it mean in the state of

17     Massachusetts to be a licensed pesticide

18     applicator?

19               MR. UEHLEIN:  Objection.

20          A.   I'm not -- you know, I haven't really

21     looked into that in great detail, you know,

22     how they actually handle it state by state.

23     So I'm afraid I'm kind of -- I don't really

24     feel like I can give you a good answer to
```

1     that.

2     BY MR. KALAS:

3          Q.   As a licensed pesticide applicator,

4     did Mr. Cotter learn how to properly apply

5     pesticides?

6                    MR. UEHLEIN:  Objection.

7          A.   I -- you know, again, not having

8     really looked into the training and

9     certification in Massachusetts, I think, you

10    know, what you're saying is there's a good

11    chance that that's true, but I haven't really

12    looked into that.

13    BY MR. KALAS:

14         Q.   Well, you're a certified industrial

15    hygienist, right?

16         A.   I am.

17         Q.   And you're a fellow of the American

18    Industrial Hygiene Association, right?

19         A.   That's true, yes.

20         Q.   And one of the things that I think

21    industrial hygienists talk about are hierarchy

22    of controls, right?

23         A.   Yes, that's true.

24         Q.   And industrial hygienists often train

Robert F. Herrick, Sc.D.

1        individuals to handle chemicals in a -- in a

2        way that minimizes exposure, correct?

3            A.   That's a common activity for

4        industrial hygienists, yes.

5            Q.   Have you ever trained someone in the

6        handling of pesticides?

7            A.   No, I haven't.

8            Q.   Have you ever observed the training of

9        individuals who are going to handle

10       pesticides?

11           A.   No, I don't recall ever having

12       observed that.

13           Q.   So you don't know one way or another

14       as to whether or not Massachusetts licensed

15       pesticide applicator training trains

16       applicators to avoid skin contact of

17       pesticides?

18           A.   Yeah, you know, sorry.  I really

19       haven't looked into the Massachusetts

20       training.  So I'm afraid I don't have a good

21       answer for that.

22           Q.   Well, despite whatever training

23       Mr. Cotter got as a licensed pesticide

24       applicator, he did report contact with his

Robert F. Herrick, Sc.D.

```
1          skin with Roundup, right?

2               A.   I do remember him saying that, yeah.

3               Q.   And we talked about the episodic time

4          when the backpack sprayer leaked, right?

5               A.   I'm sorry.  You kind of broke up

6          there.

7               Q.   I'm sorry.  We talked about the

8          episodic time when the backpack sprayer

9          leaked, right?

10              A.   He did report that, yes.

11              Q.   But then on a more chronic basis, he

12         reported skin contact when he would be mixing

13         in a rush -- and that's at page 80 of his

14         deposition -- or he would get it on his legs

15         and arms when spraying, and that's at page 79

16         of his deposition.

17                   Do you recall that?

18              A.   Yes, I do.

19              Q.   Are there any other areas of skin

20         contact that Mr. Cotter reported when either

21         discussing his case with you or in his

22         deposition?

23              A.   I'm just looking at the one -- my

24         Footnote Number 3 and his deposition on
```

```
1         page 80.  He remembered getting wet, and then

2         I put in quotes, pretty much when mixing

3         Roundup.  So he -- you know, he did report

4         that.  And when he was asked about specific

5         instances, he replied that there were too many

6         of them to recall.  That's my Footnote 2.

7              So, I mean, I think that's -- you

8         know, that's roughly consistent with what you

9         just described.

10        Q.   Okay.  Yeah, and I wasn't focused on

11        the time, the number of times as much as the

12        locations on the body.

13             Are there any other locations on the

14        body, say, for that episode with the backpack

15        sprayer other than the hands from mixing, the

16        legs and the arms that he reported getting

17        Roundup on?

18        A.   You know, in my -- my just thinking

19        about his deposition, I seem to recall that he

20        got Roundup on his back when he had this

21        occasion --

22        Q.   Right.

23        A.   -- that the sprayer leaked.  I mean, I

24        do -- I do remember him mentioning that.
```