Robert F. Herrick, Sc.D.

```
1              Q.    Right.  And that was -- I said setting

2        aside the episodic.  So the one time on the

3        back or maybe a few times, if it leaked a few

4        times.  But beyond that, do you recall any

5        other locations where he had dermal exposure

6        that he talked about besides his arms, legs,

7        and hands?

8              A.    Oh, okay.

9                    MR. UEHLEIN:  Objection.

10             A.    No, I don't remember, you know, him

11        talking about that.

12        BY MR. KALAS:

13             Q.    And Mr. Cotter bought both refill

14        bottles and then refill powder packets in

15        order to mix and load his Roundup, right?

16             A.    He did, yeah.

17             Q.    And the refill bottles could either be

18        a concentrated mix or a premixed dilution,

19        right?

20             A.    That's true, I think, yes.

21             Q.    And at his deposition, a picture was

22        actually marked of the refill bottles.  I

23        think it was Exhibit 5.  And those were

24        diluted.  But he testified to using
```

```
1        concentrate as well; isn't that right?

2            A.   I remember that, yeah.  Yes.

3            Q.   And when Mr. Cotter sprayed

4        residentially, unless he was clearing a bed --

5        and this is going back to that testimony on

6        page 92 -- unless he was clearing a bed, he

7        was typically spraying in a see-a-weed,

8        spray-a-weed manner or spot spraying; is that

9        fair?

10           A.   Are you talking about during the --

11           Q.   Commercial.

12           A.    -- the commercial use?

13           Q.   Yes.

14           A.   I think that's pretty fair.  He seemed

15       to, you know -- when he was asked that, that's

16       kind of the way that he broke it out.

17           Q.   Okay.  And on an average day -- well,

18       strike that.

19               Now, he typically used a backpack

20       sprayer when applying commercially, right?

21           A.   I think he said something to the

22       effect that he used the backpack, you know,

23       for the larger applications and that he

24       used -- on each individual property he served,
```

1    he used the backpack at least once a month.  I

2    have a recollection of him, you know, kind of

3    putting that amount of detail to it.

4        Q.   And then beyond that, he would use the

5    hand sprayer, right?

6        A.   Well, yeah.  He had the 1- and

7    2-gallon little --

8        Q.   Pump guy.

9        A.   -- pump guy, and then he had the

10   Windex bottles.

11       Q.   Right.  So he had three different

12   application tools.  He had a backpack sprayer

13   for bigger jobs; a pump sprayer, 1 or 2 gallon

14   for a normal day; and then a Windex bottle for

15   real quick sprays; is that -- is that fair? --

16   as a commercial applicator?

17       A.   That -- I think that tracks with the

18   way he described it, yes.

19       Q.   And when he would spray -- and this

20   goes residentially or commercially -- he

21   testified to wearing shorts, T-shirts, leather

22   gloves, and then sometimes goggles or

23   sunglasses.

24            Do you recall that?

Robert F. Herrick, Sc.D.

```
 1           A.    Yeah, and then he said as he -- when

 2      he got older, he wore a hat apparently.  So,

 3      yeah, and I'm just scrolling through the

 4      deposition.  He -- shorts and T-shirt, leather

 5      work boots, glasses, leather gloves, and

 6      baseball hats when he got older, yeah.

 7           Q.    Okay.  So when he reported getting

 8      Roundup on his hands when mixing and loading,

 9      do you know one way or another whether or not

10      those hands were gloved with leather gloves

11      when that was occurring?

12           A.    I don't think he was, you know, really

13      asked that.  I mean, I'm just trying to think

14      about, you know, kind of the mixing process,

15      whether he would be likely to wear gloves

16      while he was mixing as opposed to when he was

17      spraying.  I don't think he really -- he might

18      not have been asked that.  I don't remember

19      seeing any information about that.

20           Q.    And did you follow up on that when you

21      were conducting your interview on June 10?

22           A.    Specifically about the leather gloves?

23           Q.    Yes, sir.

24           A.    I didn't ask him about the gloves, no.
```

1          Q.   And the leather gloves would reduce

2     dermal exposure to that Roundup that got on

3     his hands when mixing and loading to some

4     degree, right?  What that degree is, we would

5     have to go to the literature and find out how

6     much glyphosate permeates the leather.  But to

7     some degree, the leather gloves would reduce

8     dermal exposure.  Would you agree with that?

9               MR. UEHLEIN:  Objection.

10         A.   I -- I would think to a pretty small

11    extent since, you know, the glyphosate's in a

12    water solution.  And, you know, I haven't

13    looked into this, but I would be very

14    surprised if the leather provided, you know, a

15    very substantial amount of protection against

16    that.

17    BY MR. KALAS:

18         Q.   Well, what if the leather gloves were

19    lined with cotton?

20         A.   Well, cotton --

21               MR. UEHLEIN:  Objection.

22         A.   You know, I could easily see the

23    water-based liquid going through both the

24    leather and the cotton.

Robert F. Herrick, Sc.D.

```
1      BY MR. KALAS:

2          Q.   Well, have you actually reviewed the

3      literature on the permeation through cotton of

4      glyphosate in a Roundup solution in a paper

5      called Wester 1996?

6          A.   I haven't looked into that, no.

7          Q.   And that's because -- and going back

8      to not asking him about whether or not he had

9      the gloves on, whether or not he's wearing

10     leather gloves on his hands when he's mixing

11     and loading is immaterial to an exposure day

12     calculation, true?

13              MR. UEHLEIN:  Objection.

14         A.   Well, yeah, I really wasn't -- you

15     know, to answer the question that I was

16     working on, I really didn't dig down for that

17     level of information.

18     BY MR. KALAS:

19         Q.   And that's because your answer would

20     be the same as far as exposure days whether or

21     not he was wearing leather gloves, right?

22         A.   That's probably true.  I don't really

23     see that the leather glove would have been,

24     you know, a real major factor.
```

Robert F. Herrick, Sc.D.

```
 1              Q.    If Mr. Cotter were wearing a
 2       water-repellent Tyvek suit, your answer for
 3       exposure days would be the same as opposed to
 4       what he actually wore, shorts and a T-shirt,
 5       right?  The exposure days would be the
 6       exposure days?
 7              A.    That -- that would be true.  You just,
 8       you know, calculate the days when he reported
 9       that he used Roundup.
10              Q.    And if he were wearing a
11       water-repellent Tyvek suit, as opposed to
12       shorts and T-shirt, the amount of glyphosate
13       that could reach his skin, because it's in a
14       water-based solution, would likely be far
15       lower, right?
16              A.    I think that's -- that's a reasonable
17       thing to say, yes.
18              Q.    Now, what Mr. Cotter was wearing, the
19       shorts and the T-shirts and I think you said
20       leather boots, leather gloves was similar to
21       what the applicators were wearing in the
22       dermal arm in Pierce, correct?
23              A.    I would have to go back to Pierce and
24       take a look.  I mean, I -- I think they were
```

Robert F. Herrick, Sc.D.

```
1        doing it wearing shorts and T-shirts, yeah, so

2        they did have -- they did have exposed skin

3        on, like, the arms and legs, yeah.  I think

4        they were -- I don't know if they were wearing

5        boots or canvas shoes.  I don't remember

6        exactly what she said in there, but she did

7        make some comment about the footwear.

8            Q.   Would it be helpful if we went back

9        and looked just so you're sure?

10           A.   Yeah, sure, let's take a look.

11           Q.   Give me a moment.

12

13               (Exhibit No. 9 marked for

14       identification.)

15

16       BY MR. KALAS:

17           Q.   I've marked Pierce as Exhibit 9.

18           A.   Okay.  I've got it.

19           Q.   And if you want to look at what they

20       were wearing, it's on "Methods" on page 355 in

21       the second paragraph.

22           A.   Okay.

23               (Witness reviews document.)

24               Okay.  "For dermal exposure group,
```

Robert F. Herrick, Sc.D.

```
1         applicators wore their own shirts, shorts,

2         T-shirts, socks, athletic shoes."

3              Yeah, that's what I was -- I remember

4         she said something about the shoes, but that

5         clarifies it.

6         Q.   Yeah.  So --

7         A.   Yes.

8         Q.   And so just to -- now that you've been

9         able to refresh your memory, what Mr. Cotter

10        wore when applying Roundup products was

11        similar to what the dermal arm of applicators

12        were wearing in the Pierce study, correct?

13        A.   Yeah, the only difference might be the

14        shoes.

15        Q.   And the fact that he actually wore

16        gloves, right, leather gloves?

17        A.   Oh, right, right.  Yeah.

18        Q.   And so his dermal exposure might have

19        been slightly lower than the dermal arm of the

20        Pierce study, fair?

21             MR. UEHLEIN:  Objection.

22        A.   Slightly.  I'm not persuaded that the

23        leather, you know, would give him a

24        substantial amount of protection, but I can't
```

1          rule it out.

2          BY MR. KALAS:

3              Q.   Got it.  Now, Mr. Cotter testified to

4          washing after work, right?

5              A.   Yes, he did.

6              Q.   And to the extent that there was

7          glyphosate remaining on his skin in the

8          Roundup solution, water is effective at

9          removing that glyphosate from the skin, is it

10         not?

11             A.   You know, I haven't really tried to

12         dig into that.  I wouldn't be surprised, but I

13         haven't really looked at that particular

14         question.

15             Q.   And you wouldn't be surprised that

16         water's effective in removing it from the skin

17         because of the chemistry of glyphosate, right?

18                      MR. UEHLEIN:  Objection.

19             A.   Well, it is in a water-based solution.

20         So I -- you know, as I said, I wouldn't be

21         surprised.

22         BY MR. KALAS:

23             Q.   Glyphosate is hydrophilic, true?

24             A.   It is, yeah.

Robert F. Herrick, Sc.D.

```
1              Q.   And that means, in layman's terms, it
2         has an affinity for water, right?
3              A.   Right.
4              Q.   And do you have any opinion one way or
5         another how long it takes for dermal
6         absorption to begin after glyphosate reaches
7         the skin?
8              A.   Oh, I really -- you know, the only --
9         I haven't really looked in the literature in
10        that.  I mean, there is some indication of
11        that if we looked at the data since we're in
12        the Pierce paper.  You know, that's one of the
13        things that Pierce reported was the time
14        course after exposure ended, and, you know,
15        she did a series of urine samples 3, 6, 12, 24
16        hours after application.
17             So there is -- you know, there is an
18        indication there, but I haven't looked beyond
19        that.
20             Q.   Okay.  And in your time-weighted
21        exposure assessment, you did not include a
22        variable for the period of time, however short
23        or long it may be, from which -- from the time
24        from which glyphosate reaches the skin until
```

Robert F. Herrick, Sc.D.

```
 1      absorption starts, right?  You didn't include

 2      that sort of variable?

 3           A.   No, I didn't.

 4           Q.   Okay.  And so in your time-weighted

 5      exposure assessment, there could be a portion

 6      of time in that where glyphosate has reached

 7      the skin but absorption has not yet begun,

 8      true?

 9                     MR. UEHLEIN:  Objection.

10           A.   Sure.  Yeah.

11      BY MR. KALAS:

12           Q.   Okay.

13                     MR. UEHLEIN:  John, we've been

14      going an hour or so.  I recommend we take a

15      little break.

16                     MR. KALAS:  Absolutely.  That's

17      fine.

18                     THE WITNESS:  Okay.

19                     THE VIDEOGRAPHER:  The time is

20      12:36.  We're off the record.

21

22                (Recess taken from 12:36 p.m.

23                to 12:46 p.m.)

24
```

Robert F. Herrick, Sc.D.

```
 1                    THE VIDEOGRAPHER:  The time is

 2        12:46.  We are back on the record.

 3                    MR. KALAS:  Shall we proceed?

 4                    THE WITNESS:  Sure.

 5        BY MR. KALAS:

 6            Q.   Now, Mr. Cotter applied occupationally

 7        for 25 years, true?

 8            A.   Let me just get to the report.  That

 9        does sound familiar, yeah.

10                 Let's see.  He was -- he had one

11        season.  It was actually, I think, something

12        like two months, when he was working with the

13        germinate, and then from '95 to '19, to 2019,

14        for 24 years, he was working with his Lawn

15        Rangers.

16            Q.   So with the germinate, that makes 25

17        years, right?

18            A.   Right.  Uh-huh.  Yes.

19            Q.   And he estimated he applied -- I think

20        he said six to seven days a week initially,

21        and then later it reduced to five days a week,

22        right?

23            A.   That was what he said.  I think I

24        remember that, yeah.
```

Robert F. Herrick, Sc.D.

1          Q.   And he applied from March to early

2     December, right?

3          A.   That sounds familiar, yeah.  I think

4     that's what I put in the report.

5          Q.   Okay.  Now, I've spent some time in

6     the Northeast.  I -- actually quite a bit of

7     time.  And the first freeze usually comes,

8     from my experience, in late October to early

9     November.

10              Is that your experience as well as a

11     Massachusetts resident?

12              MR. UEHLEIN:  Objection.

13          A.   Let's see.  Late October, early

14     November, yeah, or I -- you know, our rule of

15     thumb around here is always that if you get to

16     Thanksgiving without having your first

17     blizzard, you're doing something right.  So,

18     you know, I would put the late, you know, the

19     end date, you know, maybe back into first or

20     second week of November.

21     BY MR. KALAS:

22          Q.   Okay.  And, also, I've been to a

23     Red Sox game in April, and it is extremely

24     cold at night.

Robert F. Herrick, Sc.D.

1          When is the last freeze, in your

2     experience, living in Massachusetts?

3               MR. UEHLEIN:  Objection.

4     A.   Well, there can be freezes, you know,

5     definitely into April.  I've been in a

6     similar -- opening day at Fenway Park.  So,

7     you know, you certainly can't rule out freezes

8     in April.

9     BY MR. KALAS:

10    Q.   Okay.  And the reason I'm asking is

11    Mr. Cotter testified that he would apply

12    Roundup through early December and beginning

13    in March, and I guess what I'm asking, more as

14    a Massachusetts resident than as an exposure

15    expert, do things start growing -- green

16    things start growing in March in

17    Massachusetts?

18              MR. UEHLEIN:  I'm just going to

19    object to the extent this is outside the scope

20    of Dr. Herrick's designation or his expertise.

21    A.   Yeah, and, you know, I don't really

22    know, you know, based on where I'm living

23    here, exactly what sort of microclimate, you

24    know, he's dealing with, you know.  He's down

Robert F. Herrick, Sc.D.

```
1      on the Cape.  So, you know, I don't feel like

2      I'm really all that familiar with, you know,

3      kind of the growing season in the area where

4      he was.

5      BY MR. KALAS:

6          Q.   Okay.  He also applied residentially

7      at four residences in Taunton and North

8      Easton, correct?

9          A.   Yeah, I think that's right.  I'm just

10     looking at my -- I think I have that in my

11     table here.

12              (Witness reviews document.)

13              Yeah, here we go.  So he had Bay Road

14     in Taunton and then three addresses in North

15     Easton, yes.

16         Q.   And starting with the Taunton address,

17     he testified that he'd apply at Taunton every

18     week for a half hour, right?

19         A.   Right.

20         Q.   And he lived at Taunton from 1983 to

21     1986, right?

22         A.   Uh-huh, yeah.

23         Q.   And he would use a pump sprayer to

24     apply at Taunton, right?
```

Robert F. Herrick, Sc.D.

```
1            A.   Yeah, that hand pump sprayer, yes.

2            Q.   And then he moved to North -- to North

3      Easton, to the Sheridan address, and he lived

4      there from 1986 to 1988, right?

5            A.   Yeah.

6            Q.   And he testified that in the beginning

7      he would apply at the Sheridan address every

8      other day, and then he would apply every other

9      week.

10               Now, do you remember that?

11           A.   Yes, I do.

12           Q.   Okay.  What was Mr. Cotter's

13     occupation in the 1980s?

14           A.   Oh, let's see.  Let's just -- just

15     give me a second.  I think I remember.  I have

16     that in my report.

17               (Witness reviews document.)

18               From, let's see, starting in '74, he

19     worked for the Hendrickson Dairy, and he drove

20     a milk truck.

21           Q.   How long did he do that?

22           A.   I'm kind of working backwards.  What

23     he -- what he said is, starting in the early

24     '90s, he worked for KSK Engineering, and there
```

1        he drove a truck and collected money.  So, if

2        we say, prior to that, he was at Hendrickson

3        from '74 and he started with KSK in the early

4        '90s, so we're talking about 16 years, I

5        guess, at the dairy.

6            Q.    Okay.  And do you know the volume of

7        Roundup he applied at Sheridan in the 1986 to

8        '88 time period?

9                  MR. UEHLEIN:  Objection.

10           A.    You know, I don't remember seeing that

11       in the record, the actual amount that he used.

12       No, I don't have a good feel for that.

13       BY MR. KALAS:

14           Q.    Well, the reason I ask about the

15       volume -- and, again -- well, the reason I ask

16       the exposure assessor about the volume is

17       because it seems to me that Mr. Cotter would

18       have had to spend an awful lot of his milk

19       truck paycheck to apply Roundup every other

20       day to the Sheridan property.  Don't you

21       agree?

22                 MR. UEHLEIN:  Objection.

23           A.    You know, I don't really have a good

24       feel for what his salary might have been or

Robert F. Herrick, Sc.D.

1          how much Roundup would have cost him at that

2          point.

3          BY MR. KALAS:

4               Q.   Have you ever bought a bottle of

5          concentrated Roundup?

6               A.   You know, I was thinking about that,

7          and, no, I never did.  I did use Roundup, but

8          when I bought it, I bought it in, you know,

9          the bottle that, you know, like he called the

10         Windex bottle.

11              Q.   So you don't have an opinion as to how

12         much Roundup would have cost in the 1980s?

13              A.   You know, I'm afraid I don't.

14              Q.   Let's go to Squantum.  Squantum, it's

15         S-q-u-a-n-t-u-m.  Mr. Cotter lived there from

16         1988 to 1993, correct?

17              A.   I've got him there to '91.  Is that --

18         I'm looking in my report.  Is it -- I thought

19         I had him down there --

20              Q.   I don't have him going to Rainbow

21         until '93, but it doesn't much matter.

22              A.   Okay.

23              Q.   The record is what the record is.

24                   Mr. Cotter applied at Squantum -- it's

```
 1      tough for me to say -- every other week for 45

 2      minutes after he cleared out the mulch beds in

 3      the first two weeks, right?

 4          A.   That -- yeah, that's what I -- I'm

 5      looking.  That is what he said in his

 6      deposition, yeah.

 7          Q.   And likewise for Rainbow, which was

 8      either '91 or '93 through 2019, the

 9      application period, he applied every other

10      week for 45 minutes using a pump sprayer,

11      right?

12          A.   That's what he said, yes.

13          Q.   Now, looking at Exhibit 2, your

14      report, and just looking at the calculations

15      that you have on page 11, or, I guess,

16      appendix page 1, you have here both your

17      time-weighted and your nontime-weighted

18      exposure day calculations, right?

19          A.   Right, uh-huh.

20          Q.   Okay.  And just focusing on

21      time-weighted, you only calculated

22      time-weighted exposure days -- or strike that.

23               You calculated time-weighted exposure

24      days for both residence total lifetime days,
```

Robert F. Herrick, Sc.D.

1        and then Lawn Rangers time-weighted, right?

2             A.   Right.  And because in the Lawn

3        Rangers, I did it for three different levels

4        one, four, and eight hours a day.

5             Q.   Right.  And just to take the midpoint

6        for Lawn Rangers, which is 1,700.92

7        time-weighted days, essentially 1,701

8        time-weighted days, and then you add that to

9        the residence total lifetime time-weighted

10       days, you get, using the midpoint number,

11       about 1,780 lifetime time-weighted days.

12              Is that -- is that a fair midpoint

13       number?

14            A.   Yes.

15            Q.   Okay.  And what's really driving that

16       1,780 number, makes up the vast majority of

17       it, is that commercial application, right?

18            A.   His time with the Lawn Rangers, yeah.

19            Q.   Now, your calculation of one-hour,

20       four-hour, and eight-hour days, I think we've

21       talked about the record support and what

22       you're looking at for the one hour of

23       application day.  I think it was the 30

24       minutes from page 92 of the transcript, plus

Robert F. Herrick, Sc.D.

1     the lawn mower time; is that fair?

2         A.   Yeah, that's fair.

3         Q.   And actually I just said something

4     that doesn't make -- that maybe isn't clear on

5     the record.  I read this spreadsheet as the

6     1,701, just taking the midpoint, only

7     including the -- only including the commercial

8     days.  Does that include the residential as

9     well?

10        A.   That 1,700 is the total, both

11    commercial and residential.

12        Q.   Okay.  So the 1,701 number, just

13    taking the midpoint, what's driving that

14    number, for a large part, is the commercial

15    application, true?

16        A.   That's true, yes.

17        Q.   Now the record's clear.

18             Now, looking at the four-hour day,

19    four hours per day at Lawn Rangers, using

20    Roundup fours hours a day, so half his working

21    day, where in the record is support for the

22    potential that he used Roundup for four hours

23    per day every day at Lawn Rangers?

24        A.   Well, two things.  One is he, you

Robert F. Herrick, Sc.D.

1       know, actually didn't work just eight-hour

2       days.  You know, frequently he worked ten- or

3       twelve-hour days.

4               And so where I came up with this idea

5       was that, you know, based on the number of

6       lawns he was doing a day and then yards and

7       flower beds, that it wasn't unreasonable to

8       think that, you know, as sort of a midpoint

9       estimate, he was either treating the flower

10      beds or these other areas for four of those

11      twelve hours a day.

12          Q.  Okay.  Where in the record support --

13      where does he talk about, in the deposition

14      anywhere, spending a full third of his time

15      applying Roundup when working?

16              MR. UEHLEIN:  Objection.

17          A.  I'm just looking back to see where I

18      talked about that in the report.

19              (Witness reviews document.)

20              THE VIDEOGRAPHER:  This is the

21      videographer.  Can we go off the record real

22      quick?

23              MR. KALAS:  Sure.

24              THE VIDEOGRAPHER:  The time is

Robert F. Herrick, Sc.D.

```
 1        1:01.  We are off the record.

 2

 3                (Recess taken from 1:01 p.m.

 4                to 1:03 p.m.)

 5

 6                     THE VIDEOGRAPHER:  The time is

 7        1:03.  We are back on the record.

 8                     MR. KALAS:  Darlene, before we

 9        went off, there was a pending question.  Can

10        you just read that back in, please.

11

12                *(Question read.)

13

14        BY MR. KALAS:

15           Q.   That's the question, Dr. Herrick.

16           A.   Okay, sure.  Remember what he said was

17        that on days when he wasn't doing whole beds,

18        he used the hand spray bottle for about 30

19        minutes at a time, so that was 30 minutes on

20        the properties.  And if he did twelve

21        properties a day, that would put him up to 360

22        minutes of spraying time, and that's on days

23        when he wasn't doing the whole beds.

24                So that's where I came up with, you
```

Robert F. Herrick, Sc.D.

```
1          know, this kind of midpoint estimate of four

2          hours, and then on days when he was doing

3          whole beds, you know, I extrapolated that to,

4          you know, more spray time at each property.

5          And, again, for 12 or 15 properties a day,

6          that in a sort of a worst-case situation, he

7          was spraying for 480 minutes a day.  So that's

8          where that's based on.

9               Q.   Okay.  So let me make sure I

10         understand.  So you're basing that off the

11         testimony about 30 minutes a day spraying,

12         which is found at page 92, right?

13              A.   That's what he said, yes.

14              Q.   So let's go and look at that testimony

15         again.  I know we've already looked at it

16         once.

17                   It says, page 92, line 13, "Okay.  I

18         know you said you sprayed weeds as you saw

19         them.  Can you at all give me a sense of about

20         how much time you spent on an average day

21         spraying Roundup versus all the other things

22         you were doing for lawn maintenance?

23                   "Answer:  Yeah, in the course of the

24         day, I probably would have spent 30 minutes a
```

Robert F. Herrick, Sc.D.

```
1        day on spray unless I was doing the whole beds

2        at somebody's house."

3                Did I read that correctly?

4        A.   You did, yeah.

5        Q.   And based on that testimony, you have

6        assumed that 30 minutes a day could mean 30

7        minutes per house a day, and thus you've

8        reached a four-hour and eight-hour midpoint in

9        high-exposure hypothetical.

10               Is that a fair statement?

11                MR. UEHLEIN:  Objection.

12       A.   Yeah, that's a fair statement.  That's

13       sort of how I interpreted the way this line of

14       questioning was going, that that was his daily

15       use on each property.

16       BY MR. KALAS:

17       Q.   Again, just so the record's clear, you

18       didn't ask him in your interview on June 10 to

19       clarify whether he meant 30 minutes in a total

20       day on all the places he went to versus 30

21       minutes per house in a day, right?

22       A.   No, I didn't ask him that.

23       Q.   And the question and answer on

24       lines 13 to 22, they never say -- it never
```

1        says there 30 minutes per house.  It says 30

2        minutes a day, right?

3              A.   Let's take a look at the...

4                   Right.  That's the way the question

5        was asked.

6              Q.   And that's the way the answer was

7        given as well, true?

8              A.   That was what he said in the lines

9        that you just quoted, yeah.

10             Q.   Okay.  Hypothetically, if Mr. Cotter

11       meant that he only applied Roundup 30 minutes

12       throughout his day on a typical day as opposed

13       to 30 minutes per property, you would agree

14       with me that the 1,700 -- 1,700 time-weighted

15       day figure and the 3,320 time-weighted day

16       figure would both be gross overestimates of

17       his time-weighted exposure days?  Would you

18       agree with that?

19             A.   They would be --

20                  MR. UEHLEIN:  Objection to the

21       characterization.

22             A.   Yeah, they -- they would be if you

23       adjusted for spraying a shorter period of time

24       each day, then those values would be lower.

Robert F. Herrick, Sc.D.

```
 1        BY MR. KALAS:

 2            Q.   So, for instance -- and I know this

 3        has the residential value in it as well -- so

 4        the commercial value in the midpoint figure is

 5        1,620 eight-hour exposure days, right?

 6            A.   Right.

 7            Q.   Okay.  That number would be reduced

 8        eight times if he only applied 30 minutes a

 9        day, right?

10            A.   Right.

11            Q.   And that eight-hour-per-day number of

12        3,320, taking out the 80 days from

13        residential, so 3,240, that number would be

14        reduced 16 times if he only applied 30 minutes

15        a day on average, right?

16            A.   That would be the minimum amount,

17        yeah.

18            Q.   And, in fact, your minimum amount, if

19        hypothetically his average day was only 30

20        minutes a day, would be two times as small as

21        what you've estimated here.  So it would go

22        from 400 or so down to 200, right?

23            A.   Well, that -- you know, again, we

24        talked about this earlier.  Where I got that
```

```
1      one hour per day would be if he did 30 minutes

2      and then the additional time doing -- during

3      the spot spraying.

4          Q.   Right, and I'm just asking a

5      hypothetical.  I know where you got it.

6              Hypothetically, if he testified at

7      trial, for instance, that, No.  On my average

8      day, I applied 30 minutes per day, then taking

9      the residential use out of it, which is 80

10     days, the commercial use in eight-hour

11     time-weighted days would go from 400 to 200,

12     right?

13         A.   That's true, yes.

14         Q.   Now, we talked about this fellow the

15     last time, and are you aware that a guy named

16     Dr. William Sawyer has been disclosed as an

17     expert for Plaintiffs in this Cotter matter as

18     well?

19         A.   Yeah, I've heard his name.  Right.

20         Q.   And do you have any understanding as

21     to what Dr. Sawyer will be opining on in this

22     matter?

23              MR. UEHLEIN:  Objection.

24         A.   My impression is that he focuses, you
```

1    know, more on the toxicology and sort of the

2    mechanistic side of things.  But I don't

3    really have a good feeling for what, you know,

4    in particular he might be testifying about.

5    BY MR. KALAS:

6        Q.   I want you to assume, hypothetically,

7    for the next series of questions that

8    Dr. Sawyer has calculated an internal dose for

9    Mr. Cotter.

10           Can you assume that?

11       A.   Sure.

12       Q.   And you haven't seen his report,

13   right?

14       A.   I don't think I have.

15              MR. UEHLEIN:  Just to clarify,

16   you're talking about a report in the Cotter

17   matter?

18              MR. KALAS:  Yes, sir.

19   BY MR. KALAS:

20       Q.   You haven't seen his report in the

21   Cotter matter, Dr. Herrick?

22       A.   Hang on just one second.

23       Q.   Sure.

24       A.   I'm just checking here because I saw

Robert F. Herrick, Sc.D.

```
 1        his report in Constantine.

 2             Q.   Right.

 3             A.   Hang on one second.  I'm just looking.

 4        Just bear with me.  I need to look through my

 5        files on Cotter.

 6                  (Witness reviews document.)

 7                  Oh, wait a minute.  Okay, yeah.  I do

 8        have it.

 9             Q.   You do have his report?

10             A.   I do, yeah.

11             Q.   Now, that report does not appear on

12        your reliance materials.  I take it you're not

13        relying on his report for any of your

14        opinions?

15             A.   No.  I was just looking -- I don't

16        exactly remember when I got this.  I got it

17        pretty recently.  But I had written my report,

18        you know, before -- before I saw this.

19             Q.   Okay.  Well, since you have it

20        already, then I -- we can take this out of

21        hypotheticals and put it into the realm of

22        actual concrete numbers.

23                  Give me a moment, and I'll mark it as

24        Exhibit 10.
```

Robert F. Herrick, Sc.D.

```
 1
 2              (Exhibit No. 10 marked for
 3         identification.)
 4
 5    BY MR. KALAS:
 6         Q.   So I've marked Dr. Sawyer's report in
 7    the Cotter matter as Exhibit 10.
 8              If you can just look quickly to the
 9    Zoom screen, Dr. Herrick, I've put the first
10    page of it up on the share screen.
11              Is this the header of the report that
12    you have in your files as well?
13         A.   June 23, yes.
14         Q.   And if you go down in Dr. Sawyer's
15    report to page 38.
16              Let me know when you've gotten down
17    there and had a chance to familiarize
18    yourself.
19         A.   Just give me a minute here.
20         Q.   Yes, absolutely.
21         A.   I need to open it back up here.
22              Okay.  Got it.
23              Which page?
24         Q.   So I'm looking at page 38.
```

Robert F. Herrick, Sc.D.

```
 1          A.   Let me go down here.  Just one second.

 2          Q.   Yes.

 3          A.   Okay.  I'm on 38.

 4          Q.   And if you see there, Dr. Sawyer is

 5      talking about using a passive dosimetry study

 6      to calculate a dose, and then he goes down,

 7      and he has a box of dermal exposure and then a

 8      systemic dose.

 9               Do you see that?

10          A.   Yes.

11          Q.   Okay.  And do you see the systemic

12      dose he calculated for Mr. Cotter here is .008

13      milligrams per kilogram per day?  Did I read

14      that correctly?

15          A.   You did, yeah.

16          Q.   Now, I want to use that and go back,

17      so keep that number in your mind, .008 mgs per

18      kg.  I want to go back to your expert report

19      and back to your exposure breakdown, which is

20      on page 11 of your expert report, Exhibit 2.

21          A.   Okay.

22          Q.   Okay.  And on your exposure breakdown

23      for nontime-weighted exposure days, lifetime,

24      residential, and commercial, you have
```

```
 1        41.96.5 -- or excuse me -- 4,196.5 exposure

 2        days.  Right?

 3            A.    That's the nontime-weighted exposure

 4        days, yes.

 5            Q.    Right.  So that's the -- that's the

 6        number of exposure days overall in his life.

 7        He had -- the midpoint is 4,197, fair?

 8            A.    Yes, right.

 9            Q.    So I want to take Dr. Sawyer's number,

10        which is .008 mgs per kg, and plug it into the

11        exposure days to figure out the lifetime dose

12        of glyphosate that Mr. Cotter received.  And

13        so let me ask a foundational question.

14                 Would multiplying a calculated dose by

15        a toxicologist to exposure days calculated by

16        an exposure assessment expert, like yourself,

17        be a reasonable way to calculate a lifetime

18        absorbed dose?

19                     MR. UEHLEIN:  Objection.

20            A.    You know, I would have to say I'm not

21        that familiar with the way that value came

22        from Sawyer's calculation, so I really don't

23        feel like I can answer that.

24        BY MR. KALAS:
```

Robert F. Herrick, Sc.D.

```
1            Q.    Well, I know you're not familiar with

2       the way that value came from Dr. Sawyer's

3       calculations because, as you told me very

4       early on in this deposition, you're not here

5       to be the dose assessment expert.  That's for

6       the toxicologist, right?

7                       MR. UEHLEIN:  Objection.

8            A.    Right.

9       BY MR. KALAS:

10           Q.    And so Dr. Sawyer, being the

11      toxicologist, calculated a dose, and we just

12      looked at that, right?

13           A.    Okay.  Sure.

14           Q.    And then you would multiply dose in a

15      given day times the number of days you're

16      exposed to get a lifetime dose.  Is that a

17      fair way to do that?

18                       MR. UEHLEIN:  Objection.  That

19      was asked and answered.

20           A.    You know, I -- just looking at it for

21      the first time here, I don't feel like I can

22      give you a really good answer as to how -- you

23      know, how you would go about doing that

24      calculation.  I would really need to --
```

1      BY MR. KALAS:

2          Q.   Well, that's fine.  I'm going to

3      calculate some numbers, and I just want to

4      make sure that you think I'm doing them

5      correctly.

6               Can you see the calculator on the

7      screen that I'm sharing here?

8          A.   Let's take a look.  Yes.

9          Q.   Okay.  Now, your nontime-weighted

10     exposure days were 4,196.5.

11              Do you see that?

12         A.   I do.

13         Q.   Okay.  And did I enter that correctly

14     into the calculator?

15         A.   Yes.

16         Q.   And then Dr. Sawyer's dose was .008

17     mgs per kg.  So I'm going to multiply the

18     exposure days times the dose.

19              I put in .008.  Did I put that in

20     correctly into the calculator?

21         A.   You did, yes.

22         Q.   And then that equals 33.572.

23              Is that what the calculator came out

24     at, Dr. Herrick?

```
1              A.   It appears to be, yes.

2              Q.   And that would be 33.572 milligrams

3        per kilogram, right?

4              A.   Yes.

5                   MR. UEHLEIN:  Objection.

6        BY MR. KALAS:

7              Q.   Now, Mr. Cotter weighed -- if we go

8        back -- let me stop the share real quick.

9                   If we go back to Dr. Sawyer's report,

10       he talks about this.  Mr. Cotter weighed 85.7

11       kilograms.

12                  Can you see that in his report right

13       here?

14             A.   I'm looking.  Yes, uh-huh.

15             Q.   So then if we go back to our

16       calculator, we multiply the 33.572 milligrams

17       per kilogram that we got from the last

18       equation, multiplying that by or -- did I

19       enter -- let me ask this:  Did I enter 33.572

20       correctly into the calculator?

21             A.   You did, yeah.

22             Q.   And I multiply that by 85.7, which is

23       the kilograms.

24                  Did I enter that correctly into the
```

Robert F. Herrick, Sc.D.

1    calculator?

2         A.    You did.

3         Q.    Okay.  And that comes up with a

4    lifetime dose of 2,877.12 milligrams.

5              Did I read that correctly?

6         A.    You did.

7         Q.    And Mr. Cotter -- so we'll keep that

8    number -- keep a pin in that number.

9              Now, Mr. Cotter was diagnosed with NHL

10   at the age of 58, correct?

11                   MR. UEHLEIN:  Objection.

12        A.    I don't remember that.  You know, I

13   didn't look at that information really.

14   BY MR. KALAS:

15        Q.    Okay.  Going back to Dr. Sawyer's

16   report, do you see here Dr. Sawyer reports

17   that he was diagnosed with mantle cell

18   lymphoma at the age of 58?

19        A.    I do see that, yes.

20        Q.    Okay.  Any reason to disagree with

21   that?

22        A.    I haven't seen any information

23   otherwise.

24        Q.    So the next thing I want to figure out

Robert F. Herrick, Sc.D.

1          is the number of days, lifetime days

2          Mr. Cotter had lived before he was diagnosed

3          with NHL.

4                    Mr. Cotter, 58 years, did I enter that

5          correctly in the calculator?

6          A.    You did.

7          Q.    And then 365 days in a year.

8                    Did I enter that correctly in the

9          calculator?

10         A.    You did.

11         Q.    And that comes out to 21,170 days,

12         right?

13         A.    Yes.

14         Q.    Okay.  Going back to that dose, we

15         came up with 2,877.12 milligrams.

16                    Did I enter that correctly in the

17         calculator?

18                         MR. UEHLEIN:  Objection.

19         A.    You did.

20         BY MR. KALAS:

21         Q.    Divided by 21,170 days.

22                    Did I enter that correctly in the

23         calculator?

24         A.    You did.

Robert F. Herrick, Sc.D.

```
1            Q.   That comes up with an average daily

2       dose of .136 milligrams a day.

3                 Did I read that correctly from the

4       calculator?

5            A.   You did.

6            Q.   And just to get a

7       milligram-per-kilogram dose, I'll divide that

8       by his weight, 85.7.

9                 Did I enter that correctly in the

10      calculator?

11           A.   You did.

12           Q.   And that comes up with a number of

13      .00159 milligram per kilogram per day.

14                Did I read that correctly?

15           A.   You did.

16           Q.   Are you aware of a regulatory value or

17      a regulator that considers a dose of .00159

18      milligrams per kilogram per day a dose that

19      increases the risk of NHL in a glyphosate

20      applicator?

21                     MR. UEHLEIN:  Objection.  That

22      lacks foundation, and it's outside the scope

23      of Dr. Herrick's disclosure.

24           A.   Yeah, you know, I don't feel like I
```

Robert F. Herrick, Sc.D.

1         can really, you know, give you a qualified

2         answer to that.  I haven't really ever looked

3         into that.

4         BY MR. KALAS:

5             Q.   Right.  So I'm asking if you're aware,

6         and if the answer is No, I'm not aware because

7         I haven't looked into it, that's -- that's

8         fine.  Is that why you're not aware?  You

9         haven't looked into it?

10            A.   No, I haven't looked at that.

11            Q.   And, likewise, are you aware of any

12        regulator that considers a dose of .136

13        milligrams per day a dose that causes an

14        increased risk for NHL?

15                     MR. UEHLEIN:  Same objection.

16            A.   I really haven't looked at that

17        particular issue.

18        BY MR. KALAS:

19            Q.   Now, you talk about in your report,

20        Dr. Herrick, that Mr. Cotter was told -- well,

21        actually, let me back up before I get to that.

22                Assuming Dr. Sawyer is correct that

23        Mr. Cotter was diagnosed with NHL in 2014, in

24        December of 2014 -- do you remember just

1    seeing that?

2        A.   Yeah, I remember just looking at that.

3    Right.

4        Q.   Would you agree that his exposures

5    from 2015 to 2019 are immaterial to the

6    causation of his lymphoma since it manifested

7    in 2014?

8              MR. UEHLEIN:  Objection.  Lacks

9    foundation.  Outside the scope.

10       A.   Yeah, you know, I'm sorry.  That's

11   kind of out of my lane.

12   BY MR. KALAS:

13       Q.   Well, let me ask something that's a

14   little more -- maybe a little -- a little bit

15   more tangible.

16            When you're thinking about exposure in

17   a disease, right -- I know you've looked at

18   exposures in diseases throughout your career;

19   is that a true statement?

20       A.   I have, yes.

21       Q.   When you're thinking about an exposure

22   and a disease, can an exposure that occurs

23   after the manifestation of a disease be the

24   initiating factor in that disease?

Robert F. Herrick, Sc.D.

```
 1                    MR. UEHLEIN:  Same objection.

 2         A.   You know, it's really not my area, but

 3     I would say that, you know, you could have a

 4     situation where some disease process had been

 5     initiated and when the factor that we're

 6     interested in comes upon the scene, it

 7     promotes something that's already underway.

 8     BY MR. KALAS:

 9         Q.   Right.  And so you -- there's such a

10     thing as a cancer promoter, right?

11         A.   Sure.

12         Q.   And what you see is, you know,

13     somebody has an initiation.  Let's take --

14     let's take asbestos and lung cancer, right?

15     Somebody has an initiation of lung cancer from

16     their smoking, and then the asbestos that

17     they're exposed to could promote the

18     manifestation of that lung cancer.

19              Is that an example of what you were

20     thinking about?

21         A.   You know, I don't actually know if

22     asbestos is a promoter, so I don't know if I

23     would think necessarily that's a good example.

24     But there are other chemicals that are thought
```

Robert F. Herrick, Sc.D.

```
1        to be primarily active as promoters.

2            Q.   You're familiar with the Bradford Hill

3        criteria, right?

4            A.   I am.

5            Q.   Have you heard of the criteria

6        temporality?

7            A.   I have.

8            Q.   What does temporality mean?

9            A.   Well, it's that the exposure needs to

10       have occurred before the initiation of the

11       disease process.

12           Q.   And would you agree that exposures

13       from 2015 to 2019 could not initiate a cancer

14       in 2014?

15                   MR. UEHLEIN:  Objection.

16           A.   Could not.  I suppose you could -- you

17       could make that argument, yeah.

18       BY MR. KALAS:

19           Q.   Well, I'm an attorney.  I get to make

20       arguments.  But I'm asking you, as a

21       scientist, is it possible, from a temporality

22       point of view, for exposures from 2015 to 2019

23       to initiate a cancer that occurs in 2014?

24                   MR. UEHLEIN:  To be fair, you're
```

Robert F. Herrick, Sc.D.

```
1        asking him as a scientist a question to which

2        he's neither been designated nor has said that

3        he has evaluated this question in his expert

4        opinion.  So let's look at your question

5        through that lens.

6              It's outside the scope of the

7        designation and outside of what he said his

8        expert opinions in this case are.

9        BY MR. KALAS:

10        Q.   You may answer, Dr. Herrick.

11        A.   Well, I would say that, you know,

12        looking at the Bradford Hill criteria, you

13        would say that it's very unlikely that an

14        exposure that occurred after the initiation

15        point was actually a causal factor.

16        Q.   And, hypothetically, because I guess I

17        need to ask this as a hypothetical, if it's

18        impossible for exposures that occur after an

19        initiation to initiate a cancer, then you

20        would agree that the lifetime day and

21        intensity would -- or excuse me --

22        time-weighted lifetime day calculations for

23        the years 2015 to 2019 would be immaterial to

24        the causation of his cancer, true?
```

1                    MR. UEHLEIN:  Objection.

2          A.   Yeah, if we want to stick with the

3     idea that, you know, we're only looking at

4     initiation.

5     BY MR. KALAS:

6          Q.   Okay.  Now, you mention in your

7     report, Dr. Herrick, that Mr. Cotter stopped

8     using Roundup because a doctor told him that

9     Roundup had been associated with NHL.

10              Do you remember that?

11         A.   I remember that that was something he

12    mentioned in his deposition, yeah.

13         Q.   Were you aware that the doctor who

14    told him that, told Mr. Cotter that, is a

15    retained expert witness for Plaintiffs in

16    Roundup litigation who's made tens of

17    thousands of dollars testifying in these

18    cases?

19                   MR. UEHLEIN:  Objection.  Lacks

20    foundation.

21         A.   No, I hadn't heard that.

22    BY MR. KALAS:

23         Q.   Did anyone -- from your review of the

24    record, did anyone besides that single doctor

Robert F. Herrick, Sc.D.

```
 1        tell Mr. Cotter that his glyphosate use could

 2        be associated with his NHL?

 3                    MR. UEHLEIN:  Same objection.

 4           A.   You know, as I looked at the record in

 5        the case, I'd have to say I didn't really look

 6        for that kind of information.

 7                    MR. KALAS:  Maddie, how much

 8        more time do I have?

 9                    THE VIDEOGRAPHER:  Give me one

10        second.  I'll add it up for you.

11                    MR. KALAS:  Thank you.

12

13           (Pause in proceedings.)

14

15                    MR. UEHLEIN:  So, John, just to

16        be clear, you know, I don't know that my

17        e-mail agreement with Anthony Martinez, we

18        said three hours.  I take it your position,

19        Defendant's position -- and it's going to

20        apply to all the depositions moving forward --

21        is that it's three hours of run time.

22                    MR. KALAS:  Yes.

23                    MR. UEHLEIN:  Okay.  Just want

24        to be clear on that.  Yes.
```

```
 1                    MR. KALAS:  Yes, that's fine.

 2        BY MR. KALAS:

 3             Q.   Dr. Herrick, I want to look at a

 4        biomonitoring article with you here for a

 5        moment.

 6

 7                  (Exhibit No. 11 marked for

 8        identification.)

 9

10        BY MR. KALAS:

11             Q.   I've marked it as Exhibit 11.

12                  See if it will let me -- it's telling

13        me I can't rename it, but -- there it is.  Now

14        it renamed.

15                  All right.  So there is Exhibit 11.

16             A.   Hang on just a second.

17             Q.   Yes.

18             A.   Let me do this again.  It didn't seem

19        to make it over.

20                  Just give me a minute here.

21                  Acquavella?

22             Q.   Yes, sir.

23             A.   Got it.

24             Q.   I've marked this as Exhibit 11, and
```

Robert F. Herrick, Sc.D.

1        it's an article that's entitled "Glyphosate

2        Biomonitoring for Farmers and Their Families:

3        Results from the Farm Family Exposure Study."

4                Did I read that correctly?

5        A.   You did, yeah.

6        Q.   And it's in a peer-reviewed journal

7        called Environmental Health Perspectives,

8        right?

9        A.   Yes, it is.  Uh-huh.

10       Q.   And this is an example, if you just

11       look at the abstract, of a biomonitoring

12       study, correct?

13       A.   Yeah, just give me a second here.

14       Yeah.  "We evaluated urinary glyphosate

15       concentrations for 48 farmers, their spouses,

16       and their 79 children," yeah.

17       Q.   And is this an article you reviewed in

18       reaching your opinions?

19       A.   No, it wasn't.

20       Q.   And did you do a -- I guess I should

21       ask foundationally did you do a search of the

22       peer-reviewed literature for articles like

23       this?

24                MR. UEHLEIN:  Objection.

Robert F. Herrick, Sc.D.

```
 1              A.   I searched the literature.  I actually
 2        didn't uniquely search for studies of
 3        biomarkers.
 4        BY MR. KALAS:
 5              Q.   So how did you search the literature?
 6              A.   I was looking, you know, mainly at
 7        exposure, you know, things that had exposure
 8        in the -- in the titles, in the keywords.
 9              Q.   This actually does have "exposure" in
10        the title doesn't it?
11              A.   Oh, I think it does.  I'm saying I'm
12        not ruling out that I haven't -- that I didn't
13        find it.  What I'm saying is I didn't, you
14        know -- once I saw what it was about, I didn't
15        rely on it.
16              Q.   So you may have looked at it briefly,
17        but because it wasn't focused on exposure days
18        and time-weighted exposure days, you didn't
19        evaluate it further; is that fair?
20                   MR. UEHLEIN:  Objection.
21              A.   I think that's probably fair.  I found
22        it, but I didn't dig into it.
23        BY MR. KALAS:
24              Q.   All right.  Well, I just want to look
```

Robert F. Herrick, Sc.D.

```
1         at some of the characteristics of these

2         farmers.  So this is a study -- if you look

3         here at the "Materials and Methods," a study

4         of licensed pesticide applicators from South

5         Carolina and Minnesota?

6              A.   Yes.

7              Q.   And what they -- if you look down here

8         at the characteristics on Table 2, they had

9         "Field observers' characterizations of farmers

10        on the day of application."

11                 Do you see that?

12             A.   Yeah.  Hang on.  I'm just scrolling

13        down here.

14             Q.   Okay.

15             A.   Table 2, yes.

16             Q.   And we have about two-thirds wearing

17        rubber gloves when mixing and loading and

18        about a third not, right?

19             A.   Yes.  70.8 percent, yeah.

20             Q.   And Mr. Cotter didn't wear rubber

21        gloves, right?

22             A.   No, he didn't.

23             Q.   Then we have farmers with acreage

24        treated between 10 and 439 acres, right?
```

Robert F. Herrick, Sc.D.

```
 1          A.   Yeah, right.

 2          Q.   And Mr. Cotter didn't apply to 439

 3     acres in a given day, right?

 4          A.   No, I don't think so.

 5               MR. UEHLEIN:  Objection.

 6     BY MR. KALAS:

 7          Q.   And number of loads, we have anywhere

 8     from one load, all the way up to twelve loads,

 9     right?

10          A.   Yeah.  Uh-huh, yes.

11          Q.   And did Mr. Cotter ever report mixing

12     and loading twelve backpacks full of Roundup

13     in a given day?

14          A.   I don't think he used that much, no.

15          Q.   And then we have observed spills

16     during mixing, and I'd say a handful of

17     farmers had spills during mixing, right?

18          A.   Yeah, I see that.  Uh-huh, 14 percent.

19          Q.   About the same number had spills

20     during applying, right?

21          A.   Yeah, 14.6 percent.

22          Q.   Then about a third had observed skin

23     contact with the pesticides, right?

24          A.   Right.
```

Robert F. Herrick, Sc.D.

```
 1              Q.    And that's what Mr. Cotter talked

 2         about.  He had skin contact with the

 3         pesticides, right?

 4              A.    He did mention that, yeah.

 5              Q.    And so just to kind of sum up those

 6         characteristics, these farmers applied more

 7         Roundup to a greater area than Mr. Cotter, but

 8         they likely had only a minority of them with

 9         skin contact, like Mr. Cotter, right?

10              A.    That's --

11                         MR. UEHLEIN:  Objection.

12                         THE STENOGRAPHER:  I'm sorry.

13         Was there an objection?

14                         MR. UEHLEIN:  Yes, that was an

15         objection.

16                         THE STENOGRAPHER:  Thank you.

17         And the answer?

18              A.    Yes, about 31.3 percent of them

19         reported they had skin contact.

20         BY MR. KALAS:

21              Q.    Okay.  So let's look at the worst-case

22         scenario in this study real quick, and it's

23         right here in this paragraph.

24                         It says, "The maximum urinary
```

1    concentration for a child, 29 parts per

2    billion, was for a teenage boy who actively

3    assisted his father with the mixing and

4    application.  The boy's father had the highest

5    urinary concentration among applicators.  The

6    field notes documented long periods spent by

7    the farmer repairing the boom sprayer and

8    evidence of spills when mixing and loading.

9    The use of protective gloves was not observed

10   for father or son during mixing or loading or

11   during the repairs.  The father was also

12   observed to smoke cigarettes while repairing

13   the boom sprayer."

14           Did I read that correctly?

15       A.   You did, yeah.

16       Q.   Then going to the next sentence, it

17   says, "Maximum systemic dose for farmer

18   applicators was estimated to be .004 mgs per

19   kg, and the distribution of values was highly

20   skewed."

21           Did I read that correctly?

22       A.   You did, yeah.

23       Q.   And so in that farmer that the authors

24   report having the highest urinary

Robert F. Herrick, Sc.D.

1    concentration, he had evidence of spills while

2    he was mixing and loading, right?

3        A.    Apparently, yeah.

4        Q.    And that's what Mr. Cotter reported as

5    well, right?

6        A.    Uh-huh.

7        Q.    And he didn't wear protective gloves

8    when mixing and loading, right?

9        A.    Right.

10       Q.    And he -- and Mr. Cotter also reported

11   not wearing, I guess, rubber gloves when

12   mixing and loading, right?

13       A.    Right.

14       Q.    But this farmer, unlike Mr. Cotter,

15   was smoking while handling equipment that had

16   Roundup on it, right?

17       A.    Yeah, he was observed to smoke

18   cigarettes while repairing the boom sprayer.

19       Q.    And is that a -- can smoking

20   cigarettes while handling equipment that has

21   pesticides on it enhance the absorption of the

22   pesticides?

23              MR. UEHLEIN:  Objection.

24       A.    You know, I'm afraid I don't really

Robert F. Herrick, Sc.D.

```
1        feel comfortable trying to -- I mean, I would

2        have to speculate at that.

3   BY MR. KALAS:

4        Q.   Okay.  But you would agree that this

5        group of farmers -- this group of farmers and

6        these farmers who are handling large amounts

7        of glyphosate and are applying it to hundreds

8        of acres are highly exposed individuals?  You

9        would agree with that?

10        A.   Well, I haven't really, you know, dug

11        into this article.  So I'm -- you know, if

12        that's -- let me just take a look at the

13        abstract here.

14        Q.   Sure.

15        A.   (Witness reviews document.)

16             I mean, the one thing that -- you

17        know, again, I'm just, you know, looking at

18        this for the first time in a -- probably a

19        very long time.  The one thing that caught my

20        eye as we were going down through the table

21        that you referred to was that 60 percent of

22        these guys, if they're guys, were using

23        tractors with closed cabs, you know, which

24        would definitely be a factor in terms of how,
```

```
1          you know, how their exposure was.

2              Q.   Right.  And 40 percent were not,

3      right?

4              A.   Yeah, right.

5              Q.   And 40 -- and 30 percent were not

6      wearing rubber gloves, right?

7              A.   Right.

8              Q.   And 15 percent had spills, right?

9              A.   Yeah.

10             Q.   And 33 percent applied to over 100

11     acres, right?

12             A.   Yes.

13             Q.   And despite all that, despite all

14     those characteristics, the highest dose they

15     were able to measure was .004 mgs per kg,

16     right?

17             A.   This was the guy that was doing the

18     repairs?

19             Q.   Yes, sir.

20             A.   Yes.

21             Q.   And so there's a wide range of

22     exposures in these farmers, right?  Because

23     you have the closed cabs wearing rubber

24     gloves, all the way to the open cabs not
```

Robert F. Herrick, Sc.D.

```
1        wearing rubber gloves, right?

2             A.   Yeah, uh-huh.

3             Q.   And at the high end, at the -- at the

4        end, in the not in the closed cabs, not

5        wearing rubber gloves, these are very highly

6        exposed individuals.

7                  Would you agree with that?

8                       MR. UEHLEIN:  Objection.

9             A.   Again, you know, I guess I would like

10       to know what the comparison is.  I mean,

11       compared to the general population, I think we

12       could say they are highly exposed.

13       BY MR. KALAS:

14            Q.   Well, let me ask you this:  Is a

15       farmer applying Roundup to hundreds of acres

16       exposed to more glyphosate than a landscaper,

17       like Mr. Cotter?

18                      MR. UEHLEIN:  Objection.

19            A.   Yeah.  You know, and I don't really

20       feel like I can give you a real good answer to

21       that because I haven't really dug into the

22       information here, and, also, I'm, you know,

23       kind of reluctant to try to generalize about

24       the level that you would find among
```

```
 1        landscapers.

 2        BY MR. KALAS:

 3             Q.   Well, thinking back to the Andreotti

 4        study, which we looked at earlier, that's a

 5        prospective cohort epidemiology study, right?

 6             A.   I think so, yeah.

 7             Q.   And in that prospective cohort

 8        epidemiology study, they looked at farmers,

 9        right?

10             A.   They did, yeah.

11             Q.   And they looked at licensed pesticide

12        applicators, like Mr. Cotter, right?

13             A.   I think so, yeah.

14             Q.   Is there any other epidemiology study

15        that explicitly looked at licensed pesticide

16        applicators, like Mr. Cotter --

17                       MR. UEHLEIN:  Objection.

18        BY MR. KALAS:

19             Q.   -- that you reviewed?

20             A.   I would have to go back, you know, on

21        those six studies that we were talking about.

22        I don't actually remember.  I think in some

23        cases they had information.  Again, some of

24        them were from outside the U.S., and all but
```

Robert F. Herrick, Sc.D.

```
1        the -- you know, some of those people were

2        licensed pesticide applicators.

3            Q.    Okay.  You agree that the Andreotti

4        study -- the aim of the Andreotti study was to

5        look at highly exposed individuals to

6        glyphosate?

7                        MR. UEHLEIN:  Objection.

8    BY MR. KALAS:

9            Q.    Is that fair?

10           A.    Yeah, I think that's probably fair.

11           Q.    And when they looked at those highly

12       exposed individuals to glyphosate, they did

13       not see a relationship between glyphosate and

14       NHL, true?

15           A.    That's what I recall, yeah.

16           Q.    And I believe you've testified before

17       that you're unaware of a chemical that doesn't

18       cause cancer at a high dose that then does

19       cause cancer at a lower dose.

20               Do you still agree with that

21       proposition today?

22                       MR. UEHLEIN:  Objection.

23           A.    I have to say I'm really not trying

24       to -- you know, I'm not keeping up with, you
```

1    know, all the information about possible

2    carcinogens.  So I think, as a general rule,

3    you know, that's probably a fair statement,

4    but I wouldn't rule out that there could be

5    exceptions.

6    BY MR. KALAS:

7        Q.   And the other epidemiology studies you

8    looked at, the Eriksson and McDuffie study

9    that looked at these exposure day metrics, do

10   you know if those studies, when they looked at

11   exposure days, controlled for other exposures

12   in those applicators?

13       A.   My recollection is that they did.

14   They had information about a range of

15   exposures.  In their analysis, they attempted

16   to adjust for the presence of other exposures

17   that might have been confounding.

18       Q.   Okay.  Let's look at the Eriksson

19   study, then, which we marked as Exhibit 6.

20       A.   I'll get it up here.

21           Okay.

22       Q.   If you look at the Eriksson study,

23   Table II, that's where their days lifetime

24   exposure assessment is, right?

Robert F. Herrick, Sc.D.

```
 1          A.    I'm scrolling down.

 2          Q.    I have it up on the screen, too, if

 3    that's helpful but...

 4          A.    No, I've got it.

 5          Q.    Table II is where the days lifetime

 6    exposure assessment is?

 7          A.    Right.

 8          Q.    And do you see there that they have

 9    less than or equal to ten days and greater

10    than ten days for glyphosate?

11          A.    They do.

12          Q.    And if you go down to the key here, it

13    says, "Adjustment was made for age, sex, and

14    year of diagnosis or enrollment."

15                Do you see that?

16          A.    I do, yeah.

17          Q.    Okay.  Do they say they adjust for

18    other pesticides?

19          A.    Not in this -- not in this table, no.

20          Q.    And all the odds' ratios for the other

21    pesticides that aren't glyphosate, are almost

22    all of them above 1?

23          A.    Let's see.  Number of -- a number of

24    them are, yeah.
```

```
1              Q.   And are many of them statistically

2        significant?

3              A.   It looks like a fair number, you know,

4        a fair number of them are, yeah.

5              Q.   Without adjusting for other pesticides

6        in this table, could a situation called

7        confounding occur?

8              A.   Well, you can't -- you've clearly got

9        multiple exposures, so, you know, you can

10       never completely rule confounding out.  What

11       I -- you know, what I haven't done is tried

12       to, you know, take a look -- for example,

13       further down they talk about the way they

14       tried to deal with mixed exposures.

15             Q.   Right.  They talk about that down

16       here.  They do a multivariate analysis,

17       right?

18             A.   Right, right.

19             Q.   And then when they did a multivariate

20       analysis on glyphosate adjusting for other

21       exposures, the results were no longer

22       statistically significant, true?

23             A.   I'm just scanning down here.

24             Q.   That's Table VII I'm looking at.
```

Robert F. Herrick, Sc.D.

```
1          A.    You're in Table VII.  Yeah, right.

2                Right.  When they did the multivariate

3     analysis, the odds ratio went from 2.02 to

4     1.51.

5          Q.    Right.  And that suggests that

6     confounding is operating for at least some of

7     the cases in this study, true?

8          A.    That would -- I think that would be

9     certainly a possibility, yeah.

10               MR. KALAS:  I'm going to reserve

11    the rest of my time and -- for any follow-up.

12               MR. UEHLEIN:  How much time is

13    that?

14               THE VIDEOGRAPHER:  About six

15    minutes now.

16

17               CROSS-EXAMINATION

18    BY MR. UEHLEIN:

19         Q.    Dr. Herrick, I do have a few follow-up

20    questions, please.

21               I want to go back to earlier in the

22    deposition.  You were asked some questions

23    comparing the work that you did in this case

24    to work that you did in the Constantine case.
```

Robert F. Herrick, Sc.D.

1              Do you recall that line of

2       questioning?

3          A.   Yes, sure.

4          Q.   In particular, you were asked about

5       your use of the ART model in the Constantine

6       case.

7              Do you recall that?

8          A.   I do.

9          Q.   The ART model evaluates inhalation

10      exposure; is that correct?

11         A.   That's correct, yeah.

12         Q.   Mr. Kalas --

13              MR. UEHLEIN:  Am I pronouncing

14      that correctly?  Is Kalas or "Kalas"?

15              MR. KALAS:  It's "Kalas."  You

16      got it.  Thank you.

17      BY MR. UEHLEIN:

18         Q.   Mr. Kalas, in comparing your work in

19      this case and that case, he characterized your

20      work in the Cotter case as more limited than

21      the work that you did in the Constantine case.

22              Do you agree with that

23      characterization?

24         A.   Well, in a sense that the nature of

Robert F. Herrick, Sc.D.

1     the question that I was asked to address was a

2     different question, and you could say it was

3     more limited in scope to -- by comparison with

4     what I was asked to address in the Constantine

5     case, yeah.

6          Q.   In the Constantine case, were you

7     asked to address -- or let me ask you this:

8     In the Constantine case, did you, in fact, do

9     an exposure day calculation?

10         A.   No, I didn't.

11         Q.   In the Constantine case, did you do an

12    inhalation exposure assessment?

13         A.   That's what I did in Constantine,

14    yeah.

15         Q.   In the Cotter case, did you do an

16    exposure day calculation?

17         A.   I did, yes.

18         Q.   In the Cotter case, did you do an

19    inhalation exposure assessment?

20         A.   No, I wasn't asked to do that.

21         Q.   Is it fair to say, then, that rather

22    than characterizing it as more limited, it

23    would be more accurate to say that you did a

24    different assessment in Cotter than you did in

```
 1        Constantine?

 2                    MR. KALAS:  Objection.  Form.

 3        A.   Well, that would be fair because the

 4        nature of the question was different.

 5        BY MR. UEHLEIN:

 6        Q.   You were asked a series of questions

 7        earlier in the day, on two different

 8        occasions, about some testimony of

 9        Mr. Cotter's.

10             Do you recall that, particularly

11        testimony on page 92 about the amount of

12        Roundup that he used?

13        A.   Yes, I do.

14        Q.   At one point, Mr. Kalas characterized

15        your work as making assumptions about

16        Mr. Cotter's internal thinking.

17             Do you recall that?

18        A.   Yes, I do.

19        Q.   And in doing your exposure analysis in

20        this case, did you make any assumptions about

21        Mr. Cotter's internal thinking?

22        A.   No, I didn't really try to, you know,

23        get into what his internal thoughts were.

24        Q.   When you were testifying about your
```

1    review of the deposition, is it fair to say

2    that you read his deposition at -- for its

3    plain language, meaning to the best of your

4    abilities?

5                    MR. KALAS:  Objection.  Form.

6         A.   I think that's a fair way to

7    characterize it, yeah.

8    BY MR. UEHLEIN:

9         Q.   Okay.  And the numbers that you came

10   up with in your report, particularly the

11   numbers regarding the amount of time that he

12   used Roundup, were numbers that were based on

13   your -- your best reading of Mr. Cotter's

14   testimony, correct?

15                   MR. KALAS:  Objection.  Form.

16        A.   I would agree with that.  I think

17   that's correct.

18   BY MR. UEHLEIN:

19        Q.   Is it fair to say that -- is it fair

20   to say that reading a deposition and

21   interpreting the testimony that is given in

22   that deposition is a foundational element to a

23   retrospective exposure assessment in a case

24   like this?

1                    MR. KALAS:  Objection.  Form.

2          A.   Yeah, it's a very important part.

3     BY MR. UEHLEIN:

4          Q.   In other words, in order to execute a

5     methodology, you need to put data into that

6     method, correct?

7          A.   You definitely need data and

8     descriptive information that you can harvest

9     from the deposition, yeah.

10         Q.   So part of your process in doing that

11    is reading the -- or going to the available

12    sources of data and, through reading plain

13    language, ascertaining what the data to enter

14    is, correct?

15                   MR. KALAS:  Objection.  Form.

16         A.   That's -- that's a good way to

17    characterize the process, yeah.

18    BY MR. UEHLEIN:

19         Q.   I just want to return quickly to the

20    comparison between the line of questioning

21    comparing the work in the Cotter case to the

22    work you did in the Constantine case.

23              Do you think that your assessment in

24    Cotter is deficient in any way because you did

Robert F. Herrick, Sc.D.

```
 1        not quantitatively evaluate Mr. Cotter's

 2        inhalation exposures?

 3            A.   I don't think I would characterize it

 4        as deficient.  It's a different approach to

 5        classifying, you know, and trying to quantify

 6        the nature of his exposure.  So it's -- you

 7        know, developing an exposure metric, and

 8        between the two metrics, there are differences

 9        just given the nature of the question that

10        they're being applied to.

11            Q.   Do you believe, in your words, that

12        the approach that you used in the Cotter case

13        is a scientifically reliable way of evaluating

14        Mr. Cotter's exposure to Roundup given the

15        data available in this case?

16            A.   Well, I do, and I say that because the

17        approach -- the two different approaches that

18        I followed were approaches that had been used

19        by other investigators whose results were

20        published in the peer-reviewed literature and

21        I felt were reliable.  So that, I think, is

22        the foundation for the methods that I wound up

23        using.

24            Q.   Okay.  And what are those -- the
```

Robert F. Herrick, Sc.D.

```
1        investigators that you just referred to, who

2        are they?

3            A.   Oh, it's the six epidemiology studies

4        that I included in my report, those six

5        references that we've been talking about

6        today.

7            Q.   You were asked some questions about an

8        intensity factor.

9                 Do you recall that?

10           A.   Yes, I do.

11           Q.   I know that Mr. Kalas ran you through

12       several of the items that were listed in that

13       study as factors that go into the intensity

14       factor.

15                Do you recall that?

16           A.   I do, yes.

17           Q.   Okay.  In your opinion, as you looked

18       at the data available in this particular case,

19       do you feel that there was sufficient data,

20       sufficient information for you to reliably

21       calculate an intensity factor in your

22       assessment?

23           A.   I think I would have needed a more

24       detailed request and some further information
```

1        from Mr. Cotter to really reliably try to

2        address the intensity question.

3             Q.   Do you feel that the lack of an

4        intensity factor makes your opinions in this

5        case any less reliable?

6             A.   No, because if we look at these six

7        studies that we're talking about today, you

8        know, they all looked at the cumulative

9        exposure, and in one case, Eriksson, it was

10       weighted for duration, but even in the study

11       we were talking about where they did address

12       the intensity factor, they also did analysis

13       just by ever -- never exposed and also by

14       duration of exposure.  So it was, you know,

15       one of the aspects that they looked at but not

16       the only one.

17            Q.   What were the routes of exposure that

18       were looked at in those six epidemiological

19       studies that you just discussed?

20                 MR. KALAS:  Objection.  Form.

21            A.   Well, these were questionnaire-based

22       studies that didn't include direct

23       measurements, but I think, you know, it's

24       reasonable to say that given what we know

Robert F. Herrick, Sc.D.

1    about pesticide application, these people had

2    both inhalation and dermal exposures.

3               MR. KALAS:  I'll withdraw that

4    last objection.  I thought you meant

5    r-o-o-t-s, and I'm, like, What the heck does

6    he mean?  But, okay.  Got it.

7    BY MR. UEHLEIN:

8        Q.   You were asked about whether or --

9    strike that.

10              Dr. Herrick, do you recall you were

11   asked a series of questions about the Eriksson

12   study?  And, in particular, there were

13   questions about the information that was

14   sought from the study participants in the

15   Eriksson study.

16              Do you recall that?

17       A.   Yes, I do.

18       Q.   Okay.  And I believe that you

19   testified that you had not seen -- you didn't

20   have or don't have a copy of the questionnaire

21   that was used in the Eriksson study; is that

22   correct?

23       A.   That is correct, yeah.

24       Q.   Do you feel that the lack of viewing

1       of the questionnaire that was used in the

2       Eriksson study makes your application of the

3       methodology available in the published study

4       itself any less reliable?

5           A.   No.  I think, you know, given the way

6       the methods were described, I think the

7       approach that I took was -- was faithful to

8       the work that Eriksson did in their

9       investigation even though I didn't see exactly

10      what they asked in the questionnaire and then

11      what they inquired about in the telephone

12      interviews.

13          Q.   So you believe that there was

14      sufficient information available in the

15      published literature, in particular the

16      published Eriksson study that is an exhibit to

17      this deposition, for you to apply that

18      eight-hour time-weighted exposure day

19      calculation?

20                  MR. KALAS:   Objection.  Form.

21          A.   Yes, I do.

22      BY MR. UEHLEIN:

23          Q.   You were asked a hypothetical about

24      Mr. Cotter wearing a Tyvek suit and

Robert F. Herrick, Sc.D.

```
1        chemical-resistant gloves.

2               Do you recall that?

3        A.   I do, yes.

4        Q.   First of all, those are -- just to be

5        clear, those are not the facts of this case,

6        correct?

7        A.   No.  His -- what he wore is what I

8        included in my report, you know, which was

9        short-sleeved shirt, shorts, leather gloves,

10       and leather boots.

11       Q.   If -- if the case had been such

12       that -- the facts in this case had been such

13       that Mr. Cotter was, in fact, wearing a Tyvek

14       suit and chemical-resistant gloves every time

15       that he applied Roundup, do you think that the

16       exposure day calculation and eight-hour

17       time-weighted exposure day calculation, as

18       articulated in the six epidemiological studies

19       that you testified earlier today, would be a

20       good fit to evaluate the exposures of

21       Mr. Cotter?

22               MR. KALAS:  Objection.  Form.

23       A.   No.  If Cotter had been wearing that

24       level of protection, it would have required a
```

Robert F. Herrick, Sc.D.

```
1        very different approach, and these six

2        studies, you know, probably wouldn't have been

3        good comparisons.

4        BY MR. UEHLEIN:

5            Q.   Is it fair to say that when you're

6        deciding what methodology to apply, that you

7        look to the data available, the facts

8        available, to then find an assessment method

9        that works given the data and the facts

10       available?

11                   MR. KALAS:  Objection.  Form.

12           A.   Yeah, that's one of the things that,

13       you know, I have always followed in my own

14       research and my teaching.  You know, we would

15       train the students to say what you should do

16       is let the data drive your approach.  So, in

17       other words, don't undertake an approach

18       that's too ambitious to be supported by the

19       data available, but on the other hand, take an

20       approach that can reliably be traced back to

21       the quality and quantity of information that

22       you have to work with.

23       BY MR. UEHLEIN:

24           Q.   And did you follow that line of
```

1    thinking in choosing the methodology that you

2    did in this case?

3        A.   Yeah, that was exactly the logic that

4    I employed to do the calculations that are in

5    my report.

6        Q.   And if we start throwing outlandish

7    hypotheticals in there, that would actually

8    potentially change the whole basis for

9    choosing the particular methodology that you

10   choose to employ; fair to say?

11                   MR. KALAS:   Objection.   Form.

12       A.   Yeah, if the underlying circumstances

13   were very different, the approach to the

14   exposure assessment would have to be adjusted

15   to accommodate that.

16   BY MR. UEHLEIN:

17       Q.   I think that the record is very clear

18   in this case that you did not attempt to

19   calculate a dose, a milligram per kilogram of

20   body weight dose for Mr. Cotter, correct?

21       A.   That's correct.

22       Q.   Did you spend any time comparing the

23   results of your exposure day calculations to

24   the results of any other expert in this case's

Robert F. Herrick, Sc.D.

```
 1       calculations, including Dr. Sawyer?

 2                    MR. KALAS:  Objection.  Form.

 3           A.   No, I didn't see any of the other

 4       experts' work until after I had finished my

 5       report.

 6       BY MR. UEHLEIN:

 7           Q.   Do you hold any opinions in this case

 8       comparing the results of your exposure day

 9       calculations to the results of any other

10       expert in this case's exposure estimations or

11       dose estimations?

12           A.   No, I haven't tried to make that sort

13       of comparison.

14           Q.   You used a series of six

15       epidemiological studies to guide your method

16       in exposure assessment, correct?

17           A.   That's correct, yeah.

18           Q.   I just want to be clear.  Are you --

19       in this case, are you offering epidemiological

20       opinions based on those studies?

21           A.   No, I'm not.

22           Q.   Okay.  But you utilized the exposure

23       portion of those studies to inform your

24       opinions in those cases, correct?
```

Robert F. Herrick, Sc.D.

```
 1                      MR. KALAS:  Objection.  Form.

 2                      MR. UEHLEIN:  Yes.  Let me

 3          strike that.

 4          BY MR. UEHLEIN:

 5              Q.   You used the exposure information in

 6          those studies to inform your opinions in this

 7          case, correct?

 8                      MR. KALAS:  Objection.  Form.

 9              A.   Right.  What I used was relied on the

10          methods that they described in their

11          publications to inform my approach.

12          BY MR. UEHLEIN:

13              Q.   There was a line of questioning that

14          you were asked about confounding factors and

15          other pesticide use in Eriksson.

16                  Do you recall that?

17              A.   I do.

18              Q.   Would you characterize that as going

19          to the epidemiological basis for that study,

20          or would you characterize that as being for

21          something relevant to the exposure foundation

22          of that study?

23              A.   Well, if there is confounding going

24          on, it would only show up in the epidemiologic
```

Robert F. Herrick, Sc.D.

```
 1      analysis.  It doesn't turn up in the exposure

 2      assessment, per se.

 3          Q.   So is it fair to say that that is

 4      really outside of your either area of

 5      expertise and/or your purview in this case?

 6                  MR. KALAS:  Objection.  Form.

 7          A.   I would agree with that, yeah.

 8      BY MR. UEHLEIN:

 9          Q.   Okay.  You're -- in this case, you're

10      using Eriksson for the exposure, not for its

11      epidemiological results, correct?

12                  MR. KALAS:  Objection.  Form.

13          A.   Which is true for Eriksson and the

14      other studies as well.

15      BY MR. UEHLEIN:

16          Q.   Okay.  Do you think that that line of

17      questioning about confounding factors would be

18      better posed to an epidemiologist?

19                  MR. KALAS:  Objection.  Form.

20          A.   I think someone who was a specialist

21      in epidemiology would be in a better position

22      to really address that than I am.

23                  MR. UEHLEIN:  Those are all of

24      the questions that I have, Dr. Herrick.  Thank
```

Robert F. Herrick, Sc.D.

```
 1       you.

 2                     MR. KALAS:  Dr. Herrick, I have

 3       a few follow-up questions.

 4                     MR. UEHLEIN:  John, just before

 5       you begin, very quick.

 6                     MR. KALAS:  Yes.

 7                     MR. UEHLEIN:  Dr. Herrick,

 8       Mr. Kalas has -- you know, is not going to

 9       be -- not going to stop at six minutes on the

10       dot but has a couple of minutes questioning

11       left.

12                 Are you okay continuing, or do you

13       need a break?

14                     THE WITNESS:  Oh, no.  Let's

15       just keep on.

16                     MR. UEHLEIN:  I just wanted to

17       make sure.

18                     THE WITNESS:  Sure.

19

20                     REDIRECT EXAMINATION

21       BY MR. KALAS:

22           Q.   Dr. Herrick, starting with the last

23       thing that Mr. Uehlein asked you about, which

24       was exposure assessment and -- in the
```

Robert F. Herrick, Sc.D.

```
1        epidemiology studies.

2              Do you remember that line of

3        questioning?

4          A.   I do, yeah.

5          Q.   Outside of litigation, so when you're

6        working as an industrial hygienist in

7        nonlitigation projects and you're asked to do

8        an exposure assessment of individuals to look

9        at whether or not there's an association

10       between exposures or just a single exposure

11       and a disease outcome, do you look at all of

12       the exposures those individuals have or just

13       focus on a single one to the exclusion of

14       other exposures?

15         A.   Well, to really address the question

16       about causation, which I think is at the root

17       of what you're asking, you really need to do a

18       comprehensive exposure assessment.

19         Q.   By "comprehensive exposure

20       assessment," you mean look at all of the

21       exposures, not a single one?

22         A.   Right.  To the extent that you can get

23       that information, yes.

24         Q.   Okay.  You were asked about the
```

1        intensity factor information and whether or

2        not you could have conducted an

3        intensity-weighted exposure day assessment

4        using the methodology from Andreotti.

5              Do you remember those questions?

6        A.   I do.

7        Q.   Okay.  Without looking at the Coble

8        article and the Dosemeci article that followed

9        it in 2011, can you even opine, sitting here

10       today, about the information that needs to go

11       in to the intensity-weighting metric in order

12       to do that assessment?

13       A.   You know, I would have to go a little

14       deeper into those articles to really give you

15       a good answer.  I think there's no doubt in my

16       mind that there's information in their methods

17       about the nature of the information that they

18       acquired.  So I would -- I would need to

19       refresh myself on those studies.

20       Q.   Okay.  And so when you answered that

21       you didn't think you could do an

22       intensity-weighting exposure day assessment in

23       response to Mr. Uehlein's questions, in fact,

24       you actually don't know whether or not you

1      could do one without looking at the Coble

2      article, true?

3                    MR. UEHLEIN:  Objection.

4           A.   Yeah, what I was trying to say in

5      response to his question -- and I hope I

6      understood it right -- is, you know, given the

7      nature of the information that I have right

8      now from Mr. Cotter, I don't know if I could

9      do the intensity-weighting without getting

10     more information.

11     BY MR. KALAS:

12          Q.   Right.  And if you did go and look at

13     the Coble article, you could ask Mr. Cotter in

14     a second interview or you could have asked him

15     in the June 10 interview, if you had looked at

16     Coble before that, for the information that

17     could allow you to do that assessment,

18     correct?

19          A.   Well, I could have at least, you know,

20     tried to establish from Cotter if he -- if he

21     had that kind of information, right, if he

22     remembered that level of detail.

23          Q.   Okay.  Now, Mr. Uehlein asked you some

24     questions about the data that goes into your

1    model and that reading a deposition is data

2    that's needed in order to execute your

3    methodology, and I think it was described as

4    foundational.

5            Do you remember that series of

6    questions?

7        A.   I do, yeah.

8        Q.   After you get that data, in order to

9    execute your methodology in this matter,

10   starting with the nontime-weighted exposure

11   days, just the exposure days, generally after

12   you get that data out of the depo, your

13   process, then, is to add up all of the days

14   that the plaintiff said he was exposed, right,

15   for the nontime-weighted?

16       A.   Right.  The total number of days per

17   year times the years that he applied.

18       Q.   Okay.  And to conduct that

19   methodology, it's really a matter of basic

20   addition, correct?

21       A.   Well, there's some multiplication

22   involved in there, too, but, yeah.

23       Q.   Okay.  And that is a methodology --

24   and I don't mean any offense to you, but that

Robert F. Herrick, Sc.D.

```
1        is a methodology that an eighth grader likely

2        could calculate, right?

3                    MR. UEHLEIN:  Objection.

4            A.   Well, given the eighth graders I know,

5        they would have to be able to build a

6        spreadsheet first because they don't use

7        calculators anymore.  But my answer is sure.

8        It's basic math.

9        BY MR. KALAS:

10           Q.   And likewise for the eight-hour

11       exposure day, time-weighted exposure days, the

12       arithmetic in that involves the addition of

13       one variable, which is normalizing for

14       eight-hour days, right?

15           A.   Yeah, by including the actual duration

16       per day.

17           Q.   Okay.  And the mathematics involved in

18       that is also addition and multiplication,

19       correct?

20           A.   That's correct, yeah.

21           Q.   Okay.  Last question.  If asked to

22       come to trial, do you intend to come to trial?

23           A.   Oh, sure.

24                    MR. KALAS:  Okay.  I don't have
```

Robert F. Herrick, Sc.D.

```
 1        any more questions.

 2                       MR. UEHLEIN:  I don't have any

 3        follow-up.

 4                       THE VIDEOGRAPHER:  The time is

 5        2:20.  We're off the record.

 6

 7             (Off video record at 2:20 p.m.)

 8

 9                       THE STENOGRAPHER:  Before the

10        attorneys hang up, regular turnaround?  Does

11        anybody need a rough draft?

12                       MR. KALAS:  Whatever the

13        standard order is.  I don't know what our

14        briefing schedule is.  So it's not for me.

15        It's for the folks who do the briefing.

16             Christian, do you know when motions

17        are due?

18                       MR. UEHLEIN:  I don't.  I don't.

19        For us, yes, regular turnaround is fine.  If

20        that were to change, I would reach out to you.

21                       MR. KALAS:  Darlene, whatever

22        the folks from Shook order from Golkow is

23        fine.

24             (Proceeding concluded at 2:21 p.m.)
```

```
 1                    CERTIFICATION

 2        I, DARLENE M. COPPOLA, a Notary Public, do hereby

 3   certify that ROBERT F. HERRICK, SC.D., after having

 4   satisfactorily identifying himself, appeared remotely

 5   on the 6th day of September, 2022 from Marblehead,

 6   Massachusetts, and was by me duly sworn to testify to

 7   the truth and nothing but the truth as to his

 8   knowledge touching and concerning the matters in

 9   controversy in this cause; that he was thereupon

10   examined upon his oath and said examination reduced to

11   writing by me; and that the statement is a true record

12   of the testimony given by the witness, to the best of

13   my knowledge and ability.

14        I further certify that I am not a relative or

15   employee of counsel/attorney for any of the parties,

16   nor a relative or employee of such parties, nor am I

17   financially interested in the outcome of the action.

18        WITNESS MY HAND THIS 19th day of September, 2022.

19

20

21   DARLENE M. COPPOLA              My commission expires:

22   NOTARY PUBLIC                   November 11, 2022

23   REGISTERED MERIT REPORTER

24   CERTIFIED REALTIME REPORTER
```

Robert F. Herrick, SC.D.

```
 1                    UNITED STATES DISTRICT COURT

 2                  NORTHERN DISTRICT OF CALIFORNIA

 3                          MDL NO. 2741

 4

 5         *********************************
           IN RE:  ROUNDUP PRODUCTS
 6         LIABILITY LITIGATION

 7         THIS DOCUMENTS RELATES TO:

 8         ROBERT AND DARYA COTTER v. MONSANTO
           COMPANY
 9         CASE NO. 3:20-CV-03108-VC

10

           *********************************
11

12              I, ROBERT F. HERRICK, SC.D., say that I have

13         read the foregoing deposition and hereby declare under

14         penalty of perjury the foregoing is true and correct:

15         (as prepared)  (as corrected on errata.)

16              Executed this _____ day of _____,

17         2022, at _____, _____.

18

19

20

21              _____

22                    ROBERT F. HERRICK, SC.D.

23

24
```

```
1                    CORRECTION PAGE

2          DEPONENT:   ROBERT F. HERRICK, SC.D.

3          DATE TAKEN: SEPTEMBER 6, 2022

4          CASE:      ROUNDUP - ROBERT COTTER, ET AL.

5                     VS. MONSANTO COMPANY, ET

6          ************************************************

7          PAGE / LINE / SHOULD READ

8          _____/_____/_____

9          _____/_____/_____

10         _____/_____/_____

11         _____/_____/_____

12         _____/_____/_____

13         _____/_____/_____

14         _____/_____/_____

15         _____/_____/_____

16         _____/_____/_____

17         _____/_____/_____

18         _____/_____/_____

19         _____/_____/_____

20         _____/_____/_____

21         _____/_____/_____

22         _____/_____/_____

23         _____/_____/_____

24         _____/_____/_____
```